1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA          )   C-11-01846 LHK
    CORPORATION,                      )
                                      )   SAN JOSE, CALIFORNIA
7              PLAINTIFF,             )
                                      )   NOVEMBER 15, 2013
8         VS.                         )
                                      )   VOLUME 4
9   SAMSUNG ELECTRONICS CO., LTD.,    )
    A KOREAN BUSINESS ENTITY;         )   PAGES 810-1064
10  SAMSUNG ELECTRONICS AMERICA,      )
    INC., A NEW YORK CORPORATION;     )
11  SAMSUNG TELECOMMUNICATIONS        )
    AMERICA, LLC, A DELAWARE          )
12  LIMITED LIABILITY COMPANY,        )
                                      )
13             DEFENDANTS.            )
    _____    )

14

15

16          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20         APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF           MORRISON & FOERSTER
        APPLE:                  BY:   HAROLD J. MCELHINNY
 4                                    RACHEL KREVANS
                                      NATHANIEL B. SABRI
 5                              425 MARKET STREET
                                SAN FRANCISCO, CALIFORNIA  94105
 6

 7                              WILMER, CUTLER, PICKERING,
                                HALE AND DORR
 8                              BY:   WILLIAM F. LEE
                                      LAUREN B. FLETCHER
 9                              60 STATE STREET
                                BOSTON, MASSACHUSETTS  02109
10

11                              BY:   MARK D. SELWYN
                                950 PAGE MILL ROAD
12                              PALO ALTO, CALIFORNIA  94304

13      FOR DEFENDANT           QUINN, EMANUEL, URQUHART,
        SAMSUNG:                OLIVER & HEDGES
14                              BY:   WILLIAM C. PRICE
                                      JON C. CEDERBERG
15                              865 SOUTH FIGUEROA STREET
                                10TH FLOOR
16                              LOS ANGELES, CALIFORNIA  90017

17                              BY:   VICTORIA F. MAROULIS
                                      KEVIN B. JOHNSON
18                              555 TWIN DOLPHIN DRIVE
                                SUITE 560
19                              REDWOOD SHORES, CALIFORNIA  94065

20

21

22

23

24

25
```

1                        INDEX OF WITNESSES

2        PLAINTIFF'S

3        PHILIP SCHILLER
                DIRECT EXAM BY MR. MCELHINNY (RES.)  P. 815
4               CROSS-EXAM BY MR. PRICE              P. 854
                REDIRECT EXAMIN BY MR. MCELHINNY     P. 907
5               RECROSS-EXAM BY MR. PRICE            P. 910

6

7        DEFENDANT'S

8        TIM SHEPPARD
                DIRECT EXAM BY MS. MAROULIS          P. 953
9               CROSS-EXAM BY MR. MCELHINNY          P. 974
                REDIRECT EXAM BY MS. MAROULIS        P. 981
10              RECROSS-EXAM BY MR. MCELHINNY        P. 982

11       ERIC JUE
                BY VIDEOTAPED DEPOSITION             P. 985
12

13       GREG JOSWIAK
                BY VIDEOTAPED DEPOSITION             P. 987
14

15       MICHAEL WAGNER
                DIRECT EXAM BY MR. PRICE             P. 990
16              CROSS-EXAM BY MR. LEE                P. 1031

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2                                      MARKED      ADMITTED

3       PLAINTIFF'S

4       133                                        816
        127                                        820
5       17                                         827
        134                                        827
6       135                                        829
        142                                        830
7       15                                         832
        143, 144, 145, 146                         841
8       12.1                                       848

9       DEFENDANT'S

10      578                                        858
        2628                                       865, 870
11      2522                                       881
        572.027                                    895
12      2709                                       897
        2708                                       899
13      753                                        953
        676                                        953
14      601                                        985
        572                                        985
15      2517                                       987
        534                                        988
16      701.006                                    1000
        701.005                                    1000
17      701                                        1000
        781.002                                    1018
18      952.014                                    1024
        702                                        1028

19

20      JOINT

21      1043                                       836
        1042                                       837
22      1093                                       861
        1037                                       873

23

24

25

```
 1     SAN JOSE, CALIFORNIA                    NOVEMBER 15, 2012

 2                    P R O C E E D I N G S

 3        (JURY OUT AT 9:02 A.M.)

 4             THE COURT:  I WOULD LIKE APPLE TO FILE A RESPONSE TO

 5     SAMSUNG'S MOTION TO STRIKE.  CAN YOU DO THAT BY NOON?

 6             MR. MCELHINNY:  YES, YOUR HONOR.

 7             THE COURT:  OKAY.  ALL RIGHT.  ANY OTHER ISSUES?

 8             MR. MCELHINNY:  ONE TECHNICAL ISSUE.

 9         YESTERDAY YOUR HONOR ADMITTED, GRANTED OUR MOTION TO ADMIT

10     PLAINTIFF'S EXHIBIT 3, WHICH IS THE THREE SETS OF PICTURES, THE

11     BEFORE, DURING, AND AFTER PICTURES OF THE SAMSUNG PHONES.

12             THE COURT:  YES.

13             MR. MCELHINNY:  WHEN IT WAS ON OUR EXHIBIT LIST, YOUR

14     HONOR HAD PREVIOUSLY ORDERED US TO REMOVE ONE OF THE PHONES

15     FROM PAGE 3, AND SO WE'RE GOING TO DO THAT AS AN ACCOMMODATION,

16     ALTHOUGH THAT WAS NOT THE EXHIBIT THAT MR. PRICE USED.

17         SO THE DOCUMENT THAT ACTUALLY WILL BE PUT INTO EVIDENCE

18     SHOULD BE MARKED AS EXHIBIT, PLAINTIFF'S EXHIBIT 3A BECAUSE IT

19     WILL REMOVE THE VIBRANT PHONE FROM THE THIRD PICTURE.

20             THE COURT:  ANY OBJECTION TO THAT?

21             MS. MAROULIS:  NO, YOUR HONOR.

22             THE COURT:  OKAY.  ANYTHING ELSE?

23         OKAY.  LET'S BRING IN OUR JURY, PLEASE.

24         OH, I'D ALSO LIKE YOU TO FILE A STIPULATED EXHIBIT LIST

25     LIKE YOU DID LAST YEAR.
```

1           MR. MCELHINNY:  YES, YOUR HONOR.

2           THE COURT:  SINCE WE'RE PROBABLY GOING TO CLOSE ON

3     MONDAY, I'D LIKE YOU TO FILE IT AT THE END OF THE DAY TODAY AND

4     ANOTHER ONE ON MONDAY.  OKAY?

5           MS. MAROULIS:  YES, YOUR HONOR.

6           THE COURT:  OKAY.  THANK YOU.

7           (JURY IN AT 9:03 A.M.)

8           THE COURT:  MR. SCHILLER, PLEASE GO AHEAD AND TAKE

9     THE STAND, SIR.  YOU ARE STILL UNDER OATH.

10          **(PHILIP SCHILLER, PLAINTIFF'S WITNESS, WAS PREVIOUSLY**

11    **SWORN.)**

12          THE COURT:  TIME IS 9:04.  GO AHEAD, PLEASE.

13                  **DIRECT EXAMINATION (RESUMED)**

14    BY MR. MCELHINNY:

15    Q.  MR. SCHILLER, WHEN WE BROKE YESTERDAY, WE HAD JUST BEEN

16    TALKING ABOUT THE PRESS REACTION TO THE ANNOUNCEMENT, THE

17    JANUARY 2007 ANNOUNCEMENT TO THE IPHONE.

18          SO CAN YOU REFRESH OUR RECOLLECTIONS, PLEASE, ABOUT WHAT

19    THE PRESS REACTION WAS TO THE ORIGINAL ANNOUNCEMENT?

20    A.  FIRST, IT WAS IMMENSE.  EVERYBODY WAS EXCITED ABOUT AND

21    INTERESTED IN THE LAUNCH OF THE IPHONE, AND EVERYONE, IT

22    SEEMED, IN THE WORLD WAS WRITING AND TALKING ABOUT IT.

23          AND THE, THE VARIATION RANGED FROM THOSE THAT WERE JUST

24    AMAZED AND BLOWN AWAY AND TALKING ABOUT THIS INCREDIBLE

25    BREAKTHROUGH WITH A NEW PHONE, AND THERE WERE THOSE AT THE

```
 1    OTHER END OF THE SPECTRUM SAYING THAT APPLE WAS CRAZY TO GET

 2    INTO THE PHONE BUSINESS, DIDN'T KNOW WHAT WE WERE DOING, AND

 3    WOULD FAIL MISERABLE AND RUIN THE COMPANY.  SO YOU HAD

 4    TREMENDOUS COMMENTARY ON ALL ENDS OF THE SPECTRUM.

 5    Q.   DO YOU HAVE A BINDER OF EXHIBITS IN FRONT OF YOU?

 6    A.   YES, I DO.

 7    Q.   WOULD YOU OPEN IT, PLEASE, TO PLAINTIFF'S EXHIBIT 133.

 8    CAN YOU IDENTIFY FOR US WHAT THAT DOCUMENT IS?

 9    A.   THIS IS AN ARTICLE FROM "THE NEW YORK TIMES" WRITTEN IN

10    JANUARY OF 2007 BY DAVID POGUE.

11              MR. MCELHINNY:  YOUR HONOR, I MOVE PLAINTIFF'S

12    EXHIBIT 133.

13              THE COURT:  ANY OBJECTION?

14              MR. PRICE:  YOUR HONOR, AS BEFORE, I BELIEVE THAT --

15    WE HAVE NO FURTHER OBJECTIONS, AND AS BEFORE, I THINK IT SHOULD

16    BE ADMITTED NOT FOR ITS TRUTH.

17              THE COURT:  THAT'S FINE.  THIS IS NOT FOR THE TRUTH

18    OF THE MATTER ASSERTED.

19         (PLAINTIFF'S EXHIBIT 133 WAS ADMITTED IN EVIDENCE.)

20    BY MR. MCELHINNY:

21    Q.   MR. SCHILLER, WE HAVE PREPARED A DEMONSTRATIVE, WHICH IS

22    PDX 1A.  CAN YOU USE THIS, PLEASE, TO SORT OF SUMMARIZE FOR US

23    WHAT MR. POGUE'S ARTICLE SAID ON JANUARY 11TH, 2007?

24    A.   YES.  FIRST OF ALL, YOU CAN SEE THAT THE HEADLINE OF THE

25    ARTICLE WAS "APPLE WAVES ITS WAND AT THE PHONE."  THERE'S A
```

SCHILLER DIRECT (RES.)

1        PICTURE OF AN IPHONE ON THE LEFT.

2            AND HERE ARE A FEW QUOTES FROM THAT ARTICLE.  DAVID WROTE,

3        "AS YOU'D EXPECT WITH APPLE, THE IPHONE IS GORGEOUS.  ITS FACE

4        IS SHINY BLACK, RIMMED BY MIRROR-FINISH STAINLESS STEEL."

5            "THE IPHONE'S BEAUTY ALONE WOULD BE ENOUGH TO PROMPT

6        CERTAIN MEMBERS OF THE IPOD CULT TO DIG FOR THEIR CREDIT CARD."

7            "THE REAL MAGIC, HOWEVER, AWAITS WHEN YOU BROWSE THE WEB.

8        TO ENLARGE IT, YOU CAN DOUBLE-TAP ANY SPOT; THEN YOU DRAG YOUR

9        FINGER TO SCROLL IN ANY DIRECTION."

10           "YOU CAN USE A BRAND-NEW FEATURE THAT APPLE CALLS

11       MULTITOUCH; YOU SLIDE YOUR THUMB AND FOREFINGER TOGETHER (LIKE

12       PINCHING) OR APART ON THE GLASS.  AS YOU DO SO, THE WEB PAGE

13       BEFORE YOU GROWS OR SHRINKS IN REAL TIME, AS THOUGH IT'S

14       PRINTED ON A SHEET OF LATEX.  IT WORKS WITH PHOTOS TOO, AND

15       IT'S WICKED COOL."

16       Q.   SIR, DID THE PRESS COVERAGE OF THE IPHONE CONTINUE AFTER

17       THE FIRST WEEK FOLLOWING THE MACWORLD ANNOUNCEMENT?

18       A.   OH, YES.

19       Q.   AND WHAT WAS THE NATURE OF THE PRESS COVERAGE?

20       A.   THERE WAS A TREMENDOUS AMOUNT OF COVERAGE.

21           MR. PRICE:  OBJECTION.  AGAIN, THIS COMES IN NOT FOR

22       THE TRUTH, AND PERHAPS WE CAN TELL THE JURY WHAT THAT MEANS.

23           MR. MCELHINNY:  SO FAR HE'S NOT TESTIFYING TO --

24           THE COURT:  HE HASN'T TESTIFIED TO ANYTHING.  THERE

25       IS NO EXHIBIT RIGHT NOW.

1          MR. PRICE:  HE'S ASKING ABOUT WHAT THE PRESS IS

2     SAYING ABOUT THIS.

3          MR. MCELHINNY:  NO.  I ASKED HIM WHAT THE NATURE OF

4     THE PRESS COVERAGE WAS AND WHETHER THERE WAS CONTINUING PRESS

5     COVERAGE.  IF I -- I --

6          THE COURT:  ALL RIGHT.  THE OBJECTION'S OVERRULED.

7     LET'S KEEP GOING.

8          MR. PRICE:  I THOUGHT HE WAS ASKING AT THE TIME IN

9     THE PRESS.

10    BY MR. MCELHINNY:

11    Q.   CAN YOU DESCRIBE THE NATURE OF THE PRESS COVERAGE AND THE

12    AMOUNT OF IT?

13    A.   IT WAS IMMENSE.  IN FACT, I RECALL THAT A HARVARD BUSINESS

14    SCHOOL PROFESSOR CALLED IT THE GREATEST LAUNCH IN HISTORY, AND

15    THERE WAS COVERAGE WORLDWIDE FROM EVERYONE IN THE PRESS.

16    Q.   DID APPLE DO ANYTHING TO PROMOTE -- WELL, LET'S GET OUR

17    DATES.  SO THE ANNOUNCEMENT'S IN JANUARY OF 2007.  WHEN IS THE

18    IPHONE ACTUALLY RELEASED?

19    A.   WE FIRST SHIPPED IT IN LATE JUNE OF 2007.

20    Q.   DURING THE SIX MONTHS BETWEEN THE ANNOUNCEMENT AND THE

21    SHIPPING, DID APPLE DO ANYTHING TO, TO SORT OF CREATE INTEREST

22    IN THE IPHONE ITSELF?

23    A.   YES.  WE HAD A MARKETING STRATEGY BETWEEN THAT JANUARY AND

24    JUNE.  IT BEGAN EARLY ON IN THE FIRST COUPLE MONTHS, JANUARY

25    AND FEBRUARY, AND INTO MARCH.  ACTUALLY THE STRATEGY WE CALLED

1    GO DARK, BE QUIET, BECAUSE THERE WAS SO MUCH PRESS COVERAGE,

2    THERE WAS NO NEED TO DO MARKETING -- THE WORLD WAS DOING IT FOR

3    US -- AND THEN VERY CAREFULLY TO RAMP UP THE MARKETING TOWARDS

4    THE SHIPMENT.

5        SO IN MARCH THERE WAS THE ACADEMY AWARDS, SO WE MADE A

6    BRIEF AD CALLED HELLO, WHICH WAS PEOPLE ANSWERING THE

7    TELEPHONE, AS A FUN LITTLE REMINDER THAT WE WERE READY TO

8    LAUNCH A PHONE SOON.

9        AND THEN AS WE GOT TO JUNE, WE WANTED PEOPLE TO BE READY

10   FOR THE AVAILABILITY OF IPHONE, SO WE CREATED A FEW TV ADS TO

11   START FOR PEOPLE TO SEE IT AGAIN AND LEARN A LITTLE BIT ABOUT

12   HOW IT WORKED SO WHEN IT CAME IN STORES, THEY WOULD HAVE AN

13   IDEA ABOUT WHAT IT DID AND WHY THEY WANTED ONE.

14   Q.   WE'LL COME BACK TO THAT POINT IN A MINUTE, BUT IF YOU'LL

15   OPEN YOUR BINDER, PLEASE, TO PLAINTIFF'S EXHIBIT 127.

16   A.   I SEE THAT.

17   Q.   YOU SEE A CD DISK THERE.  DID APPLE CREATE AN AD THAT WAS

18   CALLED "HOW TO"?

19   A.   WE DID.

20       MR. MCELHINNY:  YOUR HONOR, I MOVE PLAINTIFF'S

21   EXHIBIT 127.

22       MR. PRICE:  YOUR HONOR, NO FURTHER OBJECTIONS.

23   AGAIN, NOT FOR THE TRUTH OF ANYTHING SAID IN THE AD.

24       THE COURT:  ALL RIGHT.  THAT IS CORRECT.

25       YOU ARE NOT TO CONSIDER THE CONTENT OF THE AD FOR ITS

1      TRUTH.  BUT IT'S ADMITTED.

2            (PLAINTIFF'S EXHIBIT 127 WAS ADMITTED IN EVIDENCE.)

3                  THE COURT:  GO AHEAD, PLEASE.

4                  MR. MCELHINNY:  AT THIS POINT WE'D LIKE TO SHOW 127,

5      YOUR HONOR.

6                  THE COURT:  GO AHEAD, PLEASE.

7                  MR. MCELHINNY:  AND ASK THAT THE LIGHTS BE DIMMED,

8      PLEASE.

9            (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10     BY MR. MCELHINNY:

11     Q.    WHAT WAS THE PURPOSE OF THAT AD, SIR?

12     A.    THAT AD, IN ITS BRIEF 30 SECONDS, WAS DESIGNED TO

13     COMMUNICATE A FEW THINGS.  FIRST, YOU SEE THE IPHONE VERY

14     CLEARLY.  WE WANTED TO SHOW HOW BEAUTIFUL IT WAS.

15            SECOND, THIS IS A NEW EXPERIENCE FOR MOST PEOPLE, THE IDEA

16     OF USING YOUR HAND TO DO THINGS ON A PHONE, TO TOUCH IT WITH

17     YOUR FINGERS, SO WE WANTED IN THAT BRIEF TIME TO GIVE YOU A

18     NUMBER OF EXAMPLE EXPERIENCES, SCROLLING, TAPPING, MOVING

19     AROUND, ZOOMING IN ON A WEB PAGE SO YOU COULD GET A SENSE OF

20     WHAT IT WOULD BE LIKE TO CONTROL THESE THINGS WITH YOUR HAND

21     AND MULTITOUCH.

22            AND THIRD, JUST TO SHOW A WIDE RANGE OF THINGS THAT THE

23     IPHONE WOULD BE ABLE TO DO FOR YOU, THAT IT WAS A VERY CAPABLE

24     DEVICE THAT WOULD LET YOU NOW SEARCH ON THE WEB AND DO ALL

25     THESE INCREDIBLE THINGS.

1    Q.   WERE THERE UNIQUE OR UNUSUAL RISKS INVOLVED IN TRYING TO

2    BRING A MULTITOUCH PRODUCT TO MARKET FOR THE FIRST TIME?

3    A.   OH, YES, A GREAT MANY.

4    Q.   AND HELP US WHO ARE NOT IN THE BUSINESS TO UNDERSTAND WHAT

5    THOSE RISKS WERE.

6    A.   WELL, AT THE TIME BACK IN 2007, THE MOST POPULAR PHONES

7    WERE ALL PHONES THAT HAD PHYSICAL KEYBOARDS, EITHER SIMPLE

8    NUMBER PADS, AS WE ALL REMEMBER THOSE, YOU WOULD TYPE ON IT

9    WITH A NUMBER AND TRY TO CREATE LETTERS TYPING ON THEM, OR

10   PHONES MORE LIKE BLACKBERRIES THAT HAD FULL KEYBOARDS AND

11   WORKED MORE LIKE A PERSONAL COMPUTER WITH A POINTING STICK THAT

12   YOU MOVED AN ARROW ON THE SCREEN.  SO PEOPLE WERE USED TO

13   INTERFACE DEVICES.

14        AND NOW HERE WE WERE COMING UP WITH A FULL GLASS SCREEN

15   THAT HAD A SOFTWARE KEYBOARD AND WAYS TO MANIPULATE OBJECTS

16   WITH YOUR FINGERS AND THAT WAS VERY FOREIGN AND DIFFERENT TO

17   EVERYBODY.

18        AND SO WE WERE STRIKING OUT INTO AN AREA THAT, SO FAR, NO

19   ONE HAD REALLY BEEN SUCCESSFUL AT AND CREATED, AND WE HAD TO

20   EXPLAIN TO USERS BOTH WHAT THAT WAS AND WHY THAT WOULD BE A

21   GREAT EXPERIENCE.  NO ONE ASSUMED IT WAS AT THE TIME.

22        IT WAS VERY RISKY.

23             THE COURT:  EXCUSE ME.  I'M LOOKING AT THE PARTIES'

24   FINAL AGREED UPON EXHIBIT LIST FROM THE 2012 TRIAL AND THERE

25   WAS NO RESTRICTION ON PX 17, SO I'M STRIKING THAT LIMITATION.

1          YOU CAN CONSIDER IT FOR THE TRUTH OF THE MATTER THAT'S

2     ASSERTED IN THE AD.

3               MR. MCELHINNY:  THANK YOU, YOUR HONOR.  SO THAT

4     REFERS TO THE AD THAT WE JUST SHOWED CAN BE CONSIDERED FOR THE

5     TRUTH?

6               THE COURT:  PX 127.

7               MR. MCELHINNY:  THANK YOU.

8     Q.   WHAT WAS IT ABOUT THE PRODUCT ITSELF THAT, THAT -- OR WAS

9     THERE ANYTHING ABOUT THE PRODUCT ITSELF THAT HELPED YOU CREATE

10    THIS INTRODUCTION TO MULTITOUCH TECHNOLOGY?

11    A.   OH, THERE WERE -- THERE WERE A NUMBER OF THINGS.  I THINK

12    AS WE CREATED THE EXPERIENCE OF THE IPHONE, THE TEAM HAD TO

13    SOLVE A NUMBER OF PROBLEMS THAT, THAT WERE CREATED WHEN YOU GET

14    RID OF KEYBOARDS AND TRY TO CREATE NEW WAYS TO MANEUVER AROUND,

15    AND IN INVENTING THOSE THINGS, THEY INVENTED SOLUTIONS TO

16    PROBLEMS THAT MADE IT SUCCESSFUL.

17          AND THESE ARE THE SOLUTIONS THAT ALLOW YOU TO SCROLL

18    AROUND AND PINCH AND ZOOM AND DOUBLE TAP, AND ALL THESE THINGS

19    WERE DONE IN WAYS THAT WERE UNIQUELY APPLE.  THEY WERE WAYS

20    THAT MADE IT, IN THE END, REALLY EASY TO USE.

21          IT ALL ADDS UP TO THAT.  THAT'S THE THING I THINK WE'RE

22    BEST KNOWN FOR, BEAUTIFUL PRODUCTS THAT ARE EASY TO USE, AND

23    ALL OF THESE CAPABILITIES, DELIVERING THIS ABILITY TO DO THIS

24    STUFF, WAS DONE WITH INVENTIONS AND TECHNOLOGIES THAT

25    ULTIMATELY MADE IT BEAUTIFULLY EASY TO USE.

1    Q.   DID YOU HAVE TO MAKE CHANGES TO THE RETAIL ENVIRONMENT, TO

2    THE STORES IN ORDER TO SELL YOUR PRODUCT?

3    A.   OH, YEAH.  THIS IS ANOTHER THING THAT'S HARD TO PUT OUR

4    HEAD BACK IN THAT TIME IT WAS SUCH A WHILE AGO.

5         BUT WE KNEW WHEN WE WERE WORKING ON THE IPHONE THAT ONE OF

6    THE HUGE CHALLENGES AT THE POINT OF SALE -- WHEN WE WENT INTO

7    CARRIER STORES, TWO THINGS WE OBSERVED.

8         ONE, AT THE TIME PHONES WERE ALL OFF.  THEY WERE JUST WHAT

9    WE CALL DUMMY PHONES WITH BLANK SCREENS OR STICK ON FAKE

10   SCREENS.  YOU COULDN'T ACTUALLY EXPERIENCE ANY PRODUCT BECAUSE

11   THEY ALL WORKED IN SIMILAR WAYS WITH PHYSICAL BUTTONS.

12        SO WE WANTED TO HAVE DEVICES THAT ACTUALLY WERE TURNED ON

13   IN THE STORE AND YOU COULD TRY THEM OUT, BECAUSE IF YOU DIDN'T

14   TRY THIS OUT, YOU REALLY WEREN'T GOING TO PUT DOWN YOUR MONEY

15   AND BUY A DEVICE THAT WORKED UNLIKE ANYTHING YOU'D EVER USED

16   BEFORE.  YOU NEEDED TO TRY IT OUT.

17        SECONDLY, A BIG PART OF THIS EXPERIENCE WAS THE INTERNET.

18   DO YOU WANT TO TRY IT, TRY SEARCHING AND SCROLLING AROUND IN

19   THE INTERNET?

20        WELL, MOST STORES DIDN'T HAVE INTERNET ACCESS AND NONE OF

21   THEIR DEVICES WERE ON THE INTERNET.

22        SO WE HAD TO WORK WITH STORES WHEN WE LAUNCHED TO BOTH

23   ENABLE THE DEVICES TO BE ON, AND TO ALLOW YOU TO HAVE INTERNET

24   ACCESS SO YOU COULD TRY THIS AND DECIDE THAT IT ACTUALLY DID

25   WORK FOR YOU.

1    Q.   COULDN'T CONSUMERS FIGURE OUT HOW TO WORK THIS PHONE BY

2    LOOKING AT THE INSTRUCTION MANUAL?

3    A.   WELL, ONE OF THE THINGS THAT WE'RE REALLY PROUD OF WITH

4    OUR PRODUCTS IS THERE ISN'T AN INSTRUCTION MANUAL.  WE TRY TO

5    MAKE IT SO EASY TO USE THAT ANYONE CAN PICK IT UP, DISCOVER HOW

6    THINGS WORK, AND LEARN HOW TO USE IT AND ENJOY IT WITHOUT

7    HAVING TO READ MANUALS.

8    Q.   ARE YOU FAMILIAR WITH AN INSTRUCTION "PRODUCT AS HERO"?

9    A.   YES.

10   Q.   WHAT IS PRODUCT AS HERO, SIR?

11   A.   IT'S A SAYING WE USE IN MARKETING AT APPLE THAT WHEN WE'RE

12   MARKETING OUR PRODUCT, IT'S ALL ABOUT THE PRODUCT.  WE WANT THE

13   CUSTOMER TO SEE THE PRODUCT, UNDERSTAND IT, HOPEFULLY LOVE IT

14   LIKE WE DO.

15        SO WE MAKE MOST ALL OF OUR MARKETING HAVE THE PRODUCT AS

16   THE HERO OF THE AD.  IT'S NOT SCREENS WITH PEOPLE.  IT'S NOT

17   LIFESTYLE SITUATIONS.  IT'S THE PRODUCT THAT'S MOST FOCUSSED ON

18   IN ALL THE MARKETING.

19   Q.   AND WHY DOES THAT WORK FOR YOU?

20   A.   BECAUSE THE PRODUCT IS REALLY BEAUTIFUL AND REALLY UNIQUE.

21   THOSE ARE THE THINGS THAT ALLOW US TO HAVE THIS ENTIRE

22   MARKETING STRATEGY.

23   Q.   WHERE WERE YOU WHEN THE IPHONE WAS ORIGINALLY RELEASED?

24   A.   WE, MY MARKETING TEAM, WE ALL KNEW THAT THE FIRST DAY

25   LAUNCHING AND SHIPPING THE IPHONE WAS A MOMENTOUS DAY, SO WE

1    ALL SPREAD OUT ACROSS THE COUNTRY TO BE IN STORES AND SORT OF

2    FEEL THE EXCITEMENT FROM THE CUSTOMERS.

3         AND I DID THAT AS WELL.  I WENT TO CHICAGO TO OUR MICHIGAN

4    AVENUE APPLE RETAIL STORE TO BE THERE WHEN IT OPENED AND THE

5    FIRST CUSTOMERS CAME IN TO GET AN IPHONE.

6    Q.   AND WHAT WAS THE -- WHAT WAS THE ATMOSPHERE?

7    A.   OH, MY GOODNESS.  IT WAS JUST ONE OF THE MOST EXCITING

8    THINGS.  YOU KNOW, YOU COMPARE IT TO HUGE SPORTS EVENTS OR I

9    GET THAT FEELING AT A BIG CONCERT.  IT'S JUST THE ENERGY AND

10   THE ENTHUSIASM.  IT WAS A SPECIAL DAY.

11        AND IN FACT, IT WAS SO SPECIAL, I ACTUALLY BROUGHT MY SON

12   WITH ME.  I TOOK HIM OUT OF SCHOOL AND HE CAME, OR OUT OF CAMP

13   AT THE TIME, FROM CALIFORNIA AND I TOOK HIM TO CHICAGO SO HE,

14   TOO, COULD MAKE THIS A DAY WE SHARED TOGETHER, THIS ONE HUGE

15   MOMENTOUS DAY.

16   Q.   LET ME GET THIS STRAIGHT.  YOU BROKE THE LAWS OF THE STATE

17   OF CALIFORNIA BY TAKING YOUR SON OUT OF SCHOOL?

18   A.   IT WAS SUMMER SCHOOL, SO I THINK WE'RE GOOD.

19   Q.   OH, OKAY.  GOOD.

20        DID YOU SEE ANY REVIEWS FOR THE IPHONE AFTER IT WAS

21   RELEASED?

22   A.   YES.

23   Q.   AND WHAT WERE THE NATURE OF THE REVIEWS THAT CAME UP?

24   A.   WELL, AGAIN, THEY WERE A TREMENDOUS NUMBER OF REVIEWS.

25        MR. PRICE:  OBJECTION.  I'D JUST REQUEST AN

1     INSTRUCTION THAT THE ORAL TESTIMONY ABOUT REVIEWS IS NOT FOR

2     THE TRUTH OF WHAT'S IN THE REVIEWS.

3              MR. MCELHINNY:  I'M GOING TO PUT IN SPECIFIC

4     EXHIBITS, YOUR HONOR, AND HE CAN GET HIS INSTRUCTION WHEN THE

5     EXHIBITS COME.  THEY'RE NEXT.

6              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

7     BY MR. MCELHINNY:

8     Q.   JUST GENERALLY, SIR, WHAT WAS THE NATURE OF THE REVIEWS?

9     A.   AGAIN, TREMENDOUS EXCITEMENT ABOUT THIS NEW KIND OF

10    PRODUCT AND SOMETHING THAT PEOPLE HADN'T SEEN BEFORE, AND THE

11    REVIEWERS HAD TO BOTH TALK ABOUT A PRODUCT, BUT MORE SO THAN

12    THEY HAD IN THE PAST, EXPLAIN HOW IT WORKED TO USERS WHO

13    WEREN'T USING IT YET THEMSELVES.  SO THESE WERE PRETTY BIG

14    DEALS, THESE REVIEWS.

15    Q.   IN YOUR BINDER, WOULD YOU PLEASE LOOK AT PLAINTIFF'S

16    EXHIBIT 17.

17    A.   OKAY.

18    Q.   WHAT IS PLAINTIFF'S EXHIBIT 17?

19    A.   THIS IS A SUMMARY OF SOME OF THE NEWS COVERAGE ABOUT

20    IPHONE WHEN WE LAUNCHED IT.

21             MR. MCELHINNY:  YOUR HONOR, MOVE PLAINTIFF'S EXHIBIT

22    17.

23             THE COURT:  ALL RIGHT.  AND THIS IS ADMITTED, BUT

24    WITH THE INSTRUCTION THAT YOU ARE NOT TO CONSIDER IT FOR THE

25    TRUTH OF THE CONTENT OF THIS EXHIBIT.

```
 1          ANY OTHER --

 2              MR. PRICE:  NO FURTHER OBJECTIONS.

 3          (PLAINTIFF'S EXHIBIT 17 WAS ADMITTED IN EVIDENCE.)

 4      BY MR. MCELHINNY:

 5      Q.   CAN WE JUST SHOW IT BRIEFLY?

 6          THIS WILL BE IN YOUR BINDERS.  IT'S A WRITTEN SUMMARY OF

 7      THE RELEASES.

 8          SIR, COULD YOU LOOK AT EXHIBIT PX 134 IN YOUR BINDER.

 9      A.   YES.

10      Q.   WHAT IS THAT, SIR?

11      A.   THIS IS AN ARTICLE IN THE "WALL STREET JOURNAL" AND

12      WRITTEN IN JUNE 27TH, 2007 BY WALT MOSSBERG.

13      Q.   AND WHO IS WALTER MOSSBERG?

14      A.   HE'S ONE OF THE MOST POPULAR, BEST KNOWN TECHNOLOGY

15      WRITERS IN THE UNITED STATES.

16              MR. MCELHINNY:  YOUR HONOR, MOVE PX 134.

17              MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR, AND

18      REQUEST THE SAME INSTRUCTION.

19              THE COURT:  YES.  YOU ARE NOT TO CONSIDER THIS

20      EXHIBIT FOR THE TRUTH OF ITS CONTENTS.

21          GO AHEAD.  THAT'S ADMITTED.

22          (PLAINTIFF'S EXHIBIT 134 WAS ADMITTED IN EVIDENCE.)

23      BY MR. MCELHINNY:

24      Q.   MR. SCHILLER, WE HAVE CREATED ANOTHER DEMONSTRATIVE WHICH

25      IS PDX 2, IF YOU'LL FIND THAT IN YOUR BINDER, PLEASE.
```

```
 1              CAN YOU GIVE -- USE THIS SUMMARY IN ORDER TO GIVE US AN

 2     IDEA OF WHAT THIS ARTICLE SAID?

 3              MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR.  SAME

 4     LIMITING INSTRUCTION.

 5              MR. MCELHINNY:  WE ALREADY GOT THE LIMITING

 6     INSTRUCTION, YOUR HONOR.

 7              THE COURT:  GO AHEAD, PLEASE.

 8              MR. MCELHINNY:  THANK YOU.

 9              THE WITNESS:  THE TITLE OF THE ARTICLE IS "TESTING

10     OUT THE IPHONE," AND WHAT YOU SEE HERE ARE SOME OF THE IMAGES

11     THAT WERE INCLUDED IN THE ARTICLE, BOTH OF THE IPHONE, AS WELL

12     AS A TABLE ON THE RIGHT THAT SHOWS THE IPHONE AGAINST SOME OF

13     ITS THEN BIGGEST COMPETITORS, AND A FEW QUOTES FROM

14     MR. MOSSBERG.

15          AND WHAT HE WROTE WAS, "THE IPHONE IS, ON BALANCE, A

16     BEAUTIFUL AND BREAKTHROUGH HANDHELD COMPUTER."

17          "THE IPHONE IS SIMPLY BEAUTIFUL."

18          "THE IPHONE IS A WHOLE NEW EXPERIENCE AND A PLEASURE TO

19     USE."

20     Q.   SIR, WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT PX 135.

21     A.   YES.

22     Q.   WHAT IS PX 135?

23     A.   IT IS A SPECIAL STORY IN "TIME MAGAZINE" ABOUT THE BEST

24     INVENTIONS OF 2007.

25              MR. MCELHINNY:  YOUR HONOR, MOVE PX 135.
```

 1            MR. PRICE:  NO FURTHER OBJECTIONS AND REQUEST THE

 2    SAME LIMITING INSTRUCTION.

 3            THE COURT:  ALL RIGHT.  YOU ARE NOT TO CONSIDER THIS

 4    EXHIBIT FOR THE TRUTH OF ITS CONTENTS.  IT'S ADMITTED.

 5        (PLAINTIFF'S EXHIBIT 135 WAS ADMITTED IN EVIDENCE.)

 6            THE COURT:  GO AHEAD, PLEASE.

 7    BY MR. MCELHINNY:

 8    Q.  MR. SCHILLER, WE HAVE CREATED A DEMONSTRATIVE, PDX 3.  CAN

 9    YOU USE THIS DEMONSTRATIVE TO SUMMARIZE FOR US WHAT WAS IN THE

10    "TIME BEST INVENTIONS OF THE YEAR" ARTICLE.

11    A.  YES.  FIRST, YOU SEE THE DATE.  IT'S NOVEMBER OF 2007, SO

12    AFTER THE IPHONE HAS BEEN SHIPPING.  YOU SEE THE COVER OF

13    "TIME MAGAZINE" THERE AS IT WAS PRINTED, AND THAT WAS

14    INCREDIBLY REMARKABLE.  THERE'S THE IPHONE ON THE COVER OF

15    "TIME MAGAZINE."  PRODUCTS DON'T USUALLY MAKE IT ON TO THE

16    COVER OF NEWS MAGAZINES LIKE "TIME MAGAZINE."

17            NOT ONLY DOES IT SHOW, OF COURSE, THE BEAUTIFUL IPHONE, IT

18    ALSO SHOWS ITS ICON LAYOUT ON THE HOME SCREEN, AND THEY HAD FUN

19    WITH THE ICONS AND SPELLED OUT THE TITLE OF THE STORY, "BEST

20    INVENTIONS OF 2007."

21            AND THEN THERE'S JUST A COUPLE QUOTES HERE FROM THAT

22    STORY.  IT SAID, "APPLE'S IPHONE IS STILL THE BEST THING

23    INVENTED THIS YEAR.  WHY?  FIVE REASONS."

24            THE FIRST REASON, "THE IPHONE IS PRETTY."  "GOOD DESIGN IS

25    ACTUALLY AS IMPORTANT AS GOOD TECHNOLOGY."

1     Q.   IS THAT SOMETHING THAT APPLE BELIEVES, THAT GOOD DESIGN IS

2     ACTUALLY AS IMPORTANT AS GOOD TECHNOLOGY?

3     A.   OH, YES, AT OUR VERY CORE.

4     Q.   IF YOU LOOK, PLEASE, AT PDX 142.

5          CAN YOU TELL US WHAT PDX 142 IS, PLEASE?

6     A.   IT IS A NEWS STORY FROM "THE NEW YORK TIMES," THE

7     TECHNOLOGY SECTION CALLED "BITS."

8     Q.   CAN YOU TELL US THE DATE OF IT, PLEASE?

9     A.   THIS CAME OUT IN NOVEMBER 23RD, 2011.

10         MR. MCELHINNY:  YOUR HONOR, MOVE PX 142.

11         MR. PRICE:  NO FURTHER OBJECTIONS, YOUR HONOR, AND

12    THE SAME LIMITING INSTRUCTION.

13         THE COURT:  ALL RIGHT.  YOU ARE NOT TO CONSIDER THIS

14    EXHIBIT FOR THE TRUTH OF ITS CONTENTS.

15         (PLAINTIFF'S EXHIBIT 142 WAS ADMITTED IN EVIDENCE.)

16         THE COURT:  GO AHEAD, PLEASE.

17    BY MR. MCELHINNY:

18    Q.   SIR, IF YOU LOOK, PLEASE, AT THE DEMONSTRATIVE THAT WE'VE

19    CREATED, PDX 16, CAN YOU USE THIS TO SUMMARIZE FOR US THE

20    "NEW YORK TIMES" ARTICLE THAT THE JURY WILL HAVE IN ITS

21    BINDERS?

22    A.   YES.  THIS IS AN ARTICLE THAT WAS ABOUT AN EXHIBIT CREATED

23    BY THE PATENT, U.S. PATENT OFFICE AFTER MR. JOBS PASSED AWAY.

24    AND YOU SEE THE TITLE OF IT.  IT IS "PATENT OFFICE HIGHLIGHTS

25    JOBS'S" INVENTIONS, EXCUSE ME, "INNOVATIONS," AND YOU SEE A

1      PHOTO FROM THE EXHIBIT WHERE THERE IS A WALL OF IPHONES

2      CREATED, AND ON EACH OF THOSE IPHONES ARE A DOZEN U.S. PATENTS

3      AWARDED TO MR. JOBS AND MANY OF THEM ACROSS ALL THE SCREENS,

4      ALL DIFFERENT ONES.

5           AND THIS -- AND A QUOTE HERE IS FROM THE STORY.  I'LL READ

6      IT.  IT SAYS, "THE UNITED STATES PATENT AND TRADEMARK OFFICE IN

7      ALEXANDRIA, VIRGINIA RECENTLY UNVEILED AN EXHIBIT OF 30 GIANT

8      IPHONE-LIKE MODELS HONORING THE INVENTIONS OF THE LATE

9      STEVE JOBS.  EACH IPHONE MODEL DISPLAYS PATENTS THAT LIST

10     MR. JOBS AS INVENTOR OR CO-INVENTOR.  ALTOGETHER ABOUT 300

11     PATENTS ARE ON DISPLAY, GIVING EXHIBIT ATTENDEES A VISUAL TOUR

12     THROUGH APPLE'S HISTORY OF DESIGN AND INNOVATION."

13     Q.   SIR, HOW WERE THE ORIGINAL SALES NUMBERS FOR THE ORIGINAL

14     IPHONE?

15     A.   OH, THEY WERE FANTASTIC.

16     Q.   HAVE YOU PREPARED A SUMMARY THAT SHOWS US THOSE SALES

17     FIGURES?

18     A.   YES.

19     Q.   WOULD YOU LOOK AT PX 15 IN YOUR BINDER.

20     A.   OKAY.

21     Q.   IS THIS THAT SUMMARY?

22     A.   YES, IT IS.

23          MR. MCELHINNY:  YOUR HONOR, I MOVE PX 15.

24          THE COURT:  ANY OBJECTION?

25          MR. PRICE:  NO OBJECTION.

1          THE COURT:  IT'S ADMITTED.

2          (PLAINTIFF'S EXHIBIT 15 WAS ADMITTED IN EVIDENCE.)

3          THE COURT:  GO AHEAD, PLEASE.

4    BY MR. MCELHINNY:

5    Q.   CAN YOU TELL US HOW THIS SHOWS US THE SALES FIGURES FOR

6    THE ORIGINAL IPHONE, PLEASE.

7    A.   YES.  THIS IS A CHART OF CUMULATIVE UNIT SALES, SO TOTAL

8    SALES IN THE UNITED STATES OF BOTH IPHONE AND IPAD.

9          THE BLUE LINE REPRESENTS THE IPHONE.  IT STARTS IN THE

10   BOTTOM LEFT MIDWAY IN 2007 WHEN THE IPHONE STARTED SHIPPING,

11   AND IT EXTENDS ALL THE WAY UNTIL MID-2012.

12   Q.   AND CAN YOU TELL US, USING THIS, APPROXIMATELY HOW MANY

13   IPHONES YOU SOLD BETWEEN JUNE 2007 AND SEPTEMBER 2007?

14   A.   OVER 1.3 MILLION.

15   Q.   SIR, HOW WERE SALES NUMBERS FOR LATER MODELS OF THE

16   IPHONE?

17   A.   EVEN GREATER.  WE USED TO TALK ABOUT HOW WITH EACH

18   SUCCESSIVE VERSION, THE SALES SURPASSED THE PREVIOUS VERSIONS.

19   SO WE WERE ALWAYS VERY, VERY IMPRESSED AND HAPPY WITH SALES

20   VOLUME.

21   Q.   CAN YOU GIVE US SOME IDEA OF HOW MANY INDIVIDUAL UNITS OF

22   IPHONES APPLE SOLD BETWEEN THE INTRODUCTION IN JUNE OF 2007

23   THROUGH THE END OF 2012?

24   A.   WELL, TYPICALLY EACH YEAR WE'LL BRING OUT A NEW MODEL

25   ABOUT ONCE A YEAR, AND SO EACH OF THOSE MODELS THEN WOULD CARRY

1    THROUGH AND, IN TOTAL, BY MID OF 2012, AS THIS CHART SHOWS, WE

2    HAD SOLD OF THOSE OVER 77 AND A HALF MILLION UNITS.

3    Q.   SEVENTY-SEVEN AND A HALF MILLION UNITS?

4    A.   YES.

5    Q.   FROM YOUR PERSPECTIVE AS THE HEAD OF MARKETING AT APPLE,

6    DID THE INTRODUCTION OF THE IPHONE HAVE ANY AFFECT ON THE

7    MARKETPLACE FOR HANDHELD PHONES?

8    A.   YES, A HUGE EFFECT.

9    Q.   AND HOW WOULD YOU DESCRIBE THAT EFFECT, SIR?

10   A.   WELL, WE CONSIDERED THE IPHONE A NEW GENERATION OF

11   SMARTPHONE.  THE MAJORITY OF PHONES SOLD BEFORE IPHONE

12   TYPICALLY ARE CALLED FEATURE PHONES IN OUR LANGUAGE.  THEY

13   DON'T RUN ON ADVANCED COMPUTING OPERATING SYSTEMS.  THEY DON'T

14   DO MANY OF THE TASKS THE IPHONE DOES.  THEY'RE VERY GOOD FOR

15   THE BASIC FUNCTIONS OF MAKING A CALL AND LISTING YOUR CONTACTS.

16       AND SO THE MARKET REALLY DIVIDED NOW INTO THE FEATURE

17   PHONE MARKET AND THE NEW EMERGING SMARTPHONE MARKET, AND AT

18   THAT POINT EVERYTHING CHANGED TO A CASE WHERE CUSTOMERS WERE

19   EITHER MOVING FROM A FEATURE PHONE INTO A SMARTPHONE, OR HAD A

20   SMARTPHONE AND THEN COULD MAKE ONE DAY UPGRADE TO ANOTHER

21   SMARTPHONE.

22       AND THAT'S HOW WE LOOKED AT THE MARKET AFTER IPHONE.

23   Q.   I WANT TO TURN FOR A MINUTE TO THE IPAD.  CAN YOU TELL US,

24   PLEASE, WHAT THE GENERATION -- THE GENESIS WAS OF THE

25   DEVELOPMENT OF THE IPAD PRODUCT.

1    A.   YES.  BEFORE IPAD, APPLE WAS KNOWN IN THE COMPUTING

2    BUSINESS FOR OUR PERSONAL COMPUTERS, THE MAC, AND THE MAC HAD

3    BEEN GROWING WITH BOTH DESKTOP AND NOTEBOOK MODELS, AND MORE

4    AND MORE NOTEBOOKS WERE BECOMING PREDOMINANT SALES, THE

5    MAJORITY OF OUR MAC SALES, AS WITH OTHER COMPANIES.

6         AND AS TIME WAS MARCHING ON, PRICES WERE GETTING LOWER AND

7    LOWER, WHICH IS GREAT.  YOU CAN GET MORE COMPUTERS INTO MORE

8    PEOPLE'S HANDS.

9         BUT WE WERE STARTING TO SEE THE EMERGENCE OF NEW DEVICES,

10   NEW NOTEBOOK DEVICES THAT WERE EXTREMELY AFFORDABLE, BUT POORLY

11   MADE.  SOME PEOPLE CALLED THESE NET BOOKS.

12        AND THESE NET BOOKS STARTED SHOWING UP AND WE LOOKED AT,

13   WELL, WHAT COULD APPLE DO TO OFFER SOMETHING EQUALLY

14   AFFORDABLE, BUT WE WOULDN'T MAKE SOMETHING OF THE QUALITY OF

15   THOSE NET BOOKS.  THEY WERE, FRANKLY, CHEAPER AND POORLY

16   CONSTRUCTED AND NOT SOMETHING APPLE WOULD EVER BE PROUD TO MAKE

17   FOR OUR CUSTOMERS.

18        SO WE CHALLENGED OURSELVES TO FIGURE OUT WHAT WOULD BE A

19   FUTURE PERSONAL COMPUTER THAT WOULD HAVE INCREDIBLE FEATURES

20   AND AMAZING QUALITY AND BE AFFORDABLE.

21        AND THE TEAM REALIZED THAT THE BEST WAY TO TAKE THIS ON

22   WAS TO REMOVE THINGS, TO REMOVE HINGES FOR THINGS OPENING AND

23   CLOSING LIKE WITH LAPTOPS, TO ACTUALLY REMOVE THE KEYBOARDS AND

24   ALL THE KEYS AND ALL THOSE MOVING PARTS, AND IF YOU COULD GET

25   RID OF ALL OF THAT, YOU COULD MAKE SOMETHING SIMPLER, MORE

1    AFFORDABLE AND MORE DURABLE.

2         BUT THAT POSED THE CHALLENGE THAT, WITHOUT THAT KEYBOARD,

3    HOW DO YOU TYPE ON IT?

4         SO THE IPAD PROJECT STARTED WORKING ON MULTITOUCH

5    TECHNOLOGY, THE ABILITY TO TYPE ON THE SCREEN WITH BOTH HANDS

6    AND MANIPULATE OBJECTS WITHOUT A MOUSE OR TRACK PAD, AND THAT'S

7    THE GENESIS OF CREATING THE IPAD.

8    Q.   WHEN WAS THE IPAD INTRODUCED?

9    A.   IN JANUARY OF 2010.

10   Q.   AND WHEN WAS THE IPAD FIRST RELEASED?

11   A.   IN APRIL OF 2010.

12   Q.   AGAIN, GENERALLY, WHAT WAS THE RECEPTION FOR THE IPAD,

13   SIR?

14   A.   FANTASTIC.

15   Q.   AND HOW WERE SALES FOR THE IPAD?

16   A.   ALSO TREMENDOUS.

17   Q.   IF YOU GO BACK TO PLAINTIFF'S EXHIBIT 15, CAN YOU EXPLAIN

18   WHAT THIS TELLS US ABOUT SALES OF THE IPAD, SIR?

19   A.   YES.  THE IPAD SALES ARE REPRESENTED BY THE ORANGE LINE ON

20   THE BOTTOM RIGHT OF THIS CHART.  THEY START IN MID-2010 WHEN IT

21   BEGINS IT SHIP AND EXTEND THROUGH MID-2012.

22   Q.   AND CAN YOU GIVE US SOME IDEA ABOUT THE QUANTITIES?

23   A.   WELL, AS YOU CAN SEE, THEY GREW VERY QUICKLY.  IN FACT, IF

24   YOU LOOK AT THE SIMILAR FIRST QUARTERS OF IPHONE, IT SHIPPED

25   EVEN MORE UNITS IN ITS FIRST QUARTERS OF SALES THAN THE IPHONE

1    DID.  AND ON THIS CHART, BY MID-2012, WE HAD SOLD OVER 28

2    MILLION IPADS.

3    Q.   SIR, WOULD YOU OPEN YOUR BINDER, PLEASE, TO EXHIBIT JX,

4    JOINT EXHIBIT 1043.

5    A.   YES.

6    Q.   CAN YOU TELL US WHAT JOINT EXHIBIT 1043 IS?

7    A.   IT'S A U.S. DESIGN PATENT FOR AN ELECTRONIC DEVICE, IN

8    THIS CASE AN IPHONE FOR ITS DESIGN.

9    Q.   AND IS THAT PATENT NUMBER D618,677S?

10   A.   YES, IT IS.

11          MR. MCELHINNY:  YOUR HONOR, MOVE JOINT EXHIBIT 1043.

12          THE COURT:  ANY OBJECTION?

13          MR. PRICE:  NO OBJECTION.

14          THE COURT:  IT'S ADMITTED.

15       (JOINT EXHIBIT 1043 WAS ADMITTED IN EVIDENCE.)

16          THE COURT:  GO AHEAD, PLEASE.

17   BY MR. MCELHINNY:

18   Q.   IF YOU LOOK IN YOUR BINDER, PLEASE, AT JOINT EXHIBIT

19   JX 1042, CAN YOU TELL US, PLEASE, WHAT JOINT EXHIBIT 1042 IS?

20   A.   YES.  IT'S A U.S. DESIGN PATENT FOR THE GRAPHICAL USER

21   INTERFACE WITH A DISPLAY SCREEN OF THE IPHONE.

22   Q.   AND IS THAT NUMBERED D604,305S?

23   A.   YES, IT IS.

24          MR. MCELHINNY:  YOUR HONOR, MOVE JOINT EXHIBIT 1042.

25          THE COURT:  ANY OBJECTION?

1          MR. PRICE:  YES, YOUR HONOR.  OBJECT TO ANYTHING

2     AFTER 1042-8.  WHAT FOLLOWS IS NOT THE PATENT, BUT PART OF THE

3     FILE HISTORY.

4          MR. MCELHINNY:  ALL WE INTEND TO OFFER IS THE PATENT,

5     YOUR HONOR.

6          THE COURT:  ALL RIGHT.  SO THAT ENDS AT 1042.3.  IS

7     THAT CORRECT?

8          MR. MCELHINNY:  I THINK IT'S 1042. --

9          THE COURT:  I'M SORRY, EXCUSE ME.

10         MR. MCELHINNY:  -- 7, YOUR HONOR.

11         THE COURT:  THAT'S FINE.

12         MR. MCELHINNY:  THANK YOU.  IT'S ADMITTED.

13        (JOINT EXHIBIT 1042 WAS ADMITTED IN EVIDENCE.)

14    BY MR. MCELHINNY:

15    Q.   MR. SCHILLER, WHY DID APPLE SEEK PATENT PROTECTION FOR ITS

16    DESIGNS?

17    A.   WELL, A COUPLE REASONS.  FIRST OF ALL, A LOT OF PEOPLE

18    WORKED A LONG TIME VERY HARD ON THESE THINGS AND YOU WANT TO

19    RECOGNIZE THAT WORK AND, AND MAKE SURE IT'S PROPERLY ATTRIBUTED

20    TO THEM.

21         SECONDLY, FROM MY STANDPOINT IN MARKETING, THESE

22    INVENTIONS ARE PART OF WHAT DIFFERENTIATE OUR PRODUCT, THAT WE

23    TRY TO CREATE PRODUCTS THAT ARE BEAUTIFUL, WE TRY TO MAKE

24    PRODUCTS THAT WORK IN UNIQUELY NEW WAYS AND THEY ARE THE THINGS

25    THAT, SOME OF THE THINGS THAT MAKE OUR PRODUCT SPECIAL AND SOME

1       OF THE REASONS WHY CUSTOMERS WILL RUN TO BUY OUR PRODUCT AND

2       SOMETHING THAT I BASED A LOT OF OUR MARKETING ON, HOW IT LOOKS,

3       HOW IT WORKS.

4            AND SO THEY ARE APPLE'S PRODUCTS AND THEY ARE WHAT WE WANT

5       TO MARKET AND SELL AND CREATE A BUSINESS AROUND.

6       Q.   BASED ON YOUR EXPERIENCE IN MARKETING, IS IT YOUR VIEW

7       THAT DESIGN IS IMPORTANT TO, TO ENCOURAGE CUSTOMERS TO BUY YOUR

8       PRODUCTS?

9       A.   I THINK THAT THE DESIGN IS INCREDIBLY IMPORTANT.  I THINK

10      OUR UNIQUENESS OF OUR DESIGNS ARE, ARE VERY IMPORTANT TO US AND

11      I THINK IT MATTERS TO ALL CUSTOMERS.

12      Q.   FROM -- AGAIN, BASED ON YOUR EXPERIENCE IN MARKETING THE

13      PRODUCT, WHAT ARE SOME OF THE REASONS WHY THE IPHONE HAS, IN

14      FACT, BEEN SO SUCCESSFUL?

15      A.   WELL, THERE ARE MANY REASONS.  SOME OF THE ONES THAT I

16      THINK ARE IMPORTANT ARE, FIRST, THAT IT IS A VERY BEAUTIFUL

17      OBJECT.  I THINK EVERYONE CARES ABOUT THAT.

18           SECONDLY, IT DOES THINGS THAT YOU WANT TO DO.  IF IT

19      DIDN'T, YOU WOULDN'T WANT ONE.  SO IT PROVIDES A LOT OF USEFUL

20      FUNCTIONS TO PEOPLE THROUGHOUT THEIR DAY.

21           AND THIRD, IT DOES THOSE THINGS IN A WAY THAT IS UNIQUE

22      AND FUN AND EASY TO USE AND MAKES IT A JOY TO HAVE A PRODUCT

23      AND DO THE THINGS YOU WANT TO DO WITH IT.

24      Q.   WE HAVE SEEN, NOT FOR THE TRUTH, BUT WE'VE SEEN A NUMBER

25      OF ARTICLES THAT HAVE DESCRIBED THE IPHONE AS A REVOLUTION.

1           AGAIN, BASED ON YOUR EXPERIENCE, WERE THERE PRODUCTS IN

2     THE MARKET SIMILAR TO THE IPHONE BEFORE THE IPHONE WAS

3     INTRODUCED?

4     A.   NOT IN MY EXPERIENCE, NO.

5     Q.   WHAT ARE SOME OF THE THINGS THAT MADE THE IPAD SUCCESSFUL?

6     A.   WELL, VERY SIMILAR TO THE IPHONE.  I BELIEVE IT'S

7     INCREDIBLY BEAUTIFUL.  THE TEAM WORKED VERY HARD ON ITS

8     APPEARANCE.

9           I THINK IT DOES THINGS THAT PEOPLE WANT TO DO, VALUABLE

10     THINGS IN THEIR DAY, AND THAT IS AN EVEN BIGGER CHALLENGE IN

11     THE IPAD, MAKING A NEW CLASSIC DEVICE.

12           AND IT DOES THOSE THINGS IN A WAY THAT'S EASY AND

13     INTUITIVE AND FUN AND SO EASY THAT, AGAIN, THERE'S NO MANUAL

14     WITH IT.  YOU CAN JUST EXPLORE AND START TO USE IT.

15           AND WE'VE SEEN A TREMENDOUS ADOPTION OF IT FROM A HUGE

16     RANGE OF AGES FROM VERY, VERY YOUNG CHILDREN TO SENIOR

17     CITIZENS, AND I THINK THAT SPEAKS TO THE INCREDIBLE EASE OF USE

18     THAT IT HAS THAT SUCH A WIDE RANGE OF PEOPLE CAN ENJOY USING

19     IT.

20     Q.   SIR, AS OPPOSED TO YOUR INDEPENDENT OPINION, DO YOU HAVE

21     ANY FACTUAL BASIS FOR YOUR VIEWS THAT DESIGN AND EASE OF USE

22     DRIVE CONSUMER SALES?

23     A.   YES, WE DO.

24     Q.   IF YOU WOULD LOOK PLEASE, AGAIN, IN YOUR BINDER AT EXHIBIT

25     PX 143, I'M GOING TO ASK YOU ABOUT FOUR SEPARATE DOCUMENTS, BUT

1    LET'S LOOK AT ALL OF THEM FIRST.  OKAY?

2    A.   OKAY.

3    Q.   PX 143.

4    A.   YES.

5    Q.   PX 144.

6    A.   OKAY.

7    Q.   PX 145.

8    A.   YES.

9    Q.   I WON'T TAKE THE SURPRISE OUT OF IT.  THE NEXT ONE IS

10   PX 146.

11   A.   OKAY.

12   Q.   WHAT ARE THESE DOCUMENTS, SIR?

13   A.   THESE ARE EXCERPTS FROM SURVEYS DONE BY MY MARKET RESEARCH

14   TEAM ASKING IPHONE BUYERS QUESTIONS ABOUT THEIR PRODUCT AND

15   THEIR EXPERIENCE WITH THE PRODUCT.

16   Q.   AND WHAT TIME PERIOD DO THESE COVER, THESE SURVEYS COVER?

17   A.   EACH ONE IS COVERING A QUARTER, OR THREE MONTHS LONG.  THE

18   FIRST ONE IS THE FOURTH QUARTER OF FISCAL 2010; THE SECOND ONE

19   IS THE FIRST QUARTER OF FISCAL 2011; THE THIRD ONE IS THE

20   SECOND QUARTER OF FISCAL 2011; AND THE FOURTH ONE IS THE THIRD

21   QUARTER OF FISCAL 2011.

22       SO THEY'RE SEQUENTIAL QUARTERS.

23           MR. MCELHINNY:  YOUR HONOR, I MOVE INTO EVIDENCE

24   PX 143, 144, 145 AND 146.

25           THE COURT:  ANY OBJECTION?

```
 1              MR. PRICE:  NO OBJECTION.

 2              THE COURT:  THEY'RE ADMITTED.

 3         (PLAINTIFF'S EXHIBITS 143, 144, 145, AND 146 WERE ADMITTED

 4    IN EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6    BY MR. MCELHINNY:

 7    Q.   SIR, AS A LITTLE BACKGROUND, FIRST, WHAT IS AN IPHONE

 8    BUYER SURVEY?

 9    A.   IT IS A SURVEY THAT MY MARKET RESEARCH TEAM DOES WHERE

10    THEY CONTACT IPHONE, RECENT IPHONE BUYERS, SOMEBODY WHO BOUGHT

11    IN THE LAST FEW MONTHS OR LAST -- YEAH, FEW MONTHS -- AND

12    ASKING THEM FOR ANSWERS TO QUESTIONS ABOUT WHAT THEY THINK

13    ABOUT THEIR IPHONE OR WHAT MATTERED TO THEM IN THEIR PURCHASE

14    OF THE IPHONE.

15    Q.   REMIND US WHAT YOUR MARKET SURVEY TEAM IS AND WHAT IT

16    DOES.

17    A.   I HAVE A SMALL TEAM OF PEOPLE THAT ARE CHARGED WITH DOING

18    CUSTOMER RESEARCH, AND THEY DO BASICALLY TWO FORMS OF RESEARCH.

19         ONE IS THEY WILL DO PRIMARY RESEARCH, WHICH THIS IS, WHERE

20    YOU ACTUALLY YOURSELF GO AND ASK A CUSTOMER OR SOMEONE A

21    QUESTION AND THEN COMPILE THE RESULTS.

22         BUT THEY ALSO COMPILE SECONDARY RESEARCH, WHICH IS NOT

23    RESEARCH THAT APPLE DID, BUT MAYBE SOME OTHER FIRM DID AND WE

24    WANTED TO SEE WHAT IT SAID AND WE'LL PURCHASE THOSE AND SHARE

25    THOSE INTERNALLY.
```

1      Q.   HAVE YOU CREATED A SUMMARY OF SOME OF THE INFORMATION ON

2      THE DOCUMENTS THAT WE'VE JUST PUT INTO EVIDENCE?

3      A.   YES.

4      Q.   IF YOU WOULD LOOK, PLEASE, AT CHART PDX 10.1, PDX 10, THE

5      DEMONSTRATIVE.  CAN YOU EXPLAIN WHAT THIS SUMMARY TELLS US?

6      A.   YES.  SO WHAT THIS SHOWS IS FOR ONE OF THE QUESTIONS IN

7      THAT SURVEY -- AND EACH OF THOSE FOUR SURVEYS THAT WE'VE SPOKEN

8      ABOUT HERE HAVE THIS SAME QUESTION IN IT -- HOW PEOPLE

9      RESPONDED.

10          AND THE QUESTION IN THIS CASE OF IPHONE BUYERS IS, HOW

11     IMPORTANT WAS ATTRACTIVE APPEARANCE AND DESIGN IN THEIR

12     DECISION TO PURCHASE THE IPHONE?

13          AND THE CUSTOMER COULD RESPOND WITH ONE OF FOUR THINGS:

14     IT WAS VERY IMPORTANT; SOMEWHAT IMPORTANT; NEITHER IMPORTANT OR

15     UNIMPORTANT; OR DON'T KNOW OR VERY UNIMPORTANT OR WHAT

16     UNIMPORTANT.

17          AND THE WAY WE LOOK AT THIS IN MARKETING IS SIMPLY WE ASK

18     THE QUESTION AND WE'LL COMBINE THE TOP TWO, VERY IMPORTANT AND

19     SOMEWHAT IMPORTANT, INTO ONE NUMBER, AND THAT'S CALLED THE TOP

20     TWO BOX NUMBER, AND THAT IS OUR METHOD FOR GENERALLY WAS IT

21     IMPORTANT TO THEM.  IT'S A GOOD MEASURE OF THAT.

22          AND SO ON THIS QUESTION OF ATTRACTIVE APPEARANCE AND

23     DESIGN, WHAT YOU SEE IS THAT BY THE TWO BLUE BOXES, THE

24     COMBINED RESPONSE BY THESE CUSTOMERS WAS OVER 80 PERCENT

25     CONSISTENTLY FELT THAT ATTRACTIVE APPEARANCE AND DESIGN WAS

```
 1     IMPORTANT TO THEIR PURCHASE DECISION.

 2     Q.   WHAT DOES ATTRACTIVE APPEARANCE AND DESIGN, WHAT DOES THAT

 3     ENCOMPASS IN THESE SURVEYS?

 4     A.   WELL, I BELIEVE WHAT WE'RE TRYING TO GET AT IS THE

 5     CUSTOMER'S FEELINGS ABOUT THE PHYSICAL APPEARANCE OF THE

 6     IPHONE, AS WELL AS WHAT THE USER INTERFACE LOOKS LIKE.

 7     Q.   DOES APPLE DO A LOT OF SURVEYING OF ITS OWN?

 8     A.   A FAIR AMOUNT, YES.

 9     Q.   DO YOU PURCHASE THIRD PARTY SURVEYS?

10     A.   WE DO THAT AS WELL.

11     Q.   HOW LONG, IN YOUR CAREER, HAVE YOU BEEN WORKING WITH

12     SURVEYS?

13     A.   OH, I'VE BEEN WORKING WITH SURVEYS SINCE I WAS IN

14     COLLEAGUE AND CREATING THEM.  SO MOST OF MY LIFE.

15     Q.   IS THERE AN ART TO CREATING SURVEYS?

16     A.   ABSOLUTELY.

17     Q.   AND JUST, WE DON'T -- YOU COULD SPEND DAYS, I KNOW, BUT

18     CAN YOU GIVE US THE 35 SECOND SUMMARY, PLEASE.

19     A.   I WILL TRY.  IT'S A COMPLEX TOPIC.

20          THE FIRST THING IS TO TRY TO UNDERSTAND WHAT YOU CAN ASK

21     AND WHAT -- AND GET A REASONABLE RESULT AND WHAT YOU CAN ASK

22     THAT WON'T PRODUCE A REASONABLE RESULT.

23          AND THEN TO ALWAYS, ALWAYS UNDERSTAND THE CONTEXT OF WHAT

24     YOU'RE LOOKING AT, WHAT WAS ASKED, WHO YOU ASKED IT OF, THAT'S

25     THE BASE OF THE RESPONDENTS, AND TRY TO ONLY READ THE DATA AND
```

1    NOT READ TOO MUCH INTO IT.  PEOPLE TEND TO EXTRAPOLATE AND READ

2    TOO MUCH.

3         AND THERE ARE SO MANY GUIDELINES TO IT, BUT I'LL GIVE YOU

4    ONE EXAMPLE OF SOMETHING I ALWAYS THINK ABOUT IN THE SURVEYS.

5              MR. PRICE:  I'M GOING TO OBJECT.  I THINK WE GETTING

6     INTO AN UNDISCLOSED EXPERT OPINION.

7              THE COURT:  OVERRULED.

8         GO AHEAD, PLEASE.

9              THE WITNESS:  SO ONE OF THE THINGS I TRIED TO DO, AND

10   THIS SURVEY I THINK REPRESENTS IT REALLY WELL, IS IT'S

11    REASONABLE TO ASK A CUSTOMER WHAT THEY THINK ABOUT SOMETHING

12    THEY JUST DID.  IT'S REASONABLE TO ASK THEM ABOUT SOMETHING

13    RECENT OR THAT THEY'RE GOING TO DO SOON.

14     I DON'T TRY TO CREATE A SURVEY, IF I CAN, WHERE YOU

15    ACTUALLY HAVE TO PUT SOMETHING IN THEIR HEAD TO THEN GET IT

16    OUT.

17         IN OTHER WORDS, I LOVE ASKING QUESTIONS OF PEOPLE OF "WHAT

18    DO YOU THINK," AND THEN TRY TO LEARN FROM THEM.

19         BUT WHEN I SAY, "HERE'S SOMETHING YOU DIDN'T KNOW.  LET ME

20    TELL IT TO YOU.  AND NOW YOU TELL ME BACK WHAT YOU THINK."

21    WELL, THAT'S GETTING LESS RELIABLE DATA.

22         AND THE MORE YOU LAYER ON VARIABLES, THE MORE COMPLEX IT

23    GETS, I JUST THINK THE LESS RELIABLE THE DATA.  THAT'S MY

24    EXPERIENCE OF DOING THIS.

25

1       BY MR. MCELHINNY:

2       Q.   ARE THERE GOOD SURVEYS AND BAD SURVEYS?

3       A.   ALWAYS.

4       Q.   AND WHEN YOU ARE HANDED A SURVEY OR YOU BUY A SURVEY, WHAT

5       DO YOU DO TO DETERMINE WHETHER OR NOT THE SURVEY RESULTS ARE

6       WORTH RELYING UPON?

7       A.   I ALWAYS LOOK AT THE METHODOLOGY, HOW DID THEY ASK?  WHAT

8       TOOLS DID THEY USE?  I LOOK AT THE TIME FRAME IT WAS DONE IN TO

9       TRY TO UNDERSTAND THE CONTEXT OF HOW CLOSE IT WAS TO THE ACTUAL

10      EVENT AND ACTIVITIES.  I TRY TO LOOK AT THE BASE OF THE

11      RESPONDENTS TO UNDERSTAND, IS THAT THE REPRESENTATIVE GROUP?

12      DO THEY HAVE ANY BIAS BUILT IN OR NOT?  AND I TRY TO PUT MYSELF

13      IN THE PLACE OF THE PERSON BEING ASKED TO UNDERSTAND HOW

14      REASONABLE IT IS TO EXPECT THEM TO ANSWER THE QUESTION AND WHAT

15      CAN YOU EXPECT THE RESULTS TO BE.

16           IT'S -- YOU CAN ASK ANYONE ANYTHING, BUT AT THE END OF THE

17      DAY, YOU HAVE TO CONSIDER ALL OF THESE VARIABLES TO UNDERSTAND

18      THE RELATIVE RELIABILITY OF THE RESULTS.

19      Q.   WHY WOULD APPLE BUY SURVEYS FROM THIRD PARTIES WHEN APPLE

20      DOESN'T CONTROL THE METHODOLOGY OF THOSE SURVEYS?

21      A.   OH, VERY SIMPLY BECAUSE OTHERS WILL SEE THEM AND WE WANT

22      TO KNOW WHAT THEY SAY.

23      Q.   IF YOU TURN TO THE SECOND PAGE OF THIS DEMONSTRATIVE,

24      PDX 10.2, THIS TALKS ABOUT EASE OF USE.

25           CAN YOU TELL US WHAT THIS SURVEY RESULTS TEACH US ABOUT

1      EASE OF USE?

2      A.   SO THIS IS A VERY SIMILAR TO THE PREVIOUS CHART.  IT

3      REPRESENTS THE RESPONSE IN OUR IPHONE BUYER'S SURVEY THAT WE

4      ASKED OF CUSTOMERS.

5           THE QUESTION IN THIS WAS, "HOW IMPORTANT WAS EASE OF USE

6      TO YOUR DECISION TO PURCHASE AN IPHONE?"

7           AND AGAIN, LOOKING AT THE SAME TOP TWO BOX METHODOLOGY,

8      WHAT YOU SEE IS CONSISTENTLY WELL OVER 90 PERCENT OF THE

9      CUSTOMERS OF THE SURVEY RESPONDED THAT EASE OF USE WAS

10     IMPORTANT TO THEIR PURCHASING DECISION.

11     Q.   AND FIRST OF ALL, WHAT IS EASE OF USE?

12     A.   EASE OF USE IS WHAT WE CONSIDER AN ATTRIBUTE.  IT'S HOW

13     EASY SOMETHING IS TO USE, AND IN MY BELIEF WHEN YOU'RE TALKING

14     SPECIFICALLY ABOUT AN IPHONE, YOU'RE TALKING ABOUT THE SOFTWARE

15     AND THE FEATURES OF THE SOFTWARE AND HOW THEY COMBINE TO MAKE

16     THE TASKS YOU WANT TO DO EASY TO DO.

17     Q.   AND IN -- BASED ON YOUR EXPERIENCE, WHAT IS IT ABOUT THE

18     IPHONE THAT MAKES IT EASY TO USE?

19     A.   WELL, THERE HAVE BEEN MANY THINGS THAT WE'VE DONE IN THE

20     USER INTERFACE WITH MULTITOUCH THAT MAKES IT EASY FOR THE

21     CUSTOMER TO DO THE THINGS THEY WANT TO DO.

22          WE HAD TO MAKE IT INTUITIVE.  WE HAD TO MAKE IT SO THAT

23     EVEN THOUGH THESE ARE SOFTWARE BUTTONS, THEY SOMEHOW CREATED A

24     SENSE OF, OF PLACE WHERE YOU INTUITIVELY UNDERSTOOD THE PHYSICS

25     AND THE REALITY AROUND THAT PLACE, SO HOW THINGS MOVED AROUND,

1    HOW THEY RESPONDED TO YOUR FINGER.  HOW THEY INTERPRETED WHAT

2    YOU WERE TRYING TO DO WITH ONE OR TWO OR MORE FINGERS AND AS

3    YOU DID DIFFERENT TASKS ARE ALL THINGS THAT THE TEAM WORKED ON

4    TO TRY TO MAKE A VERY INTUITIVE, OBVIOUS, EASY TO USE

5    ENVIRONMENT.

6    Q.    SIR, WOULD YOU OPEN YOUR BINDER, PLEASE, TO EXHIBIT 12.1.

7    A.    OKAY.

8    Q.    WHAT IS IN YOUR BINDER, SIR?

9    A.    IT IS A CD WITH A VIDEO ON IT.

10    Q.    DOES IT HAVE THE TITLE OF THE VIDEO?

11    A.    YES.  WATERED DOWN.

12    Q.    HAS APPLE CREATED ADVERTISING THAT DIRECTLY ADVERTISES ITS

13    EASE OF USE?

14    A.    YES.

15    Q.    IS THIS AN EXAMPLE OF THAT AD?

16    A.    IT IS.

17            MR. MCELHINNY:  YOUR HONOR, I MOVE 12.1.

18            THE COURT:  WITH THE SAME ADMONITION, ANY OBJECTION?

19            MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR.

20            MR. MCELHINNY:  I THINK THE ADS COME WITHOUT AN

21    ADMONITION, YOUR HONOR.

22            THE COURT:  WELL, IF THIS IS PX 12 FROM THE 2012

23    TRIAL, THERE WAS A LIMITING INSTRUCTION.

24            MR. MCELHINNY:  OKAY.

25            THE COURT:  ALL RIGHT.  SO YOU'RE NOT TO CONSIDER IT

```
1        FOR THE TRUTH OF ITS CONTENTS.

2             (PLAINTIFF'S EXHIBIT 12.1 WAS ADMITTED IN EVIDENCE.)

3                  THE COURT:  GO AHEAD, PLEASE.

4                  MR. MCELHINNY:  MAY WE DIM THE LIGHTS AND SHOW 12.1,

5        PLEASE?

6                  THE COURT:  YES.  MS. PARKER BROWN.

7             THANK YOU.

8             (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

9        BY MR. MCELHINNY:

10       Q.   MR. SCHILLER, I'D LIKE TO CHANGE TOPICS NOW AND TALK A

11       LITTLE BIT ABOUT COMPETITION.

12            IS SAMSUNG ONE OF APPLE'S COMPETITORS IN THE SMARTPHONE

13       MARKET?

14       A.   YES.

15       Q.   LET ME SHOW YOU THE LIST OF INFRINGING PRODUCTS IN THIS

16       CASE.

17            THE LIST OF INFRINGING PRODUCTS.

18            (PAUSE IN PROCEEDINGS.)

19       BY MR. MCELHINNY:

20       Q.   SIR, DID THESE PRODUCTS COMPETE WITH APPLE'S SMARTPHONES

21       AND TABLETS?

22       A.   YES, THEY DID.

23       Q.   DO APPLE AND SAMSUNG EACH SELL THEIR SMARTPHONE AND TABLET

24       PRODUCTS THROUGH SIMILAR RETAIL CHANNELS?

25       A.   YES, WE DO.
```

1     Q.   HAVE YOU PREPARED A CHART THAT SHOWS THE SIMILARITY IN THE

2     RETAIL CHANNELS FOR THESE SALES?

3     A.   YES.

4     Q.   IF YOU OPEN YOUR BINDER TO PDX 13.

5     A.   OKAY.

6     Q.   WE CAN PUT IT ON YOUR SCREEN.

7          CAN YOU USE THIS TO EXPLAIN THE SIMILARITIES IN THE RETAIL

8     CHANNELS, PLEASE.

9     A.   YES.  WHAT YOU SEE ON THIS CHART IS APPLE'S SALES

10    CHANNELS, A SAMPLING OF THEM ON THE LEFT, THE CHANNELS HERE IN

11    THE U.S., AND ON THE RIGHT A SAMPLE OF SOME SAMSUNG SALES

12    CHANNELS AS WELL.  AND I THINK THIS IS A NICE DEMONSTRATION OF

13    THE VARIETY OF CHANNELS THAT WE BOTH EXIST IN.

14         YOU SEE FIRST ARE CARRIER CHANNELS, AT&T, VERIZON, SPRINT,

15    YOU SEE AN ON-LINE CHANNEL, AMAZON.COM, AS WELL AS RETAILERS,

16    TARGET, WAL-MART, BEST BUY AND RADIO SHACK.

17    Q.   THANK YOU.

18         SIR, DO YOU REMEMBER THE FIRST TIME THAT YOU SAW EITHER A

19    GALAXY, SAMSUNG GALAXY PHONE OR A PICTURE OF ONE?

20    A.   YES, I DO.

21    Q.   AND CAN YOU TELL US WHAT YOUR REACTION WAS THE FIRST TIME

22    YOU SAW ONE OF THOSE PHONES?

23    A.   YES.  IT WAS A NEWS STORY --

24         MR. PRICE:  OBJECTION UNDER 403, YOUR HONOR.

25         THE COURT:  OVERRULED.

1          GO AHEAD, PLEASE.  YOU MAY ANSWER.

2              THE WITNESS:  IT WAS A NEWS STORY THAT I READ THAT

3      HAD A PICTURE AND STORY ABOUT THE GALAXY S SMARTPHONE, AND I

4      REMEMBER BEING QUITE SHOCKED WHEN I SAW IT.  MY FIRST THOUGHT

5      WAS, WOW, THEY'VE COMPLETELY COPIED THE IPHONE, AND IT WAS

6      ASTONISHING AND SHOCKING TO ME.

7      BY MR. MCELHINNY:

8      Q.   WHY WAS IT SHOCKING TO YOU?

9      A.   WELL, WE ALL COMPETE AND MAKE OUR PRODUCTS AND MAKE THINGS

10     FOR CUSTOMERS.

11         BUT TO SEE SOMETHING THAT APPEARED TO MY EYE TO GO SO FAR

12     TO MAKE IT LOOK EXACTLY LIKE AN IPHONE AND SO MUCH SO THAT

13     PEOPLE MIGHT CONFUSE IT FROM A MARKETING STANDPOINT IS A

14     REALLY, REALLY BAD THING TO HAVE TO DEAL WITH AND CAUSES

15     TREMENDOUS PROBLEMS FOR ME.

16     Q.   WHY IS THAT KIND OF COPYING A PROBLEM FOR YOU IN

17     MARKETING?

18     A.   WELL, IN MARKETING, AS WE'VE SPOKEN ABOUT EARLIER, APPLE'S

19     ENTIRE MARKETING STRATEGY IS AROUND THE PRODUCT AS THE HERO.

20     WE SHOW THE PRODUCT, WE SHOW WHAT IT LOOKS LIKE, WE SHOW WHAT

21     IT DOES AND BUILD THE DEMAND FOR IT AROUND HOW IT LOOKS AND HOW

22     IT WORKS, AND WE DO THAT AROUND WHAT WE BELIEVE TO BE UNIQUE

23     LOOKS, UNIQUE FEATURES THAT WE'VE INVENTED AND THAT WILL DRIVE

24     OUR SALES AND DEMAND FOR OUR PRODUCT, AS WELL AS THE

25     ASSOCIATION WITH APPLE AS THE INNOVATOR AND INVENTOR OF THESE

1    THINGS.

2          AND WHEN SOMEONE ELSE CREATES SOMETHING THAT LOOKS A LOT

3    LIKE IT IN WAYS THAT ARE UNIQUE TO US AND CREATES SOMETHING

4    THAT WORKS LIKE OURS DOES AND THE THINGS THAT WE'VE INVENTED,

5    THEY NOW MAKE IT REALLY HARD FOR CUSTOMERS TO FIGURE OUT WHOSE

6    PRODUCT IS WHOSE.  WHEN YOU SEE A BILLBOARD OR MAGAZINE AD, IF

7    THEY LOOK THE SAME, WHOSE WAS IT?  YOU DON'T KNOW.

8          SO IT DILUTES THE MARKETING I DO.  IT WEAKENS MY ABILITY

9    TO CREATE DEMAND FOR CUSTOMERS.

10         AND IN THE END, IT ALSO WEAKENS THE VIEW THE WORLD HAS OF

11   APPLE AS THIS GREAT DESIGNER AND GREAT INNOVATOR IF PEOPLE

12   FIRST SAW AN AD OF A SAMSUNG PRODUCT THAT COPIED SOMETHING FROM

13   APPLE AND THEN THEY THOUGHT THEY DID IT AND THEY SEE APPLE

14   LATER, THEY DON'T ASSOCIATE US AS THE INNOVATOR AND CREATOR AND

15   DESIGNER OF THOSE THINGS AND IT MAKES US SEEM MUCH LESS OF A

16   COMPANY, MUCH LESS OF A PRODUCT IN CUSTOMERS' MINDS.  I THINK

17   IT UNDERMINES OUR ENTIRE MARKETING EFFORT.

18   Q.   BASED ON YOUR ACTUAL EXPERIENCE, HAS THE PATENT

19   INFRINGEMENT THAT SAMSUNG HAS BEEN FOUND LIABLE FOR, HAS THAT

20   ACTUALLY AFFECTED YOUR ABILITY TO MARKET APPLE PRODUCTS?

21   A.   YES, I BELIEVE SO.

22   Q.   AND --

23         MR. PRICE:  OBJECTION, VAGUE.  VAGUE AS TO MARKET

24   VERSUS SALES.

25         MR. MCELHINNY:  WELL, I DEFINED MARKETING AT THE VERY

1        BEGINNING OF THE --

2                THE COURT:  OVERRULED.

3            GO AHEAD, PLEASE.  YOU MAY ANSWER.

4        BY MR. MCELHINNY:

5        Q.   AND WHAT ARE THE EFFECTS THAT YOU HAVE OBSERVED, SIR?

6        A.   I SEEN THAT SINCE THIS HAS BEGUN, IT HAS BEEN MUCH HARDER

7        FOR US TO MARKET OUR PRODUCTS AND GAIN AN UNDERSTANDING WITH

8        CUSTOMERS THAT THESE PRODUCTS ARE UNIQUE AND SPECIAL AND

9        CREATED BY APPLE.

10           I FOUND IT MUCH HARDER TO CREATE DEMAND AND PEOPLE

11       QUESTION OUR INNOVATION AND DESIGN SKILLS IN WAYS THAT THEY

12       NEVER USED TO AFTER THIS ALL BEGAN.

13       Q.   SIR, IF WE FOCUS SPECIFICALLY ON 2010 AND 2011, IF THE

14       INFRINGING PRODUCTS IN THIS CASE HAD NOT BEEN ON THE MARKET, DO

15       YOU VIEW -- DO YOU BELIEVE THAT YOUR MARKETING OF APPLE

16       PRODUCTS WOULD HAVE BEEN EVEN MORE SUCCESSFUL?

17               MR. PRICE:  OBJECTION.  LACK OF FOUNDATION AS TO

18       SUCCESS.

19               THE COURT:  OVERRULED.

20           GO AHEAD, PLEASE.

21               THE WITNESS:  YES.  THIS IS AN INCREDIBLY IMPORTANT

22       TIME.  WE SPOKE EARLIER ABOUT HOW THE MARKET CHANGED AFTER THE

23       IPHONE INTO THE PREVIOUS FEATURE PHONE MARKET AND THE NEW

24       SMARTPHONE MARKET, AND WE ALL WERE TRYING TO GET CUSTOMERS INTO

25       SMARTPHONES, AND THEN WE KNOW THAT THEY LIKE TO STAY WITH THOSE

1        ECOSYSTEMS AND INFLUENCE THEIR FAMILY AND FRIENDS AS WELL.

2            AND DURING THIS TIME, I BELIEVE THAT AS THIS HAS BEEN

3        OCCURRING THAT IT'S BEEN HARDER FOR US TO GET NEW CUSTOMERS AND

4        BRING THEM INTO OUR ECOSYSTEM AND TO EXPERIENCE THE FIRST APPLE

5        PRODUCT THAN HAD THIS NOT OCCURRED.

6        Q.   HAVE THERE BEEN TIMES WHEN APPLE WAS NOT AVAILABLE ON

7        PARTICULAR CARRIERS?

8        A.   YES, OF COURSE.

9        Q.   HAVE YOU BEEN ABLE SUCCESSFULLY TO MARKET APPLE PRODUCTS

10       TO PEOPLE WHO WERE NOT ON ONE OF THE APPLE CARRIERS AND TO

11       ENCOURAGE THEM TO SWITCH CARRIERS?

12       A.   WE HAVE.

13       Q.   AND HOW DID YOU DO THAT?

14       A.   WE TRIED TO CREATE A UNIQUE PRODUCT THAT SOMEONE ELSE

15       DOESN'T HAVE, SO ONE REASON TO BUY A PRODUCT IS TO -- IS

16       CERTAINLY BECAUSE YOU WANT TO STAY ON YOUR CARRIER, BUT IF YOUR

17       CARRIER DOESN'T HAVE A PRODUCT AND THAT PRODUCT HAS FEATURES

18       AND CAPABILITIES OR DESIGNS THAT YOU REALLY WANT, THEN YOU'RE

19       MORE WILLING TO CONSIDER SWITCHING AND GOING TO ANOTHER

20       CARRIER.

21           SO THAT UNIQUENESS HELPS ACTUALLY WHEN YOU'RE IN A

22       SITUATION WHERE YOU'RE NOT ON EVERY CARRIER.

23               MR. MCELHINNY:  THANK YOU VERY MUCH.

24           TENDER THE WITNESS, YOUR HONOR.

25               THE COURT:  ALL RIGHT.  TIME IS NOW 9:53.

1              MR. PRICE:  MAY WE HAVE SOME TIME TO SET UP?

2              THE COURT:  OF COURSE.

3              THE WITNESS:  YOUR HONOR, COULD I GET A CUP OF WATER?

4              THE COURT:  OH, PLEASE.  GO AHEAD.

5          (PAUSE IN PROCEEDINGS.)

6              THE COURT:  ARE YOU READY NOW?

7              MR. PRICE:  I THINK WE'RE READY, I THINK IF

8      MR. SCHILLER HAS THE BINDERS.

9          DO YOU.

10             THE WITNESS:  YES.

11             MR. PRICE:  TERRIFIC.

12             THE COURT:  OKAY.  TIME IS NOW 9:55.

13         GO AHEAD, PLEASE.

14             MR. PRICE:  THANK YOU.

15                         **CROSS-EXAMINATION**

16     BY MR. PRICE:

17     Q.   GOOD MORNING, MR. SCHILLER.

18          I WANT TO ASK YOU ABOUT WHEN THE IPHONE FIRST CAME OUT.

19     YOU WERE TALKING ABOUT HOW PHENOMENALLY WELL RECEIVED IT WAS

20     AND HOW IT GOT GREAT PRESS; CORRECT?

21     A.   YES.

22     Q.   OKAY.  AND IT'S -- YOUR BELIEF IS THAT CERTAINLY THE

23     IPHONE WAS THE FIRST PHONE IN THE MARKET TO COMMERCIALLY BE

24     COMMERCIALLY SUCCESSFUL IN MANY OF THE FEATURES THAT IT

25     OFFERED; CORRECT?

1    A.    YES.

2    Q.    NOW, YOU SAID IN YOUR DIRECT THAT -- I THINK ONE OF THE

3    FIRST QUESTIONS WAS ABOUT, ABOUT APPLE DISCOVERING MULTIPLE

4    TOUCH.

5         DO YOU RECALL THAT?

6    A.    YES.

7    Q.    AND OF COURSE YOU UNDERSTAND THAT, THAT THE ONLY

8    INTELLECTUAL PROPERTY CONCERNING TOUCHING THAT'S IN THIS CASE

9    CONCERNS THE APPLE PATENT; CORRECT?

10   A.    I DON'T KNOW THAT EXACTLY.  I'M NOT A PATENT LAWYER.  SO

11   IF YOU SAY THAT'S THE CASE, I BELIEVE YOU.  I'M NOT AN EXPERT

12   ON THE PATENTS.

13   Q.    OKAY.  WHAT APPLE ACTUALLY DISCOVERED OR INVENTED IS

14   BOUNDED BY WHAT ITS PATENT SAYS, AND THIS IS PATENT '163 THAT

15   I'M TALKING ABOUT.  YOU UNDERSTAND THAT?

16   A.    I UNDERSTAND WE HAVE A PATENT IN THIS CASE ON MULTITOUCH,

17   YES.

18   Q.    OKAY.  AND THAT -- AND THAT WHAT'S IN THAT PATENT BOUNDS

19   WHAT APPLE INVENTED; RIGHT?

20   A.    AGAIN, I THINK WHEN YOU SAY "BOUNDS," YOU'RE TALKING IN

21   TERMS OF THE LEGAL DEFINITION OF THE CASE AND I'M NOT A LAWYER,

22   SO I'M NOT THE PROPER PERSON TO ANSWER THAT ONE WAY OR ANOTHER.

23   Q.    SURE.  OKAY.  WELL, IN TERMS OF DISCOVERING MULTITOUCH, I

24   WANT TO SHOW YOU, IF I CAN, A VIDEO WHICH THE JURY HAS ALREADY

25   SEEN.  THIS IS -- DO YOU KNOW WHO JEFFERSON HAN IS?

1    A.   I ACTUALLY HAD NEVER HEARD OF HIM BEFORE THIS CASE.

2    Q.   OKAY.  LET ME SHOW YOU, IT'S EXHIBIT 556, AND THIS WAS IN

3    2006 BEFORE THE '163 PATENT WAS FILED.

4         IF WE COULD SHOW THAT?

5            MR. MCELHINNY:  YOUR HONOR, COULD WE HAVE A LITTLE

6    LESS TESTIMONY FROM MR. PRICE, PLEASE?

7            THE COURT:  OVERRULED.

8         GO AHEAD, PLEASE.  SHOW THE VIDEO.

9         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10   BY MR. PRICE:

11   Q.   NOW, IN THE VIDEO THEY MENTIONED A GENTLEMAN NAMED

12   BILL BUXTON, AND DO YOU KNOW WHO MR. BUXTON IS?

13   A.   NO, I DO NOT.

14   Q.   OKAY.  I MEAN, YOU ARE INVOLVED IN APPLE'S MARKETING;

15   CORRECT?

16   A.   YES.

17   Q.   YOU SAID YOU'RE NOT ONE OF THEIR TECHNICAL GUYS WHO COULD

18   EXPLAIN TO US, YOU KNOW, THE BOUNDARIES OF WHAT APPLE ACTUALLY

19   INVENTED AND WHAT IT DID NOT INVENT; CORRECT?

20   A.   CORRECT.

21   Q.   SO WHEN YOU SAID THAT APPLE DISCOVERED MULTITOUCH, YOU

22   WERE USING MULTITOUCH IN A, IN A NON-TECHNICAL SENSE; CORRECT?

23   A.   WELL, FIRST, AGAIN, I WAS USING IT WHEN WE WERE TALKING

24   ABOUT THE ORIGINAL WORK ON THE IPAD, WHICH WAS BEFORE THIS

25   VIDEO, YEARS BEFORE.

SCHILLER CROSS

1          AND I TALKED ABOUT DISCOVERING WHAT IT WAS LIKE TO PUT IT

2     ON A MOBILE DEVICE AND USE IT ON THE IPAD TO DO THE THINGS WE

3     WERE DOING.

4          SO I WAS ACTUALLY TALKING WITHIN THE BOUNDS OF WHAT WE

5     WERE DOING WITH MULTITOUCH.  THAT'S HOW I USED THE WORD.

6     Q.   AND I GAVE YOU THE WRONG NUMBER BEFORE, AND I APOLOGIZE.

7      IT'S THE PATENT '915.

8          THAT PATENT WAS NOT EVEN FILED UNTIL AFTER THE DATE OF

9     THIS VIDEO; CORRECT?

10    A.   I DON'T KNOW THE DATE OF THE FILING.  I COULD LOOK IT UP.

11     PERHAPS.

12    Q.   AND ARE YOU AWARE OF THE TESTIMONY OF APPLE'S EXPERT,

13     DR. SINGH?

14    A.   NO.

15    Q.   YOU ARE?

16    A.   NO, I'M NOT.

17    Q.   OKAY.  THEN I WON'T ASK YOU ABOUT IT.

18         LET ME ASK YOU, THOUGH, AT THE TIME OF APPLE'S -- LET ME

19    REPHRASE IT THIS WAY.  THERE CAME A TIME WHEN THE MARKETING ARM

20    OF APPLE WANTED TO START DOING SOME ADVERTISING OR MARKETING

21    ABOUT HOW APPLE WAS THE FIRST AT CERTAIN THINGS.

22         DO YOU RECALL THAT?

23    A.   NO, I DON'T RECALL THAT.

24    Q.   OKAY.  LET ME SHOW YOU EXHIBIT 578.  AND DO YOU RECOGNIZE

25     THIS, SIR --

1            MR. MCELHINNY:  YOUR HONOR, I DON'T THINK THIS HAS

2      BEEN ADMITTED.

3            MR. PRICE:  YEAH, DON'T SHOW IT.  DON'T PUT IT UP

4      UNTIL I TELL YOU TO, RYAN.  THANK YOU.

5      Q.   AND YOU RECOGNIZE IT AT THE TOP, YOU SEE THESE ARE THE

6      E-MAIL EXCHANGES THAT INCLUDES MR. SINCLAIR, KELLEY ALTICK AND

7      ERIC JUE; CORRECT?

8      A.   YES.

9      Q.   AND COULD YOU TELL US WHO MR. SINCLAIR IS?

10     A.   HE WAS A PRODUCT MANAGER ON MY PRODUCT MARKETING TEAM.

11     Q.   AND ERIC JUE, WHO IS THAT?

12     A.   ALSO A PRODUCT MANAGER ON MY MANAGING TEAM.

13     Q.   AND KELLEY ALTICK?

14     A.   I DO NOT KNOW KELLEY ALTICK.

15     Q.   AND IF YOU LOOK AT THIS, THIS APPEARS TO BE AN E-MAIL THAT

16     WAS SENT WITHIN APPLE?

17     A.   IT'S A FEW E-MAILS INSIDE APPLE, YES.

18           MR. PRICE:  OKAY.  YOUR HONOR, MOVE EXHIBIT 578 INTO

19     EVIDENCE.

20           THE COURT:  ANY OBJECTION?

21           MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

22           THE COURT:  IT'S ADMITTED.

23        (DEFENDANT'S EXHIBIT 578 WAS ADMITTED IN EVIDENCE.)

24     BY MR. PRICE:

25     Q.   AND IF WE CAN TURN TO -- YOU KNOW E-MAILS HAVE STRINGS, SO

1      AT THE BOTTOM IS REALLY THE FIRST E-MAIL; RIGHT?

2      A.   YES.

3      Q.   AND IF WE TURN TO LOOK AT THE FIRST E-MAIL, WE HAVE TO

4      ACTUALLY GO TO THE THIRD PAGE WHERE IT STARTS, 578.003.

5           AND AT THE BOTTOM HERE, YOU SEE THERE'S AN E-MAIL THAT

6      STARTS -- I'LL START AT THE FROM REBECCA VAN DYCK, AND THE

7      E-MAIL HERE SAYS, "AS WE'RE STARTING TO THINK ABOUT THE NEXT

8      ROUND OF WORK ON IPHONE, WE'RE TRYING TO GET SMART OF SOME OF

9      IPHONE'S HISTORICAL MILESTONES.  SO STARTING WITH THE VERY

10     FIRST IPHONE, WE'RE LOOKING FOR A LIST OF INNOVATIONS AND

11     TECHNOLOGIES," NEXT PAGE, "THAT IPHONE WAS THE FIRST TO

12     INCORPORATE.  SOME EXAMPLES:  THE FIRST PHONE TO INCORPORATE A

13     FULL TOUCHSCREEN FACE.  THE FIRST PHONE TO HAVE MULTITOUCH

14     INTERFACE GESTURES.  THE FIRST PHONE TO HAVE ROBUST APPS AND

15     APP STORE.  THE FIRST PHONE TO INCORPORATE A PROXIMITY SENSOR."

16          SO WERE YOU AWARE OF THIS SEARCH TO TRY TO FIND FIRSTS?

17     A.   NO.

18     Q.   DOES MR. SINCLAIR REPORT DIRECTLY TO YOU?

19     A.   NO.

20     Q.   HOW MANY LEVELS DOWN IS HE?

21     A.   TWO LEVELS, I BELIEVE.

22     Q.   OKAY.  SO THIS EFFORT DIDN'T ACTUALLY MAKE ITS WAY TO YOU?

23     A.   CORRECT.

24     Q.   IF WE LOOK AT PAGE 578.002, AND LET'S LOOK AT THIS "HEY

25     MICHAEL" FROM STEVEN SINCLAIR ON APRIL 6TH, 2010.

```
 1          IF YOU WOULD GET THE DATE IN THERE, TOO, THAT WOULD BE

 2     GREAT.

 3          YOU SEE WHERE MR. SINCLAIR WROTE, "IT'S TOUGH TO APPROACH

 4     THIS WITH THE CRITERIA BEING 'FIRST.'  I DON'T KNOW HOW MANY

 5     THINGS WE CAN COME UP WITH THAT YOU COULD LEGITIMATELY CLAIM WE

 6     DID FIRST.  CERTAINLY WE HAVE THE FIRST COMMERCIALLY SUCCESSFUL

 7     VERSIONS OF MANY FEATURES, BUT THAT'S DIFFERENT THAN LAUNCHING

 8     SOMETHING TO MARKET FIRST.  CAN WE NUANCE THIS SO IT ISN'T

 9     ABOUT SHIPPING A FEATURE FIRST."

10          AND AN EXAMPLE, "THE FIRST PHONE TO INCORPORATE A FULL

11     TOUCH SCREEN FACE," AND "NOT TRUE" AND YOU'LL SEE WHERE IT SAYS

12     WIKIPEDIA AND AN LG PRADA, AND THEN IT GOES ON TO TALK ABOUT

13     APPS.

14          SO I TAKE IT THAT IF THE PEOPLE TWO LEVELS UNDER YOU

15     CONCLUDED SOMETHING WASN'T WORTH PURSUING, IT WOULDN'T REACH

16     YOU?

17     A.   THAT MIGHT BE THE CASE.

18     Q.   AND THIS REFERS TO THE LG PRADA.  I'M GOING TO SHOW YOU

19     WHAT'S A JOINT EXHIBIT, 1093.

20          AND YOUR HONOR, MAY I APPROACH THE WITNESS TO SHOW HIM

21     THIS?

22              THE COURT:  YES.  HAS THAT PREVIOUSLY BEEN ADMITTED

23     IN THIS CASE?

24              MR. PRICE:  I DON'T THINK SO.

25              MR. MCELHINNY:  WE MOVE ITS ADMISSION, YOUR HONOR.
```

```
 1                THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

 2                MR. PRICE:  THEN IT'S A JOINT REQUEST.

 3            (JOINT EXHIBIT 1092 WAS ADMITTED IN EVIDENCE.)

 4      BY MR. PRICE:

 5      Q.   I'LL SHOW YOU 1093, WHICH IS NOW ADMITTED (HANDING).

 6            AND LET ME ASK YOU, DO YOU KNOW WHETHER THAT'S THE PHONE

 7      THAT WAS BEING REFERRED TO AS A PHONE WITH A TOUCHSCREEN FACE,

 8      THE LG PRADA?

 9      A.   I DO NOT KNOW FOR CERTAIN.

10      Q.   WELL, IN YOUR TESTIMONY ON DIRECT, YOU WERE TALKING ABOUT

11      PHONES -- CAN WE SWITCH THIS TO THE ELMO -- YOU WERE TALKING

12      ABOUT COMPARING THE IPHONE TO PHONES BEFORE THE IPHONE.

13            DO YOU RECALL THAT?

14      A.   YES.

15      Q.   AND WHEN YOU WERE MAKING THAT COMPARISON ABOUT, YOU KNOW,

16      HOW THE IPHONE WAS NEW IN MANY WAYS, WERE -- DID YOU HAVE IN

17      MIND, THEN -- NO SIGNAL.

18            AH.  DID YOU HAVE IN MIND THE LG PRADA, WHICH IS EXHIBIT

19      1093?

20      A.   OF COURSE NOT, NO.

21      Q.   YOU ALSO TALKED IN YOUR DIRECT ABOUT THE IPHONE BEING

22      BEAUTIFUL.

23      A.   YES.

24      Q.   AND IT'S A NICE LOOKING PRODUCT; RIGHT?

25      A.   I BELIEVE SO.
```

1    Q.   APPLE DOESN'T OWN OR HAVE A PATENT ON A PRODUCT BEING

2    BEAUTIFUL OR SEXY; CORRECT?

3    A.   CORRECT.

4    Q.   AND APPLE DOESN'T OWN A PATENT ON THERE BEING A

5    TOUCHSCREEN; RIGHT?

6    A.   I DON'T BELIEVE SO.

7    Q.   SO LET ME TALK ABOUT -- YOU WERE TALKING A LITTLE BIT

8    ABOUT, ABOUT COMPETITION AND --

9    A.   UM --

10   Q.   AND COMPETITORS.

11   A.   I'M SORRY.  ARE WE STILL TALKING ABOUT THE LG PHONE?

12   Q.   NO.  I'M GOING TO SWITCH.

13   A.   I COULD TELL YOU WHY -- YOU ASKED IF I DIDN'T THINK ABOUT

14   IT.  I COULD TELL YOU MORE.

15   Q.   I'D LOVE TO ON APPLE'S TIME.  I'M ON THE CLOCK.

16        SO I WANT TO TALK A LITTLE BIT ABOUT COMPETITION, AND IT'S

17   TRUE THAT YOU KNEW THAT EVENTUALLY THERE WOULD BE OTHER

18   COMPETITORS IN THE MARKET THAT HAD A SMARTPHONE WHERE YOU COULD

19   WATCH VIDEO AND DO E-MAIL AND MAKE CALLS AND THOSE THINGS THAT

20   MR. JOBS SHOWED IN THAT KICK OFF MEETING WHERE YOU SAID IT

21   WOULD BE, IT'S GOING TO BE A PHONE AND IT'S GOING TO DO MUSIC

22   AND ALL THAT.  YOU KNEW THERE WOULD BE THAT KIND OF

23   COMPETITION?

24   A.   WELL, THERE'S ALWAYS COMPETITION.  I DON'T RECALL

25   SPECIFICALLY THINKING ABOUT THAT AT THE TIME.

1    Q.   WELL, YOU KNEW YOU WOULDN'T BE THE ONLY, ONLY PRODUCT IN

2    THE MARKET THAT DID ALL OF THOSE THINGS, MULTIMEDIA, PHONES,

3    ALL THAT?  YOU KNEW THAT SOMEBODY WAS GOING TO COME OUT AND

4    COMPETE WITH YOU?

5    A.   AGAIN, THERE WAS COMPETITION ALL ALONG IN ALL THOSE AREAS,

6    YES.

7    Q.   OKAY.  AND YOUR OBSERVATION IS THAT THE INDUSTRY DOES TEND

8    TO FOLLOW TRENDS OF PRODUCTS THAT ARE DOING WELL; CORRECT?

9    A.   IT DEPENDS.  SOMETIMES THEY DO.  SOMETIMES THEY DON'T.

10   Q.   OKAY.  FOR EXAMPLE, IF YOU'D LOOK AT EXHIBIT 2628, THAT'S

11   GOING TO BE IN THAT SECOND BINDER.

12   A.   I SEE THAT.

13   Q.   GREAT.  AND IF YOU LOOK AT THIS, YOU SEE IT'S AN APPLE

14   DOCUMENT THAT LOOKS LIKE A CES AND MACWORLD TRADE SHOW REPORT.

15        DO YOU SEE THAT?

16   A.   I SEE THAT.

17   Q.   OKAY.  AND THERE WERE TRADE SHOWS THAT APPLE WOULD GO TO

18   AND THEN THEY WOULD DO INTERNAL REPORTS CONCERNING THEIR

19   THOUGHTS OF WHAT THEY SAW AT THE TRADE SHOW?

20   A.   NOT OFTEN, NO.  I DON'T KNOW WHAT -- I HAVEN'T SEEN THIS

21   BEFORE AND I'M NOT USED TO SEEING DOCUMENTS LIKE THIS, NO.

22   Q.   WELL, IT'S FROM PRODUCT MARKETING.  DO YOU SEE THAT?

23   A.   IT'S FROM THE EUROPEAN PRODUCT MARKETING TEAM, YES.  IT'S

24   NOT A U.S. DOCUMENT.

25   Q.   DO YOU RECOGNIZE THIS AS BEING AN APPLE DOCUMENT?

1    A.   I DO NOT.  I HAVEN'T SEEN THIS BEFORE.  IT COULD BE.  I

2    DON'T KNOW.

3    Q.   WELL, IF YOU LOOK AT THE FORMAT AND YOU LOOK AT THE

4    CONFIDENTIAL AND YOU LOOK AT THE BATES HERE WHERE IT SAYS APL,

5    WHICH I'LL REPRESENT TO YOU MEANS IT WAS PRODUCED BY APPLE, IF

6    YOU LOOK AT THE FRONT WHERE IT SAYS "CONTAINS APPLE

7    CONFIDENTIAL BUSINESS INFORMATION," DOES THAT LEAD YOU TO BE

8    ABLE TO TELL US THAT IT'S YOUR BELIEF THAT THIS IS, IN FACT, AN

9    APPLE DOCUMENT?

10          MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THERE'S NO

11   FOUNDATION FOR THIS ANSWER.  HE'S TRYING TO ENCOURAGE HIM BY

12   GIVING HIM WRONG INFORMATION ABOUT THE LETTERING.  THE WITNESS

13   HAS NEVER SEEN THIS DOCUMENT BEFORE.

14          MR. PRICE:  FOR AUTHENTICATION, I JUST NEED --

15          THE COURT:  THE AUTHENTICATION HAS ALREADY BEEN

16   STIPULATED TO BY THE PARTIES, BUT IF THERE'S NO 602 FOUNDATION

17   OF PERSONAL KNOWLEDGE, THEN YOU NEED TO MOVE ON.

18          MR. PRICE:  WELL, YOUR HONOR, IF THERE'S FOUNDATION,

19   I DO MOVE 2628 INTO EVIDENCE.

20          THE COURT:  THAT'S -- ANY OBJECTION TO THAT?

21          MR. MCELHINNY:  I OBJECT TO IT, YOUR HONOR.  THERE'S

22   NO FOUNDATION.  NO WITNESS HAS IDENTIFIED THIS DOCUMENT.

23          MR. PRICE:  YOUR HONOR, IT JUST HAS TO HAVE AN

24   INDICIA OF RELIABILITY FOR AUTHENTICATION.

25          OH, AND IT WAS ADMITTED AT THE LAST TRIAL.  THANKS.

```
 1              THE COURT:  IT'S ADMITTED.

 2        (DEFENDANT'S EXHIBIT 2628 WAS ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD.

 4    BY MR. PRICE:

 5    Q.   NOW, YOU SAY THIS WAS THE EUROPEAN MARKETING --

 6              THE COURT:  YOU KNOW, THERE'S NO FOUNDATION AS TO

 7    THIS WITNESS, THOUGH.  WHY DON'T YOU MOVE ON?  IT'S ADMITTED AS

 8    AN EXHIBIT.  YOU CAN ARGUE IT IN CLOSING.

 9         BUT THIS WITNESS SAYS HE DOESN'T KNOW ABOUT IT.

10         ALL OF MY OBJECTIONS EVERY NIGHT HAVE BEEN IF THERE'S NO

11    602 PERSONAL KNOWLEDGE, YOU NEED TO MOVE ON.

12              MR. PRICE:  YOUR HONOR, I'M GOING TO CORRECT MYSELF

13    BECAUSE I DON'T WANT TO DECEIVE THE COURT.  I HAVE BEEN TOLD

14    THIS WAS NOT ADMITTED AT THE LAST TRIAL.

15              MR. MCELHINNY:  I JUST FOUND THAT OUT AS WELL.

16    MR. PRICE REPRESENTED THAT IT WAS.

17              THE COURT:  IT'S OKAY.  WHY DON'T YOU GO ON, PLEASE?

18    ASK ANOTHER QUESTION.

19              MR. PRICE:  SURE.

20    Q.   SO MY UNDERSTANDING IS YOU ARE WORLDWIDE HEAD OF

21    MARKETING.

22    A.   I AM.

23    Q.   AND SO THIS IS WITHIN YOUR PURVIEW, THAT IS, THE EMEA

24    PRODUCT MARKET?

25    A.   THEY DID NOT REPORT TO ME AT THAT TIME.
```

1    Q.   SO LET ME TALK THEN ABOUT -- WHEN WE'RE TALKING ABOUT THE

2    INDUSTRY ITSELF AND COMPETITION, YOU REMEMBER THE FIRST TIME

3    YOU SAW THE GALAXY TAB?

4    A.   YES, I RECALL THAT.

5    Q.   OKAY.  AND I THINK YOU TOLD US THAT WHEN YOU FIRST SAW THE

6    GALAXY TAB, YOU WERE MORE SHOCKED THAN WHEN YOU FIRST SAW THE

7    IPHONE, I MEAN THE SAMSUNG PHONE?

8    A.   I BELIEVE I SAID THAT IN THE LAST CASE, YES.

9    Q.   OKAY.  AND SO CAN YOU TELL US WHAT THE CIRCUMSTANCES ARE

10   WHERE YOU SAW THE GALAXY TAB AND WERE MORE SHOCKED THAN YOU

11   WERE WHEN YOU SAW THE IPHONE?

12   A.   I BELIEVE THAT WAS ALSO IN A NEWS STORY ABOUT THE

13   ANNOUNCEMENT OF IT WHEN I FIRST SAW IT.

14   Q.   SO YOU HADN'T ACTUALLY HELD IT OR PLAYED WITH IT OR LOOKED

15   AT ITS FEATURES; CORRECT?

16   A.   I HAD NOT HELD IT OR PLAYED WITH IT.

17   Q.   SO WAS THERE A PICTURE OF IT?

18   A.   YES.

19   Q.   OKAY.  AND WAS IT, LIKE -- COULD YOU DESCRIBE THE PICTURE?

20   A.   THERE WAS A PHOTO FROM THE FRONT OF THE GALAXY TAB, AND I

21   BELIEVE IT WAS ACCOMPANIED WITH A STORY AND THE STORY TALKED

22   ABOUT HOW MUCH IT LOOKED LIKE THE IPAD AS WELL.  SO I HAD BOTH

23   TEXT AND A PHOTO TO GO BY ON MY SHOCK.

24        AND MY SHOCK WAS, AS I STATED AT THE TIME, WAS NOT SO

25   MUCH -- NOT ONLY THAT IT LOOKED LIKE IPAD, BUT AT THE -- THAT

1        THIS WAS ANOTHER EXAMPLE OF SAMSUNG COPYING APPLE PRODUCTS.

2             AND SO WHAT THE GREATER SHOCK WAS, AS I BELIEVE I SAID

3        LAST TIME, WAS THAT, OH, MY GOODNESS, THEY'RE COPYING --

4        THEY'RE GOING TO COPY OUR WHOLE PRODUCT LINE.  THAT WAS WHAT

5        THE ADDITIONAL SHOCK I HAD SAID WAS.

6        Q.   AND DID YOU -- DID THE ARTICLE SAY ANYTHING ABOUT THE

7        FEATURES THAT ARE AT ISSUE IN THIS CASE?

8        A.   I DON'T RECALL AT THIS TIME.

9        Q.   OKAY.  WHAT YOU MAINLY RECALL IS YOU WERE SHOCKED WHEN YOU

10       SAW THE LOOK AND DESIGN?

11       A.   BOTH THE LOOK AND THE DESIGN, AS WELL AS COMMENTARY IN THE

12       ARTICLE ABOUT IT BEING LIKE AN IPAD.

13       Q.   AND THE ARTICLE, THE PICTURE, IT DIDN'T SHOW THE, THE

14       TABLET ON; RIGHT?

15       A.   IT MAY HAVE.  I DON'T RECALL.

16       Q.   I MEAN, DO YOU RECALL -- I'M GOING TO SHOW YOU EXHIBIT,

17       JOINT EXHIBIT 1036, AND I UNDERSTAND THIS ALREADY IS IN

18       EVIDENCE.

19            SO THIS IS WHAT YOU SAW, AND I'M SHOWING YOU EXHIBIT 1036

20       (INDICATING).  CAN YOU SEE IT FROM THERE?

21       A.   I CAN SEE WHAT YOU'RE HOLDING.

22       Q.   AND THIS IS WHAT YOU SAW THAT, THAT -- WHERE THE

23       APPEARANCE SHOCKED YOU?

24       A.   AGAIN, I DON'T RECALL THE PHOTO IN THE ARTICLE AT THIS

25       TIME.  I REMEMBER MY REACTION OF HAVING SEEN IT.

```
 1     Q.   LET'S SEE IF THIS HELPS.  YOU CAN SEE IT NOW.  WOULD THAT

 2     APPEARANCE HAVE SHOCKED YOU?

 3     A.   AGAIN, I'M NOT PUTTING MYSELF BACK IN TIME IN 2010.  I'M

 4     TELLING YOU WHAT I FELT AND WHAT I THOUGHT WHEN I SAW IT.

 5     Q.   DID YOU --

 6          I'M SORRY, YOUR HONOR.  MAY I APPROACH THE WITNESS?

 7          THE COURT:  PLEASE, GO AHEAD.

 8     BY MR. PRICE:

 9     Q.   OKAY.  I'M GOING TO GET CLOSER TO YOU.  I THINK THIS MIGHT

10     HELP BECAUSE PROBABLY YOU CAN SEE IT BETTER.

11          SO I'M JUST WONDERING THAT WHEN YOU SAW THAT, YOU TALKED

12     ABOUT THE SHOCK.  DID -- DID THAT -- DID LOOKING AT THAT, THAT

13     APPEARANCE, MAKE YOU THINK "I'M GOING TO HAVE A HARDER TIME

14     MARKETING AND I'M SHOCKED THAT THEY'RE COPYING US"?

15          MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THAT'S A

16     COMPOUND QUESTION.  WE'VE ASKED SEVERAL TIMES THAT WE GET ONE

17     QUESTION AT A TIME.

18          THE COURT:  OVERRULED.

19          GO AHEAD, PLEASE.  YOU MAY ANSWER.

20          THE WITNESS:  OKAY.  WHAT I RECALL AT THE TIME WAS

21     SEEING A PHOTO OF IT AND READING A STORY ABOUT IT AND FEELING

22     THAT THEY'RE -- THAT SAMSUNG IS NOW ON A STRATEGY OF COPYING

23     OUR ENTIRE PRODUCT LINE.

24          THAT'S WHAT I RECALL.  THAT'S -- THAT WAS MY THOUGHT.

25     BY MR. PRICE:
```

1    Q.   OKAY.  BUT THE ONLY THING YOU RECALL NOW ABOUT THE ARTICLE

2    THAT YOU CAN RECALL WITH ANY DETAIL IS THE LOOK OF THE PRODUCT?

3    A.   I DON'T RECALL WHETHER THE ARTICLE HAD A FULL HANDS ON

4    DEMONSTRATION OF IT OR NOT.  I DON'T RECALL.

5    Q.   WELL, IN ANY EVENT, YOU KNOW THAT, THAT THIS PRODUCT, THAT

6    SAMSUNG HAS THE RIGHT TO MAKE A PRODUCT, HARDWARE THAT LOOKS

7    LIKE THIS, THAT APPLE DID NOT INVENT THE LOOK OF EXHIBIT 1036,

8    THE TABLET.  YOU UNDERSTAND THAT?

9    A.   I DON'T KNOW WHAT RIGHT SAMSUNG HAS.  THAT'S NOT MY PLACE

10   TO SAY.

11   Q.   OKAY.  BUT YOU KNOW APPLE DOESN'T OWN THE RIGHT TO

12   PRECLUDE THE USE OF THIS DESIGN OF THE HARDWARE?  YOU KNOW

13   THAT?

14   A.   AGAIN, I THINK THAT THAT'S A LEGAL DETERMINATION.  YOU

15   SHOULD ASK THE LAWYER.  I'M NOT A LAWYER.

16   Q.   YOU KNOW THAT'S WHAT THE JURY FOUND?

17             MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THAT

18   MISSTATES THE JURY'S -- THE JURY VERDICT COVERED A PATENT THAT

19   COVERED BOTH THE FRONT AND THE BACK.  IT WAS MUCH LARGER THAN

20   THIS --

21             THE COURT:  WAIT.  PLEASE DON'T -- PLEASE DON'T

22   ARGUE.

23             MR. PRICE:  LET ME ASK IT --

24             THE COURT:  I'M GOING TO ALLOW 2628 IN EVIDENCE.

25   I'VE LOOKED THROUGH THE OBJECTIONS.  THERE'S NO OBJECTION AS TO

1    THAT SPECIFIC DOCUMENT.  IF YOU'RE ONLY OBJECTION IS

2    FOUNDATION, I AGREE AS TO PERSONAL KNOWLEDGE, 602, THIS WITNESS

3    CAN'T TESTIFY TO IT.

4         BUT IT IS AN APPLE DOCUMENT AND THE PARTIES HAVE

5    STIPULATED TO THE AUTHENTICITY OF YOUR THEIR DOCUMENTS.

6         SO 2628 IS IN, MR. PRICE.

7         MR. PRICE, DX 2628 IS ADMITTED.

8         (DEFENDANT'S EXHIBIT 2628 WAS ADMITTED IN EVIDENCE.)

9              MR. PRICE:  THANK YOU, YOUR HONOR.

10        AND LET ME APOLOGIZE.  I MISSTATED AND I'M BEING

11   REMINDED --

12             THE COURT:  NOT A PROBLEM.

13             MR. PRICE:  -- BY MY COUNSEL -- I MEAN WHETHER THIS

14   WAS FOUND TO INFRINGE.  I DO APOLOGIZE ON THAT.

15   Q.   LET ME ASK YOU THIS:  WHEN THIS CAME OUT, THE 1036, LATER

16   SAMSUNG CAME OUT WITH A LARGER ONE; RIGHT?

17   A.   I BELIEVE SO.

18   Q.   AND THAT'S EXHIBIT 1037, AND LET ME ASK YOU IF YOU

19   RECOGNIZE THIS AS SAMSUNG'S LARGER TABLET.  IF YOU DO, THAT'S

20   FINE.

21   A.   I CAN'T TELL FROM HERE.  IT LOOKS LIKE AN IPAD TO ME FROM

22   HERE.

23   Q.   I'M GOING TO COME FORWARD (HANDING).

24   A.   YES, I SEE IT.

25   Q.   OKAY.  AND I'M GOING TO FOLLOW UP ON THAT COMMENT BECAUSE

1    I WAS INCORRECTLY USING THE WRONG PAD HERE.

2         THAT IS -- THERE WERE JURY FINDINGS ON THIS (INDICATING).

3         SO I WANTED TO ASK YOU ABOUT THIS, WHICH IS EXHIBIT 1037.

4         (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

5    BY MR. PRICE:

6    Q.   BECAUSE THIS, WHICH YOU SAID TO YOU LOOKS LIKE AN IPAD

7    (INDICATING) --

8    A.   FROM THAT DISTANCE, YES.

9    Q.   ACTUALLY, I BROUGHT IT UP TO YOU.  DID YOU CHANGE YOUR

10   MIND WHEN I SHOWED IT TO YOU (HANDING)?

11   A.   SOME ANGLES DO.  SOME DON'T.  I THINK THERE ARE ELEMENTS

12   OF EACH.

13   Q.   OKAY.  SO WITH RESPECT TO THE DESIGN OF EXHIBIT 1037, WITH

14   RESPECT TO THIS -- AND THIS ONE I'M PRETTY SURE I'M RIGHT ON

15   BECAUSE I HAD TWO PEOPLE WHISPER IN MY EAR -- WITH RESPECT TO

16   THIS, THE JURY FOUND THERE WAS NO DESIGN INFRINGEMENT

17   (INDICATING); CORRECT?

18   A.   I DON'T KNOW.  I DON'T -- I'M NOT AN EXPERT ON WHICH

19   OBJECTS WERE FOUND WITH WHICH INFRINGEMENT, SO --

20   Q.   OKAY.  YOU SAID THAT YOU WERE FINDING IT -- YOU FOUND IT

21   MORE DIFFICULT TO MARKET?

22   A.   YES.

23   Q.   BECAUSE, BECAUSE THINGS LIKE EXHIBIT 1037 WERE IN THE

24   MARKET; RIGHT?

25   A.   I SAID IT WAS DIFFICULT TO MARKET AS SAMSUNG WAS BRINGING

 1    OUT ALL OF THESE PRODUCTS THAT WERE COPYING APPLE'S PRODUCTS.

 2    Q.   OKAY.  BUT THIS TABLET, 1037, THIS TABLET, SAMSUNG IS

 3    ENTITLED TO COMPETE WITH YOU IN THE MARKET WITH THIS TABLET?

 4            MR. MCELHINNY:  YOUR HONOR, MISSTATES THE EVIDENCE.

 5    THAT'S ONE OF THE ACCUSED DEVICES IN THIS CASE.

 6            MR. PRICE:  1037?  NO, IT'S NOT.

 7            MR. MCELHINNY:  IT'S THE TABLET.

 8            MR. PRICE:  NO.  THIS IS THE TEN INCH.

 9            MR. MCELHINNY:  OH, YOU SWITCHED.  I'M SORRY.

10            THE COURT:  I DON'T HAVE -- JX 1037, HAS THAT BEEN

11    ADMITTED IN THIS CASE?

12            MR. PRICE:  YOUR HONOR, I DON'T KNOW IF IT HAS.  I'D

13    MOVE IT INTO EVIDENCE GIVEN THE WITNESS'S IDENTIFICATION.

14            THE COURT:  OKAY.  AND WHICH -- WHICH ONE IS THAT?

15            MR. PRICE:  THIS IS THE 10 INCH TABLET.

16            THE COURT:  AND WHAT'S THE NAME?

17            MR. PRICE:  JOINT TRIAL EXHIBIT NUMBER 1037.

18            THE COURT:  BUT WHAT IS IT?

19            MR. PRICE:  IT IS GALAXY TAB 10.1 (WI-FI) JX 1037.

20            THE COURT:  ALL RIGHT.  IS THERE ANY OBJECTION?

21            MR. MCELHINNY:  YOUR HONOR, THIS IS A TABLET THAT WAS

22    FOUND TO INFRINGE IN THE LAST CASE.  IT'S NOT RELEVANT TO THIS

23    CASE.  IT INFRINGED ALL THREE UTILITY PATENTS.

24            MR. PRICE:  AND I'M ASKING ABOUT THE DESIGN, YOUR

25    HONOR.

1              MR. MCELHINNY:  WELL, THAT'S WHAT'S MISLEADING.  HE

2      SAID THEY HAD THE RIGHT TO SELL THIS PRODUCT IN THE

3      UNITED STATES.

4              THE COURT:  OKAY.  I'M SORRY.  I'M SORRY.

5              MR. PRICE:  LET ME REPHRASE.

6              THE COURT:  WAIT.  WAIT ONE SECOND, PLEASE.

7              MR. PRICE:  LET ME REPHRASE.  I'M TRYING TO FOCUS

8      JUST ON THE DESIGN.

9              THE COURT:  OKAY.  I JUST WANT TO CLEAR UP THE

10     EXHIBITS.

11             MR. PRICE:  SURE.

12             THE COURT:  1037, ARE YOU OBJECTING TO ITS ADMISSION,

13     MR. MCELHINNY?

14             MR. MCELHINNY:  I AM NOT OBJECTING TO ITS ADMISSION,

15     YOUR HONOR.

16             THE COURT:  OKAY.  SO IT IS ADMITTED.

17         (JOINT EXHIBIT 1037 WAS ADMITTED IN EVIDENCE.)

18             THE COURT:  LET ME -- AND FOR THIS, I WON'T CHARGE

19     ANYONE'S TIME.  IT'S 10:20.  I JUST WANT TO CLEAR IT UP.

20         I DON'T HAVE THE LG PRADA AS BEING ADMITTED, AND I ALWAYS

21     RECORD WHAT WITNESS IDENTIFIED IT ON WHAT DATE AND WHAT WITNESS

22     ADMITTED IT, SO I MAY HAVE MISSED THAT.

23         CAN YOU TELL ME -- THIS IS NOT BEING CHARGED TO ANYONE'S

24     TIME -- WHICH WITNESS HAD THE LG PRADA, BECAUSE I DON'T HAVE

25     ANY RECORDING --

```
 1              MR. MCELHINNY:  ARE YOU TALKING ABOUT THIS TRIAL OR

 2    THE LAST TRIAL?

 3              THE COURT:  I'M TALKING ABOUT THIS TRIAL.  BOTH OF

 4    YOU HAVE SAID THAT JX 1093, THE LG PRADA, HAS ALREADY BEEN

 5    ADMITTED.

 6              MR. MCELHINNY:  IT WAS ADMITTED FIVE MINUTES AGO WITH

 7    THIS WITNESS.

 8              MR. PRICE:  YEAH.

 9              MR. MCELHINNY:  MR. PRICE SHOWED IT TO THIS WITNESS.

10    I MOVED ITS ADMISSION.

11              THE COURT:  OH, THAT'S THE ONE.  OKAY.  I THOUGHT YOU

12    SAID IT HAD ALREADY BEEN ADMITTED.

13         OKAY.  SO IT'S ADMITTED TODAY WITH MR. SCHILLER.  OKAY.  I

14    JUST WANTED TO MAKE SURE MY RECORD IS CLEAR.

15         OKAY.  10:20.  GO AHEAD, PLEASE.

16              MR. PRICE:  OKAY, THANKS.

17    Q.   MR. SCHILLER, SORRY FOR BEING CONFUSING.

18         LET ME MAKE THIS STATEMENT AS CLEARLY AS I CAN, AND THAT

19    IS, IT'S YOUR UNDERSTANDING THAT THIS DESIGN, THAT SAMSUNG CAN

20    COMPETE WITH THIS DESIGN IN THE MARKETPLACE, EVEN THOUGH YOU

21    SAID IN YOUR MIND IT LOOKS LIKE AN IPAD?

22    A.   I DON'T KNOW EITHER WAY.  AGAIN, IF IT'S ABOUT COMPETING

23    WITH WHAT'S INFRINGING AND WHAT ISN'T INFRINGING, I WOULD SAY

24    ASK THE LAWYER.  THERE'S A LONG LIST AND I DON'T KNOW EACH ONE

25    BY NAME.
```

1    Q.   OKAY.  BUT YOU DO REMEMBER THE LARGER SAMSUNG TABLET

2    COMING OUT; RIGHT?

3    A.   YES.

4    Q.   AND YOU DO RECALL THINKING -- AT THE TIME YOU THOUGHT THIS

5    DESIGN, THEY'RE NOT ENTITLED TO COMPETE WITH US WITH THIS

6    DESIGN?

7    A.   AGAIN, I THOUGHT THAT WITH THE VERY FIRST GALAXY TAB.

8    THAT'S WHEN I MADE MY STATEMENT ABOUT THE FIRST GALAXY TAB WHEN

9    IT CAME OUT.  I DON'T RECALL MY THOUGHTS WHEN THAT ONE CAME OUT

10   AS WELL.

11   Q.   OKAY.  IN ANY EVENT, IT'S TRUE THAT A COMPETITOR CAN

12   COMPETE WITH APPLE IN THE TABLET MARKET WITH THE DESIGN WHICH

13   IS 1037?  THE DESIGN --

14           MR. MCELHINNY:  CALLS FOR A LEGAL CONCLUSION FROM

15   THIS WITNESS WHO SAID HE DOESN'T KNOW THE ANSWER THREE TIMES

16   ALREADY.

17           THE COURT:  OVERRULED.

18       GO AHEAD.  YOU MAY ANSWER.

19           THE WITNESS:  I DO NOT KNOW EITHER WAY WHICH SAMSUNG

20   DEVICES ARE ALLOWED TO COPY OUR DESIGNS AND WHICH ONES ARE NOT.

21   BY MR. PRICE:

22   Q.   OKAY.  SO WHEN YOU SAY "COPY OUR DESIGNS," YOU UNDERSTAND

23   THAT APPLE HAS PROTECTION ON DESIGNS ONLY THAT ARE COVERED BY

24   ITS PATENT, IT ONLY HAS EXCLUSIVE RIGHTS BY WHAT IS ACTUALLY IN

25   THE PATENT?  DO YOU UNDERSTAND THAT?

1      A.   YES, YES, I DO.

2      Q.   OKAY.  AND YOU UNDERSTAND THAT COMPETITORS ARE ENTITLED TO

3      TRY TO COMPETE WITH APPLE BY LOOKING SIMILAR OR PERFORMING

4      FUNCTIONS AS LONG AS THEY DON'T DO SOMETHING WHICH APPLE

5      EXCLUSIVELY HAS THE RIGHT TO DO?

6      A.   THAT SOUNDS CORRECT.

7      Q.   AND --

8           THE COURT:  CAN YOU HOLD ON ONE SECOND?  I'D LIKE TO

9      TAKE A BRIEF RECESS.

10          I'M GOING TO ASK THE JURY TO PLEASE STEP OUT.

11          TIME IS NOW 10:23.

12          (JURY OUT AT 10:23 A.M.)

13          THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

14     LEFT THE COURTROOM.  YOU MAY TAKE A SEAT.

15          I'M LOOKING AT MY ORDER WHERE I ALLOW CERTAIN

16     NON-INFRINGING ALTERNATIVES BASED ON THE 2012 JURY'S

17     NON-INFRINGEMENT VERDICT TO BE ADMITTED IN THIS CASE, AND I

18     DIDN'T RULE ON GALAXY TAB 10.1 WI-FI.

19          THE ONES THAT I ALLOWED WERE CAPTIVATE, CONTINUUM, GEM,

20     INDULGE, INTERCEPT, NEXUS S 4G, REPLENISH, TRANSFORM, AND THEN

21     THE ONE PRADA THAT I ADDED BASED ON THE DESIGN PATENTS.

22          SO WHY ARE WE HAVING TESTIMONY ON THIS PRODUCT?  IT WASN'T

23     REALLY EVEN LITIGATED.

24          MR. PRICE:  IT'S -- YOUR HONOR, IT'S NOT A

25     NON-INFRINGING DESIGN.

```
1              THE COURT:  OKAY.

2              MR. PRICE:  THE REASON I'M PRESENTING IT IS

3    MR. SCHILLER, AS THE MARKETING, HEAD OF MARKETING, HAS CLAIMED

4    HIS SHOCK AND WOULD LIKE FOR APPLE TO HAVE A BETTER MARKET TO

5    COMPETE IN.

6         I WOULD POINT OUT THAT APPLE DOESN'T HAVE THE ABILITY OR

7    RIGHT TO PRECLUDE CERTAIN THINGS FROM BEING IN THE MARKET, THAT

8    IS, THERE'S GOING TO BE COMPETITION IN THIS MARKET USING

9    DESIGNS OTHER THAN THE IPAD.

10             THE COURT:  OKAY.  I'M SORRY.  CAN YOU WAIT ONE

11   SECOND?

12             MR. PRICE:  SURE.

13             THE COURT:  SO THIS WAS NOT LITIGATED.  YOU HAVE NO

14   ORDER ON THIS ONE.  IS THAT RIGHT?

15             MR. PRICE:  THERE'S --

16             THE COURT:  I'M TRYING TO NAIL THIS DOWN, PLEASE.

17             MR. PRICE:  I DIDN'T ASK FOR PERMISSION IN ADVANCE TO

18   USE THIS FOR THIS PURPOSE, YOUR HONOR, NO.

19             THE COURT:  OKAY.  SO THERE WAS NO ORDER ON THIS

20   THEN?

21             MR. PRICE:  OH, NO.

22             THE COURT:  I'M JUST LOOKING AT THE 2012 VERDICT

23   FORM.

24             MR. MCELHINNY:  IF I CAN HAVE JUST ONE WORD, YOUR

25   HONOR?
```

1              THE COURT:  YES.

2              MR. MCELHINNY:  IT CANNOT BE A NON-INFRINGING

3     ALTERNATIVE BECAUSE THE PATENT THAT IT WAS FOUND NOT TO

4     INFRINGE IS NOT AT ISSUE IN THIS CASE.  IT IS SIMPLY A

5     MISLEADING EXHIBIT.

6              THE COURT:  OKAY.  HANG ON.  I'M SORRY.  HANG ON ONE

7     SECOND.

8              MR. PRICE:  SURE.

9              THE COURT:  LET ME GET TO THE BOTTOM OF THIS.

10             MR. PRICE:  SURE.

11             THE COURT:  SO WE'RE TALKING ABOUT GALAXY TAB.

12             MR. PRICE:  10.1, YOUR HONOR.

13             THE COURT:  10.1 WI-FI.

14             MR. PRICE:  10.1.

15             THE COURT:  OKAY.  AND THAT WAS JX 1037.

16             MR. PRICE:  UM-HUM.

17             THE COURT:  OKAY.  THAT WAS FOUND NOT TO INFRINGE THE

18    D'889 PATENT, WHICH IS NOT IN THIS CASE.

19          LET ME SEE ABOUT THE OTHERS, OKAY?  JUST GIVE ME ONE

20    SECOND, PLEASE.  I WANT TO NAIL THIS DOWN.

21          YOU MAY STEP DOWN, SIR.  WE'RE GOING TO NEED A LITTLE TIME

22    TO GET THIS CLEARED UP.

23             THE WITNESS:  OH, OKAY.

24             THE COURT:  OKAY.  THANK YOU.

25          (PAUSE IN PROCEEDINGS.)

```
 1              THE COURT:  ALL RIGHT.  THIS IS WHAT I HAVE FOR

 2    GALAXY TAB 10.1 WI-FI, JX 1037.  IT WAS FOUND NOT TO INFRINGE

 3    THE D'889; IT WAS NOT ACCUSED OF INFRINGING THE D'677 OR THE

 4    D'087' AND IT WAS FOUND TO INFRINGE THE '381, '915 AND '163.

 5         OF THE MANY, MANY ORDERS I'VE ISSUED SINCE OCTOBER, THIS

 6    ONE WAS NOT BRIEFED.  THERE WAS NO MOTION.

 7         SO THAT'S FINE.  IF YOU WANT TO GET IT IN, THERE WAS NO

 8    OBJECTION.  APPLE SORT OF WAIVED ITS OBJECTION TO GET THIS IN.

 9         BUT I AM NOW GOING TO ALLOW THEM THEN TO GIVE THE FULL

10    VERDICT ON THIS PRODUCT, OKAY?  I THINK THAT'S FAIR CROSS.

11              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

12              MR. PRICE:  UNDERSTOOD.

13              THE COURT:  OKAY.  ALL RIGHT.  THEN LET'S BRING OUR

14    JURY BACK.  AND WHERE'S MR. SCHILLER?  IS HE --

15              THE CLERK:  HE MAY HAVE TAKEN BIO BREAK.

16              THE COURT:  OH, BIO BREAK.  LET'S -- LET'S GO A

17    LITTLE BIT MORE.  I WAS THINKING WE'D TAKE A LONGER BREAK TO DO

18    THE RULE 50 MOTIONS OUTSIDE THE PRESENCE OF THE JURY.  WE

19    CAN -- LET'S JUST GO FOR ANOTHER -- LET'S GO ANOTHER TEN

20    MINUTES AND THEN WE'LL TAKE A BREAK.  IS THAT ALL RIGHT?

21              MR. PRICE:  THAT'S GOOD.

22              THE COURT:  OKAY.  ALL RIGHT.

23         BRING BACK THE JURY, PLEASE.

24         (JURY IN AT 10:28 A.M.)

25              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A
```

1      SEAT.

2             ALL RIGHT.  PLEASE GO AHEAD, MR. PRICE.

3                MR. PRICE:  THANK YOU, YOUR HONOR.

4      Q.   SO MR. SCHILLER, THE QUESTIONS I'M ASKING YOU ARE JUST

5      ABOUT THE DESIGN, BECAUSE I THINK YOU SAID YOU THINK DESIGN IS

6      FAIRLY IMPORTANT.

7      A.   YES.

8      Q.   RIGHT?  AND SO I'M TALKING ABOUT THE PHYSICAL HARDWARE

9      DESIGN HERE.

10            AND IS IT CORRECT THAT, THAT AT THE TIME THAT SAMSUNG CAME

11     OUT WITH 10:37, THIS PHYSICAL HARDWARE DESIGN, APPLE HAD THE

12     IPAD OUT AS WELL; CORRECT.

13     A.   YES.

14     Q.   OKAY.  AND I THINK THE FIRST ONE, TO BE CLEAR, THAT CAME

15     OUT FROM SAMSUNG WAS THE 1036, WHICH IS SMALLER VERSION THAN

16     THE IPAD.  CORRECT?

17     A.   YES.

18     Q.   AND IS IT YOUR UNDERSTANDING THAT ALL OF THE -- I'M NOT

19     TALKING ABOUT THE UTILITY PATENTS, BUT THAT APPLE HAS NOT

20     ACCUSED THIS OF DESIGN INFRINGEMENT?  DO YOU UNDERSTAND THAT?

21     A.   I DON'T KNOW FOR CERTAIN.  AGAIN, THAT -- ALL OF THE LIST

22     OF DEVICES INVOLVED IN BOTH CASES, I'M NOT AN EXPERT ON THAT.

23     Q.   OKAY.  LET ME GO TO SOMETHING WHICH I THINK YOU MIGHT KNOW

24     ABOUT AS MARKETING.

25            IT'S COMMON IN THE INDUSTRY TO TRY TO DO SIMILAR PRODUCTS

881

1     IF SOMEONE ELSE'S PRODUCT IS VERY SUCCESSFUL; CORRECT?

2     A.   I WOULDN'T SAY THAT AS A RULE, NO.

3     Q.   OKAY.  WELL, LET ME SHOW YOU, IF I COULD, EXHIBIT

4     2522.001.

5          AND DO YOU RECOGNIZE THAT?

6     A.   YES, I -- I RECOGNIZE THIS AS AN E-MAIL.

7     Q.   AND IT'S AN E-MAIL IN WHICH YOU ARE ONE OF THE RECIPIENTS?

8     A.   CORRECT.

9          MR. PRICE:  OKAY.  YOUR HONOR, MOVE EXHIBIT 2522 INTO

10    EVIDENCE.

11         THE COURT:  ANY OBJECTION?

12         MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

13         THE COURT:  IT'S ADMITTED.

14    (DEFENDANT'S EXHIBIT 2522 WAS ADMITTED IN EVIDENCE.)

15         THE COURT:  GO AHEAD, PLEASE.

16    BY MR. PRICE:

17    Q.   AND THIS IS AN E-MAIL TO YOU FROM EDDIE CUE.  CAN YOU TELL

18    US WHO HE IS?

19    A.   HE IS AN EXECUTIVE AT APPLE.

20    Q.   DOES HE REPORT TO YOU?

21    A.   NO.

22    Q.   AND HE'S SENDING THIS TO TIM COOK.  CAN YOU TELL ME WHO HE

23    WAS -- WHAT MR. COOK'S POSITION WAS ON JANUARY 24TH, 2011?

24    A.   HE -- I DON'T REMEMBER THE EXACT MOMENT, BUT I THINK AT

25    THAT POINT HE HAD ALREADY BECOME CEO OF APPLE.

1      Q.   AND THEN WE'VE GOT YOU ON THIS AS WELL; CORRECT?

2      A.   YES.

3      Q.   AND MR. CUE SAYS, "HAVING USED A SAMSUNG GALAXY, I TEND TO

4      AGREE WITH MANY OF THE COMMENTS BELOW (EXCEPT ACTUALLY MOVING

5      OFF THE IPAD).  I BELIEVE THERE WILL BE A 7 INCH MARKET AND WE

6      SHOULD DO ONE.  I EXPRESSED THIS TO STEVE SEVERAL TIMES."

7           DO YOU SEE THAT?

8      A.   YES.

9      Q.   AND IF WE LOOK AT THE -- AT WHAT THE ATTACHMENT IS, YOU

10     SEE IT GOES ON TO DESCRIBE SOME OF THE ADVANTAGES OF HAVING A 7

11     INCH TABLET.  DO YOU SEE THAT?

12     A.   I DO.

13     Q.   AND I THINK IF YOU GO TO THE NEXT PAGE, THE SECOND PAGE.

14          (PAUSE IN PROCEEDINGS.)

15          MR. PRICE:  AH, HERE WE GO.

16          HERE IT SAYS, "AS AN ASIDE, THE DIFFERENCE IN ICON SIZE IS

17     NEGLIGIBLE AND IONS ON MY IPOD TOUCH ARE ACTUALLY SMALLER THAN

18     THOSE OF THE TAB."  AND THIS IS IN BLUE "SO APPLE'S 'SANDPAPER

19     DOWN YOUR FINGERS' TO USE A 7-INCH TABLET ARGUMENT IS A FALLACY

20     IN MY OPINION."

21          DO YOU KNOW WHAT THAT'S REFERRING TO, "APPLE'S SANDPAPER

22     DOWN YOUR FINGERS"?

23     A.   YES.

24     Q.   WHAT'S THAT REFERRING TO?

25     A.   I BELIEVE AT ONE POINT MR. JOBS MADE A COMMENT, WHEN

1    SOMEONE ASKED IF WE WOULD MAKE A TABLET SMALLER THAN THE 10

2    INCH SIZE, THAT THE ICONS AND THE ELEMENTS OF THE SCREEN WOULD

3    GET SMALLER, BUT YOUR FINGER DON'T GET SMALLER, AND THE ANALOGY

4    WE USED WAS YOU CAN'T SANDPAPER YOUR FINGERS TO MAKE THEM

5    SMALLER TO WORK ON A SMALLER SCREEN.

6    Q.   AND IN FACT, AFTER SAMSUNG CAME INTO THE MARKET WITH ITS 7

7    INCH TABLET, APPLE LATER, RESPONDING TO COMPETITION, CAME OUT

8    WITH ITS SMALLER TABLET?

9    A.   A SMALLER TABLET, NOT THE SIZE OF THE GALAXY TABLET.

10   Q.   RIGHT.  THIS IS ABOUT SEVEN INCHES; RIGHT?

11   A.   YES.

12   Q.   AND YOURS WAS SMALLER.  WAS IT 7.9 INCHES?  IS THAT RIGHT?

13   A.   APPROXIMATELY, YEAH.  JUST SHY OF 8 INCHES.

14   Q.   AND THAT -- AND GOING DOWN SMALLER LIKE THAT, IN RESPONSE

15   TO COMPETITION OR SEEING AN OPPORTUNITY, YOU -- APPLE HAS DONE

16   QUITE WELL SELLING THOSE SMALLER IPADS?

17   A.   WELL, IT IS AN IPAD WITH ALL THE THINGS THAT THE PREVIOUS

18   IPAD HAS.  IT'S NOT A DIFFERENT PRODUCT OTHER THAN SCREEN SIZE,

19   AND IN MY VIEW, SCREEN SIZE IS JUST A COMMODITY LIKE OTHER

20   COMMODITIES.

21       SO, YES, WE HAVE IPADS WITH DIFFERENT SCREEN SIZES.  IT

22   ISN'T IN RESPONSE TO COMPETITION.

23   Q.   WELL, FIRST YOU HAD MR. JOBS SAYING, "I'M NOT, WE'RE NOT

24   GOING TO DO IT," AND THEN YOU DID IT.

25   A.   THAT'S RIGHT.

1     Q.   AND THAT'S BECAUSE YOU THOUGHT THERE WAS A MARKET FOR IT?

2     A.   THAT ISN'T HOW I WOULD EXPLAIN WHAT WE THOUGHT, NO.

3     Q.   WELL, IT SOLD REALLY WELL?

4     A.   YES.

5     Q.   OKAY.  AND APPLE HAS -- APPLE RESPONDS TO COMPETITION,

6     WITHIN THE BOUNDS OF THE LAW; RIGHT?

7     A.   I'M SURE THERE ARE TIMES WE HAVE, YES.

8     Q.   FOR EXAMPLE, APPLE STARTED OUT ON AT&T AND WENT TO OTHER

9     CARRIERS; RIGHT?

10    A.   BUT THAT WASN'T ABOUT COMPETITION.

11         SEE, THERE ARE CERTAIN THINGS WE DO, BUT THAT'S NOT HOW WE

12    DESIGN WHAT WE THINK ABOUT WITH OUR PRODUCTS, AND IN THIS

13    EXAMPLE, WHAT HAPPENED WAS STEVE DIDN'T BELIEVE YOU COULD MAKE

14    A TABLET AT A 7 INCH SIZE AND MAKE IT WORK AS WELL AS OUR 10

15    INCH SIZE TABLET.

16         SO THE TEAM WENT OFF, NOTHING TO DO WITH COMPETITION, THE

17    TEAM WENT OFF AND DID AN EXPERIMENT.  THEY SAID, HOW MUCH

18    SMALLER CAN WE TAKE THE SCREEN FROM 10 INCHES DOWN TO MAKE IT

19    STILL BE A GREAT IPAD EXPERIENCE?

20         SO IT WAS ALL ABOUT US TRYING TO CREATE A GREAT PRODUCT

21    FOR OUR CUSTOMER, AND THEY DETERMINED THAT JUST SHY OF 8

22    INCHES, WE COULD STILL MAKE AN EXPERIENCE TO BE PROUD OF.

23         THE SIZE THAT SAMSUNG HAD DOWN TO 7 INCH WITH THE MORE

24    LINEAR LAYOUT WASN'T WHAT WE WENT TO.

25         SO WE WEREN'T TRYING TO RESPOND TO COMPETITION.  WE WERE

1    SIMPLY TRYING TO MAKE OUR PRODUCT BETTER WITHIN THE BOUNDS OF

2    WHAT WE KNEW HOW TO DO.  IT WASN'T ABOUT COMPETITION.

3    Q.   WELL, IF YOU GO TO THE FRONT OF THIS, MR. JOBS WAS OPPOSED

4    TO MAKING ANY SMALLER IPAD?

5    A.   AT THAT TIME WHEN HE SAID THAT, WHICH WAS QUITE A WHILE

6    AGO, YES.

7    Q.   AND THE DECISION TO GO SMALLER CAME OUT AFTER THE SAMSUNG

8    TABLET CAME ON TO THE MARKET?

9    A.   YES.

10   Q.   AND RECENTLY, FOR EXAMPLE, APPLE HAS INTRODUCED A NEW

11   IPHONE WHICH IS LESS EXPENSIVE THAN ANOTHER IPHONE IT PRODUCED

12   AT THE SAME TIME; CORRECT?

13   A.   WE --

14   Q.   THE IPHONE 5, THE IPHONE 5C?

15   A.   YES.  BUT WE HAVE HAD OTHER PHONES LESS EXPENSIVE THAN

16   THAT BEFORE IT.

17   Q.   I'M TALKING ABOUT NEW PHONES, NEW PHONES THAT WERE LESS

18   EXPENSIVE THAN THE FLAGSHIP PHONE, THE IPHONE?

19   A.   I'M SORRY.  I'M NOT SURE WHAT YOU'RE REFERRING TO.

20   Q.   YOU DON'T UNDERSTAND THE FLAGSHIP PHONE CONCEPT?

21   A.   I JUST DON'T KNOW WHICH PHONES YOU'RE REFERRING TO.

22   Q.   THE IPHONE 5C THAT YOU CAME OUT WITH THAT WAS DESIGNED TO

23   BE PRICED LESS EXPENSIVE?

24   A.   THE IPHONE 5C IS LESS EXPENSIVE THAN THE IPHONE 5S.  THOSE

25   ARE TWO PHONES WE SELL TODAY.

1    Q.   SO LET ME ASK YOU THEN ABOUT YOUR EXPERIENCE AND APPLE'S

2    EXPERIENCE CONCERNING DECISION FACTORS, THAT IS, WHY CUSTOMERS

3    BUY THINGS.

4         YOU'LL AGREE THAT YOUR IPHONE HAS HUNDREDS AND HUNDREDS OF

5    FEATURES?

6    A.   YES.

7    Q.   AND EVERY FEATURE YOU PUT ON THE IPHONE YOU PUT IN

8    THINKING IT'S GOING TO MAKE THE IPHONE BETTER; CORRECT?

9    A.   WE HOPE SO, YES.

10   Q.   YOUR VIEW, THOUGH, IS THAT CUSTOMERS DON'T THINK OF ONLY

11   INDIVIDUAL FEATURES WHEN THEY'RE BUYING A PHONE, THEY THINK OF

12   IT ALL TOGETHER; CORRECT?

13   A.   I THINK THEY THINK BOTH, THAT THEY DO THINK ABOUT THE

14   ENTIRE EXPERIENCE, AND THEY THINK ABOUT SOME FEATURES, YES.

15   Q.   WELL, NO.  HAVEN'T YOU TESTIFIED THAT YOU DON'T THINK THEY

16   THINK OF ONLY INDIVIDUAL FEATURE, THEY THINK ABOUT THE WHOLE, I

17   DON'T WANT TO SAY GESTALT, BUT THE EXPERIENCE OF PUTTING ALL

18   THOSE FEATURES TOGETHER?

19   A.   YES, THEY DO THINK ABOUT THAT.

20   Q.   AND, IN FACT, YOU TALKED ABOUT EASE OF USE.  YOU TALKED

21   ABOUT, YOU KNOW, YOU'RE TRYING TO GIVE THE CONSUMER AN OVERALL

22   EXPERIENCE THAT SOMETHING, FOR EXAMPLE, IS EASY TO USE;

23   CORRECT?

24   A.   AT ONE LEVEL.  THIS IS A VERY COMPLEX TOPIC, BUT, YES, AT

25   ONE LEVEL.

1    Q.   AND AGAIN, YOU UNDERSTAND THAT APPLE DOESN'T OWN THE

2    EXCLUSIVE RIGHT TO AN OVERALL CONCEPT OF EASE OF USE; THAT IS,

3    COMPETITORS ARE ALLOWED TO TRY TO MAKE THEIR PRODUCTS EASIER TO

4    USE IF THEY DON'T INFRINGE APPLE'S PATENTS?  YOU UNDERSTAND

5    THAT?

6    A.   YES.

7    Q.   AND IN CONNECTION WITH THE, THE EASE OF USE, THE OVERALL

8    EASE OF USE I MEAN, IT'S YOUR VIEW THAT THE IPHONE, OVERALL, IS

9    EASIER TO USE THAN ANY OF ITS COMPETITORS?

10   A.   I HOPE SO, YES.

11   Q.   AND YOU THOUGHT THAT THROUGHOUT THE YEARS?

12   A.   YES.

13   Q.   SO IF SOMEONE WAS REALLY -- YOUR BELIEF IS IF SOMEONE WAS

14   FOCUSSED ON EASE OF USE AS DRIVING THEM TO PURCHASE SOMETHING,

15   THEN IF THEY'RE, IF THEY'RE SMART, THEY'RE GOING TO BUY AN

16   IPHONE BECAUSE, OVERALL, IT IS EASIER TO USE?

17   A.   THAT'S NOT ALL THEY THINK.  I THINK EVERYBODY CARES ABOUT

18   EASE OF USE TO SOME DEGREE, AND IT VARIES BY THE INDIVIDUAL,

19   BUT TO A DEGREE, AND MOST EVERYBODY CARES ABOUT THAT.

20        IT'S NOT ALL THEY CARE ABOUT, THOUGH.

21   Q.   IF IT'S SOMETHING THAT SOMEBODY CARES ABOUT A LOT, IF IT'S

22   LIKE A NUMBER 1 CONSIDERATION, YOUR BELIEF IS THEY WOULD BUY AN

23   APPLE IF THAT WAS REALLY WHAT DROVE THE SALE?

24   A.   I'D LIKE THEM TO, YES.

25   Q.   PARDON?

1       A.   I'D LIKE THEM TO, YES.

2       Q.   I'M SURE YOU'D LOVE THEM TO.

3            BUT MY QUESTION IS, IF IT'S SOMETHING THAT'S REALLY

4       DRIVING THEM TO BUY SOMETHING, IF THEY'RE SAYING I WANT

5       SOMETHING THAT'S EASIEST TO USE, YOU THINK THEY WOULD BUY AN

6       APPLE IF THAT'S THEIR PRIMARY CRITERIA?

7       A.   I CAN'T SAY WITHOUT KNOWING THE INDIVIDUALS AND THEIR

8       ISSUES AND WHAT THEY WANT.  I THINK THAT'S TOO ABSTRACT.

9            I THINK PEOPLE SHOULD CARE ABOUT EASE OF USE.  MOST

10      EVERYONE DOES.  BUT IT'S NOT THE ONLY PURCHASE DECISION.

11      Q.   OKAY.  SOME PURCHASERS MIGHT FOCUS ON SOME OTHER ASPECT OF

12      A PHONE THAT MATTERS TO THEM.

13      A.   I THINK WE ALL CONSIDER MULTIPLE ASPECTS WHEN WE PURCHASE

14      A DEVICE.

15      Q.   OKAY.  APPLE HAS A LOT OF EXPERIENCE IN THESE SURVEYS;

16      RIGHT?

17      A.   YES.

18      Q.   AND IT ASKED ABOUT EASE OF USE IN THE SURVEYS; CORRECT?

19      A.   SOMETIMES, YES.

20      Q.   AND THAT'S A BROAD TERM.  YOU SAID IT COVERS HUNDREDS OF

21      FEATURES; CORRECT?

22      A.   YES.

23      Q.   AND SOME OF THE FEATURES THAT IT COVERS ARE, FOR EXAMPLE,

24      THE SET UP RIGHT OUT OF THE BOX; CORRECT?

25      A.   YES, THAT CONTRIBUTES TO EASE OF USE.

1    Q.   IN FACT, YOU SAID THAT'S ONE OF THE THINGS ABOUT EASE OF

2    USE THAT YOU'RE MOST PROUD OF WITH RESPECT TO THE IPHONE?

3    A.   PERHAPS I DID.  I AM PROUD OF THAT, YES.

4    Q.   AND I THINK YOU WERE SAYING THAT IPHONE DOESN'T COME WITH

5    INSTRUCTIONS BECAUSE IT'S SO EASY TO USE; CORRECT?

6    A.   CORRECT.  THERE'S NO NEED.

7    Q.   NOW, YOU ALSO LOOK AT COMPETITORS' PRODUCTS SOMETIMES TO

8    SEE WHAT'S OUT IN THE MARKETPLACE AND, YOU KNOW, SEE HOW

9    THEY'RE DOING AND, COMPARED TO YOU, WHAT THEY'RE OFFERING

10   CONSUMERS; RIGHT?

11   A.   YES.

12   Q.   SO DO MOST OF THE SAMSUNG PHONES, THEY COME WITH A MANUAL,

13   DON'T THEY?

14   A.   I DON'T KNOW.

15   Q.   OKAY.  SO YOU HAVEN'T CHECKED TO SEE WHETHER OR NOT YOU

16   SCORED BETTER ON THAT ONE?

17   A.   I DON'T KNOW.

18   Q.   OKAY.

19        THE COURT:  IT'S 10:41.  CAN WE GO AHEAD AND TAKE OUR

20   BREAK THIS MORNING?

21        MR. PRICE:  YES.

22        THE COURT:  OKAY.  THANK YOU.

23    ALL RIGHT.  LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK

24   NOW.  AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T RESEARCH OR

25   DISCUSS THE CASE.

```
 1              THANK YOU.  AND YOU CAN LEAVE YOUR BINDERS HERE IF YOU'D

 2    LIKE.

 3              AND YOU MAY STEP DOWN.

 4                   THE WITNESS:  THANK YOU.

 5         (JURY OUT AT 10:41 A.M.)

 6                   THE COURT:  ALL RIGHT.  THANK YOU.  LET'S TAKE OUR

 7    BREAK.

 8                   MR. MCELHINNY:  MAY I RAISE ONE ISSUE WITH YOU, YOUR

 9    HONOR?

10                   THE COURT:  WAIT UNTIL THE DOOR CLOSES.

11         OKAY.  THE RECORD SHOULD REFLECT THE JURORS HAVE LEFT THE

12    COURTROOM.  PLEASE TAKE A SEAT.

13                   MR. MCELHINNY:  I WANT SOME GUIDANCE BECAUSE I WANT

14    TO DO WHAT YOUR HONOR WANTS ME TO DO.

15         ON REDIRECT, I WANT TO BE ABLE TO SHOW -- MR. SCHILLER

16    DOESN'T HAVE THE PRIOR VERDICT MEMORIZED, SO I WANT TO BE ABLE

17    TO SHOW HIM THE LINE OF THE PRIOR VERDICT THAT, THAT RELATES TO

18    THE 1037 THAT YOUR HONOR SAID I COULD DO, AND THE QUESTION IS

19    WHETHER OR NOT TO SHOW THE ENTIRE VERDICT OR JUST THE LINE.

20                   THE COURT:  NO.

21                   MR. MCELHINNY:  THE PROBLEM WITH THE LINE IN THE

22    CHARTS IS IT DOESN'T SHOW THE PATENTS.

23                   THE COURT:  I DON'T WANT THIS JURY TO SEE THE 2012

24    JURY VERDICT.  CAN WE JUST GET A STIPULATION OR SOME AGREEMENT

25    HERE?
```

```
 1              MR. PRICE:  YEAH.

 2              THE COURT:  WHY DON'T WE DO IT BY STIPULATION?  I

 3    DON'T WANT THEM TO SEE WHAT OTHER PRODUCTS WERE IN THE LAST

 4    CASE.  I DON'T WANT THEM --

 5              MR. MCELHINNY:  THAT'S WHY I ASKED.

 6              THE COURT:  YEAH.  SO CAN WE JUST DO IT BY

 7    STIPULATION, PLEASE?

 8              MR. PRICE:  YEAH, WE CAN STIPULATE.

 9              THE COURT:  THANK YOU.  TO AVOID THAT ISSUE.

10              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  THANK YOU.  LET'S TAKE OUR

12    BREAK.

13         (RECESS FROM 10:42 A.M. UNTIL 10:54 A.M.)

14              THE COURT:  LET'S GO.  IT'S 10:54.

15         (JURY IN AT 10:54 A.M.)

16              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

17         10:54.  GO AHEAD, PLEASE.

18              MR. PRICE:  YOUR HONOR, MAY I BEGIN?

19              THE COURT:  I SAID 10:54.  GO AHEAD, PLEASE.

20              MR. PRICE:  I'M SORRY.

21              THE COURT:  10:55.  GO AHEAD.

22              MR. PRICE:  I'M SORRY.  I DIDN'T HEAR.

23    Q.   SIR, IF I CAN APPROACH, LET ME SHOW YOU EXHIBIT 1058.  I

24    MEANT TO USE THIS EARLIER.  DO YOU RECOGNIZE THIS AS ONE OF

25    SAMSUNG TABLETS?
```

1              MR. MCELHINNY:  YOUR HONOR, HE'S NOW USING ANOTHER

2     EXHIBIT WHICH HE DID NOT SEEK A PRIOR ORDER ON.  WE HAVE

3     OBJECTIONS TO THIS ENTIRE LINE OF QUESTIONING AND THE USE OF

4     THESE EXHIBITS.

5              THE COURT:  OBJECTION IS SUSTAINED.

6         TAKE THAT BACK, PLEASE.

7              MR. PRICE:  OKAY.

8     Q.   SO WE WERE TALKING ABOUT --

9              THE COURT:  ARE YOU GOING TO DO THAT WITH ANY OTHER

10    EXHIBITS?

11             MR. PRICE:  NO, YOUR HONOR.

12             THE COURT:  OKAY.  THANK YOU.

13             MR. PRICE:  IT'S NOT FOR --

14             THE COURT:  OKAY.  GO AHEAD, PLEASE.

15             MR. PRICE:  IT'S NOT FOR NON-INFRINGING ALTERNATIVE.

16             THE COURT:  I'M SORRY.  I CAN'T HEAR YOU.

17             MR. PRICE:  I'M SORRY.  IT'S NOT FOR NON-INFRINGING

18    ALTERNATIVES.  I WON'T BE USING IT ANYMORE.

19             THE COURT:  OKAY.

20    BY MR. PRICE:

21    Q.   WE WERE TALKING ABOUT EASE OF USE, AND I THINK WE WERE

22    TALKING ABOUT SET UP, AND YOU ALSO BELIEVED ABILITY TO ACCESS

23    ADVANCED FEATURES, ABILITY TO DO THAT WAS EASE OF USE?

24    A.   SURE.

25    Q.   YOU SAID THE SATISFACTORY BROWSER CONTRIBUTES TO EASE OF

1      USE?

2      A.   IT DOES.

3      Q.   THE MAIL APPLICATION CONTRIBUTES TO EASE OF USE.

4      A.   YES.

5      Q.   AND IN BREAKING OUT EASE OF USE, IF YOU'D LOOK AT EXHIBIT

6      69, WHICH IS IN EVIDENCE, PLAINTIFF'S EXHIBIT 69, PX 69, AND

7      LOOK AT PAGE, IT'S A J.D. POWER SURVEY, AND LOOK AT PAGE 43,

8      .43, AND YOU SEE IT DESCRIBES THINGS HERE.

9           IT SAYS 26 PERCENT, USE OF OPERATION, IT TALKS ABOUT

10     QUALITY OF SOUND CALL, EASE OF PRESSING THE BUTTONS, EASE OF

11     NAVIGATING, THE ABILITY TO ADJUST THE VOLUME, GETTING AROUND

12     THE MENU SYSTEM, CALLING FEATURES, TEXT MESSAGING AS BEING PART

13     OF WHAT THEY IDENTIFIED AS EASE OF USE.

14          DO YOU AGREE THAT ALL OF THOSE ARE COMPONENTS OF EASE OF

15     USE?

16     A.   THEY CAN BE.  SOME OF THEM ARE KIND OF SMALL.  I THINK

17     ADJUSTING VOLUME ISN'T -- ISN'T AS IMPACTICAL AS SOME OF THE

18     OTHERS.  BUT GENERALLY, YES, THESE ARE SOME FEATURES OF EASE OF

19     USE.

20     Q.   BUT APPLE, IN ITS SURVEY TO ITS RESPONDENTS, DIDN'T BREAK

21     OUT EASE OF USE TO SEE WHICH OF THE HUNDREDS OF ASPECTS OF EASE

22     OF USE WERE PARTICULARLY IMPORTANT ONE WAY OR THE OTHER;

23     CORRECT?

24     A.   I DON'T RECALL US ASKING FOR DIFFERENT ELEMENTS WITH

25     RESPECT TO EASE OF USE.

1    Q.   AND APPLE WOULD HAVE ANOTHER COMPANY, COM-TECH, DO

2    QUARTERLY SURVEYS, FOUR TIMES A YEAR, ABOUT WHAT ANDROID

3    PURCHASERS DID; CORRECT?

4    A.   I WOULDN'T DESCRIBE WHAT WE DID AS HAVING THEM DO IT.

5    THEY'RE A COMPANY THAT CREATES SURVEYS, AND I BELIEVE WE BUY

6    SOME OF THEM.  BUT WE DON'T HAVE THEM DO THEM IN MY

7    UNDERSTANDING.

8    Q.   SO YOU BOUGHT THEM FOUR TIMES A YEAR?

9    A.   I DON'T KNOW THE PERIOD OF THEM.  WE BOUGHT SOME.  I DON'T

10   KNOW HOW OFTEN THEY CAME OUT.

11        MR. PRICE:  OKAY.  PARTS OF EXHIBIT 572 ARE IN

12   EVIDENCE.  THAT'S, I THINK, 572.03.  IF WE CAN SHOW THE FRONT

13   PAGE THAT IS IN EVIDENCE.

14        AND I'D LIKE TO SHOW, IF I COULD, EXHIBIT -- PAGE 27, YOUR

15   HONOR.  THIS IS ONE OF THOSE DOCUMENTS THAT WE'RE GOING PAGE BY

16   PAGE.  572.027.

17        AND WE NEED TO SHOW IT ONLY TO THE WITNESS AND THE JURY.

18        WELL, ACTUALLY, NO.  -- THERE'S AN AGREEMENT THAT WE CAN

19   SHOW THAT PAGE TO EVERYONE, YOUR HONOR.

20        THE COURT:  OKAY.  GO AHEAD, PLEASE.

21   BY MR. PRICE:

22   Q.   AND IF YOU LOOK AT THAT, YOU SEE THESE WERE ANDROID USERS

23   IMPORTANCE OF ATTRIBUTES IN THE PURCHASE DECISION.  DO YOU SEE

24   THAT?

25   A.   I SEE THAT, YES.

1    Q.   AND I THINK YOU DESCRIBED SCREEN SIZE AS BEING A COMMODITY

2    A FEW MINUTES AGO; CORRECT?

3    A.   I DID.

4    Q.   AND FOR ANDROID PURCHASERS, IT'S UP THERE AS, LIKE, THIRD

5    MOST IMPORTANT; CORRECT?

6    A.   IN -- OF THESE THINGS ASKED, YES.

7    Q.   AND, IN FACT, FOR INTENDED PURCHASERS, IT'S IN THE -- 90

8    PERCENT THINK THE LARGE SCREEN IS AN IMPORTANT ATTRIBUTE;

9    CORRECT?

10   A.   I WOULDN'T SAY THAT GENERALLY.  I THINK THESE QUESTIONS OF

11   THESE THINGS ARE ASKED ON THIS LIST, YES.

12   Q.   IN PARTICULAR, THESE ARE ASKING PEOPLE WHO PURCHASED OR

13   ARE GOING TO PURCHASE ANDROID, NOT THOSE WHO PURCHASED APPLE;

14   CORRECT?

15   A.   I BELIEVE THAT'S THE BASE OF PEOPLE THEY ARE QUESTIONING,

16   YES, WERE ANDROID USERS.

17          MR. PRICE:  YOUR HONOR, I MOVE IN 572.027.

18          THE COURT:  ANY OBJECTION?

19          MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

20          THE COURT:  IT'S ADMITTED.

21      (DEFENDANT'S EXHIBIT 572.027 WAS ADMITTED IN EVIDENCE.)

22          THE COURT:  GO AHEAD, PLEASE.

23   BY MR. PRICE:

24   Q.   NOW, ONE OF THE THINGS THAT COULD BE A PURCHASE FACTOR

25   DECISION IS BRAND; CORRECT?

1    A.   IT CAN BE.  I FIND IT TO BE AN EXTREMELY COMPLEX TOPIC,

2    SO -- BUT, YES.

3    Q.   WELL, APPLE HAS DONE SURVEYS ON EXACTLY THAT, HOW THE

4    BRAND AFFECTS THE PERCEPTION OF THE PUBLIC WITH RESPECT TO

5    APPLE; CORRECT?

6    A.   THERE MAY BE.  I DON'T RECALL ONE AT THE MOMENT.

7    Q.   LET ME SHOW YOU EXHIBIT 2709.  DO YOU RECOGNIZE 2709?

8    A.   NO, I DO NOT.

9    Q.   LET ME CALL YOUR ATTENTION TO THE REPORT FROM BRAND

10   MEASUREMENT RESEARCH.

11   A.   I DON'T KNOW THAT I EVER SAW THIS.

12   Q.   WHAT IS BRAND MEASUREMENT RESEARCH?

13   A.   I DON'T KNOW WHAT IT'S MEANT IN THIS CASE.  I'D HAVE TO

14   READ THE REPORT TO KNOW WHAT THEY'RE REFERRING TO.

15   Q.   DO YOU KNOW WHO ART RANGEL -- IS IT RANGEL?

16   A.   YES, ART RANGEL.

17   Q.   WHO'S HE?

18   A.   HE RUNS OUR MARKET RESEARCH TEAM AND REPORTS TO ME.

19   Q.   SO THIS WAS SOMETHING WHICH WAS SENT TO MR. RANGEL WHO

20   REPORTS DIRECTLY TO YOU; CORRECT?

21   A.   YES.

22        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 2709 INTO

23   EVIDENCE.

24        THE COURT:  ANY OBJECTION?

25        MR. MCELHINNY:  YOUR HONOR, NO OBJECTION, ALTHOUGH WE

1        WANT THE REPORT ITSELF FILED UNDER SEAL.

2                THE COURT:  OKAY.  THAT'S GRANTED.

3            (DEFENDANT'S EXHIBIT 2709 WAS ADMITTED IN EVIDENCE.)

4        BY MR. PRICE:

5        Q.   AND DID MR. RANGEL REPORT TO YOU THAT THE "RESEARCH FOUND

6        THAT APPLE HAS BECOME THE ESTABLISHMENT THEY WERE ORIGINALLY

7        FIGHTING AND NOW DICTATES WHAT THE MARKET WANTS, WHEN THE

8        MARKET WILL GET IT, AND CHARGE A PREMIUM FOR THE PRIVILEGE OF

9        USING THEIR PRODUCTS"?

10       A.   NO, HE DID NOT.

11       Q.   HE DID NOT REPORT THAT TO YOU?

12       A.   NO.

13       Q.   DID HE REPORT TO YOU, IF YOU LOOK AT PAGE 28 --

14       A.   AS I STATED EARLIER IN MY TESTIMONY ABOUT RESEARCH, IT'S

15       IMPORTANT TO UNDERSTAND THE FOUNDATION OF WHO'S BEING

16       RESEARCHED BEFORE YOU READ INTO THE CONCLUSIONS, AND SINCE I

17       HAVEN'T SEEN THIS BEFORE, I JUST FLIPPED TO THE FIRST PAGE, WHO

18       DID WE HEAR FROM, AND I SEE THIS IS A QUALITATIVE STUDY OF FOUR

19       PEOPLE SITTING AT FOUR TABLES.

20            SO IF WE'RE GOING TO ASK ABOUT IT, I CAUTION FROM TRYING

21       TO DRAW ANY CONCLUSIONS ABOUT WHAT ANYONE IN THE WORLD THINKS

22       BECAUSE THIS IS A QUALITATIVE STUDY OF FOUR PEOPLE SITTING AT

23       FOUR TABLES AND NOT STATISTICALLY SIGNIFICANT INFORMATION.

24       Q.   IT'S BEING CIRCULATED AT APPLE; CORRECT?

25       A.   I BELIEVE SO, SINCE YOU'VE SHOWN IT TO ME.

1     Q.   TO THE PERSON THAT REPORTS DIRECTLY TO YOU; CORRECT?

2     A.   YES.

3     Q.   AND THE CONCLUSION OF THE REPORT WHICH APPLE PROVIDED, IF

4     YOU LOOK AT PAGE 28 CONSIDERING THE APPLE BRAND IS THAT PRICE,

5     UNIVERSALLY CONSIDERED TO BE HIGHER, ALOOF AND ELITIST, APPLE'S

6     BELIEVED TO BE ONLY FOR THE TRENDY AND POPULAR, WHICH LEADS

7     MANY TO REVIEW THE BRAND AS DISTANT AND ELITIST; AND RETAIL

8     EXPERIENCE, WHILE FOR HEAVY USERS THE RETAIL EXPERIENCE IS

9     EXCITING, FOR MANY THE EXPERIENCE IS DAUNTING, INTIMIDATING,

10    STIFLING, AND OFF-PUTTING.

11          ONE OF THE THINGS YOU WERE CONCERNED ABOUT, BY THE WAY,

12    THAT WAS LIMITING SALES OF APPLE WAS THE IN-STORE EXPERIENCE,

13    THAT IS, YOU THOUGHT THAT THE SALESMAN AT THE -- IN THE

14    IN-STORE EXPERIENCE, NOT THE APPLE STORES -- WERE NOT VERY

15    EXPERIENCED AT SELLING THE IPHONES AND WERE DIRECTING PEOPLE TO

16    ANDROID PRODUCTS; CORRECT?

17          MR. MCELHINNY:  YOUR HONOR, THAT IS A COMPOUND

18    QUESTION.  THEY'RE NOT EXPERIENCED, DIRECTING PEOPLE TO

19    ANDROID.  IT'S A CHAIN OF QUESTIONS THAT THE WITNESS CAN'T

20    ANSWER.

21          THE COURT:  SUSTAINED.

22          CAN YOU ASK ANOTHER QUESTION?  I THINK IT'S SLIGHTLY

23    CONFUSING.

24          MR. PRICE:  SURE.

25    Q.   YOUR BELIEF WAS THAT THE SALES PEOPLE AT THE RETAIL STORES

SCHILLER CROSS

```
1    WERE NOT DOING A GOOD EXPERIENCE OF SELLING APPLE PRODUCTS?

2    A.   MY BELIEF?  NO, I DON'T RECALL THINKING ABOUT THAT IN

3    THOSE TERMS.

4    Q.   LET ME SHOW YOU EXHIBIT 2708.  DO YOU RECOGNIZE THIS AS AN

5    E-MAIL CHAIN BETWEEN YOU AND MR. N-G?  CAN YOU PRONOUNCE THAT

6    FOR ME?

7    A.   STAN NG.

8    Q.   THANK YOU.  YOU RECOGNIZE THAT AS AN E-MAIL CHAIN BETWEEN

9    THE TWO OF YOU?

10   A.   I DO SEE THAT.

11          MR. PRICE:  MOVE 2708 INTO EVIDENCE, YOUR HONOR.

12          THE COURT:  ANY OBJECTION.

13          MR. MCELHINNY:  NONE, YOUR HONOR.

14          THE COURT:  IT'S ADMITTED.

15      (DEFENDANT'S EXHIBIT 2708 WAS ADMITTED IN EVIDENCE.)

16          THE COURT:  GO AHEAD, PLEASE.

17   BY MR. PRICE:

18   Q.   AND IF WE GO TO THE LAST PAGE, IT TALKS ABOUT THE STUDY

19   BEING -- "THE PURPOSE OF THE LAST PARAGRAPH WAS TO QUANTIFY THE

20   IMPACT OF KEY INFLUENCE HAVE ON THE SMARTPHONE PURCHASE

21   DECISION AT RETAIL POINT-OF-SALE WITH PARTICULAR EMPHASIS ON

22   IPHONE AND ANDROID BUYERS."

23       DO YOU SEE THAT?

24   A.   I SEE THAT SENTENCE.

25   Q.   AND IF WE GO TO PAGE 2, MR. JOSWIAK AND YOU, IN THE MIDDLE
```

1    OF THIS LITTLE PARAGRAPH ON SEPTEMBER 1 ON DOWN, IT SAYS "THIS

2    VALIDATES THE HUGE RELIANCE ANDROID SHOPPER ON THE IN STORE

3    SALES PERSON AND HOW MUCH THE SALES PERSON INFLUENCES THE

4    SITUATION.

5         "WE NEED TO GET BETTER THERE."

6         DO YOU SEE THAT?

7    A.   I SEE THAT SENTENCE.

8    Q.   AND YOUR RESPONSE ABOVE IS, "WE HAVE ALWAYS KNOWN THAT THE

9    HANDS ON HITS WERE CRITICAL TO THE IPHONE BUYING EXPERIENCE AND

10   THAT ANDROID, DUE TO ITS VARIED OEM MODEL, IS SOLD MORE IN

11   STORE THAN AN APPLE SALE."

12        OEM IS THE ORIGINAL EQUIPMENT MANUFACTURER, MEANING

13   SAMSUNG AND MOTOROLA; RIGHT?  OEM IS THE MANUFACTURER?

14   A.   YES.

15   Q.   OKAY.  "AND WE HAVE ALWAYS KNOWN THE WEAKNESS OF THE

16   CARRIER SALES PEOPLE IN OUR GO TO MARKET CHAIN, ESPECIALLY

17   EVIDENCED BY THE SLOW GROWTH IN ADVOCACY IN CHANNELS LIKE

18   VERIZON."

19        DO YOU SEE THAT?

20   A.   I DO.

21   Q.   AND THE RESPONSE BY MR. NG, IF YOU GO TO THE NEXT PAGE, IF

22   WE CAN GO TO THE SECOND TO THE LAST PARAGRAPH AND THE LAST

23   PARAGRAPH, "TWICE AS MANY ANDROID CUSTOMERS MAKE THEIR DECISION

24   DURING THE RETAIL STORE VISIT AS OPPOSED TO BEFORE.  COMBINE

25   THAT WITH THE FACT THAT HALF OF ANDROID CUSTOMERS DON'T EVEN

1    SEE OUR DISPLAY OR MERCHANDISING AND I START TO QUESTION OUR

2    FISO STRATEGY.  MAYBE WE JUST NEED TO STAND OUT."

3         WHAT DOES FISO MEAN?

4    A.   FIT IN, STAND OUT.  IT'S TALKING ABOUT A POINT OF SALE

5    FIXTURE TABLE STRATEGY.

6    Q.   OKAY.  IT GOES, "WE ALWAYS KNEW THAT CARRIER SALES PEOPLE

7    WERE WEAK, BUT KNOWING IT IS THE NUMBER ONE THING THAT PEOPLE

8    DO AND TWICE AS MUCH AS ANYTHING ELSE REALLY CALLS INTO

9    QUESTION FOR ME WHETHER WE NEED TO ATTACK OUR CARRIER SHOPS."

10        DO YOU SEE THAT?

11   A.   I SEE THAT.

12   Q.   AND IF WE CAN GO ON UP TO -- ACTUALLY, WE'LL MOVE OFF OF

13   THIS DOCUMENT.

14   A.   AGAIN, I JUST CAUTION THOSE COMMENTS MADE ON A SURVEY OF

15   FOUR PEOPLE AT FOUR TABLES.  THAT'S MY CAUTION ON THIS SURVEY.

16   Q.   FROM THIS SURVEY?

17   A.   YES.

18   Q.   BUT WHAT THAT SURVEY WAS REVEALING, SIR, IS SOMETHING

19   WHICH YOU ALREADY KNEW.  WHAT YOU SAID IS "I ALREADY KNEW ABOUT

20   HOW WEAK THOSE WERE."  THAT'S WHAT YOU SAID IN YOUR E-MAIL;

21   RIGHT?

22   A.   YES, I SAID SOME OF MY THOUGHTS.  I DIDN'T NECESSARY REFER

23   TO THE SURVEY RESULTS IN MY THOUGHTS.

24   Q.   OKAY.  I JUST WANT TO MAKE SURE WE -- YOU AGREED.

25        NOW, LET ME ASK YOU ABOUT 4G.  WHAT IS THAT?

1      A.   FOURTH GENERATION USUALLY REFERS TO A NETWORKING

2      TECHNOLOGY FOR CELLULAR NETWORKS.

3      Q.   AND APPLE PHONES DIDN'T HAVE 4G TECHNOLOGIES IN 2010 AND

4      2011; CORRECT?

5      A.   I DON'T RECALL THE EXACT MODELS BY TIME INTRODUCTION.  I'D

6      HAVE TO LOOK THAT UP.  I FORGET.

7      Q.   SO DO YOU KNOW OF ANY IN 2011 OR 2010?

8      A.   I DO NOT BELIEVE WE DID, NO.

9      Q.   OKAY.  AND SAMSUNG'S PHONES, SOME OF THOSE HAD 4G

10     TECHNOLOGY, LIKE THE EPIC 4G AND -- I CAN'T READ MY WRITING.

11     I'LL SAY THE EPIC 4G BECAUSE THAT'S KIND OF EASY.  CORRECT?

12     A.   I DON'T KNOW.  MAYBE THEY DID.

13     Q.   YOU TALKED ABOUT RETAIL CHANNELS, AND THAT WAS YOUR

14     EXHIBIT 13.  AND IF WE COULD LOOK AT PDX 13, IT WAS A

15     DEMONSTRATIVE THAT YOU WERE SHOWN.

16          AND IF WE ACTUALLY LOOK AT THIS, APPLE SALES CHANNELS,

17     WHEN IT FIRST CAME OUT, IT WAS ONLY ON AT&T; CORRECT?

18     A.   IN THE U.S., YES.

19     Q.   AND BETWEEN JUNE 2007 AND FEBRUARY 2001, IT WAS ONLY ON --

20     FEBRUARY 2011, IT WAS ONLY ON AT&T?

21     A.   AS A CARRIER.  BUT SOME OF THE OTHER CHANNELS IT ALSO WAS

22     BEING SOLD.  IT WAS BEING SOLD IN BEST BUY AND OTHER CHANNELS

23     AS WELL, YES, SO THERE WERE OTHER CARRIERS.

24     Q.   SO OTHER CARRIERS, AT&T AND VERIZON AND SPRINT, AND

25     SPRINT -- LET'S PUT UP SLIDE 8.  OPENING SLIDE 8.  SORRY.

1           SO IT'S CORRECT THAT BETWEEN THESE DATES, WE'RE TALKING

2     ABOUT CARRIERS, STARTING FEBRUARY 11 THROUGH OCTOBER 14TH,

3     2011, APPLE WAS ON AT&T AND VERIZON; CORRECT?

4     A.   YES.

5     Q.   AND AFTER OCTOBER 2011, AT THAT POINT SPRINT CAME ON;

6     CORRECT?

7     A.   I BELIEVE SO.

8     Q.   AND T-MOBILE WAS NOT SELLING APPLE UNTIL APRIL OF 2013;

9     CORRECT?

10    A.   CORRECT.

11    Q.   AND IF WE GO BACK TO YOUR DEMONSTRATIVE, PDX 13, OF SALES

12    CHANNELS, TARGET WASN'T RETAILING SELLING IPHONES UNTIL

13    NOVEMBER 7TH OF 2010; CORRECT?

14    A.   I DON'T -- WE HAD A COUPLE SALES PROGRAMS THROUGHOUT THE

15    TIME WITH THEM ON AND OFF, SO I DON'T KNOW THE EXACT TIMES OF

16    EACH OF THOSE.

17    Q.   IS IT CORRECT THAT THE ORIGINAL IPAD WAS RELEASED IN APRIL

18    OF 2010?

19    A.   YES.

20    Q.   AND THE IPAD 2 WAS RELEASED IN MARCH OF 2011?

21    A.   CORRECT.

22           MR. PRICE:  ONE MOMENT, YOUR HONOR.

23         (PAUSE IN PROCEEDINGS.)

24           MR. PRICE:  I WAS JUST CHECKING TO SEE IF THERE'S

25    ANYTHING ELSE I HAD TO SHOW YOU BECAUSE YOU'RE THE ONLY PERSON

1      WHO COULD TELL US ABOUT IT.

2      Q.   SO WHEN WE LOOK AT YOUR EXPERIENCE AS A MARKETING, SOMEONE

3      IN MARKETING, YOU'VE TOLD US THAT THERE ARE HUNDREDS OF FACTORS

4      THAT MAY GO INTO WHY SOMEONE MIGHT BUY AN IPHONE; CORRECT?

5      A.   YES.

6      Q.   HUNDREDS OF FACTORS AS TO WHY SOMEONE MIGHT BUY A SAMSUNG;

7      CORRECT?

8      A.   YES.

9      Q.   AND THOSE FACTORS MIGHT NOT BE THE SAME?  THAT IS, SOME

10     PEOPLE MAY PREFER THINGS WHICH ONLY SAMSUNG OFFERS, SUCH AS THE

11     COMMODITY YOU REFERRED TO AS THE BIG SCREEN?

12     A.   THERE MAY BE SOME ITEMS NOT THE SAME ON BOTH LISTS,

13     CORRECT.

14     Q.   SOME ITEMS SUCH AS A REMOVABLE BATTERY; CORRECT?

15     A.   YES.

16     Q.   THAT IS, SAMSUNG, WE CAN REMOVE THE BATTERY, AND APPLE YOU

17     CANNOT; CORRECT?

18     A.   I DON'T KNOW.  I DON'T LOOK AT WHAT SAMSUNG BATTERIES DO.

19     Q.   OKAY.  WELL, ISN'T -- ACTUALLY, HAVEN'T YOU DONE SURVEYS

20     AND REPORTS ON BATTERY CAPABILITY?  THAT IS, YOU KNOW, WHICH

21     PHONES ARE BETTER IN BATTERY, WHICH ARE BETTER IN SCREEN SIZE

22     BETWEEN YOU AND SAMSUNG?

23     A.   I DON'T RECALL.  PERHAPS.  I DON'T REMEMBER ONE.

24     Q.   OKAY.  AND YOU'RE AWARE THAT IF YOU LOOK AT THE

25     DEMOGRAPHICS OF WHO'S BUYING A SAMSUNG AND WHO'S BUYING AN

1    APPLE, YOU'RE AWARE THAT THOSE DEMOGRAPHICS ARE DIFFERENT?

2    A.   SOME REPORTS SUGGEST THAT.  I DON'T KNOW TO WHAT EXTENT,

3    BUT THERE MAY BE SOME DIFFERENCES OVER TIME.

4    Q.   OKAY.  SO THAT THE GROUP OF SAMSUNG BUYERS -- WELL, STRIKE

5    THAT.

6         AS SOMEONE WHO'S IN MARKETING AND DOES SURVEYS, IF YOU

7    WANT TO LOOK TO SEE WHAT A GROUP OF SAMSUNG BUYERS, WHY THEY

8    BOUGHT THEIR PHONES, YOU KNOW, BECAUSE OF DIFFERENT

9    DEMOGRAPHICS, THERE MAY BE DIFFERENT REASONS THEY BOUGHT THEIR

10   PHONES THAN WHY APPLE PEOPLE BOUGHT THEIR PHONES; RIGHT?

11   A.   I DON'T REALLY BELIEVE THAT.  I THINK THAT SOME OF

12   THESE -- THERE ARE DIFFERENCES.  THEY'RE GRADED BY DIFFERENT

13   SITUATIONS.

14        BUT WHEN WE'RE TALKING ABOUT MILLIONS AND MILLIONS OF

15   PEOPLE, IT'S MORE OFTEN THAT THEY'RE THE SAME THAN THEY ARE

16   DIFFERENT.  YOU CAN FIND DIFFERENCES BETWEEN DIFFERENT TIMES

17   AND DIFFERENT SITUATIONS.  BUT IN GENERAL, ORDERS OF -- PEOPLE

18   ON THIS ORDER OF MAGNITUDE GENERALLY ARE THE SAME OVER AN

19   ENTIRE POPULATION OF PEOPLE.

20   Q.   WELL, APPLE HAS IN ITS FILES MULTIPLE REPORTS FROM

21   COM-TECH ASKING ANDROID BUYERS WHY THEY DID CERTAIN THINGS;

22   CORRECT?

23   A.   YES.

24   Q.   ASKING ANDROID BUYERS WHO THEIR PREFERENCES WERE; CORRECT?

25   A.   YES.

1    Q.   AND THEIR ANSWERS ARE USUALLY DIFFERENT THAN THE APPLE

2    BUYERS, SUCH AS THAT SCREEN SIZE; CORRECT?

3    A.   THERE MAY BE SOME ANSWERS THAT ARE DIFFERENT, YES.

4    Q.   OKAY.  AND APPLE, TO DATE AS FAR AS YOU KNOW, HASN'T DONE

5    ANY SURVEYS TO ASK SAMSUNG BUYERS WHO BOUGHT THE PHONES WITH

6    THE ACCUSED FEATURES WHY THEY BOUGHT THOSE PHONES, WHETHER IT

7    HAD ANYTHING TO DO WITH THE ACCUSED FEATURES; CORRECT?

8    A.   WELL, I WOULDN'T -- I HAVEN'T AND WOULDN'T DO A SURVEY

9    THAT, A, OF THINGS THAT I JUST KNOW GENERALLY TO BE TRUE; AND,

10   B, I'M NOT SURE THAT YOU COULD PROPERLY CONSTRUCT A SURVEY OF

11   THAT KIND.

12   Q.   DO YOU THINK YOU HAVE LESS OR MORE EXPERIENCE IN DOING

13   SURVEYS THAN PROFESSOR HAUSER, WHO WAS APPLE'S EXPERT?

14   A.   I DON'T KNOW PROFESSOR HAUSER.

15   Q.   OKAY.  I MEAN, IF APPLE'S EXPERT SAID THAT HE COULD DO

16   SUCH A SURVEY AND WAS QUALIFIED TO DO IT, WOULD YOU HAVE ANY

17   REASON TO DISPUTE THAT?

18   A.   EXACTLY WHAT KIND OF SURVEY ARE YOU ASKING FOR?

19   Q.   ASKING SAMSUNG BUYERS WHO BOUGHT THESE, BOUGHT PHONES WITH

20   THE ACCUSED FEATURES WHY THEY CHOSE THEIR PHONES?

21   A.   OH, SURE.  SURVEYS ABOUT CUSTOMERS TODAY AND WHAT THEY BUY

22   AND WHY ARE REASONABLE.

23        I THOUGHT YOU WERE ASKING FOR A SURVEY ABOUT WHETHER

24   CUSTOMERS LIKED SOMETHING DURING THIS TIME A COUPLE YEARS AGO.

25   THAT I WOULDN'T DO.

```
1          MR. PRICE:  NO FURTHER QUESTIONS.

2          THE COURT:  OKAY.  THE TIME IS NOW 11:15.

3                     REDIRECT EXAMINATION

4    BY MR. MCELHINNY:

5    Q.   SIR, YOU HAD SOMETHING THAT YOU WANTED TO SAY ABOUT THE LG

6    PRADA AND WHY YOU DIDN'T THINK ABOUT IT AND I WAS INTERESTED IN

7    IT AND I'LL TAKE IT ON MY TIME.

8    A.   SURE.  WELL, SIMPLY WHEN HE SHOWED ME THAT PHONE AGAIN, I

9    RECALL THAT IT WAS A PHONE THAT ISN'T A SMARTPHONE, SO I DIDN'T

10   THINK ABOUT THAT AS WE WERE BRINGING TO MARKET SMARTPHONES, AND

11   IT WASN'T MULTITOUCH, AND I THINK IT EVEN HAD A BLACK AND WHITE

12   U/I.

13        SO WHEN WE THINK ABOUT BEING, CREATING SOMETHING NEW IN

14   THE MARKET, I WOULDN'T HAVE COMPARED SOMETHING THAT WASN'T A

15   SMARTPHONE AND WASN'T MULTITOUCH.  THAT WOULDN'T EVEN HAVE

16   ENTERED MY THOUGHT TO THINK ABOUT AND LOOK AT.

17   Q.   SIR, I'M GOING TO ASK YOU A QUESTION, BUT BEFORE I ASK YOU

18   A QUESTION, I'M GOING TO GIVE YOU SOME FACTS WHICH I BELIEVE

19   ARE STIPULATED AND NOT IN DISPUTE.

20        COUNSEL SHOWED YOU THIS GALAXY TAB 7.0 (INDICATING), AND

21   I'M GOING TO TELL YOU THAT THIS IS ON THE JURORS' LIST AS ONE

22   OF THE ACCUSED DEVICES IN THIS CASE.  OKAY?

23   A.   OKAY.

24   Q.   COUNSEL ALSO SHOWED YOU THIS TABLET, WHICH IS THE GALAXY

25   10 -- THE GALAXY 10.1 WI-FI, EXHIBIT 1037 (INDICATING).
```

1          AND I'M GOING TO TELL YOU THAT IN THE PREVIOUS CASE, THE

2   JURORS DETERMINED THAT THIS TABLET INFRINGED ALL THREE OF THE

3   UTILITY PATENTS AT ISSUE IN THIS CASE.

4          AND I BELIEVE WE HAVE A STIPULATION THAT THAT'S TRUE.

5              MR. PRICE:  STIPULATED THAT THAT'S TRUE.

6   BY MR. MCELHINNY:

7   Q.   AND THEN I'M GOING TO TELL YOU THAT IN HIS EXAMINATION,

8   COUNSEL REFERRED TO THE EPIC 4G PHONE AS A FOURTH GENERATION

9   PHONE, AND I'M GOING TO TELL YOU THAT THAT EPIC 4G IS ALSO ON

10  THE JURORS' LIST AS ONE OF THE ACCUSED DEVICES IN THIS CASE.

11  OKAY?

12  A.   OKAY.

13  Q.   THOSE ARE THE FACTS.  NO DISPUTE ABOUT IT.

14         THE QUESTION IS THIS:  DOES APPLE INTEND TO ALLOW SAMSUNG

15  TO SELL INFRINGING PRODUCTS IN THE UNITED STATES?

16  A.   ABSOLUTELY NOT.

17  Q.   DOES IT MATTER WHETHER IT INFRINGES ONE PATENT OR FIVE

18  PATENTS OR FIFTY PATENTS?

19  A.   NO TO ME IT DOESN'T.

20  Q.   WHY AREN'T YOU JUST LETTING SAMSUNG INFRINGE YOUR PATENTS?

21  A.   BECAUSE ULTIMATELY WHAT'S BEEN DONE HERE IS TO COPY MANY

22  ATTRIBUTES OF APPLE'S PRODUCTS AND TO COPY BOTH DESIGNS AND

23  FEATURES, AND THESE ARE THINGS THAT ARE THE VERY ESSENCE OF

24  WHAT APPLE IS ABOUT, HOW WE CREATE WHAT WE HOPE CUSTOMERS LOVE,

25  HOW WE'VE BUILT OUR BUSINESS AND WHAT DIFFERENTIATES US.

1    THAT'S WHAT OUR BUSINESS IS ABOUT.  OTHER COMPANIES HAVE OTHER

2    BUSINESS MODELS.  THAT'S APPLE'S, AND IF WE DON'T HAVE THAT, WE

3    DON'T HAVE APPLE'S ENTIRE BUSINESS.

4         AND YOU CAN PICK APART ONE FEATURE OR ONE PRODUCT, BUT AT

5    THE END OF THE DAY, THERE IS A CUMULATIVE EFFECT OF DOING ALL

6    THIS THAT IS INCREDIBLY DAMAGING AND, AND AT SOME POINT IT HAS

7    TO STOP AND YOU SAY NO TO ANY OF THESE PRODUCTS THAT DO THAT.

8    Q.   ONE MORE QUESTION.  COUNSEL ASKED YOU WHETHER OR NOT WHEN

9    YOU INTRODUCED THE IPHONE YOU DIDN'T EXPECT COMPETITION, YOU

10   DIDN'T EXPECT PEOPLE TO TRY TO MAKE PHONES THAT WERE SIMILAR,

11   CLOSE TO, NOT INFRINGING THE LAW.

12        DO YOU REMEMBER THAT SERIES OF QUESTIONS?

13   A.   I DO.

14   Q.   BASED ON YOUR PERSONAL EXPERIENCE IN 2010 AND 2011, WHAT

15   HAPPENED TO THE PHONE COMPANIES THAT DIDN'T INFRINGE YOUR

16   PATENTS?

17   A.   WELL, I THINK THEY --

18            MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

19            THE COURT:  SUSTAINED.

20            MR. MCELHINNY:  HE WAS THERE, YOUR HONOR.  THESE ARE

21   HIS COMPETITORS.  HE KNOWS WHAT THE MARKET SHARE IS.  WE'VE PUT

22   UP SALES.  THIS IS HIS JOB.

23            MR. PRICE:  HE DOESN'T KNOW IF THEY INFRINGED OR

24   DIDN'T INFRINGE OR ACCUSE OR DIDN'T ACCUSE, UNLESS THERE'S A

25   STIPULATION THAT NO OTHER COMPETITORS INFRINGED.

```
1              THE COURT:  OBJECTION IS SUSTAINED.

2              MR. MCELHINNY:  MAY I TRY TO REPHRASE IT?

3              THE COURT:  TRY TO REPHRASE.

4     BY MR. MCELHINNY:

5     Q.   WHAT HAPPENED TO SAMSUNG'S MARKET SHARE COMPARED TO, FOR

6     EXAMPLE, THE MARKET SHARE OF NOKIA?

7     A.   THEIR MARKET SHARE WENT UP DRAMATICALLY DURING THIS TIME.

8     Q.   WHOSE?

9     A.   SAMSUNG'S MARKET SHARE WENT UP DRAMATICALLY.

10    Q.   WHAT HAPPENED TO NOKIA'S MARKET SHARE?

11    A.   IT PLUMMETED.

12    Q.   WHAT HAPPENED TO SAMSUNG'S MARKET SHARE COMPARED TO

13    MOTOROLA'S MARKET SHARE?

14    A.   AS A GREAT EXAMPLE, BOTH ANDROID MAKERS, AND SAMSUNG'S

15    MARKET SHARE GREW DRAMATICALLY AND MOTOROLA'S HAS DROPPED

16    DRAMATICALLY.

17             MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:20.

19        ANY RECROSS?

20             MR. PRICE:  YES.

21                         RECROSS-EXAMINATION

22    BY MR. CEDERBERG:

23    Q.   SO SAMPLE IS TAKING MARKET SHARE FROM THESE OTHER ANDROID

24    MANUFACTURERS AND NOKIA; CORRECT?

25             MR. MCELHINNY:  THIS IS WHAT HE JUST CLAIMED HE
```

```
1        DOESN'T HAVE FOUNDATION ABOUT, HOW --

2              THE COURT:  OVERRULED.

3          GO AHEAD, PLEASE.  ASK YOUR QUESTION, MR. PRICE.

4              THE WITNESS:  I THINK THEY HAVE TAKEN MARKET SHARE,

5     SAMSUNG HAS TAKEN MARKET SHARE BOTH FROM APPLE AND SOME OTHER

6     SMARTPHONE MANUFACTURERS AS WELL.

7     BY MR. PRICE:

8     Q.   APPLE'S MARKET SHARE HAS SPIKED EVERY TIME THEY COME OUT

9     WITH A NEW PRODUCT?

10    A.   THERE IS WHAT WE CALL A SEASONAL EFFECT TO OUR MARKET

11    SHARE AND SALES, AND THEY'RE INFLUENCED BOTH BY THE TIME OF

12    YEAR, AS WELL AS THE INTRODUCTION OF PRODUCTS.

13    Q.   IT SPIKES EVERY TIME THERE'S A NEW PRODUCT; RIGHT?

14    A.   IT WILL GO UP IF THERE'S A NEW PRODUCT.

15    Q.   AND THEN AS THE PRODUCT GETS OLDER, THE MARKET SHARE MAY

16    DECREASE, AND DOES; CORRECT?

17    A.   YES, IT CAN.

18    Q.   AND WHAT YOU'VE JUST TOLD US IS THAT SAMSUNG IS BEATING

19    OUT THE OTHER ANDROID MANUFACTURERS; CORRECT?

20    A.   THAT'S NOT WHAT I JUST TOLD YOU.  WHAT I TALKED ABOUT WAS

21    DURING THIS TIME, DURING THIS TIME THAT WE'RE TALKING ABOUT

22    WHERE ANDROID AND IPHONE WERE IN COMPETITION, ONE COMPANY HAS

23    GROWN DRAMATICALLY FASTER THAN IT EVER USED TO, SAMSUNG, DURING

24    THE TIME THESE PRODUCTS ARE INFRINGING.

25              AND THESE OTHER COMPANIES THAT HAVEN'T DONE THE EXTENT OF
```

```
 1      INFRINGING SAMSUNG HAS DONE HAVEN'T GROWN AT THE SAME RATE.

 2      THERE'S A DIFFERENCE.  ONE IS COPYING.  THE OTHERS ARE NOT, AS

 3      MUCH.  AND SO I SEE A BIG DIFFERENCE HAPPENING IN THE

 4      MARKETPLACE.

 5      Q.   APPLE HAS ACCUSED OTHER MANUFACTURERS OF COPYING?

 6      A.   I'M NOT INVOLVED WITH THAT.  I WOULDN'T KNOW.

 7      Q.   YOU'RE AWARE OF IT?  YOU JUST SAID THAT THEY'RE NOT

 8      COPYING.  YOU'VE ACCUSED OTHERS OF COPYING?

 9      A.   I SAID AS MUCH AS SAMSUNG.

10      Q.   IN THIS TIME FRAME, BY THE WAY, APPLE'S MARKET SHARE HAS

11      EXPLODED THE WHOLE TIME SINCE THE IPHONE CAME OUT.

12      A.   I'M SORRY.  IS THERE A QUESTION?

13      Q.   APPLE'S IPHONE -- WHAT SHARE OF THE MARKET DOES APPLE

14      HAVE?

15      A.   IN THE 20'S IN THE U.S. RIGHT NOW.

16      Q.   AND DURING THE TIME FRAME HERE AT THE END OF 2011, WHAT

17      WAS IPHONE -- WHAT WAS APPLE'S SHARE?

18      A.   I DON'T KNOW.

19      Q.   DO YOU CALL IT WAS 45 PERCENT?

20      A.   NO, I DON'T RECALL.

21           THE COURT:  ARE YOU DONE?

22           MR. PRICE:  OH, I'M SORRY.  YEAH.

23           THE COURT:  OKAY.  11:22.

24      ALL RIGHT.  MAY THIS -- ARE YOU GOING TO ASK ANY MORE

25      QUESTIONS?
```

1            MR. MCELHINNY:  I AM NOT, YOUR HONOR.  I WILL.

2            THE COURT:  OKAY.

3            MR. MCELHINNY:  I HADN'T PLANNED ON IT.

4            THE COURT:  OKAY.  SO MAY THIS WITNESS BE EXCUSED AND

5     IS IT SUBJECT TO RECALL OR NOT?

6            MR. MCELHINNY:  HE IS EXCUSED.  WE MAY RECALL HIM,

7     BUT HE'S NOT SUBJECT TO ORDER OF THE COURT.

8            THE COURT:  OKAY.  AND MR. PRICE, EXCUSED, NOT

9     SUBJECT TO RECALL FROM YOU?

10           MR. PRICE:  NOT SUBJECT TO RECALL, YOUR HONOR.

11           THE COURT:  OKAY.  THEN YOU ARE EXCUSED.

12           MR. MCELHINNY:  AT THIS TIME, YOUR HONOR, SUBJECT TO

13    THE FINAL COMPLETION OF THE EXHIBIT LIST, APPLE RESTS ITS

14    CASE-IN-CHIEF.

15           THE COURT:  OKAY.

16           MR. PRICE:  YOUR HONOR, APPARENTLY I OMITTED -- I --

17    OH, I WAS GOING TO MOVE SOMETHING IN THAT'S ALREADY IN.  NEVER

18    MIND.

19           THE COURT:  OKAY.  ALL RIGHT.

20        SO LET ME ASK, WHAT IS YOUR ESTIMATED -- CAN WE HANDLE

21    THIS IN FIVE, TEN MINUTES, THE ISSUE YOU WANTED TO BRING UP?

22           MS. MAROULIS:  FIFTEEN MINUTES, YOUR HONOR.

23           THE COURT:  WELL, THERE IS SOMETHING THAT WE NEED TO

24    HANDLE OUTSIDE YOUR PRESENCE, AND WE CAN EITHER JUST GO AHEAD

25     AND HAVE YOU BREAK FOR LUNCH EARLY, WOULD YOU PREFER THAT,

```
 1        RATHER THAN HAVING TO WAIT FOR US TO TAKE CARE OF THIS?  YOU
 2        COULD GO AHEAD AND GO TO LUNCH NOW, WE'LL TAKE CARE OF OUR
 3        ISSUE, WHICH WE HAVE TO DO OUTSIDE YOUR PRESENCE, AND THEN TAKE
 4        OUR OWN LUNCH BREAK.  DOES THAT SOUND OKAY?
 5            WHY DON'T WE GO AHEAD THEN, COULD WE COME BACK AT 12:45
 6        TODAY?  IS THAT ALL RIGHT?  OKAY.
 7            AND AT THE END OF TODAY, I WILL ALSO GIVE YOU AN UPDATE AS
 8        TO THE SCHEDULE FOR NEXT WEEK.  AS YOU CAN TELL, WE'VE BEEN
 9        GOING PRETTY FAST AND THE PARTIES ARE LIMITED AS TO THEIR TIME,
10        SO THERE'S A POSSIBILITY WE MAY BE GETTING THIS CASE TO YOU
11        EVEN EARLIER THAN WHAT I HAD PREDICTED ON TUESDAY.  BUT I'LL
12        GIVE YOU AN UPDATE AT THE END OF THE DAY WHEN WE SEE EXACTLY
13        HOW MUCH OF THE TRIAL EVIDENCE HAS COME IN BY THE END OF TODAY.
14        OKAY?
15            SAME ADMONITIONS.  PLEASE KEEP AN OPEN MIND.  DON'T
16        DISCUSS OR RESEARCH THE CASE.
17            THANK YOU.
18            (JURY OUT AT 11:25 A.M.)
19                THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT THE
20        JURORS HAVE LEFT THE COURTROOM.
21            GO AHEAD, PLEASE.  LET -- YOU KNOW, LET'S DO A LITTLE
22        HOUSEKEEPING.  I THINK THAT WE HAVE COMPLETELY RESOLVED ONE WAY
23        OR THE OTHER ALL OF THE EXHIBITS.  DO YOU HAVE ANYTHING THAT'S
24        PENDING ON YOUR LIST?  I DON'T.
25                MR. MCELHINNY:  WE DON'T THINK WE DO, YOUR HONOR.
```

```
1              THE COURT:  OKAY.  MS. MAROULIS?

2              MS. MAROULIS:  YOUR HONOR, THE PARTIES ARE DISCUSSING

3       THE LIST OF JOINT EXHIBITS TO BE ADMITTED INTO EVIDENCE, BUT

4       THERE'S NOTHING THAT THE COURT HAD NOT RULED ON THAT WAS

5       SUBMITTED TO THE COURT.

6              THE COURT:  OKAY.  ALL RIGHT.  LET'S GO AHEAD AND

7       SET -- SO LET ME TELL YOU WHAT I THINK OF, IN TERMS OF THE

8       SCHEDULE.

9          I THINK YOU HAVE MAYBE SIX HOURS LEFT AT THE MOST, LESS

10      THAN THAT.  SO I THINK IF WE GO THREE HOURS AT LEAST THIS

11      AFTERNOON AND THREE HOURS YOU'LL BE DONE BY MONDAY MORNING AT

12      LUNCH TIME, I THINK.

13         SO IF THAT'S THE CASE, I WAS GOING TO PROPOSE THAT PERHAPS

14      WE LET THE JURORS GO HOME AT THE LUNCH HOUR AND TAKE THE

15      AFTERNOON OFF.

16         AT THAT POINT YOU CAN DO YOUR RENEWED RULE 50 MOTIONS

17      AFTER THE CLOSE OF ALL THE EVIDENCE, WE CAN HAVE THAT HEARING

18      AND THE JURY INSTRUCTION CONFERENCE AND GET THE JURY

19      INSTRUCTIONS COMPLETELY READY.

20         I ALSO WANT YOU ALL TO STIPULATE TO THE EXHIBITS THAT ARE

21      GOING INTO THE JURY ROOM AND STIPULATE TO THE FINAL EXHIBIT

22      LIST.

23         WE'LL GET ALL OF THAT COMPLETELY READY AND THEN TUESDAY

24      MORNING I'LL READ THE PRELIMINARY INSTRUCTIONS, WHICH WILL TAKE

25      ABOUT 40 MINUTES I THINK, AND I WAS GOING TO SUGGEST THAT WE
```

```
 1        JUST DO CLOSINGS STRAIGHT AND JUST HAVE THE JURORS GO TO LUNCH

 2    LATER RATHER THAN TAKING A LUNCH BREAK IN THE MIDDLE OF

 3    CLOSING.  BUT I DON'T HAVE A STRONG VIEW AS TO THAT.

 4            ANYONE WANT TO COMMENT ON THAT SCHEDULE?

 5                MR. LEE:  I THINK THAT'S FINE WITH APPLE, YOUR HONOR.

 6                MR. PRICE:  YOUR HONOR, I'M AFRAID THEY'RE GOING TO

 7    BE EXHAUSTED.

 8                THE COURT:  SO YOU'D RATHER TAKE A LUNCH BREAK?

 9                MR. PRICE:  I THINK I'D RATHER TAKE A BREAK IF THAT'S

10    OKAY.

11                THE COURT:  THAT'S FINE.

12                MR. LEE:  EITHER WAY IS FINE, YOUR HONOR.

13                THE COURT:  OKAY.  THAT'S FINE.  THEN WHY DON'T WE

14    JUST KEEP OUR REGULAR SCHEDULE ON TUESDAY.  THAT'S FINE WITH

15    ME.

16        BUT I DO WANT YOU TO FILE AT LEAST EXHIBIT LISTS THROUGH

17    THE END OF TODAY.  WHY DON'T YOU FILE THOSE ON -- DO YOU WANT

18    TO FILE THEM ON -- WHAT DO YOU WANT?  SATURDAY OR SUNDAY?  I

19    JUST NEED TO COMPARE IT AGAINST MY OWN LIST SO WE CAN DISCUSS

20    ANY DISCREPANCIES, BUT --

21                MS. MAROULIS:  SUNDAY WOULD BE GREAT, YOUR HONOR.

22                THE COURT:  THAT'S FINE.  SO THAT IS, I BELIEVE, THE

23    17TH.  SO FILE THAT ON THE 17TH.  LET'S SAY 10:00 A.M.

24        AND THEN YOU'LL FILE YOUR FINAL ONES ON THE 18TH AND

25    STIPULATE TO THE EXHIBITS.  I'D LIKE YOU TO FILE IT IN TIME FOR
```

1    ME TO COMPARE IT TO MY OWN LIST, SO LET'S SAY CAN YOU DO

2    6:00 P.M. ON THE 18TH?

3              MS. MAROULIS:  YES, YOUR HONOR.

4              THE COURT:  OKAY.  ALL RIGHT.  SO THAT'LL TAKE CARE

5     OF OUR EXHIBITS.

6         ALL RIGHT.  LET'S GO AHEAD THEN WITH YOUR RULE 50 MOTIONS,

7     PLEASE.

8              MS. MAROULIS:  YOUR HONOR, SAMSUNG MOVES FOR RULE 50

9      MOTIONS ON SEVERAL GROUNDS.  I'LL TRY TO BE BRIEF SO WE CAN

10     FINISH IN TIME FOR LUNCH BREAK.

11         FIRST OF ALL, APPLE FAILED TO INTRODUCE ANY EVIDENCE OF

12     LOST PROFITS FOR SEVERAL PATENTS AT ISSUE.  THERE ARE '381,

13     '163, AND D'677 PATENTS.  THE COURT PRECLUDED APPLE FROM

14     RELYING ON ITS EXPERT TESTIMONY AND THERE WAS NO OTHER

15     TESTIMONY OTHERWISE.

16         SO AS A MATTER OF LAW, THE JUDGMENT SHOULD BE GIVEN ON

17     LOST PROFITS THEORIES, OR NO LOST PROFITS THEORIES FOR THOSE

18     PATENTS.

19         SIMILARLY AS TO THE DESIGN PATENT NUMBER '305, APPLE DID

20     NOT PRESENT ANY LOST PROFITS THEORY, THROUGH ITS EXPERT OR

21     OTHERWISE, SO JUDGMENT OF NO LOST PROFITS SHOULD BE GIVEN ON

22     THAT PATENT AS WELL.

23         WITH RESPECT TO THE LAST REMAINING UTILITY PATENT ON WHICH

24     APPLE WAS SEEKING LOST PROFITS, WHICH IS THE '915 PATENT, APPLE

25     DID NOT MEET ITS BURDEN ON SEVERAL PANDUIT FACTORS.

1        FIRST OF ALL, APPLE DID NOT PROVE ABSENCE OF ACCEPTABLE

2    NON-INFRINGING ALTERNATIVES, WHICH IS PANDUIT FACTOR 2 ON WHICH

3    APPLE HAS ITS BURDEN.

4        IN EVIDENCE THERE WERE A NUMBER OF ACCEPTABLE

5    NON-INFRINGING ALTERNATIVES, SUCH AS INTERCEPT, TRANSFORM,

6    GALAXY ACE PHONES.

7        IN ADDITION TO THAT, THERE WAS SOME OTHER TECHNOLOGIES

8    INTRODUCED BY SAMSUNG, WHICH IS JEFFERSON -- INTRODUCED INTO

9    THE EVIDENCE BY SAMSUNG, THE NOMURA PRIOR ART, JEFFERSON HAN

10   PRIOR ART FRACTAL ZOOM, AND A VARIETY OF OTHER TECHNOLOGIES.

11       ALONG THE SAME LINES WITH RESPECT TO FACTOR 2, APPLE

12   PRESENTED NO EVIDENCE THAT SHOWED DEMAND FOR THE PARTICULAR

13   PATENTED FEATURES ASSERTED IN THIS CASE.

14       UNDER BIC LEISURE, TO RECOVER LOST PROFITS, A PATENT OWNER

15   MUST PROVE A CAUSAL RELATIONSHIP BETWEEN THE INFRINGEMENT AND

16   THE LOSS OF PROFITS.

17       APPLE HERE DID NOT PRESENT THE BUT FOR EVIDENCE THAT IS

18   THE QUESTION CENTRAL TO THIS CASE.

19       APPLE PRESENTED DR. HAUSER, BUT HE ONLY MEASURED THE PRICE

20   PREMIUM FOR THE PATENTED FEATURES.  APPLE COULD NOT EVEN

21   PRESENT EVIDENCE THAT ANY OF THE CONSUMERS, WHETHER THOSE

22   SURVEYED BY DR. HAUSER OR OTHERWISE, WERE AWARE OF THE PATENTED

23   FEATURES AT ISSUE.

24       FURTHER, APPLE PRESENTED INSUFFICIENT EVIDENCE OF THE

25   SPECIFIC PRODUCTS FOR WHICH IT CLAIMS LOST PROFITS BEING IN THE

1    SAME MARKET AS THE INFRINGING SAMSUNG PRODUCTS, NOT COMPETITION

2    GENERALLY, BUT WITH RESPECT TO THE SPECIFIC PRODUCTS AT ISSUE.

3         FURTHER, WITH RESPECT TO THE PANDUIT FACTOR ON CAPACITY,

4    APPLE FAILED TO ESTABLISH CAPACITY FOR AT LEAST THE IPAD 2 AND,

5    THEREFORE, DID NOT MEET ITS PANDUIT FACTOR ON CAPACITY.

6         FINALLY, WITH RESPECT TO THE LAST PANDUIT FACTOR, WHICH IS

7    THE LOST PROFITS CALCULATIONS THEMSELVES, APPLE IMPROPERLY

8    INCLUDED IN THE CALCULATIONS THE WORLDWIDE PRICE FOR IPHONE AND

9    IPAD.  BECAUSE THE CALCULATIONS NEED TO BE BASED ON THE U.S.

10   SPECIFIC PRICE, APPLE DID NOT ESTABLISH THE PANDUIT FACTOR 4,

11   WHICH IS PRECISE CALCULATION OF LOST PROFITS.

12        APPLE FURTHER DID NOT ESTABLISH, OR IT IGNORED THE PRICE

13   ELASTICITY ISSUES IN CONTRAVENTION OF THE PRECEDENT IN BIC

14   LEISURE VERSUS WINDSURFING.

15        APPLE IGNORES THE ELASTICITY POINTS WHERE THE

16   SAMSUNG/APPLE PRODUCTS COMPETE ON DIFFERENT PRICE CATEGORIES

17   AND FURTHER INCLUDED IN THEIR LOST PROFITS CALCULATIONS UNITS

18   WHERE APPLE DID NOT EVEN HAVE THE SAME CARRIERS AS SAMSUNG

19   OFFERING THOSE PRODUCTS.

20        THERE ARE SOME OTHER DIFFERENCES THAT APPLE'S ANALYSIS

21   IGNORES, INCLUDING DIFFERENCES IN ATTRIBUTES BETWEEN THE

22   PHONES, SUCH AS MECHANICAL KEYBOARDS VERSUS SOFTWARE SOFT

23   KEYBOARDS, DIFFERENT SIZE OF THE SCREEN, AND OTHER ATTRIBUTES.

24        THE CALCULATION OF LOST PROFITS INCLUDES IMPROPER THE

25   GALAXY TAB 7.0 3G EVEN THOUGH THERE'S NO EVIDENCE THAT IT

1    COMPETES IN THE SAME MARKET AS IPAD AND IPAD 2.

2         FURTHER, AS SHOWN BY SAMSUNG, APPLE DID NOT ESTABLISH

3    EVIDENCE THAT ANDROID USERS ACTUALLY WOULD CHOOSE APPLE IF

4    SAMSUNG PHONES WEREN'T AVAILABLE ON THE MARKET.

5         IN SHORT, WITH RESPECT TO THE '915 PATENT, APPLE FAILED TO

6    PROVE A NUMBER OF PANDUIT FACTORS AND NO LOST PROFITS SHOULD BE

7    AVAILABLE.

8         TO THE EXTENT APPLE ARGUES HERE TODAY OR ELSEWHERE THAT

9    THEY ARE SEEKING OR ENTITLED TO LOST PROFITS ON THE OTHER

10   PATENTS, THESE SAME PANDUIT FACTORS AND THE ABSENCE OF EVIDENCE

11   ALSO APPLY TO THOSE.

12        MOVING ON TO THE REASONABLE ROYALTY, APPLE FAILED TO

13   APPORTION THE ROYALTY AND THE REVENUES AS BETWEEN THE

14   INFRINGING AND NOT INFRINGING FEATURES IN CONTRAVENTION OF THE

15   FEDERAL CIRCUIT PRECEDENT SUCH AS LUCENT VERSUS GATEWAY AND

16   UNILOC VERSUS MICROSOFT.

17        WE'VE HEARD SOME TESTIMONY ABOUT MS. DAVIS ASSUMING THAT

18   APPLE WAS AN UNWILLING LICENSEE, BUT THEY DID NOT PRESENT

19   ACTUAL EVIDENCE THAT IT WAS NOT WILLING TO LICENSE EVER DESIGN

20   PATENTS OR UTILITY PATENTS, AND OF COURSE THAT IS NOT THE CASE

21   FACTUALLY.

22        FURTHERMORE, THE GEORGIA PACIFIC TEST, THE WHOLE POINT OF

23   IT IS THAT IT ASSUMES A WILLING LICENSOR AND LICENSEE, SO THAT

24   ASSUMPTION IS INCORRECT HERE IN CONTRAVENTION OF THE FEDERAL

25   CIRCUIT PRECEDENT AND, THEREFORE, THE REASONABLE ROYALTY WAS

1    NOT ESTABLISHED.

2         AS WITH THE NON-INFRINGING ALTERNATIVE AND THE NO LOST

3    PROFITS CONTEXT, HERE APPLE ASSUMED, FOR THE PURPOSES OF ITS

4    REASONABLE ROYALTY ANALYSIS, THAT SAMSUNG WOULD BE ENTIRELY OUT

5    OF THE MARKET DURING THE RELEVANT PERIOD, IGNORING THE ENTIRETY

6    OF THE DIFFERENT NON-INFRINGING ALTERNATIVES.

7         WE ALREADY MENTIONED THE NON-INFRINGING ALTERNATIVES FOR

8    THE '915 PATENT, BUT SPECIFICALLY WITH RESPECT TO '163, AT

9    LEAST THE FOLLOWING NON-INFRINGING ALTERNATIVES WERE PRESENTED:

10   THE INTERCEPT, CAPTIVATE, CONTINUUM, GEM, INDULGE, TRANSFORM,

11   NEXUS S 4G, AND ADDITIONAL TECHNOLOGIES SUCH AS TAP TO ZOOM AND

12   SCROLL OVER AND TAP TO ZOOM, TAP TO ZOOM -- SORRY, PARDON ME.

13        SO THOSE WERE THE ALTERNATIVES FOR THE '163 PATENT.

14        WITH RESPECT TO THE '381 PATENT, AGAIN, WE HAVE INTERCEPT,

15   TRANSFORM, AND ADDITIONAL TECHNOLOGIES PRESENTED BY SAMSUNG

16   DURING THE EXAMINATIONS.

17        FURTHERMORE, THE LAUNCHTILE, TABLECLOTH, AND SEVERAL

18   OTHERS ALSO SHOW THE EVIDENCE OF NON-INFRINGING ALTERNATIVES

19   AND, THEREFORE, APPLE CANNOT FULLY PROVE THAT SAMSUNG WOULD

20   HAVE BEEN OUT OF THE MARKET THAT ENTIRE PERIOD OF TIME.

21        FURTHER TO MY EARLIER POINT THAT THEY DID NOT APPORTION

22   BETWEEN INFRINGING AND NON-INFRINGING FEATURES, APPLE BASICALLY

23   HELPED ITSELF TO THE ENTIRE MARKET VALUE WITHOUT ESTABLISHING

24   THE BASIS FOR IT AND ESTABLISHING THAT THE PATENTED FEATURES

25   WERE THE REASON, THE BASIS FOR THE CONSUMER DEMAND.

1          IN PRIOR MOTIONS, IN THE PRETRIAL MOTIONS, WE'VE ALREADY

2   EXPLAINED SAMSUNG'S CONCERNS ABOUT THE COST AND INCOME

3   APPROACHES THAT MS. DAVIS PRESENTED AND HOW THESE APPROACHES

4   ARE CONTRARY TO THE EVIDENCE.

5          SPECIFICALLY WITH RESPECT TO THE INCOME APPROACH,

6   MS. DAVIS INCLUDED THE BRAND VALUE CALCULATIONS WHERE SHE

7   ATTRIBUTED A LOT MORE VALUE TO THE PATENT AT ISSUE AND DID NOT

8   SEPARATE THAT FROM OTHER PATENTS THAT APPLE HAS, AND OVERALL

9   BRAND VALUE AS WELL.

10          SPECIFICALLY, HER CALCULATIONS INCLUDE ALL PATENTS OTHER

11   THAN JUST THE TWO DESIGN PATENTS AT ISSUE, THE '677 AND '305

12   PATENTS.

13          AND FINALLY, APPLE DID NOT INTRODUCE PROBATIVE EVIDENCE OF

14   COMPARABLE LICENSES AS REQUIRED BY THE GEORGIA PACIFIC FACTORS.

15          WITH RESPECT TO THE FINAL THEORY, THE ESTABLISHMENT OF

16   SAMSUNG'S PROFITS, AGAIN, WE'VE ARGUED THIS IN PRIOR PLEADINGS

17   AND PRIOR TRIAL, BUT APPLE PRESENTS NO EVIDENCE OF

18   APPORTIONMENT.

19          SAMSUNG PREVIOUSLY CITED A NUMBER OF CASES, INCLUDING THE

20   PIANO CASES, BUSH & LANE PIANO VERSUS BECKER BROTHERS AND

21   UNTEMEYER VERSUS FREUND, ALL OF THOSE CASES STAND FOR THE

22   PROPOSITION THAT YOU CANNOT GET INFRINGER'S PROFITS ON THE

23   ENTIRE DEVICE AND YOU CAN ONLY DO IT FOR THE ACTUALLY

24   INFRINGING FEATURE.

25          APPLE FURTHER DID NOT PRESENT ANY EVIDENCE OF CAUSATION,

1    THAT THESE PARTICULAR ACCUSED FEATURES OF THE DESIGN PATENTS OR

2    THE PATENTED DESIGNS DRIVE THE SALES AND DID NOT INCLUDE THAT

3    IN THEIR CALCULATION ANALYSIS.

4        AS WITH THE LOST PROFITS CALCULATIONS, APPLE ONLY

5    PRESENTED WORLDWIDE PROFITS, NOT U.S. PROFIT FIGURES, AND THAT

6    WAS IMPROPER IN TERMS OF CALCULATING THE INFRINGER'S PROFITS.

7        FINALLY, WITH RESPECT TO THE PROFITS, APPLE'S EXPERT DID

8    NOT REASONABLY ACCOUNT FOR SAMSUNG'S DIRECT AND INDIRECT COSTS

9    AND DID NOT CONSIDER SOME OF THE COSTS, AND APPLE'S EXPERT

10   IMPROPERLY APPLIED SEC GROSS PROFIT PERCENTAGES TO STA AND SEA

11   WITHOUT THE BASIS.

12       WE ALSO WOULD LIKE TO SEEK SEVERAL RULINGS REGARDING THE

13   DAMAGES CASE AS A WHOLE.  FIRST OF ALL, APPLE HAS PRESENTED NO

14   EVIDENCE TO SUPPORT AN AWARD OF DAMAGES GREATER THAN 379

15   MILLION AND JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED ON

16   THAT BASIS.

17       APPLE FAILED TO INTRODUCE ANY EVIDENCE WHERE SAMSUNG WAS

18   ON NOTICE AS TO THE SPECIFIC PRODUCTS AT ISSUE.  WE BRIEFED

19   THAT BEFORE IN THIS CASE, AND JUDGMENT AS A MATTER OF LAW THAT

20   APPLE IS NOT ENTITLED TO ANY DAMAGES BEFORE THE NOTICE DATE OR

21   ANY DAMAGES IN THIS CASE AFTER JUNE 30, 2012.

22       AND, YOUR HONOR, I'M SORRY.  WHEN I WAS TALKING ABOUT THE

23   INFRINGER'S PROFITS, I NEGLECTED TO MENTION THAT ALSO THE

24   INFRINGER'S PROFITS ARE ONLY AVAILABLE WHERE THE DESIGNS ARE

25   APPLIED TO ARTICLES, AND THERE WAS NO DISCUSSION AND NO

1    EVIDENCE INTRODUCED ON WHETHER THE THREE, THE DESIGNS IN THE

2    '305 AND '677 PATENTS WERE ACTUALLY APPLIED TO THE ARTICLES

3    REQUIRED BY SECTION 289.

4         IF THE COURT DOESN'T HAVE ANY QUESTIONS, I WILL RESPOND TO

5    ANYTHING THAT APPLE WILL SAY.

6              THE COURT:  YOU KNOW, WE HAD A DISCUSSION ABOUT THE

7    THREE DIFFERENT ENTITIES AND BEFORE TRIAL YOU ALL SAID NO, YOU

8    WOULD NOT BE FIGHTING THAT ISSUE SINCE ALL THREE WERE FOUND

9    LIABLE, AND NOW YOU ARE AFTER WE ALREADY HAD THAT DISCUSSION

10   BEFORE TRIAL.  YOU'RE NOW MAKING A DISTINCTION BETWEEN THE

11   THREE ENTITIES.  WE SPECIFICALLY DISCUSSED THIS I THINK ON

12   NOVEMBER THE 5TH.

13             MS. MAROULIS:  YOUR HONOR, IF I UNDERSTAND YOU

14   CORRECTLY, THIS WAS WITH RESPECT TO JURY INSTRUCTIONS AND

15   WHETHER WE CAN REFER TO ALL ENTITIES AS ONE OR DIFFERENT ONES,

16   BECAUSE WE DID AGREE THAT THEY CAN ALL BE REFERRED TO AS

17   SAMSUNG.  AM I --

18             THE COURT:  WELL, I GUESS I WAS JUST THINKING OF YOUR

19   STATEMENT THAT SEC GROSS PROFITS ARE WRONGLY BEING ATTRIBUTED

20   TO STA.

21        WHY DON'T I HEAR FROM APPLE NOW?  THANK YOU.

22             MS. MAROULIS:  THANK YOU, YOUR HONOR.

23             MR. LEE:  CAN I JUST HAVE A SECOND, YOUR HONOR?

24             THE COURT:  OKAY.

25             MR. LEE:  YOUR HONOR, MAYBE I CAN TAKE SOME AND TAKE

1        SOME ISSUES OUT AND GO TO THE ISSUES HERE IN DISPUTE.

2            I THINK AS TO LOST PROFITS ON THE '381 AND THE '163,

3    THEY'RE GOVERNED BY YOUR HONOR'S PRIOR ORDER.  WE DIDN'T OFFER

4    EVIDENCE BECAUSE OF THE PRIOR ORDER.  WE FILED OUR OFFER OF

5    PROOF AND THAT'S THE REASON IT WASN'T LITIGATED.

6            WE DID NOT SEEK LOST PROFITS, APPLE'S LOST PROFITS ON THE

7    D'677 OR THE D'305.

8            NOW TO GO TO THE CONTESTED MATTERS.

9            ON THE '915, IF I WERE TO WALK THROUGH THE PANDUIT

10   FACTORS, WHICH IS ONE WAY TO ADDRESS IT, WE HAVE PROVIDED

11   EVIDENCE OF COMPETITION.  BY WAY OF EXAMPLE, PX 60 DESCRIBED A

12   TWO HORSE RACE.  MS. DAVIS'S TESTIMONY AT PAGE 647, DAY 3, PAGE

13   647, LINES 15 TO 17 DESCRIBES THAT COMPETITION.

14           MR. SCHILLER TODAY, I DON'T HAVE THE TRANSCRIPT CITES

15   OBVIOUSLY, YOUR HONOR, DESCRIBED THAT COMPETITION IN DETAIL

16   BOTH ON DIRECT AND CROSS-EXAMINATION.

17           AS TO DEMAND FOR THE PATENTED PRODUCT, MR. BLEVINS

18   TESTIFIED ABOUT THE DEMAND FOR THE PATENTED PRODUCTS AT

19   DIFFERENT TIMES DESCRIBING IT AS ABSOLUTELY STAGGERING AT DAY

20   2, TRIAL TRANSCRIPT 497, LINE 3.

21           SAMSUNG, IN FACT, HAS STATED ITS AGREEMENT, AND I WOULD

22   CITE YOUR HONOR TO TRIAL TRANSCRIPT DAY 3, 759, LINE 25 TO 760,

23   LINE 1.

24           MS. DAVIS, BUILDING UPON MR. BLEVINS' TESTIMONY AND THE

25   OTHER THINGS IN THE RECORD, DESCRIBED DEMAND FOR THE PATENTED

1    PRODUCT, WHICH I UNDERSTAND FROM MR. PRICE'S QUESTION IS NOT IN

2    DISPUTE, AT DAY 3, TRIAL TRANSCRIPT 650, LINE 6, LINE 6.

3         AS TO DEMAND FOR THE PATENTED FEATURES, WHICH ARE THE

4    FOCUS OF A LOT OF THE ATTENTION DURING THE CROSS AT LEAST, WE

5    HAVE PUT BEFORE YOUR HONOR MS. DAVIS'S TESTIMONY, DAY 3, TRIAL

6    TRANSCRIPT PAGE 650, LINES 22 TO 24 SPECIFICALLY GIVING AN

7    OPINION ON THE DEMAND FOR THE PATENTED FEATURES.

8         YOU ALSO HAD THE TESTIMONY OF DR. BALAKRISHNAN AND

9    DR. SINGH.

10        MS. DAVIS ALSO REFERRED TO SURVEYS DONE BY APPLE, SURVEYS

11   WHICH CAME IN TODAY FROM MR. SCHILLER.  HER CONCLUSIONS BASED

12   UPON THAT WERE AT YESTERDAY'S TRANSCRIPT PAGE 651, LINE 3 TO 7.

13        THERE WERE ALSO A SERIES OF DOCUMENTS THAT CAME IN, SOME

14   TODAY, YOUR HONOR, FROM MR. SCHILLER, BUT ALSO PX 34, THE

15   IPHONE EFFECT ANALYSIS DOCUMENT FROM SAMSUNG, PX 36, WHICH

16   INCIDENTALLY, YOUR HONOR, IS A SURVEY COMMISSIONED BY SAMSUNG

17   THAT PROVIDED DIRECT EVIDENCE OF CONSUMER ADVANTAGE FOR THE

18   '915 SCROLLING GESTURE FEATURE.  THAT'S AT PX 36.36.

19        AND MS. DAVIS TESTIFIED SPECIFICALLY ABOUT THAT AS SHOWING

20   DEMAND FOR THE PATENTED FEATURE YESTERDAY AT PAGE 656, LINE 25

21   TO 657, LINE 1.

22        WE ALSO OFFERED PX 40, I WON'T GO INTO IT IN DETAIL, BUT

23   IT ALSO DEMONSTRATES CONSUMER DEMAND FOR THE PATENTED FEATURES.

24        ON CAPACITY, MR. BLEVINS TESTIFIED BOTH AS TO EXHIBIT

25   PX 182, AND ALSO AS A QUALITATIVE MATTER ON THE CAPACITY THAT

1     APPLE HAD AS DISTINGUISHED FROM CURRENT SUPPLY AND THEIR

2     ABILITY TO SATISFY A 10 PERCENT INCREASE, A GREATER INCREASE

3     THAN WE'RE TALKING ABOUT HERE.

4          AND FINALLY, SHE DID HER PROFITS CALCULATIONS AT PDX

5     100.16, BASICALLY TAKING THE INFRINGING UNITS, CALCULATING THE

6     LOST PROFITS IN THE MANNER IN WHICH SHE DESCRIBED IN SOME

7     DETAIL.

8          THERE WAS EVIDENCE OF NON-INFRINGING SUBSTITUTES, BOTH THE

9     ABSENCE OF NON-INFRINGING SUBSTITUTES FOR THE '915 PATENT, BOTH

10    ADDRESSED IN THE EXPERT TESTIMONY AND MS. DAVIS'S TESTIMONY.

11         AND YOU'LL EVEN RECALL, YOUR HONOR, THAT WE CROSS-EXAMINED

12    ABOUT SOME OF THE PRIOR ART.  IT WAS PUT VERY QUICKLY IN FRONT

13    OF THE TECHNICAL EXPERTS.  THEY BASICALLY DEMONSTRATED WHY THEY

14    WERE NOT ACCEPTABLE NON-INFRINGING SUBSTITUTES.

15         AS TO THE REASONABLE ROYALTY, THE TESTIMONY OF MS. DAVIS,

16    DR. BALAKRISHNAN, AND DR. SINGH, AND DR. HAUSER SATISFY THE

17    REQUIREMENTS OF GEORGIA PACIFIC.

18              THE COURT:  ACTUALLY, WHY DON'T YOU GO BACK TO

19     ABSENCE OF NON-INFRINGING ALTERNATIVES?  WHAT'S THE BEST YOU

20     HAVE ON THAT?

21              MR. LEE:  IN TERMS OF SPECIFIC -- WE HAVE -- WE HAVE,

22     YOUR HONOR, THE TESTIMONY OF DR. BALAKRISHNAN.  WE HAVE THE

23     TESTIMONY OF DR. SINGH.

24          BUT WE FOCUSSED ON THE PERIOD OF TIME DURING WHICH

25     MS. DAVIS WAS, HER DAMAGES PERIOD.  THERE'S -- THE TEXTUAL

```
 1     PROOF WE PUT IN, I DON'T HAVE THE PAGES FOR YOU RIGHT NOW, BUT

 2     WE CAN GET THEM, DEMONSTRATED THAT THERE WERE NO ACCEPTABLE

 3     NON-INFRINGING SUBSTITUTES FOR THE '915 PATENT.

 4          AND YOUR HONOR WILL RECALL ALSO THAT, FROM PANDUIT, THAT

 5     THE ACCEPTABLE NON-INFRINGING SUBSTITUTES IS A PART OF THE

 6     LARGER DISCUSSION OF DEMAND FOR THE PATENTED FEATURES AND IT'S

 7     SUPPOSED TO BE TAKEN INTO ACCOUNT IN THAT CONTEXT.

 8          BUT THERE IS SUFFICIENT PROOF TO SATISFY OUR BURDEN TO

 9     BEGIN THE PROCESS, WHICH WE KNOW IS AN ISSUE FOR THE CHARGING

10     CONFERENCE BEFORE YOUR HONOR.

11          ON THE REASONABLE ROYALTY --

12          THE COURT:  WHAT IS THE TEXTUAL PROOF THAT YOU'RE

13     TALKING ABOUT OR REFERRING TO?

14          MR. LEE:  WELL, LET ME SEE IF I CAN GET YOU A PRECISE

15     CITATION.  OKAY?

16          THE COURT:  OKAY.

17          (PAUSE IN PROCEEDINGS.)

18          MR. LEE:  JUST A SECOND, YOUR HONOR.

19          (PAUSE IN PROCEEDINGS.)

20          MR. LEE:  YOUR HONOR, WE'LL GET YOU THE PRECISE PAGE

21     CITATIONS.

22          BUT LET ME SAY -- LET ME REFER YOU TO THE TESTIMONY.  DO

23     YOU REMEMBER WHEN DR. SINGH WAS ASKED ABOUT NOMURA, THE TAPE,

24     THE TABLE, AND A THIRD --

25          THE COURT:  NOMURA, HAN, AND FRACTAL ZOON.
```

1          MR. LEE:  RIGHT.

2          THE COURT:  I'M NOT --

3          MR. LEE:  HE WENT THROUGH EACH ONE OF THEM AND SAID

4    IT WOULD NOT BE ACCEPTABLE FOR THIS REASON:  ONE HAS A BIG

5    PROJECTOR, ONE HAS A TABLE, ONE IS HARD FROZEN IN, IT WOULDN'T

6    HAVE WORKED IN THE TABLET.

7          HE WENT THROUGH EACH OF THE PIECES OF PRIOR ART THAT THEY

8    CLAIM WOULD HAVE BEEN AN ACCEPTABLE NON-INFRINGING SUBSTITUTE

9    AND DESCRIBED IN DETAIL ON HIS REDIRECT, AND WE'LL GET YOU THAT

10   PAGE, WHY EACH ONE OF THEM WOULD NOT BE AN ACCEPTABLE

11   NON-INFRINGING SUBSTITUTE.  EITHER THEY'RE NOT CAPABLE OF BEING

12   USED ON A TABLET OR THEY WERE PART OF A LARGER SYSTEM WITH THE

13   PROJECTOR UP IN THE AIR AND THIS BIG TABLE DOWN BELOW, OR THEY

14   WERE HARD WIRED AND HARD FROZEN ONLY TO DO ONE OR TWO THINGS.

15   YOU RECALL THE PRIOR ART THAT INVOLVED THE MAPPING.

16          SO FOR EACH OF THE ALLEGEDLY NON-INFRINGING SUBSTITUTES,

17   ACCEPTABLE NON-INFRINGING SUBSTITUTES, DR. SINGH WENT THROUGH

18   IN THE '915 PATENT JUST WHY THEY WERE NOT AND THAT IS IN THE

19   RECORD AND IT'S PROOF AND WE'LL GET YOU THE PAGE FROM THE --

20          THE COURT:  WELL, NO, I'M NOT CONCERNED ABOUT NOMURA,

21   HAN, AND FRACTAL ZOOM.  THOSE WERE ALL PART OF THE TRIAL AND I

22   DO RECALL, THE 2012 TRIAL AND HERE, AND I DO RECALL DR. SINGH'S

23   TESTIMONY AS TO THOSE THREE.

24          BUT WHAT ABOUT THE INTERCEPT AND THE TRANSFORM?

25          MR. LEE:  AS NON-INFRINGING -- WELL, YOUR HONOR, WE

1        DID NOT -- WE DIDN'T HAVE THE OBLIGATION TO GO THROUGH EVERY

2        SINGLE ONE OF THE THINGS THAT MIGHT HAVE BEEN SUGGESTED.

3                THE COURT:  UM-HUM.

4                MR. LEE:  BUT FOR BOTH OF THEM, FOR ALL FIVE OF THEM,

5        DR. SINGH HAS SAID THERE IS NOT AN ACCEPTABLE -- THEY ARE NOT

6        ACCEPTABLE NON-INFRINGING SUBSTITUTES.

7                AND THIS GOES TO ANOTHER ISSUE THAT YOUR HONOR WILL HAVE

8        TO ADDRESS AT THE CHARGING CONFERENCE.  FOR SOME OF THESE

9        OTHERS, THEY ARE PRODUCTS WHICH INFRINGE OTHER APPLE PATENTS.

10               IF THEY INFRINGE OTHER APPLE PATENTS, THEY'RE NOT

11       AVAILABLE NON-INFRINGING ALTERNATIVES, AND THAT IS SOMETHING

12       THAT'S IN THE RECORD BECAUSE IT'S IN YOUR HONOR'S PRELIMINARY

13       JURY CHARGE.

14               THE ONLY NON-INFRINGING, ALLEGEDLY NON-INFRINGING PRODUCT

15       IS THE INTERCEPT AND THE QUESTION OF WHETHER THAT WOULD BE AN

16       ACCEPTABLE SUBSTITUTE.

17               SO, YOUR HONOR, IF I MOVE FROM THE TRANSFORM TO THE

18       INTERCEPT, YOUR HONOR WILL RECALL THAT THE INTERCEPT IS IN.

19       IT'S ONE OF THE FIRST EXHIBITS THAT WENT IN.  IT'S THE SLIDER

20       PHONE, AND WHETHER THAT'S AN ACCEPTABLE NON-INFRINGING

21       SUBSTITUTE FOR THE ACCUSED PHONES, THAT, THE PHONE ITSELF MAKES

22       THE ARGUMENT ON ITS FACE.

23               SO IF WE TAKE ALL THREE OF THE PIECES OF PRIOR ART, THE

24       TRANSFORM, WHICH INFRINGES OTHER APPLE PATENTS, AND A SLIDER

25       PHONE, THAT'S THE EVIDENCE THAT WAS OPENED ON ON THE '915.

1      THAT'S THE EVIDENCE THAT'S IN THE RECORD.

2          THERE IS NO RULE 50 BASIS FOR DETERMINING THERE'S NO BASIS

3      FOR THE JURY TO DECIDE IT.

4          THE COURT:  WHAT'S THE EXHIBIT NUMBER ON -- THE

5      INTERCEPT IS JX 1009.  CAN I SEE THAT?

6          OH, THE INTERCEPT IS A SLIDER WITH A KEY PAD?

7              MR. LEE:  IT'S A SLIDER WITH A HARD --

8              THE COURT:  A HARD KEY PAD.

9              MR. LEE:  IT'S WITH A FIRM KEY PAD, JUST WHAT

10     MR. SCHILLER WAS TALKING ABOUT EARLIER TODAY.

11             THE COURT:  OKAY.

12             MR. LEE:  SO IF WE TAKE THE FIVE THINGS, YOUR HONOR,

13     THE THREE PIECES OF PRIOR ART WHICH DR. SINGH ADDRESSED

14     SPECIFICALLY -- AND HOPEFULLY WE'LL HAVE THE PAGE, IT'S DURING

15     HIS REDIRECT, BUT WE'LL GET YOU THE PRECISE PAGE CITATION --

16     THE TRANSFORM INFRINGES OTHER APPLE PATENTS, THAT'S IN THE

17     PRELIMINARY JURY CHARGE, AND WE WOULD CONTEND IT'S NOT AN

18     AVAILABLE, ACCEPTABLE NON-INFRINGING SUBSTITUTE.

19         AND THEN YOU HAVE LAST IS THE INTERCEPT, WHICH IS A SLIDER

20     PHONE, A SLIDER PHONE WITH A HARD KEYBOARD.

21             THE COURT:  BUT WHAT'S THE RELEVANCE IF THAT'S THE

22     '915.  THE '915 IS NOT ON THE SHAPE OR THE DESIGN.

23             MR. LEE:  YOUR HONOR, THE QUESTION IS WHETHER IT'S AN

24     ACCEPTABLE NON-INFRINGING SUBSTITUTE FOR THE PRODUCT THAT'S

25     BEEN FOUND TO INFRINGE.

1      AND I KNOW WE'RE GOING TO GET TO THIS DURING THE COURSE OF

2    THEIR CASE, BUT THIS ARGUMENT THAT YOU CAN TAKE ONE FEATURE OF

3    ONE PRODUCT WITH NO PROOF THAT YOU COULD TAKE THAT AND PUT IT

4    OVER INTO ANOTHER PRODUCT AND SAY THAT'S ENOUGH TO PROVE THE

5    AVAILABILITY OF A NON-INFRINGING SUBSTITUTE IS NOT CONSISTENT

6    WITH THE FEDERAL CIRCUIT'S LAW.

7      THE QUESTION IS, IS THE PRODUCT AN ACCEPTABLE

8    NON-INFRINGING SUBSTITUTE?  IT'S NOT A QUESTION OF CAN I PICK

9    THIS FEATURE AND SAY IF IT COULD POSSIBLY BE IMPORTED OVER INTO

10   THIS PRODUCT, WOULD IT BE AN ADEQUATE NON-INFRINGING

11   SUBSTITUTE?  THAT'S NOT THE ISSUE.

12     THE ISSUE IS, IS THE PRODUCT AN ACCEPTABLE NON-INFRINGING

13   SUBSTITUTE?

14     AND, YOUR HONOR, IF YOU THINK ABOUT WHEN YOU SAID THAT,

15   FOR INSTANCE, YOU HAD NO -- YOU HAD LESS CONCERN ABOUT NOMURA

16   AND THE TABLETOP, IT'S LOOKING AT THAT ENTIRE PRODUCT AND THE

17   MANNER IN WHICH THE ALLEGED FEATURES ARE SUPPOSEDLY USED IN

18   THAT ENTIRE PRODUCT WHICH DEMONSTRATE THAT THEY'RE NOT

19   ACCEPTABLE NON-INFRINGING SUBSTITUTES FOR THE PRODUCT.

20     AND, IN ADDITION TO THAT, WE PRODUCED A HOST OF PROOF THAT

21   THERE WAS DEMAND FOR THE PATENTED FEATURES, AND THAT PROOF OF

22   DEMAND FOR THE PATENTED FEATURES UNDER PANDUIT IS SUFFICIENT TO

23   SATISFY THAT NEXT -- THAT REQUIREMENT.

24     ONE LAST THOUGHT ON THIS, YOUR HONOR, IF I COULD?

25        THE COURT:  GO AHEAD, PLEASE.

1           MR. LEE:  UNLIKE THE PRIOR ART, SUCH AS NOMURA, WHICH

2     IS REAL PRIOR ART AND WE CAN ACTUALLY TALK ABOUT WHAT IT DOES

3     AND WHAT IT DIDN'T DO AND HOW IT WAS DIFFERENT, YOUR HONOR WILL

4     REMEMBER THAT THESE ALLEGED HYPOTHETICAL DESIGN AROUNDS BASED

5     UPON THE TRANSFORM AND THE INTERCEPT, YOU CAN LOOK AT IT ONE OF

6     TWO WAYS.

7           IS THE TRANSFORM AN ACCEPTABLE NON-INFRINGING PRODUCT?

8           THE ANSWER IS NO BECAUSE IT WOULDN'T BE AVAILABLE BECAUSE

9     IT INFRINGED OTHER APPLE PATENTS.

10          WITH THE INTERCEPT, WHICH YOUR HONOR JUST LOOKED AT, WOULD

11    BE AN ACCEPTABLE NON-INFRINGING SUBSTITUTE?

12          THE ANSWER IS NO AS A PRODUCT.

13          IF YOU FOCUS, AS I THINK MR. PRICE'S CROSS-EXAMINATIONS

14    DO, ON THE FEATURE, YOUR HONOR, IT BECOMES A HYPOTHETICAL

15    NON-INFRINGING SUBSTITUTE.  THE HYPOTHETICAL NON-INFRINGING

16    SUBSTITUTE IS TAKING SOMETHING FROM THE INTERCEPT OR THE

17    TRANSFORM AND PUTTING IT INTO THE PHONES THAT HAVE BEEN

18    ADJUDICATED TO INFRINGE.  THAT'S A HYPOTHETICAL NON-INFRINGING

19    SUBSTITUTE.  THAT'S THEIR BURDEN.

20          OUR BURDEN IS TO PROVE THAT THAT WHICH WAS CLAIMED TO BE

21    ON THE MARKET AND AVAILABLE WAS EITHER NOT AVAILABLE OR IT WAS

22    NOT AN ACCEPTABLE NON-INFRINGING SUBSTITUTE.

23          SO FOR EACH OF THE THINGS THAT WERE NON-HYPOTHETICAL

24    DESIGN AROUNDS OR ALTERNATIVES, WE DEMONSTRATED, AND THERE'S

25    PROOF IN THE RECORD SUFFICIENT TO GO TO THE JURY, THAT THEY

```
1      WERE NOT AVAILABLE NON-INFRINGING SUBSTITUTE PRODUCTS.

2           AS TO THE TRANSFORM AND THE INTERCEPT, THERE'S NOTHING.

3      THEY'RE HYPOTHETICAL DESIGN AROUNDS TAKING FEATURE A FROM ONE

4      PHONE, CLAIMING IT CAN BE IMPORTED OVER INTO FEATURE B.

5           AND NOT ONLY IS THERE NO EVIDENCE OF THAT IN THE RECORD SO

6      FAR, IT'S SAMSUNG'S BURDEN, AND MY BET IS WE'RE GOING TO GET TO

7      THE END OF THIS TRIAL AND THERE'S NOT GOING TO BE ANY PROOF

8      THAT THAT CAN BE DONE FROM ANYBODY.

9           THE -- I'M SORRY.  THE TRANSCRIPT CITATION FROM DR. SINGH

10     IS TESTIMONY AT 482, LINE 4 TO 483, LINE 2, AND HE SPECIFICALLY

11     IS DISCUSSING NOMURA AND FRACTAL ZOOM.

12          THE COURT:  ALL RIGHT.  ANYTHING ELSE?

13          MR. MCELHINNY:  YES, YOUR HONOR, ONE ADDITIONAL

14      MINUTE ON MS. MAROULIS'S ADDITIONAL THREE MOTIONS THAT SHE

15      FILED, OR NOT RULE 50, BUT THE REQUESTS FOR RULINGS.

16          ON HER REQUEST THAT THERE'S BEEN, THAT THE COURT ISSUE A

17     RULING THAT THERE'S NO POSSIBLE VERDICT OVER 379 MILLION, WE

18     DON'T THINK THAT'S AN APPROPRIATE ORDER FROM THE COURT.  WE

19     DON'T HAVE A -- WE DON'T HAVE A RULING FROM THE JURY, BUT

20     UNLESS YOU'RE GOING TO PUT IT INTO A JURY INSTRUCTION TO THE

21     JURY, WHICH THEY HAVEN'T ASKED FOR YET, BUT UNLESS YOU'RE GOING

22     TO DO THAT, WE DON'T THINK SIMPLY ANNOUNCING IT IS AN

23     APPROPRIATE FUNCTION.

24          ON HER MOTION ABOUT THE NO NOTICE AS TO SPECIFIC PRODUCTS,

25     YOUR HONOR HAS ALREADY DEALT WITH THAT ISSUE AND OVERRULED THAT
```

1    SPECIFIC OBJECTION AS HAVING BEEN WAIVED AT THE FIRST TRIAL.

2         ON HER REQUEST THAT THERE BE NO DAMAGES BEFORE THE NOTICE

3    DATE OR AFTER JUNE 30TH, AGAIN, WE THINK THAT'S AN APPROPRIATE

4    SUBJECT TO BE TAKEN UP IN FINAL JURY INSTRUCTIONS.

5         AND FINALLY, ONCE AGAIN, YOUR HONOR'S MEMORY IS EXACT.  IN

6    DOCKET NUMBER 2650, WHICH IS THE TRANSCRIPT OF THE 11-5

7    HEARING, AT PAGE 40, LINE 16 TO PAGE 41 THROUGH LINE 8, YOUR

8    HONOR WILL REMEMBER THAT WE WERE TALKING ABOUT SAMSUNG'S MOTION

9    IN LIMINE TO PRECLUDE US FROM TALKING ABOUT TRANSFER TAXES AND

10   THE WAY PROFITS ARE ALLOCATED BETWEEN THE THREE ENTITIES, AND

11   IN RESPONSE TO YOUR HONOR'S INQUIRY, MR. ALDEN REPRESENTED TO

12   THE COURT THAT ALL THREE OF THE ENTITIES WERE LIABLE FOR

13   INFRINGER'S PROFITS AND THAT THEY WOULD NOT BE DISTINGUISHING

14   BETWEEN THE THREE ENTITIES AND, ON THAT BASIS, YOUR HONOR

15   GRANTED THEIR MOTION IN LIMINE.

16        MR. LEE:  LAST TWO POINTS, YOUR HONOR.

17        ON REASONABLE ROYALTY, YOU HAVE THE TESTIMONY OF DAVIS,

18   BALAKRISHNAN, SINGH, AND HAUSER.  THEY WENT THROUGH THE

19   HYPOTHETICAL NEGOTIATION AND THE BASE ROYALTY.

20        THERE, IN FACT, WAS A PORTION THAT YOUR HONOR REJECTED A

21   CHALLENGE TO MR. MUSIKA'S TESTIMONY ON THIS SAME BASIS IN THE

22   FIRST TRIAL, AND SHE THEN DETERMINED HER AMOUNT BASED UPON THAT

23   DISCIPLINE.

24        THERE'S NO ENTIRE MARKET VALUE RULE VIOLATION TO THE

25   MANNER IN WHICH SHE WENT ABOUT DETERMINING THE ROYALTY, AND IT

1    IS APPORTIONED.

2         ON THE INFRINGER'S PROFITS, THE ENTIRE DEVICE IS, AS A

3    LEGAL MATTER, THE PROPER BASE.  THESE ARE THE DESIGN PATENTS

4    WHICH COVER THE APPEARANCE OF THE ENTIRE -- WELL, OF A

5    SUBSTANTIAL PORTION OF THE DEVICE.

6         AND MS. DAVIS, THERE'S NO DISPUTE AS TO WHAT THE REVENUES

7    ARE THAT ARE AT ISSUE.  THERE WERE NO DISPUTES ABOUT THE COST

8    OF GOODS SOLD THAT WERE AN ISSUE.

9         THERE'S A DISPUTE ABOUT THESE ALLOCATED COSTS.  SHE WENT

10   THROUGH THE ADVERTISING COSTS, THE GENERAL AND ADMINISTRATIVE

11   COSTS, AND THE OTHER COSTS THAT ARE ALLEGEDLY ALLOCATED AND

12   EXPLAINED WHY THERE IS NOTHING THAT'S BEEN GIVEN TO HER THAT,

13   IN FACT, TIES THOSE COSTS TO, DIRECTLY ATTRIBUTES THOSE COSTS

14   TO THE 13 PHONES AND THE SALE OF THOSE 13 PHONES AND,

15   THEREFORE, SHE HAS NOT SUBTRACTED THEM FOR PURPOSES OF

16   DETERMINING HER LOST PROFITS NUMBER.

17        SHE ALSO EXPLAINED WHY COMPARISON TO GAAP ACCOUNTING FOR

18   COMPANY-WIDE DETERMINATION OF LOST PROFITS ISN'T THE RIGHT OR

19   THE CORRECT PROCESS FOR DETERMINING AN INFRINGER'S PROFITS IN

20   THIS CIRCUMSTANCE.

21        THAT IS SUFFICIENT EVIDENCE TO GO TO THE JURY ON THE

22   QUESTION OF WHETHER APPLE'S ENTITLED TO SAMSUNG'S LOST PROFITS.

23        AND I THINK COLLECTIVELY, MR. MCELHINNY, AND I, I HOPE

24   WE'VE ADDRESSED EACH OF THE DIFFERENT POINTS THAT MS. MAROULIS

25   HAS RAISED.

```
 1            THE COURT:  ALL RIGHT.

 2            MS. MAROULIS:  YOUR HONOR, MAY I RESPOND BRIEFLY?

 3            THE COURT:  ONE MINUTE.

 4            MS. MAROULIS:  YES, YOUR HONOR.

 5        WITH RESPECT TO '915 NON-INFRINGING ALTERNATIVES, THE

 6    ENTIRETY OF DR. SINGH'S TESTIMONY ON THE PHONES IS CONTAINED IN

 7    PAGES 469 THROUGH 470 OF THE TRIAL TRANSCRIPT, AND HE DOES NOT

 8    DENY THAT THESE PHONES DO NOT INFRINGE.  HE DIDN'T SAY ANYWHERE

 9    HERE THAT THEY ARE SOMEHOW UNACCEPTABLE.

10        HE WAS NOT REDIRECTED ON THESE POINTS, SO THERE'S NO

11    ALTERNATIVE TESTIMONY ON IT.  HE GOES THROUGH PHONES AND ADMITS

12    THAT THEY'RE NOT INFRINGING.

13        FURTHERMORE, THE INTERCEPT PHONE WAS NOT EVEN ACCUSED, OR

14    IT WAS -- IT WASN'T FOUND INFRINGING, WHICH MEANS THAT IT WAS

15    NOT SUBJECT TO THE POINTS THAT MR. LEE MADE REGARDING THAT.

16        WITH RESPECT TO THE PHONE BEING A SLIDER PHONE, AS YOUR

17    HONOR POINTS OUT, THE FACT THAT IT'S A SLIDER PHONE DOESN'T

18    MATTER FOR '915, BUT IT'S EVEN MORE SIGNIFICANT BECAUSE APPLE

19    IS ACTUALLY SEEKING LOST PROFITS ON A NUMBER OF SLIDER PHONES,

20    SO FOR THE PURPOSE OF LOST PROFITS, THEY FEEL THAT PEOPLE, IF

21    THEY DIDN'T BUY A SLIDER PHONE OF SAMSUNG, WOULD GO AND BUY A

22    NON-SLIDER PHONE AT APPLE.

23        AS WE PREVIOUSLY BRIEFED UNDER THE GRAIN PROCESSING, THE

24    NON-INFRINGING SUBSTITUTE NEEDS TO BE MERELY AVAILABLE.  IT

25    DOESN'T HAVE TO BE ON THE MARKET AS A PRODUCT.
```

938

1          AND THE COURT HAS ALREADY REJECTED THE RITE-HITE ARGUMENTS

2     THAT APPLE KEEPS MAKING, WHICH IS THAT IF A PRODUCT IS SUBJECT

3     TO AN INFRINGEMENT VERDICT FOR A DIFFERENT PATENT, IT CANNOT BE

4     AN AVAILABLE NON-INFRINGING SUBSTITUTE TECHNOLOGY.

5          SO THOSE ARE THE POINTS WITH RESPECT TO THE FACT THAT FOR

6     '915 PATENT, APPLE FAILED TO ESTABLISH AVAILABILITY OF

7     NON-INFRINGING ALTERNATIVES THROUGH MR. SINGH OR OTHERWISE, AND

8     THERE'S NO ADDITIONAL RECORD IN THE EVIDENCE THAT APPLE PUT IN

9     WHY THESE ALTERNATIVES ARE NOT ACCEPTABLE.

10          MR. LEE:  YOUR HONOR, ONE MINUTE.

11          OUR OBLIGATION IS TO PROVE THE ABSENCE OF AVAILABLE

12     NON-INFRINGING SUBSTITUTES, NOT HYPOTHETICAL, NOT HYPOTHETICAL

13     ALTERNATIVES THAT THEY MIGHT COME UP WITH SIX YEARS AFTER THE

14     FACT.  AVAILABLE NON-INFRINGING SUBSTITUTES.

15          AND FOR EACH OF THEM, THERE IS PROOF IN THE RECORD, AND

16     DR. SINGH ADDRESSES THE ALLEGEDLY NON-INFRINGING SUBSTITUTES

17     LIKE NOMURA AND FRACTAL ZOOM AT PAGE 482, LINE 4 TO 483, LINE

18     2.

19          FOR THE TRANSFORM AND FOR THE INTERCEPT, WE'RE TALKING NOW

20     ABOUT HYPOTHETICAL DESIGN AROUNDS.

21          A HYPOTHETICAL DESIGN AROUND WOULD TAKE SOMETHING FROM ONE

22     PHONE AND PUT IT INTO ANOTHER.  IT'S NOT OUR OBLIGATION, UNDER

23     PANDUIT OR GRAIN PROCESSING, TO ADDRESS EVERY POSSIBLE

24     HYPOTHETICAL DESIGN AROUND.

25          THAT'S WHY IT BECOMES THEIR BURDEN WHEN YOU GET TO

```
1    HYPOTHETICAL DESIGN AROUNDS.  THEY HAVE TO COME UP WITH

2    SOMETHING THAT SAYS, OKAY, FOR THE DIFFERENT PHONES MR. PRICE

3    HAS BEEN SHOWING FOLKS, YES, YOU COULD TAKE THAT FEATURE, YES,

4    IT WOULD BE TECHNOLOGICALLY AND COMMERCIALLY FEASIBLE TO MOVE

5    IT OVER, AND YES, YOU COULD HAVE DONE IT IN SUCH AND SUCH A

6    PERIOD OF TIME.

7          YOUR HONOR IS NOT GOING TO SEE ANY EVIDENCE ON THAT IN

8    THIS TRIAL, AND THIS DISTINCTION BETWEEN REAL WORLD AVAILABLE

9    NON-INFRINGING SUBSTITUTES AND HYPOTHETICAL NON-INFRINGING

10   SUBSTITUTES THAT LAWYERS COME UP WITH SIX YEARS AFTER THE FACT

11   IS AN IMPORTANT ONE, AND OUR BURDEN ONLY EXTENDS TO THE FIRST

12   AND WE DISCHARGED IT.

13             MS. MAROULIS:  YOUR HONOR --

14             THE COURT:  ALL RIGHT.

15             MS. MAROULIS:  -- INTERCEPT IS A REAL WORLD PHONE AND

16   IT'S NOT A PHONE THAT INFRINGED ANY PATENTS.  IT IS NOT A

17   HYPOTHETICAL PHONE.  YOUR HONOR HELD IT IN HER HAND.

18   THEREFORE, MR. LEE'S ARGUMENT DOES NOT APPLY TO THAT PHONE AND

19   OTHERS AS WELL.

20          AND IF I MAY JUST CLARIFY THAT THE LAST GROUNDS THAT I

21   LISTED IN MY MOTION WERE ALSO JMOL GROUND AS OPPOSED TO JURY

22   INSTRUCTIONS.  I THINK COUNSEL MISUNDERSTOOD ME.

23             MR. LEE:  YOUR HONOR, FIRST, I THINK I CAN GET YOU A

24   CITE WHERE THEY, WHERE SAMSUNG TOOK THE POSITION THAT THE

25   DESIGN -- THAT THE INFRINGING ALTERNATIVE BASED UPON INTERCEPT
```

1    WAS HYPOTHETICAL.

2         THE SECOND THING IS, WITH THE PHONE PHYSICALLY IN THE

3    MARKET, THE PHONE PHYSICALLY IN THE RECORD AND THE DISCUSSION

4    ABOUT THAT, THE JURY IS ENTITLED TO DECIDE WHETHER THAT IS AN

5    ACCEPTABLE NON-INFRINGING SUBSTITUTE OR NOT, WHETHER IT WAS

6    AVAILABLE, WHETHER IT WOULD HAVE BEEN ACCEPTABLE FOR THE

7    PRODUCTS THAT HAVE BEEN DETERMINED TO INFRINGE.

8         AND THERE ARE A HOST OF THEM THAT INFRINGE THE '915 PATENT

9    THAT DON'T HAVE A SLIDER KEYBOARD.

10        THE COURT:  ALL RIGHT.  WELL, THE COURT FINDS THAT NO

11   REASONABLE JURY WOULD HAVE A LEGALLY SUFFICIENT EVIDENTIARY

12   BASIS TO FIND OR TO AWARD LOST PROFITS DAMAGES TO APPLE FOR THE

13   '381 PATENT, THE '163 PATENT, THE D'677 PATENT, THE D'305

14   PATENT.

15        APPLE CONCEDES THAT IT DID NOT PRESENT ANY EVIDENCE FOR

16   LOST PROFITS FOR THESE PATENTS BECAUSE OF THE COURT'S PRIOR

17   ORDER EXCLUDING APPLE TO DO SO.

18        I UNDERSTAND THAT YOU ALL HAVE CERTAINLY APPEALED THAT TO

19   THE FEDERAL CIRCUIT.

20        BUT YOU DID THANKFULLY COMPLY WITH MY ORDER AND NOT TRY TO

21   EVADE IT AND BRING IN OTHER EVIDENCE, WHICH IN THIS CASE

22   SOMETIMES HAPPENS.  SO I APPRECIATE THAT.

23        BUT THAT MOTION IS GRANTED AS TO LOST PROFITS AS TO THOSE

24   FOUR PATENTS.

25        WITH REGARD TO REASONABLE ROYALTY, THE COURT FINDS THAT A

1    REASONABLE JURY WOULD HAVE A LEGALLY SUFFICIENT EVIDENTIARY

2    BASIS TO FIND FOR APPLE, SO THAT'S DENIED.

3         AND SIMILARLY WITH REGARD TO INFRINGER'S PROFITS AS TO --

4    I'M NOT GOING TO GIVE YOU RULINGS ON EVERYTHING, BUT I WILL

5    GIVE YOU RULINGS ON AS MUCH AS I CAN RIGHT NOW.

6         SO WITH REGARD TO INFRINGER'S PROFITS AS TO THE D'305 AND

7    THE D'677, THE COURT SIMILARLY FINDS THAT APPLE HAS PRESENTED A

8    LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR A JURY, A REASONABLE

9    JURY TO FIND THAT IN ITS FAVOR ON THAT QUESTION.

10        SO THE RULE 50 MOTION AS TO INFRINGER'S PROFITS AS TO THE

11   TWO DESIGN PATENTS IS ALSO DENIED.

12        NOW, WITH REGARD TO THE '915 LOST PROFITS, I WOULD LIKE TO

13   RESERVE ANY RULING UNTIL LATER IN THE CASE.  OKAY?

14        AND WITH REGARD TO YOUR REQUESTS, I'VE ALREADY RULED ON NO

15   DAMAGES BEFORE NOTICE DATES, NO DAMAGES AFTER JUNE 30TH, 2012.

16   APPLE'S NOT ARGUING FOR ANYTHING OTHERWISE.

17        I REALLY DON'T THINK IT'S NECESSARY FOR THIS TO BE A JMOL

18   MOTION OR --

19             MR. LEE:  I DON'T THINK SO.

20             MS. MAROULIS:  YOUR HONOR, I THINK WE NEED TO

21   PRESERVE SOME THINGS FOR THE RECORD, SO WE UNDERSTAND THAT YOU

22   RULED ALREADY.

23             THE COURT:  I'VE ALREADY RULED ON THAT.

24        I'VE ALSO ALREADY RULED ON WHETHER, YOU KNOW, NOTICE HAS

25   TO BE GIVEN BY PRODUCT --

1          MS. MAROULIS:  CORRECT.

2          THE COURT:  -- AND ISSUED A WHOLE ORDER ON THAT.  SO

3    I'M UNCLEAR ON -- YOU'RE ASKING ME TO RE-RULE ON SOMETHING I'VE

4    ALREADY RULED ON?

5          MS. MAROULIS:  YOUR HONOR CAN INCORPORATE THAT BY

6    REFERENCE.  I BELIEVE THAT WE NEED TO DO IT FOR PRESERVING THE

7    JMOL ISSUES FOR THE APPEALS, BUT WE ARE NOT TRYING TO REARGUE

8    THAT AT ALL.  IT'S SIMPLY TO PRESERVE THE RIGHTS.

9          THE COURT:  OKAY.  I'M FULLY AWARE THAT EVERYTHING

10   I'VE DONE ON THIS CASE IS GOING TO BE APPEALED, SO -- BUT I

11   HAVE ISSUED RULINGS ON THAT.

12       LET'S TALK ABOUT THE NO AWARD OF DAMAGES ABOVE 379

13   MILLION.  MS. DAVIS, A NUMBER OF TIMES, SAID THAT ALL OF HER

14   ESTIMATES ARE CONSERVATIVE.

15         MR. LEE:  THAT WAS WHAT MR. MUSIKA SAID LAST TIME,

16   AND THAT'S WHAT SHE SAID IN HER REPORT, AND SO SHE WAS JUST

17   ACCURATELY SAYING WHAT IN HER REPORT.

18       WE UNDERSTAND YOUR HONOR'S RULING.  YOUR HONOR, QUITE

19   BEYOND THE GRAIN PROCESSING RULING, WHEN YOU HAD THE ISSUE ON

20   BRIEFING AND YOUR HONOR ISSUED FIRST THE ORDER, THEN THE

21   RULING, WE UNDERSTOOD IT.  I THINK YOUR HONOR KNOWS THAT WE'VE

22   COMPLIED WITH IT.  WE HAVEN'T TRIED TO INTRODUCE ANYTHING

23   BEYOND THAT.

24       BUT AT THE END OF THE DAY, ONCE ALL THE EVIDENCE IS IN,

25   THE JURY IS ENTITLED, WITH THE INFORMATION THAT'S BEFORE IT, TO

```
1       REACH A DETERMINATION ON WHAT THEY THINK THE FAIR DAMAGES ARE.

2           IF YOUR HONOR THINKS IT'S NOT SUPPORTED BY THE SUBSTANTIAL

3       EVIDENCE, THEN YOUR HONOR WILL EITHER REMIT IT OR, HEAVEN

4       FORBID, ORDER A NEW TRIAL.

5           THE COURT:  OH, PLEASE, DON'T EVEN -- DON'T

6       TRAUMATIZE ME THAT WAY.

7           (LAUGHTER.)

8           THE COURT:  WE MAY HAVE TO RETRY EVERYTHING

9       ULTIMATELY AFTER AN APPEAL, BUT LET'S NOT EVEN THINK ABOUT

10      THAT.

11          MR. LEE:  YOUR HONOR, I THINK AN INSTRUCTION TO THE

12      JURY THAT SAYS THAT THE VERY MOST YOU CAN AWARD IS $379 MILLION

13      WOULD BE VERY UNUSUAL.  YOU KNOW, LET'S SAY THEY DECIDED THEY

14      DID THEIR OWN MATH AND THEY DECIDED THAT IT WAS $385 MILLION.

15          THE COURT:  I'M NOT INCLINED TO GRANT THAT.

16          MR. LEE:  YEAH.

17          THE COURT:  BUT LET ME AT LEAST THINK ABOUT THAT ONE.

18          MS. MAROULIS:  YOUR HONOR, OUR CONCERN IS DURING HIS

19      OPENING, MR. MCELHINNY MADE A NUMBER OF VERY INFLAMMATORY

20      REMARKS ABOUT BREAKING THE LAW AND PUTTING VERY LARGE NUMBERS

21      OUT THERE, SO APPLE IS STILL ENCOURAGING THE JURY TO GO BEYOND

22      THE EVIDENCE THAT WAS STATED BY MS. DAVIS AND THIS IS ONE OF

23      THE REASONS WE WERE SEEKING THAT, BECAUSE THE EVIDENCE ONLY

24      SUPPORTS 379 AND NOTHING MORE, SO ANYTHING ABOVE THAT WOULD BE

25      CAUSED BY THE JURY'S POTENTIAL DESIRE TO PUNISH SAMSUNG, WHICH
```

1      IS NOT THE WAY THE DAMAGES SHOULD WORK.

2          AND YES, MR. LEE IS CORRECT.  IF THAT HAPPENS, WE'LL COME

3      BACK ON THE POST-TRIAL MOTIONS.  BUT WE ALSO CAN ADJUDICATE IT

4      NOW BECAUSE APPLE'S CASE-IN-CHIEF IS DONE AND WE KNOW THAT

5      THERE'S NOTHING ELSE THAT THE JURY CAN REASONABLY FIND ABOVE

6      379.

7              MR. LEE:  BUT YOUR HONOR, FIRST, I THINK THE FIRST

8      COMMENT ABOUT MR. MCELHINNY'S OPENING HAS NOTHING TO DO WITH

9      THIS ISSUE.

10         THE SECOND IS THE IDEA THAT THE JURY SHOULD KNOW THAT

11     THERE WERE 11.7 INFRINGING PRODUCTS AND $3.5 BILLION OF

12     REVENUES, RIGHT?  THAT'S JUST A FACT.  AND YOUR HONOR WILL

13     LEARN THIS AFTERNOON THAT MR. WAGNER AGREES THAT THOSE ARE THE

14     NUMBERS.

15         NOW, THE QUESTION IS, WHAT DO WE DO WITH THOSE NUMBERS?

16     AND WE HAVEN'T ASKED FOR A BILLION OR TWO BILLION.  WE'VE TAKEN

17     THOSE AND GONE THROUGH A DISCIPLINED ANALYSIS AND THREE

18     DIFFERENT BUCKETS.  THIS ISN'T -- THESE ARE JUST FACTS.

19         AND AS YOUR HONOR INSTRUCTED US TO DO IN THE SECOND ORDER

20     ON THESE ISSUES, NEITHER MS. DAVIS NOR MR. MCELHINNY NOR

21     MS. KREVANS MADE ANY EFFORT TO USE THOSE FACTS AND SUGGEST A

22     HIGHER NUMBER TO THE JURY.

23         BUT THERE ARE FACTS THAT -- IF I WERE SAMSUNG, I WOULDN'T

24     WANT THEM TO KNOW ABOUT THEM, EITHER, BECAUSE THEN THE JURY

25     MIGHT REALIZE THAT $52 MILLION IS, LIKE, .4 PERCENT OF THE

```
 1      REVENUES THEY GARNERED.  BUT THAT'S JUST RELEVANT EVIDENCE.

 2      IT'S NOT JMOL.

 3              THE COURT:  I'M NOT INCLINED TO GRANT THAT, BUT I

 4      WOULD LIKE TO THINK ABOUT IT A LITTLE, A LITTLE FURTHER.

 5          ANYTHING ELSE?

 6              MR. LEE:  NOT FOR APPLE, YOUR HONOR.

 7              THE COURT:  NO?  I'M GOING TO ASK MS. PARKER BROWN,

 8      DO YOU HAVE THE JURORS' PHONE NUMBERS?

 9              THE CLERK:  I DO NOT.

10              THE COURT:  YOU DIDN'T GET THEIR CELL PHONE NUMBERS?

11          I WAS GOING TO ASK THEM TO COME IN, YOU KNOW --

12              THE CLERK:  THERE MAY BE SOME THAT EAT LUNCH HERE.

13              THE COURT:  WHY DON'T WE TAKE A BREAK UNTIL 1:15,

14      BECAUSE BY THE TIME YOU GET OUT OF THE METAL DETECTORS, YOU

15      WON'T BE ABLE TO EAT.  SO WE'LL SAY 1:15.

16              CAN YOU PLEASE GET ALL THEIR CELL PHONES --

17              THE CLERK:  ONE DOESN'T HAVE ONE.

18              THE COURT:  AND TELL THEM THEY CAN TAKE A BREAK UNTIL

19      1:15?

20          OKAY.  THANK YOU ALL.

21              MR. LEE:  THANK YOU, YOUR HONOR.

22              MS. MAROULIS:  THANK YOU, YOUR HONOR.

23          (LUNCH WAS TAKEN FROM 12:13 P.M. TO 1:17 P.M.)

24                      AFTERNOON SESSION

25          (JURY OUT AT 1:17 P.M.)
```

1                    THE COURT:  OKAY.  WELCOME BACK.  TAKE A SEAT,

2         PLEASE.

3                    THE CLERK:  READY FOR THE JURY?

4                    THE COURT:  YES.  ANY ISSUES?

5                    MR. PRICE:  I'D LIKE TO PUT ON THE RECORD WITH

6         RESPECT TO MR. WAGNER WHO WILL BE TESTIFYING THIS AFTERNOON, I

7         HAVE INSTRUCTED HIM NOT TO USE THE PHRASE, QUOTE, "DIRECTLY

8         ATTRIBUTABLE" PURSUANT TO THIS COURT'S ORDER.  YOU'LL RECALL

9         THAT PHRASE WASN'T USED BEFORE.

10                   THE COURT:  RIGHT.

11                   MR. PRICE:  IT MADE IT INTO THE JURY INSTRUCTIONS.

12            SO I JUST WANT TO PLACE IN THE RECORD, HE WOULD TESTIFY

13        THAT HE'S SAYING THE SAME THING, BUT HE DIDN'T KNOW WHAT THE

14        JURY INSTRUCTION WOULD BE, BUT HE WILL NOT TESTIFY OR USE THAT

15        PHRASE PURSUANT TO THE COURT, THE ORDER OF THE COURT.

16                   THE COURT:  OKAY.  THANK YOU.

17            WE'RE ISSUING AN ORDER ON ALL THE RULE 50'S NOW, THE SAME

18        AS WHAT I SAID.

19                   MR. MCELHINNY:  OKAY.  THANK YOU.

20                   MR. PRICE:  YOUR HONOR, I'VE BEEN CORRECTED BY APPLE.

21        APPARENTLY THEY HAVE NO OBJECTION TO MR. WAGNER USING THE WORDS

22        "DIRECTLY ATTRIBUTABLE."  THEY JUST HAD AN OBJECTION TO THE

23        OPENING.

24                   MS. KREVANS:  NO, ACTUALLY, YOU HAD AN OBJECTION TO

25        AN OPENING SLIDE WE HAD THAT HAD THE WORDS "DIRECTLY

 1    ATTRIBUTABLE" IN QUOTES BECAUSE YOU TOOK A POSITION THAT THAT

 2    WAS USING A JURY INSTRUCTION IN OPENING.

 3         WE TOOK THE QUOTES OFF AND -- OUR EXPERT TESTIFIED ABOUT

 4    IT BECAUSE IT WAS THE TEST THAT SHE APPLIED.

 5              MR. PRICE:  OH.

 6         MS. KREVANS:  IF IT IS ACTUALLY THE TEST THAT

 7    MR. WAGNER APPLIED, WE, OF COURSE, WOULD HAVE NO OBJECTION TO

 8    HIM DISCUSSING IT.

 9         WE WOULD HAVE AN OBJECTION IF HE WENT BEYOND THE SCOPE OF

10    HIS REPORT, OF COURSE.

11              MR. PRICE:  WELL, THAT'S THE THING, YOUR HONOR.  THE

12    PHRASE IS NOT IN THE REPORT BECAUSE THE JURY INSTRUCTION HADN'T

13    BEEN CREATED YET.  HE WOULD SAY HIS REPORT SAYS THE SAME THING.

14         HE OBVIOUSLY WOULD LIKE TO USE THE PHRASE, BECAUSE

15    OTHERWISE APPLE WOULD ARGUE HE NEVER USED THIS PHRASE AND IT'S

16    IN THE JURY INSTRUCTION.

17         I HAD A MISUNDERSTANDING AND APPLE HAS NO OBJECTION TO HIM

18    USING THAT AND EXPLAINING WHAT HE MEANS WHEN HE SAYS IT.

19              MS. KREVANS:  JUST TO BE CLEAR, YOUR HONOR, THE

20    OBJECTION HERE THAT MR. PRICE IS TALKING ABOUT IS AN OBJECTION

21    THAT SAMSUNG MADE TO ONE OF APPLE'S OPENING SLIDES BECAUSE IN

22    THE SLIDE THE WORDS "DIRECTLY ATTRIBUTABLE" WERE IN QUOTES AND

23    SAMSUNG MADE THE OBJECTION THAT YOUR HONOR HAD DIRECTED THAT WE

24    SHOULD NOT QUOTE JURY INSTRUCTIONS OR ARGUE THE LAW IN THE

25    OPENING.

1      THAT'S THE ONLY OBJECTION THAT'S BEEN MADE WITH RESPECT TO

2   THE WORDS "DIRECTLY ATTRIBUTABLE," AND ON THAT BASIS WE TOOK

3   THAT OUT OF OUR OPENING.

4      IT HAD NOTHING TO DO WITH MS. DAVIS'S TESTIMONY BECAUSE

5   SHE DID USE THE PHRASE "DIRECTLY ATTRIBUTABLE" IN HER REPORT.

6      WITH RESPECT TO MR. WAGNER, THE ISSUE IS DIFFERENT, AND IT

7   IS WHETHER OR NOT HE IS GOING TO TESTIFY BEYOND THE SCOPE OF

8   HIS REPORT BECAUSE DID HE NOT USE THOSE WORDS IN HIS REPORT.

9           MR. PRICE:  MY UNDERSTANDING IS THERE WAS AN ORDER

10   THAT WAS STRICKEN FROM HIS REPORT, YOUR HONOR, AND HE COULDN'T

11   SAY IT.  IF APPLE TELLS ME I'M WRONG AND THAT THEY'RE JUST

12   GOING TO CROSS-EXAMINE HIM ON THAT --

13           MS. KREVANS:  WE ARE NOT SAYING THAT.  WE'RE NOT

14   WAIVING ANYTHING ABOUT THE SCOPE OF HIS REPORT OR ORDERS MADE

15   ON HIS REPORT.

16           MR. PRICE:  I'M CONFUSED.

17           MS. KREVANS:  MS. DAVIS' TESTIMONY, THIS WAS IN HER

18   REPORT.

19           MR. PRICE:  I'M TALKING ABOUT MR. WAGNER.

20      I DON'T WANT HIM TO VIOLATE THE COURT'S ORDER, YOUR HONOR,

21   THAT'S ALL I'M SAYING, AND IF APPLE AGREES IT WOULDN'T VIOLATE

22   THE COURT'S ORDER --

23           MS. KREVANS:  WE DO NOT AGREE TO THAT.

24           MR. PRICE:  IN THAT CASE, YOUR HONOR, LET ME SAY

25   AGAIN, HE WILL NOT USE THE PHRASE, BECAUSE MY UNDERSTANDING IS

```
1       THE COURT HAS STRICKEN THAT FROM HIS REPORT.

2          HE WOULD SAY THAT WHAT HE DOES IN HIS REPORT IS THE SAME

3       AS THAT PHRASE, HE DIDN'T USE THE PHRASE BECAUSE THE JURY

4       INSTRUCTIONS HADN'T BEEN CREATED YET.

5          BUT MY UNDERSTANDING IS THAT IS THE STATE OF THE ORDERS

6       NOW, AND IF APPLE DISAGREES, I OBVIOUSLY WOULD BE WILLING TO BE

7       CORRECTED.

8          I'M GLAD I RAISED IT BECAUSE THERE'S SOME CONFUSION.

9          (PAUSE IN PROCEEDINGS.)

10          THE COURT:  WHAT IS THE RELEVANT PORTION OF THE, OF

11      THE ORDERS?  I JUST WANT TO GET THIS CLARIFIED NOW.

12          MR. PRICE:  IT'S FOUND AT 2575.

13          THE COURT:  WELL, I'M LOOKING FOR THE -- I THOUGHT IT

14      WAS IN A MOTION TO STRIKE.

15          MR. PRICE:  YES, YOUR HONOR.  IT WAS.

16          THE COURT:  UM-HUM.

17          MR. PRICE:  IT'S PAGE 13 UNDER F, SAMSUNG'S EXPENSES,

18      AND -- I'M TRYING TO FIND WHERE THE SENTENCE STARTS.  I'M

19      TRYING TO FIND WHERE THE SENTENCE STARTS.  REWORDING WAGNER'S

20      UPDATED REPORT --

21          THE COURT:  I'M SORRY.  I'M LOOKING AT 2552

22      STRIKING --

23          MS. KREVANS:  THAT'S THE --

24          MR. PRICE:  THIS IS DOCKET 2575.  IT'S THE ORDER.

25          THE COURT:  WHICH ORDER IS THAT?
```

```
1          MR. PRICE:  IT'S -- I DON'T HAVE THE FRONT PAGE.

2     DOCKET 2575.

3          THE COURT:  I SEE.  I SEE.  I HAVE THAT.  OKAY.  WHAT

4     PAGE?

5          MR. PRICE:  IT'S PAGE 13, PARAGRAPH F ON SAMSUNG'S,

6     EXPENSES, LINE 12, REWORDING WAGNER'S UPDATED REPORT TO COPY

7     THE 2012 JURY INSTRUCTIONS VOCABULARY VERBATIM IS NOT WITHIN

8     THE SCOPE OF THIS COURT'S ORDER ALLOWING THE PARTIES TO FILE

9     SUPPLEMENTAL EXPERT REPORTS, WITH A CITATION FROM THE COURT.

10    "THE COURT GRANTS APPLE'S MOTION TO STRIKE THE NEW," QUOTE,

11    "'DIRECTLY ATTRIBUTABLE' TERMINOLOGY FROM WAGNER'S UPDATED" --

12         THE COURT:  OKAY.  AND THEN YOU MOVED TO STRIKE THE

13    SAME PHRASE FROM APPLE'S SLIDES?

14         MR. PRICE:  FROM THE OPENING SLIDE BECAUSE IT WAS A

15    LEGAL INSTRUCTION, SO IT'S REALLY UNRELATED.  MS. DAVIS --

16         THE COURT:  OKAY.  SO THEN WHAT -- HOW IS THIS GOING

17    TO BE REFERRED TO THEN?  JUST DIRECT AND INDIRECT EXPENSES,

18    LIKE IN HIS ORIGINAL -- LIKE IN MR. WAGNER'S ORIGINAL REPORT?

19         MR. PRICE:  HE WILL SAY IT'S NECESSARY, YEAH, THAT

20    IT'S NECESSARY TO SELL THE PHONES, AS HE SAID IN HIS REPORT.

21         THE COURT:  DO YOU HAVE ANY OBJECTION TO THAT?

22         MS. KREVANS:  YOUR HONOR, AS LONG AS HE STICKS TO

23    WORDS THAT WERE ACTUALLY IN HIS REPORT, WE'RE OKAY.  I DON'T

24    KNOW WHAT HE'S GOING TO SAY AND WHAT WE'LL OBJECT TO.  IF HE

25    GOES BEYOND WHAT'S IN HIS REPORT, WE'LL OBJECT.
```

1          MR. PRICE:  JUST SO WE'RE CLEAR, OF COURSE HE DIDN'T

2    HAVE THE JURY INSTRUCTION AT THE TIME HE DID HIS REPORT.  IF HE

3    WERE ABLE TO TESTIFY, HE WOULD SAY --

4          THE COURT:  ALL RIGHT.  TELL ME THE RELEVANT

5    PARAGRAPHS OF HIS REPORT.  I WANT TO PULL IT UP AND I WANT TO

6    BE ABLE TO RULE ON AN EVIDENTIARY OBJECTION.  WHAT'S THE

7    RELEVANT PARAGRAPH?

8          MR. PRICE:  IT WOULD BE IN THE REPORT.  THROUGHOUT

9    THE REPORT, HE NEVER SAYS THE WORDS "DIRECTLY ATTRIBUTABLE."

10   THAT'S --

11         THE COURT:  I KNOW.  WHERE DOES HE TALK ABOUT DIRECT

12   OR INDIRECT EXPENSES?  WHAT'S THE RELEVANT PARAGRAPH?

13         MR. PRICE:  LET ME FIND THAT, YOUR HONOR.

14         THE COURT:  I SEE DEDUCTIBLE EXPENSES.  THAT'S ON

15   PARAGRAPH PAGE 154, PARAGRAPH 393.

16         MR. PRICE:  YOUR HONOR, IT'S -- WHEN HE TALKS ABOUT

17   THE DEDUCTIBLE EXPENSES, IT'S ON PAGE 155, PARAGRAPH 395, AND

18   BASICALLY THE LAST PART WHERE HE SAYS THESE COSTS ARE NECESSARY

19   FOR THE MANUFACTURE OF THE ACCUSED PRODUCTS AND ARE, THEREFORE,

20   DEDUCTIBLE.

21         THE COURT:  OKAY.

22         MR. PRICE:  IT'S PAGE 155.

23         THE COURT:  OKAY.  ANY OTHER PARAGRAPHS THAT I SHOULD

24   JUST BE ON THE LOOKOUT FOR TO BE ABLE TO RULE ON ANY

25   SPONTANEOUS EVIDENTIARY OBJECTIONS?

1          MR. PRICE:  I -- THAT'S ALL, YOUR HONOR.

2          THE COURT:  OKAY.

3          MR. PRICE:  THAT'S ALL.

4          THE COURT:  ALL RIGHT.  LET'S GO AHEAD, PLEASE.

5        (JURY IN AT 1:25 P.M.)

6          THE COURT:  SO DO WE NOW HAVE CONTACT NUMBERS FOR YOU

7     FOR THE PEOPLE THAT CAN BE CONTACTED BY PHONE?  OKAY, GREAT.

8     THANK YOU.

9        DO YOU HAVE THAT?

10          THE CLERK:  I DO.

11          THE COURT:  OKAY, GREAT.  TIME IS 1:26.  WELCOME

12     BACK.  PLEASE TAKE A SEAT.

13        CALL YOUR FIRST WITNESS, PLEASE.

14          MS. MAROULIS:  GOOD AFTERNOON, YOUR HONOR.  SAMSUNG

15     CALLS ITS FIRST WITNESS, TIMOTHY SHEPPARD.

16        AND WHILE MR. SHEPPARD IS SETTLING IN, I'M GOING TO MOVE

17     TWO EXHIBITS INTO EVIDENCE.

18          THE COURT:  OKAY.

19          MS. MAROULIS:  THEY ARE DX 753 AND DX 676, AND BOTH

20     WERE ADMITTED DURING THE LAST TRIAL.

21          THE COURT:  ALL RIGHT.  ANY OBJECTION?

22          MR. MCELHINNY:  NONE, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  SO DX 753 AND DX 676 ARE

24     ADMITTED.

25        TIME IS 1:27.  I'LL PROVIDE SOME TIME FOR EVERYONE TO GET

SHEPPARD DIRECT

```
1    THEIR PHOTOS AND GET SETTLED IN.

2            MS. MAROULIS:  GOOD AFTERNOON, MR. SHEPPARD.

3            THE COURT:  TIME IS STILL 1:27.

4            THE CLERK:  HE'S NOT BEEN SWORN IN YET.

5        WOULD YOU STAND AND RAISE YOUR RIGHT HAND, PLEASE?

6        (TIM SHEPPARD, DEFENDANT'S WITNESS, SWORN.)

7            THE WITNESS:  I DO.

8            THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

9        WOULD YOU STATE --

10           MS. MAROULIS:  GOOD AFTERNOON, MR. SHEPPARD.

11           THE CLERK:  STATE YOUR NAME, PLEASE, AND SPELL IT.

12           THE COURT:  SOMETIME IS STILL 1:27.

13           THE WITNESS:  MY NAME IS TIM SHEPPARD, T-I-M

14   S-H-E-P-P-A-R-D.

15                    DIRECT EXAMINATION

16   BY MS. MAROULIS:

17   Q.   MR. SHEPPARD, WHO DO YOU WORK FOR?

18   A.   I WORK FOR SAMSUNG TELECOMMUNICATIONS AMERICA.

19   Q.   IS IT REFERRED TO AS STA SOMETIMES?

20   A.   IT IS.

21   Q.   WHAT DOES STA DO?

22   A.   STA SELLS HANDSETS AND TELECOMMUNICATIONS, NETWORK

23   EQUIPMENT IN THE U.S. MARKET.

24   Q.   WHERE IS STA LOCATED?

25   A.   ITS HEADQUARTERS IS IN DALLAS.  IT'S IN DALLAS.
```

1    Q.   AND WHERE IS THE REST OF SAMSUNG LOCATED?

2    A.   SAMSUNG IS A MULTINATIONAL COMPANY.  THERE'S OPERATIONS IN

3    MANY COUNTRIES, BUT THE HEADQUARTERS IS IN KOREA.

4    Q.   OKAY.  WHAT POSITION DO YOU HOLD AT STA?

5    A.   I'M THE VICE-PRESIDENT OF FINANCE AND OPERATIONS.  I ALSO

6    HOLD THE TITLE OF CHIEF CUSTOM OFFICER.

7    Q.   WHAT ARE YOUR RESPONSIBILITIES AS VICE-PRESIDENT OF

8    FINANCE?

9    A.   I'M RESPONSIBLE FOR -- IN MY CURRENT ROLE, I'M RESPONSIBLE

10   FOR WORKING WITH THE SAMSUNG CFO.

11           MR. MCELHINNY:  EXCUSE ME.  IF I MAY?

12       MR. SHEPPARD, WE'VE LEARNED THROUGH EXPERIENCE THAT THAT

13   MICROPHONE IS NOT VERY SENSITIVE.  YOU HAVE TO HAVE IT RIGHT

14   NEXT TO YOUR MOUTH FOR US TO BE ABLE TO HEAR YOU.

15           THE WITNESS:  OKAY.

16   BY MS. MAROULIS:

17   Q.   MR. SHEPPARD, IF YOU CAN LEAN THE MICROPHONE TOWARDS YOU

18   LIKE THAT, THAT WOULD BE GREAT.

19   A.   SURE.  IS THAT BETTER?

20   Q.   ALL RIGHT.  HAVE YOU HELD ANY OTHER POSITIONS AT STA?

21   A.   YES.  I WAS THE CONTROLLER OF THE COMPANY UNTIL LATE LAST

22   YEAR.

23   Q.   AND HOW LONG HAVE YOU BEEN WITH SAMSUNG?

24   A.   JUST OVER FIVE YEARS.

25   Q.   WHAT DID YOU DO BEFORE SAMSUNG?

1    A.   I WORKED AS THE CONTROLLER FOR A VENTURE CAPITAL COMPANY

2    IN DALLAS; PRIOR TO THAT, I WORKED AS THE -- IN A NUMBER OF

3    FINANCIAL ROLES FOR A SOFTWARE COMPANY FOR TEN YEARS; AND I

4    STARTED MY CAREER IN, AS AN AUDITOR FOR A PUBLIC ACCOUNTING

5    FIRM IN LONDON.

6    Q.   CAN YOU TELL US A LITTLE BIT ABOUT YOUR EDUCATION?

7    A.   YES.  I HAVE A BACHELOR'S OF ENGINEERING DEGREE; I HAVE AN

8    M.B.A.; AND I PASSED THE EQUIVALENT OF THE U.S. CPA EXAM IN

9    LONDON.

10   Q.   WHAT'S IT CALLED IN ENGLAND?  THE EQUIVALENT OF CPA?

11   A.   THERE ARE SEVERAL QUALIFICATIONS YOU CAN HOLD.  I PASSED

12   THE EXAM FOR, AS THE CERTIFIED CHARTERED COUNSEL.

13   Q.   FROM YOUR ROLE AS THE V-P OF FINANCE, DID YOU LEARN ABOUT

14   THE ACCOUNTING SYSTEMS AND PROCEDURES USED BY SAMSUNG?

15           MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THE PRIOR

16   RULINGS OF THIS COURT, WE HAVE TO DISTINGUISH BETWEEN THE

17   VARIOUS SAMSUNG ENTITIES ON THIS PARTICULAR QUESTION.  THIS

18   IDENTICAL OBJECTION WAS SUSTAINED.

19           THE COURT:  I KNOW WHAT YOU'RE REFERRING TO.  THE

20   OBJECTION IS SUSTAINED.

21       GO AHEAD, PLEASE.

22   BY MS. MAROULIS:

23   Q.   SIR, ARE YOU FAMILIAR FROM YOUR WORK AS THE V-P OF FINANCE

24   WITH THE ACCOUNTING SYSTEMS AND PROCEDURES FOR STA, SEC, AND

25   SEA?

```
 1              MR. MCELHINNY:  SEC IS THE ONE IN WHICH THERE'S NO

 2   FOUNDATION, YOUR HONOR.

 3              MS. MAROULIS:  YOUR HONOR, LAST TRIAL MR. SHEPPARD

 4   TESTIFIED ABOUT THIS EXACT QUESTION, SO IF HE'S PERMITTED TO

 5   GIVE AN ANSWER, THE COURT WILL SEE THAT'S THE SAME ANSWER WAS

 6   GIVEN LAST TRIAL.

 7              MR. MCELHINNY:  YOUR HONOR, THE OBJECTION WAS

 8   SUSTAINED AT DOCKET NUMBER 1842, 3007:2-8 AS TO HIS KNOWLEDGE

 9   ABOUT SEC PROCEDURES.

10              MS. MAROULIS:  MAY I LAY A FOUNDATION, YOUR HONOR?

11              MR. MCELHINNY:  YOUR HONOR --

12   BY MS. MAROULIS:

13   Q.   MR. SHEPPARD, ARE YOU FAMILIAR WITH THE STA?

14              THE COURT:  OBJECTION IS SUSTAINED.

15         GO AHEAD.

16   BY MS. MAROULIS:

17   Q.   ARE YOU FAMILIAR WITH THE STA ACCOUNTING SYSTEMS AND

18   PROCEDURES?

19   A.   I AM.

20   Q.   HOW DID YOU LEARN ABOUT THE ACCOUNTING SYSTEMS AND

21   PROCEDURES?

22   A.   IN 2009, WE DID AN UPGRADE TO S.A.P. ACCOUNTING SYSTEM.

23   WE WORKED WITH A TEAM ACROSS NORTH AMERICA TO MAKE AND UPGRADE

24   TO OUR ACCOUNTING SYSTEM.  IT WAS PART OF A GLOBAL UPGRADE OF

25   THE SYSTEM.
```

1    Q.   WAS THERE A MEETING AT WHICH YOU LEARNED ABOUT THESE

2    PROCEDURES?

3    A.   YES.  I MET WITH COLLEAGUES FROM BOTH SEA, STA, AND SEC AS

4    TO HOW WE WOULD UPGRADE OUR SYSTEMS AND WHAT ACCOUNTING

5    PROCEDURES WE WOULD USE.

6    Q.   DID YOU IMPLEMENT ANY PARTICULAR ACCOUNTING STANDARDS?

7    A.   WE DID.  AS PART OF THAT PROCESS, WE ACTUALLY PREPARED FOR

8    A CHANGE OF ACCOUNTING SYSTEM TO ONE THAT WE ADOPT, IFRS.

9    Q.   WHAT IS IFRS ACCOUNTING STANDARD?

10   A.   IFRS IS AN INTERNATIONAL VERSION OF GAAP WHICH MOST

11   COUNTRIES HAVE ADOPTED.  THERE IS AN ACTUAL PROCESS IN PLAY

12   RIGHT NOW TO BRING GAP AND IFRS DURING AND WORKING TOGETHER TO

13   CREATE ONE INTERNATIONAL STANDARD.

14   Q.   OKAY.  AT THAT MEETING THAT YOU JUST REFERENCED, WAS

15   S.A.P. DATA DISCUSSED?

16   A.   YEAH.  THE PRIMARY PURPOSE OF THE MEETING WAS TO HOW EACH

17   ENTITY WOULD USE THE SAME VERSION OF S.A.P.  FROM 2009 ONWARDS,

18   ALL ENTITIES WERE USING ONE VERSION OF S.A.P.

19   Q.   WHAT EXACTLY IS S.A.P. DATABASE?

20   A.   AS YOU IMAGINE, MOST COMPANIES USE SOME KIND OF

21   COMPUTER-BASED ACCOUNTING SYSTEM TO REPORT ALL THEIR

22   TRANSACTIONS, AND SAMSUNG HAS USED S.A.P., OR IS USING S.A.P.

23   Q.   IS S.A.P. DATABASE MAINTAINED IN THE ORDINARY COURSE OF

24   BUSINESS?

25   A.   IT IS.  IT'S USED EVERY DAY, HOUR BY HOUR, MINUTE BY

SHEPPARD DIRECT

1    MINUTE.

2    Q.   CAN YOU PULL PRODUCT LEVEL INFORMATION FROM THE S.A.P.

3    DATABASE?

4    A.   YOU CAN.

5    Q.   WHAT KIND OF INFORMATION?

6    A.   YOU CAN PULL A LOT OF INFORMATION.  YOU CAN SEE WHERE YOU

7    SHIPPED PRODUCT TO, WHERE YOU BILLED SOMEONE, WHEN THEY PAID

8    YOU FOR THE PRODUCT.  YOU CAN SEE THE COSTS ASSOCIATED WITH

9    THAT PRODUCT.

10   Q.   OKAY.  CAN YOU PLEASE TURN TO TAB OF EXHIBIT 753 IN YOUR

11   BINDER, AND THAT'S BEEN ADMITTED IN THE EVIDENCE.

12        RYAN, MAY WE PLACE THE EXHIBIT UP?

13        SIR, CAN YOU TELL US WHAT THIS DOCUMENT IS?

14   A.   YES.  THIS IS THE AUDITED CONSOLIDATED FINANCIAL

15   STATEMENTS OF SAMSUNG ELECTRONICS COMPANY AND THEIR

16   SUBSIDIARIES FOR THE YEAR ENDED 2011.

17   Q.   AND HAS THIS EXHIBIT -- HAS THIS DOCUMENT BEEN PUBLICLY

18   AVAILABLE?

19   A.   YES, IT'S PUBLICLY AVAILABLE.

20   Q.   WHO IS THE AUDITOR THAT AUDITED THESE FINANCIAL

21   STATEMENTS?

22   A.   THIS -- THESE FINANCIAL STATEMENTS WERE AUDITED BY THE

23   AMERICAN ACCOUNTING FIRM OF PRICEWATERHOUSECOOPERS.

24   Q.   LET'S TAKE A LOOK AT PAGE 753.005.  WHAT INFORMATION IS ON

25   THIS PAGE?

1    A.   THIS IS THE CONSULTANT ACTIVITY.  MOST PEOPLE WOULD CALL

2    IT A PROFIT AND LOSS STATEMENT.

3    Q.   WHAT WAS SAMSUNG'S CONSOLIDATED OPERATING PROFIT MARGIN IN

4    2011?

5    A.   2011, THE OPERATING PROFIT MARGIN WAS APPROXIMATELY 11

6    PERCENT.

7    Q.   HOW DO YOU DERIVE THAT CALCULATION?

8    A.   IN THE MIDDLE OF THE PAGE, THERE'S A LINE THAT SAYS

9    OPERATING PROFIT, AND YOU TAKE THAT NUMBER AND DIVIDE IT INTO

10   THE TOP LINE THAT SAYS REVENUE.

11   Q.   CAN YOU EXPLAIN TO THE JURY IN LAY TERMS WHAT OPERATING

12   PROFIT IS?

13   A.   YES.  IF YOU START WITH THE REVENUE, THE EASIEST WAY TO

14   THINK ABOUT THAT IS THAT REPRESENTS ALL OF THE SALES YOU'VE

15   MADE TO CUSTOMERS, AND AFTER YOU DEDUCT ALL OF THE EXPENSE OF

16   THE MAKING THE PRODUCT, GETTING THE PRODUCT, ADVERTISING YOUR

17   PRODUCT, DEVELOPING YOUR PRODUCT, COLLECTING PAYMENT FROM THE

18   CUSTOMERS, YOU END UP WITH A LINE CALLED OPERATING PROFIT.

19        SO THAT REPRESENTS REALLY AFTER YOU'VE TAKEN IN ALL THE

20   COST OF MAKING THE PRODUCT AND SELLING IT, THIS IS WHAT YOU

21   HAVE LEFT OFFER.

22   Q.   IF YOU TURN TO PAGE DX 753.076, WHAT IS SHOWN IN FOOTNOTE

23   31?

24   A.   WHICH ONE?

25   Q.   DX 753.076?

1        A.    OKAY, GOT IT.   OKAY.

2        Q.    TAKE A LOOK AT PARAGRAPH OR FOOTNOTE 31.   WHAT IS DEPICTED

3    THERE?

4        A.    31 IS ENTITLED "SEGMENT INFORMATION."   THIS IS VERY COMMON

5    THAT LARGE, LARGE COMPANIES ARE REQUIRED TO EXPLAIN HOW THEY

6    MANAGE THE MAJOR DIVISIONS OF THE BUSINESS, WHAT'S THE

7    PROFITABILITY FOR THOSE DIVISIONS.

8        Q.    WHAT SEGMENT DO THE HANDSETS AND TABLETS FALL INTO?

9        A.    THE HANDSETS AND TABLETS AND NETWORK COMMUNICATION

10   EQUIPMENT IS UNDER TELECOMMUNICATIONS LINE.   SO THAT'S THE ONE,

11   TWO, THE THIRD COLUMN OVER.

12       Q.    WHAT WAS THE OPERATING PROFIT MARGIN FOR THE

13   TELECOMMUNICATION SEGMENT IN 2011?

14       A.    IN 2011, IT WAS 15 PERCENT, APPROXIMATELY 15 PERCENT.

15       Q.    LET'S NOW TURN TO PAGE 753.077.   WHAT IS THE OPERATING

16   PROFIT MARGIN FOR THE TELECOMMUNICATIONS SEGMENT FOR THE YEAR

17   2010?

18       A.    I BELIEVE IT WAS APPROXIMATELY 11 PERCENT.

19       Q.    AND I NOW WANT TO TURN YOUR ATTENTION TO SAMSUNG'S

20   OPERATING EXPENSES.

21            CAN YOU PLEASE TURN TO TAB 3960?   IT'S SDX 3960.002 IN

22   YOUR BINDER.

23       A.    OKAY.

24       Q.    DO YOU SEE THAT THERE ARE VARIOUS EXPENSES LISTED ON THIS

25   SLIDE?

1    A.   YES.

2    Q.   ARE YOU FAMILIAR WITH THESE EXPENSES FOR STA?

3    A.   YES, I AM.

4    Q.   CAN YOU WALK US THROUGH WHAT ARE SOME OF THE SALES

5    EXPENSES THAT STA INCURS IN SELLING THE PRODUCTS AT ISSUE IN

6    THIS TRIAL?

7    A.   OKAY.  FOR SALES EXPENSES?

8    Q.   YES, PLEASE.

9    A.   OKAY.  SO STARTING WITH THE TOP LINE, SO IT SAYS SALES

10   EXPENSE, LOGISTICAL EXPENSE.  WHAT IT MEANS IS THIS IS THE COST

11   ASSOCIATED WITH MOVING THE PRODUCT FROM THE FACTORY, YOU KNOW,

12   MOVING IT BY PLANE OR OCEAN TO GET INTO THE UNITED STATES; YOU

13   HAVE TO PUT IT IN A WAREHOUSE; YOU CLEAR CUSTOMS; AND THEN YOU

14   HAVE TO MOVE THE PRODUCT FROM A WAREHOUSE TO THE CUSTOMER'S

15   WAREHOUSE.

16   Q.   WHAT ARE SOME OF THE OTHER SALES EXPENSES?

17   A.   SOME OF THE OTHER SALES EXPENSES IS OBVIOUSLY YOU NEED TO

18   BE ABLE TO INFORM CUSTOMERS THAT THE PRODUCT IS AVAILABLE, SO

19   YOU TYPICALLY DO THAT THROUGH ADVERTISING ON TV OR BILLBOARDS

20   OR SOCIAL MEDIA.  THERE'S MANY, MANY DIFFERENT WAYS TO

21   ADVERTISE THAT THE PRODUCT'S AVAILABLE.

22        THE NEXT LINE IS WE HAVE SOME FLUCTUATIONS IN OUR STAFFING

23   NEEDS.  YOU HAVE TYPICALLY YOU HAVE SEASONAL TIMES THROUGHOUT

24   THE YEAR, SO MONTHS OR PERIODS ARE BUSIER THAN OTHERS, SO YOU

25   HAVE SOME TEMPORARY STAFF.

1          NEXT LINE IS YOU WOULD LIKE TO INSURE THE PRODUCT, SO

2     WHILE IT'S MOVING FROM THE FACTORY TO THE CUSTOMER, YOU MAKE

3     SURE THERE'S NO LOSS TO YOUR PRODUCTS.  YOU BUY INSURANCE.

4          YOU WANT TO INSURE THE BUILDINGS YOU HAVE, LIKE THE

5     WAREHOUSE.

6          AND THEN YOU HAVE TO BUY INSURANCE IN CASE THERE ARE SOME

7     UNKNOWN ISSUE, YOU INSURE YOUR EMPLOYEES AND OPERATIONS.

8     Q.   WHAT ABOUT G&A EXPENSES THAT WE SEE ON THIS SLIDE?

9     A.   SO THERE ARE G&A STAFF INVOLVED IN SUPPORTING THE

10    OPERATION, YOU MUST PAY THEM SALARY, OVERTIME, MAYBE BONUSES.

11    YOU HAVE HEALTH CARE COSTS THAT ARE INCLUDED IN THE BENEFITS.

12         IN THE G&A EXPENSE LINE, BELOW THAT WE HAVE DEPRECIATION.

13    WHAT THIS REALLY MEANS IS JUST A WAY OF ACCORDING THE COSTS OF

14    THE FURNITURE, SOME TABLES AND CHAIRS AND DESKS, YOU GIVE THEM

15    A COMPUTER SO THEY CAN KEY ENTRIES INTO S.A.P. SO THEY CAN DO

16    THEIR BEST AT THEIR JOB.

17         AND THEN THE LAST LINE WE HAVE TRAVEL EXPENSES.  YOU NEED

18    TO TRAVEL AROUND.  WE HAVE BUILDINGS WHERE PEOPLE NEED TO SIT

19    AND WORK, AND YOU HAVE THE EXPENSES FOR THE RENT AND THE

20    BUILDING FOR YOUR BUSINESS.

21    Q.   CAN SAMSUNG SELL PHONES WITHOUT ANY OF THESE EXPENSES?

22    A.   NO, YOU CAN'T SELL A PHONE THAT YOU CAN'T MOVE IN A

23    SHIPMENT.  YOU CAN'T SELL A PHONE UNLESS YOU TELL SOMEONE THAT

24    IT EXISTS AND YOU HAVE TO MARKET IT, ADVERTISE IT.

25    Q.   DOES STA INCUR ANY R&D EXPENSES?

1    A.   STA DOES.

2    Q.   WHAT KIND OF R&D EXPENSES DOES STA INCUR?

3    A.   STA LAUNCHES PRODUCTS ON A FREQUENT BASIS, AS IT TURNS OUT

4    ABOUT ONCE A DAY, SO THIS IS A STEADY PROCESS.

5         ONE OF THE KEY PARTS OF LAUNCHING A PRODUCT IS YOU HAVE TO

6    TEST THAT IT WORKS THE WAY THAT YOU WANT IT TO WITH THE

7    CARRIER, AND THEY WORK WITH THE HANDSETS, AND WHEN YOU LAUNCH

8    THEM, WE WORK WITH THOSE COMPANIES TO GO MAKE SURE IT WORKS.

9    DRIVE IN THE NEIGHBORHOOD AND DO TESTS TO MAKE SURE THE PHONE

10   DOESN'T DROP A CALL.

11        THEN AFTER YOU LAUNCH IT, THEN YOU WILL THEN HAVE TO

12   SUPPORT THE HANDSET FOR SOME TIME, SO YOU'LL NEED TO DO SEVERAL

13   SOFTWARE UPGRADES OVER THE LIFE OF THE DEVICE.

14        AND EVEN IF YOU STOP SELLING HANDSET, YOU STILL HAVE TO

15   RUN AND SUPPORT THE DEVICE FOR ONE MORE YEAR AS THE WARRANTY

16   PERIOD WITH A HANDSET.

17        SO AFTER YOU LAUNCH HANDSET, YOU'RE INVOLVED FOR A LONG

18   TIME IN SUPPORTING HANDSET FROM R&D.

19   Q.   AND ARE THERE OTHER TYPES OF R&D EXPENSES THAT A COMPANY

20   MAY INCUR?

21   A.   YES.  SOME ELEMENT OF R&D LOOKS TO THE FUTURE.  FOR

22   EXAMPLE, MOST PEOPLE ARE AWARE THAT 4G NETWORKS ARE BEING

23   SUPPORTED NOW.

24        THERE IS ACTUALLY WORK BEING DONE NOW TO DESIGN AND

25   IMPLEMENT THE 5G NETWORKS, NEXT GENERATION.

1    Q.   DO THE R&D EXPENSES SHOW UP ON STA'S BOOKS?

2    A.   YES, THEY DO.  BUT THE WORK IS ACTUALLY DONE UNDER

3    DIRECTION OF SEC, THE PARENT COMPANY, AND SEC REIMBURSES US FOR

4    THAT R&D WORK EVERY MONTH.

5    Q.   ARE THERE ANY OTHER OPERATING EXPENSES THAT ARE INCURRED

6    BY STA BUT REIMBURSED BY SEC?

7    A.   YES.  I'VE TALKED ABOUT THE MARKETING EXPENSE, THE

8    ADVERTISING.  WE SPEND A LOT OF MONEY IN THE U.S. MARKET, I'M

9    SURE THE PEOPLE HAVE SEEN THE COMMERCIALS ON TV, AND THOSE

10   COSTS ARE ALSO REIMBURSED BY SEC AS TO EACH MARKET.

11   Q.   LET'S SWITCH GEARS AND TALK ABOUT ALLOCATION OF EXPENSES.

12   HOW DOES SAMSUNG ALLOCATE EXPENSES?

13        MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THAT -- WE'RE

14   BLURRING THE LINE AGAIN.  THE QUESTION IS --

15        MS. MAROULIS:  IT'S TO SUBSIDIARIES.

16        THE COURT:  PLEASE REPHRASE THE QUESTION.

17   BY MS. MAROULIS:

18   Q.   MR. SHEPPARD, HOW DOES STA ALLOCATE EXPENSES?

19   A.   STA, SO AS PART OF THE GLOBAL ROLL OUT OF THE

20   INTERNATIONAL VERSION OF S.A.P. IN 2009, EACH SUBSIDIARY IS

21   REQUIRED TO, AT THE END OF EACH MONTH WHEN IT'S CLOSING ITS

22   BOOKS -- AND PRETTY MUCH EVERY COMPANY WILL CLOSE THE BOOKS

23   AFTER YOU'VE GONE THROUGH THE PROCESS OF RECONCILING YOUR BANK

24   ACCOUNT, INVOICED YOUR CUSTOMERS, CUSTOMERS HAVE PAID YOU AND

25   YOU'VE RECORDED THE CASH TRANSACTIONS.

1          THEN YOU GO THROUGH THE PROCESS OF CLOSING THE BOOKS TO

2     THEN ALLOCATE YOUR COSTS TO PRODUCTS SO YOU CAN UNDERSTAND THE

3     PROFITABILITY OF THE PRODUCT.

4          IN STA'S PROCESS, IT'S A THREE STEP METHODOLOGY, WHICH IS

5     TO TAKE THE COSTS, LIKE THE LOGISTICS COSTS WE TALKED ABOUT

6     WITH THE WAREHOUSING MOVEMENTS, YOU CAN SPECIFICALLY IDENTIFY

7     THOSE AT THE PRODUCT LEVEL.

8          THEN YOU MAY HAVE A PROCESS WHERE A TEAM OF PEOPLE WORKING

9     ON MULTIPLE PRODUCTS -- TAKE THE EXAMPLE OF THE TESTING

10    PRODUCTS.  YOU MAY HAVE THE TEAM THAT'S WORKING ON FOUR OR FIVE

11    PRODUCTS AT A TIME AS YOU TAKE THEM OUT AND WORK AND DIVIDE IT

12    AMONG THE FOUR OR FIVE PRODUCTS.  THAT'S THE SECOND STEP.

13         THEN THE THIRD STEP IN THE ALLOCATION IS TO TAKE A TEAM,

14    LIKE THE RESOURCES TEAM, WHICH HAS TO RECRUIT ALL THE

15    EMPLOYEES, MAKE SURE THEY GET PAID AND GET BENEFITS, AND YOU

16    ALLOCATE THOSE COSTS ACROSS ALL THOSE PRODUCTS AS WELL.

17    Q.   IS THAT A COMMON PRACTICE FOR ACCOUNTANTS TO ALLOCATE

18    COSTS IN THIS WAY?

19    A.   IT'S VERY COMMON.  THE REQUIREMENT IS TAUGHT IN MOST

20    ACCOUNTING SCHOOLS, AND IT'S A REQUIREMENT ON THE PART OF THE

21    U.S. OR THE U.K. CPA EXAM TO ACTUALLY STUDY AND TAKE A TEST IN

22    THIS AREA.

23    Q.   AS THE VICE-PRESIDENT OF FINANCE AT STA, IS IT YOUR

24    UNDERSTANDING THAT THE SAME ALLOCATION SYSTEM IS USED

25    COMPANY-WIDE?

1              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THERE'S NO

2     FOUNDATION AS TO WHAT HAPPENS IN KOREA.

3              MS. MAROULIS:  YOUR HONOR, LAST TRIAL THE WITNESS WAS

4     PERMITTED TO TESTIFY THAT THE ACCOUNTING PROCEDURES --

5              THE COURT:  JUST -- I HAVE THE TRANSCRIPT.  JUST CITE

6     THE PAGE AND LINE NUMBER, PLEASE.

7              MS. MAROULIS:  YES, YOUR HONOR.  IT'S -- THE TRIAL

8     TESTIMONY IS ON PAGE 3002 AT LINES 4 THROUGH 12 AND 3002, LINE

9     20 THROUGH 3003, LINE 3.

10             THE COURT:  ALL RIGHT.  OVERRULED.

11        GO AHEAD, PLEASE.

12    BY MS. MAROULIS:

13    Q.   SIR, WHAT WOULD BE THE ALTERNATIVE TO ALLOCATING EXPENSES

14    OTHER THAN IN THE WAY YOU DESCRIBED?

15    A.   IF YOU -- I DON'T KNOW OF AN ALTERNATIVE.  IF YOU WANT TO

16    KNOW WHAT YOUR PROFIT IS AT THE PRODUCT LEVEL, IF YOU DON'T

17    KNOW HOW MUCH YOUR COSTS ARE AT THE PRODUCT LEVEL, YOU DON'T

18    KNOW HOW MUCH TO CHARGE.

19             THE COURT:  EXCUSE ME.  THAT'S NOT WHAT'S ON THOSE

20    PAGES 302 TO 303 IN ANY WAY.

21             MS. MAROULIS:  YOUR HONOR, IT STATES --

22             THE COURT:  JUST GIVE ME THE LINE NUMBER, PLEASE.

23             MS. MAROULIS:  YES.  3002 AT PAGE -- AT LINE 4.  THE

24    QUESTION IS -- I'M SORRY.

25             THE COURT:  "AND WHAT'S YOUR POSITION?"

```
 1            MS. MAROULIS:  THE POSITION IS AS THE VICE-PRESIDENT.

 2            THE COURT:  "VICE-PRESIDENT OF FINANCE AND

 3     OPERATIONS" IS LINE 5.

 4            MR. MCELHINNY:  IF I MAY, YOUR HONOR?

 5            THE COURT:  YEAH.

 6            MR. MCELHINNY:  THAT WAS THEIR ATTEMPT TO LAY THE

 7     FOUNDATION.  YOUR RULING IS AT 3007, LINES 2 TO 7.

 8            THE COURT:  I DON'T SEE ANY ALLOCATION TESTIMONY

 9     HERE, BUT I'LL ALLOW ONE QUESTION.

10        GO AHEAD.

11     BY MS. MAROULIS:

12     Q.   JUST SO THE RECORD IS CLEAR, MAY I REPEAT THE QUESTION?

13     A.   SURE.

14     Q.   EARLIER YOU TESTIFIED THAT -- STRIKE THAT.

15        DO OTHER PARTS OF SAMSUNG USE THE SAME EXPENSE ALLOCATION

16     METHODOLOGY AS THE ONE YOU JUST DESCRIBED?

17     A.   YES, THEY DO.

18     Q.   LET'S SWITCH TOPICS A BIT AND LOOK AT ADMITTED EXHIBIT

19     DX 676.

20        ARE YOU FAMILIAR WITH THIS DOCUMENT, SIR?

21     A.   OH, 676.  YES.

22     Q.   DID YOU TESTIFY ABOUT IT IN THE PREVIOUS TRIAL?

23     A.   I DID.

24     Q.   WHAT DOES DX 676 SHOW?

25     A.   IT'S HARD TO SEE.  IT IS A SPREADSHEET REPORT FROM S.A.P.
```

1    THAT SHOWS REVENUE, SALES, AND COSTS FOR PRODUCTS FROM A PERIOD

2    OF MAY 2010 THROUGH JUNE 2012.

3    Q.   DOES THIS DOCUMENT COME FROM THE AUDITED S.A.P. DATABASE

4    THAT YOU TESTIFIED ABOUT EARLIER?

5    A.   YES, IT DOES.

6    Q.   AND DID YOU TAKE ANY STEPS TO VERIFY THE DATA IN DX 676?

7          MR. MCELHINNY:   TO BE CLEAR, YOUR HONOR, IN THE

8    LAST -- HE'S ALLOWED TO TESTIFY, UNDER YOUR HONOR'S PREVIOUS

9    RULING, AS TO THE SECTION FOR STA AND THE SECTION FOR SEA, BUT

10   NOT THE SEC NUMBERS ON THIS DOCUMENT.

11         MS. MAROULIS:   UNDERSTOOD, YOUR HONOR.

12   Q.   SIR, DID YOU TAKE ANY STEPS TO VERIFY THE DATA IN DX 676?

13   A.   I DID.  I PUT MY AUDITOR'S HAT ON.  I HAD SOME OF MY

14   ACCOUNTING STAFF PULL DATA FROM S.A.P., AND THEN SHOWED ME THE,

15   THAT DATA EXTRACTED AND I COMPARED CELL BY CELL FOR THE STA

16   PORTIONS OF THE SPREADSHEET FROM THE DATE THAT THAT WAS INDEED

17   FROM S.A.P.

18   Q.   WAS THIS THE ONLY VERSION OF EXHIBIT 676 THAT SAMSUNG

19   PRODUCED IN THIS CASE?

20   A.   NO.  THERE WERE OTHER VERSIONS.

21   Q.   ARE THERE ANY DIFFERENCES BETWEEN THIS AND PRIOR VERSIONS?

22   A.   YES.  IF I COULD EXPLAIN SOME OF THEM BRIEFLY?

23        THIS LITIGATION HAS BEEN ONGOING FOR SOME TIME AND EXTRA

24   DATA WAS ADDED TO COVER THE NEW TIME PERIODS, I THINK Q-2001 --

25   Q-2011 TO Q-2012 WERE EXAMPLES.

1          THERE IS A -- THERE WAS A REQUEST TO DO A WORLDWIDE

2     VERSION AND A U.S. ONLY VERSION OF THE SALES INFORMATION.

3          I BELIEVE -- THOSE THE ONES THAT COME TO MY MIND.

4     Q.   WERE THERE ANY ERRORS IN THE PRIOR SPREADSHEETS?

5     A.   THERE WAS NO -- AS FAR -- TO THE BEST OF MY KNOWLEDGE,

6     THERE WERE NO ERRORS IN THE EXTRACTION OF THE S.A.P. DATA

7     PUTTING IT IN THIS DATABASE, BUT THERE WERE SOME EXCEL

8     TABULATION ERRORS WHICH WERE IDENTIFIED AND CORRECTED.

9          TO THE BEST OF MY KNOWLEDGE, THERE ARE NO ERRORS IN THE

10    EXHIBIT HERE.

11    Q.   NOW, LET'S SWITCH TOPICS AND LOOK AT SDX 7008.001 IN YOUR

12    BINDER.

13    A.   OKAY.

14    Q.   LOOKING AT THIS SLIDE, DO YOU UNDERSTAND THAT THESE ARE

15    THE PRODUCTS AT ISSUE IN THIS CASE?

16    A.   NO.  I'M SURE THAT'S NOT THE CORRECT -- MAYBE -- YES.

17    THAT'S NOT WHAT I HAVE IN MY BINDER.

18          MR. MCELHINNY:  THAT'S NOT WHAT WE HAVE IN OUR BINDER

19    EITHER, YOUR HONOR.

20          MS. MAROULIS:  ALL RIGHT.  LET'S TRY SDX 7008-1,

21    WHAT'S IN MY BINDER'S AND WHAT'S IN THE WITNESSES AND OPPOSING

22    COUNSEL'S BINDER.

23    Q.   WHILE WE'RE GETTING THE SLIDE UP, I WAS GOING TO USE THE

24    SLIDE AS A PROP, BUT LET'S JUST TALK FOR A BIT.

25    A.   OKAY.

SHEPPARD DIRECT

1    Q.   ONE OF THE PHONES THAT I'LL SHOW YOU IS DROID CHARGE.

2    DOES DROID CHARGE HAVE 4G CAPABILITY?

3    A.   I THINK THIS IS THE SLIDE THAT'S IN MY BINDER.

4    Q.   OKAY, GREAT.  SO WHICH OF THE PHONES ON THIS --

5             MR. MCELHINNY:  I'M SORRY.  WHICH -- THIS IS NOT THE

6    EXHIBIT IN MY BINDER.  I'M TRYING TO FIGURE OUT WHAT EXHIBIT

7    WE'RE WORKING OFF OF.

8             THE COURT:  MINE IS DIFFERENT, TOO.  I THINK THE ONE

9    IN THE BINDER IS .001 AND THIS IS .002.  THAT MIGHT BE THE

10   DIFFERENCE.

11            MS. MAROULIS:  I THINK EVERYONE HAS THE SAME IN THEIR

12   BINDERS.

13            THE COURT:  NOT A PROBLEM.  LET'S GO AHEAD AND USE

14   THE ONE ON THE SCREEN THEN.

15            MS. MAROULIS:  WE SHOULD HAVE THE RIGHT ONE.

16   Q.   SO MR. SHEPPARD, DOES DROID CHARGE HAVE 4G CAPABILITY?

17   A.   DROID CHARGE, YES, THAT WAS, I BELIEVE, THE FIRST LTE

18   DEVICE FROM SAMSUNG ON VERIZON'S NETWORK.

19   Q.   DOES EPIC 4G HAVE 4G CAPABILITY?

20   A.   YES.

21   Q.   HOW ABOUT EXHIBIT 4G?

22   A.   YES.

23   Q.   OKAY.  AND INFUSE 4G?

24   A.   YES.

25   Q.   OKAY.  IT'S NOT ON THIS SLIDE, BUT WHAT WAS THE FIRST DATE

1    OF SALE FOR THE GALAXY ACE?

2    A.   THE DATE WAS FEBRUARY 2011.

3    Q.   AND WHEN WAS SAMSUNG'S GALAXY TAB RELEASED?

4    A.   IT WAS RELEASED -- IT'S ON THIS SLIDE.  IT'S ON THIS DATE

5    OF -- I THINK IT'S 2010.

6         I APOLOGIZE.  MY ENGLISH BRAIN IS TRYING TO FIGURE OUT IS

7    THAT NOVEMBER OR OCTOBER.  BUT I THINK THAT'S SAYING THAT

8    NOVEMBER OF 2010.

9    Q.   VERY WELL.  LET'S TALK ABOUT PROFITABILITY ISSUES.

10        DOES SAMSUNG EXPECT ITS PRODUCTS TO BE PROFITABLE OVER THE

11   ENTIRE LIFE OF THE PRODUCT?

12             MR. MCELHINNY:  WHO'S THE "SAMSUNG" HERE, YOUR HONOR?

13             MS. MAROULIS:  I MEAN STA, BUT I'M HAPPY TO CLARIFY.

14   Q.   DOES STA EXPECT ITS PRODUCTS TO BE PROFITABLE OVER THE

15   ENTIRE LIFE OF THE PRODUCT?

16   A.   WHEN YOU LAUNCH A PRODUCT, YOU'D EXPECT TO MAKE A PROFIT

17   OVER THE LIFE OF THE PRODUCT.

18        HOWEVER, WHAT TYPICALLY HAPPENS IS YOU MAKE MOST OF YOUR

19   PROFIT DURING THE EARLY PART OF THE SALES CYCLE, AND TOWARDS

20   THE END YOU MAY BREAK EVEN, OR YOU MAY TAKE A LOSS AS YOU GET

21   READY TO MAKE WAY FOR THE NEXT PRODUCT.

22        REMEMBER, THIS IS A PROCESS WHERE WE ISSUE A NEW PHONE

23   EVERY WEEK, SO THERE'S A CONSTANT CHANGE OF THE PRODUCT LINE.

24   Q.   WHY NOT JUST STOP SELLING PRODUCTS IF THEY STOP BEING

25   PROFITABLE?

```
 1    A.   WELL, THAT'S A GOOD QUESTION.  SO TOWARDS THE END OF THE

 2    LIFE, YOU HAVE TO THEN MAKE A BALANCE BETWEEN HOW MUCH

 3    INVENTORY DO YOU HAVE OR THE CARRIER HAS, WHEN DO YOU WANT TO

 4    LAUNCH THE NEXT PHONE?

 5         YOU HAVE TO MAKE A DECISION, DO YOU STOP SELLING AND WRITE

 6    EVERYTHING OFF, OR DO YOU TRY TO GET AS MUCH MONEY AS YOU CAN

 7    FOR THE INVENTORY YOU HAVE AS YOU GET READY FOR THE NEXT

 8    LAUNCH?

 9    Q.   FOR THE 13 PRODUCTS AT ISSUE IN THIS CASE, WHAT IS THE

10    PROFIT MARGIN?

11              MR. MCELHINNY:  WHOSE PROFIT MARGIN, YOUR HONOR?

12              MS. MAROULIS:  YOUR HONOR, THE WITNESS IS TESTIFYING

13    AS THE VICE-PRESIDENT OF FINANCE OF STA.  HE SHOULD BE ABLE TO

14    TESTIFY AS TO THE PROFIT MARGIN.  HE DOES AUDITED FINANCIAL

15    STATEMENTS FOR THE COMPANY.

16              MR. MCELHINNY:  COULD WE ESTABLISH A FOUNDATION ABOUT

17    WHETHER OR NOT STA HAS A SEPARATE PROFIT MARGIN FOR ITS

18    PRODUCTS?

19              THE COURT:  WHY DON'T YOU PROVIDE THAT?

20    BY MS. MAROULIS:

21    Q.   SIR, IN YOUR CAPACITY AS THE VICE-PRESIDENT OF FINANCE,

22    ARE YOU AWARE OF THE PROFIT MARGIN ON THE PRODUCTS AT ISSUE IN

23    THIS CASE?

24              THE COURT:  FOR WHICH ENTITY IF WE'RE GOING TO GET

25    INTO THIS?
```

1     BY MS. MAROULIS:

2     Q.   ARE YOU FAMILIAR WITH THE PROFIT MARGIN FOR THE STA

3     PRODUCTS?

4     A.   I AM FAMILIAR WITH PROFIT MARGINS AS MUCH THAT WE, WE

5     ACTUALLY SET BONUS TARGETS FOR OUR PROFIT, WHICH WE THEREFORE

6     WE HAVE TO BE ABLE TO RECORD THEM AND MEASURE THE PROFITS.

7     Q.   AND USING THAT KNOWLEDGE, WHAT IS THE PROFIT MARGIN FOR

8     THE 13 PRODUCTS AT ISSUE?

9     A.   11 PERCENT.

10    Q.   OKAY.  WITH RESPECT TO CAPTIVATE, CONTINUUM, DROID CHARGE,

11    EPIC 4G, INDULGE, GEM, AND INFUSE 4G, WHAT IS THE PROFIT MARGIN

12    FOR THOSE SEVEN PHONES?

13    A.   OH, LET ME CORRECT MY PREVIOUS STATEMENT.

14         PROFIT MARGIN FOR THE WHOLE GROUP IS 10.  FOR THE SMALLER

15    GROUP, THE PROFIT MARGIN IS 11 PERCENT.

16    Q.   OKAY.  WHAT ABOUT THE PHONE IN CAPTIVATE?  WAS IT

17    PROFITABLE DURING THE PERIOD OF JUNE 16TH, 2011, THROUGH

18    JUNE 30, 2012?

19    A.   IT WAS NOT.  THAT WAS -- SO THIS PRODUCT HAD A LAUNCH DATE

20    OF THE MIDDLE OF 2010, SO ONE YEAR LATER, IT WAS NEAR THE END

21    OF ITS LIFE CYCLE.  THIS WAS A GALAXY S I DEVICE.

22         WE HAD THE GALAXY S II, WHICH WE MADE READY TO BE

23    ANNOUNCED AND LAUNCHED, SO IT WAS IN THE END OF THE LIFE CYCLE.

24         SO IT WAS IN THE END OF LIFE CYCLE.

25    Q.   HOW ABOUT GEM?  WAS THAT PROFITABLE?

1    A.   THE GEM IS THE EXCEPTION OUT OF ALL THESE PRODUCTS.  IT

2    NEVER MADE A PROFIT UNFORTUNATELY.

3    Q.   WHAT ABOUT DROID CHARGE?

4    A.   DROID CHARGE DID MAKE A PROFIT.  TOWARDS THE END OF ITS

5    LIFE CYCLE, IT DID NOT.

6    Q.   AND FINALLY, THE CONTINUUM?

7    A.   THE CONTINUUM, SAME PATTERNS AT THE OTHERS, THAT IT MADE A

8    PROFIT IN THE EARLY PART OF ITS LIFE CYCLE, BUT IT DID NOT

9    TOWARDS THE END.

10        MS. MAROULIS:  THANK YOU SIR.  I DON'T HAVE QUESTIONS

11   AT THIS POINT.

12        THE COURT:  OKAY.  THE TIME IS 1:56.

13                          **CROSS-EXAMINATION**

14   BY MR. MCELHINNY:

15   Q.   MR. SHEPPARD, I DON'T KNOW THAT WE'VE MET.  MY NAME IS

16   HAROLD MCELHINNY.  I'M NOT AN ATTORNEY FOR SAMSUNG.  OKAY.

17        YOU WERE JUST TALKING ABOUT STA'S PROFIT MARGIN.

18        MS. MAROULIS:  EXCUSE ME, COUNSEL.  CAN I HAVE A

19   BINDER FOR THE WITNESS, PLEASE?

20        MR. MCELHINNY:  I DON'T.  I DON'T.  I'M JUST GOING TO

21   USE THE ONE YOU GAVE HIM.

22        MS. MAROULIS:  OKAY.

23   BY MR. MCELHINNY:

24   Q.   YOU WERE JUST TALKING ABOUT STA'S PROFIT MARGIN ON CERTAIN

25   PHONES; CORRECT?

SHEPPARD CROSS

1    A.   YES.

2    Q.   AND LET ME MAKE SURE -- I'M NOT AN ACCOUNTANT, SO ROUGHLY

3    SPEAKING, IS IT FAIR TO SAY THAT WHAT YOU'RE TALKING ABOUT IS

4    THE DIFFERENCE BETWEEN WHAT THEY SOLD IT FOR AND WHAT THEY

5    BOUGHT IT FOR?

6    A.   NO.

7    Q.   OKAY.  IS IT TRUE THAT STA BUYS ITS PHONES FROM SAMSUNG

8    KOREA?

9    A.   IT IS TRUE THAT --

10   Q.   IS THIS A DIFFICULT QUESTION, SIR?  WHO DO YOU BUY YOUR

11   PHONES FROM?

12   A.   I'D LIKE TO GIVE YOU A CLEAR ANSWER.

13        MS. MAROULIS:  YOUR HONOR, MAY MR. MCELHINNY NOT

14   INTERRUPT THE WITNESS?

15        THE COURT:  PLEASE DON'T INTERRUPT THE WITNESS.

16        MR. MCELHINNY:  I WON'T AGAIN.

17        THE WITNESS:  SO THERE ARE HANDSETS MANUFACTURED IN,

18   IN KOREA AND CHINA, AND THOSE DEVICES ARE SHIPPED TO US FROM

19   EITHER CHINA OR KOREA INTO THE U.S. MARKET.

20        IN SOME CASES, MORE THAN HALF THE CASES, THERE'S A FINAL

21   ASSEMBLY PROCESS THAT ACTUALLY HAPPENS IN TEXAS THAT STA

22   ACTUALLY DOES CONTROL.

23   BY MR. MCELHINNY:

24   Q.   MR. SHEPPARD, I TRIED TO ASK MY QUESTION CLEARLY.  LET ME

25   TRY IT AGAIN.

```
1    A.   SURE.

2    Q.   FROM WHOM DOES STA BUY ITS PHONES?  WHO DO YOU PAY TO --

3    WHO DO YOU PAY WHEN YOU PAY FOR THE PHONES?

4         MS. MAROULIS:  OBJECTION, YOUR HONOR.  I BELIEVE THIS

5    GOES BEYOND -- IT VIOLATES ONE OF YOUR ORDERS THAT PREVIOUSLY

6    WAS DISCUSSED.

7         MR. MCELHINNY:  YOUR HONOR, SHE JUST WENT INTO PROFIT

8    MARGINS.

9         THE COURT:  OVERRULED.

10        GO AHEAD.  PLEASE ANSWER THE QUESTION.

11        THE WITNESS:  SO AT THE END OF EACH MONTH, WE MAKE A

12   PAYMENT TO THE SEC FOR THE PAYMENT OF HANDSETS.

13   BY MR. MCELHINNY:

14   Q.   AND WHO DETERMINES THE PRICE THAT YOU PAY SEC?

15   A.   GOSH, THAT'S A COMPLICATED QUESTION.

16   Q.   WHO'S INVOLVED IN MAKING THAT DETERMINATION?  LET'S TRY TO

17   MAKE IT SIMPLE.  WHO'S INVOLVED IN MAKING THAT DETERMINATION?

18   A.   SO IT'S A COMBINATION OF -- SO THIS IS A FUNCTION OF OUR

19   AGREEMENT BETWEEN THE KOREAN GOVERNMENT AND THE U.S.

20   GOVERNMENT.

21        MS. MAROULIS:  YOUR HONOR, I MUST OBJECT TO THIS

22   TESTIMONY THAT COUNSEL IS ELICITING, AND THE RELEVANT DOCKET

23   NUMBER IS 2645 WHERE YOUR HONOR REFERENCED THE PRIOR

24   DISCUSSIONS IN LAST YEAR'S TRIAL.

25        MR. MCELHINNY:  UNLESS THEY OPENED THE DOOR.
```

1          THE COURT:  GO AHEAD.  THE OBJECTION IS OVERRULED.

2      YOU MAY ANSWER IT.  THE DOOR HAS BEEN OPENED ON THAT.

3  BY MR. MCELHINNY:

4  Q.   I'M SORRY.  AN AGREEMENT BETWEEN -- WHO'S INVOLVED IN THIS

5  AGREEMENT BETWEEN SETTING THE PRICE?

6  A.   THE U.S. GOVERNMENT AND KOREAN GOVERNMENT.

7  Q.   WOULD YOU DESCRIBE -- YES OR NO QUESTION COMING UP.  ARE

8  YOU READY?  WOULD YOU DESCRIBE THE PRICE YOU PAY TO SEC AS A

9  MARKET PRICE?

10  A.   UNDER --

11          MS. MAROULIS:  SAME OBJECTION, YOUR HONOR.

12          THE COURT:  OVERRULED.

13      GO AHEAD.  YOU MAY ANSWER.

14          THE WITNESS:  UNDER THE BASIS OF THE TAX AGREEMENT

15  THAT WE HAVE BETWEEN SAMPLE, SEC, THE KOREAN GOVERNMENT, AND

16  THE U.S. GOVERNMENT, I BELIEVE MY UNDERSTANDING IS THE PRICE WE

17  PAY IS BASED ON THE MARKET PRICE.

18  BY MR. MCELHINNY:

19  Q.   SO THE ANSWER TO MY QUESTION IS, YES, YOU WOULD CALL THAT

20  A MARKET PRICE?

21  A.   THE PEOPLE MUCH SMARTER THAN ME WHO HAVE NEGOTIATED THAT

22  AGREEMENT HAVE AGREED MARKET PRICE.

23  Q.   IS YOUR ANSWER TO MY QUESTION YES?

24  A.   I BELIEVE SO, YES.

25  Q.   OKAY.  THANK YOU.

```
 1            COULD I HAVE -- AGAIN, SO THAT WE'RE CLEAR HERE, CAN I
 2     HAVE DX 676 UP ON THE SCREEN.
 3            IT'S IN YOUR BINDER, SIR.  IT'S ONE OF THE DOCUMENTS YOUR
 4     COUNSEL JUST SHOWED YOU.
 5     A.   OKAY.
 6     Q.   WHEN THE JURY ACTUALLY GETS THIS AND THEY CAN READ IT --
 7     IT'S IN THIS SIZE -- IT'S DIVIDED UP BETWEEN THREE COMPANIES;
 8     CORRECT?  SEPARATE NUMBERS FOR THREE COMPANIES?
 9     A.   IT'S DIVIDED -- WELL, THAT'S ONE WAY TO LOOK AT IT.  IT'S
10     ACTUALLY DIVIDED UP INTO SALES PROCESS AT THE TOP AND THE
11     MANUFACTURING PROCESS AT THE BOTTOM.
12     Q.   AND THE SALES PROCESS IS STA, YOUR COMPANY; CORRECT?
13     A.   CORRECT.
14     Q.   AND SEA, WHICH IS ANOTHER AMERICAN SUBSIDIARY; CORRECT?
15     A.   CORRECT.
16     Q.   AND YOU'RE HERE TODAY TO TELL US ABOUT THOSE NUMBERS ON
17     THIS SHEET; CORRECT?
18     A.   THAT IS CORRECT.
19     Q.   ALL RIGHT.  THE BOTTOM SECTION REFERS TO SEC, THE KOREAN
20     COMPANY, AND YOU ARE NOT HERE TODAY TO TELL US ABOUT WHAT THOSE
21     NUMBERS ARE; CORRECT?
22     A.   THAT IS CORRECT.
23     Q.   ARE WE GOING TO SEE A WITNESS FROM SAMSUNG KOREA COME HERE
24     TO EXPLAIN THOSE NUMBERS TO THIS JURY?
25            MS. MAROULIS:  OBJECTION.  INAPPROPRIATE QUESTION FOR
```

```
1        THE WITNESS.  ARGUMENTATIVE AND BADGERING.

2               THE COURT:  OVERRULED.

3    BY MR. MCELHINNY:

4    Q.   WOULD YOU LIKE ME TO REPEAT THE QUESTION?

5               THE COURT:  ACTUALLY, IF HE KNOWS.

6               MR. MCELHINNY:  YES.

7    Q.   DO YOU KNOW WHETHER --

8               THE COURT:  IF HE DOESN'T KNOW, YOU NEED TO STOP THIS

9    LINE OF QUESTIONING.

10              MR. MCELHINNY:  SORRY, YOUR HONOR.

11   Q.   DO YOU KNOW WHETHER OR NOT THIS JURY IS GOING TO SEE A

12   WITNESS FROM SAMSUNG KOREA WHO CAN SPEAK KNOWLEDGEABLY TO THE

13   SAMSUNG ELECTRONICS COMPANY NUMBERS?

14              MS. MAROULIS:  YOUR HONOR, IT ALSO CALLS FOR

15   PRIVILEGED INFORMATION BECAUSE THE ONLY WAY THE WITNESS WOULD

16   KNOW IS FROM CONVERSATIONS WITH COUNSEL.

17              THE COURT:  WELL, HE CAN ANSWER WHETHER HE KNOWS OR

18   NOT.

19              THE WITNESS:  I DO NOT KNOW THE ANSWER TO THAT

20   QUESTION.

21              THE COURT:  THEN MOVE ON, PLEASE.

22   BY MR. MCELHINNY:

23   Q.   CAN I HAVE SDX 3960.  LET'S GO TO PAGE 2.

24        THIS IS A DOCUMENT THAT YOU TESTIFIED ABOUT JUST A COUPLE

25   MINUTES AGO; CORRECT?
```

1      A.   CORRECT.

2      Q.   THERE'S ANOTHER PAGE OF THIS DOCUMENT, ISN'T THERE, PAGE 3

3      THAT TALKS ABOUT SEC OPERATING EXPENSES?

4      A.   NOT IN MY BINDER, NO.

5      Q.   GOOD, OKAY.  FINE.

6           SIR, IF YOU KEEP IN MIND THE OPERATING EXPENSES THAT YOU

7      TOLD US ABOUT, IN THE OPENING STATEMENTS IN THIS CASE,

8      SAMSUNG'S LAWYER DESCRIBED THOSE EXPENSES AS OPERATING EXPENSES

9      ARE, QUOTE, "SHARED ACROSS PRODUCT LINES."

10          DO YOU AGREE WITH THAT CHARACTERIZATION?

11     A.   I'VE NEVER HEARD THE AGREED STATEMENTS.

12     Q.   THAT'S NOT MY QUESTION, SIR.  DO YOU AGREE -- WHEN YOU

13     WERE DISCUSSING ALLOCATION, DO YOU AGREE THAT IT'S CORRECT TO

14     DESCRIBE THESE EXPENSES AS, QUOTE, "SHARED ACROSS PRODUCT

15     LINES"?

16     A.   COULD YOU REPEAT --

17          MS. MAROULIS:  OBJECTION.  OUTSIDE THE SCOPE AND THE

18     WITNESS WASN'T PRESENT FOR THE OPENING ARGUMENTS.

19          THE COURT:  OVERRULED.

20          GO AHEAD.  YOU MAY ANSWER.

21     BY MR. MCELHINNY:

22     Q.   IS IT ACCURATE TO DESCRIBE THE EXPENSES YOU JUST DESCRIBED

23     TO THESE JURORS, THE OPERATING EXPENSES, AS, QUOTE, "SHARED

24     ACROSS PRODUCT LINES"?

25     A.   WELL --

```
1     Q.   IS IT ACCURATE, SIR?  THAT'S ALL I'M ASKING.

2     A.   SO I THINK I EXPLAINED --

3     Q.   SIR, IS IT ACCURATE?  YES OR NO?

4     A.   SO --

5              MS. MAROULIS:  YOUR HONOR, MR. MCELHINNY IS NOT

6     LETTING THE WITNESS ANSWER.

7              MR. MCELHINNY:  I HAVE NO FURTHER QUESTIONS OF THIS

8     WITNESS, YOUR HONOR.

9                         REDIRECT EXAMINATION

10    BY MS. MAROULIS:

11    Q.   MR. SHEPPARD --

12             THE COURT:  TIME IS 2:03.

13    BY MS. MAROULIS:

14    Q.   MR. SHEPPARD, DOES EXHIBIT 676 INCLUDE FINANCIAL DATA FOR

15    SEC?

16    A.   676?

17    Q.   YES.

18    A.   YES, IT DOES.

19             MS. MAROULIS:  THANK YOU, SIR.

20             THE WITNESS:  THANK YOU.

21             THE COURT:  ALL RIGHT.

22             MS. MAROULIS:  AND, I'M SORRY, ONE MORE QUESTION.

23             THE COURT:  GO AHEAD, PLEASE.

24    BY MS. MAROULIS:

25    Q.   COUNSEL CUT YOU OFF WHEN YOU WERE TRYING TO EXPLAIN
```

1    YOURSELF.  DID YOU NEED TO ADD ANYTHING TO YOUR ANSWER?

2    A.   I WAS TRYING TO EXPLAIN THAT I -- I THINK I EXPLAINED IN

3    MY TESTIMONY ABOUT THE THREE STEP ALLOCATION PROCESS AND WHY

4    PEOPLE WOULD WORK ON MULTIPLE PRODUCTS AND YOU HAVE TO ALLOCATE

5    COSTS ACROSS THOSE PRODUCTS.

6         I THINK THAT'S STILL A VALID ANSWER TO WHY THE WORK IS NOT

7    DONE ONE PERSON AT A TIME PER ONE PRODUCT ONLY.  YOU WORK ON

8    MULTIPLE THINGS AT A TIME.  MOST PEOPLE MULTITASK.

9              MS. MAROULIS:  THANK YOU, SIR.

10             THE WITNESS:  THANK YOU.

11             THE COURT:  OKAY.

12             MR. MCELHINNY:  MR. SHEPPARD, ONE QUESTION.

13             THE COURT:  TIME IS 2:04.  GO AHEAD.

14                      **RECROSS-EXAMINATION**

15   BY MR. MCELHINNY:

16   Q.   MR. SHEPPARD, GIVEN THE EXPLANATION YOU JUST GAVE, IS IT

17   FAIR TO DESCRIBE THOSE OPERATING EXPENSES AS, QUOTE, "SHARED

18   ACROSS PRODUCT LINES"?

19   A.   I'M -- YOU SAID PRODUCT LINES AND I'M THINKING PRODUCTS,

20   SO I'M NOT SURE WHAT THE DEFINITION OF PRODUCT LINE IS.  BUT --

21   Q.   LET ME FIX IT.

22   A.   SURE.

23   Q.   WOULD YOU ACCEPT THAT IT IS FAIR TO SAY THAT THOSE ARE

24   EXPENSES THAT ARE SHARED ACROSS PRODUCTS?

25   A.   WELL, I'M NOT SURE WHICH EXPENSES WE'RE REFERRING TO,

```
 1         BUT --

 2         Q.   ON YOUR LIST.

 3         A.   SO ON MY LIST, YOU WILL HAVE SOME PRODUCTS THAT ARE VERY

 4    SPECIFIC, SOME COSTS VERY SPECIFICALLY ATTRIBUTABLE TO VERY

 5    SPECIFIC PRODUCTS.

 6         IF YOU SHIP A PRODUCT ON A TRUCK AND THAT TRUCK ONLY HAS

 7    ONE PRODUCT ON IT, IT'S VERY SPECIFIC.  IF YOU SHIP A TRUCK AND

 8    IT HAS THREE PRODUCTS ON IT, IT'S VERY EASY TO DIVIDE THAT

 9    TRUCK ACROSS INTO THREE.

10         Q.   LET'S MAKE A DEAL.  I'M GOING TO TRY ONE MORE TIME, AND IF

11    YOU CAN'T ANSWER MY QUESTION, SAY "I CAN'T ANSWER IT THE WAY

12    YOU'RE ASKING ME."  OKAY?

13         IS IT FAIR TO DESCRIBE THE OPERATING EXPENSES THAT YOU

14    TOLD US ABOUT IN GREAT DETAIL AS SHARED ACROSS PRODUCTS?

15         A.   I THINK I'M TRYING TO BE --

16         Q.   CAN YOU SAY THAT -- CAN YOU ANSWER THAT QUESTION YES OR

17    NO?

18         A.   THERE'S SOMETHING --

19         Q.   FIRST, CAN YOU ANSWER IT YES OR NO?

20         A.   I'M STRUGGLING TO BE -- I'M TRYING TO BE AS PRECISE --

21         Q.   BUT THAT'S NOT -- NOW I'M ASKING YOU A DIFFERENT QUESTION.

22    CAN YOU ANSWER THAT PREVIOUS QUESTION YES OR NO?

23              MS. MAROULIS:  OBJECTION.  ARGUMENTATIVE, CUTTING OFF

24    THE WITNESS.

25              THE COURT:  LET HIM ANSWER, PLEASE.
```

1    BY MR. MCELHINNY:

2    Q.   CAN YOU ANSWER THAT QUESTION YES OR NO?

3    A.   I'M TRYING TO BE AS CLEAR AS I CAN WITH THE ANSWER OF HOW

4    YOU ALLOCATE COSTS.

5              MR. MCELHINNY:  NOTHING FURTHER.

6              MS. MAROULIS:  NOTHING FURTHER.

7              THE COURT:  ALL RIGHT.  TIME IS 2:06.  DO YOU HAVE

8    ANOTHER QUESTION?

9              MS. MAROULIS:  NO, YOUR HONOR.  WE'RE DONE.

10             THE COURT:  I'M SORRY.  IS HE EXCUSED, AND SUBJECT TO

11   RECALL OR NOT?

12             MR. MCELHINNY:  WITHOUT RECALL.

13             MS. MAROULIS:  HE'S EXCUSED WITHOUT RECALL.

14             THE COURT:  WITHOUT RECALL, OKAY.

15        THANK YOU, SIR.  YOU'RE EXCUSED.

16             MS. MAROULIS:  YOUR HONOR, SAMSUNG'S NEXT WITNESS IS

17   GOING TO BE APPLE EMPLOYEE ERIC JUE, LAST NAME IS J-U-E.  HE'S

18   GOING TO TESTIFY BY DEPOSITION.

19        HE IS A PRODUCT LINE MANAGER FOR IPOD, AND DURING THE

20   RELEVANT TIME PERIOD, HE WAS A SENIOR PRODUCT MARKETING MANAGER

21   FOR IPHONE AND WE'RE GOING TO PLAY HIS DEPOSITION NOW.

22             THE COURT:  OKAY.  WHY DON'T WE WAIT ONE SECOND,

23   PLEASE, AND HAND OUT THE PHOTOS, AND IF YOU WANT THE LIGHTS TO

24   BE DIMMED.  THANK YOU.

25             (PAUSE IN PROCEEDINGS.)

1    **(THE VIDEOTAPED DEPOSITION OF ERIC JUE WAS PLAYED IN OPEN**

2    **COURT OFF THE RECORD.)**

3    MS. MAROULIS:  YOUR HONOR, WE WILL LODGE INTO

4    EVIDENCE THE DEPOSITION CLIP REPORT, WHICH IS DEFENDANT'S

5    EXHIBIT NUMBER 2803, AND WE MOVE INTO EVIDENCE DISPLAYED

6    EXHIBITS 601 AND 572.

7    THE COURT:  ANY OBJECTION?

8    MR. MCELHINNY:  NONE, YOUR HONOR.

9    THE COURT:  ALL RIGHT.  SO 572 --

10   MS. MAROULIS:  AND THAT'S 27 MINUTES, 49 SECONDS.

11   THE COURT:  IS 572 SUBJECT TO A SEALING REQUEST?

12   MR. MCELHINNY:  IT IS, YOUR HONOR, OTHER THAN THE

13   SPECIFIC PAGES THAT WERE SHOWN ON THE SCREEN.

14   THE COURT:  OKAY.  ARE THESE DX'S OR PX'S?

15   MS. MAROULIS:  THESE ARE DX.

16   THE COURT:  OKAY.  SO DX 601 IS ADMITTED, AND DX 572

17   IS ADMITTED AND IT'S GOING TO BE SEALED, EXCEPT FOR PAGES

18   572.003 AND 572.028.

19   (DEFENDANT'S EXHIBITS 601 AND 572 WERE ADMITTED IN

20   EVIDENCE.)

21   MS. MAROULIS:  YES, YOUR HONOR.

22   SAMSUNG CALLS ITS NEXT WITNESS.  IT'S APPLE EMPLOYEE NAMED

23   GREG JOSWIAK.  HE IS THE VICE-PRESIDENT IN CHARGE OF MARKETING

24   IPHONE, IPOD, AND IOS, AND WE'RE GOING TO PLAY HIS DEPOSITION

25   NOW.

JOSWIAK VIDEO DEPOSITION

1              THE COURT:  OKAY.  CAN I GET THE CLIP, PLEASE, JUST

2      FOR THE LENGTH OF TIME FOR THE DISTRIBUTION?

3              MS. MAROULIS:  FOR MR. JOSWIAK?

4              THE COURT:  NO, THE WITNESS YOU JUST HAD.

5              MS. MAROULIS:  THAT WAS 27 MINUTES.

6              THE COURT:  27, OKAY.

7              MS. MAROULIS:  YES.  THE NEXT CLIP, YOUR HONOR, IS 11

8      MINUTES, SO DOES THE COURT WANT TO TAKE A BREAK OR AFTER THIS

9      SEGMENT?

10             THE COURT:  11 MINUTES?  CAN WE GO 11 MINUTES?  OKAY.

11             MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  AFTER THIS

12     NEXT ONE, I HAVE TWO VERY SHORT COUNTERS, I THINK THEY'RE ABOUT

13     ONE MINUTE OR TWO MINUTES EACH, BUT THEY SHOULD BE SHOWN

14     TOGETHER.

15             THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO TAKE YOUR

16     BREAK NOW OR GO ANOTHER 15 MINUTES?

17             JUROR:  15 MINUTES.

18             THE COURT:  ALL RIGHT.  LET'S GO AHEAD, PLEASE.

19     THANK YOU.

20             MS. MAROULIS:  LET'S PLAY MR. JOSWIAK'S TESTIMONY.

21             **(THE VIDEOTAPED DEPOSITION OF GREG JOSWIAK WAS PLAYED IN**

22     **OPEN COURT OFF THE RECORD.)**

23             THE COURT:  OKAY.

24             MS. MAROULIS:  YOUR HONOR, THAT DEPOSITION CLIP WAS

25     11 MINUTES AND 43 SECONDS, AND WE WOULD MOVE IT -- I'M SORRY --

1        WE LODGE IT INTO EVIDENCE AS DEFENDANT'S EXHIBIT 2801.

2            AND THEN MOVE INTO EVIDENCE THE DISCUSSED EXHIBITS, WHICH

3    WERE DX 2517, DX 534, AND THE THIRD EXHIBIT DISCUSSED IS

4    ALREADY IN EVIDENCE, IT'S DX 572.

5                THE COURT:  OKAY.  DO YOU HAVE THE CLIPS FOR ME?

6                MS. MAROULIS:  YES, YOUR HONOR.

7                THE COURT:  OKAY.  IF I CAN HAVE COPIES OF ALL OF

8    THEM, IT WOULD HELP FOR POST-TRIAL MOTIONS FOR ME TO HAVE THEM

9    TOGETHER.

10       DX 2517, ANY OBJECTION TO ITS ADMISSION?

11               MR. MCELHINNY:  I'M SORRY.  517, YOUR HONOR?

12               THE COURT:  2517?

13               MR. MCELHINNY:  NO OBJECTION.

14               THE COURT:  THAT'S ADMITTED.

15         (DEFENDANT'S EXHIBIT 2517 WAS ADMITTED IN EVIDENCE.)

16               THE COURT:  AND DX 534?

17               MR. MCELHINNY:  UNDER SEAL, YOUR HONOR, EXCEPT FOR

18   THE PAGES SHOWN.

19               MS. MAROULIS:  AND THEN DX 572 HAS ALREADY BEEN

20   ADMITTED, BUT IT WAS REFERENCED IN THE TESTIMONY.

21               THE COURT:  OKAY.  YOU'RE GOING TO HAVE TO DO A

22   SEALING ORDER BECAUSE I DON'T KNOW WHAT PAGES WERE SHOWN.

23   THERE'S NO SEPARATE DOT, YOU KNOW, EXTENSION NUMBER.

24               MS. MAROULIS:  YES, YOUR HONOR.  WE'LL COOPERATE TO

25   PREPARE THAT.

```
 1              THE COURT:  OKAY.  ALL RIGHT.  SO THOSE ARE ADMITTED.

 2         (DEFENDANT'S EXHIBIT 534 WAS ADMITTED IN EVIDENCE.)

 3              MR. MCELHINNY:  YOUR HONOR, AT THIS POINT I HAVE TWO

 4    SHORT COUNTER-DESIGNATIONS OF MR. JOSWIAK'S DEPOSITION.

 5              THE COURT:  OKAY.  TIME IS 2:50.  GO AHEAD.

 6         (THE VIDEOTAPED DEPOSITION OF GREG JOSWIAK WAS PLAYED IN

 7    OPEN COURT OFF THE RECORD.)

 8              MR. MCELHINNY:  AND THEN WE HAVE ONE MORE, YOUR

 9    HONOR.

10         (THE VIDEOTAPED DEPOSITION OF GREG JOSWIAK WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12              MR. MCELHINNY:  THE FIRST DESIGNATION, YOUR HONOR, WE

13    WOULD LIKE TO LODGE IS PLAINTIFF'S EXHIBIT 3041.  IT RAN FOR 24

14    SECONDS.

15         THE SECOND DESIGNATION WE WOULD LIKE TO RUN, LODGE AS

16    PX 3042.  IT RAN FOR 33 SECONDS.

17              THE COURT:  OKAY.  ARE YOU DONE?

18              MR. MCELHINNY:  I AM, YOUR HONOR.

19              THE COURT:  ALL RIGHT.  TIME IS 2:52.

20         ALL RIGHT.  CALL YOUR NEXT WITNESS, PLEASE.

21              MS. MAROULIS:  DOES THE COURT NEED TO TAKE A BREAK?

22    WE PROMISED THE JURY.

23              THE COURT:  OH, THAT'S RIGHT.  THANK YOU.  THANK YOU

24    FOR REMINDING ME.

25         LET'S TAKE A BREAK TO 3:00 O'CLOCK.
```

```
 1              ALL RIGHT.  THANK YOU.

 2              WE'LL TAKE IT TO 3:05.  THANK YOU.

 3              (JURY OUT AT 2:53 P.M.)

 4                  MS. MAROULIS:  YOUR HONOR, IS IT POSSIBLE TO GET THE

 5          TIME ESTIMATE AS WE'RE NEARING THE END OF THE DAY?

 6                  THE COURT:  IS THE DOOR CLOSED?

 7              OKAY.  THERE ARE NO JURORS IN THE COURTROOM.

 8              DO YOU WANT THE ESTIMATE RIGHT NOW OR DO YOU WANT IT AT

 9          THE END OF THE DAY?

10                  MS. MAROULIS:  RIGHT NOW IF POSSIBLE.

11                  THE COURT:  SURE.  OKAY.  GIVE ME ONE MINUTE, PLEASE.

12              (PAUSE IN PROCEEDINGS.)

13                  THE COURT:  OKAY.  TODAY SAMSUNG HAS USED 2 HOURS AND

14          22 MINUTES.  AND APPLE HAS USED 1 HOUR AND 9 MINUTES.

15                  MS. MAROULIS:  THANK YOU, YOUR HONOR.

16                  THE COURT:  OKAY.  THANK YOU.

17              (RECESS FROM 2:54 P.M. UNTIL 3:07 P.M.)

18              (JURY IN AT 3:07 P.M.)

19                  THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

20          SEAT.

21              PLEASE CALL YOUR NEXT WITNESS.

22                  MR. PRICE:  YOUR HONOR, SAMSUNG CALLS MICHAEL WAGNER.

23                  THE COURT:  ALL RIGHT.  PLEASE COME FORWARD, SIR.

24                  THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

25              **(MICHAEL WAGNER, DEFENDANT'S WITNESS, SWORN.)**
```

1          THE WITNESS:  I DO.

2              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

3          AND STATE YOUR NAME, PLEASE, AND SPELL IT.

4              THE WITNESS:  MICHAEL JOSEPH WAGNER, LAST NAME IS

5      SPELLED W-A-G-N-E-R.

6              THE COURT:  ALL RIGHT.  TIME IS NOW 3:08.

7          GO AHEAD PLEASE.

8              MR. PRICE:  THANK YOU, YOUR HONOR.

9                        **DIRECT EXAMINATION**

10     BY MR. PRICE:

11     Q.   MR. WAGNER, HAVE YOU BEEN HIRED TO GIVE EXPERT TESTIMONY

12     IN THIS CASE?

13     A.   I HAVE.

14     Q.   BY SAMSUNG?

15     A.   THAT IS CORRECT.

16     Q.   COULD YOU TELL US WHAT YOUR ASSIGNMENT WAS?

17     A.   MY ASSIGNMENT WAS TO REVIEW AND COMMENT UPON THE WORK OF

18     JULIE DAVIS, APPLE'S DAMAGES EXPERT; AND ALSO COME UP WITH AN

19     INDEPENDENT OPINION OF WHAT THE PROPER MEASURE OF DAMAGES ARE

20     IN THIS CASE.

21     Q.   BEFORE WE TALK ABOUT YOUR OPINION, LET'S TALK A LITTLE BIT

22     ABOUT YOU.  COULD YOU TELL US ABOUT YOUR EDUCATION?

23     A.   I HAVE A BACHELOR OF SCIENCE IN ENGINEERING, WHICH I

24     RECEIVED FROM SANTA CLARA UNIVERSITY IN 1969; I HAVE A MASTER'S

25     IN BUSINESS ADMINISTRATION FROM UCLA WHICH I RECEIVED IN 1971;

```
1    AND I HAVE A JURIS DOCTORATE DEGREE FROM LOYOLA UNIVERSITY

2    SCHOOL OF LAW AT LOS ANGELES IN 1975.

3    Q.   AND DO YOU HAVE ANY PROFESSIONAL LICENSES?

4    A.   I HAVE TWO CURRENT PROFESSIONAL LICENSES.  I'M A CERTIFIED

5    PUBLIC ACCOUNTANT IN THE STATE OF CALIFORNIA.  I'M ALSO A

6    LICENSED ATTORNEY.

7    Q.   ARE YOU A MEMBER OF ANY PROFESSIONAL ORGANIZATIONS?

8    A.   YES.  I'M A MEMBER OF THE AMERICAN INSTITUTE THE CERTIFIED

9    PUBLIC ACCOUNTANTS, AND THE CALIFORNIA SOCIETY OF CPA'S.

10   Q.   NOW, HAVE YOU BEEN ACTIVELY INVOLVED IN ANY VARIETY OF

11   ORGANIZATIONS AS YOU'VE BEEN A CPA?

12   A.   YES.  I'VE BEEN VERY ACTIVE IN BOTH OF THOSE

13   ORGANIZATIONS.  FOR THE AICPA, I WAS ON THE INAUGURAL COMMITTEE

14   FOR THE CERTIFICATE OF FORENSIC -- FOR CERTIFIED FINANCIAL

15   FORENSICS, WHICH IS A DESIGNATION BY THE AICPA FOR CPA'S WHO DO

16   THE WORK LIKE I DO AND MS. DAVIS DOES IN THIS COURTROOM.  I WAS

17   NUMBER 23 WITH THAT DESIGNATION OUT OF NOW OVER 5,000 CPA'S.

18       I SERVED ON THE PRACTICE STANDARDS COMMITTEE FOR THE

19   MANAGEMENT CONSULTING DIVISION OF THE AICPA WHICH, WHEN I WAS

20   ON THAT COMMITTEE, WE SET THE STANDARDS FOR CPA'S DOING

21   MANAGEMENT CONSULTING WORK IN THE UNITED STATES.

22       I SERVED ON THE NATIONAL LITIGATION SERVICES COMMITTEE FOR

23   THE AICPA.

24       I WAS THE CO-EDITOR OF THE CPA EXPERT FOR A NUMBER OF

25   YEARS, WHICH IS THE PUBLICATION FOR CPA'S WHO DO LITIGATION
```

```
1     WORK AND BUSINESS VALUATION.  AND I ALSO SERVED ON THE BUSINESS

2     VALUATION TASK FORCE FOR THAT ORGANIZATION.

3          FOR THE CALIFORNIA SOCIETY OF CPA'S 25 YEARS AGO, FOR

4     THREE YEARS, I WAS THE CHAIRMAN OF THE LITIGATION SERVICES

5     COMMITTEE.

6     Q.   CAN YOU TELL US, WHAT'S THE SEDONA CONFERENCE?

7     A.   THE SEDONA CONFERENCE IS A NONPROFIT ORGANIZATION THAT IS

8     PUT IN PLACE TO HELP DEVELOP POLICY AND IMPROVE THE LAW IN THE

9     AREA OF COMPLEX LITIGATION.

10    Q.   AND DO YOU HAVE ANYTHING TO DO WITH THAT?

11    A.   YES.  I'M ON THE WORKING GROUP FOR PATENT DAMAGES OF THE

12    SEDONA CONFERENCE.

13    Q.   AND WHAT IS THAT WORKING GROUP?  COULD YOU EXPLAIN TO US

14    WHAT THAT DOES?

15    A.   WELL, IT'S FOUR FEDERAL JUDGES, 26 ATTORNEYS, HALF OF

16    WHICH ARE FROM MAJOR TECHNOLOGY COMPANIES LIKE APPLE, IT'S LIKE

17    GOOGLE, MICROSOFT, HEWLETT-PACKARD, CISCO, INTELLECTUAL

18    PROPERTY LAWYERS FROM THOSE TYPES OF FIRMS, AND ALSO LAWYERS

19    LIKE IN THIS COURT WHO WORK FOR LAW FIRMS WHO WORK ON THE

20    INTELLECTUAL PROPERTY MATTERS, AND THEN THERE ARE THREE DAMAGE

21    EXPERTS THAT ARE PART OF THAT COMMITTEE.  I'M ONE OF THOSE

22    THREE.

23    Q.   NOW, I HATE TO DO THIS, BUT IS THERE A LAWYER IN THIS

24    COURT THAT'S A MEMBER OF THAT?

25    A.   YES.  RACHEL KREVANS IS A MEMBER OF THAT GROUP, AND A FINE
```

1     MEMBER I MIGHT STATE.

2     Q.   MAYBE SHE'S NOT HERE.  OH, THERE SHE IS.

3          COULD YOU TELL US, DO YOU HAVE ANY PUBLICATIONS IN THE

4     FIELD?

5     A.   I HAVE 29 PROFESSIONAL PUBLICATIONS, NINE OF WHICH DEAL

6     DIRECTLY WITH PATENT DAMAGES.  THE PUBLICATION I'M MOST PROUD

7     OF IS THE LITIGATION SERVICES HANDBOOK.  I WAS THE ORIGINAL

8     EDITOR OF THAT BOOK.  IT'S NOW IN ITS FIFTH EDITION AND I WAS A

9     CO-EDITOR FOR FOUR EDITIONS.  SINCE I'M SEMI-RETIRED I'VE

10    STOPPED THAT WORK.

11         BUT IT'S A PUBLICATION THAT'S BEEN RECOGNIZED THE FEDERAL

12    JUDICIAL CENTER AS A RECOGNIZED WORK IN THE AREA OF PATENT

13    DAMAGES AND GENERAL DAMAGES WORK.

14    Q.   IS THERE A CHAPTER IN THAT ON ECONOMIC DAMAGES IN THE

15    FIRST TWO EDITIONS?

16    A.   YES, THERE IS.

17    Q.   OKAY.  AND IS THERE ANY PARTICULAR, YOU THINK ANY HONOR

18    ASSOCIATED WITH THAT PARTICULAR CHAPTER?

19    A.   YEAH.  THAT CHAPTER HAD A BIBLIOGRAPHY AND FIVE ADDITIONAL

20    REFERENCE SOURCES FOR FEDERAL JUDGES IF THEY WANTED TO KNOW

21    MORE INFORMATION ON ECONOMIC DAMAGES, AND MY BOOK WAS ONE OF

22    THOSE SOURCES.

23    Q.   ANY OTHER PUBLICATIONS?

24    A.   AS I SAID BEFORE, I GOT A TOTAL OF 29 AND NINE DEAL WITH

25    PATENT DAMAGES.

1    Q.   HOW MANY TIMES HAVE YOU BEEN QUALIFIED AS AN EXPERT

2    WITNESS IN FEDERAL COURT?

3    A.   I DON'T KNOW ABOUT THE NUMBER IN FEDERAL STATE, BUT IN ALL

4    COURTS, INCLUDING STATE COURTS, I'VE TESTIFIED 130 TIMES AS A

5    DAMAGES EXPERT.

6    Q.   OF THOSE TIMES, WERE THEY ALL PLAINTIFF, ALL DEFENDANT, OR

7    A MIX?

8    A.   LIKE MS. DAVIS, IT'S PRETTY EVENLY SPLIT BETWEEN

9    PLAINTIFF'S WORK AND DEFENDANT'S WORK.

10             MR. PRICE:  YOUR HONOR, I TENDER MR. WAGNER AS AN

11    EXPERT ON DAMAGES.

12             THE COURT:  ANY VOIR DIRE OR ANYTHING?

13             MR. LEE:  NO OBJECTION.

14             THE COURT:  SO CERTIFIED.  GO AHEAD, PLEASE.

15    BY MR. PRICE:

16    Q.   LET'S TALK ABOUT THE ANALYSIS YOU'VE BEEN ASKED TO DO IN

17    THIS CASE, AND COULD YOU GIVE US A HIGH LEVEL SUMMARY OF ANY

18    OPINIONS YOU HAVE CONCERNING MS. DAVIS'S CALCULATION OF

19    DAMAGES?

20    A.   YEAH.  I DISAGREE WITH ALL THREE OF HER MEASURES OF

21    DAMAGES.  THEY'RE ALL APPROPRIATE, POSSIBLY, BUT I DISAGREE

22    WITH HER LOST PROFITS CALCULATION BECAUSE I HAVE NOT SEEN

23    EVIDENCE THAT THE SINGLE PATENT AT ISSUE FOR LOST PROFITS DROVE

24    DEMAND FOR ANY OF SAMSUNG'S PRODUCTS AND THAT APPLE WOULD HAVE

25    MADE ANY OF THOSE SALES BUT FOR THE INFRINGEMENT OF THAT ONE

1      PATENT.

2           AS FAR AS SAMSUNG'S PROFITS CALCULATION, I THINK SHE'S

3      PROPERLY CALCULATED THE REVENUES AND COSTS OF GOODS SOLD, BUT

4      SHE HAS IGNORED CERTAIN NECESSARY OPERATING EXPENSES THAT

5      SHOULD BE SUBTRACTED, SO SHE'S OVERSTATED SAMSUNG'S PROFITS.

6           AND THIRD, I BELIEVE HER REASONABLE ROYALTY RATES ARE

7      OVERSTATED.

8      Q.   LET'S FOCUS FIRST ON THE CATEGORY OF ANY PROFITS APPLE

9      LOST BECAUSE SAMSUNG INFRINGED THE '915 PATENT.  OKAY?  SO

10     WE'RE FOCUSSED ON THAT.  DO YOU UNDERSTAND?

11     A.   I DO.

12     Q.   OKAY.  AND HAVE YOU PREPARED A CHART THAT KIND OF

13     SUMMARIZES YOUR OPINIONS ON MS. DAVIS'S CALCULATION OF LOST

14     PROFITS FOR APPLE'S INFRINGEMENT OF THE '915 PATENT?

15     A.   YES.

16     Q.   AND IF WE COULD PUT UP SDX 7001.06.  I'M SORRY, .016.

17          AND COULD YOU EXPLAIN TO US WHAT'S REFLECTED IN THIS

18     SLIDE?

19     A.   YES.  THE FIRST BULLET POINT SAYS THAT THERE'S AN

20     ASSUMPTION THAT SHE HAS MADE THAT THE '915 PATENTED FEATURE

21     WOULD BE REMOVED FROM SAMSUNG PRODUCT, AND WHEN SHE MAKE THAT

22     ASSUMPTION, SHE ASSUMES THAT SAMSUNG'S PRODUCT WOULD BE OUT OF

23     THE MARKET.

24          AND THAT'S, I DON'T BELIEVE, A NECESSARY ASSUMPTION,

25     BECAUSE THIS IS JUST A SOFTWARE CHANGE.  THEY COULD HAVE

1    INTRODUCED THIS PRODUCT AND THEN, AFTER THE PROPER TIME OF

2    DESIGN AROUND, THEY COULD HAVE INTRODUCED THE SOFTWARE FEATURE

3    IN THEIR PHONE THAT HAD HUNDREDS OF FEATURES WHEN THEY

4    INTRODUCED IT.

5    Q.   NOW, WHEN YOU SAY A SOFTWARE CHANGE, YOU'D HAVE TO TAKE

6    THE PHONE AND TAKE IT APART AND LOOK AT THE INNARDS, DO

7    ANYTHING LIKE THAT?

8    A.   NO.  IT'S LIKE MY PHONE.  EVERY MONTH OR SO I GET A

9    SOFTWARE UPDATE AUTOMATICALLY FROM MY PROVIDER.  I DON'T HAVE

10   TO DO ANYTHING EXCEPT FOR ACCEPT THE TIME THAT IT WILL BE

11   UPDATED, MY PHONE WILL BE UPDATED.

12   Q.   OKAY.  SO WE'LL GET INTO A LITTLE BIT LATER ABOUT THIS

13   PART OF THE BUT FOR WORLD.

14        I'D LIKE YOU TO FOCUS NOW ON THE BULLET THAT APPLE WOULD

15   NOT HAVE MADE ADDITIONAL SALES, AND YOU SAY THERE'S NO EVIDENCE

16   THAT ANY SAMSUNG CUSTOMER PURCHASED THE ACCUSED PHONES BECAUSE

17   OF THIS '915 FEATURE.

18        COULD YOU TELL US WHAT'S THE BASIS OF THAT?

19   A.   WELL, THE BASIS IS PRINCIPALLY I LOOKED AT THE ACTUAL

20   CUSTOMER SURVEYS THAT WERE DONE BY BOTH APPLE AND SAMSUNG IN

21   THIS CASE, NOT FOR PURPOSES OF THIS LITIGATION, BUT TO RUN

22   THEIR BUSINESSES DURING THIS RELEVANT TIME PERIOD, AND IN NONE

23   OF THESE SURVEYS DID I FIND ANY INDICATION BY EITHER OF THESE

24   COMPANIES THAT THE LIMITED FUNCTIONALITY OF THE '915 PATENT IS

25   WHAT DROVE ANYONE IN THEIR PURCHASE DECISION.

1          I'VE NOT SEEN ONE PIECE OF EVIDENCE THAT SAMSUNG EVER

2     MARKETED THAT FEATURE, THE '915 FEATURE TO ANY OF THEIR

3     CUSTOMERS, SO HOW COULD THEIR CUSTOMERS EVEN HAVE KNOWN THAT

4     THAT FEATURE EXISTED WHEN THEY MADE THEIR PURCHASE DECISION?

5          I BELIEVE THE CUSTOMERS BOUGHT THESE PHONES FOR OTHER

6     FEATURES, THE ONES THAT WERE MAKING SAMSUNG THE LEADER IN

7     CERTAIN FUNCTIONALITY OF THE SMARTPHONE MARKET, THINGS LIKE

8     LARGE L.E.D. SCREENS, THE LARGEST SCREEN SIZE IN THE INDUSTRY,

9     THE FASTEST PROCESSOR, THE FIRST COMPANY TO PUT 4G TECHNOLOGY

10    IN A PHONE SO THAT YOUR DATA WOULD TRANSFER FASTER, THE FIRST

11    COMPANY TO HAVE TURN BY TURN NAVIGATION IN THEIR GPS SYSTEM.

12         THESE ARE THE REASONS PEOPLE BOUGHT THE PHONES.  IT WAS

13    THE DRIVING DEMAND FOR THE SAMSUNG PRODUCTS, NOT THE ONE

14    FEATURE OF THE '915 PATENT.

15    Q.   NOW, FOCUSSING ON THE SURVEYS THAT APPLE DID, OR THAT

16    APPLE COMMISSIONED, DO THESE SURVEYS REVEAL FACTORS THAT

17    PURCHASERS CARED ABOUT?

18    A.   THEY DID.  THEY LOOKED AT WHAT IS DRIVING DEMAND FOR

19    PHONES, AND NONE OF THESE SURVEYS INDICATED THAT THE UNIQUE

20    FEATURE OF THE '915 IS WHAT ANYONE CARED ABOUT WHEN THEY

21    ACTUALLY MADE A PURCHASE DECISION.

22    Q.   NOW, DO YOU -- HAVE YOU PREPARED -- YOU LOOKED AT SEVERAL

23    STUDIES; CORRECT?

24    A.   I DID.

25    Q.   DID YOU PREPARE A SUMMARY OF THE APPLE STUDIES THAT YOU

1     LOOKED AT?

2     A.   I PREPARED A NUMBER OF SUMMARIES, AND YES, I DID HAVE ONE

3     THAT DID THAT AS WELL.

4     Q.   IF WE COULD LOOK AT, I THINK 701.005.  APPARENTLY -- I'M

5     SORRY, 701.006.  DX 701.006.  006 WOULD BE GREAT, RYAN.

6          HERE WE GO.  IS THIS ONE OF THE SUMMARIES YOU PREPARED?

7     A.   IT IS.

8     Q.   IF YOU LOOK AT THE BOTTOM, IT SAYS "SOURCES."

9          NOW, WHAT -- ONE, TWO, THREE, FOUR, FIVE, SIX, WHAT ARE

10    THOSE SOURCES?

11    A.   THESE ARE SURVEYS DONE BY A COMPANY CALLED COM-TECH WHO

12    WAS PROVIDING SURVEYS TO APPLE.  THESE CAME OUT OF APPLE'S

13    RECORDS, SO THESE ARE STUDIES THAT APPLE HAD TO STUDY THE

14    MARKET.

15    Q.   AND WHAT ARE THE NUMBERS THAT WE HAVE HERE AT THE TOP?

16    WHAT DO THOSE RELATE TO?

17    A.   THAT RELATES TO DIFFERENT PERIOD OF TIMES, USUALLY

18    QUARTERLY.  THE FIRST ONE ACTUALLY IS FOR A THREE QUARTER

19    PERIOD.

20    Q.   WHAT DO THE NUMBERS REFLECT HERE?  DO YOU SEE UNDER, FOR

21    EXAMPLE, MULTIMEDIA FUNCTIONS, YOU HAVE 31 PERCENT, SECOND

22    QUARTER AND FOURTH QUARTER.  WHAT DOES THAT REFER TO?

23    A.   THAT SAYS THAT 31 PERCENT OF THE PURCHASE IN THAT

24    QUARTER --

25              MR. LEE:  YOUR HONOR, I'M SORRY TO INTERRUPT, BUT

WAGNER DIRECT

```
1        THIS SHOULD BE SEALED, SO IT SHOULDN'T BE ON THIS SCREEN.

2               MR. PRICE:  OH.

3               MR. LEE:  AND BEFORE IT'S OFFERED, BUT --

4               MR. PRICE:  OKAY.

5               MR. LEE:  I DON'T THINK IT'S BEEN OFFERED AS FAR AS I

6        KNOW.

7               MR. PRICE:  I'M SORRY.  I'LL OFFER, IF I HAVE THE

8        RIGHT NUMBER, 701.006.

9               THE COURT:  ANY OBJECTION?

10              MR. LEE:  NO OBJECTION TO THAT EXHIBIT, BUT IT WILL

11       BE SUBJECT TO A SEALING ORDER, AND WE'LL ADD IT TO WHAT WE GIVE

12       YOUR HONOR LATER IN THE DAY.

13              THE COURT:  OKAY.

14              MR. LEE:  THAT'S JUST THE ONE THING, RIGHT?

15              MR. PRICE:  RIGHT.

16              MR. LEE:  OKAY.

17              MR. PRICE:  I'LL BE ALSO LOOKING AT 005.

18              MR. LEE:  YOUR HONOR, SAME SITUATION FOR 005.

19              THE COURT:  OKAY.  DO YOU WANT TO MOVE THAT NOW?

20              MR. PRICE:  YES, YOUR HONOR.

21              THE COURT:  OKAY.  ANY OBJECTION TO --

22              MR. LEE:  NO OBJECTION, EXCEPT IT SHOULD BE SEALED.

23              THE COURT:  OKAY.  THAT'S ADMITTED.

24          (DEFENDANT'S EXHIBITS 701.005 AND 701.006 WERE ADMITTED IN

25       EVIDENCE.)
```

```
 1              MR. PRICE:  ACTUALLY, I WOULD MOVE IN THE ENTIRE

 2    SUMMARY OF SURVEYS, EXHIBIT 701, ALL SEALED.

 3              THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT?

 4              MR. LEE:  NONE EXCEPT THAT IT SHOULD BE SEALED.

 5              THE COURT:  I'M SORRY.  THE WHOLE THING SHOULD BE

 6    SEALED?

 7              MR. LEE:  YEAH.  IT'S A SUMMARY OF -- EVERY PAGE IS A

 8    SUMMARY OF SURVEY INFORMATION LIKE YOU HAVE HERE.  IT'S ONLY

 9    NINE PAGES IN TOTAL.

10              MR. PRICE:  YEAH.

11              THE COURT:  OKAY.  SO YOU'RE ASKING FOR IT ALL TO BE

12    SEALED OR NOT?

13              MR. LEE:  YES, ALL NINE PAGES.

14              THE COURT:  ALL RIGHT.  IT'S ADMITTED SUBJECT TO

15    SEALING.  GO AHEAD, PLEASE.

16         (DEFENDANT'S EXHIBIT 701 WAS ADMITTED IN EVIDENCE.)

17    BY MR. PRICE:

18    Q.  MR. WAGNER, WE'RE SEALING THESE BECAUSE THIS IS APPLE'S

19    CONFIDENTIAL INFORMATION.

20         THESE ARE THE COM-TECH STUDIES YOU LOOKED AT?

21    A.  THEY ARE.

22    Q.  IF YOU LOOK AT 701.005, COULD YOU TELL US WHAT THAT

23    REFLECTS?

24    A.  WELL, THIS IS 006.

25    Q.  I'M KNOW.  I'M GOING TO SWITCH TO 005 NOW?
```

1    A.    OH, 005, THIS IS A STUDY OF WHAT WERE THE REASONS PEOPLE

2    PURCHASED ANDROID PHONES DURING THESE QUARTERS.

3    Q.    SO MR. WAGNER, IN LOOKING AT THESE STUDIES, WERE THERE

4    FACTORS THAT ARE REVEALED IN THESE STUDIES THAT CONSUMERS CARE

5    ABOUT IN BUYING, FOR EXAMPLE, ANDROID PHONES?

6    A.    YES.  EACH ONE OF THOSE -- THE LINES ON THIS SURVEY ARE

7    THE PRINCIPLE REASONS WHY SOMEONE BOUGHT A PHONE, AND AN

8    EXAMPLE, LOOKING AT THAT FIRST PERIOD, THE MOST IMPORTANT

9    REASON WAS MULTIMEDIA FUNCTIONS.

10         THAT'S WHY PEOPLE BUY SMARTPHONES.  THEY WANT TO BE ABLE

11   TO SURF THE INTERNET, TO READ THEIR E-MAIL, TO SEND E-MAILS, TO

12   DO TEXT MESSAGES, LISTEN TO THEIR MUSIC, PLAY GAMES.  THAT'S

13   WHY PEOPLE BUY A SMARTPHONE.

14         THE SECOND MOST IMPORTANT REASON IN THAT PERIOD WAS THE

15   BRAND MODEL, WHICH IS 25 PERCENT.

16         AGAIN, APPLE'S GOT A GREAT BRAND.  SAMSUNG HAS A GREAT

17   BRAND.  ALL THE MAJOR COMPANIES IN THIS SPACE HAVE GOOD BRANDS.

18         BUT THAT'S A DISTINGUISHING FEATURE THAT PEOPLE PAY FOR

19   AND MAKE THEIR DECISION ON.

20   Q.    AND THESE ARE STUDIES THAT GO TO WHY SOMEONE MADE AN

21   ANDROID PURCHASE; CORRECT?

22   A.    CORRECT.

23   Q.    OKAY.  NOW, LET ME ASK YOU ABOUT SOME SPECIFIC FACTORS,

24   AND SPECIFICALLY ABOUT PRICE.  DID YOU SEE ANY DATA THAT PRICE

25   MATTERS?

1    A.   PRICE CLEARLY MATTERS.

2    Q.   AND IF WE LOOK AT EXHIBIT 69, THIS IS ALREADY IN EVIDENCE,

3    IT'S A J.D. POWER REPORT AT 69.24.  THIS IS ONE OF THE

4    DOCUMENTS YOU REVIEWED?

5    A.   IT IS.

6    Q.   AND COULD YOU TELL US WHAT 69.24 TELLS YOU?

7    A.   IF YOU LOOK AT THE BOTTOM CHART, IT SHOWS YOU IN THE

8    FOURTH QUARTER OF 2010 THAT THE AVERAGE PRICE OR COST THAT A

9    CONSUMER PAID FOR VARIOUS CONSUMER, OR SUPPLIER'S PHONES, APPLE

10   IS THE MOST EXPENSIVE.  IT'S $206 ON AVERAGE.

11        AND SAMSUNG, WHICH IS THE SECOND BAR TO THE RIGHT OF THE

12   CHART IS $139.

13        SO A SAMSUNG PHONE DURING THIS TIME PERIOD IS MUCH CHEAPER

14   THAN THE APPLE PHONE ON AVERAGE.  THE APPLE PHONE, ON AVERAGE,

15   IS 48 PERCENT MORE EXPENSIVE.

16        AND THERE'S SOMETHING CALLED PRICE ELASTICITY DEMAND.  AS

17   A PRICE INCREASES, THERE'S LESS DEMAND FOR PRODUCT BECAUSE

18   PEOPLE JUST CAN'T AFFORD IT OR WON'T PAY THAT PRICE, AND THAT

19   HAS TO BE TAKEN INTO CONSIDERATION.

20   Q.   DID MS. DAVIS TAKE THAT INTO CONSIDERATION IN DETERMINING

21   THAT PEOPLE WHO HAD BOUGHT A SAMSUNG WOULD LEAVE AND BUY AN

22   APPLE IF THE '915 FUNCTIONALITY WASN'T THERE?

23   A.   NO.  IN FACT, SHE ASSUMED THAT EVERYONE WHO BOUGHT A

24   PRODUCT FOR $139 WOULD INSTEAD BE WILLING TO GO PAY $206.  SHE

25   DID NOT TAKE PRICE ELASTICITY DEMAND INTO CONSIDERATION IN HER

1    ANALYSIS.

2    Q.   AND WITH RESPECT TO HER CALCULATION OF THE PRICES FOR

3    SAMSUNG AND APPLE TABLETS, OKAY, DO YOU AGREE WITH MS. DAVIS'S

4    CALCULATIONS OF THE PRICE DIFFERENCE BETWEEN THOSE TABLETS?

5    A.   NOT FOR THE TABLET THAT'S AT ISSUE IN THIS CASE, NO.

6    Q.   OKAY.  AND WHICH TABLET IS THAT?

7    A.   THAT IS THE, THE 7.0 3G TABLET.

8    Q.   AND IF WE COULD LOOK AT EXHIBIT 952.10 AND HAVE YOU LOOK

9    AT IT FIRST, 952.010, COULD YOU TELL US, I'M GOING TO LET YOU

10   LOOK AT IT IN YOUR -- THIS IS ONE OF YOURS, SO I THINK WE'LL BE

11   OKAY.

12           MR. LEE:  WE'RE AT 952.0?

13           MR. PRICE:  010.

14       (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

15           MR. LEE:  CAN WE JUST HAVE A SECOND, YOUR HONOR?

16       (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

17           MR. LEE:  SO IT'S .01, YOUR HONOR.

18           MR. PRICE:  THIS ROUNDS OUT TO THREE DIGITS I GUESS.

19           THE WITNESS:  IS THERE A QUESTION PENDING?

20           MR. PRICE:  I'M WAITING TO --

21           MR. LEE:  NO SEALING ISSUE ON THIS.

22   BY MR. PRICE:

23   Q.   COULD YOU TELL US WHAT 952.01 IS?

24   A.   YES.  THIS IS AN ANALYSIS OF PRICES AND STANDARD MARGINS,

25   WHICH IS BASICALLY GROSS PROFIT, FOR SOME OF THE APPLE PRODUCTS

WAGNER DIRECT                                                      1004

```
1      IN THE SECOND QUARTER OF 2011, AND THIS IS THE QUARTER THAT IS

2      RELEVANT TO THE LOST PROFITS CALCULATION.  THIS IS THE ONLY

3      QUARTER WHERE LOST PROFITS ARE BEING SOUGHT.

4      Q.   AND IF WE CAN PUT 952.01 UP ON THE SCREEN, AND COULD YOU

5      TELL US WHAT THIS SHOWS WITH RESPECT TO THE IPAD, OR IPAD 2?

6      A.   WELL, THE FIRST FIVE NUMBERS ARE DIFFERENT PRICES FOR

7      IPADS IN THAT TIME PERIOD.

8             MR. LEE:  THIS IS A DIFFERENT PAGE.

9             MR. PRICE:  01.  OKAY.  TAKE THAT DOWN.

10        SORRY, YOUR HONOR.  THIS NEEDS TO BE SEALED, SO WE WILL

11     JUST SHOW IT THE JURY.

12            THE COURT:  OKAY.

13            MR. PRICE:  I'LL BLOCK THIS OFF.

14     Q.   ████████████████████████████████████████████████████

15     ██████████████████

16     ████   ██████████████████████████████████████████████████

17     ████████████████████████████████████████████████████

18     ████████████████████████████████████████████████████████████

19     ████████████████████████████████████████████████████████████

20     ████████████████████████████████████████████████████████

21     ████████

22            MR. LEE:  YOUR HONOR, HE'S NOT --

23            MR. PRICE:  YOU CAN'T SAY.

24            THE WITNESS:  OH, I'M SORRY.

25
```

```
 1    BY MR. PRICE:

 2    Q.   THOSE TWO ARE --

 3               MR. LEE:  YOUR HONOR, CAN I HAVE THAT STRICKEN OR

 4    SEALED IN THE RECORD WHEN HE'S READING FROM THE SEALED

 5    DOCUMENT?

 6               MR. PRICE:  WE CAN HAVE IT SEALED, YOUR HONOR.

 7               THE COURT:  ALL RIGHT.  WE'LL HAVE JUST THAT QUESTION

 8    AND ANSWER SEALED.

 9    BY MR. PRICE:

10    Q.   LET ME ASK YOU, WHY ARE THESE TWO NUMBERS RELEVANT?

11    A.   THOSE NUMBERS ARE RELEVANT BECAUSE THEY ARE THE PRODUCTS

12    THAT WOULD HAVE BEEN SOLD IF THERE WERE ANY SALES COMPARED TO

13    TABLET 7.0 3G, WHICH WAS ALSO A CELLULAR ENABLED IPAD OR TABLET

14    PRODUCT.

15         YOU HAVE TO UNDERSTAND, THERE'S TWO TYPES OF TABLETS.

16    THERE'S ONE THAT'S ONLY WI-FI ENABLED, THAT MEANS THE ONLY TIME

17    YOU CAN ACCESS THE INTERNET IS IF YOU HAVE A WI-FI CONNECTION;

18    AND THERE'S TABLETS THAT YOU CAN ALSO CONNECT THROUGH YOUR

19    CELLULAR NETWORK AND THOSE ARE MUCH MORE EXPENSIVE AND THAT'S

20    THE PROPER COMPARISON WE SHOULD BE MAKING IN THIS CASE.

21    Q.   AND IF YOU COMPARE THE PROPER PRICE OF THE IPAD 2 THAT

22    SHOULD BE USED WITH THE GALAXY TAB -- AND FIRST LET ME ASK YOU,

23    IS THERE ANY DISAGREEMENT BETWEEN YOU AND MS. DAVIS AS TO THE

24    AVERAGE PRICE OF THE GALAXY TAB?

25    A.   SHE NEVER CALCULATED, BUT SHE USED THE SAME DATA THAT I
```

WAGNER DIRECT

1    USED, SO SHE SHOULDN'T DISAGREE WITH IT.

2    Q.   AND I DON'T MIND YOU TELLING THE JURY HOW MUCH THAT

3    AVERAGE IS.  WHAT'S THE AVERAGE FOR THE GALAXY TAB AT THAT TIME

4    FRAME?

5    A.   IN THE SECOND QUARTER OF 2011, IT WAS $367.

6    Q.   AND SO THE DIFFERENCE IN PRICE WOULD BE THE DIFFERENCE

7    BETWEEN THIS AVERAGE THAT WE SEE ON THE SCREEN AND $367?

8    A.   RIGHT.

9    Q.   OKAY.  AND DO YOU AGREE WITH MS. DAVIS, DID MS. DAVIS TAKE

10   INTO ACCOUNT THE PRICE DIFFERENCE?

11   A.   NO.  SHE ASSUMED THAT EVERYONE WHO -- 75 PERCENT OF THE

12   PEOPLE THAT BOUGHT THE TAB PRODUCT AT $367 WOULD PAY THE PRICES

13   THAT ARE HIGHLIGHTED ON THIS CHART AT AT&T WITHOUT ANY

14   ADJUSTMENT FOR THE QUANTITY THAT WOULD BE SOLD.

15   Q.   LET ME GET BACK AND MAKE SURE WE'RE CLEAR ON THIS.  IN HER

16   ANALYSIS, WAS IT 75 PERCENT OF THE TOTAL, OR WHAT WAS HER

17   ANALYSIS?

18   A.   NO, FOR THE IPAD.  IT WAS 75 PERCENT OF THE TOTAL FOR THE

19   IPAD.

20   Q.   OKAY.  WERE THERE ANY OTHER DIFFERENCES BETWEEN THE

21   SAMSUNG TAB AND THE IPAD THAT SHE DID NOT TAKE INTO ACCOUNT IN

22   THE ANALYSIS?

23   A.   I BELIEVE SHE DIDN'T TAKE INTO CONSIDERATION THERE'S A

24   SIZE DIFFERENCE.  SOMEONE CHOSE AND WANTED A 7 INCH SCREEN, AND

25   IF THEY COULDN'T BUY THAT, ALTHOUGH THERE WERE OTHER 7 INCH

```
 1        SCREENS IN THE MARKETPLACE, MS. DAVIS ASSUMED THEY WOULD HAVE

 2        BOUGHT A 9.7 INCH SCREEN, BASICALLY A 10 INCH SCREEN.

 3        Q.   NOW, LET ME GO BACK TO YOUR EXHIBIT 7001.016.  WE'RE

 4        TALKING ABOUT -- WE TALKED ABOUT THE EVIDENCE WHETHER ANYONE

 5        WOULD BUY AN IPHONE OR AN IPAD IF THEY DIDN'T HAVE THIS '915

 6        FUNCTIONALITY.

 7            LET ME ASK YOU ABOUT THE BUT FOR WORLD AND WHETHER THERE

 8        WERE NON-INFRINGING ALTERNATIVES.  OKAY?  DID SHE TAKE THAT

 9        INTO ACCOUNT?

10        A.   I DON'T BELIEVE SO.

11        Q.   AND HOW WOULD YOU TAKE THAT INTO ACCOUNT?

12        A.   WELL, YOU HAVE TO TAKE IN CONSIDERATION WHAT ELSE WOULD

13        HAPPEN IN THIS BUT FOR WORLD, AND THE ONLY THING THAT'S

14        RELEVANT TO THE '915 PATENT IS THIS SCROLL VERSUS GESTURE

15        FUNCTIONALITY.

16            AND YOU HAVE TO SAY, IF THAT FUNCTIONALITY, OR REALLY EVEN

17        JUST THE WAY IT'S DONE, BECAUSE I UNDERSTAND THAT THERE ARE

18        WAYS YOU CAN DO THAT THAT ARE NON-INFRINGING, SO YOU HAVE TO

19        UNDERSTAND WHAT WOULD HAPPEN, WHAT WOULD BE DIFFERENT IN THIS

20        WORLD, AND I DON'T THINK THERE WOULD BE ANY DIFFERENCE IN THAT.

21            MR. LEE:  I OBJECT TO THE LAST PART, YOUR HONOR.  TO

22        THE EXTENT HE'S STARTING TO IDENTIFY NON-INFRINGING

23        ALTERNATIVES, HE ONLY HAS A VERY LIMITED DISCLOSURE IN HIS

24        EXPERT REPORT AND HE SHOULD BE LIMITED TO THAT.

25            THE COURT:  WHAT'S THE RELEVANT PARAGRAPH OF HIS
```

1    REPORT?

2              MR. PRICE:  YOUR HONOR, I DON'T HAVE THE PAGE IN

3    FRONT OF ME.  I CAN'T SEE WHAT HE SAID BECAUSE I DON'T HAVE THE

4    FUNCTIONAL.

5              MR. LEE:  YOUR HONOR, THE RELEVANT PARAGRAPH IN HIS

6    EXPERT REPORT FOR THIS CASE IS PAGE 187, PARAGRAPH 493 AND 494

7    FOR THE '915.

8              THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.

9        GO AHEAD, PLEASE.

10   BY MR. PRICE:

11   Q.   WELL, LET ME ASK YOU THIS:  DO YOU KNOW -- ARE THERE ANY

12   PARTICULAR PHONES THAT YOU HAVE IN MIND THAT YOU TALKED ABOUT

13   IN YOUR REPORT, FOR EXAMPLE?

14   A.   YES.

15   Q.   OKAY.

16   A.   THE INTERCEPT.

17   Q.   INTERCEPT?

18   A.   OR THE NEXUS.

19   Q.   AND THAT'S EXHIBIT 1009.  IF WE COULD PUT -- DO WE HAVE

20   THAT HERE?  HERE WE GO.

21        SO I HAVE 1009, THE INTERCEPT HERE (INDICATING).

22        AND YOU RECOGNIZE THIS -- I SHOULDN'T HAVE SAID THAT.

23        DO YOU RECOGNIZE THIS AS THE INTERCEPT (INDICATING)?

24   A.   I DO.

25   Q.   AND CAN YOU -- TO YOUR KNOWLEDGE, DOES THE INTERCEPT

1    INFRINGE ANY OF THE PATENTS THAT HAVE BEEN ASSERTED IN THIS

2    CASE?

3    A.   MY UNDERSTANDING, IT DOES NOT.

4    Q.   WHEN WAS THIS PHONE FOR SALE IN THE U.S.?

5    A.   IT WAS LAUNCHED ON JULY 11TH, 2010.

6    Q.   DID SAMSUNG ACTUALLY SELL THIS PHONE TO CUSTOMERS?

7    A.   THEY DID.  THEY SOLD $271 MILLION OF THAT UNIT.

8    Q.   WHERE DO YOU GET THAT DATA?

9    A.   I GET IT OUT OF EXHIBIT DX 646.

10   Q.   AND WHAT DOES THAT TELL YOU ABOUT WHETHER IT'S AN

11   ALTERNATIVE?

12   A.   IT'S CLEARLY COMMERCIALLY SUCCESSFUL FOR A PHONE TO SELL

13   THAT MANY DOLLARS WORTH OF SALES.

14   Q.   IS -- WHAT IS ANOTHER EXAMPLE THAT YOU CAN GIVE US IN OUR

15   TIME FRAME?

16   A.   I THINK THE NEXUS S PHONE.

17   Q.   AND THAT'S EXHIBIT --

18            MR. LEE:  I OBJECT, YOUR HONOR.  THIS IS ONE OF THE

19   PHONES THAT'S NOT AT ISSUE IN THE NEW TRIAL.  IT'S SUBJECT TO

20   YOUR HONOR'S ORDER.

21            THE COURT:  I KNOW.  IT'S NOT IN HIS REPORT, EITHER.

22            MR. LEE:  RIGHT.

23            THE COURT:  THAT'S STRICKEN.

24            MR. PRICE:  OKAY.

25            THE COURT:  OKAY.  THAT'S STRICKEN FROM THE RECORD.

```
 1        YOU'RE NOT TO CONSIDER IT.

 2              MR. PRICE:  ONE SECOND, YOUR HONOR.

 3         (PAUSE IN PROCEEDINGS.)

 4    BY MR. PRICE:

 5    Q.   DID YOU ALSO CONSIDER THE, THE GALAXY ACE -- I'M SORRY.

 6    OH, THEY'RE SAMSUNG PRODUCTS.

 7         DID YOU CONSIDER THE GALAXY ACE?

 8    A.   YES.

 9    Q.   AND DO WE HAVE A SLIDE FOR THE GALAXY ACE, EXHIBIT 1030?

10    HERE WE GO.  WE HAVE THE PHONE ITSELF.

11         AND DOES THE GALAXY ACE INFRINGE THE '915 PATENT?

12    A.   IT IS MY UNDERSTANDING IT DOES NOT.

13    Q.   OKAY.  WAS THE PHONE SOLD IN THE UNITED STATES?

14    A.   NO.  IT WAS ONLY SOLD INTERNATIONALLY.

15    Q.   COULD YOU DRAW ANY CONCLUSION FROM THE FACT THAT THE ACE

16    DOESN'T INFRINGE THE '915 PATENT?

17    A.   YES.  THIS WAS A VERY SUCCESSFUL PRODUCT FOR SAMSUNG,

18    ACTUALLY ONE OF THE BIGGEST SELLERS OF ALL TIME, SO CLEARLY IT

19    WAS COMMERCIALLY SUCCESSFUL.

20    Q.   WHAT DOES THIS TELL YOU ABOUT WHETHER SAMSUNG COULD SELL

21    PHONES THAT DID NOT INFRINGE THE '915?

22    A.   IT'S EVIDENCE THAT THEY COULD.

23    Q.   NOW, LET ME TALK ABOUT WHAT MS. DAVIS TALKED ABOUT, DESIGN

24    AROUND TIMES.

25         COULD YOU TELL US WHAT THAT CONCEPT IS?
```

1    A.   WELL, THE CONCEPT IS THAT AS SOON AS YOU CAN DESIGN AROUND

2    A PRODUCT AND OFFER A SIMILAR FUNCTIONALITY, THEN THE LOST

3    PROFITS WILL STOP BECAUSE YOU'LL BE BACK IN THE MARKET SELLING

4    YOUR PHONES.

5    Q.   AND I THINK MS. DAVIS CONCLUDED THE DESIGN AROUND TIMES

6    FOR THE '915 PATENT WOULD BE ABOUT SIX MONTHS?

7    A.   WELL, I DON'T THINK SHE CONCLUDED THAT.  THAT'S JUST AN

8    ASSUMPTION SHE WAS GIVEN BY AN APPLE ENGINEER, JUST LIKE I

9    CAN'T CONCLUDE THAT IT'S ONLY ONE MONTH PURSUANT TO THE SAMSUNG

10   ENGINEERS WHO TOLD ME IT WOULD BE ONE MONTH.

11   Q.   AND IN CALCULATING -- IF YOU WERE GOING TO CALCULATE LOST

12   PROFITS, WHAT DESIGN AROUND TIME WOULD YOU USE?

13   A.   WELL, YOU USE THE RIGHT ONE, WHICHEVER IS RIGHT.  I DON'T

14   KNOW.

15        BUT THE WAY THIS DAMAGE CLAIM, LOST PROFITS IS CONSTRUCTED

16   AND BASED ON WHEN THE DESIGN AROUND PERIOD WOULD START, IF

17   SAMSUNG COULD DESIGN AROUND THE '915 PATENT IN ANY TIME LESS

18   THAN FOUR AND A HALF MONTHS, THERE'S NO LOST PROFITS.

19   Q.   LET ME TALK TO YOU NOW ABOUT CAPACITY IN CONNECTION WITH

20   LOST PROFITS.

21        AND FOR THE IPAD OR THE TABLET LOST PROFITS, DID MS. DAVIS

22   MAKE THE CORRECT ASSUMPTION AS TO WHETHER OR NOT APPLE COULD

23   EVEN SELL IPAD 2'S IN THE PERIOD OF TIME IN WHICH SHE HAS THE

24   LOST PROFITS?

25   A.   I DON'T PROFESSIONALLY AGREE WITH HER CONCLUSION.

1     Q.   AND WHY IS THAT?

2     A.   THAT -- REMEMBER, THE LOST PROFITS PERIOD IS FROM

3     APRIL 15TH, 2011, THROUGH MAY 29TH, 2011.  THIS IS WITHIN A

4     MONTH OF THE INTRODUCTION OF THE IPAD 2.

5          AND ON APRIL 20TH, FIVE DAYS INTO THIS LOST PROFITS

6     PERIOD, TIM COOK, THE CHIEF OPERATING OFFICER OF APPLE, IN THE

7     EARNINGS CONFERENCE CALL, STATED "WE HAVE THE MOTHER OF ALL

8     BACKLOGS."

9          THEY COULD NOT MEET THE EXISTING DEMAND OF IPAD 2'S, LET

10    ALONE ADD MORE TO IT.

11    Q.   IF YOU COULD LOOK AT EXHIBIT 25F.15, THIS IS IN

12    MS. DAVIS'S REPORT.  I BELIEVE IT WAS SHOWN DURING HER

13    EXAMINATION.  25F.15.

14         AND IF WE COULD -- AND SO IF WE CAN JUST SHOW THAT TO THE

15    JURY AND TO THE COURT.

16         SO WITHOUT SAYING THE NUMBERS, OKAY, WHAT DOES THIS TELL

17    YOU ABOUT WHETHER THERE IS CAPACITY FOR THE IPAD 2 IN THE

18    DAMAGES PERIOD?

19    A.   WELL, YOU CAN SEE THAT THERE'S COLUMNS, AND IF YOU LOOK AT

20    THE THIRD COLUMN FROM THE RIGHT, IT SAYS FISCAL Q-3 '11.

21         YOU HAVE TO UNDERSTAND THAT APPLE, LIKE COMPANIES CAN DO,

22    DON'T HAVE THE SAME YEAR THAT WE HAVE, WHICH IS A CALENDAR

23    YEAR.  THEIR YEAR ENDS SEPTEMBER 30TH.

24         SO THE CALENDAR YEAR, OR CALENDAR QUARTER SECOND IN 2011,

25    WHICH IS RELEVANT TO THE LOST PROFITS CALCULATION, IS THE

1      COMMENT HERE THAT SAYS FISCAL QUARTER 3 2011.  THAT'S ACTUALLY

2      CALENDAR YEAR SECOND QUARTER 2011.

3          IF YOU GO ALL THE WAY TO THE BOTTOM OF THIS CHART, THERE'S

4      AN AREA CALLED EXCESS UNUSED CAPACITY, AND YOU CAN SEE FOR BOTH

5      THE IPAD AND IPAD 2 AND WHAT THE TOTAL IS.  THAT TELLS ME THAT

6      THERE IS NOT SUFFICIENT CAPACITY.

7      Q.   AND JUST TO BE CLEAR WHERE IT SAYS FYQ 3, THAT WOULD BE,

8      IF WE WERE JUST TALKING ANNUAL YEAR LIKE WE HAVE, THAT WOULD

9      ACTUALLY BE THE SECOND?

10     A.   SECOND QUARTER, THAT'S MARCH, APRIL, AND MAY OF 2011,

11     WHICH SPANS THE LOST PROFITS PERIOD.

12     Q.   ALL RIGHT.  AND IF IPADS WERE BEING SOLD INSTEAD, THAT IS,

13     PEOPLE CAME AND SAID, INSTEAD OF BUYING THE LATEST AND

14     GREATEST, WE'LL MOVE TO AN IPAD, HOW WOULD THAT AFFECT THE LOST

15     PROFITS CALCULATION?

16     A.   I DON'T THINK THERE WOULD BE ANY LOST PROFITS BECAUSE AT

17     THIS PERIOD OF TIME THIS PRODUCT IS SO OLD THAT APPLE IS STILL

18     SELLING THEM, BUT THEY'RE ACTUALLY SELLING THEM FOR A LOSS.  SO

19     THERE WOULD BE NO LOST PROFITS.

20     Q.   AND WHERE DO YOU GET THAT FROM?

21     A.   IF YOU GO BACK TO THAT EXHIBIT WHERE I SHOWED THE PRICES

22     THAT YOU BETTER NOT PUT IT ON THE SCREEN THIS TIME.

23     Q.   DON'T PUT IT ON THE SCREEN, 952.01.  DON'T PUT IT ON THEIR

24     SCREEN.

25     A.   SO IF YOU LOOK AT THIS, AT THE BOTTOM HALF OF THIS

1       EXHIBIT, YOU SEE AVERAGE STANDARD MARGIN, AND YOU CAN SEE FOR

2       THE ORIGINAL IPAD AND THE ORIGINAL IPAD 3G, YOU CAN SEE THE

3       NUMBERS THAT ARE THERE.

4            AND THAT IS JUST AT THE GROSS MARGIN LEVEL.  THERE'S STILL

5       GOING TO BE MORE COSTS TO SELL THESE PRODUCTS THAT ARE THE

6       OPERATING COSTS, THE SELLING COSTS, THE MARKETING COSTS, AND SO

7       THERE WILL BE EVEN LESS PROFIT THERE.

8            BUT THAT IS A PER UNIT PROFIT FOR THESE PRODUCTS.  THEY'RE

9       NOT GOING TO MAKE ANY MONEY IF THAT'S WHAT THEY SELL IN THIS

10      LOST PROFITS PERIOD.

11      Q.   SO SPEAKING OF WHAT TO DEDUCT, LET'S GO TO A SECOND AREA

12      NOW, WHICH IS INFRINGER'S PROFITS, THAT IS, APPLE GETS PART OF

13      SAMSUNG'S PROFITS AS A RESULT OF THE JURY FINDING INFRINGEMENT

14      ON SEVEN OF THESE PRODUCTS.

15           AND IF WE CAN PUT UP SLIDE 7001.005, COULD YOU SHOW US

16      WHAT THIS SHOWS?

17      A.   THIS IS A DEMONSTRATIVE I PREPARED THAT EXPLAINS WHAT I

18      THINK IS THE APPROPRIATE CALCULATION.

19      Q.   YOU CAN SHOW THAT TO EVERYONE.

20           AND GENERAL AGREEMENT ON REVENUES?

21      A.   WE -- MS. DAVIS AND I TOTALLY -- WE AGREE COMPLETELY ON

22      WHAT TOTAL REVENUES ARE.

23      Q.   SO LET'S TALK THEN ABOUT THE COSTS.  THE FIRST ELEMENT IS

24      COST OF GOODS SOLD.  YOU AND MS. DAVIS AGREE ON THAT?

25      A.   THERE'S ACTUALLY A SLIGHT EXCEPTION, BUT WE BASICALLY

1    AGREE.  THERE'S ONE PRODUCT, THE INFUSE 4G, WHICH IS ALSO SOLD

2    INTERNATIONALLY AND THERE'S DIFFERENT FEATURES IN THE

3    INTERNATIONAL PHONES AND THE PRODUCTS ARE SLIGHTLY DIFFERENT.

4    BUT IT'S A VERY SMALL CHANGE.

5    Q.   SO WE HAVE OPERATING EXPENSES.  THAT'S WHERE YOU DISAGREE,

6    CORRECT?

7    A.   THAT'S CORRECT, THAT'S WHERE WE DISAGREE, THAT MS. DAVIS

8    CALCULATED NOT A PENNY OF THESE OPERATING EXPENSES WHICH I

9    THINK ARE NECESSARY EXPENSES.

10   Q.   WHY DO YOU THINK OPERATING EXPENSES ARE NECESSARY

11   EXPENSES?

12   A.   BECAUSE YOU CAN'T SELL A PHONE WITHOUT INCURRING THOSE

13   TYPES OF COSTS.  JUST BECAUSE YOU MAKE A PHONE AND IT'S SITTING

14   IN A WAREHOUSE, THAT DOESN'T MEAN YOU'RE GOING TO SELL IT.

15   IT'S NECESSARY TO GET OUT IN THE MARKETPLACE AND SELL THESE

16   PRODUCTS.

17   Q.   SO COULD YOU TELL US GENERALLY WHAT KIND OF EXPENSES WE'RE

18   TALKING ABOUT HERE IN THE OPERATING EXPENSES AREA?

19   A.   WELL, THE FIRST ONE, SALES EXPENSE, THIS IS A VERY

20   COMPETITIVE INDUSTRY, AND IF YOU GO INTO YOUR SERVICE PROVIDER,

21   I DON'T KNOW IF IT'S VERIZON OR T-MOBILE OR AT&T OR SPRINT, AND

22   YOU LOOK AT THEIR CHOICES OF PHONE, THEY HAVE LIMITED FLOOR

23   SPACE AND ALL OF THESE MANUFACTURERS ARE COMPETING TO HAVE

24   THEIR PHONE SOLD BY THAT NETWORK, OR THAT CARRIER.  SO IT'S

25   VERY COMPETITIVE.

1          AND SO SAMSUNG IS SELLING, SENDING SALES PEOPLE TO ALL

2     THESE MAJOR CARRIERS TO TRY TO CONVINCE THEM WHY YOU SHOULD

3     HAVE THE SAMSUNG PHONES RATHER THAN MOTOROLA OR LG OR APPLE

4     PHONE, AND THOSE ARE REAL COSTS.

5     Q.   AND HOW ABOUT MARKETING?  DO YOU HAVE TO MARKET PHONES TO

6     SELL THEM?

7     A.   ABSOLUTELY, AND THAT'S ONE REASON WHY SAMSUNG HAS BEEN

8     SUCCESSFUL.  THEY'VE VERY HEAVILY PROMOTED AND INCUR A LOT OF

9     COSTS IN ADVERTISING AND MARKETING.  THEY HAVE PRINT ADS, THEY

10    HAVE BILLBOARDS, THEY HAVE TELEVISION ADS, THEY HAVE WEB ADS.

11    THERE'S POINT OF SALE MATERIALS IN THESE VERIZON STORES OR AT&T

12    STORES.

13         THEY SPEND A LOT OF MONEY ON MARKETING AND ADVERTISING.

14    Q.   AND R&D EXPENSES?

15    A.   R&D, YOU COULDN'T -- YOU CAN HAVE A PHONE THAT PEOPLE

16    SPENT REAL TIME DEVELOPING IT AND THEN IMPROVING IT DURING ITS

17    LIFETIME, SO THOSE ARE REAL COSTS THAT HAVE TO BE INCURRED.

18    Q.   AND THEN GENERAL AND ADMINISTRATIVE?

19    A.   AGAIN, YOU NEED AN UMBRELLA ORGANIZATION TO DO ALL OF

20    THESE DIFFERENT THINGS.  IT JUST DOESN'T HAPPEN IN A VACUUM.

21    THEY HAVE TO BE CONTROLLED, AND YOU NEED MANAGEMENT TO DO THAT.

22    Q.   NOW, WITH RESPECT TO THESE EXPENSES, IF, YOU KNOW, THE

23    SALES FORCE IS SELLING SEVEN DIFFERENT PHONES, HOW DO YOU

24    EXPENSE THEM?

25    A.   WELL, THERE'S COMMON METHODS, AND THE METHODS THAT WERE

1    USED BY SAMSUNG IN THIS CASE, THAT YOU HAVE TO ALLOCATE THOSE

2    COSTS.

3         IF YOU JUST ONLY SOLD A PRODUCT IN A CASE IN YOUR COMPANY

4    AND ALL OF THEM WERE INFRINGING THE DESIGN PATENT, YOU WOULDN'T

5    HAVE TO DO ALLOCATION.

6         BUT IF YOU SELL MULTIPLE PRODUCTS AND SOME OF THEM DON'T

7    INFRINGE, YOU HAVE TO ALLOCATE THESE COMMON COSTS THAT ARE

8    NECESSARY IN ORDER TO COME OUT WITH YOUR TOTAL PROFITS.

9    Q.   NOW, IF YOU TAKE INTO ACCOUNT THESE COSTS, HAVE YOU DONE A

10   CALCULATION AS TO WHAT THE -- WHAT SAMSUNG'S PROFITS WERE ON

11   THESE SEVEN PRODUCTS?

12   A.   YES.  FOR THE INFUSE 4G FROM APRIL 15TH, 2011, THROUGH

13   JUNE 30TH, 2012, AND FOR THE OTHER SIX PRODUCTS FROM JUNE 16TH,

14   2011, THROUGH JUNE 30TH, 2012.

15   Q.   OKAY.  IF WE COULD LOOK AT EXHIBIT 952, IF YOU COULD LOOK

16   AT IT, SIR, COULD YOU TELL US WHAT THAT IS?

17   A.   952?

18   Q.   952.

19        I'M SORRY.  781.  IT'S ALWAYS GOOD TO HAVE SOMEBODY

20   HELPING YOU.  I'LL TRUST YOU.

21        781.002.

22             MR. LEE:  I'M SORRY.

23             THE WITNESS:  YES.  THIS IS MY CALCULATION OF WHAT I

24   BELIEVE THE OPERATING PROFIT, THE TOTAL PROFIT OF SAMSUNG IS

25   DURING THIS PERIOD OF TIME FOR THE SEVEN PRODUCTS THAT HAVE

```
 1      BEEN FOUND TO INFRINGE THE DESIGN PATENTS.

 2              MR. PRICE:  IF WE COULD SHOW THAT 781.002 AND MOVE IT

 3      INTO EVIDENCE, YOUR HONOR?

 4              THE COURT:  ANY OBJECTION?

 5              MR. LEE:  NO OBJECTION, YOUR HONOR.

 6              THE COURT:  IT'S ADMITTED.

 7          (DEFENDANT'S EXHIBIT 781.002 WAS ADMITTED IN EVIDENCE.)

 8              THE COURT:  GO AHEAD, PLEASE.

 9      BY MR. PRICE:

10      Q.   COULD YOU EXPLAIN -- WE CAN SHOW IT.  THE JURY SEES IT

11      RIGHT NOW.

12          SO IF YOU COULD EXPLAIN, WE'VE GOT THE PHONES LISTED.

13      YOU'VE GOT A TOTAL OF 9,590,000 AND THEN A TOTAL, EXCLUDING

14      LOSSES, OF 52,734,959.  CAN YOU TELL US WHAT YOU MEAN BY THAT?

15      A.   WELL, YOU CAN SEE THAT DURING THIS PERIOD, WHICH IS END OF

16      LIFE FOR SOME OF THESE PRODUCTS, AND SOME OF THESE PRODUCTS

17      ACTUALLY WEREN'T ALL THAT SUCCESSFUL, THAT THEY ACTUALLY SHOW

18      LOSSES DURING THE RELEVANT PERIOD OF TIME THAT DAMAGES CAN BE

19      CLAIMED.

20          SO FOUR OF THE SEVEN PRODUCTS ACTUALLY LOSE MONEY.  IF YOU

21      SUBTRACT THOSE LOSSES FROM THE PROFITS, THE PROFIT PRODUCTS,

22      YOU GET THE $9.6 MILLION.

23          BUT IF YOU DO NOT SUBTRACT THE LOSSES AND ONLY COUNT THE

24      OPERATING PROFIT FOR THE SUCCESSFUL PRODUCTS, THE NUMBER IS

25      52.7 MILLION.
```

```
1      Q.   NOW, LET ME ASK YOU ABOUT THESE OPERATING EXPENSES.  DID

2      MS. DAVIS USE ANY ALLOCATION OF OPERATING EXPENSES IN HER

3      CALCULATION OF APPLE'S LOST PROFITS?

4      A.   YES.

5      Q.   COULD YOU EXPLAIN HOW SHE DID THAT?

6      A.   WELL, SHE CALCULATED, AND PROPERLY SO, WHAT'S CALLED

7      INCREMENTAL PROFITS FOR LOST PROFITS, WHICH IS DIFFERENT THAN

8      TOTAL PROFITS FOR UNJUST ENRICHMENT, AND IN THAT AREA, SHE

9      RECOGNIZED THAT EVEN THOUGH THERE WAS ONLY A HANDFUL, A VERY

10     SMALL NUMBER OF SALES THAT SHE ADDED TO APPLE BASED ON THE HUGE

11     AMOUNT OF SALES THEY ACTUALLY HAD, SHE RECOGNIZED THERE'S GOING

12     TO BE SELLING AND DISTRIBUTION EXPENSES THAT SHOULD BE

13     CONSIDERED AND SHE DID SUBTRACT THEM AND THOSE ARE ALLOCATED

14     COSTS.

15     Q.   AND DOES APPLE USE THE SAME GENERAL METHODOLOGY TO

16     ALLOCATE ITS COSTS AMONG PRODUCT LINES?

17     A.   THEY DO.

18     Q.   OKAY.  AND WHAT'S THE BASIS OF THAT?

19     A.   WELL, IT'S MR. BUCKLEY'S DEPOSITION, WHO WAS A 30(B)(6)

20     FOR THE CORPORATE REPRESENTATIVE, APPLE, TO EXPLAIN THEIR

21     FINANCIALS.

22          AND IT'S ALSO FROM LOOKING AT THEIR, THEIR GAAP PRODUCT

23     LINE REPORTS.

24     Q.   OKAY.  NOW, WHAT'S A PRODUCT LINE REPORT?

25     A.   A PRODUCT LINE REPORT IS SOMETHING THAT'S NOT THE OVERALL
```

```
 1        COMPANY.  WHEN APPLE SAYS "I WANT A PROFIT AND LOSS STATEMENT

 2        FOR, SAY, THE IPHONE," THEY HAVE TO LOOK AT ONLY COSTS AND

 3        REVENUES RELATED TO THE IPHONE.

 4            BUT A LOT OF THOSE COSTS ARE SHARED COSTS, SO THEY

 5        ALLOCATE COSTS FROM CORPORATE, FROM G&A, FROM THEIR MARKETING

 6        DEPARTMENT, FROM THEIR SALES DEPARTMENT TO THE IPHONE PRODUCT

 7        LINE.

 8        Q.  IF WE COULD LOOK AT, AND I BELIEVE THIS IS UNDER SEAL,

 9        PX 181.1, IT'S UNDER SEAL, BUT WE CAN SHOW IT THE WITNESS, THE

10        COURT, THE JURY, AND I'D APPRECIATE IT, TOO.  PX 181.1.  HERE

11        WE GO.

12            SO LET'S -- CAN YOU -- WHAT DOES THIS TELL YOU WITH

13        RESPECT TO WHETHER OR NOT MS. DAVIS USED ALLOCATED COSTS -- I'M

14        SORRY.

15            WHAT DOES THIS TELL YOU AS TO WHETHER OR NOT APPLE, IN

16        DOING ITS PRODUCT LINE PROFIT CALCULATIONS, USED SHARED COSTS?

17        A.  WELL, IF YOU LOOK AT THIS STATEMENT AND THE LINE ITEMS OF

18        THE STATEMENT, YOU GO DOWN UNDER EITHER REVENUE, STANDARD

19        MARGIN, AND ADJUSTED STANDARD MARGIN, ALL OF THE COSTS

20        UNDERNEATH THERE ARE ALLOCATED COSTS.

21        Q.  OKAY.  AND COULD YOU POINT OUT WHAT COSTS YOU'RE TALKING

22        ABOUT?

23        A.  THEY WOULD START UNDER, RIGHT UNDER ADJUSTED STANDARD

24        MARGINS.  SO PERIOD EXPENSE, FREIGHT AND DUTY, WARRANTY, SCRAP

25        REWORK, EXCESS/OBSOLETE, PHONE SUPPORT, SERVICE/PRODUCT
```

```
 1        EXPENSE, OTHER COSTS OF GOODS SOLD, THOSE ARE ALL ALLOCATED

 2        COSTS TO THIS PRODUCT LINE.

 3             AND THEN ALL OF THE COSTS BELOW THOSE NUMBERS AS WELL ARE

 4        ALLOCATED.  IN FACT, IT EVEN SAYS IN R&D THAT IT IS BOTH DIRECT

 5        AND ALLOCATED COSTS.

 6        Q.   IF WE COULD MOVE UP THE PAGE AND LOOK AT THE FOOTNOTE.

 7        DOES THAT GIVE YOU ANY INFORMATION AS TO WHETHER OR NOT APPLE,

 8        WHEN IT CALCULATES ITS PROFITS, ALSO INCLUDES SHARED COSTS

 9        AMONG THE PRODUCT LINES?

10        A.   THEY DO.  THE NOTE SAYS, "IPHONE REVENUE, STANDARD COSTS,

11        UNITS DIRECT."  THE SECOND SENTENCE SAYS, "OTHER AMOUNTS

12        ALLOCATED BASED ON OVERALL COMPANY RESULTS."  THAT MEANS THEY

13        BASICALLY ALLOCATE BASED ON REVENUE.

14        Q.   SO IN FAILING TO TAKE THESE OPERATING COSTS INTO ACCOUNT

15        IN CALCULATING, YOU KNOW, SAMSUNG'S PROFITS, IS MS. DAVIS, WAS

16        MS. DAVIS CONSISTENT?

17        A.   NO.  I THINK SHE'S INCONSISTENT AND I THINK IT'S NOT FAIR

18        TO BE ABLE TO DO IT ON APPLE'S BOOKS AND YOU CAN'T DO IT ON

19        SAMSUNG'S BOOKS.

20        Q.   NOW, LET ME ASK YOU ABOUT THE, THE DATA THAT YOU LOOKED

21        AT.  COULD YOU DESCRIBE TO US YOUR UNDERSTANDING AS TO HOW THAT

22        DATA IS COLLECTED AND INPUTTED?

23        A.   WELL, THE ACTUAL DATA THAT IS THE RESULT, OR IS THE BASIS

24        OF MY CALCULATION IS THE BOOKS AND RECORDS, THE UNDERLYING

25        ACCOUNTING SYSTEM OF THE COMPANY.
```

1          THIS INFORMATION IS PUT IN USUALLY ELECTRONICALLY THESE

2     DAYS BY SUPPLIERS AND BY INVOICING CUSTOMERS, ALL OF THE

3     TRANSACTIONS ARE DONE NEW ELECTRONICALLY.

4          BUT THESE TRANSACTIONS ARE ENTERED IN SAMSUNG BOOKS AND

5     RECORDS DAILY, HOURLY, AND THAT'S THE INFORMATION THAT'S THE

6     UNDERLYING SOURCE FOR MY CALCULATION.

7     Q.   WHAT IS THE UNDERLYING BOOK AND RECORD OF SAMSUNG?

8     A.   IT'S BASICALLY WHAT'S CALLED THE GENERAL LEDGER.

9     Q.   AND COULD YOU TELL US WHAT THE S.A.P. SYSTEM IS?

10    A.   WELL, THEIR GENERAL LEDGER IS S.A.P., AND I KNOW ALL OF

11    YOU KNOW MICROSOFT BECAUSE THEY'RE WELL KNOWN BECAUSE THEY

12    HAVE -- THEY'RE THE LARGEST SOFTWARE COMPANY IN THE WORLD, AND

13    IT'S BECAUSE THEY ARE THE LARGEST PROVIDER OF SOFTWARE FOR

14    DESKTOPS AND LAPTOPS.

15         S.A.P. IS THE MICROSOFT OF THE BUSINESS WORLD.  THEY ARE

16    THE LARGEST PROVIDER OF BUSINESS SOFTWARE TO THE MAJOR

17    CORPORATIONS OF THE WORLD.  IN FACT, BOTH OF THE PARTIES IN

18    THIS LAWSUIT HAVE S.A.P. SYSTEMS.

19         YOU GUYS KNOW ORACLE BECAUSE THEY'RE HERE, BUT ORACLE IS

20    THE SECOND BIGGEST PLAYER IN THAT SPACE.

21    Q.   AND SO IN THAT SYSTEM, HOW IS DATA PUT IN?  IS IT PUT IN,

22    LIKE, MONTHS, YEARS AFTERWARDS?  OR WHAT HAPPENS?

23    A.   NO.  IT'S PUT IN AT THE TIME THE TRANSACTIONS ARE

24    OCCURRING ON A DAILY BASIS.

25    Q.   NOW, A REPORT LIKE WAS GENERATED HERE WITH A, YOU KNOW, A

1    PHONE-BY-PHONE KIND OF DATA, IS THAT SORT OF REPORT USUALLY

2    DONE AT COMPANIES FOR, YOU KNOW, FOR QUARTERLY REPORTS OR FOR

3    THE TYPICAL TYPE OF REPORT THAT A MANAGER WOULD GET?

4    A.   I'VE ANALYZED MOST OF THE MAJOR COMPANIES IN THE WORLD

5    THAT HAVE MULTILINE PRODUCTS.  NO ONE DOES THAT ON A PERIODIC

6    BASIS FOR MANAGEMENT.  IT'S TOO MUCH DETAIL.  THERE'S A LOT OF

7    ASSUMPTIONS THAT ARE MADE.  THE COST IS TOO GREAT FOR THE

8    BENEFIT.  COMPANIES JUST DON'T DO IT.

9    Q.   BUT IS THE DATA THERE SO YOU CAN DO IT?

10   A.   THE DATA IS THERE SO YOU CAN DO IT, BUT COMPANIES NORMALLY

11   DO NOT DO IT.

12   Q.   IS WHAT YOU SAW WITH THE DATA CONSISTENT WITH -- FIRST LET

13   ME ASK YOU.  SAMSUNG'S AUDITED FINANCIAL STATEMENTS, THOSE

14   EXIST, RIGHT?

15   A.   THEY DO.

16   Q.   OKAY.  AND HOW IS THAT DATA PREPARED?  DOES IT USE THE

17   SAME SYSTEM?

18   A.   IT USES THE EXACT SAME S.A.P. SYSTEM THAT IS THE BASE OF

19   THE INFORMATION THAT I USED, AND THAT SYSTEM HAS TO HAVE

20   INTEGRITY, OR PRICEWATERHOUSECOOPERS, WHICH IS A FIRM I USED TO

21   BE A PARTNER AT, WOULD NOT PROVIDED AN AUDITED OPINION TO

22   SAMSUNG.

23   Q.   NOW, WITH RESPECT TO THE DATA THAT WAS IN THAT

24   SPREADSHEET, DOES MS. DAVIS RELY ON THAT DATA?

25   A.   SHE DID FOR THE REVENUES AND THE COSTS OF SALES.

1    Q.   SO LET ME ASK YOU THEN ABOUT -- GO THEN TO YOUR OPINION ON

2    SAMSUNG'S PROFITS OVER THE RELEVANT TIME PERIOD -- I'M SORRY --

3    FOR THE SEVEN PRODUCTS, 781.002.

4         YOU'RE SAYING THAT THAT IS 52,734,959?

5    A.   IT IS.

6    Q.   INCIDENTALLY, I WANT TO MAKE SURE WE GET THIS.  DID YOU --

7    IF YOU LOOK AT 952.014, IN CONNECTION WITH YOUR ANALYSIS, DID

8    YOU LOOK AT THE LAUNCH DATES OF SAMSUNG PRODUCTS?

9    A.   I DID.

10   Q.   AND DOES 952.014 REFLECT THAT?

11   A.   YES.

12             MR. PRICE:  YOUR HONOR, I MOVE 952.014 INTO EVIDENCE.

13             THE COURT:  ANY OBJECTION?

14             MR. LEE:  NO OBJECTION.

15             THE COURT:  IT'S ADMITTED.

16        (DEFENDANT'S EXHIBIT 952.014 WAS ADMITTED IN EVIDENCE.)

17             THE COURT:  GO AHEAD, PLEASE.

18   BY MR. PRICE:

19   Q.   AND FINALLY, MR. WAGNER, I WANT TO TALK TO YOU ABOUT

20   REASONABLE ROYALTIES, AND THIS IS -- DO YOU UNDERSTAND WHAT

21   MS. DAVIS DID TO, TO CALCULATE REASONABLE ROYALTIES FOR THESE

22   UTILITY PATENTS?  NOT THE DESIGN PATENTS, BECAUSE SHE'S TOLD US

23   SHE'S NOT USING THAT FOR THAT.

24        BUT ON THESE, THE '381, THE '915, AND THE OTHER ONE, '163,

25   DO YOU UNDERSTAND WHAT SHE DID IN TRYING TO COME UP WITH A

```
1     REASONABLE ROYALTY?

2     A.   I DO.

3     Q.   AND WHAT DID SHE DO?

4     A.   WELL, SHE USED -- SHE LOOKED AT ALL THREE OF THE GENERALLY

5     ACCEPTED APPROACHES AND SHE USED TWO OF THEM, THE INCOME

6     APPROACH AND THE COST APPROACH, AND SHE ENDED UP RELYING UPON

7     THE INCOME APPROACH, WHICH I BELIEVE IN MY OPINION IS

8     INAPPROPRIATE BECAUSE IT'S INCONSISTENT WITH THE ASSUMPTIONS

9     THAT SHE HAS AND THE WORK SHE DID IN THE LOST PROFITS AREA.

10         SHE ADMITTED IN THE LOST PROFITS AREA THAT THERE IS A

11    DESIGN AROUND PERIOD THAT SAMSUNG CAN DESIGN AROUND THESE

12    PRODUCTS.  THAT IS THE ONLY PERIOD THAT SHE SHOULD BE

13    CALCULATING A ROYALTY.

14         BUT SHE CALCULATES A ROYALTY THAT GOES ALL THE WAY THROUGH

15    UNTIL, WELL, ACTUALLY, JUNE 30TH, 2012, AND THEN WHATEVER YOU

16    AWARD WILL GO THROUGH, I ASSUME, SOME ACCOUNTING PERIOD THROUGH

17    THE JUDGMENT OF THE TRIAL, WHICH IS TYPICAL, AND THAT'S JUST

18    TOO LONG A PERIOD TO BE PAYING REASONABLE ROYALTIES.

19         AND SHE DID THIS COST APPROACH, WHICH WAS THE ONE SHE

20    DIDN'T TELL YOU WHAT HER CONCLUSIONS WERE, WHICH WERE ABOUT ONE

21    QUARTER OF THE RATES THAT SHE USED ON THE INCOME APPROACH.  I

22    HAVE A LOT OF PROBLEMS WITH WHAT SHE DID WITH THE INCOME

23    APPROACH.  SHE USED A METHODOLOGY --

24    Q.   LET'S FOCUS ON THAT.  SHE MENTIONED THE COST APPROACH BUT

25    DIDN'T PRESENT THOSE RESULTS.  WHAT IS THE INCOME APPROACH?
```

1     A.   THE INCOME APPROACH IS YOU LOOK AT WHAT ARE THE PROFITS

2     THAT ARE EARNED AS A RESULT OF PRACTICING THE INVENTION, AND

3     SHE DIDN'T EVEN LOOK AT THE PROFITS OF SAMSUNG ON THAT.  SHE

4     LOOKED AT THE PROFITS OF APPLE.

5          IF SHE'S RIGHT ABOUT LOST PROFITS, SHE'S CALCULATED ALL

6     PROFIT EFFECTS ON APPLE OF LICENSING THESE PATENTS, AND NOW

7     THIS "YOU SHOULD BE FOCUSSING YOUR INQUIRY ON SAMSUNG'S

8     PROFITS."  SO THAT'S ONE BIG MISTAKE SHE MADE.

9          AND ALSO THE METHODOLOGY SHE USED, WHICH IS KIND OF A

10    HYBRID THAT I CALL, IN OUR LANGUAGE, THE ANALYTICAL APPROACH.

11    SHE LOOKS AT EXCESS PROFITS OF THE PRODUCTS THAT ARE INFRINGING

12    COMPARED TO THE AVERAGE PROFITS EARNED BY SAMSUNG.  BUT THE WAY

13    SHE DID IT IS A WAY I'VE NEVER SEEN DONE BEFORE AND IT USES

14    BRAND VALUE TO COME UP WITH A NUMBER AND SUBTRACTS THAT.

15         BUT THEN THE REAL PROBLEM, EVEN IF THAT PART OF THE

16    ANALYSIS IS CORRECT, SHE STOPPED THERE.  THE NUMBER SHE USED TO

17    APPROACH THE PATENTS AT ISSUE IS REALLY WHAT'S LEFT OVER FOR

18    ALL THE PATENTS THAT -- UTILITY PATENTS THAT APPLE HAS.

19         SO SHE DIDN'T DO PROPER APPORTIONMENT UNDER WHAT'S CALLED

20    GEORGIA PACIFIC FACTOR NUMBER 13, WHICH SHE SAYS SHE

21    CONSIDERED.

22    Q.   AND WHAT'S THE EFFECT OF THAT?

23    A.   THE EFFECT OF THAT IS, IN EFFECT, THE RATE SHE HAS IS LIKE

24    A LICENSE FOR ALL OF APPLE'S UTILITY PATENTS, NOT JUST THE

25    THREE UTILITY PATENTS IN THIS LAWSUIT.

1    Q.   NOW, DID YOU DO YOUR OWN ANALYSIS ON THE DESIGN AROUND

2    COSTS?

3    A.   I DID.

4    Q.   AND WHY DID YOU DO THAT?

5    A.   BECAUSE, AGAIN, AS AN ECONOMIC PERSON, I BELIEVE THAT AT

6    THE NEGOTIATION, IF THE ALLEGED INFRINGER, OR THE INFRINGER

7    HERE, THE LICENSEE, HAS A NEXT BEST ALTERNATIVE, THAT'S GOING

8    TO CAP WHAT THEY HAVE TO PAY.

9        IF THEY CAN REALLY DO IT ANOTHER WAY AND THE LICENSOR IS

10   ASKING FOR WAY TOO MUCH MONEY, THEY'LL SAY, I'M NOT GOING TO DO

11   THAT, BECAUSE IF THAT'S WHAT YOU WANT, I'LL DO THIS OTHER THING

12   AND YOU'LL HAVE NO ROYALTIES.

13   Q.   AND IF WE LOOK AT EXHIBIT 702.005, DOES THAT REFLECT --

14   WELL, FIRST LET ME ASK YOU THIS:  DOES EXHIBIT 702 REFLECT YOUR

15   ANALYSIS FOR THE DESIGN AROUND COSTS FOR THESE UTILITY PATENTS?

16   A.   IT DOES.

17        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 702 INTO

18   EVIDENCE.

19        THE COURT:  ANY OBJECTION?

20        MR. LEE:  NO OBJECTION.

21        THE COURT:  IT'S ADMITTED.

22   (DEFENDANT'S EXHIBIT 702 WAS ADMITTED IN EVIDENCE.)

23        THE COURT:  GO AHEAD, PLEASE.

24   BY MR. PRICE:

25   Q.   COULD YOU TELL US WHAT, HOW YOU DID THIS?

1    A.   WELL, I DID IT THE SAME WAY THAT MS. DAVIS DID WHEN SHE

2    WAS ASKING THE APPLE ENGINEERS HOW LONG IT WAS GOING TO TAKE TO

3    DESIGN AROUND THESE PATENTS.  I HAD CONVERSATIONS WITH SAMSUNG

4    ENGINEERS AND ASKED THEM, HOW LONG WOULD IT TAKE YOU TO DESIGN

5    AROUND THESE THREE UTILITY PATENTS?

6         AND THEN I WENT TO THE HUMAN RESOURCES DEPARTMENT TO FIND

7    OUT WHAT IS THE BURDENED COST FOR THE TYPES OF PEOPLE THAT

8    WOULD BE DOING THE WORK?

9         AND I JUST MULTIPLIED THE HOURS IT WOULD TAKE TO DO THE

10   DESIGN AROUND TIMES WHAT IT COSTS SAMSUNG TO PAY THE PEOPLE TO

11   DO IT AS THE COST OF DESIGN AROUND.

12   Q.   AND IF YOU LOOK AT 7001.050, IS THIS -- DOES THIS CHART

13   REFLECT YOUR CONCLUSIONS?

14   A.   RIGHT.  NOW, THE MIDDLE COLUMN IS NOT MY OPINION.  I

15   CANNOT GIVE YOU AN OPINION ABOUT HOW LONG THIS WOULD TAKE.

16        BUT THE INFORMATION I RECEIVED FROM SAMSUNG WAS THAT FOR

17   THE '381 PATENT, IT WOULD TAKE FOUR WEEKS AND THREE DAYS.

18   THAT'S ACTUALLY THREE DAYS LONGER THAN THE APPLE ENGINEERS TOLD

19   JULIE DAVIS IT WOULD TAKE TO DESIGN AROUND THAT PATENT.

20        FOR THE '163 PATENT, IT WOULD TAKE, ACCORDING TO THE

21   SAMSUNG ENGINEERS, TWO WEEKS AND TWO DAYS, AND THAT'S SLIGHTLY

22   LESS THAN THE APPLE ENGINEERS TOLD MS. DAVIS THAT IT WOULD TAKE

23   A MONTH, FOUR WEEKS.

24        AND THEN THE '915 PATENT, THE SAMSUNG ENGINEERS TOLD ME IT

25   WOULD TAKE FOUR WEEKS, AND THIS IS WHERE THERE'S THE BIG

1    DISAGREEMENT BECAUSE THE APPLE ENGINEERS SAID IT WOULD TAKE SIX

2    MONTHS TO DO THIS.

3             MR. PRICE:  ONE MOMENT, YOUR HONOR.

4        (PAUSE IN PROCEEDINGS.)

5    BY MR. PRICE:

6    Q.   SO MR. WAGNER, COULD YOU THEN TELL THE JURY THEN WHAT YOUR

7    OVERALL CONCLUSION IS WITH RESPECT TO THE AMOUNT THAT SAMSUNG

8    SHOULD PAY APPLE AS A RESULT OF THE JURY FINDING INFRINGEMENT

9    ON THE PRODUCTS AND THE PATENTS IN THIS CASE?

10   A.   THAT FOR THE PRODUCTS THAT INFRINGE THE DESIGN PATENTS,

11   THAT YOU SHOULD AWARD THE $52 MILLION THAT I'VE CALCULATED.

12            AND FOR THE PRODUCTS THAT INFRINGE, AND FOR THE PERIOD

13   THAT INFRINGED THE UTILITY PATENTS, THEY SHOULD PAY THIS TOTAL

14   COMBINED COST OF $27,300 TO DESIGN AROUND THE UTILITY PATENTS.

15   Q.   AND HOW ABOUT LOST PROFITS, THAT IS, HOW MANY SALES APPLE

16   WOULD HAVE GOT FROM SAMSUNG CUSTOMERS IF THOSE PHONES DIDN'T

17   HAVE THE '915 UTILITY PATENT FUNCTION, THAT ONE PATENT

18   FUNCTION?

19   A.   IT'S MY OPINION THAT THERE ARE NO LOST PROFITS.  APPLE

20   WOULD NOT HAVE MADE ADDITIONAL SALES.

21   Q.   OKAY.  BY THE WAY, WITH RESPECT TO THE CALCULATION, IF YOU

22   ASSUME THAT SHE'S CORRECT AND THE NUMBER OF PEOPLE WOULD MOVE,

23   YOU KNOW, TO APPLE PRODUCTS, DO YOU AGREE WITH THE NUMBER SHE

24   CAME UP WITH ANYWAY?

25   A.   NO.  I DO HAVE A COUPLE PROBLEMS WITH HER ACTUAL

```
1    CALCULATION OF THE PROFITS THAT WOULD GO TO THEM AS WELL.

2    Q.   AND WHAT, WHAT COSTS DID YOU CALCULATE AS A ROYALTY?  WHAT

3    ROYALTY DAMAGES DID YOU CALCULATE?

4    A.   $27,300.

5    Q.   AND DID YOU CALCULATE A COST FOR REPLACING THE -- FOR --

6         (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

7    BY MR. PRICE:

8    Q.   DID YOU CALCULATE THE COSTS OF REPLACEMENT FOR THE D'305?

9    THOSE ARE THE ICONS?

10   A.   I DID.

11   Q.   AND WHAT DID YOU CALCULATE?

12   A.   $1,152, WHICH IS ONLY THREE DAYS OF WORK TO BASICALLY

13   REDESIGN THE SOFTWARE, THE GRAPHICAL USER INTERFACE.

14   Q.   AND DURING THE TIME FRAME, WERE THERE PHONES THAT HAD

15   ICONS THAT DID NOT INFRINGE?

16   A.   THAT'S MY UNDERSTANDING.

17   Q.   AT THE SAME TIME FRAME?

18   A.   AT THE SAME TIME FRAME.

19        MR. PRICE:  OKAY.  ONE MOMENT, YOUR HONOR.

20        (PAUSE IN PROCEEDINGS.)

21        MR. PRICE:  NOTHING FURTHER, YOUR HONOR.

22        THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:02.

23        MR. LEE:  CAN WE HAVE A MINUTE TO SET UP, YOUR HONOR?

24        THE COURT:  THAT'S FINE.

25        IF YOU WANT TO TAKE A MOMENT TO STRETCH, PLEASE DO SO OR
```

```
1     GET SOME WATER.

2          (PAUSE IN PROCEEDINGS.)

3               THE COURT:  ALL RIGHT.  WOULD EVERYONE PLEASE TAKE A

4     SEAT?

5          ALL RIGHT.  IT IS 4:04.  GO AHEAD, PLEASE.

6                       CROSS-EXAMINATION

7     BY MR. LEE:

8     Q.   GOOD AFTERNOON, MR. WAGNER.

9     A.   GOOD AFTERNOON, MR. LEE.

10    Q.   LET'S SEE IF WE CAN GET A FEW AREAS OF AGREEMENT DOWN.

11         YOU AGREE THAT SAMSUNG HAS BEEN FOUND TO INFRINGE FIVE

12    APPLE PATENTS; CORRECT?

13    A.   I DO.

14    Q.   YOU AGREE THAT 13 PRODUCTS THAT ARE AT ISSUE BEFORE THIS

15    JURY INFRINGE AT LEAST ONE OF THOSE PATENTS; CORRECT?

16    A.   THAT IS CORRECT.

17    Q.   AND IN MOST CASES MORE THAN ONE PATENT; CORRECT?

18    A.   THAT'S TRUE.

19    Q.   AND IN THE CASE OF THE INFUSE 4G, FIVE APPLE PATENTS;

20    CORRECT?

21    A.   THAT'S THE ONLY PRODUCT THAT INFRINGES ALL FIVE PATENTS.

22    Q.   AND YOU ALSO KNOW THAT THE PRIOR JURY FOUND ALL FIVE OF

23    THOSE PATENTS TO HAVE BEEN VALIDLY ISSUED BY THE UNITED STATES

24    PATENT OFFICE; CORRECT?

25    A.   OTHERWISE WE WOULDN'T BE HERE, I AGREE WITH THAT.
```

1    Q.   RIGHT.  BECAUSE THE PATENTS HAVE BEEN FOUND VALID AND

2    INFRINGED; CORRECT?

3    A.   CORRECT.

4    Q.   SO WHAT YOU AND I ARE GOING TO TALK ABOUT IS HOW MUCH

5    COMPENSATION SHOULD BE PAID FOR SAMSUNG'S INFRINGEMENT;

6    CORRECT?

7    A.   CORRECT.

8    Q.   SO LET'S TALK ABOUT AND HELP THE JURY WITH THE NUMBER OF

9    ACTS OF INFRINGEMENT THAT WERE FOUND BY THE PRIOR JURY.

10        OF THE SAMSUNG PRODUCTS FOUND TO INFRINGE, 12 ARE

11   SMARTPHONES; CORRECT?

12   A.   CORRECT.

13   Q.   ONE IS A LAPTOP, A TABLET COMPUTER; CORRECT?

14   A.   YES.

15   Q.   SO LET'S FOCUS ON THE SMARTPHONES FIRST; CORRECT?

16        THERE ARE 10.7 MILLION INFRINGING PHONES THAT WERE SOLD BY

17   SAMSUNG; CORRECT?

18   A.   THAT'S MY CALCULATION.

19   Q.   AND IT'S ALSO MS. DAVIS'S CALCULATION; CORRECT?

20   A.   IT IS.

21   Q.   THERE'S NO DISAGREEMENT BETWEEN YOU, 10.7 MILLION ACTS OF

22   INFRINGEMENT BY SMARTPHONES; CORRECT?

23   A.   IF YOU CONSIDER EACH SALE AN ACT OF INFRINGEMENT, YOU ARE

24   CORRECT.

25   Q.   AND YOU AND MS. DAVIS AGREE UPON THAT?

```
1    A.   WE DO.

2    Q.   NOW, FOR THAT 10.7 MILLION ACTS OF INFRINGEMENT, SAMSUNG

3    COLLECTED $3.4 BILLION IN REVENUE; CORRECT?

4    A.   BASED ON MY CALCULATION, I AGREE WITH YOU.

5    Q.   YEAH.  AND YOU HEARD MR. MCELHINNY TALK ABOUT THOSE

6    FIGURES IN HIS OPENING; CORRECT?

7    A.   HE DID.

8    Q.   AND MR. PRICE SUGGESTED IN HIS OPENING THAT THERE WAS SOME

9    DISAGREEMENT.  DO YOU REMEMBER THAT?

10   A.   YEAH.  I THINK THE DISAGREEMENT IS THAT THERE'S ALSO

11   REALLY HOW MANY OF THESE WERE SOLD WERE REVENUES FOR THE ONES

12   THAT ARE THE SUBJECT OF THE DESIGN PATENT.

13   Q.   BUT IF WE'RE TALKING ABOUT ALL OF THE ACTS OF

14   INFRINGEMENT, 10.7 MILLION, $3.4 BILLION, OR SO, IS THE RIGHT

15   NUMBER; CORRECT?

16   A.   YES.

17   Q.   AND FOR THE TABLET COMPUTERS, 725,000 TABLETS WERE SOLD;

18   CORRECT?

19   A.   I BELIEVE THAT'S CORRECT.

20   Q.   YOU AND MS. DAVIS AGREE; CORRECT?

21   A.   WE DO.

22   Q.   EACH AN ACT OF INFRINGEMENT; CORRECT?

23   A.   YES.

24   Q.   AND SAMSUNG COLLECTED $325 MILLION IN REVENUE; CORRECT?

25   A.   THAT IS CORRECT.
```

1    Q.   SO JUST TO PUT THINGS IN CONTEXT, YOUR TOTAL $52 MILLION

2    IN DAMAGES WOULD ALLOW SAMSUNG TO KEEP ABOUT 99.5 PERCENT OF

3    ALL THE REVENUES IT COLLECTED FOR INFRINGING THESE PATENTS;

4    CORRECT?

5    A.   WELL, BASED ON YOUR CALCULATION, I DON'T THINK THAT'S A

6    RELEVANT CALCULATION.  WE SHOULD BEGIN FOCUSSING ON THAT

7    SMALLER NUMBER OF THESE PHONES THAT ARE SOLD THAT ARE

8    INFRINGING ONLY THE DESIGN PATENT.

9    Q.   IS THAT CALCULATION CORRECT?

10   A.   I HAVEN'T -- I HAVE NO REASON TO DOUBT YOUR CALCULATION.

11   Q.   ALL RIGHT.  NOW, ACTUALLY, YOU STATED YOU HAD MANY

12   DISAGREEMENTS WITH MS. DAVIS.  CORRECT?

13   A.   THERE ARE A NUMBER OF DISAGREEMENTS.

14   Q.   BUT YOU KNOW HER; CORRECT?

15   A.   I DO.

16   Q.   YOU KNOW HER AS A VERY WELL RESPECTED AND WELL RECOGNIZED

17   PRACTITIONER IN YOUR FIELD; CORRECT?

18   A.   I HAVE A VERY HIGH PERSONAL AND PROFESSIONAL REGARD FOR

19   MS. DAVIS.

20   Q.   AND SO IF SOMEONE WERE TO SUGGEST THAT SOMETHING IN HER

21   BACKGROUND DIDN'T QUALIFY HER TO RENDER THE OPINIONS THAT SHE

22   GAVE HERE, YOU WOULDN'T AGREE WITH THAT, WOULD YOU?

23   A.   I WOULDN'T AGREE WITH THAT AS A DAMAGE EXPERT.

24   Q.   RIGHT.  YOU JUST HAPPEN TO DISAGREE ON THE MERITS OF SOME

25   OF THE DISCUSSIONS?

```
 1        A.   WE JUST HAVE PROFESSIONAL DISAGREEMENTS.

 2        Q.   ALL RIGHT.  NOW, BEFORE I -- I'M GOING TO GET INTO THE

 3     DETAILS, AS MUCH AS I CAN TODAY, BUT I'D LIKE TO PUT IN CONTEXT

 4     FOR THE JURY YOUR OPINIONS.

 5             YOU JUST TOLD THE JURY THAT A REASONABLE ROYALTY FOR THE

 6     THREE UTILITY PATENTS -- THAT'S THE '163; CORRECT?

 7        A.   THAT'S ONE OF THE THREE.

 8        Q.   YEAH.  THERE ARE THREE; RIGHT?

 9        A.   YES.

10        Q.   AND TO SAVE TIME, THERE ARE THREE UTILITY PATENTS;

11     CORRECT?

12        A.   YES.

13        Q.   YOU AWARD ZERO LOST PROFITS; CORRECT?

14        A.   I DO.

15        Q.   YOU AWARD ONLY A REASONABLE ROYALTY; CORRECT?

16        A.   THAT'S CORRECT.

17        Q.   IT'S ABOUT $28,000; CORRECT?

18        A.   ROUNDING UP, YES.

19        Q.   SO THE LADIES AND GENTLEMEN OF THE JURY UNDERSTAND, THAT

20     COVERS 9.8 MILLION INFRINGING SALES, DOESN'T IT?

21        A.   I THINK THAT'S PROBABLY CORRECT.

22        Q.   IT COVERS $3.1 BILLION IN REVENUES TO SAMSUNG; CORRECT?

23        A.   I WOULD NOT DISAGREE WITH THAT NUMBER.

24        Q.   RIGHT.  AND YOU THINK THAT THE REASONABLE ROYALTY FOR THAT

25     INFRINGEMENT OF THOSE UTILITY PATENTS SHOULD BE $28,000?
```

```
 1     A.   I DO BASED ON THE NEXT BEST ALTERNATIVE.

 2     Q.   ALL RIGHT.  NOW, LET'S PUT THAT IN CONTEXT.

 3          AS OF AUGUST 20TH, 2013, YOU HAD BEEN PAID $1.7 MILLION BY

 4     SAMSUNG, HADN'T YOU?

 5     A.   I HADN'T.  MY FIRM BILLED THEM AND I BELIEVE WE COLLECTED

 6     THOSE BILLINGS.

 7     Q.   AND SINCE AUGUST 20TH THROUGH TODAY, YOU'VE BILLED ANOTHER

 8     QUARTER MILLION DOLLARS OR SO; CORRECT?

 9     A.   NO.  I KNEW YOU'D BE ASKING THIS, SO I DECIDED TO TELL YOU

10     WHAT IT IS.  THROUGH OCTOBER 31ST, WE BILLED $1,897,816.

11     Q.   GOOD.

12     A.   5,554 HOURS OF WORK.

13     Q.   LET'S CALL IT $1.9 MILLION; CORRECT?

14     A.   WE CAN DO THAT.

15     Q.   SO YOUR $28,000 IS A HYPOTHETICAL NUMBER; CORRECT?  IT'S

16     WHAT SOMEONE COULD HAVE DONE IF THEY HAD HAPPENED TO DESIGN

17     AROUND; CORRECT?

18     A.   YES.

19     Q.   YOU'RE NOT SUGGESTING TO THE LADIES AND GENTLEMEN OF THE

20     JURY THAT SAMSUNG, IN FACT, DID THAT?

21     A.   NO, I'M NOT DOING THAT.

22     Q.   SO YOUR BELIEF IS THAT SAMSUNG COULD HAVE AVOIDED ALL OF

23     THESE PROBLEMS ON THE UTILITY PATENTS FOR $28,000?

24     A.   I DO IF THE ASSUMPTIONS I'VE BEEN GIVEN ARE CORRECT.

25     Q.   SO LET'S NOW TALK ABOUT SOME OF THE FACTORS THAT GO INTO
```

```
 1      YOUR OPINION AND LET'S TALK ABOUT SOME OF THESE DOCUMENTS THAT

 2      YOU ACTUALLY HAVE SEEN.  OKAY?

 3           NOW, YOU AGREE WITH ME THAT DEMAND FOR THE PATENTED

 4      PRODUCT IS RELEVANT BOTH TO LOST PROFITS AND TO REASONABLE

 5      ROYALTY; CORRECT?

 6      A.   I DO.

 7      Q.   YOU WOULD AGREE WITH ME THAT THE QUESTION OF WHETHER

 8      SOMEONE HAS COPIED THE PRODUCT IS RELEVANT TO AT LEAST

 9      REASONABLE ROYALTY; CORRECT?

10           MR. PRICE:  OBJECTION, YOUR HONOR.  THAT'S NOT, IF I

11      RECALL, NOT PART OF THE CASE.

12           MR. LEE:  WELL --

13           THE COURT:  OVERRULED.

14           GO AHEAD, PLEASE.

15      BY MR. LEE:

16      Q.   ISN'T THAT RELEVANT?

17      A.   I DON'T THINK SO.  IN FACT, I THINK I TOLD YOUR PARTNER,

18      MR. QUARREL, AT MY DEPOSITION, AS A DAMAGES EXPERT, I DON'T

19      DEAL WITH COPYING.

20      Q.   HAVE YOU EVER HEARD THE GEORGIA PACIFIC FACTORS?

21      A.   MANY TIMES.

22      Q.   HAVE YOU HEARD OF FACTOR NUMBER 11, WHICH IS, QUOTE, "THE

23      EXTENT TO WHICH THE INFRINGER HAS MADE USE OF THE INVENTION"?

24      A.   RIGHT.  BUT I -- THE USE THAT I THINK IS HOW DID THEY USE

25      IT IN THE MARKETPLACE?  DID THEY USE IT TO SELL THEIR PHONES?
```

```
1     WAS IT A GREAT NEW FEATURE?

2          THAT'S THE USE THAT I ADDRESS IN G.P. FACTOR NUMBER 11.

3     Q.   YOU THINK IT HAS NOTHING TO DO WITH WHETHER THE INFRINGER

4     HAS ACTUALLY COPIED THE INVENTION AND PUT IT IN THEIR PRODUCTS?

5     IS THAT YOUR TESTIMONY?

6     A.   YEAH.  I'VE ALWAYS BELIEVED THAT DEALT WITH THE

7     WILLFULNESS ISSUE THAT I'VE NEVER BEEN ASKED TO ADDRESS.

8     Q.   SO YOUR BELIEF IS AND YOUR OPINIONS ARE PREDICATED UPON A

9     FACT THAT HOW SAMSUNG GOT THE FEATURES OF THE PATENTS NOW FOUND

10    TO INFRINGE INTO THE PRODUCTS IS IRRELEVANT TO THE ISSUES

11    BEFORE YOU?

12    A.   RIGHT.  BECAUSE THEN I'D BE DOING A WILLFULNESS OPINION,

13    AND I DON'T THINK THAT'S MY PREROGATIVE AS A DAMAGES EXPERT.

14    Q.   I'M NOT ASKING YOU TO DO A WILLFULNESS OPINION.  MY

15    QUESTION IS SIMPLY THIS:  YOU DIDN'T CONSIDER THAT AT ALL, DID

16    YOU?

17    A.   I DID NOT.

18    Q.   RIGHT.  SO YOU DO KNOW THAT DEMAND FOR THE PATENTED

19    FEATURES IS RELEVANT; CORRECT?

20    A.   THAT'S WHAT'S MOST RELEVANT.

21    Q.   YOU KNOW THAT DEMAND FOR THE PATENTED PRODUCTS IS

22    RELEVANT, CORRECT?

23    A.   UNDER PANDUIT FACTOR NUMBER 1, IT CLEARLY IS.

24    Q.   YOU KNOW THAT THE UTILITY AND ADVANTAGES OF THE INVENTION

25    ARE RELEVANT; CORRECT?
```

1      A.   I AGREE.

2      Q.   YOU KNOW THAT THE COMMERCIAL SUCCESS OF PRODUCTS

3      INCORPORATING THE INVENTIONS ARE RELEVANT; CORRECT?

4      A.   THAT'S G.P. FACTOR NUMBER 8, AND I AGREE WITH YOU.

5      Q.   AND I'M GOING TO QUOTE AGAIN TO YOU, AND YOU KNOW, BECAUSE

6      HER HONOR, WE EXPECT, WILL INSTRUCT THE JURY ON THIS, THAT THE

7      EXTENT TO WHICH THE INFRINGER HAS MADE USE OF THE INVENTION IS

8      ONE OF THE GEORGIA-PACIFIC FACTORS; CORRECT?

9      A.   IT IS.

10     Q.   ALL RIGHT.  SO LET'S LOOK AT HOW YOU DETERMINE DEMAND FOR

11     PATENTED PRODUCTS, OKAY, DEMAND FOR PATENTED FEATURES, AND

12     WHETHER THE INFRINGER HAS INCORPORATED OR USED THE INVENTION.

13     OKAY?

14          YOU WOULD AGREE WITH ME THAT INFORMATION THAT YOU MIGHT

15     WANT TO CONSIDER IS WHAT CONSULTANTS THAT SAMSUNG HIRED BEFORE

16     THIS LITIGATION TOLD SAMSUNG WERE IMPORTANT FEATURES TO HAVE IN

17     ITS PRODUCTS; CORRECT?

18     A.   I THINK THAT'S RELEVANT.

19     Q.   YOU WOULD AGREE THAT WHAT SAMSUNG EXECUTIVES TOLD THEIR

20     OWN DESIGNERS WERE IMPORTANT WOULD BE RELEVANT; CORRECT?

21     A.   I THINK THAT'S RELEVANT INFORMATION.

22     Q.   BUT WHEN YOU FORMED YOUR OPINIONS, YOU DIDN'T ASK TO SEE

23     WHAT SAMSUNG EXECUTIVES HAD TOLD SAMSUNG ENGINEERS AND

24     EMPLOYEES ABOUT APPLE'S PRODUCTS, DID YOU?

25     A.   THAT IS CORRECT.  I DID NOT SEE THAT INFORMATION WHEN I

1      RENDERED MY OPINION.

2      Q.   AND THE REASON YOU DIDN'T IS YOU RELIED UPON THE LAWYERS

3      TO GIVE YOU THE DOCUMENTS THAT YOU USED TO RENDER YOUR OPINION;

4      CORRECT?

5      A.   NO, THAT'S NOT TRUE.  IN FACT, IN MY DEPOSITION WHEN I WAS

6      ASKED, HAVE YOU SEEN THESE DOCUMENTS BEFORE, THEY WERE ON MY

7      DOCUMENTS CONSIDERED LIST.

8          I DIDN'T LOOK AT THEM BECAUSE I THOUGHT THE MORE RELEVANT

9      INFORMATION IS WHAT IS HAPPENING IN THE MARKETPLACE, WHAT

10     CONSUMERS WANT, NOT WHAT SOME ENGINEERS AT SAMSUNG WANTED.

11     Q.   WELL, MR. WAGNER, YOU JUST TOLD ME THAT DEMAND FOR THE

12     PATENTED PRODUCT IS RELEVANT; CORRECT?

13     A.   OH, THAT'S -- CLEARLY.  THERE'S NO DISPUTE.  I AGREE THAT

14     THERE'S DEMAND FOR THE PATENTED PRODUCT.

15     Q.   MR. WAGNER, DEMAND FOR THE PATENTED FEATURE IS RELEVANT;

16     CORRECT?

17     A.   ABSOLUTELY.

18     Q.   THE GEORGIA PACIFIC FACTORS ARE RELEVANT; CORRECT?

19     A.   EVERY ONE OF THEM.

20     Q.   AND YOU JUST TOLD ME FIVE MINUTES AGO THAT WHAT SAMSUNG

21     EXECUTIVES ARE TELLING THEIR OWN EMPLOYEES ABOUT WHAT SHOULD GO

22     IN THEIR PRODUCT IS RELEVANT TO THOSE ISSUES; CORRECT?

23     A.   I SAID IT ONCE AND I'LL SAY IT AGAIN.  YES.

24     Q.   ALL RIGHT.  SO LET'S LOOK AT WHAT SAMSUNG EXECUTIVES WERE

25     TELLING SAMSUNG EMPLOYEES ABOUT WHAT SHOULD BE PUT INTO THEIR

1      PRODUCTS.

2          YOU DON'T DISPUTE THAT SAMSUNG STUDIED THE IPHONE WHEN

3      DEVELOPING THE INFRINGING PHONES; CORRECT?

4      A.   I DO NOT.

5      Q.   AND YOU'VE ACTUALLY LOOKED AT THE DOCUMENTS THAT WOULD

6      TAKE YOU CHRONOLOGICALLY THROUGH THE PROCESS OF WHAT SAMSUNG

7      DID; CORRECT?

8      A.   YES.

9      Q.   TURN IN THE BINDER, IF YOU WOULD, TO VOLUME 6 -- VOLUME 1,

10     TAB 6.  AND WE'VE DONE THIS A LITTLE DIFFERENT THAN MR. PRICE

11     HAS DONE.  I'M GOING TO GIVE YOU A TAB NUMBER AND THEN I'LL

12     TELL WHAT YOU THE EXHIBIT IS.  IT'LL BE A LITTLE EASIER TO MOVE

13     ALONG.

14     A.   THANK YOU.  THAT'S A LOT EASIER.

15     Q.   OKAY.  THANK YOU.  I HOPE SO.

16         SO TURN, IF YOU WOULD, TO PX 34.  VOLUME 1, TAB 6.

17         DO YOU HAVE THAT IN FRONT OF YOU?

18     A.   I DO.

19     Q.   ALL RIGHT?  SO NOW WE'RE IN 2007; CORRECT?

20     A.   CORRECT.

21     Q.   AND THE DATE OF THIS DOCUMENT IS SEPTEMBER OF 2007;

22     CORRECT?

23     A.   IT IS.

24     Q.   YOU KNOW WHAT LSI SYSTEM, OR SYSTEM LSI IS, DON'T YOU?

25     A.   YEAH.  IT'S A PART OF SAMSUNG THAT DOESN'T MAKE

1    SMARTPHONES.  THEY MAKE COMPONENTS FOR SMARTPHONES.

2        IN FACT, THEY'RE THE PART OF SAMSUNG THAT SUPPLIES

3    COMPONENTS TO APPLE.

4    Q.   RIGHT.  THAT WAS MY NEXT QUESTION.  THIS IS THE GROUP OF

5    PEOPLE WHO ACTUALLY ARE SUPPLYING PARTS TO APPLE; CORRECT?

6    A.   CORRECT.

7    Q.   NOW, YOU KNOW THAT THE IPHONE WAS INTRODUCED IN JULY OF

8    2007; CORRECT?

9    A.   I DO.

10   Q.   WE'RE NOW IN SEPTEMBER 2007; CORRECT?

11   A.   IN THIS DOCUMENT WE ARE.

12   Q.   YEAH.  WE'RE LOOKING AT A DOCUMENT PREPARED BY THE GROUP

13   OF PEOPLE WHO ARE SUPPLYING COMPONENTS TO APPLE; CORRECT?

14   A.   YES.

15   Q.   TURN, IF YOU WOULD, TO PAGE 34.37.

16       NOW, THE JURY HAS SEEN THIS BEFORE, AND I'M NOT GOING TO

17   GO THROUGH ALL OF THE SAME PORTIONS THEY'VE SEEN BEFORE, BUT

18   YOU SEE THE IPHONE EFFECT ANALYSIS?

19   A.   I DO.

20   Q.   NOW, IN THE MIDDLE OF THE PAGE, THERE IS A STATEMENT WHICH

21   WE HAVEN'T FOCUSSED ON BEFORE, AND IF I CAN BRING IT UP, IT

22   SAYS, "HW PORTION:  EASY IMITATION."  CORRECT?

23   A.   THAT'S WHAT IT SAYS.

24   Q.   YOU UNDERSTAND THAT WHAT THE SAMSUNG FOLKS WERE TALKING

25   ABOUT IS THE HARDWARE OF THE APPLE IPHONE; CORRECT?

```
 1      A.   THAT WOULD BE MY ASSUMPTION.

 2      Q.   AND WHAT THEY SAID BACK IN SEPTEMBER 2007 IS "EASY

 3   IMITATION."  CORRECT?

 4      A.   THAT'S WHAT THIS LINE SAYS.

 5      Q.   TURN, IF YOU WOULD, TO THE NEXT PAGE.  NOW, THE AUTHORS OF

 6   THE DOCUMENT, THE SAMSUNG AUTHORS, THEN IDENTIFIED THE FACTORS

 7   THAT COULD MAKE THE IPHONE A SUCCESS.

 8        DO YOU SEE THAT?

 9      A.   I DO.

10      Q.   AND THE FIRST FACTOR LISTED -- ARE YOU WITH ME?

11      A.   I AM.

12      Q.   OKAY.  AND IF I GO TOO FAST --

13      A.   I CAN MULTITASK.

14      Q.   IF I GO TOO FAST, YOU LET ME KNOW, OKAY?  BECAUSE IT'S

15   IMPORTANT THAT WE BOTH BE ON THE SAME PAGE, AS WELL AS THE

16   COURT AND THE JURY.

17      A.   THANK YOU.

18      Q.   THE FIRST BULLET POINT IS "EASY AND INTUITIVE U/I."

19        DO YOU SEE THAT?

20      A.   I DO.

21      Q.   THAT MEANS USER INTERFACE?

22      A.   IT DOES TO ME.

23      Q.   "THAT COVERS ALL USER CLASSES, INCLUDING MALE, FEMALE, OLD

24   AND YOUNG."  CORRECT?

25      A.   YES.
```

1    Q.   AND THE SECOND FACTOR THAT THE SAMSUNG EMPLOYEES

2    IDENTIFIED FOR THE IPHONE SUCCESS WAS "A BEAUTIFUL DESIGN."

3    CORRECT?

4    A.   YES.

5    Q.   NOW, THERE IS, IN THIS DOCUMENT, AN IDENTIFICATION OF SOME

6    OF THE THINGS THAT COULD CAUSE THE IPHONE TO FAIL; CORRECT?

7    A.   I BELIEVE THERE IS.

8    Q.   YOU RECALL THAT, DON'T YOU?

9    A.   I DO.

10   Q.   RIGHT.  AND YOU KNOW THAT SAMSUNG WAS TRYING TO FIGURE

11   OUT, BACK IN 2007, IS THE IPHONE GOING TO SUCCEED OR IS IT

12   GOING TO FAIL; CORRECT?

13   A.   RIGHT.  BECAUSE THESE PEOPLE NEED TO KNOW HOW MANY

14   COMPONENTS THEY'RE GOING TO HAVE TO SUPPLY TO APPLE, SO THEY'RE

15   TRYING TO FIGURE OUT HOW SUCCESSFUL APPLE IS GOING TO BE.

16   Q.   SO THEY'RE TRYING TO FIGURE OUT WHETHER THE IPHONE IS

17   GOING TO BE A SUCCESS, AND THEY'RE NOT SO SURE; CORRECT?

18   A.   I DON'T KNOW IF I WOULD GO TO THAT EXTENT, BUT THEY

19   REALIZED IT'S VERY EARLY IN THE PRODUCT LIFE AND IT MAY NOT BE

20   A PHENOMENAL SUCCESS IN THE LONG RUN.

21   Q.   SO YOU AGREE, THERE ARE THE POSSIBILITY OF SUCCESS, THE

22   POSSIBILITY OF FAILURE; CORRECT?

23   A.   AS OF THIS DATE, THAT'S CORRECT.

24   Q.   YES, THAT'S NEXT QUESTION.  SO LET'S WIND THE MOVIE

25   FORWARD.  LET'S GO TO EARLY 2010.  ALL RIGHT?

1          LET'S LOOK AT ANOTHER DATE.  TURN, IF YOU WOULD, TO TAB 7,

2    WHICH IS PX 40.  YOU HAVE SEEN THIS BEFORE, HAVE YOU NOT?

3    A.   I SEEN THIS BEFORE.

4    Q.   NOW, THIS IS ALMOST 15 MONTHS AFTER THE LAST DOCUMENT WE

5    LOOKED AT; CORRECT?

6    A.   YES.

7    Q.   IT IS BEFORE SAMSUNG LAUNCHED THE PRODUCTS THAT ARE

8    ACCUSED OF INFRINGING IN THIS CASE?

9    A.   THAT'S AN ACCURATE STATEMENT.

10   Q.   ALL RIGHT.  NOW, LET'S SEE HOW THE VIEWS OF SAMSUNG HAVE

11   CHANGED IN THESE 14 OR 15 MONTHS.

12        LET ME WITHDRAW THAT AND SAY THIS:  DURING THAT 14 OR 15

13   MONTHS, YOU KNOW FROM YOUR ANALYSIS AND STUDY OF THE CASE THAT

14   IT BECAME CLEAR THAT THE IPHONE WAS GOING TO BE AN ENORMOUS

15   SUCCESS; CORRECT?

16   A.   I AGREE WITH THAT.

17   Q.   YOU AGREE THAT IT, IN FACT, REVOLUTIONIZED THE SMARTPHONE

18   MARKET; CORRECT?

19   A.   I WOULD AGREE WITH THAT STATEMENT.

20   Q.   ALL RIGHT.  A REVOLUTION; CORRECT?

21   A.   YES.

22   Q.   SO NOW LET'S GO BACK AND SEE HOW THAT REVOLUTION AFFECTED

23   THE VIEWS OF SAMSUNG EXECUTIVES.

24        TURN, IF YOU WOULD, TO THE FIRST PAGE, AND IT'S CALLED --

25   THE E-MAIL CHAIN IS DESCRIBED AS "SUMMARY OF EXECUTIVE LEVEL

1    MEETINGS SUPERVISED BY HEAD OF DIVISION."

2        DO YOU SEE THIS?

3    A.   I DO.

4    Q.   AND THE PEOPLE ON THIS E-MAIL ARE THE MOST SENIOR SAMSUNG

5    EXECUTIVES; CORRECT?

6    A.   I BELIEVE THAT'S CORRECT.  I'M NOT CERTAIN OF THAT FACT.

7    Q.   ONE OF THE PEOPLE IDENTIFIED IN JK SHIN, S-H-I-N; CORRECT?

8    A.   YES.

9    Q.   YOU KNOW THAT HE WAS THE HEAD OF SAMSUNG'S MOBILE DIVISION

10   WORLDWIDE?

11   A.   HE WAS.

12   Q.   SO LET'S SEE WHAT HE'S REPORTING NOW IN EARLY 2010.

13       TURN, IF YOU WOULD, TO PAGE 40.2, AND IN THE MIDDLE OF THE

14   PAGE YOU'LL SEE MR. SHIN REPORTING, OR SAYING, QUOTE, "ALL THE

15   CARRIERS TELL ME, HEY JK, YOUR PHONES HAVE GREAT TECHNOLOGICAL

16   PROWESS AND EVERYTHING'S GREAT.  BUT IT'S HARD TO SELL THEM AS

17   HIGH-END PHONES."

18       DO YOU SEE THAT?

19   A.   I DO.

20   Q.   MR. SHIN GOES ON TO SAY, QUOTE, "I HEAR THINGS LIKE:

21   LET'S MAKE SOMETHING LIKE THE IPHONE."  CORRECT?

22   A.   THAT'S WHAT THAT SENTENCE SAYS.

23   Q.   AND THEN MR. SHIN, THE HEAD OF MOBILE FOR ALL OF SAMSUNG

24   WORLDWIDE, GOES ON TO SAY, "WHEN EVERYBODY (BOTH CONSUMERS AND

25   THE INDUSTRY) TALK ABOUT UX" -- THAT'S USER EXPERIENCE;

WAGNER CROSS

```
 1        CORRECT?

 2        A.   YES.

 3        Q.   -- "THEY WEIGH IT AGAINST THE IPHONE.  THE IPHONE HAS

 4        BECOME THE STANDARD."

 5             CORRECT?

 6        A.   THAT'S CORRECT.

 7        Q.   NOW, IF YOU SKIP DOWN A LITTLE FURTHER, MR. SHIN TELLS HIS

 8        EMPLOYEES MORE.  SAME PAGE.  DO YOU SEE THE SENTENCE, THE

 9        PARAGRAPH THAT BEGINS "DO YOU KNOW HOW DIFFICULT"?

10        A.   I SEE THAT, YES.

11        Q.   QUOTE, "DO YOU KNOW HOW DIFFICULT THE OMNIA IS TO USE?

12        WHEN YOU COMPARE THE 2007 VERSION OF THE IPHONE WITH OUR

13        CURRENT OMNIA, CAN YOU HONESTLY SAY THE OMNIA IS BETTER?  IF

14        YOU COMPARE THE UX OF THE IPHONE, IT'S A DIFFERENCE BETWEEN

15        HEAVEN AND EARTH."

16             DO YOU SEE THAT?

17        A.   I DO.

18        Q.   NOW, MR. PRICE ASKED MS. DAVIS A QUESTION ABOUT THE OMNIA

19        YESTERDAY.  DO YOU REMEMBER THAT?

20        A.   I DO.

21        Q.   AND I THINK MR. PRICE SUGGESTED THAT IT WAS AN

22        UNSUCCESSFUL AND INADEQUATE PHONE.

23        A.   IT WAS A WINDOWS-BASED OPERATING SYSTEM THAT DID NOT WORK

24        WELL.

25        Q.   SO LET'S BE SURE WHAT HAPPENED AS A RESULT OF WHAT
```

```
1       MR. PRICE SAID.

2           SAMSUNG IS WORKING WITH THE OMNIA, A WINDOWS-BASED PHONE;

3       CORRECT?

4       A.   YES.

5       Q.   THEY CONCLUDE THAT THE DIFFERENCE BETWEEN THAT PHONE THAT

6       THEY'D BEEN WORKING ON, RIGHT, AND THE IPHONE IS A DIFFERENCE

7       BETWEEN HEAVEN AND EARTH; CORRECT?

8       A.   THAT'S WHAT THIS SAYS.

9       Q.   AND THEN THREE MONTHS LATER, THE GALAXY EMERGES; CORRECT?

10      A.   THAT SOUNDS RIGHT.

11      Q.   NOW, MR. WAGNER, DO YOU KNOW -- YOU WERE HERE DURING THE

12      TESTIMONY OF MR. SCHILLER; CORRECT?

13      A.   I WAS.

14      Q.   YOU HEARD HIM TALK ABOUT THE THREE YEARS THAT THE APPLE

15      FOLKS WORKED IN SECRET TO DEVELOP THE IPHONE?

16      A.   I DID.

17      Q.   YOU HEARD ABOUT THE RISK; CORRECT?

18      A.   SURE.

19      Q.   IT TOOK SAMSUNG THREE MONTHS TO DEVELOP THE GALAXY, DIDN'T

20      IT?

21      A.   THEY DID.  THIS IS A COMPANY THAT DEVELOPS NEW PHONES

22      EVERY WEEK.

23      Q.   THAT DOCUMENT IS DATED FEBRUARY 2010; CORRECT?

24      A.   OH, THAT'S TRUE.

25      Q.   FROM THE TIME MR. SHIN GIVES THE INSTRUCTIONS THAT WE'VE
```

1    JUST SEEN, IT TAKES AROUND THREE MONTHS AND THEY HAVE A PHONE,

2    THE GALAXY PHONE; CORRECT?

3    A.   YOU'RE MAKING, ASKING ME TO ASSUME A FACT I HAVE NO

4    EVIDENCE ON, AND NEITHER DO YOU, THAT THEY DIDN'T START UNTIL

5    THIS DATE.  THEY MAY HAVE BEEN DESIGNING THAT GALAXY PHONE FOR

6    SOME PERIOD OF TIME BEFORE THIS MEMO.

7    Q.   SO YOU THINK THAT THEY WERE ACTUALLY WORKING ON THE GALAXY

8    PHONE, DESIGNING THE GALAXY PHONE, BUT WHEN THEY WANTED TO

9    COMPARE SOMETHING TO THE IPHONE, THEY PICKED THE OMNIA?

10   A.   THAT WAS ON THE MARKET AT THE TIME, YES.  THE GALAXY WAS

11   NOT.  HOW COULD YOU MAKE ANY COMPARISON?

12   Q.   NOW, TELL ME, WAS THE GALAXY UNDER DEVELOPMENT ON THE DATE

13   OF THIS HEAVEN AND EARTH E-MAIL?

14   A.   I DON'T KNOW.  AND I TOLD YOU, I HAVE NO --

15            MR. PRICE:  OBJECTION, YOUR HONOR.  THERE'S NO

16   FOUNDATION.

17            MR. LEE:  I JUST ASKED HIM IF HE KNEW.

18            THE COURT:  OVERRULED.

19       GO AHEAD.

20   BY MR. LEE:

21   Q.   NOW, LET'S GO TO PAGE 40.4.  AND DO YOU SEE SOMETHING THAT

22   SAYS "SUMMARY OF COMMENTS OF THE HEAD OF THE DIVISION"?

23   A.   I DO.

24   Q.   ALL RIGHT.  NOW, LET'S LOOK AT 40.5 AND LET'S SEE WHAT

25   MR. SHIN, THE HEAD OF THE DIVISION, GAVE AS INSTRUCTIONS TO

```
 1        FOLKS.  OKAY?

 2             AT 40.5, MR. SHIN SAYS, QUOTE, "I HAVE CONFIDENCE," AND

 3        I'LL HIGHLIGHT THIS FOR YOU, "I HAVE CONFIDENCE IN OUR

 4        PRODUCTS.  H/W" -- THAT'S HARDWARE; CORRECT?

 5        A.   YES.

 6        Q.   -- "IN THEIR EXTERIOR DESIGN AND IN THEIR QUALITY.  BUT

 7        WHEN IT COMES TO THE EASE OF OUR UX, I LACK SUCH CONFIDENCE.

 8             "INFLUENTIAL FIGURES OUTSIDE THE COMPANY COME ACROSS THE

 9        IPHONE, AND THEY POINT OUT THAT 'SAMSUNG IS DOZING OFF.'"

10             THAT'S WHAT MR. SHIN TOLD HIS EMPLOYEES BACK IN FEBRUARY

11        OF 2010; CORRECT?

12        A.   HE DID.

13        Q.   NOW, LAST PORTION OF THIS I WANT TO FOCUS ON, THE SAME

14        PAGE, THE PARAGRAPH BEGINS "ALL THIS TIME."

15             "ALL THIS TIME, WE'VE BEEN PAYING ALL OUR ATTENTION TO

16        NOKIA, AND CONCENTRATED OUR EFFORTS ON THINGS LIKE FOLDER, BAR,

17        SLIDE, YET WHEN OUR UX IS COMPARED TO THE UNEXPECTED COMPETITOR

18        APPLE'S IPHONE, THE DIFFERENCE IS TRULY THAT OF HEAVEN AND

19        EARTH.

20             "IT'S A CRISIS OF DESIGN."

21             DO YOU SEE THAT?

22        A.   I DO.

23        Q.   NOW, REMEMBER I ASKED YOU BACK IN SEPTEMBER OF 2007

24        WHETHER THE DOCUMENT YOU AND I LOOKED AT PREDICTED SUCCESS FOR

25        THE IPHONE OR PREDICTED FAILURE?  DO YOU REMEMBER THAT?
```

1    A.   I DON'T THINK THEY'RE PREDICTING.  THEY'RE JUST SAYING

2    HERE ARE POSSIBILITIES.

3    Q.   RIGHT.  BY THIS TIME NOW THEY'RE DESCRIBING APPLE AS THE

4    UNEXPECTED COMPETITOR; CORRECT?

5    A.   CORRECT.

6    Q.   YOU KNOW WHAT THAT MEANS.  IT MEANS THAT SAMSUNG DIDN'T

7    EXPECT THEM TO BE A COMPETITOR; CORRECT?

8    A.   I BELIEVE THAT'S ACCURATE.

9    Q.   AND AS A CONSEQUENCE, MR. SHIN WANTED TO DO SOMETHING;

10   CORRECT?

11   A.   HE WANTED TO MOTIVATE HIS WORKERS, YES.

12   Q.   AND SO WHAT HE DID IS HE TOLD THEM THAT THE TIME HAS COME

13   TO CHANGE OUR METHODS; CORRECT?

14   A.   THAT'S, I THINK, A FAIR ASSESSMENT.

15   Q.   WELL, IT'S MORE THAN A FAIR ASSESSMENT.  FROM THE VERY

16   HIGHEST LEVEL OF SAMSUNG, IT'S IN WRITING.  HE SAYS, IN THIS

17   DOCUMENT, "THE IPHONE'S EMERGENCE MEANS THE TIME WE HAVE TO

18   CHANGE OUR METHOD HAS ARRIVED."  RIGHT?

19   A.   THAT'S ACCURATE.

20   Q.   AND, IN FACT, THAT'S WHAT THEY DID?  IN THE NEXT THREE

21   MONTHS, THEY CHANGED THEIR METHODS, DID THEY NOT?

22   A.   I WOULD ASSUME FROM THAT DAY FORWARD THAT THEY CHANGED

23   THEIR METHODS, YES.

24   Q.   NOW, YOU ACTUALLY KNOW FROM THE DOCUMENTS WHAT THEY DID TO

25   CHANGE THEIR METHODS, TO MOVE FROM THE OMNIA, THIS MICROSOFT

1    PHONE THAT, AS MR. PRICE DESCRIBED IT, WAS AT LEAST

2    UNSUCCESSFUL, YOU'VE LOOKED AT SOME OF THE DOCUMENTS THAT

3    ACTUALLY DESCRIBE WHAT HAPPENED WHEN THEY CHANGED THEIR

4    METHODS; CORRECT?

5    A.   I BELIEVE I DID, BUT YOU'D HAVE TO REFRESH MY

6    RECOLLECTION.

7    Q.   SURE.  TURN, IF YOU WOULD -- AND WE'LL DO THIS ONE

8    DOCUMENT, I'LL TRY TO GET IN, TO START IT AND THEN IT'LL BE

9    4:30.

10        TURN, IF YOU WOULD, TO VOLUME 1, TAB 8.  ARE YOU THERE?

11   A.   I'M THERE.

12   Q.   NOW, WE'RE MOVED ONE MONTH FURTHER FORWARD, MARCH 2ND,

13   2010.  THIS IS PX 44?

14   A.   CORRECT.

15   Q.   THIS IS JUST THREE WEEKS AFTER MR. SHIN HAS GIVEN THE

16   INSTRUCTIONS THAT IT HAS COME TIME TO CHANGE OUR METHODS;

17   CORRECT?

18   A.   YES.

19   Q.   NOW, THIS PRESENTATION COMPARES FEATURES OF SAMSUNG PHONES

20   IN DEVELOPMENT NOW; CORRECT?

21   A.   IT DOES.

22   Q.   AND IT COMPARED THEM TO ONE PHONE, THE IPHONE; CORRECT?

23   A.   THAT'S ACCURATE.

24   Q.   IF YOU TURN TO PAGE 3, IF YOU COULD, AND I'LL PUT IT ON

25   THE SCREEN, WHAT THE SAMSUNG FOLKS SAY IS THERE ARE 126 ISSUES

1       FOUND.

2            DO YOU SEE THAT?

3       A.   I DO.

4       Q.   THAT'S 126 ISSUES COMPARING THE IPHONE TO THE PHONE IN

5       DEVELOPMENT AT SAMSUNG; CORRECT?

6       A.   WELL, THE TWO PHONES.  IT LOOKS LIKE 27 OF THEM RELATED TO

7       THE S1 AND 99 OVERLAPPED WITH THE LISMORE.

8       Q.   OKAY.  SO FAIR ENOUGH.  SO THERE ARE TWO IPHONES BEING

9       COMPARED TO THE IPHONE, AND THERE ARE A VARIETY OF ISSUES?

10      A.   YES.

11      Q.   OKAY.  AT LEAST THE 126 ISSUES; CORRECT?

12      A.   YES.

13      Q.   AND THEN WHAT HAPPENS IS FOR EACH OF THESE 126 ISSUES, AND

14      WE COULD GO THROUGH PAGE BY PAGE BY PAGE, THERE ARE ACTUALLY

15      DIRECTIONS FOR IMPROVEMENTS; CORRECT?

16      A.   THERE IS.

17      Q.   AND THE DIRECTIONS FOR IMPROVEMENTS GO FEATURE BY FEATURE

18      BY FEATURE; CORRECT?

19      A.   RIGHT.  IT SHOWS THERE ARE HUNDREDS OF FEATURES.

20      Q.   RIGHT.  BUT THIS DOCUMENT, THIS SAMSUNG DOCUMENT

21      SPECIFICALLY ADDRESSES THE FEATURES OF THE PATENTS THAT HAD

22      BEEN FOUND TO INFRINGE, DOES IT NOT?

23      A.   I THINK MAYBE ONE OF THE 126 PAGES, OR MAYBE 2, BUT THAT

24      WOULD BE THE MOST.

25      Q.   DO YOU THINK THAT THEY INCLUDED IT IF IT WASN'T IMPORTANT?

1    A.   I WOULD IMAGINE ANYTHING IS IMPORTANT.  BUT WHETHER IT

2    DRIVES DEMAND IS ANOTHER QUESTION.

3    Q.   HAVE YOU SEEN DOCUMENTS FROM SAMSUNG THAT DESCRIBE THE

4    NEED TO EMULATE FEATURES IN THE APPLE PATENTS AND PRODUCTS AS

5    SERIOUS?  HAVE YOU SEEN THOSE?

6    A.   I BELIEVE SO.

7    Q.   YEAH.  NOW, YOU UNDERSTAND WHAT "SERIOUS" MEANS; CORRECT?

8    A.   I THINK I DO.

9    Q.   YEAH.  IT MEANS IMPORTANT; CORRECT?

10   A.   SURE.

11          MR. LEE:  ALL RIGHT.  SO -- YOUR HONOR, I'M JUST

12   GOING TO MOVE TO THE NEXT SPECIFIC PORTION OF THE DOCUMENT.

13   THIS IS A GOOD TIME TO BREAK IF THAT'S ALL RIGHT.

14          THE COURT:  OKAY.  ALL RIGHT.  THE TIME IS NOW 4:29.

15          MR. LEE:  ONE MINUTE OFF.

16          THE COURT:  ALL RIGHT.  I SUSPECT THAT THE EVIDENCE

17   PORTION OF THIS CASE WILL END ON MONDAY AND I MAY BE ABLE TO

18   GIVE YOU THE JURY INSTRUCTIONS AND READ THEM TO YOU AND GIVE

19   THEM TO YOU IN HARD COPY ON MONDAY AND THEN WE WOULD BE CLOSING

20   ON TUESDAY MORNING.

21          EACH SIDE IS ENTITLED TO AN HOUR AND A HALF EACH, AND I

22   WILL GIVE YOU THE OPTION ON THAT DAY OF WHETHER YOU WANT TO GO

23   STRAIGHT THROUGH ALL OF THE CLOSINGS OR WHETHER YOU WOULD LIKE

24   TO TAKE YOUR REGULAR LUNCH BREAK FROM NOON TO ONE.

25          I DON'T THINK WE HAVE TO DECIDE THIS ISSUE RIGHT NOW

```
 1    BECAUSE WE NEED TO SORT OF SEE HOW THE REST OF THE CASE GOES.

 2         THERE IS A POSSIBILITY THAT YOU MAY BE EXCUSED EARLY ON

 3    MONDAY DEPENDING ON WHAT WE NEED TO TAKE CARE OF.  THERE'S

 4    CERTAIN THINGS THAT WE DO HAVE TO TAKE CARE OF OUTSIDE YOUR

 5    PRESENCE TO GET EVERYTHING READY, TO FINALIZE THE FINAL JURY

 6    INSTRUCTIONS AND JUST GET EVERYTHING READY FOR THE CLOSE OF THE

 7    CASE.

 8         BUT IN THE MEANTIME, ENJOY YOUR WEEKEND AND SAME

 9    ADMONITIONS.  PLEASE DO NOT RESEARCH OR DISCUSS THE CASE AND

10    PLEASE KEEP AN OPEN MIND.

11         IF YOU WOULD PLEASE LEAVE YOUR JURY BINDERS IN THE JURY

12    ROOM.

13         ALL RIGHT.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

14         AND YOU MAY STEP DOWN.

15            THE WITNESS:  THANK YOU, YOUR HONOR.

16         (JURY OUT AT 4:31 P.M.)

17            THE COURT:  OKAY.  THE RECORD SHOULD REFLECT ALL THE

18    JURORS HAVE LEFT THE COURTROOM.  YOU MAY TAKE A SEAT.

19         I'LL GIVE YOU YOUR TIME TOTALS.

20         I'M ALSO THINKING THAT I DON'T THINK THAT AN EXTENSIVE

21    FINAL JURY INSTRUCTION CONFERENCE IS NECESSARY BECAUSE THE

22    DISPUTES THAT REMAIN ARE ALL ISSUES THAT WE'VE ALREADY SORT OF

23    COVERED, THE NOTICE DATES, THE DATE OF FIRST INFRINGEMENT, THE

24    DESIGN AROUND START DATE, ET CETERA, SO I WOULD LIKE TO PROPOSE

25    THAT IF WE FILE THIS, THAT YOU BE GIVEN SOME TIME -- LET'S SAY
```

```
1    WE FILE IT ON SUNDAY, FOR EXAMPLE -- THAT YOU BE GIVEN UNTIL

2    MONDAY MORNING AT 10:00 OR 11:00 TO FILE THE OBJECTIONS, AND

3    THEN WE GO FILE AND THEN I'LL READ THE INSTRUCTIONS ON

4    FRIDAY -- PARDON ME -- ON MONDAY AFTERNOON.

5          ANYONE WANT TO BE HEARD ON THAT?

6          MR. LEE:  YOUR HONOR, SO LONG AS THE WRITTEN

7    OBJECTIONS SERVE THE PURPOSE OF THE CHARGING CONFERENCE TO

8    PRESERVE, YOU KNOW, ISSUES, THAT WOULD BE FINE.

9          THE COURT:  WELL, WE MAY JUST DO IT ORALLY.  I JUST

10   DON'T THINK IT'S GOING TO TAKE THAT LONG BECAUSE THE ISSUES

11   THAT YOU RAISE ARE BASICALLY THE ONES THAT WE'VE --

12         MR. LEE:  I THINK THAT'S RIGHT.

13         THE COURT:  -- ALREADY DEALT WITH QUITE EXTENSIVELY,

14   I THINK, ALREADY.

15         MR. LEE:  I THINK THAT'S RIGHT.

16         THE COURT:  DO YOU WANT TO BE HEARD ON THIS,

17   MS. MAROULIS?

18         MS. MAROULIS:  I JUST WANT TO GET THE EXACT SCHEDULE,

19   YOUR HONOR.  WHEN DO YOU WANT THE OBJECTIONS ON MONDAY, WHAT

20   TIME?

21         THE COURT:  YOU MEAN THE MONDAY OBJECTIONS?  I

22   THOUGHT YOU WERE FILING THOSE TONIGHT.

23         MS. MAROULIS:  I'M SORRY.  YOU SAID THE COURT WOULD

24   FILE THE INSTRUCTIONS ON SUNDAY, AND DO YOU NEED ANY ADDITIONAL

25   WORK PRODUCT FROM US OR JUST TALK ON MONDAY?
```

1    THE COURT:  WELL, LET ME -- YOU KNOW, I CERTAINLY

2    DON'T WANT ANOTHER, YOU KNOW, 75 PAGE FILING ON THIS.  A LOT OF

3    THESE ISSUES HAVE BEEN ALREADY RELITIGATED SO MANY TIMES.

4    MS. MAROULIS:  WE CAN DO IT ORALLY, YOUR HONOR.

5    THE COURT:  WHAT WOULD YOU PREFER, JUST TO DO IT

6    ORALLY?  I MEAN, YOU ALREADY HAVE YOUR, YOUR OBJECTIONS IN THE

7    JOINT DISPUTED INSTRUCTIONS.

8    MR. LEE:  CORRECT.

9    THE COURT:  SO YOU CAN CERTAINLY JUST REASSERT THOSE.

10   OR YOU COULD, YOU KNOW, JUST SAY YOU'RE PRESERVING ALL OF THOSE

11   OBJECTIONS.  YOU CERTAINLY WILL HAVE DONE THAT FOR THE RECORD.

12   MR. LEE:  YEAH, I THINK THAT'S FINE TO DO THEM ORAL.

13   WE CAN DO THEM QUICKLY.

14   MS. MAROULIS:  YES.

15   THE COURT:  OKAY.  WELL, THEN, WHY DON'T -- WE WILL

16   FILE A FINAL SET OF JURY INSTRUCTIONS.  I'LL ALLOW YOU A VERY

17   BRIEF -- I WOULD LIKE TO INSTRUCT THIS JURY ON MONDAY.

18   I PRESUME THAT THE RULE 50 MOTION, CONSIDERING HOW LONG IT

19   TOOK THIS TIME, I'D LIKE TO SET AT LEAST PERHAPS 45 MINUTES TO

20   AN HOUR FOR THAT.

21   IT PROBABLY MAKES SENSE TO WAIT ON CLOSINGS -- RATHER THAN

22   SOME STARTING ON MONDAY AFTERNOON AND THE REST CONTINUING, IT

23   PROBABLY MAKES SENSE TO DO THAT ALL IN ONE DAY.  WHETHER

24   THERE'S A BREAK OR NOT, I'M GOING TO LET THIS JURY DECIDE HOW

25   THEY WANT TO BREAK IT UP IN TERMS OF BREAKS AND LUNCH.

1058

```
 1          BUT LET'S PLAN THEN ON PERHAPS EVEN GIVING THE FINAL JURY

 2     INSTRUCTIONS TO THEM ON MONDAY AFTERNOON, EXCUSING THEM, AND

 3     THEN ARGUING THE RULE 50 MOTIONS, AND THEN YOU CAN SPEND THE

 4     REST OF THE DAY PREPARING FOR YOUR CLOSINGS.  OKAY?

 5          ALL RIGHT.  ANYTHING ELSE THAT WE NEED TO COVER?

 6     OTHERWISE I'M GOING TO GIVE YOU THE TIME TOTALS.

 7               MS. MAROULIS:  YOUR HONOR, THERE ARE A COUPLE OF

 8     ISSUES.  THERE WAS A MOTION TO STRIKE TWO OF APPLE'S REBUTTAL

 9     WITNESSES, AND GIVEN THAT WE NEED TO RESERVE TIME FOR CROSS, WE

10     WERE WONDERING WHEN WE SHOULD EXPECT A DECISION OR ANY FURTHER

11     ARGUMENT.

12          AND SECONDLY, WE WOULD LIKE APPLE TO ADVISE US WHAT, WHO

13     REBUTTAL WITNESSES ARE BECAUSE THEY HAVE FIVE AND WE DON'T

14     IMAGINE ALL OF THEM WILL GO.

15               THE COURT:  ALL RIGHT.  WELL, WITH REGARD TO THE

16     MOTION TO STRIKE, THAT IS DENIED.  YOU KNOW, MR. WAGNER HAS

17     TESTIFIED ABOUT THE DESIGN AROUNDS, HOW LONG IT WOULD TAKE,

18     WHETHER THERE WERE ACTUALLY INFRINGING ALTERNATIVES.

19          SO THAT MOTION IS DENIED.  I'M NOT GOING TO PROHIBIT APPLE

20     FROM BEING ABLE TO CALL DR. BALAKRISHNAN AND SINGH .

21          I'LL GIVE YOU A RULING ON HAUSER --

22               MS. MAROULIS:  YOUR HONOR, MAY I ADDRESS BRIEFLY THIS

23     RULING?

24               THE COURT:  YOU'VE ALREADY BRIEFED IT.  DO WE NEED TO

25     NOW ARGUE EVERYTHING THAT'S ALREADY BEEN FULLY BRIEFED?  OR --
```

 1            MS. MAROULIS:  THE ISSUE IS THAT NON-INFRINGING

 2     ALTERNATIVES AND THE ABSENCE THEREOF IS APPLE'S BURDEN.  THEY

 3     WERE SUPPOSED TO DO IT IN THEIR CHASE-IN-CHIEF.  THEY DID NOT

 4     DO IT VERY MUCH.  NOW THEY WANT TO COME BACK AND DO OVER.

 5            THEY INTRODUCED IN THE DISCLOSURES 900 LINES OF SOURCE

 6     CODE.  THAT WAS SOMETHING THEY WERE SUPPOSED TO HAVE DONE IN

 7     THEIR CASE-IN-CHIEF.  THEY DON'T GET TO COME BACK AND DO

 8     BASICALLY EXTENDED REDIRECT ON THEIR WITNESSES THAT THEY WISH

 9     THEY DID AT THE TIME.

10            MR. WAGNER TESTIFIED ABOUT HOW LONG IT WOULD TAKE TO DO

11     DESIGN AROUND.

12            BUT BASED ON THE DISCLOSURES WE RECEIVED, THE EXTENT OF

13     THE EXPERT TESTIMONY IS GOING TO BE MUCH MORE EXTENSIVE.  THEY

14     WILL DO OVER THE NON-INFRINGING ALTERNATIVES, AND THEY MIGHT

15     TRY TO UNDERMINE THE JURY'S NON-INFRINGEMENT VERDICT FOR THOSE

16     OTHER PRODUCTS.

17            AND THAT IS OUR CONCERN.  WE OBVIOUSLY OBJECT TO THE

18     SCOPE, BUT IT'S NOT A TRUE REBUTTAL IN ANY MEANINGFUL WAY.  IT

19     IS A RESTATEMENT OF THEIR PRIOR TESTIMONY.

20            MR. LEE:  YOUR HONOR, IF WE COULD BREAK THIS INTO TWO

21     PARTS?

22            THE COURT:  THAT'S FINE.

23            MR. LEE:  THE ARTICULATION OF THE LAW WHICH WAS

24     PROVIDED TO YOU BEFORE LUNCH AND WAS JUST PROVIDED TO YOU ON

25     NON-INFRINGING ALTERNATIVES IS NOT COMPLETE AND IF YOUR HONOR

```
 1    LOOKS AT DOCKET 1903 AT 51, 50 AND 51, WHICH ARE YOUR HONOR'S

 2    INSTRUCTIONS FROM THE LAST CASE --

 3            THE COURT:  UM-HUM.

 4            MR. LEE:  -- OUR JOB IS NOT TO PROVE, OUR BURDEN IS

 5    NOT TO PROVE THAT THERE WERE NO ACTUAL NON-INFRINGING

 6    SUBSTITUTES.  WE CAN DO THAT UNDER THE PANDUIT FACTORS.

 7            BUT IF THERE ARE, YOUR INSTRUCTION SAYS, AND YOUR

 8    INSTRUCTIONS ARE 100 PERCENT CORRECT, ALL WE HAVE TO DO IS TAKE

 9    ACCOUNT OF THOSE NON-INFRINGING AVAILABLE, ACTUAL

10    NON-INFRINGING SUBSTITUTES.

11            AND MS. DAVIS, AT TRANSCRIPT YESTERDAY PAGE 659 TO

12    TRANSCRIPT 671, DID EXACTLY THAT.  SHE SAID, YES, THERE WERE

13    OTHER PRODUCTS OUT THERE THAT COULD HAVE BEEN USED AND THIS IS

14    HOW I'VE ADJUSTED.

15            SO I DON'T THINK WE HAVE TO SORT IT OUT NOW BECAUSE I

16    THINK YOUR HONOR'S INSTRUCTION WILL BE AS IT WAS LAST TIME.

17            BUT THIS IDEA THAT WE HAVE THE BURDEN OF PROVING THAT

18    THERE WERE NO ACTUAL NON-INFRINGING SUBSTITUTES ISN'T CORRECT.

19    WE CAN DO THAT -- FIRST, WE CAN PROVE THE BUT FOR REQUIREMENT

20    UNDER YOUR INSTRUCTION ON PAGE 50 IN A VARIETY OF WAYS.

21            ONE WAY IS PANDUIT.  IF WE CHOOSE PANDUIT, WHEN YOU GET TO

22    THE SECOND FACTOR, YOU CAN EITHER PROVE THERE ARE NO ACTUAL, AS

23    OPPOSED TO HYPOTHETICAL, NON-INFRINGING ALTERNATIVES, OR IF

24    THERE ARE, YOU HAVE TO ACCOUNT FOR THEM AND THAT'S PRECISELY

25    WHAT SHE DID.
```

```
 1          AS TO THE --

 2              MR. MCELHINNY:  THE MOTION TO STRIKE, THIS IS AN

 3      IMPOSITION ON THE COURT.  I MEAN, IT'S COMPLETELY SPECULATIVE.

 4      WE DON'T KNOW FOR SURE WE'RE GOING TO CALL THEM.  WE DON'T KNOW

 5      WHAT WE'RE GOING TO ASK THEM.

 6          IF WE VIOLATE ANY KIND OF RULES, THERE'S AN OBJECTION THAT

 7      CAN BE MADE AT THE SPECIFIC TIME.

 8          BUT AS YOUR HONOR JUST SAID, TO FORECLOSE US OR LIMIT THE

 9      TESTIMONY OR WHATEVER BEFORE IT ACTUALLY COMES IN AND BEFORE

10      THEIR CASE IS CLOSED, WE'RE WAY PREMATURE HERE.

11              MS. MAROULIS:  YOUR HONOR, THE BLACK LETTER LAW OF

12      THE PANDUIT FACTORS IS THAT APPLE BEARS THE BURDEN OF PROVING

13      THE ABSENCE OF NON-INFRINGING ALTERNATIVE.  IT'S NOT REBUTTAL

14      AND WE -- THAT IS THE REASON WE MOVED.

15              MR. PRICE:  YOUR HONOR, IF I --

16              THE COURT:  YOU KNOW, I -- DO WE NEED TO ARGUE THIS

17      NOW?

18              MR. LEE:  NO.

19              THE COURT:  YOU HAVEN'T EVEN CLOSED YOUR CASE.  I WAS

20      NOT SURE WHY YOU TALKED ABOUT THE MOTION EVEN BEFORE YOU PUT ON

21      YOUR CASE.

22              MS. MAROULIS:  YOUR HONOR --

23              THE COURT:  BUT YOU SAID YOU NEEDED A RULING, SO I'M

24      GIVING YOU -- IF YOU NEED IT RIGHT NOW, I'M TELLING YOU IT'S

25      DENIED.
```

```
 1            IF YOU WANT TO WAIT AND SEE AFTER YOUR CASE IS COMPLETELY

 2      IN --

 3                MS. MAROULIS:  IN THAT CASE WE'D LIKE TO WAIT THEN.

 4                MR. PRICE:  WE'LL CHOOSE WAIT.

 5           (LAUGHTER.)

 6                THE COURT:  ALL RIGHT.

 7                MR. MCELHINNY:  THEY WOULD ALSO LIKE TO REBRIEF IT AT

 8      THAT TIME, YOUR HONOR.

 9           (LAUGHTER.)

10                THE COURT:  NO, NO.  PLEASE.  I --

11                MS. MAROULIS:  WE STAND BY OUR BRIEFS.

12                THE COURT:  I THINK YOU'VE GIVEN US ENOUGH TO-DO

13      ITEMS FOR THE WEEKEND.  PLEASE, LET'S NOT ADD TO THAT.

14         I HATE TO ASK, BUT WHAT ELSE OTHER THAN YOUR TIME TOTALS,

15      WHICH I'M READY TO GIVE YOU.

16                MR. LEE:  NOTHING FOR APPLE, YOUR HONOR.

17                THE COURT:  OKAY.

18                MS. MAROULIS:  NOTHING FOR SAMSUNG.

19                THE COURT:  ALL RIGHT.  SO THE TOTAL TIME USED TODAY

20      FROM SAMSUNG WAS 2 HOURS AND 28 MINUTES.  TOTAL TIME USED TODAY

21      BY APPLE WAS 1 HOUR AND 35 MINUTES.

22         SO THE TRIAL TOTALS, 6 HOURS AND 25 MINUTES FOR SAMSUNG,

23      AND 5 HOURS AND 48 MINUTES FOR APPLE.

24         OKAY?  SO APPLE HAS --

25                MR. LEE:  YOUR HONOR --
```

```
 1              THE COURT:  -- 2 HOURS AND 12 MINUTES LEFT AND
 2     SAMSUNG HAS 6 HOURS AND 25 MINUTES LEFT.
 3          YES?
 4              MR. LEE:  I HOPE NOT 6 HOURS LEFT.
 5              THE COURT:  I'M SORRY.  1 HOUR AND 35 MINUTES LEFT.
 6              MR. LEE:  YOUR HONOR, I -- AND THIS IS JUST, IT MAY
 7     BE ALL OF THE DATA THAT'S FLYING.  I THINK YOUR HONOR SAID
 8     SAMSUNG HAD 2 HOURS AND 22 MINUTES BEFORE MR. WAGNER STARTED.
 9              THE COURT:  OH, WAIT A MINUTE.  LET ME DOUBLE-CHECK
10     THAT.
11          I'M SORRY.  THAT WAS FOR YESTERDAY.
12          TODAY WAS 3 HOURS AND 17 MINUTES.  SO IT WAS AN HOUR AND 7
13     ON SCHILLER; 31 MINUTES ON SHEPPARD; SO THE TOTAL AFTER ALL OF
14     THE SHEPPARD REDIRECT AND DEPOS WAS 2 HOURS AND 22 MINUTES; AND
15     THEN IT WAS 55 MINUTES WITH MR. WAGNER.  SO IT'S A TOTAL OF 3
16     HOURS AND 17 MINUTES.  EXCUSE ME.
17          ALL RIGHT.  THEN LET ME UPDATE MY -- I APOLOGIZE.  SO 3
18     HOURS AND 17 MINUTES TODAY, WHICH IS 7 HOURS AND, WHAT IS THAT,
19     14 MINUTES TOTAL USED.  I THINK THAT'S RIGHT.  SO 7 HOURS AND
20     14 MINUTES USED, WHICH MEANS 46 MINUTES LEFT.  ALL RIGHT.
21          AND I'LL JUST DOUBLE CHECK FOR APPLE AS WELL.  YEAH, IT
22     WAS 55 MINUTES ON SCHILLER; AN HOUR AND 9 MINUTES AFTER ALL THE
23     DEPOS; 26 MINUTES ON WAGNER.  SO AN HOUR AND 35 MINUTES TODAY
24     IS CORRECT.  SO YOU STILL HAVE 2 HOURS AND 12 MINUTES.
25          OKAY?
```

1          MR. LEE:  THANK YOU, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  THANK YOU.

3      (THE EVENING RECESS WAS TAKEN AT 4:42 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  NOVEMBER 16, 2013

19

20

21

22

23

24

25