1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

APPLE INC., A CALIFORNIA          )  C-11-01846 LHK
6   CORPORATION,                      )
                                      )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,             )
                                      )  NOVEMBER 18, 2013
8          VS.                        )
                                      )  VOLUME 5
9   SAMSUNG ELECTRONICS CO., LTD.,    )
    A KOREAN BUSINESS ENTITY;         )  PAGES 1065-1279
10  SAMSUNG ELECTRONICS AMERICA,      )
    INC., A NEW YORK CORPORATION;     )
11  SAMSUNG TELECOMMUNICATIONS        )
    AMERICA, LLC, A DELAWARE          )
12  LIMITED LIABILITY COMPANY,        )
                                      )
13              DEFENDANTS.           )
    _____   )

14

15

16          TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17           UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

1

2       A P P E A R A N C E S:

3       FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:   HAROLD J. MCELHINNY
4                                    RACHEL KREVANS
                                     NATHANIEL B. SABRI
5                              425 MARKET STREET
                               SAN FRANCISCO, CALIFORNIA  94105
6

7                              WILMER, CUTLER, PICKERING,
                               HALE AND DORR
8                              BY:   WILLIAM F. LEE
                                     LAUREN B. FLETCHER
9                              60 STATE STREET
                               BOSTON, MASSACHUSETTS  02109
10

                               BY:   MARK D. SELWYN
11                             950 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
12

13      FOR DEFENDANT          QUINN, EMANUEL, URQUHART,
        SAMSUNG:               OLIVER & HEDGES
14                             BY:   WILLIAM C. PRICE
                                     JON C. CEDERBERG
15                             865 SOUTH FIGUEROA STREET
                               10TH FLOOR
16                             LOS ANGELES, CALIFORNIA  90017

17                             BY:   VICTORIA F. MAROULIS
                                     KEVIN B. JOHNSON
18                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
19                             REDWOOD SHORES, CALIFORNIA  94065

20

21

22

23

24

25

1                        INDEX OF WITNESSES

2        DEFENDANT'S

3        MICHAEL WAGNER
              CROSS-EXAM BY MR. LEE (RES.)       P. 1072
4             REDIRECT EXAM BY MR. PRICE         P. 1133
              RECROSS-EXAM BY MR. LEE            P. 1148
5

6

7

8        PLAINTIFF'S

9        JULIE DAVIS
              FURTHER REDIRECT EXAM BY MS. KREVANS P. 1161
10            FURTHER CROSS-EXAM BY MR. PRICE       P. 1191
              FURTHER REDIRECT EXAM BY MS. KREVANS P. 1209
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1068

<pre>
 1
 2                        INDEX OF EXHIBITS

 3                                    MARKED      ADMITTED

 4   PLAINTIFF'S

 5   62                                            1108
     58                                            1166
 6

 7

 8

 9   DEFENDANT'S

10   952, EXCLUDING .03, .04, .05, .10            1140
     952.010                                      1140
11   536                                          1183

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
1    SAN JOSE, CALIFORNIA                    NOVEMBER 18, 2012

2                      P R O C E E D I N G S

3        (JURY OUT AT 8:52 A.M.)

4            THE COURT:  ON THE EXHIBIT LIST, IS IT 676 OR 676A?

5            MS. MAROULIS:  YOUR HONOR, THE COURT WAS CORRECT,

6    IT'S 676.  IT WAS ALWAYS THIS WAY, BUT THE PARTIES

7    INADVERTENTLY INTRODUCED "A" DURING THE EXCHANGES.  SO WE

8    CONFIRMED THAT IT IS 676 AND IT'S THE REDUCED SPREADSHEET,

9    MEANING ONLY THE PRODUCTS AT ISSUE IN THIS CASE.

10           THE COURT:  OKAY, GREAT.  SO WE'LL JUST CONTINUE TO

11   CALL IT 676 THEN.

12           MS. MAROULIS:  CORRECT.

13           THE COURT:  AND DID YOUR RECORD OF WHAT HAD A

14   LIMITING INSTRUCTION MATCH MINE?

15           MS. MAROULIS:  WE'RE STILL GOING THROUGH IT, YOUR

16   HONOR.

17           THE COURT:  OKAY.

18           MS. MAROULIS:  MR. SABRI OF APPLE'S TEAM AND

19   MS. JENKINS OF OUR TEAM ARE CONFERRING AND WE'LL PUT SOMETHING

20   TOGETHER AND RECONCILE WITH THE COURT'S LIST.

21           THE COURT:  OKAY.  LET ME KNOW IF YOU HAVE ANYTHING

22   DIFFERENT.

23           MS. MAROULIS:  YES, YOUR HONOR.

24           THE COURT:  ALL RIGHT.  AND THEN WHAT ELSE?  ANYTHING

25   ELSE FOR TODAY?
```

```
 1              MS. MAROULIS:  A COUPLE OF QUICK QUESTIONS.

 2          ONE IS WITH RESPECT TO THE CLOSING SLIDES.  THIS MORNING

 3      WE LODGED THE SLIDES TO WHICH WE'RE OBJECTING TO.  THE QUESTION

 4      IS WHETHER THE COURT WOULD LIKE FULL CLOSING DECKS FROM EITHER

 5      OR BOTH OF THE PARTIES.

 6              THE COURT:  I THINK THAT WOULD PROBABLY BE HELPFUL.

 7              MS. MAROULIS:  WE'LL GIVE YOU THAT THIS MORNING THEN.

 8              THE COURT:  OKAY.  THANK YOU.

 9              MS. MAROULIS:  AND FINALLY, SAMSUNG MAY HAVE

10      ADDITIONAL OBJECTIONS TO APPLE REBUTTAL, BUT WE THINK IT'S BEST

11      TO ADDRESS IT AFTER OUR CASE-IN-CHIEF IN THE EVENT APPLE DOES

12      NOT CALL CERTAIN OF ITS WITNESSES SO WE DON'T TAKE UP THE

13      COURT'S TIME NOW IF, FOR EXAMPLE, THEY DON'T CALL ONE OF THE

14      THREE WITNESSES.

15              THE COURT:  OKAY.

16              MR. MCELHINNY:  AND ONE POINT, YOUR HONOR.  YOU

17      SUGGESTED THAT YOU WANTED A NOTICE DATE CHART IN THE JURY'S

18      BINDER.  WE CAN PREPARE THAT IF THAT'S STILL WHAT YOU WOULD

19      LIKE.

20              THE COURT:  I THINK THE JURY INSTRUCTION THAT

21      PROVIDES THE NOTICE DATES WILL BE SUFFICIENT.

22              MR. MCELHINNY:  I THINK SO, TOO.

23          THANK YOU, YOUR HONOR.

24              THE COURT:  YEAH.  I HAD THOUGHT ABOUT PUTTING IN

25      CHARTS IN THE FINAL, BUT I THINK THE INSTRUCTIONS ARE HOPEFULLY
```

```
 1        CLEAR ENOUGH THAT THE JURY KNOWS, YOU KNOW, WHEN THEY CAN'T DO

 2        MORE THAN ONE TYPE OF DAMAGES REMEDY, ET CETERA.  SO I THINK

 3        IT'S CLEAR ENOUGH.

 4               MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 5               THE COURT:  OKAY.  ANYTHING ELSE?  WE'LL SEE HOW LONG

 6        WE GO THIS MORNING.  IF YOUR EVIDENCE TAKES THE FULL MORNING,

 7        THEN WHAT I WILL PROBABLY DO IS EXCUSE THE JURY FOR THE DAY,

 8        WE'LL TAKE A LUNCH BREAK, AND THEN WE'LL COME BACK AND HAVE

 9        RULE 50 MOTIONS AND THE JURY INSTRUCTION CONFERENCE.

10           BUT WE'LL SEE.  LET'S SEE HOW LONG IT TAKES TODAY.

11           ANYTHING ELSE?

12               MR. LEE:  NOT FOR APPLE, YOUR HONOR.

13               MS. MAROULIS:  NOT FOR SAMSUNG.  THANK YOU.

14               THE COURT:  ALL RIGHT.  THANK YOU.

15         THEN I'LL -- IF WE OUR JURY --

16               THE CLERK:  I CAN SEE IF THEY'RE ALL THERE.

17               THE COURT:  YEAH.

18         (PAUSE IN PROCEEDINGS.)

19               THE CLERK:  ONE IS IN THE REST ROOM.

20               THE COURT:  OKAY.  WHY DON'T WE JUST --

21               THE CLERK:  I JUST TOLD THEM TO KNOCK ON THE DOOR

22        WHEN THEY'RE READY.

23               THE COURT:  PERFECT.  THANK YOU.  I DON'T WANT TO PUT

24        PRESSURE ON ANYONE WHEN THEY'RE IN THE BATHROOM.

25               THE CLERK:  YEAH.
```

```
 1            (JURY IN AT 8:55 A.M.)

 2                THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

 3            ALL RIGHT.  WE'RE CONTINUING WITH MR. WAGNER'S

 4      CROSS-EXAMINATION.

 5            SIR, YOU'RE STILL UNDER OATH.

 6            (MICHAEL WAGNER, DEFENDANT'S WITNESS, WAS PREVIOUSLY

 7      SWORN.)

 8                THE COURT:  TIME IS NOW 8:56.  GO AHEAD, PLEASE.

 9                MR. LEE:  THANK YOU, YOUR HONOR.

10                      CROSS-EXAMINATION (RESUMED)

11      BY MR. LEE:

12      Q.   GOOD MORNING, MR. WAGNER.

13      A.   GOOD MORNING, MR. LEE.

14      Q.   TO GET US BACK TO WHERE WE WERE AT 4:30 ON FRIDAY, WE

15      AGREED THAT DEMAND FOR THE PATENTED FEATURES WAS RELEVANT TO

16      BOTH LOST PROFITS AND REASONABLE ROYALTY; CORRECT?

17      A.   WE DID.

18      Q.   WE AGREED THAT DEMAND FOR THE PATENTED PRODUCTS WAS ALSO

19      RELEVANT TO BOTH ISSUES; CORRECT?

20      A.   I BELIEVE IT IS.

21      Q.   AND WE ALSO AGREED THAT THE USE BY THE DEFENDANT, SAMSUNG

22      IN THIS CASE, OF THE PATENTED FEATURES OR THE PATENTS WAS ALSO

23      RELEVANT TO REASONABLE ROYALTY; CORRECT?

24      A.   WE DID.

25      Q.   AND WE WERE THEN GOING THROUGH A SERIES OF SAMSUNG
```

1    DOCUMENTS WITH YOU.  DO YOU RECALL THAT?

2    A.   I DO.

3    Q.   AND WE WERE UP UNTIL MARCH OF 2010.  DO YOU RECALL THAT?

4    A.   MARCH 2ND.

5    Q.   AND THAT WAS ABOUT THREE WEEKS AFTER THE CRISIS IN DESIGN

6    DIRECTIVE FROM MR. SHIN THAT SAMSUNG CHANGE ITS METHODS OF

7    DOING BUSINESS; CORRECT?

8    A.   THAT IS CORRECT.

9    Q.   ALL RIGHT.  SO NOW THAT'S WHERE WE WERE AND WE'RE ALL AT

10   THE SAME PLACE.

11        LET'S GO BACK TO EXHIBIT 44 THAT WE WERE LOOKING AT

12   BEFORE, AND IT'S IN VOLUME 1, TAB 4.

13        DO YOU HAVE IT?

14   A.   IT'S AT TAB 8 IN MY BINDER, NOT TAB 4.

15   Q.   YOU'RE RIGHT.  VOLUME 1, TAB 8.  DO YOU HAVE IT?

16   A.   YES, I DO.

17   Q.   ALL RIGHT.  NOW, WE WERE LOOKING AT EXHIBIT 44 ON FRIDAY;

18   CORRECT?

19   A.   WE WERE.

20   Q.   OKAY.  NOW, LET'S DO THIS:  WITH EXHIBIT 44 IN HAND, LET'S

21   TURN, IF WE COULD, TO PAGE 58, AND WHAT I WANT TO DO NOW WITH

22   THE LADIES AND GENTLEMEN OF THE JURY IS TO COMPARE WHAT SAMSUNG

23   WAS SAYING IN MARCH OF 2010 WITH THE SPECIFIC PATENTS THAT

24   THEY'RE GOING TO HAVE TO CONSIDER.  OKAY?

25        DO YOU HAVE PAGE 58 AT THE BOTTOM?  DO YOU SEE THAT?

1    A.   I DO.

2    Q.   NOW, I WANT TO FOCUS ON THE FEATURE, RIGHT, THE FEATURE

3    THAT'S DESCRIBED IN THIS SLIDE.

4         DO YOU SEE IT?

5    A.   I DO.

6    Q.   AND IT'S REFERRING TO DOUBLE TAP TO ZOOM; CORRECT?

7    A.   IT IS.

8    Q.   AND ON THE LEFT-HAND SIDE, THERE IS THE IPHONE; CORRECT?

9    A.   IT IS.

10   Q.   AND ON THE RIGHT-HAND SIDE THERE IS THE S1, WHICH YOU

11   UNDERSTAND TO BE THE SAMSUNG PHONE; CORRECT?

12   A.   THE SAMSUNG PHONE UNDER DEVELOPMENT, YES.

13   Q.   ALL RIGHT.  AND THAT PHONE EVENTUALLY BECAME?

14   A.   I THINK IT'S THE I9000.

15   Q.   RIGHT.  AND THEN EVENTUALLY?

16   A.   THE GALAXY PHONES.

17   Q.   RIGHT.  OKAY.  NOW, THE IPHONE, WHAT SAMSUNG WAS SAYING IN

18   MARCH OF 2010 IS "AFTER THE SCREEN HAS BEEN EXPANDED AND

19   ANOTHER POINT IS DOUBLE TAPPED, IT MOVES TO THE AREA THAT WAS

20   POINTED AND EXPANDS THE SCREEN."

21        DO YOU SEE THAT?

22   A.   I DO.

23   Q.   AND THEN THERE'S A COMPARISON TO S1 ON THE RIGHT-HAND

24   SIDE; CORRECT?

25   A.   THERE IS.

1    Q.   AND AT THE TOP IT SAYS, DESCRIBING THE SAMSUNG PHONE,

2    "DOUBLE TAP ONLY SUPPORTS EXPANSION/REDUCTION THEREFORE IT'S

3    NOT POSSIBLE TO MOVE QUICKLY FROM THE EXPANDED SCREEN MODE."

4    CORRECT?

5    A.   YES.

6    Q.   AND THE RECOMMENDED IMPROVEMENT IS AT THE BOTTOM; CORRECT?

7    A.   IT DOESN'T SAY WHAT IT IS.  IT JUST SAYS THAT THEIR

8    FUNCTION NEEDS TO BE SUPPLEMENTED.

9    Q.   RIGHT.  NOW, APPLE'S '163 PATENT CLAIMS THE METHOD OF

10   PERFORMING DOUBLE TAP TO ZOOM; CORRECT?

11   A.   IT -- IT CLAIMS A METHOD OF DOING THAT, YES.

12   Q.   RIGHT.  A METHOD OF DOING WHAT IS DESCRIBED ON PAGE 58 OF

13   THIS MARCH 2010 DOCUMENT; CORRECT?

14   A.   I BELIEVE THAT'S CORRECT.

15   Q.   SEVEN OF THE 13 SAMSUNG PRODUCTS IN THIS TRIAL HAVE BEEN

16   FOUND TO INFRINGE THAT '163 PATENT; CORRECT?

17   A.   THAT'S TRUE.

18   Q.   THERE ARE ABOUT 4.5 MILLION UNITS OF SAMSUNG PRODUCT THAT

19   INFRINGE THE '163 PATENT DURING THE DAMAGES PERIOD; CORRECT?

20   A.   I THINK THAT'S CORRECT.

21   Q.   4.5 MILLION UNITS THAT HAVE THE FEATURE OF THE '163

22   PATENT; CORRECT?

23   A.   YES.

24   Q.   AND SO THE LADIES AND GENTLEMEN OF THE JURY UNDERSTAND,

25   YOU THINK FAIR COMPENSATION FOR THAT 4.5 MILLION ACTS OF

1      INFRINGEMENT IS $5,800; CORRECT?

2      A.   I DO.

3      Q.   NOW, LET'S GO TO THE '915 PATENT.

4           THERE ARE 12 SAMSUNG PRODUCTS THAT INFRINGE THE '915

5      PATENT; CORRECT?

6      A.   CORRECT.

7      Q.   THOSE 12 PRODUCTS COMPRISE, OR TOTAL, ABOUT 4.7 MILLION

8      INFRINGING PRODUCTS DURING THE DAMAGES PERIOD; CORRECT?

9      A.   CORRECT.

10     Q.   AND SO THE LADIES AND GENTLEMEN OF THE JURY HAVE THIS ONE

11     RIGHT TOO, FOR THAT 4.5 MILLION UNITS THAT INFRINGE THE '915

12     PATENT, YOU SAY SAMSUNG SHOULD PAY $10,800; CORRECT?

13     A.   I DO.

14     Q.   IN TOTAL?

15     A.   IN TOTAL.

16     Q.   THAT'S YOUR BEST JUDGMENT?

17     A.   IT'S THE NEXT BEST ALTERNATIVE TO SAMSUNG, SO IT IS THE

18     RIGHT NUMBER.

19     Q.   NOW, NEXT BEST ALTERNATIVE TO SAMSUNG, BUT SAMSUNG NEVER

20     DID WHAT YOU SAY THEY SHOULD HAVE DONE; CORRECT?

21     A.   THAT IS CORRECT.

22     Q.   THIS IS WHAT YOU SAY THEY COULD HAVE DONE, BUT THEY NEVER

23     DID?

24     A.   THAT IS CORRECT.

25     Q.   NOW, LET'S LOOK AT ANOTHER PAGE OF EXHIBIT 44, PAGE 122 IF

1        YOU WOULD.

2            DO YOU HAVE THAT BEFORE YOU?

3        A.   I DO.

4        Q.   THIS PAGE COMPARES THE ICONS ON THE IPHONE TO SAMSUNG'S

5        PHONE IN DEVELOPMENT; CORRECT?

6        A.   IT DOES.

7        Q.   NOW, THE COMMENT ABOUT THE SAMSUNG PHONE AT THE BOTTOM,

8        AND I'LL HIGHLIGHT IT, IT SAYS THAT SAMSUNG'S PHONE, QUOTE,

9        "FEELS AWKWARD SINCE ALL ICONS HAVE FRAMES ON THE BACKGROUND."

10           DO YOU SEE THAT?

11       A.   I DO.

12       Q.   AND IT COMPARES IT TO THE IPHONE ON THE LEFT AND SAYS "THE

13       IPHONE HAS ICONS ON A HOME SCREEN HAVE HIGH INTUITIVENESS

14       BECAUSE A BACKGROUND IS USED ONLY WHEN NECESSARY."

15           CORRECT?

16       A.   THAT'S WHAT IT SAYS.

17       Q.   AND THEN BACK IN MARCH OF 2010 IN THIS CONFIDENTIAL

18       DOCUMENT, THERE'S A SUGGESTION FOR IMPROVEMENT; CORRECT?

19       A.   THERE'S DIRECTIONS FOR IMPROVEMENT, YES.

20       Q.   AND THE DIRECTION FOR IMPROVEMENT IS TO MODIFY THE HOME

21       SCREEN TO HAVE A CLEAN AND UNIFORM EFFECT; CORRECT?

22       A.   IT DOES.

23       Q.   NOW, THE D'305 PATENT THAT THE LADIES AND GENTLEMEN OF THE

24       JURY HAVE IN THEIR BINDERS CLAIMS, OR COVERS, THE ORNAMENTAL

25       DESIGN OF IPHONE'S HOME SCREEN; CORRECT?

1    A.   THAT'S TRUE.

2    Q.   SEVEN OF THE 13 PRODUCTS AT ISSUE IN THIS TRIAL HAVE BEEN

3    FOUND BY THE PRIOR JURY TO INFRINGE THAT PATENT; CORRECT?

4    A.   YES.

5    Q.   NOW, YOU WOULD AWARD A ROYALTY FOR ONLY FOUR OF THOSE

6    PRODUCTS, CORRECT, UNDER YOUR ANALYSIS?

7    A.   NO.  UNDER A DISGORGEMENT OF PROFITS THEORY, YES.  I THINK

8    UNDER REASONABLE ROYALTY THAT ALL OF THEM SHOULD BE AWARDED

9    DAMAGES.

10   Q.   RIGHT.  SO DURING THE DAMAGES PERIOD FOR THE '305, THERE

11   WERE ABOUT 800,000 INFRINGING SOLD; CORRECT?

12   A.   I THINK IT'S MORE LIKE 900,000.

13   Q.   FAIR ENOUGH.  I'LL TAKE YOUR NUMBER.

14        FOR THAT 900,000 UNITS, YOUR NUMBER, YOUR REASONABLE

15   ROYALTY NUMBER IS $1,152; CORRECT?

16   A.   CORRECT.

17   Q.   $1,152 FOR 800,00 INFRINGING UNITS; CORRECT?

18   A.   I THOUGHT WE AGREED IT WAS 900,000, BUT YES.

19   Q.   OKAY.  ACTUALLY, THAT'S EVEN BETTER.  IF IT'S 900,000, BUT

20   THE AMOUNT IS THE SAME, $1100 -- $1152?

21   A.   CORRECT.

22   Q.   NOW, MR. WAGNER, BEFORE YOU PREPARED YOUR REPORT IN THIS

23   CASE, NO ONE AT SAMSUNG HAD EVER GIVEN YOU EXHIBIT 44, HAD

24   THEY?

25   A.   NO, THEY HAD.  IT WAS IN MY DOCUMENTS CONSIDERED LIST.

1      Q.   OKAY.

2      A.   I JUST PERSONALLY MYSELF HAD NOT REVIEWED IT.

3      Q.   OKAY.  FAIR ENOUGH.

4           NOW, LET ME MOVE TO A DIFFERENT TOPIC.  THERE'S BEEN A LOT

5      OF DISCUSSION DURING THE COURSE OF THE TRIAL ABOUT SURVEYS.

6      YOU'VE BEEN HERE FOR SOME OF THAT; CORRECT?

7      A.   I HAVE.

8      Q.   NOW, YOU, YOURSELF, ARE NOT A SURVEY EXPERT; CORRECT?

9      A.   I AM NOT.

10     Q.   AND YOU HAVE NOT CONDUCTED ANY SURVEYS FOR THIS CASE;

11     CORRECT?

12     A.   THAT IS CORRECT.

13     Q.   BUT YOU HAVE REVIEWED SOME SURVEYS THAT WERE DONE BY

14     APPLE; CORRECT?

15     A.   I'VE REVIEWED, I BELIEVE, ALL THE SURVEYS IN THE RECORD

16     THAT APPLE HAS DONE AND SAMSUNG HAS DONE IN THE REAL WORLD.

17     Q.   YEAH.  SOME WERE DONE BY APPLE IN THE REAL WORLD; CORRECT?

18     A.   CORRECT.

19     Q.   SOME WERE DONE BY SAMSUNG IN THE REAL WORLD; CORRECT?

20     A.   THAT'S WHAT I JUST SAID.

21     Q.   AND SOME WERE DONE BY THIRD PARTIES IN THE REAL WORLD;

22     CORRECT?

23     A.   YES.

24     Q.   NOW, THAT'S WHAT I WANT TO TALK ABOUT IS THE REAL WORLD

25     SURVEYS THAT WERE DONE BACK IN 2010 OR SO.  DO YOU HAVE THAT IN

1    MIND?

2    A.   I DO.

3    Q.   NOW, THOSE WERE REAL WORLD SURVEYS DONE BY APPLE ON THE

4    ONE HAND OR SAMSUNG ON THE OTHER TO BASICALLY EXPLORE MARKET

5    CONDITIONS, MARKET DEMAND, AND CONSUMER PREFERENCES; CORRECT?

6    A.   CORRECT.

7    Q.   NOBODY WAS OUT THERE BACK IN 2010 DOING A SURVEY THAT SAID

8    "I'VE GOT THIS PATENT, THIS '915 PATENT.  I BETTER DO A SURVEY

9    IN CASE SOMEONE INFRINGES IT TO SEE HOW IMPORTANT IT IS."  NO

10   ONE IS DOING THAT, ARE THEY?

11   A.   WELL, IT'S TRUE.  THE '915 PATENT DIDN'T EVEN ISSUE UNTIL

12   NOVEMBER 30TH OF 2010, SO NO ONE IN 2010 BEFORE THAT WOULD EVEN

13   KNOW THE PATENT EXISTS.

14   Q.   AND YOU KNOW FROM YOUR BUSINESS EXPERIENCE THAT COMPANIES

15   LIKE APPLE AND SAMSUNG ARE NOT OUT THERE DOING SURVEYS THAT SAY

16   "I'M GOING TO ASSUME THAT SAMSUNG IS GOING TO INFRINGE MY

17   PATENT, MY '915 PATENT.  I BETTER DO A SURVEY TO SHOW HOW

18   IMPORTANT THAT FEATURE IS."

19   A.   THAT'S RIGHT.  THEY'RE LOOKING AT THE FEATURES, WHAT'S

20   ENABLED BY THE PATENT, NOT THE PATENT ITSELF.

21   Q.   RIGHT.  NOW, THERE WAS ONE SURVEY THAT WAS DONE AFTER THE

22   LITIGATION COMMENCED THAT WAS BY DR. HAUSER; CORRECT?

23   A.   CORRECT.

24   Q.   AND YOU WERE HERE WHILE DR. HAUSER WAS EXAMINED AND

25   CROSS-EXAMINED; CORRECT?

1    A.   I WAS.

2    Q.   SAMSUNG DIDN'T DO ANY SURVEY THAT YOU'RE RELYING UPON AS

3    PART OF THIS LITIGATION, DID THEY?

4    A.   NOT FOR PURPOSES OF THIS LITIGATION.

5    Q.   SO ALL THE COULDA WOULDA'S THAT WERE GIVEN TO DR. HAUSER

6    WERE THINGS THAT SAMSUNG DIDN'T DO; CORRECT?

7    A.   CORRECT.  NEITHER PARTY DID IT.

8    Q.   OKAY.  NOW, LET'S LOOK AT WHAT PEOPLE ACTUALLY DID, TO USE

9    YOUR PHRASE, IN THE REAL WORLD.  WOULD YOU TURN TO TAB 2 -- I'M

10   SORRY -- VOLUME 2, TAB 9, WHICH IS PX 46 ALREADY IN EVIDENCE.

11   TELL ME WHEN YOU'RE THERE.

12   A.   I'M THERE.

13   Q.   THIS IS THE MAY 2010 PRESENTATION FROM SAMSUNG'S SOFTWARE

14   VERIFICATION GROUP; CORRECT?

15   A.   CORRECT.

16   Q.   SO NOW WE'VE WOUND THE MOVIE FORWARD A LITTLE BIT AND

17   WE'RE ABOUT FOUR MONTHS, THREE MONTHS AFTER MR. SHIN'S

18   DIRECTIVE TO CHANGE SAMSUNG'S METHODS; CORRECT?

19   A.   THAT IS CORRECT.

20   Q.   THIS IS BEFORE SAMSUNG LAUNCHED ANY OF THE INFRINGING

21   PHONES; CORRECT?

22   A.   IT IS.

23   Q.   THIS IS, AGAIN, A COMPARISON BETWEEN SAMSUNG'S PHONE IN

24   DEVELOPMENT AND THE IPHONE ON THE MARKET; CORRECT?

25   A.   IT IS.

1    Q.   NOW, THERE WERE A LOT OF QUESTIONS ABOUT SURVEYING PEOPLE

2    WHO WERE ACTUALLY SAMSUNG USERS.  DO YOU REMEMBER MR. PRICE

3    ASKING THOSE QUESTIONS?

4    A.   I DO.

5    Q.   TURN, IF YOU WOULD, TO PAGE 46.14 OF THIS DOCUMENT.  DO

6    YOU HAVE IT BEFORE YOU?

7    A.   I DO.

8    Q.   THIS TELLS US HOW THIS DOCUMENT WAS PREPARED; CORRECT?

9    A.   AT LEAST SOME OF THE INFORMATION ABOUT HOW IT WAS

10   PREPARED, YES.

11   Q.   FAIR ENOUGH.  AND ONE THING IT TELLS US IS THIS WAS A

12   SURVEY OF 30 USERS OF SAMSUNG PRODUCTS; CORRECT?

13   A.   YES.

14   Q.   ALL RIGHT.  AND THAT -- SO THIS IS ACTUALLY WHAT THEY CALL

15   A REAL WORLD SURVEY, SOMETHING NOT DONE FOR PURPOSES OF

16   LITIGATION, DONE AT A TIME BEFORE THERE WAS LITIGATION, TO SEE

17   WHAT THE REAL WORLD THOUGHT; CORRECT?

18   A.   IT DOES.

19   Q.   SO IF YOU THEN LOOK AT PAGES 46.20 TO 46.74 -- AND WE'RE

20   NOT GOING TO LOOK AT ALL OF THEM -- THERE ARE 75 PAGES OF

21   SIDE-BY-SIDE COMPARISONS BETWEEN THE IPHONE AND SAMSUNG'S PHONE

22   IN DEVELOPMENT; CORRECT?

23   A.   CORRECT.  THERE'S A COMPARISON OF 75 DIFFERENT FEATURES IN

24   THESE PHONES.

25   Q.   RIGHT.  AND THEY COMPARE THE IPHONE TO THE SAMSUNG PHONE

1    AND THERE ARE SUGGESTIONS OF IMPROVEMENT OR DIRECTIVES FOR

2    IMPROVEMENT; CORRECT?

3    A.   YES.

4    Q.   ALL RIGHT.  LET'S LOOK AT A COUPLE OF THOSE SUGGESTIONS

5    AND SEE HOW THEY RELATE TO THE PATENTS THE JURORS HAVE BEFORE

6    THEM.

7         TURN, IF YOU WOULD, TO PAGE 46.66.  DO YOU HAVE IT BEFORE

8    YOU?

9    A.   NOT YET.

10   Q.   I'M SORRY.

11   A.   I'M THERE.

12   Q.   TELL ME WHEN YOU'RE THERE.  YOU'RE THERE.  DO YOU SEE

13   46.66?

14   A.   I DO.

15   Q.   AND AGAIN I'M GOING TO FOCUS ON THE FEATURE.  FOR THE

16   IPHONE, THE SURVEY RESULTS SAY "IF A WEB PAGE IS DRAGGED TO THE

17   EDGE AND THE HAND IS RELEASED, A BOUNCING VISUAL EFFECT IS

18   PROVIDED."

19        DO YOU SEE THAT?

20   A.   THAT IS CORRECT.

21   Q.   ALL RIGHT.  AND AT THE BOTTOM, UNDER DIRECTIONS FOR

22   IMPROVEMENT, IT SAYS, "PROVIDE A FUN VISUAL EFFECT WHEN

23   DRAGGING A WEB PAGE."

24        DO YOU SEE THAT?

25   A.   I DO.

1     Q.   BY COMPARISON -- NOW, THESE ARE SURVEY RESULTS; CORRECT?

2     A.   YES.

3     Q.   REAL WORLD SURVEY RESULTS.

4          BY COMPARISON FOR THE SAMSUNG PHONE ON THE LEFT, THE

5     SURVEY RESULTS REPORT, QUOTE, "PLAIN BECAUSE NO SPECIAL EFFECTS

6     ARE PROVIDED WHEN DRAGGING WEB PAGE TO THE BOTTOMMOST OR SIDE

7     EDGES."

8          CORRECT?

9     A.   IT SAYS THAT, YES.

10    Q.   AND HAVING MADE THAT COMPARISON, HAVING HAD THOSE REAL

11    WORLD SURVEY RESULTS ON A FEATURE COVERED BY ONE OF THE PATENTS

12    HERE, THE DIRECTION IS "PROVIDE A FUN VISUAL EFFECT."

13         CORRECT?

14    A.   THAT'S WHAT SAMSUNG IS RECOMMENDING.

15    Q.   AND THE '381 PATENT, THE PATENT THE JURY HAS BEFORE THEM,

16    IS A PATENT THAT COVERS PROVIDING A FUN VISUAL EFFECT BY

17    BOUNCING BACK AT THE EDGE OF THE PAGE; CORRECT?

18    A.   WELL, IT DOES -- IT PROVIDES ONE METHOD FOR THAT.  THERE

19    ARE OTHER METHODS YOU CAN HAVE THE SAME BOUNCE BACK WITHOUT

20    PRACTICING THE '381 PATENT.

21    Q.   SURE.  BUT FOR 12 OF THE 13 PRODUCTS THAT ARE BEFORE THIS

22    JURY, THEY USE THE METHOD OF THE '381 PATENT?  THAT'S WHAT THE

23    PRIOR JURY FOUND; CORRECT?

24    A.   IS IT 12 OR IS IT SEVEN?

25    Q.   I THINK IT'S 12, BUT IF YOU'D LIKE TO LOOK AT YOUR EXPERT

1        REPORT -- LET'S -- RATHER THAN TAKE THE TIME, LET ME ASK YOU

2        THIS:  THE TOTAL NUMBER OF PRODUCTS INFRINGING THE '381 PATENT

3        IS ABOUT 10 MILLION; CORRECT?

4        A.   THAT SOUNDS RIGHT.  IT'S COVERING THE LONGEST PERIOD OF

5        TIME.

6        Q.   SURE.  OKAY.  SO FOR THAT 10 MILLION PRODUCTS THAT

7        INFRINGE THE '381 PATENT, YOU THINK SAMSUNG SHOULD PAY $11,340;

8        CORRECT?

9        A.   RIGHT, TO DESIGN AROUND THAT PATENT.

10       Q.   SO WE'VE GOT A SAMSUNG SURVEY BACK IN MAY OF 2010 TALKING

11       ABOUT THE NEED TO INCORPORATE OR ADDRESS THIS FEATURE, WE HAVE

12       A JURY VERDICT ON 10.8 MILLION UNITS OF INFRINGEMENT, AND YOU

13       THINK THE FAIR COMPENSATION IS $11,000; CORRECT?

14       A.   RIGHT.  YOU GO TO THE SURVEY AND YOU GO BACK TO THE

15       SUMMARY PAGE, THEY DIDN'T BRING THIS INFORMATION FORWARD TO THE

16       SUMMARY PAGE.  THAT'S NOT WHAT THEY'RE LOOKING AT.  THAT'S NOT

17       WHAT THE EXECUTIVES WERE CONCLUDING WAS THE REAL WORLD DEMAND

18       FOR THE PRODUCT.

19       Q.   MR. WAGNER, MY QUESTION WAS THIS:  FOR 10,000 -- FOR 10

20       MILLION UNITS, YOUR NUMBER IS $11,340; CORRECT?

21       A.   FOR THE SECOND TIME, YES.

22       Q.   OKAY.  NOW, LET'S TURN TO EXHIBIT 57, IF YOU COULD.  IT'S

23       IN VOLUME 1, TAB 4.

24            NOW, I WANT TO JUST ASK YOU ABOUT YOUR --

25       A.   THAT'S MY -- I HAVE A DEPOSITION AT THAT TAB.

```
1    Q.   IN VOLUME 1?

2    A.   YEAH.  VOLUME 1, TAB 4 IS A COPY OF MY DEPOSITION, ONE OF

3    MY FOUR DEPOSITIONS IN THIS CASE.

4    Q.   OH, FAIR ENOUGH.  FAIR ENOUGH.  TURN TO EXHIBIT 57 AND LET

5    ME GIVE YOU THE RIGHT PLACE.

6    A.   IT'S -- I'LL TELL YOU, IT'S VOLUME 2, TAB 10.

7    Q.   RIGHT.  VOLUME 1, TAB 4 IS YOUR DEPOSITION, CORRECT.

8         SO GO TO VOLUME 2, TAB 10.

9    A.   I'M THERE.

10   Q.   ARE YOU THERE?

11   A.   YES.

12   Q.   NOW, I WANT TO GO TO THIS, WHAT YOU JUST TOLD THE LADIES

13   AND GENTLEMEN OF THE JURY ABOUT THE IMPORTANCE OF THE FEATURES.

14        WE'VE NOW WOUND THE MOVIE FORWARD TO APRIL OF 2011 AND NOW

15   WE'RE TALKING ABOUT THE IPAD; CORRECT?

16   A.   THIS IS FOR THE GALAXY TAB 8.9, NOT AT ISSUE IN THIS CASE.

17   Q.   RIGHT.  BUT TURN, IF YOU WOULD -- BECAUSE I WANT TO TALK

18   ABOUT FEATURES, OKAY?  DO YOU HAVE EXHIBIT 57 BEFORE YOU?

19   A.   I DO.

20   Q.   ALL RIGHT.  TURN, IF YOU WOULD, IN EXHIBIT 57 TO PAGE 57.4

21   THROUGH 57.20.

22   A.   WAS THE FIRST PAGE 57.4?

23   Q.   57.4, THIS IS JUST A STARTING POINT.

24        NOW, TO HELP THE LADIES AND GENTLEMEN OF THE JURY SO WE

25   CAN GET TO THE PAGE AT ISSUE QUICKLY, THIS IS A DOCUMENT,
```

1       AGAIN, A SAMSUNG DOCUMENT; CORRECT?

2       A.   IT IS.

3       Q.   AND AT 57.4, IT'S DESCRIBING WHAT SAMSUNG ENGINEERS CALLED

4       MAJOR PROBLEM AREAS; CORRECT?

5       A.   CORRECT.

6       Q.   IF WE TURN TO PAGE 57.19, IF YOU WOULD.  NOW, ONE OF THE

7       THINGS WHERE -- ONE OF THE THINGS THAT'S DISCUSSED ON 57.19 IS

8       THE VISUAL EFFECT OF THE SAMSUNG PRODUCT COMPARED TO THE

9       IPAD 2; CORRECT?

10      A.   CORRECT.

11      Q.   NOW, LET'S SEE -- YOU WERE HERE FOR MR. PRICE'S OPENING

12      WHERE HE DESCRIBED THE INVENTIONS OF THE APPLE PATENTS AS

13      NARROW?  WERE YOU THERE?

14      A.   I WAS.

15      Q.   TRIVIAL?

16      A.   I --

17           MR. PRICE:  OBJECTION.

18           THE WITNESS:  I DON'T KNOW IF HE USED THAT WORD.

19           MR. PRICE:  I NEVER SAID THAT.

20      BY MR. LEE:

21      Q.   NOW, THIS ISSUE BACK IN 2011 GETS A STAMP AT THE TOP,

22      THAT'S SAMSUNG'S STAMP; CORRECT?

23      A.   IT IS.

24      Q.   AND THE WAY THEY LABELED THIS ISSUE IN THEIR INTERNAL

25      DOCUMENTS BEFORE -- NOT PART OF THIS LITIGATION -- IS

1          "CRITICAL;" CORRECT?

2          A.    THAT IS CORRECT.

3          Q.    SO LET'S LOOK AT WHAT THE CRITICAL PROBLEM WAS, IF WE

4          COULD.  ALL RIGHT?

5                KEEPING THIS BEFORE YOU, THE COMPARISON -- THE IPAD -- THE

6          SAMSUNG PRODUCT IS DESCRIBED AS "LACKING A FUN, WOW EFFECT."

7                CORRECT?

8          A.    THAT IS CORRECT.

9          Q.    IT'S DESCRIBED AS "TOP-MOST/BOTTOM-MOST AND DIAGONAL

10         MOVEMENTS LACK BOUNCE EFFECT."

11               CORRECT?

12         A.    THAT IS CORRECT.

13         Q.    AND SAMSUNG SAID, AS A CONSEQUENCE, THEY WERE GOING TO

14         REVIEW THE BOUNCE EFFECT; CORRECT?

15         A.    THEY WERE FOR THIS PRODUCT THAT'S NOT AT ISSUE IN THIS

16         CASE.

17         Q.    YEAH.  BUT THE FEATURE, AS WE'VE BEEN TALKING ABOUT, IS

18         THE BOUNCE EFFECT AS COVERED BY THE APPLE PATENT; CORRECT?

19         A.    I AGREE WITH THAT.

20         Q.    SO THIS IS NOT THE ONLY TIME IN THIS PRESENTATION THEY

21         DISCUSSED THE BOUNCE FEATURE; CORRECT?

22         A.    I AGREE WITH THAT AS WELL.

23         Q.    TURN TO 57.73, IF YOU WOULD.

24               NOW, THE ISSUE HERE IS, ON THIS PAGE, QUOTE, "NO SPRINGING

25         BOUNCE EFFECT."

1            CORRECT?

2       A.   THAT'S WHAT IT SAYS.

3       Q.   AND THE ISSUE IS LABELED THIS TIME AS "SERIOUS."

4            CORRECT?

5       A.   THAT IS CORRECT.

6       Q.   SO BACK WHEN SAMSUNG WAS CONSIDERING THESE ISSUES IN ITS

7       INTERNAL DOCUMENTS IN THE REAL WORLD, NOT FOR PURPOSES OF

8       LITIGATION, THINGS LIKE THE BOUNCE EFFECT WERE CRITICAL AND

9       SERIOUS ISSUES; CORRECT?

10      A.   ACCORDING TO THESE DOCUMENTS, THAT IS CORRECT.

11      Q.   AND THESE ARE FROM SAMSUNG, SIR; CORRECT?

12      A.   THESE ARE FROM SAMSUNG PEOPLE, YES.

13      Q.   YOU HAVE NO REASON TO DOUBT THE CONCLUSIONS THEY REACHED

14      IN THESE INTERNAL CONFIDENTIAL DOCUMENTS, DO YOU?

15      A.   NO.   THEY HAVE HUNDREDS OF CRITICAL ISSUES THAT THEY ARE

16      DISCUSSING IN THESE DOCUMENTS.

17      Q.   RIGHT.   NOW, MR. WAGNER, LET ME GO TO ANOTHER TOPIC.

18           YOU TALKED TO THE LADIES AND GENTLEMEN OF THE JURY ABOUT

19      DESIGN AROUND PERIODS.   DO YOU RECALL THAT?

20      A.   I DO.

21      Q.   AND YOU TALKED ABOUT IT FOR BOTH THE '915 PATENT; CORRECT?

22      A.   YES.

23      Q.   AND YOU TALKED ABOUT IT FOR THE REASONABLE ROYALTY

24      COMPUTATION THAT YOU MADE; CORRECT?

25      A.   I DID.

1      Q.   NOW, LET'S JUST BE SURE THAT THE JURY UNDERSTANDS A COUPLE

2      THINGS.  ONE I THINK WE'VE COVERED ALREADY.

3           THESE HYPOTHETICAL DESIGN AROUNDS THAT YOU USED TO COME UP

4      WITH YOUR $28,000 NUMBER, SAMSUNG NEVER IMPLEMENTED THEM, DID

5      THEY?

6      A.   THAT IS CORRECT.

7      Q.   SO THEY'RE JUST THINGS YOU SAY THEY COULD HAVE DONE THAT

8      THEY NEVER DID; CORRECT?

9      A.   THAT IS CORRECT.

10     Q.   SO LET'S ALSO TALK ABOUT HOW YOU CAME TO THE DESIGN AROUND

11     PERIODS.  OKAY?

12          AS YOU TOLD US, YOU'RE NOT A COMPUTER SCIENTIST OR

13     COMPUTER -- YOU'RE AN ENGINEER BY TRAINING IN COLLEGE; CORRECT?

14     A.   AND SOME WORK EXPERIENCE, BUT YES.

15     Q.   BUT THE DESIGN AROUND PERIODS WERE NOT SOMETHING YOU CAME

16     UP WITH ON YOURSELF, BY YOURSELF; CORRECT?

17     A.   NO, I DID NOT.

18     Q.   SO LET'S MAKE SURE THAT THE JURY UNDERSTANDS HOW YOU CAME

19     UP WITH THEM.  THE DESIGN AROUND PERIODS WERE PROVIDED TO YOU

20     IN TELEPHONE CALLS WITH KOREAN ENGINEERS OF SAMSUNG; CORRECT?

21     A.   THAT IS CORRECT.

22     Q.   YOU DON'T SPEAK KOREAN; CORRECT?

23     A.   I DON'T.

24     Q.   THEY DON'T SPEAK ENGLISH; CORRECT?

25     A.   I THINK SOME OF THEM HAD HALTING ENGLISH, BUT THERE WAS A

1    PERSON THERE FROM SAMSUNG WHO TRANSLATED FOR THEM.

2    Q.   RIGHT.  AND THE PERSON DOING THE TRANSLATING WAS A LAWYER

3    WHO WAS A SAMSUNG EMPLOYEE WHO WAS SITTING WITH THE SAMSUNG

4    EMPLOYEE IN KOREA DOING THE TRANSLATION; CORRECT?

5    A.   THAT'S ACCURATE.

6    Q.   AND YOU GOT YOUR DESIGN AROUND PERIODS FROM THE

7    TRANSLATION DONE BY THE SAMSUNG LAWYERS; CORRECT?

8    A.   YES.

9    Q.   AND IT'S TRUE, IS IT NOT, THAT YOU DID NOTHING ON YOUR OWN

10   TO VERIFY WHETHER THOSE DESIGN AROUND TIMES WERE ACCURATE OR

11   NOT?

12   A.   THAT'S CORRECT.  I WOULDN'T HAVE ANY EXPERIENCE IF I TRIED

13   TO DO IT TO GIVE ANY VALUE IN THIS COURTROOM.

14   Q.   RIGHT.  SO IF THERE IS -- DO YOU KNOW -- DO YOU KNOW

15   WHETHER ANY OF THOSE SAMSUNG ENGINEERS ARE GOING TO TESTIFY

16   HERE AND TELL THE JURY WHAT THE BASIS IS OF THOSE DESIGN AROUND

17   PERIODS?

18   A.   I DON'T BELIEVE SO.

19          MR. PRICE:  OBJECTION TO THAT.  ARGUMENTATIVE.

20          THE COURT:  OVERRULED.  OVERRULED.

21      GO AHEAD.

22   BY MR. LEE:

23   Q.   NOW, AND THE ONLY BASIS -- WELL, LET ME -- WITHDRAWN.

24      YOUR ENTIRE REASONABLE ROYALTY OPINION OF $28,000 FOR

25   10 MILLION INFRINGING UNITS IS BASED ON DESIGN AROUND PERIODS;

1      CORRECT?

2      A.   IT IS.

3      Q.   AND THE ONLY BASIS FOR YOUR DESIGN AROUND PERIODS IS WHAT

4      THE SAMSUNG LAWYERS TOLD YOU BY TELEPHONE THROUGH THEIR

5      LAWYERS; CORRECT?

6      A.   IT'S BASED ON HIS TRANSLATION.  IT WAS DONE

7      CONTEMPORANEOUS WITH THE PHONE CALL THAT I WAS ON WITH THE

8      KOREAN ENGINEERS.

9      Q.   RIGHT.  AND IT'S TRUE, IS IT NOT, THAT WHEN THEY GAVE YOU

10     THOSE DESIGN AROUNDS, THEY DIDN'T GIVE YOU A SINGLE DOCUMENT,

11     NOT A SINGLE DOCUMENT THAT WOULD HELP EXPLAIN, DOCUMENT, OR PUT

12     DOWN ON PAPER HOW THOSE DESIGN AROUNDS WERE GOING TO GET DONE;

13     CORRECT?

14     A.   THAT'S ACCURATE.

15     Q.   SO WHAT THEY DID IS THEY TOLD YOU HOW LONG IT WOULD TAKE,

16     BUT THEY DIDN'T EVEN TELL YOU WHAT THEY WOULD DO; CORRECT?

17     A.   THAT'S CORRECT.  EVEN IF THEY TOLD ME WHAT THEY WOULD DO,

18     I PROBABLY COULDN'T EVEN REALLY REMEMBER WHAT THAT WAS OR

19     UNDERSTAND WHETHER THAT WAS SUFFICIENT OR NOT.

20     Q.   ALL RIGHT.  SO LET'S TALK ABOUT THE D'677 PATENT, ONE OF

21     THE PATENTS AT ISSUE HERE; CORRECT?

22     A.   CORRECT.

23     Q.   AND I WANT TO TALK ABOUT -- AGAIN, I WANT TO GET FOCUSSED

24     ON WHAT WAS HAPPENING IN THE REAL WORLD, OKAY, AS OPPOSED TO

25     WHAT SOMEONE COULDA, SHOULDA, WOULDA DONE.  OKAY?

1          SAMSUNG HAD NOTICE THAT APPLE SAID WAS INFRINGING THE

2     D'677 PATENT IN APRIL 2011; CORRECT?

3     A.   I THINK THAT'S CORRECT.

4     Q.   SO NOW WE'RE IN APRIL OF 2011.  BUT SAMSUNG KEPT MAKING

5     INFRINGING PHONES AND BRINGING OUT NEW MODELS RIGHT THROUGH

6     NOVEMBER OF 2011; CORRECT?

7     A.   I THINK THAT'S CORRECT.

8     Q.   SO FOR SEVEN MONTHS AFTER APPLE SAID "PLEASE STOP,"

9     SAMSUNG KEPT BRINGING OUT INFRINGING PHONES; CORRECT?

10    A.   THEY DID.

11    Q.   NOW, YOU SAY THAT IT WOULD TAKE NO TIME TO DESIGN AROUND

12    THE D'677 PATENT.

13    A.   CORRECT, BECAUSE THEY ALREADY HAD MANY OTHER OPTIONS AND

14    DESIGNS THAT WERE ALREADY IN THE MARKETPLACE THAT THEY COULD

15    HAVE USED INSTEAD.

16    Q.   NOW, IS THERE GOING TO BE ANY -- WITHDRAWN.

17         SO JUST SO WE UNDERSTAND YOUR TESTIMONY, IT IS THAT THEY

18    COULD HAVE DESIGNED AROUND THE D'677 PATENT IN NO TIME AT ALL,

19    BUT INSTEAD THEY DECIDED TO INTRODUCE INFRINGING PHONES FOR

20    ANOTHER SIX MONTHS?

21    A.   THEY WEREN'T FOUND TO INFRINGE DURING THAT TIME PERIOD.

22         AS I FIND IN ALMOST EVERY CASE, THE ALLEGED INFRINGER AT

23    THAT TIME DOES NOT BELIEVE THAT THEY INFRINGE THE PATENTS OR

24    THAT THE PATENTS ARE VALID.

25         I RARELY, IF EVER, SEE SOMEONE CHANGE THEIR CONDUCT DURING

1      THE PERIOD OF TIME YOU'RE EXPRESSING.

2      Q.   AND ONE THING WE CAN AGREE UPON IS AFTER SAMSUNG WAS ASKED

3      TO STOP, EVEN THOUGH IT HAD ALL OF THESE DESIGN AROUNDS THAT

4      YOU'VE TALKED ABOUT, THEY DIDN'T; CORRECT?

5      A.   THAT'S MY UNDERSTANDING.

6      Q.   ALL RIGHT.  SO NOW LET'S TALK ABOUT THE '163 PATENT.

7      THAT'S DOUBLE TAP TO ZOOM; CORRECT?

8      A.   YES.

9      Q.   IN YOUR OPINION, IT WOULD HAVE TAKEN TWO WEEKS TO DESIGN

10     AROUND THAT PATENT; CORRECT?

11     A.   NO.  AGAIN, YOU SAY THAT'S MY OPINION.  THAT'S WHAT -- THE

12     INFORMATION I WAS GIVEN.

13     Q.   FAIR ENOUGH.  FAIR ENOUGH.  AND WE OUGHT -- THAT'S VERY

14     FAIR.  I WANT TO BE VERY CLEAR ON THAT.

15         IT'S NOT YOUR OPINION TWO WEEKS IS THE DESIGN AROUND

16     PERIOD; CORRECT?

17     A.   CORRECT.  JUST LIKE MS. DAVIS CAN'T SAY IT'S REALLY FOUR

18     WEEKS.

19     Q.   RIGHT.  IT'S JUST INFORMATION THAT YOU WERE GIVEN THAT YOU

20     RELY UPON; CORRECT?

21     A.   CORRECT.

22     Q.   BUT THE ONLY INFORMATION YOU RELY UPON FOR YOUR REASONABLE

23     ROYALTY OPINION; CORRECT?

24     A.   CORRECT.

25     Q.   ALL RIGHT.  NOW, LET'S -- AGAIN, ON THE '163 PATENT, FIVE

1    MONTHS AFTER SAMSUNG HAD NOTICE, IT CONTINUED TO INTRODUCE NEW

2    PHONES THAT HAD THE INFRINGING FEATURES; CORRECT?

3    A.   CORRECT.

4    Q.   ALL RIGHT.  EVEN THOUGH, ACCORDING TO YOUR COMPUTATIONS,

5    IT WOULD HAVE TAKEN $5,580 TO DESIGN AROUND; CORRECT?

6    A.   CORRECT.

7    Q.   LET'S GO TO THE '381 PATENT.  THAT'S THE BOUNCE BACK

8    PATENT; CORRECT?

9    A.   CORRECT.

10   Q.   THE SAMSUNG ENGINEERS TOLD YOU, THROUGH THE INTERPRETER,

11   THAT IT WOULD TAKE FOUR WEEKS TO DESIGN AROUND THE '381 PATENT;

12   CORRECT?

13   A.   FOUR WEEKS AND THREE DAYS, AND THAT'S ACTUALLY LONGER THAN

14   THE TIME THAT, ORALLY ON A TELEPHONE CALL, THAT MS. DAVIS WITH

15   NO DOCUMENTATION GOT THE SAME INFORMATION FROM AN APPLE

16   ENGINEER.  THE ONLY DIFFERENCE IS SHE DIDN'T NEED A TRANSLATOR.

17   Q.   RIGHT.  MR. WAGNER, MY QUESTION WAS, IT'S FOUR WEEKS AND

18   THREE DAYS IS THE NUMBER THAT YOU USED?

19   A.   THAT'S CORRECT.

20   Q.   AND IN THE REAL WORLD, SAMSUNG WAS INTRODUCING PHONES

21   FOUND TO INFRINGE THE '381 PATENT AS LATE AS OCTOBER 2011;

22   CORRECT?

23   A.   THAT IS CORRECT.

24   Q.   SO 14 MONTHS AFTER APPLE SAID "PLEASE STOP, PLEASE STOP,"

25   SAMSUNG STILL IS RELEASING NEW PHONES; CORRECT?

1       A.   I'M NOT SURE WHERE THE 14 MONTHS COMES FROM.

2       Q.   FOR SOME PERIOD OF TIME; CORRECT?

3       A.   YES, FOR SOME PERIOD OF TIME.

4       Q.   EVEN THOUGH YOU THINK IT WOULD TAKE $11,000 TO DESIGN

5       AROUND; CORRECT?

6       A.   YES.

7       Q.   ALL RIGHT.  NOW LET'S TALK ABOUT THE '915 PATENT AND WHAT

8       HAPPENED IN THE REAL WORLD.  SAMSUNG KNEW ABOUT THE '915 PATENT

9       NO LATER THAN APRIL 15TH, 2011; CORRECT?

10      A.   CORRECT.

11      Q.   AND THAT'S THE DATE ON WHICH APPLE AGAIN SAID "PLEASE

12      STOP, STOP USING THE '915 PATENT."  CORRECT?

13      A.   CORRECT.

14      Q.   THE INFORMATION THAT THE SAMSUNG ENGINEERS GAVE YOU BY

15      TELEPHONE IS IT WOULD TAKE FOUR WEEKS TO DESIGN AROUND THE '915

16      PATENT; CORRECT?

17      A.   CORRECT.

18      Q.   BUT IN THE REAL WORLD, SAMSUNG KEPT INTRODUCING PHONES

19      FOUND TO INFRINGE THE '915 PATENT AS LATE AS OCTOBER 2011;

20      CORRECT?

21      A.   CORRECT.

22      Q.   FOR SIX MONTHS AFTER APPLE SAID, "PLEASE STOP."  CORRECT?

23      A.   YES.

24      Q.   EVEN THOUGH IN YOUR VIEW IT WOULD HAVE TAKEN $10,000 TO

25      ELIMINATE THE PROBLEM?

```
1    A.   IF THEY HAD KNOWN AT THAT TIME IN THAT PERIOD YOU'RE

2    EXPRESSING THAT THEY ACTUALLY INFRINGED A VALID PATENT, THAT'S

3    TRUE.

4    Q.   WELL, APPLE SAID, "WE'VE GOT A VALID PATENT THAT'S ISSUED

5    BY THE PATENT OFFICE.  PLEASE STOP."

6         DID THEY DESIGN AROUND?

7    A.   NO.  AND LIKE I SAY, I'VE BEEN IN HUNDREDS OF PATENT CASES

8    AND I NEVER SEE ALLEGED INFRINGERS CHANGE THEIR BEHAVIOR DURING

9    THE PERIOD OF TIME UP TO A JUDGMENT.

10   Q.   YOU HAVE NEVER SEEN, MR. WAGNER, ANYBODY WHO HAS BEEN

11   ACCUSED OF INFRINGING DESIGN AROUND A PRODUCT WITHOUT WAITING

12   FOR A JURY VERDICT?  IS THAT YOUR TESTIMONY?

13   A.   WELL, I -- MAYBE, IN HUNDREDS, ONCE OR TWICE.

14   Q.   ONCE OR TWICE?

15   A.   I'VE SEEN SOME TIMES THAT I'VE HAD CLIENTS, WHEN I'M

16   WORKING FOR THE ALLEGED INFRINGER, ACTUALLY DESIGN AROUND A

17   PATENT.  THEY'VE ACTUALLY DONE IT IN THE LAB AND THEY'VE

18   DONE -- THEY'VE GOT PRODUCTS READY.

19        THEY DON'T INTRODUCE IT IN THE MARKET BECAUSE THEY BELIEVE

20   THAT THAT WOULD BE AN ADMISSION THAT WE INFRINGE.

21   Q.   ONCE OR TWICE IN HUNDREDS OF TIMES PEOPLE DID THE

22   RESPONSIBLE THING AND JUST WENT TO THE OTHER DESIGN?

23            MR. PRICE:  OBJECTION.  THAT'S ARGUMENTATIVE.

24            THE COURT:  OVERRULED.

25            MR. LEE:  I'LL WITHDRAW IT.
```

1     Q.   ALL RIGHT.  LET'S TALK ABOUT YOUR ALTERNATIVE DESIGNS.

2     YOU GAVE THE JURY SOME TESTIMONY THAT THERE WERE SOME

3     ALTERNATIVE DESIGNS THAT COULD BE USED FOR THE '915 AND D'677

4     PATENTS BASED UPON THE PRIOR JURY'S VERDICT.  DO YOU RECALL

5     THAT?

6     A.   I DO.

7     Q.   RIGHT.  AND ONE OF THEM WAS THE GALAXY ACE.  DO YOU RECALL

8     THAT?

9     A.   YES.

10    Q.   YOU TESTIFIED ABOUT THAT JUST LAST FRIDAY; CORRECT?

11    A.   I DID.

12    Q.   BUT THE GALAXY ACE WAS FOUND BY THE PRIOR JURY TO INFRINGE

13    THE '381 PATENT, WASN'T IT?

14    A.   YES.  BUT THAT'S BEFORE THE LOST PROFITS PERIOD IS

15    APPROPRIATE, SO THAT'S IRRELEVANT.

16    Q.   WELL, HER HONOR WILL TELL THE JURY WHAT'S RELEVANT AND

17    IRRELEVANT.

18         MY QUESTION IS SIMPLY THIS:  DID THE JURY FIND THE '381

19    PATENT WAS INFRINGED BY THE GALAXY ACE?

20    A.   THEY DID.

21    Q.   DID THE JURY FIND THAT THE GALAXY ACE WAS INFRINGED BY THE

22    '163 PATENT?

23    A.   YES, THOSE ARE THE TWO PATENTS THAT THE JURY FOUND THE

24    GALAXY ACE INFRINGED.

25    Q.   RIGHT.  AND DO YOU HAVE ANY INFORMATION, MR. WAGNER, ABOUT

1    HOW SAMSUNG WOULD DESIGN AROUND THOSE TWO PATENTS IN ORDER TO

2    ALLOW THEMSELVES TO HAVE A NON-INFRINGING ALTERNATIVE ON THE

3    MARKET?

4    A.   YES.  EVEN YOUR EXPERT AGREES WITH ME ON THIS POINT, THAT

5    BY THE TIME THE LOST PROFITS ARE RELEVANT, BOTH OF THOSE

6    PRODUCTS WOULD HAVE BEEN DESIGNED AROUND, AND SO SHE DOESN'T

7    INCLUDE ANY INFRINGEMENT OF THE '381 OR '163 IN HER LOST

8    PROFITS CALCULATION.

9    Q.   NOW, IS IT YOUR BELIEF -- I WANT TO MAKE SURE WE GET THIS

10   DOWN -- IS IT YOUR BELIEF THAT APPLE WOULD HAVE LET SAMSUNG

11   SELL PRODUCTS THAT INFRINGED THE '381 AND '163 PATENTS AS

12   ALTERNATIVES TO THE '915 PATENT?  IS THAT REALLY YOUR BELIEF?

13   A.   WELL, IF THEY'RE CLAIMING LOST PROFITS, I DON'T THINK THEY

14   HAVE ANY RIGHT.

15        IF IT'S REASONABLE ROYALTY, I DO BELIEVE THAT'S RELEVANT.

16   Q.   MR. WAGNER, APPLE HAD SUED SAMSUNG SAYING "PLEASE STOP,"

17   RIGHT?

18   A.   OH, CLEARLY, YES.

19   Q.   AND IS IT YOUR BELIEF THAT APPLE WOULD, HAVING SUED AND

20   SAID "PLEASE STOP INFRINGING THE '381" -- APPLE DID THAT,

21   CORRECT?

22   A.   THEY DID.

23   Q.   THEY SAID "PLEASE STOP INFRINGING THE '163."  THEY DID

24   THAT; CORRECT?

25   A.   I DON'T EVER REMEMBER SEEING THE WORD "PLEASE," BUT THEY

1    DID ASK THEM TO STOP.

2    Q.   FAIR ENOUGH.  WELL, YOU KNOW, ALL PLEADINGS ARE INTENDED

3    TO BE POLITE.

4    A.   I WOULD HOPE SO.

5    Q.   SO "PLEASE" WAS MY ADDITION.

6         HAVING SUED TO SAY "STOP," DO YOU REALLY THINK APPLE WOULD

7    HAVE LET SAMSUNG COME ON THE MARKET WITH THOSE PRODUCTS AS

8    NON-INFRINGING ALTERNATIVES TO THE '915?

9    A.   I DON'T THINK IT'S APPLE'S DECISION, BASED ON THE

10   STRUCTURE OF THE CASE, WHAT THEY CAN AND CANNOT DO.  THAT'S

11   BASED ON THE LAW.

12   Q.   I'M ASKING YOU, IN A REAL WORLD, DO YOU THINK APPLE WOULD

13   HAVE LET THAT HAPPEN?

14   A.   I THINK THAT APPLE WOULD USE ANYTHING THEY COULD TO STOP

15   SAMSUNG FROM COMPETING.

16   Q.   FROM COMPETING OR INFRINGING?

17   A.   BOTH.

18   Q.   OKAY.  BUT WE'RE TALKING HERE ABOUT INFRINGING; CORRECT?

19   A.   CORRECT, AND I SHOULD HAVE USED THE WORD "INFRINGING."

20   Q.   OKAY.  NOW, LET'S TALK ABOUT THE INTERCEPT.

21        THIS IS THE INTERCEPT, CORRECT, JX 1009 (INDICATING)?

22   A.   IT IS.

23   Q.   AND THIS IS ONE OF THE PHONES THAT YOU SAY CUSTOMERS IN

24   THE REAL WORLD WOULD HAVE FOUND AN ACCEPTABLE NON-INFRINGING

25   SUBSTITUTE; CORRECT?

1    A.   I DO.

2    Q.   ALL RIGHT.  NOW, YOU KNOW THAT ACTUALLY MS. DAVIS

3    ACCOUNTED FOR THE INTERCEPT IN HER LOST PROFITS ANALYSIS, DON'T

4    YOU?

5    A.   SHE DID.

6         AND I WANT TO CORRECT SOMETHING I SAID ON FRIDAY, THAT I

7    SAID MS. DAVIS DID NOT CONSIDER ANY NON-INFRINGING

8    ALTERNATIVES.  THAT WAS NOT PROPER.

9    Q.   RIGHT.

10   A.   SHE DID.

11   Q.   SHE, IN FACT, DID; CORRECT?

12   A.   SHE DID.

13   Q.   OKAY.  SO NOW LET'S LOOK AT WHAT CUSTOMERS WERE SAYING

14   ABOUT THE INTERCEPT.  OKAY?

15        THERE WERE TWO POINTS I WANTED TO CLEAR UP.  ONE WAS

16   WHETHER SHE HAD ADDRESSED THE INTERCEPT AND ALLOWED FOR IT IN

17   HER COMPUTATIONS, AND WE CAN AGREE SHE DID; CORRECT?

18   A.   SHE DID.

19   Q.   BUT LET'S TALK ABOUT WHAT CUSTOMERS WERE SAYING ABOUT THE

20   INTERCEPT.  TURN, IF YOU WOULD, TO VOLUME 2, TAB 19, WHICH IS

21   PX 69.

22        NOW, AGAIN, YOU'VE SEEN THIS BEFORE; CORRECT?

23   A.   I HAVE.

24   Q.   THIS IS A REAL WORLD SURVEY; CORRECT?

25   A.   IT IS.

1      Q.   NOT DONE FOR PURPOSES OF LITIGATION; CORRECT?

2      A.   THAT IS CORRECT.

3      Q.   BY A THIRD PARTY?

4      A.   YOU'RE ACCURATE.

5      Q.   NOW, IT'S DATED MARCH OF 2011; CORRECT?

6      A.   IT IS.

7      Q.   AND J.D. POWER, IN FACT, IS QUITE RESPECTED IN THE FIELD;

8      CORRECT?

9      A.   I BELIEVE THEY ARE.

10     Q.   TURN, IF YOU WOULD, TO PAGE 6.  AND ONE OF THE THINGS THAT

11     THE SURVEY SAYS IS THAT ONE OF ITS PURPOSES IS "DETERMINE

12     CRITICAL FACTORS THAT IMPACT CUSTOMER SATISFACTION ACROSS

13     SMARTPHONE USER SEGMENTS, INCLUDING AT THE MODEL LEVEL."

14          DO YOU SEE THAT?

15     A.   I DIDN'T SEE WHERE YOU'RE READING, BUT I'M SURE THAT'S

16     WHAT ONE OF THEIR OBJECTIVES WOULD BE.

17     Q.   DO YOU SEE IT?

18     A.   I SEE.

19     Q.   AND WE'RE ON THE SAME PAGE, PAGE 6, AND THE SAME BULLET,

20     THE SECOND ONE DOWN; CORRECT?

21     A.   WE ARE.

22     Q.   TURN TO THE NEXT PAGE, IF YOU WOULD, SO THE JURY CAN

23     UNDERSTAND HOW MANY PEOPLE ACTUALLY GOT SURVEYED HERE.  IT'S

24     ABOUT 7,000 PEOPLE; CORRECT?

25     A.   THAT SOUNDS RIGHT.

1     Q.   AND ABOUT 760 OF THEM WERE ACTUALLY SAMSUNG USERS;

2     CORRECT?

3     A.   YES.

4     Q.   SO REAL WORLD SURVEY DONE FOR PURPOSES OTHER THAN THE

5     LITIGATION; CORRECT?

6     A.   CORRECT.

7     Q.   NOW, LET'S LOOK AT WHAT THE SURVEY FINDINGS WERE IN THIS

8     REAL WORLD SURVEY.

9          TURN TO PAGE 11.  DO YOU HAVE THAT BEFORE YOU?

10    A.   I DO.

11    Q.   NOW, THE SURVEY FOUND THAT AMONG PEOPLE WHO WERE

12    CONSIDERING PURCHASING A NEW SMARTPHONE IN THE NEXT SIX MONTHS,

13    33 PERCENT CONSIDERED THEMSELVES LIKELY TO PURCHASE AN IPHONE;

14    CORRECT?

15    A.   IT SAYS THAT.

16    Q.   BY COMPARISON, ONLY 10 PERCENT ELECTED TO PURCHASE A

17    SAMSUNG PHONE; CORRECT?

18    A.   YES.

19    Q.   TURN, IF YOU WOULD, TO PAGE 61.  THERE'S BEEN SOME

20    CROSS-EXAMINATION ABOUT WHETHER A PURCHASER OF A SAMSUNG PHONE

21    WOULD BE INTERESTED IN PURCHASING AN APPLE IPHONE OR SOME OTHER

22    PRODUCT; CORRECT?

23    A.   CORRECT.

24    Q.   YOU'VE REVIEWED PAGE 61 BEFORE?

25    A.   I BELIEVE I'VE SEEN THIS PAGE BEFORE.

1    Q.   AND THIS IS LIKELIHOOD OF REPURCHASING A CURRENT BRAND;

2    CORRECT?

3    A.   CORRECT.

4    Q.   SO FOR APPLE, 37 PERCENT DEFINITELY WILL PURCHASE ANOTHER

5    APPLE, AND 49 PERCENT PROBABLY WILL; CORRECT?

6    A.   YES.

7    Q.   LET'S GO ALL THE WAY TO THE RIGHT FOR SAMSUNG.  ACCORDING

8    TO THE SURVEY, 6 PERCENT, RIGHT, DEFINITELY WILL REPURCHASE A

9    SAMSUNG, 50 PERCENT PROBABLY WILL; CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   THE 6 PERCENT NUMBER IS A SIGNIFICANT NUMBER, IS IT NOT?

12   A.   I BELIEVE IT'S SIGNIFICANT, YES.

13   Q.   YES.  OKAY.  TURN, IF YOU WOULD, TO PAGE 84, PX 69-84, AND

14   LET'S SEE HOW THE INTERCEPT COMPARES TO THE IPHONE IN THIS REAL

15   WORLD SURVEY.

16        ON PAGE 64 -- I'M GOING TO PUT 84 AND 85 BOTH UP THERE.

17   YOU'VE SEEN BOTH PAGES?

18   A.   I HAVE.

19   Q.   ON THE LEFT-HAND SIDE, PAGE 84, ARE THE TOP RANKED PHONES,

20   AND THE TOP RANKED PHONE IS THE APPLE IPHONE 4; CORRECT?

21   A.   CORRECT.

22   Q.   ALL RIGHT.  THE INTERCEPT DOESN'T EVEN APPEAR ON THIS

23   PAGE, DOES IT?

24   A.   IT DOES NOT APPEAR.

25   Q.   YOU ACTUALLY HAVE TO GO TO THE NEXT PAGE WITH THE LOWER

```
1    RANKING PHONES TO FIND THE INTERCEPT; CORRECT?

2    A.   I BELIEVE THAT'S CORRECT.

3    Q.   AND THERE ARE AN AWFUL LOT OF PHONES BETWEEN THE IPHONE

4    AND THE SAMSUNG INTERCEPT; CORRECT?

5    A.   THERE IS.

6    Q.   AND IT'S YOUR TESTIMONY THAT THE INTERCEPT, WITH THAT TYPE

7    OF CONSUMER SATISFACTION, WOULD BE AN ACCEPTABLE NON-INFRINGING

8    SUBSTITUTE?

9    A.   YES, BASED ON THE AUDIENCE THAT IS RELEVANT TO MY

10   CALCULATION.

11   Q.   ALL RIGHT.  IS THAT DIFFERENT THAN THE AUDIENCE THAT WAS

12   RELEVANT TO J.D. POWER?

13   A.   IT'S VERY DIFFERENT.

14   Q.   IN THIS REAL WORLD SURVEY?

15   A.   RIGHT.  THIS REAL WORLD SURVEY WAS LOOKING --

16   Q.   UM --

17        MR. PRICE:  OBJECTION.  HE SHOULD BE ABLE TO FINISH

18   HIS ANSWER.

19   BY MR. LEE:

20   Q.   GO AHEAD.  GO AHEAD.

21   A.   THE REAL WORLD SURVEY IS NOT LOOKING AT PEOPLE THAT HAVE

22   ALREADY BOUGHT A PARTICULAR PHONE.  AS MR. LEE ADEQUATELY

23   EXPLAINED TO YOU, IT'S A MUCH SMALLER PERCENTAGE OF PEOPLE THAT

24   ARE INTERESTED IN SAMSUNG VERSUS APPLE IN THE REAL WORLD OF

25   TOTAL POPULATION.
```

1          BUT ONCE YOU GET TO THIS 10 PERCENT OR SO THAT WANT TO BUY

2     A SAMSUNG PHONE, THAT'S WHO YOU HAVE TO TEST, NOT THE OVERALL

3     POPULATION, WHICH THESE CHARTS ARE ADDRESSING.

4     Q.    WELL, MR. WAGNER, THE 5 PERCENT WHO DEFINITELY WILL BUY

5     ANOTHER SAMSUNG PHONE, THEY'RE SAMSUNG PURCHASERS, AREN'T THEY?

6     A.    JUST LIKE THE PEOPLE THAT ARE AT ISSUE IN THIS CASE.

7     Q.    RIGHT.  AND OF ALL THOSE 760 SAMSUNG PEOPLE WHO WERE

8     SURVEYED, 5 PERCENT DEFINITELY WOULD STAY WITH SAMSUNG; RIGHT?

9     A.    I DON'T -- I THINK IT WAS 6 PERCENT, BUT THAT'S CLOSE.

10    Q.    6 PERCENT.

11         NOW, LET'S TALK ABOUT THE COMPETITION BETWEEN APPLE AND

12    SAMSUNG.  YOU'VE BEEN HERE IN THE COURTROOM WHEN SOME OF THE

13    BUSINESS PEOPLE, LIKE MR. SCHILLER, WHO WERE ACTUALLY IN THE

14    TRENCHES SAID APPLE AND SAMSUNG ARE VERY DIRECT COMPETITORS;

15    CORRECT.

16    A.    I THINK MR. SCHILLER IS FAR ABOVE THE TRENCHES, BUT YES,

17    HE'S AN EXECUTIVE AT APPLE.

18    Q.    AND HE -- THEY TESTIFIED THEY COMPETE FOR THE SAME

19    CUSTOMERS; CORRECT?

20    A.    PARDON ME?

21    Q.    THEY COMPETE FOR THE SAME CUSTOMERS IN THE MARKETPLACE?

22    A.    OH, I AGREE WITH THAT.

23    Q.    THEY'RE -- SAMSUNG'S INTERNAL DOCUMENTS RECOGNIZE THIS

24    HEAD-TO-HEAD COMPETITION; CORRECT?

25    A.    THEY DO.

1    Q.   TURN, IF YOU WOULD, TO VOLUME 2, TAB 13, PX 60.  DO YOU

2    HAVE THAT BEFORE YOU?

3    A.   I DO.

4    Q.   NOW, AGAIN, THIS IS ANOTHER TOP SECRET SAMSUNG DOCUMENT

5    OBTAINED DURING THE COURSE OF THE LITIGATION; CORRECT?

6    A.   IT IS.

7    Q.   NOT SPECIALLY PREPARED FOR LITIGATION; CORRECT?

8    A.   IT WAS NOT.

9    Q.   IT WAS PREPARED BY MR. DENISON, WHO IS THE HEAD OF

10   STRATEGY FOR SAMSUNG TELECOMMUNICATIONS AMERICA; CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   NOW, BY THE WAY, DID YOU TALK TO MR. DENISON IN PREPARING

13   YOUR OPINIONS IN THIS CASE IN?

14   A.   I DID NOT.

15   Q.   SO YOU DIDN'T TALK TO THE HEAD OF STRATEGY FOR STA IN

16   PREPARING YOUR OPINIONS?

17   A.   THAT IS RIGHT.

18   Q.   BUT YOU COULD HAVE IF YOU WANTED TO; CORRECT?

19   A.   HE WAS AVAILABLE TO ME, YES.

20   Q.   ALL RIGHT.  TURN, IF YOU WOULD, TO SLIDE 8 IN PX 60.

21        NOW, THERE ARE A LOT OF DIAGRAMS AND STUFF ON THIS PAGE,

22   BUT LET'S LOOK AT MR. DENISON'S CONCLUSION AT THE TOP.  "U.S.

23   MARKET BECOMING A TWO HORSE RACE BETWEEN APPLE AND SAMSUNG."

24        CORRECT?

25   A.   THAT IS CORRECT, FOR A PERIOD THAT'S AFTER THE LOST

```
 1      PROFITS PERIOD.

 2      Q.   RIGHT.  THIS DOCUMENT IS DATED FEBRUARY 2012; CORRECT?

 3      A.   RIGHT, WHICH IS ALMOST A HALF YEAR AFTER THE PERIOD THAT'S

 4      RELEVANT TO THIS CASE.

 5      Q.   RIGHT.  AND YOU THINK THAT A YEAR BEFORE 2011, SAMSUNG AND

 6      APPLE WEREN'T INTENSE COMPETITORS COMPETING FOR THE SAME

 7      CUSTOMERS IN THE SAME MARKET, MR. WAGNER?

 8      A.   OH, NO.  I THINK THEY'VE ALWAYS BEEN THAT.

 9      Q.   NOW, TURN IF YOU WOULD, THEN, TO PX 62, WHICH IS VOLUME 2,

10      TAB 14.  TELL ME WHEN YOU'RE THERE.

11      A.   I'M THERE.

12      Q.   YOU RECOGNIZE THIS AS AN INTERNAL, ANOTHER INTERNAL

13      SAMSUNG DOCUMENT TALKING ABOUT COMPETITION BETWEEN APPLE AND

14      SAMSUNG?

15      A.   I DO.

16            MR. LEE:  WE OFFER PX 62, YOUR HONOR.

17            THE COURT:  ANY OBJECTION?

18            MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR.

19            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

20      (PLAINTIFF'S EXHIBIT 62 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22      BY MR. LEE:

23      Q.   TURN, IF YOU WOULD, TO PAGE 11.  THIS IS -- THE DOCUMENT'S

24      ENTITLED "STA OFFENSIVE PORTFOLIO STRATEGY."  CORRECT?

25      A.   IT DOES.
```

1    Q.   TURN, IF YOU WOULD, TO PAGE 11.  LET'S GO TO PAGE 16.

2    A.   16?

3    Q.   16.  16.  I'M SORRY.  DO YOU HAVE IT BEFORE YOU?

4    A.   I DO.

5    Q.   AND DO YOU SEE THE DEFENSIVE PORTFOLIO STRATEGY, WHICH IS

6    DESCRIBED AS "PREVENT SPRINT AND T-MOBILE IPHONE DEFECTORS."

7    CORRECT?

8    A.   IT DOES.

9    Q.   SPRINT AND T-MOBILE IPHONE DEFECTORS ARE PEOPLE WHO MIGHT

10   PURCHASE AN IPHONE INSTEAD OF A SAMSUNG PHONE?

11   A.   WELL, NOT DURING THE PERIOD OF TIME THAT'S RELEVANT TO

12   THIS LAWSUIT.  THESE CARRIERS DIDN'T CARRY AN IPHONE UNTIL

13   AFTER THE PERIOD THAT YOU HAVE TO ADDRESS AS A JURY IN THIS

14   CASE.

15   Q.   BUT --

16   A.   BUT IN THE FUTURE THEY WOULD BE, YES.

17   Q.   MR. WAGNER, THE COMPETITION BETWEEN THE PARTIES IS

18   RELEVANT TO REASONABLE ROYALTY, IS IT NOT?

19   A.   DURING THE PERIOD OF TIME THAT THE ROYALTY IS DUE, YES.

20   Q.   YES.  AND SOME OF THESE DOCUMENTS WE'VE JUST SEEN ARE

21   DOCUMENTS GENERATED DURING THE PERIOD OF TIME COVERED BY THE

22   REASONABLE ROYALTY PERIOD; CORRECT?

23   A.   I AGREE IT'S RELEVANT TO ROYALTIES, NOT RELEVANT TO LOST

24   PROFITS.

25   Q.   WELL, I JUST WANT TO BE SURE THAT THE LADIES AND GENTLEMEN

1   OF THE JURY ARE NOT CONFUSED.

2   A.   I DO, TOO.

3   Q.   WHEN YOU'RE TALKING ABOUT PERIOD, YOU'RE TALKING ABOUT

4   PERIOD FOR THE '915 LOST PROFITS; CORRECT?

5   A.   CORRECT.

6   Q.   BUT ALL THESE DOCUMENTS ABOUT COMPETITION AND TAKING,

7   PREVENTING DEFECTORS ARE RELEVANT TO REASONABLE ROYALTY;

8   CORRECT?

9   A.   THAT'S TRUE.

10  Q.   NOW, IN THE NEXT FOUR PAGES OF THIS INTERNAL DOCUMENT,

11  SAMSUNG'S PRESENTATION DESCRIBES ITS PLAN TO RETAIN CUSTOMERS

12  AND NOT LET THEM GO TO THE IPHONE; CORRECT?

13  A.   CORRECT.

14  Q.   AND THIS WAS A STRATEGY TO KEEP PEOPLE FROM GOING FROM

15  SAMSUNG TO THE IPHONE; CORRECT?

16  A.   CORRECT.

17  Q.   NOW, LET ME MOVE TO ANOTHER TOPIC, BUT RELATED.

18       IT'S YOUR OPINION, IS IT NOT, MR. WAGNER, THAT IF

19  CUSTOMERS WERE FORCED TO WAIT A COUPLE WEEKS OR A MONTH WHILE

20  SAMSUNG REDESIGNED ITS PHONES -- DO YOU HAVE THAT IN MIND?

21  A.   I DO.

22  Q.   -- APPLE WOULD NOT HAVE SOLD A SINGLE ADDITIONAL PRODUCT

23  DURING THAT PERIOD OF TIME?

24  A.   THAT'S MY OPINION.

25  Q.   NOT A SINGLE ONE?

1    A.   I THINK IT'S POSSIBLE, BUT I THINK THERE'S BEEN NO PROOF

2    THAT THAT WOULD HAVE HAPPENED.

3    Q.   SO LET'S SEE IF THE JURY CAN PUT THIS IN CONTEXT.  I WANT

4    TO FOCUS ON THE PERIOD MAY AND JUNE OF 2011.  CORRECT?  CAN YOU

5    DO THAT?

6    A.   I CAN DO THAT.

7    Q.   IN MAY AND JUNE OF 2011, SAMSUNG SOLD 2.7 MILLION

8    INFRINGING PRODUCTS; CORRECT?

9    A.   THAT MAY BE TRUE.

10        THE MORE RELEVANT PERIOD IS THE MIDDLE OF APRIL, SECOND

11   HALF TO MAY.  JUNE ISN'T RELEVANT.

12   Q.   WELL, I'M JUST TRYING TO GET THE DATES DOWN.  HER HONOR

13   WILL TELL THE JURY WHAT PERIODS ARE RELEVANT.

14        I'M JUST TRYING TO TALK ABOUT WHAT YOUR OPINION IS AS A

15   DAMAGES EXPERT RATHER THAN AS A LAWYER.  OKAY?

16   A.   I'VE ALWAYS -- I THINK I'M DOING IT AS A DAMAGES EXPERT.

17   Q.   OKAY.  FAIR ENOUGH.  I THINK YOU ARE, TOO.

18        NOW, 2.7 MILLION PRODUCTS, INFRINGING PHONES WERE SOLD

19   DURING THE PERIOD OF MAY AND JUNE 2011; CORRECT?

20   A.   I HAVE NO REASON TO DISAGREE.  I DON'T HAVE THAT NUMBER

21   MEMORIZED.

22   Q.   I'LL REPRESENT TO YOU I'VE TAKEN IT RIGHT OUT OF YOUR

23   REPORT.

24   A.   THANK YOU.

25   Q.   NOW, IT'S YOUR OPINION, IS IT NOT, THAT IF THOSE 2.7

```
1    MILLION PHONES HAD NOT BEEN ON THE MARKET, THOSE INFRINGING

2    PHONES, APPLE WOULD NOT HAVE MADE A SINGLE ADDITIONAL SALE;

3    CORRECT?

4    A.   CORRECT, BASED ON THE INFORMATION THAT I HAVE SEEN.

5    Q.   RIGHT.  SO YOU'RE NOT SAYING THEY WOULD HAVE MADE, SOLD

6    ONE PHONE, TWO PHONES, OR EVEN 5 PERCENT OF ALL PHONES;

7    CORRECT?

8    A.   WELL, ANYTHING IS POSSIBLE, BUT I HAVEN'T SEEN THE

9    EVIDENCE THAT THAT WOULD HAVE HAPPENED.

10   Q.   YOU'VE SEEN ALL THE SURVEY EVIDENCE, ALL THE DEMANDS, ALL

11   OF THE COMPETITION DOCUMENTS, AND YOU HAVEN'T SEEN ANY EVIDENCE

12   THAT IF 2.7 MILLION INFRINGING PHONES WERE OFF THE MARKET,

13   APPLE WOULD NOT HAVE SOLD ONE ADDITIONAL PHONE?

14   A.   WELL, I AGREE -- DISAGREE WITH SOMETHING IN YOUR QUESTION,

15   THAT THESE PHONES WOULD BE OFF THE MARKET.

16        AGAIN, WE'RE ONLY TALKING ABOUT ONE PATENT WITH ONE VERY

17   NARROW FEATURE THAT WAS NOT PROFILED, NEVER SAW A SINGLE PAGE

18   YET IN THIS TRIAL THAT SHOWED THE '915 PATENT WAS SOMETHING

19   THAT WAS CRITICAL OR SERIOUS.  IT'S THE OTHER PATENTS.

20        SO DON'T BE CONFUSED.  IT'S ONLY THE '915 PATENT THAT I'M

21   ADDRESSING IN LOST PROFITS.

22   Q.   BUT MR. WAGNER, AS WE'VE TALKED ABOUT, DEMAND FOR PATENTED

23   FEATURES, DEMAND FOR THE PATENTS, USE OF THE FEATURES, THEY'RE

24   ALL RELEVANT TO REASONABLE ROYALTY; RIGHT?

25   A.   NO ARGUMENT.  I AGREE WITH THAT.
```

1    Q.   OKAY.

2    A.   I'VE SAID THAT NOW A NUMBER OF TIMES TO YOU.

3    Q.   THAT'S WHY I'M TRYING TO PUT THEM TOGETHER, BOTH IN THE

4    INTERESTS OF TIME AND ALSO SO THE JURY HAS THE FACTS.

5         NOW, LET'S GO TO VOLUME 2, TAB 14.  DO YOU HAVE THAT

6    BEFORE YOU?

7    A.   I DO.

8    Q.   TURN, IF YOU WOULD, TO PAGE 12.  I WANT TO SEE HOW SAMSUNG

9    COMPETED WITH APPLE IN THE MARKETPLACE.

10        DO YOU HAVE THAT BEFORE YOU?

11   A.   I DO.

12   Q.   THIS IS DISCUSSING HOW SAMSUNG IS GOING TO COMPETE WITH

13   WHAT PHONES; CORRECT?

14   A.   YEAH, WITH THE IPHONE AS THE MAIN FOCUS, BUT IT'S ALL, TO

15   ALL THE PRODUCTS THAT APPLE WILL BE OFFERING IN THIS FUTURE

16   TIME PERIOD.

17   Q.   RIGHT.  AND ONE OF THE PHONES THAT SAMSUNG IS GOING TO

18   COMPETE WITH IS THE CAPTIVATE; CORRECT?

19   A.   IT IS.

20   Q.   THAT'S ONE OF THE PHONES THAT WAS FOUND TO INFRINGE

21   APPLE'S PATENTS; CORRECT?

22   A.   THAT IS CORRECT.

23   Q.   ANOTHER PHONE THEY'RE GOING TO COMPETE WITH IS THE

24   FASCINATE; CORRECT?

25   A.   YES.

1    Q.   THAT'S ANOTHER PHONE THAT'S BEEN FOUND TO INFRINGE;

2    CORRECT?

3    A.   CORRECT.

4    Q.   ANOTHER PHONE THAT'S GOING TO COMPETE WITH THE IPHONE ON

5    THIS CHART IS THE DROID CHARGE; CORRECT?

6    A.   YES.

7    Q.   THAT'S BEEN FOUND TO INFRINGE APPLE'S PATENTS; CORRECT?

8    A.   THAT IS CORRECT.

9    Q.   TURN TO PAGE 17.  ANOTHER PHONE THAT THEY HAVE IDENTIFIED

10   TO COMPETE WITH APPLE'S NEW IPHONE IS THE EPIC 4G; CORRECT?

11   A.   YES.

12   Q.   AND THE EPIC 4G HAS BEEN FOUND TO INFRINGE APPLE'S

13   PATENTS; CORRECT?

14   A.   IT HAS.

15   Q.   SO NOW LET ME GO TO THIS CAPACITY ISSUE.

16        NOW, CAPACITY HAS ONLY TO DO WITH LOST PROFITS; CORRECT?

17   A.   CORRECT.

18   Q.   IT HAS NOTHING TO DO WITH REASONABLE ROYALTIES; CORRECT?

19   A.   YOU ARE CORRECT.

20   Q.   AND IT'S VERY IMPORTANT TO FOCUS ON THE PERIOD THAT'S AT

21   ISSUE; CORRECT?

22   A.   I AGREE WITH THAT.

23   Q.   AND THE PERIOD FOR WHICH APPLE IS SEEKING LOST PROFITS IS

24   BASICALLY, LIKE, SIX WEEKS, APRIL 2011 THROUGH MAY 29TH, 2011;

25   CORRECT?

1    A.   APRIL 15TH, YES.

2    Q.   APRIL 15TH TO MAY 29TH, 2011; CORRECT?

3    A.   CORRECT.

4    Q.   NOW, YOU WERE HERE WHEN THE LADIES AND GENTLEMEN OF THE

5    JURY WATCHED MR. JUE'S DEPOSITION?  DO YOU RECALL THAT?

6    A.   NO.  YOU'RE ASSUMING A FACT NOT IN EVIDENCE.

7    Q.   OKAY.

8    A.   I STEPPED OUT DURING THE DEPOSITIONS.

9    Q.   ALL RIGHT.  DID YOU READ HIS DEPOSITION?

10   A.   I DID NOT.

11   Q.   OKAY.  SO YOU DON'T KNOW WHAT HE SAID ABOUT CAPACITY OR

12   THE AVAILABILITY OF PRODUCTS DURING THE SIX WEEK PERIOD YOU'RE

13   FOCUSSING ON?

14   A.   FOR WHICH PRODUCT?

15   Q.   FOR THE IPHONE.

16   A.   NO.  I DON'T -- I AGREE THAT APPLE HAD CAPACITY FOR THE

17   IPHONE.  THERE'S NO DISAGREEMENT.

18   Q.   OKAY.  SO DURING THAT PERIOD OF TIME, YOU AGREE THAT

19   BETWEEN APRIL 15TH AND MAY 29TH, 2011, APPLE HAD CAPACITY TO

20   MAKE MORE IPHONES; CORRECT?

21   A.   YES.  THEY MET THAT PANDUIT FACTOR NUMBER 3 TEST IN MY

22   OPINION.

23   Q.   SO THERE'S REALLY NO DISPUTE ON THAT; CORRECT?  THERE'S NO

24   DISPUTE BETWEEN YOU AND MS. DAVIS ON THAT?

25   A.   THERE IS NOT.

1    Q.   OKAY.  NOW LET'S GO TO A SECOND BUCKET OF PRODUCTS.  WE'VE

2    TALKED ABOUT REASONABLE ROYALTY AND WE'VE TALKED ABOUT APPLE'S

3    LOST PROFITS; CORRECT?

4    A.   WE HAVE.

5    Q.   AND WE'VE TALKED ABOUT THEM TO SOME EXTENT TOGETHER

6    BECAUSE THERE'S INFORMATION ABOUT THEM THAT OVERLAPS; CORRECT?

7    A.   YES.

8    Q.   OKAY.  SO NOW LET'S TALK ABOUT SAMSUNG'S PROFITS, THE

9    THIRD BUCKET.  CAN WE DO THAT?

10   A.   WE CAN.

11   Q.   NOW, THERE'S NO DISPUTE THAT THAT IS THE AVAILABLE MEASURE

12   OF DAMAGES FOR THE DESIGN PATENTS; CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   SO LET'S SEE IF WE CAN GET WHERE YOU AND MS. DAVIS AGREE

15   AND WHERE YOU DISAGREE.

16        YOU AGREE ON THE TOTAL AMOUNT OF REVENUES; CORRECT?

17   A.   WE DO.

18   Q.   YOU AGREE ON THE COST OF GOODS SOLD; CORRECT?

19   A.   BASICALLY WE DO.

20   Q.   BUT WHERE YOU DISAGREE IS ON THE EXPENSES, IF ANY, THAT

21   ARE TO BE DEDUCTED AFTER COSTS OF GOODS SOLD; CORRECT?

22   A.   THAT'S ACCURATE.

23   Q.   ALL RIGHT.  AND YOU CALCULATED -- YOU CALCULATED TWO

24   NUMBERS ACTUALLY IN YOUR EXPERT REPORT, DIDN'T YOU?

25   A.   I BELIEVE I -- I HAD A LOT MORE THAN TWO NUMBERS, BUT YES.

```
1    Q.   I'M SORRY.  ON THIS ISSUE, YOU CALCULATED TWO DIFFERENT

2    NUMBERS.  ONE IS THE $52 MILLION NUMBER YOU GAVE THE JURY;

3    CORRECT?

4    A.   YES.

5    Q.   AND THE OTHER WAS A $70 MILLION NUMBER; CORRECT?

6    A.   NOW YOU'VE REFRESHED MY RECOLLECTION.  YES, I DID.

7    Q.   ALL RIGHT.  SO FOR THE SAME ISSUE, YOU COMPUTED 70 MILLION

8    ON ONE HAND AND 52 MILLION ON THE OTHER; CORRECT?

9    A.   BY USING DIFFERENT METHODOLOGIES, YES.

10   Q.   AND IN THE FIRST TRIAL, THE METHOD YOU TESTIFIED ABOUT WAS

11   THE $70 MILLION NUMBER; CORRECT?

12   A.   I DIDN'T TESTIFY TO THAT NUMBER, BUT I USED THAT APPROACH

13   IN THE FIRST TRIAL.

14   Q.   SO IF WE USED THE APPROACH THAT YOU USED IN THE FIRST

15   TRIAL, THE NUMBER WOULD BE $70 MILLION; CORRECT?

16   A.   IT WOULD.

17   Q.   NOW LET'S GO TO THE PLACE WHERE YOU AND MS. DAVIS

18   DISAGREE.  FOR PURPOSES OF COMPUTING INFRINGER'S -- YOU

19   UNDERSTAND THE CONCEPT OF INFRINGER'S PROFITS; CORRECT?

20   A.   I DO.

21   Q.   YOU UNDERSTAND IT'S A SPECIAL REMEDY FOR DESIGN PATENTS;

22   CORRECT?

23   A.   UNDER SECTION 289 OF TITLE 35, YOU CAN BE AWARDED THE

24   TOTAL PROFITS OF THE INFRINGER.

25   Q.   THERE'S A SPECIAL RULE; CORRECT?
```

1    A.   IT IS.

2    Q.   NOW, PROFIT IS DETERMINED BY DEDUCTING THE SELLING PRICE

3    OR SELLING REVENUES FROM DIRECT EXPENSES; CORRECT?

4    A.   I THINK YOU SAID THAT BACKWARDS.

5    Q.   I'M SORRY.  IT'S DEDUCTING DIRECT EXPENSES FROM THE TOTAL

6    REVENUES FOR THE PRODUCT; CORRECT?

7    A.   NOW YOU SAID IT CORRECTLY.

8    Q.   AND AS I SAID, YOU AND MS. DAVIS AGREE ON THE TOTAL

9    REVENUES; CORRECT?

10   A.   WE DO.

11   Q.   YOU AGREE UPON THE COSTS OF GOODS SOLD; CORRECT?

12   A.   AGAIN, BASICALLY WE DO.

13   Q.   NOW, LET'S DO THIS.  LET'S GO TO THE EXPENSES WHERE YOU

14   DISAGREE.

15        TURN, IF YOU WOULD, TO VOLUME 2, TAB 15.  DO YOU HAVE THAT

16   BEFORE YOU?

17   A.   I DO.

18   Q.   NOW, THIS IS A DOCUMENT THAT DESCRIBES EXPENSES THAT WERE

19   DEDUCTED IN CALCULATING SAMSUNG'S PROFITS; CORRECT?

20   A.   CORRECT.

21   Q.   IT INCLUDES COST FIGURES FROM SAMSUNG ELECTRONICS COMPANY;

22   CORRECT?

23   A.   IT DOES.

24   Q.   THE KOREAN PARENT; CORRECT?

25   A.   YES.

1    Q.   NOW, THIS IS A SHEET THAT YOU -- THAT MR. SHEPPARD

2    TESTIFIED ABOUT; CORRECT?

3    A.   HE DID TESTIFY TO THIS SHEET, YES.

4    Q.   AND THIS IS A SHEET THAT YOU USED; CORRECT?

5    A.   YES.

6    Q.   NOW, MR. WAGNER, SAMSUNG WAS YOUR CLIENT; CORRECT?

7    A.   CORRECT.

8    Q.   YOU WERE WORKING FOR THEM; CORRECT?

9    A.   I'M RETAINED BY THE LAWYERS WHO ARE WORKING FOR THEM, YES.

10   Q.   AND THERE WAS SOME DISCUSSION IN YOUR DIRECT ABOUT S.A.P.

11   AND I WANTED TO EXPLAIN TO THE JURY WHY S.A.P. WAS IMPORTANT.

12        YOU HAD SOME TROUBLE GETTING NUMBERS OUT OF YOUR OWN

13   CLIENT, DIDN'T YOU?

14   A.   I DID.

15   Q.   RIGHT.  THEY ACTUALLY -- YOU ASKED FOR THE NUMBERS AND

16   THEY GAVE YOU A SPREADSHEET THAT HAD NUMBERS IN IT THAT WAS

17   SPECIALLY PREPARED FOR LITIGATION; CORRECT?

18   A.   CORRECT.  THIS WAS NOT PREPARED IN THE NORMAL COURSE OF

19   BUSINESS.

20   Q.   RIGHT.  AND THEY GAVE IT TO YOU THE NIGHT BEFORE YOUR

21   FIRST REPORT WAS DUE; CORRECT?

22   A.   CORRECT.

23   Q.   AND THEN, MR. WAGNER, OVER A PERIOD OF TIME, THEY GAVE YOU

24   EIGHT DIFFERENT VERSIONS OF THIS SPECIALLY PREPARED FOR

25   LITIGATION DOCUMENT; CORRECT?

1      A.   THEY DID.

2      Q.   RIGHT?

3      A.   BUT IT WASN'T THE ORDER THAT YOU JUST EXPRESSED IN YOUR

4      QUESTION.

5      Q.   ALL RIGHT.  FAIR ENOUGH.  SO IN THE INTERESTS OF TIME,

6      I'LL JUST SAY IT THIS WAY.  THE DOCUMENT RELIED UPON WAS

7      PREPARED IN KOREA SPECIALLY FOR THIS LITIGATION; CORRECT?

8      A.   CORRECT.

9      Q.   YOU HAD TROUBLE GETTING ACCURATE NUMBERS FROM YOUR CLIENT;

10     CORRECT?

11     A.   OVER SOME PERIOD OF TIME, I DID.

12     Q.   AND THEY GAVE YOU NINE DIFFERENT VERSIONS BEFORE YOU

13     SETTLED UPON A FINAL VERSION; CORRECT?

14     A.   CORRECT.  BUT SOME OF THE LAST VERSIONS WERE JUST

15     UPDATING, THEY WEREN'T CHANGING ANYTHING.  IT WAS GIVING ME

16     ADDITIONAL PERIODS OF TIME.

17     Q.   OKAY.

18     A.   SO IT'S UNFAIR TO CHARACTERIZE THOSE AS BEING SOMETHING

19     DIFFERENT.

20     Q.   BUT THERE WERE CERTAINLY VERSIONS OF THE NINE WHERE THE

21     NUMBERS WERE DIFFERENT; CORRECT?

22     A.   THERE WERE.  AND THERE WAS ONE MAJOR PROBLEM WHICH I NEVER

23     AGREED WITH AND EVENTUALLY IT WAS SOLVED.

24     Q.   AND YOU TOLD THEM YOU DISAGREED WITH IT; CORRECT?

25     A.   I DID.

```
 1      Q.   OKAY.  NOW, THIS SHEET THAT YOU RELIED UPON AND

 2      MR. SHEPPARD TALKED ABOUT, CAN WE AGREE THAT THE EXPENSES ON

 3      THIS SHEET CONTAIN SOME EXPENSES THAT ARE NOT DIRECTLY RELATED

 4      TO A SPECIFIC PRODUCT?

 5      A.   WELL, IT -- I WOULD SAY THERE'S -- IF WHAT YOU MEAN IS

 6      THEY'RE NOT 100 PERCENT RELATED TO THE PRODUCT, YES, THERE ARE

 7      COSTS THAT ARE ALLOCATED.

 8           "DIRECTLY" IS NOT AN ACCOUNTING TERM.

 9      Q.   WELL, MR. WAGNER, LET'S SEE WHAT YOU'VE SAID IN YOUR

10      REPORT AND YOUR DEPOSITION, SO LET'S START WITH VOLUME 1, TAB

11      4, IF YOU WOULD.

12           THIS IS YOUR DEPOSITION AT PAGE 838, LINES 8 THROUGH 11.

13      DO YOU HAVE IT BEFORE YOU?

14      A.   I DO.

15      Q.   "QUESTION:  YOU ALSO AGREE THAT SAMSUNG'S OPERATING

16      EXPENSES CONTAIN SOME EXPENSES THAT ARE NOT RELATED TO A

17      SPECIFIC PRODUCT; CORRECT?

18           "ANSWER:  CORRECT."

19      A.   I DO.

20      Q.   DO YOU STAND BY THAT TESTIMONY?

21      A.   I DO.

22      Q.   NOW LET'S LOOK AT WHAT YOU SAID IN YOUR EXPERT REPORT,

23      YOUR APRIL 20, 2012 --

24           MR. PRICE:  YOUR HONOR, I OBJECT.  THAT'S NOT THE

25      FULL ANSWER.  YOU CAN'T STOP --
```

```
 1              THE COURT:  OVERRULED.  YOU'LL HAVE CROSS -- YOU'LL

 2     HAVE REDIRECT TIME.

 3     BY MR. LEE:

 4     Q.   LET'S LOOK AT WHAT YOU SAID IN YOUR APRIL 20, 2012, EXPERT

 5     REPORT.

 6          NOW, THE JURY HAS HEARD SOMETHING ABOUT EXPERT REPORTS

 7     BEFORE.  THESE ARE REPORTS THAT YOU PREPARE UNDER THE COURT'S

 8     RULES; CORRECT?

 9     A.   CORRECT.

10     Q.   AND YOU PREPARE THEM TO TELL THE OTHER SIDE WHAT YOUR

11     OPINIONS ARE AND WHAT YOUR CONCLUSIONS ARE; CORRECT?

12     A.   WELL, A LOT MORE THAN THAT.  IT WOULD BE A VERY SHORT

13     REPORT IF IT WAS ONLY OPINIONS.  I HAVE TO, PURSUANT TO FEDERAL

14     RULES, EXPLAIN TO THE OTHER SIDE MY OPINIONS AND THE BASES FOR

15     MY OPINIONS.

16     Q.   ALL RIGHT.  SO LET'S LOOK AT, IN YOUR REPORT THAT YOU

17     CAREFULLY PREPARED, IT'S AT VOLUME 1, TAB 5A.  ARE YOU THERE?

18     A.   YES.

19     Q.   TURN, IF YOU WOULD, TO PARAGRAPH 323.  ARE YOU THERE?

20     A.   IF YOU GIVE ME THE PAGE NUMBER, I'LL BE THERE FASTER.

21     Q.   SURE.  LET ME GET IT FOR YOU.  PAGE 135.

22     A.   135.

23     Q.   AND YOUR VERY FIRST SENTENCE IS, QUOTE, "AS PART OF ITS

24     CALCULATION OF THE OPERATING EXPENSES (AND COGS TO A LESSER

25     DEGREE), SAMSUNG ALLOCATES EXPENSES THAT ARE NOT DIRECTLY
```

```
1     RELATED TO A SPECIFIC PRODUCT."

2          IS THAT WHAT YOU WROTE IN YOUR REPORT?

3     A.   I DID, AND THAT'S WHAT I JUST EXPLAINED.  WHAT I MEANT

4     THERE IS WHAT I TOLD THE JURY, IS IF IT'S A COMMON COST, IT

5     WOULD NOT BE DIRECT AND YOU HAVE TO ALLOCATE IT.

6     Q.   SO THE COMMON COSTS THAT YOU AND MS. DAVIS DISAGREE UPON,

7     RESEARCH AND DEVELOPMENT IS ONE CATEGORY; CORRECT?

8     A.   CAN YOU SAY THAT AGAIN?

9     Q.   YOU GUYS DISAGREE -- YOU AND MS. DAVIS DISAGREE ON

10    RESEARCH AND DEVELOPMENT COSTS; CORRECT?

11    A.   WE DO.

12    Q.   ADVERTISING COSTS; CORRECT?

13    A.   CORRECT.

14    Q.   AND GENERAL AND ADMINISTRATIVE COSTS; CORRECT?

15    A.   WE DO.

16    Q.   AND FOR EACH OF THOSE THREE, YOU HAVEN'T SEEN A SINGLE

17    DOCUMENT, NOT A SINGLE DOCUMENT THAT DIRECTLY, TO USE YOUR

18    WORDS, THAT DIRECTLY RELATES THOSE COSTS TO A SPECIFIC PRODUCT,

19    HAVE YOU?

20    A.   THAT'S TRUE.

21    Q.   RIGHT.  IF THE STANDARD IS DIRECTLY RELATED, YOU CANNOT

22    TESTIFY THAT THESE EXPENSES ARE DIRECTLY RELATED TO ANY OF THE

23    PRODUCTS AT ISSUE; CORRECT?

24    A.   DEPENDS ON WHAT THE DEFINITION OF THAT WORD IS.

25    Q.   I'M USING YOUR WORD, DIRECTLY RELATED TO A SPECIFIC
```

```
1    PRODUCT.  IF I USE YOUR WORDS FROM APRIL OF 2012, YOU HAVE NOT

2    SEEN A SINGLE DOCUMENT THAT SAYS THOSE EXPENSES ARE DIRECTLY

3    RELATED; CORRECT?

4    A.   RIGHT.  BUT THAT'S DIFFERENT THAN DIRECTLY ATTRIBUTED.

5    Q.   WELL, MR. -- I ASKED YOU ABOUT YOUR WORDS, NOT DIRECTLY

6    ATTRIBUTABLE.  I ASKED YOU ABOUT DIRECTLY RELATED; CORRECT?

7    A.   CORRECT.

8    Q.   I'M JUST USING YOUR WORDS.  HER HONOR WILL TELL THE JURY

9    WHAT THE LEGAL STANDARD IS.  YOU UNDERSTAND THAT?

10   A.   I DO.

11   Q.   BUT USE USING YOUR WORDS, DIRECTLY RELATED, YOU CAN'T GIVE

12   THIS JURY THE OPINION THAT ANY OF THESE THREE CATEGORIES OF

13   EXPENSES ARE DIRECTLY RELATED; CORRECT?

14   A.   WELL, I BELIEVE THAT MR. SHEPPARD TESTIFIED THAT A NUMBER

15   OF THE COSTS IN R&D WHEN THEY'RE DOING SOFTWARE UPDATES ARE

16   DIRECTLY RELATED TO PRODUCTS.

17   Q.   HAVE YOU SEEN A SINGLE DOCUMENT THAT DEMONSTRATES THAT FOR

18   ANY OF THE PRODUCTS AT ISSUE?

19   A.   I HAVEN'T SEEN ANY DOCUMENTS.

20   Q.   HAVE YOU SEEN ANY TESTIMONY FROM A SAMSUNG ENGINEER THAT

21   SAYS THAT?

22   A.   NO.

23   Q.   HAVE YOU SEEN ANY TESTIMONY FROM ANYBODY AT SAMSUNG WHO

24   CAN ATTRIBUTE A SINGLE DOLLAR OF RESEARCH AND DEVELOPMENT COSTS

25   TO A SPECIFIC PRODUCT?
```

1    A.   NOT BEYOND WHAT I JUST SAID.

2    Q.   CAN YOU IDENTIFY A DOCUMENT, THE TESTIMONY OF A SAMSUNG

3    WITNESS, OR ANYBODY ELSE, WHO CAN ATTRIBUTE A SINGLE DOLLAR OF

4    ADVERTISING EXPENSE TO ONE OF THESE PRODUCTS?

5    A.   NO.

6    Q.   CAN YOU IDENTIFY A SINGLE DOCUMENT OR WITNESS THAT

7    ATTRIBUTES A SINGLE DOLLAR OF THE GENERAL ADMINISTRATIVE

8    OVERHEAD TO ANY ONE OF THESE PRODUCTS?

9    A.   I DON'T BELIEVE MR. SHEPPARD TESTIFIED TO DOLLARS.

10   Q.   NOW, LET ME JUST ASK YOU A FEW OTHER QUESTIONS ABOUT THESE

11   EXPENSES BY CATEGORY, SO I'LL START WITH RESEARCH AND

12   DEVELOPMENT, AND LET'S TAKE THE INFUSE 4G.

13        COULD WE DO THAT?

14   A.   SURE.

15   Q.   DURING THE PERIOD FROM JULY 2011 THROUGH MARCH 2012,

16   SAMSUNG ALLOCATED APPROXIMATELY $9.5 MILLION IN RESEARCH AND

17   DEVELOPMENT EXPENSES TO THE INFUSE 4G; CORRECT?

18   A.   I BELIEVE THAT'S CORRECT.

19   Q.   THE INFUSE 4G HAD BEEN DELIVERED TO CARRIERS AND WAS BEING

20   SOLD TO CUSTOMERS BY THEN; CORRECT?

21   A.   IT WAS.

22   Q.   AND YOU HAVE NOT SEEN ANY RECORD OF SAMSUNG THAT SAYS THAT

23   A PENNY OF THAT $9.5 MILLION WAS USED FOR THE INFUSE 4G, HAVE

24   YOU?

25   A.   I HAVE NOT SEEN THOSE DOCUMENTS.

1    Q.   OKAY.  NOW, IT'S TRUE, IS IT NOT, THAT FOR THE RESEARCH

2    AND DEVELOPMENT COSTS, THERE ARE SEVEN PRODUCTS AT ISSUE ON

3    SAMSUNG'S PROFITS; CORRECT?

4    A.   YES.

5    Q.   ALL RIGHT.  SO WE JUST TALKED ABOUT ONE, THE INFUSE 4G;

6    CORRECT?

7    A.   WE DID.

8    Q.   FOR THE OTHER SIX PRODUCTS, IT'S TRUE, IS IT NOT, THAT YOU

9    DON'T HAVE ANY INFORMATION THAT ATTRIBUTES A SINGLE RESEARCH

10   AND DEVELOPMENT DOLLAR TO A SPECIFIC PRODUCT; CORRECT?

11   A.   I HAVEN'T SEEN THE UNDERLYING DOCUMENTS, YOU ARE CORRECT.

12   Q.   IT'S TRUE, IS IT NOT, THAT YOU HAVE NO ACCURATE

13   INFORMATION ON THE SPECIFIC AMOUNT OF MONEY THAT SAMSUNG SPENT

14   TO DEVELOP ANY OF THE SEVEN INFRINGING PRODUCTS AT ISSUE ON

15   SAMSUNG'S LOST PROFITS -- SAMSUNG'S PROFITS; CORRECT?

16   A.   I DON'T KNOW WHETHER THE INFORMATION IS ACCURATE OR NOT.

17   THAT'S, I THINK, PUTTING AN UNFAIR BURDEN ON MY CLIENT.

18        APPLE COULDN'T DO IT, EITHER, IF THEY HAD TO DO THIS.  NO

19   COMPANY CAN GIVE YOU THAT LEVEL OF DETAIL ON AN ACCURATE BASIS.

20   Q.   WELL, LET'S SEE WHAT YOU SAID WHEN YOU WERE ASKED THIS

21   QUESTION AT YOUR DEPOSITION.  TURN IF YOU WOULD TO VOLUME 1,

22   TAB 3.

23   A.   TAB WHAT?

24   Q.   TAB 3.  DO YOU HAVE IT?

25   A.   I DO.

1       Q.   PAGE 620, LINE 19 TO 22.

2            "QUESTION:  DO YOU HAVE ANY ACCURATE INFORMATION ON THE

3       SPECIFIC AMOUNT OF MONEY THAT SAMSUNG SPENT TO DEVELOP ANY OF

4       THE ACCUSED PRODUCTS?

5            "ANSWER:  I DO NOT."

6            WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT ANSWER?

7       A.   I DID, AND I'LL GIVE IT TO YOU AGAIN.  THAT'S CORRECT.

8       Q.   YOU STAND BY IT?

9       A.   I DO.

10      Q.   AND IN FACT, MS. DAVIS AGREES.  SHE SAYS THERE'S NOTHING

11      THAT ATTRIBUTES A SINGLE DOLLAR TO A SPECIFIC PRODUCT; CORRECT?

12      A.   I BELIEVE SHE AGREES WITH THAT.

13      Q.   ALL RIGHT.  LET'S TALK ABOUT ADVERTISING COSTS.  THAT'S

14      THE SECOND OF THE THREE CATEGORIES; CORRECT?

15      A.   THE SECOND YOU'VE ASKED ME TO ADDRESS, YES.

16      Q.   AND THE SECOND OF THE THREE CATEGORIES THAT YOU AND

17      MS. DAVIS DISAGREE UPON?

18      A.   NO.  YOU DIDN'T ASK ABOUT SELLING EXPENSES.  SHE DOESN'T

19      THINK ANY SELLING EXPENSES ARE APPROPRIATE AND I DO.

20      Q.   OKAY.  I WILL GET TO THOSE IN A SECOND.  OKAY?

21           LET'S DO ADVERTISING AND THEN WE'LL COME TO THE THIRD

22      CATEGORY.  OKAY?

23           SO FOR ADVERTISING, IT'S TRUE, IS IT NOT, THAT YOU CANNOT

24      IDENTIFY ANY ADVERTISING COST OR EXPENSE THAT IS ATTRIBUTABLE

25      TO ANY OF THE SEVEN PHONES AT ISSUE IN THIS TRIAL; CORRECT?

```
 1          A.   I HAVE NOT SEEN ANY ACTUAL ADS RUN OR PRINT MEDIA RELATED

 2     TO THE PRODUCTS AT ISSUE.

 3          Q.   SO THE ANSWER IS YOU CANNOT; CORRECT?

 4          A.   I CANNOT.

 5          Q.   ALL RIGHT.  SO LET ME TALK ABOUT THE CAPTIVATE JUST BY WAY

 6     OF EXAMPLE, WHICH YOU MENTIONED.

 7               DURING THE PERIOD JUNE 16TH THROUGH JUNE 30, 2011, SAMSUNG

 8     REPORTED ABOUT $1.5 MILLION OF ADVERTISING COSTS FOR THE

 9     CAPTIVATE.  DO YOU REMEMBER THAT?

10          A.   I DON'T -- I DON'T KNOW WHY THAT PERIOD IS RELEVANT, BUT

11     YES, IT'S POSSIBLE.

12          Q.   RIGHT.  AND YOU CAN'T ATTRIBUTE A SPECIFIC DOLLAR OF THOSE

13     ADVERTISING EXPENSES TO THE CAPTIVATE; CORRECT?

14          A.   I HAVEN'T SEEN ANY UNDERLYING DOCUMENTS TO DO THAT.

15          Q.   RIGHT.  DID YOU ASK ANYONE AT SAMSUNG TO GIVE YOU THE

16     UNDERLYING DOCUMENTS?

17          A.   NO.

18          Q.   ALL RIGHT.  SO YOU FORMED YOUR OPINIONS ON THIS WITHOUT

19     ASKING YOUR OWN CLIENT FOR THE INFORMATION; CORRECT?

20          A.   RIGHT.  YOU'RE ASKING ME TO DO SOMETHING THAT I HAVEN'T

21     DONE IN 37 YEARS.

22          Q.   WELL, MR. WAGNER, WHETHER YOU'VE DONE IT OR NOT FOR 37

23     YEARS, DID YOU ASK YOUR CLIENT -- YOU UNDERSTAND THAT THE

24     QUESTION OF WHETHER ADVERTISING EXPENSES CAN BE ATTRIBUTED TO

25     THE SPECIFIC PRODUCTS AT ISSUE WAS A QUESTION IN THIS CASE;
```

1      CORRECT?

2      A.   OH, I KNEW IT WAS A QUESTION IN THIS CASE.

3      Q.   SO DID YOU RAISE YOUR HAND AND SAY, TO YOUR OWN CLIENT,

4      "WOULD YOU PLEASE GIVE ME THE DOCUMENTS THAT WOULD ALLOW ME TO

5      CONCLUDE ONE WAY OR ANOTHER WHETHER THESE EXPENSES THAT I'M

6      ATTRIBUTING TO THE PHONES ARE, IN FACT, ATTRIBUTABLE TO THESE

7      PHONES"?  DID YOU ASK THEM FOR THAT?

8      A.   NO, I WOULD NOT DO THAT.

9      Q.   OKAY.  NOW, LET'S TALK ABOUT GENERAL AND ADMINISTRATIVE

10     EXPENSES IF WE COULD.  THIS IS A THIRD CATEGORY.

11     A.   I THOUGHT WE WERE GOING TO TURN TO SELLING EXPENSES.

12     THAT'S WHAT YOU JUST TOLD ME.

13     Q.   SURE.  YOU AND MS. DAYS DISAGREE ON SELLING EXPENSES;

14     CORRECT?

15     A.   WE DO.

16     Q.   AND YOU WERE HERE FOR WHAT SHE SAID ABOUT IT; CORRECT?

17     A.   I WAS.

18     Q.   AND YOU THINK THEY, IN FACT, SHOULD BE DEDUCTED; CORRECT?

19     A.   I DO.

20     Q.   AND YOU DON'T HAVE A SINGLE DOCUMENT THAT SPECIFICALLY

21     ATTRIBUTES ANYTHING OF WHAT YOU CALL A SELLING EXPENSES TO ANY

22     OF THE PHONES AT ISSUE; CORRECT?

23     A.   RIGHT.  MY UNDERSTANDING IS THE SALES FORCE AREN'T

24     ORGANIZED BY PRODUCT.  THEY SELL ALL PRODUCTS OF THE CARRIERS.

25     Q.   RIGHT.

1     A.    SO IT WOULD BE IMPOSSIBLE TO DO WHAT YOU'RE SUGGESTING.

2     Q.    RIGHT.  IT'S A LITTLE BIT LIKE IF I RAN A GROCERY STORE,

3     I'M SELLING A HOST OF DIFFERENT PRODUCTS; CORRECT?

4     A.    CORRECT.

5     Q.    AND IF I'M SELLING COKE ZERO, THE COSTS DIRECTLY

6     ATTRIBUTABLE TO THE COKE ZERO IS WHAT I PAY FOR THE COKE ZERO.

7     THAT'S ONE COST; CORRECT?

8     A.    THAT'S NOT THE SELLING EXPENSE, BUT THAT'S ONE OF THE

9     COSTS.  THAT'S THE COST OF GOODS SOLD.

10    Q.    RIGHT.  BUT THERE'S ALSO THE RENT FOR THE STORE; CORRECT?

11    A.    THERE IS.

12    Q.    THE INSURANCE FOR THE STORE; CORRECT?

13    A.    THERE IS.

14    Q.    THE COST OF THE PERSON WHO'S WORKING THE DESK; CORRECT?

15    A.    YES.  THOSE ARE ALL GENERAL ADMINISTRATIVE EXPENSES.

16    Q.    RIGHT.  AND IF I STOP SELLING COKE ZERO, BUT I CONTINUE TO

17    SELL DIET PEPSI, PEPSI, AND COKE, I STILL HAVE ALL OF THOSE

18    COSTS, DON'T I?

19    A.    ALL OF THE COSTS YOU JUST DESCRIBED, I BELIEVE YOU WOULD.

20    Q.    ALL RIGHT.  SO LET'S TALK ABOUT GENERAL AND ADMINISTRATIVE

21    COSTS.

22          YOU AGREE THAT, AGAIN, YOU HAVE NOT BEEN ABLE TO IDENTIFY

23    A SINGLE DOLLAR OF GENERAL AND ADMINISTRATIVE EXPENSE THAT IS,

24    TO USE YOUR WORDS, DIRECTLY RELATED TO ANY OF THE SEVEN

25    PRODUCTS AT ISSUE; CORRECT?

1    A.   CORRECT.  THERE'S NO ORGANIZATION SET UP JUST TO SELL

2    THESE SEVEN PRODUCTS.

3    Q.   RIGHT.  AND IN THIS CATEGORY THAT YOU DEDUCTED, THERE IS

4    LABOR COSTS FOR SAMSUNG'S ADMINISTRATIVE STAFF; CORRECT?

5    A.   THERE WOULD BE.

6    Q.   WAGES AND BENEFITS FOR SAMSUNG'S OFFICE STAFF; CORRECT?

7    A.   YES.

8    Q.   INSURANCE?

9    A.   CORRECT.

10   Q.   DEPRECIATION COSTS; CORRECT?

11   A.   THERE WOULD BE.

12   Q.   AND YOU CANNOT IDENTIFY A SINGLE DOLLAR OF THOSE EXPENSES

13   THAT IS, TO USE YOUR WORDS, DIRECTLY RELATED TO THE SEVEN

14   PRODUCTS AT ISSUE; CORRECT?

15   A.   RIGHT, BECAUSE I DON'T BELIEVE THERE'S ANY, AGAIN,

16   ADMINISTRATION THAT'S SET UP JUST TO SELL THESE PARTICULAR

17   SEVEN PRODUCTS.  IT'S SET UP TO SELL ALL THEIR PRODUCTS.

18   Q.   RIGHT.  SO THE ANSWER TO MY QUESTION IS YOU CANNOT;

19   CORRECT?

20   A.   I CANNOT.

21   Q.   NOW, YOU TALKED A LITTLE BIT ABOUT AUDITED FINANCIAL

22   STATEMENTS FOR APPLE AND SAMSUNG.  DO YOU RECALL THAT?

23   A.   I DO.

24   Q.   AND YOU REFERRED TO GENERALLY ACCEPTED ACCOUNTING

25   PRINCIPLES; CORRECT?

1    A.   I DON'T REMEMBER SAYING THAT, BUT I WOULD AGREE THAT'S

2    CORRECT.

3    Q.   FAIR ENOUGH.  IF YOU DON'T, IT'S THE JURY'S MEMORY THAT

4    COUNTS, AND IF YOU DON'T REMEMBER, I'LL ASK IT A DIFFERENT WAY.

5         YOU DO REMEMBER DISCUSSING GENERALLY ACCEPTED ACCOUNTING

6    PRINCIPLES; CORRECT?

7    A.   I'VE DONE IT MANY TIMES IN MY LIFE.  I DON'T REMEMBER

8    DOING IT ON FRIDAY, BUT MAYBE I DID.

9    Q.   BUT YOU TALKED ABOUT HOW APPLE AND SAMSUNG REPORTED ON

10   THEIR EARNINGS AS A COMPANY; CORRECT?

11   A.   YES.

12   Q.   ALL RIGHT.  YOU UNDERSTAND, DO YOU NOT, THAT THE QUESTION

13   OF CALCULATING INFRINGER'S PROFITS IS, AS WE SAID, A SPECIAL

14   RULE; CORRECT?

15   A.   I BELIEVE IT WOULD BE.

16   Q.   IT'S A SPECIAL RULE THAT HAS SPECIFIC DEFINITION FOR HOW

17   YOU COMPUTE THOSE PROFITS; CORRECT?

18   A.   I DON'T THINK THAT'S TRUE.  I WISH I DID HAVE BETTER

19   GUIDANCE.  THERE IS NOT A LOT OF GUIDANCE ABOUT HOW TO MAKE

20   THIS CALCULATION.

21   Q.   ALL RIGHT.  NOW, LET ME COME TO MY VERY LAST TOPIC ON THE

22   REASONABLE ROYALTY.

23        IT'S YOUR TESTIMONY, IS IT NOT, THAT -- JUST SO WE'RE

24   CLEAR NOW, JUST COMING TO THE REASONABLE ROYALTY, YOUR ENTIRE

25   OPINION IS BASED UPON DESIGN AROUND PERIODS; CORRECT?

1    A.   IT IS.

2    Q.   IF THE JURY FINDS THAT THERE'S NO EVIDENCE IN THE RECORD

3    FROM ANY SAMSUNG ENGINEER, FROM ANY TECHNICAL EXPERT, FROM

4    ANYBODY ELSE, THERE'S NO BASIS FOR YOUR OPINION; CORRECT?

5    A.   WELL, IF THEY DON'T ACCEPT THE HOURS THAT I HAVE

6    CALCULATED AND THE PROPER WAGE RATES BURDENED TO APPLY TO THAT,

7    THEN THEY HAVE NO OTHER NUMBER.

8    Q.   RIGHT.  YOU HAVE GIVEN THEM NO OTHER BASIS TO DETERMINE A

9    REASONABLE ROYALTY; CORRECT?

10   A.   CORRECT.

11   Q.   RIGHT.  THEY HAVE TO ACCEPT THE INFORMATION THAT YOU HAVE

12   GOTTEN FROM THE SAMSUNG ENGINEERS BY TELEPHONE IN ORDER TO

13   ACCEPT YOUR $28,000 FOR 10 MILLION INFRINGING PRODUCTS;

14   CORRECT?

15   A.   THEY DO.

16        MR. LEE:  NOTHING FURTHER, YOUR HONOR.

17        THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:04.

18   (PAUSE IN PROCEEDINGS.)

19        THE COURT:  ARE YOU READY TO GO, MR. PRICE?

20        MR. PRICE:  I BELIEVE I AM.

21        THE COURT:  OKAY.  TIME IS NOW 10:04.  GO AHEAD,

22   PLEASE.

23                    **REDIRECT EXAMINATION**

24   BY MR. PRICE:

25   Q.   MR. WAGNER, LET ME FOCUS FIRST ON YOUR CALCULATION OF

1     SAMSUNG'S PROFITS, OKAY?

2         AND YOU WERE ASKED ABOUT THE CALCULATION YOU DID IN THE

3     FIRST TRIAL VERSUS THIS ONE AND HOW THE NUMBERS WERE DIFFERENT,

4     52 MILLION VERSUS 70.  COULD YOU TELL THE JURY WHY THE

5     DIFFERENCE?

6     A.   YES.  THE FIRST TRIAL, THE 70 MILLION WAS BASED ON WHAT I

7      CALLED A PER UNIT METHODOLOGY.

8         THERE IS A TIMING DIFFERENCE BETWEEN WHEN THE PRODUCT'S

9      MANUFACTURED IN KOREA AND THEY RECOGNIZE PROFITS ON THEIR BOOKS

10     AND THE PRODUCT IS SOLD IN THE UNITED STATES BY STA, AND I WAS

11     TRYING TO MATCH THAT WITH THIS PER UNIT METHODOLOGY.

12        BUT BASED ON WHAT I UNDERSTAND THE CORRECT TIME PERIOD IS,

13     A VERY LIMITED TIME PERIOD FOR LOST PROFITS IN THIS CASE, I HAD

14     TO TAKE THAT TIMING INTO CONSIDERATION AND ACTUALLY ONLY

15     CALCULATE SEC'S MANUFACTURING PROFITS IN THAT TIME PERIOD AND

16     NOT TRY TO MATCH THE ACTUAL COSTS FOR MANUFACTURING AND THE

17     SELLING OF THE UNIT, AND THAT'S WHY I USED A SUMMATION METHOD

18     THIS TIME WHICH, FOR THE PURPOSES IN THIS TRIAL, I THINK IS

19     MORE ACCURATE.

20     Q.   AND YOU SAY FOR "THE PURPOSES OF THIS TRIAL."  WHAT'S THE

21      DIFFERENCE?

22     A.   THERE WAS A MUCH LONGER PERIOD OF LOST PROFITS IN THE

23      FIRST TRIAL, OR I SHOULD SAY INFRINGER'S PROFITS IN THE FIRST

24      TRIAL.

25     Q.   OKAY.  AND YOU -- THERE WAS SOME TESTIMONY ABOUT YOUR

1    RELYING ON THAT SPREADSHEET, EXHIBIT 180A.

2    A.   CORRECT.

3    Q.   DO YOU RECALL THAT?  AND YOU WERE TALKING -- YOU WERE

4    ASKED QUESTIONS ABOUT DIFFERENT VERSIONS OF THAT SPREADSHEET.

5    A.   I WAS.

6    Q.   WHAT DID YOU THINK ABOUT WHETHER OR NOT IT WAS APPROPRIATE

7    TO RELY ON WHAT YOU DID RELY ON IN THE SPREADSHEET?

8    A.   WELL, I THINK IT WAS ENTIRELY APPROPRIATE.  AGAIN, THE

9    FIRST TIME THE SPREADSHEET WAS PREPARED, IT WAS BECAUSE APPLE

10   ASKED FOR VERY DETAILED FINANCIAL INFORMATION BY PRODUCT, WHICH

11   WAS FAIR.  THEY'RE ENTITLED TO THAT.

12        BUT SAMSUNG HAD NEVER CREATED FINANCIAL STATEMENTS LIKE

13   THAT BEFORE, SO ALTHOUGH THERE WAS NO PROBLEM WITH GETTING THE

14   DATA FROM S.A.P., WHEN THEY IMPORT THAT INTO EXCEL SPREADSHEETS

15   AND TRY TO AMASS THESE HUNDREDS OF THOUSANDS OF ENTRIES, THEY

16   MADE SOME MECHANICAL MISTAKES.

17        THEY FIXED THEM, AND BY THE TIME THEY GET TO THE END, I

18   BELIEVE THEY ARE ACCURATE, SO I HAD NO PROBLEMS WITH RELYING

19   UPON THAT TYPE OF INFORMATION.

20   Q.   COULD YOU EXPLAIN HOW THIS S.A.P. SYSTEM WAS USED TO

21   ACCOUNT FOR THE EXPENSES?

22   A.   WELL, THEY'RE -- THE UNDERLYING BOOKS AND RECORDS OF THE

23   COMPANY ON A DAILY AND HOURLY BASIS, THIS INFORMATION IS BEING

24   INPUTED INTO THAT SYSTEM, AND THEN IT HAS TO BE EXTRACTED

25   THROUGH QUERIES TO TRY TO IDENTIFY COSTS BY INDIVIDUAL PRODUCT

1      AT AN INDIVIDUAL TIME PERIOD.

2      Q.   NOW, YOU WERE ASKED --

3           IF I MAY, YOUR HONOR, I THINK THAT THERE WAS SOME, A

4      QUESTION AND ANSWER FROM MR. WAGNER'S DEPOSITION THAT WAS READ

5      INTO EVIDENCE AND I'D LIKE TO READ THE COMPLETE ANSWER, IF I

6      COULD.

7           838, LINES 8 THROUGH 18.

8               THE COURT:  GO AHEAD, PLEASE.

9               MR. PRICE:  THANK YOU.

10     "QUESTION:  YOU ALSO AGREED THAT SAMSUNG'S OPERATING

11     EXPENSES CONTAIN SOME EXPENSES THAT ARE NOT RELATED TO SPECIFIC

12     PRODUCT; CORRECT?

13          "ANSWER:  CORRECT."

14          CONTINUING:  "AND AS DISCUSSED WITH MR. OLSON PREVIOUSLY

15     UNDER OATH THAT THERE ARE MANY COMMON COSTS IN ANY COMPLEX

16     ORGANIZATION, AND THOSE COSTS ARE DIRECTLY ATTRIBUTABLE TO THE

17     PRODUCT ISSUE, BUT THEY HAVE TO BE ALLOCATED BECAUSE THAT

18     PARTICULAR COST IS SHARED BY A NUMBER OF PRODUCTS."

19     Q.   WAS THAT THE FULL ANSWER THAT YOU GAVE?

20     A.   RIGHT, AND THAT'S WHAT I TRIED TO EXPLAIN AGAIN TODAY.

21     Q.   AND YOU WERE ASKED QUESTIONS ABOUT "DIRECTLY RELATED."  DO

22     YOU RECALL THOSE QUESTIONS?

23     A.   I DO.

24     Q.   AND YOU SAID THAT THAT'S DIFFERENT THAN WHAT YOU SAID

25     HERE, WHICH IS "DIRECTLY ATTRIBUTABLE."

1           MR. LEE:  YOUR HONOR, I OBJECT.

2           THE COURT:  SUSTAINED.  THERE'S BEEN A MOTION ON

3    THAT.

4           MR. PRICE:  IT WAS OPENED UP IN DIRECT EXAM.

5           MR. LEE:  NO.

6           MR. PRICE:  SPECIFICALLY.

7           THE COURT:  IT WAS NOT.  PLEASE GO AHEAD TO SOMETHING

8    ELSE.

9           MR. PRICE:  OKAY.

10   Q.   NOW, IS -- IS THAT AN ACCOUNTING WORD, THOUGH?

11          MR. LEE:  YOUR HONOR, THIS --

12          THE COURT:  WHAT'S THE QUESTION?  CLARIFY THE

13   QUESTION.

14   BY MR. PRICE:

15   Q.   WHAT DO YOU MEAN BY "DIRECT," WHAT YOU USED, "DIRECTLY

16   RELATED"?  IS THAT AN ACCOUNTING WORD?

17   A.   NO.  THERE'S NEVER A WORD LIKE THAT.  THERE ARE DIRECT

18   EXPENSES AND INDIRECT, AND THAT'S A DIFFERENCE BETWEEN A COST

19   THAT IS 100 PERCENT RELATED TO A PRODUCT AND A COST THAT HAS TO

20   BE SHARED AMONG A NUMBER OF PRODUCTS.

21   Q.   OKAY.  NOW, THESE COSTS THAT HAVE TO BE SHARED, ARE THEY

22   NECESSARY TO MAKE THE PRODUCT?

23   A.   THEY ARE.

24   Q.   OKAY.  NOW, YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT, IN

25   THE ALLOCATION OF COSTS, ABOUT WHETHER YOU ASKED FOR, YOU KNOW,

1      SPECIFIC, YOU KNOW, DOCUMENTS THAT WOULD SHOW THAT A SPECIFIC

2      COST WAS RELATED TO A SPECIFIC PRODUCT.

3           I GUESS YOU WERE ASKED SPECIFICALLY, YOU KNOW, WHY DIDN'T

4      YOU RAISE YOUR HAND?  YOU WERE ASKED WHETHER YOU RAISED YOUR

5      HAND, AND I'M GOING TO ASK YOU THE WHY NOT.

6           WHY DIDN'T YOU RAISE YOUR HAND AND ASK FOR THOSE SORTS OF

7      DOCUMENTS?

8      A.   BECAUSE I'M RELYING UPON THE INTEGRITY OF THE ACCOUNTING

9      SYSTEM AT SAMSUNG.  AGAIN, I HAVE NO REASON TO EXPECT THAT IT

10     ISN'T RELIABLE.

11          MS. DAVIS, WHEN SHE WAS CALCULATING APPLE'S COSTS, DIDN'T

12     ASK FOR INVOICES AND THAT TYPE OF DETAIL AND SHE RELIED ON

13     APPLE'S ACCOUNTING SYSTEM, WHICH IS A GOOD ASSUMPTION, AND I

14     DID THE SAME FOR SAMSUNG.  THAT'S WHAT DAMAGE EXPERTS NORMALLY

15     DO.

16     Q.   WHEN YOU SAID IN YOUR -- OKAY.  IN ALL YOUR YEARS AS BEING

17     AN EXPERT WHEN YOU'RE CALCULATING THESE COSTS, IS THIS THE KIND

18     OF THING THAT YOU DO TO SAY, "I WANT TO SEE A PIECE OF PAPER"?

19     A.   NO.

20     Q.   AND WHY NOT?

21     A.   BECAUSE, AGAIN, IT'S A LEVEL OF DETAIL, IT WOULD BE AN

22     INCREDIBLE EXPENSE, AND I THINK MOST TIMES I WOULD NEVER FIND A

23     DIFFERENCE BETWEEN WHAT THE COMPANY IS RECORDING AS THEIR COSTS

24     AND WHAT THEY ACTUALLY INCURRED.

25          THEIR AUDITORS ARE DOING THAT.  IF THERE'S NO INTEGRITY TO

1     THEIR ACCOUNTING SYSTEM, THEY COULDN'T GIVE A CLEAN AUDIT

2     OPINION, AND SAMSUNG GETS CLEAN AUDIT OPINIONS EVERY YEAR.

3     Q.   IN PREPARING YOUR REPORT, DID YOU TALK TO ANYONE AT SEC IN

4     KOREA ABOUT THE ACCOUNTING METHODS?

5     A.   I DID.  I TALKED TO A MR. CHOI, WHO IS A MANAGER IN THE

6     FINANCE DEPARTMENT OF THE MOBILE BUSINESS UNIT AT SAMSUNG

7     KOREA, AND HE EXPLAINED TO ME HOW THEY ALLOCATE THE COSTS, HE

8     EXPLAINED THEIR CHART OF ACCOUNTS TO ME, AND IT WAS IDENTICAL

9     TO WHAT THEY WERE DOING IN STA.

10    Q.   NOW, YOU WERE SHOWN --

11         YOUR HONOR, I NEGLECTED TO DO THIS.  WE'D TALKED ABOUT

12    SPECIFIC PAGES OF EXHIBIT 952.  I NOW MOVE EXHIBIT 952 INTO

13    EVIDENCE?

14              THE COURT:  ALL RIGHT.  ANY OBJECTION, MR. LEE?

15              MR. LEE:  JUST ONE SECOND, YOUR HONOR.

16         (PAUSE IN PROCEEDINGS.)

17              MR. LEE:  THERE IS A RULING THAT EXCLUDES -- YOUR

18    HONOR SUSTAINED OBJECTIONS TO PAGE 03, 04, 05, AND .10

19    PREVIOUSLY, SO I OBJECT FOR THE REASONS THAT HAVE BEEN

20    ADDRESSED AND THE OBJECTION HAS BEEN SUSTAINED.

21              MR. PRICE:  THOSE WERE REMOVED FROM THE EXHIBIT THAT

22    WE HAVE PROVIDED THE COURT AND MR. WAGNER.

23              MR. LEE:  CAN I TAKE A LOOK AT IT?

24              MR. PRICE:  SURE.

25         (PAUSE IN PROCEEDINGS.)

1          MR. LEE:  YOUR HONOR, JUST SO THE RECORD IS CLEAR, AT

2     LEAST THE COPY THAT I JUST LOOKED AT HAS REMOVED PAGES .03,

3     .04, .05, .10 IN LIGHT OF YOUR HONOR'S PREVIOUS REJECTION --

4     SUSTAINING OF OBJECTIONS.

5          AND THEN THE DOCUMENT WILL BE SEALED.

6          MR. PRICE:  YES.

7          MR. LEE:  OKAY.

8          THE COURT:  ALL RIGHT.  SO MINUS .03, .04, .05 AND

9     .10 AND SEALING THE ENTIRE DOCUMENT, SEALING THE ENTIRE

10    DOCUMENT?  CORRECT?

11         MR. PRICE:  YES.

12         THE COURT:  WE'RE SEALING -- OKAY.  THAT'S ADMITTED.

13         (DEFENDANT'S EXHIBIT 952, EXCLUDING PAGES .03, .04, .05,

14    AND .10, WAS ADMITTED IN EVIDENCE.)

15         THE COURT:  GO AHEAD, PLEASE.

16         I HAVE 952.01 WAS DISCUSSED ON NOVEMBER 15TH.

17         MR. LEE:  YES.

18         THE COURT:  INSTEAD OF .010, .10.  IS THAT RIGHT?

19         MR. ANDERSON:  IT'S IN EVIDENCE.

20         THE COURT:  I DON'T HAVE THAT AS BEING MOVED INTO

21    EVIDENCE, 952.010.

22         MR. PRICE:  IN THAT CASE WE MOVE IT INTO EVIDENCE.

23         THE COURT:  OKAY.  ALL RIGHT.  THAT'S ADMITTED TODAY.

24         (DEFENDANT'S EXHIBIT 952.010 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  ALL RIGHT.  THANK YOU.

1              PLEASE, GO AHEAD.

2      BY MR. PRICE:

3      Q.   YOU ALSO MENTIONED IN YOUR DIRECT EXAMINATION THAT

4      MS. DAVIS HAD TAKEN INTO ACCOUNT THE INTERCEPT AS A

5      NON-INFRINGING ALTERNATIVE.  DO YOU RECALL THAT?

6      A.   YES.

7      Q.   NOW, IN CONNECTION WITH THE TABLET, DID SHE TAKE INTO

8      ACCOUNT ANY PRODUCT AS A NON-INFRINGING ALTERNATIVE FOR THAT?

9      A.   NO.

10     Q.   LET ME ASK YOU ABOUT A FEW DOCUMENTS, BECAUSE I'M A LITTLE

11     LIMITED HERE, THAT YOU WERE SHOWN, AND SPECIFICALLY LET ME SHOW

12     YOU EXHIBIT 34.

13             DO YOU RECALL BEING SHOWN THIS CONCERNING THE FEASIBILITY

14     REVIEW ON STANDALONE AP BUSINESS?

15             IF WE COULD PUT UP 34.1.

16             DO YOU RECALL THAT?

17     A.   I DO.

18     Q.   AND SPECIFICALLY, YOU WERE ASKED TO TURN TO PAGE 37,

19     34.37.  AND IF WE COULD BLOW THAT UP SO WE CAN SEE THE PART YOU

20     WERE ASKED ABOUT, START WITH STIMULATE/ENHANCING.  YOU SEE

21     THERE'S A SECTION THERE IN THE BULLET POINT

22     "STIMULATE/ENHANCING UPGRADING HW PERFORMANCE FOR OTHER

23     COMPETITORS SMARTPHONE AND MULTIMEDIA FEATURES.  HW PORTION:

24     EASE IMITATION."

25             DO YOU RECALL BEING ASKED ABOUT THAT?

1    A.    YES.

2    Q.    DOES THAT HAVE ANYTHING TO DO WITH THE PATENTS AT ISSUE IN

3    THIS CASE?

4    A.    NO.  THE ONLY THING THAT DEALS WITH THE HARDWARE IS THE

5    LOOK OF THE HARDWARE AND THE DESIGN PATENTS.

6         WHAT'S DESCRIBED IN THIS BULLET POINT HAS NOTHING TO DO

7    WITH THAT TYPE OF DESIGN.

8    Q.    DOES THIS HAVE TO DO WITH SELLING SAMSUNG PHONES?

9    A.    NO.  THIS HAS TO DO WITH SELLING THEIR APPLICATION

10   PROCESSORS TO BOTH APPLE AND TO POTENTIALLY OTHER SMARTPHONE

11   MANUFACTURERS WHO WANT TO OFFER MULTIMEDIA PHONES.

12   Q.    AND WHAT KIND OF HARDWARE ARE WE TALKING ABOUT?  THAT IS,

13   SAMSUNG WOULD BE SELLING HARDWARE TO OTHER COMPETITORS?

14   A.    CORRECT.

15   Q.    AND --

16   A.    WELL, IT'S THE APPLICATION PROCESSORS THAT ALLOWS THESE

17   TYPES OF FUNCTIONALITIES IN THESE SMARTPHONES.

18   Q.    AND COULD YOU TELL US WHAT THIS APPLICATION PROCESSOR IS?

19   A.    THAT'S -- THAT'S REALLY THE BRAINS OF YOUR PHONE.  IT'S

20   LIKE THE PROCESSOR IN YOUR COMPUTER.  THAT'S WHAT DOES ALL THE

21   PROCESSING OF THE INFORMATION.

22   Q.    AND I'M SORRY, MR. WAGNER.  DID MS. DAVIS TAKE INTO

23   ACCOUNT TAB 10.1 4G LTE WHEN SHE STOPPED THE LOST PROFITS ON

24   THE GALAXY TAB THAT'S ACCUSED IN THIS CASE?

25   A.    SHE DID NOT.

1    Q.   YOU SURE ABOUT THAT?  I'LL ASK HER.  THAT'S OKAY.

2         AND WITH RESPECT --

3    A.   OH, I'M SORRY.  I MISUNDER -- YES, SHE DID TAKE THAT INTO

4    CONSIDERATION.  SHE STOPPED HER CALCULATION AT THAT POINT.

5    Q.   I DON'T WANT TO PUT WORDS IN YOUR MOUTH.  IF YOU DON'T

6    REMEMBER --

7    A.   I DID REMEMBER NOW THAT YOU ASKED ME THE QUESTION.

8    Q.   OKAY.  AND NOW THAT YOU RECALL THAT SOMEWHAT LENGTHY

9    REPORT, WHY DID SHE STOP THE CALCULATIONS AT THAT POINT?

10   A.   BECAUSE THERE WAS A VIABLE NON-INFRINGING ALTERNATIVE IN

11   THE MARKETPLACE.

12   Q.   AND I'M GOING TO SHOW YOU WHAT'S BEEN MARKETED AS EXHIBIT

13   1038, WHICH IS THE TAB 10.1 4G LTE.

14        AND IF I MAY APPROACH, YOUR HONOR?

15             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

16             MR. LEE:  YOUR HONOR, YOUR HONOR --

17   BY MR. PRICE:

18   Q.   IS THIS THE PRODUCT SHE USED (HANDING)?

19             MR. MCELHINNY:  YOUR HONOR, BEFORE HE DOES THAT --

20             THE COURT:  I DID SUSTAIN THE OBJECTION LAST WEEK.

21             MR. LEE:  YES.  SAME OBJECTION.

22             MR. PRICE:  IT WAS A DIFFERENT ISSUE, YOUR HONOR.

23   THIS IS NOW HER CALCULATION IN CONSIDERING NON-INFRINGING

24   ALTERNATIVES.

25             MR. LEE:  SAME ISSUE, YOUR HONOR.

1          THE COURT:  SAME ISSUE.  WE'VE LITIGATED THIS ISSUE

2    OF WHAT PRODUCTS COME IN AND THIS ONE WAS NOT ALLOWED IN, SO --

3          MR. PRICE:  OKAY.  I'LL MOVE ON THEN, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  THE OBJECTION IS SUSTAINED.

5    BY MR. PRICE:

6    Q.   LET ME ASK YOU TO TURN, IF YOU WOULD, TO EXHIBIT 40, AND

7    SPECIFICALLY I'M GOING TO GO TO 40.5.  I'LL JUST SHOW IT ON THE

8    SCREEN.

9          AND THIS IS THE CRISIS OF DESIGN DOCUMENT.  DO YOU

10   REMEMBER MR. LEE KEPT TALKING ABOUT THE CHANGE OF PLAN THAT

11   SAMSUNG HAD?  DO YOU RECALL THAT?

12   A.   I DO.

13   Q.   OKAY.  AND LET'S GO TO THAT SENTENCE, IF WE CAN.  IF WE GO

14   TO THE SECOND PARAGRAPH -- I ASSUME WE CAN SHINE THE LINE,

15   RYAN, HERE.  HERE WE GO.  THANK YOU.

16        DO YOU RECALL -- IT SAYS HERE THAT THAT STYLE OF BUSINESS

17   HAS WORKED UNTIL NOW -- COME ON, LAST LINE -- WITH THE IPHONE'S

18   EMERGENCE MEANS THE TIME WE HAVE TO CHANGE OUR METHODS HAS

19   ARRIVED.  DO YOU SEE THAT?

20   A.   I DO.

21   Q.   AND THE SENTENCES ABOVE TALK ABOUT ALL THE "EXECUTIVES AND

22   EMPLOYEES IN THE MOBILE COMMUNICATIONS DIVISION ARE DILIGENT

23   AND EXEMPLARY THAT ALL THIS TIME, WHEN OPERATORS MADE COMMENTS

24   ABOUT THE DESIGNS WE PUT BEFORE THEM, WE MODIFIED AND MODIFIED

25   AGAIN, WITHOUT MISSING A SINGLE COMMENT."

1          DO YOU SEE THAT?

2     A.   I DO.

3     Q.   AND THAT'S TALKING ABOUT THE METHOD, IS IT NOT, OF

4     LISTENING TO THE NOKIA'S AND THE VERIZON'S AND GETTING COMMENTS

5     FROM THEM AS TO HOW THEY WANTED THE PHONES DESIGNED; CORRECT?

6     A.   I DON'T THINK THEY'RE LISTENING TO NOKIA, BUT THEY'RE

7     LISTENING TO THEIR CARRIERS.

8     Q.   YEAH, TO THE CARRIERS, I APOLOGIZE.

9          SO THIS IS REFERRING TO THE METHODS OF LISTENING TO THE

10    CARRIERS AS TO WHAT THEY WANT IN THE DESIGN OF THE PHONES;

11    CORRECT?

12    A.   I BELIEVE THAT'S CORRECT.

13    Q.   AND THIS SAYS THAT METHOD OF LISTENING TO THE CARRIERS IS

14    NO LONGER, OR IT'S TIME TO CHANGE THAT; CORRECT?

15    A.   CORRECT.

16    Q.   AND IF WE LOOK AT THE NEXT SENTENCE, OR THE NEXT

17    PARAGRAPH, IT SAYS, "IN REGARDS TO EXTERIORS, DO YOUR BEST NOT

18    TO CREATE A PLASTIC FEELING AND INSTEAD CREATE A METALLIC

19    FEEL."

20         AT THIS TIME -- ACTUALLY, I'LL GO ON.

21         ARE YOU AWARE OF THAT BEING PART OF ANY PATENT THAT APPLE

22    HAS?

23    A.   IT HAS NOTHING TO DO WITH ANYTHING IN THIS CASE.

24    Q.   "AS FOR UX," THAT'S THE USER INTERCHANGE?

25    A.   EXPERIENCE.

1    Q.  DO YOU SEE IN THIS PARAGRAPH HERE ANYTHING TALKING ABOUT

2    ANY OF THE PATENTED FEATURES IN THIS CASE?

3    A.  NO.

4    Q.  AND THEN IT SAYS "OUR MOST IMPORTANT ASSET IS OUR SCREEN.

5    IT IS VERY IMPORTANT THAT WE MAKE SCREEN SIZE BIGGER AND IN THE

6    FUTURE MOBILE PHONES WILL ABSORB EVEN THE FUNCTION OF E-BOOKS."

7    DO YOU SEE THAT?

8    A.  I DO.  AND IT'S ALSO MENTIONED ALSO IN THE BEGINNING OF

9    THIS WHOLE DOCUMENT THAT THAT'S WHAT SAMSUNG REALIZES IS THEIR

10   ASSET AND THAT'S HOW THEY'RE GOING TO SELL PHONES AND THAT'S

11   GET BIGGER SCREENS ON THESE PHONES AND THEY DID DO THAT.

12   Q.  NOW, IN LOOKING AT ALL THESE DOCUMENTS, YOU UNDERSTAND

13   THERE'S A LOST PROFITS ALLEGATION HERE CONCERNING INFRINGEMENT

14   OF THE '915 PATENT?

15   A.  YES.

16   Q.  AND IN THE DOCUMENTS YOU WERE SHOWN, WAS THERE ANY MENTION

17   OF THE '915 PATENT?

18   A.  NO, NO DOCUMENT I'VE SEEN IN MY OWN REVIEW OR HAS BEEN

19   SHOWN IN THIS TRIAL AT ALL IN THESE HUNDREDS OF FEATURES THAT

20   ARE BEING ANALYZED MENTIONED THE '915 FUNCTIONALITY.

21   Q.  NOW, WITH RESPECT TO, BY THE WAY, SUBTRACTING OPERATING

22   EXPENSES, USING YOUR CALCULATIONS, HOW DID THE PROFIT MARGINS

23   ON THESE PHONES COMPARE WITH THE PROFIT MARGINS OVERALL FOR

24   SAMSUNG?

25   A.  WELL, IF YOU LOOK AT THE OVERALL LIFE OF THE PHONES THAT

```
 1    ARE ACCUSED IN THIS CASE, IT'S VERY TYPICAL OF ALL THE PHONES

 2    THAT SAMSUNG SELLS.

 3    Q.   HOW ABOUT IF YOU LOOK AT MS. DAVIS'S PROFIT MARGINS, THE

 4    WAY SHE CALCULATED THEM?  HOW DID THEY COMPARE WITH THE PROFIT

 5    MARGINS OVERALL OF SAMSUNG PHONES?

 6    A.   IT'S ABOUT DOUBLE.

 7    Q.   AND FINALLY, LET ME ASK YOU THIS:  WITH RESPECT TO

 8    REASONABLE ROYALTY AND IN WHAT YOU'VE TESTIFIED TO AS THE

 9    GEORGIA PACIFIC FACTORS, OKAY, WHAT IN YOUR OPINION IS THE MOST

10    IMPORTANT OF THOSE FACTORS?

11    A.   TO ME THE MOST IMPORTANT -- WELL, THERE'S TWO:  G.P.

12    FACTOR NUMBER 9, WHICH IS REALLY THE NATURE OF THE IMPROVEMENT

13    WHERE YOU LOOK AT WHAT IS THE ADVANCE THAT THIS PATENT TEACHES

14    OVER THE PRIOR ART, AND THEN WHAT ARE THE NON-INFRINGING

15    ALTERNATIVES?

16         AND THEN THE OTHER FACTOR THAT'S REALLY IMPORTANT IS G.P.

17    FACTOR NUMBER 13 WHERE YOU HAVE TO APPORTION THE PROFITS OF THE

18    VALUE THAT THE INFRINGER RECEIVES FROM THE PRODUCTS THAT ARE

19    UNRELATED TO THE PATENTS-IN-SUIT.

20    Q.   AND EXPLAIN WHAT THAT MEANS WHEN YOU SAY THAT YOU HAVE TO

21    LOOK AT THINGS UNRELATED TO THE PATENTS-IN-SUIT.

22    A.   WELL, SAMSUNG IS THE, FOR THE LAST COUPLE YEARS, HAS BEEN

23    THE SECOND -- HAS THE SECOND MOST NUMBER OF PATENTS ISSUED IN

24    THE UNITED STATES AFTER IBM.  THEY HAVE A LOT OF PATENTED

25    TECHNOLOGY IN THESE ACCUSED PRODUCTS THAT'S THEIR OWN, THAT
```

1    THEY'VE INVENTED.

2         YOU HAVE TO LOOK AT THEIR CONTRIBUTIONS IN MANUFACTURING

3    AND MARKETING AND ALL THESE OTHER THINGS THAT ARE UNRELATED TO

4    THIS ONE TINY PATENT THAT YOU'RE BEING ASKED TO ADDRESS, AND

5    UNLESS YOU DO THAT PROPERLY, YOU'RE GOING TO OVERSTATE THE

6    ROYALTY RATE.

7    Q.   AND HAVE YOU SEEN ANY DATA AT ALL THAT COMPARES THE VALUE

8    IN A PHONE OF, SAY, THE '915 PATENT TO THE VALUE OF ALL THE

9    OTHER FEATURES IN THAT PATENT?

10   A.   NO.

11        MR. PRICE:  ONE SECOND.

12        NOTHING FURTHER, YOUR HONOR.

13        THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:22.

14        IS THERE ANY RECROSS?

15        MR. LEE:  VERY BRIEFLY, YOUR HONOR.

16        THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  TIME IN

17   NOW 10:23.

18        GO AHEAD.

19                    **RECROSS-EXAMINATION**

20   BY MR. LEE:

21   Q.   JUST A FEW QUESTIONS.  YOU TALKED ABOUT PX 34, WHICH IS A

22   SEPTEMBER 2007 DOCUMENT.

23   A.   YES.

24   Q.   HAVE YOU TALKED TO ANYBODY WHO PREPARED THE DOCUMENT?

25   A.   I DID NOT.

1    Q.   TURN, IF YOU WOULD, IT'S IN VOLUME 1, TAB 4.  TURN, IF YOU

2    WOULD, TO PAGE 37.  I WANT TO SEE IF I UNDERSTAND WHAT YOU MEAN

3    WHEN YOU SAY THIS HAS NOTHING TO DO WITH THE PATENTS THAT ARE

4    AT ISSUE.

5         YOU HAVE THIS IPHONE EFFECT ANALYSIS; CORRECT?

6    A.   YOU SAID IT WAS IN TAB 4.  I THINK IT'S TAB 6.

7    Q.   YOU MAY BE CORRECT.

8    A.   WHICH PAGE?

9    Q.   34.36 AND 37.

10   A.   36.

11   Q.   DO YOU HAVE IT?

12   A.   I DO.

13   Q.   SO THERE'S THE START AT THE BEGINNING OF 36, AND THEN IF

14   WE GO TO PAGE 37 WHERE WE TALKED ABOUT THE IPHONE EFFECT

15   ANALYSIS, OKAY, THEY'RE DISCUSSING MORE THAN THE PROCESSORS

16   THAT ARE MADE BY SAMSUNG, ARE THEY NOT?

17   A.   I DON'T BELIEVE SO.

18   Q.   WELL, MR. WAGNER, UNDER "HW PORTION," DO YOU SEE THAT,

19   HARDWARE PORTION?

20   A.   I DO.

21   Q.   "EASY IMITATION."

22        LET'S LOOK AT WHAT THE SUBBULLET POINT IS.  "TOUCHSCREEN

23   USER INTERFACE, DISPLAY/VIDEO RESOLUTION."

24        DO YOU SEE THOSE?

25   A.   I DO.

```
1     Q.   NOW, YOU ALSO TALKED ABOUT PX 40.

2          COULD WE HAVE PX 40 ON THE SCREEN?

3          THIS IS THE E-MAIL CHAIN, RIGHT, AND YOU WERE HERE WHEN --

4     YOU AND I DISCUSSED WHAT MR. SHIN SAID.

5     A.   WE DID.

6     Q.   AND YOU JUST GAVE THE JURY YOUR INTERPRETATION OF WHAT

7     MR. SHIN WAS COMMUNICATING TO HIS FOLKS?

8     A.   WELL, AT LEAST ON CERTAIN PARTS OF THIS E-MAIL, YES.

9     Q.   DID YOU TALK TO MR. SHIN?

10    A.   I DID NOT.

11    Q.   DID YOU ASK TO TALK TO MR. SHIN?

12    A.   I DID NOT.

13    Q.   ONE MORE THING.  PX 36, AND I'LL PUT IT ON THE SCREEN,

14    MR. WAGNER, AND I'M GOING TO PUT UP PAGE 36, AND I JUST WANT TO

15    EXPLORE THIS, THE CONCEPT THAT YOU SAID THAT THERE'S NOTHING

16    THAT SHOWS THAT ANY INDICATION THAT THE '915 PATENT WAS

17    IMPORTANT.

18         THIS IS A SAMSUNG DOCUMENT -- THIS IS THE GRAVITY TANK

19    ANALYSIS THAT WAS DONE FOR SAMSUNG; CORRECT?

20    A.   IT IS.

21    Q.   AND IN THE LEFT-HAND CORNER, DO YOU SEE "FUN.  GESTURES

22    LIKE TWO FINGERED PINCH AND FLICK ADD GAME-LIKE QUALITY TO

23    INTERACTIONS."

24         MR. PRICE:  YOUR HONOR, I OBJECT.  THIS WASN'T IN THE

25    DISCLOSURE.  WASN'T SHOWN TO HIM ON DIRECT.
```

WAGNER RECROSS

```
 1              MR. LEE:  IT WASN'T, YOUR HONOR, BECAUSE HE JUST

 2     TESTIFIED HE SAW NOTHING IN THE DOCUMENTS THAT REFERRED TO THE

 3     '915 FEATURE.

 4              THE COURT:  OVERRULED.

 5     BY MR. LEE:

 6     Q.   YOU SEE THAT, DON'T YOU?

 7     A.   I DO.

 8     Q.   LAST QUESTION.  YOU TESTIFIED ABOUT THE INTEGRITY OF THE

 9     FINANCIAL INFORMATION THAT SAMSUNG GAVE TO YOU; CORRECT?

10     A.   I DID.

11     Q.   HAVE YOU DONE ANYTHING TO RECONCILE THE INFORMATION THEY

12     GAVE YOU WITH THE AUDITED FINANCIAL STATEMENTS YOU REFERRED TO?

13     A.   NO.

14     Q.   NOTHING AT ALL; CORRECT?

15     A.   NO.  AND YOU COULDN'T BECAUSE THE INFORMATION I'M LOOKING

16     AT ISN'T THE TYPE OF INFORMATION THAT'S IN THE AUDITED

17     FINANCIALS.  THERE'S NO COST ALLOCATIONS OR COMMON COSTS IN

18     THEIR AUDITED FINANCIALS.  IT'S ALL THE COSTS OF THE COMPANY.

19          SO YOU COULD NOT DO WHAT YOU'RE SUGGESTING.

20     Q.   RIGHT.  SO WHEN PEOPLE PREPARE, ACCORDING TO GENERALLY

21     ACCEPTED ACCOUNTING PRINCIPLES, THEIR COMPANY-WIDE INFORMATION,

22     THAT DOESN'T HAVE THE INFORMATION YOU NEED TO DETERMINE

23     SAMSUNG'S INFRINGER'S PROFITS; CORRECT?

24     A.   I AGREE WITH THAT.

25              MR. LEE:  THANK YOU.  NOTHING FURTHER, YOUR HONOR.
```

```
 1              THE COURT:  TIME IS 10:27.

 2          ANYTHING FURTHER, MR. PRICE?

 3              MR. PRICE:  NO, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

 5      AND IS IT SUBJECT TO RECALL OR NOT?

 6              MR. PRICE:  MAY BE EXCUSED, YOUR HONOR.

 7              THE COURT:  ALL RIGHT.  WHAT ABOUT YOU?

 8              MR. LEE:  NOT SUBJECT TO RECALL, YOUR HONOR.

 9              THE COURT:  NOT SUBJECT TO RECALL?

10              MR. LEE:  NOT SUBJECT TO RECALL.

11              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

12      STEP DOWN.

13          OKAY.  LET'S GO AHEAD AND -- SHOULD WE TAKE OUR BREAK NOW?

14      THE -- WELL, LET ME ASK, ARE YOU RESTING AT THIS POINT?

15              MR. PRICE:  SUBJECT TO CHECKING ON THE EXHIBITS

16      AND --

17              MS. MAROULIS:  YOUR HONOR, IF WE CAN TAKE A QUICK

18      BREAK AND CHECK ON THE EXHIBITS IF ANYTHING NEEDS TO BE MOVED

19      IN, THEN WE CAN REST.

20              THE COURT:  THAT'S FINE.  THAT'S FINE.

21          NOW, THERE WILL NOT BE ANY MOTIONS AFTER THE RESTING;

22      CORRECT?

23              MR. LEE:  YOUR HONOR, WE HAVE TWO RULE 50 MOTIONS

24      GOING TO DISCRETE ISSUES, BUT WE CAN TAKE -- WE CAN -- THE

25      OFFICIAL WAY TO DO THIS MIGHT BE TO MOVE TO THE REBUTTAL CASE
```

```
 1      AND TAKE THEM UP AT THE END WITH ALL THE RULE 50 MOTIONS.  BUT
 2      I'M HAPPY --
 3              MS. MAROULIS:  WE'LL DO THE RULE 50 MOTIONS AFTER
 4      REBUTTAL, YOUR HONOR.
 5              THE COURT:  OKAY.  SO THAT'S OKAY WITH BOTH SIDES.
 6         OKAY.  THEN WE WON'T HAVE TO TAKE A LONGER THAN USUAL
 7      BREAK RIGHT NOW.  WE'LL JUST TAKE OUR NORMAL BREAK.
 8         ALL RIGHT.  LET'S TAKE A BREAK UNTIL 10:45, PLEASE.
 9      AGAIN, SAME ADMONITIONS.  PLEASE KEEP AN OPEN MIND.  DON'T
10      DISCUSSION OR RESEARCH THE CASE.
11         THANK YOU.
12         (JURY OUT AT 10:28 A.M.)
13              THE COURT:  THE JURORS HAVE LEFT THE COURTROOM.
14      PLEASE TAKE A SEAT.
15         JUST GIVE ME A HEADS UP ON WHAT YOUR RULE 50'S ARE GOING
16      TO BE ABOUT.
17              MR. LEE:  SURE.  THERE WILL BE TWO, YOUR HONOR.
18         THE FIRST GOES TO SAMSUNG'S LOST PROFITS AND SAMSUNG'S
19      BURDEN TO PROVE THAT THE EXPENSES IN DISPUTE ARE DIRECTLY
20      ATTRIBUTABLE, AND WE THINK, GIVEN MR. WAGNER'S TESTIMONY USING
21      THE DIRECTLY RELATED, THERE IS NO ISSUE TO GO TO THE JURY.
22         THERE ARE NO -- THERE'S NOTHING TO SATISFY SAMSUNG'S
23      BURDEN.
24         I WON'T GIVE YOU THE ARGUMENT.  I'LL JUST IDENTIFY THE
25      ISSUES.
```

```
1          AND IF SAMSUNG IS, IN FACT, RESTING, YOUR HONOR, ON THE

2     QUESTIONS OF THESE HYPOTHETICAL DESIGN AROUNDS, THERE HAS BEEN

3     NO TECHNICAL TESTIMONY THAT SAYS EITHER ONE OF TWO THINGS:

4     THAT YOU TAKE FEATURE A FROM THE INFRINGING PRODUCT AND PUT IT

5     INTO PRODUCT B; OR THAT PRODUCT A COULD BE DESIGNED AROUND, TO

6     THE EXTENT IT INFRINGES OTHER PATENTS, TO BE NON-INFRINGING.

7          SO IT'S JUST THOSE TWO NARROW ISSUES THAT WE'D LIKE TO

8     ADDRESS.  BUT WE CAN --

9              THE COURT:  OKAY.  WELL, I'M ACTUALLY READY TO RULE

10    ON THAT, IF THAT'S WHAT THEY ARE.

11             MR. LEE:  THAT'S NOT A GOOD THING.

12        (LAUGHTER.)

13             THE COURT:  I JUST WANT TO KEEP THIS CASE MOVING.

14             MR. LEE:  WE UNDERSTAND.  WE UNDERSTAND.

15        BUT I THINK, FOR PURPOSES OF THE RECORD, WE NEED TO MAKE

16    THEM.

17             THE COURT:  OH, I UNDERSTAND.

18             MR. LEE:  AND I'M HAPPY TO AMPLIFY A LITTLE BIT WHEN

19    WE GET TO THE RULE 50 MOTIONS, BUT THOSE ARE THE ONLY TWO.

20             MS. MAROULIS:  WE OBVIOUSLY OPPOSE, YOUR HONOR, BUT

21    IF IT'S GOING TO BE DENIED, WE DON'T WANT TO TAKE UP THE

22    COURT'S TIME RIGHT NOW.

23             THE COURT:  OKAY.  I MEAN, I'M READY TO DENY THEM

24    RIGHT NOW, IF YOU WANT TO ARGUE THEM NOW, I DON'T KNOW HOW LONG

25    THAT'LL TAKE.  I THINK IT SHOULD JUST TAKE A FEW MINUTES.
```

```
1              I THINK THESE ISSUES NEED TO GO TO THE JURY.

2              MR. LEE:  YOUR HONOR, I THINK WE'VE STATED THE BASIS,

3      AND IN THE INTERESTS OF -- I MEAN, FOR PURPOSES OF PRESERVING

4      THE RECORD, IT'S JUST THOSE TWO THINGS.  IT'S THAT THE

5      STANDARDS'S DIRECTLY ATTRIBUTABLE, THEY HAVE THE BURDEN.  WE

6      DON'T BELIEVE THERE'S ENOUGH TO GO TO THE JURY.

7              ON THE HYPOTHETICAL NON-INFRINGING ALTERNATIVES, THERE'S

8      BEEN NO TESTIMONY THAT WOULD INDICATE EITHER WHAT WOULD BE

9      REQUIRED TO IMPORT A FEATURE FROM ONE PRODUCT TO ANOTHER, OR

10     WHAT WOULD BE REQUIRED TO DESIGN AROUND OTHER PATENTS THAT

11     COVER THAT.

12             THOSE WOULD BE THE BASES.

13               THE COURT:  ALL RIGHT.  WELL --

14             MS. MAROULIS:  YOUR HONOR, ARE THESE DENIED OR DO WE

15     NEED TO ADDRESS THEM RIGHT NOW?

16               THE COURT:  I'M SORRY.  REPEAT THAT.  I COULDN'T HEAR

17     YOU.

18             MS. MAROULIS:  YES, YOUR HONOR.  WOULD YOU LIKE US TO

19     ADDRESS THAT, OR ARE THESE GOING TO BE DENIED RIGHT NOW?

20               THE COURT:  ALL RIGHT.  THE COURT FINDS THAT A

21     REASONABLE JURY WOULD HAVE A LEGALLY SUFFICIENT EVIDENTIARY

22     BASIS TO FIND FOR SAMSUNG ON THESE ISSUES, SO BOTH RULE 50

23     MOTIONS ARE DENIED.

24             MS. MAROULIS:  THANK YOU, YOUR HONOR.

25               THE COURT:  OKAY.  LET'S GO AHEAD AND TAKE OUR BREAK
```

```
 1          AND WE'LL SEE EVERYONE BACK AT 10:45.  THANK YOU.

 2              (RECESS FROM 10:31 A.M. UNTIL 10:49 A.M.)

 3              (JURY OUT AT 10:49 A.M.)

 4              THE COURT:  THANK YOU.  WELCOME BACK.  PLEASE TAKE A

 5      SEAT.

 6          LET ME RULE ON THE MOTION TO STRIKE THE TESTIMONY OF

 7      DR. BALAKRISHNAN AND SINGH.

 8          THE BALAKRISHNAN MOTION APPEARS TO BE MOOTED, RIGHT,

 9      BECAUSE APPLE DOES NOT INTEND TO CALL DR. BALAKRISHNAN.  IS

10      THAT CORRECT?

11              MR. MCELHINNY:  THEY'RE BOTH MOOTED, YOUR HONOR.

12      WE'RE NOT GOING TO CALL EITHER ONE.

13              THE COURT:  OH.  OKAY.  WELL, THE MOTION IS DENIED AS

14      MOOT.

15          (LAUGHTER.)

16              THE COURT:  THEN LET'S BRING IN OUR JURY, UNLESS YOU

17      HAD ANY OTHER ISSUES.

18              MR. MCELHINNY:  I THINK THERE ARE JUST EXHIBIT ISSUES

19      SO THAT THEY CAN REST.

20              THE COURT:  AH, YES.  OKAY, PLEASE, LET'S DO THAT.

21              MR. PRICE:  YOUR HONOR, I THINK EVERYTHING IS IN, SO

22      WE ARE READY TO REST.

23          THERE IS ONE ISSUE.  MS. DAVIS IS THEIR FIRST WITNESS.

24              THE COURT:  UM-HUM.

25              MR. PRICE:  AND I WANTED TO BRING UP ONE ISSUE.
```

1           YOU RECALL IN THE LAST TRIAL THAT YOU RULED THAT APPLE

2      COULD ASK A LEADING QUESTION OF THEIR EXPERT ABOUT THE

3      MAGISTRATE COMMENTING ON THE UNRELIABILITY OF THE SAMSUNG DATA.

4                THE COURT:  YES.

5                MR. PRICE:  THAT WAS A SPECIFIC QUESTION AND ANSWER.

6                THE COURT:  THAT'S RIGHT.

7                MR. PRICE:  AND THAT WAS DONE IN THE LAST TRIAL

8      DURING MR. MUSIKA'S DIRECT.

9                THE COURT:  I REMEMBER THAT.

10               MR. PRICE:  AND THAT WAS A WEIGHING OF WHETHER IT WAS

11     FAIR TO DO THAT.

12          THEY DID NOT ASK THAT QUESTION IN DIRECT.  IT IS NOW

13     REBUTTAL, AND I THINK THAT'S A DIFFERENT WEIGHING ISSUE AT THIS

14     POINT.

15          YOU KNOW, YOU ALSO SAID, OF COURSE, IT COULDN'T BE USED IN

16     CLOSING OR CLOSING DEMONSTRATIVE.

17          SO AT THIS POINT, YOUR HONOR, IT SHOULD HAVE BEEN BROUGHT

18     OUT IN DIRECT IF THEY WERE GOING TO.

19               MS. KREVANS:  YOUR HONOR, CAN I MAKE THIS EASY?

20          IF WHAT MR. PRICE IS ASKING IS DO I INTEND TO ASK

21     MS. DAVIS, ON REBUTTAL, THE SINGLE QUESTION WE WERE GOING TO

22     ASK ABOUT THE WEIGHING, I DON'T.

23               MR. PRICE:  NEVER MIND.

24          (LAUGHTER.)

25               THE COURT:  OKAY.  SO ARE WE SET?  WHY DON'T WE --

```
1        I'D LIKE YOU TO REST IN FRONT OF THE JURY JUST SO THEY KNOW

2     THAT YOU'VE DONE THAT.

3              MR. PRICE:  YES, ALL RIGHT.

4              THE COURT:  SO LET'S DO THAT FIRST.

5        I WAS GOING TO SUGGEST THAT WE TRY TO GET ALL THE EVIDENCE

6     IN -- YOU HAVE ABOUT AN HOUR AND A HALF TOTAL -- THAT WE TRY TO

7     FINISH BY 12:15, HAVE THE JURORS TAKE AN EXTENDED LUNCH BREAK,

8     WE'LL TAKE OUR LUNCH, AND THEN COME BACK AND HAVE A JURY

9     INSTRUCTION -- WELL, ACTUALLY, I'D LIKE TO DO THE JURY

10    INSTRUCTION CONFERENCE BEFORE SO THAT WE CAN GET THE FINAL

11    INSTRUCTIONS PREPARED OVER LUNCH AND TO BRING THEM BACK TO JUST

12    READ THE JURY INSTRUCTIONS, EXCUSE THEM FOR THE DAY, AND THEN

13    WE'LL HANDLE OUR RULE 50 MOTIONS.

14       SO IS THAT ACCEPTABLE TO BOTH PARTIES?

15             MS. KREVANS:  FOR APPLE, YES, YOUR HONOR.

16             MR. PRICE:  YES, YOUR HONOR.

17             THE COURT:  OKAY.  ALL RIGHT.  THEN LET'S DO THAT.

18       AND I'M GOING TO LET THEM KNOW THAT THAT'S WHAT WE'RE

19    PLANNING TO DO.  IS THAT ALL RIGHT?

20             MS. KREVANS:  YES, YOUR HONOR.

21             THE COURT:  OKAY.  THANK YOU.

22             MR. PRICE:  ACTUAL, YOUR HONOR, BEFORE -- CAN WE MAKE

23    SURE THAT WE'RE ON THE RIGHT PAGE?  CAN YOU TELL US HOW MUCH

24    TIME --

25             THE COURT:  YES, I WILL DO THAT FOR BOTH SIDES.
```

```
 1           OKAY.  SO SAMSUNG HAS USED 7 HOURS AND 33 MINUTES AND HAS

 2      27 MINUTES LEFT.

 3           APPLE HAS USED 7 HOURS AND 2 MINUTE AND HAS 58 MINUTES

 4      LEFT.

 5           SO WE LITERALLY HAVE ABOUT AN HOUR AND A HALF LEFT OF

 6      EVIDENCE.

 7               MS. KREVANS:  THANK YOU, YOUR HONOR.

 8               THE COURT:  OKAY.  ALL RIGHT.

 9           THEN MS. PARKER BROWN, WOULD YOU PLEASE BRING IN OUR JURY?

10      THANK YOU.

11           (JURY IN AT 10:52 A.M.)

12               THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

13           LET ME GIVE YOU A QUICK UPDATE ON SCHEDULING.  SO THE

14      PARTIES HAVE A TOTAL OF LESS THAN AN HOUR LEFT AND A HALF OF

15      EVIDENCE TO PRESENT TO YOU.  I'M GOING TO SUGGEST THAT WE GO

16      AHEAD AND FINISH, WHICH MEANS YOU'LL BE GOING TO LUNCH ABOUT 20

17      MINUTES LATE, IF THAT'S OKAY.

18           AND THEN I'D LIKE YOU TO TAKE AN EXTENDED LUNCH BECAUSE WE

19      ARE GOING TO HAVE A CONFERENCE ABOUT THE FINAL JURY

20      INSTRUCTIONS, THEN WE'LL TAKE A LUNCH AND GET ALL OF THE FINAL

21      INSTRUCTIONS READY SO THAT WHEN YOU COME BACK FROM YOUR

22      EXTENDED LUNCH, I'LL GO AHEAD AND READ THE JURY INSTRUCTIONS TO

23      YOU, GIVE YOU HARD COPIES FOR YOUR BINDERS, AND THEN I'LL GO

24      AHEAD AND EXCUSE YOU.

25           THEN THERE ARE MORE THINGS THAT WE HAVE TO DO OUTSIDE YOUR
```

```
 1     PRESENCE THIS AFTERNOON.

 2          THEN WHEN YOU COME TOMORROW AT 9:00, WE CAN GO STRAIGHT TO

 3     CLOSING ARGUMENTS.

 4          THE READING OF INSTRUCTIONS MAY TAKE ABOUT 40 MINUTES, SO

 5     AT LEAST THAT'LL SAVE THAT TIME TOMORROW SO THAT YOU SHOULD

 6     DEFINITELY BE ABLE TO DELIBERATE STARTING WITH LUNCH TOMORROW.

 7          IS THAT OKAY?  IS THAT AN OKAY SCHEDULE?

 8          ALL RIGHT.  SO I'LL LET YOU KNOW SHORTLY HOW MUCH TIME

 9     WE'LL TAKE OFF FOR FOR LUNCH.  I MAY NEED TO HAVE ONE

10     CONVERSATION WITH THE PARTIES ABOUT HOW EXTENSIVE TIME THEY'RE

11     GOING TO NEED FOR THAT CONFERENCE, WHICH I SHOULD HAVE DONE

12     BEFORE YOU CAME OUT, BUT -- ALL RIGHT.

13          LET'S JUST GO AHEAD.  MAYBE WE'LL TAKE A BRIEF BREAK AND

14     I'LL ASK THE QUESTION AT THAT TIME.

15          SO MR. PRICE, GO AHEAD, PLEASE.  TIME IS NOW 10:54.

16          MR. PRICE:  YOUR HONOR, SAMSUNG RESTS.

17          THE COURT:  ALL RIGHT.  THEN MS. KREVANS, GO AHEAD

18      AND CALL YOUR NEXT WITNESS, PLEASE.

19          MS. KREVANS:  APPLE CALLS JULIE DAVIS, YOUR HONOR.

20          AND, YOUR HONOR, I'M GOING BINDER-FREE.

21          THE COURT:  ALL RIGHT.

22          MS. KREVANS:  I JUST HAVE A DOCUMENT AND A CD.  THE

23      WITNESS ALREADY HAS THEM AND THESE ARE COPIES FOR THE COURT.

24          THE COURT:  ALL RIGHT.

25          MS. KREVANS:  TWO COPIES OF ONE DOCUMENT AND TWO
```

```
 1      COPIES OF THE SAME CD.

 2                 THE COURT:  OKAY.  THANK YOU.

 3           (JULIE DAVIS, PLAINTIFF'S WITNESS, WAS PREVIOUSLY SWORN.)

 4                 THE COURT:  ALL RIGHT.  TIME IS NOW 10:55.

 5           MS. DAVIS, YOU ARE STILL UNDER OATH.

 6                 THE WITNESS:  I UNDERSTAND.  THANK YOU.

 7                 THE COURT:  GO AHEAD, PLEASE.

 8                      FURTHER REDIRECT EXAMINATION

 9      BY MS. KREVANS:

10      Q.   GOOD MORNING, MS. DAVIS.

11      A.   GOOD MORNING.

12      Q.   WERE YOU IN COURT FRIDAY AND THIS MORNING WHEN MR. WAGNER

13      TESTIFIED ABOUT HIS DAMAGES OPINIONS IN THIS CASE?

14      A.   YES, I WAS.

15      Q.   AND YOU HEARD SOME CRITICISMS HE MADE OF YOUR DAMAGES

16      CALCULATION?

17      A.   I DID.

18      Q.   LET'S START WITH SOME ISSUES RELATING TO THE SAMSUNG

19      PROFIT, INFRINGER'S PROFITS MEASURE OF DAMAGES.

20           YOU RECALL THE TESTIMONY THAT MR. WAGNER GAVE ABOUT THAT?

21      A.   I DO.

22      Q.   WHAT WAS -- WHAT WAS THE NUMBER THAT HE SAID WAS THE

23      APPROPRIATE NUMBER FOR SAMSUNG'S INFRINGEMENT OF THE D'677 AND

24      D'305 PATENTS BY THE INFUSE 4G AND THE D'305 PATENT BY SIX

25      ADDITIONAL SAMSUNG PROFITS?
```

1    A.   I RECALL THAT TO TOTAL ABOUT $52 MILLION.

2    Q.   OKAY.  MR. LEE, COULD YOU BRING UP DX 781, PAGE 2.

3         AND THIS IS MR. WAGNER'S CALCULATION OF SAMSUNG PROFITS.

4         IS THIS THE NUMBER YOU'RE REFERRING TO?

5    A.   IT IS.

6    Q.   COULD YOU REMIND THE JURY WHERE THEY WILL FIND, IN THE

7    EXHIBITS IN THE JURY ROOM, YOUR CALCULATION OF SAMSUNG'S

8    PROFITS?

9    A.   THAT WILL COME FROM EXHIBIT 25F THAT WE DISCUSSED LAST

10   WEEK.

11   Q.   OKAY.  HOW DID MR. WAGNER CALCULATE THE SAMSUNG PROFIT

12   NUMBERS?

13   A.   HE STARTED OUT THE SAME WAY I DID, USING ESSENTIALLY THE

14   SAME SOURCE OF INFORMATION THAT I DID.  WE AGREED ON THE

15   REVENUE NUMBERS, AND WE ESSENTIALLY AGREED ON THE COSTS OF

16   GOODS SOLD NUMBERS.

17        SO THE DIFFERENCE IN OUR TWO CONCLUSIONS RELATES

18   SPECIFICALLY TO THE OTHER EXPENSES THAT HE HAS DEDUCTED AND I

19   HAVE NOT.

20   Q.   OKAY.  LET'S JUST START WITH A LITTLE BIT OF TERMINOLOGY

21    SO THAT WE'RE ALL CLEAR.

22        IS THERE AN ACCOUNTING TERM THAT DESCRIBES THE NUMBER THAT

23   MR. WAGNER CAME TO THAT IS TOTAL REVENUES, MINUS COSTS OF GOODS

24   SOLD, AND ALSO MINUS ALL OF THE OTHER EXPENSES OF THE COMPANY?

25   A.   YES.  THAT WOULD TYPICALLY BE REFERRED TO AS OPERATING

1       INCOME OR OPERATING PROFITS.

2       Q.   OPERATING PROFITS, OKAY.

3            DID MR. WAGNER USE AN OPERATING PROFIT NUMBER AS HIS

4    MEASURE OF SAMSUNG PROFITS FOR PURPOSES OF THE INFRINGER'S

5    PROFITS DAMAGES REMEDY IN THIS CASE?

6    A.   ESSENTIALLY, YES.

7    Q.   DID YOU?

8    A.   I DID NOT.

9    Q.   WHY NOT?

10   A.   I APPLIED A SPECIFIC TEST, AS I UNDERSTAND I AM TO DO, FOR

11   DESIGN PATENT INFRINGEMENT DAMAGES.  THAT TEST IS WHAT WE

12   TALKED ABOUT LAST WEEK.  THAT'S THE DIRECTLY ATTRIBUTABLE

13   PROFITS.

14   Q.   AND WITH RESPECT TO THESE OTHER EXPENSES, DID YOU LOOK FOR

15   EVIDENCE AS TO WHETHER ANY OF THEM WERE DIRECTLY ATTRIBUTABLE

16   TO THESE SEVEN PRODUCTS THAT INFRINGED APPLE'S DESIGN PATENTS?

17   A.   YES, I DID.

18   Q.   AND DID YOU FIND ANY?

19   A.   I DID NOT.

20   Q.   ANOTHER TERMINOLOGY THAT I'D LIKE TO GET STRAIGHT.  IS

21   THERE A TERM THAT ACCOUNTANTS USE TO DESCRIBE THE NUMBER YOU

22   GET WHEN YOU TAKE TOTAL REVENUE AND YOU SUBTRACT COSTS OF GOODS

23   SOLD?

24   A.   YES.  THAT WOULD TYPICALLY BE REFERRED TO AS EITHER GROSS

25   PROFITS OR GROSS MARGIN.

1   Q.   GROSS PROFITS OR GROSS MARGIN?

2   A.   RIGHT.

3   Q.   THOSE TWO MEAN THE SAME THING?

4   A.   THEY DO.

5   Q.   AND THAT'S WHAT ACCOUNTANTS CALL IT WHEN YOU TAKE THE

6   TOTAL REVENUE AND YOU SUBTRACT THE COSTS OF GOODS SOLD?

7   A.   THAT'S CORRECT.

8   Q.   NOW, YOU RECALL MR. WAGNER GIVING SOME TESTIMONY ABOUT HIS

9   VIEW THAT COMPANIES DON'T REPORT PRODUCT-BY-PRODUCT DATA AND

10  NUMBERS TO MANAGEMENT BECAUSE IT'S TOO MUCH DETAIL?

11  A.   I RECALL THAT.

12  Q.   DO YOU AGREE WITH THAT?

13  A.   NOT NECESSARILY, NO.

14  Q.   HAVE YOU SEEN INSTANCES WHEN COMPANIES DO REPORT TO

15  MANAGEMENT ON PROFITS FROM SPECIFIC PRODUCTS?

16  A.   YES, I HAVE.

17  Q.   WHEN COMPANIES DO REPORT TO MANAGEMENT ON PROFITS FROM

18  SPECIFIC PRODUCTS, DO THEY TYPICALLY USE GROSS MARGIN, OR GROSS

19  PROFIT, OR OPERATING PROFITS AS THE NUMBER THEY REPORT?

20  A.   GENERALLY WHEN THEY'RE LOOKING AT PRODUCT --

21       MR. PRICE:  OBJECTION.  THIS WAS NOT IN HER REPORT.

22       MS. KREVANS:  THIS IS REBUTTAL TO THE TESTIMONY THAT

23  MR. WAGNER GAVE, AND SHE IS TALKING HERE ABOUT JUST THE

24  TERMINOLOGY THAT SHE USED IN HER REPORT, AND WE'RE GOING TO GO

25  NOW TO A DOCUMENT THAT IS ABSOLUTELY IN HER REPORT.

1           THE COURT:  ALL RIGHT.  OVERRULED.

2       GO AHEAD, PLEASE.

3           THE WITNESS:  I'M GOING TO HAVE TO HAVE YOU GIVE ME

4   THAT QUESTION AGAIN, PLEASE.

5   BY MS. KREVANS:

6   Q.   WHEN COMPANIES DO REPORT TO MANAGEMENT ON SOMETHING LIKE

7   PROFIT FOR A PARTICULAR PRODUCT, DO THEY TYPICALLY USE A GROSS

8   MARGIN NUMBER TO REPORT OR AN OPERATING PROFIT?

9   A.   THEY WOULD PROBABLY MOST COMMONLY USE A GROSS PROFIT FOR A

10  PRODUCT SPECIFIC MARGIN.

11  Q.   HAVE YOU SEEN ANY EXAMPLE OF SUCH A REPORT IN THIS CASE?

12  A.   I HAVE, IN SAMSUNG'S OWN FILES.

13  Q.   COULD YOU LOOK AT PX 58.  THAT'S THE DOCUMENT THAT'S IN

14  FRONT OF YOU.

15      WHAT IS PX 58?

16  A.   THIS IS A DOCUMENT THAT CAME FROM SAMSUNG'S FILES.  IT

17  CONSISTS OF A COVER THAT IS AN E-MAIL EXCHANGE, AND ATTACHED TO

18  THAT IS A PRESENTATION.

19  Q.   IS THE PRESENTATION -- IS BOTH THE E-MAIL AND THE

20  PRESENTATION A DOCUMENT AUTHORED BY SAMSUNG?

21  A.   IT APPEARS TO BE, YES.

22          MS. KREVANS:  YOUR HONOR, WE OFFER PX 58.

23          THE COURT:  ANY OBJECTION?

24          MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR.

25          THE COURT:  IT'S ADMITTED.

```
 1          (PLAINTIFF'S EXHIBIT 58 WAS ADMITTED IN EVIDENCE.)

 2              THE COURT:  GO AHEAD, PLEASE.

 3      BY MS. KREVANS:

 4      Q.   OKAY.  COULD WE JUST, MR. LEE, MAKE THE TOP PART OF THIS

 5      E-MAIL A LITTLE BIT BIGGER SO IT'S EASIER TO SEE?  THANK YOU.

 6              WHAT'S THE -- WHAT ARE THE VITAL STATISTICS OF THIS

 7      E-MAIL, MS. DAVIS?  WHO'S IT FROM?  WHO'S IT TO?  AND WHAT'S

 8      THE DATE?

 9      A.   LET'S START WITH THE DATE.  IT'S JUNE 17 OF 2011.  IT IS

10      FROM JUSTIN DENISON, WHO AT THE TIME WAS THE V-P OF STRATEGY

11      AND CORPORATE PLANNING FOR SAMSUNG TELECOMMUNICATIONS AMERICA,

12      WHICH YOU KNOW AS STA.

13              AND IT IS GOING TO A NUMBER OF INDIVIDUALS.  THE FIRST ONE

14      ON THE LIST IS HIS OWN NAME, BUT RIGHT AFTER THAT IS A

15      GENTLEMAN NAMED DALE SOHN, AND I UNDERSTAND HIM TO BE THE CEO

16      OF STA AT THAT TIME.

17      Q.   THE CEO, THE HEAD OF THE COMPANY?

18      A.   THE HEAD OF STA, YES.

19      Q.   OKAY.  THE TITLE OF THIS E-MAIL SAYS "GS CHOI'S DIRECTION

20      AND REQUEST TO STA."  WHO WAS MR. CHOI?

21      A.   I UNDERSTAND GS CHOI TO HAVE BEEN THE HEAD EXECUTIVE, THE

22      CEO, IF YOU WILL, OF SAMSUNG ELECTRONICS OVERALL.

23      Q.   SAMSUNG ELECTRONICS, THE PARENT COMPANY IN JAPAN?

24      A.   IN KOREA.

25      Q.   I'M SORRY, IN KOREA.
```

```
 1          SO THIS IS AN E-MAIL TO A NUMBER OF PEOPLE ABOUT A

 2     REQUEST, AT STA ABOUT A REQUEST THAT HAD COME FROM THE BOSS IN

 3     KOREA?

 4     A.   THAT'S CORRECT.

 5     Q.   OKAY.  COULD YOU LOOK AT PAGE 5?  ACTUALLY, WHY DON'T WE

 6     JUST LOOK AT THE VERY FIRST PAGE, SO PAGE 2.  RIGHT.  THE FIRST

 7     PAGE AFTER THE E-MAIL, MR. LEE.  GO ONE MORE.

 8          WHAT'S THE NATURE OF THE ATTACHMENT TO THIS E-MAIL?

 9     A.   THE PRESENTATION THAT IS ATTACHED TO THIS E-MAIL APPEARS

10     TO BE A PRESENTATION THAT WAS PREPARED TO RESPOND TO A REQUEST

11     MADE BY MR. CHOI WHICH HAD TO DO WITH HOW WOULD SAMSUNG GO

12     ABOUT COMPETING WITH APPLE, AND ALSO INCREASING ITS OWN PROFITS

13     AT THE TIME.

14     Q.   OKAY.  IF WE GO DOWN TO THE -- GO BACK TO THE WHOLE PAGE,

15     IF WE COULD FOR A MOMENT, MR. LEE.

16          DO YOU SEE THERE ARE SOME NOTES UNDER THIS, WHAT LOOKS

17     LIKE A DRAFT POWERPOINT SLIDE?

18     A.   YES.

19     Q.   GO DOWN ABOUT FIVE BULLET POINTS IN THE NOTES.  SO THE

20     FIRST ONE SAYS "WHAT DOES IT MEAN TO BEAT APPLE?"

21          KEEP GOING DOWN, ABOUT FOUR MORE.  IT SAYS "HOW CAN OUR

22     SALES TEAM JUSTIFY ADDITIONAL ABOUT $100 ASP?"

23          WHAT DOES ASP REFER TO?

24     A.   ASP IS TALKING ABOUT, IN THE CONTEXT OF THIS DOCUMENT, THE

25     AVERAGE SELLING PRICE.  SO IT APPEARS TO BE ADDRESSING A
```

1     QUESTION OF HOW CAN WE INCREASE OUR AVERAGE SELLING PRICE BY

2     APPROXIMATELY $100?

3     Q.   YOU SEE THE BULLET POINT TWO BELOW THAT, "PROVIDE STA VIEW

4     OF WHEN WE CAN/WILL CATCH UP TO APPLE -- EMPHASIZE HOW

5     DANGEROUS APPLE IS INSTALLED BASE, CARRIER MINDSHARE/CONVERSION

6     PERSPECTIVE, ET CETERA."

7          WHAT DOES INSTALLED BASE REFER TO THERE?

8     A.   THAT'S TALKING ABOUT THE TOTAL NUMBER --

9          MR. PRICE:  I'M GOING TO OBJECT ON LACK OF

10    FOUNDATION.

11         THE COURT:  LAY THE FOUNDATION, PLEASE.

12    BY MS. KREVANS:

13    Q.   MS. DAVIS, HAVE YOU STUDIED THE DOCUMENTS PRODUCED BY

14    SAMSUNG AND APPLE THAT GO TO THE NATURE OF THE SMARTPHONE

15    BUSINESS IN GENERAL AND HOW THE SMARTPHONE MANUFACTURERS RELATE

16    TO THE CARRIERS WHO ACTUALLY PROVIDE TELEPHONE SERVICES TO

17    CONSUMERS WHO BUY SMARTPHONES?

18    A.   YES, I HAVE.

19    Q.   IN THE CONTEXT OF WHAT YOU'VE LEARNED FOR THIS CASE, DO

20    YOU HAVE AN UNDERSTANDING OF WHAT INSTALLED BASE REFERS TO?

21    A.   TYPICALLY, YES.  WHEN INSTALLED BASE IS USED IN THIS

22    CONTEXT, IT'S REFERRING TO THE NUMBER OF UNITS OF A PRODUCT

23    THAT IS ALREADY OUT IN THE FIELD.

24         SO WHAT I THINK THEY'RE TALKING ABOUT HERE IS APPLE HAD

25    LOTS AND LOTS OF IPHONES ALREADY OUT IN THE MARKETPLACE.

1     Q.   AND THE REFERENCE TO CARRIER MINDSHARE/CONVERSION

2     PERSPECTIVE, WHAT IS THAT REFERRING TO?

3     A.   I UNDERSTAND THAT TO --

4             MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

5             MS. KREVANS:  YOUR HONOR, I THINK I'VE ALREADY LAID

6     THE FOUNDATION.  I'M HAPPY TO ASK ANOTHER QUESTION IF YOU THINK

7     IT'S NECESSARY.

8             THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION ON

9     THOSE TERMS?

10    BY MS. KREVANS:

11    Q.   AGAIN, FROM THE DOCUMENTS YOU'VE STUDIED IN THIS CASE, DO

12    YOU HAVE AN UNDERSTANDING OF WHAT CARRIER MINDSHARE AND

13    CONVERSION PERSPECTIVE REFER TO?

14    A.   YES, I DO.

15    Q.   CAN YOU PLEASE EXPLAIN THAT?

16    A.   I UNDERSTAND --

17            MR. PRICE:  OBJECTION.  STILL NO FOUNDATION, YOUR

18    HONOR.

19            THE COURT:  OVERRULED.

20         GO AHEAD, PLEASE.

21            THE WITNESS:  I UNDERSTAND THAT, AT LEAST IN THE

22    CONTEXT OF THIS DOCUMENT, WHAT IT'S TALKING ABOUT WITH RESPECT

23    TO CARRIER MINDSHARE IS SAMSUNG WANTS TO GET THE ATTENTION OF

24    CARRIERS SO THE CARRIER, THE AT&T'S AND THE VERIZON'S AND

25    OTHERWISE, WOULD BE WILLING TO OFFER SAMSUNG PRODUCTS IN THEIR

```
1        STORES.

2            SO HOW MUCH OF THE MINDSHARE ARE THEY GETTING OF CARRIERS

3        VERSUS APPLE OR OTHER MANUFACTURERS?

4        BY MS. KREVANS:

5        Q.   COULD YOU LOOK AT PAGE 5, WHICH HAS THE SLIDE NUMBER 3

6        FROM THIS POWERPOINT ON IT.  "EXECUTIVE SUMMARY, GS CHOI

7        REQUEST."

8            IF YOU LOOK AT THE FIRST BULLET POINT, YOU SEE IT SAYS

9        "STA MUST RESPOND WITH A PLAN TO BEAT APPLE BY Q-3'11 OR Q-4'11

10       WITH A LONGER-TERM GOAL OF GROWING SUPER-PREMIUM ASP'S TO MATCH

11       APPLE IN 2012."

12           WHAT DOES SUPER ASP REFER TO?

13               MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.  SHE'S

14       NOT AN EXPERT IN THIS INDUSTRY.

15       BY MS. KREVANS:

16       Q.   MS. DAVIS --

17           I'M SORRY.

18               THE COURT:  LAY A FOUNDATION, PLEASE.

19       BY MS. KREVANS:

20       Q.   MS. DAVIS, DO YOU HAVE AN UNDERSTANDING, BASED ON YOUR

21       STUDY OF THE SMARTPHONE INDUSTRY IN THIS CASE, OF WHAT'S

22       REFERRED TO HERE AS SUPER PREMIUM ASP'S?

23       A.   YES, AND I THINK THE REST OF THIS DOCUMENT MAKES THAT

24       CLEAR AS WELL.

25       Q.   WHAT'S THAT UNDERSTANDING?
```

```
 1      A.   WHAT THEY'RE REFERRING TO HERE IS A PREMIUM PRICE FOR THE

 2      HANDSETS THEMSELVES.

 3           SO THEY, THEY RECOGNIZE THAT APPLE WAS ABLE TO CHARGE A

 4      HIGHER PRICE BECAUSE IT WAS BELIEVED TO BE A PREMIUM PRODUCT,

 5      AND SAMSUNG WISHED TO CHARGE A HIGHER PRICE ON ITS OWN PRODUCTS

 6      AS WELL.

 7      Q.   AND THE SECOND BULLET POINT OF THIS SLIDE REFERS TO A

 8      J.K. SHIN.  WHO IS MR. SHIN?

 9      A.   WE'VE ALREADY SEEN MR. SHIN'S NAME BEFORE.  I UNDERSTAND

10      HIM TO HAVE BEEN THE HEAD OF THE ENTIRE MOBILE DIVISION OF

11      SAMSUNG.  HE IS THE GENTLEMAN WHOSE COMMENTS WERE SUMMARIZED IN

12      PX 40 THAT HAD TO DO WITH CRISIS OF DESIGN AND HEAVEN AND

13      EARTH.

14      Q.   IS THERE A PAGE OF THIS SLIDE PRESENTATION TO SAMSUNG TOP

15      MANAGEMENT THAT HAS PROFITABILITY INFORMATION SPECIFIC TO ONE

16      OF THE INFRINGING PRODUCTS IN THIS CASE?

17      A.   YES, THERE IS.

18      Q.   AND WHAT PAGE IS THAT?

19      A.   I'LL FIND THAT FOR YOU.  THAT IS 58.14, WHICH IS PAGE 12

20      OF THE PRESENTATION.

21      Q.   OKAY.  COULD YOU -- THIS IS THE SLIDE TITLED "APPLE

22      IPHONE 4 HARDWARE COSTS SIMILAR TO GALAXY S, BUT ASP PREMIUM

23      DRIVING GM GAP."  IS THAT WHERE WE ARE?

24      A.   YES, THAT'S WHERE WE ARE.

25      Q.   AGAIN, TERMINOLOGY.  WHAT DOES GM GAP REFER TO?
```

1    A.   GM GAP FOR THIS SLIDE IS TALKING ABOUT GROSS MARGIN, SO

2    IT'S TALKING ABOUT THE DIFFERENCE IN THE GROSS MARGIN AS

3    CALCULATED BY SAMSUNG ON ITS OWN GALAXY CAPTIVATE PRODUCT AS

4    COMPARED TO WHAT IT ESTIMATED THE IPHONE GROSS MARGIN TO BE.

5    Q.   SO THOSE IPHONE NUMBERS ON THE RIGHT, THOSE ARE SAMSUNG

6    ESTIMATES?

7    A.   THEY WOULD ONLY BE ESTIMATES, YES.

8    Q.   OKAY.  GROSS MARGIN, IS THAT THE NUMBER YOU DESCRIBED

9    EARLIER THAT'S THE TOTAL REVENUE MINUS COSTS OF GOODS SOLD?

10   A.   YES.

11   Q.   ALL RIGHT.  WHAT SPECIFIC SAMSUNG PRODUCT THAT'S AT ISSUE

12   IN THIS CASE DOES THIS SLIDE CONCERN?

13   A.   AS YOU SEE ON THE BOTTOM OF THAT BAR ON THE LEFT, THIS IS

14   REFERRING TO THE GALAXY S CAPTIVATE, SO IT IS ONE OF THE

15   INFRINGING PRODUCTS IN THIS CASE.  IN FACT, WE TALKED ABOUT IT

16   LAST WEEK.

17   Q.   AND IS THIS ONE OF THE PRODUCTS THAT INFRINGED AN APPLE

18   DESIGN PATENT?

19   A.   YES.

20   Q.   AND CAN YOU REMIND US, WHAT'S THE DATE OF THIS

21   PRESENTATION?

22   A.   THE DATE OF THIS PRESENTATION, AS WE SAW ON THE FIRST

23   PAGE, IS JUNE 17, 2011.

24   Q.   WHAT DOES THIS SLIDE, THIS PRESENTATION TO SAMSUNG'S TOP

25   MANAGEMENT, SAY IN JUNE 2011 ABOUT WHETHER THE GALAXY CAPTIVATE

1    WAS A PROFITABLE PHONE?

2    A.   IT'S SHOWING THAT IT DEFINITELY IS PROFITABLE.  IN FACT,

3    IT'S MAKING A PROFIT MARGIN, A GROSS MARGIN OF $224 PER UNIT AT

4    THAT TIME, WHICH WAS EQUAL TO A 48 PERCENT MARGIN.

5    Q.   48 PERCENT GROSS PROFIT MARGIN?

6    A.   CORRECT.

7    Q.   IS THE GALAXY S CAPTIVATE ONE OF THE PHONES THAT

8    MR. WAGNER SAYS APPLE SHOULD GET NO SAMSUNG PROFITS ON?

9    A.   IT'S ONE OF THEM WHERE HE'S CALCULATED A LOSS OF

10   $29 MILLION FOR THAT PRODUCT.

11   Q.   MR. WAGNER SAYS SAMSUNG HAD A LOSS ON THE GALAXY

12   CAPTIVATE?

13   A.   YES.

14   Q.   SAMSUNG'S DOCUMENT SHOWS IT HAD A PROFIT.  WHAT WAS THE

15   PROFIT MARGIN AGAIN FROM THIS SAMSUNG DOCUMENT FOR THE GALAXY

16   CAPTIVATE IN JUNE OF 2011?

17   A.   THIS DOCUMENT, AS YOU SEE ON THE SCREENS, SHOWS A MARGIN

18   OF 48 PERCENT.

19   Q.   IS THAT -- SORRY.  I TURNED MY PAGE TOO SOON, MS. DAVIS.

20        IS THIS GROSS MARGIN OF 48 PERCENT FOR THE CAPTIVATE THE

21   SAME AS THE GROSS MARGIN FOR THE CAPTIVATE THAT IS REPORTED IN

22   THE FINANCIAL INFORMATION THAT SAMSUNG GAVE APPLE FOR THIS

23   CASE.

24   A.   NO, IT IS NOT.  THE SAME PERIOD OF TIME IN THE INFORMATION

25   THAT WAS REPORTED TO APPLE SHOWS A GROSS MARGIN OF 43 PERCENT.

1    Q.   SO A LITTLE LOWER?

2    A.   YES.

3    Q.   OKAY.  TURN TO ANOTHER ISSUE ABOUT SAMSUNG PROFITS, SOME

4    OF THE EXPENSES THAT MR. WAGNER SAYS HE DEDUCTED AND CRITICIZED

5    YOU FOR NOT DEDUCTING.  LET'S START WITH G&A EXPENSE.

6         YOU RECALL MR. WAGNER'S TESTIMONY TO THE EFFECT THAT G&A

7    EXPENSE SHOULD BE DEDUCTED BY THIS JURY BECAUSE EVERY COMPANY

8    NEEDS AN UMBRELLA ORGANIZATION TO MANAGE AND CONTROL THE

9    BUSINESS AND TAKE CARE OF THINGS LIKE CLEANING AND OFFICE

10   SUPPLIES AND THAT SORT OF THING?

11   A.   I REMEMBER THAT.

12   Q.   DO YOU AGREE THAT COMPANIES HAVE EXPENSES LIKE THAT?

13   A.   I AGREE THAT THERE CERTAINLY ARE SUCH EXPENSES, BUT THOSE

14   EXPENSES, AS WE DISCUSSED LAST WEEK, WOULD NOT MEET THE

15   DIRECTLY ATTRIBUTABLE TEST AS IT RELATES TO THE SEVEN PRODUCTS

16   THAT WE'RE TALKING ABOUT HERE.

17        MR. PRICE:  WELL, I OBJECT, YOUR HONOR.  THAT'S

18   STATING A LEGAL OPINION.

19        MS. KREVANS:  IT'S NOT A LEGAL OPINION, YOUR HONOR.

20   IT'S HER OPINION ABOUT HOW THE SPECIFIC TEST DIRECTLY

21   ATTRIBUTABLE APPLIES TO THESE FACTS.

22        THE COURT:  OVERRULED.

23        GO AHEAD, PLEASE.

24   BY MS. KREVANS:

25   Q.   LET'S TURN TO SALES EXPENSE, MS. DAVIS.  DO YOU RECALL

1    MR. WAGNER'S TESTIMONY LAST WEEK AND THIS MORNING THAT SALES

2    EXPENSE MUST BE DEDUCTIBLE BECAUSE SAMSUNG SALES PERSONNEL HAD

3    TO GO TO CARRIERS AND PERSUADE THEM TO CARRY A MIX OF SAMSUNG

4    PHONES AND SOME OF THE PHONES IN THIS CASE WERE IN THAT MIX?

5    DO YOU RECALL THAT?

6    A.   I DO RECALL THAT.

7    Q.   IS HE RIGHT THAT THAT HAPPENED?

8    A.   HE'S RIGHT THAT THAT ACTIVITY TOOK PLACE, PRESUMABLY.

9         BUT THE AMOUNTS THAT ARE INCLUDED IN PX 180 THAT WE LOOKED

10   AT AND THE AMOUNT THAT MR. WAGNER HAS DEDUCTED IS NOT RELATED

11   TO THE SEVEN PHONES IN THIS CASE, AND THAT WAS EXPLAINED PRETTY

12   CLEARLY BY THE SAMSUNG WITNESS WHO TESTIFIED ABOUT THAT IN HIS

13   DEPOSITION, MR. SIMS FROM KOREA WHO WAS THE V-P OF FINANCE.

14   Q.   WHAT DID MR. SIMS SAY THAT YOU FOUND RELEVANT TO WHETHER

15   THE SALES EXPENSE ALLOCATION NUMBERS THAT MR. WAGNER DEDUCTED

16   ARE DIRECTLY ATTRIBUTABLE TO THE PHONES IN THIS CASE?

17   A.   WHAT HE EXPLAINED IS THAT THE SALES EXPENSES THAT YOU SEE

18   ON PX 180 COME FROM A POOL OF COSTS THAT WERE EXPENDED IN THAT

19   PARTICULAR MONTH, FOR EXAMPLE, BUT THAT AMOUNT ISN'T DIRECTLY

20   ATTRIBUTABLE TO ANY SPECIFIC PHONE.  IT'S ALL THE PHONES.

21        AND WHAT'S PARTICULARLY RELEVANT TO UNDERSTAND IS THAT THE

22   SELLING PROCESS FOR THESE SEVEN PHONES WAS ALREADY COMPLETE BY

23   THE TIME WE GET TO THE POINT WHERE WE'RE TRYING TO MEASURE THE

24   PROFITS.

25        AS YOU'LL RECALL, WHEN WE TALKED ABOUT CAPTIVATE.

1   CAPTIVATE WAS THE PRODUCT THAT WAS LAUNCHED IN JULY OF 2010.

2   IT WAS ACTUALLY ANNOUNCED IN JUNE OF 2010, SO BY THAT TIME, THE

3   SALES PEOPLE HAD ALREADY COMPLETED THEIR JOB OF CONVINCING AT&T

4   TO OFFER THAT PHONE.

5           AFTER THAT, THE SALES PEOPLE HAD NO FURTHER INVOLVEMENT,

6   OR WOULD HAVE NEEDED NO FURTHER INVOLVEMENT IN THE CAPTIVATE.

7           AND THAT'S TRUE FOR ALL SEVEN OF THE PHONES.

8           SO THE AMOUNTS THAT ARE INCLUDED IN PX 180 ARE NOT RELATED

9   SPECIFICALLY TO THESE PHONES.  THEY'RE PROBABLY NOT RELATED IN

10  ANY WAY TO THESE PHONES.

11  Q.   DID SAMSUNG GIVE YOU ANY SPECIFIC INFORMATION ABOUT THE

12  SALES EXPENSE THAT ACTUALLY OCCURRED DURING THE TIME PERIOD

13  WHEN THE CARRIER -- WHEN SAMSUNG WOULD HAVE BEEN TALKING TO THE

14  CARRIERS ABOUT THESE SEVEN PHONES?

15  A.   NO.

16  Q.   DID SAMSUNG GIVE YOU ANY INFORMATION INDICATING THAT IF

17  THEY HADN'T BEEN SELLING THESE PARTICULAR PHONES, THEY WOULD

18  HAVE HAD FEWER SALES PEOPLE CALLING ON THE CARRIERS?

19  A.   NO.

20  Q.   DID SAMSUNG GIVE YOU ANY INFORMATION SUGGESTING IN ANY WAY

21  THAT THEIR SALES EXPENSE WOULD HAVE CHANGED IF THEY HAD BEEN

22  SELLING DIFFERENT PHONES INSTEAD OF THESE SEVEN INFRINGING

23  PHONES IN THIS TIME PERIOD?

24  A.   NO.

25  Q.   LET ME TAKE YOU TO ANOTHER PROFIT CATEGORY THAT MR. WAGNER

1      GAVE SOME TESTIMONY ABOUT.

2          YOU RECALL MR. WAGNER'S TESTIMONY ABOUT MARKETING OR

3      ADVISING EXPENSES?

4      A.   I DO.

5      Q.   DID SAMSUNG PROVIDE ANY SPECIFIC INFORMATION IN THIS CASE

6      ABOUT HOW MUCH IT SPENT TO DO ADVERTISING FOR ANY OF THE SEVEN

7      PHONES THAT INFRINGE THE DESIGN PATENTS?

8      A.   NO, NEITHER MR. WAGNER NOR I HAD ACCESS TO ANY SUCH

9      INFORMATION.

10     Q.   IS THERE ANY WAY FOR THE JURY TO KNOW WHETHER ANY SUCH

11     INFORMATION EVEN EXISTS?

12     A.   NO.  APPARENTLY SAMSUNG HAS CHOSEN NOT TO PROVIDE IT IF IT

13     DOES EXIST.

14     Q.   DID APPLE HAVE ANY WAY OF KNOWING WHAT THAT INFORMATION

15     MIGHT BE, IF IT EXISTS, OTHER THAN RELYING ON SAMSUNG TO

16     PROVIDE IT?

17     A.   NO, APPLE WOULD HAVE NO WAY OF KNOWING THAT.

18     Q.   OKAY.  LET'S TURN TO R&D EXPENSE.  THAT'S ANOTHER CATEGORY

19     THAT MR. WAGNER GAVE SOME TESTIMONY ABOUT.

20         DO YOU RECALL MR. WAGNER'S TESTIMONY ON THE R&D EXPENSE

21     ISSUE?

22     A.   I DO.

23     Q.   DO YOU AGREE WITH WHAT MR. WAGNER SAID?

24     A.   NO.

25     Q.   WHY NOT?

1    A.   ONCE AGAIN, THIS IS A CATEGORY OF EXPENSE WHERE THE

2    INFORMATION THAT MR. WAGNER'S RELYING UPON TO INCLUDE IN HIS

3    DEDUCTIONS IS UNRELATED TO THESE SPECIFIC PHONES.

4         ONCE AGAIN, IT HAS THE SAME CHARACTERISTICS, IF YOU WILL,

5    OF THE SALES EXPENSE.  AS MR. SIMS EXPLAINED IN HIS

6    DEPOSITION -- ONCE AGAIN, HE'S THE V-P OF FINANCE OF SAMSUNG IN

7    KOREA FOR THIS PARTICULAR PART OF SAMSUNG -- HE EXPLAINED THAT

8    THE RESEARCH AND DEVELOPMENT COSTS THAT YOU SEE ON PX 180 FOR

9    ANY GIVEN MONTH ARE COMING FROM THE POOL OF RESEARCH AND

10   DEVELOPMENT THAT WAS TAKING PLACE DURING THAT MONTH.

11        BY THE TIME, FOR EXAMPLE, WE LOOK AT CAPTIVATE, CAPTIVATE

12   HAS BEEN ON THE MARKET FOR A YEAR.  THAT RESEARCH AND

13   DEVELOPMENT WAS DONE A LONG TIME AGO, SO THOSE AMOUNTS THAT

14   YOU'RE LOOKING AT ARE UNRELATED TO CAPTIVATE.

15        AND IF WE STICK WITH CAPTIVATE AS THE EXAMPLE,

16   MR. WAGNER'S CALCULATION DEDUCTS ABOUT $22 MILLION OF RESEARCH

17   AND DEVELOPMENT FOR CAPTIVATE, AND WE KNOW THAT'S NOT TAKING

18   PLACE IN THE PERIOD THAT YOU'RE ASKED TO MEASURE THE PROFITS

19   FOR.

20   Q.   DID SAMSUNG PROVIDE ANY DOCUMENTS SHOWING WHAT THEIR

21   ACTUAL R&D EXPENSES WERE FOR CAPTIVATE FROM THE PRIOR TIME

22   PERIOD IN WHICH THEY ACTUALLY DEVELOPED THAT PHONE?

23   A.   NO.

24   Q.   DID APPLE HAVE ANY ACCESS TO THAT DOCUMENT, THOSE

25   DOCUMENTS WITHOUT SAMSUNG GIVING THEM TO THEM?

1    A.   NO.

2    Q.   DID YOU HAVE ANY WAY OF FINDING OUT THAT INFORMATION OTHER

3    THAN GETTING IT FROM SAMSUNG?

4    A.   THAT WOULD BE THE ONLY WAY I WOULD HAVE ACCESS TO THAT

5    INFORMATION.

6    Q.   OKAY.  DO YOU HAVE ANY UNDERSTANDING OF WHY SAMSUNG DIDN'T

7    PROVIDE THAT INFORMATION?

8              MR. PRICE:  OBJECTION, YOUR HONOR.

9              THE COURT:  SUSTAINED.

10             MR. PRICE:  CALLS FOR SPECULATION.

11             THE COURT:  SUSTAINED.

12   BY MS. KREVANS:

13   Q.   LET'S TALK ABOUT ONE MORE ISSUE ABOUT SAMSUNG PROFITS.

14        WERE YOU IN COURT LAST WEEK WHEN THE SAMSUNG

15   TELECOMMUNICATIONS OF AMERICA, THE STA WITNESS, MR. SHEPPARD

16   TESTIFIED?

17   A.   YES, I WAS.

18   Q.   COULD WE SEE 753, DX 753, PAGE 5.  AND THIS IS A PAGE THAT

19   WAS SHOWN DURING MR. SHEPPARD'S TESTIMONY.

20        DO YOU HAVE AN UNDERSTANDING OF WHAT PAGE 5 OF DX 753 IS,

21   MS. DAVIS?

22   A.   I DO.

23   Q.   WHAT IS IT?

24   A.   AS YOU SEE THERE IN THE TITLE, THIS IS THE CONSOLIDATED

25   STATEMENT OF INCOME FOR ALL OF SAMSUNG ELECTRONICS COMPANY AND

1        ITS SUBSIDIARIES.

2        Q.   SO THIS IS A COMPANY-WIDE STATEMENT FOR A PARTICULAR --

3        FOR THE ENTIRE SAMSUNG FAMILY OF COMPANIES?

4        A.   THIS IS THE ENTIRE COMPANY THAT, THAT MAKES THE

5        ELECTRONICS PRODUCTS.

6             SO THIS IS BROADER, OBVIOUSLY, THAN JUST THE SEVEN PHONES

7        THAT WE'RE HERE TO TALK ABOUT.  IT'S EVEN BROADER THAN JUST

8        MOBILE PHONES IN GENERAL.  THIS INCLUDES ALL OF THE PRODUCTS

9        THAT SAMSUNG ELECTRONICS MAKES, SO THAT INCLUDES THINGS LIKE

10       TV'S, REFRIGERATORS, AIR CONDITIONERS.

11            THIS PARTICULAR DOCUMENT WOULD NOT BE OF ANY USE TO YOU IN

12       TRYING TO DETERMINE SAMSUNG'S PROFITS ON THE SEVEN PRODUCTS

13       YOU'RE BEING ASKED TO ADDRESS.

14       Q.   COULD WE SEE DX 754.545.  CAN WE SEE PAGE 545, MR. LEE.

15            THIS IS A DOCUMENT THAT WAS SHOWN EARLIER WITH ANOTHER

16       WITNESS.

17            MS. DAVIS, WHAT ARE WE LOOKING AT HERE.

18       A.   THIS IS THE CONSOLIDATED STATEMENT OF OPERATIONS, IN OTHER

19       WORDS, A LOSS STATEMENT, PROFIT AND LOSS STATEMENT FOR APPLE.

20       SO THIS IS THE ENTIRE COMPANY OF APPLE.

21       Q.   DO THE NUMBERS IN THIS CONSOLIDATED PROFIT AND LOSS

22       STATEMENT FOR THE ENTIRE APPLE COMPANY RELATE IN ANY WAY TO THE

23       PROPER DETERMINATION OF DAMAGES IN THIS CASE?

24       A.   NO.  ONCE AGAIN, THIS IS THE ENTIRE COMPANY, SO IT'S ALL

25       PRODUCTS THAT APPLE SELLS, AND IT'S INTENDED TO INCLUDE ALL

1    REVENUES, ALL EXPENSES, ALL PRODUCTS.  THEREFORE, NOT

2    PARTICULARLY PERTINENT TO TRYING TO DETERMINE LOST PROFITS

3    UNDER AN INCREMENTAL PROFITS RULE.

4    Q.   NOW, IN HIS TESTIMONY LAST WEEK, MR. WAGNER REFERRED TO A

5    REMEDY FOR UNJUST ENRICHMENT IN PART OF HIS TESTIMONY.  WHAT

6    DOES THAT REFER TO?

7    A.   I UNDERSTOOD HIM TO USE THAT TERM TO MEAN THE DEFENDANT'S

8    PROFITS, OR SAMSUNG'S PROFITS IN THIS CASE.

9    Q.   SO UNJUST ENRICHMENT IS ANOTHER TERM THAT CAN BE USED TO

10   REFER TO AN INFRINGER WHO INFRINGES A DESIGN PATENT HAVING TO

11   GIVE BACK THE PROFITS THAT THEY MADE ON THE PRODUCTS THAT

12   INFRINGE THE PATENT?

13   A.   THAT'S RIGHT.

14   Q.   LET ME ASK YOU ABOUT ANOTHER THING THAT MR. WAGNER SAID.

15   HE MENTIONED AT ONE POINT, WHEN WE WERE DISCUSSING YOU, A

16   HANDFUL OF VERY SMALL NUMBER OF SALES THAT MS. DAVIS ADDED TO

17   APPLE IN COMPUTING LOST PROFITS.

18        DO YOU UNDERSTAND WHAT HE WAS REFERRING TO?

19   A.   I THINK SO.

20   Q.   WHAT WAS HE REFERRING TO?

21   A.   I UNDERSTOOD HIM TO BE REFERRING TO THE 360,000 UNITS THAT

22   WE DISCUSSED LAST WEEK THAT I HAVE INCLUDED IN THE LOST PROFITS

23   CALCULATION.  SO THAT'S ABOUT 3 PERCENT OF THE 11 MILLION

24   INFRINGING UNITS IN THIS CASE.

25   Q.   ALL RIGHT.  LET'S SWITCH TO A TOPIC, A DIFFERENT TOPIC,

1    LOST PROFITS FOR THE IPHONE.  OKAY?

2         YOU RECALL MR. WAGNER GIVING SOME TESTIMONY ABOUT THE USE

3    OF SURVEY EVIDENCE?

4    A.   I DO.

5    Q.   DID YOU NEED ANY SURVEY DATA THAT YOU DID NOT HAVE IN

6    ORDER TO DETERMINE APPLE'S LOST PROFITS DAMAGES FOR THE IPHONE

7    IN THIS CASE?

8    A.   NO, I DID NOT.  I HAD THE ACTUAL MARKET SHARE DATA, WHICH

9    I THINK IS EVEN MORE RELIABLE FOR THE PURPOSES OF DETERMINING

10   WHAT WOULD HAVE HAPPENED IF THE INFRINGING PRODUCTS WERE NOT ON

11   THE MARKET, WHERE WOULD THOSE CUSTOMERS HAVE GONE AND WHAT

12   WOULD THEY HAVE PURCHASED, AND I THINK IT'S LIKELY THAT THEY

13   WOULD HAVE GOTTEN MOST CUSTOMERS IN THE MARKETPLACE.

14   Q.   WHAT'S THE MARKET SHARE, ACTUAL MARKET SHARE INFORMATION

15   THAT YOU'RE REFERRING TO.

16   A.   THAT INFORMATION CAME FROM A THIRD PARTY SOURCE THAT'S

17   KNOWN FOR THE RESEARCH IT DOES IN THIS AREA.  IT'S REFERRED TO

18   AS IDC.

19   Q.   IDC?

20   A.   IDC.

21   Q.   AND DID YOU RELY ON THAT DATA FOR PURPOSES OF FORMING YOUR

22   CONCLUSION?

23   A.   I DID.

24        MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

25   DX 536, THAT'S DEFENDANT'S EXHIBIT 536.  IT IS A CD CONTAINING

1      THIS, THE WHOLE OF THE IDC DATA, WHICH IS EXTREMELY VOLUMINOUS.

2                THE COURT:  ANY OBJECTION?

3                MR. PRICE:  THE OBJECTION IS LACK OF FOUNDATION.  I'M

4      NOT EVEN --

5                MS. KREVANS:  YOUR HONOR, THIS IS A DOCUMENT FROM

6      DEFENDANT'S EXHIBIT LIST.  IT'S DATA RELIED UPON BY THE EXPERTS

7      IN THIS CASE TO FORM THEIR OPINIONS.  WE OFFER IT.

8                THE COURT:  IT'S ADMITTED.

9           (DEFENDANT'S EXHIBIT 536 WAS ADMITTED IN EVIDENCE.)

10               THE COURT:  GO AHEAD, PLEASE.

11          IS THIS UNDER SEAL?

12               MS. KREVANS:  THIS IS UNDER SEAL, YOUR HONOR.

13               THE COURT:  THE WHOLE THING?

14               MS. KREVANS:  THE ENTIRE THING.  IT'S CONFIDENTIAL

15     THIRD PARTY DATA.

16               THE COURT:  OKAY.

17               MS. KREVANS:  YOUR HONOR, MAY I APPROACH THE WITNESS

18     AND GIVE HER A COUPLE OF THE PHONES THAT ARE IN EVIDENCE?

19               THE COURT:  THAT'S FINE.

20     BY MS. KREVANS:

21     Q.   MS. DAVIS, I'VE GIVEN YOU THE TWO PRODUCTS THAT HAVE BEEN

22     PUT IN EVIDENCE IN THIS CASE, THE INTERCEPT, JX 1009, AND THE

23     GALAXY ACE, JX 1030 (HANDING).

24          LET'S START WITH THE INTERCEPT.  YOU HEARD MR. WAGNER'S

25     TESTIMONY ABOUT THE INTERCEPT, THAT IT DID NOT INFRINGE ANY

1    APPLE PATENT THAT'S AT ISSUE IN THIS CASE, AND THAT IT WAS

2    AVAILABLE AS AN ALTERNATIVE TO THE INFRINGING SAMSUNG PHONES.

3         DO YOU RECALL THAT?

4    A.   I DID HEAR THAT.

5    Q.   DID YOU TAKE THE AVAILABILITY OF THE INTERCEPT AS AN

6    ALTERNATIVE TO THE INFRINGING PRODUCTS INTO ACCOUNT IN DOING

7    YOUR LOST PROFITS ANALYSIS?

8    A.   YES, I DID.  I THINK MR. WAGNER EVEN CLARIFIED THIS

9    MORNING THAT HE UNDERSTOOD THAT THAT'S EXACTLY WHAT I'D DONE.

10   Q.   OKAY.  CAN YOU -- BECAUSE THERE WAS SOME CONFUSION ABOUT

11   THIS, CAN YOU EXPLAIN TO THE JURY HOW YOU TOOK THE AVAILABILITY

12   OF THE INTERCEPT INTO ACCOUNT IN DOING YOUR IPHONE LOST PROFITS

13   ANALYSIS?

14   A.   WHAT I HAVE DONE IS RECOGNIZED THE FACT THAT THIS IS A

15   NON-INFRINGING SAMSUNG PRODUCT, SO SOMEONE WHO WALKED INTO A

16   CARRIER STORE AND WISHED TO PURCHASE A PRODUCT, IF THE

17   INFRINGING PRODUCTS WERE NOT AVAILABLE, WOULD HAVE THIS ONE AS

18   AN ALTERNATIVE, ALONG WITH THE IPHONE AND THE OTHER

19   MANUFACTURERS AS WELL.

20        SO THE GRAPHIC THAT WE LOOKED AT LAST WEEK WHERE YOU SAW

21   THAT I WAS REDISTRIBUTING THE INFRINGING UNITS TO THE VARIOUS

22   MANUFACTURERS, INCLUDING APPLE AND THE OTHERS, A PORTION OF

23   THEM WERE GOING BACK TO SAMSUNG BECAUSE SOME OF THOSE PEOPLE

24   WOULD HAVE PURCHASED THIS PRODUCT.

25   Q.   LET'S LOOK AT THAT GRAPHIC AGAIN.  FOR THE RECORD, IT'S

```
 1        PDX 100.12.
 2             COULD YOU JUST WALK THE JURY THROUGH THIS, BECAUSE THIS
 3        INVOLVED NOT JUST THE INTERCEPT, BUT ALSO SOME CARRIER-SPECIFIC
 4        FACTORS.
 5        A.   IT DOES.  IN FACT, IF WE WALK THROUGH THIS ANIMATION
 6        ITSELF, YOU'LL RECALL THAT THE ORANGE PORTION OF THIS BAR
 7        REPRESENTS THE INFRINGING UNITS, WHICH WOULD NOT HAVE BEEN
 8        AVAILABLE IN THE MARKETPLACE, SO THOSE PEOPLE WOULD HAVE HAD TO
 9        CHOOSE SOMETHING ELSE.
10        Q.   JUST LET ME STOP YOU.  THAT'S THE INFRINGING UNITS DURING
11        THE SIX WEEK PERIOD FOR THE LOST PROFITS CALCULATION?
12        A.   THANK YOU FOR POINTING THAT OUT.  ACTUALLY, THIS
13        PARTICULAR GRAPHIC IS LOOKING AT THE ENTIRE CALENDAR, BUT, YES,
14        WE ARE ONLY LOOKING FOR LOST PROFITS AT THAT SIX WEEKS.
15        Q.   OKAY.  NOW WHAT HAPPENS?
16        A.   SO WHAT HAPPENS THEN IS THOSE INFRINGING UNITS GET
17        REDISTRIBUTED, EITHER TO SAMSUNG, APPLE, OR THE OTHER
18        MANUFACTURERS BASED UPON THEIR RESPECTIVE MARKET SHARES.
19             YOU'LL RECALL THAT WE TALKED ABOUT THE FACT THAT SOME
20        CARRIERS DIDN'T CARRY, DIDN'T OFFER FOR SALE THE IPHONE PRODUCT
21        DURING THAT PERIOD OF TIME, SO, THEREFORE, I'VE ASSUMED THAT 74
22        PERCENT OF THE PEOPLE WHO PURCHASED PRODUCTS, THE INFRINGING
23        PRODUCTS AT THOSE CARRIERS WOULD HAVE CHOSEN TO STAY AT THE
24        CARRIERS AND PROBABLY PURCHASED ANOTHER SAMSUNG PRODUCT
25        INSTEAD.
```

1          THE AVERAGE NUMBER OF PEOPLE WHO ARE WILLING TO CHANGE

2     CARRIERS IS 26 PERCENT FROM THE DOCUMENT THAT YOU'LL HAVE IN

3     EXHIBIT 25F, AND SO I CONSIDERED ONLY THOSE 26 PERCENT OF THE

4     PEOPLE AS ONES WHO WOULD HAVE CONSIDERED THE IPHONE AMONG THEIR

5     OTHER ALTERNATIVES, AND THEN I'VE USED THE MARKET SHARE TO

6     ADJUST THAT PORTION OF THE 26 PERCENT OF THOSE CARRIERS.

7     Q.   AND THEN HOW DID THE INTERCEPT PLAY INTO THIS CALCULATION

8     AGAIN?

9     A.   THE INTERCEPT WAS PART OF THE ORANGE BAR THAT RETURNS BACK

10    TO SAMSUNG IN THIS PARTICULAR GRAPHIC BECAUSE I HAVE ASSUMED

11    THAT IT WAS AN ALTERNATIVE IN THE MARKETPLACE, AND, THEREFORE,

12    THERE MIGHT HAVE BEEN SOME CUSTOMERS WHO WOULD HAVE PURCHASED

13    THAT INSTEAD AND THEY WOULD, THEREFORE, REMAIN WITH SAMSUNG.

14    Q.   SO JUST SO THIS IS CLEAR, YOUR CALCULATION ASSUMED THAT IN

15    ADDITION TO THE NUMBER OF INTERCEPTS THAT SAMPLE ACTUALLY SOLD

16    IN THIS TIME PERIOD, THEY WOULD HAVE SOLD AN ADDITIONAL, SOME

17    ADDITIONAL NUMBER?

18    A.   YES, THAT'S CORRECT.

19    Q.   WHEN WAS THE INTERCEPT FIRST SOLD?

20    A.   I RECALL THE INTERCEPT TO HAVE FIRST BEEN SOLD IN JUNE OR

21    JULY OF 2010.

22    Q.   THE PREVIOUS YEAR?

23    A.   OF -- YES, THE PREVIOUS YEAR.

24    Q.   AND ON WHAT CARRIERS WAS THE INTERCEPT OFFERED?

25    A.   THE INTERCEPT WAS AVAILABLE ONLY FROM SPRINT AND ITS

1    SUBSIDIARY, VIRGIN MOBILE.  THIS PARTICULAR PHONE IS BRANDED

2    VIRGIN MOBILE.

3    Q.   OKAY.  MR. WAGNER TESTIFIED THAT THERE WERE 271 MILLION

4    TOTAL SALES FOR THE INTERCEPT.  DO YOU AGREE WITH THAT NUMBER?

5    A.   I AGREE WITH THE NUMBER IN TOTAL, BUT I DO NOT AGREE THAT

6    IT'S A RELEVANT NUMBER.

7    Q.   WHY NOT?

8    A.   BY THE TIME WE GET TO THE LOST PROFITS PERIOD, 230 MILLION

9    OF THOSE -- $230 MILLION OF THAT HAD ALREADY BEEN SOLD.

10        THE ONLY PORTION OF THAT THAT RELATES TO THE LOST PROFITS

11   PERIOD IS ABOUT $20 MILLION, SO IT'S A FAIRLY SMALL PROPORTION

12   OF UNITS.  I RECALL IT TO BE ABOUT 100,000 UNITS SOLD DURING

13   THAT SIX WEEKS OF THE LOST PROFITS PERIOD.

14   Q.   OKAY.  THE OTHER PHONE I GAVE YOU IS THE GALAXY ACE.

15        DO YOU RECALL MR. WAGNER'S TESTIMONY ABOUT THE GALAXY ACE?

16   A.   I DO.

17   Q.   DID YOU ASSIGN ANY SHARE OF THE INFRINGING PRODUCTS THAT

18   SAMSUNG SOLD, INFRINGING IPHONES -- STRIKE THAT.  LET ME START

19   OVER AGAIN.

20        WE'RE TALKING ABOUT IPHONE LOST PROFITS, SO WE'RE TALKING

21   ABOUT INFRINGING SAMSUNG SMARTPHONES DURING THE LOST PROFITS

22   PERIOD.

23        DID YOU ASSIGN ANY OF THE SALES THAT SAMSUNG SHOULDN'T

24   HAVE MADE OF SMARTPHONES IN THAT TIME PERIOD TO THE GALAXY ACE

25   PRODUCT?

1      A.   I DID NOT.

2      Q.   WHY NOT?

3      A.   AT LEAST A COUPLE OF REASONS.

4           NUMBER ONE, THIS PHONE WAS FOUND TO INFRINGE THE '381 AND

5      THE '163, THEREFORE, IT WOULD NOT HAVE BEEN ON THE MARKET.

6           SECONDLY, AS MR. WAGNER POINTED OUT, THIS PHONE WAS ONLY

7      SOLD OUTSIDE THE UNITED STATES.  IT WAS NEVER SOLD BY A U.S.

8      CARRIER.  I'M NOT AWARE OF ANY EVIDENCE THAT EVEN SUGGESTS THAT

9      IT WAS TECHNICALLY POSSIBLE FOR IT TO WORK ON A U.S. CARRIER

10     NETWORK.

11     Q.   OKAY.  MAY I ASK YOU ABOUT ANOTHER THING THAT MR. WAGNER

12     SAID ABOUT APPLE'S LOST PROFITS ON THE IPHONE, SO LOST PROFITS

13     PIVOTAL TO SAMSUNG'S SALES OF SMARTPHONES.

14          YOU RECALL THAT HE GAVE SOME TESTIMONY ABOUT THE

15     IMPORTANCE OF LARGE SCREEN SIZE ON SMARTPHONES TO CONSUMER

16     PURCHASING DECISIONS?

17     A.   I DO REMEMBER THAT.

18     Q.   DID YOU TAKE INTO ACCOUNT THE ISSUE OF SCREEN SIZE AND

19     RELATIVE SCREEN SIZE WHEN YOU DECIDED HOW MANY OF THE

20     SMARTPHONE SALES THAT SAMSUNG SHOULDN'T HAVE MADE IN THE LOST

21     PROFITS PERIOD SHOULD BE ALLOCATED TO APPLE INSTEAD OF BACK TO

22     SAMSUNG OR TO OTHER CARRIERS?

23     A.   I DID.

24     Q.   HOW DID YOU TAKE SCREEN SIZE INTO ACCOUNT?

25     A.   YOU'LL RECALL THAT WE TALKED ABOUT THIS LAST WEEK IN THE

1    SENSE THAT THE LARGE SCREENS THAT SAMSUNG'S TALKING ABOUT WERE

2    ONLY AVAILABLE ON THE INFRINGING PHONES.

3         IF YOU TAKE THE INFRINGING PHONES OFF THE MARKET, AS

4    YOU'RE ASKED TO DO, THEN THAT'S NOT REALLY AN OPTION ANYMORE.

5    THOSE PEOPLE WHO PURCHASED THE INFRINGING PHONES HAVE TO MAKE A

6    DIFFERENT CHOICE, ONE OF WHICH, THE ONLY ONE OF WHICH THAT

7    SAMSUNG CAN POINT TO OF ITS OWN PHONES, IS THIS ONE, AND THIS

8    ONE IS A SMALLER SCREEN THAN IPHONE (INDICATING).

9    Q.   I'M SORRY.  WHAT PHONE ARE YOU LOOKING AT?

10   A.   I'M SORRY.  I'M LOOKING AT THE INTERCEPT.  THIS WAS FOUND

11   NOT TO INFRINGE ANY OF APPLE'S PATENTS.  THIS ONE WOULD HAVE

12   BEEN AVAILABLE FOR SALE.  BUT IT'S A SMALLER SCREEN.

13        SO THE LARGE SCREEN ISSUE IS NOT PARTICULARLY IMPORTANT.

14        BUT EVEN TO THE EXTENT IT IS, I HAVE CONSIDERED IT BY

15   TAKING INTO ACCOUNT THE REAL WORLD CHOICES MADE BY REAL WORLD

16   CUSTOMERS, SO SOME OF THOSE PEOPLE CHOSE OTHER MANUFACTURERS'

17   PRODUCTS BECAUSE THEY HAVE SCREENS THAT ARE LARGER THAN IPHONE,

18   AMONG OTHER PHONES.

19   Q.   ONE LAST THING ABOUT APPLE'S LOST PROFITS ON THE IPHONE.

20        MR. WAGNER GAVE SOME TESTIMONY BASICALLY THAT IN YOUR

21   ANALYSIS, YOU ASSUMED THAT EVERYONE WHO PURCHASED A SAMSUNG

22   PHONE FOR $139 WOULD HAVE BOUGHT AN IPHONE INSTEAD FOR $206.

23        DID YOU, IN FACT, MAKE THAT ASSUMPTION IN YOUR ANALYSIS?

24   A.   I DID NOT.  I THINK HE MISSPOKE.  I THINK HE KNOWS, AS YOU

25   KNOW, THAT I HAVE INCLUDED ONLY 360,000 UNITS IN MY LOST

1      PROFITS CALCULATION.  I HAVE NOT ASSUMED THAT EVERYONE WHO

2      PURCHASED A SAMSUNG INFRINGING PHONE WOULD HAVE INSTEAD

3      PURCHASED AN IPHONE.

4           BUT MORE IMPORTANTLY THAN THAT, PERHAPS, I DON'T THINK THE

5      $139 NUMBER THAT HE GAVE FROM THE J.D. POWER SURVEY IS RELEVANT

6      TO OUR DISCUSSION BECAUSE IT'S NOT LIMITED TO THE SPECIFIC

7      PHONES IN THIS CASE.  THAT'S ALL SAMSUNG PHONES, INCLUDING ITS

8      LOWER END MODELS.

9      Q.   LET'S SWITCH FOR A MINUTE TO REASONABLE ROYALTIES.  YOU

10     WERE HERE THIS MORNING AND LAST WEEK WHEN MR. WAGNER TESTIFIED

11     ABOUT REASONABLE ROYALTIES?

12     A.   YES.

13     Q.   AND ON WHAT NUMBER OF APPLE PRODUCTS TOTAL DID MR. WAGNER

14     CALCULATE REASONABLE ROYALTIES FOR THE THREE APPLE UTILITY

15     PATENTS?

16     A.   I THINK THE NUMBER THAT HE GAVE TODAY ROUNDED TO ABOUT

17     10 MILLION.  I BELIEVE IT WAS ABOUT 9.8 MILLION UNITS.

18     Q.   AND HE HAD A TOTAL AMOUNT OF ROYALTIES THAT HE SAID

19     SAMSUNG WOULD HAVE PAID IF THEY'D ACTUALLY TAKEN A LICENSE TO

20     USE THE THREE APPLE UTILITY PATENTS IN THESE 10 MILLION PHONES.

21     WHAT WAS THAT NUMBER?

22     A.   APPROXIMATELY $28,000.

23     Q.   WHAT IS THAT PER UNIT?

24     A.   THAT'S LESS THAN THREE-TENTHS OF A CENT PER UNIT.

25           MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

```
1              THE COURT:  OKAY.  TIME IS NOW 11:34.

2              MR. PRICE:  IF WE COULD DISTRIBUTE OUR BINDERS?

3         (PAUSE IN PROCEEDINGS.)

4              THE CLERK:  I THINK YOU ALREADY HAVE THEM.

5              THE COURT:  I'M SORRY?

6              THE CLERK:  I THINK YOU ALREADY HAVE THEM.

7         (PAUSE IN PROCEEDINGS.)

8              THE COURT:  MR. PRICE, ARE YOU READY?

9              MR. PRICE:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  TIME IS 11:36.

11        GO AHEAD, PLEASE.

12                        RECROSS-EXAMINATION

13   BY MR. PRICE:

14   Q.   MS. DAVIS, LET ME ASK YOU A LITTLE BIT ABOUT THE

15   INFRINGER'S PROFITS, THAT IS, SAMSUNG'S PROFITS.

16        SO FOCUSSING ON THAT, LET ME ASK YOU ABOUT WHAT YOU'D CALL

17   OPERATING EXPENSES.  AND YOU AGREE THAT OPERATING EXPENSES ARE

18   NECESSARY, GENERALLY, IN ORDER TO SELL A PRODUCT?

19   A.   I DO.

20   Q.   YOU AGREE THAT THEY ARE NECESSARY?  FOR EXAMPLE,

21   ADVERTISING EXPENSES ARE, IN GENERAL, ARE NECESSARY IN GENERAL

22   TO SELL PRODUCTS?

23   A.   I WOULDN'T AGREE THAT ADVERTISING IS NECESSARY, BUT I

24   WOULD CERTAINLY AGREE THAT MOST COMPANIES DO SOME ADVERTISING.

25   Q.   AND YOU THINK THEY DO THAT BECAUSE THEY THINK IT'LL
```

1    INCREASE THE SALES OF THEIR PRODUCTS?

2    A.   THAT'S WHAT THEY HOPE, YES.

3    Q.   AND ALL OF THE PEOPLE WHO, YOU KNOW, MANAGE THE COMPANY

4    AND KIND OF DO THE GENERAL MANAGEMENT, I MEAN, IN GENERAL,

5    THEY'RE NECESSARY TO SELL, TO HAVE AN ORGANIZATION THAT SELLS

6    PRODUCTS; CORRECT?

7    A.   IN GENERAL, THE PEOPLE THAT ARE OPERATING THE COMPANY ARE

8    NEEDED TO OPERATE THE COMPANY, WHICH INCLUDES THE EXERCISE OF

9    MAKING AND SELLING PRODUCTS, YES.

10   Q.   OKAY.  SO NOW, HAVING TALKED ABOUT WHAT'S NECESSARY, THERE

11   ARE ISSUES THAT COME UP IN HOW TO ALLOCATE THOSE EXPENSES TO

12   CERTAIN ACTIVITIES; CORRECT?

13   A.   ISSUES IN WHAT CONTEXT?  ALLOCATIONS CERTAINLY TAKE PLACE,

14   YES.

15   Q.   AND IN FACT, YOU'VE SEEN, AS AN ACCOUNTANT, THAT WHEN YOU

16   DON'T HAVE SPECIFIC INFORMATION, OR CAN'T HAVE SPECIFIC

17   INFORMATION, FOR EXAMPLE, FOR A SALESMAN WHO SELLS SIX PHONES,

18   HOW MUCH EFFORT HE USES TO SELL A PHONE, THAT A COMPANY WILL

19   SOMETIMES ALLOCATE THAT SHARED EXPENSE; CORRECT?

20   A.   THAT'S RIGHT.

21   Q.   AND THAT METHOD OF ALLOCATING SHARED EXPENSES, THAT'S NOT

22   SOMETHING THAT'S BEEN MADE UP FOR USE IN THIS CASE; CORRECT?

23   A.   NO.  THAT'S COMMONLY DONE FOR COMPANY-WIDE FINANCIAL

24   STATEMENTS.

25   Q.   AND, IN FACT, IT'S COMMONLY DONE FOR -- IF YOU'RE LOOKING

1    AT A SPECIFIC PRODUCT; CORRECT?

2    A.   CERTAINLY FOR SOME ANALYSES IT CAN BE, YES.

3    Q.   YOU'VE SEEN SOME ANALYSES WHERE A COMPANY WILL ALLOCATE

4    OPERATING EXPENSES, RESEARCH AND DEVELOPMENT EXPENSES,

5    ADVERTISING EXPENSES TO COME UP WITH A PROFIT ON A SPECIFIC

6    PRODUCT?  YOU'VE SEEN THAT?

7    A.   YES.

8    Q.   IN FACT, YOU'VE DONE THAT?

9    A.   YES, BUT NOT IN THE CONTEXT OF A DIRECTLY ATTRIBUTABLE

10   ANALYSIS.

11   Q.   OKAY.  WELL, I KNOW YOU'RE USING THE WORDS "DIRECTLY

12   ATTRIBUTABLE."

13        PRIOR TO THIS CASE, DID YOU EVER USE THAT CONCEPT BEFORE

14   IN DOING ANY PROFIT CALCULATIONS?

15   A.   NO, I DON'T THINK I'VE EVER BEEN ASKED TO DETERMINE THE

16   INFRINGER'S PROFITS IN A DESIGN PATENT CASE.

17   Q.   OKAY.  SO YOU'RE NOT AN EXPERT IN INTERPRETING A LEGAL

18   STANDARD IN A DESIGN CASE WHERE INFRINGER'S PROFITS ARE BEING

19   AWARDED; CORRECT?

20   A.   I'M CERTAINLY NOT GOING TO PROVIDE A LEGAL INTERPRETATION,

21   NO.

22   Q.   SO, FOR EXAMPLE, THE PHRASE WAS "DIRECTLY ATTRIBUTABLE,

23   SUCH THAT THERE IS A NEXUS TO THE PRODUCT," I'VE NOTICED THAT

24   IN ALL OF YOUR TESTIMONY, YOU'VE NEVER MENTIONED THE PHRASE

25   "SUCH THAT THERE IS A NEXUS TO THE PRODUCT."

1          IS THAT RIGHT?

2     A.   I HAVE NOT.  YOU AND I TALKED ABOUT THAT LAST WEEK.  I

3     UNDERSTAND THOSE TWO PHRASES TO MEAN ABOUT THE SAME THING.

4     Q.   WELL, I'M JUST WONDERING WHY, IN ALL THE HOURS OF

5     TESTIMONY WHEN YOU'VE USED THE PHRASE "DIRECTLY ATTRIBUTABLE,"

6     YOU HAVEN'T ADDED THE PHRASE "SUCH THAT THERE IS A NEXUS TO THE

7     PRODUCT."  YOU'VE INTENTIONALLY NOT USED THAT PHRASE; CORRECT?

8     A.   I'M NOT SURE I CAN GET THAT ENTIRE PHRASE OUT OF MY MOUTH

9     OVER AND OVER AGAIN.

10    Q.   OKAY.  MAYBE YOU SHOULDN'T USE IT 40 TIMES.  BUT YOU

11    DIDN'T USE IT ONCE?

12    A.   I AGREE.  THEY MEAN THE SAME THING TO ME.

13    Q.   AND -- AND WITH RESPECT TO MR. WAGNER, YOU WERE HERE

14    DURING THE ENTIRE EXAMINATION OF MR. WAGNER; RIGHT?

15    A.   YES, I WAS.

16    Q.   AND YOU WERE HERE DURING THIS QUESTION AND ANSWER, WHICH

17    IS READ INTO EVIDENCE.

18         "YOU ALSO AGREE THAT SAMSUNG'S OPERATING EXPENSES CONTAIN

19    SOME EXPENSES THAT ARE NOT RELATED TO SPECIFIC PRODUCT;

20    CORRECT?

21         "ANSWER:"  AND AS DISCUSSED -- "CORRECT.  AND AS DISCUSSED

22    WITH MR. OLSON PREVIOUSLY UNDER OATH THAT THERE ARE MANY COMMON

23    COSTS IN ANY COMPLEX ORGANIZATION AND THOSE COSTS ARE DIRECTLY

24    ATTRIBUTABLE TO THE PRODUCT AT ISSUE, BUT THEY HAVE TO BE

25    ALLOCATED BECAUSE THAT PARTICULAR COST IS SHARED BY A NUMBER OF

1      COSTS."

2            YOU HEARD THAT TESTIMONY FROM MR. WAGNER ABOUT HIS

3      UNDERSTANDING OF DIRECTLY ATTRIBUTABLE; CORRECT?

4      A.   I HEARD THAT.  I DON'T AGREE WITH IT, BUT I HEARD IT.

5      Q.   AND YOU DON'T AGREE EVEN THOUGH THIS IS THE FIRST TIME

6      YOU'VE EVER TESTIFIED ABOUT WHAT IS DIRECTLY ATTRIBUTABLE SUCH

7      THAT THERE IS A NEXUS TO THE PRODUCT; CORRECT?

8      A.   THAT'S CORRECT.  THAT'S A SPECIAL STANDARD USED IN DESIGN

9      PATENT CASES.

10     Q.   AND IT'S A STANDARD FOR WHICH YOU ARE NOT AN EXPERT;

11     CORRECT?

12     A.   WELL, I DON'T KNOW WHAT YOU MEAN BY THAT.

13     Q.   YOU'VE NEVER USED THE STANDARD BEFORE IN YOUR LIFE?

14     A.   I'VE NEVER USED THE DIRECTLY ATTRIBUTABLE STANDARD AS I

15     UNDERSTAND WE'RE ASKED TO DO HERE.

16     Q.   OKAY.  AND IF -- I'D LIKE YOU TO LOOK AT ONE OF APPLE'S

17     DOCUMENTS.

18           AND FOR THIS, YOUR HONOR, WE'RE GOING TO HAVE TO, I THINK,

19     ONLY SHOW IT TO THOSE WHO CAN SEE IT, WHICH WOULD BE THE

20     WITNESS AND YOU AND ATTORNEYS AND THE JURY.

21           AND THAT'S EXHIBIT 181.

22           AND DO YOU HAVE THAT IN FRONT OF YOU?

23     A.   I DO.

24     Q.   AND IF WE COULD BLOW UP, RYAN, SO WE CAN SEE LIKE THE

25     FIRST QUARTER OF THIS.  YEAH, THAT WOULD WORK.

1       ACTUALLY, CAN YOU GO DOWN ALL THE WAY?  THERE WE GO.

2    LET'S SEE IF THIS HELPS.  MAYBE WE CAN SCROLL AS WE GO ALONG.

3       SO THIS IS AN APPLE GAAP REPORT NOT ON THE WHOLE COMPANY,

4    BUT ON A LINE OF BUSINESS; CORRECT?

5    A.   IT IS.  THIS IS WHAT WE WERE LOOKING AT LAST WEEK, THE

6    GAAP LINE BUSINESS REPORT.

7    Q.   OKAY.  AND IF YOU LOOK AT THESE QUARTERS -- YOU KNOW WHEN

8    THE IPHONE CAME OUT; CORRECT?

9    A.   YES.

10   Q.   THAT WAS IN JUNE OF 2007.  AND THAT WOULD BE WHAT QUARTER

11   FOR APPLE?

12   A.   JUNE OF 2007 WOULD BE TOWARDS THE END OF ITS FISCAL YEAR

13   '07.

14   Q.   BUT WOULD THAT BE IN THE THIRD QUARTER OF '07?

15   A.   YES.

16   Q.   SO IF WE LOOK AT THIRD QUARTER '07 -- SO AT THIS POINT,

17   THE ONLY IPHONE ON THE MARKET IS THAT ORIGINAL IPHONE; CORRECT?

18   A.   OF COURSE.

19   Q.   AND IF WE LOOK AT THE CALCULATIONS HERE, YOU'VE GOT TOTAL

20   REVENUE MINUS TOTAL STANDARD COSTS; CORRECT?

21       MS. KREVANS:  YOUR HONOR, THIS IS BEYOND THE SCOPE OF

22   THE DIRECT.

23       MR. PRICE:  NO, IT GOES TO --

24       MS. KREVANS:  WE'RE IN THE THIRD QUARTER OF 2007.

25       MR. PRICE:  IT GOES TO HOW YOU DO EXPENSES AND HOW

1      APPLE DOES THEM.

2            THE COURT:  OVERRULED.

3         GO AHEAD, PLEASE.

4      BY MR. PRICE:

5      Q.   AND IF YOU LOOK DOWN THIS, YOU SEE THERE ARE EXPENSES THAT

6      INCLUDE RESEARCH AND DEVELOPMENT, FREIGHT AND DUTY, WARRANTY,

7      ET CETERA; CORRECT?

8      A.   YES.

9      Q.   OKAY.  AND AT THE BOTTOM THERE'S A NOTE THAT TALKS ABOUT

10     THE METHODOLOGY THAT IPHONE REVENUE, STANDARD COST, AND UNITS

11     ARE DIRECT, AND THE OTHER AMOUNTS ARE ALLOCATED BASED ON

12     OVERALL COMPANY RESULTS.

13     A.   THAT'S RIGHT.

14     Q.   ALL RIGHT.  SO IF WE LOOK AT ANYTHING BELOW REVENUE AND

15     STANDARD COSTS, AND THEN THE CALCULATION THERE WHERE IT SAYS

16     STANDARD MARGIN, WHAT'S BELOW THERE, ALL OF THOSE ARE ALLOCATED

17     BASED ON THE OVERALL COMPANY RESULTS?

18     A.   THAT'S RIGHT.

19     Q.   SO FROM THE THIRD QUARTER OF 2007 UNTIL -- LET'S SEE, THE

20     IPHONE 3G CAME OUT IN THE FOURTH QUARTER OF 2000 -- FOURTH

21     CALENDAR QUARTER OF 2008?

22     A.   WHICH ONE ARE YOU ASKING ABOUT?

23     Q.   THE NEXT IPHONE, THE IPHONE 3G.

24     A.   YES, THAT'S PROBABLY RIGHT.

25     Q.   SO THAT'S -- IF WE CAN HIGHLIGHT FOURTH QUARTER OF 2008

1    HERE, SO DURING THAT TIME FRAME BETWEEN THE THIRD QUARTER OF

2    2007 UP TO THE FOURTH QUARTER OF 2008, THE ONLY PRODUCT IN THE

3    MARKET, IPHONE PRODUCT, WAS THAT ORIGINAL IPHONE?

4    A.   THAT'S RIGHT.

5    Q.   BUT THERE WAS RESEARCH AND DEVELOPMENT GOING ON WITH

6    RESPECT TO, YOU WOULD THINK, WITH RESPECT TO THE NEXT IPHONE?

7    A.   IT IS RELATED TO THE NEXT IPHONE.  IT'S NOT RELATED TO THE

8    ONE THAT'S ALREADY ON THE MARKET.

9    Q.   OKAY.  BUT IF YOU GO DOWN HERE, YOU SEE THAT IN THE FOURTH

10   QUARTER OF 2007, AND IN THE FIRST QUARTER OF 2008, AND THE

11   SECOND QUARTER OF 2008, AND IN THE THIRD QUARTER, UNDER

12   RESEARCH AND DEVELOPMENT, DIRECT AND ALLOCATED, YOU'VE GOT

13   EXPENSES HERE.

14        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

15           MR. PRICE:  I WANT TO MAKE SURE I'VE GOT WHEN THE

16   IPHONE 3G CAME OUT.

17   Q.   I'VE BEEN DIRECTED THAT THE IPHONE 3G CAME OUT IN THE

18   THIRD CALENDAR QUARTER BECAUSE IT WAS JULY 2008.

19        IS DOES THAT SOUND RIGHT?

20   A.   THAT SOUNDS RIGHT.

21   Q.   SO LET'S UNHIGHLIGHT FOUR, RYAN, AND HIGHLIGHT THREE HERE.

22   OKAY?

23        SO HERE WE HAVE, IF YOU LOOK AT RESEARCH AND DEVELOPMENT

24   WHERE IT'S 27, 30, 46, SO THOSE RESEARCH AND DEVELOPMENT COSTS,

25   FOR ONE THING, YOU UNDERSTAND THEY'RE ALLOCATED?

1     A.    SURE.

2     Q.    AND THEY ARE, IN THIS REPORT, BEING SUBTRACTED FROM GROSS

3     MARGIN; CORRECT?

4     A.    YES.

5     Q.    AND THE ONLY IPHONE OUT THERE AT THE TIME IN THE MARKET

6     THAT'S BEING SOLD IS THE ORIGINAL IPHONE, NOT THE ONE THAT'S

7     COMING OUT; CORRECT?

8     A.    RIGHT.

9     Q.    NOW, LET ME ASK YOU ABOUT THE GALAXY ACE.  I THINK YOU

10    SAID THAT YOU DON'T HAVE ANY INFORMATION THAT THAT WAS SOLD IN

11    THE U.S.; CORRECT?

12    A.    THAT'S MY UNDERSTANDING, THAT IT'S -- AS MR. WAGNER WAS

13    EXPLAINING, THIS WAS ONLY SOLD OUTSIDE THE U.S., OR AT LEAST IT

14    WAS ONLY SOLD BY CARRIERS OUTSIDE THE U.S.

15    Q.    WELL, YOU UNDERSTAND THAT THIS WAS A PHONE THAT WAS

16    ACCUSED OF INFRINGEMENT IN THE PRIOR TRIAL; CORRECT?

17    A.    I'M AWARE OF THAT.

18    Q.    AND YOU UNDERSTAND IT CAN'T BE ACCUSED OF INFRINGEMENT IN

19    THE U.S. IN THE PRIOR TRIAL UNLESS THERE ARE U.S. SALES?

20    A.    I THINK THERE WERE SOME RANDOM SALES OF UNLOCKED PRODUCT

21    BY AMAZON AND OTHERWISE, BUT IT WAS NEVER CARRIED BY A U.S.

22    CARRIER.

23    Q.    SO WHAT YOU'RE SAYING IS IT'S YOUR UNDERSTANDING THAT

24    APPLE PUT IN EVIDENCE THAT THERE WAS A GRAY MARKET FOR THE

25    GALAXY ACE IN THE UNITED STATES, THAT THEY WERE SOLD ON AMAZON

DAVIS FURTHER RECROSS

1    AND OTHER PLACES; CORRECT?

2    A.   I DON'T KNOW WHETHER IT WAS REFERRED TO AS A GRAY MARKET

3    OR NOT, BUT THAT WAS THE ONLY WAY IT WAS SOLD INSIDE THE

4    UNITED STATES.

5    Q.   WELL, YOU HAVE SOME UNDERSTANDING OF WHAT'S A GRAY MARKET

6    VERSUS WHAT'S KIND OF A LEGITIMATE MARKET?

7    A.   I DO.

8    Q.   AND SO YOU WOULD CHARACTERIZE THOSE AS BEING GRAY MARKET

9    SALES; RIGHT?

10   A.   I TYPICALLY THINK OF A GRAY MARKET AS ILLEGAL SALES, SO I

11   DON'T THINK YOU WANT ME THINKING OF A GRAY MARKET FOR YOUR

12   SAMSUNG SALES AS BEING ILLEGAL.

13        BUT I WILL AGREE WITH YOU THAT THOSE WERE NOT SALES MADE

14   ON A U.S. CARRIER.

15   Q.   SO WITH THAT PHONE, YOU'VE ASSUMED, LET'S SEE, A ONE MONTH

16   DESIGN AROUND FOR THE '381.

17        LET ME REPHRASE THAT.

18        BASED UPON YOUR DISCUSSIONS WITH AN APPLE ENGINEER, YOU'VE

19   CONCLUDED THAT THERE WAS A ONE MONTH DESIGN AROUND PERIOD FOR

20   THE '381 AND '163 PATENTS; RIGHT?

21   A.   WHEN I WAS PREPARING MY ANALYSES, I USED A ONE MONTH

22   DESIGN AROUND FOR THOSE, YES.

23   Q.   AND YOU ASSUMED THEN -- SO SAMSUNG, UNDER THAT, IN YOUR

24   ANALYSIS, WOULD HAVE COMPLETED DESIGNING AROUND THE '381 PATENT

25   BY JULY 31, 2010?

```
 1                    MS. KREVANS:  OBJECTION.  BEYOND THE SCOPE, YOUR

 2       HONOR.

 3                    MR. PRICE:  NO.

 4                    THE COURT:  OVERRULED.

 5               GO AHEAD, PLEASE.

 6                    THE WITNESS:  THAT'S TRUE FOR PURPOSES OF THIS TRIAL.

 7       THAT'S WHY IT'S NOT INCLUDED IN THE LOST PROFITS.

 8       BY MR. PRICE:

 9       Q.   AND THAT THEY WOULD HAVE COMPLETED DESIGNING AROUND THE

10       '163 PATENT BY FEBRUARY 4, 2010; CORRECT?

11       A.   FEBRUARY 4 OF 2010?

12       Q.   I'M SORRY, 2011.  SORRY.  I DID THAT LAST TIME, TOO.

13            BY FEBRUARY 4, 2011.  SORRY.

14       A.   AND YOU'RE TALKING ABOUT THE '163?

15       Q.   THE '163, YES.

16       A.   CERTAINLY IT WOULD HAVE BEEN REDESIGNED BY THAT POINT,

17       YES.

18       Q.   OKAY.  AND YOU UNDERSTAND THAT SAMSUNG BEGAN SELLING THE

19       GALAXY ACE IN, NOT IN THE U.S. MARKET, BUT IN THE EUROPEAN, IN

20       FEBRUARY OF 2011; CORRECT?

21       A.   I DON'T HAVE ANY SALES INFORMATION FOR THE ACE, SO I CAN'T

22       TELL YOU WHEN IT STARTED SELLING.

23       Q.   WELL, YOU -- WERE YOU HERE WHEN MR. SHEPPARD TESTIFIED TO

24       THAT, THAT THE FIRST DATE OF SALE FOR THE GALAXY ACE WAS

25       FEBRUARY OF 2011?
```

```
1    A.   I WAS HERE FOR HIS TESTIMONY.  I DON'T REMEMBER HIM

2    ADDRESSING THAT PARTICULAR QUESTION.

3    Q.   OKAY.  SO LET ME -- LET ME ASK YOU TO ASSUME THEN, IF YOU

4    DON'T REMEMBER THE TESTIMONY -- THERE'S BEEN A LOT -- THAT IF

5    IT WAS -- THAT IF -- THAT THERE WAS ENOUGH TIME, UNDER YOUR

6    ASSUMPTIONS, IF YOU ASSUME THAT THE ACE WAS ACTUALLY AVAILABLE

7    IN 2011, THAT THE DESIGN AROUND COULD HAVE BEEN ACCOMPLISHED

8    WITH RESPECT TO THE '381 AND '163 PATENTED BY APRIL OF 2011?

9    A.   I AGREE.

10   Q.   AND YOU'RE AWARE THAT THE GALAXY ACE WAS FOUND NOT TO

11   INFRINGE ANY OF THE OTHER APPLE PATENTS; CORRECT?

12   A.   AS FAR AS I KNOW, THAT'S CORRECT.

13   Q.   LET ME ASK YOU ABOUT THE LOST PROFITS, THAT IS, APPLE'S

14   LOST PROFITS.

15        AND IN THE ANALYSIS YOU JUST GAVE THE JURY, DID YOU USE

16   THE TEST THAT YOU USED IN THE RIDDELL CASE, THAT IS, WHERE YOU

17   WERE TRYING TO SEE WHETHER OR NOT A -- SOMEONE WHO PURCHASED A

18   SAMSUNG PHONE WOULD HAVE PURCHASED THAT PHONE IF IT DIDN'T HAVE

19   WHATEVER FEATURES WERE IN THAT PHONE THAT INFRINGED?

20   A.   NO.  THE TEST I'M TRYING TO APPLY HERE IS WHAT WOULD THOSE

21   PEOPLE HAVE PURCHASED IF THE INFRINGING PRODUCTS HAD NOT BEEN

22   ON THE MARKET.  I WAS ADDRESSING THAT SAME TEST IN THE RIDDELL

23   VERSUS SCHUTT CASE, AND THAT IS WHAT WOULD THOSE SCHOOL

24   DISTRICTS, AND OTHERWISE, WHICH FOOTBALL HELMET WOULD THEY HAVE

25   PURCHASED HAD THOSE PRODUCTS NOT BEEN ON THE MARKET, THE
```

1       INFRINGING PRODUCT?

2            AND I ULTIMATELY CONCLUDED THEY WOULD CONTINUE TO PURCHASE

3       A SCHUTT PRODUCT BECAUSE THE PATENTED FEATURES WERE NOT

4       IMPORTANT TO THEIR SALE.

5       Q.   BUT YOU RECALL THAT DURING YOUR ORIGINAL CROSS-EXAMINATION

6       THAT I READ TO YOU YOUR TESTIMONY IN THAT TRIAL?  DO YOU RECALL

7       THAT?

8       A.   I REMEMBER THAT.

9       Q.   AND YOU SAID THAT THERE AREN'T LOST PROFITS BECAUSE THE

10      PEOPLE DIDN'T BUY THE PRODUCT BECAUSE OF THE INFRINGING

11      FEATURES?  DO YOU RECALL THAT?

12      A.   THAT'S RIGHT, WHICH LED ME TO CONCLUDE THAT THEY WOULD

13      HAVE PURCHASED A SCHUTT PRODUCT INSTEAD, BECAUSE ALL THEY CARED

14      ABOUT WAS THE CONCUSSION TO THE HELMETS, NOT THE SHAPE OF THE

15      EAR FLAP.

16      Q.   OKAY.  GOOD TO KNOW.

17           SO IN THIS CASE, HAVE YOU DONE ANY ANALYSIS TO DETERMINE

18      WHETHER OR NOT A SAMSUNG CUSTOMER WHO BOUGHT AN INFRINGING

19      PHONE WOULD HAVE STILL BOUGHT THAT PHONE EVEN IF IT HAD NOT HAD

20      THE INFRINGING FEATURES?

21      A.   NO.  I HAVE ASSUMED THOSE INFRINGING PHONES WOULD NOT HAVE

22      BEEN ON THE MARKET BECAUSE THEY INFRINGED THE PATENTS AND,

23      THEREFORE, I HAVE ASKED THE QUESTION AND ANSWERED THE QUESTION

24      OF WHAT WOULD THOSE PEOPLE HAVE PURCHASED INSTEAD.

25      Q.   AND WITH RESPECT TO -- YOU SAID YOU TOOK INTO ACCOUNT

1     SCREEN SIZE ALSO BECAUSE YOU USED I GUESS WHAT YOU CALLED THE

2     REAL WORLD DATA.

3         DO YOU REMEMBER THAT YOU USED THE INFORMATION FROM THE

4     REAL WORLD TO TAKE INTO ACCOUNT SCREEN SIZE; CORRECT?

5     A.   THAT'S RIGHT.

6     Q.   AND WHAT YOU'RE TALKING ABOUT IS THIS -- IS IT IDC?  ITC?

7     A.   IDC, YES, INTERNATIONAL DATA CORP. AS I RECALL.

8     Q.   RIGHT.  AND YOU'RE LOOKING AT THEIR DATA WHICH SHOWS HOW

9     BUYERS ARE DISTRIBUTED ACROSS MANUFACTURERS; CORRECT?

10    A.   THAT'S RIGHT.

11    Q.   AND SO --

12    A.   BY CARRIER.

13    Q.   CARRIER.  WELL, FOR -- FOR -- YEAH.  SO, FOR EXAMPLE, IF

14    SOMEONE IS ON VERIZON, IF A SAMSUNG CUSTOMER IS ON VERIZON;

15    CORRECT?

16    A.   YES.

17    Q.   AND YOU'RE SAYING THAT SAMSUNG CUSTOMER NOW CAN'T BUY THE

18    INFRINGING PHONE?  THAT'S PART OF YOUR ANALYSIS; RIGHT?

19    A.   THAT'S CORRECT.

20    Q.   AND THEN WHAT YOU DO IS YOU TAKE THE PERCENTAGE WITHIN

21    VERIZON OF HOW MANY PURCHASERS HAVE BOUGHT AN APPLE, HAVE

22    BOUGHT SAMSUNG, MOTOROLA, ET CETERA, CORRECT?

23    A.   THAT'S RIGHT.

24    Q.   AND THOSE NUMBERS, AGAIN, THOSE PERCENTAGES ARE BASED ON

25    THE OVERALL POPULATION; CORRECT?

1    A.   THEY'RE BASED UPON THE POPULATION WITHIN THAT SPECIFIC

2    CARRIER.

3    Q.   RIGHT.  AND, HOWEVER, THE PEOPLE YOU WERE TAKING AWAY FROM

4    SAMSUNG ARE PEOPLE WHO ORIGINALLY CHOSE SAMSUNG OVER THOSE

5    OTHER CARRIERS; CORRECT?

6    A.   THAT'S RIGHT.  WE'RE TRYING TO FIGURE OUT WHAT WOULD HAVE

7    HAPPENED IF THE INFRINGING PRODUCTS HAD NOT BEEN ON THE MARKET.

8    Q.   LET ME ASK YOU WITH RESPECT TO REASONABLE ROYALTIES, YOU

9    TALKED ABOUT -- IN DETERMINING A REASONABLE ROYALTY, YOU LOOKED

10   AT VARIOUS FACTORS WHICH YOU CALLED WHAT?

11   A.   THE GEORGIA PACIFIC FACTORS?

12   Q.   RIGHT.  AND HOW MANY OF THOSE ARE THERE?

13   A.   THERE ARE 15.

14   Q.   AND DO YOU GIVE EQUAL WEIGHT TO EVERY FACTOR?

15   A.   NO.

16   Q.   DO YOU RECALL -- AND IF YOU DON'T, I'LL BE GLAD TO LET YOU

17   LOOK AT YOUR NOTEBOOK -- DO YOU RECALL FACTOR 13?

18   A.   I DO.

19   Q.   GREAT.  WHAT IS IT?

20   A.   IT'S THE APPORTIONMENT FACTOR, SO IT HAS TO DO WITH

21   DETERMINING THE CONTRIBUTION THAT A PARTICULAR PATENT MAKES TO

22   THE OVERALL PRODUCT AS COMPARED TO THE UNPATENTED FEATURES OF

23   THAT PRODUCT.

24   Q.   AND SO IN THAT FACTOR, ONE OF THE THINGS YOU'D LOOK AT --

25   I MEAN, LET'S STEP BACK.

DAVIS FURTHER RECROSS

1       THE IDEA WITH THE GEORGIA PACIFIC REASONABLE ROYALTY

2    CALCULATION IS THAT PEOPLE ARE SITTING ACROSS FROM THE

3    NEGOTIATING TABLE; CORRECT?

4    A.   YES.

5    Q.   OKAY.  IT'S A HYPOTHETICAL NEGOTIATION; CORRECT?

6    A.   IT IS.  IT DID NOT TAKE PLACE.

7    Q.   AND IT'S A NEGOTIATION THAT TAKES PLACE WHERE BOTH PARTIES

8    AGREE FOR THE PURPOSES OF THE NEGOTIATION THAT THE PATENTS ARE

9    VALID AND THAT THEY APPLY; CORRECT?

10   A.   THEY AGREE THAT THEY'RE VALID AND INFRINGED IF THAT'S WHAT

11   YOU MEAN BY "THEY APPLY," YES.

12   Q.   NOW, IN THE REAL WORLD, THERE CAN BE DISAGREEMENTS AS TO

13   WHETHER PATENTS ARE VALID AND WHETHER THEY'RE INFRINGED;

14   CORRECT?

15   A.   OF COURSE.

16   Q.   SO IN THE REAL WORLD, IF YOU'RE ACCUSED OF INFRINGING A

17   PATENT, YOU KNOW, SOMETIMES YOU SAY:  I DON'T AGREE.  I'M GOING

18   TO HAVE SOMEONE DECIDE THAT."  CORRECT?

19   A.   THERE'S LOTS OF DISCUSSION THAT SAYS "I DON'T AGREE."  I

20   DON'T KNOW THAT THEY WOULD OFTEN SAY "I'M GOING TO HAVE SOMEONE

21   DECIDE THAT."

22   Q.   I MEAN SOMEONE LIKE A JURY WHERE YOU SAY "WE'RE GOING TO

23   GO AND HAVE SOMEONE DECIDE WHO'S RIGHT ON THAT."  YOU KNOW THAT

24   HAPPENS ALL THE TIME IN THE REAL WORLD?

25   A.   IT DOES HAPPEN THAT THERE ARE LAWSUITS WHEN THEY CANNOT

1    AGREE.

2    Q.   FOR EXAMPLE, THE GALAXY ACE YOU'RE LOOKING AT, THAT WAS

3    ACCUSED OF INFRINGING THE '677 PATENT, THAT IS, APPLE'S DESIGN

4    ON THE FACE; CORRECT?

5    A.   I THINK THAT'S ACCURATE, BUT I DON'T RECALL SPECIFICALLY.

6    Q.   AND SAMSUNG SAID, "WE DON'T AGREE," IT WENT TO TRIAL, AND

7    THE JURY FOUND THAT THAT WAS -- THAT IT DID NOT INFRINGE THAT

8    PATENT; CORRECT?

9    A.   IT DIDN'T INFRINGE THAT PATENT.  IT INFRINGED OTHER

10   PATENTS.

11   Q.   EVEN THOUGH IT HAD, IN FACT, BEEN ACCUSED OF IT; CORRECT?

12   A.   CORRECT.

13   Q.   SO IT'S NOT UNREASONABLE -- IF YOU'RE ACCUSED OF

14   INFRINGING A PATENT, IT'S NOT UNREASONABLE TO SAY "I'M GOING TO

15   LET SOMEBODY ELSE DECIDE THAT AND NOT JUST AGREE WITH YOU."

16   CORRECT?

17   A.   I WOULD AGREE WITH THAT.

18   Q.   SO, BUT IN THE HYPOTHETICAL NEGOTIATION FOR REASONABLE

19   ROYALTIES, YOU'RE SUPPOSED TO ASSUME THAT THE PATENTS ARE VALID

20   AND THAT THEY'RE INFRINGED?  I MEAN, THAT'S PART OF THE

21   NEGOTIATION; RIGHT?

22   A.   IT'S PART OF THE TEST, YES.

23   Q.   OKAY.  SO IN THAT NEGOTIATION, IT'S NOT REAL WORLD, IT'S

24   HYPOTHETICAL, ONE OF THE THINGS THAT WOULD TAKE PLACE IS THE

25   PARTY THAT'S INFRINGING COULD SAY, "OKAY, IF WE'RE ASSUMING

```
1     IT'S VALID AND INFRINGED, OKAY, I WOULD DO SOMETHING ELSE AND,

2     THEREFORE, I WON'T PAY YOU AS MUCH."  CORRECT?

3     A.   YES, THAT WOULD BE CONSIDERED.

4     Q.   SO, FOR EXAMPLE, HE WOULD CONSIDER WHETHER OR NOT SAMSUNG,

5     IN THAT SITUATION WHERE IT'S, IT'S ASSUMED VALIDITY, IT'S

6     ASSUMED INFRINGEMENT, SO YOU'VE GOT TO DO SOMETHING, THAT YOU

7     WOULD -- THEY MIGHT TAKE THE TECHNOLOGY OUT, OR THEY MIGHT SAY,

8     COULD I REPLACE IT WITH SOMETHING ELSE?  CORRECT?

9     A.   THAT WOULD BE SOMETHING THEY WOULD THINK ABOUT, YES.

10    Q.   AND WHETHER OR NOT THEY DID THAT IN THE REAL WORLD AFTER

11    THEY WERE ACCUSED OF INFRINGING WOULD HAVE NOTHING TO DO WITH

12    THE HYPOTHETICAL NEGOTIATION WHERE THEY'RE TOLD, "YOU'RE

13    ASSUMING IT'S INFRINGING, YOU'RE ASSUMING IT'S VALID."  RIGHT?

14    A.   I DON'T AGREE WITH YOU.  IF SAMSUNG REALLY BELIEVED THAT

15    THEY COULD DESIGN AROUND THESE PATENTS FOR $28,000 IN A MATTER

16    OF A FEW WEEKS, THEY WOULD HAVE DONE IT.  WE WOULDN'T HAVE

17    NEEDED TO HAVE BEEN HERE, PARTICULARLY IF THEY BELIEVED THAT

18    THAT PRODUCT THAT WOULD HAVE BEEN THE RESULT OF THAT REDESIGN

19    WOULD HAVE BEEN PERFECTLY ACCEPTABLE.

20    Q.   OR THEY MIGHT HAVE SAID, "YOU'RE OVERREACHING AND WE'RE

21    GOING TO TAKE A STAND HERE BECAUSE YOU'RE TRYING TO CONTROL THE

22    MARKET"?

23    A.   THEY MIGHT HAVE.  IT SEEMS LIKE AN UNUSUAL DECISION FOR A

24    PRUDENT BUSINESS PERSON TO MAKE.

25              MR. PRICE:  OKAY.  NOTHING FURTHER.
```

1              THE COURT:  ALL RIGHT.  TIME IS 11:59.

2         ANY REDIRECT?

3              MS. KREVANS:  JUST A COUPLE THINGS, YOUR HONOR.

4              THE COURT:  OKAY.  TIME IS 11:59.

5         GO AHEAD, PLEASE.

6                   **FURTHER REDIRECT EXAMINATION**

7    BY MS. KREVANS:

8    Q.   MS. DAVIS, ON CROSS-EXAMINATION MR. PRICE ASKED YOU ABOUT

9    A DOCUMENT THAT WAS THE -- WE'RE NOT GOING TO PUT IT UP ON THE

10   SCREEN BECAUSE IT'S A CONFIDENTIAL APPLE DOCUMENT -- BUT IT WAS

11   THE GAAP LINE OF BUSINESS REPORT.  DO YOU RECALL THAT?

12   A.   YES.

13   Q.   WHAT DOES GAAP REFER TO?

14   A.   THAT'S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

15   Q.   THAT'S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, SO THAT'S

16   G-A-A-P, AND WE CALL IT GAAP?

17   A.   CORRECT.

18   Q.   OKAY.  IS THAT A SET OF RULES THAT ARE USED TO DO

19   FINANCIAL STATEMENTS FOR COMPANIES?

20   A.   YES.  IT'S USED FOR REPORTING COMPANY-WIDE RESULTS, OR IN

21   THIS CASE THEY USE IT FOR THE ENTIRE IPHONE DIVISION.

22   Q.   IS THAT THE SAME SET OF RULES THAT APPLIED TO THOSE

23   SAMSUNG AND APPLE CONSOLIDATED FINANCIAL STATEMENTS THAT WE

24   LOOKED AT EARLIER THIS MORNING WHEN I WAS ASKING YOU QUESTIONS?

25   A.   YES.  THAT WOULD BE USED FOR COMPANY-WIDE REPORTING AND

1    THAT'S WHAT AUDITORS ARE LOOKING FOR.

2    Q.   IS THE GAAP SET OF RULES THE SAME TEST THAT APPLIES FOR

3    DETERMINING INFRINGER'S PROFITS IN A PATENT INFRINGEMENT CASE?

4              MR. PRICE:  OBJECTION.  CALLS FOR LEGAL CONCLUSION.

5              THE COURT:  OVERRULED.

6         GO AHEAD, PLEASE.

7              THE WITNESS:  NO.

8              MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.  WE'RE

9    GOING TO GIVE BACK THE REST OF OUR TIME.

10             THE COURT:  OKAY.  TIME IS NOW NOON.

11        ANY FURTHER QUESTIONS, MR. PRICE?

12             MR. PRICE:  NO, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  SO DOES APPLE REST?

14             MR. MCELHINNY:  YOUR HONOR, APPLE RESTS.

15             THE COURT:  ALL RIGHT.  SO LADIES AND GENTLEMEN,

16   YOU'VE NOW HEARD ALL OF THE EVIDENCE IN THE CASE.

17        YOU MAY STEP DOWN, MS. DAVIS.

18             THE WITNESS:  THANK YOU.

19             THE COURT:  SO WE'LL GO AHEAD AND TAKE OUR LUNCH

20   BREAK.  WE WILL HAVE A CONFERENCE OUTSIDE YOUR PRESENCE ABOUT

21   THE FINAL JURY INSTRUCTIONS, SO TO GIVE TIME FOR US TO GET

22   EVERYTHING READY, WOULD YOU PLEASE COME BACK AT 2:00 O'CLOCK?

23        AT THAT TIME WE'LL PROVIDE YOU THE FINAL JURY

24   INSTRUCTIONS, I'LL READ THEM TO YOU, AND THEN YOU'LL BE EXCUSED

25   FOR THE DAY AND THEN WE'LL SEE YOU BACK HERE TOMORROW MORNING

1        AT 9:00 O'CLOCK FOR THE CLOSING ARGUMENTS.

2            SAME ADMONITIONS.  PLEASE KEEP AN OPEN MIND, DON'T DISCUSS

3    OR RESEARCH THE CASE.

4            THANK YOU.

5        (JURY OUT AT 12:02 P.M.)

6            THE COURT:  THE JURORS HAVE LEFT THE COURTROOM.

7        PLEASE TAKE A SEAT.

8        I'LL JUST STATE FOR THE RECORD THAT SAMSUNG HAD TWO

9    MINUTES LEFT AND APPLE HAD 16 MINUTES LEFT.

10           ALL RIGHT.  WITH REGARD TO THE FINAL JURY INSTRUCTIONS,

11   THE LANGUAGE IN THE PREFACE OF THE TENTATIVE FINAL JURY

12   INSTRUCTIONS WAS MEANT TO MAKE IT CLEAR THAT ALL PARTIES HAVE

13   RESERVED ALL PREVIOUSLY FILED OBJECTIONS.

14          IS THERE AN AGREEMENT FROM THE PARTIES THAT ALL OF YOUR

15   PREVIOUS OBJECTIONS ARE PRESERVED FOR APPEAL?

16           MR. LEE:  YES, YOUR HONOR.

17           MS. MAROULIS:  YES, YOUR HONOR.

18           THE COURT:  ALL RIGHT.  SO BEYOND WHAT YOU'VE ALREADY

19    PRESERVED FOR THE RECORD IN NUMEROUS, NUMEROUS BRIEFINGS, IS

20    THERE ANYTHING ELSE THAT YOU WOULD LIKE TO RAISE REGARDING THE

21    TENTATIVE FINAL JURY INSTRUCTIONS THAT WERE FILED YESTERDAY?

22           MR. LEE:  YOUR HONOR, JUST A FEW THINGS.

23           THE COURT:  OKAY.

24           MR. LEE:  CAN MR. SELWYN ADDRESS THIS?

25           THE COURT:  PLEASE, GO AHEAD.

```
 1              MR. SELWYN:  YOUR HONOR, I'LL JUST MOVE THROUGH THE

 2      INSTRUCTIONS AS EXPEDITIOUSLY AS I CAN WITH OUR OBJECTIONS.

 3              WITH RESPECT TO INSTRUCTION NUMBER 16, APPLE OBJECTS TO

 4      THE PROPOSED INSTRUCTION BECAUSE IT OMITS ANY STATEMENT

 5      REGARDING HOW THE PRIOR JURY VERDICT SHOULD BE TREATED.

 6              APPLE'S PROPOSED INSTRUCTION WOULD MAKE CLEAR THAT THIS

 7      JURY IS NOT TO REVISIT THE ISSUES OF INFRINGEMENT AND VALIDITY

 8      BECAUSE THEY WERE DECIDED BY THE PRIOR JURY.

 9              WITH RESPECT TO INSTRUCTION NUMBER 20 --

10              THE COURT:  ACTUALLY, WAIT ONE SECOND.

11              IS THERE ANY OBJECTION FROM SAMSUNG AS TO ONE SENTENCE

12      THAT STATES YOU ARE NOT TO -- WHAT IS THE LANGUAGE YOU WANT?

13              MS. MAROULIS:  I'M SORRY, YOUR HONOR?  WHAT IS THE

14      INSTRUCTION NUMBER?

15              THE COURT:  NUMBER 16, SUMMARY OF CONTENTIONS.  YOU

16      WANT ONE SENTENCE -- WHY DON'T YOU STATE VERBATIM WHAT IT IS

17      THAT YOU WANT AND LET'S SEE IF WE CAN GET AN AGREEMENT.

18              MS. MAROULIS:  I HAVE INSTRUCTION 18.  THAT'S WHY I'M

19      TRYING TO FIGURE OUT WHERE WE ARE.

20              MR. SELWYN:  YOUR HONOR, THE INSTRUCTION THAT WE

21      WOULD LIKE IS "A PRIOR JURY ALREADY DECIDED THAT SAMSUNG

22      INFRINGED APPLE'S PATENTS THROUGH THE SALE OF THE SMARTPHONE

23      AND TABLET DEVICES AT ISSUE IN THIS TRIAL, AND THAT APPLE'S

24      PATENTS ARE VALID.  YOU ARE NOT TO REVISIT THOSE ISSUES."

25              MS. MAROULIS:  YOUR HONOR, THIS WAS ALREADY ADDRESSED
```

```
1    IN THE PRELIMINARY INSTRUCTIONS, SO WE DON'T BELIEVE IT'S

2    NECESSARY TO PUT THAT IN.

3              THE COURT:  GIVE ME YOUR LANGUAGE THAT YOU WOULD LIKE

4    ONE MORE TIME.  "A PRIOR JURY ALREADY DECIDED THAT SAMSUNG

5    INFRINGED APPLE'S PATENTS" --

6              MR. SELWYN:  "THROUGH THE SALE OF THE SMARTPHONE AND

7    TABLET DEVICES AT ISSUE IN THIS TRIAL, AND THAT APPLE'S PATENTS

8    ARE VALID.  YOU ARE NOT TO REVISIT THOSE ISSUES."

9              THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD AND STATE ANY

10   OTHER OBJECTIONS.  YOU SAID OBJECTION -- INSTRUCTION NUMBER 20

11   WAS YOUR NEXT ONE.

12             MR. SELWYN:  WITH RESPECT TO INSTRUCTION NUMBER 20,

13   APPLE OBJECTS TO THE PROPOSED INSTRUCTION IN ITS ENTIRELY

14   BECAUSE IT'S UNNECESSARY AND POTENTIALLY CONFUSING.

15        THIS JURY WILL HAVE NO NEED TO APPLY AND COMPARE THE CLAIM

16   LANGUAGE TO THESE SAMSUNG PRODUCTS, OR TO ANY PRIOR ART.

17   RATHER, THIS JURY MUST ACCEPT THE INFRINGEMENT AND VALIDITY

18   FINDINGS OF THE FIRST JURY.

19        THE INSTRUCTION ALSO, AND I THINK THIS IS JUST AN

20   INADVERTENT ERROR, INCORRECTLY REFERENCES U.S. PATENT NUMBER

21   7,675,941, WHICH IS A SAMSUNG PATENT THAT WAS ASSERTED AGAINST

22   APPLE THAT THE PRIOR JURY FOUND NOT INFRINGED AND YOUR HONOR

23   SUBSEQUENTLY FOUND INVALID.

24             THE COURT:  OKAY.  THAT'S GOING TO BE CORRECTED.  I

25    APOLOGIZE FOR THAT MISTAKE.
```

```
 1              MR. SELWYN:  MOVING ON, YOUR HONOR, WITH RESPECT TO

 2      INSTRUCTION NUMBER 22, APPLE OBJECTS TO THE LAST PARAGRAPH OF

 3      THE INSTRUCTION AS AN INCORRECT STATEMENT OF LAW FOR THE

 4      REASONS THAT APPLE HAS PREVIOUSLY STATED.

 5              THE COURT:  ALL RIGHT.  GO AHEAD WITH YOUR NEXT

 6      OBJECTION, PLEASE.

 7              MR. SELWYN:  WITH RESPECT TO OBJECTION NUMBER 23,

 8      APPLE OBJECTS TO THE SENTENCE READING "THE TIME PERIOD RELEVANT

 9      TO DETERMINING THE AVAILABILITY OF A NON-INFRINGING SUBSTITUTE

10      IS THE ENTIRE PERIOD DURING WHICH SAMSUNG INFRINGED APPLE'S

11      PATENTS" FOR THE REASONS THAT APPLE PREVIOUSLY STATED.

12          IN ADDITION, APPLE'S POSITION IS THAT AS A MATTER OF LAW,

13      A NON-INFRINGING PRODUCT THAT INFRINGES ANOTHER APPLE PATENT IS

14      NOT AN AVAILABLE NON-INFRINGING SUBSTITUTE AND, THEREFORE,

15      APPLE OBJECTS TO INSTRUCTION NUMBER 23 TO THE EXTENT IT DOES

16      NOT INCLUDE SUCH AN INSTRUCTION.

17          APPLE ALSO BELIEVES THAT THIS JURY SHOULD BE INSTRUCTED

18      THAT IT IS PERMITTED TO FIND AS A MATTER OF FACT THAT A PRODUCT

19      FOUND TO INFRINGE OTHER APPLE PATENTS IS NOT AVAILABLE AS AN

20      ACCEPTABLE NON-INFRINGING SUBSTITUTE AND, THEREFORE, WE OBJECT

21      TO THIS INSTRUCTION TO THE EXTENT THAT IT DOES NOT INCLUDE THAT

22      STATEMENT.

23          APPLE ALSO OBJECTS TO INSTRUCTION NUMBER 23 TO THE EXTENT

24      THAT IT DOESN'T STATE THAT SAMSUNG HAS THE BURDEN OF PROVING

25      THE EXISTENCE OF HYPOTHETICAL ALTERNATIVES WHEN AN ALLEGED
```

1       ALTERNATIVE IS NOT ON THE MARKET DURING THE DAMAGES PERIOD.

2               AND LAST, APPLE OBJECTS TO THE INSTRUCTION NUMBER 23 TO

3       THE EXTENT THAT IT VARIES FROM THE INSTRUCTIONS THAT APPLE

4       PROPOSED FOR NON-INFRINGING ALTERNATIVES IN DOCKET NUMBERS 2707

5       AND 2768.

6               MOVING ON, WITH RESPECT TO INSTRUCTION NUMBER 28, APPLE --

7               THE COURT:  ACTUALLY, LET ME STOP YOU ONE SECOND.  I

8       WILL TELL YOU THE ONES THAT I'M WILLING TO ENTERTAIN.

9               YOUR ONE INSTRUCTION REGARDING WHAT THE PRIOR JURY FOUND

10      IN INSTRUCTION 16.

11              WITH REGARD TO INSTRUCTION NUMBER 20, I'VE ALREADY FOUND

12      THAT I THINK THE CLAIM CONSTRUCTION WOULD BE HELPFUL TO THIS

13      JURY.  I'M GOING TO FIX THE PATENT NUMBER.

14              22, YOUR OBJECTION IS OVERRULED.  WE'VE ALREADY LITIGATED

15      THAT ISSUE.

16              BUT WITH REGARD TO 23, I'M WILLING TO CONSIDER -- YOU'RE

17      TALKING ABOUT THE LANGUAGE FROM GRAIN PROCESSING; CORRECT?

18              MR. SELWYN:  THAT'S RIGHT.

19              THE COURT:  THAT THE INFRINGER HAS THE BURDEN TO

20      OVERCOME THE INFERENCE BY SHOWING THAT THE SUBSTITUTE WAS

21      AVAILABLE DURING THE ACCOUNTING PERIOD.  ALL RIGHT.  I WILL

22      TAKE A FURTHER LOOK AT THAT.

23              OKAY.  WHAT'S YOUR NEXT ONE?

24              MR. SELWYN:  I BELIEVE I MAY HAVE OMITTED INSTRUCTION

25      NUMBER 22.  APPLE OBJECTS TO THE LAST PARAGRAPH OF THE

1    INSTRUCTION AS AN INCORRECT STATEMENT OF LAW.

2              THE COURT:  OH, YOU DID THAT ONE.  THAT'S OVERRULED.

3              MR. SELWYN:  OKAY.  WITH RESPECT TO INSTRUCTION

4    NUMBER 28, APPLE OBJECTS TO THE INSTRUCTION TO THE EXTENT THAT

5    IT VARIES FROM WHAT APPLE HAS PROPOSED, AND IN PARTICULAR,

6    APPLE'S PROPOSED INSTRUCTION STATED THAT THE JURY MUST AWARD

7    DAMAGES, WHEREAS THE COURT'S INSTRUCTION USES THE WORD "MAY,"

8    WHICH WE BELIEVE TO BE INCORRECT.

9              THE COURT:  ALL RIGHT.  THAT'S DENIED.

10             MR. SELWYN:  AND LASTLY, WITH RESPECT TO INSTRUCTION

11   NUMBER 29, APPLE OBJECTS TO THE PROPOSED INSTRUCTION FOR THE

12   SAME REASON THAT APPLE OBJECTED TO THE INSTRUCTION REGARDING

13   THE CLAIM CONSTRUCTION FOR THE UTILITY PATENTS AS UNNECESSARY

14   AND POTENTIALLY CONFUSING BECAUSE THIS JURY WILL NOT NEED TO

15   INTERPRET APPLE'S DESIGN PATENT CLAIMS.

16             THE COURT:  ALL RIGHT.  THAT'S OVERRULED.  I WILL

17   PROBABLY INCLUDE THE WHOLE PATENT NUMBER.

18        OKAY.  SO THOSE ARE THE ONLY THREE THAT I'M WILLING TO

19   CONSIDER.  ACTUALLY, I SHOULD SAY FOUR.  16, I WILL RETHINK

20   ABOUT WHETHER WE SHOULD INCLUDE A STATEMENT THAT THE PREVIOUS

21   JURY FOUND INFRINGEMENT AND VALIDITY SIMILAR TO LANGUAGE USED

22   IN THE PRELIMINARY JURY INSTRUCTION.

23             I'LL FIX THE PATENT NUMBER ON INSTRUCTION NUMBER 20.

24             I'LL CONSIDER ADDING THAT IT'S SAMSUNG'S BURDEN ON 23.

25             AND FOR 29, I'LL INCLUDE THE ENTIRE PATENT NUMBER RELEVANT

```
1          TIME PERIOD RATHER THAN JUST D'677.

2               OKAY.  THANK YOU.

3                    MR. SELWYN:  THANK YOU.

4                    THE COURT:  LET ME HEAR FROM SAMSUNG.  WHAT ARE YOUR

5          OBJECTIONS TO THE TENTATIVE FINAL JURY INSTRUCTIONS FILED

6          YESTERDAY, UNDERSTANDING THAT ALL OF YOUR PREVIOUS OBJECTIONS

7          HAVE BEEN PRESERVED FOR APPEAL?

8                    MS. MAROULIS:  UNDERSTOOD, YOUR HONOR, AND WE WILL

9          NOT REPEAT ANYTHING FROM PRIOR OBJECTIONS.

10              STARTING WITH SUMMARY OF CONTENTIONS, WHICH IS INSTRUCTION

11         16.

12                   THE COURT:  OKAY.

13                   MS. MAROULIS:  SAMSUNG SOUGHT TO ADD THE JURY NEEDS

14         TO DECIDE THE AMOUNT AND TYPE OF DAMAGES.

15              THE COURT'S JUST PUT THE AMOUNT AND WE WANTED TO FIND, TO

16         FIND A PLACE FOR THE TYPE OF DAMAGES AS WELL, BECAUSE THERE ARE

17         THREE DIFFERENT TYPES OF DAMAGES AND, FOR A MORE CLEAR RECORD,

18         THAT WOULD BE USEFUL.

19                   THE COURT:  ALL RIGHT.  THAT'S OVERRULED.  WE ALREADY

20         LITIGATED THAT IN 2012 AND I'VE ALREADY RULED ON THAT IN THE

21         PRELIMINARY JURY INSTRUCTIONS AS WELL.

22              GO AHEAD, PLEASE.

23                   MS. MAROULIS:  THAT TAKES CARE OF OUR OBJECTION TO

24         INSTRUCTION 21 AS WELL.

25                   THE COURT:  OKAY.
```

```
 1            MS. MAROULIS:  WITH RESPECT TO INSTRUCTION 20, WE

 2     AGREE THAT THE PATENT WAS NOT MEANT TO BE '941.

 3            SAMSUNG OBJECTS TO THE CURRENT INSTRUCTION 23, AND

 4     SPECIFICALLY, WE OBJECT TO THE ADDITION OF THE TERM

 5     "ACCEPTABLE."  THIS IS AN INSTRUCTION THAT SAMSUNG TOOK

 6     ENTIRELY FROM THE NORTHERN DISTRICT OF CALIFORNIA MODEL PATENT

 7     INSTRUCTIONS, AND THE SPECIFIC LANGUAGE WE OBJECT TO ARE

 8     "ACCEPTABLE" IN THREE PLACES; AND THEN ADDITIONAL LIMITATION ON

 9     A NON-INFRINGING ALTERNATIVES, THAT CONSUMERS WOULD HAVE TO

10     VIEW THE SUBSTITUTE AS AN EQUIVALENT TO THE PATENTED DEVICE,

11     AND THAT IT WOULD HAVE TO OVERCOME TECHNOLOGY OTHER THAN THE

12     PATENTS-IN-SUIT.

13            WE BELIEVE IT DOES NOT -- IT DEVIATED FROM THE MODEL

14     INSTRUCTION AND IS NOT WARRANTED BY THE LAW ON THE

15     NON-INFRINGING ALTERNATIVES, AND ON THE RECORD, TO THE EXTENT

16     YOUR HONOR IS CONSIDERING APPLE'S ADDITIONAL LIMITATIONS, WE

17     OBJECT TO THOSE AS WELL BECAUSE THE LAW IS CLEAR THAT THE

18     BURDEN ON NON-INFRINGING ALTERNATIVES IS APPLE'S, AND THAT'S

19     THE GRAIN PROCESSING CASE.

20            THE COURT:  RIGHT.  BUT THERE'S A BURDEN SHIFTING.

21            BUT LET ME ASK YOU A QUESTION JUST SO I UNDERSTAND ALL OF

22     YOUR OBJECTIONS.  YOU'RE OBJECTING TO THE ACCEPTABLE LIMITATION

23     IN FRONT OF NON-INFRINGING SUBSTITUTES; YOU'RE OBJECTING TO THE

24     CONSUMERS --

25            MS. MAROULIS:  THE PHRASE, YOUR HONOR, IS "CONSUMERS
```

```
1        WOULD VIEW THE SUBSTITUTE AS EQUIVALENT TO THE PATENTED

2        DEVICE."

3                THE COURT:  OKAY.  AND WHAT WAS THE OTHER --

4                MS. MAROULIS:  THEN THERE'S A NON-OBJECTIONABLE

5        PHRASE, AND WE OBJECT ONLY TO THE -- IN PARENTHESES, IT SAYS

6        "OR OTHER PATENTED TECHNOLOGY" BECAUSE WE BELIEVE IT'S

7        CONFUSING HERE.

8                THE COURT:  NOW, THE "OTHER PATENTED TECHNOLOGY,"

9        THAT WAS YOUR THIRD OBJECTION TO THIS INSTRUCTION?

10               MS. MAROULIS:  CORRECT, YOUR HONOR.

11               THE COURT:  ALL RIGHT.  THANK YOU.  I WILL TAKE

12       ANOTHER LOOK AT THOSE.

13               MS. MAROULIS:  WITH RESPECT TO INSTRUCTION 27, THE

14       UTILITY PATENTS, REASONABLE ROYALTY, SAMSUNG OBJECTS TO THE

15       COURT TAKING OUT THE LANGUAGE REGARDING THE SMALLEST SALEABLE

16       UNIT AND BELIEVES THAT APPLE SHOULD NOT BE ENTITLED TO SEEK

17       ENTIRE MARKET VALUE DAMAGES HERE.

18           THE SPECIFIC LANGUAGE THAT WE WERE HOPING TO INSERT AND WE

19       PROPOSED IN OUR INSTRUCTIONS WAS "IF A PRODUCT WITH MULTIPLE

20       COMPONENTS IS ACCUSED OF INFRINGEMENT, THE BASE IS GENERALLY

21       THE SMALLEST SALEABLE FEATURE OR COMPONENT THAT PRACTICES THE

22       PATENT, NOT THE ENTIRE ACCUSED PRODUCT," AND THAT'S THE

23       LANGUAGE AND CONCEPTS THAT ARE BASED ON LASER DYNAMICS AND

24       SIMILAR CASES ON REASONABLE ROYALTY.

25           IN PARTICULAR, WE ALSO OBJECT TO THE LANGUAGE NOT BEING
```

```
1      INCLUDED THAT THE PATENTED FEATURE DRIVES DEMAND.

2          IF YOUR HONOR HEARD, TODAY MR. LEE WAS QUESTIONING

3      MR. WAGNER ABOUT WHETHER FEATURE DRIVING DEMAND WAS REASON --

4      WAS RELEVANT TO REASONABLE ROYALTY, AND THIS IS PRECISELY THE

5      POINT, WHICH IS FOR THEM TO CLAIM THE ENTIRE MARKET VALUE,

6      APPLE WOULD HAVE TO PROVE THAT THEIR FEATURES ACTUALLY DRIVE

7      DEMAND.

8              THE COURT:  WELL, I THOUGHT THAT THE LANGUAGE IN

9      LINES 12 THROUGH 14, WHICH STATE, "FOR EXAMPLE, IF YOU FIND

10     THAT FOR A $100 CAR, THE PATENTED FEATURE IS THE TIRES WHICH

11     SELL FOR $5, THE BASE REVENUE WOULD BE $5.  HOWEVER, IN A

12     CIRCUMSTANCE IN WHICH THE PATENTED FEATURE IS THE REASON

13     CUSTOMERS BUY THE WHOLE PRODUCT, THE BASE REVENUE COULD BE THE

14     VALUE OF THE WHOLE PRODUCT."

15             MS. MAROULIS:  YOUR HONOR IS CORRECT THAT THAT GOES

16     TO THAT CONCEPT.

17         BUT WE WERE LOOKING FOR SOMETHING MORE SMALL, WHICH IS

18     THAT IF THERE'S A PART OF A TIRE THAT IS PATENTED, THAT'S THE

19     PART THAT NEEDS TO BE DRIVING THE SALE.  SO THAT IS WHERE THE

20     SMALLEST SALEABLE UNIT CONCEPT COMES FROM THAT WAS REFERENCED

21     IN LASER DYNAMICS AND OTHER SIMILAR CASES.

22             THE COURT:  OKAY.  WE'LL LOOK AT THAT AGAIN.  WHAT

23     ELSE?  ANYTHING ELSE?

24             MS. MAROULIS:  OKAY.  ON NUMBER 28, JUST TO REENFORCE

25     THAT WE PREVIOUSLY PRESERVED THE NOTICE, THE PRODUCT SPECIFIC
```

1        NOTICE ISSUE AND WE WILL NOT BE REARGUING IT HERE.

2             THE INSTRUCTION COUNTER DOES NOT INSTRUCT THE JURY THAT

3        SAMSUNG WAS TO BE GIVEN WRITTEN NOTICE AND THAT WAS IN OUR

4        PROPOSED INSTRUCTION, SO WE WOULD REQUEST THAT THE WRITTEN

5        NOTICE ASPECT BE ADDED IF POSSIBLE.

6             FOR INSTRUCTION NUMBER 30 ON DESIGN PATENTS, IT'S THE

7        SAME, AMOUNT VERSUS TYPE OF DAMAGES LANGUAGE THAT WE PREVIOUSLY

8        COVERED.

9             AND ONE MOMENT, YOUR HONOR.

10            THE INSTRUCTION NUMBER 32, DESIGN PATENT DAMAGES, WE HAVE

11       THE SAME OBJECTION AS TO UTILITY INSTRUCTION 27, WHICH IS THAT

12       THE SMALLEST SALEABLE UNIT ISSUE SHOULD BE ADDED AND THE

13       FEATURE DRIVING DEMAND IS AN IMPORTANT CONCEPT, WHICH WAS

14       PROVIDED IN OUR PROPOSED INSTRUCTIONS.

15            WITH RESPECT TO INSTRUCTION NUMBER 33, IT'S A DESIGN

16       PATENT INSTRUCTION, IT MIRRORS OUR OBJECTION ON UTILITY AS TO

17       NOTICE NEEDED TO BE IN WRITING AND PRODUCT SPECIFIC.

18            FURTHERMORE, THE COURT REJECTED SAMSUNG'S PROPOSED

19       INSTRUCTION ON CAUSATION, THIS WAS OUR FINAL PROPOSED

20       INSTRUCTION 23, BUT IT DOESN'T HAVE A NUMBER IN THE COURT'S

21       INSTRUCTIONS.  SO FOR THE RECORD, THAT INSTRUCTION WAS

22       SUBMITTED BY SAMSUNG AT DOCKET NUMBER 2513 AND BASICALLY ARGUED

23       THAT THE JURY SHOULD BE INSTRUCTED THAT THE CAUSATION NEEDS TO

24       BE PROVEN BY THE PLAINTIFF.

25            THAT, YOUR HONOR, IS, I BELIEVE, THE TOTALITY OF OUR NEW

```
 1          OBJECTIONS, NOT REARGUING ANY PRIOR ONES THAT WE PRESERVED.

 2               THE COURT:  OKAY.  THANK YOU.

 3               MS. MAROULIS:  THANK YOU.

 4               THE COURT:  THANK YOU ALL.  WE WILL GO BACK AND SOME

 5          OF THESE, FOR EXAMPLE, THE PRODUCT SPECIFIC NOTICE, THAT'S

 6          ALREADY BEEN EXTENSIVELY LITIGATED AND MY RULING STILL STANDS.

 7               BUT FOR SOME OF THESE ISSUES WE'LL TAKE A SECOND LOOK.

 8          OKAY?  SO WE'LL FILE THE FINAL JURY INSTRUCTIONS AS SOON AS WE

 9          CAN SO WE CAN INSTRUCT THE JURY AT 2:00 O'CLOCK.

10               SO LET'S INSTRUCT THE JURY AT 2:00, AND THEN AFTER THEY'RE

11          EXCUSED, WE CAN THEN HAVE ANY HEARING ON RULE 50 MOTIONS.

12               ANYTHING ELSE THAT WE NEED TO HANDLE TODAY, OTHER THAN

13          RULE ON YOUR MILLIONS AND MILLIONS OF CLOSING OBJECTIONS?

14               IS THERE ANY OBJECTIONS THAT HAVE BEEN MOOTED, EITHER

15          YOU'VE REACHED SOME AGREEMENT ON SLIDES, BECAUSE IT'S QUITE

16          ONEROUS?

17               MS. MAROULIS:  YOUR HONOR, SAMSUNG PROPOSED A NUMBER

18          OF MODIFICATIONS TO SLIDES LATE LAST NIGHT, MIDDLE OF THE

19          NIGHT, SO WE CAN CONFER WITH APPLE AND SEE IF THAT RESOLVES

20          CERTAIN OBJECTIONS.  THEY MIGHT HAVE ALREADY BEEN RESOLVED, BUT

21          THAT --

22               THE COURT:  I THINK THERE ARE, LIKE, 100 SLIDES OF

23          SAMSUNG'S PRESENTATION THAT APPLE IS OBJECTING TO.  TO THE

24          EXTENT THAT YOU CAN NARROW YOUR DISPUTE, IT WOULD BE MUCH

25          APPRECIATED.
```

1223

```
 1        MS. KREVANS:  WE HAVE BEEN TRYING, YOUR HONOR.  BOTH

 2   PARTIES HAVE MANY OBJECTIONS.

 3        THERE ARE SOME OBJECTIONS THAT DID COME IN, AS I

 4   UNDERSTAND IT, IN THE MIDDLE OF NIGHT, SOME ISSUES FROM

 5   SAMSUNG, POSSIBLE RESOLUTIONS.  WE WILL CONTINUE TO WORK ON IT

 6   AND WE WILL, OF COURSE, INFORM THE COURT PROMPTLY IF FURTHER

 7   THINGS GET RESOLVED.

 8        THE COURT:  WELL, I'D LIKE TO SET A DEADLINE BY WHICH

 9   YOU'LL GIVE ME SOME UPDATE ON WHETHER YOU'VE BEEN ABLE TO REACH

10   RESOLUTION.  THIS IS NOT AN OPPORTUNITY TO RAISE NEW OBJECTIONS

11   OR TO REBRIEF OLD OBJECTIONS.

12        BUT IF YOU HAVE REACHED ANY AGREEMENTS, THAT WOULD BE MUCH

13   APPRECIATED TO KNOW ABOUT AS SOON AS POSSIBLE.  I MEAN, WE'RE

14   OBVIOUSLY WORKING ON THESE NOW.

15        MS. KREVANS:  YES, YOUR HONOR.  IF WE REACH

16   AGREEMENT, WE'LL SIMPLY SEND A JOINT E-MAIL TO THE COURT SAYING

17   "THERE ARE NO FURTHER OBJECTIONS ON THIS ONE, THIS ONE, THIS

18   ONE."

19        I'M NOT ON THE MIDDLE-OF-THE-NIGHT CREW, SO I CAN'T BE

20   MORE SPECIFIC THAN THAT, BUT I KNOW A NUMBER OF THINGS HAVE

21   BEEN RESOLVED AND WE'LL LOOK AT THEM.

22        THE COURT:  OKAY.  WELL, CAN WE -- IF A NUMBER HAVE

23   ALREADY BEEN RESOLVED, CAN WE SET SOME DEADLINES?  CAN YOU AT

24   LEAST NOTIFY US ABOUT THE ONES THAT HAVE BEEN RESOLVED?  EVEN

25   IF IT'S ONE, IT'S STILL HELPFUL.  WE DON'T HAVE A
```

```
 1    MIDDLE-OF-THE-NIGHT CREW.  WE ARE MORNING CREW, NIGHT CREW,

 2    MIDNIGHT CREW, EVERYTHING.  SO WHATEVER YOU CAN DO --

 3              MR. MCELHINNY:  CAN I SUGGEST --

 4              THE COURT:  YES.

 5              MR. MCELHINNY:  -- THERE'S ANOTHER WAY TO RESOLVE A

 6    HUGE NUMBER OF THEM, YOUR HONOR.

 7              THE COURT:  YES.

 8              MR. MCELHINNY:  THERE'S NO SURPRISE ELEMENT ANYMORE.

 9    EVERYBODY HAS EXCHANGED THESE DECKS.  THEY DON'T HAVE TO

10    HIGHLIGHT THE ONES THEY'RE USING IN DECKS THAT ARE 250 LONG.

11         EACH SIDE COULD NOTIFY YOU OF THE ONES THAT THEY'RE NOT

12    GOING TO USE THAT ARE SUBJECT TO OBJECTION AND THEN THAT WOULD

13    MOOT THE ARGUMENT.

14              THE COURT:  WELL, I MEAN, I WANT BOTH.  IF YOU'VE

15    REACHED AGREEMENT, I WANT TO HEAR THAT.  AND ALSO IF YOU'RE NOT

16    GOING TO USE IT, I'D LIKE TO KNOW THAT AS WELL.

17         CAN YOU FILE SOMETHING, WHAT ABOUT JUST TO GIVE ME ANY --

18    WELL, DO YOU -- WHICH ONES HAVE YOU AGREED TO ALREADY?

19              MS. KREVANS:  THE ONES THAT WERE AGREED TO THROUGH

20    LATE LAST NIGHT HAVE ALREADY -- THEY WERE TAKEN OUT OF WHAT WAS

21    GIVEN TO THE COURT, SO THE AGREEMENTS THAT HAPPENED ALREADY

22    HAVE BEEN --

23              THE COURT:  THEY'RE ALREADY REFLECTED IN THE FILINGS?

24              MS. KREVANS:  SO I THINK OUR AGREEMENT WAS TO LEAVE

25    COURT AND SEE IF WE CAN COME TO ANY MORE AGREEMENTS, AND IF WE
```

1225

```
 1        CAN, WE WILL LET YOU KNOW.

 2             THE COURT:  WELL, I WOULD LIKE TO KNOW AS SOON AS

 3        POSSIBLE.  I DON'T KNOW IF YOU SAW, BUT I HAVE, LIKE, CROSS

 4        SUMMARY JUDGMENT MOTIONS IN ANOTHER PATENT CASE ON THURSDAY; I

 5        HAVE FOUR OR FIVE LAW AND MOTION MATTERS THIS THURSDAY;

 6        MULTIPLE CRIMINAL SENTENCINGS WEDNESDAY MORNING.  I MEAN, WE

 7        HAVE OTHER CASES WE'RE ALSO TRYING TO KEEP GOING.

 8           SO CAN YOU, AT 1:00 O'CLOCK, JUST GIVE US SOME UPDATE OF

 9        IF THERE ARE ANY FURTHER ITEMS THAT YOU HAVE REACHED AGREEMENT

10        ON, THAT WOULD BE HELPFUL.

11             MS. KREVANS:  WE WILL DO THAT, YOUR HONOR.

12             THE COURT:  OR SLIDES THAT YOU KNOW YOU'RE NOT GOING

13        TO USE NOW.

14             MS. MAROULIS:  SURE, YOUR HONOR.  CAN WE HAVE UNTIL

15        1:30?

16             THE COURT:  THAT'S FINE.  ANYTHING YOU CAN GIVE US,

17        EVEN IF IT'S A COUPLE, ANYTHING WOULD BE HELPFUL BECAUSE THERE

18        ARE A LOT OF OBJECTIONS.

19             MS. KREVANS:  WE WILL DO THAT, YOUR HONOR.

20           AND ALSO THE PARTIES ARE GOING TO GET TOGETHER THIS

21        AFTERNOON TO GO THROUGH IN PERSON TOGETHER THE EXHIBITS TO MAKE

22        SURE THAT WE HAVE A FINALLY AGREED UPON SET AND LIST AND GET

23        THAT PROMPTLY TO THE COURT SO THAT WE HAVE AN AGREED UPON SET

24        THAT CAN GO INTO THE JURY TOMORROW.

25             THE COURT:  RIGHT.  I THINK WE SAID THAT YOU WOULD
```

```
 1      FILE THE FINAL STIPULATED EXHIBIT LIST BY 6:00 O'CLOCK SO THAT

 2      WE CAN COMPARE IT TO MY LIST AND THEN WE CAN TRY TO RESOLVE ANY

 3      DISCREPANCIES LIKE WE DID LAST NIGHT.

 4           MS. KREVANS:  THAT'S RIGHT, YOUR HONOR.

 5           AND THEN THE OTHER THING WE'RE GOING TO DO IS WE'RE

 6      ACTUALLY GOING TO GET TOGETHER AND GO PHYSICALLY THROUGH THE

 7      EXHIBITS AND MAKE SURE WE ALL AGREE THIS IS THE EXACT PIECE OF

 8      PAPER BECAUSE, OF COURSE, SOME EXHIBITS DID GET MODIFIED DURING

 9      THE TRIAL, AND WE'LL MAKE SURE THAT THAT ALL HAPPENS TODAY AND

10      IN A TIMELY WAY.

11           THE COURT:  RIGHT.  BECAUSE THOSE WILL BE GOING TO

12      THE JURY TOMORROW INTO THE DELIBERATION ROOM, SO WE DO NEED

13      STIPULATIONS FROM BOTH SIDES BY TONIGHT.

14           MS. MAROULIS:  YOUR HONOR, WOULD YOU LIKE ONE

15      COMPLETE SET OR TWO COMPLETE SETS FOR THE JURY ROOM?

16           THE COURT:  I GUESS IF WE GET ONE COMPLETE SET FOR

17      THE CLERK'S OFFICE AND ONE COMPLETE SET FOR US, THEN WE COULD

18      PROBABLY THEN RETURN OUR, OUR SETS TO YOU AND JUST HAVE ONE SET

19      OF ACTUALLY ADMITTED EXHIBITS FOR THE POST-TRIAL MOTIONS.

20           LET ME THINK ABOUT THAT AND GET BACK TO YOU IF THAT'S

21      OKAY.

22           MS. KREVANS:  SO JUST LET US KNOW TOTAL HOW MANY YOU

23      WANT AND WE CAN DO WHATEVER NUMBER YOU WANT.

24           THE COURT:  ALL RIGHT.  SO I WOULD LIKE, THEN, IF YOU

25      COULD, AT 1:30, JUST FILE AN UPDATE, PLEASE, ON IF YOU'VE
```

```
 1     REACHED ANY FURTHER AGREEMENTS ON PROPOSED SLIDES, AND IF

 2     YOU'VE DECIDED NOT TO USE ANY, ANY UPDATES WOULD BE

 3     APPRECIATED.

 4              MS. KREVANS:  WE WILL DO THAT, YOUR HONOR.

 5              THE COURT:  OKAY.  AND THEN IF YOU HAVE ANY FURTHER

 6     UPDATES, BECAUSE OBVIOUSLY WE'LL BE WORKING ON THESE FOR QUITE

 7     SOME TIME, IF YOU COULD FILE MAYBE ANOTHER UPDATE AT, WHAT TIME

 8     MAKES SENSE, 4:00 O'CLOCK?  WE'LL PROBABLY ALREADY HAVE BEEN

 9     SPENDING QUITE A BIT OF TIME ON IT, BUT IT'LL SAVE US A LITTLE

10     BIT TO KNOW THAT WE DON'T HAVE TO FINALIZE EVERY SINGLE RULING.

11              MS. KREVANS:  THAT WOULD BE FINE, YOUR HONOR.  AND IF

12     WE COME TO AGREEMENTS LATER THAN THAT, WE'LL OBVIOUSLY LET YOUR

13     HONOR KNOW AS SOON AS IT HAPPENS.

14              THE COURT:  OKAY, GREAT.  THEN I WILL SEE EVERYONE

15     BACK AT 2:00.  THANK YOU.

16          I'M GOING TO RETURN -- THESE ARE THE CROSS-EXAMINATION

17     BINDERS FOR MS. DAVIS.

18          OKAY.  THANK YOU EVERYBODY.  WE'LL SEE YOU BACK AT 2:00

19     O'CLOCK.

20              (LUNCH RECESS WAS TAKEN FROM 12:24 P.M. TO 2:27 P.M.)

21

22

23

24

25
```

```
1                        AFTERNOON SESSION

2           (JURY OUT AT 2:27 P.M.)

3                THE COURT:  WELCOME BACK.  THANK YOU FOR YOUR

4      PATIENCE.  SORRY FOR OUR DELAY.  PLEASE TAKE A SEAT.

5           LET ME TELL YOU WHAT CHANGES WERE MADE TO THE FINAL JURY

6      INSTRUCTIONS AND ALLOW YOU TO REPRESERVE YOUR WELL PRESERVED

7      OBJECTIONS.

8           SO I WAS PERSUADED BY MR. SELWYN ON NUMBER 16 THAT SINCE

9      THE PRELIMINARY INSTRUCTION SAID THAT THE FINAL INSTRUCTIONS

10     WOULD GOVERN THE DELIBERATIONS, THAT IT WAS WORTH REPEATING

11     WHAT THE JURY IN THE PRIOR PROCEEDING HAD FOUND, SO THERE IS A

12     NEW SECOND PARAGRAPH IN INSTRUCTION NUMBER 16 WHICH JUST

13     PROVIDES THAT THE PRIOR PROCEEDING'S JURY FOUND THAT THE

14     SAMSUNG 13 PRODUCTS AT ISSUE INFRINGE ONE OR MORE OF THE

15     FOLLOWING APPLE PATENTS AND FOUND THE PATENTS VALID.

16          THE REST OF THAT INSTRUCTION IS THE SAME.

17          ON INSTRUCTION NUMBER 20, I CORRECTED THE ERROR AS TO THE

18     PATENT NUMBER FOR THE THIRD PATENT.

19          FOR 23, THIS IS PROBABLY THE SIGNIFICANT CHANGE, I DID

20     DELETE WHETHER CONSUMERS WOULD FIND -- WOULD VIEW THE

21     SUBSTITUTE AS EQUIVALENT TO THE PATENTED TECHNOLOGY.  THAT WAS

22     SOMETHING THAT WAS ADDED BY THE COURT AND IT'S NOT IN THE CAL

23     MODEL INSTRUCTIONS FOR LOST PROFITS FACTORS TO CONSIDER.

24          BUT I DID LEAVE IN THE "ACCEPTABLE" ADJECTIVE BEFORE

25     "NON-INFRINGING SUBSTITUTES" AND DID LEAVE IN THE PARENTHETICAL
```

```
 1    THAT SAMSUNG WOULD HAVE TO DESIGN AROUND OTHER PATENTED

 2    TECHNOLOGY.  THOSE REMAIN THE SAME.

 3         ON JURY INSTRUCTION NUMBER 29, I DID INCLUDE THE WHOLE

 4    DESIGN PATENT NUMBERS RATHER THAN JUST THE LAST THREE DIGITS.

 5         AND OTHERWISE I DENIED ALL THE OTHER REQUESTS TO CHANGE

 6    THE JURY INSTRUCTIONS.

 7         HAVING HEARD THAT THOSE ARE THE CHANGES, WOULD YOU LIKE TO

 8    RENEW, JUST FOR THE RECORD, YOUR OBJECTIONS?

 9         MS. MAROULIS:  YOUR HONOR, SAMSUNG RENEWS FOR THE

10    RECORD ITS OBJECTION TO THE STATEMENT IN INSTRUCTION NUMBER 16;

11    AND ALSO WITH RESPECT TO INSTRUCTION 23, RENEWS ITS OBJECTION

12    TO THE PARENTHETICAL REGARDING OTHER PATENTED TECHNOLOGIES AND

13    THE INSERTION OF THE TERM "ACCEPTABLE."

14    THANK YOU.

15         THE COURT:  UNDERSTOOD.  AND FOR 16, YOUR OBJECTION

16    IS TO NOT INCLUDING THAT THE JURY MUST DETERMINE THE TYPES OF

17    DAMAGES?  THAT'S YOUR OBJECTION?

18         MS. MAROULIS:  NO, YOUR HONOR.  IT'S -- THAT IS ONE

19    THAT I MADE THIS MORNING, BUT IT'S ALSO TO THE ADDITIONAL

20    STATEMENTS RESTATING THAT THE JURY HAD FOUND INFRINGEMENT

21    BECAUSE IT WAS ALREADY GIVEN IN THE PRELIMINARY INSTRUCTIONS.

22         THE COURT:  ALL RIGHT.  THANK YOU.

23    ANY -- MR. SELWYN OR MR. MCELHINNY, ANYONE WANT TO STATE

24    ANY --

25         MR. SELWYN:  APPLE HAS NO FURTHER OBJECTIONS BEYOND
```

```
 1        WHAT'S ALREADY BEEN STATED.

 2              THE COURT:  OKAY.  THANK YOU.

 3        AND I DID, JUST SO THE RECORD IS CLEAR, I ADDED THE

 4   ADDITIONAL LANGUAGE IN NUMBER 16 BECAUSE INSTRUCTION NUMBER 21

 5   OF THE PRELIMINARY SAYS "AFTER THE EVIDENCE HAS BEEN PRESENTED,

 6   I WILL GIVE YOU FINAL INSTRUCTIONS ON THE LAW THAT APPLIES TO

 7   THE CASE," AND THE FINAL INSTRUCTIONS WILL PROBABLY GAIN MORE

 8   ATTENTION FROM THE JURY THAN THE PRELIMINARIES AND I THOUGHT IT

 9   WAS JUST WORTH MAKING CLEAR WHAT WAS AT ISSUE IN THE CASE.

10        OKAY.  WITH THAT THEN, LET'S BRING IN OUR JURY --

11   ACTUALLY, DO WE HAVE OUR COPIES, THOUGH?  WE MAY NEED TO WAIT

12   UNTIL THE COPIES COME UP.

13        WE'RE HAVING NINE COPIES MADE THAT ARE DOUBLE-SIDED AND

14   HOLE PUNCHED SO THE JURORS CAN PUT THEM IN THEIR JURY BINDERS.

15              THE CLERK:  YEAH.  VIKRAM BROUGHT COPIES FOR THE

16   COUNSEL, AND JUST GAVE ME ONE FOR LEE-ANNE.

17              THE COURT:  OKAY, LEE-ANNE HAS HER COPY?

18              MS. MAROULIS:  YOUR HONOR, WHILE WE'RE WAITING, WOULD

19   YOU LIKE THE PARTIES TO RENEW THEIR JMOL BRIEFLY?

20              THE COURT:  SURE, WE CAN DO THAT WHILE WE'RE WAITING.

21        AND THERE ARE ISSUES THAT I WOULD LIKE TO HEAR ARGUMENT ON

22   THIS TIME.  I WOULD LIKE TO HEAR SAMSUNG'S REBUTTAL TO APPLE'S

23   RULE 50 MOTION REGARDING NO TECHNICAL TESTIMONY FOR THE

24   HYPOTHETICAL DESIGN AROUNDS.

25        I WOULD ALSO LIKE TO HEAR APPLE'S POSITION, ASSUMING
```

1231

```
 1      SAMSUNG RENEWS ITS RULE 50 MOTION THAT IT MADE ON FRIDAY, AS TO

 2      NON-INFRINGING ALTERNATIVES.

 3           SO -- WELL, WHY DON'T YOU FIRST TELL ME WHAT RULE 50

 4      MOTIONS YOU'RE GOING TO BE MAKING.

 5                MS. MAROULIS:  YOUR HONOR, SAMSUNG WAS PLANNING TO

 6      RENEW THE MOTION IT PREVIOUSLY MADE AND SIMPLY TO ADD THAT

 7      THAT, THROUGH SAMSUNG'S CASE-IN-CHIEF AND THROUGH THE REBUTTAL

 8      TESTIMONY, THERE WAS ADDITIONAL EVIDENCE ADDUCED OF LACK OF

 9      DEMAND FOR THE PATENTED FEATURE, OR APPLE'S FAILURE TO PROVE

10      DEMAND FOR THE PARTICULAR PATENTED FEATURE, AND THROUGH

11      MR. WAGNER'S TESTIMONY AND THE COMBINATION OF THAT WITH THE

12      CROSS-EXAMINATIONS OF APPLE TECHNICAL EXPERTS.

13           THERE'S ALSO A DISPUTABLE PRESENCE OF ACCEPTABLE

14      NON-INFRINGING ALTERNATIVES IN THE FORM OF ACTUAL PHONES, AND

15      ALSO POTENTIAL TECHNOLOGIES.

16           SO IT'S LARGELY THE SAME GROUNDS AS WE STATED LAST TIME ON

17      FRIDAY, BUT WITH THE BENEFIT OF ADDITIONAL EVIDENCE THAT CAME

18      IN OVER THE LAST TWO DAYS.

19                THE COURT:  SO LET ME -- SO YOU'RE SAYING THERE'S A

20      LACK OF DEMAND FOR THE PATENTED FEATURES?

21                MS. MAROULIS:  CORRECT.

22                THE COURT:  AND CAN YOU PLEASE RE-ARTICULATE THE

23      SECOND BASIS OF YOUR RULE 50 MOTION, WHETHER THERE ARE

24      ACCEPTABLE NON-INFRINGING ALTERNATIVE PHONES AND TECHNOLOGY?

25      IS THAT WHAT YOU SAID?
```

1          MS. MAROULIS:  YES, YOUR HONOR.  JUST GIVE ME ONE

2     SECOND.

3          YOUR HONOR, LAST FRIDAY SAMSUNG MADE A MOTION FOR JMOL

4     BASED ON LACK OF DEMAND, WHICH IS FOR PATENTED FEATURE, WHICH

5     IS PANDUIT FACTOR 2, AND RELATED TO THAT, APPLE'S FAILURE TO

6     PROVE ABSENCE OF NON-INFRINGING ALTERNATIVES.  THAT WAS BEFORE

7     SAMSUNG PUT ON ITS CASE-IN-CHIEF.

8          AND AFTER THAT, AFTER SAMSUNG WAS ABLE TO PUT ON ITS

9     CASE-IN-CHIEF, THIS MOTION IS NOW EVEN STRONGER BECAUSE WE'VE

10    PUT IN UNREBUTTED EVIDENCE THAT, FOR EXAMPLE, THE PHONE NAMED

11    INTERCEPT WAS ON THE MARKET PRIOR TO THE START OF THE LOST

12    PROFITS PERIOD, WAS AVAILABLE, AND WAS ACCEPTABLE BECAUSE IT

13    WAS SELLING SUBSTANTIAL AMOUNTS OF SALES.

14         MR. WAGNER TESTIFIED THAT IT WAS A VERY WELL SELLING PHONE

15    AND POINTED THE JURY TO EVIDENCE OF THAT.

16         MS. DAVIS ACTUALLY ADMITTED THAT INTERCEPT ALSO WAS A

17    NON-INFRINGING ALTERNATIVE, AND THAT EVIDENCE STANDS

18    UNREBUTTED.

19         WITH RESPECT TO ACE, WE HAVE EVIDENCE OF IT BEING ON THE

20    MARKET PRIOR TO THE RELEVANT PERIOD AND EVIDENCE OF SALES AS

21    WELL.

22         SO BASICALLY THE TWO PRONGS OF THE PANDUIT FACTOR 2 HERE

23    HAVE NOT BEEN SATISFIED.  APPLE HAS NOT PROVEN ABSENCE OF

24    NON-INFRINGING ALTERNATIVES, AND HAS NOT PROVEN THAT THERE IS

25    DEMAND FOR A SPECIFIC PATENTED FEATURE OF THE '915 PATENT.

1233

```
1              MR. LEE:  YOUR HONOR, I'LL TAKE THEM IN ORDER.  THERE

2    IS EVIDENCE OF DEMAND FOR THE PATENTED PRODUCT, AS WELL AS THE

3    PATENTED FEATURE, INCLUDING THE GRAVITY TANK CONSULTING REPORT

4    THAT WAS PREPARED FOR SAMSUNG.

5              THERE WAS TESTIMONY FROM DR. SINGH ABOUT THE SIGNIFICANCE

6    OF THE INVENTION, ITS IMPORTANCE AND HOW IT'S DISTINGUISHED

7    OVER WHATEVER -- WHAT ELSE WAS AVAILABLE.

8              THERE IS DOCUMENTARY EVIDENCE IN SAMSUNG'S OWN FILE ABOUT

9    THE PATENTED PRODUCT.  THERE'S THE GRAVITY TANK ANALYSIS GOING

10   SPECIFICALLY TO THE PATENTED FEATURE.

11             AND THERE WAS THE TESTIMONY OF DR. SINGH AND OTHERS ABOUT

12   THE IMPORTANCE OF THE PATENTED FEATURE.

13             ON THE ALTERNATIVE -- ON THE NO ALTERNATIVES WERE

14   AVAILABLE, THIS, YOUR HONOR, MAY BE A PLACE WHERE I THINK THE

15   ARGUMENT GOT OFF IN WHAT I SUGGEST, RESPECTFULLY, WAS THE WRONG

16   LEGAL FRAMEWORK.

17             OUR OBLIGATION IS NOT TO PROVE THAT THERE WERE NO

18   AVAILABLE NON-INFRINGING ALTERNATIVES, AND I THINK THERE ARE

19   TWO PARTS TO THE ANALYSIS, YOUR HONOR.

20             ONE IS REAL WORLD AVAILABLE ALTERNATIVES, AND YOUR HONOR'S

21   INSTRUCTIONS SAY THAT OUR JOB IS NOT TO PROVE THAT THERE WERE

22   NONE.  OUR JOB WAS EITHER TO PROVE THAT THERE ARE NONE, OR, IF

23   THERE ARE SOME, TO ACCOUNT FOR THEM, AND THAT'S EXACTLY WHAT

24   MS. DAVIS DID.

25             AND BOTH SHE AND MR. WAGNER AGREED TODAY, AND PREVIOUSLY,
```

1    THAT SHE ACCOUNTED FOR THE INTERCEPT, THE ONE PHONE THAT WAS

2    FOUND NOT TO INFRINGE ANY OF THE PATENTS, AND SHE BASICALLY

3    CONDUCTED A MORE FULL ANALYSIS THAT COMPLIED WITH YOUR HONOR'S

4    INSTRUCTIONS.

5        SO SHE TOOK THE REAL WORLD AVAILABLE NON-INFRINGING

6    ALTERNATIVES AND ACCOUNTED FOR THEM.

7        TO THE EXTENT THAT THERE ARE, THERE WERE OTHER PHONES THAT

8    INFRINGED OTHER PATENTS, SHE BASICALLY SAID, "LOOK, THERE'S

9    NOTHING HERE THAT SAYS THEY COULD HAVE DESIGNED AROUND THESE

10   OTHER PATENTS.  I, THEREFORE, ASSUMED THEY'RE NOT AVAILABLE."

11       THAT'S A FACTUAL QUESTION FOR THE JURY TO RESOLVE.

12       AS TO THE SECOND CATEGORY, WHICH IS THE HYPOTHETICAL

13   DESIGN AROUNDS, THAT MAY GO TO YOUR HONOR'S SECOND QUESTION

14   ABOUT OUR RULE 50 MOTION.

15       THE HYPOTHETICAL DESIGN AROUNDS ARE SAMSUNG'S BURDENS, AND

16   JUST PUTTING UP A VIDEO THAT SAYS, "HERE ARE TWO PRODUCTS THAT

17   SORT OF LOOK ALIKE" WITHOUT ANY -- WE'RE NOW AT A POINT, YOUR

18   HONOR -- AND I'LL DO THIS QUICKLY BECAUSE I'M REITERATING WHAT

19   I SAID YESTERDAY -- WE'RE AT A POINT WHERE ALL THE EVIDENCE IS

20   IN, THERE'S NOT A SINGLE TECHNICAL EXPERT WHO TESTIFIES HOW YOU

21   WOULD TAKE A FEATURE FROM AN ALLEGEDLY NON-INFRINGING PHONE AND

22   PUT IT INTO AN INFRINGING PHONE.

23       THERE'S NOT AN EXPERT WHO'S TESTIFIED HOW YOU WOULD TAKE A

24   PHONE THAT INFRINGES SOME PATENTS, BUT NOT THE PARTICULAR

25   PATENT AT ISSUE, AND REDESIGN AROUND THE OTHER PATENTS TO MAKE

1     IT NON-INFRINGING.

2          SO I THINK, IF I GO TO YOUR HONOR'S INSTRUCTIONS THAT

3     YOU'RE GOING TO GIVE IN A FEW MINUTES, ON THE QUESTION OF

4     PANDUIT, WE HAVE SATISFIED THE FIRST PRONG.

5          ON THE SECOND, THE ARGUMENT THAT WE FOCUSSED ON YESTERDAY

6     BASICALLY IS A BURDEN THAT WE DON'T HAVE, WHICH IS TO PROVE

7     THAT ABSOLUTELY THERE ARE NONE.

8          MS. DAVIS DIDN'T SAY THAT.  SHE SAID "I ASSUME THERE ARE

9     SOME AND I'M TAKING ACCOUNT FOR THEM," AND SHE SPECIFICALLY

10    TOOK ACCOUNT FOR THE INTERCEPT.

11          THE COURT:  ALL RIGHT.  I'M SORRY TO INTERRUPT THIS,

12    AND I DO WANT TO CONTINUE THIS DISCUSSION LATER, BUT WE NOW

13    HAVE OUR INSTRUCTIONS, SO LET'S BRING IN OUR JURY SO WE CAN

14    EXCUSE THEM FOR THE DAY.

15          (JURY IN AT 2:39 P.M.)

16          THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

17    I APOLOGIZE FOR MAKING YOU WAIT.

18          YOU SHOULD NOW HAVE A HARD COPY OF THE FINAL JURY

19    INSTRUCTIONS, AND THEY'VE BEEN THREE HOLE PUNCHED SO YOU CAN

20    PLACE THEM IN YOUR BINDERS IF YOU WISH, AND YOU WILL HAVE THESE

21    WITH YOU DURING THE DURATION OF YOUR DELIBERATIONS.

22          THERE'S A TABLE OF CONTENTS AS WELL IF THERE'S ANYTHING IN

23    PARTICULAR YOU'D LIKE TO REVIEW LATER.

24          I AM REQUIRED TO READ THEM TO YOU EVEN THOUGH YOU HAVE

25    THEM, SO LET'S START WITH FINAL JURY INSTRUCTION NUMBER 1, DUTY

```
1    OF THE JURY.

2         MEMBERS OF THE JURY:  NOW THAT YOU HAVE HEARD ALL OF THE

3    EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU AS TO THE LAW OF THE

4    CASE.

5         EACH OF YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT

6    YOU MAY TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR

7    DELIBERATIONS.

8         LET ME GIVE YOU ONE MINUTE TO PUT THEM IN YOUR BINDERS IF

9    YOU WANT TO DO THAT.

10        (PAUSE IN PROCEEDINGS.)

11        THE COURT:  WE'RE ON PAGE 2.  EVERYONE READY?  OKAY.

12   LET ME JUST REPEAT THAT.

13        MEMBERS OF THE JURY:  NOW THAT YOU HAVE HEARD ALL OF THE

14   EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU AS TO THE LAW OF THE

15   CASE.

16        EACH OF YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT

17   YOU MAY TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR

18   DELIBERATIONS.

19        YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

20   ANYTHING I MAY SAY OR DO AS INDICATING THAT I HAVE AN OPINION

21   REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

22        IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN

23   THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT

24   TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER

25   YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY
```

1    ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR

2    SYMPATHY.  THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON

3    THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH

4    TO DO SO.

5         IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

6    AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL

7    IMPORTANT.

8         NUMBER 2.  BURDEN OF PROOF -- PREPONDERANCE OF THE

9    EVIDENCE.

10        WHEN A PARTY HAS THE BURDEN OF PROOF ON ANY CLAIM OR

11   DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, IT MEANS YOU MUST

12   BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OR DEFENSE IS MORE

13   PROBABLY TRUE THAN NOT TRUE.

14        YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE,

15   REGARDLESS OF WHICH PARTY PRESENTED IT.

16        NUMBER 3.  WHAT IS EVIDENCE.

17        THE TRIAL IS NOW OVER.  THE EVIDENCE YOU ARE TO CONSIDER

18   IN DECIDING WHAT THE FACTS ARE CONSISTS OF:

19        1.  THE SWORN TESTIMONY OF ANY WITNESS;

20        2.  THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE; AND

21        3.  ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

22        NUMBER 4.  WHAT IS NOT EVIDENCE.

23        IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

24   TESTIMONY AND EXHIBITS THAT WERE RECEIVED INTO EVIDENCE.

25   CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM

```
 1          IN DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

 2              1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE.

 3      THE LAWYERS ARE NOT WITNESSES.  WHAT THEY SAID IN THEIR OPENING

 4      STATEMENTS AND THROUGHOUT THE TRIAL, AND WHAT THEY WILL SAY IN

 5      THEIR CLOSING ARGUMENTS OR AT OTHER TIMES ARE ALL INTENDED TO

 6      HELP YOU INTERPRET THE EVIDENCE.  BUT THESE ARGUMENTS AND

 7      STATEMENTS ARE NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM

 8      DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY

 9      OF THEM CONTROLS.

10              2.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

11      ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

12      BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

13      YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S

14      RULING ON IT.

15              3.  TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN, OR THAT

16      YOU HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND MUST

17      NOT BE CONSIDERED.

18          IN ADDITION, SOMETIMES TESTIMONY AND EXHIBITS ARE RECEIVED

19      ONLY FOR A LIMITED PURPOSE; WHEN I GIVE A LIMITING INSTRUCTION,

20      YOU MUST FOLLOW IT.

21          NUMBER 4.  ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE

22      COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE

23      THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

24          NUMBER 5.  EVIDENCE FOR A LIMITED PURPOSE.

25          SOME EVIDENCE MAY HAVE BEEN ADMITTED FOR A LIMITED PURPOSE
```

1    ONLY.  YOU MUST CONSIDER IT ONLY FOR THAT LIMITED PURPOSE AND

2    FOR NO OTHER.

3         NUMBER 6.  CHARTS AND SLIDES NOT RECEIVED IN EVIDENCE.

4         CERTAIN CHARTS AND SLIDES NOT RECEIVED IN EVIDENCE HAVE

5    BEEN SHOWN TO YOU IN ORDER TO HELP EXPLAIN THE CONTENTS OF

6    BOOKS, RECORDS, DOCUMENTS, OR OTHER EVIDENCE IN THE CASE.  THEY

7    ARE NOT THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.

8         NUMBER 7.  CHARTS AND SUMMARIES IN EVIDENCE.

9         CERTAIN CHARTS AND SUMMARIES HAVE BEEN RECEIVED INTO

10   EVIDENCE TO ILLUSTRATE INFORMATION BROUGHT OUT IN THE TRIAL.

11   YOU MAY USE THOSE CHARTS AND SUMMARIES AS EVIDENCE, EVEN THOUGH

12   THE UNDERLYING DOCUMENTS AND RECORDS ARE NOT HERE.  YOU SHOULD

13   GIVE THEM ONLY SUCH WEIGHT AS YOU THINK THEY DESERVE.

14        NUMBER 8.  DIRECT AND CIRCUMSTANTIAL EVIDENCE.

15        EVIDENCE MAY BY DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

16   IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

17   WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

18   CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

19   WHICH YOU COULD FIND ANOTHER FACT.

20        YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES

21   NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

22   OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

23   WEIGHT TO GIVE TO ANY EVIDENCE.

24        NUMBER 9.  CREDIBILITY OF WITNESSES.

25        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

```
1    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

2    YOU MAY BELIEVE EVERYTHING A WITNESS SAID, OR PART OF IT, OR

3    NONE OF IT.

4         PROOF OF A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER

5    OF WITNESSES WHO TESTIFIED ABOUT IT.

6         IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

7    INTO ACCOUNT:

8         NUMBER 1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO

9    SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

10        NUMBER 2.  THE WITNESS'S MEMORY;

11        NUMBER 3.  THE WITNESS'S MANNER WHILE TESTIFYING;

12        NUMBER 4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE

13   CASE AND ANY BIAS OR PREJUDICE;

14        NUMBER 5.  WHETHER OTHER EVIDENCE CONTRADICTED THE

15   WITNESS'S TESTIMONY;

16        NUMBER 6.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY

17   IN LIGHT OF ALL THE EVIDENCE; AND

18        NUMBER 7.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

19        THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

20   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

21   IT.

22        NUMBER 10.  IMPEACHMENT EVIDENCE -- WITNESS.

23        THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

24   DIFFERENT TESTIMONY ON A PRIOR OCCASION MAY BE CONSIDERED,

25   ALONG WITH ALL OTHER EVIDENCE, IN DECIDING WHETHER OR NOT TO
```

1      BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE TO THE

2      TESTIMONY OF THE WITNESS AND FOR NO OTHER PURPOSE.

3              NUMBER 11.  TAKING NOTES.

4          YOU MAY HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR NOT

5      YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF THE

6      EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

7      NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

8      JURORS.

9              NUMBER 12.  DEPOSITION IN LIEU OF LIVE TESTIMONY.

10         YOU HEARD SOME WITNESSES TESTIFY BY DEPOSITION.  A

11     DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE

12     TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE TRUTH AND

13     LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE QUESTIONS AND

14     ANSWERS ARE RECORDED.

15         YOU SHOULD CONSIDER DEPOSITION TESTIMONY, PRESENTED TO YOU

16     IN COURT IN LIEU OF LIVE TESTIMONY, INSOFAR AS POSSIBLE, IN THE

17     SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

18             NUMBER 13.  USE OF INTERROGATORIES OF A PARTY.

19             EVIDENCE WAS PRESENTED TO YOU IN THE FORM OF ANSWERS OF

20     ONE OF THE PARTIES TO WRITTEN INTERROGATORIES SUBMITTED BY THE

21     OTHER SIDE.  THESE ANSWERS WERE GIVEN IN WRITING AND UNDER OATH

22     BEFORE THE ACTUAL TRIAL, IN RESPONSE TO QUESTIONS THAT WERE

23     SUBMITTED IN WRITING UNDER ESTABLISHED COURT PROCEDURES.

24         YOU SHOULD CONSIDER THE ANSWERS, INSOFAR AS POSSIBLE, IN

25     THE SAME WAY AS IF THEY WERE MADE FROM THE WITNESS STAND.

1        NUMBER 14.  EXPERT OPINION.

2        SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE, WERE

3    PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE OPINIONS.

4        OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY OTHER

5    TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH

6    WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

7    EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

8    AND ALL THE OTHER EVIDENCE IN THE CASE.

9        NUMBER 15.  USE OF DEVICES DURING DELIBERATIONS.

10       DEVICE HANDLING DIRECTIONS.

11       THE PHYSICAL DEVICES YOU RECEIVED ARE EVIDENCE IN THIS

12   TRIAL.  YOU MAY USE THEM IN YOUR DELIBERATIONS, AND MAY CONNECT

13   TO THE INTERNET THROUGH THE WEB BROWSER APPLICATION, BUT YOU

14   MUST NOT ALTER OR MODIFY THE DEVICES IN ANY WAY.

15       SOME OF THE DEVICES HAVE SIM CARDS IN THEIR PACKAGING.

16   THESE SIM CARDS ARE NOT TO BE INSERTED INTO THE PHONES.

17       SOME OF THE DEVICES HAVE A MOBILE DATA CONNECTION, AND YOU

18   WILL NOT NEED TO TAKE ANY ADDITIONAL ACTION TO USE THE WEB

19   BROWSER APPLICATION.

20       OTHERS MUST FIRST BE CONNECTED TO THE COURT'S WI-FI

21   NETWORK TO ACCESS THE INTERNET.

22       ONCE CONNECTED, YOU MUST DECLINE ANY SOFTWARE UPDATE

23   NOTIFICATIONS THAT MAY BE PRESENTED TO YOU.

24       YOU ALSO MUST NOT DOWNLOAD ANY CONTENT, SUCH AS APPS,

25   MUSIC, PHOTOGRAPHS, OR GAMES, TO THE DEVICES.

```
 1              CONNECTING TO THE INTERNET.

 2              TO CONNECT A DEVICE TO THE COURT'S WI-FI NETWORK, SELECT

 3    "USDCSJ01" FROM THE LIST OF AVAILABLE WIRELESS NETWORKS AS

 4    DEPICTED BELOW.

 5              FROM THE APPLICATION MENU, SELECT THE WEB BROWSER

 6    APPLICATION.

 7              FROM THE COURT'S WI-FI LOG IN PAGE, SCROLL TO THE BOTTOM

 8    AND CLICK ON THE BLUE "CONNECT" APOSTROPHE -- I'M SORRY --

 9    EXPLANATION MARK, BUTTON.

10              SOME DEVICES MAY DISPLAY A SYSTEM UPDATE NOTIFICATION LIKE

11    THE ONES BELOW.  AND AS YOU CAN SEE ON PAGE 19, THERE'S VARIOUS

12    SOFTWARE UPDATE, SYSTEM UPDATE, ANDROID SYSTEM UPDATE

13    NOTIFICATIONS THAT YOU CAN RECEIVE.

14              IF YOU SEE SUCH A SCREEN, YOU MUST DECLINE THE REQUEST TO

15    UPDATE THE SYSTEM.  SELECT "INSTALL LATER" OR PRESS THE "HOME"

16    OR "BACK" BUTTON TO EXIT THE NOTIFICATION SCREEN.

17              NUMBER 16.  SUMMARY OF CONTENTIONS.

18              I WILL NOW SUMMARIZE FOR YOU EACH SIDE'S POSITIONS ON THE

19    ISSUES YOU MUST DECIDE.

20              DURING A PRIOR PROCEEDING, A JURY FOUND THAT SAMSUNG'S 13

21    PRODUCTS AT ISSUE IN THIS TRIAL INFRINGED ONE OR MORE OF THE

22    FOLLOWING APPLE PATENTS:  U.S. PATENT NUMBERS 7,469,381;

23    7,844,915; 7,864,163, D618,677; AND D604,305.  THE JURY ALSO

24    FOUND THESE PATENTS VALID.

25              APPLE SEEKS MONEY DAMAGES FOR SAMSUNG'S SALES OF THESE 13
```

1     PRODUCTS.

2          SAMSUNG DISPUTES THE AMOUNT OF DAMAGES APPLE CLAIMS.

3          YOUR SOLE JOB IN THIS TRIAL IS TO DETERMINE THE AMOUNT OF

4     DAMAGES TO BE AWARDED TO APPLE.

5          17.  DUTY TO DELIBERATE.

6          WHEN YOU BEGIN YOUR DELIBERATIONS, YOU SHOULD ELECT ONE

7     MEMBER OF THE JURY AS YOUR PRESIDING JUROR.  THAT PERSON WILL

8     PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

9          YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

10    REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT MUST BE

11    UNANIMOUS.

12         EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT YOU

13    SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL THE EVIDENCE,

14    DISCUSSED IT FULLY WITH THE OTHER JURORS, AND LISTENED TO THE

15    VIEWS OF YOUR FELLOW JURORS.

16         DO NOT HESITATE TO CHANGE YOUR OPINION IF THE DISCUSSION

17    PERSUADES YOU THAT YOU SHOULD.  DO NOT COME TO A DECISION

18    SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

19         IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

20    VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

21    HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

22    HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

23    SIMPLY TO REACH A VERDICT.

24         NUMBER 18.  COMMUNICATION WITH THE COURT.

25         IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

1    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE BAILIFF,

2    SIGNED BY YOUR PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF THE

3    JURY.

4         NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE

5    WITH ME EXCEPT BY A SIGNED WRITING; I WILL COMMUNICATE WITH ANY

6    MEMBER OF THE JURY ON ANYTHING CONCERNING THE CASE ONLY IN

7    WRITING, OR HERE IN OPEN COURT.

8         IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

9    PARTIES BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

10   CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

11   QUESTION.

12        REMEMBER THAT YOU ARE NOT TO TELL ANYONE -- INCLUDING

13   ME -- HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, UNTIL

14   AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN

15   DISCHARGED.

16        DO NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE TO THE COURT.

17        NUMBER 19.  RETURN OF VERDICT.

18        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

19   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR PRESIDING JUROR

20   WILL FILL IN THE FORM THAT HAS BEEN GIVEN TO YOU, SIGN AND DATE

21   IT, AND ADVISE THE COURT THAT YOU ARE READY TO RETURN TO THE

22   COURTROOM.

23        INSTRUCTION NUMBER 20.  UTILITY PATENTS -- INTERPRETATION

24   OF CLAIMS.

25        A PATENT'S CLAIMS DEFINE WHAT IS COVERED BY THE PATENT.

1    UTILITY PATENT CLAIMS ARE NUMBERED SENTENCES AT THE END OF THE

2    PATENT THAT DESCRIBE THE BOUNDARIES OF THE PATENT'S PROTECTION.

3           IT IS MY JOB AS JUDGE TO EXPLAIN TO YOU THE MEANING OF ANY

4    LANGUAGE IN THE CLAIMS THAT NEEDS INTERPRETATION.

5           I HAVE INTERPRETED THE MEANING OF SOME OF THE LANGUAGE IN

6    THE UTILITY PATENT CLAIMS INVOLVED IN THIS CASE.  YOU MUST

7    ACCEPT THOSE INTERPRETATIONS AS CORRECT.  FOR CLAIM LANGUAGE

8    WHERE I HAVE NOT PROVIDED YOU WITH ANY MEANING, YOU SHOULD

9    APPLY THE CLAIM LANGUAGE'S PLAIN AND ORDINARY MEANING.

10          U.S. PATENT NUMBER 7,469,381, CLAIM 19.

11          THE DETERMINE "DISPLAYING" MEANS "SHOWING OR REVEALING TO

12   THE VIEWER."

13          THE TERM "ELECTRONIC DOCUMENT" MEANS "A DOCUMENT STORED IN

14   A DIGITAL FORMAT."  AN "ELECTRONIC DOCUMENT" INCLUDES, BUT IS

15   NOT LIMITED TO, A WEB PAGE; A DIGITAL IMAGE; A WORD PROCESSING,

16   SPREADSHEET OR PRESENTATION DOCUMENT; OR A LIST OF ITEMS IN A

17   DIGITAL FORMAT.  AN ELECTRONIC DOCUMENT NEED NOT BE STORED IN A

18   SINGLE FILE.

19          THE TERM "FIRST DIRECTION" DOES NOT REQUIRE A STRICTLY

20   LINEAR FINGER MOVEMENT.

21          THE TERM "EDGE OF THE ELECTRONIC DOCUMENT" HAS ITS PLAIN

22   AND ORDINARY MEANING.  AN EDGE OF AN ELECTRONIC DOCUMENT IS NOT

23   LIMITED TO AN EXTERNAL EDGE AND MAY BE INTERNAL.

24          U.S. PATENT NUMBER 7,844,915, CLAIM 8.

25          THE TERM "INVOKES" MEANS "CAUSES" OR "CAUSES A PROCEDURE

```
 1    TO BE CARRIED OUT."

 2         U.S. PATENT NUMBER 7,864,163, CLAIM 50.

 3         THE COURT HAS NOT INTERPRETED ANY TERMS FROM THIS PATENT.

 4         NUMBER 21.  UTILITY PATENT DAMAGES -- BURDEN OF PROOF.

 5         I WILL INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES FOR

 6    UTILITY PATENT INFRINGEMENT.

 7         YOU MUST DETERMINE THE AMOUNT OF MONEY DAMAGES TO AWARD TO

 8    APPLE FOR SAMSUNG'S INFRINGEMENT.  THE AMOUNT OF THOSE DAMAGES

 9    MUST BE ADEQUATE TO COMPENSATE APPLE FOR THE INFRINGEMENT.  A

10    DAMAGES AWARD SHOULD PUT APPLE IN APPROXIMATELY THE FINANCIAL

11    POSITION IT WOULD HAVE BEEN IN HAD THE INFRINGEMENT NOT

12    OCCURRED.  BUT IN NO EVENT MAY THE DAMAGES AWARD BE LESS THAN A

13    REASONABLE ROYALTY.

14         YOU SHOULD KEEP IN MIND THAT THE DAMAGES YOU AWARD ARE

15    MEANT TO COMPENSATE APPLE AND NOT TO PUNISH SAMSUNG.

16         APPLE HAS THE BURDEN TO PERSUADE YOU OF THE AMOUNT OF ITS

17    DAMAGES.  YOU SHOULD AWARD ONLY THOSE DAMAGES THAT APPLE PROVES

18    IT SUFFERED BY A PREPONDERANCE OF THE EVIDENCE.  WHILE APPLE IS

19    NOT REQUIRED TO PROVE ITS DAMAGES WITH MATHEMATICAL PRECISION,

20    IT MUST PROVE THEM WITH REASONABLE CERTAINTY.

21         APPLE IS NOT ENTITLED TO DAMAGES THAT ARE REMOTE OR

22    SPECULATIVE.

23         NUMBER 22.  UTILITY PATENT DAMAGES -- LOST PROFITS --

24    GENERALLY.

25         IN THIS CASE, APPLE SEEKS TO RECOVER LOST PROFITS FOR THE
```

```
1        '915 PATENT FOR SOME OF SAMSUNG'S SALES OF INFRINGING PRODUCTS,

2        AND A REASONABLE ROYALTY ON THE REST OF SAMSUNG'S INFRINGING

3        SALES.

4             TO RECOVER LOST PROFITS FOR INFRINGING SALES, APPLE MUST

5        SHOW THAT BUT FOR THE INFRINGEMENT, THERE IS A REASONABLE

6        PROBABILITY THAT APPLE WOULD HAVE MADE SALES THAT SAMSUNG MADE

7        OF THE INFRINGING PRODUCTS.

8             APPLE MUST SHOW THE SHARE OF SAMSUNG'S SALES THAT APPLE

9        WOULD HAVE MADE IF THE INFRINGING PRODUCTS HAD NOT BEEN ON THE

10       MARKET.

11            YOU MUST ALLOCATE THE LOST PROFITS BASED UPON THE CUSTOMER

12       DEMAND FOR THE PATENTED FEATURE OF THE INFRINGING PRODUCTS.

13       THAT IS, YOU MUST DETERMINE WHICH PROFITS DERIVE FROM THE

14       PATENTED INVENTION THAT SAMSUNG SELLS, AND NOT FROM OTHER

15       FEATURES OF THE INFRINGING PRODUCTS.

16            NUMBER 23.  UTILITY PATENT DAMAGES -- LOST PROFITS --

17       FACTORS TO CONSIDER.

18            APPLE IS ENTITLED TO LOST PROFITS FOR THE '915 PATENT IF

19       APPLE PROVES ALL OF THE FOLLOWING:

20            NUMBER 1.  THAT THERE WAS DEMAND FOR THE PATENTED

21       PRODUCTS;

22            NUMBER 2.  THAT THERE WERE NO ACCEPTABLE NON-INFRINGING

23       SUBSTITUTES FOR EACH OF THE INFRINGING PRODUCTS, OR, IF THERE

24       WERE, THE NUMBER OF THE SALES OF EACH PRODUCT MADE BY SAMSUNG

25       THAT APPLE WOULD HAVE MADE DESPITE THE AVAILABILITY OF OTHER
```

1    NON-INFRINGING SUBSTITUTES.

2         THE TIME PERIOD RELEVANT TO DETERMINING AVAILABILITY OF A

3    NON-INFRINGING SUBSTITUTE IS THE ENTIRE PERIOD DURING WHICH

4    SAMSUNG INFRINGED APPLE'S PATENTS.

5         AN ALTERNATIVE MAY BE CONSIDERED AVAILABLE AS A POTENTIAL

6    SUBSTITUTE EVEN IF IT WAS NOT ACTUALLY ON SALE DURING THE

7    INFRINGEMENT PERIOD.

8         FACTORS SUGGESTING THAT THE ALTERNATIVE WAS ACCEPTABLE AND

9    AVAILABLE INCLUDE, BUT ARE NOT LIMITED TO, WHETHER THE

10   MATERIAL, EXPERIENCE, AND KNOW-HOW FOR THE ALLEGED SUBSTITUTE

11   WERE READILY AVAILABLE.

12        FACTORS SUGGESTING THAT THE ALTERNATIVE WAS NOT ACCEPTABLE

13   AND AVAILABLE INCLUDE, BUT ARE NOT LIMITED TO, WHETHER THE

14   MATERIAL WAS OF SUCH HIGH COST AS TO RENDER THE ALTERNATIVE

15   UNAVAILABLE AND WHETHER SAMSUNG HAD TO DESIGN OR INVENT AROUND

16   THE PATENTED TECHNOLOGY (OR OTHER PATENTED TECHNOLOGY) TO

17   DEVELOP AN ALLEGED SUBSTITUTE;

18        3.  THAT APPLE HAD THE MANUFACTURING AND MARKETING

19   CAPACITY TO MAKE ANY INFRINGING SALES ACTUALLY MADE BY SAMSUNG

20   AND FOR WHICH APPLE SEEKS AN AWARD OF LOST PROFITS; AND

21        NUMBER 4.  THE AMOUNT OF PROFIT THAT APPLE WOULD HAVE MADE

22   IF SAMSUNG HAD NOT INFRINGED.

23        NUMBER 24.  '915 PATENT DAMAGES -- LOST PROFITS -- AMOUNT

24   OF PROFIT.

25        APPLE MAY CALCULATE ITS LOST PROFITS ON ANY LOST SALES BY

1    COMPUTING THE LOST REVENUE FOR SALES IT CLAIMS IT WOULD HAVE

2    MADE BUT FOR THE INFRINGEMENT AND SUBTRACTING FROM THAT FIGURE

3    THE AMOUNT OF ADDITIONAL COSTS OR EXPENSES IT WOULD HAVE

4    INCURRED IN MAKING THOSE LOST SALES, SUCH AS COST OF GOODS,

5    SALES COSTS, PACKAGING COSTS, AND SHIPPING COSTS.

6         NUMBER 25.  '915 PATENT DAMAGES -- LOST PROFITS -- MARKET

7    SHARE.

8         ONE WAY APPLE MAY PROVE THE NUMBER OF SALES IT WOULD HAVE

9    MADE IF THE INFRINGEMENT HAD NOT HAPPENED IS TO PROVE ITS SHARE

10   OF THE RELEVANT MARKET EXCLUDING INFRINGING PRODUCTS.

11        YOU MAY AWARD APPLE A SHARE OF PROFITS EQUAL TO THAT

12   MARKET SHARE.

13        IN DECIDING APPLE'S MARKET SHARE, YOU MUST DECIDE WHICH

14   PRODUCTS ARE IN APPLE'S MARKET.  PRODUCTS ARE IN THE SAME

15   MARKET IF THEY ARE SUFFICIENTLY SIMILAR TO COMPETE AGAINST EACH

16   OTHER.  TWO PRODUCTS ARE SUFFICIENTLY SIMILAR IF ONE DOES NOT

17   HAVE A SIGNIFICANTLY HIGHER PRICE THAN OR POSSESS

18   CHARACTERISTICS SIGNIFICANTLY DIFFERENT THAN THE OTHER.

19        NUMBER 26.  UTILITY PATENT DAMAGES -- REASONABLE

20   ROYALTY -- ENTITLEMENT.

21        APPLE ALSO SEEKS A REASONABLE ROYALTY FOR THE INFRINGEMENT

22   OF ITS UTILITY PATENTS.  APPLE SHOULD BE AWARDED A REASONABLE

23   ROYALTY FOR ALL INFRINGING SAMSUNG SALES FOR WHICH APPLE HAS

24   NOT PROVED OR IS NOT SEEKING LOST PROFITS DAMAGES.

25        UTILITY PATENT DAMAGES -- REASONABLE ROYALTY --

1      DEFINITION.

2          A ROYALTY IS A PAYMENT MADE TO A PATENT HOLDER IN EXCHANGE

3      FOR THE RIGHT TO MAKE, USE, OR SELL THE CLAIMED INVENTION.

4      THIS RIGHT IS CALLED A "LICENSE."

5          A REASONABLE ROYALTY IS THE PAYMENT FOR THE LICENSE THAT

6      WOULD HAVE RESULTED FROM A HYPOTHETICAL NEGOTIATION BETWEEN THE

7      PATENT HOLDER AND THE INFRINGER TAKING PLACE AT THE TIME WHEN

8      THE INFRINGING ACTIVITY FIRST BEGAN.

9          IN CONSIDERING THE NATURE OF THIS NEGOTIATION, YOU MUST

10     ASSUME THAT THE PATENT HOLDER AND THE INFRINGER WOULD HAVE

11     ACTED REASONABLY AND WOULD HAVE ENTERED INTO A LICENSE

12     AGREEMENT.

13         YOU MUST ALSO ASSUME THAT BOTH PARTIES BELIEVED THE PATENT

14     WAS VALID AND INFRINGED.

15         YOUR ROLE IS TO DETERMINE WHAT THE RESULT OF THAT

16     NEGOTIATION WOULD HAVE BEEN.  THE TEST FOR DAMAGES IS WHAT

17     ROYALTY WOULD HAVE RESULTED FROM THE HYPOTHETICAL NEGOTIATION

18     AND NOT SIMPLY WHAT EITHER PARTY WOULD HAVE PREFERRED.

19         A ROYALTY CAN BE CALCULATED IN SEVERAL DIFFERENT WAYS AND

20     IT IS FOR YOU TO DETERMINE WHICH WAY IS THE MOST APPROPRIATE

21     BASED ON THE EVIDENCE YOU HAVE HEARD.

22         ONE WAY TO CALCULATE A ROYALTY IS TO DETERMINE WHAT IS

23     CALLED AN "ONGOING ROYALTY."  TO CALCULATE AN ONGOING ROYALTY,

24     YOU MUST FIRST DETERMINE THE "BASE," THAT IS, THE PRODUCT ON

25     WHICH THE INFRINGER IS TO PAY.  YOU THEN NEED TO MULTIPLY THE

1    REVENUE THE DEFENDANT OBTAINED FROM THAT BASE BY THE "RATE," OR

2    PERCENTAGE THAT YOU FIND WOULD HAVE RESULTED FROM THE

3    HYPOTHETICAL NEGOTIATION.

4        FOR EXAMPLE, IF THE PATENT COVERS A NAIL AND THE NAIL

5    SELLS FOR $1, AND THE LICENSEE SOLD 200 NAILS, THE BASE REVENUE

6    WOULD BE $200.

7        IF THE RATE YOU FIND WOULD HAVE RESULTED FROM THE

8    HYPOTHETICAL NEGOTIATION IS 1 PERCENT, THEN THE ROYALTY WOULD

9    BE $2, OR THE RATE OF .01 TIMES THE BASE REVENUE OF $200.

10       IF THE PATENT COVERS ONLY PART OF THE PRODUCT THAT THE

11   INFRINGER SELLS, THEN THE BASE WOULD NORMALLY BE ONLY THAT

12   FEATURE OR COMPONENT.

13       FOR EXAMPLE, IF YOU FIND THAT FOR A $100 CAR, THE PATENTED

14   FEATURE IS THE TIRES WHICH SELL FOR $5, THE BASE REVENUE WOULD

15   BE $5.

16       HOWEVER, IN A CIRCUMSTANCE IN WHICH THE PATENTED FEATURE

17   IS THE REASON THE CUSTOMERS BUY THE WHOLE PRODUCT, THE BASE

18   REVENUE COULD BE THE VALUE OF THE WHOLE PRODUCT.

19       A SECOND WAY TO CALCULATE A ROYALTY IS TO DETERMINE A

20   ONE-TIME LUMP SUM PAYMENT THAT THE INFRINGER WOULD HAVE PAID AT

21   THE TIME OF THE HYPOTHETICAL NEGOTIATION FOR A LICENSE COVERING

22   ALL SALES OF THE LICENSED PRODUCT, BOTH PAST AND FUTURE.

23       THIS DIFFERS FROM PAYMENT OF AN ONGOING ROYALTY BECAUSE,

24   WITH AN ONGOING ROYALTY, THE LICENSEE PAYS BASED ON THE REVENUE

25   OF ACTUAL LICENSED PRODUCTS IT SELLS.

1          WHEN A ONE-TIME LUMP SUM IS PAID, THE INFRINGER PAYS A

2     SINGLE PRICE FOR A LICENSE COVERING BOTH PAST AND FUTURE

3     INFRINGING SALES.

4          IN DETERMINING A REASONABLE ROYALTY, YOU MAY CONSIDER THE

5     FOLLOWING FACTORS:

6          1.  THE ROYALTIES RECEIVED BY THE PATENTEE FOR THE

7     LICENSING OF THE PATENT-IN-SUIT, PROVING OR TENDING TO PROVE AN

8     ESTABLISHED ROYALTY.

9          2.  THE RATES PAID BY THE LICENSEE FOR THE USE OF OR

10    PATENTS COMPARABLE TO THE PATENT-IN-SUIT.

11         3.  THE NATURE AND SCOPE OF THE LICENSE, AS EXCLUSIVE OR

12    NONEXCLUSIVE OR AS RESTRICTED OR NON-RESTRICTED IN TERMS OF

13    TERRITORY, OR WITH RESPECT TO WHOM THE MANUFACTURED PRODUCT MAY

14    BE SOLD.

15         4.  THE LICENSOR'S ESTABLISHED POLICY AND MARKETING

16    PROGRAM TO MAINTAIN HIS OR HER PATENT MONOPOLY BY NOT LICENSING

17    OTHERS TO USE THE INVENTION OR BY GRANTING LICENSES UNDER

18    SPECIAL CONDITIONS DESIGNED TO PRESERVE THAT MONOPOLY.

19         5.  THE COMMERCIAL RELATIONSHIP BETWEEN THE LICENSOR AND

20    LICENSEE, SUCH AS WHETHER THEY ARE COMPETITORS IN THE SAME

21    TERRITORY IN THE SAME LINE OF BUSINESS, OR WHETHER THEY ARE

22    INVENTOR AND PROMOTER.

23         6.  THE EFFECT OF SELLING THE PATENTED SPECIALTY IN

24    PROMOTING SALES OF OTHER PRODUCTS OF THE LICENSEE, THE EXISTING

25    VALUE OF THE INVENTION TO THE LICENSOR AS A GENERATOR OF SALES

1    OF HIS NON-PATENTED ITEMS, AND THE EXTENT OF SUCH DERIVATIVE OR

2    CONVOYED SALES.

3         7.  THE DURATION OF THE PATENT AND THE TERM OF THE

4    LICENSE.

5         8.  THE ESTABLISHED PROFITABILITY OF THE PRODUCT MADE

6    UNDER THE PATENTS, ITS COMMERCIAL SUCCESS, AND ITS CURRENT

7    POPULARITY.

8         9.  THE UTILITY AND ADVANTAGES OF THE PATENTED PROPERTY

9    OVER THE OLD MODES OR DEVICES, IF ANY, THAT HAD BEEN USED FOR

10   WORKING OUT SIMILAR RESULTS.

11        10.  THE NATURE OF THE PATENTED INVENTION, THE CHARACTER

12   OF THE COMMERCIAL EMBODIMENT OF IT AS OWNED AND PRODUCED BY THE

13   LICENSOR, AND THE BENEFITS TO THOSE WHO HAVE USED THE

14   INVENTION.

15        11.  THE EXTENT -- PARDON ME -- THE EXTENT TO WHICH THE

16   INFRINGER HAS MADE USE OF THE INVENTION AND ANY EVIDENCE

17   PROBATIVE OF THE VALUE OF THAT USE.

18        12.  THE PORTION OF THE PROFIT OR OF THE SELLING PRICE

19   THAT MAY BE CUSTOMARY IN THE PARTICULAR BUSINESS OR IN

20   COMPARABLE BUSINESS TO ALLOW FOR THE USE OF THE INVENTION OR

21   ANALOGOUS INVENTIONS.

22        13.  THE PORTION OF THE REALIZABLE PROFITS THAT SHOULD BE

23   CREDITED TO THE INVENTION AS DISTINGUISHED FROM THE

24   NON-PATENTED ELEMENTS, THE MANUFACTURING PROCESS, BUSINESS

25   RISKS, OR SIGNIFICANT FEATURES OR IMPROVEMENTS ADDED BY THE

```
 1        INFRINGER.

 2             14.  THE OPINION AND TESTIMONY OF QUALIFIED EXPERTS.

 3             15.  THE AMOUNT THAT A LICENSOR (SUCH AS THE PATENTEE )

 4        AND A LICENSEE (SUCH AS THE INFRINGER) WOULD HAVE AGREED UPON

 5        AT THE TIME THE INFRINGEMENT BEGAN IF BOTH HAD BEEN REASONABLY

 6        AND VOLUNTARILY TRYING TO REACH AN AGREEMENT; THAT IS, THE

 7        AMOUNT WHICH A PRUDENT LICENSEE -- WHO DESIRED, AS A BUSINESS

 8        PROPOSITION, TO OBTAIN A LICENSE TO MANUFACTURE AND SELL A

 9        PARTICULAR ARTICLE EMBODYING THE PATENTED INVENTION -- WOULD

10        HAVE BEEN WILLING TO PAY AS A ROYALTY AND YET BE ABLE TO MAKE A

11        REASONABLE PROFIT AND WHICH AMOUNT WOULD HAVE BEEN ACCEPTABLE

12        BY A PRUDENT PATENTEE WHO WAS WILLING TO GRANT A LICENSE.

13             IT IS UP TO YOU, BASED ON THE EVIDENCE, TO DECIDE WHAT

14        TYPE OF ROYALTY IS APPROPRIATE IN THIS CASE.

15             NUMBER 28.  UTILITY PATENT DAMAGES -- DATE OF

16        COMMENCEMENT.

17             DAMAGES THAT APPLE MAY BE AWARDED BY YOU COMMENCE ON THE

18        DATE THAT SAMSUNG HAS BOTH INFRINGED AND BEEN NOTIFIED OF THE

19        PATENT OR PATENTS SAMSUNG INFRINGED.

20             YOU MAY NOT AWARD APPLE DAMAGES FOR INFRINGING A PATENT

21        BEFORE SAMSUNG HAD NOTICE OF APPLE'S CLAIM OF INFRINGEMENT OF

22        THAT PATENT.

23             I HAVE DETERMINED THAT SAMSUNG RECEIVED NOTICE OF APPLE'S

24        CLAIM OF INFRINGEMENT FOR THE '381 PATENT ON AUGUST 4, 2010;

25        FOR THE '915 PATENT ON APRIL 15, 2011; AND FOR THE '163 PATENT
```

1        ON JUNE 16, 2011.

2            INSTRUCTION 29.  DESIGN PATENTS -- INTERPRETATION OF

3    PATENT CLAIMS.

4            DESIGN PATENTS PROTECT THE ORNAMENTAL APPEARANCE,

5    INCLUDING SHAPE OR CONFIGURATION, OF AN ARTICLE OF MANUFACTURE.

6    DESIGN PATENTS DO NOT PROTECT THE FUNDAMENTAL ASPECTS OF HOW

7    THE ARTICLE CLAIMED IN THE PATENT WORKS.

8            UNLIKE UTILITY PATENTS, A DESIGN PATENT CAN ONLY HAVE ONE

9    CLAIM.  THAT CLAIM COVERS ALL THE FIGURES IN THE PATENT.  IT IS

10   PERMISSIBLE TO ILLUSTRATE MORE THAN ONE EMBODIMENT OF A DESIGN

11   IN A SINGLE DESIGN PATENT APPLICATION.  EACH DESIGN PATENT

12   CONTAINS MULTIPLE DRAWINGS TO ILLUSTRATE THE CLAIMED DESIGN.

13           THE SCOPE OF THE CLAIM ENCOMPASSES THE DESIGN'S VISUAL

14   APPEARANCE AS A WHOLE.  IT DOES NOT COVER A GENERAL DESIGN

15   CONCEPT AND IS NOT LIMITED TO ISOLATED FEATURES OF THE

16   DRAWINGS.

17           ALL MATTER DEPICTED IN SOLID LINES CONTRIBUTES TO THE

18   OVERALL APPEARANCE OF THE DESIGN.

19           IT IS MY JOB AS A JUDGE TO INTERPRET FOR YOU WHAT IS

20   CLAIMED BY THE PATENTS.  YOU MUST ACCEPT MY INTERPRETATIONS AS

21   CORRECT.

22           WHEN CONSIDERING THE DESIGN PATENTS, YOU SHOULD VIEW

23   CERTAIN FEATURES IN THE DRAWINGS IN THIS WAY:

24           D618,677 PATENT.

25           THE D'677 PATENT CLAIMS THE ORNAMENTAL DESIGN OF AN

```
1    ELECTRONIC DEVICE AS SHOWN IN FIGURES 1 THROUGH 8.  THE BROKEN

2    LINES IN THE D'677 PATENT CONSTITUTE UNCLAIMED SUBJECT MATTER.

3    THE USE OF SOLID BLACK SURFACE SHADING ON THE D'677 PATENT

4    REPRESENTED THE COLOR BLACK.  THE USE OF OBLIQUE LINE SHADING

5    ON THE D'677 PATENT IS USED TO SHOW A TRANSPARENT, TRANSLUCENT,

6    OR HIGHLY POLISHED OR REFLECTIVE SURFACE.

7         D604,305 PATENT.

8         THE D'305 PATENT CLAIMS THE ORNAMENTAL DESIGN FOR A

9    GRAPHICAL USER INTERFACE FOR A DISPLAY SCREEN OR PORTION

10   THEREOF, AS SHOWN IN FIGURES 1 THROUGH 2.  THE BROKEN LINE

11   SHOWING OF A DISPLAY SCREEN IN BOTH VIEWS FORMS NO PART OF THE

12   CLAIMED DESIGN.

13             MR. LEE:  YOUR HONOR?

14             THE COURT:  YES.

15             MR. LEE:  IN THE SECOND SENTENCE, THE INSTRUCTION

16   READS "THE FUNCTIONAL ASPECTS."  YOUR HONOR SAID "FUNDAMENTAL,"

17   SO I THOUGHT IT WAS JUST IMPORTANT TO GET THAT RIGHT.

18             THE COURT:  I'M SORRY.  WHICH LINE IS THAT?

19             MR. LEE:  SECOND SENTENCE.

20             THE COURT:  OH, THE FUNCTIONAL.  I APOLOGIZE.  THAT

21   SENTENCE SHOULD READ, "DESIGN PATENTS DO NOT PROTECT THE

22   FUNCTIONAL ASPECTS OF HOW THE ARTICLE CLAIMED IN THE PATENT

23   WORKS."  EXCUSE ME.  MY MISTAKE.

24        LET'S GO TO NUMBER 30.  DESIGN PATENT DAMAGES -- BURDEN OF

25   PROOF.
```

1          I WILL INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES FOR

2     INFRINGEMENT OF APPLE'S DESIGN PATENTS.

3          YOU MUST DETERMINE THE AMOUNT OF DAMAGES TO AWARD TO APPLE

4     FOR SAMSUNG'S INFRINGEMENT.  THE AMOUNT OF THOSE DAMAGES MUST

5     BE ADEQUATE TO COMPENSATE APPLE FOR THE INFRINGEMENT.  YOU

6     SHOULD KEEP IN MIND THAT THE DAMAGES YOU AWARD ARE MEANT TO

7     COMPENSATE APPLE AND NOT TO PUNISH SAMSUNG.

8          IN RELATION TO DESIGN PATENTS, APPLE CAN ELECT TO PROVE

9     EITHER ACTUAL DAMAGES, KNOWN AS COMPENSATORY DAMAGES, OR IT MAY

10    ELECT TO PROVE SAMSUNG'S PROFITS AS ITS MEASURE OF POTENTIAL

11    RECOVERY WITH RESPECT TO THE SALE OF EACH UNIT OF AN INFRINGING

12    PRODUCT.

13         AS COMPENSATORY DAMAGES, APPLE MAY PROVE A REASONABLE

14    ROYALTY FOR THE DESIGN PATENT.  APPLE IS NOT ENTITLED TO

15    RECOVER BOTH COMPENSATORY DAMAGES AND SAMSUNG'S PROFITS ON THE

16    SAME SALE.

17         APPLE HAS THE BURDEN TO PROVE THAT APPLE'S CALCULATION OF

18    DAMAGES IS CORRECT BY A PREPONDERANCE OF THE EVIDENCE.  WHILE

19    APPLE IS NOT REQUIRED TO PROVE ITS DAMAGES WITH MATHEMATICAL

20    PRECISION, IT MUST PROVE THEM WITH REASONABLE CERTAINTY.

21         APPLE IS NOT ENTITLED TO DAMAGES THAT ARE REMOTE OR

22    SPECULATIVE.

23         NUMBER 31.  DESIGN PATENT DAMAGES -- DEFENDANT'S PROFITS.

24         IN THIS CASE, APPLE SEEKS SAMSUNG'S PROFITS FOR SALES OF

25    PRODUCTS THAT INFRINGE APPLE'S DESIGN PATENTS.  YOU MAY AWARD

1    TO APPLE SAMSUNG'S TOTAL PROFIT ATTRIBUTABLE TO THE INFRINGING

2    PRODUCTS.

3         SAMSUNG'S "TOTAL PROFIT" MEANS THE ENTIRE PROFIT ON THE

4    SALE OF THE ARTICLE TO WHICH THE PATENTED DESIGN IS APPLIED,

5    AND NOT JUST THE PORTION OF PROFIT ATTRIBUTABLE TO THE DESIGN

6    OR ORNAMENTAL ASPECTS COVERED BY THE PATENT.  "TOTAL PROFIT"

7    DOES NOT INCLUDE PROFIT ATTRIBUTABLE TO OTHER PRODUCTS THAT MAY

8    BE SOLD IN ASSOCIATION WITH AN INFRINGING ARTICLE EMBODYING THE

9    PATENTED DESIGN.

10        APPLE IS ENTITLED TO ALL PROFIT EARNED BY SAMSUNG ON SALES

11   OF ARTICLES THAT INFRINGE APPLE'S DESIGN PATENTS.  PROFIT IS

12   DETERMINED BY DEDUCTING CERTAIN EXPENSES FROM GROSS REVENUE.

13   GROSS REVENUE IS ALL OF THE INFRINGER'S RECEIPTS FROM THE SALE

14   OF ARTICLES USING ANY DESIGN FOUND INFRINGED.

15        APPLE HAS THE BURDEN OF PROVING SAMSUNG'S GROSS REVENUE BY

16   A PREPONDERANCE OF THE EVIDENCE.

17        EXPENSES CAN INCLUDE COSTS INCURRED IN PRODUCING THE GROSS

18   REVENUE, SUCH AS THE COST OF THE GOODS.  OTHER COSTS MAY BE

19   INCLUDED AS DEDUCTIBLE EXPENSES IF THEY ARE DIRECTLY

20   ATTRIBUTABLE TO THE SALE OR MANUFACTURE OF THE INFRINGING

21   PRODUCTS RESULTING IN A NEXUS BETWEEN THE INFRINGING PRODUCTS

22   AND THE EXPENSE.

23        SAMSUNG HAS THE BURDEN OF PROVING THE DEDUCTIBLE EXPENSES.

24        NUMBER 32.  DESIGN PATENT DAMAGES -- REASONABLE ROYALTY.

25        IF APPLE HAS NOT PROVED ITS CLAIM TO SAMSUNG'S PROFITS,

1        THEN APPLE SHOULD BE AWARDED A REASONABLE ROYALTY FOR ALL

2        INFRINGING SALES BY SAMSUNG.  IN NO EVENT SHOULD THE DAMAGES

3        YOU AWARD APPLE FOR DESIGN PATENT INFRINGEMENT BE LESS THAN A

4        REASONABLE ROYALTY.

5             THE DEFINITION OF A REASONABLE ROYALTY FOR DESIGN PATENT

6        INFRINGEMENT IS THE SAME AS THE DEFINITION I EXPLAINED TO YOU

7        IN JURY INSTRUCTION NUMBER 27.

8             HOWEVER, WHEREVER IN THAT INSTRUCTION I REFERRED TO THE

9        PATENTED INVENTION OR A UTILITY PATENT, YOU SHOULD NOW FOCUS ON

10       THE DESIGN PATENTS OR PATENTED DESIGNS.

11            NUMBER 33.  DESIGN PATENT DAMAGES -- DATE OF COMMENCEMENT.

12            DAMAGES THAT YOU MUST AWARD APPLE COMMENCE ON THE DATE

13       THAT SAMSUNG HAS BOTH INFRINGED AND BEEN NOTIFIED OF THE DESIGN

14       PATENT OR PATENTS SAMSUNG INFRINGED.

15            YOU MAY NOT AWARD APPLE DAMAGES FOR INFRINGING A PATENT

16       BEFORE SAMSUNG HAD NOTICE OF APPLE'S CLAIM OF INFRINGEMENT OF

17       THAT PATENT.

18            I HAVE DETERMINED THAT SAMSUNG RECEIVED NOTICE OF APPLE'S

19       CLAIM OF INFRINGEMENT FOR THE D'677 PATENT ON APRIL 15, 2011;

20       AND FOR THE D'305 PATENT ON JUNE 16, 2011.

21            NUMBER 34.  MONETARY REMEDIES -- ONLY ONE RECOVERY PER

22       ACCUSED SALE.

23            YOU SHOULD AWARD ANY REMEDY TO WHICH APPLE HAS PROVEN IT

24       IS ENTITLED WITH RESPECT TO EACH SALE OF AN INFRINGING

25       SMARTPHONE OR TABLET, EXCEPT THAT YOU SHOULD NOT AWARD APPLE

1       TWICE FOR THE SAME SALE OF ANY INFRINGING SMARTPHONE OR TABLET.

2            THIS MEANS THAT IF YOU AWARD INFRINGER'S PROFITS UNDER

3       DESIGN PATENT INFRINGEMENT FOR THE SALE OF A CERTAIN NUMBER OF

4       INFRINGING SMARTPHONES, YOU MAY NOT ALSO AWARD LOST PROFITS FOR

5       THE '915 PATENT OR REASONABLE ROYALTIES FOR THOSE SAME SALES.

6            IF YOU AWARD LOST PROFITS FOR THE '915 PATENT OR

7       REASONABLE ROYALTIES FOR THE SALE OF A CERTAIN NUMBER OF

8       INFRINGING SMARTPHONES OR TABLETS, YOU MAY NOT AWARD

9       INFRINGER'S PROFITS AS TO THOSE SMARTPHONES OR TABLETS.

10           YOU DO NOT HAVE TO USE THE SAME THEORY TO CALCULATE

11      DAMAGES FOR EVERY SALE, HOWEVER.  FOR EXAMPLE, AN AWARD MAY BE

12      SPLIT BETWEEN LOST PROFITS FOR SOME SALES AND A REASONABLE

13      ROYALTY FOR THE REMAINDER OF SALES OF A PRODUCT THAT INFRINGES

14      THE '915 PATENT.

15           FOR ANY SALE WHERE YOU MEASURE DAMAGES BY A REASONABLE

16      ROYALTY, YOU MAY INCLUDE REASONABLE -- I'M SORRY -- YOU MAY

17      INCLUDE ROYALTY AMOUNTS FOR EACH PATENT INFRINGED BY THE SALE.

18           IF A SALE IS AWARDED ONE FORM OF MONETARY RECOVERY, THAT

19      SAME SALE CANNOT BE AWARDED ANOTHER FORM OF MONETARY RECOVERY.

20           NUMBER 35.  EVIDENCE SEALED FROM THE PUBLIC.

21           SOME EVIDENCE MAY BE SEALED FROM THE PUBLIC BECAUSE IT

22      CONTAINS HIGHLY CONFIDENTIAL BUSINESS INFORMATION OF THE

23      PARTIES.  YOU MUST NOT DRAW ANY INFERENCES ABOUT THE NATURE OF

24      THE EVIDENCE OR GIVE ANY GREATER OR LESSER WEIGHT TO THE

25      EVIDENCE BASED ON WHETHER IT WAS SEALED.

```
 1          THOSE ARE THE FINAL JURY INSTRUCTIONS.  I'M NOW GOING TO

 2    EXCUSE YOU EARLY FOR THE DAY.  THE TIME IS NOW 3:21.  AND I'LL

 3    GIVE YOU THE SAME ADMONITIONS OF PLEASE KEEP AN OPEN MIND AND

 4    PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  PLEASE KEEP YOUR

 5    BINDERS IN THE JURY ROOM.

 6          WE'LL SEE YOU TOMORROW MORNING AT 9:00 O'CLOCK FOR CLOSING

 7    ARGUMENTS.  EACH SIDE HAS BEEN GIVEN 1.5 HOURS FOR CLOSING, SO

 8    YOU WILL DEFINITELY START DELIBERATING AROUND LUNCH TIME.

 9    OKAY?

10          THANK YOU VERY MUCH FOR YOUR PATIENCE AND YOUR SERVICE.

11          (JURY OUT AT 3:22 P.M.)

12           THE COURT:  ALL RIGHT.  ALL THE JURORS HAVE LEFT THE

13     COURTROOM.

14          PLEASE TAKE A SEAT.

15          LET'S GO AHEAD AND CONTINUE WITH OUR RULE 50.  WE'RE

16    CURRENTLY DISCUSSING SAMSUNG'S RULE 50, AND I'LL GIVE AN

17    OPPORTUNITY TO APPLE TO ALSO RENEW ITS RULE 50 MOTION.

18          BUT MR. LEE, WHY DON'T YOU CONTINUE REGARDING ABSENCE OF

19    ACCEPTABLE NON-INFRINGING ALTERNATIVES?

20           MR. LEE:  YES.

21          AND YOUR HONOR, IF I COULD BACK UP A LITTLE BIT, JUST TO

22     PUT IT ALL IN ORDER?  SO IF I TAKE THE TWO POINTS THAT

23     MS. MAROULIS STARTED WITH, FIRST WAS DEMAND FOR PATENTED

24     FEATURES, AND SO THAT I'M COMPLETE FROM YESTERDAY AND TODAY,

25     THERE IS DR. HAUSER'S TESTIMONY ON THE DEMAND FOR THE PATENTED
```

```
 1         FEATURE, INCLUDING THE '915.

 2              THERE IS PX 30, WHICH INCLUDES --

 3                   THE COURT:  OH, EXCUSE ME.

 4                   THE CLERK:  JUST LOGISTICAL QUESTIONS.

 5                   THE COURT:  APPARENTLY THE JURY HAS LOGISTICAL

 6         QUESTIONS BEFORE THEY LEAVE TODAY.

 7                   THE CLERK:  THEY'RE WONDERING, NUMBER ONE, WHETHER

 8         THEY'LL BE ABLE TO BRING CALCULATORS OR WHETHER WE'LL BE ABLE

 9         TO PROVIDE CALCULATORS.

10                   MR. LEE:  THEY'RE ON THE PHONES.

11                   THE CLERK:  AND THE SECOND QUESTION, AND I GUESS WE

12         COULD TAKE THAT EASEL BACK THERE, THERE'S NO BOARD BACK THERE

13         LIKE THERE IS DOWNSTAIRS.

14                   THE COURT:  I SEE.  OKAY.

15                   THE CLERK:  BUT I CAN TAKE THAT IN THERE.  IT LOOKS

16         LIKE THERE'S --

17                   THE COURT:  YES.  JUST MAKE SURE THAT NONE OF THE

18         PAPERS HAVE ANY WRITING ON IT.

19                   MR. LEE:  A CALCULATOR IS FINE WITH US, YOUR HONOR.

20                   MS. MAROULIS:  MAY I CHECK, YOUR HONOR?

21                   THE CLERK:  THERE SEEMS TO BE ENOUGH PAPER.  IF NOT,

22         I CAN SEE IF SANDY HAS SOME MORE.

23                   THE COURT:  AND ALL THE PAPER THAT'S ON THE EASEL IS

24         BLANK?

25                   THE CLERK:  YES.
```

```
1          THE COURT:  OKAY.  SO WE'LL SEND THAT EASEL INTO THE
2   JURY ROOM.  YOU CAN GO AHEAD AND TAKE THAT IN.
3          MS. MAROULIS:  YOUR HONOR, A REGULAR CALCULATOR WOULD
4   BE FINE, NOT SOME COMPUTER WHERE THEY CAN GO ON THE INTERNET OR
5   SOMETHING, JUST A BASIC CALCULATOR.
6          THE COURT:  OKAY.  WELL, I CAN PROVIDE THEM ONE AND
7   SHOW IT TO THE PARTIES TOMORROW MORNING TO MAKE SURE THAT IT IS
8   ACCEPTABLE TO EACH SIDE.
9          MR. LEE:  THAT'S FINE.
10          MS. MAROULIS:  SURE.
11          THE COURT:  OKAY.  THEY JUST WANT ONE OR MULTIPLE?
12   JUST ONE, RIGHT?
13          THE CLERK:  THEY JUST SAID COULD THEY BRING
14   CALCULATORS, BUT I SUPPOSE IF THEY CAN SHARE --
15          THE COURT:  WE CAN GIVE THEM TWO CALCULATES.
16          MS. MAROULIS:  THAT'S FINE.
17          MR. LEE:  THAT'S FINE.
18          THE COURT:  OKAY.  IF YOU WILL LET THEM KNOW THAT
19   THEY SHOULD NOT BRING THEIR OWN, THAT WE'LL PROVIDE TWO THAT
20   THE PARTIES HAVE REVIEWED AND FIND ACCEPTABLE.
21       OKAY.  DID THEY HAVE ANY OTHER QUESTIONS,
22   MS. PARKER BROWN?
23          THE CLERK:  THAT'S ALL SO FAR.  IF THERE ARE ANY
24   MORE, I'LL COME RIGHT BACK OUT.  THOSE WERE THE MAIN ONES.
25          THE COURT:  OKAY.
```

1        ALL RIGHT.  LET'S RESUME, FOR THE SECOND TIME THEN, THESE

2     RULE 50 MOTIONS.

3        GO AHEAD, PLEASE.

4          MR. LEE:  ALL RIGHT.  YOUR HONOR, THERE IS PX 30,

5     WHICH WENT IN THROUGH DR. HAUSER.  THERE'S DR. HAUSER'S

6     TESTIMONY AT PAGE 530, LINE 11 STATING THAT THE SURVEYS

7     DEMONSTRATE THERE WAS A SUBSTANTIAL DEMAND FOR THE FEATURES OF

8     ALL THREE PATENTS, INCLUDING THE '915, AND THE TESTIMONY AT

9     519, 19 THROUGH 22 ABOUT A PRICE PREMIUM.

10       THERE'S ALSO PX 36, WHICH IS AT PAGE 36.36, DIRECT

11    EVIDENCE OF CONSUMER DEMAND FOR THE SCROLL VERSUS GESTURE

12    FEATURE.  THAT ACTUALLY WAS TESTIFIED ABOUT BOTH BY MS. DAVIS

13    AND BY MR. WAGNER.

14       AND THERE THEN IS A SERIES OF OTHER EXHIBITS WHICH

15    DEMONSTRATE DEMAND FOR THE, BOTH THE DESIGN, YOUR HONOR, BUT

16    ALSO THE USER INTERFACE, AND ALL THREE OF THE UTILITY PATENTS

17    GOES TO THE USER INTERFACE.  I WENT THROUGH MOST OF THEM

18    YESTERDAY AND I WON'T REITERATE THEM TODAY.

19       SO THOSE WE THINK DEMONSTRATE SUFFICIENT DEMAND FOR THE

20    PATENTED FEATURE TO GO TO THE JURY.

21       ON NON-INFRINGING ALTERNATIVES, YOUR HONOR, IF I GO TO

22    YOUR INSTRUCTION THAT YOU JUST GAVE THE JURY, NUMBER 23, 23,

23    24, AND 25 WOULD BE THE RELEVANT INSTRUCTIONS, AS WE WERE

24    SAYING BEFORE THE JURY CAME IN, INSTRUCTION 23, PARAGRAPH 2

25    SAYS THAT WE CAN EITHER PROVE THERE WERE NO ACCEPTABLE

1      NON-INFRINGING SUBSTITUTES, OR IF THERE WERE, THE NUMBER OF

2      SALES FOR EACH PRODUCT MADE BY SAMSUNG THAT APPLE WOULD HAVE

3      MADE.

4           THAT'S, IN FACT, WHAT MS. DAVIS DID.  SHE USED THE

5      METHODOLOGY DESCRIBED IN INSTRUCTIONS 24 AND 25.  SHE

6      SPECIFICALLY INCLUDED THE INTERCEPT, AS SHE TESTIFIED TODAY,

7      AND MR. WAGNER AGREED.

8           SO FOR THE INTERCEPT, THE NON-INFRINGING PHONE, SHE

9      ALLOCATED TO THE -- SHE ALLOCATED IN HER ANALYSIS.

10          AS TO OTHER PHONES THAT, ACTUAL PHONES THAT I UNDERSTAND

11     COULD BE CLAIMED TO BE INFRINGING, SHE TESTIFIED THAT THEY ALL

12     INFRINGE SOME OTHER PATENTS AND THAT THERE'S NO INDICATION OF

13     HOW YOU WOULD DESIGN AROUND THOSE PATENTS.

14          IN FACT, SHE SAID SO ON CROSS AT PAGE 748, LINES 13 TO 25

15     WHEN MR. PRICE ASKED HER QUESTIONS ABOUT THIS.

16          LASTLY, YOUR HONOR, AND THIS ACTUALLY OVERLAPS WITH OUR

17     RULE 50 MOTION, IS THE QUESTION OF HYPOTHETICAL NON-INFRINGING

18     SUBSTITUTES AS OPPOSED TO ACTUAL PRODUCTS OR ACTUAL

19     NON-INFRINGING ALTERNATIVES.

20          FOR A HYPOTHETICAL NEGOTIATION DESIGN AROUND, SAMSUNG HAD

21     THE BURDEN OF PROVING THAT.  BUT THE REQUIREMENT IS THAT THERE

22     BE SOME PROOF THAT THE NECESSARY EQUIPMENT, THE KNOW-HOW, THE

23     EXPERIENCE TO IMPLEMENT THE FEATURE WAS THERE.

24          WHAT WE -- WHAT THE JURY HAD WAS SOME PRIOR ART.  YOUR

25     HONOR WILL RECALL THE JURY SAW THE FIRST TIME AND SUGGESTED

1      THAT IT LOOKED A LOT ALIKE.  NO INDICATION FOR NOMURA OR ANY OF

2      IT THAT -- AS TO HOW YOU WOULD DESIGN AROUND.

3           AND THEN SOME COMPARISONS BETWEEN PHONES NOT INFRINGING

4      THIS PATENT, BUT INFRINGING OTHERS, WITH THE SUGGESTION THAT

5      YOU COULD TRANSPORT THE FEATURE OF ONE TO ANOTHER.

6           NO EXPERT TESTIMONY AT ALL, NOT EVEN ANY TECHNICAL

7      TESTIMONY FROM SAMSUNG AS TO HOW YOU WOULD MAKE THAT HAPPEN.

8           AND WE BELIEVE THAT ALLOWING THE JURY JUST TO LOOK AT THE

9      TWO THINGS SIDE-BY-SIDE, WITHOUT ANY INDICATION OF HOW THE

10     SOFTWARE WOULD HAVE TO BE MODIFIED TO TAKE A FEATURE OF PHONE A

11     AND PUT IT IN PHONE B DOESN'T GIVE A TRIABLE ISSUE OR

12     SUBSTANTIAL EVIDENCE WHICH COULD SUSTAIN THE JURY'S VERDICT ON

13     THESE HYPOTHETICAL DESIGN AROUNDS.

14          SO THAT ACTUALLY ADDRESSES BOTH OUR MOTION, YOUR HONOR,

15     AND THEIRS.

16               THE COURT:  ALL RIGHT.  THANK YOU.

17          LET ME HEAR FROM SAMSUNG.  I'M PARTICULARLY INTERESTED

18     ABOUT THE HYPOTHETICAL DESIGN AROUND AND THERE NOT BEING ANY

19     TESTIMONY REGARDING TRANSPORTING FEATURES FROM A NON-INFRINGING

20     PHONE TO AN INFRINGING PHONE.

21               MS. MAROULIS:  YOUR HONOR, THERE WAS ACTUALLY QUITE A

22      BIT OF TESTIMONY, AND THE TESTIMONY WE'RE RELYING ON IS THE

23      COMBINATION OF DR. SINGH FOR '915 PATENT, MS. DAVIS, AND --

24               THE COURT:  OKAY.  WHAT DID DR. SINGH SAY ABOUT THAT?

25               MS. MAROULIS:  DR. SINGH ADMITTED THAT THERE WERE A

```
1        NUMBER OF PHONES AND A NUMBER OF DIFFERENT PRIOR ART

2        TECHNOLOGIES THAT WERE DIFFERENT FROM AND DID NOT INFRINGE THE

3        '915 PATENT.

4             THEREAFTER, MR. WAGNER TESTIFIED THAT INTERCEPT AND ACE

5        WERE NOT ONLY NOT INFRINGING, BUT WERE ALSO ACCEPTABLE AND

6        AVAILABLE ON THE MARKET.  HE USED THE --

7                 THE COURT:  BUT WHO TESTIFIED ABOUT ACTUALLY

8        TRANSPORTING FEATURES FROM EITHER THE PRIOR ART OF PHONES THAT

9        DON'T INFRINGE THE '915 INTO PRODUCTS THAT DO?

10                MS. MAROULIS:  YOUR HONOR, ONE DOESN'T NEED TO

11       DEMONSTRATE THAT THEY NEED TO BE TRANSPORTED.

12            MS. DAVIS, IN HER ANALYSIS, ADMITTED TODAY THAT SHE

13       ASSUMED THAT SAMSUNG COULD HAVE DESIGNED AROUND THE '915 PATENT

14       WITHIN, I BELIEVE, A MONTH.  IT WOULD BE BEFORE THE DAMAGES

15       PERIOD BEGINS.

16            SHE, IN HER OPINIONS, RELIED ON APPLE ENGINEERS AS TO HOW

17       LONG THE DESIGN AROUND WOULD TAKE, BUT SHE ASSUMED -- SHE DID

18       NOT SAY THAT NO DESIGN AROUND WAS POSSIBLE.

19            SHE SAID THAT DESIGN AROUND PERIOD IS LONGER THAN WHAT

20       MR. WAGNER SUGGESTED, BUT HER ASSUMPTION AND HER ANALYSIS IS

21       BASED ON THE FACT THAT DESIGN AROUND IS POSSIBLE AND IS NO

22       LONGER THAN A MONTH.

23                THE COURT:  BUT ISN'T IT SAMSUNG'S BURDEN TO SHOW

24       DESIGN AROUNDS --

25                MS. MAROULIS:  YOUR HONOR --
```

```
 1              THE COURT:  -- WERE ACCEPTABLE AND AVAILABLE?

 2              MS. MAROULIS:  APPLE BEARS THE BURDEN TO SHOW ABSENCE

 3      OF NON-INFRINGING ALTERNATIVES.  IT DOESN'T SHIFT IF THEY FAIL

 4      TO MEET.

 5              THE COURT:  BUT THEN THE BURDEN SHIFTS.  THE BURDEN

 6      SHIFTS TO THE DEFENDANT.  AND SO TELL ME WHAT, WHAT EVIDENCE IS

 7      THERE THAT THESE HYPOTHETICAL DESIGN AROUNDS WERE ACCEPTABLE

 8      AND AVAILABLE.

 9              MS. MAROULIS:  FIRST OF ALL, YOUR HONOR, THE SALE OF

10      THE NON-INFRINGING PHONES, THE PHONES THAT DON'T INFRINGE THE

11      '915 PATENT, INTERCEPT, ACE, AND REPLENISH, IS THE EVIDENCE

12      THAT THESE DESIGN AROUNDS ARE -- DESIGN AROUND TECHNOLOGIES ARE

13      AVAILABLE.

14          COMBINED WITH MS. DAVIS'S ADMISSION THAT ONE COULD DESIGN

15      AROUND '915 PATENT BEFORE THE RELEVANT DAMAGES THEORY, DAMAGES

16      PERIOD, IT SHOWS THAT THESE DESIGN AROUNDS, WHILE HYPOTHETICAL,

17      ARE POSSIBLE.

18          YOU COMBINE THAT WITH MR. WAGNER'S TESTIMONY THAT THEY'RE

19      AVAILABLE, BECAUSE THEY WERE ON THE MARKET AT THE RELEVANT

20      TIME.  MR. SHEPPARD ALSO TESTIFIED THAT ACE WAS ON THE MARKET

21      IN FEBRUARY 2011.

22          AND FINALLY, MR. WAGNER POINTED TO THE SALES AND THE

23      SUCCESS OF THE PRODUCT TO MAKE IT ACCEPTABLE.

24          SO WE HAVE KIND OF THREE PRONGS:  NON-INFRINGING;

25      AVAILABLE; AND ACCEPTABLE.  IT'S NOT INFRINGING BECAUSE
```

1    DR. SINGH AND BALAKRISHNAN ADMITTED THAT CERTAIN PHONES IN

2    EVIDENCE, AND CERTAIN TECHNOLOGIES, ARE NON-INFRINGING AND

3    DIFFERENT FROM THE PATENTS-IN-SUIT.

4        THEY ARE AVAILABLE BECAUSE THESE PHONES WERE ON THE MARKET

5    AND THE PRIOR ART WAS IN THE RECORD.  DR. SINGH ADMITTED ON

6    CROSS-EXAMINATION.

7        AND THEY'RE ACCEPTABLE BECAUSE, AT LEAST WITH RESPECT TO

8    THE PRODUCTS, IT SHOWS THAT THESE PHONES WERE SOLD.

9        AND WITH RESPECT TO PRIOR ART --

10            THE COURT:  WHAT'S THE EVIDENCE OF SALES ON THE ACE?

11            MS. MAROULIS:  I'M SORRY, YOUR HONOR?

12            THE COURT:  WHAT'S THE EVIDENCE OF SALES ON THE ACE

13    IN THIS TRIAL?

14            MS. MAROULIS:  MR. WAGNER TESTIFIED THAT ACE WAS SOLD

15    WIDELY.  I DON'T HAVE THE CITE.  I'M GOING TO ASK MY TEAM TO

16    COME UP WITH THE TRANSCRIPT CITE RIGHT NOW.

17            THE COURT:  THE EVIDENCE IS THAT NO U.S. CARRIER SOLD

18    THE ACE; CORRECT?

19            MS. MAROULIS:  YOUR HONOR, IN THE LAST TRIAL, APPLE

20    ASSERTED THAT ACE INFRINGED AND THERE WERE SALES IN THE

21    UNITED STATES.

22            THE COURT:  I'M ASKING, WHAT IS THE EVIDENCE IN THIS

23    TRIAL OF SALES OF THE ACE?  WHAT DOES THIS JURY HAVE REGARDING

24    SALES OF THE ACE?  WHAT -- WHAT I HEARD WAS THAT NO U.S.

25    CARRIER SOLD THE ACE IN THE UNITED STATES.

1       MS. MAROULIS:  YOUR HONOR, MR. WAGNER TESTIFIED AT

2    PAGE 1010 AT 15 TO 19 THAT GALAXY ACE WAS ONE OF THE BIGGEST

3    SELLERS OF ALL TIME.  THE JURY IS ENTITLED TO CREDIT HIS

4    TESTIMONY AND MAKE THEIR OWN CONCLUSIONS ABOUT THAT.

5           THE COURT:  IN THE UNITED STATES?

6       (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

7           THE COURT:  THE TESTIMONY IS THAT NO U.S. CARRIER

8    SOLD THE ACE IN THE UNITED STATES.

9           MS. MAROULIS:  I'M SORRY, YOUR HONOR.  I MIGHT HAVE

10   BEEN OUT OF THE COURTROOM.

11       BUT MS. DAVIS ADMITTED THE SALE ALSO OF THE ACE IN THE

12   UNITED STATES BY RESELLERS.

13       AND IF YOU RECALL, YOUR HONOR, LAST YEAR APPLE MADE VERY

14   STRENUOUS EFFORTS TO PROVE THAT THERE WERE SALES IN THE

15   UNITED STATES AND OUR JMOL ON THIS ISSUE WAS DENIED FOR THAT

16   REASON.

17       SO THE JURORS HAVE TESTIMONY OF MR. WAGNER AND THE JURORS

18   HAVE ADMISSION BY MS. DAVIS.

19           THE COURT:  SO DID MR. WAGNER SAY THE ACE WAS THE

20   BIGGEST SELLER IN THE UNITED STATES?

21           MS. MAROULIS:  THE QUOTE I JUST SAW DID NOT SAY

22   EITHER IN THE UNITED STATES OR OUTSIDE THE UNITED STATES.  SO

23   IT'S --

24           THE COURT:  OKAY.

25       (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

1        MS. MAROULIS:  YOUR HONOR, I UNDERSTAND THAT THE

2   TRANSCRIPT SAYS THAT IT'S THE BIGGEST SELLER.  IT DOESN'T SAY

3   IN THE UNITED STATES.

4        THE COURT:  OKAY.  ALL RIGHT.  ANYTHING ELSE THAT

5   EITHER SIDE WOULD LIKE TO STATE ON BEHALF OF ITS RULE 50 MOTION

6   OR IN RESPONSE TO THE OTHER PARTY'S RULE 50 MOTION?

7        MR. LEE:  JUST LESS THAN ONE MINUTE, YOUR HONOR.

8        THE COURT:  OKAY.

9        MR. LEE:  I THINK MS. MAROULIS'S ARGUMENT

10   DEMONSTRATES WHY IT'S IMPORTANT TO SEPARATE THE ACTUAL PRODUCTS

11   FROM THE HYPOTHETICAL, AND THE REASON THAT WE HAVE THE BURDEN

12   ON THE ACTUAL IS THAT'S A TARGET YOU CAN SHOOT AT.

13        THERE ARE PRODUCTS LIKE THE INTERCEPT AND THE ACE, AND

14   MS. DAVIS TESTIFIED ABOUT THEM, THEY'RE REAL PRODUCTS, SO WE

15   HAVE THE BURDEN OF SHOWING EITHER THAT THEY'RE NOT AVAILABLE OR

16   THAT WE'VE ACCOUNTED FOR THEM.

17        WE TOOK THE BURDEN OF ACCOUNTING FOR THEM.

18        THE HYPOTHETICAL IS THEIR BURDEN BECAUSE HOW CAN WE SHOOT

19   AT WHAT WE DON'T KNOW THEY'RE GOING TO SAY?

20        AND DR. SINGH'S TESTIMONY ACTUALLY JUST SAID, FOR THE

21   THREE PRIOR ART REFERENCES, IT'S SO DIFFERENT, THERE'S NO

22   INDICATION IT CAN BE USED IN THE TABLET.

23        THERE IS NO TESTIMONY ON THE HYPOTHETICAL DESIGN AROUNDS,

24   WHICH IS THE FOCUS OF OUR MOTION, THAT WOULD ALLOW THE JURY TO

25   CONCLUDE THAT YOU COULD MODIFY THE SOFTWARE, YOU COULD DO

```
1     ANYTHING TO MAKE IT AVAILABLE AND ACCEPTABLE.

2          MS. MAROULIS:  VERY BRIEFLY, YOUR HONOR.

3     THE JURY SAW THE EVIDENCE PRESENTED TO MR. SINGH AND SAW

4     HOW CLOSE THE SYSTEMS ACTUALLY WERE, SO WHILE HE COULD SAY IT'S

5     DIFFERENT, THEY COULD CONCLUDE OTHERWISE BY WATCHING WITH THEIR

6     OWN EYES HOW THOSE SYSTEMS OPERATED.

7          SECONDLY, MR. LEE REFERENCED MS. DAVIS TAKING INTO ACCOUNT

8     INTERCEPT.

9          BUT MS. DAVIS DID NOT PROPERLY TAKE IT INTO ACCOUNT

10    BECAUSE SHE DID NOT CONSIDER VARIOUS FACTORS, LIKE PRICE

11    DIFFERENTIAL AND OTHER DIFFERENT ATTRIBUTES.

12         AND FINALLY, AS WE PREVIOUSLY ARGUED, DR. HAUSER'S SURVEY

13    DOES NOT ACTUALLY SHOW DEMAND FOR SPECIFIC PATENTED FEATURES.

14    IT MERELY SHOWS THE POTENTIAL PRICE PREMIUM.

15         THE COURT:  ALL RIGHT.  LET ME -- I'M GOING TO DENY

16    ALL OF THESE RULE 50 MOTIONS AND I'LL ISSUE AN ORDER.

17         BUT LET ME ASK, MR. LEE, WHAT IS THE EXACT ARTICULATION OF

18    YOUR MOTION?  THAT SAMSUNG HAS FAILED TO DEMONSTRATE THAT ITS

19    HYPOTHETICAL DESIGN AROUNDS WERE ACCEPTABLE AND AVAILABLE?

20    WHAT EXACTLY IS THE WORDING OF YOUR MOTION?

21         MR. LEE:  I WOULD PHRASE IT THIS WAY, YOUR HONOR:

22    THAT SAMSUNG HAS FAILED TO CARRY ITS BURDEN TO PROVE THAT THE

23    HYPOTHETICAL NON-INFRINGING SUBSTITUTES WERE AVAILABLE AND

24    ACCEPTABLE DURING THE PERIOD APRIL 15TH, 2011, TO MAY 29TH,

25    2011.
```

```
 1              IS THAT GOOD ENOUGH?

 2              THE COURT:  I'M JUST TRYING TO WRITE IT DOWN SO WE

 3      CAN GET THE ORDER PHRASED CORRECTLY.

 4              MR. LEE:  OKAY.

 5              THE COURT:  OKAY.  THAT SAMSUNG FAILED TO CARRY ITS

 6      BURDEN THAT ITS HYPOTHETICAL NON-INFRINGING SUBSTITUTES WERE

 7      AVAILABLE AND ACCEPTABLE FROM APRIL 15TH, 2011, THROUGH MAY 29,

 8      2011?  IS THAT CORRECT?

 9              MR. LEE:  THAT'S CORRECT, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  THESE RULE 50 MOTIONS ARE

11      DENIED.  ALL OF THESE ISSUES WILL GO TO THE JURY.

12          ALL RIGHT.  ANYTHING ELSE THAT WE NEED TO TAKE CARE OF?

13      YOU'RE GOING TO FILE THE EXHIBIT LISTS WITH THE LIMITING

14      INSTRUCTIONS AND THE SEALING DESIGNATIONS.

15              MS. KREVANS:  YES, YOUR HONOR.  SOME OF OUR

16      COLLEAGUES ARE WORKING TO MAKE SURE IT'S COMPLETELY AGREED ON

17      BACK AT THE OFFICE RIGHT NOW.

18              THE COURT:  OKAY.  WHAT ELSE DO WE HAVE TO DO?

19      YOU'RE ALSO GOING TO STIPULATE TO THE ACTUAL EXHIBITS GOING

20      INTO THE JURY ROOM?

21              MS. KREVANS:  THAT PROCESS IS HAPPENING RIGHT NOW AS

22      WELL.

23          AND I THINK THE COURT WAS GOING TO LET US KNOW HOW MANY

24      COPIES WE SHOULD PROVIDE.

25              THE COURT:  HOW VOLUMINOUS ARE THE EXHIBITS THIS
```

```
1    TIME?

2              MS. MAROULIS:  NOT VERY BECAUSE A LOT OF THEM ARE

3    PHONES, BUT -- I DON'T KNOW HOW MANY BOXES.  ONLY PERSON WITH

4    KNOWLEDGE IS ACTUALLY WORKING ON THE EXHIBITS.

5              MS. KREVANS:  THEY'RE SITTING IN A ROOM RIGHT NOW

6    WITH THEM.

7              THE COURT:  AND TRYING TO WORK THAT THROUGH?

8              MR. JOHNSON:  I THINK IT'S PROBABLY TWO BINDERS AND

9    THEN A BUNCH OF PHONES.

10             MS. KREVANS:  A BUNCH OF PHONES.

11             THE COURT:  IT'S TWO BINDERS AND TWO PHONES?

12             THE CLERK:  A CARTFUL OF PHONES PROBABLY.

13             MS. KREVANS:  IT MAY BE A LITTLE BIGGER BECAUSE SOME

14   OF THEM HAVE BEEN COPIED SINGLE SPACE, SINGLE SIDED.  BUT IT

15   WILL NOT BE BOXES AND BOXES.

16             THE COURT:  OKAY.  WHY DON'T WE TAKE ONE SET, THEN,

17   FOR CHAMBERS.  IT JUST WOULD BE HELPFUL FOR US FOR THE

18   POST-TRIAL MOTIONS.  THEN IF WE DON'T NEED THEM, WE'LL ASK YOU

19   TO RETRIEVE THEM AFTER WE'VE USED THEM FOR THE POST-TRIAL

20   MOTIONS.

21         ALL RIGHT.  THANK YOU.  IF YOU COULD PROVIDE ONE EXTRA

22   SET.

23             WHAT ELSE OTHER THAN EXHIBITS AND THE EXHIBIT LISTS?

24             MR. MCELHINNY:  WHAT TIME WOULD YOU LIKE US TOMORROW

25   MORNING, YOUR HONOR?
```

```
1              THE COURT:  DO YOU THINK THERE'S ANYTHING WE'LL NEED

2     TO DISCUSS IN ADVANCE?  OR SHOULD WE JUST START AT 9:00?

3              MR. MCELHINNY:  WE DON'T --

4              MR. LEE:  I HOPE NOT.

5              MS. MAROULIS:  YOUR HONOR, THE PARTIES AGREED THAT

6     THERE MIGHT BE A FEW ADDITIONAL SLIDES BASED ON TODAY'S

7     TESTIMONY.

8         WE'RE HOPING TO RESOLVE IT WITHOUT OBJECTIONS.  AND THEY

9     WOULDN'T BE BRIEFED.  WE'RE JUST GOING TO BRING ANY DISPUTES TO

10    THE MORNING.

11        BUT WE HOPE THAT THERE WON'T BE ANY.

12             THE COURT:  WELL, I NEED TO -- IS THAT THE CASE?

13    THERE ARE MORE SLIDES?

14             MR. MCELHINNY:  WE ARE NOT, YOUR HONOR.  THAT'S MORE

15    WHAT WE'RE SORT OF NERVOUS ABOUT OVER HERE.

16             THE COURT:  WHAT ADDITIONAL SLIDES --

17             MS. MAROULIS:  YOUR HONOR --

18             THE COURT:  I MEAN, DON'T YOU HAVE 250 SLIDES

19    ALREADY?

20             MS. MAROULIS:  WE ACTUALLY JUST PROVIDED APPLE WITH

21    OUR OPENING SLIDES, THAT'S WHY THE NUMBER IS SO BIG, BECAUSE

22    THEY REFERENCE TO PRIOR SLIDES WITHOUT -- THEY PROVIDED THEM.

23    THEY'RE NOT IN THEIR DECK.  SO I THINK THE PARTIES HAVE ROUGHLY

24    THE SAME SLIDES.

25             BUT THE BASIC POINT IS THAT WE DON'T HAVE THE TRANSCRIPT
```

1    YET.  WE'D LIKE TO READ IT AND, IF WE HAVE TWO OR THREE SLIDES,

2    WE'LL KEEP IT VERY, VERY LITTLE, YOUR HONOR.

3        IS THAT OKAY?

4            THE COURT:  NO.  I'M NOT GOING TO DO THAT IN THE

5    MORNING.

6        SO LET'S PUT SOME LIMITS ON THIS.  IF YOU'RE GOING TO DO

7    IT, I'LL ALLOW UP TO THREE ADDITIONAL SLIDES, IF IT'S

8    NECESSARY, AND YOU'RE GOING TO FILE THEM BY 5:00 O'CLOCK.  I

9    MEAN, YOU'VE ALREADY GIVEN US HUNDREDS AND HUNDREDS OF SLIDES

10   TO REVIEW, OVER 100 OBJECTIONS, AND WE JUST CANNOT -- WE JUST

11   CAN'T TAKE ANY MORE AND I'M NOT GOING TO DO THIS IN THE MORNING

12   ON THE FLY.

13       SO YOU GET THREE ADDITIONAL SLIDES AT MOST.  YOU'RE GOING

14   TO FILE THEM, FILE THEM BY 5:00 O'CLOCK.

15           AND THEN FILE ANY OBJECTIONS AND RESPONSES BY 7:00.  CAN

16   YOU DO THAT?

17           MS. MAROULIS:  YES, YOUR HONOR.

18           MR. MCELHINNY:  YES, YOUR HONOR.

19           THE COURT:  NOW, I'M GLAD TO HEAR THAT AT LEAST SEVEN

20   OF THE DISPUTES THAT WERE RESOLVED.  HAVE YOU RESOLVED ANY

21   MORE?

22           MS. KREVANS:  I'M TOLD ONE MORE HAS BEEN RESOLVED SO

23   FAR, YOUR HONOR.

24           THE COURT:  OH, OKAY, GREAT.  I THINK YOU WERE GOING

25   TO FILE AN UPDATE AT 4:00 O'CLOCK, SO IF YOU COULD PLEASE DO

1    THAT?  WHY DON'T -- SO 4:00 O'CLOCK FOR AN UPDATE, AND THEN I'M

2    GOING TO SET ANOTHER -- I'M HOPING YOU'LL JUST KEEP WINNOWING

3    THIS DOWN.  CAN WE SET ANOTHER DESIGN FOR ANY FURTHER UPDATES?

4    YOU WANT TO SET 6:00 OR 7:00 O'CLOCK?

5            MR. MCELHINNY:  YOUR HONOR, THE THING THAT'S GOING TO

6    REDUCE THE BURDEN ON THE COURT IS WHEN WE FIND OUT WHICH OF

7    THESE HUGE SLIDE DECKS ARE ACTUALLY GOING TO BE USED.

8        THE LIKELIHOOD THAT WE'RE GOING TO COME TO AGREEMENT,

9    THAT'S GETTING SMALLER AND SMALLER.

10       BUT IT IS THE FACT THAT WE ARE OBJECTING TO A LARGE NUMBER

11   OF THEIR SLIDES THAT THEY'RE NOT GOING TO USE.

12           THE COURT:  ALL RIGHT.  WELL, AT THIS 4:00 O'CLOCK

13   UPDATE, I'D ALSO LIKE YOU TO INCLUDE ANY SLIDES THAT YOU'RE NOT

14   PLANING TO USE.

15       I'LL SET ANOTHER DEADLINE OF 6:00 P.M. FOR ANY FURTHER

16   UPDATES, EITHER OF ONES THAT YOU AGREE UPON OR THAT YOU'RE NOT

17   PLANNING TO USE.  THAT WOULD BE HELPFUL.

18       OKAY.  WHAT ELSE?

19       THEN LET'S -- WHY DON'T WE JUST MEET AT 8:45 A.M. JUST IN

20   CASE?  WE CAN SAY 8:50.  I DON'T REALLY HAVE A STRONG FEELING

21   ABOUT IT.  WHY DON'T WE SAY 8:50, ANY LAST MINUTE CHANGES.

22   OTHERWISE 9:00 O'CLOCK WE'LL START WITH CLOSING.

23       OKAY.  ANYTHING ELSE?

24           MS. MAROULIS:  NOT FOR SAMSUNG, YOUR HONOR.

25           MR. MCELHINNY:  NOTHING FURTHER FOR APPLE, YOUR

1     HONOR.

2            THE COURT:  OKAY.  THANK YOU.  THEN WE'LL SEE YOU IN

3     THE MORNING.

4            (WHEREUPON, THE EVENING RECESS WAS TAKEN.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18        DATED:  NOVEMBER 18, 2013

19

20

21

22

23

24

25