<pre>
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION

 4

 5

    APPLE INC., A CALIFORNIA        )  C-11-01846 LHK
 6  CORPORATION,                    )
                                    )  SAN JOSE, CALIFORNIA
 7               PLAINTIFF,         )
                                    )  NOVEMBER 19, 2013
 8          VS.                     )
                                    )  VOLUME 6
 9  SAMSUNG ELECTRONICS CO., LTD.,  )
    A KOREAN BUSINESS ENTITY;       )  PAGES 1280-1434
10  SAMSUNG ELECTRONICS AMERICA,    )
    INC., A NEW YORK CORPORATION;   )
11  SAMSUNG TELECOMMUNICATIONS      )
    AMERICA, LLC, A DELAWARE        )
12  LIMITED LIABILITY COMPANY,      )
                                    )
13               DEFENDANTS.        )
    _____)

14

15

16                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE LUCY H. KOH
17                 UNITED STATES DISTRICT JUDGE

18

19

20                 APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23

24

25           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
</pre>

```
 1

 2       A P P E A R A N C E S:

 3       FOR PLAINTIFF          MORRISON & FOERSTER
         APPLE:                 BY:  HAROLD J. MCELHINNY
 4                                   RACHEL KREVANS
                                     NATHANIEL B. SABRI
 5                              425 MARKET STREET
                                SAN FRANCISCO, CALIFORNIA  94105
 6

 7                              WILMER, CUTLER, PICKERING,
                                HALE AND DORR
 8                              BY:  WILLIAM F. LEE
                                     LAUREN B. FLETCHER
 9                              60 STATE STREET
                                BOSTON, MASSACHUSETTS  02109
10

                                BY:  MARK D. SELWYN
11                              950 PAGE MILL ROAD
                                PALO ALTO, CALIFORNIA  94304
12

13       FOR DEFENDANT          QUINN, EMANUEL, URQUHART,
         SAMSUNG:               OLIVER & HEDGES
14                              BY:  WILLIAM C. PRICE
                                     JON C. CEDERBERG
15                              865 SOUTH FIGUEROA STREET
                                10TH FLOOR
16                              LOS ANGELES, CALIFORNIA  90017

17                              BY:  VICTORIA F. MAROULIS
                                     KEVIN B. JOHNSON
18                              555 TWIN DOLPHIN DRIVE
                                SUITE 560
19                              REDWOOD SHORES, CALIFORNIA  94065

20

21

22

23

24

25
```

1282

1

2                        INDEX OF PROCEEDINGS

3

4      CLOSING ARGUMENT BY MR. LEE              P. 1288

5      CLOSING ARGUMENT BY MR. PRICE             P. 1327

6      REBUTTAL CLOSING BY MR. MCELHINNY         P. 1383

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 19, 2012

 2                      P R O C E E D I N G S

 3        (JURY OUT AT 8:47 A.M.)

 4            THE COURT:  SINCE WE HAVE A LITTLE TIME, ARE THERE

 5    ANY ISSUES?

 6        OTHERWISE I'D LIKE TO GET SOME STIPULATIONS.

 7            MR. MCELHINNY:  NO ISSUES FOR APPLE, YOUR HONOR.

 8            THE COURT:  ALL RIGHT.  ANY ISSUES, MR. PRICE?

 9            MR. PRICE:  NO ISSUES.

10            THE COURT:  ALL RIGHT.  THANK YOU.

11        LET ME JUST GET SOME STIPULATIONS, PLEASE.  I WOULD LIKE A

12    STIPULATION AS TO THE FOLLOWING:  ONE IS THAT THE BAILIFF MAY

13    EXCUSE THE JURORS AT RECESS, LUNCH BREAK, AND AT THE END OF THE

14    DAY WITHOUT THE COURT BEING IN SESSION; TWO IS THAT THE JURORS

15    MAY LEAVE THE JURY DELIBERATION ROOM FOR THE PURPOSE OF GOING

16    TO LUNCH, NOT IN THE CUSTODY OF THE BAILIFF; THAT THEY MAY TAKE

17    BREAKS OUTSIDE THE JURY DELIBERATION ROOM, NOT IN THE CUSTODY

18    OF THE BAILIFF; AND AT THE CLOSE OF THE DAY'S DELIBERATIONS,

19    THEY MAY SEPARATE AND RETURN THE NEXT COURT DAY TO RESUME

20    DELIBERATIONS.

21            MR. MCELHINNY:  APPLE STIPULATES, YOUR HONOR.

22            THE COURT:  THANK YOU.

23            MR. PRICE:  SAMSUNG STIPULATES AS WELL.

24            THE COURT:  ALL RIGHT.  THANK YOU.

25        AND WE'LL DO THE SAME PROCESS WE DID LAST TIME.
```

```
1    MS. PARKER BROWN IS GOING TO FILE A CLERK'S NOTICE AT THE END

2    OF EACH DAY JUST LETTING YOU KNOW THAT THE JURORS HAVE

3    ADJOURNED FOR THE DAY AND THEY'VE GONE HOME.

4         ALSO, IF AND WHEN THERE IS A VERDICT, SHE WILL FILE A

5    NOTICE OF VERDICT SO YOU ALL CAN GET HERE AS QUICKLY AS

6    POSSIBLE.

7         (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

8    CLERK.)

9              THE COURT:  ALL RIGHT.  ALSO, IS MR. MINTZ HERE?

10             MR. MINTZ:  YES.

11             THE COURT:  OKAY.  HE'S AGREED TO DO THE SAME MEDIA

12   E-MAIL TREE AS WAS DONE LAST TIME, SO IF THERE IS A VERDICT,

13   MS. PARKER BROWN WILL LET HIM KNOW, AND THEN IF ANY MEMBERS OF

14   THE MEDIA WOULD PLEASE GIVE THEIR CONTACT INFORMATION TO

15   MR. MINTZ, HE WILL ALSO LET THEM KNOW.

16        YOU CAN ALSO CHECK ON ECF FOR ANY CLERK'S NOTICES OF

17   VERDICTS.

18        WE'VE GOTTEN AN INQUIRY AS TO HOW MUCH TIME THERE WILL BE

19   BETWEEN WHEN WE RECEIVE A NOTICE OF A VERDICT AND WHEN WE'LL

20   ACTUALLY BRING THE JURORS IN TO TAKE THE VERDICT.

21        LET ME HEAR FROM COUNSEL.  HOW QUICKLY CAN YOU ALL BE

22   HERE?

23             MR. MCELHINNY:  WE CAN BE HERE IN 30 MINUTES, YOUR

24   HONOR.

25             THE COURT:  IN 30 MINUTES YOU SAID?
```

1        MR. MCELHINNY:  YES, YOUR HONOR.

2        THE COURT:  OKAY.

3        MR. PRICE:  WE CAN AS WELL.

4        THE COURT:  OKAY.  ALL RIGHT.  WELL, THEN, WE'LL

5    ASSUME THAT AMOUNT OF TIME.

6        AND IF YOU WOULD PLEASE BE SURE MS. PARKER BROWN HAS YOUR

7    BEST CONTACT INFORMATION SO SHE CAN LET YOU KNOW WHEN THERE IS

8    A NOTE.  I ASSUME YOU ALL WANT TO BE PRESENT IF THERE'S ANY

9    JURY NOTE.

10        MR. MCELHINNY:  WE WOULD VERY MUCH LIKE TO BE

11    PRESENT, YOUR HONOR.

12        MR. PRICE:  YES, YOUR HONOR.

13        THE COURT:  OKAY.  ALL RIGHT.

14        LET ME ALSO SHOW YOU, THESE ARE THE CALCULATORS THAT WE'RE

15    PLANNING TO SEND IN TO THE JURY (INDICATING).  I DON'T KNOW IF

16    YOU WANT TO INSPECT THESE.

17        MR. MCELHINNY:  I JUST CAN'T READ THE BRAND NAME.

18        THE COURT:  OKAY.  IT SAYS STAPLES.

19        (LAUGHTER.)

20        MR. MCELHINNY:  PERFECT, YOUR HONOR.

21        MR. PRICE:  NO PROBLEM, YOUR HONOR.

22        THE COURT:  IF THIS GIVES YOU HEARTBURN, LET ME KNOW.

23    BUT WE'RE PLANNING TO SEND THESE IN.

24        NOW, LET ME MAKE SURE.  THIS IS THE RED WELL THAT WILL GO

25    IN WITH THE JURY (INDICATING).  IT'S EMPTY.  I WILL PUT THE TWO

1    STAPLES CALCULATORS IN THERE AND INCLUDE 2631, WHICH IS THE

2    VERDICT FORM THAT WAS PREVIOUSLY FILED.

3        I'LL ALSO LET YOU INSPECT THESE AFTER WE FINISH CLOSINGS.

4        IT HAS ABOUT TEN BLANK JUROR NOTE FORMS.

5        AND HAVE YOU BOTH AGREED THAT THE JOINT SUBMISSION OF

6    FINAL ADMITTED TRIAL EXHIBIT LIST THAT YOU FILED AT ECF 2789 IS

7    THE FINAL TRIAL EXHIBIT LIST?

8        MR. MCELHINNY:  APPLE AGREES TO THAT, YOUR HONOR.

9        MS. MAROULIS:  YES, YOUR HONOR.

10       THE COURT:  OKAY.  SO I HAVE THREE COPIES THEN OF ECF

11   NUMBER 2789 THAT WILL ALSO GO INTO THIS RED WELL.

12       AND HAVE YOU STIPULATED TO THE ACTUAL EXHIBITS THAT WILL

13   GO INTO THE JURY ROOM?

14       MR. MCELHINNY:  WE HAVE, YOUR HONOR.  WE INSPECTED

15   THEM AND STIPULATED TO THEM.

16       MS. MAROULIS:  YES.

17       THE COURT:  OKAY.  AND ARE THEY ON THIS CART NEXT TO

18   MS. PARKER BROWN, OR WHERE ARE THE ONES THAT YOU ACTUALLY WANT?

19       MR. MCELHINNY:  WE THINK THEY'RE IN THE BOXES OVER

20   HERE IN FRONT OF THE SCREEN, YOUR HONOR.

21       THE COURT:  OKAY.  ALL RIGHT.  WELL, AFTER WE FINISH

22   WITH CLOSINGS, THEN I WILL JUST HAVE EACH SIDE INSPECT

23   EVERYTHING ONE LAST TIME AND GET ON THE RECORD THAT YOU'RE

24   STIPULATING TO THE SUBMISSION OF THESE TO THE JURORS.  OKAY?

25       ALL RIGHT.  WHAT ELSE DO WE NEED TO HANDLE?  ANYTHING

```
1         ELSE?  NOTHING ELSE?

2                    MR. PRICE:  NO, YOUR HONOR.

3                    THE COURT:  ALL RIGHT.  WELL, LET'S SEE IF OUR JURORS

4         ARE HERE.  MAYBE WE CAN EVEN START EARLY.

5              (PAUSE IN PROCEEDINGS.)

6              (JURY IN AT 8:52 A.M.)

7                    THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

8              OKAY.  LADIES AND GENTLEMEN, YOU HAVE NOW HEARD ALL THE

9         EVIDENCE AND THE LAW.  IT IS NOW TIME TO HEAR THE CLOSING

10        ARGUMENTS OF COUNSEL.  EACH COUNSEL WILL HAVE AN OPPORTUNITY TO

11        REVIEW THE EVIDENCE AND ARGUE TO YOU WHAT HE OR SHE BELIEVES

12        THAT EVIDENCE HAS SHOWN.

13             I AGAIN REMIND YOU THAT WHAT THE ATTORNEYS SAY DURING

14        THEIR ARGUMENTS IS NOT EVIDENCE.  IF ANY ATTORNEY MISSTATES THE

15        EVIDENCE OR THE LAW, YOU ARE TO RELY ON YOUR OWN RECOLLECTION

16        OF THE EVIDENCE AND TO THE JURY INSTRUCTIONS THAT I HAVE

17        PROVIDED AND READ TO YOU.

18             THE PLAINTIFF WILL GIVE THE FIRST ARGUMENT.  NEXT THE

19        DEFENSE WILL GIVE ITS ARGUMENT.  BECAUSE THE PLAINTIFF HAS THE

20        BURDEN OF PROOF, THE PLAINTIFF WILL HAVE THE LAST OPPORTUNITY

21        TO ADDRESS YOU IN HIS OR HER CLOSING ARGUMENT.

22             EACH SIDE WILL HAVE A TOTAL OF ONE HOUR AND A HALF TO

23        ADDRESS YOU.

24             UPON THE CONCLUSION OF ARGUMENT, YOU WILL BEGIN

25        DELIBERATIONS IN THE JURY ROOM.  REMEMBER THAT YOU ARE NOT TO
```

1    DISCUSS THE CASE UNLESS ALL EIGHT JURORS ARE PRESENT IN THE

2    JURY ROOM.

3          AND I WILL SHOW YOU, WHAT YOU WILL BE RECEIVING, AT YOUR

4    REQUEST, IS TWO CALCULATORS, AND THE -- I'LL GO AHEAD AND SHOW

5    YOU NOW.  THERE IS ONE VERDICT FORM; THERE ARE ABOUT TEN JUST

6    BLANK NOTES THAT YOU CAN MAKE A REQUEST FOR ANY INFORMATION,

7    ANY QUESTION.

8          AGAIN, PLEASE DON'T TELL US WHAT ANY VOTE IS OR HOW YOU'RE

9    LEANING IN TERMS OF ANY DECISION, AND THEN WE'LL GIVE YOU A

10   WRITTEN RESPONSE.

11         AND THE PARTIES HAVE A JOINT LIST OF ALL EXHIBITS THAT

12   HAVE BEEN ADMITTED DURING THE TRIAL, THERE ARE THREE COPIES OF

13   THESE SO MULTIPLE PEOPLE CAN SEE THEM SIMULTANEOUSLY; AND THEN

14   YOU'LL GET ONE SET OF ALL OF THE EXHIBITS.  OKAY?

15         SO YOU'LL BE GETTING THIS RED WELL SHORTLY AFTER YOU START

16   DELIBERATING.

17         ALL RIGHT.  WITH THAT, TIME IS NOW 8:55.  GO AHEAD,

18   PLEASE.

19         **(MR. LEE GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

20   **PLAINTIFF.)**

21         MR. LEE:  THANK YOU, YOUR HONOR.

22   GOOD MORNING, LADIES AND GENTLEMEN.

23         LET ME BEGIN OUR CLOSING BY THANKING YOU FOR YOUR TIME,

24   YOUR CAREFUL ATTENTION, AND YOUR JURY SERVICE.  IT'S HARD TO

25   BELIEVE THAT IT'S ONLY A WEEK AGO THAT YOU WERE SELECTED FOR

1        THIS JURY.  WE KNOW THAT AN AWFUL LOT OF INFORMATION HAS COME

2        YOUR WAY.  AT TIMES IT MUST HAVE SEEN AS IF YOU WERE DRINKING

3        FROM AN INFORMATION FIREHOSE SITTING IN THOSE CHAIRS.

4             ON BEHALF OF APPLE, MR. MCELHINNY, MS. KREVANS, AND ALL

5        THE FOLKS WHO'VE WORKED WITH US, WE THANK YOU FOR YOUR TIME AND

6        YOUR ATTENTION.

7             ONE OF THE GREATEST PARTS OF OUR JURY SYSTEM, ONE OF THE

8        REASONS IT'S ONE OF THE GREAT SYSTEMS IN THE WORLD IS BECAUSE

9        IT BRINGS TOGETHER FOLKS LIKE YOU, FOLKS WHO CAN BRING THEIR

10       COMMON SENSE AND YOUR COLLECTIVE JUDGMENT TO BEAR ON ISSUES,

11       ISSUES SUCH AS HER HONOR INSTRUCTED YOU ON YESTERDAY.

12            IT IS YOUR COMMON SENSE THAT WILL ALLOW YOU TO FOCUS ON

13       WHAT PEOPLE DID, WHAT THEY ACTUALLY DID IN THE REAL WORLD AND

14       NOT, AS MR. MCELHINNY SAID IN THE OPENING, WHAT PEOPLE NOW SAY

15       THEY COULD HAVE DONE, THEY SHOULD HAVE DONE, THEY WOULD HAVE

16       DONE.

17            AND IT'S YOUR COMMON SENSE THAT WILL ALLOW YOU TO

18       RECOGNIZE THAT HISTORICAL DOCUMENTS, DOCUMENTS THAT WERE

19       GENERATED BEFORE THERE WAS LITIGATION YEARS AGO, DOCUMENTS

20       GENERATED BY BOTH PARTIES THAT TELL YOU THE STORY OF WHAT

21       OCCURRED, WILL TELL THE TRUTH.  WITNESSES FORGET, OR IN THE

22       CASE OF SAMSUNG HERE, WITNESSES DON'T APPEAR.  DOCUMENTS,

23       LADIES AND GENTLEMEN, DON'T LIE.

24            IT IS YOUR COMMON SENSE THAT WILL ALLOW YOU TO RECOGNIZE

25       THAT SAMSUNG HAS INFRINGED NOT ONE, NOT TWO, NOT THREE, NOT

1    FOUR, BUT FIVE PATENTS.  YET, THEY ARE TELLING YOU THOSE

2    PATENTS ARE NARROW AND INSIGNIFICANT.

3            AND IT IS YOUR COMMON SENSE THAT WILL ALLOW YOU ULTIMATELY

4    TO DECIDE WHETHER SAMSUNG SHOULD PROFIT, BECAUSE THAT'S WHAT

5    THEY'RE ASKING YOU TO DO, SAMSUNG SHOULD PROFIT FROM ITS MORE

6    THAN 10 MILLION INFRINGING ACTS.

7            NOW, YOU MAY HAVE NOTICED THAT APPLE AND SAMSUNG

8    APPROACHED THIS TRIAL AND THE PRESENTATION OF THE EVIDENCE,

9    MR. MCELHINNY PROMISED YOU, IN VERY DIFFERENT WAYS.  APPLE

10   BROUGHT YOU TWO OF ITS MOST SENIOR EXECUTIVES, TONY BLEVINS AND

11   PHIL SCHILLER, TO TELL YOU THE HISTORY OF APPLE, THE HISTORY OF

12   THESE INVENTIONS, AND THE DEVELOPMENT AND THE INNOVATION OF THE

13   IPHONE AND THE IPAD.

14           THEY WERE WILLING TO SIT IN THAT CHAIR AND UNDERGO THE

15   CRUCIBLE OF CROSS-EXAMINATION.

16           APPLE BROUGHT YOU TWO COMPUTER SCIENTISTS,

17   DR. BALAKRISHNAN AND DR. SINGH, WHO DESCRIBED THE INVENTIONS

18   AND THEIR IMPORTANCE TO YOU.

19           WHAT DID SAMSUNG BRING YOU?  SAMSUNG BROUGHT YOU NO

20   EXECUTIVE FROM KOREA, THE PARENT COMPANY, TO TESTIFY UNDER

21   OATH.

22           SAMSUNG BROUGHT YOU NO SAMSUNG DESIGNER, ENGINEER, OR

23   ANYONE ELSE TO EXPLAIN TO YOU HOW THEY DEVELOPED THEIR

24   SMARTPHONES AND TABLETS.

25           SAMSUNG BROUGHT YOU NO TECHNICAL EXPERT TO EXPLAIN WHETHER

1        THE THINGS THE LAWYERS SAY ARE POSSIBLE ARE REALLY POSSIBLE.

2            SAMSUNG BROUGHT YOU NO ONE TO EXPLAIN THE PAGE AFTER PAGE

3    OF COPYING DOCUMENTS THAT YOU HAVE SEEN IN SAMSUNG'S FILES.

4            SAMSUNG BROUGHT YOU NO ONE TO EXPLAIN HOW THEY DEVELOPED

5    THEIR PRODUCTS AND WHY THEY DID IT IN AN INFRINGING WAY.

6            INSTEAD, SAMSUNG HAS OFFERED YOU TWO WITNESSES,

7    MR. SHEPPARD AND MR. WAGNER.  THAT'S IT.

8            AND A LOT OF ARGUMENT FROM ATTORNEYS.  AND REMEMBER WHAT

9    HER HONOR JUST SAID.  WHAT THE ATTORNEYS SAY IS NOT EVIDENCE

10   ABOUT WHAT COULD HAVE BEEN DONE, WHAT SHOULD HAVE BEEN DONE,

11   WHAT WOULD HAVE BEEN DONE.

12           WELL, LET'S LOOK AT WHAT THE PARTIES DID, NOT WHAT THEY

13   WISHED THEY HAD DONE.  LET'S LOOK AT THE DOCUMENTS THAT YOU'LL

14   HAVE BACK IN THE ROOM, WHAT THEY TELL US ABOUT WHAT ACTUALLY

15   HAPPENED.

16           AND I'M GOING TO START WITH APPLE.

17           IN HIS OPENING, MR. MCELHINNY ASKED YOU TO GO BACK IN

18   TIME.  HE SAID IT WAS ONE OF THE HARDEST THINGS THAT WE AS, YOU

19   AS JURORS, WE AS LAWYERS HAVE TO DO.  HE ASKED YOU WHERE YOU

20   WERE ON JANUARY 9TH, 2007 WHEN THE IPHONE WAS INTRODUCED.

21           BUT YOU NOW KNOW, WE HAVE TO GO BACK FURTHER IN TIME.  WE

22   HAVE TO GO BACK ALMOST A DECADE TO THE BEGINNING OF THE

23   DEVELOPMENT OF THE IPHONE.

24           TEN YEARS AGO, APPLE MADE AN AMBITIOUS AND RISKY DECISION.

25   IT WAS A COMPUTER COMPANY, A COMPANY THAT SOLD COMPUTERS AND

1    HAD A SUCCESSFUL IPOD.

2          BUT IT HAD NEVER MADE A PHONE, AND NO ONE HAD EVER MADE A

3    SMARTPHONE LIKE IT MADE EVENTUALLY.

4          BUT AS MR. SCHILLER TOLD US, APPLE DECIDED TO RISK IT ALL.

5    IT DECIDED TO DEVELOP A BET-THE-COMPANY PRODUCT, A BEAUTIFUL

6    AND INTUITIVE, MULTIFUNCTION SMARTPHONE THAT THE WORLD HAD

7    NEVER SEEN BEFORE.

8          HUNDREDS OF APPLE ENGINEERS WORKED IN SECRET TRYING TO

9    DEVELOP SOMETHING THAT HAD NEVER BEEN DONE BEFORE.  THEY WORKED

10   TIRELESSLY WITH NO GUARANTEE OF SUCCESS.  THEY INVENTED.  THEY

11   CREATED.  THEY INNOVATED.

12         AND AFTER MORE THAN THREE YEARS, HUNDREDS OF THOUSANDS OF

13   HOURS, BILLIONS OF DOLLARS OF INVESTMENT, AS WE NOW KNOW, THEY

14   INVENTED THE IPHONE.

15         NOW, LET ME ASK YOU JUST FOR A MINUTE, JUST FOR A MINUTE,

16   TO PUT YOURSELF IN THE POSITION OF THESE INVENTORS.  SOME OF

17   THESE INVENTORS ARE WELL KNOWN TO YOU.  MR. JOBS WAS ONE OF THE

18   INVENTORS OF THE D'677 PATENT.

19         BUT SOME OF THEM, FOR INSTANCE, THE INVENTORS OF THE '163

20   PATENT, ARE FOLKS THAT YOU MAY HAVE HEARD OF, LIKE

21   MR. FORSTALL, BUT MANY OF WHICH YOU PROBABLY HAVE NOT HEARD

22   ABOUT AT ALL.

23         LADIES AND GENTLEMEN, I ASK YOU TO PUT YOURSELF IN THEIR

24   POSITION FOR THIS REASON:  THESE ARE THE PEOPLE WHO WENT TO THE

25   CUPERTINO RESEARCH FACILITY DAY AFTER DAY AFTER DAY.  THESE ARE

1    THE PEOPLE WHO KNEW THAT THEIR FUTURE, THE FUTURE OF THEIR

2    COMPANY, AND THE FUTURE OF THEIR FELLOW EMPLOYEES DEPENDED UPON

3    THEIR ABILITY TO INVENT AND INNOVATE WHERE OTHERS HAD NOT DONE

4    BEFORE.

5         THESE ARE THE PEOPLE WHO CAME INTO THE FACILITY BEFORE THE

6    SUN CAME UP AND LEFT AFTER THE SUN WENT DOWN.

7         AND THESE ARE THE PEOPLE WHO REVOLUTIONIZED THE WAY THAT

8    WE COMMUNICATE WITH EACH OTHER.

9         IMAGINE THAT YOU'RE ONE OF THEM TODAY, YEARS LATER, AFTER

10   A JURY SITTING IN YOUR CHAIRS HAD DETERMINED THAT SAMSUNG HAS

11   TAKEN THEIR INVENTIONS, HAS USED THEM MILLIONS OF TIMES, AND

12   IMAGINE YOU'RE ONE OF THEM LISTENING TO SAMSUNG SAY YOUR

13   INVENTIONS ARE INSIGNIFICANT, YOUR INVENTIONS ARE NARROW.

14        WELL, WE ACTUALLY KNOW TODAY THAT AFTER THREE YEARS OF

15   WORK WHEN THE IPHONE CAME TO MARKET, IT ACTUALLY WAS A

16   REVOLUTION.

17        YOU DON'T HAVE TO TAKE MY WORD FOR IT.  ONE OF THE TWO

18   WITNESSES SAMSUNG CALLED, MR. WAGNER, THEIR EXPERT, SAID HE

19   AGREED IT WAS A REVOLUTION.

20        BUT IF WE GO BACK IN TIME TO JANUARY 6TH, 2007, AS FOLKS

21   SAT IN THE MOSCONE CENTER IN SAN FRANCISCO WAITING FOR THE

22   PRESENTATION, THE WORLD DID NOT KNOW WHAT TO EXPECT.  THE WORLD

23   DIDN'T KNOW WHAT MR. JOBS WAS GOING TO INTRODUCE, AND APPLE

24   DIDN'T KNOW HOW THE WORLD WOULD REACT TO THIS INNOVATION AND

25   THIS INVENTION.

1          THE REACTION WAS IMMEDIATE AND IT WAS OVERWHELMING.  THE

2     "NEW YORK TIMES" CALLED THE IPHONE GORGEOUS.  THIS IS PX 133,

3     AND YOU'LL HAVE IT IN THE JURY ROOM.

4          THE "NEW YORK TIMES" SAID "EVIDENTLY, THE FAIRY GODMOTHER

5     LIVES IN SOME BACK ROOM AT APPLE."

6          NOW, LET ME MENTION ONE THING HERE.  YOU MAY RECALL WHEN

7     IT CAME INTO EVIDENCE, HER HONOR SAID IT'S NOT ADMITTED FOR THE

8     TRUTH.  IT ISN'T.  IT'S NOT ADMITTED TO SHOW THAT THE FAIRY

9     GODMOTHER LIVES IN SOME BACK ROOM AT APPLE.  IT'S ADMITTED TO

10    SHOW THAT THIS WAS THE REACTION, AND YOU CAN TAKE THIS FOR ITS

11    REACTION.

12         WE'RE THE LAST PEOPLE WHO WOULD TRY TO CONVINCE YOU THAT

13    THE FAIRY GODMOTHER LIVES AT APPLE.

14         BUT THEY WEREN'T THE ONLY ONES.  THE

15    "WALL STREET JOURNAL," PDX 2.1, DESCRIBES THE IPHONE AS "SIMPLY

16    BEAUTIFUL" AND "A WHOLE NEW EXPERIENCE AND PLEASURE TO USE."

17         AND IN PDX 3.1, YOU NOW KNOW THAT "TIME MAGAZINE" NAMED IT

18    THE INVENTION OF THE YEAR.

19         BUT REMEMBER WHAT MR. SCHILLER TOLD YOU.  NOT ALL THE

20    REACTION WAS POSITIVE.  THERE WERE DOUBTERS.  THERE WERE PEOPLE

21    WHO THOUGHT THE IPHONE WOULD FAIL.  THERE WERE PEOPLE WHO

22    THOUGHT APPLE WOULD FAIL.

23         AND, LADIES AND GENTLEMEN, ONE OF THE GROUPS THAT DOUBTED,

24    AS YOU NOW KNOW, WAS SAMSUNG.

25         NOW, AS TIME PASSED, IT BECAME CLEAR THAT THE IPHONE WAS,

```
 1        INDEED, A REVOLUTION.  INDEED, A STUNNING COMMERCIAL SUCCESS.

 2             FOR ITS GROUNDBREAKING INVENTIONS, THE UNITED STATES

 3        PATENT AND TRADEMARK OFFICE AWARDED APPLE THE PATENTS THAT ARE

 4        BEFORE YOU, AMONG OTHERS.  MR. JOBS AND THE OTHER INVENTORS

 5        TOOK GREAT PRIDE IN THESE PATENTS AND THESE AWARDS.

 6             BUT THEY TOOK GREATER PRIDE IN THE PRODUCT THEY BROUGHT TO

 7        MARKET THAT CHANGED THE WAY WE LIVE.

 8             IN FACT, WHEN MR. JOBS GAVE HIS PRESENTATION AT THE

 9        MOSCONE CENTER, HE WARNED OTHER COMPETITORS THAT APPLE HAD 200

10        PATENTS THAT PROTECTED THE INVENTIONS THAT WENT INTO THE

11        IPHONE.

12             RECENTLY, AS YOU NOW KNOW, THE PATENT OFFICE ITSELF

13        RECOGNIZED THE MARVELOUS INNOVATION OF THE IPHONE WITH A

14        DISPLAY, A DISPLAY THAT HONORED MR. JOBS AND HIS CO-INVENTORS

15        WITH AN EXHIBIT FEATURING THEIR PATENTS.

16             NOW, APPLE DID IT NOT JUST ONCE, IT DID IT TWICE.  IT DID

17        IT WITH THE IPAD AS WELL.

18             AGAIN, AS YOU HEARD MR. SCHILLER TELL YOU, IT UNDERTOOK

19        THE RISK OF INVENTING A BEAUTIFUL, INNOVATIVE, AND

20        REVOLUTIONARY PRODUCT.  APPLE INTRODUCED THE IPAD.  IT, TOO,

21        HAS BEEN ENORMOUSLY SUCCESSFUL.  IT, TOO, WAS THE PRODUCT OF

22        HARD WORK AND RISK.  IT, TOO, REVOLUTIONIZED THE MARKET.  AND

23        IT, TOO, HAS BEEN COPIED.

24             NOW, LET'S TALK ABOUT WHAT SAMSUNG DID AT THE SAME TIME.

25             AS MR. MCELHINNY TOLD YOU IN HIS OPENING, IN SOME WAYS,
```

1    OUR BEST WITNESS IN THIS CASE IS SAMSUNG.  SAMSUNG HAS ITS

2    STORY THAT IS TOLD BY THE DOCUMENTS THAT HAVE BEEN PRODUCED IN

3    THIS LITIGATION FROM ITS OWN FILES.

4         NOW, THE IPHONE LAUNCHED IN JUNE 2007.  HERE, IN PDX -- IN

5    PX 3A.1, WHICH YOU'LL HAVE, HERE ARE SOME OF THE PHONES THAT

6    SAMSUNG WAS SELLING BEFORE THE IPHONE WAS INTRODUCED.

7         NOW, AS YOU KNOW FROM PX 34, A FEW MONTHS LATER, JUST A

8    FEW MONTHS LATER IN SEPTEMBER 2007, SAMSUNG SET OUT TO

9    CAREFULLY ANALYZE THE IPHONE.  THIS ANALYSIS, WHICH YOU'LL HAVE

10   IN THE JURY ROOM, WAS DONE BY THE GROUP AT SAMSUNG WHO HAD

11   APPLE'S CONFIDENTIAL INFORMATION ABOUT THE COMPONENTS FOR THE

12   IPHONE.

13        AND WHAT DID THEY CONCLUDE?  THEY CONCLUDED, IN

14   EXHIBIT 34, THAT APPLE HAD MADE A DEVICE THAT WAS EASY AND

15   INTUITIVE.  IT HAD A BEAUTIFUL DESIGN.  AND IT HAD HARDWARE,

16   HARDWARE, THE OUTSIDE, THAT WAS, TO QUOTE SAMSUNG, "EASILY

17   IMITATED."

18        BUT AS I SAID EARLIER, BACK IN 2007, SAMSUNG WASN'T SURE

19   THAT APPLE WAS GOING TO BE A SUCCESS.  IT WAS ONE OF THE

20   DOUBTERS.

21        SO HOW DID SAMSUNG DEMONSTRATE THAT?  HERE'S PX 3A.2.

22   HERE ARE THE PHONES THAT SAMSUNG INTRODUCED, SOME OF THE PHONES

23   THAT SAMSUNG INTRODUCED IN THE YEAR AFTER THE IPHONE CAME TO

24   MARKET.

25        BUT THEN, SAMSUNG REALIZED IT HAD BEEN WRONG.  IT REALIZED

1    THAT APPLE, IN FACT, WAS REVOLUTIONIZING THE MARKET.  IT

2    RECOGNIZED THAT THE IPHONE HAD BECOME THE STANDARD.

3         THE IPHONE WENT FROM A STANDING START TO MORE THAN 20

4    PERCENT OF THE MARKET.

5         AND IT WASN'T JUST SAMSUNG WHO REALIZED IT.  ITS

6    CUSTOMERS, ITS CARRIERS WERE TELLING IT.

7         IN PX 36, SAMSUNG RECOGNIZED AND WAS TOLD THAT THE IPHONE

8    WAS GETTING RAVE REVIEWS FROM CONSUMERS AND THE PRESS.

9         IN PX 40, SAMSUNG BEGAN HEARING FROM ITS CARRIERS, AT&T,

10   VERIZON, THAT IT WAS HARD TO SELL SAMSUNG PHONES, ITS KIND OF

11   PHONES.

12        WE NOW KNOW WHAT HAPPENED.  IN FEBRUARY OF 2010, THERE WAS

13   A SUMMIT MEETING.  J.K. SHIN, THE HEAD OF WORLDWIDE MOBILE,

14   CALLS EVERYBODY IN SAMSUNG'S TOP MANAGEMENT TOGETHER.

15        AND WHAT DO THEY WANT TO TALK ABOUT?  THEY WANT TO TALK

16   ABOUT THE UNEXPECTED COMPETITOR.  REMEMBER I SAID THAT THERE

17   WAS A DOUBTER?  IT WAS SAMSUNG.

18        YOU DON'T HAVE TO TAKE MY WORD FOR IT.  THIS IS SAMSUNG

19   SAYING HERE'S THE UNEXPECTED COMPETITOR, AND THEN THEY COMPARE

20   THE IPHONE TO THE PRODUCTS THEY HAD IN DEVELOPMENT AND THEY

21   SAID THE DIFFERENCE WAS "THE DIFFERENCE BETWEEN HEAVEN AND

22   EARTH."

23        HEAVEN, THE IPHONE; EARTH, THE SAMSUNG PHONES.

24        AND THEY CONCLUDED, AS YOU NOW KNOW, THAT THERE WAS A

25   CRISIS IN DESIGN.

1          OUR -- NOT OUR WORDS.  THEIR WORDS.  AND WHEN YOU LOOK AT

2    THE ORIGINAL DOCUMENT, IT'S IN BOLD.  IT WAS THAT IMPORTANT.

3          WHY WAS THERE A CRISIS IN DESIGN?  MR. SHIN SAID SO IN

4    WRITING, AND HE TOLD FOLKS WHY.  HE SAID THAT HE LACKED

5    CONFIDENCE IN SAMSUNG'S USER INTERFACE AND EXPERIENCE.

6          LADIES AND GENTLEMEN, THE FIRST OF THE THREE UTILITY

7    PATENTS, THEY'RE ALL ABOUT THE USER INTERFACE.

8          HE SAID, IN THE SAME DOCUMENT, THAT HE WAS BEING TOLD THAT

9    SAMSUNG WAS DOZING OFF.  AND SO HE GAVE AN INSTRUCTION.  HE

10   GAVE TWO INSTRUCTIONS.  THE FIRST INSTRUCTION, WHICH YOU'LL

11   FIND AT PX 40.5, WAS "THE TIME HAS COME TO CHANGE OUR METHODS."

12   INSTRUCTION NUMBER ONE.

13         WHAT WAS INSTRUCTION NUMBER TWO?  "LET'S MAKE SOMETHING

14   LIKE THE IPHONE."

15         AND WHAT DID SAMSUNG DO?  IT CHANGED ITS METHODS, JUST

16   LIKE THE BOSS SAID TO.  IT MADE SOMETHING LIKE THE IPHONE, JUST

17   LIKE THE BOSS SAID TO.

18         AND THOSE PRODUCTS INFRINGED FIVE APPLE PATENTS, 13

19   DIFFERENT PRODUCTS, AND 27 MILLION TIMES.

20         NOW, YOU MAY ASK YOURSELF, HOW COULD SAMSUNG DO IN MONTHS

21   WHAT IT TOOK APPLE THREE YEARS TO DO?

22         WE KNOW THE ANSWER TO THAT QUESTION NOW, AND WE KNOW IT

23   FROM SAMSUNG'S DOCUMENTS.  NOT FROM ME.  NOT FROM MR. MCELHINNY

24   OR MS. KREVANS.  BUT FROM SAMSUNG'S DOCUMENTS BECAUSE THOSE

25   DOCUMENTS TELL US EXACTLY WHAT HAPPENED.

1        ONE MONTH AFTER MR. SHIN SENT HIS DIRECTIVES OUT, HERE'S

2    WHAT HAPPENED.  IN PX 44, WHICH MR. MCELHINNY SHOWED YOU AT THE

3    OUTSET AND WHICH YOU'LL HAVE IN THE JURY ROOM, SAMSUNG COMPARED

4    THE PHONE THAT EVENTUALLY BECAME THE GALAXY WITH THE IPHONE.

5        NOW, SAMSUNG IDENTIFIED MANY DIFFERENCES BETWEEN THE TWO,

6    DIFFERENCES THAT ARE CALLED DEFICIENCIES.  THESE PROBLEMS --

7    THERE WAS A HOST OF PROBLEMS THAT WERE IDENTIFIED.

8        BUT AS YOU NOW KNOW, SOME OF THE PROBLEMS THAT WERE

9    IDENTIFIED, IMPORTANT PROBLEMS, WENT DIRECTLY TO THE PATENTS

10   BEFORE YOU.

11       SO WHEN YOU LOOK AT PX 44, YOU'LL SEE AT 44.58 SAMSUNG

12   SPECIFICALLY TOLD ITS ENGINEERS TO ADOPT APPLE'S DOUBLE TAP TO

13   ZOOM FUNCTIONALITY.

14       BUT THAT'S NOT ALL.  AT 44.122, PAGE 122, SAMSUNG

15   SPECIFICALLY TOLD ITS ENGINEERS TO MODIFY THE ICONS ON ITS

16   PHONES, ON ITS HOME SCREEN, TO MIMIC THE IPHONE, THE INVENTION

17   OF THE D'305 PATENT.

18       IN A SURVEY, A SEPARATE DOCUMENT THAT SAMSUNG HAD,

19   PX 36.36, SAMSUNG RECOGNIZED THAT CONSUMERS LIKE THE FUN EFFECT

20   OF GESTURES, LIKE THE TWO FINGERED PINCH AND THE FLICK, THE

21   INVENTION OF THE '915 PATENT.

22       SO WHAT DID SAMSUNG TELL ITS ENGINEERS TO DO?  YOU'LL

23   SEE -- YOU'LL HAVE EXHIBIT PX 46.66 BEFORE YOU.  THEY TOLD

24   THEIR ENGINEERS TO REDESIGN THEIR PRODUCTS BECAUSE THEY LACKED

25   THE BOUNCE EFFECT, AND TO INCORPORATE THE BOUNCE EFFECT, THE

1      BOUNCE EFFECT THAT'S COVERED BY THE '381 PATENT.

2           SAMSUNG ACTUALLY COPIED THE BOUNCE EFFECT FOR THE TABLETS

3      AS WELL.

4           I'M GOING TO PUT ON THE SCREEN NOW PX 57.73, AND WHILE IT

5      MAKES THE SAME POINT I JUST MADE FROM EXHIBIT 46, I BRING THIS

6      UP FOR ONE IMPORTANT REASON.  YOU HEARD A WEEK AGO THAT APPLE'S

7      INVENTIONS ARE NARROW, THAT THEY'RE INSIGNIFICANT, THAT THEY'RE

8      JUST ONE OF A THOUSAND THINGS.

9           WELL, HERE IS WHAT SAMSUNG WAS SAYING BACK IN 2011 WHEN IT

10     WAS DESIGNING THIS TABLET.  THE BOUNCE EFFECT WASN'T

11     INSIGNIFICANT.  IT WASN'T NARROW.  IT WAS SERIOUS.

12          REMEMBER, DOCUMENTS DON'T LIE.  YOU CAN'T GO BACK AND

13     CHANGE THEM.  IT WAS SERIOUS THEN.  IT WAS SERIOUS WHEN THEY

14     INCORPORATED IT.  IT WAS SERIOUS WHEN THEY INFRINGED.

15          NOW, I'M SURE THAT MR. PRICE IS GOING TO TELL YOU THAT

16     EVERYBODY BENCHMARKS.  THEY PLAYED THE VIDEOTAPED DEPOSITION

17     WHERE PEOPLE DISCUSS BENCHMARKING AND HE SAYS, WELL, THAT'S ALL

18     WE WERE DOING.

19          THAT'S NOT CORRECT.  LET ME SHOW YOU THE SLIDE THAT YOU

20     WERE SHOWN IN OPENING.  THIS WAS BENCHMARKING THAT THEY CLAIMED

21     APPLE WAS DOING.

22          WELL, LADIES AND GENTLEMEN, YOU NOW KNOW FROM THE EVIDENCE

23     THAT THIS SLIDE IS ACTUALLY DATED FEBRUARY 2007.  THE IPHONE

24     HAD BEEN INTRODUCED.  THE IPHONE HAD BEEN DESIGNED.  NO ONE IS

25     INCORPORATING FEATURES FROM THIS SAMSUNG PHONE ON THE RIGHT

1       INTO THE IPHONE.

2           THIS WAS, AS MR. SCHILLER TOLD YOU, COMPARING PRODUCTS ON

3       THE MARKET FOR BENCHMARKING PURPOSES.

4           NOW LET'S GO BACK TO WHAT SAMSUNG WAS DOING.

5           JUST MONTHS AFTER THE CRISIS IN DESIGN MEETING, JUST

6       MONTHS AFTER THE DIRECTIONS CAME DOWN FROM THE TOP, THIS IS

7       WHAT SAMSUNG'S PRODUCTS NOW LOOKED LIKE.  THIS IS PDX 109.

8       REMEMBER THE PRE-IPHONE PRODUCTS?  DO YOU REMEMBER THE PHONES

9       DURING THE PERIOD OF TIME WHEN THEY WERE DOUBTING?

10          THESE ARE THE PHONES AFTER THE CRISIS IN DESIGN MEETING

11      AND THE INSTRUCTIONS CAME DOWN FROM THE TOP.

12          NOW, WHAT HAPPENED AFTER THAT?  DEMAND FOR SAMSUNG PHONES

13      SKYROCKETED.

14          THIS IS PDX 108.8.  DO YOU REMEMBER MS. DAVIS EXPLAINING

15      THIS CHART TO YOU?  AND SHE DREW YOUR ATTENTION TO THE RED LINE

16      IN 2010.  THAT'S WHEN SAMSUNG, WHICH HAD BEEN LOSING MARKET

17      SHARE ON THOSE PHONES I SHOWED YOU BEFORE THE IPHONE COPY CAME

18      OUT, ALL OF A SUDDEN SPIKES UP.  AND SHE TOLD YOU, AND

19      MR. WAGNER DIDN'T DISPUTE IT, THAT 90 PERCENT, 90 PERCENT OF

20      THOSE PHONES INFRINGED APPLE'S PATENTS.

21          NOW, SAMSUNG HAS MADE MUCH OF THE FACT THAT ITS PHONES ARE

22      ANDROID, AND I'M GOING TO COME BACK TO THAT.  THEY ARE.

23          BUT YOU ALSO NOW KNOW THAT THERE ARE OTHER MANUFACTURERS

24      OF ANDROID-BASED PRODUCTS THAT WEREN'T SKYROCKETING LIKE THAT,

25      THAT WEREN'T ACHIEVING MARKET SHARE WITH 90 PERCENT OF THEIR

1       PHONES INFRINGING APPLE'S PATENTS.

2           WHAT WAS THE DIFFERENCE BETWEEN THESE OTHER ANDROID

3   MANUFACTURERS AND SAMSUNG?

4           MR. SCHILLER TOLD YOU.  HE TOLD YOU -- HE TOLD MR. PRICE,

5   UNDER CROSS-EXAMINATION, SAMSUNG HAD SYSTEMATICALLY COPIED

6   APPLE'S ENTIRE PRODUCT LINE.

7           NOW, WHEN APPLE SAW SAMSUNG'S SMARTPHONE, MR. SCHILLER

8   TOLD YOU HE WAS SHOCKED.

9           WHEN THEY SAW THEIR TABLET, THEY WERE SHOCKED AGAIN.

10          APPLE DID THE RIGHT THING.  IT ASKED SAMSUNG TO STOP USING

11  ITS TECHNOLOGY.  YOU SAW THAT IN THE POWERPOINT.

12          BUT SAMSUNG REFUSED.

13          APPLE HAD NO CHOICE.  IT SUED.  IF IT HAD NOT SUED AND

14  COME BEFORE YOU AND HER HONOR, IT WOULD HAVE ABANDONED THE

15  INVENTIONS AND IT WOULD HAVE ABANDONED ALL THE WORK DONE IN

16  THOSE LABORATORIES OVER A THREE YEAR PERIOD.

17          NOW, OBVIOUSLY APPLE COULDN'T ASSERT ALL OF ITS PATENTS,

18  SO IT CHOSE FIVE, FIVE THAT REFLECTED THE BREADTH OF THE

19  INVENTIONS, AND YOU NOW HAVE THEM BEFORE YOU.

20          YOU HAVE THE '381 PATENT, THE BOUNCE BACK.

21          YOU HAVE THE '915 PATENT, THE PINCH TO ZOOM.

22          YOU HAVE THE '163 PATENT, DOUBLE TAP TO ZOOM.

23          AND YOU HAVE THE TWO DESIGN PATENTS THAT RELATE TO ASPECTS

24  OF THE IPHONE'S APPEARANCE.

25          AND YOU ALSO NOW KNOW THAT A JURY SITTING IN THE SAME

1       EIGHT CHAIRS AS YOU DECIDED THAT THOSE PATENTS WERE VALID, THE

2       PATENT OFFICE DID THE RIGHT THING WHEN IT ISSUED THEM, AND THAT

3       SAMSUNG HAD INFRINGED THEM WITH 13 DIFFERENT PRODUCTS.

4            THAT JURY CONSIDERED SOME OF THE SAME PRIOR ART THAT WAS

5       PUT BEFORE YOU.  IN FACT, THEY SAW MORE, AS DR. SINGH TOLD YOU,

6       AND THEY FOUND EVERY PATENT VALID.

7            NOW, AT THE OPENINGS, THERE APPEARED TO BE SOME

8       DISAGREEMENT ABOUT THE TOTAL NUMBER OF ACTS OF INFRINGEMENT.

9       DO YOU REMEMBER THAT?  AND THE TOTAL NUMBER OF DOLLARS.

10           BUT YOU NOW KNOW THERE WAS REALLY NO DISAGREEMENT.

11      MS. WAGNER -- MR. WAGNER AND MS. DAVIS TOLD YOU THAT SAMSUNG

12      SOLD 10.7 MILLION INFRINGING PRODUCTS AND COLLECTED

13      $3.5 BILLION.

14           NOW, I WANT TO PUT THOSE NUMBERS IN CONTEXT BECAUSE I

15      THINK THEY WILL HELP YOU DECIDE THE ISSUES THAT ARE BEFORE YOU.

16           APPLE HAS ASKED YOU FOR ABOUT $380 MILLION.  THAT WILL

17      LEAVE SAMSUNG WITH $3.1 MILLION IN REVENUE.  YOU'VE HEARD A LOT

18      ABOUT ALL THESE OTHER FEATURES, ANDROID, LARGER SCREEN SIZE,

19      BATTERIES THAT ARE REMOVABLE.

20           NO ONE IS TRYING TO TAKE ALL OF THEIR REVENUES AWAY.

21      YOU'RE GOING TO HEAR ABOUT APPORTIONING INVENTIONS.  WE HAVE

22      DONE ALL THAT.  WE HAVE DONE WHAT HER HONOR'S JURY INSTRUCTIONS

23      REQUIRE.  WE HAVE ASKED FOR APPROXIMATELY 10 PERCENT OF WHAT

24      THEY COLLECTED FROM INFRINGING OUR PRODUCTS.

25           WE'RE LEAVING THEM WITH 90 PERCENT TO ADDRESS ANDROID,

1    SCREEN SIZE, REMOVABLE BATTERIES, AND ANY OTHER FEATURES THAT

2    THE PHONES MAY HAVE.

3         BUT THINK ABOUT WHAT SAMSUNG IS ASKING YOU TO DO.  THEY

4    ARE ASKING TO RETAIN $3.45 BILLION, 99 PERCENT, 99 PERCENT OF

5    WHAT THEY COLLECTED.  THAT'S NOT ABOUT OTHER FEATURES.  THAT'S

6    ABOUT TRYING TO PROFIT FROM ACTS OF INFRINGEMENT.

7         NOW, LET'S COME TO THE ULTIMATE ISSUE, THE ONLY ISSUE

8    YOU'LL BE ASKED TO DECIDE, WHICH IS HOW MUCH SHOULD SAMSUNG PAY

9    TO PUT APPLE BACK IN THE POSITION IT SHOULD HAVE BEEN IN IF ITS

10   INTELLECTUAL PROPERTY HAD NOT BEEN TAKEN.

11        APPLE CAN NEVER GET BACK TO WHERE IT SHOULD HAVE BEEN IN

12   2010.  AS HER HONOR TOLD YOU AT THE VERY BEGINNING, PATENTS ARE

13   ABOUT THE RIGHT TO EXCLUDE.  THEY'RE ABOUT THE RIGHT, FOR A

14   PERIOD OF TIME, TO BE ABLE TO PRACTICE YOUR INVENTION

15   EXCLUSIVELY.

16        NO ONE CAN GIVE THAT BACK TO APPLE.

17        AND DO YOU KNOW WHY?  I CAN'T SAY IT ANY BETTER THAN

18   MR. PRICE DID.  MR. PRICE SAID, AND WE'LL PUT IT ON THE SCREEN

19   NOW, THAT SAMSUNG CROSSED THE LINE.

20        SAMSUNG DESTROYED APPLE'S RIGHT TO BE THE ONLY SMARTPHONE

21   MANUFACTURER USING ITS PATENTED DESIGNS.  THE INFUSE 4G BY

22   ITSELF INFRINGED ALL FIVE OF THESE PATENTS.

23        LADIES AND GENTLEMEN, THAT'S NOT COINCIDENCE.  THAT DIDN'T

24   HAPPEN BY HAPPENSTANCE.

25        NOW, YOU'RE PROBABLY ASKING YOURSELF, HOW AM I GOING TO

1    KEEP ALL THIS STRAIGHT?  THE JUDGE IS GOING TO GIVE US A

2    CALCULATOR.  HOW ARE WE GOING TO DETERMINE WHAT THE DAMAGES ARE

3    FOR THESE 13 PRODUCTS?

4         WHAT I'M GOING TO TRY TO DO IS WHAT MR. MCELHINNY

5    PROMISED.  WE'RE GOING TO TRY TO GIVE YOU THE INFORMATION THAT

6    WE THINK WILL HELP YOU DECIDE THE ISSUE.

7         MUCH OF IT COMES FROM MS. DAVIS, AND MS. DAVIS, DURING HER

8    EXAMINATION, THIS EXHIBIT -- IT'S EXHIBIT 25F WHICH YOU'LL HAVE

9    IN THE JURY ROOM -- HAS HER ANALYSIS AND IT ACTUALLY WILL

10   ANSWER THE QUESTIONS IN THAT VERDICT FORM IN THE RED WELL.

11        THE FIRST QUESTION YOU'RE GOING TO BE ASKED TO ANSWER IS

12   THIS:  WHAT IS THE TOTAL DOLLAR AMOUNT THAT APPLE IS ENTITLED

13   TO RECEIVE IN DAMAGES FROM SAMSUNG?

14        THAT'S THE FIRST.

15        THE SECOND IS MORE SPECIFIC:  FOR THE TOTAL DOLLAR AMOUNT

16   IN YOUR ANSWER TO QUESTION 1, PLEASE PROVIDE A BREAKDOWN BY

17   PRODUCT.

18        LET ME REVIEW THE EVIDENCE WE GAVE YOU THAT WE BELIEVE

19   WILL HELP ANSWER THOSE QUESTIONS FOR YOU.

20        PAGE 2 OF THIS EXHIBIT, 25F, WILL GIVE YOU OUR TOTAL

21   AMOUNT.  THIS IS THE AMOUNT THAT MS. DAVIS TESTIFIED TO.  SHE

22   SAID IT WAS CONSERVATIVE, AND WE BELIEVE IT IS, AND I THINK

23   I'LL BE ABLE TO SHOW YOU THE REASONS WHY.

24        THIS IS THE TOTAL NUMBER SHE CALCULATED FOR LOST PROFITS,

25   SAMSUNG'S PROFITS, AND REASONABLE ROYALTY, ALL FIVE PATENTS,

1    ALL INFRINGING PRODUCTS, NOT DOUBLE COUNTING FOR A SINGLE

2    PRODUCT, JUST SINGLE COUNTING.  OKAY?

3         NOW, IF WE TURN TO PAGE 4 OF EXHIBIT 25F, YOU'LL SEE THAT

4    MS. DAVIS HAS BROKEN IT DOWN BY PRODUCT, BY CATEGORY, WITH THE

5    TOTAL.

6         AND ON PAGE 4 OF EXHIBIT 25F, YOU WILL HAVE THE

7    INFORMATION THAT WE PRESENTED TO YOU.  YOU HAVE TO JUDGE

8    WHETHER WE SUPPORTED IT, WHETHER YOU BELIEVE MS. DAVIS'S

9    CONCLUSIONS.  WE HAVE -- THIS IS THE INFORMATION WE PRESENTED

10   YOU, AND THE FAR RIGHT-HAND COLUMN WILL ALLOW YOU TO COMPLETE

11   QUESTION 2 OF THE VERDICT FORM.

12        SO LET ME NOW GO TO SOME OF THE NUTS AND BOLTS OF THE

13   SPECIFIC DAMAGES CLAIMS, AND I'M GOING TO START WITH LOST

14   PROFITS.

15        NOW, I WANT TO SAY SOMETHING, BECAUSE IT MAY HAVE BEEN

16   HARD TO PICK UP DURING THE BACK AND FORTH IN THE LAST WEEK.

17   APPLE IS SEEKING LOST PROFITS ON ONLY 360,000 PHONES.  AND I'M

18   GOING TO TELL YOU WHY IN A MINUTE IT'S ONLY 360,000 PHONES.

19   THAT'S 3 PERCENT OF THE TOTAL INFRINGING PRODUCTS.

20        MS. DAVIS SAID THAT WAS A REASONABLE NUMBER TO CLAIM LOST

21   PROFITS ON, 360,000 PHONES, THAT IF SAMSUNG HAD BEEN OFF THE

22   MARKET WITH THESE 10 MILLION PHONES, APPLE WOULD HAVE SOLD

23   300,000.

24        REMEMBER WHAT MR. WAGNER SAID TO YOU?  IF SAMSUNG HAD BEEN

25   OFF THE MARKET, APPLE WOULD NOT HAVE MADE ONE SALE.  DOES THAT

1    MAKE SENSE?  THAT'S FOR YOU TO DECIDE.

2         NOW, LET ME EXPLAIN HOW MS. DAVIS GOT TO 360,000 FOR THE

3    '915 PATENT.

4         IN THE INSTRUCTIONS YESTERDAY -- IN THE INSTRUCTIONS

5    YESTERDAY, JUDGE KOH INSTRUCTED YOU THAT TO RECOVER LOST

6    PROFITS FOR INFRINGING SALES, APPLE MUST SHOW -- THIS

7    INSTRUCTION IS ON THE SCREEN RIGHT NOW.  I'M NOT GOING TO READ

8    IT AGAIN.

9         SHE THEN INSTRUCTED YOU AS FOLLOWS IN INSTRUCTION NUMBER

10   25:  ONE WAY APPLE MAY PROVE THE NUMBER OF SALES IT WOULD HAVE

11   MADE IF THE INFRINGEMENT HAD NOT HAPPENED IS TO PROVE ITS SHARE

12   OF THE RELEVANT MARKET, INCLUDING INFRINGING PRODUCTS.

13        THAT IS EXACTLY WHAT MS. DAVIS DID.  SHE SAID SHE WAS

14   CONSERVATIVE.  THE EVIDENCE DEMONSTRATES THAT SHE WAS.

15        SHE STARTED WITH NEARLY 7 MILLION PHONES THAT INFRINGED

16   THE '915 PATENT.  BUT SHE SAID, YOU KNOW, I'M NOT GOING TO ASK

17   FOR LOST PROFITS ON ALL 7 MILLION.  THAT WOULDN'T MAKE SENSE.

18        NO MORE SENSE THAN THE IDEA THAT APPLE WOULDN'T HAVE GOT

19   ONE OF THE 7 MILLION.

20        I'M GOING TO SAY THERE'S A SHORT PERIOD OF TIME DURING

21   WHICH THOSE PHONES COULDN'T HAVE BEEN SOLD, A DESIGN AROUND

22   PERIOD.

23        AND SHE SAID, DURING THAT PERIOD OF TIME, THE NUMBER OF

24   SALES BY SAMSUNG WAS 1.8 MILLION.

25        BUT THEN SHE SAID -- NOW, WHEN YOU GET TO THE 1.8 MILLION,

1    REMEMBER, MR. WAGNER SAYS APPLE WOULDN'T HAVE MADE EVEN ONE OF

2    THOSE SALES.

3        MR. WAGNER SAID THAT EVEN THOUGH, AGAIN, THE INTERNAL

4    DOCUMENTS OF SAMSUNG -- AND THIS IS PX 60.8 -- SAID THE U.S.

5    MARKET WAS BECOMING A TWO HORSE RACE, APPLE AND SAMSUNG.

6        BUT MS. DAVIS SAID, LOOK, I'M NOT GOING TO EVEN ASK FOR

7    ALL 1.8 MILLION PHONES.  SHE SAID THERE ARE OTHER COMPANIES

8    LIKE HTC, MOTOROLA, THERE ARE SOME OTHER PRODUCTS THAT SAMSUNG

9    HAD, THEY COULD HAVE MADE SOME OF THOSE SALES.

10       SO TO BE CONSERVATIVE, I'M GOING TO TAKE THE PHONES THAT

11   SAMSUNG SOLD -- DO YOU REMEMBER THIS ANIMATION?  SHE TOOK THE

12   SAMSUNG PHONES AND SHE SAID, I'M GOING TO DIVIDE THEM AMONG

13   OTHER SMARTPHONE MANUFACTURERS AND APPLE AND SAMSUNG AND THE

14   PORTION SHE GAVE APPLE WAS 360,000 SALES.

15       REMEMBER, NOW, MR. WAGNER SAID, OF THAT ORANGE BAR, ZERO,

16   NOT ONE.

17       NOW, MS. DAVIS THEN CALCULATED THE AMOUNT OF DAMAGES, AND

18   IT CAME TO $113 MILLION.

19       NOW, THE COURT ALSO INSTRUCTED YOU IN A SEPARATE SET OF

20   INSTRUCTIONS ABOUT SOMETHING CALLED THE PANDUIT FACTORS.  THIS

21   IS ANOTHER WAY TO PROVE LOST PROFITS, AND MS. DAVIS DID THAT AS

22   WELL.  WE CAN PROVE THEM UNDER INSTRUCTION 22 OR 23.

23   MS. KREVANS PUT IN THE EVIDENCE THAT WE BELIEVE DEMONSTRATES

24   BOTH.

25       THERE ARE FOUR FACTORS UNDER PANDUIT.  MS. DAVIS DESCRIBED

1     THEM TO YOU IN THE BIG DEMONSTRATIVE THAT WAS BEFORE YOU.  LET

2     ME GO THROUGH THEM VERY QUICKLY.

3           THE FIRST FACTOR WAS DEMAND FOR THE PATENTED PRODUCT.

4     EVERYBODY AGREES THAT THERE WAS DEMAND FOR THE IPHONE.

5     EVERYBODY AGREES THAT THERE WAS DEMAND FOR THE IPAD.  YOU SAW

6     THAT WHEN I TOLD YOU THE CHRONOLOGICAL STORIES OF THE PARTIES.

7           THE SECOND IS THE AVAILABILITY OF THE NON-INFRINGING

8     ALTERNATIVES, AND HERE IS THE COURT'S INSTRUCTION, AND THIS

9     BECOMES IMPORTANT BECAUSE OF ALL YOU'VE HEARD ABOUT

10    NON-INFRINGING ALTERNATIVES FROM SAMSUNG.

11          APPLE'S BURDEN IS TO SHOW THAT THERE WERE NO, THERE WERE

12    NO ACCEPTABLE NON-INFRINGING SUBSTITUTES FOR EACH OF THE

13    INFRINGING PRODUCTS, OR, IF THERE WERE, THE NUMBER OF SALES OF

14    EACH PRODUCT MADE BY SAMSUNG THAT APPLE WOULD HAVE MADE DESPITE

15    THE AVAILABILITY OF NON-INFRINGING SUBSTITUTES.

16          SO LET'S BE CLEAR.  WE CAN EITHER PROVE THERE WERE NONE,

17    OR WE COULD ACCOUNT FOR THEM.

18          BUT YOU NOW KNOW THAT MS. DAVIS ACCOUNTED FOR THEM.  SHE

19    ACCOUNTED FOR THE REAL WORLD NON-INFRINGING ALTERNATIVES AS

20    JUST DESCRIBED TO YOU.

21          SO WHAT DOES SAMSUNG SAY?  IT REALLY SAYS A COUPLE THINGS.

22    FIRST IT SAYS, WELL, THERE ARE THESE OTHER PRODUCTS OUT THERE,

23    THESE OTHER SAMSUNG PRODUCTS THAT WERE FOUND NOT TO INFRINGE

24    THE '915 PATENT.  THEY COULD BE NON-INFRINGING ALTERNATIVES.

25    DO YOU REMEMBER THAT?

```
1          WELL, LADIES AND GENTLEMEN, YOU'RE GOING TO SEE THE

2    JUDGE'S INSTRUCTION AT 23.  IF IT'S NOT INFRINGING, IT HAS TO

3    NOT INFRINGE THIS PATENT OR OTHER APPLE PATENTS.  YOU SEE THE

4    PHRASE "WHETHER SAMSUNG HAD TO DESIGN OR INVENT AROUND THE

5    PATENTED TECHNOLOGY (OR OTHER PATENTED TECHNOLOGY)."

6          THINK HOW MANY TIMES WHEN THEY TALKED TO YOU ABOUT A

7    NON-INFRINGING ALTERNATIVE, IT TURNED OUT THAT, WELL, OH MY

8    GOSH, THAT NON-INFRINGING PHONE INFRINGES A BUNCH OF OTHER

9    APPLE PATENTS.

10         THEY'RE NOT NON-INFRINGING ALTERNATIVES.  DO YOU THINK

11   APPLE WOULD HAVE SHARED THEM WITH SAMSUNG, TO ALLOW THEM TO

12   INFRINGE THE '915?  NO.

13         THE SECOND THING THEY SAID IS, WE HAVE THIS INTERCEPT

14   PHONE.  THIS IS THE NON-INFRINGING ALTERNATIVE, RIGHT?

15         WELL, LET ME SAY THIS ABOUT THAT.  THE FIRST IS YESTERDAY

16   YOU SAW THE J.D. POWER SURVEY.  THEY'RE CLAIMING THAT PEOPLE

17   WHO BOUGHT THEIR PHONE WOULD HAVE BOUGHT THE INTERCEPT RATHER

18   THAN THE IPHONE.

19         THIS IS THE LIST OF THE RANKING OF QUALITY OF PHONES BY

20   J.D. POWER.  ON THE LEFT IS THE APPLE IPHONE.  ON THE RIGHT,

21   WAY DOWN, IS THE INTERCEPT.  DO YOU THINK THAT REALLY IS WHAT

22   WAS GOING TO HAPPEN IN THE REAL WORLD?  THAT THE PEOPLE WHO

23   COULDN'T GET THESE INFRINGING PHONES WERE GOING TO SAY, I'M

24   GOING TO BUY SOMETHING AT THE BOTTOM OF THIS.  RIGHT?  OR ARE

25   THEY GOING TO GO TO THE TOP OF THIS?
```

1          BUT IN THE END, IT DOESN'T REALLY MATTER BECAUSE MS. DAVIS

2    SAID, WELL, I GET ALL THIS.  I'M NOT GOING TO FIGHT ABOUT IT.

3    I'M GOING TO GIVE THEM CREDIT FOR THE INTERCEPT, AND SHE DID.

4          REMEMBER, MR. WAGNER ADMITTED IT COMING AROUND THAT, OH,

5    YEAH, SHE DID ACCOUNT FOR THE INTERCEPT.

6          AND THE LAST THING THAT THEY SAY IS, COULDA, WOULDA,

7    SHOULDA.  WE COULDA DESIGNED AROUND.  WE WOULDA DESIGNED

8    AROUND.

9          REMEMBER HOW THEY SHOWED YOU NON-INFRINGING PHONES THAT

10   HAD BOUNCED BACK, ONE THEY SAY, AND ONE THAT DIDN'T.

11         DID THEY CALL A SINGLE WITNESS TO TELL YOU HOW HARD IT

12   WOULD BE TO TAKE THE SOFTWARE OF ONE AND PUT IT IN THE SOFTWARE

13   OF THE OTHER?  DID THEY CALL A SINGLE WITNESS WHO COULD EXPLAIN

14   TO YOU WHETHER THEY WERE, IN FACT, THE SAME?  NO.

15         AND DO YOU WANT TO KNOW WHY?  BECAUSE IF AN EXPERT WITNESS

16   GOT ON THE STAND, LIKE DR. BALAKRISHNAN AND DR. SINGH, AND WE

17   HAD A CHANCE TO CROSS-EXAMINE THEM, THEY WOULD HAVE HAD TO TELL

18   YOU, NO, THIS ISN'T EASY.  THIS IS WHY WE'VE DEVOTED OUR LIVES

19   TO COMPUTER SCIENCE.  THIS IS HARD.

20         SO WHEN YOU SEE THESE VIDEOS THAT THEY'VE SHOWED YOU IN

21   THE OPENING AND THEY COME BACK AGAIN IN THE CLOSING, ASK

22   YOURSELF THIS:  HAS THERE BEEN A SINGLE WITNESS TO EXPLAIN TO

23   YOU HOW HARD IT WOULD BE TO PUT ONE INTO THE OTHER?  TO

24   REDESIGN ONE PHONE TO BE ANOTHER?  HAS THERE BEEN A SINGLE

25   PIECE OF EVIDENCE?  THE ANSWER IS NO.

```
 1            INSTEAD, IT'S MOSTLY BEEN WHAT THE LAWYERS SAY.  BUT AS

 2      HER HONOR SAID, WHAT WE SAY IS NOT EVIDENCE.  IT'S JUST

 3      ARGUMENT.

 4            THE THIRD THING WAS CAPACITY.  AND, AGAIN, THIS IS ONE OF

 5      THE THINGS TO WHICH THERE'S NO DISPUTE.  MR. WAGNER AND

 6      MS. DAVIS AGREE THAT THERE WAS CAPACITY DURING THE RELEVANT

 7      TIME TO PRODUCE MORE IPHONES.  MR. BLEVINS TALKED ABOUT IT.

 8      THEY ULTIMATELY AGREED.

 9            NOW, YOU WERE SHOWN THE DEPOSITION TESTIMONY OF MR. JUE.

10      DO YOU REMEMBER THAT?  HE TESTIFIED FOR A WHILE, AND HE WENT ON

11      FOR ABOUT 15 MINUTES ABOUT PRODUCT SHORTAGES OF IPHONES.

12            I SAT THERE WONDERING, WHY ARE WE LISTENING TO THIS?

13      BECAUSE MR. JUE WAS TALKING ABOUT 2010.

14            MS. DAVIS'S PERIOD WAS 2011.  IT HAD NOTHING TO DO WITH

15      NOTHING.  NOTHING.  IT WAS MISDIRECTION.

16            NOW, APPLE ALSO HAD THE CAPACITY TO SELL ADDITIONAL IPADS.

17      MR. BLEVINS WAS COMPLETELY SQUARE WITH YOU.  THEY HAD MORE

18      DEMAND FOR IPAD 2'S THAN THEY COULD HAVE EVER IMAGINED, BUT

19      THEY HAD IPAD 1'S THAT COULD HAVE FULFILLED THAT INCREMENTAL

20      INCREASE.

21            AND THEN, THE FOURTH THING MS. DAVIS DID IS TO USE ALL OF

22      THAT INFORMATION AND CALCULATE THE LOST PROFITS.  AND, AGAIN,

23      IT WAS $113 MILLION.

24            NOW, LET ME JUST SAY A FEW THINGS ABOUT THE ATTACK SAMSUNG

25      MADE ON MS. DAVIS'S CALCULATION.
```

1          FIRST THEY SUGGESTED THAT WE HAVE TO GO

2     CUSTOMER-BY-CUSTOMER, SALE-BY-SALE TO DEMONSTRATE TO YOU THAT

3     WE WOULD HAVE MADE THOSE SALES.

4          WELL, THE LAW ISN'T SO IMPRACTICAL.  THEY'RE THE

5     INFRINGER.  THEY KNOW WHAT THEY DID.

6          WE'RE TRYING TO DIG IT OUT AND ROOT IT OUT AND WE HAD TO

7     GO TO LITIGATION TO GET THE DOCUMENTS YOU'VE SEEN.

8          AS A CONSEQUENCE, ALL HER HONOR REQUIRES, AND IT'S IN

9     INSTRUCTION 22, IS THAT WE SHOW IT'S REASONABLY PROBABLE THAT

10    WE WOULD HAVE MADE THOSE SALES.

11         SAMSUNG SAYS A LOT ABOUT SURVEYS.  YOU'VE HEARD THE WORD

12    "SURVEY" MORE IN THE LAST WEEK THAN YOU PROBABLY HAVE IN YOUR

13    ENTIRE LIVES.

14         LET ME SAY THIS ABOUT THE ATTACK ON SURVEYS:  THE FIRST

15    THING IS YOU HAVE A WHOLE BUNCH OF SURVEYS THAT ARE IN THE

16    HISTORICAL DOCUMENTS THAT WERE DONE NOT FOR LITIGATION.

17         LET ME GIVE YOU THE BEST SURVEY.  THE BEST SURVEY IS THIS:

18    WHEN THE PHONE CAME TO THE MARKET, THEIR MARKET SHARE

19    SKYROCKETED ON THE BACK OF 90 PERCENT OF THEIR PRODUCTS

20    INFRINGING.  THAT'S THE MARKET'S -- THAT'S A CONSUMER SURVEY.

21    THAT'S PEOPLE SPEAKING WITH THEIR WALLETS.  WHAT BETTER SURVEY

22    COULD YOU HAVE?

23         YOU ALSO HAD DR. HAUSER, WHO DID A CONJOINT SURVEY, THE

24    TYPE OF SURVEYS HE'S DONE FOR PEOPLE LIKE GENERAL MOTORS, AND

25    DR. HAUSER'S SURVEY SHOWED THAT THERE WAS DEMAND FOR THE

1        FEATURES OF THE '915 PATENT.

2             BUT AGAIN, SAMSUNG'S OWN DOCUMENTS TELL YOU THIS FEATURE

3        WAS IMPORTANT.  EXHIBIT PX 36.36, REMEMBER THIS?  WE SHOWED IT.

4        MR. WAGNER SAID YESTERDAY HE HAD NOT SEEN A SINGLE DOCUMENT

5        THAT TALKED ABOUT THE IMPORTANCE OF THE '915 FEATURE.

6             AND ON RECROSS, I SAID, MR. WAGNER, THIS IS FROM SAMSUNG'S

7        FILES.  LOOK IN THE LOWER LEFT-HAND CORNER.  WHAT ARE THEY

8        TALKING ABOUT?

9             NOW, THERE'S A FINAL REASON THAT THE ATTACK ON SURVEYS IS

10       INCORRECT.  IT'S THE MORE WOULDA, COULDA, SHOULDA.

11            DID SAMSUNG PRODUCE TO YOU A SINGLE PERSON WHO DID A

12       SURVEY?  A SINGLE PERSON?

13            MR. SCHILLER TOLD YOU ABOUT APPLE'S SURVEYS.  DR. HAUSER

14       TOLD YOU ABOUT HIS SURVEYS.

15            SAMSUNG BROUGHT YOU NO ONE.  SAMSUNG SUGGESTED THAT

16       SOMEHOW BACK IN 2010 IT WAS APPLE'S JOB TO EXPECT THAT SOME

17       WOULD INFRINGE THEIR PATENTS AND TO DO A SURVEY THAT SAYS,

18       WELL, IF YOU INFRINGE OUR PATENTS, THAT FEATURE MUST BE

19       IMPORTANT?

20            AS MR. WAGNER SAID, THAT'S NOT HOW THE REAL WORLD WORKS.

21       PEOPLE ARE NOT DOING SURVEYS BANKING ON THE FACT THAT PEOPLE

22       ARE GOING TO INFRINGE THEIR INTELLECTUAL PROPERTY.

23            AND WHEN THE TIME CAME FOR LITIGATION, ONE PARTY DID A

24       SURVEY.  DR. HAUSER.  ONE PARTY DID NOT, AND INSTEAD JUST

25       ATTACKED THE OTHER.

1          NOW, LET ME GO TO SAMSUNG'S PROFITS.  SEPARATE, SEPARATE

2     CATEGORY.

3          AND IF YOU GO BACK TO MS. DAVIS'S SUMMARY OF CALCULATIONS

4     ON PAGE 2 OF EXHIBIT 25F, YOU'LL SEE THAT WE'RE ASKING FOR

5     $231 MILLION.

6          IS THAT A LOT OF MONEY?  IT IS.

7          BUT JUDGE IT AGAINST THE REVENUES.  JUDGE IT AGAINST THE

8     REVENUES THAT SAMSUNG GOT.

9          NOW, AS HER HONOR INSTRUCTED YOU, DESIGN PATENTS ARE A

10    VERY SPECIAL CATEGORY.  MR. MCELHINNY SAID IN HIS OPENING THAT

11    CONGRESS HAS MADE SPECIAL RULES AND IT'S BECAUSE DESIGN PATENTS

12    ARE IMPORTANT.  THE SPECIAL RULE, A RULE THAT SAMSUNG HAS

13    DESCRIBED AS VERY STRICT, IS CALLED INFRINGER'S PROFITS.  IT'S

14    A SPECIAL RULE FOR A SPECIAL PURPOSE, BECAUSE THE PURPOSE OF

15    DESIGN PATENTS IS TO KEEP PEOPLE FROM TAKING YOUR DESIGNS.

16         DESIGN PATENTS COVER DESIGNS THAT ARE NOT FUNCTIONAL.

17    THERE'S ONLY ONE REASON TO INFRINGE A DESIGN PATENT.  IT'S TO

18    TAKE THE DESIGN.

19         AND IF YOU TAKE THE DESIGN IN THE MANNER IN WHICH SAMSUNG

20    DID, THE LAW REQUIRES THAT YOU GIVE YOUR PROFITS BACK.

21         NOW, THIS IS NOT PUNISHMENT.  THIS IS NOT PUNITIVE.  THIS

22    IS SAYING, GIVE US BACK WHAT YOU GOT.  IT'S WHAT MR. WAGNER

23    ADMITTED WAS UNJUST ENRICHMENT.

24         NOW, MR. PRICE SAYS THE LAW IS VERY STRICT ON THIS.  THIS

25    IS WHAT HE SAID IN HIS OPENING.  AND HE'S CORRECT.

```
 1              AND AS YOU NOW KNOW -- I'M GOING TO PUT UP PDX 109.59 --

 2     THE TWO DESIGN PATENTS WERE INFRINGED BY SEVEN DIFFERENT

 3     PRODUCTS.

 4              NOW, THERE'S BEEN SOME WOULDA, COULDA, SHOULDA.  WE COULD

 5     HAVE CHANGED OUR ICONS.  IT WOULDN'T HAVE COST MUCH.  I THINK

 6     MR. WAGNER SAID IT WOULD HAVE COST ALMOST ZERO.

 7              BUT THEY DIDN'T.  THEY DIDN'T CHANGE THEIR ICONS.

 8              NOW, LET ME FOCUS THE DISPUTE FOR YOU ON THE SAMSUNG

 9     PROFITS, THIS VERY SPECIAL RULE, AND LET ME SAY THIS:  IF YOU

10     ACTUALLY LOOK AT THE INSTRUCTIONS FOR LOST PROFITS AND YOU

11     COMPARE THE INSTRUCTIONS FOR LOST PROFITS TO SAMSUNG'S PROFITS,

12     IT'S -- LET ME GIVE THEM TO YOU PRECISELY -- IF YOU COMPARE THE

13     TWO INSTRUCTIONS, YOU'LL SEE THAT THE MANNER IN WHICH YOU

14     COMPUTE LOST PROFITS IS DIFFERENT THAN THE MANNER IN WHICH YOU

15     COMPUTE INFRINGER'S PROFITS.  WHY?  BECAUSE OF THIS SPECIAL

16     RULE.

17              NOW, LET'S TALK ABOUT HOW YOU WOULD DO IT, AND HERE'S HOW

18     YOU WOULD DO IT.

19              SAMSUNG AND APPLE AGREE ON WHAT THE TOTAL REVENUES ARE.

20     SAMSUNG AND APPLE AGREE ON WHAT THE COSTS OF GOODS SOLD WERE.

21     SO THE QUESTION IS, ARE THERE OTHER EXPENSES THAT SHOULD BE

22     DEDUCTED?

23              AND THIS IS THE PLACE WHERE HER HONOR'S INSTRUCTIONS ARE

24     CRITICALLY IMPORTANT AND I'M GOING TO TAKE A LITTLE TIME TO

25     LOOK AT INSTRUCTION NUMBER 31.
```

1           AND I'M GOING TO -- YOU'LL HAVE THIS AND YOU SHOULD

2     CONSIDER IT IN ITS ENTIRETY.  I'M NOT SUGGESTING TO YOU FOR A

3     SECOND THAT THAT WHICH I'VE CALLED OUT SEPARATELY IS SOMETHING

4     YOU SHOULD CONSIDER SEPARATELY.

5           BUT LET'S LOOK AT WHAT HER HONOR SAID.  "SAMSUNG'S 'TOTAL

6     PROFIT' MEANS THE ENTIRE PROFIT ON THE SALE OF THE ARTICLE TO

7     WHICH THE PATENTED DESIGN IS APPLIED," NOT SOME PORTION, NOT

8     SOME FRACTION, THE ENTIRE THING.

9           SHE ALSO INSTRUCTED YOU THAT APPLE IS ENTITLED TO ALL

10    PROFIT EARNED BY SAMSUNG ON SALES THAT INFRINGE APPLE'S DESIGN

11    PATENTS.

12          AND THEN SHE SAID TWO CRITICALLY IMPORTANT THINGS THAT

13    WILL HELP YOU RESOLVE THIS QUESTION OF THESE OTHER EXPENSES,

14    ALL RIGHT?

15          SHE SAID, "EXPENSES CAN INCLUDE COSTS INCURRED IN

16    PRODUCING GROSS REVENUE, SUCH AS THE COST OF GOODS SOLD."

17    MS. DAVIS AND MR. WAGNER AGREE.

18          "OTHER COSTS MAY BE INCLUDED AS DEDUCTIBLE EXPENSES IF

19    THEY ARE DIRECTLY ATTRIBUTABLE TO THE SALE OR MANUFACTURE OF

20    THE INFRINGING PRODUCTS RESULTING IN A NEXUS BETWEEN THE

21    INFRINGING PRODUCTS AND THE EXPENSE."

22          ONE EXAMPLE, THE COST OF GOODS SOLD.  THAT'S THE FIRST

23    IMPORTANT THING IN HER INSTRUCTION.

24          AND THE SECOND IS THIS:  SAMSUNG HAS THE BURDEN OF PROVING

25    THE DEDUCTIBLE EXPENSES.

```
 1            WHY?  WHY WOULD SAMSUNG, IN A CASE WHERE WE HAVE THE

 2    BURDEN OF PROOF OF PROVING OUR DAMAGES TO YOU, WHY?  BECAUSE IN

 3    THIS SPECIAL CATEGORY, TO ENSURE THAT THE DESIGN PATENTS OF

 4    PEOPLE ARE NOT INAPPROPRIATELY TAKEN AND USED, THE BURDEN GOES

 5    TO THEM IF THEY WANT TO KEEP SOME OF THE MONEY.

 6            THESE RULES ARE DIFFERENT THAN GENERALLY ACCEPTED

 7    ACCOUNTING PRINCIPLES.  MS. DAVIS EXPLAINED THAT.  THESE ARE

 8    RULES FOR A SPECIAL PURPOSE.  ALL THE TESTIMONY ABOUT GENERALLY

 9    ACCEPTED ACCOUNTING PRINCIPLES, ALL THE TESTIMONY ABOUT

10    FINANCIAL, CONSOLIDATED FINANCIAL REPORTING, THEY HAVE NOTHING

11    TO DO WITH THIS.

12            WHY?  BECAUSE THERE ARE DIFFERENT RULES FOR DESIGN

13    PATENTS, DIFFERENT RULES THAT SERVE A DIFFERENT PURPOSE.

14            AND AS I SAID, MS. DAVIS TOLD YOU THEY WERE DIFFERENT.

15    THE COURT TOLD YOU THEY WERE DIFFERENT.  AND I WOULD ASK YOU

16    JUST TO COMPARE -- I HAVE THE RIGHT INSTRUCTIONS NOW -- COMPARE

17    INSTRUCTION 24 TO INSTRUCTION -- WHICH IS LOST PROFITS AND HOW

18    YOU COMPUTE IT -- WITH INSTRUCTION 31, WHICH TELLS YOU THE

19    SPECIAL RULES.

20            SO SAMSUNG HAS THE BURDEN, THE BURDEN OF PROVING TO YOU

21    THAT ITS ADVERTISING, GENERAL AND ADMINISTRATIVE, AND THESE

22    RESEARCH AND DEVELOPMENT EXPENSES ARE DIRECTLY ATTRIBUTABLE.

23            NOW, LET ME TRY TO ADDRESS ONE THING THAT WAS JUST A RED

24    HERRING.  WE'RE NOT CLAIMING THEY DIDN'T INCUR THESE EXPENSES.

25    OF COURSE THEY INCURRED THESE EXPENSES.
```

1           THE QUESTION IS WHETHER, ON THESE SPECIAL RULES, ARE THEY

2     DIRECTLY ATTRIBUTABLE?  IS THERE A NEXUS BETWEEN THEM?  AND THE

3     ANSWER IS THEY'RE NOT.

4           MS. DAVIS EXPLAINED TO YOU THAT IN HER EFFORT TO DETERMINE

5     WHETHER SAMSUNG COULD PROVE THIS TO YOU, SHE LOOKED AT THE

6     TESTIMONY.  SHE LOOKED AT THE DOCUMENTS.

7           SAMSUNG DID NOT PRODUCE A SINGLE DOCUMENT TYING THESE

8     EXPENSES TO THE SEVEN SPECIFIC PRODUCTS.  NOT ONE DOLLAR TO ONE

9     PHONE.

10          NOW, IT'S NOT A COINCIDENCE.  DO YOU REMEMBER MR. WAGNER

11    TALKING ABOUT THE SPREADSHEET THAT HE USED?  DO YOU REMEMBER

12    THAT IT TOOK NINE TIMES TO GET IT RIGHT?  DO YOU REMEMBER THAT

13    IT'S NOT REALLY THE UNDERLYING INFORMATION, JUST WHAT THE

14    SAMSUNG FOLKS PREPARED FOR MR. WAGNER?

15          WELL, SAMSUNG TRIED NINE TIMES, LADIES AND GENTLEMEN, NINE

16    TIMES TO GET IT RIGHT, AND AT THE END OF NINE TIMES, THERE'S

17    NOT A SINGLE DOCUMENT, A SINGLE ENTRY THAT TIES ANYTHING TO

18    THESE EXPENSES THAT MAKES THEM DIRECTLY ATTRIBUTABLE TO SOME

19    NEXUS AS THE COURT REQUIRES.

20          AND MR. WAGNER TESTIFIED HONESTLY YESTERDAY, CANDIDLY,

21    THAT HE COULD NOT DIRECTLY ATTRIBUTE, THAT HE HAD NOT A SINGLE

22    DOCUMENT, NOT A SINGLE DOCUMENT THAT DIRECTLY RELATES THOSE

23    COSTS, THE THREE CATEGORIES, TO A SPECIFIC PRODUCT.

24          MR. WAGNER WAS RIGHT.  YOU WILL GO BACK IN THE JURY ROOM

25    AND LOOK AT THE EXHIBIT BOOK AND YOU WILL NOT FIND A SINGLE

1      DOCUMENT THAT ATTRIBUTES THESE.

2          AND DID SAMSUNG PUT A WITNESS ON THE STAND WHO COULD

3      ATTRIBUTE ANY OF THESE COSTS TO THESE SEVEN PHONES?  NO.

4          TO RESEARCH AND DEVELOPMENT?  THEY WERE USING EXPENSES

5      THAT WERE INCURRED AFTER THE PHONE WAS ON THE MARKET.

6          FOR ADVERTISING, MR. WAGNER ADMITTED HE COULDN'T TIE ANY

7      OF THE ADVERTISING DOLLARS TO THE SPECIFIC PHONES.

8          AND HE ADMITTED THE SAME FOR GENERAL AND ADMINISTRATIVE.

9          REMEMBER THE ANALOGY WE TALKED ABOUT YESTERDAY.  YOU OWN A

10     GROCERY STORE, YOU HAVE RENT, YOU HAVE INSURANCE, YOU HAVE

11     FOLKS WORKING FOR YOU.  YOU'RE SELLING COKE ZERO, BUT DIET

12     PEPSI AND A HOST OF OTHER THINGS, RIGHT?

13         THE COST THAT'S DIRECTLY ATTRIBUTABLE TO COKE ZERO IS

14     PAYING FOR THE COKE ZERO, BUT THE OTHERS ARE NOT BECAUSE IF YOU

15     STOP SELLING IT AND SOLD JUST DIET COKE AND DIET PEPSI, YOU

16     STILL HAVE ALL THOSE COSTS.

17         NOW, YOU MAY SAY TO YOURSELF, WHY ARE THOSE SPECIAL RULES?

18         HERE'S THE REASON FOR THE SPECIAL RULES:  MS. DAVIS AND

19     MR. WAGNER AGREED THAT $850 MILLION WAS COLLECTED BY SAMSUNG

20     FOR PHONES THAT INFRINGE THE DESIGN PATENTS.

21         SAMSUNG WANTS TO KEEP $800 MILLION, AND IT WANTS TO KEEP

22     IT TO COVER EXPENSES LIKE GENERAL OPERATING AND ADMINISTRATIVE

23     EXPENSES AND RESEARCH AND DEVELOPMENT EXPENSES THAT HAVE

24     NOTHING TO DO WITH THIS PHONE, THESE PHONES.

25         BUT HER HONOR'S INSTRUCTIONS TELL YOU THAT'S NOT THE WAY

```
1     OUR LEGAL SYSTEM WORKS.

2          SO WHEN YOU GO BACK TO FILL OUT THE VERDICT FORM ON THE

3     DESIGN PATENTS, IF YOU TURN TO PX 25, AGAIN, PAGE 4, YOU WILL

4     SEE THAT MS. DAVIS HAS GIVEN YOU THE INFORMATION THAT SHE

5     CONCLUDED WAS APPROPRIATE FOR THE DESIGN PATENTS.

6          NOW, THE LAST CATEGORY, REASONABLE ROYALTY.  THIS IS --

7     WE'RE TAKING OUT ALL THE PRODUCTS THAT ARE IN LOST PROFITS.

8     WE'RE TAKING OUT ALL OF THE PRODUCTS THAT ARE IN SAMSUNG

9     PROFITS, AND THE QUESTION IS, WHAT'S LEFT?

10         NOW, TO BE CLEAR, FOR THE THREE UTILITY PATENTS, 8 MILLION

11    INFRINGING UNITS.  MR. WAGNER SAID $28,000.

12         MS. DAVIS GAVE YOU SOMETHING DIFFERENT.  SHE SAID, HERE'S

13    HOW YOU DETERMINE A REASONABLE ROYALTY, AND I BELIEVE THAT A

14    REASONABLE ROYALTY -- AND I'M PUTTING IT ON THE SCREEN NOW, THE

15    TESTIMONY NOW -- SHE TESTIFIED THAT THE '915 PATENT WOULD COVER

16    A ROYALTY OF $3.10 PER UNIT AND THE '381 AND '163 PATENT WOULD

17    COVER $2.02 PER UNIT.

18         NOW, THE TESTIMONY WAS HER DISCIPLINE IN WALKING THROUGH

19    THE ISSUES.

20         BUT, REMEMBER, WE DID MORE.  DR. BALAKRISHNAN AND

21    DR. SINGH GOT UP AND TALKED ABOUT THE IMPORTANCE OF THE

22    INVENTION.  THEY TALKED ABOUT WHAT HAD HAPPENED BEFORE.  THEY

23    TALKED ABOUT THE ADVANCE.  THEY TALKED ABOUT WHY THIS WAS

24    IMPORTANT.

25         MR. BLEVINS AND MR. SCHILLER GOT ON THE STAND AND TALKED
```

1          ABOUT THE COMMERCIAL SUCCESS OF THE PRODUCTS.

2                AND THEN, THROUGH OUR CROSS-EXAMINATION, SAMSUNG GOT ON

3          THE STAND, SAMSUNG GOT ON THE STAND IN THE FORM OF ITS OWN

4          DOCUMENTS, AND THEY TOLD YOU HOW EXTENSIVE THEIR USE WAS.  THEY

5          TOLD YOU WHY THEY USED IT, BECAUSE THE ORDER CAME FROM THE TOP

6          TO CHANGE THE WAYS OF DOING THINGS, MAKE SOMETHING JUST LIKE

7          THE IPHONE.

8                MS. DAVIS THEN APPLIED THESE ROYALTIES TO THE REMAINING

9          UNITS AND SHE CAME UP WITH A REASONABLE ROYALTY FOR THOSE

10         REMAINING UNITS OF $34.6 MILLION.

11               YOU CAN FIND -- EXCUSE ME.  YOU CAN FIND THAT ON PAGE 4 OF

12         PX 25.

13               NOW, HERE WAS WHAT MR. WAGNER SAID WAS A REASONABLE

14         ROYALTY.  MR. PRICE PUT THIS UP IN THE OPENING.  $28,000 FOR

15         NEARLY 11 MILLION ACTS OF INFRINGEMENT.

16               IMAGINE THAT YOU'RE ONE OF THE INVENTORS OF THESE PATENTS

17         SITTING HERE LISTENING TO THAT.  $30,000 FOR ALL OF THESE

18         INVENTIONS.

19               NOW, MR. WAGNER ADMITTED THAT HIS ENTIRE THEORY WAS

20         DEPENDENT UPON TELEPHONE CONVERSATIONS WITH SAMSUNG FOLKS IN

21         KOREA.  THEY DIDN'T SPEAK ENGLISH, HE DIDN'T SPEAK KOREAN.

22         THERE WERE SAMSUNG LAWYERS SITTING NEXT TO THEM TRANSLATING.

23               WE HAVE NO IDEA WHAT WAS SAID BECAUSE HE DIDN'T TELL US.

24               BUT WE DO KNOW THIS:  WHATEVER ESTIMATES THEY GAVE HIM, HE

25         DIDN'T KNOW WHAT WOULD NEED TO BE -- WHAT WOULD HAVE BEEN

1    REQUIRED TO DESIGN AROUND, WHO COULD HAVE DONE IT, HOW LONG IT

2    WOULD HAVE TAKEN, AND WE KNOW THAT HE DID NOTHING, NOTHING AT

3    ALL TO CONFIRM THE ACCURACY.

4         NOW, IT MIGHT HELP TO DO A REAL WORLD REALITY CHECK ON

5    THIS WOULDA, COULDA, SHOULDA, BECAUSE THINK ABOUT WHAT SAMSUNG

6    DID IN THE REAL WORLD.

7         SAMSUNG WANTS YOU TO BELIEVE THAT WHEN APPLE SAID

8    "STOP" -- I SAID "PLEASE STOP" YESTERDAY, I'LL JUST MAKE IT

9    "STOP" TODAY -- APPLE SAID "STOP," FOR $30,000, THEY COULD HAVE

10   AVOIDED ALL THE PROBLEMS.  THEY COULD HAVE AVOIDED MR. WAGNER'S

11   $1.9 MILLION.  THEY COULD HAVE AVOIDED ALL THOSE LAWYERS, AND

12   THEY SHOULD HAVE, IN FACT, AVOIDED ALL OF US.  RIGHT?  $30,000,

13   THEY COULD HAVE DONE THAT.

14        WHAT DID THEY DO?  YOU HEARD THE CROSS.  PHONE AFTER PHONE

15   AFTER PHONE, WEEK AFTER WEEK AFTER WEEK, MONTH AFTER MONTH

16   AFTER MONTH, THEY CONTINUED TO INTRODUCE INFRINGING PHONES.

17        IF YOU THINK THEY COULD HAVE AVOIDED ALL THIS FOR $30,000,

18   DO YOU THINK THEY WOULD HAVE CONTINUED TO SELL INFRINGING

19   PHONES FOR ANOTHER YEAR?  THIS IS THE PLACE WHERE YOUR COMMON

20   SENSE WILL HELP US REACH THE RIGHT RESULTS.

21        NOW, SAMSUNG'S INFRINGEMENT, FOR MANY OF THESE PHONES,

22   CONTINUED FOR SIX MONTHS, SEVEN MONTHS, AND MANY MORE MONTHS.

23        LET ME TALK ABOUT ONE FINAL THING.  THIS IS SAMSUNG

24   SHOWING YOU THE VIDEOS OF WHAT THEY SAY ARE NON-INFRINGING

25   PHONES, AND SAMSUNG IS SHOWING YOU PRIOR ART.  DO YOU REMEMBER

1    THIS?  FRACTAL ZOOM?  AND THEIR SUGGESTION WAS, WELL, THIS WAS

2    PRIOR ART.  THEY'RE TRYING TO SHOW YOU HOW NARROW THE

3    INVENTIONS WERE.

4         LET ME BE VERY CLEAR ABOUT WHAT SAMSUNG IS TRYING TO DO.

5    THEY WANT YOU -- AND HER HONOR HAS TOLD YOU THAT WE CANNOT DO

6    THIS -- TO REVISIT THE FIRST JURY DECISION.  THEY ARE

7    SUGGESTING TO YOU THAT SOMEHOW THIS SHOULD DRIVE YOUR DECISION.

8         DO YOU REMEMBER DURING VOIR DIRE WHEN I TURNED TO YOU AND

9    SAID, "ARE YOU ABLE TO ACCEPT THE FIRST JURY'S DECISION?"  LAST

10   TUESDAY I ASKED EACH OF YOU THAT, AND YOU ALL SAID YES.

11        WHY DID I ASK THAT?  BECAUSE WE KNEW, WE KNEW THIS WAS

12   WHAT WAS GOING TO HAPPEN.

13        WELL, LADIES AND GENTLEMEN, THE FIRST JURY SAW THIS, SAW

14   MORE, DR. SINGH TOLD YOU THAT, AND THE FRACTAL ZOOM GAVE YOU

15   THE BEST EXAMPLE POSSIBLE.  HE TOLD YOU THE FRACTAL ZOOM WAS

16   THIS HUGE TABLE WITH THIS BIG PROJECTOR AND A BIG COMPUTER AND

17   THE IDEA THAT YOU COULD EVER PUT IT IN A PHONE OR A TABLET WAS

18   BEYOND HIM.

19        AND HE TOLD YOU THAT THAT BIG THING SAT RIGHT HERE

20   OCCUPYING THIS SPACE BEFORE ME.  THE FIRST JURY SAW IT.  THEY

21   DETERMINED THE PATENT TO BE VALID.

22        DON'T REVISIT WHAT YOUR COLLEAGUES DID WHEN THEY FOUND

23   THIS PATENT, THESE PATENTS VALID AND INFRINGED.

24        NOW, AT THE END OF THE DAY, WHAT DOES MS. DAVIS TOTAL THEM

25   UP?  AND I'M GOING TO GO BACK TO THE BEGINNING.  SHE TOTALS

1    THEM UP, LOST PROFITS, 113 MILLION; SAMSUNG'S PROFITS, 23

2    MILLION -- 231 MILLION; REASONABLE ROYALTY, 34 MILLION.

3         IS THAT A LOT OF MONEY?  MR. MCELHINNY TOLD YOU IN THE

4    OPENING, YES, IT IS.

5         BUT, WOW, THERE WAS AN AWFUL LOT OF INFRINGEMENT.

6    $3.5 BILLION.  THAT'S THE NUMBER TO JUDGE THAT AGAINST.

7         NOW, I'M COMING TO THE END OF OUR FIRST PART OF OUR

8    CLOSING AND I'M GOING TO SIT DOWN AND YOU'RE NOT GOING TO HAVE

9    TO LISTEN TO ME AGAIN.

10        MR. PRICE WILL PROVIDE SAMSUNG'S CLOSING.  MR. MCELHINNY

11   WILL GET UP AND PROVIDE OUR FINAL WORD.

12        BUT LET ME LEAVE YOU WITH THIS THOUGHT:  OUR PATENT SYSTEM

13   HAS EXISTED FOR 200 YEARS.  IT IS THE SYSTEM THAT IS EMBEDDED

14   IN OUR CONSTITUTION.  IT IS A SYSTEM THAT ENCOURAGES AND

15   REWARDS INNOVATION, INVENTION, AND CREATIVITY.  IT IS A SYSTEM

16   THAT SAYS IF YOU INVENT, WE'LL GIVE YOU A PATENT, AND WE'LL

17   GIVE YOU THE RIGHT TO PROFIT FROM YOUR INVENTIONS.

18        AND THE FOLKS THAT HAVE, THE FOLKS THAT HAVE HAVE

19   REINVESTED IN MORE RESEARCH AND DEVELOPMENT, MORE JOBS, NEW

20   INVENTIONS, NEW PRODUCTS.

21        BUT IT'S ALSO A SYSTEM THAT SAYS, TO PROTECT THE

22   INVENTORS, WE'RE NOT GOING TO ALLOW PEOPLE TO INFRINGE.  WE'RE

23   NOT GOING TO ALLOW PEOPLE TO TAKE INTELLECTUAL PROPERTY FROM

24   OTHERS.

25        AND IF YOU DO, YOU HAVE TO PAY FOR THE PRIVILEGE.  YOU

1        HAVE TO PAY FOR HAVING INFRINGED ON OTHER PATENTS.

2             THAT SYSTEM HAS WORKED FOR US FOR 200 YEARS.  IT HAS MADE

3        US THE WORLD TECHNOLOGY LEADER.  IT HAS MADE US THE WORLD'S

4        LEADER IN INVENTIONS.

5             AND LADIES AND GENTLEMEN, THE EVIDENCE BEFORE YOU SHOWS

6        THIS:  APPLE DID EXACTLY WHAT OUR SYSTEM WANTS US TO DO.

7        APPLE'S FOLKS SAT IN THOSE ROOMS AND THEY INVENTED.  THEY

8        INNOVATED.  THEY CREATED.  THEY TOOK AN ENORMOUS RISK -- I KNOW

9        IT'S HARD TO GO BACK IN TIME -- BUT THEY TOOK AN ENORMOUS RISK,

10       AND THEY SUCCEEDED, AND THE PATENT OFFICE RECOGNIZED THAT THEY

11       DID.

12            AND APPLE CAME TO MARKET WITH ENORMOUSLY SUCCESSFUL

13       PRODUCTS.  THEY TOOK THE REVENUE, THEY REINVESTED IN RESEARCH

14       AND DEVELOPMENT, THEY BROUGHT NEW PRODUCTS LIKE THE IPAD TO

15       MARKET.  MORE JOBS, MORE RESEARCH, MORE DEVELOPMENT.

16            APPLE HAS DONE EXACTLY WHAT OUR SYSTEM SAYS WE SHOULD DO.

17            SAMSUNG HAS DONE EXACTLY WHAT OUR SYSTEM SAYS YOU SHOULD

18       NOT.  THEY TOOK INSTRUCTIONS FROM THE TOP TO CHANGE THEIR WAYS.

19       THEY TOOK INSTRUCTIONS FROM THE TOP TO COPY THE IPHONE.

20            AND THEY DID.  AND THEY INFRINGED OUR PATENTS MULTIPLE

21       TIMES, MULTIPLE PATENTS, MULTIPLE PRODUCTS, MILLIONS AND

22       MILLIONS OF TIMES.

23            BUT OUR SYSTEM CAUGHT THEM.

24            SAMSUNG TOLD THE FIRST JURY THE PATENTS WERE INVALID.  THE

25       JURY SAID, NO, THAT'S WRONG.

1    SAMSUNG TOLD THE FIRST JURY, NO, WE DON'T INFRINGE ANY OF

2    THESE.  THE JURY SAID, NO, THAT'S WRONG.

3        NOW SAMSUNG IS AT ITS THIRD AND FINAL EXCUSE, WHICH IS

4    THESE ARE NARROW.  THEY'RE INSIGNIFICANT.  THERE'S ALL THESE

5    OTHER FEATURES.  WE WANT TO KEEP 99 PERCENT OF WHAT WE REALIZED

6    FROM INFRINGING.

7        AND TO DO THAT, THEY ARE TELLING YOU THAT APPLE WOULD NOT

8    HAVE SOLD ONE PHONE IF THEIR INFRINGING PHONES WERE OFF THE

9    MARKET.  THEY'RE TELLING YOU FOR THREE INVENTIONS THAT WERE

10   PRAISED BY EVERYONE OVER A PERIOD OF NOW ALMOST SEVEN YEARS, WE

11   SHOULD GET $30,000.

12       DOES THAT MAKE SENSE TO YOU?  I'M GOING TO LEAVE THAT

13   ISSUE TO YOU.

14       BUT I WILL SAY THIS:  IF YOU ACCEPT SAMSUNG'S NUMBER, YOU

15   HAVE TURNED OUR SYSTEM ON ITS HEAD.  THE SYSTEM WILL BECOME ONE

16   WHERE THE INFRINGER PROFITS AND THE INVENTOR IS PUNISHED.  DOES

17   THAT MAKE SENSE?

18       THANK YOU.

19       THE COURT:  ALL RIGHT.  IT IS NOW 9:56.  WE'LL GO

20   AHEAD AND WE'LL TAKE A 15 MINUTE BREAK AT 10:30.  OKAY?

21       YOU READY?  OKAY.  TIME IS NOW 9:57.  GO AHEAD, PLEASE.

22       **(MR. PRICE GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

23   **DEFENDANT.)**

24       MR. PRICE:  LADIES AND GENTLEMEN, I WANT TO THANK

25   YOU, AS MR. LEE DID, FOR SITTING HERE AND LISTENING TO THIS

1    AVALANCHE OF INFORMATION AND NUMBERS.  IT MAY NOT BE THE MOST

2    EXCITING THING YOU'VE DONE IN YOUR LIFE, BUT IT'S OBVIOUSLY

3    VERY IMPORTANT AND WE VERY MUCH APPRECIATE THE ATTENTION YOU'VE

4    GIVEN THIS.

5         I WANT TO TALK ABOUT MR. LEE'S PRESENTATION.  YOU KNOW, I

6    HAD AN OUTLINE, AND AS WHAT USUALLY HAPPENS WHEN YOU GO SECOND,

7    YOU KIND OF HAVE TO THROW IT OUT THE DOOR SOMETIMES BECAUSE I

8    WANT TO START WITH, WITH TWO THINGS.

9         ONE IS, AS I SAID A WEEK AGO WHEN I STOOD UP HERE BEFORE

10   YOU, THAT SAMSUNG IN THIS PART OF THE CASE IS NOT CHALLENGING,

11   YOU KNOW, THE JURY'S FINDING THAT WE INFRINGED CERTAIN PATENTS,

12   AND I'M GOING TO TALK TO YOU ABOUT THOSE PATENTS AND ABOUT THE

13   SCOPE.

14        AND I HAVE TO DO THAT BECAUSE EVEN THOUGH WE'RE HERE

15   WILLING TO PAY WHAT THE LAW PROVIDES FOR DAMAGES, APPLE HAS

16   TRIED TO MISCHARACTERIZE THESE PATENTS SO THAT THEY ARE THE

17   IPHONE.  APPLE HAS TRIED TO SAY, IN EFFECT, YOU KNOW, BEAUTY,

18   YOU CAN'T MAKE SOMETHING THAT'S ATTRACTIVE.  THEY'VE TRIED TO

19   SAY WITH THESE PATENTS, YOU KNOW, BECAUSE WE HAVE CERTAIN

20   PATENTS, YOU HAVE TO MAKE SOMETHING THAT'S HARD TO USE.

21        THEY BASICALLY HAVE LOOKED AT THESE PATENTS AND SAID, IT'S

22   OUR ENTIRE PRODUCT, AND IT'S NOT.  AND I'M GOING TO TALK ABOUT

23   THE DESIGN PATENTS AND THE RULES THAT APPLY TO THOSE.

24        BUT WITH RESPECT TO THESE THREE UTILITY PATENTS, YOU'LL

25   RECALL THAT MR. LEE SAID, I THINK, THAT APPLE HAD 200 PATENTS

1    THAT COVERED THE IPHONE.  WE'RE ONLY TALKING ABOUT THREE HERE,

2    AND THE QUESTION IS, YOU KNOW, WHAT ABOUT THOSE OTHER INVENTORS

3    ON THE IPHONE?  DON'T THEIR PATENTS MATTER?

4         THEY'RE SAYING THESE THREE INVENTIONS, BECAUSE SOME OF

5    THEM WERE USED IN SAMSUNG PRODUCTS, DROVE SAMSUNG SALES.

6         AND I'M GOING TO SHOW YOU HOW THE EVIDENCE SHOWS THAT

7    ISN'T TRUE.

8         BUT ONE THING I WANTED TO MENTION FAIRLY QUICKLY IS

9    MR. LEE MADE THE ARGUMENT, IF THERE WERE ALL THESE SUBSTITUTES

10   OUT THERE AT THE TIME, THEN WHY DID SAMSUNG KEEP INFRINGING

11   WHEN THEY WERE TOLD STOP?  DO YOU REMEMBER THAT QUESTION?

12        AND WHAT HE FORGOT TO TELL YOU IS THAT, YOU KNOW, WHEN

13   SAMSUNG WAS ACCUSED -- YOU KNOW, FIRST OF ALL, THERE IS AN OPEN

14   ISSUE AS TO WHETHER OR NOT WE INFRINGED PATENTS.  WE'RE

15   ENTITLED TO HAVE SOMEONE DECIDE THAT WHEN THERE ARE

16   DISAGREEMENTS.

17        FOR EXAMPLE, WITH THE -- WITH THE DESIGN PATENTS, YOU'VE

18   SEEN THE PATENT DESIGN.  THAT'S D'677, AND I THINK IT'S

19   JX 1043.2.  I DON'T KNOW IF YOU REMEMBER THE, THE PATENT

20   ITSELF, BUT IT COVERS THE FACE.

21        AND APPLE'S BASICALLY, WHEN THEY SUED SAMSUNG, SAID, YOU

22   CAN'T MAKE ANY PHONES THAT, THAT LOOK PRETTY, THAT LOOK

23   ELEGANT.

24        HERE'S THE PATENT.  WE DIDN'T THINK OUR PHONES INFRINGED.

25   THEY ACCUSED ONE OF OUR PHONES AND SAID, STOP MAKING IT BECAUSE

1          IT INFRINGES THAT DESIGN.

2                AND A JURY, WE WENT TO THE JURY AND THEY SAID NO, YOU CAN

3          USE THAT DESIGN.  THAT DESIGN ISN'T SOMETHING APPLE OWNS.  YOU

4          CAN LOOK LIKE THAT.

5                THAT PRODUCT WAS THE GALAXY ACE.  AND LET ME SEE IF I CAN

6          FIND IT HERE.  OH, IT'S MISSING.

7                AH, IT'S CHARGING.

8                THAT'S THE GALAXY ACE (INDICATING).  WE HAD TO GO TO A

9          JURY TO SAY, OKAY, THIS FACIAL DESIGN WE CAN USE.

10               AND IF YOU COMPARE THE ACE TO THE INFUSE 4G, WHICH THE

11         JURY FOUND DID INFRINGE THAT PATENT DESIGN -- AND LET'S LOOK AT

12         SLIDE 302 -- YOU SEE, WE HAVE JURIES WHEN COMPANIES HAVE

13         DISAGREEMENTS SO THEY CAN DECIDE THESE THINGS.

14               AND SO WHAT WE HAVE FOUND FROM THE JURY IS THAT WE CAN GO

15         IN THE MARKET AND WE CAN USE THE GALAXY ACE DESIGN FOR THE

16         FRONT OF THE PHONE.  WE CAN USE THAT HARD CASE.  WE CAN USE

17         THAT GLASS.  WE CAN USE THAT.

18               WE CAN'T USE THE 4G IS WHAT THE JURY FOUND.

19               AND SO WHEN APPLE COMES TO YOU AND SAYS, STOP, YOU KNOW,

20         WHY DON'T YOU STOP?  BECAUSE YOU DON'T AGREE WITH THEM THAT YOU

21         NEED TO STOP.

22               AND WHY DIDN'T WE SWITCH TO A NON-INFRINGING DESIGN?

23               WELL, HERE YOU HAVE A NON-INFRINGING DESIGN, THE GALAXY

24         ACE.  WHY DIDN'T WE SWITCH TO IT?  BECAUSE APPLE WAS SAYING,

25         STOP THAT, TOO.  THEY WERE SAYING YOU CAN'T USE A DESIGN WHICH

1    THEY DON'T OWN.

2         AND SO WE HAVE TO COME TO A JURY AND HAVE A JURY DECIDE

3    THAT, KNOWING THAT IF THEY DECIDE AGAINST US, THEN WE'RE GOING

4    TO HAVE TO PAY, YOU KNOW, WHAT THE LAW PROVIDES AS DAMAGES.

5         YOU REMEMBER THE '305 PATENT?  THAT IS -- AGAIN, THIS IS

6    ABOUT THE LOOK.  THE '305 IS ABOUT THE ICONS.

7         WELL, THE ACE DOESN'T INFRINGE THE ICONS.

8         AND IF YOU LOOK AT SLIDE '305, YOU SEE THE NOTICE TO

9    SAMSUNG ABOUT THE ICONS, THIS IS IN JUNE 2011, IS THE APPLE

10   PATENT WHERE APPLE SAYS WE HAVE A PATENT ON THE ICONS.

11        OKAY.  WELL, WE HAD IN THE MARKET AT THE TIME THE ACE

12   WHICH HAD THESE ICONS.  THEY DON'T INFRINGE.

13        NOW, LET'S COMPARE WITH SOMETHING THAT DOES.  LET'S GO TO

14   SLIDE 312.

15        WE ALSO HAD ON THE MARKET THE INTERCEPT, WHICH WAS

16   LAUNCHED IN JULY 2010, ALMOST A YEAR BEFORE, APPLE TOLD US

17   ABOUT THEIR PATENT.  IT DOESN'T INFRINGE, EITHER.

18        THESE PATENTS ARE VERY NARROW.  THEY ARE -- THEY ONLY

19   COVER CERTAIN ASPECTS, AND YOU CAN SEE THAT A COMPANY -- AND I

20   THINK YOU MIGHT HAVE A HARD TIME, TOO -- TRYING TO FIGURE OUT

21   WHAT CAN YOU DO AND WHAT CAN'T YOU DO?

22        WHAT YOU DO KNOW IS YOU'RE ALLOWED TO COMPETE BY MAKING

23   SOMETHING ELEGANT AND SWEET AND BEAUTIFUL AND SEXY.  APPLE

24   DOESN'T OWN THAT, DOESN'T OWN BEAUTIFUL AND SEXY.  THAT'S SLIDE

25   318.

1          AND YOU SAW ALL THESE DOCUMENTS ABOUT PRETTY AND LOVELY

2     AND BEAUTIFUL AND IT'S A REVOLUTION AND IT'S ELEGANT.

3          WELL, THAT'S WONDERFUL.  APPLE CAME OUT WITH A PRODUCT,

4     YOU KNOW, WHICH WAS A GOOD PRODUCT.  IN FACT, IT WAS SOMETHING

5     WHICH, A PRODUCT WHICH PUT THINGS TOGETHER AND WAS SUCCESSFULLY

6     MARKETING THESE ELEMENTS THAT IT PUT TOGETHER.  IT WAS THE

7     FIRST THAT BASICALLY -- IT MAY NOT HAVE BEEN THE FIRST TO COME

8     UP WITH A CERTAIN TECHNOLOGY OR THE FIRST TO MARKET, BUT IT WAS

9     REALLY VERY SUCCESSFUL AND IT KIND OF TAUGHT THE INDUSTRY A

10    THING OR TWO ABOUT HOW TO PUT THINGS TOGETHER AND MAKE THINGS

11    SUCCESSFUL.  I MEAN, YOU COULD LEARN FROM APPLE.

12         BUT IF YOU RECALL, THERE WAS AN E-MAIL EARLY ON WHEN APPLE

13    WANTED TO ADVERTISE AND COME OUT WITH, YOU KNOW, SOME MARKETING

14    ABOUT, YOU KNOW, WE WERE FIRST ON MANY THINGS.  AND I DON'T

15    KNOW IF YOU RECALL THE E-MAIL.  I'M TRYING TO FIND THE NUMBER

16    ACTUALLY HERE.  I DON'T -- DO YOU HAVE THE NUMBER?

17         I'LL SHOW THAT TO YOU IN JUST A SECOND WHERE THE RESPONSE

18    WAS, WELL, YOU KNOW, WE LOOK AT ALL THOSE THINGS AND WE SAY

19    WE'RE FIRST.  WELL, WE WERE THE FIRST TO COMMERCIALIZE,

20    SUCCESSFULLY COMMERCIALIZE THESE THINGS, BUT NOT REALLY FIRST

21    TO MARKET.

22         AND HERE WE HAVE IT, IT'S EXHIBIT 578.001.  AND THIS IS --

23    IN THE MIDDLE HERE, APRIL 26TH, STEVE SINCLAIR WROTE, YOU KNOW,

24    IT'S TOUGH TO APPROACH THIS WITH THE CRITERIA BEING FIRST.  I

25    DON'T KNOW HOW MANY THINGS WE CAN COME UP WITH THAT YOU COULD

1    LEGITIMATELY CLAIM WE DID FIRST.  CERTAINLY WE HAVE THE FIRST

2    COMMERCIALLY SUCCESSFUL VERSIONS OF MANY FEATURES, BUT THAT'S

3    DIFFERENT THAN LAUNCHING SOMETHING TO MARKET FIRST.  SO WE NEED

4    TO NUANCE THE MESSAGE.

5         AND APPLE IS VERY GOOD AT SENDING OUT A MESSAGE, VERY,

6    VERY GOOD.

7         AND THEY TALK ABOUT, FOR EXAMPLE, THE LG PRADA WHICH WAS

8    THE FIRST PHONE TO HAVE MULTITOUCH AND INTERFACE GESTURES.

9         SO WHEN YOU'RE ACCUSED OF INFRINGING THESE PATENTS, YOU

10   KNOW, AND YOU'RE A COMPANY LIKE SAMSUNG, YOU'RE TRYING TO

11   COMPETE, YOU'VE GOT TO ASK YOURSELF, YOU KNOW, DO I THINK THAT

12   I'M INFRINGING?  DO I THINK THIS IS SOMETHING THAT APPLE IS

13   ENTITLED TO OWN?  AND WE'RE ENTITLED TO CHALLENGE THAT.

14        AND, AGAIN, WITH RESPECT TO THE IPADS, APPLE WAS SAYING,

15   YOU DON'T OWN THINGS THAT, THAT THE JURY FOUND WE DID OWN AND

16   COULD HAVE DONE.

17        FOR EXAMPLE, ON THE '915 PATENT, YOU KNOW, THAT'S -- YOU

18   REMEMBER THAT PATENT.  THAT'S THE ONE WHERE YOU CAN SCROLL AND

19   YOU CAN, YOU CAN, YOU KNOW, KIND OF WIDEN THINGS LIKE THIS

20   (INDICATING).  DO YOU RECALL THAT PATENT?

21        WELL, APPLE ACCUSED THE ACE OF INFRINGING THAT PATENT, AND

22   THE JURY FOUND IT DIDN'T.

23        APPLE ACCUSED THE INTERCEPT AND THE REPLENISH OF VIOLATING

24   THOSE PATENTS, AND THEY DIDN'T.

25        AND LET ME SHOW YOU WHAT THEIR EXPERT SAID -- OR WHAT WE

1    SHOWED THE JURY IN THE FIRST TRIAL.  AND YOU SAW THIS.  IT'S A

2    VIDEO.  IT'S 214.  IF WE CAN SHOW THAT?  214.

3         ALL RIGHT.  THEY CLAIM THIS INFRINGED, AND THIS IS THE

4    ACE, AND IT DOES NOT INFRINGE.

5         BUT WE HAD TO GO TO COURT TO DETERMINE THAT WE COULD DO IT

6    THAT WAY.  AT THE TIME WE WERE ACCUSED -- YOU SEE HOW IT GOES

7    UP, AND THEN, LIKE THE OTHERS WHICH ARE IN THIS CASE, IT

8    WIDENS.

9         YOU KNOW, AT THE TIME APPLE COMES TO US AND SAYS STOP,

10   THEY'RE TELLING US TO STOP ALL OF THIS.  WHY DIDN'T WE DO WHAT,

11   YOU KNOW, YOU AND YOUR COMMON SENSE KNOW WE COULD DO?  I MEAN,

12   THERE ARE SOFTWARE CHANGES YOU GET IN YOUR PHONES WHEN YOU TURN

13   THEM ON, WHEN YOU CLICK AND SAY DOWNLOAD NEW THINGS, YOU GET

14   THOSE, SOMETIMES THEY'RE KIND OF ANNOYING, WE'VE GOT A NEW

15   VERSION OF IOS, CLICK HERE AND IT'LL COME OVER THE AIR TO YOU,

16   LIKE THAT.

17        WELL, WE HAD THIS WAY, SAMSUNG DID, OF CREATING THIS

18   EFFECT THAT IS NOT COVERED BY APPLE'S PATENTS.  APPLE COMES AND

19   SAYS, STOP DOING ALL THIS.  AND WE'RE SAYING WE DON'T THINK WE

20   INFRINGE.  WE CAN'T, AT THAT MOMENT, GO OVER AND SIMPLY DO WHAT

21   THE ACE DOES AND NOT INFRINGE ANYMORE.

22        IT IS A DESIGN AROUND.  IT'S IN THE MARKET.

23        BUT WE CAN'T, WE CAN'T RELY ON THAT BECAUSE THEY'RE

24   ACCUSING US OF INFRINGING THAT, TOO.  THEY'RE SAYING, YOU CAN'T

25   DO THAT.

1          AND SO WE HAVE TO GO TO SOMEONE LIKE YOU AND SAY, WELL, WE

2     NEED YOU TO DECIDE.  AND WE DO THAT.

3          LOOK AT 217 AS WELL.  THIS SHOWS SOME OF THE OTHER PHONES

4     WHICH THEY ACCUSED OF INFRINGING.

5          BUT WITH RESPECT TO THE INTERCEPT, YOU SEE IT ON THE RIGHT

6     THERE.  IT GOES UP AND IT EXPANDS.

7          APPLE DOESN'T OWN THAT.  IT DOESN'T OWN EVERY METHOD OF

8     SCROLLING AND PINCHING TO ZOOM.  THEIR EXPERT TOLD YOU THAT.

9     WE DIDN'T NEED TO BRING AN EXPERT BECAUSE THEY WERE OUR

10    WITNESSES.  THEY TOLD YOU THAT THIS, THE JURY FOUND, DOES NOT

11    INFRINGE, CONTRARY TO WHAT THEY SAID IN THE FIRST TRIAL, THE

12    INTERCEPT, AND THAT THERE ARE MORE WAYS TO ACHIEVE THAT EFFECT

13    THAN THE WAYS THAT APPLE OWNS.

14         AND AGAIN, WHEN APPLE CAME TO US AND SAID STOP, WE HAD THE

15    TECHNOLOGY IN THE INTERCEPT.  WE HAD IT AVAILABLE.  BUT WE

16    COULDN'T JUST SAY, OH, WE'LL SOLVE THE PROBLEM BY DOING THAT

17    BECAUSE APPLE WAS SAYING, WE OWN THAT, TOO.

18         THE SAME THING WITH RESPECT TO THE '163.  YOU REMEMBER

19    THAT'S THE TAP TO ZOOM AND THEN YOU TAP -- IF YOU -- THERE'S A

20    COLUMN THAT YOU COULD FIND, YOU TAP ON THE OTHER COLUMN AND IT

21    WILL CENTER, THAT PATENT.

22         WELL, AGAIN -- IF WE CAN SHOW SLIDE 226?  IN THE FIRST

23    TRIAL, THE CAPTIVATE AND CONTINUUM, WHICH WERE IN THIS TRIAL,

24    WERE ACCUSED OF INFRINGING THAT PATENT.

25         AND IF WE CAN SHOW WHAT THEY DO?  IT'S THE SAME AS THE,

1          THE FUNCTION.  THE WAY YOU LOOK AT IT, IT LOOKS THE SAME.

2              AND BY THE WAY, WHERE THIS SAYS INFRINGING SMARTPHONES,

3      THIS IS BECAUSE THIS IS THE VIDEO OF APPLE'S EXPERT FROM THE

4      FIRST TRIAL.  THEY WERE CLAIMING WE COULDN'T DO THIS, WHAT THE

5      CAPTIVATE AND CONTINUUM DO.

6              WE CAN.  APPLE'S PATENT IS NARROW ENOUGH THAT IT DOES NOT

7      COVER ALL WAYS OF ACHIEVING THAT EFFECT.

8              AND WHILE APPLE IS COMPARING, PRETENDING REALLY, THAT

9      THEIR PATENTS COVER EASE OF USE, COVER ALL WAYS OF DOING THESE

10     THINGS, THEY DON'T.

11             NOW, AT THE TIME THEY ACCUSED US OF IT, WE COULDN'T SAY,

12     OH, WE'LL JUST SWITCH EVERYTHING OVER TO DOING IT THE WAY THE

13     CAPTIVATE AND CONTINUUM DO IT AND THAT'LL SOLVE THE PROBLEM

14     BECAUSE APPLE'S RESPONSE WAS, YOU CAN'T DO IT THAT WAY, EITHER.

15             AND ONE OF THE JURY INSTRUCTIONS THAT YOU HAVE, AND THIS

16     IS JURY INSTRUCTION 23 -- AND I THINK THAT'S SLIDE 553, RYAN --

17     ONE OF THE JURY INSTRUCTIONS YOU HAVE -- NOW, THIS IS WITH

18     RESPECT TO LOST PROFITS.  I MEAN, MR. LEE HAS SAID TO YOU, YOU

19     KNOW, LOOK AT ALL THESE SALES THEY MADE AND HOW MUCH ARE THE --

20     YOU KNOW, IT'S GOING TO BE UNFAIR IF WE DON'T GET A LOT OF

21     MONEY FOR THIS BASICALLY.

22             BUT YOU'VE GOT TO FOLLOW THE LAW.  THERE ARE REASONS THESE

23     RULES EXIST.  AND WHAT THE LAW PROVIDES IS THAT, IS THAT WHEN

24     YOU ARE TOLD THAT YOU INFRINGE SOMETHING, IF THERE IS ANOTHER

25     WAY TO INVENT IT AT THE TIME -- I MEAN, IT IS A HYPOTHETICAL

 1    QUESTION BECAUSE THE LAW PROVIDES THAT IF THERE WAS ANOTHER WAY

 2    TO DO IT, IF THERE WAS ANOTHER WAY WHICH WOULD HAVE BEEN JUST

 3    AS ACCEPTABLE, THEN WHAT THEY'RE SAYING IS THEN APPLE REALLY

 4    HASN'T BEEN HARMED.

 5         YES, YOU MAY HAVE BEEN, QUOTE, INFRINGING THEIR PATENT.

 6    YOU MAY HAVE BEEN DOING IT IN A WAY WHICH THEY OWN.

 7         BUT IF THERE WAS SOMETHING OUT THERE WHICH WOULD HAVE BEEN

 8    JUST AS GOOD, THEN YOU'RE NOT REALLY GETTING A VALUE BECAUSE

 9    THERE WAS SOMETHING OUT THERE THAT WAS JUST AS GOOD.

10         AND SO THE LAW PROVIDES THAT, YOU KNOW, AN ALTERNATIVE MAY

11    BE CONSIDERED AVAILABLE AS A POTENTIAL SUBSTITUTE EVEN IF IT

12    WAS NOT ACTUALLY ON SALE DURING THE INFRINGEMENT PERIOD.

13         NOW, I'VE SHOWN YOU THAT THE ACE AND THE INTERCEPT WERE

14    ACTUALLY ON SALE.  YOU KNOW, AND THERE'S NO QUESTION THAT THE

15    ACE INFRINGES OTHER PATENTS AND IT'S ACCUSED HERE, OR WAS

16    ACCUSED OF INFRINGING OTHER PATENTS.

17         BUT THE QUESTION HERE IS THE TECHNOLOGY, THE TECHNOLOGY OF

18    THE '163, OF THE '915.  FOR EXAMPLE, WAS THAT TECHNOLOGY

19    AVAILABLE THAT DID NOT INFRINGE?

20         AND IT WAS.  YOU SAW IT WITH YOUR OWN EYES.  AND THE JURY

21    HAS TOLD US IT WAS AVAILABLE.  IN FACT, ON THE MARKET.

22         AND FACTORS SUGGESTING THAT THE ALTERNATIVE WAS ACCEPTABLE

23    AND AVAILABLE INCLUDE, BUT ARE NOT LIMITED TO, WHETHER THE

24    MATERIAL, EXPERIENCE, AND KNOW-HOW FOR THE ALLEGED SUBSTITUTE

25    WERE READILY AVAILABLE.

1          YES, THEY WERE READILY AVAILABLE.  THEY WERE ALREADY ON

2     THE MARKET IN OUR PHONES.

3          BUT WE COULDN'T SAY, OH, WE'LL SWITCH TO DOING THAT

4     BECAUSE APPLE WAS SAYING AT THE TIME THAT WE OWN ALSO THAT, AND

5     THEY WERE WRONG ON THAT.

6          SO THAT'S WHY YOU DON'T JUST STOP WHEN APPLE COMES BY AND

7     SAYS, YOU KNOW, YOU'VE GOT TO STOP, GUYS, BECAUSE WE OWN IT,

8     BECAUSE THEY DON'T OWN EVERYTHING THEY THINK THEY OWN AND THE

9     SCOPE OF THESE PATENTS IS NOT AS BROAD AS THEY COME IN HERE AND

10    TELL YOU.

11         SO I WANT TO TALK THEN ABOUT THE RULES GOVERNING, YOU

12    KNOW, NOW THAT WE'RE HERE AND IT'S BEEN FOUND THAT WE INFRINGED

13    CERTAIN PATENTS, GOVERNING, WELL, THEN, WHAT IS APPLE OWED?

14    BECAUSE IT IS OWED SOMETHING FOR THE USE OF THOSE PATENTS

15    BECAUSE THE JURY DETERMINED, YES, IN THESE SITUATIONS, YOU WERE

16    USING APPLE'S PROPERTY.

17         AND FIRST, THOUGH, I WANT TO FOCUS A LITTLE BIT ON WHAT

18    MR. LEE WAS TALKING TO YOU ABOUT ABOUT THE WAY SAMSUNG

19    COMPETED.

20         AND THE REASON I WANT TO TALK TO YOU ABOUT THAT, BECAUSE

21    WHEN I GOT UP HERE A WEEK AGO, I SAID THIS ISN'T THE TIME TO

22    BRING UP PITCHFORKS AND PUNISH, AND IN FACT, JUDGE KOH HAS SAID

23    TO YOU JURY INSTRUCTIONS ON A NUMBER OF INSTRUCTIONS, I THINK

24    INSTRUCTIONS 21 AND 30, THAT YOU'RE NOT HERE TO PUNISH.

25         BUT APPLE IS SUGGESTING THAT THERE IS SOMETHING THAT

1      SAMSUNG DID THAT WAS SOMETHING, YOU KNOW, SORT OF EVIL OR

2      INSIDIOUS, AND I'M AFRAID THAT HE'S DOING THAT SO THAT YOU

3      MIGHT FEEL THAT AND SAY, WELL, WE'VE GOT TO DO SOMETHING MORE

4      THAN WHAT THE LAW ALLOWS.

5           AND IF YOU LOOK AT THE WAY THIS MARKET WORKED, LADIES AND

6      GENTLEMEN, THE COMPETITORS, THE PEOPLE, THE COMPANIES ARE

7      ALWAYS LOOKING AT THEIR OTHER PRODUCTS TO SEE WHERE THEY'RE

8      LAGGING.  I MEAN, THAT'S WHAT ALL COMPANIES DO.

9           AND THAT'S WHAT MOST OF THESE DOCUMENTS SHOW IS THAT WE'RE

10     LOOKING TO SEE, ARE WE LAGGING?  SAMSUNG'S DOCUMENTS WILL HAVE

11     HUNDREDS OF PAGES COMPARING TO THE IPHONE SAYING, YOU KNOW,

12     WHERE ARE WE LAGGING?

13          APPLE DOES THE SAME THING.

14          AND IT'S NOT -- YOU KNOW, I'M NOT SUGGESTING THAT THERE'S

15     ANYTHING WRONG WITH IT.  I'M NOT SUGGESTING THAT THERE'S

16     ANYTHING WRONG WITH LOOKING AT YOUR COMPETITORS AND CHANGING

17     WHAT YOU DO BECAUSE OF THEM.

18          APPLE DOES IT.  YOU REMEMBER THAT, THAT SAMSUNG CAME OUT

19     WITH A 7 INCH TABLET AND APPLE HAD THE LARGER TABLET, AND THERE

20     WAS AN INTERNAL E-MAIL AT APPLE -- THIS IS 2522, AND THIS IS IN

21     JANUARY OF 2011.  THIS WAS FROM MR. CUE WHO REPORTED TO

22     MR. SCHILLER, AND IF WE CAN SHOW AT THE TOP HERE, AND TO

23     MR. TIM COOK, YOU HAVE HEARD OF HIM, AND IT TALKS ABOUT HOW

24     THERE WILL BE A 7 INCH MARKET AND WE SHOULD DO ONE.

25          AND THEN STEVE, THAT'S MR. JOBS, SAYS HE SEEMED VERY

1    RECEPTIVE LAST TIME, AND I FOUND E-MAIL, BOOKS, FACEBOOK AND

2    VIDEO VERY COMPELLING ON A 7 INCH, WHICH WAS WHAT SAMSUNG CAME

3    TO THE MARKET WITH.  WEB BROWSING IS DEFINITELY THE WEAKEST

4    POINT, BUT STILL USABLE.

5         AND HE ATTACHED THIS ARTICLE, AND IF WE CAN SEE JUST THE

6    BACKGROUND OF THE ARTICLE HERE, WHICH IS LOOKING AT THE TAB,

7    AND BASICALLY THE BEST TABLET IS THE ONE YOU HAVE WITH YOU, AND

8    THEN THE REVIEWER SAID, AS AN ASIDE, THE DIFFERENCE IN ICON

9    SIZE IS NEGLIGIBLE AND THE ICONS ON MY IPOD TOUCH ARE ACTUALLY

10   SMALLER THAN THOSE ON THE TABLET.  APPLE'S SANDPAPER DOWN YOUR

11   FINGERS TO USE A 7 INCH TABLET ARGUMENT IS A FALLACY IN MY

12   OPINION.

13        WHAT HE'S REFERRING TO IS THAT APPLE'S USER MARKET HAD

14   BEEN EXPRESSED BY MR. JOBS PREVIOUSLY, AND IF YOU LOOK AT

15   EXHIBIT 601, THIS IS ON AN EARNINGS CALL WHERE MR. -- IN

16   OCTOBER 2010 WHERE MR. JOBS WAS TALKING ABOUT THE MARKET AND

17   THE MARKET FOR SMALL TABLETS.

18        AND IF WE CAN GO TO PAGE 10 AND 11, I THINK THAT'S

19   601.010, PAGE 10, HERE WE GO, BASICALLY MR. JOBS AT THE TIME

20   WAS OF THE OPINION ABOUT THE MARKET THAT, THAT THESE SMALL

21   DISPLAYS, YOU MIGHT BE ABLE TO INCREASE THE RESOLUTION, BUT

22   IT'S MEANINGLESS UNLESS YOUR TABLET ALSO INCLUDES SANDPAPER SO

23   THE USER CAN SAND DOWN THEIR FINGERS TO AROUND ONE QUARTER OF

24   THE PRESENT SIZE.  APPLE HAS DONE EXTENSIVE USER-TESTING ON

25   TOUCH INTERFACES OVER MANY YEARS AND WE REALLY UNDERSTAND THIS

1      STUFF.

2            HE TALKS ABOUT THERE BEING CLEAR LIMITS AND THE 10 INCH

3      SCREEN SIZE IS THE MINIMUM SIZE REQUIRED TO CREATE GREAT TABLET

4      APPS.  THE 10 INCH, AFTER LOTS OF RESEARCH, THAT'S THE MINIMUM

5      SIZE.

6            BUT WHAT HAPPENED IS APPLE OBSERVED THE MARKETPLACE,

7      SAMSUNG AND OTHERS WERE COMING OUT WITH SMALLER TABLETS, AND

8      APPLE DID WHAT COMPETITORS DO, YOU KNOW, WHICH WAS DO WHAT

9      BASICALLY MR. CUE HAD SAID IN THAT EARLIER E-MAIL.

10           AND IN THAT E-MAIL, IT MIGHT AS WELL HAVE BEEN LET'S MAKE

11     SOMETHING LIKE THE TABLET, YOU KNOW?  LET'S CREATE SOMETHING

12     THAT'S LIKE THE TABLET, THAT'S REALLY WHAT THAT E-MAIL SAID,

13     BECAUSE IT WAS COMPELLING AND THERE WAS A MARKET FOR IT.

14           AND THAT'S WHAT APPLE DID AND THERE'S NOTHING, ABSOLUTELY

15     NOTHING WRONG WITH THAT, AND MR. SCHILLER CAME IN HERE AND

16     SAID, OH, IT WASN'T IN RESPONSE TO MARKET.  WE DID RESEARCH AND

17     WE CAME OUT 7.8.

18           WELL, THAT RESEARCH MUST HAVE BEEN DIFFERENT THAN THE

19     YEARS AND YEARS OF COMPELLING RESEARCH THAT MR. JOBS WAS

20     REFERRING TO THAT SAID THAT THE 10 INCH WAS THE MINIMUM.

21           WHAT HAPPENED HERE IS THAT APPLE SAW THAT THERE WAS A

22     MARKET BEING DEVELOPED AND SAID WE'RE GOING TO COMPETE, AND

23     THERE'S NOTHING WRONG WITH THAT.

24           NOW LET'S LOOK AT SAMSUNG AND WHAT THEY DID.

25           AND FIRST OF ALL, THERE'S ONE EXHIBIT I WANT TO TALK TO

1       YOU ABOUT BECAUSE I THINK IT IS MISLEADING, AND THAT'S

2       EXHIBIT 34.  THAT WAS THE FIRST EXHIBIT MR. LEE TALKED ABOUT.

3       THIS IS -- WHICH HE CALLED A COPYING EXHIBIT.  THIS IS THE

4       SEPTEMBER 2007 FEASIBILITY REVIEW ON STANDALONE A.P. BUSINESS.

5            NOW, THIS ISN'T ABOUT SAMSUNG MAKING PHONES AT ALL.

6       SAMSUNG MAKES LOTS OF STUFF, TV'S, ELECTRONICS, AND THEY MAKE

7       PROCESSORS THAT GO IN PHONES.  THEY MAKE CHIPS.  THIS IS A

8       TOTALLY SEPARATE DIVISION THAT MADE CHIPS.  IT ALSO MADE OTHER

9       SORTS OF HARDWARE.

10           AND MR. LEE SAID THAT, WELL, THIS GROUP HAD SOME OF

11      APPLE'S CONFIDENTIAL INFORMATION, BUT I DON'T THINK HE

12      INTENDED, AND THERE'S NO EVIDENCE TO SUGGEST, THAT SAMSUNG

13      ABUSED THAT INFORMATION AT ALL, THAT THERE WAS ANY MISUSE OF

14      CONFIDENTIAL INFORMATION.

15           I DON'T THINK MR. MCELHINNY WILL COME UP HERE AND SUGGEST

16      THERE WAS, EITHER, BECAUSE THERE WASN'T.

17           BUT WHAT THIS DOCUMENT IS ABOUT IS RECOGNIZING, HEY, APPLE

18      CAME OUT WITH THE IPHONE.  A LOT OF OTHER MANUFACTURERS ARE

19      GOING TO COME OUT WITH PHONES THAT ARE LIKE IT.  YOU KNOW,

20      THEY'RE GOING TO TRY TO HAVE PHONES THAT HAVE NICE SCREENS AND

21      DO VIDEOS AND SUCH, AND WE'RE GOING TO SUPPLY THEM.  IT'S AN

22      OPPORTUNITY FOR US, SAMSUNG, THIS DIVISION, TO SUPPLY THEM WITH

23      PARTS, WITH CHIPS, WITH HARDWARE.

24           AND IF YOU LOOK AT 34.37, THIS IS WHAT THIS IS TALKING

25      ABOUT.  YOU SEE WHERE IT SAYS, STIMULATE ENHANCING AND

1    UPGRADING HARDWARE PERFORMANCE FOR OTHER COMPETITORS'

2    SMARTPHONE MULTIMEDIA FEATURES.

3          AND WHEN IT SAYS HARDWARE IS EASY IMITATION, THEY'RE NOT

4    TALKING ABOUT THE CASE OF A PHONE.  THEY'RE TALKING ABOUT THE

5    TOUCHSCREEN, THE GLASS, THE VIDEO RESOLUTION, THE PERFORMANCE,

6    THE FLASH MEMORY, I MEAN, THINGS THAT WE CAN DO TO SEND STUFF

7    TO OUR COMPETITORS.  THIS PART OF SAMSUNG SELLS TO THE

8    COMPETITORS.

9          AND THEN IF WE GO TO A COUPLE PAGES LATER, 34.34, YOU LOOK

10   AT THE CONCLUSIONS AND IT'S TALKING ABOUT HOW WE'RE GOING TO

11   INTEGRATE, YOU KNOW, WITH OUR A.P., WHICH IS WITH THESE

12   PROCESSORS.

13         AND IT'S TALKING ABOUT ONE CHIP HARDWARE.  IT'S TALKING

14   ABOUT WHAT THIS PART OF THE COMPANY DOES.

15         THIS HAS NOTHING TO DO WITH COPYING THE IPHONE WHATSOEVER,

16   EVEN THOUGH IT HAS A CUTE LITTLE PHRASE, HARDWARE, EASY TO

17   IMITATE.  SO IT WOULD BE EASY TO MISLEAD SOMEONE INTO THINKING

18   THAT THAT MEANS THE CASE OF THE IPHONE WHEN IT DOESN'T.

19         LET ME FOCUS MORE ON THIS PLAN, THIS CHANGE OF STRATEGY,

20   BECAUSE MR. LEE'S ENTIRE THEORY ABOUT WHAT HAPPENED HERE WAS

21   THAT AT THE VERY TOP OF SAMSUNG, THERE WAS A CHANGE OF STRATEGY

22   AND THAT CHANGE OF STRATEGY WAS TO COPY THE IPHONE, THESE

23   HUNDREDS AND -- YOU KNOW, EVERYTHING ABOUT THE IPHONE.

24         AND IF YOU LOOK AT EXHIBIT 40, THIS IS THE CRISIS OF

25   DESIGN, AND YOU REMEMBER MR. LEE SAID THAT THE CHANGE IN

1    STRATEGY WAS TO BE LIKE THE IPHONE.  I URGE YOU TO LOOK AT THIS

2    DOCUMENT BECAUSE WHAT THE AUTHOR SAYS IN THIS DOCUMENT IS THAT

3    WE'RE BEING TOLD BY CARRIERS, I WANT SOMETHING LIKE THE IPHONE.

4        THAT DOESN'T SAY THAT'S THEIR CHANGE IN STRATEGY AT ALL.

5    IN FACT, IF YOU LOOK AT THE DOCUMENT -- AND HERE IT IS.  ALL

6    THE CARRIERS TELL ME, "HEY, JK, YOUR PHONES HAVE GREAT

7    TECHNOLOGICAL PROWESS.  I HEAR THINGS LIKE THIS:  LET'S MAKE

8    SOMETHING LIKE THE IPHONE."

9        BUT WHAT DOES HE SAY THE CHANGE IN STRATEGY IS AFTER

10   GETTING THIS SORT OF INPUT?

11       WELL, LET'S GO ON TO -- THIS IS GOING TO BE SLIDE 324, I

12   BELIEVE.  I'M SORRY.  40.5.  WHAT HE SAYS IS THE WORLD IS

13   CHANGING, THAT DURING THE TIME BEFORE, THAT WHEN THE

14   OPERATORS -- AND HE'S REFERRING TO THE CARRIERS THERE -- MADE

15   COMMENTS ABOUT DESIGNS, WE PUT THEM IN, WE MODIFY THEM AGAIN

16   AND AGAIN AND AGAIN.  THAT STYLE OF BUSINESS HAS WORKED UNTIL

17   NOW, BUT THE IPHONE'S EMERGENCE MEANS THE TIME WE HAVE TO

18   CHANGE OUR METHODS HAS ARRIVED.

19       NOW, WHAT'S HE TALKING ABOUT CHANGING METHODS?  WHAT HE'S

20   TALKING ABOUT IS -- AND I'M GOING TO SHOW YOU IN THE NEXT

21   PARAGRAPHS -- WHAT HE'S TALKING ABOUT IS UNTIL NOW, WE HAD THE

22   CARRIERS TELL US WHAT THEY WANTED US TO PUT ON THE PHONES.

23       IPHONE GOES DIRECTLY TO THE CONSUMER.  APPLE DIDN'T REALLY

24   CARE WHAT THE CARRIER SAID.  IT WAS AN EMERGING MARKET, JUST

25   LIKE THE 7 INCH TABLET WAS AN EMERGING MARKET THAT APPLE WENT

1        INTO WHEN SAMSUNG REVEALED THERE WAS A MARKET FOR THAT.

2              WELL, THERE WAS A MARKET, LET'S MAKE PHONES THAT APPEAL TO

3        THE CONSUMERS, AND APPLE'S PATENTS DON'T PREVENT YOU FROM DOING

4        THAT.

5              SO WHAT WAS THE DIRECTION THAT WE GOT?  IT WAS, IN REGARD

6        TO EXTERIORS, DO YOUR BEST NOT TO CREATE A PLASTIC FEELING,

7        INSTEAD CREATE A METALLIC FEEL.

8              BY THE WAY, AT THAT TIME ON THE MARKET YOU HAD THE

9        IPHONE 3GS, WHICH IS JX 1002, AND IT HAD MORE OF A PLASTICY

10       FEEL TO IT THAN THE ORIGINAL IPHONE DID.

11             AND THAT WE WANTED AN INTERFACE THAT WAS EASY TO USE,

12       REGARDLESS OF AGE, OCCUPATION, LEVEL OF EDUCATION.  IN OTHER

13       WORDS, WE WANTED SOMETHING THAT WAS EASY TO USE, AND APPLE

14       DOESN'T OWN EASY TO USE.

15             IT DOESN'T SAY "COPY APPLE."

16             AND HE TALKS ABOUT HE WANTS TO FLOW LIKE WATER.

17             AND THEN, "OUR MOST IMPORTANT ASSET IS OUR SCREEN."  YOU

18       KNOW, IF YOU WANT A LARGE SCREEN, THEN AND NOW, APPLE REFUSES

19       TO SELL IT.  THAT'S JUST THEIR BUSINESS STRATEGY.  WE REFUSE TO

20       LET YOU BUY THAT FROM US.  IF YOU WANT THAT, YOU HAVE TO GO

21       SOMEWHERE ELSE.

22             AND THEN IT'S VERY IMPORTANT THAT WE MAKE SCREEN SIZE

23       BIGGER AND THE FUTURE OF MOBILE PHONES WILL ABSORB EVEN THE

24       FUNCTION OF E-BOOKS.

25             READ THIS.  IT IS NOT A LET'S GO OUT AND COPY APPLE.

1    THAT'S NOT WHAT IT IS.  IT'S LET'S TRY TO COMPETE BETTER AND

2    MAKE OUR PHONES MORE APPEALING TO CONSUMERS.

3         IN FACT, YOU SAW EXHIBIT 46.  THAT'S THE DOCUMENT, YOU

4    REMEMBER, WHICH HAS PAGES AND PAGES OF THINGS THAT CONSUMERS

5    SAY ABOUT COMPARING A PROTOTYPE THAT SAMSUNG HAD, THE BEHOLD,

6    TO THE IPHONE, AND THERE ARE SOME PAGES THAT TALK ABOUT THE

7    BROWSER AND THEY TALK ABOUT, YOU KNOW, THE BOUNCE BACK.  THEY

8    TALK ABOUT IT.

9         BUT WHEN YOU LOOK AT THAT DOCUMENT AT THE END, IT TALKS

10   ABOUT WHAT DID THE CONSUMERS REALLY PREFER?  I MEAN, EVEN

11   SAMSUNG'S BROWSER WITHOUT, YOU KNOW, WITHOUT A BOUNCE EFFECT OR

12   ANYTHING?

13        AND IF WE LOOK AT THAT 46.17, EVEN WITHOUT CHANGING THE

14   BROWSER, THIS PROTOTYPE SCORED BETTER ON PERFORMANCE THAN THE

15   IPHONE.  SAMSUNG WAS OFFERING SOMETHING ALREADY WHICH THIS

16   SURVEY SHOWED THE CONSUMERS LIKED BETTER THAN THE WAY THE

17   IPHONE WAS PERFORMING.

18        AND AS FOR THE AESTHETICS, LET'S GO TO 46.18.  THIS IS

19   VERY CLOSE, AND AGAIN, THIS IS A PROTOTYPE WHICH DOESN'T

20   INFRINGE ANY OF THESE PATENTS, YOU KNOW, THAT THE CONSUMERS

21   FOUND THAT, YOU KNOW, THAT THE AESTHETIC QUALITY WAS SIMILAR AS

22   WELL.

23        SO WHAT SAMSUNG WAS TRYING TO DO WAS TO COMPETE IN THIS

24   EMERGING MARKET WHERE YOU'RE BYPASSING THE CARRIERS IN TERMS

25   WHAT THEY WANT AND THEY'RE TRYING TO FIGURE OUT WHAT THE PUBLIC

1    WANTS, AND THEY DID A LOT OF RESEARCH INTO THAT.  IT LOOKED AT

2    THAT.  IT LOOKED AT APPLE, AND IT LOOKED AT OTHERS AS WELL, AND

3    IT WAS TRYING TO COME OUT WITH WHAT IT THOUGHT WAS THE BEST

4    PHONE IT COULD.

5         THERE'S NO EVIDENCE THAT THERE WAS AN INTENTION TO

6    INFRINGE ANY PATENTS.

7         AND, AGAIN, THESE ARE THINGS WHICH APPLE DOES AS WELL IN

8    TERMS OF SEEING, ARE THEY LAGGING THE COMPETITION?  APPLE

9    SYSTEMATICALLY STARTED LOOKING AT COMPETITORS' PRODUCTS AT

10   LEAST AS EARLY AS 2008.

11        IF WE CAN PUT UP EXHIBIT 2517?  THIS WAS AN E-MAIL ABOUT

12   THE COMPETITIVE ANALYSIS, THAT UNIT THAT WAS BEING FORMED.

13        AND IF WE CAN BLOW UP THIS.  IT'S TALKING ABOUT THE FIRST

14   STEP OF THE COMPETITIVE ANALYSIS INITIATIVE, THEY'RE GOING TO

15   PURCHASE DEVICES, AND ON -- WHEN THEY ARRIVE, WE'LL START

16   VERIFYING THEIR FEATURE SET AND THEN START PERFORMANCE

17   BENCHMARKING AGAINST THE IPHONE.

18        AND THEN IT GOES ON TO SAY EACH FUNCTIONAL TEAM WILL NEED

19   TO ANALYZE THE AREA THAT WE ARE LAGGING COMPETITION.

20        THAT'S WHAT COMPANIES DO.  AND AS I SAID WHEN I GOT UP

21   HERE, WHEN THAT HAPPENS, YOU KNOW, YOU SOMETIMES MAY CROSS THE

22   LINE, AND WHEN YOU DO, YOU'VE GOT TO PAY FOR IT.  YOU'VE GOT TO

23   PAY WHAT THE LAW PROVIDES.  SOMETIMES YOU DO, AS WITH THE

24   INFUSE 4G, ON THE DESIGN.

25        AND SOMETIMES, AS WITH THE GALAXY ACE ON THAT DESIGN, YOU

```
 1     DON'T, EVEN THOUGH YOUR COMPETITORS MAY ACCUSE YOU OF CROSSING

 2     THE LINE THEN.

 3          AND SO THEN YOU NEED SOMEONE TO DECIDE IT, AND THEN YOU

 4     NEED SOMEONE TO DETERMINE, OKAY, WHAT DO WE DO HERE?  HOW MUCH

 5     HAS APPLE BEEN HARMED?

 6          SO THAT'S KIND OF PART OF THE COMPETITIVE PROCESS.

 7          SO I WANT TO STEP BACK NOW AND TALK ABOUT WHAT SAMSUNG IS

 8     HERE TO DO, WHICH IS TO GUIDE YOU TO FIGURE OUT, OKAY, GIVEN

 9     WHAT HAPPENED, YOU KNOW, WHAT THE OTHER JURY HAS DECIDED

10     HAPPENED, WHAT SHOULD APPLE GET?

11          AND I THINK WHAT THE EVIDENCE IS GOING TO SHOW YOU IS THAT

12     WHEN YOU LOOK AT THESE RULES, AND THESE RULES ARE CREATED FOR A

13     VERY SPECIFIC REASON, YOU'LL FIND THAT THAT AMOUNT IS

14     $52 MILLION, AND LARGELY THAT'S BECAUSE OF THE DESIGN PATENTS.

15          YOU KNOW, THERE'S ONLY ONE OF THESE PHONES THAT INFRINGED

16     THE D'677 AND THERE ARE, I THINK, SEVEN PHONES WHERE THOSE

17     ICONS LOOKED TOO MUCH LIKE APPLE'S.

18          AND THE EVIDENCE -- I MEAN, NOT THE EVIDENCE, THE LAW, YOU

19     KNOW, THAT HER HONOR GAVE YOU IS CLEAR.

20          IF YOU DO THAT, THEN YOU HAVE TO GIVE APPLE YOUR PROFITS.

21          AND LET'S TALK ABOUT WHAT THOSE ARE, WHAT THOSE PROFITS

22     WERE, AND MAYBE WE CAN TALK ABOUT THAT AFTER A BREAK.

23               THE COURT:  ALL RIGHT.  THANK YOU.

24          IT'S 10:30 NOW.  THIS IS THE ONLY BREAK WE'RE GOING TO

25     TAKE THIS MORNING.  I'D LIKE TO GO THROUGH WITH THE REST OF THE
```

```
1      PRESENTATIONS, SO WE'LL TAKE A 20 MINUTE BREAK.

2          LET'S TAKE A 20 MINUTE BREAK.  THAT'LL BE THE ONLY BREAK

3      THIS MORNING.

4          THANK YOU ALL.

5          (JURY OUT AT 10:31 A.M.)

6          (RECESS FROM 10:31 A.M. UNTIL 10:52 A.M.)

7          (JURY OUT AT 10:52 A.M.)

8              THE COURT:  OKAY.  WELCOME BACK.

9          LET'S BRING IN OUR JURY.

10         (JURY IN AT 10:53 A.M.)

11             THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

12     SEAT.

13         OKAY.  TIME IS NOW 10:53.

14         GO AHEAD, PLEASE.

15             MR. PRICE:  LADIES AND GENTLEMEN, I WANT TO TALK NOW

16     ABOUT THE MEASURE OF DAMAGES, BECAUSE THIS PART IS, IT'S A

17     DAMAGES CASE.

18         WE DIDN'T BRING IN CHIEF EXECUTIVES FROM KOREA OR

19     DESIGNERS BECAUSE WE'RE NOT HERE TO CONTEST INFRINGEMENT.  WE

20     DIDN'T BRING IN ENGINEERS BECAUSE WE USED APPLE'S ENGINEER

21     WITNESSES TO PROVE OUR CASE.

22         THIS CASE IS FOCUSSED ON DAMAGES.

23         AND BY THE WAY, APPLE TOOK DEPOSITIONS OF A LOT OF KOREAN

24     WITNESSES, AND IF THERE WAS ANYTHING THEY THOUGHT THEY HAD TO

25     SAY THAT WAS RELEVANT TO THIS CASE, THEY COULD HAVE PLAYED
```

1    THOSE DEPOSITIONS TO YOU.

2         THIS CASE ISN'T ABOUT THAT.  IT'S NOT ABOUT INFRINGEMENT.

3    IT'S ABOUT DAMAGES.

4         AND I WANT TO TALK FIRST ABOUT, ABOUT SAMSUNG'S PROFITS

5    BECAUSE, AS YOU SAW, IF YOU INFRINGE ONE OF THE DESIGN PATENTS,

6    THEN YOU HAVE TO GIVE UP YOUR PROFITS, EVEN IF, EVEN IF PEOPLE

7    BOUGHT YOUR PHONES FOR SOMETHING OTHER THAN THAT DESIGN, EVEN

8    IF YOU HAVE, AS MR. WAGNER SAID, HUNDREDS OF PATENTS ON YOUR

9    PHONE, LIKE SAMSUNG DOES.

10        IF ITS DESIGN, YOU KNOW, INFRINGES APPLE'S PATENT, THEN

11   YOUR PROFITS STILL GO TO APPLE, EVEN IF YOU PUT THE EFFORT INTO

12   IT, EVEN IF CONSUMERS BOUGHT IT FOR A COMPLETELY DIFFERENT

13   REASON.

14        THAT'S WHAT THE DESIGN PATENT RULES TELL YOU.  THAT'S WHAT

15   THE JUDGE TOLD YOU.

16        AND IF YOU LOOK AT THAT, YOU HEARD ALL THESE THINGS ABOUT

17   3.5 BILLION IN REVENUES OR 3.4 IN THE REVENUES.

18        WELL, WE WERE -- THE DESIGN IS, YOU HEARD, PROBABLY

19   APPLE'S, YOU KNOW, MOST TREASURED ASSET.  THEY'VE TOLD YOU HOW

20   IMPORTANT THAT WAS, RIGHT?

21        THE AMOUNT OF REVENUE ON THOSE PHONES THAT INFRINGED THE

22   DESIGN PATENT ARE $854 MILLION.  THAT'S WHAT BOTH EXPERTS

23   AGREED ON, THAT THAT'S THE REVENUE.

24        SO WHEN YOU'RE LOOKING AT, AT SAMSUNG GIVING UP PROFITS,

25   WE'RE NOT TALKING ABOUT 3.4 BILLIONS OR HUNDREDS -- WE'RE

1    TALKING ABOUT $854 MILLION.  AND I'M NOT SAYING THAT'S A SMALL

2    SUM.  BUT I'M SAYING THAT WHEN YOU AWARD DAMAGES, YOU GIVE UP

3    PROFITS.  YOU DON'T GIVE UP THE REVENUES.

4        AND WHAT APPLE HAS TRIED TO DO IS TURN THIS INTO A CASE ON

5    PROFITS, WITH RESPECT TO INFRINGER'S PROFITS, TO TURN THIS INTO

6    A CASE OF SEMANTICS SAYING THAT THINGS ARE DIFFERENT, THAT YOU

7    DON'T APPLY THE REAL WORLD RULES, AND THAT'S SIMPLY NOT TRUE.

8        IF YOU LOOK AT THE JURY INSTRUCTION -- IF WE CAN PUT UP

9    INSTRUCTION 31, IT'S SLIDE 544 -- IT TELLS YOU THAT PROFIT IS

10   DETERMINED BY DEDUCTING EXPENSES FROM GROSS REVENUE.

11       BUT THEN IT TELLS YOU WHAT EXPENSES DO YOU DEDUCT?  AND IT

12   SAYS EXPENSES CAN INCLUDE COSTS INCURRED IN PRODUCING THE GROSS

13   REVENUE, SUCH AS THE COST OF THE GOODS.  THE COST OF GOODS

14   SOLD, YOU CAN DEDUCT THAT.

15       BUT IT DOESN'T STOP THERE.  IT'S NOT JUST COSTS OF GOODS

16   SOLD.  IT GOES ON TO TELL YOU, OTHER COSTS MAY BE INCLUDED AS

17   DEDUCTIBLE EXPENSES IF THEY ARE DIRECTLY ATTRIBUTABLE TO THE

18   SALE OR MANUFACTURE OF THE INFRINGING PRODUCTS RESULTING IN A

19   NEXUS BETWEEN THE INFRINGING PRODUCTS AND THE EXPENSE.

20       THERE HAS TO BE A RELATIONSHIP, AND THERE IS NO QUESTION

21   WITH RESPECT TO OPERATING EXPENSES THAT THERE IS A NEXUS.

22       NOW, YOU REMEMBER WHEN MS. DAVIS TESTIFIED HOW SHE USED

23   THE WORDS "DIRECTLY ATTRIBUTABLE" AGAIN AND AGAIN IN HER

24   EXAMINATION?  AND I ASKED HER ON CROSS, WHY DIDN'T YOU EVEN

25   ONCE, IN YOUR EXAMINATION, DISCUSS THE FACT THAT YOU DEDUCT

1    EXPENSES THAT HAVE A NEXUS BETWEEN THE INFRINGING PRODUCTS AND

2    THE EXPENSE?  IT WASN'T MENTIONED ONCE.

3         AND MS. DAVIS, ALTHOUGH SHE'S A FINE ACCOUNTANT, TOLD YOU

4    THAT SHE HAD NO EXPERTISE AT ALL IN THIS.  THIS IS SLIDE 540.

5         HER TESTIMONY WAS, AND THIS IS CONCERNING ALLOCATING

6    SHARED EXPENSES, SHE TALKED ABOUT THAT METHOD OF ALLOCATING

7    SHARED EXPENSES IS NOT SOMETHING THAT'S BEEN MADE UP FOR THIS

8    CASE, IT'S COMMONLY DONE.  IF YOU'RE LOOKING AT A SPECIFIC

9    PRODUCT, YOU ALLOCATE EXPENSES THAT COME TO PROFIT.

10        AND SHE'S SEEN ANALYSES WHERE COMPANIES HAVE DONE THAT.

11   IN FACT, SHE'S DONE THAT.

12        BUT SHE SAID, NOT IN THE CONTEXT OF A DIRECTLY

13   ATTRIBUTABLE ANALYSIS.

14        AGAIN, SHE DIDN'T MENTION THE NEXUS PART, THAT THERE HAS

15   TO BE A NEXUS BETWEEN THE COST AND MANUFACTURING THE PRODUCT.

16        AND I SAID, OKAY, WELL I KNOW YOU'RE USING THE WORDS

17   "DIRECTLY ATTRIBUTABLE."  PRIOR TO THIS CASE, DID YOU EVER USE

18   THAT CONCEPT BEFORE IN DOING ANY PROFIT CALCULATIONS?

19        NO, I DON'T THINK I'VE EVER BEEN ASKED TO DETERMINE THE

20   INFRINGER'S PROFITS IN A PATENT CASE.

21        SHE'S NEVER DONE THIS BEFORE.  SHE'S NOT AN EXPERT IN

22   THIS.

23        SLIDE 541.  IT SAYS, "IT'S A STANDARD FOR WHICH YOU ARE

24   NOT AN EXPERT, CORRECT?

25        "WELL, I DON'T KNOW WHAT YOU MEAN BY THAT.

```
1            "YOU'VE NEVER USED THE STANDARD BEFORE IN YOUR LIFE?

2            "I'VE NEVER USED THE DIRECTLY ATTRIBUTABLE STANDARD AS I

3      UNDERSTAND WE'RE ASKED TO DO HERE."

4            SHE CANNOT TELL YOU ANYTHING ABOUT WHAT THIS JURY

5      INSTRUCTION MEANS, EXCEPT WHAT PEOPLE IN THE REAL WORLD KNOW

6      WHAT IT MEANS WHEN YOU'RE LOOKING AT WHETHER OR NOT AN EXPENSE

7      IS RELATED TO, WHETHER THERE IS A NEXUS BETWEEN AN EXPENSE AND

8      A PRODUCT IN TRYING TO ARRIVE AT THE PROFIT.

9            AND IN THAT REGARD, IT'S UNDISPUTED THAT OPERATIONAL

10     EXPENSES, THAT IS, EXPENSES LIKE ADVERTISING -- YOU WANT TO

11     INCREASE YOUR SALES?  YOU ADVERTISE.  EXPENSES LIKE PAYING

12     SALESMEN.  IF YOU WANT TO SELL PRODUCTS, YOU HAVE TO HAVE

13     SALESMEN.

14           THESE OPERATIONAL EXPENSES NOT ONLY -- THEY'RE MORE THAN

15     RELATED TO PRODUCING A PRODUCT.  THEY AREN'T JUST -- IT'S NOT

16     JUST THERE'S A NEXUS BETWEEN THOSE TYPES OF EXPENSES AND

17     PRODUCING A PRODUCT.

18           THOSE EXPENSES ARE NECESSARY TO PRODUCE A PRODUCT.

19     MS. DAVIS TOLD YOU THAT.  YOU CAN'T PRODUCE A PRODUCT AND SELL

20     IT WITHOUT INCURRING THOSE EXPENSES, WITHOUT PAYING SALESMEN,

21     WITHOUT ADVERTISING.

22           LET'S SEE IF WE CAN PUT UP 542.

23           "LET ME ASK YOU A LITTLE BIT ABOUT INFRINGER'S PROFITS,

24     THAT IS, SAMSUNG'S PROFITS.  SO FOCUSSING ON THAT, LET ME ASK

25     YOU ABOUT WHAT YOU'D CALL OPERATING EXPENSES.  AND YOU AGREE
```

1      THAT OPERATING EXPENSES ARE NECESSARY, GENERALLY, IN ORDER TO

2      SELL A PRODUCT?

3           "I DO."

4           THESE ARE NOT MADE UP EXPENSES.  THESE ARE EXPENSES THAT,

5      YES, THEY HAVE A NEXUS TO THE PRODUCT.  THEY'RE NECESSARY TO

6      MAKE THE PRODUCT.  THEY'RE MORE THAN COSTS OF GOODS SOLD.

7           YOU ADD THEM IN, AS THE INSTRUCTION SAYS YOU DO, YOU ADD

8      IN COSTS THAT ARE DIRECTLY ATTRIBUTABLE SUCH THAT THERE IS A

9      NEXUS, A RELATIONSHIP BETWEEN THAT EXPENSE AND THE PRODUCT.

10          MR. WAGNER EXPLAINED IT TO YOU.  YOU RECALL THAT I READ IN

11     THE FOLLOWING TESTIMONY.

12          ACTUALLY, WHERE AM I?  DO YOU HAVE IT?

13          YESTERDAY, AFTER MR. LEE CROSS-EXAMINED MR. WAGNER WHERE

14     HE SAID -- DO YOU REMEMBER HE READ PART OF MR. WAGNER'S ANSWER

15     IN THE CROSS-EXAMINATION AND I GOT UP AND I READ THE ENTIRE

16     ANSWER?

17          THE QUESTION WAS, "YOU ALSO AGREED THAT SAMSUNG'S

18     OPERATING EXPENSES CONTAIN SOME EXPENSES THAT ARE NOT RELATED

19     TO SPECIFIC PRODUCT; CORRECT?

20          "ANSWER:  CORRECT."

21          AND THEN IT CONTINUED, "AND AS DISCUSSED WITH MR. OLSON,"

22     WHO'S ANOTHER ATTORNEY OF APPLE'S, "PREVIOUSLY UNDER OATH THAT

23     THERE ARE MANY COMMON COSTS IN ANY COMPLEX ORGANIZATION, AND

24     THOSE COSTS ARE DIRECTLY ATTRIBUTABLE TO THE PRODUCT ISSUE, BUT

25     THEY HAVE TO BE ALLOCATED BECAUSE THAT PARTICULAR COST IS

1        SHARED BY A NUMBER OF PRODUCTS."

2               SO THERE'S AGREEMENT THAT YOU CANNOT MAKE THESE PRODUCTS,

3        THESE ACCUSED PRODUCTS, WITHOUT THE OPERATING EXPENSES.

4               THE NEXT QUESTION IS, YOU KNOW -- OH, AND THERE'S NO

5        QUESTION THAT APPLE DEDUCTS OPERATING EXPENSES WHEN IT'S

6        ARRIVING AT ITS PROFIT.  APPLE ITSELF DOES THIS.

7               IF WE LOOK AT SLIDE 473, IN FACT, BOTH APPLE AND SAMSUNG,

8        ON THEIR AUDITED STATEMENTS, DEDUCT FROM REVENUE ADVERTISING

9        COSTS, R&D COSTS, OTHER OPERATING COSTS.  BOTH OF THEM DO.

10              AND I'M GOING TO SHOW YOU NOW AT SLIDE, I THINK, THIS IS

11       THE AUDITED FINANCIAL STATEMENTS OF APPLE, THIS IS 144.  144.

12       HERE WE GO.

13              AND, AGAIN -- YEAH, THIS IS FINE.  SO THIS IS APPLE'S

14       AUDITED FINANCIAL STATEMENTS.  YOU SEE THEY'VE GOT COST OF

15       SALES SUBTRACTED FROM NET SALES, AND THAT GIVES YOU A GROSS

16       MARGIN.

17              AND IT'S NOT GROSS THAT THEY'RE ENTITLED TO.

18              AND YOU THEN DEDUCT RESEARCH AND DEVELOPMENT, SELLING,

19       GENERAL AND ADMINISTRATIVE EXPENSES, TOTAL OPERATING EXPENSES

20       TO COME TO YOUR OPERATING INCOME, WHICH IS, WHEN YOU'RE GOING

21       TO PAY TAXES ON PROFITS, THAT'S WHAT YOU GO TO.

22              APPLE ALSO DOES THAT WHEN THEY DO IT BY PRODUCT.  WHEN

23       THEY'RE BREAKING IT DOWN BY PRODUCT, APPLE DOES THE SAME THING.

24       IT DEDUCTS ALLOCATED OPERATIONAL EXPENSES.

25              AND ON THIS I -- THIS ONE DOES NEED, IS SEALED AND IS --

1    THEREFORE, IT CAN ONLY BE SHOWN TO ME UP HERE AND TO THE JURY

2    AND THE JUDGE, AND THAT IS SLIDE 477.  I'M SORRY.  IT'S EXHIBIT

3    181, SLIDE 474.  IT'S SEALED.

4         AND THIS IS WHERE APPLE IS CALCULATING ITS PROFIT ON A

5    LINE OF BUSINESS, THE IPHONE, AS COMPARED TO THE IPAD OR OTHER

6    AREAS OF PROFIT.

7         AND YOU SEE IN THIS DOCUMENT, IF YOU CAN BLOW IT UP, THAT

8    QUARTER -- IF YOU CAN, RYAN, SO IT'S THE -- IF YOU LOOK AT

9    THIS, TOTAL REVENUE AND TOTAL STANDARD COSTS, THOSE ARE NOT

10   ALLOCATED.  EVERYTHING ELSE THAT'S DEDUCTED THERE ARE ALLOCATED

11   BASED ON THE COMPANY'S OVERALL RESULTS.

12        WHAT WE'RE TALKING ABOUT HERE IS HOW TO BEST ESTIMATE

13   COSTS THAT ARE DIRECTLY ATTRIBUTABLE AND NECESSARY, NOT JUST

14   HAVE A NEXUS, BUT NECESSARY TO MAKING THE PRODUCT.

15        WHAT THE ACCOUNTANT DOES, THE QUESTION IS, OKAY, WE KNOW

16   THE COSTS, WE KNOW THAT IT'S DIRECTLY ATTRIBUTABLE BECAUSE

17   THESE COSTS WERE NECESSARY TO MAKE THE PRODUCT, HOW DO WE

18   ESTIMATE THAT?

19        BECAUSE YOU KEEP -- APPLE KEEPS COMING UP HERE AND SAYING

20   THEY DIDN'T BRING SOMEONE IN HERE WITH PIECES OF PAPER AND

21   INVOICES AND ALL OF THAT, AND YOU HEARD FROM MR. WAGNER THAT

22   THAT'S NOT HOW COMPANIES OPERATE ANYMORE.  THIS ISN'T THE

23   NINETEENTH CENTURY, OR EVEN TWENTIETH, SADLY.  TIME MARCHES ON.

24        WHAT COMPANIES HAVE THESE DAYS IS THESE ELECTRONIC

25   SYSTEMS.  WHAT SAMSUNG USES IS THE S.A.P. SYSTEM.  EVERYONE

```
 1    AGREES IT'S ONE OF THE BEST SYSTEMS OUT THERE, THAT IT IS

 2    RELIABLE, THAT IT IS ACCURATE.  APPLE USES THE SAME SYSTEM.

 3          AND SO WHEN YOU HAVE COSTS, YOU INPUT IT INTO THE SYSTEM.

 4    THAT SYSTEM IS PART OF THE COMPANY'S AUDIT, SO WHEN

 5    PRICEWATERHOUSE COMES AND AUDITS SAMSUNG, THEY EXAMINE THAT

 6    SYSTEM TO SEE WHAT ITS INTEGRITY IS.  THAT'S WHAT MR. WAGNER

 7    TOLD YOU.

 8          SO THE QUESTION THEN IS, OKAY, YOU'VE GOT THESE EXPENSES

 9    WHICH ARE NOT JUST, DON'T JUST HAVE A NEXUS TO THE PRODUCT,

10    THEY ARE NECESSARY TO THE PRODUCT, HOW DO YOU ESTIMATE THEM?

11          AND OF COURSE THE JURY INSTRUCTIONS DON'T TELL YOU HOW YOU

12    ESTIMATE THEM.  THAT'S WHY YOU HAVE EXPERTS COME IN AND TELL

13    YOU, HOW DO YOU ESTIMATE THOSE COSTS?

14          AND THE EVIDENCE IS UNDISPUTED THAT THE WAY YOU ESTIMATE

15    COSTS IS YOU ALLOCATE THEM BECAUSE YOU -- IT'S IMPOSSIBLE --

16    APPLE COULDN'T DO IT, EITHER -- TO COME IN WITH AN INVOICE FOR

17    EVERY PRODUCT.

18          SO WITH RESPECT TO THESE OPERATING COSTS -- BY THE WAY,

19    MS. DAVIS ALSO ALLOCATES THOSE COSTS WHEN SHE CALCULATES

20    APPLE'S LOST PROFITS.  SHE USES ALLOCATED COSTS.

21          SO IF YOU LOOK IN SUMMARY AS TO WHAT THE REAL WORLD

22    EVIDENCE HERE IS AS TO WHETHER OR NOT THESE COSTS ARE, HAVE A

23    NEXUS TO MAKING PRODUCTS, LOOK AT EXHIBIT 477 WHICH KIND OF

24    SUMMARIZES WHAT WE'RE TALKING ABOUT HERE, THAT APPLE'S

25    OPERATING EXPENSES ARE DEDUCTIBLE, APPLE DOES IT IN ITS 10-K
```

1    STATEMENTS.  APPLE DOES IT IN ITS PRODUCT LINE, THAT IS, EVEN

2    WHEN IT'S NOT JUST THE OVERALL SUMMARY.

3         AT TRIAL, APPLE DEDUCTS OPERATING EXPENSES TO CALCULATE

4    ITS LOST PROFITS.

5         BUT AT TRIAL, IT TELLS YOU, DON'T DEDUCT ALLOCATED

6    OPERATING EXPENSES FOR SAMSUNG, AND THAT'S BECAUSE IT INCREASES

7    THEIR DAMAGES BY OVER $200 MILLION, AND THEY'RE NOT ENTITLED TO

8    THAT.

9         THEY'RE ENTITLED TO SAMSUNG'S PROFITS, WHAT WE REALLY MADE

10   AFTER MAKING NECESSARY EXPENSES TO MAKE THESE PRODUCTS.

11        SO WITH RESPECT TO THE ALLOCATION AND HOW DO YOU ESTIMATE

12   THAT IN THE REAL WORLD, THE JURY INSTRUCTIONS DON'T TALK ABOUT

13   HOW YOU ESTIMATE.  THAT'S WHY YOU HAVE EXPERTS.

14        AND IT'S COMMON, AS APPLE DOES, AS SAMSUNG DOES, SO IT'S

15   COMMON THAT YOU ALLOCATE.  THAT'S HOW ACCOUNTANTS DO IT.

16        IN FACT, YOU HEARD FROM MR. SHEPPARD THAT YOU'RE TAUGHT TO

17   DO THAT.  THIS IS AT 414, THAT WHEN YOU TAKE THESE EXAMS THAT

18   ACCOUNTANTS HAVE TO TAKE IN ORDER TO BECOME ACCOUNTANTS, ONE OF

19   THE THINGS YOU'VE GOT TO LEARN IS HOW TO ALLOCATE COSTS IN A

20   WAY THAT IS MOST ACCURATE, YOU KNOW, THAT IS THE BEST ESTIMATE

21   OF COSTS FOR A PRODUCT.

22        AND THERE IS NO ALTERNATIVE TO THAT, HE ALSO TESTIFIED.

23   AND APPLE KNOWS IT.  THERE IS NO, LET'S BRING IN PAPERS, YOU

24   KNOW, ON OUR HORSE AND BUGGY TO COME IN HERE AND SHOW YOU.

25   THAT'S NOT HOW IT WORKS IN THE REAL WORLD.

```
1          AND SAMSUNG DOES THE SAME THING.  YOU REMEMBER THERE'S

2     TESTIMONY THAT, WELL, THE RESEARCH AND DEVELOPMENT ACTUALLY

3     TAKES PLACE HERE, AND SO THE RESEARCH AND DEVELOPMENT THAT IS

4     TAKING PLACE AT THE TIME OF THE PROFIT STATEMENTS, YOU KNOW, IS

5     REALLY NOT RESEARCH AND DEVELOPMENT FOR THESE PRODUCTS.

6          AND THE ANSWER IS WHAT ACCOUNTANTS ARE LOOKING FOR IS THE

7     BEST WAY TO ESTIMATE RESEARCH AND DEVELOPMENT, AND THE WAY THEY

8     DO IT IS THEY HAVE TO INCUR THE EXPENSES AS THEY OCCUR, YOU

9     HAVE TO INCUR THEM, SO YOU ALLOCATE THE CURRENT EXPENSES TO THE

10    CURRENT PRODUCTS THAT ARE OUT THERE AS THE BEST ESTIMATE.

11         THAT'S WHAT APPLE DOES ON ITS LINE ITEM, ON ITS PRODUCT

12    LINE.  IF YOU GO AGAIN TO SLIDE, I THINK IT'S 545, YOU'LL SEE

13    IT.

14         REMEMBER I TALKED TO MS. DAVIS AND SAID, YOU KNOW, HERE

15    YOU'VE GOT THE IPHONE COMING OUT IN THE THIRD QUARTER OF 2007,

16    AND HERE YOU HAVE THE 3GS COMING OUT IN 2008, AND SO THE

17    PRODUCT THAT'S IN THE MARKET BETWEEN THOSE TWO TIMES IS THE

18    ORIGINAL IPHONE.  THEY'RE DOING RESEARCH AND DEVELOPMENT ON THE

19    3GS.  BUT THEY CHARGE AND ALLOCATE THAT EXPENSE TO THE ORIGINAL

20    IPHONE.

21         I CAN'T TURN AROUND.

22         AND THAT'S THE NUMBERS HERE.  YOU SEE THOSE RESEARCH AND

23    DEVELOPMENT COSTS WHICH ARE ALLOCATED?  BECAUSE THAT'S THE BEST

24    ESTIMATE OF HOW TO DO THAT.  IT'S NOT BEING UNFAIR.  IT IS

25    WHAT -- AND YOU DO USE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
```

1    IN ESTIMATING THE VALUE, THE NUMBER FOR SOMETHING WHICH IS A

2    COST THAT IS NECESSARY TO MAKE THE PRODUCT.

3         WHEN YOU MAKE THAT CALCULATION, WHEN YOU DEDUCT BOTH THE

4    GROSS -- THE COSTS OF GOODS SOLD AND THESE NECESSARY COSTS, THE

5    NUMBER YOU COME UP WITH -- WE CAN PUT UP 781.002 -- IS

6    $52,734,959, AND THAT'S BECAUSE FOR THE TIME FRAME THAT WE'RE

7    TALKING ABOUT IN THE DAMAGES, SOME OF THESE PRODUCTS LOST

8    MONEY.  WE'RE NOT DEDUCTING THOSE LOSSES.

9         IF YOU NETTED THESE OUT, SOME YOU LOST MONEY, SOME YOU

10   GAINED, YOU'D END UP WITH ABOUT 9 MILLION PROFIT.

11        BUT WE'RE NOT DOING THAT BECAUSE WE'RE NOT SAYING THAT

12   APPLE SHOULD SUFFER THOSE LOSSES.

13        BUT THE TOTAL, EXCLUDING THE LOSSES, IS 52,734,000.

14        AND AS A REALITY CHECK, BY THE WAY, YOU COULD LOOK AT WHAT

15   WAS SAMSUNG'S PROFITS FOR THESE PHONES OVER THEIR LIFETIME,

16   ACCORDING TO THESE RECORDS, AND COMPARE THAT WITH THE

17   CALCULATIONS THAT YOU DID FOR THE PROFITS ON THESE PARTICULAR

18   PHONES FOR THIS TIME PERIOD, AND MR. WAGNER SAYS IF YOU COMPARE

19   HIS NUMBERS, THAT IS, THIS $52 MILLION NUMBER WITH, YOU KNOW,

20   THE LIFE OF THE PRODUCT, THEN YOU'RE GOING TO FIND IT'S THE

21   SAME PROPORTION.  AND THAT'S SLIDE 546.

22        WITH RESPECT TO SUBTRACTING OPERATING EXPENSES, USING YOUR

23   CALCULATIONS, HOW DID THE PROFIT MARGINS ON THESE PHONES

24   COMPARE WITH THE PROFIT MARGINS OVERALL?  HE SAYS YOU LOOK AT

25   THE OVERALL LIFE, IT'S VERY TYPICAL OF ALL THE PHONES THAT

1    SAMSUNG SELLS.  THAT IS, THE PROFIT MARGIN HE'S CALCULATED HERE

2    IS TYPICAL OF THE PROFIT MARGIN THAT SAMSUNG SELLS, AND OTHERS,

3    AND THAT MS. DAVIS'S DOUBLES THE PROFIT.

4         NOW, WE'RE SAYING APPLE IS ENTITLED TO OUR PROFIT, BUT NOT

5    SOME RIGGED CALCULATION OF THE PROFIT BASED ON SEMANTICS.

6         BY THE WAY, THERE WAS SOME SUGGESTION THAT THIS DATABASE

7    WAS NOT ACCURATE BECAUSE THERE WERE DIFFERENT VERSIONS, AND YOU

8    HEARD THE EXPLANATIONS FOR THAT.

9         MS. DAVIS USED THAT SPREADSHEET FOR HER COSTS OF GOODS

10   SOLD, AND SHE TESTIFIED THAT THE BIGGEST DIFFERENCE IN ALL

11   THESE VERSIONS, IF YOU LOOKED AT THEM, WAS IN COSTS OF GOODS

12   SOLD, WHICH IS THE NUMBER SHE USED.

13        AND SHE ALSO TESTIFIED THAT THE DIFFERENCES IN THOSE NINE

14   SPREADSHEETS ON OPERATING EXPENSES WAS NOT SIGNIFICANT, AND

15   THAT'S AT SLIDE 445 THAT SHOWS THAT.

16        "WHEN YOU LOOKED AT THE OPERATING EXPENSES, YOU DID AN

17   ANALYSIS THAT SHOWED THERE WERE NO SIGNIFICANT CHANGES

18   WHATSOEVER.

19        "THERE WERE CHANGES, BUT THEY WEREN'T SIGNIFICANT

20   CHANGES," AND THAT WAS TALKING ABOUT THE SPREADSHEETS THAT --

21   THAT'S EXHIBIT 667, I BELIEVE.  676.

22        SO, YES, APPLE'S ENTITLED TO SAMSUNG'S PROFITS ON THESE

23   SEVEN PHONES WHERE THERE WAS REVENUE NOT OF BILLIONS, BUT OF

24   ABOUT 854 MILLION, AND THE PROFIT ON THERE FOR THE TIME PERIOD

25   THAT IS RELEVANT IN THIS CASE IS THE $52 MILLION.

1          NOW LET'S TALK ABOUT APPLE'S LOST PROFITS, AND THAT

2     CALCULATION -- THE CALCULATION THAT APPLE MAKES, I THINK IT'S

3     ON A CERTAIN NUMBER, 1.8 MILLION PHONES I THINK I HEARD.

4          AND BY THE WAY, THIS IS BECAUSE APPLE'S LIMITED ON WHAT

5     THEY CAN GET FOR THEIR LOST PROFITS BY WHEN THEY GAVE NOTICE.

6     I MEAN, YOU HEARD ABOUT HOW MANY INFRINGING PHONES WERE SOLD.

7     THAT DOESN'T MATTER.

8          THE QUESTION IS, WHAT DOES THE LAW ALLOW AS TO WHEN YOU

9     CAN COLLECT LOST PROFITS?  AND IN THIS CASE, AND I WANT TO MAKE

10    THIS VERY CLEAR, THE LOST PROFITS ARE JUST BECAUSE OF ONE

11    PATENT, THE '915 PATENT.  THAT'S ALL.  IT'S ONLY BECAUSE OF ONE

12    PATENT.

13         AND IT'S FOR THE TIME FRAME FROM APRIL 15TH TO MAY 30TH.

14    THAT ISN'T BECAUSE MS. DAVIS WAS BEING CONSERVATIVE.  THAT'S

15    BECAUSE THAT'S WHAT THE LAW PROVIDES THAT APPLE IS ENTITLED TO.

16    WHEN THEY GET UP HERE AND SAY, OH, YOU'RE GOING TO LET SAMSUNG

17    DO THIS AND THAT AND LOOK AT THESE PERCENTAGES, THIS NUMBER IS

18    SMALL.

19         THE QUESTION ISN'T WHAT THEY PREFER TO HAVE.  IN FACT, THE

20    JURY INSTRUCTION SAYS THAT.  IT'S NOT WHAT APPLE PREFERS TO

21    HAVE.  IT IS WHAT THE LAW REQUIRES.

22         AND WHAT THE LAW REQUIRES HERE IS THAT YOU LOOK AT THIS

23    TIME FRAME, APRIL 15TH TO MAY 30TH.  AND THE QUESTION IS, IN

24    SELLING THESE COMPLEX PRODUCTS WITH THEIR BUNDLE OF FEATURES, I

25    MEAN, THERE ARE OVER HUNDREDS AND HUNDREDS OF FEATURES IN THESE

1    PRODUCTS, IN DOING THAT, DID THE INFRINGING FEATURES DRIVE

2    SALES?  DID PEOPLE BUY THESE PHONES BECAUSE OF THESE PATENTED

3    FEATURES?

4         AND THAT'S WHAT THE COURT INSTRUCTED YOU.  IF YOU LOOK AT

5    THE INSTRUCTION, THIS IS SLIDE 551, AND MR. LEE TALKED ABOUT

6    THIS, BUT I DON'T THINK -- WELL, LET ME JUST READ THIS.  "YOU

7    HAVE TO ALLOCATE LOST PROFITS BASED UPON THE CUSTOMER DEMAND

8    FOR THE PATENTED FEATURE OF THE INFRINGING PRODUCT.  THAT IS,

9    YOU MUST DETERMINE WHICH PROFITS DERIVE FROM THE PATENTED

10   INVENTION THAT SAMSUNG SELLS, AND NOT FROM OTHER FEATURES OF

11   THE INFRINGING PRODUCTS."

12        THESE PRODUCTS, AS WE SAID, HAVE HUNDREDS OF FEATURES.

13        NOW, WHAT MS. DAVIS DOES IS SHE JUST SAYS, HERE'S THE

14   POPULATION PERCENTAGE I'M GOING TO DISTRIBUTE.

15        THE QUESTION -- THERE ARE TWO QUESTIONS, THOUGH.  YES,

16   SHOULD SHE DISTRIBUTE BY POPULATION?  THAT'S A QUESTION.

17        BUT THE FIRST QUESTION IS, DOES THE PHONE GO INTO SALES

18   THAT SHE DISTRIBUTES IN THE FIRST PLACE?  THAT IS, CAN YOU SAY

19   THAT THERE ARE SALES OF THESE SAMSUNG PHONES THAT WERE MADE

20   BECAUSE THEY HAD A SCROLL OR A BOUNCE AS OPPOSED TO BECAUSE,

21   FOR EXAMPLE, THEY HAD A BIG SCREEN?

22        APPLE REFUSED TO SELL BIG SCREENS.  IF YOU WERE A CONSUMER

23   AND WANTED A BIG SCREEN, YOU'VE GOT TO GO TO ANOTHER

24   MANUFACTURER.  NOT JUST SAMSUNG, BUT TO ANOTHER MANUFACTURER.

25        SO YOU HAVE TO YOURSELF THEN, HAS THERE BEEN ANY PROOF

PRICE CLOSING

Case 5:11-cv-01846-LHK Document 2844 Filed 12/03/13 Page 85 of 156

1364

```
1    THAT A SINGLE CONSUMER BOUGHT THESE PHONES BECAUSE OF THE

2    PATENTED FEATURES?

3         AND MS. DAVIS TALKED ABOUT THOSE OTHER FEATURES AS WELL.

4         THERE'S 4G.  DURING THE TIME FRAME HERE, APPLE DIDN'T HAVE

5    4G.  SAMSUNG DID.  IF YOU WANTED 4G, YOU'VE GOT TO GO TO

6    SAMSUNG OR OTHER PHONES.

7         WHY BUY THE INFUSE 4G, FOR EXAMPLE?

8         CAN WE GO TO THE ELMO HERE?

9         ALL RIGHT.  THIS PHONE HAS FEATURES WHICH, YOU KNOW -- HOW

10   DO I UNZOOM THIS?  SOMEONE WHO KNOWS WHAT THEY'RE DOING COME UP

11   HERE.

12        THIS PHONE HAS FEATURES SUCH AS ITS HOME PAGE IS NOT THE

13   APPLICATION PAGE.  YOU KNOW HOW WHEN YOU TURN ON YOUR IPHONE,

14   YOU GO TO THE APPS?

15        THAT'S NOT EVEN ON THE HOME PAGE FOR A SAMSUNG PHONE.  YOU

16   CAN GO LIKE THIS AND THE BACKGROUND MOVES (INDICATING).  I

17   DON'T KNOW IF YOU KNOW THAT.  YOU CAN PUT A PICTURE THERE AND

18   IT HAS THAT FUN FEATURE.

19        WHEN YOU DO LOOK AT APPLICATIONS, WE'VE TALKED ABOUT

20   DESIGN AROUNDS.  I MEAN, THIS -- AND THE JURY HELD IT INFRINGED

21   BECAUSE THERE WERE TILES.  YOU KNOW, YOU REMEMBER THE PATENT ON

22   THE ICONS, THAT THERE WERE TILES AROUND THEM?  YOU KNOW?  YOU

23   NOTICE THE JURY FOUND THEY INFRINGE.

24        WELL, FOR EXAMPLE, THERE'S A TILE HERE AROUND THE CLOCK.

25   IF YOU TOUCH IT AND HOLD IT, IT GOES TO THE HOME PAGE AND
```

1    THERE'S NO TILE (INDICATING), SO THERE'S ACTUALLY A DESIGN

2    AROUND FOR THAT RIGHT IN THE PHONE ITSELF WHICH YOU DO JUST BY

3    PUSHING.

4         YOU CAN ADD THINGS TO YOUR HOME PAGE, LIKE LET'S SAY YOU

5    WANT, YOU KNOW, A CLOCK ON THE HOME PAGE.  YOU CAN DO THAT

6    (INDICATING).  YOU CAN'T -- YOUR HOME PAGE ON APPLE IS THE

7    APPLICATION PAGE.

8         I MEAN, I'M JUST SHOWING YOU DIFFERENCES THAT THIS PHONE

9    HAS TO AN APPLE PHONE, AND THE QUESTION IS, TAKING EVERYTHING

10   TOGETHER, THIS BUNDLE, WAS THERE ANY EVIDENCE THAT CONSUMERS

11   WHO BOUGHT THIS PHONE BOUGHT THE PHONE AND THE OTHER PHONES

12   BECAUSE OF THE FEATURES THAT WERE IN THERE?

13        AND BY THE WAY, TO MS. DAVIS IT DIDN'T MATTER HOW MANY

14   FEATURES.  IS IT JUST THE BOUNCE BACK?  IS IT THE SCROLLING?

15   IT DOESN'T MATTER TO HER AT ALL.  IT'S NOT TAKEN INTO ACCOUNT

16   AT ALL.

17        UNDER HER ANALYSIS, WE HAVE THE EPIC 4G, FOR EXAMPLE, AND

18   SHE SAYS THIS -- THAT IF YOU BOUGHT THIS PHONE, YOU BOUGHT IT

19   BECAUSE OF THESE FEATURES AND NOT THE OTHER FEATURES ON THE

20   PHONE.

21        WELL, THIS IS A SLIDER.  YOU KNOW, HER, HER ASSUMPTION,

22   NOT EVIDENCE, HER ASSUMPTION IS THAT PEOPLE WHO BOUGHT THIS

23   PHONE, YOU KNOW, BOUGHT IT BECAUSE IT HAD A PARTICULAR PATENTED

24   FEATURE IN IT, ONE OF THESE THREE FEATURES, THESE THREE UTILITY

25   FEATURES AND NOT, FOR EXAMPLE, BECAUSE THEY WANTED A HARD

1    KEYBOARD OR BECAUSE THIS IS THE EPIC 4G THAT HAD 4G CAPABILITY.

2        THIS -- BY THE WAY, THE INFUSE PHONE WITH THE BIGGER

3    SCREEN WITH THESE FEATURES WITH THE 4G, THIS PHONE ALONE IS

4    $43.9 MILLION OF HER LOST PROFITS FIGURE.  AND DID YOU HEAR ANY

5    EVIDENCE THAT ANY CONSUMER BOUGHT THIS PHONE BECAUSE OF ANY OF

6    THE APPLE PATENTS?

7        THE DROID CHARGE, THAT'S JX 1025.  THAT'S ABOUT

8    $26 MILLION OF HER CATEGORY.  AND, AGAIN, THE QUESTION IS WHY?

9    WHY DID PEOPLE BUY THESE PHONES?

10       YOU SAW LOTS OF SURVEYS.  YOU SAW SURVEYS OF WHAT WAS

11   IMPORTANT TO ANDROID BUYERS, THINGS LIKE SCREEN SIZE.  DO YOU

12   REMEMBER THAT WAS EXHIBIT 572?  WHY DID ANDROID BUYERS BUY

13   THEIR ANDROID PHONES?

14       572.082, SLIDE 11 I THINK IT IS.

15       AND WHAT YOU HEARD WAS -- AND THIS IS A SURVEY THAT APPLE

16   DID, APPLE PURCHASED, PAID FOR, AND THIS HAS TO BE -- NO, THIS

17   IS NOT SEALED.

18       AND THE FIRST THING THEY SAY IS TOP REASONS FOR BUYING

19   ANDROID AMONG THOSE WHO EVEN CONSIDERED THE IPHONE, BECAUSE 75

20   PERCENT OF THE PEOPLE WHO BOUGHT ANDROID PHONES DID NOT EVEN

21   CONSIDER THE IPHONE.  DIDN'T EVEN CONSIDER IT.

22       AND OF THOSE WHO DID, WHO DID THE WEIGHING, YOU KNOW, HERE

23   ARE THE REASONS:  SERVICE PROVIDER, GOOGLE BRAND, LARGER

24   SCREEN, MARKET FOR APPS, TURN BY TURN TECHNOLOGY.

25       THESE PHONES COME IN BUNDLES.  YOU CAN'T BUY A FEATURE,

```
1     YOU KNOW.  YOU CAN BUY APPS.  YOU CAN'T BUY A FEATURE.  IT'S IN

2     A BUNDLE.

3            AND THE QUESTION IS, DID CONSUMERS BUY THIS BUNDLE INSTEAD

4     OF AN APPLE PHONE BECAUSE OF THESE APPLE FEATURES?

5            AND THERE'S SIMPLY NO EVIDENCE OF IT.

6            AND THE ONLY EVIDENCE THEY BRING TO YOU OF THAT IS

7     MR. HAUSER, PROFESSOR HAUSER, AND WHAT HE DID WAS A DEMAND

8     STUDY WHERE HE SAID HE FOUND THAT CONSUMERS WOULD PAY FOR THESE

9     THREE APPLE FEATURES, AND THERE WERE OTHER FEATURES HE TESTED,

10    TOO, AND HE DIDN'T TELL YOU HOW THEY COMPARED TO THE OTHER

11    FEATURES HE TESTED.

12           AND IF YOU TESTED EVERY FEATURE IN THE PHONE, YOU CAN

13    IMAGINE HOW MUCH WE'RE GOING TO BE TALKING ABOUT FOR ADDED

14    FEATURES.  YOU'LL BE IN THE THOUSANDS OF DOLLARS.

15           BUT FUNDAMENTALLY, HE DID NOT TEST WHY SOMEONE BOUGHT AN

16    ANDROID PHONE, WHY THEY BOUGHT THEIR OWN ANDROID PHONE.  YOU

17    MIGHT RECALL THAT THE PEOPLE IN THIS STUDY WERE PEOPLE WHO

18    BOUGHT THE PHONES THAT HAD THESE ACCUSED FEATURES.  THEY HAD

19    ACTUALLY MADE THAT PURCHASING DECISION.  HE DIDN'T ASK THEM,

20    DID YOU EVEN KNOW THEY HAD THOSE FEATURES?  HE DIDN'T ASK THEM,

21    WHY DID YOU BUY YOUR PHONE?

22           SLIDE 338.  HE DIDN'T ASK WHY THEY BOUGHT THEM, WERE THEY

23    AWARE -- IF THE DEVICE DIDN'T HAVE THE TOUCHSCREEN FEATURES,

24    WOULD THEY HAVE SWITCHED TO APPLE?  HE DIDN'T ASK ANY OF THAT.

25           HE TOLD YOU HE WAS QUALIFIED TO DO THAT, HE JUST WASN'T
```

1       ASKED TO.

2               AND TO FIND OUT WHY CONSUMERS, WHAT THEY VALUED IN TERMS

3       OF THE SAMSUNG PHONES, YOU NEED TO COMPARE THE RELATIVE VALUE

4       AND WHY DID YOU BUY THIS PHONE?

5               IF YOU SAY, FOR EXAMPLE, THAT A ROCK, YOU KNOW, WEIGHS

6       FIVE POUNDS AND IT WEIGHS, YOU KNOW -- WHAT'S THE -- IS IT

7       HEAVIER THAN ANOTHER ROCK?  YOU NEED TO KNOW WHAT THE VALUE OF

8       THE ROCK IS, WHAT THE WEIGHT OF THE OTHER ROCK IS.

9               YOU KNOW, WHEN YOU'RE ASKING, WHY DID CONSUMERS BUY A

10      SAMSUNG PHONE, YOU'VE GOT TO SAY, OKAY, HOW DO YOU VALUE THE

11      FEATURES THAT ARE UNIQUE TO SAMSUNG?  YOU HAVE TO INCLUDE THAT

12      IN THE STUDY IF YOU'RE TRYING TO FIND OUT WHY CONSUMERS BOUGHT

13      A SAMSUNG PHONE.

14              AND HE DIDN'T DO THAT.  THAT'S SLIDE 364.  HE WAS ASKED,

15      "DR. HAUSER, IF YOU WANTED TO DO A STUDY TO COMPARE ONE OF THE

16      UTILITY FEATURES TO A UNIQUE ANDROID FEATURE, LIKE SCREEN SIZE

17      OR UNIQUE SOFTWARE, YOU'D HAVE TO INCLUDE THOSE FEATURES IN THE

18      STUDY?"

19              HE SAID, "YES."

20              BUT HE DIDN'T BECAUSE HE WASN'T TASKED TO DO THAT, AND

21      THEREFORE, YOU HAVE NO EVIDENCE AT ALL THAT CONSUMERS BOUGHT

22      ANY OF THESE PHONES BECAUSE OF THESE UTILITY FEATURES.

23              YOU HAVE NO EVIDENCE THAT THOSE SALES WOULD GO INTO THE

24      SUM OF SALES THAT MS. DAVIS THEN DISTRIBUTES WHERE SHE SAYS, I

25      DISTRIBUTE SOME TO APPLE, SOME TO SAMSUNG, ET CETERA.

1          MOREOVER, BECAUSE OF THE DIFFERENCE IN SALES PRICE ON

2     THESE PHONES AND THE DIFFERENCE IN FEATURES, THEY ARE IN A

3     DIFFERENT MARKET.

4          ONE OF THE INSTRUCTIONS YOU HAVE IS INSTRUCTION 25, WHICH

5     IS SLIDE 552, WHICH TALKS ABOUT HOW -- YOU KNOW, ONCE YOU'RE TO

6     THE NEXT STEP, OKAY, DID PEOPLE BUY THESE PHONES BECAUSE OF

7     THESE FEATURES OR NOT?  OR IS IT BECAUSE OF SAMSUNG FEATURES?

8          AND ONCE YOU GET TO THAT NEXT STEP, THEN IN DISTRIBUTING

9     THAT, ONE THING YOU NEED TO CONSIDER IS WHAT PRODUCTS ARE,

10    QUOTE, "IN APPLE'S MARKETS," AND IF TWO PRODUCTS ARE

11    SUFFICIENTLY SIMILAR, IF ONE DOES NOT HAVE A SIGNIFICANTLY

12    HIGHER PRICE THAN OR POSSESS CHARACTERISTICS SIGNIFICANTLY

13    DIFFERENT THAN THE OTHER.

14         AND YOU HEARD THE EVIDENCE ABOUT THE PRICE DIFFERENCES IN

15    THESE PHONES.  THE PRICE DIFFERENCE IN THE PHONES, THERE'S A

16    J.D. POWER STUDY, EXHIBIT 69, SLIDE 12, WHICH TALKS TO YOU

17    ABOUT THE AVERAGE PRICE DIFFERENCE IN THE PHONES, AND IT'S -- I

18    THINK THE APPLE PHONE IS, ON AVERAGE, OF 48 PERCENT MORE

19    EXPENSIVE.  AND THAT'S EXHIBIT 69.24.

20         FOR THE IPAD 2, IF YOU LOOK AT EXHIBIT 458, WHICH IS UNDER

21    SEAL, SLIDE 458, IT'S EXHIBIT -- WHEN WE DO THIS SEALING STUFF,

22    IT TAKES A WHILE BECAUSE WE'VE GOT TO TURN OFF SOME MONITORS --

23    YOU SEE THE DIFFERENCE BETWEEN THE PRICE OF THE GALAXY TAB AND

24    THE IPAD?

25         NOW, IF YOU LOOK AT THE ORIGINAL IPAD, DO YOU RECALL

1       MR. WAGNER'S TESTIMONY THAT IF CONSUMERS DIDN'T BUY THAT, THEN

2       THEY DID APPLE A FAVOR BECAUSE APPLE WAS ACTUALLY LOSING MONEY

3       ON THE IPADS, SO THERE'S NO LOST PROFITS FOR THAT.

4              FINALLY, ON THIS, ON THIS LOST PROFITS, WE'RE ONLY TALKING

5       ABOUT THE SCROLL AND THE ZOOM.  THAT'S THE ONLY PATENT FOR LOST

6       PROFITS THAT WE'RE TALKING ABOUT HERE.

7              SO WHAT I WAS SAYING, YOU'VE GOT TO ASK YOURSELF, DID THE

8       CONSUMER BUY THIS PHONE BECAUSE OF THE INFRINGING FEATURE?

9       WE'RE JUST TALKING ABOUT THAT ONE FEATURE OUT OF HUNDREDS AND

10      HUNDREDS OF FEATURES ON THE PHONE, INCLUDING ONES THAT ARE

11      UNIQUE TO SAMSUNG.

12             AND YOU HEARD MR. SINGH TESTIFY ABOUT HOW THERE ARE OTHER

13      WAYS TO DO SCROLL TO ZOOM, AND I SHOWED YOU THAT THE ACE, THE

14      GALAXY ACE, WHICH IS IN THIS CASE.  THE JURY DETERMINED THAT

15      EVEN THOUGH IT LOOKS LIKE SCROLL TO ZOOM, JUST LIKE APPLE'S

16      PRODUCTS DO, YOU KNOW, IT DOES NOT INFRINGE APPLE'S PATENT.

17             AND SO IF THERE CAN BE A DESIGN AROUND, THERE ARE NO LOST

18      PROFITS.

19             AND MS. DAVIS TOLD YOU THAT IT WOULD TAKE SIX MONTHS TO

20      DESIGN AROUND THIS PARTICULAR PATENT.

21             AND IF WE CAN PUT UP SDX 8002.017, NOW, MS. DAVIS SAID IT

22      WOULD TAKE SIX MONTHS TO DESIGN AROUND, TO HAVE THE PHONE THAT

23      WOULD DO THE SCROLLING AND THE ZOOMING AND NOT INFRINGE THE

24      PATENT.  SHE GOT THAT BY TALKING TO AN APPLE ENGINEER.

25             THE APPLE ENGINEER WASN'T BROUGHT HERE FOR YOU.  SHE GOT

1       IT BY TALKING TO HIM.

2             THAT WAS THE METHODOLOGY THAT BOTH DAMAGES EXPERTS USED.

3       MR. WAGNER HAD A TRANSLATOR BECAUSE THEY SPOKE KOREAN.  THAT'S

4       THE ONLY DIFFERENCE IN THE METHODOLOGY.

5             AND SHE SAYS SIX MONTHS BECAUSE THE PATENT ISSUED ON

6       NOVEMBER 30TH, BUT THE DAMAGES PERIOD STARTS APRIL 15TH BECAUSE

7       THAT'S WHEN APPLE SAID, HEY, WE HAVE A PATENT ON THIS.  THAT'S

8       WHEN THEY GAVE NOTICE.

9             AND THERE'S LOST PROFITS BECAUSE SHE SAYS OF HOW LONG THE

10      DESIGN PERIOD WAS.  IF THE DESIGN PERIOD WAS SHORTER, THERE

11      WOULD BE NO LOST PROFITS AT ALL.  MR. WAGNER SPOKE TO THE

12      SAMSUNG DESIGNER WHO SAID, NO, IT WOULD BE ABOUT FOUR WEEKS.

13            AND THAT WAS BEFORE, THAT WAS BEFORE THE JURY FOUND THAT

14      WHAT SAMSUNG'S PRODUCTS DO, FOR EXAMPLE, THE ACE AND THE

15      INTERCEPT, DO NOT INFRINGE THE PATENT.

16            IN OTHER WORDS, INSTEAD OF DESIGNING AROUND EVERYTHING,

17      YOU ACTUALLY HAD THE PRODUCTS IN THE MARKET THAT HAD THE

18      TECHNOLOGY OF THE 9 -- THAT LOOKS SIMILAR TO THE '915 PATENT.

19            AND IF WE LOOK AT SLIDE 465, SO REMEMBER THE DAMAGES

20      PERIOD STARTS OVER HERE, APRIL (INDICATING).  THE INTERCEPT

21      CAME OUT ON JULY 7TH, 2010, AND THE GALAXY ACE, FEBRUARY 2011.

22            AND IF WE'RE LOOKING JUST AT THE '915 TECHNOLOGY, WE

23      SHOWED YOU THE VIDEOS -- AND YOU CAN PLAY WITH THESE PHONES --

24      YOU KNOW, THEY DON'T INFRINGE.

25            AND SO AT THE TIME WE GOT NOTICE -- WE -- NO, NO, DON'T GO

1    THERE.  TAKE THAT OFF.

2         AND SO THERE WOULD BE NO LOST PROFITS, BECAUSE IF APPLE

3    SAID, HEY, YOU CAN -- YOU KNOW, THE ACE IS OKAY, YOU CAN SWITCH

4    TO THAT -- NOW, THEY DIDN'T, THEY ACCUSED IT OF INFRINGING AND

5    WE HAD TO GET A JURY'S DECISION TO REALIZE THAT THAT WAS A

6    NON-INFRINGING ALTERNATIVE THAT WAS ALREADY OUT THERE BECAUSE

7    APPLE WAS SAYING THIS ALSO INFRINGES.

8         AND SO BY THE TIME THE DAMAGE PERIOD STARTS, THERE WOULD

9    HAVE -- THE TIME -- IF WE GO BACK TO 8002.017, THE TIME THAT

10   YOU START YOUR DESIGN AROUND IS AT THE TIME OF INFRINGEMENT

11   BECAUSE IT'S A HYPOTHETICAL, AND IT IS TRYING TO PUT THE

12   PARTIES WHERE THEY WOULD BE IF THERE HAD BEEN NO INFRINGEMENT.

13        THAT'S WHY THE DAMAGES PERIOD, THE DAMAGES PERIOD OF TIME

14   DOESN'T START UNTIL HERE BECAUSE WE HAVE NOTICE.  THAT'S WHEN

15   YOU GET NOTICE.

16        BUT THE DESIGN AROUND STARTS HERE, AND THAT'S WHAT

17   MS. DAVIS DID.  SHE SAID, OKAY, HOW LONG WOULD IT TAKE YOU TO

18   DESIGN AROUND THIS STARTING AT THE DATE THE PATENT ISSUED?

19        AND SHE SAYS SIX MONTHS.

20        WELL, IF IT'S FOUR WEEKS, YOU DON'T HIT.  YOU DON'T GET

21   ANY LOST PROFITS, NONE AT ALL.  SHE ADMITS THAT.

22        IS FOUR WEEKS THE MORE REASONABLE ESTIMATE?  THAT ESTIMATE

23   WAS MADE USING THE SAME METHODOLOGY SHE DID, BY THE WAY, WHICH

24   WAS TALKING TO AN ENGINEER, WAS MADE BEFORE SAMSUNG EVEN COULD

25   SAY, WITH CERTAINTY, THE GALAXY ACE AND THE INTERCEPT DO NOT

1      INFRINGE THAT TECHNOLOGY BECAUSE A JURY FOUND THAT.

2          SO IF WE START ON NOVEMBER 30TH, AND THEN KNOWING THAT

3      THAT IS NOT INFRINGING, AND YOU SAW THE VIDEOS, IT IS -- I

4      MEAN -- AND YOU CAN, AGAIN, PLAY WITH THE PRODUCTS WHEN YOU GET

5      BACK THERE -- IT'S THE SAME LOOK TO THE CONSUMER AS WHAT

6      APPLE'S NARROW PATENT DOES, NARROW IN THE SENSE THAT APPLE

7      DOESN'T OWN THE WORLD.  THEY DON'T OWN WHAT THE GALAXY ACE AND

8      THE INTERCEPT DO.

9          SO THE KEY QUESTION FOR LOST PROFITS IS, WAS THERE ANY

10     EVIDENCE THAT A CONSUMER, YOU KNOW, BOUGHT THESE PHONES BECAUSE

11     OF THE '915 PATENT?

12         THAT COULD HAVE BEEN DETERMINED.  IT WAS APPLE'S BURDEN TO

13     DETERMINE THAT.  THEY'RE THE ONES THAT NEED TO COME IN HERE AND

14     SAY, YEAH, PEOPLE BOUGHT THAT PHONE BECAUSE OF THAT, AND TO DO

15     THAT, THEY HAD TO COMPARE THAT TO THE OTHER FEATURES OF THE

16     PHONE, WHAT THE SAMSUNG CONSUMERS WOULD HAVE THOUGHT, YOU KNOW,

17     HOW WOULD YOU VALUE THE 4G AND THE BIGGER SCREEN AND THE

18     ANDROID SOFTWARE AND THE GPS TURN BY TURN NAVIGATION, THINGS

19     THAT APPLE WASN'T OFFERING, AND THEY CHOSE NOT TO DO THAT.

20         AND THAT'S WHY MR. WAGNER SAYS YOU CAN'T AWARD LOST

21     PROFITS.

22         AND IN ADDITION, YOU CAN'T BECAUSE THERE WAS A DESIGN

23     AROUND THAT WAS ALREADY IN THE MARKET.  APPLE WAS ACCUSING IT

24     OF INFRINGING, TOO, IN THE TRIAL SAYING THAT IT DID, BUT IT

25     DOESN'T.

1         SO LET ME NOW TALK TO YOU ABOUT REASONABLE ROYALTY.

2         REASONABLE ROYALTY IS COMMON SENSE.  REASONABLE ROYALTY

3    IS, YOU KNOW, YOU'VE GOT TWO PEOPLE AT THE NEGOTIATING TABLE,

4    AND THE QUESTION IS, WHAT AGREEMENT WOULD THEY HAVE REACHED AS

5    TO WHAT THEY WOULD PAY FOR THINGS?  YOU KNOW, THEY HAVE POINTS

6    THEY'D MAKE, WE HAVE POINTS WE'D MAKE, WHAT WOULD PEOPLE AGREE

7    TO?

8         AND IT'S NOT WHAT THE PARTIES PREFER -- REMEMBER I TOLD

9    YOU -- LET'S GO TO SLIDE 554.  REMEMBER I TOLD YOU THAT ONE OF

10   THE INSTRUCTIONS WAS, YOU KNOW -- THIS IS INSTRUCTION 27 -- YOU

11   KNOW, THAT YOU HAVE TO CONSIDER THAT, ASSUME THAT THE PATENT

12   HOLDER AND INFRINGER WOULD HAVE ACTED REASONABLY, AND THE TEST

13   IS, WHAT WOULD HAVE RESULTED FROM THIS HYPOTHETICAL

14   NEGOTIATION, NOT WHAT EITHER PARTY WOULD HAVE PREFERRED.

15        SO IT'S NOT -- YOU KNOW, IT'S NOT SOMEONE SAYING, I WOULD

16   PREFER THAT WE'D HAVE GOTTEN SALES, OR I WOULD PREFER THIS

17   ROYALTY.

18        AND YOU ALSO HAVE TO LOOK AT, AGAIN, WHY DID PEOPLE BUY

19   THE PRODUCT?

20        AND SLIDE 555 TALKS ABOUT, FOR EXAMPLE, A BASE FOR A

21   ROYALTY.  YOU KNOW, IF YOU'VE GOT A $100 CAR AND THE PATENTED

22   FEATURE IS THE TIRES THAT SELL FOR $5, THEN THE BASE REVENUE

23   WOULD BE $5, IT WOULDN'T BE THE 100.

24        APPLE KEEPS SAYING TO LOOK AT ALL THE REVENUE WE MADE FROM

25   THESE PHONES.  YOU DON'T LOOK AT THE REVENUE WE MADE FROM THE

1       PHONES.  YOU LOOK AT THE CONTRIBUTION OF THESE UTILITY PATENTS

2       TO THAT REVENUE.  THAT IS, DID PEOPLE BUY THE PHONES BECAUSE OF

3       THAT?  HOW MANY?

4              DO YOU KNOW THE ANSWER TO THAT?  YOU DON'T BECAUSE NO ONE

5       TOLD YOU.

6              AND IF YOU LOOK AT THE OTHER FACTORS THEN THAT YOU

7       CONSIDER, NUMBER 9, THESE ARE CALLED THE GEORGIA PACIFIC

8       FACTORS.  SO IF YOU'RE NEGOTIATING, YOU'D SAY, HEY, I WANT YOU

9       TO PAY ME THREE OR FOUR BUCKS, THEN ONE THING YOU'D SAY IS,

10      WELL, WHAT ARE THE ADVANTAGES OF YOUR PATENT OVER OTHER WAYS OF

11      DOING OLD MODES THAT HAVE BEEN USED FOR WORKING OUT SIMILAR

12      RESULTS?

13             AND SAMSUNG WOULD HAVE SAID, WELL, LOOK, APPLE, THERE'S --

14      I DON'T NEED TO USE YOUR UTILITY PATENTS.  I MEAN, FOR THE '163

15      PATENT, I MEAN, THAT'S THE ONE, YOU KNOW, WHERE YOU TAP TO ZOOM

16      AND THEN TAP TO MOVE OVER.  FOR ONE THING, IT'S KIND OF

17      LIMITED.  YOU HAVE TO TAP TO ZOOM AND THEN TAP TO MOVE OVER.

18      IF YOU TAP TO ZOOM AND THEN SLIDE A LITTLE BIT, THAT DOES NOT

19      INFRINGE.

20             SAMSUNG WOULD SAY, YOU KNOW, THAT'S NOT ANY DIFFERENT THAN

21      WHAT OUR CAPTIVATE DOES AND WHAT OUR CONTINUUM DOES -- THOSE

22      ARE JX 1011 AND JX 1016 -- OR FROM WHAT THE GEM DOES, OR WHAT

23      THE INTERCEPT DOES.  THEY HAVE THAT SAME FUNCTION, BUT DON'T

24      INFRINGE.  DO YOU REMEMBER THOSE VIDEOS?

25             I'LL PLAY YOU 225.  THESE ARE, AGAIN, AT THE FIRST TRIAL

1    WHEN THEY WERE SAYING THAT THESE INFRINGED AND THIS TECHNOLOGY

2    IS, IF WE PLAY IT, IS TAP TO ZOOM, AND THEN TAP AND IT SLIDES

3    OVER.

4         SO THAT WOULD BE PART OF THE NEGOTIATION IS WHY WOULD

5    SAMSUNG PAY A LARGE ROYALTY IF IT COULD SAY, WE'VE GOT THIS

6    TECHNOLOGY ALREADY.  THESE PHONES DON'T INFRINGE.

7         THESE PHONES DO.  THAT'S WHAT A JURY DECIDED.

8         AND THE HYPOTHETICAL IS THAT YOU HAVE ALL THIS KNOWLEDGE

9    NOW AT THE HYPOTHETICAL DATE, RIGHT?

10        AND YOU ALSO SAW HOW, WITH THE '381 PATENT, HOW PREVIOUS

11   TECHNOLOGY HAD THE BOUNCE BACK, YOU KNOW, WHERE YOU SAW THE BIG

12   TABLE WHERE THEY'RE GOING AND BOUNCING BACK.  IT HAS TO BOUNCE

13   BACK TO THE EDGE TO BE SOMETHING THAT INFRINGES THE '381

14   PATENT.

15        DO YOU REMEMBER THE INTERCEPT -- AND I'M GOING A LITTLE

16   FAST HERE BECAUSE I DON'T HAVE A SUPER AMOUNT OF TIME -- THE

17   INTERCEPT PHONE THAT SAMSUNG HAS WHICH DOES NOT INFRINGE THAT

18   PATENT?  IT SLIDES OVER AND IT BOUNCES BACK, BUT IT LEAVES A

19   LITTLE GRAY AREA.  IT DOESN'T BOUNCE ALL THE WAY BACK.

20        THAT DOESN'T INFRINGE.  AND SO SAMSUNG WOULD HAVE SAID,

21   WELL, IN A HYPOTHETICAL NEGOTIATION, WHY WOULD WE PAY YOU A LOT

22   OF MONEY WHEN WE CAN DO THAT AND YOU CAN'T REALLY TELL THE

23   DIFFERENCE?

24        IS THE INTERCEPT WORKING THESE DAYS?  IT'S HERE SOMEWHERE.

25        AND THEN YOU'VE GOT FACTOR 13.  IF WE CAN GO TO 566, SLIDE

1    566?  AND ACTUALLY -- OKAY, NOW THAT WE GOT THIS WORKING, THIS

2    RELATES TO BOTH, SO I'LL GO HERE.

3         AND THAT'S, YOU KNOW, THE PORTION OF REALIZABLE PROFITS

4    THAT SHOULD BE CREDITED TO THE INVENTION AS DISTINGUISHED FROM

5    NON-PATENTED ELEMENTS, THE MANUFACTURING PROCESS, BUSINESS

6    RISKS, OR SIGNIFICANT FEATURES OR IMPROVEMENTS ADDED BY THE

7    INFRINGER.

8         AND THAT'S REALLY A SIMILAR QUESTION THAT YOU HAD FOR LOST

9    PROFITS, WHICH IS, LOOK, I'VE -- WE'RE MAKING THIS PHONE -- AND

10   WE'RE NOT TALKING ABOUT THE DESIGN PATENTS HERE, UNDERSTAND.

11   THIS IS, THIS IS -- BECAUSE MS. DAVIS SAID, YOU KNOW, SHE

12   DIDN'T PRESENT ROYALTIES ON DESIGN PATENTS.  WE'RE TALKING

13   ABOUT THESE UTILITY PATENTS.

14        AND SO TO SAY, YOU KNOW, THERE'S SO MANY THINGS IN HERE,

15   WHY WOULD CUSTOMERS BUY THIS PHONE BECAUSE OF THE ONE OR TWO

16   PATENTED FEATURES IT HAS OUT OF THE HUNDREDS THAT ARE IN THERE?

17   CAN YOU SHOW ME THAT THEY DO THAT?  AND THERE'S ABSOLUTELY NO

18   EVIDENCE AT ALL THAT IT DOES.

19        NOW IF WE CAN GO BACK TO THE ELMO HERE.

20        I WAS TALKING ABOUT THE INTERCEPT AND THE BOUNCE BACK.

21   YOU SEE HOW THAT BOUNCES BACK THERE?  BUT IT DOESN'T BOUNCE ALL

22   THE WAY (INDICATING).  THERE'S THAT LITTLE GRAY AREA THERE.  DO

23   YOU SEE?  YOU COULD DO THAT OR YOU COULD PAY MILLIONS AND

24   MILLIONS AND MILLIONS OF DOLLARS.  WHAT WOULD YOU DO?

25        AND BY THE WAY, WHILE MS. DAVIS'S ROYALTY NUMBERS LOOK,

1       COULD LOOK LOW BECAUSE, YOU KNOW, PER PHONE, THINK OF ALL THE

2       TECHNOLOGIES THAT ARE IN THIS PHONE AND IF YOU HAD TO PAY FOR

3       EVERY ONE OF THEM AND HOW MUCH IT WOULD COST TO MAKE A PHONE.

4       YOU KNOW, HOW MANY THOUSANDS OF DOLLARS IT WOULD COST TO MAKE A

5       PHONE IF YOU HAD TO PAY FOR EVERY SPECIFIC FEATURE THAT'S IN

6       THAT PHONE.

7               YOU HAVE TO TAKE THAT INTO CONSIDERATION WHEN YOU'RE

8       TALKING ABOUT COMING UP WITH A ROYALTY RATE, AND YOU

9       SPECIFICALLY -- OH, THE BATTERY -- HAVE TO TAKE THAT INTO

10      CONSIDERATION WHEN YOU'RE ASKING, WHY WOULD I DO THAT WHEN I'VE

11      GOT OTHER WAYS OF DOING IT?

12              AND THEN WE HAVE FACTOR 11, WHICH I'LL QUICKLY SHOW YOU.

13      OR NOT SO QUICKLY.  I THINK IT'S 566.  AND THIS IS THE EXTENT

14      TO WHICH THE INFRINGER HAS MADE USE OF THE INVENTION AND ANY

15      EVIDENCE PROBATIVE OF THE VALUE OF THAT USE, AND THAT IS, YOU

16      KNOW, DID THIS DRIVE SALES?  DID THESE FEATURES ON THESE

17      PHONES -- AND THEY'RE DIFFERENT PHONES WITH DIFFERENT FEATURES

18      ACCUSED OF INFRINGING -- IS THAT WHY PEOPLE BOUGHT THE PHONES?

19      AND WHAT DID SAMSUNG CONTRIBUTE?

20              AND YOU HEARD MR. WAGNER'S TESTIMONY, EXHIBIT 567 -- I'M

21      SORRY -- THAT TALKS ABOUT SAMSUNG BEING, IN THE LAST FEW YEARS,

22      THE SECOND MOST NUMBER OF PATENTS ISSUED IN THE UNITED STATES.

23      THEY HAVE A LOT OF PATENTED TECHNOLOGY IN THESE ACCUSED

24      PRODUCTS THAT'S THEIR OWN, THAT THEY'VE INVENTED.

25              YOU HAVE TO LOOK AT THEIR CONTRIBUTIONS IN MANUFACTURING

1    AND MARKETING AND ALL THESE OTHER THINGS THAT ARE UNRELATED TO

2    THE ONE TINY PATENT THAT YOU'RE ASKED TO ADDRESS, AND UNLESS

3    YOU DO THAT PROPERLY, YOU'RE GOING TO OVERSTATE THE ROYALTY

4    RATE.

5         AND SO WHAT MR. WAGNER SAID WHAT THEY'VE AGREED TO WAS,

6    SAMSUNG, HOW MUCH WOULD IT COST US TO, TO REPLACE WHAT YOU SAY

7    IS INFRINGING?

8         AND MR. WAGNER USED THE SAME METHODOLOGY THAT MS. DAVIS

9    USED, WHICH WAS HE ASKED AN ENGINEER, AND HE CAME UP WITH SLIDE

10   46.  AND THIS IS HOW LONG IT WOULD COST TO IMPLEMENT

11   REPLACEMENTS OF THESE PARTICULAR PRODUCTS.

12        AND APPLE IS GOING TO SAY, LOOK HOW LOW THAT IS.

13        BUT IT'S LOW ONLY IF YOU FOLLOW THE RULES.  IF YOU FOLLOW

14   THE RULES OF THIS HYPOTHETICAL NEGOTIATION, WHEN YOU CONSIDER,

15   DID THESE DRIVE THE PRODUCT, DID THESE FEATURES DRIVE THE

16   PRODUCT, WHEN YOU CONSIDER, WHAT ELSE DID WE HAVE OUT THERE

17   THAT WE COULD HAVE SAID IN THE NEGOTIATION, BUT WE CAN DO THIS,

18   AND WE HAD THINGS THAT PERFORMED THE SAME VISUAL FUNCTION, THAT

19   DO NOT INFRINGE, ALTHOUGH APPLE ACCUSED THEM OF IT AT THE TIME.

20        AND SO AT THE TIME WE COULDN'T SAY, OH, WE GIVE UP, WE'RE

21   GOING TO CHANGE TO THE NON-INFRINGING WAY OF DOING IT BECAUSE

22   APPLE WAS SAYING, YOU'VE GOT TO GO TO TRIAL ON THAT, TOO.

23        AND SO WHEN YOU GET YOUR VERDICT FORM, IF WE CAN SWITCH TO

24   THE ELMO, AND ACTUALLY, WHAT MR. WAGNER CALCULATES IS A LUMP

25   SUM ROYALTY, SO THAT REALLY IS HARD -- YOU CAN'T DIVIDE THAT

1      OVER THE PRODUCTS.  AND SO WHEN YOU FILL THIS OUT, WHAT'S THE

2      TOTAL DOLLAR AMOUNT THAT APPLE'S ENTITLED TO RECEIVE?

3              IF YOU GO THROUGH THE PRODUCTS, YOU'LL GO TO HIS CHART ON

4      INFRINGER'S PROFITS, THAT IS, WHAT PHONES SAMSUNG MADE MONEY

5      ON, YOU KNOW, THAT INFRINGED THE DESIGN PATENTS.

6              AND IF YOU LOOK AT THAT CHART, WHICH I SHOWED YOU EARLIER,

7      IT'S 42.9 FOR THE INFUSE 4G, 3.285 FOR THE INDULGE, AND

8      6,507,000 FOR THE EPIC 4G, THAT THIS IS -- THESE ARE THE

9      PRODUCTS THAT SAMSUNG MADE MONEY ON FOR THE DESIGN PATENTS.

10             THAT'S AFTER YOU DEDUCT THE APPROPRIATE EXPENSES.

11             WHEN YOU GO TO THE TOTAL, BECAUSE IT'S A LUMP SUM ROYALTY

12     PAYMENT, YOU WOULD TAKE THAT NUMBER AND YOU WOULD ADD $28,452

13     TO GET YOU TO $52,763,411.

14             BECAUSE THAT'S HOW TO ACCOUNT, ON THE VERDICT FORM, FOR

15     THAT LUMP SUM ROYALTY PAYMENT THAT, IN A HYPOTHETICAL

16     NEGOTIATION, THAT TWO REASONABLE PEOPLE WOULD AGREE ON

17     CONSIDERING THE CONTRIBUTION OF THE PATENTED TECHNOLOGY TO THE

18     PRODUCTS, THAT IS, WHETHER IT DRIVES THE SALES, AND WHETHER OR

19     NOT THERE WERE OTHER THINGS THAT EXISTED AT THE SAME TIME THAT

20     COULD HAVE DONE VIRTUALLY THE SAME THING FOR FREE.

21             SAMSUNG IS HERE TO HAVE YOU DECIDE WHAT THE LAW PROVIDES

22     IS THE APPROPRIATE DAMAGES, WHAT THE LAW PROVIDES, WHAT THOSE

23     INSTRUCTIONS TELL YOU THAT YOU SHOULD DO.

24             WE'RE HERE, AND WE'RE WILLING -- WE'RE HERE AND TELLING

25     YOU, OF COURSE, THAT THAT'S $52 MILLION WHEN YOU FOLLOW THE

1    LAW.

2            AND WHAT APPLE HAS DONE IS THEY'VE COME HERE AND THEY'VE

3    APPEALED TO EMOTION.  THEY'VE STOLEN THE IPHONE, MR. SCHILLER

4    SAID.

5            NO, WE DIDN'T.  THE IPHONE HAS GOT HUNDREDS AND HUNDREDS

6    OF FEATURES, SO DO OURS, UNIQUE FEATURES.

7            EVERY BIT OF REVENUE WE'VE GOTTEN FROM THESE PHONES,

8    SOMEHOW APPLE IS ENTITLED TO A CHUNK OF THAT.  NO.

9            WHEN IT COMES TO THE UTILITY PATENTS, THE QUESTION IS, WHY

10   DID SOMEONE BUY THE PHONE?  IS IT BECAUSE IT HAD A BOUNCE?  IS

11   IT BECAUSE IT HAD THE SCROLL TO ROLL?  IS IT BECAUSE OF ALL THE

12   FEATURES?  NOT A PIECE OF EVIDENCE ON THAT.

13           ENGINEERS, THEY LIKED THE FEATURES, BY THE WAY.

14   STEVE JOBS LOVED THE IPHONE.  HE WAS RIGHT.

15           STEVE JOBS HATED THE 7 INCH TABLET.  HE WAS WRONG.

16           EXECUTIVES OR REVIEWERS CAN BE RIGHT OR WRONG.  THE

17   QUESTION IS, WHAT DO THE CONSUMERS THINK?

18           AND THAT QUESTION, WHAT DO CONSUMERS THINK, WHY DID

19   CONSUMERS BUY THESE PHONES WITH THIS BUNDLE OF FEATURES THAT

20   INCLUDE FEATURES THAT APPLE REFUSED TO PROVIDE ITS CUSTOMERS,

21   LIKE THE LARGER SCREEN SIZE, 4G, TURN BY TURN GPS AT THE TIME,

22   AND OTHERS, WHY DID THEY BUY THESE PHONES?  WAS IT BECAUSE OF

23   THOSE FEATURES?  WHAT WOULD THAT ALLOCATION BE?

24           THAT QUESTION APPLE STUDIOUSLY AVOIDED.  IT DID NOT HAVE

25   ANYONE COME IN AND DO THAT FOR YOU, AND IT'S THEIR BURDEN, AND

```
1    YOUR COMMON SENSE TELLS YOU.  PLAY WITH THESE PHONES.  LOOK AT

2    THEM AND ASK YOURSELF, DID CONSUMERS BUY THESE PHONES BECAUSE

3    OF THESE THREE LIMITED FEATURES?  YOU HAVE NO EVIDENCE THEY

4    DID.

5         BUT APPLE IS TRYING TO TAKE ADVANTAGE OF THE FACT THAT,

6    YOU KNOW, WE CROSSED THE LINE ACCORDING TO THE LAST JURY ON

7    SOME PHONES, AND OTHERS WE DIDN'T, EVEN THOUGH THE LOOK TO THE

8    CONSUMERS IS EXACTLY THE SAME.

9         AND THEY'RE SAYING BECAUSE OF THAT, JUSTICE IS GIVING US

10   ALL THIS MONEY.  REALLY WHAT THEY'RE SAYING IS, IN THE MARKET,

11   JUSTICE IS JUST US.  AND YOU CAN'T LET THEM DOMINATE THE MARKET

12   THAT WAY.

13        BUT DO GIVE THEM WHAT THE LAW ENTITLES THEM TO.  AND IF

14   YOU DO THAT, I THINK YOU'LL COME UP WITH THAT $52 MILLION

15   NUMBER.

16        AND I THANK YOU FOR YOUR ATTENTION.  THIS IS PROBABLY NOT

17   THE MOST RIVETING CASE YOU'VE EVER LISTENED TO OR WILL LISTEN

18   TO.  IT'S NOTHING LIKE "THE GOOD WIFE" OR SOME GREAT TV SHOWS,

19   BUT IT'S IMPORTANT AND WE REALLY APPRECIATE YOUR LISTENING TO

20   THE EVIDENCE AND EVALUATING IT.

21        THANK YOU.

22             THE COURT:  11:48.  REBUTTAL?

23        (PAUSE IN PROCEEDINGS.)

24             THE COURT:  OKAY.  YOU HAVE 28 MINUTES.  TIME IS NOW

25   11:49.
```

1           GO AHEAD, PLEASE.

2           **(MR. MCELHINNY GAVE HIS REBUTTAL CLOSING ARGUMENT ON**

3       **BEHALF OF THE PLAINTIFF.)**

4           MR. MCELHINNY:  THANK YOU.

5           A FEW CLOSING THOUGHTS AND THEN WE'LL LET YOU GET ON WITH

6       YOUR JOB.

7           I WANT TO START WITH WHERE COUNSEL JUST LEFT, WITH THE

8       QUESTION OF WHY ARE WE HERE TODAY?  THAT'S WHAT HE JUST ASKED.

9       HE SAID, WHY ARE WE HERE TODAY?

10          I WANT TO DO THIS A LITTLE DIFFERENTLY.  I WANT TO RELY

11      ON -- INSTEAD OF TELLING YOU THINGS THAT I'D LIKE YOU TO

12      BELIEVE, I WANT TO RELY ON THE EVIDENCE THAT CAME IN IN THE

13      CASE, AND WE HAVE THE ANSWER TO THAT QUESTION BECAUSE

14      MR. SCHILLER GAVE IT TO US UNDER OATH.

15          I ASKED HIM, "WHY AREN'T YOU JUST LETTING SAMSUNG INFRINGE

16      YOUR PATENTS?

17          AND HE SAID, "BECAUSE ULTIMATELY WHAT'S BEEN DONE HERE IS

18      TO COPY MANY ATTRIBUTES OF APPLE'S PRODUCTS AND TO COPY BOTH

19      THE DESIGNS AND FEATURES, AND THESE ARE THINGS THAT ARE THE

20      VERY ESSENCE OF WHAT APPLE IS ABOUT, HOW WE CREATE WHAT WE HOPE

21      CUSTOMERS LOVE, AND WE'VE BUILT OUR BUSINESS AND WHAT

22      DIFFERENTIATES US.  THAT'S WHAT OUR BUSINESS IS ABOUT.  OTHER

23      COMPANIES HAVE OTHER BUSINESS MODELS.  THAT'S APPLE'S, AND IF

24      WE DON'T HAVE THAT, WE DON'T HAVE APPLE'S ENTIRE BUSINESS.

25          "AND YOU CAN PICK APART ONE FEATURE OR ONE PRODUCT, BUT AT

1    THE END OF THE DAY, THERE IS A CUMULATIVE EFFECT OF DOING ALL

2    OF THIS THAT IS INCREDIBLY DAMAGING, AND AT SOME POINT IT HAS

3    TO STOP AND YOU SAY NO TO ANY OF THESE PRODUCTS THAT DO THAT."

4         THAT WAS THE TESTIMONY OF ONE OF APPLE'S HIGHEST

5    EXECUTIVES TELLING YOU WHY APPLE IS HERE IN THIS CASE.

6         WITH LIMITED TIME, I JUST WANT TO TAKE ON SOME TOPICS,

7    OKAY, SO THE FIRST ONE I WANT TO TAKE ON IS WHAT I CALL THE

8    DESIGN AROUND.

9         COUNSEL HAS SHOWN YOU A LOT OF PHONES.  COUNSEL HAS

10   DEMONSTRATED A LOT OF PHONES.  COUNSEL HAS SUGGESTED THAT YOU

11   GO IN AND PLAY WITH THE PHONES, AND AT THE END OF ALL OF THAT,

12   WHAT HE HAS SUGGESTED IS THAT SAMSUNG, IF IT WANTED TO, COULD

13   HAVE DESIGNED AROUND OUR PATENTS.

14        AND HE IS SUGGESTING THAT IT COULD HAVE BEEN EASY, IT

15   COULD HAVE BEEN DONE FOR A COUPLE THOUSAND DOLLARS, $10,000,

16   AND HE IS SUGGESTING THAT THOSE PHONES WOULD HAVE SOLD ON THE

17   MARKET.

18        WHAT EVIDENCE DID YOU HEAR ABOUT THAT?  ARE YOU SUPPOSED

19   TO GUESS WHETHER TECHNOLOGY FROM THE ACE COULD JUST BE TAKEN

20   AND PUT INTO ANOTHER PHONE?  ARE YOU SUPPOSED TO GUESS HOW LONG

21   THAT WOULD TAKE?

22        I WANT TO MAKE A LITTLE POINT HERE ABOUT THE DIFFERENCE

23   BETWEEN THE '915 AND THE OTHER TWO UTILITY PATENTS.  THE BOUNCE

24   PATENT AND THE DOUBLETOUCH TO ZOOM ARE, IN FACT, WHAT YOU WOULD

25   CALL FEATURES.

1          BUT THE '915, IF YOU REMEMBER, ACTUALLY GOES TO HOW A
2     TOUCHSCREEN WORKS.  IT IS WHAT TEACHES THE TOUCHSCREEN TO
3     DISTINGUISH BETWEEN ONE FINGER AND MULTIPLE FINGERS AND TO
4     UNDERSTAND THAT ONE FINGER MEANS SCROLL AND MULTIPLE FINGERS
5     MEANS A GESTURE.
6          THAT'S DEEPER THAN ANY PARTICULAR FEATURE.  YOU DON'T --
7     IF YOU DON'T HAVE THAT ABILITY, YOUR TOUCH PHONE WILL NOT WORK
8     SUCCESSFULLY.
9          AND YOU HEARD JULIE DAVIS SAY, IF YOU'RE GOING TO BE
10    CHANGING THE VERY NATURE OF THE WAY THAT THE TOUCH PHONE WORKS,
11    IT HAS TO BE COORDINATED ACROSS ALL OF THE OTHER PROGRAMS ON
12    THE PHONE.
13         SAMSUNG CAN'T SIMPLY COME IN HERE AND SAY, TO USE THE
14    PHRASE YOU HEARD, WE WOULD HAVE DONE THAT, WE COULD HAVE DONE
15    THAT, WE SHOULD HAVE DONE THAT.
16         THEY DIDN'T.  THEY DIDN'T DO THAT.  YOU KNOW THAT.  YOU
17    HAVE NOT SEEN ANY PHONE THAT THEY SAID, THIS WAS A DESIGN
18    AROUND.  WE CHANGED THE WAY WE WERE DOING IT IN ORDER TO MAKE A
19    NEW PHONE, A NEW PRODUCT THAT WORKED.  YOU HAVE NOT SEEN ONE.
20         WHAT YOU HAVE HEARD IS A LOT OF EXPLANATIONS FROM LAWYERS.
21         TO TELL YOU THE TRUTH -- NOBODY WILL BELIEVE THIS, BUT
22    IT'S THE TRUTH -- IT IS SORT OF HARD TO KEEP YOUR SELF-ESTEEM
23    WHEN YOU'RE A TRIAL LAWYER BECAUSE EVERY TIME YOU STEP UP IN
24    FRONT OF A JURY, THERE'S SOMEONE IN A BLACK ROBE UP THERE WHO
25    SAYS "WHAT THIS PERSON IS ABOUT TO TELL YOU IS NOT EVIDENCE.

1    IT'S NOT WHAT YOU SHOULD BE RELYING ON TO MAKE YOUR DECISIONS.

2    IT'S SUPPOSED TO HELP YOU UNDERSTAND THE EVIDENCE."

3         BUT WHAT DOES THAT MEAN IN THE REAL WORLD?  AND FOR THAT

4    I'M GOING TO SHARE WITH YOU ONE OF MY WIFE'S RULES OF THUMB.

5         MY WIFE LEARNED AT A VERY YOUNG AGE THAT IF SHE WAS IN A

6    CONVERSATION WITH SOMEBODY AND SHE SAID THAT SOMETHING WAS TRUE

7    AND THE PERSON LOOKED AT HER SORT OF QUIZZICALLY, SHE

8    IMMEDIATELY THOUGHT TO HERSELF, OH, MY GOD, WHERE DID I HEAR

9    THIS?

10        AND IF HER ANSWER WAS, I HEARD IT FROM THE LAWYER -- WHICH

11   IS WHAT SHE CALLS ME AFFECTIONATELY -- SHE ALL OF A SUDDEN

12   WOULD THINK, I DON'T WANT TO GO TOO MUCH FURTHER IN THIS

13   CONVERSATION BECAUSE I MAY NOT BE RIGHT.  I MAY NOT BE SURE

14   THAT WHAT I AM SAYING IS TRUE.

15        AND I'D SUGGEST THAT'S THE RULE OF THUMB THAT YOU USE IN

16   THE JURY ROOM.  WHEN YOU'RE DISCUSSING THE STRENGTHS AND

17   WEAKNESSES OF EVERYBODY'S CASE AND WHEN YOU SAY, WELL, SAMSUNG

18   COULD HAVE DESIGNED AROUND, OR THIS WAS NOT AN IMPORTANT

19   PATENT, OR WE DON'T KNOW WHY PEOPLE WOULD DO THIS, OR APPLE'S

20   EXPERTS MADE OUR CASE, JUST STOP FOR A MINUTE AND SAY TO

21   YOURSELF, WHERE DID I HEAR THAT?  WHERE DID I HEAR THAT?

22        AND NO MATTER WHOSE ARGUMENT IT IS, IF YOU HEARD IT FROM A

23   LAWYER, IF YOU DIDN'T SEE IT IN A DOCUMENT, IF A WITNESS DIDN'T

24   TESTIFY TO IT UNDER OATH, STOP JUST FOR A MINUTE AND SAY, IS

25   THAT EVIDENCE?  DID THEY PROVE THAT TO US?

```
1            AND THE REASON IT'S IMPORTANT IS BECAUSE, IF YOU'VE

2      NOTICED, LAWYERS ARE NOT UNDER OATH.  LAWYERS DON'T GET

3      CROSS-EXAMINED.  I DON'T GET TO JUMP UP TO MR. PRICE AND SAY,

4      WELL, HOLD IT.  YOU DIDN'T SHOW THEM THE NEXT PAGE OF THAT

5      DOCUMENT.  THAT DOESN'T HAPPEN.

6            BUT IT DOES HAPPEN TO WITNESSES.  AND THAT'S WHY IT'S

7      IMPORTANT THAT SAMSUNG DID NOT BRING YOU A SINGLE WITNESS.

8            SO DESIGN AROUNDS, WHAT DO WE KNOW FROM THE EVIDENCE?  WE

9      KNOW THAT THEY HAVEN'T SHOWN YOU ONE.  WE KNOW -- IF I COULD

10     SEE SLIDE 109.69.  WE KNOW THAT EVEN AFTER THEY GOT NOTICE OF

11     THE INFRINGEMENT OF OUR PATENT, THEY CONTINUED TO INTRODUCE NEW

12     PRODUCTS THAT INFRINGED THE PATENT.

13           THEY TELL YOU THAT THEY COULD HAVE CHANGED IT FOR $10,000

14     AND IT WOULD HAVE HAD ALL THE FEATURES, PEOPLE WOULD HAVE

15     BOUGHT IT, THEY WOULD HAVE LOVED IT.

16           BUT WE KNOW THAT THEY DIDN'T DO THAT.

17           WE ALSO KNOW WHY THEY DIDN'T DO THAT, BECAUSE MR. SHIN

18     TOLD US THAT THEY WERE IN THE MIDDLE OF A CRISIS OF DESIGN.  HE

19     TOLD YOU IN THAT DOCUMENT THAT HE HAD LOST FAITH IN THEIR OWN

20     DESIGN PROCESS.

21           AND FINALLY, WE KNOW THEY DIDN'T DO IT BECAUSE THEIR

22     PHONES WERE SELLING LIKE CRAZY.  PRIOR TO THIS COPYING, THEY

23     HAD BEEN LOST IN THE WORLD OF ALL THE OTHER ANDROID USERS, AND

24     THEN THEY INTRODUCED THESE NEW PHONES AND, THROUGH SALES OF 90

25     PERCENT OF INFRINGING PRODUCTS, THEY LEFT THE ANDROID WORLD
```

```
 1    BEHIND.

 2         WHY WOULD THEY CHANGE THAT?  WHY WOULD THEY DESIGN AROUND

 3    THAT WHEN IT WAS THE COPYING OF APPLE THAT WAS SELLING THEIR

 4    PRODUCTS?

 5         I WANT TO TALK TO YOU -- AND THIS IS ACTUALLY, I THINK,

 6    PRETTY IMPORTANT AND I THINK YOU -- THIS MAY BE HELPFUL TO YOU.

 7         THERE IS A DISPUTE ABOUT WHAT THE LAW IS ON THIS ISSUE OF

 8    SAMSUNG'S PROFITS AND WHAT COSTS TO DEDUCT.

 9         YOU'LL REMEMBER THAT MS. DAVIS TOLD YOU THAT SHE USED

10    DIFFERENT RULES FOR SAMSUNG'S INFRINGE -- LOST INFRINGER'S

11    PROFITS THAN SHE USED FOR APPLE'S RULES AND THAT ARE DIFFERENT

12    THAN THE NORMAL ACCOUNTING RULES.

13         AND YOU JUST HEARD COUNSEL -- THEY SUGGEST THAT BECAUSE

14    SHE USED DIFFERENT RULES, THAT IT'S WRONG, THAT IT'S NOT FAIR

15    FOR APPLE'S PROFITS TO DO THIS ALLOCATION, FOR SAMSUNG'S

16    PROFITS, YOU DIDN'T.  OBVIOUSLY THERE'S SOMETHING WRONG WITH

17    WHAT YOU'VE DONE.

18         HOW DO YOU DECIDE THAT?  HOW DO YOU KNOW WHICH OF THE

19    LAWYERS IS TELLING YOU THE TRUTH ON THAT?

20         FORTUNATELY, AGAIN, THE ANSWER COMES FROM THE COURT.  LOOK

21    AT YOUR JURY INSTRUCTIONS.  YOU HAVE SEPARATE JURY INSTRUCTIONS

22    ON HOW TO CALCULATE APPLE'S PROFITS AND HOW TO CALCULATE

23    SAMSUNG'S LOST PROFITS.  THE JURY INSTRUCTION ON HOW TO

24    CALCULATE APPLE'S PROFITS IS JURY INSTRUCTION NUMBER 24 IN YOUR

25    BINDER.
```

```
 1            AND LOOK WHAT IT SAYS.  IT SAYS, "APPLE MAY CALCULATE ITS

 2     LOST PROFITS ON ANY LOST SALES BY COMPUTING THE LOST REVENUE,"

 3     WE ALL START AT REVENUE, "FOR SALES IT CLAIMS IT WOULD HAVE

 4     MADE BUT FOR THE INFRINGEMENT AND SUBTRACTING FROM THAT FIGURE

 5     THE AMOUNT OF ADDITIONAL COSTS OR EXPENSES THAT IT WOULD HAVE

 6     INCURRED IN MAKING THOSE" SALES, "LOST SALES," COSTS OF GOODS

 7     SOLD, "SUCH AS COST OF GOODS," SAME.

 8            BUT THEN IT GOES ON AND SAYS YOU SUBTRACT SALES COSTS, YOU

 9     SUBTRACT PACKAGING COSTS, AND YOU SUBTRACT SHIPPING COSTS.

10            WHEN YOU DO THE APPLE LOST PROFITS, YOU DO THIS

11     ALLOCATION, YOU DO THE DEDUCTION OF ALL THE OTHER EXPENSES.

12     IT'S -- BECAUSE IT REDUCES APPLE'S PROFITS.  IT LOWERS THE

13     AMOUNT THAT WE'RE ENTITLED TO RECEIVE.

14            AND THAT IS THE JURY INSTRUCTION AND THAT IS WHAT

15     MS. DAVIS SPECIFICALLY TOLD YOU THAT SHE DID.

16            WHEN YOU CALCULATE SAMSUNG'S LOST PROFITS, IT'S A VERY

17     DIFFERENT JURY INSTRUCTION.  THERE WE'RE LOOKING AT 31 --

18                MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT.  THIS IS

19      IMPROPER ARGUMENT TO SUGGEST THAT ONE INSTRUCTION TRUMPS THE

20      OTHER.

21                MR. MCELHINNY:  YOUR HONOR, IT INSTRUCTS THEM --

22                THE COURT:  OVERRULED.

23      GO AHEAD.

24                MR. MCELHINNY:  THANK YOU.

25            YOU'VE GOT ANOTHER INSTRUCTION THAT SAYS READ ALL THE
```

1    INSTRUCTIONS AS A WHOLE.

2         IN 31 WHERE IT TALKS ABOUT DEFENDANT'S PROFITS, IT DOESN'T

3    SAY SHIPPING COSTS, IT DOESN'T SAY SALES COSTS, IT DOESN'T SAY

4    PACKAGING.

5         INSTEAD IT HAS AN ENTIRE DIFFERENT FORMAT.  IT SAYS DEDUCT

6    COSTS THAT ARE DIRECTLY ATTRIBUTABLE TO THE SALE, AND THAT

7    SAMSUNG HAS TO PROVE THAT TO YOU.

8         SO THE RULES ARE DIFFERENT.  THE CALCULATIONS ARE

9    DIFFERENT.  THE TESTS ARE DIFFERENT, EXACTLY AS MS. DAVIS TOLD

10   YOU THEY WERE, EXACTLY AS THE LAW REQUIRES, AND THEY'RE THE

11   TESTS THAT SHE CARRIED OUT.

12        WHY ARE THEY DIFFERENT?  WHY IS IT FAIR TO HAVE DIFFERENT

13   RULES?

14        IRONICALLY, IT WAS MR. WAGNER WHO TOLD US, BECAUSE HE SAID

15   THE LAW USES THE PHRASE UNJUST ENRICHMENT.

16             MR. PRICE:  YOUR HONOR --

17             MR. MCELHINNY:  YOU'LL ALSO SEE THAT IN THIS --

18             MR. PRICE:  IT IS IMPROPER ARGUMENT TO SAY WHY THE

19    LAW IS A CERTAIN WAY.  THAT'S FROM YOU.

20             MR. MCELHINNY:  IT'S THE POLICY.

21             THE COURT:  OVERRULED.

22        GO AHEAD, PLEASE.

23             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

24        IT'S ALSO IMPORTANT, IT'S ALSO IMPORTANT, AT THE BEGINNING

25    OF INSTRUCTION 31, TO SEE THAT IT STARTS WITH THE WORDS "TOTAL

1    PROFIT."  YOU DON'T SEE THAT IN THE OTHER ONE.  SO IT'S

2    EMPHASIZING IN THIS SECTION THAT WE WANT ALL OF THEIR PROFIT,

3    AND THE REASON THE LAW WANTS THAT IS BECAUSE DESIGN PATENTS,

4    CONGRESS BELIEVES, ARE MORE IMPORTANT AND HAVE DEMONSTRATED A

5    UNIQUE ABILITY TO DRIVE CONSUMERS.

6         SO THE ANSWER IS YES, MS. DAVIS APPLIED A DIFFERENT TEST.

7         SAMSUNG SAYS, DON'T APPLY A DIFFERENT TEST.  SAMSUNG SAYS

8    MS. DAVIS DOESN'T KNOW WHAT SHE'S DOING BECAUSE SHE APPLIED

9    DIFFERENT TESTS.

10         AND I'LL GO FURTHER AND I'LL SAY, IF THEY'RE SO WRONG

11   ABOUT THIS, WHAT ELSE DID THEY TELL YOU THIS MORNING IS EQUALLY

12   WRONG?

13         I'LL GIVE YOU ANOTHER EXAMPLE OF SOMETHING THAT IS.

14   SURVEYS.

15         FIRST OF ALL, LET ME SAY AGAIN, YOU WILL NOT FIND THE WORD

16   "SURVEY" ANY PLACE IN YOUR JURY INSTRUCTIONS.  IT'S NOT THERE.

17   NOBODY HAD TO BRING IN SURVEYS.  NOBODY HAD TO DO ANYTHING

18   ABOUT SURVEYS BECAUSE THE JURY INSTRUCTION TELLS YOU, JURY

19   INSTRUCTION 25 TELLS YOU EXACTLY HOW APPLE IS SUPPOSED TO

20   CALCULATE, AND IT SAYS YOU DO IT BASED ON MARKET SHARE BECAUSE

21   MARKET SHARE ELIMINATES THE GUESSWORK.

22         MARKET SHARE IS NOT GUESSING HOW MANY CONSUMERS WOULD HAVE

23   DONE THIS.  IT TELLS US HOW THE MARKET HAS BEHAVED

24   HISTORICALLY, AND THE LAW BELIEVES THAT IS THE BEST PREDICTOR

25   OF WHAT WOULD HAVE HAPPENED IN THIS HYPOTHETICAL WORLD.

1          BUT, AGAIN, COUNSEL SAYS, OH, APPLE HAS A THOUSAND

2     SURVEYS.  WE DIDN'T BRING IN ANY SURVEYS.  APPLE HAS A THOUSAND

3     SURVEYS.

4          APPLE HIRED DR. HAUSER TO DO A SURVEY THAT PROVED THAT

5     CONSUMERS THOUGHT THESE PARTICULAR INVENTIONS AND PATENTS WERE

6     VALUABLE.

7          COUNSEL SAYS, WELL, I WOULD HAVE DONE IT DIFFERENTLY.  BUT

8     I DIDN'T.

9          HE SAID OVER AND OVER AND OVER AGAIN TO YOU, AND I DON'T

10    WANT THIS TO BE LEFT UNCORRECTED, THAT YOU NEVER SAW A SURVEY

11    OF PEOPLE WHO ACTUALLY CHOSE SAMSUNG'S PHONES.  HE KEPT SAYING,

12    THIS SURVEY PROVES THIS OR DOESN'T PROVE THIS, THIS SAYS THIS,

13    THIS SAYS THIS, YOU'VE NEVER SEEN THE SURVEY OF PEOPLE WHO

14    ACTUALLY PURCHASED SAMSUNG'S PHONES.

15         YOU HEARD THAT WORD.  YOU HEARD THAT PHRASE.  IT WAS THIS

16    MORNING.  YOU HEARD IT THROUGH CROSS-EXAMINATION.

17         I WANT TO REMIND YOU ABOUT EXHIBIT 69.  I THINK WE SAW

18    THIS YESTERDAY.  IT CAME IN WITH MR. WAGNER.

19         THIS IS A SAMSUNG DOCUMENT, BUT THEY PURCHASED THIS SURVEY

20    FROM J.D. POWER, AND IT COVERED THE YEAR MARCH -- IT COVERED

21    THE TIME PERIOD OF MARCH 2011, EXACTLY THE TIME -- ROUGHLY

22    ALMOST EXACTLY THE TIME WE'RE TALKING ABOUT FOR DAMAGES.

23         AND IF YOU LOOK AT PAGE 7, THIS TELLS US WHO WAS SURVEYED.

24         SO THIS IS NOT LIMITED TO A PARTICULAR COMPANY.  IT

25    SURVEYS ALL CELL PHONE OWNERS, AND IT SHOWS US THAT APPLE

1     PEOPLE WERE SURVEYED, HTC PEOPLE WERE SURVEYED, NOKIA,

2     MOTOROLA.  BUT IT TELLS US THAT 760 SAMSUNG PURCHASERS

3     PARTICIPATED IN THIS SURVEY.

4           IF YOU LOOK AT PAGE 11, COUNSEL JUST STOOD IN FRONT OF YOU

5     AND SAID WE DON'T HAVE A SURVEY THAT TELLS US WHY PEOPLE

6     PURCHASED THEIR CELL PHONE.  WE DON'T HAVE A SURVEY THAT SAYS

7     APPLE'S PATENTS ARE IMPORTANT.

8           IF YOU LOOK AT THE SECOND ARROW, THE SURVEY SAYS "NEARLY

9     HALF (45 PERCENT) OF SMARTPHONE OWNERS INDICATE THEY CHOSE

10    THEIR MODEL BECAUSE THEY LIKED ITS OVERALL DESIGN AND STYLE."

11    THEY BOUGHT BECAUSE OF THE DESIGN.

12          "AND 43 PERCENT CHOSE THEIR DEVICE BECAUSE IT FEATURED A

13    TOUCHSCREEN FOR EASY NAVIGATION."  NAVIGATION IS WHAT THE

14    BOUNCE PATENT IS ALL ABOUT, REMEMBER THE DESERT FOG ISSUE AND

15    HOW YOU MOVE STUFF AROUND.

16          "SIMPLE OPERATION IS IMPORTANT, AS 36 PERCENT OF THE

17    OWNERS REPORT HAVING CHOSEN THEIR HANDSET BECAUSE IT IS

18    'GENERALLY EASY TO USE.'"

19          EXACTLY THE ISSUES THAT WE HAVE LITIGATED IN THIS CASE.

20          AND THEN THEY RANKED THE REASONS.  IF YOU LOOK AT PAGE 58,

21    THIS SURVEY RANKS THE OVERALL REASONS.  AND WHAT'S IMPORTANT,

22    YOU -- I DON'T THINK WE'VE SHOWN YOU THIS, BUT THE SURVEY --

23    SURVEYS ONLY ANSWER THE QUESTIONS THAT ARE ASKED.  SO WHEN YOU

24    LOOK AT A RANKING, IF YOU LOOK AT THE RANKING THAT COUNSEL

25    KEEPS SHOWING YOU, IT WON'T SAY ANYTHING ABOUT DESIGN BECAUSE

```
1    THEY WEREN'T ASKED ABOUT THAT.  IT DOESN'T TALK ABOUT EASE OF

2    USE.

3         IT TALKS ABOUT SPECIFIC HARDWARE FUNCTIONS, AND PEOPLE

4    CAN'T ANSWER A SURVEY IF IT DOESN'T HAVE THOSE ANSWERS ON IT.

5         THIS IS ACTUALLY A COMPARATIVE SURVEY BECAUSE IT HAS ALL

6    OF THE FEATURES, ALL OF THE ISSUES WE CARE ABOUT.

7         AGAIN, LIKED OVERALL DESIGN AND STYLE, 45 PERCENT.

8         TOUCHSCREEN, 43 PERCENT.

9         GENERALLY EASY TO USE, 36 PERCENT.

10        AND IF YOU WONDER HOW IMPORTANT THE ANDROID OPERATING

11   SYSTEM WAS, YOU HAVE TO GO ALL THE WAY DOWN TO 20 PERCENT,

12   OPERATING SYSTEM PLATFORM.

13        THIS IS THE SURVEY THAT COUNSEL HAS REPRESENTED TO YOU

14   MULTIPLE TIMES IS NOT IN EVIDENCE.  IT'S EXHIBIT 69 IF YOU WANT

15   TO LOOK AT IT.

16        BUT THEN IF YOU LOOK AT PAGE 61 OF THIS, THE BOTTOM CHART,

17   IF YOU LOOK AT THE FAR RIGHT COLUMN, IT'S JUST SAMSUNG, SO THIS

18   IS A SURVEY OF PEOPLE WHO BOUGHT THE SAMSUNG PHONES, AND WHAT

19   IT TELLS US IS 44 PERCENT OF THOSE PEOPLE TOLD US THAT THEY

20   WOULD NOT BUY A SAMSUNG PHONE OR PROBABLY NOT BUY A SAMSUNG

21   PHONE AS THEIR NEXT PURCHASE.

22        AND SAMSUNG WOULD HAVE YOU BELIEVE THAT NOT ONE OF THE

23   PEOPLE WHO BOUGHT AN INFRINGING PHONE IN THIS CASE WOULD HAVE

24   BOUGHT AN IPHONE.  HALF OF THEIR CUSTOMERS WOULD HAVE GONE TO A

25   DIFFERENT COMPANY.  IT IS INCONCEIVABLE THAT THEY WOULD NOT
```

1      HAVE COME TO APPLE.

2              WHEN I SAID AT THE BEGINNING THAT SAMSUNG WAS GOING TO BE

3      THE STAR WITNESS IN OUR CASE, YOU MIGHT HAVE THOUGHT THAT YOU

4      WERE GOING TO SEE SEVERAL WITNESSES FROM SAMSUNG.  BUT YOU

5      HAVEN'T.

6              YOU MAY BE WONDERING, I HOPE YOU ARE WONDERING, WHAT WERE

7      THEY THINKING?  HOW CAN THEY DISRESPECT THE PROCESS SO MUCH

8      THAT THEY DON'T EVEN COME TO THE TRIAL?

9              HOW CAN THEY SAY THAT THEY GET TO MAKE $3.5 BILLION AND

10     PAY $28,000 AS A ROYALTY?

11             THAT'S BEYOND HYPOTHETICAL.  THAT'S UNBELIEVABLE.

12             HOW CAN THEY SAY THAT NOT ONE PERSON WOULD HAVE BOUGHT AN

13     APPLE IPHONE?

14             WHY DIDN'T MR. WAGNER GIVE YOU A CHART THAT WOULD SHOW YOU

15     HOW TO FILL OUT THE JURY FORM?  THE ONE THAT MR. PRICE JUST

16     SHOWED YOU DOESN'T FOLLOW THE INSTRUCTIONS BECAUSE IT DOESN'T

17     HAVE ALL THE DAMAGES FOR ALL THE PHONES.  THEY HAVE NOT GIVEN

18     YOU ANY ASSISTANCE IN HOW TO FILL OUT THE JURY FORM.

19             WHY ARE THEY DOING THAT?  WHAT ARE THEY THINKING?

20             DON'T UNDERESTIMATE THEM AND DON'T UNDERESTIMATE THEIR

21     STRATEGY.  WE HAVE SEEN FROM THEIR DOCUMENTS THAT SAMSUNG

22     DOESN'T DO ANYTHING QUICKLY.  IT DOESN'T DO ANYTHING

23     OFFHANDEDLY.  IT STUDIES AND STUDIES AND STUDIES AND THEN IT

24     COMES UP WITH A STRATEGY THAT IT THINKS IS GOING TO WORK.

25             IF A SAMSUNG EXECUTIVE HAD BEEN BRAVE ENOUGH TO COME INTO

1       THIS COURTROOM, HE WOULD HAVE HAD TO STAND IN THAT CHAIR AND HE

2       WOULD HAVE HAD TO ANSWER QUESTIONS UNDER OATH AND THROUGH

3       CROSS-EXAMINATION.

4               PHIL SCHILLER DID THAT.  TONY BLEVINS DID THAT.

5               BUT NOT ONE SAMSUNG EXECUTIVE WAS WILLING TO DO THAT.

6               I WILL TELL YOU PLAINLY WHAT THEIR STRATEGY IS.  THEY

7       EXPECT YOU TO COMPROMISE YOUR VERDICT.  THEY EXPECT YOU TO COME

8       IN WITH A VERDICT THAT IS BETWEEN WHAT WE'RE ASKING AND WHAT

9       THEY'RE ASKING, AND SO THEY HAVE MADE A CALCULATED DECISION

10      THAT IF THEY TELL YOU THE NUMBER FOR LOST PROFITS IS ZERO, AND

11      IF THEY TELL YOU THAT THE NUMBER FOR ROYALTIES IS $28,000, THAT

12      THE PLACE THAT YOU WILL COME IN ON THE MIDDLE ON THAT WILL BE

13      LOWER THAN IF THEY'D PUT UP REAL NUMBERS.  THAT'S THEIR PLAN.

14              WE ARE EXTREMELY FORTUNATE TO LIVE IN WHAT I'LL CALL THE

15      GREATER BAY AREA.  NOT ONLY IS IT BEAUTIFUL, BUT WE LIVE IN THE

16      CENTER OF ONE OF THE MOST VIBRANT ECONOMIES IN THE WORLD.

17      INTEL, YAHOO, ORACLE, FACEBOOK, EBAY, AND HUNDREDS AND HUNDREDS

18      OF OTHER COMPANIES, INCLUDING GOOGLE, AND INCLUDING APPLE, AND

19      THESE COMPANIES ATTRACT TALENTED EMPLOYEES AT EVERY LEVEL.

20      EVEN, WE HEARD, SAMSUNG HAS OPENED A RESEARCH CENTER HERE SO

21      THAT THEY CAN TAKE ADVANTAGE OF THE TALENT IN THIS AREA.

22              THE COMPANIES PROVIDE JOBS.  THEY CREATE TECHNOLOGY THAT

23      IMPROVES THE WAY PEOPLE WORK.  AND THE COMPANY -- AND THIS

24      ECONOMY SUPPORTS AN EDUCATION SYSTEM THAT IS SECOND TO NONE IN

25      THE WORLD, BERKELEY, STANFORD, SAN JOSE STATE, U.S. SANTA CRUZ,

1        EVEN SANTA CLARA WHERE I WENT TO SCHOOL.

2            THESE EDUCATIONAL INSTITUTIONS INTERACT WITH THIS ECONOMY,

3        INTERACT WITH THESE COMPANIES AND CREATE A PLACE THAT THE WHOLE

4        WORLD KNOWS AS SILICON VALLEY.

5            BUT LET'S BE EQUALLY CLEAR ABOUT ONE THING.  OUR VIBRANT

6        ECONOMY ABSOLUTELY DEPENDS ON FAIR COMPETITION.  IT DEPENDS ON

7        A PATENT SYSTEM THAT ENCOURAGES INVENTORS TO INVENT, IT

8        ENCOURAGES INVESTORS TO INVEST, AND IT ENCOURAGES EMPLOYERS TO

9        HIRE.

10           IF WE ALLOW THAT SYSTEM OF LAW TO DECAY, INVESTORS WILL

11       NOT INVEST, PEOPLE WILL NOT TAKE RISKS, AND OUR ECONOMY WILL

12       DISAPPEAR.

13           WHEN I WAS YOUNG, I USED TO WATCH TELEVISION ON

14       TELEVISIONS THAT WERE MANUFACTURED IN THE UNITED STATES.

15       MAGNAVOX, MOTOROLA, RCA.  THESE WERE REAL COMPANIES.  THEY WERE

16       WELL KNOWN AND THEY WERE FAMOUS.  THEY WERE CREATORS.  THEY

17       WERE INVENTORS.  THEY WERE LIKE THE APPLE AND GOOGLE TODAY.

18           BUT THEY DIDN'T PROTECT THEIR INTELLECTUAL PROPERTY.  THEY

19       COULDN'T PROTECT THEIR IDEAS.  AND YOU ALL KNOW THE RESULT.

20       THERE ARE NO AMERICAN TELEVISION MANUFACTURERS TODAY.

21           MR. PRICE:  I OBJECT.  THIS IS IMPROPER ARGUMENT,

22        OUTSIDE THE SCOPE, AND LIMITED ELEMENTS THAT ONE SHOULD NOT

23        APPEAL TO IN A COURT OF LAW.

24           MR. MCELHINNY:  I DON'T THINK THAT'S RIGHT, YOUR

25        HONOR.  THIS IS AN ARGUMENT ABOUT THE POLICY OF THESE LAWS.

```
 1              THE COURT:  CAN YOU MOVE ON, MR. MCELHINNY?

 2              MR. MCELHINNY:  I CAN.

 3         THERE ARE TWO WAYS THAT SAMSUNG COULD WIN THIS CASE, AND

 4    STILL CAN.  FIRST, THEY COULD HAVE CONVERSED -- THEY COULD HAVE

 5    CONVINCED THE FIRST JURY NOT TO PROTECT OUR INTELLECTUAL

 6    PROPERTY.  BUT THAT DIDN'T HAPPEN.

 7         BUT SECOND, THEY CAN WIN THIS CASE IF THEY CONVINCE YOU TO

 8    COMPROMISE ON THE VERDICT.

 9         IF THE COST OF BREAKING THE LAW IS A SMALL FINE -- AND

10    $52 MILLION IS A VERY SMALL PIECE OF $3.5 BILLION -- SAMSUNG'S

11    COPYING WILL HAVE PROVEN SUCCESSFUL.

12         COUNSEL TOLD YOU THIS WAS AN IMPORTANT CASE, BUT YOU KNEW

13    THAT BEFORE YOU CAME HERE.  YOU KNOW THAT BY LOOKING IN THE

14    COURTROOM.

15         PEOPLE WILL KNOW WHAT YOU SAY IN YOUR VERDICT.  COMPANIES

16    LIKE SAMSUNG WILL STUDY IT AND WILL USE IT TO DEFINE THEIR

17    FUTURE CONDUCT.

18         IT IS ONE OF THE AMAZING ASPECTS OF OUR SYSTEM THAT EIGHT

19    PEOPLE, STRANGERS, CHOSEN BY LOT, GET TO RENDER A DECISION THAT

20    WILL INFLUENCE THE WAY THAT COMPANIES BEHAVE IN THE FUTURE, NOT

21    JUST IN THE BAY AREA, BUT AROUND THE WORLD.

22         OBVIOUSLY APPLE HOPES THAT YOU WILL RENDER A VERDICT THAT

23    PROTECTS INTELLECTUAL PROPERTY.

24         LET ME MAKE IT ABSOLUTELY CLEAR.  THIS IS NOT ABOUT

25    PUNISHMENT.  THIS IS NOT ABOUT PITCHFORKS.  THIS IS NOT ABOUT
```

1    GETTING EVEN.

2         THIS IS WHAT MR. PHIL SCHILLER SHOWED YOU, TOLD YOU IT

3    WAS.  IF JURIES TAKE THE PROFIT, IT'S LAW ENFORCEMENT.  IF

4    JURIES TAKE THE PROFIT OUT OF PATENT INFRINGEMENT, THEN PATENT

5    INFRINGERS WILL STOP.

6         IF SAMSUNG EVENTUALLY BELIEVES THAT THEY WILL NOT MAKE

7    MONEY DOING THIS, THEY WILL STOP INFRINGING OUR PATENTS.

8         IN ANY EVENT, WHATEVER YOU DECIDE, WE'D LIKE TO SAY

9    OBVIOUSLY YOU'VE BEEN AN ATTENTIVE, HARD WORKING JURY.  WE KNOW

10   YOU'VE COMMUTED MILES TO COME HERE FOR THIS.  WHATEVER YOUR

11   DECISION IS, ON BEHALF OF APPLE AND ITS EMPLOYEES, WE WOULD

12   LIKE TO THANK YOU FOR YOUR SERVICE.

13            THE COURT:  OKAY.  TIME IS NOW 12:15.

14       CAN WE SWEAR IN OUR BAILIFF, PLEASE.

15            THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

16       (COURT SECURITY OFFICER SWORN.)

17            COURT SECURITY OFFICER:  I DO.

18            THE CLERK:  TAKE THEM BACK?

19            THE COURT:  ALL RIGHT.  THEN YOU MAY NOW BEGIN YOUR

20   DELIBERATIONS IN THE JURY DELIBERATION ROOM.

21       THE BAILIFF WILL BE WAITING OUTSIDE.  IF YOU NEED TO HAVE

22   ANY COMMUNICATION WITH THE BAILIFF, THEN JUST KNOCK ON THE

23   DOOR.

24       PLEASE KEEP ALL COMMUNICATIONS IN WRITING BECAUSE THE

25   PARTIES ARE ENTITLED TO KNOW EITHER WHAT YOU'RE ASKING OR WHAT

```
1    INFORMATION IS GOING IN TO YOU AND TO HAVE SOME INPUT ON THAT.

2        OKAY.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

3        (JURY OUT AT 12:16 P.M.)

4            THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THE

5    JURORS HAVE LEFT THE COURTROOM.  PLEASE TAKE A SEAT.

6        I JUST WANT TO SHOW YOU WHAT WILL GO BACK INTO THE JURY

7    ROOM.  CAN I JUST HAVE BOTH SIDES' COUNSEL TAKE A LOOK AND

8    STATE ON THE RECORD WHETHER THIS MEETS YOUR APPROVAL.

9        IT'S THE RED WELL THAT HAS THE TWO CALCULATORS, THE

10   VERDICT FORM, AND THE BLANK JURY NOTES, AND THEN THREE COPIES

11   OF THE PARTIES' JOINT EXHIBIT LIST.

12       (PAUSE IN PROCEEDINGS.)

13           MR. LEE:  IT'S GOOD WITH APPLE, YOUR HONOR.

14           MR. PRICE:  THAT'S FINE WITH SAMSUNG, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  THANK YOU.  THEN

16   MS. PARKER BROWN WILL TAKE THAT IN.

17       WHERE ARE THE EXHIBITS THAT ARE SUPPOSED TO GO TO THE

18   JURY?  AND MAY I ALSO GET ON THE RECORD THAT BOTH SIDES

19   STIPULATE TO THE EXHIBITS THAT WILL BE GIVEN TO THE JURY.

20       (PAUSE IN PROCEEDINGS.)

21           THE COURT:  DO YOU HAVE A SEPARATE COPY OF THE

22   EXHIBITS AS WELL, I MEAN OF THE PHONES?  OR DO YOU HAVE A

23   SEPARATE --

24           MR. SABRI:  WE DON'T HAVE SEPARATE COPIES OF THE

25   PHYSICAL DEVICES, YOUR HONOR.
```

1    THE COURT:  OKAY.  THAT'S FINE.  BUT THIS WHOLE CART

2    HAS A LOT OF PHONES THAT WEREN'T ADMITTED IN THIS TRIAL, SO I

3    WANT TO MAKE SURE THAT DOESN'T GO IN.  SO WHAT IS THE FULL

4    UNIVERSE OF WHAT NEEDS TO GO TO THE JURY ROOM?  ALL FOUR OF

5    THOSE BOXES?  OR --

6    MS. JENKINS:  IT'S JUST THE FIRST TWO BOXES HERE.

7    THE COURT:  OKAY.  THAT ARE UN -- THAT ARE UN -- THAT

8    ARE OPENED AT THE TOP?

9    MS. JENKINS:  YES.

10    THE COURT:  OKAY.  WHAT IS THAT THAT'S ON TOP OF

11    THAT?  IS THAT A LAPTOP?

12    MS. JENKINS:  THAT'S THE LAPTOP, YES.  THERE ARE

13    THREE EXHIBITS, I THINK, THAT ARE -- THERE'S SOME VIDEOS AND A

14    SPREADSHEET ON THE LAPTOP.

15    THE COURT:  OKAY.  ARE YOU --

16    MS. KREVANS:  YOUR HONOR, THERE ARE FOUR EXHIBITS

17    THAT ARE ELECTRONIC, THREE ARE VIDEOS AND ONE WAS THAT

18    SPREADSHEET THAT IS ON A CD.

19    IF THE JURORS WANT TO SEE THOSE, THE PARTIES HAVE

20    AGREED -- WE'VE PUT TOGETHER A COMPUTER THAT THE JURORS CAN'T

21    DO ANYTHING WITH OTHER THAN LOOK AT THE EXHIBITS AND GIVE THEM

22    A FLASH DRIVE WITH THE EXHIBITS.

23    OTHERWISE THE COMPUTER HAS HAD THE USB DRIVE DISABLED SO

24    THAT NOTHING CAN HAPPEN WITH IT.

25    I THINK THE ONE OTHER THING THAT HAS TO HAPPEN IS THAT

1    BECAUSE COUNSEL WERE STILL USING THE PHYSICAL EXHIBITS THIS

2    MORNING, WE NEED TO SEGREGATE OUT THE PHYSICAL EXHIBITS THAT

3    ARE IN EVIDENCE, SO THE TOTALITY OF WHAT WILL GO IN IS THE

4    BINDERS, THE COMPUTER WITH THE FLASH DRIVE SO THEY CAN SEE THE

5    ELECTRONIC EXHIBITS, AND THE PHYSICAL EXHIBITS THAT ARE GOING

6    TO GO IN IN THIS TRIAL, AND WE'RE SORTING THAT OUT RIGHT NOW.

7         THE COURT:  ALL RIGHT.  WHY DON'T WE GO AHEAD, THEN,

8    AND SEND IN THE TWO BOXES THAT INCLUDE THE LAPTOP.

9         LET ME JUST GET ON THE RECORD, HAS APPLE REVIEWED THOSE

10   TWO BOXES AND DO YOU STIPULATE TO THOSE ITEMS GOING TO THE JURY

11   ROOM?

12        MS. KREVANS:  YES, YOUR HONOR.

13        THE COURT:  OKAY.  WHAT ABOUT FOR SAMSUNG?  HAVE YOU

14   REVIEWED THE CONTENTS OF THOSE TWO BOXES AND DO YOU STIPULATE

15   THAT THOSE SHOULD GO TO THE JURY ROOM?

16        MS. MAROULIS:  YES, YOUR HONOR.

17        THE COURT:  ALL RIGHT.  THANK YOU.

18        THEN LET'S TAKE A FEW MOMENTS FOR BOTH SIDES TO REVIEW THE

19   ACTUAL PHONES THAT WILL GO IN AND I'LL NEED A STIPULATION ON

20   THE RECORD AS WELL THAT YOU'VE INSPECTED THE PHONES AND YOU

21   BOTH STIPULATE THAT THEY SHOULD GO TO THE DELIBERATION ROOM.

22        (PAUSE IN PROCEEDINGS.)

23        THE COURT:  I'M ALSO GOING TO RETURN THESE BINDERS TO

24   YOU, SINCE YOU'RE GIVING US AN EXACT REPLICA OF THE SAME

25   EXHIBITS.  WE HAVE OUR ONE SET FOR ANY POST-TRIAL MOTIONS, BUT

```
 1        I THINK THESE ARE LARGELY DUPLICATIVE, SO I'M GOING TO RETURN

 2   THESE AS WELL.

 3              MR. PRICE:  YOUR HONOR?

 4              THE COURT:  YES.

 5              MR. PRICE:  BEFORE YOU LEAVE THE BENCH, IF I COULD, I

 6   NEED TO PROTECT SAMSUNG'S RIGHTS HERE AND I HAVE TO MOVE FOR A

 7   MISTRIAL.

 8        THERE WAS A DIRECT APPEAL TO RACIAL BIAS IN THAT CLOSING,

 9   AMERICAN COMPANIES WHO DIDN'T PROTECT THEIR RIGHTS, AND THERE'S

10   NO EVIDENCE OF THAT AT ALL.

11        AND YOU KNOW WHAT HAPPENED, WHICH IS THESE ASIAN COMPANIES

12   CAME IN AND TOOK OVER.  THAT'S WHAT HE WANTED THEM TO THINK.

13        AND ALSO AT THE END HE TALKED ABOUT THIS IS ABOUT LAW

14   ENFORCEMENT.

15        IT'S NOT.  THIS ISN'T ABOUT LAW ENFORCEMENT, AS HE KNOWS

16   THESE JURORS WOULD UNDERSTAND IT, PARTICULARLY JUROR NUMBER, IS

17   IT SEVEN, SIX, WHOSE HUSBAND IS IN LAW ENFORCEMENT.

18        HE DELIBERATELY, INTENTIONALLY APPEALED TO PREJUDICE.  IT

19   WASN'T JUST A THROW AWAY.  IT WAS A WHOLE STORY ABOUT HOW

20   AMERICAN COMPANIES WERE RUN OUT OF BUSINESS BECAUSE THEY DIDN'T

21   PROTECT THEIR RIGHTS.

22        THERE IS NO EVIDENCE OF THAT WHATSOEVER.

23        AND EVEN IF THERE WERE, IT'S IRRELEVANT TO THIS TRIAL.

24              MR. MCELHINNY:  COUNSEL ARGUED THAT THIS CASE WAS

25   PUNITIVE.  HE ARGUED ABOUT THE REASONS WHY IT WAS BEING
```

1    BROUGHT.  HE ARGUED -- HE TOLD THEM THAT THEY HAD TO FOLLOW THE

2    LAW.  HE TOLD THEM A HUNDRED TIMES WHAT THE PATENT LAW WAS.

3        IT'S COMPLETELY APPROPRIATE TO TALK ABOUT THE PURPOSES OF

4    THE PATENT LAW, WHAT IT'S INTENDED TO PROTECT AND WHAT HAPPENS

5    IF YOU DON'T PROTECT IT.  THAT -- THAT'S WELL DOWN THE MAIN

6    STREAM OF EVERY ARGUMENT I'VE EVER HEARD IN A PATENT CASE, YOUR

7    HONOR.

8        MR. LEE SAID ESSENTIALLY THE SAME THING AT THE BEGINNING

9    WITHOUT OBJECTION.

10        MR. PRICE:  I HAVEN'T HEARD A DEFENSE TO SAYING

11   AMERICAN COMPANIES WERE, AREN'T IN BUSINESS NOW BECAUSE OF YOU

12   KNOW WHAT HAPPENED, WHEN THERE'S ABSOLUTELY NO EVIDENCE OF THAT

13   AND THERE WAS ONLY ONE THING THAT HE WANTED THE JURY TO

14   CONCLUDE FROM THAT.

15        MR. MCELHINNY:  IT IS, ONE, THE AMERICAN PATENT LAWS

16   THAT WE'RE TALKING ABOUT.

17        BUT, TWO, THAT'S COMMON KNOWLEDGE ABOUT THE FACT OF WHAT

18   HAPPENED TO TELEVISIONS, AND IT IS AN EXAMPLE OF WHAT HAPPENS,

19   IN MY VIEW, IF YOU DON'T ENFORCE THE PATENT LAWS.

20        I THINK THE LEGISLATIVE HISTORY OF THE FEDERAL CIRCUIT

21   WOULD ARGUE THAT THAT WAS ONE OF THE REASONS THAT LED TO THE

22   INTRODUCTION OF THE FEDERAL CIRCUIT WAS THE ENFORCEMENT OF -- I

23   MADE THE SAME ARGUMENT TO YOUR HONOR ON THE INJUNCTION WHEN WE

24   FIRST STARTED WITH THIS CASE.  THAT IS THE RISK IF WE DON'T

25   ENFORCE THESE LAWS.

```
 1            MR. PRICE:  ASIAN COMPANIES WILL DRIVE OUT AMERICAN

 2    COMPETITORS?  COME ON.

 3            MR. MCELHINNY:  I DID NOT SAY A WORD ABOUT RACE.  I

 4    DID NOT SAY A WORD ABOUT ASIAN COMPANIES.

 5         I TALKED ABOUT PROTECTING, AMERICAN COMPANIES PROTECTING

 6    THEIR INTELLECTUAL PROPERTY.

 7            MR. PRICE:  SAMPLE MAKES A LOT OF TV'S AND HE SAID,

 8    YOU KNOW WHAT HAPPENED.

 9            THE COURT:  WELL, THE REQUEST FOR A MISTRIAL IS

10    DENIED.

11         (PAUSE IN PROCEEDINGS.)

12            MR. PRICE:  YOUR HONOR?

13            THE COURT:  YES.

14            MR. PRICE:  YOUR HONOR, IF I MAY, I KNOW YOU'VE GOT A

15    LOT OF PAPER AND IT'S WINDING DOWN, BUT COULD WE FILE A FIVE

16    PAGE BRIEF ON THE MISTRIAL?  EVERY ONE OF THESE JURORS --

17    ALMOST EVERY ONE OF THESE JURORS OWNS A SAMSUNG TV AND WE'D

18    JUST LIKE TO PUT OUR FULL ARGUMENTS ON THE RECORD.

19            THE COURT:  WELL, LET ME ASK, I'M INCLINED -- I COULD

20    GIVE YOU AN ADDITIONAL FIVE TO TEN MINUTES TO ADDRESS THAT

21    ISSUE IF YOU WANT.  I CAN BRING THIS JURY BACK OUT AND GIVE YOU

22    A REBUTTAL ON THAT ISSUE, BUT NOTHING ELSE.

23         WOULD YOU LIKE THAT?

24            MR. PRICE:  ONE MOMENT.

25         (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)
```

```
 1            MR. PRICE:  I THINK, YOUR HONOR, I THINK THAT'S JUST

 2     GOING TO FOCUS IT, SO I DON'T THINK THAT WOULD CURE THE

 3     PROBLEM.

 4            THE COURT:  WELL, WHAT ABOUT ANY ADDITIONAL

 5     INSTRUCTION FROM THE COURT?

 6            MR. PRICE:  I DON'T BELIEVE THAT WOULD CURE THE

 7     PROBLEM EITHER.

 8            THE COURT:  WELL, I COULD REMIND THEM OF THE JURY

 9     INSTRUCTION THAT THEY ARE NOT TO BE INFLUENCED BY ANY PERSONAL

10     LIKES OR DISLIKES, OPINIONS, PREJUDICE, OR SYMPATHY.

11            MR. PRICE:  THAT -- I THINK -- YOU COULD.  I THINK

12     THAT WOULDN'T CURE IT.  THAT'S FAIRLY TYPICAL WHEN THERE'S BEEN

13     A DIRECT APPEAL, WHAT I THINK IS A DIRECT APPEAL TO THEIR

14     PERSONAL EXPERIENCE AND NOW OWNING PHONES MADE FROM SOMEONE, A

15     COMPANY THAT'S NOT A U.S. COMPANY, AND THAT'S BECAUSE THE

16     PATENT LAWS WEREN'T ENFORCED.

17            THE COURT:  WELL, I COULD ADD TO THAT THAT THEY'RE

18     NOT TO BE, IN ADDITION TO THAT SENTENCE THAT'S IN JURY

19     INSTRUCTION NUMBER 1, ALSO ADD TO THAT THAT THEY ARE NOT TO BE

20     INFLUENCED BY WHERE THE PARTIES ARE BASED.

21            MR. PRICE:  I THINK EVEN AS YOU SAY IT TO YOURSELF,

22     IT -- IT -- YOU KNOW, I JUST DON'T THINK ANY OF THOSE WOULD

23     REALLY UNDO WHAT MR. MCELHINNY INTENTIONALLY ACCOMPLISHED,

24     WHICH IS TO ACCESS THAT PART OF THEIR EXPERIENCE AND THEIR

25     MEMORY THAT THEY HAVE THESE -- THEY HAVE NOW PHONES MADE BY
```

```
 1        SAMSUNG, SELLING IN THE UNITED STATES.

 2              AND HE CREATED THE PROBLEM.

 3          I -- I HONESTLY DON'T THINK THERE'S A FIX FOR IT, OTHER

 4     THAN WHAT WE REQUESTED, A MISTRIAL.  AND I KNOW HOW MUCH YOU

 5     ENJOY US BEING HERE, SO I'M SURE IT WOULD BE FUN TO DO IT

 6     AGAIN.

 7              THE COURT:  DOES ANYONE ON APPLE WANT TO BE HEARD?

 8     OTHERWISE I'M GOING TO AT LEAST REITERATE THIS INSTRUCTION.  I

 9     DON'T THINK THAT WHAT I'VE HEARD RISES TO THE LEVEL OF A

10     MISTRIAL, BUT I THINK SOME REMEDY MIGHT BE APPROPRIATE TO AVOID

11     UNNECESSARY ISSUES LATER ON POST-TRIAL MOTIONS.

12              MR. MCELHINNY:  AGAIN, I DON'T WANT TO REITERATE

13     ANYTHING.  I THINK THE ARGUMENT WAS PERFECTLY APPROPRIATE.  I

14     DON'T -- I THINK THIS IS AN OVERREACTION.

15          BUT IF YOUR HONOR, FOR THE RECORD, IF -- WE DON'T HAVE ANY

16     OBJECTION TO GIVING THEM FURTHER INSTRUCTIONS.

17              MR. PRICE:  YOUR HONOR, IF YOU GIVE FURTHER

18     INSTRUCTIONS, I THINK YOU WOULD AT LEAST HAVE TO TELL THEM WHY

19     YOU'RE DOING IT, OR CALL THEIR ATTENTION TO THE COMMENT, BUT WE

20     STILL DO NOT BELIEVE THAT WOULD COME CLOSE TO UNRINGING THE

21     BELL.

22              MR. MCELHINNY:  WE WOULD OBJECT TO THAT, YOUR HONOR.

23              THE COURT:  TO WHAT?

24              MR. MCELHINNY:  CRITICIZING THE COMMENT, WHICH I

25     CONTINUE TO BELIEVE IS A COMPLETELY FAIR ARGUMENT.
```

```
 1                 THE COURT:  WELL, I UNDERSTOOD THAT'S NOT WHAT
 2     SAMSUNG'S REQUESTING.
 3             SAMSUNG'S REQUEST IS ONLY A MISTRIAL; CORRECT?
 4                 MR. PRICE:  THAT'S CORRECT.
 5                 THE COURT:  YOU'RE NOT REQUESTING ANY REMEDY AT ALL?
 6                 MR. PRICE:  WE'RE REQUESTING A MISTRIAL AS A REMEDY,
 7     YES.
 8                 THE COURT:  BUT THAT'S THE ONLY ONE YOU'RE
 9     REQUESTING?
10                 MR. PRICE:  YES.
11                 THE COURT:  OKAY.  SO I'VE GIVEN YOU THE OPTION TO
12     READDRESS THE JURY.  YOU'RE DECLINING THAT OPTION; CORRECT?
13                 MR. PRICE:  YES, YOUR HONOR.  I DON'T THINK IT WOULD
14     WORK.
15                 THE COURT:  I'M SORRY.  I COULDN'T HEAR THAT.
16                 MR. PRICE:  I DON'T THINK IT WOULD HELP, YES.
17                 THE COURT:  ALL RIGHT.  AND YOU'RE REQUESTING ANY
18     CURATIVE INSTRUCTION -- YOU'RE DECLINING ANY CURATIVE
19     INSTRUCTION; CORRECT?
20                 MR. PRICE:  CORRECT.
21                 THE COURT:  YOU ARE ALSO DECLINING THE COURT GIVING
22     ANY ADMONISHMENT TO APPLE; CORRECT?
23                 MR. PRICE:  I'M SORRY, YOUR HONOR?
24                 THE COURT:  YOU ARE DECLINING THE COURT GIVING ANY
25     ADMONISHMENT TO APPLE; CORRECT?
```

```
1              MR. PRICE:  I'M DECLINING THAT AS A REMEDY.  I THINK

2      IT WOULD BE APPROPRIATE, BUT I'M DECLINING IT AS A FULL REMEDY

3      FOR THE WRONG.

4              THE COURT:  WELL, I'M GIVING YOU THE OPTION.  I CAN

5      DO THAT.  BUT YOU'RE SAYING YOU DON'T WANT THAT; CORRECT?

6              MR. PRICE:  NOT IF IT WAS MY REQUEST FOR A MISTRIAL.

7      I DON'T THINK I -- I DIDN'T CREATE THE PROBLEM, SO I DON'T

8      THINK I SHOULD BE, YOU KNOW, HELD TO MAKE THAT CHOICE.  I THINK

9      I SHOULD BE ABLE TO --

10             THE COURT:  WELL, I'M GIVING YOU THAT CHOICE.

11             MR. PRICE:  I UNDERSTAND.

12             THE COURT:  IT'S A YES OR NO.  ARE YOU ACCEPTING IT

13     OR ARE YOU DECLINING IT?

14             MR. PRICE:  I'M DECLINING IT IF YOU MEAN -- IF IT

15     SUGGESTS THAT I AM WAIVING THE MOTION FOR A MISTRIAL, BECAUSE I

16     DON'T THINK IT WILL TOTALLY CURE THE WRONG.

17             THE COURT:  I UNDERSTAND YOU WANT TO PRESERVE YOUR

18     MISTRIAL MOTION.  DO YOU WANT ME TO GIVE THIS JURY AN

19     ADMONISHMENT OR NOT?

20             MR. PRICE:  IT COULDN'T HURT.  IT WOULD BE A BETTER

21     SITUATION.  I --

22             THE COURT:  ALL RIGHT.  THIS IS WHAT I'D LIKE TO DO.

23     I WOULD LIKE TO REPEAT JUST THE SENTENCE IN INSTRUCTION

24     NUMBER 1 THAT STATES, "AND YOU MUST NOT BE INFLUENCED BY ANY

25     PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY,"
```

```
 1        AND THAT "ANY APPEAL TO ANY OF THOSE IS IMPROPER."

 2            THAT'S ALL I WANT TO SAY AND SEND THEM BACK.

 3                MR. PRICE:  I UNDERSTAND.

 4                THE COURT:  ANY COMMENT FROM APPLE?

 5                MR. MCELHINNY:  WE DON'T THINK IT'S WARRANTED, BUT WE

 6        UNDERSTAND YOUR HONOR'S DECISION.

 7                THE COURT:  OKAY.  ALL RIGHT.  THEN WHY DON'T

 8        EVERYONE PLEASE TAKE YOUR SEATS AGAIN, AND I'M GOING TO GIVE

 9        THAT ADMONISHMENT.

10                THE CLERK:  I'LL GO AROUND TO THE BAILIFF?  IS THAT

11        THE MORE PROPER WAY TO BRING THEM OUT?

12                THE COURT:  OKAY, THAT'S FINE.

13            I'M NOT GOING TO ADDRESS IT MORE DIRECTLY BECAUSE I DON'T

14        WANT TO HIGHLIGHT IT, BUT I THINK THAT WOULD BE A SUFFICIENT

15        CURATIVE INSTRUCTION.

16                MR. PRICE:  THE PROBLEM, YOUR HONOR, IS THAT THEY MAY

17         THINK WE DID SOMETHING.

18                THE COURT:  THAT WHAT?

19                MR. PRICE:  THEY MAY THINK THAT SAMSUNG WAS APPEALING

20         TO SYMPATHY BECAUSE THEY'RE ASKING FOR, AS WHAT MR. MCELHINNY

21          SAID, A COMPROMISED VERDICT OR SOMETHING.

22            SO IF IT HAS NO, TO USE THE WORD NEXUS, OR HAS NO TIE TO

23         MR. MCELHINNY'S COMMENTS, I THINK IT WOULD HAVE NO EFFECT AT

24         ALL AND MAY ACTUALLY POTENTIALLY HAVE A NEGATIVE EFFECT.

25                MR. LEE:  YOUR HONOR --
```

```
 1              THE COURT:  WELL, WAIT ONE SECOND THEN.  I'M SORRY.

 2      ONE SECOND, PLEASE.

 3              MR. PRICE:  BECAUSE THEY'RE GOING TO WANT TO THINK,

 4      WHY WERE WE BROUGHT BACK FOR THAT?

 5              MR. LEE:  YOUR HONOR, SPEAKING ON MR. MCELHINNY'S

 6      BEHALF, SINCE HE'S THE ONE -- HE ASKED ME TO STEP UP TO HIS

 7      DEFENSE AND I WILL.

 8          MR. PRICE, DURING HIS CLOSING, YOU REMEMBER THE JUSTICE IS

 9      JUST US?  THE OCCUPYING THE WHOLE WORLD?  THAT COULD HAVE BEEN

10      IN A CLOSING ARGUMENT IN AN ANTITRUST CASE.  IT WAS -- IT WAS

11      APPEALING TO THE JUROR'S BELIEFS THAT APPLE WAS TRYING TO

12      OCCUPY SOME SPACE THAT IT WAS NOT ENTITLED TO BE.

13          THERE WERE A HOST OF DIFFERENT POINTS IN HIS ARGUMENT

14      WHERE HE WAS TALKING ABOUT COMPETITION THAT APPLE WAS NOT

15      ENTITLED TO.  DO YOU REMEMBER AT THE VERY END, JUSTICE IS JUST

16      US, SUGGESTING THAT APPLE WAS TRYING TO BASICALLY USE THESE

17      CASES TO DRIVE THEM OUT OF THE MARKETPLACE?

18          THAT IS NO MORE PROPER ARGUMENT, SUGGESTING THAT THERE IS

19      SOME SORT OF ANTITRUST VIOLATION FLYING OUT THERE IN THE ETHER,

20      THAN WHAT MR. MCELHINNY SAID.

21          I THINK WE THINK THEY'RE DELIBERATING, THEY SHOULD

22      CONTINUE TO DELIBERATE.  YOUR HONOR GAVE THAT INSTRUCTION TO

23      THEM.  IT'S IN THE INSTRUCTIONS.

24          IN CLOSING ARGUMENT, AS ALSO HAPPENS, PEOPLE -- IT GETS A

25      LITTLE WIDER, WHICH IS WHY YOUR HONOR GIVES THE INSTRUCTION
```

```
 1          THAT IT'S NOT EVIDENCE AND IT'S NOT TO BE TAKEN AS EVIDENCE.

 2              AND I THINK, YOU KNOW, WHEN MR. PRICE SAYS IT MIGHT

 3          SUGGEST THAT THEY'VE DONE SOMETHING WRONG, IF WE'RE GOING TO

 4          START ASKING FOR CURATIVE INSTRUCTIONS, THE IDEA THAT THEY CAN

 5          SUGGEST THAT THESE PEOPLE'S RESULTS WOULD BE DRIVEN BY APPLE

 6          ENGAGING IN SOME SORT OF ANTICOMPETITIVE CONDUCT BY ENFORCING

 7          THE PATENT LAWS, IT'S WRONG AS A LEGAL MATTER, BUT IT'S CLEARLY

 8          IRRELEVANT AND APPEALING TO A SET OF EMOTIONS THAT HAS NOTHING

 9          TO DO WITH THIS CASE.

10              SO IT GOES BOTH WAYS.

11              THE COURT:  I HEAR YOU, BUT DO YOU WANT TO COMMENT ON

12          I'M GOING TO REPEAT THAT SENTENCE, "AND YOU MUST NOT BE

13          INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

14          PREJUDICES, OR SYMPATHY.  ANY APPEAL TO ANY LIKES, DISLIKES,

15          PREJUDICES, OR SYMPATHY IS IMPROPER."

16              DO YOU WANT TO BE HEARD ON THAT WHAT I VIEW AS A CURATIVE

17          INSTRUCTION?

18              MR. LEE:  I THINK THE SECOND SENTENCE IS EASY BECAUSE

19          WE'RE COMING RIGHT OFF THE PLACE WHERE MR. PRICE OBJECTED.  THE

20          OBJECTION WAS -- YOUR HONOR ASKED MR. MCELHINNY TO MOVE ON,

21          YOUR HONOR SUSTAINED AT THE TIME, HE DID MOVE ON, HE LEFT THE

22          TOPIC.  I THINK THAT BRINGS ATTENTION TO -- IT DOES SUGGEST

23          THAT IT'S OUR BURDEN TO BEAR.

24              YOUR HONOR INSTRUCTED THEM THIS AT THE OUTSET.  YOUR HONOR

25          INSTRUCTED THEM THAT AGAIN TODAY.
```

1       MR. PRICE ASKED THOSE QUESTIONS IN THE VOIR DIRE OF EACH

2   OF THE PEOPLE WHO WERE SEATED.

3       I THINK CALLING ATTENTION TO THAT IS, YOU KNOW, IT'S -- WE

4   COULD HAVE OBJECTED, I COULD HAVE OBJECTED ON THE JUSTICE, JUST

5   US SUGGESTION, BUT WE UNDERSTAND IT'S ARGUMENT, AND IT'S JUST

6   ARGUMENT.

7           MR. PRICE:  YOUR HONOR, MR. LEE JUST EXPLAINED WHY HE

8   WOULDN'T THINK THAT THAT INSTRUCTION MIGHT APPLY TO SOMETHING I

9   SAID BECAUSE IT'S A BROAD INSTRUCTION.

10      APPEALING TO RACE, I THOUGHT WE'RE PASSED THAT, AND

11  THERE'S NOTHING ELSE THAT COMMENT DOES BUT APPEAL, YOU KNOW, TO

12  RACIAL PREJUDICE.

13      AND -- I MEAN, I'VE HEARD NO OTHER EXPLANATION AS TO WHY

14  YOU WOULD HAVE TO TELL THEM, "YOU ALL KNOW WHAT HAPPENED."

15      AND I MEAN, MR. MCELHINNY HASN'T TOLD YOU, REVEALED TO YOU

16  WHAT HE EXPECTED THEM TO THINK THEN, BUT I THINK WE ALL THOUGHT

17  THE SAME THING, AS HE KNEW WE WOULD.

18          MR. LEE:  ACTUALLY, YOUR HONOR, I'M ASIAN AND I

19  DIDN'T THINK THE SAME THING.

20      I THOUGHT IT WAS MR. MCELHINNY TALKING ABOUT A REAL WORLD

21  EXPERIENCE WHERE PEOPLE KNOW THAT IT WAS A MAJOR INDUSTRY.  HE

22  SAID THEY DIDN'T PROTECT THEIR INTELLECTUAL PROPERTY.  THAT WAS

23  THE STATEMENT.

24      AND THERE WAS NOTHING ABOUT WHAT COMPANIES CAME IN -- THIS

25  IS ALL A SERIES OF INFERENCES THEY'RE TRYING TO MAKE IN ORDER

```
1    TO GIVE THEMSELVES SOME BASIS TO COMPLAIN ABOUT A VERDICT THAT

2    WE DON'T EVEN KNOW WHAT IT'S GOING TO BE YET.

3        IT'S -- I COULD MAKE YOU EXACTLY THE SAME ARGUMENT THAT --

4            THE COURT:  WELL, I THINK THE -- SORRY TO INTERRUPT

5    YOU.  TO SAY AMERICAN COMPANY VERSUS NON-AMERICAN COMPANY

6    CLEARLY IMPLIES FOREIGN.

7        SO THIS IS WHAT I'D LIKE TO DO.  I'D LIKE TO JUST REPEAT

8    THE INSTRUCTION, "YOU MUST NOT BE INFLUENCED BY ANY PERSONAL

9    LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY, AND ANY

10   APPEALS TO" --

11           MR. PRICE:  YOU SHOULD SAY PREJUDICE, YOUR HONOR.

12   THAT'S WHAT WAS TALKED ABOUT, PREJUDICE.

13           THE COURT:  WHAT IF THE CURATIVE INSTRUCTION JUST

14   SAID "ANY APPEAL TO PREJUDICE OR SYMPATHY IS IMPROPER"?

15           MR. PRICE:  I THINK IT'S APPROPRIATE.  I THINK IT

16   CURES THE PROBLEM, BUT I THINK IT'S APPROPRIATE.

17           MR. LEE:  WELL, YOUR HONOR, IF IT'S NOT GOING TO CURE

18   THE PROBLEM, THEN I THINK WE SHOULDN'T DO ANYTHING.  THEY'RE

19   DELIBERATING.  THEY'RE IN THE ROOM.  THEY'VE BEEN CHARGED.

20       IF ALL WE'RE GOING TO SEE IS A MISTRIAL MOTION, THEN THEY

21   SHOULD FILE THEIR MOTION.

22       BUT TAKING UP A CURATIVE INSTRUCTION THAT'S NOT GOING TO

23   MAKE THE PROBLEM GO AWAY, AFTER THE FOLKS HAVE BEEN DELIBERATED

24   FOR SOME PERIOD OF TIME, WE DON'T THINK WOULD BE THE RIGHT WAY

25   TO GO.
```

```
1              MR. PRICE:  AND THE TRANSCRIPT SAYS "I THINK IT CURES

2     THE PROBLEM."  WHAT I SAID WAS, I DON'T THINK IT CURES THE

3     PROBLEM.  I JUST WANT TO MAKE SURE THE "DON'T" IS IN THERE.

4          (PAUSE IN PROCEEDINGS.)

5              THE COURT:  I'M LOOKING AT THE TIME THAT THE JURORS

6     WENT IN.  I THINK IT WAS APPROXIMATELY --

7              THE CLERK:  I HAVE IT --

8              THE COURT:  -- 12:17.

9              THE CLERK:  THAT'S WHAT I HAVE.

10             THE COURT:  ALL RIGHT.  TIME IS NOW 12:40.  I'D LIKE

11    TO GIVE THIS CURATIVE INSTRUCTION AND I'M GOING TO DO THAT.

12         CAN YOU PLEASE BRING IN OUR JURY?

13             THE CLERK:  THEY SEEM TO ALREADY BE WRITING A NOTE.

14             THE COURT:  OKAY.

15         (PAUSE IN PROCEEDINGS.)

16             THE CLERK:  DO YOU WANT TO SEE THE NOTE BEFORE THEY

17    COME OUT OR JUST HAVE THEM COME OUT?

18             THE COURT:  THANK YOU.

19         (JURY IN AT 12:41 P.M.)

20             THE COURT:  ALL RIGHT.  WELCOME BACK.  TIME IS NOW

21    12:41.

22         I HAVE NOTE NUMBER 1 FROM THE JURY -- PLEASE TAKE A

23    SEAT -- AND I'LL JUST READ IT TO YOU.  I'LL ALSO PROVIDE HARD

24    COPIES TO COUNSEL.

25         IT SAYS, "WE HAVE CHOSEN A JURY FOREMAN/PRESIDING JUROR,
```

```
 1        COLLEEN ALLEN, NUMBER 5.

 2             "ALSO, WE REQUEST SOME TAPE FOR THE WALLS AND

 3       HIGHLIGHTERS.  ALSO, EXTRA PAPER."

 4             IS THE PAPER THAT YOU'RE REQUESTING THE BIG PAPER FOR THE

 5       EASEL?  OH, NO, JUST YOUR OWN NOTE PAPER, LINED PAPER?

 6             OKAY.  SO WE'LL PROVIDE THAT, ALL OF THAT TO YOU.

 7                  THE CLERK:  I HAVE TWO HIGHLIGHTERS HERE.

 8                  THE COURT:  ALL RIGHT.  WE'LL ALSO GET YOU SOME OTHER

 9       COLORS AS WELL, PINK, BLUE, GREEN, IN ADDITION TO THE YELLOWS.

10             NOW, AS I SAID WHEN I READ YOU FINAL JURY INSTRUCTION

11       NUMBER 1, YOU MUST FOLLOW ALL OF MY INSTRUCTIONS AND NOT SINGLE

12       OUT SOME AND IGNORE OTHERS.  THEY'RE ALL IMPORTANT.

13             I DO WANT TO JUST REMIND YOU OF JURY INSTRUCTION NUMBER 1,

14       WHICH DOES STATE THAT YOU MUST NOT BE INFLUENCED BY ANY

15       PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY,

16       AND ANY APPEAL BY ANY OF THE PARTIES TO ANY PREJUDICE OR

17       SYMPATHY IS NOT PROPER.

18             SO WITH THAT INSTRUCTION, I'M GOING TO EXCUSE YOU BACK TO

19       THE JURY ROOM TO BEGIN DELIBERATIONS, AND WE WILL PROVIDE

20       YOU -- WOULD YOU LIKE MASKING TAPE?

21                  JUROR:  PREFERABLY FOR THE WALLS.

22                  THE COURT:  OKAY.  SO WE'LL -- LET ME JUST MAKE A

23       LIST.  MASKING TAPE, DIFFERENT COLORED HIGHLIGHTERS, AND EXTRA

24       LINED EIGHT AND A HALF BY 11 PAPER.

25             BLESS YOU.
```

1        IS THERE ANYTHING ELSE THAT YOU NEED?  OKAY.

2        IF YOU NEED ANY FURTHER SUPPLIES, PLEASE JUST SEND A NOTE.

3   ALL RIGHT?

4        THANK YOU ALL.

5            THE CLERK:  I'M GOING TO GIVE THEM THESE AS THEY'RE

6   GOING BACK.

7        (JURY OUT AT 12:44 P.M.)

8            THE CLERK:  THE CLERK'S OFFICE DOES NOT HAVE MASKING

9   TAPE.  THEY HAVE SHIPPING TAPE.

10           THE COURT:  OKAY.  WE'LL GO BUY SOME.

11       ALL RIGHT.  PLEASE TAKE A SEAT.  THE JURORS HAVE LEFT THE

12   COURTROOM.  THE TIME IS NOW 12:44.

13       AS YOU KNOW, WE HAVE YOUR SUMMARY JUDGMENT MOTIONS IN THE

14   SECOND CASE ON DECEMBER 12TH, AND SO I WOULD ASK -- I

15   UNDERSTAND YOU ARE GOING TO BRING A MOTION FOR A MISTRIAL --

16   THAT YOU INCLUDE THAT IN THE POST-TRIAL BRIEFING THAT WE

17   ALREADY SET THE SCHEDULE AND HEARING FOR LAST WEEK.  OKAY?

18       THERE ARE MANY OTHER MOVING PIECES IN ALL OF YOUR

19   LITIGATIONS.  I'M SURE THAT WE'RE GOING TO BE QUITE BUSY

20   BETWEEN NOW AND JANUARY, WHICH IS WHEN YOU HAVE YOUR HEARING.

21       BUT IS THERE ANYTHING -- HAVE YOU AGREED ON THE

22   SMARTPHONES?

23           MS. KREVANS:  WE STOPPED SORTING THEM OUT, YOUR

24   HONOR, SO WE WOULDN'T INTERRUPT THE COURT.

25           THE COURT:  OKAY.

1           MS. KREVANS:  SO PERHAPS MR. SABRI AND MR. BEDECARRE

2    COULD DO THAT AGAIN.

3           THERE IS ONE OTHER MATTER, YOUR HONOR.

4           THE COURT:  WHAT IS THAT?

5           MS. KREVANS:  IT'S SOMETHING WE WOULD LIKE TO TAKE

6    OFF THE COURT'S WORKLOAD IN THE NEAR FUTURE, IN THAT WE HAVE

7    BEEN DISCUSSING TIMING, WE AND SAMSUNG HAVE BEEN DISCUSSING

8    TIMING FOR POST-VERDICT FEE AND COSTS MOTIONS.

9           YOU'LL RECALL THAT THOSE WERE PUT OFF AFTER THE FIRST

10   TRIAL TO -- THAT THEY NOT BE FILED UNTIL AFTER THIS TRIAL, AND

11   WE HAVE MADE AN AGREEMENT IN PRINCIPLE THAT WE'LL DOCUMENT THE

12   STIPULATION AND SUBMIT IT TO THE COURT TO POSTPONE THEM FURTHER

13   SO THAT RATHER THAN BEING DUE 14 DAYS FROM NOW WITH THE SAMSUNG

14   RESPONSE BASICALLY ON CHRISTMAS, WE'RE GOING TO PUT THEM OFF SO

15   THAT THE EARLIEST THEY WOULD BE FILED IS 21 DAYS AFTER THE

16   RESOLUTION OF THE POST-TRIAL MOTIONS, BUT THE DEADLINE FOR THEM

17   ACTUALLY COULD BE AFTER THE FINAL RESOLUTION OF APPEALS IN THIS

18   CASE IF THE PARTIES CHOSE TO WAIT SO LONG.

19           MS. MAROULIS:  THAT'S CORRECT.

20           MS. KREVANS:  SO WE'LL TAKE OFF THE COURT'S PLATE THE

21   NEED TO DEAL WITH FEES AND COSTS IN THE SAME DECEMBER AND

22   JANUARY TIME FRAME.

23           THE COURT:  OKAY.  AND I'M SORRY, REMIND ME, I

24   THOUGHT THAT IN THE LAST ROUND OF POST-TRIAL MOTIONS, WE DIDN'T

25   DEAL WITH THIS BECAUSE WE DON'T HAVE A FINAL JUDGMENT AND

1        YOU'RE OBVIOUSLY GOING TO APPEAL EVERYTHING.

2             I WOULD ASSUME THAT WOULD APPLY TO THIS MOTION AS WELL.

3        NO?

4               MS. KREVANS:  WE ACTUALLY DIDN'T DEAL WITH THE FIRST

5        FOR A SLIGHTLY DIFFERENT REASON.  I THINK EVERYBODY JUST FELT

6        THERE WAS SO MUCH TO DEAL WITH AND IT DIDN'T MAKE SENSE TO DO

7        IT UNTIL POST-TRIAL MOTIONS WERE RESOLVED, AND THEN IT GOT

8        POSTPONED FARTHER.

9             WE WANT TO PUT IT OFF AGAIN UNTIL THE POST-TRIAL MOTIONS

10       AT LEAST ARE RESOLVED, AND THAT WILL EASE BURDEN ON EVERYONE

11       OVER THE HOLIDAYS, INCLUDING THE COURT.

12              THE COURT:  SO WHEN DOES THAT MEAN, THOUGH?  WHEN DO

13       YOU WANT THAT DECIDED?  UNDERSTANDING THAT WE HAVE -- FOR THE

14       SECOND CASE, WE HAVE DECEMBER 12TH FOR SUMMARY JUDGMENT

15       MOTIONS, AND OTHER MOTIONS HAVE ALSO BEEN FILED; WE HAVE

16       JANUARY 23RD IS THE DAUBERTS ON THE SECOND CASE; WE HAVE A

17       HEARING JANUARY 30TH FOR THE POST-TRIAL MOTIONS FOR THIS CASE;

18       WE HAVE MARCH 5TH AS THE PRETRIAL CONFERENCE IN THE SECOND

19       CASE, AND MARCH 30TH AS THE TRIAL DATE.

20              MS. MAROULIS:  YOUR HONOR, THESE WOULDN'T BE DUE TO

21       THE COURT UNTIL AFTER THE APPEAL, BUT A PARTY CAN HAVE AN

22       OPTION OF FILING THEM AFTER THE POST-TRIAL MOTIONS ARE FULLY

23       DECIDED, BUT BEFORE THE APPEAL.  SO WE'RE PUTTING IT OFF MUCH

24       FURTHER THAN THE COURT'S CURRENT DATES.

25              THE COURT:  WELL, CAN YOU JUST FILE THAT AFTER THE

```
1    APPEAL?  THAT APPEAL MIGHT MOOT ALL OF THESE ISSUES.  I DON'T

2    KNOW.

3             MS. KREVANS:  YOUR HONOR, WE, WE DON'T THINK THAT'S

4    WISE FOR A NUMBER OF REASONS.  I THINK THE PARTIES HAVE --

5             MS. MAROULIS:  WE ACTUALLY PROPOSED THAT, BUT

6    APPLE -- WE'RE TRYING TO COMPROMISE TO COME UP WITH A

7    STIPULATION, SO THE COMPROMISE WAS NO EARLIER THAN AFTER ALL

8    THE POST-TRIAL MOTIONS AND NO LATER THAN AFTER THE APPEALS.

9    SAMSUNG PREFERS TO DO IT AFTER THE APPEALS, BUT WE'RE JUST

10   PUTTING OUR POSITION ON THE RECORD.

11            THE COURT:  WELL, YOU KNOW, WE MAY FACE A SITUATION

12   LIKE YOU FACED IN 2012 WHERE, YOU KNOW, I'M ASSUMING WE'RE

13   GOING TO HAVE TO DEAL WITH THE PERMANENT INJUNCTION ISSUE ONCE

14   THE MANDATE ISSUES TO THE DISTRICT COURT AGAIN.  WE MAY OR MAY

15   NOT HAVE TO DEAL WITH THE SANCTIONS ISSUE ON THE PROTECTIVE

16   ORDER VIOLATIONS.

17         THERE IS JUST A LOT THAT'S BEEN SCHEDULED BETWEEN NOW AND

18   MARCH, SO YOU'RE ASKING ME THAT ON TOP OF ALL OF THAT, YOU WANT

19   ME ALSO TO HANDLE A FEES AND COSTS MOTION WHEN IT COULD HAVE

20   BEEN BROUGHT AFTER APPEAL?  IS THAT --

21            MS. KREVANS:  YOUR HONOR, WE THINK THESE ARE DISCRETE

22   MATTERS.  WE WILL MAKE SURE THAT WE FILE THEM AT A TIME THAT'S

23   NOT INCONVENIENT FOR THE COURT.

24         BUT WE DON'T THINK THERE'S A NEED TO POSTPONE THEM FOR

25   SEVERAL MORE YEARS.
```

1          MS. MAROULIS:  SAMSUNG PROPOSES TO FILE THEM AFTER

2     THE APPEALS ARE RESOLVED.

3          THE COURT:  SO I'M ASSUMING, AFTER THE MARCH 30TH

4     TRIAL, WE'LL SIMILARLY HAVE AS INTENSE A POST-TRIAL MOTION,

5     BRIEFING, AND HEARING SCHEDULE.  I MEAN, WE ISSUED NINE

6     SUBSTANTIVE ORDERS AFTER THE LAST TRIAL.  THAT TOOK US QUITE

7     SOME TIME.

8          SO IF YOU'RE SAYING WHAT IS AN INCONVENIENT TIME FOR THE

9     COURT, I WOULD SAY IT'S AN INCONVENIENT TIME THROUGH ANY

10    POST-TRIAL MOTIONS IN THE NEXT TRIAL.

11         BUT IF YOU WANT ME TO HANDLE FEES AND COSTS INSTEAD OF A

12    PERMANENT INJUNCTION, I CAN DO THAT.  OR INSTEAD OF SANCTIONS,

13    I CAN DO THAT.

14         SO AT SOME POINT, I'M JUST GOING TO ASK YOU TO MAKE A

15    CHOICE, BECAUSE WE ARE NOT AN EXCLUSIVE APPLE V. SAMSUNG COURT,

16    AND YOU NEED TO RECOGNIZE I HAVE, YOU KNOW, 6-, 700 OTHER

17    CASES.  CRIMINAL CASES HAVE SPEEDY TRIAL RIGHTS.

18         SO, YOU KNOW, AT A CERTAIN POINT YOU'RE GOING TO MAKE A

19    SELECTION BECAUSE I JUST -- YOU KNOW, WE CANNOT DEVOTE ALL OF

20    OUR RESOURCES JUST TO YOUR DISPUTES.

21         MS. KREVANS:  WE UNDERSTAND THAT, YOUR HONOR, AND WE

22    UNDERSTAND THE COURT'S ADMONITION TO CHOOSE OUR TIME CAREFULLY

23    AND WE WILL DO SO.

24         WE, WE ARE ALL IN AGREEMENT THAT WE SHOULD PUT IT OFF NOW

25    SO IT DOESN'T COME IN AT THIS TIME, WHICH IS VERY INTENSE FOR

```
 1          BOTH PARTIES AND THE COURT.

 2                    THE COURT:  YOU'RE JUST DEFINING "THIS TIME" AS

 3          BETWEEN NOW AND THE HOLIDAYS AT THE END OF THIS CALENDAR YEAR?

 4                    MS. KREVANS:  NO, NO, NO.

 5                    MS. MAROULIS:  NO, YOUR HONOR.  IT WOULD BE AFTER THE

 6          POST-TRIAL MOTIONS ARE DECIDED.

 7                    THE COURT:  SO IT WOULD BE, WHAT, FEBRUARY, MARCH

 8          WHERE WE'RE IN APPLE II TRIAL?  I MEAN, THAT DOESN'T MAKE ANY

 9          SENSE TO ME.

10                    MS. MAROULIS:  YOUR HONOR, MAYBE WE SHOULD CONFER

11          AGAIN AND GET BACK TO YOU.

12                    THE COURT:  ALL RIGHT.

13                    MS. MAROULIS:  WE WERE JUST TRYING TO EXPLAIN THAT

14          IT'S NOT GOING TO HAPPEN RIGHT NOW.  SO --

15                    THE COURT:  I MEAN, PERHAPS THAT ONE COULD GO TO

16          ARBITRATION.

17                    MS. MAROULIS:  WE WILL REPORT TO COURT SHORTLY AFTER

18          TALKING TO EACH OTHER.

19                    MS. KREVANS:  YES, WE WILL GET BACK TO THE COURT

20          PROBABLY -- THE ISSUE IS, OF COURSE, THAT WE HAVE THIS VERY

21          LIMITED 14 DAY DEADLINE AND WE WANT TO MAKE SURE THAT THAT'S

22          NOT IMPOSED ON THE PARTIES OR THE COURT OR THE CLERK BECAUSE

23          OTHERWISE THERE IS AN AVALANCHE OF ADDITIONAL PAPER.

24                    THE COURT:  WELL, CAN'T YOU STIPULATE TO SOME

25          EXTENSION TO HAVE THIS HEARD AFTER APPEALS, OR AT SOME LATER
```

```
 1      TIME?  I MEAN, BETWEEN -- I MEAN, YOU'VE SEEN THE BRIEFING ON

 2      SUMMARY JUDGMENTS FOR DECEMBER 12TH.  IT'S BOXES AND BOXES.  SO

 3      I JUST THINK THAT WE WILL NOT BE ABLE TO HANDLE THAT AS WELL.

 4          BUT MAKE YOUR CHOICE.  IF YOU'D LIKE TO HANDLE THAT IN

 5      LIEU OF A PERMANENT INJUNCTION OR THE SANCTIONS MOTION, OR IF

 6      YOU WANT TO MAKE SOME OTHER ELECTION, I WILL DEFER TO YOU.

 7      OKAY?

 8              MS. KREVANS:  WE WILL CONFER FURTHER WITH COUNSEL,

 9      YOUR HONOR, AND WE WILL SUBMIT SOMETHING THAT'S AGREED UPON AND

10      THAT WE THINK WILL BE ACCEPTABLE TO THE COURT.

11              THE COURT:  ALL RIGHT.  THANK YOU.

12          WE'LL GO AHEAD, THEN, LIKE WE DID IN THE LAST CASE -- I

13      DON'T THINK I NEED TO SUBMIT A WRITTEN RESPONSE TO JURY NOTE

14      NUMBER 1 SINCE WE HANDLED THAT IN OPEN COURT.

15          BUT WE'LL GO AHEAD AND FILE THE NOTES AS WE DID LAST TIME.

16          ALL RIGHT.  ANYTHING ELSE?

17          PLEASE GIVE MS. PARKER BROWN YOUR BEST CONTACT

18      INFORMATION, AND YOU CAN JUST HAVE, YOU KNOW, ONE PERSON ON

19      EACH SIDE.

20              THE CLERK:  I WONDER IF THE PARTIES HAVE EXTRA

21      NOTEBOOK PAPER.  THEY DID WHEN THEY RAN OUT IN THE LAST TRIAL.

22              THE COURT:  OKAY.  DO YOU HAVE ANY MORE LINED

23      NOTEBOOK PAPER?  I THINK WE DO HAVE THE MASKING TAPE.

24              THE CLERK:  WE DO.

25              THE COURT:  AND WE DO HAVE ALL THE HIGHLIGHTERS.
```

```
1              THE CLERK:  I WILL GET SOME OTHER COLORS.

2              THE COURT:  I DO HAVE SOME LINED PAPER.

3              MR. JOHNSON:  I'M TOLD WE HAVE PAPER, YOUR HONOR.

4              THE COURT:  OH, OKAY.  IF WE COULD --

5              MR. JOHNSON:  I THINK THEY WANT LINED PAPER, RIGHT, I

6     MEAN SEPARATE?  THEY WANT THREE HOLE PUNCH?

7              THE COURT:  YOU KNOW, I HAVE ACTUALLY MORE LINED

8     THREE HOLE PUNCH PAPER FROM A PATENT TRIAL FROM LAST YEAR, SO

9     WE CAN -- AND THOSE ARE ALL BLANK, SO WE CAN PROVIDE THOSE TO

10    THEM.  BUT THANK YOU.  IF THEY NEED MORE, THEN WE MAY ASK YOU

11    TO PLEASE PROVIDE THOSE NOTE PADS.

12        OKAY.  WHAT ELSE?  ANYTHING ELSE?

13             MR. MCELHINNY:  NOTHING FURTHER FROM APPLE, YOUR

14    HONOR.

15             THE COURT:  NO?  OKAY.

16             MR. PRICE:  NOTHING, YOUR HONOR.

17             THE COURT:  THANK YOU.  SO WE'LL LET YOU KNOW AS SOON

18    AS WE GET ANY FURTHER NOTES AND CERTAINLY IF THERE'S A VERDICT.

19        THANK YOU.

20        OH, I'M SORRY, EXCUSE ME.  IS THERE AN AGREEMENT ON THE

21    PHONES THAT CAN GO BACK TO THE JURY?

22             MR. SABRI:  MOMENTARILY.

23             THE COURT:  OKAY.  NO PROBLEM.

24             MR. BEDECARRE:  AND YOUR HONOR, WE HAVE THE TWO

25    BOXES, THE TWO SETS OF THE PAPER EXHIBITS.
```

```
1              THE CLERK:  FOR CHAMBERS.

2              THE COURT:  PERFECT.

3         CAN WE RETURN THESE TO YOU AND THEN USE THIS DOLLY TO TAKE

4    OUR EXHIBITS BACK?  THANK YOU.

5         (PAUSE IN PROCEEDINGS.)

6              THE COURT:  OKAY.  EXCUSE ME.  CAN WE GO BACK ON THE

7    RECORD?

8              MR. LEE:  YES, YOUR HONOR.

9              THE COURT:  IS THERE NOW AN AGREEMENT AS TO THE

10   ACTUAL PHYSICAL ITEMS, NOT DOCUMENTS, MAINLY PHONES AND

11   TABLETS, THAT WILL BE GOING BACK TO THE JURY?

12             MS. KREVANS:  THERE IS, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  AND MS. KREVANS, ON BEHALF OF

14   APPLE, HAVE YOU REVIEWED EVERYTHING ON THE CART THAT WILL BE

15   GOING TO THE JURY ROOM?

16             MS. KREVANS:  WE HAVE, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  AND YOU STIPULATE THAT IS

18   APPROPRIATE AND SHOULD GO TO THE JURY ROOM?

19             MS. KREVANS:  I DO.

20             THE COURT:  OKAY.  AND ON BEHALF OF SAMSUNG, CAN YOU

21   IDENTIFY YOURSELF, PLEASE?

22             MR. BEDECARRE:  AL BEDECARRE.

23             THE COURT:  AND HAVE YOU REVIEW ALL OF THE ITEMS ON

24   THE CART?

25             MR. BEDECARRE:  WE HAVE, YOUR HONOR.
```

```
1              THE COURT:  AND ON BEHALF OF SAMSUNG, DO YOU

2     STIPULATE THAT THOSE ARE THE APPROPRIATELY ADMITTED EXHIBITS

3     THAT SHOULD GO TO THE JURY ROOM?

4              MR. BEDECARRE:  WE DO.

5              THE COURT:  ALL RIGHT.  THANK YOU.

6              THE CLERK:  ALSO THE TWO POWER STRIPS AND CHARGERS.

7              THE COURT:  AH.

8              MS. KREVANS:  THEY'RE ALSO ON THE CART, YOUR HONOR.

9              THE COURT:  OKAY, GREAT.  TWO POWER STRIPS AND

10    CHARGERS, BOTH SIDES ARE FINE WITH BOTH; CORRECT?

11         MS. KREVANS?

12             MS. KREVANS:  YES, YOUR HONOR.

13             MR. BEDECARRE:  CORRECT, YOUR HONOR.

14             THE COURT:  THANK YOU ON BEHALF OF SAMSUNG.

15         ALL RIGHT.  ANYTHING ELSE THAT NEEDS TO GO BACK TO THE

16    JURY, OR IS THAT THE --

17             MS. KREVANS:  THAT'S IT.

18             THE COURT:  -- FULL UNIVERSE?

19             MS. KREVANS:  THE COMPUTER SO THAT THEY CAN LOOK AT

20    THE ELECTRONIC EXHIBITS WENT IN WITH THE BOXES AND THE PAPER

21    EXHIBITS.

22             THE COURT:  OKAY.  NOW, DOES THAT COMPUTER NEED ANY

23    SPECIAL INSTRUCTION, OR IS IT PRETTY OBVIOUS?

24             MS. KREVANS:  IT'S OBVIOUS, AND THERE'S ALSO AN

25    INSTRUCTION IN CASE THAT WASN'T CLEAR ENOUGH.
```

```
 1              THE COURT:  ALL RIGHT.  AND BOTH SIDES STIPULATED TO

 2     THAT INSTRUCTION; CORRECT?

 3              MR. BEDECARRE:  YES, WE DID, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  THANK YOU.

 5              MS. KREVANS:  THANK YOU, YOUR HONOR.

 6          (A RECESS WAS TAKEN PENDING THE JURY'S DELIBERATIONS.)

 7          (JURY OUT AT 2:35 P.M.)

 8              THE COURT:  WHY DON'T WE JUST HAVE ALL COUNSEL PLEASE

 9     STATE YOUR APPEARANCE?

10              MR. SABRI:  NATHAN SABRI FOR APPLE, YOUR HONOR.

11              MS. MAROULIS:  VICTORIA MAROULIS, KEVIN JOHNSON, AND

12     AL BEDECARRE FOR SAMSUNG.

13              THE COURT:  OKAY.  WELCOME BACK.

14          THIS IS IN RESPONSE TO JURY NOTE NUMBER 2, WHICH REQUESTED

15     EIGHT INDIVIDUAL COPIES OF PX 25F, PAGES 2 THROUGH 5, AND EIGHT

16     COPIES OF DX 781, PAGE 2.

17          AND I BELIEVE THAT A COPY OF THIS INSTRUCTION WAS PLACED

18     ON EACH OF YOUR COUNSEL TABLES; CORRECT?

19              MR. SABRI:  CORRECT, YOUR HONOR.

20              MS. MAROULIS:  YES, YOUR HONOR.

21              THE COURT:  ALL RIGHT.  DID YOU REVIEW THESE

22     EXHIBITS?  THESE ARE THE EIGHT COPIES THAT WE'D LIKE TO SEND

23     BACK.  DID YOU GET A CHANCE TO REVIEW THESE?

24              MR. SABRI:  WE HAVEN'T YET.

25              THE COURT:  OH, OKAY.  CAN YOU PLEASE -- THERE ARE
```

1    EIGHT COPIES OF PAGE 2 OF MR. WAGNER'S CALCULATIONS, WHICH ARE

2    DEFENSE EXHIBIT 781.002, AND EIGHT COPIES OF MS. DAVIS'S

3    CALCULATIONS, WHICH ARE PLAINTIFF'S EXHIBIT 25F.2.

4        GO AHEAD, PLEASE, AND LOOK THROUGH ALL EIGHT COPIES JUST

5    SO THERE'S NO DISPUTE AS TO WHAT WENT IN TO THE JURORS.

6        (PAUSE IN PROCEEDINGS.)

7            THE COURT:  ALL RIGHT.  COUNSEL FOR APPLE, MR. SABRI,

8    DID YOU REVIEW ALL EIGHT COPIES OF PX 25F.2 THAT'S GOING TO THE

9    JURY?

10            MR. SABRI:  I DID, YOUR HONOR.

11            THE COURT:  AND THOSE ARE SATISFACTORY?

12            MR. SABRI:  THOSE ARE SATISFACTORY.

13            THE COURT:  OKAY.  AND YOU REVIEWED ALL COPIES OF DX

14    781.002 THAT ARE GOING INTO THE JURY?

15            MR. SABRI:  I DID.

16            THE COURT:  AND THOSE ARE SATISFACTORY?

17            MR. SABRI:  THEY ARE.

18            THE COURT:  OKAY.  ALL RIGHT.  MS. MAROULIS, DID YOU

19    REVIEW ALL EIGHT COPIES OF PX 25F.2?

20            MS. MAROULIS:  YES, YOUR HONOR.

21            THE COURT:  AND THEY WERE SATISFACTORY?

22            MS. MAROULIS:  CORRECT.

23            THE COURT:  ALL RIGHT.  DID YOU ALSO REVIEW DX

24    781.002, ALL EIGHT COPIES?

25            MS. MAROULIS:  YES.

```
 1              THE COURT:  AND THEY WERE SATISFACTORY AS WELL?

 2              MS. MAROULIS:  YES.

 3              THE COURT:  ALL RIGHT.  THANK YOU ALL.

 4          AND I'LL ASK MS. PARKER BROWN TO GIVE THESE TO THE BAILIFF

 5     TO THEN GIVE TO THE JURY, AND WE'LL JUST LET YOU ALL KNOW IF WE

 6     HAVE ANYTHING ELSE.

 7              OKAY.  THANK YOU.

 8              MR. SABRI:  THANK YOU, YOUR HONOR.

 9              THE COURT:  OH, DO YOU WANT ME TO WRITE ON THE NOTE

10     THAT WE ARE GIVING THEM THEIR COPIES?

11              MS. MAROULIS:  I DON'T KNOW IF IT'S NECESSARY.

12              THE COURT:  I GUESS WE COULD DO THAT.  WHO HAS THE

13     ORIGINAL NOTE?

14              MR. SWARUUP:  I DON'T --

15              THE COURT:  I HAVE A COPY OF THE NOTE.  I CAN JUST --

16     THAT'S FINE.  WE MIGHT AS WELL REPORT AT WHAT TIME.  MY

17     TRANSCRIPT IS OFF.  WHAT TIME DOES IT SAY IT IS?

18              THE REPORTER:  2:39.

19              THE COURT:  OKAY.  I'LL JUST SAY 2:39, I'LL SHOW EACH

20     OF THE PARTIES -- DID SHE ALREADY TAKE IT INTO THEM?

21              MR. SWARUUP:  SHE JUST TOOK IT TO THE BAILIFF.

22              THE COURT:  OH.  WHY DIDN'T SHE WAIT?  I THOUGHT WE

23     WANTED THE NOTE TO GO TOGETHER.

24              MR. SWARUUP:  OH, DO YOU WANT THEM --

25          (PAUSE IN PROCEEDINGS.)
```

THE CLERK: I USUALLY FILE THE JURY NOTES AT THE END, OR DO YOU WANT ME TO FILE THEM AS THEY COME IN?

THE COURT: YOU KNOW, I'M DOING THE COVER FOR THAT, SO NEXT TIME CAN YOU WAIT UNTIL WE'RE DONE BEFORE BRINGING IT TO THEM?

THE CLERK: OH, I'M SORRY.

THE COURT: THAT'S OKAY.

THE CLERK: I WILL.

THE COURT: ALL RIGHT. JUST FOR COUNSEL, I JUST WROTE "HERE ARE THE DOCUMENTS YOU REQUESTED. 11-19-2013 AT 2:39 P.M." OKAY?

MS. MAROULIS: THANK YOU, YOUR HONOR.

MR. SABRI: THANK YOU, YOUR HONOR.

THE COURT: OKAY. AND WE'LL FILE THIS AS WELL.

(A RECESS WAS TAKEN PENDING THE JURY'S DELIBERATIONS.)

(JURY OUT AT 3:37 P.M.)

THE COURT: OKAY. WELCOME BACK. YOU SHOULD HAVE A COPY OF BOTH JURY NOTES ON YOUR CHAIR.

PLEASE TAKE A SEAT.

DO YOU HAVE THEM BOTH?

MS. KREVANS: WE DO, YOUR HONOR.

MR. JOHNSON: YES, YOUR HONOR.

THE COURT: OH, OKAY. SO WITH REGARD TO NUMBER 4 --

THE CLERK: THEY'VE ALREADY ACTUALLY TAKEN THEIR BREAK.

```
 1              THE COURT:  THEY ALREADY TOOK IT?

 2              THE CLERK:  THEY JUST TOOK IT WALKING UP AND DOWN THE

 3     HALL, SO THAT ONE IS TAKEN CARE OF.

 4              THE COURT:  OKAY.  ALL RIGHT.  WE CAN EVEN LET THEM

 5     KNOW, IF THEY WANT TO GO OUTSIDE THE COURTHOUSE, THEY CAN.  SO

 6     I WOULD PROPOSE LETTING THEM KNOW THAT THEY CAN TAKE A BREAK

 7     OUTSIDE THE JURY DELIBERATION ROOM, OR EVEN OUTSIDE THE

 8     COURTHOUSE, AT ANY TIME.  THEY JUST NEED TO LET US KNOW SO THAT

 9     MS. PARKER BROWN CAN LET THEM IN THROUGH THE BUZZER DOOR.

10     OKAY.  SO LET ME JUST -- ANY OBJECTION TO THAT?

11              MS. KREVANS:  WE ARE ALL IN FAVOR OF FRESH AIR AT

12     APPLE, YOUR HONOR.

13              MR. JOHNSON:  AGREED.

14              THE COURT:  ALL RIGHT.

15          (PAUSE IN PROCEEDINGS.)

16              THE COURT:  ALL RIGHT.  I JUST WROTE, "YOU MAY TAKE A

17     BREAK OUTSIDE OF THE JURY DELIBERATION ROOM AND OUTSIDE OF THE

18     COURTHOUSE AT ANY TIME.  PLEASE LET THE BAILIFF KNOW SO HE OR

19     SHE CAN NOTIFY MS. PARKER BROWN, WHO WILL SIT IN THE FIFTH

20     FLOOR HALLWAY TO BUZZ YOU BACK INTO THE COURTHOUSE'S INTERNAL

21     HALLWAY."

22          ALL RIGHT.  NOW LET'S GO TO THE OTHER ISSUE, AND THAT IS

23     JURY NOTE 3, WHICH REQUESTS A COPY OF PDX 100, THE POSTER BOARD

24     SHOWING THE LOST PROFITS FACTORS PRESENTED BY MS. KREVANS

25     DURING MS. DAVIS'S TESTIMONY, AND THAT'S THE BLOW UP POSTER
```

1    BOARD.

2         I HAVE A THOUGHT AS TO HOW WE SHOULD RESPOND TO THIS, BUT

3    I'D LIKE TO HEAR WHAT YOUR PROPOSAL IS.

4         MS. KREVANS:  YOUR HONOR HAS ESTABLISHED A RULE THAT

5    THE DEMONSTRATIVES ARE NOT GOING INTO THE JURY ROOM, AND WE

6    THINK THAT OBVIOUSLY AT THIS POINT WE SHOULD RESPECT AND KEEP

7    THAT RULE.

8         IF THEY WANTED TO SEE THE POSTER BOARD, WE THOUGHT THAT

9    THE BEST WAY TO DO IT WOULD BE TO BRING THEM OUT, HAVE THEM BE

10   ABLE TO TAKE ANOTHER LOOK AT IT, BUT NOT SEND IT INTO THE JURY

11   ROOM WITH THEM BECAUSE THE OTHER DEMONSTRATIVES HAVE NOT GONE

12   IN THERE.

13        THE COURT:  OKAY.  LET ME HEAR FROM SAMSUNG.

14        MR. JOHNSON:  YOUR HONOR, WE AGREE THAT THE

15   DEMONSTRATIVES SHOULDN'T GO INTO THE JURY ROOM.  THEY'RE NOT

16   EVIDENCE.

17        BUT WE WOULD ALSO OBJECT TO THEM COMING BACK OUT TO LOOK

18   AT THE DEMONSTRATIVE.  WE HAVEN'T DONE THAT WITH RESPECT TO

19   ANYTHING ELSE.

20        THE DEMONSTRATIVES IN THE FIRST TRIAL WHERE THE JURY GOT

21   TO LOOK AT THEM AGAIN WERE AGREED UPON IN THE PAST.

22        SO WE THINK THAT THERE'S -- THEY HAVE THE JURY

23   INSTRUCTIONS, THEY HAVE THE TESTIMONY, THEY'VE BEEN INSTRUCTED

24   ON LISTENING AND TO USE THEIR MEMORIES AS BEST AS POSSIBLE.

25   THEY TOOK NOTES.  SO COMING BACK OUT TO LOOK AT THE

1433

```
1      DEMONSTRATIVE WE THINK WOULD BE IMPROPER.

2              THE COURT:  I WAS GOING TO PROPOSE A STATEMENT THAT

3      SAYS THAT PDX 100 IS A DEMONSTRATIVE AND THAT NO -- NEITHER

4      PARTY'S DEMONSTRATIVES HAVE BEEN ADMITTED INTO EVIDENCE, BUT

5      THEY CAN REFER TO FINAL JURY INSTRUCTION NUMBER 23, BECAUSE

6      THAT LAYS OUT THE PANDUIT FACTORS, WHICH SEEMS LIKE WHAT THIS

7      JURY IS INTERESTED IN SEEING IN THE DEMONSTRATIVE.

8          ANY OBJECTION TO THAT?

9              MR. JOHNSON:  NO OBJECTION, YOUR HONOR.

10             MR. LEE:  NO OBJECTION, YOUR HONOR.

11             THE COURT:  OKAY.  LET ME GO AHEAD AND WRITE THAT UP.

12         (PAUSE IN PROCEEDINGS.)

13             THE COURT:  ALL RIGHT.  I WROTE, "PDX 100 IS A

14     DEMONSTRATIVE.  NO DEMONSTRATIVES OF ANY PARTY HAVE BEEN

15     ADMITTED INTO EVIDENCE.  WE CANNOT GIVE YOU A COPY OF PDX 100.

16     HOWEVER, WE REFER YOU TO FINAL JURY INSTRUCTION NUMBER 23."

17         IS THAT ACCEPTABLE FOR SAMSUNG?

18             MR. JOHNSON:  YES, YOUR HONOR.

19             THE COURT:  FOR APPLE?

20             MR. LEE:  YES, YOUR HONOR.

21             THE COURT:  OKAY.  SO THE DELIBERATIONS HAVE TO END

22     TODAY AT 4:30.  I'M NOT GOING TO LET THEM GO OVER.  THEY'LL

23     HAVE TO COME BACK AT 9:00 O'CLOCK TOMORROW.

24         I THINK THEY ALREADY KNOW THAT, RIGHT, MS. PARKER BROWN?

25             THE CLERK:  I THINK WE TOLD THEM THAT AT THE
```

1     BEGINNING, BUT WHEN WE PUT THIS BACK, I CAN HAVE THE BAILIFF

2     REMIND THEM.

3               THE COURT:  WELL, LET'S -- LET'S NOT DO THAT BECAUSE

4     I DON'T WANT THEM TO FEEL RUSHED.  BUT AT 4:30, WE'LL JUST HAVE

5     THE BAILIFF KNOCK ON THE DOOR AND LET THEM KNOW THAT THEY NEED

6     TO COME BACK TOMORROW MORNING.

7          OKAY.  ALL RIGHT.  WELL, WE WILL FILE COPIES OF THESE

8     NOTES SO YOU HAVE A COPY OF THEM.

9          ALL RIGHT.  THANK YOU VERY MUCH.

10              MS. MAROULIS:  THANK YOU, YOUR HONOR.

11              MR. LEE:  THANK YOU, YOUR HONOR.

12              MR. JOHNSON:  THANK YOU.

13              MS. KREVANS:  THANK YOU, YOUR HONOR.

14          (A RECESS WAS TAKEN PENDING THE JURY'S DELIBERATIONS.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  NOVEMBER 19, 2013

19

20

21

22

23

24

25