QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kathleen M. Sullivan (Cal. Bar No. 242261)
kathleensullivan@quinnemanuel.com
Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**SAMSUNG'S CORRECTED NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 50 AND 59**<br><br>Date:     **January 30, 2014**<br>Time:     **1:30 p.m.**<br>Place:    **Courtroom 8, 4th Floor**<br>Judge:   **Hon. Lucy H. Koh**<br><br>**PUBLIC REDACTED VERSION** |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................................................... I

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.  INTRODUCTION ................................................................................................................ 1

II.  BACKGROUND ................................................................................................................. 2

    A.  The Parties' Damages Theories At Trial ................................................................. 2

    B.  The Jury's Verdict .................................................................................................... 3

III.  LEGAL STANDARDS ...................................................................................................... 4

    A.  Judgment as a Matter of Law, New Trial and/or Remittitur ................................... 4

    B.  Permissibility of Examining the Nature of the Award ............................................ 5

IV.  THE RECORD IS INSUFFICIENT TO SUPPORT THE JURY AWARD OF LOST PROFITS FOR THE '915 PATENT ...................................................................... 5

    A.  Apple Presented No Evidence of Demand for the '915 Patented Feature ............... 6

        1.  Generic Praise for "Ease of Use" Is Insufficient to Show Demand for the '915 Patented Feature ............................................................... 7

        2.  Apple's Own Survey Showed that Consumers Chose Android Phones for Features Unrelated to the '915 Patent ............................... 8

        3.  Samsung's Documents Do Not Show Demand for the '915 Patented Feature ...................................................................................... 8

        4.  Apple Failed to Identify Any Difference Between the '915 Patented Feature and Non-infringing Alternatives .......................... 9

        5.  The Hauser Survey Did Not Show Demand for the '915 Patented Feature ...................................................................................... 10

    B.  The Undisputed Evidence of Available Non-Infringing Alternatives Also Bars Lost Profits Damages ..................................................................................... 13

        1.  The Intercept Was an Available and Acceptable Non-Infringing Substitute ...................................................................................... 13

        2.  The Galaxy Ace Was Another Available and Acceptable Non-Infringing Alternative ............................................................................... 14

        3.  Samsung Could Have Designed Around the '915 Patent ......................... 16

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

C.     Apple Failed to Allocate Its Purported Lost Profits Based on Demand for the '915 Patented Feature ........................................................................ 18

D.     The Evidence Is Insufficient To Support Lost Profits Based on Apple's *Pro Rata* Share of the Market ........................................................................ 18

       1.     Ms. Davis Failed to Account for Significant Differences Between the Infringing Products and Apple's Products ............................................. 19

       2.     Ms. Davis Did Not Consider Price Disparities Between the Infringing Samsung Smartphones and the iPhone ................................... 21

       3.     Apple Failed to Show That the Galaxy Tab Competed With the iPad ....... 22

E.     Apple Lacked Capacity to Make Additional Tablet Sales ..................................... 23

V.     THE JURY'S ROYALTY AWARD SHOULD BE SET ASIDE ..................................... 24

A.     The Record Lacks Sufficient Evidence to Support the Jury's Reasonable Royalty Award .................................................................................. 24

B.     The Evidence Is Insufficient To Support Any Apportionment Of Apple's Royalty Between Patented and Unpatented Features .............................................. 26

VI.     THE JURY'S AWARD OF INFRINGER'S PROFITS SHOULD BE SET ASIDE ......... 27

A.     No Reasonable Jury Could Hold that Samsung Failed to Prove That All of its Operating Expenses Are Deductible ................................................................ 27

B.     The Jury's Infringer's Profits Award Results In Double Counting........................ 30

C.     There Is No Evidence that the Award of $142,054,256 for Samsung's Profits Was Attributable to Infringement of Apple's Design Patents ..................... 30

VII.     ALTERNATIVELY, AT A MINIMUM, THE JURY'S DAMAGES AWARD SHOULD BE REMITTED .................................................................................. 32

A.     Reduction of $112,742,324 In Lost Profits Damages .............................................. 33

B.     Reduction of $34,596,741 In Reasonable Royalty Damages .................................. 33

C.     Reduction of $89,319,297 In Infringer's Profits ..................................................... 34

D.     Reduction of $148,374,085 In Lost Profits And Reasonable Royalty ................... 34

E.     Reduction of $202,061,621 In Lost Profits And Infringer's Profits ....................... 34

F.     Reduction of $123,916,038 In Infringer's Profits and Reasonable Royalty .......... 35

G.     Reduction of $237,693,382 In Lost Profits, Infringer's Profits, And Reasonable Royalty ........................................................................................ 35

VIII.     APPLE'S IMPROPER AND PREJUDICIAL ARGUMENTS WARRANT A NEW TRIAL .................................................................................................. 35

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

A.   Apple's Repeated Reference to Samsung's Total Infringing Revenues Warrants a New Trial .................................................................................... 35

B.   Apple's Direct Appeal to Racial Prejudice Warrants a New Trial .......................... 38

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*BIC Leisure Prods. v. Windsurfing Int'l,*
  1 F.3d 1214 (Fed. Cir. 1993)..................................................................................18, 21

*Bird v. Glacier Elec. Coop., Inc.,*
  255 F.3d 1136 (9th Cir. 2001)......................................................................................38

*Bush & Lane Piano Co. v. Becker Bros.,*
  222 F. 902 (2d Cir. 1915)..............................................................................................31

*Bush & Lane Piano Co. v. Becker Bros.,*
  234 F. 79 (2d Cir. 1916)................................................................................................31

*Calhoun v. United States,*
  568 U.S. __, 133 S. Ct. 1136 (2013)............................................................................38

*Calico Brand, Inc. v Ameritek Imports, Inc.,*
  527 F. App'x 987 (Fed. Cir. July 18, 2013)....................................................................6

*Carbice Corp. of Am. v. Am. Patents Dev. Corp.,*
  283 U.S. 27 (1931)........................................................................................................31

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
  295 F.3d 1277 (Fed. Cir. 2002)....................................................................................30

*City of Cleveland v. Peter Kiewit Sons' Co.,*
  624 F.2d 749 (6th Cir. 1980)........................................................................................40

*Commil USA, LLC v. Cisco Systems, Inc.,*
  720 F.3d 1361 (Fed. Cir. 2013)....................................................................................40

*Cornell Univ. v. Hewlett-Packard Co.,*
  609 F. Supp. 2d 279 (N.D.N.Y. 2009)....................................................................31, 32

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001)................................................................................18, 21

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.,*
  692 F.2d 1245 (9th Cir. 1982)........................................................................................5

*In re First Alliance Mortgage Co.,*
  471 F.3d 977 (9th Cir. 2006)..........................................................................................5

*Fiskars, Inc. v. Hunt Mfg. Co.,*
  279 F.3d 1378 (Fed. Cir. 2002)....................................................................................14

*Garretson v. Clark,*
  111 U.S. 120 (1884)......................................................................................................27

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)................................................24, 25, 26, 27

*Grain Processing Corp. v. Am. Maize-Prods.*,
   185 F.3d 1341 (Fed. Cir. 1999)...................................................5, 13, 16, 17

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
   No. C-02-3378, 2007 WL 2344962 (N.D. Cal. Aug. 16, 2007)................................33

*James v. Sheklanian*,
   No. 08-cv-01943, 2010 WL 3504804 (E.D. Cal. Sep. 7, 2010) ..............................28

*Junker v. HDC Corp.*,
   No. C-07-5094, 2008 WL 3385819 (N.D. Cal. July 28, 2008) ..............................31

*Lakeside-Scott v. Multnomah Cty.*,
   556 F.3d 797 (9th Cir. 2009)............................................................4

*Landes Const. Co., Inc. v.  Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987)..........................................................35

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)...................................................24, 31, 37

*LeBlanc v. Am. Honda Motor Co.*,
   141 N.H. 579 (1997) ...................................................................40

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009).................................................4, 5, 25

*Mirror Worlds, LLC v. Apple Inc.*,
   784 F. Supp. 2d 703 (E.D. Tex. 2011) ..................................................27

*Mirror Worlds, LLC v. Apple Inc.*,
   No. 2011-1392, 2011 WL 6939526 (Nov. 10, 2011) ......................................37

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007)...........................................................4

*Nat'l Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp.*,
   261 F.2d 35 (7th Cir. 1958)...........................................................28

*Oracle Am., Inc. v. Google, Inc., No. C 10-3561*,
   2012 WL 850705 (N.D. Cal. Mar. 13, 2010) .............................................12

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978)..................................................5, 13, 18

*Rattray v. City of Nat'l City*,
   51 F.3d 793 (9th Cir. 1994)............................................................4

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010).....................................................26, 31

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ..................................................................5, 6, 13

*Romberg v. Nichols*,
   970 F.2d 512 (9th Cir. 1992), *vacated on other grounds*, 506 U.S. 1075 (1993) ...................28

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
   932 F.2d 1453 (Fed. Cir. 1991) .................................................................6, 13, 14

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
   612 F.3d 1365 (Fed. Cir. 2010) .........................................................................5

*Tilghman v. Proctor*,
   125 U.S. 136 (1888) ...................................................................................32

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ..........................................................24, 27, 36, 37

*United States v. 4.0 Acres of Land*,
   175 F.3d 1133 (9th Cir. 1999) ........................................................................36

*United States v. H & R Block*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................12

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ...........................................................4, 24, 25, 26

*Willey v. Ketterer*,
   869 F.2d 648 (1st Cir. 1989) ..........................................................................40


**Statutes**

35 U.S.C. § 271(a) ..........................................................................................15

35 U.S.C. § 284 ........................................................................................25, 32

35 U.S.C. § 289 ....................................................................................30, 31, 32

35 U.S.C. § 74 ..............................................................................................31

Federal Rule of Civil Procedure 50(b) .......................................................................4

Federal Rule of Civil Procedure 59 ....................................................4, 5, 32, 33, 34, 35, 38


**Miscellaneous**

18 Cong. Rec. 834 (Jan. 20, 1887) .........................................................................32

Act of Feb. 4, 1887, 24 Stat. 387 ..........................................................................32

Barnaby J. Feder, *Last U.S. TV Maker Will Sell Control to Koreans*,
   NEW YORK TIMES, July 18, 1995 ........................................................................39

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

Kimberly A. Moore, *Xenophobia in American Courts*,
    97 N.W. Univ. L. Rev. 1497, 1509-1510 (2003) ................................................................40

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on January 30, 2014, at 1:30 p.m., before the Honorable Lucy H. Koh, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") shall and hereby do move the Court for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), renewing Samsung's prior request pursuant to Federal Rule of Civil Procedure 50(a), and alternatively for a new trial or remittitur pursuant to Federal Rule of Civil Procedure 59, as to Apple's claims for damages, as more fully set forth below.   This motion is based on the memorandum of points and authorities below, the trial record, the accompanying declarations of Anthony P. Alden and Michael J. Wagner, all pleadings and papers on file in this action, such matters as are subject to judicial notice, and all other matters or arguments that may be presented in connection with this motion.


DATED: December 13, 2013          QUINN EMANUEL URQUHART &
                                  SULLIVAN, LLP

                                  By   /s/ Victoria F. Maroulis
                                      Charles K. Verhoeven
                                      Kathleen M. Sullivan
                                      Kevin P.B. Johnson
                                      Victoria F. Maroulis
                                      Michael T. Zeller
                                      Attorneys for SAMSUNG ELECTRONICS CO.,
                                      LTD., SAMSUNG ELECTRONICS AMERICA,
                                      INC., and SAMSUNG
                                      TELECOMMUNICATIONS AMERICA, LLC

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Samsung respectfully requests that the Court set aside or remit the jury's improper damages award in the new trial.   The award is not supported by the evidence and testimony of record.   The jury awarded lost profits on Apple's '915 patent even though Apple presented no evidence of consumer demand for the narrow feature claimed in the '915 patent.   Indeed, the record shows that Samsung's customers purchased phones and tablets for many features, including price, that have nothing to do with Apple's '915 patent.   Also, Samsung demonstrated that it possessed acceptable non-infringing substitutes, and could have incorporated other design-arounds had it known Apple had a valid patent.   Apple thus failed to carry its burden to show that infringement of the '915 patent caused any lost sales.

Further, the record lacks sufficient evidence to support the jury's reasonable royalty award.   The Federal Circuit requires that a reasonable royalty opinion be supported by an explanation of how the concluded rates are supported by the evidence.   Here, the jury was given no explanation of Apple's concluded rates, and in particular Apple failed to explain how its royalty claims purport to apportion between the value of the patented features at issue and the value of the many other features in Samsung's smartphones and tablets.

Likewise, the jury's award of infringer's profits should be vacated.   Rather than answering the question of what operating expenses are deductible in order to calculate Samsung's total profits, as required under well-settled law, the jury attempted to split the amount in controversy, returning a compromise verdict that ignored the undisputed evidence of Samsung's operating expenses.   There is no rational basis for the jury's award and it too should be set aside.

In the alternative, Samsung respectfully requests a new trial based on Apple's repeated references to Samsung's revenues from all infringing products, as opposed to those found to infringe Apple's design patents, and blatant appeals to racial, ethnic, and national prejudice.   Throughout the trial, Apple portrayed Samsung as a foreign threat to the local and national economy.   These appeals to crude ethnic stereotypes and racial bias included, in closing, an appeal to animus towards Asian television manufacturers for the alleged destruction of

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1  television manufacturing in the United States. Apple's cynical appeal to racial, ethnic, and

2  national sentiment has no place in our system of civil justice and warrants a new trial.

3  **II.  BACKGROUND**

4  **A.  The Parties' Damages Theories At Trial**

5  At trial, Apple sought a total of $379,776,091 in damages:  $113,777,344 in lost profits

6  damages for the '915 patent, $231,373,554 in Samsung's alleged profits for infringement of

7  Apple's design patents for which lost profits were not sought, and $34,625,193 in reasonable

8  royalty damages for sales not otherwise eligible for lost profits or infringer's

9  profits. PX25F.4. Apple's damages expert, Julie Davis, calculated Apple's lost profits by

10 determining the number of infringing sales made during the portion of the assumed design around

11 period made after Apple notified Samsung of the '915 patent, performing certain market share

12 adjustments, and then multiplying the remaining units by Apple's incremental per unit

13 profit. PX25G1.2-.3. Ms. Davis calculated Samsung's profits on those products for which lost

14 profits were not awarded by subtracting only Samsung's costs of goods sold from its revenues

15 from sales of products found to infringe Apple's design patents after Apple notified Samsung of

16 the patents, arriving at Samsung's gross profits. PX25G1.4. Finally, Ms. Davis calculated

17 reasonable royalty damages by multiplying the remaining infringing units by a per unit royalty for

18 each infringed patent.    *Id.*; PX25F.16.

19 Samsung showed at trial that Apple's damages claims were unsupported.  The appropriate

20 damages measure was $52,734,959 in Samsung's profits (DX781.002) and $28,452 in reasonable

21 royalties (*see* DX702.008).  Samsung's damages expert, Michael Wagner, testified that Apple

22 was not eligible for any lost profits because it had failed to prove "but for" causation.  That is,

23 Apple failed to show that any Samsung customers who purchased the infringing products would

24 have instead purchased an Apple product "but for" the infringement because there was no

25 evidence that the '915 patented feature drove consumer demand, and there were numerous

26 acceptable non-infringing alternatives available. 11/15/13 Trial Tr. 994:16-995:1, 1007:3-

27 20. Mr. Wagner also testified that Apple's claim to Samsung's profits was overstated because

28 Apple failed to deduct Samsung's operating expenses, which were necessary to make and sell the

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

infringing products.  *Id.* at 1015:5-16.   Finally, Mr. Wagner showed that a reasonable royalty rate would be much lower than Apple's proposal because Samsung would not have agreed to pay more than the cost to design around Apple's patents.   DX702.002.

### B.   The Jury's Verdict

Comparing the jury's damage award for each product with the amounts presented by Apple's expert in PX25F.4 reveals the following:

- For each of the six Samsung devices found to infringe only utility patents (Exhibit 4G, Galaxy Prevail, Galaxy Tab, Nexus S 4G, Replenish, and Transform), the jury awarded 100% of Apple's claimed lost profits and reasonable royalty.   Wagner Decl. ¶ 12.

| Product | Lost Profits Sought by Apple in PX25F.4 | Royalty Sought by Apple in PX25F.4 | Total = Jury Award |
|---------|------------------|------------------|------------------|
| Exhibit 4G | $0 | $2,044,683 | $2,044,683 |
| Galaxy Prevail | $7,327,589 | $14,815,746 | $22,143,335 |
| Galaxy Tab | $6,584,344 | $2,959,682 | $9,544,026 |
| Nexus S 4G | $8,172,989 | $2,386,918 | $10,559,907 |
| Replenish | $0 | $3,046,062 | $3,046,062 |
| Transform | $1,729,350 | $460,749 | $2,190,099 |

- For each of the seven Samsung devices found to infringe both design and utility patents (Captivate, Continuum, Droid Charge, Epic 4G, Gem, Indulge, and Infuse 4G), the jury awarded 100% of Apple's claimed lost profits and reasonable royalty, *plus* 61.3960645 % of Apple's claimed infringer's profits.   Wagner Decl. ¶ 13.   The 61.3960645 % figure is the exact average of the parties' respective total infringer's profits calculations, represented as a percentage of Ms. Davis's total number.   *Id.* at ¶ 14 ($231,373,554 + $52,734,959/2)/ $231,373,533 = 61.3960645 %).   With that percentage in hand, the jury applied it uniformly to the amount Apple sought for infringer's profits for each of the seven products.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

| Product | Lost Profits Sought by Apple in PX25F.4 | Royalty Sought by Apple in PX25F.4 | 61.3960645% of Samsung's Profits Sought by Apple in PX25F.4[1] | Total = Jury Award |
|---|---|---|---|---|
| Captivate | $8,961,578 | $1,957,240 | $10,202,994 | $21,121,812 |
| Continuum | $2,777,984 | $539,394 | $3,161,495 | $6,478,873 |
| Droid Charge | $25,696,440 | $1,340,523 | $33,669,057 | $60,706,020 |
| Epic 4G | $7,152,084 | $4,077,884 | $26,698,726 | $37,928,694 |
| Gem + | $1,406,069 | $702,838 | $2,722,546 | $4,831,453 |
| Indulge | $0 | $290,148 | $9,627,692 | $9,917,840 |
| Infuse 4G | $43,968,916 | $3,327 | $55,971,744 | $99,943,987 |

These calculations show that *$113,777,344* of the verdict represents Apple's purported *lost profits*; *$142,054,256* of the verdict represents *Samsung's profits*; and *$34,625,194* represents Apple's claimed *royalties*.   *Id.* at ¶¶15-17.

## III.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law, New Trial and/or Remittitur

Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) is required where a plaintiff fails to present a legally sufficient basis for a reasonable jury to rule in its favor. *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009). "On post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).   A new trial is appropriate under Federal Rule 59 where "the verdict is against the weight of the evidence, [] the damages are excessive, or [] for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *Rattray v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir. 1994) (new trial to prevent "miscarriage of justice").   "The same rule requiring the trial court to scrutinize the evidence applies to motions for new trial." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012). Remittitur is appropriate under Rule 59 where the damages awarded by the jury exceed the

---

[1]   Rounded to the nearest dollar.

1  "maximum amount sustainable by the proof."   *D&S Redi-Mix v. Sierra Redi-Mix & Contracting*

2  *Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

3        **B.**     **Permissibility of Examining the Nature of the Award**

4        Where the basis for a jury's award is unspecified on the face of the verdict form, a party is

5  permitted to "work[] the math backwards" to determine it.   *Lucent*, 580 F.3d at 1336-37; *see also*

6  *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010).   This Court

7  conducted just such an analysis after the first trial, following the rule of *In re First Alliance*

8  *Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), that a trial court must "acknowledg[e] what is

9  apparent" when a jury uses a consistent formula that can be traced down "to the dollar."   Dkt.

10  2271 at 8-9 (quoting *First Alliance Mortg.*, 471 F.3d at 1002).   Where this reverse engineering

11  makes clear the jury used an impermissible legal theory to award damages, the Court is "forbidden

12  by *First Alliance Mortgage*" to salvage the verdict by "bending over backward" to find some other

13  theory to explain the numbers.   *Id.* at 24; *see also id.* at 10 ("Under *First Alliance Mortgage*, this

14  Court cannot ignore the import of these numbers, even if the evidence as a whole could have

15  supported an award of a similar, or even higher, amount.").[2]

16  **IV.**    **THE RECORD IS INSUFFICIENT TO SUPPORT THE JURY AWARD OF LOST**
       **PROFITS FOR THE '915 PATENT**

17        As demonstrated above, the jury's award includes a total of $113,777,344 in lost profits

18  damages on ten products.   Wagner Decl. ¶15.   To recover lost profits, Apple had to establish

19  that it would have made additional profit but for Samsung's infringement.   *Grain Processing*

20  *Corp. v. Am. Maize-Prods.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999).   The sole method by which

21  Apple attempted to make this showing was the four-factor test enumerated in *Panduit Corp. v.*

22  *Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978).   *See* Dkt. 2719 at 3-4

23  (finding that Apple never disclosed any other theory of lost profits).   At trial, Apple bore the

24  burden of proving each *Panduit* factor.   *See, e.g., Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538,

25  ————————————

26     [2]  Samsung sought to avoid the need for such reverse engineering by proposing a verdict form
that broke out damages for each product by remedy and specified that the jury "may not award
Apple more than one type of remedy ((a), (b), or (c)) for each infringing sale."   Dkt. 2510.

27  Apple's proposed form lacked this specificity (Dkt. 2512), and Samsung objected to its adoption
(Alden Decl. Ex. 1, 11/5/13 Hrg. Tr. 12:16-19).

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   1545 (Fed. Cir. 1995) (*en banc*).

2          The record fails to support the award of lost profits damages for several reasons.   First,

3   Apple failed to show consumer demand for the '915 patented feature.   Second, Apple failed to

4   prove the absence of non-infringing alternatives.   Third, Ms. Davis' market share allocation

5   failed to prove the number of sales Apple would have made despite the availability of acceptable

6   non-infringing alternatives.   Finally, Apple failed to show that it had capacity to make additional

7   iPad sales.   Accordingly, the Court should grant judgment as a matter of law eliminating the

8   jury's lost-profits award.

9          **A.      Apple Presented No Evidence of Demand for the '915 Patented Feature**

10         Apple failed to show that purchasers of the infringing Samsung products were driven by

11   the desire for the '915 patented feature, as opposed to the numerous other features in Samsung's

12   phones.   It was Apple's burden to show consumer demand for the patented feature, not merely

13   demand for the patented product.   Dkt. 2657 at 5-6 (finding Apple must show demand for the

14   patented features "such that consumers would be unwilling to purchase a competing product that

15   lacked the patented features;" and collecting authority); *see also Rite-Hite*, 56 F.3d at 1545-46

16   (lost profits are limited to amounts "lost to the patentee because of the infringement"); *Slimfold*

17   *Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1458 (Fed. Cir. 1991) (affirming denial of lost

18   profits for failure to prove buyers "specifically want" a product with the patented feature); *Calico*

19   *Brand, Inc. v Ameritek Imports, Inc.*, 527 F. App'x 987, 996-97 (Fed. Cir. July 18, 2013) (vacating

20   lost profits award because patentee had no evidence that consumers preferred its patented

21   mechanism to an alternative found in competitors' products).

22         Here, Apple failed to identify a single consumer whose reasons for buying an infringing

23   Samsung product included a desire for the '915 patented feature.   Nor did Apple identify any

24   evidence of consumer demand for the '915 patented feature.   On the critical question of whether,

25   in the absence of the '915 patented feature in the infringing Samsung products, *consumers* would

26   have purchased iPhones and iPads instead, Apple presented no evidence at all.

27

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1. ***Generic Praise for "Ease of Use" Is Insufficient to Show Demand for the '915 Patented Feature***

At trial, Apple introduced evidence of demand for "ease of use."  But this Court has already held that such evidence insufficient to show consumer demand for the '915 patented feature.  Dkt. 2197 at 10 ("Many factors go into making a product easy to use, but the features for which Apple is asserting patent protection are very specific.  A consumer may want a phone that is easy to use, but this does not establish that a tap-to-zoom feature, for example, or any given type of gesture, is a driver of consumer demand.").  Ms. Davis pointed only to demand for "ease of use" in Apple surveys.  *See* 11/14/13 Trial Tr. 650:22-651:7 ("there is clearly demand for ease of use").  However, she subsequently admitted that "ease of use" refers many features, and that none of the surveys in fact asked about the accused features in this case:

> Q.   And you've seen testimony that indicates that that phrase, ease of use, refers to hundreds and hundreds of features; correct?
>
> A.   It certainly refers to lots of features, yes.
>
> Q.   Well, you saw -- you said you've read the testimony. Hundreds? Would you agree it's hundreds? You've seen that testimony?
>
> A.   I don't remember that specific testimony, but that wouldn't surprise me at all.
>
> Q.   And none of those surveys asked a single question about tap to zoom or flicking or the accused, the accused features in this case? Is that correct? Yes or no?
>
> A.   I think that's correct.

*Id*. at 792:10-22; *see also id.* at 734:19-21 ("Q. …Did you do any survey to see why people bought Samsung phones?  A. No, I have not performed any surveys.").

Likewise, Apple senior executive Phil Schiller testified that Apple's surveys studied "ease of use," but admitted that the concept covers hundreds of features.  11/15/13 Trial Tr. 888:18-22 ("Q. And [Apple] asked about ease of use in the surveys; correct?  A. Sometimes, yes.  Q. And that's a broad term. You said it covers hundreds of features; correct?  A. Yes.").  Mr. Schiller also admitted that none of the Apple surveys asked about the accused features in this case:  "Q. Okay. And Apple, to date as far as you know, hasn't done any surveys to ask Samsung buyers who bought the phones with the accused features why they bought those phones, whether it had anything to do with the accused features; correct?  A. Well, I wouldn't -- I haven't and wouldn't

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   …"   *Id*. at 906:4-8.   Apple evidence of demand for "ease of use" was not sufficient to show

2   demand for the '915 patented feature.

### 2.   *Apple's Own Survey Showed that Consumers Chose Android Phones for Features Unrelated to the '915 Patent*

At trial, Apple offered no surveys that asked whether the '915 patented feature influenced consumer purchasing decisions.   Instead, the surveys in evidence established that many features have a real influence on Samsung's customers, none of which has anything to do with the '915 patented feature.   Ms. Davis admitted that Apple itself performed a survey of "top reasons for buying Android among those who considered an iPhone."   11/14/13 Trial Tr. at 736:4-6.   This survey identified the following top reasons for purchasing an Android-based phone among those who considered an iPhone: current wireless service provider, trust in the Google brand, larger screen, the Android Market for apps, better integration with Google services, the latest and greatest smartphone, turn-by-turn GPS navigation, and the latest technology.   DX572.082. None of the reasons for purchasing an Android phone that Apple identified has anything to do with the '915 patented feature.

### 3.   *Samsung's Documents Do Not Show Demand for the '915 Patented Feature*

Apple argued at trial that Samsung's own documents show demand for the '915 patented feature.   They do not.   Apple relied on PX34, a document from a Samsung business involved in supplying chips to smartphone manufactures.   Even Ms. Davis characterized this document as at most showing generic praise for the iPhone's ease of use.

> Q.   What did you find on [PX 34] page 38 that was relevant to your analysis of demand for Apple's products or the patented features?
>
> A.   As you see on this page, it's titled "iPhone effect analysis," and in the middle of the bottom, or on the right, it says "factors that could make iPhone a success," and it lists four such factors.   The first two of those are "easy and intuitive U/I," that means user interface, "that covers all user classes."

11/14/13 Trial Tr. 653:12-20; PX34.38.   Likewise, Apple used PX40 – an internal email about an earlier Samsung business meeting – to show generic praise for the iPhone's user experience.   *See* 11/14/13 Trial Tr. 658:10-659:17 (Ms. Davis reading selective quotes on the iPhone "user experience").   This Court has already held that generic praise for the iPhone's user experience is

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   "too general" to show demand for the '915 patented feature.   Dkt. 2197 at 10.

2   Apple also relied on PX36, a document produced by a third party consultant, Gravity Tank,

3   which purports to report what certain *Apple* customers liked about their phones, including that

4   "gestures like the two fingered pinch and flick add a game-like quality to interactions.   The flip

5   adds a level of cool."   11/14/13 Trial Tr. 656:14-24; PX36.36.   Again, this Court has already

6   found this document insufficient to show demand for the patented features.

> Apple does not have a patent on enlarging pictures and moving them around, but
> rather on a specific way of enlarging pictures.   Nor does Apple have a patent on
> the general concept of a two-finger pinch or flick. . . .   Moreover, evidence of
> what Apple customers like about their phones does not establish that any
> consumers bought Samsung phones because of these same features.   Further, the
> language on which Apple relies consists of quotations that Samsung's consultant
> gathered from individual iPhone users; the quotations do not make any broader
> claims about the market and the factors that influence consumer choice generally.

11   Dkt. 2197 at 10.   None of the documents on which Apple relied speaks to why consumers chose

12   to buy *Samsung* smartphones and tablets, and none concerns the '915 patented feature, as opposed

13   to the unpatented "general concept of a two-finger pinch or flick."   *Id.*

### 4.   *Apple Failed to Identify Any Difference Between the '915 Patented Feature and Non-infringing Alternatives*

16   At trial, Samsung presented evidence that its Intercept (JX1009) and Galaxy Ace (JX1030)

17   phones, which do not infringe the '915 patent, include the feature of one finger to scroll and two

18   fingers to zoom.   *See* 11/13/13 Trial Tr. 468:23-470:11; PDX 29.21-.22 (Apple video showing

19   Intercept and Galaxy Ace using one finger to scroll and two fingers to zoom).   Apple offered no

20   evidence that the non-infringing "one finger to scroll and two fingers to zoom" feature in the

21   Intercept or Galaxy Ace was less important or desirable to consumers than the "one finger to scroll

22   and two fingers to zoom" feature in the products found to infringe the '915 patent.   To the

23   contrary, Apple's expert Dr. Singh admitted that there are "not a lot of differences" between the

24   "one finger to scroll and two fingers to zoom" feature in the Intercept and Galaxy Ace compared

25   to the infringing Samsung devices.   *See* 11/13/13 Trial Tr. 469:15-19, 470:2-6.   Given this

26   uncontroverted evidence, Apple was required to show that there was nonetheless consumer

27   demand for the *infringing* feature.   It did not do so.   Apple failed to present a shred of evidence

28   that consumers preferred the infringing "one finger to scroll and two fingers to zoom" feature to

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1    the non-infringing one.    For this reason alone, the jury's lost profits award should be set aside.

2         **5.**     ***The Hauser Survey Did Not Show Demand for the '915 Patented Feature***

3        Apple will no doubt point to Dr. Hauser's survey as evidence of demand for the '915

4    patented feature.    But the Hauser survey failed to show that, but for Samsung's infringement of

5    the '915 patent, consumers would have purchased Apple devices, rather than non-infringing

6    devices from Samsung or another Android manufacturer.    Dr. Hauser conceded that his survey

7    did not ask Samsung consumers whether they would have switched to Apple if any of the utility

8    patent features had not been in the infringing devices.    11/13/13 Trial Tr. 549:3-14; 11/14/13

9    Trial Tr. 597:4-9. In fact, Dr. Hauser admitted that he did not test "a market for smartphones or

10    tablets in which consumers choose among brands of smartphones or tablets (e.g. Samsung versus

11    Apple)."[3]    11/13/13 Trial Tr. 551:22-552:6, 552:21-24.    At most, Dr. Hauser's survey could

12    provide estimates of amounts Samsung consumers would be willing to pay for the patented

13    features in Samsung devices.    It provides no evidence that Samsung consumers would have

14    purchased an Apple device or any other brand absent the '915 patented feature.    *See id.* at 553:7-

15    8 (conceding that "I have not tried to forecast whether or not people would by a specific brand.").

16        Nor does Dr. Hauser's $39 "price premium" for the '915 feature in a hypothetical Samsung

17    smartphone provide evidence of consumer demand sufficient to sustain an award of lost profits.

18    *First*, Dr. Hauser admitted that his "price premiums" do not reflect what consumers would

19    *actually* pay in the real world.    11/14/13 Trial Tr. 591:8-13; *see also id.* at 519:23-520:7

20    (agreeing that "the amount that consumers are willing to pay for a feature" is not the same as "the

21    market price for that feature").    *Second,* Dr. Hauser failed to estimate "price premiums" for any

22    of the hundreds of other features that go into smartphones and tablets, including marquee features

23    such as screen size, operating system and turn by turn GPS navigation.    Without knowing how

24    the $39 "price premium" for the '915 feature compares to the "price premiums" Dr. Hauser's

25    survey would generate for *other* features, it is not possible to draw any meaningful conclusion

26    about demand for the '915 feature; a similar premium for every feature in the phone would quickly

27
   [3]    Dr. Hauser admitted that such a study could have been done and that he has the
28    qualifications to do it.    11/13/13, Trial Tr. 549:3-24.

1  yield a number exceeding the price of the phone.

2      *Third*, Dr. Hauser recognized that there are numerous smartphone and tablet features

3  unique to Samsung and Android.   *See* 11/14/13 Trial Tr. 593:1-594:16.   But he failed to ask

4  Samsung consumers "how much they valued" them.   *Id.* at 597:10-15; *see also id.* at 611:25-

5  612:4 (agreeing that, "if you wanted to do a study to compare the utility [patent] features to unique

6  Android feature[s] . . . you'd have to include those features in the study").   Absent information

7  about the value Samsung consumers place on the features they would have to give up by switching

8  to Apple, Dr. Hauser's "price premium" for the '915 feature says nothing about whether Apple

9  would have made any of Samsung's sales but for the infringement.

10      *Fourth*, although Dr. Hauser claimed that his survey estimated "price premiums" for the

11  patented features over non-infringing alternatives (11/14/13 Trial Tr. 587:7-11), he failed to show

12  survey respondents the "one finger to scroll and two fingers to zoom" feature in *non-infringing*

13  devices such as the Intercept (JX1009) and the Galaxy Ace (JX1030).   Accordingly, his survey

14  failed to establish that consumers would pay *any* "price premium" for the '915 patented feature

15  over available non-infringing alternatives.

16      *Fifth*, Dr. Hauser failed to determine whether Samsung consumers were even aware of the

17  patented features at the time of purchase (11/13/13 Trial Tr. 542:5-10), and admitted that if

18  consumers were not aware of the features "they wouldn't be willing to pay anything for them" (*id.*

19  at 543:21-23).   Thus, Dr. Hauser's "price premium" provides no evidence that the purchasing

20  decisions of Samsung consumers would have been any different had the '915 patented feature not

21  been included in the seven devices for which the jury awarded lost profits.

22      Furthermore, numerous methodological flaws in Dr. Hauser's surveys render his estimated

23  "price premium" for the '915 patented feature unreliable.   As Dr. Hauser conceded at trial,

24  focusing survey respondents on the patented features might produce a willingness to pay that is

25  "too high."   *Id.* at 522:7-10, 527:23-528:8.   For that reason, he included five additional

26  "distraction features."   *Id.* at 520:8-21.   This did not fix the problem.   By artificially focusing

27  respondents on only six of the hundreds of features that go into smartphones and tablets (including

28  those Apple's own surveys show consumers actually consider in the real world), the survey

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   created a substantial risk of producing a "price premium" for the '915 patented feature that is "too

2   high."   *Id.* at 528:5-8 ("There would be the true willingness to pay and then something I would

3   have caused by the way I asked the questions."); *see also Oracle Am., Inc. v. Google, Inc.*, No. C

4   10-3561, 2012 WL 850705, *9-13 (N.D. Cal. Mar. 13, 2010) (excluding conjoint survey that

5   tested only seven out of many features, noting that "participants in the study were artificially

6   forced to focus on startup time even if in the real world, startup time was unimportant to them,"

7   and "[i]f Dr. Shugan had instead showed 39 different features to a study participant, then startup

8   time (*i.e.*, the patented functionality) may have been drowned out by the multitude of other

9   features that are considered by real-world consumers.").

10       Dr. Hauser further conceded that, in order to "infer willingness to pay," it is important to

11   present survey respondents with "realistic decisions."   11/13/13 Trial Tr. 522:9-14.    Yet, his

12   survey bears no resemblance to the real world in numerous respects, including that survey

13   respondents (a) did not use real money when they made their choices (*id*. at 515:12-15); (b) did

14   not see real products or even images of real products, but rather were given "partial descriptions"

15   of hypothetical products (*id*. at 550:23-551:2); (c) were not permitted to choose among different

16   brands (*id*. at 551:22-552:6, 552:21-24); and (d) were required to make 16 different product

17   choices, each from among 28 different product descriptions, in only 20 to 25 minutes (11/14/13

18   Trial Tr. 579:12-580:8, 11/13/13 Trial Tr. 541:4-23).

19       Most telling are the irrational results of the survey itself.    Out of the hundreds of features

20   that go into a smartphone, Dr. Hauser estimated that Samsung consumers − who on average paid

21   $152 for their Samsung smartphone (11/14/13 Trial Tr. 583:15-20) − would be willing to pay *$100*

22   for just three software features related to the touchscreen, and $39 for the '915 patented feature

23   alone.   11/13/13 Trial Tr. 529:17-25.   None of these features are among those identified in

24   Apple's own market research as important to consumers in making purchase decisions (s*ee*

25   DX572.027), and Apple introduced no evidence to show that the '915 patented feature is even

26   considered by real-world consumers.   Such irrational results are entitled to no weight.   *See*

27   *Oracle Am.*, 2012 WL 850705, *9-13 (citing "conjoint study's own irrational results" as grounds

28   for exclusion); *United States v. H & R Block*, 833 F. Supp. 2d 36, 67-68 (D.D.C. 2011) (finding

-12-

1   conjoint survey unreliable due to "inconsistent and anomalous results").[4]

2       In sum, because Apple failed to show that consumer demand was driven by the '915

3   patented feature, the record fails to support the jury's award of $113,777,344 in lost profits.

4       **B.    The Undisputed Evidence of Available Non-Infringing Alternatives Also Bars
             Lost Profits Damages**

5       An award of lost profits must be based on "sound economic proof of the nature of the

6   market and likely outcomes with infringement factored out of the economic picture," and must

7   take into account "any alternatives available to the infringer."   *Grain Processing*, 185 F.3d at

8   1350-51.   At trial, Apple bore the burden of proving the absence of acceptable non-infringing

9   substitutes, or showing "but-for" sales it would have made despite non-infringing alternatives.

10  *See, e.g., Rite-Hite*, 56 F.3d at 1545 (citing *Panduit*, 575 F.2d at 1156).

11      The undisputed evidence was that Samsung made significant sales of similar products that

12  do not infringe the '915 patent.   *See Grain Processing*, 185 F.3d at 1352 ("[M]arket sales of an

13  acceptable noninfringing substitute often suffice alone to defeat a case for lost profits.").   The

14  evidence also showed that acceptable non-infringing technologies were known and available to

15  Samsung before the accounting period.   *Id.* at 1354.   These facts alone make the jury's lost

16  profit award unsustainable.   *See, e.g., id.* at 1349 ("In the face of this noninfringing substitute,

17  Grain Processing could not prove lost profits."); *Slimfold*, 932 F.2d at 1458 (alleged infringer's

18  possession of its own non-infringing alternative bars lost profits).

19      **1.    *The Intercept Was an Available and Acceptable Non-Infringing
             Substitute***

20

21      It was undisputed that the Intercept was an available non-infringing alternative no later

22  than July 11, 2010, before the commencement of the lost profits period.   11/15/13 Trial Tr.

23  1009:4-5.   The Intercept provided users with all the benefits of the patented invention—Apple's

24      [4]    Dr. Hauser testified that, but for the features covered by the three utility patents, Samsung
25  consumers would not have purchased the phones at issue in the case, although he conceded that
    opinion appeared nowhere in his report.   11/13/13 Trial Tr. 554:20-555:2.   He offered no
26  support for this undisclosed opinion other than his "price premiums" (*see id.*), which for all the
    reasons stated above fail to show demand for the '915 patented feature sufficient to support an
27  award of lost profits, let alone that Samsung consumers would have purchased Apple devices
    rather than another Samsung or Android device but for the '915 patented feature.   Indeed, Dr.
28  Hauser conceded:   "I don't know what phones they're going to switch to."   *Id.* at 548:3-4.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

own technical expert admitted that the Intercept's scrolling and gesture feature is visually identical to that in the infringing products.   11/13/13 Trial Tr. 469:20-470:6 (admitting there are "not a lot of differences" between the infringing products and the Intercept); *see also* PDX29.22.   The Intercept was a commercial success, earning over $271 million in sales (11/15/13 Trial Tr. 1009:6-13), more than the majority of the infringing smartphones (*see* DX676).   *See Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002) ("[S]ales data showing market acceptance of a non-infringing alternative may provide significant evidence that the alternative was acceptable to consumers . . . .").

Ms. Davis conceded that the Intercept was an available non-infringing alternative. 11/18/13 Trial Tr. 1184:10-19.   She nevertheless testified that Apple was entitled to lost profits based on her assumption that the Intercept would have made only its *pro rata* share of the infringing sales.   *See id.* at 1184:20-1186:18.   But Ms. Davis failed to identify any evidence to support this assumption.   A bare assumption is not sufficient to meet Apple's burden to show causation, which required Apple to prove that purchasers of the infringing products would have chosen an iPhone rather than the Intercept.[5]   *See Slimfold,* 932 F.2d at 1458 (upholding denial of lost profits where patentee failed to show that defendant would not have made a substantial portion or the same number of sales using other non-infringing products).   Absent such proof, the Intercept bars Apple's claim to lost profits.

## 2.   The Galaxy Ace Was Another Available and Acceptable Non-Infringing Alternative

The Galaxy Ace was another non-infringing alternative available to Samsung before the lost profits period.   11/15/13 Trial Tr. 970:25-971:1 (Galaxy Ace released February 2011).   As with the Intercept, the Galaxy Ace was a huge commercial success—"one of [Samsung's] biggest sellers of all time" (11/15/13 Trial Tr. 1010:15-19)—and Dr. Singh was unable to identify any

---

[5]   Nor does PX69 justify Ms. Davis' treatment of the Intercept.   On its face, PX69 cautions that the Intercept's customer satisfaction rating is based on a small sample size.   *See* PX69.85 ("Caution: small sample size").   Moreover, even this small sample was drawn from the wrong population.   PX69 measures satisfaction among *existing* Intercept users.   It is not evidence of whether consumers who wanted to purchase a Samsung phone would have switched to Apple based on their desire for the '915 patented feature.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   difference between the non-infringing scrolling and gesture feature of the Galaxy Ace and the

2   infringing feature in the products for which the jury awarded lost profits.   11/13/13 Trial Tr.

3   469:3-19.   Yet, Ms. Davis openly admitted that she failed to account for the Galaxy Ace as a

4   non-infringing alternative.   11/18/13 Trial Tr. 1187:17-1188:1.

5         Ms. Davis claimed that the Galaxy Ace was not an "available" substitute because it

6   infringed the '381 and '163 patents.   *See, e.g.,* 11/14/13 Trial Tr. 747:11-18, 750:17-19; 11/18/13

7   Trial Tr. 1188:4-5.   The Court has already rejected this claim.   *See* Dkt. 2657 at 8-9 (finding no

8   support for a "legal rule that a product that infringes other patents . . . is automatically incapable of

9   serving as an acceptable noninfringing alternative to the patents for which the patentee is seeking

10  lost profits.").   Furthermore, Ms. Davis's testimony contradicted her own damages model.   As

11  the Court already recognized, "[u]nder Davis's lost profits damages model . . . the design around

12  periods for the ['381 and '163] patents ended well before the dates on which Apple first became

13  eligible for infringement damages."   Dkt. 2719 at 2.   Ms. Davis assumed that Samsung would

14  have designed around the '381 and '163 patents by July 31, 2010 and February 4, 2011,

15  respectively. 11/18/13 Trial Tr. 1200:15-1201:17.   Thus, in the "but for" market as *Ms. Davis*

16  *herself constructed it*, the Galaxy Ace would not have infringed any asserted Apple patent when

17  the lost profits period began on April 15, 2011.   *See id.* at 1202:3-12.   Therefore the Ace would

18  have been an additional acceptable noninfringing substitute during the damages period, precluding

19  any award of lost profits.

20        Ms. Davis next claimed that the Galaxy Ace was not "available" because it was only sold

21  internationally.   *Id.* at 1188:6-10.   This argument is foreclosed by the jury's findings of

22  infringement in the first trial.   The jury's finding that the Galaxy Ace infringed the '381 and '163

23  patents necessarily required a determination that it was sold or offered for sale in the United

24  States.   *See* 35 U.S.C. § 271(a).   Apple cannot have it both ways—arguing that the Ace was sold

25  in the United States for purposes of infringement, but not sold in the United States for purposes of

26  non-infringing alternatives.   The uncontroverted evidence that the Galaxy Ace was an available

27  and acceptable non-infringing alternative also bars Apple's lost profits claim.

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

3.  *Samsung Could Have Designed Around the '915 Patent*

At trial, Ms. Davis did not dispute that Samsung could have redesigned the infringing products with non-infringing alternative technology that would have been equally acceptable to consumers.  *See* 11/14/13 Trial Tr. 663:11-18.  Ms. Davis assumed that Samsung would begin this design around process on November 30, 2010, and would complete this process six months later.  *Id.* at 663:6-10, 664:12-665:4; PDX100.11.  She admitted that Apple would not be entitled to lost profits if Samsung could have completed the design around process before April 15, 2011.  *Id.* at 744:6-12, 750:21-751:6; SDX 8002.017.  Thus, in awarding lost profits damages, the jury accepted Ms. Davis's assumption that Samsung could *not* have completed the design-around process before April 15, 2011.[6]  *Id.* at 661:13-662:10.

However, the undisputed evidence was that Samsung had *already* developed non-infringing alternative technology before April 15, 2011, and thus had no need to design around the '915 patent.  *See Grain Processing*, 185 F.3d at 1354 (patentee not entitled to lost profits where defendant had "all of the necessary equipment, know-how, and experience" to switch to a non-infringing alternative that was "well known in the field" prior to the accounting period).  Samsung first implemented this non-infringing technology in the Intercept in July 2010, more than four months before the '915 patent even issued.  11/15/13 Trial Tr. 1009:4-5 (Intercept released July 11, 2010).[7]  Samsung replicated this technology in February 2011, when it released the Galaxy Ace—a product which became one of its biggest sellers.  *Grain Processing*, 185 F.3d at 1351 ("[M]arket sales provide significant evidence of availability as a substitute.") (internal quotation marks omitted).  The Intercept and Galaxy Ace—regardless of whether these products themselves suffice to defeat Apple's claim for lost profits—indisputably proved that non-

---

[6]   The only evidence Ms. Davis cited in support of this assumption was her conversation with a single Apple engineer who told her that the design around process would take six months. 11/14/13 Trial Tr. 743:17-22.   Ms. Davis did not do anything to investigate Samsung's ability to design around the '915 patent other than read Mr. Wagner's report.  *Id.* at 746:8-15.   In contrast to Ms. Davis's six-month design around period, Mr. Wagner assumed that Samsung could have designed around the '915 patent in four weeks, based on discussions with the Samsung engineers with knowledge of Samsung's design around capability.   11/15/13 Trial Tr. 1027:25-1029:2; DX 702.002.

[7]   In fact, the Intercept predated all of the products at issue.   *See* SDX7008.1; JX1500A2.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   infringing alternative technologies were available to Samsung before the lost profits period.

2       Moreover, Apple's expert Dr. Singh admitted that there were numerous prior art methods

3   of using one finger to scroll and two fingers to zoom known in the field that do not practice the

4   '915 patent, including the Jefferson Han system, the Nomura patent, and the FractalZoom

5   application.  *See* 11/13/13 Trial Tr. 455:2-459:23; *see also* SDX 8003.003; SDX 8003.005; SDX

6   8003.007.  Apple did not dispute that all of these three prior art systems were non-infringing

7   alternatives to the '915 patented feature.  Dr. Singh also admitted that the '915 patent could be

8   avoided simply by using three fingers to scroll, as in the Diamondtouch system.   11/13/13 Trial Tr.

9   458:18-459:23.  These uncontroverted admissions confirm that non-infringing alternatives to the

10  '915 patent were not only available, but "well known in the field" before the lost profits period.

11  *See Grain Processing*, 185 F.3d at 1354.   That the PTO has since found the '915 patent invalid

12  reinforces the fact that numerous non-infringing methods of scrolling and zooming were known in

13  the art before November 30, 2010, and certainly before April 2011.

14      Finally, the trial evidence established that Samsung was more than capable of quickly

15  implementing changes to its software.   Indeed, Apple argued that Samsung completed the *entire*

16  *design process* for the original Galaxy S product in just *three months* (*id.* at 1048:19-22),

17  discrediting Ms. Davis's assumption that Samsung would have needed *twice as long* to redesign

18  just a *single feature*.   Samsung releases a brand new product every single week (*id.* at 971:22-

19  23), and regularly updates its software even after releasing products onto the market.   *See, e.g.,*

20  *id.* at 963:11-13 (Samsung "do[es] several software upgrades over the life of the device"); *id.* at

21  995:16-996:11 (Samsung updates its software as often as once every month); PX60.38 (Samsung

22  launched at least 18 upgrades in 2011); PX58.19 (planning multiple operating system upgrades to

23  Galaxy Tab in 2011).   This evidence—and Apple's failure to offer any evidence to the

24  contrary—demonstrates that Samsung had all of the equipment, know-how, and experience

25  needed to implement non-infringing software in the infringing products in less than six months.

26      In short, the question of whether Samsung had available and acceptable non-infringing

27  substitutes is not even a close call.   The trial record is unambiguous: Samsung had available and

28  acceptable non-infringing products and technology before the lost profits period.   The Court

1    should grant judgment as a matter of law eliminating the jury's lost-profits award.

2    **C.    Apple Failed to Allocate Its Purported Lost Profits Based on Demand for the '915 Patented Feature**

3    Final Jury Instruction No. 22 instructed the jury that it "must allocate the lost profits based

4    upon the customer demand for the patented feature of the infringing products.    That is, you must

5    determine which profits derive from the patented invention that Samsung sells, and not from other

6    features of the infringing products."    Dkt. 2784 at 28.    Apple failed to provide evidence

7    enabling the jury to do so.    Although Ms. Davis admitted that numerous features in the infringing

8    Samsung devices are important to consumers (11/14/13 Trial Tr. 670:20-671:3, 734:22-735:4), she

9    failed to present the jury with any calculation of the proportion of Samsung's profits purportedly

10   derived from the '915 patented feature, as opposed to "other features of the infringing products."

11   *Id.*    The jury thus had no basis to perform any allocation of Apple's purported lost profits "based

12   upon the customer demand for the" '915 patented feature, as required by the Jury Instruction.

13   For this reason too, the jury's lost profits award should be set aside.

14   **D.    The Evidence Is Insufficient To Support Lost Profits Based on Apple's *Pro Rata* Share of the Market**

15   In certain circumstances, patentees may rely on market share data to account for non-

16   infringing alternatives.    *See, e.g.*, *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218

17   (Fed. Cir. 1993).    The patentee, however, still bears the burden of proving that it would have

18   made its *pro rata* share of the infringing sales.    *See id.* (reversing lost profits award based on

19   market share where patentee "did not show with reasonable probability that [defendant's]

20   customers would have purchased from [the patentee] in proportion with [the patentee's] market

21   share.").    The patentee must prove that the patented products and the infringing products are so

22   similar in terms of price and product characteristics that the infringer's customers would "transfer

23   their demand to the patent owner's product in the absence of the infringer's product."    *Id.* at 1218

24   (*Panduit* factors "presuppose that demand for the infringer's and patent owner's products is

25   interchangeable" and that the patentee's products would "be acceptable to the infringer's

26   customers"); *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1356

27   (Fed. Cir. 2001) ("a patentee must show that the infringing units do not have a disparately higher

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   price than or possess characteristics significantly different from the patented product.").

2       Here, Apple failed to show that *any* of Samsung's customers would have purchased an

3   iPhone in the absence of the infringing products.   *First*, Ms. Davis failed to account for

4   fundamental differences between the infringing products and the iPhone, which make it highly

5   unlikely that Samsung's customers would have switched to the iPhone in the absence of the

6   infringing products.   *Second*, Apple offered no evidence to support the conclusion that the

7   infringing smartphones were sold at prices comparable to the iPhone.   And *third*, Apple offered

8   no evidence that the Galaxy Tab competed in the same market segment as the iPad.

9       **1.    *Ms. Davis Failed to Account for Significant Differences Between the Infringing Products and Apple's Products***

10      Ms. Davis allocated the infringing sales based on market share data without any attempt to

11  adjust her allocation for differences in product characteristics that segment the smartphone market.

12  Rather, she simply assumed that a market share allocation would account for these differences,

13  telling the jury it should assume that purchasers of the infringing products "would behave like

14  other people behave in the real market and they will make decisions similar to other people in the

15  real market."   11/14/13 Trial Tr. at 671:4-20.   This assumption was belied by the testimony of

16  Apple's own survey expert, unsupported, and in fact contrary to the overwhelming weight of the

17  evidence at trial, which showed that Samsung customers were far more likely to purchase another

18  Samsung or Android product than an iPhone.

19      Dr. Hauser testified that he could not predict consumer behavior based on market share

20  data without additional information regarding "people's preferences with respect to brand."

21  11/14/13 Trial Tr. 602:3-17; *see also id.* at 598:9-24, 599:14-600:6.   Yet, this is exactly what Ms.

22  Davis did.   The evidence at trial confirmed that each of the infringing products is fundamentally

23  different from Apple's products in terms of operating system and brand.   Consumer loyalty based

24  on operating system and brand are defining characteristics of the smartphone market, as Apple

25  itself has argued throughout this litigation.   *See, e.g.,* Dkt. 1982 at 4-5 ("smartphone purchasers

26  are likely to develop brand and platform loyalty that will affect future sales"); Dkt. 1982-2 at ¶ 23

27  (the smartphone market "exhibits a unique set of characteristics . . . includ[ing] strong customer

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1  loyalty and platform stickiness as a result of perceived high switching costs"); *id.* at ¶ 28

2  ("Apple's customers tend to be loyal to Apple, and Android customers tend to be loyal to

3  Android."). Ms. Davis repeatedly acknowledged that consumers have "distinct preferences"

4  based on operating system and brand. *See, e.g.,* 11/14/13 Trial Tr. 670:20-671:3.

5        The trial evidence also established the existence of key product features that are unique to

6  Samsung and Android products. For example, Apple's own documents showed that numerous

7  Android products offered a significantly larger screen size than the iPhone. DX712.055; *see also*

8  DX712.005; DX712.010; DX712.017. Similarly, Samsung and Android phones offered clear

9  advantages in terms of 4G capability (*compare* 11/15/13 Trial Tr. 902:24-903:8 *with id.* at 970:16-

10  24), GPS navigation (11/14/13 Trial Tr. 740:13-23), and battery life (DX712.052). Apple's

11  surveys identified these features as important drivers of consumer demand for Samsung and

12  Android products. ████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ██████████████████; DX572.082 (top reasons for choosing Android included "preferred larger

15  screen," "turn by turn GPS navigation," and battery life); *see also* 11/15/13 Trial Tr. 997:5-

16  1001:13 (Mr. Wagner summarizing Apple surveys showing Android purchases are driven by

17  features for which Samsung is the market leader); DX701.005.

18        Having already made the deliberate decision to choose the Android operating system and

19  the Samsung and Google brands over Apple and iOS, the evidence showed that Samsung

20  consumers were far more likely to turn to other Samsung or Android products. An ████████

21  ████████████████████████████████████████████████████████████

22  ██████ The same survey showed that 75% of Android buyers did not even consider the iPhone.

23  DX572.082. Among the 25% of Android users willing to consider the iPhone, "trusted the

24  Google brand" was the second most frequently cited reason for choosing an Android product over

25  iPhone. *Id.*; *see also* DX701.005 (summarizing Apple surveys showing that ██████████████

26  ████████████████████████████████████ from Q2 2010 – Q2 2011.)

27  A J.D. Power study similarly found that at least 56% of Samsung buyers were likely to buy

28  another Samsung product. PX69.61. Ms. Davis herself acknowledged that Apple surveys

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

showed that consumer purchasing decisions are heavily influenced by features that are unique to Samsung and Android products.   11/14/13 Trial Tr. 734:22-735:4; *see also id.* at 593:1-594:16, 595:19-596:5 (Dr. Hauser's testimony that Samsung products offer different features that are potentially determinative of consumer purchasing decisions). She further admitted that Samsung's customers had already expressed their preferences by virtue of their decision to buy a Samsung and Android product.   *Id.* 758:13-19.

Given this mountain of evidence, including admissions by Dr. Hauser and Ms. Davis herself, that Samsung consumers were far more likely to turn to other Samsung or Android products, no reasonable juror could have accepted Ms. Davis's contrary assumption that purchasers of the infringing products would behave just like everybody else, as if they had never expressed any prior preference for a Samsung Android-based product.   Because this unsupported assumption is the foundation for Ms. Davis's lost profits analysis, and in turn the jury's lost profits award, the award cannot stand.

### 2.   *Ms. Davis Did Not Consider Price Disparities Between the Infringing Samsung Smartphones and the iPhone*

At trial, Apple had the burden to prove that each of the products on which it sought lost profits damages competed in the same price segments as the iPhone.   *See BIC Leisure*, 1 F.3d at 1218 (clear error not to account for the fact that defendant was selling to the entry level consumer, whereas patentee's products were high end).   While Apple offered evidence of competition between Apple and Samsung generally (*see, e.g.,* PX60.8 (smartphone market becoming a "Two Horse Race"); PX3040 at 115:18-116:19 (Pendleton Dep.) (Apple and Samsung compete in various price segments)), it failed to offer any evidence that the infringing Samsung phones had prices comparable to the iPhones which Apple claimed it would have sold.   In fact, Apple offered no evidence at all showing the retail prices of the iPhone.   This alone renders Apple's reliance on a market share allocation unsustainable.   *Crystal Semiconductor,* 246 F.3d at 1356 ("a *patentee* must show that the infringing units do not have a disparately higher price than . . . the patented product") (emphasis added).

The pricing-related evidence in the record showed that many of the infringing smartphones

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1  were priced significantly lower than the iPhone.   According to a March 2011 J.D. Power study,
2  the average retail price of the iPhone was $206, compared to the $139 average retail price for
3  Samsung's smartphones.  *See* PX69.24; 11/15/13 Trial Tr. 1002:6-15.   Dr. Hauser's survey also
4  confirmed a price disparity, showing that respondents paid just $152 on average for their Samsung
5  phones.   11/14/13 Trial Tr. 583:15-20.   In fact, for many of the products at issue, Samsung's
6  *unsubsidized* wholesale price was lower than the average *subsidized* retail price of the iPhone.
7  *See* DX952.012.   Apple presented no evidence that consumers who purchased these low-price
8  phones would have purchased the more expensive iPhone.  *See* DX2709.61 ████████████

9  ████████████████████████████████████████████████████████████████

10  ████████████████████████████

11           **3.     *Apple Failed to Show That the Galaxy Tab Competed With the iPad***

12           Apple also failed to show lost profits on the Galaxy Tab because it presented no evidence
13  that the Galaxy Tab competed in the same market as the iPad.   Apple itself viewed seven-inch
14  tablets such as the Galaxy Tab as competing in a different market segment than the 9.7" iPad.
15  11/15/13 Trial Tr. 1006:20-1007:2; DX 2522.01 (internal email written by an Apple executive
16  stating that "I believe there will be a 7" market," and that Apple should develop a 7" tablet to
17  compete with the Galaxy Tab).   The Galaxy Tab was also sold at significantly lower prices.   In
18  the second calendar quarter of 2011, the average selling price of the Galaxy Tab was just $368,
19  compared to ████████ for the carrier-enabled versions of the iPad 2.[8]   DX952.010.   Ms.
20  Davis never even calculated the selling price of the Galaxy Tab, much less account for how price
21  disparities would impact consumer demand.   *See* 11/15/13 Trial Tr. 1005:21-1006:1.   Instead,
22  Ms. Davis simply assumed that 75% of consumers who bought the Galaxy Tab would have
23  purchased an iPad.   *Id.* at 1006:9-19.   There is no trial evidence to support that assumption, and
24  the jury's lost profits award for the Galaxy Tab should be vacated.

25

26

27       [8]   As Mr. Wagner explained, the Galaxy Tab model at issue is supported by 3G networks, as
     opposed to the WiFi-only version.   11/18/13 Trial Tr. 1005:15-19.   Thus, the proper price
28   comparison for Galaxy Tab is with the 3G-enabled versions of the iPad.   *Id.*

E.     **Apple Lacked Capacity to Make Additional Tablet Sales**

The evidence also fails to show that Apple had the capacity to manufacture and sell additional iPads during the lost-profits period (April 15, 2011 - May 29, 2011).   The lost-profits period falls squarely within a period of severe backlogs for the iPad 2.   11/15/13 Trial Tr. 1011:21-1012:10.   Tony Blevins, Apple's Vice President of Procurement, admitted that Apple was "sold out" of the iPad 2 in March and April 2011.   11/13/13 Trial Tr. 498:9-19.   Despite Apple's efforts to increase supply as quickly as possible, Apple "didn't have enough supply" to meet demand for the iPad 2 until June 2011—*after* the lost-profits period.   *See id.* at 501:23-502:3; *see also id.* at 503:12-20 ("it took us several months to support as many as [consumers] wanted, that's correct."); *id.* at 506:12-22 ("So despite Apple's best effort with regard to . . . iPad 2, there were months when there wasn't enough on the shelves for people to make the sales; correct?   A:   Yes, I would agree with that.").   Apple's own exhibit showed that ███████████████ ███████████████████████████████████████████████████████████████████[9]

*See* PX25F.15.

No Apple witness testified that Apple had additional capacity during the lost-profits period.   Instead, Apple's witnesses misleadingly focused on quarters either before or after the lost-profits period.   For example, Ms. Davis testified that Apple had excess capacity during the *second* fiscal quarter of 2011—*before* the start of the lost profits period.   11/14/13 Trial Tr. 673:5-674:6.   Similarly, Mr. Blevins testified that Apple had capacity to increase supply of the iPad 2 during the third and fourth *calendar* quarters of 2011—*after* the lost profits period ended.   11/13/13 Trial Tr. 499:13-23 (testimony regarding "the third and fourth calendar reports").[10]   The

---

[9]     Apple's third fiscal quarter corresponds to the second calendar quarter, spanning April through June.   *See* 11/15/13 Trial Tr. 1012:11-1013:6; *see also* Alden Decl. Ex. 2 (glossary of terms included in juror notebook stating that "Apple Inc. follows a fiscal calendar that begins on October 1 and ends on September 30 of the following year").

[10]     Mr. Blevins' testimony that Apple continued to manufacture the original iPad after releasing the iPad 2 was similarly misleading.   As Mr. Blevins later "clarified," Apple stopped manufacturing the original iPad in FYQ3'11.   11/13/13 Trial Tr. 508:15-509:1 ("[W]e were manufacturing both in the second fiscal quarter . . . . The following quarter we stopped manufacturing the iPad 1.");  *see also id.* at 505:14-506:6 (PX182 shows no increase in the number (footnote continued)

only time period relevant to lost profits is Apple's third fiscal quarter (second calendar quarter) of 2011.   Apple offered no evidence of excess iPad capacity during that time.   For this reason too, the Court should enter judgment eliminating the jury's lost-profits award.

## V.   THE JURY'S ROYALTY AWARD SHOULD BE SET ASIDE

### A.   The Record Lacks Sufficient Evidence to Support the Jury's Reasonable Royalty Award

The jury awarded Apple $34,625,194 in reasonable royalty damages—the exact amount presented by Ms. Davis in her primary damages calculation.   Wagner Decl. ¶ 16; PX25F.2. Under controlling Federal Circuit law, the Court should strike the award because Apple introduced insufficient evidence to support it.

In *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012), the patentee brought an action alleging infringement of patents directed to automating delivery of professional services and to technology for backing up client data.   *Id.* at 17.   The jury awarded approximately $8 million in reasonable royalty damages.   *Id.* at 26.   However, the Federal Circuit "remand[ed] for a new trial on damages because the jury's damages verdict [wa]s unsupported by the record."   *Id.* at 18.   Importantly, the Federal Circuit observed:

> We do not require that witnesses use any or all of the *Georgia–Pacific* factors when testifying about damages in patent cases.   If they choose to use them, however, reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration. . . .   Expert witnesses should concentrate on *fully* analyzing the *applicable* factors, not cursorily reciting all fifteen.   And, while mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed.

*Id.* at 31 (citation omitted; emphasis in original); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012) (holding that the district court erred by not granting a new trial on damages because the expert's reasonable royalty opinion was "arbitrary and speculative" and the royalty rate was "untethered from the patented technology at issue."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (holding that evidence

---

of salable units of the original iPad during FYQ3'11); *id.* at 509:17-510:3 ("Q3 we stopped"); PX25F.15 (no excess unused capacity of the original iPad during FYQ3'11).

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   purporting to support application of the *Georgia-Pacific* factors "must be tied to the relevant facts

2   and circumstances of the particular case at issue and the hypothetical negotiations that would have

3   taken place in light of those facts and circumstances at the relevant time.").

4          In *Whitserve*, the plaintiff's damages expert offered the jury a "generalized discussion of

5   the *Georgia-Pacific* factors," including that "it is appropriate to adjust the [royalty] rate up or

6   down using the *Georgia-Pacific* factors" and "that almost all factors justified an increase in the

7   applicable rate, a few were neutral in terms of their impact, and none justified a decreased rate."

8   *Id.*   Nonetheless, because the expert "did not explain how much each factor affected the rate"

9   (*id.*), and in particular how he converted a royalty rate based on *profit* to one based on *revenue* (*id.*

10  at 32-33), the court found his testimony insufficient to support the jury's award.   "Without some

11  guideposts, the task of determining a reasonable royalty under 35 U.S.C. § 284 is impossible.

12  'The law does not require an expert to convey all his knowledge to the jury . . .' *Lucent*, 580 F.3d

13  at 1329.   But we have also said that 'superficial testimony' and the simple recitation of royalty

14  numbers that happen to be in the ballpark of the jury's award will not support the jury's award

15  when no analysis is offered to the jury which would allow them to evaluate the probative value of

16  those numbers."   *Id.* at 32 (citation omitted).

17         Here, Ms. Davis' testimony concerning a reasonable royalty was even more superficial

18  than that found inadequate in *Whitserve*.   In *Whitserve*, the plaintiff's expert at least identified

19  each of the fifteen *Georgia-Pacific* factors and testified generally as to whether they affected the

20  rate positively, negatively or not at all.   *Id.*   at 31.   In contrast, while Ms. Davis testified that

21  she used a "*Georgia-Pacific* analysis" (11/14/13 Trial Tr. at 706:14), she did not even bother to

22  identify all the factors, let alone "*fully* analyz[e] the *applicable*" ones.   *Id.*   Rather, Ms. Davis

23  identified just *one factor* that she found "particularly relevant" (*id.* at 706:22)—"the relationship

24  between the parties" (*id.* at 706:23-24)—and then conclusorily asserted that "Samsung and Apple

25  are direct competitors, and typically one would expect a royalty agreement, or a license agreement

26  to have higher royalties between competitors than the one that does not . . . ."   (*id* at 706:23-

27  707:2).   That was the extent of Ms. Davis's explanation of her *Georgia-Pacific* analysis.   Ms.

28  Davis offered no "explanation of both why and generally to what extent" any particular *Georgia-*

-25-                          Case No. 11-cv-01846-LHK

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   *Pacific* factor affected her analysis.    *Whitserve*, 694 F.3d at 31.

2          Apple will no doubt argue that Ms. Davis's testimony was sufficient.    It is certainly true

3   that Ms. Davis testified:    (a) as to what a reasonable royalty is (*id.* at 703:23-704:6); (b) that she

4   generally used a *Georgia-Pacific* analysis and "three different methods to arrive at reference

5   points," including one sentence descriptions of each of those methods (*id.* at 705:2-706:18); (c)

6   that she found one *Georgia-Pacific* factor "particularly relevant" (*id.* at 706:21-707:6); (d) as to

7   her ultimate "conclusions as to the reasonable royalty rate" for each patent, and that the rates are

8   additive (*id.* at 707:7-709:2); and (e) that she multiplied her rates by the number of infringing units

9   to arrive at her $34.6 million total (*id.* at 709:3-15).    It is also true that Apple introduced Ms.

10  Davis's final rates and "reference points" into evidence (PX25F.16), along with a "Summary"

11  table showing Ms. Davis's royalty calculations per product per month (PX25G1.4).

12         Critically, however, Ms. Davis provided no testimony explaining how she arrived at either

13  her "reference points" or final royalty rates, either in the context of the *Georgia-Pacific* factors or

14  otherwise.    This is precisely the type of superficial presentation the Federal Circuit found

15  insufficient to support a reasonable royalty award.    *Whitserve*, 694 F.3d at 32 ("'[S]uperficial

16  testimony' and the simple recitation of royalty numbers that happen to be in the ballpark of the

17  jury's award will not support the jury's award when no analysis is offered to the jury which would

18  allow them to evaluate the probative value of those numbers.").    The jury had no way to assess

19  the "reasonableness" of Ms. Davis's royalty rates because it was given no explanation of how she

20  arrived at them.    It was Apple's burden, not Samsung's, "to persuade the court with legally

21  sufficient evidence regarding an appropriate reasonable royalty." *ResQNet.com, Inc. v. Lansa,*

22  *Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (citation omitted).    Although it had every opportunity to

23  do so, Apple did not satisfy its burden.

24         **B.      The Evidence Is Insufficient To Support Any Apportionment Of Apple's**
                   **Royalty Between Patented and Unpatented Features**
25         The record lacks any evidence apportioning Apple's royalty award.    Apple itself

26  recognizes that "the patentee . . . must in every case give evidence tending to separate or apportion

27  the defendants' profits and the patentee's damages between the patented feature and the

28

1  unpatented features, and such evidence must be reliable and tangible, and not conjectural or

2  speculative." *Uniloc*, 632 F.3d at 1318  (quoting *Garretson v. Clark*, 111 U.S. 120, 121

3  (1884)); *see Mirror Worlds, LLC v. Apple Inc.*, 784 F. Supp. 2d 703, 726 27 (E.D. Tex. 2011)

4  (granting Apple's JMOL to vacate a jury's damages award because of the patentee's failure to

5  apportion as required by *Uniloc*).   But Apple failed to provide such apportionment evidence here.

6          At trial, Mr. Wagner testified that Ms. Davis did not undertake any apportionment under

7  *Georgia-Pacific* factor number 13—"[t]he portion of the realizable profits that should be credited

8  to the invention as distinguished from nonpatented elements, the manufacturing process, business

9  risks, or significant features or improvements added by the infringer."   *Georgia-Pacific Corp. v.*

10  *United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).   In cataloguing the

11  deficiencies of Ms. Davis's royalty opinion, Mr. Wagner explained:

12          [T]he real problem, even if that part of the analysis [*i.e.,* using brand value] is
            correct, she stopped there.   The number that she [Ms. Davis] used to approach the
13          patents at issue is really what's left over for all the patents that – utility patents that
            Apple has.   So she didn't do proper apportionment under what's called *Georgia-*
14          *Pacific* factor number 13, which she says she considered.

15  11/15/13 Trial Tr. at 1026:15-21.   As Mr. Wagner further explained, "[t]he effect of that is, in

16  effect, the rate she [Ms. Davis] has is like a license for *all* of Apple's utility patents, not just the

17  three utility patents in this lawsuit."   *Id.* at 1026:23-25 (emphasis added).

18          Apple failed to offer a shred of evidence that Ms. Davis had undertaken the required

19  apportionment either in its case-in-chief or in response to Mr. Wagner's opinion.   Although

20  Apple called Ms. Davis in rebuttal, she did not respond to Mr. Wagner's apportionment criticism.

21  Accordingly, not only did Apple fail to provide any evidence of apportionment, but Mr. Wagner's

22  testimony on Ms. Davis's failure to apportion her royalty was uncontroverted.   There was thus

23  insufficient evidence to support Ms. Davis's royalty numbers, which the jury ultimately accepted.

24  The Court should enter judgment striking the royalty award for this reason as well.

25  **VI.    THE JURY'S AWARD OF INFRINGER'S PROFITS SHOULD BE SET ASIDE**

26  **A.    No Reasonable Jury Could Hold that Samsung Failed to Prove That All of its
             Operating Expenses Are Deductible**

27          The jury's award included a total of $142,054,256 in Samsung's profits on seven phones:

28

1   Captivate, Continuum, Droid Charge, Epic 4G, Gem, Indulge, and Infuse 4G.   (Wagner Decl.

2   ¶17.)   As explained in Section B, above, this amount is the result of an improper calculation that

3   split the difference between Apple's and Samsung's respective calculations of Samsung's total

4   profits.   (*See id*. at ¶13.)   By refusing to answer the question of what operating expenses are

5   deductible, the jury returned an improper compromise verdict.   "A compromise verdict

6   demonstrates that [the] jury failed to give due regard to the evidence."   *James v. Sheklanian*, No.

7   08-cv-01943, 2010 WL 3504804, at *4 (E.D. Cal. Sep. 7, 2010); *see also Romberg v. Nichols*, 970

8   F.2d 512, 521 (9th Cir. 1992), *vacated on other grounds*, 506 U.S. 1075 (1993) ("Part of a district

9   court's function, however, is to prevent such 'Solomonic solutions' by the jury.   When a jury

10   compromises its verdict, its verdict should not stand."); *Nat'l Fire Ins. Co. of Hartford v. Great*

11   *Lakes Warehouse Corp.*, 261 F.2d 35, 38 (7th Cir. 1958) (reversing the trial court's denial of a

12   motion for new trial where the jury awarded one-half of the amount of loss as established by the

13   undisputed evidence at trial).

14       There is no rational basis for an award that simply "splits the baby" and deducts an

15   estimated percentage of operating expenses, but not all operating expenses, in the product-by-

16   product calculations of Samsung's total profits.   The evidence was uncontroverted that Samsung

17   incurred operating expenses in the sale and manufacture of the seven phones at issue, and that

18   these expenses had the requisite nexus with that sale or manufacture.   Samsung introduced

19   DX676, a spreadsheet which shows detailed operating expenses for each phone.   Tim Sheppard,

20   Vice President of Finance and Operations at Samsung Telecommunications America, testified that

21   each Samsung entity uses the same computer-based accounting system from S.A.P.   11/15/13

22   Trial Tr. at 956:17-958:1.   In particular, Samsung's S.A.P. database includes the costs associated

23   with each product.   *Id*. at 958:2-9.   Included in these costs are operating expenses necessary to

24   sell the products at issue, such as sales expenses, G&A expenses, R&D expenses, and marketing

25   expenses.   *Id*. at 960:19-964:10.   Mr. Sheppard testified that Samsung uses the same three-step

26   allocation methodology throughout the company (*id*. at 964:18-965:16; 967:15-17), and that

27   Samsung's allocation methodology is "very common."   *Id*. at 965:17-22 ("The requirement is

28   taught in most accounting schools, and it's a requirement on the part of the U.S. or the U.K. CPA

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   exam to actually study and take a test in this area.").   Mr. Sheppard testified that the data on

2   operating expenses in DX676 comes from Samsung's audited S.A.P. database, and that he

3   personally took steps to verify that the data in DX676 was identical to the data in the S.A.P.

4   database.   *Id.* at 968:3-17.)   Apple did not rebut this evidence and testimony.

5          The jury received Mr. Wagner's calculations of Samsung's total profits on each phone,

6   calculated by subtracting the deductible operating expenses.   DX781.002 (total profits of

7   $52,734,959).   The jury also heard testimony from Mr. Wagner that these operating expenses are

8   necessary for the sale and manufacture of the phones (11/15/13 Trial Tr. at 1015:5-1016:21), and

9   further that, as in any complex organization, there are many common costs that are directly

10  attributable to the sale and manufacture of the phones.   11/18/13 Trial Tr. at 1136:2-20.

11         Apple did not dispute Samsung's evidence of its operating expenses, instead taking the

12  position that no operating expenses should be deducted at all.   11/14/13 Trial Tr. at 695:13-22.

13  However, Ms. Davis admitted that operating expenses are necessary to sell products.   11/18/13

14  Trial Tr. at 1191:14-19 ("Q. …And you agree that operating expenses are necessary, generally, in

15  order to sell a product?   A. I do."); *see also id.* at 1192:3-9 (Ms. Davis admitted that a

16  management organization is necessary to make and sell products).

17         Rather than confine itself to the testimony and evidence presented, the jury reached a

18  compromise verdict by splitting the difference between Apple's and Samsung's infringer's profits

19  numbers.   In particular, the jury awards uniformly apply a 61.3960645% factor to Apple's

20  product-by-product claims for Samsung's profits, a percentage that reflects the mid-point between

21  Apple's overall calculation of gross profits, $231,373,554, and Samsung's overall calculation of

22  total profits, $52,734,959.   *Compare* PX25F.4 *with* DX781.002; *see also* Wagner Decl. ¶13.

23  Therefore, the jury did not answer the question of what "costs may be included as deductible

24  expenses," Dkt. 2784 at 39 (Final Jury Instruction No. 31), for which the only rationally supported

25  answer is "total operating expenses."   Instead, the jury impermissibly split the amount in

26  controversy, arriving at an improper compromise verdict.   The Court should enter judgment

27  setting aside the jury's infringer's profits award.

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1    **B.     The Jury's Infringer's Profits Award Results In Double Counting**

2           Under the law, Apple is entitled to only one form of recovery on each sale.   In splitting

3    the difference between Mr. Wagner's total profits figure of $52,734,959 and Ms. Davis's gross

4    profits figure of $231,373,553 (*see* Wagner Decl. ¶13), the jury incorrectly used as one of its data

5    points Mr. Wagner's figure for Samsung's total profits on *all* infringing sales during the notice

6    period, rather than Samsung's total profits on only those sales eligible for an award of infringer's

7    profits (*see* DX781.002).   Because the infringing sales during the notice period include some

8    sales for which the jury also awarded lost profits, this constitutes improper double recovery.   35

9    U.S.C. § 289 (barring double recovery); *see also Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295

10   F.3d 1277, 1291 (Fed. Cir. 2002).

11          In particular, Apple requested an award for the Infuse 4G that includes both lost profits (for

12   the '915 patent) and Samsung's profits (for the D'677 patent) during the period from April 15,

13   2011 to May 29, 2011.   *See* PX25F.2-3.   The jury's award improperly awards lost profits on

14   certain sales of the Infuse 4G and also credits Apple with a portion of Samsung's profits on the

15   same sales.   Moreover, because Mr. Wagner's figure for Samsung's total profits included units

16   for which the jury had already awarded lost profits, the percentage use by the jury to derive per-

17   product infringer's profits – 61.3960645% – was tainted by the double counting and inflated.   For

18   this reason too, the Court should enter judgment setting aside the jury's infringer's profits award.

19   **C.     There Is No Evidence that the Award of $142,054,256 for Samsung's Profits**
     **Was Attributable to Infringement of Apple's Design Patents[11]**
20
            The Court should enter judgment striking the infringer's profits award for the additional

21   reasons that Apple did not limit its calculations of Samsung's profits to those attributable to use of

22   the patented designs.   While 35 U.S.C. § 289 allows an award for patent infringement on an

23   "article of manufacture" up "to the extent of [the infringer's] total profit," it does not eliminate the

24

25   _____

         [11]     Samsung has previously asserted that Section 289 infringer's profits are subject to
26   apportionment.   *See, e.g.*, Dkt. 999-2 at 21-25; Dkt. 1819 at 5; Dkt. 1990-3 at 18-19, 25-26.
     The Court has previously rejected this argument.   However, solely for the purpose of
27   preservation for appeal, Samsung asserts that the portion of the jury's award representing
     infringer's profits should be set aside for failure to apportion Samsung's profits between the
28   patented designs and other non-patented elements of the devices.

requirement inherent in all patent infringement litigation that causation must be shown. *See*
*Carbice Corp. of Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33 (1931) (patent infringement is
"essentially a tort"); *see ResQNet.com,* 594 at 869 ("At all times, the damages inquiry must
concentrate on compensation for the economic harm caused by infringement of the claimed
invention.").   Unless limited to the portion of profits attributable to infringement of the patented
design, rather than other, non-infringing features of accused devices, an infringer's profits remedy
violates the causation requirement and imposes excessive damages far beyond any compensation
or deterrence rationale. *Cf. Laserdynamics*, 694 F.3d. at 67-68 (limiting damages "in any case
involving multi-component products" to "the smallest salable patent-practicing unit" unless
"demand for the entire product is attributable to the patented features"); *Junker v. HDC Corp.*, No.
C-07-5094, 2008 WL 3385819, at * 5 (N.D. Cal. July 28, 2008) (applying same rule to infringer's
profits under section 289); *Bush & Lane Piano Co. v. Becker Bros.*, 222 F. 902, 905 (2d Cir. 1915)
and *Bush & Lane Piano Co. v. Becker Bros.*, 234 F. 79, 81-82 (2d Cir. 1916) (applying same rule
to predecessor statute to § 289 and limiting infringer's profits to those attributable to design of
piano case rather than whole piano); *see also Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp.
2d 279, 286-87 (N.D.N.Y. 2009) (Rader, J.).[12]

The record contains no evidence that the entire sales value of any Samsung product was
attributable to the design of the front face or GUI, as opposed to the numerous non-infringing
technological components that enable the devices to function and drive consumer choice.
Apple's own studies showed that, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and just 5% of respondents to a J.D. Power
study identified visual appeal as why they purchased a phone.  PX69.43 (all aspects of physical
design comprised only up to 23% of the reasons for consumer selections, and visual appeal
amounted to only 22% of that 23%, or just 5% of the total).   There was thus no evidence that
infringement of the design of the front face or GUI caused Samsung to receive $142 million in

---

[12]   It is also worth noting that the 1952 Patent Act materially changed the text of the design patent infringement remedy, formerly in 35 U.S.C. § 74, by eliminating the heading characterizing the provisions as a "penalty", the knowledge requirement, and the phrase "the total profit made by him from the manufacture or sale."   *See* Alden Decl. Ex. 3.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1    profits.[13]

2          In summary, the Court should enter judgment eliminating the $113,777,344 representing

3    Apple's purported lost profits, the $142,054,256 representing Samsung's profits, and the

4    $34,625,194 representing Apple's claimed royalties, and awarding Apple total damages of

5    $52,763,411.   This amount is Mr. Wagner's calculation of Samsung's total profits on the seven

6    devices found to infringe the design patents, plus a reasonable royalty on the remaining sales of

7    devices found to infringe Apple's design and utility patents, and is the only amount of damages

8    supported by the evidence.

9    **VII.    ALTERNATIVELY,  AT  A  MINIMUM,  THE  JURY'S  DAMAGES  AWARD
         SHOULD BE REMITTED**

10          In the event the Court does not grant judgment as a matter of law, the jury's award should,

11   at very least, be remitted.   Remittitur is appropriate under Rule 59 "(1) where the court can

12   identify an error that caused the jury to include in the verdict a quantifiable amount that should be

13   stricken . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of

14   being greater than the amount a reasonable jury could have awarded, although the surplus cannot

15   be ascribed to a particular, quantifiable error."   *Cornell Univ.*, 609 F. Supp. 2d at 292 (citations

16   omitted).   "[T]he proper amount of a remittitur is the maximum amount sustainable by the

17

18          [13]    Apple also failed to introduce any evidence that Samsung applied the designs or any
     colorable imitation thereof to the infringing products, as required by 35 U.S.C. §289.   Section
19   289 prescribes an "additional remedy" against any person who "without license of the owner, (1)
     *applies* the patented design or any colorable imitation thereof *to* any article of manufacture for the
20   purpose of sale, or (2) sells or exposes for sale any article of manufacture *to which* such design or
     colorable imitation *has been applied*."   (Emphasis added).   Being undefined in the Patent Act,
21   the ordinary meaning of "applies" is:   "To place in contact; to put or adjust (one thing to
     another)."   Alden Decl. Ex. 4, Webster's New Int'l Dictionary 131 (2d ed. 1938).   Giving the
22   text its ordinary meaning, it plainly connotes a design that is physically or conceptually separable
     from an underlying article of manufacture and capable of removal without altering what the
23   underlying article of manufacture is.   This interpretation is confirmed by the legislative history of
     Section 289's ancestor, the Act of Feb. 4, 1887, 24 Stat. 387.   *See* 18 Cong. Rec. 834 (Jan. 20,
24   1887); Alden Decl. Exs. 5-6.   To interpret Section 289 as applying to all cases of alleged design
     patent infringement, as distinct from clear-cut cases where a patented design has been "applied" to
25   an otherwise structurally complete article, would be to undermine the Patent Act's vesting of
     district courts with broad discretion to enhance damages under 35 U.S.C. § 284.   Such an
26   interpretation would also undermine the principle that, absent willfulness, a federal court ought not
     "undertake to punish [an infringer] by obliging him to pay more than a fair compensation to the
27   person wronged."   *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888).   Because Apple introduced
     no evidence that the patented D'305 and D'677 designs were "applied to" the infringing products,
28   the jury's award of infringer's profits cannot be sustained.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   evidence." *Informatica Corp. v. Business Objects Data Integration, Inc.*, No. C-02-3378, 2007

2   WL 2344962, at *4 (N.D. Cal. Aug. 16, 2007).   Here, the Court has available numerous easily

3   quantifiable bases to reduce the award.[14]

4       **A.**      **Reduction of $112,742,324 In Lost Profits Damages**

5        Should the Court decide that the lost profits portion of the jury's award should be stricken,

6   but find that the reasonable royalty and infringer's profits portions should be sustained, the Court

7   should exercise its discretion under Rule 59 to reduce the award by $112,742,324, leaving a total

8   award of  $177,714,469.   This represents 61.3960645% of Samsung's profits sought by Apple

9   in PX25F.4 and 100% of the reasonable royalty presented by Ms. Davis in PX25F.5, her

10  alternative calculations prepared in the event no lost profits were awarded.   Wagner Dec. ¶19.[15]

11       Alternatively, if the Court determines that only the jury's award of lost profits on the

12  Galaxy Tab was unsupported by the evidence because Apple lacked capacity to supply additional

13  iPads, *see supra*, but finds that the lost profits award on all other products, and the reasonable

14  royalty and infringer's profits portions of the award should be sustained, the Court should reduce

15  the award by $6,394,777, leaving a total award of $284,062,016.   Wagner Dec. ¶20.

16      **B.**      **Reduction of $34,596,741 In Reasonable Royalty Damages**

17       Should the Court decide that the reasonable royalty portion of the jury's award should be

18  stricken, but find that the lost profits and infringer's profits portions should be sustained, the Court

19  should exercise its discretion under Rule 59 to reduce the award by $34,596,741, leaving a total

20  award of $255,860,052.   This represents 100% of the lost profits and 61.3960645% of Samsung's

21  profits sought by Apple in PX25F.4, plus 100% of the reasonable royalty as calculated by Mr.

22  Wagner in DX702.002.   Wagner Dec. ¶21.

---

[14]   The Court could enter judgment as a matter of law as to any of the reductions discussed in this Section VII for same reasons as discussed in Sections IV – VI above.   At a minimum, however, the Court should grant a new trial conditioned on the rejection of remittitur under each scenario discussed herein within its Rule 59 discretion.

[15]   Another reason to set aside the award of lost profits is that the '915 patent, which is the sole basis of Apple's lost profits claim, has been found invalid recently by the Patent Office. Samsung incorporates by reference its Motion to Stay filed on November 21, 2013 (Dkt. 2811). Clearly, Samsung should not have to pay damages on an invalid patent.

C.     **Reduction of $89,319,297 In Infringer's Profits**

Should the Court decide that the infringer's profit portion of the jury's award should be stricken as an improper compromise verdict, but find that the lost profits and reasonable royalty portions should be sustained, the Court should exercise its discretion under Rule 59 to reduce the award by $89,319,297, leaving a total award of $201,137,496.   This represents 100% of the lost profits and reasonable royalty sought by Apple in PX25F.4, as well as 100% of Samsung's profits calculated by Mr. Wagner in DX781.002     Wagner Dec. ¶18.

D.     **Reduction of $148,374,085 In Lost Profits And Reasonable Royalty**

If the Court determines that both the lost profits and reasonably royalty portions of the jury's award should be remitted, but sustains the infringer's profits portion of the award, the Court should exercise its discretion under Rule 59 to reduce the award by $148,374,085, leaving a total award of $142,082,708.   This represents 61.3960645% of Samsung's profits sought by Apple in PX25F.4, and 100% of the reasonable royalty calculated by Mr. Wagner in DX702.002.   Wagner Dec. ¶22.

Alternatively, if the Court determines that only the jury's award of lost profits on the Galaxy Tab and the jury's reasonable royalty award should be remitted, but sustains the lost profits portion of the award for all other products and the infringer's profits portion of the award, the Court should reduce the award by $41,181,085, leaving a total award of $249,275,708. Wagner Dec. ¶23.

E.     **Reduction of $202,061,621 In Lost Profits And Infringer's Profits**

If the Court determines that both the lost profits and infringer's profits portions of the jury's award should be remitted, but sustains the reasonable royalty portion of the award, the Court should exercise its discretion under Rule 59 to reduce the award by $202,061,621, leaving a total award of $88,395,172.   This represents 100% of Samsung's profits as calculated by Mr. Wagner in DX781.002, and 100% of the reasonable royalty presented by Ms. Davis in PX25F.5— her alternative calculations prepared in the event no lost profits were awarded.   Wagner Dec. ¶25.

Alternatively, if the Court determines that only the jury's award of lost profits on the Galaxy Tab and the infringer's profits portion of the award should be remitted, but sustains the

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1  lost profits portion of the award for all other products and the reasonable royalty portion of the

2  award, the Court should exercise its discretion under Rule 59 to reduce the award by $95,714,072,

3  leaving a total award of $194,742,721.   Wagner Dec. ¶26.

4  **F.       Reduction of $123,916,038 In Infringer's Profits and Reasonable Royalty**

5          If the Court determines that both the infringer's profits and reasonable royalty portions of

6  the jury's award should be remitted, but sustains the lost profits portion of the award, the Court

7  should exercise its discretion under Rule 59 to reduce the award by $123,916,038, leaving a total

8  award of $166,540,755.   This represents 100% of the lost profits sought by Apple in PX25F.4,

9  100% of Samsung's profits as calculated by Mr. Wagner in DX781.002, and the reasonable

10  royalty calculated by Mr. Wagner in DX702.002.   Wagner Dec. ¶24.

11  **G.       Reduction of $237,693,382 In Lost Profits, Infringer's Profits, And Reasonable**
12  **Royalty**

13          If the Court determines that the lost profits, infringer's profits, and reasonable royalty

14  portions of the jury's award should all be remitted, the Court should exercise its discretion under

15  Rule 59 to reduce the award by $237,693,382, leaving a total award of $52,763,411.   This

16  represents 100% of Samsung's profits as calculated by Mr. Wagner in DX781.002 and the

17  reasonable royalty calculated by Mr. Wagner in DX702.002.   Wagner Dec. ¶27.

18          Alternatively, if the Court determines that only the jury's award of lost profits on the

19  Galaxy Tab, and the infringer's profits and reasonable royalty portions of the award should be

20  remitted, but sustains the lost profits award as to all other products, the Court should reduce the

21  award by $130,500,382, leaving a total award of $159,956,411.   Wagner Dec. ¶28.

22  **VIII.  APPLE'S IMPROPER AND PREJUDICIAL ARGUMENTS WARRANT A NEW
TRIAL**

23  **A.       Apple's Repeated Reference to Samsung's Total Infringing Revenues
Warrants a New Trial**

24          In the alternative, the Court should grant a new trial under Rule 59 because Apple

25  improperly used Samsung's total revenue figures to seek an inflated damages verdict.   Under

26  Rule 59, the court may grant a motion for a new trial, even if the verdict is supported by

27  substantial evidence, in order to prevent a miscarriage of justice.   *See Landes Const. Co., Inc. v.*

28

-35-                          Case No. 11-cv-01846-LHK

1   *Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); *United States v. 4.0 Acres of Land*,

2   175 F.3d 1133, 1139 (9th Cir. 1999).

3          Samsung's $3.5 billion revenue from sales of the infringing products was irrelevant to this

4   case.   The $3.5 billion figure represents Samsung's revenue on all thirteen products at issue, not

5   just the products found to infringe Apple's design patents.   Nor did Apple advance any theory

6   that would permit its claimed damages to be assessed against all of Samsung's infringing revenues.

7   Yet, Apple repeatedly flaunted Samsung's total revenues in order to mislead the jury into thinking

8   that its damages calculations were somehow "conservative."

9          The Court sustained Samsung's objection to Apple's use of Samsung's total revenue figure

10  because it "misleadingly suggests that Apple may be eligible to recover infringer's profits on all of

11  Samsung's infringing sales and not merely those sales that infringed a design patent."   Dkt. 2721

12  at 4.   Apple deliberately ignored the Court's instruction, however, using Samsung's total revenue

13  for the very purpose the Court found misleading and prejudicial.   Although none of Apple's

14  claims called for the jury to apply a disgorgement remedy to $3.5 billion in revenue, Apple

15  expressly encouraged the jury to "decide how much of that 3.5 billion Samsung should rightfully

16  return to Apple."   11/13/13 Trial Tr. 347:20-22.   Apple asked the jury to "take 379 million out

17  of the 3.5 billion it earned and to give that amount back to Apple."   *Id.* at 353:15-17.

18         Apple's invocation of Samsung's total revenues also violated the entire market value rule.

19  In *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit held that a new trial was warranted

20  where the patentee disclosed the entire market value of the defendant's infringing sales without

21  satisfying the entire market value rule.   632 F.3d at 1318-19.   The court held that "[t]he

22  disclosure that a company has made $19 billion in revenue from an infringing product cannot help

23  but skew the damages horizon for the jury."   *Id.* at 1320.   Even if the patentee merely used the

24  entire market value as a "check," doing so improperly "lend[ed] legitimacy" to its requested

25  damages.   *Id.* at 1321.   Furthermore, by belittling the defendant's royalty calculations as a tiny

26  fraction of the overall infringing revenues, the patentee "may have inappropriately contributed to

27  the jury's rejection of his calculations."   *Id.*   Thus, the court upheld the trial court's ruling that

28  the jury's deliberations had been "tainted" because the "$19 billion cat" could not be "put back

-36-                              Case No. 11-cv-01846-LHK

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1    into the bag."    *Id.* at 1319-20.

2        Apple used the entire market value of Samsung's infringing sales for the same improper

3    purposes that warranted a new trial in *Uniloc*.   Apple belittled the calculations of Samsung's

4    damages expert as less than 1% of Samsung's infringing revenues.   *See, e.g.,* 11/15/13 Trial Tr.

5    1034:1-4 ("[Y]our total $52 million in damages would allow Samsung to keep about 99.5 percent

6    of all the revenues it collected for infringing these patents; correct?"); *see also id.* at 1035:15-23

7    (chiding Mr. Wagner for calculating a $28,000 reasonable royalty that "covers 9.8 million

8    infringing sales" and "$3.1 billion in revenues"); 11/19/13 Trial Tr. 1304:3-5 ("They are asking to

9    retain $3.45 billion, 99 percent, 99 percent of what they collected."); *id.* at 1398:9-11 ("$52

10   million is a very small piece of $3.5 billion"); *id.* at 1395:9-11 ("How can they say that they get to

11   make $3.5 billion and pay $28,000 as a royalty?   That's beyond hypothetical.   That's

12   unbelievable.").[16]

13       Apple also improperly used the entire market value of Samsung's infringing sales to

14   portray its own damages calculation as reasonable.   *See LaserDynamics,* 694 F.3d at 68

15   ("Admission of such overall revenues, which have no demonstrated correlation to the value of the

16   patented feature alone, only serve to make a patentee's proffered damages amount appear modest

17   by comparison, and to artificially inflate the jury's damages calculation").   Apple explicitly

18   framed its requested damages as a percentage of the entire market value of the infringing sales.

19   11/19/13 Trial Tr. 1303:23-24 ("We have asked for approximately 10% of what they collected

20   from infringing our [patents].").   Apple expressly asked the jury to assess its $379 million

21   damages request relative to Samsung's total revenues.   *Id.* at 1324:24-1325:6 ("Is [$379 million]

22   a lot of money?   Mr. McElhinny told you in the opening, yes it is.   But, wow, there was an

23   awful lot of infringement.   $3.5 billion.   *That's the number to judge that against.*"); 11/13/13

24   Trial Tr. 347:13-16 "People are going to talk about how much money the damages are, whether

25   that's a large number.   You have to have the context.   $3.5 billion from selling infringing phones

26   _____
         [16]    When litigating as defendant, Apple has objected to virtual identical questioning and
27   argument.   *See* Brief for Defendant-Appellee Apple Inc., *Mirror Worlds, LLC v. Apple Inc.*, No.
     2011-1392, 2011 WL 6939526, at *56-57 (Nov. 10, 2011).   Notably, Apple's counsel in *Mirror*
28   *Worlds* was the same counsel who represented Apple in this case.

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1    and tablets." ).

2        Apple similarly used the total number of infringing sales to paint Ms. Davis's lost profits

3    calculation as "conservatively" limited to "3 percent of the total infringing products."   11/19/13

4    Trial Tr. 1306:18-19; *see also* 11/18/13 Trial Tr. 1181:21-24 (Ms. Davis testifying that she

5    calculated lost profits on "360,00 units . . . about 3 percent of the 11 million infringing units in this

6    case."); 11/13/13 Trial Tr. 350:11-16 ("[C]onsumers who bought Samsung products would have

7    purchased 360,000 Apple products if the infringing products had not been on the market.   That's

8    not a very high percentage.   That's just a little over 3 percent of the 11 -- 10.8 million products

9    that we're talking about, 3 out of 100.").   In reality, Ms. Davis's *Mor-Flo* analysis allocated a

10   much higher percentage of the relevant sales to Apple.   The "10.8 million units" includes *all*

11   *sales* from June 2010 to July 2012—even though Ms. Davis conceded that Apple was only entitled

12   to lost profits for the six-week period from April 15, 2011 to May 29, 2011.   The "10.8 million

13   units" also includes *all product*s—including several products for which Ms. Davis did not

14   calculate lost profits, like the Replenish, which did not infringe the '915 patent, as well as Exhibit

15   4G and Indulge.

16       **B.    Apple's Direct Appeal to Racial Prejudice Warrants a New Trial**

17       Independently, new trial is warranted under Rule 59 because Apple's appeals to prejudice

18   against race, ethnicity, and nationality, which have no place in American courtrooms, rendered the

19   trial unfair to Samsung.   *See, e.g.*, *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th

20   Cir. 2001) ("Racial stereotyping cannot be condoned in civil cases.").   Such appeals to prejudice

21   are "an affront to the Constitution's guarantee of equal protection of the laws" and "offend[] the

22   defendant's right to an impartial jury."   *Calhoun v. United States*, 568 U.S. __, 133 S. Ct. 1136,

23   1137 (2013), *denying cert.* (opinion of Sotomayor, J.).   Because Apple engaged in such improper

24   appeals, Samsung's renewed motion for mistrial should be granted.

25       Apple's insidious "American-us versus foreign-them" theme permeated the trial.

26   Apple's counsel referred to SEC employees as the "Korean bosses" of "Samsung America."

27   11/13/13 Trial Tr. 349:1-5; *see also* 11/18/13 Trial Tr. 1167:1-3.   Throughout trial, Apple

28   gratuitously reinforced SEC's foreign status, rebranding it as "Samsung Korea," "Korean

-38-                          Case No. 11-cv-01846-LHK
**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

Samsung," the "Korean parent," and "the Korean company," or simply equating SEC with Korea. 11/13/13 Trial Tr. 348:17-19; 11/14/13 Trial Tr. 966:1-2, 975:7-22, 978:19-979:13; 11/18/13 Trial Tr. 1118:21-25, 1166:19-25, 1178:4-10, 1175:13.   Apple injected additional reminders of "otherness," repeatedly pointing out when witnesses could not speak or read Korean and that certain Samsung engineers "don't speak English."   11/13/13 Trial Tr. 412:5-9; 11/18/13 Trial Tr. 1090:18-1091:5; 11/19/13 Trial Tr. 1322:19-23; *see also* 11/15/13 Trial Tr. 976:14-977:6.   By closing, Apple lumped all the defendants with "Samsung Korea," arguing that no "Samsung executive had been brave enough to come into this courtroom," even though Apple's counsel had cross-examined one of *STA*'s executives.   11/19/13 Trial Tr. 1395:25-1396:3.

Meanwhile, Apple's counsel appealed to U.S. nationalism and local parochialism, describing the Bay Area as "the center of one of the most vibrant economies in the world," and threatening: "if we allow [the patent] system of law to decay, investors will not invest, people will not take risks, and ***our*** *economy will disappear*."   *Id.* at 1397:10-12 (emphasis added).   His meaning was clear:   accept Apple's arguments or a foreign company will destroy Silicon Valley businesses.

Apple's appeal to fear of foreign companies escalated further.   Its counsel referenced an economic theory devoid of evidence in the record and pled for the jury to save the U.S. from foreign domination by ruling in Apple's favor:

> When I was young, I used to watch television on televisions that were manufactured in the United States.   Magnavox, Motorola, RCA.   These were real companies.   They were well known and they were famous.   They were creators. They were inventors.   They were like the Apple and Google today.

*Id.* at 1397:13-17.   He then "explained" their sorry fate: "But they didn't protect their intellectual property."   Pause.   "They couldn't protect their ideas."   Double pause.   "And you all know the result."   Even longer and more dramatic pause.   "There are no American television manufacturers today."[17]   *Id.* at 1397:18-20.   Samsung immediately objected, and the Court

---

[17] Apple's closing ignored the complex history of American television companies unable to modernize outdated technology, compete with overseas labor, or timely respond to consumer demand.   It was intended to invoke regret for the loss of American manufacturing and animus toward the Asian manufacturers now leading the television industry.   *See, e.g.,* Barnaby J. Feder, (footnote continued)

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**

1   instructed Apple's counsel to move on.   *Id.* at 1397:21-1398:2.   But the damage was already

2   done, and Samsung subsequently moved for a mistrial.   *See, e.g., LeBlanc v. Am. Honda Motor*

3   *Co.*, 141 N.H. 579 (1997) ("It is true that counsel's closing reference was brief.   At the same

4   time, when an elephant has passed through the courtroom one does not need a forceful reminder.")

5   (quoting *Willey v. Ketterer,* 869 F.2d 648, 652 (1st Cir. 1989)).

6        Under these circumstances, a new trial is necessary.   In *City of Cleveland v. Peter Kiewit*

7   *Sons' Co.*, 624 F.2d 749 (6th Cir. 1980), the court reversed and remanded a case where the

8   plaintiff's attorney sought to exploit a hometown bias by "mak[ing] several comments, and

9   ask[ing] several questions, which were intended to inform and emphasize that [the defendant] had

10  its corporate residence in another state."   *Id*. at 757.   Those remarks were held to be "obviously

11  designed to prejudice the jurors."   *Id.* at 758 (internal quotations omitted).

12       Similarly, in *Commil USA, LLC v. Cisco Systems*, *Inc.*, 720 F.3d 1361 (Fed. Cir. 2013), the

13  trial court properly granted a new trial where defense counsel "attempted to play upon religious

14  prejudices and ethnic stereotypes" by quipping that he bet the Jewish plaintiff had not eaten pork

15  at lunch, and referring to the "most important trial" "in the Bible" for the supposed purpose of

16  asking the question, "What is truth?"   720 F.3d at 1370.   The court condemned as a "manifest

17  injustice" the attorney's creation of an "us v. them mentality" through "irrelevant references to

18  ethnicity and religion."   *Id.*   As *Commil* confirmed, the threat of juror bias against foreign

19  parties is genuine.   An empirical study by now-Judge Moore of the Federal Circuit showed that

20  domestic patentees had an 82% win rate against foreign defendants in cases with juries, but when

21  the roles were switched, the foreign patentees won just 38% of the time.   Kimberly A. Moore,

22  *Xenophobia in American Courts*, 97 N.W. UNIV. L. REV. 1497, 1509-1510 (2003).   In contrast,

23  when tried to a judge, the win rate for domestic plaintiffs plummeted to nearly the same level as

24  foreign plaintiffs.   *Id.*   A new trial should be granted so that Samsung may have a fair trial.

25

26

27  *Last U.S. TV Maker Will Sell Control to Koreans*, NEW YORK TIMES, July 18, 1995.
    (http://www.nytimes.com/1995/07/18/us/last-us-tv-maker-will-sell-control-to-koreans.html).

28

1  DATED: December 13, 2013

2

3

4

5

6

7

8

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By   /s/ Victoria F. Maroulis
   Charles K. Verhoeven
   Kathleen M. Sullivan
   Kevin P.B. Johnson
   Victoria F. Maroulis
   Michael T. Zeller

   Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
   INC., and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR**