1   HAROLD J. MCELHINNY (CA SBN 66781)          WILLIAM F. LEE
    hmcelhinny@mofo.com                          william.lee@wilmerhale.com
2   MICHAEL A. JACOBS (CA SBN 111664)            WILMER CUTLER PICKERING
    mjacobs@mofo.com                             HALE AND DORR LLP
3   RACHEL KREVANS                               60 State Street
    rkrevans@mofo.com                            Boston, MA 02109
4   ERIK J. OLSON (CA SBN 175815)                Telephone: (617) 526-6000
    ejolson@mofo.com                             Facsimile: (617) 526-5000
5   MORRISON & FOERSTER LLP
    425 Market Street                            MARK D. SELWYN (SBN 244180)
6   San Francisco, California  94105-2482        mark.selwyn@wilmerhale.com
    Telephone:  (415) 268-7000                   WILMER CUTLER PICKERING
7   Facsimile:  (415) 268-7522                   HALE AND DORR LLP
                                                 950 Page Mill Road
8                                                Palo Alto, California 94304
    Attorneys for Plaintiff and                  Telephone: (650) 858-6000
9   Counterclaim-Defendant APPLE INC.            Facsimile: (650) 858-6100

10

11

12                  UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                       SAN JOSE DIVISION

15

16
    APPLE INC., a California corporation,        Case No. 11-cv-01846-LHK (PSG)
17
                 Plaintiff,                      **APPLE INC.'S OPPOSITION TO
18                                               SAMSUNG'S MOTION FOR JMOL,
         v.                                      NEW TRIAL, AND/OR REMITTITUR**
19
    SAMSUNG ELECTRONICS CO., LTD., a             Hearing Date:  January 30, 2014
20  Korean corporation; SAMSUNG ELECTRONICS      Time:          1:30 p.m.
    AMERICA, INC., a New York corporation; and   Courtroom:     8, 4th Floor
21  SAMSUNG TELECOMMUNICATIONS                   Judge:         Hon. Lucy H. Koh
    AMERICA, LLC, a Delaware limited liability
22  company,

23               Defendants.

24

25

26            REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

I.     INTRODUCTION .......................................................................................... 1

II.    LEGAL STANDARDS.................................................................................... 1

III.   SAMSUNG HAS NOT SHOWN THAT THE VERDICT AS A WHOLE
       IS "GROSSLY EXCESSIVE OR MONSTROUS, CLEARLY NOT
       SUPPORTED BY THE EVIDENCE, OR BASED ONLY ON
       SPECULATION OR GUESSWORK." ............................................................ 2

IV.    SAMSUNG'S MOTION FOR JMOL ON APPLE'S LOST PROFITS
       SHOULD BE DENIED.................................................................................... 4

       A.   Apple Presented Substantial Evidence Of Demand For The '915
            Patented Features. ............................................................................. 5

            1.   Dr. Hauser's conjoint survey by itself is sufficient evidence
                 of consumer demand for the '915 patent...................................... 6

            2.   Other evidence supports demand for the '915 patent.................... 9

            3.   Samsung improperly attempts to argue inferences against
                 Apple. ........................................................................................ 11

       B.   Apple Properly Accounted For Non-Infringing Alternatives, Even
            Though The Record Supports A Finding That No Such Alternatives
            Existed............................................................................................... 13

            1.   The jury reasonably could have found that Apple lost
                 360,000 sales to Samsung's infringement despite the
                 Intercept and Galaxy Ace. .......................................................... 13

            2.   Samsung failed to show that the Intercept and Galaxy Ace
                 were "acceptable" and "available" to all of Samsung's 1.8
                 million customers who purchased an infringing phone
                 during the lost profits period....................................................... 15

            3.   The jury was entitled to reject Samsung's claim that it could
                 have designed around the '915 patent in less than six
                 months. ....................................................................................... 17

            4.   Samsung failed to meet its burden to show that the Intercept
                 and Galaxy Ace were "non-infringing" alternatives.................. 18

       C.   Apple's Lost Profits Calculation Accounted for Non-Infringing
            Alternatives, Price Differences, Non-Infringing Features, and Other
            Market Factors. ................................................................................. 19

       D.   The Record Supports Apple's Capacity To Make The Modest Lost
            Tablet Sales It Claimed. .................................................................... 24

V.     SAMSUNG'S MOTION FOR JMOL ON THE JURY'S REASONABLE
       ROYALTY AWARD SHOULD BE DENIED. .............................................. 24

       A.   Substantial Evidence Supports The Jury's Reasonable Royalty
            Award. ............................................................................................... 24

       B.   The Jury's Reasonable Royalty Award Was Appropriately
            Apportioned. ..................................................................................... 26

VI.    SAMSUNG'S MOTION FOR JMOL ON SAMSUNG'S PROFITS
       SHOULD BE DENIED..................................................................................... 27

       A.    Substantial Evidence Supports The Jury's Award Of Samsung's
             Profits. ................................................................................................. 27

       B.    The Award Of Samsung's Profits Does Not Result In Double-
             Counting. .............................................................................................. 28

       C.    There Is No Apportionment Requirement Under 35 U.S.C. § 289..................... 29

VII.   SAMSUNG'S ALTERNATIVE MOTION FOR REMITTITUR SHOULD
       BE DENIED................................................................................................. 29

VIII.  SAMSUNG'S MOTION FOR A NEW TRIAL SHOULD BE DENIED. ...................... 30

       A.    References To Samsung's Revenues Do Not Warrant A New Trial. .................. 30

       B.    Apple Did Not Appeal To Racial Prejudice.......................................... 32

IX.    CONCLUSION ............................................................................................. 34

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Am. Seating Co. v. USSC Group, Inc.*,
   514 F.3d 1262 (Fed. Cir. 2008) ............................................................................................... 15

5

*Apple Inc. v. Samsung Elecs. Co. (Apple III)*,
   735 F.3d 1352 (Fed. Cir. 2013) ............................................................................................. 7, 9

6

7

*BIC Leisure Prods. v. Windsurfing Int'l, Inc.*,
   1 F.3d 1214 (Fed. Cir. 1993) .................................................................................................. 20

8

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
   977 F.2d 1555 (Fed. Cir. 1992) ................................................................................................ 5

9

10

*Calico Brand, Inc. v Ameritek Imports, Inc.*,
   527 F. App'x 987 (Fed. Cir. July 18, 2013) ........................................................................... 11

11

12

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) .............................................................................................. 20

13

14

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982) ........................................................................................... 2, 30

15

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
   232 F.3d 1258 (9th Cir. 2000) ................................................................................................ 34

16

17

*DSPT Int'l, Inc. v. Nahum*,
   624 F.3d 1213 (9th Cir. 2010) .................................................................................................. 1

18

19

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010) .............................................................................................. 12

20

*Georgia-Pacific. Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................................................................... 26

21

22

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ................................................................................................ 30

23

24

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .................................................................................................. 2

25

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) .................................................................................................... 3

26

27

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
   734 F.3d 1352 (Fed. Cir. 2013) ...................................................................................... 1, 2, 14

28

*James v. Sheklanian*,
No. 08-cv-01943, 2010 WL 3504804 (E.D. Cal. Sept. 7, 2010) ............................................ 28

*Kehr v. Smith Barney, Harris Upham & Co.*,
736 F.2d 1283 (9th Cir. 1984)........................................................................................32-33

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009)................................................................................................. 9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012).............................................................................................. 32

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
791 F.2d 1356 (9th Cir. 1986)............................................................................................... 1

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)............................................................................................. 3

*Minks v. Polaris Indus.*,
546 F.3d 1364 (Fed. Cir. 2008)............................................................................................. 2

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
138 F.3d 1437 (Fed. Cir. 1998)........................................................................................... 29

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996).......................................................................................... 2, 30

*Oracle Am., Inc. v. Google Inc.*,
No. C 10-3561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ..................................... 8

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978)........................................................................................... 5, 7

*Parker-Hannifin Corp. v. Champion Labs., Inc.*,
No. 1:06-CV-2616, 2008 U.S. Dist. LEXIS 61108 (N.D. Ohio Aug. 4, 2008) ..................... 16

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
212 F.3d 493 (9th Cir. 2000)........................................................................................... 2, 30

*Powell v. Home Depot U.S.A., Inc.*,
663 F.3d 1221 (Fed. Cir. 2011)...................................................................................... 13, 28

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)............................................................................................................. 8

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
563 F.3d 1358 (Fed. Cir. 2009)...................................................................................... 2, 29

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995).............................................................................. 2, 5, 11, 23

*Settlegoode v. Portland Pub. Schs.,*
    371 F.3d 503 (9th Cir. 2004).........................................................................30, 31

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,*
    932 F.2d 1453 (Fed. Cir. 1991) ........................................................................ 11

*Spectralytics, Inc. v. Cordis Corp.,*
    649 F.3d 1336 (Fed. Cir. 2011) ...................................................................26, 28

*Standard Havens Prods., Inc. v. Gencor Indus.,*
    953 F.2d 1360 (Fed. Cir. 1991) ........................................................................ 15

*State Indus., Inc. v. Mor-Flo Indus., Inc.,*
    883 F.2d 1573 (Fed. Cir. 1989) ........................................................................ 20

*SynQor, Inc. v. Artesyn Techs., Inc.,*
    709 F.3d 1365 (Fed. Cir. 2013) ........................................................................ 25

*Telcordia Techs., Inc. v. Cisco Sys., Inc.,*
    612 F.3d 1365 (Fed. Cir. 2010) .......................................................................... 3

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) ........................................................................ 32

*United States v. H&R Block,*
    833 F. Supp. 2d 36 (D.D.C. 2011) ..................................................................... 8

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.,*
    106 F.3d 894 (9th Cir. 1997).......................................................................32, 34

*Whitserve LLC v. Computer Packages, Inc.,*
    694 F.3d 10 (Fed. Cir. 2012) ............................................................................ 26

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001)............................................................................. 3

**STATUTES**

35 U.S.C.
    § 284.................................................................................................................. 27
    § 289.............................................................................................................4, 29

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ................................................................................................. 9

## I.       INTRODUCTION

During the five-day retrial, Apple presented the jury with detailed testimony and evidence demonstrating the significant damage caused by Samsung's infringement of five Apple patents by thirteen infringing products.  In seeking JMOL or a new trial, Samsung does not even attempt to satisfy the applicable standard—that the jury's damages award must stand unless it is "'grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'"  *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986) (citation omitted).  Instead, Samsung invites the Court to deconstruct the verdict and find fault with the amounts that Samsung contends the jury awarded for each form of damages that Apple claimed.  Samsung fails to acknowledge, however, that the Court engaged in such an inquiry after the first trial because it concluded the jury had applied an impermissible legal theory.  (Dkt. 2271 at 14, 22.)  Samsung identifies no impermissible theory now.

Samsung's attacks on the supposed components of the jury's award fail in any event. Samsung focuses on isolated snippets of testimony and documents, asking the Court to draw inferences in Samsung's favor and to assume the jury could give credence only to the opinion of its own damages expert and none to Apple's.  The Court should reject Samsung's improper approach and uphold the jury's damages award in its entirety.

## II.      LEGAL STANDARDS

The Court should deny JMOL if the jury's verdict is "'supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'"  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (citation omitted).  When reviewing a damages award, the Court should uphold the jury's finding "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."  *Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1365 (internal quotation marks omitted); *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1360 (Fed. Cir. 2013).  In challenging a reasonable royalty award, Samsung "must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low

as to be unsupportable as an estimation" of damages. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc) (internal quotation marks omitted).

The Court may grant a new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000). Under that standard, a damages award may be set aside "only upon a *clear showing* of excessiveness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857 (Fed. Cir. 2010) (denying new trial on damages) (internal quotation marks omitted).[1]

Remittitur is only permissible if the jury's award "is grossly excessive or monstrous." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1372 (Fed. Cir. 2009). The proper amount of a remittitur is "the maximum amount sustainable by the proof." *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996) ("This court has adopted the 'maximum recovery rule' which requires this court to remit the damage award to the highest amount the jury could 'properly have awarded based on the relevant evidence.'") (citation omitted). To grant a remittitur, the Court would have to give Apple the option of a new damages trial. *See Minks v. Polaris Indus.*, 546 F.3d 1364, 1370-71 (Fed. Cir. 2008) (citing *Hetzel v. Prince William Cnty.*, 523 U.S. 208 (1998)).

## III.   SAMSUNG HAS NOT SHOWN THAT THE VERDICT AS A WHOLE IS "GROSSLY EXCESSIVE OR MONSTROUS, CLEARLY NOT SUPPORTED BY THE EVIDENCE, OR BASED ONLY ON SPECULATION OR GUESSWORK."

Samsung makes no attempt to show that the jury's award of $290 million was "'grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *Integrated Tech. Corp.*, 734 F.3d at 1360 (citation omitted). Instead, Samsung asks the Court to deconstruct the verdict and assign dollar amounts to Apple's lost profits, infringer's profits, and reasonable royalties. Samsung invokes the Court's March 1, 2013 Order Re:

---

[1] Although Samsung notes that a new trial may be granted where "damages are excessive" (Mot. 4:21), Samsung does not argue for a new trial on that ground. Instead, Samsung requests a new trial (1) conditioned on the rejection of remittitur (*id.* 33 n.14) and (2) based on alleged prejudicial arguments (*id.* 35-40).

Damages, but the rationale of that Order does not support Samsung's new request.  There, the Court recognized that courts are "generally required to give great deference to jury awards, and to uphold them where they are supportable by the evidence in the record," but noted an exception "where it is readily apparent from the numbers that the jury applied an impermissible legal theory in arriving at its award."  (Dkt. No. 2271 at 8 (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006).)  The Court concluded that the exception applied because, in the Court's view, the first jury's award impermissibly included infringer's profits prior to the earliest design patent notice date and because the award also included infringer's profits for the Galaxy Prevail, which the jury found infringed only utility patents.  (Dkt. 2271 at 14, 22.)[2]  In contrast, Samsung does not and cannot now argue that the November 21 verdict rests on an impermissible legal theory. The Court should decline Samsung's invitation to deconstruct a verdict that Samsung challenges based on sufficiency of the evidence.  *See, e.g., Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1108 (9th Cir. 2001) (refusing to consider whether particular categories of damages were supported by substantial evidence where the record as a whole supported jury's overall damages award).[3]

Moreover, the argument underlying Samsung's proffered deconstruction is unsound. Samsung offers a mathematical formula that accounts for the amount of the jury's award, but cannot show that the jury necessarily adopted the reasoning on which Samsung's argument relies. Samsung surmises that the jury awarded Apple $89,319,298 less than Apple's total claimed

---

[2] Apple preserves its objections to the Court's reverse engineering of the first jury's verdict (*see* Dkt. 2050 at 17-18), as well as to the Court's ruling that the first jury verdict was based on an impermissible legal theory regarding notice dates (Dkt. 2271).

[3] Samsung's cited cases (Mot. 5) do not support its request to deconstruct the verdict.  As indicated in the Court's March 1, 2013, Order, *In re First Alliance Mortgage Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) involved a jury award that was "directly traceable" to an instructional error and inadmissible evidence.  In *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), Microsoft argued that "working the math backwards" indicated that the jury had impermissibly applied the entire market value rule in its damages award, but the court did not hold that it was proper to deconstruct that verdict or any other.  *Id.* at 1336.  Instead, the court simply stated, "[a]ssuming that the jury did apply the entire market value rule, such application would amount to legal error."  *Id.*  In *Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010), the appeals court held that the district court did not clearly err in finding that a jury verdict compensated the patent holder only for past infringement and did not abuse its discretion by so interpreting the verdict form.

1    damages by averaging the parties' calculations of infringer's profits, and then dividing the result

2    by the amount of Samsung's profits that Apple claimed under 35 U.S.C. § 289.  (Mot. 3.)

3    Samsung then theorizes that, because this formula was based in part on *Samsung's* infringer's

4    profits number—which included units for which the jury chose instead to award lost profits—the

5    jury necessarily double counted and awarded both Apple's lost profits and infringer's profits on

6    those units.  (*Id.* at 30.)

7          Samsung's theory that the jury necessarily double counted ignores alternative

8    explanations for the verdict.  The jury may have decided, for example, to award Apple a portion

9    of its total requested amount to account for issues that the jury determined warranted a deduction,

10   and simply used Mr. Wagner's number as an approximate reasonableness check on Apple's

11   number.  In calculating Samsung's profits, Mr. Wagner and Ms. Davis agreed on the amounts of

12   Samsung's revenues and the costs of goods sold, but disagreed as to whether Samsung was

13   entitled also to deduct allocated operating expenses.  (Dkt. 2840 at 693-703; Dkt. 2843 at 1163-81

14   & PX180A (Davis); Dkt. 2841 at 1015:5-9 (Wagner).)  Mr. Wagner testified that this

15   disagreement about deductible expenses was largely responsible for the difference between his

16   and Ms. Davis's totals for Samsung's profits—a difference of $221,782,944 before losses are

17   excluded.  (Dkt. 2841 at 1015:5-9; *compare* PX25F.4, *with* DX781.002.)  The jury may have

18   decided that $89,319,298 of Samsung's alleged operating expenses were deductible and reduced

19   Apple's request by that amount to account for them.  A decision by the jury to deduct that amount

20   as additional expenses from Apple's claimed amount of infringer's profits would not result in any

21   double counting of lost profits and infringer's profits for the same devices.  Samsung offers no

22   basis for the Court to conclude that the jury necessarily acted as Samsung presumes.

23   **IV.   SAMSUNG'S MOTION FOR JMOL ON APPLE'S LOST PROFITS SHOULD BE**
24   **      DENIED.**

25         The Court rejected Samsung's 2012 argument that Apple lacks sufficient evidence to

26   support a lost profits award, and instead confirmed the first jury's lost profits award, except for

27   products for which the Court determined the jury had applied incorrect notice dates.  (Dkt. 2271

28   at 13-14.)  Given the rules governing the retrial, the new jury heard the same damages theories

from Apple's expert, supported by evidence drawn from Apple's original exhibit list—the main difference being that even more of Apple's damages exhibits were admitted in the retrial.  (*See*, *e.g.*, PX181, PX182.)  The Court should not rule differently now.

To recover lost profits, Apple had to demonstrate a "reasonable probability that, 'but for' the infringement, [Apple] would have made the sales that were made" by Samsung.  *Rite-Hite*, 56 F.3d at 1545.  Apple did so by presenting evidence addressing each of the *Panduit* factors: (1) demand for the patented product, which Samsung admitted; (2) absence of acceptable non-infringing alternatives, (3) capacity to exploit the demand, and (4) the amount of profit Apple would have made.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978); *see Rite-Hite*, 56 F.3d at 1545 (a showing under the *Panduit* factors establishes causation).

Causation of lost profits "is a classical jury question," *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1578 (Fed. Cir. 1992), and Apple presented ample evidence to support the jury's award.  Apple's damages expert, Julie Davis, reconstructed the market based on market share, capacity, and demand—using conservative assumptions—thus demonstrating at least how many additional sales Apple would likely have made "but for" Samsung's infringement of the '915 patent.  As the Court concluded following the first trial, "[t]his constitutes exactly the type of economic evidence of causation that the Federal Circuit requires in sustaining an award of lost profits."  (Dkt. 2271 at 14.)  Each of Samsung's challenges to the lost profits award is contrary to the evidence and should be rejected.

### A. Apple Presented Substantial Evidence Of Demand For The '915 Patented Features.

Samsung first argues that there is "no evidence of demand" for the patented feature of the '915 patent.  (Mot. 6.)  That is simply not true.  As explained below, Apple presented more than substantial evidence of demand for the '915 patented features through Dr. Hauser's conjoint survey, the testimony of Apple's fact and expert witnesses, and Samsung's own documents.[4]

---

[4] As this Court has recognized (Dkt. 1157 at 10), the first *Panduit* factor is limited to demand for the patented product, *i.e.*, the iPhone and iPad—which Samsung's expert conceded is satisfied here (Dkt. 2841 at 1040:11-14).  Samsung's arguments regarding demand are therefore presumably directed to the second *Panduit* factor.

**1.** **Dr. Hauser's conjoint survey by itself is sufficient evidence of consumer demand for the '915 patent.**

Dr. John Hauser, a highly-credentialed professor of marketing at MIT (Dkt. 2739 at 511:8-514:21), provided the jury with his analysis of a choice-based conjoint survey directed to the specific features of Apple's utility patents. (*Id*. at 517:10-24.) He introduced PX30, which summarizes the results of his survey. As Dr. Hauser testified, his survey shows that "for smartphones with a base price of $199, consumers would be willing to pay an additional $39 for the features enabled by the '915 patent" (*id*. at 529:17-22) and "for tablets rather than smartphones, consumers are willing to pay $45 for the features enabled by the '915 patent. That's for a tablet price at [$]499" (*id*. at 530:1-5). Dr. Hauser explained that thousands of companies "use conjoint surveys to make real business decisions when they're trying to decide what product, features to put in products or how to price those products or to predict market demand." (*Id*. at 514:14-21.) He concluded that "[t]his survey reflects that there's a substantial demand for the features enabled by the patents in this case." (*Id*. at 530:9-12.)

Dr. Hauser tied his survey results directly to market demand for the '915 patent, testifying that "a price premium is really a willingness to pay …. [i]t's market demand." (*Id*. at 519:20-22.) During cross-examination, he reiterated that "[t]here's a high willingness to pay" for the patented features and "[t]o my mind, that's the same as market demand." (*Id*. at 554:23-25; *see also id*. at 554:2 ("Willingness to pay is synonymous with market demand.").) Dr. Hauser also identified how the high willingness to pay for the '915 patented feature would affect the market. He explained that, "but for these features, a lot of these people would not buy the phones at issue in this case." (*Id*. at 551:17-18.) Finally, Dr. Hauser testified that this "market demand indicates that [Samsung would] lose sales" if it had not included the features of the '915 patent in the infringing products. (*Id*. at 554:23-25.)

No witness ever took the stand to rebut Dr. Hauser's testimony. No other survey expert ever criticized Dr. Hauser's work or offered a different survey with different conclusions. No other witness testified that the premises or results of Dr. Hauser's survey were wrong. In other words, Samsung failed to introduce any evidence on this issue.

1   Nonetheless, Samsung now criticizes Dr. Hauser's survey and testimony as insufficient to

2   show demand for the '915 patented features.  Each of Samsung's arguments is without merit.

3   <u>Willingness to pay is a measure of consumer demand and a predictor of lost sales.</u>

4   Samsung contends that Dr. Hauser's price premiums for the '915 patent do not provide "evidence

5   of consumer demand sufficient to sustain an award of lost profits" (Mot. 10), but no witness

6   disputed Dr. Hauser's testimony that willingness to pay is a proper economic measure of

7   consumer demand (Dkt. 2739 at 519:21-22).  Indeed, in addressing Dr. Hauser's conjoint survey

8   evidence cited in support of Apple's request for a permanent injunction, the Federal Circuit saw

9   "no reason why, as a general matter of economics, evidence that a patented feature significantly

10  increases the price of a product cannot be used to show that the feature drives demand for the

11  product."  *Apple Inc. v. Samsung Elecs. Co. (Apple III)*, 735 F.3d 1352, 1368 (Fed. Cir. 2013).

12  Dr. Hauser testified that the rational economic conclusion from his survey is that Samsung

13  would have lost sales if it had not infringed the '915 patent.  (Dkt. 2739 at 551:17-18, 554:23-25.)

14  No case holds that he had to go further and prove that each individual Samsung customer would

15  have switched to Apple, particularly when Ms. Davis's calculation assumed that only a small

16  percentage of the infringing sales would generate lost sales and lost profits for Apple.

17  <u>Evidence about the '915 patent's features is enough.</u>  Samsung asserts that Dr. Hauser

18  should have estimated price premiums not only for Apple's patented features but also for *other*

19  features found in smartphones and tablets, including those unique to Android products.  (Mot. 10-

20  11.)  But neither *Panduit* nor any other case requires Apple to prove the level of consumer

21  demand for every other feature present in the accused devices in order to show demand for the

22  '915 patent.  Dr. Hauser used standard methods, which do not require separate measurement of

23  the willingness to pay for other features, to provide evidence of demand for the features of the

24  '915 patent.  (Dkt. 2739 at 523:17-25.)

25  <u>The jury could evaluate Dr. Hauser's study in the context of Samsung's arguments about</u>

26  <u>the Intercept and Galaxy Ace.</u>  Samsung further suggests that Dr. Hauser should have shown

27  survey respondents the '915 patented features in devices found *not* to infringe the '915 patent

28  (Mot. 11), but offered no evidence suggesting that this was necessary.  In any event, Samsung

1   repeatedly emphasized to the jury its arguments about the Intercept and the Galaxy Ace as non-

2   infringing alternatives.  The jury was entitled to weigh how those arguments affected

3   Dr. Hauser's conclusions.  The Court's role in deciding this motion is different.  It may not weigh

4   the evidence or draw inferences in Samsung's favor.  *See Reeves v. Sanderson Plumbing Prods.,*

5   *Inc.*, 530 U.S. 133, 150 (2000).  That Dr. Hauser did not test just the Intercept or the Ace provides

6   no basis to disregard his study.

7          <u>Dr. Hauser did not have to ask separately whether consumers were aware of each feature.</u>

8   Samsung also criticizes Dr. Hauser—again without citing any testimony supporting its

9   argument—for not determining whether Samsung consumers were aware of the patented features

10  at the time of purchase.  (Mot. 11.)  But as Dr. Hauser testified:  "If [respondents] weren't aware

11  of them, you know, in answering these questions, they wouldn't be willing to pay anything for

12  them…. If people weren't willing to pay anything for these particular features, they're going to

13  ignore those features when they answer the questions."  (Dkt. 2739 at 542:21-543:1.)  That

14  testimony fully addresses Samsung's criticism.

15         <u>Samsung offered no proof of any methodological errors.</u>  Samsung alleges that there were

16  "numerous methodological flaws" in Dr. Hauser's survey.  (Mot. 11-12.)  Again, however, it

17  offers no evidence—only attorney argument—to support that allegation.  Samsung never

18  presented any evidence that "distraction features" undermined Dr. Hauser's survey, or that the

19  price premiums were "too high" (let alone by how much).  There is nothing to suggest that

20  Dr. Hauser's work suffered from any of the concerns raised in Samsung's cited cases, both of

21  which involved a rebuttal expert's showing that the relied-upon survey or simulation resulted in a

22  plainly irrational outcome.  *See Oracle Am., Inc. v. Google Inc.*, No. C 10-3561 WHA, 2012 WL

23  850705, at *9-13 (N.D. Cal. Mar. 13, 2012) (rebuttal expert showed that survey resulted in

24  individual respondents choosing to pay more for fewer features); *United States v. H&R Block*,

25  833 F. Supp. 2d 36, 67-68 (D.D.C. 2011) (rebuttal expert showed that simulator predicted that

26  quantities purchased would rise as prices increased).[5]  Nor did Samsung present any evidence that

27

28         [5] Moreover, the Court rejected Samsung's challenges to Dr. Hauser's methodology when
    it denied Samsung's *Daubert* motion.  (Dkt. 1157 at 14.)

1   Dr. Hauser's survey was inaccurate for not presenting "realistic decisions," or that any respondent

2   provided irrational responses.  (Mot. 12-13.)  To the contrary, Dr. Hauser testified, for example,

3   that his survey was "quite accurate" even though it did not use "real dollars" (Dkt. 2739 at

4   515:21-516:1) and that "we get a more realistic, actually a very accurate, number-wise, answer to

5   what [consumers] would be willing to pay" using conjoint analysis as compared to direct survey

6   questioning (*id*. at 527:19-528:12).

7                                              * * *

8          At bottom, Samsung's contention that Dr. Hauser's analysis proves *nothing* about

9   consumer demand for the '915 patent reduces to an audacious claim:  that the jury (and now the

10  Court) must ignore everything Dr. Hauser said that favors Apple and instead accept Samsung's

11  attorney argument criticizing his survey.  Samsung has the law backwards.  In deciding JMOL,

12  the Court must "view the evidence in the light most favorable to the party in whose favor the jury

13  returned a verdict and draw all reasonable inferences in [its] favor."  *Lakeside-Scott v. Multnomah*

14  *Cnty.*, 556 F.3d 797, 800 n.2 (9th Cir. 2009); *see* Fed. R. Civ. P. 50(b).  Under that standard, there

15  can be no doubt that Dr. Hauser's conjoint survey—which Samsung failed to rebut with any

16  evidence whatsoever—provides sufficient evidence of demand for the features of the '915 patent.

17  *See Apple III*, 735 F.3d at 1368.

18              **2.      Other evidence supports demand for the '915 patent.**

19         In addition to Dr. Hauser's testimony—which on its own is sufficient—Apple provided a

20  plethora of other evidence that demonstrates demand for the '915 patented features.

21         For example, the Gravity Tank report addressing the features Samsung should include in

22  its products provided the jury with substantial evidence of consumer demand.  Mr. Wagner

23  agreed that such a report was relevant to "demand for [the] patented features."  (Dkt. 2841 at

24  1039:10-21.)  Gravity Tank's report included conclusions drawn from in-depth interviews, focus

25  groups, and a survey of 3,601 smartphone consumers.  (PX36.3-.4.)  It emphasized that the

26  "iPhone is a revolution" (PX36.20) in part because "[g]estures like the two fingered pinch and

27  flick add a game-like quality to interactions" and "[w]ith the multi-touch function you can zoom

28  in and zoom out and move photos, and that's great."  (PX36.36.)  These are direct references to

1   the features of the '915 patent.  (Dkt. 2840 at 656:14-657:1; Dkt. 2843 at 1150:13-1151:7.)[6]

2          Apple's witnesses also confirmed the importance of the '915 patented features.  Dr. Karan

3   Singh, Apple's technical expert for the '915 patent, confirmed the significance of Apple's

4   solution to the problem of navigating documents on a small mobile touchscreen using intuitive

5   touch inputs.  (Dkt. 2739 at 443:24-444:14.)  Phil Schiller, Apple's Senior Vice President of

6   Worldwide Marketing, pointed to early press reports about the iPhone that specifically mention

7   the features of the '915 patent.  (PX133 & Dkt. 2841 at 817:7-15 (discussing use of multitouch

8   interface to expand documents and photos).)  Mr. Schiller testified that Apple's solutions to the

9   challenges of touch interfaces—including "the solutions that allow you to scroll around and pinch

10  and zoom and double tap"—contribute to the ease of use that Apple is "best known for," along

11  with beautiful design.  (Dkt. 2841 at 822:8-25.)  Mr. Schiller also described how Apple used these

12  features in advertisements.  (*Id.* at 820:15-21.)  He explained how Apple's patented inventions—

13  including the features of the '915 patent—were and are core to Apple's business:

14          Because ultimately what's been done here is to copy many attributes of Apple's
            products and to copy both designs and features, and these are things that are the
15          very essence of what Apple is about, how we create what we hope customers
            love, how we've built our business and what differentiates us.  That's what our
16          business is about.  Other companies have other business models.  That's Apple's,
            and if we don't have that, we don't have Apple's entire business.
17

18  (*Id.* at 908:21-909:3.)

19          Further, Mr. Schiller and Ms. Davis both explained how, using Apple's patented

20  inventions, including the '915 patent, Samsung increased its market share and leapfrogged over

21  its competitors in 2010 and 2011.  (Dkt. 2840 at 638:18-639:11 (Davis); Dkt. 2841 at 910:5-911:6

22  (Schiller).)  This reflects the damage that the infringing products caused and is real-world

23  evidence of the importance of the infringing features to consumers.

24          This evidence distinguishes the present record from the cases that Samsung cites.  In

25  _____

26      [6] Samsung fails in its attempt to rebut this argument by citing the Court's earlier order
    denying the permanent injunction.  (Mot. 7:4, 9:1, 9:11.)  First, the Court—not the jury—was the
    decision maker in that order and, as the Court has recognized, the jury can draw its own
27  inferences.  Second, the legal standards being applied were different.  (*See* Dkt. 2562 at 65:9-11
    ("the Court's finding in a permanent injunction motion is different than what the Court is to find
28  with regard to a JMOL motion").)  Third, that order was not before the jury, has been vacated,
    and provides no basis to reevaluate a jury's verdict on damages.

*Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 932 F.2d 1453 (Fed. Cir. 1991), the

court described as "very probative" evidence "that neither Slimfold's nor Kinkead's market share

changed significantly after introduction of the 'new' doors" that lacked the infringing feature. *Id.*

at 1458. *Calico Brand, Inc. v Ameritek Imports, Inc.*, 527 F. App'x 987 (Fed. Cir. July 18, 2013)

(non-precedential), pointed to similar evidence: "Indeed, the district court acknowledged in its

summary judgment ruling that Acme was able to switch to an alternative product and maintain its

sales volume." *Id.* at 997. Further, in *Calico Brand*, Calico's marketing executive "conceded that

Calico had no documentation showing that consumers preferred the Calico safety mechanism to

an alternative mechanism found in competitors' products," while the defendant introduced

evidence showing that "the most salient driver of customer demand seemed to be the utility

lighter's price." *Id.* at 996. Finally, in *Rite-Hite*, the court *upheld* the award of lost profits; its

holding provides a foundation for the legal standards that Apple has consistently applied:

> The patentee need only show that there was a reasonable probability that the sales
> would have been made "but for" the infringement. When the patentee establishes
> the reasonableness of this inference, e.g., by satisfying the *Panduit* test, it has
> sustained the burden of proving entitlement to lost profits due to the infringing
> sales. The burden then shifts to the infringer to show that the inference is
> unreasonable for some or all of the lost sales.

56 F.3d at 1545 (citations omitted). Nothing in *Rite-Hite* suggests that the surveys, exhibits, and

testimony discussed above would be insufficient to show Apple's "but for" sales or demand for

the patented features.

### 3. Samsung improperly attempts to argue inferences against Apple.

As shown by Dr. Hauser's survey and the other evidence discussed above, the record

clearly exceeds the minimum necessary to uphold the jury's award of lost profits. Samsung's

remaining arguments rely on impermissible inferences in Samsung's favor based solely on

snippets of evidence that Samsung prefers—none of which justifies judgment as a matter of law.

Samsung argues that Apple's evidence regarding "ease of use" was "generic" and

"insufficient" to show demand for the features of the '915 patent. (Mot. 7.) But it is improper to

look at such evidence in isolation. When considered in conjunction with the evidence specific to

the '915 features discussed above, evidence of consumer demand for "ease of use" generally

*bolsters* Apple's evidence of demand for the particular "ease of use" features described in the

1   '915 patent.  Nor is it correct that Ms. Davis "pointed only to demand for 'ease of use' in Apple

2   surveys" as evidence of demand.  (*Id.*)  Her demand testimony spans eleven pages in the

3   transcript and points, among other things, to Dr. Hauser's survey, Samsung's internal documents,

4   and the Gravity Tank report.  (Dkt. 2840 at 650:20-660:12.)  Finally, no matter how specific or

5   general the demand evidence is, it helps Apple not Samsung.  *See, e.g.*, *Funai Elec. Co. v.*

6   *Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375-76 (Fed. Cir. 2010) (affirming lost profits award

7   where "[t]he evidence at trial portrayed *general industry demand* for smaller, cheaper, faster, and

8   more reliable VCRs, and Funai presented evidence that the patented technology furthers these

9   goals" (emphasis added)).

10          Samsung pushes its selective evidence to an extreme when it argues that a single page

11  from a single Apple survey trumps all other evidence addressing why Samsung consumers

12  purchased the infringing phones.  (Mot. 8.)  The relevant page from DX572 involved responses

13  from 89 out of 2,243 respondents and lists a handful of reasons those respondents bought Android

14  products.  (DX572.082; *see also* DX572.089.)  Although the reasons listed on the cited page do

15  not include the specific features of the '915 patent, nothing in the list suggests that the '915 patent

16  was not important.  Nor is any response in the survey inconsistent with demand for the '915

17  patent.  The single page of the survey cited by Samsung in no way negates the substantial

18  evidence discussed above showing demand for the '915 patent.

19          Lastly, Samsung argues that its own documents are not evidence of demand specific to the

20  '915 patent.  (Mot. 8-9.)  Apple disagrees—and the jury was entitled to as well.  As discussed

21  above (pp. 9-10), PX36 (the Gravity Tank report) demonstrates demand for the particular features

22  of the '915 patent.  PX34 ("iPhone effect analysis") lends further support to Apple's demand

23  evidence by showing praise for the iPhone's "[e]asy and intuitive [User Interface]."  (PX34.38.)

24  And PX40 ("Heaven and Earth") shows that Samsung's own executives recognized the

25  tremendous value of the iPhone's user experience features that Apple developed, such as those

26  claimed in the '915 patent.  In any event, contrary to Samsung's suggestion, there is no need for

27  each exhibit independently to support demand for the features of the '915 patent when the record

28

as a whole does.  The evidence discussed above is more than adequate for that purpose.[7]

**B.  Apple Properly Accounted For Non-Infringing Alternatives, Even Though The Record Supports A Finding That No Such Alternatives Existed.**

Samsung is incorrect that the Intercept and Galaxy Ace—which Samsung claims represent acceptable, available, and non-infringing alternatives to the '915 patent (Mot. 13-15)—foreclosed Apple from seeking lost profits as a matter of law.  The jury was entitled to award lost profits *even assuming the existence of non-infringing substitutes*.  Moreover, Ms. Davis's conservative assumptions accounted for the Intercept and Galaxy Ace, even though the record supports a finding that those devices were not acceptable, available, and non-infringing alternatives.

**1.  The jury reasonably could have found that Apple lost 360,000 sales to Samsung's infringement despite the Intercept and Galaxy Ace.**

To establish lost profits, Apple needed to show either "that there were no acceptable non-infringing substitutes" *or* "the number of the sales … Apple would have made despite the availability of other non-infringing substitutes."  (Dkt. 2784 at 29 (Final Jury Instruction No. 23).)  Samsung acknowledges that Apple could establish lost profits by making either of these showings.  (Mot. 13:9-10.)  As the Court instructed the jury:  "One way Apple may prove the number of sales it would have made if the infringement had not happened is to prove its share of the relevant market excluding infringing products.  You may award Apple a share of profits equal to that market share."  (Dkt. 2784 at 31 (Final Jury Instruction No. 25).)

Ms. Davis calculated Apple's market share as between 22.5% and 49.7% for smartphones (PX25F.8) and between 61.3% and 75.2% for tablets (PX25F.7), excluding infringing products, in the quarters after the April 15, 2011, notice date for the '915 patent.  Ms. Davis's market-share calculations accounted for the sale of *all* non-infringing smartphones and tablets sold in the United States during the time frame for which she calculated Apple's lost profits, including sales of the Intercept.  (Dkt. 2840 at 665:11-24; Dkt. 2843 at 1184:5-1186:18.)  Samsung sold about 7 million smartphones and tablets that infringed the '915 patent after the April 15, 2011, notice

---

[7] *See, e.g., Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1241 (Fed. Cir. 2011) (affirming order denying JMOL as to jury's damages award notwithstanding moving party's contrary damages theories and evidence).

1   date.  Ms. Davis did not apply Apple's market share allocation to all 7 million sales, however.

2   She instead made numerous conservative assumptions in Samsung's favor to address *theoretical*

3   design-arounds that Samsung never proved existed, as well as other factors relevant to the mobile

4   device market.  These reductions resulted in Ms. Davis assigning only ██████████████

5   ██████ tablets to a lost profit remedy—or a ██████ share of the 1.8 million infringing smartphones

6   in the conservative six-week lost-profit period.  (PX25G1.2 (smartphones); PX25G1.3 (tablets).)

7   Even Mr. Wagner admitted that Ms. Davis allocated "only a handful, a very small number of

8   sales" to Apple.  (Dkt. 2841 at 1019:9-10.)  Samsung cannot show that the jury's damages award

9   based on Ms. Davis's small number of lost sales was "'grossly excessive.'"  *Integrated Tech.*

10  *Corp.*, 734 F.3d at 1360 (citation omitted).

11       Samsung admits that Ms. Davis's lost profits analysis accounted for the Intercept, but

12  incorrectly asserts that Ms. Davis assumed Samsung "would have made only its *pro rata* share of

13  the infringing sales."  (Mot. 14:10-12.)  Ms. Davis accounted for *all* of Samsung's U.S. sales of

14  the Intercept during the lost profits period *in addition to* Samsung's *pro rata* share of the

15  infringing sales.  (Dkt. 2843 at 1186:14-18.)  Ms. Davis included all these Intercept sales as a

16  conservative reduction in Apple's damages calculation even though the evidence showed that the

17  Intercept was not an acceptable, available non-infringing substitute.  (*See* Sections IV.B.2 & .4,

18  *infra*.)  Had Ms. Davis not made that conservative assumption, her lost profits number would

19  have been higher.

20       Samsung also wrongly argues that Ms. Davis failed to account for the Galaxy Ace as a

21  non-infringing alternative.  (Mot. 15:3-4.)  No U.S. carrier sold the Galaxy Ace; Samsung only

22  sold this product internationally.  (Dkt. 2843 at 1188:6-7.)  Samsung offered no evidence to

23  suggest how many Galaxy Aces it theoretically could have sold in the United States, or even that

24  "it was technically possible for [the Galaxy Ace] to work on a U.S. carrier network."  (*Id*. at

25  1188:9-10.)  Therefore, even if there were sufficient evidence to support a finding that the Galaxy

26  Ace was an acceptable non-infringing alternative (and there was not, as discussed below),

27  Ms. Davis's lost profits calculation would have remained unchanged given the absence of U.S.

28

1 | sales of the Galaxy Ace to consider in her market-share allocation.[8]

2 |         **2.     Samsung failed to show that the Intercept and Galaxy Ace were "acceptable" and "available" to all of Samsung's 1.8 million customers who purchased an infringing phone during the lost profits period.**

3

4 |      Whether any given non-infringing alternative is an acceptable substitute for the patented

5 | product is a question of fact for the jury. *Standard Havens Prods., Inc. v. Gencor Indus.*,

6 | 953 F.2d 1360, 1373 (Fed. Cir. 1991); *see also* Dkt. 2657 at 5:19-20. "[A] non-infringing

7 | replacement product is not considered a substitute unless it is 'acceptable to all purchasers of the

8 | infringing product.'" *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1270 (Fed. Cir.

9 | 2008) (citation omitted). A reasonable jury could have found based on the evidence that the

10 | Intercept and Galaxy Ace would not be "acceptable" to all of Samsung's 1.8 million customers

11 | who purchased an infringing phone during the lost profits period. The Intercept, first sold in July

12 | 2010, was a 10-month-old phone at the time of the lost profits period. (DX952.014; Dkt. 2843 at

13 | 1186:19-21.) It had a small, low-resolution screen and a slide-out keyboard. (JX1009; JX1002;

14 | JX1003.) According to a J.D. Power survey, it ranked near the bottom of all smartphones in

15 | terms of customer satisfaction (score 694), especially when compared to the industry-leading

16 | iPhone 4 (score 836) and the iPhone 3GS (score 802).[9] (PX69.84-.85.) The Intercept also

17 | received very low customer satisfaction ratings for "[e]ase of navigating phone using touch

18 | screen, toggle/navigation wheel" as compared to the iPhone. (PX69.88, .108.) The jury

19 | reasonably could have found from this evidence that the Intercept would not have been an

20 | acceptable substitute for the iPhone to all consumers.

21 |      The jury also could have reasonably found from the evidence that the Intercept and

22

23 |     [8] Samsung contends that Apple is foreclosed from now arguing that the Ace was not sold in the United States because it argued to the first jury that U.S. sales established that the Ace was an infringing product. (Mot. 15:20-26.) But as Ms. Davis explained, "there were some random sales of unlocked product" that could explain the 2012 jury's infringement finding. (Dkt. 2843 at 1199:18-22.) There is no contradiction between the first jury's finding that such sales could support infringement and a finding by the retrial jury that the Galaxy Ace was not an acceptable alternative that was widely available to customers in the United States.

24

25

26

27 |     [9] Samsung's quibbles with the sample size and customer base of this survey go at most to fact issues for the jury. Samsung's arguments are inconsistent with its approach to Apple's surveys, and none supports ruling as a matter of law that all customers believed the Intercept was an acceptable substitute to the iPhone.

28

1    Galaxy Ace were not "available" to all of Samsung's 1.8 million customers who purchased an

2    infringing phone during the lost profits period.  Samsung points to Mr. Wagner's testimony that

3    the Intercept earned over $271 million in sales over its lifetime (Mot. 14), but ignores Ms. Davis's

4    testimony that "[t]he Intercept was available only from Sprint and its subsidiary, Virgin Mobile,"

5    and Samsung sold only "about 100,000 units" of the Intercept during the six weeks of the lost

6    profits period.  (Dkt. 2843 at 1186:24-1187:13.)  Ms. Davis adjusted her calculation of sales and

7    lost profits units at Sprint to account for this fact.  (*Id.* at 1184:5-1186:18; PX25F.10.)  The jury

8    reasonably could have found from that testimony that the Intercept was not sufficiently available

9    to customers to warrant any greater adjustment.

10       Similarly, Samsung points to Mr. Wagner's testimony that the Galaxy Ace was "one of

11   Samsung's biggest sellers of all time" (Mot. 14), but ignores Ms. Davis's testimony that it "was

12   never sold by a U.S. carrier" (Dkt. 2843 at 1188:7-8).  Samsung produced no evidence that any

13   carrier ever found the Ace to be an acceptable phone for sale in the United States in lieu of the

14   infringing smartphones.  The fact that customers could not purchase this phone from any U.S.

15   carrier is sufficient to allow the jury to determine that it was not an acceptable alternative,

16   especially in light of evidence, emphasized by Samsung, that availability of a product at specific

17   carriers affects consumer purchase decisions.  (*See, e.g.*, DX572.079 ("When shopping for a

18   smartphone, a majority limited their choices to those offered by their service provider.").)

19       The lack of a U.S. carrier also could have led the jury reasonably to find that the Galaxy

20   Ace was not "available" to the Samsung customers who purchased an infringing phone in the lost

21   profits period.  Further, Ms. Davis testified that the Galaxy Ace infringed other Apple patents,

22   and for that additional reason would not have been available for purchase during the lost profits

23   period.[10]  (Dkt. 2843 at 1188:4-5.)  It is undisputed that the Galaxy Ace infringed other Apple

24   _____

25   [10] Samsung asserts that the Court previously rejected Apple's argument that the Galaxy
     Ace cannot be considered "available" because it infringed other Apple patents.  But the Court
     merely determined that no "legal rule" precluded the jury from deciding that issue.  (Dkt. 2657 at

26   8:27-9:3.)  The jury was free to evaluate—and to reject—Samsung's claim that it could have
     made the Galaxy Ace available despite its infringement of other Apple patents.  *See, e.g., Parker-*

27   *Hannifin Corp. v. Champion Labs., Inc.*, No. 1:06-CV-2616, 2008 U.S. Dist. LEXIS 61108, at
     *17 (N.D. Ohio Aug. 4, 2008) ("[I]f the alleged substitutes infringe any one of plaintiffs' patents,

28   those substitutes are illegally on the market and it would thus be reasonable to conclude that
     plaintiffs would make those sales instead.").

1  patents and that Apple would never license Samsung to use its other technology.  (*Id*. at 1098:18-

2  20 (Wagner); Dkt. 2841 at 908:13-19 (Schiller).)  The jury reasonably could have found from this

3  evidence that the Galaxy Ace would not have been available to all consumers.

>    **3.    The jury was entitled to reject Samsung's claim that it could have
>    designed around the '915 patent in less than six months.**

6        Ms. Davis testified at length at trial, based on her conversation with Henri Lamiraux,

7  Apple's Vice President of iOS, that it would take Samsung at least six months to design around

8  the '915 patent given the complexity of the software modifications involved.  (Dkt. 2840 at

9  661:13-663:5.)  Mr. Wagner offered contrary testimony, based on his translated conversations

10  with Samsung engineers, that it would take Samsung only four weeks to design around the '915

11  patent.[11]  (Dkt. 2841 at 1027:25-1029:2.)  Unlike Ms. Davis's in-depth testimony, Mr. Wagner

12  admitted that the Samsung engineer only said "how long it would take," not "what they would

13  do," and that "[e]ven if they [had] told me what they would do, I probably couldn't even really

14  remember what that was or understand whether that was sufficient or not."  (Dkt. 2843 at

15  1092:15-19.)  The jury was free to credit Ms. Davis's testimony on this point and to reject Mr.

16  Wagner's.

17        Samsung argues that "undisputed evidence" shows that Samsung had already developed

18  non-infringing alternative technology embodied in the Intercept and Galaxy Ace, and therefore no

19  reasonable jury could have concluded it would take as long as six months to design around the

20  '915 patent.  (Mot. 16:11-17:1.)  But Samsung ignores that it failed to show that the technology of

21  the Intercept and Galaxy Ace implemented the '915 features in a non-infringing way, how

22  Samsung would have implemented the purportedly non-infringing technology from the Intercept

23  and Ace in different products, or how long it would have taken to do so.  No fact or expert

24  technical witness provided *any* testimony concerning how Samsung could have turned an

---

[11] Samsung also points to Mr. Sheppard's and Mr. Wagner's testimony that Samsung provides regular software updates to its customers as evidence that it could implement non-infringing software in less than six months.  (Mot. 17:14-25.)  But neither of them purported to have technical expertise and Samsung brought no technical witness to explain that it even knew how to design non-infringing software to replace the '915 patented features, let alone implement that software in less than six months across all the third-party applications that interface with Samsung's phones.

1    infringing product into a non-infringing product using technology from the Intercept or Ace—let

2    alone that it could have been done in less than six months.  In contrast, Ms. Davis testified that

3    "the software in [the non-infringing] phone is the same as the software in the infringing phones."

4    (Dkt. 2840 at 750:7-11.)  That uncontroverted testimony echoed Samsung's representations in its

5    prior JMOL motion that the Intercept and Galaxy Ace had the "same Android version" as its

6    infringing phones.  (Dkt. 1990 at 14:16-18.)  On this record, the jury was free to reject Samsung's

7    argument that unspecified technology from the Intercept and Ace could have been transferred to

8    other products to implement the features of the '915 patent in a non-infringing way.

9            Samsung also argues that other non-infringing alternatives existed, like DiamondTouch

10   and FractalZoom, and that Samsung "was more than capable of quickly implementing changes to

11   its software."  (Mot. 17:2-25.)  But DiamondTouch and Fractal Zoom did not contain software

12   written for any smartphone or tablet, let alone tailored to work in the Android code used in

13   Samsung phones, and Samsung brought no technical expert or engineer to explain whether or

14   how such integration could be done.  Moreover, as Mr. Wagner admitted, Samsung continued to

15   introduce phones found to infringe the '915 patent as late as October 2011, and chose *not* to

16   implement any supposedly-existing alternatives.  (Dkt. 2843 at 1096:18-21.)  Based on this

17   evidence, the jury was not required to accept Samsung's claim that Samsung could have designed

18   and implemented a non-infringing alternative to the '915 patent in less than six months.

19           **4.      Samsung failed to meet its burden to show that the Intercept and
20                     Galaxy Ace were "non-infringing" alternatives.**

21           The Court previously ruled that, so long as Apple presented particularized evidence of

22   consumer demand for the '915 patent (which it did, as discussed in Section IV.A above), it was

23   Samsung's burden to show that the products found not to infringe the '915 patent at the 2012 trial

24   contained the features of the '915 patent in a way that did not infringe Apple's patents.  (*See* Dkt.

25   2657 at 6:10-15.)  Critically, the Court previously ruled that Samsung could not rely on "the mere

26   fact of the 2012 jury's noninfringement verdict" to show that its own non-infringing products

27   contained the '915 features in a non-infringing way.  (*Id*. at 6:15-21.)  That is because it would

28   require speculation to know "whether the 2012 jury found that various Samsung products did not

infringe certain Apple patents because they lacked the patented feature entirely or simply lacked an infringing version of the patented feature." (*Id*.)  For example, as Dr. Singh testified, mobile websites do not enable the same functionality as a normal webpage.  (Dkt. 2739 at 483:13-484:8.)  Therefore, if the first jury had tested a device on a mobile website, it may have concluded that the device lacked the patented features altogether and therefore did not infringe, even though it might have infringed if tested on a normal website.

Yet Samsung has nothing more than the jury's non-infringement verdict to support its bald assertions that the Intercept and Galaxy Ace contained the '915 features in a way that did not infringe the '915 patent.  First, Samsung brought no technical expert to explain how the '915 features functioned in the Intercept and Galaxy Ace.  Second, while Samsung's counsel argued to the retrial jury that the Intercept and Ace functioned in a non-infringing manner, that argument rested on mere speculation that the 2012 jury found those phones contained a non-infringing version of the '915 feature (as opposed to finding that those phones did not infringe for a separate reason).  (*See, e.g.*, Dkt. 2844 at 1370:14-16 ("The jury determined that even though [the Galaxy Ace] looks like scroll to zoom, just like Apple's products do, you know, it does not infringe Apple's patent.").)  The Court has already said that this is not enough.  (Dkt. 2657 at 6:15-21.)  Finally, for the reasons discussed above in Section IV.B.3, the jury reasonably could have concluded that the technology of the Intercept and Galaxy Ace did not implement the features of the '915 patent in a non-infringing way and therefore that those devices did not qualify as non-infringing alternatives.

## C.    Apple's Lost Profits Calculation Accounted for Non-Infringing Alternatives, Price Differences, Non-Infringing Features, and Other Market Factors.

Samsung's arguments that Apple cannot claim its "pro rata" share of the market to calculate lost profits and failed to allocate its lost profits based on demand for the '915 patented features (Mot. 18-22) do not warrant any relief.

The Court has already seen and rejected Samsung's market share arguments.  In its 2012 post-trial motion, Samsung argued that:  (1) Apple "failed to take price elasticity of demand into consideration" in light of the price differential in the Apple and Samsung products; (2) consumers

1   purchase Samsung products for "the functionality of Samsung's phones"; and (3) consumers

2   would buy an Android smartphone, not an iPhone, absent Samsung's infringement.  (Dkt. 1990 at

3   21.)  Each of these arguments appears again in Samsung's current motion.[12]  The Court has

4   rejected each before:

> Mr. Musika provided detailed evidence regarding how the market would likely
> have behaved absent Samsung's infringement, including:  (1) the market share of
> various smartphone manufacturers, based on data collected and analyzed by
> independent research firm IDC (including Apple, Samsung, and other
> manufacturers, to whom he assigned the largest market share) (PX25A1.8; [Dkt.
> 1839 at] 2084:23-2085:9); (2) Apple's capacity to manufacture additional phones
> and tablets (PX25A1.14-15; [Dkt. 1839 at] 2085:13-2086:3); and (3) consumer
> demand, based on both expert survey evidence and fact witness testimony ([Dkt.
> 1839 at] 2076:3-2077:8).  The Federal Circuit has noted that it "has affirmed lost
> profit awards based on a wide variety of reconstruction theories where the
> patentee has presented reliable economic evidence of 'but for' causation."
> *Crystal Semiconductor*, 246 F.3d at 1355.  Mr. Musika's opinion reconstructs the
> market based on market share, capacity, and demand, thus demonstrating how
> many additional sales Apple would likely have made, but for Samsung's
> infringement.  This constitutes exactly the type of economic evidence of causation
> that the Federal Circuit requires in sustaining an award of lost profits.

14   (Dkt. 2271 at 13-14.)  Ms. Davis used the same model and relied on the same evidence.  The

15   same conclusions apply.

16          <u>Lost profits may be allocated according to market share.</u>  Samsung's argument rests on the

17   erroneous premise that it is improper to allocate lost profits according to market share.  The

18   Federal Circuit has held that allocation based on market share is an acceptable method to address

19   non-infringing alternatives.  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed.

20   Cir. 1989) (permitting use of a market share allocation to account for non-infringing alternatives).

21   This Court's jury instructions say so as well.  (Dkt. 2784 at 31 (Final Jury Instruction No. 25)

22   ("One way Apple may prove the number of sales it would have made if the infringement had not

23   happened is to prove its share of the relevant market excluding infringing products.  You may

24   award Apple a share of profits equal to that market share.").)

25

26   [12] Samsung has repeatedly argued that *BIC Leisure Products v. Windsurfing International, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993), and *Crystal Semiconductor Corp. v. TriTech*

27   *Microelectronics International, Inc.*, 246 F.3d 1336, 1356 (Fed. Cir. 2001), preclude a lost profit award in Apple's favor.  The Court has already rejected that argument in connection with the first

28   *Daubert* motions (Dkt. 1157 at 10-11) and the first post-trial motions (Dkt. 2271 at 13-14).  Nothing about the factual context after the second trial makes the arguments apt now.

1   <u>Samsung misstates the evidence.</u>  Samsung's argument that Apple's lost profit damages

2   reflect an amount equal to "its *pro rata* share of the infringing sales" is contrary to the record.

3   (Mot. 18.)  In the second quarter of 2011, Apple's market share for smartphones was 24.7%.

4   (PX25F.8.)  In contrast, the ▮▮▮▮ smartphone units included in Apple's lost profits calculation

5   represent only a ▮▮▮▮ share of the 1.8 million infringing smartphones Samsung sold in the six

6   week lost profit period.  (PX25G1.2 (showing Samsung's sales).)  Use of a pro rata share, without

7   other reductions, would have resulted in a substantially higher lost profits award.

8       Ms. Davis took repeated reductions from the infringing sales to "slic[e] [her] number

9   down and down and down" to account conservatively for the various factors that could affect

10  consumer's choices.  (Dkt. 2840 at 668:9-11; *see id.* at 663:11-671:22.)  These include

11  adjustments to account for the hypothetical possibility of a design around (*id.* at 663:19-22) and

12  for products sold at carriers where Apple was not selling iPhones (*id*. at 665:25- 668:8), and a

13  conservative assumption that any new design would be instantly and completely accepted by the

14  marketplace (*id*. at 663:23-664:10).  Further, Ms. Davis testified that the market share allocation

15  step itself accounted for differences in "price," "operating platform preference," and "other

16  product features," making an additional adjustment for each of these unnecessary.  (*Id*. at 670:4-

17  671:20.)  Apple's damages calculation took non-infringing features into account in a number of

18  ways, so that the lost profits attributed to the patented features were not overstated.  Samsung is

19  fighting a straw man, not Ms. Davis's damages calculations.[13]

20      <u>The jury had a basis to allocate among the infringing and non-infringing features.</u>

21  Samsung's contention that the jury was given no basis to allocate among the infringing and non-

22  infringing features is equally mistaken.  (*See* Mot. 18.)  For example, Ms. Davis specifically

23  addressed the issue of large screen size and why it would not affect her calculation.  (Dkt. 2843 at

24  1188:18-1189:18.)  She further discussed how her calculations used real-world choices by

25  consumers to "synthesize" and address consumer preferences and choices among various features

26

27      [13] For the same reason, Samsung's argument that Dr. Hauser's testimony conclusively
    establishes that you cannot use "market share data without additional information" to allocate lost
28  profits units (Mot. 19) misses the mark.  Ms. Davis did not use market share data without
    additional information.  Moreover, Dr. Hauser did not criticize Ms. Davis's methods.

1   and options, allocating substantial amounts of sales to other Android manufacturers and to

2   Samsung as a result.  (Dkt. 2840 at 670:20-671:20.)  By accounting for market share at specific

3   carriers, Ms. Davis also captured differences in customer preferences for operating platform and

4   other features that manifest themselves in decisions to purchase service from AT&T as compared

5   to Verizon or Sprint.  (*Id.* at 666:16-668:8.)  This testimony and the adjustments described above

6   are more than an adequate basis to address any need to allocate among infringing and non-

7   infringing features as described in Jury Instruction No. 22.[14]

8          Samsung fails to support its bold claim that the evidence does not "show that *any of*

9   *Samsung's customers* would have purchased an iPhone."  (Mot. 19.)  In essence, Samsung argues

10  that, due to differences in price or other product features, Samsung and Apple operate in different

11  markets.  That conclusion cannot withstand the undisputed evidence—largely from Samsung

12  itself—that Apple and Samsung compete fiercely in all price categories for sales of smartphones

13  and tablets, including:

14         •  Samsung's internal documents.  (*E.g.*, PX40.5 ("when our UX is compared to the

15  unexpected competitor Apple's iPhone, the difference is truly that of Heaven and Earth"); PX58.5

16  ("STA must respond with a plan to beat Apple by Q3'11 or Q4'11"); PX60.8 ("US Market

17  Becoming a Two Horse Race Between Apple and Samsung."); PX62.11-.20 (showing the

18  infringing phones in competition with the iPhone).)

19         •  Testimony from both Apple and Samsung witnesses, including Samsung's Chief

20  Marketing Officer and its damages expert.  (Dkt. 2841 at 848:15-22 (Schiller) ("Q. Sir, did th[is

21  list of infringing] products compete with Apple's smartphones and tablets?  A. Yes, they did.");

22  Dkt. 2797-3 (Pendleton) ("Q. So, do Apple and Samsung compete in all three [price] categories?

23  A. Yes."); Dkt. 2843 at 1106:21-22 (Wagner) ("Q. They [Apple and Samsung] compete for the

24  same customers in the marketplace?  A. Oh, I agree with that.").)

25         As with many other issues in this case, Samsung's own internal strategy documents

26  _____

27         [14] Samsung cites no law other than Jury Instruction No. 22 for its claim that an allocation
    between infringing and non-infringing features must occur.  (Mot. 18.)  Apple objected to the
    instruction as not reflecting Federal Circuit law on the issue of lost profits damages.  Nonetheless,

28  the dispute is moot because Ms. Davis reduced lost profits and allocated among units in a manner
    that addresses consumer demand for non-infringing features.

1  undermine its arguments, as they show the infringing products competing against Apple's iPhone

2  at equivalent price points.  (*E.g.*, PX62 (pitting the Droid Charge, Infuse 4G (Dempsey),

3  Captivate, Epic 4G and other products against Apple's iPhone at various price points).)  And any

4  price differences did not preclude the jury from finding, consistent with the evidence, that

5  Samsung and Apple were competing in the same market, for the same customers, through

6  Samsung's sale of the infringing phones.

7       <u>Surveys regarding other factors do not undermine the verdict.</u>  Samsung also cannot

8  undermine the verdict by referring to surveys that identify various factors other than the '915

9  patent's features that are attractive to various segments of the smartphone or tablet market.  (*See*

10  Mot. 19-21.)  Those surveys are entirely consistent with Ms. Davis's testimony and calculations,

11  which assign a small percentage of sales to lost profits.  Nor is it enough for Samsung to offer

12  attorney argument that these features make it "far more likely" that Samsung customers would

13  turn to a different product.  This is not what Samsung was saying internally when STA executives

14  characterized the United States market as a "two horse race" between Apple and Samsung or

15  drafted its "Beat Apple" strategy.  (PX60.8; PX58.)  Moreover, Ms. Davis's calculation assigned

16  far more than half of the infringing units to Samsung or other Android makers, rather than to

17  Apple.  Apple provided a record sufficient to show a reasonable probability that 360,000

18  infringing sales would have been made by Apple.  This is all that *Rite-Hite* and the jury

19  instructions require, and it is all that is necessary to defeat Samsung's post-trial arguments.

20       <u>Samsung's tablet-market arguments contradict the record.</u>  Samsung's arguments that the

21  Galaxy Tab and the iPad exist in separate markets (Mot. 22) cannot be reconciled with the

22  evidence at trial.  Mr. Schiller testified that the Galaxy Tab competed with Apple's iPad.  (Dkt.

23  2841 at 848:15-22.)  Samsung's United States executives told Samsung Korea's Chief Financial

24  Officer, "In 2011 Galaxy Tablets Faced Strong Competition from Both the High End iPad and the

25  Low Tiered Fire/Nook."  (PX60.6.)  Moreover, Samsung did not present a single executive or

26  employee to testify that, contrary to these internal documents, the Galaxy Tab and the iPad do not

27  compete.  Rather, it asks the Court to draw that inference from disputed evidence about price

28  differences or product characteristics.  That is not the proper inquiry for a post-trial motion.

1  Samsung argued its evidence to the jury.  The jury rejected Samsung's position.  As long as there

2  is evidence to support they jury's conclusion—and there is ample evidence as discussed above—

3  the verdict should be confirmed.

4       **D.      The Record Supports Apple's Capacity To Make The Modest Lost Tablet
                  Sales It Claimed.**
5

6       While Samsung does not argue that Apple lacked capacity to sell more iPhones during the

7  damages period, it claims that there is no evidence that Apple could have sold any additional

8  iPads in April or May of 2011.  (Mot. 23.)  That is not so.  Apple claimed lost profits on less than

9  ███████ iPad units.  (PX25G1.3.)  That number reflects a less than ██ increase over the 4.3

10 *million* iPads that Apple sold in the United States the second calendar quarter of 2011.

11 (PX25G1.7.)  It is less than half of the 100,000 unit increase that Mr. Blevins described as "quite

12 trivial" and "routine[.]"  (Dkt. 2739 at 498:20-499:23.)  It was a drop in the bucket, even in a

13 period in which Apple was experiencing strong consumer demand.

14      Samsung incorrectly argues that Mr. Blevins's testimony establishes that Apple could not

15 sell any more iPads in the relevant periods.  But the very document that Samsung used to cross-

16 examine Mr. Blevins shows that Apple held ██████ iPad2 "actual units unsold" at the end of the

17 first calendar quarter (*i.e.*, March 31, 2011) and ██████ "actual units unsold" on June 30, 2011.

18 (PX182.1.)  Apple's lost sales of ██████ units fit well within this unsold inventory.  Mr. Blevins

19 further testified that the first generation iPad was available during the same period; his testimony

20 is confirmed by PX182, which shows ██████ units available for sale at the beginning of the

21 second calendar quarter.  (Dkt. 2739 at 498:20-24; PX182.1.)  This is more than sufficient to

22 permit a jury to reject Samsung's claim that Apple had an insurmountable shortage during these

23 months.

24 **V.     SAMSUNG'S MOTION FOR JMOL ON THE JURY'S REASONABLE ROYALTY
            AWARD SHOULD BE DENIED.**
25
        **A.      Substantial Evidence Supports The Jury's Reasonable Royalty Award.**
26

27      The amount that Samsung calculates as the jury's award for reasonable royalty damages is

28 supported by substantial evidence and should not be disturbed.  Reasonable royalty damages

1    should be upheld when they "are supported by substantial evidence and not excessive or based

2    only on speculation and guesswork." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1382

3    (Fed. Cir. 2013). Ms. Davis's testimony, along with the testimony of Apple's other witnesses and

4    the admitted trial exhibits, is more than sufficient to allow a reasonable jury to award Apple its

5    requested royalties.

6         Ms. Davis testified that she used three different methods to arrive at her reasonable royalty

7    rates and, as Samsung concedes (Mot. 26), she described each of those methods. (Dkt. 2840 at

8    705:2-706:8.) Ms. Davis further testified that she applied a *Georgia-Pacific* analysis to arrive at

9    her final royalty rates. (*Id*. at 706:8-18.) She explained to the jury that the issue of demand was

10   relevant to that analysis (*id*. at 649:25-650:4) and spoke at length about demand for the patented

11   products, features, and designs (*id*. at 650:20-659:17). She explained that Dr. Hauser's survey

12   results showed that consumers were willing to pay more for the patented features. (*Id.* at 654:4-

13   8.) She also testified regarding several internal Samsung documents that "indicate that even

14   Samsung had a demand for th[e] [patented] features and functionalities." (*Id*. at 660:6-10

15   (discussing PX34, PX36, and PX40).)

16        Apple's other witnesses also discussed demand for the patented features and Samsung's

17   copying of those features. For example, Dr. Balakrishnan, Apple's technical expert on the '381

18   patent, testified that "Samsung had carefully studied the bounce feature of the '381 patent," that

19   "their documentation indicates that they should implement this functionality," and that the

20   "functionality actually was implemented in many of their products." (Dkt. 2739 at 422:9-19.)

21   Dr. Singh, Apple's technical expert on the '915 and '163 patents, testified similarly with respect

22   to those patents. (*See, e.g.*, *id*. at 450:6-11 (Samsung concluded that they should "adopt double

23   tap as a supplementary zooming method. And further, that the user experience of the iPhone can

24   be used as a design benchmark.").) As the Court has previously noted, such evidence is probative

25   of several of the *Georgia-Pacific* factors, including Factor 8 (commercial success of the patented

26   product), Factor 9 (utility and advantages of the patented technology), and Factor 11 (infringer's

27   use of the invention and the value of that use). (*See, e.g.*, Dkt. 2721 at 2.)

28        The record also contains ample evidence concerning the *Georgia-Pacific* factors most

1  relevant to Ms. Davis's analysis, including *Georgia-Pacific* Factor 5—"[t]he commercial

2  relationship between the licensor and licensee, such as, whether they are competitors in the same

3  territory in the same line of business." *Georgia-Pacific. Corp. v. U.S. Plywood Corp.*, 318 F.

4  Supp. 1116, 1120 (S.D.N.Y. 1970). Mr. Schiller testified, for example, that Samsung's infringing

5  products competed directly with Apple's iPhone and iPad products. (Dkt. 2841 at 848:10-

6  849:16.) Ms. Davis provided additional detail regarding the direct competition between Apple

7  and Samsung (Dkt. 2840 at 647:10-648:17, 659:5-17; *see, e.g.*, PX60.8; PX40.5), and explained

8  that it would increase the royalty rate because licensing its technology to Samsung may cause

9  Apple to lose sales it otherwise would have made (Dkt. 2840 at 706:21-707:6). Mr. Wagner

10  agreed that Apple and Samsung compete directly and that this is relevant to determining a

11  reasonable royalty. (Dkt. 2843 at 1106:11-1110:16, 1113:8-1114:15; *see, e.g.*, PX62.12, .16-.17.)

12       Contrary to Samsung's argument (Mot. 24-26), this is far from the situation in *Whitserve*

13  *LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012), where the damages expert used a

14  "discarded rule of thumb" as his starting point and a "superficial recitation of the *Georgia-Pacific*

15  factors, followed by conclusory remarks" to support his opinion. *Id.* at 31. In light of Ms.

16  Davis's testimony and other record evidence, the jury's award of $34,625,194 in reasonable

17  royalty damages is not outrageously high, is amply supported by the evidence, and should be

18  upheld. *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1345 (Fed. Cir. 2011).

19       **B.    The Jury's Reasonable Royalty Award Was Appropriately Apportioned.**

20       Samsung's argument (Mot. 26-27) that Ms. Davis's reasonable royalty numbers failed to

21  account for unpatented features of the infringing products is unfounded. As Ms. Davis testified,

22  her reasonable royalty calculation reflected "the amount of money that one party would pay to

23  another for the right to use the other's intellectual property, or specifically in this case, *the*

24  *patented technology*." (Dkt. 2840 at 634:1-6 (emphasis added).) The starting point for Ms.

25  Davis's reasonable royalty rates were "the costs to Samsung of being out [of] the market long

26  enough to design around *the patents in this case*," and "the benefits and advantages to Samsung

27  of using the patented technology, so what profits might be attributable to the use *of that*

28  *technology*." (*Id.* at 705:13-25 (emphasis added); *see also id.* at 644:14-16 (directing jury to

1   PX25F.16 for detail regarding reasonable royalty reference rates); PX25F.16 nn.2-3 (explaining

2   that Ms. Davis's reasonable royalty reference rates were based on the "value of the patents at

3   issue" and "the cost to an entity to develop or replace the specific technology in question").)

4   Because the basis for Ms. Davis's reasonable royalties was a measure of the value of the patents,

5   not the full value of the products, there was no need to apportion any further.[15]

6   **VI.    SAMSUNG'S MOTION FOR JMOL ON SAMSUNG'S PROFITS SHOULD BE
           DENIED.**

7

8          **A.    Substantial Evidence Supports The Jury's Award Of Samsung's Profits.**

9          Substantial evidence supports an award of Samsung's profits at least as large as what

10  Samsung calculates the jury awarded.[16]  Ms. Davis testified that the jury should award Apple

11  $231,373,554 in Samsung's profits for the infringement of Apple's design patents.  (Dkt. 2840 at

12  639:23; PX25F.4.)  Mr. Wagner placed Samsung's profits, excluding losses, at $52,734,959.

13  (DX781.002.)  Both experts agreed that Samsung's gross revenues from its sale of products that

14  infringe Apple's design patents was $854 million.  (Dkt. 2840 at 692:5-11; Dkt. 2841 at 1014:20-

15  22; Dkt. 2843 at 1116:16-17; PX180A; PDX100.17.)  They also agreed that the amount of costs

16  of goods sold to deduct from those revenues was approximately $623 million.  (Dkt. 2840 at

17  692:25-693:8; Dkt. 2843 at 1116:18-19; PX180A; PDX100.17.)  The only dispute was whether

18  Samsung was entitled to deduct any of its remaining operating expenses.  (Dkt. 2843 at 1116:20-

19  22.)  Ms. Davis testified that she did not see any evidence that those operating expenses were

20  directly attributable to the seven products found to infringe Apple's design patents, and thus

21  testified that none of them should be deducted in calculating Samsung's profits.  (Dkt. 2840 at

22  702:20-703:3; PX180A; PDX100.20A.)  Mr. Wagner conceded that he, too, had not seen any

23  _____

24          [15] Even if the Court believed that the jury's reasonable royalty award was not supported
       by the evidence, the proper remedy would not be to "strike the award" (Mot. 24) but to order a
       new trial.  The Patent Act requires compensation for infringement that is "in no event less than a

25  reasonable royalty," 35 U.S.C. § 284, and Samsung's own expert agreed that Apple is entitled to a
       reasonable royalty (Dkt. 2841 at 1035:5-21).  As the Court has previously recognized, "[t]he law

26  requires the jury to award some amount of damages for each infringing sale."  (Dkt. 2271 at 22.)

27          [16] As stated in Apple's Post-Trial Motion for JMOL (Dkt. 2876 at 2-5), Apple is entitled
       to the full amount of Samsung's profits for infringement of the D'305 and D'677 patents (*i.e.*,

28  $231,373,554) because Samsung failed to meet its burden regarding deductible expenses as a
       matter of law.

1    evidence directly attributing a single dollar of those operating expenses to individual products,

2    but nonetheless opined that 100% of them should be deducted.  (Dkt. 2843 at 1124:23-1125:9,

3    1127:2-9, 1127:23-1128:4, 1129:20-24, 1130:20-1131:2.)

4           An award of Samsung's profits between the numbers advocated by Mr. Wagner and Ms.

5    Davis would not be an impermissible "compromise verdict" as Samsung claims.  (Mot. 28.)  "A

6    compromise verdict 'is one reached when the jury, unable to agree on liability, compromises that

7    disagreement by entering a low award of damages.'"  *James v. Sheklanian*, No. 08-cv-01943,

8    2010 WL 3504804,  at *4 (E.D. Cal. Sept. 7, 2010) (quoting *Nat'l R.R. Passenger Corp. v. Koch*

9    *Indus., Inc.*, 701 F.2d 108, 110 (10th Cir. 1983)).  Here, liability was already established, and

10   "[t]he jury was entitled to choose a damages award within the amounts advocated by the opposing

11   parties."  *Spectralytics*, 649 F.3d at 1347.

12          Because the jury's award falls "'within the range encompassed by the record as a whole,'"

13   Samsung is not entitled to judgment as a matter of law.  *Powell*, 663 F.3d at 1241 (citation

14   omitted).  Indeed, it was Samsung's burden to prove the additional operating expenses, if any,

15   that were deductible for the purposes of calculating Samsung's profits.  (Dkt. 2784 at 39 (Final

16   Jury Instruction No. 31).)  Thus, to the extent Samsung believes there was no basis for the jury to

17   "split the baby," the tie goes to Apple.  If, as Samsung argues (Mot. 28), the jury was not entitled

18   to find that some fraction of Samsung's operating expenses were deductible, then there was no

19   basis for finding *any* of Samsung's costs deductible, and Apple should be awarded the entire

20   $231,373,554 that it sought in infringer's profits.

21          **B.      The Award Of Samsung's Profits Does Not Result In Double-Counting.**

22          Ms. Davis testified that the jury should award Apple $231,373,554 in Samsung's profits.

23   (Dkt. 2840 at 639:23.)  Although certain infringing products were eligible for an award of

24   multiple damages types, Ms. Davis placed each individual unit into only one damages category.

25   (*Id.* at 634:9-25.)  Her calculation of Samsung's profits was therefore limited to only those units

26   for which she did not seek an award of lost profits or reasonable royalty.  The jury ultimately

27   awarded Apple only a portion of Ms. Davis's $231,373,554 number.  Because the entirety of

28   Ms. Davis's calculation of Samsung's profits was a valid award for the units for which Apple did

1    not seek lost profits or a reasonable royalty, the portion of this number awarded by the jury does

2    not constitute double-counting.

3          **C.      There Is No Apportionment Requirement Under 35 U.S.C. § 289.**

4          Under Federal Circuit precedent, there is no apportionment requirement for infringer's

5    profits under 35 U.S.C. § 289.  *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1442-43

6    (Fed. Cir. 1998).  The Court has already rejected Samsung's argument that an award of

7    infringer's profits is subject to apportionment as "clearly foreclosed" by this precedent and should

8    not entertain it again.  (Dkt. 2271 at 12.)  Even Samsung admits that it made the argument solely

9    to preserve the issue for appellate review.  (Mot. 30 n.11.)

10   **VII.   SAMSUNG'S ALTERNATIVE MOTION FOR REMITTITUR SHOULD BE
             DENIED.**
11

12         Based on the premise that the Court will decide that one or more portions of the jury's

13   award should be stricken (*e.g.*, Mot. 33:5-8), Samsung asks the Court to reduce the award and

14   grant "a new trial conditioned on the rejection of remittitur" (*id.* at 33 n.14).  For the same reasons

15   the Court should deny Samsung's JMOL motion in its entirety, the Court should deny Samsung's

16   alternative motion for remittitur that depends on its JMOL motion.

17         Moreover, Samsung fails to satisfy the standard for remittitur.  As Samsung

18   acknowledges, the "'proper amount of a remittitur is the maximum amount sustainable by the

19   evidence.'"  (Mot. 32-33 (citation omitted).)  And remittitur is only permissible if the jury's

20   award is "monstrous."  *Revolution Eyewear*, 563 F.3d at 1372.  Samsung must therefore show

21   that the verdict *as a whole* is monstrous and more than the maximum sustainable by the evidence.

22   Samsung never attempts to satisfy this standard.

23         Finally, Samsung repeatedly seeks far greater reductions than the evidence would sustain.

24   For each scenario in which Samsung posits that the Court confirms the portion of the award that

25   Samsung attributes to infringer's profits, Samsung contends that Apple should receive only

26   "61.3960645% of Samsung's profits sought by Apple in PX25F.4."  (Mot. 33:8-9, 33:20:21,

27   34:12-13.)  Thus, were the Court to find a problem in a component of the jury's award

28   *independent of* infringer's profits, Samsung seeks not only to reduce the total award by the

1  amount of the faulty component, but also to cap the amount of infringer's profits that Apple

2  would receive.  But under "the 'maximum recovery rule,'" a court remits a damage award "to the

3  highest amount the jury could 'properly have awarded based on the relevant evidence.'"  *Oiness*,

4  88 F.3d at 1030 (citation omitted); *see D&S Redi-Mix*, 692 F.2d at 1249 (proper amount of a

5  remittitur is "the maximum amount sustainable by the proof").  The highest amount the jury *could*

6  have awarded for infringer's profits was the amount that Apple claimed in PX25F.4.  That the

7  jury awarded Apple less than the full amount of damages it claimed is immaterial.[17]

8  **VIII.   SAMSUNG'S MOTION FOR A NEW TRIAL SHOULD BE DENIED.**

9        **A.**      **References To Samsung's Revenues Do Not Warrant A New Trial.**

10        Contrary to Samsung's argument (Mot. 35-38), the few scattered references in the record

11  to Samsung's total revenues do not warrant a new trial.  The Court may grant a new trial only

12  under very limited circumstances.  *Passantino*, 212 F.3d at 510 n.15 ("The trial court may grant a

13  new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or

14  perjurious evidence, or to prevent a miscarriage of justice.").  The standard for granting a new

15  trial is especially difficult to satisfy here because Samsung made no contemporaneous objection

16  to any of the references before the jury to its total revenues.[18]  *Settlegoode v. Portland Pub. Schs.*,

17  371 F.3d 503, 517 (9th Cir. 2004) ("There is an even 'high[er] threshold' for granting a new trial

18  where, as here, [a party] failed to object to the alleged misconduct during trial.")  (first alteration

19  in original) (quoting *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th

20   

---

21       [17] As part of its remittitur argument, Samsung asserts that ongoing proceedings regarding reexamination of the '915 patent provide a reason to "set aside the award of lost profits," and

22  incorporates its motion to stay (Dkt. 2811).  (Mot. 33 n.15.)  The Court should reject Samsung's arguments for the same reasons it denied the motion to stay (*see* Dkt. 2831) and for the reasons stated in Apple's opposition (Dkt. 2816), which Apple incorporates herein by reference.

23   

24       [18] Samsung's objection to Ms. Davis's demonstratives did not preserve its claim of error for the references to Samsung's total revenues made at trial.  Samsung's objection (Dkt. 2700 at 1-2) and the Court's ruling (Dkt. 2721 at 4) were limited to those particular demonstratives.

25  (*E.g.*, Dkt. 2721 at 4 ("[T]he presentation of this total revenue figure *on these Slides* misleadingly suggests that Apple may be eligible to recover infringer's profits on all of Samsung's infringing

26  sales and not merely those sales that infringed a design patent."  (emphasis added)).)  Samsung filed no motion *in limine* or other general objection to the admission of its total revenues.  In any event, Samsung's objection to Ms. Davis's demonstratives did not relieve its obligation to object

27  contemporaneously at trial.  A party may not "sit silent in the face of claimed error" and "wait to raise the error until after the negative verdict."  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174,

28  1193 (9th Cir. 2002).

1   Cir. 1986)).  Under these circumstances, a new trial may be granted only upon a showing of plain

2   error.  *Id.*  "Plain error review requires:  (1) an error; (2) that the error be plain or obvious; (3) that

3   the error have been prejudicial or affect a substantial right; and (4) that review be necessary to

4   prevent a miscarriage of justice."  *Id.*  Samsung falls far short of meeting that demanding

5   standard.

6        There was no error—and certainly not plain error—in Apple's references to Samsung's

7   total revenues at trial.  On the contrary, Samsung opened the door by repeatedly referencing its

8   own profit margins in an attempt to make its damages calculation seem reasonable.  For example,

9   Mr. Sheppard testified in detail about Samsung's profit margins for (i) the entire company (Dkt.

10  2841 at 959:3-6); (ii) Samsung's telecommunications business segment (*id.* at 960:12-18);

11  (iii) the thirteen products at issue in the retrial (*id.* at 973:2-14); and (iv) the seven products

12  involved in the retrial for which Apple sought Samsung's profits (*id.* at 973:14-15).  Mr. Wagner

13  compared his calculation of Samsung's profits to Samsung's company-wide profit margin and

14  criticized Ms. Davis's calculation as "double" that number.  (Dkt. 2843 at 1146:21-1147:6.)  And

15  in closing, Samsung argued that its profit margins demonstrate the reasonableness of its damages

16  calculations.  (Dkt. 2844 at 1360:14-1361:3.)  As Mr. Sheppard explained, Samsung's profit

17  margins are derived directly from its total revenues; indeed, Samsung's profit margins are simply

18  the percentage of its total revenues that Samsung considers profit.  (Dkt. 2841 at 959:7-10.)

19  Samsung cannot now complain that Apple presented evidence of what those total revenues are,

20  much less claim a miscarriage of justice because Apple made the same comparison that Samsung

21  itself used to place the parties' damages calculations into context.

22       Samsung also incorrectly argues that its total revenues are irrelevant.  (Mot. 36.)  Apple

23  sought Samsung's profits as damages, and the starting point for calculating Samsung's profits is

24  Samsung's revenues.  (*See* Dkt. 2784 at 39 (Final Jury Instruction No. 31) ("Profit is determined

25  by deducting certain expenses from gross revenue.").)  Although Samsung argues that it was

26  improper for Apple to present evidence of Samsung's profits for all thirteen products at issue

27  when Apple sought Samsung's profits for only seven (Mot. 36), Samsung itself presented

28  evidence of its profit margins for all thirteen products (Dkt. 2841 at 973:2-14), as well as

1   Samsung's profit margins for its telecommunications business segment (*id.* at 960:12-18) and

2   across the entire company (*id.* at 959:3-6).  Samsung cannot credibly claim that its total revenues

3   for all thirteen products are irrelevant when it presented calculations derived from the same

4   evidence, in addition to business-segment and company-wide calculations that have a far more

5   attenuated connection to the issues at trial.

6        Nor is Samsung correct (Mot. 36-38) that Apple violated the entire market value rule by

7   presenting evidence of Samsung's total revenues.  None of Apple's damages calculations was

8   based on the entire market value of Samsung's infringing products.  To the contrary, Ms. Davis

9   explained that she calculated a per-unit royalty rate using three different methods—none of which

10  depended upon Samsung's total revenues.  (*See* Dkt. 2840 at 705:2-706:7.)  Moreover, the jury

11  was properly instructed on the limited circumstances under which it could apply the entire market

12  value rule.  (Dkt. 2784 at 33 (Final Jury Instruction No. 27).)  The jury is presumed to have

13  followed that instruction.  *See Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply*

14  *Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) ("In interpreting jury verdicts, we must assume that the

15  jury followed the trial court's instructions.").  There is no basis for finding any violation of the

16  entire market value rule here, let alone one that affected the jury's deliberations.

17       Samsung cites *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir.

18  2012), and *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), to argue that

19  Apple's mention of Samsung's total revenues was improper.  (Mot. 36-37.)  But those cases

20  involved only utility patents; infringer's profits were not at issue.  *See LaserDynamics*, 694 F.3d

21  at 56; *Uniloc*, 632 F.3d at 1296-97.  Moreover, neither case involved a situation where, as here,

22  the defendant itself injected its total revenues into the case by comparing its damages calculations

23  to its profit margins.  (*See* Dkt. 2841 at 959:3-10, 960:12-18, 973:2-15; Dkt. 2844 at 1360:14-

24  1361:3.)

25       **B.    Apple Did Not Appeal To Racial Prejudice.**

26       There is no basis for granting a new trial based on any alleged appeals to racial prejudice.

27  To warrant a new trial on those grounds, "the 'flavor of misconduct must sufficiently permeate an

28  entire proceeding to provide conviction that the jury was influenced by passion and prejudice in

1    reaching its verdict.'"  *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th

2    Cir. 1984) (quoting *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 388 (9th Cir. 1965)).

3    Apple made no appeals to racial prejudice, let alone the type of pervasive argument necessary to

4    justify a new trial.

5            Contrary to Samsung's argument (Mot. 38-39), the scattered references in the record to

6    Korea are not evidence of any improper appeals to racial prejudice.  In context, those statements

7    simply refer to Samsung's corporate structure, and Samsung made no contemporaneous objection

8    to any such testimony or argument.  (*See* Dkt. 2739 at 348:16-18, 349:1-5; Dkt. 2841 at 966:1-2,

9    975:7-22, 978:19-979:13; Dkt. 2843 at 1118:21-25, 1166:19-1167:3, 1175:11-13, 1178:4-10.)

10   Samsung's profits were at issue in this case, and understanding Samsung's corporate structure is

11   necessary to interpret Samsung's financial documents, which distinguish between Samsung's

12   Korean corporate parent and its American subsidiaries.  (*See* PX180A.)  There was no prejudice

13   to Samsung in presenting that evidence.  Indeed, the case caption itself—which identifies

14   Samsung Electronics Co., Ltd. as "a Korean business entity"—makes the same distinction.

15           There also was nothing improper in Apple's references to translations from native Korean

16   speakers.  Those statements explain how witnesses obtained the information that they relied upon,

17   and again, Samsung made no contemporaneous objection to those statements.  For example,

18   Dr. Balakrishnan—who does not speak or understand Korean—testified that he knew what was in

19   Samsung's documents by relying on official translations of documents originally written in

20   Korean.  (*See* Dkt. 2739 at 412:5-11.)  And Mr. Wagner explained that he received his

21   information about Samsung's hypothetical design-arounds from conversations with Samsung's

22   Korean engineers that were translated by Samsung's own in-house counsel.  (*See* Dkt. 2843 at

23   1090:18-1091:8.)  It was not the fact that the engineers spoke Korean that Apple criticized; rather,

24   it was the fact that there was no way to independently verify the information that Mr. Wagner

25   received from an interested party.  (*See* Dkt. 2844 at 1322:19-23 ("Now, Mr. Wagner admitted

26   that his entire theory was dependent upon telephone conversations with Samsung folks in Korea.

27   They didn't speak English; he didn't speak Korean.  There were Samsung lawyers sitting next to

28   them translating.  We have no idea what was said because he didn't tell us.").)  In any event, the

1   jury was properly instructed not to be influenced by the fact that a witness speaks a language

2   other than English. (*See* Dkt. 2716 at 16.)  Samsung has provided no basis to overcome the

3   strong presumption that the jury followed that instruction. *See Westinghouse*, 106 F.3d at 901.

4          Nor was the reference to television manufacturers in Apple's closing argument an

5   improper appeal to racial prejudice.  Samsung argued throughout trial that the patents-in-suit

6   claim narrow and insignificant inventions. (*See, e.g.*, Dkt. 2739 at 374:12-375:1, 424:19-425:3,

7   428:23-429:6, 454:4-21; Dkt. 2844 at 1331:18-21, 1336:2-10, 1373:2-8.)  To rebut that argument,

8   Apple's closing emphasized the policy reasons for patent protection.  Indeed, directly preceding

9   the reference to television manufacturers, Apple laid out the policy reasons for robust patent

10  protection. (*See* Dkt. 2844 at 1397:5-12 ("Our vibrant economy absolutely depends on fair

11  competition.  It depends on a patent system that encourages inventors to invent, it encourages

12  investors to invest, and it encourages employers to hire.  If we allow that system of law to decay,

13  investors will not invest, people will not take risks, and our economy will disappear.").)  Even if

14  Apple's reference to television manufacturers were somehow misinterpreted, the Court gave a

15  curative instruction reminding the jury of its obligation not to be "influenced by any personal

16  likes or dislikes, opinions, prejudices, or sympathy, and any appeal by any of the parties to any

17  prejudice or sympathy is not proper." (*Id.* at 1416:14-17.)  There is a "strong presumption" that

18  the jury followed that curative instruction. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258,

19  1270 (9th Cir. 2000).  The Court also offered several alternative "remedies" to Samsung before

20  issuing its curative instruction, all of which Samsung declined. (Dkt. 2844 at 1405:19-1406:20.)

21         Accordingly, Samsung has not shown—and cannot show—that Apple made any improper

22  appeals to racial prejudice, let alone any pervasive argument that improperly caused the jury—

23  which awarded Apple less than it claimed—to reach its verdict based on passion and prejudice.

24  **IX.   CONCLUSION**

25         For the foregoing reasons, Samsung's motion for JMOL, new trial, and/or remittitur

26  should be denied.

27

28

1

Dated:  January 6, 2014    MORRISON & FOERSTER LLP

2

3             By: */s/ Harold J. McElhinny*

4                HAROLD J. McELHINNY

5               Attorneys for Plaintiff
                APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28