QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK (PSG)<br><br>**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**<br><br>**Date:**   January 30, 2014<br>**Time:**   1:30 p.m.<br>**Place:**   Courtroom 8, 4th Floor<br>**Judge:**  Hon. Lucy H. Koh<br><br>**[EVIDENTIARY HEARING REQUESTED]**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.   APPLE HAS STILL FAILED TO SHOW ANY IRREPARABLE HARM
     CAUSED BY INFRINGEMENT OF THE UTILITY PATENTS ..................................... 2

     A.   The Hauser Conjoint Survey Does Not Satisfy The Causal Nexus Standard ........... 3

          1.   The Hauser Survey's Methodological Flaws Preclude Its "Price
               Premiums" From Reliably Proving That The Patented Features
               Drive Consumer Demand ............................................................................ 4

          2.   The Hauser Survey Suffers From Other Methodological Flaws That
               Preclude A Reliable Finding Of Causal Nexus ........................................... 7

     B.   The Generic Consumer Reviews Do Not Satisfy The Causal Nexus
          Standard ............................................................................................................... 10

     C.   The Purported Evidence Of Copying Does Not Satisfy The Causal Nexus
          Standard ............................................................................................................... 12

II.  THE EVIDENCE DEMONSTRATES THAT MONETARY DAMAGES WOULD
     ADEQUATELY COMPENSATE APPLE ........................................................................ 13

     A.   Apple Voluntarily Offered To License *All* Its Utility Patents To Samsung In
          October 2010 And Afterwards ............................................................................. 13

     B.   Apple's Other Licenses Confirm That Monetary Damages Are Adequate ............ 15

III. THE BALANCE OF HARDSHIPS DOES NOT FAVOR AN INJUNCTION ................ 18

IV.  THE PUBLIC INTEREST WEIGHS AGAINST AN INJUNCTION .............................. 21

V.   ALTERNATIVELY, THE COURT SHOULD STAY ENFORCEMENT OF ANY
     INJUNCTION WITH RESPECT TO THE '915 PATENT ............................................... 23

VI.  THE COURT SHOULD HOLD AN EVIDENTIARY HEARING ................................... 25

CONCLUSION ................................................................................................................... 25

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................................... 13

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007) ............................................................................... 1

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ........................................................................... 18

*Advanced Cardio. Sys., Inc. v. Medtronic Vascular, Inc.*,
    579 F. Supp. 2d 554 (D. Del. 2008) .................................................................... 18

*Apple Inc. v. Samsung Elecs. Co.*,
    678 F.3d 1314, 1324 (Fed. Cir. 2012) ............................................................... 1, 3

*Apple, Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) .................................................................... *passim*

*Belden Techs., Inc. v. Superior Essex Commc'ns LP*,
    802 F. Supp. 2d 555 (D. Del. 2011) .................................................................... 20

*Broadcom Corp. v. Qualcomm Inc.*,
    543 F.3d 683 (Fed. Cir. 2008) ............................................................................. 23

*Brocklesby v. United States*,
    767 F.2d 1288 (9th Cir. 1985) ............................................................................. 15

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ............................................................................. 4

*Charlton v. Estate of Charlton*,
    841 F.2d 988 (9th Cir. 1988) ............................................................................... 25

*Cook Biotech Inc. v. Acell, Inc.*,
    460 F.3d 1365 (Fed. Cir. 2006) ........................................................................... 24

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .............................................................................................. 2

*Flexiteek Americas, Inc. v. PlasTEAK, Inc.*,
    2010 WL 2976859 (S.D. Fla. July 20, 2010) ...................................................... 24

*Folb v. Motion Picture Industry Pension & Health Plans*,
    16 F. Supp. 2d 1164 (C.D. Cal. 1998) ................................................................. 15

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

*Gemtron Corp. v. Saint-Gobain Corp.*,
    572 F.3d 1371 (Fed. Cir. 2009) .................................................................................24

*LaserDynamics, Inc. v. Qanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .....................................................................................18

*MercExchange, L.L.C. v. eBay, Inc.*,
    500 F. Supp. 2d 556 (E.D. Va. 2007) ....................................................................12, 20

*Monsanto Co. v. Geertson Seed Farms*,
    130 S. Ct. 2743, 2761 (2010) .....................................................................................2

*Nichia Corp. v. Seoul Semi. Ltd.*,
    2008 WL 346416 (N.D. Cal. Feb. 7, 2008) ...............................................................21

*Oracle Am., Inc. v. Google, Inc.*,
    2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ..........................................................9, 10

*Peach State Labs, Inc. v. Env'tl Mfg. Solutions, LLC*,
    2012 WL 503837 (M.D. Fla. Feb. 15, 2012) .............................................................24

*Quern v. Jordan*,
    440 U.S. 332 (1979) ...................................................................................................4

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ...................................................................................18

*Roper Corp. v. Litton Sys., Inc.*,
    757 F.2d 1266 (Fed. Cir. 1985) .................................................................................21

*S.O.I.TEC Silicon On Insulator Tech., S.A. v. MEMC Elec. Materials, Inc.*,
    2011 WL 2748725 (D. Del. July 13, 2011) ...............................................................21

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
    2013 WL 3289085 (D. Mass. June 27, 2013) ............................................................20

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
    996 F.2d 1236 (Fed. Cir. 1993) .................................................................................23

*TiVo, Inc. v. EchoStar Corp.*,
    646 F.3d 869 (Fed. Cir. 2011) ...................................................................................21

*United States v. H & R Block*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .............................................................................10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .....................................................................................25

*W.R. Grace & Co. v. Local Union 759*,
    461 U.S. 757 (1983) ...................................................................................................24

*Warner Chilcott Labs. Ireland Ltd. v. Mylan Pharms., Inc.,*
   451 Fed. App'x 935, 939 (Fed. Cir. 2011) ................................................................25

## **Statutes and Rules**

15 U.S.C. § 1116(a) ................................................................................................25

35 U.S.C. § 283 ......................................................................................................25

N.D. Cal. ADR L.R. 6-12(a) ..................................................................................15

# INTRODUCTION

Apple's cursory renewed request for a permanent injunction fails to mention that the Federal Circuit's November 18 decision overwhelmingly affirmed this Court's denial of Apple's prior request for a permanent injunction and remanded only on very narrow grounds.  *See Apple, Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352 (Fed. Cir. 2013) ("*Apple III*").  The Circuit affirmed this Court's denial of an injunction with respect to all three design patents-in-suit (the D'677, D'087, and D'305 patents) and registered iPhone trade dress and unregistered iPhone 3G trade dress.  The Circuit reaffirmed the centrality of the causal nexus requirement to irreparable harm analysis, holding that this Court "was correct to require a showing of some causal nexus between Samsung's infringement and the alleged harm to Apple as part of the showing of irreparable harm,'" *id.* at 1360 (quoting *Apple Inc. v. Samsung Elecs. Co.,* 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*")), and rejecting Apple's mistaken argument that such a showing is limited to preliminary injunctions.  The Circuit likewise found "no error in [this Court's] decision to consider evidence of Apple's past licensing behavior" when evaluating the adequacy of money damages.  *Id.* at 1370.  And the Circuit affirmed this Court's ruling that the balance of hardships was neutral (*id.* at 1371) and that the public interest weighs *against* an injunction (*id.* at 1372-73).

The Federal Circuit remanded only so that this Court could consider whether Apple can meet the stringent standard for a permanent injunction with respect to the three utility patents-in-suit (the '381, '915, and '163 patents) under newly clarified standards for irreparable harm and inadequacy of money damages.  *See Apple III*, 735 F.3d at 1368, 1371.  The Circuit expressed *no* opinion on the merits of Apple's requested injunction, and directed this Court in the first instance to weigh the evidence and to resolve the factual disputes in light of the clarified standards.  *See id.* Controlling precedent requires that such disputes be resolved only after full adversarial process and evidentiary hearing.  *See, e.g.*, *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007) ("If we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be exercising our own discretion as if we were the first-line court of equity. That role belongs exclusively to the district court."); *see also infra*, Part VI.  Apple thus errs in presuming that a permanent injunction is preordained.

To the contrary, Apple's renewed motion falls far short of satisfying the stringent requirements for a permanent injunction.  Apple again fails to demonstrate a causal nexus to irreparable harm, as its recycled evidence fails to show that the patented features drive demand.  Apple fails to demonstrate that money damages would be inadequate, for Apple has both licensed the asserted utility patents to competitors and offered *Samsung* a license to those very patents as recently as July 2013.  The balance-of-hardships and public-interest factors should not be reconsidered on remand (*see Apple III*, 735 F.3d at 1371-73 & n.8), but if they are, they weigh against a permanent injunction.  Samsung no longer sells the products found to infringe, Samsung has designed around the patented features in other products, an injunction directed at unaccused products would create substantial confusion in the marketplace, and an injunction would potentially deprive consumers of Samsung smartphones and tablets containing numerous features when only a minor handful of features were found to infringe.  But even if Apple had met its burden here (which it has not), any permanent injunction as to the '915 patent should be stayed in light of the Patent Examiner's final decision invalidating all asserted claims on reexamination.

## ARGUMENT

As the Federal Circuit reiterated, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Apple III*, 735 F.3d at 1359 (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010)).  Instead, such relief is warranted only where, "[i]n accordance with the principles of equity," a patentee demonstrates "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  *Id.* (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Here, Apple has failed to demonstrate any of these elements, and thus its renewed motion should be denied.

## I.  APPLE HAS STILL FAILED TO SHOW ANY IRREPARABLE HARM CAUSED BY INFRINGEMENT OF THE UTILITY PATENTS

The Federal Circuit rejected Apple's argument that the causal nexus requirement applied

only to preliminary injunctions, explaining the requirement "applies equally" to preliminary and permanent injunctions since it "is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—*e.g.*, 'sales [that] would be lost even if the offending feature were absent from the accused product.'" *Apple III*, 735 F.3d at 1361 (quoting *Apple I*, 678 F.3d at 1324).  In other words, "[w]ithout a showing of causal nexus, there is no *relevant* irreparable harm." *Id.* at 1363 (emphasis added).  Apple nonetheless persists in trying to show a causal nexus to consumer demand based on Hauser's flawed conjoint survey, generic consumer reviews of Apple products, and evidence of purported copying by Samsung.  These efforts fare no better under the Circuit's clarified causal nexus standard than they did before.[1]

### A.    The Hauser Conjoint Survey Does Not Satisfy The Causal Nexus Standard

Apple's continued reliance (Dkt. 2897, at 3-4) on the conjoint survey by its expert, John Hauser, is unavailing.  That survey purported to show that, assuming a base price for smartphones of $199 and tablets of $499, "Samsung consumers were willing to pay $39 more for a smartphone and $45 more for a tablet that included the '915 patent's claimed feature and $100 more for a smartphone and $90 more for a tablet that included all three utility patents' claimed features." *Apple III*, 735 F.3d at 1367; *see also* PX30.  Apple is incorrect in arguing (Dkt. 2897, at 3) that these supposed "price premiums" are "strong evidence of a causal nexus."

In its decision, the Federal Circuit reiterated that irreparable harm can be shown only where a patented feature "drive[s] the demand for the product" (*Apple III*, 735 F.3d at 1360 (quoting *Apple I*, 678 F.3d at 1324)) and clarified only that a patentee need not "show that the patented feature is the one and only reason for consumer demand" (*id.* at 1364).  As the Circuit explained, such demand may be shown through "evidence that a feature significantly increases the

---

[1]   For this same reason, Apple's heavy reliance (Dkt. 2897, at 2) on what it claims were this Court's prior findings of irreparable harm (Dkt. 2197 at 5-6) is misplaced.  As the Federal Circuit recognized, these findings merely reflect that "Apple has suffered harm *as a result of Samsung's sales of smartphones and tablets*" (*Apple III*, 735 F.3d at 1360 (emphasis added)), not, as Apple now states, that it "has suffered—and will continue to suffer—irreparable harm unless Samsung's infringement is enjoined" (Dkt. 2897, at 2).

1   desirability of a product incorporating that feature" or "evidence that a patented feature

2   significantly increases the price of a product." *Id.* at 1368.  The Hauser survey, however, is

3   evidence of neither because of its serious methodological flaws—which the Federal Circuit

4   directed this Court "to address in the first instance" on remand (*id.*).[2]  While Apple refers in

5   conclusory, passing terms to Dr. Hauser's purportedly "reliable methods" (Dkt. 2897, at 5), it

6   provides no explanation or defense of them.  The flaws, whether taken individually or collectively

7   as discussed more fully below, are dispositive.[3]

8           **1.    The Hauser Survey's Methodological Flaws Preclude Its "Price**
                    **Premiums" From Reliably Proving That The Patented Features Drive**
9                   **Consumer Demand**

10          Contrary to Apple's intimations (Dkt. 2897, at 3-4), Dr. Hauser's supposed "price

11   _____

12   [2]   The parties have also addressed the Hauser survey in connection with Samsung's post-trial
     motion for judgment as a matter of law on lost profits with respect to the '915 patent (*see* Dkt.
13   2877, at 10-13; Dkt. 2908, at 6-9), but the context, record, and legal standards are different there
     than here.  Indeed, in its opposition to Samsung's post-trial motion, Apple's arguments regarding
14   the Hauser survey principally concern the Rule 50(b) standard, the *Panduit* factors for lost profits,
     and the purported lack of trial testimony countering Dr. Hauser's methodology; none of these
15   arguments is applicable here.

16   [3]   Following issuance of its December 2012 order denying a permanent injunction, the Court
     struck for procedural reasons the declarations of Tulin Erdem (Dkt. 2054-01), Ramamirtham
17   Sukumar (Dkt. 2054-03), and Yoram (Jerry) Wind (Dkt. 2054-04) that Samsung had submitted in
     opposition to Apple's original motion for a permanent injunction.  *See* Dkt. 2212, at 2.  In its
18   recent decision, the Federal Circuit directed this Court to address on remand Samsung's arguments
     that there are "methodological flaws with Dr. Hauser's survey," which are supported by the expert
19   opinions in the Erdem, Sukumar, and Wind declarations.  *See Apple III*, 735 F.3d at 1368.  To
     ensure that the record is consistent with the Federal Circuit's decision, Samsung has re-filed those
20   declarations contemporaneously with this Opposition as attachments to the Declaration of Kevin
     Smith.  *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) (on remand, district court must
21   act consistent with letter and spirit of mandate); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
     576 F.3d 1348, 1356 (Fed. Cir. 2009) ("The mandate rule requires that the district court follow an
22   appellate decree as the law of the case.").  Those declarations are referred to herein as "Erdem
     10/19/12 Decl.", "Sukumar 10/19/12 Decl.", and "Wind 10/19/12 Decl."  Samsung has also filed
23   new declarations from these declarants, which are referred to herein as "Erdem 1/9/14 Decl.",
     "Sukumar 1/9/14 Decl.", and "Wind 1/9/14 Decl."  For the Court's convenience, Samsung has
24   also re-filed, as attachments to the Smith Declaration, the declarations of Stephen Gray ("Gray
     10/18/12 Decl.") and Andries van Dam ("van Dam 10/18/12 Decl."), which were previously filed
25   in opposition to Apple's original motion for a permanent injunction.  Samsung has filed new
     declarations from these declarants as well, which are referred to herein as "Gray 1/9/14 Decl." and
26   "van Dam 1/9/14 Decl.".

27

28

premiums" for the patented features in hypothetical Samsung smartphones and tablets do not reliably prove consumer demand. *First*, because of the methodology that Hauser employed in his conjoint study, his results do *not* demonstrate that "a patented feature significantly increases the *price* of a product." *Apple III*, 735 F.3d at 1368 (emphasis added). As Hauser has repeatedly conceded, the "price premiums" (*i.e.*, "willingness to pay" numbers) from his survey do not reflect what consumers would *actually* pay for features in the real world. *See* Trial I Tr. 1935:21-25 ("[T]hose numbers … [are] a demand slide [sic]. It's what people would be willing to pay. It's not what they actually pay in the marketplace."); Trial II Tr. 591:8-13 (agreeing that his survey results do not reflect "what people would actually pay in the marketplace"); *id.* at 519:23-520:07 (agreeing that "the amount that consumers are willing to pay for a feature" is not the same as "the market price for that feature"); *see also* Wind 1/9/14 Decl. ¶ 47 ("Professor Hauser … does not, however, provide estimates of the extent to which *actual marketplace prices* might have been affected by Samsung's incorporation of the patented features, nor can he."); Sukumar 10/19/12 Decl. & Sukumar 1/9/14 Decl. ¶ 4 ("Professor Hauser's estimated consumer WTP for a feature does not measure the ability of Samsung to profitably raise its prices for its products …."); Sukumar 10/19/12 Decl. & Sukumar 1/9/14 Decl. ¶ 16 (similar). Indeed, as Hauser explained, the conjoint analysis he employed here will often produce willingness-to-pay numbers far above what actual market prices will bear because the analysis "assumes no competition"—even though "competitive context is a critical part of the purchase situation." Trial I Tr. 1940:13-21; *see also* Wind 1/9/14 Decl. ¶ 46 ("Because Professor Hauser's survey, by design, ignores the role of competing products, his analysis does not provide a basis for measuring the increase in the price of a product due to the inclusion of patented features."); *accord* Wind 1/9/14 Decl. ¶¶ 47-49; Sukumar 10/19 Decl. & Sukumar 1/9/14 Decl. ¶ 6.[4]  This fundamental methodological defect in

---

[4]  Underscoring how divorced Hauser's results are from the real world conditions of consumer demand, Samsung consumers paid on average $152 for their Samsung smartphone. Trial II Tr. 583:15-20. Yet, Hauser's flawed survey estimates that those consumers would be willing to pay $100 for only three software features related to the touchscreen and $39 for the '915 patented feature alone (*id.* at 529:17-25; PX30). As Samsung's expert confirms, the Hauser survey results
(footnote continued)

1   Hauser's survey alone warrants disregarding it as persuasive evidence of consumer demand.

2          But even if hypothetical "willingness to pay" had a direct relationship to price (which it

3   does not), Hauser further conceded that the true cost of a smartphone is *not* the $199 base price

4   that he used in the survey, but rather is up to $5000, given the required contract with a wireless

5   carrier.  *See* Trial II Tr. 580:9-15.  With the correct denominator, even the "price premiums" in the

6   Hauser survey show only a nominal value for the patented features.  *Compare id.* at 592:14

7   (Hauser stating that the "willingness to pay" for the '915 patent "would be less than a dollar a

8   month") *with* http://www.techhive.com/article/2046003/no-u-s-smartphone-costs-arent-highest-in-

9   the-world.html (average monthly cost of U.S. smartphone is $105).  As the Federal Circuit has

10  ruled, "consumers' willingness to pay a nominal amount for an infringing feature will [not]

11  establish a causal nexus." *Apple III*, 735 F.3d at 1368.[5]

12         *Second*, the Hauser survey is not persuasive evidence that "a feature significantly increases

13  the *desirability* of a product incorporating that feature."  *Id.* (emphasis added).  While a "price

14  premium" may provide some indication of the value a consumer places on a particular feature, it is

15  not possible to determine the "degree" (*id.*) to which patented features increase a product's

16  desirability without knowing the value of the patented features *relative to the value of the other*

17  *features* in a smartphone or tablet.  Here, as Hauser has conceded, his conjoint survey results do

18  not detail the hundreds of other features in a smartphone or tablet or show how much consumers

19  value the patented features relative to those many other features, including features unique to

20  Samsung and Android.  *See* Trial II Tr. 597:10-15 (Hauser conceding that his survey did not "ask

21  them how much they valued, relatively speaking, the features that are unique to Samsung and

22  Android); *id.* at 611:25-612:4 (Q:  Dr. Hauser, if you wanted to do a study to compare one of the

23  ————————————————

24  are inconsistent with actual marketplace evidence of demand.  Sukumar 10/19 Decl. & Sukumar
    1/9/14 Decl. ¶¶ 16-19.

25      [5]   At the very least, even accepting Hauser's results, there is no basis to enjoin a product that
26  does not infringe all three asserted patents.  Hauser's survey does not provide a price premium for
    the '381 patent's claimed features or the '163 patent's claimed features standing alone (or even in
    combination), and it shows only a $39 premium for the claimed features in the '915 patent.  These
27  non-existent or nominal price premiums do not support a causal nexus between any infringement
    and any harm.  *See Apple III*, 735 F.3d at 1368.

28

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

1  utility features to unique Android feature, like screen size or unique software, you'd have to

2  include those features in the study?  A.  Yes."); *see also* Wind 1/9/14 Decl. ¶¶ 50-54.  Hauser

3  further conceded that his survey did not test for and does not indicate whether participants were

4  even aware of the patented features at the time of purchase (Trial II Tr. 542:5-10), even though he

5  acknowledged that consumers "wouldn't be willing to pay anything for" features of which they

6  were unaware (*id.* at 542:21-23; *see also* Wind 1/9/14 Decl. ¶¶ 55-58).  Thus, Dr. Hauser's "price

7  premium" does not constitute reliable evidence that the patented features significantly increased

8  the desirability of any Samsung product.[6]

9          *Third*, even if the Hauser survey could support entering an injunction against the specific

10  Samsung products found to infringe the utility patents (which it does not), it cannot support

11  Apple's broad request to enjoin other Samsung products "not more than colorably different from

12  an Infringing Product as to a feature found to infringe."  Dkt. 2897-1.  The Hauser survey does not

13  purport to address whether features in other products drive consumer demand, and Apple provides

14  no basis to avoid the causal nexus requirement with respect to products not even at issue in this

15  litigation.  To the contrary, such an injunction against unaccused products for which there is *no*

16  evidence relating to consumer demand would violate the causal nexus requirement.

17          **2.      The Hauser Survey Suffers From Other Methodological Flaws That
                      Preclude A Reliable Finding Of Causal Nexus**

18

19          While each of the foregoing methodological deficiencies in Hauser's conjoint survey is

20  fatal to the survey's reliability, the survey contains other methodological flaws that grossly inflate

21          [6]  Apple's reliance (Dkt. 2897, at 4) on Dr. Hauser's undisclosed opinion that, "but for" the

22  patented features, Samsung consumers would not have purchased the accused smartphone and
    tablets (Trial II Tr. 551:13-18; *see also id.* at 547:15-548:2, 552:21-553:11, 544:16-20), is

23  procedurally improper (*see* Dkt. 2743).  That opinion in any event is unsupported by the survey
    itself, which, as Hauser conceded, required respondents to choose only among Samsung product

24  profiles (Trial II Tr. 551:22-552:6, 552:21-24, 553:7-8), did not ask Samsung consumers whether
    they would have switched to Apple if any of the utility patent features had not been in the

25  infringing devices (*id.* at 549:3-14, 597:4-9), and did not test "a market for smartphones or tablets
    in which consumers choose among brands of smartphones or tablets" (*id.* at 551:22-552:6, 552:21-

26  24, 553:7-8).  Accordingly, Hauser's survey says nothing meaningful about whether Samsung
    consumers' purchasing behavior would have been any different had the devices not contained the

27  patented features.  *See* Wind 1/9/14 Decl. ¶¶ 43-44.

28

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

its results.  *First*, Hauser's failure to incorporate appropriate *non-infringing* alternatives inflated the "price premiums" over the next best non-infringing alternative.  Wind 1/9/14 Decl. ¶¶ 75-79. While Hauser explained that his price premium is intended to measure the willingness to pay for the patented features over non-infringing alternatives (Trial II Tr. 587:7-11), his survey did not show the non-infringing alternatives and prior art that Apple's own witnesses admitted appear to have the same or nearly the same functionality as the patented features.  For example, Hauser failed to show respondents (1) the "one finger to scroll and two fingers to zoom" feature in the Intercept (JX1009) and the Galaxy Ace (JX1030), which were found not to infringe the '915 patent; (2) the "bounce-back" feature in the Intercept (JX1009), which was found not to infringe the '381 patent; (3) or the "tap to re-center after zoom" feature in the Captivate (JX1011), which was found not to infringe the '163 patent.  Dkt. 1931, at 4; Wind 1/9/14 Decl. ¶ 78.  Each of these alternatives has the exact or nearly identical functionality as the products found to infringe.  Trial II Tr. 469:6-470:11, 471:2-23; PDX 14.22; PDX29.21-23; PDX29.23; JX1009; JX1011; JX1030. Likewise, Hauser failed to show survey respondents techniques having essentially the same functionality as the patented features that Apple's technical experts testified do not infringe.[7] Because of these methodological errors, the Hauser survey does not reliably establish that consumers would pay *any* "price premium"—let alone a substantial one—for the patented features over the available non-infringing alternatives.

   *Second*, Hauser's price premiums are overstated because his survey artificially focused on only six of the hundreds of features in smartphones and tablets and omitted numerous features (including features that are unique to Samsung and Android) that consumers have identified as important.  Wind 10/19/12 Decl. ¶¶ 70-72; Wind 1/9/14 Decl. ¶¶ 84-86; Erdem 10/19/12 Decl. & Erdem 1/9/14 Decl. ¶¶ 16, 25-62.  These omissions include speakerphone, voice dialing, memo,

---

[7]  *See* Trial I Tr. 454:18-459:23 (Singh testimony that the one finger scrolling and two finger zooming of Han, Nomura and FractalZoom do not infringe the '915 patent); *id.* at 460:12-463:12, 468:6-16 (Singh testimony that not substantially centering upon a second gesture does not infringe the '163 patent); *id.* at 425:14-428:14 (Balakrishnan testimony that hard stop does not infringe, and that Tablecloth, LaunchTile, and non-zoomed in image bounce do not infringe the '381 patent).

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

MP3 player functionality, battery life, text-messaging options, GPS, and turn-by-turn navigation. Wind 10/19/12 Decl. ¶ 70; Wind 1/9/14 Decl. ¶ 84.  Omitting known important features can lead survey respondents to overvalue the features that *are* included in the survey, even if they are told to "hold all else constant."  Wind 10/19/12 Decl. ¶¶ 71-72; Wind 1/9/14 Decl. ¶¶ 85-86.  Indeed, Hauser acknowledged that focusing survey respondents on the patented features can produce a willingness to pay that is "too high."  Trial II Tr. 522:7-10, 527:23-528:8; *cf. Oracle Am., Inc. v. Google, Inc.*, 2012 WL 850705, *9-13 (N.D. Cal. Mar. 13, 2012) (excluding conjoint survey that tested only seven out of many features, noting that "participants in the study were artificially forced to focus on startup time even if in the real world, start up time was unimportant to them").

*Third*, although Hauser acknowledged that, to "infer willingness to pay," survey respondents must be presented with "realistic decisions" (Trial II Tr. 522:9-14), his survey failed to simulate a real marketplace, thus further inflating his survey's results.  For example, (a) survey respondents did not use real money when they made their choices (*id.* at 515:12-15); (b) did not see real products or even real images of real products (*id.* at 550:23-551:2); and (c) were forced to choose among Samsung product profiles and thus could not choose other brands or make "no choice" at all (*id.* at 551:22-552:6; 552:21-24).  This unrealistic survey methodology too tends to inflate price premiums since survey respondents exhibit substantially less price sensitivity when they can choose to spend unlimited amounts of hypothetical dollars (Wind 10/19/12 Decl. ¶¶ 68-69; Wind 1/9/14 Decl. ¶¶ 82-83) and are required to make a product selection (Wind 10/19/12 Decl. ¶¶ 66-67; Wind 1/9/14 Decl. ¶¶ 45, 80-81).

*Fourth*, Hauser's price premium results for the patented features are also independently unreliable because of a bias associated with the animated feature descriptions used in the survey. Wind 10/19/12 Decl. ¶¶ 56-60; Wind 1/9/14 Decl. ¶¶ 70-74; Sukumar 10/19/12 Decl. & Sukumar 1/9/14 Decl. ¶¶ 8, 11, 14-19.  Specifically, the surveys included multimedia animation descriptions for touchscreen, connectivity, and camera features, but only text and still graphics for storage, apps, and the size/weight features.  Wind 10/19/12 Decl. ¶ 57; Wind 1/9/14 Decl. ¶ 71.  Hauser's price premiums for features presented via multimedia animation are systematically higher than the features presented via text and still graphics, thus suggesting that animation bias drives or at least

1    taints his willingness-to-pay estimates.  Wind 10/19/12 Decl. ¶¶ 58-60; Wind 1/9/14 Decl. ¶¶ 72-

2    74; Sukumar 10/19/12 Decl. & Sukumar 1/9/14 Decl. ¶¶ 8, 11, 14-19.

3           Taken individually or together, these multiple, serious methodological flaws generated

4    irrational results that show that Hauser's survey cannot reliably support a finding of causal nexus.

5    *Cf. Oracle*, 2012 WL 850705, *9-13 (citing "conjoint study's own irrational results" as grounds

6    for exclusion); *United States v. H & R Block*, 833 F. Supp. 2d 36, 67-68 (D.D.C. 2011) (conjoint

7    survey unreliable due to "inconsistent and anomalous results").  For instance, the underlying data

8    from Hauser's survey shows that (1) 32% of respondents would prefer to pay $199 rather than $99

9    for the benchmark smartphone; (2) 43% of respondents would prefer to pay $99 rather than $0 for

10   the benchmark smartphone; (3) between 19% and 43% of respondents would pay an additional

11   $100 for an otherwise identical smartphone; (4) as many as 31% of respondents would pay an

12   additional $200 for an otherwise identical smartphone; and (5) when the base price of the

13   smartphone is $0 with a two-year contract, Hauser's price premium for the three patented

14   touchscreen features is $266—nearly *twice as much* as survey respondents actually paid on

15   average for their Samsung devices in their entirety in the real world.  Wind 10/19/12 Decl. ¶¶ 46-

16   54; Wind 1/9/14 Decl. ¶¶ 59-68; *see also* Wind 1/9/14 Decl. ¶ 59 n.105 (responding to Hauser

17   reply declaration).[8]  On their face, these nonsensical results further demonstrate the unreliability of

18   Hauser's results and refute Apple's reliance on them as persuasive evidence of causal nexus

19   between any infringement and any harm.

20          **B.      The Generic Consumer Reviews Do Not Satisfy The Causal Nexus Standard**

21          Nor can Apple carry its burden for the requested injunction based on "additional consumer

22   research" purportedly showing "that the features claimed by Apple's utility patents are important

23   to consumers."  (Dkt. 2897, at 4.)  In its recent decision, the Federal Circuit deemed insufficient

24   _____

25          [8]   The data from Dr. Hauser's survey also irrationally shows a miniscule price premium for
     features that command significant premiums in marketplace (such as memory capacity).  Sukumar
26   10/19/12 Decl. & Sukumar 1/9/14 Decl. ¶¶ 16-17.  While Hauser contended in the original
     permanent injunction proceeding that these findings resulted from an incorrect methodology (Dkt.
27   2130 ¶¶ 28-29), Hauser himself has endorsed the methodology used (*see* Dkt. 927-13 ¶¶ 104-05).

28

                                                    -10-                     Case No. 11-cv-01846-LHK

1   Apple's "surveys 'identify[ing] Apple's easy-to-use interface as critical to the success of Apple's

2   products,' consumer reviews praising Apple's 'multi-touch user interface,' and 'unrebutted

3   testimony at trial' describing ease of use as among the reasons for the success of the iPhone,"

4   because "this evidence simply shows that ease of use, in general, is important to the iPhone"—not

5   that the specific patented features drive consumer demand.  *Apple III*, 735 F.3d at 1367.  Apple

6   recycles this material in its renewed motion, never explaining why such generic evidence shows

7   that "Samsung's incorporation of the *patented features* influenced demand for its products," as

8   Federal Circuit precedent requires.  *Id.* (emphasis added).  For instance, as this Court previously

9   concluded, the Gravity Tank presentation (*see* Dkt. 2897, at 4) addresses generalized concepts

10  well beyond the narrow scope of the utility patents-in-suit and reflects quotations from individual

11  iPhone users that "do not make any broader claims about the market and the factors that influence

12  consumer choice generally."  Dkt. 2197, at 10.  The other cited "consumer reviews" (Dkt. 2897, at

13  4) are equally hollow.

14      Apple again cites to evidence that consumers generally value "ease of use" (*see* Dkt. 2897,

15  at 5), but ignores that its own expert and its own senior executive have both conceded that the

16  concept of "ease of use" covers *hundreds* of features (Trial II Tr. 792:10-22 (Davis)); *id.* at

17  888:18-22 (Schiller)) extending far beyond the three limited features of the asserted utility patents.

18  Such evidence does not demonstrate that consumers purchase Samsung products based on the

19  *specific* innovations at issue here.  *See* Dkt. 2197, at 10 ("Many factors go into making a product

20  easy to use, but the features for which Apple is asserting patent protection are very specific.  A

21  consumer may want a phone that is easy to use, but this does not establish that a tap-to-zoom

22  feature, for example, or any given type of gesture, is a driver of consumer demand.").  Indeed, one

23  of Apple's surveys identified the following top reasons for purchasing an Android-based phone

24  among those who considered an iPhone:  current wireless service provider, trust in the Google

25  brand, larger screen, the Android Market for apps, better integration with Google services, the

26  latest and greatest smartphone, turn-by-turn GPS navigation, and the latest technology.

27  DX572.082.  *None* of these reasons has anything to do with Apple's three patented features.

28      In sum, none of the "consumer research" upon which Apple continues to rely provides any

basis for finding a causal nexus between the patented features and any harm to Apple.

**C.     The Purported Evidence Of Copying Does Not Satisfy The Causal Nexus Standard**

Nor can Apple (Dkt. 2897, at 5) salvage its causal nexus argument with purported evidence that Samsung copied the features claimed by Apple's utility patents.  As the Federal Circuit reiterated, such evidence—even if credited here—"is insufficient by itself to establish the requisite causal nexus." *Apple III*, 735 F.3d at 1367; *see also* Dkt. 2197, at 11 ("Evidence of copying … proves what Samsung *thought* would attract purchasers, not what *actually* attracted purchasers."). Apple, moreover, simply recycles the evidence it presented with its original motion, which at most shows that Samsung engaged in standard competitive analysis that Apple itself practices—not that Samsung engaged in a concerted effort to copy Apple's patents.  *See* Trial I Tr. 760:19-776:8 (Forstall); *id.* at 532:8-536:25 (Stringer); *id.* at 2838:9-2842:11 (Howarth).[9]

For example, Apple cites PX46.66, but this document calls only for a "fun visual effect," not one that is covered by the '381 patent.  Likewise, PX57.19 is part of an assessment of numerous visual effects that have no bearing on the '381 patent; PX38.24 discusses double-tap to zoom and two-level zooming, not the recentering behavior covered by the '163 patent; and PX44.58 does not clearly even address the '163 patent, and in any event gives no support to the claim that this patent actually drives sales.  Apple continues to offer no "copying" evidence regarding '915 at all.  The purported evidence of "copying" does not come close to showing that consumer purchases were driven by the patented features.[10]

---

[9]  Apple's reference to a purported concession by Samsung's damages expert (Dkt. 2897, at 5) is misleading because, contrary to Apple's intimations, there is no evidence of "Samsung executives … telling their own employees about what should go into their product," let alone the patented features at issue here.

[10]  Even if Apple could satisfy the causal nexus requirement here, the extent of irreparable harm with respect to the '915 patent would be particularly minimal given the Patent Examiner's decision invalidating that patent—thus further counseling against issuance of an injunction pertaining to that patent.  *See, e.g.*, *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 2013 WL 3289085, *7 (D. Mass. June 27, 2013) (even PTO's "preliminary rejection does weaken [patentee's] showing of irreparable harm, since [patentee] has not suffered any cognizable harm at all if its patents were improvidently granted."); *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp.
(footnote continued)

## II.     THE EVIDENCE DEMONSTRATES THAT MONETARY DAMAGES WOULD ADEQUATELY COMPENSATE APPLE

As to the adequacy of legal remedies, the Federal Circuit found that the key "question at hand" in evaluating the licensing evidence is whether "monetary damages will adequately compensate Apple for Samsung's infringement of the particular patents at issue in this lawsuit," and thus remanded for further consideration of this issue. *Apple III*, 735 F.3d at 1370. The full circumstances surrounding Apple's licensing history—including both Apple's offers to license *all* its utility patents to Samsung and Apple's actual licensing of the utility patents-in-suit to third parties—demonstrate that money damages are adequate here.

### A.     Apple Voluntarily Offered To License *All* Its Utility Patents To Samsung In October 2010 And Afterwards

The Federal Circuit directed this Court on remand to "resolve[] whether Apple's offer included the asserted patents," recognizing that the parties disputed the scope of Apple's October 2010 licensing offer to Samsung but that it could not "tell if [this Court had] reached a conclusion on this issue." *Apple III*, 735 F.3d at 1370 n.7. Despite this explicit directive, Apple nowhere attempts to defend its position on this issue in its renewed motion. In fact, it makes no mention of it at all. The evidence demonstrates that Apple's October 2010 offer included the asserted utility patents and, as a result, monetary damages would be adequate to compensate for any infringement here. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339-40 (Fed. Cir. 2012) (district court clearly erred in finding damages would not provide adequate compensation based in part on patentee's attempts to license asserted patents to defendant).

Chip Lutton, a senior director at Apple and former chief patent counsel, explicitly admitted that in ████████████████████████████████████████████████████

_____

2d 556, 575 n.15 (E.D. Va. 2007) (stating that, "when the court considers a *prospective* motion in equity, it would be imprudent not to consider the ongoing reexamination" and that, where PTO has declared patent-in-suit invalid as obvious, "this court has a legitimate reason to question whether [patentee] will suffer irreparable harm"). As discussed further below, the Patent Examiner's decision finally rejecting the '915 patent also reinforces that the balance-of-hardships and public-interest inquiries favor Samsung. *See infra*, at 19-20, 22.

1

2

3

4  Similarly, Apple's written

5  presentation from the parties' October 2010 licensing meeting did not carve out the three asserted

6  utility patents or state that certain patents were unavailable for licensing.  *See* DX586 (Dkt. 2063-

7  10); Trial I Tr. 1964:20-1965:18, 1968:20-25; 1971:5-19; 1972:9-17.   To the contrary, the

8  presentation reflects that Apple gave Samsung the option of taking an "Advanced Mobile

9  Computing Device" license, which included "Apple advanced features" like the "[m]ultitouch user

10  interface."  DX586.008, .014, .015.  DX586 also shows that Apple proposed a fixed dollar rate

11  per-smartphone and per-tablet, with a 20% discount for products "Not Using Proprietary Features"

12  such as "distinctive industrial designs, software platforms or feature sets."  DX586.013, .015.

13  This discount demonstrates that even features Apple deemed "proprietary" were *included* in

14  Apple's licensing offer.[11]

15  Moreover, licensing discussions between Apple and Samsung that took place long after the

16  completion of briefing on Apple's original motion for permanent injunction further undermine

17  Apple's assertion that "it never offered to license the asserted patents to Samsung."  *Apple III*, 735

18  F.3d at 1370.

19

20

21

22

23

24  _____

25  [11]   Apple's presentation from a August 2010 licensing meeting with Samsung (PX52) likewise

26  suggests that Apple was willing to license the asserted utility patents.  The presentation does not
   identify any utility patents that Apple would *not* license (*see* Trial I Tr. 1968:16-19), and it

27  concludes with a statement that contains no restrictions on the scope of a license:  "Samsung needs
   a license to continue to use Apple patents in infringing smartphones" (PX52 at 23).

28

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

1  ███████████████████████████████████████████████████████████

2  █████████████████████████████████████████████████████[12]

### B.    Apple's Other Licenses Confirm That Monetary Damages Are Adequate

The Federal Circuit also directed this Court to consider Apple's past licenses and "any relevant differences from the current situation."  *Apple III,* 735 F.3d at 1370.  As explained below, Apple's licenses with third parties reinforce that monetary damages are adequate here.

*First*, Apple  concedes that its License Agreement with *competitor* HTC includes *all* of Apple's utility patents (Dkt. 2182-5, Ex. 1; Wagner Decl. ¶¶ 11-23; Dkt. 2583-04, at 20), including the '381 and '915 patents that Apple asserted in litigation against HTC (Dkt. 2382-3, Ex. A (8/26/13 Wagner Rpt., ¶ 344)).  While Apple argues (Dkt. 2897, at 7) that the anti-cloning provision in the HTC license shows that Apple would not license its utility patents to Samsung, Apple presents no evidence—or even argument—that any of the accused features in *Samsung's* products would qualify as "cloned features" under the HTC license.  *See* Dkt. 2194-1, Ex. 1 at APLNDC-Y0000408273A4811 (defining "cloned product" and "cloned feature").  The License Agreement itself, moreover, shows that the anti-cloning provision does not apply to the asserted utility patents.  Exhibit A to the License Agreement provides numerous elaborate requirements for

---

[12]  Apple's latest licensing offers—which were made during negotiations between the parties and *not* during a mediation—are admissible evidence.  While Federal Rule of Evidence 408 prohibits using settlement offers to prove liability, validity or the amount of a claim, Samsung presents this evidence for a different purpose—to prove Apple's willingness to license its patents. *See* Dkt. 449, at 64 n.39 (denying Rule 408 objection and admitting settlement offers used to show willingness to license); *Brocklesby v. United States*, 767 F.2d 1288, 1293 (9th Cir. 1985) (upholding admission of settlement agreement for purposes "distinct from proving liability") Northern District of California ADR Local Rule 6-12(a) likewise does not apply here because it covers only communications during a court-ordered mediation.  N.D. Cal. ADR L.R. 6-12(a). And *Folb v. Motion Picture Industry Pension & Health Plans*, 16 F. Supp. 2d 1164 (C.D. Cal. 1998), which this Court cited in denying Samsung's request for discovery (Dkt. 2913, at 4), holds that discussions between parties that take place *outside of a mediation*—such as those at issue here—are *not* protected from use in litigation.  16 F. Supp. 2d at 1180 ("Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation.").  Moreover, in the prior permanent injunction proceedings both in this Court and the Federal Circuit, Apple itself introduced evidence, and did not object to Samsung's introduction of evidence, relating to settlement offers insofar as they concerned Apple's willingness to license the utility patents at issue.

a product to constitute a Cloned Product, including that the non-functional visual appearance in the HTC device be "substantially similar" to that in an Apple device. Dkt. 2182-5, Ex. A; Wagner Decl. ¶ 18. The License Agreement refers to the non-functional visual appearance, along with functional aspects, as "Distinctive Apple User Experience." Dkt. 2182-5, Ex. A; Dkt. 2177-03. Exhibit A, however, *excludes* "[f]unctionality and related methods (for example, 'pinch to zoom' functionality)" from "Distinctive Apple User Experience." Dkt. 2182-5, Ex. 1 at Ex. A. ¶ 1. Thus, a functionality that infringes the '915 patent—which covers a technique for distinguishing between scroll and gesture operations, such as "pinch to zoom"—could not support deeming a product to be a "Cloned Product" under the Apple-HTC license. Wagner Decl. ¶ 19. Likewise, infringement on the '163 patent could not be the basis for finding a "Cloned Product" because that patent simply claims a specific type of functionality, not a "non-functional distinctive visual appearance." *Id.* ¶ 20.[13] And the '381 patent, which Apple's own expert, Mr. Balakrishnan, has repeatedly described as covering "bounceback functionality," cannot qualify as a "Distinctive Apple User Experience" because it simply covers "functionality and related methods." *See, e.g.,* Trial I Tr. 1740:13-1741:1, 1742:15-22, 1752:11-15, 1753:4-12; Wagner Decl. ¶ 22.[14]

*Second*, Apple erroneously relies on the Court's Order Conditionally Granting Apple's Motion to Exclude HTC Settlement Agreement (Dkt. 2667) to argue that the HTC license is not pertinent. In the cited Order, however, the Court merely concluded that the HTC license was of

---

[13]   Apple's own description of the '163 patent concedes as much: "The '163 patent claims the 'double-tap-to-zoom' capability of the iPhone and iPad, which allows a touchscreen device to enlarge and center the text of an electronic document when a user taps twice on a portion of that document and, in response to a second user gesture on another portion of the document, recenters the screen over that portion of the document." Wagner Decl., Ex. D (Apple Opening Appeal Br. 22).

[14]   Infringement of the '381 patent would not support deeming a product to be a "Cloned Product" for another independent reason. Exhibit A requires that the Cloned Feature not result from "any features or design elements included in any HTC Android Mobile Communication Devices or Android Mobile OS that have been released prior to the Effective Date." Ex. A, ¶ 3(v). Prior to the Effective Date, however, Apple asserted in court and the ITC that HTC offered features in its Android smartphones and tablets that infringed the '381 patent. Because HTC released features prior to the Effective Date that Apple accused of infringing the '381 patent, Apple cannot rely on these features to claim that a product is a clone. Wagner Decl. ¶ 23.

1    limited probative value for purposes of evaluating the parties' hypothetical negotiation—a topic

2    not at issue here. *Id.* at 7. In contrast, the Court recognized in its Order that the HTC license was

3    relevant to Apple's willingness to license its utility patents and found that Apple "appears to have

4    included at least two of the utility patents-in-suit in the HTC Agreement." *Id.* at 10-11. The Court

5    ruled: "Samsung *will be allowed* to introduce the HTC Agreement and Wagner's analysis of it

6    solely to rebut any testimony or argument by Apple that Apple has never or would never license

7    the utility patents-in-suit." *Id.* at 11. And, as noted, the Federal Circuit specifically directed this

8    Court to consider Apple's past licenses on remand. *Apple III,* 735 F.3d at 1370.

9       *Third*, Apple does not dispute that its separate license with *competitor* Nokia covers the

10    '381 patent. Instead, it contends that this license is not relevant because it is a "'provisional

11    license' for a limited 'standstill' period." Dkt. 2897, at 7. But the Apple-Nokia license did not

12    simply resolve claims for past damages; it is *forward-looking* and covers the period from June 12,

13    2011 to December 31, 2016. Dkt. 2061, Pierce Decl. Ex. 12-1 at p. 2 & ¶ 7.1.

14       *Fourth*, Apple erroneously seeks (Dkt. 2897, at 7) to distinguish its licenses with HTC and

15    Nokia on the ground that they included "numerous other patents not at issue here." While the fact

16    that Apple licensed numerous patents would perhaps be material in determining the amount of a

17    reasonable royalty for the three utility patents, the issue here is simply whether Apple licensed the

18    utility patents relevant to this motion to competitors. Apple did so. The inclusion (or exclusion)

19    of *other* patents in the licenses does not change the fact that Apple willingly licensed its utility

20    patents at issue here to competitors.

21       *Finally*, Apple wrongly claims (Dkt. 2897, at 7) that the HTC and Nokia licenses are

22    irrelevant because they were the product of litigation settlements. Apple fails to mention,

23    however, that it made this argument on appeal, and the Federal Circuit was well aware that these

24    licenses settled litigation. The Federal Circuit nevertheless remanded so this Court could give

25    them further consideration, and thus necessarily rejected Apple's relevance argument. *Apple III*,

26    735 F.3d at 1370-71. In any event, even though the HTC and Nokia licenses settled litigation,

27    they still demonstrate that Apple chose to license its utility patents to large competitors in

28    exchange for money in lieu of other options, which is the pertinent inquiry on this permanent

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

injunction motion.  *See Advanced Cardio. Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 557, 560 (D. Del. 2008) (relying on licenses that settled litigation to find money damages were adequate).  The cases upon which Apple relies not only cannot trump the Federal Circuit's decision in this case, but are also inapposite.  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323 (Fed. Cir. 2008), recognizes that a court has discretion to evaluate all circumstances surrounding a license to a competitor to determine if it demonstrates the adequacy of money damages and simply held, without discussion, that the district court did not clearly err in not relying on a license that settled litigation.  *Id*. at 1328-9 & n.* ("We decline to consider whether it would be appropriate under other circumstances to deny injunctive relief because the patentee had licensed the patented technology to other competitors.").  *LaserDynamics, Inc. v. Qanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), involved a reasonable royalty analysis and not a permanent injunction motion; the excluded license was an outlier because it was signed after the counterparty had been repeatedly sanctioned; and the court actually admitted numerous other licenses that settled litigation.  *Id*. at 57-58, 77-78.  *LaserDynamics* also acknowledged that in *ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860 (Fed. Cir. 2010), the Federal Circuit had recently considered a license that settled litigation to be the "most reliable license" in the record.  694 F.3d at 77-78.

## III.    THE BALANCE OF HARDSHIPS DOES NOT FAVOR AN INJUNCTION

The third factor—balance of hardships—continues not to support  issuance of a permanent injunction.  In its prior opinion denying injunctive relief, this Court found that the balance of hardships was neutral and therefore did not favor entry of an injunction. Dkt. 2197, at 18-19. Notwithstanding Samsung's discontinuance of the accused products, Apple argued on appeal that this was error because it "would be harmed by the risk of Samsung's continued infringement." 735 F.3d at 1371.  Apple also contended that "an injunction is essential to providing Apple the swift relief needed to combat any future infringement by Samsung through products not more than colorably different from those already found to infringe."  *Id*. (quoting Apple Opening Appeal Br. 42).  Finally, Apple argued that an injunction was necessary because "the parties have product lines of vastly different scope [because] Apple launches only a small number of new products each year [while] Samsung launches 50 new smartphones each year."  Smith Decl. Ex. 6 (Apple

1   Opening Appeal Br. 42-43).)  The Federal Circuit rejected each of these arguments by Apple and

2   affirmed this Court's finding without directing further consideration on remand.  *Id*.  The Court's

3   finding is now law of the case.

4        In its renewed motion, Apple nevertheless presents the same arguments that this Court and

5   the Federal Circuit have previously considered and rejected.  In a repetition of its prior briefing,

6   Apple argues that it needs an injunction "to combat any future infringement by Samsung through

7   products not more than colorably different from those already found to infringe."  Dkt. 2897, at 8.

8   That argument has even less merit today than it did when Apple first made it over a year ago.

9   Despite the passage of time, Apple has not identified a single new Samsung product that is "not

10   more than colorably different" from the adjudicated products.  Nor does Apple contend that

11   Samsung continues to sell or has re-released any adjudicated products.

12        Apple's argument (Dkt. 2897, at 8-9) that the absence of an injunction is more burdensome

13   to it because it sells fewer models of smartphones than Samsung is also recycled from its original

14   motion.  Not only has the Federal Circuit considered and rejected that argument (*see* 735 F.3d at

15   1371), but Apple bases it on stale evidence regarding Samsung's product offerings from nearly a

16   year and a half ago (Dkt. 2897, at 9 (citing Dkt. 1610, Dkt. 1842)).  Apple's argument fails on

17   additional grounds.  Apple cites no authority for the proposition that the relative number of models

18   sold by the patentee and the alleged infringer is relevant to the balance of hardships.  The number

19   of smartphones that Samsung has on the market is also irrelevant because the undisputed evidence

20   shows that Samsung has discontinued all allegedly *infringing* sales.  *See infra*, at 20.  Nor is there

21   any evidence that the number of models of smartphones that Apple chooses to have available at

22   any given time is relevant to the level of competition those products face.

23        Moreover, contrary to Apple's argument, any changed circumstances since the Court's last

24   decision actually tip the balance of hardships further ***against*** an injunction.  As noted, although a

25   year has passed, Apple has provided no evidence that Samsung continues to sell or has re-released

26   any adjudicated products.  Furthermore, since that time, the Patent Office has completed its

27   reexamination of Apple's '915 patent—the only patent for which Apple even attempts to suggest

28   there is any continuing infringement—and found that all the asserted claims are invalid.  Dkt.

2899; Godici Decl. ¶¶ 9-17.  This final decision, made by an expert administrative body after a thorough examination, undermines any legitimate interest Apple might have in an injunction with respect to the '915 patent and shows that an injunction would impose a substantial hardship on Samsung by permitting Apple to seek the removal of products from the market based on patent claims that the Patent Examiner has found invalid.  *See, e.g., Smith & Nephew*, 2013 WL 3289085 (balance of hardships weighed against entry of permanent injunction where the PTO had rejected all asserted claims); *Belden Techs., Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 578-79 (D. Del. 2011) (where PTO had rejected claims "the court concludes that the harm to defendants if the injunction were to issue on invalid patents is much greater than the harm to plaintiffs should the injunction not issue at all"); *MercExchange*, 500 F. Supp. 2d at 585 (where the PTO had issued only an interim rejection of the asserted claims, finding that the balance of harms weighed against entry of a permanent injunction because of the "potential for [defendant] to lose customers if forced to remove" the infringing product from its website "only to later discovery that the [asserted] patent was never valid and [defendant] always had the legal right to utilize such functionality").

Further, Apple fails to present any evidence that it would obtain ***any*** legitimate benefit from an injunction as to ***any*** of the three utility patents.  Apple admits that Samsung has discontinued every adjudicated product (Dkt. 2897, at 9 n.1; *see also* Cho Decl. ¶¶ 4-5; Kerstetter Decl. ¶¶ 3-5; Kim Decl. ¶¶ 3-4), and Samsung has implemented design-arounds on all current products, thereby precluding any possible infringement (Cho Decl. ¶¶ 6-14; van Dam 1/9/14 Decl. ¶¶ 24-34; van Dam 10/18/12 Decl. ¶¶ 24-34; Gray 1/9/14 Decl. *passim*; Gray 10/18/12 Decl. ¶¶ 31-55).  Samsung has also introduced undisputed expert testimony that these design-arounds do not infringe the asserted patents.  Dkt. 2054-5; Dkt. 2054-2.  Apple does not suggest that the design- arounds on the '381 and '163 patents are anything other than non-infringing, but does speculate (Dkt. 2897, at 3) that, notwithstanding these discontinuances and design-arounds, there might be some lingering infringement of the (now found invalid) '915 patent in *unaccused* Samsung products.  But, despite its emphasis on the number of products Samsung has on the market (Dkt. 2897, at 8-9), Apple never identifies a single Samsung product that it believes

continues to infringe and that is no more than colorably different than the adjudicated products.[15]
It is thus clear that Apple's goal is not to prevent infringement of a valid patent, but instead to use
the injunction as a vehicle to create fear, uncertainty and doubt that will dissuade retailers and
wholesalers from carrying Samsung's devices[16] and to drag this Court into disputes about products
that Apple has never accused or sued on.  This type of anti-competitive harm to Samsung and the
market, coupled with the fact that Samsung does not sell any of the adjudicated products, strongly
counsels against entry of an injunction.[17]

## IV.   THE PUBLIC INTEREST WEIGHS AGAINST AN INJUNCTION

In its prior opinion denying a permanent injunction, this Court ruled that the fourth
factor—the public interest—weighed ***against*** issuing an injunction.  As the Court explained, "[t]he
public interest does not support removing phones from the market when the infringing
components constitute such limited parts of complex, multi-featured products."  Dkt. 2197, at 21.
On appeal, the Federal Circuit affirmed, holding that this Court acted within its discretion in

---

[15]   Even under Apple's request, an injunction can extend only to the adjudicated products and
those "no more than colorably different."  Although Apple contends without explanation that
Samsung's design around of the '915 patent is still infringing, it does not argue and has presented
no evidence that the new design is insignificant and thus "no more than colorably different" from
the adjudicated products.  *See TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011)
(en banc) ("Where one or more of those elements previously found to infringe has been modified,
or removed, the court must make an inquiry into whether that modification is significant.  If those
differences between the old and new elements are significant, the newly accused product as a
whole shall be deemed more than colorably different from the adjudged infringing one, and the
inquiry into whether the newly accused product actually infringes is irrelevant.").

[16]   Indeed, as the Court will recall, Apple improperly attempted to create just such uncertainty
and doubt with the Court's preliminary injunction against the Galaxy Tab 10.1 (which was
subsequently vacated after the jury's non-infringement verdict as to the Tab 10.1).  *See* Smith
Decl. Exs. 10-12.

[17]   *See, e.g.*, *S.O.I.TEC Silicon On Insulator Tech., S.A. v. MEMC Elec. Materials, Inc.*, 2011
WL 2748725, *21-22 (D. Del. July 13, 2011) (denying permanent injunction where, *inter alia*,
"[t]here is no indication that MEMC still employs [the infringing] process"); *Nichia Corp. v. Seoul
Semi. Ltd.*, 2008 WL 346416, *1-2 (N.D. Cal. Feb. 7, 2008) (denying permanent injunction where,
*inter alia*, it was "undisputed that defendants no longer manufacture the accused product"); *cf.
Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1273 (Fed. Cir. 1985) (affirming denial of
preliminary injunction where "there is nothing of record establishing *present* infringement or an
*immediate* threat of renewed infringement").

1   reaching this conclusion.  735 F.3d at 1373.  The Circuit stated that this Court *could*—but was not

2   required—to "reevaulat[e] the public interest factor" in the event it "modifies its conclusion with

3   regard to irreparable harm."  *Apple III*, 735 F.3d at 1372 n.8.  Because Apple still has not

4   demonstrated irreparable harm, as shown above, there is no basis to revisit this factor now.

5       In any event, the Court previously found that Apple's public interest arguments were not

6   persuasive (*see* Dkt. 2197, at 20-21), and they fare no better now even if this factor is reevaluated.

7   The public interest continues to weigh heavily against entry of an injunction.  It is still the case

8   that Apple's motion seeks to "deprive consumers of Samsung's infringing phones when … only

9   limited features of the phones have been found to infringe any of Apple's intellectual property."

10  Dkt. 2197, at 21.  It also continues to be the case that a permanent injunction would sow

11  uncertainty in the market and disrupt suppliers, retailers, and carriers.  Indeed, following entry of

12  preliminary injunctions against Samsung in this and the related case pending in this Court, Apple

13  sent letters to third parties threatening them with contempt.  Smith Decl. Exs. 10-12.  Apple,

14  moreover, does not dispute that the accused products have all been discontinued.  Dkt. 2897, at 9

15  n.1.  And Samsung has implemented design-arounds on all its current products.  Cho Decl. ¶¶ 6-

16  14; Gray 1/9/14 Decl. *passim*; Gray 10/18/12 Decl. ¶¶ 31-55.  An injunction therefore would only

17  prevent the sale of unnamed, unaccused products that are "no more than colorably different"—a

18  vague term that will surely spawn additional litigation and place significant burdens on Samsung

19  and third parties as they struggle to determine its scope.  This anticompetitive uncertainty is not in

20  the public interest, particularly given Apple's abuse of the short-lived Galaxy Tab 10.1

21  preliminary injunction that it misrepresented to carriers and other third parties.

22      Moreover, as with the balance of hardships, changed circumstances since the Court's prior

23  ruling demonstrate that, if anything, an injunction is even more contrary to the public interest than

24  before.  The Patent Examiner has now completed reexamination of Apple's '915 patent and found

25  that every asserted claim is invalid.  Dkt. 2899; Godici Decl. ¶¶ 9-17.  The only public interest

26  Apple identifies is the generic interest in enforcing patents.  But the public has no interest in

27  enforcing patents that the Patent Examiner has found invalid.  The public interest thus weighs

28  especially strongly against an injunction with respect to the '915 patent.

Nor, contrary to Apple's argument (Dkt. 2897, at 9), is there "evidence that [the asserted utility] patents together make Samsung's infringing products more desirable to consumers."  Even if there were evidence to support Apple's "causal nexus" argument (and there is not), the Court's finding that the accused products "contain a far greater number of non-infringing features to which consumers would no longer have access if this Court were to issue an injunction" remains dispositive.  Dkt. 2197, at 21; *see also Apple III*, 735 F.3d at 1372-73 ("We see no problem with the district court's decision, in determining whether an injunction would disserve the public interest, to consider the scope of Apple's requested injunction relative to the scope of the patented features and the prospect that an injunction would have the effect of depriving the public of access to a large number of non-infringing features.").

## V.   ALTERNATIVELY, THE COURT SHOULD STAY ENFORCEMENT OF ANY INJUNCTION WITH RESPECT TO THE '915 PATENT

If the Court determines that, notwithstanding the arguments above, Apple has satisfied its burden and is entitled to a permanent injunction, it should stay enforcement of that injunction with respect to the '915 patent until the Patent Office issues a reexamination certificate confirming the patentability of one or more of the asserted claims.  The Court has broad discretion to stay enforcement of a permanent injunction, especially where the asserted claims are being reexamined and have been rejected by the Patent Examiner.  *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 687, 701-02, 704 (Fed. Cir. 2008) (affirming sunset provision staying enforcement of permanent injunction for up to twenty months after the verdict because it properly "balance[d] the policy of protecting the patentee's rights against the desirability of avoiding immediate market disruptions" (quotation omitted)).  Indeed, the Federal Circuit has held that, under some circumstances, it is an abuse of discretion *not* to stay enforcement of a permanent injunction. *Standard Havens Prods., Inc. v. Gencor Indus., Inc*., 996 F.2d 1236 (Fed. Cir. 1993) (unpubl.).

Any injunction based on alleged infringement of the '915 patent should be stayed in light of the Patent Examiner's determination that the asserted claims are invalid.  Dkt. 2899; Godici Decl. ¶¶ 9-17.  For the reasons stated above, enforcement of any injunction based on a patent that the Patent Examiner has found invalid is not in the public interest, serves no legitimate purpose,

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

1   and would irreparably harm Samsung.  In similar circumstances, courts have not hesitated to stay

2   enforcement of a permanent injunction.  *Peach State Labs, Inc. v. Env'tl Mfg. Solutions, LLC*,

3   2012 WL 503837 (M.D. Fla. Feb. 15, 2012) (staying enforcement of permanent injunction

4   "pending a Final Decision of the USPTO of the Reexamination and Appeal"); *Flexiteek Americas,*

5   *Inc. v. PlasTEAK, Inc*., 2010 WL 2976859 (S.D. Fla. July 20, 2010) (similar).

6          Apple may argue that its appeal of the Patent Examiner's decision may be successful and

7   that it will be harmed in the interim if it cannot enforce the injunction with respect to the '915

8   patent.  But such an argument depends on Apple ultimately overturning the Patent Examiner's

9   decision—which is unlikely.  Godici Decl. ¶¶ 25-26.  If the injunction is not stayed and Apple is

10  permitted to enforce an injunction on the '915 patent despite the Patent Examiner's decision,

11  Samsung's business could be impaired and subjected to unwarranted threats of contempt based on

12  a wrongfully issued injunction.[18]  *See Flexiteek*, 2010 WL 2976859, at *6.

13         Further, unlike any harm to Apple, the harm to Samsung from issuance of a permanent

14  injunction could be irreparable.  "A party injured by the issuance of an injunction later determined

15  to be erroneous has no action for damages in the absence of a bond."  *W.R. Grace & Co. v. Local*

16  *Union 759*, 461 U.S. 757, 770 n.14 (1983).  Unless the Court orders a bond (which, given the

17  _____

18      [18]   The Court previously denied Samsung's motion to stay the entire case in light of the Patent

19  Examiner's final decision invalidating the claims of the '915 patent.  Dkt. 2831.  The Court denied
    that motion in part based on Apple's representation that the Patent Examiner's Advisory Action

20  was not "the conclusion of reexamination proceedings, or even proceedings before the examiner."
    Dkt. 2816, at 2.  The Court thus concluded that Apple could "file a response to a 'final' rejection

21  within the period allowed for the response, and that this may still result in the Examiner's
    withdrawal of the rejection or allowance/certification of the claims."  Dkt. 2831, at 3, 6-7.  But

22  Apple's representation proved misleading, for it never did file a response to the rejection and
    instead simply filed a notice of appeal to the Patent Trial and Appeal Board, making it clear that

23  proceedings before the Patent Examiner have concluded.

24      The Court also denied the motion in part because it would delay an appeal to the Federal
    Circuit on the merits of Apple's claims.  Dkt. 2831, at 7-8.  Staying enforcement of the permanent

25  injunction, however, would not preclude entry of a final appealable judgment.  *See, e.g., Gemtron*

26  *Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371 (Fed. Cir. 2009) (considering appeal of final
    judgment where enforcement of permanent injunction was stayed by district court); *Cook Biotech*

27  *Inc. v. Acell, Inc*., 460 F.3d 1365 (Fed. Cir. 2006) (same).  *See generally* Dkt. 2831, at 7-8 (noting
    that court has not yet entered a final judgment).

28

1  circumstances, it should here were a permanent injunction of any scope entered, *see* 15 U.S.C. §

2  1116(a); 35 U.S.C. § 283), Samsung will be unable to recover for the injuries it would suffer from

3  Apple's attempts to enforce an injunction based on the invalid '915 patent.  Apple, on the other

4  hand, will be able to recover damages were it able to prove any post-judgment infringement.

5  Thus, even if the circumstances here did not preclude issuance of an injunction with respect to the

6  '915 patent, a stay would avoid potential irreparable harm to Samsung.

7  **VI.     THE COURT SHOULD HOLD AN EVIDENTIARY HEARING**

8          Samsung respectfully requests that the Court schedule an evidentiary hearing so that the

9  parties may present live testimony on the factual disputes discussed above and identified in the

10  Federal Circuit's decision.  It is clear that a district court must hold an evidentiary hearing to

11  resolve material factual disputes when considering a request for a permanent injunction, *see, e.g.*,

12  *Warner Chilcott Labs. Ireland Ltd. v. Mylan Pharms., Inc.,* 451 Fed. App'x 935, 939 (Fed. Cir.

13  2011), *Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988), and that "a hearing on

14  the merits—*i.e.,* a trial on liability—does not substitute for a relief-specific evidentiary hearing

15  unless the matter of relief was part of the trial on liability, or unless there are no disputed factual

16  issues regarding the matter of relief," *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C.

17  Cir. 2001).  Here, the Federal Circuit instructed this Court to resolve factual disputes with respect

18  to Apple's evidence of purported irreparable harm, *Apple III,* 735 F.3d at 1368, and "Apple's past

19  licensing behavior," including "the scope of Apple's October 2010 licensing offer to Samsung,"

20  *id*. at 1370 & n.7.  These disputes may be resolved only following an evidentiary hearing.

**<u>CONCLUSION</u>**

22          Apple's renewed motion for a permanent injunction should be denied.

**SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION**

1    DATED:  January 9, 2014            QUINN EMANUEL URQUHART &
2                                       SULLIVAN, LLP

3

4                                       By /s/ Victoria F. Maroulis
                                           Charles K. Verhoeven
5                                          Kathleen M. Sullivan
                                           Kevin P.B. Johnson
6                                          Victoria F. Maroulis
                                           Michael T. Zeller
7

8                                          Attorneys for SAMSUNG ELECTRONICS CO.,
                                           LTD., SAMSUNG ELECTRONICS AMERICA,
9                                          INC. and SAMSUNG
                                           TELECOMMUNICATIONS AMERICA, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28