QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kathleen M. Sullivan (Cal. Bar No. 242261)
kathleensullivan@quinnemanuel.com
Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Susan R. Estrich (Cal. Bar No. 124009)
susanestrich@quinnemanuel.com
Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>              Plaintiff,<br><br>       vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>              Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**DECLARATION OF YORAM (JERRY) WIND IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

    A.   Assignment And Objectives ............................................................................. 1

    B.   Qualifications .................................................................................................... 1

    C.   Approach And Materials Reviewed .................................................................. 4

II.  SUMMARY OF CONCLUSIONS ............................................................................. 4

III. BACKGROUND ......................................................................................................... 8

    A.   Case Status ....................................................................................................... 8

    B.   Patented Features and Non-Infringing Alternatives ........................................ 9

    C.   Background On Smartphones And Tablets ..................................................... 11

    D.   Overview Of Professor Hauser's Analysis .................................................... 13

IV.  ANALYSIS OF HAUSER REPORT ........................................................................ 17

    A.   The Surveys Upon Which Professor Hauser's Findings Are Based Are Ill-
         Suited To Evaluate Whether The Patented Features Drove Consumer
         Demand For Samsung Smartphones And Tablets ........................................... 17

         1.   The Surveys Upon Which Professor Hauser's Findings Are Based
              Were Not Designed To Evaluate Whether The Patented Features
              Are Among the Features that Cause Consumers To Purchase
              Samsung Smartphones And Tablets ..................................................... 17

         2.   Professor Hauser's Survey Analysis Was Not Designed For Nor Can
              It Be Used To Evaluate the Impact Of The Patented Features On
              The Prices Of The Accused Smartphones And Tablets .......................... 20

         3.   Professor Hauser's Analysis Failed To Show That Inclusion Of The
              Patented Features Made The Accused Products Significantly More
              Desirable ............................................................................................... 23

              (a)   The WTP Figures Calculated By Professor Hauser Do Not
                    Demonstrate That The Patented Features Had A Significant
                    Impact On The Desirability Of The Accused Products .................. 23

              (b)   Professor Hauser's Analysis Failed To Demonstrate That
                    Consumers Were Aware Of Or Used The Patented Features
                    In The Accused Products ............................................................... 24

B.     Professor Hauser's Estimates Of The WTP Price Premium Associated With The Features Claimed In The Utility Patents Are Based On An Underlying Methodology That Generates Nonsensical Predictions ........................................... 26

      1.     Professor Hauser's Methodology Suggests That A Substantial Portion Of Survey Respondents Prefer To Pay Higher Prices For Otherwise Identical Smartphones And Tablets ........................................... 26

      2.     Professor Hauser's Methodology Suggests That A Large Portion Of Samsung Owners Prefer Clearly Inferior, Yet Identically Priced, Smartphones And Tablets ........................................... 28

      3.     Professor Hauser's Estimates Of The WTP Price Premium Associated With Just The Touchscreen Features Examined Exceed The $152 Average Smartphone Price Paid By Survey Respondents .......... 30

C.     The Surveys Underlying Professor Hauser's Findings Embody Numerous Design Flaws That Invalidate His Analysis And Appear To Inflate His Price Premium Estimates ........................................... 31

      1.     Professor Hauser's WTP Price Premium Estimates Associated With The Features Claimed In The Utility Patents Are Conflated By An Apparent Bias Associated With Animated Feature Descriptions .............. 31

      2.     Professor Hauser's Failure To Appropriately Account For Non-Infringing Alternative Features Results In Apparently Inflated WTP Price Premium Estimates ........................................... 34

      3.     Professor Hauser's WTP Price Premium Estimates May Be Inflated Because Respondents Were Forced To Choose Samsung Smartphones ........................................... 37

      4.     Professor Hauser's WTP Price Premium Estimates May Be Biased Upward Due To The Fact That There Are No Actual Consequences To Purchasing More Expensive Products In A Hypothetical Survey ......... 38

      5.     Professor Hauser's WTP Price Premium Estimates May Be Overstated Because His Survey Omits A Number Of Important Features And Benefits Associated With The Smartphone And Tablet Purchase Decision ........................................... 39

D.     Professor Hauser Failed To Externally Validate His Model ................................. 41

V.     CONCLUSION ........................................... 41

1  I, Yoram (Jerry) Wind, declare as follows:

2  **I.    INTRODUCTION**

3      **A.    Assignment And Objectives**

4      1.    I was asked by counsel for Samsung to evaluate the Expert Report of John R.

5  Hauser (the "Hauser Report") and the conjoint study discussed therein and, in particular, to

6  comment on whether the conjoint study conducted by Professor Hauser demonstrates that the

7  touchscreen features claimed in U.S. Patent Numbers 7,469,381 ("the '381 patent"); 7,844,915

8  ("the '915 patent"); and 7,864,163 ("the '163 patent") drive consumer demand for accused

9  Samsung smartphones and tablets, including whether the patented features significantly increase

10  the price of Samsung smartphones and tablets; and/or whether the patented features significantly

11  increase the desirability of Samsung smartphones and tablets.[1]

12      **B.    Qualifications**

13      2.    I am the Lauder Professor and Professor of Marketing at the Wharton School of the

14  University of Pennsylvania.   I joined the Wharton staff in 1967, upon receipt of my doctorate

15  from Stanford University.

16      3.    **Publications** – I have been a regular contributor to the marketing field, including

17  22 books and over 250 papers, articles, and monographs. My books and articles, which are

18  frequently cited by other authors, encompass marketing strategy, marketing research, new product

19  and market development, consumer behavior, organizational buying behavior, and global

20  marketing strategy.

21      4.    **Editorships** – I have served as the editor-in-chief of the *Journal of Marketing*, as a

22  guest editor of numerous marketing journals, on the policy boards of the *Journal of Consumer*

23  *Research,* and *Marketing Science*, and on the editorial boards of the major marketing journals.   I

24  am the founder of Wharton School of Publishing and served as its first Wharton editor from 2004

25  to 2008.

26      5.    **Teaching and Consulting** – I have taught MBA, Ph.D., and executive

27

28  _____
[1] On October 19, 2012, I submitted a declaration in this matter.   This declaration is an update to that declaration.

development courses on a wide range of marketing topics.   I also have consulted extensively for many Fortune 500 firms, including major consumer goods firms. In my teaching, consulting, editorial, and university positions I have designed, conducted, and evaluated thousands of marketing and consumer research studies.

6.   **Expert Witness** – I have conducted and evaluated marketing and consumer research in a litigation context, have been qualified as a marketing and survey research expert, and testified in trial in a number of federal courts.

7.   **Awards** – I have received various awards, including the four major marketing awards – The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007).   I also received the first Faculty Impact Award by Wharton Alumni (1993).   I was elected to the Attitude Research Hall of Fame in 1984.   I have also been honored with a number of research awards, including two Alpha Kappa Psi Foundation awards.   In 2001, I was selected as one of the ten grand Auteurs in Marketing and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances. In 2010, I was selected as one of the Ten Legends of Marketing, and Sage Publications is publishing eight volumes of my writings.

8.   **Complete Resume and Compensation** – My resume and the legal cases in which I have testified in deposition or trial are included in Appendices A and B.[2]   My total compensation for review and analysis of the relevant material and preparation of this expert report is based on my regular consulting rate of $1,000 an hour.

9.   **Experience with Conjoint Analysis** – With Paul Green and Doug Carroll, I wrote in 1973 the first book on conjoint analysis – Multi-Attribute Decisions in Marketing: A Measurement Approach.[3]   Since the early 1970s, as part of the research team including Paul Green and Abba Krieger, we developed many of the advances in conjoint analysis and have applied conjoint analyses in hundreds of academic and commercial studies.   See, for example:

---

[2] A copy of my CV can also be found at https://marketing.wharton.upenn.edu/profile/196/cv.
[3] Wind, Yoram, Paul E. Green, and J. Douglas Carroll. Multi-Attribute Decisions in Marketing: A Measurement Approach. Hinsdale: The Dryden Press, 1973.

- "Subjective Evaluation Models and Conjoint Measurement"[4]

- "Consumer Menu Preference: An Application of Additive Conjoint Measurement"[5]

- "New Way to Measure Consumers' Judgments"[6]

- "New Developments in Conjoint Analysis"[7]

- "Conjoint Analysis of Price Premiums for Hotel Amenities"[8]

- "Thirty Years of Conjoint Analysis: Reflections and Prospects"[9]

- "Conjoint Analysis: Methods and Applications"[10]

- "Applying Conjoint Analysis to Legal Disputes: A Case Study"[11]

10.     Additionally, the e-book I co-authored with Abba Krieger and Paul Green, Adventures in Conjoint Analysis: A Practitioner's Guide to Trade-Off Modeling and Applications,[12] offers a summary of reflections on some of our work over the years, in which we

---

[4] Green, Paul E., Frank J. Carmone, and Yoram Wind. "Subjective Evaluation Models and Conjoint Measurement." *Behavioral Science* 17.3 (May 1972): 288-299, available at http://dl.dropbox.com/u/9686940/windj/7205_Subjective_Evaluation_Models_and_Conjoint.pdf.

[5] Green, Paul E., Yoram Wind, and Arun K. Jain. "Consumer Menu Preference: An Application of Additive Conjoint Measurement." *Proceedings of the Third Annual Conference of the Association for Consumer Research*. Ed. M. Venkatesan. Chicago: Association for Consumer Research, 1972. 304-315, available at http://dl.dropbox.com/u/9686940/windj/7208_Consumer_Menu_Preferences_An_Application.pdf.

[6] Green, Paul E. and Yoram Wind. "New Way to Measure Consumers' Judgments." *Harvard Business Review* 53 (July - Aug. 1975): 107-117, available at http://dl.dropbox.com/u/9686940/windj/7509_New_Way_to_Measure_Consumers'.pdf.

[7] Wind, Yoram (Jerry). "New Developments in Conjoint Analysis." Paper presented at the 25th Annual Midwest Conference of the American Statistical Association on What's New in Statistical Techniques for Marketing Research, Mar. 1978.

[8] Goldberg, Stephen M., Paul E. Green, and Yoram Wind. "Conjoint Analysis of Price Premiums for Hotel Amenities." *Journal of Business* 57.1.2 (1984): S111-S132, available at http://dl.dropbox.com/u/9686940/windj/8403_Conjoint_Analysis_of_Price_Premiums.pdf.

[9] Green, Paul E., Abba M. Krieger, and Yoram (Jerry) Wind. "Thirty Years of Conjoint Analysis: Reflections and Prospects." *Interfaces* 31.3.2 (May - June 2001): S56-S73, available at http://dl.dropbox.com/u/9686940/windj/0102_Thirty_Years_of_Conjoint_Analysis.pdf.

[10] Green, Paul E., Jerry Wind, and Vithala R. Rao. "Conjoint Analysis: Methods and Applications." The Technology Management Handbook. Ed. Richard C. Dorf. Boca Raton, FL: CRC Press, 1998. 12-66–12-72, available at http://dl.dropbox.com/u/9686940/windj/9903_Conjoint_Analysis_Methods_and_Applications.pdf.

[11] Wind, Yoram (Jerry), Abba M. Krieger, and Paul E. Green. "Applying Conjoint Analysis to Legal Disputes: A Case Study." Wharton School Working Paper, 2002, available at http://dl.dropbox.com/u/9686940/windj/0601_Applying_Conjoint_Analysis_to_Legal.pdf.

[12] Krieger, Abba M., Paul E. Green and Yoram (Jerry) Wind. Adventures in Conjoint Analysis: A Practitioner's Guide to Trade-Off Modeling and Applications. Philadelphia: The Wharton School, 2004, available at https://marketing.wharton.upenn.edu/faculty/green/monograph/.

applied conjoint analysis in the design of products and services, positioning, market segmentation, product assortment, pricing, and other marketing and business decisions.   These applications included the design of the Courtyard by Marriott, and projects for numerous firms such as AT&T, Ford, IBM, Xerox, American Airlines, FedEx, MasterCard, Monsanto, Pfizer, GSK, and a number of other B2C and B2B firms.   For an illustrative list of applications, see Table 2 of "Thirty Years of Conjoint Analysis: Reflections and Prospects."[13]

### C.   Approach And Materials Reviewed

11.   **Approach and Criteria for Evaluation** – In preparing this report, I relied on marketing, consumer behavior, and consumer research concepts, methods, and findings (a) as reflected in the professional literature and as taught by me and others at Wharton and other leading universities, and (b) as practiced by me and other leading professionals in conducting and evaluating marketing and consumer research for academic peer-reviewed publications and for management and courts as input into their decisions. These principles are consistent with the criteria outlined in the <u>Manual for Complex Litigation</u> (4th Edition) published in 2004 by the Federal Judicial Center.

12.   **Material Reviewed and Research Team** – In reaching these conclusions, I reviewed and/or relied upon the items listed in Appendix C.   These materials include, among other things, Professor Hauser's report, deposition and trial testimony.   I also have discussed issues in this case with my colleague and research collaborator, Professor Abba Krieger, and with Analysis Group.   In addition, some of the analysis that supports the opinions expressed in this declaration was performed by staff members at Analysis Group working under my direction and supervision.

## II.   SUMMARY OF CONCLUSIONS

13.   **The surveys upon which Professor Hauser's findings are based are ill-suited to evaluate whether the patented features drove consumer demand for Samsung smartphones**

---

[13]  Green, Paul E., Abba M. Krieger, and Yoram (Jerry) Wind. "Thirty Years of Conjoint Analysis: Reflections and Prospects." *Interfaces* 31.3.2 (May - June 2001): S56-S73, available at http://dl.dropbox.com/u/9686940/windj/0102_Thirty_Years_of_Conjoint_Analysis.pdf.

**and tablets.**   That is, Professor Hauser's conjoint analysis does not provide a reliable or valid basis for determining whether the touchscreen features claimed in the '915, '163, or '381 patents (the "utility patents" or "patents at issue"), alone or in combination with other features, drove demand for the Samsung smartphones or tablets that incorporated those features.   The reasons for this include the following:

- **Professor Hauser's analysis was not designed to evaluate whether the patented features are among the features that cause even some consumers to purchase Samsung smartphones and tablets.**   His surveys were not designed to examine why respondents select Samsung smartphones or tablets over competing products or choose to make no purchase at all.   He limited his surveys to owners of Samsung smartphones or tablets and forced those respondents to choose only Samsung devices.   Respondents did not have the choice to select competing products, nor did they have the choice not to select Samsung devices because prices were too high or the devices did not meet their purchase requirements. Consequently, Professor Hauser's surveys do not provide a basis by which to analyze the extent to which decisions to purchase Samsung's devices depended on the incorporation of the patented features.   (See paragraphs 39-45)

- **Professor Hauser's analysis was not and cannot be used to evaluate the impact of the patented features on the prices of the accused smartphones and tablets.** Because his analysis is based on presenting survey respondents with purchase choices that do not account for the role of competition, Professor Hauser's analysis does not and cannot provide estimates of the extent to which actual marketplace prices might have been affected by Samsung's incorporation of the patented features.   Professor Hauser estimates a similarly named, but conceptually very different, quantity he calls willingness-to-pay ("WTP") price premium.   Actual marketplace prices of a given product depend critically on the role of competing products, whereas the WTP price premium Professor Hauser estimated does not. Because Professor Hauser's survey is premised on the assumption that respondents

1    buy only Samsung phones, price effects cannot be measured in the context of the

2    competitive marketplace that actually exists.   Put simply, Professor Hauser's

3    analysis does not provide a basis by which to make marketplace predictions

4    because it accounts for only very narrow portions of the smartphone and tablet

5    products on the market. (See paragraphs 46-49)

6    • **Professor Hauser's analysis failed to show that inclusion of the patented**

7    **features made the accused products significantly more desirable.**   Professor

8    Hauser's WTP price premium estimates conflate estimates of feature desirability

9    and estimates of respondent price sensitivity.   Regardless of the desirability of a

10   given feature, greater price insensitivity generates larger WTP estimates for that

11   feature.   This is problematic because further examination of Professor Hauser's

12   analysis reveals that respondents are unrealistically insensitive to price.   Absent

13   behavioral assumptions imposed by Professor Hauser, for example, the responses

14   to his survey suggest that as many as 40 percent of respondents would prefer to pay

15   more for a given phone than less (depending on the price of the phone).

16   Consequently, Professor Hauser's WTP estimates may be driven primarily by price

17   insensitivity and do not imply that the patented features significantly increase the

18   desirability of the accused products.   Further, the design of Professor Hauser's

19   survey does not allow for comparisons of the desirability of the patented features to

20   the overall desirability of the Samsung's devices, whether measured directly in

21   terms of desirability or indirectly in terms of his flawed WTP estimates, because

22   his analysis does not account for desirability of the many, many features of the

23   accused devices that he omitted from his analysis.   His analysis also fails to

24   account for the extent to which any desirability for the patented features that might

25   be reflected his analysis is driven by educating survey respondents about features

26   that they would otherwise be unaware of. (See paragraphs 50-58)

27   14.   **Professor Hauser's methodology generates predictions that are inconsistent**

28   **with market realities and common sense.**   Specifically, Professor Hauser's estimates of the

WTP price premium associated with the features claimed in the utility patents are based on an underlying methodology that generates nonsensical predictions.   For example, they suggest that:

- As many as 43 percent of survey respondents chose to purchase smartphones or tablets that were priced higher than an identical lower-priced device.   (See paragraphs 59-61)

- As many as 35 percent of respondents preferred clearly inferior yet identically priced devices.   (See paragraphs 62-65)

- The smartphone WTP price premium associated with just the touchscreen features examined by Professor Hauser exceeds the $152 average price paid by survey respondents.   (See paragraphs 66-68)

15.   **The design of the surveys that underlie Professor Hauser's findings embodies numerous flaws that appear to invalidate his analysis and/or inflate his price premium estimates.**   Professor Hauser's WTP price premium estimates associated with the features claimed in the utility patents:

- Are conflated by systematically higher WTP price premium estimates associated with animated descriptions used to describe the features claimed in the utility patents.   (See paragraphs 70-74)

- Appear to be inflated because his analysis failed to adequately assess the willingness-to-pay for features associated with technologies claimed in the utility patents as compared with appropriate non-infringing substitute technologies.   (See paragraphs 75-79)

- May be inflated by a survey design which forced respondents to choose Samsung devices by not including other brands or a "no choice option."   (See paragraphs 80-81)

- May not accurately reflect respondents' price sensitivity because respondents' survey responses are linked to hypothetical, and not actual, spending.   (See paragraphs 82-83)

- May be overstated because his survey omits a number of important features and

benefits associated with the smartphone and tablet purchase decision.   (See paragraphs 84-86)

16.   **Professor Hauser failed to externally validate his model.**   Professor Hauser conducted internal validity tests to determine whether his findings were consistent within his sample of respondents.   However, Professor Hauser failed to conduct any external validity tests to determine whether his findings might be meaningful beyond the sample of respondents he surveyed and beyond his narrow survey environment. (See paragraph 87.)

III.   **BACKGROUND**

A.   **Case Status**

17.   On August 24, 2012, a jury found that Samsung had infringed several Apple patents, including the '381 patent, the '915 patent, and the '163 patent.[14]   I understand that Samsung is appealing the verdict.

18.   On September 21, 2012, Apple asked the Court to permanently enjoin Samsung from selling certain smartphones and tablets.[15]   That motion was denied in December 2012 by the U.S. District Court for the Northern District of California[16]   On November 18, 2013, the U.S. Court of Appeals for the Federal Circuit affirmed the district court's denial of a permanent injunction with respect to the three design patents-in-suit (D'677, D'087 and D'305) and registered iPhone trade dress and unregistered iPhone 3G trade dress and remanded for further consideration the court's denial of a permanent injunction with respect to the three utility patents-in-suit ('381, '915 and '163 patents).   Apple renewed its motion for a permanent injunction with respect to the three utility patents-in-suit on December 26, 2013.[17]   Among the arguments that Apple has made in support of its motion is that Samsung's infringement has resulted in "incalculable lost market share and lost downstream sales" for Apple.[18]

---

[14] Vascellaro, Jessica E. "Apple Wins Big in Patent Case," *The Wall Street Journal*, August 25, 2012, available at online.wsj.com/article/SB10000872396390444358404577609810658082898.html (viewed October 9, 2012).

[15] *Apple's Motion for a Permanent Injunction and for Damages Enhancements,* September 21, 2012.

[16] *Order Denying Motion for Permanent Injunction*, December 17, 2012, pp. 8 and 11.   *See also, Appeal from the United States District Court for the Northern District of California in No. 11-CV-1846*, p. 18-19.

[17] *Apple Inc.'s Renewed Motion for a Permanent Injunction*, December 26, 2013.

[18] *Apple Inc.'s Renewed Motion for a Permanent Injunction,* December 26, 2013, p. 6.

19. Apple has used the results of the Hauser Conjoint Analysis as evidence that the patented features "make Samsung's infringing products more desirable to consumers," "significantly increases the price" of Samsung's smartphones and tablets and as "particularly strong evidence of a causal nexus" between the patentee's irreparable harm and the defendant's infringement.[19]  According to *Apple's Renewed Motion for a Permanent Injunction:*

> …MIT professor John Hauser conducted a conjoint survey showing that Samsung consumers would pay a substantial price premium for products containing the specific features claimed by Apple's utility patents.  As the Federal Circuit explained, "evidence that a patented feature *significantly increases* the price of a product" may show that the feature drives demand for the product.  Dr. Hauser's survey showed that Samsung consumers would be willing to pay $39 more for a smartphone with a $199 base price if it contained the specific features claimed by the '915 patent, or $100 more if it contained the features claimed by all three of Apple's asserted utility patents.  For a tablet with a base price of $499, consumers would be willing to pay an additional $45 if it contained the features claimed by the '915 patent, or $90 more if it contained the features claimed by all three of Apple's utility patents.  Those large price premiums show "substantial demand for the features enabled by the patents in this case."[20]

### B.    Patented Features and Non-Infringing Alternatives

20. I understand that Samsung has been found to have incorporated touchscreen features claimed in the '381, '915, and '163 patents in certain smartphones and tablets.   I also understand that Samsung has developed and implemented non-infringing alternatives which provide customer benefits that are comparable to the features claimed in the Apple patents that Samsung was found to have infringed.

21. U.S. Patent No. 7,469,381 issued December 23, 2008 and is entitled "List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display."[21]   I understand that the '381 patent relates to the "bounce back" or "rubberband" feature that indicates when a user has scrolled to the end of a document on a touchscreen display.[22]   When the user scrolls to

---

[19] *Apple Inc.'s Renewed Motion for a Permanent Injunction,* December 26, 2013, p. 3.

[20] *Apple Inc.'s Renewed Motion for a Permanent Injunction,* pp. 3-4. (internal citations omitted.)

[21] U.S. Patent No. 7,469,381 B2.

[22] Declaration Of Andries Van Dam, Ph.D. In Support Of Samsung's Opposition To Apple's Motion For A Permanent Injunction And For Damages Enhancements Regarding U.S. Patent No. 7,469,381, October 18, 2012 ("Van Dam Declaration"), pp. 5-6; U.S. Patent No. 7,469,381 B2, at column 21.  *See also,* Reed, Brad. "Apple vs. Samsung: The gory details," *BGR,* August 24, 2012, available at http://www.bgr.com/2012/08/24/apple-samsung- (footnote continued)

the end of a document, the screen continues past the edge of the document and temporarily displays a shaded area before bouncing or "snap[ing] back" to the edge of the document.[23]   I further understand that this functionality was incorporated into certain Samsung smartphones and tablets.

22.     I understand that Samsung has developed a non-infringing alternative to the '381 patent that has been implemented in several of its smartphones and tablets.[24]   This non-infringing alternative replaces the "rubberband" feature with a blue glow that emanates from the edge of the screen whenever the user attempts to scroll past the edge.   I understand that, under the non-infringing alternative, the screen stops at the edge of the document such that no "rubberband" effect is implemented.[25]

23.     U.S. Patent No. 7,844,915 issued November 30, 2010 and is entitled "Application Programming Interfaces for Scrolling Operations."[26]   I understand that the '915 patent claims an "autoswitch" feature that enables the device to distinguish between single finger gestures (such as scrolling) and multi-finger gestures (such as "pinch to zoom").[27]   I further understand that this functionality    was incorporated in certain Samsung smartphones and tablets.

24.     I understand that Samsung has developed a non-infringing alternative to the '915 patent that has been implemented in the Galaxy S II (T-Mobile) smartphone.[28]   This non-infringing alternative modifies the underlying software but leaves the user's experience essentially unchanged.   That is, a user will still be able to scroll (with one finger) and zoom on documents

---

trial-verdict-samsung-loses-big/ (viewed October 9, 2012); Arthur, Charles. "Apple v Samsung: the questions the jury has to answer," *The Guardian*, August 22, 2012, available at http://www.guardian.co.uk/technology/2012/aug/22/jurors-samsung-apple-questions (viewed October 9, 2012).

[23]  Van Dam Declaration, p. 5.

[24]  Van Dam Declaration, pp. 6-7.

[25]  Van Dam Declaration, p. 6.

[26]  U.S. Patent No. 7,844,915 B2.

[27]  Declaration Of Stephen Gray In Support Of Samsung's Opposition To Apple's Motion For A Permanent Injunction And Damages Enhancement, October 18, 2012 ("Gray Declaration"), p. 5; Reed, Brad. "Apple vs. Samsung: The gory details," *BGR,* August 24, 2012, available at http://www.bgr.com/2012/08/24/apple-samsung-trial-verdict-samsung-loses-big/ (viewed October 9, 2012); Arthur, Charles. "Apple v Samsung: the questions the jury has to answer," *The Guardian*, August 22, 2012, available at http://www.guardian.co.uk/technology/2012/aug/22/jurors-samsung-apple-questions (viewed October 9, 2012).

[28]  Gray Declaration, pp. 15-16.

1  (using two fingers).[29]

2       25.    U.S. Patent No. 7,864,163 issued January 4, 2011 and is entitled "Portable

3  Electronic Device Method, and Graphical User Interface for Displaying Structured Electronic

4  Documents."[30]   I understand that the '163 patent claims a method of navigating a document on a

5  small screen device.   More specifically, the '163 patent relates to a method by which the user can

6  double-tap the screen to re-center and zoom in on a section of the screen.[31]   The user can then

7  double-tap on other portions of the screen to re-center the display while still zoomed in.[32]   I

8  further understand that this functionality was incorporated in certain Samsung smartphones and

9  tablets.

10       26.    I understand that Samsung has developed a non-infringing alternative to the '163

11  patent that has been implemented in several of its smartphones and tablets.[33]   This non-infringing

12  alternative modifies the approach presented in the '163 patent.   Under this non-infringing

13  alternative, after the user has performed a double-tap to zoom and re-center the screen, a

14  subsequent double-tap causes the screen to zoom out rather than re-center on another portion of

15  the screen.   Additionally, a subsequent single-tap results in no response from the device.[34]

16      **C.**    **Background On Smartphones And Tablets**

17       27.    Smartphones are voice and data handheld mobile wireless communications devices

18  that can be distinguished from other mobile handsets, referred to as "feature phones," by their

19  advanced operating systems.[35]   A key feature distinguishing smartphones from other handsets is

20

21

---

22  [29] Gray Declaration, p. 15.
   [30] U.S. Patent No. 7,864,163 B2.

23  [31] Gray Declaration, pp. 16-17; Reed, Brad. "Apple vs. Samsung: The gory details," *BGR,* August 24, 2012, available at http://www.bgr.com/2012/08/24/apple-samsung-trial-verdict-samsung-loses-big/ (viewed October 9, 2012); Arthur, Charles. "Apple v Samsung: the questions the jury has to answer," *The Guardian,* August 22, 2012,

24  available at http://www.guardian.co.uk/technology/2012/aug/22/jurors-samsung-apple-questions (viewed October 9, 2012).

25  [32] Gray Declaration, pp. 16-17.

26  [33] Gray Declaration, pp. 17-19.
   [34] Gray Declaration, p. 18.

27  [35] *See e.g.,* "North American Smartphones Market," Frost & Sullivan report number N81F-65, December 2010, p. 14; Kidron, Ittai and George Iwanyc, "2012 Handset Guidebook," Oppenheimer Equity Research, November 13,

28  2011 ("Oppenheimer 2012 Handset Guidebook"), p. 93.

1   the ability to run third-party applications.[36]   These phones offer a range of advanced features and

2   functionalities, including email support, the ability to access the internet, and multimedia functions

3   (such as gaming and streaming music and video).[37]

4          28.    A tablet is a hybrid of a computer and a smartphone that incorporates a flat

5   touchscreen and typically measures 7 to 10 inches across.[38]   Tablets typically offer Wi-Fi

6   connectivity,[39]  and while a subset of tablets offer cellular communications capability,[40]  they are

7   not primarily used for voice communications.    Instead, they are primarily used for personal

8   computing uses such as gaming, email, and web browsing.[41]

9          29.    Consumer surveys conducted by or for Samsung and Apple indicate that features

10  relevant to smartphone customer purchase decisions include, among others, screen size,

11  connectivity options, music & video capabilities, Bluetooth, camera, GPS, email access, battery

12  life, keyboard, touchscreen, brand name, apps, display type, video calling, screen quality, and

13  operating system.[42]   One website cited in the Hauser Report refers to approximately 30

14  smartphone features in its product comparisons,[43]  as do research reports from other third-party

15  sources.[44]   A number of other attributes also affect the consumer purchase decision, including the

16  quality, cost, and brand name of the network service provider; the price of the monthly service

17  plan; and recommendations from other users and salespeople.[45]   The fact that many attributes

18  contribute to the smartphone consumer's purchase decision is consistent with the way

---

19      [36] Oppenheimer 2012 Handset Guidebook, p. 93.

20      [37] Oppenheimer 2012 Handset Guidebook, p. 93.
        [38] Bell, Donald. "Tablet Buying Guide," *CNET*, March 28, 2012, available at http://reviews.cnet.com/tablet-
21  buying-guide/?tag=auxPromo (viewed October 16, 2012); Tablet Computer Definition, *PC Magazine*, available at
    http://www.pcmag.com/encyclopedia_term/0,2542,t=tablet+computer&i=52520,00.asp (viewed October 16, 2012);
22  "Tablet Buying Guide," *Consumer Reports*, May 2012, available at
    http://www.consumerreports.org/cro/tablets/buying-guide.htm (viewed October 16, 2012).
23      [39] "Tablet Buying Guide," *Consumer Reports*, May 2012, available at
    http://www.consumerreports.org/cro/tablets/buying-guide.htm (viewed October 16, 2012).
24      [40] *See, e.g.,* APLNDC-Y0000024130-333, pp. 160, 216-217.
        [41] APLNDC-Y0000023361-427, p. 389; APLNDC-Y0000024130-333, p. 246.
25      [42] *See, e.g.,* SAMNDCA00250503-557, p. 525; APLNDC-X0000006548-647, p. 566; APLNDC0002007608-
    704, p. 634.
26      [43] http://cell-phones.toptenreviews.com/smartphones/ (viewed October 12, 2012).   *See also*, Hauser Report, p.
    22.
27      [44] *See, e.g.,* SAMNDCA00190144-243, at 195.
        [45] *See, e.g.,* SAMNDCA00252685-775, p. 707; "How to Buy a Cell Phone," *PC World,* November 29, 2011,
28  available at http://www.pcworld.com/article/125653/cell_phone_guide.html (viewed October 16, 2012).

1  smartphones, such as the AT&T version of the Galaxy SII, are displayed on Samsung's website.[46]

2  Similarly, there are a variety of features that are relevant to tablet customer purchase decisions.[47]

3       30.    The features claimed in the patents at issue contribute to, and make use of,

4  touchscreen technology.   However, the patents at issue do not cover touchscreen technology in

5  and of itself, nor are they necessary for a touchscreen to be functional.   I also understand that

6  they do not cover many of the touchscreen features and functionalities that are incorporated in

7  Samsung phones, such as the ability to type, scroll, or double-tap to select links.   Consistent with

8  this, while the Samsung website for the AT&T version of the Galaxy SII smartphone lists the

9  touchscreen among the many features and attributes of the device, it describes the touchscreen

10  broadly as "[t]echnology that enables users to interact with a phone by touching images, words, or

11  icons on the display."[48]   As such, the functions claimed in the patents at issue contribute, at most,

12  some incremental value to the overall user experience of the touchscreen, which is just one of the

13  many features relevant to smartphone and tablet customer purchase decisions.

14       **D.    Overview Of Professor Hauser's Analysis**

15       31.    The Hauser Report, dated March 22, 2012, describes and reports the results of the

16  conjoint analysis that he undertook related to his assignment "to determine the price premium, if

17  any, that Samsung consumers are willing to pay for… features"[49] in smartphones and tablets

18  associated with the patents at issue, including the '915 patent, the '381 patent, and the '163

19  patent.[50]

20       32.    Professor Hauser used a web-based conjoint analysis survey procedure[51] along

21  with a hierarchical Bayes choice-based conjoint ("HB CBC") statistical methodology to develop

22  his price premium estimates.[52]   His approach included the following elements:

23

---

24     [46] *See, e.g.,* Exhibit 1.
   [47] APLNDC-Y0000023361-427, p. 387; APLNDC-Y0000024130-333, p. 233; http://tablets-

25  review.toptenreviews.com/ (viewed October 12, 2012).   *See also*, Hauser Report, p. 22.
   [48] Exhibit 2.

26     [49] Hauser Report, p. 6.
   [50] The Hauser Report also addresses U.S. Patent No. 7,663,607 as it relates to tablets and U.S. Patent No.

27  7,812,828 as it relates to smartphones; however, I understand that those patents were dropped from the litigation.
   [51] Hauser Report, p. 8.

28     [52] Hauser Report, p. 17.

DECLARATION OF YORAM (JERRY) WIND

i.    A series of 20 interviews were conducted with smartphone and tablet consumers to develop an understanding about consumers' use of smartphones and tablets.[53]

ii.   Using this information, a questionnaire was developed.   This questionnaire was pre-tested with another 20 respondents to examine the design and clarity of the survey instrument.[54]

iii.  Survey respondents completed a set of screener questions to determine eligibility for the conjoint survey.[55]   Respondents who passed the screener section proceeded immediately to the conjoint survey introduction, which included instructions for completing the survey as well as lengthy descriptions of each of the features included in the survey.[56]   Three of the feature descriptions were accompanied by text, static images, and multimedia animations that further explained the features, while others were accompanied only by text and static images.[57]   The following features were included in the survey: (1) capabilities of the touchscreen; (2) size and weight; (3) camera; (4) storage/memory; (5) connectivity; (6) number of apps; and (7) price.[58]

iv.   The survey considered four levels of each feature.[59]   For the touchscreen, "three of the touchscreen capability levels (for both smartphones and tablets) were intended to be chosen such that they would represent a product that included a non-infringing alternative for one or more of the patents at issue."[60]

v.    For both smartphones and tablets, each survey respondent was asked to choose

---

[53] Hauser Report, p. 20.

[54] Hauser Report, p. 24.

[55] Hauser Report, pp. 29-30.

[56] Hauser Report, pp. 32-33.

[57] Animations were used for the descriptions of touchscreen capability, camera, and connectivity.   The remaining four features (size and weight, number of apps, storage/memory, and price) used only static images.   Hauser Report, p. 33.

[58] Hauser Report, pp. 9, 33.   Respondents were told "[a]side from these features below, you should assume that all other smartphone features are the same for every smartphone offering you see." Hauser Report, p. 36.

[59] Exhibit 3 lists the features and feature levels for Professor Hauser's smartphone survey.   Exhibit 4 lists the features and feature levels for Professor Hauser's tablet survey.   The level descriptions are largely similar in the smartphone and tablet surveys, though they differ somewhat for the touchscreen, connectivity and size and weight features.

[60] Hauser Report, p. 32.

among four hypothetical products composed of sets of product features.   The exercise was repeated 16 times for each respondent.   Professor Hauser does not specify the approach he employs to determine the composition of the products shown on each choice screen.[61]   However, it appears that the features used in each smartphone or tablet on a given choice screen were determined using a randomized sampling without replacement approach.[62]

vi.   As described by Professor Hauser, respondents were forced to choose among the four options presented to them.   Respondents were asked, "[i]f these were your only options and you were choosing a new smartphone [tablet], which Samsung smartphone [tablet] would you choose?"[63]   That is, the survey was designed such that respondents would not make comparisons with other devices available in the marketplace.

33.   The smartphone and tablet surveys were taken by 604 and 599 individuals, respectively, who had purchased an infringing Samsung product in the prior two years.[64]   After eliminating certain of the survey respondents, samples of 455 Samsung smartphone users and 415 Samsung tablet users were analyzed.[65]   All surveys were administered via the Internet.[66]

34.   From the survey results, Professor Hauser estimated a series of "partworths" for each respondent, which represent the partial contribution to utility of each level of each feature from consuming a product.   Professor Hauser supplemented these partworths with prior information about the estimated partworths based on consumer-behavior theory.[67]

35.   Professor Hauser then applied an approach known as Randomized First Choice

---

[61] Professor Hauser states only that the examples used in the choice screens were generated randomly to avoid order effects.   Hauser Report, pp. 23, 34-35, 37.

[62] More specifically, each choice screen contained four phones (or tablets), and each feature had four possible levels. For each feature, the first device was randomly assigned one of the four possible levels, then the second device was randomly assigned one of the three remaining levels, then the third device was randomly assigned one of the two remaining levels, and finally the last level was assigned to the fourth device.   Thus, each level of each feature was represented in exactly one device on each choice screen.   The randomization was done using Sawtooth software.

[63] Hauser Report, p. 35.

[64] Hauser Report, p. 30, 37.

[65] Hauser Report, p. 17, 38.

[66] Hauser Report, p. 28.

[67] See, e.g., Hauser Report, pp. 41-42, 45.

("RFC") market simulation ("RFC Simulation") to the partworth estimates to estimate the price premium for features associated with the patents at issue.[68]   More specifically, Professor Hauser estimated the price premium associated with a particular product attribute by using the RFC Simulation to determine the price at which *half* of the survey respondents would select a higher price phone with a given attribute over an otherwise identical phone that lacks that attribute.[69] The WTP price premium is the difference in the prices between the two phones (that vary by a single feature but are otherwise identical).

36.     Exhibit 5 summarizes the steps employed by Professor Hauser to determine his estimate of the WTP price premium for the "autoswitch" feature claimed in the '915 patent.   This involves a comparison of two phones:   Phone A and Phone B.   With respect to the touchscreen features, Phone A includes the "autoswitch" feature as well as the "reliable touch," "rubberband," and "tap to re-center after zoom" features.   Phone B includes only the reliable touch, rubberband, and tap to re-center after zoom features, but not autoswitch.   The phones are identical with respect to the other non-price features.[70]   The benchmark price for Professor Hauser's WTP price premium calculations is $199.[71]

37.     When priced at that benchmark price, the RFC Simulation predicts that 67 percent of the survey respondents would prefer Phone A.   The RFC Simulation predicts that half of the survey respondents would prefer Phone A at price of $238 relative to Phone B at a price of $199, hence the $39 WTP price premium associated with the '915 patent/autoswitch feature.[72]   Exhibit 6 summarizes the steps employed by Professor Hauser to determine the $100 price premium associated with the features claimed in the '915, '163, and '381 patents collectively.[73]   Using the

---

[68] Hauser Report, pp. 50-52.

[69] Hauser Report, pp. 51, 55.

[70] According to Professor Hauser, "In the simulation, the levels of other features do not affect the consumer's choice as long as they are held constant between the two product options."  Hauser Report, p. 51.  However, this is true only if there are no interaction terms between levels across features. Hauser chose to fit a model without interaction terms (even though they might be relevant) which is why his statement holds.

[71] Hauser Report, p. 53.

[72] Exhibit 5.

[73] It is important to note that Professor Hauser's methodology implicitly limits his WTP price premium estimates to $100 for any given feature level.   The reason is that maximum price level in the Hauser survey is $299, and by
(footnote continued)

same approach for tablets, Professor Hauser estimated a WTP price premium of $45 associated with the '915  patent/autoswitch feature and a $90 price premium associated with the features claimed in the '915, '163, and '381 patents collectively.  Exhibits 7 and 8 are the tablet analogues of Exhibits 5 and 6.

38.    Professor Hauser summarized his WTP estimates as follows:

> …for both smartphones and tablets, Samsung consumers are willing to pay a significant price premium for the tested features that are covered by the patents at issue. For smartphones with a base price of $199, the estimated price premium is $39 for the '915 Patent alone… [and] the estimated price premium is $100 for the '915, '163 and '381 Patents taken together.  For tablets with a base price of $499, the estimated price premium is … $45 for the '915 Patent alone, and $90 for the '915, '163 and '381 Patents taken together.[74]

## IV.    ANALYSIS OF HAUSER REPORT

### A.    The Surveys Upon Which Professor Hauser's Findings Are Based Are Ill-Suited To Evaluate Whether The Patented Features Drove Consumer Demand For Samsung Smartphones And Tablets

#### 1.    The Surveys Upon Which Professor Hauser's Findings Are Based Were Not Designed To Evaluate Whether The Patented Features  Are Among the Features that Cause Consumers To Purchase Samsung Smartphones And Tablets

39.    Interpreting Professor Hauser's survey results requires understanding his underlying survey design.  Two central features of his survey design involve the selection of survey participants and the smartphone and tablet choices presented to survey respondents.  First, survey participants were required to have purchased at least one Samsung smartphone or tablet in the last two years.[75]  The screening questions excluded any consumer who did not previously own a Samsung smartphone or tablet but intended to purchase one in the near future,[76] while not excluding any recent Samsung owners who no longer used their Samsung smartphone or tablet as

---

using a benchmark price of $199, Professor Hauser does not allow the price of the preferred smartphone to be increased by more than $100.

[74] Hauser Report, pp. 7-8.
[75] Hauser Report, p. 30.
[76] The screening questions specify that any person who has not owned at least one Samsung smartphone or tablet in the last two years will be terminated from the survey.  Hauser Report, Exhibit D, p. 3 and Exhibit E, p. 3.

1    their primary device.[77]

2          40.      Second, survey participants who satisfied the screening requirements were

3    restricted to choosing Samsung devices.[78]   Survey respondents were not given the option of

4    selecting devices that compete with Samsung smartphones (*e.g.* Apple iPhones) or tablets (*e.g.*

5    Apple iPads).   Nor were survey respondents presented with the option to not, effectively, buy a

6    device because none of the presented choices met their purchase requirements.

7          41.      Professor Hauser acknowledged the limitations of his survey with respect to

8    constraining respondents to choices of Samsung smartphones and tablets alone:

9                  For each set of four alternative smartphones in a choice task,
10                 respondents were asked:   "If these were your only options and you
                   were choosing a new smartphone [tablet], which Samsung
11                 smartphone [tablet] would you choose?" By explicitly asking
                   respondents to focus only on the four options provided to them, *the*
12                 *survey was designed with the goal that respondents would not make*
                   *comparisons with other devices available in the marketplace.*[79]
13

14   This approach does not correspond with the reality of the marketplace in which consumers are free

15   to choose among different brands of smartphones and tablets that differ in many ways including

16   price levels, features, and other benefits not included in Professor Hauser's study.

17         42.      Professor Hauser further described how his survey design omitted an option that

18   would have allowed him to estimate what he refers to as "primary demand" for the products

19   analyzed in his survey:

20                 In some instances researchers augment the choice among profiles in
                   the choice task by allowing the respondent to choose an "outside
21                 option," that is, to choose not to choose among the options (this is
                   also known as the "no-choice" option).   *This outside-option design*
22                 *is appropriate when a researcher wishes to estimate* <u>*primary*</u>
                   <u>*demand*</u> *for smartphones.*[80]
23

24   _____

     [77] The screening questions specify that any person who has owned a Samsung phone in the last two years and can
25   identify the device are allowed to continue with the survey.   This may include, for example, people who have
     purchased a Samsung device in the last two years before switching to a different manufacturer's device or people who
26   have purchased a Samsung device in the last two years but already decided their next device will be from a different
     manufacturer.   Hauser Report, Exhibit D, pp. 3-4 and Exhibit E, pp. 3-4.
27   [78] Hauser Report, p. 35.
     [79] Hauser Report, p. 35 (emphasis added).
28   [80] Hauser Report, p. 35 (emphases added).

Professor Hauser, however, does not explicitly describe what primary demand reflects and, in turn, what his surveys fail to account for.   Marketers use the term "primary demand" in reference to demand for the product category as a whole.[81]   In the context of Professor Hauser's surveys, however, "primary demand" by virtue of the surveys' design reflects *the demand for Samsung smartphones and tablets*.   As such, Professor Hauser has essentially acknowledged that his surveys were *not* designed to analyze the demand for Samsung smartphones or tablets.

43.   Because Professor Hauser's conjoint study does not accurately depict market reality by allowing respondents to choose options other than Samsung smartphones and tablets, the survey data collected by Professor Hauser was not used – and cannot be used – to determine whether consumers' purchasing behavior would have been any different had the patented features not been incorporated into Samsung's devices, or to estimate the extent to which the patents at issue drove sales that Samsung would not have otherwise made.   That is, the data collected by Professor Hauser cannot be used, for example, to estimate the extent to which people bought Samsung smartphones instead of competing smartphones because of the patented features, or the extent to which people would choose to purchase another brand of smartphone if the Samsung smartphones did not have the patented features.   Nor can the survey be used to estimate the extent to which people purchased a Samsung smartphone rather than not buying a smartphone at all.   This is inherent in the design of Professor Hauser's surveys.   Because respondents are not given any "outside options," whether they are for competitor smartphones or no smartphone purchase at all, the survey response data collected by Professor Hauser does not allow for a systematic examination of the product features associated with Samsung smartphones versus an alternative.   All 13,920 choices from all 870 respondents reported in Professor Hauser's survey data involve the selection of a Samsung device, regardless of the product features.[82]

44.   Importantly, Professor Hauser's estimates of the amounts consumers are willing to pay for the patented features – even if reliable and valid, which they are not – do not provide any

---

[81]   *See, e.g.,* Pride, William M. and O.C. Ferrell, <u>Marketing</u>, South-Western College Publishing, 2012, p. 512.
[82]   Professor Hauser reported results from 455 smartphone respondents and 415 tablet respondents.   Each respondent provided 16 choice responses. Hauser Report, pp. 17, 19.   (455 + 415) * 16 = 13,920.

1  guidance regarding the extent to which the features claimed in the utility patents were among

2  features that drove Samsung sales.   Put another way, Professor Hauser's survey does not show

3  that "but for" the patented features Samsung would have lost sales.   It is perfectly conceivable

4  that consumers who have a high willingness-to-pay for features, as measured in Professor

5  Hauser's survey, would purchase Samsung devices even without the features claimed in those

6  patents. These consumers may have a strong affinity for the Samsung brand, the Android

7  operating system, or any of a number of other features[83] and benefits[84] that consumers regularly

8  identify as being central to their decision to purchase smartphones and tablets.[85]   Conjoint

9  analysis/surveys are widely used to examine which product features drive consumer purchases

10  among "competing" alternatives.   Professor Hauser, however, did not conduct such a survey.

11      45.      In his reply declaration in support of Apple's motion for a permanent injunction,

12  Professor Hauser argued that my criticism regarding his failure to include a no choice option was

13  contradicted by a statement I made in my deposition.[86]   As I noted, there are differing opinions

14  regarding the appropriateness of incorporating of a no choice option in conjoint surveys.

15  However, in my experience, discussion over the appropriateness of using a no choice option is

16  generally in the context of surveys that provide respondents with a choice among competing

17  alternatives and not in cases where competitive products are absent, as in the survey employed by

18  Professor Hauser.

19          **2.    Professor Hauser's Survey Analysis Was Not Designed For Nor Can It Be Used To Evaluate the Impact Of The Patented Features On The**

20          **Prices Of The Accused Smartphones And Tablets**

21      46.      I understand that the Federal Circuit has clarified that the standard for

22

---

23  [83] Examples of other important features not included in Professor Hauser's survey include battery life, operating system, display quality, and multimedia (video and music) capabilities.   *See, e.g.,* SAMNDCA00250503-557, p. 525;

24  APLNDC-X0000006548-647, p. 566; APLNDC0002007608-704, p. 634; APLNDC-Y0000023361-427, p. 387; APLNDC-Y0000024130-333, p. 233.

25  [84] Consumers consider many additional factors when making a smartphone or tablet purchase decision, including quality of network service, network coverage, cost of service (voice and/or data) plans, consumer reviews, word of

26  mouth recommendations, etc. *See, e.g.,* SAMNDCA00252685-775, p. 707; "How to Buy a Cell Phone," *PC World,* November 29, 2011, available at http://www.pcworld.com/article/125653/cell_phone_guide.html (viewed October 16,

27  2012).
      [85] *See, e.g.,* SAMNDCA00250503-557, p. 525; SAMNDCA00252685-775, p. 707.
      [86] Reply Declaration of John R. Hauser in Support of Apple's Motion for a Permanent Injunction, at ¶41.

28

1  demonstrating that patented features drive demand for a product may include evidence that "a

2  patented feature significantly increases the price of the product."[87]   Some smartphone and tablet

3  features are clearly drivers that influence market prices.   For example, the current retail price of

4  an Apple iPhone 5S with 16 GB of memory is $199 while the market price of an otherwise

5  identical phone with 32 GB of memory is $299.[88]   Because Professor Hauser's survey, by design,

6  ignores the role of competing products, his analysis does not provide a basis for measuring the

7  increase in the price of a product due to the inclusion of patented features.

8         47.      Professor Hauser provides what he refers to as WTP price premiums for the

9  patented features.   He does not, however, provide estimates of the extent to which *actual*

10  *marketplace prices* might have been affected by Samsung's incorporation of the patented features,

11  nor can he.   Professor Hauser's WTP price premium is similarly named, but conceptually very

12  different.   Actual marketplace prices of a given product depend critically on the role of

13  competing products, whereas Professor Hauser's WTP estimates do not account for the role of

14  competing products in any way.[89]   Absent the ability to choose from competing products, survey

15

16         [87] *Appeal from the United States District Court for the Northern District of California in No. 11-CV-1846,* p. 26
         [88] http://store.apple.com/us/buy-iphone/iphone5s (viewed on January 9, 2014).   These prices reflect subscriber

17  contracts with carriers.

         [89] Paul Samuelson described competition through the prices and availability of related goods as one of the

18  primary forces behind the demand curve.   *See* Samuelson, Paul A, and William D Nordhaus. *Economics*. 19th Edition,
2009, p. 48. ["The prices and availability of *related goods* influence the demand for a commodity.   A particularly

19  important connection exists among substitute goods – ones that tend to perform the same function."]   [emphasis in
original]   *See also* Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 14th Edition, Boston: Prentice Hall

20  Publishing, 2012, at 390-391, Browning, Edgar and Mark Zupan, *Microeconomic Theory & Applications*, 6th Edition,
Reading: Addison-Wesley, 1999, at 17, 22-27, Besanko, David and Ronald Braeutigam, *Microeconomics*, 2nd

21  Edition, Hoboken: John Wiley & Sons, 2005, at 47-49, and N. Gregory Mankiw, *Principles of Economics*, 6th
Edition, Mason: South-Western   Cengage Learning, 2012, at 69-70.   Note that the major retailers and carriers that

22  sell Samsung devices also sell a range of competing devices.   *See, e.g.,*
http://www.att.com/shop/wireless/devices/smartphones.html (viewed on January 9, 2014);

23  http://www.att.com/shop/wireless/devices/tablets.html?source=IC00WWTAB0000000L&wtExtndSource=Tablets.ht
ml (viewed on January 9, 2014); http://www.verizonwireless.com/b2c/device/smartphone (viewed on January 9,

24  2014); http://www.verizonwireless.com/b2c/device/tablet (viewed on January 9, 2014);
http://www.bestbuy.com/site/mobile-cell-phones/mobile-phones-with-

25  plans/pcmcat209400050001.c?id=pcmcat209400050001 (viewed on January 9, 2014);
http://www.bestbuy.com/site/ipad-tablets-ereaders/tablets/pcmcat209000050008.c?id=pcmcat209000050008 (viewed

26  on January 9, 2014); http://www.radioshack.com/family/index.jsp?categoryId=2032359 (viewed on January 9, 2014);
http://radioshackwireless.com/mobile/?r=radioshack&refcode1=RSK_0000_000_CELLTOP (viewed on January 9,

27  2014);
http://shop.sprint.com/mysprint/shop/phone_wall.jsp?filterString=smartphone&INTNAV=ATG:HE:Smartphones

28  (viewed on January 9, 2014);
         (footnote continued)

1    respondents may have more readily accepted higher prices on Samsung devices.    Restricting

2    consumer choice, as Professor Hauser has done, likely has the effect of inflating WTP estimates.

3    By not accounting for the critical role of competition in determining prices, Professor Hauser's

4    price estimates are not comparable to actual marketplace prices.    Any comparison between

5    Professor Hauser's price estimates and actual marketplace prices would be, in effect, an apples to

6    oranges comparison.

7            48.    The necessity of explicitly incorporating competitive offerings in the choice set in

8    order to evaluate the impact of specific features on the price of products that incorporate them is

9    demonstrated by one of Apple's own experts, Dr. Peter Rossi, who coauthored a recent paper

10   describing the problems of ignoring competition:[90]

> A conjoint survey attempts to simulate marketplace purchase behavior for a sample of consumers. Product features are manipulated according to an experimental design and the respondents are asked to choose from among hypothetical products define [sic] by product features...  However, conjoint studies must be designed specifically for demand and profit calculations.  <u>In particular, the set of competitive brands available in the marketplace must be included and the choice tasks must include the "outside option."</u>[91]

17           49.    The authors go on to describe the impact of failing to account for one effect of

18   competition on pricing:

> In many instances, these analyses are misleading and do not well-approximate the true value of the product feature. WTP… will typically overstate the price… effects from the introduction of a patented product feature.[92]

---

http://shop.sprint.com/mysprint/shop/phone_wall.jsp?flow=&tabId=dvcTab1820005&INTNAV=ATG:HE:Tablets (viewed on January 9, 2014).

[90] Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013). Available at SSRN: http://ssrn.com/abstract=2359003.   Dr. Rossi filed a report on behalf of Apple in this matter.   Expert Report of Peter Rossi, April 16, 2012.

[91] Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at pp. 43-45. Available at SSRN: http://ssrn.com/abstract=2359003. [emphasis added]. *See also* pages 13-14, which state that the "outside" or "no choice" option, the major set of competitive brands, and major product features "must be" included in the conjoint analysis.

[92] Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at p. 45. Available at SSRN: http://ssrn.com/abstract=2359003.

3. **Professor Hauser's Analysis Failed To Show That Inclusion Of The Patented Features Made The Accused Products Significantly More Desirable.**

(a) **The WTP Figures Calculated By Professor Hauser Do Not Demonstrate That The Patented Features Had A Significant Impact On The Desirability Of The Accused Products.**

50.     In its Renewed Motion for a Permanent Injunction, Apple argued that the "price premiums" that Professor Hauser calculated are "evidence that [the patented features] make Samsung's infringing products more desirable to consumers."[93]  There are several problems with this conclusion.   First, as described above, what Apple and Professor Hauser call "price premiums" for the patented features do not, in fact, reflect premiums associated with the market price for the accused products.   This is because Professor Hauser's analysis cannot account for the impact of individual Samsung features on market prices due to his failure to incorporate competing products in his survey.

51.     Second, the magnitudes of the WTP estimates that Professor Hauser calculated conflate (a) the partworths for the patented features that provide a measure of the value individual respondents place on the patented features relative to the other features Professor Hauser includes in his survey and (b) the estimated price sensitivity of the individual respondents. As described in detail below, my analysis of Professor Hauser's conjoint model shows that there is substantial and extreme price insensitivity demonstrated by the survey respondents.   Professor Hauser does not attempt to disentangle the impact of this price insensitivity and the partworths associated with the patented features for the purposes of determining the extent to which the desirability of the accused devices depends on inclusion of the patented features. This is important because consumers who are insensitive to price are willing to pay a large amount for all features.   As a result, high WTP estimates for given features do not imply that the feature significantly adds to the desirability of the product as a whole.

52.     Third, Apple attempts to claim that, because the WTP figures calculated by Professor Hauser are "large" relative to the base price of the accused products, this shows

---

[93]  Apple Inc.'s Renewed Motion for a Permanent Injunction, at 3.

1    "substantial demand for the features enabled by the patents in this case."[94]  This conclusion is

2    flawed. WTP and market price are two very different concepts and are not directly comparable.

3         53.     Even if Professor Hauser were to inappropriately rely on his WTP estimates for the

4    patented features as a proxy for desirability, he does not have a comparable measure to evaluate

5    the WTP for the accused products as a whole.    He has not estimated the WTP for the accused

6    products, nor can he.    While he could generate WTP estimates for the features he explicitly

7    included in his analyses, such an approach would omit many features of the accused devices,

8    including many of the features that Samsung explicitly promoted.[95]    Further, the WTP of the

9    patented features in this case are relatively small even when compared only to the sum of the WTP

10   estimates for the limited number of features included by Professor Hauser in his surveys in this

11   case, including patented and distraction features.[96]    Accounting for all of the WTP estimates by

12   Professor Hauser in this case and Professor Hauser's exclusion of the hundreds of other features in

13   the accused products suggests that the relative WTP of the patented features may be *de minimis*.

14        54.     It also is worth noting that there are well-accepted conjoint techniques, such as

15   hybrid conjoint models, that *explicitly* address the desirability to respondents of product features.[97]

16   Professor Hauser could have utilized such a technique here, but did not.

       **(b)    Professor Hauser's Analysis Failed To Demonstrate That**
17            **Consumers Were Aware Of Or Used The Patented Features In**
18            **The Accused Products**

19        55.     In order for a feature to impact a product's desirability, consumers must be aware

---

[94]  Apple Inc.'s Renewed Motion for a Permanent Injunction, at 3-4 ("Dr. Hauser's survey showed that Samsung consumers would be willing to pay $39 more for a smartphone with a $199 base price if it contained the specific features claimed by the '915 patent, or $100 more if it contained the features claimed by all three of Apple's asserted utility patents. (PX30; Dkt. 2739 at 529:17-25.) For a tablet with a base price of $499, consumers would be willing to pay an additional $45 if it contained the features claimed by the '915 patent, or $90 more if it contained the features claimed by all three of Apple's utility patents. (PX30; Dkt. 2739 at 530:1-8.). Those large price premiums show 'substantial demand for the features enabled by the patents in this case.'")

[95]  *See, e.g.,* http://www.samsung.com/us/mobile/cell-phones/SGH-T989ZKBTMB-features (viewed January 9, 2014); http://www.samsung.com/global/microsite/galaxytab/10.1/feature.html (viewed January 9, 2014); cell-phones.toptenreviews.com/smartphones/ (viewed October 12, 2012); tablets-review.toptenreviews.com (viewed October 12, 2012).

[96]  Exhibit 30.

[97]  Hybrid conjoint models involve the collections of three types of data from each respondent: 1) attribute-level desirability values for the levels of each attribute separately, 2) attribute importance data, and 3) conjoint responses to a limited set of full profiles.  *See, e.g.,* Green, Paul E., "Hybrid Models for Conjoint Analysis: An Expository Review", Journal of Marketing Research, Vol. 21, No. 2 (May 1984), pp. 155-169, at p. 156.

of the existence of the feature.    In this case, Professor Hauser's survey did not ask about, and Dr.
Hauser otherwise provided no evidence regarding, the extent to which consumers, in the real
world, were aware of the patented features.[98]    In fact, it does not appear that the patented features
are prominently mentioned, if at all, by Samsung in its marketing of the accused products on its
website.[99]

56.    In his survey, Professor Hauser spent a considerable amount of time educating
respondents about the patented features.[100]    This was done through animations, text, and icons
that were shown to participants taking the survey.    As a result, the consumers taking the survey
appear to have been given much more information about the patented features than consumers in
the marketplace.    Consumers who purchased Samsung smartphones and tablets in the real world
would not have had access to the same tutorial given by Professor Hauser prior to making their
purchase decisions.

57.    Academic research has shown that if respondents are not aware of the attributes
shown in the conjoint survey, the estimated values associated with the attribute will be inflated.
According to one author:

---

[98]  Expert Report of John R. Hauser, March 22, 2012, at Exhibits D and E; Transcript of Proceedings Volume 2, Apple Inc. v. Samsung Electronics Co., Ltd, et al., C-11-01946 LHK, November 13, 2013, at 542.    Professor Hauser's survey design forced 100 percent awareness and could not be used to measure if in the real world consumers would have even considered any of these features.

[99]  *See, e.g.,* http://www.samsung.com/us/mobile/cell-phones/SGH-I897ZKAATT-features; http://www.samsung.com/us/mobile/cell-phones/SCH-I400ZKAVZW-features; http://www.samsung.com/us/mobile/cell-phones/SCH-I510RAAVZW-features; http://www.samsung.com/us/mobile/cell-phones/SPH-D700ZKASPR-features; http://www.samsung.com/us/mobile/cell-phones/SGH-T759ZKBTMB-features; http://www.samsung.com/us/mobile/cell-phones/SCH-I500RKAVZW-features; http://www.samsung.com/us/mobile/cell-phones/SPH-M820ZKABST-features; http://www.samsung.com/us/mobile/cell-phones/SGH-T959HABTMB-features; http://www.samsung.com/us/mobile/cell-phones/SGH-I777ZKAATT-features; http://www.samsung.com/us/mobile/cell-phones/SGH-T989ZKBTMB-features; http://www.samsung.com/us/mobile/cell-phones/SCH-R930DSAUSC-features; www.samsung.com/us/mobile/galaxy-tab/SGH-I987ZKAATT-features; www.samsung.com/us/mobile/cell-phones/SCH-I100ZKAXAR-features; www.samsung.com/us/mobile/cell-phones/SCH-R910ZKAMTR-features; www.samsung.com/us/mobile/cell-phones/SGH-I997ZKAATT-features; www.samsung.com/us/mobile/cell-phones/SCH-I500RKAUSC-features; www.samsung.com/us/mobile/cell-phones/SPH-M580ZKASPR-features; www.samsung.com/us/mobile/cell-phones/SGH-T959ZKATMB-features; http://www.samsung.com/galaxyace/ace_overview.html; http://www.samsung.com/global/microsite/galaxytab/10.1/feature.html (all viewed January 9, 2014).

[100]  Hauser Report, Exhibits D and E.

> Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace. For example, featuring the attribute 'surge protector' may make this attribute salient even though it may not be salient in actual choices.[101]

> Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices.[102]

58.    Professor Hauser is aware of this limitation, as evidenced by his own prior writings. In a 2004 article entitled, *Conjoint Analysis, Related Modeling, and Applications*, he noted that there is a need for further research in order to account for the difference between conjoint analysis, which informs respondents about product attributes, and the real world, where such attributes may not be known. According to Professor Hauser:

> Conjoint analysis is based on measurements that inform respondents about product features. However, in real markets such information diffuses and does not happen instantaneously. Thus, we expect further development of methods that combine the diffusion of information among customers with models of how customers will choose based on that information.[103]

**B.    Professor Hauser's Estimates Of The WTP Price Premium Associated With The Features Claimed In The Utility Patents Are Based On An Underlying Methodology That Generates Nonsensical Predictions**

**1.    Professor Hauser's Methodology Suggests That A Substantial Portion Of Survey Respondents Prefer To Pay Higher Prices For Otherwise Identical Smartphones And Tablets**

59.    In order to further evaluate the reliability and validity of Professor Hauser's WTP price premium estimates, I employed the RFC Simulation technique underlying those estimates to evaluate predictions not reported by Professor Hauser in his report.   Specifically, I employed the RFC Simulation relied on by Professor Hauser to evaluate predictions related to a benchmark smartphone – a smartphone that embodies the highest level attributes for each of the non-price

---

[101] J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* (1997): 244.

[102] J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* (1997): 252.

[103] Hauser, J., and V. Rao, "Conjoint Analysis, Related Modeling, and Applications," in Wind, J. and P. Green (eds.), *Advances in Market Research and Modeling: Progress and Prospects* (Boston, MA: Kluwer Academic Publishers, 2004):18 available at http://web.mit.edu/hauser/www/Papers/Hauser_Rao%20Conjoint%20Analysis%20Green%20Festschrift%202002.pdf (viewed July 1, 2013).

features[104] – that differed only in terms of price.   Exhibit 9 shows specific predictions of the RFC Simulation employed by Professor Hauser, including the following[105]:

- 32 percent of survey respondents would prefer to pay $199 rather than $99 for the benchmark smartphone;

- 43 percent of survey respondents would prefer to pay $99 rather than $0 for the benchmark smartphone;

- between 19 percent and 43 percent of survey respondents would pay an additional $100 for an otherwise identical smartphone;

- as many as 31 percent would pay an additional $200 for an otherwise identical smartphone; and

- 16 percent would prefer to pay $299 for a smartphone they could have for free (but, in both cases, come with a two-year carrier contract).

Exhibit 10 shows qualitatively similar predictions associated with Professor Hauser's tablet analysis.   For example, 41 percent of respondents would prefer to pay $359 rather than $199 for an otherwise identical tablet, while 15 percent of respondents would prefer to pay $659 rather than $199 for an otherwise identical tablet.[106]

60.     These results are at odds with common sense.   They demonstrate that the RFC Simulation upon which Professor Hauser bases his WTP price premium estimates generates predictions in which survey respondents are unrealistically insensitive to price.   This renders his

[104] Professor Hauser notes that feature levels that are held constant between the two phones will not affect the consumer's choice.   Hauser Report, p. 51.   However, this is true only if there are no interactions between the features and feature levels used in the conjoint exercise.

[105] In his reply report (Reply Declaration of John R. Hauser in Support of Apple's Motion for a Permanent Injunction, ¶¶ 23-24) Professor Hauser criticizes the use of RFC Simulation for this purpose. It is important to note that Professor Hauser estimates WTP price premiums based on both RFC Simulations and FC Simulations.   Unlike the RFC analyses discussed here, FC Simulations do not generate the nonsensical predictions described above. However, this a function of the price monotonicity constraints employed by Professor Hauser and is entirely independent of inferences made regarding the respondents' sensitivity to price based on their survey responses.   Put another way, an FC Simulation will always predict, because of the price monotonicity constraints employed by Professor Hauser, that 100 percent of the respondents will choose a cheaper but otherwise identical phone _regardless of how they respond to the survey_.   An alternative way to demonstrate the nonsensical predictions generated by Professor Hauser's analysis is to conduct FC Simulations _without the price monotonicity assumptions_ employed by Professor Hauser.   Exhibit 31 shows that the results of such simulations generate equally nonsensical results and highlights that the respondents in Professor Hauser's surveys are implausibly insensitive to price.

[106] Exhibit 10.

1   WTP price premium estimates unreliable and invalid because they largely reflect overall survey

2   respondent price insensitivity.

3          61.     Hauser's reliance on his survey, despite these results, also is at odds with what

4   other researchers have recommended.    A recent paper states:

> If a number of respondents have posteriors for price coefficients that
> put most mass on positive values, this suggests a design error in the
> conjoint study; perhaps, respondents are using price as a proxy for
> the quality of omitted features and ignoring the 'all other things
> equals survey instructions.' In this case, the conjoint data should be
> discarded and the study re-designed.[107]

9   The authors further state, "[u]nless the distribution of price sensitivity puts little mass near zero,

10  the conjoint data will not be useful for economic valuation using either our equilibrium approach

11  or for the use of the more traditional and flawed p-WTP methods."[108]

12          **2.     Professor Hauser's Methodology Suggests That A Large Portion Of
                   Samsung Owners Prefer Clearly Inferior, Yet Identically Priced,
13                 Smartphones And Tablets**

14         62.     I also employed the RFC Simulation to generate predictions involving pairs of

15  smartphones where one is clearly superior to another.    For example, I compared a $199

16  benchmark smartphone,[109] with 64 GB of memory capacity, to an otherwise identical $199

17  smartphone with only 8 GB of memory capacity.    The RFC Simulation predicted that 35 percent

18  of survey respondents would select the 8 GB smartphone.[110]    Similarly, I compared a $499

19

20

---

21  [107] Allenby, Greg M. and Brazell, Jeffrey P. and Howell, John R. and Rossi, Peter E., Economic Valuation of
    Product Features (October 9, 2013). Available at SSRN: http://ssrn.com/abstract=2338154.   Exhibit 31 shows that up
22  to 40% of respondent in Prof. Hauser's study have posteriors for price coefficients that are on average positive (i.e.,
    end up with a preference for a higher price all else equal). In particular, 40% of respondent prefer a $99 phone to an
23  identical free phone.
       [108] Allenby, Greg M. and Brazell, Jeffrey P. and Howell, John R. and Rossi, Peter E., Economic Valuation of
24  Product Features (October 9, 2013). Available at SSRN: http://ssrn.com/abstract=2338154.   Exhibit 9 shows that
    when Hauser constrains his estimation of price coefficient to be positive, he in fact ends up with a large proportion of
25  respondent with mass around 0 (because it was forced to be positive by design). This is visible in Exhibit 9 in which
    we see that up to 43% of respondents would be simulated to prefer a $99 phone over an identical free phone, which
26  shows that when you add a little noise around the price coefficient estimates (use of randomized first choice) the sign
    flips (in other words, it was very close to 0).
27     [109] The benchmark smartphone is one that embodies the highest level attributes for each of the features aside
    from the one being varied in the current example (in this case, memory).
28     [110] Exhibit 11.

benchmark tablet,[111] with 64 GB of memory capacity, to an otherwise identical $499 tablet with only 8 GB of memory capacity.    The RFC Simulation predicted that 31 percent of survey respondents would select the 8 GB tablet.[112]    By way of reference, a 64 GB micro SD memory card that can be inserted into many Samsung smartphone models retails for prices in the range of $50.[113]    Similarly, upgrading from the 16 GB Samsung Galaxy SIII to the otherwise identical 32 GB Samsung Galaxy SIII costs consumers $50.[114]

63.    Similar comparisons were conducted involving other features.    For example, the RFC Simulation predicted that 25 percent of respondents would select the $199 benchmark smartphone with only the cellular and Wi-Fi connectivity features over an otherwise identical smartphone with cellular, Wi-Fi, Tethering, Micro USB, and HDMI connectivity features.[115]    In addition, the RFC Simulation predicted that 24 percent of respondents would select the $199 benchmark tablet with only Wi-Fi connectivity over an otherwise identical tablet with Wi-Fi, Bluetooth, Micro USB, and HDMI connectivity features.[116]    The consumer benefits of these additional connectivity features are discussed widely.[117]

---

[111] The benchmark tablet is one that embodies the highest level attributes for each of the features aside from the one being varied in the current example (in this case, memory).

[112] Exhibit 12.

[113] *See, e.g.*, http://www.amazon.com/SanDisk-SDSDU-064G-A11-Ultra-UHS-I-Class/dp/B007B5RJA6/ref=sr_1_94?s=pc&ie=UTF8&qid=1350430546&sr=1-94&keywords=sandisk+64 (viewed October 10, 2012).   *See also*, http://www.samsung.com/us/mobile/cell-phones-accessories#container (viewed October 8, 2012)

[114] *See, e.g.*, http://shop.sprint.com/mysprint/shop/phone_wall.jsp?filterString=smartphone&isDeeplinked=true&INTNAV=ATG:HE:Smartphones (viewed October 18, 2012).

[115] Exhibit 13.

[116] Exhibit 14.

[117] *See, e.g.*, Ziegler, Chris. "Why Is Verizon's iPhone 5 Unlocked? Don't Thank Google or the FCC." *The Verge*. September 25, 2012, available at http://www.theverge.com/2012/9/25/3405610/verizon-iphone-5-unlocked-open-access-fcc. (viewed October 17, 2012);   Ziegler, Chris. "AT&T adding an extra 2GB to phone tethering plans, launching Mobile Hotspot app February 13th." *Engadget*, February 2, 2011, available at www.engadget.com/2011/02/02/atandt-adding-an-extra-2gb-to-phone-tethering-plans-launching-mob/ (viewed October 17, 2012); Purewal, Sarah Jacobsson. "The ultimate Android tethering guide." *PC World*, September 5, 2012, available at http://www.pcworld.com/article/261928/the_ultimate_android_tethering_guide.html (viewed October 17, 2012); "Motorola Droid Razr Maxx review (Verizon Wireless)." *CNET*, October 17, 2012, available at http://reviews.cnet.com/smartphones/motorola-droid-razr-maxx/4505-6452_7-35128051-2.html (viewed October 17, 2012); Miller, Matthew. "ACCELL MHL adapter turns the HTC Flyer into a portable media server (review)." *The Mobile Gadgeteer*, September 8, 2011, available at http://www.zdnet.com/blog/mobile-gadgeteer/accell-mhl-adapter-turns-the-htc-flyer-into-a-portable-media-server-review/5095 (viewed October 17, 2012); Bennett, Brian. "New iPad first tablet with Bluetooth 4.0: Should you care?" *CNET*, March 9, 2012, available at http://news.cnet.com/8301-1035_3-57394350-94/new-ipad-first-tablet-with-bluetooth-4.0-should-you-care/ (viewed October 18, 2012).

64.     The breadth of app availability is also widely discussed.[118]   Yet the RFC Simulation predicted that 43 percent of survey respondents would select the $199 benchmark smartphone that had access to 150,000 apps over one that is otherwise identical, but with access to 600,000 apps.[119]   The comparable figure for the $199 benchmark tablet is 44 percent.[120]

65.     These findings are nonsensical.   Similar to the comparisons of phones that differ only in price, the findings demonstrate that the RFC Simulations upon which Professor Hauser bases his WTP price premium estimates generate predictions that are inconsistent with central tenets of consumer behavior.   The findings also demonstrate that Professor Hauser's WTP price premium estimates cannot be relied on.

**3.     Professor Hauser's Estimates Of The WTP Price Premium Associated With Just The Touchscreen Features Examined Exceed The $152 Average Smartphone Price Paid By Survey Respondents**

66.     The results of Professor Hauser's WTP analysis also appear nonsensical when compared against the actual market prices of consumers' devices.[121]   Respondents in Professor Hauser's smartphone survey reported spending an average of $152 on their Samsung smartphones.[122]   Professor Hauser's own WTP estimates imply that the price premium for the individual touchscreen features – reliable touch ($65), rubberband and tap to re-center ($75), and autoswitch ($39) – amount to $179.[123]   That is, the WTP estimates of the touchscreen features analyzed by Professor Hauser – which comprise only a fraction of the total number of touchscreen features, which, in turn, comprise only a small fraction of all smartphone features – exceed the actual amount, on average, survey respondents paid for their smartphone.

67.     Professor Hauser's WTP estimates are similarly out of line with market realities

---

[118] For example, Apple's website highlights that its "App Store has the world's largest collection of mobile apps." (http://www.apple.com/iphone/from-the-app-store/, accessed October 18, 2012).   *See also*, Pogue, David, "Just How Many Android Tablet Apps Are There?", *The New York Times,* July 1, 2011, available at http://pogue.blogs.nytimes.com/2011/07/01/mystery-how-many-android-tablet-apps/ (viewed October 18, 2012).
[119] Exhibit 15.
[120] Exhibit 16.
[121] One should make this comparison with caution because, as noted above, Professor Hauser's WTP price premiums do not reflect actual market price premiums associated with the patented features.
[122] Hauser Report, p. 53.   Professor Hauser's survey instructed smartphone survey respondents to assume that the price shown was for a smartphone purchased with a 2-year service contract.   Hauser Report, Exhibit D, p. 14.
[123] Exhibit 17.

1  when estimated based on a different benchmark price.   With respect to his smartphone

2  calculations, Professor Hauser generated his WTP price premium estimates based on a benchmark

3  smartphone arbitrarily priced at $199 and noted that doing so was conservative.[124]   However, as

4  noted earlier, basing his WTP estimates on the $199 benchmark price also has the effect of

5  limiting his WTP estimates to, at most, $100.[125]

6        68.   Exhibits 18 and 19 demonstrate the unrealistic WTP estimates generated by

7  Professor Hauser's methodology when the estimates are based on a benchmark smartphone priced

8  at $0 (with a two year contract).   Specifically, Professor Hauser's methodology generates a WTP

9  price premium of $164 for the features associated with the '915 patents (autoswitch) and a WTP

10  price premium of $266 for the features associated with the '915, '381, and '163 patents,

11  collectively.[126]   These WTP figures, too, stand in stark contrast to the actual prices survey

12  respondents reported paying for smartphones (in their entirety) and further demonstrate the

13  unreliability and invalidity of Professor Hauser's findings.

14  **C.**    **The Surveys Underlying Professor Hauser's Findings Embody Numerous
Design Flaws That Invalidate His Analysis And Appear To Inflate His Price
15  Premium Estimates**

16        69.   The predictions generated by Professor Hauser's analysis strongly suggests

17  problems with the underlying survey design.   My review reveals a number of such problems that

18  invalidate Professor Hauser's price premium estimates.

19          **1.**    **Professor Hauser's WTP Price Premium Estimates Associated With
The Features Claimed In The Utility Patents Are Conflated By An
20  Apparent Bias Associated With Animated Feature Descriptions**

21        70.   Any findings associated with a conjoint analysis depend critically on the manner

22  in which the features of interest are presented to survey respondents.   In addition, the reliability

23  and validity of the findings depends on respondents clearly understanding the product features

24  upon which the survey is based.   The reliability and validity of the findings also depend on a

25  survey design that does not artificially influence respondents' choices so as to introduce bias.

---

26  [124] Hauser Report, p. 53.
[125] This is because the RFC Simulation is limited to prices with the range explicitly considered in Professor
27  Hauser's survey.   For smartphones, prices range from $0 to $299.   Hauser Report, Exhibit D, p. 14.
[126] Exhibits 18 and 19.

28

71.    As noted above, in addition to price, Professor Hauser's surveys consider features associated with the smartphone or tablet's:    (i) touchscreen, (ii) connectivity, (iii) camera, (iv) storage/memory, (v) app availability, and (vi) size and weight.    The touchscreen features associated with the utility patents were described to survey respondents on a web-based interface employing text, static images, and multimedia animations.[127]    The connectivity and camera features were also described using text, static images, and multimedia animations.[128]    In contrast, the other non-price features – related to storage/memory, app availability, and size and weight – were described only with text and static images.    They did not rely on multimedia animations.[129]

72.    There are numerous reasons why an analysis that uses different visual stimuli for some of the features being tested could produce biased results for those features.    First, multimedia animations may be easier for survey respondents to comprehend, particularly in instances in which the subject feature involves actions that can be difficult to depict in static images or describe in words.    Second, multimedia animations can be more engaging to respondents, such that respondents may pay substantially more attention to features that are accompanied by multimedia animations than to those without multimedia animations.    Third, the use of multimedia animations for a subset of the features being tested might signal to respondents that those features may be more important than features that are accompanied only by static images.    For example, respondents may perceive that the features that have multimedia animations are more important to the survey creators due to the extra time and effort that was expended in developing the animations (relative to developing a static image).[130]    For these

---

[127]  Hauser Report, p. 33 and Exhibit D, pp. 9-10.

[128]  Hauser Report, p. 33 and Exhibit D, pp. 7, 12-13.

[129]  Hauser Report, p. 33 and Exhibit D, pp. 7-9, 11, 13-14.

[130]  It has been well known for decades that survey takers can be easily biased by unbalanced treatment or loading, particularly on topics they are not highly familiar with such very granular smartphone features. Stanley Payne wrote in his 1951 textbook The Art of Asking Questions, that "It is on marginal issues, which the public knows little about and cares little about, that loading can most easily distort the picture of public opinion." S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951): 235.    As discussed above, researchers have found that even mentioning an attribute can inflate its value even without the unbalanced treatment of attributes featured in Professor Hauser's survey.   *See* J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," Sawtooth Software Conference Proceedings (1997): 244. ["Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the
(footnote continued)

1    reasons, it is customary in conjoint analysis to use the same presentation approach for every

2    feature in the survey.

3         73.    In Exhibit 20, I summarize the WTP price premium estimates for the smartphone

4    feature and level combinations not reported by Professor Hauser by employing the RFC

5    Simulation in the same manner as Professor Hauser.[131]   In particular, I present the respective

6    WTP price premium estimates for each feature relative to a $199 benchmark phone that embodies

7    the highest attribute level for each of the six non-price features (consistent with Professor

8    Hauser).[132]   This leads to 18 distinct WTP price premium estimates.[133]   These WTP price

9    premium estimates range from $11 to $100 (Professor Hauser's externally imposed cap).   The

10   estimates associated with the nine attribute levels associated with the features that did not employ

11   a multimedia animated description – storage/memory, app availability, and size and weight –

12   range from $11 to $31.[134]   The estimates associated with the nine smartphone attribute levels

13   associated with the features that did employ a multimedia animated description – touchscreen,

14   connectivity, and camera – range from $33 to greater than $100.[135]   Thus there is a clear

15   distinction between the features described with multimedia animations and those that were not:

16   the smartphone WTP price premium estimates are uniformly higher for the features described with

17   multimedia animations.   The results are depicted graphically in Exhibit 21.   Exhibits 22 to 24

18   depict the smartphone WTP price premium estimates by level and show an even more pronounced

19   distinction between the features that were described with multimedia animations in contrast to

20   those that were not.   Exhibit 25 summarizes the WTP price premium estimates for the tablet

21   feature and level combinations not reported by Professor Hauser.   Exhibits 26 to 29 show a

22   similarly strong tendency for tablet features described with multimedia animations to be associated

---

marketplace. For example, featuring the attribute 'surge protector' may make this attribute salient even though it may
not be salient in actual choices."]

[131] Note that these estimates were generated based on the methodology employed to generate Table 4 in Professor
Hauser's Report.   They are not based on the alternative "robustness check" methodology described in Paragraph 104
of his Report based on the "median-consumer."

[132] Exhibit 20.

[133] There are 6 six non-price features with four levels each, allowing for three WTP price premium estimates per
level (relative to the highest level of a given feature).

[134] Exhibit 20.

[135] Exhibit 20.

DECLARATION OF YORAM (JERRY) WIND

1    with high WTP price premium estimates.

2        74.    These findings imply that the WTP price premium estimates reported by Professor

3    Hauser for the features claimed in the utility patents are likely driven, at least in part, by the

4    manner in which they were presented to respondents when taking the survey.   Additionally,

5    while Professor Hauser employs multiple methods to test the "fit and predictive ability" of his

6    model, none of these are able to account for the influence of the animated descriptions.[136]   For

7    example, the hold-out analysis Professor Hauser describes in his report[137]  seeks only to test the

8    predictive ability of the model by using a subset of choices from each respondent to estimate the

9    model and predict the respondent's behavior for the remaining "hold-out" choices.    More

10   importantly, there is no clear or conventional method by which to analyze and, effectively,

11   disentangle the role that preferences of the survey respondents had in driving Professor Hauser's

12   WTP price premium estimates from the role of the animated descriptions.    More generally, the

13   apparent effect of the multimedia animations relied on by Professor Hauser further undermines the

14   reliability and validity of his findings.

15                    **2.    Professor Hauser's Failure To Appropriately Account For Non-**
                          **Infringing Alternative Features Results In Apparently Inflated WTP**
16                        **Price Premium Estimates**

17       75.    Professor Hauser's conjoint survey did not appropriately account for the possibility

18   of non-infringing alternatives to the patented features.[138]   Despite Professor Hauser's claim that

19   the touchscreen capability levels "were chosen such that they would represent a product that

20   included a non-infringing alternative,"[139]  Professor Hauser's survey did not adequately account

21   for alternative, non-infringing technologies that Samsung could have, and ultimately has (as

_____

[136] Hauser Report, pp. 42-46.
[137] Hauser Report, pp. 42-45.
[138] Professor Hauser states that "[t]hree of the touchscreen capability levels (for both smartphones and tablets) were chosen such that they would represent a product that included a non-infringing alternative for one or more of the patents at issue." Hauser Report, p. 32.  However, the stimuli presented to respondents at the screen in which they were asked to choose between various alternatives did not include any reference to alternative implementations of the features.   It is not clear whether survey participants understood that alternatives presented on the choice screen as lacking a certain feature (*i.e.* no autoswitch, no rubberband, or no tap to re-center after zoom) would involve alternatives presented in the animations.   In addition, Professor Hauser has failed to provide evidence of the extent (if any) to which alternatives presented in the animations influenced respondents' interpretations of the stimuli presented at the choice screen.
[139] Hauser Report, p.32.

1   described above in paragraphs 22-26), employed to provide consumer benefits that are comparable

2   to those provided by the features claimed in the utility patents.

3        76.    The touchscreen features included in Professor Hauser's Smartphone survey levels

4   included combinations of the following features:   autoswitch/ no autoswitch, rubberband/no

5   rubberband, and tap to re-center after zoom/no tap to re-center after zoom.[140]   During Professor

6   Hauser's survey, participants were first presented with animations of these features and potential

7   alternatives.[141]   Participants then continued to a screen that described a choice between various

8   alternatives that involved either the feature or the *lack* of the feature (e.g. autoswitch vs. a lack of

9   autoswitch).   That is, at the time of choice, the stimuli engaging survey respondents were the

10   presence or absence of a given feature.   As such, Professor Hauser's analysis can, at best,

11   estimate consumers' incremental utility and willingness-to-pay for the infringing feature *relative*

12   *to having no feature at all.*   The analysis does not provide a reliable estimate of the incremental

13   utility and willingness-to-pay for the patented features relative to non-infringing alternative

14   versions of those features.   Because Professor Hauser's survey did not present respondents with

15   appropriate non-infringing benchmarks against which to compare the patented features at the

16   screen in which participants actually chose between various alternatives, his results appear to

17   overestimate the relevant partworth measures and lead to invalid and apparently inflated

18   willingness-to-pay inferences related to each of the three patented features.[142]

19        77.    For example, based on the descriptions provided to respondents on the choice

20

---

21   [140] Hauser Report, p. 49 and Exhibit D, pp. 9-10.

    [141] Survey participants were shown an animation of a potential alternative for each of the features (autoswitch,
22   rubberband, and tap to re-center after zoom).  For the autoswitch feature, participants were shown an alternative in
    which the user was required to press a button on the screen to switch from multi-touch to single-touch.  For the
23   rubberband feature, participants were shown an alternative where a red border flashed around the entire frame when a
    user scrolled past the end of a page.  For the tap to re-center after zoom feature, participants were shown an
24   alternative in which a user double-tapped to zoom back out and double-tapped on another part of the screen to re-
    center and zoom to that point.

25   [142] Furthermore, Professor Hauser's results likely overestimate the range of relative values by measuring against
    the wrong benchmark.  In conjoint analysis, the relative importance of an attribute depends on the range of attribute
26   levels used in the conjoint survey.  Here, at the screen in which respondents actually chose between various
    combinations of features, Professor Hauser's survey presents only two levels of each infringing feature – the inclusion
27   of the infringing feature and the complete absence of any version of that feature.  Using "no feature" as the baseline
    increases the range of WTP values that result from Professor Hauser's analysis.  Proper inclusion of an appropriate
28   non-infringing alternative would generate more precise results.

screens, Professor Hauser measures the WTP price premium for the rubberband feature against an alternative of no rubberband feature, rather than against the "blue glow" non-infringing alternative (described above) developed and, ultimately, implemented by Samsung.[143]   Doing so provides, at best, an indication of respondents' willingness-to-pay for the rubberband feature as compared to no alternative feature.   Furthermore, Professor Hauser fails to account for the customer benefits associated with the "blue glow" non-infringing alternative actually implemented by Samsung, which was never shown to survey respondents.   As a result, Professor Hauser's analysis will likely overstate the importance of the '381 patent.

78.   Similarly, based on the descriptions provided to respondents on the choice screens, Professor Hauser measures the WTP price premium for the "tap to re-center after zoom" relative to "no tap to re-center after zoom".   As noted above, Samsung has designed and implemented a design around to this feature where after the user has performed a double-tap to zoom and re-center the screen, a subsequent double-tap causes the screen to zoom out rather than re-center on another portion of the screen.[144]   By failing to adequately present this alternative at the screen where participants chose between various options, Professor Hauser does not adequately account for the non-infringing alternative implementation.   Moreover, I understand that the tap to re-center feature in Samsung's Captivate smartphone, which was found not to infringe the '163 patent,[145] provides a user the exact or nearly identical functionality as Samsung phones found to infringe the '163 patent.   Professor Hauser failed to account for this in his survey. Consequently, his analysis will likely overstate the importance of the '163 patent.

79.   Finally, as discussed above, Samsung has developed a design around for the

---

[143] As discussed above, the screens at which participants were prompted to choose between various options made no reference to any alternative feature and   thus, the stimuli engaging the respondents at the time of choice were simply "rubberband" and "no rubberband".   The animation did present to respondents a non-infringing alternative. However, the alternative presented in was not an adequate representation of the non-infringing alternative implemented by Samsung.   The "blue glow" alternative developed by Samsung is a very different stimulus to end users than the "red frame" alternative shown to participants in Professor Hauser's survey.

[144] Although survey participants were shown an animation depicting this alternative implementation of the feature, Professor Hauser has not provided adequate evidence that this representation influenced respondents' interpretations of the stimuli presented at the choice screen (i.e., "tap to re-center after zoom" vs. "no tap to re-center after zoom").

[145] Amended Jury Verdict, August 24, 2012, at 4.

"autoswitch" patented feature that, based on software changes, provides a user experience that is essentially the same as the patented feature.   Professor Hauser did not account for this.[146]   As a result, Professor Hauser's WTP estimates associated with the '915 patent will likely overstate the importance of the patent.

### 3. Professor Hauser's WTP Price Premium Estimates May Be Inflated Because Respondents Were Forced To Choose Samsung Smartphones

80.   As noted above, Professor Hauser surveys forced respondents to choose Samsung phones.   He did not provide them with a "no choice option," a topic that has been the subject of considerable academic research.   A recent publication by Brazell *et al*. noted the following:

> It has long been advanced that one should include a [no-choice option] in choice-based conjoint designs… Inclusion of the no-choice option increases design efficiency (Anderson and Wiley, 1992), better mimics the choice process in many situations (Louviere and Woodworth, 1983) directly measuring demand for specific tested products in the context of the entire market, and allows one to model market growth as more attractive alternatives are introduced.[147]

In addition, researchers have noted that including a "no choice option" enhances the realism of the choice tasks and survey.[148]

81.   Brazell *et al*. further describe the results of an experiment comparing a survey that incorporates forced choices with one that incorporates a no choice option.   They find that respondents can exhibit less price sensitivity, sometimes substantially less, when faced with forced

---

[146] The animation for the alternative to the autoswitch feature involved a significantly different user experience, in which the user was required to tap a button on the screen to switch between multi-touch and single-touch modes. Even for participants whose choices were influenced by this earlier animation, Professor Hauser's survey measures, at best, respondents' willingness-to-pay for the autoswitch feature as compared to an alternative feature significantly different from Samsung's implemented alternative.

[147] See Brazell, Jeff D., Christopher G. Diener, Ekaterina Karniouchina, William L. Moore, Válerie Séverin and Pierre-Francois Uldry, "The no-choice option and dual response choice designs," *Marketing Letters*, Vol. 17, No. 4 (Dec., 2006), pp. 255-268 ("Brazell *et al*."), p. 256.

[148] *See, e.g.,* Orme, Bryan K. Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Research Publishers, Madison, WI, 2010, p. 22 ("Choice-based conjoint questions closely mimic what buyers do in the real world – choose among available offerings. Including *none* as an option enhances the realism, and allows those respondents who are not likely to purchase to express their disinterest." Emphasis in original.); Johnson, Rich and Bryan Orme: "Getting the Most from CBC," *Sawtooth Software Research Paper Series*, 1997, p. 5 ("We think it is usually a good idea to include the "None" option in the questionnaire, for these reasons… It makes the choice tasks more realistic, because that option is usually available when shopping.")

1  choices.[149]   This lower level of price sensitivity has the effect of increasing the price premium

2  associated with given attribute values.   The observation that excluding the "no choice option"

3  from a conjoint survey can lead to higher estimated price premiums undermines the reliability and

4  validity of Professor Hauser's findings.

**4.   Professor Hauser's WTP Price Premium Estimates May Be Biased Upward Due To The Fact That There Are No Actual Consequences To Purchasing More Expensive Products In A Hypothetical Survey**

7  82.   There is a difference between the amount that a consumer indicates they would be

8  willing to pay in a hypothetical transaction and the amount that they would pay when actual

9  money is involved.   Consumers' hypothetical willingness-to-pay may overstate the extent to

10  which they would *actually* pay for a feature given that they are not engaging in a transaction that

11  involves real money changing hands.[150]

12  83.   This inflated willingness-to-pay is consistent with the observation that, based on

13  Professor Hauser's survey analysis, several features examined had WTP price premium estimates

14  that were comparable to (or greater than) the average price respondents actually paid for their

15  Samsung smartphones.   For example, respondents in Professor Hauser's survey reported

16  spending an average of $152 on their Samsung smartphones.[151]   However, as discussed above, if

17  one compares them, Professor Hauser's WTP price premium estimates for the touchscreen,

18  connectivity, and camera features alone equal almost double the amount that respondents reported

19  spending on their actual smartphones.[152]   In light of this problem, one cannot rely on the findings

20  and estimates that result from Professor Hauser's analysis.

---

[149]  Brazell *et al.*, at Table 1.A.

[150]  *See, e.g.,* Harrison, Glenn W. and Elisabet E. Rustrom. 2008. "Experimental Evidence on the Existence of Hypothetical Bias in Value Elicitation Methods." In Charles R. Plott and Vernon L. Smith (eds.), Handbook of Experimental Economics Results. New York: Elsevier B.V.

[151]  Hauser Report, p. 53.   Professor Hauser's survey instructed smartphone survey respondents to assume that the price shown was for a smartphone purchased with a 2-year service contract.   Hauser Report, Exhibit D, p. 14

[152]  Exhibit 20.   The combined WTP price premium estimates for touchscreen, connectivity, and camera are at least $268.   Note that the estimates for touchscreen and camera are both capped at $100.

**5.      Professor Hauser's WTP Price Premium Estimates May Be Overstated Because His Survey Omits A Number Of Important Features And Benefits Associated With The Smartphone And Tablet Purchase Decision**

84.      There are, as noted in paragraphs 29-30, numerous features and benefits that are known to affect consumers' purchase decisions related to smartphones and tablets.   For example, a pair of 2008 presentations prepared for Samsung highlights a number of these features and related attributes that affect the smartphone purchase decision.   These features include the smartphone's screen size, connectivity options, music & video capabilities, Bluetooth, camera, GPS, email access, battery life, keyboard, brand name, and touchscreen.[153]   Similarly, Apple has identified numerous additional product attributes that are important to the purchase decision, including apps, display type, video calling, screen quality, operating system, and several others.[154] There are also a variety of features that are relevant to tablet customer purchase decisions.[155]   The websites cited by Professor Hauser include many more features, including 30 smartphone features and 26 tablet features in their product comparisons,[156]  as do research reports from other third-party sources.[157]   A number of   indirect attributes also affect the consumer purchase decision, including the quality, cost, and brand name of the network service provider; the price of the monthly service plan; and recommendations from other users and salespeople.[158]

85.      It is important for the design of the conjoint survey to incorporate the features that are known to be important consumer purchase decision drivers along with the features that the survey is designed to test.[159]   Omitting known important features can cause survey respondents to

---

[153] SAMNDCA00250503-557, p. 525; SAMNDCA00252685-775, p. 707.

[154] *See, e.g.,* APLNDC-X0000006548-647, p. 566; APLNDC0002007608-704, p. 634.

[155]  APLNDC-Y0000023361-427, p. 387; APLNDC-Y0000024130-333, p. 233; http://tablets-review.toptenreviews.com/ (viewed October 12, 2012).  *See also,* Hauser Report, p. 22.

[156] http://cell-phones.toptenreviews.com/smartphones/ (viewed October 12, 2012); http://tablets-review.toptenreviews.com/ (viewed October 12, 2012).  *See also,* Hauser Report, p. 22.

[157] *See, e.g.,* SAMNDCA00190144-243, p. 195.

[158] *See, e.g.,* SAMNDCA00252685-775, p. 707; "How to Buy a Cell Phone," *PC World,* November 29, 2011, available at http://www.pcworld.com/article/125653/cell_phone_guide.html (viewed October 16, 2012).

[159]  In constructing a conjoint survey, generating the attributes and levels is a critical step. *See, e.g.,* Orme, Bryan, "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software, Inc., 2002. The features and benefits of the product in question should be presented in the survey in a way that closely mimics the consumer purchase decision process for the product. *See, e.g.,* Orme, Bryan K. Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Research Publishers, Madison, WI, 2010, p. 45.

1   overvalue the features that are included in the survey.[160]   A design that omits important purchase

2   decision drivers can fail to capture interaction effects between features that are included and those

3   that are not, biasing the values of the included features.[161]

4       86.    Professor Hauser's survey includes some of the features known to be important to

5   the consumer purchase decision, but excludes many others identified in Samsung[162] and Apple[163]

6   internal documents, as well as the websites Professor Hauser cited as validation for his feature

7   selections[164] and the product websites for Samsung's smartphones.[165]   According to Professor

8   Hauser, "[b]ecause consumers are told to make choices among profiles assuming 'all else equal,'

9   as is the standard in conjoint analysis, the set of features does not need to be exhaustive.

10   However, a reasonable set of features makes the choices more realistic and minimizes demand

11   artifacts."[166]   While it is true that a conjoint analysis does not need to include every available

12   feature, the omission of features known to be important to the purchase decision, and thus known

13   to have value to consumers, can create an upward bias on the values of the features that are

14   included in the survey, including the features related to the patents at issue here.   In light of this

15   problem, one cannot rely on the findings and estimates that result from Professor Hauser's

16   analysis.

---

[160] *See, e.g.,* Huber, Joel. "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Proceedings of the Sawtooth Software Conference*, August 1997 ("Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace.")   *See also*, McFadden, Daniel. "The Choice Theory Approach to Market Research," *Marketing Science*, Vol. 5, No. 4, Special Issue on Consumer Choice Models (Autumn,1986), p. 291. ("When the items under study have a large number of attribute dimensions, of which only a small number can be characterized and varied experimentally, the subject's imputation of the missing variables introduces noise, and possibly bias.")

[161] *See, e.g.,* Green, Paul E. and V. Srinivasan, "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," *Journal of Marketing*, Vol. 54, No. 4 (Oct., 1990), pp. 3-19. ("It has been typical in conjoint studies to estimate only the main effects and assume away interaction effects. In certain cases, interaction effects, particularly two-way interaction effects, may be important.")

[162] *See, e.g.,* SAMNDCA00250503-557, p. 525.

[163] *See, e.g.* APLNDC-X0000006548-647, p. 566; APLNDC0002007608-704, p. 634; APLNDC-Y0000023361-427, p. 387; APLNDC-Y0000024130-333, p. 233.

[164] http://cell-phones.toptenreviews.com/smartphones/ (viewed October 12, 2012); http://tablets-review.toptenreviews.com/ (viewed October 12, 2012).   *See also,* Hauser Report, p. 22.

[165] *See, e.g.,* Exhibits 1 and 2.

[166] Hauser Report, p. 20.

**D.      Professor Hauser Failed To Externally Validate His Model**

87.      Professor Hauser failed to externally validate his model.   Professor Hauser conducted internal validity tests to determine whether his findings were consistent within his sample of respondents.   Specifically, he examined the predictive ability of his model by estimating the model on a subset of the data and then testing the predictive ability of the results obtained from that subset using two statistics, the $U^2$ and the hit rate.[167]   However, Professor Hauser failed to conduct any *external* validity tests to determine whether his findings might be meaningful beyond the sample of respondents he surveyed and beyond his narrow survey environment.   Given that conjoint analysis involves a large number of assumptions and design choices and that conjoint is always conducted under the unrealistic assumption of 100 percent awareness and availability, external validation is critical.

**V.      CONCLUSION**

88.      **In summary, Professor Hauser's Report and the conjoint analysis that it describes do not show that the features claimed in the utility patents drove demand for Samsung smartphones or tablets.**   Professor Hauser's analysis was not designed to determine whether consumers bought Samsung smartphones or tablets because the devices included the features claimed in the utility patents nor did it address whether the patented features significantly increased the market price or desirability of Samsung's accused smartphones and tablets.   His methodology, moreover, generates predictions that are inconsistent with market realities and common sense, and includes numerous flaws (described in paragraphs 59-87).   Those flaws, summarized in the figure below, render the WTP results unreliable and invalid.

---

[167] Hauser Report, pp. 42-43

| Component of Professor Hauser's Survey Design | Paragraphs | Effect |
| --- | --- | --- |
| WTP Estimation Produces Numerous Nonsensical Results | 59-68 | Undermines Reliability and Validity of Results |
| Selective Use of Multimedia Animations in Feature Descriptions | 70-74 | Appears to Inflate WTP |
| Appropriate Non-Infringing Alternatives Inadequately Considered in Survey Design | 75-79 | Appears to Inflate WTP |
| Respondents Not Provided with a "No Choice" Option | 80-81 | May Inflate WTP |
| Results are Linked to Hypothetical Spending Scenarios | 82-83 | May Bias WTP Upwards |
| Survey Excludes Several Features Critical to Consumer Purchase Decision | 84-86 | May Bias WTP Upwards |

**When taken as a whole, the result is an unreliable analysis, which appears to generate highly-inflated WTP estimates for what are, at most, tertiary touchscreen features, and which has not been externally validated.**

89.     I reserve the right to update my analysis and conclusions should new information become available.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.   Executed on January 9, 2014 at Philadelphia, Pennsylvania.

Yoram (Jerry) Wind

1

## **ATTESTATION**

2          I, Victoria F. Maroulis, am the ECF User whose ID and password are being used to file

3    this Declaration.   In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Yoram (Jerry)

4    Wind has concurred in this filing.

5

6    Dated:   January 9, 2013                    By:  */s/ Victoria F. Maroulis*

7                                                        Victoria F. Maroulis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28