1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Cal. Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kathleen M. Sullivan (Cal. Bar No. 242261)
    kathleensullivan@quinnemanuel.com
6   Kevin P.B. Johnson (Cal. Bar No. 177129)
    kevinjohnson@quinnemanuel.com
7   Victoria F. Maroulis (Cal. Bar No. 202603)
    victoriamaroulis@quinnemanuel.com
8   555 Twin Dolphin Drive 5th Floor
    Redwood Shores, California 94065
9   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
10

11  William C. Price (Cal. Bar No. 108542)
    williamprice@quinnemanuel.com
12  Michael T. Zeller (Cal. Bar No. 196417)
    michaelzeller@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
13  Los Angeles, California 90017
    Telephone: (213) 443-3000
14  Facsimile: (213) 443-3100

15  Attorneys for SAMSUNG ELECTRONICS
    CO., LTD., SAMSUNG ELECTRONICS
16  AMERICA, INC. and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC

17                  UNITED STATES DISTRICT COURT

18      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20  APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

21                  Plaintiff,                      **REPLY IN SUPPORT OF SAMSUNG'S**
                                                    **MOTION FOR JUDGMENT AS A**
            vs.                                     **MATTER OF LAW, NEW TRIAL**
22                                                  **AND/OR REMITTITUR PURSUANT TO**
    SAMSUNG ELECTRONICS CO., LTD., a               **FEDERAL RULES OF CIVIL**
23  Korean business entity; SAMSUNG               **PROCEDURE 50 AND 59**
    ELECTRONICS AMERICA, INC., a New
24  York corporation; SAMSUNG                      **Date:    January 30, 2014**
    TELECOMMUNICATIONS AMERICA,                   **Time:    1:30 p.m.**
25  LLC, a Delaware limited liability company,    **Place:   Courtroom 8, 4th Floor**
                                                    **Judge:   Hon. Lucy H. Koh**
26                  Defendants.
                                                    **REDACTED VERSION OF DOCUMENT**
27                                                  **SOUGHT TO BE SEALED**

28

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II.  THE COURT SHOULD INTERPRET THE NEW DAMAGES VERDICT ...................... 1

III.  THE RECORD DOES NOT SUPPORT AN AWARD OF $113,777,344 IN LOST PROFITS ..................................................................................................................... 2

   A.  Apple Fails to Identify Evidence of Demand for the '915 Patented Feature ........... 2

      1.  The Documents and Testimony on which Apple Relies Do Not Speak to Demand for the '915 Patented Feature ............................................. 2

      2.  The Hauser Surveys Are Not Sufficient to Show Demand for the '915 Patented Feature ..................................................................................... 4

   B.  Apple Failed to Account for Acceptable Noninfringing Alternatives ..................... 8

      1.  The Existence of Acceptable Noninfringing Alternatives Precludes Lost Profits as a Matter of Law ...................................................................... 8

      2.  Apple Failed to Prove That the Intercept Was Not an Acceptable Noninfringing Alternative .............................................................................. 10

      3.  Apple Failed to Prove that the Galaxy Ace Was Not an Acceptable Alternative ........................................................................................................ 12

      4.  Samsung Had No Need to "Design Around" the '915 Patent ...................... 13

   C.  The Evidence Does Not Support a Lost Profits Award Based on Market Share ............................................................................................................................ 14

   D.  Apple Lacked Capacity to Sell Additional iPads ................................................... 17

IV.  THE JURY'S ROYALTY AWARD SHOULD BE SET ASIDE ...................................... 18

   A.  Apple Fails to Identify Evidence Sufficient to Support the Jury's Royalty Award .......................................................................................................................... 18

   B.  Apple Fails to Identify Any Evidence of Apportionment of Apple's Royalty Between Patented and Unpatented Features .......................................................... 19

V.  THE JURY'S AWARD OF INFRINGER'S PROFITS SHOULD BE SET ASIDE ......... 20

   A.  The Record Does Not Support the Jury's Compromise Award of Infringer's Profits ........................................................................................................................ 20

   B.  Apple Asks the Court to Ignore the Jury's Double Counting ................................. 21

VI.     APPLE'S IMPROPER AND PREJUDICIAL ARGUMENTS WARRANT A NEW
        TRIAL ................................................................................................................ 21

        A.      Apple's Repeated References to Samsung's Total Infringing Revenues
                Warrants a New Trial ........................................................................ 21

        B.      Apple's Appeal to Prejudice Requires a New Trial. ................................ 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Accentra Inc. v. Staples, Inc.*,
   851 F. Supp. 2d 1205 (C.D. Cal. 2011)....................................................................9

*American Seating Co. v. USSC Group, Inc.*,
   514 F.3d 1262 (Fed. Cir. 2008) ..........................................................8, 9, 10, 11

*Apple, Inc. v. Samsung Elecs. Co.*,
   735 F.3d 1352 (Fed. Cir. 2013)............................................................................5

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
   1 F.3d 1214 (Fed. Cir. 1993).........................................................................15, 17

*Bird v. Glacier Elec. Cooperative, Inc.*,
   255 F.3d 1136 (9th Cir. 2001).......................................................................24, 25

*Bose Corp. v. JBL, Inc.*,
   112 F. Supp. 2d 138 (D. Mass. 2000) *aff'd*, 274 F.3d 1354 (Fed. Cir.   2001) ...................15, 17

*Calico Brand, Inc. v Ameritek Imports, Inc.*,
   527 Fed. App'x 987, 996-97 (Fed. Cir. 2013) ..........................................................4, 15

*Caudle v. Dist. of Columbia*,
   707 F.3d 354 (D.C. Cir. 2013) .....................................................................24, 25

*City of Cleveland v. Peter Kiewit Sons' Co.*,
   624 F.2d 749 (6th Cir. 1980)........................................................................24, 25

*Cohesive Techs., Inc. v. Waters Corp.*,
   543 F.3d 1351 (Fed. Cir. 2008) ...........................................................................9

*Commil USA, LLC v. Cisco Sys.*,
   2010 U.S. Dist. LEXIS 144014 (E.D. Tex. Dec. 29, 2010), *aff'd* 720 F.3d 1361 (Fed. Cir. 2013)........................................................................................................25

*Crystal Semiconductor Corp. v. TriTech Microelects. Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001)...........................................................................11

*DSU Med. Corp. v. JMS Co.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006) .....................13

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006)....................................................................1, 2, 20, 21

*Fiskars, Inc. v. Hunt Mfg. Co.*,
   279 F.3d 1378 (Fed. Cir. 2002) ...........................................................................10

*Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*,
   249 F. Supp. 2d 434 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005) .............................8

*Grain Processing Corp. v. Am. Maize-Products Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ................................................................................... *passim*

*James v. Sheklanian*,
   No. 08-cv-01943, 2010 WL 3504804 (E.D. Cal. Sept. 7, 2010) ............................................20

*Joy Techs., Inc. v. Flakt, Inc.*,
   954 F. Supp. 796 (D. Del. 1996) ............................................................................................12

*Kalman v. Berlyn Corp.*,
   914 F.2d 1473 (Fed. Cir. 1990) ..............................................................................................11

*Kaufman Co., Inc. v. Lantech, Inc.*,
   926 F.2d 1136 (Fed. Cir. 1991) ..............................................................................................11

*Kehr v. Smith Barney, Harris Upham & Co.*,
   736 F.2d 1283 (9th Cir. 1984) ................................................................................................24

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ............................................................................................23, 24

*LeBlanc v. American Honda Motor Co*
   141 N.H. 579 (1997) ...............................................................................................................25

*LifeScan, Inc. v. Home Diagnostics, Inc.*,
   103 F. Supp. 2d 345 (D. Del. 2000) *aff'd*, 13 F. App'x 940 (Fed. Cir. 2001) ...........................18

*Lift-U v. Ricon Corp.*,
   No. 10-CV-01850-LHK, 2012 WL 5303301 (N.D. Cal. Oct. 25, 2012) ....................................9

*Linear Tech. Corp. v. Micrel, Inc.*,
   No. C-94-1633, 2006 U.S. Dist. LEXIS 96860 (N.D. Cal. June 9, 2009) ...............................12

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1303 (Fed. Cir. 2009) ...........................................................................................1, 2

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
   No. 03-C-0990, 2006 WL 644482 (N.D. Ill. March 9, 2006), *aff'd in part rev'd in part*, 499
   F.3d 1284 (Fed. Cir. 2007) .....................................................................................................17

*Oracle Am., Inc. v. Google, Inc.*,
   No. 10-C-3561, 2012 WL 850705 (N.D. Cal. Mar. 13, 2010) .................................................7

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ................................................................................................17

*Penate v. Berry*,
   348 S.W.2d 167 (Tex. App. 1961) ..........................................................................................25

*Petersen Mfg. Co., Inc. v. Cent. Purchasing, Inc.*,
   740 F.2d 1541 (Fed. Cir. 1984) ................................................................................................5

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011) ..............................................................................................20

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ................................................................................9

*Radio Steel & Mfg. Co. v. MTD Prods., Inc.*,
    788 F.2d 1554 (Fed. Cir. 1986) ..............................................................................10

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ..................................................................................4

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) ............................................................................4, 13

*Romberg v. Nichols*,
    970 F.2d 512 (9th Cir. 1992), *vacated on other grounds*, 506 U.S. 1075 (1993) ....................21

*Rosco, Inc. v. Mirror Lite Co.*,
    626 F. Supp. 2d 319 (E.D.N.Y. 2009) ....................................................................8, 9

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
    932 F.2d 1453 (Fed. Cir. 1991) ....................................................................4, 8, 9, 14

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) ............................................................................8, 12

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011) ..........................................................................20, 21

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
    953 F.2d 1360 ..........................................................................................................9, 10

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ................................................................................8

*Sternberger v. U.S.*,
    401 F.2d 1012 (Ct. Cl. 1968) ....................................................................................5

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..........................................................19, 20, 23, 24

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ..............................................................................18, 19

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ..................................................................................2

## **Statutes**

Fed. R. Evid. 103(b) ........................................................................................................23

## I.      INTRODUCTION

Apple's opposition confirms that the Court should grant Samsung's motion for judgment, new trial, or remittitur.   Rather than grapple with what the jury actually did, Apple asks the Court to ignore it.   The Court rejected this approach before and should do so again now.   Even Apple admits elsewhere that the jury awarded it lost profits damages, reasonable royalty damages, and a portion of Samsung's profits.   Each of these components is either unsupported by substantial evidence, infected by legal error, or both.   The Court should ensure these flaws are corrected before appellate review.

## II.     THE COURT SHOULD INTERPRET THE NEW DAMAGES VERDICT

Apple asks the Court to ignore the reality of the jury's damages verdicts, Apple's own admissions, and the law.   *See In re First Alliance Mortgage Co.*, 471 F.3d 977, 1002 (9th Cir. 2006); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1303 (Fed. Cir. 2009).   Apple is wrong to do so.   While Apple's opposition argues that the Court should treat the jury's award as an inscrutable lump-sum, Apple's own JMOL motion shows it knows exactly what the jury did: "the jury awarded Apple all its requested lost profits and reasonable damages at the trial, [but] the jury did not award Apple the full amount of Samsung's profits for Samsung's infringement of the D'305 and D'677 patents."   Dkt. 2876 at 5.   Nor does Apple dispute Samsung's mathematical explanation of the jury's awards, which "are to the dollar."   *Id.* at 9 (quoting *First Alliance Mortgage*, 471 F.3d at 1002).   Instead, Apple argues that there is "no basis for the Court to conclude" that the jury actually used Samsung's explanation in reaching its awards.   Dkt. 2908-4 at 4.   Apple's theory is that *pure coincidence* resulted in the jury deducting precisely $89,319,298 from Ms. Davis's gross profits figure of $231,393,553 to arrive at its infringer's profits award. *Id.*   That contention cannot be accepted.

For one, $89,319,298 is—"to the dollar"—the exact mid-point between Mr. Wagner's and Ms. Davis's figures (($231,393,553 - $52,734,959)/2 = $89,319,298).   Second, as shown in Mr. Wagner's declaration (Dkt. 2879, ¶ 13), the jury applied this methodology to calculate the per-product amounts by consistently applying exactly the same percentage to Ms. Davis's figure for each product:   61.3960645%.   Finally, this exact percentage is derived by averaging Ms.

Davis's figure and Mr. Wagner's figure, then calculating that average ($142,054,256.50) as a percentage of the number presented by Ms. Davis ($142,054,256.50 / $231,373,554 = 61.3960645%).   *Id.* at ¶ 13.   These precise calculations are no coincidence.

Also contrary to Apple's assertion, there is nothing in the Court's March 1, 2013 Order re Damages or the relevant case law that compels the Court to ignore reality.   As the Court recognized, *First Alliance Mortgage* is "the Ninth Circuit case most analogous to the present case" (Dkt. 2271 at 8), and it counsels that the "Court cannot ignore the import of" the jury's damages numbers, "*even if the evidence as a whole could have supported an award of a similar, or even, higher amount*."   *Id.* at 10 (emphasis added).   "The Federal Circuit has applied similar reasoning (though never in a case dispositive manner)."   *Id.* (citing *Lucent*, 580 F.3d 1303). Nothing in *First Alliance Mortgage* or *Lucent* limits their holdings to cases of "impermissible legal theory," and the Court's previous analysis was not so limited.   *See* Dkt. 2271 at 13-14 (examining whether the jury's lost profits award was supported by substantial evidence).[1]   And even if the law were so limited, Samsung has identified a critical legal error that "is readily apparent from the numbers that the jury applied":   double-counting.   In any event, even if the Court were to analyze the jury's award as one undifferentiated whole, it cannot be sustained under any legal theory Apple offered (lost profits, infringer's profits, or reasonable royalty).

III.   **THE RECORD DOES NOT SUPPORT AN AWARD OF $113,777,344 IN LOST PROFITS**

A.   **Apple Fails to Identify Evidence of Demand for the '915 Patented Feature**

1.   ***The Documents and Testimony on which Apple Relies Do Not Speak to Demand for the '915 Patented Feature***

Apple does not dispute that an award of lost profits requires evidence of demand for the patented features "such that consumers would be unwilling to purchase a competing product that lacked the patented features."   Dkt. 2657 at 5-6 (collecting authority).   Yet, nothing in Apple's cited evidence speaks to this critical question: whether Samsung's customers would have purchased iPhones and iPads in the absence of the '915 patented feature in Samsung's products.

---

[1]   *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001)—cited by Apple—was decided before *First Alliance Mortgage*.   Moreover, there is nothing in *Yeti* indicating that the jury's award could be explained to a mathematical certainty.

1    Instead, Apple improperly seeks to shift the Court's attention to evidence concerning broad,

2    unpatentable ideas not covered by the patent.    This is plainly insufficient.

3         Apple relies primarily on PX36, a report by third-party consultant Gravity Tank, which

4    fails to address either Samsung's customers or the '915 patented feature.    Apple does not deny

5    that the report considers *Apple's* customers, not Samsung's.    And there is no dispute that "Apple

6    does not have a patent . . . on the general concept of a two-finger pinch or flick . . ."    Dkt. 2197 at

7    10.    Apple's contention that "these are direct references to the features of the '915 patent" (Dkt.

8    2908-4 at 9-10) is false.    Apple does not have a patent on these broad functions, which were of

9    course well-known in the prior art.    *See* Dkt. 2739 at 454:18-458:17 (prior art disclosed other

10   "ways to scroll with one finger and zoom with two fingers").    Furthermore, Apple

11   mischaracterizes Mr. Wagner's trial testimony (*see* Dkt. 2908-4 at 9), which was not directed at

12   PX36, or indeed at any document.    Rather, Mr. Wagner was asked a series of hypothetical

13   questions, and then pointed out, "I did not see that information."    Dkt. 2842 at 1039:25.    Mr.

14   Wagner certainly did not admit that PX36 was evidence of demand for the '915 patented feature.

15   *See id.* at 994:22-24 ("I have not seen evidence that the single patent at issue for lost profits drove

16   demand for any of Samsung's products . . .").

17        At trial, Apple also relied on PX34, the "System LSI" document from a separate Samsung

18   business praising the iPhone (Dkt. 2842 at 1041:16), and PX40, an internal email about generic

19   praise for the iPhone's user experience (*id.* at 1045:2).    But Apple does not deny that these

20   exhibits at most show generic praise for Apple's user interface and user experience.    *See* Dkt.

21   2908-4 at 12.    Moreover, the opinion of Dr. Singh, Apple's technical expert, on "the importance"

22   of scrolling (*see id.* at 10), is not evidence that Samsung's customers would have purchased

23   iPhones and iPads in the absence of the '915 patented feature.    Nor is Mr. Schiller's testimony

24   that "designs and features" are the "essence of what Apple is about." *Id.*    Finally, Apple's

25   argument that Samsung increased its market share in 2010 and 2011, *id.*, is a classic example of

26   the *post hoc* fallacy.    Because the products at issue contain hundreds of features (*see* Dkt. 2842 at

27   888:18-22), Apple cannot rely on Samsung's increased market share to infer that this success was

28   caused by a desire for the '915 patented feature.

Indeed, Apple ultimately appears to concede it has no evidence of demand for the specific '915 patented feature and argues "there is no need for each exhibit independently to support demand for the features of the '915 patent when the record as a whole does." *Id.* at 12-13. Apple is incorrect.   Under Federal Circuit authority, Apple must prove causation by showing that buyers "specifically want" a product with the patented feature, as opposed to the alternatives. *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991).   No amount of vague, generic praise for Apple's products, no matter how voluminous, can satisfy this test.

Apple's attempts to distinguish the relevant case law miss the mark.   Apple bears the burden to show causation – *i.e.*, that "but for" infringement of the '915 patent, Apple would have made sales that were made by Samsung.   *See* Dkt. 2908-4 at 5.   *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) (*en banc*) is not the contrary.   Apple's attempt to distinguish other cases merely identifies evidence supporting an *absence of causation*.   *See Slimfold,* 932 F.2d at 1458 (finding no proof of causation and noting that evidence of unchanged market share was probative of the absence of causation); *Calico Brand, Inc. v Ameritek Imports, Inc.*, 527 Fed. App'x 987, 996-97 (Fed. Cir. 2013) (finding no proof of causation and noting that evidence of sensitivity to price differences was probative of the absence of causation).   Nothing in those cases suggests that generic references to unpatentable ideas, or market share changes, without any demonstrated connection to the patented feature is sufficient to establish causation.

### 2.   The Hauser Surveys Are Not Sufficient to Show Demand for the '915 Patented Feature

Nor do Dr. Hauser's surveys provide sufficient evidence of demand for the '915 patented feature to support an award of lost profits.   Apple points to Dr. Hauser's conclusory testimony that the "price premiums" from his surveys show "substantial demand" for the '915 patented feature, and claims that is sufficient evidence of causation because Samsung did not offer rebuttal expert testimony.   Dkt. 2908-4 at 6; *id.* at 9.   That is not the law.   The Federal Circuit has not hesitated to vacate a damages award even though the defendant did not present a rebuttal expert.   *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("The district court seems to have been heavily influenced by Lansa's decision to offer no expert

testimony to counter Dr. David's opinion.   But . . . Lansa had no obligation to rebut until ResQNet met its burden with reliable and sufficient evidence."); *cf. Petersen Mfg. Co., Inc. v. Cent. Purchasing, Inc.*, 740 F.2d 1541, 1548-49 (Fed. Cir. 1984) (affirming summary judgment of invalidity even though defendant did not present rebuttal expert opinion); *Sternberger v. United States*, 401 F.2d 1012, 1016 (Ct. Cl. 1968) ("The fact alone that [defendant] presented no witnesses does not make plaintiff's evidence compelling or substantial.").

Dr. Hauser's admissions and the design of the surveys itself precluded the jury's reliance on the surveys' "price premiums" to establish demand for the '915 patented feature.   *First,* as Apple does not dispute, Dr. Hauser repeatedly admitted that his surveys' "price premiums" (*i.e.*, "willingness to pay" numbers) do not reflect what consumers would *actually* pay in the real world. *See* Dkt. 2739 at 591:8-13 (agreeing that his survey results do not reflect "what people would actually pay in the marketplace"); *id.* at 519:23-520:7 (same).   These admissions alone are fatal to Apple's claim that Dr. Hauser's "price premiums" show actual consumer demand for the '915 patented feature.[2]

*Second,* Apple concedes that Dr. Hauser failed to estimate "price premiums" for any of the hundreds of other features that go into a smartphone or tablet.   Apple's only response is that "neither *Panduit* nor any other case requires Apple to prove the level of consumer demand for every other feature presented in the accused devices."   Dkt. 2908-4 at 7.   Apple misses the point.   Samsung has never argued that patentees must prove the level of demand for every feature in an accused device.   Rather, Samsung's point—which Apple fails to refute—is that *here* it is not possible to draw any meaningful conclusion about demand for the '915 patent from Dr.

---

[2] Apple cites the Federal Circuit's clarified causal nexus standard for a permanent injunction in *Apple, Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013) ("*Apple III*), and suggests the Federal Circuit found that Dr. Hauser's "price premium" is evidence that the '915 patent "significantly increases" the price of Samsung's devices.   Dkt. 2908-4 at 7.   The Circuit expressed no such opinion and remanded so that this Court could consider in the first instance whether Apple can meet the stringent standard for a permanent injunction under the clarified standard.   *Apple III,* 735 F.3d at 1368, 1371.   Dr. Hauser's results do not demonstrate that "a patented feature significantly increases the price of a product" for all the reasons set forth in Samsung's opposition to Apple's renewed motion for a permanent injunction.   *See* Dkt. 2915-5 at 3-10.   For those same reasons, and as explained herein, Dr. Hauser's surveys do not support a lost profits award.

Hauser's "price premiums" without knowing the "price premiums" Dr. Hauser's surveys would generate for the other smartphone and tablet features.   Absent information about "price premiums" for unique Android features, Dr. Hauser's "price premiums" for the '915 patent say nothing about whether Samsung consumers would have switched to Apple *but for* the infringement.

*Third,* Dr. Hauser conceded that his surveys did not test for whether participants were even aware of the patented features at the time of purchase (Dkt. 2739 at 542:5-10), even though he admitted that consumers "wouldn't be willing to pay anything for" features of which they were unaware (*id.* at 542:21-23).   Apple points to Dr. Hauser's testimony that "[i]f [respondents] weren't aware of them, you know, *in answering these questions*, they wouldn't be willing to pay anything for them" (*id.* (emphasis added)), and argues that it "fully addresses" this criticism. Dkt. 2908-4.   It does not.   Before taking Dr. Hauser's surveys, each respondent was educated about the patented features through animations, written descriptions and icons.   Dkt. 2739 at 520:22-521:8; 525:21-526:3.   However, because there is no evidence that any of the respondents were aware of the '915 patented feature *at the time they actually purchased their devices,* Dr. Hauser's "price premiums" provides no evidence that the feature had any impact on actual purchase decisions.

*Fourth,* Dr. Hauser admitted that his surveys intended to estimate the incremental "price premium" for the patent features over non-infringing alternatives.   Dkt. 2840 at 587:7-11.   Yet, Apple concedes that Dr. Hauser failed to show respondents the "one finger to scroll and two fingers to zoom" feature in *non-infringing* devices, such as the Intercept (JX1009) and the Galaxy Ace (JX1030), notwithstanding Dr. Hauser's admission that the non-infringing alternative is "pretty much the same as what the infringing alternative is."   Dkt. 2840 at 608:2-21.   Apple responds that the jury was entitled to weigh how Dr. Hauser's failure to test the Intercept or Galaxy Ace affected his conclusions (Dkt. 2908-4 at 8), but that misses the mark.   By omitting noninfringing alternatives that provided the same functionality as the '915 patent (*see* Dkt. 2739 at 469:6-470:11; PDX29.21-22), Dr. Hauser's surveys failed to establish that consumers would pay *any* "price premium" for the '915 patented feature over available non-infringing alternatives.

1       *Fifth,* Dr. Hauser admitted that focusing respondents on the patented features might

2   produce a willingness to pay that is "too high" (Dkt. 2739 at 522:7-10, 527:23-528:8), and yet his

3   surveys focused on only six of the hundreds of features in smartphones and tablets.   Apple

4   glosses over this flaw, claiming "[t]here is nothing to suggest that Dr. Hauser's work suffered

5   from any of the concerns raised in Samsung's cited cases."  Dkt. 2908-4 at 8.   Not so.   In

6   *Oracle Am., Inc. v. Google, Inc.*, No. 10-C-3561, 2012 WL 850705, at *9-13 (N.D. Cal. Mar. 13,

7   2010), the court excluded a conjoint survey precisely because it artificially focused on only seven

8   of many features in the accused product.[3]

9       Apple makes no attempt to address the numerous other flaws that render Dr. Hauser's

10  "price premiums" unreliable, including that survey respondents (a) did not use real money (Dkt.

11  2739 at 515:12-15), (b) did not see real products or even images of real products (*id.* at 550:23-

12  551:2), and (c) were forced to choose among hypothetical Samsung "product profiles" and thus

13  could not choose other brands or make "no choice" at all (*id.* at 551:23-552:6, 552:21-24).   Apart

14  from Dr. Hauser's conclusory testimony that his surveys were "quite accurate" (Dkt. 2908-4 at 9),

15  Apple argues only that Samsung presented no evidence that Dr. Hauser's surveys produced

16  irrational results or that his "price premiums" were "too high."   This too is incorrect.   Dr.

17  Hauser's conclusion that consumers who on average paid $152 for their Samsung smartphone

18  would pay $100 for just three software features relating to the touchscreen, and $39 for the '915

19  patented feature alone (*see* Dkt. 2739 at 529:17-25; PX30), is nonsensical on its face.[4]

20

21       [3] Apple also argues that Samsung presented no evidence that Dr. Hauser's distraction features "undermined" his surveys.   Dkt. 2908-4 at 8.   However, Samsung did not argue that the surveys

22  were "undermined" by including distraction features, but rather by artificially focusing on only six features and not controlling for the hundreds of others in the relevant products.

23       [4] Apple's reliance on Dr. Hauser's undisclosed opinion that "but for" the '915 patented feature

24  Samsung would have lost sales (Dkt. 2908-4 at 6-7) is improper.   *See* Dkt. 2743; Dkt. 2776.   In any event, Dr. Hauser offered no support for that opinion, other than his $39 "price premium"

25  (*id.*), which, for the reasons stated above, fails to show consumer demand for that feature. Furthermore, Dr. Hauser admitted that his surveys (a) required respondents to choose only among

26  Samsung product profiles, (b) did not ask whether respondents would have switched to Apple if the patent features had not been in the infringing devices, (c) did not test "a market for

27  smartphones or tablets in which consumers choose among brands of smartphones and tablets (e.g. Samsung versus Apple)," and (d) made no attempt "to forecast whether or not people would buy a

28  specific brand."   *See* Dkt. 2882 at 10.   As Apple does not dispute, these admissions preclude
        (footnote continued)

**B.      Apple Failed to Account for Acceptable Noninfringing Alternatives**

      **1.**      ***The Existence of Acceptable Noninfringing Alternatives Precludes Lost Profits as a Matter of Law***

Apple's claim that the jury was entitled to award lost profits damages *even if* the Intercept and Galaxy Ace were acceptable alternatives (*see* Dkt. 2908-4 at 13-14) is contrary to law. Courts have consistently held that a patentee cannot establish "but for" causation—and thus cannot recover lost profits—where the defendant had an acceptable noninfringing alternative. *See, e.g.*, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) (no lost profits where a "noninfringing version of [defendant's product] was acceptable and was present in the market"); *Slimfold*, 932 F.2d at 1458 (similar); *Rosco, Inc. v. Mirror Lite Co.*, 626 F. Supp. 2d 319, 331-32 (E.D.N.Y. 2009) (similar).[5]   Because the Intercept and Galaxy Ace were acceptable noninfringing alternatives, Apple's claim for lost profits fails as a matter of law.

There is no basis for Apple's new contention that it may recover lost profits unless Samsung proved that the Intercept and Galaxy Ace were acceptable to ***all*** purchasers of the infringing products.   Dkt. 2908-4 at 15-16.   The case cited by Apple, *American Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262 (Fed. Cir. 2008), has no bearing here.   *American Seating* addressed the unique circumstance of a "bait-and-switch," where the defendant offered to sell an infringing product and then delivered a noninfringing "replacement product."   *Id.* at 1270.   In those "bait-and-switch" circumstances, it may be relevant whether the "replacement product . . . [was] acceptable to all purchasers of the infringing product."   *Id.*   Here, neither the Intercept nor

---

any reliance on the surveys to show that "but for" the infringement, Samsung consumers would have purchased Apple devices, rather than non-infringing Android devices.   *Id.*

   [5]   While the Federal Circuit has allowed patentees to rely on market share to account for noninfringing alternatives offered by *third-parties*, *see, e.g.*, *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989), it has never approved an award of lost profits based on market share where *the defendant* had acceptable noninfringing alternatives.   To the contrary, both the Federal Circuit and lower courts have refused to apply a market share approach where acceptable noninfringing alternatives were available to the defendant.   *See, e.g.*, *Slimfold*, 932 F.2d at 1458 (affirming denial of lost profits based on market share where defendant had noninfringing alternative products); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434, 455 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005) (defendant "could have sold a noninfringing alternative," and thus the patentee's "reliance on proof of its own market share, without more, is insufficient as a matter of law to support a reasonable probability of 'but for' causation of lost profits.") (citation omitted).

---

1  Galaxy Ace is such a "replacement product," and nothing in *American Seating* suggests that this

2  holding applies outside the "bait-and-switch" context.   Subsequent Federal Circuit opinions have

3  not adopted the *American Seating* formulation of the "acceptable" standard.[6]   *See, e.g.*, *Cohesive*

4  *Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1373 (Fed. Cir. 2008) (remanding for consideration

5  of whether noninfringing alternatives were acceptable "under the *Standard Havens* test"); *Presidio*

6  *Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012)

7  (alternative is not acceptable where it "lack[s] the advantages of the patented invention") (citation

8  omitted).

9  As this Court has recognized, a noninfringing alternative is acceptable where it "contain[s]

10  the patented features . . . in a way that does not infringe."  Dkt. 2657 at 5-6 (citing *Standard*

11  *Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991), and *Presidio*,

12  702 F.3d at 1361).   The Federal Circuit also has held that a noninfringing alternative—even one

13  that lacks the advantages of the patented invention—is an acceptable substitute where there is no

14  appreciable difference in commercial success between the defendant's infringing and

15  noninfringing products.   *See Slimfold,* 922 F.2d at 1458 (patentee failed to show that defendant

16  "would not have made a substantial portion or the same number of sales had it continued with its

17  old hardware"); *Grain Processing Corp. v. Am. Maize-Prods Co.*, 185 F.3d 1341, 1355 (Fed. Cir.

18  1999) (finding that infringer could have switched to a noninfringing alterative and made the same

19  sales at the same price); *see also Rosco*, 626 F. Supp. 2d at 331-32 (defendant's noninfringing

20  product was an acceptable alternative where "[c]ustomers would have bought the [noninfringing

21  product] and have in fact bought [it] in substantial quantities since it has been available for

22  purchase.").   Apple invites error by urging the Court incorrectly to apply the "bait-and-switch"

23  analysis where the facts do not involve any "bait-and-switch."

24

25

---

26      [6]  Similarly, district courts—including this Court—have applied *American Seating* only in the
"bait-and-switch" context, where "the alleged infringement . . . is not a sale, but an offer."
27  *See, e.g.*, *Lift-U v. Ricon Corp.*, No. 10-CV-01850-LHK, 2012 WL 5303301, at *9 (N.D. Cal. Oct.
25, 2012); *Accentra Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1239, n. 29 (C.D. Cal. 2011)
28  (*American Seating* addresses "a 'bait-and-switch' system").

### 2.      Apple Failed to Prove That the Intercept Was Not an Acceptable Noninfringing Alternative

Apple cannot seriously dispute that the Intercept "contain[s] the patented features . . . in a way that does not infringe."   *See* Dkt. 2657 at 6.   At trial, Dr. Singh admitted that the Intercept performed scrolling and zooming functions that were almost *identical* to the patented feature. *See* Dkt. 2739 at 469:23-470:8 ("not a lot of differences" between the Intercept and the infringing products).   A simple comparison of the Intercept and the accused products confirms that the Intercept contains the patented features.   *See* PDX29.22.[7]  Apple also does not dispute that the Intercept was hugely successful, with more than $271 million in sales through June 2012.[8]   Dkt. 2842 at 1009:6-13; *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002) ("[S]ales data showing market acceptance of a non-infringing alternative may provide significant evidence that the alternative was acceptable to consumers . . .").

Apple argues that the jury could have found that the Intercept was not an acceptable substitute due to purported deficiencies that have nothing to do with the '915 patented feature. *See* Dkt. 2908-4 at 15 (length of time in market, screen size, slide-out keyboard).   Apple cites no authority for the proposition that a noninfringing alternative may be deemed unacceptable because of one or more features unrelated to the patent.   To the contrary, the Federal Circuit looks to whether the product provided consumers with the benefits of the *patented invention*.   *See Grain Processing*, 185 F.3d at 1354; *cf. American Seating*, 514 F.3d at 1270 (customer made specific objections based on the patented lock-in mechanism); *Standard Havens*, 953 F.2d at 1373 (alternative processes "were not shown to have the advantages of the patented counterflow process"); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1556 (Fed. Cir. 1986) (similar); *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1484 (Fed. Cir. 1990) (alternatives did not

---

[7]  In light of this evidence, Apple's claim that "Samsung has nothing more than the jury's non-infringement verdict to support its bald assertions that the Intercept . . . contained the '915 features in a way that did not infringe" (Dkt. 2908-4 at 18-19) is incorrect.   The admissions of Apple's own expert—as well as the device itself—amply demonstrated that the Intercept contains the one-finger scroll and two-finger zoom feature.

[8]  Apple's attempt to downplay the commercial success of the Intercept by focusing on the "about 100,000 units" sold during the lost profits period (Dkt. 2908-4 at 16) ignores the fact that the Intercept outsold half of the accused products during this time.   *See* DX676.

1   "allow for [the] continuous filtration, at constant pressure, with effective sealing" enabled by the

2   patent).

3        Even if the purported deficiencies unrelated to the '915 patented feature were relevant—

4   and they are not—Apple's position is flatly inconsistent with the jury's awards.  For example, the

5   jury awarded over $70 million in lost profits on phones that had a substantially larger screen than

6   the iPhone (Dkt. 2840 at 737:7-738:23; SDX8002.009-012), yet Apple contends that the jury

7   could not have found the Intercept an acceptable alternative because it had a smaller screen.

8   Likewise, the jury awarded lost profits on two phones with slide-out keyboards (Epic 4G and

9   Transform), yet Apple contends that the jury could not have found the Intercept an acceptable

10  alternative because it had a slide-out keyboard.[9]

11       Finally, Apple's argument that the jury could have concluded that the Intercept was not

12  "available" to "all" purchasers of the infringing products (Dkt. 2908-4 at 15-16) is beside the

13  point.   Under *Grain Processing*, 185 F.3d at 1353, whether a noninfringing alternative is

14  "available" is relevant only "[w]hen an alleged alternative is not on the market during the

15  accounting period . . ."   Here, Apple does not dispute that the Intercept was "on the market" as of

16  July 2010, well before the accounting period, and thus "availability" is not an issue here.   In any

17  event, the pertinent question is whether an alleged alternative not "on the market" was

18  nevertheless available to *the defendant*, not to "all" of the defendant's customers.[10]   *Id.* at 1354

19  (finding that alterative was "available to [defendant] American Maize").   Thus, even if the jury

20  found that the Intercept was not available to "all" purchasers of the infringing products, this would

21  not be a valid basis for sustaining the award of lost profits.

22       ⁹ The standard used to determine whether the patentee's products are sufficiently similar to

23  the infringer's products so as to support an award of lost profits based on market share is the same
    standard used to determine whether an alleged noninfringing substitute is acceptable.  *Compare*

24  *Crystal Semiconductor Corp. v. TriTech Microelects. Int'l, Inc.*, 246 F.3d 1336, 1356 (Fed. Cir.
    2001) ("determin[ing] a patentee's market share . . . requires an analysis which excludes

25  alternatives to the patented product with disparately different prices or significantly different
    characteristics."), *with Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991) ("To

26  be deemed *acceptable*, the alleged acceptable noninfringing substitute must not have a disparately
    higher price than or possess characteristics significantly different from the patented product.")

27  (emphasis in original).
    ¹⁰ Nothing in *American Seating*, or any other case cited by Apple, suggests that a

28  noninfringing alternative must be available to "all" of the infringer's customers.

**3.**     *Apple Failed to Prove that the Galaxy Ace Was Not an Acceptable Alternative*

Apple fails to identify any evidence that would support a jury conclusion that the Galaxy Ace was not an acceptable alternative.   At trial, Apple's experts admitted that the Galaxy Ace performed the scrolling and zooming functions relevant to the '915 patent in the same way as the infringing products.   *See* Dkt. 2739 at 469:3-19 (Dr. Singh: "not a lot of differences" between Galaxy Ace compared to the accused products); Dkt. 2840 at 608:18-21 (Dr. Hauser: "I agree that, you know, if, in fact, this is a non-infringing alternative, then it's pretty much the same as what the infringing alternative is."); *id.* at 749:25-750:16 (accord Ms. Davis).   Not a single witness testified at trial that purchasers of the infringing products would have found the Galaxy Ace to be unacceptable.

Apple criticizes Samsung for not offering "evidence that any carrier ever found the Ace to be an acceptable phone."   Dkt. 2908-4 at 16.   But that was not Samsung's burden.   The *patentee* bears the burden of proving each of the *Panduit* factors, including the absence of acceptable noninfringing alternatives.   *See, e.g., SmithKline,* 926 F.2d at 1165 ("a patentee is not entitled to lost profits if the patentee fails to establish any of the [*Panduit*] requirements."); *Linear Tech. Corp. v. Micrel, Inc.*, No. C–94–1633, 2006 U.S. Dist. LEXIS 96860, at *257 (N.D. Cal. June 9, 2009) ("under *Panduit*, it is the patentee that must establish the absence of non-infringing alternatives."); *Joy Techs., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 803 (D. Del. 1996) (same).   It was Apple's burden to introduce sufficient evidence that carriers or consumers would not have found the Galaxy Ace to be an acceptable alternative in order to obtain a lost profits award.   It failed to do so.

Apple argues that Samsung's decision not to sell the Galaxy Ace to U.S. carriers is sufficient to support the conclusion that the Galaxy Ace was neither "acceptable" nor "available." Dkt. 2908-4 at 16.   Apple's argument misunderstands the hypothetical nature of the lost profits inquiry.   Reconstructing the "but for" market is "a hypothetical enterprise" that requires the patentee to "take into account . . . alternative actions the infringer foreseeably would have undertaken had he not infringed" because the infringer is "likely to offer an acceptable

noninfringing substitute . . . rather than leave the market altogether." *Grain Processing*, 185 F.3d at 1350-51.   Thus, Apple may not simply rely on the fact that Samsung did not sell the Galaxy Ace to U.S. carriers—Apple was required to show why Samsung *could not* or *would not* have done so.   *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1157 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006) (excluding expert opining that did not "include an assessment of what [defendant] would have done to move up market entry" of its noninfringing product, and focused on "only the market as it existed rather than as it would have existed in light of the projected conduct by [defendant], as is required by *Grain Processing*.").

Finally, the Court should reject Apple's attempt to repackage its *Rite-Hite* argument as a disputed question of fact for the jury to decide.   *See* Dkt. 2908-4 at 16-17.   Apple fails to address Ms. Davis's admissions that Samsung would have already returned to market with products that do not infringe the '381 and '163 patents **before** Samsung released the Galaxy Ace in February 2011.   Dkt. 2843 at 1200:23-1201:7 (Samsung would complete a design-around for the '381 patent in July 2010); *id.* at 1201:9-17 ('163 patent "certainly . . .would have been redesigned by" February 4, 2011).   Ms. Davis expressly told the jury that, under her assumptions, the Galaxy Ace would not infringe any Apple patents when the lost profits period began in April 2011.   *Id.* at 1202:3-9 ("Q. ... [U]nder your assumptions, if you assume that the Ace was actually available in [February] 2011, that the design around could have been accomplished with respect to the '381 and '163 patent[s] by April of 2011?   A.   I agree.").   In light of the undisputed record, there is no relevance to Apple's contention that the Galaxy Ace infringed these other patents (*see* Dkt. 2908-4 at 16-17) in the hypothetical, but-for inquiry required for lost profits.

### 4.   *Samsung Had No Need to "Design Around" the '915 Patent*

In awarding lost profits, the jury necessarily accepted several assumptions made by Ms. Davis for which there is no evidence in the trial record.   First, Ms. Davis assumed that Samsung did not already have a noninfringing alternative to the '915 patent, and would only start the process of developing a noninfringing alternative in November 2010.   Dkt. 2840 at 663:6-10.   Next, Ms. Davis assumed that Samsung would have removed the infringing products from the market throughout the duration of the design-around period.   *Id.* at 661:16-21.   Finally, Ms.

1   Davis assumed that Samsung would not be able to return to market with products that do not

2   infringe the '915 patent prior to April 15, 2011.   *Id.* at 664:17-665:4.

3       ***None*** of these assumptions is supported by substantial evidence.   To the contrary, all of

4   Ms. Davis's assumptions fall apart because Samsung already had a fully developed noninfringing

5   alternative *prior* to releasing *any* of the infringing products.   *See* DX952.014 (Intercept predated

6   all of the accused products).   Thus, contrary to Apple's contention (Dkt. 2908-4 at 17-18), there

7   was no need for Samsung to "turn[ ] an infringing product into a noninfringing product," or

8   "transfer[ ]" any software.   The record shows that all Samsung needed to do was continue using

9   the noninfringing software of the Intercept and Galaxy Ace.   *See Slimfold*, 922 F.2d at 1458

10  (patentee failed to show that defendant "would not have made a substantial portion or the same

11  number of sales had it continued with its old hardware").

12      Moreover, each of the *Grain Processing* factors supports a finding that Samsung had

13  readily available noninfringing alternatives.   That Samsung developed, tested, marketed and

14  released two noninfringing products prior to the accounting period shows that Samsung had "all of

15  the necessary equipment, know-how and experience."   *See Grain Processing*, 185 F.3d at 1354;

16  *see also* Dkt. 2784 at 29 (Final Jury Instr. No. 23).   The substantial commercial success of these

17  noninfringing products—as well as the numerous other prior art references disclosing

18  noninfringing alternatives to the '915 patent (*see, e.g.,* SDX8003.003; SDX8003.005;

19  SDX8003.07)—shows that alternatives were "well known in the field."   *Grain Processing*, 185

20  F.3d at 1354.   Other than Ms. Davis's unsupported assumptions, Apple fails to cite anything that

21  would support a contrary conclusion.

22      In sum, the uncontroverted trial evidence concerning the Intercept and Galaxy Ace shows

23  both that they were acceptable non-infringing alternatives and that the assumptions underlying the

24  jury's awards were entirely unsupported.   Under *Grain Processing*—the leading case on

25  noninfringing alternatives and which Apple does not even cite in its brief—Apple cannot recover

26  lost profits, and the jury's award should be set aside.

27      **C.**   **The Evidence Does Not Support a Lost Profits Award Based on Market Share**

28      While Apple is correct that a patentee may rely on its market share to prove lost sales,

Case No. 11-cv-01846-LHK

market share does not eliminate Apple's burden to establish "but for" causation.   *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) (reversing lost profits award based on market share where patentee "did not show with reasonable probability that [the infringer's] customers would have purchased from [the patentee] in proportion with [its] market share."); *Calico Brand*, 527 F. App'x at 996 ("[U]nder the *BIC Leisure* line of cases, the patentee still bears the burden of establishing a causal connection between the infringement and the lost profits.").   Thus, in order to recover lost profits based on market share, Apple needed to prove that the iPhone and the infringing products do not "differ[ ] significantly in terms of price, product characteristics, and marketing channels."   *BIC Leisure,* at 1219; Dkt. 2784 at 35 (Final Jury Instr. No. 25) ("Two products are sufficiently similar if one does not have a significantly higher price than or possess characteristics significantly different than the other.").   Contrary to Apple's claim (Dkt. 2908-4 at 21), the jury was not entitled to simply *assume* – without sound economic proof – that a "market share allocation . . . itself" accounted for any differences in price and product features.

Apple admits that Ms. Davis made no attempt to adjust her market share calculation to account for operating system and brand.   *See id.* at 21-22.   Apple's own documents showed that operating system and brand—as well as numerous product features available only from Android and Samsung, including larger screens, 4G capability, turn-by-turn GPS navigation, and increased battery capacity—segmented the smartphone market.   *See*, *e.g.*, DX572.082 (only 25% of Android users considered iPhone); DX572.008 ██████████████████████████████ ██████; *see also* Dkt. 2882 at 20 (summarizing Apple survey evidence and related testimony regarding features most important to Android users).   Courts have rejected a patentee's reliance on market share where the accused product offered important benefits that the patentee's product lacked.   *See Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 162 (D. Mass. 2000) *aff'd*, 274 F.3d 1354 (Fed. Cir. 2001) (rejecting patentee's reliance on market share where it "failed to establish a reasonable probability that a consumer buying one [product] would purchase the other as a substitute").

Apple does not dispute that the iPhone was more expensive than Samsung's products (*see* PX69.24), and that ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.   Instead, Apple asserts that Ms. Davis testified that a market share allocation accounted for any price difference.   Not so.   Ms. Davis testified only that the relevant price comparison would be between retail prices, as opposed to wholesale prices. Neither Ms. Davis nor any other Apple witness testified that a market share allocation adequately accounted for any price disparity.   Apple fails to explain how a jury could have rationally concluded that the infringing products competed with the iPhone despite "any price differences" (Dkt. 2908-4 at 23) on this record.

Apple attempts to overcome its glaring evidentiary gaps by citing evidence of competition between the two *companies*, rather than competition between the relevant *products*.   But none of Apple's generalized evidence of competition between Samsung and Apple says anything about whether the *accused products* were priced comparably to the iPhone.[11]   Even Apple's generic evidence of competition shows that most of Samsung's products were marketed at different price segments to the iPhone.   *See* PX58.5 (part of Samsung's "Beat Apple" strategy was "growing Super-Premium ASPs to match Apple in *2012*," after the lost profits period) (emphasis added); *see also* PX58.11 (Samsung's ASP "lagging behind Apple" by 49% in Q2'2011).

Finally, Apple's "evidence" of competition between the Galaxy Tab 7.0 (3G) and the iPad is unavailing.   Apple does not dispute that its ten-inch iPad 2 ██████████████████ as the seven-inch Galaxy Tab during the second calendar quarter of 2011, which encompassed the lost profits period.   *Compare* DX952.010 (iPad 2 ASP of ██████████) *with* DX676.041 (Galaxy Tab ASP of $367);[12] *cf. BIC Leisure*, 1 F.3d at 1218-19 (no lost profits in light of 60-

---

[11]   Contrary to Apple's suggestion, PX62 does not show actual pricing data.   Instead, PX62— which is dated March 25, 2011 (PX62.1)—shows possible pricing strategies Samsung could adopt if Apple launched the iPhone 5 and/or a low-end "iPhone Nano" in June or July 2011.

[12]   Samsung's opening brief (Dkt. 2882 at 22) inadvertently overstated these ASP figures by $1 each.

1   80% price disparity); *Bose Corp.*, 112 F. Supp. 2d at 162 (patentee's product did not compete with

2   infringing product in light of 65-75% price disparity); *Mitutoyo Corp. v. Cent. Purchasing, LLC*,

3   No. 03-C-0990, 2006 WL 644482, at *6 (N.D. Ill. March 9, 2006), *aff'd in part rev'd in part*, 499

4   F.3d 1284 (Fed. Cir. 2007) (patentee's products were at least twice as expensive as the infringing

5   products).   PX60, which Apple cites as evidence of competition, confirms that this price disparity

6   is a direct reflection of the fact that "Low Tiered" seven-inch tablets like the Galaxy Tab, Kindle

7   Fire and Nook operated in a different market segment than Apple's "High End iPad."   *See*

8   PX60.6; *cf.* DX2522.002 (Galaxy Tab "is roughly the same size as . . . Amazon's Kindle" and

9   "half the size of an iPad").   Apple itself acknowledged that the Galaxy Tab operated in "a 7"

10  market," and that it may be "missing a market" by not offering a seven-inch tablet to compete with

11  the Galaxy Tab.   *See* DX2522.001; DX2522.004.   The jury's lost profits should be set aside.

12      **D.      Apple Lacked Capacity to Sell Additional iPads**

13          Apple's own exhibits—prepared by Apple's damages expert—show that ██████████

14  ████████████████████████████████████████████   PX25F.15.   Apple

15  does not dispute this.   Instead, Apple misleadingly cites Mr. Blevins's testimony regarding

16  Apple's ability to increase capacity during irrelevant time periods.   Mr. Blevins's testified that an

17  increase of 100,000 units would be "trivial" during "the third and fourth calendar quarters for

18  2011" (Dkt. 2739 at 499:13-23), *i.e.*, several months *after* the lost profits period ended.   Apple's

19  argument that $6,394,777 in lost profits on the Galaxy Tab represents "a drop in the bucket"

20  misses the mark.   Dkt. 2908-4 at 24.   Apple had ████████████████████████

21  ████████████████████   *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575

22  F.2d 1152, 1156 (6th Cir. 1978) (patentee must prove "his manufacturing and marketing capability

23  to exploit the demand"); Dkt. 2784 at 29 (Final Jury Instr. No. 23).

24          Apple also points to the "actual units unsold" information in PX182 (*see* Dkt. 2908-4 at

25  24), claiming that it shows over ████████████ of iPad 2 just sitting in its inventory during the

26  second calendar quarter (third fiscal quarter) of 2011—even though Mr. Blevins' freely admitted

27  that Apple was "sold out" of iPad 2 during that time and "didn't have enough supply" to meet

28  demand despite Apple's best efforts to do so.   Dkt. 2739 at 498:9-19.   Critically, however, Ms.

Case No. 11-cv-01846-LHK

Davis expressly told the jury to "focus on the *excess unused capacity section*" of PX25F—not the "inventory" numbers in PX25F or the "unsold units" data in PX182—in deciding whether Apple had sufficient capacity.   Dkt. 2840 at 673:5-674:20 ("those 360,000 units should be compared in your mind to the numbers that you saw on the screen related to the excess unused capacity").   Neither Ms. Davis nor Mr. Blevins identified the "actual units unsold" information as evidence of Apple's ability to make additional sales, or claimed that Apple had █████████ █████ of iPad 2 sitting in its inventory.   The Court cannot sustain the jury's verdict based on a theory that was never presented to the jury.   *See LifeScan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 371 (D. Del. 2000) *aff'd*, 13 F. App'x 940 (Fed. Cir. 2001) (refusing to consider, in the context of a motion for JMOL, a theory of obviousness never presented to the jury).[13]

## IV.   THE JURY'S ROYALTY AWARD SHOULD BE SET ASIDE

### A.   Apple Fails to Identify Evidence Sufficient to Support the Jury's Royalty Award

Apple's opposition merely confirms that the Court should set aside the jury's reasonable royalty award.   Apple does not dispute that under controlling Federal Circuit precedent, Ms. Davis was, at very least, required to provide the jury with a full analysis of the applicable *Georgia-Pacific* factors and "some explanation of both why and generally to what extent the particular factor impacts the royalty calculation."   *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) (at trial, an expert witness who has used the *Georgia-Pacific* factors "should concentrate on *fully* analyzing the *applicable* factors, not cursorily reciting all fifteen.") (emphasis in original).   Apple has failed to identify anywhere in the trial record where Ms. Davis even mentioned the applicable *Georgia-Pacific* factors were, let alone fully analyzed them.   Nor has Apple identified anywhere in the trial record where Ms. Davis explained how she arrived at her "reference points" or "final royalty rates," let alone how each applicable *Georgia-Pacific* factor impacted her royalty calculation.

---

[13]   The Court already precluded Apple from making exactly the same "inventory" argument with respect to the iPhone 4 on the basis of untimely disclosure (Dkt. 2575 at 5) and should do so again here.

1   Instead, Apple points to testimony by Ms. Davis – most of which concerns lost profits, not

2   reasonable royalties – and one of Apple's technical experts, concerning purported demand for the

3   patented features.   Apple misses the point.   Under Federal Circuit law, "the simple recitation of

4   royalty numbers that happen to be in the ballpark of the jury's award when no analysis is offered

5   to the jury which would allow them to evaluate the probative value of those numbers" is

6   insufficient.   *Id.* at 32.   It was not enough for Ms. Davis to throw out royalty rates without any

7   explanation of how she arrived at them, and presume the jury would find evidence to support them

8   somewhere in the record.   Apple and Ms. Davis were required to provide the jury with some

9   *analysis* "which would allow them to evaluate the probative value of those numbers."   *Id.*[14]

10  They did not do so.   For this reason alone, the jury's royalty award should be set aside.

### B.   Apple Fails to Identify Any Evidence of Apportionment of Apple's Royalty Between Patented and Unpatented Features

12  Instead of addressing Samsung's argument, Apple attempts to rebut a different one.   For

13  the purposes of this motion, Samsung did not argue that "Ms. Davis's reasonable royalty numbers

14  failed to account for unpatented features of the infringing products."   Dkt. 2908-4 at 26.   Rather,

15  Samsung's argument is that there *is no evidence in the record* that Ms. Davis apportioned her

16  proposed royalty between patented and unpatented features; there is only the uncontroverted

17  testimony of Mr. Wagner that she did not.   *See* Dkt. 2882 at 27.   Apple concedes that it was

18  required to "*give evidence* tending to separate or apportion the defendant's profits and the

19  patentee's damages between the patented feature and the unpatented features".   *Uniloc USA, Inc.*

20  *v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added).   Yet, the four partial

21  quotes on which Apple relies (Dkt. 2908-4 at 26-27) merely attest that Ms. Davis purportedly

22  attempted to value the patents at issue.   They do not mention the word "apportionment" or even

23  the concept of unpatented features, let alone come close to the "reliable and tangible" evidence of

24  apportionment that the Federal Circuit requires.   *Uniloc*, 632 F.3d at 1318.   At no point during

---

26  [14]   Apple does not dispute that the principles articulated in *Whitserve* are binding on this
27  Court.   Instead, it attempts to distinguish *Whitserve* on the facts.   But for the reasons explained in Samsung's motion (Dkt. 2882 at 25), Ms. Davis's explanation of her royalty rates in this case
28  was even more superficial than that criticized by the Federal Circuit in *Whitserve*.

the trial did the jury hear anything on apportionment other than Mr. Wagner's testimony that Ms. Davis did not "do a proper apportionment under what's called *Georgia-Pacific* factor 13."   Dkt. 2882 at 27.

## V.     THE JURY'S AWARD OF INFRINGER'S PROFITS SHOULD BE SET ASIDE

### A.     The Record Does Not Support the Jury's Compromise Award of Infringer's Profits

Apple cannot credibly dispute that the jury's infringer's profits awards split the difference between Mr. Wagner's and Ms. Davis's numbers.   Instead, it argues that such an award was permissible because it fell "within the amounts advocated by the opposing parties."   Dkt. 2908-4 at 28 (citation omitted).   But under controlling law, such an improper split award cannot stand even it falls within the range of awards advocated by the parties. *See In re First Alliance Mortgage Co.*, 471 F.3d at 1002; Dkt. 2271 at 10 (analyzing same).

As more fully explained in Samsung's motion (Dkt. 2882 at 28-29), the evidence was uncontroverted that Samsung incurred operating expenses in the sale and manufacture of the seven phones found to infringe design patents, and that these expenses had the requisite nexus with that sale or manufacture.   Ms. Davis's decision to ignore this evidence, despite her admission that operating expenses are necessary to sell products (*see* Dkt. 2843 at 1191:14-19, 1192:3-9), was not supported by anything other than her own *ipse dixit.*    That is not sufficient and led to an irrational compromise verdict that cannot stand.[15]

The logic of *James v. Sheklanian*, No. 08-cv-01943, 2010 WL 3504804 (E.D. Cal. Sept. 7, 2010), squarely applies here.    A compromise verdict is improper because it "subverts the law and contorts findings of fact in favor of a desired result" and because it shows the jury "failed to give due regard to the evidence."   *Id.* at *4 (internal quotations omitted).[16]   Here, the jury ignored the

---

[15]     Apple's suggestion (Dkt. 2908-4 at 27-28) that Mr. Wagner did not testify he saw evidence of directly attributable operating expenses misrepresents the record.   *See*, *e.g.*, Dkt. 2842 at 1021:20-1022:8; *id.* at 1015:5-1016:21; Dkt. 2843 at 1136:2-20.

[16]     Apple's other cases are not on point and do not support such an irrational award. Neither *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011) nor *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011) were compromise verdict cases. While a compromise verdict, by its very nature, will necessarily fall somewhere between "the amounts advocated by the opposing parties," *Spectralytics*, 649 F.3d at 1347, that fact cannot justify a verdict that disregards the law and evidence.   *See Romberg v. Nichols*, 970 F.2d 512, 521 (9th (footnote continued)

1  uncontroverted evidence of the amount of Samsung's operating expenses, and instead tried to split

2  the difference between the figures proffered by the parties' experts.   Such a verdict cannot stand.

3       **B.**       **Apple Asks the Court to Ignore the Jury's Double Counting**

4       Apple does not dispute that if the jury's award of Samsung's profits is predicated on

5  splitting the difference between Mr. Wagner's total profits figure of $52,734,959 (which included

6  units for which the jury awarded lost profits) and Ms. Davis's gross profits figure of

7  $231,393,553, then the award must be set aside for double-counting.   Instead, Apple argues that

8  there is "no basis for the Court to conclude" that this is what the jury did.   Dkt. 2908-4 at 4.   For

9  the reasons discussed in Section II, *supra*, this argument defies reality.   Because the jury used

10  Mr. Wagner's figure to calculate infringer's profits, and Mr. Wagner's figure already included

11  units on which the jury awarded lost profits, the jury's award of Samsung's profits must be set

12  aside for double-counting.   Contrary to Apple's contention, under *First Alliance Mortgage,* the

13  Court cannot ignore this error, "even if the evidence as a whole could have supported an award of

14  a similar, or even higher, amount."   Dkt. 2271 at 10.

15  **VI.**   **APPLE'S IMPROPER AND PREJUDICIAL ARGUMENTS WARRANT A NEW TRIAL**

16       **A.**       **Apple's Repeated References to Samsung's Total Infringing Revenues**
17               **Warrants a New Trial**

18       Apple fails to defend its repeated and deliberate references to Samsung's total revenues as

19  the appropriate measure for damages.   Far from making a "few scattered references" to the $3.5

20  billion amount (Dkt. 2908-4 at 30), Apple brought the number up at least *15 times* in just five days

21  of trial.[17]   This was not an incidental occurrence; it was one of Apple's central trial themes.

22       Tellingly, Apple cannot offer a single reason why this repeated comparison was relevant

23  where half the devices were ineligible for infringer's profits.   At trial, Apple's counsel was more

24  forthcoming in trying to justify its statements, arguing that "the jury should know that there were

25  Cir. 1992), *vacated on other grounds*, 506 U.S. 1075 (1993) (explaining that "such 'Solomonic
26  solutions' by the jury" should not be allowed to stand).
    [17]   Six times in opening argument (Dkt. 2739 at 347:9-22, 350:2-6; 353:13-17); four times
27  during the presentation of evidence (Dkt. 2840 at 638:6-9 (Davis); Dkt. 2843 at 1033:2-4,
1033:13-15, 1034:1-4 (Wagner)); and five times during closing (Dkt. 2844 at 1303:10-13, 1304:3-
28  6, 1324:24-1325:6, 1395:9-11, 1398:9-11).

1   11.7 infringing products and $3.5 billion of revenues" so that "the jury might realize $52 million

2   is, like, .4 percent of the revenues they garnered," and claiming "that's just relevant evidence."

3   Dkt. 2840 at 944:10-945:2.    Apple has now abandoned that argument and instead claims these

4   references were proper because Samsung supposedly "opened the door by repeatedly referencing

5   its own profit margins."    Dkt. 2908-4 at 31.    But Apple raised Samsung's total revenue number

6   *six times* in opening arguments alone—before Samsung had asked a single witness about its profit

7   margins.    Dkt. 2739 at 347:9-22, 350:2-6, 353:13-17.    Apple then elicited the $3.5 billion

8   number during Mr. Davis's direct examination, again before Samsung's first witness ever testified.

9   Dkt. 2840 at 636:19-638:9.

10          Apple's *post hoc* justification also makes no sense.    Samsung's witnesses' testimony

11  about Samsung's profit margins reveals nothing about its total revenues.    It is axiomatic that a

12  business can have very small revenues, despite high profit margins, and *vice versa*.    Moreover,

13  Samsung introduced evidence of its profit margins to show the reasonableness of its calculation of

14  infringer's profits.    Dkt. 2843 at 1146:21-1147:6.    By contrast, Apple repeatedly bandied about

15  Samsung's total revenues to portray Apple's *total damages claim*—including for six products

16  found to infringe only utility patents—as conservative.    At trial, Apple also never sought to rebut

17  Samsung's profit margin evidence using the $3.5 billion figure, as Apple would have if—contrary

18  to what the record shows here—that were the true reason Apple introduced it.

19          Apple's second justification is that Samsung's revenues were relevant because Apple

20  sought Samsung's profits as damages.    Dkt. 2908-4 at 31.    But Apple never denies it was

21  prohibited from seeking infringer's profits on half of the devices.    Nor does Apple explain why it

22  did not use the *accurate and much lower* revenue number for the seven products on which it was

23  actually seeking Samsung's profits, which Apple's own expert admitted would be the appropriate

24  number.    Dkt. 2840 at 710:20-711:20.

25          Apple's "waiver" argument fares no better.    Dkt. 2908-4 at 30.    Apple first states that

26  Samsung made no objection, but in a footnote admits that the Court sustained Samsung's

27  objection to Ms. Davis's prejudicial demonstratives showing the total revenue figure.    *Id*. at 30

28  n.18.    Apple's argument appears to be that where the Court has expressly precluded certain

information from being conveyed to the jury in a demonstrative because it "misleading," it is perfectly fine to convey *the exact same information* to the jury by way of oral claims.   The absurdity of this argument is self-evident.   The Court's ruling that Ms. Davis's demonstrative "misleadingly suggests that Apple may be eligible to recover infringer's profits on all of Samsung's infringing sales and not merely those that infringed a design patent" preserved Samsung's claim.   *See* Fed. R. Evid. 103(b) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *cf. LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 70-71 (Fed. Cir. 2012) (ordering new trial even though no objection or challenge was made to improper reliance on defendant's total revenue amounts until after verdict).   This also was not the only time Samsung objected.   Before Samsung even began its case, it objected to Apple using the $3.5 billion figure in opening arguments as "inflammatory" and requested that the jury be told the absolute ceiling for damages was not $3.5 billion as Apple had repeatedly stated, but only the amount Apple had sought.   Dkt. 2840 at 943:19-944:1. Instead, the jury was allowed to render a verdict believing Samsung's total revenue for all 13 devices was a permissible maximum.[18]

Apple's excuses regarding the entire market value rule also fail.   Apple admits that "[n]one of Apple's damages calculations was based on the entire market value of Samsung's products" (Dkt. 2908-4 at 32), so Apple concededly had no relevant or properly disclosed basis for comparing any damages calculations to Samsung's revenues.   Apple's reference to a single jury instruction and the presumption that the jury obeyed it is also hollow.   *Id.* at 32.   In *Uniloc*, 632 F.3d at 1318-21, the district court had specifically told the jury that it could not base damages on the entire revenue of the defendant.   Nonetheless, the Federal Circuit found this pointed instruction insufficient to cure the prejudice.

---

[18]   That Samsung did not submit a motion *in limine* on this issue (Dkt. 2908-4 at 30 n.18) is irrelevant.   Samsung cannot now be punished for having failed to guess beforehand what impermissible and prejudicial arguments Apple would make throughout trial, especially where, as Apple admits, it did not base its damages calculations on this theory (*id.* at 32).

Finally, *Uniloc* and *LaserDynamics* are not distinguishable simply because they involved utility patents and not infringer's profits.   Dkt. 2908-4 at 32.   The cases were applying the broader rule that admitting large, irrelevant financial amounts that do not correlate to permissible damages theories in order to inflate a verdict is error warranting a new trial.   *LaserDynamics*, 694 F.3d at 68; *Uniloc*, 632 F.3d at 1318-21.   Because Apple deliberately and repeatedly referenced Samsung's revenues for all 13 products for the sole purpose of minimizing its own damages claim and deriding Samsung's alternative calculation, the Court should grant a new trial.

**B.    Apple's Appeal to Prejudice Requires a New Trial.**

Apple's cursory defense of its appeal to prejudice and bias ignores both the offensiveness of its actions and applicable precedent.   Rather than justify its invocation of anti-foreign sentiment in closing, Apple offers excuses for why it so frequently focused on Korea *before* closing in the hopes of showing that its misconduct did not "permeate [the] entire proceeding." Dkt. 2908-4 at 32-33 (quoting *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984)).   Even if Apple could justify each pre-closing reference—which it does not even attempt—that would not excuse Apple's irrelevant, unsupported, and prejudicial closing narrative of the collapse of the *American* television industry.   Dkt. 2844 at 1397:13-20.   As the Ninth Circuit made clear in distinguishing *Kehr*, "[f]or conduct to 'permeate' a proceeding it need not occur throughout the proceeding.   Were that the case, the most blatant, unjustified, and prejudicial misconduct in closing argument would never warrant reversal because it would have occurred only at the end of a trial."  *Bird v. Glacier Elec. Cooperative, Inc.*, 255 F.3d 1136, 1145 n.16 (9th Cir. 2001) (vacating jury verdict based on appeals to racial and ethnic bias in closing arguments); *see also Caudle v. Dist. of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013) (reversing denial of new trial based on prejudicial closing argument).

Apple also attempts to excuse its insidious pre-closing emphasis on Korea by arguing that its comments were independently non-prejudicial and that Samsung did not contemporaneously object to them.   Dkt. 2908-4 at 33.   These are red-herrings.   New trials are warranted when a series of seemingly innocent comments and implications instills unsavory associations in the jurors' minds.  *See*, *e.g.*, *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756-58 (6th

1   Cir. 1980).   The cumulative effect of comments must be "considered as a whole" even though "no

2   objections were made to these remarks."   *Commil USA, LLC v. Cisco Sys.,* 2010 U.S. Dist.

3   LEXIS 144014, at *5-7 (E.D. Tex. Dec. 29, 2010), *aff'd* 720 F.3d 1361 (Fed. Cir. 2013); *see also*

4   *Bird*, 255 F.3d at 1140, 1152 (failure to object did not waive right to a new trial).

5          Any initial presumption that the jury followed the court's instruction regarding bias is far

6   outweighed by the impropriety of Apple's appeal.   Even an immediate and "potent instruction"

7   that, "[s]ometimes when a lawyer injects irrelevant information into a case it's because he

8   perceives a weakness in the merits of his case," has been held insufficient to cure the harm done

9   by counsel.   *Commil USA*, 720 F.3d at 1369-70; *see also Peter Kiewit*, 624 F.2d at 756-58; *Penate*

10  *v. Berry*, 348 S.W.2d 167, 168 (Tex. App. 1961).   Indeed, the "curative" instruction on which

11  Apple relies (Dkt. 2908-4 at 34) is virtually identical to one found insufficient because it "is given

12  in virtually every trial; it was not in any way directed at [the specific prejudicial] argument."

13  *Caudle,* 707 F.3d at 363.   As recognized in *LeBlanc v. American Honda Motor Co.*, "it will be an

14  unusual case in which the invocation of racial or ethnic bias should not result in a mistrial or

15  sanctions."   141 N.H. 579, 583 (1997).

16         Apple is incorrect that Samsung was not harmed because the jury awarded less than *Apple*

17  sought.   Dkt. 2908-4 at 34.   The proper question is whether the jury awarded more than what

18  *Samsung* argued for, which it did.   That the award was between the parties' requests reflects the

19  closeness of the case, which *increases* the likelihood that the prejudice was not harmless.   *See*

20  *Peter Kiewit*, 624 F.2d at 759 (prejudicial statements should be even more "closely scrutinized"

21  when the case is close); *see also Commil*, 720 F.3d at 1366, 1370-71 (finding party was prejudiced

22  even though jury found in its favor).

23         Finally, Samsung cannot be found to have relinquished its right to seek a mistrial because

24  it did not accept as sufficiently curative the Court's offer to address the jury for a few additional

25  minutes or immediately draft a new instruction.   Dkt. 2844 at 1405:19-1407:6.   Justice could

26  hardly be served if an aggrieved party is required to cure the harm caused by a pre-meditated

27  appeal to racial prejudice by crafting, on-the-fly, an instruction or ten-minute closing response.

28  The only cure is a new trial.

1    DATED: January 13, 2013            QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
2
                                        By   /s/ Victoria F. Maroulis
3                                          Charles K. Verhoeven
                                           Kathleen M. Sullivan
4                                          Kevin P.B. Johnson
                                           Victoria F. Maroulis
5                                          Michael T. Zeller

6                                          Attorneys for SAMSUNG ELECTRONICS CO.,
                                           LTD., SAMSUNG ELECTRONICS AMERICA,
7                                          INC., and SAMSUNG
                                           TELECOMMUNICATIONS AMERICA, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28