1   HAROLD J. MCELHINNY (CA SBN 66781)   WILLIAM F. LEE
    hmcelhinny@mofo.com                  william.lee@wilmerhale.com
2   MICHAEL A. JACOBS (CA SBN 111664)    WILMER CUTLER PICKERING
    mjacobs@mofo.com                     HALE AND DORR LLP
3   RACHEL KREVANS (CA SBN 116421)       60 State Street
    rkrevans@mofo.com                    Boston, MA 02109
4   ERIK J. OLSON (CA SBN 175815)        Telephone: (617) 526-6000
    ejolson@mofo.com                     Facsimile: (617) 526-5000
5   MORRISON & FOERSTER LLP
    425 Market Street                    MARK D. SELWYN (SBN 244180)
6   San Francisco, California  94105-2482  mark.selwyn@wilmerhale.com
    Telephone:  (415) 268-7000           WILMER CUTLER PICKERING
7   Facsimile:  (415) 268-7522           HALE AND DORR LLP
                                         950 Page Mill Road
8                                        Palo Alto, California 94304
                                         Telephone: (650) 858-6000
9   Attorneys for Plaintiff APPLE INC.   Facsimile: (650) 858-6100

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15   APPLE INC., a California corporation,      Case No. 11-cv-01846-LHK (PSG)

16                Plaintiff,                     **APPLE INC.'S REPLY IN SUPPORT
                                                 OF ITS RENEWED MOTION FOR A
17          v.                                   PERMANENT INJUNCTION**

18   SAMSUNG ELECTRONICS CO., LTD., a
     Korean business entity; SAMSUNG
19   ELECTRONICS AMERICA, INC., a New York      Date:    January 30, 2014
     corporation; SAMSUNG                        Time:    1:30 p.m.
20   TELECOMMUNICATIONS AMERICA, LLC, a         Place:   Courtroom 8, 4th Floor
     Delaware limited liability company,         Judge:   Hon. Lucy H. Koh
21
                  Defendants.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ........................................................................................ 1

II.     ARGUMENT ................................................................................................ 1

    A.      Samsung's Infringement Has Irreparably Harmed Apple ...................................... 2

        1.      Dr. Hauser's survey is strong evidence of a causal nexus. ......................... 2

        2.      Consumer research and reviews demonstrate the importance of the features claimed by Apple's utility patents. ................................................. 7

        3.      Samsung's copying confirms the existence of a causal nexus. ................... 8

    B.      Monetary Damages Are Inadequate To Compensate Apple. ................................. 9

        1.      Apple did not offer to license the asserted patents to Samsung in 2010. ........................................................................................................... 9

        2.      The parties' recent settlement discussions do not suggest that damages would be adequate. ........................................................................ 10

        3.      Apple's limited past licensing practices do not suggest that damages would be adequate to compensate for Samsung's infringement. .............. 10

    C.      The Balance Of Hardships Favors Entry Of An Injunction. ................................ 12

    D.      The Public Interest Favors An Injunction. ........................................................... 13

    E.      The Court Should Not Delay Enforcement Of Any Injunction During The '915 Reexamination Proceedings ........................................................................ 14

    F.      There Is No Need For An Evidentiary Hearing. ................................................... 15

III.    CONCLUSION ........................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ActiveVideo Networks, Inc. v. Verizon Communications Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ................................................................................ 9

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ........................................................................ 10, 11

*Apple Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ................................................................................ 8

*Apple Inc. v. Samsung Electronics Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) ........................................................................ *passim*

*Douglas Dynamics, LLC v. Buyers Products Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ................................................................................ 2

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................................. 2

*Edwards Lifesciences AG v. CoreValve, Inc.*,
    699 F.3d 1305 (Fed. Cir. 2012) ................................................................................ 1

*Ethicon Inc. v. Quigg*,
    849 F.2d 1422 (Fed. Cir. 1988) ........................................................................ 13, 14

*Funai Electric Co. v. Daewoo Electronics Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010) ................................................................................ 8

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ............................................................................ 10, 11

*Microsoft Corp. v. Motorola, Inc.*,
    904 F. Supp. 1109 (W.D. Wash. 2012) ................................................................... 3

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ................................................................................ 1

*Robert Bosch LLC v. Pylon Manufacturing Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ................................................................................ 2

*TV Interactive Data Corp. v. Sony Corp.*,
    929 F. Supp. 2d 1006 (N.D. Cal. 2013) ............................................................... 3, 4

*Warner Chilcott Laboratories Ireland Ltd. v. Mylan Pharmaceuticals Inc.*,
    451 F. App'x 935 (Fed. Cir. 2011) ......................................................................... 15

**STATUTES AND REGULATIONS**

28 U.S.C. § 1295 ................................................................................................................... 14

37 C.F.R.

    § 41.31 ........................................................................................................................... 14

    § 41.39 ........................................................................................................................... 14

    § 41.43 ........................................................................................................................... 14

1

## I.      INTRODUCTION

2      As the Court recently noted, "Apple has been awaiting resolution of its request for a

3  permanent injunction for nearly a year and a half following the jury's infringement verdict."

4  (Dkt. 2913 at 3.)  Yet Samsung persists in its strategy of delay—seeking to extend the briefing

5  schedule for Apple's renewed motion, belatedly moving for discovery relating to Apple's

6  negotiations with Samsung, requesting an evidentiary hearing even though the record is already

7  fully developed, and asking the Court to stay enforcement of any injunction with respect to the

8  '915 patent.  Samsung also filed more than a thousand pages of documents, including 17

9  declarations, in response to Apple's 10-page renewed motion.  Samsung's voluminous filings are

10  an attempt to avoid the Court's page limitations and contain expert opinions that were not timely

11  disclosed.  The Court should strike those materials, just as it did before.  (*See* Dkt. 2212.)[1]

12      Samsung's attempts to complicate and delay these proceedings should not detract from the

13  merits, which overwhelmingly support entry of an injunction.  Accordingly, the Court should

14  enjoin Samsung from further infringement of Apple's '381, '915, and '163 patents.

15  ## II.      ARGUMENT

16      Samsung attempts to portray the four-factor test for injunctive relief as so "stringent" as to

17  be essentially impossible to satisfy.  (Opp. at 1, 2.)  But the Federal Circuit's decision in *Apple III*

18  was made against the backdrop of repeated holdings that the analysis must proceed "with an eye

19  to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement

20  in the vast majority of patent cases.'"  *Presidio Components, Inc. v. Am. Technical Ceramics

21  Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547

22  U.S. 388, 395 (2006) (Roberts, C.J., concurring)).  Thus, in traditional cases involving

23  infringement by a direct competitor—such as here—"the winner of a judgment of validity and

24  infringement may normally expect to regain the exclusivity that was lost with the infringement."

25  *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012); *see also*

26

27  _____

[1] To the extent the Court does consider Samsung's declarations, Apple has cited the responsive declarations that it previously filed:  Dkt. 2127 (Singh Declaration), and Dkt. 2130 (Hauser Declaration).  If the Court requests, Apple will refile those materials.

28

1    *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *Robert*

2    *Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).  Samsung has shown no

3    reason to depart from that longstanding precedent.  Instead, applying the Federal Circuit's

4    guidance for these remand proceedings to the evidentiary record compels the traditional result:  a

5    permanent injunction against further infringement by Apple's direct competitor.

6    **A.**       **Samsung's Infringement Has Irreparably Harmed Apple.**

7    Samsung does not dispute the Court's prior finding that Samsung's sale of infringing

8    products has irreparably harmed Apple.  (Dkt. 2197 at 5-7.)  Samsung challenges only whether

9    there is a sufficient "causal nexus" between Samsung's infringement and the irreparable harm to

10    Apple.  There certainly is.  While Samsung separates and attacks the individual pieces of Apple's

11    evidence of a causal nexus, the Federal Circuit instructed that the Court must consider that

12    evidence as a whole.  *See Apple Inc. v. Samsung Elecs. Co. (Apple III)*, 735 F.3d 1352, 1368 (Fed.

13    Cir. 2013) ("On remand, the court must assess whether Apple's other evidence, including its ease-

14    of-use evidence and evidence of copying, in combination with Dr. Hauser's survey evidence,

15    suffices to establish irreparable injury.").  When viewed collectively, the evidence is more than

16    sufficient to demonstrate a causal nexus that satisfies the irreparable harm factor.

17    **1.**       **Dr. Hauser's survey is strong evidence of a causal nexus.**

18    To demonstrate the requisite causal nexus, "Apple must show some connection between

19    the patented feature and demand for Samsung's products," which can be shown in "a variety of

20    ways."  *Apple III*, 735 F.3d at 1364.  One way is to provide "evidence that a feature significantly

21    increases the desirability of a product incorporating that feature."  *Id.* at 1368.  Evidence that

22    customers are willing to pay a significant price premium for a feature means that it significantly

23    increases the desirability of the product.  Indeed, the Federal Circuit recognized as much when it

24    explained the type of proof sufficient to show a causal nexus.  *Id.*

25    Samsung's argument (Opp. at 6-7) that Dr. Hauser's survey is not evidence of the

26    desirability of the patented features contradicts the principles articulated by the Federal Circuit in

27    *Apple III*.  Dr. Hauser's survey on its face shows that Samsung customers are willing to pay "a

28    substantial price premium" for the specific features enabled by Apple's utility patents (Dkt. 2739

at 528:13-22), which demonstrates "a substantial demand for the features enabled by the patents in this case" (*id.* at 530:9-12).  Samsung challenges the use of conjoint analyses generally as evidence of consumer demand, but courts routinely recognize the reliability of those methods, including studies by Samsung's own experts measuring consumers' willingness to pay.  *See, e.g.*, *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-27 (N.D. Cal. 2013); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 1109, 1120 (W.D. Wash. 2012).

Samsung is also incorrect in arguing that Dr. Hauser's survey is not evidence that "a patented feature significantly increases the *price* of a product."  (Opp. at 5 (internal quotation marks omitted).)  Samsung suggests that willingness to pay has nothing to do with a product's price.  As Dr. Hauser testified, however, "a price premium is really a willingness to pay.  It's market demand."  (Dkt. 2739 at 519:19-22.)  The final market price is a function of supply and demand, but "when a firm decides to price a product, they'll take into consideration what people are willing to pay with respect to demand."  (*Id.* at 519:23-520:7.)  Higher demand thus leads to higher prices.  In any event, Samsung never explains why Apple must predict the actual market price—especially since Dr. Hauser's survey directly addresses the relevant question of consumer demand for the patented features.  *Apple III* requires no more than that.  735 F.3d at 1368.

Samsung quibbles with Dr. Hauser's methodology and suggests alternative inquiries that Dr. Hauser could have made.  (Opp. at 4-10.)  But none of Samsung's criticisms undermines the reliability of Dr. Hauser's survey or its ability to show that Samsung's products are significantly more desirable because of Apple's utility patents.  The Court previously rejected Samsung's challenge to the reliability of Dr. Hauser's methodology when it denied Samsung's *Daubert* motion.  (Dkt. 1157 at 13-14.)  Samsung has never offered an alternative study challenging Dr. Hauser's conclusions or subjected its experts who criticize Dr. Hauser's survey to cross-examination at trial.  In a footnote, Samsung attempts to sidestep those issues by saying that the parties' arguments relating to Dr. Hauser's survey in connection with Samsung's JMOL motion are inapplicable (Opp. at 4 n.2), but two juries have already rejected Samsung's criticisms of Dr. Hauser's survey in awarding lost profits to Apple.  Moreover, Samsung's arguments as to Dr. Hauser's survey are either factually incorrect or inconsistent with the applicable legal standard.

1    *First*, Samsung challenges the reliability of Dr. Hauser's survey because it included "only

2    six of the hundreds of features in smartphones and tablets." (Opp. at 8.) But it is not possible to

3    design a survey that tests all a product's features, especially in a complex multi-feature product

4    like a smartphone or tablet. (Dkt. 2739 at 523:17-25; Dkt. 2840 at 590:19-591:2, 610:7-18.)

5    "Consumer preferences are too complex—and the principles of equity are too flexible—for that to

6    be the correct standard." *Apple III*, 735 F.3d at 1364. Nor is it necessary to evaluate every other

7    feature to assess the demand for the features claims by Apple's patents. *See TV Interactive*, 929

8    F. Supp. at 1026 (rejecting *Daubert* challenge based on the failure to test additional features

9    because testing six or fewer features is the "accepted methodology" in a conjoint analysis). Dr.

10   Hauser explained that he used consumer interviews to carefully select other important features to

11   include in his survey and chose a sufficient number of those other features to ensure that the

12   survey accurately measured demand for the specific patented features. (Dkt. 2739 at 524:1-16;

13   Dkt. 2840 at 610:19-611:1; *see also* Dkt. 2130 ¶¶ 31-34.) To the extent Samsung suggests that

14   more is required,[2] it is inviting the Court to apply the type of rigid rule concerning proof of a

15   causal nexus that the Federal Circuit expressly rejected. *Apple III*, 735 F.3d at 1364.

16   *Second*, Samsung is incorrect that Dr. Hauser did not include appropriate non-infringing

17   alternatives in his survey. (Opp. at 8.) On the contrary, Dr. Hauser explained that he included

18   non-infringing alternatives for each patented feature, which he selected with the help of technical

19   experts. (Dkt. 2840 at 587:7-11; *see also* Dkt. 2130 ¶¶ 44-46.) Samsung argues that Dr. Hauser

20   should have included other non-infringing alternatives based on the first jury's verdict or the prior

21   art (Opp. at 8), but Samsung has not shown that these products were viable alternatives.[3] (*See*

22   Dkt. 2908 at 13-18.) Nor has Samsung presented evidence that consumers would prefer those

23   alternatives to the non-infringing alternatives that Dr. Hauser actually used. The Intercept

24

25   [2] Even if more were needed, Dr. Hauser's testimony that "but for these features, a lot of
     these people would not buy the phones at issue in this case" satisfies even the most stringent
26   causal nexus standard. (Dkt. 2739 at 551:13-18.) Samsung has no basis to complain (Opp. at 7
     n.6) that this testimony contains a supposedly undisclosed opinion when it was directly
27   responsive to Samsung's own question on cross-examination.

     [3] It is not clear how Samsung envisions that Dr. Hauser could have included the prior art
28   that Samsung identifies (Opp. at 8 n.7), as none of those products is a smartphone or tablet.

1   (JX1009), for example, ranked near the bottom of a consumer satisfaction survey (PX69.84-.85)

2   and lowest among Samsung phones with respect to touchscreen features (PX69.102).  In any

3   event, Samsung's argument that Dr. Hauser had to test every potential non-infringing alternative

4   would set an impossible standard for most patentees to meet.

5       *Third*, Samsung argues that Dr. Hauser's survey was unrealistic or biased because it did

6   not use "real money" or "real images of real products," did not include an option to make "no

7   choice at all," and used "animation descriptions" to depict the patented features.  (Opp. at 9.)

8   Samsung has not conducted any alternative study measuring the supposed biases introduced by

9   Dr. Hauser's survey design and provides no evidence—only speculation from its experts—that

10  any aspects of the survey design affected the results that Dr. Hauser obtained.  Nor could it.  Dr.

11  Hauser's survey design conformed with well-accepted methods of gauging realistic consumer

12  choices.  (Dkt. 2739 at 521:12-522:6 ("It's really meant to be a very realistic description to the

13  consumer.  It's something that we've been using for a long time and they find realistic and they

14  find it very comfortable to actually make choices."); *id.* at 523:20-25 ("And this is the way that

15  we do it in the industry.  It's a very accepted form of doing a conjoint analysis.").)  For example,

16  as Dr. Hauser explained, it is very rare to conduct a conjoint analysis using real money.  (*Id.* at

17  515:12-20.)  But that does not affect whether the study reliably measures consumer demand—as

18  confirmed by a study funded by the National Science Foundation.  (*Id.* at 516:11-517:1.)  In fact,

19  Samsung's own experts routinely employ the same methods to determine consumer preferences

20  without using real dollars and have acknowledged that the use of hypothetical dollars does not

21  undermine the survey's accuracy.  (Selwyn Decl. Ex. A at 54:2-57:3.)  Samsung cannot now

22  credibly take the opposite position to challenge Dr. Hauser's conclusions.

23      *Fourth*, Samsung inconsistently argues that Dr. Hauser's results are so large as to be

24  "divorced … from the real world" (Opp. at 5 n.4) but so small as to be "nominal" (*id.* at 6).

25  Samsung cannot have it both ways.  Regardless, Dr. Hauser reported that consumers were willing

26  to pay $39 and $100 price premiums for smartphones having a $199 base price without the

27  patented features.  (PX30.)  Those are significant price premiums, as Dr. Hauser testified.  (Dkt.

28  2739 at 528:19-22.)  Even when compared to the lifetime cost of a phone, neither Dr. Hauser nor

1    any other witness suggested that the results reflected only a nominal willingness to pay.[4]

2         *Fifth*, Samsung's argument that Dr. Hauser's survey cannot support an injunction against

3    products "not more than colorably different" from those found to infringe is without merit.  (Opp.

4    at 7.)  Dr. Hauser's survey was specific to the patented features, not any particular infringing

5    product.  (*See* Dkt. 2739 at 550:23-551:2.)  It makes no difference whether the patented features

6    are in the models found to infringe or in newer products containing the patented features; the

7    demand for the patented features shown by Dr. Hauser's survey is the same.

8         *Sixth*, Dr. Hauser's survey did not produce irrational results.  The supposedly irrational

9    results that Samsung cites (Opp. at 10) are based on predictions made by Dr. Wind using

10   improper analytical methods that magnify statistical noise in the data, not any actual irrational

11   responses from the survey participants.  (*See* Dkt. 2130 ¶¶ 19-29.)  Samsung has not identified a

12   single survey participant who responded that he or she would choose the higher priced of two

13   otherwise identical smartphones.[5]  (*Id.* ¶¶ 21-24.)  Moreover, the values that Dr. Hauser

14   determined for the patented features do not suggest that adding other features would drive the

15   price of a smartphone or tablet prohibitively high.  As Dr. Hauser explained, the price premiums

16   for individual features are not additive, so it is incorrect to assume that consumers would price a

17   package of features as high as the sum of its individual parts.  (Dkt. 2840 at 611:2-18.)

18        Samsung has offered no valid criticism of Dr. Hauser's methods, let alone an alternative

19   survey challenging the substantial price premiums for the patented features shown by Dr. Hauser.

20   Dr. Hauser's survey is precisely the type of proof that the Federal Circuit recognized shows a

21   causal nexus between the patentee's irreparable harm and the defendant's infringement.  Together

22   with the other evidence in the record, it is more than sufficient to carry Apple's burden.

23   _____

24        [4] Samsung is also incorrect that Apple has failed to offer sufficient evidence to warrant an
     injunction against any product that does not infringe all three patents.  (Opp. at 6 n.5.)  The '915
     patent demonstrates a substantial price premium of $39 over smartphones with a base price of
25   $199.  (PX30.)  Although Dr. Hauser did not measure the price premiums for the '381 and '163
     patents individually, the price premium of $100 for all three patents together is substantially
26   higher than the '915 patent alone, demonstrating the significant value added by the other patents.

27        [5] Samsung's argument (Opp. at 10 n.8) that Dr. Hauser's study reflects an irrationally
     small price premium for features that command higher market prices, such as memory capacity, is
     also unfounded.  The market price for features like memory capacity does not reflect *average*
28   consumer demand for those features.  (*See* Dkt. 2130 ¶¶ 26-27.)

2.   **Consumer research and reviews demonstrate the importance of the features claimed by Apple's utility patents.**

Samsung argues (Opp. at 10-12) that the consumer research and reviews cited in Apple's motion are relevant only if they are sufficient on their own to carry Apple's burden.  While the consumer research and reviews do independently demonstrate the importance of the patented features, the Federal Circuit expressly remanded this case so that the Court could consider this very evidence *in combination with* the other proof of a causal nexus in the record.  *Apple III*, 735 F.3d at 1368.  It would be error to dismiss this evidence out of hand, as Samsung invites the Court to do.  When properly considered, this evidence independently corroborates the proof of demand for the patented features demonstrated by Dr. Hauser's survey.

Samsung attempts to dismiss the praise for the patented features in consumer research and reviews as "generic," but ignores that none of this evidence was prepared with these patents or this litigation in mind.  If anything, the fact that the descriptions in those consumer research reports and reviews closely describe the claimed features in lay terms highlights the importance of those features to consumers.  (*E.g.*, PX36.36 ("Gestures like the two fingered pinch and flick add a game-like quality to interactions.  The flip adds a level of cool."); *id.* ("Lists bounce, icon flitter – the iPhone has a sense of whimsy that shows a thoughtful character in the interface."); PX133.3 (praising "double-tap" and multi-touch pinch-to-zoom features).)  Nor can Samsung diminish that praise for the patented features as merely reflecting individual opinions.  The GravityTank report, for example, is based on survey results from thousands of consumers (PX36.4), but only a handful of participant responses are featured in the report.  Even in the small subset of individual responses featured, there are multiple comments discussing the patented features (*e.g.*, PX36.36), which demonstrates the importance consumers place on these features.

The survey evidence demonstrating the importance of ease-of-use generally further confirms the importance of the patented features to consumers and takes on even greater significance now in light of the Federal Circuit's guidance that evidence of a causal nexus may be considered in the aggregate for related patents.  *Apple III*, 735 F.3d at 1365.  The three utility patents involved here claim related touchscreen technologies and together greatly enhance the

ease-of-use of smartphones and tablets using those technologies.  (*E.g.*, Dkt. 1610 at 625:4–626:19 (Apple's software inventions make its devices "intuitive and simple").)  The fact that this survey evidence does not describe in exact terms the claims of any individual patent does not matter, where it accurately captures the aggregate benefit of Apple's utility patents.  *Cf. Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375-76 (Fed. Cir. 2010) (affirming lost profits award based on evidence of "general industry demand" for the patented features).

### 3.    Samsung's copying confirms the existence of a causal nexus.

Samsung again incorrectly argues (Opp. at 12) that the evidence of its deliberate copying is irrelevant because that evidence is insufficient on its own to show the requisite causal nexus. The Federal Circuit has explained that evidence of Samsung's copying is "certainly relevant to the issue of nexus between the patent and market harm."  *Apple III*, 735 F.3d at 1367 (quoting *Apple Inc. v. Samsung Elecs. Co.* (*Apple I*), 678 F.3d 1314, 1327-28 (Fed. Cir. 2012)).  Even so, Apple is not relying on Samsung's copying in isolation.  Rather, together with Dr. Hauser's survey and the consumer research and reviews, Samsung's copying confirms the consumer demand for the patented features claimed by Apple's utility patents.

Nor can Samsung downplay the evidence of its copying as mere "standard competitive analysis."  (Opp. at 12.)  It is one thing to be aware of the competition, but it is quite another to formulate a copying plan through side-by-side comparisons with a competitor's products.  Yet that is precisely what Samsung did here.  For example, although Samsung argues that PX46.66 concerns a visual effect that is unrelated to the '381 patent (Opp. at 12), that page focuses on emulating the iPhone's "bouncing visual effect" when a webpage is dragged beyond its endpoint. Likewise, contrary to Samsung's argument that PX57.19 discussed "numerous visual effects that have no bearing on the '381 patent" (Opp. at 12), that document singles out the lack of a "bounce effect" as the "critical" deficiency in Samsung's product.  Nor can Samsung deny that PX38 demonstrates copying of the '163 patent, where it instructs that Samsung should adopt "Double-Tap" zooming, using the iPhone "as a design benchmark."  (PX38.24.)  Similarly, PX44.58 describes the iPhone's double-tap-to-zoom feature and suggests that "Double Tap zoom in/out function needs to be supplemented" in Samsung's own product.  Although these documents use

1   shorthand descriptions of Apple's inventions rather than the claim language, that does not

2   diminish the force of this evidence—particularly given that these documents are all translations.

3   There can hardly be more direct evidence of copying than the side-by-side comparisons with

4   Apple's products in Samsung's own documents.

5           **B.**       **Monetary Damages Are Inadequate To Compensate Apple.**

6         Samsung does not contest the Court's prior finding that Apple's losses defy calculation

7   and therefore "suggest that money damages may not provide a full compensation." (Dkt. 2197 at

8   18.) Samsung challenges only whether Apple's prior licensing practices demonstrate that

9   damages can properly compensate for Samsung's infringement of these patents. As explained in

10  Apple's opening brief and below, money damages would be wholly inadequate here.

11          **1.**       **Apple did not offer to license the asserted patents to Samsung in 2010.**

12        Samsung's contention that Apple offered to license the infringed patents to Samsung in

13  October 2010 is unfounded. Boris Teksler, Apple's then-Director of Patent and Licensing

14  Strategy, testified that during the October 2010 discussions Apple "absolutely [did] not" offer

15  Samsung a license to the asserted patents. (Dkt. 1839 at 2013:9-2014:6.) He explained that the

16  '381, '915, and '163 patents are all part of Apple's "unique user experience" that the company

17  "strongly desire[s] not to license." (Dkt. 1695 at 1955:22-1957:9.) Though Samsung cites the

18  absence of an explicit carve-out provision in the written presentation, Mr. Teksler, in discussing

19  the same presentation, was unequivocal that the offer did *not* include the patents currently at

20  issue. (Dkt. 1839 at 2022:22-24.) Apple's then in-house counsel, Chip Lutton, testified that

21  conversations with Samsung never reached the point of discussing whether the '381 patent would

22  be included in a potential agreement. (Dkt. 2915-35 at 197:6-19.) The excerpted portion of Mr.

23  Lutton's testimony on which Samsung relies (Opp. at 13-14) suggests, at most, that Mr. Lutton

24  considered the *possibility* of licensing the '381 patent. But a willingness in Mr. Lutton's mind to

25  discuss the potential for licensing this one patent is not an offer, let alone the type of licensing

26  "campaign" or "pursuit of [the infringer]" that the Federal Circuit has found relevant when

27  assessing a patentee's past attempts to license asserted patents to the defendant. *ActiveVideo*

28  *Networks, Inc. v. Verizon Commc'ns Inc.*, 694 F.3d 1312, 1339-40 (Fed. Cir. 2012).

1

2.      **The parties' recent settlement discussions do not suggest that damages would be adequate.**

2

3       More recent settlement discussions between the parties have no relevance to the adequacy

4    of money damages.  Samsung contends that these conversations may be considered because they

took place outside of court-ordered mediations.  (Opp. at 15 n.12.)  The Court has recently held,

5

however, that "confidentiality protections still appl[y]" to those discussions.  (Dkt. 2913 at 4.)  To

6

avoid having a chilling effect on future negotiations, the Court should not parse the parties' recent

7

settlement discussions as part of Samsung's efforts to oppose Apple's injunction request.

8

9       Even if considered, the parties' recent settlement discussions would be of minimal

probative value.  As Samsung notes, these conversations "took place long after the completion of

10

briefing on Apple's original motion for permanent injunction."  (Opp. at 14.)  The discussions

11

were thus heavily "tainted by the coercive environment of patent litigation" that the Federal

12

Circuit has recognized often distorts licensing terms and reduces the reliability of settlement

13

agreements.  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012).[6]

14

And regardless of what was discussed in the parties' unsuccessful negotiations to date,[7] Apple has

15

been willing to license these patents only in extremely limited circumstances and with anti-

16

cloning and other provisions designed to prevent the exact behavior that Samsung engaged in

17

when it infringed these patents.  (*See* Mot. at 6-8; *infra* pp. 11-12.)  In any case, the fact that no

18

agreement has been reached between the parties underscores the *inadequacy* of money damages

19

for Samsung's infringement.

20

3.      **Apple's limited past licensing practices do not suggest that damages would be adequate to compensate for Samsung's infringement.**

21

22      Samsung further suggests that "the issue here is simply whether Apple licensed the utility

23   patents relevant to this motion to competitors."  (Opp. at 17.)   But this narrow focus on the

24

[6] Samsung attempts to distinguish *LaserDynamics* because it involved a reasonable royalty analysis (Opp. at 18), but that analysis is equally applicable here.  The relevant inquiry in the context of a permanent injunction is "whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement."  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008).

25

26

27      [7] Samsung incorrectly claims (Opp. at 14) that Apple made recent offers to Samsung without anti-cloning provisions.  Every offer Apple made to Samsung has included limits to both the scope of any license and a prohibition against cloning Apple products.  (Watrous Decl. ¶ 4.)

28

1    existence of prior licenses involving the asserted patents is the exact approach the Federal Circuit

2    rejected when it held that "the court erred by ending its analysis upon concluding that the asserted

3    patents are not 'priceless.'"  *Apple III*, 735 F.3d at 1370.  Apple's mere "willingness to license its

4    patents is not sufficient per se to establish lack of irreparable harm."  *Acumed*, 551 F.3d at 1328.

5    Rather, the adequacy of money damages analysis depends on the "relevant differences" between

6    "Apple's past licensing practices" and "the current situation."  *Apple III*, 735 F.3d at 1370.

7           Samsung's attempts to summarily dismiss these relevant differences should be rejected.

8    *First*, Samsung asserts that the Federal Circuit "necessarily rejected Apple's relevance argument"

9    based on the fact that prior licenses resulted from settlement agreements.  (Opp. at 17.)  However,

10   the Federal Circuited "*agree[d]* with Apple" that certain factors—including that Apple "entered

11   into the HTC and Nokia agreements to settle pending litigation"—"*are relevant* to whether

12   monetary damages will adequately compensate Apple for Samsung's infringement of the asserted

13   patents."  *Apple III*, 735 F.3d at 1370 (emphasis added).  Because settlements "ostensibly reflect[]

14   not the value of the claimed invention but the strong desire to avoid further litigation," they are a

15   less reliable indicator of the adequacy of money damages.  *LaserDynamics*, 694 F.3d at 78.

16          *Second*, Samsung glosses over the fact that the HTC and Nokia agreements include

17   numerous other patents by arguing that the "inclusion . . . of *other* patents in the licenses does not

18   change the fact that Apple willingly licensed its utility patents at issue here to competitors."

19   (Opp. at 17.)  But again, the inquiry does not end with the fact that Apple licensed the asserted

20   patents.  The inclusion of other patents in these cross-license agreements suggests damages alone

21   are not sufficient compensation for infringement of *these patents*.  As the Court has previously

22   found, the face of "the HTC Agreement does not fully or clearly quantify the benefit Apple

23   received."  (Dkt. 2673 at 7.)  It is "a broad cross license through which Apple receives not only

24   royalty payments, but also a fully paid-up license to practice certain HTC patents," the value of

25   which Samsung's experts have not "attempt[ed] to place a dollar amount on."  *Id.*

26          *Finally*, Samsung attempts to brush aside the significant restrictions in the HTC and Nokia

27   licenses that distinguish them from the unencumbered use of Apple's patents that Samsung would

28   enjoy absent an injunction.  The HTC agreement was carefully crafted to prevent HTC from

1    "cloning" Apple products, "*includ[ing] functional aspects*" of the "Distinctive Apple User

2    Experience." (Dkt. 2194-01 ¶¶ 5.1, 12.1, 12.3, 12.4, Ex. A (emphasis added).) [8]  As Mr. Teksler

3    testified, the '381, '915, and '163 patents are all part of this unique user experience. (Dkt. 1695 at

4    1955:22-1957:9.)  Furthermore, the Court has already found that because of this "complicated

5    anti-cloning provision," the HTC agreement "fails to exemplify clearly the type of license

6    Samsung arguably needed for its products." (Dkt. 2673 at 7.)  It is therefore not an appropriate

7    proxy for determining the adequacy of money damages here.

8                    **C.       The Balance Of Hardships Favors Entry Of An Injunction.**

9           Samsung has not identified any legitimate reason why it would be burdened by an

10   injunction.  On the contrary, Samsung repeatedly asserts that it has stopped selling all the

11   particular models found to infringe. (Opp. at 18-20.)  As the Court previously recognized, that

12   argument only highlights the *absence* of any burden to Samsung. (Dkt. 2271 at 19.)[9]

13          Samsung further claims that Apple's concern that Samsung will continue its infringement

14   through products not more than colorably different from those found to infringe is unjustified.

15   But as Dr. Singh explained (Dkt. 2127), Samsung's supposed design-around to the '915 patent is

16   trivial and still infringing.  Samsung faults Apple for failing to identify any current Samsung

17   product that is still infringing and not more than colorably different from those previously found

18   to infringe (Opp. at 20-21 & n.15), but has not disclosed any non-infringing design-around to the

19   '915 patent. (*See* Dkt. 2127 (Singh Declaration).)  Until Samsung provides evidence of a suitable

20   design-around, Apple has no basis to believe that Samsung's current products are non-infringing

21   or more than colorably different from those previously adjudicated to infringe.

22          Samsung also cannot claim to be burdened because the asserted claim of the '915 patent

23   has been rejected in reexamination. (Opp. at 19-20.)  As explained below (pp. 14-15), a final

24   ────────────────────

25          [8] Michael Wagner's declaration (Dkt. 2915-14) regarding the HTC agreement is untimely
     disclosed and improper expert opinion.  Samsung offered Mr. Wagner as an expert on damages,
     not the interpretation of licensing agreements or contract law. (Dkt. 2841 at 994:10-14.)

26          [9] Samsung is incorrect (Opp. at 19) that the Court's prior conclusion concerning the
     balance of hardships is binding as law of the case.  Since the Court last considered the issue,
27   Samsung has ceased selling all products previously found to infringe.  Even if the Court declines
     to revisit its prior conclusion on the balance of hardships, that does not support denial of an
28   injunction.  The Court previously found the balance of hardships to be neutral. (Dkt. 2197 at 19.)

1   determination on the validity of the '915 patent is still years away.  The '915 patent remains in

2   full effect until there is final resolution by the Federal Circuit, and Samsung is bound until then

3   by the jury's finding of infringement of a valid patent.  *See Ethicon Inc. v. Quigg*, 849 F.2d 1422,

4   1427-29 (Fed. Cir. 1988).  Samsung's predictions about the outcome of the reexaminations have

5   proven incorrect before (*e.g.*, Dkt. 2323); the Court should not credit those same arguments now.

6          Samsung's claim (Opp. at 21) that it would be burdened by the threat of enforcing an

7   injunction also rings hollow.  Whether Samsung continues to infringe is entirely within

8   Samsung's control, and as the Court has recognized, Samsung cannot claim to be burdened by the

9   enforcement of an injunction should it choose to continue to infringe Apple's patents.  (Dkt. 2271

10  at 19.)  Moreover, the absence of an injunction is a far greater burden for Apple to bear than

11  Samsung would face to comply with an injunction; an injunction is the only effective remedy

12  Apple has against ongoing infringement by Samsung's large and evolving product line.

13         **D.      The Public Interest Favors An Injunction.**

14         Samsung selectively relies on snippets from the Court's prior analysis of the public

15  interest, but ignores the Court's findings that the public interest supports the enforcement of

16  patent rights to reward investment-based risk.  (Dkt. 2271 at 20.)  Far from having merely some

17  "generic" interest in the enforcement of patent rights (Opp. at 22), Apple made a substantial

18  investment in the face of significant risks to develop the technologies claimed in the '381, '915,

19  and '163 patents.  (Dkt. 2840 at 802:25-803:12.)  It would be against the public interest to reward

20  Samsung's infringement with a compulsory license to technologies that Apple worked

21  tirelessly—and risked so much—to develop.

22         Moreover, Samsung relies on portions of the Court's analysis that are no longer valid in

23  light of the Federal Circuit's recent guidance.  The Federal Circuit invited the Court to revisit its

24  public interest analysis based on its application of the correct causal nexus standard.  *See Apple*

25  *III*, 735 F.3d at 1373 n.8.  Samsung cites the Court's prior finding that the public interest would

26  not be served because its phones contain numerous non-infringing features (Opp. at 22-23), but

27  ignores that—under a proper application of the causal nexus standard—the features claimed by

28  the infringed patents are among those that drive demand for the infringing products (Mot. at 2-6;

1  *supra* pp. 2-9).  The incentive to innovate would be greatly reduced if competitors had free access

2  to the features that consumers value, such as those claimed by Apple's patents.

3      Nor would an injunction be anticompetitive, as Samsung contends.  (Opp. at 22.)  The

4  only anticompetitive result would be allowing Samsung to continue to compete with Apple

5  unfairly through products containing features not more than colorably different than those already

6  found to infringe.[10]  The public would benefit from the diversity of competing products that

7  enjoining Samsung's infringement would provide.[11]

8      **E.    The Court Should Not Delay Enforcement Of Any Injunction During The
             '915 Reexamination Proceedings.**

9      There is no reason for the Court to stay enforcement of an injunction with respect to the

10  '915 patent during the ongoing reexamination proceedings.  Samsung asserts that the "Patent

11  Examiner has now completed reexamination of Apple's '915 patent."  (Opp. at 22.)  That is

12  incorrect.  On December 19, 2013, Apple requested a further interview with the Examiner.  (Ho

13  Decl. ¶ 3, Ex. A.)  That request was granted and an interview scheduled for January 16, 2014.

14  (Ho Decl. ¶ 4, Ex. B.)  Apple also filed a notice of appeal.  (Ho Decl. ¶ 5.)  As Samsung's own

15  expert admits, the Examiner now "has the option to either reopen prosecution or maintain the

16  appeal."  (Dkt. 2915-11 ¶ 18.)  The Examiner retains authority over the reexamination until after

17  he answers Apple's appeal brief and considers Apple's rebuttal brief, and he may reopen the

18  prosecution at several stages during this process.  C.F.R. §§ 41.39(a)(1), 41.43(a)(1); *see also* Ho

19  Decl. Ex. C.  The reexamination may also be appealed to the Patent Trial and Appeal Board, and

20  ultimately to the Federal Circuit.  28 U.S.C. § 1295(a)(4)(A); 37 C.F.R. § 41.31.  Therefore, even

21  under the aggressive timeline laid out by Samsung's expert, the reexamination will not end until

22  late 2015 at the earliest.  At least until then, the '915 patent remains in full effect and Samsung is

23  bound by the jury's finding that it infringed a valid patent.  *Ethicon*, 849 F.2d at 1427-29.

24

25      [10] Samsung contends (Opp. at 22) that including products "no more than colorably
26  different" is impermissibly vague.  The Federal Circuit held, however, that it is proper to include
    such language, which tracks the standard for contempt.  *Apple III*, 735 F.3d at 1372.

27      [11] As with the balance of hardships (*supra* pp. 12-13), the '915 reexamination—which is
28  still far from a final determination—does not diminish the public interest in granting an
    injunction.

1   Samsung's speculation regarding the outcome of the reexamination proceedings does not justify

2   further delay.

3         Nor can Samsung's biased predictions justify ignoring the enormous harm to Apple that

4   would be caused by its inability to enforce an injunction with respect to the '915 patent.  Just as

5   monetary damages are inadequate to compensate Apple for Samsung's infringement (*see* Mot. at

6   6-8; *supra* pp. 9-12), a bond would be an inadequate substitute for the ability to enforce an

7   injunction.  Furthermore, Samsung's claim that its "business could be impaired and subjected to

8   unwarranted threats" (Opp. at 24) absent a stay cannot be reconciled with its insistence that it has

9   stopped infringing Apple's patents.  If Samsung is confident that its design-arounds do not

10   infringe the '915 patent, then enforcement of the injunction poses no threat to Samsung.

11         **F.**    **There Is No Need For An Evidentiary Hearing.**

12         The Court did not hold an evidentiary hearing with respect to Apple's original motion for

13   a permanent injunction, and there is no need to do so at this late stage.  The record is already fully

14   developed from the prior proceedings in this case, including two trials.  The Federal Circuit

15   remanded so that the Court could reconsider the record evidence under the correct legal standard.

16   *Compare Apple III*, 735 F.3d at 1368 (remanding for consideration of the record evidence under

17   the correct legal standard), *with Warner Chilcott Labs. Ireland Ltd. v. Mylan Pharms. Inc.*, 451 F.

18   App'x 935, 939 (Fed. Cir. 2011) (evidentiary hearing required on remand where the district court

19   acknowledged the existence of disputed issues of material fact that "necessitate[d] further

20   testimony and cross examination").[12]  An evidentiary hearing at this stage would serve no purpose

21   other than to further delay resolution of Apple's request for an injunction.

22   **III.**    **CONCLUSION**

23         Apple respectfully requests that the Court enter an order permanently enjoining Samsung

24   from infringing Apple's '381, '915, and '163 patents.

25

26         [12] As to the one disputed fact identified by Samsung—the October 2010 licensing discussions—the Federal Circuit did not suggest the record was inadequate.  It cited the pertinent

27   evidence and noted that it "cannot tell if the district court reached a conclusion on this issue." *Apple III*, 735 F.3d at 1370 n.7.  The established record, which includes Mr. Teksler's testimony

28   (Dkts. 1695, 1839), permits the Court to resolve this issue without a further evidentiary hearing.

1    Dated: January 16, 2014                    WILMER CUTLER PICKERING
                                                  HALE AND DORR LLP
2

3

4                                         By:  */s/ William F. Lee*
                                                  WILLIAM F. LEE
5
                                               Attorneys for Plaintiff
6                                              APPLE INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that a true and correct copy of the above and foregoing document has been

3    served on January 16, 2014 to all counsel of record who are deemed to have consented to

4    electronic service via the Court's ECF system per Civil Local Rule 5-1.

5

6                                        */s/ William F. Lee*
                                         William F. Lee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28