UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California Corporation, | Case No. 5:11-cv-01846-LHK (PSG) |
| Plaintiff, | **ORDER GRANTING MOTION FOR SANCTIONS** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | **(Re: Docket Nos. 2374, 2435)** |
| Defendants. | |

A junior associate missing one redaction among many in an expert report is not exactly a historical event in the annals of big-ticket patent litigation. Even if regrettable, these things can happen, and almost certainly do happen each and every day. But when such an inadvertent mistake is permitted to go unchecked, unaddressed, and propagated hundreds and hundreds of times by conscious – and indeed strategic – choices by that associate's firm and client alike, more significant and blameworthy flaws are revealed.

1

Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

To address such flaws in this case, abrogate the harm suffered, and discourage recurrence, the court GRANTS the motion for sanctions by Plaintiff Apple Inc. and non-party Nokia Corporation, as set forth below.

## I. TIMELINE: WHAT HAPPENED TO THE TEECE REPORT?

In July of 2013, Nokia's Paul Melin filed a declaration that launched a thousand accusations.[1] In that document, Melin claims that Samsung's Seungho Aho had recited for him the precise terms of an Apple/Nokia license agreement in the course of a Samsung/Nokia licensing negotiation, that Ahn admitted getting the information through his attorneys, and that Ahn had confidently declared "all information leaks."[2]

At the first hearing on this matter on October 1, 2013, Apple and Nokia argued to the court that it appeared that Samsung had used the information disclosed in violation of Section 6 of this court's protective order to gain an advantage not only in the Samsung/Nokia licensing negotiations, but also in proceedings before the United States International Trade Commission and United States Federal Trade Commission and in litigation around the globe.[3] However, before they could say more, Apple and Nokia prevailed that they needed discovery to find out the details.[4] In light of the scant explanation and evidence proffered by Samsung, the court obliged, authorizing substantial document production and depositions.[5]

---

[1] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

[2] *Id.*

[3] *See* Docket No. 2485 at 5-11.

[4] *See id.* at 23; *see also* Docket No. 2374.

[5] *See* Docket No. 2483. This order was subsequently affirmed by Judge Koh based on her conclusion that it was a "highly appropriate and necessary mechanism for determining answers to basic questions that Samsung has been unable to provide." *See* Docket No. 2538 at 8.

By the second hearing on October 22, Apple and Nokia's general allegations were a little more fulsome, but details remained limited.[6] A few months after an initial disclosure by Samsung's attorneys at the Quinn Emanuel firm of various Apple license terms in an expert report by David Teece, an in-house Samsung attorney somehow picked the terms of the Apple/Nokia license out of a redacted spreadsheet and sent those terms to a licensing executive for some unknown purpose.[7] Several months after that, Quinn Emanuel sent another copy of the improperly redacted report to that same Samsung attorney, who was told to delete it.[8] But after several months, the same Samsung attorney circulated yet another copy of the improperly redacted report, casting doubt as to whether the instruction to delete was actually followed.[9] Shortly before the negotiations between Samsung and Nokia began, a document entitled "Nokia-Apple License Memo" was widely circulated within Samsung and sent to another outside law firm.[10] Any one of these events by themselves-and certainly the lot together-would be enough to raise suspicions, but because of Samsung's sweeping privilege assertions,[11] neither Apple nor Nokia had access to enough information to tell a clear and coherent story.

In the interest of getting to the bottom of things, while respecting any valid assertions of privilege that Samsung may have had, the court undertook an in camera review of all the documents identified as relevant but privileged.[12] That review gave the court an outline that filled

---

[6] *See generally* Docket No. 2581.

[7] *See* Docket No. 2557-4 at 4, 11.

[8] *See* Docket No. 2558-29 at 3; Docket No. 2557-4 at 8.

[9] *See id.*

[10] *See* Docket No. 2557-4 at 9-10; Docket No. 2558-29 at 4.

[11] *See* Docket No. 2556-3 at 11.

[12] This review included more than 20,000 pages of documentary evidence, along with over 5500 pages of declarations. This is, of course, in addition to reviewing the 61 briefs submitted by the parties and the deposition transcripts covering over 50 hours of testimony.

3
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

in many of the whos, whats, and whens of the information's transmission, but very few whys or hows:

- March 24, 2012: Quinn Emanuel posted an insufficiently redacted copy of David Teece's Initial Expert Report to an FTP site and emailed more than 90 Samsung employees with instructions for accessing the document, including Seungho Ahn, Clayton Kim, James Kwak, and Indong Kang.[13] The insufficient redactions exposed the terms of several of Apple's confidential license agreements, including those with Nokia and Ericsson.[14] Although the FTP site was apparently taken down within ten days,[15] the tainted document was downloaded and distributed widely within the first two days, creating ample copies for additional dissemination.[16]

- June 29, 2012: "With regard to [a] question [Kim] posed," Daniel Shim, an in-house attorney at Samsung, highlighted for Kim the detailed terms of the Apple-Nokia license from a redacted spreadsheet.[17] The spreadsheet in question had been

---

[13] *See, e.g.,* Tab Nos. 2, 215.  The tab numbers in this footnote and those that follow refer to the tabs of the documents submitted by Samsung for in camera review.  Because Samsung offered to turn over the vast majority of the documents cited in this order, the court finds that privilege has been waived as to those documents.  As to all other documents cited, the court finds that the portions discussed in this order are not privileged.

[14] *See id.*

[15] *See* Docket No. 2883 at 36.

[16] *See, e.g.,* Tab Nos. 3-5 (emails between March and May 2012 attaching and circulating Teece using a downloaded copy); Tab No. 215 (directing the recipients to "[p]lease access the FTP site below, download Teece report, and circulate it.").

[17] Although both Shim and Kim have been deposed and filed declarations in this matter, *see* Docket Nos. 2557-10 (Shim Depo.), 2557-14 (Kim Depo.), 2556-16 (Shim Decl., 10/21/13), 2807-14 (Shim Decl. 11/15/13); 2807-9 (Kim Decl.), at first blush, neither remembered the context of this exchange, *see* Docket No. 2557-10 at 124: 12-15 ("Q: Do you have any memory at all as to why you were sending this spreadsheet to Mr. Kim in June of that year? A: I do not."); Docket No. 2557-14 at 73-75; Docket No. 2807-9 at 2 ("I no longer remember why Daniel and I were emailing each other and our legal counsel on or around June 29, 2012.").  Both claimed not to remember what the information was going to be used for or why they were discussing the terms. *See id.*  Given just a few days, though, Shim developed a clearer memory as to how he identified the terms, as well as a clearer memory of the context.  In a declaration sworn six days after his deposition, Shim swears that it was easy to recognize the terms of the Apple/Nokia license because Nokia was the only party that Apple would be contracting with in Euros.  *See* Docket No. 2556-16 at 2-3 ("The spreadsheet disclosed the terms, including the specific financial terms, of various patent licenses that Apple had with other companies.  While the spreadsheet was anonymized as to the company, I deduced to a reasonable degree of certainty from one of the entries that it identified the license terms for Apple's license with Nokia, including its specific financial terms.  It was the only entry on the spreadsheet listed in Euros and described large amounts that I thought very likely would be paid only by Apple to settle what I had read and heard was a significant litigation claim against Apple by Nokia that at the time posed a serious risk to a large portion of Apple's European business.").  This reasoning does not appear, however, anywhere in the June 29 email, nor does he qualify his identification in any way, to indicate that he was less than 100% sure about the identification.  *See* Tab Nos. 222, 225.

prepared in the course of litigation between Apple and Samsung in the Netherlands.[18] It contained the detailed terms of Apple's licenses with other major players in the industry, but the names of the companies had all been redacted.[19] Only nine people in Samsung were authorized to view this spreadsheet, and Shim was one of them.[20] The terms identified match precisely the key terms revealed in the Teece Report.

- July-December 2012: The insufficiently redacted Teece Report continued to circulate within Samsung, and to its outside counsel.[21] Ultimately, over 200 people not authorized by the protective order would receive the document with the confidential license terms.

- December 22, 2012: In response to a request over the holidays, a Quinn Emanuel senior associate emailed Shim a copy of the insufficiently redacted Teece Report.[22] For some unknown reason, a Quinn Emanuel junior associate reviewed the redactions again and identified the incomplete redaction.[23] The junior associate immediately brought it to the attention of the senior associate and a partner,[24] specifically noting that Apple had never approved the redactions to the original Teece Report, which contrasted with their explicit approval of other reports.[25] In response, the senior associate asked Shim to delete the email, which Shim confirmed he did,[26] but nothing more was done to contain or investigate the damage, and neither Apple nor Nokia were notified that there had been a disclosure.

- January 4, 2013: In forwarding Shim a "clean"[27] copy of the Teece Report, the senior associate also forwarded an email chain which highlighted for Shim precisely where the confidential information could be found in older versions of the document.[28]

---

[18] *See* Tab Nos. 8, 221.

[19] *See id.*

[20] *See* Docket No. 2557-10 at 122.

[21] *See, e.g.,* Tab Nos. 17, 18, 216, 225, 258, and 260.

[22] *See* Tab No. 19.  Microunity, a company engaged in a separate litigation with Samsung, used Teece's testimony in the Apple/Samsung litigation against Samsung in their case, and Shim wanted to review the report in order to develop a rebuttal.  *See* Docket No. 2557-10 at 138-39.

[23] *See* Tab No. 20. This was the same associate who had prepared the initial redactions for the version of the report to go on the FTP site.  *See* Docket No. 2883 at 34.

[24] *See* Tab No. 20.

[25] *See id.*

[26] *See* Docket No. 2807-15, Ex. 4.

[27] This version of the Teece Report still contained unredacted information regarding Ericsson's licenses with Apple, but in a different section of the report.

[28] *See* Tab No. 20.

5
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

- February-March 2013: Samsung referenced and discussed the terms in Apple's license with Ericsson (the same terms that were disclosed in the insufficiently redacted Teece Report) as critical to their upcoming arbitration with Ericsson while simultaneously undergoing extensive discovery to obtain those terms.[29]

- March 31, 2013: In preparation for Samsung's negotiations with Nokia, the Williams and Connolly law firm delivered a report to Samsung on the terms of the Apple/Nokia license agreement.[30] This report was prepared in response to a request by Indong Kang in early March and drew its conclusions from an exhaustive review of public financial filings from both companies, as well as selected news reports and predictions.[31]

- May 13, 2013: Shim emailed Quinn Emanuel a copy of the Teece Report with the confidential license terms still unredacted. Quinn Emanuel did nothing in response.[32]

- June 4, 2013: During a negotiation between Samsung and Nokia, Paul Melin proposed a licensing fee far above what the Samsung team believed was appropriate.[33] According to Ahn, Nokia justified the figure by referencing a similar fee paid by a company of approximately Samsung's size.[34] Melin says that in response, Ahn recited the terms of Nokia's parallel license with Apple and stated that he had learned the terms from his lawyers because "all information leaks."[35] Ahn claims that the number he quoted was actually an estimate based on public, not private, information, and he was just "pretending" to be more certain than he was.[36]

- July 1, 2013: Nokia filed a motion for a protective order in the 12-630 case, and the current circus began.[37]

---

[29] *See, e.g.,* Tab Nos. 87, 90, 93, 121, 144, and 239.

[30] *See* Tab No. 56.

[31] *See id.*

[32] *See* Tab No. 272.

[33] *See* Docket No. 2557-8 at 81-82.

[34] *See id.*

[35] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

[36] *See* Docket No. 2557-8 at 94.

[37] *See* Case No. 5:12-cv-0630-LHK (PSG), Docket No. 647.

6
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

With this outline in mind, on November 8, 2013, the court issued an Order to Show Cause Why Sanctions Are Not Warranted as to three particular violations of its protective order:

1. Samsung's wrongful use of the disclosed sensitive business information in preparing for:
   a. its negotiations and arbitrations with Ericsson between May 2012 and May 2013;
   b. its negotiations with Nokia between March 22, 2012 and June 4, 2013;

2. QE's failure to fully redact sensitive business information from the Initial Expert Report of David Teece, resulting in the pervasive distribution of the SBI to Samsung employees who were not authorized to have access to it; and

3. QE's failure to follow the procedures set forth in Section 18 of the Protective Order after repeated notice of the disclosure of sensitive business information.[38]

The court also authorized Samsung to take its own discovery.[39]

## II. THE GOVERNING LEGAL STANDARDS

In evaluating the record before it, the court is faced with three separate questions. First, has its protective order been violated? Second, if the protective order has been violated, does the court have the authority to issue sanctions for those violations? Finally, if the court has the authority to issue sanctions, what factors should it consider in determining whether sanctions are warranted?

### A.     There Is No Intent Requirement To Violate The Protective Order

In order to determine whether or not a protective order has been violated, courts focus on the terms of the order itself.[40] In this case, Section 6(a) of the protective order states that "Protected Material shall not *voluntarily* be distributed, disclosed, or made available to anyone except as expressly provided in this order."[41] Quinn Emanuel and Samsung have argued that this

---

[38] Docket No. 2689 at 5.

[39] *See id.*

[40] *See e.g., Biovail Labs., Inc. v. Anchen Pharm., Inc.*, 463 F. Supp. 2d 1073, 1080 (C.D. Cal.2006); *On Command Video Corp. v. LodgeNet Entm't Corp.*, 976 F. Supp. 917, 922 (N.D. Cal. 1997).

[41] *See* Docket No. 687 at 5 (emphasis added).

7
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

creates an intent requirement to find a violation of the order.[42] However, in the context of discovery issues, "voluntarily" is typically interpreted as "absent court compulsion," rather than "with intent or willfulness."[43] This interpretation is consistent with how other courts have addressed protective order violations.[44] Interpreting "voluntarily" as such in this context, the court finds that this protective order does not establish a willfulness requirement; absent court order, any distribution, disclosure, or making available of protected information is a violation, regardless of the intent of the perpetrator.

**B.  This Court Has The Authority Under Fed. R. Civ. P. 37 To Issue Sanctions For Violations Of Its Protective Order**

While at least one other appellate court disputes the applicability of Rule 37 to Rule 26(c) protective orders,[45] the Ninth Circuit has repeatedly held that Rule 37 "provide[s] comprehensively for enforcement of all [discovery] orders, including Rule 26(c) protective orders."[46] Whatever the merits of the conclusions of other jurisdictions, when the Ninth Circuit has spoken, this court is duty-bound to listen. Because the conduct here stems directly from the protective order issued under Rule 26(c) "to provide or permit discovery," the court has the authority to issue sanctions

---

[42] *See* Docket No. 2556-3 at 2.

[43] *See, e.g., Gifford v. Precision Pallet, Inc.*, Case No. 07-2339-JTM, 2008 WL 4078787, at *4 (D. Kan. Aug. 28, 2008) (contrasting voluntary disclosure with disclosure pursuant to court order); *Hodgson v. Bell Letter Serv., Inc.*, 63 F.R.D. 109, 111 (D. Conn. 1974) (same); *Nat'l Steel Products Co. v. Superior Court*, 164 Cal. App. 3d 476, 482 (1985) (same); *see also* 7 Annotated Patent Digest § 42:79 ("A voluntary disclosure does not occur where a court order has compelled the disclosure. Such disclosure is not voluntarily.").

[44] *See, e.g., Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012) (holding undisputed that inadvertent disclosures violate a protective order).

[45] *See, e.g.*, *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001) (holding that Rule 26(c) protective orders "do not fall within the scope of Rule 37(b)(2).").

[46] *See Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.*, 992 F.2d 932, 934-35 (9th Cir. 1993); *Flastoff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 704 (9th Cir. 1983) ("Fed. R. Civ. P. 37(a) empowers the courts to impose sanctions for failures to obey discovery orders."); *see also United States v. Nat'l Med. Enters., Inc.,* 792 F.2d 906, 911 (9th Cir. 1986) (affirming Rule 37 sanctions for violation of protective order); *cf. Smith & Fuller*, 685 F.3d at 490 (same).

8
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

and structure remedies for any violations under Rule 37(b)(2)(A).[47] Such sanctions may be imposed against parties or counsel.[48]

**C. Sanctions Should Be Structured Both To Remedy The Harm Caused And Deter Similar Conduct**

Authority, however, is not obligation. In other words, protective order violations may, but do not necessarily, constitute sanctionable conduct. Rule 37 provides that the court "may issue further just orders" in response to violations of discovery orders, including the judicial establishment of facts, striking certain evidence or defenses, or other appropriate sanctions for various discovery violations.[49] Because the rule mandates sanctions under certain conditions but only allows for them under others, the court has the discretion to determine whether sanctions are appropriate.

In determining whether to issue sanctions, or what forms the sanctions should take, a court must look to the totality of the circumstances surrounding each violation. In *Falstaff Brewing Corp. v. Miller Brewing Co.*, the Ninth Circuit explained that "Rule 37(b) sanctions may serve either remedial and compensatory purposes or punitive and deterrent purposes."[50] Although the court has broad discretion to fashion remedies to the misconduct, the harshest sanctions, such as exclusion of evidence or dismissal, are to be reserved for cases of bad faith or willful misconduct.[51]

---

[47] Because the court finds sufficient authority to issue sanctions under Rule 37, it does not consider any alternative sources such as its inherent authority.

[48] *See* Cal. Prac. Guide Fed. Civ. P. Before Trial Ch. 11(V)-C ("Sanctions may be imposed against the attorneys [or clients] separately or against the attorneys and clients jointly and severally.") (*citing Hyde & Drath v. Baker*, 24 F.3d 1162, 1172 (9th Cir. 1994)).

[49] *See* Fed. R. Civ. P. 37.

[50] 702 F.2d 770, 783 (9th Cir. 1983).

[51] *See United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369 (9th Cir. 1980). Case-dispositive sanctions are subject to an additional five factor balancing test: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring

9
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

In light of *Falstaff*, the ideal remedy is one that advances both the remedial and deterrent goals of sanctions, as the need for one is not diminished by a need for the other. Thus, sanctions may be warranted where a relatively innocent violation leads great harm, where there is strong evidence of bad faith or willful conduct (even if there is minimal evidence of harm), and certainly where both are present. In all circumstances, an appropriate sanction will stem from the balance of the two.

### III. DISCUSSION: THE CONDUCT AT HAND

With these standards in mind, the court now turns to the instant matter. In this court's order to show cause, the court identified five instances of conduct that may warrant sanctions. Applying the framework above to those instances in light of the evidence presented, the court concludes as follows:

**A.     March 2012-May 2013:  The Court Is Not Persuaded That Samsung Used Information From The Teece Report In Negotiations With Ericsson And Nokia**

In its order to show cause, the court noted that sanctions may be warranted against Samsung for its wrongful use of the insufficiently redacted Teece Report in preparing for negotiations with Ericsson and Nokia.[52] In response, Samsung produced numerous declarations and supporting documents providing alternative sources for the information that had given the court pause.[53] With respect to Ericsson, Samsung explains that Ericsson itself told Samsung the terms of its license with Apple in the course of their mediations,[54] an assertion backed up by the sworn statement of an

---

disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

[52] *See* Docket No. 2689 at 5.

[53] *See* Docket No. 2807.

[54] *See id.* at 14.

attorney from the Kirkland & Ellis firm.[55]  Given that no representative from Ericsson or anyone else has come forward to refute that assertion, the court credits the testimony and accepts this explanation.  With respect to the Nokia terms, however, although Samsung proffers numerous possible sources for its information, each explanation is tenuous at best.  "It was in published news sources," Samsung urges.[56]  "I just guessed," Ahn insists.[57]  And then there is the "Apple-Nokia license memo" prepared by Williams and Connolly.[58]  Although the court finds each one of Samsung's explanations shaky on its own, together they leave the court unpersuaded that Samsung used the Teece Report in either the Ericsson or Nokia negotiations.

**B.    March, 2012:  A Quinn Emanuel Junior Associate Failed To Properly Redact The Teece Report, Violating This Court's Protective Order, But Not In A Context Requiring Sanctions**

The court also indicated in its order to show cause that sanctions may be warranted for the initial failure to redact the Teece report.[59]  It is undisputed that at some point in late March 2012, a junior associate working late one night failed to fully redact Apple's confidential license terms from an expert report.[60]  Section 9(a) of the protective order indicates that among the information that "the Parties agree . . . if non-public, shall be presumed to merit the 'HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY' designation" are "pricing information . . . financial data [and] licensing of the Producing Party's intellectual property."[61]  The

---

[55] *See* 2807-13 at 6.

[56] *See* 2481 at 48.

[57] *See* 2557-8 at 16.

[58] *See* Tab No. 246.

[59] *See* Docket No. 2689 at 5.

[60] *See* Docket Nos. 2807, 2835-3 at 11-18.

[61] *See* Docket No. 687 at 11.

uncontroverted evidence establishes that unredacted portions of the report contained the licensing terms for Apple's intellectual property,[62] and although Samsung attempts to argue that this information was already public, the sources it references all state that the numbers they contain are, at best, estimates, as the parties are keeping the information confidential, and in fact, the terms they disclose do not match those described in the Teece Report.[63]  Based on this evidence, the court finds that the information was non-public, and that the failure to redact this information was a violation of this court's protective order.

That said, every lawyer in this case has acknowledged that these types of mistakes happen.  In a case of this size and scope, it would be completely unreasonable to expect every person on every team to perform perfectly at all times.  As Samsung points out in its brief, if the court begins issuing sanctions every time a document is less than fully redacted, it will quickly lose any bandwidth to deal with any other matters.[64]  The cavalcade that followed did not happen because of this one mistake.  As discussed in more detail below, if the process around this one mistake had been more appropriately engineered to guard the sensitive information it was processing, the missed redaction could have been caught and this entire fiasco avoided.  For the simple error in redaction, however, the court does not find that sanctions can reasonably be imposed; the harm resulting from this error alone is too small and speculative to punish when it is so clear that this act, more than any other before the court, was inadvertent.

---

[62] *See* Docket No. 2485 at 49-53.

[63] *See* Docket No. 2395 at 6 ("Bernstein analyst Pierre Ferragu *estimates* . . . Swedbank AB analyst Jari Honko *estimated* . . . Though the public filing did not disclose the sum it was paid by Apple in their patent deal, *the information would suggest*") (emphasis added).

[64] *See* Docket No. 2835-3 at 22.

12
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

**C.   March 23, 2012 – August 1, 2013:  The Incompletely Redacted Teece Report Was Widely Circulated Within Samsung In Violation Of This Court's Protective Order, And Those Hundreds Of Violations Merit Sanctions**

One inadvertent mistake resulted in the widespread distribution of confidential information to hundreds of people who were not authorized to have access to it.  Each time this information went to a new person who was not authorized to receive it under the protective order, Section 9(b) was violated, and although each individual violation here may have been as inadvertent as the initial missed redaction above, sanctions are warranted here due to the breadth/volume of violations and the fact that Samsung and its outside counsel made a conscious decision to set up a system that would allow violations of that scope to ensue from a mistake that small and, frankly, predictable.

Mr. Quinn himself candidly and tellingly described his firm in court that as "650 lawyers wide and 1 lawyer deep."[65]  In cases of this complexity, relying on such a structure to manage highly confidential information from both parties and non-parties is akin to a trapeze artist flying high without a net.  99.99% of the time, no net is required.  But in the 0.01% of the time when the trapeze fails, the net is not there, and the fall causes much more damage than it otherwise might.

The information traded by Apple and Samsung in this case was considered sufficiently valuable by both parties to merit an interlocutory appeal to the Federal Circuit to keep it protected from the public,[66] the vast majority of whom have absolutely no interest in it and no ability to use the information even if they were to discover it.  It is sufficiently valuable to merit hundreds and hundreds of pages of sealing motions, with thousands of pages more in supporting declarations.  If keeping this information from the public is worth all of that, then surely, logically, it would be

---

[65] *See* Docket No. 2581 at 60:24-25.

[66] *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 727 F.3d 1214 (Fed. Cir. 2013).

13
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

worth a second, or even a third, round of review before producing it to a competitor corporation, who would know exactly how to exploit it.  Yet this basic precaution was not put in place. Because of this "1 lawyer deep" structure, a single inadvertent mistake led to confidential information being widely distributed within Samsung.  This is unacceptable.

Even with a "1 lawyer deep" structure, the information may yet have been contained if Samsung and its executives had not adopted the practice of downloading and circulating litigation documents to the far corners of the globe.  Samsung, however, decided to mine the documents produced in the litigation for all the value they could possibly extract, an understandable position given how expensive the information was, and its legitimate goal of maintaining consistent positions in all its litigation across the world.  That said, there is always a risk that something slips through, and Samsung could just as easily have chosen to minimize the individuals exposed to litigation documents in case it did.  But it chose otherwise.  The Teece Report went to hundreds of people who were in no way involved in the Apple litigation.  Given his sudden recollection that it was the currency of the Apple/Nokia terms that allowed him to pluck them out of the redacted spreadsheet, just days after offering no such explanation while testifying under oath, the court does not find Shim's explanation that he never used the insufficiently redacted Teece Report credible. Even if others somehow missed the actual, unredacted information, the fact of the matter remains that they had no right to have the information in the first place.  This in and of itself was a substantial harm to Apple and Nokia.[67]  Samsung's suggestion to the contrary ignores its own stipulation to a protective order that prohibits "disclosure" even without use.[68]

---

[67] *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 773 (9th Cir. 1983) (affirming the imposition of sanctions where documents were not returned pursuant to the protective order, but there was no evidence of misuse or harm); *cf. Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012) (affirming the imposition of sanctions without discussing harm caused by inadvertent dissemination of confidential information to parties outside the protective order).

[68] *See, e.g.,* Docket No 687 at 24 ("good cause" shall "include an objectively reasonable concern

Having adopted this attitude of share-and-share-alike which allowed the leaked information to spread so far, Samsung is as culpable for this debacle as Quinn Emanuel. Its willful failure to institute sufficient safeguards for the information warrants sanctions when considered in light of the vast distribution of confidential information that occurred because such protections were not in place.

**D.    December 21, 2012-January 4, 2013:  Quinn Emanuel Violated Section 18(a) Of This Court's Protective Order, And That Violation Merits Sanctions**

Finally, the court must consider Quinn Emanuel's failures to follow the procedures set forth in Section 18(a) of the protective order once it learned of the inadvertent disclosures. That section, entitled "INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER" provides that "[i]n the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure."[69]

The first of these failures occurred in December of 2012. On December 21 and 22, 2012, Quinn Emanuel became aware that a document containing Apple and Nokia's confidential business information had been uploaded to a server accessible by many Samsung employees.[70] A junior associate found the information in a redacted version of the Teece Report that he personally had

---

that the Person will, advertently or inadvertently, *use or disclose* Discovery Materials"), 30 ("The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized *disclosure and/or use* thereof is made.") (emphasis added).

[69] Docket No. 687 at 30.

[70] *See* Tab No. 20.

15
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

prepared, so that it could be circulated within Samsung.[71] This was sufficient to provide Quinn Emanuel with notice that there was a problem dating back as far as March, 2012.

Yet even though this young associate raised his concerns with the senior associate and the partner responsible for guarding against these kinds of errors, Quinn Emanuel did nothing to follow up. True, the senior associate addressed the immediate issue of Shim receiving the particular copy of the unredacted report just sent.[72] If that was the first time the report had ever been circulated, that may have been enough. But it was not. That report had gone out to the client nine months earlier, and both associates knew or should have known that.

Quinn Emanuel protests that in reality, it did not know, so it should not be held accountable for the lapse,[73] an argument which fails for a number of reasons. First, at least one person at Quinn Emanuel-the junior associate who prepared the initial redactions and caught the error in December-actually knew that the report had gone out to the client FTP site in its incompletely redacted form. Again, Quinn Emanuel's "1 lawyer deep" strategy caused the problem. In a case of this size with this many resources and this much confidential information floating about, it is only reasonable to expect that a firm's left hand will know what the right hand has been doing with that information.[74] If no one on the Quinn Emanuel team was responsible for knowing what documents had gone out to the client, such that that person would have been aware that the Teece report had gone out before, that is a flaw for which the firm must be held accountable.

---

[71] *See id; see also* Docket No. 2883 at 34.

[72] *See* Docket No. 2807-15, Ex. 4.

[73] *See* Docket No. 2835-3 at 11.

[74] *See* Docket No. 2581 at 60 ("Mr. Quinn: The reason [for this problem] is that nobody put it together . . . We are 650 lawyers wide and 1 lawyer deep. And one lawyer doesn't necessarily know what another lawyer is doing.").

16
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

In order to comply with Section 18(a), to which Quinn Emanuel and its client had stipulated, Quinn Emanuel should have "immediately" picked up the phone to call Apple and let them know that there was a problem.[75] Instead, it did nothing. This conduct requires sanctions.

### E. July 1 – August 1, 2013: Quinn Emanuel Again Violated Section 18(A) Of This Court's Protective Order, And That Violation Merits Sanctions

Later, on July 1, 2013, Nokia filed a motion for a protective order in the 12-630 case, alerting Quinn Emanuel that somehow, Nokia's confidential license with Apple had gotten through the protective order shield and into Samsung's hands.[76] Quinn Emanuel, however, did not tell Apple. By July 16, 2013, at the very latest, they had concrete, actual notice that the confidential information had definitely been disclosed.[77] Still, Quinn Emanuel did not tell Apple. Despite the protective order's clear directive to "immediately notify counsel for the Producing Party," Quinn Emanuel kept the information quiet for another fifteen days while independently negotiating with Nokia, as though hoping that would make the problem go away.[78] Clearly, that hope was misplaced.

## IV. REMEDIES

Having concluded that its protective order was repeatedly violated and at least some of these violations warrant sanctions, the court must consider what sanctions would be appropriate in this case. Apple and Nokia propose a number of creative sanctions that Quinn and Samsung should face in light of their misconduct, suggesting everything from an injunction against Samsung in the

---

[75] *See* Docket No. 687 at 30.

[76] Quinn Emanuel argues that this motion alone provided Apple with the required notice under the protective order, as it is on the ECF notification list-serve. *See* Docket No. 2883 at 45-46. However, there is no reason whatsoever that a motion by a third party for a protective order based on unsubstantiated allegations would serve to provide the notice required under Section 18(a). Apple was entitled to a phone call, or at least an email.

[77] *See* Docket No. 2395-3 at 2.

[78] *See id.* at 2-3.

17
Case No. 5:11-cv-01846-LHK (PSG)
ORDER GRANTING MOTION FOR SANCTIONS

12-630 case[79] to a ten-year ban from representing any party adverse to Nokia.[80] The vast majority of these are ludicrously overbroad, such as the suggestion that both Samsung and Quinn Emanuel should be banned from any situation in which they might make use of licensing information for the next two years.[81] Although the evidence has shown Quinn Emanuel failed to notify the relevant parties at the relevant times, and that Shim made use of the information, there has been insufficient evidence that this failure to notify or misuse ultimately implicated any issue in this or any other litigation or negotiation. By the final hearing on December 9, 2013, this lack of clear evidence was obvious in the tone of the moving parties. Apple and Nokia's allegations had shifted, acknowledging that the evidence of misuse is "circumstantial,"[82] must overcome facial "inconsistencies,"[83] and that even they could only characterize it as "more likely than not" that the information had been used.[84] In short, what began as a chorus of loud and certain accusations had died down to aggressive suppositions and inferences, and without anything more, Quinn Emanuel and Samsung cannot reasonably be subject to more punitive sanctions.

Quinn Emanuel shall reimburse Apple, Nokia, and their counsel for any and all costs and fees incurred in litigating this motion and the discovery associated with it, as required by Rule 37 in the absence of "substantial justification" or other showing of "harmlessness," neither of which the court finds here. That expense, in addition to the public findings of wrongdoing, is, in the

---

[79] *See* Docket No. 2838-3 at 19.

[80] *See* Docket No. 2836-4 at 24.

[81] *See* Docket No. 2838-3 at 18.

[82] Docket No. 2873-3 at 4.

[83] Docket No. 2872-5 at 1-2.

[84] Docket No 2873-3 at 4.

court's opinion, sufficient both to remedy Apple and Nokia's harm and to discourage similar conduct in the future.

For the remainder of the 11-1846 and 12-0630 cases, before distributing or filing redacted documents, Quinn Emanuel and any other firm representing Samsung, shall send the redacted versions to Apple's counsel for their review and approval. Apple and its counsel shall adopt a similar practice.

Finally, with Apple and Nokia's consent, Quinn Emanuel shall be responsible for ensuring that all copies of the Teece report containing confidential information are deleted, erased, wiped, or otherwise permanently removed from Samsung's control within fourteen days of this order.

**IT IS SO ORDERED.**

Dated: January 29, 2014

_____
PAUL S. GREWAL
The United States Magistrate Judge