UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., A Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, <br><br> Defendants. | Case No.: 11-CV-01846-LHK <br><br> ORDER DENYING SAMSUNG'S MOTION FOR JUDGMENT AS A MATTER OF LAW, REMITTUR, OR A NEW TRIAL; DENYING APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND OTHER POST-TRIAL RELIEF |

On November 21, 2013, after six days of trial and two days of deliberation, a jury awarded Apple roughly $290 million in damages for Samsung's infringement of three U.S. utility patents and two U.S. design patents. *See* Dkt. 2822 ("November 2013 Jury Verdict"). That verdict was not the first damages verdict in this case. Fifteen months earlier, a different jury had sided with Apple and awarded roughly $1.049 billion on its infringement and trade dress claims against Samsung. *See* Dkt. 1931 ("August 2012 Amended Jury Verdict"). Samsung successfully moved for judgment as a matter of law as to that first award, based on a theory that Apple's damages numbers relied on improper notice dates. *See* 35 U.S.C. § 287(a) (predicating infringement damages in certain circumstances on proof that "the infringer was notified of the infringement and continued to infringe thereafter"). Because Apple had not presented sufficient evidence to recalculate the

1

appropriate damages award for some of the infringing sales at issue in light of the proper notice dates, the Court struck approximately $410 million from the first award and ordered a limited new trial on damages relating only to those sales. *See* Dkt. 2271 at 26 ("Retrial Order"); 2316 at 2 (Case Management Order reinstating portion of original jury award). The November 2013 verdict is the result of that retrial.

The parties have now filed post-trial motions addressing the jury's latest verdict. Specifically, Apple seeks additur, supplemental damages, and prejudgment interest, *see* Apple's Motion for Judgment as a Matter of Law ("Apple JMOL"), Dkt. 2876, and Samsung has moved for judgment as a matter of law, remittitur, and a new trial, *see* Samsung's Motion for Judgment as a Matter of Law ("Samsung JMOL"), Dkt. 2877.[1] The Court held a hearing on the post-trial motions on January 30, 2014. For the following reasons, the Court DENIES each of the parties' requests.

## I.     LEGAL STANDARD

Rule 50 permits a district court to grant judgment as a matter of law "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). A party seeking judgment as a matter of law after a jury verdict must show that the verdict is not supported by "substantial evidence," meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).

A new trial is appropriate under Rule 59 "only if the jury verdict is contrary to the clear weight of the evidence." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). A court should grant a new trial where necessary "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

---

[1] Apple has also renewed its request for a permanent injunction. *See* Dkt. 2897. The Court will address that renewed request in a separate order.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

## II.  APPLE'S REQUEST FOR SUPPLEMENTAL DAMAGES AND PREJUDGMENT INTEREST

Apple renews its request for the Court to award supplemental damages for infringing products sold after August 25, 2012, and for prejudgment interest based on the two verdicts and supplemental damages. Apple JMOL at 6-8. The Court previously decided to wait until the appeals of this case are resolved to begin the process of calculating supplemental damages and prejudgment interest. *See* Retrial Order at 6, 8 (citing *Intron, Inc. v. Benghiat*, 2003 WL 22037710, at *16 (D. Minn. 2003); *Eolas Techs., Inc. v. Microsoft Corp.*, 2004 WL 170334 at *8 (N.D. Ill. 2004), *vacated in part on other grounds*, 399 F.3d 1325 (Fed. Cir. 2005)). Apple asks the Court to reconsider this decision because Samsung is no longer selling any of the infringing products "and the Court can now readily compute a final total." Apple JMOL at 6.

The Court declines Apple's invitation to revisit its decision. Even Apple acknowledges that proceeding with an accounting now will require additional discovery. *See id.* at 7-8. The Court maintains its conclusion that obtaining the Federal Circuit's guidance, both as to the merits as well as to how to calculate supplemental damages, before proceeding with an accounting is the most efficient and acceptable way to proceed. *See* Retrial Order at 3-6. Accordingly, Apple's request to proceed with discovery and an accounting of supplemental damages and prejudgment interest is DENIED.

## III.  THE PARTIES' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

The jury's November 2013 verdict awarded a lump sum to Apple in the amount of $290,456,793, broken down only by product.[2] Before evaluating the propriety of this award, the

---

[2] The jury awarded the following damages amounts for each infringing product:

| Samsung Product | Jury Award |
|---|---|
| Captivate | $21,121,812 |
| Continuum | $6,478,873 |
| Droid Charge | $60,706,020 |
| Epic 4G | $37,928,694 |
| Exhibit 4G | $2,044,683 |
| Galaxy Prevail | $22,143,335 |
| Galaxy Tab | $9,544,026 |
| Gem | $4,831,453 |
| Indulge | $9,917,840 |

(footnote cont'd)

3

Court must determine whether it may deconstruct the overall award into the three categories of damages that Apple sought at trial: (A) Apple's lost profits for certain of Samsung's sales that infringed Apple's U.S. Utility Patent No. 7,844,915 (the "'915 Patent"); (B) a reasonable royalty for Samsung's remaining sales that infringed the '915 Patent and sales that infringed one or both of Apple's U.S. Utility Patent Nos. 7,864,163 (the "'163 Patent") and 7,469,381 (the "'381 Patent"); and (C) Samsung's profits for Samsung's sales that infringed two Apple design patents (U.S. Design Patent Nos. D604,305 (the "D'305 Patent") and D618,677 (the "D'677 Patent")).

Samsung contends that the jury awarded all the lost profits and reasonable royalties Apple requested and the average of the infringer's profits the parties requested. Samsung JMOL at 3-4. Although Apple argues that Samsung improperly "deconstruct[s] the verdict," it does not seriously contend that the jury awarded anything less than the full amount Apple requested in lost profits and reasonable royalties. *See* Apple Opp. at 2-4 (contesting "Samsung's proffered deconstruction" of the jury verdict only as to the award of Samsung's profits). Indeed, in its own motion for judgment as a matter of law, Apple acknowledges that "the jury awarded Apple all its requested lost profits and reasonable royalty damages." Apple JMOL at 2; *see* Dkt. 2885-1 at 2 n.2 (Apple's notice of errata to its motion acknowledging that "[t]he damages awarded for the six products for which Apple sought only Apple's lost profits and a reasonable royalty were identical to the damages calculated by [Apple's damages expert]."). In light of these concessions by Apple, the Court assumes the jury adopted Apple's proposed lost profits and reasonable royalty calculations. The Court will separately address the award of Samsung's profits below.

---

(footnote cont'd from previous page)

| Samsung Product | Jury Award |
|-----------------|------------|
| Infuse 4G | $99,943,987 |
| Nexus S 4G | $10,559,907 |
| Replenish | $3,046,062 |
| Transform | $2,190,099 |

Dkt. 2822 at 1-2.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

## A. The Jury's Award of Lost Profits Damages

The jury awarded $113,777,344 in lost profits to Apple for Samsung's infringement of the '915 Patent.[3] At trial, Apple based its entitlement to lost profits on the four factors enumerated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978): (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) capacity to exploit the demand, and (4) the amount of profit Apple would have made but for Samsung's infringement. Samsung challenges the bulk of Apple's lost profits award for failure to establish factors two and four. *See* Samsung JMOL at 6-22. Samsung also challenges the award of lost profits as to the Galaxy Tab based on Apple's alleged lack of capacity to make additional tablet sales (*Panduit* factor 3). *See id.* at 23-24. The Court has little trouble concluding that Apple presented sufficient evidence to support the jury's lost profits award.

The Court already rejected Samsung's sufficiency arguments as to Apple's lost profits theory after the first trial, concluding that Apple's evidence "constitute[d] exactly the type of economic evidence of causation that the Federal Circuit requires in sustaining an award of lost profits." Retrial Order at 14 (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001)). For the retrial, the Court restricted Apple's damages expert to the same lost profits theory. *See* Dkt. 2316 at 3.[4] Apple complied with that restriction, presenting the same evidence of entitlement to lost profits through its retrial damages expert, Julie Davis, as it did through its first damages expert, Terry Musika. *Compare* 2013 Tr. 665:14-671:22; PX 25F.8 (Davis expert testimony and exhibits relating to the market share of various smartphone manufacturers, based on data collected and analyzed by independent research firm IDC) *with* 2012 Tr. 2084:23-2085:9; PX 25A1.8 (same from Musika); *compare* 2013 Tr. 671:24-676:17; PX25F.14-15 (Davis testimony and exhibits relating to Apple's capacity to manufacture additional phones and tablets) *with* 2012 Tr. 2085:13-2086:3; PX25A1.14-15 (same from Musika); *compare*

---

[3] Roughly speaking, the '915 patent covers touch-to-scroll and pinch-to-zoom technology. *See Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1358 (Fed. Cir. 2013).
[4] Because Apple's damages expert from the first trial passed away in December 2012, the Court permitted Apple to substitute a new damages expert, but prohibited her from relying on "(1) new sales data . . . ; (2) new products; and (3) new methodologies or theories." Dkt. 2316 at 3.

5

1    2013 Tr. 650:5-660:12 (Davis testimony about survey and other evidence indicating demand) *with*

2    2012 Tr. 2076:3-2083:3 (same from Musika).

3       What is more, in pre-trial motions for the damages retrial, Samsung successfully restricted

4    Apple's lost profits case in the retrial to damages on the '915 Patent alone—even though Apple

5    obtained a verdict of lost profits damages as to all three utility patents in the first trial. *See* Dkt.

6    2719 (Nov. 12, 2013 Order granting Samsung's emergency motion to exclude).[5] If anything, Apple

7    spent more time eliciting testimony during the retrial in support of its identical lost profits theory,

8    bolstering its arguments to the jury for lost profits damages under the '915 patent alone. *See* 2013

9    Tr. 688:23-690:16 (Davis relying on Apple's profits and loss statements in PX181); *id.* 508-509

10    (Apple's vice president of procurement testifying about Apple's iPad capacity and PX182).

11    Samsung fails to explain how Apple's previously adjudged "adequate" evidence has become

12    insufficient to support Apple's trimmed lost profits claim in this trial.

13       Samsung did not introduce any additional evidence at the retrial that required the jury to

14    now reject Apple's request for lost profits damages. Samsung presented largely the same types of

15    evidence in the retrial that it elicited in the first trial. *Compare* Samsung JMOL at 6-12, 18-22

16    (compiling cross-examination evidence of Davis and Hauser regarding alleged failure to focus on

17    demand for the patented features) *with* 2012 Trial Tr. 2124:19-2135:22 (cross examination of

18    Musika regarding alleged lack of demand for the patented features); *id.* 2142:20-2143:24 (same);

19    *id.* 2151:4-2159:24 (same); *id.* 1923:5-1945:14 (cross examination of Hauser as to whether his

20    surveys accurately reflect market demand for the patented features); *compare* Samsung JMOL at

21    23-24 (compiling evidence of Apple's alleged lack of capacity for the iPad 2) *with* 2012 Trial Tr.

22    3046:25-3047:8 (Samsung's damages expert testifying as to alleged lack of capacity for the iPad

23    2).

---

24

25   [5] In a ruling prior to the damages retrial, the Court held that, for purposes of claiming lost profits
on a particular patent, potential design arounds for that patent must be considered as of the date of
26   first infringement rather than the date the defendant received notice of the infringement. *See* Dkt.
2660. Because Davis conceded that shifting the design around dates for the '381 and '163 Patents
27   meant that Samsung would have designed around those two patents by the date Samsung received
notice of them, Apple was unable to claim lost profits for those patents and was forced to rely
28   solely on a claim for reasonable royalties. *See* Dkt. 2719.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

During the damages retrial, Samsung presented two proposed noninfringing alternatives that Samsung was unable to present at the first trial. In particular, the first jury found that Samsung's Galaxy Ace and Intercept smartphones did not infringe the '915 Patent. *See* August 2012 Amended Jury Verdict at 3. During the retrial, Samsung relied on the first jury's noninfringement finding as to those two phones to argue to the retrial jury that Apple failed to show the absence of acceptable noninfringing alternatives. *See, e.g.*, 2013 Trial Tr. 468:23-470:11; PDX 29.21-.22. The retrial jury, however, reasonably rejected Samsung's noninfringing alternatives defense.

As to the Galaxy Ace, Apple told the jury that the first jury found that this phone infringed Apple's '163 and '381 Patents. *See* 2013 Trial Tr. 1188:4-5. For that reason, the jury could have concluded that the Galaxy Ace was not an available noninfringing alternative. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548 (Fed. Cir. 1995) (en banc) (affirming factual lost profits finding where "the only substitute for the patented device was . . . another of the patentee's devices" and therefore "*being patented by [the patentee]*, it was not available to customers except from [the patentee]") (emphasis added).[6] Samsung highlights Davis's concessions that design arounds for the '381 and '163 patents would have been complete before the Galaxy Ace came on the market, *see* 2013 Trial Tr. 1200:23-1201:7, 1201:9-17, and contends that those concessions preclude Apple from arguing that the '381 and '163 Patents rendered the Galaxy Ace unavailable. Although compelling, the jury was not required to credit that design around argument in light of the fact that Samsung had not in fact developed a version of the Galaxy Ace that did not infringe the '381 and '163 Patents.

As to the Intercept, the evidence showed that that phone was a 10-month-old device at the time of the lost profits period with a small, low-resolution screen and a slide-out physical

---

[6] In a pre-trial ruling, the Court held, over Apple's objection, that the Federal Circuit's decision in *Rite-Hite* did not prevent, as a matter of law, Samsung from arguing at trial that the Galaxy Ace was an available noninfringing alternative even though it infringed other Apple patents. *See* Dkt. 2657 at 8-13. Nonetheless, Rite-Hite makes clear that, as a "question of proof," 56 F.3d at 1548, the jury could permissibly conclude that the Galaxy Ace was not in fact available because it infringed other patents.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

keyboard. *See* DX952.014; JX1009; 2013 Trial Tr. 1186:19-21. Moreover, the phone ranked below the industry average—and well below the iPhone 4 and iPhone 3GS—in a 2011 J.D. Power customer satisfaction survey that included Samsung customers. *See* PX69.84-.85. From this evidence, the jury could have concluded that the Intercept was not an acceptable alternative.

Finally, Samsung argues that it could have easily and quickly implemented the noninfringing touch-to-scroll, pinch-to-zoom technology imbedded in the Intercept and Galaxy Ace in another phone. *See* Samsung JMOL at 16-17. However, Samsung presented no evidence to that effect. The jury permissibly disagreed with Samsung's attorney argument. Samsung's request for judgment as a matter of law as to the jury's lost profits award is therefore DENIED.

## B. The Jury's Award of Reasonable Royalty Damages

The jury awarded Apple the $34,625,194 in reasonable royalty damages that it requested. The Court holds that substantial evidence supports this award. Through Davis, Apple provided expert testimony as to a reasonable royalty rate on which the parties would have agreed in a hypothetical negotiation based on an evaluation of a number of factors. In particular, Davis testified that she evaluated "the cost[s] to Samsung of being out [of] the market long enough to design around the patents in this case," 2013 Trial Tr. 705:19-21 ("Cost Approach"), the "profits . . . attributable to [Samsung's] use of [the] technology[,]" *id.* 705:23-24 ("Income Approach"), the demand for the patented features, *see id.* 649:25-650:4, 650:20-660:10, and the "relationship between the parties," *id.* 706:23-707:6.

Using her Cost Approach, Davis calculated Samsung's expected costs of not obtaining a license for each patent (i.e., its costs of being off the market for a period of time and its costs of designing around each of the patented features). For the '381 Patent (which covers bounce-back technology), Davis calculated Samsung's estimated costs at $0.85 for smartphones and $0.98 for tablets. For the '915 Patent, Davis calculated Samsung's estimated costs at $1.30 for smartphones and $1.50 for tablets. For the '163 Patent (which covers tap-to-zoom, tap-to-center technology), Davis calculated Samsung's estimated costs at $0.85 for smartphones and $0.98 for tablets. *See* PX25F.16.

8

Using her Income Approach, Davis evaluated Samsung's estimated profits from obtaining a license to the technology at $0.52 to $4.03 for the '381 Patent, $0.80 to $6.20 for the '915 Patent, and $0.52 to $4.03 for the '163 Patent. *Id.* After considering the fifteen *Georgia-Pacific* factors and their relative weight, Davis settled on a reasonable royalty rate for each patent that fell a little below halfway between her estimated profit ranges. *See id.* (listing Davis's proposed final per unit royalty rate at $2.02 for the '381 patent, $3.10 for the '915 Patent, and $2.02 for the '163 Patent). The jury reasonably relied on Davis's calculations in setting its reasonable royalty award.

Other evidence supported the jury's adoption of Apple's reasonable royalty number. Apple's technical experts established evidence of demand for the patented features by testifying that Samsung's own documents indicated that Samsung had studied and decided to adopt the features of the utility patents-in-suit based on their embodiment in Apple's products. *See* 2013 Trial Tr. 422:9-19, 450:6-11 (describing PX57 at 73 and PX38 at 24). Moreover, numerous witnesses and documents supported Apple's claim that the parties' relationship was (and is) highly competitive. *See id.* 848:10-849:16 (testimony from Apple's senior vice president of worldwide marketing), *id.* 1106:11-1110:16 (Samsung's damages expert acknowledging competition), PX62 (Samsung document entitled "iPhone 5 Counter Strategy") (capitalization removed).

Samsung challenges the evidence presented at the retrial on two grounds. As set forth below, although the Court finds Samsung's challenges warrant careful evaluation in light of a number of recent Federal Circuit opinions closely scrutinizing the propriety of large reasonable royalty awards, the Court ultimately concludes that neither challenge warrants upsetting this jury's damages award.

### 1. Davis's *Georgia-Pacific* Analysis

Samsung first contends that the *Georgia-Pacific* analysis Davis used in reaching her proposed reasonable royalty rate was insufficient under *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012). In *Whitserve*, the Federal Circuit held that a defendant's motion for judgment as a matter of law against a reasonable royalty award should have been granted, in part because the patentee's expert proffered only a "superficial recitation of the *Georgia-Pacific* factors." *Id.* at 31; *see id.* ("[R]eciting each factor and making a conclusory remark about its impact

9

on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration.").

Taken as a whole, Davis's reasonable royalty opinion overcomes the concerns raised in *Whitserve*. In her testimony related to a reasonable royalty, Davis emphasized factor 5 (the competitive relationship between the parties). *See* 2013 Trial Tr. 706:21-707:6 (Davis confirming that this factor is "particularly relevant"). She also relied on the demand for the patented features, *see id.* 650:20-659:17; *id.* 649:25-650:4 (testifying that demand is "relevant to the determination of the amount of reasonable royalties")—which is relevant to at least factor 8 (commercial success of the product made under the patent), factor 9 (utility and advantages of the patented technology), and factor 11 (infringer's use of the invention and the value of that use). Although Davis might have spent more time testifying about the quantifiable impact of the *Georgia-Pacific* factors on her final royalty rate, even *Whitserve* acknowledges that, when conducting such an analysis, "mathematical precision is not required." 694 F.3d at 31.

Although not itself admitted into evidence, Davis's expert report further supports the jury's award here. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (holding that questions challenging an expert's damages model "should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert*" and not "[u]nder the guise of sufficiency of the evidence."). In her expert report, Davis supported the reasonable royalty opinion she ultimately gave to the jury by describing and adopting Musika's full analysis of the *Georgia-Pacific* factors, including those factors that Davis and Musika found to be "neutral," as well as the factors Davis emphasized at trial. *See* Dkt. 2517-4 ("Davis Rep.") ¶¶ 198-251, Exhibits 42, 43, 46-S, 47-S. Indeed, Samsung never challenged the admissibility of Apple's experts' reasonable royalty opinions prior to trial on the basis that they failed to analyze the *Georgia-Pacific* factors sufficiently. *See* Dkt. 927-1 at 4-7 (Samsung *Daubert* motion); 1157 at 11-13 (*Daubert* Order). In light of Davis's trial testimony and the support in her expert report, the Court concludes that Davis's reasonable royalty opinion satisfies the *Whitserve* requirement that

experts using the *Georgia-Pacific* factors "should concentrate on *fully* analyzing the *applicable* factors" rather than "cursorily reciting all fifteen." 694 F.3d at 31 (emphases in original).[7]

### 2. Apportionment Between Patented and Unpatented Features

The second ground on which Samsung challenges the reasonable royalty award is Apple's alleged failure to "'give evidence tending to separate or apportion the defendants' profits and the patentee's damages between the patented feature and the unpatented features.'" Samsung JMOL at 26 (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)). The Court, however, agrees with Apple that Davis sufficiently accounted for the patented and unpatented features in proposing a royalty rate to the jury. In particular, in selecting a rate from the range of possible rates derived from her Income Approach, Davis explicitly stated in her expert report that she adopted Musika's "apportioning [of] [Samsung's] profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property." Davis Rep. Exhibits 46-S, 47-S. As this Court similarly stated in response to Samsung's *Daubert* challenge prior to the first trial, "while Samsung may disagree with [Ms. Davis's] apportionment . . ., [her] basic income approach methodology is sound and is not subject to exclusion under FRE 702 and *Daubert*." *Daubert* Order at 12; *see Versata*, 717 F.3d at 1264. Moreover, Davis's testimony that she used as a check on her proposed royalty rate "the costs to Samsung of being out [of] the market long enough to design around *the patents in this case*," 2013 Trial Tr. 705:19-20 (emphasis added), provided yet another indication that she adequately measured the value of the patented features, rather than the unpatented features, in calculating a reasonable royalty.

---

[7] *Whitserve* is distinguishable for yet another reason. The expert in *Whitserve* calculated a reasonable royalty rate by starting from a "now discarded rule of thumb that assumes the patentee would get about 25% of the infringer's expected profit" and relying on the *Georgia-Pacific* factors to increase that rate to one that appeared to be up to 86.75% of the infringer's profit. *Id.* at 31-33. In other words, the expert in *Whitserve* used a "bare-bones *Georgia-Pacific* analysis" to approximately triple his starting royalty rate. *Id.* at 33. Davis did not similarly inflate her starting rate using the *Georgia-Pacific* factors. Instead, the record makes clear that Davis picked a rate below the midpoint of the estimated profitability ranges of the relevant products in light of the design-around costs to Samsung and the *Georgia-Pacific* factors. *See* PX25F.16.

This is not a case like *Uniloc*, where the patentee relied on the entire market value rule (i.e.,

assessing damages based on a percentage of the entire market value of the accused product)

without a showing that "'the entire value of the whole machine, as a marketable article, is properly

and legally attributable to the patented feature.'" 632 F.3d at 1318 (quoting *Garreston v. Clark*,

111 U.S. 120, 121 (1884)). Here, Davis did not purport to rely on the entire market value rule, nor

has Samsung accused her of doing so. Davis's determination of a royalty rate based on an

apportionment of the results of her Income Approach as well as the cost to Samsung of proceeding

without a license to the patented technology (as opposed to a royalty rate that equals a percentage

of Samsung's overall revenue for sales of the infringing product) gave the jury sufficient evidence

to account for the unpatented features of the infringing phones.

For the foregoing reasons, Samsung's request for judgment as a matter of law as to the

jury's reasonable royalty award is DENIED.

### C. The Jury's Award of Infringer's Profits

The remainder of the jury award ($142,054,256)—the portion not attributable to lost profits

or reasonable royalties—is based on Samsung's profits for its infringement of the D'305 and D'677

Patents. Section 289 of Title 35 authorizes damages for design patent infringement of the amount

of the infringer's "total profit" for each infringing sale. At trial, the parties agreed on Samsung's

gross revenues from infringing sales ($854 million) and essentially agreed on the deductible costs

of goods related to those sales ($623 million). *See* 2013 Trial Tr. 692:1-11; 692:25-693:8; 1014:21-

1015:4; PDX100.17. The parties centrally disputed the amount of operating expenses to be

deducted from Samsung's gross revenues. Davis testified that none of Samsung's claimed

operating expenses was directly attributable to the infringing products and therefore Apple's

infringer's profits award should be Samsung's gross revenues less its costs of goods, or

approximately $231 million. *See* 2013 Trial Tr. 702:24-703:3. Samsung's damages expert, Michael

Wagner, testified that all Samsung's operating expenses—including Samsung's overall logistical,

advertising, temporary staffing, insurance, depreciation, travel, research and development, and

general and administrative expenses, *see* 2013 Trial Tr. 961:4-964:10; SDX3960.002,

SDX7001.005—should be allocated to each infringing phone and also deducted from Samsung's

12

1    gross revenues, *see id.* 1015:5-16; DX676. After deducting operating expenses, Mr. Wagner

2    proposed a total infringer's profits award of approximately $53 million. *See* DX781.002.

3    The jury's award of infringer's profits falls exactly halfway between each side's proposed

4    award. Samsung notes that this award of infringer's profits can also be viewed as 61.3960645% of

5    Davis's proposed infringer's profits award. Samsung JMOL at 3.

### 1.    Samsung's Motion for Judgment as a Matter of Law

7    Samsung's motion for judgment as a matter of law as to the jury's infringer's profits award

8    is based on two distinct challenges: (a) the jury entered an improper compromise verdict, and

9    (b) the jury improperly double counted infringing sales by awarding two types of damages for

10   certain infringing sales. The Court addresses both challenges in turn.

### a.    Compromise Verdict

12   Samsung first contends that the jury's infringer's profit award is an improper compromise

13   verdict. *See* Samsung JMOL at 28-29. This challenge is easily dismissed. A compromise verdict

14   "'is one reached when the jury, *unable to agree on liability*, compromises that disagreement and

15   enters a low award of damages.'" *Romberg v. Nichols*, 970 F.2d 512, 521 (9th Cir. 1992) (quoting

16   *Nat'l R.R. Passenger Corp. v. Koch Indus.*, 701 F.2d 108, 110 (10th Cir. 1983)) (emphasis added),

17   *vacated on other grounds*, *Nichols v. Romberg*, 506 U.S. 1075 (1993). Here, liability was not at

18   issue because the first jury had already found that Samsung infringed Apple's valid patents. "Proof

19   of damages is governed by a less strict standard than proof of liability." *Landes Const. Co., Inc. v.*

20   *Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987). The Court agrees with Apple that the

21   jury in the damages retrial "was entitled to choose a damages award within the amounts advocated

22   by the opposing parties." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011).

### b.    Double Counting

24   Samsung's second challenge warrants a more extensive analysis. Samsung attacks the

25   jury's infringer's profits award on the ground that the verdict is the result of improper double

26   counting. More specifically, Samsung contends that the jury improperly awarded both lost profits

27   and infringer's profits for the same infringing sales. The jury was instructed that it could not award

28   lost profits or reasonable royalties on any sales for which it also awarded infringer's profits. *See*

13

Dkt. 2784 at 42 (Final Jury Instruction No. 34). Samsung contends that the jury disobeyed this instruction by averaging the parties' overall proposed infringer's profits awards even though Davis and Wagner disagreed as to the number of infringing sales to be used to calculate the infringer's profit award. Samsung JMOL at 30. Because Wagner's infringer's profits calculation captured some phones that Davis included in her lost profits calculation, Samsung contends the jury's averaging of the two proposals impermissibly awarded two forms of damages for the same infringing sale.

An example will help clarify the purported problem. The controversy here stems from the jury's damages award for the Infuse 4G ($99,943,987), which infringes both the '915 Patent and the D'677 Patent. Davis used a two-step process to calculate damages for the Infuse 4G. First, Davis opined, and the jury indisputably accepted, that Apple was entitled to $43,968,916 in lost profits for Infuse 4G sales that would have gone to Apple but for the infringement. *See* PX25G1.2. Second, with respect to all other sales of the Infuse 4G—i.e., sales that Samsung would have kept (for example because of a customer's loyalty to Samsung), sales that would have gone to a third-party, or sales that occurred after the design-around period—Davis opined that Apple was entitled to $91,165,035 in infringer's profits. *See* PX25G1.4. In contrast, Wagner did not believe Apple was entitled to any lost profits, and therefore he attributed *all* the Infuse 4G sales to his proposed infringer's profits award of $42,942,776. *See, e.g.*, 2013 Trial Tr. 994:20-995:1; DX781.002. Samsung contends that the jury necessarily and improperly awarded Apple lost profits and infringer's profits damages on some of the same Infuse 4G sales by adopting Davis's lost profits number, which captures some of the infringing Infuse 4G sales, and by also relying on Wagner's infringer's profits award, which captures all the infringing Infuse 4G sales including those that were part of Davis's lost profits calculation.

The Court finds that if Samsung is correct that the jury averaged both sides' proposed infringer's profits award, then Samsung is also correct that the jury improperly double counted. For the following reasons, however, Samsung's attempt to deconstruct the jury's infringer's profits award goes too far.

As an initial matter, the standard for evaluating a jury's damages verdict is generally lenient. The Court "must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). It will be a "rare case in which it is sufficiently certain that the jury['s damages] award was not based on proper consideration of the evidence" and therefore cannot stand. *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).

The proceedings here do not suggest that this is such a case. In the two cases on which Samsung relies to contend that the Court should reverse engineer the jury's infringer's profits award, the Court of Appeals was concerned with whether the jury had relied on an *expert's* "incorrect damages calculation." *Id.* at 1002; *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338 (Fed. Cir. 2009) ("What *Lucent's licensing expert proposed* here does not comport with the purpose of damages law or the entire market value rule.") (Emphasis added). Similarly, when this Court closely examined the jury verdict from the first trial, the Court did so out of concern that "the jury's awards for patent infringement . . . [were] based on *Mr. Musika's numbers*," which used "[erroneous] early notice dates." Retrial Order at 18 (emphasis added). Here, in contrast, Samsung maintains that its expert's damages analysis was proper, but that the jury nonetheless acted improperly because it relied on only part of his conclusions. In other words, Samsung asks the Court to conclude that the jury ignored the Court's instructions and reached an improper damages verdict all on its own, even though the Court has no reason to believe the jury was led even partially astray by improper expert testimony. In these circumstances, precedent does not require the Court to deconstruct the jury's award in search of error.

In any event, the Court does not agree with Samsung that the jury's error here is a "mathematical certainty." Samsung Reply at 2 n.1. Unlike the breakdown of the overall award between lost profits, reasonable royalties, and infringer's profit, Samsung fails to justify its contention that the jury *must have* settled on an infringer's profits amount by averaging the two experts' overall infringer's profits proposals. Even Wagner's declaration in support of Samsung's motion for judgment as a matter of law does not say the jury necessarily reached its conclusion in

15

the way Samsung suggests; instead, Wagner merely concludes that "[t]he percentage applied by the jury [to each product that infringed a design patent], 61.3980645%, *can be calculated* by averaging the Samsung profits numbers presented by Ms. Davis . . . and myself." Dkt. 2979 ¶ 14 (emphasis added).

Just as likely, the jury could have halved the overall operating expenses deducted by Wagner ($178,638,595) and deducted that halved amount ($89,319,298) from Davis's proposed infringer's profit award ($231,373,554). Following that logic, the jury would have arrived at the same number for an overall infringer's profits award ($142,054,256) and the same percentage reduction of Davis's proposed infringer's profit award (61.3980645%). Under this scenario, however, the jury would have relied solely on Davis's proposed infringer's profit award as a starting point—which indisputably did not include the lost profits units—and used only Wagner's overall operating expenses figure to reduce that amount. Thus, the jury would not have used Wagner's ultimate infringer's profit figure. In this way, the jury's award could still be a permissible choice "within the amounts advocated by the opposing parties," *Spectralytics*, 649 F.3d at 1347, without double counting any lost profits sales. Samsung does not explore, much less rebut, this or any other possible explanation for the jury's award. Because "juries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and because the Court is able to construe the evidence here in a way that is consistent with the jury's verdict, *see Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 189 (9th Cir. 1989), the Court concludes the jury reached its verdict without double counting.

Accordingly, Samsung's motion for judgment as a matter of law as to the jury's infringer's profits award is therefore DENIED.[8]

---

[8] Samsung also challenges the jury's infringer's profits award on the ground that Samsung's profit was not attributable to its infringement of Apple's design patents. Samsung JMOL at 30. Samsung acknowledges, however, that the Court has already rejected this argument as "clearly foreclosed by Federal Circuit precedent." Retrial Order at 12 (citing *Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1442-43 (Fed. Cir. 1998)); *see Nike Inc.*, 138 F.3d at 1441 ("'It is expedient that the infringer's entire profit on the article should be recoverable,' for 'it is not apportionable' . . . .") (quoting H.R. Rep. No. 1966 at 1 (1886), *reprinted in* 18 Cong. Rec. 834 (1887)). Samsung provides no basis for the Court to reconsider that conclusion now, and the Court declines to do so.

16

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Apple also moves for judgment as a matter of law on the award of infringer's profits, contending that "[t]he only reasonable conclusion that the jury could have reached . . . was that Apple is entitled to the full amount of Samsung's profits." Apple JMOL at 2. Apple made a similar request for additur after the first trial. The Court rejects Apple's request now just as it did then. *See* Retrial Order at 2. The Seventh Amendment prohibits a judicial increase in a damages award made by a jury. *See Dimick v. Schiedt*, 293 U.S. 474, 486-87 (1935). The jury heard the parties' competing evidence and argument as to how much of Samsung's operating expenses the jury should deduct from Samsung's infringement revenues. The reasonableness of Samsung's proffered overhead allocation formula—based on a three-step methodology that Samsung Telecommunications America's Vice-President of Finance and Operations testified the company used in the ordinary course of business, *see* 2013 Trial Tr. 964:18-965:22, 967:14-17—was a dispute for the jury to resolve. *See Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378, 401 (S.D.N.Y. 2004), *aff'd*, 153 F. App'x 703 (Fed. Cir. 2005) ("'The reasonableness of the proffered overhead allocation formula is a question of fact in all cases.'") (quoting *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 105 (2d Cir. 1999)). The jury partially credited both sides' positions and reached a reasonable decision. The Court will not disturb the verdict. Apple's request for judgment as a matter of law is therefore DENIED.

## IV. SAMSUNG'S NEW TRIAL MOTIONS

Samsung alleges two bases on which the Court should grant it a new trial. Both bases allege that Apple made improper and prejudicial arguments at trial. The Court is not convinced by either.

### A. Apple's References to Samsung's Revenues From Infringing Sales

First, Samsung argues that Apple improperly referenced Samsung's total infringing revenues 15 times during trial. *See* Samsung Reply at 21. Samsung, however, made no contemporaneous objection to any of these references. At no time during trial did Samsung raise with the Court the concern it raises now: that Apple was improperly presenting an irrelevant revenue number in order to make Apple's requested damages seem relatively insignificant. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("[A]llowing a party to wait to

1    raise the error until after the negative verdict encourages that party to sit silent in the face of

2    claimed error.").

3         Although Samsung successfully raised a pre-trial objection to certain slides that Apple

4    planned to use during Davis's infringer's profits testimony, Samsung's two-and-a-half line pre-trial

5    objection was sustained and was limited to those particular slides. *See* Dkt. 2700 at 2 (objecting to

6    PDX100.7, PDX100.30, PDX100.31, and PDX100.34); *see also* Dkt. 2721 (sustaining objections).

7    Pointing to the Court's pre-trial ruling sustaining that objection and citing Fed. R. Evid. 103(b),

8    Samsung contends that it did not need to renew its objection during trial. Samsung Reply at 23; *see*

9    Fed. R. Evid. 103(b) ("Once the court rules definitively on the record — either before or at trial —

10   a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). But

11   Rule 103(b) applies to preserving claims of error as to an adverse ruling, not claims of error that

12   relate to a ruling in a party's favor. *See* Fed. R. Evid. 103(a) (setting out rules for preserving a

13   "claim [of] error *in a ruling* to admit or exclude evidence") (emphasis added). Samsung never

14   alerted the Court to concerns that Apple's use of Samsung's total revenue number at different

15   stages "deliberately ignored the Court's instruction" regarding Davis's infringer's profits

16   testimony; improperly "belittled the calculations of Samsung's damages expert;" or "flaunted

17   Samsung's total revenues in order to mislead the jury into thinking that its [overall] damages

18   calculations were somehow 'conservative.'" Samsung JMOL at 36-37. Indeed, even after Apple's

19   case in chief, Samsung argued merely that it was entitled to judgment as a matter of law that Apple

20   presented no evidence to support an award of damages greater than $379 million, 2013 Trial Tr. at

21   923:17-21, not that Apple's references to Samsung's revenues were unfairly prejudicial, should

22   have been excluded, or warranted a curative instruction.[9]

23        Without having alerted the Court to Apple's alleged misconduct during trial, Samsung

24   cannot now establish that it is entitled to a new trial absent a showing of "plain or fundamental

25

26   ─────────────────
     [9] Apple also used Samsung's revenue during the first trial, without objection from Samsung. *See*
27   2012 Trial Tr. at 4123:6-10 (Apple's counsel during closing argument: "Samsung's infringing sales
     have generated $8.160 billion in revenue for Samsung. The damages in this case should be large
     because the infringement has been massive.").

28

     Case No.: 11-CV-01846-LHK
     ORDER DENYING POST-TRIAL MOTIONS

error." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 517 (9th Cir. 2004); *see Hemmings*, 285 F.3d at 1193 ("Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault . . . .") (internal quotation marks and citation omitted). Samsung has not made this showing. As Samsung implicitly acknowledges, a portion of Samsung's revenue number was relevant for calculating the award of Samsung's profits. *See* Samsung Reply at 21-22 (noting that only half of the sales that were the subject of the damages retrial were ineligible for infringer's profits) (emphasis added). The Court instructed the jury to determine Samsung's profit "by deducting certain expenses from gross revenue," defined as "all of the infringer's receipts from the sale of articles using any design found infringed." Dkt. 2784 at 39 (Final Jury Instruction No. 31). The jury is presumed to have followed this instruction. *See Richardson*, 481 U.S. at 211.

Moreover, the jury's infringer's profits award—which was in between the two parties' proposals—indicates that the jury followed the Court's instruction on gross revenues. During the damages retrial, both parties' experts agreed on the proper measure of gross revenues in proposing their damages totals. *See*, *e.g.*, 2013 Trial Tr. at 692 (Davis testimony that she and Wagner agreed on infringer's profits revenues); 1034:5-8 (Wagner testifying that the total revenues number was not "a relevant calculation" and that "[w]e should begin focusing on that smaller number of these phones that are sold that are infringing only the design patent"). Moreover, as discussed above, the jury rendered a verdict supported by substantial evidence. In such a situation, a finding of plain error is inappropriate. *See Settlegoode*, 371 F.3d at 520 (holding that a district court abused its discretion by finding plain error in part because "there was more than sufficient evidence for the jury to find in [plaintiff's] favor"); *Hemmings*, 285 F.3d at 1195 (finding no plain error where "[i]n the absence of counsel's improper statements, we cannot say that we think a different verdict was likely"). Samsung has not explained why a different result is warranted here. Indeed, Samsung has not addressed the plain error standard at all.

For the foregoing reasons, on this record, Samsung cannot establish that allowing the jury to hear Apple's references to Samsung's revenues on all infringing sales amounted to plain error.

19

### B.    Apple's Appeal to Prejudice

Last, Samsung contends that a new trial is warranted under Rule 59 on the basis that Apple appealed to racial, ethnic, and national origin prejudice throughout its case. Samsung relies primarily on Apple counsel's closing argument, which Samsung contends was an inappropriate, prejudicial appeal. For the reasons stated below, the Court finds that while the comments were troubling, a new trial is not warranted under the applicable standard.

Samsung principally relies on the following portion of Apple's closing argument:

> We are extremely fortunate to live in what I'll call the Greater Bay Area. Not only is it beautiful, but we live in the center of one of the most vibrant economies in the world. Intel, Yahoo, Oracle, Facebook, eBay, and hundreds and hundreds of other companies, including Google, and including Apple, and these companies attract talented employees at every level. Even, we heard, Samsung has opened a research center here so that they can take advantage of the talent in this area.
>
> The companies provide jobs. They create technology that improves the way people work. And the company -- and this economy supports an education system that is second to none in the world, Berkeley, Stanford, San Jose State, U.S. [sic] Santa Cruz, even Santa Clara where I went to school.
>
> These educational institutions interact with this economy, interact with these companies and create a place that the whole world knows as Silicon Valley.
>
> But let's be equally clear about one thing. Our vibrant economy absolutely depends on fair competition. It depends on a patent system that encourages inventors to invent, it encourages investors to invest, and it encourages employers to hire.
>
> If we allow that system of law to decay, investors will not invest, people will not take risks, and our economy will disappear.
>
> When I was young, I used to watch television on televisions that were manufactured in the United States. Magnavox, Motorola, RCA. These were real companies. They were well known and they were famous. They were creators. They were inventors. They were like the Apple and Google today.
>
> But they didn't protect their intellectual property. They couldn't protect their ideas. And you all know the result. There are no American television manufacturers today.

2013 Trial Tr. at 1396:14-1397:20. Samsung's counsel immediately objected, stating "[t]his is improper argument, outside the scope, and limited elements that one should not appeal to in a court of law." *Id.* at 1397:21-23. Apple's counsel stated that "I don't think that's right, your honor. This

20

is an argument about the policy of these laws." *Id.* at 1397:24-25. The Court asked Apple's counsel if he could move on, to which Apple's counsel indicated, "I can," *id.* at 1398:1-2, and did so.

After the jury left the courtroom and entered the deliberation room for deliberations, Samsung's counsel moved for a mistrial. The Court denied the motion without prejudice to renewal in the instant post-trial motions. *Id.* at 1407:8-11. Further, the Court offered Samsung various potential remedies. The Court asked Samsung's counsel if he would like a rebuttal to the arguments in Apple's closing that Samsung's counsel found problematic. *Id.* at 1408:11-13. The Court also offered to bring the jury back into the courtroom to hear the Court's reiteration of the Court's earlier instruction that jurors should not be motivated by sympathies or prejudice. *Id.* at 1414:4-10. Samsung's counsel stated that while he did not believe that this would cure the problem, it would be appropriate. *Id.* at 1414:15-16.

At this point, the Court, over Apple's contention that any curative instruction was unnecessary, brought the jury back to the courtroom. Only twenty-three minutes had elapsed since the jury entered the deliberation room, and the jury gave the Court a note as it reentered the courtroom. *Id.* at 1415:16-18. The note informed the Court that the jury had selected a foreperson and that the jurors needed certain office supplies for their deliberations, including paper, highlighters, and tape. *Id.* at 1415:25-1416:3. After handling the jury note for office supplies, the Court instructed the jurors as follows:

> Now, as I said when I read you final jury instruction number 1, you must follow all of my instructions and not single out some and ignore others. They're all important. I do want to just remind you of jury instruction number 1, which does state that you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy, and any appeal by any of the parties to any prejudice or sympathy is not proper. So with that instruction, I'm going to excuse you back to the jury room to begin deliberations.

*Id.* at 1416:10-19. As the Court's admonishment suggests, this was not the first time the Court had instructed the jury regarding setting aside prejudices. The Court's very first preliminary jury instruction, distributed and read to jurors before opening statements, stated that "you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy." *Id.* at 321:10-11. Moreover, the Court provided a similar instruction as the first instruction of the final jury instructions, which were distributed and read to jurors prior to closing arguments: "You must not

21

be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide the case solely on the evidence before you. You will recall that you took an oath to do so." *Id.* at 1236:25-1237:4. Importantly, each juror had a printed copy of the preliminary jury instructions throughout the entire trial and deliberations and a printed copy of the final jury instructions during closing arguments and deliberations.

The Court begins its analysis by noting that while attorneys have an obligation to serve as fierce advocates for their clients, this obligation must be tempered by attorneys' obligation to ensure that the judicial system is fundamentally fair. Fairness of our system requires that all parties, regardless of race, ethnicity, or national origin, not only receive a trial free from prejudice, but also perceive that they will receive such a trial. This fairness is undermined when counsel either explicitly or implicitly invokes the prejudice of jurors rather than relying on the applicable law and the proven facts. *See LeBlanc v. Am. Honda Motor Co., Inc.*, 688 A.2d 556, 560 (N.H. 1997) ("This sort of argument, which may be indirect or implied, as well as direct or express, is nonetheless an affront to the court.") (internal quotation marks and citation omitted).

Here, the Court finds the implications of Apple counsel's statements in closing argument troubling. The transcript does not capture the full context of counsel's closing argument. *See Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1371 (Fed. Cir. 2013) (noting that a district court's "on-the-scene assessment of the prejudicial effect, if any, carries considerable weight") (internal quotation marks omitted). Counsel's argument clearly suggested an us-versus-them, American-versus-non-American theme to the jury, which could have evoked national origin prejudice. This effect is minimized by the cold transcript, which elides counsel's strategic and effective pauses, timed in a way that created silence for listeners to connect the dots and make troubling inferences. The transcript further does not capture the broader context of the courtroom and the trial, during which the immediate rows behind the attorneys were filled with client representatives with obvious differences in terms of racial and ethnic backgrounds. Therefore, an American-versus-non-American theme, which might not be troubling in every case given Americans and non-Americans are of diverse backgrounds, in the context of this trial also could have been perceived as invoking racial or ethnic prejudice.

22

Moreover, the impact of statements that call into question the actual and perceived fairness of our judicial system to all parties must be considered in the broader context regarding whether all juries in the United States can fairly adjudicate patent disputes between American companies and foreign companies. Judge Moore's empirical work before joining the U.S. Court of Appeals for the Federal Circuit cites statistical support for a perception of potential jury bias. *See* Kimberly A. Moore, *Xenophobia in American Courts*, 97 Nw. L. Rev. 1497 (2003). Judge Moore's study found that "foreign patent holder win rates in jury trials against domestic infringers (38%) are significantly lower than domestic patent holder win rates against foreign infringers (82%). In contrast, in cases decided by judges, the patentee win rate is almost identical, with domestic patentees winning 35% of the time against foreign infringers, and foreign patentees winning 31% of the time against domestic infringers." *Id.* at 1509-10. Moreover, Judge Moore found that while foreign inventors acquire 45% of patent rights annually, they seek to enforce their patent rights in only 13% of litigated cases, notwithstanding the fact that litigated foreign patents are, according to Judge Moore, likely to be stronger than their domestic counterparts. *Id.* at 1504-05, 1535-36. As Judge Moore states, "[t]he disparity is important in part because it may reflect foreigners' cynicism about their prospects of enforcing patents in U.S. courts." *Id.* at 1504. Judge Moore concluded that "[t]he perceptions, and verifiable accuracy of the perceptions, of xenophobic bias in the U.S. patent litigation process likely have substantial impact on international trade and foreign relations and undermine confidence in the U.S. legal process for foreign and domestic parties alike." *Id.* at 1550.

Particularly in light of this empirical context and the high-profile nature of this litigation, the Court expresses its disapproval and disappointment in the comments that led to the instant motion. Counsel in this case have been exceptionally well prepared, and the Court has no doubt that counsel carefully chose each theme before presenting it to the jury in closing arguments. As the Court expressed after counsel's statement, the Court is particularly troubled by the clear implication of the closing argument that Samsung's foreignness was at issue in this case. 2013 Trial Tr. at 1414:5-6 ("To say American versus non-American company clearly implies foreign.").

Nonetheless, despite the troubling nature of counsel's closing argument, the Court notes that the level of misconduct here does not warrant a mistrial under the Ninth Circuit's standard. *See*

United States District Court
For the Northern District of California

1    *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984) (noting that

2    the Ninth Circuit has "no trouble concluding that [counsel's] remarks were improper" though the

3    comments do not warrant a mistrial). Under Ninth Circuit case law, granting a motion for new trial

4    on the grounds of attorney misconduct is only appropriate where the "flavor of misconduct . . .

5    sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by

6    passion and prejudice in reaching its verdict." *Id.* (internal quotation marks omitted). The Court

7    must consider whether any allegedly offending remarks were isolated or persistent, whether

8    opposing counsel timely objected or moved for a mistrial, and whether the jury's award was

9    excessive. *Id.* As part of this inquiry, the Court must consider when the potentially problematic

10   comments occurred and what proportion of the trial was infected by such comments. *United States*

11   *v. Rhodes*, 713 F.2d 463, 469 (9th Cir. 1983). The Federal Circuit has suggested that courts should

12   also consider whether counsel persists in making problematic statements even after being

13   admonished by the court to refrain from so doing. *Commil*, 720 F.3d at 1370. Ultimately, "[a] new

14   trial is warranted only if counsel's misconduct affected the verdict." *Mateyko v. Felix*, 924 F.2d

15   824, 828 (9th Cir. 1990).

16       In this case, the Court finds that Apple counsel's statements at closing argument, while

17   potentially evoking prejudice, do not meet the standard for two reasons. First, misconduct did not

18   permeate the proceedings. Rather, the problematic comments were confined to a few seconds of the

19   closing argument, which quickly came to an end upon Samsung's objection and this Court's

20   admonishment to Apple's counsel to move on. *Settlegoode*, 371 F.3d at 518 ("[W]here offending

21   remarks occurred principally during opening statement and closing argument, rather than

22   throughout the course of the trial, we are less inclined to find the statements pervaded the trial and

23   thus prejudiced the jury.") (internal quotation marks omitted); *Cooper v. Firestone Tire & Rubber*

24   *Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (holding isolated comments in closing argument is

25   insufficient to warrant mistrial).

26       Samsung contends that at other parts of the trial, Apple evoked racial or national origin

27   prejudice (1) by using the phrase "Samsung Korea" and asking questions regarding whether certain

28   actions were undertaken by Samsung's Korean executives, and (2) by pointing to the fact that

24

certain Samsung engineers did not speak English. Samsung JMOL at 38-39. The Court disagrees. As a threshold matter, Samsung did not contemporaneously object to any of the references about which it now complains, and Samsung's counsel conceded at the hearing on the instant motion that these questions and comments were not problematic at the time they were asked or made. Transcript of January 30, 2014 Hearing, Dkt. 2945, at 86:15-87:17.

With respect to the first set of questions and comments to which Samsung points, the Court finds that these references were made to explain Samsung's corporate structure and the interplay between various executives. For example, Samsung now contends that the following comment in opening statement by Apple counsel was troublesome:

> You will have Plaintiff's Exhibit 60 to look at. This is a document, the title of it is "STA Competitive Situation Paradigm Shift." I can't translate all of that for you because I don't know what all of it means, but the STA is Samsung Telecommunications of America. It's one of the American subsidiaries of the Korean Samsung Communications Company.

2013 Trial Tr. 348:13-18. The Court finds that these questions and comments did not evoke racial or national origin prejudice. Instead, they aided the jury in understanding the relationship between the various Samsung entities who were Defendants in the litigation and to explain various documents. *See also id.* at 1166:17-1167:4 (asking questions regarding corporate structure to explain the relationships between various Samsung executives discussed in an email exhibit). Importantly, Samsung itself recognized the importance of its corporate structure. On direct, Tim Sheppard, a Samsung executive, testified as follows:

> Q. Where is STA [Samsung Telecommunications America] located?
> A. Its headquarters is in Dallas. It's in Dallas
> Q. And where is the rest of Samsung located?
> A. Samsung is a multinational company. There's operations in many countries, but the headquarters is in Korea.

*Id.* at 953:24-954:3. Samsung strains credulity when it claims that these factual questions and comments about Samsung's corporate structure evoke racial or national origin prejudice.

With respect to the second set of questions and comments to which Samsung points, the Court notes that the line of questioning was directed toward impeaching Samsung's damages expert. Samsung extensively relied on Wagner's conversations with Samsung engineers to contend that Samsung could design around the patents in suit. Accordingly, Apple challenged the reliability

25

of the information that Wagner received from the engineers by noting the various challenges in the

communications between the engineers and Wagner:

> Q. But the design around periods were not something you came up with on yourself, by yourself; correct?
> A. No, I did not.
> Q. So let's make sure that the jury understands how you came up with them. The design around periods were provided to you in telephone calls with Korean engineers of Samsung; correct?
> A. That is correct.
> Q. You don't speak Korean; correct?
> A. I don't.
> Q. They don't speak English; correct?
> A. I think some of them had halting English, but there was a person there from Samsung who translated for them.
> Q. Right. And the person doing the translation was a lawyer who was a Samsung employee who was sitting with the Samsung employee in Korea doing the translation; correct?
> A. That's accurate.
> Q. And you got your design around periods from the translation done by the Samsung lawyers; correct?
> A. Yes.
> Q. And it's true, is it not, that you did nothing on your own to verify whether those design around times were accurate or not?
> A. That's correct. I wouldn't have any experience if I tried to do it to give any value in this courtroom.
> Q. Right. So if there is -- do you know -- do you know whether any of those Samsung engineers are going to testify here and tell the jury what the basis is of those design around periods?
> A. I don't believe so.

*Id.* at 1090:15-1091:18. Here too, Samsung overreaches by claiming that these questions evince or

evoke racial or national origin prejudice. Apple's references to Korea and translation were

designed to show the following multiple bases for the unreliability of Wagner's testimony on a

critical point: (1) Wagner's conversations with Samsung engineers were by international telephone

calls and not face-to-face; (2) Wagner could not directly communicate with Samsung engineers and

thus could not directly evaluate the Samsung engineers' statements; and (3) most importantly, that

the use of an interested party, a Samsung lawyer, as the translator between Wagner and the

Samsung engineer rendered Wagner's testimony regarding the design arounds potentially

unreliable. Prejudice was not the basis for or effect of this line of questioning. *See also id.* at

1322:19-22 ("Now, Mr. Wagner admitted that his entire theory was dependent upon telephone

conversations with Samsung folks in Korea. They didn't speak English, he didn't speak Korean.

*There were Samsung lawyers sitting next to them translating.*") (emphasis added). Accordingly, the

26

Court finds that the comments to which Samsung points are not rooted in prejudice, and that therefore, attorney misconduct did not "permeate" the proceedings.

Second, there is no evidence that the jury was influenced by Apple's problematic comments during closing argument. To the contrary, here the Court instructed the jury not to be influenced by any prejudices or sympathies multiple times, including once shortly after the problematic statements. "[T]he law presumes that jurors carefully follow the instructions given to them." *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1023 (9th Cir. 2000). This is a "crucial assumption underlying [the] system." *Parker v. Randolph*, 442 U.S. 62, 73 (1979). In cases in which parties have moved for new trials on the basis of attorney misconduct, courts have routinely held that a curative instruction is a factor weighing strongly against granting a new trial. *See Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009); *Mateyko*, 924 F.2d at 828. Moreover, here the presumption that the jury was not animated by prejudice is particularly strong in light of the fact that the jury came back twenty-three minutes after the start of deliberations with a note asking for office supplies to aid their deliberations. This suggests that the jury was focused on the task at hand—calculating damages—and was not fixated on any potentially improper argument made by counsel in closing. The jury's verdict further shows that the jury was appropriately focused on the evidence and the relevant law. As discussed above, the jury verdict was not excessive. This is probative evidence that the jury was not unduly affected by prejudicial comments. *See Kehr*, 736 F.2d at 1286 (holding the fact that "the jury's award of damages in this case was not excessive" cut against awarding a new trial on the basis of attorney misconduct).

The authority Samsung cites in support of a new trial is distinguishable. For example, unlike *Commil USA*, 720 F.3d at 1370-71, where the Federal Circuit affirmed a grant of a mistrial when counsel invoked religious prejudice in closing argument and on cross-examination, including after the district court had given a curative instruction, here, counsel's problematic statements were much more confined and did not occur after the Court's curative instruction. Moreover, the holding in *Commil USA* stemmed from deference to the district court's findings. *Id.* at 1370, 1375 (O'Malley, J. concurring in part and dissenting in part) ("I agree with the majority that it is

27

appropriate to defer to the trial court's first-hand assessment of whether counsel's conduct was sufficiently improper as to call into question the integrity of the jury's verdict.").

*Caudle v. Dist. of Columbia*, 707 F.3d 354 (D.C. Cir. 2013), is also distinguishable, because in that case, where the D.C. Circuit reversed a denial of a mistrial, counsel made four improper arguments, including making an impermissible "argument after the district court had sustained *three* objections." *Id.* at 361 (emphasis in original). Unlike *Caudle*, in the instant case, after the Court asked Apple's counsel to move on from the troubling line of argument, counsel did so, and did not thereafter make any problematic comments.

Moreover, unlike *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001) (emphasis added), where the Ninth Circuit refused to recognize a tribal court judgment because "closing argument [in the tribal court case] was *replete* with appeals to bias," the problematic statement in the instant case was isolated, not pervasive. *See also City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.3d 749, 755 (6th Cir. 1980) (reversing for a new trial where counsel "almost continuously sought to plant the seed in the minds of the jurors that [the defendant] was a very large corporation with international operations," including in opening statement, examination of multiple witnesses, and closing argument).

Finally, *LeBlanc*, 688 A.2d at 560, in which the New Hampshire Supreme Court, applying New Hampshire law, reversed a denial of a mistrial, is also distinguishable. In *LeBlanc*, counsel asked troubling questions during examination of witnesses regarding Honda's status as a Japanese company and followed up with a closing argument that evoked Pearl Harbor and inspired xenophobia. *Id.* at 581-82. Despite the fact that counsel objected to both the questioning and the closing argument, the trial "court did not strike the remarks or issue a curative instruction to the jury." *Id.* at 582. Unlike *LeBlanc*, here, the only objection was to closing argument and a prompt curative instruction was given to the jury.

In sum, the Court finds that Apple counsel's comments do not warrant a mistrial. Nonetheless, the Court finds this situation troubling. Next month, these parties and these counsel are set to go to trial for a third time. Counsel are encouraged to be mindful of the important role

that lawyers play in the actual and perceived fairness of our legal system as they prepare for and litigate the next round of this patent dispute.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the parties' post-trial motions.

**IT IS SO ORDERED.**

Dated: February 7, 2014

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

United States District Court
For the Northern District of California