1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation, | Case No.: 11-CV-01846-LHK |
| Plaintiff, | ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., A Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | **[REDACTED]** |
| Defendants. | |

Apple, Inc. ("Apple") owns U.S. Patent Nos. 7,469,381 (the "'381 Patent"); 7,844,915 (the "'915 Patent"); and 7,864,163 (the "'163 Patent") (collectively, the "utility patents-in-suit"), which each cover a particular touchscreen user interface software feature. A jury found that Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") infringed these patents through sales of 23 different smartphones and tablets. Apple now moves, based only on these three patents, to enjoin Samsung from "making, using, offering to sell, selling within the United States, or importing into the United States any of the Infringing Products or any other product not more than colorably different from an Infringing Product as to a feature found to infringe." ECF No. 2897-1 ("Proposed Order"). Apple's motion is fully briefed, and the Court heard oral arguments on

1

Apple's motion on January 30, 2014. Having considered the parties' arguments, the briefing, the relevant law, and the record in this case, the Court concludes that Apple has not established that it is entitled to the permanent injunction it seeks. Apple's Renewed Motion for a Permanent Injunction is therefore DENIED.

## I. TECHNOLOGICAL BACKGROUND

Because the particular features claimed by the utility patents-in-suit are relevant to the Court's conclusion, the Court begins by briefly reviewing the claimed features. The '381 Patent, entitled "List Scrolling And Document Translation, Scaling, And Rotation On A Touch-Screen Display" and colloquially referred to as the "snap back" patent, discloses a method for displaying an electronic document when a user scrolls beyond the edge of the document. *See* '381 Patent, Abstract. The application for the '381 Patent was filed on December 14, 2007, and the patent issued on December 23, 2008.

Users of portable electronic devices frequently need to view electronic documents at a magnification such that the entire document cannot be displayed at once. Thus, in order to view off-screen portions of the electronic document, a user needs a way to scroll the display window. However, conventional user interfaces were awkward because the display did not necessarily reflect the user's intent. *See id.* col. 2. The '381 Patent reduces user interface limitations by "provid[ing] for easy and intuitive scrolling of lists and translating of electronic documents on a device with a touch screen display." *Id.* col.8 ll.26-28. In other words, a user is alerted to having reached the border of a document by a "snap back" feature that gives the user the impression of scrolling just past the border of the document, with the document then snapping back to the edge of the display window.[1]

---

[1] Apple asserted claim 19 of the '381 Patent at trial, which reads:

> A device, comprising:
> a touch screen display:
> one or more processors;
> memory; and
> one or more programs, wherein the one or more programs are stored in the memory and
>     configured to be executed by the one or more processors, the programs including:
>     instructions for displaying a first portion of an electronic document;
>     instructions for detecting a movement of an object on or near the touch screen display;

United States District Court
For the Northern District of California

The '915 Patent, entitled "Application Programming Interfaces For Scrolling Operations," was colloquially referred to at trial as the "pinch to zoom" patent. The '915 Patent discloses a method for operating through an application programming interface (API) that provides scrolling operations. *See* '915 Patent, Abstract. "The API interfaces between the software applications and user interface software to provide a user of the device with certain features and operations." '915 Patent at 1:34-36. The invention discloses APIs which "transfer function calls to implement scrolling, gesturing, and animating operations for a device." '915 Patent at 1:65-67. The application for the '915 Patent was filed January 7, 2007, and the patent issued November 30, 2010.[2]

---

instructions for translating the electronic document displayed on the touch screen display in a first direction to display a second portion of the electronic document, wherein the second portion is different from the first portion, in response to detecting the movement;

instructions for displaying an area beyond an edge of the electronic document and displaying a third portion of the electronic document, wherein the third portion is smaller than the first portion, in response to the edge of the electronic document being reached while translating the electronic document in the first direction while the object is still detected on or near the touch screen display; and instructions for translating the electronic document in a second direction until the area beyond the edge of the electronic document is no longer displayed to display a fourth portion of the electronic document, wherein the fourth portion is different from the first portion, in response to detecting that the object is no longer on or near the touch screen display.

'381 Patent at col.36 l.58 – col.37 l.23.

[2] Apple asserted claim 8 of the '915 Patent at trial, which, simply stated, requires both one-finger scroll and pinch-to-zoom functionality. Claim 8 reads:

A machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:

receiving a user input, the user input is one or more input points applied to a touch-sensitive display that is integrated with the data processing system;

creating an event object in response to the user input;

determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

3

The '163 Patent, entitled "Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents," is colloquially referred to as the double-tap-to-zoom patent. The '163 Patent discloses a touchscreen feature allowing the user to tap (or use some other predefined gesture) to zoom and center the touchscreen image, with a subsequent tap (or other gesture) on another area of the image recentering the image on the location of the second tap. '163 Patent at 17:20-65. The application leading to the '163 Patent was filed on September 4, 2007, and the patent issued January 4, 2011.[3]

---

> responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object; and
>
> responding to at least one gesture call, if issued by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input.

'915 Patent at col.23 l.65 – col.24 l.21.

[3] Apple asserted claim 50 of the '163 Patent at trial, which, simply stated, requires one gesture to zoom and a different gesture to center a display. Claim 50 reads:

A portable electronic device, comprising:

a touch screen display;

one or more processors;

memory; and

one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors, the one or more programs including:

> instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content;
>
> instructions for detecting a first gesture at a location on the displayed portion of the structured electronic document;
>
> instructions for determining a first box in the plurality of boxes at the location of the first gesture;
>
> instructions for enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display;
>
> instruction for, while the first box is enlarged, a second gesture is detected on a second box other than the first box; and

Apple filed this action on April 15, 2011, alleging infringement of several Apple utility and design patents and dilution of Apple's trade dress. As explained below, only the utility patents are the basis for Apple's instant request for a permanent injunction. At the outset of this case, Apple moved for a preliminary injunction, *see* ECF No. 86, seeking an injunction against three Samsung products for infringement of three of Apple's design patents[4] and four Samsung products for infringement of the '381 Patent.[5] On December 2, 2011, this Court denied Apple's motion. *See* ECF No. 452 at 63. Apple appealed that decision to the Federal Circuit, which issued a decision that became the first of now three successive Federal Circuit opinions on injunction issues in this and a related case involving the same parties, Case No. 12-CV-00630. As these opinions guide the Court's analysis here, the Court begins with an overview of the relevant holdings.

A.      *Apple I*

On May 14, 2012, the Federal Circuit affirmed this Court's denial of Apple's preliminary injunction request in this case as to the '381 Patent and two of the three design patents, but vacated and remanded the denial as to one of the three design patents. *See Apple, Inc. v. Samsung Elecs. Co.* ("*Apple I*"), 678 F.3d 1314, 1316-17 (Fed. Cir. 2012). The most significant holding in *Apple I* for the purposes of the present motion is the Federal Circuit's approval of this Court's use of a causal nexus requirement to evaluate Apple's claimed irreparable harm. The relevant portion of the Federal Circuit's opinion is reproduced below:

> We hold that the district court was correct to require a showing of some causal nexus between Samsung's infringement and the alleged harm to Apple as part of the showing of irreparable harm. To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. *If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product.* Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct.

---

instructions for, in response to detecting the second gesture, the structured electronic document is translated so that the second box is substantially centered on the touch screen display.

[4] Apple sought to preliminarily enjoin Samsung's Galaxy S 4G and Infuse 4G smartphones and Galaxy Tab 10.1 tablet computer for infringing Apple Design Patent Nos. D618,677 (the "D'677 patent"), D593,087 (the "D'087 patent"), and D504,889 (the "D'889 patent"). *See* ECF No. 452.
[5] Apple sought to preliminarily enjoin Samsung's Galaxy S 4G, Infuse 4G, and Droid Charge smartphones and Galaxy Tab 10.1 tablet for infringing the '381 Patent. *See* ECF No. 452.

*Apple I*, 678 F.3d at 1324 (emphasis added). The Federal Circuit thus affirmed this Court's analysis of the irreparable harm factor, and vacated and remanded only as to the D'889 Patent on the issue of whether that patent was likely to be found invalid. Upon remand, Apple renewed its motion for a preliminary injunction based only on the D'889 Patent, which this Court granted as to the Galaxy Tab 10.1. *See* ECF No. 1135.

On August 24, 2012, a jury determined that the Galaxy Tab 10.1 did not infringe the D'889 Patent. *See* ECF No. 1931. In light of the jury's noninfringement finding, this Court dissolved the preliminary injunction. *See* ECF No. 2011.

### B. *Apple II*

*Apple II* arose out of a related case, filed on February 8, 2012, involving the same parties but different utility patents and accused products. *See Apple, Inc. v. Samsung Elecs. Co.* ("*Apple II*"), 695 F.3d 1370 (Fed. Cir. 2012); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, Case No. 12-cv-00630 (N.D. Cal.). Apple moved for a preliminary injunction against Samsung's Galaxy Nexus smartphone for alleged infringement of four patents. This Court granted Apple's motion as to the so-called "unified search" patent, which, put simply, refers to the concept of allowing a user to search multiple locations using one interface. *See Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838 (N.D. Cal. 2012). This Court denied Apple's motion as to the other three patents. *Id.*

In granting Apple's preliminary injunction motion, this Court once again looked for a causal nexus between the patented features and the alleged irreparable harm: "[A] patentee seeking to establish irreparable harm by virtue of lost sales must show that the infringing feature is a 'drive[r] [of] demand for the product,' such that its presence or absence from the product is responsible for the substantial gain or loss, respectively, of market share." *Id.* at 906 (quoting *Apple I*, 678 F.3d at 1324). This Court noted, however, that the Federal Circuit had yet to provide "more detailed guidance on what standard of proof would satisfy the movant's burden" to show that the patented features drive demand for the accused product. *Id.* at 905.

Apple asserted that Siri, a personal-assistant application in Apple's iPhone 4S, embodies the unified search patent and drives demand. Siri uses voice-recognition technology to allow users to search across multiple locations by talking to their phone. *Id.* at 906. This Court agreed with

6

Apple that demand for Siri demonstrated the importance of the patented feature. This Court concluded that, "[e]ven accepting Samsung's argument that the intelligent voice-recognition aspect of Siri, as advertised, also contributes to consumer interest in the iPhone 4S, Apple has shown that the [unified search] Patented feature is core to Siri's functionality and is thus a but-for driver of demand for Siri." *Id.* at 909.

Samsung appealed this Court's ruling as to the unified search patent. Apple did not appeal this Court's denial of Apple's motion for a preliminary injunction as to the other three patents. On appeal, the Federal Circuit reversed the Court's finding that Samsung's infringement of the unified search patent caused Apple's irreparable harm. *See Apple II*, 695 F.3d at 1380. Before addressing the flaw in the Court's opinion, however, the Federal Circuit expanded on the causal nexus requirement established in *Apple I*. In particular, the Federal Circuit held that:

> The relevant question is not whether there is *some* causal relationship between the asserted injury and the infringing conduct, but *to what extent* the harm resulting from selling the accused product can be ascribed to the infringement. It is not enough for the patentee to establish some insubstantial connection between the alleged harm and the infringement and check the causal nexus requirement off the list. *The patentee must rather show that the infringing feature drives consumer demand for the accused product.*

*Id.* at 1375 (emphases added). Further, the Federal Circuit found that "[t]he causal nexus requirement is not satisfied simply because removing an allegedly infringing component would leave a particular feature, application, or device less valued or inoperable." *Id*. at 1376.

Turning to this Court's causal nexus conclusions, the Federal Circuit held that the facts did not support a causal nexus finding:

> At best, the district court's findings indicate that some consumers who buy the iPhone 4S like Siri because, among other things, its search results are comprehensive. That does not sufficiently suggest, however, that consumers would buy the Galaxy Nexus because of its improved comprehensiveness in search. More specifically, that an application may sell in part because it incorporates a feature does not necessarily mean that the feature would drive sales if sold by itself.

*Id*. As a result, the Federal Circuit concluded that "the causal link between the alleged infringement and consumer demand for the Galaxy Nexus is too tenuous to support a finding of irreparable harm," *id*., and that therefore "the district court abused its discretion in enjoining the sales of the Galaxy Nexus," *id.* at 1380. This Court subsequently dissolved the injunction. *See* ECF No. 1383.

7

## C.     *Apple III*

Meanwhile, the present case proceeded to trial, and, on August 24, 2012, a jury returned a verdict that 26 Samsung products infringed one or more of Apple's patents or diluted Apple's trade dress. *See* ECF No. 1931 (Amended Jury Verdict). The jury awarded Apple $1,049,343,540 in damages for Samsung's infringement. *Id.* Because Apple had presented an incorrect legal theory and insufficient evidence for some of the infringing sales at issue, the Court struck $410,020,294 of the jury's damages award. ECF No. 2271 at 26 (Retrial Order); 2316 at 2 (Case Management Order reinstating portion of original jury award). A damages retrial was held in November 2013 to recalculate the damages for those sales, and the retrial jury awarded Apple $290,456,793 instead. ECF No. 2822 (Retrial Jury Verdict). The Court upheld the retrial jury's damages award, *see* ECF No. 2947, resulting in a total damages award to Apple of approximately $929,780,039.

Following the first trial, Apple moved to permanently enjoin Samsung from continuing to infringe the patents-in-suit and dilute its trade dress, based on the jury's infringement and dilution findings. On December 17, 2012, this Court denied Apple's request as to all the intellectual property at issue. *See Apple, Inc. v. Samsung Elecs. Co.* ("*Apple III*"), 909 F. Supp. 2d 1147 (N.D. Cal. 2012). A brief description of the portion of the Court's order denying Apple's requested permanent injunction with respect to the utility patents-in-suit follows.

Applying the four *eBay* factors,[6] the Court found that the irreparable harm, inadequacy of legal remedies, and public interest factors all favored Samsung and counseled against a permanent injunction. The Court found that the balance of hardships factor was neutral. The Court held that Apple failed to prove a causal nexus between Samsung's infringement and Apple's alleged harm and thus failed to establish irreparable harm. Because the causal nexus inquiry is again central to

---

[6] In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court held that a patentee seeking a permanent injunction must make a four-part showing:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391.

Apple's renewed motion for a permanent injunction, the Court reviews the previously presented evidence in some detail.

Apple presented three types of evidence to prove a causal nexus: (1) documents and testimony showing the importance of ease of use as a factor in phone choice; (2) evidence that Samsung deliberately copied the patented features; and (3) a conjoint survey performed by Apple's expert, Dr. John Hauser. *See id.* at 1155.

The Court found that the ease of use evidence—Apple's first type of causal nexus evidence—was "simply too general." *Id.* This evidence included several product reviews, media articles, and consultant reports that refer to the touchscreen and interface of the iPhone or Apple's tablet device (the iPad) as easy to use. *See, e.g.*, PX36.36 (GravityTank consulting report to Samsung); ECF No. 2127-15 at 45 (McKinsey & Co. consulting report to Samsung); PX133.3 (*New York Times* article); PX135.2 (*Time Magazine* article); PX143.6 (iPhone buyer survey); PX144.6 (same); PX145.5 (same); PX146.6 (same). Moreover, the Court found that, even to the extent Apple's documents and testimony touched on specific ease of use features, that evidence was highly anecdotal—"insufficient to establish anything other than a single consumer's experience." *Apple III*, 909 F. Supp. 2d at 1155. The Court also held that Apple's utility patents-in-suit cover only particular implementations of certain touchscreen features, but that Apple's ease of use evidence refers at best to the broader touchscreen feature concepts, like "two finger pinch and flick." *Id.* (internal quotation marks omitted). The Court concluded that "Apple's evidence that consumers value a general category of features related to Apple's utility patents cannot, under the Federal Circuit's guidance, establish the requisite causal nexus." *Id.* at 1155-56.

Apple's evidence of copying included several Samsung documents indicating that Samsung believed that Samsung should add some of the iPhone's touchscreen effects to Samsung's products. *See, e.g.*, PX38.19, 38.24; PX44.58, PX46.66; PX57.19; PX57.73. Relying on the Court's earlier preliminary injunction order and the Federal Circuit's *Apple I* opinion considering similar copying evidence, the Court found that Apple's copying evidence was insufficient to establish a causal nexus because that evidence only "proves what Samsung *thought* would attract purchasers, not what *actually* attracted purchasers." *Apple III*, 909 F. Supp. 2d at 1156; *see also Apple I*, 678 F.3d

9

at 1327-28 ("[T]he relevant inquiry focuses on the objective reasons as to why the patentee lost sales, not on the infringer's subjective belief as to why it gained them (or would be likely to gain them).").

Finally, the Court considered evidence stemming from the conjoint survey conducted by Apple's expert Dr. Hauser. Dr. Hauser's survey, which is described in more detail below,[7] tested consumers' willingness to pay for certain smartphone and tablet features by presenting respondents with four device choices with varying combinations of different feature sets. Dr. Hauser recorded each hypothetical device consumers chose and performed a statistical analysis of the results to arrive at the amount consumers are willing to pay for each tested feature relative to other tested features. *See generally* ECF No. 1363-1 ("Hauser Expert Report"). However, the Court found that "evidence of the price premium over the base price Samsung consumers are willing to pay for the patented features is not the same as evidence that consumers will buy a Samsung phone instead of an Apple phone because it contains that feature." *Apple III*, 909 F. Supp. 2d at 1156 (citation omitted). Because the Court concluded that the survey did "not address the relationship between demand for a feature and demand for a complex product incorporating that feature and many other features," the Court held that "Apple's survey evidence does not establish that any patented feature drives consumer demand for the entire product." *Id.* The Court ultimately found that, because Apple had failed to provide sufficient evidence to show a causal nexus between Samsung's infringement and Apple's alleged harm, Apple had failed to show irreparable harm. *Id.* at 1156-57.

As to the remaining *eBay* factors, the Court found as follows. The Court determined that Apple's licensing activity tipped the inadequacy of legal remedies factor in Samsung's favor. In particular, the Court stated that "Apple's licensing activity suggests that Apple does not believe that these patents are priceless, such that there can be no fair price set for Samsung's practice of the claimed inventions or designs." *Id.* at 1160. That fact, coupled with the Court's conclusion that Samsung would not have any difficulty paying the damages judgment, led the Court to conclude that "Apple will be substantially compensated for its injuries without an injunction." *Id.* On the

---

[7] *See infra* Part IV.A.1.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

balance of hardships, the Court determined that "neither party would be greatly harmed by either outcome" and therefore that factor was neutral. *Id.* at 1161.

Finally, the Court weighed the public interest in preserving the rights of patentholders, on the one hand, against the public interest in having several product choices when shopping for a smartphone or tablet, on the other hand, and concluded that "while the public interest does favor the protection of patent rights, it would not be in the public interest to deprive consumers of phones that infringe limited non-core features, or to risk disruption to consumers without clear legal authority." *Id.* at 1163.

"Weighing all of the factors, the Court conclude[d] that the principles of equity d[id] not support the issuance of an injunction." *Id.* Apple's inability to establish a causal nexus between Samsung's infringement and its harm, combined with the Court's finding that neither the inadequacy of damages nor the public interest supported an injunction, led the Court to hold that Apple was not entitled to a permanent injunction.

### D. *Apple IV*

Apple appealed the Court's ruling in *Apple III*, and the Federal Circuit affirmed this Court's ruling as to the design patent and trade dress claims, but vacated and remanded as to the utility patents-in-suit. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.* ("*Apple IV*"), 735 F.3d 1352 (Fed. Cir. 2013).

The Federal Circuit's opinion in *Apple IV* primarily addressed and clarified the standard by which courts evaluating requests for permanent injunctions should determine whether the first two factors of the *eBay* test are satisfied. As to irreparable harm, the Federal Circuit confirmed that its preliminary injunction rulings in *Apple I* and *Apple II* as to causal nexus "appl[y] equally" in the permanent injunction context. *Id.* at 1361. Nevertheless, the Court clarified that, while "Apple must show that the infringing feature drives consumer demand for the accused product," Apple is not "required to show that a patented feature is *the sole reason* for consumer purchases." *Id.* at 1364 (internal quotation marks omitted). "[R]ather than show that a patented feature is *the exclusive reason* for consumer demand, Apple must show some connection between the patented feature and demand for Samsung's products." *Id.* The Federal Circuit then listed three examples of

11

evidence that would suffice: (1) "evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions," (2) "evidence that the inclusion of a patented feature makes a product significantly more desirable," or (3) "evidence that the absence of a patented feature would make a product significantly less desirable." *Id*.

Turning to Apple's evidence of causal nexus, the Federal Circuit agreed with this Court that Apple's ease of use and copying evidence was too general to establish a causal nexus by itself. *Id*. at 1367. As to Dr. Hauser's survey evidence, however, the Federal Circuit held that this Court erred by rejecting the survey results simply because Dr. Hauser did not measure whether the patented features caused consumers to buy a Samsung device instead of an Apple device. *Id*. at 1367-68. The Federal Circuit held that, if Dr. Hauser's survey evidence showed that "a feature *significantly* increases the price of a product," that evidence would be relevant to show that the feature drives demand for the product. *Id*. at 1368 (emphasis added). "The question becomes one of degree, to be evaluated by the district court. Here, the district court never reached that inquiry because it viewed Dr. Hauser's survey evidence as irrelevant." *Id*. The panel thus vacated this Court's causal nexus findings and remanded to (1) evaluate the degree of consumers' willingness to pay for the patented features, and (2) consider Samsung's additional criticisms of the Hauser survey's methodology. *Id*.

The Federal Circuit also found a potential abuse of discretion in this Court's decision in *Apple III* to analyze the patents-in-suit separately. *See Apple III*, 909 F. Supp. 2d at 1153 (requiring Apple to "establish[] a causal nexus for each of its patents and trade dresses individually"). The Federal Circuit held that "there may be circumstances where it is logical and equitable to view patents in the aggregate," for example "where they all relate to the same technology or where they combine to make a product significantly more valuable." *Apple IV*, 735 F.3d at 1365. The Federal Circuit left it to this Court "to address this issue in the first instance on remand." *Id*. On remand, Samsung does not dispute that the Court should view the patented features in the aggregate, and, as explained below, the Court does so.

The Federal Circuit also identified error in this Court's original analysis of the inadequacy of legal remedies factor. First, the Federal Circuit rejected this Court's reliance on Samsung's

12

ability to pay money damages, holding that, "unlike an infringer's *inability* to pay a judgment, which may demonstrate the inadequacy of damages, a defendant's *ability* to pay a judgment does not defeat a claim that an award of damages would be an inadequate remedy." *Apple IV*, 735 F.3d at 1369 (citation omitted, emphasis in original). Second, the Federal Circuit found that this Court also erred in its consideration of Apple's past licensing behavior. Even if the evidence showed that Apple may be willing to license *some* patents to Samsung at some price, the panel held that the proper analysis considers whether Apple is willing to license the *utility patents-in-suit* to Samsung. *Id.* at 1370-71. "[B]efore relying on Apple's licensing offer as evidence of the adequacy of damages, the court should have resolved whether Apple's offer included the asserted patents and trade dress." *Id.* at 1370 n.7. As to the other Apple licenses in the record—licenses to IBM, HTC, and Nokia—"[t]he district court's exclusive focus on whether Apple's patents are 'priceless' and whether Samsung is 'off limits' led it to disregard Apple's evidence that *Samsung's* use of *these patents* is different." *Id.* at 1370 (emphasis in original). The Federal Circuit went on to call into question the relevance of the licenses in the record, distinguishing each license for various reasons. *Id.*

Finally, the Federal Circuit affirmed this Court's analysis of the last two *eBay* factors. On the balance of the hardships factor, the Federal Circuit found no abuse of discretion in this Court's determination that the factor was neutral because Samsung is no longer selling the infringing products, even though many of those products remained with retailers. *Id.* at 1371. As to the public interest factor, the Federal Circuit affirmed this Court's conclusion that the public's interest in enforcing patent rights was outweighed by "the prospect that an injunction would have the effect of depriving the public of access to a large number of non-infringing features." *Id.* at 1372-73.

In sum, the Federal Circuit held that this Court "abused its discretion in analyzing Apple's evidence of irreparable harm and the inadequacy of legal remedies," and remanded the case so that this Court could "reconsider, consistent with [the Federal Circuit's] opinion, Apple's request for a permanent injunction against Samsung's infringement of its three utility patents." *Id.* at 1373.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

Upon remand, Apple renewed its motion for a permanent injunction for Samsung's infringement of its utility patents. ECF No. 2897. Samsung filed an opposition, ECF No. 2915-4, and Apple filed a reply, ECF No. 2925. The Court heard oral arguments on January 30, 2014.

## III.   LEGAL STANDARD

The Patent Act provides that in cases of patent infringement a court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Though injunctions were once issued in patent cases as a matter of course, the Supreme Court ruled in 2006 that "broad classifications" and "categorical rule[s]" were inappropriate in analyzing whether to grant a permanent injunction. *eBay*, 547 U.S. at 393. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). Instead, a patentee seeking a permanent injunction must make the four-part showing discussed above. *See supra* n.7.

In considering Apple's renewed motion, the Court now reevaluates each of these four factors in the light of the Federal Circuit's further guidance, and determines whether, on balance, the principles of equity support the issuance of a permanent injunction in this case.

## IV.   DISCUSSION

### A.   Irreparable Harm

"[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple II*, 695 F.3d at 1374.

This Court previously found that Apple will suffer irreparable harm from Samsung's continued sale of infringing smartphones and tablets.[8] "Apple and Samsung are direct competitors" that fiercely compete for first-time smartphone buyers. *Apple III*, 909 F. Supp. 2d at 1151. According to Samsung documents, Samsung views Apple as its primary competitor in the

---

[8] The fact that Samsung has voluntarily ceased sale of its infringing products does not moot Apple's request for an injunction. *See Allee v. Medrano*, 416 U.S. 802, 810-11 (1974).

smartphone and tablet markets, with the U.S. market being a "two horse race between Apple and Samsung." PX60, PX184. Further, "Apple has continued to lose market share to Samsung." *Apple III*, 909 F. Supp. 2d at 1152. Throughout this case, Apple has consistently offered unrebutted evidence that Samsung's market share has grown substantially from June 2010 to the second quarter of 2012, and that Samsung has followed an explicit strategy to increase its market share at Apple's expense. PX62.11-15. Apple has also been harmed by its loss of downstream sales, as network compatibility and brand loyalty cause many consumers to be "locked in" to either Apple or Samsung after their initial purchase. *Apple III*, 909 F. Supp. 2d at 1152. Although the Federal Circuit did not disturb any of these particular findings on appeal, *Apple IV*, 735 F.3d at 1360, it did hold that, for purposes of establishing the type of irreparable harm necessary to obtain a permanent injunction against patent infringement, a patentee must nevertheless establish a causal nexus between any irreparable harm and the infringement of the patents-in-suit.

Accordingly, the Federal Circuit left to this Court the task of determining whether Apple can demonstrate "a sufficiently strong causal nexus" between the irreparable harm it is likely to suffer and Samsung's infringement. *Apple II*, 695 F.3d at 1374. Regarding this requirement, the Federal Circuit concluded that "additional analysis is required," remanding so that this Court could "assess whether Apple's other evidence, including its ease-of-use evidence and evidence of copying, in combination with Dr. Hauser's survey evidence, suffices to establish irreparable injury." *Apple IV*, 735 F.3d at 1368. The Court now undertakes this analysis and concludes that Apple's evidence fails to establish the requisite causal nexus.

To prove a causal nexus between Apple's irreparable harm and Samsung's infringement, "Apple must 'show that the infringing feature *drives* consumer demand for the accused product.'" *Id.* at 1364 (quoting *Apple II*, 695 F.3d at 1375) (emphasis added). "[R]ather than show that a patented feature is *the exclusive reason* for consumer demand," however, "Apple must show some connection between the patented feature and demand for Samsung's products," such as by introducing "[(1)] evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions . . . [;(2)] evidence that the inclusion of a patented feature makes a product significantly more desirable . . . [; or (3)] evidence that the absence of a patented

15

feature would make a product significantly less desirable." *Id*. The Federal Circuit noted that not all evidence of demand for the patented feature would suffice to establish a causal nexus. In particular, the Court gave as an example an infringing cup holder in a $20,000 car. Even though consumers may be willing to pay an additional $10 for the infringing cup holder, the value added is so small that the cup holder could not drive demand for the car. *Id.* at 1368.

The Federal Circuit also counseled that "there may be circumstances where it is logical and equitable to view patents in the aggregate" when analyzing causal nexus. *Id.* at 1365. One such circumstance is "where [the patents] all relate to the same technology or where they combine to make a product significantly more valuable." *Id*. Here, the utility patents-in-suit cover different aspects of touchscreen software features, and the inventions are all directed to making devices with touchscreens easier to use. Therefore, in conducting its causal nexus analysis, the Court considers the aggregate effect of the utility patents-in-suit in driving consumer demand for Samsung's products.

Apple presents the same three groups of evidence that were before the Court in *Apple III* to prove that Samsung's infringement caused Apple irreparable harm: (1) documents and testimony showing the importance of ease of use as a factor in phone choice; (2) evidence that Samsung deliberately copied the patented features; and (3) evidence stemming from a conjoint survey performed by Dr. Hauser. Samsung counters Apple's evidence by submitting surveys showing the importance of attributes other than the patented features in consumer purchasing decisions. Because in *Apple IV* the Federal Circuit agreed with this Court's conclusions that the evidence in groups one and two could not establish causal nexus, the Court here focuses first on Apple's conjoint survey evidence in light of *Apple IV*'s instruction that the Court not truncate its review of that evidence. The Court will then "assess whether Apple's other evidence, including its ease-of-use evidence and evidence of copying, in combination with Dr. Hauser's survey evidence, suffices to establish irreparable injury." *Id.* at 1368.

### 1. Dr. Hauser's Conjoint Survey

Dr. Hauser employed a web-based conjoint survey methodology to measure consumer preferences for Samsung products. Hauser Expert Report ¶ 15. "The general idea behind conjoint

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

analysis is that consumers' preferences for a particular product are driven by features or descriptions of features embodied in that product." *Id.* ¶ 17. Dr. Hauser constructed two surveys, one for tablets and one for smartphones. In each survey, Dr. Hauser asks respondents to choose among four hypothetical devices, 16 successive times. Dr. Hauser refers to each selection question in his survey as a "choice set," or "choice task," and to each hypothetical device in a choice set as a "profile." *Id.* ¶ 18. For both the smartphone and tablet survey, Dr. Hauser included the following six features for each profile within a choice set: (1) touchscreen capabilities, (2) size and weight, (3) camera, (4) storage, (5) connectivity, (6) number of apps, and (7) price. *Id.* ¶¶ 38, 42-47.

Each profile in a choice set had a different quality level for each feature. For example, the "camera" feature in each profile had one or more of the following attributes: a 3, 8, or 12 megapixel rear-facing camera; a 2 megapixel front-facing camera; low- or high-resolution video recording, autofocus, and zoom. *See id.* Ex. D. In the preceding example, the rear-facing camera "attribute" can have one of three "levels" of 3, 8, or 12 megapixels. For the "storage" feature, Dr. Hauser varied the levels from 8 gigabytes capacity to 64 gigabytes capacity. *Id.* ¶ 17.

Dr. Hauser included the patented features in the "touchscreen capability" feature. In particular, Dr. Hauser identified the functionality provided by the '381 Patent as "Rubberband," the functionality provided by the '915 Patent as "Auto Switch," and the functionality provided by the '163 Patent as "Tap to Re-center after Zoom." *Id.* Ex. E at 9; ¶ 67. Dr. Hauser then set the "touchscreen capability" feature for each profile at one of four options consisting of different combinations of the patented features. For the smartphone survey, Dr. Hauser used the following four options for "touchscreen capability": (A) reliable touch,[9] auto switch, rubberband, tap to re-center after zoom; (B) less reliable touch, auto switch, rubberband, tap to re-center after zoom; (C) reliable touch, rubberband, tap to re-center after zoom, and (D) reliable touch. *Id.* ¶ 67.[10] The

---

[9] Even though it is not a patented feature, Dr. Hauser included "reliable touch" as an attribute within the touchscreen feature to distract respondents from the survey's focus. Dr. Hauser used "reliable touch" to signify a device that "reliably and accurately tracks finger movement." Hauser Expert Report, Ex. D at 10 (capitalization removed).

[10] Similarly, for the tablet survey, Dr. Hauser used the following four options for "touchscreen capability": (A) full multi-touch (not a patented feature), auto switch, rubberband, tap to re-center after zoom; (B) very limited multi-touch, auto switch, rubberband, tap to re-center after zoom, (C) full multi-touch, rubberband, tap to re-center after zoom, and (D) full multi-touch. *See* Hauser Expert Report ¶ 67.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

parties refer to all the features other than the "touchscreen capability" feature as "distraction

features," because Dr. Hauser included them in order to distract respondents from the survey's

focus. *See id.* ¶ 19.

Before beginning the survey, respondents viewed descriptions of the surveyed features. *Id.*

¶¶ 63-66. These descriptions included animations for the touchscreen, camera, and connectivity

features, but only static images and text for the other attributes. *Id.* After the animations and other

descriptions, the survey presented participants with the choice sets. *Id.* ¶ 68. "For each set of four

alternative smartphones [or tablets] in a choice task, respondents were asked: 'If these were your

only options and you were choosing a new smartphone [tablet], which Samsung smartphone

[tablet] would you choose?'" *Id.* ¶ 69. Each of the four alternative product choices were displayed

graphically, as follows:



*Id.* Ex. F at QCONJOINT.

Using the data gathered from a large number of survey responses, Dr. Hauser applied

statistical methods to estimate consumers' willingness to pay for each level of each tested feature.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

*Id.* ¶¶ 20-34. In particular, Dr. Hauser estimates a "price premium" garnered by each of the levels for each feature, including combinations of the patented features, on a "market." *Id.* ¶ 96. Dr. Hauser, however, is careful to note that he "use[s] the term 'market' in a specific way to cover only smartphone and tablet types that [he] ha[s] varied in the survey," and that he has "not tested a market for smartphones or tablets in which consumers choose among various brands of smartphones or tablets (e.g., Samsung vs. Apple)." *Id.* ¶ 96; *see* ECF No. 2840 ("Retrial Tr.") at 591:8-13 ("Q: And none of those numbers would reflect, by the way, what people would actually pay in the marketplace? [Dr. Hauser]: Oh, I'm very clear on that. I just have market demand and that the, the actual price that you pay depends upon both the demand and also what Apple and Samsung would be willing to supply."). In other words, the "market" in Dr. Hauser's survey choice sets consists of four hypothetical devices with six features of varying levels, rather than the real-world market.

The Federal Circuit vacated this Court's prior treatment of Dr. Hauser's survey, holding that evidence of consumers' willingness to pay for the patented features may be relevant to whether the patented features drive consumers' purchasing decisions. The Federal Circuit remanded so that this Court, examining the evidence, could determine whether Dr. Hauser's survey demonstrates that consumer interest in the patented features is sufficient to find that the features "significantly increas[e] the desirability" of Samsung's products. *Apple IV*, 735 F.3d at 1364. The Federal Circuit also directed this Court to consider Samsung's criticisms of Dr. Hauser's methodology. *Id.* at 1368. Below, the Court fully considers Dr. Hauser's survey and Samsung's criticisms of it. For the following reasons, the Court concludes that the survey results fail to show the "requisite causal nexus" between Samsung's infringement and Apple's claimed irreparable harm. *Id.* at 1367.

> ### a. Dr. Hauser Evaluates Relative Willingness to Pay for Features Rather than Effect on Product Prices

First, Dr. Hauser's survey does not provide a way to directly compare consumers' willingness to pay for particular features to the overall value of the infringing devices. In other words, Dr. Hauser's survey measures the market demand for the patented features in a vacuum, without relation to the actual price or value of the devices. ECF No. 2915-24, Declaration of

19

Yoram (Jerry) Wind ("Wind Decl.") ¶¶ 46-47. The parties do not dispute that the ultimate price of a product is a combination of market demand and market supply. ECF No. 2915-7, Declaration of R. Sukumar ("Sukumar Decl.") ¶ 6. Dr. Hauser agreed at trial that he is "very clear" that his figures do not reflect "what people would actually pay in the marketplace." Retrial Tr. at 591:8-13. As a result, the survey leaves the Court with no way to compare Dr. Hauser's willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices. The serious market competition in the smartphone and tablet industry works to depress prices, whereas Dr. Hauser's survey did not account at all for competitor products or other supply at all. Wind. Decl. ¶¶ 46-49; *see* Retrial Tr. at 591:8-13 (Dr. Hauser testifying that "I just have market demand and . . . the actual price that you pay depends upon both the demand and also what Apple and Samsung would be willing to supply."); Hauser Expert Report ¶ 96 (defining the term "market" in a "specific way" that does not account for supply).

This failure to account for actual market prices explains why the price premiums for just the six features that Dr. Hauser's survey considered add up to a maximum of $422 for smartphones and $482 for tablets, whereas the smartphone base price used was $199 and the tablet base price used was $499. Wind Decl. Ex. 30. If Dr. Hauser's willingness to pay estimates related to actual smartphone and tablet prices, the combined price premiums for just six of the hundreds of feature sets in the devices would very likely be less than the price of the devices. However, Dr. Hauser's results indicate that, given a base smartphone costing $199, consumers would be willing to pay $621 for the same smartphone with all six of the tested features at the highest levels. Without a proper baseline figure to use for comparison, the Court can compare only respondents' willingness to pay for the patented features to respondents' willingness to pay for different levels of the distraction features, which are only a small subset of the features contained in the accused devices. Using the Federal Circuit's car example, *see* 735 F.3d at 1368, even taking the price of the cup holder as $10, Dr. Hauser's survey provides no way to determine the price of the car. This lack of information about how the patented features compare to the overall price of the infringing device is a significant hurdle for Dr. Hauser's survey evidence.

20

1   The Court recognizes that "evidence that a patented feature significantly increases the price

2   of a product" may "be used to show that the feature drives demand for the product." *Id.* at 1368.

3   Here, however, Dr. Hauser's survey evidence measures only demand for the patented features in

4   Dr. Hauser's limited market and does not account for supply at all, much less the real-world

5   intersection of market demand and market supply, which sets the real-world market price for the

6   devices. Thus, absent some baseline device price for comparison, the survey results cannot

7   demonstrate that the patented features significantly increase the *price* of a product.

8           **b.      Dr. Hauser's Limited Features Provide Little Information as to
                       Whether any Price Increase is Significant**
9

10          Of the price premium results in Dr. Hauser's smartphone and tablet surveys, substantial

11  portions are attributable to features other than the patented features. Specifically, Dr. Hauser's

12  survey results return a price premium for all six tested features at their highest level (e.g., a camera

13  with an 8 MP rear camera, HD video recording, autofocus, 2 MP Front Camera, and zoom; 64 GB

14  memory) of $422 for smartphones and $482 for tablets. Of those totals, the price premiums for all

15  the patented features are $100 in smartphones (or under one quarter of the total price premiums)

16  and $90 in tablets (or under one fifth of the total price premiums). In other words, the distraction

17  features account for 76% of the price premiums in Dr. Hauser's smartphone survey and 81% of the

18  price premiums in Dr. Hauser's tablet surveys.

19          As the Court addresses more fully below, a multitude of other survey evidence not prepared

20  for the purpose of litigation indicates that numerous features that were not tested—such as battery

21  life, MP3 player functionality, operating system, text messaging options, GPS, and processor

22  speed—are highly important to consumers. *See infra* Part IV.A.2.a. Dr. Hauser's survey omitted

23  these many significant smartphone and tablet features, features that surely have non-negligible

24  value. If the features identified in the consumer surveys had been included in Dr. Hauser's survey,

25  the patented features would account for an even smaller percentage of the price premiums. Because

26  Dr. Hauser's survey instead created a market in which consumers could choose only among four

27  hypothetical devices at a time with six features of varying levels, any price premium that

28  consumers are willing to pay for the patented features in the survey is devoid of sufficient context.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

Thus, it is not clear whether the price premiums for the patented features in Dr. Hauser's limited survey indicate that consumers are willing to pay *significantly* more for a product with the patented features or that the patented features "make[] the product *significantly* more desirable." *Apple IV*, 735 F.3d at 1364.

Apple, citing *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-27 (N.D. Cal. 2013), argues that this Court would be wrong to criticize Dr. Hauser's failure to test more than six features of the accused products. The *TV Interactive* court, however, was confronted with similarly "odd[]" large price premiums (in that case, the value of the six tested features added to $133.11, as compared to a $150 Blu-ray player at issue), but faced only the question of whether to exclude the expert's survey results on *Daubert* grounds. *Id.* at 1025-26. The court did not need to take the extra step presented to this Court of drawing irreparable harm conclusions from the survey results. Moreover, in *TV Interactive*, the conjoint survey expert explicitly warned against extrapolating the survey data to draw conclusions about the entire product, i.e., "making projections beyond [the surveyed] values." *Id.* at 1026 (internal quotation marks and alteration omitted). Yet that is precisely what Apple asks this Court to do here: extrapolate from the survey results regarding a limited number of features to determine whether the patented features drive consumer demand for the entire product.

*TV Interactive*'s no-extrapolation warning suggests that using Dr. Hauser's conjoint survey to show a significant increase in product price could be unreliable. Indeed, Judge Alsup excluded on *Daubert* grounds a choice-based conjoint survey for purposes of calculating an infringer's increase in market share due to infringing features (as opposed to establishing simply a relative willingness to pay for the infringing features). *See Oracle Am., Inc. v. Google Inc.*, No. 10-CV-03561, 2012 WL 850705, *9-11 (N.D. Cal. March 13, 2012). Here, of course, the Court is not addressing a *Daubert* challenge. The Court is weighing the persuasiveness of Dr. Hauser's survey as evidence of causal nexus. In this context, the Court finds that the survey's omission of numerous other important feature sets, as well as the survey's failure to show that the patented features stand out even when viewed among all tested features, make it difficult for the Court to conclude that Dr.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

1   Hauser's survey results establish that the patented features significantly increase the price of the

2   product or otherwise drive demand for the product.

3       The Court's above analysis of Dr. Hauser's conjoint survey results is consistent with the

4   jury's damages award in this case. At trial, Apple used Dr. Hauser's conjoint survey results to

5   establish demand for the patented product as part of its lost profits case. *See Panduit Corp. v.*

6   *Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). *Panduit* requires only that Apple

7   show that "demand for the patented product" exists, not the degree of demand. *Id.* at 1156. Apple's

8   damages experts testified that they used Dr. Hauser's survey results only "as an indicator of

9   demand." Retrial Tr. 654:4-8. In other words, they concluded that the fact that "people were

10  willing to pay more for a product because it had certain features suggested to me that they wanted

11  those features." *Id.* But Apple did not use those results at trial to argue how much more people

12  were willing to pay for the patented features. To the contrary, Apple had its damages expert in the

13  damages retrial clarify on direct that she did not rely on the actual values from the survey results to

14  establish any conclusions as to degree of demand. *See id.* at 659:21-25 ("Q. There are some dollar

15  amounts associated with the results of [Dr. Hauser's] survey. Did you actually use those dollar

16  amounts in assessing damages? A. No. I was relying upon his survey as an indicator of demand.").

17  Apple's damages expert from the original trial similarly relied on the same Dr. Hauser survey to

18  support only the damages expert's conclusion "that there was demand for the three utility patents,"

19  Dkt No. 1839 ("Trial Tr.") 2077:1-8, not the degree of that demand. Now that the case has reached

20  the injunction stage, the Court declines to use the survey results in a way that even Apple's

21  damages experts chose to avoid.

22          c.      **Indications that Dr. Hauser's Survey Inflates the Value of the**
                    **Patented Features**
23

24      Samsung has raised a host of arguments based on the survey's presentation that challenge

25  the persuasiveness of Dr. Hauser's survey evidence. *See* Opp. at 8-10.[11] The Federal Circuit

26  ────────────────────
    [11] In the related case between these parties, Apple provided the Court access to the actual Internet
27  survey taken by respondents in that case. *See* ECF No. 1164, Case No. 12-CV-00630. At the
    hearing on Apple's renewed injunction motion, Apple's counsel invited the Court to look at that
28  survey to inform its understanding of the survey that Dr. Hauser used in the present case. *See* Hr'g
    Tr. at 25:9-12, 28:23-24. Accordingly, the Court has reviewed the survey as provided to

23

instructed this Court to address those "other [purported] methodological flaws" in the first instance. *Apple IV*, 735 F.3d at 1368. Accordingly, the Court has analyzed all of Samsung's more than a dozen additional contentions regarding Dr. Hauser's survey and concludes that at least two aspects of Dr. Hauser's survey presentation further obscure the degree to which the patented features contribute to the demand of the patented features.

### i. Inadequate Presentation of Noninfringing Alternatives

The Court finds Dr. Hauser's survey results are undermined because the survey appears to have failed to adequately account for noninfringing alternatives to the patented features. The Federal Circuit in *Apple IV* suggested that courts should consider the impact of potential noninfringing alternatives in the causal nexus analysis. *Apple IV*, 735 F.3d at 1364-65 ("And if a particular patented laptop battery lasts significantly longer than any other battery on the market, then the replacement of that battery with a noninfringing battery might make a laptop less desirable. In that case, it might be reasonable to conclude that the patented battery is a driver of consumer demand for the laptop."). In other words, because there must be "some connection between the *patented* feature and demand for Samsung's products," Apple should show that the patented features are sufficiently valuable over noninfringing alternatives to drive consumer demand. *Id*. at 1364 (emphasis added).

However, Dr. Hauser's use of mere shorthand descriptions of the patented features to depict the presence of the patented features and a strike-out to depict their absence, as shown in the next subsection, may have misled respondents into believing that the profile lacked any features of those types, rather than that the profile merely lacked the particular implementation of those features as patented by Apple. *See* Wind Decl. ¶ 78. For example, by asking respondents to choose between only "Rubberband" and "~~Rubberband~~" when choosing profiles in a choice set, the survey suggested that respondents were choosing between a device that helped a user identify the border of a document and one that did not, even though it is undisputed that noninfringing alternatives to the border-identifying feature of the '381 Patent existed. *See* Hauser Reply Decl. ¶ 45. Although

respondents, using a web browser. That review helped the Court reach its conclusions regarding the presentation of Dr. Hauser's survey.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

Dr. Hauser described to respondents possible noninfringing alternatives to the patented features at the beginning of the survey, when presenting the 16 choice sets, Dr. Hauser did not remind respondents that those noninfringing alternatives could replace the patented features. Dr. Hauser could have easily done so by, for example, replacing the shorthand description of the patented feature (e.g., "Rubberband") with a shorthand description of a noninfringing alternative. By instead merely crossing out the patented feature, the survey likely inflated the measured price premiums, because it suggested that the patented features captured a broader concept then that claimed in the patents-in-suit. *See Apple II*, 695 F.3d at 1376 ("Apple must show that consumers buy the Galaxy Nexus because it is equipped with the apparatus claimed in the '604 patent—not because it can search in general, and not even because it has unified search.").

### ii.        Undue Emphasis of Patented Features

Similarly, the survey highlights the patented features using various attention-drawing graphic effects. For example, the touchscreen features are centrally located on the product choice screen. *See* Hauser Expert Report, Ex. G at QCONJOINT. This placement focuses respondents' attention on the patented features rather than the other tested features because respondents' eyes are naturally drawn to the center of the screen. *See* Sukumar Decl. ¶ 15. In addition, the patented features, by virtue of receiving more description than the other tested features, occupy more screen space than the other features. *See* Hauser Expert Report, Ex. G at QCONJOINT; *see also* Sukumar Decl. ¶ 15. Not only do the more detailed descriptions of the patented features increase the likelihood that respondents dwell longer on the patented features when choosing their survey responses, but the patented features' sizeable descriptions also cause the patented features to appear more prominent on the product choice screen.

Even further, the survey employs different graphic effects when portraying the absence of the patented features. When the survey presents respondents with a product choice missing one of the patented features, the graphic displays a bright red line striking through the name of the patented feature. However, when the survey presents respondents with a product choice without one of the distraction features, the graphic simply omits the name of that feature. Moreover, the survey uses a darker colored background for the "touchscreen capability" feature (which includes

25

the patented features) than for the other features, drawing attention to the patented features and underscoring the bright red lines. Sukumar Decl. ¶ 15. The attribute levels for the camera and touchscreen capability from two potential profiles illustrate these differing graphic effects:

**PROFILE 1**                                                **PROFILE 2**

                                         

                                         

Hauser Expert Report, Ex. D at 15 (excerpted). As shown, the camera feature in Profile 2 omits Zoom by simply omitting that feature from the icon and substituting higher-level attributes ("High Res," "2MP Front," and "12MP Rear") with lower-level ones ("Low Res" and "3MP Rear"). The patented features, in contrast, are shown to be absent from Profile 2 by way of red strike-throughs, which leave the underlying feature on the screen to remind the respondent that it is missing. The different effects underscore the absence of the patented features when they are missing from a product choice. Sukumar Decl. ¶ 14.[12]

The survey also appears to have inflated the relative value of the patented features by giving much more information to respondents about the patented features than consumers in the marketplace have about those features. *See* Wind Decl. ¶ 56. Research has shown that "attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace." Joel Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* 2 (1997), *available at* http://www.sawtoothsoftware.com/download/

---

[12] Perhaps in response to Samsung's criticism on this score, Dr. Hauser's survey in Case No. 12-CV-630 does not use white text on a dark background with red strike-throughs to indicate the absence of patented features, as was done in this case.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

techpap/whatlrnd.pdf. "Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choice." *Id*. at 10. Dr. Hauser himself, in a paper written outside of the litigation context, recognized in 2004 that this artificial-focus problem is a "conceptual issue" with conjoint studies that requires "further development" to address. John Hauser & Vithala Rao, "Conjoint Analysis, Related Modeling, and Applications," in Wind, J. and P. Green (eds.), *Advances in Market Research and Modeling: Progress and Prospects* (Boston, MA: Kluwer Academic Publishers, 2004):18 *available at* http://web.mit.edu/hauser/www/Papers/ (filename Hauser_Rao Conjoint Analysis Green Festchrift.pdf).

Dr. Hauser's survey appears to have drawn particular attention to the patented features in yet another way. Dr. Hauser used multimedia animations to describe the touchscreen, camera, and connectivity features, whereas he described the other tested features using only static images and text. Samsung expert Dr. Jerry Wind contends that the multimedia animations could have signaled to respondents that those features should be relatively more important, thereby increasing respondents' relative willingness to pay estimates for those features. Wind Decl. ¶ 72. Dr. Hauser responds that the higher willingness to pay estimates for the features described by multimedia animations could simply reflect consumers' higher valuations of those features. Hauser Reply Decl. ¶ 36. Both sides find support in the fact that respondents valued all the feature types described by animations higher than all the features described only by text and static images. Wind Decl. ¶ 73. Although the Court does not decide which expert is correct on this point, it suffices to say that Dr. Wind's criticisms appear genuine, and, without a more convincing rebuttal from Dr. Hauser, the criticisms further reduce the persuasiveness of Dr. Hauser's survey results.

The Court finds that the extra attention given to the patented features in the survey through these various graphic effects and presentation methods likely inflated their price premiums. Consequently, the survey results likely overstate consumers' relative willingness to pay for the patented features.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

The Court has fully evaluated Dr. Hauser's conjoint survey and its results to determine whether they show the degree of connection necessary to establish that the patented features drive consumer demand for the infringing products, either directly or circumstantially. For the reasons set forth above, the Court concludes that Dr. Hauser's survey evidence is unpersuasive on this point. As Apple's damages expert explained at trial, Dr. Hauser's survey provides simply "an indicator of demand." Retrial Tr. at 659:24-25. It does not readily provide an indicator of the degree of demand necessary to show that the patented features "drive[] consumer demand for the accused product[s]." *See Apple IV*, 735 F.3d at 1364. The Court is not persuaded by Apple's attempt to stretch Dr. Hauser's survey to accomplish this latter showing. *See TV Interactive*, 929 F. Supp. 2d at 1026.

Even when this Court asked at oral argument whether Dr. Hauser's survey shows that the patented features drive demand for the accused products, Apple's counsel was unable to respond directly, but instead argued that the Federal Circuit substituted an "'a connection'" test for the previous "driver of demand" test. Hr'g Tr. 34:8-36:17; *see id.* at 36:4-6 ("I'm not trying to be difficult or to wordsmith when I focus on the words 'a connection,' because that's very much what they said."). But that is not what the Federal Circuit said. The Federal Circuit held there must be "*some connection* between the patented feature and demand for Samsung's products," *Apple IV*, 735 F.3d at 1364 (emphasis added). Despite Apple's representation that the phrase "a connection" was briefed and argued to the Federal Circuit, *see* Hr'g Tr. 29:9-17, the phrase "a connection" appears nowhere in *Apple IV*.

In context, it is clear that the Federal Circuit's use of "some connection" does not suggest that *any* connection is sufficient. *See*, *e.g.*, *id.* ("Apple must show that the infringing feature drives consumer demand for the accused product.") (internal quotation marks omitted); *id.* ("There might be a variety of ways to make this required showing, for example, with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions. It might also be shown with evidence that the inclusion of a patented feature makes a product significantly more desirable. Conversely, it might be shown with evidence that the absence of a patented feature

would make a product significantly less desirable."). Throughout the *Apple* cases, the Circuit has always required that the infringement cause more than "an insignificant amount of lost sales," *Apple I*, 678 F.3d at 1324; that an "insubstantial" loss of market share caused by the infringement is "not enough," *id.* at 1325; that "[i]t is not enough for the patentee to establish some insubstantial connection between the alleged harm and the infringement," *Apple II*, 695 F.3d at 1375; and that a "nominal" willingness to pay for an infringing feature will not establish a causal nexus, *Apple IV*, 735 F.3d at 1368. Dr. Hauser's survey results simply do not allow the Court to determine whether the patented features meet this test.

### 2. Other Evidence of Demand

The Federal Circuit's decision in *Apple IV* did not disturb this Court's conclusions with respect to Apple's other evidence of irreparable harm: Apple's ease of use and copying evidence. Instead, the Federal Circuit instructed this Court to consider fully Dr. Hauser's survey evidence, and then "assess whether Apple's other evidence, including its ease of use evidence and evidence of copying, *in combination with Dr. Hauser's survey evidence*, suffices to establish irreparable injury." *Id.* at 1368 (emphasis added). Accordingly, the Court again reviews Apple's other evidence, but this time with due regard to Dr. Hauser's survey results.

### a. Ease of Use Evidence

Apple's ease of use evidence includes several product reviews, media articles, and consultant reports that refer to the iPhone or iPad's touchscreen and interface as easy to use. Most of the documents refer simply to ease of use, without reference to any of the patented features. For example, an iPhone buyer survey shows that consumers care about ease of use generally. *See* PX143.6; *see also* PX144.6 (same); PX145.5 (same); PX146.6 (same). This Court previously found that this ease of use evidence "is simply too general." *Apple III*, 909 F. Supp. 2d at 1155. The Federal Circuit approved this Court's conclusion and itself found that Apple's ease of use evidence "simply shows that ease of use, in general, is important to the iPhone" but "does not prove that Samsung's incorporation of the patented features influenced demand for its products." *Apple IV*, 735 F.3d at 1367.

Dr. Hauser's survey results do not change the Court's conclusion. Unlike the ease of use evidence cited in the preceding paragraph, Dr. Hauser focuses on the patented features. But he does so to the exclusion of other ease of use features identified in Apple's documents. Other than "reliable touch," *see supra* n.10, Dr. Hauser did not include distraction features that go to ease of use generally or that capture the acknowledged benefits of the touchscreen in particular, such as that popular devices have "[f]ew buttons" and "minimal and screen-centric" design, PX36.31; exhibit "[c]onsistent behaviors across apps," PX36.35; provide mobile access to television, video, and music, PX36.39; and allow easy access to new apps, PX36.41. Because Dr. Hauser's survey did not address many of the other features referenced in Apple's ease of use documents, Apple has failed to provide a reliable depiction of how the patented features correlate to the demand for the overall infringing products.

Furthermore, to be helpful to Apple, the ease of use evidence from iPhone buyer surveys would have to allow the Court to make the inference that because ease of use is important to Apple's iPhone customers, other customers may have purchased Samsung devices based on Samsung's inclusion of the patented features, which relate to particular ease of use aspects, in Samsung's products. The Federal Circuit has already reviewed this type of inference with some disapproval. *See Apple II*, 695 F.3d at 1376 ("At best, the district court's findings [in favor of irreparable harm] indicate that some consumers who buy the iPhone 4S like Siri because, among other things, its search results are comprehensive. That does not sufficiently suggest, however, that consumers would buy the Galaxy Nexus because of its improved comprehensiveness in search."). Apple falls short of its burden absent additional corroborating evidence that would help the Court draw the connection between what influences Apple's customers to purchase Apple devices and what influences Samsung customers to buy Samsung devices. Dr. Hauser acknowledges that his definition of "market" does not correlate the market for Apple devices to the market for Samsung devices. *See* Hauser Expert Rep. ¶ 96. Accordingly, the Court continues to find Apple's ease of use evidence as to the iPhone insufficient, even in conjunction with Dr. Hauser's survey evidence, to satisfy Apple's burden.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

### b.      Evidence of Samsung Copying

Apple's evidence of copying included several Samsung documents indicating that Samsung should add some of the iPhone's touchscreen effects to its products. *See, e.g.*, PX38.19, .24; PX44.58, PX46.66; PX57.19; PX57.73. Relying on *Apple I*, this Court concluded that such evidence was "insufficient to establish the required causal nexus." *Apple III*, 909 F. Supp. 2d at 1156 (citing *Apple I*, 678 F.3d at 1327-28 ("[T]he relevant inquiry focuses on the objective reasons as to why the patentee lost sales, not on the infringer's subjective beliefs as to why it gained them (or would be likely to gain them.")). In *Apple IV* the Federal Circuit said that Apple's copying evidence "may be relevant, but it is insufficient." 735 F.3d at 1368.

Dr. Hauser's survey evidence might helpfully supplement Apple's copying evidence if, for example, the survey evidence showed that Samsung's subjective beliefs proved to be true in the marketplace. For the reasons discussed above, however, Dr. Hauser's survey results do not reliably reconstruct the market. For example, one of Apple's copying documents suggests that Samsung believed that the double-tap-to-zoom feature was preferable to a touch-and-hold-to-zoom feature. *See* PX38.13, .15-16, .19. But because Dr. Hauser's survey appears to have improperly discounted the impact of noninfringing alternatives, *see supra* Part IV.A.1.c.i, the survey fails to show whether consumers generally agreed with Samsung's subjective belief as to this feature. Similarly, because Dr. Hauser's survey does not evaluate most of the features included in Apple's copying documents, *see* PX44.25 ("[Feature No.] 21. . . . i-Phone: With the Previous and Next buttons, it is easy to navigate between e-mail messages"); PX44.102 ("[Feature No.] 97.. . . i-Phone: Can control the music playback from within the playlist through the control bar while music is playing"); PX44.126 ("[Feature No.] 121 . . . i-Phone: When using voice recorder, provides image of a microphone and displays volume"), Dr. Hauser's survey evidence does not give the Court a way to determine whether, even as to the features that Samsung allegedly copied, the patented features were among those that drove demand. Accordingly, the Court concludes that Dr. Hauser's survey evidence does not supplement Apple's copying evidence in a way that establishes a causal nexus.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

c. **Other Consumer Surveys**

Samsung presents substantial and compelling counter evidence questioning the importance of the patented features, which the Court weighs against Dr. Hauser's survey and Apple's other evidence of causal nexus. Much of this evidence comes from Apple's own consumer surveys that, unlike Dr. Hauser's survey, were not prepared for the purpose of litigation. For example, a 2011 iPhone Buyer Survey identified twelve features that consumers found to be important when choosing an iPhone: web capabilities, ease of use, ability to download and use applications, value for price paid, multi-tasking, appearance and design, battery life, camera, retina display, FaceTime video calling, HD video recording, and ability to edit video. "Q1 FY11 iPhone Buyer Survey" (APLNDC-Y0000027341-422, at 347-369). The equivalent study for iPads listed eleven key attributes: portability, Wi-Fi capabilities, entertainment options, ease of use, cool/fun factor, battery life, screen size, quality, weight, applications, and 3G capabilities. "Q1 FY11 iPad Tracking Study" (APLNDC-Y0000023730-907, at 816).[13] Another iPhone consumer survey uses thirteen categories of attributes: easy to use, service and support, (Trust) Apple brand, quality of apps, battery life, value for price paid, quantity of apps, attractive appearance and design, ability to sync iPhone content, camera with LED flash, retina display, HD video recording and FaceTime video calling. "iPhone Buyer Survey Q3 FY11" (APLNDC-Y0000027506-599, at 523).

These and other similar consumer surveys demonstrate that ease of use is undoubtedly important to consumers, along with a number of other broad categories, when they make their purchasing decisions. ECF No. 2915-6, Declaration of Tulin Erdem ("Erdem Decl.") ¶¶ 37-46; *see also, e.g.*, "2009 Wireless Consumer Smartphone Satisfaction Study Volume 1," J.D. Power and Associates (SAMNDCA00190144-243, at 195-196); "Yankee Group Samsung Strategy Session" (SAMNDCA00250503-557, at 525-526); "Q1 FY11 iPad Tracking Study" (APLNDC-Y0000023730-907, at 816); "Q1 FY11 iPhone Buyer Survey" (APLNDC-Y0000027341-422, at 347-369); "Attitudes and Usage of Smartphone owners," Hall & Partners (SAMNDCA00252685-775, at 707-708, 714); "August 2010 iPad Buyer Survey" (APLNDC-Y0000023361-427, at 381-

---

[13] Note that several other features were also included in that survey that relate more to the way in which the buyer uses the iPad, for example "for personal related travel."

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

389); "iPhone Buyer Survey Q3 FY11" (APLNDC-Y0000027506-599, at 512-523); "Q2 FY11 iPhone Buyer Survey" (APLNDC0000036266-348, at 275-301); "Q2 FY10 iPhone Buyer Survey" (APLNDC-Y0000026687-807, at 695-710). Yet, these surveys do not suggest that the patented features are a driver of demand. *See Apple IV*, 735 F.3d at 1367 (approving this Court's prior treatment of Apple's ease of use and copying evidence). Apple has not shown that they are—not with Dr. Hauser's survey, not with its general ease of use evidence, and not with its copying evidence—and the Samsung evidence cited in this subsection further suggests the actual, relative impact of the patented features on demand for the infringing devices is unknown.

### 3. Summary as to Irreparable Harm

The Federal Circuit held that the question of the causal nexus to Apple's irreparable harm is "one of degree, to be evaluated by the district court." *Apple IV*, 735 F.3d at 1368. After careful examination of all the evidence, the Court finds that Apple has failed to demonstrate that Samsung's inclusion of the patented features made Samsung's products "significantly more desirable," such that Samsung's infringement caused Apple irreparable harm. *Apple IV*, 375 F.3d at 1364. Smartphones and tablets are complex devices embodying hundreds of features, inventions, and components. Dr. Hauser's survey evidence provided results for only six of those elements, in a form that he readily concedes may not be extrapolated to the real market. *See, e.g.*, Retrial Tr. at 591:8-13. Nor does the rest of the evidence supplement or otherwise corroborate Dr. Hauser's results in a way that would allow Apple to meet its burden. The various consumer surveys presented to the Court, including Dr. Hauser's survey, do no more than confound the Court's efforts to determine whether—of the many smartphone and tablet features such as the camera, screen quality, operating system, and screen size—the three patented features at issue here drive consumer demand. Put another way, the evidence shows that the three patented features may add to a device's appeal, but Apple has not shown that these specific features are among several that "cause consumers to make their purchasing decisions" or otherwise drive consumer demand. *Apple IV*, 735 F.3d at 1364. Accordingly, Apple has not met its burden of proving the requisite causal nexus to establish irreparable harm.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

## B. Adequacy of Legal Remedies

In its opinion, the Federal Circuit specifically addressed the evidence on Apple's willingness to license the utility patents-in-suit to Samsung, stating that "[t]he parties dispute the scope of Apple's October 2010 licensing offer to Samsung." *Apple IV*, 735 F.3d at 1370 n.7. The panel could not "tell if the district court reached a conclusion on this issue," so the Federal Circuit thus directed that "before relying on Apple's licensing offer as evidence of the adequacy of damages, the court should have resolved whether Apple's offer included the asserted patents and trade dress." *Id.* On remand, the parties hotly contest whether Apple offered Samsung a license to any of Apple's utility patents-in-suit. The Court finds that, although the evidence is ambiguous as to whether Apple offered Samsung a license to the '381 Patent, Apple's licensing discussions with Samsung do not demonstrate that monetary damages were adequate compensation.

Samsung, referring to a presentation Apple made in October 2010, argues that Apple offered Samsung a license in October 2010. The October 2010 presentation slides make clear that Apple discussed the possibility of licensing patents to Samsung, perhaps even offering Samsung a license. *See* DX 586. However, the slides never mention any specific patents, instead referring to a "Phone license," "Smart license," and "Advanced Mobile License." DX 586.008.

The evidence is inconclusive as to whether the licenses discussed in October 2010 included the '381 Patent. ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ██ Apple, citing testimony from Boris Teksler, Apple's Director of Patent and Licensing Strategy in Fall 2010, contends that Apple never offered Samsung a license to any of the asserted patents. Mr. Teksler testified that Apple's October 2010 offer "never included Apple's unique user experience and [Apple] made that clear." ECF No. 1839 at 2022:4-9. Throughout his testimony, Mr. Teksler did not waver from his statements that Apple's October 2010 offer "absolutely [did] not" include the patents-in-suit. *See, e.g.*, ECF No. 1839 at 2013:9-21, 2022:22-24; ECF No. 1695

34

at 1955:22-1957:9. ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Negotiations apparently ended shortly after Apple

outlined several possible frameworks for a license deal.

The Court need not conclusively resolve whether Apple in fact offered Samsung a license
to the '381 Patent because the foregoing evidence makes clear that Apple did not consider
monetary remedies to be adequate compensation. Even assuming that Apple offered Samsung a
license to the '381 Patent, the evidence demonstrates that Apple was highly reluctant to license its
"unique user experience" patents to Samsung, a direct competitor. This finding is consistent with
Apple's licensing practices with other competitors. For example, Apple licensed the utility patents-
in-suit to HTC only in settlement of litigation and on terms preventing HTC from using the
licensed patents in combination with Apple's "Distinctive Apple User Experience." ECF No. 2194-
1 ("HTC Agreement") at Ex. A. The Federal Circuit found that these exact license characteristics
indicate that damages are an inadequate remedy. *Apple IV*, 735 F.3d at 1370. Furthermore,
Samsung presents no evidence indicating that Apple offered Samsung a license to either the '915
Patent or the '163 Patent prior to filing this suit. The evidence of Apple's exceptionally restrictive
licensing practices therefore establishes that monetary remedies would be inadequate to
compensate Apple for the irreparable harm, if any, incurred from Samsung's infringement.

Samsung argues that Apple has made multiple license offers to Samsung within the past
year. These recent settlement discussions have minimal probative value, as they are "tainted by the
coercive environment of patent litigation." *See, e.g.*, ECF No. 2738 at 18; *see also LaserDynamics,
Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (holding "that license fees that are
tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable
royalty"). Were the Court to find that the parties' recent settlement discussions disfavor entering an
injunction, future patentees would be much less likely to engage in negotiations while litigation is
pending. The Court denied Samsung's request for further discovery into these ongoing settlement
discussions out of this very same concern. *See* ECF No. 2913 at 4 ("'[I]f participants cannot rely on
the confidential treatment of everything that transpires during [mediation] sessions then counsel of

35

necessity will feel constrained to conduct themselves in a cautious, tight-lipped, noncommittal manner more suitable to poker players in a high-stakes game than adversaries attempting to arrive at a just solution of a civil dispute.'") (quoting *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1173 (C.D. Cal. 1998)) (internal quotation marks omitted). Therefore, these discussions do not disturb the Court's conclusion that Apple's past licensing behavior as to Samsung demonstrates that legal remedies are inadequate.

### 1. Other Apple Licenses

Samsung also contends that Apple's other licenses confirm that monetary damages are adequate. Opp. at 15-18. In particular, Samsung cites Apple's licenses with IBM, HTC, and Nokia that include some or all of the three utility patents-in-suit. On appeal, the Federal Circuit noted that these licenses have "relevant differences from the current situation." *Apple IV*, 735 F.3d at 1370. Indeed, the Federal Circuit found that "numerous factors" suggested that Apple's past licenses with other companies were not relevant because Samsung uses Apple's technology differently than those licensed companies. *Id*. For example, as to the Apple-IBM license, the panel stated that "IBM is not a competitor in the smartphone market, and . . . the license was entered into five years before Apple launched the iPhone." *Id*. The Court agrees that, because IBM and Apple were not competitors in the smartphone or tablet market and the license was entered into five years before Apple launched the iPhone, the IBM-Apple license is of little relevance to whether Apple would be adequately compensated by a license to Samsung.

Both the Nokia and HTC agreements resulted from litigation settlements. *Id*. Moreover, the Nokia license "was a 'provisional license' for a limited 'standstill' period, and the HTC agreement excluded HTC products that were 'clones' of Apple's products." *Id*. (citation omitted). Because of these special conditions, the Nokia-Apple and HTC-Apple licenses provide little insight into whether Apple would be willing to provide Samsung unencumbered access to the patented features for money. Therefore, the Court holds that Apple's other licenses do not support a finding that damages are an adequate remedy.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

## 2.    Summary as to Monetary Remedies

The Court concludes that damages for the irreparable harm Apple alleges are difficult to quantify. Although the Court in its previous determination found that Apple's past licensing behavior indicated that legal remedies could provide adequate compensation, the Federal Circuit's recent guidance and this Court's further examination of the evidence lead to a different conclusion here. Apple's past licensing behavior demonstrates a reluctance to license the utility patents-in-suit to Samsung, and several factors distinguish Apple's licenses to IBM, HTC, and Nokia from the present circumstances.

This conclusion, however, is ultimately of little help to Apple because the Court will not issue a permanent injunction based on irreparable harm that Samsung's infringement did not cause, even if monetary remedies will not compensate Apple for that irreparable harm. To prevail on the inadequacy of legal remedies *eBay* factor, Apple needs to show that the irreparable harm established in the first *eBay* factor is not compensable through monetary remedies. *See eBay*, 547 U.S. at 391 (listing as the first two factors a patentee must show for an injunction "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for *that injury*") (emphasis added). The Federal Circuit in *Apple IV* also highlighted that an injunction should not issue without a finding that Samsung's infringement caused Apple irreparable harm when it held that "[o]f course, if, on remand, Apple cannot demonstrate that demand for Samsung's products is driven by the infringing features, then Apple's reliance on lost market share and downstream sales to demonstrate the inadequacy of damages will be substantially undermined." *Apple IV*, 735 F.3d at 1371. Apple, in other words, cannot obtain a permanent injunction merely because Samsung's lawful competition impacts Apple in a way that monetary damages cannot remedy. To award an injunction to Apple in these circumstances would ignore the Federal Circuit's warning that a patentee may not "'leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant.'" *Apple IV*, 735 F.3d at 1361 (quoting *Apple II*, 695 F.3d at 1374-75). For that reason, the Court ultimately finds that—despite Apple's apparent unwillingness to license the patents-in-suit to Samsung—monetary remedies would more appropriately remedy the injury arising out of Samsung's infringement of the

37

utility patents-in-suit than would an injunction. Accordingly, the second *eBay* factor favors Samsung.

## C. Balance of Hardships

The Federal Circuit found no abuse of discretion in this Court's prior analysis concluding that the balance of the hardships factor was neutral. *Apple IV*, 735 F.3d at 1371. Three of the four main arguments the parties raise now are essentially the same arguments as in the briefing on Apple's original motion for a permanent injunction in this case (*Apple III*) and in the briefing on appeal (*Apple IV*). The Court sees no reason to depart from its earlier determination.

First, Apple contends that an injunction is necessary to protect Apple against future infringement by Samsung through products not more than colorably different than those already found to infringe. Apple also made this argument to the Federal Circuit. *See* ECF No. 2915-34, Smith Decl. Ex. 6 at 42. The fact that the Federal Circuit found no error in this Court's conclusion counsels against crediting Apple's argument here. In addition, Apple's fear that Samsung will reintroduce infringing products when Samsung has already stopped selling all the infringing products is speculative, and does not demonstrate that Apple will suffer hardship absent an injunction.

Second, Apple argues, as it did before the Federal Circuit, *see id.* at 42-43, that, because Apple has a substantially smaller product line than Samsung, Samsung's continued infringement of Apple patents is especially harmful to Apple, but an injunction against Samsung products will not greatly affect Samsung's overall product offerings, many of which were not accused in this case. Again, Apple's argument fails to tip the balance of this factor in Apple's favor because Samsung has undisputedly ceased selling its infringing products. *See* Mot. at 9 n.1; Opp. at 19.

Samsung also makes two arguments. First, Samsung asserts, as it did before, that an injunction would disrupt its relationships with retailers and wholesalers. The Court previously considered this argument, finding that Samsung failed to explain "*how* an injunction would cause the asserted disruptions, or what hardship they would actually present for Samsung, as opposed to hardship for the carriers and consumers." *Apple III*, 909 F. Supp. 2d at 1161. Further, and perhaps more importantly, "carriers who sold the infringing products have assumed the risk of this type of

38

disruption." *Id.* (citing *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected.")). The Federal Circuit found no abuse of discretion in this analysis. *Apple IV*, 735 F.3d at 1371.

Samsung's second argument is the only new argument on the balance of the hardships factor. Samsung contends that entering an injunction based on infringement of the '915 Patent would present a hardship for Samsung because the PTO has invalidated the asserted claim of the '915 Patent on reexamination. As the Court noted in its order denying Samsung's most recent motion to stay the case, however, the reexamination proceedings are far from complete. *See* ECF No. 2831, at 2-3. At this point, and on these facts, it is impossible to know what the ultimate outcome of the '915 Patent's reexamination proceedings will be. The Court declines to rely on a PTO office action now on appeal to the Patent Trial and Appeal Board as a basis for denying Apple's request for a permanent injunction. Thus, on the balance of the hardships, "neither party will suffer any particularly great hardship" from either outcome of Apple's renewed motion for a permanent injunction. *Apple III*, 909 F. Supp. 2d at 1161-62. The Court again finds this factor to be neutral.

### D. Public Interest

The Federal Circuit also found that this Court did not abuse its discretion in finding that the public interest factor weighed slightly in favor of Samsung. *Apple IV*, 735 F.3d at 1371-73. Other than the argument on the '915 Patent's reexamination proceedings that the Court already rejected, the parties present no new arguments on the public interest factor. Apple continues to press that the public interest favors strong patent rights, and that an injunction is necessary to incentivize future innovation. Samsung, on the other hand, stresses the public policy against enjoining entire complex products based on the infringement of limited, non-core features. The Court previously recognized that both concerns are valid but on balance found the concern over a small number of features exerting inordinate control over an entire product to be more compelling. *Apple III*, 909 F. Supp. 2d at 1163 ("[W]hile the public interest does favor the protection of patent rights, it would not be in

39

the public interest to deprive consumers of phones that infringe limited non-core features, or to risk disruption to consumers without clear legal authority.").

The only new fact is that Samsung represents that no infringing units are currently in the marketplace. *See* Opp. at 19. Apple presents no evidence that any current Samsung devices incorporate the patented features. As such, it appears that the public interest slightly favors Samsung.

### E. Weighing the Equities: An Injunction is Not Warranted

The Court concludes that Apple simply has not met its burden of proof to warrant an injunction. Most significant is Apple's failure to prove a causal nexus between Samsung's infringement of Apple's patents and Apple's irreparable harm. The Federal Circuit instructed that "evidence that a patented feature *significantly* increases the *price* of a *product*" may "be used to show that the feature drives demand for the product." *Apple IV*, 735 F.3d at 1368 (emphasis added). For the reasons stated above, Dr. Hauser's survey evidence does not demonstrate the patented features' effect on the *price* of a *product*, nor does it prove that the patented features' effect on demand for the product is *significant*. Apple asks the Court to extrapolate from Dr. Hauser's willingness to pay estimates for the patented features to the market price of the product— something Dr. Hauser himself concedes is inappropriate. ECF No. 2840 at 591:8-13 ("Q: And none of those numbers would reflect, by the way, what people would actually pay in the marketplace? A: Oh, I'm very clear on that. I just have market demand and that the, the actual price that you pay depends upon both the demand and also what Apple and Samsung would be willing to supply."). Without consideration of the baseline price of the products or market supply (influenced for example by other competitors on the market), Dr. Hauser's willingness to pay numbers are devoid of a proper context. As to whether the patented features' impact is significant, Dr. Hauser failed to appropriately consider noninfringing alternatives, and a host of presentation issues combined to inflate survey respondents' willingness to pay for the patented features. When the Court directly asked at oral argument, even Apple's counsel could not represent that Dr. Hauser's survey proves that the patented features drive demand for Samsung's products. *See* Hr'g Tr. 34:8-35:9.

40

In addition, the contemporaneous consumer survey evidence not created for the purposes of litigation demonstrates that other smartphone and tablet features contribute to consumer demand for the products. Samsung presents several consumer surveys—commissioned by both Apple and Samsung to understand consumer preferences—showing that consumers value a multitude of features. Not a single market research study conducted outside of the context of litigation even asks about the patented features. In the face of these studies, Dr. Hauser's survey and Apple's ease of use and copying evidence fail to show that the patented features drive consumer demand.

The Court has evaluated the patented features in the aggregate and has reviewed all of the evidence for and against an injunction submitted by both parties. Based on the totality of all of the evidence, the Court finds that Apple has not shown that the combined effect of the three patented features drive consumer demand.

In the end, the Court is left with Apple's request to prohibit Samsung from selling 23 of its products, and any products not more than colorably different, in the United States based on Samsung's infringement of three Apple utility patents. To persuade the Court to grant Apple such an extraordinary injunction—to bar such complex devices for incorporating three touchscreen software features—Apple bears the burden to prove that these three touchscreen software features drive consumer demand for Samsung's products. Apple has not met this burden. Accordingly, the Court continues to heed Justice Kennedy's observation in *eBay* that "[w]hen the patented invention is but a small component of the product the companies seek to produce . . . legal damages may well be sufficient to compensate for the infringement." *eBay*, 547 U.S. at 396 (Kennedy, J., concurring); *see also Apple IV*, 735 F.3d at 1372-73. Similarly here, the totality of the evidence fails to show that the patented inventions drive consumer demand. The Court concludes that, on this showing, it would be inequitable to enjoin Samsung's products from U.S. markets.

## V. CONCLUSION

For the foregoing reasons, Apple's Renewed Motion for a Permanent Injunction is hereby DENIED.

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION

**IT IS SO ORDERED.**


Dated: March 6, 2014

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No.: 11-CV-01846-LHK
ORDER DENYING APPLE'S RENEWED MOTION FOR PERMANENT INJUNCTION