# Exhibit C
# (Redacted Version)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>                    Plaintiff,<br>     v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                    Defendants. | Case No.11-cv-01846-LHK<br><br>**EXPERT REPORT OF TERRY L. MUSIKA, CPA** |

**SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Apple Intellectual Property In Suit that the particular accused product is accused of infringing.

84. The aforementioned structural restrictions imposed by law on the calculation of damages involving multiple categories of intellectual property results in the need to approach the calculation of damages for each unit sold of the Samsung Accused Products in a sequential manner. Further, there is an inherent hierarchy of damage remedies that I apply due to the variation in per unit damages associated with each remedy. First, I consider whether an accused item qualifies for lost profits. If a unit sale of an accused item qualifies for lost profits, no other form of damage remedy is awarded. If a unit sale of an accused item does not qualify for lost profits, then my next consideration is whether the accused item qualifies for damages under an infringer's profit calculation. Once again, if the unit sale of an accused item qualifies for an infringer's profit, no other form of damage remedy is possible. Finally, if neither a lost profit or an infringer's profit damage is assigned to a unit sale of an accused unit, then the damage calculation would be based on a reasonable royalty for every item of Apple Intellectual Property In Suit that the Samsung product is accused of infringing. **Exhibit 16** is a simple hypothetical illustration of the aforementioned sequential approach to the calculation of damages.

85. Using this method, I have calculated the damages that can be reasonably calculated for Samsung's sales of the individual units of various models identified as Samsung Accused Products in light of each element of the Apple Intellectual Property In Suit and summarized the results on **Exhibits 17 and 17.1** and as further summarized in the table below. I have made the calculation on a product by product basis because the limitation on damages is product specific. I determined the amount of damage on each individual product that was subject to lost profits, infringer's profits and a reasonable royalty because I wanted to make sure that I did not calculate more than the allowable damages on any given product.

|  | **Revenue Basis** | **Gross Profit Basis** |
|---|---|---|
| Lost Profits | $583,191,122 | $583,191,122 |
| Infringer's Profits – Design Patents, Trade Dress & Trademarks | 5,510,092,347 | 2,008,994,149 |
| Reasonable Royalty | 0 | 0 |
| **Total Damages** | **$6,093,283,469** | **$2,592,185,271** |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

86. In the alternative, I assumed that all Apple Intellectual Property In Suit was valid and infringed by all Samsung Accused Products. However, I removed any lost profits remedy from the damage calculation. The results of this calculation are summarized on **Exhibits 18 and 18.1** and in the table below**.**

|  | **Revenue Basis** | **Gross Profit Basis** |
|---|---|---|
| Infringer's Profits – Design Patents, Trade Dress & Trademarks | $6,424,701,038 | $2,337,518,680 |
| Reasonable Royalty | 0 | 0 |
| **Total Damages** | $6,424,701,038 | $2,337,518,680 |

87. As a second alternative, I have assumed that all Apple Intellectual Property In Suit was valid and infringed by all Samsung Accused Products. However, I removed infringer's profits from the damage calculation. The results of this calculation are displayed on **Exhibit 19** and summarized in the table below.

| Lost Profits | $583,191,122 |
|---|---|
| Reasonable Royalty | 511,999,442 |
| **Total Damages** | $1,095,190,564 |

88. I could calculate the damage amount based on other combinations of remedies, such as lost profits alone or reasonable royalty alone and as describe further below, I have prepared the damages model in such as way that it can accommodate changes in what products remain in the case or are infringed, what patents remain in the case and are infringed, when Samsung was aware that Apple was asserting claims against it and corresponding changes regarding when Samsung might begin an effort to redesign its products in light of the Apple Intellectual Property in Suit.

89. Although **Exhibits 17, 18, and 19** provide a separate analysis of the amount of damages that would result under the various forms of remedy available to Apple assuming all categories and items of Apple Intellectual Property In Suit are valid and violated, the results present a damage calculated for only some of the many possible outcomes that may result from a trial. Based on the fact there are

multiple logical and permissible categories of damages (e.g., as described above), 31 different individual items of Apple intellectual property, 22 separate claims, 32 different accused products at issue, a very large number of potential scenarios exist. I also understand that Samsung contends that they did not receive actual or constructive notice of some of the asserted patents until approximately April of 2011. Although Apple disputes Samsung's claim, I am able to calculate the impact to Apple's damages of changes to the date on which notice occurred and any resulting effort to design around would begin. Given these variables, there are more than tens of thousands of possible outcomes. It is not practical or even possible to submit a report reflecting the damage outcome associated with every possible outcome. However, the damage model used to calculate the damages reported herein is capable of calculating a final damage amount based on different combinations of these variables in connection with a Court decision or the evidence at trial. Therefore, I am prepared to calculate and render an opinion on the amount of damages if less than the total number of Samsung Accused Products proceeds to trial, if less than all patents proceed to trial, if damages are limited to any particular period for any of the Intellectual Property in Suit, or if Samsung was on notice of the intellectual property and began an effort to design around the patents at a different date, if and when requested to do so by counsel or the Court or based on the evidence presented at trial. I am also prepared to produce both the results of any calculation and the complete Access database model used to perform my calculation if asked to do so.

90. I have provided a description of my calculation of lost profits, infringer's profits and reasonable royalty in a separate section for each form of remedy. **Exhibit 20** is a summary of the organization and calculation of each form of damage based on each item of Apple Intellectual Property In Suit.

91. The foregoing calculations are necessarily limited by the information available to me at this time. Two comments on this subject are noteworthy. First, information on sales and financial performance for both Apple and Samsung, as well as other relevant metrics discussed below are available only through December 31, 2011. Before trial, I would expect to receive some, if not all of the relevant information through June 30, 2012 and would update accordingly. Second, Samsung refused to produce certain information relevant to my calculations in response to a Court order and other discovery requests prior to the close of discovery. Apple has sought such materials from the Court.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

124. This decision reflects a matter of judgment that substantially misses a significant portion of the harm that Apple is experiencing. There is ample evidence that Samsung copied Apple's designs and its patented technology. It is also apparent that they did so based on a belief that such actions made the resulting products significantly more desirable to consumers. Empirically, Samsung did not begin to succeed in the smartphone marketplace until products that used Apple's Intellectual Property In Suit entered the market in 2010. There is no support that any alternative design would be commercially acceptable. Nonetheless, it is difficult to obtain a precise measure of that change. My analysis can however, measure the impact that changes in the level of acceptance would have on Apple's damages. My analysis can estimate the amount of lost profits that was available but not claimed as a damage assuming Samsung's design around model was not commercially acceptable. There are 18,230,472 accused units. I calculated lost profits on only 2,197,534 of the total (approximately 12%). Assuming an infringer's profit was awarded on every accused unit in which a lost profit damage was not claimed,

[text redacted]

125. My model is similarly conservative in that it assumes that Samsung returns to the market and can achieve similar sales immediately upon its return. Again, this is unlikely in practice and this assumption significantly reduces the amount of lost profits that I calculate on Apple's behalf.

126. The third condition is whether Apple had the demonstrated operational capacity to replace Samsung's accused sales. To evaluate Apple's ability to handle the excess demand created by the need to supply iPhones and iPads in the "but-for" market, I have (1) evaluated a capacity analysis performed by Apple and set forth in two reports that were discussed at the deposition of Mark Buckley, and (2) had discussions with Mr. Buckley and Rory Sexton, Apple's VP of Supply and Demand Management.[116] This analysis represents Apple's actual quarterly manufacturing and sales results as well as Apple's capacity to produce units above what was actually manufactured, referred to by Apple as "Installed Capacity." To calculate the installed capacity, Apple determined the number of manufacturing lines

---

[116] APLNDC-Y0000055416 and APLNDC-Y0000055417; Deposition of Mark Buckley, February 23, 2012, Exhibits 15 and 16; Discussion with Rory Sexton and Mark Buckley.

1 which were in place during the 2010 – 2011 period. Next, by applying the maximum manufacturing rates and the number of days and hours in service, the maximum number of units available was calculated. Last, Apple made adjustments to decrease that maximum to accommodate for periods where there were known shortages in parts and materials, product allocated to a particular location, time needed for maintenance, holidays, and other periods in which manufacturing stops, and other factors that affect capacity as well as to adjust for returns, and manufacturing defects.[117]

127. As shown on **Exhibits 26 & 27**, I have used Apple's analysis to calculate the quarterly excess unused capacity for both the iPhone and the iPad. ███████████████████████████████████████████████████████████████████████████ This created a conservative estimate of Apple's excess capacity available for the sales of units in the "but-for" scenario. Additionally, I made the excess capacity created during a quarter to be available at the start of the following quarter because I did not have timing detail. ███████████████████████████████████████████ As shown on **Exhibit 17.2**, Apple demonstrated its ability to have capacity to accommodate additional units as calculated in this report.

128. The fourth and final factor requires that the calculation be completed to a reasonable degree of certainty. As described in detail below, I have completed a detailed analysis of Apple's sales "but-for" Samsung's alleged infringement. This calculation relies on the parties' document production, sworn testimony and industry analysts who are relied upon by both Apple and Samsung. Additionally, this model is constructed using a series of conservative approaches which are described in detail in this report.

129. The above analysis is intended to provide evidentiary support for the position that Apple would have made Samsung's sales "but-for" Samsung's improper use and reliance on one or more identified items of Apple Intellectual Property In Suit. However, as indicated my methodology adopts an even more conservative premise in that it assumes that Samsung would have developed some conceptual design

---

[117] Discussion with Rory Sexton and Mark Buckley.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

alternative to the asserted intellectual property, returned to the market once such conceptual alternative was designed, tested, manufactured and distributed to sell an equivalent number of units with the redesigned product. All these assumptions are conservative. Accordingly, Apple's lost sales are based on the amount of lost sales only during the number of months Samsung is removed from the market. **Exhibit 20** identifies the number of months to design, test, manufacture and distribute an alternative smartphone and tablet that does not embody the accused element of each item of Apple Intellectual Property In Suit. This period begins at the later of the issuance of the item of Apple Intellectual Property In Suit or the date in which Samsung first sold the product embodying the Apple Intellectual Property In Suit and assumes that Samsung had notice of the patents on that date. I understand that Samsung contends that it lacked actual or constructive notice of its infringement for at least some of the patents until suit was filed. To the extent that Samsung succeeds with respect to this claim, the calculations done to determine the amount of time that Samsung would be unable to sell products should begin at the date in which notice is proven. As noted above, the model can be adjusted to provide the Court, counsel or the jury an alternative calculation reflecting this change.

130. I then reduced the number of remaining Samsung accused smartphone units that would have been sold by Apple "but-for" Samsung's reliance on Apple's intellectual property by removing all but 26% of the remaining accused smartphones that were sold to carriers that did not, at the time of the accused sale by Samsung, include a replacement Apple product. I include 26% of the sales made by carriers that did not include an Apple product at this stage of my lost profits calculation based on a Google survey that is displayed on **Exhibit 28.** The Google survey found that 26% of 2,961 respondents questioned in 2010 that recently purchased a cell phone indicated that they had chosen a new carrier for their purchase. The basis of this conservative reduction in removing 74% of the sales made to carriers that did not carry an Apple product is also reflected on **Exhibit 20**.

131. I next reduced the number of remaining Samsung accused units that would have been sold by Apple "but-for" Samsung's reliance on Apple's intellectual property by removing all remaining accused items that would have been sold by other Original Equipment Manufacturers ("OEMs") that offered non-accused smartphones or tablets at the time of the accused sale. The basis of the sales that would have been made by other OEMs that offered non-accused smartphones or tablets at the time of the

## S. PROFESSIONAL ARRANGEMENT

265. My work for expert services provided in this matter is charged at a standard billing rate of $550 per hour and is in no way contingent on the outcome of this matter. In addition, I will be reimbursed for all reasonable out-of-pocket expenses incurred in connection with my analyses and testimony in this case.

March 22, 2012

Terry L. Musika, CPA