# EXHIBIT J

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

| | | |
|---|---|---|
| In the Matter of: | ) | Investigation No. |
| CERTAIN MOBILE DEVICES | ) | 337-TA-750 |
| AND RELATED SOFTWARE | ) | |

_____

Hearing Room A

United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.

Friday, September 23, 2011

PREHEARING AND TUTORIAL

The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.

BEFORE:  THE HONORABLE THEODORE R. ESSEX

APLNDC-X0000006145

Page 2

1   APPEARANCES:
2       For Complainant Apple:
3           MARK G. DAVIS, ESQ.
4           BRIAN E. FERGUSON, ESQ.
5           ROBERT T. VLASIS, ESQ.
6           EDWARD S. JOU, ESQ.
7           CHRISTOPHER T. MARANDO, ESQ.
8           Weil, Gotshal & Manges LLP
9           1300 Eye Street, N.W., Suite 900
10          Washington, D.C. 20005
11
12          JILL J. HO, ESQ.
13          BRIAN C. CHANG, ESQ.
14          Weil, Gotshal & Manges LLP
15          201 Redwood Shores Parkway
16          Redwood Shores, CA 94065
17
18          MATTHEW D. POWERS, ESQ.
19          STEVEN S. CHERENSKY, ESQ.
20          PAUL T. EHRLICH, ESQ.
21          ROBERT L. GERRITY, ESQ.
22          Tensegrity Law Group LLP
23          201 Redwood Shore Parkway
24          Redwood Shores, CA 94065
25

Page 3

1   APPEARANCES (Continued):
2
3   For Respondent Motorola Mobility, Inc.:
4           CHARLES K. VERHOEVEN, ESQ.
5           DAVID EISEMAN, ESQ.
6           Quinn Emanuel Urquhart & Sullivan LLP
7           50 California Street, 22nd Floor
8           San Francisco, CA 94111
9
10          EDWARD J. DeFRANCO, ESQ.
11          Quinn Emanuel Urquhart & Sullivan LLP
12          51 Madison Avenue, 22nd FLoor
13          New York, New York 10010
14
15          DAVID A. NELSON, ESQ.
16          Quinn Emanuel Urquhart & Sullivan LLP
17          500 West Madison Street, Suite 2450
18          Chicago, Illinois 60661
19
20
21
22
23
24
25

Page 4

1   APPEARANCES (Cont'd):
2
3   For ITC Staff:
4           LISA KATTAN, ESQ.
5           ANNE GOALWIN, ESQ.
6           U.S. International Trade Commission
7           500 E Street, S.W.
8           Washington, D.C. 20436
9
10
11      Attorney-Advisor:
12          GREGORY MOLDAFSKY, ESQ.
13          Attorney-Advisor
14          Office of Administrative Law Judges
15          U.S. International Trade Commission
16          500 E Street, S.W.
17          Washington, D.C. 20436
18
19
20      *** Index appears at end of transcript ***
21
22
23
24
25

Page 5

1               P R O C E E D I N G S
2                    (9:00 a.m.)
3           JUDGE ESSEX:  All right.  This is a
4   preliminary hearing in Certain Mobile Devices,
5   Related Software, case 337-TA-750.
6           Complainant, would you like to
7   introduce yourself for the record?
8           MR. POWERS:  Thank you, Your Honor,
9   Matt Powers for Apple.
10          MR. DAVIS:  Mark Davis, Weil Gotshal,
11  for Apple.
12          MR. FERGUSON:  Brian Ferguson, also
13  for Apple.
14          MR. EHRLICH:  Paul Ehrlich for Apple.
15          MR. JOU:  Ed Jou for Apple.
16          MR. GERRITY:  Robert Gerrity for
17  Apple.
18          Mr. MELAUGH:  David Melaugh for Apple.
19          MR. VLASIS:  Robert Vlasis for Apple.
20          MS. HO:  Julie Ho for Apple.
21          MR. CHANG:  Brian Chang for Apple.
22          MR. MARANDO:  Chris Marando for Apple.
23          JUDGE ESSEX:  Thank you very much.
24  Respondent's counsel?
25          MR. VERHOEVEN:  Good morning, Your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Honor, Charles Verhoeven representing Motorola
2  Mobility.  With me is my partner, David Nelson,
3  and Ed DeFranco, David Eiseman.  And we also
4  have in-house from Motorola, Tom Miller is
5  here, Your Honor.
6       JUDGE ESSEX:  Thank you very much.
7  Staff?
8       MS. KATTAN:  Good morning, Your Honor,
9  Lisa Kattan from the Office of Unfair Import
10 Investigations.  With me are Anne Goalwin and
11 intern Gary Coad.
12      JUDGE ESSEX:  Welcome.  Welcome.  All
13 right.  Before we get into the issues today,
14 let me go over some housekeeping matters.
15 We're scheduled for September 26th through
16 October 5th.  Our normal hours are going to run
17 from 9:00 o'clock to 5:00 o'clock.  At the end
18 of each day, everyone will have 20 minutes to
19 clear the courtroom and lock up.  I would ask
20 you to please be prompt, because my Staff has
21 to stay, and if you linger, they have to
22 linger.
23      Parties will be responsible for
24 allocating and keeping track of your own time.
25 The exhibits, as they are presented, will be

1  received in evidence at the end of the person's
2  testimony, including the cross, redirect, and
3  recross.
4       Talk among yourselves.  No one has to
5  read exhibits in front of me.  You can work
6  with the court reporter and get those in the
7  record.
8       Parties may use physical exhibits.
9  However, you are warned -- and I think Motorola
10 is aware of this from a recent previous case --
11 that if you put in physical exhibits, you don't
12 get those back.
13      If you want the exhibit back, like
14 your engineers have a favorite old phone that
15 is their own invention, please take a picture
16 of it, put the picture in the record as a
17 substitute.  You may do that without asking
18 permission, but if you leave the physical
19 exhibit in, it is mine.
20      We're going to, with this case, as we
21 have been experimenting with, try to eliminate
22 separate findings of facts.  We're going to ask
23 you to cite the findings of facts and such in
24 the briefs, and any citations and supporting
25 evidence should be directly to the exhibits or

1  the trial testimony.
2       In light of this, we're going to try
3  page limits as follows:  For the initial
4  post-hearing briefs, I have a 200-page page
5  limit.  To those of you who may have questions
6  about it and so on, that is 200 pages, double
7  spaced, 12 point font, Microsoft standard.
8       If you write more, if you feel a
9  burning desire to do appendices, addendums,
10 footnotes, attachments, however you want to
11 characterize it, after 200 pages, I lose the
12 ability to read.
13      You can do them.  I am not going to
14 read them.  Your post-page reply briefs are
15 100-page limit.  If there is a real strong need
16 to do otherwise, I will entertain motions, if
17 it cannot possibly be done within 200 pages or
18 cannot possibly be done within 100.  Make a
19 motion.  Otherwise, I will not read past those
20 limits.
21      I will add also that greater minds
22 than my own have found brevity is the soul of
23 wit.  Judge Michel has urged that less can be
24 more.  And anything else that might encourage
25 conciseness, I would ask you to cite.

1       Initial post-trial briefs and the
2  final exhibit lists, it is my calculations are
3  due October 19th, 2011.  Reply briefs will be
4  due October 28th, 2011.  At the end of the
5  hearing, the parties will have two days for
6  courtroom cleanup.
7       Do you have any questions or comments
8  with those matters?
9       I would add briefly that I do allow
10 coffee and other beverages in the courtroom.
11 However, I also would hasten to add you are
12 responsible to clean up your own areas and pick
13 up after yourselves.  Nobody here is assigned
14 to do that at the Commission.  If it becomes a
15 problem, then I will revisit that, but for
16 right now, beverages and things of that nature
17 are permitted, as long as we abide by that rule
18 that we're going to clean up after ourselves.
19      Let me turn, if there is nothing else
20 administratively right now from any of the
21 parties, we will go into the motions in limine
22 and objections.
23      Hearing nothing, we had a number of
24 agreements on the motions in limine.  If I skip
25 something or I miss -- lose track of something

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1 and that, at the end of the ones that I know
2 about, we will take up the ones I have
3 forgotten, if there are any.
4       We will start with motion in limine
5 number 6 to exclude the testimony of witnesses
6 who were not offered for deposition or in the
7 alternative to compel deposition.  And Apple
8 has moved to preclude a number of witnesses.  I
9 am not going to go into detail about which ones
10 and so forth for the record.
11       Right now, I do find that those
12 witnesses were timely disclosed and on a
13 procedural schedule that we have and the rules
14 that we have, Motorola is under no obligation
15 to disclose which one it actually intended to
16 call at hearing, until they filed a first
17 prehearing statement.  I find there was an
18 opportunity to interview the witnesses, take
19 depositions, and so on, so none of those
20 motions regarding witnesses are granted.  They
21 are all denied.
22       I think Apple have ample opportunity
23 for cross-examination.  They will be able to
24 handle the witnesses.
25       Turning to Motorola and their motion

Page 11

1 in limine to preclude Apple from introducing an
2 expert opinion testimony of an undisclosed
3 expert, and this apparently involves an expert
4 witness that has been disclosed,
5 Dr. Subramanian -- can you pronounce that?
6       MR. DAVIS:  Dr. Subramanian.
7       JUDGE ESSEX:  Dr. Subramanian.  I
8 probably should know that.  I believe I have
9 had him before.
10       In any event, it is quite common in
11 these cases that experts come in and do rely on
12 teardown reports, reports from other agencies,
13 people they hired to conduct tests and so
14 forth.  The motion is denied.
15       To the extent he may not have
16 supervised the lab, that he may not have
17 supervised those to provide proper information,
18 those are all issues that would go to weight
19 and I am confident that the abilities of the
20 attorneys cross-examining will help me assess
21 the appropriate weight to give those reports
22 and give to the expert testimony.
23       So those are denied.  He may testify.
24 He may use the UBM reports.  And any problems
25 with those, I expect will be brought out in

Page 12

1 cross-examination.
2       We will turn to Apple's high-priority
3 objections that I'm aware of now, number 2,
4 that Motorola should be precluded from
5 submitting an expert report and incorporating
6 the expert report into expert witness
7 statements.
8       I find no problem with the manner of
9 the expert reports having been done by
10 incorporation.  Those matters can be brought
11 in.  They could be brought in
12 question-by-question.  And I don't specifically
13 state how those things ought to be done in the
14 witness statements and so forth.
15       So to the extent that they incorporate
16 by reference or have references to expert
17 reports that are included in any fashion in a
18 witness statement, the parties are aware of
19 those, they can bring it out on
20 cross-examination.  The entire expert reports
21 are not evidence and, but to the extent
22 they are alluded to in the witness statement
23 and covered, then I, again, suggest
24 cross-examination can cover that matter, and I
25 deny their motion to preclude.

Page 13

1       The reports themselves are not
2 evidence and will not be admitted, but to the
3 extent they are included in a witness
4 statement, that is permissible.  You can
5 cross-examine on it.  And we will just deal
6 with them on a case-by-case basis.
7       Regarding the number 6, the objection
8 is the same as the motion in limine and that's
9 covered by the ruling above.  It is denied.
10 Objection number 9, Motorola should be
11 precluded from offering testimony regarding
12 products that are not accused of infringing the
13 '607 patent and the '828 patent.
14       I am puzzled.  If Motorola wants to
15 use their time to attack patents that are not
16 in issue here, I don't know why Apple -- it is
17 irrelevant and can be excluded on that grounds.
18 I'm not prepared to rule right now.  We will do
19 it on a question-by-question basis, when those
20 witnesses come up.
21       But to the extent that one party
22 should use their time on matters that are not
23 before me, I find odd that this is made as an
24 objection, but I will grant it, to the extent
25 that if there are questions regarding patents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  not in issue, those would be -- they would have
2  to demonstrate the relevance or they will be
3  excluded, but on a question-by-question basis,
4  we will take those up when those witnesses are
5  in front of us.
6      Number 10, Motorola should be
7  precluded from offering designated deposition
8  testimony outside the scope of the corporate
9  deposition.  Again, I would like you to work it
10 out.  To the extent a witness has offered
11 something that is not within their designation,
12 that would be irrelevant.
13     But we will have to take it up on a
14 question-by-question basis.  The objection will
15 be well-founded if the witness is speaking of
16 something that's clearly outside their area,
17 unless they are offered as a fact witness, and
18 it is within their personal knowledge.  But I
19 would have to see what questions there are and
20 rule on them specifically, so I am going to
21 take that up again witness-by-witness or
22 question-by-question.  If you believe when a
23 witness statement is offered, there is an offer
24 of evidence in there that's beyond the scope,
25 we will take those up specifically.

1      Regarding Motorola's high-priority
2  objection, saying Apple should be precluded
3  from offering opinion testimony of the
4  undisclosed expert, again, this is the same as
5  the motion in limine and it is denied.
6      Regarding evidence offered without a
7  sponsoring witness, I have never seen so many
8  proposed exhibits without a sponsoring witness.
9  To the extent that the parties are in agreement
10 and it makes sense, I will allow it.
11     I find it unusual and we will see how
12 it goes and that, but if the parties do not
13 agree on it, the evidence normally must have a
14 sponsoring witness, and I will so hold.  But to
15 extent that the parties are in agreement, that
16 will be fine.
17     I have reviewed the attached
18 stipulations, they're fine with the Court.  The
19 more that the parties can agree and streamline
20 the case, generally the happier you will find
21 me to be.  So I will accept the stipulations.
22     I was handed one more thing this
23 morning that we hadn't covered up in my office,
24 and apparently there is a Respondent's motion
25 to terminate the investigation with respect to

1  the '430 patent, suggesting Apple does not own
2  the patent and has no standing asserted.  Is
3  that still a motion in front of us?
4      MR. EISEMAN:  It is, Your Honor.
5      JUDGE ESSEX:  All right.  And I assume
6  Apple is claiming they still own the patent?
7      MR. POWERS:  Yes, Your Honor.
8      JUDGE ESSEX:  Then the facts are in
9  dispute.  The motion will be denied and we will
10 see what the facts bring, but I assumed there
11 would be a factual dispute on this.  As you
12 know, the rules -- I would have to interpret
13 the facts that are before me in the most
14 favorable manner for Apple, and at this time,
15 as long as there is disagreement, we're going
16 to hear the evidence on it so the motion is
17 denied at this time.
18     Those are the rulings I have.  And the
19 issues I'm aware of as alive.  There has been a
20 lot of progress and there has been a lot of
21 discussion of the parties, which I utterly
22 approve.  So what was originally in front of me
23 was fairly massive and this has been whittled
24 down.  Have I missed any motions in limine or
25 priority objections that are still in front of

1  us before we go?  Complainant?
2      MR. POWERS:  I believe not, Your
3  Honor.
4      MR. VERHOEVEN:  No, Your Honor.
5      JUDGE ESSEX:  Staff?
6      MS. KATTAN:  No, Your Honor.
7      JUDGE ESSEX:  All right.  Complainant,
8  do you have -- how would you like to proceed
9  this morning?  I understand that you have
10 either some argument or questions?
11     MR. POWERS:  We're prepared to proceed
12 with the technical tutorial, Your Honor, with
13 our expert witness.
14     JUDGE ESSEX:  All right.  Is there
15 anything else to take up before we go to
16 tutorials?
17     MR. VERHOEVEN:  Nothing else, Your
18 Honor.
19     MR. DAVIS:  Your Honor, just a couple
20 follow-up issues with regard to Your Honor's
21 ruling.  With regard to the ability to cross
22 the witnesses for which no depositions were
23 taken, we have asked Motorola for their trial
24 testimony in the recent '744 case, Your Honor,
25 to help us with that cross.  And they haven't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 18

1  denied that they have a duty to supplement or
2  that it is subject to discovery requests in
3  other cases for which there is a cross-use
4  agreement, they have just been dragging their
5  heels in providing us that transcript.
6       So, Your Honor, we would just ask that
7  Motorola have us -- provide us with those
8  transcripts so we can use those in
9  cross-examining these witnesses for which we
10 weren't able to take a deposition.
11      JUDGE ESSEX:  All right.  Let me just
12 say one thing at the outset.  If you want to
13 stay on my good side, and I don't recall having
14 discussed with you beforehand, but I would ask
15 you, please do not characterize things in a
16 negative fashion, the dragging heels.  I
17 understand what you want and what you need, but
18 characterizing it that way really doesn't help,
19 and I find parties cooperate better if we do
20 not use derogatory terms to describe the
21 actions.
22      What you are saying is you have not
23 yet received it.  Perfectly fine.  But as
24 people have appeared before me, attorneys
25 appeared before me realize, I want to keep

Page 19

1  those types of characterizations out of the
2  cases and that.  As far as I know, everyone
3  here has behaved as a thoroughly competent
4  professional, and I want to keep our
5  conversations on that basis.
6       MR. DAVIS:  Very good, Your Honor, I
7  apologize.
8       JUDGE ESSEX:  If you would.  Motorola,
9  do you have that testimony?  Do you want to
10 provide it?  Where are we on it?
11      MR. DeFRANCO:  Your Honor, we did
12 attempt to cooperate.  We provided the
13 testimony of some witnesses that we thought was
14 relevant, the PenPoint prior art reference, you
15 may remember from the other case, the same
16 three witnesses are scheduled to appear here.
17      We gave them that testimony because it
18 was on the same prior art.  We thought that was
19 a reasonable place to draw the line because, as
20 you are aware, and we informed them, one of the
21 experts is in common between the two cases,
22 Dr. Locke, but he wasn't crossed in the other
23 case.  His direct involved different patents.
24      And there was confidential information
25 in that testimony.  We're all in trial mode.

Page 20

1  We thought, you know, that was the appropriate
2  place to draw the line.  There didn't seem to
3  be the pressing need for us to figure out what
4  was confidential or not in Dr. Locke's direct
5  examination, given that it involved different
6  patents and different technologies.  There are
7  a couple of fact witnesses that would apply to
8  as well.  There was the same issue there, Your
9  Honor, with respect to confidential information
10 and we didn't see the overlap warranted the
11 discovery.
12      Our last point, which we expressed to
13 them, obviously, discovery has long since
14 closed.  We said this would be a two-way
15 street.  Their witnesses have testified at all
16 sorts of hearings and trials.  Are we going to
17 get all that information?  It seemed
18 unwarranted to let them open the door in that
19 respect.  We thought, as I said, we drew the
20 line at a reasonable place and that was our
21 position overall on it.
22      JUDGE ESSEX:  All right.  Staff, would
23 you like to be heard regarding this matter?
24      MS. KATTAN:  No, Your Honor.
25      JUDGE ESSEX:  Thank you.  And I do

Page 21

1  note discovery has closed a long time ago.  I
2  appreciate cooperation.  I like to see it.  To
3  the extent that these appear to be discovery
4  requests, then I am not going to entertain
5  them.  I appreciate that there is a long
6  witness list, but you did have it within the
7  discovery period.
8       I know it is a burden to depose
9  everyone.  I understand that it can cause
10 burdensome costs, but we are where we're at and
11 we're going to proceed.  I am not going to
12 issue any kind of order regarding any further
13 testimony.  To the extent parties can cooperate
14 and if you have information they are interested
15 in, perhaps a deal can be done, but there will
16 be no further orders regarding discovery at
17 this time.
18      Let's proceed with the tutorial.
19 Counsel?
20      MR. FERGUSON:  Thank you, Your Honor,
21 good morning.  I am just here to present our
22 expert, who will actually be doing the heavy
23 lifting today, in presenting the technology
24 tutorial.  His name is Dr. Ravin Balakrishnan.
25 Dr. Balakrishnan is a professor at the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  University of Toronto.  He has a Ph.D. in
2  computer science.  His research interests
3  involve the technology we think is very germane
4  to the case today and includes touch input and
5  sensing technologies.
6        He has published over 100 papers in
7  that area.  He is an inventor on nine U.S.
8  patents.  And we're very pleased to present him
9  here today.  He will, of course, be doing some
10  additional heavy lifting when it comes to the
11  trial starting on Monday.
12        And unless there are any questions, I
13  will just turn the floor over to him.  I
14  believe we have handed out copies of our
15  tutorial to everyone.
16        JUDGE ESSEX:  Well, I have got my
17  copy.  Does everybody else have one?
18        MR. VERHOEVEN:  Yes, Your Honor.
19        JUDGE ESSEX:  All right.  Doctor.
20        DR. BALAKRISHNAN:  Is the microphone
21  good?  All right.
22        So I guess that's my bio sheet, which
23  Brian has already introduced me.  So the
24  overview of today's tutorial is we're going to
25  be talking about several different topics.

1  First of all, we're going to be talking about
2  multi-touch touch-screen operation.  And within
3  that, I will be talking about the hardware and
4  the software relevant to that technology.
5        Subsequent to that, I will be talking
6  about adding components to a computer system,
7  which is the second topic.  And then we will
8  round this off with talking about the specific
9  technologies related to the three patents that
10  are of interest in this case, the first one
11  being the multi-point touchscreens patent, the
12  '607 patent, followed by the ellipse fitting
13  for multi-touch surfaces patent, which is the
14  '828 patent; and ending with the
15  object-oriented system locator system patent,
16  the '430 patent.
17        So first let's start with multi-touch
18  touchscreen operation.  And just at a very high
19  level, I have on the left-hand side of the
20  screen a hypothetical phone and the user
21  bringing a finger down to touch it.  And when
22  the user touches it, the touch device requires
23  two broad pieces of technology to process that
24  touch.
25        First, it needs some hardware to sense

1  that the user has touched it at a particular
2  location.  And then some software to actually
3  identify and process that touch data into a
4  user command or gesture that can be applied to
5  a particular software application.
6        So in terms of the hardware, there are
7  several different types of sensor technologies
8  that can sense that user touch on the device.
9  And here are some examples.  There are
10  resistive technologies, infrared, optical ones
11  using cameras, surface acoustic wave
12  technologies, and the last example here are the
13  capacitive technologies is the one I want to
14  focus on because it is the most germane to the
15  patent of interest here in this case.
16        So let's talk about capacitive
17  sensors.  So capacitive sensors, and I am going
18  to talk about four broad topics within that
19  genre of sensing.  First of all, there is an
20  issue of what is known as surface capacitance.
21  Then I will talk about entire row and entire
22  column capacitance sensing, followed by
23  row/column intersection capacitance sensing,
24  and then I will discuss two terms that are of
25  interest, which are mutual versus

1  self-capacitance.
2        So let's take each of these in turn
3  now.  So, first of all, before I get into those
4  four sub-topics, what is capacitive sensing at
5  a very high level?  So when two conductive,
6  electrically conductive elements come together,
7  the electrical charge between them changes.
8        And this change in energy between
9  those two elements is measured as what is known
10  as capacitance.  And what is also interesting
11  is that the human finger is electrically
12  conductive.  And if you bring your finger
13  towards an electrically charged element, the
14  capacitance change caused by that finger can be
15  used to detect touching.
16        So that's a very high overview of what
17  capacitive sensing is all about.  So let's talk
18  about surface capacitance now.
19        So what I'm showing you on this
20  screen, which is CDX-10.010, is a schematic.
21  And on the top is a side view of a hypothetical
22  touchscreen device.  On the bottom is a frontal
23  view of it.
24        And, first of all, this device is
25  going to have a conductive coating, some kind

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1  of conductive coating applied to an insulator.
2  All right?
3       Now, current will be applied to the
4  four corners of that conductive coating.  And
5  when a finger comes towards the surface and
6  then touches it, a capacitor is formed between
7  that finger and that conductive coating.  And
8  essentially draws current from those corners.
9       And you see there in the red circle,
10 the point of contact representing that finger.
11 And that location of that finger can be
12 calculated by measuring the change in current
13 at those four corners.
14      So based on that, we can interpolate
15 the X and Y position of that finger or point of
16 contact.
17      Now, that was a single finger touching
18 that conductive surface capacitor.  Now, what
19 happens if two touches happen to touch that
20 same device?  And here the two touches are
21 indicated in the red circles.
22      With this technology, what happens is
23 only the average position is reported.  So the
24 average of those two touches roughly is
25 indicated by the orange circle.  And, as a

Page 27

1  result, you get a value that is indicative of
2  the approximate center of those two touches and
3  not the two touches separately, which might be
4  more desirable in some situations.
5       So surface capacitance touch screens,
6  which detect single touches quite reliably are
7  used in devices where such single touch
8  applications make sense, for example, in ATM
9  machines that many of us are familiar with.
10 And this is an example of an ATM-type terminal.
11      Now, moving along from surface
12 capacitance, if we want to do a bit more than
13 just sense a single touch accurately, we can
14 look at what's known as entire row and entire
15 column capacitive sensing.
16      And what we do here is on this graph
17 -- sorry, on this slide, I'm going to show a
18 hypothetical touch sensor being built up with
19 rows, several rows of conductive material.  So
20 instead of a single piece like in the previous
21 surface capacitance technology, here we're
22 going to break it up into rows and each row has
23 a lead coming out of it that will take a charge
24 on it, electrical current on it.
25      And we overlay this with an insulating

Page 28

1  layer.  And then overlay it with a series of
2  columns of similar conductive material running
3  orthogonal or perpendicular to the rows that
4  were previously laid down.  So you have
5  basically got a grid of rows and columns of
6  conductive material separated by an insulating
7  layer.
8       And the way this technology works is
9  you run currents through these conductors and
10 measure the capacitance relative to ground.
11 And any time you touch a portion of this
12 sensor, one or more rows and columns will be
13 activated.
14      So in this example, I have shown one
15 row and one column with the hypothetical values
16 of capacitance being read.  Now, if you have
17 two touches on the same row, that activates the
18 same row, it will activate one row but two
19 columns, for example.
20      Now, if I have two touches on
21 different rows and different columns, you get
22 two rows and two columns being activated.  As
23 you can see here, the two fingers are touching
24 two different spots.
25      Now, an interesting thing happens with

Page 29

1  this technology, is if I take my two fingers
2  and I touch a very different two positions but
3  which happen to activate the exact same rows
4  and columns, the sensor gives me the same set
5  of values.
6       So I am going to go back and forth
7  here.  Two fingers in this orientation activate
8  those two columns and those two rows
9  (indicating), the same values.  Now, if I move
10 my fingers to another orientation, which
11 happens to activate those same rows and
12 columns, I get those same values, and, as a
13 result of putting these two side-by-side, it is
14 impossible to distinguish between these two
15 very different touches using this technology.
16      So another problem with this
17 technology is if I have a very large touch or a
18 larger touch, so, for example, I put a thumb
19 down with much of it touching the surface, it
20 may activate three columns, for example, and
21 two rows.
22      And then if I subsequently put a
23 finger down with a smaller touch, that would
24 typically only activate, say, one column and
25 one row.  In this case, though, because the

APLNDC-X0000006152
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  thumb has already activated three of those
2  rows, it masks the smaller touch of the single
3  finger.
4        As a result, it is difficult to say
5  exactly where the finger is in terms of which
6  row it is on.
7        So these are two potential problems
8  with this entire row and entire column type of
9  capacitive sensing.
10        So let's move on to the next type of
11 capacitive sensing, which is known as row and
12 column intersection capacitive sensing.
13        So here we have a very similar kind of
14 layout.  A series of rows of conductive
15 material, like in the previous section, and we
16 call this drive rows in this case.  And then
17 again we put an overlay insulating layer of
18 glass or plastic.
19        And then overlay a series of
20 orthogonal or perpendicular columns of
21 conductive material.  And these are the sense
22 columns.
23        So this graph -- this figure looks
24 very similar to the previous figure, except the
25 way the sensing works is it is going to sense

1  the relative capacitance between the
2  intersections of the rows and the columns as
3  opposed to the rows and columns to its ground
4  as in the previous case.
5        And this type of sensor allows you to
6  detect the changes of capacitance at the
7  intersection.  So when I put a finger down, it
8  no longer activates the entire row and entire
9  column.  You get the points around the finger,
10 around the intersection point.
11        And if I put two fingers down like in
12 the following figure (indicating), it activates
13 the relevant intersection points.  And now the
14 key -- the interesting thing here is that the
15 problem we saw before of two fingers that
16 intersect the same columns and rows can
17 uniquely be identified because the intersection
18 points are different in this case.
19        Now, another term that is going to
20 come up in this case, set of terms is mutual
21 versus self-capacitance.  So I thought I would
22 explain that a little bit here.
23        Capacitive sensing can be built with
24 different principles.  And I have alluded to
25 that earlier.  Some of them use

1  self-capacitance, which is essentially the
2  sensing the change in capacitance between the
3  conductor on the device and ground.  So the
4  figure here basically illustrates I have got a
5  conductor and an insulating layer on top of it
6  and I have got electric field between the
7  conductor and ground.  And if my finger comes
8  in and perturbs that electric field, that
9  change is measured relative to ground.  And
10 that's called self-capacitance.
11        The other kind is called mutual
12 capacitance, where the sensing of change in
13 capacitance occurs between two conductors that
14 are separately charged.  And this figure here
15 illustrates that, when the finger comes in, the
16 capacitance changes relative to the two
17 conductors.
18        So that covers the hardware overview
19 of capacitance sensing.  So let's talk about
20 software.
21        So once I have got my hardware and it
22 generates some touch data, some software is
23 required to properly interpret this data in
24 order to make use of it for particular
25 applications.

1        So, for example, on the left-hand side
2  here, I have got a hypothetical phone.  And on
3  the right-hand side, it shows an application.
4  It happens to have a photograph on it.
5        If I bring my fingers down and the
6  sensor senses that, those touches, it acquired
7  the -- the hardware acquires that touch data
8  and the software then processes that touch data
9  to do something appropriate with it.  So in
10 this example, the fingers are going to move
11 apart and you get this kind of zooming element
12 here, so the processing of that touch data
13 interpreted that movement of those two fingers
14 to mean zoom in to that picture in this photo
15 application.
16        For just -- just to give you another
17 example, a different touch on a map application
18 here coming down, the finger comes down, a
19 single finger, and it moves.  The software
20 interprets that in a different manner from the
21 previous example to take that movement and
22 interpret that as a move to pan or move that
23 map.
24        All right.  So that's the overview of
25 the technology for the touchscreen portion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Now I am going to move to talking about adding
2   components to a computer system. And I am now
3   on CDX-10.043.
4        So here I have got a very high-level
5   overview, a schematic overview of what a
6   computer system might look like. And I have at
7   one level, we have got hardware that may have a
8   central processing unit, some memory, storage,
9   and then above that an operating system that
10  talks to that hardware.
11       And also talks to application
12  software. Here we have shown a few examples,
13  Internet applications, photo software,
14  messaging, word processing, and obviously there
15  could be many others.
16       And taking this computer system as a
17  whole, the operating system needs to recognize
18  and interact with both the software and the
19  hardware. So you can think of the operating
20  system as the intermediary, so to speak,
21  between these two pieces, hardware and the
22  software.
23       And one thing that comes up is when
24  you add new hardware or software to the system,
25  it typically would require restarting the

1   computer device. So, for example, I think many
2   of us have seen these dialogue boxes in your
3   favorite operating system where you add a new
4   piece of hardware or install software and it
5   says you can't use that until you reboot.
6        So this is one issue that comes up.
7        So how do you add these components to
8   an operating system and potentially without
9   rebooting it? So imagine an operating system
10  that has an active area with support for
11  different applications and hardware already
12  loaded up and running. For example, here in
13  this slide, which is CDX-10.046, the active
14  area happens to have support for a web browser,
15  support for a photo application, and support
16  for a music player, for example.
17       And now the user comes in with a USB
18  thumb drive as the little picture on the right
19  and attempts to plug this into the system. And
20  the system says, okay, what do I do with this?
21       And it needs to figure out what is
22  compatible with this USB hard drive. How do
23  you support this and talk to it in an
24  appropriate way?
25       So you could go out and identify all

1   possible components that are compatible with
2   this USB hard drive. And, for example, it may
3   find two possible components that may be a
4   reasonable fit for running and operating this
5   USB hard drive.
6        And using some ranking methodology
7   within its software, it may say, okay, the one
8   on the right, which I have colored in blue,
9   happens to be the most compatible. And it is
10  going to select that as the support piece to
11  handle this USB hard drive, USB thumb drive.
12  And it is going to add this to the active part
13  of the operating system.
14       So I have shown that added below the
15  music support there. And by adding that
16  compatible component, this new component is now
17  -- the support for it is now available as a
18  resource to the operating system and can
19  subsequently be used by the operating system
20  for other applications.
21       So that gives you the overview of
22  adding components to the computer system. So
23  now let's talk about the technologies related
24  to the three patents that are in suit here. So
25  first, the first patent here is the '607

1   patent, called multi-point touchscreen. And
2   there are three main points here that I am
3   going to discuss.
4        One is that -- this is about a
5   transparent touch panel that detects multiple
6   touches. It generates distinct signals
7   representing those -- representative of those
8   multiple touches. And that's important. That
9   is a different shape between these multiple
10  touches and it also uses row/column
11  intersection capacitance that I talked about
12  earlier to detect those multiple touches.
13       So let me illustrate what happens, so
14  I can illustrate what this patent is talking
15  about. On the left-hand side, I have a
16  hypothetical touchscreen shown in the blue
17  rectangle, a schematic of a user's hand that
18  will be moving towards the touchscreen. In the
19  middle is an array of numbers. And this
20  represents the rows and columns of the
21  touchscreen and the values that are read from
22  it hypothetically.
23       On the right-hand side will be a 3D
24  graphical illustration of how those values
25  change just to visualize what happens. So as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 the fingers of the user's hand move forward
2 towards the touchscreen, the capacitance at the
3 intersection points of the touchscreen where
4 the fingers are going to come in contact with
5 start to change.
6        And we see this by the values that I
7 have put a yellow halo or orange halo around in
8 the middle.  And you also see that in the 3D
9 graphical representation, the values start to
10 increase.
11        And we keep moving forward towards the
12 screen.  The capacitance gets perturbed
13 further.  The values change.  And we see also
14 more intersection points come into play.
15        And, finally, as the actual contact
16 happens, you see the main contact points, which
17 happen to have a value of 200 in this example
18 followed by a series of points around it that
19 also have capacitance values that are non-zero,
20 and you can see how these two points are
21 different, even in the three-dimensional
22 representation on the right.
23        So that's the basic overview of what
24 this technology is about.  And because it
25 detects the capacitance of the intersection

1 points, it is able to distinguish between these
2 two kinds of touches, which intersect the same
3 rows and columns, but at different positions.
4        The hardware itself is constructed in
5 the following manner from a conceptual point of
6 view.  So let's start at the bottom with the
7 LCD display or the liquid crystal display.
8 This is the display that displays the
9 information that we see.  It doesn't have to do
10 with a touch per se.
11        On top of that, we overlay it with --
12 or the patent talks about overlaying it with an
13 insulating layer.  It could be glass or
14 plastic.  Then a series of conductive lines,
15 traces are laced on this glass or plastic in
16 this case in one direction.
17        And then an adhesive layer to glue it
18 all together.  And then another insulating
19 layer to separate this set of conductors from
20 the ones that are going to come after that.
21        Then we put another set of conductive
22 layers perpendicular to the one that is
23 previously laid down, which is why we show it
24 in the other direction, followed by another
25 adhesive layer to hold those conductors down,

1 and another insulating layer.
2        So in result, you end up with two sets
3 of transparent.  The key thing here is these
4 conductive lines are transparent and everything
5 above the LCD display is transparent.
6        And you end up with this touchscreen
7 panel.  Here is another view of it, 3D exploded
8 view diagram.  At the bottom, you have got the
9 LCD display, and in the middle, you have got
10 this touch sensor, which I just showed you how
11 it is constructed, and then you have got this
12 insulating layer.
13        These -- the top two layers should be
14 transparent.  Otherwise you end up with -- I
15 think I had a frozen clicker here for a second.
16        Touch panels, they are
17 non-transparent, have been around for a while.
18 The opaque touch pads that you see on laptops
19 and so forth that I have shown on the right.
20 These, if you put an LCD display on it,
21 obviously you won't be able to see the display
22 and the touch, transparent touchscreen
23 arrangement on the left is what this patent is
24 about.
25        And obviously an opaque touchscreen

1 doesn't make a particularly useful touch device
2 if you have a display underneath.  So that's
3 what that patent is about.
4        So next let's turn our attention to
5 the '828 patent, which is about ellipse fitting
6 for multi-touch surfaces.  So this patent
7 processes touch data from a touch sensitive
8 surface.
9        It then segments that data into pixel
10 groups that are representative of those
11 different distinguishable touches.  And then it
12 mathematically fits an ellipse to a pixel
13 group.  So what does this all mean?
14        So the patent is about processing
15 touch data by fitting an ellipse.  All right?
16 So if you have on the left-hand side here, I
17 have got a hypothetical touch device, and if
18 the user touches that device, the hardware and
19 software acquire that touch data, and then the
20 software needs to process that data in some
21 fashion in order to make use of that touch to
22 perform the appropriate action.
23        In this case, the touch has activated
24 a photo browsing application.  Now, let's talk
25 about -- mentioned here the method is for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1  processing touch data by fitting an ellipse.
2      So why ellipses?  So here is a graphic
3  of what a human hand looks like.  Primarily
4  we're talking about human hands touching the
5  device in order to operate it.
6      And if we just look at this, we see
7  that where the contacts are, typically the
8  fingers, the thumb, and sometimes the palm, the
9  ellipses are an approximation of these
10 contacts.  So they are representative of what
11 these contacts could be.  So that's why
12 ellipses are used in this patent.
13     And how does it do this ellipse
14 fitting?  First of all, you start with a touch
15 device.  You have got a hardware that senses
16 that touch.  It generates some raw touch data
17 using that row/column intersection technology
18 we talked about.
19     So the data might look something like
20 this (indicating), where you have got -- where
21 the white points are kind of the highest
22 values.  And it tapers off around the touches.
23 And you have also got some stray data or noise
24 shown by those gray pixels there.
25     So the software would remove some of

Page 43

1  that noise, the background noise, clean up the
2  data which is the image on the right-hand side.
3  By the way, I am on CDX-10.074, just for the
4  record.
5      And then the next step of the
6  processing after background noise is removed,
7  it segments that data into pixel groups, so it
8  groups them.  And here I have shown that
9  grouping and by color coding the data in green
10 and red to represent the two different groups,
11 and, finally, it mathematically fits an ellipse
12 to each of those pixel groups.  So that's how
13 the ellipse fitting is done at a very high
14 level.
15     Ellipses themselves can be described
16 with numerical parameters.  So here I have an
17 ellipse, and I am showing it on a cartesian
18 grid.  One of the parameters will be the
19 centroid or the X/Y center of the ellipse.  In
20 this case, it happens to have a value of 4 and
21 5, for example.
22     Another parameter would be the major
23 axis or the longest axis describing that
24 ellipse.  In this case, I have shown it in red
25 and hypothetically a value of 9.

Page 44

1      The minor axis, which is the
2  perpendicular axis to the major axis and the
3  shorter of the two, which I have shown in blue
4  here, and another parameter would be the
5  orientation of the ellipse away from the one of
6  the primary axes, in this case, for example, 60
7  degree orientation.
8      Now, different touches -- so here in
9  this figure on CDX-10.076, three different type
10 of touch data on the top and showing different
11 ellipses being fit to those touch data with
12 different parameters.
13     So another part of this patent is once
14 the ellipses have been fit, how do you track
15 movement of the data.  So, for example, on the
16 left-hand side, I am going to show you a finger
17 touching down.  As the user moves that finger,
18 the touch data is moving and the system
19 monitors the starting and ending points by
20 tracking the movement of those touch data as I
21 have shown as a schematic on the right-hand
22 side.
23     There is another example here.  I have
24 got a photo, and in this case, it is going to
25 be a two-finger touch, where you bring two

Page 45

1  fingers together.  On the right-hand side, you
2  see the touch data is two fingers -- two touch
3  points fairly close to each other, and as the
4  user stretches their finger, brings them apart,
5  the photo zooms in, but the touch data also
6  moves apart and the system keeps track of that
7  movement.
8      So that was patent '828.  So now let's
9  talk about the '430 patent which is the
10 object-oriented system locator system patent.
11     And this patent talks about locating
12 system components based on search criteria
13 including properties.  And then it adds support
14 to the operating system for hardware and
15 software components located in that search
16 without having to reboot the operating system.
17     So I will give you an example of what
18 this does.  So, again, here we have an
19 operating system which happens to have an
20 active area, happens to have a few things
21 already active in that operating system,
22 support for contacts list, support for notepad
23 application, support for a browser, for
24 example, and let's say the user is now on this
25 touch device and has the contacts application

APLNDC-X0000006156

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 loaded up.
2     And it happens to touch at the bottom
3 there where you see there is an e-mail that
4 happens to be part of the information in the
5 contacts list and the user has touched the
6 e-mail.  Now, when the user touches the e-mail,
7 the system says, okay, clearly an e-mail
8 application is needed to process this e-mail.
9 Because the contact list itself cannot deal
10 with it.
11     So it searches for compatible e-mail
12 applications, because e-mail is not currently
13 in the active area.  So it does that search and
14 it finds there are two possible e-mail
15 applications.  And we're just calling this
16 e-mail 1 and e-mail 2 for illustrative
17 purposes.
18     And based on its internal ranking, it
19 finds that e-mail 2 is the best match that
20 should be used.  And what it is going to do is
21 it is going to select e-mail 2 and load that
22 into the operating system, make it -- provide
23 support for that e-mail, e-mail 2 application.
24     And once that is provided, it
25 dynamically launches it for the user.  And as

1 you can see to the right now, the user is able
2 to interact with the e-mail application that
3 support has been provided for.
4     Now, once this e-mail support is
5 already in the operating system, subsequent
6 attempts to access e-mail does not require that
7 search anymore.  It is already there.  So, for
8 example, now, the user later on goes to the
9 notepad application, which is what the user is
10 going to be clicking on there on the yellow
11 icon on this slide, which is CDX-10.086, just
12 for the record.
13     When the user clicks on that, the
14 notepad application is activated.  It is
15 already there.  It is brought up.  The user
16 looks at that, and again, for example, it
17 happens to be an e-mail in the notes, John at
18 Smithpartners.com, if a user clicks on that,
19 now, the system realizes, okay, the support for
20 e-mail is already in the system.  It simply
21 activates that and gets to that e-mail
22 application for the user.
23     So the key thing here is the
24 application is dynamically used again and again
25 subsequently without any reloading of it.

1     And I think that's the end of my
2 tutorial.  If there are any questions, I am
3 happy to take them.
4     JUDGE ESSEX:  Thank you very much.
5     DR. BALAKRISHNAN:  Thank you.
6     MR. DeFRANCO:  Good morning, Your
7 Honor.  For Motorola, we will have two experts
8 presenting the tutorial today.  They will be
9 dealing with the patents that they will be
10 handling at the hearing tomorrow.  Our first
11 expert is Dr. Andrew Wolfe, Your Honor.  He is
12 dealing with the two touchscreen patents, the
13 '828 and the '607.  Just a few words about
14 Dr. Wolfe's background.
15     He has a B.S. in electrical
16 engineering and computer science from John
17 Hopkins.  He has a Ph.D. in electrical and
18 computer engineering from Carnegie-Mellon.  He
19 began his career, his working career back in
20 1983 as a touchscreen designer.  He eventually
21 had his own touchscreen company.  He then
22 taught at Princeton for about six years.  Then
23 he moved on to become the chief technology
24 officer of a company called S3.  And at that
25 time, he was also teaching at Stanford.

1     And again, he will be handling the
2 first two patents, the touchscreen patents.
3 One thing I should note for the record, Your
4 Honor, we did mark our tutorial as containing
5 confidential or CBI information.
6     There is some information in there
7 about material that's component material
8 supplied for the touchscreens by one of
9 Motorola's vendors, Atmel.  And they provided
10 their information as confidential.  So there
11 will be a short portion, and if the expert
12 doesn't note it, I will note it for the record,
13 where we need a minute or two to go on the
14 confidential record, if that's okay.
15     JUDGE ESSEX:  All right.
16     DR. WOLFE:  Good morning, Your Honor.
17 As is mentioned, I am going to talk about the
18 first two patents, the '607 and '828 patent.
19 One is about the multi-point touchscreen and
20 one is about the ellipse fitting process.  I
21 apologize that I will be repeating some of the
22 information, but I want to go over it in
23 detail.
24     JUDGE ESSEX:  Okay.
25     DR. WOLFE:  Let's start at the very

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 beginning. The idea of a touchscreen is to
2 allow you to interact with a computer or
3 similar device.
4          And the basic idea is that there is
5 some type of a touch sensitive surface that's
6 placed over or integrated with the display of
7 something like a computer. And the idea is to
8 be able to interact with the computer by
9 selecting objects or manipulating objects on
10 the computer.
11          So the basic idea is that we have some
12 objects, some pictures or something on the
13 computer screen. We want to be able to select
14 them in an easy way by touching them. You
15 reach out and touch something and it has been
16 selected and the computer knows that it has
17 been selected. It is easier to use sometimes
18 than a keyboard or a mouse and very durable
19 and, therefore, it is an attractive technology.
20          Now, touchscreen technologies have
21 been around for a long time, more than 50
22 years. And there are lots of different
23 touchscreen technologies. We're not going to
24 cover them all today.
25          They all measure some physical

1 phenomena that is altered by the touch, whether
2 that be light or sound or more modernly some
3 type of an electrical signal. And by measuring
4 how an electrical signal changes, you can
5 detect that the screen has been touched and
6 where it has been touched.
7          As was mentioned, there are two main
8 types of electrical touch sensors, one that
9 measures resistance called resistive and one
10 that measures capacitance called capacitive.
11          And the technology that's at issue in
12 these patents is capacitive touch sensing
13 technology. So that's where I am going to
14 focus my attention today.
15          Now, capacitance is an electrical
16 property. It is a property of all physical
17 materials. All physical objects have
18 capacitance. A wire has capacitance. A person
19 has capacitance. And especially their finger.
20          Your desk has capacitance. And any of
21 those can be measured using electronic circuits
22 that are designed to measure capacitance. And
23 that's how capacitance changes are detected.
24          Now, capacitance does a lot of
25 different things from a physical perspective.

1 But what is important from the perspective of a
2 touchscreen designer is that it allows certain
3 kinds of electronic signals, electronic signals
4 that oscillate, to pass from one conductor to
5 another even if those conductors are not
6 touching each other.
7          So capacitance actually allows a
8 signal to kind of jump through the air or
9 through space from one conductor to another or,
10 in this case, from a conductor to your finger.
11          And as was mentioned, there are two
12 main types of capacitive touch sensors that are
13 interesting for this case, self-capacitive and
14 mutual capacitive. Self-capacitive is where
15 you measure a single device, a single
16 electrode, or a single wire, and mutual
17 capacitive, and the word mutual is where you
18 measure between two electrodes or between two
19 wires.
20          And the best way to understand how
21 each one works is to look at some examples of
22 each. So I am going to show you some rather
23 old examples of each one.
24          This is an example of a
25 self-capacitive system. It comes from an early

1 patent, 1972. And it is typical of the
2 physical structure that would be involved in
3 self-capacitance. You have got a display.
4 Here you can kind of see an image of a TV tube
5 here. On top, there is a face plate or overlay
6 that contains transparent conductive touch
7 plates. Very, very thin metal electrodes that
8 are so thin that you can see through them.
9          They are shown here as these boxes.
10 And I have colored a few of them in red just to
11 call them out.
12          Each of those is connected by a wire
13 back to some sensing electronics, which is part
14 of a computer. And that allows the capacitance
15 on each of these electrodes to be measured by
16 the electronics and reported to the computer.
17          Now, the way that this works is we
18 start with something called a voltage source.
19 And in this case, the voltage source is
20 something called an oscillator. And it creates
21 an oscillating signal that goes up and down.
22          That oscillating signal is sent to one
23 of these electrodes. And because there is some
24 capacitance in the electrode, it allows the
25 signal to oscillate back and forth because of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1    the way the voltage source has been designed.
2        Now, what will happen is when you
3    touch that electrode, it adds capacitance to
4    the system.  And that additional capacitance
5    draws some of the current out of the voltage
6    source and makes it operate more slowly, makes
7    it oscillate more slowly.
8        So what happens is the up and downs of
9    that signal get stretched out.
10       And we can see that happening.  Now,
11   there is also a sensing circuit connected to
12   this wire.  And that sensing circuit can
13   measure this oscillating signal and determine
14   whether or not it is being stretched out.
15       And what we will see is when it is
16   touched, the sensing circuit measures it, and
17   it can detect a touch and turn on a light or
18   inform a computer.
19       And that's the basic operation of a
20   self capacitance system.  Now, mutual
21   capacitance works a little bit differently.
22   Here is an early mutual capacitance system,
23   1968.  And it has over this display two
24   electrodes, calls them both, again, transparent
25   electrically conducting plates.  They are thin

Page 55

1    films of metal that you can see through.  They
2    basically act like wires.
3        One of them is shown here in blue.
4    That's called a drive electrode.  And we will
5    drive an electrical signal on to that
6    electrode.  The other that I have shown in red
7    is called the sensing electrode.
8        And what will happen is as we drive a
9    signal on to the blue electrode, some of that
10   signal will jump across or leak across that gap
11   because of the capacitance that's present.  And
12   appear on the red electrode.
13       If we were to put a finger over top of
14   these electrodes, then we're going to add
15   capacitance.  And some additional signal energy
16   will jump to the finger and back down from the
17   blue to the red across the finger.
18       That extra energy then appears on the
19   red conductor along with the energy that was
20   there before and we get a bigger signal.  And
21   that's what we're going to detect.
22       So here again is an illustration.  We
23   have a voltage source with an oscillating
24   signal.  When it is touched, more of the signal
25   leaks across that gap through the finger

Page 56

1    because of the capacitance in the finger.
2        That capacitance can be detected by
3    the sensing circuit, which sees a larger
4    signal.  It can then turn on a light or inform
5    a computer.  And that's the basic operation of
6    mutual capacitance.
7        Now, in a more modern system, it would
8    be difficult to have these kinds of mutual
9    capacitance sensors spread across the entire
10   display because each one has two wires.  And
11   all those wires would start to get in the way.
12       So you can build this same kind of a
13   circuit using a more innovative structure.  And
14   here is an example of that.
15       Now, in this structure, we have two
16   layers of material.  In one layer, we have got
17   a bunch of these blue lines, these drive
18   electrodes.  And we drive a signal on to one of
19   those drive electrodes.
20       Then on a separate layer that is
21   separated by an insulating gap, we have a
22   sensing layer.  That sensing layer is where we
23   measure.  So we have still got a blue conductor
24   and a red conductor separated by a gap.  But
25   now they are on two different layers.  And

Page 57

1    where they overlap, there is a small gap where
2    the signal can leak through from the blue
3    conductor to the red conductor.
4        If we were to touch at that
5    intersection point, we would add additional
6    capacitance.  Just like we did in the prior
7    example.  Some of that signal can now jump up
8    to the finger and back down to the red
9    conductor, the sense conductor, and increase
10   the strength of the signal.  So the signal
11   comes in on one layer and then can be measured
12   on the other and we have the same kind of a
13   mutual capacitance detection that we saw
14   before.
15       But now what we can do is we can
16   measure at each one of these intersection
17   points.  And that requires a slightly more
18   complicated process.
19       To make it run quickly, what we can do
20   is we can measure all of the sense electrodes
21   at the same time.  We can attach a sensing
22   circuit to each one and measure them all at the
23   same time.
24       And then we can drive an oscillating
25   signal on to one of the drive electrodes.  And

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    when we drive onto that one drive electrode, at
2    every crossing point some of the signal will
3    leak through to the sense electrode.
4            Less signal, if it is not being
5    touched.  More signal, if it is being touched.
6            And we can then measure that with a
7    circuit and turn each one of those measurements
8    into a number.  A zero, if it is not being
9    touched, and a higher number, if it is being
10   touched.
11           And the more capacitance that's
12   present, because the finger is closer, because
13   the body is larger, or because you are pushing
14   harder, the higher the number.
15           And what we can do is we can then do
16   that one row at a time.
17           We now drive a signal on the second
18   drive electrode.  And then on the third.  And
19   each one generates a row of numbers until we
20   start to form an array.
21           As we get close to the location being
22   touched, we start to get higher numbers until
23   we have scanned through every one of the rows
24   on the array, we have developed a complete
25   array of data, an array of numbers that

1    describe basically the capacitance values at
2    each point on the array.  This can then be
3    processed by a computer which can determine
4    exactly the location of the touch.
5            Now, you have to build one of these
6    touchscreens, and to build it you need physical
7    materials.  Now, I started designing
8    touchscreens in 1983.  The materials are
9    essentially the same as they were then.
10           And these materials, because they need
11   to conduct electricity and be see through are
12   essentially the same terms that are used in
13   building displays themselves.
14           You start with some type of a
15   substrate, something that you are going to
16   actually build on, something physical.  And
17   that can be glass, it can be a rigid plastic
18   called PET, P-E-T, which is a plastic that is
19   used in or it can be a film,
20   something that's very similar to a heavy duty
21   ZIP lop bag, essentially flexible plastic that
22   can be coated with various things and that can
23   be adhered to the display.
24           You need conductors to carry the
25   electricity around.  And you have a choice.

1    You can use opaque conductors like copper and
2    silver, in which case they need to be very
3    thin, but you still might be able to see those.
4    For many years there have been transparent thin
5    film conductors back in the industry, dating
6    back to LCD watches back in the '70s and that's
7    made of a metallic material called indium tin
8    oxide that in the industry we call ITO.  And
9    that allows you to make wires you can
10   essentially see through.
11           Then these things need to be put
12   together.  So you need an adhesive, some type
13   of a glue.  Usually it is something called an
14   optically clear adhesive.  And that's simply an
15   adhesive that you can see through.  You call up
16   an adhesive manufacturer and tell them what
17   kind of things you want to glue and they send
18   you a jar of the stuff.
19           So that's kind of the general
20   background of how these work.  Now I want to
21   kind of show you what you get when you put all
22   this together and what it can do.  I have a
23   very short video.
24           This shows that you can detect a touch
25   on a computer.  You can detect multiple touches

1    because you have scanned the entire array.
2            You can detect gestures.  As we see,
3    you will be able to detect the different
4    fingers.  And you can detect gestures such as
5    moving things around.  And we will get a map up
6    here in a minute.  You will see that you can
7    scale it by pinching or moving fingers apart.
8    All the kinds of things that you might want to
9    do with a touchscreen.
10           Rotation.  Just I have to give some
11   context, that particular image was one of the
12   pieces of art that's mentioned in the patent,
13   something that was developed by Sony that's
14   developed -- that describes how to detect
15   different fingers, how to use gestures, and how
16   to use this kind of a grid to make these kinds
17   of measurements.
18           Now I am going to talk specifically
19   about how this is done in the '607 patent.  As
20   we saw, this patent relates to a multilayer
21   touchscreen.  It detects multiple touches that
22   occur at the same time on different locations.
23   This is shown here.
24           And it describes a particular touch
25   panel assembly that's based upon multiple

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1   layers that have transparent conductive lines.
2         Now, actually, there are two different
3   embodiments that are described in the '607
4   patent.  They do work differently.  One is a
5   self-capacitance embodiment.  Like the example
6   I showed you before, it has individual
7   electrodes.  Each one of those electrodes is
8   connected via a line to a sensing circuit.
9   That way they can all be measured at the same
10  time using the same kind of a self-capacitance
11  technique that I showed you previously.
12        There is another embodiment that works
13  completely differently in the patent that uses
14  row and column electrodes on two layers.  This
15  is a single layer design.  This is a two-layer
16  design.
17        This uses the mutual capacitance
18  measurement technique to measure the
19  capacitance between the rows and the columns
20  and uses the scanning technique to do that.
21        Once again, the self-capacitance
22  embodiment describes individual electrodes,
23  each of which is connected to a sensing circuit
24  here on the side through some traces, some
25  wires.  All on one layer.

Page 63

1         The mutual capacitance embodiment is
2   the one that's of more interest today.  It
3   operates differently.  It uses mutual
4   capacitance, rather than self-capacitance.  And
5   it has the same kind of structures that we have
6   seen before.
7         It has a bunch of sense lines.  In
8   this particular embodiment, the sense lines are
9   placed on a lower layer, so they can all be
10  measured at one time.  And unlike that
11  embodiment, this one is rotated.
12        So here the sense lines move
13  horizontally, rather than vertically.  That
14  really just depends on how you draw the picture
15  of the sensor.  It works the same way.
16        There are also drive lines.  Now, the
17  sense lines we can identify because they are
18  connected to capacitive sensing circuits.  And
19  they are the ones that measure the change in
20  capacitance at the nodes or intersections.
21        The drive lines are connected to the
22  voltage sources, as I showed you in the earlier
23  example, and during operation currents driven
24  through one driveline at a time.  I have
25  illustrated two but, in fact, these need to

Page 64

1   operate just like the example I showed you
2   before, one at a time, so that you can measure
3   one column of intersections at a time and then
4   scan through the entire array to create an
5   array of data.
6         And the drive lines in this embodiment
7   sit on an upper layer.  The sensing circuit
8   scans through it and it measures the capacitance
9   at each of the intersections.  I am going to
10  now go ahead, we have talked about the '607
11  patent, how it works, how it uses mutual
12  capacitance.  I am going to tell you a little
13  bit about what's in the Motorola products at a
14  very general level.
15        There are a lot of different Motorola
16  products that have been accused.  Here are some
17  examples.  They can be grouped into three
18  categories based on how the sensors are
19  designed.
20        The first category is one I have named
21  the flooded X basic products.  Flooded X refers
22  to the way the drive layer is designed.  It is
23  designed to try to fill up as much space with
24  conductor as possible to act as a shield.  What
25  you end up with there is a set of drive

Page 65

1   electrodes.
2         The drive electrodes here, unlike the
3   last example we looked at, the drive electrodes
4   here are on the lower layer right next to the
5   LCD display.
6         Then on an upper layer, a sense layer,
7   there are sensing electrodes.  The sensing
8   electrodes are the ones that are connected to
9   the sensing circuitry.  The drive electrodes
10  are connected to a voltage source one at a
11  time.  And they are separated from each other
12  using -- with these white insulators.
13        These, again, are made out of the same
14  type of a thin-film metal, the ITO, and they
15  are placed on plastic PET films that are very,
16  very thin.  That's all assembled using
17  adhesives.
18        The second way that the accused
19  products build screens is something I called a
20  flooded X with Y interpolation.  The drive
21  layer, the lower layer next to the display is
22  the same as in the previous example, but the
23  sensing layer, the sensing electrodes use a
24  different structure.
25        They extend both vertically and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  horizontally, so that there are overlapping
2  horizontal structures that come very close to
3  each other.
4          These structures allow for a smooth
5  transition as you move across the screen.  The
6  finger goes from covering maybe 50 percent of
7  one of those lines, and as you move it, it
8  moves very slowly, 40 percent, 30 percent, and
9  at the same time starts covering an increasing
10 percentage of the adjacent electrode.  And that
11 allows for a much smoother transition as you
12 move your finger across the screen.
13         Again, these layers are sense, layer
14 on top, drive layer on the bottom, and
15 assembled into one structure.
16         The third design is called the flooded
17 X with X and Y interpolation.  It uses the same
18 sensing layer that has the ladder-like cross
19 structure.  And it uses a different kind of a
20 drive layer.
21         A drive layer is a single metal
22 electrode.  Instead of being separated with
23 insulators that go all the way across, it is
24 connected around these white gaps so that the
25 electricity can flow throughout the entire

1  thing and then these are driven in groups,
2  rather than one at a time.
3          That, again, allows different voltages
4  to appear on each one, on each part of this
5  electrode because it is all connected and,
6  again, allows for a smoother transition.
7          Again, it is assembled using adhesive.
8  So basically that's the '607 patent.  We will
9  get into comparing them as we get into the
10 trial, but for today, we will move on and talk
11 about the '828 patent and how it does
12 mathematical ellipse fitting.
13         Again, let's start with a little bit
14 of background.  Whenever you have a sensor that
15 has rows and columns, the goal is to make those
16 rows and columns small enough that you can
17 measure with some precision.
18         And when you do that, a finger will
19 cover multiple rows and multiple columns and
20 you have to figure out exactly where it is
21 being touched.
22         The traditional way to do that is to
23 calculate a weighted center of all the
24 measurements that correspond to the touch and
25 that weighted center is called a centroid.

1  Sometimes early designs would also try to
2  estimate the size of the pressure of the touch
3  and sometimes those correlate because if you
4  notice when you press your finger down,
5  sometimes the bottom of it gets bigger, but it
6  also gets closer to what's being touched.
7          So you can measure either one of those
8  and sometimes that's reported as some type of a
9  strength of touch or a Z value.
10         Now, the '828 extends upon that by
11 describing an apparatus and the way that it
12 uses that apparatus to process touch input data
13 in order to do more, to actually fit a shape,
14 an ellipse to the data that's been gathered for
15 a particular touch.
16         Figure 1 shows the overall process
17 from the '828 patent.  It starts off by
18 describing some specific electronic scanning
19 hardware that can be used to gather this array
20 of data.
21         The hardware that's in the '828 is a
22 self-capacitance screen where you have rows and
23 columns of individual electrodes.  Now, they
24 have found a way to avoid having this problem
25 of having too many wires coming out of all

1  those electrodes by taking the two wires that
2  are related or the one wire for each
3  self-capacitance electrode and connecting it to
4  other wires using some transistors.
5          They don't measure the row and column
6  wires.  They measure a stand-alone electrode
7  like the other self-capacitance embodiments
8  that I showed, but they use rows and columns to
9  bring those signals to the edge of the device.
10         Once they have measured the data, they
11 form an array of numbers.  Then they teach that
12 array of numbers can be visualized as a set of
13 pixels, as a set of drawing elements that
14 represent the data.
15         And if we look at some of that data,
16 we can see that you can kind of see what
17 happens when a hand touches the screen.  You
18 get some data corresponding to each finger or
19 each part of the palm that's close to the
20 screen.
21         So they form this data.  They
22 eliminate all of the noise, so that the data is
23 a little bit clearer.  That's done in a step
24 called calibration and proximity image
25 formation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1    That then moves to a module called
2 contact tracking and identification.  Contact
3 tracking and identification performs two
4 functions.  One is segmentation.
5    It wouldn't make sense to try to fit
6 an ellipse to all that data together.  What you
7 want to do is fit an ellipse to the data that
8 corresponds to each individual finger.  So you
9 want to take this big array of data and break
10 it up into groups where each group corresponds
11 to one finger or one part of the palm.
12    And that's what segmentation does is
13 it breaks that up.  And then in contact
14 tracking and identification, its parameterized
15 by fitting an ellipse.  That's the main thrust
16 of the patent.
17    These steps are described in figure
18 18.  The first part of figure 18 describes some
19 detail, how this particular embodiment of
20 segmentation works, but we're going to quickly
21 move on to the bottom part where ellipses are
22 fit to each group of data.
23    Now, an ellipse is a mathematical
24 construct.  And it is to specify an ellipse,
25 you need at least five parameters to tell you

Page 71

1 what the size and shape of the ellipse is.
2    And one set of five that is commonly
3 used are the X and Y centroid position, the
4 lengths of the major and minor axes, and the
5 orientation and rotation.  And I will look at
6 these in a little more detail in a minute.
7    And this patent specifically teaches
8 you how to take a set of data in this pixelated
9 form and to mathematically derive these
10 parameters for an ellipse.  It uses a technique
11 called a unitary transformation of the group
12 covariance matrix, Geov.
13    Now, there are some errors in the
14 formulas in this patent, but for today, we're
15 going to assume that they have all been
16 corrected.
17    So the '828 patent talks about how you
18 calculate these five parameters.  I am going to
19 go through them.  Two of the parameters are the
20 centroid position.  Its vertical and its
21 horizontal position, X and Y.  The major axis
22 is the length in the long direction.  The minor
23 axis is the length in the short direction at 90
24 degrees from the major axis.
25    And then the orientation is the

Page 72

1 rotation of the ellipse.  You have an ellipse,
2 you have to calculate all five.
3    There is a very detailed procedure
4 given in the patent, the mathematics are there.
5 It starts off with three equations that do
6 essentially what I told you you have to do
7 before.
8    These look like very complicated math,
9 but they are really not that complicated in
10 this one.  What it really says is you add up
11 all the numbers that correspond to one touch.
12 That tells you how strong the touch is.
13    And then you look at where the average
14 is in the X direction and where the average is
15 in the Y direction and that's the weighted
16 center, the centroid.  So this is what was done
17 before.  This then gets extended in the patent
18 to show how you can compute a full set of
19 ellipse parameters.
20    So that gives you this X and Y
21 centroid value.  Then it goes through and does
22 some fancy linear algebra, that I am not going
23 to go through in detail, but it computes these
24 Eigenvalues of this matrix.  The Eigenvalues
25 can be used to figure out the length of the

Page 73

1 major axis, the length of the minor axis, and
2 the rotation of an ellipse model.
3    Once the ellipse model has been
4 identified -- it is a very long patent, it has
5 more than 60 columns or so.  Only a small
6 portion of it has to do with the actual forming
7 of the ellipse.  Then there is lots of
8 description about interesting ways to use the
9 ellipse data, to use it for typing, to use it
10 to recognize a hand, to use it to recognize
11 gestures, and that's the next step is to use
12 all those processes and form data.
13    And then the data you get from all
14 those processes from the typing recognizer or
15 the cord motion recognizer is placed into a
16 queue and it is sent to a host computer system
17 where it can use that data.
18    Now I am going to quickly go through
19 what the Motorola products do in terms of
20 processing data.  And, again, there is a
21 touchscreen that's made of --
22    MR. DeFRANCO:  I'm sorry for the
23 interruption.  This is probably a good breaking
24 point.  We're going to go on the confidential
25 record in a moment.  So we would ask people

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

```
 1   to -- who are not on the protective order --
 2          JUDGE ESSEX:  Motorola confidential?
 3          MR. DeFRANCO:  Third party Atmel
 4   confidential, Your Honor.
 5          JUDGE ESSEX:  Okay.
 6          (Whereupon, the trial proceeded in
 7   confidential session.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 75

Page 76



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78



//

Page 79

1    (Whereupon, the trial resumed in open
2  session.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1              O P E N   S E S S I O N
2       MR. DeFRANCO:  I would like to take a
3  moment, Your Honor, to introduce our second
4  expert, Dr. Douglas Locke.  He will be talking,
5  of course, about the '430 patent.  Just a few
6  words, again, about Dr. Locke's background.
7       He has a B.S. in physics.  He also has
8  a Ph.D. in computer science.  That's from
9  Carnegie-Mellon.  27 years with IBM was his
10  first employment in software development.  He
11  then moved on to Lockheed where, again, he did
12  systems and software development for six years.
13       He moved on to be the VP at a startup
14  for four years that dealt with embedded Linux
15  operations.  For the last seven years, Dr.
16  Locke has been a technical consultant in the
17  industry and in patent cases such as this.
18       DR. LOCKE:  Good morning, Your Honor.
19       JUDGE ESSEX:  Good morning, Doctor.
20       DR. LOCKE:  I want to talk about the
21  '430 patent today.  And I'm going to spend my
22  time talking just about the '430 patent, so I
23  am not going to try to give any background
24  information regarding other things or the
25  products or anything of that sort.  I just want

Page 81

1  to deal with the patent itself.
2       And I will figure out how to use this
3  clicker while I am doing this.
4       JUDGE ESSEX:  If you can't, your Ph.D.
5  is not serving you well.
6       DR. LOCKE:  I suspect I can probably
7  work it out.  I have to find the right one.
8  That will probably work a lot better.
9       So the patent is called the
10  object-oriented system locator system.  I want
11  to note the name because I think it is
12  important.  The patent, the inventor believed
13  this was important.  He identified it as
14  object-oriented.  I will talk about the term
15  object-oriented in a few minutes in a little
16  bit more detail, but it refers to a way in
17  which modern software is written, something
18  called object-oriented programming is commonly
19  used today in many, many environments.
20       And this patent, which dates back a
21  few years, was dealing with that technology.
22  It does not claim to have invented that
23  technology.  It is making use of it.
24       A system locator means it is going to
25  be looking for things.  It is going to be

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1   looking for what it calls components.  In fact,
2   in the abstract, we see pretty clearly what it
3   thinks it is about and the abstract gives a
4   good description of what it is about.  The idea
5   is that it is to add system components, so I
6   have highlighted the system components there,
7   is to add system components to a system without
8   running an installation program.
9           And it uses that term, that phrase in
10  several places in the patent specification.  It
11  does this using what is called a location
12  framework.  And I will talk a bit about
13  frameworks a little bit later so we get an idea
14  of what this is about.  But this is a location
15  framework, in other words, a framework that
16  locates things.
17          It is used to locate system components
18  whose properties match some properties that are
19  specified in a search criteria.
20          So that's really what the patent is
21  fundamentally about.  And we will see that as
22  we go through it.  So I am going to try to
23  describe what's in the specification of the
24  patent, what it spends its time doing and then
25  I will talk about one of the claims just a

Page 83

1   little bit to see what is in that particular
2   claim because that's a key claim in this case.
3           In terms of the background of the
4   invention, the inventors state that there are a
5   number of things that are used to add
6   components to systems.  And they talk about
7   various prior art, but it points out that in
8   the opinion of the inventor, none have
9   addressed the issue of managing and updating
10  components employed by an application or system
11  program on the fly.
12          And this relates, you know, back
13  directly to what was said in the introduction
14  in the abstract.
15          It goes on to say that ideally, system
16  programs -- and I will talk more about what a
17  system program is in a little bit -- and
18  applications, ideally system programs and
19  applications should be able to identify system
20  components dynamically.
21          So the inventor believes that's not
22  been done prior to this and believes that
23  that's what the patent is trying to produce.
24          So right after that, it goes on to the
25  summary of the invention.  Accordingly, the

Page 84

1   primary objective of the present invention is
2   to add the system components to the computer
3   system without running an installation program.
4           And that's what the patent inventor
5   said it was about.  It is -- a location
6   framework is used, I mentioned that a minute
7   ago and I will again talk more in detail about
8   it -- is used to locate system components whose
9   properties match those specified in the search
10  criteria.
11          Notice the wording of this is pretty
12  much the same as what was in the abstract.  And
13  this is identified then as the summary of the
14  invention and the primary objective of the
15  invention.
16          Taking a quick look here, talking
17  about object-oriented programming, I want to
18  try to introduce that a little bit because the
19  patent spends quite a bit of time, in fact,
20  talking about object-oriented programming.  The
21  idea is in object-oriented programming, we
22  define the world of computation, if you will,
23  as a set of classes.
24          And a class identifies what are the
25  basic characteristics of an object.  Using a

Page 85

1   class, or from a class, we can identify
2   instances of that class and those are called
3   objects.
4           And then within an object, it will
5   have behaviors and those are usually done with
6   method calls and define the behavior of an
7   object.
8           So just as a quick example, a class
9   might be a human being.  I think hopefully all
10  of us in this room are members of that class.
11  Members of that class have attributes, we have
12  shown a few here, first name, gender, date of
13  birth, weight, hair color, address.
14          The human beings have a set of
15  behaviors, just a few of the behaviors are
16  here.  We have left off a few behaviors that we
17  don't need to talk about, but a human being
18  might be able to think or eat, walk, run,
19  sleep, breathe, and so forth.
20          Given that I have a class then of
21  human beings, then I also have instances of
22  human beings.  Here we have an object.  She
23  might not like to be called an object, but from
24  the point of view of an object-oriented
25  programming, she is one.  She has attributes,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  first name, Jane, gender, date of birth,
2  weight, hair color, address, and she has a set
3  of behaviors that have been defined for this
4  particular object because it is a member of the
5  class of human beings, think, eat, walk, run,
6  sleep, and breathe.
7      We have another object here, Tim.  Tim
8  also has a set of attributes, essentially the
9  same attributes as the others because Tim is
10 also a member of the class of human beings.
11 But Tim is a special kind of human being
12 because his behaviors not only includes the
13 ones from before, which it inherited from the
14 original class of human beings, but this
15 particular individual also does something
16 additional to the other human beings perhaps
17 don't do, not all of them, at least, and that
18 is that he plays video games.
19     So the idea here is that an object
20 such as Jane Smith can, in fact, invoke methods
21 or can tell, if you will, other objects what to
22 do.
23     So Jane Smith, for example, might turn
24 her steering wheel indicating that a command
25 right turn should be given.  And if she tries

1  to give that to the object Tim Smith, probably
2  nothing much happens.  Tim Smith may not know
3  how to do a right turn, unless perhaps Jane is
4  a sergeant and Tim is a corporal, then in which
5  case Tim would know what to do with it, but in
6  our example, Tim doesn't know what to do with
7  it.
8      If she gives that same command to a
9  different object, in this case an automobile,
10 then right turn is one of the methods that that
11 automobile knows how to handle.  All of this
12 just illustrates the idea of objects, classes,
13 and methods as they are used in computer
14 software today.
15     Let me talk a little bit about how
16 this all fits together in this patent.  I think
17 you saw a similar diagram to this, not quite
18 the same.  When we think about putting together
19 a system, we start with the hardware and we
20 usually put that at the bottom.  This, by the
21 way, is sort of a classic diagram that people
22 have been building for years doing -- defining
23 systems.
24     On top of the hardware, we have
25 something called an operating system.  Now,

1  operating systems are big or small.  They do
2  lots of things, but they basically allow all of
3  the applications to be able to make use of the
4  hardware.
5      The purpose of the operating system is
6  to make the hardware available, make the
7  purpose for having the hardware available to
8  the application.  And there is lots of things
9  that it does.
10     In addition, most systems today have
11 something that is called a framework.  The
12 framework may sometimes be considered part of
13 the operating system.  Other times it is not
14 considered part of the operating system.  But
15 in this situation, it is a part of this overall
16 package and we will think of it as if it were
17 part of the operating system.
18     The framework is what I am going to
19 come back to in a couple of minutes, but the
20 framework is where we start seeing
21 object-oriented things happening.
22     The quote at the top of this slide
23 says, "a prior art approach is to layer objects
24 and class libraries in a procedural
25 environment."

1      So the inventor is identifying this as
2  a prior art approach in which the operating
3  system is a procedural environment, but the
4  framework and the applications are
5  object-oriented environments.  That by laying
6  them on top, the application, being
7  object-oriented, doesn't have to worry about
8  the fact that the operating system underneath
9  and anything else there is actually procedural
10 in nature and would, therefore, be operated on
11 somewhat differently.
12     So the object-oriented portions of
13 this are on the top.  Now, one of the things
14 that's interesting about this is the inventor
15 identified this as prior art, but actually the
16 inventor uses exactly this construct in the
17 preferred embodiments throughout the patent.
18     So while it is prior art, he is
19 actually not going beyond the prior art in this
20 particular case.
21     So as I mentioned, an aspect of
22 object-oriented programming is a framework
23 approach.  The inventor identifies that in the
24 patent here as it is quoted.
25     From a programming standpoint, then,

1    the frameworks are groups of interconnected
2    objects.  So an object framework, if I just go
3    back to that previous one, a framework actually
4    consists of a set of classes or set of objects
5    defined by classes and each of those have
6    methods.  So everything that we're talking
7    about in the framework and applications is
8    composed of classes, objects, methods and other
9    parts of the object-oriented environment.
10        The idea here is to create a
11   pre-fabricated structure of a working
12   application.  That's the idea of a framework.
13   So the framework exists before the application
14   is written and the application then makes use
15   of that to do the work that it does.  There are
16   a lot of different kinds of frameworks.  Again,
17   this is a quote from the patent that identifies
18   a few commercial examples.  It is important to
19   note the inventor does not believe that he is
20   inventing frameworks.
21        He does not believe he is inventing
22   object-oriented systems or object-oriented
23   design or object-oriented programming.  Those
24   are merely tools he is going to use in defining
25   what he thinks of as his invention.

1        So commercial examples are shown here.
2    And I won't get into the details of those, but
3    there are a number of them out there at the
4    time of this invention.
5        There are even more today.
6        In the same way that an application
7    framework provides the developer with this, the
8    system also has frameworks and provides system
9    level services.  And they can -- developers
10   then can sub-class or override these to create
11   customized solutions.  We saw that example with
12   Tim and Jane in the example before where Tim
13   was a sub-class of humans that can do video
14   games.
15        Here are just a quick sample code.
16   This is not any particular computer language,
17   but it has some similarities to some real
18   computer languages.
19        But here I have defined something, a
20   class called mouse.  The word private there
21   means that the things that are in this class
22   are not visible outside the class.  They are
23   only maintained inside the class.
24        And in this class, we have the
25   position of the mouse, we have a couple of

1    methods of horizontal move and vertical move,
2    and there probably would be other things as
3    well in a real object of this type.
4        And, in addition, we have a second
5    class, which we call here wireless mouse.  And
6    wireless mouse extends mouse, which means it is
7    a subclass of mouse that happens to be the way
8    Java uses -- describes a subclass.  And, again,
9    its contents are private.  They wouldn't have
10   to be, but they often are private.  We call
11   that encapsulation where we keep things inside
12   the class.
13        And this particular object adds to the
14   regular mouse.  It adds something else called a
15   channel, which would identify what frequency
16   the wireless devices were operating on.  So you
17   can see from that that what the inventor is
18   talking about in terms of being able to
19   sub-class or override to create customized
20   solutions, the idea is you can take the
21   starting class, in this case mouse, and add
22   things to it.
23        And without having to redo the mouse.
24   So if he already has a set of code that knows
25   about how to handle a mouse, he needs to learn

1    about how to deal with a wireless mouse in
2    adding to that class.
3        So the patent goes on with an example,
4    considering a multimedia framework, for
5    example, which does audio and video.  MIDI.
6    MIDI refers to musical keyboards and things of
7    that sort that can be attached to a computer.
8    Animation.  There is lots of capabilities one
9    would like to have in computer systems, whether
10   they are large or small, and the idea of a
11   framework is to provide a set of pre-built
12   mechanisms, pre-fabricated mechanisms to make
13   it possible for the application to use and
14   build its own application using it.
15        So with the framework -- in fact, the
16   sentence in the middle of this points out the
17   developer that wanted to do a new kind of
18   device would have to write a device driver to
19   handle the entire functionality of the new
20   device he wanted to handle.
21        With a framework, the developer
22   presumably would only need to supply the
23   characteristics that are different from the
24   existing parts that are already in the
25   framework.

APLNDC-X0000006168

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1     And that presumably makes the job
2 perhaps easier.
3     I want to move now to claim 1 of the
4 '430 patent.  And it is important to note here
5 -- and this is the only claim I am going to
6 look at, this is the independent claim that is
7 asserted in this case -- and it is important to
8 note here that this claim, and you will see as
9 we go through it, does not ever mention the
10 frameworks.  It does not ever mention
11 object-oriented.
12     The claim that is mentioned here is
13 dealing only with the idea of searching and
14 finding things.  And what to do with it.  So we
15 will talk about that as we go through here.
16     The preamble of the claim is shown
17 right here (indicating).  So it is a computer
18 implemented method.  So it is obviously going
19 to be dealing with software on a computer for
20 dynamically adding support for hardware or
21 software components with one or more
22 properties.  So these components will have
23 properties.
24     And the word properties, you will get
25 to hear a lot about in this case.  We're adding

Page 95

1 those to an operating system.  We showed
2 earlier what an operating system is.  And we
3 might or might not include a framework.
4     But the framework is not mentioned
5 here.  It adds them to an operating system on a
6 computer that has memory and has some steps.
7     And, in fact, there are four steps in
8 claim 1.  And coincidentally, they are labeled
9 A, B, C, and D, which makes it easier to
10 identify them.
11     In an example that I am going to show
12 here, I have a computer with a screen and a
13 keyboard and a mouse and a printer.  And the
14 idea here is that perhaps I would like to add a
15 printer to this or at least have the
16 application deal with a printer in this
17 computer.
18     So point A in this claim says that I
19 am going to specify the hardware and software
20 components search criteria, so here I am just
21 defining what are the characteristics of the
22 thing I want to look for.
23     And so in this case, I want to search
24 for a printer and maybe there are laser and ink
25 jet printers, maybe there are black or white or

Page 96

1 color printers, maybe they have different
2 speeds and I want something a certain speed or
3 over.  Maybe I care what manufacturer.  And
4 there may well be many other properties as
5 well.
6     So the idea in point B, limitation B
7 of this claim is that it queries the operating
8 system to identify one or more of these
9 components that meet the criteria.  In this
10 case, the query says, I am looking for a laser
11 printer, I want it to be color, I want 30 pages
12 per minute and I am interested in an Epson
13 printer.  Notice the application creates that
14 query, passes it to the framework which passes
15 it to the operating system to try to identify
16 what it is looking for.
17     Step C in the claim says, return the
18 hardware and software components meeting the
19 target hardware and software component search
20 criteria.  So the operating system here returns
21 a set of printers that match that criteria and
22 returns them back up to the application so the
23 application can do something with them.
24     The last element is D, which says I
25 want to add support for the hardware or

Page 97

1 software components to the operating system
2 without rebooting the operating system.  I
3 would note that this is the first place
4 rebooting is even mentioned in the patent.
5     We will talk a lot about this claim,
6 about this step of the claim as we go through
7 the case and you will find us spending some
8 time discussing some of the issues in it.
9     I don't mention here what it does
10 because we believe that this step of the claim
11 is somewhat indefinite.
12     And that's what I have to say about
13 the '430 patent.
14     JUDGE ESSEX:  All right.  Thank you
15 very much, Doctor.
16     All right.  Do you have anything else
17 to add this morning?
18     MR. POWERS:  Nothing further.
19     MR. VERHOEVEN:  I think that's it for
20 today, Your Honor.
21     JUDGE ESSEX:  All right.  No
22 housekeeping or anything else we can do at this
23 time?
24     MR. VERHOEVEN:  Been working really
25 well together, so I don't think we have any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
APLNDC-X0000006169

Page 98

1  further issues.
2       JUDGE ESSEX:  I appreciate that.
3  Thank you very much.  We're adjourned.  We will
4  see you Monday.
5       (Whereupon, at 10:40 a.m., the
6  prehearing conference and tutorial concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1       C O N T E N T S
2
3  CONFIDENTIAL SESSIONS: 75-79
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 100

1       CERTIFICATE OF REPORTER
2  TITLE:  Certain Mobile Devices and Related Software
3  INVESTIGATION NO: 337-TA-750
4  HEARING DATE:    September 23, 2011
5  LOCATION:       Washington, D.C.
6  NATURE OF HEARING: Prehearing and Tutorial
7       I hereby certify that the foregoing/attached
   transcript is a true, correct and complete record of
8  the above-referenced proceedings of the U.S.
   International Trade Commission.
9  Date:  September 23, 2011
10 SIGNED:KAREN BRYNTESON_____
11      Signature of the Contractor of the
        Authorized Contractor's Representative
12      1220 L Street, N.W, Suite 600
        Washington, D.C. 20005
13
       I hereby certify that I am not the Court
14 Reporter and that I have proofread the
   above-referenced transcript of the proceedings of the
15 U.S. International Trade Commission, against the
   aforementioned Court Reporter's notes and recordings,
16 for accuracy in transcription in the spelling,
   hyphenation, punctuation and speaker identification
17 and did not make any changes of a substantive nature.
   The foregoing/attached transcript is a true, correct
18 and complete transcription of the proceedings.
19 SIGNED:JOHN D. LASHER  _____
        Signature of Proofreader
20
       I hereby certify that I reported the
21 above-referenced proceedings of the U.S. International
   Trade Commission and caused to be prepared from my
22 tapes and notes of the proceedings a true, correct and
   complete verbatim recording of the proceedings.
23
   SIGNED:KAREN BRYNTESON  _____
24      Signature of the Court Reporter
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

In the Matter of:        ) Investigation No.

CERTAIN MOBILE DEVICES   ) 337-TA-750

AND RELATED SOFTWARE     )

Hearing Room A

United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.

Monday, September 26, 2011

VOLUME I

The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.

BEFORE:  THE HONORABLE THEODORE R. ESSEX

Page 102

1  APPEARANCES:
2      For Complainant Apple:
3          MARK G. DAVIS, ESQ.
4          BRIAN E. FERGUSON, ESQ.
5          ROBERT T. VLASIS, ESQ.
6          EDWARD S. JOU, ESQ.
7          CHRISTOPHER T. MARANDO, ESQ.
8          Weil, Gotshal & Manges LLP
9          1300 Eye Street, N.W., Suite 900
10         Washington, D.C. 20005
11
12         JILL J. HO, ESQ.
13         BRIAN C. CHANG, ESQ.
14         Weil, Gotshal & Manges LLP
15         201 Redwood Shores Parkway
16         Redwood Shores, CA 94065
17
18         MATTHEW D. POWERS, ESQ.
19         STEVEN S. CHERENSKY, ESQ.
20         PAUL T. EHRLICH, ESQ.
21         ROBERT L. GERRITY, ESQ.
22         Tensegrity Law Group LLP
23         201 Redwood Shore Parkway
24         Redwood Shores, CA 94065
25

Page 103

1  APPEARANCES (Continued):
2
3  For Respondent Motorola Mobility, Inc.:
4          CHARLES K. VERHOEVEN, ESQ.
5          DAVID EISEMAN, ESQ.
6          Quinn Emanuel Urquhart & Sullivan LLP
7          50 California Street, 22nd Floor
8          San Francisco, CA 94111
9
10         EDWARD J. DeFRANCO, ESQ.
11         Quinn Emanuel Urquhart & Sullivan LLP
12         51 Madison Avenue, 22nd FLoor
13         New York, New York 10010
14
15         DAVID A. NELSON, ESQ.
16         Quinn Emanuel Urquhart & Sullivan LLP
17         500 West Madison Street, Suite 2450
18         Chicago, Illinois 60661
19
20
21
22
23
24
25

Page 104

1  APPEARANCES (Cont'd):
2
3  For ITC Staff:
4          LISA KATTAN, ESQ.
5          ANNE GOALWIN, ESQ.
6          U.S. International Trade Commission
7          500 E Street, S.W.
8          Washington, D.C. 20436
9
10
11         Attorney-Advisor:
12         GREGORY MOLDAFSKY, ESQ.
13         Attorney-Advisor
14         Office of Administrative Law Judges
15         U.S. International Trade Commission
16         500 E Street, S.W.
17         Washington, D.C. 20436
18
19
20         *** Index appears at end of transcript ***
21
22
23
24
25

1 (Pages 101 to 104)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

```
1              P R O C E E D I N G S
2                   (9:00 a.m.)
3         JUDGE ESSEX:  All right.  Let's come
4    to order.  We're in case 337-TA-750.
5         Complainants, do we have any
6    housekeeping to take up before we get into
7    opening statements of the case?
8         MR. POWERS:  Yes, Your Honor, we do.
9    The parties continued to work over the weekend
10   to reach additional agreements to streamline
11   the case, and we have achieved certain
12   stipulations that we think will do that.  We
13   would like to present those to you now if we
14   may.
15        JUDGE ESSEX:  You may.
16        MR. POWERS:  Mr. Ferguson has a list
17   and copies of those.
18        MR. FERGUSON:  Good morning, Your
19   Honor.
20        JUDGE ESSEX:  Good morning.
21        MR. FERGUSON:  We have, as Mr. Powers
22   indicated, we did reach a number of
23   stipulations or agreements over the weekend
24   that hopefully will reduce the time of the
25   trial.  That includes a number of witnesses who
```

Page 106

```
1    have submitted witness statements, but through
2    agreement of the parties, we will -- the
3    parties will forego live cross-examination of
4    some of those witnesses and instead rely on
5    deposition designations.
6         So the list of witnesses that you have
7    had in the pretrial briefs has changed.  And if
8    I may, I will pass up a list of what now
9    appears to be the actual witnesses who will
10   appear here at the trial for examination.
11        There is some estimated times there
12   that are just times that we have put in and
13   have included Motorola's times.  That may
14   change, but let me get that list and I will
15   provide those.
16        JUDGE ESSEX:  All right.
17        MR. FERGUSON:  May I approach?
18        JUDGE ESSEX:  You may.  Does the court
19   reporter have one?
20        MR. FERGUSON:  The other issue is,
21   Your Honor, the parties have discussed the
22   objections to the expert witness statements,
23   and we have reached an agreement last night
24   that resolves all outstanding objections to all
25   of the expert witness statements.
```

Page 107

```
1         There are a couple of edits that will
2    be made to those, so revised statements will go
3    in, but I believe as it currently stands, there
4    is no need for Your Honor to rule on any
5    outstanding objections to any of the expert
6    witness statements.
7         JUDGE ESSEX:  All right.
8         MR. FERGUSON:  And then we have also,
9    last night, Apple provided to Motorola and the
10   Staff a list of all the exhibits that Apple
11   intends to enter as part of its case-in-chief.
12   And I believe we have reached agreement and
13   resolved all outstanding objections to those
14   exhibits.  And we will, pursuant to your
15   direction at the pretrial, provide those lists
16   to the court reporter for entry.
17        JUDGE ESSEX:  Excellent.  Thank you.
18        MR. FERGUSON:  And I believe those are
19   the stipulations and the agreements that have
20   been reached that we wanted to bring to your
21   attention this morning.
22        JUDGE ESSEX:  All right.
23        MR. FERGUSON:  Did I forget anything?
24        MR. VERHOEVEN:  For the most part, I
25   agree with that.  I notice on the handout, the
```

Page 108

```
1    schedule indicates we will finish by Friday.
2    That's a little optimistic.  That's a hoped-for
3    goal.  So --
4         JUDGE ESSEX:  We have every right to
5    hope.  I understand.  I am not holding you to
6    it and releasing the room.
7         MR. VERHOEVEN:  Thank you, Your Honor.
8    And I agree we have agreed on resolving all the
9    objections to the witness statements.  In terms
10   of the exhibits, Mr. DeFranco is going to
11   address that, if that's okay, Your Honor.
12        JUDGE ESSEX:  That's all right.
13        MR. FERGUSON:  Your Honor, if I may
14   clarify one point, too, the exhibits that we
15   provided last night to Motorola are all of the
16   exhibits that were cited in the Apple witness
17   statements, the witness statement of the Apple
18   witnesses.
19        There are, as you know, a number of
20   exhibits that the parties submitted to you as
21   part of the joint stipulation for entry of
22   exhibits -- for receipt of exhibits without a
23   sponsoring witness.  Those were the
24   submissions, I think, on August 29th.  And
25   there was a follow-up on, I believe, September
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 109

1  21st.
2         There are numerous exhibits there, of
3  course.  And I believe on Friday, you had
4  indicated that you did not have any specific
5  problem with that, but we were seeking your
6  guidance as to how to actually enter those
7  exhibits into the record.
8         JUDGE ESSEX:  Well, if the parties
9  have agreed on those, and agree they can come
10 in without a sponsoring witness, then I will
11 allow them.  Again, just present the list to
12 the court reporter, use them as you will, and
13 if there is a disagreement and so on, then we
14 will take it up at its appropriate time and I
15 will rule on it at that time.
16        But how are we on the exhibits without
17 a sponsoring witness?  Because generally those
18 are disfavored.  If there is a disagreement,
19 you will have to find a sponsoring witness.  If
20 there is agreement, that is acceptable to me.
21        MR. FERGUSON:  I believe I can
22 represent there is an agreement with all of
23 those exhibits that they would be admitted.
24        JUDGE ESSEX:  All right.  That will be
25 fine, then.

Page 110

1         MR. FERGUSON:  Thank you, Your Honor.
2         MR. DeFRANCO:  Two quick comments,
3  Your Honor.  Just on the last point, no
4  surprise, it was a bit of a late night last
5  night.  We're confirming that we have an
6  agreement on all the exhibits.
7         JUDGE ESSEX:  All right.
8         MR. DeFRANCO:  That's -- we will take
9  care of that this evening.
10        JUDGE ESSEX:  All right.
11        MR. DeFRANCO:  Then one other issue.
12 The parties have discussed, of course,
13 sequestration, plan on following the normal
14 rule that fact witnesses will be sequestered.
15 It doesn't apply to experts.  Just wanted to
16 make sure that that was in the record.
17        JUDGE ESSEX:  Normally, the designated
18 experts stay in the room as long as they are
19 signed on to the confidential order.
20        MR. DeFRANCO:  Thank you, Your Honor.
21        MS. KATTAN:  Your Honor, I would just
22 like to clarify also that the parties' schedule
23 does not include any cross-examination time by
24 the Staff.
25        JUDGE ESSEX:  And the Staff will have

Page 111

1  the opportunity to cross-examine, and that's
2  why it is very optimistic to get out by Friday,
3  but you will get your time and they have been
4  neglectful of that, and I would remind the
5  parties to bear in mind that we have three, and
6  include Staff in these matters, but whatever
7  cross you feel is appropriate, you will have a
8  chance to do.
9         MS. KATTAN:  Thank you, Your Honor.
10        JUDGE ESSEX:  All right.  Do we have
11 anything else to take up?
12        MR. POWERS:  There is one small item,
13 Your Honor, we're not quite ready, but we
14 wanted to advise Your Honor of it.  With
15 respect to the experts we have been discussing
16 and agreed qualification as to them related to
17 all the patents, we haven't yet finalized that,
18 but we wanted to advise you that that's in the
19 works and we expect that we will be able to
20 reach agreement on that as well to remove that
21 issue.
22        JUDGE ESSEX:  All right.  And having
23 said that, are you ready to proceed?
24        MR. POWERS:  I am, Your Honor.
25        JUDGE ESSEX:  Proceed.

Page 112

1         MR. POWERS:  May it please the Court,
2  Your Honor, I would like to begin with a
3  discussion of some of the contributions that
4  both parties have made to various aspects of
5  technology, because in fairness, both parties,
6  Apple and Motorola, have made significant
7  contributions over the years in various ways.
8         And both are justly proud of those
9  contributions.  The point of this case from
10 Apple's perspective is that this case involves
11 a particular set of contributions, a particular
12 type of technology with which Apple is very,
13 very familiar as a result of its background and
14 with which Motorola is not particularly
15 familiar by virtue of its background.
16        And I would like to go through that a
17 little bit to explain that before we talk about
18 the patents in specifics.  So with respect to
19 Apple, one of the aspects of Apple's history of
20 innovation, which is very well-known, was the
21 introduction of the MacIntosh computer in 1984.
22        And I want to pause there briefly
23 because what's important here is really two
24 different things.  One is that what made the
25 MacIntosh famous at some level was its user

3 (Pages 109 to 112)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  interface.  And the concept of an easy,
2  familiar user-friendly user interface was
3  something that Apple was known for very early,
4  has focused on for very long, and is central to
5  the issues in this case where a different user
6  interface is at the core of the inventions that
7  led to the iPhone and the other products we're
8  talking about.
9       But the other aspect of the MacIntosh,
10 which is not quite so obvious, is the advances
11 in computer engineering, software engineering,
12 software architecture that Apple has been known
13 for as well.  Apple has been known for that for
14 35 years because it started out, of course, as
15 a computer company.
16      And one aspect of this case, in
17 addition to the user interface technology for
18 which Apple is well-known, is the application
19 of concepts integral to the development of
20 computers to how a cell phone works.
21      Those two aspects will be at the heart
22 of this case.  Those two aspects are at the
23 heart of Apple's competence and long, long
24 history of innovation.
25      In 2001, Apple released OS X, which

1  was a very, very famous advance in operating
2  systems, known for many, many, many things, but
3  one of them, in particular, it was known for is
4  relevant to this case as well, which is a
5  particular way of associating and finding new
6  attributes, new components, new parts of the
7  system and loading them quickly so that you can
8  use them.
9       It turns out that that advance in
10 computer architecture, in software
11 architecture, was essential to some of the
12 things that we now take for granted in cell
13 phones today.
14      Also in 2001, Apple continued its
15 advances in user interfaces with the release of
16 the iPod.  The iPod had a different user
17 interface; the famous click spinning wheel.
18 And that iPod, of course, went on to transform
19 and explode an entirely new industry, the MP3
20 or music player industry.
21      2007, of course, came the introduction
22 of the iPhone, which is directly relevant to
23 this case.  And the iPhone, again, had many,
24 many innovative aspects and many things that
25 were relevant, but two most relevant here are,

1  again, the user interface, advancing the user
2  interface from the MacIntosh, from the iPod,
3  now to include multi-touch technology, about
4  which you will hear quite a bit in this trial,
5  but also, again, integrating and applying and
6  extending some of the computer technology Apple
7  had been working on for so long as a computer
8  company.
9       Of course, the introduction of the
10 iPad in 2010 was yet another innovation of
11 Apple's.  Again, extending some of the same
12 technologies that we're talking about here.
13      And the world noticed with regard to
14 the introduction of the iPhone, I want to point
15 out and focus on that because that, of course,
16 is what we're really talking about with many of
17 the technologies here, Steve Jobs when he
18 released it in January of 2007 proclaimed it
19 was a revolutionary product that will change
20 everything.
21      Well, although there were some
22 skeptics about the grandiosity of that
23 statement, it was proved to be true.  And it
24 was proved to be true really because, in part,
25 in large part, of the two things I have just

1  been talking about, the multi-touch user
2  interface and the extensions of computer
3  technology that Apple had been working on for
4  quite some time.
5       First, let's talk about the
6  multi-touch touchscreen.  That really takes two
7  things to make it work that we're going to talk
8  about here.  First is hardware, which can
9  accurately sense multiple touches.  Because the
10 gestures that we're all now familiar with on an
11 iPhone aren't just touching a button and
12 releasing it, but very complex gestures, which
13 the screen has to be able to recognize and
14 differentiate from other complex gestures.
15      But once you have got hardware that
16 can actually accurately sense those multiple
17 complex touches, you have to have software that
18 interprets those touches or gestures and
19 understands what user command they translate
20 into.  So that you understand a pinch to zoom
21 is a pinch to zoom and causes that to happen on
22 the screen that you're looking at.
23      And we will be talking about both of
24 those.  And, of course, both of those
25 correspond to two of the patents-in-suit in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1   this case.
2       Now, the world recognized the advances
3   of the iPhone and, more importantly,
4   specifically recognized that the iPhone
5   advances were directly linked in large part to
6   the aspects that we're talking about here.
7   Bloomberg Business Week called that iPhone
8   touchscreen "magic."  And said it was -- the
9   most impressive feature of the new iPhone was
10  the sophisticated, multi-point touchscreen.
11      And, in particular, what that
12  particular article talked about was try more
13  than one finger on a conventional touchscreen.
14  The screen outlined in Apple's patent
15  application will be able to react to as many as
16  15 simultaneous touches.
17      Now, the patent application that that
18  article is referring to is exactly the
19  application that led to the '607 patent in this
20  case.
21      So there is -- you cannot find, I
22  think, more direct evidence of nexus, if you
23  will.  The success of the iPhone was recognized
24  by the world as linked in large part to the
25  success of that particular patented touchscreen

Page 118

1   represented by the '607 patent because of its
2   capability of recognizing multiple,
3   independent, simultaneous touches.
4       PC World was another example of the
5   chorus that finally came around and saw the
6   iPhone as the incredible advance that it was.
7   One of the things PC World said was "due in
8   large part to the overwhelming success of
9   Apple's iPhone and Smartphone, touchscreen
10  technology is winning more attention than ever
11  before.  Countless handset makers have tried to
12  mimic Apple's success with the iPhone by
13  creating touchscreen-based devices of their
14  own."
15      That of course goes directly to
16  another indicia of the significance of Apple's
17  inventions.  They say the most sincere form of
18  flattery is imitation.  Well, Apple was
19  flattered.  But Apple was also copied.
20      And the world before the iPhone in
21  terms of how phones looked, how phones operated
22  was dramatically different, a sea change from
23  before the iPhone until after the iPhone.  And
24  that fact is also directly relevant to an
25  appreciation of the significance of Apple's

Page 119

1   innovations.
2       PC World also said in March of 2011
3   "touchscreen panels have been around for more
4   than a decade, but it was the 2007 introduction
5   of the multi-touchscreen in Apple's iPhone that
6   galvanized the market.  Now, the business is
7   going gang busters, everybody is trying to do
8   the same thing."
9       But importantly, PC World also noted,
10  "before the iPhone, most touchscreens used
11  pressure-sensitive, resistive touch panels,
12  which required the user physically press down
13  on the screen.  Resistive screens could track
14  the position of just one finger at a time.
15  Apple chose a competing technology, projected
16  capacitance, which responds to a light touch
17  and can also sense a finger as it enters the
18  electronic field" -- that's a typo -- "above
19  the touch surface, a technique called proximity
20  sensing."
21      So what the world, the industry noted
22  was that Apple went a different way.  It
23  bucked, if you would, the conventional wisdom
24  because the conventional wisdom at that time
25  for this type of application used these

Page 120

1   resistive pressure-sensitive screens, which
2   really didn't work for the type of applications
3   Apple wanted.
4       Apple bucked the conventional wisdom
5   and despite the skepticism, Apple proved itself
6   to be right.
7       There is a second aspect, of course,
8   to how the touchscreen operates.  I alluded to
9   it earlier, and that's the software.  It is one
10  thing to have the hardware that can recognize
11  and record the individual touches.  You then
12  have to have software that understands and
13  translates those touches or gestures into
14  commands.
15      That relates to the '828 patent.
16  Wayne Westerman is one of the inventors of that
17  patent and will testify here.  His invention
18  was acknowledged also in the press as a
19  technology that was only developed a few years
20  ago.  He did it at the University of Delaware.
21  And was acknowledged to help drive Apple's key
22  breakthrough in the new iPhone.
23      Why?  Well, "the wonder lies in an
24  entirely new way of controlling computers, cell
25  phones, and other electronic devices, allowing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1    users to initiate computer commands with just
2    finger gestures."
3            That innovation, again, was not
4    something that had been existing anywhere in
5    the market in any respect beforehand, was
6    ground-breaking, and key to the innovation and
7    success of the iPhone.
8            And the iPhone, let's not
9    underestimate how significant it is.  It is
10   only four years ago.  Four years ago the iPhone
11   was released.
12           And you literally have four-year old
13   children now walking up to television sets and
14   touching them and can't figure out why they
15   don't respond to their touch.  The ubiquity of
16   the technology that Apple developed and made
17   possible, and the ubiquity of its influence on
18   how we live our lives in four short years is
19   astounding.
20           Motorola:  Again, Motorola has made
21   significant contributions over the years in
22   many ways of which it is justly proud.  I have
23   taken a few from their web site to show the
24   progression in history.
25           But one of the things that you will

Page 122

1    see from Motorola's history is that it has been
2    strong historically in hardware, not, of
3    course, a computer company, but hardware.
4            But not so strong in software.  And
5    the problem, of course, for Motorola is as the
6    handset market has changed, it used to be
7    primarily a piece of hardware.  That's where
8    Motorola was strong.  That's where its history
9    was.
10           Smartphones now are much more about
11   software and much more about areas of
12   competence that Motorola has historically not
13   had.  Let's begin from their web site from one
14   of their first contributions.  Of which they
15   are very, very proud which they put on their
16   web site, the walkie-talkies which helped our
17   GIs in World War II.  That formed the basis of
18   some of their early pager technology, which
19   they then are also very well-known for, going
20   from the '50s into the '70s.
21           And I don't think anybody has not seen
22   a Motorola walkie-talkie or a Motorola pager or
23   a Motorola -- or something that was used by
24   repair crews to communicate with each other.
25   Motorola, of course, was very, very significant

Page 123

1    in those markets.
2            Continuing into the mid-'90s, with
3    their pagers, the bottom right one is they
4    called it the Tango pager.  That's 1995.
5    Pagers, of course, are now not so significant
6    in a world dominated by cell phones and
7    Smartphones.  So Motorola moved from pagers to
8    cell phones.  Again, to its credit, giving it
9    its due, Motorola actually did -- was
10   significant in the early days of the cell phone
11   market.
12           They had a product called the DynaTAC
13   8000, about which some of Motorola's witnesses
14   have testified in their direct witness
15   statements.  And they are quite proud, again,
16   from their web site of the first -- they claim
17   credit for having the first private handheld
18   mobile phone call ever made.  And this was a
19   recreation by one of the Motorola people using
20   that DynaTAC.
21           And that's in 1983.  In more modern
22   times, of course, Motorola has made somewhat
23   smaller and more conventional-looking cell
24   phones.  It is best known, I think, for the
25   RAZR, which was in the early to mid-'90s, but

Page 124

1    the problem, of course, for Motorola is that
2    the market for cell phones changed.  And what
3    changed it was Apple.
4            And that is reflected over and over
5    again in the commentary and just the facts of
6    how Motorola has been progressing as a company.
7    The New York Times, I think, probably put it
8    best in April of 2009 with the headline,
9    "Motorola scrambles to restore its lost cell
10   phone glory."
11           Motorola was a dominant cell phone
12   manufacturer in the early '90s.  The problem,
13   of course, as The New York Times reported, is
14   that by 2009, they were "stuck heavily in the
15   handset death spiral."  Why?
16           Well, of course, the reason was cell
17   phones had changed.  "Apple and others had
18   transformed the market with phones that can do
19   anything a computer can do and more."
20           That quote is significant in two
21   respects.  One, of course, Apple was leading
22   the charge but two, the notation about the
23   change from a simple piece of hardware that's a
24   cell phone to a phone that is really a
25   computer.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 125

1    That's the technology that Apple, of
2  course, has since 1975 and been developing.
3  And that's an area of expertise which, of
4  course, Motorola had not historically had.
5    So in the New York Times article,
6  Motorola's CEO gave his prescription for how he
7  was going to turn Motorola around, how to
8  reverse that handset death spiral.  What did he
9  say?
10   He said:  Well, in the current and
11 next quarter, Motorola will begin shipping
12 touch-screen phones, the kind that Apple and
13 others already have.
14   So the world and Motorola recognized
15 that Apple's introduction of the iPhone changed
16 the world, and that Motorola had to play
17 catchup and to start shipping the types of
18 phones that Apple had introduced.
19   And that meant a touchscreen phone.
20 And that's at the heart of two of the patents
21 in this case.
22   A very quick time line for Motorola's
23 phone and Smartphone history:  The RAZR, of
24 course, was 2004, very, very popular phone, but
25 none of those are touchscreen phones.  They are

Page 126

1  just basic phones of the type that we were all
2  familiar with.
3    In 2006, the year before the iPhone
4  came out, Motorola actually had a very
5  simplistic touchscreen phone, but not one that
6  you could use your fingers on.  It required a
7  stylus.
8    And that's significant because that
9  really was in many ways the state of the art in
10 2006.  If you wanted a touchscreen, you would
11 use a stylus that would poke it.  That was that
12 resistive type of screen we talked about
13 earlier.
14   In 2007, the iPhone came into
15 existence and changed the world.  And it took
16 Motorola two more years until it released its
17 first touchscreen phones, the Cliq and the
18 Droid, 2009 for both of them.  Both of those
19 were simpler phones, they were not multi-touch,
20 they were single touch.  But they were in many
21 ways attempting to mimic the iPhone, attempting
22 to put Motorola out of that handset death
23 spiral.
24   And it wasn't until 2010, three years
25 after the iPhone, that Motorola released the

Page 127

1  Droid X and the Bionic later in 2011, which
2  were multi-touch cell phones fully utilizing
3  the capabilities Apple had introduced three and
4  four years before.
5    Those were the types of phones that
6  Motorola knew it needed to introduce to try to
7  compete and those are the types of phones that
8  are squarely covered by Apple's innovations and
9  patents.  Those are also the phones that when
10 you use them, you can do the same types of
11 things that Apple's phones made popular and
12 introduced four years earlier.  One example is
13 this multi-touch capabilities, is the pinch to
14 zoom or moving around.
15   Anyone who has used these phones,
16 knows how convenient it is to zoom in and see a
17 bit of text larger if it is too small in your
18 e-mail or something else, or move through a map
19 and change which part of the map you are
20 looking at.  That's available because of
21 Apple's multi-touch technology that is patented
22 in this case.
23   Motorola has adopted it in 2010.  In
24 addition, Motorola's devices adopted Apple's
25 patented computer-based technology.  What that

Page 128

1  computer-based technology, which is reflected
2  in the '430 patent that we're going to talk
3  about in a bit, it talks about a way of
4  dynamically finding applications that you need
5  to use on the fly and need to use quickly.
6    And a good example of that that we now
7  take simply for granted is if you are in an
8  e-mail and the e-mail -- in the e-mail someone
9  lists their phone number, we now take for
10 granted that you can just touch the phone
11 number in the e-mail and the phone will dial
12 that number.
13   What we may not be aware of is that in
14 order to do that, the phone has to change the
15 application.  We're actually in an e-mail
16 application that doesn't dial phone numbers.
17   So the cellular phone, the Smartphone
18 has to figure out which program to go use, go
19 get that right program that can make the phone
20 call, launch that program that can make the
21 phone call, and all we see is we touch the
22 phone number on the e-mail program and we get a
23 phone call.
24   But underneath that, under the covers
25 is a series of computer-based architecture,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 129

1   software steps that Apple innovated that made
2   that possible, that Motorola has now adopted.
3          And now I would like to get into more
4   detail, Your Honor, for a bit about the
5   multi-touch patents at issue here, beginning
6   with the '607 patent, which is the hardware
7   patent.
8          The title is multi-point touchscreen.
9   And the inventor who will be here to talk about
10  that is Steve Hotelling.  He is Apple's senior
11  director for touch hardware, named inventor on
12  about 50 U.S. patents.  And almost 100 pending
13  applications.
14         And he will be our first witness.  He
15  recognized the problem with the prior art
16  software -- prior art hardware.  The prior art
17  hardware had various configurations, but what
18  it couldn't do was accurately recognize the
19  location and movement of multiple finger
20  contacts.
21         And one of the problems he will
22  testify about is that if you had two fingers as
23  shown in the screen on two different positions,
24  because of the way these hardware devices were
25  designed, you couldn't tell whether the actual

Page 130

1   touch was where the fingers were or almost the
2   mirror image of where the fingers were.
3          And that was one of the problems that
4   was shown in the prior art that he was trying
5   to solve.  And he did solve it.
6          Another problem in the prior art is
7   that when you had touchscreens or touch
8   sensitive panels, they were usually not
9   transparent.  They were often on an opaque
10  touch pad on a computer that we have all seen
11  before, or they were something like this
12  quantum board, which is one of the pieces of
13  prior art that Motorola relies upon here, which
14  when you put it on top of a real touchscreen,
15  you can see it not at all transparent.  It
16  obscures the whole face.
17         So that is one of the problems with
18  prior art hardware is that in addition to not
19  being able to recognize accurately multiple
20  touches, it wasn't transparent, which you need
21  for the new type of device Apple was creating.
22         The solution in the '607 patent is
23  what is called row/column intersection
24  capacitance.  That is one part of the solution.
25  That's one way that you are accurately able to

Page 131

1   detect multiple touches.
2          But, in addition, it was transparent.
3   So let you have the iPhone that we're -- the
4   iPhone and iPhone-like devices that we're used
5   to seeing today.  And it was the combination of
6   those two inventions, and the other aspects of
7   the '607 patent that make the iPhone able to
8   recognize the gestures that we all take for
9   granted today.
10         The infringement with regard to the
11  Motorola devices is quite straightforward with
12  respect to the '607 patent.  The '607 patent
13  claims a touch panel that's transparent.  There
14  is no doubt it is.  You can see right through
15  it.  It is configured to detect multiple
16  touches.  It is quite straightforward, of
17  course, that it does so.  That won't be denied.
18         There is a first layer with a
19  plurality of transparent first conductive
20  lines.  You can see them right there
21  highlighted in blue.
22         A second layer, with additional lines,
23  going the opposite direction.  Plainly there in
24  the device.
25         And the intersections being positioned

Page 132

1   at different locations in the plane.  That's
2   plainly true as well.  And, finally, of course,
3   they are connected to capacitive monitoring
4   circuitry.  There will be no debate about that.
5   Fairly straightforward.
6          Well, what does Motorola then argue?
7   It argues that this configuration, which is
8   from their own tutorial, those lines that you
9   see, particularly the purple lines underneath,
10  aren't lines.  And we will have a discussion
11  about that that will partly be a claim
12  construction discussion and partly another
13  discussion.
14         But Motorola's argument is that in
15  order to be lines, they must have a constant
16  line width, be narrow, and continuous.  And
17  they will take the position that the lines you
18  see on the screen are not lines.
19         In fact, one problem with them, other
20  than the obvious fact that those lines appear
21  to be lines, is that the patent, the '607
22  patent, is quite straightforward in saying
23  there is not a very rigid geometry that's
24  required for these lines.  It goes on at quite
25  a length to say they could be any shape, not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

1    only do they not have to be constant line
2    width, narrow and continuous, but the geometry
3    can be -- line width and spacing may be widely
4    varied.  So the patent teaches quite the
5    opposite of the rigid construction Motorola
6    attempts to rely upon for non-infringement.
7        On validity, I think we see a similar
8    story.  This patent went through the ringer at
9    the Patent Office, over 300 references were
10   discussed, and cited and considered.  And
11   Motorola's references that they offered to you
12   are really of the same type that the Patent
13   Office considered over and over again.  There
14   is a bucket of references that just simply
15   aren't transparent, and we will show some
16   examples of those, and there is another bucket
17   that simply aren't multi-touch.
18        And what Motorola is attempting to do,
19   which was what was argued in the Patent Office
20   record is you can take a little piece of one
21   reference, combine it with another piece of
22   another reference, and maybe a little piece of
23   a third reference and, ah-ha, you have the
24   iPhone.
25        Of course the law of obviousness, as

Page 134

1    Your Honor knows well, doesn't quite work that
2    way.  And the reality is that these references
3    do not anticipate or render obvious the iPhone.
4        Some examples, the very first
5    reference they are talking about is this
6    SmartSkin device.  And I want to note that this
7    SmartSkin device is a tabletop piece of
8    plywood, although this looks like it might be
9    shining through the bottom, that is a projected
10   light coming up top.  It is plywood, so it is
11   certainly not transparent, and you can also
12   tell quite clearly that it doesn't -- wouldn't
13   be very useful or thought to be very useful for
14   an iPhone-type device.
15        It was also discussed twice in the
16   prosecution history.  So this is something
17   that, again, is really a reread of what was
18   done before and doesn't in any way render this
19   invention obvious.
20        The Quantum products are another
21   example.  The Quantum products are plainly not
22   transparent and they are not multi-touch on a
23   single sensor as is described.
24        But perhaps more important, the Court
25   says, and I know Your Honor knows well, have

Page 135

1    pointed in the context of obviousness that
2    often the most important evidence is so-called
3    objective evidence of non-obviousness.
4        If the iPhone had been so obvious, as
5    Motorola now claims, then one thinks Motorola,
6    which had a substantial investment in the cell
7    phone business, would have done something to
8    avoid its handset death spiral earlier, that it
9    would have done what it now says is obvious
10   before the iPhone was introduced, rather than
11   waiting for the iPhone to come out and mimic
12   it.
13        That goes to the heart of several of
14   the objective considerations of
15   non-obviousness.  The industry praise, of
16   course, the widespread copying, and the
17   extensive sales of the iPhone, 44 billion as of
18   2010 and counting.
19        All of that goes to say that
20   obviousness is easy to see in hindsight, but to
21   paraphrase from Forrest Gump, obvious is as
22   obvious does.  And they didn't do it.  And the
23   world didn't do it.
24        The world didn't see this as obvious,
25   only Apple did.  And now everybody is copying

Page 136

1    it and saying that it was easy to do
2    beforehand.
3        The '828 patent, of course, is the
4    software side of the multi-touch equation.  One
5    of the inventors, Wayne Westerman, will be our
6    second witness.  He is a senior engineer at
7    Apple.  He cofounded a company called
8    FingerWorks, which is what he used to start his
9    invention.
10        That company was acquired by Apple in
11   2005.  He is a named inventor of 30 U.S.
12   patents and almost 80 pending applications.
13        And the story of how he founded the
14   technology in the '828 patent is interesting.
15   He was a Ph.D. student at the University of
16   Delaware, and was suffering from repetitive
17   stress injury from all of the typing that he
18   was having to do.
19        And he was actually enduring a fair
20   amount of pain typing his Ph.D. thesis which
21   became the essence or at least part of the '828
22   patent.  So ironically, he cured his RSI with
23   an invention that allowed you to input data
24   without typing, with light-touch sensitive
25   devices.  And that is going to be at the heart

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 137

1    of the software side of the multi-touch
2    technology.
3           Again, the prior art had some
4    substantial problems.  There were touchscreens,
5    of course, in the prior art, as the industry
6    praise recognizes, but it came with substantial
7    limitations.
8           The prior art touchscreen technology
9    really focused typically on the location of
10   touches.  It wasn't computing the size or shape
11   of those touches generally.
12          And it turns out that the shape is
13   important to being accurate on multi-touch
14   detection.  So the accuracy of the prior art
15   devices was quite limited.  The multi-touch
16   capability was quite limited.  And when you
17   want to try to make complex gestures, like a
18   rotate or a pinch and zoom, something that
19   isn't a tap, the accuracy requirements go up.
20   And that's one of the things that was clearly
21   missing from the prior art.
22          And all of the types of things we now
23   take for granted on these types of devices were
24   just simply not available in the prior art.
25          So what was the solution?

Page 138

1    Dr. Westerman's solution in part started with
2    generating proximity image data for the touch.
3    You see in the blue there the two
4    representations of two finger touches.
5           But then segmenting that image into
6    different pixel groups.  What that means is
7    saying I'm going to call the one on the left
8    one finger and the one on the right another
9    finger.  And there is a process that you have
10   to go through in order to make that
11   determination because there is all sorts of
12   stray data that gets recorded.
13          And then mathematically fitting an
14   ellipse to the pixel group.  Now, why an
15   ellipse?  Well, what Dr. Westerman realized was
16   that ellipses actually fairly closely
17   approximate the touch of a human hand.
18          And if you fit an ellipse to it, you
19   may increase the accuracy of your recognition
20   of touches and reduce the noise from stray
21   touches that aren't intended to be fingertips.
22          Infringement:  Again, fairly
23   straightforward.  Apple touchscreens are
24   well-known to support many different touch
25   commands, pinch to zoom is a good example where

Page 139

1    you can pinch on the flower and highlight the
2    bee.  Dragging where you can move a map or
3    something else across, very, very well-known.
4           Motorola touchscreens can now do the
5    identical commands used in the identical way
6    where you are just moving your hand across the
7    screen and pinching or dragging.
8           Now, do they do it in the same way?
9    We have confirmed that -- in order to avoid
10   putting CBI on the screen, I am going to
11   summarize for Your Honor what that type of
12   evidence will be.  But first and foremost, it
13   will be internal source code, which tells you
14   exactly how the products work, documents from
15   Motorola's suppliers, such as Atmel, including
16   source code that tell you how their products
17   work, Google Android documents, that's the
18   first time we have named that company, so let's
19   talk about it briefly.
20          Google, of course, supplied the
21   Android software which you will be hearing
22   quite a bit about and have read quite a bit,
23   that forms the basis for many of Motorola's
24   handset operation.  It is the source code
25   software.

Page 140

1           And then the testimony of Google,
2    Atmel, and Motorola engineers about how their
3    products work, all of that has been submitted.
4           And, of course, the inspection and
5    analysis by Dr. Ravin Balakrishnan, who you met
6    in the tutorial.
7           All of that will confirm that, in
8    fact, Motorola does what the patent says you
9    should do and how you should do it.
10          I do want to put up something that's
11   not CBI, which is Android software that's
12   published.  You will notice over and over again
13   in the parameters that are described as being
14   used by the Android software, we're talking
15   about ellipses.  The major axis, the minor
16   axis, the orientation, the X and Y center
17   positions of those ellipses.
18          That is explicitly called out in the
19   Android code.  Those are also explicitly some
20   of the parameters that are talked about in the
21   '828 patent.
22          So what does Motorola say in response?
23          They say, yes, that code is there.
24   But we often don't compute all of those
25   variables.  We may not compute those variables,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 141

1  we will substitute a default variable instead
2  of computing one.
3       Well, the key term here is, are you
4  mathematically fitting an ellipse?  And I
5  submit to Your Honor that if you are using an
6  equation with several variables and you merely
7  default variable for one or two of them, you
8  are still mathematically fitting the ellipse.
9  It may not be the same precision as if you
10 computed all five variables or six variables
11 but you are still using math to fit an ellipse.
12      And that will be the issue that's
13 presented to you primarily with regard to
14 Motorola's infringement of the '828 patent.
15      Validity:  Again, of course, this
16 patent went through the ringer in the Patent
17 Office.  Again, well over 300 prior art
18 references, not a simple prosecution.
19      And, again, Motorola's art that's
20 submitted to you falls within the same type of
21 buckets of what the Patent Office squarely
22 considered.  This is a multi-touch patent, of
23 course.  And they submit several single-touch
24 references.
25      Well, the single-touch reference isn't

Page 142

1  going to make obvious multi-touch.  They submit
2  optical, non-scanning, non-touch sensing
3  devices.  Well, that's not going to be
4  particularly relevant to a touch sensing
5  device.
6       They present static scanning, limited
7  touch processing, many other things that are
8  exactly the type actually considered by the
9  Patent Office, and with regard to the Bisset
10 '352 patent, explicitly considered by the
11 Patent Office.  So this really is not anything
12 new to what the Patent Office considered and
13 rejected in issuing the ground breaking '828
14 patent.
15      Again, of course, the objective
16 considerations of non-obviousness are the same.
17 The stupendous iPhone sales, the widespread
18 industry praise, and, of course, the widespread
19 copying by Motorola and others.
20      All of which goes to show that if it
21 had been obvious, somebody else would have
22 tried to make that $44 billion, somebody else
23 would have done this before, rather than
24 copying the iPhone.
25      The last patent I want to turn to is

Page 143

1  the '430 patent.  This is the one that moves
2  out of the multi-touch arena and into the
3  computer software architecture, software
4  engineering arena.
5       The invention is called
6  object-oriented system locator system.  And
7  that's a reflection of the fact that this can
8  be used with object-oriented programming
9  techniques, which of course Android used.
10      And there are really two problems in
11 the prior art called out in the '430 patent.
12 The first is that you want to be able to
13 identify system components dynamically.
14 Dynamically, of course, means you don't have to
15 go wait for it, it is right there when we touch
16 that phone number in our e-mail application, it
17 goes and finds that phone application on the
18 fly right then and is able to do so quickly and
19 easily.
20      Well, at that point, that hadn't been
21 done.  And we talked about this in the
22 tutorial, so I won't repeat it, but the way the
23 prior art tried to do it at that time
24 principally was to search for a component by
25 its name.

Page 144

1       In other words, if you knew the name
2  of what you wanted, then you could go find it
3  pretty easily.  And there were similar, if you
4  knew when the file was created, but you had to
5  know specific details about what you were
6  searching for to find it.
7       And that's a problem because you may
8  not know what the best program is that you want
9  at that particular time.
10      The second problem in the prior art is
11 you want to be able to update components,
12 applications, et cetera, on the fly.  Again,
13 when you were in your e-mail program, you don't
14 want to wait while it says looking for it, I
15 have to reboot, please restart your phone, I
16 will call as soon as we get all that done.
17      Now, in the prior art, of course, that
18 was a problem.  When you reloaded -- when you
19 loaded new software or tried to access a new
20 piece of hardware, you would frequently get a
21 message like this one that says, "a newly
22 installed program requires this computer to be
23 restarted."  We would not like to do that if
24 we're touching that phone number in our e-mail
25 program.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

1    And so that's one of the innovations
2  that this '430 patent makes clear.
3    And, again, we talked about this in
4  the tutorial, so I won't belabor it, but one of
5  the things the '430 patent talks about is using
6  a framework -- and that's important later -- to
7  identify these components dynamically using
8  properties.  Again, not the name, but something
9  about that device that let's it find it not
10 knowing the name.  The example we used in the
11 tutorial was a USB device.  We will use the
12 same one.
13   So instead of calling it USB support A
14 or B, it is flash storage or Matt's USB device.
15 And that could be a property that's allotted to
16 it, and you can search for that.
17   And it turns out that if you do that,
18 you can find it very quickly without knowing
19 the name, add it to the operating system, then
20 that USB device will work and off you go.
21   That's the use of properties in a
22 framework.  So now let's talk about
23 infringement.
24   Again, infringement, Android has two
25 ways to identify those target components, to

Page 146

1  identify that e-mail in a contact.  Here the
2  example is you are in a contacts program, and
3  you want to touch that e-mail address and send
4  an e-mail.
5    Well, the contacts program doesn't
6  send e-mails.  That's not what it does.  So you
7  need to go to a different program just the way
8  you had to go to a cell phone program from your
9  e-mail before.
10   So in your Android device, you would
11 touch your contact, it would touch the e-mail,
12 and what Android has, interestingly enough, are
13 two ways to identify target components.  One
14 way is called explicit intents.  You will hear
15 quite a bit about that.
16   Explicit intents corresponds exactly
17 to the old name way of doing it.  If you know
18 what name you are looking for, an explicit
19 intent will call for it by name and it will say
20 I want the e-mail program and the e-mail
21 program goes right into the stack and off you
22 go.
23   But there is a second way -- and this
24 is obviously just the way the prior art was
25 working, calling for it by name.  The second

Page 147

1  way Motorola's products work using Android is
2  called implicit intents.  And just as the name
3  implies, implicit intents don't require the
4  name but use properties, use characteristics of
5  what you are looking for that are well
6  established and can be filtered.
7    And what happens is if you don't know
8  the name, you can still search and what it does
9  is it finds something that's appropriate for an
10 e-mail program, not using the name.  And that's
11 exactly the type of properties that the '430
12 patent is talking about.
13   It will find the right e-mail program.
14 It will find the right e-mail program without
15 the name and put it into the active area so it
16 can then be dialed, e-mail -- or contact the
17 e-mail immediately at that point.
18   Just the way you would be dialing the
19 phone from your e-mail in the other example.
20 And I wanted to put this up.  This is, again,
21 public.  This is Google's description, one of
22 Google's descriptions of the Android operating
23 system and applications on top.
24   And you will notice at the top, the
25 top part of the operating system is bounded by

Page 148

1  this red box.  The top part of the operating
2  system has something called application
3  framework.
4    The exact same term and exact same
5  concept of the framework that's being used in
6  the '430 patent.  And there are two parts of
7  that framework, one is called the activity
8  manager and one is called the package manager.
9    And you will hear more detailed
10 testimony later, of course, and you have seen
11 some of it already in the witness statements,
12 but the activity manager is what will be
13 involved in sending out those implicit intents,
14 the ones that ask for a program not by name,
15 and the package manager will take that, go find
16 it, go find the right program, and send it back
17 to the -- return it back to the activity
18 manager so that you can dial your phone call or
19 send your e-mail from another program.
20   Well, in light of that, what is
21 Motorola's non-infringement position going to
22 be to you?  One of their arguments is that
23 there is an installation program and it has to
24 be installed.
25   Well, of course, that's true.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 149

```
 1    Everything has to be installed at some point.
 2    But what is true and what Motorola doesn't and
 3    can't deny is that that installation program
 4    does not run at all during this intent
 5    resolution process that we're talking about,
 6    which are the steps of the claim.
 7         It is not involved.  And, therefore,
 8    the installation program really is irrelevant
 9    to the part -- to the timing of the claim that
10    we're talking about.
11         Another argument that Motorola will
12    make is, well, there is not really any support
13    that's added.  And you will recall that one
14    of the claim limitations.  We're talking about
15    adding support for these programs.  Something
16    that let's those programs run.
17         Well, there won't be any dispute that
18    various connections are added within the OS
19    when those activities are started.  And let's
20    go back to the operating system diagram from
21    Google.  There is no dispute when you call that
22    e-mail program from the earlier example, and if
23    it hadn't been in the activity stack before,
24    connections will be established inside that
25    operating system that weren't there before that
```

Page 150

```
 1    let you run e-mail quickly and efficiently
 2    right then from your phone.
 3         Same, the activities will be added to
 4    the activity stack that weren't there.  That's
 5    adding support.  And services, an example that
 6    you saw in the witness statements of music, are
 7    also supported again by added binder objects
 8    that occur in that operating stack.
 9         Again, we think those non-infringement
10    positions simply don't go to the heart at all
11    of the invention, which is that you are using
12    these properties to find and run an operating
13    program that isn't the one you were using
14    before.
15         Validity:  Well, the validity position
16    from Motorola here is really in a way something
17    where the gentleman doth protest too much.  The
18    basic position as I understand it, is that
19    everything can search and find, that you can
20    find using almost anything, something in the
21    prior art and smart folders are there and so
22    any form of searching, in their view, basically
23    invalidates this patent.
24         Well, of course, that ignores two
25    things, if I may, Your Honor.  One is this
```

Page 151

```
 1    patent was subject to examination.  If indeed
 2    every form of searching would have invalidated
 3    this patent, you would have thought that the
 4    examiner would have given a rejection based on
 5    something.
 6         There was not a rejection in this file
 7    history over any piece of prior art.  So
 8    certainly the examiner disagreed with Motorola
 9    in saying that any form of searching
10    invalidated it.
11         And, indeed, one of the key pieces of
12    prior art on which Motorola relies here is
13    UNIX, the UNIX find system.  UNIX was
14    specifically discussed in the specification
15    itself, yet not used as a basis for rejection
16    by the examiner either who obviously was
17    familiar with UNIX.
18         And what Motorola's argument also
19    ignores is the fact that the claims don't say
20    you search with just anything, which is really
21    what their invalidity position amounts to.  The
22    claims say you are searching based on one or
23    more properties, specifying a target hardware
24    or component software search criteria including
25    one or more properties.
```

Page 152

```
 1         So the way that Motorola tries to get
 2    its argument that any form of search
 3    invalidates is effectively to make properties
 4    anything.  Well, I will submit to Your Honor
 5    that when you read the file history and hear
 6    the testimony, you will be quite clear that one
 7    or more properties is not searching by
 8    anything, for example, the old way of searching
 9    by name, but something more specific, something
10    exactly like Android's and Motorola's implicit
11    intents and exactly what is described in the
12    '430 specification.
13         UNIX, which is their lead prior art
14    reference, is of course the typical old prior
15    art that is described of searching by name and
16    file size and things like that and creation
17    date.  That's all well-known.
18         There are other pieces of prior art is
19    literally just a smart folder.  You have a
20    folder called people, and it goes and finds
21    people's names and puts them in automatically.
22    I will submit that's quite different from what
23    the '430 patent is talking about, but that is,
24    again, one of their lead pieces of prior art.
25         And so at the end of that process, we
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 153

1    believe that you will find that that patent is
2    both, we will ask you to find that that patent
3    is both valid and infringed.
4         And in sum, Your Honor, we think that
5    the evidence will show to you a great history
6    of innovation by Apple, one that has centered
7    in relevant parts on the user interface,
8    ranging from the user interface of the Mac to
9    the user interface of the iPhone.  And that
10   user interface has been copied by everyone,
11   including Motorola, in order to restore its
12   lost glory.  That user interface is what we
13   have patented and that user interface is what
14   Motorola has now used and we will ask Your
15   Honor to issue an order stopping that copying.
16   I thank you very much for your time.
17        JUDGE ESSEX:  Thank you.
18        MR. VERHOEVEN:  Good morning, Your
19   Honor.
20        JUDGE ESSEX:  Good morning.
21        MR. VERHOEVEN:  That was a long 30
22   minutes.  I will try to keep mine a little bit
23   shorter.  I beg Your Honor's indulgence, if I
24   go over a couple of minutes.
25        One other thing I would like to note

Page 154

1    is I have four minutes of confidential
2    material, and I will indicate that when we come
3    up on it, Your Honor, if that's okay.
4         JUDGE ESSEX:  All right.
5         MR. VERHOEVEN:  What I would like to
6    do, Your Honor, is use my time to highlight
7    some of the major arguments that -- and distill
8    from the massive amounts of material the major
9    points with respect to each of the patents, but
10   before I do that, I want to talk about five
11   minutes maybe about the parties in this case.
12        I think the one thing that Mr. Powers
13   and I agree on, Your Honor, is that both these
14   companies are technology companies and do have
15   a history of innovation.
16        With respect to my client, Motorola,
17   really briefly, Your Honor, as you probably
18   know, Your Honor, Motorola is a relatively old
19   company in the United States.  It has got a
20   long history of innovation.  It was founded in
21   the 1920s, Your Honor, Motorola developed the
22   first commercially successful car radio in the
23   1930s.  And then in the 1940s, Motorola
24   developed the BC-611 walkie-talkie, which was
25   an iconic walkie-talkie in World War II.

Page 155

1         Flashing forward in time, Your Honor,
2    to 1983, as Mr. Powers acknowledged, Motorola
3    developed the very first commercially available
4    portable cell phone.
5         In 1991, Motorola demonstrated the
6    world's first GSM cellular system and phone.
7    Now GSM is one of the two major types of
8    networks that are across the country now.  CDMA
9    and GSM.  Motorola demonstrated the first one.
10        Mr. Powers says, well, Motorola is
11   mostly a hardware company.  But all of these
12   things involve hardware and software.
13   Certainly the GSM is a protocol that involves
14   very important software aspects, as well as
15   hardware aspects.
16        Going to 2001, Motorola developed the
17   very first GPRS cellular phone.  As Your Honor
18   probably knows, prior to that time, cell phones
19   were analog.  And GPRS was the first technology
20   that allowed digital cellular telephones, so
21   you could actually transmit data digitally, a
22   very major advance.
23        Obviously involved software, as well
24   as hardware, Your Honor.
25        Going to 2008, Motorola demonstrated

Page 156

1    the first over the air demonstration of the LTE
2    technology, which Your Honor has probably seen
3    in saturation advertisements by Verizon as 4G
4    technology.  It is the new and latest 4G
5    technology, network technology.
6         And Motorola was the first to
7    demonstrate that.  Again, these are protocols.
8    These are software.  Fundamental software, not
9    just user interface software.
10        And then finally, for the record, Your
11   Honor, in January of 2011, Motorola divided
12   itself into Motorola Mobility and Motorola
13   Solutions.  And during this case, we have
14   terminated -- or the parties have agreed to
15   terminate the investigation as to Solutions.
16   The cell phone business is in Motorola
17   Mobility.  And that's the Respondent in this
18   case.
19        These are exemplary Motorola products
20   in this case, Your Honor, that are accused.
21   They are all very high tech,
22   industry-recognized products.  All of these
23   products run on the Android operating system,
24   Your Honor.
25        So let's take a minute and talk about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1  Android, because one of the three patents does
2  have some implication as to the operating
3  system.  Android was cofounded by Andy Rubin in
4  2003.  And his idea was to create an open
5  source ecosystem for operating systems and
6  Smartphone technology.
7          This is in contrast to, for example,
8  the Microsoft operating system or the Apple
9  operating system, which are proprietary
10  operating systems.  The Android operating
11  system, Your Honor, not only is it open source,
12  but it is provided for free to OEMs.  And the
13  idea is as in generally open source technology,
14  is that you will develop the best software
15  technology by having an open source community
16  who is contributing all of their ideas to the
17  technology.
18          And in 2005, Your Honor, Google
19  acquired the Android business.  And the idea
20  there was Google had a lot of synergies with
21  that.  They had a lot of products like Google
22  Maps -- software products like Google Maps and
23  whatnot that they could combine with that to
24  provide a better user experience.
25          And in 2007, both Motorola and Google,

Page 158

1  Your Honor, cofounded the Open Handset
2  Alliance, which was an alliance designed to
3  promote the idea of having open source
4  technology in the Smartphone community.  And
5  virtually every major player, with some notable
6  exceptions, are part of this alliance, Your
7  Honor.
8          And then Android was released in 2008,
9  Android 1.0.  Since the release of Android, not
10  only Motorola but several other OEMs are using
11  this operating system.  And it has had -- it
12  has been very popular and technically praised.
13  As you can see, it has grown to over 50 percent
14  market share in just a short period of time up
15  to 2010.
16          This is simply a graphic.  This is
17  slide 6, Your Honor, of the Android community.
18  And as you can see, every major carrier is part
19  of the Android community and supports Android
20  and the sale of mobile phones using Android,
21  not just Motorola but Samsung, HTC, LG, and
22  literally hundreds of other equipment
23  manufacturers, Your Honor, have agreed that
24  this is a good technology and it is helpful for
25  us, it gives the consumers more choice, while

Page 159

1  allowing us to -- while allowing the
2  manufacturers to differentiate themselves.
3          A couple of sentences on the Motorola
4  products at issue here, there is no dispute
5  that these products have received accolades
6  from the industry for their technical
7  innovation.  This is not a situation where
8  we're looking at this is a knockoff of an Apple
9  product.  These products are different and they
10  have different functionality.
11          For example, when the Droid was first
12  released running Android 2.0, Time awarded it
13  gadget of the year.  And Engadget, a technical
14  periodical, awarded it the best Smartphone
15  2009.  When the Xoom tablet was released, that
16  was Motorola's first tablet, Your Honor, it ran
17  Android 3.0, and CNET awarded it the Best of
18  CES award.  And there is many other awards.
19  This is just a couple that these products have
20  received.
21          So there can't be any dispute the
22  accused products here are technically
23  innovative, they are differentiated, and they
24  have been recognized by the industry.
25          Now, I don't dispute Mr. Powers'

Page 160

1  statement that Apple is an innovative company.
2  There is no disputing that.  But I will say,
3  Your Honor, and I think this is important,
4  there is a difference between popularizing a
5  technology by spending hundreds of millions of
6  dollars in advertising versus inventing that
7  technology.
8          Now, Your Honor, I'm sure, has read
9  stories time and time again about inventors who
10  came up with something but somebody else
11  popularized it and they never made any money on
12  it.  Well, here this is an important
13  distinction.
14          There is no dispute that Apple
15  popularized touchscreen technology when it
16  released the iPhone, but the question here is
17  not did they make it popular, the question is
18  did they invent the patents, are the patents
19  they are asserting related to that technology
20  and did they actually invent it?
21          And here what we see is juxtaposed
22  against Motorola's innovation, the three
23  patents that are being asserted, two of them
24  weren't even developed by Apple.  The '430
25  patent was developed by Taligent, a different

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 161

1  company.  The '828 patent was developed at the
2  University of Delaware.  And Apple simply
3  acquired that technology when it acquired
4  FingerWorks.
5      The final patent, the '607 patent,
6  Your Honor, the evidence is going to show
7  indisputably that the multi-touch innovation
8  that they are claiming, the mutual capacitive
9  multi-touch innovation that they are claiming,
10 Your Honor, was not conceived of or invented by
11 Apple but, in fact, was invented by Sony and
12 Apple simply copied it.
13     With that overview, Your Honor, I
14 would like to get into the three patents.  I
15 would like to start with the '607 patent.
16     The '607 patent generally is directed
17 to a touch panel, it is a hardware patent, Your
18 Honor, a touch panel having a transparent
19 sensing medium that is able to detect multiple
20 touches at the same time at distinct locations
21 in the touch panel.
22     And this is figure 9 from the patent,
23 Your Honor.  And you saw this in the tutorial.
24 This is mutual capacitance, and there is two
25 embodiments in the patent, and this is the one

Page 162

1  that's being asserted.  Mutual capacitance.
2  And the idea on mutual capacitance is that you
3  have got drive lines and you have got sense
4  lines.  And they are cross-hatched.
5      And the drive lines are connected to a
6  voltage source.  And that drives current
7  through the drive lines.  The crosshatched
8  lines are called the sense lines, Your Honor.
9  And the sense lines are connected to a
10 capacitive monitoring circuitry.
11     And the capacitive monitoring
12 circuitry, when a user touches in the circle
13 areas, for example, the capacitive monitoring
14 circuitry is able to sense a change in
15 capacity.  Where?  At the intersection there
16 between the cross wires.
17     And figure 10 here is simply taking
18 figure 9 and turning it on its side.  And so
19 you can see here that the drive lines in blue
20 correspond here and they are going along this
21 way so they look like a solid line.  And the
22 sense lines, which are crosshatched, are in
23 red, and you can see right here (indicating)
24 they appear one after another.
25     And that's the basic invention here

Page 163

1  that's claimed in the patent.
2      Now, the evidence is going to show,
3  Your Honor, that Apple didn't come up with that
4  idea.  The evidence is going to show that a
5  gentleman from Sony, Mr. Rekimoto, came up with
6  that idea and he developed that idea, he called
7  it SmartSkin, Your Honor.
8      And this is JX-367, one of the
9  documents related to SmartSkin that discusses
10 his innovation.  The evidence is going to show
11 that the SmartSkin is a multilayer multiple
12 capacitance-sensing grid of conductive lines
13 used to detect multiple touches.  The same as
14 in the '607 patent.  It was developed by Sony,
15 the evidence will show.
16     It was publicly demonstrated in the
17 United States at a tech convention in 2002.
18 Prior to that time, Sony filed a patent
19 application on it in Japan.
20     And so there is no question that this
21 technology came before the '607 patent.
22 Motorola alleges this SmartSkin technology
23 anticipates -- you heard Mr. Powers talk about
24 obviousness -- this is anticipation.  This
25 shows the anticipation of the '607 patent.  And

Page 164

1  I will just note that in Staff's prehearing
2  brief, they indicated -- Staff indicated they
3  agree that this is indeed anticipatory art.
4  Let's look at it.
5      You can see in the article the exact
6  same cross-hatching that's claimed in the '607
7  patent, Your Honor.  It discloses drive lines
8  that are connected to a voltage source, Your
9  Honor.  It discloses sense lines that are
10 connected -- operatively connected to a sense
11 capacity circuitry.
12     And you can see right here
13 (indicating) that the article itself shows the
14 recognition of multiple touches.  But lest
15 there is any doubt, at page 2, it says in the
16 text "as a result, the system can recognize
17 multiple objects."
18     And here is another figure.  You can
19 see it is detecting five different fingertips
20 at the same time, Your Honor.
21     So we contend, Motorola contends this
22 is anticipatory, and the Staff agrees.  Now I
23 would like to go on the confidential record,
24 please.  And this is Apple confidential.
25 //

APLNDC-X0000006186

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 165

1        (Whereupon, the trial proceeded in
2    confidential session.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 166

1    C O N F I D E N T I A L   S E S S I O N
2        MR. VERHOEVEN:  Lots of people here
3    this morning.
4        JUDGE ESSEX:  We're apparently having
5    our own equipment problem.  Look around.  Is
6    there anybody in here that's not permitted
7    during confidential session?
8        MR. VERHOEVEN:  I think we're okay,
9    Your Honor.
10        JUDGE ESSEX:  Okay.  If the door
11    opens, I will direct you to stop talking until
12    we figure it out.
13        MR. VERHOEVEN:  Thank you, Your Honor.
14        JUDGE ESSEX:  Go ahead.
15        MR. VERHOEVEN:  So I apologize for
16    going on confidential, but this is really
17    important.  And I just wanted to cover it
18    quickly in my overview.
19        The evidence indisputably shows, Your
20    Honor, that Apple -- Mr. Powers said, well, the
21    inventor of the '607 patent, Mr. Hotelling,
22    recognized the problem.
23        The evidence shows he may have
24    recognized the problem, Your Honor, but he did
25    not recognize the solution.  He saw -- the

Page 167

1    inventors saw the solution demonstrated by Sony
2    and copied it.  And let's go through that
3    evidence.
4        So in September of 2003, and this is
5    an e-mail from Steve Hotelling, that's the same
6    gentleman that you saw introduced by
7    Mr. Powers, he is discussing the multi-touch
8    tablet solution.  And he says, here it is,
9    multi-touch tablet solution, and he says, "this
10    might be a case where the input solution is the
11    furthest from achievable."  So as of September
12    13, they wanted -- they knew they wanted
13    multi-touch, Your Honor, but they didn't know
14    how to do it.
15        And they said at that point, it was
16    the furthest from achievable.  And then he says
17    "we will need to work hard to come up with a
18    true multi-finger-touch solution."  It is right
19    in the documents.
20        And then I just note down here, it
21    says, "this project is the highest on Tim's
22    list and SJ's" -- that's Steve Jobs -- "list,
23    according to Tim."
24        So the evidence shows September 2003,
25    they knew they wanted it, but they -- it was

Page 168

1    the farthest from achievable, but it was still
2    on the highest priority of their list.
3        Next slide.
4        This is Mr. Hotelling's inventor
5    notebook.  In September/October 2003 time
6    frame, Your Honor, and you can see he is
7    talking about multi-touch is needed, September
8    29th, 2003.
9        And what is he working on?  Well, we
10    will see this will be fleshed out in the
11    evidence more, Your Honor, but remember the
12    '607 patent, there is two embodiments?  The one
13    on the front page is self-capacitance.  That's
14    this thing here (indicating) that he is working
15    on.
16        There is no mention of the second
17    embodiment in the patent, the one that's
18    accused in this case, which is mutual
19    capacitance, which is the cross-hatching.
20        So as of this point in time, he is
21    working on it, he is trying to get it, but he
22    is only looking at self-capacitance.
23        Then fast forward to November 3, 2003,
24    Your Honor.  One of the other inventors on the
25    '607, Strickon -- I'm probably mispronouncing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

1  his name, Your Honor -- he sees a demonstration
2  from Sony and here it is in the e-mail. He
3  says, "Sony CSL has demonstrated a technology
4  that could work for multi-touch input." And he
5  has a link. And we will look at that link in a
6  second, Your Honor.
7      But it is undisputable that inventor
8  Strickon did not think of this. He saw it at
9  Sony.
10     And we will look at what he saw, but
11 notably here on November 7th, he takes what he
12 saw and he sends it to the brainstorming group
13 at Apple, trying to work on this technology.
14 Indisputable.
15     Now, this is what he saw. We will
16 play a video.
17     (Video played.)
18     I think we have technical difficulties
19 as well, Your Honor. I meant to play the video
20 you saw in the tutorial. But he clearly saw,
21 Your Honor, the Sony technology being
22 demonstrated, a hand moving around,
23 multi-touch, and this is exactly the same
24 technology as the SmartSkin technology.
25     And it is what we are alleging is

Page 170

1  anticipatory. To repeat, Apple did not come up
2  with it. It saw it with Sony. What did Apple
3  do after it saw Sony demonstrating it?
4      Literally, 13 days later, Apple copies
5  the SmartSkin technology. In their meeting
6  notes on November 20th, 2003, not only are they
7  working on self-capacitance, they have got a
8  new one, rows and columns using ITO.
9      Now, Mr. Powers said, well, this
10 SmartSkin, it was on a piece of ply board or
11 plywood and it wasn't transparent. What he
12 failed to tell Your Honor is that the SmartSkin
13 article we're relying on expressly says you can
14 use ITO as the conductive material.
15     ITO, Your Honor, has long been known
16 to be a transparent conductive material. So
17 the reference itself says that you can use this
18 same row and column technology using ITO.
19     So it is not a question of would it
20 have been obvious to add ITO. The disclosure
21 itself expressly says you can use ITO.
22     So finally, I will note that the
23 inventor Strickon admits that he had not
24 thought to use mutual capacitance prior to
25 seeing the SmartSkin demonstration.

Page 171

1      So here we have a situation -- and I
2  come back to it -- there is a difference
3  between popularizing and inventing. And here
4  we have a situation where Sony is the one that
5  came up with this cross-hatched mutual
6  capacitance idea, in order to allow
7  multi-touch. And Apple simply copied it.
8      Now we can go back on the public
9  record, Your Honor.
10     JUDGE ESSEX: All right.
11     (Whereupon, the trial resumed in open
12 session.)

Page 172

1         O P E N   S E S S I O N
2      JUDGE ESSEX: Does somebody want to
3  tell the folks outside that they can come in,
4  since our sign wasn't working?
5      MR. VERHOEVEN: Shall I just continue?
6      JUDGE ESSEX: Go ahead.
7      MR. VERHOEVEN: Thank you. In
8  addition to the SmartSkin reference, Your
9  Honor, on the '607 patent, there is another
10 reference that also is plainly anticipatory and
11 that is the Perski '455 patent, Your Honor.
12 And this is a patent, the provisional
13 application was filed in 2003. This one was
14 not considered -- it is undisputed -- was not
15 considered during prosecution of the '607
16 patent, Your Honor.
17     And here is figure 2 from Perski. It
18 looks familiar. It is the same cross-hatched
19 mutual capacitance technology that's claimed in
20 the '607 patent.
21     And the patent itself expressly says,
22 "it should be noted that this algorithm is
23 preferably able to detect more than one finger
24 touch at the same time."
25     Multi-touch, using the same

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 173

1    cross-hatched drive lines, sense lines, mutual
2    capacity technology and it predates the '607
3    patent.
4         Motorola's position is that this is
5    also anticipatory, and I believe that the Staff
6    is in agreement on that.
7         Let's go to '607, Your Honor, for
8    non-infringement. I want to cover three
9    highlights on non-infringement, Your Honor.
10        The first is the requirement in claim
11   1 that the second conductive lines are
12   operatively coupled to capacitive monitoring
13   circuitry. There is no dispute that that's a
14   requirement. You have got your first
15   conductive lines. You have your cross-hatched
16   second conductive lines. The second conductive
17   lines need to be operatively coupled to the
18   capacitive monitoring circuitry.
19        Now, I thought I heard Mr. Powers say
20   there is no dispute with respect to this
21   element. Well, that's simply not correct, Your
22   Honor. There is a major, major dispute with
23   respect to this element.
24        In particular, Apple and its expert,
25   when they were pointing to what they allege

Page 174

1    infringe this element, Your Honor, they point
2    to the ITO2 layer right here (indicating). And
3    this is from JX-657 and JX-626.
4         And this is the layer (indicating).
5    And this has the lines that they are saying are
6    the second conductive lines. The problem is,
7    Your Honor, these lines are drive lines. They
8    are not sense lines.
9         And they are connected to a voltage
10   source. They are not connected to capacitance
11   monitoring circuitry, Your Honor. There is
12   simply no evidence showing that these lines are
13   connected to a capacitance monitoring
14   circuitry.
15        What Apple's expert does, Your Honor,
16   and he says these are connected to an
17   integrated circuit chip. Well, the integrated
18   circuit chip does thousands of different
19   functions. It has tons of circuitry in it.
20        What they don't do, Your Honor -- they
21   treat that like a black box. What they don't
22   do is they don't connect the dots. And they
23   don't show that these alleged second conductive
24   lines are actually operatively connected to a
25   specific capacitance monitoring circuitry.

Page 175

1    They don't do that because they can't, Your
2    Honor, because it is not.
3         The chip has capacitance monitoring
4    circuitry but it is not connected to these
5    lines. They are not pointing to the right
6    thing and they can't meet their burden of
7    proof, Your Honor.
8         So that's the first point. The second
9    point on the '607 non-infringement is going to
10   the other independent asserted claim, Your
11   Honor, claim 10.
12        Unlike claim 1, Your Honor, claim 10
13   claims a specific type of material that is used
14   in the different layers, in particular, glass.
15        And we don't infringe claim 10, Your
16   Honor, because all of the accused devices
17   indisputably don't use glass. They use PET,
18   which is an acronym for polyethylene
19   terephthalate, I believe, Your Honor. It is a
20   plastic.
21        It first came out in the 2 liter Coke
22   bottle in the '70s. This is indisputably not
23   glass. It is plastic. What is Apple's
24   argument? They say, well, you should construe
25   the word glass to mean glass or plastic. Well,

Page 176

1    I am not going to get into the details of the
2    claim construction, except to say, Your Honor,
3    we intend to present evidence that glass means
4    glass, and it doesn't mean glass or plastic or
5    any other type of material.
6         And in claim 1, the patentee did not
7    claim a specific material, Your Honor. Just a
8    transparent material. And in claim 10, they
9    elected to choose glass.
10        Under claim differentiation
11   principles, this is limited to glass and can't
12   include a plastic.
13        Because Motorola's products
14   indisputably don't have glass in their sensor
15   layers, there is no infringement of claim 10.
16        Finally, the third point on
17   non-infringement of the '607, Your Honor, is
18   the first conductive line, second conductive
19   lines. Now, Mr. Powers pointed to an
20   implementation of the accused product other
21   than this one. And he said, well, those look
22   like lines to me. Well, he pointed to the
23   wrong thing, Your Honor.
24        We're talking about two specific
25   implementations. It is not all Motorola's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 177

1  products, but it is some of them.
2      And it is the flooded X with Y
3  interpolation product and the flooded X with X
4  and Y interpolation products.  And those
5  products have this pattern (indicating) as
6  their electrode sense pattern.
7      And as you can see when you pull it
8  out, these are not simply lines.  They have a
9  complex interdigitated finger pattern.  They
10  are not of equal length or width in any sense
11  of the word -- geometric shape of a line, more
12  like a tree than a line.  They certainly have
13  fingers sticking out of them.
14      And we believe those should not be --
15  do not fit the idea of a first conductive line.
16  Again, it is a claim construction issue, Your
17  Honor.
18      And Apple's expert says things like
19  squares are lines.  Things like stars are
20  lines.  We believe that a line should be
21  properly construed as a likely extent of equal
22  width.  It could be rectilinear, it could be
23  curvilinear, but it can't be a star or can't be
24  an interdigitated finger pattern.
25      So we believe with respect to these

Page 178

1  specific products that these elements of
2  conductive lines are not met.
3      So that's the summary of the '607
4  patent, Your Honor.  Moving quickly to the '828
5  patent, again, this is just to summarize, '828
6  is talking about ellipse fitting.  And I want
7  to focus on one element of the asserted claims.
8      All the claims require this element
9  "mathematically fitting an ellipse."  And there
10  is a claim construction issue, Your Honor, with
11  respect to this phrase, "mathematically fitting
12  an ellipse."  And Motorola and the Staff
13  propose a construction that they believe is
14  required by the specification, and I will go
15  back to that, this is slide 24, Your Honor.
16      And in the specification, it talks
17  about the ellipse fitting procedure and it says
18  it requires a unitary transformation of the
19  group covariance matrix.  And it goes on to
20  specific requirement of five variables that
21  need to be used in order to do the ellipse
22  fitting.
23      What Motorola and the Staff have
24  agreed is that the construction, the proper
25  construction of this is to include that

Page 179

1  covariance matrix of second moments.  And so
2  they both, Staff and Motorola, propose that.
3      Apple, their proposed construction is
4  recursive and unhelpful, Your Honor.  It simply
5  says a computation that defines an ellipse.
6      Well, that's just rearranging the
7  words of the claim.  That doesn't provide any
8  help, as Your Honor knows, to decide, well,
9  what is the boundaries of the claim?  What is
10  in?  What is out?
11      And a recursive rearrangement of the
12  words is not a proper construction.  If you use
13  the correct construction, which is what the
14  spec says is required, this group covariance
15  matrix, you will see that none of the accused
16  products meet those elements.
17      Now, I heard Mr. Powers admit that
18  Motorola does not have all five variables in
19  the accused products.  So I would submit, Your
20  Honor, that this is really more claim
21  construction determinative on this issue.
22      If, in fact, this formula is required
23  by the claims, there is really no dispute that
24  the Motorola products do not measure the five
25  elements that are required.

Page 180

1      The products here, and I will
2  summarize, they do do the X and Y coordinates,
3  but all the other things they measure are
4  different.  And touch amplitude and touch area,
5  and then certain versions of the Xoom have a
6  fifth measurement, the touch vector.  But none
7  of these measurements determine the size or
8  shape of the touch.
9      Now, you saw this very same
10  illustration in Mr. Powers' presentation, Your
11  Honor, and this is how the ellipse is defined,
12  five parameters.  You have got the X and Y
13  coordinate.  Well, the Motorola products do
14  that.
15      But then you also have the major axis,
16  the minor axis, and the orientation.  There is
17  no dispute, Your Honor, that the accused
18  Motorola products do not do all five --
19  calculate all five of these parameters.
20      And I just note, I believe the Staff
21  agrees that the Motorola products do not
22  infringe this element because they don't --
23  they do not include all of those parameters.
24      Briefly on invalidity on the '828,
25  Your Honor, there is several references.  I am

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 181

1    going to talk about one.  The Desai thesis,
2    this is published in November of 1994.  It is
3    undisputed it is prior art.  The Desai thesis
4    discloses methods for processing pixelated
5    proximity data from touch sensitive surfaces
6    and that includes ellipse fitting.  The Desai
7    thesis wasn't considered during prosecution of
8    the '828, Your Honor.
9          Apple, in response to this reference,
10   does not dispute that it discloses every single
11   element of every single claim except this
12   element here, "segmentating each proximity
13   image into one or more pixel groups."  And
14   Apple interprets this limitation to require the
15   ability to segment more than one touch.
16         Well, Your Honor, I would submit the
17   reference itself plainly shows that a
18   disclosure of the ability to segment more than
19   one touch, and in particular, this is page 117
20   of RX-351, it says, the Bayesian techniques
21   developed so far do not make any assumptions
22   about the number of objects places on the
23   array.  The line field plot could potentially
24   differentiate the boundaries between different
25   objects.  Not just potentially.  You can see it

Page 182

1    right there.  It is disclosing multi-touch
2    right there in the figures, Your Honor.  We
3    would submit the Desai thesis as anticipatory
4    as well and the '828 patent, not only is it not
5    infringed, but it is invalid for anticipation.
6          Briefly, to finish up on '430, the
7    third patent, Your Honor, this is directed --
8    this is a very confusing patent to be quite
9    frank.  But it is directed to -- it purports to
10   be directed to a system for adding components
11   to a computer system without running an
12   installation program.  Mr. Powers didn't
13   mention that part, without running an
14   installation program, which is pretty
15   important.
16         Notably this was developed in the
17   early '90s for desktop computers, not for
18   Smartphones.  And finally, it wasn't developed
19   by Apple.  It was developed by Taligent.
20         Just really briefly, without going
21   into the details of the claims, you can see
22   from the summary of the invention, the primary
23   objective of this alleged invention is to add
24   system components, that's operating system
25   components, Your Honor, system components like

Page 183

1    documents, tools, fonts, libraries to a
2    computer system without running an installation
3    program.
4          And then in this other part, column 6,
5    7 through 18, it says the system was designed
6    to enable a user to add components -- again,
7    they are talking about the operating system --
8    without running an installation program.
9          And it goes on to talk about how the
10   installation program is replaced with something
11   called a location framework.
12         Well, Your Honor, this patent is --
13   how do I say -- is not unique.  And there is
14   multiple instances in the prior art that
15   disclose using these frameworks to search for
16   components and to add components in the art.
17         For example, UNIX find -- before I get
18   to UNIX find, I just want to note that
19   Mr. Powers characterized the prior art as,
20   well, in the prior art, you could search by
21   name but this is searching by properties.  And
22   that's what's new or unique.
23         The evidence is going to refute that,
24   Your Honor.  The prior art, you could search by
25   properties and, in fact, the evidence will show

Page 184

1    that a name is obviously a property of a file.
2    So it is the name of the file.  But you could
3    also search by things other than names.  You
4    could search by other properties; size, type,
5    what have you.
6          And so we dispute that assertion.  In
7    any event, going to one of our two principal
8    references for anticipation, UNIX find, the
9    evidence is going to show that UNIX find is a
10   command found on the UNIX operating system that
11   allows the user to search for the files based
12   on their names or content.  We believe name of
13   the file is a property of a file.
14         UNIX find teaches adding files to the
15   operating system based on the results of the
16   search.  And rebooting is not required.
17         Now, Mr. Powers says, well, there is a
18   reference to UNIX in the patent, but it is
19   undisputed that UNIX find, this reference, was
20   not considered during the prosecution of the
21   '430 patent, Your Honor.
22         And notably this is -- you remember
23   Dr. Balakrishnan from the tutorial, Your Honor,
24   Apple's expert.  He has admitted that the UNIX
25   find discloses every single element of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

1  asserted claims of the '430 patent, Your Honor,
2  with the exception of one word, properties.
3         And the way that Apple distinguishes
4  UNIX find, Your Honor, is to interpret a plain
5  word like properties of a component in a
6  bizarre way.  They are saying properties of a
7  component don't mean all the properties of the
8  component, they only mean properties that are
9  non-intrinsic to the component.
10        Now, Your Honor, there is -- nowhere
11 in the specification does the word
12 non-intrinsic even appear.  So we believe that
13 this construction, if you will, of properties
14 is litigation-inspired to distinguish UNIX
15 find.
16        And I will just note that UNIX find,
17 both Staff and Motorola believes it is
18 anticipatory.
19        Quickly, Your Honor, Malone '870 is
20 the second big reference on '430.  It claims
21 priority to an application filed on June 30th,
22 1989.  It also describes an object oriented
23 software system that allows users to define the
24 properties of objects and search for objects
25 based on those properties.  It wasn't

Page 186

1  considered by the examiner.
2         And, again, Staff agrees that this one
3  also anticipates '430.  Two quick sentences on
4  the non-infringement and I will conclude, Your
5  Honor?
6         JUDGE ESSEX:  Finish what you have to
7  say.  You have all the time that you need
8  within reason.
9         MR. VERHOEVEN:  Thank you, Your Honor.
10        JUDGE ESSEX:  Don't rush.
11        MR. VERHOEVEN:  Thank you.  Okay.  So
12 this is -- just then I will take one more
13 sentence on Malone '870.  This reference also,
14 Your Honor, is indisputably a printed
15 publication prior to the critical date and
16 discloses every single element.
17        So both of these two references, Your
18 Honor, we believe anticipate -- we are not
19 talking about obviousness -- anticipate the
20 '430 asserted claims.
21        Now, moving to non-infringement on
22 '430, Your Honor, I want to address two things.
23 The '430 patent, claim 1, one of the elements,
24 element D, and we will look at that in detail
25 in cross-examination, is this step called

Page 187

1  adding support for the hardware and software
2  components to the operating system.  So you are
3  adding something to the operating system.
4         That's the whole point of '430.  The
5  alleged innovation is, look, we can add a
6  component to the operating system without
7  having to run an installation program.  At that
8  high level, that's what they are saying.
9         Well, that requires that you have to
10 add something to the operating system.  And
11 what Apple points to as meeting this element is
12 something called the activity stack.  Now, the
13 activity stack is just -- you are probably most
14 familiar with it, Your Honor, if you use the
15 back button on your Smartphone.
16        I don't know if you have ever done
17 that or on a computer.  If you word program,
18 you go back.  All the activity stack does is it
19 contains a reference, if you instantiate a
20 program, that that's where you were the last
21 time.
22        So if you want to go backwards instead
23 of having to hit the button to relaunch the
24 program, you can just hit "back."  That's the
25 activity stack in a nutshell.

Page 188

1         That doesn't add anything to the
2  operating system, Your Honor.  It simply
3  doesn't add anything.
4         Apple says, well, it adds support,
5  because this is adding support.  There is a big
6  dispute in this case about what does that mean
7  to add support?  We think it is indefinite.
8  Apple says, well, it means facilitate, whatever
9  that means.  We're not sure.
10        So we will get into the details of
11 what that means in cross-examination, but we
12 contend that whatever it means, you have to be
13 adding something, adding some code or something
14 to the operating system.
15        And the activity stack indisputably is
16 not adding anything.  It is simply the
17 operating system performing the way it is
18 supposed to perform.  That's all it is.
19        Second point I would like to make,
20 Your Honor, is that the whole point of the
21 invention of the '430 patent is to add system
22 components to a computer system without running
23 an installation program.  That's in the
24 abstract.  It is in the summary of the
25 invention.  It is repeated in the text in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 189

1    column 5 or 6, I believe, of the invention.
2    That is the core alleged innovation.
3          You can add it, you don't have to run
4    an installation program.  Well, Your Honor, it
5    is undisputed in this case -- or the evidence
6    is undisputed in this case that with respect to
7    Android, which is what they are pointing to for
8    infringement of this, you cannot add any code
9    to Android without running an installation
10   program.
11         You can't do what the patent says is
12   the primary objective of the present invention.
13   So we're taking a round peg and trying to put
14   it in a square hole or the other way around,
15   Your Honor.  This simply doesn't apply to the
16   Android system.
17         And it is only through gymnastics on
18   the claim construction interpretations that we
19   get away from even talking about what is
20   supposedly the core of the invention, and we're
21   talking about what does facilitate mean?  Does
22   it mean adding, does it not mean adding?
23         I submit, Your Honor, once you have
24   heard all the evidence with respect to what is
25   the core of this invention, what is the primary

Page 190

1    objective, what is the alleged innovation, it
2    will be to add to the operating system without
3    doing an installation program and you are not
4    going to see any evidence, Your Honor, that
5    with respect to the accused software, you can
6    add anything without running an installation
7    program.
8          If you want to add code, you have got
9    to run an installation program.  That concludes
10   my opening statement.  Thank you, Your Honor.
11         JUDGE ESSEX:  Thank you.  Do you wish
12   to have an opening statement, Staff?
13         MS. KATTAN:  Yes, Your Honor, a brief
14   one.
15         JUDGE ESSEX:  Go ahead.
16         MS. KATTAN:  Good morning, Your Honor.
17   Can you hear me?  There we go.  As you know
18   from our prehearing brief, Your Honor, the
19   Staff does not expect the evidence to show that
20   there has been a violation of Section 337.
21         What I would like to do is just take a
22   few minutes and go through what I think are the
23   key claim construction issues in the case.  And
24   I would like to note these are just starting
25   points.  There are a number of other issues

Page 191

1    that are case dispositive, which I'm sure the
2    parties will go into in great detail, but these
3    are the issues that I think you can begin your
4    analysis with.
5          I would like to first talk about the
6    '828 patent, which is the software patent that
7    pertains to mathematically fitting an ellipse.
8    In the Staff's opinion, it is valid but not
9    infringed, and the evidence is expected to show
10   that the Apple iPhone 4 practices at least one
11   claim of this patent.
12         The parties have identified nearly 20
13   claim terms for construction in this patent.
14   In the Staff's view, most of the constructions
15   offer a distinction without a difference.  And
16   I'm hopeful that after the evidence comes in,
17   the parties will be able to reach stipulated
18   constructions as to most of these terms and
19   just deal with the heart of their dispute.
20         And that's true for all three of the
21   patents in this investigation.
22         But one claim term that I'm sure the
23   parties will not reach a stipulation on is the
24   term mathematically fitting an ellipse.  And
25   also in another independent claim, "the means

Page 192

1    for fitting an ellipse," which you heard
2    discussed this morning.
3          The Staff agrees with Motorola that
4    the intrinsic evidence will show that the
5    applicants for the '828 patent acted as their
6    own lexicographers.  By writing into the
7    specification at column 26 that the ellipse
8    fitting procedure "requires a unitary
9    transformation of the group covariance matrix"
10   followed in that column by a number of formulas
11   that set forth that procedure.
12         Of course, the claim cannot be
13   automatically limited to a preferred embodiment
14   or even a single embodiment, but in the Staff's
15   view, the word requires in the specification
16   means requires.  And the intrinsic evidence
17   will show that the applicants gave a clear
18   definition of something that they viewed to be
19   special and novel about their invention.
20         Now, the Staff has also offered a few
21   claim constructions that differ from the
22   private parties.  One I would like to bring to
23   your attention is the construction of the term
24   ellipse parameters, which appears in dependent
25   claims 2, 11 and 29.  It will become evident as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 193

1   Your Honor hears the evidence on infringement,
2   why Apple has proposed a rather open ended,
3   plain and ordinary definition of the term
4   ellipse parameters, and why Motorola,
5   conversely, has offered a narrow definition
6   that requires the use of the formulas set forth
7   in the specification.
8         In the Staff's view, the intrinsic
9   evidence supports an ordinary meaning that is
10  at neither extreme.  Specifically, the ellipse
11  parameters are simply classical parameters that
12  define an ellipse as a matter of geometry.
13        The specification identifies some of
14  these parameters in columns 9 and 26, but in
15  the Staff's view, the specification does not
16  limit the term or give it a special definition.
17        The parties' dispute with regard to
18  ellipse parameters is both in regard to what is
19  an ellipse parameter, as you heard this
20  morning, and also how many of these parameters
21  one needs to adequately identify or define an
22  ellipse.
23        With regard to the '607 patent, which
24  is the hardware patent, the Staff believes that
25  the evidence is expected to show that the '607

Page 194

1   patent is infringed, but that it is not valid.
2   Again, here the parties have identified 21
3   claim terms for construction and I'm hopeful
4   that after the evidence is in, a lot of those
5   claim terms will not need to be addressed by
6   Your Honor.
7         Despite the complexity of this
8   technology, in the Staff's view, the primary
9   dispute here, as you heard this morning, is the
10  correct definition of the claim term "lines."
11  In the Staff's view, the patent does not limit
12  what a line can be.
13        The specification at column 14
14  describes lines broadly and consistently with
15  its plain meaning.  There are a number of other
16  claim constructions that flow from the
17  construction of the term lines such as
18  electrically isolated, spatially separated,
19  transverse, substantially parallel, and
20  substantially perpendicular, so the
21  construction of lines for the '607 patent is a
22  good place to start.
23        Moreover, in terms of infringement in
24  the Staff's view, if a structure at its core is
25  a line, even if the evidence shows it has

Page 195

1   additional features such as legs or bridges
2   that may add functionality, under Radio Steel
3   and other Federal Circuit cases, that core
4   structure still literally infringes.
5         Finally, turning to the '430 patent,
6   the Staff believes that the evidence will show
7   that the '430 patent under Apple's construction
8   of the claim term "properties" lacks enablement
9   and written description.  Under the correct
10  claim construction, it is anticipated and it is
11  also infringed.
12        The Staff further believes that the
13  evidence will show that the domestic industry
14  products do practice claims of the '430 patent.
15        Here again, the parties have
16  identified a dozen claim terms for
17  construction.  The key dispute appears to be
18  what the correct construction of the term
19  properties is.  The Staff believes that the
20  patent does not limit the claim properties to
21  non-inherent or non-intrinsic properties, as
22  Apple has argued.
23        In fact, if the claim is limited to
24  non-intrinsic properties, the evidence will
25  show it is invalid under Section 112 for

Page 196

1   failure to describe to one of ordinary skill
2   how to determine whether a property is a
3   claimed non-intrinsic property or not.
4         In the Staff's view, the lack of
5   description of non-intrinsic properties is a
6   symptom of a problem this patent has as a whole
7   which appears to be a mismatch between a rather
8   specific system and method claimed in the
9   specification and claims which are written much
10  more broadly and don't really map on to the
11  specification.
12        In the Staff's view, the result is
13  that the correct -- under the correct claim
14  constructions, the evidence will show that the
15  '430 patent is infringed, but that the claims'
16  breadth is also their undoing because they
17  encompass the disclosure of several prior art
18  references, and for that reason, the patent is
19  anticipated.
20        Thank you.
21        JUDGE ESSEX:  Thank you.  I think this
22  might be a good time to take our morning break
23  before we get started in the case.  So we're
24  going to take a 15-minute break.  Be back here
25  at 5 till.  We're adjourned.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 197

1    (A recess was taken at 10:39 a.m.,
2  after which the trial resumed at 10:54 a.m.)
3    JUDGE ESSEX:  All right.  I think we
4  have solved our sign problem.
5    Complainants, are you ready?  Do we
6  have anything to take up before you call your
7  first witness?
8    MR. POWERS:  We don't, Your Honor.
9    JUDGE ESSEX:  Then please call your
10  first witness.
11    MR. FERGUSON:  Thank you, Your Honor.
12  Apple calls as its first witness Steven
13  Hotelling.
14    JUDGE ESSEX:  All right.  Good
15  morning.  Before you sit down, would you please
16  raise your right hand.
17  Whereupon--
18    STEVEN P. HOTELLING,
19  having been first duly sworn, was examined and
20  testified as follows:
21    JUDGE ESSEX:  Please be seated.
22    DIRECT EXAMINATION
23  BY MR. FERGUSON:
24    Q.   Good morning, Mr. Hotelling.
25    A.   Good morning.

Page 198

1    Q.   Could you please state and spell your
2  name for the record.
3    A.   Steven Porter Hotelling, S-t-e-v-e-n,
4  P-o-r-t-e-r, H-o-t-e-l-l-i-n-g.
5    Q.   Mr. Hotelling, did you submit a
6  witness statement in this investigation?
7    A.   Yes, I did.
8    Q.   You have a binder in front of you.
9  Could you take a look at that and please look
10  at what has been marked as CX-205C.
11    A.   Yes.
12    Q.   This is labeled Corrected Witness
13  Statement of Steven Hotelling; is that right?
14    A.   Yes, that's correct.
15    Q.   And is that your signature on page 19
16  of the document?
17    A.   Yes, it is.
18    Q.   And did you give the answers to the
19  questions that are asked in this witness
20  statement?
21    A.   Yes, I did.
22    MR. FERGUSON:  Your Honor, we offer
23  Mr. Hotelling for cross-examination.
24    JUDGE ESSEX:  All right.
25  //

Page 199

1    CROSS-EXAMINATION
2  BY MR. DeFRANCO:
3    Q.   Good morning, Mr. Hotelling.
4    A.   Good morning.
5    Q.   Thanks for being here.  You, of
6  course, have the privilege of being the first
7  witness at this hearing.
8    Let's start with the patent that you
9  are here to talk about, okay?  You are one of
10  the named inventors on the '607 patent; is that
11  correct?
12    A.   That's correct.
13    Q.   You are aware, are you not, that
14  that's one of the three patents at issue in
15  this investigation; is that true?
16    A.   Yes, that's true.
17    Q.   Why don't we start, Ryan, please, by
18  putting up a slide that shows, I believe, the
19  cover page of the '607 patent.
20    Let's just talk about a few things on
21  the cover page just for the record,
22  Mr. Hotelling, okay?  Do you see that the title
23  of your patent is multi-point touchscreen; is
24  that correct?
25    A.   Yes, that's correct.

Page 200

1    Q.   And for the record, again, this was
2  filed May 6th of 2004?
3    A.   Yes.
4    Q.   And it issued February 6th, 2010; is
5  that correct, sir?
6    A.   I think so, yes.
7    Q.   Now, this is not the only patent you
8  have.  You have many other patents.  Is that
9  true?
10    A.   Correct.
11    Q.   You are aware of the general structure
12  of patents, for example, there is an abstract
13  usually up front which gives a general
14  description of the subject matter of what the
15  patent is all about.  Is that fair?
16    A.   Yes.
17    Q.   And if we look, I don't know if that's
18  going to blow up very well, would you blow up
19  the abstract, please.  And just in case, I will
20  read you the first sentence.  It says, "a touch
21  panel having a transparent capacitive sensing
22  medium configured to detect multiple touches or
23  near touches that occur at the same time and at
24  distinct locations in the place of the touch
25  panel," and then it goes on.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 201

1    Is that a fair overview of the subject
2  matter of the '607 patent?
3    A.   Yes, in the plane of the touch panel,
4  yes.
5    Q.   Sir, just for the record, again, there
6  are two other inventors, I think some of us may
7  be challenged by their names.  Would you help
8  us pronouncing those names?
9    A.   Yes.  Joshua Strickon and Brian Huppi.
10    Q.   If I get those wrong, feel free to
11  correct me, okay?  Let's talk about your
12  background for just a little bit, okay?
13    A.   Okay.
14    Q.   You gave us some of this information
15  in your witness statement.  I just want to
16  cover it.  So everyone can hear about it a bit.
17  You started with Apple in about September,
18  toward the end of September 2002; is that
19  correct?
20    A.   Yes, that is correct.
21    Q.   And do you remember what title that
22  you had when you were hired by Apple?
23    A.   Yes.  Senior manager, input
24  engineering.
25    Q.   Input, like input device engineering;

Page 202

1  is that right?
2    A.   Correct, pertaining to human input.
3    Q.   And types of devices that you began
4  working with when you assumed that role at
5  Apple, can you give us some examples?
6    A.   Yes.  Computer mice, keyboards for
7  laptops, desktop keyboards, track pads for
8  laptops, remote controls.
9    Q.   Those are the kinds of devices you
10  talked about in your witness statement; is that
11  right?
12    A.   In the deposition.  I may have talked
13  about in the witness statement as well.
14    Q.   Okay.  Let's step back for a minute.
15  Your witness statement is what you mentioned
16  this morning, some direct testimony you
17  prepared in this case.  Is that -- do you
18  understand that?
19    A.   Yes, yes.
20    Q.   We may talk a bit about your
21  deposition.  You were also deposed in this
22  case.  Do you remember that?
23    A.   Yes.
24    Q.   You were deposed in your capacity as
25  an inventor on the '607 patent.  Do you

Page 203

1  remember that, sir?
2    A.   Yes.
3    Q.   You also talked a little bit as a
4  corporate witness on the structure of Apple's
5  iPhone 4.  Do you remember that, too?
6    A.   Yes, I do.
7    Q.   Okay.  We will get back to those
8  later.
9    A.   Okay.
10    Q.   This is -- I don't mean this to be a
11  memory test.  If there is something in your
12  witness statement that you would like to refer
13  to, please do that at any time.  Okay?
14    A.   Okay.
15    Q.   Also, we're going to talk about some
16  documents.  I will point you to some sections
17  of documents.  Sometimes in the interest of
18  time, I am not going to go over an entire
19  paragraph, but if for some reason you want to
20  look at something else that's in the paragraph
21  we're talking about, another page, please, feel
22  free to do that.
23    A.   Thank you.
24    Q.   Okay.  So going back to your
25  background for a minute, the types of input

Page 204

1  devices that you worked on when you first
2  joined Apple, they are different somewhat than
3  the more specialized input device you might say
4  that is the subject matter of your '607 patent;
5  is that fair?
6    A.   That's correct.
7    Q.   You had a team of five when you joined
8  and it grew a bit after that, but at some
9  point, you and your team transitioned to a new
10  type of input device in your experience.  Is
11  that right?
12    A.   That's correct.
13    Q.   Generally, it was the multi-touch
14  device that is the subject matter of the patent
15  that you ultimately -- you and Mr. Strickon,
16  Mr. Huppi ultimately obtained; is that right?
17    A.   That's correct.
18    Q.   Now, is it fair to say that for you
19  personally, putting aside the other members of
20  your team, but for you personally, that was
21  your first involvement in the research and
22  development of multi-touch devices?
23    A.   Yes, that's correct.
24    Q.   I know you said in your witness
25  statement there was a course you had at

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 205

1    Stanford that I think touched on the subject
2    quite a few years earlier.  Is that fair?
3        A.   On capacitive sensing, yes.
4        Q.   Right.  And you were at a number of
5    companies after you left college, I think you
6    said one engineer at one of those companies may
7    have touched -- some of their work touched on
8    capacitive work, but you didn't remember a lot
9    of detail about that; is that right?
10       A.   Yes, that's correct.
11       Q.   So this was your personally, this was
12   your first true experience in the research of
13   these types of devices; is that correct?
14       A.   Yes.  Can I clarify, for multi-touch
15   devices, yes.
16       Q.   Now, how long, sir, have you been an
17   engineer?
18       A.   So I received my degree from Stanford
19   in 1994.  I completed course work there in
20   1987.
21       Q.   And you have been an engineer at
22   various companies until you joined Apple?
23       A.   Yes.
24       Q.   In that time period, correct?
25       A.   Correct.

Page 206

1        Q.   And it is fair to say generally in
2    engineering when there is a problem to solve, a
3    good starting place is to figure out what's
4    been done by others.  Is that right?
5        A.   That's one approach, yes.
6        Q.   And your group didn't deviate from
7    that approach, right?  I mean, isn't it fair to
8    say that your group back in the 2003 time
9    frame, when the emphasis shifted to this new
10   multi-touch research that your group began
11   working on, they did what typical, normal smart
12   engineers do, they try to figure out what
13   others have done so they don't waste time
14   starting from ground zero when you can leverage
15   or benefit from the work of others; is that
16   fair?
17       A.   Not entirely.  We didn't spend a lot
18   of time searching for what else was out there.
19       Q.   But you did spend some time, didn't
20   you, you and your team?
21       A.   Certainly, yes.
22       Q.   You looked at the products of other
23   companies, for example, to see as a starting
24   point whether this device that you were asked
25   to implement in future Apple products already

Page 207

1    existed, right?  That makes perfect sense if
2    you can buy it at a reasonable price off the
3    shelf, that's the smartest starting point,
4    isn't it?
5        A.   Yes.
6        Q.   That wasn't the case, you couldn't
7    find this off the shelf; is that fair?
8        A.   That is correct.
9        Q.   But you did -- and I mean you and your
10   team -- did find information publicly available
11   about other companies and the work they had
12   done, right?
13       A.   Yes, certainly.
14       Q.   So the members of your team went to
15   trade shows and saw devices available by other
16   companies.  Isn't that true, sir?
17       A.   Yes.
18       Q.   Some of the members of your team did
19   literature research to find patents,
20   publications, articles to build up their
21   knowledge to see what had been done by others
22   in the field.  Isn't that right?
23       A.   Yes, somewhat, although not a formal
24   study.
25       Q.   But they did look for articles, right?

Page 208

1    That makes perfect sense, they did the right
2    thing, right?
3        A.   Yes.
4        Q.   They also visited vendors and asked
5    about the technology that they had available,
6    didn't they do that?
7        A.   Yes.
8        Q.   Some vendors visited Apple and showed
9    what they had available, what they could offer,
10   right?  Isn't that true?  Do you remember that,
11   sir?
12       A.   In the context of this, of the
13   multi-point touchscreen?
14       Q.   Yes, sir.
15       A.   We didn't see any -- you know, we
16   didn't receive any visits related to the
17   multi-point touchscreen from suppliers.
18       Q.   But your team did go out and explore
19   what materials product suppliers had available?
20       A.   Absolutely, yes.  Manufacturing
21   materials, certainly, yes.
22       Q.   Okay.  You personally don't remember
23   any visits from vendors to Apple in the subject
24   matter area, but you are not saying that that
25   didn't occur among members of your team; is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 209

1    that fair?
2        A.   So we had suppliers that visited Apple
3    that showed us their technologies, but none of
4    them, to my memory, had a multi-point
5    touchscreen.
6        Q.   None of them in the 2000 time frame
7    had the multi-point touchscreen that you were
8    looking to develop; is that right?
9        A.   Yes, that is correct.
10       Q.   Some of them had different types of
11   devices, we're going to talk about the
12   technology a bit, we're going to turn to that
13   just to get some background of the technology,
14   some had devices that were not suitable, they
15   weren't transparent, for example, right?  Is
16   that fair?
17       A.   Yes.
18       Q.   Some had -- were touch devices, they
19   were not multi-touch devices.  Is that fair?
20       A.   Yes.
21       Q.   But you did explore what was available
22   in the marketplace, the state of technology at
23   the time.  Is that true?
24       A.   Basically, yes.
25       Q.   And is it also fair to say very

Page 210

1    generally that as usually happens in
2    engineering, what you and your team see in the
3    world as a state of the art or the state of the
4    field impacts your decision making to some
5    degree, doesn't it?
6        A.   Yes.
7        Q.   We're going to talk about some of the
8    products of others in just a moment.  I am
9    going to get back to that again.
10            But I just want to segue for a moment
11   because we're going to use some terms later on.
12   And I just want to make sure that we're on the
13   same page and give a little background, okay?
14       A.   Okay.
15       Q.   Basic concepts set forth, discussed in
16   your patent, two types of capacitance, right?
17   Mutual capacitance on the one hand and
18   self-capacitance on the other hand.  Fair?
19       A.   Yes.
20       Q.   I think a slide will help.  We will
21   try some slides, see how this goes.
22            Let's, Ryan, please put up RDX-17,
23   number 003.  Mr. Hotelling, I am just going to
24   tell you what this is.  I am not trying to be
25   -- to get you to buy into anything that you

Page 211

1    don't agree with.
2            This is a graphic that has already
3    been used in this case.  I think it simplifies
4    just using the actual figure 9 of the patent,
5    which this is taken from, because it has some
6    colors and some labels.  Please, if you see
7    anything wrong with this, let me know.  Okay?
8            I am not -- really, I am not trying to
9    get you to buy in or say that this is
10   100 percent accurate, but I think it is a good
11   guide for us to walk through briefly some of
12   the technology that's in your patent and some
13   of the technology we're going to talk about in
14   the documents we're going to take a look at.
15           Does that make sense, sir?
16       A.   Sure.
17       Q.   So mutual capacitance, and I am going
18   to read this because I don't want to screw it
19   up, okay?  Simply, it is -- mutual capacitance
20   is the quantity of capacitance from one
21   electrical circuit node to a different
22   electrical circuit node.  Is that a simple and
23   fair description?
24       A.   Yes.
25       Q.   I took that right out of your depo.

Page 212

1    So that was the right answer.
2            Now, if you look at the colored
3    version of figure 9, do you see there is some
4    labels there?  I want to take you through the
5    labels.  If there is something wrong there, let
6    me know, but this pattern, they are drive
7    lines; is that correct?  These are going in the
8    vertical direction.
9        A.   Yes.
10       Q.   Very simply, the drive lines are
11   connected to a voltage source.  Is that fair?
12       A.   Correct.
13       Q.   And it says -- there is a label down
14   there that says, flex circuit connects drive
15   lines to voltage source.  Do you see that?
16       A.   Yes.
17       Q.   Okay.  And the second type of lines,
18   mutual capacitance, there are sense lines,
19   right?
20       A.   For this, yes, for this type of mutual
21   capacitance, yes.
22       Q.   Okay.  And it shows sense lines in red
23   there.  Do you see that?
24       A.   Yes.
25       Q.   Okay.  And the sense lines are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 213

```
 1   connected to a capacitive sensing circuit.  Is
 2   that right?
 3       A.    That is correct.
 4       Q.    There was some items there, I think
 5   four of them circled in yellow.  Those are
 6   nodes.  Do you see that?
 7       A.    Yes.
 8       Q.    Would you just tell us what a node is,
 9   please?
10       A.    It is the intersection between the
11   drive and sense lines, the closer to that
12   intersection, the more the mutual capacitance
13   is affected by nearby objects.
14       Q.    Got it.  Thank you.
15           The sensing circuit, what does the
16   sensing circuit do, sir?
17       A.    So in this embodiment, correct?
18       Q.    Yes.
19       A.    So the sensing circuit stimulates the
20   drive line, and drives all the other lines to
21   ground and detects the decrease in capacitance
22   from the drive lines to the sense lines.
23       Q.    Now, your prior answer, you said, in
24   this embodiment.  You had many patents.  You
25   are not an expert in patent interpretation or
```

Page 214

```
 1   analysis; is that correct?
 2       A.    Yes, that's correct.
 3       Q.    And I think you were asked about some
 4   claim language terminology at your deposition,
 5   and I think you said something to that effect.
 6   You are not an expert in interpreting patent
 7   claims; is that fair?
 8       A.    That's correct.
 9       Q.    That's why we have so many lawyers in
10   this room, right?
11           So I am really not going to try to get
12   you to buy in to any claim construction.
13   That's not the exercise here.  Please feel free
14   to use your own words, obviously.  But I am
15   going to -- I am not going to take you through
16   the claims and try to get you to agree to one
17   construction or another.
18           I want to talk about your technology.
19   I want to go through the background and then I
20   want to turn to the documents, your documents,
21   some of them that you used in your witness
22   statement and some others that were not in your
23   witness statement, but that Apple produced.
24   Okay.  Are you with me?
25       A.    Yes.
```

Page 215

```
 1       Q.    If you are ever uncomfortable that you
 2   think I am asking a loaded question, I will ask
 3   another one because, again, that's not my
 4   intent.
 5       A.    All right.
 6       Q.    So you were telling us about the
 7   structure in figure 9, mutual capacitance.  You
 8   told us about the changes in capacitance that
 9   occur at the node.
10           And then how does that change in
11   capacitance in a multi-touch device help to
12   recognize multiple touch events like two
13   fingers on a screen?
14       A.    Okay.  The human body has significant
15   parasitic capacitance back to the device.  And
16   so as fingers get close to or touch
17   intersections between drive lines and sense
18   lines, they effectively steal charge from those
19   intersections.
20           And that is detected by measuring the
21   change in the charge coupling to the sense
22   lines, most accurately, when the sense lines
23   are using virtual ground charge amplifiers.
24       Q.    Now, that concept generally, how
25   mutual capacitance works, you wouldn't say that
```

Page 216

```
 1   you invented that, correct?  That was out there
 2   in the field, wasn't it?
 3       A.    Definitely mutual capacitance on rows
 4   and columns was out there in the field.
 5       Q.    Okay.  That piece was.  Certainly
 6   there is parts that you would say was your
 7   invention.  We will talk about that generally.
 8       A.    Yes.
 9       Q.    We will get to that.  But right now,
10   mutual capacitance, that concept was out there
11   in the field; is that fair?
12       A.    Yes, that's fair.
13       Q.    Okay.  Let's turn to the second type
14   of capacitive device -- I hope I didn't butcher
15   that -- it is self-capacitance.  Is that right?
16       A.    Okay.
17       Q.    I think we have a slide for this.  If
18   I have it right, it should be 17.004.  Again,
19   generally, the intent here is to use stuff we
20   have all seen, so there is no controversy.
21   This I will tell you again, represent to you, a
22   couple of figures from your patent, this time
23   6A and 6B.
24           There is a paragraph about the spec.
25   Again, this was a slide used earlier in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 217

1  case. I am not trying to point out anything
2  particular in that language. I want to get us
3  all in the mindset of self-capacitance. Okay?
4  Does that make sense?
5     A.   Yes.
6     Q.   And, by the way, this figure 6A, and I
7  don't know if you have it handy anymore, but it
8  is the same as the figure that is shown on the
9  cover page of the '607 patent; is that right?
10    A.   It looks the same. Let's see. Just
11 one moment. Let me get the actual patent here.
12 Yes, that looks the same.
13    Q.   Now, this is a different configuration
14 then, mutual capacitance, isn't it?
15    A.   As described here, yes. Do you want
16 me to explain?
17    Q.   I am not sure.
18    A.   Okay.
19    Q.   Let me think about that.
20    A.   Okay.
21    Q.   Now, self-capacitance is not the road
22 that you and your team chose to go down in
23 developing the technology that was ultimately
24 used in certain of Apple's products such as the
25 iPhone 4; is that right?

Page 218

1     A.   That is correct, yes.
2     Q.   Now, just generally, so we have got it
3  in the record, again, I am going to read a
4  couple of sentences to make sure I don't screw
5  it up. Okay?
6         Self-capacitance, "each of the sensing
7  points is provided by an individually charged
8  electrode." Is that correct?
9     A.   That sounds correct, yes.
10    Q.   When an object approaches or touches
11 the surface of the touchscreen, the object
12 capacity couples to those electrodes and takes
13 charge away from them. Is that correct?
14    A.   That is also correct, yes.
15    Q.   So when your team first started
16 working on -- and what's the best way to --
17 multi-touch project, what is the best way to
18 refer to this?
19    A.   We called it the Q79 project.
20    Q.   That's not very exciting.
21    A.   Okay. You can call it the multi-point
22 touchscreen project.
23    Q.   Okay. Is that okay if we use that?
24    A.   That's fine.
25    Q.   Now, I can't remember if you gave a

Page 219

1  specific date when your team first started
2  working on the multi-touchscreen project.
3         Do you remember the specific date?
4     A.   We did not give a specific date in the
5  witness statement.
6     Q.   That's right. I just want to follow
7  up.
8     A.   Okay.
9     Q.   Do you know a specific date?
10    A.   I don't know a specific date, no.
11    Q.   Do you know a general time period?
12    A.   Yes.
13    Q.   And is your understanding of the
14 general time period, does that come from
15 documents that you reviewed?
16    A.   So if you are asking when we started
17 working on it, I didn't actually go back and
18 research that, in particular.
19    Q.   All right.
20    A.   But I did review my notebook from a
21 certain time frame, so I know at least in that
22 time frame that we were working on it.
23    Q.   Right. And you know then in the
24 September to November and onward time frame is
25 when you were working on this project, you and

Page 220

1  your team. Is that fair?
2     A.   In reviewing my notebook, we started
3  in June. There are references to the project
4  starting in the June time frame. As far as
5  when we feel like we had a conception or
6  invention, that was the September through
7  November time frame.
8     Q.   Okay. And your memory for both of
9  those points, first when you and your team
10 first started working on this project and then
11 segueing to when you believed you had what's
12 again not the legal terminology, conception,
13 when you think you had your invention, a little
14 later on in the fall, September to November; is
15 that right?
16    A.   That's correct.
17    Q.   Now, your memory of those events comes
18 from documents, is that fair?
19    A.   So definitely I refreshed my memory by
20 looking at documents, although I have some
21 independent memory of sequences, but not exact,
22 you know, weeks and such.
23    Q.   Okay. And that's what I want to
24 explore just so the record is clean. Not that
25 there is anything inaccurate in your statement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1   I am not trying to say that.  But sometimes
2   people remember events independently.  Right?
3   They just -- something is --
4       A.   Yes.
5       Q.    -- you remember when you first saw
6   Neil Armstrong step on the moon, right?
7   Something about it, you remember the day, the
8   week, the month, independently of anything
9   else?  Do you understand that?
10      A.   Yes.
11      Q.   Now, in your witness statement, you
12  say several times, and this is perfectly fine,
13  you say this document helped refresh my memory.
14  And that document helped refresh my memory.
15          Do you remember that?
16      A.   Yes, that's correct.
17      Q.   I didn't see in your witness statement
18  when you are talking about these events, when
19  the research began, when you and your team
20  first had the conception, I didn't see you have
21  any independent recollection separate from
22  documents that help you remember things.
23          In other words, some event in your
24  personal life or something else that happened
25  at work that helped you to pinpoint

Page 222

1   independently of documents when things
2   occurred, when those events occurred.  Is that
3   fair?
4       A.   That's correct.  In my witness
5   statement, I did not, yes.
6       Q.   And you looked at the documents that
7   helped you to remember things.  Is that fair?
8       A.   Yes, helped to tie things to specific
9   dates, yes.
10      Q.   Okay.  We're going to look at some of
11  those documents.  Let's just finish up and go
12  back to self-capacitance for a minute.
13          Again, when your team started in about
14  June of 2003 --
15      A.   Yeah, just to clarify, I reviewed my
16  notebook, which was -- that notebook for which
17  I reviewed, started in June.  So we may have
18  been working on -- the need for or the vision
19  for wanting to have a great multi-touch,
20  multi-point touchscreen could have been earlier
21  than that, but as far as, you know, diving deep
22  and prioritizing the project, that was
23  certainly after June, yes.
24      Q.   There is no other documents you have
25  seen since your deposition or since you

Page 223

1   prepared your witness statement that would
2   bring to mind any events earlier than June that
3   you would like to point out to us?
4       A.   No, no.
5       Q.   So if we go back to the June time
6   frame when your research, the team, the
7   research -- excuse me, that you and your team
8   was working, the first direction you were
9   taking was self-capacitance.  Is that -- do you
10  remember that?
11      A.   Yes.
12      Q.   Okay.  Now, in your witness statement,
13  you did exactly what you just told us you did.
14  You went back and you looked at documents, you
15  used those documents to help get timing of
16  events back in your mind, back seven, eight
17  years ago, whatever it is now.  Right?  Is that
18  fair?
19      A.   That's correct.
20      Q.   Now, I want to ask you about some of
21  your witness statements and make sure that I
22  have the record straight about what is or is
23  not in some of these documents.  Okay?  Let's
24  put up the question and answer from number 8
25  for Mr. Hotelling's witness statement.

Page 224

1           MR. FERGUSON:  Your Honor,
2   Mr. Hotelling's witness statement is marked
3   confidential.  And question 8, I believe, is
4   going to get into the subject matter of --
5           JUDGE ESSEX:  We can go on the
6   confidential record.  This is Apple
7   confidential.
8           MR. FERGUSON:  Yes, I would like to go
9   on the confidential record for this.
10          JUDGE ESSEX:  All right.
11          (Whereupon, the trial proceeded in
12  confidential session.)
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 225

1    C O N F I D E N T I A L   S E S S I O N
2    BY MR. DeFRANCO:
3        Q.   All right.  This is the question and
4    answer format from your witness statement.  Do
5    you see that, sir?
6        A.   Yes.
7        Q.   And you may have had some help
8    preparing the answers or the questions.  That's
9    pretty common.  But this, you know, what's in
10   your witness statement is your testimony.  Do
11   you understand that, sir?
12       A.   That's correct.
13       Q.   Is that fair?
14       A.   Yes.
15       Q.   And I think you had one correction to
16   a typo of an exhibit number, but other than
17   that, did you have any other corrections to
18   make to the substance of your statement?
19       A.   No.
20       Q.   So if we look at this paragraph
21   briefly, you say that in the fall of 2003, you
22   and Brian drafted a white paper envisioning how
23   users would interact with Apple products in the
24   year 2006.
25           Do you see that?

Page 226

1        A.   Yes.
2        Q.   And Brian was Brian Huppi, one of the
3    other named inventors on the '607 patent; is
4    that right?
5        A.   That's correct.
6        Q.   And you talk in that -- shortly after
7    that you talk about a white paper that was
8    drafted, that you drafted, I believe, in
9    October of 2003.  Do you remember that?
10       A.   Yes.
11       Q.   Let's put up, Ryan, Exhibit CX-522C.
12           Now, this is one of the documents.  Do
13   you remember this?  You talked about this in
14   your witness statement.
15       A.   Yes.
16       Q.   And you drafted this document?  I
17   think it has got a date up at the top of
18   October 16th, 2003.
19       A.   Yes, it does.
20       Q.   Is that about from when this document
21   was prepared, sir?
22       A.   Yes, it was.
23       Q.   Okay.  And you talk about the general
24   vision in this document, and you refer
25   specifically, I believe, to section 3.3.  And

Page 227

1    we can put that on the screen, please, Ryan.
2            Why don't you please blow up the first
3    paragraph.  Now, this is a general description
4    of the vision that you were talking about, sir?
5        A.   Yes.
6        Q.   And the point here I just want to make
7    sure we have is that there is no discussion of
8    a transparent multi-touch panel using mutual
9    capacitance, what we talked about earlier.  Is
10   that correct?
11       A.   Yes, that's correct.
12       Q.   Okay.
13       A.   There is no description here.
14       Q.   And this is as of October 16th, 2003;
15   is that right?
16       A.   Yes.
17       Q.   Let's turn to another document I want
18   to ask you about, in the same time frame, this
19   is RX-26C.  And let me know when you are there
20   in the binder, sir.
21       A.   Different binder?  Okay.
22       Q.   Now, this is -- it says on the cover
23   page, touchscreen technologies white paper,
24   October 2003, Brian Huppi.  Do you see that?
25       A.   Yes.

Page 228

1        Q.   And Brian Huppi worked in your group
2    at that time?
3        A.   Yes, he did.
4        Q.   And he is one of the other named
5    inventors; is that right?
6        A.   Yes.
7        Q.   And do you recall -- I don't believe
8    you discussed this particular document in your
9    witness statement.
10       A.   That's correct.
11       Q.   You have seen this document before?
12       A.   Just one moment.  Let me take a quick
13   look through it.  I haven't seen it for a long
14   time.
15       Q.   Absolutely.
16       A.   So the content in here looks very
17   familiar, but I don't remember specifically
18   seeing this document, but it definitely looks
19   like Brian's work.
20       Q.   Okay.  When you say the content, there
21   is information, there is text, there is
22   pictures, that looks familiar to you?
23       A.   Yes, yes.
24       Q.   Do you have any reason, sir, to doubt
25   that you got this from Mr. Huppi in your group

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 229

1  in 19 -- I'm sorry, in October of 2003?
2      A.   No, this very much looks like Brian's
3  work.
4      Q.   And the first section just briefly
5  talks about available technologies.  Do you see
6  that in table 1?
7      A.   Yes.
8      Q.   In your memory, that's Mr. Huppi's
9  summary of what was available at that time.  Do
10 you see that?
11     A.   Yes.
12     Q.   And then he goes on on the second page
13 to talk about the need for multi-point.  Do you
14 see that?
15     A.   Yes.
16     Q.   And that continues over to the next
17 page and the next until he gets down to new
18 technology.  Do you see that?  And that's at
19 the bottom of a document numbered 4827723.
20         Do you see that?
21     A.   Yes.
22     Q.   And that continues over again and he
23 discusses sense traces on the following page,
24 which leads to a familiar figure on document
25 4827725.  Do you see that?

Page 230

1      A.   Yes.
2      Q.   Now, that's the -- it looks very
3  similar to the figure we saw in the '607
4  patent, sir?
5      A.   Yes.
6      Q.   Also on the cover page; is that right?
7      A.   Correct.
8      Q.   And that's the self-capacitance --
9      A.   Yes.
10     Q.   -- implementation or however you
11 describe it, but that's a self-capacitance
12 structure; is that true, sir?
13     A.   That is correct.
14     Q.   That's not mutual capacitance; is that
15 right?
16     A.   Yes, that's correct.
17     Q.   Okay.  And then if you turn to the
18 back, it looks like Mr. Huppi has attached some
19 of the types of information we talked about
20 earlier starting on document 4827729 and going
21 through 4827735.
22         Do you see that sort of product
23 literature of what others were doing in the
24 area or at least some others?  Do you see that,
25 sir?

Page 231

1      A.   Yes.
2      Q.   Okay.  Again, that was not a document
3  that was discussed in your witness statement,
4  but I did want to cover it because it is in
5  that same month that you are pointing to some
6  white papers.  Do you understand that?
7      A.   Yes.
8      Q.   So let's turn now back to your witness
9  statement to a document that's a little later
10 in time.  First, let's put up question and
11 answer number 14 from your direct testimony.
12         And you say we're going to look at the
13 document, but I just want to give everybody
14 some background.  It says, "yes, this is a
15 later version of the same white paper from
16 November 2003.  This version adds figures
17 depicting the Q79 project, an internal code
18 name that we used to refer to an early
19 iPad-like product development project."
20         Do you see that, sir?
21     A.   Yes.
22     Q.   And you mentioned Q79.  It is the same
23 Q79 project?
24     A.   Yes, it is.
25     Q.   For what it is worth, that was not

Page 232

1  directed to phones specifically or exclusively.
2  Initially it was an iPad-like product
3  development project?
4      A.   The first target for the technology
5  was definitely a larger iPad-like device, yes.
6      Q.   A larger format; is that correct?
7      A.   Correct.
8      Q.   And let's turn to that exhibit itself,
9  536C.  And this is from -- I don't believe you
10 mentioned a date of this document.  You said it
11 is generally from November, the November time
12 frame; is that right, sir?
13     A.   I think there is a rev history on it.
14     Q.   There is a rev history about -- on
15 page 12 of 12.
16     A.   Yes.  So rev E is on November 20th.
17     Q.   Now, do you know for sure that this is
18 rev E?  Would this necessarily be rev E, for
19 what it's worth?
20     A.   Yes, because it is the last entry in
21 the rev table.
22     Q.   So it looks like this one dates from
23 November 20th.  Is that right?
24     A.   That's correct.
25     Q.   Okay.  And that's the November 20th

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 233

1  version of this particular document; is that
2  right?
3      A.   That's correct, yes.
4      Q.   Okay.  And I didn't see discussion in
5  here specifically about mutual capacitance.  I
6  don't remember you mentioning that in your
7  witness statement.
8          Do you remember that?
9      A.   That is correct, yes.
10     Q.   Okay.  So those are some of the
11 earlier white papers that you mentioned.  And
12 these are the type of documents, sir, that you
13 said helped you to remember some of the events
14 that you talked about.  Is that fair?
15     A.   Yes.
16     Q.   So let's -- I want to go back to the
17 events in November of 2003, but for just a
18 moment, I want to go back to discuss some of
19 the other companies that you talked to, some of
20 the technology you looked at briefly.  Okay?
21     A.   Okay.
22     Q.   Remember we talked about that?  Let's,
23 Ryan, again, put question 23 and answer on the
24 screen, please.
25         Now, generally, sir, let's just read

Page 234

1  this so we're all on the same page.  Were you
2  able to develop a transparent full-image
3  multi-touch sensor.  Do you see that?
4      A.   Yes.
5      Q.   And the answer you gave: "Yes,
6  working together with input device team members
7  Brian Huppi and Josh Strickon, we came up with
8  a design for a transparent multi-touch sensor
9  that could deliver the multi-touch touchscreen
10 experience we had envisioned."  Do you see
11 that, sir?
12     A.   Yes, I do.
13     Q.   You didn't mention in your witness
14 statement, I don't think, any particular
15 companies whose products you looked at in this
16 time frame to see what they had available and
17 what types of technology they were working on.
18 Do you recall that?
19     A.   In my witness statement?  No, I don't
20 think I did.
21     Q.   For example, I didn't see any mention
22 of FingerWorks in the statement; is that
23 correct, sir?
24     A.   That's correct.
25     Q.   But back in 2003, you are aware,

Page 235

1  aren't you, at least certain members of your
2  team like Brian Huppi, who prepared that white
3  paper we saw, went out and looked at the
4  technology that was out there.  Is that true?
5      A.   Yes.
6      Q.   And he looked at FingerWorks; is that
7  true?
8      A.   Definitely.  We were working with
9  FingerWorks.
10     Q.   And are you aware that members of your
11 team asked FingerWorks whether they had worked
12 on any concept or concepts for doing a
13 multi-point transparent solution to the
14 multi-touch issue?  Are you aware of that?
15     A.   I'm sorry, you are asking if we asked
16 FingerWorks if they had a touchscreen?
17     Q.   Sure.
18     A.   Type of thing?
19     Q.   If they had any concepts that would
20 address that issue.
21     A.   Yeah.
22     Q.   Do you remember that, sir?
23     A.   I don't think we did.
24     Q.   If I showed you Mr. Huppi's testimony
25 to that effect, would you disagree with it?

Page 236

1  Let's put up --
2      A.   Oh, okay.  I mean, his memory --
3  that's fine.  You can show me his testimony.
4      Q.   Would you like to see it?
5      A.   Sure.
6      Q.   Let's put up slide 17.007.  Again, I
7  don't expect you to know everything that
8  everybody said.  Just want to get some facts
9  out.  But this is Mr. Huppi's testimony.
10         Did you ask FingerWorks whether they
11 could create a version for you of a transparent
12 touchscreen, multi-touch device?
13         Do you see that, sir?
14     A.   Yes, I see it.
15     Q.   His answer: "I believe we did talk to
16 them, again under NDA, asking them whether they
17 had been able to -- or if they had worked on
18 any concepts for doing a multi-point
19 transparent solution.  And as I recall, they
20 indicated that they had not been pursuing such
21 a solution."
22         Do you see that, sir?
23     A.   Yes, I see that.
24     Q.   And that's along the lines of what we
25 talked about early in your testimony, common

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 237

1  for engineers in trying to solve a problem
2  looking to see what others had available?
3      A.   Yes, although we tend to avoid asking
4  questions that can give others a lead on what
5  we're doing, so we definitely don't do very
6  much of that.
7      Q.   You would like it to be a one-way
8  street, if you can, to protect the company,
9  right?
10     A.   We're careful not to disclose our
11 confidential information.
12     Q.   Right.  But that doesn't mean you
13 don't ask them what they are working on, when
14 you are trying to develop a product and you
15 want information, you will ask them what they
16 may have available.  Is that fair?
17     A.   Sometimes just asking the question can
18 be -- can lead them to understand what it is
19 that we want.  So we tend to be very careful
20 about what we ask suppliers about their
21 technology.
22     Q.   Certainly.  You are careful not to,
23 for example, say what product the technology is
24 going to be used in, that would be a big no-no
25 for any company, and Apple certainly is no

Page 238

1  exception, right?
2      A.   Yes.
3      Q.   Okay.  But you still need to ask the
4  question to see if you can get help to see if
5  the technology is available; is that fair?
6      A.   So our approach is not exactly what
7  you are suggesting.  It is not that we will say
8  do you have a solution that will allow us to do
9  a multi-point touchscreen.  We will generally
10 ask suppliers -- so I see that Brian has
11 testified that he did ask FingerWorks for
12 transparent, but our general approach is to ask
13 general roadmap questions and get all of the
14 options they have.
15         And as opposed to asking focused
16 questions, that indicates where we would like
17 to take technology.
18     Q.   Okay.  All right.  But putting aside
19 that generalization, at least plainly in this
20 instance, a specific inquiry was made; is that
21 fair?
22     A.   Yes, in this case, it looks like Brian
23 did.
24     Q.   And do you personally remember looking
25 at what FingerWorks had available in this time

Page 239

1  frame?
2      A.   Yes.
3      Q.   And would you disagree if I told you
4  that Mr. Strickon testified that looking at the
5  self-capacitance figure in the '607 patent, he
6  said this appeared to be similar to the
7  electrode array that could be used in a
8  FingerWorks sensor?
9      A.   It had some similarities and some
10 differences.
11     Q.   Okay.  Fair enough.
12         And do you recall that FingerWorks
13 also had a multi-touch capacitive design but it
14 wasn't transparent?
15     A.   Yes.
16     Q.   Do you remember that specifically?
17     A.   I do, yes.
18     Q.   Okay.  Let's talk about some of your
19 other e-mails and documents from this time
20 frame.  We went through some of the October
21 white papers earlier.  Do you remember that?
22     A.   Yes.
23     Q.   I want to stay in that time frame and
24 I want to go back a little earlier in time to
25 September of 2003.  I would like to put up on

Page 240

1  the screen an e-mail that I believe you sent
2  which is RX-140C.
3         Ryan, can you blow up the top for now.
4         Just for the record, sir, is this an
5  e-mail that you sent on September 13th, 2003?
6      A.   Yes.
7      Q.   And you sent it to your coinventors of
8  the '607 patent, Mr. Huppi and Mr. Strickon,
9  among others, or other?
10     A.   Yes, that's correct.
11     Q.   Okay.  And it is entitled R&D
12 investigation priorities.  Do you see that?
13     A.   Yes.
14     Q.   What did you mean by investigation
15 priorities at the time?
16     A.   I meant what we should prioritize
17 working on.
18     Q.   And the first one, let's make that a
19 little bigger, Ryan, and we're going to talk
20 about the first priority that you addressed is
21 multi-touch tablet solution.  Do you see that?
22     A.   Yes.
23     Q.   And that's the same development or
24 project or issue we have been talking about
25 this morning; is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 241

1    A.   Yes.
2    Q.   And the first sentence says, "this
3  might be a case where the input solution is the
4  furthest from achievable.  All of the other key
5  hardware components seem to be off the shelf,
6  yet it seems that we will need to work hard to
7  come up with a true multi-finger touch
8  solution."
9        Do you see that, sir?
10   A.   Yes, I do.
11   Q.   And that's -- that first sentence,
12 again, describes the general subject matter we
13 have been talking about here this morning; is
14 that right?
15   A.   Yes, that's correct.
16   Q.   And at least at that point in time,
17 you described it in your words as the furthest
18 from achievable.  Is that right?
19   A.   Yes, most difficult.
20   Q.   Now, a little bit further down below
21 in that e-mail, let's start with the fifth line
22 from the bottom, Ryan.  Yeah, right there,
23 that's great.
24        In this -- that's why I went through
25 law school.  I'm not the best engineer.  I will

Page 242

1  suffer through this.
2        Down toward the bottom, sir, you say
3  "this seems the most challenging yet
4  potentially an area that we could create some
5  patentable IP due to our unique, new
6  requirements for our desired interaction
7  model."
8        Do you see that?
9    A.   Yes.
10   Q.   It is fair to say you were doing your
11 job and thinking ahead at this point in time.
12 Is that right?
13   A.   Yes.
14   Q.   At least at this point, you weren't
15 saying we have got it, we should get a patent
16 on it, this is ground-breaking technology, you
17 were looking ahead to say at least what we have
18 been looking for as of September, we haven't
19 found, let's think down the road about IP
20 protection?  Is that fair?
21   A.   Yeah, definitely the intent was that
22 there is going to be a lot of -- it is a new
23 problem that hadn't been brought before, so
24 there is going to be a lot of potential IP in
25 the future.  It wasn't to say that in the past

Page 243

1  we never had any patentable IP.  It is just to
2  say in the future, there was going to be a lot
3  coming up.
4    Q.   And you were thinking about that early
5  on, working on this technology, let's think
6  about patents to come?
7    A.   Yes.
8    Q.   Fair?
9    A.   Um-hum.
10   Q.   It has Brian H.  Is that Brian Huppi
11 in parenthesis?
12   A.   Correct.
13   Q.   Was that something that -- do you
14 remember why his name is in parentheses?
15   A.   I don't, but I'm presuming usually
16 when I put someone's name in parenthesis, it
17 means that this comment is targeted towards
18 them or that there should be some follow-up
19 from them.
20   Q.   Just to finish off with this, I will
21 tell you there has been some discussion about
22 it.  Given that you are here, let's go through
23 the last couple of sentences.
24        It says, "this project is the highest
25 on Tim's list."  Do you see that?

Page 244

1    A.   Yes.
2    Q.   Who is Tim?  Do you remember?
3    A.   There is two Tim's.  Let me see which
4  one it is.  Can I mention both?
5    Q.   Yeah, sure.
6    A.   So it could have been Tim Bucher or
7  Tim Cook.  Tim Bucher would be more likely
8  because I interacted with him a lot more, but I
9  wasn't sure if he was there at this time.  If
10 Tim Bucher wasn't there, it would be Tim Cook
11 but someone could go back and check and find
12 out if Tim Bucher was there because he was part
13 of my management team.
14   Q.   Is Tim Bucher still with Apple?
15   A.   No, he is not.
16   Q.   Tim Cook is still with Apple?
17   A.   Yes, he is.
18   Q.   What is his position today?
19   A.   Today he is CEO.
20   Q.   SJ's, do you see that, according to
21 Tim?  Do you recall who SJ stands for?
22   A.   Yes, that indicates Steve Jobs.
23   Q.   And you go on to say, "it would be
24 great if we could come up with something that
25 works in a relatively short amount of time."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 245

1        Do you see that?
2    A.   Yes, I do.
3    Q.   And by short amount of time, you mean
4  short amount of time to develop this
5  technology.  Is that right?
6    A.   Yeah, generally, our philosophy is we
7  want to come up with a working demo as quickly
8  as possible, something that works is basically
9  working demo.  It is an Apple culture to get
10  the demo quickly, even if the product may be
11  further off.
12    Q.   Okay.  But my question is a little
13  different.  At least for this project, when I
14  read that, I get the sense that there was, in
15  addition to the importance of the technology,
16  you were also to some extent highlighting the
17  urgency in completing the work.
18        Is that fair?
19    A.   Definitely, yeah.  For important
20  projects, we want to move as quickly as we can,
21  yes.
22    Q.   And I think you used the word
23  prototype.  Just generally, what is a
24  prototype?
25    A.   So a prototype, a key milestone is a

Page 246

1  prototype that demonstrates the feature or the
2  function that people can pass around and play
3  with.
4    Q.   Now, there has been discussion in the
5  case of prototypes relating to the multi-point
6  touchscreen project that's the subject of your
7  patent.  Do you remember that?
8    A.   Yes.
9    Q.   And you were asked about at your
10  deposition.  Do you recall that?
11    A.   Yes.
12    Q.   And you mentioned generally prototypes
13  in your witness statement; is that right?
14    A.   Yes.
15    Q.   If I have it right, at some point,
16  there was a prototype using criss-cross wires?
17  Copper wires?
18    A.   Yes.
19    Q.   Do you remember that?
20    A.   Yes, I do.
21    Q.   That's a prototype that you and your
22  team made?
23    A.   That's correct.
24    Q.   You don't remember exactly when that
25  prototype was made, do you?

Page 247

1    A.   I can bound it, but I don't remember
2  exactly when it was made.
3    Q.   And that prototype doesn't exist
4  anymore?
5    A.   We can't find it.
6    Q.   You have looked?
7    A.   Yes, definitely.
8    Q.   Was that -- would you call that a
9  mutual capacitance configuration?
10    A.   Yes.
11    Q.   Was there a self-capacitance prototype
12  configuration?
13    A.   Yeah, definitely.  We had full working
14  -- much more mature, yes.
15    Q.   Do those exist anymore?
16    A.   Definitely, yes.
17    Q.   How about a prototype using -- I think
18  there was a prototype using the ITO.  Do you
19  remember that?
20    A.   Yes.
21    Q.   And what is ITO?
22    A.   Indium tin oxide.
23    Q.   And that is a material that is
24  conductive but it is transparent; is that
25  right?

Page 248

1    A.   Generally transparent, yes.
2    Q.   You can see through it; is that right?
3    A.   Correct.
4    Q.   Apple didn't invent ITO, did it?
5    A.   I don't know that it didn't, but I
6  don't know that -- I don't suppose it did.
7    Q.   You probably would have heard about it
8  if Apple invented it?
9    A.   I suppose so, yes.
10    Q.   But ITO is transparent; is that right?
11    A.   It depends on its properties.  Usually
12  the goal for ITO is to make it as transparent
13  as possible, given the electrical resistance
14  tradeoff.
15    Q.   That's right.  And copper, obviously,
16  is not transparent; is that right?
17    A.   Unless it is very, very thin, it is
18  not transparent.
19    Q.   And when you talk about going back to
20  the ITO prototype, was there a prototype that
21  was made with just one kind of cross-hatching
22  of ITO?
23    A.   No.
24    Q.   What ITO prototype was there?
25    A.   We went to full 1-inch size format

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 249

1   with ITO.
2       Q.   And you didn't have an exact date when
3   that prototype was prepared; is that correct?
4       A.   I don't, no.
5       Q.   Does that prototype exist anymore?
6       A.   I don't think so.
7       Q.   You have looked for that prototype,
8   too?
9       A.   Yes.
10      Q.   So from this time frame, from this
11  September, November time frame that you talked
12  about in your witness statement when conception
13  occurred, in your memory, the prototypes from
14  that period don't exist any longer; is that
15  correct?
16      A.   That's correct.
17      Q.   But you do have some documentation,
18  records.  You have your inventor notebook from
19  that time frame; is that right?
20      A.   Yes.
21      Q.   Now let's take a look at that.  That's
22  Exhibit 306C.
23      A.   Should I look in this one?  Okay, I
24  have got it.
25      Q.   Now, this is your -- this is your

Page 250

1   inventor notebook from I think the June 2003
2   time frame to early 2004, February 2004.  Is
3   that right?
4       A.   Yes, that's correct.
5       Q.   And I think you said earlier today you
6   looked -- did you look for an inventor notebook
7   from an earlier period of time, but you weren't
8   able to find it?
9       A.   No, I turned -- basically, I turned in
10  all my notebooks to legal, and they suggested
11  that I look through this notebook to get the
12  relevant details, so I spent the time to review
13  this one in detail.
14          I didn't look at the other notebooks.
15      Q.   Okay.
16      A.   They do exist, though.
17      Q.   You didn't look at an earlier
18  notebook?
19      A.   Or later notebook, correct.
20      Q.   You talk about a few pages of this
21  notebook in your witness statement.  Do you
22  remember that?
23      A.   Yes.
24      Q.   Let's bring that to mind.  If you can
25  put up question 42, please, on the screen.

Page 251

1       Ryan, I don't know if you can do this,
2   but can you put page 88 of the 306 kind of
3   beneath that maybe?  All right.  Again, this is
4   -- we're now at a page in your notebook that's
5   from the end of September 2003; is that
6   correct?
7       A.   That's correct.
8       Q.   And in your testimony, you say, "this
9   notebook" -- talking about page 88 of
10  Exhibit CX-306C -- "this is a notebook entry
11  dated September 29th, 2003 that describes many
12  of my team's goals and initial ideas for the
13  multi-touch project."  Is that correct?
14      A.   Yes, that's correct.
15      Q.   And it notes the problems with using
16  single point and projection scan detection
17  systems and highlights the focus of what we
18  needed to develop, a transparent pixel array of
19  capacitance sensors using transparent
20  electrodes made of indium tin oxide ITO placed
21  over an LCD display.
22          Do you see that?
23      A.   Yes.
24      Q.   Now, that's not what the subject
25  matter of the claims in the '607 is all about?

Page 252

1   Let me ask a better question.
2           That's not a mutual capacitance
3   configuration, is it?
4       A.   This diagram doesn't describe the type
5   of technology used, whether self or mutual.
6       Q.   Okay.  And then if you go over to page
7   89, you also talked about this in the witness
8   statement.  Do you see there on page 89, do you
9   see that drawing that you have, that pattern
10  there?
11      A.   Yes.
12      Q.   Do you see that?  That's a
13  self-capacitance configuration, isn't it, sir?
14      A.   Yes, as drawn here, that's a
15  self-capacitance configuration, yes.
16      Q.   It is kind of a very rough
17  approximation of what's shown in the figures
18  6A, 6B of your patent and on the cover page of
19  the patent as the self-capacitance
20  configuration?
21      A.   It is roughly the same.  I'm not
22  positive about whether it is figure 6A or 6B,
23  but I can take your word for it.
24      Q.   Okay.
25          JUDGE ESSEX:  Counsel, let me ask you,

APLNDC-X0000006208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 253

1    I'm assuming you have a ways to go?
2         MR. DeFRANCO:  Yes, Your Honor.
3         JUDGE ESSEX:  All right.  We're not
4    going to get done in the next two minutes, are
5    we?
6         MR. DeFRANCO:  No.
7         JUDGE ESSEX:  This might be a good
8    time to pause for our noon recess.
9         So, Mr. Hotelling, we're not going to
10   get through you before lunch, and so you are
11   comfortable at lunch, I want to give you some
12   quick instruction.  You cannot discuss your
13   testimony or the matters relating to it with
14   anyone while you are on break.
15        But that doesn't mean you have to sit
16   by yourself in a corner.  You can talk about
17   the weekend's football or anything else you
18   want, but just no matters that pertain to your
19   testimony or this case.  Is that clear?
20        THE WITNESS:  Okay, yes.
21        JUDGE ESSEX:  All right.  We're in
22   recess.  We will be back at 1:00 o'clock.
23        (Whereupon, at 11:56 a.m., a lunch
24   recess was taken.)
25

Page 254

1              AFTERNOON SESSION
2                  (1:00 p.m.)
3         JUDGE ESSEX:  All right.  Let's come
4    back to order.  And I would remind you that you
5    are still under oath.  And I hope you had a
6    good lunch.  Are we ready to proceed?
7         MR. DeFRANCO:  Yes, Your Honor.
8         JUDGE ESSEX:  All right.  Proceed.
9         MR. DeFRANCO:  Thank you.
10   BY MR. DeFRANCO:
11   Q.   Mr. Hotelling, just a couple of
12   housekeeping items.  I think I actually may
13   have misspoken very early on.  I asked you
14   about the issue date of the '607 patent.  I may
15   have said February 6th, 2010.  It is February
16   16th, 2010.
17        Can you just confirm that for us,
18   please?
19   A.   I see, yes, it is February 16th, 2010.
20   Thank you.
21   Q.   One other follow-up.  You were talking
22   to us about prototypes.  We talked about a
23   copper wire prototype.  Do you remember that?
24   A.   It was a copper prototype, didn't
25   really have wires, but yes, it was a copper

Page 255

1    prototype.
2    Q.   It used copper; is that right?
3    A.   Correct, yes.
4    Q.   You said in some instances, copper can
5    be thin enough to be transparent.  Do you
6    remember that?
7    A.   Yes, I do.
8    Q.   But you were not saying that the
9    prototype had copper that was thin enough to be
10   transparent.  Is that correct?
11   A.   That's correct, yes.
12   Q.   Okay.  Now, before the lunch break,
13   sir, we were talking about your inventor
14   notebook.  I would like to go back to that
15   again.  We were talking about page 89.
16        And we were at the point where we were
17   discussing this -- the hand drawing that you
18   made on page 89 of an array.  Do you see that,
19   sir?
20   A.   Yes, I do.
21   Q.   And we said roughly that's the type of
22   self-capacitance array that is shown in figure
23   6 of what eventually became the '607 patent; is
24   that correct?
25   A.   Just let me check figure 6 quickly.

Page 256

1    Yes, that's correct.
2    Q.   There is no discussion on that page of
3    mutual capacitance, is there?
4    A.   No, there is not.
5    Q.   Okay.  Now, the notebook again, we're
6    looking at was from June of 2003 to February
7    2004.  Is that right?
8    A.   Yes, that's correct.
9    Q.   And you reviewed that notebook to
10   prepare your direct witness statement; isn't
11   that correct, sir?
12   A.   Yes, that's correct.
13   Q.   Okay.  Now, I would like to take a
14   look at an e-mail, which is numbered RX-158C.
15        Sir, have you seen this e-mail before?
16   A.   Not recently, but I'm sure I saw it
17   then, yes.
18   Q.   Now, you can see that it is from one
19   of your team members, Joshua Strickon; is that
20   correct?
21   A.   Yes.
22   Q.   It is to the
23   Q79brainstorming@group.Apple.com.  Is that the
24   address?
25   A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 257

1    Q.   That's a group address, a group
2  address for addressees that were in the Q79
3  brainstorming group; is that right?
4    A.   That's right.
5    Q.   That's the project we discussed this
6  morning; is that correct, a multi-touchscreen
7  larger format?
8    A.   Yes, the Q79 is indeed, that is
9  correct.
10   Q.   And you were a member, sir, of that
11 group back in this time frame; is that correct?
12   A.   Yes.
13   Q.   Now, do you see in this e-mail,
14 Mr. Strickon was informing you and the other
15 members of the Q79 team about the Sony
16 SmartSkin multi-touch technology.  Do you see
17 that?
18   A.   Yes.
19   Q.   And at the bottom of that e-mail,
20 Mr. Strickon goes on to provide a link to a
21 Sony web site.  Do you see that as well?
22   A.   I do.
23   Q.   There has been some testimony about --
24 from the other inventors in this case about a
25 video of that product that shows the product

Page 258

1  being used.  Do you remember ever seeing that
2  video yourself?
3    A.   I recently saw it, and, yes, I did see
4  it.
5    Q.   Okay.  Did you see it back in the time
6  frame we're talking about or don't you
7  remember?
8    A.   I didn't remember, but after seeing
9  the video again, I do remember now, yes.
10   Q.   Okay.  You do remember seeing that
11 video back in that time frame?
12   A.   I do remember seeing the video, yes.
13   Q.   Do you remember who showed you that
14 video?  Was it Mr. Strickon himself, do you
15 know?
16   A.   I believe it was Josh, yes.
17   Q.   In that time frame, you also remember
18 looking at the article that was published on
19 the Sony SmartSkin system.  Isn't that correct?
20   A.   Yes, that's correct.
21   Q.   And you remember seeing that in the
22 late 2003 time frame; is that right?
23   A.   Yes, that's correct.
24   Q.   Why don't we put that up for a moment.
25 This is JX-367.

Page 259

1         Is this the article on the Sony
2  SmartSkin?
3    A.   It looks like it, yeah, JX-367.  Let's
4  see.
5    Q.   And --
6    A.   Is that here?
7    Q.   Yeah.
8    A.   I can see it on the screen.
9    Q.   We will get it for you.
10   A.   Yes, that's correct.
11   Q.   And you do remember seeing this
12 article before in that time frame, and you
13 believe it was brought to your attention by
14 either Mr. Huppi or Mr. Strickon; is that
15 correct?
16   A.   That's correct.
17   Q.   Okay.  Now, is it your understanding
18 at the time that the device that's discussed in
19 this article was able to detect multiple
20 touches?
21   A.   Yes, but not quickly.
22   Q.   Okay.  But it could detect multiple
23 touches; is that correct?
24   A.   Yes, it could, correct.
25   Q.   Do you remember seeing that in the

Page 260

1  video that relates to this device, sir?
2    A.   Yes, I do.
3    Q.   Okay.  And it also showed a mutual
4  capacitance setup; is that correct?  Do you
5  remember testifying about that?
6    A.   Yes.
7    Q.   Okay.  Now, are you aware that
8  Mr. Strickon testified that seeing this article
9  and information about Sony influenced his views
10 and thoughts about using mutual capacitance?
11   A.   No.
12   Q.   Do you recall that at the time,
13 Mr. Strickon discussing that with you?
14   A.   His -- you mean his -- I'm sorry.  Can
15 you repeat the question?  I thought you were
16 asking about the testimony, but you are asking
17 about --
18   Q.   I am talking about this article and
19 discussions with Mr. Strickon.  Do you remember
20 any discussions with Mr. Strickon at the time
21 about this article and the Sony SmartSkin
22 product leading him to think about using mutual
23 capacitance?
24   A.   Yes, although I think Brian may have
25 been part of those discussions as well, but,

APLNDC-X0000006210

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 261

1   yes, I definitely remember the discussion of
2   mutual capacitance as a candidate for
3   multi-point touchscreen.
4       Q.   Right.  And you remember, sir, that
5   discussion coming up at or about the time that
6   this article was distributed by Mr. Strickon;
7   is that correct?
8       A.   Yeah.  I'm not sure that -- I think it
9   was before his e-mail date, but I think we did
10  discuss it in that time frame.
11      Q.   Okay.  You didn't see any discussion
12  any earlier than his e-mail in your -- in your
13  lab notebook, for example; is that right?
14      A.   That is correct, yes.
15      Q.   In the documents, I didn't see any
16  discussion of a mutual capacitance system, any
17  earlier than this article in the documents you
18  cited in your direct testimony.  Is that true?
19      A.   That is correct, yes.
20      Q.   Now, and also I didn't remember any
21  discussion of this article in your direct
22  witness statement.  Is that correct?
23      A.   That is also correct, yes.
24      Q.   You didn't discuss the video in the --
25  in your direct witness statement.  Is that

Page 262

1   true?
2       A.   Yes, that is true.
3       Q.   You didn't discuss discussions you had
4   at the time with either Mr. Strickon or
5   Mr. Huppi about this article about the Sony
6   SmartSkin or the video in your direct witness
7   statement; is that correct, sir?
8       A.   Yes, that's correct.
9       Q.   Now, you do discuss some meeting notes
10  that I would like to turn to now in about the
11  same time frame.  Do you remember that?  Let's
12  take a look at Exhibit JX-528C.
13      A.   Yes.
14      Q.   And, again, sir, just for the record,
15  Ryan, let's blow up the top of this e-mail,
16  please.
17          Again, subject matter is Q79.  That's
18  the same group we were talking about, the
19  brainstorming group, sir?
20      A.   Yes.
21      Q.   And it says, meeting notes for
22  11/20/03.  That's, I think you said at your
23  deposition, there were regular meetings of the
24  brainstorming group and there were records kept
25  of what was discussed at those meetings; is

Page 263

1   that fair?
2       A.   That's correct.
3       Q.   Okay.  And does this, taking a look at
4   this, is this one of those sets of meeting
5   notes that you testified about?
6       A.   Yes, it is.
7       Q.   And, again, it is from November 20th,
8   is that right, of 2003?
9       A.   That is correct.
10      Q.   That is on the order of two weeks,
11  maybe 13 days, if I am doing the math right,
12  after Mr. Strickon sent his e-mail about the
13  Sony SmartSkin device; is that right?
14      A.   Let's see.  What was the date of that
15  e-mail again?  Was it -- just to double-check
16  it.  The 7th to the 20th.  So, yes, that was
17  two weeks, correct.
18      Q.   Now, if we can turn to paragraph 51
19  and the answer, and maybe we can put the two on
20  the same screen, Ryan.  Maybe you can put the
21  first four bullet points of that memo on the
22  bottom and the paragraph 53 -- I'm sorry-- 51
23  and the answer at the top.
24      A.   Let me get my witness statement out
25  here at the same time.

Page 264

1       Q.   Let's put 51 at the top and blow up
2   the memo, JX-528C we were just looking at at
3   the bottom.  Or vice versa.
4          Great, thank you.  This is the
5   paragraph in your direct witness statement,
6   Mr. Hotelling, where you discuss the meeting
7   notes from November 21st, 2003.  Do you see
8   that?
9       A.   Yes.
10      Q.   And just to put it in perspective, the
11  question is:  In Exhibit JX-528C, also one of
12  the documents you reviewed -- is JX-528C also
13  one of the documents you reviewed that
14  refreshed your recollection?"
15          Do you see you answered yes?
16      A.   Yes, I do.
17      Q.   First answer, the first sentence
18  reads, "these meeting notes reminded me that
19  sometime before November 30th, 2003, Josh and
20  Brian I (the members of the input devices
21  team investigating multi-touch sensor
22  development) had come up with the idea of
23  building a sensor using a grid of rows and
24  columns of ITO lines."
25          Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 265

1    A.   Yes, I do.
2    Q.   ITO, again, is that transparent
3  material we talked about earlier; is that
4  right, sir?
5    A.   That's correct.
6    Q.   This is the first time in your witness
7  statement, I believe, that you have put a date
8  to that idea or that conception of the product
9  that you were trying to create.  Is that
10  correct?
11    A.   That's correct.  This is the first
12  time we had -- we know from the documentation
13  that by that time, we had shifted our focus or
14  had the idea, at least, to use row and columns
15  of ITOs.
16    Q.   Okay.  Now, in terms of the Sony
17  article we looked at before from 13 days
18  earlier, are you aware that Mr. Strickon
19  testified that he doesn't recall discussing
20  using mutual capacitance prior to seeing that
21  Sony article?
22    A.   No, I am not aware of his testimony
23  there.
24    Q.   And are you aware that -- have you
25  studied the Sony SmartSkin article recently or

Page 266

1  have you not looked at it in some period of
2  time?
3    A.   No, definitely I have looked at it
4  recently.
5    Q.   Okay.  And are you aware that there
6  are figures there that show using copper in a
7  grid pattern for a mutual capacitance device,
8  have you seen that in the Sony SmartSkin
9  article?
10    A.   I have seen in the SmartSkin article,
11  a picture using copper.
12    Q.   And in terms of -- do you recall
13  discussing mutual capacitance and the SmartSkin
14  article with the other inventors on the '607
15  patent, Mr. Huppi and Mr. Strickon?
16    A.   Yes.
17    Q.   Okay.  You discussed that after the
18  article was brought to your attention by
19  Mr. Strickon on about -- in early November of
20  2003?
21    A.   I think we had discussed it
22  previously.
23    Q.   Okay.
24    A.   But didn't focus on it.
25    Q.   Okay.  You don't know how much earlier

Page 267

1  in time?
2    A.   Not precisely, no.
3    Q.   You haven't seen any documents that
4  would date it -- and as we saw, it is not
5  identified in your inventor notebook.  Is that
6  fair?
7    A.   That is correct.
8    Q.   And, again, as I said earlier, you
9  don't have any prototypes from this particular
10  time period; is that fair, sir?
11    A.   With respect to prototypes using the
12  copper prototype, we looked for it and couldn't
13  find it.
14    Q.   And you couldn't find the one with the
15  ITO either; is that correct?
16    A.   Correct.  We found other models, but
17  not the first ones.
18    Q.   Okay.  And if you look back at what we
19  have marked as JX-528C, these are the meeting
20  notes, do you see the second bullet point,
21  "there are three main methods for touch input
22  that Input Devices is investigating."  Do you
23  see that?
24    A.   Yes, I do.
25    Q.   Do you see the third bullet point says

Page 268

1  row and column ITOs, do you see that?
2    A.   Yes.
3    Q.   And once again, that's the transparent
4  material that we have discussed earlier; is
5  that correct?
6    A.   That is correct.
7    Q.   Rows and columns are the drive and
8  sense lines that we talked about earlier?
9    A.   Yes.
10    Q.   All right.  Thanks for that.
11       Let's turn briefly for a moment to
12  another topic and document you discuss in your
13  direct witness statement.  Now, if you'd put
14  up, please, Ryan, question 21 and the answer.
15       This is where you refer to something
16  as, you know, shadowed multi-touch.  Do you
17  remember that, sir?
18    A.   Yes.
19    Q.   And you say that there are three
20  classes of touch detection.  Do you remember
21  that, sir?
22    A.   Yes.
23    Q.   And those are single-touch systems,
24  shadowed multi-touch systems, and full
25  multi-touch systems; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 269

1    A.   That's correct.  Those are general
2 categories.
3    Q.   And then you go on to talk about a
4 slide presentation.  And let's put that up,
5 Ryan.  It is JX-531C.
6        And this is a slide presentation that
7 you presented to Apple executives describing
8 the history of multi-touch development at
9 Apple; is that correct, sir?
10   A.   Yes, that is correct.
11   Q.   And you contributed to these slides
12 and helped prepare them; is that right?
13   A.   Yes, I did.
14   Q.   You also participated in presenting
15 these to Apple executives?
16   A.   Yes, I did participate.
17   Q.   I want to turn to slide 50 of this
18 presentation.  If you blow up the middle one,
19 that's good enough, you see in the middle you
20 talk about what is labeled at the top shadowed
21 multi-touch.  Do you see that?
22   A.   Just one second.  I am going to pull
23 the document out.  Sorry, I am just going to
24 locate the page here just to be sure.
25 Actually, can you help me?  Are they sequential

Page 270

1 by this number here?  Got it.  Okay.  Sorry
2 about the delay there.  Yes, this is, this is
3 --
4    Q.   No worries.  Just a couple of quick
5 questions on that.  So the center, that's the
6 shadowed multi-touch configuration that you
7 were talking about in your witness statement?
8    A.   Yes, that's the category.
9    Q.   And would you agree that that can
10 still detect multiple touches?
11   A.   Not reliably, no.
12   Q.   But it could?
13   A.   For some touches, it can detect that
14 there are more than one touch.
15   Q.   For example, couldn't it detect a
16 pinch, for example?
17   A.   It wouldn't necessarily know that
18 there is only two.  It would know that there is
19 more than one, but there might be three or
20 four.  So in terms of detecting a pinch, it is
21 not good at it.
22   Q.   If it were a simple two finger pinch,
23 it could detect a two finger pinch, couldn't
24 it?
25   A.   If it had independent information that

Page 271

1 there was only two fingers, then yes.
2    Q.   I want to turn to the last topic.  I
3 want to talk about the construction of the
4 iPhone 4 for a minute.
5    A.   Okay.
6    Q.   Do you remember that you testified
7 about this at your deposition a bit?
8    A.   Yes.
9    Q.   Do you recall that, sir?
10   A.   Yes.
11   Q.   Do you remember that you were a
12 corporate witness on that topic?  You were
13 designated to testify on that topic?
14   A.   Yes, I do.
15   Q.   Let's turn briefly to question and
16 answer 65, please.  Now, in that question and
17 answer, sir, you talk about the multiple layers
18 of materials in the iPhone 4.  Do you see that?
19   A.   Yes, that's correct.
20   Q.   And those are the layers in the touch
21 sensor that is used in the iPhone 4?
22   A.   Yes.
23   Q.   And then you go on a little bit
24 further on in question and answer 68, if we
25 could put that up for a minute, I just wanted

Page 272

1 to bring this back to mind, sir.  This is where
2 you are talking about a document that we're
3 going to look at in a moment.  And maybe we
4 could just lower that, Ryan, and put up at the
5 top JX-531C.  And it is page 33.
6        All this, sir, is where you are
7 discussing a document that shows the various
8 layers in the touchscreen of the iPhone 4.  Do
9 you remember that?
10   A.   Yes.
11   Q.   Okay.  What I would like to do, and
12 obviously feel free to look at your witness
13 statement, but we're looking over at the -- if
14 you could just center that other -- that's it
15 -- if you could center that whole piece, Ryan,
16 that's great.
17        At the top, two product code names?
18 Do you remember which is which?
19   A.   Yes, the iPhone 4 is N90.
20   Q.   And the N88, that's a 3G phone?
21   A.   That's correct, 3GS.
22   Q.   That's not one of the phones we're
23 dealing with?
24   A.   That's correct.
25   Q.   Okay.  And what is depicted generally

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 273

1 on the right-hand side, sir?
2    A.   That's a stackup diagram.
3    Q.   I would like you -- I think it would
4 be more efficient if you just walk us through
5 the layers from bottom to top, if you would.
6 Do you mind?
7    A.   From bottom to top?  Okay.  So the
8 layer that's basically black in this
9 presentation is the LCD.  Do you want me to use
10 the pointer?  That's the display right there
11 (indicating).
12        Above that in this diagram, it is 175
13 microns or 0.75 millimeters, which is the same
14 as 175 microns of pressure sensitive adhesive
15 or optically clear adhesive.
16        This layer for different versions of
17 the phone were slightly different, 150 microns
18 for one, 175 microns for the other.  This layer
19 is the 330 microns of what we call the DITO
20 glass, which is an acronym for double indium
21 tin oxide glass.  Above that is 150 microns of
22 PSA, pressure sensitive adhesive or optically
23 clear adhesive.
24        And at the top is 800 microns of the
25 cover glass.

Page 274

1    Q.   Now, you mentioned DITO.  The ITO part
2 of it, that's the same type of material we
3 talked about earlier today; is that correct?
4    A.   That's correct.
5    Q.   This configuration for the touchscreen
6 there, there are very thin drive and sense
7 lines somewhere in this layer stack; is that
8 correct, sir?
9    A.   When you talk about thin, are you
10 describing the Z direction as opposed to the X
11 and Y directions?
12    Q.   Yes.
13    A.   Yes, their thickness is very small in
14 the Z direction.
15    Q.   And would you just point that out for
16 us, where the drive lines and the sense lines
17 in the iPhone 4 would be?
18    A.   Yes.  On the lower side of the DITO
19 glass are the -- is the indium tin oxide layer
20 which contains the drive lines for the iPhone
21 4.  On the upper side of the DITO glass is the
22 indium tin oxide layer that contains the sense
23 lines for the iPhone 4.
24    Q.   And is there a reason why they are not
25 shown?  Are they too thin to be shown on this

Page 275

1 diagram?
    A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 278

Page 280

45 (Pages 277 to 280)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APLNDC-X0000006215

Page 281

Page 283

1 the SmartSkin reference.
2     Q.   And did Apple tell the Patent Office
3 about the SmartSkin reference?
4     A.   Yes, we did.
5     Q.   Can we see JX-2, please.  I would like
6 to go to page 3 of the reference, left-hand
7 column at the bottom.
8     A.   Left-hand column at the bottom.  Okay.
9     Q.   Next page, please.  Back, back.  Stop.
10        The left-hand column, can you blow up
11 the bottom where it says other publications?
12 Thank you.
13        And what is shown there,
14 Mr. Hotelling?
15     A.   This is showing several other
16 publications, including Jun Rekimoto's
17 SmartSkin reference.
18     Q.   Is that the same reference that you
19 were shown in your cross-examination?
20     A.   Yes, it was.
21     Q.   JX-367C?
22     A.   Yes.
23        MR. FERGUSON:  No other questions,
24 Your Honor.
25        JUDGE ESSEX:  Thank you.

Page 282

Page 284

8        MR. DeFRANCO:  Thank you very much.
9 That's all I have.  Thank you.
10        MS. KATTAN:  No cross-examination,
11 Your Honor.
12        JUDGE ESSEX:  All right.
13        REDIRECT EXAMINATION
14 BY MR. FERGUSON:
15     Q.   Mr. Hotelling, you remember being
16 asked some questions on your cross-examination
17 about the SmartSkin reference?
18     A.   Yes, I do.
19     Q.   Now, had you considered, had your team
20 considered using mutual capacitance for your
21 touchscreen sensor prior to seeing the
22 SmartSkin reference?
23     A.   So, yeah, we considered a lot of
24 different configurations, but by the time we
25 decided to focus, shift our effort, we had seen

1        MR. DeFRANCO:  Just a couple of quick
2 followup questions.
3        RECROSS-EXAMINATION
4 BY MR. DeFRANCO:
5     Q.   Just put the first page of the list of
6 references on the screen, please, in the '607
7 patent.  Yes, scroll up.  That's on the cover
8 page.  Take that down.  We will do it a sheet
9 at a time.
10        Just briefly there, references cited
11 on the first page, is that correct, sir?  You
12 have seen that list?
13     A.   References cited, U.S. patent
14 documents, correct.
15     Q.   Let's flip to the next page.  Those
16 are other additional references that were cited
17 to the Patent Office.  Do you see that, sir?
18     A.   Yes, I do.
19     Q.   And the next page, do you see that's
20 yet another page listing additional references
21 cited to the Patent Office?  Do you see that?
22     A.   Yes, I do.
23     Q.   And the next page, do you see there is
24 another page, I believe, with references.  Do
25 you see that, sir?

APLNDC-X0000006216

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 285

1    A.   Page 4, I do see, yes.
2    Q.   Let's go to page 5, please.  There are
3  a few references on that page.  Do you see
4  that, sir?
5    A.   Yes, I do.
6    Q.   You don't have a specific recollection
7  of being involved in the prosecution of this
8  patent; that is before it issued from the
9  Patent Office?
10   A.   No, not a deep involvement, no.
11   Q.   You have not personally read all these
12 references; isn't that correct, sir?
13   A.   I have read some of them, but not all
14 of them, no.
15   Q.   There is hundreds and hundreds here.
16 You have not read all those references, right?
17   A.   That is correct, I have not read all
18 of these references.
19   Q.   And you're not an expert in Patent
20 Office procedure.  You don't have any idea how
21 much time the average patent examiner has to
22 examine an application, do you?
23   A.   No, I don't.
24   Q.   Okay.
25        MR. DeFRANCO:  Thank you.

Page 286

1        MS. KATTAN:  I have nothing further.
2        MR. FERGUSON:  No, Your Honor, just
3  admission of the exhibits.
4        JUDGE ESSEX:  All right.
5        Mr. Hotelling, it appears that you are
6  done with your testimony.  Thank you very much.
7  And you are dismissed.
8        THE WITNESS:  Thank you.
9        MR. FERGUSON:  Your Honor, we do have
10 a list of exhibits for admission.
11       JUDGE ESSEX:  If you will just give
12 those to the court reporter, that will be fine.
13 I don't ask that you read them into the record.
14 I don't think it benefits me or anybody else in
15 the room.
16       MR. FERGUSON:  Thank you, Your Honor.
17       (Complainant Exhibit Numbers CX-205C,
18 CX-306C, CX-512C, CX-513C, CX-514C, CX-515C,
19 CX-516C, CX-517C, CX-522C, CX-536C, CX-537C,
20 CX-538C, CX-539C, CX-540C, CX-541C, CX-542C,
21 CX-543C were received into evidence.)
22       (Joint Exhibit Numbers JX-002,
23 JX-482C, JX-488C, JX-528C, JX-530C, JX-531C,
24 JX-534C, JX-535C, JX-690C were received into
25 evidence.)

Page 287

1        JUDGE ESSEX:  Thank you.  Apple, would
2  you like to call your next witness?
3        MR. DAVIS:  Yes, Your Honor, Apple
4  calls Wayne Westerman.  We're fetching the
5  witness right now.
6        JUDGE ESSEX:  That's fine.  Do we need
7  to be on the confidential record starting with
8  him?
9        MR. DAVIS:  Not for the -- verifying
10 the witness statement, but I don't know what
11 the cross will be.
12       JUDGE ESSEX:  All right.  Let's go on
13 the public record then.
14       (Whereupon, the trial resumed in open
15 session.)

Page 288

1         O P E N   S E S S I O N
2        MR. DAVIS:  We're ready, Your Honor.
3        JUDGE ESSEX:  You found him, did you?
4        MR. DAVIS:  We did, indeed.
5        JUDGE ESSEX:  If you would remain
6  standing for just a moment and raise your right
7  hand for me.
8  Whereupon--
9            WAYNE C. WESTERMAN,
10 having been first duly sworn, was examined and
11 testified as follows:
12       JUDGE ESSEX:  Please be seated.
13          DIRECT EXAMINATION
14 BY MR. DAVIS:
15   Q.   Dr. Westerman, could you please state
16 your entire name?
17   A.   Wayne Carl Westerman.
18   Q.   And you have in front of you a witness
19 binder.  Could you turn to the first exhibit?
20 It is marked as CX-208C.  It is entitled the
21 witness statement of Wayne Westerman.  Let me
22 know when you find that.
23   A.   Yes.
24   Q.   And if you can look through that.  Is
25 that the witness statement that you submitted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 289

1  in connection with this investigation?
2      A.   Yes.
3      Q.   And if you could turn to page 10.  Is
4  that your signature that appears there?
5      A.   Yes.
6      Q.   Okay.  And does this witness statement
7  contain your answers to the questions that are
8  set forth therein?
9      A.   Yes.
10         MR. DAVIS:  Your Honor, we turn the
11  witness over for cross.
12         MR. NELSON:  Thank you, Your Honor.
13             CROSS-EXAMINATION
14  BY MR. NELSON:
15     Q.   I think I have some material to pass
16  out here.  Good afternoon.
17     A.   Good afternoon.
18     Q.   I am Dave Nelson.  I don't think we
19  have met before, but I am going to ask you some
20  questions, all right?
21     A.   Okay.
22     Q.   Good.  Let's put JX-3 up here.  Now,
23  JX-3, a patent entitled ellipse fitting for
24  multi-touch surfaces, 7,818,828.  Do you see
25  that?

Page 290

1      A.   Yes.
2      Q.   You are a named inventor on this
3  patent, correct?
4      A.   That's correct.
5      Q.   And you have one other joint inventor
6  on that; is that right?
7      A.   That's right.
8      Q.   And what is that gentleman's name?
9      A.   John G. Elias.
10     Q.   Elias, okay.  Now, the subject matter
11  of the '828 patent, that came out of some work
12  you were doing in connection with the
13  dissertation that you were doing at the
14  University of Delaware, right?
15     A.   That's correct.
16     Q.   And that was work you were doing along
17  with Mr. Elias, correct?
18     A.   Yes.
19     Q.   Now, you were involved in drafting a
20  patent application, weren't you, in connection
21  with work that was done with that dissertation?
22     A.   Yes.
23     Q.   Did you actually work on drafting the
24  application?
25     A.   I did.  I wrote it, most of it and

Page 291

1  then the university brought in a patent lawyer
2  to help review and amend it.
3      Q.   But you did the initial draft of that
4  application?
5      A.   Yes.
6      Q.   And as you said you reviewed that and
7  reviewed it before it was filed, correct?
8      A.   Yes.
9      Q.   Okay.  So there were several patents,
10  I think, that you received where you were a
11  named inventor that issued from that
12  application, right?
13     A.   Yes.
14     Q.   And one of those was what I will call
15  the '828 patent, JX-3 in the case.  Is that
16  right?
17     A.   Right.
18     Q.   So that -- this '828 patent here,
19  JX-3, that came from that original application
20  that you drafted which came from work that you
21  did in connection with your dissertation at the
22  University of Delaware, right?
23     A.   Correct.
24     Q.   Okay.  Now, the actual '828 patent,
25  though, that we have up here, JX-3, that didn't

Page 292

1  issue until much later, correct?
2      A.   Correct.
3      Q.   When I say much later, I mean much
4  later than when you filed that original
5  application, right?  You have to give audible
6  answers.
7      A.   Yes.
8      Q.   Okay.  So and, in fact, the '828
9  patent, that issued sometime after you joined
10  Apple, right?
11     A.   Yes.
12     Q.   And you joined Apple, I think you said
13  in your direct witness statement at the same
14  time that Apple acquired a company that you had
15  founded previously; is that correct?
16     A.   Yes.
17     Q.   And that company was FingerWorks; is
18  that right?
19     A.   Yes.
20     Q.   FingerWorks was a company that you
21  founded, I think you said maybe around 1999; is
22  that right?
23     A.   Yes.
24     Q.   Okay.  And that was along with
25  Mr. Elias; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 293

1    A.   Elias.
2    Q.   Excuse me, Mr. Elias.
3    A.   Yes.
4    Q.   Now, when Apple bought your company,
5  they also bought your patent applications; is
6  that right?
7    A.   They bought it from the University.
8  They bought the -- the University was the
9  original assignee of this line of patent
10  applications.
11    Q.   The University of Delaware was the
12  original assignee of the patent applications?
13    A.   Of this -- of this family or line of
14  patent applications.
15    Q.   And when you say this family or line,
16  you're talking about the line that the '828
17  arose from; is that right?
18    A.   Yes.
19    Q.   So then at the time Apple bought your
20  company FingerWorks, right?
21    A.   Yes.
22    Q.   That was 2005; is that correct?
23    A.   Yes.
24    Q.   What month in 2005?
25    A.   February.

Page 294

1    Q.   February of 2005.  So when Apple
2  bought your company, FingerWorks, in 2005,
3  FingerWorks didn't own the applications and
4  patents that were in the line that led to the
5  '828?
6    A.   No, FingerWorks had a license to them,
7  an exclusive -- I believe it was an exclusive
8  license of some sort.
9    Q.   So FingerWorks -- that's your company,
10  right?
11    A.   Um-hum.
12    Q.   Had a license to the patents that had
13  issued from the application that you originally
14  filed based upon the work that you did in your
15  dissertation, correct?
16    A.   Yes.
17    Q.   But the University of Delaware owned
18  that application and all the patents that arose
19  from that, correct?
20    A.   Yes.
21    Q.   And that was true as of February of
22  2005 when Apple purchased FingerWorks?
23    A.   Yes.
24    Q.   So let's just talk a little bit about
25  the '828 patent.  Now, you said there was a

Page 295

1  number of patents that issued from that
2  original application that you filed, correct?
3    A.   Yes.
4    Q.   And do you know about how many?
5    A.   I think someone mentioned the other
6  day it was like 25.  I don't know.  A year ago
7  it was like 12.  I don't know what the current
8  number is.
9    Q.   Okay.  You are not sure.
10    A.   Yeah, it was a very long application.
11    Q.   But the '828 patent, you agree that
12  primarily concerns mathematical fitting of
13  ellipses to pixel groups that are received from
14  a touch sensing device; is that a fair
15  characterization?
16    A.   Yeah, that's a fair characterization
17  of the claims.
18    Q.   Okay.  Of the claims of the '828
19  patent?
20    A.   Yeah.
21    Q.   Okay.  So let's talk a little bit
22  about this elliptical fitting.  The primary
23  reason that you wanted to do this elliptical
24  fitting was so that you could distinguish one
25  hand part from another on a touch device; is

Page 296

1  that right?
2    A.   I'd say that's the primary reason.  It
3  is not the only reason.
4    Q.   But that is the primary reason?
5    A.   Yeah.
6    Q.   So let's look at this dissertation.
7  Can we put up -- well, it is JX-291.  You have
8  it in the book if you want to look at the
9  original.  Sometimes that is easier than the
10  screen.
11    A.   Okay.
12    Q.   Let's put up RDX-18.002.  I have some
13  excerpts from here.
14        So this excerpt that I have on
15  RDX-18-002 is from your dissertation at page
16  19.  So here you say, "nevertheless,
17  distinguishing palm contacts from finger
18  contacts on a large MTS is imperative for the
19  motion recognition algorithms to ignore palm
20  motions and allow palms to rest on the
21  surface."
22        Do you see that?
23    A.   Yes.
24    Q.   So, first of all, MTS, is that
25  multi-touch surface?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 297

1    A.   Yes.
2    Q.   And so is that, that idea expressing
3  this concept that we just talked about, the
4  idea of being able to distinguish one hand part
5  from another?
6    A.   That's one example, yes.
7    Q.   Okay.  And, similarly, down here at
8  the bottom, I have this sentence highlighted,
9  "identifying the thumb and maintaining a
10 consistent order for other finger contacts also
11 aids extraction of hand motion parameters."
12       Is that, again, that idea of being
13 able to recognize me --
14   A.   That's one example.
15   Q.   We have to get a little rhythm here.
16 So I know that sometimes it doesn't seem like I
17 am done with -- or it seems like I am done, but
18 it takes me a little while sometimes.  I
19 apologize.  So let me start that over.
20       So this last sentence here identifying
21 thumb and finger contacts, that's, again, this
22 notion of being able to distinguish one hand
23 part from another, correct?
24   A.   That's another example, yes.
25   Q.   And if we look at page 84 now, it is

Page 298

1  on the next slide, RDX-18.3, here it says,
2  "while the user will not vary contact shape or
3  orientation intentionally, such parameters will
4  assist finger and hand identification in
5  chapter 4."
6        Do you see that?
7    A.   Yes.
8    Q.   Now, if you look -- and why don't we
9  put up the JX-291 at page 84 here.
10       So page 84 of your JX-291, this is
11 your dissertation, correct?
12   A.   Yes.
13   Q.   And this is in the ellipse fitting
14 section.  So that sentence that I just pulled
15 out, if I look at it again, we can highlight it
16 here, Ryan.  That's fine.
17       "While the user typically will not
18 vary contact shape or orientation
19 intentionally, such parameters will assist
20 finger and hand identification in chapter 4."
21 So are the parameters that you are referring to
22 there that are generated from
23 the ellipse fitting procedure?
24   A.   Yes, contact shape and orientation
25 generally, yes.

Page 299

1    Q.   So that, again, that's consistent with
2  this idea that you talked about that you wanted
3  to be able to precisely fit ellipses to the
4  pixel group so you could identify one finger
5  from another, right?
6    A.   Right, but elsewhere, I do --
7  somewhere in the patent and the dissertation, I
8  do, you know, mention the possibility of
9  actually controlling something with the
10 rotation of your thumb or the orientation of
11 your thumb.
12   Q.   Right.  And that would be another
13 thing that you might want to do, recognize
14 exactly how the thumb is oriented and fitting
15 this ellipse precisely to that thumb touch
16 would help you do that, right?  We've got to
17 get your audible answer.
18   A.   Yes.
19   Q.   Okay.  Thank you.
20       So let me go to RDX-4 now.  So this is
21 from your dissertation now into chapter 4 that
22 we just saw referred to on the previous page
23 that we looked at, page 84.  This is now at
24 page 116 of your dissertation.
25       Here you say, "if the MTS" -- again,

Page 300

1  the multi-touch surface -- "was only to be used
2  for typing, trying to identify each surface
3  contact might not be worthwhile because key
4  taps should be distinguished by their spatial
5  location, not which finger strikes the key."
6        Do you see that?
7    A.   Yes.
8    Q.   So there, the idea, what you are
9  saying at least in the dissertation is if all
10 you are trying to do is detect key taps, then
11 you don't necessarily need to be able to
12 distinguish one finger from another, correct?
13   A.   Yeah.  I think you should keep in mind
14 I am talking specifically there about fingers,
15 and I don't think I would have said the same
16 thing about palms because if a palm tapped a
17 key, you would want to ignore it, right?  But
18 maybe it doesn't matter whether it is the index
19 finger or the middle finger for typing.
20   Q.   Right.  You don't need to know which
21 specific one, just generate the key taps.
22       Now, with the palm, there are ways you
23 can detect the palm without knowing it as the
24 palm, correct?  Meaning it is a fairly large
25 contact area, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 301

1    A.   Well, that's another big topic of the
2   dissertation.  I wouldn't simply -- want to
3   oversimplify that, yeah, there is a lot of --
4   generally, for detecting palms, you need -- you
5   often need multiple clues at once, but that's
6   one of them, is the large size, yes.
7    Q.   Okay.  So then here, the next
8   sentence, you say, "but recognition of the
9   rich, bimanual chordic manipulations
10  demonstrated in chapter 5, demands reliable
11  clustering of surface contacts with their
12  originating hand as well as reliable finger
13  ordering and thumb identification within each
14  hand."
15       Do you see that?
16   A.   Yes.
17   Q.   So the idea was that you wanted to be
18  able to precisely detect which finger was
19  touching the screen, multiple fingers touching
20  the screen, the orientation of those fingers so
21  that you could implement these bimanual chordic
22  manipulations, right?
23   A.   Yes, that was an important objective,
24  but I believe all along at the same time I was
25  -- another, as I say, another big part of doing

Page 302

1   a good multi-touch system is ignoring things
2   such as palms.
3        And so it is not just identifying the
4   fingers.  It is identifying palms and other
5   instances where you want to -- fingers are
6   applied and situations where you want to ignore
7   contacts and reject them also.
8    Q.   Sorry.  I didn't mean to talk over
9   you.  Are you done?
10   A.   Um-hum.
11   Q.   So then what you are saying is what
12  you wanted to be able to do was precisely
13  identify fingers, hand parts, some of which you
14  want to know their orientation and which finger
15  it is, others you want to ignore, correct?
16   A.   Um-hum, yes.
17   Q.   Okay.  And the way that you are able
18  to distinguish these hand parts from one
19  another -- let me start over.
20       In order to be able to do that, what
21  you did was invented a very precise way to do
22  the measurements of touch data and help the
23  multi-touch system tell you useful things about
24  those touches, right?
25   A.   Yeah, it is a combination -- I did

Page 303

1   measurements of the shape and orientation of
2   individual touches and then another part of the
3   dissertation is the overall arrangement of the
4   touches relative to one another.  That is sort
5   of the inter-touch geometry is also -- also
6   provides important clues.
7    Q.   And at least part of that precise way
8   to do this detection was this ellipse fitting
9   procedure that we looked at in section 3,
10  starts at around page 84 of your dissertation,
11  correct?
12   A.   Yes.
13   Q.   Okay.  And now in order for this
14  ellipse fitting procedure to be useful and
15  detect these various things, these precise
16  touches and what part it is and what the
17  orientation of the finger was, it needed to be
18  precise, correct?
19   A.   Yes.
20   Q.   And if we look back at the
21  dissertation at page 84, this would be JX-291,
22  and let's just put it up there, no, page 84,
23  you had it right.  Okay, good.
24       So on page 84 here in the
25  dissertation, this is the precise ellipse

Page 304

1   fitting procedure that you described, correct?
2    A.   I believe it continues on to the next
3   page.
4    Q.   Okay.  It continues on to the next
5   page.
6    A.   To the end of that section, including
7   the paragraph after equation 320.
8    Q.   Yeah, okay.  So we will talk about
9   that in a minute.  Let me go back up to the
10  beginning of this.
11       So you say at the very end of that
12  first paragraph in this ellipse fitting
13  section, "the ellipse fitting procedure
14  requires a unitary transformation of the group
15  covariance matrix Gcov of second moments Gxx,
16  Gxy, and Gyy, correct?
17   A.   That's what I say, yes.
18   Q.   So that's the precise ellipse fitting
19  procedure that you were describing, correct?
20   A.   Well, that's just the first step.
21  Unitary transformation means a rotation of the
22  coordinate system of the matrix.
23   Q.   Then the rest of the steps are found
24  from 3.12 down to 3.18?
25   A.   Yeah, once you find the Eigenvalues

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 305

1   and Eigenvectors covariance matrix, which are
2   part of doing a unitary transformation off of
3   that -- the axis where the data is spread out
4   the most, it would be like the long axis for
5   thumb, the long axis, you rotate your
6   coordinate system to there, and that procedure
7   leads to Eigenvalues and Eigenvectors.
8   Equations 316 through 318, I show how to get
9   major radius, minor radius and orientation from
10  those Eigenvalues.
11      Q.   And those equations then will give you
12  the parameters of the ellipse that you are
13  trying to fit to the touch data, correct?
14      A.   Yes, in this case.
15      Q.   Now, let's go to JX-3.  Column 26,
16  Ryan, of JX-3.  And let's pull that out a
17  little bit.  Yeah, start with the since --
18  about line 18, 17.  Can you get the last three
19  equations in there?
20          So then here in column 26 of the
21  patent, this is from the application that you
22  drafted, correct?
23      A.   Yes.
24      Q.   And the portion that's here, is that
25  part of the application that you drafted?

Page 306

1       A.   Yes.
2       Q.   So again, it says, the ellipse fitting
3   procedure requires a unitary transformation of
4   the group covariance matrix G -- where it says
5   sub eov.  Should that be sub cov?
6       A.   It should.
7       Q.   Of second moments Qxx, Qxy, Gyy?
8       A.   That should be Gxx, Gxy, Gyy.
9       Q.   So that shouldn't be a Q, that should
10  be a G, and that should be a G (indicating)?
11      A.   Yes, apparently there was clerical
12  error during one of the many, I guess,
13  retypings of later versions of the patent.
14      Q.   But then the equations that are shown
15  here in order to generate the ellipse
16  parameters, those are the same equations that
17  we just looked at from your dissertation,
18  correct?
19      A.   Yes.
20      Q.   So let's step back through an example.
21  Now we need to go up to the top of column 26.
22  You can blow up all of 26 down to the arc
23  tangent equation we were just looking at.
24          Now let's take an example where you
25  have the pixel group that you want to fit an

Page 307

1   ellipse to.  So you have that data.  We have
2   the equations up here, Gz and there is a
3   summation of all Ez's, do you see that?
4       A.   Yes.
5       Q.   I think in the patent it refers to
6   this Gz as the group proximity value; is that
7   right?
8       A.   Yes.
9       Q.   And essentially that's just an
10  addition of all the points and the value of how
11  close the touch object is to the touch sensor,
12  correct?
13      A.   Yeah, it is a sum of the sensor
14  readings at each pixel in that group of pixels.
15      Q.   Right.  So you just add them all up?
16      A.   Yeah.
17      Q.   Basically is what you are doing.  Now,
18  this next one, we have Gx.  And we have another
19  summation of Ez times Ex divided by that group
20  proximity value, correct?
21      A.   Right.
22      Q.   So basically -- and let me see if I
23  get this right -- what you are doing is you are
24  going through in the X direction, meaning let's
25  just say X is horizontal and Y is vertical.

Page 308

1   And I take my sense data and I sum up a row of
2   that X data and I multiply the X, that
3   coordinate value, that X value by the proximity
4   value for that pixel and I get a product,
5   correct?
6       A.   Right.
7       Q.   It gives me a number?
8       A.   Yeah.
9       Q.   And then I divide that by the total
10  group proximity, right?
11      A.   Yes.
12      Q.   So essentially what is going on here
13  is that at least for Gx, I am finding a
14  weighted average of the proximity of that touch
15  data, correct?
16      A.   Right.
17      Q.   So it kind of tells me in the X
18  direction, where is the center of that
19  pressure, essentially?
20      A.   Right.
21      Q.   That's a fair characterization?
22      A.   Yeah.  For -- it is sort of analogous
23  to center of -- well, what lay people would
24  hear of as center of mass, what is the center
25  of mass of something.  It is not mass, of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 309

1   course, it is the touch proximity.
2       Q.   Right.  Basically how close the object
3   is and that kind of equates to a pressure,
4   right, is the idea?  Is that fair?
5       A.   I don't know if it -- it equates -- it
6   is being the center of something, not whether
7   it is the pressure, but it is the average
8   center, center averaged over the object.
9       Q.   The center of the average of how close
10  the touch object is to the sensor in the X
11  direction, correct?
12      A.   Okay.
13      Q.   Okay.  And so then we have got the
14  next equation here, 14, we have got Gy, and
15  then I have a similar equation here, but this
16  sums the product of Ez times Ey instead of Ex
17  and then divides it by that group proximity
18  value, right?
19      A.   Yes.
20      Q.   So that's doing exactly the same thing
21  but now in the Y direction, in the vertical
22  direction, correct?
23      A.   Yes.
24      Q.   So then basically what you get from
25  this, I think you described, is the center of

Page 310

1   mass or the center of proximity, let's say, you
2   get a center of proximity for your touch data,
3   correct?
4       A.   Yes.
5       Q.   In an X/Y coordinate system, correct?
6       A.   Yes.
7       Q.   All right.  So then I take that
8   information, that information being those X/Y
9   coordinates that I just generated, and now I
10  need to generate these second moments, correct?
11      A.   Yeah.  The centroid is sometimes
12  called the first moment.  So next we do the
13  second moments.
14      Q.   Okay.  And with those second moments,
15  can you tell us in some lay terms essentially
16  what those second moments are?
17      A.   Second moments are -- in statistics,
18  they are kind of like -- they end up being sort
19  of the spread, like if you have a statistical
20  distribution like a bell curve, and your
21  centroid is the center of the peak in the bell
22  curve, and the second moment is going to tell
23  you about how wide it is, the spread of it, and
24  they also could -- you might know them as
25  standard deviation or variants.

Page 311

1       Q.   So then essentially what you are
2   getting here is a spread in the X direction off
3   the center, a spread in the Y direction off the
4   center, and then this, I think you said it
5   would be Gxy, would be kind of a spread along
6   the diagonal off the center, correct?
7       A.   Something like that, yes.
8       Q.   Okay.  And that's going to give me the
9   second moments that I am going to use in my
10  covariance matrix, correct?
11      A.   Yes.
12      Q.   But so far the only thing I have found
13  -- from going through the equations, the only
14  thing I found in terms of anything I am going
15  to use for ellipse parameters is that center,
16  correct?
17      A.   Well, the center, and I would also say
18  where we started equation 12, the total signal
19  that's also a very important parameter to
20  characterize the touch.
21      Q.   It tells you how close the touch is?
22      A.   How strong it is.  It also tells you
23  -- it is a mix of how close it is and how big
24  it is, how much area it has.  It is really kind
25  of both.

Page 312

1       Q.   Is what you are saying is you sum it
2   up over all the pixels, so if I have a wide
3   touch that might not be so close, I will
4   generate a value, but if I have a more narrow
5   touch, so to speak, or smaller more pointed
6   touch, that's very close, that will generate
7   another value, correct?
8       A.   Yeah.
9       Q.   But in that example, those two values
10  could be pretty similar, couldn't they?
11      A.   They could, but oftentimes in practice
12  you find that the large object -- I mean,
13  theoretically they could be, but in practice
14  you could often neglect that, you know, for
15  palms or something that are really large.
16          I mean, they are just -- even if they
17  are not real close, they are still going to
18  have a huge signal compared to a finger, or
19  tend to.
20      Q.   Okay.  So then after I have generated
21  the second moments, what I end up doing is
22  finding the first and second Eigenvalues of
23  that covariance values, correct?
24      A.   Yes.
25      Q.   We're going to spare everybody.  We're

APLNDC-X0000006223

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 313

1    not going to go ahead and explain what those
2    Eigenvalues are, okay?
3        A.   Okay.
4        Q.   Fair?
5        A.   Yes.
6        Q.   Let's just assume that they are
7    generated now, first one, second one, and those
8    are going to give me essentially the square of
9    the major and minor axes of the ellipse,
10   correct?
11       A.   Yes.
12       Q.   And then finally, this last one is
13   orientation, correct?  I am figuring out the
14   orientation G sub theta; is that right?
15       A.   Yes.
16       Q.   Theta, that's this little Greek letter
17   here?
18       A.   Right.
19       Q.   Some engineers, mathematicians like to
20   use that to denote angles, correct?
21       A.   Yeah.
22       Q.   Okay.  Now what I am doing is I am
23   taking the arc tangent of the first Eigenvalue
24   less the spread in the X direction divided by
25   the diagonal spread, correct?

Page 314

1        A.   Yes.
2        Q.   And that will give me an angle that
3    tells me how that ellipse that I am trying to
4    fit is oriented, correct?
5        A.   Yes.
6        Q.   And when I say oriented, I am talking
7    about with respect to my X/Y axis that we
8    started with, correct?
9        A.   Yes.
10       Q.   So then from that process, I have now
11   generated the X position of the center,
12   correct?
13       A.   Yes.
14       Q.   That's here in 13.  I have generated
15   the Y position of the center, correct?
16       A.   Yes.
17       Q.   I have generated the major axis of my
18   ellipse, correct, in equation 19?
19       A.   Yes.
20       Q.   I have generated a minor axis in
21   equation 20, correct?
22       A.   Yes.
23       Q.   And I have generated the orientation
24   in equation 21, correct?
25       A.   Yes.

Page 315

1        Q.   So those that I just went through,
2    those would be the five degrees of freedom, so
3    to speak, of an ellipse, right?
4        A.   Yes.
5        Q.   Basically, the five parameters that
6    you need to specify to specify an ellipse,
7    correct?
8        A.   Yes, for an arbitrary ellipse, yes.
9        Q.   By arbitrary, you could always have
10   special cases where you already know
11   information beforehand, but assuming I don't
12   know information beforehand, I don't know where
13   the touch is going to be, then I need those
14   five parameters, correct?
15       A.   Yes.
16       Q.   Now, you agree to mathematically fit
17   an ellipse, you need to calculate the
18   parameters that describe the ellipse, correct?
19       A.   Yes.  You need -- you need to
20   calculate parameters for an ellipse.
21       Q.   And you also agree that fitting an
22   ellipse to a pixel group would not include
23   obtaining, simply obtaining measured data from
24   an object that is in general ellipse-like,
25   correct?

Page 316

1        A.   Well, I would say it wouldn't include
2    just, you know, copying measure -- I think the
3    confusion and the words can come there is are
4    you talking about measuring kind of in the Z
5    axis in the pixel strength, if you are just
6    copying a group of pixels that happen to have
7    an ellipse shape and you aren't measuring the
8    spread, the spatial extent of them, then you
9    aren't fitting an ellipse.  You are just making
10   a copy of an image of pixels, right?
11            Is that clear?
12       Q.   Yeah, yeah, no, I understand what you
13   are saying.  So, I mean, essentially what you
14   are saying is you can't simply copy the data,
15   you have to figure out these statistical
16   spreads that we talked about so that you can
17   actually fit an ellipse to that data as well?
18       A.   Well, you have got to -- you have got
19   to figure out the spread somehow.  You have to
20   make some sort of spatial measurement on it.
21       Q.   And we talked a little bit before
22   about, just a minute ago, about these five
23   parameters to specify an ellipse, right?
24       A.   Yeah.
25       Q.   An arbitrary ellipse, I think you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 317

1  called it.  So the X position to Y position,
2  the length of the major axis, the length of the
3  minor axis, and the orientation, right?
4      A.   Yeah.
5      Q.   But in addition to that, even if I
6  know all five of those things, I have to know
7  that I am also fitting an ellipse to those five
8  things, correct?
9      A.   Well, hold on.  What is -- I have to
10  know it for what?  What was the question?
11      Q.   Because I could take those five
12  parameters I just described and I could draw a
13  rectangle, too, right?
14      A.   Yeah, I mean, you can always take --
15  circumscribe a circle or a rectangle with an
16  ellipse, and -- and I think the measurements
17  you may do might really be the same in both
18  cases, depending on what your source data looks
19  like, you would do the same thing, and I think
20  the result would seem to be kind of equivalent.
21  To me, regardless of the objective, if it was
22  the same process, I don't know.
23      Q.   Okay.  I am just trying to -- I mean,
24  the idea is even if I have all those five
25  things, in order to fit an ellipse, as opposed

Page 318

1  to one of these other things, I need to know
2  that I am fitting an ellipse, correct?
3      A.   No, I am not sure I agree with that
4  exactly.
5      Q.   Okay.  Let me turn back to your time
6  with FingerWorks.
7      A.   Okay.
8      Q.   So FingerWorks, you start that in
9  about 1999, correct?
10      A.   Yes.
11      Q.   And that was after, shortly after you
12  completed your Ph.D.; is that right?
13      A.   Yes.
14      Q.   And the Ph.D. dissertation is shown in
15  JX-291, that we have been talking about
16  earlier, correct?
17      A.   Yes.
18      Q.   If we just go to the first page of
19  that, because I don't think we showed the first
20  page yet, that's this title hand tracking,
21  finger identification, and chordic manipulation
22  on a multi-touch surface, right?
23      A.   Yes.
24      Q.   Now, I think you said FingerWorks, you
25  sold that to Apple in 2005, February of 2005,

Page 319

1  correct?
2      A.   Yes.
3      Q.   And in between that 1999 and 2005, you
4  were trying to make products, trying to license
5  technology, those kinds of things?
6      A.   Yes, we started shipping our own large
7  touch pads and keyboards in the late fall of
8  2000 and then throughout that period, we were
9  trying to attract interest from, you know, some
10  of the larger computer companies.
11      Q.   And those larger computer companies
12  included Apple and Microsoft, some companies
13  like that?
14      A.   Yes.
15      Q.   Any others that you remember?
16      A.   Compaq, IBM, Toshiba, probably
17  Hewlett-Packard.  I'm not sure about
18  Hewlett-Packard.
19      Q.   So what was your title at FingerWorks
20  while you were there?
21      A.   I had a couple.  For a while I was
22  chief technology officer, I think.  I think I
23  changed it.  I don't remember what it changed
24  to.
25      Q.   But you were essentially in charge of

Page 320

1  the technology, at the head of the technology
2  development; is that correct?
3      A.   I was in charge of the software and
4  firmware side of the technology.
5      Q.   Software and firmware -- I'm sorry,
6  are you done?  Yeah, the software and firmware
7  algorithms?
8      A.   (Witness nods.)
9      Q.   You need to give an audible answer.
10      A.   Yes.
11      Q.   So then Mr. Elias, did I get that
12  right this time?
13      A.   Yes, Elias.
14      Q.   What was his position at FingerWorks?
15      A.   For most of the time, he was the CEO.
16  But he also was kind of the chief hardware
17  designer.
18      Q.   And you said for most of the time, he
19  was the CEO.  Was there a point in time where
20  FingerWorks had another CEO?
21      A.   Yeah.  And in 2004, we hired Jeff
22  White as CEO, who was -- had been an executive
23  at Hewlett-Packard.
24      Q.   Do you remember when in 2004 Mr. White
25  started?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 321

1    A.   Early summer, I think.
2    Q.   So then I think one of the things you
3  said that you were doing at FingerWorks between
4  1999 and 2004 was designing touch sensors,
5  correct?
6    A.   Yes.
7    Q.   And you were out trying to sell those
8  touch sensors to some of the major computer
9  manufacturers, correct?
10   A.   Yes.
11   Q.   Okay.  And were you also trying to
12 license your technology to those major computer
13 manufacturers, separate and apart from selling
14 them products?
15   A.   Yes.
16   Q.   And one of the companies that you were
17 trying to license your technology to was Apple;
18 is that right?
19   A.   Yes.
20   Q.   And did you also try to sell Apple
21 touch sensor products?
22   A.   Yes.  You mean -- I mean, what do you
23 mean by touch sensor product?
24   Q.   Meaning that your products, the ones
25 that FingerWorks had that says you can buy a

Page 322

1  touch sensor from me as opposed to saying you
2  can license my designs?
3    A.   Well, we were trying to license.  We
4  had a touch sensor chip that we were trying to
5  license to them.
6    Q.   A test center chip?
7    A.   A capacitive sensor, a computer -- a
8  little sensor chip.
9    Q.   Like a touch controller is what you
10 are saying?
11   A.   It was a little chip that helped you
12 build devices to do touch sensing, but it was
13 just --
14   Q.   Okay.  Now, Apple did initially
15 license your technology from FingerWorks,
16 correct?
17   A.   Yeah, they were -- I mean, I don't
18 remember exactly how far -- I mean, that was --
19 they did license it, but before, I think, the
20 license was actualized, I think they ended up
21 purchasing us before they actually made
22 payments or shipped product under it.  I don't
23 know exactly what stage the process was
24 interrupted by the acquisition.
25   Q.   But there was some license executed

Page 323

1  that you recall?
2    A.   I think so.
3    Q.   And that license, the dollar value was
4  pennies per unit, is that about right?  Is that
5  consistent with your recollection?
6    A.   Yeah, because it was only for this
7  chip.  It was really certainly not a license
8  for our whole technology.
9    Q.   Okay.  It wasn't a license for the
10 whole technology.  What is the distinction that
11 you are drawing?
12   A.   Well, I guess that's hard to -- I
13 mean, the whole technology, you know, could
14 include all the software we developed and
15 system and this is for a chip that could be,
16 you know, used to do something as simple as
17 like, you know, a single finger touch sensor.
18        So I just say it was a small subset of
19 the technology.
20   Q.   Now, during the time that you were at
21 FingerWorks, between this 1999 and 2005 time
22 frame, did you have competitors in the touch
23 sensor technology that you were developing?
24   A.   Well, I guess, you know, there are
25 competitors in low-level touch sensors.  We

Page 324

1  didn't really have competitors for the type of
2  large -- the multi-touch surfaces.  I really
3  can't think of any competitors in multi-touch
4  -- in large multi-touch surfaces.
5    Q.   How about in touch sensor development
6  generally, do you recall any?
7    A.   Yeah, there were the existing small
8  like laptop track pad manufacturers that make
9  the little tiny track pads that Apple -- Apple
10 had been shipping those on their laptops since
11 the '90s.
12   Q.   Do you recall who any of those
13 companies were?
14   A.   Cirque, Synaptics, Alps or something.
15   Q.   Do you recall a company named Quantum
16 Research?
17   A.   I don't believe I was aware of them at
18 the time.
19   Q.   But since?
20   A.   Yes.
21   Q.   I think you said a moment ago when I
22 asked you about the license with Apple for the
23 touch sensor technology, that Apple only
24 licensed a small piece; is that right?
25   A.   I assume.  It seems like it would have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1  been -- I wasn't in charge of licensing, but it
2  seems like it would have been bad business
3  practice to sign away everything at once if all
4  they wanted was a simple sensor chip.
5      Q.   What was that name that you mentioned?
6  You just mentioned a name.
7      A.   No, I didn't.
8      Q.   I thought you said it would have been
9  somebody's practice.
10     A.   I said it would have been bad
11 business.
12     Q.   Oh, bad business.  It would have been
13 bad business.  Do you know who would have been
14 responsible at that time for deciding the
15 license to Apple?
16     A.   Jeff White probably.
17     Q.   Jeff White would have been involved.
18 Can we look at RDX-10.  Here is an e-mail from
19 Jeff White to Michael Clerkin.  Do you know who
20 Michael Clerkin was?
21     A.   Yeah, he was probably -- he was with
22 the intellectual property office at University
23 of Delaware.  He may have been their lawyer or
24 something.  I don't remember his exact
25 position.

Page 326

1      Q.   But you are generally familiar with
2  him as being in the IP department at the
3  University of Delaware, right?
4      A.   Yeah.
5      Q.   And the subject here is patent
6  assignment proposal.  Do you see that?
7      A.   Yes.
8      Q.   Were you involved in the 2004 time
9  frame in patent assignment discussions with the
10 University of Delaware?
11     A.   No, I was not involved in those
12 discussions.
13     Q.   So I have a line here in this
14 highlight and we will see if it refreshes your
15 recollection about anything.  It says first,
16 "the big opportunities with the large producers
17 of notebook PCs and mice only want to license
18 the technology as Apple has done and will only
19 pay literally pennies per unit with no
20 long-term commitment."  Do you see that?
21     MR. DAVIS:  Objection, Your Honor,
22 lacks foundation.  The witness just indicated
23 he wasn't involved.
24     JUDGE ESSEX:  When you object, could
25 you turn your microphone on?

Page 327

1      MR. DAVIS:  I did, Your Honor.  I must
2  have been too far away when I stood up.
3      JUDGE ESSEX:  Well, I will let you try
4  to lay a foundation, Mr. Nelson, if you want
5  to.
6      MR. NELSON:  Well, what I had asked
7  him is whether this refreshes his recollection.
8  See, he has in his witness statement, Your
9  Honor, a number of questions and answers about
10 secondary consideration and the value of the
11 technology.  And here is something that
12 contradicts that to a certain degree.  And all
13 I am doing is showing it to him to see if that
14 refreshes his recollection on anything, Your
15 Honor.
16     JUDGE ESSEX:  Doctor, does this
17 refresh your recollection, having looked at it?
18     THE WITNESS:  Well, I wouldn't say
19 that it -- I mean, it doesn't -- I mean, I
20 don't recall this e-mail.  I think John Elias
21 and I recused ourselves from the licensing
22 negotiations with the University at this point
23 because we were -- were at the time or had been
24 employees of the University and so we let Jeff
25 White handle that.

Page 328

1      I guess, you know, the comment I would
2  make is, again, this is -- this is a big
3  difference from licensing the simple capacitive
4  sensor that could be made to create simple
5  sensors or the tiny track pads which existed at
6  the time, which is what, I think, Jeff might be
7  referring to here is that's what they had
8  licensed at the time versus licensing the more
9  rich and broad multi-touch, large multi-touch
10 surface technologies, which were so far ahead
11 at the time that these manufacturers really
12 weren't even considering them yet.
13 BY MR. NELSON:
14     Q.   But to your recollection, Jeff White,
15 who was the CEO of FingerWorks at the time, was
16 the person that was responsible for the
17 licensing discussions with Apple, correct?
18     A.   Yes, and the University.
19     Q.   So just one more slide, RDX -- well,
20 before I go there, so I talked a little bit
21 about competitors out there.  Generally
22 speaking, you said you were aware of certain
23 people that at least had touch sensing devices
24 out there, correct?
25     A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 329

1    Q.   Now, do you have any idea whether
2  FingerWorks had ever looked at whether those
3  other touch sensing devices were implementing
4  FingerWorks' technology?
5    A.   Had we -- we hadn't -- I mean, are you
6  asking did we do teardowns?  Did we do, you
7  know -- we were very small, we didn't -- we
8  were focused on the development of our own
9  products and we didn't have the resources to
10 kind of do that kind of competitive analysis.
11   Q.   Were you aware there was at least some
12 competitive analysis done?
13   A.   I can't -- I will have to think about
14 that a moment.  I can't think of any right now.
15   Q.   Let me show you one more thing to see
16 if this refreshes your recollection on this
17 point.  Go to RDX-18.011.  Here it says, "there
18 are two competing technologies that are very
19 different technical implementations with
20 seemingly no infringement, yet they deliver
21 similar attributes to the end users as far as
22 multi-touch devices are concerned.  Both are
23 being worked by giants in the industry."
24        Do you see that?
25   A.   Yeah, I have no idea what that's

Page 330

1  referring to.
2    Q.   You don't recall having any
3  discussions with Jeff White on the topic of
4  competitive analysis?
5    A.   No.
6    Q.   Okay.
7         MR. NELSON:  Thank you very much.  I
8  don't have any more questions right now, Your
9  Honor.
10        JUDGE ESSEX:  Thank you.
11        MS. KATTAN:  No cross-examination,
12 Your Honor.
13        JUDGE ESSEX:  Fine.
14             REDIRECT EXAMINATION
15 BY MR. DAVIS:
16   Q.   Dr. Westerman, could I ask you to turn
17 in your notebook to your thesis, JX-91.
18   A.   Yes.
19   Q.   Do you recall being asked questions
20 about this at the beginning of your
21 examination?
22   A.   Yes, I do.
23   Q.   Does your thesis describe fitting an
24 ellipse to a pixel group?
25   A.   Yes, I believe so.

Page 331

1    Q.   Can we -- and, indeed, counsel
2  directed your attention to the section entitled
3  3.2.8.2, ellipse fitting, correct?
4    A.   Yes.
5    Q.   And that was page 84 of your thesis --
6    A.   And 85.
7    Q.   And 85.  Starting at page 84, going on
8  to 85 with JX-291.114 to 115.  So how many ways
9  of fitting an ellipse are described in that
10 section?
11   A.   Well, there is two ways.  There is the
12 more involved statistical approach that we
13 stepped through on page 84.  And then on page
14 85, it talks about situations where --
15 basically where the pixel group isn't big
16 enough for those approaches to work as well,
17 and that might be when you have a very small
18 finger touch or a low resolution electrode
19 array.
20   Q.   Could you identify where in this
21 section of ellipse fitting in section 3.2.8.2
22 that that second approach is described?
23   A.   It is after equation 320, the
24 paragraph there, yes.
25   Q.   Could you describe how this method

Page 332

1  works?
2    A.   Well, it talks about what to do when
3  basically the finger gets too small or the
4  pixels too weak compared to the resolution of
5  your image.  And at this point, we don't want
6  things to just kind of -- well, we find it
7  advantageous to set some limits or defaults for
8  the ellipse parameters, so that we can report
9  consistent parameters always to other parts of
10 the system.
11        So, for example, if the contact is
12 very small, we can assume it is circular and
13 set the eccentricity to one and implicitly
14 since major radius and minor -- the ratio of
15 major to minor radius is eccentricity, then you
16 would set the major and minor radius equal to
17 like a lower limit default value or it is
18 suggested here you could also set them
19 proportional to your total group proximity Gz.
20   Q.   Okay.  And what kind of shape do you
21 get when you do that?
22   A.   You would get a circle.
23   Q.   Okay.  And is a circle a form of
24 ellipse?
25   A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 333

1    Q.    And why set a default value?  Why not
2  just not use any value for those particular
3  parameters?
4    A.    Well, you have to remember we're
5  building, you know, a multi-layered system.
6  And other parts of the system, maybe they are
7  trying to identify the fingers or whatever.  We
8  always kind of want to report good values or
9  within ranges that make sense, and sometimes
10 when you just take the textbook equations, and
11 your data is insufficient, those equations
12 produce values that don't make as much sense.
13         And so as a good engineer, you look --
14 you alter your method to take that into account
15 and try to produce values for the parameters
16 that make sense all the time, 100 percent of
17 the time.  And then that makes it easier to
18 engineer the rest of the system.
19    Q.   If you performed the second method
20 described in your thesis rather than the first
21 method, do you still get a circle or other form
22 of ellipse that is indicative of where the
23 touch event occurred?
24    A.    Yes, yes, you do.  You are still
25 getting contact size, you get a circle

Page 334

1  representative of like the smallest finger that
2  you are expecting from the system and you get a
3  fixed orientation.  Really for circles,
4  orientations don't matter but for other parts
5  of the system it is better to have that
6  orientation fixed vertical than to have it just
7  spinning around randomly.
8    Q.    Okay.  Could you -- I want to talk now
9  about your patent, the '828 that's at issue
10 here, which is JX-3.  Could you turn to figure
11 18?
12    A.    Figure 18?
13    Q.    Figure 18 of the patent, JX-3.  Let me
14 know when you have got it open.
15    A.    Okay.
16    Q.    Generally speaking, what does figure
17 18 show?
18    A.    Figure 18 shows the segmentation of
19 the whole proximity image into groups of
20 pixels.  And then in step 272, it shows fitting
21 ellipses to the pixel groups and the output of
22 a set of parameters for each pixel group.
23    Q.    Okay.  Let's turn now to the part of
24 the specification that talks about step 272,
25 which is fit ellipsis to combined groups.

Page 335

1          Could you turn to column 25 of the
2  patent.  Do you see starting around like 54
3  where it states, "the last step, 272, of the
4  segmentation process is to extract shape, size,
5  and position parameters from each of the
6  electrode -- from each electrode group."  Do
7  you see that?
8    A.    Yes, I see that.
9    Q.    For how long in the patent does the
10 description of step 272 go on for?
11    A.    It goes on through column 26 and the
12 first paragraph of column 27.
13    Q.    And let's talk about that top
14 paragraph of column 27, since the question
15 stopped with regard to the embodiments shown in
16 column 26.
17         Does -- what is the method that is
18 described here at the top of column 7?
19    A.    Well, there is is, in the first sentence,
20 it is talking about, again, using the total
21 proximity as an alternate indicator of contact
22 size rather than the fitted ellipse parameters,
23 which I'm kind of implicitly referring to the
24 minor radius and major radius, which are other
25 direct measures of the size.

Page 336

1          And then I talk about, again, for your
2  smaller contacts and in the situation where the
3  size of your pixel group to the size of the
4  finger is low, then we can set default values
5  for some of the ellipse parameters.
6    Q.    Okay.  And what kind of shape do you
7  get when you practice the methods shown at the
8  top of column 27?
9    A.    You would get a circle.
10    Q.    I'm sorry, go ahead.
11    A.    Assuming you -- I mean, in practice,
12 what we -- we would set eccentricity to, say,
13 one or a small value and then a major/minor
14 radius have to be set to be equal again.
15    Q.    Okay.  And does the method described
16 at the top of column 27 that we're looking at
17 now, does that require that a unitary
18 transformation of the covariance matrix be used
19 to set all the ellipse parameters?
20    A.    No, in this case, you are kind of
21 bypassing or overriding all of that and you
22 would most likely make this sort of alternate
23 determination based on the thresholding, the Gz
24 or maybe counting the number of pixels or
25 something in your contact, you would decide

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 337

1  whether to use this alternate method.
2     Q.   Okay.  I want to turn now to the
3  language that you were directed to on column
4  26, lines 18 or so where it says -- do you see
5  where it says the ellipse fitting procedure
6  requires a unitary transformation of the group
7  covariance matrix and it goes on?  Do you see
8  that sentence?
9     A.   Right.
10     Q.   All right.  If all you do is obtain a
11  unitary transformation of the group covariance
12  matrix, Geov of second moments Gxx, Gxy and
13  Gyy, do you -- would that by itself provide you
14  any parameters for an ellipse?
15     A.   No, not -- I mean, not by itself.
16  That just means rotating the coordinate space
17  of that matrix.
18     Q.   And can you turn to claim 3 of the
19  '828 patent, which should be column 60.
20     A.   Okay.
21     Q.   Do you see where it states, "the
22  method of claim 2 wherein the one or more
23  ellipse parameters is selected from the group
24  consisting of position, shape, size,
25  orientation, eccentricity, major radius, minor

Page 338

1  radius, and any combination thereof"?
2     A.   Yes.
3     Q.   All right.  So according to the
4  specification, are the parameters, shape and
5  size always computed from the covariance matrix
6  transformation procedure that's described in
7  column 26?
8     A.   No, no, they are not.  An example
9  would be in figure 25 for contact size so here
10  we're trying to create what we call this thumb
11  size factor, and it is -- it is like a special
12  detector for something that's sized more like a
13  thumb than either a finger or a palm.
14        And here you will see we're using on
15  the X axis the contact size, but in this case
16  we're using the normalized total proximity,
17  which is Gz or equation 12 that we talked about
18  earlier as that indicator contact size.
19        And that was, you know, again, it is
20  just an alternate way of doing things, because
21  the prototypes at the time, the Gz was more
22  reliable than the major and minor radius
23  measurements explicitly output from the
24  Eigenvalues.
25     Q.   Okay.  And speaking of the

Page 339

1  Eigenvalues, are there any claims of the patent
2  that specifically claim competing Eigenvalues
3  or Eigenvectors to fit an ellipse?
4     A.   Yes, I believe there are.  That would
5  be dependent claim number 5, dependent claim
6  number 9, and then there is also dependent
7  claim number 20.
8     Q.   Okay.  And let's go back to column 27
9  and the method that's described there.  Is that
10  an example of mathematically fitting an
11  ellipse?
12        MR. NELSON:  I am going to object as
13  leading, Your Honor.
14        JUDGE ESSEX:  I'm sorry, what is the
15  nature of the objection?
16        MR. NELSON:  I'm sorry.  I don't have
17  my mic on.  I am going to object as leading,
18  Your Honor.
19        JUDGE ESSEX:  Let's rephrase it.  What
20  does this depict?
21        MR. DAVIS:  It is a yes-or-no
22  question.
23        JUDGE ESSEX:  Give me the question
24  again.
25        MR. DAVIS:  The question I had asked

Page 340

1  was, does that disclose mathematically fitting
2  an ellipse?  Or does that disclose some other
3  way of fitting an ellipse?
4        JUDGE ESSEX:  Why don't you tell me
5  what that discloses, Doctor?
6        THE WITNESS:  Yes, I believe it is an
7  alternate way of fitting the ellipse
8  parameters.
9        JUDGE ESSEX:  What parameters?
10        THE WITNESS:  Eccentricity,
11  orientation, setting it to a default, and there
12  is another example where we use, in figure 25,
13  where we use the ratio of eccentricity to
14  proximity as a stand-in for the width of the
15  contact, which is like an alternate way of --
16  and another -- well, that's an alternate way of
17  -- sorry.  My words are backwards.
18        So the minor radius is sort of the
19  first way of measuring the width, but if you
20  divide -- if you interpret the total proximity
21  as an area that's roughly the minor radius
22  times the major radius, and you divide that by
23  eccentricity, which is the major radius divided
24  by the minor radius, then that value in, I
25  think it is figure 25C, is basically equivalent

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 341

1    to a minor radius squared, but it is obtained
2    without directly using the minor radius.
3         Again, we did that because for those
4    prototypes and the noise characteristics of
5    them, that actually gave you a more stable
6    answer to kind of take this round-about method
7    than to use the minor radius directly.
8    BY MR. DAVIS:
9         Q.    Do you assign numbers to the, to the
10   -- to each of the five parameters that you use
11   to define an ellipse?
12        A.    Yes.  In this paragraph we do this,
13   and we have basically always kind of had these
14   limits then and still do in the code, to do
15   this.
16        Q.    And do you use the numbers to define
17   the ellipse?
18        A.    Yes, they become the ellipse
19   parameters.
20        Q.    And does it result in a circle or an
21   ellipse of a certain size once you plug in
22   those numbers?
23        A.    Yeah, it --
24        MR. NELSON:  Your Honor, I am just
25   going to object.  It is leading again.  It is

Page 342

1    the same exact issue we had before.
2         JUDGE ESSEX:  You are kind of leading
3    the witness.  Can you rephrase and let him
4    answer?
5    BY MR. DAVIS:
6         Q.    Sure.  Well, what do you get from the
7    numbers that are assigned to the five
8    parameters?
9         A.    Well, what you get is a circle.  We
10   have limits like for the major/minor radius of
11   something like 5 or 6 millimeters, that those
12   values are not allowed to go -- regardless of
13   what the equations originally put out, we don't
14   let the numbers go below 5 or 6 millimeters in
15   that same function.  We limit them, sort of cap
16   them at 5 or 6 millimeters and then those get
17   transmitted as like a 5 or 6 millimeter circle
18   throughout the system.
19        Q.    Okay.  When you were working on your
20   Ph.D., were you aware of others who attempted
21   to address the problems that you were
22   addressing in your thesis?
23        A.    Well, obviously, I think I have
24   hundreds of references talking about earlier
25   work, but no one had attempted to, I guess,

Page 343

1    develop a multi-touch surface so ambitiously
2    with identifying the fingers and trying to
3    merge typing and pointing and gestures and many
4    different modalities on the same surface.
5         Q.    Did you -- did you refer to a Rubine
6    reference in your thesis?
7         A.    Yes, I find a quote by Rubine, I
8    believe from his Master's or Ph.D. thesis in
9    '93 where he was working with a sensor frame,
10   which is another early -- it was a multi-touch
11   device.  Would you like me to --
12        Q.    Could I ask you to turn to JX-291.150.
13   What is shown there?
14        A.    So this is my discussion of Rubine and
15   his work with multi-path gestures on the sensor
16   frame.  And I quote him in the lower paragraphs
17   there where he says that for the devices such
18   as data gloves, which are attached to the hand,
19   and you have actually got sensors, wires
20   running down to each finger, then those devices
21   know exactly which finger is which, which
22   finger is associated with different sensor
23   input.
24        And so, you know, he says they could
25   build one class for thumb paths and one for

Page 344

1    forefinger paths and you could easily assign a
2    different operation to each finger.  Then he
3    says for the sensor frame and multi-finger
4    tablets, they cannot tell which of the fingers
5    is the thumb, this is the forefinger and so on.
6    Thus, there is no a priori solution to the path
7    sorting and he says the solution he adopted was
8    to just try to apply a consistent ordering
9    between the paths.
10        MR. DAVIS:  Thank you, Your Honor.  I
11   have no further questions at this time.
12        MR. NELSON:  Just a couple.
13        RECROSS-EXAMINATION
14   BY MR. NELSON:
15        Q.    All right.  Let's put column 27 back
16   up there of JX-3, the '828 patent.  In that
17   paragraph we were just talking about, let's
18   blow that up again.
19        The one right at the top there.  There
20   you go.  The first sentence you just looked at
21   with counsel, it says, "on low resolution
22   electrode arrays, the total group proximity Gz
23   is a more reliable indicator of contact size as
24   well as finger pressure than the fitted ellipse
25   parameters."  Right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 345

1    A.   Yes.
2    Q.   So I think you said that that's used
3  instead of the fitted ellipse parameters in
4  what's described here in this paragraph at
5  column 27, correct?
6    A.   Well, what I said is -- I mean, in
7  practice, what it really means is it is used
8  instead of minor radius and major radius
9  individually.  I mean, that's the intended
10  meaning.
11    Q.   Right.  And instead of the fitted
12  ellipse parameters, right?
13    A.   That's what it says.
14    Q.   Okay.  And then if you go down below,
15  you talked about in this next sentence,
16  "therefore, if proximity images have low
17  resolution" -- first of all, what is low
18  resolution?
19    A.   I don't define that.  And that's why,
20  you know, in practice, we still use this, and
21  that's not to say that the resolution is low,
22  but in practice what this means is it is, when
23  the size of the fingertip contact gets so small
24  relative to the resolution you have, whatever
25  it is, that you only get a few pixels out, then

Page 346

1  you are probably in a situation where this
2  applies.
3    Q.   So but here in column 27, you don't
4  tell people that are reading the patent when
5  something is low resolution or when something
6  is not low resolution, correct?
7    A.   No, I don't.
8    Q.   Okay.  And then it goes on to say,
9  "the orientation and the eccentricity of small
10  contacts are set to default values rather than
11  their measured values and total group proximity
12  Gz is used as the primary measure of contact
13  size instead of major and minor axis lengths,"
14  do you see that?
15    A.   Yes.
16    Q.   And so let's focus on the orientation
17  and eccentricity.  Set to default values, that
18  means they are not calculated, correct?
19    A.   I don't agree with that, because to me
20  in the work that I do, we're always computing
21  these things.  And, as I say, having to place
22  limits and sort of post-process.  And to me
23  that's part of the process is to keep values
24  within a meaningful range.  And that's what
25  this is talking about.

Page 347

1    Q.   Well, what this says is you set to
2  default value, correct?
3    A.   You do, but it is based on -- you are
4  setting it to default value, but it is usually
5  -- you know, it is based on a decision, which
6  is, you know, all part of the calculation.
7          You are setting, you know, at the end
8  of the equations your default value, too, but
9  it is based on, you know, a set of decisions
10  and formulas and this would be as well.
11    Q.   Well, here in column 27, you don't
12  tell anybody that's reading this patent, set it
13  to a default value that's dependent upon
14  something that you measure, do you?
15    A.   I don't say it, but I say the
16  eccentricity of small contacts, I don't say it
17  is large, and so I think there is an implicit
18  decision in there that you are only going to do
19  this for the small ones, so implicitly you are
20  making a decision somehow, as I suggested
21  earlier, probably based on Gz, of what's small
22  and what is large and whether to do this.
23    Q.   But you don't say any of that here in
24  the paragraph in 27, correct?
25    A.   I don't give the details of that.

Page 348

1    Q.   Okay.  So then in the example that you
2  were talking about with counsel, I think you
3  said that what you do, what you did in practice
4  is you set the eccentricity value to 1,
5  correct?
6    A.   Yep.
7    Q.   Eccentricity value of 1 is a circle,
8  correct?
9    A.   Yep.
10    Q.   So that's a value, right?  That's not
11  calculated, correct?
12    A.   I mean, it is a value.  To say it is
13  not calculated, as I say, to me, the
14  calculation is still -- the process you are
15  taking to get there is still a calculation.
16    Q.   So what you are saying is you
17  calculated something to determine that I
18  shouldn't use any of those values, I should set
19  it to a default value?
20    A.   Yes, I think so.
21    Q.   But the determination of the default
22  value is not a calculation in and of itself,
23  correct?
24    A.   Not -- not as explained here.
25    Q.   Okay.  Thank you very much for your

62  (Pages 345 to 348)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 349

1  time.
2       MR. NELSON:  I don't have any further
3  questions at this time, Your Honor.
4       MS. KATTAN:  No questions, Your Honor.
5       MR. DAVIS:  Just a couple of
6  questions, Your Honor.
7            REDIRECT EXAMINATION
8  BY MR. DAVIS:
9    Q.   Could we pull back up column 27, JX-3.
10  So in the example that's provided at the top of
11  column 27, do you use the numbers that are
12  assigned as default values to determine the
13  size or shape of the circle?
14       MR. NELSON:  I am going to object as
15  leading, Your Honor.  He can ask him what he
16  uses the values for, but he can't keep
17  suggesting the answers.
18       JUDGE ESSEX:  Rephrase your question,
19  please.
20  BY MR. DAVIS:
21    Q.   Sure.  So what is used to determine
22  the size and shape of the circle?
23    A.   That would be -- I mean, the default
24  values become like, you know, they would become
25  like the major radii and minor radii.  And

Page 350

1  those would have been chosen, as I said,
2  probably like representative of the smallest
3  fingertip you would reasonably expect to see,
4  like, you know, a child's fingertip or
5  something.
6    Q.   Is the default value a number value or
7  is it some other type of value?
8    A.   It is a numeric measurement, like 5 or
9  6 millimeters.
10    Q.   Okay.  And are number values assigned
11  to each parameter or are there certain
12  parameters for which no number value is
13  assigned?
14    A.   Well, typically when we engineer these
15  systems, in order to allow layering of them
16  and, you know, or in order to keep the layers
17  independent, you want your bottom layer, let's
18  call it the ellipse-fitting layer, to always
19  provide values for all parameters.
20       And you may have many different
21  alternate ways that you calculate those in
22  different conditions, but you always provide
23  them, so the next layer of the system doesn't
24  have to have any special knowledge about, oh,
25  is this value good now or is it only -- it

Page 351

1  doesn't have to worry about whatever -- all
2  those different conditions.  It can be
3  100 percent rock solid confident that values
4  for all parameters are always provided from
5  lower layers.
6    Q.   Okay.  And under the example that is
7  provided at the top of column 27, what are you
8  using the values to do?
9    A.   Well, we can be using them -- sorry.
10  I am not sure what level.
11       I mean, in that layer, you know, they
12  are filling in the ellipse parameters.  And
13  then in the higher layers, they could be using
14  them to decide if something is a finger or a
15  palm or a thumb like on the edge of a phone or
16  for debugging to display -- to display the
17  touches for purposes of just seeing what
18  touches are on the screen and how big they are.
19    Q.   Okay.  So is the example that's
20  provided at the top of column 27, is that an
21  example -- is that mathematically fitting an
22  ellipse or not mathematically fitting an
23  ellipse?
24       MR. NELSON:  Objection, leading, Your
25  Honor.  It is exactly the same question you

Page 352

1  have already sustained the objection to.
2       JUDGE ESSEX:  Let me ask the question
3  here from my -- having listened to the three of
4  you go over this and that, is there a point
5  where the contact seems so slight to the system
6  that it fits a value and that value is always
7  the same?  Is that what is going on here?
8       THE WITNESS:  Well, it is for
9  particular parameters.  It is not for all.
10       JUDGE ESSEX:  I understand not for all
11  parameters, but for particular parameters, if
12  it is below a minimum, then it has a value that
13  will always be the same value?
14       THE WITNESS:  Yes.
15       JUDGE ESSEX:  Is that what is going
16  on?
17       THE WITNESS:  Yes.
18       JUDGE ESSEX:  Okay.
19       MR. DAVIS:  Thank you.
20       JUDGE ESSEX:  Are you happy with that?
21       MR. DAVIS:  I am happy with that, Your
22  Honor.
23       JUDGE ESSEX:  Are you happy with that?
24       MS. KATTAN:  Yes, Your Honor.
25       JUDGE ESSEX:  All right.  Anything

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 353

1  else?
2          MR. NELSON:  Nothing from us, Your
3  Honor.
4          JUDGE ESSEX:  All right, Doctor.  I
5  think we're done with you.  Thank you very
6  much.
7          THE WITNESS:  Okay.
8          JUDGE ESSEX:  And I think it is a good
9  time to take our afternoon break.  We're in
10 recess until 3:30.
11         (A recess was taken at 3:11 p.m.,
12 after which the trial resumed at 3:30 p.m.)
13         MR. DAVIS:  Your Honor, one
14 housekeeping matter before we move on to the
15 next witness.  That is just to move into
16 evidence the exhibits used during the
17 examination of Dr. Westerman.
18         JUDGE ESSEX:  Is there any dispute on
19 these at all?
20         MR. NELSON:  No, Your Honor.
21         JUDGE ESSEX:  All right.  Then just
22 hand them to the court reporter and the other
23 parties, and we will consider it done.
24 //
25 //

Page 354

1          (Complainant Exhibit Numbers CX-208C,
2  CX-210, CX-211, CX-212C, CX-215, CX-216 were
3  received into evidence.)
4          (Joint Exhibit Numbers JX-003, JX-245,
5  JX-291, JX-488C were received into evidence.)
6          MR. DAVIS:  Your Honor, one other
7  housekeeping issue to take up, and that is the
8  parties are still working out the proposed
9  agreement with regard to the scope of expertise
10 of the various experts.  So with the Court's
11 indulgence, I'd like to hold off on offering
12 Dr. Balakrishnan as an expert in a particular
13 field until the parties have a chance to work
14 that out.
15         It looks like we will be able to do
16 it.  It just hasn't happened yet.
17         JUDGE ESSEX:  All right.
18         MR. DAVIS:  With that in mind, Your
19 Honor, Apple calls its next witness, Dr. Ravin
20 Balakrishnan.
21         And, I'm sorry, one other issue we
22 should take up for housekeeping and that is the
23 way in which we're going to handle the cross
24 and redirect.
25         As an accommodation to counsel for

Page 355

1  Motorola, we were willing to allow them to have
2  different attorneys cross on different patents.
3          We have learned that counsel for
4  Motorola would like to further divvy it up,
5  such that it would be cross on one patent and
6  then redirect on a patent, and then moving on
7  to cross on the next patent, and then redirect
8  on the next patent.
9          We, frankly, think that's prejudicial
10 to Apple and we don't want our accommodation of
11 allowing them to have different attorneys split
12 up the cross being used against us to further
13 change the normal order, which is cross and
14 then redirect.
15         JUDGE ESSEX:  All right.  So what are
16 you proposing, that they do all their cross
17 tagging their attorneys in the midst of it and
18 then redirect?
19         MR. DAVIS:  So they can tag team the
20 witness, Your Honor, on cross.  They finish
21 their cross.  And then we would do our
22 redirect.  And then we would segregate it out
23 by patent.  And then they would be able to --
24         JUDGE ESSEX:  I think you can handle
25 it that way.  That seems to me like it

Page 356

1  shouldn't be a problem.  You can hand off.  You
2  have experience with it.
3          MR. VERHOEVEN:  It is whatever Your
4  Honor's preference is.  In the last trial we
5  did it that way.  But if that's an issue --
6          JUDGE ESSEX:  I think you agreed last
7  time, and if we don't have agreement this time,
8  then we will do it all cross, and then
9  redirect, in one swoop.
10         MR. VERHOEVEN:  All right.
11         JUDGE ESSEX:  I don't have a
12 preference.  We just need to make our record.
13         MR. VERHOEVEN:  One other guidepost,
14 Your Honor, on this, is unlike the last trial
15 where the parties had agreed to do, for the
16 experts, to do the whole shebang, invalidity
17 and non-infringement cross at once, counsel for
18 Apple in this case has said they would like to
19 do their rebuttal case separately and recall
20 their experts later.
21         I understand that's a practice at the
22 ITC.
23         JUDGE ESSEX:  We have done it that way
24 and we can do it that way.
25         MR. VERHOEVEN:  We're not going to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 357

1  fight with that.  I just wanted to let Your
2  Honor know, the scope of Mr. Balakrishnan on
3  this calling, correct me if I am wrong, is
4  going to be limited to claim construction and
5  non-infringement.
6       MR. DAVIS:  Right, and domestic
7  industry.
8       MR. VERHOEVEN:  And domestic industry.
9       JUDGE ESSEX:  All right.
10      MR. DAVIS:  Okay.
11      JUDGE ESSEX:  Having done that, can we
12  have the Doctor?  Good afternoon, Doctor.  It
13  is good to see you again.
14  Whereupon--
15          RAVIN BALAKRISHNAN,
16  having been first duly sworn, was examined and
17  testified as follows:
18      JUDGE ESSEX:  Please be seated.
19      THE WITNESS:  Thank you.
20          DIRECT EXAMINATION
21  BY MR. DAVIS:
22   Q.   Dr. Balakrishnan, could you please
23  state your full name?
24   A.   It is Ravin Balakrishnan.
25   Q.   Could you turn in your witness binder

Page 358

1  to the first exhibit, CX-201C.
2       JUDGE ESSEX:  Pardon me, counsellor.
3  Should I have a binder?
4       MR. DAVIS:  I'm sorry.  I thought it
5  was passed up to you.  Your Honor, if I may
6  approach.
7       JUDGE ESSEX:  You may.
8       MR. DAVIS:  So it is actually several
9  boxes of binders.
10      JUDGE ESSEX:  I think this falls into
11  be careful what you ask for.  Proceed.
12  BY MR. DAVIS:
13   Q.   Dr. Balakrishnan, if you could turn to
14  CX-201C.  Is this a copy of the witness
15  statement that -- your initial witness
16  statement that you provided in connection with
17  this investigation?
18   A.   Yes, it is.
19   Q.   Okay.  And could you turn to page 133
20  of Exhibit CX-201C.  Is that your signature
21  that appears there?
22   A.   Yes, it is.
23   Q.   And does this witness statement
24  contain your answers to the questions that are
25  set forth therein?

Page 359

1   A.   Yes, it does.
2   Q.   Okay.
3       MR. DAVIS:  Your Honor, we turn over
4  the witness.
5       MR. VERHOEVEN:  Good afternoon, Your
6  Honor.
7       JUDGE ESSEX:  Good afternoon.
8          CROSS-EXAMINATION
9  BY MR. VERHOEVEN:
10   Q.   Good afternoon, Dr. Balakrishnan.  I
11  am going to pass out some binders before I get
12  started.  Did I pronounce your name correctly?
13   A.   Yes, you did.  Thank you.
14   Q.   Thank you.
15      MR. VERHOEVEN:  Your Honor, I only
16  have one binder, although it is a thick one,
17  because of the prosecution history.
18      JUDGE ESSEX:  Thank you.
19  BY MR. VERHOEVEN:
20   Q.   Dr. Balakrishnan, I'm going to examine
21  you.  My name is Charles Verhoeven.  I am going
22  to examine you on the '430 patent.
23       You have given opinions as to the '430
24  and the '828 patent, correct?
25   A.   That's correct.

Page 360

1   Q.   So my questioning will be limited to
2  the '430 patent, just so you know, okay?
3   A.   Okay.
4   Q.   Ryan, can we put up JX-1, the '430
5  patent.
6   A.   Just a comment.  The binder here under
7  the full -- under the tab JX-1, I have actually
8  got JX-3.
9       MR. VERHOEVEN:  Your Honor, may I
10  approach?
11      JUDGE ESSEX:  He is quite right.
12      MR. VERHOEVEN:  I apologize for that.
13      MR. DAVIS:  JX-1 should be in the
14  direct exhibits.
15      MR. VERHOEVEN:  There you go.
16      JUDGE ESSEX:  It appears, if you are
17  going to the '430 patent, that appears to be
18  JX-4, which is after his JX-1 exhibit.
19      MR. VERHOEVEN:  Your Honor, I believe
20  that's the prosecution history.  What we will
21  do is we will swap out the correct patent into
22  the binders at the end of the day today.  We
23  have it up on our electronic screen.
24  BY MR. VERHOEVEN:
25   Q.   I have put up the '430 patent on the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 361

1    screen.  You can see it right there and you
2    have a copy from your direct binders, correct,
3    sir?
4        A.   Yes, I do.
5        Q.   And that's one of the two patents you
6    analyzed in this case, right?
7        A.   Yes.
8        Q.   And Apple is currently asserting
9    claims 1, 3, and 5 of that patent against
10   Motorola Mobility in this investigation; is
11   that right, sir?
12       A.   Yes, I believe that's correct.
13       Q.   Okay.  Ryan, can we put up claim 1 of
14   the '430 patent.  Would Your Honor like a copy
15   of the '430 patent?
16           JUDGE ESSEX:  I have one.
17           MR. VERHOEVEN:  You have one?  Okay.
18   BY MR. VERHOEVEN:
19       Q.   I would first like to talk about some
20   claim construction issues, Dr. Balakrishnan.
21   And, in particular, let's start
22   with the preamble of claim 1.
23           You know what the preamble is, right?
24       A.   Yes, I do.
25       Q.   What is your understanding of what a

Page 362

1    preamble is in claim 1?
2        A.   What it is?
3        Q.   Yes, sir.
4        A.   The preamble is the first paragraph
5    there.
6        Q.   This paragraph up here (indicating)?
7        A.   Yes.
8        Q.   Indicating?
9        A.   Yes, before this element A.
10       Q.   So for the record, it is "a computer
11   implemented method for dynamically adding
12   support for hardware or software components
13   with one or more properties to an operating
14   system active on a computer with a memory," and
15   then it says comprising the steps of, correct?
16       A.   Yes.
17       Q.   Now, the parties have a dispute with
18   respect to the preamble in terms of claim
19   construction, correct?
20       A.   I believe so, yes.
21       Q.   And, Ryan, if we could go to
22   RDX-15.003.  This is simply a chart in which I
23   have attempted to depict the parties' claim
24   construction positions as to the preamble.
25           Can you take a look at that, sir?  And

Page 363

1    the claim term again is "dynamically adding
2    support for hardware or software components
3    with one or more properties."
4            Motorola's construction is "adding
5    hardware or software components with one or
6    more properties without running an installation
7    program," right?  Is that your understanding?
8        A.   Yes.
9        Q.   And the Staff's proposed construction
10   is "adding support for hardware or software
11   components to a computer system without running
12   an installation program."  Right?
13       A.   Yes.
14       Q.   So both Motorola and the Staff believe
15   that this preamble language is limiting, right?
16       A.   That part of the preamble, yes.
17       Q.   Right.  And both Motorola and the
18   Staff believes that it requires that you are
19   adding hardware or software components, and
20   Staff's construction adding support for
21   hardware or software components, and they both
22   say "without running an installation program,"
23   right?
24       A.   That's correct.
25       Q.   And that's a key dispute between the

Page 364

1    parties, right?
2        A.   Yes, it is one dispute.
3        Q.   And Apple's construction on the
4    preamble is that the preamble is simply not
5    limiting, right?
6        A.   Yes.
7        Q.   And is that your opinion, too, sir?
8        A.   Yes, it is.
9        Q.   Okay.  Can you explain to His Honor --
10   I know you are not a patent lawyer; are you?
11       A.   No, I am not.
12       Q.   But you did have some understanding of
13   the rules of the road under patent law as to
14   when a preamble should be limiting and when it
15   shouldn't be limiting that you used to form the
16   basis for your opinion; is that right?
17       A.   Yes, I was given some instructions.
18       Q.   Can you explain what was your
19   understanding that you used, that you applied
20   to come up with your opinion?
21       A.   So I am going by memory here.  It is
22   detailed in my expert reports.  But going by
23   memory, the steps, the subsequent steps are not
24   limited by the preamble.
25       Q.   Okay.  And based on -- I understand

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 365

1   you have your detailed reports, but just for
2   right now, is there any other requirement that
3   you use that you can recall when you came up
4   with your opinion as to whether the preamble is
5   limiting or not?
6      A.   I don't remember the exact legal
7   instructions given to me.  I could look it up.
8      Q.   Okay.  Let me see if I can refresh
9   your recollection.
10     A.   Sure.
11     Q.   Is it your understanding that a
12  preamble limits a claimed invention, if it
13  recites essential structure?  Do you remember
14  applying that understanding?
15     A.   Yes, if it says something that the
16  subsequent steps have to rely upon, yes.
17     Q.   Okay.  And is it your understanding
18  also that a preamble will limit a claimed
19  invention if there is limitations in the
20  preamble that are necessary to give life,
21  meaning, and vitality to the subsequent steps
22  in the claim?
23     A.   Yes, I think that's consistent with
24  what I said earlier.
25     Q.   Now, let's look at, back to claim 1,

Page 366

1   please, right here.  I have got it on the
2   screen.  So this is JX-1, column 13, 39 through
3   56, claim 1 of the '430 patent.
4          Now, do you see here under element B,
5   do you see there is a reference to operating
6   system?
7      A.   Yes.
8      Q.   And can we highlight that, please,
9   Ryan?  Or we can't?  Can we highlight on the
10  slide?  I guess we can.  Good.
11         So do you see the immediate -- the
12  word immediately preceding it is "the"?
13     A.   I'm sorry, the --
14     Q.   Do you see the highlighting on the
15  screen, sir?
16     A.   Yes, I do.
17     Q.   Right before operating it says "the
18  operating system," right?
19     A.   Yes, I do.
20     Q.   And there is an antecedent to "the
21  operating system" in this claim, isn't there,
22  sir?
23     A.   I don't see that.  I see this as
24  querying the operating system.
25     Q.   Do you know what an antecedent is?

Page 367

1      A.   Something that was previously defined.
2      Q.   Isn't it true that this phrase "the
3   operating system," the antecedent is an
4   operating system active on a computer?  Can we
5   highlight, Ryan, "an operating system active on
6   a computer"?  Do you want me to repeat the
7   question for you?
8      A.   Sure.
9      Q.   Okay.  Now that we have got it
10  highlighted, isn't it true, sir, that the
11  phrase "the operating system" in element B is
12  -- the antecedent for that is contained in the
13  preamble where it says "an operating system"?
14     A.   I am not sure from a legal perspective
15  how that machination works, but as a technical
16  expert I am reading this and saying querying
17  the operating system cannot be any other
18  operating system but the one this whole claim
19  and patent is talking about.  So I don't see --
20  I guess you call it antecedent basis.
21     Q.   Okay, yeah.  Let's said aside the word
22  antecedent.
23     A.   Okay.
24     Q.   You would agree with me the phrase
25  "the operating system" is referring back to "an

Page 368

1   operating system active on a computer," right?
2      A.   Well, to the extent that it is all
3   talking about an operating system, yes.
4      Q.   Okay.  And claim B, it just says "the
5   operating system."  Right?  It doesn't say the
6   operating system active on a computer, does it?
7      A.   The claim language itself doesn't have
8   the words active on a computer in the element,
9   in element B here.
10     Q.   So let's just use our imagination and
11  pretend to erase this preamble.  Pretend it
12  doesn't exist.  Pretend this claim 1 just said
13  a method with the steps of, and it didn't say
14  anything else.
15         You would agree with me that in step B
16  a person of ordinary skill, if they didn't see
17  this, would not know that the operating system
18  has to actually be an active operating system
19  and not an operating system that's not active?
20  Right, sir?
21     A.   No, I disagree with that.  I think if
22  you are querying the operating system, you
23  cannot query an inactive or dead operating
24  system or one that's not running.  So it would
25  make no sense whatsoever to be querying an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 369

1    operating system that's not active.
2        Q.   Okay.  Well, would you agree with me
3    that the words active on a computer don't
4    appear in element B?
5        A.   The words don't appear, sure.
6        Q.   So element B doesn't expressly say
7    that the operating system has to be active on a
8    computer, does it?
9        A.   It doesn't have those three words
10   there, but I think, as any technical person of
11   skill in the art reading this would understand
12   this to be querying a running operating system
13   because an operating system that is not running
14   or active on a computer cannot be queried in
15   any meaningful way.
16       Q.   Okay.  Let's look at another example,
17   element D.  Do you see element D there?
18       A.   Yes, I do.
19       Q.   Okay.  And let's highlight element D.
20   Now, element D -- it takes a little while to
21   highlight the slides -- element D talks about
22   adding support for the hardware and software
23   components.  "The hardware and software
24   component" refers back to hardware and software
25   components with one or more properties in the

Page 370

1    preamble, right?
2        A.   It is talking about adding hardware
3    and software components, yes.
4        Q.   And it is referring back, it says "the
5    hardware and software components," right?
6        A.   Well, I don't see the -- the hardware
7    and software components in the preamble there
8    as being anything specific, so that D, the same
9    words in element D has to necessarily refer
10   back per se.
11       I think they are general enough terms,
12   hardware and software components, that
13   reference is not necessary.  That would be my
14   read of this.
15       Q.   When you were told the rules of the
16   road by your counsel to help you form your
17   opinions, were you informed that where a term
18   is preceded by the word "the" it must have an
19   antecedent basis for that term, that claim term
20   to be definite?
21       A.   I don't recall whether I got such
22   instruction or not.  I might have.
23       Q.   Okay.
24       A.   I have gotten a lot of legal
25   instruction on this case.

Page 371

1        Q.   I understand.  And this is difficult
2    claim construction stuff.  I understand.
3        But, in any event, "the hardware and
4    software," it is a fair reading that that's
5    referring to, where the preamble says "a
6    computer implemented method for dynamically
7    adding support for hardware or software
8    components," these hardware and software
9    components in D are the ones -- it is referring
10   back to the hardware and software components in
11   the preamble, correct?
12       A.   No, as I said earlier, I just answered
13   your earlier question, which I think was
14   exactly the same question, the hardware and
15   software components here in the preamble are
16   not anything particular, not anything special
17   as far as I can tell, and the same kind of
18   fairly general language is used in element D.
19   So I don't see any difference between the use
20   of the term there such that one would
21   necessarily have to limit the other.
22       Q.   My question was specific.  My question
23   was these words, "the hardware and software
24   components," that's a reference back to
25   hardware and software components in the

Page 372

1    preamble, right?  Those are the same things?
2        A.   They are the same -- they would be the
3    same hardware and software components.  I am
4    not sure whether it is necessarily a reference
5    back to the same language necessarily.
6    Hardware and software components are very
7    general, fairly general terms.
8        Q.   So this would be talking about -- I'm
9    sorry.
10       A.   I'm sorry, known to people in the art.
11       Q.   I'm sorry?
12       A.   Hardware and software components are
13   something that is known to those skilled in the
14   art.  So I don't see, you know, having to
15   expand upon it.
16       Q.   So your view is that this phrase, "the
17   hardware and software components," that could
18   be referring to hardware and software
19   components other than the hardware and software
20   components mentioned here in the preamble?
21       A.   No, it is not what I am saying.
22       Q.   So you agree then that the hardware
23   and software components in D are referring
24   back, that's what it is talking about, the
25   hardware and software components in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 373

1  preamble?
2     A.   No, I think what I am saying is in D
3  it is hardware and software components that are
4  being added to the operating system.  I'm not
5  sure about the reference back, whether that's
6  necessary or not.
7     Q.   So they could be other hardware and
8  software components not referenced in the
9  preamble; is that what you are saying?
10    A.   It could be any hardware and software
11 components is what I am saying, yes.
12    Q.   So the answer is yes, in your view
13 this phrase the hardware and software
14 components can be referring to hardware and
15 software components other than those referenced
16 in the preamble?
17    A.   It could be those referenced in the
18 preamble.  It could be those not referenced in
19 the preamble.  I don't think one excludes the
20 other necessarily.
21    Q.   But according to your interpretation,
22 one option is it could be hardware and software
23 components that aren't referenced in the
24 preamble?  Isn't that what you just said?
25    A.   I would say it may not exclude that.

Page 374

1     Q.   Okay.  So then it could include them,
2  right?  Yes?
3     A.   Yes, I think so.
4     Q.   Now, element D, adding support for
5  hardware and software components without
6  rebooting the operating system, the word
7  dynamically does not appear here in element D,
8  does it, sir?
9     A.   No, it does not.
10    Q.   Ryan, if we could highlight from here,
11 "dynamically adding hardware or software
12 components."  There we go.
13         Now, in the preamble there is a
14 reference to hardware or software components,
15 you see that, right?
16    A.   Yes.
17    Q.   And a reference to adding support for
18 hardware and software components, right?
19    A.   Yes.
20    Q.   And that's just like D, adding support
21 for the hardware and software components,
22 right?  The only difference is the word "the,"
23 right?
24    A.   That's one difference, yes.
25    Q.   But the preamble adds a word

Page 375

1  dynamically adding, right?
2     A.   It has that word there, yes.
3     Q.   Okay.  And you have given the opinion
4  that you don't think dynamically means anything
5  more than what's in D, is that what your
6  opinion is?
7     A.   That's correct.  Dynamically, without
8  rebooting the operating system, is effectively
9  adding that support for hardware and software
10 components dynamically.
11    Q.   Now, when you were given the rules of
12 the road here, were you informed that as a
13 matter of claim construction, general
14 principle, and I know there is a lot of them,
15 but I am just asking to see, to check your
16 foundation here, were you aware of the
17 principle that when interpreting claim
18 language, if different words are used, that the
19 presumption is that they have -- the patentee
20 intended to mean something different by using
21 them?  Were you ever informed of that?
22    A.   I believe we had a discussion of, or I
23 was told something about that, but I am not
24 sure of the exact definitive rule, I guess,
25 that had to apply.  I can't recall if I was

Page 376

1  given a definitive rule or not.
2     Q.   Fair enough.  You would agree with me
3  that dynamically is a different word than the
4  words in D, that's a new word that doesn't
5  appear in D, right?
6     A.   In terms of just letters in the
7  syntax, yes, it is a different word, but in
8  terms of the context of reading this, you are
9  adding stuff to an operating system without
10 rebooting.  I think one skilled in the art
11 would understand that to be essentially
12 equivalent, one example of dynamically adding
13 that support.
14    Q.   Essentially equivalent?  Is that what
15 you said?
16    A.   Yeah.
17    Q.   Okay.
18    A.   Without rebooting.  You mean in the
19 context of the claims.
20    Q.   Isn't it true, sir, that you can add
21 support for hardware or software components to
22 the operating system without rebooting in a way
23 that's not dynamic?
24    A.   I am trying to think of an example
25 where that might be possible.  So I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 377

1  reboot and it is still not dynamic.
2        I'm not sure.  I have to think about
3  that.  Can you repeat that question again, if
4  you don't mind, or if the court reporter --
5  because it is a little tongue twisting there
6  for me.
7        Q.    And it is getting late in the day as
8  well.  Let me try it one more time.
9             Isn't it true that you can add support
10 for hardware and software components without
11 rebooting the system in a way that is not
12 dynamic?
13       A.    I guess that might be possible if you,
14 for example, add a file that has the right
15 drivers, you copied it, say, for example, to a
16 file directory, that might do it.  And it is
17 arguable whether that is dynamic or not.  At
18 some point there is an issue of how dynamic is
19 dynamic.  And the fact that something is
20 happening on the fly is dynamic, so --
21       Q.    You could, you could, if I said I want
22 you to design a system that adds support for
23 hardware and software components without
24 rebooting in a way that is not dynamic, you
25 could do it, you could write code to do that,

Page 378

1  couldn't you, sir?
2        A.    Right, but the reason I am hesitating
3  on the answer is what is the limits of what is
4  meant by dynamic is why I am hesitating because
5  is somebody putting something on the system
6  manually while the system is running, that
7  could be interpreted as being dynamic, or not
8  dynamic, depending.
9        Q.    Let's assume that a human being who
10 has to manually put something on the system is
11 not dynamic.  That's one you could add support
12 for hardware or software components on the
13 system without rebooting, right?
14       A.    If we say that is the bounds of being
15 dynamic, not dynamic, fine, yes, you could do
16 them, but that's a definition of you putting a
17 line on, okay, this is not dynamic.
18       Q.    Well, manually you would agree
19 manually putting something on a system is not
20 dynamic?
21       A.    Well, dynamic has the interpretation
22 of also happening on the fly, so I could have
23 somebody manually doing it while the operating
24 system is running, and this is happening on the
25 fly.  Somebody is manually sticking something

Page 379

1  in while it's running, so it could be dynamic.
2        Q.    Let me ask you this.  You have
3  reviewed the specification.  You reviewed the
4  whole patent.  This isn't talking -- when it is
5  talking about dynamically adding support, it is
6  not talking about manually adding support, is
7  it?
8        A.    In the examples in the patent, I have
9  not come across that.
10       Q.    Right.  And it is fair to say a person
11 of ordinary skill wouldn't read this and think
12 dynamically could mean manually adding, right?
13       A.    In the context of the particular
14 patent, sure, you probably would exclude that.
15       Q.    In the context of this patent.
16       A.    Oh, of this patent that we're talking
17 about, of course.
18       Q.    Do you agree?
19       A.    In this context, I think you could put
20 that bounds on the word dynamically.
21       Q.    Okay.  So dynamic clarifies to a
22 person of ordinary skill in the art that this
23 is, this step, adding support for hardware and
24 software, that excludes manually adding it, it
25 is dynamic, it is on the fly, right, something

Page 380

1  that happens automatically?
2        A.    Something that happens on the fly.
3  I'm not sure automatically is the right -- some
4  set of actions has to happen to trigger that.
5        Q.    You would agree it clarifies it,
6  right?
7        A.    I don't think it clarifies it, because
8  without -- if I read D on its own, as you
9  posited earlier, if you forgot about the
10 preamble and say it is gone, if I read just
11 element D in the context of the patent, I would
12 understand that to be I'm not manually adding
13 stuff, it is happening in the system, and you
14 call it automatic, sure, let's use that word
15 automatic.
16       Q.    Well --
17       A.    I don't think you need the preamble
18 there to clarify element D in the context of
19 the patent.
20       Q.    Well, let's take a look.  Let's do
21 exactly what you said.  Let's imagine -- can we
22 black out or erase -- you probably can't do
23 that.  Why don't you bring up -- well, Ryan,
24 can you black out the preamble?  We will use
25 our imagination.  Pretend the preamble doesn't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 381

1   exist.  There we go.  Great.
2        So if all we're looking at is these
3   steps, and it just says a method, then A could
4   be somebody hand typing in specifying target
5   hardware or software components, right?  There
6   is nothing saying you couldn't do it by hand,
7   if we don't look at the preamble?
8        A.   No, but I am reading this now modified
9   claim, without the preamble, and I am reading
10  it in context of the patent.
11       Q.   Okay.  Let's just set a place marker.
12  You agree it is now modified?
13       A.   Yeah, the preamble is gone.
14       Q.   Right.  There is limitations that are
15  gone now, aren't there?
16       A.   No.
17       Q.   Okay.  Why is it now modified?
18       A.   Well, because you just put a blackout
19  on some language there.  It is modified, as on
20  this slide, you modified it.
21       Q.   Okay.  I interrupted your answer.  I
22  want to let you finish.  What were you going to
23  say?
24       A.   I am not sure which answer I was
25  giving that was interrupted at this point.

Page 382

1        Q.   Well, let's go back to my question
2   then.  If we don't have this language in the
3   preamble, A could be performed manually, right?
4        A.   No, I disagree with that, because I am
5   reading -- I would still be reading these
6   elements of the claim in the context of the
7   patent, which is talking about electronic stuff
8   going on, not a human being sitting and typing
9   stuff in or manually plugging in things.  So I
10  think the context is still very important.
11       Q.   So you would agree that what you
12  should do is import a limitation from the spec
13  into this language that says all of these steps
14  have to be automatic?  I mean, it doesn't say
15  in any of these steps that it has to be
16  automatic, does it?
17       A.   It doesn't say that, no.
18       Q.   And it doesn't say that these steps
19  have to be done dynamically on an active
20  operating system in a computer implemented
21  method, does it?
22       A.   It doesn't use those words.  I mean,
23  that's --
24       Q.   Right.  So those words are gone.  They
25  used to be in the preamble.  Now that they are

Page 383

1   gone, isn't it true that there is nothing
2   expressly limiting these steps, at least step A
3   and step D, from being performed manually?
4   Fair?
5        A.   I still don't think that's fair,
6   because I think this still has to be read in
7   the context of the overall patent, which is not
8   about manual.  It is about an object-oriented
9   locator system.  It is clearly a computer based
10  system.  It is clearly talking about operating
11  systems running on computers.  That's the whole
12  theme of this patent.
13            It is not about manually typing things
14  in.
15       Q.   Well, I don't disagree with that, sir.
16  Let me try asking you this:  Setting aside the
17  specification, if you just looked at this
18  language here, someone presented you with this
19  language --
20       A.   Without looking at the patent at all?
21       Q.   Yes.
22       A.   Okay.
23       Q.   Are you with me?
24       A.   Sure.
25       Q.   Okay.

Page 384

1        A.   So it is a big hypothetical, because I
2   don't see how this would relate to anything, if
3   it is taken completely out of context.
4        Q.   Well, if we're just looking at these
5   steps in isolation, you would agree, step A,
6   there is nothing expressly saying that needs to
7   be performed automatically, dynamically on an
8   active operating system in a computer
9   implemented method, correct?
10       A.   If I take A -- so your hypothetical is
11  I take A, B, C, and D here without even reading
12  the patent, is that your hypothetical?
13       Q.   That's what I said.
14       A.   Okay, if that's your hypothetical, I
15  think it is -- I have to think about that,
16  because now you are doing this completely out
17  of context.  And, you know, what is hardware,
18  what is search criteria, and all of these
19  things, I think, has to be informed by what's
20  in the patent.
21       Q.   Okay.  So you can't answer it without
22  thinking about it further?
23       A.   I think I have to think about it
24  further, because if you are pulling it
25  completely out of the patent, I haven't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 385

1    considered that in any detail.
2        Q.   So you have no opinion in response to
3    that question?
4        A.   That particular hypothetical, where
5    you said completely take it out, divorce it
6    from the entire patent, pretend I haven't read
7    it at all.
8        Q.   Yes.
9        A.   Yeah, I would have to -- I would have
10   to think about this in more detail.  I don't
11   want to give you an on-the-fly opinion.
12       Q.   One final question and I will move on.
13   Looking at this language in isolation like step
14   A and step D, looking at those two steps in
15   isolation, you can't tell His Honor whether,
16   looking at language only, not the
17   specification, whether that would require a
18   dynamic action that's automatic as part of an
19   active computer implemented method or it could
20   be performed by hand?
21       A.   No, as I said, if we take this
22   completely out of context of the patent, this
23   could refer to anything.  So I don't think it
24   is a fair question.  I mean, it doesn't make a
25   lot of sense, actually.

Page 386

1        Q.   Let's move on to the prosecution
2    history.  I am still on the subject of whether
3    or not the preamble should be limiting of the
4    claim, but I am going to move from the claim
5    language now to another piece of intrinsic
6    evidence, the prosecution history.
7            And hopefully I have got this right in
8    the binder.  I think it is JX-4.  That's a very
9    thick document.  I am going to try to help you
10   by putting up pages on slides.  You can feel
11   free to go through it if you want.  It is going
12   to be kind of difficult for you to go through
13   it, I know, because you have seen it, it is a
14   very thick prosecution history but you have got
15   it there if you want it.
16       A.   I assume the JX-4 in my binder is the
17   same as the one in your binder?
18       Q.   If I can approach, I will confirm
19   that.
20           JUDGE ESSEX:  You may.
21           THE WITNESS:  It looks the same.  Mine
22   looks thicker, to be honest.
23   BY MR. VERHOEVEN:
24       Q.   Maybe you should use mine.  That is
25   probably excerpted.

Page 387

1            Now, like I said, feel free to try to
2    find that in there.  It will take a lot of time
3    if you do it for every question.  So I put
4    slides up.
5            But if you feel you would like to,
6    feel free to go ahead and try to find it.
7    There is control numbers on the bottom and I
8    will refer to those control numbers.  And
9    that's how you will navigate through it.
10       A.   Fair enough.
11       Q.   So you have seen JX-4 before?  You
12   have reviewed the prosecution history of the
13   '430 patent, sir?
14       A.   Yes, I have.
15       Q.   What I would like to do is walk
16   through the office actions and responses.  So I
17   am going to start with the first office action
18   of March 22, 1994.  I have put it on the screen
19   for you, sir.  This is JX-4 at page 932.  We're
20   looking at slide RDX-15.007.
21       A.   If you could give me a minute to get
22   to that page in the binder.  Okay, I have it
23   there.
24       Q.   This is the first office action in the
25   prosecution history dated March 22, 1994,

Page 388

1    correct?
2        A.   Yes, it is.
3        Q.   And can we go to RDX-15.005, please,
4    Ryan.  I have just put up on the screen page 25
5    from JX-04.  This is the original application
6    and the original claims.  I should have put
7    this up before the office action.  I apologize.
8    I told you it would be difficult.
9        A.   Just give me a second.  I am going to
10   mark the other one so I can get back to it
11   quickly.
12       Q.   If you want, I can give you the
13   representation that these are true and correct
14   copies of the pages.
15       A.   Sure.  I will take your word for that.
16   But I am having trouble reading it on the
17   screen.
18       Q.   Okay.
19       A.   If you want me to read it, I should go
20   to the paper.  But if you don't want me to read
21   it --
22       Q.   No, go ahead.  It is page 25.
23       A.   Okay, I have got it.
24       Q.   And you see the original claim 1 up
25   here?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 389

1    A.   Yes.
2    Q.   Do you agree that was the original
3 claim in the original application?
4    A.   The originally submitted, yes.
5    Q.   Now, on the next slide to help deal
6 with the problem of seeing it, I have taken --
7 I am focusing on the preamble.  And I have
8 depicted on the top box, this is slide 6 of
9 RDX-15, the preamble from claim 1 as was
10 originally submitted to the Patent Office, you
11 can feel free to double-check it against the
12 actual document.  And then in the bottom box I
13 have put the preamble from claim 1 as issued,
14 JX-1.  Do you see that, sir?
15    A.   Yes.
16    Q.   Now, if you look at the preamble that
17 was originally submitted, it doesn't specify
18 that this is a computer implemented method like
19 it does in claim 1 of the issued preamble,
20 correct?
21    A.   It doesn't have those words, no.
22    Q.   The originally submitted preamble does
23 not include the term dynamically, right?
24    A.   That is correct.
25    Q.   That term is in the issued claim 1

Page 390

1 preamble, right?
2    A.   Yes.
3    Q.   And the original preamble likewise
4 doesn't refer to components or hardware or
5 software components like the issued preamble
6 does, right?
7    A.   It has components, but doesn't break
8 it down into hardware or software.
9    Q.   That's right.  And there is no
10 reference in the original preamble to adding
11 support to an operating system like there is,
12 you see here, adding support to an operating
13 system of claim 1 of the issued preamble?  Do
14 you see that there?
15    A.   Yes.
16    Q.   There is no reference to that in the
17 original preamble, right?
18    A.   It has operating system on it but it
19 doesn't have the adding support portion.
20    Q.   The preamble just says a method for
21 processing system components, right?
22    A.   That's the start of it, yes, of the
23 original preamble.
24    Q.   Okay.  Now, let's go back to the
25 office action that I had you look at first.

Page 391

1 This is, again, at page 932.  And this is the
2 March 22, 1994 office action.
3    A.   Okay.
4    Q.   You can see, reading the document, I
5 am not going to blow it up, you have it in
6 front of you, it says claims 1 through 41 are
7 rejected, right?
8    A.   Yes, it does.
9    Q.   And that's every single claim in the
10 application, right?
11    A.   I have to check whether 41 was the
12 last but I believe it was all of them, yes.
13    Q.   If we go to the next slide on the
14 screen here, this is the examiner's office
15 action remarks.  So if you want to look at the
16 source core document, it is just a couple pages
17 beyond at 933.
18    A.   Um-hum.  Just give me a minute if you
19 don't mind.  Okay.
20    Q.   You say in paragraph 3, I have
21 highlighted, it says "claims 1 through 41 are
22 rejected under 35 U.S.C. Section 112, second
23 paragraph, as being indefinite for failing to
24 particularly point out and distinctly claim the
25 subject matter which applicant regards as the

Page 392

1 invention."
2        Do you see that?
3    A.   Yes.
4    Q.   So that's basically, to translate that
5 into lay person, or maybe not even lay person,
6 but that's basically saying, look, your claims
7 are indefinite, right?
8    A.   They are rejected as being indefinite,
9 yes.
10    Q.   Right.  And then if you look at the
11 next paragraph, it says "in claim 1, line 1,
12 processing system components is vague and
13 indefinite.  It is not clear what is meant by
14 system components (are these hardware and/or
15 software components) or how they are
16 processed."  Do you see that?
17    A.   Yes.
18    Q.   Now, claim 1, line 1, that's referring
19 to the preamble, right?
20    A.   Yes, line 1 was the preamble, right.
21    Q.   So the examiner rejected claim 1 and
22 specifically pointed to the preamble and the
23 phrase processing system components and said
24 that's indefinite, right?
25    A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 393

1    Q.    Now, sir, if the preamble wasn't
2  limiting, why would the Patent Office care
3  whether it is indefinite or not?
4    A.    So I am not sure I completely
5  understand your question, because one
6  interpretation of your question to me would be
7  -- are you saying that anything could be
8  written as a preamble if it is not limiting?
9    Q.    Well, I believe your opinion is the
10 preamble doesn't contain any limitations for
11 claim 1.  Is that your opinion?
12   A.    That it doesn't limit the subsequent
13 four elements of the claim, yes.
14   Q.    It doesn't limit anything, it is not
15 limiting, right?
16   A.    It is not limiting for those elements,
17 yes.
18   Q.    We don't need to even look at it to
19 determine whether there is infringement or to
20 make an assessment of domestic industry, right?
21 That's your opinion?
22   A.    If the elements, as I testified
23 earlier today, if the elements A-to-D are read
24 in context of the patent, not -- but you asked
25 me to take it completely outside, and I said I

Page 394

1  would need more time to think about that.
2    Q.    So my question to you is, doesn't it
3  seem strange if that's your opinion that the
4  patent examiner is pointing out the preamble
5  and the phrase processing system components,
6  and saying one of the reasons I am rejecting
7  claim 1 is because the preamble is vague and
8  indefinite?  If it wasn't limiting at all, it
9  wouldn't matter if it was indefinite or not,
10 would it?
11   A.    So it wasn't -- I am not sure you can
12 equate the two necessarily.  I think the
13 preamble needs to make some sense if you are
14 going to have a preamble.  It doesn't mean that
15 if it is, it has to be non--- I mean, it
16 doesn't mean it cannot be vague and -- it
17 doesn't mean it can be vague and indefinite.
18 That's what I meant to say.
19   Q.    Well, let's move on to see what
20 happened after this rejection.  Let's go to
21 slide RDX-15.10.  And this is a depiction of an
22 amendment that the applicant made together with
23 remarks dated March 31, 1994.  You can find
24 that if you want to use the source documents at
25 JX-4 on page 962.

Page 395

1    A.    Yes, I have the document.  Thanks.
2    Q.    And you see after it says greetings,
3  do you see it says amendment in the title,
4  right?
5    A.    Yes.
6    Q.    And after greetings it says, in
7  response to the office action dated March 22,
8  1994, please amend the application as follows.
9  Do you see that?
10   A.    Yes, I do.
11   Q.    And if you look at the very next page,
12 and I have pulled it out so it is easier to
13 read, sir, on slide 11 of RDX-15, and again
14 this is from JX-4, '963, here is amended claim
15 1, right?
16   A.    Was there a question there?
17   Q.    You agree this is the amended claim 1?
18   A.    Yes, it is.
19   Q.    Okay.  And you understand that the
20 brackets, when you are looking at it in the
21 patent prosecution history and there is an
22 amendment where words are surrounded by
23 brackets, that means they are deleted?
24   A.    That were previously in, that's right.
25   Q.    And then when words are underlined,

Page 396

1  that means they are the new words that are
2  added by the amendment?
3    A.    That's correct.
4    Q.    Okay.  So you see in claim 1 that the
5  patentee amended the preamble?
6    A.    Yes, there was an amendment.
7    Q.    And the applicant deleted the words
8  system, processing system components, and added
9  processing hardware and software components.
10 Do you see that?
11   A.    Yes.
12   Q.    And if you look at the applicant's
13 remarks, and this is on page 967, and for the
14 record we're on RDX-15, slide 12.  Are you
15 there, sir?
16   A.    Yes, I am.
17   Q.    The applicant says, to explain the
18 amendment, "all the pending claims were
19 objected to under 35 U.S.C. Section 112, second
20 paragraph.  Applicant has made appropriate
21 amendments to particularly point out and
22 distinctly claim the invention in clear and
23 definite terms."
24        Do you see that?
25   A.    Yes, yes, I do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 397

1    Q.   So part of what the applicant did to
2    particularly point out and distinctly claim the
3    invention in clear and definite terms was to
4    amend the preamble to add hardware and software
5    components; isn't that true, sir?
6    A.   That was one of the changes, yes.
7    Q.   So the patentee is representing here
8    that the amendments to the preamble were made
9    to distinctly claim the invention, right?
10   A.   I believe they are referring to all
11   the amendments they have made, not just
12   necessarily any one of those amendments, but
13   yes.
14   Q.   Well, including the preamble
15   amendments, right?
16   A.   Sure, includes all of the amendments.
17   Q.   Okay.  Let's go to the next event that
18   occurred in the prosecution history, which is
19   another office action.  This is dated June 9th,
20   1994.  I have depicted the first page of the
21   office action on slide RDX-15.013.
22        You can find it in your binder at JX-4
23   at page 971.
24   A.   I have it, yes.
25   Q.   Are you there?  This is the second

Page 398

1    office action in the file history, correct?
2    A.   I believe so.  I'd have to, you know,
3    spend some time double-checking that but I will
4    take your representation for that and I believe
5    it is.
6    Q.   You don't recall an intermediate
7    office action between this one and the earlier
8    one, right?
9    A.   Not that I recall, no.
10   Q.   Okay.  And the examiner rejected claim
11   1 again, right?
12   A.   That is correct.
13   Q.   And if we go to page 972 of JX-4, and
14   I have depicted an excerpt of that on a slide
15   RDX-15.014, we have got examiner remarks,
16   correct?
17   A.   Yes.
18   Q.   And the examiner says in paragraph 3
19   on page 972, "claims 1 through 5, 7, 8, 12, 13,
20   15," and it goes on to list a bunch of numbers
21   -- "are rejected under 35 U.S.C. Section 112,
22   second paragraph, as being indefinite for
23   failing to particularly point out and
24   distinctly claim the subject matter which
25   applicant regards as the invention."

Page 399

1    Do you see that?
2    A.   Yes, I do.
3    Q.   So, once again, the examiner is
4    saying, you know, you amended but I am still
5    rejecting claim 1 as indefinite under Section
6    112, right?
7    A.   Yes, that's what he says.
8    Q.   And then the examiner continues in the
9    next paragraph, "in claims 1 and 22, lines 1
10   through 2," now, before I go on, you would
11   agree with me claim 1, lines 1 through 2, is
12   referring to the preamble of the amended claim
13   1, correct?
14   A.   Of the amended claim, yes.
15   Q.   So in claim 1, lines 1 through 2,
16   "'processing hardware and software components'
17   is vague and indefinite.  It is not clear how
18   these components are processed or what is meant
19   by processing."
20        Do you see that?
21   A.   Yes.
22   Q.   And then it continues, "it is not seen
23   that there is any processing being done.  This
24   appears to be a method and apparatus for
25   searching for hardware and software components

Page 400

1    of a computer system."
2         Do you see that, sir?
3    A.   Yes, I do.
4    Q.   So the examiner, again, is pointing to
5    the preamble, this time the amended preamble,
6    and saying your amendment where you added
7    hardware and software components, that's still
8    vague and indefinite.  Right?
9    A.   That's what he is saying, yes.
10   Q.   Okay.  And same question, why would he
11   be saying that if the preamble is not limiting,
12   sir?
13   A.   So he is saying that those phrases are
14   limiting, but the amendment subsequently, I
15   believe -- I have got to find it -- also
16   changed a bunch of other things as well.  So it
17   is not just the preamble that got changed.
18   Q.   I understand that.  But I am asking
19   you about this highlighted language where it
20   refers to claim 1, lines 1 through 2.  Do you
21   see that?
22   A.   Yes.
23   Q.   And he specifically says that the
24   amended preamble is indefinite, right?
25   A.   He says that phrase is vague and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 401

1    indefinite, yes.
2        Q.   And the reason he is saying that is
3    because in his view, the preamble should be
4    limiting and it should be definite, right?
5        A.   I'm not sure about limiting.  I think
6    he is saying it should be definite.  He doesn't
7    say anything about limiting here.
8        Q.   Okay.  You agree that he says it
9    should be definite?
10       A.   Yes, he is saying -- well, he is
11   saying it is currently vague and indefinite.
12   So by implication, he probably wants to see
13   something that's not vague and not indefinite,
14   but I don't see anything about it being
15   limiting in that language.
16       Q.   Okay.  And you don't -- it doesn't
17   occur to you that it seems strange that he
18   would be rejecting the preamble as vague and
19   indefinite if the preamble is not limiting in
20   the first instance?
21       A.   Well, I think he would want it to be
22   not vague and not indefinite.  Whether it is
23   limiting or not, limiting the subsequent claim
24   steps, that's a separate issue as far as I can
25   tell.

Page 402

1        Q.   In your opinion indefiniteness is
2    separate from whether a claim is limiting?
3        A.   Whether that -- whether the preamble
4    is limiting.
5        Q.   Let's go to the next.  This is a
6    further excerpt from the remarks section of the
7    office action.  This is on page 973.  First
8    full paragraph.  It is page 3 of the remarks
9    section of the office action.  I am depicting
10   RDX-15.015.
11       Do you see the examiner continues "in
12   claims 1 and 22, the preamble indicates
13   processing hardware and software components;
14   however, the body of the claim speaks of
15   hardware or software components.  It is not
16   clear if a search criteria can be directed to
17   hardware only or software only, or if there can
18   be a search for a combination of hardware and
19   software components."
20       Do you see that?
21       A.   Yes.
22       Q.   So, again, in addition to what we just
23   looked at, the examiner has a problem with the
24   preamble because it is inconsistent with the
25   elements, at least in his view, right?

Page 403

1        A.   What he is saying is in that version
2    of the amended claim, it appears inconsistent,
3    yes.
4        Q.   And why would he care if it is not
5    limiting?
6        A.   I don't see why it would have to be --
7    if something is consistent, I don't see why it
8    has to be limiting.
9        Q.   All right.  Let's go look at the next
10   thing that happened after this office action.
11   I direct your attention to page 975 of JX-4,
12   and here we have another amendment.  This is
13   dated July 27th, 1994, amendment and remarks.
14       Do you see that, sir?
15       A.   Yes, I do.
16       Q.   For the record, we're looking at
17   RDX-15.016.  You would agree this is the
18   amendment in response to the last office action
19   we looked at?
20       A.   Yes, it appears to be.
21       Q.   And it says right on the front page,
22   "in response to the second office action dated
23   June 9, 1994, please amend the application as
24   follows."  Right?
25       A.   Yes.

Page 404

1        Q.   So if we look at the next page, 976 of
2    JX-04, we see the amended -- the second amended
3    claim, right?  Let me be more precise.
4        I have depicted the second amended --
5    amendment of claim 1 in the prosecution
6    history, correct?
7        A.   The second version, right.
8        Q.   Do you see where it says twice amended
9    at the top?
10       A.   Right.
11       Q.   And if we look at the preamble, we can
12   see that the word processing -- well, let me
13   take a step back.
14       Do you see over here, can we
15   highlight, Ryan, "and/or"?  Now, you remember
16   in the office action we just looked at, the
17   second problem that the examiner had was the
18   inconsistency between "and" and "or" in the
19   preamble versus the claims, right?
20       A.   That was one inconsistency, yes.
21       Q.   So it looks like the patentee dealt
22   with that by making this amendment, does that
23   look right to you?
24       A.   It is one change they have made, yes.
25       Q.   And they have deleted "and" and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 405

1    substituted "or"?
2        A.   That's correct.
3        Q.   To clarify the issue that the patent
4    examiner had an issue with, right?
5        A.   That's correct.
6        Q.   And that's an amendment in the
7    preamble, right?
8        A.   That is an amendment to the preamble.
9        Q.   And the other issue that the examiner
10   had was this processing.  Remember, the
11   examiner said, look, it is not clear what
12   processing is being done, it looks like we're
13   searching, and I am paraphrasing, but remember
14   we just looked at that?
15       A.   Yes.
16       Q.   So the applicant dealt with that by
17   deleting the word processing, right?  Do you
18   see processing is in brackets?
19       A.   Right, I'm sorry, I am just referring
20   back to the earlier comments by the examiner.
21   Yes, they did change processing to dynamically,
22   yes.
23       Q.   And replaced processing with the
24   phrase computer implemented method for
25   dynamically adding support with one or more

Page 406

1    properties to an operating system active on a
2    computer, correct?
3        A.   I'm not sure that it is replacing just
4    the word processing.  I think they clarified
5    that whole sentence.
6        Q.   That's a good point.  Added a lot more
7    detail than just processing, didn't it?
8        A.   Fair enough.
9        Q.   And the reason the applicant did this
10   is to distinctly claim and provide definiteness
11   to the preamble; isn't that true, sir?
12       A.   Well, I think the reason he is doing
13   it is to overcome the objections of the, of the
14   examiner, who said it is vague and indefinite,
15   I guess, is what he used.
16       Q.   Exactly.  So this, more specific
17   language was added in response to the patent
18   examiner's statement that processing is
19   indefinite, right?
20       A.   I just need to go back to that,
21   whether he meant just processing or processing
22   with the context.  Could you direct me back to
23   that, where we had it before?
24       Q.   I could show you the slide.
25       A.   Yeah, that would be fine.

Page 407

1        Q.   Okay.  Right here.  This is 972.  "In
2    claims 1, lines 1 through 2, processing
3    hardware and software components is vague and
4    indefinite.  It is not clear how these
5    components are processed or what is meant by
6    processing.  It is not seen that there is any
7    processing being done.  This appears to be a
8    method and apparatus for searching for hardware
9    and software components of a computer system."
10           Do you see that?
11       A.   Yes.
12       Q.   And then if we go fast forward to the
13   amendment, the applicant deletes processing,
14   right?
15       A.   Yes.
16       Q.   And adds this much more specific
17   language in the preamble, right?
18       A.   Yes.
19       Q.   And the applicant did that to respond
20   to the examiner's rejection that the preamble
21   was indefinite, correct?
22       A.   It appears to be the case, yes.
23       Q.   And the applicant did that to try to
24   make the preamble more definite to distinctly
25   claim what it is they are claiming in the

Page 408

1    preamble, correct, sir?
2        A.   Sure, that was the objection of the
3    examiner and they made those changes to satisfy
4    that or to overcome that objection, yes.
5        Q.   Right.  Let's look at the remarks that
6    go along with this amendment.  This is for the
7    record RDX-15, slide 18.  This is the remarks
8    section of the same document, correct?
9        A.   Yes, it is.
10       Q.   And applicant says the examiner's
11   Section 112 objection in paragraph 3 -- that's
12   the paragraph we just looked at, right, sir?
13       A.   Yes, it is.
14       Q.   That's the paragraph that was
15   objecting to the preamble of the use of the
16   word processing, right?
17       A.   Yes.
18       Q.   "The examiner's section 112 objection
19   in paragraph 3 is addressed in the claims that
20   have been crafted to present the patentable
21   subject matter in a clear, concise manner and
22   particularly point out and distinctly claim the
23   invention."
24           Do you see that?
25       A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 409

1    Q.   So the patentee is saying I made these
2  amendments in response to your objections to
3  the preamble, I amended the preamble, to
4  distinctly claim the invention.  Isn't that
5  what he is saying?
6    A.   Yes.
7    Q.   But it is your opinion, nevertheless,
8  the preamble is not limiting?
9    A.   Yes, I don't see how, given if you
10  read the elements of those claims, I don't see
11  how that requires the preamble per se in the
12  context of the entire patent?
13    Q.   And it is your opinion that a person
14  of ordinary skill in the art reading -- you
15  know the prosecution history is publicly
16  available, right?
17    A.   Yes, I believe so.
18    Q.   And one of the reasons it is publicly
19  available is so the public can see what
20  amendments were made, what distinctions were
21  made during the prosecution so they can
22  understand the scope of the claimed invention,
23  right?
24    A.   Sure, that's one reason for it.
25    Q.   And isn't it true, sir, a person

Page 410

1  reading the prosecution history here would see
2  based on the back and forth with the Patent
3  Office that, indeed, this preamble had to be
4  amended in order to get this patent issued in a
5  way that distinctly claimed the invention?
6    A.   They would see that as one amendment,
7  yes, but I also note that they amended some of
8  the elements of the claims as well.
9    Q.   Fair point.  But they would say that
10  that was one of the amendments that was made to
11  distinctly claim the invention, those
12  amendments in the preamble.  Fair?
13    A.   Fair enough, yes.
14    Q.   Okay.  So let's move on from the issue
15  of whether the preamble is limiting or not and
16  this is a related issue on the same claim term.
17        So I will go back to the claim
18  construction slide here.  This is RDX-15.20.
19  The related issue is let's assume the preamble
20  is limiting.  I understand you disagree with
21  that.  But if it is limiting, we have the
22  question of how should we construe this claim
23  term, dynamically adding support for hardware
24  or software components with one or more
25  properties.

Page 411

1        Do you follow me?
2    A.   Yes, you are saying if, if the
3  preamble is limiting.
4    Q.   If this phrase on the left column is
5  an actual limitation, in other words, if I'm
6  right and you are wrong and it is limiting, the
7  next step is we have to ask the question of
8  what does it mean, right?
9    A.   Okay.
10    Q.   Are you with me?
11    A.   Sure.
12    Q.   And Motorola and the Staff agree that
13  at least part of what dynamically adding
14  support for hardware and software components
15  means is that you are adding support or adding
16  hardware or software components without running
17  an installation program, right?
18    A.   I don't think it has to be that.  It
19  could be that.
20    Q.   But let me -- it is getting a little
21  bit late, and maybe I misspoke.  All I am
22  trying to do is set the stage for what the
23  parties' positions are.
24        So you understand that Motorola and
25  the Staff both think this phrase should include

Page 412

1  the requirement that whatever you are adding,
2  you are doing it without running an
3  installation program?
4    A.   That is Motorola and Staff's position,
5  yes.
6    Q.   Right.
7    A.   That I agree.
8    Q.   Now, I understand you and Apple say
9  this is not limiting at all, right?
10    A.   That's right.
11    Q.   Now, in your witness statement you
12  don't offer any proposed construction for this
13  phrase, do you?
14    A.   Beyond what's already there?
15    Q.   Beyond preamble is not limiting.
16    A.   I don't believe so.
17    Q.   So you have no opinion in your witness
18  statement as to what this phrase means,
19  correct?
20    A.   Beyond --
21    Q.   Beyond saying it doesn't mean
22  anything.
23    A.   We haven't provided a particular
24  construction,, if that's what you are asking.
25    Q.   Right.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 413

1    A.   A different construction, no.
2    Q.   You have provided no proposed
3 construction for this phrase, other than to say
4 it is not limiting, correct?
5    A.   That is correct.
6    Q.   So if the Court found I think it is
7 limiting, there is nothing in your witness
8 statement where you offer an opinion on what it
9 means; fair?
10    A.   As an alternate construction, I don't
11 recall putting one forward, no.
12    Q.   You don't recall anything where you
13 state in your witness statement here is what I
14 think this construction of this should be,
15 right?
16    A.   That is different from it not being
17 limiting, yes.
18    Q.   I'm sorry.  Did you say yes?
19    A.   That would be different from not being
20 limiting, yes, we did not put that forward,
21 yes.
22    Q.   Okay.  Now, if we look at just the
23 word -- just one second.  Bear with me one
24 second, Your Honor.  I will organize my
25 thoughts to try to be more efficient.

Page 414

1       All right.  What I would like to do,
2 even though you don't have an opinion, is just
3 to walk through the intrinsic evidence and see
4 what the intrinsic evidence says about whether
5 this requirement of adding an installation
6 program is part of this phrase dynamically
7 adding support.  Okay?
8    A.   All right.
9    Q.   So let's start with the abstract.
10    A.   Can I get the patent back?  Because it
11 is not in this binder.
12    Q.   Yes.
13    A.   We have it here.
14    Q.   Oh, you have it?
15    A.   In this other binder.  Are we done
16 with the file history for a little bit?
17    Q.   You should keep it handy.  Do you want
18 me to take it away?
19    A.   That's okay.  I will try to squeeze it
20 in here.  No problem.
21    Q.   I thought about giving you excerpts,
22 but then I was worried you would want to look
23 at other things, so I just gave you the whole
24 thing.
25    A.   So back to JX-3, yes.  Sorry.

Page 415

1    Q.   This is the '430 patent.  And I have
2 just illustrated the abstract on slide
3 RDX-15.022, abstract is a short summary of what
4 the invention is, right?
5    A.   Sure.
6    Q.   It is not describing a specific
7 preferred embodiment, it is talking about the
8 invention as a whole; fair?
9    A.   It is giving a broad-brush overview of
10 the invention, yes.
11    Q.   Of the invention, though, right?
12    A.   Of the overall scope of things, yes.
13    Q.   And here it says, "a method and system
14 for adding system components" -- and it gives
15 some examples of those -- "documents, tools,
16 fonts, libraries, et cetera," do you see that?
17    A.   Yes.
18    Q.   I will skip the parenthetical.  "A
19 method and system for adding system components
20 to a computer system without running an
21 installation program."
22       Do you see that?
23    A.   Yes.
24    Q.   So the abstract specifies, and it only
25 uses three sentences to describe the invention,

Page 416

1 right?
2    A.   It is using three sentences to give a
3 broad-brush overview of the entire patent, yes.
4    Q.   So this is the most basic elements of
5 a summary of what the invention is, right?
6    A.   I am not sure I would say the most
7 basic elements.  I would say it is a very
8 broad-brush overview of the invention.  Basic
9 elements may be much more specific than what's
10 in the abstract.
11    Q.   Summary of the invention?
12    A.   I don't think it is a summary.  I
13 think it is, like I said, it is a broad-brush
14 overview.
15    Q.   Okay.
16    A.   It is not trying to say this
17 encapsulates everything in the invention.  I
18 don't think that is fair at all.
19    Q.   You should look to the summary of the
20 invention section to see what the summary is,
21 right?
22    A.   I'm sorry?
23    Q.   I asked you if this is a good summary
24 of the invention.  You said you are not sure it
25 is.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 417

1    A.   I don't think -- I don't think it is
2  necessarily a summary in that it encapsulates
3  everything in the invention.  I think it is a
4  good overview of the invention.
5    Q.   Is it your understanding that the
6  phrase summary means it should encapsulate
7  every single aspect?
8    A.   I don't think it would have to have
9  all details, but a summary gives you kind of
10 the essence of it.
11   Q.   The essence.  And would you agree this
12 is the essence of the invention?
13   A.   It gives me a good overview of the
14 invention, yes.
15   Q.   Okay.  And it expressly says that you
16 are adding system components without running an
17 installation program.
18   A.   That's what that sentence says, of
19 course.
20   Q.   Okay.  Now, let's look at the actual
21 summary of the invention.  This is the '430
22 patent, JX-1, column 1, lines 52 through 57.
23        You have the patent there.  You can
24 read the source document if you want.
25   A.   Yes, I have it.

Page 418

1    Q.   I have pulled it out for ease of
2  reference, if you want to look at a bigger
3  font.
4    A.   Okay, I can read it.
5    Q.   Do you agree this is a fair depiction
6  of the first paragraph that immediately follows
7  the title summary of the invention?
8    A.   It is, it is the first paragraph, yes.
9    Q.   You agree to that?
10   A.   Sure, of course.
11   Q.   Okay.  And it says in the first
12 paragraph of the summary of the invention,
13 "accordingly, it is a primary objective of the
14 present invention to add system components to a
15 computer system without running an installation
16 program."
17        Do you see that?
18   A.   Yes.
19   Q.   A person of ordinary skill in the art
20 reading this patent would say this, a primary
21 objective of this invention is to add
22 components without running an installation
23 program, right?
24   A.   That's what that sentence says, sure.
25   Q.   That's what it says.  And it is not

Page 419

1  talking about a specific embodiment, is it?
2    A.   Not necessarily, no.
3    Q.   Not at all.  Summarizing the
4  invention, right?  That's what it says, right?
5    A.   It is, it is an objective of the
6  present invention.  It is an objective of the
7  present invention.
8    Q.   Objective of what?
9    A.   Of the present invention.
10   Q.   The present invention, right?
11   A.   Yeah, absolutely.
12   Q.   An objective means what to you?
13   A.   A goal.
14   Q.   And it is not just an objective, what
15 kind of objective is it?
16   A.   Well, it says here primary objective.
17   Q.   The primary or a primary objective,
18 right?
19   A.   Sure.
20   Q.   So it is a big objective, right?
21   A.   It is a primary objective.
22   Q.   And it is not just an objective of one
23 of the embodiments, it is an objective, a
24 primary objective of the invention as a whole,
25 isn't it?

Page 420

1    A.   Well, that's what it says, yes.
2    Q.   That's what it says.  And it expressly
3  says without running an installation program,
4  doesn't it, sir?
5    A.   That's right.
6    Q.   Now, let's go into the more specific
7  language in the specification where it is
8  describing in more detail.  And I would like to
9  direct your attention to column 6, lines 7
10 through 18.
11        I pulled them out on the screen, so it
12 has got bigger font if you want to look at it.
13   A.   No, I can read it here.
14   Q.   It says there, "the system is designed
15 to enable a user to add components without
16 running an installation program."  Do you see
17 that?
18   A.   Yes.
19   Q.   And then it continues, "to support
20 this goal," goal is sort of a synonym for
21 objective, isn't it?
22   A.   Fair enough.
23   Q.   To support this goal, an installation
24 program is, what, replaced?  So it is saying to
25 a person of ordinary skill in the art, the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 421

1  system here in the embodiment is designed to
2  add without running an installation program,
3  which is the same thing that is says in the
4  abstract, the same thing said in the summary of
5  the invention, right?
6      A.   Yes.
7      Q.   And it clarifies, to support this
8  goal, not only do they not use it, they said an
9  installation program is replaced, right?  Isn't
10 that what it says?
11     A.   Of course.
12     Q.   And it is replaced with something
13 else, a location framework, right?
14     A.   That's right.
15     Q.   So a person of ordinary skill reading
16 the art or -- excuse me, let me start over.
17         A person of ordinary skill in the art
18 reading this would understand that this is a
19 more detailed description of the summary of the
20 invention and is talking about to achieve that
21 primary objective, to achieve that goal the
22 installation program is replaced with something
23 else called a location framework; isn't that
24 right, sir?
25     A.   Just give me one second.  I want to

Page 422

1  make sure this excerpt of column 6 is actually
2  relating back to the summary of the invention
3  as you are claiming, if I may.  Reading the
4  whole thing I am not sure it necessarily is
5  clarifying the abstract per se, because a few
6  lines before what you highlighted, it talks
7  about an example.
8          And so, you know, it clearly says what
9  it says, but whether it is clarifying the
10 abstract or not or giving more detail to the
11 abstract, I don't know.
12     Q.   But you agree generally the detailed
13 description that follows the summary of the
14 invention is relating to the summary of the
15 invention, it is just more detailed, correct?
16     A.   In general, yes.  Whether it is
17 exactly referring back to saying I am going to
18 clarify that abstract with more detail per se,
19 I'd have to spend a bit more time looking at
20 this.
21     Q.   I didn't mean to suggest that this is
22 specifically expressly referencing the summary
23 of the invention, but you would agree this is a
24 follow-on detailed description that gives more
25 detail of what's described in the summary of

Page 423

1  the invention in the abstract, right?
2      A.   It is more detail of the entire
3  invention.
4      Q.   And in the more detailed section, it
5  repeats that the system is designed to run
6  without an installation program and it further
7  states that actually the installation program
8  is replaced; fair?
9      A.   Of course.
10     Q.   Okay.  Let's look really briefly at
11 the prosecution history on this subject, not
12 the subject of whether it is limiting or not
13 but the related subject, if it is limiting,
14 what does it mean?  Okay?  Are you ready?
15     A.   Yes, I have the prosecution history.
16     Q.   Now, if we go to -- I direct your
17 attention to -- this is, again, the prosecution
18 history is JX-4.  I direct your attention to
19 '975.  This is the July 27th, 1994 amendment we
20 looked at.
21     A.   Yes.  July 27th, right.
22     Q.   This is the applicant's amendment in
23 response to the second office action, right?
24     A.   Yes.
25     Q.   And, again, the next slide, RDX-15.28,

Page 424

1  I am just redepicting the amended claim just to
2  refresh your recollection.  This is the
3  amendment in the second amendment, right?
4      A.   Yes.
5      Q.   And this is where the applicant added
6  the word dynamically and replaced that with
7  processing, I won't read all the amendments,
8  but dynamically and it says adding support and
9  it continues, right?
10     A.   The replace processing with a computer
11 implemented method, there is a whole bunch of
12 things that have been changed there, yes.
13     Q.   The additions are that the method is
14 computer implemented and it is dynamically
15 adding support for those hardware and software
16 components, and it is doing so with one or more
17 properties, and it is doing so, you are adding
18 to an operating system that's active, right,
19 all those things were added.
20     A.   Yes, everything that's underlined on
21 the thing is added, yes.
22     Q.   And then I would like to focus on the
23 applicant's remarks.  We looked at this but
24 didn't look at this last sentence.  This is
25 JX-4, 978.  And this is the July 27th, 1994

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 425

1    amendment and remarks.  Are you there, sir?
2       A.   Yes, I am.
3       Q.   And we looked at this first paragraph
4    where the patentee talks about the
5    indefiniteness objection in paragraph 3.  Do
6    you remember when we talked about that?
7       A.   You mean the second paragraph here?
8       Q.   The second paragraph of -- yes, thank
9    you, sir, I misspoke.
10          Let me reask the question.  I have
11   depicted the second paragraph on the screen
12   here, correct?
13      A.   Yes.
14      Q.   And the first sentence of the second
15   paragraph, that's the sentence we already
16   looked at, right?
17      A.   Yes, right.
18      Q.   Do you remember that?
19      A.   Yep.
20      Q.   And now after saying, look, we made
21   these amendments in response to the 112
22   objection to paragraph 3, the patentee says the
23   following:  "The changes were made to expressly
24   claim the steps summarized in the summary of
25   the invention, 'add system components

Page 426

1    (documents, tools, fonts, libraries, et cetera)
2    to a computer system without running an
3    installation program'."
4          Do you see that, sir?
5       A.   Yes, I do.
6       Q.   Wouldn't a person of ordinary skill
7    reading this understand that the intent of the
8    patentee and the understanding of the examiner
9    was that these amendments include this notion
10   that you are adding to a computer system
11   without running an installation program, sir?
12      A.   Could I have the question read back to
13   me, if you don't mind?
14          THE REPORTER:  "Question:  Wouldn't a
15   person of ordinary skill reading this
16   understand that the intent of the patentee and
17   the understanding of the examiner was that
18   these amendments include this notion that you
19   are adding to a computer system without running
20   an installation program, sir?"
21          THE WITNESS:  Okay, thank you.  Yes, I
22   think it is saying that those changes are made
23   to expressly claim those elements, yes.
24          MR. VERHOEVEN:  Thank you.  Your
25   Honor, I am about to switch to a whole long new

Page 427

1    topic.  I can keep going if you want.
2          JUDGE ESSEX:  I have no doubt you can
3    keep going.  All right.  I think this is
4    probably, if you have a whole new topic, and
5    I'm assuming there will be dynamic redirect
6    after your other lawyers, so this is probably
7    about as good a time to take our evening break
8    as we can.
9          Doctor, I always hate -- I try to
10   break neatly when we're not in the middle of
11   it, but we are in the middle of your testimony.
12   I would remind you that you are not to discuss
13   your testimony or look subjects up or anything
14   having to do with it.
15          Do not discuss with anybody this
16   evening, don't look things up and that.  We
17   need you as though you were on the stand
18   continually.
19          However, don't be shy with going out
20   to dinner with your friends or the attorneys,
21   if you don't have friends.
22          You can discuss other topics, sports,
23   anything else you want to, but please do not
24   discuss matters of your testimony.  Understood?
25          THE WITNESS:  I understand.

Page 428

1          JUDGE ESSEX:  All right.  Thank you.
2    You are excused for the evening.
3          Do we have anything else to take up?
4          MR. VERHOEVEN:  I don't think so, Your
5    Honor.
6          MR. POWERS:  No, Your Honor.
7          MR. VERHOEVEN:  We're going to
8    continue to work on the exhibits.
9          JUDGE ESSEX:  I know you will, and I
10   appreciate the way you all have continued to
11   work.  If there is nothing else, we're
12   adjourned for the evening and I will see you in
13   the morning.
14          (Whereupon, at 4:55 p.m., the trial
15   recessed, to reconvene at 9:00 a.m. on Tuesday,
16   September 27, 2011.)
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 429

1  C O N T E N T S
2  WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
3  STEVEN P. HOTELLING  197  199  282   284
4  WAYNE C. WESTERMAN  288  289  330  344
5                349    --
6  RAVIN BALAKRISHNAN  357  359
7
8
9        AFTERNOON SESSION: 254
10
11     CONFIDENTIAL SESSIONS: 166-171, 225-287
12
13        E X H I B I T S
14 EXHIBIT NO:   MARKED  RECEIVED
15 COMPLAINANT
16 CX-205C........................ 286
17 CX-306C........................ 286
18 CX-512C........................ 286
19 CX-513C........................ 286
20 CX-514C........................ 286
21 CX-515C........................ 286
22 CX-516C........................ 286
23 CX-517C........................ 286
24 CX-522C........................ 286
25 CX-536C........................ 286

Page 430

1  EXHIBIT NO:    MARKED  RECEIVED
2  COMPLAINANT
3  CX-537C........................ 286
4  CX-538C........................ 286
5  CX-539C........................ 286
6  CX-540C........................ 286
7  CX-541C........................ 286
8  CX-542C........................ 286
9  CX-543C........................ 286
10 CX-208C........................ 354
11 CX-210........................ 354
12 CX-211........................ 354
13 CX-212C........................ 354
14 CX-215........................ 354
15 CX-216........................ 354
16 JOINT
17 JX-002........................ 286
18 JX-482C........................ 286
19 JX-488C........................ 286
20 JX-528C........................ 286
21 JX-530C........................ 286
22 JX-531C........................ 286
23 JX-534C........................ 286
24 JX-535C........................ 286
25 JX-690C........................ 286

Page 431

1  EXHIBIT NO:    MARKED   RECEIVED
2  JOINT
3  JX-003........................ 354
4  JX-245........................ 354
5  JX-291........................ 354
6  JX-488C........................ 354
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 432

1       CERTIFICATE OF REPORTER
2  TITLE:  Certain Mobile Devices and Related Software
3  INVESTIGATION NO: 337-TA-750
4  HEARING DATE:    September 26, 2011
5  LOCATION:    Washington, D.C.
6  NATURE OF HEARING: Volume 1
7     I hereby certify that the foregoing/attached
   transcript is a true, correct and complete record of
8  the above-referenced proceedings of the U.S.
   International Trade Commission.
9  Date:  September 26, 2011
10 SIGNED:KAREN BRYNTESON_____
11    Signature of the Contractor of the
      Authorized Contractor's Representative
12    1220 L Street, N.W, Suite 600
      Washington, D.C. 20005
13
      I hereby certify that I am not the Court
14 Reporter and that I have proofread the
   above-referenced transcript of the proceedings of the
15 U.S. International Trade Commission, against the
   aforementioned Court Reporter's notes and recordings,
16 for accuracy in transcription in the spelling,
   hyphenation, punctuation and speaker identification
17 and did not make any changes of a substantive nature.
   The foregoing/attached transcript is a true, correct
18 and complete transcription of the proceedings.
19 SIGNED:JOHN D. LASHER _____
      Signature of Proofreader
20
      I hereby certify that I reported the
21 above-referenced proceedings of the U.S. International
   Trade Commission and caused to be prepared from my
22 tapes and notes of the proceedings a true, correct and
   complete verbatim recording of the proceedings.
23
   SIGNED:KAREN BRYNTESON _____
24    Signature of the Court Reporter
25

APLNDC-X0000006253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 433

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

In the Matter of:    ) Investigation No.

CERTAIN MOBILE DEVICES  ) 337-TA-750

AND RELATED SOFTWARE   )

_____

Hearing Room A

United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.

Tuesday, September 27, 2011

VOLUME II

The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.

BEFORE:  THE HONORABLE THEODORE R. ESSEX

Page 434

```
 1   APPEARANCES:
 2       For Complainant Apple:
 3           MARK G. DAVIS, ESQ.
 4           BRIAN E. FERGUSON, ESQ.
 5           ROBERT T. VLASIS, ESQ.
 6           EDWARD S. JOU, ESQ.
 7           CHRISTOPHER T. MARANDO, ESQ.
 8           Weil, Gotshal & Manges LLP
 9           1300 Eye Street, N.W., Suite 900
10           Washington, D.C. 20005
11
12           JILL J. HO, ESQ.
13           BRIAN C. CHANG, ESQ.
14           Weil, Gotshal & Manges LLP
15           201 Redwood Shores Parkway
16           Redwood Shores, CA 94065
17
18           MATTHEW D. POWERS, ESQ.
19           STEVEN S. CHERENSKY, ESQ.
20           PAUL T. EHRLICH, ESQ.
21           ROBERT L. GERRITY, ESQ.
22           Tensegrity Law Group LLP
23           201 Redwood Shore Parkway
24           Redwood Shores, CA 94065
25
```

Page 435

```
 1   APPEARANCES (Continued):
 2
 3   For Respondent Motorola Mobility, Inc.:
 4           CHARLES K. VERHOEVEN, ESQ.
 5           DAVID EISEMAN, ESQ.
 6           Quinn Emanuel Urquhart & Sullivan LLP
 7           50 California Street, 22nd Floor
 8           San Francisco, CA 94111
 9
10           EDWARD J. DeFRANCO, ESQ.
11           Quinn Emanuel Urquhart & Sullivan LLP
12           51 Madison Avenue, 22nd FLoor
13           New York, New York 10010
14
15           DAVID A. NELSON, ESQ.
16           Quinn Emanuel Urquhart & Sullivan LLP
17           500 West Madison Street, Suite 2450
18           Chicago, Illinois 60661
19
20
21
22
23
24
25
```

Page 436

```
 1   APPEARANCES (Cont'd):
 2
 3   For ITC Staff:
 4           LISA KATTAN, ESQ.
 5           ANNE GOALWIN, ESQ.
 6           U.S. International Trade Commission
 7           500 E Street, S.W.
 8           Washington, D.C. 20436
 9
10
11       Attorney-Advisor:
12           GREGORY MOLDAFSKY, ESQ.
13           Attorney-Advisor
14           Office of Administrative Law Judges
15           U.S. International Trade Commission
16           500 E Street, S.W.
17           Washington, D.C. 20436
18
19
20       *** Index appears at end of transcript ***
21
22
23
24
25
```

APLNDC-X0000006254

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 437

```
 1              P R O C E E D I N G S
 2                  (9:00 a.m.)
 3          JUDGE ESSEX:  Let's come to order.  Do
 4   we have housekeeping to do before we recall our
 5   witness?
 6          MR. DAVIS:  One minor issue, Your
 7   Honor.  The parties were able to come to an
 8   agreement with regard to the expertise of the
 9   various experts.  If you would like to handle
10   that now, we can do that, or we can do it at
11   another time.
12          JUDGE ESSEX:  If you are in agreement,
13   call your experts, and we will accept them for
14   whatever the agreement of the parties is, just
15   see it is in the record, I don't need to hear
16   it.  I will be happy to hear the witnesses.
17          MR. DAVIS:  So one of the
18   agreements that the parties have reached is
19   with regard to two of the economic experts, so
20   they actually won't be here, so it will be
21   easiest just to read into the record --
22          JUDGE ESSEX:  All right.  If you want
23   to proceed that way, do you want to do that at
24   this time?
25          MR. DAVIS:  Yes, Your Honor.
```

Page 438

```
 1          JUDGE ESSEX:  All right.  Is that all
 2   right with Respondents and Staff?
 3          MR. NELSON:  That's fine, Your Honor.
 4   We had reached it.  I mean, I think the witness
 5   statements address it, but it's all good.
 6          JUDGE ESSEX:  That's fine.
 7          MS. KATTAN:  It is fine, Your Honor.
 8          JUDGE ESSEX:  Thank you.  Go ahead and
 9   proceed.
10          MR. DAVIS:  Yes, Your Honor.  So
11   Dr. Subramanian and Dr. Wolfe are agreed to be
12   experts in touchscreen design and touch sensing
13   technology.  Dr. Balakrishnan is agreed to be
14   an expert in computer programming and software
15   development and touchscreen design and touch
16   sensing technology.
17          Dr. Locke is agreed to be an expert in
18   computer programming and software development.
19   And Ms. Mulhern and Mr. Bakewell are
20   acknowledged to be experts in financial
21   analysis and IP licensing and valuation.
22          JUDGE ESSEX:  Very good.
23          Do we have anything else?
24          MR. VERHOEVEN:  One other thing, Your
25   Honor.
```

Page 439

```
 1          JUDGE ESSEX:  Mr. Verhoeven?
 2          MR. VERHOEVEN:  Actually, two things.
 3   First, just for the record, is that remember we
 4   had the wrong exhibit in the tabs yesterday in
 5   Dr. Balakrishnan's cross binder.  We
 6   accidentally had put JX-3 under the tab for
 7   JX-1.
 8          We have replaced those in the binders
 9   during the break, and now it contains the
10   correct JX for the record.
11          The second thing I would like to
12   raise, Your Honor, is with respect to one of
13   the Motorola witnesses, and, in particular,
14   Mr. Andy Rubin, who is one of the cofounders of
15   Android and is senior vice president at Google.
16          Complainant has indicated late last
17   night that they were prepared to waive cross on
18   Mr. Rubin and so we didn't have him get on a
19   plane, which he was going to do last night.
20   And we appreciate that.  However, they have
21   indicated that they have some objections to his
22   witness statement, and I think we need to
23   resolve those now so that we know if we need to
24   call him and get him back on a plane, in light
25   of those objections.
```

Page 440

```
 1          And if I could briefly summarize that,
 2   the issue for Your Honor.
 3          JUDGE ESSEX:  You may summarize your
 4   side of it.  I will give Complainant a chance
 5   to summarize theirs.
 6          MR. VERHOEVEN:  Should they go ahead
 7   and go first, since it is their objection?
 8          JUDGE ESSEX:  However you want to
 9   proceed.  Why don't you go ahead and tell me
10   your objection.
11          MR. FERGUSON:  Thank you, Your Honor.
12          Our objection, very briefly, is that
13   with respect to Mr. Rubin, there are four
14   questions and answers that we believe are
15   inappropriate and have no relationship or no
16   relevance to any issue in this particular
17   investigation.  It is questions 57, 58, 60, and
18   61 of the --
19          JUDGE ESSEX:  Can one of you put them
20   up on the screen for me?  Because, not
21   surprisingly, I don't have these memorized as
22   well as I'm sure counsel does.  Are they
23   confidential?
24          MR. FERGUSON:  I don't believe they
25   are.  I think the entire witness statement was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 441

1   non-confidential.
2        MR. VERHOEVEN:  I can summarize really
3   briefly.
4        JUDGE ESSEX:  Go ahead and give a
5   summary.
6        MR. FERGUSON:  Here it is, Your Honor.
7   57, 58, questions 57 and 58.
8        MR. VERHOEVEN:  Your Honor, should I
9   summarize for you?  Basically here is the
10  issue.  We had a prior ITC litigation.
11       JUDGE ESSEX:  We did.
12       MR. VERHOEVEN:  Brought by the same
13  Complainant, Apple, against a different
14  Respondent, a company called HTC.  It was the
15  710 investigation.
16       And the allegations were against the
17  same operating system, so you have the same
18  Complainant, the same operating system.  And
19  Mr. Rubin appeared in that case, was
20  cross-examined, and then in a later
21  post-hearing petition, petition for review
22  filed by Apple, the statements were made to
23  suggest that Mr. Rubin's work -- Mr. Rubin had
24  worked at Apple in the past.
25       And statements were made to suggest,

Page 442

1   by Apple, that Mr. Rubin developed or his
2   framework for Android was somehow influenced
3   from his work at Apple, with the inference that
4   somehow there was some sort of copying or use
5   of --
6        JUDGE ESSEX:  Was that in the actual
7   testimony?  I know that's been in the public
8   domain.
9        MR. VERHOEVEN:  Yeah, it was in a
10  petition for rehearing brief filed by Apple
11  that was publicly made available, Your Honor.
12  And so if we don't -- so Mr. Rubin in his
13  witness statement here has a few questions
14  where he says that's ridiculous, I didn't --
15  nothing that I came up with with Android had
16  anything to do with the work I did with Apple.
17       Now, they are saying, well, this isn't
18  relevant, but what is to stop them from filing
19  a petition, a post-hearing brief in this case,
20  making the same allegation that they made with
21  respect to the same operating system and we
22  simply have these questions to refute that for
23  the record, so that we have something in the
24  evidence that refutes that and they can't make
25  that allegation without --

Page 443

1        JUDGE ESSEX:  All right.  Hang on.  I
2   understand that part.  Let me ask Apple.  Do
3   you have any witnesses that are going to
4   present any evidence regarding Mr. Rubin's
5   service at Apple and whether or not he has a
6   basis for the Android system from those years?
7   My recollection is that the general journal
8   said it was not even related to iPhones in any
9   way, shape, or form.
10       MR. FERGUSON:  Your Honor, we have no
11  witness who has offered any testimony, nor do
12  we have a witness who is going to offer any
13  testimony regarding Mr. Rubin's employment at
14  Apple or any of the roles he played with
15  respect to his employment at Apple.
16       We did not raise this issue at all in
17  our pretrial brief.  So there is no --
18       JUDGE ESSEX:  Yeah --
19       MR. FERGUSON:  There is no question it
20  is not going to be raised in our post-hearing
21  brief.
22       MR. VERHOEVEN:  Your Honor --
23       MR. DAVIS:  If you want, Your Honor, I
24  have a copy of the witness statement.
25       JUDGE ESSEX:  Let me take a quick look

Page 444

1   at those questions.  You may approach.
2        MR. FERGUSON:  57, 58, 60, and 61,
3   Your Honor.
4        JUDGE ESSEX:  All right.
5        MR. VERHOEVEN:  Your Honor, if I could
6   say one final thing?
7        JUDGE ESSEX:  Yes, you may.
8        MR. VERHOEVEN:  If counsel for Apple
9   is willing to represent that they are not going
10  to make such an allegation in this
11  investigation, and they stand by that
12  representation, then obviously this isn't an
13  issue.  We're just simply trying to prevent
14  what happened the last time.
15       JUDGE ESSEX:  I appreciate your
16  concern, but I don't recall this being in any
17  of the pretrial briefs or any notices that this
18  issue would be played at all.  Has Apple raised
19  this at all in any way in its pretrial briefs?
20       MR. FERGUSON:  We have not raised it
21  at all.
22       JUDGE ESSEX:  And you do tell me it is
23  not going to be raised in your evidence?
24       MR. FERGUSON:  That's correct, Your
25  Honor.

APLNDC-X0000006256

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        JUDGE ESSEX:  So it would be totally
2   irrelevant, and impermissible for them to raise
3   it.  Staff, would you like to be heard?
4        MS. KATTAN:  No, Your Honor.  It seems
5   the issue is resolving itself.
6        MR. DAVIS:  Your Honor, I only have
7   one copy.  I should give her a chance to look
8   at the questions.
9        JUDGE ESSEX:  All right.
10       MR. VERHOEVEN:  Your Honor, with those
11  representations --
12       JUDGE ESSEX:  They are not
13  representations.  Those are in the record here.
14       MR. VERHOEVEN:  That's fine.
15       JUDGE ESSEX:  And I would be very,
16  very upset if Apple were misrepresenting to me,
17  and I have ways of making it known when I am
18  unhappy, as you are aware.  So this is a
19  non-issue in this case.  They have no evidence.
20  It was not preserved in their pretrial
21  briefing.
22       If it should come in in some side door
23  and that, I would slam that shut in a most
24  forceful way.  So I will not allow those
25  questions, because it is a non-issue.
```

```
1        And if Apple is not going to raise it,
2   as per their brief and as per their
3   representation here, then there is nothing to
4   refute.
5        MR. VERHOEVEN:  Thank you very much,
6   Your Honor.  And so I'm assuming that Mr. Rubin
7   does not need to appear and we're waiving cross
8   at this point?
9        MR. FERGUSON:  As we said last night,
10  that's correct.
11       MR. VERHOEVEN:  Thank you, Your Honor.
12       JUDGE ESSEX:  Thank you very much for
13  your cooperation.  Apple as well.  I appreciate
14  it.
15       MR. FERGUSON:  Thank you, Your Honor.
16       JUDGE ESSEX:  Thank you.  Respondents,
17  do we have anything else to take up?
18       MR. NELSON:  One more.
19       JUDGE ESSEX:  You don't have to raise
20  your hand, Mr. Nelson.  You can just stand.
21       MR. NELSON:  Too much time in school,
22  Your Honor.  With respect to the exhibits
23  yesterday that we used on cross, we worked
24  everything out, as we have been, with the
25  exhibits.  There is one issue with respect to
```

```
1   two of the demonstratives that Apple has an
2   objection to.
3        As we did in the previous case with
4   Your Honor, in 744, we had been with the
5   witnesses, we were putting in the
6   demonstratives that were used, so that you have
7   those.  They were referred to in the
8   transcript.  They are obviously not part of the
9   evidence in the case, but we admit those.
10       And Apple has an objection to those.
11  We want those just because that -- if you want
12  to look back at that part of the record and you
13  want to have that context, it is there, but
14  Your Honor knows what is evidence and what is
15  not evidence.
16       JUDGE ESSEX:  All right, thank you
17  very much.  And I don't take -- demonstratives
18  are not evidence, but they are part of the
19  record, and they are attorney argument,
20  basically, which, as you know, we have to
21  listen to.
22       MR. DAVIS:  Our only objection was if
23  you recall, these were the University of
24  Delaware e-mails that Dr. Westerman was
25  questioned about and said that he had no
```

```
1   knowledge whatsoever about.
2        JUDGE ESSEX:  I think they are
3   appropriate in the record to show what it was
4   we were asking Dr. Westerman.  As far as being
5   substantive for the truth within those things,
6   they are not, particularly when he said he did
7   not know what they were.
8        At that point, they did not refresh
9   his memory, therefore, they would have no
10  substance value at this point.  Maybe they can
11  come up in some other context.  I suspect,
12  perhaps, we will see them in some other place
13  later, but right now, they have no substantive
14  value at all as far as I understand the law.
15  You can help me out if I am mistaken.
16       MR. DAVIS:  Very good, Your Honor.
17       JUDGE ESSEX:  All right.  Thank you.
18       All right.  That takes care of the
19  housekeeping.
20       MR. POWERS:  Yes, Your Honor.
21       JUDGE ESSEX:  I believe that you are
22  holding court on cross-examination, Mr.
23  Verhoeven, but we had a witness at that time.
24  //
25  //
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 449

1    Whereupon--
2          RAVIN BALAKRISHNAN,
3    a witness, called for examination, having previously
4    been duly sworn, was examined and testified further as
5    follows:
6          JUDGE ESSEX:  Good morning, Doctor.
7          THE WITNESS:  Good morning.
8          JUDGE ESSEX:  I am sure it is probably
9    not necessary. Doctor, I will remind you, you
10   are still under oath from yesterday.
11         THE WITNESS:  Yes, I understand.
12         JUDGE ESSEX:  Make sure your
13   microphone is on.  Very well.  Go ahead.
14         MR. VERHOEVEN:  Thank you, Your Honor.
15           CROSS-EXAMINATION -- Resumed
16   BY MR. VERHOEVEN:
17   Q.   Good morning, Dr. Balakrishnan.
18   A.   Good morning.
19   Q.   Ryan, could we put up RDX-15.031.
20   Dr. Balakrishnan, yesterday afternoon we were
21   talking about the preamble.  Do you remember
22   that?  And we had several questions about that.
23        I would like to now move to a
24   different subject, still on claim construction
25   And, in particular, step D that I have

Page 450

1    highlighted in claim 1 of the '430 patent,
2    adding support for the hardware and software
3    components to the operating system.  Okay?
4    A.   Okay.
5    Q.   If we go to the next slide, this is
6    slide 32, I simply put up the parties' claim
7    constructions here.  And the term on the left,
8    again, "adding support for the hardware and
9    software components of the operating system."
10   You understand Motorola's position is that this
11   phrase is indefinite?  Right?
12   A.   Yes, I do.
13   Q.   And the Staff says that the phrase
14   should have its plain and ordinary meaning,
15   right?
16   A.   Yes, I do.
17   Q.   And Apple has a construction that this
18   phrase should be construed as "facilitating
19   access to the hardware or software components,"
20   correct?
21   A.   Yes.
22   Q.   And in your opinion, you agree with
23   Apple's construction?
24   A.   Yes, I do.
25   Q.   Okay.  Now, what I would like to do is

Page 451

1    walk through the intrinsic evidence with
2    respect to this term.  So let's start with the
3    claim language itself.
4          Now, I have highlighted on slide 33 a
5    couple of the phrases from element D, adding,
6    and then it says, support for the hardware and
7    software components, and then it says, "to the
8    operating system."
9          Do you see that?
10   A.   Yes, I do.
11   Q.   So the claim -- you would agree the
12   claim expressly says that you are adding
13   something to the operating system, right?
14   A.   It says you are adding support to the
15   operating system.
16   Q.   Right.  And that's something, right?
17   You are adding something to the operating
18   system?
19   A.   You are adding support for the
20   hardware and software to the operating system,
21   yes.
22   Q.   So you are adding something that
23   didn't exist before to the operating system?
24   A.   Well, I think adding support is what
25   it is, it is facilitating access to the

Page 452

1    hardware and software.
2    Q.   That's my point.  Go ahead, sorry.
3    A.   And it doesn't necessarily mean, you
4    know, putting something into the operating
5    system, if that's what you mean by that.
6    Q.   Yeah, that's actually my point, sir.
7    Isn't it true that under Apple and your
8    construction, facilitating access, you have
9    deleted adding something to the operating
10   system?  You have deleted the word adding to
11   the operating system, that's not in your
12   construction anymore?
13   A.   No, it continues to add support to the
14   operating system.
15   Q.   But you dispute that you are adding
16   anything to the operating system in this step,
17   don't you?
18   A.   No, we say facilitates access, which
19   means equivalent to adding support, not just
20   adding, but adding support.
21   Q.   But under your construction of
22   facilitating access, you don't need to add any
23   software or anything to the operating system,
24   you just need to facilitate?  Isn't that true?
25   Let me ask it a different way, sir.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 453

1    Under your construction, does that
2  still require that you add some software to the
3  operating system?
4    A.  I don't think it requires adding
5  software necessarily to the operating system.
6    Q.  Okay.  Does it require adding any code
7  to the operating system?
8    A.  To the extent that code is software, I
9  don't think it needs to add code per se.
10   Q.  Isn't it true that under your
11 construction, facilitating access, you have
12 written out the phrase adding to the operating
13 system?  You are not adding anything to the
14 operating system?
15   A.  No.  As I testified earlier, it is
16 adding support.  And that's different, could be
17 different from adding code or adding software.
18 I can facilitate access, which is adding
19 support, without necessarily adding code or
20 adding software.
21   Q.  The operating system is code?
22   A.  The operating system is code, sure.
23   Q.  It is what it is.  You have got an
24 operating system, it is a certain amount of
25 code, right?

Page 454

1    A.  That's correct.
2    Q.  And this says you are adding something
3  to that operating system.  Well, since the
4  operating system is 100 percent code, if you
5  are adding something to it, don't you need to
6  be adding code?
7    A.  Not necessarily.  I am adding support
8  for that hardware and software components.  I
9  am not necessarily adding something to the
10 operating system.
11   Q.  I guess my confusion is since the only
12 way you can add -- since the entirety of the
13 operating system is code, right --
14   A.  Yes.
15   Q.  -- and since this says you are adding
16 something to the operating system, wouldn't a
17 person of ordinary skill in the art understand
18 that you are adding code to the operating
19 system?
20   A.  Not necessarily --
21   Q.  Whether you call it support or a
22 component or anything else?  You are adding to
23 the operating system?
24   A.  I am adding support.
25      MR. DAVIS:  Your Honor, if I could

Page 455

1  just -- if the witness be allowed to answer the
2  question posed before a new question is posed
3  to him.
4      JUDGE ESSEX:  I will take that in the
5  form of an objection.  This is
6  cross-examination.  Do let him complete his
7  answer here.
8      THE WITNESS:  I am not sure where we
9  are after the interruption, if we can reask the
10 question, please.
11 BY MR. VERHOEVEN:
12   Q.  I won't belabor the point.  I will ask
13 it one more time.
14      Isn't it true that a person of
15 ordinary skill in the art looking to this
16 language, knowing that an operating system is
17 100 percent code, seeing that the claim says
18 you are adding something to that operating
19 system, isn't it true that person of ordinary
20 skill in the art would conclude you are adding
21 some form of code to the operating system?
22   A.  That is not true.
23   Q.  But you would agree, at least, that
24 Apple's and your proposed construction of this
25 phrase would remove any requirement that you

Page 456

1  add code to the operating system, fair?
2    A.  It doesn't preclude adding code to the
3  operating system.  It doesn't require it,
4  necessarily.
5    Q.  Okay.  Let's move on from the claim
6  language.  Again, we're talking about claim
7  construction of this element.  Let's move on
8  from the claim language to another piece of
9  intrinsic evidence, the prosecution history for
10 this term.
11      I would like to start -- and you can
12 turn if you want to, again, into the binder.
13 This is simply what we looked at yesterday, the
14 original claim 1.
15   A.  Yes, give me a minute.
16   Q.  And I am depicting on the screen
17 RDX-15, slide 34, which contains JX-4, page 25.
18   A.  Okay, I have got it.
19   Q.  Now, you see there is no step D in the
20 original claim, right?
21   A.  That is correct.
22   Q.  But there is something I want to note
23 in element C, which states, "returning matched
24 system components via the locator request to
25 enable access to the one or more system

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 457

1    components." Do you see that?
2        A.   Yes.
3        Q.   I want to highlight, element C had
4    this phrase, to enable access, right?
5        A.   It has that phrase, yes, of course.
6        Q.   If we turn to the examiner's first
7    rejection, again, this is just a cover page,
8    JX-4, page 932, we looked at this yesterday, do
9    you remember, March 22, 1994 office action?
10       A.   Yes. Let me just get to that page.
11       Q.   Sure.
12       A.   Okay.
13       Q.   And then I would like to turn to page
14   933 of that office action, this paragraph 3
15   which we looked at a portion of yesterday,
16   remember?
17       A.   Yes.
18       Q.   And you see -- I would like to look at
19   a different sentence in paragraph 3 here, the
20   last sentence. This is the examiner's -- just
21   to refresh, the examiner rejected for
22   indefiniteness, right?
23       A.   I have got to look at that again just
24   to --
25       Q.   Sure. Do you see where it says,

Page 458

1    claims 1 through 41 are rejected under 35 USC
2    Section 112, second paragraph, as being
3    indefinite?
4        A.   Yes, I do now.
5        Q.   Okay. And then the next paragraph is
6    statements explaining the examiner's rejection,
7    correct?
8        A.   For portions of the claims, yes.
9        Q.   Yes. And so I would like to focus on
10   the highlighted language on the screen. It
11   says, "in lines 7 through 8, it is not clear
12   what enable access to the system component
13   means." Do you see that?
14       A.   Yes, I do.
15       Q.   So the examiner rejected -- part of
16   the rejection for indefiniteness was the
17   examiner was saying I don't know what enable
18   access to system components means, right?
19       A.   That is the reason he gave, yes.
20       Q.   Okay. And then if we could go forward
21   to the amendment and remarks in the prosecution
22   history, March 31st, 1994, do you remember we
23   looked at this yesterday?
24       A.   I believe so. Just give me one second
25   to get to that page. Yes.

Page 459

1        Q.   And then the next page, page 963 of
2    JX-04, which is depicted on the screen, depicts
3    the first amendment for claim 1, right?
4        A.   Yes, it does.
5        Q.   And you will see that in response to
6    what we just looked at from the office action,
7    the patentee deleted that phrase that contained
8    the phrase enable access? Do you see I have
9    highlighted it there?
10       A.   Yes, they did.
11       Q.   So "via the locator request to enable
12   access to the one or more system components"
13   was deleted in response to the examiner saying
14   I don't know what enable access means, right?
15       A.   Yes.
16       Q.   Okay. And then if we go forward to
17   the second rejection, this is JX-04.971, the
18   second office action dated June 9th, 1994, we
19   looked at that yesterday, right?
20       A.   Yes, I believe we did look at this
21   yesterday, yes.
22       Q.   And then if we go to page 972, just --
23   I'm sorry, take a step back. The examiner
24   again rejected the claims as indefinite in the
25   second office action, right?

Page 460

1        A.   So some have been canceled and a bunch
2    have been rejected. And --
3        Q.   If you look at paragraph 3, which I
4    have depicted on the screen, you can sort of
5    see it there.
6        A.   Yes, that's right.
7        Q.   Do you see it?
8        A.   Yes.
9        Q.   And the examiner stated, and I have
10   highlighted it on the screen, this is page 972
11   of JX-04, "in claim 1, line 10 and" -- let me
12   start over.
13            "In claim 1, line 10 and claim 22,
14   lines 10 through 11, returning hardware or
15   software components is vague and indefinite.
16   It is not clear what this means. How are
17   components returned and where are they returned
18   to? It is not clear what is done with
19   components after they are searched for and
20   returned."
21            Do you see that?
22       A.   Yes, I do.
23       Q.   And just to help tie this together,
24   let's go back to the amendment again. This is
25   element C that the examiner is referring to,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 461

1    right?  It says, as amended, it says,
2    "returning hardware or software components
3    meeting the target hardware or software
4    component search criteria."  Do you see that?
5        A.    Yes, I do.
6        Q.    And I forgot to mention when we were
7    looking at this that this was added to replace
8    the enable access language, right?
9        A.    From the earlier claim, yes.
10       Q.    Exactly.  So enable access was
11   deleted.  This return hardware system -- excuse
12   me, hardware/software components meeting the
13   target hardware/software components search
14   criteria was added, and then the examiner still
15   rejected on indefiniteness, saying that the
16   returning hardware or software components
17   change is still vague and indefinite, right?
18       A.    Yes, that's what he is saying, yes.
19       Q.    Okay.  Then the next thing that
20   happened is there was the second amendment,
21   right, we looked at this yesterday dated July
22   27th, 1994?
23       A.    That is correct.
24       Q.    That's when we see for the very first
25   time adding support for the hardware or

Page 462

1    software components to the operating system
2    without rebooting the operating system, element
3    D, right?
4        A.    That's one that was added, yes.
5        Q.    And that's the first time this
6    limitation appeared in the prosecution history,
7    right?
8        A.    As far as I can tell, yes.
9        Q.    And this is an attempt by the patentee
10   to answer the last rejection and, remember, the
11   rejection was it is not clear what happens
12   after it is returned?  Here, we will go back to
13   it.
14             We're back at slide 40, page 972.
15   "How are the components returned and where are
16   they returned to?  It is not clear what is done
17   with the components after they are searched for
18   and returned."  Do you see that?
19       A.    Yes.
20       Q.    So in the amendment they added this
21   step to address that objection or statement by
22   the examiner.  Fair?
23       A.    I would say at least partially, yes.
24       Q.    Now, going back to the parties' claim
25   constructions, you have said adding support

Page 463

1    means facilitating access, right?
2        A.    Facilitating access to the hardware or
3    software components, yes.
4        Q.    Now, the original claim 1 we looked
5    at, there was a step C that contained the
6    phrase returning matched system components via
7    the locator request to enable access.  Do you
8    remember that?
9        A.    Yes.  Could you put that back?
10       Q.    Do you want to put it back on?  Okay.
11       A.    Or just tell me where it is again.
12       Q.    I will get it for you.  Hold on a
13   second.  Let's go to slide 34.  I have just put
14   it on the screen for your ease of convenience.
15   That's the original claim, remember, it says to
16   enable access?
17       A.    Right.
18       Q.    And do you remember that was rejected
19   by the examiner as indefinite?
20       A.    That's correct.
21       Q.    During the remarks, it says it is not
22   clear what enable access to the system
23   component means, right?
24       A.    That's right.
25       Q.    And then the applicant deleted enable

Page 464

1    access, right?
2        A.    Yes.
3        Q.    We saw that right here, deleted enable
4    access.  Now, you are saying that this new
5    phrase that was added "adding support to the
6    operating system" means facilitate access,
7    right?
8        A.    That's correct.
9        Q.    If we could go to slide 43 again.
10   Facilitate access.
11       A.    Facilitating access to the hardware or
12   software components.
13       Q.    Now, sir, doesn't facilitate access
14   mean the same thing as enable access?
15       A.    No, I think it is a bit more
16   descriptive than enable.  It is not exactly --
17   it is not a synonym per se.
18       Q.    It is not a synonym?
19       A.    I don't think it is exactly a synonym.
20       Q.    Let's look at the Doubleday Roget's
21   Thesaurus.  A thesaurus lists synonyms, right?
22       A.    I am not sure it lists exact synonyms,
23   but words that are similar, sure.
24       Q.    I have brought out, this is from
25   RX-1796.  The definition or the entry for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 465

1    enable in the thesaurus, Roget's Doubleday
2    Thesaurus, and synonyms are empower,
3    facilitate.  Do you see?
4        A.   Yes, I do.
5        Q.   It is a synonym, isn't it?
6        A.   In this definition, it might be, yes.
7        Q.   And the examiner says enable is
8    indefinite, right?
9        A.   In that context of that claim, yes.
10       Q.   So why wouldn't facilitate be just as
11   indefinite, sir?
12       A.   To me, I see facilitate access being
13   descriptive of adding support, which is a
14   different term or part of the claims that's
15   been added subsequently.  It is not referring
16   back to the original claim that was deleted.
17   This is -- now we're talking about facilitating
18   access, which is describing what adding support
19   means.  I think it is a reasonable description
20   of what adding support means.
21       Q.   Well, you know, you understand that
22   the indefiniteness issue is -- you need to have
23   clear, definite boundaries, so that somebody
24   who doesn't want to infringe a patent can know
25   the metes and bounds of what is permissible and

Page 466

1    not permissible, right?
2        A.   Fair enough.
3        Q.   And part of the claim construction
4    process is to determine those boundaries of
5    what the claim covers and what it doesn't
6    cover, right?
7        A.   Part of it, yes.
8        Q.   So my question is, if enable is
9    indefinite, how is facilitate not indefinite?
10   How is a person of ordinary skill going to
11   know, well, facilitate is different enough from
12   enable so I know when I am facilitating and not
13   facilitating?
14       A.   In this context for element D of claim
15   1, it is talking about adding support, and the
16   facilitating there, facilitating access there
17   is used to explain what adding support is.  And
18   I think that one skilled in the art would be
19   able to understand, okay, I am going to provide
20   some ability to support these components and
21   the operating system, access to that.
22       Q.   How would a person of ordinary skill,
23   sir, know the difference between facilitate
24   access and enable access?
25       A.   I think it is just, to me, it is a

Page 467

1    question of degree.  I think facilitating
2    access means you do a little bit more maybe
3    than just simply enabling access, so --
4        Q.   So a little bit more?  I am going to
5    infringe if I do a little bit more, or I am not
6    going to infringe if I do not do a little bit
7    more?  That's the standard under your claim
8    construction?
9        A.   Well, you asked me how does it differ
10   from enabling access, and I see that as a
11   question of degree.  I don't see that as being
12   identical words necessarily.
13       Q.   And how is someone acting in good
14   faith who doesn't want to infringe this patent
15   going to be able to determine under your
16   construction how many degrees is safe, if it is
17   a question of degree?  They are not going to be
18   able to, are they?
19       A.   If you are saying is there something
20   drawn in the sand, a line drawn in the sand
21   per se, yes, it is a little bit flexible, let's
22   put it that way.
23       Q.   It is flexible.  Is that what you
24   said?
25       A.   Yes.

Page 468

1        Q.   Let's move on to another piece of
2    intrinsic evidence, the specification.
3        A.   Sure.
4        Q.   Again, if we look at the summary of
5    the invention?
6        A.   Is the patent back in this binder now?
7        Q.   I don't know if you were in the
8    courtroom when I clarified.  I think we have
9    replaced the --
10       A.   Okay.
11       Q.   Actually, before I go to the summary
12   of the invention, you have read the whole
13   patent, right?
14       A.   Yes, sir.
15       Q.   Isn't it true, sir, that the phrase
16   adding support does not appear anywhere in the
17   specification of the '430 patent?
18       A.   It appears in the claim language.  You
19   said specification?
20       Q.   Of course.  I apologize.  Setting
21   aside the amendment that was added that we just
22   looked at, talking about the written
23   specification, the figures, the abstract, the
24   summary of the invention, and the detailed
25   specification, are you with me?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 469

1    A.  Yes.
2    Q.  In reviewing that, isn't it true that
3 the phrase adding support appears nowhere in
4 that intrinsic evidence?
5    A.  I can't say definitively at this
6 point, but I don't recall seeing that phrase in
7 the spec.
8    Q.  Okay.
9    A.  But it might be, if one did a search.
10 I don't recall having seen it.
11    Q.  Okay.  You don't point to the phrase
12 adding support anywhere in your witness
13 statement, right, from the specification?
14    A.  I don't believe I do.
15    Q.  Okay.  If we look at the summary of
16 the invention, JX-1, column 1, line 52 through
17 57, it says, "accordingly, it is a primary
18 objective of the present invention to add
19 system components to a computer system without
20 running an installation program."  Do you see
21 that?  We looked at it yesterday.
22    A.  Yes, I do.
23    Q.  It doesn't say add support here, it
24 says add system components, right?
25    A.  That's right.

Page 470

1    Q.  Okay.  And there is flow charts in the
2 figures in the '430 patent in the
3 specification, correct?
4    A.  What is the question?
5    Q.  Well, for example, figure 6 is an
6 example of a flow chart in the figures to the
7 '430 patent.
8    A.  Yes.
9    Q.  Figure 6 is a flow chart of the logic
10 associated with processing a system locator
11 request in accordance with the preferred
12 embodiment, right?  If you look at column 2 at
13 lines 17 through 19, that verbatim description
14 of figure 6 is contained in the patent.
15    A.  Yes, that's right.
16    Q.  And figure 6, if we walk through the
17 flow chart, input search criteria to the
18 locator class object, do you see that?
19    A.  Yes.
20    Q.  Input the scope of the search, box
21 620, do you see that?
22    A.  Yes.
23    Q.  630, use scope to determine a set of
24 system entities that have the specified search
25 criteria, right?

Page 471

1    A.  Yes.
2    Q.  And then another one, 640, talks about
3 iterating through the scope of the search and
4 eliminating system entities that do not have
5 the search criteria, right?
6    A.  Yes.
7    Q.  And 650, return located system
8 entities to the initiating class, right?
9    A.  That's right.
10    Q.  No element D, right?
11    A.  In terms of adding support?
12    Q.  Yeah.  The flow chart ends with return
13 located system entities to the initiating class
14 and then says stop, right?
15    A.  In this particular figure, yes, it is
16 returning the particular entity, yes.
17    Q.  There is no depiction of a step after
18 the return step, correct?
19    A.  Of course, yes.
20    Q.  And if you look at figure 7, figure 7
21 is a flow chart of the logic associated with
22 processing a network locator request in
23 accordance with the preferred embodiment,
24 correct?
25    A.  That's correct.

Page 472

1    Q.  And if we walk through figure 7, it
2 has got very similar boxes, so 710 is the
3 input, 720 is inputting the scope of the
4 search, et cetera.  Do you see that?
5    A.  Yes, I do.
6    Q.  And then the last box before stop is
7 750, right?
8    A.  That's correct.
9    Q.  And box 750 of figure 7 says return
10 located network entities to the initiating
11 class, right?
12    A.  Yes, it does.
13    Q.  That corresponds with step C of claim
14 1 of the '430 patent, correct?
15    A.  Just give me one second here to make
16 sure that's correct.  It appears to, yes.
17    Q.  Okay.  And then similar to figure 6,
18 there is no box corresponding to step D, it
19 just says stop, right?
20    A.  In this figure, yes.
21    Q.  Okay.  And then figure 8 of the
22 patent, let's look at that.  Figure 8 depicts a
23 flow chart of the logic associated with
24 processing an application locator request in
25 accordance with the preferred embodiment,

10  (Pages 469 to 472)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<div style="text-align:right">Page 473</div>

1  correct?
2      A.   Yes.
3      Q.   And as we can see here, the last box
4  on figure 8 before stop is box 850?
5      A.   That is correct.
6      Q.   And it says, return located
7  application entities to the initiating class,
8  correct?
9      A.   Yes.
10     Q.   And then the next step of the flow
11 chart is stop, 860, right?
12     A.   Yes.
13     Q.   So similarly, figure 8 does not
14 disclose any embodiment of step D, correct?
15     A.   In that figure, no.
16     Q.   And isn't it true, sir, that in none
17 of the figures of the '430 patent is there any
18 disclosure of step D of claim 1?
19     A.   If you are saying is there a flow
20 chart with the explicit terminology there, the
21 answer is no.
22     Q.   Okay.  Now, just to summarize, based
23 on the review of the specification, and I mean
24 to exclude the claims when I say specification,
25 so the figures, the abstract, the detailed

<div style="text-align:right">Page 474</div>

1  written specification.  Are you with me?
2      A.   Yes.
3      Q.   You would agree that the specification
4  does not contain any description of this adding
5  support step, element D?  Nowhere is the phrase
6  adding support found in the specification?
7      A.   That specific phrase is not found, no.
8      Q.   And nowhere in these figures in the
9  flow charts is there any boxes talking about
10 any support, correct?
11     A.   That phrase is not found in the flow
12 charts.
13     Q.   And the access support phrase, as we
14 have seen, wasn't in the original claims, it
15 was added based on indefiniteness rejections by
16 the examiner, correct?
17     A.   That is correct.
18     Q.   And your proposed construction of
19 adding support is facilitating access, right?
20     A.   That is correct.
21     Q.   But the examiner has already said that
22 a synonym of facilitating access, enabling
23 access, is indefinite, hasn't he?
24     A.   He did not say it was a synonym.  He
25 said enabling access was indefinite and he

<div style="text-align:right">Page 475</div>

1  wasn't talking about adding support.  He was
2  talking about the earlier claim, claim C there,
3  I believe.
4      Q.   Yes.  But the examiner said the phrase
5  enabling access was indefinite, correct?
6      A.   In the context of that early element.
7      Q.   Enabling access is a synonym for your
8  proposed construction, facilitating access,
9  correct?
10     A.   It is a synonym based on that
11 particular thesaurus that you put up, yes.  I
12 don't necessarily agree with that.
13     Q.   And it is your contention to His Honor
14 that this phrase "facilitating access," that a
15 person of ordinary skill would know when they
16 were facilitating access and when they weren't?
17     A.   In terms of adding support, which is
18 element D of the claim --
19     Q.   In terms of your construction,
20 facilitating access.
21     A.   For that element D, yes.
22     Q.   Okay.  And where would they draw the
23 bright line boundary there?
24     A.   Well, I don't think there is a hard
25 boundary per se, no.

<div style="text-align:right">Page 476</div>

1      Q.   Okay.  Let's move on to the subject of
2  infringement, non-infringement.
3      A.   Okay.
4      Q.   Okay?  And in your witness statement,
5  you have given two examples -- well, let me
6  take a step back and set a foundation.
7           It is your opinion that the accused
8  Motorola products infringe claim 1 of the '430
9  patent, correct?
10     A.   That is correct.
11     Q.   And I believe in your witness
12 statement, you have given two examples in your
13 direct witness statement that you say are
14 instances where the Motorola accused products
15 infringe claim 1 of the '430 patent.  Do you
16 remember that?
17     A.   I believe so.  If I could have the
18 witness statement in front of me, to reference
19 --
20     Q.   I am going to walk through.
21     A.   Okay.
22     Q.   Remember one was basically selecting
23 an e-mail address, sending an e-mail generally?
24     A.   Yes.
25     Q.   And the other one was turning on your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 477

1 phone and having your home page icons appear,
2 just generally.
3     A.   In the launcher, yes.
4     Q.   For launch.  Those are the two
5 examples you gave in your witness statement,
6 right?
7     A.   I believe so, yes.
8     Q.   Okay.  And I have prepared some
9 demonstratives just to help us walk through
10 that functionality, so we could have it in mind
11 when I ask you some questions about it, okay?
12     A.   Okay.
13     Q.   So if we go to the next slide here,
14 this is one of our phones, and I just took some
15 pictures of it, trying to help set a foundation
16 of what you are talking about when you are
17 walking through the accused technology.  All
18 right?  So this is one of my partners' phones.
19        So this is the home screen, right?
20 The phone is on?
21     A.   It appears to be.
22     Q.   And I want to first walk through your
23 e-mail example.  So then in your example -- and
24 this I am adding some steps, tell me if you
25 think they are incorrect to do -- but one way

Page 478

1 of doing your e-mail example is a user could
2 hit the contacts icon, right?
3     A.   I believe -- I believe that is a
4 contacts icon.  It is covered by the finger.
5     Q.   But you touch it and the next thing
6 that happens is your contacts come up, right?
7     A.   Sure.
8     Q.   And that's a list of names, right?
9     A.   Yes, of course.
10     Q.   And then the next thing that happens
11 is the user touches one of the contacts, right?
12     A.   Yes.
13     Q.   And then the contact information for
14 that person, and this is slide 53, is
15 displayed, correct?
16     A.   Yes, it is.
17     Q.   And then there is an e-mail button
18 right there, so this is going to your e-mail
19 example.  A user could touch the e-mail button
20 or the e-mail --
21     A.   Button --
22     Q.   Row, I guess.
23     A.   E-mail address there.
24     Q.   So he can pick that.  Now, I believe
25 it is in your direct witness statement, your

Page 479

1 testimony is that when somebody using the
2 accused products does that, that an implicit
3 intent is sent to an activity manager in the
4 software, right?
5     A.   I believe that's correct.
6     Q.   I'm sorry?
7     A.   I believe that's correct, yes.
8     Q.   Okay.  And that that -- the intent
9 will request a component to compose an e-mail
10 message?  That's your testimony?  Let me just
11 continue.  And that will be passed on to the
12 package manager?
13     A.   That is correct.
14     Q.   Okay.  And then the package manager
15 will match that request, right?
16     A.   Matches that implicit intent.
17     Q.   That implicit intent to potential
18 components, right?
19     A.   That match it, yes.
20     Q.   Okay.  And then here, in this example,
21 there is multiple matches?
22     A.   That is correct.
23     Q.   Do you see that?  So that's one way it
24 could work, right?
25     A.   That's one outcome, yes.

Page 480

1     Q.   And then -- so this, what we're
2 looking at here, would be a list of matches?
3     A.   Yes.
4     Q.   If you want to send an e-mail to this
5 person who I have identified, there is three
6 different ways that they say you could send an
7 e-mail, right?
8     A.   As a result of those, of that matching
9 process, it has found three potential
10 components.
11     Q.   And then the user selects one, right?
12     A.   Sure.
13     Q.   And then the user clicks on Gmail in
14 our example and then, boom, up comes what?  The
15 application?
16     A.   The Gmail component, yes.
17     Q.   So the Gmail component is
18 instantiated, right?
19     A.   That's right.  It is added to the
20 activity stack and it starts running.
21     Q.   And when we're talking about the
22 elements and you are applying the elements to
23 the accused technology, element D, adding
24 support to the operating system, what we just
25 looked at --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 481

1   A.   Yes.
2   Q.   -- you believe that that is happening
3   when the, in this step, when the e-mail
4   application is instantiated -- is added to the
5   activity manager and instantiated, correct?
6   A.   Added to the activity stack.
7   Q.   Excuse me.  Thank you.  Added to the
8   activity stack and instantiated, right?
9   A.   That's right, then support is provided
10  for that, yes.
11  Q.   Okay.  So it is this step between here
12  and here (indicating), at least from the user's
13  perspective, where you are saying element D is
14  performed in the accused devices?
15  A.   In this particular example, yes.
16  Q.   And under the hood, the way the
17  software is functioning, what your testimony is
18  is that what is happening is that this e-mail
19  application is added to the activity stack?
20  A.   The application itself is not.
21  Q.   Oh, the application is not added to
22  the activity stack?
23  A.   No, a link to that application.
24  Q.   A link.  So a link is added to the
25  activity stack.  And the application program is

Page 482

1   instantiated?
2   A.   That's correct.
3   Q.   Right?  Okay.  And it is that
4   functionality that you are pointing to in this
5   example that meets element D, in your opinion?
6   A.   For adding support, yes.
7   Q.   I'm sorry?
8   A.   For adding support, yes.
9   Q.   Okay, exactly.  And then really
10  briefly, the second example is your home screen
11  example.  So here I have just started the same
12  phone.  I guess the start is it is turned off,
13  right?
14  A.   Sure.
15  Q.   And then you turn it on, there is a
16  button on the back of this particular phone, so
17  I can't show someone pushing it, but it turns
18  on and icons come on the home screen, right?
19  A.   Yes.
20  Q.   And in this example, your testimony is
21  that when somebody turns on the phone, that an
22  implicit intent is sent to the activity manager
23  and it requests components that match
24  properties associated with the home screen,
25  right?

Page 483

1   A.   Yes.
2   Q.   So, you know, what icons do I need to
3   put on the home screen?  Right?
4   A.   Those would be the ones to match, yes.
5   Q.   And then the activity manager sends
6   that to the property manager, which does the
7   matching, and these components get returned?
8   These icons get returned that we're looking at?
9   A.   Did you say property manager?  It
10  sends you to the package manager.
11  Q.   I'm sorry.  I meant to say package
12  manager.
13  A.   Package manager does the matching,
14  yes.
15  Q.   So the package manager does the
16  matching.  And then these icons get returned,
17  right?
18  A.   These get added to the activity stack
19  and they appear, yes, on the screen.
20  Q.   And then a user can select one of the
21  icons, right?
22  A.   Sure.
23  Q.   And then in this example, the user is
24  selecting calendar.  Do you see that?
25  A.   Okay.

Page 484

1   Q.   And then when the user selects
2   calendar, the calendar program is instantiated,
3   right?
4   A.   It is run, yes.
5   Q.   And a link to that is added to the --
6   let me make sure I get the terminology right --
7   where is the link added to?
8   A.   It goes to the activity stack.
9   Q.   So, again, on --
10  A.   Well, hang on a second.  This is
11  already in the activity stack, because we have
12  already loaded these in the launcher, right?
13  So now you are just activating something that's
14  already in the activity stack.
15  Q.   Okay.  Let's clarify that then.  At
16  what point, is it right here, when the user
17  turns it on, that there is a link to the
18  activity stack?
19  A.   I believe all of these already are in
20  the activity stack, I believe.
21  Q.   And for purposes of element 1D in your
22  second example, the accused software
23  functionality that you contend meets element 1D
24  is pretty much the same thing as the first
25  example, right?  A link is added to the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 485

1  activity stack?
2     A.   Right, except there wasn't that
3  chooser interface in between.  It is not --
4     Q.   Tell me for the record what specific
5  functionality in your second example meets 1D?
6     A.   So the support is already added when
7  the thing was booted up in the launcher, right?
8     Q.   Okay.  And what specific
9  functionality, software functionality meets
10 that support added?
11    A.   The links in the activity stack.
12    Q.   Anything else?
13    A.   You are talking just for 1D, right?
14    Q.   That's correct, sir.
15    A.   I'm not sure I am completely
16 understanding.  You are not rebooting the
17 operating system, which is the other part of
18 element 1D.
19    Q.   Element 1D says without rebooting the
20 operating system, right?
21    A.   That's right.
22    Q.   So --
23    A.   So it did not reboot the operating
24 system, right.
25    Q.   That's correct.  I am trying to make

Page 486

1  sure I have got your understanding on the
2  record, in your second example, what software
3  functionality meets the phrase, adding support
4  to the operating system?
5     A.   So these are added to the activity
6  stack, yes.
7     Q.   So adding a link to the activity stack
8  in the second example is also what you say
9  meets the adding support functionality?
10    A.   Yes.
11    Q.   Okay.  So those are your two examples,
12 right?
13    A.   I believe those are the two, yes.
14    Q.   And just generally, it is your
15 testimony that element 1D is met in the accused
16 products by this functionality of adding a link
17 to the activity stack?
18    A.   Yes, it is instantiated in that
19 activity stack, yes.  So now I have accessed --
20 the activity stack provides access.
21    Q.   Now, is it your testimony that
22 instantiating a file meets the adding support
23 language?
24    A.   Not just instantiating it.  I think it
25 has to remain there so that it is support for

Page 487

1  that activity or one of these applications like
2  the e-mail, for example, is an activity.  It
3  remains available to the operating system.
4  Just instantiating it once and then it
5  disappearing would not be adding support to the
6  operating system.
7     Q.   So it is instantiating and adding a
8  link to the activity stack?
9     A.   Right, and it stays there until --
10 until you explicitly remove it.
11    Q.   Now, isn't it true that when you were
12 talking about the prior art in your rebuttal
13 report, that you testified -- let me withdraw
14 the question.
15        Isn't it true that in your rebuttal
16 witness statement, when you were addressing the
17 prior art, that you testified that it is your
18 opinion that instantiating a file does not meet
19 the element of adding support for a component
20 to the operating system?
21    A.   I will have to refresh my memory on
22 the rebuttal report.  I haven't reviewed it
23 just before this, because I was assuming
24 today's testimony is about the infringement
25 report, the first report, but just

Page 488

1  instantiating without continual adding support,
2  continuing support for it would not be meeting
3  this claim of adding support, as I just
4  mentioned in my previous answer.  It has got to
5  remain there for the operating system to --
6     Q.   And when you say remain there, just
7  for the record, so we're absolutely clear, you
8  are simply referring to the link to the
9  activity stack, right?
10    A.   The link in the activity stack.
11    Q.   The link in the activity stack.
12    A.   That says these are the active things
13 in the operating system.  So the support there
14 remains in the activity stack.
15    Q.   And the activity stack is simply a
16 list of the active things that a user -- it
17 maintains a record of the list of the things
18 that a user has instantiated or gone to, right?
19    A.   That's instantiated and are active.
20    Q.   So you can hit --
21    A.   So I don't have to reload it again.
22    Q.   And so you can hit the back button on
23 your phone to go backwards?  That's the
24 activity stack?
25    A.   Yes, that's one example of using the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 489

1  activity stack, yes.
2      Q.   But you agree that these -- the things
3  that are on the activity stack, those are
4  programs that were launched, the components
5  were actually launched, right?
6      A.   What do you mean by launched?
7      Q.   Instantiated?  Turned on and running?
8      A.   That's right.
9      Q.   They are matched, they are found, they
10  were turned on, they are running?
11      A.   That's right.
12      Q.   Right?  And what you are pointing to
13  is simply a link that's maintained in the
14  activity stack, which says this is the last
15  thing you went to and it is an active program?
16  That's all it is, right?
17      A.   No, the activity stack has a series of
18  links, assuming there is more than one.
19      Q.   Right.
20      A.   Of all the things that have been
21  loaded and instantiated to run.
22      Q.   Turned on.  Right.  Okay.  But it is
23  your testimony that adding support is not met
24  by actually launching a program, right?
25      A.   Just launching the program and not

Page 490

1  maintaining something like an activity stack to
2  provide support for that subsequently, so if I
3  just independently or on the outside, just ran,
4  executed a program, that alone would not be
5  adding support to the operating system for that
6  program subsequently.
7      Q.   So let me go back to claim 1, Ryan.
8  If we can put up claim 1 without any
9  highlighting on it.
10          So claim 1, just to review, has this
11  method where you specify a target component,
12  right?  And you specify search criteria.  And
13  then you query the operating system to try and
14  find it, right?
15      A.   Right.
16      Q.   And then the operating system returns
17  hardware or software components meeting the
18  target hardware or software component search
19  criteria, right?
20      A.   Yes.
21      Q.   So in the e-mail example, that would
22  be those e-mail applications that you might
23  instantiate, right?
24      A.   It is returning, yes, some information
25  to identify that, those components, yes.

Page 491

1      Q.   And element D is the adding support
2  element, right?
3      A.   Right.
4      Q.   Now, it is your testimony that this
5  element is not met by actually launching the
6  software components that you found, that that's
7  not adding support, but it is your testimony
8  that after you launch it, you actually launch
9  it, merely having a link to the task list,
10  activity task list is the adding support?  Is
11  that your contention?
12      A.   If I just launch it and I no longer
13  maintain -- I don't keep track of that or
14  maintain support for that, so that the
15  operating system can subsequently access that,
16  then I am not adding support for it.
17      Q.   But the application is still running,
18  sir, it is still running, even after you have
19  the link to the task list, isn't it?
20      A.   Of course it is running, yes.
21      Q.   It is running.
22      A.   Right.
23      Q.   It is not just adding -- you are not
24  just adding support.  That's just a link, but
25  you don't actually have the component live and

Page 492

1  running, and you are saying that's not adding
2  support?
3      A.   You said don't have the component live
4  and running?
5      Q.   Let me try to say it this way:  Would
6  you say that adding support for a hardware --
7  for the hardware and software components, that
8  you can meet that by launching, actually
9  launching the hardware and software components?
10  In other words, take out the word support,
11  adding the hardware and software components,
12  that could be launching them, right?
13      A.   Just -- so now you are changing the
14  claim term on me.  So you are saying remove the
15  word support, and you have got just adding that
16  to the operating system?
17      Q.   Right.
18      A.   So I have got to think about that a
19  little bit, because you have changed the claim
20  language on me.  So we simply add that to the
21  operating system, then let's say, for example,
22  that application is now just running and no
23  other information about that application is
24  maintained, then that would be adding, yes, but
25  not adding support, because I don't have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 493

1    further support for that, for that component
2    subsequently.
3         So just executing something, it is
4    just in memory and the CPU is executing it,
5    that's all it is doing.  It doesn't have --
6    enable any subsequent support for that for
7    subsequent access, like, for example, in the
8    activity stack.
9    Q.   So your contention is that if you
10   don't just link to a program, but you actually
11   launch the whole program, that that doesn't
12   meet this element?
13   A.   If I just launch it and don't maintain
14   any connection to it, and information about it,
15   then it does not meet the support.
16   Q.   Well, if you launch it, you are
17   looking at it, it is up on the screen?  There
18   is a connection to it, sir.
19   A.   At that instance, yes.
20   Q.   And it is your testimony that that
21   doesn't meet adding support?
22   A.   Well, I haven't added any support for
23   it.  I am just running it.
24   Q.   Okay.  Running an application program
25   isn't supporting it?

Page 494

1    A.   It is only supporting it for that
2    instant.
3    Q.   It is your opinion as well that
4    executing a program is not adding support to
5    the operating system, right?
6    A.   Just executing it is not, as per the
7    claims and the way it is read in the patent.
8    Q.   And it is your testimony that
9    initializing a file is not adding support to
10   the operating system, correct?
11   A.   What do you mean by initializing the
12   file?
13   Q.   Well, what do you mean by it?  Do you
14   understand what that means, initializing?
15   A.   Just opening a file?
16   Q.   Yeah.
17   A.   Just opening a file would not be
18   adding support, no.
19   Q.   And it is your opinion that
20   dynamically loading a file is not adding
21   support?
22   A.   If I just load it and do not maintain
23   any infrastructure of information about that
24   file for access, like I have been saying all
25   along, then it does not add support for it.

Page 495

1    Q.   Isn't it true, sir, in all these
2    examples, initiating, executing, loading, the
3    system always maintains support, you need to
4    maintain support in order for it to run; isn't
5    that true?
6    A.   No, it just runs.  So I am not keeping
7    information to say, hey, if I want to run this
8    again, if I want to access it again, here is
9    how I do it.  I don't have that kind of
10   support, which is what this claim is -- claim
11   element is asking.
12   Q.   So it is your testimony as well that
13   copying an object into a new folder is not
14   adding support to the operating system,
15   correct?
16   A.   Just merely copying it?  No.
17   Q.   And loading a component into memory is
18   not adding support under your opinion, right?
19   A.   Just loading it into memory?  No.
20   Q.   But, you say, adding a link to a list
21   that says here are the programs that you have
22   launched and you can hit the back button to go
23   back to those programs, that is adding support?
24   A.   Adding a link to that activity stack
25   that maintains a record of what has been

Page 496

1    instantiated and what is available at the
2    operating system level to other users or to
3    other applications or to the back button, that
4    is adding support, yes.
5    Q.   And it is your opinion that a person
6    of ordinary skill in the art looking at this
7    language and looking at the specification, they
8    would be able to know that, hey, I'm not going
9    to infringe this, as long as I don't have a
10   link to the activity manager or to the activity
11   stack?  I can launch programs, I can load them
12   into memory, I can copy them into files, and I
13   can take these hardware and software components
14   and load them into memory, execute them,
15   instantiate them, none of that is going to meet
16   this language, but, be careful, if I put a link
17   to what I have done to the activity stack, all
18   of a sudden I have infringed?
19   A.   If you maintain support for these
20   instantiated components in the operating
21   system, yes, and that's what the activity stack
22   is doing.
23   Q.   And it is your opinion --
24   A.   It is maintaining support for that.
25   Q.   And it is your opinion that a person

APLNDC-X0000006269
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 497

1    of ordinary skill reading this intrinsic
2    evidence would know that's the metes and bounds
3    of element D?  That's your opinion?
4        A.   Absolutely, yes.
5        Q.   Okay.  Let's talk really briefly about
6    the activity stack.  You have heard of a Google
7    -- let me take a step back.
8            The activity stack is part of the
9    Android system?
10       A.   That's right.
11       Q.   Which is Google's software?
12       A.   Yes.
13       Q.   And you have heard of an employee of
14   Google, Dianne Hackborn, correct?
15       A.   I have reviewed some of her -- the
16   material she has put in.  I have never met her,
17   no.
18       Q.   You read her deposition testimony?
19       A.   I have read parts of it.
20       Q.   Do you remember that she testified
21   that the activity stack is a navigational tool?
22       A.   I don't remember the exact term she
23   used.  If you could show me that.
24       Q.   Well, do you agree, the activity stack
25   is a navigational tool?

Page 498

1        A.   That is one -- that is one use of the
2    activity stack, yes.
3        Q.   You have your phone and it has got a
4    little back button, a little arrow, it goes
5    backwards arrow, and you hit it, and it takes
6    you back to the last application you were
7    looking at, right?
8        A.   That's one use of the activity stack.
9        Q.   That's how you can navigate using the
10   activity stack?
11       A.   Sure.
12       Q.   Okay.  And it is simply a list of the
13   activities that the user has visited, right?
14       A.   And that have been instantiated by the
15   operating system, yes.
16       Q.   They have already been turned on by
17   the operating system?
18       A.   Right, they have already been turned
19   on.  They are available for use.
20       Q.   They are still turned on?
21       A.   That's right.  And they are available
22   for use.  They are all the activities that are
23   available on the system right now.
24       Q.   And I believe you said the activity
25   stacks, that the applications themselves are

Page 499

1    not actually copied into the activity stack, it
2    is just a link, right?
3        A.   The application itself is not in the
4    stack, no.
5        Q.   And the user can access all of those
6    active applications on the activity stack
7    without using the activity stack, right?  They
8    can just go back to the applications?
9        A.   When you say back to the applications,
10   what do you mean by that?
11       Q.   Well, a user can access an application
12   -- well, let's take it one step at a time.
13           A user can access an application that
14   is not on the activity stack by just
15   instantiating it, right?
16       A.   If it is not already in the activity
17   stack when they say they click an icon for that
18   application, it goes through that whole search
19   process through the package manager and then
20   gets put on the activity stack and
21   instantiated.  So at that first time it is
22   being accessed.
23       Q.   So do you agree with me?
24       A.   I am not sure if I agree with you.  If
25   it is not already in the activity stack, they

Page 500

1    can access it, but eventually it gets on the
2    activity stack before they actually start using
3    it.
4        Q.   So you have a cell phone?
5        A.   Right.
6        Q.   -- and I don't have mine with me, but
7    it has got applications on it, right?  Are you
8    with me so far?
9        A.   Sure.
10       Q.   And a user can access those
11   applications without using an activity --
12   without using the back button or accessing the
13   activity stack, correct?
14       A.   No, if the user, say, launches an
15   application from -- by clicking on an icon, for
16   example, as we have discussed, the Google --
17   the Android system goes through, searches for
18   that application, looks for it through the
19   package manager, puts it on the activity stack,
20   and then launches it.
21           So whether you are saying the user is
22   clicking on the activity stack, no, not in that
23   particular example.  But the activity stack is
24   coming into play in that process.
25       Q.   Is it your testimony that a user can't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 501

1  navigate to an activity that's not on the
2  activity stack?
3      A.   You said can't, as in cannot?  If it
4  is not currently on the activity stack, the
5  application does get on it and then the user is
6  using it.  But, yes, sure, you can -- you can
7  instantiate something that's not on it, but it
8  does get on it before it is used.
9      Q.   Okay.  So you can instantiate
10 something that's not on the activity stack,
11 correct?
12     A.   Yes, but as I said, it gets on the
13 activity stack before the application gets
14 used.
15     Q.   Well, let's use your example of Gmail
16 or the example I went through.  Your witness
17 statement was more general, it is just talking
18 about e-mail generally, but do you remember the
19 example I went through when the user selected
20 Gmail?
21     A.   Sure.
22     Q.   Okay.  Now, in that example, Gmail was
23 already installed on the Smartphone, right, the
24 application was already installed?
25     A.   The code is already in the phone, yes,

Page 502

1  but it is not running -- assuming you already
2  haven't clicked on it earlier.
3      Q.   So in your example, no new code is
4  added to the phone?
5      A.   New code to the phone?
6      Q.   Yes.
7      A.   Assuming Gmail was installed already,
8  no.
9      Q.   And no new code is added to the
10 operating system?
11     A.   New code, no, but it may be executing,
12 if you run it for the first time, it will be
13 executing the code for the first time.
14     Q.   So for the record, no new code is
15 added to the operating system in this -- in
16 your example, correct?
17     A.   If you mean added as in executing
18 versus added to the file system, I'm not sure
19 what you mean by added here.
20     Q.   Okay.  Well, you have got operating
21 system software on your phone?
22     A.   Yes.
23     Q.   And when -- in your example, no new
24 code is added to the operating system on the
25 phone, correct?

Page 503

1      A.   When Gmail is clicked on, is that what
2  --
3      Q.   In any of your examples.
4      A.   Assuming the code is already on the
5  phone, in other words, loaded beforehand, then
6  new code is not added to the phone.
7      Q.   Okay.  So in your e-mail example, the
8  e-mail application programs are already on the
9  phone, right?
10     A.   It could be on the phone, yes.
11     Q.   And in that instance, no new code is
12 added as part of your functionality that you
13 are saying meets claim 1, correct?
14     A.   No new code is -- in that example,
15 would be added to the phone, yes.
16     Q.   I'm sorry, did you say yes?
17     A.   Yes, I agreed with you, yes.
18     Q.   Okay.  Now, in terms of functionality,
19 isn't it true that the amount of functionality
20 provided by a link to the activity stack is
21 much less than the level of functionality
22 provided by instantiating an entire program?
23     A.   I'm not sure necessarily I agree with
24 that.  When you say much less functionality,
25 what do you mean by that?

Page 504

1      Q.   I mean --
2      A.   Just because --
3      Q.   -- the amount of code that is running
4  to support the component.
5      A.   The amount of code does not
6  necessarily meet the amount of functionality.
7  I could have one line of code that does a lot
8  of stuff.  I could have 100 lines of code that
9  does very little.
10     Q.   Okay.  And when you execute a program,
11 the amount of code that's running to support
12 the component for that program is much larger
13 than simply putting a pointer into the activity
14 stack, isn't it, sir?
15     A.   The way you phrased it, if I am just
16 running the program, it is running instruction
17 by instruction.  And I don't see how that's any
18 more than one instruction to put a pointer in
19 the activity stack, for example.
20     Q.   And when you copy an entire
21 application into a new folder, the amount of
22 code that's running to support that
23 functionality is much greater than simply
24 putting a link in an activity stack, isn't it,
25 sir?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 505

1    A.    Not necessarily.  A copy function is
2  literally one line of machine code.  I don't
3  see how that's more complex.
4    Q.    When you launch a component and
5  execute it, the amount of code that is running
6  to support that component is much larger than
7  just putting a link in an activity stack, isn't
8  it?
9    A.    I'm not sure.  I will have to look at
10  the actual code for a particular system to see
11  if it is larger.  It may be.  It may not be.
12  Just putting something on an activity stack
13  doesn't necessarily mean it is a trivial thing
14  of putting one thing on.  A whole bunch of
15  other things may be happening or may be
16  required to happen before that can go on the
17  activity stack.
18          Similarly, running the code itself
19  could be a simple matter of saying start here
20  and start executing, or it could involve a
21  whole bunch of other things.  So I think it is
22  in many ways a loaded question or a question
23  that doesn't make a lot of sense.
24    Q.    Well, you are not sure, but you are
25  sure that all of those things, instantiating,

Page 506

1  executing, loading, copying, with respect to a
2  component, are not adding support to that
3  component, but simply leaving a link saying,
4  hey, this was launched on the activity stack,
5  is adding support?  Right?
6    A.    Well, all I said I wasn't sure about
7  is whether there was more code or less code
8  because the amount of code is not necessarily
9  reflective of complexity or functionality as
10  you are trying to equate the two.  And I don't
11  think it makes any sense for equating the
12  amount of code to the complexity of
13  functionality.
14    Q.    So the amount of code that's used in
15  relation to supporting a hardware or software
16  component is irrelevant to whether you are
17  adding support or not?
18    A.    The amount of code?  I would say it
19  has no bearing.  A good programmer may write it
20  with a very efficient, small amount of code and
21  somebody else may do it with a lot of code.
22  The amount of code has no bearing.
23    Q.    How is a person of ordinary skill in
24  the art supposed to be able to tell how much
25  code support is necessary to meet adding

Page 507

1  support?
2    A.    I think you are continuing to go --
3  put a lot of value in this notion of the amount
4  of code.  I think any programmer would know
5  that the amount of code is a lousy metric for
6  any kind of complexity or understanding
7  anything.  It is not the amount of code.  It is
8  what that code does that's important.
9          And the issue here is adding support
10  means it is not just running.  I am going to
11  give you some ability to access those
12  components without rebooting the operating
13  system.
14    Q.    So all I have to do is have the
15  ability to access the components without
16  rebooting, and that means adding support?
17    A.    I have got support for that.  It has
18  already been instantiated.  It is ready to go,
19  so to speak.  It is not about the amount of
20  code.  I think that's a completely simplistic
21  equation.
22    Q.    Is code that enables access to the
23  hardware or software components adding support?
24    A.    If it is just enabling access, as in
25  saying here is the file name, for example, that

Page 508

1  would not be adding support.  I have got to
2  load it up and do something with it, right?
3    Q.    And, similarly, code that facilitates
4  access to a hardware or software component, in
5  your opinion, is not adding support, correct?
6    A.    Facilitating access, I think, is what
7  this is all about, providing some support, some
8  facility to access this hardware and software
9  component.
10    Q.    So enabling access to the hardware or
11  software components is not adding support, but
12  facilitating access to the hardware or software
13  components, in your opinion, is adding support?
14  Is that what you just said, sir?
15    A.    To the extent that you draw -- I draw
16  a distinction between facilitating and
17  enabling, yes.
18    Q.    Okay.  And a person of ordinary skill
19  in the art would understand how to make that
20  distinction?
21    A.    I would hope so, yes.
22    Q.    Now, isn't it true that activity
23  stacks -- well, let me take a step back.
24          This activity stack functionality that
25  you say meets element D, are you contending

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 509

1    that the novelty here in claim 1 is having
2    activity stack functionality?
3        A.   No, it doesn't have to be an activity
4    stack.  It is some functionality to add
5    support.
6        Q.   Well, that's what you point to in your
7    examples in the witness statement is the
8    activity stack, right?
9        A.   No, I point to the process that puts
10   stuff on the activity stack and maintains that
11   ability to access those hardware and software
12   components.
13       Q.   Activity stacks were around long
14   before the '430 patent was filed in 1993; isn't
15   that true?
16       MR. DAVIS:  Your Honor, objection.
17   We're now getting into validity, as counsel
18   mentioned earlier, the way that we were
19   handling this is we're addressing now the
20   initial expert report on infringement, domestic
21   industry, and claim construction.  And the
22   issues of validity such as novelty, that's for
23   the rebuttal.
24       MR. VERHOEVEN:  Your Honor, I would
25   submit -- I am not going to take him through a

Page 510

1    reference or anything.
2        JUDGE ESSEX:  But you are touching on
3    validity, are you not?
4        MR. VERHOEVEN:  I am, to the extent it
5    concerns -- it influences claim construction,
6    Your Honor.  So we're trying to figure out what
7    this phrase means.  The witness has pointed to
8    activity stack.
9        JUDGE ESSEX:  We pretty much chewed
10   this phrase pretty hard, haven't we?
11       MR. VERHOEVEN:  All right.  I will
12   move on, Your Honor.
13       JUDGE ESSEX:  Thank you.
14       MR. VERHOEVEN:  Can I have one second
15   to organize my thoughts?
16       JUDGE ESSEX:  You may.  Absolutely.
17   And I have one question I would like to ask,
18   Doctor, if I may while I am going through here.
19       I worry more about grammar than I do
20   some of the scientists.  If I changed that
21   sentence structure and said, adding to the
22   operating system support for the hardware and
23   software components without rebooting it, would
24   it mean the same thing?
25       THE WITNESS:  So just so I understand

Page 511

1    what Your Honor is saying, you are saying
2    adding --
3        JUDGE ESSEX:  To the operating system,
4    without rebooting the operating system, support
5    for the hardware and software components --
6        THE WITNESS:  So you are moving the
7    phrase around.
8        JUDGE ESSEX:  That's correct.
9        THE WITNESS:  Let me think about that
10   for one second, if I may, Your Honor.
11       Yes, I think it would mean the same
12   thing.
13       JUDGE ESSEX:  That would mean the same
14   thing.
15       THE WITNESS:  Because you are still
16   adding support to the operating system.  You
17   are adding to the operating system some
18   support.
19       JUDGE ESSEX:  Okay, thank you.
20       MR. VERHOEVEN:  Sorry, Your Honor, I
21   didn't hear the question so I wanted to look at
22   it.
23       JUDGE ESSEX:  That's all right.
24   BY MR. VERHOEVEN:
25       Q.   Now, just a couple more questions on

Page 512

1    this subject and I will move on to something
2    else.  With respect to the accused technology,
3    you would agree with me, wouldn't you, that the
4    Android operating system cannot add any code,
5    any new code to the operating system without
6    running an installation program?
7        A.   When you say code to the operating
8    system, do you mean code to the operating
9    system that's currently running or code to the
10   phone in the storage?
11       Q.   So you have a phone that's got
12   software on it.  Part of the software is an
13   operating system.  Are you with me so far?
14       A.   Yes, I am.
15       Q.   And that operating system is the
16   Android system.  Are you with me so far?
17       A.   Okay.
18       Q.   Wouldn't you agree with me that you
19   can't add any new software to that system,
20   downloaded or put it into the phone somewhere
21   that didn't exist already on the operating
22   system, without running an installation
23   program?
24       A.   So adding it to that phone, it doesn't
25   have to be adding and running, necessarily, is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 513

1  what you are saying.
2      Q.  Just what I said.
3      A.  Just adding to the phone.  I could
4  copy files to that, to that phone without
5  necessarily running an installation program.
6  It depends on whether you call copying an
7  installation program.
8      Q.  Isn't it true the only way to add
9  applications or any new software to Android is
10  to run an installation program, sir?
11      A.  I don't believe that's necessarily
12  true.  I think it does automatic downloads, for
13  example.
14      Q.  Are you aware --
15      A.  Just not necessarily an installation
16  program per se.
17      Q.  Are you aware of the Android manifest
18  file?
19      A.  Yes, I am.
20      Q.  And the Android manifest file contains
21  a listing of intent filters expressing the
22  capabilities of the applications on the system?
23      A.  Yes.
24      Q.  And every application on the accused
25  Motorola devices must have an Android manifest

Page 514

1  file; isn't that true, for it to be functional
2  on the Android system?
3      A.  I believe that's true.
4      Q.  And each application on the accused
5  Motorola devices contains an Android manifest
6  file; isn't that right?
7      A.  Each application, yes.
8      Q.  And isn't it true that each
9  application on the accused Motorola devices
10  must be included in -- let me start over.
11      Isn't it true that each application on
12  the accused Motorola devices, including its
13  Android manifest file, must be installed by the
14  package manager?
15      A.  I'm not sure if it has to be installed
16  by the package manager.
17      Q.  Okay.  Let's -- if we could put up
18  RX-1869C.  This is Ms. Hackborn's direct
19  witness statement.  Let's see if I can refresh
20  your recollection on that.
21      A.  Okay.
22      Q.  Can you put up question 62.  Let's do
23  62 first.
24      So she says:
25      "Question:  What is the function of

Page 515

1  the package manager?
2      "Answer:  The package manager manages
3  installation of applications.  Its functions
4  include installing applications, uninstalling
5  applications, and keeping track of information
6  about the installed applications."
7      Do you agree with that?
8      A.  That is the function of the package
9  manager, yes.
10      Q.  Okay.  If we can go to question 65.
11      "Question:  Why does the package
12  manager track this information, instead of the
13  activity manager?
14      "Answer:  As I've previously
15  explained, the package manager is in charge of
16  installing applications.  When the user
17  installs an application, the package manager
18  reads the application Android manifest.XML
19  that's inside the APK file to discover the
20  kinds of things it can do, such as the
21  activities it contains and the types of intents
22  that each activity can handle.  It collects the
23  information about all of the installed
24  applications together so it can determine which
25  activities can handle the intent."

Page 516

1      Do you agree with that statement of
2  the functionality of the package manager?
3      A.  Sure.
4      Q.  So the package manager, when someone
5  wants to add an application, isn't it true the
6  package manager is in charge of installing that
7  application?
8      A.  Typically, yes.
9      Q.  In your witness statement, you don't
10  identify any instance in which that's not the
11  case, do you, sir?
12      A.  I don't believe I do.
13      Q.  Isn't it true that without registering
14  the Android manifest file -- let me start over.
15      Isn't it true that without an
16  application registering with the Android
17  manifest file in the package manager, that the
18  Android system would not be able to access any
19  functionality in that application?
20      A.  Can I have the question read back to
21  me, please?
22      Q.  Do you want me to reask it?  I will
23  reask it, sir.
24      Isn't it true with respect to a given
25  application that if the application is not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 517

1 registered with the Android manifest file with
2 the package manager, that the Android system
3 would not be able to access any functionality
4 of that application associated with the Android
5 manifest?
6    A.   To the extent your question, as I
7 understand it, says that the package manager
8 needs to know about that application, the
9 answer is yes.
10    Q.   And the package manager uses the
11 information from the Android manifest file to
12 determine which activities or services can
13 handle an implicit intent, correct?
14    A.   That is correct, yes.
15    Q.   And to summarize, in your witness
16 statement, you don't point to any functionality
17 in your witness statement in which some sort of
18 component code that does not exist on the
19 Android operating system is added to the
20 Android operating system without running an
21 installation program, do you, sir?
22    A.   I don't recall that.  I'd have to go
23 through my witness statement again just to be
24 100 percent sure.  I don't recall an example of
25 that.

Page 518

1    Q.   Okay.
2       MR. VERHOEVEN:  Your Honor, I am
3 switching to the last subject.  It will be a
4 little bit more time.  I don't know if you want
5 to take the morning break at 10:30 or some
6 other time.
7       JUDGE ESSEX:  If you are going to take
8 some time, why don't we go ahead and take our
9 break.  We will be back at quarter till.  We're
10 in recess.
11       (A recess was taken at 10:30 a.m.,
12 after which the trial resumed at 10:45 a.m.)
13       JUDGE ESSEX:  All right.
14       MR. VERHOEVEN:  Thank you, Your Honor.
15 BY MR. VERHOEVEN:
16    Q.   Dr. Balakrishnan, I would like to
17 switch subjects now to another claim
18 construction issue.
19    A.   Okay.
20    Q.   In particular, the phrase properties.
21    A.   Okay.
22    Q.   Ryan, if we could put up slide 68,
23 RDX-15, slide 68.
24       So the phrase properties, which the
25 parties have a dispute about, is contained

Page 519

1 among other places in element A, correct?
2    A.   Yes.
3    Q.   And element A, for the record, is
4 "specifying a target hardware or software
5 component search criteria including one or more
6 properties," right?
7    A.   That's right.
8    Q.   And then I put up on slide 69 here the
9 parties' positions with respect to this phrase,
10 so on the left "specifying a target hardware or
11 software component search criteria including
12 one or more properties," and Motorola and the
13 Staff say plain and ordinary meaning, right?
14    A.   Yes.
15    Q.   And Apple's construction is
16 "specifying desired attributes that are
17 potentially shared by one or more hardware or
18 software components," correct?
19    A.   Yes.
20    Q.   And your opinion is you think this is
21 -- the Apple construction is the appropriate
22 construction, correct?
23    A.   That's correct.
24    Q.   And focusing on the word properties
25 specifically in this phrase, the portion of

Page 520

1 Apple's construction is desired attributes that
2 we need to focus on, right?
3    A.   That's correct.
4    Q.   So in your opinion properties are
5 desired attributes?
6    A.   That's right, in the context of the
7 claim in the patents, yes.
8    Q.   Okay.  Now, in your witness statement,
9 you go farther than just saying desired
10 properties, and you say that these properties
11 cannot be intrinsic characteristics of a
12 component, correct?
13    A.   That's correct.
14    Q.   And so you are saying more than just
15 desired attributes, you are saying, look, you
16 have properties, and those properties, some of
17 the properties of a component are intrinsic and
18 some are not intrinsic, and only the
19 non-intrinsic properties are properties in this
20 patent.  Is that what you are saying?
21    A.   I think we're saying that the
22 properties are these desired attributes that
23 are essentially these non-intrinsic
24 characteristics of -- of the components.
25    Q.   But if I desire to search by file

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 521

1    name, you're saying that's not a property, even
2    if it is a desired attribute?
3        A.   That's right.  In the context of this
4    patent and the claims, yes, a file name is not
5    a property.
6        Q.   Even though it is a desired -- it may
7    be a desired attribute?
8        A.   It may be desired, but not in the
9    context of the claims and the -- and the
10   specifications.
11       Q.   Okay.  So, for example, it is your
12   opinion that this phrase "specifying a target
13   hardware or software component search criteria
14   including one or more properties," it is your
15   opinion that if you specify the name of a
16   component as part of your search criteria, that
17   that's not a property of the component,
18   correct?
19       A.   If it is just the name, no.
20       Q.   And it is your testimony that if you
21   specify the type of the component, that that's
22   not a property?
23       A.   To the extent the type is inherent,
24   like a file type, if that's what you mean, yes,
25   that's not a property.

Page 522

1        Q.   And it is your testimony that if you
2    specify, for example, the size of a file as
3    part of your search, that that's not a property
4    of the file, right?
5        A.   File size is typically standard
6    information of any file, so it would not be the
7    properties as understood in this -- in this
8    patent.
9        Q.   Okay.  Now, let's set aside the
10   specification and just talk about what a person
11   of ordinary skill would understand outside of
12   the context of the patent during the relevant
13   time frame.  Are you with me?
14       A.   Sure.
15       Q.   Now, setting aside the specification,
16   you would agree with me that a person of
17   ordinary skill in the art would not limit
18   component properties to just non-intrinsic
19   properties, right?
20       A.   Completely divorced from the patent?
21       Q.   That's what I just said.
22       A.   Well, I think completely divorced from
23   the patent, they will ask what is a component,
24   and try to figure that out first.
25       Q.   Let's say it is a file.

Page 523

1        A.   If it is a file, property of a file, I
2    think, would be context dependent.  And here
3    the context is the patent.  So if you take that
4    context out, you maybe include file name, maybe
5    you don't.
6        Q.   A file name is a property of a file, a
7    person of ordinary skill in the art would
8    understand that?
9        A.   It would depend on the context, is
10   what I'm saying.
11       Q.   Well, so you are saying that a person
12   wouldn't -- if you say I'm looking for these
13   five properties of a file, and you say file
14   name, file size, file type, you're saying a
15   person of ordinary skill would say, wait a
16   minute, those aren't properties of that file?
17       A.   No, if the context gave a more nuanced
18   meaning to properties, then it would not.  As I
19   said, it depends on the context of the usage of
20   the word property.
21       Q.   You agree then a person wouldn't say
22   that?  In other words, outside the
23   specification, people would understand that a
24   property of a file could be the file name?
25       A.   Depending on the context, yes.

Page 524

1        Q.   And a property of the file could be
2    the file type?
3        A.   Depending on the context, yes.
4        Q.   Yes?
5        A.   Depending on the context, yes.
6        Q.   And the same thing for file size?
7        A.   Again, depending on the context.
8        Q.   Well, let's look now at the context in
9    which this language appears in the patent.
10   Let's look at the intrinsic evidence.
11            Starting with the abstract, I won't
12   belabor this, we have looked at it twice
13   already.
14       A.   Sure.
15       Q.   It says, "a location framework is
16   employed to locate system components whose
17   properties match those specified in a search
18   criteria."  Do you see that?
19       A.   Yes, I do.
20       Q.   That doesn't say in summarizing the
21   invention that you are only looking for
22   non-intrinsic properties, right?
23       A.   It doesn't say either way.
24       Q.   Well, it says properties match those
25   specified in a search criteria?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 525

1    A.   That's correct.
2    Q.   So a person of ordinary skill in the
3  art looking at just this would understand that
4  you could specify file name in a search
5  criteria, right?
6    A.   No, I think reading this, they would
7  say, okay, what does this property mean and
8  read the rest of the specification to figure it
9  out.
10    Q.   Well, looking at this paragraph, sir,
11  it says whose properties match those specified
12  in a search criteria.  Do you see that?
13    A.   Yes.
14    Q.   A person of ordinary skill in the art
15  would understand that you could have a search
16  criteria being name, file name, right?
17    A.   I think they would want to see -- they
18  would read further to figure out what is the
19  search criteria because it is not clear in this
20  abstract what a search criteria is necessarily.
21  It is still pretty broad at this point.
22    Q.   So my question is just looking at this
23  paragraph.
24    A.   That's right.  And my answer is
25  looking at this paragraph as well.

Page 526

1    Q.   Okay.  Because I thought in your
2  answer, you said they would have to read
3  further and they do all this other stuff?
4    A.   That's right, because the paragraph is
5  not sufficient information to figure that out
6  is what I am saying.
7    Q.   You are saying a person wouldn't know
8  that you could specify a file name as a
9  property in a search criteria?
10    A.   I'm saying a person reading this
11  paragraph, without reading the rest of the
12  patent, would probably say what is the search
13  criteria?  What is meant by that?
14    Q.   But you would agree --
15    A.   And the abstract does not tell me
16  that.
17    Q.   But you would agree that a search
18  criteria could be a file's name?
19    A.   A search criteria could be a file
20  name, yes, in the right context, yes.
21    Q.   And a search criteria could be a file
22  type?
23    A.   In the right context, absolutely.
24    Q.   And a search criteria could be a file
25  size?

Page 527

1    A.   In the right context, yes.
2    Q.   Now, if you look at -- I pulled out
3  column 5, 66 through 5, 68 of the patent on
4  slide RDX-15.  It says, "a component can have
5  properties associated with it.  Every component
6  has some set of properties which identify it."
7  Do you see that?
8    A.   Yes, I do.
9    Q.   So this is intrinsic evidence that is
10  using this phrase properties that we're
11  construing, right?
12    A.   Sure.
13    Q.   And it is talking that -- it is saying
14  with respect to properties, that properties can
15  identify the component, right?
16    A.   Sure.
17    Q.   A person of ordinary skill would
18  understand that a file's name is something that
19  could identify a component, correct?
20    A.   A file name is something that could
21  identify a component, absolutely.
22    Q.   Okay.  And a file type can help
23  identify a component, can't it?
24    A.   It may not be a unique identifier, but
25  it could give you the class of components, yes.

Page 528

1    Q.   But a person looking at this sentence,
2  a person of ordinary skill looking at this
3  sentence and trying to figure out what
4  properties means would understand that in this
5  sentence, at least, it says properties are
6  things which identify the component, correct?
7    A.   Some set of properties which identify
8  it.  It is not necessarily the only thing that
9  identifies it.  And also the previous sentence
10  that you have highlighted there says a
11  component can have properties associated with
12  it.  It doesn't necessarily have to have it.
13        And then the next sentence says every
14  component has it.  So there is a little bit of
15  ambiguity there, let's say.  So the first
16  sentence says can have, which indicates
17  components also have other information
18  inherently, too.
19    Q.   Okay.  Let's go on to another place in
20  the specification, column 6, lines 7 through
21  14.  This is RDX-15, slide 74 on the screen.
22        It says, "the system is designed to
23  enable a user to add components without running
24  an installation program.  To support this goal,
25  an installation program is replaced with a

APLNDC-X0000006277

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 529

1   location framework that provides the following
2   capabilities."
3        Do you see that?
4   A.   Yes, I do.
5   Q.   And then it lists two capabilities, I
6   have only put up one here. "System software
7   can locate components whose properties match
8   those specified to the location framework." Do
9   you see that?
10  A.   Yes.
11  Q.   Now, that's a description of what we
12  just looked at in the claim language, right?
13  Querying the operating system to identify one
14  or more hardware or software components that
15  meet the target hardware or software component
16  search criteria?
17  A.   That's one example, yes.
18  Q.   Okay.  So we're replacing the
19  installation program with this thing called
20  location framework, and it allows you to do
21  this search where you can locate components,
22  right?  That's what it is saying?
23  A.   Yes, that's what it is saying.
24  Q.   And then it talks about properties,
25  properties that match those specified by this

Page 530

1   location framework, right?
2   A.   Specified to the location framework.
3   Q.   Right.  And then it says, paren,
4   "e.g." -- that's for example, right?
5   A.   Yes.
6   Q.   So this is an example of finding
7   components whose properties match those
8   specified in the location framework, right?
9   A.   I'm sorry, where are you?  I'm sorry,
10  I missed where you are?
11  Q.   It says "e.g., all components of type
12  tool."  It says that, right?
13  A.   Yes, it does.
14  Q.   And that's an example, the
15  parenthetical, e.g., all components of type
16  tool, is an example of a property search, and
17  looking for properties that match the type
18  tool, right?
19  A.   Sure.
20  Q.   That's what it says, right?
21  A.   Yes.
22  Q.   No mention of non-intrinsic properties
23  here, right?
24  A.   It is unclear whether that tool is
25  intrinsic or not, or something added

Page 531

1   subsequently in the, in the system.
2   Q.   Well, what is -- okay.  Well, a tool,
3   a person of ordinary skill would understand
4   what that means, right, tool?
5   A.   Tool?  No, it is just a word.
6   Q.   Popup blocker is a tool?
7   A.   Is it?
8   Q.   Privacy filter is a tool?  And there
9   is software tools, right?
10  A.   Those are examples of tools.  It
11  doesn't necessarily mean that's what a tool is.
12  Q.   That's what that means.
13  A.   Those are examples of tools but it
14  doesn't mean all tools have to be those.
15  Q.   Now, this expressly discloses doing a
16  property search and the property that you're
17  trying to match is the type of tool, isn't it,
18  sir?
19  A.   It is saying all components of type
20  tool.
21  Q.   Right.  I am searching for all
22  components that are a specific type of tool.
23  The property is the type.  Right, sir?
24  A.   And this is one example.  I don't
25  think it means all the properties necessarily.

Page 532

1   This is just one example.
2   Q.   It says all components of type tool.
3   So the properties that are being searched for
4   are all components that match a property, the
5   type of tool, right, sir?
6   A.   That's the example.
7   Q.   Okay.  Now, isn't it true, sir, that a
8   type of a tool is an intrinsic attribute of a
9   tool component?
10  A.   If you are saying the type as in the
11  file type, as I said earlier, that, I think,
12  would be intrinsic.  All file systems have
13  that.  If the tool is some other -- if the type
14  is not the file type, it is some other type,
15  tool type, some other property, then it would
16  not be intrinsic.
17  Q.   Tool is the component, the type is the
18  property, right?
19  A.   Tool -- no, tool is not the component.
20  It is -- a component is the component and it
21  has this property called tool.
22  Q.   Type tool.  So --
23  A.   The property name is type.  And the
24  value is tool, I guess.
25  Q.   Isn't it true, sir, that a person of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 533

1  ordinary skill in the art would understand that
2  the type of a tool is more intrinsic to a
3  component than some other arbitrary name that
4  you give to that component?
5      A.   No, I don't think that's true at all.
6      Q.   Well, let me give you an example.
7  Let's set aside the computer technical stuff
8  and just do an analogy.  Let's talk about cars.
9  Let's talk about vehicles.  There is types of
10  vehicles.
11          One type is a car, right?
12      A.   Sure.
13      Q.   And cars have properties, right?  Some
14  are intrinsic and some are not intrinsic,
15  right?
16      A.   Are you setting aside the patent or
17  are you including the patent in this discussion
18  of the analogy?
19      Q.   I am asking you, cars have properties,
20  right?
21      A.   Outside the scope of the patent, like
22  how are we using the term properties in your
23  analogy?
24      Q.   Okay.  Sir, I am just asking you,
25  would you agree that when you are talking about

Page 534

1  vehicles, there is different types of vehicles?
2      A.   That's correct.
3      Q.   And one type of a vehicle is a car?
4      A.   Sure.
5      Q.   And cars have some intrinsic
6  properties and non-intrinsic properties, right?
7      A.   If outside the scope of the patent, if
8  you set aside the patent, maybe I will agree
9  with you.
10      Q.   For example, a car -- an intrinsic
11  property of a car is that it has four wheels?
12  All cars have four wheels, right?
13      A.   No, that's wrong.
14      Q.   Okay.  Well, let me ask you this:  All
15  cars are of the type of vehicle being car,
16  right?
17      A.   Sounds like a circular definition.
18      Q.   It is about as intrinsic as you can
19  get, the type of vehicle?
20      A.   But you just defined it in terms of
21  itself, which seems nonsensical to me.
22      Q.   Now, there are attributes of a car
23  that are not intrinsic, right?  You might have
24  manual windows instead of automatic windows?
25  That's an option?  You might have white wall

Page 535

1  tires and not white wall tires.  Those are
2  non-intrinsic attributes of a car, right?
3      A.   It would depend on the car.
4      Q.   And the name you give to a car, you
5  can just pick any old name, right?  Corvette,
6  Mustang?  But isn't it true that the type of
7  vehicle, it being a car versus a bicycle, is
8  more intrinsic, sir, than even the name that
9  you give to that vehicle?
10      A.   In the car example, sure, that makes
11  sense, but I don't think that makes sense in
12  the '430 patent.  We're not talking about cars
13  here.
14      Q.   We're talking about software tools.
15      A.   That's right.
16      Q.   And the type of the software tool,
17  just like the type of the vehicle, is about as
18  intrinsic as you can get; isn't that true, sir?
19      A.   No.
20      Q.   Well, you would agree that this
21  sentence here is expressly disclosing that
22  property as used in the patent can be the type
23  of software component?
24      A.   That's right, a type, yes.  It doesn't
25  say file type necessarily.

Page 536

1      Q.   So if the type of the software
2  component is indeed intrinsic, then this is
3  expressly disclosing properties that are
4  intrinsic properties that you can search; isn't
5  that true, sir?
6      A.   If the type is intrinsic then that
7  would be true.
8      Q.   And you say a component name is
9  intrinsic, right?
10      A.   That's right.
11      Q.   So isn't it true that --
12      A.   When I say --
13      Q.   That a component type is intrinsic,
14  too, sir?
15      A.   When I say the name, I mean the file
16  name of the component.  And I said file type.
17  I didn't say type necessarily.
18      Q.   Okay.  So you agree that the file name
19  is intrinsic, right?
20      A.   That's right.
21      Q.   And wouldn't you agree that a file
22  type is intrinsic as well?
23      A.   I would say the file type is
24  intrinsic, yes.
25      Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 537

1          MR. VERHOEVEN:  Your Honor, can I have
2   one second to confer with counsel?  I am trying
3   to be a little bit more efficient here.
4          JUDGE ESSEX:  Absolutely.
5   BY MR. VERHOEVEN:
6      Q.    Can we go to slide RDX-15.81, please.
7   Now, I believe this is an excerpt from the
8   specification, column 6, lines 47 through 54,
9   sir.
10     A.    Yes, it is.
11     Q.    And I believe you referenced this part
12  of the specification, at least in part, in
13  support for your opinions with respect to the
14  meaning of properties?  Is that right?
15     A.    I believe so, yes.
16     Q.    So let's just walk through it really
17  briefly.  The first sentence "every component
18  has some set of properties which identify it."
19  That's a repeat of what we looked at in column
20  5 earlier, right?
21     A.    It sounds very similar.
22     Q.    So the patent says it twice.
23     A.    Sure.
24     Q.    And, again, a person of ordinary skill
25  would understand that things like names and

Page 538

1   types, they identify properties, right?
2      A.    No, these properties are referring to
3   not file names and not file types.
4      Q.    Well, it says properties which
5   identify it.  The "it" is the component, right?
6      A.    That's right.
7      Q.    And so a person of ordinary skill in
8   the art reading this sentence would think,
9   well, as used in the patent, they are talking
10  about properties which identify a component,
11  right?
12     A.    That's correct.
13     Q.    And file name identifies a component?
14     A.    It doesn't have to be a property which
15  identifies a component.
16     Q.    Well, file name identifies a
17  component, correct, sir?
18     A.    A file name would identify a
19  component, yes.
20     Q.    And file type would help identify a
21  component?
22     A.    That is correct.
23     Q.    And then it continues, "system
24  software may attach properties to components to
25  group specific components into specific

Page 539

1   folders."
2          Do you see that?
3      A.    That's right.
4      Q.    Now, you point to that and then there
5   is a last sentence, "In a future release, users
6   may also attach user-defined properties to
7   components."
8          Do you see that?
9      A.    That's right.
10     Q.    And you cite to that sentence as well,
11  right?
12     A.    That's right.
13     Q.    And you say, well, looking at this one
14  paragraph here (indicating), a person would
15  understand that only system-defined and
16  user-defined properties are the properties of
17  the patent.  Is that what you say?
18     A.    It is basically saying the system
19  software may attach properties, users may also
20  attach properties.  So it is showing that in
21  reading this that these properties are these
22  optional things that are attached.
23     Q.    And you say --
24     A.    And the key word is attached.  One
25  word that is important there is attached.  You

Page 540

1   are attaching these properties.
2      Q.    And as I understand your witness
3   statement -- correct me if I am wrong -- you
4   are pointing to these sentences and saying,
5   well, that would indicate to a person of
6   ordinary skill that you need to -- either the
7   system will put on the properties or the user
8   will put on the properties and, therefore, one
9   would conclude that the properties have to be
10  non-intrinsic?  Is that what you said?
11     A.    That's right, because you are
12  attaching these additional information,
13  attaching these properties to it.
14     Q.    Okay.  Now, first of all --
15     A.    Whereas -- can I finish?
16     Q.    Go ahead and finish, yes.
17     A.    Whereas the components already have a
18  file name and file type intrinsic to it.
19     Q.    Now, nowhere in here is there any
20  mention of intrinsic and non-intrinsic, right?
21     A.    Those words do not appear, you are
22  right.
23     Q.    Okay.  Now, would you agree with me --
24  I just put up an illustration here, slide 82 --
25  that there is only two ways that you can put

27 (Pages 537 to 540)
APLNDC-X0000006280

Page 541

1  properties to components, either the system
2  will put them on or a human being or user will
3  put them on, right?
4     A.   Sure.
5     Q.   So this is 100 percent of the ways
6  that you can attach properties?
7     A.   For properties, yes.
8     Q.   Whether they are intrinsic or
9  non-intrinsic; isn't that true, sir?
10    A.   I'm saying intrinsic properties are
11  not something the user puts on typically.  It
12  is there but intrinsic, you know, in the
13  definition of this patent and the intrinsic
14  characteristics are not properties.
15    Q.   Let's take file name.
16    A.   Sure.
17    Q.   You say that that is an intrinsic
18  property.
19    A.   It is an intrinsic characteristic,
20  yes.
21    Q.   So isn't it true, sir, that either a
22  user has to give it a file name or the system
23  has to give it a file name?  Those are your two
24  options?
25    A.   Sure, but it has to have a file name.

Page 542

1     Q.   So the fact that users can attach the
2  file name or the system can attach the file
3  name, that doesn't say anything about whether
4  it is intrinsic or not, does it, sir?
5     A.   The user doesn't attach the file name.
6  It just gives it the name.  A file would have a
7  name intrinsic to it that has to be populated.
8  By default it would be nothing.
9     Q.   So I guess my question is, take file
10  name.  You say that's not a property?
11    A.   That's right, in the context of this
12  patent, yes.
13    Q.   We just looked at the sentences you
14  pointed to there that says a system can attach
15  properties or the user can add properties.
16    A.   That's correct.
17    Q.   If we take file name, it has to be
18  either added by the user or added by the system
19  if you are going to put a file name on to the
20  file, right, sir?
21    A.   The notion of a file name, every
22  component already has the file name on it,
23  filling that field file name would be done by
24  the user.
25    Q.   Isn't that just a temporal argument

Page 543

1  you're making?  Sure, let's back up in time.
2  Somebody has to give the file a file name,
3  either the system does or the user does; isn't
4  that true, sir?
5     A.   Absolutely.
6     Q.   Okay.  Even if it is intrinsic?
7     A.   Of course.  It has to be named, yes,
8  sure.
9        MR. VERHOEVEN:  Your Honor, at this
10  point, I will pass the witness.  I'm sorry,
11  Your Honor, I forgot.  We're switching to the
12  other patent.
13        JUDGE ESSEX:  Well, let me ask.
14  Staff, would you prefer to conduct examination
15  at one time or do you want to go patent by
16  patent?
17        MS. KATTAN:  I would rather do it all
18  at once, Your Honor.
19        JUDGE ESSEX:  All right.  And so at
20  this point, you want to have the other patent
21  with this witness?
22        MR. VERHOEVEN:  Yes, Your Honor.
23        JUDGE ESSEX:  All right.  And that's
24  what we have agreed with Complainants as well?
25        MR. VERHOEVEN:  That is what

Page 544

1  Complainant would prefer.  We would prefer to
2  do it -- we will do what they want.
3        JUDGE ESSEX:  You will do what I want.
4        MR. VERHOEVEN:  Of course, Your Honor.
5        JUDGE ESSEX:  Very good.
6        MR. VERHOEVEN:  Thank you.
7        JUDGE ESSEX:  All right.  We will pass
8  it to Mr. Nelson then.
9        MR. NELSON:  All right.  Thank you,
10  Your Honor.
11  BY MR. NELSON:
12    Q.   Good morning.
13    A.   Good morning.
14    Q.   Yeah, it is still morning.  Ryan, can
15  you put JX-3 up on the screen, please.
16        All right.  We're going to turn now to
17  the '828 patent.  '828 patent, that's the
18  patent about mathematically fitting ellipses to
19  pixel groups, correct?
20    A.   That is correct.
21    Q.   And it is the case, isn't it, that all
22  of the asserted claims of the '828 patent
23  require mathematically fitting an ellipse to at
24  least one pixel group, among other things, of
25  course?

Page 545

1    A.   I believe so, that's true, yes.
2    Q.   Okay.  So let's focus on that.  I want
3  to talk about what it means to mathematically
4  fit an ellipse to one or more pixel groups.
5         Now, you agree with me, at least
6  initially, that to mathematically fit an
7  ellipse, I need to fit an ellipse, right?
8    A.   It sounds like a circular question,
9  but if I am mathematically fitting an ellipse,
10  I am fitting an ellipse, sure.
11    Q.   Not a square, not a rectangle, not a
12  triangle, correct?
13    A.   Of course.
14    Q.   So if I am fitting a rectangle, I am
15  not fitting the ellipse, right?
16    A.   If I am deliberately fitting a
17  rectangle, yeah, I am not fitting an ellipse,
18  absolutely.
19    Q.   And if I'm simply measuring the center
20  of a contact and where that contact might be
21  located, I'm not fitting an ellipse, correct?
22    A.   If I am just doing the measurement and
23  I have no intention of fitting an ellipse, then
24  I am measuring the center of the ellipse --
25  sorry, center of the contact.

Page 546

1    Q.   Okay.  So then it sounds like what
2  you're saying is what it comes down to, the
3  fitting ellipse part, we will talk about the
4  mathematically in a little bit, but at least
5  with respect to fitting an ellipse, it is the
6  intention of whoever does the -- designs the
7  algorithm as to whether or not they are fitting
8  an ellipse, correct?
9    A.   Not quite, because somebody could fit
10  an ellipse without intending to fit an ellipse,
11  too.  If you calculate those parameters that --
12  all the ellipse parameters, and you end up
13  drawing an ellipse, you may have intended to
14  draw something else, but you ended up with an
15  ellipse.  That's still fitting an ellipse, but
16  --
17    Q.   Well, let's explore that a little bit.
18  Can you put up RDX-16.3, please -- 2.  My
19  numbers are one off here, Your Honor.  I'm
20  sorry, I didn't remember that.
21         So let's talk about this.  Here I have
22  an ellipse, right, that's shown in RDX-16.2?
23    A.   Sure, it appears to be an ellipse,
24  yes.
25    Q.   And there is a center to that ellipse?

Page 547

1    A.   Yes.
2    Q.   It tells me where the middle is,
3  essentially, right?
4    A.   That's right.
5    Q.   And I got a major axis, that's kind of
6  the length, right, the longest points?
7    A.   The red line, yes.
8    Q.   I have got a minor axis, that's the
9  shortest, right?
10    A.   That's correct.
11    Q.   And then I have an orientation, which
12  just tells me how it is tilted from some axis,
13  correct?
14    A.   That's correct.
15    Q.   Okay.  So you agree those are the five
16  parameters that I need to define an ellipse,
17  correct?
18    A.   That's correct, like fully define an
19  ellipse, yes.
20    Q.   Yeah, to define an ellipse, right?  So
21  if I start out and I don't know where it is and
22  it is arbitrary, I think is the term that was
23  used yesterday, I need those five parameters to
24  define an ellipse, correct?
25    A.   A full ellipse, yes.

Page 548

1    Q.   Okay.
2    A.   I just want to clarify, though, if I
3  don't have an orientation, I could still have
4  an ellipse.  It just won't necessarily be
5  rotated.
6    Q.   You just don't know how to rotate it?
7    A.   That's right.  But it would still be
8  an ellipse.
9    Q.   But then if I am trying to fit data to
10  a pixel group, for example, and that pixel
11  group is tilted one way or the other, if I
12  don't have orientation, I can't orient my
13  ellipse, or I can't adjust my ellipse to fit to
14  that pixel group, correct?
15    A.   If I care about that orientation, then
16  that would be true, but I may not care.  I may
17  say I don't really care about the orientation.
18  I just want to know the extent of it and that
19  would be fine, without the orientation.
20    Q.   So, in other words, if I didn't care
21  to fit an ellipse very well is what you're
22  saying?
23    A.   Or if I didn't have enough sufficient
24  quality data, for example, to do that.
25    Q.   Okay.  Now --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 549

1    A.   I'm sorry, just to clarify, or if I
2  did not need orientation information in
3  whatever I was using that fitted data to later
4  on, I may just say forget about calculating
5  orientation.
6    Q.   Well, we will explore that a little
7  bit later.  So let's go to the next slide,
8  RDX-16-3.
9         All right.  So here I have exactly the
10  same parameters, it is shown in RDX-16-3, I
11  have a center, right, the centroid we're
12  calling it?
13    A.   Sure.
14    Q.   I have the major axis, the minor axis,
15  and I have an orientation, correct?
16    A.   Yes.
17    Q.   And this isn't an ellipse, though,
18  right, that's a rectangle?
19    A.   No, somebody has fit a rectangle to
20  those parameters.
21    Q.   So if I am fitting a rectangle, we're
22  not fitting an ellipse?  We're in agreement
23  there, even if I generate these things, but if
24  I am trying to fit a rectangle, correct?
25    A.   If you fit a rectangle, it is not an

Page 550

1  ellipse, sure.
2    Q.   Okay.  So let's focus in a little bit
3  on the claims now.  Ryan, can I have claim 1 up
4  there from JX-3.  Sorry.
5         And let's pull out that last one.
6  That's what I want to talk about this morning
7  and focus on, please.  You can blow it up a
8  little bit and then we can all see it a little
9  bit better.
10        Okay.  So mathematically fitting an
11  ellipse to at least one of the pixel groups,
12  now, you are aware that at some point in time,
13  this claim didn't have the term mathematically
14  in it, correct?
15    A.   In an earlier version during the
16  prosecution history, yes, that's correct.
17    Q.   Right.  And so at some point, at least
18  all the independent claims and most of the
19  dependent claims were rejected over a
20  reference, I think it is the Bisset '352
21  reference.  Do you recall that?
22    A.   Yes, some -- some number of claims.
23  I'm not sure if it was all of them, but...
24    Q.   Yeah.  I think if we go to RDX-16.9,
25  please.  I think it was claims 1 through 3, 6

Page 551

1  through 8, 23 to 29, 31, and 32.  Is that
2  consistent with your recollection?
3    A.   Sounds right, yes.
4    Q.   Okay.  So it was at that point in time
5  that the applicants came back and added the
6  word "mathematically" to the claims, correct?
7  In response to that rejection?
8    A.   In response to that, yes.
9    Q.   Let's go to RDX-16.10 and this might
10  help a little bit.  So RDX-16.10 --
11    A.   I'm sorry, what am I looking at here?
12    Q.   You have the excerpts in your book if
13  you want to look at those.  They are JX-6.  And
14  the page, the page with the Bisset rejection is
15  1407.  And then the response that I have here
16  is 1456 and 57, if you would like to look at
17  those.
18    A.   Sure, if you would just give me one
19  moment to quickly look at this.
20    Q.   Sure.
21    A.   Right.  Okay.  So what you have on the
22  slide is two pages, right?
23    Q.   Yeah, correct.  It is pulling out.
24  Because the claims 1 and 10 were amended and
25  then claim 24 is a means-plus-function claim,

Page 552

1  correct?
2    A.   Okay, I got it.  I was just a little
3  confused there for a second.
4    Q.   So you are in agreement then, that's
5  when the term mathematically was added,
6  correct?
7    A.   Yes.
8    Q.   Okay.  And if we look back at slide
9  16.09, we see some of the applicant's response.
10  And this is actually in the file history,
11  right?  It is all caps like this, underlined?
12  Meaning I didn't do this, that's the way it
13  looks in the file history?
14    A.   Sure, apart from the yellow highlight,
15  sure.
16    Q.   Without the yellow highlight.
17    A.   Of course.
18    Q.   But in terms of the all caps?
19    A.   Sure.
20    Q.   What the applicant says, "the office
21  action's interpretation of fitting an ellipse
22  to at least one of the pixel groups is
23  unreasonable in light of the plain meaning of
24  fitting an ellipse to, and in particular,
25  disregards the requirement to interpret claims

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 553

1  in light of the specification."  Right?
2      A.   Right.
3      Q.   If we go to RDX-16.11, this would be
4  at pages 1468 and 69 of JX-6 that you have in
5  front of you, and you see here this is in the
6  office action response, right, when the claim
7  was amended to add the word mathematically?
8      A.   Yes.
9      Q.   So he said the applicant said,
10 "specifically, paraphrasing the office action's
11 interpretation, merely obtaining measured data
12 is the same as fitting an ellipse to the data
13 so long as the measured data happens to be
14 measured from an object that is in general
15 ellipse-like"?
16         He goes on, and I will omit the
17 parenthetical.  "Applicant's representative
18 asserted that, under the plain meaning of the
19 language of the claims, without more, one
20 skilled in the art would not interpret 'fitting
21 an ellipse to at least one of the pixel groups'
22 in such a manner.  Furthermore, the office
23 action's interpretation is particularly
24 unreasonable when the claim language is viewed
25 in light of the specification, as it must be

Page 554

1  viewed.  In this regard, applicants submit that
2  the office action fails to consider the
3  disclosure of the specification when
4  interpreting at least the feature of 'fitting
5  an ellipse to at least one of the pixel
6  groups.'"  Correct?
7      A.   Yes.
8      Q.   So the applicants are pointing back to
9  the specification, here is what it means to fit
10 an ellipse, correct?  That's your
11 understanding?
12     A.   Well, they are saying you have to read
13 the specification in order to understand this
14 claim, yes.
15     Q.   Let me find 1468, I told you, right?
16     A.   That's what you have up here.
17     Q.   So you understand that the applicants
18 went on to say that simply obtaining measured
19 data from something that is ellipse-like is not
20 mathematically fitting an ellipse, correct?
21     A.   Just obtaining measured data, that's
22 right.  That's what they say.
23     Q.   So you agree with that, right?
24     A.   Sure.
25     Q.   All right.  Now, let's go to RDX-16.1,

Page 555

1  please.  That's why my numbers are off.  There
2  is two 2's.  Okay, it is fixed now.
3         So what is shown as RDX-16.2 here --
4  and we will fix this so the page numbers are
5  right -- here is the parties' constructions,
6  correct?  It is your understanding of the
7  parties' constructions?
8      A.   That's correct, yes.
9      Q.   So all of these constructions require
10 fitting an ellipse, correct?
11     A.   Sure, that's what it is doing, right.
12     Q.   So I am just trying to find the
13 agreement.
14     A.   I was wondering if there is something
15 subtle about your question but --
16     Q.   Okay.  No, I am not subtle.  You don't
17 need to worry about that.
18         So -- and you agree that both
19 constructions require at least computing
20 numerical parameters to mathematically define
21 an ellipse, right, at a minimum?
22     A.   Both constructions or Apple's
23 construction clearly requires computing
24 numerical parameters.  And I guess doing the
25 more complex thing that Motorola and Staff's

Page 556

1  construction would require computing
2  parameters, sure.
3      Q.   So we have some minimum agreement that
4  at least between the constructions, they both
5  require at least fitting an ellipse to one or
6  more pixel groups, correct?
7      A.   Well, they have to.  That's what the
8  claim term is about.
9      Q.   Agreed.  Agreed.  So they both require
10 at least that.  And they both require at least
11 computing the numerical parameters that
12 mathematically define an ellipse, correct?
13     A.   Both are computing numerical
14 parameters.  Motorola's and Staff's
15 construction just applying the unitary
16 transformation doesn't completely compute all
17 the parameters.
18     Q.   Right.  What this -- I am pointing to
19 myself -- what this construction does is it
20 provides a specific procedure for
21 mathematically defining the parameters that
22 define an ellipse, correct?
23     A.   It is providing a specific procedure
24 that computes some of the parameters, yes.
25     Q.   Right.  So, in other words, you need

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 557

1   to do at least this in order to compute your
2   parameters to fit an ellipse around the group,
3   correct?
4       A.   According to Motorola's construction.
5       Q.   Motorola and the Staff's construction,
6   correct?
7       A.   That's true.
8       Q.   And even under Apple's construction,
9   you need to compute numerical parameters that
10  mathematically define an ellipse, correct?
11      A.   That is correct.
12      Q.   Okay.  All right.  So we at least have
13  some agreement there.  The difference is
14  whether you need to include some specific
15  procedure or whether you can use any
16  mathematical procedure to compute the
17  parameters, correct?  That's the dispute?
18      A.   That's, I think, a fair
19  characterization, sure.
20      Q.   All right.  So we know that the
21  prosecution history -- in the prosecution
22  history, the applicant referred back to the
23  specification for mathematically defining an
24  ellipse, correct?
25      A.   I believe so, yes.

Page 558

1       Q.   And we were talking about this some
2   yesterday, but let's put it up on the screen.
3   Column 26, I believe it is, correct, of the
4   patent?  Column 26 at JX-3, Ryan.  And let's
5   blow up column 26.
6           So you agree that what we have here in
7   column 26 is at least one way that the patent
8   specification defines or provides for
9   mathematically defining an ellipse, correct?
10      A.   Everything -- well, everything you
11  have got highlighted here, yes, it is one
12  method, yes.
13      Q.   Right.  And just to -- I am not going
14  to go through all this.  We went through all
15  this yesterday.  But just briefly, here we're
16  figuring out where the center is, essentially?
17      A.   I'm sorry, where are you pointing to?
18      Q.   You can't -- equations 12, 13, and 14.
19  We're basically finding out the center of the
20  touch, right?
21      A.   That's right.
22      Q.   And then here in equation 16, 17, and
23  18, I'm computing the second moments, so that I
24  can establish my covariance matrix, correct?
25      A.   That's correct, with a few typos

Page 559

1   there, sure.
2       Q.   Understood.  And we talked about those
3   yesterday.
4           And then down here from my covariance
5   matrix, I am extracting the parameters to give
6   me the major axis, the minor axis, and the
7   orientation, correct?
8       A.   That's correct.
9       Q.   So here I have the center, we talked
10  about before, and X and Y where it is, so
11  that's two, and I have the major axis, that's
12  three, and I have got the minor axis, that's
13  four, and I have got the orientation.  That's
14  all five, correct?
15      A.   In this whole procedure, yes,
16  absolutely.
17      Q.   And I have computed all of these,
18  right, mathematically computed those parameters
19  in the example that's given here in column 26
20  from the top down to equation 21, correct?
21      A.   Sure, if you run through all of it,
22  yes, absolutely.
23      Q.   All right.  Now let's look into column
24  27.  And in that first paragraph up there, so
25  we talked about this some yesterday.  You were

Page 560

1   in the courtroom when we talked about this?
2       A.   Yes, I was.
3       Q.   And so what we're talking about in
4   this first paragraph now is if the touch data
5   is too small, if I don't have enough touch
6   data, then I'm going to use this total group
7   proximity instead of the fitted ellipse
8   parameters, correct?  That's one thing I am
9   going to do?
10      A.   It is saying on low resolution data,
11  yes.
12      Q.   I think what we talked about yesterday
13  in response to His Honor's question,
14  Mr. Westerman said that what's going on here is
15  that if the contact seems so slight to the
16  system, it is going to fit a particular value
17  to certain of the touches, correct?
18      A.   I think that is one example he gave as
19  to where this would apply, yes.
20      Q.   Well, that was -- that was the direct
21  answer to His Honor's question, wasn't it?
22      A.   I believe it was his answer.  I'm not
23  sure whether he meant that was the only time
24  you would use this.
25      Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 561

1    A.    I'd have to go back and look at that
2    transcript.
3    Q.    Okay.  Okay.  So we at least have that
4    agreement.
5          Now, here, Gz, you agree this sentence
6    says, it is being used as an indicator of
7    contact size as well as finger pressure.  Now,
8    finger pressure is not one of the ellipse
9    parameters, correct?
10   A.    Not directly, no.
11   Q.    Okay.  So Gz is being used as an
12   indicator of contact size, rather than the
13   fitted ellipse parameters, right?
14   A.    That's what this says, yes.
15   Q.    Okay.  And then we have the
16   orientation and the eccentricity.  Now,
17   eccentricity, that would be the ratio of the
18   major axis to the minor axis, correct?
19   A.    Sure, or the other way around.  It is
20   a ratio of those two numbers, sure.
21   Q.    Okay.  Major axis is usually bigger,
22   put that in the denominator is what you are
23   saying, right?
24   A.    Sure.
25   Q.    But those are set to default values,

Page 562

1    correct?
2    A.    In this example, yes, in this
3    embodiment, yes.
4    Q.    Right.  So it is set to a value that
5    will always be the same value, correct?  That's
6    what this is saying?
7    A.    A default value doesn't necessarily
8    have to be the same value.  Like a different
9    run of the program may set it to some other
10   default.  I am not sure I want to equate or it
11   would be appropriate to equate default with the
12   same across all uses of this embodiment.
13   Q.    Well, but you are just talking about
14   that I could implement the system and have a
15   different default value, but any given system
16   is going to have a default value, that's what
17   this is saying, correct?
18   A.    What this is saying is, yeah, that
19   these orientation and major, minor axis, which
20   is the eccentricity, would be set to some
21   default in that system, yes.
22   Q.    Okay.  So we have that agreement.
23   Now, you will agree, though, that when I set
24   the default values, that I am not doing the
25   calculation, correct?

Page 563

1    A.    It would depend.  I could set a
2    default value based on a calculation.  It
3    doesn't preclude doing a calculation.
4    Q.    So what you are saying -- let me see
5    if I understand this then.
6          So the way you understand columns 26
7    and 27 is you are going to run through -- so
8    you have a system, this is all implemented in
9    one system, correct?
10   A.    It may be one or two systems or
11   different systems.  It may implement different
12   embodiments, sure.  It doesn't have to be all
13   in one system.
14   Q.    So what you are saying is some systems
15   may not even include this setting the default
16   values if I have slight contacts, is what you
17   are saying?
18   A.    No, that's not what I am saying.  I am
19   saying that some systems may implement this
20   version.  Another system may implement what's
21   on column 26.
22   Q.    Okay.  So what -- so then maybe that's
23   an issue here.  So what you're saying is the
24   way you understand this, contrary to what we
25   heard yesterday, is that what's described in

Page 564

1    this one paragraph in 27 is something that you
2    do all the time, even if I have plenty of touch
3    data, it is a large touch, I have plenty of
4    touch data, just do it this way, don't go
5    through and fit the ellipse in a precise manner
6    the way I talked about in column 26?  Is that
7    what you are saying?
8    A.    I am saying that's possible, yes.
9    Q.    So then you disagree with what
10   Mr. Westerman said is that what is going on
11   here, what this is all about is if I have a
12   slight touch in the system, then instead of
13   going and calculating all of the parameters, I
14   am going to set certain of the parameters to
15   default values?  Correct?
16         MR. DAVIS:  Objection, Your Honor,
17   misstates prior testimony.
18         JUDGE ESSEX:  I'm sorry, I didn't hear
19   you.
20         MR. DAVIS:  I'm sorry, Your Honor.
21   Objection, misstates prior testimony.
22         JUDGE ESSEX:  Which prior testimony?
23         MR. DAVIS:  Of Dr. -- his
24   characterization of Dr. Westerman's testimony
25   is inaccurate.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 565

1    JUDGE ESSEX:  Ask your question, Mr.
2  Nelson.
3    MR. NELSON:  Do you want me to put the
4  testimony up there so we don't have any
5  disagreement about it, Your Honor?
6    JUDGE ESSEX:  Well, what is the
7  question you are asking?
8    MR. NELSON:  I am asking him about the
9  response to your questions at the end
10  yesterday.  It seems like he maybe disagrees
11  with Mr. Westerman.
12    JUDGE ESSEX:  Go ahead and put the
13  testimony up.
14    MR. NELSON:  Let's do that.  That
15  would be from the transcript yesterday, page
16  352, at the top, basically starting at 2, line
17  2.
18  BY MR. NELSON:
19    Q.   So you will agree at this point in
20  time, we're talking about that paragraph at the
21  top of column 27, correct?
22    A.   If you could give me a moment to just
23  quickly look through this, make sure I am
24  oriented.
25    Q.   Sure.

Page 566

1    A.   I believe Dr. Westerman is referring
2  to what's in column 27 here for doing these
3  defaults, yes.
4    Q.   Well, understood.  And if we go back
5  -- and I can give you the context if you want
6  to -- so let's go back to 351, just so you make
7  sure that we're all on the same page.
8    So this is after some questions from
9  Mr. Davis, right, about this paragraph at the
10  top of column 27, right?
11    "Question:  Okay.  So under some
12  example that is provided at the top of column
13  27, is that an example, is that mathematically
14  fitting an ellipse, or mathematically fitting
15  an ellipse?"
16    Then I objected, right?  And then the
17  judge asked his question, correct?
18    A.   Right.
19    Q.   So that's what we're talking about
20  here.
21    A.   Sure.
22    Q.   We're talking about this paragraph at
23  the top of column 27, right?
24    A.   That's what -- that's right, yes.
25    Q.   And I am talking about at page 352 of

Page 567

1  the transcript at line 2, right?
2    A.   Yes.
3    Q.   "Let me ask the question here, from
4  having listened to the three of you go over
5  this and that, is there a point where the
6  contact seems so slight to the system that it
7  fits a value and that value is always the same?
8  Is that what is going on here?  Right?
9    "Answer:  Well, it is for particular
10  parameters.  It is not for all.
11    "Question:  I understand not for all
12  parameters, but for particular parameters, if
13  it is below a minimum, then it has a value that
14  will always be the same value?
15    "Answer:  Yes."
16    Correct?  So you recall that
17  testimony?
18    A.   Yes, I do.
19    Q.   Okay.  So there is no indication here
20  that there is an alternative embodiment, that
21  this is something that you put into a system
22  that no matter what touch data you have, no
23  matter how many pixels that you have in your
24  touch, that you are going to use this instead
25  of going through the precise ellipse fitting

Page 568

1  procedure that is shown in column 26, correct?
2    A.   Well, listening to the testimony
3  yesterday and reviewing this transcript, what
4  I'm saying here is Dr. Westerman answering His
5  Honor's very specific question about what
6  happens when the contact is particularly
7  slight, and Dr. Westerman giving that answer in
8  that particular context.
9    He doesn't say anything about whether
10  the embodiment in column 27 at the top
11  paragraph there could be used for -- as an
12  alternate.  It is silent on that.  He is just
13  answering a particular, very particular
14  question from His Honor.
15    Q.   Yeah.
16    A.   In a particular context.
17    Q.   Is there a point where the contact
18  seems so slight to the system that it fits the
19  value?  That's the question, right?
20    A.   That was the very specific question of
21  His Honor's, yes.
22    Q.   In other words, there is not much
23  touch data, correct?
24    A.   In that example, absolutely.
25    Q.   Right.  And so if we go back -- and,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 569

1   in fact, it says that in column 27, where it
2   refers to the proximity image having low
3   resolution, right?  Not much touch data there,
4   correct?
5       A.   Low resolution, one skilled in the art
6   reading that would say it could be not much
7   touch data, could be low resolution touch data,
8   which you could have a lot of, but the
9   resolution is low.  I think these are two
10  slightly different things.
11      Q.   All right.  Well, we will leave that.
12  I mean, that is what it is.  I think we
13  understand where the disagreement is.
14          Now, let me talk then just a little
15  bit about, go back to column 27.  And blow up
16  that first paragraph again.
17          So right at the very end here that I
18  read, well, it is not all the way at the end,
19  it says, the orientation and eccentricity of
20  small contacts are set to default values,
21  correct?
22      A.   That is correct.
23      Q.   So your understanding means that they
24  are not calculated, correct?
25      A.   No, it could be calculated and then

Page 570

1   set to a default.  A default doesn't mean it is
2   a number necessarily pulled out of thin air or
3   fixed in stone.  It could be a calculated
4   default.
5       Q.   So you're saying that --
6       A.   It could be either one is what I am
7   saying.
8       Q.   I'm sorry.  I didn't let you finish.
9   Are you done?
10      A.   I'm sorry, I interrupted you as well.
11      Q.   Okay.  No problem.
12          So let me just see if I understand
13  what you are talking about.  So you are saying
14  that it could be calculated and you decide it
15  is not good enough and I set a default value,
16  right?
17      A.   Or I use that calculated value as a
18  default, but I am not going to keep
19  recalculating that.  I may calculate that once
20  up front, for example, knowing that it is a low
21  resolution array.
22      Q.   So it is your understanding, you read
23  this, and you understand that the eccentricity
24  in the default values in the example here --
25  excuse me, the eccentricity and the orientation

Page 571

1   in the example that's given in the top
2   paragraph of column 27, that the eccentricity
3   and the orientation will be calculated, but
4   then set to a default value?
5       A.   I'm saying that's a possibility.  It
6   could be a -- so default value -- what I am
7   saying is a default value could be something
8   that's hard coded, somebody decides that at the
9   time of writing the program.  It could be
10  something that is determined on the fly by
11  either calculation or a measurement.  It could
12  be determined in many different ways.  So
13  that's all the point I am making about what a
14  default value is.
15          It doesn't have to always be
16  calculated.  It may be hard coded, right?  But
17  it could include -- it doesn't preclude a
18  calculated value, necessarily.
19      Q.   Okay.
20      A.   That's all I am saying.
21      Q.   So, Ryan, can you cue up the
22  deposition at page 82, lines 2 through 22.
23  Let's see if we can take a look at that.  You
24  have your deposition in your book right in
25  front of you, if you want to take a look.  It

Page 572

1   should be the very last thing in the book.
2       A.   I'm sorry, what line?
3       Q.   Stop that.  It is 2 -- 82, page 82,
4   line 2 through 22.
5           (Videotape played and transcribed as
6   follows:)
7           "Question:  Well, isn't it that you
8   fit the ellipse?  And it says, therefore, if
9   proximity images have low resolution, the
10  orientation and eccentricity of small contacts
11  are set to default values rather than their
12  measured values, and the total group proximity
13  Gz is used as a primary measure of contact size
14  instead of major and minor axis lengths.  It is
15  just you set it instead of using the other
16  values, right?  Doesn't it say rather than
17  their measured values?
18          "Answer:  Okay.  What it says is" --
19          MR. DAVIS:  Your Honor -- excuse me.
20  For completeness, we should really continue on.
21          JUDGE ESSEX:  Well, we haven't gotten
22  an answer yet here.  Wait and see what we get
23  here and you will have an opportunity to do
24  completeness, but I am going to let him at
25  least show what he wants to and ask the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  question.
2      (Videotape played and transcribed as
3  follows:)
4      "Answer:  What it says is, yeah,
5  default these orientation and eccentricities to
6  default values, which would imply that you
7  don't go ahead and calculate them in the first
8  place.  Why would you calculate them if I know
9  it's a low resolution image?  I am not going to
10 expend computational steps to do steps -- you
11 know, all these other equations which take up
12 some -- some of a computation.  I know it is a
13 low-res image, I'm just going to default it.
14 I'm not even going to do that calculation."
15     MR. NELSON:  Okay.  Stop it there.  So
16 what else do you want?
17     MR. DAVIS:  So you were asking whether
18 it was -- the question was one of a series of
19 questions with regard to whether using default
20 values was mathematically fitting ellipse.
21 This line of questioning continued on through
22 page 83 and on to page 84 to -- actually ended
23 up at page 85.
24     JUDGE ESSEX:  Mr. Davis, I am going to
25 let him continue with his cross-examination.

1  If you want to rehabilitate the witness when
2  you get to do redirect, certainly that's within
3  your rights, but I am not going to require that
4  cross-examine do that as well.
5      So go ahead and continue your cross.
6      MR. NELSON:  All right.  Thank you,
7  Your Honor.
8  BY MR. NELSON:
9      Q.  So let's go back to column 26 for a
10 minute.
11     A.  Of the patent?
12     Q.  JX-3.  Of the patent.  Can you put
13 that up there, Ryan?  Now, do you see here at
14 about line 18 -- the 20 is a little off -- I
15 think it is line 18.  It starts right there
16 (indicating).  "The ellipse fitting procedure
17 requires a unitary transformation of the group
18 covariance matrix Gcov" -- I think they said
19 yesterday -- "of second moments Gxx, Gxy, Gyy."
20 Do you see that?
21     A.  That's right.
22     Q.  Okay.  So you don't dispute that the
23 patent says the ellipse fitting procedure
24 requires the unitary transformation, correct?
25     A.  In the context of this embodiment,

1  absolutely not.
2      Q.  And you just think it is only required
3  in one embodiment, that's what you are saying?
4  So when the patent says it requires it, it
5  requires it only in one embodiment, that's what
6  you are saying, correct?
7      A.  That's correct.
8      Q.  And that's dependent upon your idea
9  that column 27, that one paragraph at the top
10 where there is no computation of certain
11 ellipse parameters, that they are set to
12 default values, that that is a completely
13 separate embodiment, correct?
14     A.  I am not sure that's my idea.  That's
15 what the patent says.
16     Q.  Okay.  Well --
17     A.  I didn't make it up.
18     Q.  Your idea of the patent is what I am
19 saying.
20     A.  It is my reading of the patent, and it
21 is what I think someone of skill in the art
22 would -- would read the patent to be.
23     Q.  Okay.  Right.  So then if those were
24 not two separate embodiments, but simply a
25 default case of the ellipse fitting procedure,

1  can you read column 26 and column 27 together,
2  then do you dispute that the ellipse fitting
3  procedure requires a unitary transformation of
4  the group covariance matrix Gcov of second
5  moments?
6      A.  So you are saying if these two are
7  taken together, is that what you are saying,
8  both column 26 and 27 as one embodiment?
9      Q.  Correct.
10     A.  If it is one embodiment, then, yeah,
11 sure, you would do what it says in column 26,
12 absolutely.
13     Q.  Okay.  All right.  Thank you.
14     So I am going to move on to
15 infringement, now.  Is it okay, Your Honor?
16 All right.  Non-infringement.  I am moving on
17 to non-infringement.
18     JUDGE ESSEX:  We will see.
19     THE WITNESS:  Am I in the same binder?
20 BY MR. NELSON:
21     Q.  You are in the same binder, yes.  So
22 the functionality that you accuse is on some
23 chips that are provided to Motorola by Atmel,
24 correct?
25     A.  It is not just the chips.  It is the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 577

1  Atmel chip does some computations and then it
2  passes values down into some Motorola code and
3  Android code, which then does the whole
4  process.
5      Q.   Yeah.
6      A.   So it is a combination of --
7      Q.   Yeah.  I am not sure I read it that
8  way.  So let's explore that a little bit.
9          So let's go back to the patent.  Let's
10 put claim 1 up there for an example, JX-3.  So
11 here the last element, that's the one I want to
12 focus on, mathematically fitting an ellipse to
13 at least one of the pixel groups.  Do you see
14 that?
15     A.   Of course.
16     Q.   Right?  So you agree that the
17 mathematical fitting of an ellipse has to be at
18 least to one of the pixel groups, correct?
19     A.   Sure.
20     Q.   The Atmel chip is the only one that
21 has access to the pixel groups, correct?
22     A.   You mean in terms of the raw data, not
23 being sent further downstream?
24     Q.   Correct.
25     A.   I believe that it is true for the code

Page 578

1  that I have examined.
2      Q.   Right.  So the Atmel chip does what it
3  does with the pixel groups, correct?
4      A.   I don't know what you mean by does
5  what it does, but --
6      Q.   Well --
7      A.   It does something to the pixel groups.
8      Q.   Yeah, it does something to them.  It
9  takes some measurements.  We're going to talk
10 about what those measurements are, okay, in a
11 minute.  But those measurements, whatever those
12 measurements are, those are provided to the
13 Motorola phone, correct?  That's your
14 understanding?
15     A.   It calculates some stuff.  It measures
16 some stuff, and it provides a bunch of
17 parameters for the downstream to the Motorola
18 phones, yes.
19     Q.   For the Motorola phone.  But the
20 Motorola phone doesn't have access to the pixel
21 data, right, the underlying pixel groups?
22     A.   For everything I have seen so far, it
23 may be doing something somewhere else that I
24 haven't seen, but everything I have seen so
25 far, the raw data is not sent down to the

Page 579

1  Motorola phone.
2      Q.   Okay.  So at least --
3      A.   But the phone -- sorry.  Just to
4  finish, the phone, I think you have to take it
5  as an entirety, that it is the chip and the
6  Motorola code and Android code, it is one big
7  package.  The phone, you know, is not just the
8  chip or not just the Android code or the
9  Motorola code.
10     Q.   Oh, I'm sorry.
11     A.   I am done now.  Sorry.
12     Q.   So I think we need to be a little bit
13 more precise here.  I think that's part of the
14 issue.  So there are different components and
15 different levels, I think you heard
16 Mr. Westerman talk about passing things up to
17 higher levels, correct?
18     A.   I believe he said something to that
19 effect, yes.
20     Q.   Okay.  And so there is an Atmel chip
21 that's, let's just say it is at the bottom
22 level, right?  That's the chip that takes
23 whatever sense data it gets from the
24 touchscreen and then processes that data in
25 some way, correct?

Page 580

1      A.   For the code I have seen, yes.
2      Q.   Now, the data that the Atmel code or
3  the Atmel chip processes, that data is not
4  passed up to any other layer in the Motorola
5  phone, correct?
6      A.   For the code I have seen, the raw data
7  is not passed up.
8      Q.   Right.  And it is not passed up to the
9  Android layer either, correct?
10     A.   Of course, if it is not passed up one
11 layer, it is not going to jump to the next
12 layer.
13     Q.   Understood.  But just want to be
14 precise with this.
15         So what we're talking about here in
16 terms of whatever measurements are done on the
17 pixel group, whatever data is extracted from
18 the pixel group, that's done in the Atmel chip,
19 correct?
20     A.   The work on the raw data, yes, that's
21 done on the Atmel chip.
22     Q.   So for purposes of your infringement
23 analysis, the measurements you have pointed to
24 are in the Atmel chip, correct?
25     A.   Measurements?  You mean the raw data

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 581

1    measurements?  That is coming from the sensor
2    and being read by the Atmel chip, the raw data
3    measurements, yes.
4        Q.   Right.  So those are the measurements
5    you're talking about.  So the Motorola code,
6    the Google code, that's in the higher layers.
7    They get whatever they get from this Atmel
8    chip, correct?
9        A.   They get a bunch of information from
10   the Atmel chip.
11       Q.   Right.  They get measurements.  They
12   get certain measurements of pixel data from the
13   Atmel chip, correct?
14       A.   Measurements and calculated values, a
15   combination of both.
16       Q.   But they don't get the raw data, so
17   they can't -- they being the Motorola code, the
18   Android code -- they can't do any additional
19   processing on the pixel group, correct?
20       A.   Not directly on the raw data, no.
21       Q.   All right.  So let's look at slide --
22   just to clarify this a little bit further,
23   slide RDX-16.22.  Here is from your direct
24   witness statement.  You recall these questions
25   and answers from your direct witness statement?

Page 582

1        A.   Of course.
2        Q.   So it says right here, what evidence
3    did you consider in forming your opinion?  And
4    you talk about the Atmel product guides.  And
5    then you go on here and you say, "as shown in
6    CDX-1.549" -- and if you need to see that, I
7    will get that up on the screen -- "these
8    parameters are listed in the message data for
9    Atmel multi-touch objects, and include XPOSMSB,
10   YPOSMSB, TCHAREA, TCHAMPLITUDE, TCHVECTOR."  Do
11   you see that?
12       A.   Yes, I do.
13       Q.   So what you are saying is these are
14   the parameters, this is your opinion now, I am
15   not saying I agree with you -- these are the
16   parameters that mathematically define the
17   ellipse, right?
18       A.   Sure.
19       Q.   So it is the functionality in the
20   Atmel chip that you're accusing, correct?
21       A.   That's part of it.  Those parameters
22   also get passed further down.  And the values
23   and the calculated data.
24       Q.   Right.  But they get passed further
25   down.  The layers further down or up, depending

Page 583

1    upon how you want to look at it --
2        A.   I meant the Motorola and Android code
3    subsequent.
4        Q.   Right.  The Motorola and Android code.
5    They can't do anything other than what these
6    measurements that they have been given,
7    correct?  They can't further process the pixel
8    data because they don't have the pixel data,
9    right?
10       A.   They can't further process the raw
11   pixel data, but they could further process
12   these calculated parameters or measured
13   parameters that are given to them.
14       Q.   Okay.  So at this point in time, I am
15   probably going to go into some information
16   that's Atmel confidential.  So we have to clear
17   the room anyway, Your Honor.
18            Should we just go to lunch and then do
19   that afterwards?
20            JUDGE ESSEX:  Well, I assume you have
21   a bit more to go?
22            MR. NELSON:  I do, Your Honor.
23            JUDGE ESSEX:  All right.  That makes
24   some sense, let's take a lunch break.
25            Doctor, again, as I did yesterday, I

Page 584

1    will just remind you that since you are on the
2    witness stand, it would be inappropriate to
3    discuss your testimony or the basis and so on
4    with anyone.  Feel free to mingle and discuss
5    anything else, but please don't discuss
6    anything regarding your testimony or
7    information while we're at lunch, would you
8    please?
9            THE WITNESS:  I understand, Your
10   Honor.
11           JUDGE ESSEX:  Thank you very much.
12   We're in recess and we will be back at 1:00.
13           (Whereupon, at 11:56 a.m., a lunch
14   recess was taken.)
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 585

```
 1              AFTERNOON SESSION
 2                  (1:00 p.m.)
 3         JUDGE ESSEX:  Are we ready to start
 4   with the witness again?
 5         MR. NELSON:  Yes, Your Honor.  We're
 6   going to start on the confidential record.
 7         JUDGE ESSEX:  All right.  All right.
 8   Doctor, welcome back.  And I remind you, you
 9   are still under oath.
10         (Whereupon, the trial proceeded in
11   confidential session.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 685

Page 687

1          O P E N   S E S S I O N

2          MR. DAVIS:  May I proceed, Your Honor?

3          JUDGE ESSEX:  You may.

4    BY MR. DAVIS:

5          Q.    Dr. Balakrishnan, I would like to turn

6    now to some of the questions with regard to

7    claim construction in the prosecution history

8    that you were asked with regard to

9    mathematically fitting.

10         Could we turn to JX-6 at .1468.  Let

11   me know once you have gotten there.  And I will

12   have it brought up on the screen.

13         Do you recall what this is?

14         A.    It is the prosecution history of the

15   '828 patent.

16         Q.    And, yes, what is being discussed

17   here?

18         A.    Well, what exactly are we talking, the

19   whole thing?

20         Q.    Yeah, in the remarks.  What is

21   specifically -- why don't we go ahead and start

22   with the section that starts "claims 1 through

23   3, 6 through 8, 23 through 29, 31 and 32 were

24   rejected under 35 U.S.C. section 102(e) over

25   Patent Number 5,825,352 (Bisset).  The

Page 688

1    rejections are respectfully traversed.

2    Reconsideration and withdrawal of the

3    rejections are respectfully requested."

4          In that section where they are talking

5    about the Bisset rejection, what is the

6    patentee saying here?

7          A.    The patentee is saying to the Patent

8    Office or the examiner that in the previous,

9    the previous version of the claims, 1 to 3, 6

10   to 8 and so forth, were rejected over -- due to

11   this '352 patent.  And it is saying that the

12   rejections were looked at and is requesting

13   reconsideration.

14         Q.    Did the patentee agree that the '352

15   patent disclosed fitting an ellipse?

16         A.    No.

17         Q.    What grounds did the patentee give for

18   disputing that?

19         A.    It is saying here like in the next

20   section of that document, where it says the

21   office action and so forth in capitals is

22   basically saying that the office action's

23   interpretation of fitting an ellipse is

24   unreasonable in light of the plain meaning of

25   fitting an ellipse, in particular, with regards

7          (Whereupon, the trial resumed in open

8    session.)

1  to the specification of the patent.
2      Q.    Okay.  Does the specification disclose
3  any methods for fitting an ellipse?
4      A.    Of the '828 patent or the '352?
5      Q.    Yes.
6      A.    Of the '828, yes.
7      Q.    And what different ways does the
8  patent disclose?
9      A.    The '828 patent discloses at least two
10  ways, one is with a series of equations as
11  shown in column 26 and column 27, the top
12  paragraph, which shows a method where the array
13  data is lower resolution, for example.
14      Q.    Chris, can we bring up column 27 of
15  the '828 patent and the infamous top paragraph.
16          Could you explain to us what is being
17  described in this paragraph?
18      A.    Well, what it is saying here is on low
19  resolution electrode arrays, in other words,
20  arrays that don't give you high precision data,
21  total group proximity Gz, which is the overall
22  touch that's calculated, is a more reliable
23  indicator of contact size, as well as finger
24  pressure than the fitted ellipse parameters,
25  referring to the more sophisticated

1  calculations in column 26.
2          So therefore, it says, if the
3  proximity images have low resolution, the
4  orientation and the eccentricity -- again,
5  eccentricity is essentially the major and minor
6  axis of the ellipse center default values
7  rather than the measured values, and they can
8  use that total group proximity as a measure of
9  contact size instead of major and minor axis
10  lengths.
11      Q.    And how exactly do you determine what
12  Gz is?
13      A.    Gz, if you go to column 26, you can
14  blow up the first equation there, number 12.
15  It is a very simple summation of all the
16  proximity values.
17      Q.    So why don't we go ahead and turn
18  again to page 43 of Dr. Wolfe's tutorial to
19  that depiction that we used in the earlier
20  drawing exercise.
21          So using this as an example, how would
22  you figure out Gz?
23      A.    So here you would simply sum up all
24  the non-X values there that are, I guess,
25  highlighted in gray, so you add up 4, 5, 8, and

1  so forth.
2      Q.    Okay.  And let's go back to column 27
3  again of the '828.  Does the method that's
4  described here at the top of column 27, does
5  that involve a unitary transformation of the
6  covariance matrix?
7      A.    No, it doesn't.
8      Q.    Okay.  And do you recall on cross
9  earlier being asked about whether using default
10  values equated to -- constituted mathematically
11  fitting an ellipse?
12      A.    Yes.
13      Q.    Okay.  Do you recall what your
14  response was when you were asked whether what
15  was shown in column 22 -- 27 equates to
16  mathematically fitting an ellipse?
17      A.    I believe my answer would have been
18  yes.
19      Q.    And why is that?
20      A.    Because it is still fitting the
21  ellipse parameters of X and Y and it is
22  figuring out size.  Even though it is
23  defaulting some of the parameters, in
24  particular, orientation and eccentricity, which
25  is effectively major and minor axes, it is

1  still defining an ellipse.  So that's still
2  mathematically fitting an ellipse.
3      Q.    Okay.  Now let's go to column 26 of
4  the '828.  And, again, with regard to -- I want
5  to focus on performing this unitary
6  transformation of a covariance matrix
7  associated with a pixel group.
8          Does that provide you with parameters
9  for fitting an ellipse?
10      A.    Just the unitary transformation of the
11  total -- the group covariance matrix as shown
12  in, I guess, equations 15, 16, 17, and 18
13  there, that in itself doesn't provide the
14  parameters as Dr. Westerman testified
15  yesterday, and I will paraphrase, it basically
16  just orients the frame reference to the right
17  orientation.
18      Q.    How do you actually derive the ellipse
19  parameters using the procedure that's set out
20  in column 26?
21      A.    Sure, you have to go a step further,
22  if you can get rid of the highlight there.  The
23  subsequent steps, equations 19, 20, and 21, for
24  example, are required in order to get the major
25  and minor axes, lengths, and the orientation.

APLNDC-X0000006294

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  So you have to do some more processing.  Just
2  figuring out the covariance matrix is not
3  sufficient.
4     Q.   Okay.  Let me ask you to turn to claim
5  6 now of the '828 patent.
6     A.   Sure.  Can we just get it on the
7  screen?
8     Q.   Yeah.  We're getting there.  And, I'm
9  sorry, I meant claim 3, rather, not claim 6.
10       So do you see where it says one or
11  more ellipse parameters is selected from the
12  group consisting of position, shape, size,
13  orientation, eccentricity, major radius, minor
14  radius and any combination thereof?
15     A.   Yes, I do.
16     Q.   Okay.  Does the method disclosed in --
17  on column 27 describe a way, for example, to
18  calculate size without using the unitary
19  transformation method?
20     A.   In 27?
21     Q.   Yes, column 27.
22     A.   Yes, it does.
23     Q.   And how does it do that?
24     A.   It uses the total group proximity as
25  an approximation for size.

1     Q.   And how does that work?
2     A.   Just on low resolution arrays, the
3  amount of touch would basically tell you how
4  big the spread is.  And that gives you a rough
5  approximation of what the size would be.
6     Q.   One moment.
7        MR. DAVIS:  Your Honor, at this time I
8  am going to switch over to the '430 patent.
9        JUDGE ESSEX:  All right.
10        MR. DAVIS:  And just a few questions
11  there.
12  BY MR. DAVIS:
13     Q.   Let's start with claim construction.
14  Do you recall being asked a lot of questions
15  with regard to the amounts of claim 1?
16     A.   I believe so, yes.  It was a while
17  ago.
18     Q.   So why don't we pull up RDX-15.42,
19  which shows the amendment where dynamically was
20  added to the preamble of claim 1.
21        First of all, does the body of claim 1
22  anywhere refer -- refer back to the term
23  dynamically in the preamble?
24     A.   You mean the elements A to D?
25     Q.   Yeah, the steps A through D.  Do any

1  of those steps --
2     A.   It does not.  They do not.
3     Q.   Okay.  And when they added the
4  language "adding support for" in the preamble
5  for hardware and/or software components, with
6  one or more properties to an operating system
7  active on a computer, did they add language
8  into one of the steps regarding support?
9     A.   Yes, they added, as you can see here
10  in element D, they added adding support for the
11  hardware and software components to the
12  operating system without rebooting the
13  operating system.  That was also added at the
14  same time.
15     Q.   Did they include the requirement that
16  it be dynamically in step D?
17     A.   They didn't use the word dynamically,
18  but without rebooting the operating system
19  would be understood, it is a dynamic operation.
20     Q.   Okay.  So -- and what is your
21  understanding of what that without rebooting
22  the operating system means?
23     A.   It means you're doing stuff on the
24  fly, which is what dynamically means.
25     Q.   Was the term dynamically ever used to

1  distinguish the prior art during the
2  prosecution of the patent, the '430 patent?
3     A.   I don't recall if it was used
4  specifically, no.
5     Q.   Let's turn to one of the examples that
6  Mr. Verhoeven walked you through.
7        So do you recall -- so if we could
8  bring up RDX-15.058, so do you recall this
9  example that Mr. Verhoeven walked you through
10  with the phone starting being turned off and
11  then in the next slide, 59, being turned on?
12     A.   Yes.
13     Q.   Okay.  Now, after the phone is turned
14  on, is the calendar application up and running?
15     A.   It is not up and running.  The support
16  for it has been added, but it is not up and
17  running.
18     Q.   Okay.  And then what happens when the
19  calendar application is launched?
20     A.   It gets added to the activity stack
21  and the application is instantiated and run.
22     Q.   And is the activity stack part of the
23  operating system?
24     A.   Sure.
25     Q.   Okay.  And is there additional code

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 697

1   being run in the activity stack after the
2   calendar is loaded?  Is it the same amount of
3   code that's being run in the activity stack or
4   is it less?  What is the effect?
5       A.   I think the amount of code is --
6       Q.   Active code.
7       A.   No, there would be more code running
8   overall because you have now got another
9   application running overall but the code itself
10  is not running in the activity stack, so to
11  speak.
12      Q.   How about with regard to the activity
13  stack, is there anything been added to the
14  activity stack?
15      A.   There would probably be one more
16  pointer added in there, for example, to point
17  to this new application that's now running.
18      Q.   So --
19           MR. DAVIS:  All right, Your Honor.  I
20  pass the witness.
21           JUDGE ESSEX:  All right.
22           MR. VERHOEVEN:  Your Honor, on my
23  exam, my cross-examination on '430, I have
24  nothing further.
25           JUDGE ESSEX:  Very good.

Page 698

1           MR. VERHOEVEN:  I think Mr. Nelson may
2   have a couple of questions.
3           JUDGE ESSEX:  I am not surprised.  Mr.
4   Nelson?
5           MR. NELSON:  Thank you.
6                RECROSS-EXAMINATION
7   BY MR. NELSON:
8       Q.   So I think Your Honor asked you a
9   question about when you were referring to the
10  Google code, and the calculations that are
11  going on in the Atmel chip, and how it is that
12  the Google code would fit an ellipse to the
13  pixel group when it only calculates the
14  position and the area and the touch pressure,
15  right?  Do you recall that question?
16      A.   I believe he asked a question along
17  those lines, yes.
18      Q.   Okay.  So you walked through some of,
19  at least, the flow diagram of the Google code,
20  correct?
21      A.   Flow diagram, yeah, of a bunch of
22  code.
23      Q.   And we will set aside whether that was
24  something that you have relied upon in your
25  testimony in case for a moment, and we will

Page 699

1   cover that, but with respect to that, the Atmel
2   chip that's in the accused product -- and let's
3   just take the non-touch vector products first,
4   okay, since that's the vast majority of
5   products, correct?
6       A.   Yes.
7       Q.   Okay.  The vast majority of products.
8   The non-touch vector products.  So the
9   non-touch vector products, Motorola products,
10  do not provide a major axis to the higher
11  layers of the Motorola phones, correct?
12      A.   Just give me one second here.  I will
13  take a quick look at this.  No, it does,
14  because it takes touch area and makes that into
15  major and minor.
16      Q.   It takes the touch area -- wait, the
17  Atmel chip?
18      A.   You are just talking the Atmel chip?
19      Q.   Yes, that was my question.
20      A.   Okay.  The Atmel chip is providing
21  touch area and touch amplitude and X and Y.
22      Q.   Yes.
23           MR. NELSON:  At this point we should
24  go on the confidential record.
25           JUDGE ESSEX:  All right.

Page 700

1           (Whereupon, the trial proceeded in
2   confidential session.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 713



22    (Whereupon, the trial resumed in open
23  session.)
24
25

Page 715

1    A.    Good afternoon.
2    Q.    Could you please state and spell your
3  name for the record.
4    A.    Certainly.  My name is Vivek
5  Subramanian.  First name is spelled V-i-v-e-k.
6  Last name is spelled S-u-b-r-a-m-m-a-n-i-a-n.
7    Q.    And did you submit a witness statement
8  in this investigation?
9    A.    Yes, I did.
10    Q.    You have a binder in front of you, if
11  you could look at Exhibit CX-202C.  Could you
12  just please confirm that that is the initial
13  witness statement that you submitted in this
14  investigation?
15    A.    Yes, it is.
16    Q.    And is that your signature on the last
17  page of the document?
18    A.    Yes, it is.
19    Q.    And did you give the answers to the
20  questions that were posed in this witness
21  statement?
22    A.    Yes, I did.
23        MR. FERGUSON:  Your Honor, we pass
24  Dr. Subramanian for cross.
25  //

Page 714

1        O P E N   S E S S I O N
2        JUDGE ESSEX:  Have we gotten the old
3  bottle waters out and have everything set fresh
4  for the witness?  Are we ready?
5        MR. FERGUSON:  Yes, Your Honor, thank
6  you.
7        JUDGE ESSEX:  Call your next witness.
8        MR. FERGUSON:  Apple calls as its next
9  witness Dr. Vivek Subramanian.
10        JUDGE ESSEX:  Doctor. I believe we
11  have seen you before, haven't we?
12        THE WITNESS:  Yes, Your Honor, you
13  have.
14        JUDGE ESSEX:  Would you please raise
15  your right hand.
16  Whereupon--
17        VIVEK SUBRAMANIAN,
18  having been first duly sworn, was examined and
19  testified as follows:
20        JUDGE ESSEX:  Have a seat and welcome
21  back.
22        THE WITNESS:  Thank you, Your Honor.
23        DIRECT EXAMINATION
24  BY MR. FERGUSON:
25    Q.    Good afternoon, Doctor.

Page 716

1        CROSS-EXAMINATION
2  BY MR. VERHOEVEN:
3    Q.    Good afternoon, Dr. Subramanian.
4    A.    Good afternoon.
5    Q.    My name is Charles Verhoeven.  I will
6  be doing your cross-examination in this
7  investigation.
8    A.    It is nice to meet you.
9    Q.    Ryan, if we could put up -- are we
10  turned over?  Okay.
11        I would like to begin -- well, let me
12  take a step back.
13        You are the technical expert that's
14  being proffered by Complainant, Apple, with
15  regard to the '607 patent, correct?
16    A.    That's correct.
17    Q.    And the '607 patent, it describes two
18  embodiments in the specification, correct?
19    A.    In the specification, there are two
20  major embodiments.  There are variations
21  thereof described with it.
22    Q.    There is the self-capacitance
23  embodiment, on the one hand, and there is the
24  mutual capacitance embodiment on the other
25  hand, correct?

APLNDC-X0000006297

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 717

1    A.   With respect to the major embodiments,
2 that's correct, yes.
3    Q.   And with respect to the asserted
4 claims in this case, those claims relate to the
5 mutual capacitance embodiment, correct?
6    A.   Yes, that's correct.
7    Q.   Okay.  So what I would like to do to
8 start with is just walk through the
9 specification to see generally, before we get
10 into claims and those other issues, how it
11 describes this mutual capacitance embodiment.
12 Okay?
13    A.   I understand.
14    Q.   So let's go to slide 2.  And these
15 are, these slides are all going to be excerpts
16 out of the patent itself, which is in your
17 binder, if you would like to look at it for
18 context.  That's JX-2 for the record.
19        This first cite is from column 5,
20 lines 21 through 22.  The '607 patent describes
21 mutual capacitance as measuring the mutual
22 capacitance between a first and a second set of
23 conductive lines, right?
24    A.   No.  Actually what this says is in the
25 case we have mutual capacitance, it is measured

Page 718

1 between the first and second electrodes.
2    Q.   Okay.  But we're talking about a first
3 set of electrodes and a second set of
4 electrodes, right?
5    A.   Correct.
6    Q.   Okay.  And then the specification goes
7 on, and this is in column 5, lines 47 through
8 53, in mutual capacitance, the transparent
9 conductive medium is patterned into a group of
10 spatially separated lines formed on two
11 different layers, right?
12    A.   That's correct.
13    Q.   And then it talks about two different
14 categories of lines, there is the driving lines
15 and the sensing lines, right?
16    A.   Yes, that's correct.
17    Q.   And it says the driving lines are
18 formed on a first layer and the sensing lines
19 are formed on a second layer, right?
20    A.   Yes, that's correct.
21    Q.   Okay.  And then if we go to another
22 part of the specification, this is column 13,
23 lines 25 through 28, the specification
24 continues to elaborate, the lines 152 on
25 different layers serve two different functions.

Page 719

1 Do you see that?
2    A.   Yes, I see that.
3    Q.   So that's explaining -- that's
4 referring to the drive lines and the sense
5 lines on different layers, right?
6    A.   You mean with respect to 152?
7    Q.   It says to elaborate, the lines 152 on
8 different layers serve two different functions.
9 So that the two different functions is
10 referring to the drive lines having one
11 function and the sense lines having the other
12 function, right?
13    A.   Yes, with respect to the lines 152,
14 that's correct.
15    Q.   And it continues, "one set of lines
16 152A drives a current therethrough while the
17 second set of lines 152B senses the capacitance
18 coupling at each of the nodes 154."  Correct?
19    A.   Yes, I believe you read that
20 correctly.
21    Q.   So it is explaining that on the drive
22 lines there is a current that's being driven
23 therethrough; is that right?
24    A.   Yes.
25    Q.   And then on the second set of lines,

Page 720

1 which it refers to as the sense lines, there is
2 a capacitance -- I am having trouble with that
3 word, I apologize -- capacitance coupling that
4 happens at each of the nodes, and it senses
5 that capacitance coupling, right?
6    A.   Yes, that's correct.
7    Q.   That's what it is saying, right?
8    A.   That's correct.
9    Q.   Okay.  And it continues -- and I am
10 bouncing around a little bit, but this is
11 column 5, line 60 through 67 and it explains
12 that the driving lines are connected to a
13 voltage source, right?
14    A.   Yes.
15    Q.   And that's what drives the voltage on
16 the drive lines, right, the voltage source?
17    A.   That's what applies the voltage to the
18 drive lines.
19    Q.   That's more accurate, applies the
20 voltage to the drive lines.  Right?
21    A.   That's correct.
22    Q.   And then in the second set of lines,
23 the sensing lines, they are connected to
24 capacitive sensing circuit, right?
25    A.   Yes, I believe there is an article

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 721

1  missing there, but that's correct.  It is not
2  your fault.  It is a problem with the spec.
3      Q.  There is supposed to be an "a" there?
4      A.  Yes.
5      Q.  It should read the sensing lines are
6  connected to a capacitive sensing circuit, is
7  the way you would read it, right?
8      A.  Yes, or individual capacitive sensing
9  circuits, plural, if you had multiple circuits.
10     Q.  This just says circuit, singular,
11  right?
12     A.  Right.
13     Q.  That's why you put the "a" in there,
14  right?
15     A.  That's correct.
16     Q.  And then we go to another spot here --
17  and I apologize if this is getting a little
18  repetitive, I will try to move quickly --
19  column 13, 25 to 32, I think -- no, we have
20  covered that, so I will just move on.  We have
21  covered that.  Okay.
22         So we already talked about the driving
23  lines are connected to a voltage source and the
24  sensing lines are connected to this capacitive
25  sensing circuit, right?

Page 722

1         And then the specification continues,
2  it says, "During operation, a current is driven
3  through one driving line at a time, and because
4  of capacitive coupling, the current is carried
5  through to the sensing lines at each of the
6  nodes (e.g. intersection points)."  Do you see
7  that?
8      A.  I do.
9      Q.  Now, figure 9 -- maybe this will help
10  illustrate -- but when it says a current is
11  driven through one driving line at a time, if
12  you can use figure 9, can you explain to His
13  Honor what that means?
14     A.  Certainly.  If we are using figure 9
15  in the context of column 13 of JX-2, which is
16  the '607 patent, the description says that
17  lines 152A in this example are the driving
18  lines and 152B is the sensing lines.
19         So with respect to the section we were
20  just talking about, on 152A, a voltage is
21  applied and 152A -- should I use the laser
22  pointer?
23     Q.  Sure.
24     A.  On 152A, which is shown on the bottom
25  --

Page 723

1      Q.  Be careful not to shine it in the eyes
2  of the --
3      A.  Yes, that's an extremely bright
4  pointer.  At 152A on the bottom, we see the
5  152A marking and that would be therefore the
6  flex cable feeding to the vertical lines,
7  through which the voltage will be applied.
8  There will be capacitive coupling to the
9  horizontal lines, which then have their
10  connections through the flex cable 158B.  I
11  think, yeah, 158B, that's correct.
12     Q.  Just to go back, the thing I wanted to
13  focus on -- I appreciate that explanation, but
14  I wanted to focus on something really specific.
15         It says during operation, a current is
16  driven through one driving line at a time.  How
17  does that work, if you can use figure 9 to
18  explain to His Honor?
19     A.  Certainly.  If we look at figure 9, we
20  see that on figure 9 there are a large number
21  of vertical lines 152A, to be honest, I have
22  never counted exactly how many but there is a
23  large number.
24     Q.  These here (indicating), going up and
25  down?

Page 724

1      A.  Correct.  Those are the vertical
2  lines.  And the current is driven through those
3  lines -- could I have the language again,
4  please?  Sorry.  Thank you.
5         Yes, so the current is driven through
6  the lines, we're referring back to 152A, one
7  driving line at a time, which means it is
8  stepping through them one at a time.
9      Q.  Sort of like an old-fashioned TV,
10  where it is refreshing the pixels one row at a
11  time or however that works?  Is that right?
12     A.  Almost.  An old-fashioned TV is
13  interlaced, so it is a little different.
14     Q.  A little different?  It does this
15  really fast; is that right?
16     A.  Yes, that's correct.
17     Q.  How fast?  Does the patent give you
18  any idea how fast it is?
19     A.  The patent says that it will perform
20  the operations such that, with respect to the
21  description, it will perform them fast enough
22  such that it appears to be detecting
23  simultaneously with respect to a user.
24     Q.  As a matter of physics, it is not
25  simultaneous, because there is a very small

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   amount of time between each line, right?
2       A.   As a matter of physics, it depends on
3   the resolution you are defining, but if you say
4   are they at exactly the same time to the order
5   of picoseconds, the answer is no.
6       Q.   Right.  But to the user experience, it
7   is so fast that if you touch the screen, it
8   will have covered the whole thing enough to
9   make the thing work, right?
10      A.   Not just make the thing work, make it
11  appear to occur at the same time to the user.
12      Q.   Exactly.  Okay.
13           So moving on to figure 9 then, a
14  couple more questions on that with some text
15  next to it.  This is column 13, lines 7 through
16  20 on RDX-20, slide 10.
17           Figure 9 on the left, it says "unlike
18  the touchscreen shown in figures 6 through 8"
19  -- and I will represent to you, sir, that
20  that's the non-mutual capacitance embodiment,
21  okay?
22      A.   I understand.
23      Q.   So "unlike the touchscreens shown in
24  figures 6 through 8, the touchscreen of figure
25  9 utilizes the concept of mutual capacitance

1   rather than self-capacitance."  Then it talks
2   about the two-layer grid.
3            So this is definitely talking about
4   the second embodiment, right?
5       A.   With respect to mutual versus self,
6   yes, I agree, this is referring to the mutual
7   capacitance, major embodiment.
8       Q.   This confirms what you just said, I
9   believe, I am on slide, demonstrative slide
10  number 11 of RDX-20, citing column 13, lines 27
11  through 28, it says "the second set of lines
12  152B" -- that's over here (indicating), right?
13      A.   If you are referring to the left-hand
14  side of the figure, that's correct.
15      Q.   Thank you for that.  "And that second
16  set of lines senses the capacitance coupling at
17  each of the nodes 154."  Now, can you explain
18  what that means to His Honor?
19      A.   Certainly.  If we looked again at
20  figure 9 of JX-2, we see there are a large
21  number of vertical lines, 152A, and horizontal
22  lines, 152B, laid over each other such that
23  there is numerous intersection points.
24           The intersection points are referred
25  to as nodes.  And those are the nodes labeled

1   154, for example, in figure 9.
2       Q.   Okay.  So it detects it at the
3   intersection points then; is that right?
4       A.   It senses the capacitance coupling at
5   the nodes.
6       Q.   And are those --
7       A.   And those nodes are the intersection
8   points.
9       Q.   The intersection points, okay.
10           And then, again, with figure 9, a
11  little bit more explanation, this is column 13,
12  lines 34 through 37 at the top, it says "the
13  sensing lines 152B are connected to a
14  capacitance sensing circuit (not shown) that
15  continuously senses all of the sensing lines
16  152B (always sensing)."
17           Do you see that?
18      A.   Yes.
19      Q.   Can you explain to His Honor what
20  that's saying?
21      A.   Certainly.  With respect to the '607
22  patent in the description of the embodiment
23  covering figure 9, what this section says --
24  and that's column 13, lines 34 through 37 -- it
25  says that there are sensing circuits which are

1   connected to the sensing lines 152B, and that
2   is going to happen through the flex cable 158B,
3   and the sensing circuits themselves are not
4   shown on this figure, but they would lie to the
5   left of what is shown in figure 9.
6            And they are used to continuously
7   sense all of the sensing lines 152B, which as
8   we have discussed previously are the horizontal
9   lines.
10      Q.   They are always sensing, is what it
11  says, right?
12      A.   Yes, that is what it says.
13      Q.   So this capacitive sensing circuit,
14  that's some sort of circuitry that's able to
15  detect, what?  Changes in capacitance?
16      A.   In this system, it is responding to
17  changes in the capacitive coupling material,
18  the drive lines and the sense lines at the
19  nodes.
20      Q.   Okay.  And then we're still at figure
21  9.  And the discussion of the driving lines, a
22  little bit more discussion of that, sir, at
23  column 13, 25 through 37.  I have highlighted
24  an excerpt that I will read into the record.
25           "The driving lines 152A are connected

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 729

1  to a voltage source (not shown) that separately
2  drives the current through each of the driving
3  lines 152A."  Do you see that?
4      A.   I do see that.
5      Q.   And can you explain to His Honor with
6  your pointer, if you need to, showing figure 9,
7  what is that describing?
8      A.   Certainly.  With respect to figure 9
9  of JX-2, the '607 patent, what this section of
10 the specification at column 13, lines 25
11 through 37 with respect to this embodiment says
12 is that the driving lines, which as we have
13 discussed previously are the vertical lines
14 152A are connected to a voltage source.
15      The voltage source itself is not
16 shown, but the connection would be made through
17 158A, which is a flex cable, and so, therefore,
18 the voltage source would lie somewhere between
19 what is shown in figure 9.
20      And in this embodiment, this section
21 of text says that the voltage source, which is
22 not shown, separately drives the current
23 through each of the driving lines.
24      Q.   And that's a reference back to what we
25 looked at before, that voltage source, it sends

Page 730

1  voltage one at a time through these lines
2  really fast; is that right?
3      A.   What the system does is it applies a
4  voltage to the lines one at a time and that is
5  referring back to our previous discussion.
6      Q.   And down on 14, column 14, 5 through
7  6, it says "the driving lines 152A are
8  typically coupled to the voltage source through
9  a flex circuit 158A."
10      What's that saying?
11      A.   That is actually referring to
12 something I have already described for you, the
13 section at column 14, lines 5 through 6 in
14 JX-2, which is the '607 patent, says that there
15 is a voltage source, as we have discussed
16 previously, and that voltage source is coupled
17 to the drive lines through a flex circuit 158A,
18 and that's the flexible cable we have already
19 discussed.
20      Q.   All right, sir.
21      Now, moving on to figure 10 of the
22 patent, which I have depicted up here on
23 RDX-20.018, do you see that, sir?
24      A.   Yes, I do.
25      Q.   And I have also brought up on this

Page 731

1  slide column 15, lines 24 through 29, which
2  describes figure 10.  And it says "figure 10 is
3  a partial front elevation view, in
4  cross-section of a display arrangement 170, in
5  accordance with one embodiment of the present
6  invention."
7      And then it continues a little further
8  down.  "The touchscreen may, for example,
9  correspond to the touchscreen shown in figure
10 9."
11      Do you see that?
12      A.   Yes, I do.
13      Q.   So this is sort of taking what we saw
14 of figure 9 and turning it cross-wise and
15 looking at the layers; is that right?
16      A.   That is one possibility.  This doesn't
17 require that that's the only embodiment.  It
18 says the touchscreen may, for example,
19 correspond to the touchscreen shown in figure
20 9.  It doesn't have to be for figure 9 alone.
21      Q.   All right.  And I don't mean to
22 suggest that.  But my only point is this is
23 illustrative of taking figure 9 or the second
24 embodiment, this mutual capacitance embodiment
25 and looking at it from a different angle, from

Page 732

1  this sort of cross-section view, right?  It
2  says cross-section?
3      A.   This would represent a cross-section
4  of something that could be figure 9 or
5  something different, and certainly figure 9 was
6  related to the mutual capacitance embodiment.
7  That is one of the major embodiments.
8      Q.   Okay.  Finally on RDX-20, slide 19, we
9  still have figure 10.  And I have added some
10 highlighting to it.  Above it I have depicted
11 column 15, lines 54 through 59.
12      And that says, "the driving lines 181
13 are configured to intersect or cross the
14 sensing lines 177 positioned in columns in
15 order to form a plurality of capacitive
16 coupling nodes 182."  Do you see that?
17      A.   I do see that.
18      Q.   So it is identifying the drives lines,
19 I think I have got it right, as 181, and I have
20 put it in blue, and it is that line right there
21 (indicating); is that right?
22      A.   181 is highlighted in blue on
23 RDX-20.019.  And that is, in fact, called out
24 within the '607 patent at column 15, lines 54
25 through 59 as being the driving lines.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 733

1    Q.   Okay.  Then the sense lines -- the
2  drive lines are configured to intersect or
3  cross the sense lines 177.  And if you look at
4  figure 10, hopefully I got it right, I tried to
5  depict that in red; is that right, the sense
6  line?
7    A.   Yes, you picked one sense line and you
8  highlighted it in red.  I agree with that.
9    Q.   Then to the right I am highlighting,
10  there is another sense line right there where I
11  am circling (indicating); is that right?
12    A.   Where you are circling with your laser
13  pointer, that's correct.
14    Q.   And there is another one (indicating)?
15    A.   There appears to be one.
16    Q.   It is kind of cut off halfway?
17    A.   That's correct.
18    Q.   On that same layer in the crosshatch
19  view we're seeing for the drive lines, it looks
20  like a long vertical line and for the sense
21  lines, they look like short little stubs,
22  that's because they are crosshatched in the
23  cross-sectional view, that's the way they
24  appear, correct?
25    A.   I wouldn't call the drive line a long

Page 734

1  vertical line.  It appears to be a long
2  horizontal line.
3    Q.   Thank you, sir.  It is getting late.
4  You are right.  It is a long horizontal line.
5       And the sense lines are these
6  shorter -- what would you characterize those
7  as?
8    A.   I would characterize those as
9  horizontal lines going in and out of the plane.
10    Q.   Okay.  So that's basically how the
11  mutual capacitance is discussed and described
12  in the specification, correct?  The mutual
13  capacitance embodiment, correct?
14    A.   The sections we have discussed so far
15  are parts of the discussion related to the
16  mutual capacitance embodiment and its
17  variations that are discussed within the
18  specification.
19    Q.   It is a fair summary.  Did I leave
20  anything really important out of the
21  specification?
22    A.   Well, there is substantial discussion
23  of the algorithms and the sensing circuitry,
24  which we haven't talked about.
25    Q.   But as a general summary of how the

Page 735

1  thing works, is that a fair summary?
2    A.   It is not complete without the
3  discussion of the circuitry.  If you are asking
4  me about the physical layout and architecture
5  of the panel itself, yes, I think this is a
6  good abstract for what is discussed within the
7  '607 with respect to the mutual capacitance
8  embodiments.
9    Q.   Okay.  So let's move on to the claims.
10  Let's look at claim 1.
11       I am not going to read all of this
12  claim.  We're all a little bit familiar with
13  it, I think.
14       But the first element talks about a
15  first layer having a plurality of transparent
16  first conductive lines.  Do you see that?
17    A.   I do.
18    Q.   And then the next element talks about
19  a second layer spatially separated from the
20  first layer and having a plurality of
21  transparent second conductive lines.  Do you
22  see that?
23    A.   I do.
24    Q.   And then if we go down to where I have
25  highlighted toward the bottom of the second

Page 736

1  element, it says, "each of the second
2  conductive lines being operatively coupled to
3  capacitive monitoring circuitry."  Do you see
4  that?
5    A.   I do.
6    Q.   And then it continues in a wherein
7  clause at the end, "wherein the capacitive
8  monitoring circuitry is configured to detect
9  changes in charge coupling between the first
10  conductive lines and the second conductive
11  lines," do you see that?
12    A.   I do.
13    Q.   Now, this second conductive lines that
14  it is referring to, that corresponds to the
15  description in the specification of the sense
16  lines, right?
17    A.   With respect to the specific
18  embodiment that we have talked about, certainly
19  the sense lines will be coupled to capacitive
20  monitoring circuitry.
21    Q.   Okay.  And the first conductive lines
22  in that first element, that corresponds to the
23  drive lines discussed in the specification,
24  correct?
25    A.   Again, with respect to the specific

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 737

1  embodiment we discussed, the first conductive
2  lines called out in claim 1 of the '607 patent,
3  if we were to look at the embodiment as shown
4  in figure 9, that would correspond to the drive
5  lines, given that the second conductive lines
6  we have already identified as perhaps
7  corresponding to the sense lines.
8      Q.   Thank you, sir.
9          MR. VERHOEVEN:  Your Honor, may I have
10 just one minute to confer with counsel to try
11 to edit myself?
12         JUDGE ESSEX:  Absolutely.
13 BY MR. VERHOEVEN:
14     Q.   I am skipping ahead, sir, so trust me,
15 I am saving time.
16         Okay.  Ryan, can we go to RDX-20.030.
17 Now that we have looked at the patent
18 generally, sir, I would like to address, start
19 by addressing a claim construction term from
20 the '607 patent; in particular, the phrase
21 "capacitive monitoring circuitry."  All right?
22         You are familiar with that phrase and
23 you have an opinion as to the appropriate
24 construction of that phrase, correct?
25     A.   I do.

Page 738

1      Q.   Okay.  And we just saw where that
2  appeared in claim 1.  Do you want to look at
3  that again to refresh yourself?  Let's go back
4  to RDX-20.020.
5          So it appears right here (indicating),
6  capacitive monitoring circuitry.  Do you see it
7  down in the second element?
8      A.   I see that.
9      Q.   So it appears when we're talking about
10 second conductive lines, each of the second
11 conductive lines being operatively coupled to
12 -- and then the phrase -- capacitive monitoring
13 circuitry.  Do you see that?
14     A.   Yes, I see that.
15     Q.   And the claim also in the last wherein
16 element discusses this phrase a little bit too,
17 just to refresh us, says that the capacitive
18 monitoring circuitry is configured to detect
19 changes in charge coupling between the first
20 conductive lines and the second conductive
21 lines.  Do you see that?
22     A.   I'm sorry, I missed it.  Could you
23 repeat it, please?
24     Q.   I just wanted you to make sure you
25 have seen that.  You have read that?

Page 739

1      A.   The second --
2      Q.   The wherein clause.
3      A.   The third highlighted section starting
4  at each of the -- oh, starting wherein the
5  capacitive monitoring circuitry?  Yes, I have
6  read that before.
7      Q.   So we know that from looking at the
8  claims that this phrase "capacitive monitoring
9  circuitry," this circuitry has to be
10 operatively coupled to the second conductive
11 lines, right?  That's what it says?
12     A.   Yes.
13     Q.   It also has to be configured such that
14 it can detect changes in charge coupling
15 between the first conductive lines and the
16 second conductive lines as the claim says,
17 right?
18     A.   Yes, the claim says the capacitive
19 monitoring circuitry is configured to detect
20 changes in charge coupling between the first
21 conductive lines and the second conductive
22 lines.
23     Q.   Okay.  Now let's go back to
24 RDX-20.030.
25         Now, Motorola and the Staff have

Page 740

1  proposed a construction for capacitive
2  monitoring circuitry to mean "circuitry that
3  senses change in capacitance," right?
4      A.   Yes, I believe that's the proposed
5  construction from Motorola and the Staff.
6      Q.   And --
7          JUDGE ESSEX:  I'm sorry.  Staff, are
8  you having it both ways here?
9          MR. VERHOEVEN:  It is obviously a
10 typo.  I apologize, Your Honor.  If I can
11 confer, I will make sure I have the right --
12         JUDGE ESSEX:  I was going to ask Staff
13 which one they wanted to go with.  Go ahead.
14         MS. KATTAN:  Give me one second, Your
15 Honor.
16         MR. VERHOEVEN:  Your Honor, again I
17 apologize for the typographical error.  I am
18 told that this is correct, that the Staff has
19 proposed the same construction as Motorola.
20         MS. KATTAN:  I will confirm that, but
21 I think that's right.
22         JUDGE ESSEX:  All right.  You can pen
23 it in ink at a later time.
24         MR. VERHOEVEN:  We will edit this.  I
25 apologize.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 741

1         JUDGE ESSEX:  That's fine.
2    BY MR. VERHOEVEN:
3         Q.    So at least Apple's proposed
4    construction is plain and ordinary meaning or
5    circuitry which is responsive to capacitance.
6    Right?
7         A.    Yes.
8         Q.    So the difference here is circuitry
9    that senses change in capacitance on the one
10   hand, which Motorola and the Staff propose,
11   versus circuitry which is merely responsive to
12   capacitance, right?  That's the issue that the
13   parties have a dispute about?
14        A.    With respect to the constructions,
15   yes, I agree.
16        Q.    And being responsive to something is
17   much more, much broader than sensing a change
18   in capacitance, right?  Would you agree that's
19   a broader definition?
20        A.    It is a different definition.  It
21   turns out, I think, that as it is being used,
22   we haven't used them in particularly different
23   ways, but, yes, I agree with respect to that
24   responsive would generally be less limiting in
25   that sense than sensing.

Page 742

1         Q.    You could be responsive to capacitance
2    even if you don't sense a change in
3    capacitance, couldn't you?
4         A.    If by that you are referring to the
5    fact that you can be responsive to capacitance
6    without actually measuring capacitance, yes, I
7    agree that's true.
8         Q.    Okay.  Your opinion is that Apple's
9    proposed construction is the more appropriate
10   one?
11        A.    Yes, and it is actually for the reason
12   I specifically laid out, which is there is
13   nothing in the specification which requires
14   that you actually actively measure the
15   capacitance itself.
16             You just have to be responsive to the
17   changes in the capacitance or responsive to the
18   capacitance.  You don't actually have to
19   specifically measure it.
20        Q.    Let's go to the next slide.  This is
21   RDX-20.031.  All I have done here, sir, is
22   reproduced a copy of CDX-2.063, which I believe
23   is a demonstrative slide from your witness
24   statement.
25             Does it look familiar?

Page 743

1         A.    Yes, and this appears to confirm that
2    the Staff indeed did take the same construction
3    as Motorola.
4         Q.    Thank you, sir.
5             Now, in support of your proposed
6    construction, you cite to all of these
7    different portions of the specification,
8    correct?  Am I reading that right?
9         A.    Yes, that's true.
10        Q.    So what I would like to do is I would
11   like to go through your cites and see what they
12   would tell a person of ordinary skill as to
13   this issue, this dispute between the parties.
14             Are we sensing changes in capacity or
15   are we merely being responsive to capacity?  So
16   let's look at the first one, column 2, lines 50
17   through 67.
18             I have just depicted this on
19   RDX-20.032.  Now, in this -- there is a portion
20   of this citation that you have cited to and it
21   is "the touchscreen also includes a sensing
22   circuit that acquires data from the sensing
23   device and supplies the acquired data to the
24   processor."
25             Do you see that?

Page 744

1         A.    I do.
2         Q.    So it is talking about the circuit as
3    being sensing, not merely being responsive to;
4    isn't that true, sir?
5         A.    It says a sensing circuit but it does
6    not say a circuit that senses capacitance.
7         Q.    So you think that the person of
8    ordinary skill reading this sentence wouldn't
9    understand, this is talking about a sensing
10   circuit or, excuse me, a circuit that senses
11   capacitance?
12        A.    To be precise, this is referring to a
13   sensing circuit, as long as it is sensing
14   something that is responsive to capacitance,
15   that is fine.  I don't believe that at the end
16   of the day, there is any substantive
17   disagreement in terms of what this means.
18             However, it is very clear that they do
19   not mean you have to actually measure
20   capacitance.  You could measure something else
21   that is related to capacitance and still be the
22   correct circuit to meet the requirements of the
23   claim.
24        Q.    Isn't it true that a person of
25   ordinary skill looking at this would understand

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 745

1    that this circuit senses changes in
2    capacitance?
3        A.   No, I disagree.  It is a sensing
4    circuit that acquires data.  It could do that,
5    for example, by measuring some other property
6    that also depends on capacitance.
7        Q.   Okay.  So you think a person of
8    ordinary skill would not understand that this
9    is describing a circuit that senses changes in
10   capacitance, that's your testimony to His
11   Honor?
12       A.   Yes, it is.  And, in fact, the
13   language says what it does.  It says it is a
14   sensing circuit that acquires data.
15       Q.   Let's go to your next cite.  Column 5,
16   line 1, through column 6, line 6.  You cite in
17   support for your proposed construction from the
18   intrinsic evidence says, "the driving lines are
19   connected to a voltage source and the sensing
20   lines are connected to capacitive sensing
21   circuit."
22            Again, you wanted to use the word "a"
23   there, right, a capacitive sensing circuit,
24   right?
25       A.   Yes.

Page 746

1        Q.   And then it says furthermore -- this
2    is your cite, sir, "furthermore, the sensing
3    circuit monitors changes in capacitance that
4    occurs at each of the nodes."  Do you that,
5    sir?
6        A.   I do.
7        Q.   A person of ordinary skill in the art
8    would understand that this circuit is a sensing
9    circuit, right?
10       A.   Yes.
11       Q.   And that it is sensing changes in
12   capacitance that occurs at each of the nodes,
13   right?
14       A.   No, it is monitoring changes in
15   capacitance.  The key point is I don't believe
16   this requires that you actually measure
17   capacitance.  You can measure something else
18   like charge, for example.
19       Q.   Okay.  Well, it doesn't say you could
20   measure charge.  It says the sensing circuit
21   monitors -- monitors is much more precise than
22   it may be responsive to capacitance generally,
23   right?
24       A.   No, I don't believe so.
25       Q.   You don't think that a second sensing

Page 747

1    circuit that monitors changes in capacitance
2    that occurs at each of the nodes is more
3    specific than a circuit that merely is
4    responsive to capacitance?
5        A.   I think they mean the same thing.
6        JUDGE ESSEX:  Pardon me just a second.
7    In the last sentence there, is that the same
8    circuit that's in this second line up there?
9        THE WITNESS:  Yes, Your Honor.
10       JUDGE ESSEX:  And the second line says
11   it is a capacitive sensing circuit?
12       THE WITNESS:  Yes, Your Honor.
13       JUDGE ESSEX:  Okay.  So -- okay.
14   BY MR. VERHOEVEN:
15       Q.   Let's look to the next citation that
16   you cite to in support of your proposed
17   construction, sir.  It is column 8, and you can
18   follow along with your slide.  I think you have
19   it.  If I have got the cites wrong, let me
20   know.  Column 8, 44, through column 9, line 65.
21   You cite to that portion of the spec as well,
22   correct?
23       A.   Yes, I do.
24       Q.   I have got those pages pulled out in
25   the background.  You can't really read them,

Page 748

1    but it is a very long portion of the spec.
2            Do you see it is a column and a third
3    or so, correct?
4        A.   I see that.
5        Q.   So I have just pulled out a couple of
6    excerpts from that citation.  The first one is
7    column 9, lines 31 through 36.
8            And it says, "by detecting changes in
9    capacitance at each of the sensing points 74
10   and noting the position of the sensing points,
11   the sensing circuit can recognize multiple
12   objects, and determine the location, pressure,
13   direction, speed, and acceleration of the
14   objects as they are moved across the
15   touchscreen."
16           Do you see that?
17       A.   I do.
18       Q.   So that's describing the way that the
19   sensing circuitry works, right?
20       A.   No, actually this is saying that the
21   sensing circuits can detect changes in
22   capacitance and then this is how they can
23   interpret that, essentially.
24       Q.   I probably highlighted the wrong
25   thing.  Right there is the word sensing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 749

1  circuit, right?
2     A.   That's correct.
3     Q.   So that's referring to this phrase
4  that we're construing here, right, capacitive
5  sensing circuit?
6     A.   I don't think we're construing
7  capacitive sensing circuit.
8     Q.   Well, I may be confused.  I am
9  confused.  Thank you.
10       This is referring to the phrase that
11  we're construing, capacitive monitoring
12  circuitry; is that right?
13     A.   That's correct.
14     Q.   Okay.  And a person of ordinary skill
15  in the art would understand that the sensing
16  circuit referred to here corresponds to the
17  capacitive monitoring circuitry that we
18  referred to in the second element of claim 1 in
19  the wherein clause of claim 1, correct?
20     A.   With respect to this embodiment,
21  that's correct.
22     Q.   And it says that this sensing circuit
23  can detect changes in capacitance at each of
24  the sensing points, right?
25     A.   It does.

Page 750

1     Q.   That's not measuring?
2     A.   It does not mean you have to actively
3  measure the changes in capacitance.  You just
4  have to detect that there is a change in
5  capacitance.  In fact, the second portion you
6  have cited on the same demonstrative,
7  RDX-20.034, gets to precisely the point I'm
8  trying to make.
9        You do not have to actively measure
10  capacitance.  You can do, for example,
11  specifically what it calls out here, where it
12  says you can measure the charge.  And that is
13  my point.  That is precisely the point that I
14  am making.
15        And that is exactly why I believe that
16  the --
17     Q.   Okay.
18     A.   -- construction I have provided is
19  the accurate one.
20     Q.   So measuring the amount of charge in
21  the electrodes is not part of detecting changes
22  in capacitance?  Is that your testimony?
23     A.   In fact, it is exactly the opposite.
24  That is precisely my point.  Measuring the
25  amount of charge is part of detecting changes

Page 751

1  in capacitance.  But you do not have to
2  specifically measure capacitance.  That is the
3  point.
4     Q.   You just said it is part of measuring
5  the change in capacitance, didn't you, sir?
6     A.   No, I said part of detecting changes
7  in capacitance.
8     Q.   So let's read this into the record.
9  This is column 9, lines 49 through 52.  "The
10  amount of charge in each of the electrodes are
11  measured by the sensing circuit."  Do you see
12  that?
13     A.   I do.
14     Q.   So the sensing circuit is measuring
15  something, isn't it?
16     A.   It is.  It is measuring charge, the
17  amount of charge.
18     Q.   It is not merely responsive to
19  capacitance, it is measuring things.
20     A.   Let's break this up.  It is responsive
21  to capacitance.  It is not measuring
22  capacitance.  It is measuring something else,
23  which is, in fact, responsive to changes in
24  capacitance.  That's the point.
25        It does not need to measure the

Page 752

1  capacitance.  It just needs to be responsive to
2  it.  How it is responsive to it could be, for
3  example, in this embodiment by measuring the
4  charge.
5     Q.   It needs to sense changes in
6  capacitance, doesn't it, sir?
7     A.   No, it needs to detect changes in
8  capacitance.  And it can do that, for example,
9  by measuring the charge.
10     Q.   And it needs to detect changes in
11  capacitance, correct?
12     A.   That's what it says in this embodiment
13  on column 9, line 31, I believe.
14     Q.   It doesn't need to just sense it, it
15  needs to detect it?
16     A.   It does not need to sense changes in
17  capacitance.  It needs to detect it, yes, I
18  agree.  That's why I disagree with Motorola's
19  construction, which uses sensing.
20     Q.   Okay.  Let's go to RDX-20.030 again.
21  So you would be fine if this said circuitry
22  that detects changes in capacitance?
23     A.   Well, that's not a construction
24  anybody has proposed, but provided it is
25  consistent with what I mean, yes, I think that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    would be fine.  And I think that's why I don't
2    think there is a substantive argument here.
3          However, I think that Motorola -- and
4    therefore the Staff's construction -- is
5    functionally wrong.  You are not sensing
6    changes in capacitance.  You are responding to
7    the capacitance by measuring something else.
8      Q.    You are detecting changes in
9    capacitance?
10     A.    If by detecting we're using it as it
11   is used in the specification, which means you
12   can measure something else, yes, that would be
13   fine.
14     Q.    Let's go to the next cite that you
15   cite to in support of your construction from
16   the specification.  This is RDX-20.035.
17         You cite to column 10, lines 22
18   through 36, correct, sir?
19     A.    Yes, I do.
20     Q.    Now, I have highlighted a portion of
21   this.  I would like to read it into the record.
22   It is from your citation.  "The capacitive
23   sensing circuit includes one or more sensor ICs
24   that measure the capacitance" -- do you see
25   that?

1      A.    I do.
2      Q.    -- "at each electrode and that
3    reports its findings or some form thereof to a
4    host controller."  Do you see that?
5      A.    I do.
6      Q.    That's talking about the circuit
7    measuring things, right?
8      A.    Yes, I agree.  That's consistent with
9    what I said earlier.  You do not have to sense
10   the capacitance itself.  You measure something
11   which is related to the capacitance, and,
12   therefore, you are responsive to the
13   capacitance.
14     Q.    This circuit needs to be able to
15   detect changes in the capacitance or else this
16   invention won't work, right, sir?
17     A.    I agree that the circuit needs to
18   detect changes, but it doesn't have to do that
19   by actually measuring that parameter.  It can
20   measure something else like charge.
21     Q.    If the sensor lines are merely
22   responsive to capacitance, and they don't
23   detect changes in capacitance at the node
24   coupling points, this invention won't work,
25   right, sir?

1      A.    I'm afraid you are drawing a
2    distinction that doesn't exist.  I have not
3    made a distinction between responsive to
4    capacitance and detecting changes in
5    capacitance.  I have, however, made a
6    distinction between circuitry that senses
7    changes in capacitance and circuitry which is
8    responsive to capacitance.
9      Q.    Let's go to your next citation.  This
10   is -- if we can go to slide RDX-20.036.  So
11   this is another citation that you cited in your
12   slides in support of your proposed
13   construction, right, column 13, lines 50
14   through 53?
15     A.    Yes, I think this is the one you just
16   showed me previously.
17     Q.    Okay.  I would like to pull out lines
18   50 through 53 of column 13.  We already did.
19   It is right here, sir.
20     A.    I think we have already talked about
21   this.  This is the language we talked about
22   earlier.
23     Q.    I apologize if we did.  Hold on one
24   second.  I don't think so.  If we go to the
25   previous one, this is column 10, lines 22

1    through 26.
2      A.    Okay.
3      Q.    And, you know, you made a big deal
4    about this electrode language here, right?  If
5    you go to your next cite, column 13, lines 50
6    through 53, it just says "the capacitive
7    sensing circuit typically includes one or more
8    sensor ICs that measure the capacitance in each
9    of the sensing lines 152B and that reports its
10   findings to a host controller."
11         Do you see that, sir?
12     A.    I do.  I don't recall what you meant
13   by made a big deal about electrode because I
14   haven't said anything about electrode, but with
15   respect to --
16     Q.    I apologize for that commentary.  I
17   will withdraw that.
18         This doesn't talk about electrodes,
19   does it?
20     A.    This language?  No, it doesn't.
21     Q.    It says that the sensor ICs "measure
22   the capacitance," do you see that, sir?
23     A.    I do.
24     Q.    Okay.  So the specification does say
25   that the sensor ICs measure capacitance,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 757

1  doesn't it, sir?
2     A.  It says you measure the capacitance
3  and it is even more specific.  It tells you
4  specifically that you can do that by measuring
5  the charge.  What it does not require is that
6  you have -- again, to repeat the language --
7  circuitry that senses changes in capacitance.
8  Assuming by that you mean that you have to
9  directly get the capacitance as opposed to
10  looking at something like charge.
11     Q.  It says measure the capacitance,
12  right?
13     A.  That's the language there.
14     Q.  That's even more specific than senses
15  the capacitance?
16     A.  No, I disagree.  It is different.
17     Q.  And finally you cite to column 17,
18  line 12 through column 18, line 39.  Right?
19     A.  Yes.
20     Q.  And here I will note, this is an
21  excerpt, this is another big section of the
22  specification.  It is about a column long.  I
23  have pulled out a subset of that column 17,
24  lines 24 through 35 and put it on the screen.
25  This is slide RDX-20.037 for the record.

Page 758

1     A.  Yes, I see that.
2     Q.  And here also says it changes the
3  change in capacitive coupling, changes the
4  current that is carried by the sensing lines.
5  The capacitive sensing circuit notes the
6  current change and the position of the node
7  where the current change occurred.
8        Do you see that?
9     A.  Yes, I do.
10     Q.  So that's talking about sensing
11  changes in capacitance, isn't it, sir?
12     A.  In fact, specifically this is another
13  reason that supports my construction.  You will
14  note that this specifically says the capacitive
15  sensing circuits notes the current change.
16        This is precisely my point.  It is not
17  necessary to have something that senses changes
18  in the capacitance.  You can sense something
19  else, as long as you are responsive to the
20  capacitance.  And this language, again,
21  precisely supports why I think Motorola and the
22  Staff's construction is incorrect and why I
23  think the construction preferred by Apple is
24  correct.
25     Q.  You would agree that this capacitive

Page 759

1  sensing circuit that's claimed, it has to be
2  able to note the current change and the
3  position of the node where the current change
4  occurred, right?
5     A.  With respect to this embodiment, I
6  agree 100 percent.
7     Q.  With respect to claim 1, otherwise the
8  whole mutual capacitance architecture will
9  fail, right?
10     A.  With respect to this embodiment as
11  relates to claim 1, I agree.
12     Q.  All right.  Let's move on.  Well,
13  before I move on, can you go back to your
14  slide, sir, and tell me have I covered every
15  single citation that you cite to in support of
16  your construction from your slide CDX-2.063?
17     A.  To be honest, I don't remember.  We
18  would have to go through them again.
19     Q.  I will represent to you that I have.
20     A.  That's fine.
21     Q.  Unless there is something that occurs
22  to you, I don't want you to have to go and
23  compare all these slides.  I believe I have.
24        Is there anything that sticks out?
25     A.  That's good enough for me.

Page 760

1     Q.  Okay.  All right.
2        MR. VERHOEVEN:  Your Honor, at this
3  point I am going to have to go on the
4  confidential record.  This is Motorola and
5  Atmel confidential information.
6        JUDGE ESSEX:  All right.
7        (Whereupon, the trial proceeded in
8  confidential session.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 777

Page 779

3    (Whereupon, at 5:05 p.m., the trial
4  recessed, to reconvene at 9:00 a.m. on
5  Wednesday, September 28, 2011.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 781

```
 1          C O N T E N T S
 2   WITNESS    DIRECT  CROSS  REDIRECT  RECROSS  STAFF
 3   RAVIN BALAKRISHNAN   449   648   698   638
 4   VIVEK SUBRAMANIAN
 5        714   716
 6
 7          AFTERNOON SESSION: 585
 8
 9     CONFIDENTIAL SESSIONS: 586-686, 701-713, 761-end
10
11          E X H I B I T S
12   EXHIBIT NO:     MARKED     RECEIVED
13   COMPLAINANT
14   CDX-15.1............. 673
15   CDX-15.2............. 673
16   CDX-15.3............. 673
17   CDX-15.4............. 673
18
19
20
21
22
23
24
25
```

Page 782

```
 1          CERTIFICATE OF REPORTER
 2   TITLE:  Certain Mobile Devices & Related Software
 3   INVESTIGATION NO:  337-TA-750
 4   HEARING DATE:  September 27, 2011
 5   LOCATION:  Washington, DC
 6   NATURE OF HEARING:  Volume 2
 7       I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of
 8   the above-referenced proceedings of the U S
     International Trade Commission
 9   Date: September 27, 2011
10   SIGNED:KAREN BRYNTESON_____
11       Signature of the Contractor of the
         Authorized Contractor's Representative
12       1220 L Street, N W, Suite 600
         Washington, D C  20005
13
14       I hereby certify that I am not the Court
     Reporter and that I have proofread the
15   above-referenced transcript of the proceedings of the
     U S  International Trade Commission, against the
16   aforementioned Court Reporter's notes and recordings,
     for accuracy in transcription in the spelling,
17   hyphenation, punctuation and speaker identification
     and did not make any changes of a substantive nature
18   The foregoing/attached transcript is a true, correct
     and complete transcription of the proceedings
19   SIGNED:JOHN D  LASHER  _____
          Signature of Proofreader
20
21       I hereby certify that I reported the
     above-referenced proceedings of the U S  International
22   Trade Commission and caused to be prepared from my
     tapes and notes of the proceedings a true, correct and
23   complete verbatim recording of the proceedings

24   SIGNED:KAREN BRYNTESON _____
25       Signature of the Court Reporter
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 783

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

In the Matter of:        ) Investigation No.

CERTAIN MOBILE DEVICES    ) 337-TA-750

AND RELATED SOFTWARE      )

_____

Hearing Room A


United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.


Wednesday, September 28, 2011


VOLUME III


The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.


BEFORE:  THE HONORABLE THEODORE R. ESSEX

---

Page 784

```
 1   APPEARANCES:
 2       For Complainant Apple:
 3           MARK G. DAVIS, ESQ.
 4           BRIAN E. FERGUSON, ESQ.
 5           ROBERT T. VLASIS, ESQ.
 6           EDWARD S. JOU, ESQ.
 7           CHRISTOPHER T. MARANDO, ESQ.
 8           Weil, Gotshal & Manges LLP
 9           1300 Eye Street, N.W., Suite 900
10           Washington, D.C. 20005
11
12           JILL J. HO, ESQ.
13           BRIAN C. CHANG, ESQ.
14           Weil, Gotshal & Manges LLP
15           201 Redwood Shores Parkway
16           Redwood Shores, CA 94065
17
18           MATTHEW D. POWERS, ESQ.
19           STEVEN S. CHERENSKY, ESQ.
20           PAUL T. EHRLICH, ESQ.
21           ROBERT L. GERRITY, ESQ.
22           Tensegrity Law Group LLP
23           201 Redwood Shore Parkway
24           Redwood Shores, CA 94065
25
```

---

Page 785

```
 1   APPEARANCES (Continued):
 2
 3   For Respondent Motorola Mobility, Inc.:
 4       CHARLES K. VERHOEVEN, ESQ.
 5       DAVID EISEMAN, ESQ.
 6       Quinn Emanuel Urquhart & Sullivan LLP
 7       50 California Street, 22nd Floor
 8       San Francisco, CA 94111
 9
10       EDWARD J. DeFRANCO, ESQ.
11       Quinn Emanuel Urquhart & Sullivan LLP
12       51 Madison Avenue, 22nd FLoor
13       New York, New York 10010
14
15       DAVID A. NELSON, ESQ.
16       Quinn Emanuel Urquhart & Sullivan LLP
17       500 West Madison Street, Suite 2450
18       Chicago, Illinois 60661
19
20
21
22
23
24
25
```

---

Page 786

```
 1   APPEARANCES (Cont'd):
 2
 3   For ITC Staff:
 4       LISA KATTAN, ESQ.
 5       ANNE GOALWIN, ESQ.
 6       U.S. International Trade Commission
 7       500 E Street, S.W.
 8       Washington, D.C. 20436
 9
10
11       Attorney-Advisor:
12       GREGORY MOLDAFSKY, ESQ.
13       Attorney-Advisor
14       Office of Administrative Law Judges
15       U.S. International Trade Commission
16       500 E Street, S.W.
17       Washington, D.C. 20436
18
19   For Witness Simmons:
20       ALAN J. HEINRICH, ESQ.
21       Irell & Manella LLP
22       1800 Avenue of the Stars, Suite 900
23       Los Angeles, CA 90067
24
25       *** Index appears at end of transcript ***
```

1 (Pages 783 to 786)

APLNDC-X0000006311

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 787

```
 1           P R O C E E D I N G S
 2               (9:00 a.m.)
 3      JUDGE ESSEX:  All right.  Do we have
 4  any housekeeping to take up before we begin?
 5      MR. POWERS:  Yes, we do, Your Honor,
 6  briefly.  We have been meeting and discussing
 7  on a number of subjects, and first there is a
 8  number of witnesses who are being dropped, so
 9  we can give you the updated witness order for
10  the rest of the trial.
11      Second, there have been a number of
12  prior art references that have been dropped by
13  Motorola, so we will have a list and a
14  stipulation for you that details which ones are
15  in and which ones are out.
16      And, finally, the parties have met and
17  conferred and agreed on scheduling, and have
18  agreed that because of some schedule issues, we
19  will do the remaining fact witnesses for
20  Motorola today, and we will give you that list
21  of who they are, who are coming live.  We will
22  then, with Your Honor's permission, stop for
23  the day.  That won't take the entire day and
24  begin crosses of Motorola's two experts
25  tomorrow morning with the view that that will
```

Page 788

```
 1  take most of the day tomorrow.
 2      JUDGE ESSEX:  Let me stop you just
 3  there.  Does that mean we're going to set aside
 4  our good Doctor and sandwich him around fact
 5  witnesses?
 6      MR. POWERS:  We will begin, of course,
 7  finishing Dr. Subramanian.
 8      JUDGE ESSEX:  Of course.  If you can
 9  do it, I won't object to it necessarily, but I
10  would have to explain to him that his
11  conversations are being restricted.  Go ahead.
12      MR. POWERS:  We will finish
13  Dr. Subramanian this morning, and then begin
14  the fact witnesses.
15      JUDGE ESSEX:  All right.
16      MR. POWERS:  Even that won't consume
17  the entirety of the day.
18      JUDGE ESSEX:  All right.  That's fine.
19      MR. POWERS:  The last bit is that the
20  parties have all agreed that we will finish the
21  evidentiary hearing on Friday, that to
22  accommodate schedules and everything else,
23  everybody agrees that the testimony will be
24  completed by the end of the day Friday.
25      JUDGE ESSEX:  Again, if we do that,
```

Page 789

```
 1  that will be splendid.  If we don't, I want you
 2  to develop your cases as you think they need to
 3  be developed.  So that's -- I work here.  I
 4  will be here Monday whether I am listening to
 5  you all or whether I am doing something else.
 6  Again, don't start talking faster just to try
 7  to hold to that, but I appreciate your
 8  cooperation.  It is very wonderful.
 9      MR. POWERS:  All right.
10      JUDGE ESSEX:  All right.
11      MR. VERHOEVEN:  I think we're ready to
12  go, Your Honor.
13      JUDGE ESSEX:  All right.  Do we have
14  Doctor -- yes, very good.
15  Whereupon--
16           VIVEK SUBRAMANIAN,
17  a witness, called for examination, having previously
18  been duly sworn, was examined and testified further as
19  follows:
20      THE WITNESS:  Good morning, Your
21  Honor.
22      JUDGE ESSEX:  Good morning, Doctor.
23  Welcome back.  Please be seated.  I remind you,
24  you are still under oath.
25      THE WITNESS:  I understand that.
```

Page 790

```
 1      JUDGE ESSEX:  Appreciate it.
 2       CROSS-EXAMINATION -- Resumed
 3  BY MR. VERHOEVEN:
 4   Q.   We are still on the confidential
 5  Motorola/Atmel record.
 6      JUDGE ESSEX:  All right.  We're
 7  appropriately configured by sign.
 8      (Whereupon, the trial proceeded in
 9  confidential session.)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 835

Page 837



13    (Whereupon, the trial resumed in open
14  session.)
15
16
17
18
19
20
21
22
23
24
25

APLNDC-X0000006313

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 839

1        O P E N   S E S S I O N
2  BY MR. VERHOEVEN:
3        Q.   Ryan, can we put up RDX-20, slide 51,
4  please.
5            I am just going to refer to you as
6  Doctor, so I don't butcher your last name.
7        A.   That's fine.
8        Q.   Doctor, I would like to switch to the
9  claim construction issue, in particular, this
10  phrase "lines" that appears in claim 1, among
11  other places.  I have just highlighted it to
12  give you some context before I go into it.
13            So you see where it appears in claim
14  1?
15        A.   Yes, there is a few other places it
16  appears, but you have certainly highlighted two
17  of them.
18        Q.   A first layer having a plurality of
19  transparent first conductive lines, second
20  layer spatially separated from the first layer
21  and having a plurality of transparent second
22  conductive lines, right?
23        A.   Correct.
24        Q.   And if we go -- there is a claim
25  construction issue with respect to lines,

Page 840

1  correct?
2        A.   Yes, if you mean there is a
3  disagreement, I agree.
4        Q.   Right.  Well, exactly.
5            So on slide 52, which I have put up on
6  the screen, this is simply the chart -- and
7  hopefully I got this one right with respect to
8  the Staff's position, Your Honor.
9            The claim term is lines.  Apple and
10  the Staff says plain and ordinary meaning.  Is
11  that your understanding?
12        A.   I believe that's right.
13        Q.   And Motorola has proposed a
14  construction of lines, "narrow, continuous
15  extents of length with constant line width."
16  And you disagree that that's an appropriate
17  construction, correct?
18        A.   Correct.
19        Q.   And you think lines could mean any
20  shape; is that right?
21        A.   I didn't say it could mean any shape.
22  I said it is the plain and ordinary meaning.
23  And I have provided two descriptions within the
24  specification that indicate what it could be.
25        Q.   Okay.  Now, if we were to look at --

Page 841

1  let's take a step back.  So let's talk about
2  plain and ordinary meaning for a second.
3            If we were to look at a dictionary
4  definition of the word lines, there is going to
5  be a whole bunch of plain and ordinary meanings
6  of the word lines that are all different,
7  aren't there?
8        A.   I don't know what you mean, if you are
9  being field specific with respect --
10        Q.   Well, here.  I have put up on slide
11  53, Merriam Webster's Collegiate Dictionary,
12  11th edition, 2005.  Do you see up there, it
13  says line?
14        A.   I do.
15        Q.   There is two full screen shots full of
16  definitions, different definitions for line,
17  isn't there?
18        A.   There appear to be, yes.
19        Q.   I mean, there is line of argument,
20  length of cord, a device for catching fish,
21  piping, telephone connection, a short letter.
22  And it goes on and on.
23        A.   Yes, I am disappointed, given that it
24  is fall, that you left out line of scrimmage,
25  but I agree.

Page 842

1        Q.   There you go.  Not all of these
2  definitions are appropriate for the meaning of
3  line in the patent, fair?
4        A.   Within this RDX-20.053, yes, I agree.
5        Q.   I mean, even if you all agree that
6  we're going to pick a plain and ordinary
7  meaning, you have got to -- it is not all of
8  this, right?
9        A.   Yes, I agree.
10        Q.   You have got to look at the context
11  and figure out which plain and ordinary meaning
12  you're talking about, right?
13        A.   Well, plain and ordinary meaning is
14  always done through the eyes of one of skill in
15  the art.  So, yes, I agree with that.
16        Q.   Definition number 8 here is a plain
17  and ordinary meaning for line, it says, "a
18  straight or curved geometric element that is
19  generated by a moving point and that has
20  extension only along the path of the curve."
21  Do you see that?
22        A.   I see that.  That is not a plain and
23  ordinary meaning with respect to the field of
24  the invention.
25        Q.   This is the geometric definition of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 843

1  line, right?
2  A.   Yes, I agree, that appears to be
3  geometry-related.
4  Q.   Now, isn't it fair that one of
5  ordinary skill in the art looking at the
6  specification here and thinking, well, even if
7  I am going to apply plain and ordinary meaning,
8  that they would understand that the patent,
9  when it is talking about these conductive
10  lines, is talking about a geometric meaning of
11  line?
12  A.   No, I disagree completely.  Firstly,
13  if you read the -- firstly, as used in
14  electrical engineering, lines are routinely
15  used to describe things that would not meet the
16  requirements of the definition you have
17  provided in RDX-20.056, item 8.
18      Second, the specification makes very
19  clear what it is, and it is, in fact,
20  consistent with how it is used in this field.
21  Q.   All right.
22  A.   It is not --
23  Q.   Go ahead.
24  A.   It is not limited to something that is
25  a straight or curved geometric element that is

Page 844

1  generated by a moving point and that has
2  extension only along the path of the point.
3  Q.   Well, let's go to the specification.
4  You are referring to what I have just put up on
5  the screen, column 14, lines 23 through 36; is
6  that right?
7  A.   That is one of the things I am
8  referring to, yes.
9  Q.   Let's just walk through what this
10  paragraph is saying.  It says, again, for the
11  record, I am on JX-20, slide 57, which is
12  depicting column 14, lines 23 through 36 of the
13  '607 patent.
14      It says, the lines 152 may be formed
15  from almost any shape whether rectilinear or
16  curvilinear.  Do you see that?
17  A.   I do.
18  Q.   Now, I see it says almost any shape,
19  but then it says whether rectilinear or
20  curvilinear?
21  A.   It does say rectilinear and
22  curvilinear.
23  Q.   And rectilinear is a geometric term,
24  isn't it?
25  A.   Rectilinear itself, yes, I agree.

Page 845

1  Q.   Here is the definition from Merriam
2  Webster's Collegiate Dictionary, 11th edition,
3  2005.  I have displayed it on slide 58.
4  "Rectilinear:  Moving in or forming a straight
5  line."  Do you see that?
6  A.   That is one of them.  I would also
7  point to number 2, which is characterized by
8  straight lines, for example, the skyline of a
9  modern city.
10  Q.   Okay.  And then curvilinear I have put
11  on the screen, .059, slide 059.  And there is
12  Merriam Webster's Collegiate Dictionary, 2005
13  as well.  Curvilinear is consisting of or
14  bounded by curved lines, represented by a
15  curved line, right?
16  A.   Yes, and, again, I would also point to
17  the second one, marked by flowing tracery.
18  Q.   So when we go back to the spec, isn't
19  it clear that they are talking about the
20  geometric meaning of lines?  They are not
21  talking about writing a letter, they are not
22  talking about waiting in a queue, they are
23  talking about geometrics?
24  A.   No, I disagree.  First, I do agree
25  they are not talking about writing a letter or

Page 846

1  waiting in a queue.  I agree with that.  They
2  are talking about lines as used in this
3  application.  And it says that the lines may be
4  formed from almost any shape.
5      The shapes themselves, it applies
6  geometric characterizations to those, where it
7  says whether they are rectilinear or
8  curvilinear and, in fact, this is exactly what
9  I have mentioned -- what I have shown to you
10  earlier in my direct.  I have pointed out that
11  you could construct lines out of, for example,
12  a series of diamonds connected together.  That
13  would be fine.
14      Because the diamonds are rectilinear.
15  They are characterized by lines.  They could be
16  little ovals connected end to end.  Those would
17  be curvilinear.  They are bounded by curves.
18  And the lines are formed out of them.
19  Q.   Let's go on to the next sentence.
20  Oops, I just did something wrong.  Sorry about
21  that, Your Honor.
22      Let's go to the next sentence.  And I
23  have depicted this.  We're now on slide 60,
24  RDX-20, same paragraph, column 14, 23 through
25  36 and I have just highlighted the next two

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 847

1  sentences.
2      Do you see that, sir?
3      A.   Yes.
4      Q.   And I will read them into the record.
5  "The lines on each layer may be the same or
6  different.  For example, the lines may
7  alternate between rectilinear and curvilinear."
8      Now, I have depicted on the right what
9  I think is what they are saying.  You could
10  have straight lines or curved lines.  Isn't
11  that what that is saying?
12      A.   With respect to what you have drawn, I
13  agree that what you have drawn would, in fact,
14  be encompassed by the language you have
15  highlighted, but it is not the only
16  possibility.  It makes very clear that the
17  lines themselves can be formed from almost any
18  shape, whether rectilinear or curvilinear.
19      In fact, you have formed it out of a
20  single line in each case, either a single
21  straight line or a curve.
22      Q.   Well, do you see where it says, "for
23  example, the lines may alternate between
24  rectilinear and curvilinear?  Do you see that
25  sentence?

Page 848

1      A.   I do.
2      Q.   That depiction on the right, that
3  matches that sentence, right?
4      A.   I agree that what you have drawn on
5  the right of RDX-20.060 is an example of a set
6  of lines where some of the lines are straight.
7  Therefore, they are composed of rectilinear
8  elements.  And some of the lines are curved.
9  Therefore, they are composed of a curvilinear
10  element.
11      Q.   Okay.
12      A.   I am not saying what you have drawn
13  here does not meet the requirements.  I am not
14  saying -- I am just saying it is not the only
15  possibility.
16      Q.   And then the specification goes on and
17  now I have highlighted this next slide, 61, the
18  next two sentences, which I will read into the
19  record from column 14, lines 23 through 36.
20  And those say, "further still, the shape of the
21  opposing lines may have identical shapes or
22  they may have different shapes.  For example,
23  the driving lines may have a first shape while
24  the sensing lines may have a second shape that
25  is different than the first shape."

Page 849

1      Do you see that?
2      A.   I do.
3      Q.   So that's talking about you might have
4  rectilinear lines on one layer and curvilinear
5  lines on another layer, right?
6      A.   That is certainly one possibility.  It
7  is also a possibility to have one set of lines
8  constructed out of diamonds connected end to
9  end, and the other constructed out of ovals
10  connected end to end.
11      Q.   If we go to slide 63, I have
12  highlighted the next two sentences in the
13  paragraph.  And I will read them into the
14  record.  "The geometry of the lines" -- let me
15  stop right there.
16      That's clearly talking about lines in
17  a geometric sense?  Yes?
18      A.   Yes, with respect to the individual
19  lines, the word here is geometry.  And here --
20  as used here, it is referring to the shape of
21  the line.
22      Q.   I mean, isn't it true this whole
23  paragraph is talking about the geometry of the
24  lines?
25      A.   Geometry is certainly part of what --

Page 850

1  is part of what this paragraph is talking
2  about.  What it is indicating, in fact, is
3  exactly what we're saying.  You can use
4  different geometries.  They can be rectilinear.
5  They can be curvilinear.  And you can use those
6  to form lines.
7      For example, you could take a
8  rectilinear shape, such as a diamond or a
9  crosshatch, those are rectilinear shapes, and
10  you can connect them end to end to form a line
11  or you could take a curvilinear shape, such as
12  a crescent or an oval and connect it end to end
13  to form a line and that would be fine.  And
14  that would meet the requirements of this
15  language.
16      Q.   I was only asking you whether it was
17  talking about it in the geometric sense.  Do
18  you agree?
19      A.   With respect to this sentence, it is
20  self-evident.  It says the geometry.
21      Q.   Okay.  "The geometry of the lines
22  (e.g., line widths and spacing) may also be
23  widely varied.  The geometry of the lines
24  within each layer may be identical or
25  different."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 851

1        And so, for example, the illustration
2    on slide 63 to the right would be an example
3    where you alternate between a wide line and a
4    thin line, right?
5        A.   If the blue is the lines, I think
6    that's what you are indicating here; is that
7    correct?
8        Q.   Yes.
9        A.   Yeah, this would certainly meet the
10   requirements, I agree.
11       Q.   And then the last bit here says -- and
12   this, again, is column 14, lines 23 through 36.
13   And I am now on slide 64.  The last bit of the
14   excerpt says, "and further, the geometry of the
15   lines for both layers may be" -- I'm sorry, I
16   just read that.  I apologize.
17       The next sentence says, "by way of
18   example, the line widths of the sensing lines
19   152B to driving lines 152A may have a ratio of
20   about 2:1."
21       So --
22       A.   It does say that.  And I think you did
23   mean to read that sentence you didn't read.
24       Q.   I apologize.
25       A.   It is fine.  But I know what you are

Page 852

1    talking about.
2        Q.   Okay.  So this last clause depicted on
3    the right would show sensing lines -- I don't
4    know if I got the scale exactly right, sir --
5    but sensing lines and driving lines have
6    different widths.  That's what that is saying?
7        A.   In the illustration shown to the right
8    of RDX-20.064, I agree, the ratio appears to be
9    about 4 to 1.
10       Q.   Now, in your review of the
11   specification, there is no illustration of any
12   stars being lines, right?
13       A.   Within the specification?
14       Q.   Yeah.
15       A.   You mean -- there is no drawing of a
16   star connected end to end being a line, but it
17   certainly meets the requirements of a line
18   formed from any shape, whether rectinlear or
19   curvilinear.  Stars are rectilinear shapes
20   because they are composed of lines.  And when
21   connected end to end, they would then,
22   therefore, form a line along the lines of 152.
23       Q.   I suppose if you want to get
24   metaphysical about it, any shape is composed of
25   lines if you draw it with lines, right?  Is

Page 853

1    that what you are saying?
2        A.   A shape is composed of lines if you
3    draw it of lines.  There is nothing
4    metaphysical about it.  That's fact.
5        Q.   Is it your opinion lines in the claims
6    could be any shape whatsoever?
7        A.   No, I didn't say that.  I have never
8    said, for example, that a single star would be
9    a line.
10       Q.   What about a single square?
11       A.   A single square, a rectangle or a
12   square?
13       Q.   I said square.
14       A.   I guess if I were to have a sheet of
15   plastic and the ratios were chosen such that
16   the height of the plastic or the glass, the
17   glass member, was exactly equal to the line
18   width, then a square in that instance would
19   indeed form a line.
20       Q.   What about a diamond, a single
21   diamond?  Is that a line?
22       A.   It would depend on -- a single diamond
23   in the abstract, it would not be a line, but if
24   you had a glass member that is exactly as tall
25   as the line width, then, yes, it would be a

Page 854

1    line.
2        Q.   Is it fair to say if you look at the
3    illustrations in the spec and you look at the
4    written detailed description of the spec, there
5    is no disclosure of a diamond, a single diamond
6    being a line or single star being a line or
7    anything other than straight lines or curved
8    lines?
9        A.   No, I disagree.  I agree that there is
10   no explicit disclosure that says a diamond is a
11   line or a star is a line.  However, there is
12   explicit disclosure of the fact that the lines
13   may be formed from any shape, whether
14   rectilinear or curvilinear.  Therefore, that
15   disclosure is there.
16       Q.   This is what we just looked at, column
17   14, right?
18       A.   That's correct.
19       Q.   Besides column 14, is there any other
20   place that you would like to refer me to in the
21   specification that says a line could be
22   anything?
23       A.   I think that's the only one I cited.
24   I'd have to confirm.  I believe that's the only
25   one I have cited.  I can confirm, if you want.

18 (Pages 851 to 854)
APLNDC-X0000006317

Page 855

1   Yes, the only citation I have provided is the
2   column 14 citation that we have discussed.
3       Q.   All right.  In your witness statement,
4   you cite to CDX-2.042, the slide that you
5   submitted together with your witness statement
6   in which you listed intrinsic figures that you
7   claim support your proposed construction of
8   lines.  I can put it on the screen if you want.
9           Why don't we do that, CDX-2.042.  Do
10  you remember this?
11      A.   Yes.
12      Q.   And this is from your witness -- these
13  go with your witness statement, correct?
14      A.   Yes, I believe so.
15      Q.   And this is referring to claim
16  construction of lines, right, up at the top?
17      A.   This is from the section on claim
18  construction of lines.
19      Q.   And then you cite to figures 2, 3, 9,
20  10, 11, 18, 19 in support of your proposed
21  construction of lines, right?
22      A.   This is some of the support, yes.
23      Q.   So if we go back to the slide deck,
24  please, Ryan, here is figure 2 that you cite
25  to.  That just depicts crosshatched straight

Page 856

1   lines, right?
2       A.   Yes, I agree with that.
3       Q.   And the lines that are illustrated in
4   figure 2 are narrow, continuous, extensive
5   length with constant line width, right?
6       A.   They certainly appear to be.  I mean,
7   as they are represented here, they are
8   represented as a series of dots connected end
9   to end, so you could argue that those are not
10  narrow, continuous of constant line width.  In
11  fact, they are narrow, I agree, they do appear
12  to be continuous, but they are not of constant
13  line width but they are a series of dots
14  connected end to end.
15      Q.   A person of ordinary skill in the art
16  knows that's not a series of dots, that those
17  are the conductive lines, right?
18      A.   They are indeed conductive lines.
19  They could be a series of dots connected end to
20  end provided they actually touch each other.
21  That would be allowed, based on the section of
22  figure 14 -- of column 14 that we read earlier.
23      Q.   Is it your contention that one
24  embodiment of this invention is a series of
25  dots?

Page 857

1       A.   A series of dots connected to each
2   other end to end would indeed meet the
3   requirements of lines.  That would certainly be
4   allowed.
5       Q.   Okay.
6       A.   Provided they were connected end to
7   end and ran from one end to the other, they
8   would certainly meet the requirements of lines.
9       Q.   Figure 3, you cite to.  I have put it
10  on the screen.  This is slide 66.
11          In figure 3, the lines depicted are
12  narrow, continuous extensive length with
13  constant line width, right?
14      A.   With respect to figure 3, yes, I
15  agree.  That's correct.  I mean, if by narrow
16  you mean they are thin compared to the overall
17  pitch, they certainly appear to be narrow.  And
18  they are continuous.  And within the error of
19  the drafting, they certainly appear to have
20  constant line width.
21      Q.   And you cite to figure 9, which we
22  looked at before.  I will put that on the
23  screen in slide 67.
24          Figure 9 also depicts the first and
25  second conductive lines as narrow, continuous

Page 858

1   extensive length with constant line width,
2   right?
3       A.   Figure 9, they are continuous.  I
4   would argue that they are not particularly
5   narrow.  In fact, it appears that if we look at
6   the lines on the bottom, they are relatively
7   wide, but they are indeed continuous and they
8   do appear to have constant line width.
9       Q.   These lines here are wide?
10      A.   Yes, they appear to be relative -- I
11  mean, they appear to have a pitch -- a line
12  width that is greater than 50 percent of the
13  pitch.
14      Q.   You also cite to figures 11A and B.
15  And I have put those up on the screen in slide
16  68.  And the associated text, column 16, lines
17  50 through 54 on the right.
18          It says, "figures 11A and B are
19  partial top view diagrams of a driving line 200
20  and a sensing layer 202, in accordance with one
21  embodiment.  In this embodiment, each of the
22  layers 200 and 202 includes dummy features 204
23  disposed between the driving lines and the
24  sensing lines," driving lines 206, that's those
25  lines right there (indicating), right?

19 (Pages 855 to 858)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 859

1   A.   Yes.
2   Q.   And sensing lines 208, those are the
3   crosshatched lines in the bottom figure 11B,
4   right (indicating)?
5   A.   Yes, that's correct.
6   Q.   And those lines are also narrow,
7   continuous extensive length, aren't they?
8   A.   They are continuous.  The driving
9   lines 204 appear to have a line width that is
10  less than -- on the order of 20 percent or
11  25 percent of the pitch.  So if we define that
12  as narrow, that's fine, I will say they are
13  narrow.
14       And they are continuous.  And except
15  for the stub at the end, they have constant
16  line width.  The stub at the end appears to be
17  wider.
18       If we take lines 208, those appear to
19  be at slightly more than 50 percent.  In fact,
20  they are more than.  They are about 60 percent
21  of the pitch in terms of their line width.  So
22  I don't know that you could call them narrow.
23       They are certainly continuous.  And
24  they are of constant line width, except for the
25  hemispherical cap on the top.

Page 860

1   Q.   Okay.  So all of the illustrations
2   that you point to, the figures that you point
3   to from the specification, they show straight
4   lines, don't they?  They don't show stars or
5   diamonds or boxes?
6   A.   All of the figures that I point to do
7   indeed not show stars or diamonds.  I mean, I
8   would argue that they are -- at least if we
9   could go back to figure 9, I would argue that
10  each of those is individually a box.  So they
11  certainly are a box.
12       And, indeed, I agree, if we look at
13  the vector of them, they are all shown as
14  straight.  They are not shown as having a
15  curvature across their entire extent.
16  Q.   Now, I would like to move on to
17  another thing that you addressed in your
18  witness statement, which is to respond to
19  Motorola's expert, Dr. Wolfe.
20       And you remember Dr. Wolfe depicted a
21  circle, a star -- I am not sure what this thing
22  is?
23  A.   It looks like a ghost or somewhat of a
24  representation of Texas.
25  Q.   Okay.  And he says a circle is not a

Page 861

1   line, a star is not a line, and this ghost
2   figure, that's not a line.  You disagree with
3   that, right?
4   A.   I think what -- my disagreement was
5   with his characterization of the fact that I
6   said each of those individually would be a
7   line.  And that's not what I had said.
8       What I said is the lines could be
9   formed from almost any shape, whether
10  rectilinear or curvilinear.  And the examples
11  on the right on RDX-20.069 show examples of
12  things that are certainly lines.
13  Q.   And this is what you put in response,
14  I have excerpted out, but this is what you have
15  put in response in your witness statement.
16  And, look, if you take a star and you add a
17  bunch of them in a row, that that's a line?
18  A.   Correct.
19  Q.   If you take this ghost figure and you
20  put 20 of them in a row, that that's a line?
21  That's what you are saying, right?
22  A.   That's correct.
23  Q.   Okay.  Now, I think you said that you
24  agree that line in the patent is not a queue,
25  but, sir, aren't you using the wrong definition

Page 862

1   of line here, an arrangement or placement of
2   persons or objects of one kind in an orderly
3   series, like a line of trees or waiting in
4   line?  That's not the definition the patent is
5   using?
6   A.   So I agree that a line is not an
7   arrangement of trees or a placement of persons.
8   However, that is certainly a line.  The fact
9   that I am connecting them end to end doesn't
10  make it a queue.  Or the fact that they
11  overlap, in that connecting them end to end, if
12  they were replaced by people, would be a queue,
13  but this is not a queue.  This is not people
14  end to end.  This is shapes that are put
15  together to form a line.  The line can be
16  composed of almost any shape, whether
17  rectilinear or curvilinear.  That's the
18  language in the patent.
19  Q.   So in your opinion, you are not using
20  these ghosts all lined up here as a queue?  A
21  line of ghosts?
22  A.   If you want to say that that's a
23  queue, that's fine, but more importantly with
24  respect to the patent, this is a line composed
25  of any shape with them connected -- composed of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 863

1    any shape, whether rectilinear or curvilinear.
2    And these appear to be predominantly
3    curvilinear.
4        Q.   Let's move on to, I am almost done
5    with this subject and I have one more thing I
6    want to show you.
7            What I have put on the screen at
8    RDX-20, slide 071 is figure 2 from RX-1836 that
9    you were shown at your deposition.  Do you
10   remember that?
11       A.   I don't, but I'm sure we can proceed.
12       Q.   I will represent that this was, I
13   think it was Exhibit 7 from your deposition.
14   It was marked as RX-1836.
15           You don't remember looking at this
16   array?
17       A.   Yeah, I do.  It was too zoomed out for
18   me to see.
19       Q.   I apologize.  So I have zoomed it in.
20   I have zoomed it in now.  Do you see it?
21       A.   I do.
22       Q.   And you testified at your deposition
23   that these blue shapes are lines that are
24   running diagonally.  Do you remember that?
25       A.   I recall that, yes.

Page 864

1        Q.   And you testified that you were asked
2    how many diagonal lines are there in figure 2,
3    and you testified there are 11.  Do you stand
4    by that?
5        A.   I'd have to count again.
6        Q.   Go ahead.
7        A.   Yes.
8        Q.   So they are going diagonally, right?
9    So if I start here (indicating), that's 1, 2,
10   3, 4, 5, 6, 7, 8, 9, right?  Where do you get
11   10 and 11?
12       A.   I have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
13   11.
14       Q.   So item 1 in your list, that's a
15   square?
16       A.   That is a square.
17       Q.   So in your opinion, a square is a
18   line?
19       A.   And that's why I answered your
20   previous question exactly as I did.  In the
21   abstract, it would depend, but in the specific
22   case where the height is the same as the line
23   width, it would be a line.  And that is
24   precisely the case here.
25           At this corner, the height of the line

Page 865

1    is exactly the same as the line width.
2        Q.   So just for the record, your testimony
3    is, if we're looking at RDX-20.071, which
4    depicts RX-1836 at figure 2, that the top left
5    square is a line?
6        A.   Yes.
7        Q.   Under your interpretation of line in
8    the patent?
9        A.   That's correct.
10       Q.   And the bottom right square depicted
11   in figure 2 is also a line in your opinion?
12       A.   That's correct.
13       Q.   All right.  Let's move on to a
14   different subject.  If we can go to RDX-20.079.
15   This is also a claim construction subject, sir.
16           And, in particular, the term I would
17   like to address is the claim construction of
18   the phrase glass member.  You remember there is
19   a dispute as to what that means, right?
20       A.   Yes.
21       Q.   And Motorola's proposed construction
22   is plain and ordinary meaning, right?
23       A.   That's correct.
24       Q.   The Staff's proposed construction is
25   "a relatively thick piece of clear plastic or

Page 866

1    glass that protects the display from forces,
2    which are exerted on the touchscreen," right?
3        A.   Yes, that's correct.
4        Q.   And Apple's proposed construction is a
5    "glass or plastic element," right?
6        A.   Correct.
7        Q.   And which one of those do you agree
8    with?
9        A.   Well, I support Apple's proposed
10   construction as I have already pointed out.
11       Q.   So your opinion is that glass member
12   means glass or plastic, not just glass,
13   correct?
14       A.   Correct.  In fact, that is
15   specifically called out within the
16   specification of the patent.
17       Q.   Now, let's take a second and let's set
18   aside the patent.  Okay?
19       A.   I understand.
20       Q.   And we're just talking about what the
21   plain and ordinary meaning of glass is, outside
22   of the patent.  Are you with me?
23       A.   I understand.  Of glass, not glass
24   member?  I understand.
25           MR. FERGUSON:  Your Honor, may I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 867

1   interrupt for one minute?  I believe that this
2   is no longer accurate because the Staff has --
3   and, of course, Ms. Kattan can correct me if I
4   am wrong -- the Staff has adopted Apple's
5   construction.
6           MS. KATTAN:  Yes, Your Honor.  I was
7   just looking for the page reference, but that's
8   correct.
9           JUDGE ESSEX:  All right.  I will take
10  it -- that's quite all right.  I will take it
11  that we have two here and the Staff will go
12  with Apple.
13          MR. VERHOEVEN:  And we will fix this
14  slide, Your Honor.
15          JUDGE ESSEX:  Thank you.
16          MR. VERHOEVEN:  I apologize.
17          JUDGE ESSEX:  That's not a problem.
18  Go on.
19  BY MR. VERHOEVEN:
20      Q.   Now I have lost my train of thought.
21  Oh, we're talking about the meaning of glass if
22  you set aside the patent, just the plain and
23  ordinary meaning of glass.
24      A.   I understand.
25      Q.   Isn't it true that outside of the

Page 868

1   patent, if you are talking about glass, the
2   plain and ordinary meaning of glass would not
3   include plastic?
4       A.   We're not talking about glass member,
5   we're talking about glass.  Glass in the
6   scientific definition is a super cooled liquid,
7   cooled to a solid-state so that would not
8   include plastic, because plastic is not a super
9   cooled liquid cooled to a solid-state.
10      Q.   Right.  And outside of the context of
11  the patent, if you were to say, please hand me
12  that glass beaker, you would understand that
13  that is not a plastic -- that would not, and
14  there is a plastic beaker and a glass beaker on
15  the table, you would understand the person is
16  asking for the glass one, not the plastic one,
17  right?
18      A.   If those are my two options, yes, I
19  agree.  But that has nothing to do with glass
20  member.
21      Q.   Well, let's just get to that in a
22  second.  Same question.  Glass cup, there is
23  two cups on the table, and you say please hand
24  me the glass cup, a person of ordinary skill
25  would know you are referring to the glass cup

Page 869

1   and not the plastic cup, right?
2       A.   Same answer.  If given those two
3   options of a glass cup and a plastic cup, if
4   you said pass me the glass cup, I would give
5   you the glass cup, not the plastic one.  This
6   of course has nothing to do with glass member.
7       Q.   Okay.  Now, member, that's a
8   patentee's term, right?
9       A.   It is a patentee's term.  It is also a
10  term in the English language.
11      Q.   What is your understanding of just in
12  isolation, forget glass, just the word member?
13      A.   It is an element.  It is part of
14  something.
15      Q.   So a cup could be a member, a beaker
16  could be a member, some structure?
17      A.   Well, if I had a collection of
18  beakers, 20 beakers on a table, or a beaker,
19  some spoons, and several other things on the
20  table, and that was my collection of utensils,
21  then, for example, the spoon would be a member
22  of the utensil set.
23      Q.   Now, outside of the context of the
24  patent still, and this would be highly unusual
25  for anyone to say this because member is

Page 870

1   usually sort of something you associate with
2   patents, but just let me ask the question
3   anyway.
4           Outside the context of the patent, if
5   you had two members on a table, one was plastic
6   and one was glass, and you said hand me the
7   glass member, a person of ordinary skill in the
8   art would know you are referring to the glass
9   member and not the plastic member, right?
10      A.   And you are saying the person of
11  ordinary skill has not read the patent to see
12  how the patent defines it?
13      Q.   Exactly.
14      A.   If the person of ordinary skill has
15  not read the patent, so that's the caveat you
16  are putting on me, and you give me the option
17  of saying that there are two members, a glass
18  member and a plastic member, and, therefore, by
19  definition you have said the plastic member is
20  not a glass member, then if you ask for a glass
21  member, I would give you the one that is made
22  of glass.
23      Q.   And you would understand that outside
24  of the context of the patent, when you are
25  saying glass member, you are not referring to

22 (Pages 867 to 870)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 871

1   plastic member, you are referring to something
2   made out of glass?
3       A.   But you have given me that I don't
4   have the teachings of the patent.
5       Q.   Correct.
6       A.   Given that I don't have the teachings
7   of the patent that specifically say the glass
8   member could also be plastic, if you said a
9   glass member, I would assume a glass member.
10      Q.   And the ordinary meaning outside of
11  the teachings of the patent would exclude
12  plastic member?  If someone said, hand me the
13  glass member, a person of ordinary skill in the
14  art would know that's not -- that category does
15  not include members made out of plastic, right?
16      A.   If I ignore the specific teachings of
17  the specification, which specifically say that
18  the glass member could be either glass or
19  plastic, and I assume that I'm going to use
20  glass as glass and plastic as plastic, and
21  never the twain shall meet, then indeed if I
22  refer -- if I have two things on the table and
23  one was a glass member and the other was a
24  plastic member, and they are different now,
25  based on the hypothetical you have given me,

Page 872

1   then when I asked for the glass member, I would
2   only assume you were talking about the glass
3   member, not the plastic member.
4       Q.   Okay.  So let's turn to the patent now
5   and you point to a portion of the patent and
6   the specification that in your view leads you
7   to conclude that the phrase glass in the claims
8   is not using the plain and ordinary meaning of
9   glass outside the context of the patent.  Is
10  that true?
11      A.   I'm sorry, could I have the question
12  again, please?
13          THE REPORTER:  "Question:  So let's
14  turn to the patent now and you point to a
15  portion of the patent and the specification
16  that in your view leads you to conclude that
17  the phrase glass in the claims is not using the
18  plain and ordinary meaning of glass outside the
19  context of the patent.  Is that true?"
20          THE WITNESS:  No, actually, I point to
21  a section of the patent that teaches me that
22  glass member as used in the patent is not
23  limited to glass.
24  BY MR. VERHOEVEN:
25      Q.   Fair enough.  Let me rephrase the

Page 873

1   question then.
2           Taking the phrase glass member, we
3   have already established that outside of the
4   context of the patent, that phrase, a person of
5   ordinary skill would understand that phrase,
6   glass member, does not include plastic, right?
7       A.   Well, we discussed it and I have given
8   you the caveats that we have discussed
9   previously.
10      Q.   Right.  Which is, I think you agreed
11  that if we're not looking at the patent, and
12  we're just talking about glass member, a person
13  of ordinary skill in the art would understand
14  that does not include plastic members, right?
15      A.   I believe what I said is if we exclude
16  the teachings of the patent, which explicitly
17  say that a glass member would include plastic,
18  then if you give me the constraints that a
19  glass member is glass and a plastic member is
20  plastic, if you ask for glass, I would give you
21  the glass one.
22      Q.   So I take it your opinion is with
23  respect to glass member, when you look at the
24  specification, there is a portion of the
25  specification that teaches one of ordinary

Page 874

1   skill in the art that we're not going to use
2   the plain and ordinary meaning of glass member
3   outside the context of the patent, which would
4   exclude plastic, but there is some teaching in
5   here in the specification that says we're going
6   to use a different meaning, other than the
7   plain and ordinary meaning of glass member?
8   Fair?
9       A.   Specifically, what I said is that the
10  specification teaches that a glass member could
11  be glass or plastic, and, therefore, I would
12  not just assume a glass member must only be
13  glass.
14      Q.   Okay.  So do you agree with what I
15  have asked you, then, that it would not be the
16  plain and ordinary meaning of glass member
17  outside the context of the patent?
18      A.   Given the discussion and the caveats
19  we had before, assuming we are applying those,
20  namely, you haven't looked at the
21  specification, et cetera, it is clear that here
22  the patent is providing specific teaching
23  beyond what would be the plain and ordinary
24  meaning.
25      Q.   The change is the plain and ordinary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 875

1    meaning, correct?
2        A.   Of glass member?  Yes.  There is a
3    specific meaning of glass member provided, and
4    it is not limited to just glass.
5        Q.   Okay.  So let's go to the portion of
6    the spec, the specification, I think you are
7    referring to, which is column 16, lines 35
8    through 49.
9            Did I get it right?
10       A.   Yes, I believe so.
11       Q.   So you are referring to this phrase
12   "any suitable glass or plastic material may be
13   used for the glass members."  Right?
14       A.   The section that you haven't
15   highlighted, yes, that's correct.
16       Q.   Okay.  Now, do you see this portion of
17   the specification is talking about a specific
18   illustrated embodiment and examples within the
19   specific illustrated embodiment of the
20   specification?  Let's walk through it.
21           It says with regards to configuration,
22   each of the various layers may be formed with
23   various sizes, shapes, and the like.  And then
24   it says "for example," do you see that?
25       A.   Yes.

Page 876

1        Q.   So a person of ordinary skill in the
2    art would understand this is an example, this
3    is not a limitation on the claims of the
4    invention, right?
5        A.   These are examples related to
6    embodiments.  This is not claim language,
7    clearly.
8        Q.   Well, let's take a step back.  And
9    we're talking about claim construction, right?
10       A.   We are.
11       Q.   And you have some understanding of the
12   rules of the road.  I understand you are not a
13   patent attorney, but you have some
14   understanding of the rules of the road to apply
15   when forming your opinions?
16       A.   Yes.
17       Q.   From a technical standpoint as a
18   person of ordinary skill in the art, right?
19       A.   Yes, the specification is a guide.
20       Q.   And one of the things that you are
21   aware of, correct me if I am wrong, is that it
22   is inappropriate to take a specific embodiment
23   from the specification and use that to limit
24   claim language.  Fair?
25       A.   Yes.  I agree claim language is not

Page 877

1    limited to embodiments.
2        Q.   Okay.  And do you see here it says,
3    "in the illustrated embodiment"?
4        A.   Yes.
5        Q.   So this whole paragraph is talking
6    about a specific embodiment, isn't it, sir?
7        A.   No, that's not correct.  In fact,
8    let's break it down sentence by sentence.  The
9    first sentence is not limited to just
10   illustrated embodiment.  It says, with regards
11   to configuration, each of the various layers
12   may be formed of various sizes, shapes, and the
13   like.  And this is in relation to a larger
14   description of the embodiment.
15           But the statement itself is not
16   limited to just that embodiment.  It is a
17   general statement with regard to configuration.
18           Further, the specific language we're
19   talking about, where it says any suitable glass
20   or plastic material may be used for the glass
21   members is not saying you can only do it in
22   that embodiment.  It is a general statement
23   about what characterizes glass members.  And it
24   says so explicitly.
25       Q.   So is it your testimony that the first

Page 878

1    sentence here is not describing a specific
2    embodiment?
3        A.   No, that's not what I said.  I said it
4    is a general statement.  It is applicable
5    across the board, but it is in the larger
6    context of a discussion of a specific
7    embodiment -- of a larger embodiment that
8    starts before this paragraph.
9        Q.   And then do you see where it says, "in
10   the illustrated embodiment," and it says, "the
11   first glass member has a thickness of about 1.1
12   millimeters, the second glass member," and then
13   it continues?  I am not going to read the whole
14   thing.  Do you see that?
15       A.   I do.
16       Q.   You agree that's an embodiment, right?
17       A.   Yes.  And I would point out that it
18   would be inappropriate to limit the claim to a
19   system that only has a thickness of 1.1
20   millimeters, for example.
21       Q.   Exactly.  And then you see when it
22   continues, it keeps on describing that
23   embodiment, right?
24       A.   It does.
25       Q.   And it says, "furthermore, each of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   layers may be formed with various materials."
2   Do you see that?
3       A.   Yes.
4       Q.   And then it says, "by way of example,"
5   a person of ordinary skill in the art would
6   understand that that's just an example, that's
7   not a limitation on the claims?
8       A.   Absolutely, that's not a limitation on
9   the claim.
10      Q.   And then the sentence that you point
11  to starts with the phrase "for example." Isn't
12  it true, sir, that a person of ordinary skill
13  in the art would understand that also is merely
14  an example about different ways you could do
15  things and is not meant to be a definitional
16  limit on the claims?
17      A.   This is an example of how you could do
18  things. It is not something -- given that it
19  is an example, it is not an explicit limit, but
20  it is certainly a guide to aid in definition.
21  And it tells you specifically that glass
22  members could be any suitable glass or plastic
23  material.
24           And to try to limit below that would
25  clearly be incorrect.

1       Q.   It is not your contention that this
2   phrase that starts with "for example" is an
3   instance in which the patentee is acting as his
4   own lexicographer, is it, sir?
5       A.   With respect to glass members, here he
6   provides a clear definition of what it means.
7   And that is any suitable glass or plastic
8   material may be used for the glass members.
9           So to that extent over here, he is
10  clearly defining what glass members are.
11      Q.   Okay. Let's put up from your rebuttal
12  witness statement, question 34 and the answer.
13      A.   This is from my rebuttal statement? I
14  don't think -- do I have that here?
15      Q.   I have just put it on the screen for
16  you, sir, if you would like to look at it. Do
17  you see question 34, "question: Dr. Wolfe in
18  his witness statement testimony responses to
19  questions 131 through 132 opines that he
20  considered your opinions regarding column 16:43
21  through 44, but disagrees with them." Do you
22  see that?
23      A.   Yes.
24           MR. FERGUSON: Your Honor --
25           JUDGE ESSEX: Pardon me.

1           MR. FERGUSON: Excuse me. In
2   fairness, I believe he should have a copy of
3   his entire rebuttal witness statement, if Mr.
4   Verhoeven is going to refer to it, and not just
5   put a snippet up on the screen.
6           JUDGE ESSEX: If the witness needs
7   something more to answer, then the witness may
8   ask for it, but it is cross-examination. If he
9   can answer from this, the witness may do so,
10  but we will see what he says. Go ahead.
11          MR. VERHOEVEN: Thank you, Your Honor
12  BY MR. VERHOEVEN:
13      Q.   Column 16:43-44, that's a portion of
14  that paragraph that we looked at just a minute
15  ago, right? Do you want me to put it on the
16  screen for you?
17      A.   I have JX-2 here, so I can find it.
18  It is fine. That is a portion, correct.
19      Q.   That's the one portion you cite,
20  right?
21      A.   Actually, I cited beyond that. I
22  cited all the way down to line 49.
23      Q.   Okay. Well, it is generally where we
24  were looking at before, right?
25      A.   It is.

1       Q.   It was on the screen when I was
2   walking through that paragraph, right?
3       A.   Those two lines were on the screen.
4       Q.   And then you were asked: "Do you have
5   any opinions regarding that testimony?"
6           And your answer is: "Yes. Dr. Wolfe
7   states that one of ordinary skill would not
8   interpret these two sentences as defining," and
9   you put italics around defining, do you see
10  that?
11      A.   Correct.
12      Q.   -- "for purposes of the '607 patent,
13  the term glass in glass member as glass or
14  plastic." And then you continue, "but as noted
15  above, that is not the point and certainly not
16  the basis for my opinion."
17          Do you see that?
18      A.   Correct.
19      Q.   So your opinion is not that in this
20  portion of the spec, that the patentee is
21  adding a definition of glass member, is it?
22      A.   No, you are incorrect. The patentee
23  does not define glass in glass member. He is
24  defining glass member as a whole.
25      Q.   Okay. So it is your opinion, then,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 883

1    that the specification that we were just
2    looking at -- can we go back to the slides,
3    Ryan -- that this for example sentence, that
4    that is an actual definition provided by the
5    patentee acting as his own lexicographer, that
6    is your opinion?
7        A.   It is my opinion with respect to glass
8    member, this section is providing a
9    characterization of what would be, for example,
10   a glass member.  And it specifically calls it
11   out as being any suitable glass or plastic
12   material.
13       Q.   And it starts with "for example"?
14       A.   Absolutely.
15       Q.   And do you agree that examples from
16   the spec should not be imported as limitations
17   in the claim?
18       A.   They should not limit the claim in
19   that extent, yes, I agree.
20       Q.   Okay.
21            MR. VERHOEVEN:  Your Honor, I am going
22   to switch to the subject of domestic industry.
23   I have probably more than a few minutes on
24   that.  So I don't know if you want to take the
25   morning recess.

Page 884

1            JUDGE ESSEX:  This may be a convenient
2    time to take a break.  We will come back at
3    five minutes till the hour.
4            Doctor, again, let me remind you not
5    to discuss your testimony with anybody while
6    we're on our break.  We are in recess.
7            (A recess was taken at 10:40 a.m.,
8    after which the trial resumed at 10:54 a.m.)
9            JUDGE ESSEX:  Let's come to order.
10   Are you ready to continue?
11           MR. VERHOEVEN:  I am, Your Honor.
12           JUDGE ESSEX:  Please do.
13   BY MR. VERHOEVEN:
14       Q.   I apologize, Doctor, over the break, I
15   realized I forgot to ask a couple more
16   questions with respect to the glass member
17   issue and then I will move on to domestic
18   industry.
19       A.   I understand.
20       Q.   If we could put up the highlighted
21   version of RDX-20.050 that we looked at
22   earlier.  Do you remember which is the document
23   you looked at in connection with claim 4?
24       A.   Yes.
25           MR. VERHOEVEN:  Does this need to be

Page 885

1    confidential?
2            MR. FERGUSON:  Yes.
3            MR. VERHOEVEN:  I'm sorry, Your Honor,
4    we need to go Motorola/Atmel confidential for
5    just one second.
6            JUDGE ESSEX:  Well, that creates a
7    problem.  Those that know to leave the room,
8    please do so.
9            MR. VERHOEVEN:  It will be just a
10   couple minutes.
11           JUDGE ESSEX:  I understand.
12           (Whereupon, the trial proceeded in
13   confidential session.)

Page 886

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 947



10    (Whereupon, the trial resumed in open
11   session.)

---

Page 949

1         Okay.  Go ahead.
2         MR. DeFRANCO:  With that, we will call
3   as our first witness for Motorola, Ms. Christy
4   Wyatt.
5         JUDGE ESSEX:  I was right, I would see
6   you in a minute.  If you would remain standing
7   for a moment, and raise your right hand.
8   Whereupon--
9               CHRISTY WYATT,
10  having been first duly sworn, was examined and
11  testified as follows:
12        JUDGE ESSEX:  Please be seated.
13            DIRECT EXAMINATION
14  BY MR. DeFRANCO:
15     Q.   Good afternoon, why don't you state
16  your full name for the record, please?
17     A.   Christy Wyatt.
18     Q.   Thank you.  Ms. Wyatt, you should have
19  a binder in front of you with your witness
20  statement in it.  Would you mind opening that
21  up?
22        Have you seen that before?
23     A.   Yes.
24     Q.   Is that your witness statement in this
25  case?

---

Page 948

1         O P E N   S E S S I O N
2         MR. POWERS:  Subject to the admission
3   of exhibits and the other normal formalities of
4   getting the depositions in, which I think we're
5   about to move in, that will complete Apple's
6   case-in-chief, with one caveat.
7         And the caveat is there were certain
8   Motorola witnesses who were on Apple's witness
9   list, and we agreed that they could be called
10  once in Motorola's case, so obviously our case
11  won't formally rest until those witnesses come
12  in, but subject to that, it is time to begin
13  Motorola's case-in-chief.
14        JUDGE ESSEX:  Very good.
15        MR. DeFRANCO:  That's fine, Your
16  Honor.  And with that, we're ready to call our
17  first witness.  Was there something else?  Go
18  ahead.
19        MR. FERGUSON:  Your Honor, should I
20  proceed with the admission of the exhibits from
21  our case-in-chief now?
22        JUDGE ESSEX:  No, just wait until
23  we're on a break and get the other parties, if
24  you all agree, you can give them to the court
25  reporter and we will be done with that.

---

Page 950

1      A.   Yes.
2      Q.   Did you prepare the answers to the
3   questions that are set forth in that statement?
4      A.   Yes.
5      Q.   You will notice at the back on the
6   last page, it is dated August 22nd, 2011.  Your
7   name is typewritten.  There is a signature
8   above the typewritten version of your name; is
9   that your signature?
10     A.   Yes, it is.
11     Q.   Okay.  And one thing I will note for
12  you and for the record, the parties have
13  reached an agreement with respect to certain
14  licensing issues.  That's why a portion of your
15  statement has been redacted or blackened out.
16  There is some exhibits there, but I don't need
17  to take you through it, but that won't be the
18  subject matter of your direct testimony.
19     A.   All right.
20     Q.   Okay?
21        MR. DeFRANCO:  With that, I will pass
22  the witness.  Thank you.
23        JUDGE ESSEX:  Thank you.
24            CROSS-EXAMINATION
25  BY MR. POWERS:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 951

1    Q.   Good afternoon, Ms. Wyatt.  You joined
2  Motorola in 2005; is that right?
3         JUDGE ESSEX:  Hang on just a second.
4  Let me have your cross-exam materials and the
5  other parties as well.
6         THE WITNESS:  That's right.
7         JUDGE ESSEX:  Go ahead.
8         MR. POWERS:  Thank you, Your Honor.
9  BY MR. POWERS:
10   Q.   You joined Motorola in 2005?
11   A.   Yes, I did.
12   Q.   And you came from Apple where you held
13 a similar executive position, true?
14   A.   Yes, I did.
15   Q.   At the time that you joined Motorola
16 in 2005, the iPhone had not yet been
17 introduced, true?
18   A.   That's true.
19   Q.   And at the time you joined Motorola in
20 2005, Motorola's position in the cell phone
21 market was stronger than it is today; is that
22 fair?
23   A.   Motorola's position in the market was
24 very strong at the time, yes.
25   Q.   And stronger than it is today; is that

Page 952

1  fair?
2    A.   I wouldn't know how to measure that,
3  but --
4    Q.   You were responsible in part for
5  Motorola's cell phone business, you know the
6  market share then was much better than today;
7  is that fair?
8    A.   Sure, in the future phone space,
9  that's true, yes.
10   Q.   Now, one phone that Motorola had in
11 the 2005 time frame that was very popular was
12 the Razr.  Do you recall that?
13   A.   That's true.
14   Q.   Now, the Razr was not a touchscreen
15 phone, was it?
16   A.   Correct.
17   Q.   And, in fact, Motorola did not have a
18 finger touch touchscreen phone until after the
19 iPhone was introduced.  That's true, isn't it?
20   A.   I would need to check the dates on
21 that.  We actually had been shipping
22 touchscreen devices in China for a long period
23 of time.  I am not sure when the Ming first
24 shipped.
25   Q.   You are referring to a device called

Page 953

1  the Ming?
2    A.   Yes.
3    Q.   That came with a stylus to initiate
4  touches, did it not?
5    A.   You could use your finger to draw on
6  it as well, yes.
7    Q.   To draw a Chinese character, that was
8  the intent?
9    A.   Correct.
10   Q.   The Ming was not sold in the U.S.; is
11 that true?
12   A.   Not until later, correct.
13   Q.   Okay.  Chris, could we put up
14 CDX-11.29, which is a history of at least some
15 of the Motorola phones against the iPhone.  Can
16 you see that, Ms. Wyatt?
17   A.   Yes.
18   Q.   The Ming is the one that you were
19 referring to, it is on 2006.  That's the phone
20 you were just referring to in your prior
21 testimony?
22   A.   Yes.
23   Q.   And that refreshes your recollection
24 as to when that came out, about 2006?
25   A.   Again, I don't know that I could

Page 954

1  confirm that.  My recollection is actually Ming
2  was out before that, but that was before my
3  time at Motorola, so --
4    Q.   Fair enough.  The phones on CDX-1129
5  to the left of the Ming, the Rokr, Razr, and
6  A760, those are non-touchscreen phones, right?
7    A.   The Razr and the Rokr were
8  non-touchscreen phones, yes.  The A760, I am
9  not sure, I am not familiar with that one.
10   Q.   Fair enough.  Two years after the
11 iPhone -- let me do it this way.  You were at
12 Motorola when the iPhone was introduced, true?
13   A.   Correct.
14   Q.   I take it you would agree with me that
15 was a significant competitive event in the cell
16 phone business that you were involved in?
17   A.   In hindsight, yes, but at the time, I
18 don't know that that's the way we viewed it.
19   Q.   At the time, you were skeptical about
20 whether the iPhone would be a real competitor;
21 is that fair?
22   A.   I think that's fair.  Apple is new to
23 the market.
24   Q.   And time has proved that skepticism to
25 be not well-founded; is that fair?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 955

1    A.   They have done okay.
2    Q.   Sorry?
3    A.   They have done okay.
4    Q.   Fair enough.  I will leave it there.
5         The first, the Cliq, which is shown
6  here in 2009, is that an accurate date for the
7  Cliq, by the way, for the introduction?
8    A.   Yes.
9    Q.   That is a single touch touchscreen
10 phone introduced by Motorola, true?
11   A.   I believe that's true, yes.
12   Q.   And that's the first touchscreen phone
13 that was introduced by Motorola in the United
14 States.  That's true, isn't it?
15   A.   That's the first Android touchscreen
16 phone that was introduced, yes.
17   Q.   The Cliq was not a multi-touch phone,
18 was it?
19   A.   Not to my recollection, no, it wasn't.
20   Q.   And the Droid as it was released in
21 2009, that was also not a multi-touch phone.
22 That's true, isn't it?
23   A.   Not exactly.  Droid actually shipped
24 in a couple of different versions.  The Droid
25 in the U.S. with Verizon was not a touch --

Page 956

1  multi-touch device.  The version that was
2  called Milestone that shipped in many different
3  customers around the world actually had
4  multi-touch enabled in two different
5  applications.
6    Q.   You said many different customers.
7  Did you mean countries?
8    A.   Customers and countries.
9    Q.   Okay.  In the U.S., though, the Droid
10 as it was released in 2009, that was not a
11 multi-touch phone.  True?
12   A.   True.
13   Q.   All right.  The first multi-touch
14 phone that Motorola introduced in the United
15 States was the Droid X in 2010.  Is that right?
16   A.   I believe that's correct.
17   Q.   Now, would you, as someone who is very
18 involved in the mobile phone business at
19 Motorola, would you agree that by 2009, the
20 skepticism had faded and Apple was deemed as a
21 real competitor?
22   A.   Sure.
23   Q.   By that point, Apple's sales were
24 quite substantial, weren't they?
25   A.   Yes.

Page 957

1    Q.   And Motorola's sales were in decline
2  as of 2009, weren't they?
3    A.   I don't know that at 2009, we were
4  declining.  I think we were somewhere at the
5  bottom and on our way back up, but we were just
6  about to launch our new Android line, yes.
7    Q.   In 2009, the Motorola Mobility
8  business, what is now the Motorola Mobility
9  business, that was the handset business, that
10 lost over a billion dollars in 2009, didn't it?
11   A.   I'm not going to -- I wouldn't be the
12 one to quote the financial reports from 2009.
13   Q.   Fair enough.  Let me show you then
14 CX-404 and go to page 50, please.  And there is
15 a copy in a binder for you.  I am going to show
16 you a piece of it.
17        If you need to look at more, feel free
18 to do so.  If you go to .50, and, Chris, could
19 you blow up the first third of it or so.  There
20 you go.  That's perfect.
21        Do you recognize this as a portion of
22 Motorola's financial filings with the
23 Securities and Exchange Commission?
24   A.   That's what it looks to be, yes.
25   Q.   And I take it Motorola makes every

Page 958

1  effort to make those statements accurate to the
2  SEC?
3    A.   Yes.
4    Q.   Okay.  And you see that the first
5  sentence under the indented paragraph that
6  says, "the segment incurred an operating loss
7  of $76 million in 2010, compared to an
8  operating loss of $1.2 billion in 2009."  Do
9  you see that's a reference to the mobile
10 devices business?
11   A.   Yes.
12   Q.   Does that help you recall the extent
13 of the loss in 2009 as over a billion dollars?
14   A.   Sure.
15   Q.   Sounds about right?
16   A.   Sure.
17   Q.   Okay.  You would agree with me, I take
18 it, by 2009, the skepticism that Motorola had
19 about the iPhone had switched to a desire to
20 compete with the features the iPhone was
21 offering.  Is that fair?
22   A.   I don't think we necessarily looked at
23 it feature by feature.  We looked at Android as
24 a platform that we were excited about and we
25 were about to launch a new Android product

APLNDC-X0000006328

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 959

1  line.
2  Q.   You knew, did you not, that the iPhone
3  was a multi-touch device, the one that was
4  introduced in 2007?
5  A.   Yes.
6  Q.   And then you introduced a multi-touch
7  device in 2010 in terms of the Droid X, right?
8  A.   Yes.
9  Q.   I take it that's not a coincidence?
10  You were intending to try to compete with the
11  multi-touch functionality offered by the
12  iPhone, is that fair?
13  A.   I don't know that I would draw that
14  direct correlation between seeing something on
15  an Apple device and that being our motivation
16  to put it on a Motorola device.
17  Q.   Is it your testimony to the Court that
18  the success of the iPhone and its multi-touch
19  capability had nothing to do with Motorola's
20  decision to introduce its first multi-touch
21  phone after the iPhone?  Is that your
22  testimony?
23  A.   No, I think what I'm saying is I don't
24  know -- I don't know what percentage of the
25  iPhone's success could be attributed back to

Page 960

1  multi-touch in the first place, and I don't
2  know that our decision to implement multi-touch
3  in those two applications, and then
4  subsequently across the line, along with
5  Google, was purely driven by anything we saw in
6  the Apple device.
7  I think that touch technology had been
8  around for a long time.  We had a lot of
9  customer requests.
10  Q.   Fair enough.  So it is true, though,
11  that before the iPhone was released, Motorola
12  had no multi-touch devices.  That's true,
13  right?
14  A.   I believe that's true.
15  Q.   And now after the iPhone, every single
16  one of Motorola's offerings is multi-touch?
17  A.   Android itself supports multi-touch
18  so, yes, inherently, any device that is Android
19  would support multi-touch.
20  Q.   And I take it you are not testifying
21  that the success of Apple's iPhone had nothing
22  to do with the adoption of multi-touch in
23  Motorola's devices across the line.  You are
24  not saying that, are you?
25  A.   I have no way of contributing -- I

Page 961

1  would have no way of knowing what percentage,
2  if any, success of that device had to do with
3  multi-touch.
4  Q.   Actually, my question didn't ask for a
5  percentage.  My question was, you are not
6  testifying, as I understand it, that the
7  success of Apple's multi-touch iPhone had
8  nothing to do with Motorola's decision to
9  switch entirely to multi-phone platform, that's
10  true, isn't it?  You are not saying that?
11  A.   I apologize.  You are going to have to
12  say that one more time.  What am I not saying?
13  Q.   Fair enough.  It was -- it might have
14  been a triple negative.
15  You said you don't know the percentage
16  of the reason why Motorola has switched to
17  multi-touch resulting from the success of the
18  iPhone multi-touch.  Do you recall that?
19  A.   Yes.
20  Q.   But some part of the reason that
21  Motorola went to multi-touch was the success of
22  the iPhone multi-touch, that's fair, isn't it?
23  A.   Again, I don't know how -- what direct
24  correlation you could draw.  I think it is fair
25  to say customers were asking for multi-touch,

Page 962

1  asking why it wouldn't be technically possible
2  on a device that supported it.
3  And so, therefore, we delivered the
4  feature.
5  Q.   It is also fair that you viewed, by
6  2009, Apple's iPhone as a significant
7  competitor.  That's true, isn't it?
8  A.   IPhone was a competitor in the market,
9  absolutely.
10  Q.   Now, in 2011, Motorola introduced a
11  tablet called the Xoom?  Is that right?
12  A.   Yes.
13  Q.   You need to answer audibly so the
14  court reporter can get it down.
15  A.   Yes.
16  Q.   That was also a multi-touch sensitive
17  device?
18  A.   Yes.
19  Q.   And that came after Apple's
20  introduction of the iPad, which is a
21  multi-touch sensitive tablet device, true?
22  A.   True.
23  Q.   You report to the CEO of Motorola
24  Mobility, Mr. Jha, right?
25  A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 963

1    Q.   You're aware, are you not, that
2  Mr. Jha has said publicly that in order to
3  turnaround Motorola's business, they were going
4  to introduce multi-touch devices like the
5  iPhone?  You have heard him say that, haven't
6  you?
7    A.   I don't know that I could recall him
8  saying that, not directly, sorry.
9    Q.   Are you saying you have never heard
10 inside Motorola a desire to introduce
11 multi-touch devices to compete with the iPhone,
12 that you have never heard a statement to that
13 effect?
14   A.   I can't recall hearing Sanjay Jha
15 saying we needed to deliver multi-touch to
16 compete with iPhone.  Not publicly, no.  This
17 was many years ago.  I'm saying I don't recall
18 any conversation like that.
19   Q.   Are you saying that you don't recall a
20 specific conversation or that you don't recall
21 him saying anything to that effect ever
22 generally?  There is a difference.
23   A.   I don't recall having that
24 conversation with Sanjay Jha.
25   Q.   Chris, could you bring up CDX-11.23,

Page 964

1  please.  This is a New York Times article dated
2  April 30, 2009 while you were at Motorola.  Do
3  you recall seeing it?  The headline is
4  Something That If I Were Working At Motorola, I
5  Might Have Noticed and Remembered.
6    A.   No, I mean, there was a lot of
7  articles written about us in 2009.  I don't
8  recall the specific one.
9    Q.   Many of those articles written about
10 Motorola in 2009 were negative, weren't they,
11 is that fair, about the handset business?
12   A.   I don't know.  I think many were
13 optimistic about our come back with the
14 Smartphone line.  Obviously, some were
15 commenting on our position in the market after
16 having revamped the entire company.
17   Q.   One comment that is attributed to
18 Mr. Jha -- now, he is your boss?  He is the
19 person to whom you report, the CEO of Motorola
20 Mobility; is that right?
21   A.   Yes.
22   Q.   Is that "in the current and next
23 quarter, Motorola will begin shipping
24 touchscreen phones, the kind Apple, Samsung,
25 and LG already have."  Do you see that?

Page 965

1    A.   Yes.
2    Q.   Does that help you recall Mr. Jha's
3  statement that he was attempting to turnaround
4  Motorola's fortunes by introducing touchscreen
5  phones of the type Apple had already
6  introduced?
7    A.   Well, actually, it says Apple,
8  Samsung, and LG.  I don't know that Samsung and
9  LG were shipping touch or multi-touch.  And
10 this says shipping touchscreen phones, which
11 was factual.  We were about to ship Android
12 touchscreen phones.
13   Q.   Specifically the kind that Apple and
14 others already have.  That's what the article
15 says, right?
16   A.   That is what it says, but I wouldn't
17 know whether Samsung or LG had multi-touch
18 devices at that period of time.  So I don't --
19 I don't draw the correlation with multi-touch
20 versus touch.
21   Q.   Actually, I wasn't asking about
22 Samsung and LG.  I was asking about Apple.  You
23 do know that as of that time, Apple had a
24 touchscreen phone, right?
25   A.   Oh, sure.  They are all named.

Page 966

1    Q.   My question was, does that comment
2  attributed to your boss, Mr. Jha, help you
3  recall that he had said things to that effect,
4  that the way that Motorola was going to try to
5  turnaround its unfortunate position in 2009 was
6  to start "shipping touchscreen phones of the
7  kind that Apple already had"?  Does that help
8  you recall that generally?
9    A.   No.  I think what he is saying here is
10 we're about to ship phones, an entire portfolio
11 based on Android which, yes, are touchscreen
12 phones.  So that is true, yes.
13   Q.   What Mr. Jha's statement also says,
14 though, is that it is the type that Apple has?
15   A.   Apple, Samsung, and LG, yes.
16   Q.   Right.  And that's the part of the
17 question that I was asking you about.  Does
18 that help you recall specifically that Mr. Jha
19 was making that type of a comment, that
20 Motorola was attempting to turnaround its
21 unfortunate market position in 2009 by shipping
22 the type of touchscreen phones that Apple had
23 already introduced?
24   A.   What I recall is that we were turning
25 the company around by shipping Android devices.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 967

1    And I do see the article, but I don't recall
2  ever a conversation, Sanjay saying he was going
3  to turn the company around through multi-touch
4  devices.
5      Q.   Okay.  Fair enough.  One portion of
6  your witness statement suggests that there
7  might be adverse consequences for some persons
8  employed by Motorola Mobility if the ITC were
9  to exclude importation of Motorola devices.  Do
10  you recall that portion of your testimony?
11     A.   I think it is a true statement.  I
12  don't recall the exact words in that part of
13  the statement, but yes.
14     Q.   My characterization is fair?
15     A.   We have a lot of U.S. employees that
16  would be affected by that, yes.
17     Q.   It is a fact that you don't know any
18  specific number of jobs that would be lost?
19  You just don't know?  That's fair, isn't it?
20     A.   No, that's not true.  We have the
21  mobile division, we have about 8,000 -- 7,
22  8,000 employees in the U.S., about 5,000 of
23  which are actively doing just development on
24  handsets roughly.  So it would be fair to say
25  that that would be impacted.

Page 968

1      Q.   But you don't know how many -- my
2  question was, you don't know how many jobs
3  would be lost, do you?  You don't know?
4      A.   There would be no way of knowing
5  something that hasn't happened yet.  That's
6  true.  But you would assume if we're not making
7  phones, those people aren't working on phones
8  anymore.
9      Q.   Is it your testimony that if Apple --
10  I'm sorry, if Motorola were precluded from
11  introducing the accused products in the U.S.,
12  that Motorola would no longer make phones for
13  the rest of the world?
14     A.   I think that's a fair question.  I
15  think that the majority of our revenue is still
16  U.S.-based, so you are right that we do sell
17  phones into other parts of the world.
18     Q.   So you don't know?
19     A.   True.
20     Q.   Okay.  Now, you signed your witness
21  statement on August 22nd.  True?
22     A.   Yes.
23     Q.   Exactly a week before that, there was
24  another very significant event which affected
25  Motorola's future.  That's fair, isn't it?

Page 969

1      A.   Are you referring to the Google
2  announcement?
3      Q.   That's the one.
4      A.   Yes.
5      Q.   That was August 15th.  Right?
6      A.   Yes.
7      Q.   You don't mention in your witness
8  statement the Google acquisition, do you?
9      A.   No.
10     Q.   You don't know personally what effect
11  the Google acquisition would have on Motorola's
12  job future after the acquisition is
13  consummated, assuming it is, do you?
14     A.   There would be no way of knowing that,
15  correct.
16     Q.   Okay.
17          MR. POWERS:  No further questions,
18  Your Honor.
19          MS. KATTAN:  No cross-examination,
20  Your Honor.
21          REDIRECT EXAMINATION
22  BY MR. DeFRANCO:
23     Q.   Just a few, Ms. Wyatt.  To go back to
24  your witness statement, it is dated August
25  22nd, and I believe in paragraph 3, which you

Page 970

1  are free to refer to, you had your title at
2  that time.  I just want to clarify for the
3  record.
4          At that time, your title was corporate
5  vice president of software and product
6  management, is that correct?
7      A.   Correct.
8      Q.   Did your title change actually and
9  your job position change after you --
10     A.   Yes.
11     Q.   Prepared that answer?
12     A.   I am in process with that right now,
13  actually.  We announced a reorganization last
14  week.
15     Q.   Would you mind for the record just
16  telling us your new title and a sentence or two
17  about your new responsibilities, please?
18     A.   Sure.  So my new title is corporate
19  vice president and general manager of
20  enterprise.  So previously, I was responsible
21  for the strategy and planning of software.  And
22  now I will be running a business unit focused
23  on software and hardware products, the
24  development, sales and marketing of into IT
25  customers.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 971

1    Q.   At the beginning of the examination,
2  you were asked a couple of questions about your
3  prior work experience at Apple.  Do you recall
4  that?
5    A.   Yes.
6    Q.   And I think it was mentioned the
7  iPhone was in development at that time.  Do you
8  recall that?
9    A.   Yeah.  I wouldn't -- I wouldn't know
10  how far along.  I wasn't a part of that
11  project.
12    Q.   That actually was my question.  Did
13  you have any involvement at all when you were
14  at Apple in the development of the hardware or
15  software that ultimately went into the iPhone?
16    A.   No.
17    Q.   You were asked a bit about Motorola's
18  products and you explained and spoke a little
19  bit about Android.  Is that correct?
20    A.   Yes.
21    Q.   And Motorola uses the Android
22  operating system?
23    A.   Yes.
24    Q.   Does Motorola have its own software
25  engineers?

Page 972

1    A.   Absolutely.
2    Q.   Can you give us an example or two of
3  what types of things Motorola's software
4  engineers develop or work on?
5    A.   So we get the Android operating system
6  in source code format.  We have to do the bring
7  up on the chipsets, the support of all of the
8  hardware, the software, the displays, the
9  modems.  We also do an entire suite of
10  applications we build ourself around.  Services
11  we build on top, things like synchronizing
12  contacts, social networking, a variety of
13  different things.
14    Q.   Is Motorola the only handset
15  manufacturing company that uses the Android
16  operating system?
17    A.   Oh, absolutely not.
18    Q.   Can you give us an example of some
19  others that do?
20    A.   To my knowledge, all of them, except
21  for Nokia and Apple.  Sorry.
22    Q.   Thanks very much.
23    A.   All right.
24    MR. POWERS:  Nothing further, Your
25  Honor.

Page 973

1    MS. KATTAN:  Nothing further, Your
2  Honor.
3    JUDGE ESSEX:  All right.  Thank you
4  very much.  You are dismissed.
5    THE WITNESS:  Thank you.
6    MR. NELSON:  We have another witness,
7  Your Honor.
8    JUDGE ESSEX:  Oh, good.
9    MR. NELSON:  Martin Simmons.  He is a
10  gentleman from Atmel.  He has come from
11  England.  I will go out in the hall and get
12  him.
13    JUDGE ESSEX:  Do you have binders to
14  pass out as well?
15    MR. NELSON:  I do, Your Honor.
16    JUDGE ESSEX:  Just come up and stand
17  by the witness stand for a moment, if you
18  would, please.  Raise your right hand.
19  Whereupon--
20    MARTIN SIMMONS,
21  having been first duly sworn, was examined and
22  testified as follows:
23    JUDGE ESSEX:  Please be seated.
24    DIRECT EXAMINATION
25  BY MR. NELSON:

Page 974

1    Q.   Good afternoon.
2    A.   Good afternoon.
3    Q.   Could you state your full name for the
4  record?
5    A.   Martin John Simmons.
6    Q.   Did you provide a witness statement in
7  connection with this investigation?
8    A.   I did.
9    Q.   Okay.  Can you open your binder that
10  you have right there in front of you and turn
11  to the first tab, which will be marked
12  RX-1879C.  Go ahead and take a look at that for
13  me.
14    A.   Okay.
15    Q.   Now, is this the witness statement
16  that you provided?
17    A.   It is.
18    Q.   Okay.  And are the answers that are
19  provided in there the ones that you gave in
20  response to the questions posed in the witness
21  statement?
22    A.   Yes, they are.
23    Q.   All right.  Now, look at the last
24  page.  It is dated September 6th, 2001.  Do you
25  see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 975

```
1    A.   Yes.
2    Q.   And is that your signature on that?
3    A.   Yes, it is.
4    Q.   All right.  Thank you very much.
5         MR. NELSON:  At this time, I am going
6    to pass the witness, Your Honor.
7         JUDGE ESSEX:  Thank you.
8         MR. DAVIS:  Your Honor, we will need
9    to go on the confidential record for the
10   cross-examination.  And it will be Atmel
11   confidential.
12        JUDGE ESSEX:  All right.
13        (Whereupon, the trial proceeded in
14   confidential session.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 977

Page 976



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1103



9  (Whereupon, at 4:27 p.m., the trial
10  recessed, to reconvene at 9:00 a.m. on
11  Thursday, September 29, 2011.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1105

C O N T E N T S

1
2  WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
3  VIVEK SUBRAMANIAN    --   790   928     943
4  CHRISTY WYATT     949   950   969
5  MARTIN SIMMONS    973   976   1005    1010
6  JEFFREY BROWN     1017  1018  1044    1055
7  DIANNE HACKBORN    1064  1065  1094
8
9         AFTERNOON SESSION: 947
10
11   CONFIDENTIAL SESSIONS: 791-838, 886-947, 976-end
12
13        E X H I B I T S
14  EXHIBIT NO:      MARKED    RECEIVED
15  COMPLAINANT
16  CDX-16.............. 935
17  CX-600.............. 1044
18  RESPONDENT
19  RDX-30.............. 891
20
21
22
23
24
25

Page 1106

1         CERTIFICATE OF REPORTER
2  TITLE:  Certain Mobile Devices and Related Software
3  INVESTIGATION NO: 337-TA-750
4  HEARING DATE:    September 28, 2011
5  LOCATION:      Washington, D C
6  NATURE OF HEARING: Volume 3
7     I hereby certify that the foregoing/attached
   transcript is a true, correct and complete record of
8  the above-referenced proceedings of the U S
   International Trade Commission
9  Date:  September 28, 2011
10  SIGNED:KAREN BRYNTESON_____
11     Signature of the Contractor of the
      Authorized Contractor's Representative
12    1220 L Street, N W, Suite 600
      Washington, D C  20005
13
      I hereby certify that I am not the Court
14  Reporter and that I have proofread the
   above-referenced transcript of the proceedings of the
15  U S  International Trade Commission, against the
   aforementioned Court Reporter's notes and recordings,
16  for accuracy in transcription in the spelling,
   hyphenation, punctuation and speaker identification
17  and did not make any changes of a substantive nature
   The foregoing/attached transcript is a true, correct
18  and complete transcription of the proceedings
19  SIGNED:JOHN D  LASHER _____
      Signature of Proofreader
20
      I hereby certify that I reported the
21  above-referenced proceedings of the U S  International
   Trade Commission and caused to be prepared from my
22  tapes and notes of the proceedings a true, correct and
   complete verbatim recording of the proceedings
23
   SIGNED:KAREN BRYNTESON _____
24     Signature of the Court Reporter
25

APLNDC-X0000006334

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1107

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

In the Matter of:      ) Investigation No.
CERTAIN MOBILE DEVICES    )  337-TA-750
AND RELATED SOFTWARE      )
_____

Hearing Room A


United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.


Thursday, September 29, 2011


VOLUME IV


The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.


BEFORE:  THE HONORABLE THEODORE R. ESSEX

---

Page 1108

1  APPEARANCES:
2      For Complainant Apple:
3          MARK G. DAVIS, ESQ.
4          BRIAN E. FERGUSON, ESQ.
5          ROBERT T. VLASIS, ESQ.
6          EDWARD S. JOU, ESQ.
7          CHRISTOPHER T. MARANDO, ESQ.
8          Weil, Gotshal & Manges LLP
9          1300 Eye Street, N.W., Suite 900
10         Washington, D.C. 20005
11
12         JILL J. HO, ESQ.
13         BRIAN C. CHANG, ESQ.
14         Weil, Gotshal & Manges LLP
15         201 Redwood Shores Parkway
16         Redwood Shores, CA 94065
17
18         MATTHEW D. POWERS, ESQ.
19         STEVEN S. CHERENSKY, ESQ.
20         PAUL T. EHRLICH, ESQ.
21         ROBERT L. GERRITY, ESQ.
22         Tensegrity Law Group LLP
23         201 Redwood Shore Parkway
24         Redwood Shores, CA 94065
25

---

Page 1109

1  APPEARANCES (Continued):
2
3  For Respondent Motorola Mobility, Inc.:
4          CHARLES K. VERHOEVEN, ESQ.
5          DAVID EISEMAN, ESQ.
6          Quinn Emanuel Urquhart & Sullivan LLP
7          50 California Street, 22nd Floor
8          San Francisco, CA 94111
9
10         EDWARD J. DeFRANCO, ESQ.
11         Quinn Emanuel Urquhart & Sullivan LLP
12         51 Madison Avenue, 22nd FLoor
13         New York, New York 10010
14
15         DAVID A. NELSON, ESQ.
16         Quinn Emanuel Urquhart & Sullivan LLP
17         500 West Madison Street, Suite 2450
18         Chicago, Illinois 60661
19
20
21
22
23
24
25

---

Page 1110

1  APPEARANCES (Cont'd):
2
3  For ITC Staff:
4          LISA KATTAN, ESQ.
5          ANNE GOALWIN, ESQ.
6          U.S. International Trade Commission
7          500 E Street, S.W.
8          Washington, D.C. 20436
9
10
11         Attorney-Advisor:
12         GREGORY MOLDAFSKY, ESQ.
13         Attorney-Advisor
14         Office of Administrative Law Judges
15         U.S. International Trade Commission
16         500 E Street, S.W.
17         Washington, D.C. 20436
18
19
20         *** Index appears at end of transcript ***
21
22
23
24
25

1 (Pages 1107 to 1110)

APLNDC-X0000006335

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1111

```
 1              P R O C E E D I N G S
 2              (9:00 a.m.)
 3       JUDGE ESSEX:  Let's come to order.
 4       Do we have any administrative matters
 5  to take up before we call our next witness?
 6       MR. POWERS:  We don't, Your Honor.
 7  We're on track, on time.  I think all the
 8  exhibit issues have been resolved and the lists
 9  have been submitted to the reporter.
10       JUDGE ESSEX:  Very, very good.
11       MR. POWERS:  The only other note is I
12  think we can now go on the public record as
13  well.
14       JUDGE ESSEX:  All right.  I think
15  Motorola, you are holding serve?
16       MR. DeFRANCO:  Yes, Your Honor, we're
17  ready to go.  Our next witness, Your Honor, is
18  our technical expert for the '430 patent,
19  Dr. Douglass Locke.
20  Whereupon--
21              DOUGLASS LOCKE,
22  having been first duly sworn, was examined and
23  testified as follows:
24       JUDGE ESSEX:  Please be seated and
25  good morning.
```

Page 1112

```
 1          DIRECT EXAMINATION
 2  BY MR. DeFRANCO:
 3       Q.   Good morning, Dr. Locke.
 4       A.   Good morning.
 5       Q.   You are Motorola's expert on the '430
 6  patent; is that correct?
 7       A.   Yes, that's correct.
 8       Q.   You should have a couple of binders
 9  next to you.
10       MR. DeFRANCO:  Your Honor, we passed
11  them out ahead of time this morning to save
12  some minutes.
13       JUDGE ESSEX:  Thank you.
14  BY MR. DeFRANCO:
15       Q.   I just want to look at those briefly,
16  sir.  The first binder, sir, in the front
17  should have your direct witness statement, if
18  you could take a look at that, please.
19       A.   Yes, it does.
20       Q.   And there were some corrections made,
21  but at the back, there is a date of September
22  22nd, 2011.  Do you see that?
23       A.   September 27th, yes.
24       Q.   Yes, sir.  Is that your signature?
25       A.   Yes, it is.
```

Page 1113

```
 1       Q.   Does this reflect answers to questions
 2  that you have given as your direct testimony in
 3  this case?
 4       A.   Yes, it does.
 5       Q.   I will just note for the record that
 6  to streamline some things, we have taken out
 7  some prior art.  That's why there is some
 8  blanks with respect to some answers just for
 9  information purposes for the record.
10       And if you wouldn't mind turning to
11  the second binder, sir.  In the front there
12  should be your rebuttal witness statement.
13       A.   One moment.  Yes.
14       Q.   Once again, sir, do you see your
15  signature at the back of that dated September
16  27th, 2011?
17       A.   Yes, I do.
18       Q.   And does this rebuttal witness
19  statement contain your answers to questions
20  that were posed to you, sir?
21       A.   Yes, it does.
22       Q.   Thank you very much.
23       MR. DeFRANCO:  With that, we will pass
24  the witness, Your Honor.  We will be moving
25  these into evidence at the end of his
```

Page 1114

```
 1  testimony.
 2       MR. POWERS:  May I proceed, Your
 3  Honor?
 4       JUDGE ESSEX:  You may.
 5          CROSS-EXAMINATION
 6  BY MR. POWERS:
 7       Q.   Good morning, Dr. Locke.
 8       A.   Good morning.
 9       Q.   I would like to begin with the subject
10  of claim construction, and specifically on the
11  preamble of the '430 patent.  Do you understand
12  where I am starting generally?
13       A.   I think so, yes.
14       Q.   Chris, could we put the preamble of
15  the '431, claim 1 up, please.  Now, when you
16  were coming to your conclusions regarding claim
17  construction of the preamble, you were applying
18  some legal advice that had been given to you by
19  Motorola's counsel.  Isn't that right?
20       A.   That's correct.
21       Q.   You are not a patent lawyer, not
22  skilled in interpreting claims; is that fair?
23       A.   I'm certainly not a patent lawyer.
24       Q.   Okay.  And one of the pieces of
25  guidance which you received from Motorola's
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  counsel as to whether a preamble was limiting,
2  you understood that was one of the issues,
3  didn't you?
4      A.   Yes.
5      Q.   One of the pieces of guidance that you
6  received from Motorola's counsel as to whether
7  a preamble was limiting was whether it was
8  needed to give life, meaning, and vitality to
9  the claim as a whole.  That's one of the things
10  you were told, right?
11     A.   Yes.
12     Q.   And applying that reasoning, you
13  concluded that the preamble was limiting.
14  True?
15     A.   Using that criterion as well as a
16  couple others, yes.
17     Q.   Now, you concluded that the preamble
18  was limiting and then your next conclusion was
19  that the preamble was indefinite.  Isn't that
20  true?
21     A.   I don't believe I opined that the
22  preamble was indefinite.
23     Q.   You did conclude that the term
24  hardware or software components in the preamble
25  is indefinite, right?

1      A.   Yes, that's correct.
2      Q.   Now, Chris, could you pull up just the
3  preamble, please, so we have that in mind.
4  Your interpretation, your opinion that you
5  rendered in the case was that the portion of
6  the preamble which says hardware or software
7  components can't be understood, it is
8  indefinite, right?
9      A.   That's correct.
10     Q.   All right.  So, Chris, let's blank
11  that part of the preamble out, please.  Just
12  cover it with an X or highlight it with black
13  or white.
14          I take it you would agree with me that
15  if you removed the portion of the preamble
16  which you thought was indefinite and couldn't
17  be understood, the preamble as a whole doesn't
18  make sense either, does it?
19     A.   It would need to have something there,
20  yes.
21     Q.   So your opinion that you offered to
22  His Honor was that the preamble was necessary
23  to breathe life and give meaning to the claims,
24  but the preamble itself doesn't make any sense.
25  Is that fair?

1      A.   Okay.  I think you are going a bit
2  further than I actually went in my --
3      Q.   Can you answer the question yes or no,
4  please, Dr. Locke?  Is that possible?
5      A.   Not really.  I believe you are going a
6  bit further than I went --
7      Q.   I will ask you a different question
8  then.
9      A.   Okay.
10     Q.   You do agree with me that the preamble
11  without the portion that you said is
12  meaningless doesn't really make any sense.  You
13  will agree with me that far, you just did,
14  right?
15     A.   No, I did not say that the term was
16  meaningless.  I said it was indefinite.  There
17  is a difference.
18     Q.   Okay.  And indefinite means you can't
19  understand what it means, right?
20     A.   Indefinite in this case means that it
21  was used inconsistently within the patent.  The
22  inventor used the term in an inconsistent way,
23  meaning that in the context of this particular
24  patent, it is not clear what the inventor
25  meant.

1          However, I did construe the term as an
2  alternative in the event that His Honor finds
3  that it is -- is not indefinite.
4      Q.   Okay.  The question I was asking was
5  you -- your opinion was that the term for
6  hardware and software components was
7  indefinite, right?  That's a yes-or-no
8  question, I think, Dr. Locke, fairly, isn't it?
9      A.   Yes, I believe I did.
10     Q.   All right.  And by indefinite meant
11  you couldn't give it a meaning that you were
12  satisfied with in the preamble.  That's fair,
13  isn't it?
14     A.   I believe the inventor didn't give it
15  a meaning that could be fully understood,
16  that's correct.
17     Q.   All right.  So that portion of the
18  preamble, I think we can now agree, under your
19  opinion, that portion of the preamble for
20  hardware and software components, you didn't
21  think it had meaning?
22     A.   I didn't think it was clear enough
23  what the meaning was to consider it definite.
24     Q.   Okay.  And you will agree that unless
25  you have some meaning that makes sense for that

APLNDC-X0000006337

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1119

1  component, for that hardware and software
2  component as part of the preamble, the preamble
3  as a whole doesn't make sense, it has a gap in
4  it.  That's true, isn't it?
5      A.   Okay.  In this --
6      Q.   That's a yes-or-no question, Dr.
7  Locke, I think.  Can you answer it yes or no?
8      A.   I can very seldom answer questions yes
9  or no, especially when they are a bit complex
10  such as this one.
11      Q.   Well, I will ask questions which I
12  intend to be answered yes or no.  And if you
13  want explanations, your counsel has ample
14  opportunity on redirect.
15          So if you would, please, think about
16  the question that I ask and if you can answer
17  it yes or no, please do so.  Will you?
18      A.   Well, in general, I believe it is
19  important that the record be clear as to what
20  my opinion is.
21      Q.   Dr. Locke --
22      A.   In many cases, a yes-or-no answer
23  doesn't make that clear.
24      Q.   All I am asking is if you are going --
25  if your testimony under oath is that you can't

Page 1120

1  answer a question yes or no, just say that.
2  Don't give me a long explanation I didn't ask
3  for.  Is that fair?
4      A.   I believe I am supposed to answer the
5  questions as I believe will be most clear to
6  His Honor and to the Court.  I would expect I
7  will continue to do that.
8      Q.   Actually, Dr. Locke -- I don't want to
9  engage in argument with you.  I will ask
10  questions which I believe can be answered yes
11  or no.
12          If you can't answer it yes or no, say
13  so.  Fair enough?
14      A.   I will try, but that's not the way I
15  would expect to do this.
16      Q.   Well, we will see how it goes.
17          You will agree with me, and I think
18  this is a yes-or-no question, you either do or
19  you don't agree -- you will agree with me,
20  won't you, that without the phrase in the
21  preamble that you considered indefinite, the
22  preamble itself doesn't make any sense?
23      A.   I can't answer that with a yes or no.
24      Q.   Okay.  Now, let's turn to a second
25  claim construction issue, the question of

Page 1121

1  properties.  And let's bring up RDX-5, if we
2  could, please, Chris.  That's Dr. Locke's
3  illustrative, showing some claim construction
4  positions.  Here we go.
5          No, it is RDX-4.  Here we go.  And
6  that one doesn't have properties.  Okay.  Your
7  construction of properties is plain and
8  ordinary meaning.  That's right, Dr. Locke?  Do
9  you think you can answer that one yes or no?
10      A.   I am just trying to make sure I can
11  see what it is you are referring to.  Yes,
12  that's correct.
13      Q.   Now, you're not offering an opinion
14  that properties is indefinite, are you?
15      A.   I am not offering an opinion that
16  properties is indefinite, that's correct.
17      Q.   And, Chris, if we can go back to claim
18  1, let's put that up, please.  Properties
19  appears in a couple of places, and let's
20  highlight them both.  First, in the preamble,
21  it says, "hardware or software components with
22  one or more properties."
23          Do you see that?
24      A.   Yes, I do.
25      Q.   Let's highlight the whole phrase,

Page 1122

1  please, Chris.
2          And the second place it appears is in
3  limitation A, where it says, "search criteria
4  including one or more properties."  Right?
5      A.   Yes, I see that.
6      Q.   Now let's take the search criteria one
7  first.  As I understand your opinion of
8  properties, properties is any aspect of the
9  thing you are searching for.  It could be a
10  title of a file, for example?
11      A.   Yes.
12      Q.   So any search criteria would
13  inherently be a property, in your view?
14      A.   I don't think I would make that
15  statement.
16      Q.   Well, you just said that properties
17  includes anything you would search for, right?
18  Do you recall saying that a minute ago?
19      A.   I believe -- perhaps I misunderstood
20  your question.  I think you asked -- you said
21  that -- you stated that I was saying that
22  properties were any aspect of an object or a
23  component.  I don't believe you mentioned
24  search criteria in that.
25      Q.   Fair enough.  Fair enough.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1123

1      Now, under your construction of
2  properties, which is any aspect of what you are
3  searching for, there is nothing disclosed in
4  the '430 patent that's a search criteria that
5  isn't a property?
6      A.   I believe that's correct.
7      Q.   And you can't think of any search
8  criteria that isn't a property, right?
9      A.   No, I wouldn't agree with that.
10     Q.   Do you have your deposition in front
11 of you?
12     A.   Probably.
13     Q.   Could you turn to page 61, lines 12 to
14 15.  Chris, if we can get that up on the
15 screen.  Thank you.
16     "Question:  But in your reading of the
17 '430 patent, you can't think of any search
18 criteria beyond properties, right?
19     "Answer:  Nothing comes to my mind at
20 the moment."
21     Now, let's go back to claim 1.  So if
22 there are no search criteria that aren't
23 properties, the words including one or more
24 properties in 1A are redundant?  You could have
25 just said search criteria and it would have

Page 1124

1  meant the same thing under your interpretation
2  of properties; isn't that true, Dr. Locke?
3      A.   Well, I think that --
4      Q.   That's yes-or-no question, I think.
5      A.   I can't answer it with a yes or no.  I
6  can't answer it yes or no.
7      JUDGE ESSEX:  Just one moment, please.
8  I want you to quit talking over the witness.
9  Please let him finish.  I want you to quit
10 talking over the attorney.
11     I appreciate you are both doing your
12 jobs as well as you can and that, but it is
13 very hard for the court reporter and, secondly,
14 I have to follow both of you.  And when you are
15 doing stereo, I can't.
16     So if you would both watch each other
17 that way, and, Doctor, I caution you, just --
18 he is trying to be observant to your short
19 answers and that.  As much as you can, please
20 honor his wishes on that.  Your attorneys can
21 redirect you at the end of this.  Given that
22 admonition if you can follow it as best you
23 can, and, again, just try to, one at a time,
24 please.  Go ahead.
25     And I apologize for the interruption.

Page 1125

1      MR. POWERS:  Thank you, Your Honor.
2  BY MR. POWERS:
3      Q.   You earlier testified, Dr. Locke, that
4  you couldn't think of any search criteria that
5  wouldn't be a property.  You recall just saying
6  that?  That's a yes or no, I think.
7      A.   I believe that's what I said in my
8  deposition at that time, yes.
9      Q.   Okay.  So if all search criteria are
10 properties under your construction of
11 properties, you could end limitation A after
12 search criteria, delete "including one or more
13 properties" and it would mean the same thing?
14 That's true isn't it?  Yes or no.
15     A.   I can make short answers but making
16 yes or no answers is going to be very, very
17 difficult for me.
18     Q.   Let's try a short one.
19     A.   First, I didn't agree that search
20 criteria only includes properties.  I haven't
21 considered the question as to whether there are
22 more than -- more things than search criteria.
23 Whether that's redundant is a different
24 question because the phrase one or more
25 properties acts as an antecedent for later uses

Page 1126

1  of the term search criteria and properties.
2      And the properties for the search
3  criteria.  So I don't consider them redundant
4  for the reason that they are using -- being
5  used as a an antecedent in the later
6  limitation.
7      Q.   As you sit here now, you -- well, in
8  your witness statement and in your deposition,
9  you have not identified any search criteria
10 which wouldn't be a property under your
11 definition.  That's fair, isn't it, Dr. Locke?
12     A.   I don't believe I have, because I have
13 not considered that question, yes.
14     Q.   So if -- well, I will just leave it
15 there.  Now let's go back up to the first use
16 of properties, which is in the preamble.  And
17 it says, "hardware or software components with
18 one or more properties."
19     Do you see that?
20     A.   Yes, I do.
21     Q.   Now, in your opinion, all components
22 in the context of the '430 patent have one or
23 more properties, right?
24     A.   Yes.  In fact, the patent actually
25 says that in at least two places.

Page 1127

1  Q.   So in your view, in the preamble, the
2  terms "with one or more properties," that
3  phrase doesn't add anything to the meaning
4  because all components have properties under
5  your construction of properties?  That's true,
6  isn't it?
7      A.   It is true that all components have
8  properties according to the patent, and it is
9  also true that the use of that phrase provides
10  an antecedent for later limitations.
11     Q.   But it doesn't add any meaning to the
12  term components, does it, because all
13  components have properties?  It doesn't narrow
14  or define components in any way, does it?
15     A.   I believe it does not narrow down what
16  a component is, that's correct.
17     Q.   And search criteria, one or more
18  properties doesn't narrow the search criteria
19  either for the same reason.  Isn't that true
20  under your interpretation?
21     A.   Again, I haven't stated that search
22  criteria have nothing but properties in them.
23     Q.   But you haven't identified any search
24  criteria that aren't a property under your
25  definition.  That's fair, isn't it, Dr. Locke?

Page 1128

1      A.   That's correct.
2      Q.   All right.  Now, the term properties
3  was actually added during the prosecution
4  history of the '430 patent, wasn't it, Dr.
5  Locke?
6      A.   Yes, that's correct.
7      Q.   Could you -- so -- well, let's do it
8  in order.  Could you turn to JX-4?
9           MR. POWERS:  And, Your Honor, the file
10  history is lengthy, so we have the entire thing
11  available, but we're only going to have
12  excerpts in the binders that we're referring
13  to.
14           JUDGE ESSEX:  All right.
15  BY MR. POWERS:
16     Q.   Could you turn to JX-4 at page 983.
17  And 983 is the .0983 in the bottom right-hand
18  corner.  Let me know when you have found it.
19  Do you have page 983, Dr. Locke?
20     A.   Yes, I do.
21     Q.   You are familiar by this point with
22  how a file history reflects material that's
23  added or deleted from a claim that's being
24  amended?
25     A.   Yes, I am.

Page 1129

1      Q.   And looking at page 983, you know that
2  if something is underlined in a claim that says
3  amended, that's material that's being added at
4  that point?
5      A.   Yes, I believe that's correct.
6      Q.   And material with brackets is portions
7  of the claim that were in the immediately prior
8  version that are being deleted.  Is that your
9  understanding?
10     A.   That is my understanding.
11     Q.   All right.  So we're at page 983 of
12  the file history.  And this is where in the
13  prosecution of the '430 patent, the term
14  properties in both locations, preamble and
15  modifying search criteria, were added.  Isn't
16  that right?
17     A.   I believe that's correct.  Let me just
18  check it here.  Yes, I believe that's correct.
19     Q.   So in the file history of the '430
20  patent, before this time, limitation A just
21  said, "specifying a target hardware or software
22  component search criteria," without limiting
23  the type of criteria.  That's fair, isn't it?
24     A.   Yes, I believe that's correct.
25     Q.   At this point in the prosecution

Page 1130

1  history, the applicant added the phrase,
2  "including one or more properties" to modify
3  criteria at that point.  True?
4      A.   Yes, I believe he did.
5      Q.   Similarly, in the preamble, the term
6  hardware and software components with the other
7  changes there were not modified previously by
8  the term with one or more properties.  Do you
9  see that?
10     A.   Yes, I do.
11     Q.   And that phrase was added to qualify
12  or modify the term hardware and software
13  components.  That's true, isn't it?
14     A.   Well, it was added to respond to the
15  examiner's disallowance of this claim as being
16  indefinite.
17     Q.   And with this language, the claim was
18  allowed as definite, wasn't it?
19     A.   The examiner did allow the patent to
20  be filed.  So I can't speak for what the
21  examiner believed or didn't believe.
22     Q.   But the examiner dropped
23  indefiniteness rejections and issued the
24  patent.  That's true, isn't it, Dr. Locke?  I
25  think that's a yes or no.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   I believe that is, yes.
2    Q.   All right.  Now, you understood from
3  your reading of the prosecution history that
4  the addition of properties in both of those
5  modifying phrases was intended to make the
6  claim more specific, narrower.  That's what you
7  understood from reading the prosecution
8  history, didn't you?
9    A.   I believe the patentee expressed that
10  the reason he was making the changes was to
11  overcome the objection of being indefinite.
12    Q.   And more precisely, to make the claim
13  more specific.  That's what you understood.
14  True?
15    A.   I want to check and see what the words
16  were that he used, but it was something along
17  that line.
18    Q.   Actually, let's go to your deposition
19  at page 66, line 24 through 67, 14.  Let's get
20  that up on the screen, please, Chris.
21       "Question:  Is it your opinion that
22  both of those additions of including one or
23  more properties and with one or more properties
24  were unnecessary because they were redundant of
25  what was already present in terms of search

1  criteria and the nature of components?
2       "Answer:  I believe, again, I'm not an
3  expert in patents, but I believe the inventor
4  was responding to an office action in which the
5  claims were disallowed because of being
6  indefinite.  He was trying to make them more
7  specific.
8       "So I believe he added these phrases
9  and changed the word processing, for example,
10  to try to make them more specific.  And so he
11  added them for that purpose."
12       That was your testimony at deposition,
13  Dr. Locke?
14    A.   Yes.
15    Q.   Now let's go back to the claim,
16  please, Chris.  As I understand -- and let's go
17  back -- get back to claim 1.  Let's highlight
18  each instance where one or more properties --
19  hardware and software components with one or
20  more properties and search criteria including
21  one or more properties is found.
22       As I understand your opinion regarding
23  invalidity, it is your belief that a prior art
24  system that would search for files by their
25  names would meet the limitations of claim 1 of

1  the '430 patent; is that fair?
2    A.   Yes.
3    Q.   Now, such prior art search systems
4  that would search for files by name were very,
5  very well-known at the time of the '430
6  application being filed, right?
7    A.   Yes.
8    Q.   And anybody skilled in the art would
9  know of dozens of them that would do that,
10  right?
11    A.   I can't speak for dozens, but one of
12  ordinary skill in the art should be aware that
13  that's been done, yes.
14    Q.   Not just once or twice, but done
15  routinely.  That's fair, isn't it?
16    A.   It was not an uncommon situation.
17    Q.   UNIX, which is one of the prior art
18  references you rely upon, was very well-known
19  at the time of the application of the '430
20  patent, right?
21    A.   Yes.
22    Q.   And specifically the UNIX find feature
23  on which you rely was very well-known by those
24  skilled in the art at this time, right?
25    A.   Yes.

1    Q.   So the examiner, being one skilled in
2  the art, would understand what you just
3  testified one skilled in the art would know,
4  that it is routine to find files using search
5  criteria, including the title of the file?
6    A.   I can't speak for what the examiner
7  might have known.  I don't even know who the
8  examiner was for sure in this patent.
9    Q.   Well, but if the examiner was doing
10  his job, his or her job, as I understand your
11  testimony, it would have been very, very easy
12  for that examiner to find any one of those
13  many, many references showing the ability to
14  search for files by their name.  That would
15  have not been difficult, right?
16    A.   I can't conclude what the examiner
17  looked at or didn't look at, or what the
18  examiner was thinking or not thinking.
19    Q.   My question, Dr. Locke, I actually
20  didn't ask what the examiner did look at or
21  what the examiner was thinking.  My question
22  was, it would have been very easy for that
23  examiner to find prior art references that
24  searched for files by name because they were
25  all over the prior art.  That's fair, isn't it?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   I would think that possibly an
2  examiner who wanted to look might have found
3  something like that.
4    Q.   And, in fact, an examiner in this
5  space prosecuting this application, if they
6  looked at UNIX would find, in your view, a
7  reference that easily anticipates these claims.
8  That's true, isn't it?
9    A.   Well, we haven't been through all the
10  claims in this discussion, but I believe it is
11  possible that if the examiner was familiar with
12  it, that he might have found it, but I just
13  can't speak for how the examiner does his job.
14    Q.   Well, you do know that the examiner is
15  supposed to search in the relevant technology
16  space for prior art that would do what the
17  claim does.  You know that's part of the
18  examiner's job, right?
19    A.   Yes.  But it is clear here that I am,
20  in my testimony, that -- in my opinion, that
21  the claim is invalid.  I am obviously going to
22  be disagreeing with the examiner in various
23  decisions and things that he may or may not
24  have gotten.
25    Q.   You also know that this particular

1  examiner was aware of the UNIX program because
2  it was referenced in the '430 specification.
3  You know that, don't you?  I think that's a yes
4  or no.
5    A.   No, it is not quite a yes or no, but
6  it is not a long answer.
7    Q.   Let's see how it goes.
8    A.   Certainly the word UNIX shows up in
9  this patent, so he would be aware that it would
10  be in the patent.  Whether he is aware of UNIX
11  as a concept or has used it or understands it,
12  I don't know.
13    Q.   And you are aware that the examiners
14  who are charged with prosecuting patent
15  applications or examining them are in a
16  technology area with which they are familiar,
17  putting aside the exact qualifications of this
18  particular examiner, you know as a general rule
19  that's true, don't you?
20    A.   As a very general rule, I would expect
21  that to be true.  I have seen many cases,
22  however, where the examiner seemed not to be
23  aware of things that I might have expected an
24  examiner might be aware of.
25    Q.   You are aware that in this case, with

1  this '430 patent, the examiner actually never,
2  ever rejected any claim based on prior art.
3  You're aware of that, aren't you?
4    A.   I am aware of that, yes.
5    Q.   So in your view, the examiner just
6  completely blew it, was unaware of this
7  ubiquitous prior art searching for files by
8  names, or perhaps did you conclude the examiner
9  used a different definition of properties than
10  you did?
11    A.   I do not believe the examiner used a
12  different version of properties -- or different
13  definition of properties.  I do believe the
14  examiner made a mistake in not identifying
15  prior art, yes.
16    Q.   So the examiner who is skilled in this
17  technology space was just completely unaware of
18  and completely unable to find any of these
19  ubiquitous prior art references that would
20  search for a file by its name?  That's your
21  view?
22    A.   I can't speak for what he was able or
23  not able to do.  The fact is that the record
24  does not show in the prosecution history that
25  he did identify some -- some prior art elements

1  that I believe he might have known about.
2    Q.   Well, you do know that the examiner
3  did conduct a prior art search.  You know that,
4  don't you?
5    A.   I assume that he did.
6    Q.   Well, actually, you know that, don't
7  you, from the face of the patent?  Chris, let's
8  go to the face of the patent and bring up the
9  field of search section.
10       You're aware from your knowledge of
11  patents that one of the things an examiner does
12  in every application is conduct a prior art
13  search, right?
14    A.   That is one of the things an examiner
15  is expected to do, yes.
16    Q.   And the file history reflects where
17  that examiner searched in the prior art, right?
18    A.   I believe it does.
19    Q.   So you do know that the examiner
20  actually conducted a search based on the
21  records in the Patent Office, right?
22    A.   There is a reference to a search that
23  was done, so I would assume he did a search.
24    Q.   All right.  So it is not just the
25  examiner didn't search.  The examiner either

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1139

1  disagreed with you about properties or just
2  didn't find anything in the entire prior art
3  that had searching for a file by name. That's
4  your view of the two alternatives?
5      A.   I think that's probably fair, but I
6  certainly don't agree that he had some other
7  understanding of properties than what was known
8  to one of ordinary skill of the art and is
9  expressed in this patent.
10     Q.   Well, you don't actually know what
11 definition the examiner applied for properties,
12 do you?
13     A.   He didn't actually say.
14     Q.   And you do know that before the term
15 properties was added in the claims, the claims
16 were being rejected for indefiniteness. Yes?
17     A.   Yes, they were being disallowed for
18 indefiniteness, but there are a number of
19 reasons why that was true. And he identified
20 those and he did not say specifically that
21 properties was one of them.
22     Q.   Well, properties couldn't have been
23 the reason for rejecting it because the term
24 properties didn't exist before it was added in
25 the patent -- in the claims. That's true,

Page 1140

1  right?
2      A.   That's true.
3      Q.   Okay. So before the term properties
4  was added to the claims, the claims were being
5  rejected by the examiner for indefiniteness.
6  That's true, isn't it? I think that's a yes or
7  no.
8      A.   Yes, he expressed a number of reasons
9  why he considered them to be indefinite.
10     Q.   And after the term properties was
11 added twice, the claims were allowed. That's
12 also true, right?
13     A.   Actually, properties were added only
14 once, and he did not raise a further objection
15 in terms of indefiniteness.
16     Q.   All right. And you just don't know
17 one way or the other whether the examiner was
18 using the term properties in a narrowing sense,
19 meaning components with only properties in a
20 narrowing sense and search criteria with
21 properties in a narrowing sense or in a broad
22 sense, you don't know one way or the other
23 because the examiner didn't say. That's fair,
24 isn't it?
25     A.   It is true that I don't know one way

Page 1141

1  or the other because the examiner didn't say.
2  However, the term properties was well-known in
3  the art and he would have had no reason to try
4  to narrow it in some arbitrary way that is not
5  expressed in the patent.
6      Q.   In the context of the '430 file
7  history specifically, the file history
8  distinguishes between properties and names,
9  doesn't it?
10     A.   I'm sorry, could you ask that question
11 again?
12     Q.   Certainly. You have taken the
13 position that searching by name can be
14 searching by a property, right?
15     A.   Yes.
16     Q.   Now, it is true that in the file
17 history of the '430 patent, there is a
18 distinction drawn between properties and names,
19 isn't there?
20     A.   I'm not aware of that, no.
21     Q.   Now, let's go to the file history
22 then. Let's go to JX-4 at page 963, please,
23 Chris.
24         Let me know when you have it. Are you
25 there, Dr. Locke?

Page 1142

1      A.   I am there, yes.
2      Q.   Page 963 of JX-4 is how the claims
3  read before they were amended to add properties
4  in the preamble and in limitation A. That's
5  true, isn't it?
6      A.   Yes.
7      Q.   And in the remarks that accompanied --
8  so at this point -- let's take it this way, at
9  this point in the claims, search criteria is
10 not modified by one or more properties and
11 components are not modified by one or more
12 properties, right?
13     A.   That's correct.
14     Q.   Can you turn to page 968? Do you
15 recognize that this is the portion of the
16 applicant's remarks that accompany the
17 amendment that we just looked at on page 963?
18     A.   Yes.
19     Q.   Chris, could you blow up the bottom --
20 let's blow up the entire second paragraph,
21 please.
22         Dr. Locke, at the bottom of that
23 paragraph, there is a discussion of what the
24 search criteria can be at this stage of the
25 claim where there is not a modifier on search

APLNDC-X0000006343

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  criteria, right?
2      A.   I see a sentence that says what search
3  criteria can be.
4      Q.   And, in fact, what the applicant says
5  at this point in the claim when the claim is
6  unmodified is that the search criteria can be a
7  variable, such as TPropertyQuery, or it could
8  be a user input, such as the name of the file.
9  Do you see that?
10     A.   Yes.
11     Q.   And you understand that
12  TPropertyQuery, as I have just highlighted, as
13  being something looking for a property in the
14  '430 patent, right?
15     A.   Yes.
16     Q.   So in this place in the file history
17  when the claim is unmodified about search
18  criteria, it is saying it can be either a
19  property or a name of a file.  That's what it
20  says, right?
21     A.   Yes.
22     Q.   All right.  Now, you read the
23  deposition of Mr. Nguyen, the inventor of the
24  '430 patent?
25     A.   Yes, I did.

1      Q.   And you understand that his testimony
2  is relevant to understanding what he considered
3  to be his invention?
4      A.   Well, I certainly read his testimony
5  and he believes certain things about what was
6  in his invention, yes.
7      Q.   And, in fact, you understand and
8  believe that it is important that the claims
9  reflect what the inventor thought his invention
10  was.  That's one of the things you do in
11  looking at claims, right?
12     A.   Well, I certainly did review his
13  deposition to see what he said, yes.
14     Q.   That wasn't an answer to my question.
15  Could you answer the question that I asked,
16  please?
17     A.   I'm sorry.  Can you repeat your
18  question then?
19     Q.   My question wasn't whether you read
20  it.  My question was your understanding from
21  your work in this case is that it is important
22  that a claim reflect what the inventor
23  considered to be his invention.  That's true,
24  isn't it?
25     A.   Yes.  But in this case, I strongly

1  disagree that what he said was the meaning of
2  properties in the invention.
3      Q.   So you, in this case, just disagree
4  with the inventor as to what he thought
5  properties meant.  Fair?
6      A.   I am basing it entirely on the
7  invention itself, yes.
8      Q.   In fact, you strongly disagree with
9  the inventor?
10     A.   That's correct.
11     Q.   The inventor's testimony about what he
12  considered properties to be is utterly
13  inconsistent with your definition.  True?
14     A.   He made statements about intrinsic and
15  non-intrinsic properties and some were included
16  in the patent, some were not.  I believe the
17  patent does not make any such statement.
18     Q.   Is the answer to my question yes?
19     A.   Perhaps you can ask your question
20  again.
21     Q.   The inventor's statement about what he
22  considered to be his invention with regard to
23  properties is utterly inconsistent with your
24  definition of properties.  That's true, isn't
25  it?

1      A.   I believe it is inconsistent with the
2  patent's definition of properties.
3      Q.   And your opinion?
4      A.   It is my opinion that it is
5  inconsistent with the patent's definition of
6  properties.
7      Q.   All right.  Let's turn to a different
8  term, and let's go back to claim 1, if you
9  could, please, Chris.  Another term that you
10  addressed in your testimony is the term
11  components, do you recall that, or component?
12     A.   Yes.
13     Q.   And you considered that term to be
14  indefinite, right, that was your opinion?
15     A.   Yes, it is.
16     Q.   Now, the Patent Office obviously
17  disagreed with you because it allowed the claim
18  with the term components in it, right?
19     A.   It did allow it, yes.
20     Q.   And you will agree with me that the
21  examiner who was looking at the '430 patent
22  application was focused on the question of what
23  terms were definite and what terms were
24  indefinite, right?
25     A.   He indicated twice that he thought it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   was indefinite, so I would assume he was
2   somewhat focused on that.
3       Q.   And the examiner never said the term
4   component was indefinite, did he?
5       A.   I do not believe he did.
6       Q.   Now, there actually is a plain and
7   ordinary meaning of the term component as used
8   in skill in the art?
9       A.   Certainly.
10      Q.   And that definition is a component is
11  just an item or resource or a part of something
12  else, right?
13      A.   I would use it more broadly than that,
14  because I am not sure your defining it in terms
15  of item helps a lot.  Defining it in terms of
16  resource doesn't seem to me to help a lot, but
17  it is certainly a part of something.
18      Q.   Now, given -- so if the term component
19  -- you just saw the term component in the
20  claim, you wouldn't say that is indefinite,
21  because it does have a plain and ordinary
22  meaning?  That's fair, isn't it?
23      A.   You mean if I look at this claim
24  without looking at the specification.
25      Q.   Exactly.

1       A.   And the prosecution history, then I
2   would think I would have an idea what component
3   meant, yes.
4       Q.   And you would not consider it to be
5   indefinite?
6       A.   That's correct.
7       Q.   And the basis for your indefiniteness
8   position here is that you believe the applicant
9   used the term inconsistently, right?
10      A.   That's correct.
11      Q.   Now, let's look at your alternative
12  definition.  Your alternative definition is
13  that a component is "documents, fonts, tools,
14  shared libraries, or other system resources."
15  Right?
16      A.   I don't have it in front of me, but it
17  sounds familiar.
18      Q.   Let's bring up the '430 patent, column
19  1, please, Chris.  And specifically lines 32 to
20  34.  Let's bring up that portion.  Excellent.
21           There is a sentence here that says, "a
22  component refers to a document, font, tool,
23  shared library or other system resource."
24           That's verbatim the definition that
25  you said could be used as an alternative, if

1   the Court decides -- disagrees with you about
2   indefiniteness.  Is that fair?
3       A.   I really need to check my witness
4   statement to make sure that that's precisely
5   what I said.
6       Q.   Feel free.  I think I have read it
7   accurately, but you should definitely confirm.
8       A.   Okay, yes, I believe that's correct.
9       Q.   And you based your position on the
10  presence of this sentence that says a component
11  is the list of things that you identified, and
12  you consider that to be a definition, right?
13      A.   I based it on this sentence, but in
14  the context of several other similar
15  statements, yes.
16      Q.   Now, this discussion in column 1 of
17  the patent on which you relied is actually a
18  discussion about the prior art, isn't it?
19      A.   This statement is in the middle of the
20  section discussing the background of the
21  invention, but the statement is a general
22  statement.  It is not specifically tied to the
23  prior art.
24      Q.   Is the answer to my question yes?
25      A.   The answer that I gave was the answer

1   to the question.  I cannot really say as a yes
2   or no.
3       Q.   Chris, let's just bring up -- let's
4   scroll up, if you will, a few lines up.
5           The portion of the specification in
6   which this is found is called the background of
7   the invention, right, Dr. Locke?
8       A.   Yes, I believe I just said that.
9       Q.   And the background of the invention is
10  where the inventor is discussing the prior art
11  and the reason they think their invention is
12  needed.  True?
13      A.   That's one of the things done in the
14  background of the invention, that's correct.
15      Q.   Now, that same phrase is actually
16  discussed elsewhere in the specification, isn't
17  it?
18      A.   Which same phrase?
19      Q.   What a component refers to generally.
20      A.   There are several statements about
21  what a component is, yes.
22      Q.   If you go to the summary of the
23  invention section, you understand that's moving
24  away from the prior art to actually what the
25  applicant considers to be the invention in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1151

1   terms of the parts of an application, right?
2      A.   Yes.
3      Q.   All right.  So let's go to the summary
4   of the invention section at column 1, lines 51
5   to 54.  And here again there is a discussion of
6   what components are, right?
7      A.   Yes.
8      Q.   And it says, documents, tools, fonts,
9   libraries, et cetera, right?
10     A.   This is defining system components,
11  not components.  Let's be very careful here.
12     Q.   Exactly.  Let's highlight system, too.
13  So documents, tools, fonts, libraries, those
14  are -- that's a subset of the list that was in
15  the earlier portion of column 1 that you
16  described, right?
17     A.   Well, actually, this is showing fairly
18  clearly what I believe is the major
19  inconsistency in the definition of components
20  in the patent, if I may be allowed to discuss
21  it.
22     Q.   Go ahead.
23     A.   In the summary of the invention, it
24  defines, in this particular phrase, as is
25  highlighted here, the system components as

Page 1152

1   documents, tools, fonts, libraries, et cetera.
2   It is exactly that same phrase in the abstract
3   of the invention, which is almost word for word
4   identical to the summary of the invention to
5   define system components.
6          Clearly, as phrased here and as
7   phrased in the abstract, the patent -- the
8   inventor expected that the patent was basically
9   about system components because that's all he
10  referred to in the abstract and here in the
11  summary of the invention is system components.
12  And he defined them in each case as documents,
13  tools, fonts, libraries, et cetera.
14         Obviously, the word, et cetera,
15  expands it somewhat indefinitely, but one would
16  ask, what does the et cetera actually refer to.
17  Then when he defined component in the
18  background of the invention, as you have also
19  highlighted here, he used exactly the same
20  words or almost exactly word for word with the
21  exception of the last part.  He referred -- he
22  defined a component as a document, font, tool,
23  shared library, which is a form of library, and
24  other system resource, so here he expects that
25  a component refers to, say, a system resource

Page 1153

1   and he defines it identically with a system
2   component.
3          Hence, we see one of the major reasons
4   why this is an indefinite term in this patent.
5   He seems to think component and system
6   component are the same thing here, yet he later
7   uses the terms separately and, in fact, he
8   juxtaposes system component, network component,
9   and interapplication component as being all
10  parts of a whole.
11         The whole thing together, to me, leads
12  me to believe that this is an inconsistent use
13  of component and, therefore, makes the term
14  indefinite in this, in this context.
15     Q.   Thank you.  That is very helpful to
16  understanding the basis of your opinion.  As
17  you believe one skilled in the art would read
18  these two highlighted portions together,
19  component would be the universe and system
20  components would be a subset of components.
21  Fair?
22     A.   As one of ordinary skill in the art,
23  that's what I would have expected.
24  Unfortunately, that's not what I see that the
25  inventor did.

Page 1154

1      Q.   So system components, you would expect
2   to be included within components, right?
3      A.   As one of ordinary skill in the art, I
4   would expect that to be true.
5      Q.   So overlap between system components
6   and components would not be surprising because
7   all system components are components.  True?
8      A.   Overlap is not surprising.  Defining
9   one as the same as the other would be
10  surprising.
11     Q.   The term, et cetera, in the second
12  definition would lead you as one skilled in the
13  art to think that it is not limiting, that
14  there are other things that can be system
15  components, right?
16     A.   That's correct, but I would expect it
17  to not be broader than the term component,
18  which is what he also defined.
19     Q.   So the entirety of your basis for your
20  opinion on inconsistency is the absence of the
21  word et cetera in the abstract, in the
22  background of the invention section?
23     A.   It is a little more than that.  It is
24  the fact that he defines component itself to be
25  the same as a system component, where as one of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ordinary skill in the art, I would expect a
2   system component to be a subset of components,
3   he has got it taking over the entire set.
4       Q.   So if the statement in the background
5   of the invention said, et cetera, it wouldn't
6   be inconsistent, because there would be things
7   in the component that would be unstated, but
8   perhaps different from system components.
9   That's fair as one skilled in the art would
10  read it?
11      A.   If he had chosen to say, et cetera, it
12  would have at least broadened it to where that
13  might be a possibility.
14      Q.   All right.  Now let's go to the
15  detailed description of the invention at column
16  5, lines 64 to 65.  Let's bring that up,
17  please, Chris.  And let's go up -- well, let's
18  get a little more context with it.  Let's go up
19  a few lines and broaden it, but include 64 and
20  65.  There we go.
21          This is a portion of the detailed
22  description of the invention, right, Dr. Locke?
23      A.   I believe it is.  Let me just check to
24  make sure where I think we are.
25      Q.   No problem.

1       A.   Do I have a copy of the patent here?
2       Q.   It is JX-1, if you want to refer to
3   it.
4       A.   Yes, we are in this section on the
5   detailed description.
6       Q.   And here the applicant -- the inventor
7   uses similar language that you relied upon in
8   the background of the invention to describe the
9   general concept of component, but also adds the
10  word et cetera that you found missing from the
11  background.  That's true, isn't it, Dr. Locke?
12      A.   Yes.  It also says can be.  Um-hum.
13      Q.   So let's take your alternative
14  construction for a minute and apply it to the
15  claims.  In your view, as you apply the term
16  component and hardware component, hardware and
17  software components, those mean all the same
18  thing, they are coextensive, true?
19      A.   Well, the term hardware component is
20  never used in the patent, other than in the
21  claims.  So it is pretty hard to determine what
22  exactly is coextensive with what.
23          I'm not sure I understood your
24  question completely, though.  Perhaps you could
25  show me the language you are referring to.

1       Q.   Let's go to your deposition at page
2   81, line 23, to page 82, line 2.
3           "Question:  Would you agree that the
4   phrase hardware or software components is no
5   broader than the generic term components in the
6   context of the '430 patent?
7           "Answer:  I would agree that it's no
8   broader, that's correct."
9           Do you agree it has the same scope as
10  well?
11      A.   I would agree it is no broader.  Is
12  that what your question is?
13      Q.   Now, your definition of system
14  component is the same as your definition of
15  component, right, same definition?
16      A.   Well, it is not my definition.  You
17  mean the definition that we propose?
18      Q.   Precisely.
19      A.   I'd have to check to be sure.
20      Q.   Feel free if you need to confirm.
21      A.   I think you have a demonstrative that
22  has all these on it.  It would be easier if you
23  showed me the demonstrative, I would think.
24      Q.   If you had a demonstrative that said
25  that, I would be showing it to you.  Trust me.

1       A.   Okay.
2       Q.   Perhaps this will make it easier.  If
3   you want to look at your deposition, page 87.
4   Maybe this will be a little faster for you.  87
5   -- actually, 86, lines 6 to 9 is probably the
6   quickest place.
7           "Question:  And your alternate
8   construction for hardware or software
9   components is system components, network
10  components, or application components, right?
11          "Answer:  Yes.
12          "Question:  So in your opinion, claim
13  1 covers adding support for system components
14  and network components and application
15  components, correct?
16          "Answer:  Yes."
17          That was your testimony, Dr. Locke?
18      A.   I'm not seeing the same section.
19  Maybe I am looking at the wrong page.  I
20  thought you said 87.  I'm sorry.
21      Q.   I was reading from 86.  I'm sorry.  I
22  switched on you.  But I am just trying to help
23  speed up your confirmation of what your opinion
24  was.
25      A.   I believe that's correct, then.

13 (Pages 1155 to 1158)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   And under your alternative definition,
2  system components means the same thing as
3  components generically, right?
4    A.   This would help a lot -- there is a
5  table that I thought I had in my witness
6  statement that summarizes each of the proposed
7  constructions of each of the parties, including
8  my own.
9    Q.   Let's look at your deposition at page
10  87, lines 17 to 20.
11    A.   Unfortunately, the deposition, while
12  it is helpful item by item, it would be easier
13  to see the thing in context.
14    Q.   "Question:  And as we have covered,
15  your definition of system components is
16  coextensive with your construction of
17  components generically, right?
18        "Answer:  Yes."
19        That was your testimony, right, Dr.
20  Locke?
21    A.   I believe that was an answer in --
22  after a long sequence of questions, and I am
23  trying to determine exactly what the context of
24  that was, as well as trying to find the chart
25  that I had that lists the various constructions

1  by each of the parties.
2    Q.   Is the answer to the question I asked
3  yes?  That was your testimony?  That's all I
4  asked, Dr. Locke.
5    A.   Let me take a look at the context
6  here.  I believe I did make that answer.
7    Q.   Thank you.  Let's go to claim 3,
8  please, Chris.  You recognize claim 3 of the
9  '430 patent, Dr. Locke?
10    A.   Yes.
11    Q.   Claim 3 says -- is dependent on claim
12  1, "wherein the hardware and software
13  components include system components."  Do you
14  see that?
15    A.   Yes.
16    Q.   So in your mind, under your definition
17  of components, that's really sort of redundant
18  of claim 1, since all of those are included in
19  claim 1.  Right?
20    A.   Well, you will recall earlier we
21  looked at the definition of components in the
22  patent, and identified that he used the term
23  component and the term system component in
24  exactly the same way with exactly the same
25  definition.

1        So, yes, in this case, claim 3 would
2  be redundant relative to claim 1.
3    Q.   And it is, in your view, under your
4  construction of components, meaningless to add
5  wherein the hardware and software components
6  include system components, because under your
7  definition of hardware and software components,
8  it automatically does so, true?
9    A.   If that's asking again, are they
10  redundant, I believe they are redundant with
11  claim 1.
12    Q.   Okay.
13    A.   The constructions I used are directly
14  taken from the statements of the inventor.
15    Q.   Let's move to a separate term, which
16  is the term querying the operating system.
17  And, Chris, let's bring that up in claim 1 so
18  that we have it all in front of us.  It is
19  limitation B.
20        Now, your construction of this
21  querying the operating system limitation in B
22  is making a system call, right?
23    A.   I believe that's correct, yes.
24    Q.   Now, when we asked you at your
25  deposition how you were applying that, you

1  added to your definition that you gave to the
2  Court, right?  You said making a system call to
3  the kernel of the operating system, right?
4    A.   I don't believe I added to it, but I
5  did make the statement that one of ordinary
6  skill in the art would understand that making a
7  system call means passing through the
8  protection layer between the application level
9  and the kernel level of the operating system.
10    Q.   Well, you will agree with me that your
11  claim construction as offered to the Court did
12  not include the concept of making a system call
13  to the kernel explicitly?  It just said making
14  a system call, close quote, right?
15    A.   That's what the quote says, yes.
16  That's the words that were used, yes.
17    Q.   All right.  Now, the actual claim
18  language is querying the operating system.
19  True?
20    A.   That's true.
21    Q.   Now, an operating system includes a
22  kernel, right?
23    A.   Yes, it does.
24    Q.   But it is not limited to a kernel, is
25  it?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1163

1    A.   Not necessarily.
2    Q.   In fact, the ordinary meaning of
3  operating system in the claims is broader than
4  a kernel, right?
5    A.   The meaning as used in this patent
6  appears to be broader than the kernel, yes.
7    Q.   And, in fact, the meaning of an
8  operating system in the context of the '430
9  patent explicitly includes, in addition to the
10  kernel, the use of frameworks as part of the
11  operating system.  That's true, isn't it?
12    A.   That's true, but I believe that the
13  process here of querying the operating system
14  would still need to include capabilities that
15  are in the kernel.
16    Q.   The '430 patent repeatedly talks about
17  the use of frameworks in the process of
18  querying.  True?
19    A.   Well, in terms of its preferred
20  embodiment, it refers to frameworks, yes.
21    Q.   Repeatedly.  True?
22    A.   Several times.
23    Q.   All right.  Now, and, in fact, the
24  ordinary meaning of operating system includes
25  such frameworks, right, beyond the kernel?

Page 1164

1    A.   The ordinary meaning actually doesn't
2  always include the frameworks.  The frameworks
3  are usually considered to be middleware that
4  operate on top of the operating system.  In
5  some cases, the operating system does include
6  some of the middleware where it is used by the
7  applications.  It is not always -- in fact, it
8  is not even necessarily common that the
9  frameworks would be considered part of the
10  operating system.
11    Q.   But in the context of the '430 patent,
12  your understanding that one skilled in the art
13  reading that patent would understand that the
14  frameworks are part of the operating system?
15    A.   I believe that's not inconsistent with
16  what the patent is saying, yes.
17    Q.   Is the answer to my question yes?
18    A.   I believe that the use of -- inclusion
19  of framework as part of the operating system is
20  not inconsistent with the patent.  It is not
21  quite the way you asked the question.  I was
22  trying to be clear.
23    Q.   Would one skilled in the art reading
24  the '430 patent understand that the operating
25  system as used in the claim included

Page 1165

1  frameworks?  Yes or no.
2    A.   I believe that one skilled in the art
3  probably would consider that frameworks could
4  be part of the operating system as used in the
5  patent.
6    Q.   I would like to read your deposition
7  at page 102, lines 17 through 21.
8    "Question:  Is it correct to say that
9  the application framework of Android you are
10  considering part of the operating system as the
11  term operating system is used in the '430
12  patent?
13    "Answer:  In my analysis here, yes."
14    And also read from page 107, line 5
15  through line 9.
16    "Question:  As we discussed, the use
17  of the phrase operating system that you've
18  implied in your infringement of the '430 patent
19  includes the application framework of Android,
20  correct?
21    "Answer:  Yes."
22    A.   That confirms what I just said.
23    Q.   I didn't ask you a question yet, Dr.
24  Locke.  Now, in your witness statement, to
25  support your construction of querying the

Page 1166

1  operating system as making a system call, you
2  rely on column 4, lines 47 to 52 of the '430
3  patent.  And if you wish to confirm that, let's
4  look at RX-1874, your witness statement, at
5  page 57.  That's your initial witness
6  statement, Dr. Locke.
7    A.   Yes.
8    Q.   Let's put that up.  And it is the
9  bottom paragraph, the answer to question 110,
10  please, Chris.
11    Dr. Locke, do you see that question
12  110 is addressing your construction of the term
13  we're discussing here, querying the operating
14  system?
15    A.   Yes.
16    Q.   And you say, "in contrast to Apple's
17  position, Motorola's proposed construction is
18  clearly supported by the specification.  The
19  specification's only reference to services
20  provided by an operating system is in column 4,
21  lines 47 to 52," and then you quote it.
22    Do you see that?
23    A.   Yes, I do.
24    Q.   Now, column 4, lines 47 to 52 is
25  actually talking about what it describes as the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1167

1  prior art old-style operating system such as
2  DOS or UNIX, right?
3     A.   Yes, I included that in my quote.
4     Q.   Now, in the actual '430 patent, the
5  part that you didn't include in your quote is
6  what the inventor said right after that, right?
7     A.   I can't speak from memory as to what
8  he said right after that.
9     Q.   Chris, let's bring up the '430 patent,
10 column 4.  And let's bring up lines 47 to 55.
11 And let's highlight first the portion that you
12 relied upon.
13       Do you see that, Dr. Locke, in
14 old-style operating systems, et cetera?  That's
15 the portion that you relied upon?
16    A.   Yes.
17    Q.   Starting at line 55, the inventor said
18 "when the frameworks are used, this is
19 reversed."  Do you see that?
20    A.   First of all, I would like to go back
21 --
22    Q.   My only question is, do you see that,
23 Dr. Locke?
24    A.   I cannot answer that with a yes-or-no
25 question.

Page 1168

1     Q.   Your vision is impaired?
2     A.   Apparently.
3     Q.   Do you see that on line 55 immediately
4  after the portion you quote, the patent says,
5  "when the frameworks are used, this is
6  reversed"?  Do you see that?
7     A.   Yes, I do see that but it is somewhat
8  out of context.
9     Q.   That's an answer to my question.
10 Thank you.
11       You do understand -- and I think this
12 is a yes-or-no question as well -- that the
13 '430 inventor considered the use of frameworks
14 to be part of his invention, right?  Yes or no.
15    A.   Yes, that's correct.
16    Q.   Okay.  You do understand that the
17 accused Android operating system has
18 frameworks, right?  Yes or no.
19    A.   Yes, but you are taking this
20 completely out of context in the patent.
21    Q.   All right.  Let's turn to a different
22 term, dynamically adding support.  So let's
23 bring up claim 1 and the preamble, please,
24 Chris.
25       Now, this part of the preamble, you

Page 1169

1  have offered a construction for; isn't that
2  true, Dr. Locke?
3     A.   I believe that's true.
4     Q.   And your construction of dynamically
5  adding support is "adding hardware or software
6  components with one or more properties without
7  running an installation program," right?
8     A.   I don't have that in front of me, but
9  that sounds correct.
10    Q.   And Chris has helpfully brought up a
11 portion of your witness statement.  Does that
12 help refresh your recollection, Dr. Locke?
13    A.   It does help it to just make sure we
14 didn't state it incorrectly.
15    Q.   And we have stated it correctly?
16    A.   I believe so.
17    Q.   All right.  Now, as I understand your
18 rationale for making that portion of the
19 preamble limiting is that you think it is
20 necessary to add antecedent basis for the term
21 operating system; is that right?
22    A.   Sorry, are we still talking about
23 dynamically adding support?
24    Q.   We are.
25    A.   Because your question just had to do

Page 1170

1  with an operating system.
2     Q.   It did.
3     A.   So I am not sure I understand the
4  question then.
5     Q.   All right.  Let me ask it this way.
6  We earlier discussed your understanding that in
7  general a preamble is not limiting unless it is
8  needed to give meaning to the rest of the
9  claim.  Do you recall that testimony generally?
10    A.   Well, I didn't say it quite that way,
11 no.  I said that one of the reasons that you
12 would determine whether a preamble is limiting
13 would be based on whether it gives life and
14 meaning to the rest of the claim.
15    Q.   And so what is your reason here for
16 saying the term dynamically adding support is
17 limiting in the context of claim 1 of the '430
18 patent?
19    A.   I think I expressed a couple of
20 reasons why that is -- why dynamically adding
21 support is limiting.
22    Q.   Tell us what they are.
23    A.   Okay.  First of all, the term
24 dynamically needs to be filled out as to what
25 that means, and the inventor, when they added

16 (Pages 1167 to 1170)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it, actually said in the prosecution history
2    what that meant, why they added dynamically
3    adding support.
4         And specifically, they indicated that
5    the reason they were adding the dynamically
6    adding support was specifically the word
7    dynamically is there because of the -- they
8    pointed to the abstract and the summary of the
9    invention.  Actually, I think they pointed to
10   the summary of the invention, in which it
11   states that the adding of components would be
12   done without running an installation program.
13   Q.    But that, as I understand your
14   testimony, that's how you get to a definition
15   of dynamically, which is not my question.
16        My question is, why in this case, when
17   a preamble is normally not limiting, did you
18   opine that the preamble is limiting in this
19   case with respect to dynamically adding
20   support?  I am not asking you why you thought
21   dynamically met your definition.  Why do we
22   need a definition at all?  That's the question.
23   A.    Okay.  The term dynamically is not
24   used elsewhere in the patent, and it needed to
25   be understood as part of the context of this

1    patent.  In other words, it adds life and
2    meaning to this patent.
3    Q.    Well, the word dynamically does not
4    appear in the body of claim 1 of the '430
5    patent, does it?
6    A.    It only appears in the preamble.
7    Q.    So the term dynamically in the
8    preamble does not have to be a limitation to
9    give meaning to some other term in the body,
10   because the term dynamically doesn't appear.
11   It is not antecedent basis, is it?
12   A.    The claim 1 is referring to a
13   characteristic, a capability.  It defines it in
14   four elements, but it says that it needs to do
15   it dynamically in the preamble, and I believe
16   that gives life and meaning to the use of the
17   other four limitations.
18   Q.    At the same time the term dynamically
19   was added, also the portion of element D that
20   says "adding support for the hardware and
21   software components without rebooting the
22   operating system" was added.  You recall that,
23   don't you?
24   A.    Yes, I do.
25   Q.    And that's addressing the same

1    question of adding support for the hardware and
2    software components, right?
3    A.    It is addressing the question of
4    adding support for hardware and software
5    components, but it does not address the
6    question of dynamically.
7    Q.    Well, you would agree with me, I take
8    it, that if you have to reboot the operating
9    system, that's not dynamically adding support,
10   is it?
11   A.    That's not necessarily true.
12   Q.    Do you think that it is dynamically
13   adding support if I have to go reboot the
14   entire operating system?  That's dynamic in
15   your mind?  Yes or no.
16   A.    I can't answer that with a yes or no.
17   I need to provide an explanation.
18   Q.    So in your mind, it can be a process
19   of dynamically adding support if I have to
20   reboot the entire operating system, sit there
21   while it reboots, that's dynamic?
22   A.    Can I explain?
23   Q.    No.  I want to know if it is possible,
24   yes or no.
25   A.    Well, it is.  And I can explain.

1    Q.    No.  If that's your testimony, that's
2    your testimony.
3         Now, Chris, let's put back, if we
4    could, Dr. Locke's definition.  Here we go.
5         The actual claim language says adding
6    support for hardware or software components.
7    Do you see that?
8    A.    Yes.
9    Q.    And your definition takes the word
10   support out, doesn't it?
11   A.    My definition takes -- uses the
12   language that was used by the applicants when
13   they added the phrase "adding support."
14   Q.    Is the answer to my question yes?
15   A.    Yes, and the applicants took that --
16   in defining what that meant, they did not use
17   the word adding support.  And I used what they
18   said.
19   Q.    In the claim the applicants kept the
20   word support in, didn't they?
21   A.    They did, and then they also explained
22   what they meant by that.
23   Q.    So in your mind, the applicant was
24   being careless in the claim by just including
25   superfluous claim language?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1175

1     A.   Well, the term in support is never
2  actually used in the patent at all.  So they
3  would have had trouble pointing to a part of
4  the specification that referenced adding
5  support.  The place they referenced talked
6  about adding components.
7     Q.   Well, they did use the word support in
8  the claim, right?
9     A.   They did write the word into the claim
10  but they explained what it meant in terms of
11  adding components.
12     Q.   And you understand that the purpose of
13  the claim is to define the invention, right?
14  That's the purpose of a claim as distinct from
15  a specification, you do know that?
16     A.   I do understand that.  And I also
17  understand the inventor has the right to define
18  what that means.
19     Q.   Now, Chris, could we pull up claim 7
20  of the '430 patent, please.  Claim 7 depends on
21  claim 1, right?  Dr. Locke?
22     A.   Yes, it does.
23     Q.   And claim 7 distinguishes itself from
24  claim 1 by saying, instead of adding support
25  for the hardware components, we're going to

Page 1176

1  actually add the hardware and software
2  components, right?  That's the difference
3  between claim 7 and claim 1?
4     A.   Yes, in the last update to this -- of
5  course, originally this was claim 8 in the
6  original filing.  In the last update, they
7  removed some language which would have
8  otherwise differentiated, but they ended up
9  with this one that does, in fact, say exactly
10  that, yes.
11     Q.   So in your mind, again, here the
12  applicant just made a mistake because claim 7,
13  in your view, means the same thing as adding --
14  as claim 1?
15     A.   They did end up with a claim that is
16  redundant with claim 1 in my opinion, yes.
17     Q.   But here the applicant made an
18  additional change, didn't it?  The applicant
19  included the term dynamically in the body of
20  the claim, not the preamble, right?  That's
21  true, isn't it, Dr. Locke?  I think that's a
22  yes or no.
23     A.   They did include that word, yes.
24     Q.   All right.  So if we were trying to
25  give claim 7 meaning different from claim 1,

Page 1177

1  and you understand that's the presumption,
2  right?  Do you understand the presumption when
3  you are reading claims is that you should
4  believe that the applicant didn't make a
5  mistake, you should believe at the beginning
6  that claim 7 should mean something different
7  from claim 1?  You understand that rule, don't
8  you?
9     A.   Well, claim differentiation is well
10  understood, but it doesn't always work.
11     Q.   I just asked whether you understood
12  the rule.
13     A.   Yes, I do.
14     Q.   Under your definition, claim 7 means
15  nothing in addition to claim 1, right?
16     A.   I believe that's correct.
17     Q.   All right.  Now, in your witness
18  statement -- actually, let's bring up the '430
19  patent at column 6, lines 7 to 11, please,
20  Chris.
21          Here there is a quote that says as
22  following:  "The system is designed to enable a
23  user to add components without running an
24  installation program.  To support this goal, an
25  installation program is replaced with a

Page 1178

1  location framework that provides the following
2  capabilities."
3          Do you see that?
4     A.   Yes, I do.
5     Q.   Now, that's the portion that you -- of
6  the specification that you rely to say that
7  that's -- without running an installation
8  program is, in fact, what this patent is about
9  when it is adding support for components.
10  True?
11     A.   Well, this is one of about three or
12  four places that it makes that statement, yes.
13     Q.   Well, let's bring up RX-1874, which is
14  your witness statement at page 11, question 26.
15  And it runs over to page 12, so let's bring up
16  the whole answer, please, Chris.
17          This is an answer where you are giving
18  the support for your construction that adding
19  support for components means dynamically doing
20  it without an installation program.
21          Do you see that?
22     A.   Yes.
23     Q.   And the quote from the specification
24  -- in fact, the only quote from the
25  specification that you give is the quote we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1179

1   just read from column 6, right?
2      A.   That's the one I quoted in this
3   particular context, yes.
4      Q.   And it is the only one you quoted in
5   the answer to this question.  True?
6      A.   That's true.  I believe I had
7   previously quoted, for example, the abstract
8   that makes the same statement and the summary
9   of the invention that makes the same statement.
10     Q.   If we go to page 39 of your witness
11  statement, the answer to question 79, you
12  addressed the same issue and you cite the same
13  portion, column 6, line 7 to 11, and it is the
14  only portion you cite.  Right?
15     A.   It is the portion I cited, yes.
16     Q.   And you were here for opening
17  statements when Motorola's counsel emphasized
18  this particular portion of the specification as
19  well, and emphasized the word replaced the
20  installation program with a location framework.
21  Do you recall that?
22     A.   I was not here for the opening
23  statement.
24     Q.   Sorry, I thought you were.  All right.
25        Now, you read the file history, the

Page 1180

1   entire file history of the '430 patent, so you
2   understood how different portions of the
3   specification and claims were treated, right?
4      A.   Yes.
5      Q.   Let's go to the passage of the file
6   history where this came up, so it is JX-4 at
7   page 14 originally, please, Chris.
8        Let me know when you are there, Dr.
9   Locke.
10     A.   Okay, I am there.
11     Q.   Now, Chris, could you highlight two
12  things here.  First, let's call out the bottom
13  portion of the second paragraph and the page
14  number, page 8 of 24.
15        Do you see the system is designed to
16  enable the user to add components without
17  running an installation program to support this
18  goal, an installation program is replaced, et
19  cetera, et cetera, that's the exact same
20  language from column 6 that we were talking
21  about earlier that you relied on, true?
22     A.   Yes, I believe so.
23     Q.   And this is page 8 of the original
24  application that led to the '430 patent, right?
25     A.   That's correct.

Page 1181

1      Q.   Now, we don't need to speculate about
2   what the applicant meant by that language
3   because the applicant told us in the file
4   history.  Isn't that right?
5      A.   Which language are you talking about
6   replacing, the location framework?
7      Q.   The exact language that we have been
8   talking about that you have relied upon several
9   times, that whole quote of the system is
10  designed, et cetera, and replacing -- that
11  language.  You understand what I am talking
12  about, right?
13     A.   Yes.
14     Q.   All right.  When you read the file
15  history, you saw that the applicant explained
16  what that language meant and what it applied
17  to, right?
18     A.   Perhaps you can refresh my memory.
19     Q.   You don't recall?
20     A.   Offhand, I don't recall.
21     Q.   Okay.  Let's go to page 969 of the
22  file history.  Chris, let's blow up the first
23  paragraph, if you will, please.
24        And let's first highlight claim 8
25  amended.  Let me know when you are there, Dr.

Page 1182

1   Locke.  Are you there?
2      A.   Yes.
3      Q.   You earlier said that claim 8 in the
4   file history became claim 7.  Do you recall
5   that?
6      A.   Yes.
7      Q.   And claim 7 in the actual '430 patent
8   that we looked at says, instead of adding
9   support for hardware and software components,
10  it says actually adding the hardware and
11  software components themselves, right?
12     A.   Yes, it does.
13     Q.   So this is the portion of the file
14  history where the applicant is explaining what
15  applies to the issued claim 7 where you are
16  adding the actual hardware and software
17  components, not the support.  That's true,
18  isn't it?
19     A.   That appears to be what is going on
20  here.
21     Q.   And the exact portion of the
22  specification that the applicant says that
23  relates to that claim, claim 7, where you are
24  adding the actual components, not the support,
25  is the exact same portion of the specification

APLNDC-X0000006353

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 that you keep relying upon with regard to
2 support, column 6, the other language we talked
3 about.  Isn't that true?  The exact same
4 language?
5     A.   Okay.  I believe it is pointing to
6 that same section.
7     Q.   So the applicant, in that portion of
8 the specification that you relied upon to
9 construe adding support, was specifically used
10 by the applicant not to define adding support,
11 but adding the components themselves.  That's
12 what this portion of the file history says,
13 doesn't it?
14     A.   I just need to check and see.  It
15 doesn't sound quite correct, but let me check.
16     Q.   Go ahead.
17     A.   Okay.  The patentee identified that
18 that was the same page as the detailed
19 description of the processing of these two
20 claims is found at page 8, but he references
21 lines 19 to 29, which is a large section which
22 includes the phrase that I quoted elsewhere,
23 but it has a great deal more information in it
24 than this.
25     Q.   The exact portion that you quoted is

1 within the exact portion that the applicant
2 said was relating to adding components, not
3 adding support.  That's true, isn't it, Dr.
4 Locke?
5     A.   I just said that.  It quotes a long
6 section of which the part I quoted is one small
7 part.
8     Q.   Well, in fact, the portion that the
9 applicant pointed to was page 8, lines 19 to
10 29, right?
11     A.   That's correct.
12     Q.   Let's go back to JX-14.
13         JUDGE ESSEX:  Let me just ask you, how
14 much longer are we going to be with Dr. Locke
15 this morning?
16         MR. POWERS:  This is certainly a fine
17 time for the morning break.
18         JUDGE ESSEX:  Well, that was leading
19 into my next question.  Why don't we take our
20 break and we will be back about quarter till
21 the hour.  We're in recess.
22         Dr. Locke, please don't discuss your
23 testimony or the underlying basis during
24 recess.
25         We're adjourned.

1         (A recess was taken at 10:31 a.m.,
2 after which the trial resumed at 10:45 a.m.)
3         JUDGE ESSEX:  All right.  We're back
4 on the record.  Are you ready?
5         MR. POWERS:  I am, Your Honor.
6 BY MR. POWERS:
7     Q.   Chris, can we put up claim 1 of the
8 '430 patent again, please.  And let's highlight
9 in the preamble, adding support for hardware or
10 software components, and limitation D, adding
11 support for the hardware and software
12 components.
13         Do you see the language that I have
14 highlighted, Dr. Locke?
15     A.   Yes, I do.
16     Q.   You will agree with me that that
17 language in the preamble and in limitation D is
18 functionally identical?
19     A.   The highlighted words are the same,
20 yes.
21     Q.   In limitation D, you believed that
22 that language was indefinite.  That was your
23 opinion?
24     A.   That's correct.
25     Q.   You did not take a position that that

1 language is indefinite in the preamble, did
2 you?
3     A.   I did not.  That's because the --
4     Q.   Dr. Locke --
5     A.   -- inventor chose to define what that
6 meant in the preamble.  He did not choose to
7 define what it meant in D.
8     Q.   So your position is that in the
9 specification, the exact same language was
10 defined one way in the preamble, but was left
11 silent in limitation D?  That's your position?
12     A.   Not exactly.  My position is that the
13 term, adding support for hardware and software
14 components was defined in the prosecution
15 history by the applicant, what that meant, he
16 did not similarly describe what it meant in D,
17 and the phrase adding support for hardware and
18 software components or anything about that is
19 missing from the patent specification.
20     Q.   But your position, as I understand it,
21 is the phrase adding support for hardware and
22 software components in the preamble is not
23 indefinite?
24     A.   It is not indefinite because the
25 inventor chose to define what he meant in that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1187

1  area.
2      Q.    And the same language in D is
3  indefinite under your opinion.  That's true,
4  isn't it?
5      A.    That's correct.
6      Q.    Okay.  Let's turn to the issue of
7  infringement.  And for now, I think we can
8  still stay on the public record, Your Honor,
9  but there will be a time where we will have to
10  go on the confidential record.
11          JUDGE ESSEX:  All right.
12  BY MR. POWERS:
13      Q.    Keeping the claim up and referring to
14  limitation A, do you have that in mind, Dr.
15  Locke?
16      A.    Yes.
17      Q.    Other than your position regarding the
18  indefiniteness of the term component, you have
19  no basis -- you have not asserted any basis in
20  your witness statement for non-infringement by
21  any of the accused products of limitation A.
22  That's true, isn't it?
23      A.    Let me just check my witness
24  statement, but I think that may be true.
25      Q.    Chris, let's put up page 53 of Dr.

Page 1188

1  Locke's witness statement, the answer to
2  question 121.  I think that's what you are
3  looking for, Dr. Locke.
4      A.    Probably.
5      Q.    This is of RX-1894 of the rebuttal
6  statement.  And let's bring up question 121 and
7  its answer, please, Chris.
8          Dr. Locke, do you see that on the
9  screen?
10      A.    Yes, I do.
11      Q.    You see that you asserted no ground of
12  non-infringement under Apple or the Staff's
13  construction?
14      A.    Other than the reference to the use of
15  the word components.
16      Q.    Other than your position on
17  indefiniteness?
18      A.    That's correct.
19      Q.    You understand that both Apple and the
20  Staff contend that that term is definite, true?
21      A.    Yes, I do understand that.
22      Q.    So if the Court were to adopt Apple or
23  the Staff's construction, you would not be
24  offering a position on non-infringement.
25  That's true, isn't it?

Page 1189

1      A.    Under -- well, this one discusses
2  Apple's proposed construction.  I believe
3  that's also true for the Staff's proposed
4  construction.
5      Q.    Let's go back to the claim, please,
6  Chris.  And let's turn to limitation B of claim
7  1.
8          The same is true of limitation B, that
9  putting aside your position regarding
10  indefiniteness of components, you have not
11  offered a non-infringement basis on limitation
12  B with regard to Apple or the Staff's
13  construction.  That's true, isn't it?
14      A.    I believe that's true.
15      Q.    Let's go for a moment up to the
16  preamble and the definition of the term
17  dynamically.  Your proposed construction of
18  dynamically is it means without running an
19  installation program, right?
20      A.    That's correct.
21      Q.    Now, you are familiar with the Android
22  process of generating intents and testing those
23  intents against filters and returning results
24  from those tests, that process within Android?
25      A.    Yes, I am.

Page 1190

1      Q.    During that process, no installation
2  program is run, that's true, isn't it?
3      A.    Yes.  And during that process, there
4  is no installation program, but of course it
5  only works for activities that have been
6  installed.
7      Q.    So if I install a program in 2009, it
8  is installed, it is running on my Android
9  phone, I then go through the steps of
10  specifying intent, et cetera, as described by
11  the evidence as you understand it, and I do
12  that in 2011, two years later.  Do you have my
13  hypothetical in mind?
14      A.    Yes.
15      Q.    And in 2011, no installation program
16  is being run, it was run two years ago, right?
17      A.    The process that's being described
18  using intents would not do anything at all, if
19  it had not been installed, whenever it was
20  installed.  It is the installation that
21  actually makes it added to the system in any
22  way at all.
23      Q.    Can you answer the question that I
24  asked?
25      A.    I believe I did.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1191

1    Q.   My question was in 2011.
2    A.   Yes.
3    Q.   Not in 2009.  Do you have the
4  hypothetical in mind?  The program was
5  installed in 2009 on my phone two years ago.
6  We're now in 2011, and I am running through
7  this intent process, specifying search
8  criteria, applying them against filters,
9  getting results back, all that process that you
10 are familiar with.  Okay?  And I am doing that
11 in 2011, all right?
12   A.   Yes.
13   Q.   In 2011, no installation program is
14 being run in order to perform any of those
15 steps.  That's true, isn't it?
16   A.   In 2011, no installation program is
17 being run because it was already run and that's
18 what made it work.
19   Q.   Now, in order for -- well, any program
20 has to be installed originally in order to
21 work, right?  You can't run a program that
22 hasn't been installed?
23   A.   In general, that's true.  There are
24 probably exceptions.
25   Q.   Let's turn now to limitation C,

Page 1192

1  returning hardware and --
2        JUDGE ESSEX:  Hang on just a second.
3  Go ahead.  My apology.
4        MR. POWERS:  Thank you, Your Honor.
5  BY MR. POWERS:
6    Q.   Step C is returning hardware or
7  software components meeting the target hardware
8  or software component search criteria.  Do you
9  see that?
10   A.   Yes, I do.
11   Q.   Now, as I understand it in your -- you
12 have offered an opinion that this limitation is
13 not met in the accused products, right?
14   A.   I believe so.
15   Q.   You don't dispute, do you, that the
16 search process resulting from intents and
17 comparing against intent filters produces a
18 search result, right?  You don't dispute that?
19   A.   Actually, it produces exactly one
20 search result, in contrast to the claim, which
21 says that I am returning hardware and software
22 components, plural, meeting the target hardware
23 and software component search criteria.
24   Q.   As I understand the basis for your
25 opinion in your witness statement, you are

Page 1193

1  taking the position that the accused products
2  don't meet this returning limitation because it
3  is not returned to the initiator.  Is that
4  right or to the initiating requester, was the
5  language I believe you used?
6    A.   I believe I did make that statement,
7  yes.
8    Q.   Now, the claim doesn't say to the
9  initiating requester, does it?
10   A.   The claim doesn't use that phrase, but
11 every reference in the specification does, in
12 fact, say exactly that.
13   Q.   And none of the proposed constructions
14 offered by any of the parties contains the
15 language returning to the initiating requester,
16 do they?
17   A.   That language is not included.
18   Q.   Now, let's look at -- you are familiar
19 with the Android configuration of activity
20 manager and package manager?
21   A.   Yes, I am.
22   Q.   And you are aware of the fact that the
23 intents by which an Android system requests or
24 searches for an application or an activity,
25 those intents come from the activity manager to

Page 1194

1  the package manager, right?
2    A.   Well, we would need to describe under
3  what circumstances that happens.  It does
4  happen under some circumstances, yes.
5    Q.   Well, in fact, in every case where an
6  intent is passed, it is passed from the
7  activity manager to the package manager, right?
8    A.   That's not correct.
9    Q.   Were you here for Ms. Hackborn's
10 testimony?
11   A.   I was not here, but I did take a look
12 at it.
13   Q.   You did rely on the witness statement
14 of Dianne Hackborn from Google?
15   A.   Yes, I did.
16   Q.   And you're aware that Ms. Hackborn
17 from Google was the one who wrote that code for
18 the activity manager and the package manager?
19   A.   Yes, and I am stating what I believe
20 she stated, yes.
21   Q.   Now, and you understand that according
22 to Ms. Hackborn from Google, intents in the
23 Android system are passed from the app to the
24 startActivity method.  Do you recall that?
25   A.   Again, this is not something you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    mentioned in your previous question.  Yes,
2    applications, if they are trying to start an
3    application, there is a function called
4    startActivity.  And in that, an intent is
5    passed to the application -- to the activity
6    manager.
7         Q.   All right.  So if I am in, say, a
8    viewing program and I want to go to an e-mail
9    address and I want to compose an e-mail, from
10   the viewing program, there is an intent passed
11   to the startActivity method for e-mail, right?
12        A.   That's correct, using the
13   startActivity function.
14        Q.   And that intent which is the question
15   saying I want to find an e-mail program goes to
16   the activity manager, right?
17        A.   That's correct.
18        Q.   And the activity manager sends that
19   intent to the package manager, right?
20        A.   Yes.  It sends it to the package
21   manager to resolve that intent.
22        Q.   And --
23        A.   That's not the only time that intents
24   are passed to the package manager.  That is one
25   way they can be done.

1         Q.   And in the case of the package
2    manager, if the package manager finds one
3    activity that's responsive to the intent, the
4    package manager returns that matching activity
5    to the activity manager, doesn't it?
6         A.   In fact, it always returns one, unless
7    it finds none.
8         Q.   But it returns that activity
9    specifically to the activity manager which
10   requested it, right?
11        A.   It returns an activity to the activity
12   manager that requests it, yes.
13        Q.   All right.  Let's now focus on
14   limitation D, adding support for the hardware
15   and software components to the operating system
16   without rebooting the operating system.  Let's
17   just begin for the moment with the last phrase
18   "without rebooting the operating system."
19        Do you have that in mind?
20        A.   Yes.
21        Q.   You will agree with me as part of this
22   intent resolution process where I'm calling the
23   e-mail program from the viewing program and
24   launching it, Android is not rebooting during
25   that whole process, right?

1         A.   Yes, I would agree with you.
2         Q.   All right.  Let's talk about what else
3    happens during that process, though.  When an
4    activity is started as a result of that intent
5    resolution process, there is a connection
6    created in the application framework so that --
7    well, there is a connection created in the
8    application framework of the Android operating
9    system, isn't there?
10        A.   There are actually quite a number of
11   connections that are established, just as it
12   would be for any operating system.
13        Q.   And those connections relate to the
14   new activity or application that's being added
15   to the activity stack, right?
16        A.   Right, whenever an application or in
17   this case a part of an application is being
18   executed, the operating system always maintains
19   pointers and connections to it, yes.
20        Q.   And those pointers and connections
21   which are added to the activity stack in the
22   Android operating system during this intent
23   process are not added there during the
24   installation of the application, are they?
25        A.   The ones that are associated with

1    execution would certainly not be there.  It
2    would not be connected when it is not
3    executing.
4         Q.   But those pointers and connections
5    which are added to the framework in the Android
6    operating system as part of this intent
7    resolution process are added during that
8    process, right?
9         A.   Exactly the way they would be in any
10   operating system, that's correct, throughout
11   the history of operating systems.
12        Q.   And those connections and pointers
13   that are added during this intent resolution
14   process are placed in the activity stack,
15   right?
16        A.   There is a reference that's added to
17   the activity stack, among other things, in
18   addition to a number of other references and
19   pointers, yes.
20        Q.   And those allow the activity to be
21   started without going through the whole normal
22   startup process, true?
23        A.   I'm not sure I would understand
24   exactly what your question means, so I am not
25   sure I could answer that question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1199

1    Q.   All right.  Let's turn to your
2   opinions regarding validity of the '430 patent.
3   You do recall that the -- one of the references
4   that you rely upon is the UNIX find command.
5   Do you recall that?
6    A.   Yes.
7    Q.   And you do recall that the UNIX system
8   was referenced in the specification of the '430
9   patent, but as I understand your position, the
10  find command was not specifically called out.
11  Is that fair?
12   A.   Yes, it was just referenced in the --
13  there is a list of other operating systems that
14  existed.
15   Q.   But the UNIX find command was very,
16  very, very widely known back in 1993, wasn't
17  it?
18   A.   Well, it was known by people who used
19  UNIX.
20   Q.   Very widely known throughout the
21  relevant field.  That's fair, isn't it?
22   A.   By those people who used UNIX, yes.
23   Q.   And, in fact, it was known going back
24  to the '70s, wasn't it?
25   A.   It was known by people who used UNIX,

Page 1200

1   yes.
2    Q.   Back to the '70s?
3    A.   Yes.
4    Q.   And UNIX was a well used, commonly
5   used operating system during that period,
6   wasn't it?
7    A.   It was used especially in
8   universities.  It was used in other places as
9   well, yes.
10   Q.   You will agree with me the Patent
11  Office did not cite the UNIX find command as
12  prior art against the '430 patent?
13   A.   As far as I know, they did not.
14   Q.   Now, let's talk about the UNIX find
15  command that you rely upon.  The search
16  criteria in UNIX find are either file name,
17  file size, date accessed, or number of links.
18  True?
19   A.   From my memory, I believe that's
20  correct.  I'd have to check the documentation
21  to be absolutely certain there weren't any
22  others.  I would also mention that the find --
23  UNIX is not one operating system.  There are
24  actually many implementations of UNIX.
25       Each one tends to do their own

Page 1201

1   implementation of the utilities.  Find is one
2   of those utilities.  Sometimes they add
3   additional features.
4    Q.   You will agree with me that those four
5   characteristics that you relied upon, file
6   name, file size, date accessed, et cetera,
7   apply to every file in UNIX 5.3 and later, it
8   is just everyone has a name and everyone has a
9   size, et cetera?
10   A.   Yes.
11   Q.   You are also aware that the inventor,
12  Mr. Nguyen, drew a specific distinction in his
13  testimony between file name and a property as
14  he was using that term?
15   A.   I would disagree that he drew a
16  distinction.  I think you pointed me to some
17  text earlier that you didn't allow me to
18  actually talk about that actually showed he was
19  using both of them as search criteria, and he
20  didn't distinguish them as being different as
21  far as search criteria are concerned.
22       And as you pointed out earlier, search
23  criteria is primarily associated with
24  properties.
25   Q.   You did read Mr. Nguyen's deposition

Page 1202

1   testimony?
2    A.   I did.
3    Q.   And you are aware that in that
4   deposition testimony, he disagreed strongly
5   with your view of what a property is, and
6   specifically in relation to UNIX, right?
7    A.   He does disagree with that
8   perspective, as I disagree with his perspective
9   relative to the use of the word properties.
10   Q.   You understand that Mr. Nguyen
11  testified that the UNIX file name, et cetera,
12  that you relied on, in his view, aren't
13  properties because they are just intrinsic to
14  the files, right?
15   A.   That was the view that he expressed in
16  his deposition, yes.
17   Q.   And you just disagree with that?
18   A.   That's correct.
19   Q.   That definition of properties?
20   A.   I disagree with that.  In the context
21  of this patent, I disagree with that.
22   Q.   Let's focus, then, with respect to the
23  UNIX reference you rely upon on limitation C
24  for a moment, the returning hardware and
25  software components.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1203

1        Now, the hardware and software
2   component, as you have drawn the distinction,
3   is the actual application, right?  It is not
4   merely support for it.  It is the application
5   itself.  Right?
6        A.   I wouldn't use the term application.
7   It is a component.  It is whatever the
8   component is supposed to be, a font, a
9   document, whatever.
10       Q.   The component can be a part of an
11  application, but it is not just returning a
12  name, for example, it is returning something
13  that can be run?  Fair enough?
14       A.   That's correct.
15       Q.   All right.
16       A.   It is referring to some sort of code
17  probably.
18       Q.   Executable code?
19       A.   Executable code.
20       Q.   All right.  Fair enough.
21       Now, in your witness statement, with
22  regard to UNIX, you rely specifically on the
23  print or exec commands within UNIX to satisfy
24  limitation C, don't you?
25       A.   I believe I do.

Page 1204

1        Q.   And let me ask you to get in front of
2   you, because we're going to be referring back
3   and forth to it, why don't you refer to RX-735.
4   Let me know when you have that.
5        A.   Okay.  I think I have it.
6        Q.   And that's the -- Exhibit RX-735 is
7   the UNIX reference that you are relying upon in
8   your invalidity contentions, true?
9        A.   It is the reference that I used.  I
10  also have a great deal of personal familiarity
11  with UNIX and with the find, yes.
12       Q.   But in terms of the reference that you
13  submitted to the Court as being the prior art,
14  this is the one, right?
15       A.   That's correct.
16       Q.   Now, let's talk about the exec command
17  that you are relying on for the return.  That's
18  found at page 379 of the reference.  Chris,
19  could we pull up that page.  It is the internal
20  pagination 379.  There we go.  It is a little
21  -- the shading is a little hard to read.  Can
22  we blow that up a bit, just the first half of
23  that chart and make it a little easier to read?
24       All right.  There we go.  This is
25  where in your reference Exhibit RX-735, there

Page 1205

1   is a description of the print and exec commands
2   that you say satisfy the return limitation.
3   True?
4        A.   Yes, although it is not a command.  It
5   is a parameter to the find operation.  The word
6   command there refers to what it is that it is
7   going to execute.
8        Q.   Fair enough.  Now, the exec command
9   says that what it does is "executes the given
10  command upon finding a file," right?
11       A.   It executes a command, yeah, that's
12  correct.
13       Q.   It doesn't say that it returns any
14  executable code to anything else, does it?
15       A.   Let's look at what command is in the
16  context of UNIX.  What this means is that it
17  executes any UNIX command of any sort
18  whatsoever.  It could even execute the file
19  that was found, if that happens to be
20  executable.
21       So you could choose either way.  Among
22  the commands it could execute would be a move
23  command.  It is called MV in UNIX.  There is
24  also a CP command called copying things in
25  UNIX.

Page 1206

1        So it could copy the file somewhere.
2   It could move the file somewhere.  And in doing
3   all of that, it certainly is returning it
4   potentially.
5        Q.   The portion you relied upon doesn't
6   say anything about returning anything to
7   anywhere, does it?
8        A.   The portion I relied on says that it
9   can execute the given command.  That's any UNIX
10  command.
11       Q.   Now, the print command says what that
12  will do is just print the path names of the
13  found files, right?
14       A.   Actually, to be more precise, it takes
15  the path names of the found files and puts them
16  -- sends them to the originator of the command,
17  which if it is a terminal, if it was typed in
18  by a user, would mean it would show up on the
19  terminal.
20       Q.   That's not executable code, is it?  It
21  is just a list of the names?
22       A.   That's correct.
23       Q.   Now, you referred in your earlier
24  answer to moving or copying a file as being
25  possible examples -- as being the only two

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1207

1  examples you gave of a command that might be
2  returning.  Do you recall that?
3      A.   I gave those two examples, yes.
4      Q.   Now, and you also have relied on this
5  executing command.  You will agree with me that
6  merely executing an application does not meet
7  the adding support limitation of limitation D
8  of the claim 1 of the '430 patent, right?
9      A.   Yes, I would agree with that.
10     Q.   Now, if you just move a file from one
11  directory to another, you are not adding
12  support to run a program, are you?  You are
13  moving the actual file?
14     A.   Well, I could be adding support.  For
15  example, at that time in the Windows operating
16  system, the 3.1 version, which would have been
17  the one at the time of the patent, if you moved
18  the font file into the correct directory in the
19  system, it would, in fact, enable that font
20  file to be used by applications.  And so it
21  would, in fact, be returning it and, in fact,
22  one could perhaps even say adding support, if
23  that weren't an indefinite term in this patent.
24     Q.   There is nothing in RX-735 that talks
25  about any of that, is there?  That's a yes or

Page 1208

1  no.
2      A.   I don't believe it is referenced.
3      Q.   Now, a smart folder system would be
4  moving information from one place to another,
5  right?
6      A.   Actually, a smart folder
7  implementation does a number of things.
8  Potentially it would perhaps be moving some
9  things.
10     Q.   And your opinion is that a smart
11  folder system that moves information from one
12  place to another, that that doesn't even relate
13  to this concept of adding support limitation in
14  limitation D; isn't that right?  That's your
15  opinion?
16     A.   I don't believe that's my opinion
17  exactly, no.
18     Q.   Chris, can we bring up RX-1874 and
19  page 165, Chris.
20         Let me know when you have that, Dr.
21  Locke.  It is your answer to question 385,
22  which actually begins at page 163.
23     A.   Is this in my initial --
24     Q.   It is in your initial report.
25     A.   Initial report.  I don't know that I

Page 1209

1  have that here.
2      Q.   I believe you do.  Look for RX-1874.
3      A.   Is it the witness statement or is it
4  the expert report?
5      Q.   The witness statement.
6      A.   I'm sorry.  You said expert report.
7      Q.   Oh, I'm sorry.
8      A.   Okay.  Now, again, in the witness
9  statement, which witness statement?
10     Q.   Initial.  It starts on page 163.
11  Let's bring that up, please, Chris.  Do you see
12  on page 163, question 385 is your opinion
13  regarding non-enablement, among other things,
14  of this exact limitation we're talking about,
15  the adding support limitation in limitation D
16  of claim 1 of the '430 patent?
17     A.   Yes.
18     Q.   Do you see that?
19     A.   Yes.
20     Q.   Now, Chris, let's go to page 165.  And
21  just blow up the first two-thirds, through the
22  end of the paragraph.
23         Do you see here there is a discussion,
24  your discussion of smart foldering, and whether
25  that enables or relates to this concept of

Page 1210

1  adding support for hardware and software
2  components in limitation D?
3      A.   Yes.  Let me review it for a moment.
4  I haven't looked at this for a few days.
5      Q.   Go ahead.  Chris, while he is doing
6  that, can you highlight, none of these three
7  steps relates to, let alone supports or
8  enables, "adding support for the hardware and
9  software components to the operating system
10  without rebooting the operating system."
11         Have you had a chance to review it
12  now, Dr. Locke?
13     A.   I have reviewed the portion you have
14  highlighted, but I want to look at the context
15  for just a moment, please.
16     Q.   Go ahead.  Have you now had a chance
17  to review the entire context?
18     A.   I think so.
19     Q.   All right.  Your opinion as expressed
20  on page 165 is that smart foldering does not
21  even relate to, much less enable this step D of
22  claim 1 of the '430 patent.  That was your
23  opinion there, right?
24     A.   That is my opinion there, yes.
25     Q.   Yet the very next reference you rely

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1211

1  upon is the Malone reference, the '870
2  reference, right?
3       A.   Yes.
4       Q.   That's RX-289.  And the Malone
5  reference is a smart foldering patent, right?
6       A.   Yes, it is.  It actually refers to
7  something called an object lens, which I
8  believe is a form of smart folder.
9       Q.   And the smart foldering system of
10  Malone is the same as the three steps that you
11  are just describing on page 165, don't even
12  relate to, much less enable, step D of the '430
13  patent, right?
14       A.   In looking at Malone, I was
15  considering -- again, as I have stated a number
16  of times and probably will again, consider step
17  D to be indefinite.
18       Being indefinite is because it is not,
19  in my opinion, dealt with in the patent
20  specification prior to the claims.  And,
21  therefore, I believe it is not something that
22  can be determined exactly what it means.
23       So to determine what it means in the
24  case of looking at prior art to see what's
25  being dealt with, I look at, for example, what

Page 1212

1  Dr. Balakrishnan used and said that it meant in
2  the context, for example, of the Android
3  system.
4       And in looking to see how the Android
5  system was being accused for support -- for
6  adding support in claim D or element D, he
7  mentioned things such as notification, he
8  mentioned things such as adding pointers or
9  references.  And so in that context, say,
10  looking at Malone, I could say that's what it
11  was doing.
12       And if that's what Professor
13  Balakrishnan believes is adding support, then
14  in that context, it would be adding support.  I
15  don't believe the patent itself, however,
16  identifies that that means adding support.
17       Q.   The Malone '870 reference on which you
18  rely in your invalidity opinion is a smart
19  foldering system similar to that that you are
20  discussing at page 165 of your report that we
21  just went through, right?
22       A.   It is, yes.
23       Q.   And on that page, you said such a
24  smart foldering system doesn't even relate to,
25  much less support or enable "adding support for

Page 1213

1  the hardware and software components to the
2  operating system without rebooting the
3  operating system," that's what you said there,
4  right?
5       A.   In the context of the patent, I
6  believe that is correct.  In the context of
7  what was being accused of Motorola, it is
8  somewhat of a different story.
9       MR. POWERS:  No further questions,
10  Your Honor.
11       JUDGE ESSEX:  All right.
12       MS. KATTAN:  I have no questions, Your
13  Honor.
14       JUDGE ESSEX:  Doctor, let me ask you
15  one question that has puzzled me in this.  In
16  the context of claim 1, it talks about adding
17  hardware and software in some places and talks
18  about adding support.
19       What is support, if it is not hardware
20  and not software?
21       THE WITNESS:  Well, as I have
22  mentioned, I consider the term to be indefinite
23  because of the fact that it is not called out
24  in the patent.  I would think that adding
25  support, if it had been defined, would probably

Page 1214

1  involve adding some software, adding some code,
2  for example.
3       JUDGE ESSEX:  I am not an electrical
4  engineer.  I am probably the last person in
5  this room that's not an electrical engineer,
6  but is there something other than software or
7  hardware that can be added that supports
8  hardware or software?
9       THE WITNESS:  There is nothing but
10  software that can be added to support either
11  hardware or software, in my opinion.
12       JUDGE ESSEX:  Okay.  All right.
13       MR. POWERS:  May I follow up briefly
14  on that, Your Honor?
15       JUDGE ESSEX:  I will let you follow-up
16  briefly and then go back to Motorola, yes.
17       MR. POWERS:  Thank you, Your Honor.
18  BY MR. POWERS:
19       Q.   A pointer used within software can be
20  support, right?  It tells a program where to go
21  for something?
22       A.   Yes, but I don't think the pointer is
23  added by anything.
24       MR. POWERS:  No further questions,
25  Your Honor.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1215

1    JUDGE ESSEX:  All right.  Thank you.
2         REDIRECT EXAMINATION
3  BY MR. DeFRANCO:
4    Q.   Good morning, Dr. Locke.
5    A.   Good morning.
6    Q.   A few questions on validity,
7  invalidity that you just covered.  A few of the
8  last questions dealt with the Malone reference.
9         What is your opinion on validity with
10  respect to the Malone reference?  Can you tell
11  us that generally, please.
12    A.   Yes, I believe the Malone reference
13  anticipates each of the elements of claim 1
14  and, in fact, the asserted claims.
15    Q.   There was some questions in the
16  context of the smart folder embodiment, and
17  there were some comparisons made to part of
18  your witness statement where you talked about
19  the smart folder embodiment.
20         Do you remember that?
21    A.   Yes, I do.
22    Q.   And you spoke about -- you were asked
23  to explain, well, how could it be that Malone
24  is invalidating when you had a criticism, I put
25  it, of that portion of the specification

Page 1216

1  relating to the smart folder.
2         Do you recall that?
3    A.   Yes.
4    Q.   Did that have anything to do with the
5  claim construction that you were applying in
6  terms of validity for Malone?  For example,
7  Apple's construction versus Motorola's
8  construction?
9    A.   No, not really.
10    Q.   Okay.  Under Apple's construction, was
11  there -- is Malone invalidating?
12    A.   Under Apple's construction of element
13  D, you are referring to?
14    Q.   Yes, yes.  That's right.
15    A.   In my opinion, yes.  As it was applied
16  by Apple against the Android, for example,
17  again, as I mentioned, that element D in my
18  opinion is indefinite.
19         And it is difficult to understand, so
20  I have to look at various places to try to
21  understand what was meant, but that's certainly
22  in the context of what was accused, Malone does
23  that, yes.
24    Q.   Well, if you assume it is not
25  indefinite and you use the construction that's

Page 1217

1  applied by Apple, is Malone invalidating in
2  that instance?
3    A.   Yes, I believe -- I believe so.  And
4  if we assume that it is not indefinite, then we
5  look at the things that are referenced such as
6  notification, which is in Malone, such as
7  establishing pointers to things or establishing
8  references to things, and that is certainly in
9  Malone.
10    Q.   Okay.  With respect to notifications,
11  can you explain how that is used in your
12  invalidity analysis with respect to Malone,
13  assuming, again, it is not indefinite?
14    A.   Yes.  Is it possible to put up a piece
15  of Malone?
16    Q.   Sure.  Sure.
17    A.   I think column 17 has a reference to
18  notification.
19    Q.   Malone is RX-289.  And let's go to
20  column 17.
21    A.   If we can go down to line 51 and
22  following.  This is the section where we're
23  talking about the smart folder representation
24  that is called an object lens capability in
25  Malone.  It says the last step in our example

Page 1218

1  is to add intelligent agents, and it refers to
2  intelligent agents as the mechanism that return
3  things, that you go out and find things, and
4  operate based on rules to find things based on
5  their properties.
6         We can add intelligent agents to help
7  search and modify a network of nodes.  For
8  instance, figure 16 shows an agent like one you
9  might use to notify you whenever people add
10  arguments that support positions you have
11  entered.
12         The reference to arguments supporting
13  positions refers to a particular example that
14  Malone is using to describe a use of the optic
15  lens and be able to find out when somebody adds
16  something to an object.
17    Q.   Are there other portions of Malone
18  that talk about the notification feature?
19    A.   Well, I think that it is hinted at in
20  other locations.  For example, back in column
21  7, I believe, at the top of column 7.
22  Actually, the sentence that's not quite
23  finished in column 7.  Can we maybe bring up
24  the last line of column 6 as well?  I
25  apologize.  It just makes it a little bit

APLNDC-X0000006362

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1219

1    clearer.
2         When an agent is triggered, it applies
3    a set of rules.
4         Q.   Okay.
5         A.   And we go to column 7.  It applies a
6    set of rules to a specified collection of
7    objects.  That's what I was referring to, the
8    agent and the rules that are used to define the
9    properties.  If an agent satisfies the criteria
10   specified -- if an object satisfies the
11   criteria specified in a rule, the rule performs
12   some specified action.
13        "These actions can be general actions
14   such as retrieving, classifying, mailing, and
15   deleting objects or object-specific actions
16   such as loading files or adding events to a
17   calendar."
18        So notice that's all based on the
19   triggering of an object.  And we find out later
20   as part of that notification that we can
21   trigger objects based on, for example, objects
22   being added or deleted and so forth.
23        Q.   Any other portions of the Malone
24   specification come to mind?
25        A.   Not in terms of notification.  In

Page 1220

1    terms of just the way in which things are
2    added, there is a good description, I think, in
3    column 13.  It just talks about how this whole
4    process works a little bit.
5         Q.   Okay.  If you could point us to the
6    portion of column 13 and we will bring that up
7    on the screen.
8         A.   I believe it starts at about column --
9    at about line 22, the paragraph there.  So when
10   a user sends a message containing an embedded
11   object that is expanded, the embedded object is
12   converted into text in a message.  Let me make
13   sure this is what I intended to use.  One
14   moment.
15        I guess I am not seeing the part I
16   thought I was remembering here.  So let's just
17   say I think we have covered the notification
18   aspect, however.
19        Q.   Okay.
20        A.   And elsewhere in the patent, I thought
21   it was in 13, but perhaps I am remembering
22   incorrectly, it describes how these objects are
23   collected, how they are found based on their
24   properties and then added to the smart folder
25   or the folder.

Page 1221

1         Q.   Okay.  And is there anything -- if we
2    pull up -- let's blow up the first paragraph in
3    column 13.
4         Did you cover notification that
5    relates to this paragraph?  I believe you have
6    referred to that earlier.  Did you finish your
7    answer?  Let's move away from column 13.
8         A.   I guess I am not sure what you are
9    referring to on this.
10        Q.   Okay.  Let's move away from column 13.
11        A.   Okay.
12        Q.   Now, you talked a bit -- you were
13   asked a bit about UNIX and UNIX find.  Do you
14   recall that?
15        A.   Yes.
16        Q.   Now, just so we're clear, UNIX was
17   referred to in the '430 patent specification;
18   is that correct?
19        A.   I believe there is a reference to UNIX
20   in the patent specification, along with a list
21   of other operating systems.
22        Q.   Was there any references cited with
23   respect to UNIX that specifically disclose the
24   find feature?
25        A.   No, in fact, there is nothing

Page 1222

1    specifically disclosed about UNIX.
2         Q.   Anything in the prosecution history
3    that specifically discussed the find feature in
4    UNIX, do you recall?
5         A.   No, I don't believe there is any
6    reference at all to that.
7         Q.   Could you put up claim 1, please.  In
8    your opinion, Dr. Locke, does UNIX disclose
9    element D of claim 1?
10        A.   Well, again, element D, I believe, is
11   indefinite.  But to the extent it is being used
12   to, for example, to accuse the Android system,
13   yes, I believe in that same context that it
14   would infringe element D, or do element D.
15        Q.   So assuming, for example, you use
16   Apple's construction, how would UNIX find that
17   portion and invalidate the element D?
18        A.   Well, I believe Apple's construction
19   -- I am trying to remember the exact text -- do
20   you have that?  I haven't memorized all of the
21   constructions.
22        Q.   Yes.  We will put up -- well, let's
23   find a demonstrative that shows the
24   construction.
25        Let's put up, Ryan, please,

APLNDC-X0000006363

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1223

1    CDX-001.032.  Do you see there Apple's
2    construction over to the left?
3        A.   Yes.
4        Q.   The Staff says plain and ordinary
5    meaning.  Do you see that, sir?
6        A.   Yes, I do.
7        Q.   Could you go back and explain how you
8    believe that UNIX find invalidates element D
9    under those constructions?
10       A.   Sure.  Going back to the claim, adding
11   support, I believe that UNIX find, because of
12   the ability to do commands such as move or copy
13   and placing things in directories and, in fact,
14   even executing operations or executing things
15   is going to facilitate access to the
16   components, the files that are actually being
17   produced.
18            For example, I think I mentioned the
19   font operation, finding a font could be done by
20   copying a file from one folder to the correct
21   folder, one where it would be expected to be
22   found and therefore used by word processing
23   programs.
24            In executing a program, that is
25   executing a file that is executable, which can

Page 1224

1    be done by the find command, it is going to
2    generate pointers, references in the operating
3    system in order to make that happen.  One
4    place, for example, is the process table in
5    UNIX is going to have to keep track of the
6    program while it is executing as it does for
7    any other program.
8            And that, of course, is something that
9    is usable by applications and by system
10   components, so I would say that that's
11   facilitating access in that context.
12       Q.   Okay.  And is there a concept or
13   feature in UNIX known as shell scripts?
14       A.   Yes, there is.
15       Q.   Could you explain that, please.
16       A.   Yes.  A shell script is a file, a text
17   file in UNIX that contains UNIX commands, as
18   well as additional commands that are not normal
19   UNIX commands, that allow you to execute any of
20   the utilities or any of the UNIX commands and,
21   in fact, the shell script can be run anywhere
22   you can run any other commands.
23            So it could be triggered by time.  It
24   could run periodically.  It could be used, for
25   example, for notification very easily, for

Page 1225

1    checking to see if files have been added or not
2    and then moving or copying them somewhere.
3            The shell script is a very powerful
4    concept in UNIX that can be doing any number of
5    things.
6        Q.   Can it be run in the background, so to
7    speak?
8        A.   Absolutely.  In fact, it is quite easy
9    to set it up as a background operation that
10   would periodically check for the existence of
11   certain things and either determine that the
12   existence or non-existence meant something and,
13   therefore, respond.
14       Q.   Okay.  Now, you were asked about
15   search criteria in UNIX and there were four
16   examples given, file name, file size, data
17   access, number of links.
18            Do you remember that?
19       A.   Yes.
20       Q.   And you were asked whether those were
21   common to every file name, I believe?
22       A.   I think I was asked if those were
23   common to every file in a UNIX file system.
24       Q.   That's right.
25       A.   And I think I answered that they were.

Page 1226

1        Q.   Now, if properties include things such
2    as file names, what's your opinion on whether
3    UNIX invalidates claim 1?
4        A.   In my opinion, UNIX does, in fact,
5    invalidate claim 1, assuming that properties
6    includes, as anyone would expect, things such
7    as a file name.
8        Q.   Now, you were asked about the inventor
9    testimony with respect to properties.  Do you
10   recall that?
11       A.   Yes.
12       Q.   Do you recall the inventor's
13   distinction between properties that are
14   inherent and non-inherent?
15       A.   Yes, I think he used the term inherent
16   or non-inherent.  I think he also used the term
17   intrinsic.
18       Q.   Can you explain your recollection of
19   the inventor's testimony on that, please.
20       A.   I believe the inventor was trying to
21   state that as used in the patent that the term
22   properties referred only to non-inherent or
23   non-intrinsic properties.
24       Q.   Apart from inventor testimony, did you
25   see any support for that in the claims or the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1227

1  specification or the prosecution history?
2      A.   Absolutely none.
3      Q.   You were asked about a portion of the
4  file history.  And I would like to turn to that
5  for a moment, please.
6          And if we can put up, let's start with
7  column 6 of the '430 patent, please, Ryan.  And
8  it is going to be lines 50 to 55.  Why don't
9  you start with the sentence that begins "a
10 concrete subclass using TPropertyQuery."
11         Can you start it there, Ryan, please?
12 It is about line 36.
13         Sir, you have seen this portion of the
14 specification before; is that correct?
15     A.   Oh, yes.
16     Q.   And you were asked about
17 TPropertyQuery as it relates to -- as it was
18 discussed in the prosecution history.  Do you
19 remember that?
20     A.   Yes.
21     Q.   Okay.  The last sentence talks about,
22 do you see that, it says, "in a future release,
23 users may also attach user-defined properties
24 to components."
25         Do you see that?

Page 1228

1      A.   Yes.
2      Q.   Has there been discussion about what
3  that refers to?
4      A.   Yes, there has.
5      Q.   What is your understanding of what
6  that refers to?
7      A.   Well, my understanding is that at some
8  future time, that the inventors expected that
9  users could attach user-defined properties;
10 that is, properties that they would define and
11 attach them to components.
12     Q.   As opposed to what?  If not users,
13 then what would be defining properties?
14     A.   Well, the specification goes back to a
15 previous sentence here that says system
16 software may also attach -- it doesn't say also
17 -- may attach properties to components to group
18 specific components into specific folders.  So
19 this is describing the possibility that
20 systems, system software may -- they use may,
21 the word may is used in both -- may attach
22 properties to components to group specification
23 components into specific folders.
24         I believe this is saying that either
25 the system or the application may, optionally,

Page 1229

1  attach certain properties, but there is nothing
2  about those properties that makes them inherent
3  or non-inherent or intrinsic or non-intrinsic.
4  There is no reason I couldn't attach, for
5  example, an alternative name to a property and,
6  in fact, I can do that in a UNIX system, for
7  example.
8          So there is nothing here that in any
9  way identifies this as having anything whatever
10 to do with intrinsic or non-intrinsic.
11     Q.   Okay.  And then turning -- let's turn
12 to Exhibit JX -- move this to the top of the
13 screen, the last few sentences, please, Ryan.
14 Just the last few.  Yeah, that's right, the
15 last few sentences of that same paragraph we
16 were looking at.  Move that to the top of the
17 screen.
18         And then you are going to split the
19 screen and on the bottom we're going to put
20 JX-4, it is page number 0968.  And I would
21 like to blow up the last sentence in the second
22 paragraph and put that on the bottom of the
23 screen, please.  And blow up -- make that a
24 little bit bigger on top.
25         Do you recall in cross-examination,

Page 1230

1  you were asked about this sentence in the
2  prosecution history, sir?
3      A.   Yes, I do.
4      Q.   Do you see there that that talks about
5  user input?  Do you see that portion?
6      A.   Yes.
7      Q.   Do you believe that relates in any way
8  to the discussion in the specification about
9  future releases and users being able to add
10 their defined properties?
11     A.   Yes, I think it is an example of what
12 I was saying that the user can add properties.
13 They can be attached to a component, just as
14 any properties are attached to components.
15         And the user input could input one.
16 Here the example is given as the name of a
17 file, as in the case of the T file locator.
18     Q.   As a matter of grammar, do you see in
19 the sentence after the comma that has the word
20 "or"?  It says "the search criteria can be a
21 variable such as TPropertyQuery as discussed on
22 page 14 at lines 5 to 6 and shown in the code
23 at line 30, or" -- do you see that?
24     A.   That's correct.
25     Q.   And as a matter of grammar, is that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1231

1    excluding the possibility of a file name from
2    being a property?
3        A.   Certainly not.
4        Q.   Could you explain why not in your
5    view?
6        A.   This says a search criteria can be a
7    variable such as TPropertyQuery or it can be a
8    user input, such as a name of a file.  I think
9    I mentioned that before, that in defining a
10   search criteria, the inventor does not
11   distinguish between the name of the file and
12   any other properties.
13       Q.   And is the construct of that
14   sentence, in your opinion, excluding a file
15   name from being a property as within the scope
16   of this claim?
17       A.   Definitely not.  No.  I believe the
18   inventor expected that search criteria would be
19   done based on properties, and that the name of
20   the file is as shown here, something that the
21   user could input as a search criteria, just as
22   any other property.
23       Q.   Were there any other -- do you recall
24   whether there were any other user input
25   possibilities that could be properties, other

Page 1232

1    than file names, given as examples?
2        A.   I don't recall any.
3            MR. DeFRANCO:  Your Honor, I think
4    this is probably a good break, if it is
5    convenient.
6            JUDGE ESSEX:  Do you have a while to
7    go?
8            MR. DeFRANCO:  Not too much longer,
9    but I will be able to cut it back if we -- over
10   the lunch break.
11           JUDGE ESSEX:  No, go ahead, I am
12   having fun.
13           MR. DeFRANCO:  Okay.
14   BY MR. DeFRANCO:
15       Q.   Now, you were asked about issued claim
16   7.  Do you recall that?
17       A.   Yes, I was.
18       Q.   And that was originally filed as claim
19   8.  We saw some discussion of claim 8 that was
20   in the original application.  Do you recall
21   that?
22       A.   Yes, I do.
23       Q.   And you were shown page 969 of the
24   '430 file history.  Can we bring that up,
25   please?

Page 1233

1            Now, you were asked, do you see --
2    blow up the first paragraph, please.  Now, you
3    were asked about the support for that claim
4    that was cited at the time, and it said the
5    detailed description of the processing of these
6    two claims is found at page 8, lines 19 to 29,
7    where a description of dynamic component
8    notification removal and addition is provided.
9            Do you see that?
10       A.   Yes.
11       Q.   And you gave some information in your
12   testimony about how that went beyond the
13   installation program referenced in that portion
14   of the specification, but I don't think you
15   gave your full answer.
16       A.   Yes.
17       Q.   Could you call up that portion of the
18   specification on top, please, Ryan.  That
19   became -- let me find it -- it became
20   ultimately column 6, lines 7 through 22.
21           Is that the portion of the
22   specification that you are referring to, that's
23   referenced there, sir?
24       A.   Yes.  I am not sure if it started
25   quite that early, but that includes that

Page 1234

1    section that he was referring to.
2        Q.   That includes the discussion of
3    without running an installation program?
4        A.   Yes.
5            MR. POWERS:  If I may, Your Honor, I
6    apologize for the interruption, but I think
7    counsel is unintentionally misstating the --
8    page 969 gives the exact lines from the
9    original application, which are lines 19 to 29
10   in the original application.
11           MR. DeFRANCO:  That's a better idea.
12   Why don't we go back to the original
13   application.  Do you have the page number?
14           MR. POWERS:  It is page 14.
15           MR. DeFRANCO:  Page 14, thank you.
16   BY MR. DeFRANCO:
17       Q.   Would you go to page 14, Ryan, please.
18   And we're looking at lines -- we should be
19   looking at lines 19 to 29 then.
20           Is that fair?  Are you on the same
21   page, Dr. Locke?
22       A.   I'm sorry, I just was checking
23   something.
24       Q.   Sure.
25       A.   Okay, I'm sorry.  Yes, that looks like

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the correct section.
2      Q.   Could you explain again your testimony
3   with respect to what is in that entire section
4   that's quoted in that portion of the
5   prosecution history?
6      A.   Yes.  The patentee was trying to
7   explain the changes that he had made to what
8   was then claim 8.  And it is shown there and
9   referenced this section 19 through 29, where he
10  says it is a description of dynamic component
11  notification removal and addition.
12     So the key part he was referencing in
13  this, while it does include the statement I had
14  quoted talking about without running an
15  installation program, it goes on to talk about
16  a notification.  Down below, it says that
17  system software can locate components whose
18  properties match those specified in the
19  location, to location framework, for example,
20  components of type tool, which is in my opinion
21  an intrinsic property, but leave that aside.
22     It goes on to say, system software can
23  register interest in and receive notification
24  on the additional -- addition, removal of
25  components whose properties match those

1   specified to the location framework.
2      So here the inventor is describing the
3   method of notification that is involved.  And
4   at this point, the term notification was still
5   in claim 8.  And that's what he was, in my
6   opinion, referring to.
7      Q.   Okay.  Now, I think this was the only
8   reference in this portion of the prosecution
9   history that you were shown for page 8, lines
10  19 to 29.  I would like to turn to a different
11  citation in this same portion of the
12  prosecution history.
13     Can you turn to page 978.  Can you put
14  that up, please, Ryan.  Now, could you blow up
15  -- I'm sorry, can you blow that up, please, the
16  top half of that.
17     There should be -- let me see the next
18  one, please.  I'm sorry, Ryan.
19     Now, do you see the examiner made a
20  rejection there under Section 112, paragraph 3.
21  Do you see that, sir?
22     A.   Yes, I do.
23     Q.   And do you see further on down, there
24  is a citation to the same portion of the
25  specification that we were just looking at?  Do

1   you see page 8, line 14 and on?
2      A.   Yes, it starts a little earlier, but
3   yes.
4      Q.   Okay.  Let's go to page 972, please.
5   What we will be looking at is the examiner's
6   rejection that related to this.
7      Do you see paragraph 3 refers to claim
8   1?
9      A.   Yes, it does, referring to the fact
10  that processing hardware and software
11  components, he believes, is vague and
12  indefinite.
13     Q.   Okay.  And what part -- I'm sorry,
14  what part of claim 1 do lines 1 and 2 refer to?
15     A.   That refers to the preamble.
16     Q.   Excuse me one second.  Okay, thank
17  you, you can pull that down.  There was some
18  discussion in your cross-examination about the
19  word component and whether or not that term was
20  used consistently in the specification, sir, do
21  you recall that?
22     A.   Yes, I do.
23     Q.   Can you explain your testimony on
24  that, please?
25     A.   Yes.  The term component, as I

1   mentioned at the time, is defined in several
2   places, in addition to other terms, system
3   component being a primary one.  And in the
4   abstract and summary of the invention, only a
5   system component is referenced, and in both of
6   those a definition is provided.
7      In the background of the invention,
8   the term component is defined, but it is
9   defined in exactly the same way as a system
10  component.  And, in fact, it limits itself
11  essentially to system components.  And,
12  therefore, the term component becomes very
13  difficult to determine what the inventor had in
14  mind.
15     Q.   Now I would like to turn to some of
16  your deposition testimony you were asked about.
17  You were referred to page 107, lines 5 to 9.
18  Can we put that up, please, on the screen,
19  Ryan.
20     This was a discussion about -- let's
21  blow up lines 5 to 9, please.  This was a
22  discussion about frameworks and operating
23  systems.  Do you recall that, sir?
24     A.   Yes.
25     Q.   And you were asked a question, and I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    don't believe you gave all of the information
2    you wanted to give with respect to that, the
3    relationship between frameworks and operating
4    systems.
5        A.   I'm not sure what I didn't include.
6    The framework is an application level set of
7    code that is used to support applications.
8    There are many different kinds of frameworks.
9    In fact, the patent discusses extensively
10   something called a location framework.
11       As to whether that is part of an
12   operating system is something that varies a
13   bit, depending on who one asks and where one
14   looks.
15       So in my particular case of my
16   particular analysis, I chose to consider that
17   the framework in the case of the application
18   framework in Android could be considered as
19   part of the operating system on top of the
20   kernel, which is actually a Linux -- a form of
21   Linux underneath the framework.
22       Q.   And in column 4, lines 45 to 55 of the
23   '430 patent, if we could put that up, please.
24   Just blow up -- that's it, Ryan, right down
25   there.

1        Now, I believe you were asked about a
2    portion of your witness statement that referred
3    to this section on frameworks and the reference
4    to old-style operating systems.  Do you recall
5    that?
6        A.   Yes, I do.
7        Q.   And I believe that you were asked
8    questions and you said that some of the
9    information was being presented out of context.
10   Do you recall that?
11       A.   Yes.
12       Q.   Could you explain what you were --
13   your full testimony on that, please, sir?
14       A.   Yes.  I had been pointed to the
15   section above in the first part of this that
16   says -- in fact, at line 49, it says, the
17   operating system provides services through
18   system calls.  And, of course, this is headed
19   by a statement starting at line 47 that says,
20   "in old-style operating systems such as DOS or
21   UNIX, the developer's own program provides all
22   of the structure.  The operating system
23   provides services through system calls."
24       And then I was taken down below to say
25   when frameworks were used, starting at 55, this

1    is reversed.  And we left it there and I
2    believe that was taken considerably out of
3    context.
4        This discussion is in the midst of a
5    long discussion about the use of
6    object-oriented programs, and specifically
7    about frameworks in the context of developing
8    applications.
9        So, in other words, it is pointing out
10   that the particular frameworks that are being
11   referenced here are frameworks such as the
12   Microsoft Foundation classes used in Windows in
13   which the application no longer starts at the
14   top and just executes code straight through it
15   but, rather, under this kind of a framework,
16   the execution goes first to the framework and
17   then the framework makes calls into the
18   application at different parts of the
19   application, which means that you have to
20   reverse the way you are thinking about the way
21   you write an application.
22       So instead of the old-style way of
23   just saying, well, I will start with the first
24   instruction and go instruction by instruction
25   until I am done with the program, instead I

1    write, in fact, what the Microsoft Foundation
2    classes calls events.  I write a whole series
3    of event handlers and I respond to events.
4        And so the application is totally
5    reversed in terms of how one has to think of
6    it.  And the developer typically has difficulty
7    with the transition between the two.
8        This is the context in which this
9    whole discussion is being used.  The frameworks
10   that the -- the location framework that the
11   patentee is actually talking about is not that
12   kind of a framework.  And it does not reverse
13   anything.
14       And, in fact, the inventor described
15   this as being implementable, for example, on
16   system 7, which is the operating system for the
17   MacIntosh at that time, which is, in fact, an
18   old-style operating system as described in this
19   patent that would have exactly the system calls
20   that we're talking about and would be
21   interfaced in the same way that ordinary
22   operating systems of that time were used, such
23   as UNIX.
24       Q.   Okay.  Let's turn to Exhibit JX-004,
25   page 0983, Ryan.  And if you would blow up

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1243

1  claim 1 as it existed at that point in the
2  prosecution history.
3         Do you recall, Doctor, on
4  cross-examination, you were asked about this
5  amendment in which the word properties was
6  added in two locations.  Do you see that?
7     A.   Yes.
8     Q.   It was added in the preamble and it
9  was also added in element A.  Do you see that?
10    A.   Yes, I do.
11    Q.   And you were asked some questions
12 about how that related to this no longer being
13 indefinite.  Do you recall that?
14    A.   Yes.
15    Q.   Were those the only additional words
16 that were added to the claim at this point in
17 the prosecution history toward the applicants
18 overcoming the indefinite rejection?
19    A.   No, not at all.  There were a number
20 of changes, as you can see there.  The word
21 processing was removed and replaced with
22 dynamically adding support for hardware or
23 software and, of course, the "and" was removed
24 because that had been described as inconsistent
25 with element D -- excuse me, with element C at

Page 1244

1  that time in the previous version.
2         There were a number of changes that
3  were made to make -- to resolve the issues that
4  were raised by the examiner.  So this
5  particular -- the addition of the word
6  properties was just one of a number of changes.
7     Q.   Okay.  And with respect to the
8  property limitation that was added at this
9  time, did that impact your opinion on whether
10 or not a file name could be a property?
11    A.   Oh, definitely not.
12    Q.   And why is that?
13    A.   The addition of the reference to
14 properties here is simply identifying that the
15 components will have properties and that the
16 criteria will reference the properties.  In my
17 opinion, the most likely explanation here is
18 that the inventor wanted to mention the
19 properties that are used as part of the search
20 criteria and he added it in the preamble to
21 provide an antecedent for that reference.
22    Q.   And you were also asked about your
23 testimony as to whether you could think of any
24 search criteria beyond properties.  Do you
25 recall that?

Page 1245

1     A.   Yes, I do.
2     Q.   Okay.  And you said at the time you
3  couldn't think of any search criteria beyond
4  the term properties?
5     A.   Yes.
6     Q.   Is that correct?
7     A.   That's correct.
8     Q.   Again, does that mean that file names
9  cannot necessarily be a property?
10    A.   Not at all.
11    Q.   Under the '430 patent?
12    A.   Not at all.  I would expect that
13 search criteria, the properties would easily
14 include file names.  I believe that's exactly
15 what's taught in the '430 patent.
16    Q.   And the word dynamically was added at
17 that time, too, sir?
18    A.   Yes, it was.
19    Q.   And can you remind us of your
20 understanding of the meaning of the term
21 dynamically in the context of this claim?
22    A.   Yes.  I believe dynamically means --
23 actually, the phrase on the fly is also used in
24 the patent.  I think it refers to that.  And
25 specifically as the inventors identified when

Page 1246

1  they added it, they were referring to the fact
2  that you did not need to use an -- excuse me,
3  use an installation program.
4     Q.   And could you put up claim 1, please,
5  Ryan, as it issued in the '430 patent.
6         Now, a lot of time was spent asking
7  you about the phrase "hardware or software
8  components" in element D.  Do you see that?
9     A.   Yes.
10    Q.   Let's highlight the entire phrase,
11 software for the hardware and software
12 components in element D.  And that same phrase
13 appears or a similar phrase that says, for
14 hardware or software components.  Do you see
15 that in the preamble?
16    A.   Yes.
17    Q.   And you were asked questions about,
18 well, how can you say that element D is
19 indefinite and not the preamble, if it contains
20 that similar language.  Do you recall that?
21    A.   Yes, I do.
22    Q.   Can you please explain your testimony
23 on that, sir, why you find element D indefinite
24 given that the preamble has a similar phrase?
25    A.   Yes.  When that was added by the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1247

1    inventor, as a part of the prosecution history,
2    we can see that the inventor explained what
3    that addition was there for.
4            That was added in response to an
5    indefiniteness issue.  And it is part of the
6    overall construct, dynamically adding support
7    for hardware, software components.
8            And when one looks at that and sees
9    the reason for it, at that point, he also
10   defined those two terms.  He had a specific
11   definition.  I don't have that in front of me,
12   but he defined what a hardware component and
13   what a software component was.
14           And so, therefore, it was possible to
15   give some meaning to those.  The element D is
16   the adding support element to that, adding
17   support for the hardware and software
18   components.
19           The whole -- the whole phrase there is
20   indefinite because the term adding support and
21   the concept of adding support is simply not
22   present in the rest of the specification of the
23   '430 patent.
24      Q.   Okay.  Thank you.
25           MR. DeFRANCO:  That's all I have, Your

Page 1248

1    Honor.  Thank you.
2            JUDGE ESSEX:  All right.
3            MR. POWERS:  Your Honor, I only have
4    five minutes.  Maybe we ought to do it before
5    lunch?
6            JUDGE ESSEX:  Let's go ahead and
7    press.
8            MR. POWERS:  And finish the witness?
9                RECROSS-EXAMINATION
10   BY MR. POWERS:
11      Q.   Dr. Locke, you were asked some
12   questions at the very beginning of your
13   redirect examination regarding the Malone
14   reference.  Do you recall that?
15      A.   Yes, I do.
16      Q.   And you emphasized a couple of aspects
17   of Malone and I want to focus on those briefly.
18   The first was the -- what was called in Malone
19   the agent?
20      A.   Yes.
21      Q.   Now, that agent corresponds to what
22   you also described as a locator?
23      A.   Well, the locator in the '430 patent
24   is a locator framework.  The agent is a
25   specific mechanism that's part of the overall

Page 1249

1    mechanism that's cited by Malone.
2       Q.   Exactly.  But the agent in Malone does
3    the function of the locator in '430?  Is that
4    fair?
5       A.   Yes, it does the function of a
6    locator, but the agent is not the entire thing.
7    It is the locator.  It is part of it, yes.
8       Q.   Now, your opinion with regard to the
9    locator function is that that didn't even
10   relate to this concept of element D adding
11   support for hardware and software components,
12   true?
13      A.   In the patent itself, the term adding
14   a software component, adding support for
15   hardware and a software components, in my
16   opinion, is indefinite.  There is no definition
17   for it and no support for it, that phrase, in
18   the specification.
19           So when I was looking at the prior
20   art, in order to define what was meant by that
21   as it was being applied to, for example, the
22   Android operating system, I relied on
23   statements made by, for example, Professor
24   Balakrishnan discussing the fact that he felt
25   that things such as adding references in the

Page 1250

1    activity stack had something to do with adding
2    support.
3            And I think he also said that
4    executing the program using the intents had
5    something to do with adding support.  And I was
6    looking for similar constructs in Malone and
7    concluded that in that context, it also added
8    support.
9       Q.   Are you done?
10      A.   Yes.
11      Q.   Let's try it this way.  The second --
12   in addition to this agent in Malone that
13   performs a locator function, you also focused
14   on notifications in Malone?
15      A.   Yes.
16      Q.   And both of those you relied upon in
17   support of your invalidity opinion?
18      A.   Yes.
19      Q.   Let's go to RX-1874 at page 165,
20   please, Chris.  And could you just bring up
21   that whole first paragraph.
22           This is a portion of your witness
23   statement, Dr. Locke?
24      A.   Which page?
25      Q.   165.

APLNDC-X0000006370

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   A.   Okay.  Yes.
2   Q.   In 165, you specifically call out the
3  fact that use of a locator in paragraph 1
4  about in the middle -- let's highlight that,
5  please, Chris -- number 1, there you go -- and
6  then number 3 talks about notifications, right?
7  Do you see that, Dr. Locke?
8   A.   Yes, I do.
9   Q.   And your opinion was that the locator
10 function and notification functions in the very
11 next sentence, you say, none of these three
12 steps relates to, let alone supports or enables
13 "adding support for the hardware and software
14 components to the operating system without
15 rebooting the operating system."
16       That was your opinion on page 165 of
17 your witness statement.  True?
18   A.   Yes, that is there, yes.
19       MR. POWERS:  No further questions,
20 Your Honor.
21       JUDGE ESSEX:  Thank you.
22       MR. DeFRANCO:  Two questions?  I'm
23 sorry.
24       MS. KATTAN:  I have no questions, Your
25 Honor.

1       MR. DeFRANCO:  I apologize, Your
2  Honor.
3             REDIRECT EXAMINATION
4  BY MR. DeFRANCO:
5   Q.   Leave that on the screen for a minute.
6  Dr. Locke, does what you are being shown here
7  in your witness statement, this question, does
8  this relate to your opinion that adding support
9  is indefinite?
10   A.   Not at all.
11   Q.   Can you explain?
12   A.   Yes.  My opinion that it is indefinite
13 is related to the lack of support in the
14 specification for these items, for these
15 things.
16   Q.   Does the smart folder embodiment
17 render adding support not indefinite, based on
18 the steps that are set forth in the
19 specification portion that you cite here?
20   A.   No, I believe it does not.  The adding
21 support is indefinite in spite of the smart
22 folder that is described in the '430 patent.
23 That is considered to be an embodiment.  In
24 other words, I felt that that embodiment did
25 not do the added support under the plain

1  meaning of those terms or the constructions
2  used by the parties.
3   Q.   Now, if you change your opinion,
4  hypothetically, you change it and you assume
5  that what is laid out with respect to smart
6  folders does qualify it as adding support -- do
7  you understand that?
8   A.   Yes.
9   Q.   Then is the notification discussion in
10 Malone, is that an example of how Malone
11 invalidates?
12   A.   Yes, exactly.  Malone does exactly the
13 same thing, in my opinion, as the smart folder
14 that's called out in the '430 patent.  And that
15 was the basis upon which my -- part of my
16 basis, at least, for saying that it infringes
17 -- or, excuse me, that it anticipates the claim
18 of the '430 patent.
19       MR. DeFRANCO:  Thank you.
20       MR. POWERS:  Nothing further, Your
21 Honor.
22       JUDGE ESSEX:  All right.  Doctor, I
23 think that concludes your testimony.  I'm glad
24 we were able to do it in the morning.  You are
25 dismissed.  Thank you very much.  I appreciate

1  it.
2       And we're in recess for the noon
3  recess.  Be back at about 20 after.
4       (Whereupon, at 12:19 p.m., a lunch
5  recess was taken.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1255

1           AFTERNOON SESSION
2                (1:20 P.M.)
3           JUDGE ESSEX:  All right.  Let's come
4  to order.  Do we have anything to do before we
5  call our next witness?
6           MR. POWERS:  I don't believe so, Your
7  Honor.
8           MR. NELSON:  Nothing, Your Honor.
9           JUDGE ESSEX:  Are we ready for the
10 next witness?
11          MR. NELSON:  Yes, Your Honor.  We will
12 call one more witness.
13          JUDGE ESSEX:  All right.
14          MR. NELSON:  Your Honor, we would like
15 to call Dr. Andrew Wolfe, who is the technical
16 expert for the '607 and '828 patents.
17          JUDGE ESSEX:  All right, Dr. Wolfe,
18 would you please raise your right hand.
19 Whereupon--
20               ANDREW WOLFE,
21 having been first duly sworn, was examined and
22 testified as follows:
23          JUDGE ESSEX:  Thank you.  Please be
24 seated.
25          MR. NELSON:  Your Honor, just for the

Page 1256

1  record, you have in front of you -- you notice
2  that you have the direct witness statement and
3  rebuttal witness statement with the exhibits,
4  you have book 1 of 8 and book 1 of 5.  As does
5  everyone else.  There are eight boxes over
6  there and I didn't figure --
7          JUDGE ESSEX:  That's probably enough
8  books right now.
9          MR. NELSON:  I figured we will get the
10 full set to you, but I didn't think we wanted
11 to clutter up the courtroom right now.  If it
12 is needed, we will pass it out.
13          JUDGE ESSEX:  All right.  Thank you
14 very much.
15          DIRECT EXAMINATION
16 BY MR. NELSON:
17     Q.   Could you open up book 1 of 8, the
18 direct witness statement, your direct witness
19 statement?
20     A.   Yes.
21     Q.   And let's look at RX-1885C, Ryan.
22 Now, did you prepare a witness
23 statement in this action?
24     A.   Yes, I did.
25     Q.   Okay.  And if you look at RX-1885C,

Page 1257

1  can you tell me whether that's your initial
2  witness statement in this action?
3     A.   It does appear to be.
4     Q.   Now, are the answers that are put
5  forth in there, are those your answers to the
6  questions that were posed to you?
7     A.   Yes, they are.
8     Q.   And if you look to page 295 of the
9  witness statement, tell me the date there.
10    A.   August 30th, 2011.
11    Q.   And is that your signature?
12    A.   Yes, it is.
13    Q.   Okay.  Now, let's go ahead and look at
14 the other book, the rebuttal witness statement.
15 Ryan, let's put up RX-1895C, please.
16          While he is doing that, why don't you
17 look at RX-1895C in front of you.  Do you
18 recognize that as your rebuttal witness
19 statement in this action?
20    A.   Yes, I do.
21    Q.   Okay.  Now, could you tell me whether
22 the answers that are set forth in this rebuttal
23 witness statement are the answers you provided
24 in response to the questions posed to you?
25    A.   Yes, they are.

Page 1258

1     Q.   And let's look at the last page of
2  that document, page 172.
3     A.   Yes.
4     Q.   Do you see that?  And what's the date
5  there?
6     A.   September 6th, 2011.
7     Q.   And is that your signature?
8     A.   It is.
9     Q.   Okay.
10          MR. NELSON:  At this time, Your Honor,
11 I pass the witness.
12          JUDGE ESSEX:  All right.
13          MR. NELSON:  Sorry about all the
14 paper, Your Honor.
15          MR. POWERS:  I think we're ready to
16 go, Your Honor.
17          JUDGE ESSEX:  All right.
18          MR. POWERS:  May I proceed?
19          CROSS-EXAMINATION
20 BY MR. POWERS:
21    Q.   Good afternoon, Dr. Wolfe.
22    A.   Hello.
23    Q.   I would like to begin with the '607
24 patent and the subject of claim construction.
25 Chris, could you put up claim 1 of the '607

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1259

1  patent, please.
2          And actually, bring up claim 2 along
3  with it, please.  Perfect.
4          Claims 1, 2, and 3 are three of the
5  claims that you had considered in providing
6  your opinions on the '607 patent in this case;
7  is that true?
8      A.   Yes, it is.
9      Q.   And one term that is present in claims
10  2 and 3 and other claims is the term
11  substantially as a modifier.  Do you recall
12  that?
13      A.   I didn't treat that as a term, so
14  substantially parallels is a term and
15  substantially perpendicular is a term, as I
16  understood it.
17      Q.   Fair enough.  Let's highlight
18  substantially parallel and substantially
19  perpendicular.
20          Now, and the term substantially
21  perpendicular appears also in claim 10 that you
22  construed as well?  We don't need to highlight
23  it, I think, Chris.
24      A.   I opined on it, yes.
25      Q.   And your opinion with regard to those

Page 1260

1  terms where substantially is used as a modifier
2  is that those terms are indefinite, right?
3      A.   In this patent, that's my -- that's my
4  understanding.
5      Q.   Chris --
6          MR. POWERS:  Your Honor, we have made
7  an illustrative exhibit for this patent called
8  CDX-17.1, where we have taken from the Staff's
9  prehearing brief as the most current up-to-date
10  position on all the claim constructions to help
11  us navigate through these issues.
12          JUDGE ESSEX:  All right.
13          MR. POWERS:  So I think this may avoid
14  the problem we had in some earlier examinations
15  a few days ago where something wasn't updated.
16  So we think this is the most current.
17  BY MR. POWERS:
18      Q.   So the term substantially
19  perpendicular and parallel on that, on those
20  terms, you understand that Apple and the
21  Staff's position is perpendicular or nearly
22  perpendicular or parallel and nearly parallel?
23  Do you recall that?
24      A.   I understand that.
25      Q.   So that in both Apple and the Staff's

Page 1261

1  constructions, the term substantially as a
2  modifier is interpreted to mean nearly?  Do you
3  understand?
4      A.   I understand that.
5      Q.   Okay.  And your construction is that
6  that is indefinite.  I assume that what's
7  indefinite under your construction is not the
8  term perpendicular or parallel?
9      A.   That's correct.
10      Q.   It is the modifier "substantially"?
11      A.   It is the whole term, it is the fact
12  that I don't think a person of ordinary skill
13  reading this patent would know how far they can
14  deviate from perpendicular or parallel and
15  still be within the scope of the patent.
16      Q.   You would agree with me that in this
17  area of technology and, in fact, in many, the
18  term substantially is often used, as -- in its
19  ordinary meaning, to mean nearly when it is
20  used as a modifier, approximately?
21      A.   I'm sorry what -- in the field of
22  technology?  Is that the question?
23      Q.   In this field of technology and
24  others, the term substantially is frequently
25  used, isn't it?

Page 1262

1      A.   Informally, yes.
2      Q.   And it is informally understood when
3  it is used by technologists speaking with each
4  other, isn't it?
5      A.   Yes.
6      Q.   It is a term that has an ordinary
7  meaning?
8      A.   Yeah, not a formal meaning, but an
9  informal meaning, yeah.
10      Q.   And the informal, normal meaning is
11  nearly, isn't it?
12      A.   That's right.
13      Q.   All right.  Now, you understand that,
14  including formally in patent claims, the term
15  substantially is very regularly used, don't
16  you?
17      A.   Yes.  Usually that guides one to look
18  back to the specification for guidance as to
19  what it means.
20      Q.   And, in fact, you have used the term
21  substantially in your own patents many, many
22  times, haven't you?
23      A.   Attorneys who have written claims in
24  my patents have used that and I have understood
25  what it meant there, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1263

1    Q.   So in patents where you filed
2  applications, the term substantially has
3  appeared often in the claims and you didn't
4  view your own claims as being indefinite, did
5  you?
6    A.   At that time, I don't know that I made
7  that judgment.  I understood that they referred
8  to what I described in the specification
9  reasonably well.
10    Q.   Let's bring up CX-554, please, Chris.
11        Do you recognize CX-554 as a patent of
12  yours, Dr. Wolfe?
13    A.   It is a patent where I was the
14  inventor.
15    Q.   Okay.  And this is a patent where you
16  used the term substantially several times in
17  the claims, didn't you?
18    A.   I don't recall the claims.  I'd have
19  to look at them again.
20    Q.   Chris, could you bring up claim 1,
21  please, of the '688 patent which is CX-554.
22  Starting in the very first limitation, "a
23  surface having a substantially uniform
24  resistivity."  Do you see that?
25    A.   Yes.

Page 1264

1    Q.   And in the second limitation,
2  "substantially at the midpoint," about three
3  lines down in the next limitation?
4    A.   Yes.
5    Q.   And at the very bottom in the wherein
6  clause, "substantially linear."  Let's bring up
7  that part also, please, Chris.  The next to
8  last line.  There you go.
9        So in the first claim of your '688
10  patent, CX-554, you use the term substantially
11  as a modifier three times in the first claim
12  alone, right?
13    A.   Yes.
14    Q.   Claim 7, you also use it to mean
15  substantially flat?  Let's look at that.  You
16  can see that?
17    A.   I do.
18    Q.   And claim 10, you say "substantially
19  transparent material."  Let's bring that up.
20  And claim 19, it is used twice there, isn't it,
21  "substantially uniform resistivity" and
22  "substantially rectangular area."  The line
23  right below it.  There you go.
24        So by my count, in your '688 patent,
25  you have used substantially as a modifier, I

Page 1265

1  think, six times in the claims?
2    A.   I didn't count, but --
3    Q.   Approximately?
4    A.   Approximately.
5    Q.   That's substantially right, isn't it?
6  And you didn't consider your own '688 patent to
7  be invalid as indefinite, did you?
8    A.   I understood it in light of the
9  specification at the time that I read it in
10  1995.
11    Q.   And you understand in that patent that
12  substantially is a modifier that means, for
13  example, in the case of substantially uniform
14  resistivity, not perfectly uniform resistivity?
15  Right?
16    A.   I don't remember what I disclosed in
17  the spec.  I'd have to -- you know, for
18  somebody to understand the claims of this
19  patent, they would have to go through the same
20  procedure that I went through of going through
21  and finding support in the spec and deciding
22  what could be construed and what couldn't be
23  construed.
24    Q.   So in your view, in your own '688
25  patent, if you didn't say substantially uniform

Page 1266

1  resistivity means plus or minus X amount, that
2  it is invalid as indefinite in your own patent?
3    A.   No, no, that's not my opinion.  I
4  think there needs to be enough guidance that
5  the balance can be understood.
6    Q.   Let's turn to CX-553.  And this is
7  another patent of yours, Dr. Wolfe?
8    A.   It is.
9    Q.   And if you look at claim 12, claim 12
10  uses substantially twice, both in terms of
11  substantially uniform resistivity and also
12  substantially rectangular.  Do you see that?
13    A.   I'm sorry?  Okay.
14    Q.   So again, you are using substantially
15  to modify each of those terms to mean not
16  perfectly, right?
17    A.   I'd have to go back again and look at
18  what it says in the spec and also not having
19  analyzed this claim, I don't know whether or
20  not the preamble is a limitation or not.
21    Q.   All right.  Let's look at another
22  application of yours, publication -- you have
23  several other applications that haven't yet
24  issued as patents.  Do you recall that?
25    A.   I do.

APLNDC-X0000006374

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1267

1    Q.   Let's look at publication U.S.
2  2011/0065354.  It should be in your binder.
3  Put that up, please, Chris.
4         This is an application of yours that's
5  pending?
6    A.   I believe so.  Was there an exhibit
7  number that I could look at?
8    Q.   It is in the back of your binder.  I
9  think you are --
10   A.   Do you know what tab it is?
11   Q.   I will wait until you have it.  It is
12 the touch doll one.  Let me know when you have
13 got it.
14   A.   Okay.
15   Q.   This is a pending application of
16 yours, isn't it, Dr. Wolfe?
17   A.   It is.
18   Q.   It relates to some sort of doll that
19 you can touch and make do certain actions?
20   A.   That's my recollection.
21   Q.   And if you look at claim 2, it refers
22 to a grid of conductors arranged substantially
23 orthogonally.
24   A.   Yes.
25   Q.   And that's again use of, by you in one

Page 1268

1  of your patent, patent applications in this
2  case, to modify the term orthogonally to mean
3  it doesn't have to be perfectly orthogonal,
4  right?  That's what you meant by that?
5    A.   Again, I would have to look at the
6  spec and see if I said any more about it.
7    Q.   That would be the ordinary meaning of
8  it, though, right?
9    A.   That would be the ordinary meaning,
10 yes.
11   Q.   All right.
12        MR. POWERS:  Your Honor, for
13 identification, why don't we mark this as
14 CX-601.  And we will fix that in the binders
15 and do some other things with it as well, but
16 just for identification, that's the published
17 application we just referred to.
18        JUDGE ESSEX:  All right.
19        (Complainant Exhibit Number CX-601 was
20 marked for identification.)
21        MR. POWERS:  Thank you.
22 BY MR. POWERS:
23   Q.   And if you go to claim 3 of CX-601,
24 you have "substantially longitudinal stripes"
25 and "substantially circumferential bands."  Do

Page 1269

1  you see that?
2    A.   Yes.
3    Q.   Two more uses by you in your patent of
4  the term substantially as a modifier to mean
5  not perfectly, but nearly, is that fair?
6    A.   Yes.
7    Q.   You're aware that the term
8  substantially is used in a very large number of
9  patents, aren't you?
10   A.   I am not quite sure what you mean, but
11 I have certainly seen it in patents numerous
12 times.
13   Q.   It is a very common term to be used in
14 a patent claim?
15   A.   I don't know how to characterize that.
16 I have certainly seen it.
17   Q.   Well, for illustrative purposes,
18 Chris, please put up CDX-18.  And let's blow up
19 just the first part of it, the very top part,
20 Chris.  There you go.
21        I will represent to you, Dr. Wolfe,
22 that we ran a search on the entirety of U.S.
23 patents, searching only in the claims,
24 searching for the word substantially, and
25 excluding design patents and plant patents and

Page 1270

1  others, so it is just utility patents.  Do you
2  understand?
3    A.   Yes.
4    Q.   And we found just shy of a million
5  patents, 987,743 which had the term
6  substantially in a claim.  That doesn't
7  surprise you, does it?
8    A.   I don't have any basis to judge it.  I
9  don't have any reason to doubt its truth.
10   Q.   It is not your view that all million
11 of those patents are invalid because they use
12 the term substantially, is it?
13   A.   It certainly is not.
14   Q.   All right.  Let's change topics and go
15 back to claim 1, please, Chris.  Do you recall
16 that there is another term that's been
17 construed, and there is a debate, which the
18 term is glass member?
19   A.   Yes.
20   Q.   And let's put up our illustrative,
21 which is CDX-17.01.  And you understand that
22 Apple and the Staff's construction is glass or
23 plastic element, and your proposed construction
24 and Motorola's was plain and ordinary meaning;
25 is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1271

1    A.   That's right.
2    Q.   Now, as I understand your opinion,
3 here it is that the plain and ordinary meaning
4 of glass member means that it must be made of
5 glass; is that fair?
6    A.   That's my -- that's my opinion, yes.
7    Q.   All right.  Now, that's a little
8 different from how you applied your
9 construction to the term substantially that we
10 just discussed.  There you had an ordinary
11 meaning, but you didn't apply it, right?
12    A.   No, no, no.  There is no question that
13 the ordinary meaning of substantially
14 perpendicular is perpendicular or nearly
15 perpendicular.  The question is whether or not
16 that is definite or indefinite.
17    Q.   And so your view is that nearly
18 perpendicular is indefinite?
19    A.   From the perspective that I would not
20 know as a person of ordinary skill how far from
21 perpendicular I had to get before I could avoid
22 infringing the claim.
23    Q.   Even though when one of ordinary skill
24 in the art is talking to another, they would
25 typically use the term substantially to mean

Page 1272

1 nearly and they would understand each other,
2 right?  That's what you just said a few minutes
3 ago?
4    A.   They would understand each other at a
5 general level, but not at a specific enough
6 level to be able to take -- to make a decision
7 as far as infringing or not infringing a
8 patent.
9    Q.   All right.  So let's turn to glass
10 member.  And here there is extensive discussion
11 in the specification about glass member as a
12 term which you could use for guidance.  That's
13 fair, isn't it?
14    A.   That's right.  And I did use that for
15 guidance.
16    Q.   You reviewed the specification and
17 concluded from that that glass must mean glass.
18 Is that fair?
19    A.   Yes.
20    Q.   Now, the '607 patent has, as you have
21 described it, two embodiments, one is
22 self-capacitance and one is mutual capacitance.
23 Do you recall that?
24    A.   Yes.
25    Q.   And your position is that the asserted

Page 1273

1 claims of the '607 patent cover mutual
2 capacitance but not self-capacitance, that's
3 right, isn't it?
4    A.   Yes.
5    Q.   And the spec, the specification of the
6 '607 patent describes both embodiments, a
7 self-capacitance embodiment and a mutual
8 capacitance embodiment.  True?
9    A.   It does.
10    Q.   Now, in fact, the specification
11 discusses the self-capacitance embodiment and
12 the mutual capacitance embodiment in distinct
13 portions, right, so we know which portion is
14 talking about self and which is talking about
15 mutual?
16    A.   Predominantly, yes.
17    Q.   Your witness statement -- and let's
18 put it up, please, Chris -- RX-1885, page 26,
19 the response to question 72.  Do you have that,
20 Dr. Wolfe?
21    A.   I'm sorry.  No, he gave me question
22 172.  Let me try to find it.
23    Q.   It is question 72 in Exhibit 1885,
24 RX-1885.  It is at page 26.  Let me know when
25 you have got it.

Page 1274

1    A.   Yes.
2    Q.   All right.  It is up on the screen,
3 too, if that helps you.
4    A.   Yes.
5    Q.   This is in your witness statement
6 where you say that the '607 disclosure relating
7 to self-capacitance goes from column 9, 66 to
8 column 12, line 2.
9       Do you see that?
10    A.   Yes.  At least a portion of the
11 disclosure, that portion relates to the
12 self-capacitance embodiment.
13    Q.   In fact, though, the disclosure in the
14 '607 patent specification of the
15 self-capacitance embodiment goes past column
16 12, row 2 and goes all the way to column 13,
17 row 6, doesn't it?
18    A.   I don't know.  I'd have to look at the
19 patent.
20    Q.   Let's bring up the patent.  Hold that
21 disclosure, if you can hold that answer if you
22 can, please, Chris.
23       So let's bring up column 12 of the
24 '607 patent, which is JX-2 for the record, Your
25 Honor.  Let me know when you have it in front

Page 1275

1  of you.  JX-2.
2      Do you have that, Dr. Wolfe?
3      A.   Yes.
4      Q.   Your witness statement at page 26 says
5  that the self-capacitance disclosure goes from
6  column 9, 66 to 12, line 2.  Do you see that?
7      A.   Well, it actually says the opposite.
8  It says that that portion of the patent applies
9  to the self-capacitance embodiment.
10     Q.   Fine.  I think we're saying the same
11 thing.
12         So, in fact, though, the description
13 in the '607 patent of the self-capacitance
14 embodiment goes beyond column 12, line 2?
15 Right?  And goes all the way to column 13, line
16 6?
17     A.   I agree in part and disagree in part.
18     Q.   Let me show you your expert report,
19 which is RX-874.  At page 44, paragraph 122,
20 Chris, let's bring that up and juxtapose it
21 with his answer to question 72 on page 26 of
22 RX-1885, the witness statement.  All right.
23         So, Dr. Wolfe, we have two callouts.
24 On the top of the screen -- and, Chris, I would
25 like you to print this and we will make it an

Page 1276

1  illustrative exhibit next in order, let me know
2  what that number should be -- at the top of the
3  screen, we have paragraph 122 of your expert
4  report, RX-874.
5          Do you recognize that?
6      A.   Yes.
7      Q.   And at the bottom, we have your answer
8  to question 72 at page 26 of RX-1885, which is
9  the witness statement you submitted to the
10 Court.  Am I right so far?
11     A.   Yes.
12     Q.   And the sentence is identical in both,
13 right?  The sentence reads, "a substantial
14 portion of the '607 disclosure is related only
15 to the self-capacitance embodiment."  And then
16 you have a cite to the specification in each
17 one that varies, doesn't it?  It differs?
18     A.   Yes, and I can explain to you why, if
19 you like.
20     Q.   In your expert report, you said that
21 the disclosure of the self-capacitance
22 embodiment was from column 9, 66, line 66, to
23 column 13, line 6 and figures 6 to 8.  Do you
24 see that?
25     A.   Yes.

Page 1277

1      Q.   And in your testimony, your witness
2  statement, you have shortened and changed the
3  citation still starting with column 9, line 66
4  but stopped it at column 12, line 2.  That's an
5  accurate statement so far of what you
6  submitted, right?
7      A.   Yes.
8          MR. POWERS:  Your Honor, I am told
9  this illustrative will be labeled CDX-25 of the
10 juxtaposition of the two pieces of testimony.
11         JUDGE ESSEX:  All right.
12 BY MR. POWERS:
13     Q.   Now, so what was -- let's go back --
14 so what was omitted from your testimony to the
15 Court in your witness statement was from the
16 description of the '607 disclosure of
17 self-capacitance was the part of column 12
18 after line 2 spilling over to column 13, line
19 5?  That's true, isn't it?  I think that's a
20 yes-or-no question.  That's the difference
21 between the disclosures?
22     A.   That's the difference between what I
23 said right here, yes.
24     Q.   All right.  That was all I am asking.
25         So, Chris, let's go back now to the

Page 1278

1  '607 patent and go to column 12.  And bring up
2  lines 35 to 42.  Well, actually, before we do
3  that, your expert report that said the
4  self-capacitance disclosure went all the way to
5  13:6, that was right, wasn't it?
6      A.   They are both right.  Read the
7  sentences.
8      Q.   All right.  So let's do it this way.
9  It is more complete and more accurate to say
10 the self-capacitance disclosure goes all the
11 way to 13:6, doesn't it?
12     A.   No, it is not.  That's why I corrected
13 it in the second one.
14     Q.   So let's do it this way.  It is true,
15 is it not, that the remainder of column 12,
16 going through column 13, line 5, and figures 6
17 to 8, all relate to the self-capacitance
18 embodiment, that's true, isn't it?
19     A.   Yes, but not only.
20     Q.   So let's go to column 13 and start at
21 line 6 and look at the description at 13, line
22 6, please.  13, line 6 is where the discussion
23 of a mutual capacitance embodiment begins,
24 isn't it?
25     A.   That's where the material specific to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the mutual capacitance embodiment is, yes.
2       Q.   And, in fact, what column 13, line 6
3    says is figure 9 is a top view of a transparent
4    multi-point touchscreen in accordance with
5    another embodiment of the present invention.
6    By way of example, the touchscreen 150 may
7    generally correspond to the touchscreen of
8    figs. 2 and 4.  And then it says, "unlike the
9    touchscreen shown in figures 6 to 8, the
10   touchscreen in figure 9 utilizes the concept of
11   mutual capacitance rather than
12   self-capacitance."  Right?
13      A.   Yes.
14      Q.   So figures 6 to 8 are
15   self-capacitance, not mutual, right?  That's
16   what he is saying?
17      A.   Yes.
18      Q.   And figure 9 is where it starts mutual
19   capacitance.  That's fair, isn't it?
20      A.   It is, but to be complete --
21      Q.   You have answered the question.
22      A.   That's fine.
23      Q.   Let's go back to column 12 and start
24   at column 12, line 3.  This is where -- this is
25   the portion of column 12 which you originally

1    in your expert report said was a part of the
2    self-capacitance disclosure, and then took out
3    in your testimony to the Court.  Right?  That's
4    fair?
5       A.   I originally said it was only
6    self-capacitance and then in my second thing
7    did not say it was only self-capacitance.
8       Q.   This portion was included in your
9    expert report and excluded in your statement.
10   That's true, right?
11      A.   I don't know what you mean by
12   excluded.  I didn't make any comment about it.
13      Q.   You stopped it at 12:2 and didn't
14   include 12:3?
15      A.   That's right, because that was
16   relevant to what I was talking about right
17   there.
18      Q.   That's all I was asking.
19      A.   Yes.
20      Q.   So starting at column 12, line 3, is a
21   discussion of figure 7, right?
22      A.   Yes.
23      Q.   And figure 7 is included within
24   figures 6 to 8, right?
25      A.   It is.

1       Q.   Which we just established was part of
2    the self-capacitance embodiment, right?  That
3    was what column 13 just said?
4       A.   Make clear what your question was.  Is
5    your question is column 6 through 8 part of the
6    self-capacitance embodiment?
7       Q.   We just looked at a section of column
8    13, do you recall that?
9       A.   Yes.
10      Q.   And column 13 said that figure 9,
11   unlike figures 6 to 8, related to mutual
12   capacitance, and figure 6 to 8 related to
13   self-capacitance.  Do you recall that?
14      A.   Yes, figures 6 to 8 relate to
15   self-capacitance, that's right.
16      Q.   Okay.  Now, in the description, in
17   column 12 at lines 35 to 42 -- let's bring that
18   up, please, Chris -- this is a portion of
19   column 12 that was included in your
20   self-capacitance description in your report,
21   but not in your witness statement, right?
22      A.   Yes.
23      Q.   Here there is a specific discussion
24   about glass member, right?
25      A.   Yes.

1       Q.   And it is in the self-capacitance
2    section, right?
3       A.   Yes.
4       Q.   And it says the glass member should be
5    glass, doesn't it?
6       A.   I think, yes, I think that's plain
7    meaning.  I think every place in the patent it
8    says that the glass member should be glass.
9       Q.   Well, we will see.  But in this
10   portion that's discussing self-capacitance, it
11   specifically goes out of its way to say the
12   glass member is glass, doesn't it?
13      A.   With respect to glass member 138,
14   that's true.
15      Q.   All right.  Now let's go to the mutual
16   capacitance portion of the specification that
17   relates to what you understand the asserted
18   claims to relate to, right?  The asserted
19   claims are mutual capacitance claims, in your
20   opinion?
21      A.   All the claims are mutual capacitance
22   claims, in my opinion.
23      Q.   Let's go to the mutual capacitance
24   section and go to column 16.  You will agree
25   with me that column 16 is part of the

APLNDC-X0000006378

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1283

1  description of mutual capacitance?
2      A.   It is part of it, yes.
3      Q.   And go to lines 46 to 49 and the
4  context around that. Let's bring up a little
5  bit more at the beginning so we have full
6  context all the way down.  Perfect.
7          It says, "furthermore, each of the
8  layers may be formed with various materials.
9  By way of example, each particular type of
10  layer may be formed from the same or different
11  material.  For example, any suitable glass or
12  plastic material may be used for the glass
13  members."
14         Do you see that?
15     A.   I do.
16     Q.   That's a description in the mutual
17  capacitance section, right?
18     A.   I don't believe that's a -- what do
19  you mean by description?
20     Q.   That's a statement that is in the
21  mutual capacitance section of the
22  specification?
23     A.   It certainly is.
24     Q.   All right.  Let's talk about ordinary
25  meaning for a second.  In ordinary usage, the

Page 1284

1  term glass is often used for something that
2  actually may not physically be glass.  That's
3  true, isn't it?
4      A.   In the touchscreen industry?  No.
5      Q.   Just in ordinary usage.  We're at a
6  dining room table.
7      A.   A drinking glass?
8      Q.   We're at a dining room table and I
9  have a plastic glass and you say can I have a
10  glass and I hand it to you, you wouldn't say,
11  oh, wait a minute, I don't want that as a
12  drinking glass, I insist on glass glass?  You
13  would take a glass, right?  That's common
14  usage?
15     A.   Well, I don't think that's the same
16  scope of meaning of the word.  I think that
17  means cup.
18     Q.   Well, you may disagree with whether it
19  is relevant, but could you answer the question
20  that I have asked?
21     A.   Yes, people do call a plastic drinking
22  glass informally a glass.
23     Q.   And they call eyeglasses glass even
24  though they are made of plastic?
25     A.   They call them glasses.

Page 1285

1      Q.   And a magnifying glass can be made of
2  plastic or glass, right?
3      A.   Yes.
4      Q.   Let's switch gears and talk about
5  lines and let's go back to CDX-17.001 for our
6  constructions.  Let's bring up the whole thing
7  if we can.
8      A.   I am buried in paper here.  Tell me
9  which book.
10     Q.   You understand that for lines, the
11  construction proposed by Apple and the Staff is
12  plain and ordinary meaning and that your
13  proposed construction is "narrow, continuous
14  extents of length with constant line width."
15  Right?
16     A.   For a long time Staff had another
17  construction.  If it was changed, I may have
18  forgotten that it was changed.  These two --
19  certainly Apple and Motorola's constructions,
20  but through at least the time that we wrote our
21  report, Staff had a different construction.
22         MR. POWERS:  I will ask the Staff
23  whether we have represented it accurately.  I
24  think we have.  Because it is quoted from the
25  brief.

Page 1286

1          MS. KATTAN:  Yes, Your Honor, that's
2  my position in the prehearing brief.
3          THE WITNESS:  Okay.
4  BY MR. POWERS:
5      Q.   Thank you.  So back, you understand
6  that Apple and the Staff's proposed
7  construction of lines is plain and ordinary
8  meaning, and that your proposed construction is
9  narrow, continuous extents of length with
10  constant line width.  Right?
11     A.   Yes.
12     Q.   Now, as I understand your testimony,
13  you agree that the technical mathematical
14  definition of a line does not apply here?
15     A.   That's correct.
16     Q.   And let's look to see what there is in
17  the specification that relates to your proposed
18  construction.  You also do agree that there is
19  a plain and ordinary meaning of the term lines?
20     A.   Actually, in my opinion, the plain and
21  ordinary meaning of the word lines is narrow,
22  continuous, extensive length with constant line
23  width.
24     Q.   So one technologist says to another,
25  hey, look at the lines in this chart, they

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    would be meaning to themselves narrow,
2    continuous, extents of length with constant
3    line width?  That's the meaning they would have
4    in their head immediately?  No variance from
5    that at all?
6        A.   I don't know what charts you are
7    talking about, but if one touchscreen designer
8    asked another touchscreen designer about lines
9    in a touchscreen design, that's the meaning
10   they would have.
11       Q.   And you didn't provide any evidence of
12   that in your witness statement, did you?
13       A.   Just -- I just discussed where the
14   term came from historically, how I used it in
15   the past, and what my understanding was as an
16   engineer.
17       Q.   Fair enough.  So the specification
18   contains specific discussion about the lines in
19   the '607 patent, doesn't it?
20       A.   It does.
21       Q.   Now, let's look at the '607 patent at
22   column 14, lines 23 through 36.  This is a
23   portion of the specification of the '607 patent
24   specifically discussing the term lines, right?
25       A.   It is a portion of it.  It starts

1    earlier.
2        Q.   And this portion says, "the lines may
3    be formed from almost any shape, whether
4    rectilinear or curvilinear, the lines in each
5    layer may be the same or different, for
6    example, the lines may alternate between
7    rectilinear and curvilinear, further still, the
8    shape of the opposing lines may have identical
9    shapes or they may have different shapes.  The
10   geometry of the lines (e.g. line widths and
11   spacing) may also be widely varied.  The
12   geometry of the lines within each layer may be
13   identical or different.  By way of example, the
14   line widths of the sensing lines 152B to
15   driving lines 152A may have a ratio of about 2
16   to 1."  That's the description in this portion
17   of the specification about lines, right?
18       A.   That's one paragraph out of the
19   description, yes.
20       Q.   And you would agree with me that that
21   paragraph, read fairly by one skilled in the
22   art, is saying there can be a lot of variety in
23   those lines?
24       A.   There is a lot of variety, but
25   specific variety.

1        Q.   Specifically any shape?  That's really
2    specific in your mind?
3        A.   I don't think that's what it is
4    saying.  I think what it is really saying, if
5    you read it in the context of the previous
6    paragraph and the next paragraph, I think what
7    it is saying is it can be straight or it can be
8    curved.
9             And of course, when you think about a
10   line, a line being something you might draw
11   with a ball point pen, for example, it would be
12   reasonable to say you can draw a line in any
13   shape, where what you really mean is that you
14   can draw it straight, you can draw it at any
15   variety of curve, but you don't mean that the
16   line itself could be a solid oval.  That's not
17   something that an ordinary person would call a
18   line or that it would be the shape of a star.
19   It would still be something like you could draw
20   with a pen.
21       Q.   The actual words used at column 23 are
22   the lines may be formed from almost any shape,
23   right?  Those are the words used?
24       A.   That's part of a sentence, that's
25   correct.

1        Q.   Okay.  Now, the specification does not
2    anywhere describe the lines as narrow, does it?
3        A.   No.  I think that's plain and ordinary
4    meaning, and it is consistent with everything
5    in the specification.
6        Q.   The specification doesn't even use the
7    word narrow, does it?
8        A.   No, it illustrates narrow lines, but
9    it doesn't use the word.
10       Q.   Well, you understand that examples in
11   the specification can't be used to limit the
12   claims just because a narrow line is shown,
13   that doesn't mean all lines are narrow, right?
14       A.   That's right.  Plain meaning is what I
15   used.
16       Q.   And the specification doesn't anywhere
17   say the lines have to be narrow or any words to
18   that effect, does it?
19       A.   There is not an explicit limitation
20   that says narrow in the spec.
21       Q.   And the specification does not
22   anywhere say that the lines have to have
23   constant line width, does it?  That's never
24   specified at all?
25       A.   I don't recall any place where that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1291

1   was specific.  That's the normal definition of
2   a line.
3        Q.    The specification also does not ever
4   use the word continuous to describe the lines?
5        A.    Well, what's taught in the
6   specification wouldn't work unless the lines
7   were continuous.
8        Q.    The lines have to be able to drive --
9   act as driving lines and sense lines, right?
10  That's the function of the lines in the '607
11  patent, right?
12       A.    That's the function of the claimed
13  lines.  I'd have to go carefully and see if
14  there were any lines discussed.
15       Q.    I am only talking about the claim
16  lines.  Those are the ones you opined about,
17  right?
18       A.    Yes.
19       Q.    The claim lines is -- your
20  interpretation is they are driving lines and
21  sensing lines, right?
22       A.    That's correct.
23       Q.    That's their function?
24       A.    Yes, that's their function.
25       Q.    And you could have lines that are

Page 1292

1   drive lines and sense lines that don't have a
2   constant line width, can't you, for sure?
3        A.    Well, I don't think they would be
4   lines.  You could have drive electrodes and
5   sense electrodes that don't have a constant
6   line width, but this patent doesn't teach you
7   how you would figure out location of those.
8        Q.    You don't need a constant line width
9   in order to form the function of driving or
10  sensing, do you?
11       A.    No, but you might need it to figure
12  out where the driving and sensing was coming
13  from.
14       Q.    You don't need the lines to be narrow
15  in order to perform the function of driving or
16  sensing as claimed, right?
17       A.    Well, I think as claimed you do,
18  because it says lines.
19       Q.    Putting aside your definition -- I am
20  just talking about the function.  You have said
21  that the definition of the function in the
22  claims of the lines is either to sense or
23  drive?
24       A.    Yes.
25       Q.    And putting aside whether you call

Page 1293

1   them lines under your ordinary meaning, the
2   structure can sense or drive even if it is not
3   narrow within your definition of narrow?
4   That's true, isn't it?
5        A.    You could have a drive or sense
6   electrode that's not narrow in some situations,
7   that's correct.
8        Q.    All right.  So let's put up your
9   illustrative slide 23A.  I believe you used
10  this in the tutorial.  This is RX -- RDX-1.
11  Here we go.
12            This is your -- let's start here.
13  This is your category breaking down the
14  Motorola products into three categories
15  relating to this issue of lines.  Do you recall
16  that?
17       A.    Well, it wasn't related to a
18  particular issue.  There were three categories
19  of product based on general similarities of the
20  way that their sensors were built.
21       Q.    Fair enough.  All right.  So let's
22  take the first category.  Category 1 is what
23  you called Flooded X basic, right?
24       A.    Yes.
25       Q.    And that covers the Atrix, Bravo,

Page 1294

1   Charm, Citrus, Cliq 2, Defy, Droid 2 Global,
2   Droid Pro, Droid X, Droid X2, FlipSide,
3   Titanium and XPRT devices, right?
4        A.    Yes, that's right.
5        Q.    Let's take that category first, the
6   Flooded X basic and go to slide 23A.  This was
7   something you used in the tutorial, as I recall
8   it; is that right?
9        A.    I think that's right.
10       Q.    And you showed on the left side in 23A
11  in blue the sense electrode pattern and in
12  purple on the right, the drive electrode
13  pattern, right?
14       A.    For one particular product, yes.  This
15  is a typical product, the Droid X.
16       Q.    But as I understand it, your testimony
17  was that this product is representative of all
18  of the category 1 products.  Is that fair?
19       A.    Actually, the accusations were made on
20  this product and not on others.  There is no
21  evidence presented about any of the other
22  products, so I tried to group my response in a
23  way where I responded to similar products in
24  the same way.
25       Q.    Do you understand that there is any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   difference between the product reflected on
2   your slide 23A and any of the other category 1
3   products?
4       A.   With respect to my opinions on
5   infringement in the '607 patent, no.  I said
6   no.
7       Q.   No, okay.  So let's go back to 23A.
8   The one in blue, the pattern in blue on the
9   left reflects the sense layer and the one on
10  right in purple reflects your depiction of the
11  drive layer; is that fair?
12      A.   Well, they are Motorola's depictions,
13  not mine.  But otherwise that is fair.
14      Q.   Motorola's depiction as used by you in
15  the tutorial.
16      A.   Yes.
17      Q.   Now let's take the one on the left for
18  a second.  You agree that those lines shown in
19  blue on the left on slide 23A are lines within
20  the meaning that you have ascribed to that
21  term?
22      A.   The ones in the center, the two on the
23  outside are not.
24      Q.   The eight or so lines that are in the
25  middle, those, you agree, are, in fact, lines,

1   right?
2       A.   Yes, not necessarily the claimed
3   lines, but they are lines.
4       Q.   But they meet your definition of
5   lines, putting aside any of the other
6   limitations in the claim, just that what a line
7   means under your definition, they meet that
8   definition, right?
9       A.   Yes, if I separately consider my
10  construction of line, or either of the proposed
11  constructions of lines, they are lines.
12      Q.   And if we go to the right on the right
13  in purple, the drive layer, what you have
14  described as the drive layer, the accused lines
15  -- I realize you are not agreeing that they are
16  lines -- are the somewhat thicker purple
17  horizontal portions.  Is that fair?
18      A.   That's my understanding, is that's
19  what's been accused.
20      Q.   And as I understand your contention,
21  it is that those members, let's call it that
22  for a minute to avoid --
23      A.   That's another claim word.  We prefer
24  electrodes.
25      Q.   Let's take electrodes.  Those

1   electrodes are not lines under your definition
2   because they are too wide; is that fair?
3       A.   That's one of two reasons.
4       Q.   And the other reason?
5       A.   Because they have a dual function.
6   They are intentionally wide in order to act as
7   a shield, so because they are performing two
8   functions, they are not really just -- they
9   would be much narrower if one only wanted to
10  perform the drive function.
11      Q.   So let's explore that.  That's
12  helpful.  Thank you.
13          The electrodes we have in purple on
14  the right, they perform two functions, one is
15  the function of the driving function that's
16  described in the claim, right?
17      A.   Of carrying the drive signal across
18  the screen, yes.
19      Q.   And the second function is the shield
20  function that you referred to.
21      A.   That's correct.
22      Q.   The claim doesn't say that the lines
23  can't perform other functions, right?
24      A.   That's right.
25      Q.   And you understand as a matter of

1   basic patent law, as you were instructed by
2   counsel, that something can infringe if it
3   satisfies the requirements of the claim, even
4   though it does other things?  You know that,
5   don't you?
6       A.   I do.
7       Q.   All right.  So the fact that those
8   electrodes perform a function other than drive
9   lines doesn't mean they don't infringe, in your
10  mind, right?  That's not a basis, is it?
11      A.   Not alone.  It informs my opinion that
12  they are wide by helping me understand why they
13  are wide.
14      Q.   Now, the width of those electrodes is
15  about five millimeters, right?
16      A.   I think that's correct on this
17  particular pattern, yes.
18      Q.   And they do drive current, right?
19      A.   They don't drive current, but they
20  carry current that's being driven on to them.
21      Q.   They are used to drive current?  Fair
22  enough?
23      A.   They are used by the circuit that
24  drives current.
25      Q.   Let's go to your second category,

APLNDC-X0000006382

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1299

1 category 2, which I believe you call Flooded X
2 with X interpolation. Do you recall that?
3    A.   Yes.
4    Q.   And let's bring up slide 24A. This
5 was also from your tutorial of your depiction
6 of a representative product of category 2 of
7 Flooded X with Y interpolation. Is that fair?
8    A.   Yes.
9    Q.   Let's start with the right side in
10 purple again. As I understand your opinion, it
11 is again that those purple horizontal
12 electrodes are not lines because they are too
13 wide?
14    A.   Yes, because they are wide and
15 intended to fill up as much space as possible.
16    Q.   And they are also still about five
17 millimeters thick or so?
18    A.   Five millimeters wide.
19    Q.   Wide, right?
20    A.   So they are rectangles 5 wide and
21 maybe something like 3, 4 centimeters long.
22    Q.   So the bases of your opinion as to the
23 category 2 devices are the same as category 1
24 with respect to the drive electrode pattern; is
25 that fair?

Page 1300

1    A.   Yes.
2    Q.   Now, if we go to the sense electrode
3 pattern, here as I understand it, you dispute
4 whether the crossing members or the members
5 that are shown are lines within the meaning of
6 the claim. Is that fair?
7    A.   That's something that I haven't
8 considered. My understanding of what was being
9 accused was at one point the entire electrode
10 with its cross shape that was going in two
11 directions at once was being accused. My
12 understanding is that's not the case anymore.
13 My understanding is that right now, only the
14 central portion of the electrode is being
15 accused.
16        And my opinion is that that's not the
17 claimed line for various reasons.
18    Q.   Let's see if we can narrow in focus.
19 I take it you agree that with respect to the
20 elements in blue on RDX -- on your
21 demonstrative Exhibit 24A, they are not
22 disqualified from being lines by virtue of
23 being too wide, they are thin enough to meet
24 your definition, right?
25    A.   We're talking about the entire

Page 1301

1 electrode structure that goes off in two
2 directions?
3    Q.   Yes. We're talking about what you
4 have depicted on 24A. Exactly.
5    A.   Individual pieces of it are thin
6 enough to be lines, but as a whole, it is not
7 even shaped like a line.
8    Q.   Let me -- just for the record, let me
9 try to do it this way. There are a number of
10 vertical and horizontal aspects to the blue
11 figure that reflect, without the callout, a
12 mesh type appearance. Do you agree with that
13 generally?
14    A.   A mesh-type appearance, it is not a
15 mesh, but it is -- it looks that way if you get
16 far enough away.
17    Q.   That's exactly why I said before we do
18 the callout. And trust me, we'll get to the
19 callout.
20    A.   Okay.
21    Q.   But I am trying to orient ourselves so
22 we're talking about the same things.
23    A.   Okay.
24    Q.   There is a number of vertical aspects
25 to that mesh and horizontal aspects to that

Page 1302

1 mesh, and they appear to have a width in the
2 horizontal and vertical direction individually.
3 Do you see that?
4    A.   Yes.
5    Q.   As I understand your opinion, you are
6 not saying those individual elements in the
7 horizontal and vertical direction are too wide
8 to be lines. That's not the basis for your
9 opinion?
10    A.   That's correct. There are other
11 reasons why they are not the claimed lines and
12 together when they are combined, I don't think
13 they are shaped like a line, but independently,
14 yes, independently the vertical portion of each
15 electrode is a line and independently each
16 horizontal portion of each electrode is a line.
17    Q.   Now, the structure that's shown on the
18 left in blue on your 24A demonstrative exhibit,
19 that does perform that sense function that you
20 described in the claims, doesn't it?
21    A.   The electrode as a whole does perform
22 the function of sensing, yes.
23    Q.   It does, okay.
24        Now, you understand, do you not, that
25 the Staff considered both the purple and the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1303

1  blue to be lines within the meaning of the
2  claim?
3      A.   I'm not sure I fully understand
4  Staff's opinion.  I think that at some level,
5  they said it was under doctrine of equivalents,
6  but I have not fully understood what Staff's
7  opinion was.  It was based on legal issues.
8      Q.   Okay.  So fair enough.  I will leave
9  it there.
10      All right.  Let's stay with the --
11  well, let's go to the category 3 for just a
12  minute, just to be complete, and bring up your
13  demonstrative regarding category 3, Flooded X
14  with X/Y interpolation.  That was your
15  demonstrative discussion of that category, Dr.
16  Wolfe?
17      A.   Yes.
18      Q.   And let's start again with the purple
19  for a minute in the middle.  I take it you
20  dispute whether those electrodes are lines
21  within the meaning of the claims?
22      A.   I actually even dispute whether or not
23  they are electrodes.  There is only one piece
24  of metal there.  It is connected all the way
25  through.  It is really just one electrode.

Page 1304

1      Q.   You do understand, though, in the
2  Motorola products that what you have depicted
3  in the center purple portion of 25C is
4  connected to multiple independent places in the
5  accused products to drive individual channels.
6  You're aware of that?
7      A.   No, not individual channels.  In this
8  case, it is connected -- depending on which
9  product, but every third line or -- I mean,
10  every third connection back, trace back to the
11  Atmel chip, so every third portion of an
12  electrode has a trace back to the Atmel chip.
13      And those are driven in groups, so
14  that multiple channels are driven at once.
15      MR. NELSON:  Your Honor, I hate to
16  interrupt.  At this point, we're getting down
17  to the Atmel level, so I think I have to
18  protect their confidential information so we
19  need to go on the confidential record.
20      JUDGE ESSEX:  Very well.
21      MR. POWERS:  I think we don't need to
22  go any further on this subject, so I think we
23  can skip it.  I think we have covered what I
24  want to cover.
25      MR. NELSON:  Okay.

Page 1305

1      JUDGE ESSEX:  All right.  Let's go
2  ahead and try to stay on public record then.
3      MR. POWERS:  We may have to go back on
4  the confidential record --
5      JUDGE ESSEX:  I understand that.
6  That's perfectly fine.
7      MR. POWERS:  But I think we're okay
8  here.
9  BY MR. POWERS:
10      Q.   Let's shift gears and talk about
11  validity of the '607 patent.  And one of the
12  references that you relied upon and, in fact,
13  one of the primary references is called a
14  SmartSkin reference.
15      A.   Yes, it is a paper by Jun Rekimoto
16  that talks about a product he developed called
17  SmartSkin.
18      Q.   You admit the claims of the '607
19  patent require that the touch sensors be
20  transparent, right?
21      A.   Yes.
22      Q.   You understand that.  And you
23  understand that the actual embodiment shown in
24  the SmartSkin reference are not transparent?
25      A.   The embodiment shown in the pictures?

Page 1306

1      Q.   Yes.  Everything that is shown as an
2  actual embodiment, none of that is transparent,
3  they are all opaque, right?
4      A.   If you just mean shown in pictures,
5  the embodiment that is shown in pictures is
6  opaque.
7      Q.   And beyond opaque, the primary
8  embodiment is a very large piece of plywood
9  where a projector is projecting down from on
10  top, right?
11      A.   I don't know if I'd characterize that
12  as a primary embodiment.  There are multiple
13  embodiments in there and that's one of them.
14      Q.   Well, let's look at it.  Let's look at
15  JX-367, page 2, which is figure 3 of the
16  SmartSkin reference.  Let me know when you have
17  it.
18      It is figure 3.  Dr. Wolfe, just
19  before we start, this exhibit, JX-367, that is
20  the SmartSkin reference on which you are
21  relying?
22      A.   Yes, it is.
23      Q.   And figure 3 shows the embodiment that
24  is a very, very large piece of plywood on to
25  which a projector shines?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1307

1    A.   That's what figure 3 is, yes.
2    Q.   And, in fact, every figure of the
3  SmartSkin reference is showing an opaque
4  sensor, right?
5    A.   Well, it depends.  If you look at
6  figure 9, it is predominantly transparent, but
7  it does have some copper wires that you might
8  be able to see.
9    Q.   Copper is not transparent in that
10  figure, is it?
11   A.   Right.  And the figure 9 picture there
12  is some very thin copper wires.  You can't see
13  them in this picture, but if you got close
14  enough, you might be able to see them.
15   Q.   Now, let's go to page 7 of the
16  SmartSkin reference.
17   A.   Okay.
18   Q.   It is .007 at the bottom right.  We
19  have numbered them internally just to make it
20  easier to find.
21   A.   Yes.
22   Q.   And there is a section that starts
23  about the middle of the left-hand column,
24  conclusion and directions for future work.  Do
25  you see that?

Page 1308

1    A.   Yes.
2    Q.   And this is a discussion, this begins
3  a discussion of what this group said they may
4  be doing in the future, might be possible in
5  the future.  Is that fair?
6    A.   It begins that discussion, yes.
7    Q.   And let's go to, on the next column,
8  there is a column that relates to sensors.
9  Let's bring that up.  And it is talking about
10  use of transparent electrodes.
11        This is the portion that you are
12  relying upon in the SmartSkin reference to say
13  it could have been transparent, even though
14  they didn't build one at that time that was
15  transparent, is that fair?
16   A.   The second paragraph, but, yes, in
17  general, he says that it will work with a
18  transparent sensor.  And a person of ordinary
19  skill that would read this would understand
20  that that's an ordinary row/column transparent
21  sensor.
22   Q.   They don't actually show in this
23  section or anywhere in the article how you
24  would use a transparent sensor and plug it into
25  the SmartSkin reference, do they?

Page 1309

1    A.   It would be the same way as the
2  non-transparent sensor.  You would just use --
3    Q.   I didn't ask your view of it.  I asked
4  whether they showed it.
5    A.   Well, in my opinion, they do show it
6  in figure 2.
7    Q.   Can you show me a figure or a text
8  that says exactly what -- how they would
9  implement SmartSkin with transparent sensors?
10   A.   Yes, to a person who understands this
11  paper, figure 2 tells you exactly how they
12  would do it with a transparent sensor.
13   Q.   Let's go to figure 2.  Let's go to
14  figure 2.  Figure 2 doesn't show a transparent
15  sensor, does it?
16   A.   It is the same kind of drawing that's
17  in the '607.  To a person who understands the
18  technology, it doesn't matter whether that
19  sensor is transparent or opaque.
20   Q.   But there is nothing in figure 2 that
21  is a transparent sensor.  In fact, if you read
22  the whole thing, you know that the sensor that
23  they are talking about in figure 2 is a
24  non-transparent sensor, opaque, right?
25   A.   No, you know that they describe how to

Page 1310

1  build a sensor with rows and columns of
2  conductors, and then they talk about a
3  particular first embodiment they made that was
4  opaque, and then how you could build a
5  transparent one as well.
6    Q.   So in your view, based on the
7  SmartSkin reference, it would be obvious to
8  have a display with multiple transparent
9  sensors?  That's your opinion?
10   A.   With multiple sensors?
11   Q.   Yes.  Multiple transparent sensors.
12   A.   I am missing something.  I don't know
13  why it would need to be multiple transparent
14  sensors.  It would be one transparent sensor
15  over the top of the display.
16   Q.   With multiple electrodes, right?
17  Multiple places where you would detect?
18   A.   Yes, with rows and columns just like
19  in transparent sensors that were normally used
20  at the time, and using the mutual capacitance
21  scanning technique and circuits that are
22  described in this particular publication.
23   Q.   And in your view, all of that is
24  obvious from SmartSkin?
25   A.   I think it is more than obvious.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1311

1  think it is disclosed, but I think it is also
2  obvious.
3      Q.   Now, you, in your opinion, as I
4  understand it, combined the SmartSkin reference
5  with the Rekimoto '033 application as -- to
6  support your conclusion regarding obviousness;
7  is that fair?
8      A.   In addition to my opinion on
9  anticipation and obviousness of this reference,
10  I also noted that I thought that a person of
11  ordinary skill would be motivated to combine
12  this with a patent that Mr. Rekimoto had
13  published a year before, that described the
14  same basic technology that specifically
15  disclosed a transparent sensor and showed a
16  picture of it.
17      Q.   Let's go to that Rekimoto '033
18  application.  The translation you relied on is
19  RX-1888, is it not?
20      A.   No, I mentioned I relied on two
21  translations, but I used illustrations from one
22  of them.
23      Q.   And you have the same opinion under
24  either translation, I assume?
25      A.   Yes, absolutely.  I didn't notice any

Page 1312

1  material differences between the translations.
2      Q.   So let's use RX-1888.  Let me know
3  when you have it.
4      A.   I'm sorry.
5      Q.   Now, specifically within RX-1888, the
6  portion that you cited in your expert report
7  and witness statement was figure 9 of RX-1888,
8  right?
9      A.   I may have cited more than that in the
10  appendix, but I certainly cited figure 9.  I'd
11  have to look to see if I cited more than that.
12      Q.   Let's go to figure 9.  Figure 9 is an
13  OLED sensor, is it not?
14      A.   No, no, no.  No, figure 9 is a touch
15  sensor.  And it goes over an electromagnetic
16  display that is alternately described in the
17  text as an OLED.
18      Q.   So let's --
19          JUDGE ESSEX:  Pardon me just one
20  moment while you are doing that.  What is an
21  OLED?
22          THE WITNESS:  Organic LED display.  So
23  what that is, is it is an emissive display, it
24  looks very much like an LCD, but it is made of
25  organic material and it actually, instead of

Page 1313

1  transmitting light, it actually broadcasts
2  light, but it looks kind of like a TV set.
3          JUDGE ESSEX:  Okay.  I'm sorry.
4          MR. POWERS:  No problem, Your Honor.
5  That was not the next question, but was going
6  to be about two or three later.
7          JUDGE ESSEX:  Oh, I'm sorry.
8  BY MR. POWERS:
9      Q.   Let's look at paragraph 63 of RX-1888.
10  Paragraph 63 is the description of figure 9
11  that you relied upon in your witness statement,
12  isn't it, Dr. Wolfe?
13      A.   Yes.
14      Q.   And it says, "figure 9 schematically
15  illustrates the cross-section of a non-contact
16  user input device 1 integrated with a display
17  device consisting of light-emitting elements
18  made of conductive polymer, i.e., an organic
19  LED."  Which is another way of saying OLED,
20  right?
21      A.   Yes.
22      Q.   The actual SmartSkin reference used an
23  overhead projector, right?
24      A.   In its demonstration, but it described
25  how to build the touch sensor and the

Page 1314

1  electronics that go with it that are shown in
2  figure 9.
3      Q.   But figure 9 is in RX-1888, not
4  SmartSkin, right?
5      A.   Yes.  This is an ordinary row/column
6  transparent sensor that was used in lots of
7  technologies at the time, and clearly
8  Mr. Rekimoto knew how to build one.
9      Q.   Now, as I understood your witness
10  statement, you thought it was significant to
11  the obviousness question that the same person
12  who was involved in SmartSkin, Mr. Rekimoto,
13  had also published the patent application, the
14  '033 application, which we have marked as
15  RX-1888.  That's true, yes?
16      A.   That's one factor I considered.
17      Q.   However, Mr. Rekimoto has not actually
18  made that combination as far as you know?
19      A.   As far as I know, no.  I mean, Sony
20  has made lots of transparent touchscreens, but
21  I haven't investigated whether or not
22  Mr. Rekimoto decided to make that or not.
23      Q.   Have you checked out Mr. Rekimoto's
24  current web site?
25      A.   No, I have only gone to the one link

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1315

1  in Mr. Hotelling's e-mail and looked at the
2  video.
3      Q.   So you did look at originally his web
4  site which described the SmartSkin reference,
5  right, as of about 2003?
6      A.   I looked at the video.  I don't recall
7  anything else that was on the web site.
8      Q.   Chris, let's --
9          MR. POWERS:  We have created, Your
10 Honor -- we will call it CDX-23.  You are
11 familiar with a program called the Wayback
12 Machine.
13     A.   I am.
14     Q.   And the Wayback Machine is a way of
15 determining what a web site looked at
16 particular points in time?
17     A.   It can be, yes.
18     Q.   And so let's put up CDX-23, which is,
19 I will represent to you, from the Wayback
20 Machine, the June 2003 version of Mr.
21 Rekimoto's web site.
22         And let's bring that up so we can see
23 it a little bit better.  There we go.
24         MR. NELSON:  Just a second.  I am
25 going to object at this point, Your Honor, on

Page 1316

1  foundational grounds.  I have never seen this
2  or had a chance to look at it or see where it
3  came from or anything along those lines.  So I
4  am a bit in the dark a tad here, Your Honor.
5          JUDGE ESSEX:  Well, I appreciate it.
6  And being in the dark is a position I am well
7  familiar with, but because we're in
8  cross-examination and because he is asking
9  whether he is familiar with and offering these
10 to determine a witness's familiarity, I am
11 going to allow it.
12         MR. NELSON:  Okay, thank you.
13         JUDGE ESSEX:  If we go deeper into
14 them and so forth, your objection can be taken
15 up, but right now, he is simply confronting the
16 witness with these and what the witness says is
17 a matter that we don't know.  So I am going to
18 let him continue.
19         MR. NELSON:  Thank you, Your Honor.
20         MR. POWERS:  Thank you, Your Honor.
21 BY MR. POWERS:
22     Q.   You looked at Mr. Rekimoto's web site
23 at some point in coming to your opinions,
24 right?
25     A.   No, I did not look at the entirety of

Page 1317

1  his web site.  I knew there was a video there.
2  I went there.  I clicked on the one video and
3  did not look at the rest of it.
4      Q.   You have seen a screen like the one we
5  have shown on CDX-23 when you clicked on the
6  video, right?
7      A.   I don't recall.  Somebody may have
8  actually given me a link that went directly to
9  the video.
10     Q.   So you didn't actually even bother to
11 look at Mr. Rekimoto's web site who you are
12 relying on?
13     A.   I am not relying on his web site.  I
14 am relying on his publications.
15     Q.   Well, but you are also, in fairness,
16 Dr. Wolfe, you are relying on what -- a leap he
17 would have made between the SmartSkin reference
18 and the '033 application because he is the same
19 person, you did rely upon that fact, didn't
20 you?
21     A.   No.  I relied on the fact that as one
22 motivation to combine, a person of ordinary
23 skill in the art at the time who had read Mr.
24 Rekimoto's paper and seen that his circuits
25 would be applicable to a transparent

Page 1318

1  touchscreen, would, among other things, have
2  looked at his other publications to see how to
3  build one.
4      Q.   Now, your opinion is it would have
5  been obvious to that other person looking at
6  what Mr. Rekimoto did to combine Mr. Rekimoto's
7  two publications, right?
8      A.   Yes.
9      Q.   But Mr. Rekimoto himself never
10 actually made that combination, did he?
11     A.   I don't know.
12     Q.   Well, let's put up what I will
13 represent to you is a snapshot from the current
14 -- and let's leave that up if we can, please,
15 Chris, which is CDX-23 and put up CDX-22.
16         And I will represent to you this is a
17 screen shot from Mr. Rekimoto's web site that
18 we took on September 28th.  So, I guess,
19 yesterday.  It is hard to keep track sometimes.
20         And you notice that it adds one
21 picture and no description of any embodiment
22 that has a transparent sensor.
23     A.   On this web site?  That's what I see,
24 yes.
25     Q.   Now, in fact -- well, let me do it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1319

1    this way.  You can pull that down now, Chris.
2         You testified a few minutes ago that
3    you believed that the Rekimoto reference,
4    SmartSkin and '033 individually and combined
5    would make it obvious to have a display with
6    the multiple touch sensing capability that you
7    described.  Do you recall that?
8         A.   That's not exactly what I testified.
9    I testified that the SmartSkin reference
10   anticipates, that the SmartSkin reference would
11   also, if it doesn't anticipate, make it
12   obvious, and that, in addition, the combination
13   of the SmartSkin reference and the Rekimoto
14   reference would make it obvious.
15        Q.   Now, in fact, you believe long after
16   the Rekimoto references, that it was novel and
17   patentable to have a device that was a display
18   with multiple transparent -- multiple sensors,
19   you believed that, didn't you?
20        A.   I don't understand the question.  It
21   would depend on what the claim of that patent
22   is.
23        Q.   Fair enough.  Let's show you another
24   pending application of yours, which is
25   2010/0231548.  Let's put that up on the screen,

Page 1320

1    please, Chris, and get him a copy if he needs
2    one.
3         This is another pending application of
4    yours, Dr. Wolfe?
5         A.   I believe it is, yes.
6         Q.   You filed this application in March of
7    2009?
8         A.   I need to be careful here, because
9    this is -- I have a confidential relationship
10   with someone else who filed this patent.  I'm
11   the inventor.  I did not file it.
12        Q.   This is a published document from the
13   PTO showing a publication?
14        A.   I can certainly answer questions about
15   the published document.
16        Q.   That's all I am going to ask you
17   about.  And if any of my questions get to some
18   confidential information you shouldn't
19   disclose, please tell me.  For right now, all I
20   am asking is, this is an application for a
21   patent that was filed in your name and others
22   on March 10, 2009 as it shows on the first
23   page?
24        A.   That's correct.
25        Q.   That's not confidential?

Page 1321

1         A.   That is not confidential.
2         Q.   Now, let's go to claim 1 as you filed
3    it.  Bring up the entirety of claim 1.
4              Claim 1 is short and it says, "a
5    device that is responsive to a touch from a
6    user," I take it under your opinions regarding
7    SmartSkin and Rekimoto here, you would agree
8    that that's disclosed in SmartSkin and
9    Rekimoto, right?  Is that true?
10        A.   Yes, if that's a limitation.
11        Q.   And the first paragraph says, "a
12   display comprising a plurality of
13   touch-sensitive locations."  Under your
14   interpretation, as you have offered your
15   opinion here, SmartSkin and Rekimoto clearly
16   discloses that limitation as well, right?
17        A.   Yes.
18        Q.   The next limitation says, "measurement
19   circuitry electrically coupled to both the
20   display and to each of the plurality of
21   touch-sensitive locations."  I take it you
22   would agree that's disclosed in SmartSkin and
23   Rekimoto as you have described it here?
24        A.   No, no, that means the measurement
25   circuit connects both to the touchscreen and to

Page 1322

1    the actual display, that the actual wire goes
2    both ways down into the display.
3         Q.   Let's pause on that one for a minute,
4    but I understand your point.  Let's do the
5    wherein point and come back.
6         A.   That's the novel aspect.
7         Q.   "Wherein each of the touch-sensitive
8    locations affected by the touch generates a
9    signal change in its respective associated
10   measurement circuitry."  You agree, under your
11   interpretation of SmartSkin and Rekimoto, each
12   of the touch-sensitive locations affected by
13   touch generates a signal change, right?
14        A.   Yes, but not in the associated
15   circuitry because that's tied to this.  This
16   patent is about something that actually
17   communicates signals back and forth between the
18   pixel and the touchscreen.
19        Q.   All right.  So let's -- in that case,
20   let's -- but you agree that in Rekimoto, it
21   discloses having a display which actually
22   includes the touch-sensitive locations?
23        A.   Yes.
24        Q.   In the display?
25        A.   Well, no, no, no.  The touch-sensitive

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1323

1  locations are above the display in Rekimoto.
2  They are not in the display.  When it says
3  integrated, it just means one is glued on top
4  of the other.
5      Q.   All right.  So let's go to your
6  Demonstrative Exhibit 12 from your witness
7  statement.  Let's bring that up.  Well, that's
8  definitely not the right one.  It is probably
9  from the other report, Chris.
10     From the initial report, Wolfe RDX-12.
11  Apparently we don't have it.  Can we switch
12  over so you can put up from the original
13  initial report illustrative Exhibit 12 of Dr.
14  Wolfe.  It is looking familiar.  We're in the
15  right neighborhood.
16     A.   Same one.
17     Q.   We just took a wrong turn.
18         JUDGE ESSEX:  All this location
19  technology, we can't get there.
20         MR. POWERS:  Usually we can, but there
21  is always -- there is always one, Your Honor.
22  We seem to be honing in on it, but we're not
23  quite there, Your Honor.  I am told we're
24  getting close.
25         MR. NELSON:  You could use the ELMO.

Page 1324

1         MR. POWERS:  We could but that's so
2  second rate.  I would rather fumble around
3  looking for this one.  We're getting close, I
4  think.  Ah-huh.
5  BY MR. POWERS:
6      Q.   We're now there.  Now, Dr. Wolfe, do
7  you recognize RDX-12 that we have got on the
8  screen as an illustrative exhibit that you used
9  in your witness statement?
10     A.   Yes.
11     Q.   And you said with regard to the
12  Rekimoto '033 that you relied upon for
13  invalidity that it "teaches a multilayer,
14  mutual capacitance-sensing grid of transparent
15  conductive lines used to detect multiple
16  touches that can be integrated in or laid on
17  top of an LCD display device."
18         Do you see that?
19     A.   Yes, that's -- that's the way Rekimoto
20  described it.
21     Q.   And that was accurate, right?
22     A.   Yes.  If you use the words the way he
23  described it in the patent.
24     Q.   Now, apparently, the problem has been
25  resolved, Your Honor, and so for the record,

Page 1325

1  that is slide 12 from RDX-9.  So RDX-9.12
2  apparently is how it is being used.
3         JUDGE ESSEX:  All right.
4         MR. POWERS:  And, Your Honor, we will
5  mark Dr. Wolfe's patent application that we
6  were just discussing, publication 2010/0231548,
7  as CX-602.
8         (Complainant Exhibit Number CX-602 was
9  marked for identification.)
10  BY MR. POWERS:
11     Q.   Your '602 application, Dr. Wolfe,
12  specifically also related to an OLED device,
13  OLED, same type of device that His Honor asked
14  about?
15     A.   That was the disclosed embodiment,
16  yes.
17     Q.   All right.  By the way, have you had
18  any involvement in the prosecution of that
19  application after April 8th of 2011?
20     A.   I signed my oath, and that was the
21  last thing I did, so I don't recall the dates.
22     Q.   All right.  Let's turn to a different
23  topic.
24         MR. POWERS:  Your Honor, this would
25  probably be a good time for a mid-afternoon

Page 1326

1  break, because it will be a totally different
2  topic, if you wish.  I am happy to go forward
3  if you want.
4         JUDGE ESSEX:  We can take a break if
5  this is a turning point.  Let's come back at
6  the hour.  We're in recess.
7         (A recess was taken at 2:41 p.m.,
8  after which the trial resumed at 3:00 p.m.)
9         JUDGE ESSEX:  Let's come to order.
10  Are we ready?
11         MR. POWERS:  We are, Your Honor.
12         JUDGE ESSEX:  Proceed.
13         MR. POWERS:  Thank you.
14  BY MR. POWERS:
15     Q.   Dr. Wolfe, before the break we had
16  talked about two of your pending applications
17  that related to touch sensing devices.  One was
18  the touch sensing doll that would do something
19  when you touched it and the other is the OLED
20  display.
21         Do you recall those generally?
22     A.   Yes, the invention on the second one
23  is not an OLED display, but I understand what
24  you are talking about.
25     Q.   Have you either filed any applications

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1327

1   in the area of touch displays or had any
2   involvement in prosecution in any such
3   applications since you signed on to the
4   protective order in this case on April 8th of
5   2011?
6       A.   No.
7       Q.   You do understand that that's
8   prohibited under that protective order?
9       A.   I would have to go back and read the
10  protective order, but in any case, I have not
11  been involved in any filings or prosecutions of
12  anything since that time.
13      Q.   Understood.  Thank you.
14          Let's switch gears now and talk about
15  the Perski '455 reference.
16      A.   Okay.
17      Q.   That's a reference on which you have
18  relied in your opinion of invalidity with
19  regard to the '607 patent, right?
20      A.   Yes, it is.
21      Q.   And let's bring out the Perski, bring
22  up the Perski reference, RX-708, please, Chris.
23          The filing date of the Perski '455
24  reference that you rely upon is January 15th,
25  2004, right?

Page 1328

1       A.   That was the filing of the final
2   version of the application, there were
3   provisionals.
4       Q.   Understood.  I am going to get to
5   that, trust me, but in terms of the actual
6   reference, the '455 reference on which you
7   relied, its filing date was January 15th of
8   2004, right?
9       A.   That's correct.
10      Q.   And you understand that that date,
11  filing date of Perski's '455 patent application
12  of January 2004 is after the conception date in
13  2003 that Apple contends it is entitled to.  I
14  am not asking you to agree to that.  I am
15  asking whether you understand that contention?
16      A.   Yes, at that level, I understand that
17  it is after what Apple contends.
18      Q.   And one response that you have made to
19  that contention is that the Perski '455 patent,
20  which has been marked as RX-708, is entitled to
21  a priority date of a provisional application
22  called the '808.  Right?
23      A.   That's what's been represented to me
24  by counsel.  What I did was look at the '808
25  and determine whether or not the elements of

Page 1329

1   the '607 claims are disclosed in the '808 and
2   they were.
3       Q.   And you weren't relying on the '808
4   provisional application as prior art, were you?
5       A.   Not as a publication, no.  I was
6   relying on my understanding -- my testimony is
7   that that document describes and discloses
8   every element of the asserted claims.  My
9   understanding is that the reason that's
10  relevant is because those same disclosures were
11  substantially present in the '455 patent.
12      Q.   So just to make sure that it is clear
13  in the record what your opinion is, you are not
14  contending that the '808 provisional
15  application is itself independently prior art
16  that invalidates the '607 patent, you are not
17  contending that, right?
18      A.   Again, my primary opinion is that it
19  discloses all the elements of the claims, and
20  the legal opinion based on that, I don't have
21  enough understanding of the law, but my
22  understanding of the law as it has been
23  formatted and presented is that that supports
24  the date that the '455 patent disclosed
25  particular things.

Page 1330

1       Q.   Fair enough.  Let's try it that way.
2          As I understand your opinion, it is
3   that the '455 patent, which you are contending
4   is prior art, is earlier than Apple's
5   disclosure because it gets the benefit of the
6   '808 provisional's priority date that's
7   earlier?
8       A.   Yes, that's how I understand the
9   relevance of my opinion that the elements are
10  disclosed in the '455 and the same way in the
11  '808.
12      Q.   And you base that opinion, i.e., the
13  opinion that the '455 Perski gets the benefit
14  of the earlier provisional application date
15  based on your contention that the disclosures
16  in the '455 patent are verbatim the same as
17  '808?  Do you recall that?
18      A.   Yeah.  And that's wrong.  So that's an
19  error that was pointed out in my testimony.  If
20  you read through what I said, what I was saying
21  was they were essentially the same, and I used
22  those words, and then I did use the word
23  verbatim and you are right, I should have used
24  the word essentially verbatim.
25      Q.   All right.  Or substantially verbatim?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1331

1    Let's just make sure we have a clear
2  record. Your witness statement submitted to
3  the Court said that you believe the '455 patent
4  got the benefit of the '808 provisional because
5  the disclosure of the '808 provisional was
6  verbatim the same as '455. That's what you
7  said in the witness statement, right?
8    A.  Well, what I said was they were
9  essentially the same. And then I went on to
10  explain what I meant by that. And in one place
11  in that explanation, actually two places in
12  that explanation, I did use the word verbatim.
13    Q.  Well, let's bring it up just so we're
14  not debating the language in the abstract.
15  RX-1895 at page 119. Question 305. Chris, can
16  you bring up the language that we're talking
17  about, please. Page 119.
18    A.  I am on a different page. I think I
19  am in a different document than you are.
20    Q.  It is RX-1895, which is your witness
21  statement, rebuttal statement and -- 1885. Let
22  me know when you have it. Do you see this is
23  your response to question 305?
24    A.  Yes, I see what's there.
25    Q.  On page 118, spilling over to page

Page 1332

1  119, you give some disclosures that you find in
2  the Perski '455 and then you say, "moreover,
3  each of the above disclosures is supported by
4  (and, in fact, originated, verbatim, in) the
5  Perski '808 provisional, which was filed in
6  February of 2003."
7    Do you see that?
8    A.  I do.
9    Q.  And as I understand your testimony a
10  few minutes ago, you now understand that that's
11  inaccurate. Fair?
12    A.  As written, the word "verbatim" needs
13  to be taken out. Everything else is accurate
14  in the entire answer of the question.
15    Q.  We have prepared an illustrative
16  exhibit, Your Honor, CDX-20, which is a red
17  line of the relevant portion of Perski '455
18  against the '808 application. We would like to
19  put that up on the screen.
20    Do you have a copy of that, CDX-20?
21  It is going to be a little hard to read on the
22  screen.
23    I can give you mine, if you like.
24  Here you go. May I approach, Your Honor?
25    JUDGE ESSEX: Yes.

Page 1333

1  BY MR. POWERS:
2    Q.  On CDX-20 is we have noted and this is
3  showing in blue the portions that were added in
4  Perski '455 that were not in Perski '808 and in
5  red the portions that are stricken through are
6  the portions that were in '808 that aren't in
7  '455.
8    Do you understand?
9    A.  For this page, yes.
10    Q.  And since your witness statement you
11  have done a comparison and understand that, in
12  fact, there are differences, both additions and
13  deletions between what Perski '808 provisional
14  said and Perski '455 patent said on the subject
15  of multi-touch capacitance, right?
16    A.  No, I just put the word verbatim in by
17  error. I knew all along said in other places
18  it wasn't verbatim and simply misused one word.
19    Q.  Fair enough. I am not trying to be
20  technical.
21    A.  So, no, I haven't done any more
22  comparison. As soon as it was pointed out the
23  word was there, it was clear that word was not
24  correct.
25    Q.  Okay. But you do understand there are

Page 1334

1  many differences, both additions and deletions
2  between the provisional '808 and the final
3  '455?
4    A.  In terms of words, yes. In terms of
5  meaningful substance of the claims, no.
6    Q.  All right. So let's talk about the
7  meaningful substance. The Perski embodiment
8  that you rely on for being multi-touch is
9  substantially slower than the '607 embodiment,
10  is it not?
11    A.  I don't even --
12    Q.  From the '455?
13    A.  I don't even know what that means.
14  The '607 doesn't tell us how fast it needs to
15  be.
16    Q.  All right. Fair enough.
17    A.  I guess in one embodiment it tells you
18  how fast it is.
19    Q.  Let's bring up, Chris, if we can,
20  RDX-1.11 from Dr. Wolfe's tutorial. Do you
21  recall, Dr. Wolfe, preparing this as part of
22  your tutorial where you showed how the '607
23  patent does row-by-row analysis of the various
24  sensors?
25    A.  Yes.

Page 1335

1    Q.   And you recall lighting up each row as
2  we go?  And I think we have got that animation
3  set up in the way that you did it.
4    A.   Yes.
5    Q.   Do you recall demonstrating to the
6  Court this row-by-row addition where you are
7  going each row?
8    A.   That's not my demonstration, but my
9  demonstration, one blue line at a time.
10    Q.   Did go -- went a line at a time?
11    A.   Yes, the blue lines lit up one line at
12  a time.
13    Q.   Okay.  Now, that was your description
14  of the '607 patent, how it went row by row?
15    A.   How it scans row by row.  Yeah, that
16  was a general description, yes.
17    Q.   And that's -- if there is 14 rows,
18  that's 14 scans, right?
19    A.   Yeah, I didn't count them, but if
20  there is 14 rows, that's right.
21    Q.   Now, the Perski '455 reference on
22  which you rely talks about scanning at each
23  intersection one at a time, not row by row,
24  right?
25    A.   Let's look at it.  It may.

Page 1336

1    Q.   That's your recollection, isn't it?
2    A.   I recall that sentence -- I don't
3  recall them one at a time in that sentence, so
4  I would have to look at the text to remember
5  exactly what its scanning pattern was.
6    Q.   Do you recall that Perski '455
7  specifically talks about one intersection at a
8  time?  Do you recall that?
9    A.   It talks about generating -- I don't
10  recall the exact text.  I'd have to take a look
11  at it again.
12    Q.   Let's get RX-708 for you.  Actually
13  the easiest way may be to go to your witness
14  statement.  Let's do that.  Let's go to RX-1885
15  at Appendix A-1, page 3.  Let's bring that up,
16  please, Chris.  That may be the fastest way to
17  do this.
18         Do you recall this portion of your
19  witness statement where you gave a disclosure
20  of Perski that you said was relevant to your
21  discussion?
22    A.   Okay.  Is there a portion here where
23  it says one location at a time?
24    Q.   There and continuing over to the next.
25  Keep going.  Highlight -- do you see the

Page 1337

1  portion that's highlighted?
2    A.   Yes.
3    Q.   It says, "it should be noted that this
4  finger algorithm is preferably able to detect
5  more than one finger touch at the same time.
6  This method enables the detection of multiple
7  finger touches."
8         And you are referring specifically to
9  Perski at column 14?
10    A.   Yes.
11    Q.   That's distinct locations in the touch
12  panel, not line by line?
13    A.   I'm not sure I understand the
14  question.
15    Q.   Well, let me just --
16    A.   It doesn't have anything to do with
17  his scanning --
18    Q.   Let me ask --
19    A.   -- algorithms.
20    Q.   Do you recall that Perski disclosed
21  -- '455 disclosed multiple ways of doing a
22  scan, one was slower and one was faster?  Do
23  you recall that?
24    A.   Yes, but I would want to reread them
25  to remember the details of each.

Page 1338

1    Q.   And do you recall that Perski
2  specifically said that the faster method was --
3  had the risk of inaccuracy?  Do you recall
4  that?
5    A.   Under certain conditions, the faster
6  method could be fooled, but, again, I would
7  want to reread the two methods before I gave
8  you any detailed answers on them.
9    Q.   Okay.  Let's --
10    A.   And, of course, he then followed that
11  up by saying if you run the faster method, you
12  could tell what had been fooled and you could
13  go back and rerun the first method.
14    Q.   Let's switch gears and talk about
15  Mulligan for a minute.  That's another one of
16  the references that you addressed in your
17  witness statement.
18    A.   Yes.
19    Q.   And you rely on it for both
20  anticipation and obviousness, right?
21    A.   I do.
22    Q.   And you took the position that the
23  Mulligan reference, the '160, was not before
24  the examiner in prosecution of the '607 patent?
25    A.   I don't recall.  I'd have to look back

APLNDC-X0000006392

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1339

1   at my witness statement and that list is so
2   long on the front of the patent that I don't
3   remember them all.
4      Q.   Fair enough.  Let's bring up RX-1885
5   at pages 151 to 152, please, Chris, in response
6   to question 352.
7      A.   Yes, I now recall -- it is my
8   understanding that was not put before the
9   examiner.
10     Q.   Now, in fact, the Mulligan reference
11  was specifically incorporated by reference, by
12  another reference that was before the examiner,
13  wasn't it?
14     A.   I don't know.  I will admit I did not
15  read all 329 references that were before the
16  examiner.
17     Q.   Well, you did read the references that
18  the examiner discussed specifically, didn't
19  you?
20     A.   That ones that were related to
21  relevant claim amendments.
22     Q.   Do you recall a reference called
23  Aufderheide, A-u-f-d-e-r-h-e-i-d-e?
24     A.   I do.  I have not tried to pronounce
25  it, but I have read it.

Page 1340

1      Q.   Is that close enough, do you think?
2      A.   I don't know.
3      Q.   You recall the Aufderheide reference
4   was not only one the examiner considered but
5   specifically discussed in the prosecution of
6   the '607 patent, right?
7      A.   That is true.
8      Q.   And the Aufderheide reference
9   specifically incorporated by reference the
10  application that led to the Mulligan patent on
11  which you rely for invalidity, didn't it?
12     A.   It may have.  I don't recall.
13     Q.   Chris, let's bring up JX-406, page 9
14  at 33.  And you will notice there is a series
15  of references, applications that are
16  incorporated by reference, one of which is U.S.
17  application 10/324728?
18     A.   I see that.
19     Q.   And if we go back to the Mulligan
20  patent that you are relying on, which is
21  RX-329, the application number for the Mulligan
22  reference that you are relying upon is the same
23  one, 10/324728.  Do you see that?
24     A.   That's true.
25     Q.   So now you do understand that the

Page 1341

1   Mulligan reference on which you are relying for
2   invalidity was incorporated by reference
3   explicitly into the Aufderheide reference that
4   was before the examiner in the '607 application
5   prosecution?
6      A.   The application certainly was.  I
7   haven't compared the application to the patent
8   to sort of know that they are the same, but I
9   don't know of any differences.
10     Q.   Now, the examiner -- you are familiar
11  with the concept of incorporation by reference,
12  aren't you?
13     A.   I am.
14     Q.   In fact, that's a concept that you
15  tried to use against Apple in two or three
16  places in your testimony.  True?
17     A.   It informed how I understood some of
18  the patents.
19     Q.   And so you understand that when the
20  Mulligan reference is incorporated by reference
21  into Aufderheide, that that Mulligan reference
22  is as if it were in Aufderheide in hic verba,
23  true?
24     A.   I don't have any legal training but
25  that's my understanding.

Page 1342

1      Q.   In addition to being incorporated by
2   reference, the examiner specifically discussed
3   the particular paragraph in Aufderheide that
4   did incorporate the Mulligan application.
5   You're aware of that, aren't you?
6      A.   I don't remember which paragraph you
7   discussed.
8      Q.   Well, you noted that in your witness
9   statement, didn't you?
10     A.   I noted which paragraph it was, and I
11  read at that time.
12     Q.   Let's go to March 1985 at page 47 to
13  48.  For the record, Your Honor, it is RX-1885
14  at pages 47 to 48.  This is response to
15  question 117.
16          In your response you specifically cite
17  the portion of the file history that relates to
18  Aufderheide, right?
19     A.   Yes, I do.
20     Q.   With respect to the '607 patent,
21  validity, you did address the question of
22  objective considerations on non-obviousness,
23  right?  Specifically, the success of the iPhone
24  4?
25     A.   Yes, I am used to hearing them

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    described as secondary considerations, but yes.
2        Q.   You have also heard them described as
3    objective considerations?
4        A.   I have not, but if you tell me it
5    means the same thing, I will accept that.
6        Q.   It means the same thing.
7             You don't deny as I take it that the
8    iPhone 4 has been a very successful product?
9        A.   As a whole it has been a very
10   successful product.
11       Q.   As I understand your opinion in your
12   witness statement, you believe that its success
13   is due to factors other than its multi-touch
14   touchscreen display, right?
15       A.   I believe its success primarily is due
16   to other factors and more specifically factors
17   other than what's in the '607 patent.
18       Q.   Your witness statement referred to its
19   thinness, its battery life, and various other
20   features.  Do you recall that?
21       A.   Yes, among others, yes.
22       Q.   You actually don't have any training
23   in consumer preferences or consumer surveys or
24   anything like that, do you?  It is not your
25   area of expertise?

1        A.   I was general manager of a consumer
2    electronics company.
3        Q.   You have not done any surveys about
4    why consumers buy the iPhone 4, have you?
5        A.   I have not.
6        Q.   So you don't really know why people
7    are buying the iPhone 4 in droves, do you, in
8    fact?
9        A.   I have an opinion, but no, I have not
10   measured it.
11       Q.   Let's switch gears and talk about the
12   '828 patent.
13       A.   Okay.
14       Q.   The first term I would like to address
15   is mathematically fitting an ellipse.  Do you
16   recall the dispute between the parties on that
17   term?  And let's bring up your RDX-30, which I
18   think is your description of the various
19   competing definitions.
20            That's definitely not it.  Do you
21   recall using this illustrative exhibit to set
22   forth the various proposed constructions for
23   the term mathematically fitting an ellipse to
24   at least one or more pixel groups?
25       A.   Yes, I do.

1        Q.   And the construction that you offered
2    for mathematically fitting is for at least one
3    pixel group, applying a unitary transformation
4    of the group covariance matrix of second
5    moments of proximity values for each pixel in
6    the pixel group to fit an ellipse.  Do you see
7    that?
8        A.   Yes.
9        Q.   Now, the words to fit an ellipse map
10   exactly to the fit an ellipse that's actually
11   in the claim language, right?  That's just
12   taking the claim language and moving it into
13   the construction?  Is that fair?
14       A.   Yes, but it is an important part of
15   the construction.
16       Q.   I am not saying it is not.  The term
17   fitting a shape to data, that's one that you
18   are familiar with?
19       A.   I am.
20       Q.   It is one that's a normal term that's
21   used by people skilled in the art?
22       A.   Yes, and I explained in my direct
23   statement what I think it means.
24       Q.   So the term applying a unitary
25   transformation of the group covariance matrix

1    of second moments of proximity values, that
2    whole chunk, if you will, that's your proposed
3    construction of the word mathematically?
4    Right?
5        A.   No, it is the whole phrase based on
6    what the patent tells us and what the, what the
7    applicants and the prosecution history.
8        Q.   Well, the claim term is mathematically
9    fitting an ellipse to one of the pixel groups,
10   right?
11       A.   And I construed it as a whole.  I
12   haven't tried to break it up.
13       Q.   Well, you broke it up in a sense,
14   didn't you, by saying, by taking the same
15   language, fit an ellipse from the claim into
16   your construction, right?
17       A.   In a sense, but I construed the whole
18   thing.
19       Q.   Separately you talked about each pixel
20   in a pixel group.  That's another part of the
21   claim, right?
22       A.   Yes.
23       Q.   And that applying unitary
24   transformation, blah blah blah, that whole
25   portion is your definition of what you think is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1347

1    required by the claim in order to
2    mathematically fit an ellipse.  That's fair?
3       A.   Yes, in order to mathematically fit an
4    ellipse.
5       Q.   All right.  You will agree with me
6    that that's not the ordinary meaning of
7    mathematically fitting an ellipse?
8       A.   I will agree with you.
9       Q.   And you will agree with me that
10   mathematically fitting an ellipse does have an
11   ordinary meaning?
12      A.   It does, and I think I expressed it in
13   my report.
14      Q.   And, in fact, fitting a geometric
15   shape to data is a well-known concept
16   generally, whether it is an ellipse or a line
17   or something else, right?
18      A.   It is.
19      Q.   And, in fact, the concept of
20   mathematically fitting a line to a series of
21   data points is very familiar to those skilled
22   in the art?
23      A.   Yes.
24      Q.   All right.  Now, and you understand
25   and agree that one skilled in the art would

Page 1348

1    know of several ways using the ordinary meaning
2    to mathematically fit an ellipse to a set of
3    pixel groups, a set of pixels, right?
4       A.   Yes, I think that's right.
5       Q.   Now, your witness statement gives us
6    an example using five particular parameters for
7    an ellipse, right?
8       A.   Yes, that particular example -- every
9    ellipse requires five or more parameters, every
10   ellipse model.  There is one particular example
11   that was in my --
12      Q.   But you can have different parameters
13   that fall into those five in your view?  They
14   don't have to be the same five each time,
15   right?
16      A.   Yes, they can't be arbitrary, but
17   there are different models for how you
18   parameterize an ellipse model.  Some have five
19   parameters, some have more than five parameters
20   and there are multiple models because math is
21   hard.
22      Q.   Fair enough.  And some might have
23   different five parameters substituting some for
24   others, just to fit the ellipse, fair?
25      A.   Yes, there is certain other sets of

Page 1349

1    parameters that will work and some that are
2    inappropriate.
3       Q.   And one example of five parameters
4    that you used in your report and witness
5    statement that you could precisely fit an
6    ellipse are X position, Y position, major axis,
7    minor axis, and orientation?  True?
8       A.   That's shorthand.  I mean, to be
9    precise, it is X position of the center, Y
10   position of the center, major axis length,
11   minor axis length, and orientation from the X
12   axis.
13      Q.   And orientation is usually expressed
14   an an angle?
15      A.   As an angle, a rotation.
16      Q.   Fair enough.  Now, the '828 patent
17   specifically discusses many of those types of
18   ellipse parameters, doesn't it?
19      A.   Yes, in conjunction with the unitary
20   transformation stuff.
21      Q.   And it uses some of those factors and
22   it lists some factors in addition to the five
23   that you listed, doesn't it?
24      A.   It also lists some things that I
25   called derived parameters where after you

Page 1350

1    calculate those five, you can then derive
2    additional parameters as a function of those
3    five.
4       Q.   Like size?
5       A.   Yes, once you have a major axis length
6    and a minor axis length, you can determine a
7    size of an ellipse.
8       Q.   There is a mathematical relationship
9    between the major axis length and the minor
10   axis length and size?
11      A.   There is a one-way relationship.  I
12   mean, you can't take the size and derive the
13   major axis and minor axis, but you can do it
14   the other way around.
15      Q.   And the relationship is mathematical?
16      A.   Yes.
17      Q.   All right.  Let's bring up claim 3
18   from the '828 patent, please, Chris.  Claim 3
19   is a place, isn't it, Dr. Wolfe, where the '828
20   patent lists a number of these ellipse
21   parameters?
22      A.   It is.  Can I have the patent, because
23   to understand claim 3, you have to look at
24   claim 2 and claim 1.
25      Q.   Of course.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1351

1    A.   Okay.
2    Q.   Claim 3 lists several of these ellipse
3  parameters including position, shape, size,
4  orientation, eccentricity, major radius, minor
5  radius, and any combination thereof.  Do you
6  see that?
7    A.   Yes.  There is specific ellipse
8  parameters that have been transmitted in claim
9  2.
10    Q.   And claim 3 doesn't say that -- and,
11  Chris, let's bring up claim 2, so we have the
12  context for Dr. Wolfe as well.  In fact, let's
13  have claim 1, 2, and 3 because I think that
14  will be helpful.  There we go.
15        Claim 3 and claim 2 together, of
16  course, ultimately claim 1 as well, don't
17  require five of those variables, does it?  It
18  just says one or more?
19    A.   Oh, no, of course there is five,
20  because you have to mathematically fit an
21  ellipse.  That requires that you generate at
22  least five, but you don't have to transmit all
23  five.
24    Q.   And the purpose of transmitting those
25  parameters is to operate as a control signal,

Page 1352

1  right?
2    A.   In claim 2, that's right.
3    Q.   And your understanding is that you
4  don't need all five of those parameters to
5  serve the function of the control signal in
6  claim 2.  True?  That's what it says?
7    A.   It says one or more.
8    Q.   All right.  Now, His Honor asked a
9  question, I think yesterday, about what it
10  means to mathematically fit something to a set
11  of data.  And I thought it might be helpful to
12  answer that question to talk about the context
13  first of fitting a line to a set of data.
14        You are familiar with that concept,
15  right?
16    A.   Yes.  And we're talking about ordinary
17  meaning now?
18    Q.   Ordinary meaning.  And you understand
19  that there is several ways of mathematically
20  fitting a line to a data set that you can plot
21  using math in order to do so?
22    A.   There are lots of algorithms, but they
23  are really all variations of the same method,
24  which is that you have to start with a set of
25  data and then you construct a line in order to

Page 1353

1  minimize some criteria of how close it is to
2  the data set.
3    Q.   Precisely.  So one way that you are
4  familiar with is called the least squares
5  method?
6    A.   Yes.
7    Q.   And so just so we all have some
8  orientation, you are familiar with the Davies
9  prior art reference that previously you had
10  been relying upon on this case?
11    A.   Yes, I read it.  It is a book, I
12  think.  I don't remember the whole thing.
13    Q.   It is a large book.  I understand you
14  are no longer relying upon it as a reference,
15  so I am not dealing with it in that context.  I
16  think it would be helpful on this issue.
17        Let's bring up RX-589.  First just the
18  cover page, if you will, just to confirm that
19  it is the book that you were relying upon.
20        Do you recall this book, Doctor?
21    A.   I do.
22    Q.   The Davies book talks about how you
23  can mathematically fit a line to a data set.
24  True?
25    A.   I don't remember.

Page 1354

1    Q.   Let's bring it up so you have it in
2  front of you, page 677.  I think we have almost
3  got it, Your Honor.  Page 677.  Do you have the
4  book in front of you?
5    A.   Not yet.
6    Q.   Your Honor, may I approach?
7  Apparently we don't have the whole thing
8  electronically, so I can hand out copies of the
9  relevant pages.
10        JUDGE ESSEX:  All right.
11  BY MR. POWERS:
12    Q.   All right.  So let's go to page 677
13  and specifically the second paragraph where
14  there is a general description of that least
15  squares analysis way of mathematically fitting
16  a line to data.
17        Do you see that, Dr. Wolfe?  You can
18  take down the sideways version.
19    A.   Give me just a second to read it.
20    Q.   And referring specifically, Dr. Wolfe,
21  to the sentence that says perhaps the paradigm
22  problem in this area is that of fitting a
23  straight line to a set of points.
24        In the physics laboratory, least
25  squares analysis is commonly used to tackle the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  task.  And then there is a reference to figure
2  D-1-A.  Do you see that?
3     A.   Yes.
4     Q.   So let's flip over to the next page,
5  which is page 678.  And you see there is an A
6  and a B at that point?
7     A.   Yes.
8     Q.   And you see there is a series of plus
9  symbols that are in the A plot?
10    A.   Yes.
11    Q.   Let's put this up, if we can.  It
12  would be helpful.  That's not what we want.
13  Okay.
14         So this is describing mathematically
15  fitting a shape, in this case a straight line,
16  not an ellipse or a circle, to a set of data.
17  Right?
18    A.   In general, yes.
19    Q.   And there is a series of these plus
20  signs that are shown in A.  Do you see that?
21    A.   Yes.
22    Q.   You understand those are the data
23  points that you are trying to fit this line to?
24    A.   I do.
25    Q.   And the way mathematically that you

1  fit a line to that data set is that you take
2  the values of those plus signs and you
3  manipulate them mathematically in some way, in
4  this case least squares, for example, come up
5  with a value that minimizes the differences
6  between them, and plot a line that tracks that
7  the best you can using that particular
8  mathematical algorithm, right?
9     A.   Close.  You are not minimizing the
10  distance between the data samples.  It is the
11  distance between the data samples and the line
12  that you are going to draw.
13    Q.   More precisely exactly, you are right.
14    A.   Or a function of those distances.
15    Q.   So what is shown by the Davies book is
16  a line that's fitted to that data set but
17  doesn't go through each of those data points,
18  right?  It approximates using one particular
19  mathematical algorithm, a line that's "fitted"
20  to that data, right?
21    A.   That's true for A on '678, yes.
22    Q.   And B on page 678 reflects what
23  happens when that same algorithm, that same
24  mathematical transformation, is applied but you
25  have one little outlier data point out here on

1  the right.  True?
2     A.   That's my understanding of B.
3     Q.   And so what happens is it changes the
4  slope of the line somewhat in order to
5  accommodate that new data point?
6     A.   I can't tell if that's the only
7  change, but that's the most apparent one here.
8     Q.   All right.  And, again, the line
9  doesn't go through each or even most of the
10  data points but it is fitted as that term is
11  used by those skilled in the art to that data
12  set, right?
13    A.   Yes, using ordinary meaning, yes.
14    Q.   Now, you can do the same type of thing
15  in terms of fitting a shape to data with
16  circles, can't you?
17    A.   Yes.
18    Q.   And the way you would do that if you
19  wanted to fit a circle to a data set, one way,
20  would be to find the center point of that
21  circle, that data set, right?  One way?
22    A.   It depends what you mean by center
23  point of the data set.
24    Q.   The centroid?
25    A.   The centroid?

1     Q.   Yes.  The X and Y coordinate that
2  represents the center of the data set you are
3  trying to fit a circle to.  That's one way of
4  starting to fit a circle to a data set, right,
5  mathematically?
6     A.   It could be.
7     Q.   And if you knew the size of the circle
8  that you were going to have, you could just
9  draw that circle around that centroid, couldn't
10  you?
11    A.   Well, but that's a big if.  How would
12  you know the size matches the data set unless
13  you did some additional mathematical analysis?
14    Q.   Agreed.  But if you had information
15  about the size of the data set, you could draw
16  a circle around that centroid, couldn't you?
17    A.   Only if it is based on minimizing some
18  criteria of distance between the data points
19  and the edge of the circle.
20    Q.   If you are using the least squared
21  analysis?
22    A.   That would be one way to do it, yeah.
23    Q.   And there is a number of ways, number
24  of mathematical algorithms you can use to say
25  here is how I am going to determine the size of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that circle I am going to draw around the
2    centroid, right?
3        A.   There are a number of algorithms.
4    They are not all mathematically fitting.
5        Q.   But if you are going to use a
6    mathematical algorithm, that would be
7    mathematically fitting a circle to that data
8    set, if you did it in the manner that I have
9    described, wouldn't it?
10        A.   Only if it is a fitting algorithm.
11   Only if it optimizes a criteria of distance
12   between the circle and the data set.
13        Q.   In the example of a least squared
14   analysis?
15        A.   There is always a criteria.  The
16   criteria is least squares in least squares
17   method, but there is always some criteria.
18   Otherwise you are not fitting to anything, you
19   are guessing at how big a circle.
20        Q.   But if you did have an algorithm that
21   said here is how I think, what I think the area
22   of the circle should be, given this data set,
23   that's math, right?  It may not be -- I'm
24   sorry, go ahead.
25        A.   It is not fitting, it is not fitting

1    unless it is the minimization of some
2    optimization criteria.  I mean, it is math to
3    say I am going to draw a circle that's seven
4    around.  I mean, that's math.  But that's not
5    fitting.
6        Q.   And if that seven around was derived
7    from values of the data set regarding its area,
8    that would be math, right?
9        A.   But not necessarily fitting.
10        Q.   And fitting doesn't require that you
11   capture all of the data in the data set, does
12   it?  We have seen that both in these lines,
13   right?
14        A.   Oh, no, that's wrong.  If you are
15   fitting to the data, then you are considering
16   all the data.
17        Q.   You are considering all the data, but
18   the circle wouldn't have to encompass all the
19   data in order to be fit to it, would it?
20        A.   It wouldn't have to encompass it all,
21   but it has got to be fit to it all.  You can't
22   just disregard some data because then you are
23   only fitting to the remaining data.
24        Q.   Let's turn to the second aspect of
25   your construction.  So let's put back up,

1    please, Chris, RDX-30.
2        And one part of your construction is
3    "for at least one pixel group," and then "for
4    each pixel in the pixel group."  That's one
5    difference between your proposed construction
6    and that of Apple and the Staff, right?
7        A.   Yes.
8        Q.   Where you insist that this process
9    occur for each pixel, right?
10        A.   Well, that you fit the data to all the
11   pixels, because it says the pixel group, the
12   pixel group is all the pixels.  It doesn't say
13   part of the pixel group.
14        Q.   And if we go to your witness
15   statement, RX-1885, page 217, let's bring that
16   up, please, Chris.
17        MS. KATTAN:  Your Honor, I am going to
18   object to the extent that I think we have a
19   continuing misunderstanding about the Staff's
20   claim constructions.  I have actually, if you
21   look at my brief, I believe adopted Motorola's
22   construction on that term.
23        MR. POWERS:  I apologize.
24        MS. KATTAN:  Just so the record is
25   clear.

1        JUDGE ESSEX:  I will hold Staff to the
2    construction in their own brief and will not
3    take any other counsel's word for what Staff's
4    position is.
5        MR. POWERS:  Apparently we made the
6    same mistake they did.
7        JUDGE ESSEX:  That's all right.  We're
8    balanced out now.  But I will look to Staff for
9    their position and not to any of the other
10   parties.  Thank you.
11   BY MR. POWERS:
12        Q.   At page 217 you cite the '828 patent
13   at column 26, lines 12 to 15.  Do you see that
14   for this particular issue of each pixel?
15        A.   That's one place, yes, but it is also
16   just --
17        Q.   I'm sorry, go ahead.
18        A.   It is also just in the claim language,
19   I think.
20        Q.   But in terms of the specification, the
21   only part of the specification you cite is the
22   '828 patent and column 26, lines 12 to 15,
23   right?
24        A.   Yes.
25        Q.   Let's go look at that excerpt.  Could

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1363

1  you bring up that portion, please, Chris, from
2  the '828 patent.  Column 26, 12 to 15 says,
3  "note that since the total group proximity Gz
4  integrates proximity over each pixel in the
5  group, it depends upon both the size of the
6  hand part, since large hand parts tend to cause
7  groups with more pixels, and of the proximity
8  to or pressure on the surface of the hand
9  part."
10       Do you see that?
11    A.  I see that.
12    Q.  That's the only part of the spec on
13  which you relied for your position that each
14  pixel has to be considered, right?
15    A.  Well, the claim language is part of
16  the spec, but other than that, I relied on
17  this.
18    Q.  One other piece of support that you
19  relied upon in your opinion is the file
20  history.  Do you recall that?
21    A.  I did.
22    Q.  And specifically the file history
23  regarding the Bisset patent?
24    A.  Regarding the amendment of the claim
25  to add the word mathematically in order to

Page 1364

1  overcome the objections to the examiner with
2  respect to the Bisset patent.
3    Q.  Exactly.  So let's go to, I think you
4  have set up exactly what I want to talk about,
5  so now we can skip three questions.
6       The Bisset patent actually said
7  nothing about ellipses, did it?
8    A.  That's right.  The issue there was --
9    Q.  You have answered the question.  I
10  haven't asked what else it did.  I just asked
11  whether it said anything about ellipses.  It
12  didn't, did it?
13    A.  Not based on my understanding of
14  ellipses.
15    Q.  And, in fact, what Bisset did was scan
16  along a line looking for maximum, right?
17    A.  Oh, no, Bisset did more than that.
18  That's all claimed in claim 1, but Bisset,
19  Bisset computed the length, width, and position
20  of each touch.
21    Q.  But Bisset did not attempt to fit an
22  ellipse to anything, did it?
23    A.  No, he measured the size, and he
24  computed the centroid.
25    Q.  And what the applicant said in

Page 1365

1  distinguishing Bisset was there is a difference
2  from merely obtaining data and using that data
3  to try to fit an ellipse.  True?
4    A.  That's one thing they said.
5    Q.  Let's switch to the subject of
6  infringement.  And for now, Your Honor, we can
7  still stay on the public record but we're going
8  to have to go to the confidential record fairly
9  soon.
10       One of the things that you examined in
11  looking at the question of whether the accused
12  products infringe --
13    A.  Are you still talking about the '828
14  patent?
15    Q.  Still on '828 -- is the Google Android
16  code that's present on all the accused devices.
17  That's one of the things you looked at, right?
18    A.  I did look at it some.  It was my
19  understanding from reading Dr. Balakrishnan's
20  statement that he was accusing the Atmel chip
21  of performing all the functions, and that's
22  where I focused my response, but I did look at
23  the Google code as well.
24    Q.  Let's look at your report,
25  Exhibit RX-1895 at page 53.  Chris, let's bring

Page 1366

1  up just the first third of that page if you
2  would, please.
3       This is a portion of your witness
4  statement regarding the Motorola source code
5  that's on the accused products, right?
6    A.  It is on some -- is it on all the
7  accused products?
8    Q.  The Google Android source code.
9    A.  It is an example of what's on the
10  Droid X product.
11    Q.  And you understand this Google Android
12  code is on all the accused products?
13    A.  Something reasonably similar.  I don't
14  know that it is all exactly the same as this
15  one.
16    Q.  This is not a difference you are
17  relying on?
18    A.  Fair enough.
19       MR. NELSON:  At this point, may I --
20       THE WITNESS:  I'm sorry, with the
21  exception of --
22       JUDGE ESSEX:  Hang on just a second.
23       MR. NELSON:  This is from -- it is
24  marked JX-458C, this citation.  So I think we
25  should go on the confidential record at this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1367

1  point.
2      JUDGE ESSEX:  All right.
3      (Whereupon, the trial proceeded in
4  confidential session.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 1379

Page 1381

15       (Whereupon, the trial resumed in open
16   session.)

Page 1382

1            O P E N   S E S S I O N
2        MR. POWERS:  So the sign is right.
3        JUDGE ESSEX:  All right.
4   BY MR. POWERS:
5     Q.    That because of that typographical
6   error in equation 18, that couldn't be
7   corrected by one skilled in the art and,
8   therefore, the patent is not enabled?  Do you
9   recall that?
10     A.   I do recall that.
11     Q.    Now, you also recall that there were
12   other typos in the same column of the '828
13   patent which you thought would have been
14   corrected easily by one skilled in the art,
15   right?
16     A.    Well, not easily, but when I evaluated
17   level of skill, I felt that a person of
18   ordinary skill as described by Dr. Balakrishnan
19   and I -- and I didn't see a material difference
20   there -- would be able to correct the other
21   ones from the context, but this one required a
22   level of mathematical skill that that person
23   probably wouldn't have.
24     Q.    Let's bring up column 26 of the '828
25   patent, lines 19 to 20, please.  There we go.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      In particular, typographical error in
2  column 26 that you thought was skill enabled,
3  despite the typo, is at line 21 where it says
4  Qxx and Qxy, that one skilled in the art would
5  understand that should be Gxx and Gxy; true?
6      A.   Yeah, there is another one that should
7  be Gcov and not Gcov.  And the reason that I
8  thought you could correct those is because if
9  you look at all the equations of what's
10  actually being computed, you can see that you
11  are computing these G's.
12      So because the sentence tells you that
13  you are going to compute those things and you
14  can see what's being computed, I thought that
15  was easier than figuring out mathematically how
16  to compute something where you would have to
17  know the actual equation.
18      Q.   Let's switch gears again and go to
19  invalidity.  One of the references you rely
20  upon is the Desai, D-e-s-a-i, thesis?
21      A.   Yes.
22      Q.   That's RX-351.  And specifically you
23  cite -- let's go to page 117, the figure on
24  that page.  There we go.
25      You can blow up the figure at the top,

1  please, Chris, and including the title.  There
2  we go.
3      Do you recall relying on these
4  figures, Dr. Wolfe, to show the presence in
5  your view of multiple touches in Desai?
6      A.   Yes, this is one thing that I relied
7  on.  I don't believe the claim requires
8  multiple touches, but I did rely on this to
9  show that Desai did teach it.
10      Q.   "It" being multiple touches?
11      A.   Yes.
12      Q.   In fact, what is being shown in figure
13  5.11 on page 117 is not multiple touches but a
14  single disk, right?
15      A.   It is a single disk that's touching
16  the sensor in two places or exerting pressure
17  in two places.
18      Q.   Well, you don't really know where it
19  is exerting pressure because you don't know the
20  noise level in the system, do you?  What you
21  are seeing there as apparent distinct sets of
22  mountains could just be noise in the system?
23  You don't know how --
24      A.   I guess hypothetically.  It is
25  certainly not described that way, and the

1  algorithm that's being taught here is designed
2  to distinguish them.
3      Q.   What's on the sensor is just simply a
4  disk, right?  It is not two fingers?  It is not
5  two distinct touches, it is a disk?
6      A.   That's right.  It is a disk that's
7  exerting pressure that's being measured and
8  produces this measurement.
9      MR. POWERS:  No further questions,
10  Your Honor.
11      JUDGE ESSEX:  All right.
12      MS. KATTAN:  I have a few questions,
13  Your Honor.
14      MR. NELSON:  I just have a few, Your
15  Honor.  Oh, you said you did have questions?
16  I'm sorry.
17      JUDGE ESSEX:  I misunderstood as well.
18  My apologies.  Go right ahead.
19      MR. NELSON:  Then I will wait.
20      JUDGE ESSEX:  I made the same mistake.
21  My apologies.  Go ahead.
22      EXAMINATION BY COUNSEL FOR ITC STAFF
23  BY MS. KATTAN:
24      Q.   Good afternoon, Doctor.
25      A.   How are you?

1      Q.   Fine, thank you.  I have some
2  questions for you about the '607 patent, in
3  particular, claim 5.  Could we get claim 5 of
4  the '607 patent.  That's JX-2 on the screen,
5  please.  And I have some questions about the
6  adhesive layer limitation in claim 5.
7      A.   Okay.
8      Q.   Are you with me?
9      A.   Yes.
10      Q.   Okay.  Now, Dr. Wolfe, you have an
11  opinion that there are prior art references
12  that anticipate claim 5; is that correct?
13      A.   Yes.
14      Q.   And one of those references is the
15  Perski '455 patent that you were -- it is
16  RX-708 that you were discussing with Mr. Powers
17  earlier; is that correct?
18      A.   Yes.
19      Q.   And you have an understanding that in
20  order to anticipate a claim, a reference must
21  include a disclosure of every limitation in
22  that claim; is that correct?
23      A.   Yes, either explicitly or inherently.
24      Q.   So that's my question with regard to
25  the adhesive layer.  Do you have an opinion

APLNDC-X0000006402

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1387

1  that the Perski '455 patent explicitly
2  discloses the adhesive layer that's in claim 5
3  of the '607 patent?
4      A.   I need to take a look.  I remember it
5  discloses it.  I believe it is inherently, but
6  if you don't mind, can I take a look at my
7  appendix?
8      Q.   Sure, sure.  Just to speed things up,
9  if you go to Appendix A-1 of the witness
10  statement.
11     A.   Do you happen to know the page?
12     Q.   It is Appendix A-1 of your witness
13  statement, which is RX-1885C.  We're on page
14  3031.
15     A.   Yeah, it is inherent.  The disclosed
16  embodiments are built out of foils.  Foils are
17  very thin pieces of plastic for similar, what I
18  described the other day as maybe like the side
19  of a Ziplock bag.
20         And the only practical way to put them
21  together and have a transparent touchscreen you
22  can put over a display would be to use the
23  ordinary adhesive that everybody had been using
24  for years to put together touchscreens.
25     Q.   What do you mean by the only practical

Page 1388

1  way to put them together would be to use
2  adhesive?
3      A.   If you didn't use an adhesive -- I
4  tried to think of what other ways might be.  If
5  you tried to use screws or clips or tape or
6  something, you wouldn't maintain uniform
7  spacing between the plastics.  Essentially they
8  would wrinkle, right, or they would stretch.
9          And when you have materials that are
10  so flimsy and so simple, the only practical way
11  to put them together is to use an adhesive.
12     Q.   I have a similar question with regard
13  to the SmartSkin reference, which is JX-367,
14  your analysis is in appendix 2 of RX-1885C.
15     A.   Yes.
16     Q.   You have an opinion that the SmartSkin
17  reference anticipates claim 5; is that correct?
18     A.   Yes.
19     Q.   And could you explain your analysis
20  with regard to the adhesive limitation in claim
21  5?  That's around page 34 of appendix 2 to your
22  witness statement.
23     A.   For the Rekimoto reference -- I'm
24  sorry, for the SmartSkin reference alone, you
25  would have to rely on the fact that a person of

Page 1389

1  ordinary skill would know this is a standard
2  sensor you can go buy with the adhesive already
3  on it, when he says to use a multilayer ITO
4  sensor that looks like figure 2 with rows and
5  columns, that that's really the only way that
6  ITO sensors built with multiple layers, could
7  be on two sides of one layer, so I guess now
8  that I think about it here, it is probably only
9  obvious as one of two ways that you could
10  satisfy what's taught in claim 5 in SmartSkin,
11  and then it is also obvious when you combine
12  SmartSkin with Mr. Rekimoto's patent, that the
13  material that he is disclosing is the insulator
14  would have to be held together because he has
15  multiple substrates.
16         So it is really inherent in the
17  drawing of figure 9 of Rekimoto.
18     Q.   Of the SmartSkin reference?
19     A.   Of the previous patent that can be
20  used in combination with the SmartSkin patent.
21     Q.   You are referring to the patent
22  publication RX-1888 that you discussed earlier?
23     A.   No, the Rekimoto '033 patent.  Oh,
24  yes, I'm sorry, that is RX-1888, yes.
25     Q.   Okay.  Thank you.

Page 1390

1         MS. KATTAN:  I have no further
2  questions, Your Honor.
3         JUDGE ESSEX:  Thank you.
4              REDIRECT EXAMINATION
5  BY MR. NELSON:
6      Q.   I have just a few questions for you.
7  Let's stay on the SmartSkin reference.  And one
8  of the things that you were talking about was,
9  in the SmartSkin reference, was whether there
10  was a disclosure of transparency.  Do you
11  recall that discussion?
12     A.   Yes.
13     Q.   Now, let's look at page 7 of the
14  SmartSkin reference, which is, I believe, JX-3
15  -- no, RX-367.  No, I was right the first time,
16  Your Honor, it is JX-367.  I couldn't get
17  through a day without making a mistake on the
18  numbers.
19         JX-367, page 7.  Now let's blow up
20  that section that you looked at earlier.  Now,
21  can you tell me why you think this discloses
22  the use of a transparent material to make the
23  sensing and driving conductors?
24     A.   Well, yes.  In terms of it being
25  transparent, it says it is transparent.  It

71 (Pages 1387 to 1390)
APLNDC-X0000006403

Page 1391

1   says it is made using indium tin oxide, ITO,
2   the material that any touchscreen engineer
3   would be familiar with as the material that's
4   generally used to make transparent conductors.
5        It says it can be put in front of a
6   display, which would certainly be normal for
7   something that's transparent.  And it
8   specifically talks about active matrix and
9   transparent electrodes.  So it tells you where
10  to get the technology.
11       From all that, this is very late in
12  touchscreen technology.  This is more, you
13  know, certainly more than 30 years in
14  touchscreen technology.  Touchscreens have
15  become common.  Two-layer sensors with rows and
16  columns of ITO were standard products, and I
17  think that a person of ordinary skill, who we
18  agree is a touchscreen engineer, who reads
19  this, would just read this to say this is an
20  ordinary row and column ITO touch overlay
21  that's being used in a unique way in the
22  SmartSkin product.
23     Q.   Can you explain to us why it is that
24  you can make a transparent conductor out of
25  ITO?

Page 1392

1     A.   I can try.
2     Q.   All right.
3     A.   I am not a chemist, but there is a
4   process called sputtering that's commonly used,
5   although there is some others like vapor
6   deposition.  And what you do is you take a
7   piece of glass or a roll of plastic film and
8   you place it into a vacuum chamber and you kind
9   of, just like you would sputter water with your
10  fingers, you sputter molecules of a metallic
11  material.  And they settle down into a
12  continuous sheet, but it is so thin that you
13  can see right through it.
14       And I don't know the physics of why
15  you can see right through it.  I have just
16  watched the machine and seen the material come
17  out the other end.
18     Q.   So have you had experience in your
19  work working with ITO before?
20     A.   Oh, yes, I designed products,
21  capacitive, resistive products, multiple kinds
22  of capacitive touch sensors out of ITO.  That's
23  what's specified in my patents.  I have worked
24  with ITO manufacturing factories, and I had a
25  company that built a factory that bought ITO

Page 1393

1   coded glass and plastic film and built
2   touchscreens out of it.
3     Q.   How far back does this experience go?
4     A.   I started working on this in 1983 when
5   we bought the overlay sensors as a kit from
6   another company.  By the end of 1983, I was
7   developing my own electronics, and I think we
8   started our own factory in early 1990.
9     Q.   Now, let's talk specifically about the
10  '607 patent now and its discussion of the use
11  of ITO to make transparent conductors.  Do you
12  know whether the '607 patent makes any special
13  disclosure of how to use ITO to make
14  transparent conductors?
15     A.   No, it just says to use ITO.  And I
16  presume that means ordinary ITO like any
17  touchscreen engineer would recognize.
18     Q.   Can we pull up the 607 patent, Ryan.
19  And let's look first at column 10, lines 44 to
20  49, roughly 44 to 49.  It could be 43.  There
21  you go.
22       Now, see, let's highlight this part
23  starting about line 43.  It says the electrodes
24  and sense traces can be made from any suitable
25  transparent conductive material.  By way of

Page 1394

1   example, the electrodes and traces may be
2   formed from indium tin oxide, ITO.
3        Do you see that?
4     A.   Yes.
5     Q.   Is there any particular -- is that any
6   different than what you have done in the past?
7     A.   No.  That's regular ITO.
8     Q.   Is there any particular disclosure,
9   any specific disclosure of how to do that?
10     A.   No.  It just says you make the
11  modified ITO and it claims them in one claim as
12  being made out of ITO.
13     Q.   Let's now look at column 12 about line
14  41 to 45.  I think we looked at a little of
15  this earlier.
16        Yeah, the next line down, Ryan.
17  That's fine, you can highlight all that.  So I
18  am going to start at, I think it is, line 42.
19  "In most cases the electrode layer is disclosed
20  on the glass member using suitable transparent
21  conductive materials and patterning techniques
22  such as ITO and printing."
23        Do you see that?
24     A.   Yes.
25     Q.   Can you tell me what this is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1395

1  explaining here?
2      A.   I think the same thing.  It just, when
3  it says to use ITO, I think it is regular ITO.
4  When it says printing, there are some other
5  materials that have some disadvantages as
6  compared to ITO, but they are cheaper, where
7  you can literally take the same silkscreen
8  machine that you use for making Tshirts and you
9  can print them on glass.  And you don't get as
10  good results but it is cheaper.
11          And I think it is saying in some cases
12  you can use that as well.
13      Q.   Finally, let's look at column 14,
14  starting at line 60.  And this is going to
15  continue over, Ryan, to 15, line 7.  Column 15,
16  line 7.
17          Now, I am not going to read all this
18  into the record, because it will take me too
19  long, but go ahead and read this for me and
20  tell me what this is explaining here when you
21  get done.
22      A.   Yes, this says a couple things.
23  Basically it says that you put down the ITO in
24  the normal way, that you pattern it in the
25  normal way, and it explains that if you do that

Page 1396

1  and what it implies and what a person of
2  ordinary skill would understand, if you do that
3  and you have narrow lines with substantial gaps
4  between them, you might be able to see the gaps
5  because they would have a different
6  transparency than the lines.
7          And it also says that sometimes you
8  might want to use a low resistance ITO that
9  makes this problem worse.  And when you call up
10  an ITO supplier, you tell them, they typically
11  have three, four products in their catalogue,
12  low resistance, medium resistance, high
13  resistance and it is saying if you pick the low
14  resistance, this problem could even be worse.
15      Q.   Do you think that any of the
16  disclosures or the discussions that we just
17  looked at in the '607 patents concerning the
18  use of ITO to make conductive traces were
19  beyond the knowledge of one of ordinary skill
20  in the art as of 203?
21      A.   No --
22      Q.   2003, I should say?
23      A.   No, I think they were clueless, a
24  person of ordinary skill in the art, to go get
25  these components and build them the way that

Page 1397

1  they were normally built in the industry.
2      Q.   Now, let's look back at page 7 now of
3  the SmartSkin reference again, JX-367.  And in
4  specific that paragraph there.
5          So do you believe that there is any
6  information concerning the use of ITO to make
7  conductive traces in the '607 patent that's not
8  found in the reference here to the JX-367?
9      A.   No, not if you read JX-367 as a whole.
10  It first tells you that you have to use rows
11  and columns.  It tells you that the rows and
12  columns have to be electrically isolated, and
13  then it tells you what materials to use and,
14  again, that would lead you towards the normal
15  solution of a layer of ITO rows and a layer of
16  ITO columns built in the ordinary way.
17      Q.   Now, I am going to turn to the '828
18  patent.  I do have one more line but it is
19  going to be confidential, Your Honor, so I
20  would rather just do that at the end when I
21  come back to '607, if that's okay.
22          So can we put up claims 1, 2, and 3
23  again of the '828 patent, Ryan.  Now, you
24  recall some questions about these claims
25  earlier on cross-examination?

Page 1398

1      A.   Yes.
2      Q.   With respect to claim 2, it says, "the
3  method of claim 1 further comprising
4  transmitting one or more ellipse parameters as
5  a control signal to an electronic or
6  electromechanical device," do you see that?
7      A.   Yes.
8      Q.   Can you tell me your understanding of
9  what is being discussed there?
10      A.   After you mathematically fit the
11  ellipse and mathematically fitting the ellipse
12  is going to require computing at least five
13  parameters and maybe more, you are allowed to
14  compute derived parameters the way it is taught
15  in the patent, then you have to transmit one or
16  more of those as a control signal to a device,
17  an electronic or mechanical device.
18          You don't have to send all the
19  parameters that you calculated, but you still
20  have to calculate enough parameters to fit an
21  ellipse.
22      Q.   Now let's look at claim 3.  It says
23  the method of claim 2 wherein the one or more
24  ellipse parameters is selected from the group
25  consisting of position, shape, size,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  orientation, eccentricity, major radius, minor
2  radius and any combination thereof.
3        Do you see that?
4     A.   Right.
5     Q.   So what's your understanding of the
6  reference to the ellipse parameters in claim 3?
7     A.   It refers back to which ones you
8  transmit.  So you have to go through the
9  mathematically fitting an ellipse process,
10 which as we have discussed, I believe, is the
11 process in column 26, and then it tells you to
12 go ahead and from that you can calculate
13 additional things.
14       So after you have calculated the
15 position, the orientation, the major radius
16 length, the minor radius length, the
17 eccentricity, you could certainly go through
18 and then compute the size based on those first
19 five things that you had calculated and shape,
20 I think, again, just refers to eccentricity in
21 the context of having already mathematically
22 fit an ellipse.
23       So what it says is after -- you know,
24 that those are the things that you can transmit
25 after you have done the same calculation that

1  you had to do in claim 1.
2     Q.   Now, let's look down at claim 5 for a
3  minute, Ryan.  Do you see claim 5 says, "the
4  method of claim 1 wherein fitting an ellipse to
5  a group of pixels comprises computing one or
6  more Eigenvalues and one or more Eigenvectors
7  of a covariance matrix associated with the
8  pixel group."  Do you see that?
9     A.   Yes.
10    Q.   Are Eigenvalues the same as
11 Eigenvectors?
12    A.   No.
13    Q.   Okay.  Can you explain to us, without
14 getting into too much detail, what the
15 difference is?
16    A.   They have a mathematical relationship.
17 The way that you perform this calculation is
18 that you define it by a matrix, times the
19 Eigenvectors is equal to the Eigenvalues times
20 the Eigenvectors and you find the solutions to
21 that equation.
22       And there are ways to solve that
23 equation so that you can figure out the
24 Eigenvalues or the Eigenvectors or both.
25    Q.   Do you need to compute Eigenvectors in

1  order to determine the Eigenvalues?
2     A.   No, you can do something called a QR
3  factorization that gets you the Eigenvalues
4  directly and you don't have to compute the
5  Eigenvectors.  It is not a hard calculation to
6  then compute the Eigenvectors after you have
7  computed the Eigenvalues, but you don't have to
8  do it.
9     Q.   Is there any information that an
10 Eigenvector would give you beyond an
11 Eigenvalue?
12    A.   An Eigenvector kind of tells you the
13 direction of the transformation, where the
14 Eigenvalue tells you the energy of the matrix
15 in each of the directions after the
16 transformation.
17    Q.   Now, there were some questions you had
18 on cross-examination concerning mathematically
19 fitting a geometric shape to a data set.  Do
20 you recall those questions?
21    A.   Yes.
22    Q.   So can you explain to us what it is
23 that you are operating on when you
24 mathematically fit a geometric shape to a data
25 set?

1     A.   A set of data values in multiple
2  dimensions.
3     Q.   Well, what are the set of data values?
4  Let's take an example.  So I have a touch on a
5  touchscreen.
6     A.   Yes.
7     Q.   And I generate some pixel data,
8  correct?
9     A.   Yes.
10    Q.   So if I want to fit a shape to that,
11 what is the data that I am operating on?
12    A.   It is whatever you have measured.
13 Usually in this patent it is proximity data.
14 But it could be any data.  It could be, you
15 know, whatever you have used to measure and
16 characterize the touch.  It could be light,
17 sound, all those different phenomenon that we
18 have talked about.
19    Q.   Well, if you don't have the data, can
20 you fit a shape to that data?
21    A.   No.
22    Q.   Why is that?
23    A.   Because you don't have the data.  And
24 if you remember, fitting a shape to data
25 requires optimizing some criteria of comparison

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1403

```
1    between the shape and the data.  And you can't
2    perform that comparison or even derive an
3    appropriate shape, unless you have got the
4    data.
5        Q.   Now, let's look at -- and at this
6    point I will have to go on the confidential
7    record because this is going back to that
8    source code.
9        JUDGE ESSEX:  Again, we're going to
10   have to rely on the attorneys to configure us
11   properly.
12       (Whereupon, the trial proceeded in
13   confidential session.)
14
15
16
17
18
19
20
21
22
23
24
25
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1411

Page 1413

12          (Whereupon, the trial resumed in open
13 session.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 1414

1          O P E N   S E S S I O N
2          RECROSS-EXAMINATION
3    BY MR. POWERS:
4      Q.    You recall, Dr. Wolfe, in your
5    redirect examination talking about the touch
6    area parameter that's used in all the accused
7    devices?
8      A.    Yes.
9      Q.    That touch area parameter is based on
10   all of the pixels in the pixel group, isn't it?
11     A.    It is -- well, it is counting all the
12   pixels related to one touch.
13          MR. POWERS:  That's it, Your Honor.
14   The one housekeeping issue is the portion of
15   the Davies book that we used that talked about
16   line fitting, I am not sure they are in what
17   has been marked as RX-589, so we're going to
18   separately designate those that we handed
19   around as CX-603.
20          JUDGE ESSEX:  All right.
21          MR. POWERS:  Thank you.
22          JUDGE ESSEX:  Staff, did you have any
23   further questions as a result of redirect,
24   recross, any?
25          MS. KATTAN:  No, Your Honor.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 1415

1      JUDGE ESSEX:  All right.  Thank you
2  very much.
3      All right, Dr. Wolfe, thank you very
4  much for your testimony.  You may step down.
5      THE WITNESS:  Thank you.
6      JUDGE ESSEX:  All right.  Motorola?
7      MR. NELSON:  We don't have any further
8  witnesses, Your Honor.  And so I guess we're
9  done with our case at this point, subject to
10 like we talked about yesterday, we will have to
11 work out the exhibits, but we're cooperating on
12 that.  I don't anticipate any problems.
13     JUDGE ESSEX:  I understand.  Do we
14 have anything else to do today?  Complainants?
15     MR. POWERS:  I don't believe so, Your
16 Honor.  We're all set on schedule to finish up
17 tomorrow with our two experts.
18     JUDGE ESSEX:  All right.  Then we're
19 adjourned for the day.  Thank you very much.
20     (Whereupon, the following exhibits
21 lists were provided to the court reporter for
22 receipt into evidence:)
23     (Complainant Exhibit Numbers CX-357C,
24 CX-363C, CX-365 were received into evidence.)
25 //

Page 1416

1      (Respondent Exhibit Numbers RX-812C,
2  RX-815C, RX-994C, RX-1237C were received into
3  evidence.)
4      (Complainant Exhibit Number CX-206C
5  was received into evidence.)
6      (Joint Exhibit Numbers JX-459C, JX-487
7  were received into evidence.)
8      (Complainant Exhibit Numbers
9  CDX-3.001, CX-032C.001, CX-032C.038.040,
10 CX-032C.075, CX-357, CX-366C, CX-368C, CX-399,
11 CX-403, CX-404, CX-408, CX-415, CX-416, CX-419,
12 CX-420, CX-425, CX-473C, CX-474C, CX-574C,
13 CX-575C were received into evidence.)
14     (Joint Exhibit Numbers JX-8, JX-437C,
15 JX-478C, JX-479C, JX-491, JX-532C were received
16 into evidence.)
17     (Complainant Exhibit Numbers
18 CDX-002.003, CDX-002.004, CDX-002.005,
19 CDX-002.018-37, CDX-002.039, CDX-002.040,
20 CDX-002.041, CDX-002.042, CDX-002.043-45,
21 CDX-002.046-127, CDX-002.128A, CDX-002.128B,
22 CDX-002.130-149, CDX-002.151-170,
23 CDX-002.180-196, CDX-002.198-206,
24 CDX-002.207-8, CDX-002.209-270, CDX-16, CX-91C,
25 CX-95-96, CX-108C, CX-202C were received into

Page 1417

1  evidence.)
2      (Joint Exhibit Numbers JX-2, JX-5,
3  JX-419, JX-485C were received into evidence.)
4      (Complainant Exhibit Number CX-107C
5  was received into evidence.)
6      (Joint Exhibit Numbers JX-486C,
7  JX-488C, JX-492-493, JX-497, JX-499-502,
8  JX-504-507, JX-510-511, JX-514-518, JX-520,
9  JX-522-523, JX-531C, JX-534C, JX-566C, JX-578C,
10 JX-580C, JX-603C-608C, JX-611C-612C,
11 JX-615C-618C, JX-621C-636C, JX-649C-650C,
12 JX-652C, JX-654C-655C, JX-661C-662C, JX-671C,
13 JX-675C, JX-680C, JX-695 were received into
14 evidence.)
15     (Complainant Exhibit Numbers CDX-1,
16 CDX-10.43, CDX-10.76, CDX-15.1, CDX-15.2,
17 CDX-15.3, CDX-15.4, CPX-1, CX-073C, CX-113,
18 CX-201C, CX-384C, CX-385, CX-386C, CX-391C,
19 CX-525, CX-535C were received into evidence.)
20 //
21 //
22 //
23 //
24 //
25 //

Page 1418

1      (Joint Exhibit Numbers JX-1, JX-3,
2  JX-4, JX-6, JX-015C, JX-022C-024C, JX-245,
3  JX-289, JX-458C, JX-460C, JX-461C, JX-462.001
4  to .006, JX-484C through JX-486C, JX-487,
5  JX-488C, JX-531C, JX-535C, JX-539C, JX-548C,
6  JX-552C through JX-556C, JX-557 through JX-559,
7  JX-560C through JX-563C, JX-564, JX-567,
8  JX-568, JX-570, JX-572C through JX-574C,
9  JX-576, JX-577, JX-582C through JX-584C,
10 JX-587C through JX-590C, JX-592C through
11 JX-600C, JX-601, JX-602, JX-604C, JX-605C,
12 JX-609C, JX-611C, JX-613C, JX-615C, JX-617C,
13 JX-621C, JX-624C, JX-625C, JX-627C, JX-629C,
14 JX-631C, JX-634C, JX-636C, JX-642C, JX-646C,
15 JX-651C, JX-655C through JX-657C, JX-659C
16 through JX-663C, JX-671C, JX-675C, JX-680C
17 through JX-685C, JX-686, JX-693 were received
18 into evidence.)
19     (Respondent Exhibit Numbers RDX-12.1C
20 through RDX-12.8C, RDX-15.042C, RDX-15.058C,
21 RDX-15.059C were received into evidence.)
22     (Complainant Exhibit Numbers CX-357C,
23 CX-363C, CX-365 were received into evidence.)
24 //
25 //

APLNDC-X0000006409

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1419

```
1        (Joint Exhibit Numbers JX-001 through
2   JX-008, JX-010 through JX-012, JX-437C, JX-489,
3   JX-537C, JX-538C were received into evidence.)
4        (Joint Exhibit Numbers JX-001 through
5   JX-014, JX-015C through JX-025C, JX-026 through
6   JX-292, JX-300 through JX-436, JX-437C,
7   JX-438C, JX-439 through JX-457, JX-458C through
8   JX-472C, JX-473, JX-474C through JX-486C,
9   JX-487, JX-488C, JX-489, JX-490C, JX-491
10  through JX-523, JX-524C, JX-525, JX-526C
11  through JX-537C, JX-538, JX-539C through
12  JX-556C, JX-557 through JX-559, JX-560C through
13  JX-562C, JX-563, JX-564, JX-565C, JX-566C,
14  JX-567 through JX-571, JX-572C, JX-573C,
15  JX-574C, JX-575 through JX-577, JX-578C through
16  JX-600C, JX-601, JX-602, JX-603C through
17  JX-669C, JX-670, JX-671C, JX-672, JX-673C,
18  JX-674, JX-675C, JX-676, JX-677C, JX-678C,
19  JX-679, JX-680C through JX-685C, JX-686,
20  JX-687, JX-688C through JX-690C, JX-691 through
21  JX-695, JX-696C through JX-709C were received
22  into evidence.)
23       (Whereupon, at 4:45 p.m., the trial
24  recessed, to reconvene at 9:00 a.m. on Friday,
25  September 30, 2011.)
```

Page 1421

```
1   EXHIBIT NO:    MARKED   RECEIVED
2   COMPLAINANT
3   CX-368C....................... 1416
4   CX-399....................... 1416
5   CX-403....................... 1416
6   CX-404....................... 1416
7   CX-408....................... 1416
8   CX-415....................... 1416
9   CX-416....................... 1416
10  CX-419....................... 1416
11  CX-420....................... 1416
12  CX-425....................... 1416
13  CX-473C...................... 1416
14  CX-474C...................... 1416
15  CX-574C...................... 1416
16  CX-575C...................... 1416
17  CDX-002.003................. 1416
18  CDX-002.004................. 1416
19  CDX-002.005................. 1416
20  CDX-002.018-37............. 1416
21  CDX-002.039................. 1416
22  CDX-002.040................. 1416
23  CDX-002.041................. 1416
24  CDX-002.042................. 1416
25  CDX-002.043-45.............. 1416
```

Page 1420

CONTENTS

```
2   WITNESS    DIRECT CROSS REDIRECT RECROSS STAFF
3   DOUGLASS LOCKE  1112  1114  1215   1248
4                        1252
5   ANDREW WOLFE   1256  1258  1390   1414  1385
6
7          AFTERNOON SESSION: 1255
8
9      CONFIDENTIAL SESSIONS: 1368-1381, 1404-1413
10
11       E X H I B I T S
12  EXHIBIT NO:    MARKED   RECEIVED
13  COMPLAINANT
14  CX-601.......... 1268
15  CX-602.......... 1325
16  CX-357C............. 1415
17  CX-363C............. 1415
18  CX-365............. 1415
19  CX-206C............. 1416
20  CDX-3.001.................. 1416
21  CX-032C.001................. 1416
22  CX-032C.038.040.............. 1416
23  CX-032C.075............... 1416
24  CX-357.................. 1416
25  CX-366C................. 1416
```

Page 1422

```
1   EXHIBIT NO:    MARKED   RECEIVED
2   COMPLAINANT
3   CDX-002.046-127.............. 1416
4   CDX-002.128A............... 1416
5   CDX-002.128B............... 1416
6   CDX-002.130-149.............. 1416
7   CDX-002.151-170.............. 1416
8   CDX-002.180-196.............. 1416
9   CDX-002.198-206.............. 1416
10  CDX-002.207-8................ 1416
11  CDX-002.209-270.............. 1416
12  CDX-16..................... 1416
13  CX-91C...................... 1416
14  CX-95-96.................... 1416
15  CX-108C..................... 1416
16  CX-202C..................... 1416
17  CX-107C..................... 1417
18  CDX-1...................... 1417
19  CDX-10.43................... 1417
20  CDX-10.76................... 1417
21  CDX-15.1.................... 1417
22  CDX-15.2.................... 1417
23  CDX-15.3.................... 1417
24  CDX-15.4.................... 1417
25  CPX-1...................... 1417
```

APLNDC-X0000006410

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1423

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | COMPLAINANT | | |
| 3 | CX-073C........................ | | 1417 |
| 4 | CX-113........................ | | 1417 |
| 5 | CX-201C........................ | | 1417 |
| 6 | CX-384C........................ | | 1417 |
| 7 | CX-385........................ | | 1417 |
| 8 | CX-386C........................ | | 1417 |
| 9 | CX-391C........................ | | 1417 |
| 10 | CX-525........................ | | 1417 |
| 11 | CX-535C........................ | | 1417 |
| 12 | CX-357C........................ | | 1418 |
| 13 | CX-363C........................ | | 1418 |
| 14 | CX-365........................ | | 1418 |
| 15 | RESPONDENT | | |
| 16 | RX-812C........................ | | 1416 |
| 17 | RX-815C........................ | | 1416 |
| 18 | RX-994C........................ | | 1416 |
| 19 | RX-1237C........................ | | 1416 |
| 20 | RDX-12.1C through RDX-12.8C... | | 1418 |
| 21 | RDX-15.042C........................ | | 1418 |
| 22 | RDX-15.058C........................ | | 1418 |
| 23 | RDX-15.059C........................ | | 1418 |
| 24 | JOINT | | |
| 25 | JX-459C........................ | | 1416 |

Page 1424

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-487........................ | | 1416 |
| 4 | JX-8........................ | | 1416 |
| 5 | JX-437C........................ | | 1416 |
| 6 | JX-478C........................ | | 1416 |
| 7 | JX-479C........................ | | 1416 |
| 8 | JX-491........................ | | 1416 |
| 9 | JX-532C........................ | | 1416 |
| 10 | JX-2........................ | | 1417 |
| 11 | JX-5........................ | | 1417 |
| 12 | JX-419........................ | | 1417 |
| 13 | JX-485C........................ | | 1417 |
| 14 | JX-486C........................ | | 1417 |
| 15 | JX-488C........................ | | 1417 |
| 16 | JX-492-493........................ | | 1417 |
| 17 | JX-497........................ | | 1417 |
| 18 | JX-499-502........................ | | 1417 |
| 19 | JX-504-507........................ | | 1417 |
| 20 | JX-510-511........................ | | 1417 |
| 21 | JX-514-518........................ | | 1417 |
| 22 | JX-520........................ | | 1417 |
| 23 | JX-522-523........................ | | 1417 |
| 24 | JX-531C........................ | | 1417 |
| 25 | JX-534C........................ | | 1417 |

Page 1425

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-566C........................ | | 1417 |
| 4 | JX-578C........................ | | 1417 |
| 5 | JX-580C........................ | | 1417 |
| 6 | JX-603C-608C........................ | | 1417 |
| 7 | JX-611C-612C........................ | | 1417 |
| 8 | JX-615C-618C........................ | | 1417 |
| 9 | JX-621C-636C........................ | | 1417 |
| 10 | JX-649C-650C........................ | | 1417 |
| 11 | JX-652C........................ | | 1417 |
| 12 | JX-654C-655C........................ | | 1417 |
| 13 | JX-661C-662C........................ | | 1417 |
| 14 | JX-671C........................ | | 1417 |
| 15 | JX-675C........................ | | 1417 |
| 16 | JX-680C........................ | | 1417 |
| 17 | JX-695........................ | | 1417 |
| 18 | JX-1........................ | | 1418 |
| 19 | JX-3........................ | | 1418 |
| 20 | JX-4........................ | | 1418 |
| 21 | JX-6........................ | | 1418 |
| 22 | JX-015C........................ | | 1418 |
| 23 | JX-022C-024C........................ | | 1418 |
| 24 | JX-245........................ | | 1418 |
| 25 | JX-289........................ | | 1418 |

Page 1426

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-458C........................ | | 1418 |
| 4 | JX-460C........................ | | 1418 |
| 5 | JX-461C........................ | | 1418 |
| 6 | JX-462.001 through .006....... | | 1418 |
| 7 | JX-484C through JX-486C....... | | 1418 |
| 8 | JX-487........................ | | 1418 |
| 9 | JX-488C........................ | | 1418 |
| 10 | JX-531C........................ | | 1418 |
| 11 | JX-535C........................ | | 1418 |
| 12 | JX-539C........................ | | 1418 |
| 13 | JX-548C........................ | | 1418 |
| 14 | JX-552C through JX-556C....... | | 1418 |
| 15 | JX-557 through JX-559......... | | 1418 |
| 16 | JX-560C through JX-563C....... | | 1418 |
| 17 | JX-564........................ | | 1418 |
| 18 | JX-567........................ | | 1418 |
| 19 | JX-568........................ | | 1418 |
| 20 | JX-570........................ | | 1418 |
| 21 | JX-572C through JX-574C....... | | 1418 |
| 22 | JX-576........................ | | 1418 |
| 23 | JX-577........................ | | 1418 |
| 24 | JX-582C through JX-584C....... | | 1418 |
| 25 | JX-587C through JX-590C....... | | 1418 |

APLNDC-X0000006411

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | JOINT | | |
| 2 | | | |
| 3 | JX-592C through JX-600C....... | | 1418 |
| 4 | JX-601....................... | | 1418 |
| 5 | JX-602....................... | | 1418 |
| 6 | JX-604C...................... | | 1418 |
| 7 | JX-605C...................... | | 1418 |
| 8 | JX-609C...................... | | 1418 |
| 9 | JX-611C...................... | | 1418 |
| 10 | JX-613C...................... | | 1418 |
| 11 | JX-615C...................... | | 1418 |
| 12 | JX-617C...................... | | 1418 |
| 13 | JX-621C...................... | | 1418 |
| 14 | JX-624C...................... | | 1418 |
| 15 | JX-625C...................... | | 1418 |
| 16 | JX-627C...................... | | 1418 |
| 17 | JX-629C...................... | | 1418 |
| 18 | JX-631C...................... | | 1418 |
| 19 | JX-634C...................... | | 1418 |
| 20 | JX-636C...................... | | 1418 |
| 21 | JX-642C...................... | | 1418 |
| 22 | JX-646C...................... | | 1418 |
| 23 | JX-651C...................... | | 1418 |
| 24 | JX-655C through JX-657C....... | | 1418 |
| 25 | JX-659C through JX-663C....... | | 1418 |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | JOINT | | |
| 2 | | | |
| 3 | JX-489...................... | | 1419 |
| 4 | JX-490C..................... | | 1419 |
| 5 | JX-491 through JX-523......... | | 1419 |
| 6 | JX-524C..................... | | 1419 |
| 7 | JX-525...................... | | 1419 |
| 8 | JX-526C through JX-537C....... | | 1419 |
| 9 | JX-538...................... | | 1419 |
| 10 | JX-539C through JX-556C....... | | 1419 |
| 11 | JX-557 through JX-559......... | | 1419 |
| 12 | JX-560C through JX-562C....... | | 1419 |
| 13 | JX-563...................... | | 1419 |
| 14 | JX-564...................... | | 1419 |
| 15 | JX-565C..................... | | 1419 |
| 16 | JX-566C..................... | | 1419 |
| 17 | JX-567 through JX-571......... | | 1419 |
| 18 | JX-572C..................... | | 1419 |
| 19 | JX-573C..................... | | 1419 |
| 20 | JX-574C..................... | | 1419 |
| 21 | JX-575 through JX-577......... | | 1419 |
| 22 | JX-578C through JX-600C....... | | 1419 |
| 23 | JX-601...................... | | 1419 |
| 24 | JX-602...................... | | 1419 |
| 25 | JX-603C through JX-669C....... | | 1419 |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | JOINT | | |
| 2 | | | |
| 3 | JX-671C...................... | | 1418 |
| 4 | JX-675C...................... | | 1418 |
| 5 | JX-680C through JX-685C....... | | 1418 |
| 6 | JX-686....................... | | 1418 |
| 7 | JX-693....................... | | 1418 |
| 8 | JX-001 through JX-008......... | | 1419 |
| 9 | JX-010 through JX-012......... | | 1419 |
| 10 | JX-437C...................... | | 1419 |
| 11 | JX-489....................... | | 1419 |
| 12 | JX-537C...................... | | 1419 |
| 13 | JX-538C...................... | | 1419 |
| 14 | JX-001 through JX-014......... | | 1419 |
| 15 | JX-015C through JX-025C....... | | 1419 |
| 16 | JX-026 through JX-292......... | | 1419 |
| 17 | JX-300 through JX-436......... | | 1419 |
| 18 | JX-437C...................... | | 1419 |
| 19 | JX-438C...................... | | 1419 |
| 20 | JX-439 through JX-457......... | | 1419 |
| 21 | JX-458C through JX-472C....... | | 1419 |
| 22 | JX-473....................... | | 1419 |
| 23 | JX-474C through JX-486C....... | | 1419 |
| 24 | JX-487....................... | | 1419 |
| 25 | JX-488C...................... | | 1419 |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | JOINT | | |
| 2 | | | |
| 3 | JX-670...................... | | 1419 |
| 4 | JX-671C..................... | | 1419 |
| 5 | JX-672...................... | | 1419 |
| 6 | JX-673C..................... | | 1419 |
| 7 | JX-674...................... | | 1419 |
| 8 | JX-675C..................... | | 1419 |
| 9 | JX-676...................... | | 1419 |
| 10 | JX-677C..................... | | 1419 |
| 11 | JX-678C..................... | | 1419 |
| 12 | JX-679...................... | | 1419 |
| 13 | JX-680C through JX-685C....... | | 1419 |
| 14 | JX-686...................... | | 1419 |
| 15 | JX-687...................... | | 1419 |
| 16 | JX-688C through JX-690C....... | | 1419 |
| 17 | JX-691 through JX-695......... | | 1419 |
| 18 | JX-696C through JX-709C....... | | 1419 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                        Page 1431
 1            CERTIFICATE OF REPORTER
 2    TITLE:  Certain Mobile Devices and Related Software
 3    INVESTIGATION NO: 337-TA-750
 4    HEARING DATE:    September 29, 2011
 5    LOCATION:        Washington, D C
 6    NATURE OF HEARING: Volume 4
 7            I hereby certify that the foregoing/attached
      transcript is a true, correct and complete record of
 8    the above-referenced proceedings of the U S
      International Trade Commission
 9    Date:  September 29, 2011
10    SIGNED:KAREN BRYNTESON_____
11       Signature of the Contractor of the
            Authorized Contractor's Representative
12       1220 L Street, N W, Suite 600
            Washington, D C  20005
13
            I hereby certify that I am not the Court
14    Reporter and that I have proofread the
      above-referenced transcript of the proceedings of the
15    U S  International Trade Commission, against the
      aforementioned Court Reporter's notes and recordings,
16    for accuracy in transcription in the spelling,
      hyphenation, punctuation and speaker identification
17    and did not make any changes of a substantive nature
      The foregoing/attached transcript is a true, correct
18    and complete transcription of the proceedings
19    SIGNED:JOHN D  LASHER _____
            Signature of Proofreader
20
            I hereby certify that I reported the
21    above-referenced proceedings of the U S  International
      Trade Commission and caused to be prepared from my
22    tapes and notes of the proceedings a true, correct and
      complete verbatim recording of the proceedings
23
      SIGNED:KAREN BRYNTESON _____
24       Signature of the Court Reporter
25
```

APLNDC-X0000006413

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1432

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

In the Matter of:      ) Investigation No.

CERTAIN MOBILE DEVICES   ) 337-TA-750

AND RELATED SOFTWARE    )

_____

Hearing Room A

United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.

Friday, September 30, 2011

VOLUME V

The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.

BEFORE:  THE HONORABLE THEODORE R. ESSEX

---

Page 1434

1  APPEARANCES (Continued):
2
3  For Respondent Motorola Mobility, Inc.:
4     CHARLES K. VERHOEVEN, ESQ.
5     DAVID EISEMAN, ESQ.
6     Quinn Emanuel Urquhart & Sullivan LLP
7     50 California Street, 22nd Floor
8     San Francisco, CA 94111
9
10    EDWARD J. DeFRANCO, ESQ.
11    Quinn Emanuel Urquhart & Sullivan LLP
12    51 Madison Avenue, 22nd FLoor
13    New York, New York 10010
14
15    DAVID A. NELSON, ESQ.
16    Quinn Emanuel Urquhart & Sullivan LLP
17    500 West Madison Street, Suite 2450
18    Chicago, Illinois 60661
19
20
21
22
23
24
25

---

Page 1433

1  APPEARANCES:
2     For Complainant Apple:
3        MARK G. DAVIS, ESQ.
4        BRIAN E. FERGUSON, ESQ.
5        ROBERT T. VLASIS, ESQ.
6        EDWARD S. JOU, ESQ.
7        CHRISTOPHER T. MARANDO, ESQ.
8        Weil, Gotshal & Manges LLP
9        1300 Eye Street, N.W., Suite 900
10       Washington, D.C. 20005
11
12       JILL J. HO, ESQ.
13       BRIAN C. CHANG, ESQ.
14       Weil, Gotshal & Manges LLP
15       201 Redwood Shores Parkway
16       Redwood Shores, CA 94065
17
18       MATTHEW D. POWERS, ESQ.
19       STEVEN S. CHERENSKY, ESQ.
20       PAUL T. EHRLICH, ESQ.
21       ROBERT L. GERRITY, ESQ.
22       Tensegrity Law Group LLP
23       201 Redwood Shore Parkway
24       Redwood Shores, CA 94065
25

---

Page 1435

1  APPEARANCES (Cont'd):
2
3  For ITC Staff:
4     LISA KATTAN, ESQ.
5     ANNE GOALWIN, ESQ.
6     U.S. International Trade Commission
7     500 E Street, S.W.
8     Washington, D.C. 20436
9
10
11    Attorney-Advisor:
12       GREGORY MOLDAFSKY, ESQ.
13       Attorney-Advisor
14       Office of Administrative Law Judges
15       U.S. International Trade Commission
16       500 E Street, S.W.
17       Washington, D.C. 20436
18
19
20    *** Index appears at end of transcript ***
21
22
23
24
25

---

1 (Pages 1432 to 1435)

APLNDC-X0000006414

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1436

PROCEEDINGS
(9:00 a.m.)
1. 
2. 
3. JUDGE ESSEX:  Let's come to order.
4. Complainants, where are we at?
5. MR. POWERS:  We are beginning our
6. rebuttal case, Your Honor.
7. JUDGE ESSEX:  All right.  We don't
8. have anything to take up before your rebuttal
9. case?
10. MR. POWERS:  No, Your Honor.
11. JUDGE ESSEX:  All right.  Then let's
12. begin.
13. MR. FERGUSON:  Good morning, Your
14. Honor.
15. JUDGE ESSEX:  Good morning.
16. MR. FERGUSON:  We call back to the
17. stand Dr. Vivek Subramanian.
18. JUDGE ESSEX:  Good morning, Doctor.
19. THE WITNESS:  Good morning.
20. JUDGE ESSEX:  I would remind you, you
21. have previously been sworn in this case and you
22. are still under oath as you take the stand
23. here.
24. //
25. //

Page 1437

1. Whereupon--
2. VIVEK SUBRAMANIAN,
3. a witness, called for examination, having previously
4. been duly sworn, was examined and testified further as
5. follows:
6. JUDGE ESSEX:  Please be seated.
7. THE WITNESS:  I understand, Your
8. Honor.
9. JUDGE ESSEX:  All right.
10. MR. FERGUSON:  Thank you, Your Honor.
11. We did distribute Dr. Subramanian's rebuttal
12. notebooks already, so those should be up there
13. with you.
14. DIRECT EXAMINATION
15. BY MR. FERGUSON:
16. Q.   Good morning, Dr. Subramanian.
17. A.   Good morning.
18. Q.   You should have a binder in front of
19. you that contains your rebuttal witness
20. statement.  Do you have that?
21. A.   Yes, I do.
22. Q.   And is that marked CX-569C?
23. A.   Yes, it is.
24. Q.   And can you turn, please, to the last
25. page of this document and let us know if that

Page 1438

1. is your signature?
2. A.   Yes, it is.
3. Q.   And it is dated September 6th; is that
4. right?
5. A.   That's correct.
6. Q.   And did you give the answers to the
7. questions that were posed in this rebuttal
8. witness statement?
9. A.   Yes, I did.
10. MR. FERGUSON:  Pass the witness, Your
11. Honor.
12. CROSS-EXAMINATION
13. BY MR. DeFRANCO:
14. Q.   Good morning, Doctor.
15. A.   Good morning.
16. Q.   We're going to speak this morning
17. about invalidity issues relating to the '607
18. patent; is that correct?
19. A.   I understand.
20. Q.   The '607 patent is up on the screen.
21. Obviously you spent a lot of time with this
22. patent in your work on this case.
23. Now, let's turn to the background of
24. the invention section of this patent.  And you
25. are aware generally, Doctor, that the

Page 1439

1. background section gives some information about
2. the state of the art prior to what's set forth
3. as the invention in a given patent.  Is that
4. fair?
5. A.   That is certainly one of the things
6. that is often placed in the background section.
7. Q.   Part of the purpose of the background
8. is to tell people who want ultimately to find
9. out about the scope of the invention as to what
10. was done by others before.  Fair enough?
11. A.   Yes, that's reasonable.
12. Q.   A bit of information?  This is the
13. starting point, this is the background of
14. what's in the field.  Fair enough?
15. A.   Are you referring specifically to this
16. or the background section generally?
17. Q.   Generally, generally.
18. A.   Yes, I think generally background
19. sections do contain information about what was
20. already in the field at the time.
21. Q.   You said specifically to this.  This
22. background generally did the same thing, didn't
23. it, for the '607 patent?  It gives some
24. information about what was in the field prior
25. to the invention that's later set forth?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1440

1    A.   Yes, some of that information is
2 certainly contained in the background of the
3 '607 patent.
4    Q.   Now, you have seen many patents.  It
5 is common in patents to not only discuss the
6 prior art generally, but sometimes to
7 specifically reference certain pieces of prior
8 art.  You have seen that in patents before?
9    A.   I have.
10    Q.   An example, in many of the patents we
11 have looked at in this case for different
12 reasons, the background would say something
13 about the prior art, and then it would say,
14 well, here is an example of this patent and
15 what it discloses, here is an example of that
16 patent and what it discloses, that sort of
17 thing; is that correct?
18    A.   I have certainly seen that in numerous
19 patents.  To be honest, sitting here right now,
20 I would have to look at the patents to confirm
21 that that exists, but I certainly agree that it
22 is generally true.
23    Q.   And then they go on, patents often go
24 on to say, now, there is the prior art, let's
25 discuss the advance in this particular patent?

Page 1441

1    A.   Yes, that's a structure that's quite
2 common.
3    Q.   Now, just for the record, the '607
4 patent talks about the field, but it doesn't
5 specifically call out any prior art references
6 in particular.  Is that fair?
7    A.   You mean within the background of the
8 invention section?
9    Q.   Yes, sir.
10    A.   Yes, there are no specific references
11 called out in the background of the invention
12 section and discussed within the text of the
13 same.
14    Q.   Okay.  But it does talk about what was
15 in the field at the time, and I would like to
16 walk through that just a little bit.  Okay?
17        So if we start off in the first
18 paragraph, it talks about -- actually, there
19 are two sections I should point out, the field
20 of the invention and the description of related
21 part.  Do you see that?
22    A.   I do see those two sections.
23    Q.   The first paragraph under the
24 description of the related art, that is very
25 general background about different types of

Page 1442

1 input devices; is that correct?
2    A.   Yes, that's a reasonable way of
3 describing that paragraph.
4    Q.   For example, lines 14 to 16 talks
5 about buttons, keys -- buttons or keys, mice,
6 track balls, touch pads, joy sticks, and then
7 touchscreens and the like.  Do you see that?
8    A.   Yes, I do see that language.
9    Q.   We care more, of course, about
10 touchscreens.  The next sentence reads,
11 "touchscreens, in particular, are becoming
12 increasingly popular because of their ease and
13 versatility of operation as well as their
14 declining price."
15        Do you see that?
16    A.   Yes, I see that language.
17    Q.   You don't disagree with that, do you?
18    A.   No, I generally don't disagree with
19 that.
20    Q.   So let's move on a little bit to keep
21 walking through the background.  If we go down,
22 Ryan, to line 24, that's fine.  The background
23 section goes on in the next paragraph and
24 states, "touchscreens typically include a touch
25 panel, a controller, and a software driver."

Page 1443

1        Do you see that?
2    A.   Yes, I see that language.
3    Q.   And then the next paragraph, if we go
4 down, Ryan, if you could move down to the next
5 paragraph, it says, "there are several types of
6 screen technologies including resistive,
7 capacitive, infrared, surface acoustic wave,
8 electromagnetic, near-field imaging, et
9 cetera."
10        Do you see that?
11    A.   I do.
12    Q.   Now, that's a survey of the different
13 types of touchscreens that were available in
14 the field at the time, sir?
15    A.   That's a listing of the various types
16 that were generally available at that time,
17 yes.
18    Q.   Okay.  But in this case, in
19 particular, we're interested in one particular
20 type.  Would you point that out for us?
21    A.   Which type?
22    Q.   Yes, which type.
23    A.   In general, this patent is
24 specifically focused on capacitive
25 touchscreens.

APLNDC-X0000006416

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1444

1   Q.   And of course, in this case, we have
2   talked about two different types of capacitive
3   touchscreen devices.  Would you tell us what
4   those two types are?
5   A.   Certainly.  Broadly, we have talked
6   about capacitive touchscreens that are
7   so-called self-capacitive touchscreens and
8   capacitive touchscreens that are mutual
9   capacitive touchscreens.
10  Q.   And then the next paragraph, I don't
11  think, is terrifically important unless there
12  is something you want to say about it.  It
13  talks about one of the technologies we're not
14  interested in here, do you see that, sir,
15  surface acoustic wave technologies?  Do you see
16  that, sir?
17  A.   In the paragraph starting at line 34?
18  Q.   Yes.
19  A.   I apologize, starting at line 50?
20  Q.   Yes, I'm sorry, line 50.
21  A.   That is one of the technologies that
22  it talks about in that paragraph, but certainly
23  the first line is about surface acoustic wave
24  technologies.
25  Q.   Okay.  The last paragraph, I believe

Page 1445

1   it is fair to say, is sort of the segue I was
2   alluding to earlier.  In other words, the
3   background has discussed what was in the field
4   generally and then it goes on to say, now, here
5   is the problems with what's out there, what's
6   in the field.
7        Do you see that, sir?  Do you want to
8   take a look at that?
9   A.   I see that section.
10  Q.   Well, let's -- that's great, Ryan.
11  Thanks.
12       So let's just take a minute or two and
13  go through the rest of the background section.
14  The first sentence says, "one problem found in
15  all of these technologies is that they are only
16  capable of reporting a single point even when
17  multiple objects are placed on the sensing
18  surface."
19       Do you see that?
20  A.   I do.
21  Q.   It says, "that is, they lack the
22  ability to track multiple points of contact
23  simultaneously."
24       Do you see that, sir?
25  A.   I do.

Page 1446

1   Q.   That's what we have been referring to
2   in this case as multi-point or multi-touch?  I
3   am not sure which word you prefer.  The ability
4   to sense when two different touch points are
5   being placed on a given screen?
6   A.   You can use either.  I will understand
7   what you mean.  If I don't understand, I will
8   certainly ask you for clarification.
9   Q.   So it is fair, isn't it, to say that
10  the inventors or the patent applicants at that
11  time at that portion of the background section
12  were saying, this is what the prior art is
13  lacking, it is lacking the ability to sense two
14  touch points at one time, also known as
15  multi-touch; is that fair?
16  A.   This was one of the problems that the
17  patent identified in the description on
18  description of the related art with respect to
19  the technologies available at the time.
20  Q.   Yes.
21  A.   And that includes the technologies
22  that we have listed previously.
23  Q.   Exactly.  That's the first problem,
24  right, that it discusses in this background
25  section, right, the ability -- the lack of the

Page 1447

1   ability in the prior art to sense two touch
2   points; that is, to have multi-touch?
3   A.   Yes, that is one problem that the
4   patent says is found in all of these
5   technologies, where these technologies refers
6   to resistive, capacitive, et cetera, as we have
7   discussed previously.
8   Q.   Okay.  Then it goes on and it gives a
9   little bit more information.  I think that's
10  what you were alluding to.  It says, "in
11  resistive and capacitive technologies, an
12  average of all simultaneously occurring touch
13  points are determined and a single point which
14  falls somewhere between the two, between the
15  touch points is reported."
16       Do you see that?
17  A.   I do.
18  Q.   And I think that's something that you
19  have discussed a bit earlier in this case.
20  That's an elaboration on what was discussed
21  earlier in the paragraph; that is, the lack of
22  the ability of the prior art to distinguish
23  between two touch points.
24       Is that fair, sir?
25  A.   Yes, that is.

APLNDC-X0000006417

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1448

1    Q.   Okay.  And I think the last bit of
2  that paragraph is not particularly relevant,
3  unless there is something you wanted to say
4  about it.  Now --
5    A.   So there is a relevance to that as
6  well, but --
7    Q.   Okay.  But not to capacitive
8  necessarily, is there, sir, in that last
9  sentence?  It is referring to different
10  technologies, surface wave and infrared?  Do
11  you see that?
12    A.   That particular section is
13  specifically talking about surface wave and
14  infrared technologies, where it says it is
15  impossible to discern the exact position of
16  multiple touch points that fall in the same
17  horizontal or vertical lines due to masking.
18        However, the issues associated with
19  masking exist in capacitive technologies as
20  well.
21    Q.   Okay.  But it doesn't -- in that
22  sentence, for what it is worth, it is talking
23  about surface wave and infrared in particular
24  with respect to that issue; is that fair?
25    A.   Yes, I agree with that.

Page 1449

1    Q.   And then the last paragraph goes on to
2  say that these problems are particularly
3  problematic in tablet PCs, where one hand is
4  used to hold the tablet and the other is used
5  to generate touch events.
6        Do you see that, sir?
7    A.   I see that sentence.
8    Q.   Okay.  Now, a tablet is -- we all know
9  what a tablet is.  It is like a tablet device
10  like an iPad device, is that how you think of a
11  tablet?
12    A.   With respect to what we're referring
13  to here, yes.
14    Q.   Okay.  And why don't we just show --
15  Ryan, maybe you can just leave column 2 and put
16  the first page of figures on the left-hand
17  side.
18        Now, in that paragraph, it references
19  figures 1A and 1B.  Do you see that?  It says,
20  "holding a tablet 2 causes the thumb 3 to
21  overlap with the edge of the touch sensitive
22  surface of the touchscreen."
23        Do you see that, sir?
24    A.   Yes, I see that language.
25    Q.   Generally, it is depicting the

Page 1450

1  problems in the prior art with respect to the
2  lack of the ability to sense multiple touches
3  using a tablet device and someone using two
4  fingers.
5        Do you see that?
6    A.   Actually, what this section is
7  describing is how tablets are affected by the
8  problems that we have discussed in the prior
9  art section.
10    Q.   Better put, okay.
11        Now, by the way, you were here for
12  Mr. Hotelling's testimony?
13    A.   Yes.
14    Q.   At the beginning of the case?
15    A.   Yes, I was.
16    Q.   And I believe he said something to the
17  effect of the project -- that the development
18  project for a product that Apple had in mind at
19  the time that led to the inventions in the '607
20  patent was a tablet-like device.
21        Do you remember that?
22    A.   Yes.
23    Q.   It wasn't a phone or anything else, he
24  specifically said it was a tablet.  Do you
25  recall that, sir?

Page 1451

1    A.   In terms of the origination of the
2  project, yes, I believe that's true.
3    Q.   Okay.  So to summarize, sir, we have
4  been through the background section.  We have
5  looked at some of the figures that are
6  referenced.
7        We have discussed the capacitive
8  disclosure relating to capacitive technologies.
9  Nothing in the background section says anything
10  to the effect that multi-touch was available in
11  some form prior to this patent.  Is that fair?
12    A.   No, I disagree.  It says that there
13  are problems with having multiple touches.
14  That's as far as it goes.  If you are asking
15  me, is there explicit disclosure of a system
16  that accurately detects multiple touches, yes,
17  I agree that didn't exist.
18    Q.   There is no specific disclosure of a
19  multi-touch device in the background section?
20    A.   Of a system that can accurately detect
21  multiple touches?  Absolutely, I agree.
22    Q.   And there certainly is no disclosure
23  of a system that solved the problem of being
24  able to detect multiple touches; is that fair,
25  sir?

APLNDC-X0000006418

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1452

1    A.   In the background?
2    Q.   Yes.
3    A.   Yes, I agree.
4    Q.   Okay.  Let's turn to one of the prior
5  art references in this case that's been
6  discussed a bit, the SmartSkin reference.
7  Obviously you have spent a lot of time with
8  that.
9        Let's put up on the screen RDX-28.002.
10  A little bit of background for the record, sir.
11  This is one of the prior art references that
12  Motorola is relying on in this case for its
13  invalidity assertions.
14        You're aware of that?
15    A.   Yes, I believe it was also cited
16  within the patent.
17    Q.   And there should be a date, Ryan, in
18  the lower left, if you can blow it up at the
19  bottom.  It says published in April 20 to 25th,
20  2002.
21        Do you see that, sir?
22    A.   I do.
23    Q.   And you were here for Mr. Hotelling's
24  testimony, you're aware that this is -- the
25  SmartSkin device is one of the devices that the

Page 1453

1  inventors were aware of in the course of their
2  development work that led to the '607 patent,
3  sir?
4    A.   In the time frame over which the
5  project ran, I do understand that they were
6  aware of the SmartSkin device somewhere in that
7  period.
8    Q.   Okay.  Now, let's turn to the next
9  slide, which is RDX-28.003.  And this slide is
10  actually -- it is a slide within a slide or
11  there is a slide within this slide.  It is
12  CDX-009.037, which if I have it right, this is
13  the demonstrative in which you set forth the
14  contours of your view as to what was lacking in
15  the SmartSkin reference.
16        Is that fair?
17    A.   Yes, I believe that's right.
18    Q.   And I want to understand something.
19  It says multi-touch under Motorola's
20  construction.  You're saying that SmartSkin
21  lacked multi-touch under Motorola's
22  construction in this case?
23    A.   Under specific aspects of Motorola's
24  construction, yes.
25    Q.   And at least part of the basis for

Page 1454

1  your opinion is that multi-touch would require
2  scanning every sensor location across the plane
3  of a touch panel at exactly the same instance
4  in time?
5    A.   Under Motorola's construction?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Okay.  Now, for infringement purposes
9  in this case, I want to talk about how this
10  relates to your infringement analysis.
11        It was your testimony earlier that the
12  Motorola accused products met the multi-touch
13  limitation under Motorola's construction; is
14  that right?
15    A.   Yes, I believe so.
16    Q.   For example, you said that Motorola's
17  accused products met the multi-touch aspect of
18  the preamble of the claim 1, for example, of
19  the asserted claims in this case?
20    A.   Could you point me to the specific
21  section of my --
22    Q.   Sure.  Let's put up question 260 and
23  the answer, please, Ryan.
24        Do you see there, sir, in the first
25  sentence, "the accused products also satisfy

Page 1455

1  this limitation," and we're talking about the
2  preamble in the question, "under Motorola's
3  proposed construction for the same reasons
4  discussed with respect to the preamble under
5  Apple's proposed constructions."  Do you see
6  that?
7    A.   With respect to this question, yes, I
8  see that.
9    Q.   The way that is phrased, if I have it
10  correct, under either party's construction, the
11  multi-touch limitation in your infringement
12  analysis is met, as it is set forth in the
13  preamble; is that fair?
14    A.   Could I have my report that has this,
15  so I can look at the question it is referring
16  to?
17    Q.   Sure, absolutely.
18    A.   It is not this one.  It is not this
19  one -- it's not in the rebuttal report.  This
20  is in the initial witness statement.  And you
21  said question 260?
22    Q.   Yes, sir.
23    A.   I see that.
24    Q.   Okay.  Just a couple of examples as to
25  why you found infringement of this limitation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1456

1       You said that the Motorola accused
2   products recognize multiple touches and have
3   the abilities to use multi-touch gestures; is
4   that correct?  I believe that's right in that
5   paragraph that you are taking a look at.
6       A.   Yes, it is there.
7       Q.   You have also said that the accused
8   Motorola products recognize certain gestures;
9   is that correct, sir?  And if you take a look
10  at this section, this answer where it reads,
11  "for example," do you see that?  Do you see
12  there some examples?
13      A.   Yes.
14      Q.   Of what is done in the Motorola
15  products that led you to find infringement of
16  the multi-touch aspects of claim 1?
17      A.   Yes.
18      Q.   For example, you pointed out pinch to
19  zoom; is that correct?
20      A.   That is correct.
21      Q.   You pointed out that the hardware is
22  necessarily arranged in a certain way to meet
23  the multi-touch limitation; is that correct,
24  sir?
25      A.   That's correct.

Page 1457

1       Q.   Let's turn to the next slide, please,
2   Ryan.  Now, when we turn to the SmartSkin
3   reference, obviously you don't find that the
4   SmartSkin reference is anticipatory, as
5   Motorola found; is that correct?
6       A.   I do not find that.
7       Q.   And is part of your rationale for
8   that, sir, the fact that, in your opinion,
9   SmartSkin does not have the ability to
10  recognize multiple touches under Motorola's
11  construction?
12      A.   With respect to Motorola's
13  construction, SmartSkin does not have the
14  ability to detect them at exactly the same time
15  since it scans.
16      If the intent of Motorola's
17  construction is to indicate that it has to
18  happen at exactly the same time, then it would
19  not meet it under Motorola's construction.
20      Q.   Let's take a look at part of the
21  disclosure in the SmartSkin reference.  It says
22  -- and you have been through this reference in
23  detail before, right, sir?
24      A.   I have reviewed this reference.
25      Q.   Let's -- you know what, let's put up

Page 1458

1   -- Ryan, could you put up the first page of
2   JTX-367.001.  Let's put this -- we're going to
3   spend a few minutes on this.  Let's put this
4   reference in perspective and go through the
5   abstract like we went through a bit of the
6   background of the '607 patent, okay?  Fair
7   enough?
8       A.   I understand.
9       Q.   Could you blow up the abstract,
10  please, Ryan.
11      The first sentence says, sir, "This
12  paper introduces a new sensor architecture for
13  making interactive surfaces that are sensitive
14  to human hand and finger gestures."
15      Do you see that, sir?
16      A.   I do.
17      Q.   And there is some disclosure -- we
18  will get to it -- there is some text, there is
19  some figures that show using finger touches or
20  finger gestures.  Is that fair enough, sir?
21      A.   You mean within the examples within
22  SmartSkin?
23      Q.   Yes.
24      A.   Yes, there is some descriptions of
25  that.

Page 1459

1       Q.   The next sentence goes on and reads,
2   "the sensor recognizes multiple hand positions
3   and shapes and calculates the distance between
4   the hand and the surface by using capacitive
5   sensing and a mesh-shaped antenna."
6       Do you see that, sir?
7       A.   I do.
8       Q.   "In contrast to camera-based gesture
9   recognition systems, all sensing elements can
10  be integrated within the surface and this
11  method does not suffer from lighting and
12  occlusion problems."
13      Do you see that, sir?
14      A.   I see that language as well.
15      Q.   And I think the last couple of
16  sentences are a bit more compelling.  It says,
17  "this paper describes a sensor architecture, as
18  well as two working prototype systems:  A
19  table-size system and a tablet-size system."
20      Do you see that, sir?
21      A.   I do.
22      Q.   There has been references several
23  points during the course of this hearing about
24  the table-size system, but you don't dispute,
25  sir, that this reference, the SmartSkin

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1460

1    reference, also disclosed a tablet-sized
2    system; is that fair?
3       A.   That's correct.
4       Q.   And it goes on to say, "it also
5    describes several interaction techniques that
6    would be difficult to perform without this
7    architecture."
8            Do you see that, sir?
9       A.   I see that language.
10      Q.   So let's go back to RDX-28.004, which
11   shows a blowup of figure 2 and some text
12   relating to figure 2.
13           So there has been a bit of discussion
14   about figure 2 in this case, but at least this
15   portion says at the bottom, "the system
16   time-dividing transmitting signal sent to each
17   of the vertical electrodes and the system
18   independently measures values from each of the
19   receiver electrodes."
20           Do you see that, sir?
21      A.   I see that language.  This is in
22   reference to the -- this is the second
23   paragraph of the discussion of figure 2.
24      Q.   Yes.  And it says, "these values are
25   integrated to form two-dimensional sensor

Page 1461

1    values, which we called proximity pixels.  Once
2    these values are obtained, algorithms similar
3    to those used in image processing, such as peak
4    detection, connect region analysis, and
5    template matching, can be applied to recognize
6    gestures."
7            Do you see that, sir?
8       A.   I believe you misread it.  It is
9    connected region analysis, but otherwise I
10   think you read it correctly.
11      Q.   And then the conclusion at least in
12   that paragraph says, "as a result, the system
13   can recognize multiple objects."  In parens,
14   for example, hands.  If the granularity of the
15   mesh is dense, the system can also recognize
16   the shapes of the objects.  Do you see that,
17   sir?
18      A.   There is no "also," but otherwise you
19   read it correctly.
20      Q.   You don't dispute -- thanks for that.
21   You don't dispute that is specific disclosure
22   that's set forth in the SmartSkin reference?
23      A.   That language is there, yes.
24      Q.   Now, is it your opinion that that
25   doesn't disclose the ability -- well, would you

Page 1462

1    say, sir, that the disclosure in figure 2 and
2    the related text sets forth a mutual
3    capacitance system?
4       A.   The disclosure in figure 2 and the
5    related text is certainly a system that
6    exploits mutual capacitance.
7       Q.   And it is your testimony, sir, that --
8    well, do you believe this does not disclose the
9    ability to detect multiple touches?
10      A.   With respect to the detection of
11   multiple touches alone, no, I haven't taken
12   that position.
13      Q.   Okay.  What's your position with
14   respect to multiple touches?
15      A.   With respect to SmartSkin?
16      Q.   Yes, sir.
17      A.   With respect to Apple's construction,
18   I have not taken a position that SmartSkin does
19   not disclose the ability to detect multiple
20   touches in the system shown in figure 2.
21           With respect to Motorola's
22   construction, if Motorola's construction is
23   intended to mean that detection has to occur at
24   exactly the same time, then it does not meet
25   the requirements of that construction.

Page 1463

1       Q.   Okay.  But if detection does not have
2    to occur at exactly the same time, again, then
3    you would find disclosure of that element in
4    this reference for either construction; is that
5    fair?
6       A.   So you are asking me to start from the
7    hypothetical that Motorola's construction does
8    not require detection --
9       Q.   If that were the case, yes.
10      A.   I understand.  If Motorola's
11   construction does not require detection to
12   occur at exactly the same time, then I believe
13   at least with respect to this portion, where we
14   are just talking about the ability to detect
15   multiple touches, then figure 2 shows that.
16      Q.   Okay.  Now, generally, we have been
17   through this in detail before, I am sure you
18   have read it many times.
19           Figure 2 and the associated text in
20   SmartSkin, would you say that that discloses a
21   mutual capacitance touch system that is
22   configured to recognize the relative
23   positioning of two different objects?
24      A.   Could I have the question again,
25   please?

APLNDC-X0000006421

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Would you read it back?
2           THE REPORTER:  "Question:  Figure 2
3  and the associated text in SmartSkin, would you
4  say that that discloses a mutual capacitance
5  touch system that is configured to recognize
6  the relative positioning of two different
7  objects?"
8           THE WITNESS:  I have no disagreement
9  with that statement with respect to figure 2.
10 BY MR. DeFRANCO:
11     Q.   Just for the record, I don't want to
12 belabor it.  I want to move through some of the
13 figures in the SmartSkin reference that depict
14 that visually.
15          Let's turn to the next slide.  Figure
16 7, for example, shows a person using two hands
17 to move objects, to move around the SmartSkin
18 surface and move two images.
19          Do you see that?
20     A.   Figure 7, if we look at the left, it
21 shows two halves of this image apart from each
22 other.  And then the right-hand side of figure
23 7 shows that they have been pushed together.
24 So that's what it calls concatenating two
25 objects.

1           The object is actually, as you can see
2  from figure 7, projected from a camera above.
3  And that's why you actually see the projection
4  on the person's fingers.
5      Q.   Okay.  And then if we move on to
6  figure 10, figure 10 shows a hand on the screen
7  and then it shows a two-fingered gesture.  Do
8  you see that, sir?
9      A.   On the top row of figure 10, yes, I
10 agree.
11     Q.   And that two finger gesture is
12 reminiscent, wouldn't you say, of the pinch to
13 zoom sort of gesture, just generally?
14     A.   No.  I mean, there is certainly a
15 starting point for two fingers you could use to
16 proceed into a pinch to zoom.  This is a static
17 image.  It doesn't actually show the pinching.
18     Q.   Okay.  And then the figure 13, do you
19 see that it states there two-finger gestures
20 can be used to pick up objects?  Do you see
21 that, sir?
22     A.   Yes, I see that.
23     Q.   And would you say that these figures
24 that are shown here are generalized examples of
25 multi-touch gestures in the SmartSkin

1  reference?
2      A.   These are certainly some of the
3  gestures that are discussed within the
4  SmartSkin reference and, indeed, I do agree
5  that these do involve multiple touches.
6      Q.   Let's talk a bit about transparency
7  and your opinion about what is or what is not
8  disclosed in the SmartSkin reference with
9  respect to transparency.  Okay?
10     A.   I understand.
11     Q.   Let's go to slide RX-28.006.  Again,
12 sir, in the discussion in this hearing about
13 SmartSkin, and this particular paragraph about
14 transparency, and obviously you think there is
15 some shortcomings as to the scope of the
16 disclosure of this particular paragraph; is
17 that fair enough?
18     A.   It is my opinion that there are
19 significant deficiencies with respect to this
20 paragraph.  This paragraph is a discussion --
21 it falls within the section on future work.
22     Q.   I'm sorry, I didn't mean to cut you
23 off.  We're going to go through your issues.  I
24 just wanted to set that premise, okay?
25     A.   I understand.

1      Q.   But my point is that hopefully there
2  are some things we can agree on.  And I just
3  want to establish that first, okay?
4      A.   I don't know if we will or not.
5      Q.   Okay.  Well, let's give it a shot,
6  okay?  So in this paragraph, can we at least
7  agree that it is disclosing the use of a
8  transparent sensor such as can be manufactured
9  or etched using ITO?
10     A.   In fact, this section discloses the
11 possibility in future work of using transparent
12 electrodes in a SmartSkin sensor that could be
13 obtained by using ITO.
14     Q.   Okay.  You are referring to, I
15 believe, the beginning of the section.  And I
16 didn't mean to not point that out to you, but
17 you said that before at the hearing, that the
18 future, I believe the future -- let's put that
19 up.
20          If you put the entire -- go back to
21 the entire page, Ryan.  I want to point out
22 what the Doctor is referring to.  Conclusion
23 and directions for future work.
24          I think that's what you are referring
25 to, sir, that the section that talks about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1468

1  transparent electrodes, electrodes that could
2  be made out of transparent materials such as
3  ITO, that falls in a section of the SmartSkin
4  reference that's entitled conclusions and
5  directions for future work.  Do you see that?
6      A.   It does.  It is not in a section
7  that's related to what they have done.  In
8  fact, specifically it will not work with figure
9  2.
10     Q.   Now, sir, you don't dispute, though,
11 again, figure 2 discloses a mutual capacitance
12 device?
13     A.   That's correct.
14     Q.   Okay.  So I just want to make sure,
15 though, when you are referring to future work,
16 what that says in that paragraph about ITO, you
17 don't dispute that that's an accurate statement
18 as to what the article reference had said at
19 the time?
20     A.   I mean, if you are asking me, do the
21 words indium tin oxide appear in that section,
22 the answer is yes.  However, it is my opinion
23 for detailed technical reasons that that will
24 not -- that firstly, that is in a future work
25 section and that will not work with respect to

Page 1469

1  the mutual capacitance system of figure 2.
2      Q.   Okay.  But let's go back.  Can you
3  blow up that particular paragraph?
4          Now, by the way, sir, you're aware
5  that a person can apply for a patent without
6  actually having made a prototype that's covered
7  by each and every claim of a particular patent;
8  is that true?
9      A.   With respect to prototyping,
10 absolutely.
11     Q.   Right.  For example, as we have seen
12 during this hearing by way of example, patents
13 often have many dependent claims, right?
14     A.   Yes.
15     Q.   For example, dependent claims can
16 branch off an independent claim and lay out
17 individually different materials that can be
18 used for a particular aspect of an invention.
19 Is that fair?
20     A.   Yes, that's certainly possible.
21     Q.   And one of the reasons for that is the
22 inventors want to make sure that they don't
23 have a claim that's so broad that it is going
24 to be invalidated by the prior art, so if it
25 comes time for an assertion, they can point to

Page 1470

1  one that's a bit more specific and would
2  hopefully avoid the prior art, while at the
3  same time capturing the accused device.  Fair
4  enough?
5      A.   I can't comment on the inventor's
6  intent for doing what they do, but that would
7  certainly be an outcome of having narrower
8  claims being dependent on broader independent
9  claims.
10     Q.   And this patent, in particular, the
11 '607 patent, before we get back to SmartSkin,
12 it discusses ITO, doesn't it?
13     A.   Yes, there are claims that mention
14 ITO.  And within the spec, it talks about ITO.
15     Q.   Well, I don't think there are claims
16 that specifically -- well, let me go back.
17         It discusses ITO in the specification
18 in a number of places, correct?
19     A.   Yes.
20     Q.   But it doesn't specifically reference
21 any other type of transparent material, does
22 it?
23     A.   I'd have to check.  Give me one
24 second.  And by transparent, you mean
25 transparent conductor, not glass or plastic or

Page 1471

1  glass member?
2      Q.   Yes, yes.
3      A.   I believe that's right.  I believe
4  that says with a transparent conducting medium
5  such as indium tin oxide, but it doesn't offer
6  other alternatives that do exist, but the only
7  one it specifically calls out as an example is
8  ITO.
9      Q.   Right.  Were there other alternatives
10 at that time that existed to use as a
11 transparent conductive material?
12     A.   Yes.
13     Q.   In the devices we're talking about?
14     A.   Yes.
15     Q.   None of those are disclosed?
16     A.   Explicitly disclosed?
17     Q.   Yes.
18     A.   Beyond the statement -- beyond the
19 statement saying such as, yes, I agree.  The
20 only specific disclosure of a particular
21 material is ITO.
22     Q.   And in your deposition, if I have it
23 right, you talked about characteristics of ITO
24 specifically that are -- that one needs to
25 consider in determining exactly how to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1472

1    implement or use ITO in a mutual capacitance
2    device that's intended to have multi-touch
3    capabilities.
4             Do you recall that, sir?
5        A.   I recall discussing the properties of
6    ITO in the context of how it would behave in
7    various systems.
8        Q.   Right. Sure. Right? I mean, things
9    like thickness, the width, the shape are
10   considerations, right, for how ITO is going to
11   behave in a particular implementation? Isn't
12   that fair?
13       A.   Generically, yes.
14       Q.   Resistance, you referred to
15   resistance. The resistance of the material
16   itself impacts other characteristics that may
17   be relevant to the use in the particular
18   device, sir. Is that correct?
19       A.   That's absolutely true, because the
20   resistivity of ITO is quite poor.
21       Q.   Right. And certain characteristics or
22   features that are relevant to its transparency
23   are a function of resistivity; isn't that true,
24   sir?
25       A.   If you are asking me, is there a

Page 1473

1    tradeoff between transparency and resistance,
2    the answer is yes. If you are asking me if
3    there is a tradeoff between transparency and
4    resistivity, that's not necessarily true.
5        Q.   Okay. Yes, between resistance, there
6    is a tradeoff with transparency; is that
7    correct, sir?
8        A.   Yes, in the specific case where you
9    reduce resistance by increasing thickness, you
10   degrade transparency.
11       Q.   And some of the other characteristics
12   are capacitance, you said, correct?
13       A.   ITO on its own is a conductor. When
14   we talk about capacitance of it, it would be
15   when configured in some other system.
16       Q.   But control, in terms of -- I am
17   simply asking in terms of the considerations
18   that go into designing a transparent
19   multi-touch system using ITO, you list the
20   characteristics, one is control of the
21   capacitance of the particular device at issue;
22   is that fair?
23       A.   Of the various capacitances of the
24   device at issue, yes, that would be true.
25       Q.   Yes.

Page 1474

1        A.   There is not a single capacitance.
2        Q.   I apologize for speaking over you.
3             The capacitance of the ITO that's
4    being used is part of that, isn't it?
5        A.   Capacitance is measured between -- is
6    a measure of -- capacitance is, in fact,
7    defined as DQ/DV, it is how much charge changes
8    for a given change in voltage. So there has to
9    be a reference.
10            You can't talk about the capacitance
11   of ITO on its own.
12       Q.   Yes, no, absolutely. But in
13   determining DQ over DV, you take into
14   consideration the capacitance effect of the
15   ITO?
16       A.   If you are talking about a capacitor
17   which includes one or more terminals made of
18   ITO, then in the calculation you would take
19   into account the area, among other things, of
20   the ITO.
21       Q.   And in designing a particular product,
22   you are certainly going to take into account
23   the area of the ITO and how it impacts
24   capacitance of the device overall.
25       A.   Yes, I agree with that.

Page 1475

1        Q.   Dispersion, you also mentioned
2    dispersion as another characteristic. Can you
3    tell us what dispersion is?
4        A.   Certainly. Dispersion is the change
5    in capacitance as a function of frequency and
6    more specifically it is the change in
7    dielectric constant as a function of frequency.
8        Q.   Okay. Another characteristic, another
9    variable that needs to be taken into account
10   when designing a mutual capacitance transparent
11   device that has multi-touch capability; is that
12   fair?
13       A.   I'm sorry, I didn't understand the
14   question.
15            MR. DeFRANCO: Would you read it back?
16            THE REPORTER: "Question: Okay.
17   Another characteristic, another variable that
18   needs to be taken into account when designing a
19   mutual capacitance transparent device that has
20   multi-touch capability; is that fair?"
21            THE WITNESS: Again, I still don't
22   understand the question.
23   BY MR. DeFRANCO:
24       Q.   I'm sorry, I was talking about
25   dispersion. Dispersion is another one of those

11 (Pages 1472 to 1475)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    characteristics that needs to be taken into
2    account in designing a mutual capacitance
3    multi-touch device that is transparent.  Fair
4    enough?
5        A.   Yes, I agree with that.
6        Q.   Those three characteristics relate or
7    are all factors in the implementation of ITO --
8    using ITO; is that fair enough?
9        A.   In such a device?
10       Q.   Yes.
11       A.   With respect to such a device, you do
12   consider the characteristics we talked about.
13   Dispersion is actually more related to the
14   dielectric, not to the ITO itself.
15       Q.   But it is a factor?
16       A.   In terms of doing the design of a
17   mutual capacitance system, you would consider
18   dispersion.
19       Q.   Yes.  And the characteristics that we
20   discussed, to the extent they relate or are
21   impacted by ITO, the same would be true of
22   other materials that could be used as a
23   conductor in a given device?
24       A.   If you are asking me, do the
25   properties of the conductor affect the ability

1    to implement a system, the answer is
2    absolutely, yes.
3        Q.   Well, you said that -- we agreed, at
4    least, that ITO is discussed or disclosed in
5    the '607 patent, right?
6        A.   Yes.
7        Q.   And you agreed that there were no
8    other examples of a transparent conductive
9    material specifically disclosed.  Is that
10   correct?
11       A.   The only specific example was ITO,
12   yes.
13       Q.   And I think you said there are other
14   examples in the field.
15       A.   You mean, am I aware of other
16   materials?
17       Q.   Yes.
18       A.   Yes.  In fact, I work on them.  That's
19   how I know about them.
20       Q.   And as of your deposition -- by the
21   way, you have never yourself designed or made a
22   mutual capacitance multi-touch device using
23   ITO; is that correct?
24       A.   I have never made one.
25       Q.   You have never done that yourself?

1        A.   I have never made one myself.  That's
2    absolutely true.
3        Q.   My question, going back, simply is the
4    characteristics that you identified for us,
5    resistance, capacitance, dispersion, relating
6    to the material in a multi-touch sensor, those
7    would vary based on the material, wouldn't
8    they, sir?  They would be different for ITO
9    versus some other conductive material that you
10   might consider?
11       A.   Resistance will certainly vary.
12   Capacitance in the structure, if you use the
13   same area, will not vary very much.  In fact,
14   it probably won't vary at all.  And dispersion
15   is primarily dependent on the dielectric, not
16   on the conductor itself.
17       Q.   Okay.  Now, but it is your opinion,
18   sir, that prior to the '607 patent, one of
19   skill in the art would not know how to
20   properly, correctly or effectively deposit ITO
21   for use as an electrode in a mutual
22   capacitance, multi-touch device that could
23   detect more than one touch.  Is that correct?
24       A.   To realize said device, yes, I agree.
25       Q.   And, again, part of your criticism of

1    SmartSkin is that it doesn't teach one of skill
2    in the art how to do the -- how to do that,
3    excuse me, in the section where it talks about
4    using transparent ITO as the sensor in a
5    multi-touch device; is that fair?
6        A.   That is certainly one of my
7    criticisms.
8        Q.   Okay.  Let's be fair.  Let's talk
9    about the '607 patent, okay?  Let's put it on
10   the same playing field.
11            Ryan, let's bring up -- I have made
12   some slides of this last night just to move
13   forward through this a little more quickly.
14   We're going to put up different sections of the
15   patent, rather than having to refer you to it.
16            Ryan, let's turn first to RDX-006.
17   And I will tell you, sir, what I would like to
18   do is look through for every reference of ITO
19   in the patent.  If there is something I am
20   missing, something that comes to mind, feel
21   free to look at the spec itself, but I tried to
22   capture the relevant sentences that discussed
23   ITO and a bit around it to put it in context.
24       A.   I understand.
25       Q.   Fair enough?  But you are certainly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1480

1   free to refer to anything else.  So, Ryan, we
2   should have RTX-007.  I guess that's 6.  Sorry
3   about that.
4         So, this is column 5, lines 27 to 67
5   of the '607 patent.  Do you see that?
6   A.   Yes.
7   Q.   This, if I have it right, is the first
8   reference to ITO in the '607 patent and it
9   says, "in order to produce a transparent
10  touchscreen, the capacitance sensing nodes are
11  formed with a transparent conductive medium
12  such as indium tin oxide (ITO)."
13        Do you see that, sir?
14  A.   I do.
15  Q.   And, again, before you mentioned, it
16  says such as, implying there are others, but
17  certainly it doesn't disclose any others; is
18  that right?
19  A.   It does not disclose any other than
20  explicitly disclosing indium tin oxide, but
21  that is provided in an exemplary fashion.
22  Q.   Okay.  And, by the way, it goes on to
23  discuss self-capacitance, sensing arrangements
24  and patterns for the remainder of that
25  paragraph and then we also put the beginning of

Page 1481

1   the next paragraph there, sir, excuse me, that
2   discusses mutual capacitance.
3         Do you see that?
4   A.   I see those paragraphs.
5   Q.   Okay.  Now, it is fair to say, though,
6   in this first discussion, there are no specific
7   details about how to implement or use ITO in a
8   mutual capacitance multi-touch device that's
9   transparent, is there, sir?
10  A.   Well, beyond saying that in a mutual
11  capacitance system, you have groups of
12  spatially separated lines formed on two
13  different layers, there is no additional
14  disclosure beyond what's already shown on the
15  screen.
16  Q.   That's all that's said there, right?
17  It doesn't discuss some of the characteristics
18  we talk about earlier, like impact on
19  resistance?
20  A.   These paragraphs do not mention
21  resistance, capacitance -- well, they do
22  mention capacitance, but they do not mention
23  resistance or dispersion.
24  Q.   And they don't give any other details
25  about the ITO, right?  I mean, it is fair to

Page 1482

1   say, isn't it, that at least based on this
2   paragraph alone, somebody skilled in the art
3   who is trying to replicate the mutual
4   capacitance device that can sense multiple
5   touches would need to do some experimentation,
6   wouldn't they?
7   A.   If you're asking me if they have never
8   deposited ITO before and they had to deposit
9   it, would they have to learn how to tune the
10  deposition parameters?  Yes, I agree.  The key
11  point is, however, the system of the '607
12  patent actually will work because the
13  disclosure of the circuitry allows it to work
14  with ITO.
15  Q.   Okay.  But at least in terms of --
16  we're talking now about depositing the ITO, the
17  shape of the ITO, the thickness of the ITO,
18  other characteristics of the ITO, how
19  transparent it is going to be based on the
20  resistivity, those factors we discussed
21  earlier, those details are not disclosed in
22  this portion; is that fair?
23  A.   In the paragraphs you have got on the
24  screen in RDX-28.007, I agree completely.
25  Q.   Let's turn to RDX-28.008.  Again, sir,

Page 1483

1   marching through just the ITO disclosures in
2   the '607, this is the next one we found.  It
3   says, "The electrodes 102 and sense traces 106
4   can be made from any suitable transparent
5   conductive material.  By way of example, the
6   electrodes 102 and traces 106 may be formed
7   from indium tin oxide."
8         This one is a little different, sir.
9   It doesn't say it on the slide, but I believe
10  this is referring to the self-capacitance
11  embodiment.  Nevertheless, it is discussing
12  ITO.  Do you see that, sir?
13  A.   This section is discussing ITO.
14  Q.   And then when it -- when it refers to
15  any suitable transparent -- any suitable
16  transparent conductive material, again, it
17  gives an example, the one example is ITO.  Do
18  you see that, sir?
19  A.   The explicitly called out material is
20  indeed ITO.
21  Q.   Now, the first sentence, as long as
22  we're here, says the electrodes and traces may
23  be placed on the member using any suitable
24  patterning technique, including, for example,
25  deposition, etching, printing and the like.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Do you see that, sir?
2   A.   I do.
3   Q.   Now, that's -- when it says any
4  suitable patterning technique, is that
5  referring to the fact that those patterning
6  techniques were known in the field at the time?
7   A.   With respect to these, yes.
8   Q.   With respect to the way to deposit ITO
9  on a substrate.  Is that fair?
10   A.   With respect to how to deposit --
11  actually, here it is specifically pattern --
12  how to pattern ITO on a substrate, it is making
13  clear that there are multiple ways to do that
14  and they were known at the time.
15   Q.   Okay.  You could do it by deposition,
16  etching, and printing and the like, but it
17  doesn't discuss any specific processes for
18  doing that deposition, the etching, or the
19  printing.  Is that fair?
20   A.   If by that you mean, does it give the
21  details on how to do the deposition, how to do
22  the etching, how to do the printing?  Yes, I
23  agree, there is no further detail provided.
24   Q.   And would you agree that how the
25  deposition is done, how the etching is done,

1  how the printing is done may affect the
2  physical characteristics of the ITO?
3   A.   You mean such as resistivity, et
4  cetera?
5   Q.   Yes.
6   A.   Yeah, they do.
7   Q.   Now, do you recall being asked at your
8  deposition, sir, to explain where in the '607
9  patent the inventors teach or disclose how to
10  create ITO electrodes as claimed in the patent?
11   A.   I recall some discussion of that.
12   Q.   And do you recall saying that there is
13  a fairly substantive discussion in column 10,
14  sir?
15   A.   Yes.
16   Q.   And do you recall --
17   A.   Well, I don't recall saying
18  specifically that, but it certainly would be a
19  section I would refer to.
20   Q.   Well, we can put it up.  The answer
21  that I have, sir, and this is at your
22  transcript 220, line 12 to 211, line 16, you
23  were asked:  Well, I guess let me ask you,
24  where in the '607 patent do they teach or even
25  disclose how to create ITO electrodes as

1  claimed in the asserted claims of the patent?
2      And I don't mean to test you, sir.
3  You are welcome to look at your transcript of
4  course.  It says:  Well, there is one fairly
5  substantive discussion in column 10.
6      Do you see that, sir?
7   A.   I don't, but I have no reason to doubt
8  I said that.
9   Q.   Why don't we put that up on the
10  screen, Ryan.  Why don't you get the next
11  question and answer.  Go down to line 16,
12  please.
13      So we have put, this is continuous, it
14  is just two different pages.  That's why there
15  is two different boxes.
16   A.   I understand.
17   Q.   The top question, sir, is what I just
18  asked you.
19      "Question:  Well, I guess, let me ask
20  you, where in the '607 patent do they teach or
21  even disclose how to create ITO electrodes as
22  claimed in the asserted claims of the patent."
23  Do you see that, sir?
24   A.   I see that question.
25   Q.   It is a general question, you were

1  asked to identify the ITO disclosure in the
2  '607 patent.  Do you remember that?
3   A.   That appears to be the case.
4   Q.   And it appears to be the case, doesn't
5  it, that you pointed specifically to the
6  discussion in column 10 that we just took a
7  look at.  Isn't that correct, sir?
8   A.   That's true.
9   Q.   And not that you doubted this, but
10  just so it is clear, you called that at the
11  time a fairly substantive discussion.  Is that
12  correct, sir?
13   A.   That is what I said.
14   Q.   And, in fact, you went down in
15  response to the next question, you specifically
16  read that portion of column 10 as part of your
17  answer to set forth what you viewed at the time
18  as a fairly substantive discussion.  Is that
19  correct?
20   A.   That's true.
21   Q.   Okay.  Let's turn to the next
22  disclosure of ITO in the '607 patent.  And this
23  should be on slide 009.  It is the '607 patent,
24  column 12, lines 35 to 45.
25      Do you see in this paragraph again it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1488

1    is talking about the touchscreen, it works its
2    way down to ITO at the end, but it begins, "the
3    touchscreen 134 includes a transparent
4    electrode layer that is positioned over a glass
5    member 138."
6         Do you see that, sir?
7    A.   I see that language.
8    Q.   Now, it says at the end, "in most
9    cases, the electrode layer 136 is disclosed on
10   the glass member 138 using transparent --
11   sorry, "using suitable transparent conductive
12   materials and patterning techniques such as ITO
13   and printing."
14        Do you see that?
15   A.   Yes, I do.
16   Q.   Once again, the only suitable
17   conductive material disclosed is ITO; is that
18   correct, sir?
19   A.   In terms of the example provided, yes.
20   The only example provided is ITO.
21   Q.   And the example provided here is in
22   terms of the deposition technique in this
23   particular instance, it is patterning
24   techniques using a printing method.  Is that
25   fair?

Page 1489

1    A.   That's correct.
2    Q.   Okay.  It doesn't say anything more
3    about printing, it just says that's one of the
4    techniques that can be used.  Is that correct,
5    sir?
6    A.   In the sentence you have provided,
7    yes, it only says you can use printing.  It
8    doesn't give any details.
9    Q.   So let's move on to the next reference
10   in the '607 patent.  This is slide 10.  It
11   should have column 13, line 62 to column 14,
12   line 5.
13   A.   I see that.
14   Q.   And, again, sir, this portion of the
15   specification, and if I have it correctly, this
16   is referring to figure 9 of the patent, there
17   has been some time spent in the case on figure
18   9.  I probably should have started there.
19   Ryan, do you mind putting up figure 9 of the
20   '607 patent for a moment.
21        Just for reference purposes, sir, do
22   you recall figure 9?
23   A.   I do recall figure 9.
24   Q.   And figure 9 is a mutual capacitance
25   example where we have drive and sense lines; is

Page 1490

1    that correct, sir?
2    A.   Yes, I agree with that.
3    Q.   So let's go back, Ryan, to RDX-28.010.
4    Again, the last sentence in this section after
5    pointing out the different lines in figure 9,
6    it says, "furthermore, the lines 52 can be made
7    from any suitable transparent conductive
8    material.  By way of example, the lines may be
9    formed from indium tin oxide."  Do you see
10   that, again, sir?
11   A.   I believe the lines are 152, not 52,
12   but otherwise you read it correctly.
13   Q.   Yes, sir.  Thank you.
14        Now, let's take a look at RDX-010.
15   And this is column 14, lines 60 to column 15,
16   line 23.  Okay.  The good news is this is the
17   last reference.  It is a bit longer, but I just
18   want to work through it for a moment.
19        Okay, you have seen this portion
20   before?
21   A.   Yes.
22   Q.   I want you to have it in mind.  I see
23   you are reading it.  When you are done kind of
24   going through it, would you let me know?
25   A.   Certainly.  I have read it.

Page 1491

1    Q.   Let's just read in for the record the
2    first couple of lines.  It says, "as mentioned
3    above, the lines in order to form
4    semi-transparent conductors on glass, film or
5    plastic, may be patterned with an ITO
6    material."
7         Do you see that?
8    A.   Yes.
9    Q.   Now, by the way, this says glass,
10   film, or plastic.  Are those different types of
11   materials on which ITO can be placed using the
12   techniques that were discussed earlier such as
13   etching or printing?
14   A.   Etching doesn't place the ITO.
15   Etching removes the ITO.  But with respect to
16   could you deposit ITO on glass, film, or
17   plastic as called out here, the answer is yes.
18   Q.   Yes.  You are right, sir.  The ITO is
19   deposited and then the portions of the ITO film
20   that are not going to be used in the final
21   configuration of the device are etched away.
22   Is that correct, just like you etched away
23   glass to make a pattern?  Is that true?
24   A.   Yes, that's a reasonable description.
25   Q.   And the characteristics of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1492

1  substrate material, be it glass or film or
2  plastic, that's going to affect the deposition
3  process and the process that's used to create
4  the resulting pattern, if it is etching, for
5  example.  Isn't that true, sir?
6      A.   There is some impact of the substrate
7  on the deposition.  It depends -- the amount of
8  impact depends on the deposition technique, et
9  cetera.
10     Certainly usually you can get higher
11 quality ITO on glass than you do on plastic,
12 for example.
13     Q.   But if you are using plastic, for
14 example, there is -- the characteristics of
15 plastics varies widely in terms of the features
16 that a polymer engineer or a chemical engineer
17 would discuss.  Isn't that true?  You know
18 that, sir, right?
19     A.   For better or worse, I have been
20 working on plastic based electronics for many
21 years now and, yes, the properties of the
22 plastic do impact the layers that are put on
23 top of it.
24     Q.   Properties are things such as
25 hardness; is that correct?

Page 1493

1      A.   Yes.
2      Q.   And those properties are impacted or
3  those properties need to be taken into
4  consideration in the manufacturing process, for
5  example, when you are depositing the ITO layer.
6  Isn't that true?
7      A.   When you are integrating your system,
8  in other words, you are figuring out how you
9  are going to do the deposition, the space
10 within which you can choose the deposition
11 characteristics you want to use do depend on
12 the properties of the substrate.
13     Q.   Okay.  And the use of the device
14 itself -- well, I'm sorry.
15     Not only do the characteristics of the
16 substrate affect the deposition process, there
17 are also characteristics of the substrate that
18 must be taken into account when the device
19 itself is ultimately used.  Is that fair?
20     A.   You mean in terms of the design of the
21 device, the overall device?
22     Q.   Yes, sir.
23     A.   Yes.  That's true.
24     JUDGE ESSEX:  Pardon me.  Let me
25 interrupt you just a moment.

Page 1494

1      I read this as well, and I am reading
2  the paragraph, it is talking about in order to
3  prevent the aforementioned problem, the dead
4  areas between the ITO may be filled, and I
5  don't see the dead areas as an aforementioned
6  problem in that.  It doesn't make sense to me.
7  Can you help me out with that at all?
8      THE WITNESS:  Certainly, Your Honor.
9  Actually, it is easy to do it with a figure.
10 So we can do it with figure 9, if we could have
11 figure 9, I can explain from there.
12     Actually, let's use figure 10.  That's
13 even better.
14     So, Your Honor, if you look at figure
15 10, each of these (indicating) represents a
16 stripe of ITO.
17     JUDGE ESSEX:  Right.
18     THE WITNESS:  So in this example, we
19 deposit a blanket film of ITO that covers the
20 entire plastic.  And then we etch it out from
21 certain regions to form these lines.  So now
22 what you are left with if you were to look at
23 the sheet of plastic, you have some regions
24 that have ITO.
25     JUDGE ESSEX:  Right.

Page 1495

1      THE WITNESS:  And other regions that
2  don't.  Now, it turns out the refractive index,
3  an optical property of a material, is different
4  for ITO and for plastic and is different for
5  ITO and for air.
6      It is also -- let's say you were then
7  going to put this in a sandwich where, for
8  example, you put a glue layer on top and then
9  sandwich them together.  Well, it may be
10 different for the ITO to the glue.
11     So now you have a problem.  You are
12 looking at a sheet of plastic.  Some regions,
13 the light is going through ITO, which has one
14 refractive index.  And the other regions, it is
15 going through glue, which has a different
16 refractive index.
17     And so the eye perceives a shimmer
18 because there is a variation in refractive
19 index.  So the dead area discussion is
20 referring to the areas between the ITO where
21 the ITO was removed.
22     JUDGE ESSEX:  Okay.  So it is a poorly
23 written paragraph then?  It didn't talk about
24 the refractive -- all right.  The problem of
25 the dead areas wasn't mentioned until it came

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1496

1    up with filling those areas up, and --
2         THE WITNESS:  Yes, Your Honor.  I
3    think the reason they called it -- they hadn't
4    explained what dead areas were before, but in
5    the previous paragraph they discussed etching
6    away the ITO.  So that etching process creates
7    the dead areas.
8         JUDGE ESSEX:  Okay.  I'm sorry for the
9    interruption.  Go ahead.
10   BY MR. DeFRANCO:
11        Q.   So going back and following up on His
12   Honor's comment, it says in the second
13   paragraph, "in order to prevent the
14   aforementioned problem, the dead areas between
15   the ITO may be filled with index matching
16   materials."  Do you see that, sir?
17        A.   With indexing matching materials, yes,
18   I see that.
19        Q.   Yes.  I am having a little trouble
20   reading this morning.
21             It doesn't disclose any specific index
22   matching materials, does it, sir?
23        A.   You mean a specific example of an
24   indexing matching material?
25        Q.   Yes.

Page 1497

1         A.   That's true, it does not.
2         Q.   And ITO, again, as you said earlier, I
3    believe you said was the transparency is going
4    to be a function of resistivity; is that
5    correct?
6         A.   The parameters that affect
7    transparency also have resistivity.
8         Q.   Okay.  So you could, based on the way
9    your system is designed and the way the ITO is
10   deposited, the way the ITO is etched away, if
11   etching is used, all of that may ultimately
12   affect the transparency of the ITO when it is
13   in the completed device, is that fair?
14        A.   The way the ITO is deposited --
15        Q.   Let me ask a better question.  I'm
16   sorry.
17        A.   That's fine.
18        Q.   There are characteristics of the ITO
19   itself that impact the transparency; is that
20   right?
21        A.   Yes, that's true.
22        Q.   There are certainly different brands,
23   types, versions of ITO on the market.  There
24   was back in the 2003 time frame, wasn't there?
25        A.   There are certainly different

Page 1498

1    manufacturers who brand their ITO with their
2    respective brand names.
3         Q.   Right.
4         A.   And they have different properties.
5         Q.   Different properties, different types,
6    different costs, different characteristics.  Is
7    that true?
8         A.   If by -- I don't know what exactly you
9    mean by types, but they certainly have
10   different properties and they are targeted at
11   different costs and they are available in
12   different substrates.
13        Q.   And they have different
14   transparencies?
15        A.   Yes.
16        Q.   And they have different properties?
17        A.   That's true as well.
18        Q.   And all of that is going to impact the
19   transparency when the ITO is ultimately used in
20   any device, such as a pad or a phone.  Isn't
21   that true?
22        A.   Yes, that's true.
23        Q.   And this is talking about somehow you
24   have got to come up with an index matching
25   material that is going to appear to the user

Page 1499

1    that the transparency is uniform.  Is that
2    correct?
3         A.   That is the goal of this section, yes.
4         Q.   Okay.  And, in other words, you don't
5    want somebody to look at their pad or their
6    phone and see some sort of hint or trace of the
7    ITO lines, that would be unappealing to a user
8    of the device.  Is that fair?
9         A.   Certainly that's the general problem
10   that they are trying to address, yes.
11        Q.   Okay.  So after all the work that's
12   done to design a device, to pick the ITO, to
13   figure out the characteristics you need to
14   choose the brand with a certain transparency,
15   to deposit it, to etch it away, you have got to
16   figure out, if you choose to do so, what
17   indexing material to use to put in between the
18   lines to make sure that that unpleasant effect
19   doesn't occur.  Is that fair, sir?
20        A.   Yes, I generally agree with that.
21        Q.   Okay.  And you will agree it is going
22   to take a little bit of experimentation for
23   somebody skilled in the art to figure out
24   exactly what indexing material to use to
25   achieve that result in a particular device.  Is

APLNDC-X0000006430

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1500

1   that correct?
2       A.   If you are given an unknown system,
3   you would have to measure its properties and do
4   some experimentation.  It is not a significant
5   amount with respect to that.
6       Q.   Okay.  But you will agree that in this
7   particular implementation, the inventors didn't
8   disclose what indexing material they used, did
9   they?
10      A.   That's true.
11      Q.   They didn't disclose how they were
12  able to choose a proper or appropriate indexing
13  material; isn't that correct?
14      A.   Beyond saying that you could use an
15  index, a matched index material?
16      Q.   Yes.
17      A.   I agree.  I mean, that does give the
18  guideline.  It says you would use a matched
19  index material but, yes, I agree, beyond that,
20  they haven't said what material to use, for
21  example.
22      Q.   Okay.  And somebody skilled in the art
23  would take that guideline and determine what
24  indexing material to use in their own
25  configuration?

Page 1501

1       A.   Yes.
2       Q.   So going back, we started to talk
3   about the disclosure of ITO in this particular
4   section and just to finish up on that, it says,
5   "as mentioned above, the lines in order to form
6   semi-transparent conductors on glass, film, or
7   plastic, may be patterned with an ITO
8   material."
9            Do you see that?
10      A.   You are reading the first line again?
11      Q.   Yes.
12      A.   Yes.
13      Q.   Then it goes on, "this is generally
14  accomplished by depositing an ITO layer over
15  the substrate surface, and then by etching away
16  portions of the ITO layer in order to form the
17  lines."
18           Do you see that, sir?
19      A.   I do.
20      Q.   And it says, "as should be
21  appreciated, the areas with ITO tend to have
22  lower transparency than the areas without ITO."
23  Do you see that, sir?
24      A.   I do.
25      Q.   We have discussed that at length.  And

Page 1502

1   that phrase, doesn't it imply it should be
2   appreciated by somebody in the art who has used
3   ITO before; is that correct?
4       A.   Oh, yes.  You mean someone of skill in
5   the art who read it would know what that means?
6   Yes.
7       Q.   Yes.  Okay.  So we have walked through
8   now, sir, I believe, if I have it right, all
9   the portions of the '607 specification that
10  specifically reference ITO.  Is that fair?
11      A.   With respect to the referencing of ITO
12  itself, that's true.  We haven't looked at the
13  circuit, for example.
14      Q.   We haven't looked at the circuit, but
15  at least in discussing ITO, its properties,
16  what particular brand or type should be used,
17  dispersion characteristics, resistivity
18  characteristics, its impact on the capacitance,
19  all of those issues with respect to ITO itself,
20  we have covered the portions of the '607 patent
21  that in any way discuss ITO; is that correct,
22  sir?
23      A.   With respect to the discussion of ITO
24  itself, that is true.  We haven't discussed how
25  that's impacted by the circuit choices that you

Page 1503

1   make.
2       Q.   Okay.  There are other design choices
3   that may impact the type of ITO and the
4   characteristics that it has that are used in a
5   particular device; is that fair?
6       A.   There are certainly design choices.
7   There is also a sort of fundamental circuit
8   topology choices, which are not simple design
9   choices.
10      Q.   Correct.  And those are -- all of
11  those are going to impact a particular ITO
12  that's used in the device and how it is
13  deposited and the ultimate configuration?
14      A.   They will.  And more generally, they
15  may determine whether you can use ITO or not.
16      Q.   And how would one skilled in the art
17  determine whether they can use ITO or not in a
18  particular configuration, by experimenting?
19      A.   Certainly one thing you could do if
20  you were given a particular circuit topology
21  would be do a significant amount of
22  experimentation.  And in some cases, it
23  wouldn't work, and then you would essentially
24  be driven to do invention, come up with a new
25  topology that does work.

APLNDC-X0000006431

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Now, let's talk a little bit about
2  another feature that you say is lacking in the
3  SmartSkin reference.  I believe another one is
4  you don't believe that SmartSkin discloses a
5  concept of layering and how that's covered in
6  the elements of the asserted claims of the '607
7  patent?
8    A.   With respect to specific layers,
9  that's true.
10   Q.   And in your opinion, generally, sir --
11 why don't we put up question number 118 and the
12 answer.  And here, sir, you say the layer
13 limitations are those limitations that require
14 the use of two different layers of conductive
15 lines in the touch sensor.  All of the asserted
16 claims require these limitations.
17        Do you see that?
18   A.   These layer limitations, yes, I see
19 that.
20   Q.   And you go on to say those are lacking
21 in SmartSkin; is that right?
22   A.   I say that the limitations that are
23 missing are identified in this particular CDX.
24   Q.   Now, is it also your opinion, sir,
25 that SmartSkin doesn't disclose layers because

1  it uses a copper mesh?
2    A.   You are talking about in relation to
3  figure 2?  That's true.
4    Q.   Yes.  Well, figure 2 of SmartSkin, you
5  are referring to?
6    A.   Correct.
7    Q.   Let's put up figure 2 and let's put up
8  a paragraph that we haven't looked at yet,
9  which should all be in slide 28.012.
10        Let's go through the same drill, sir.
11 Let's see what you and I can agree upon with
12 respect to figure 2, its disclosure as set
13 forth in the figure itself and the related text
14 of the SmartSkin article.  Okay?
15        You will agree with me, won't you,
16 that SmartSkin discloses a grid of transmitter
17 and receiver electrodes.  Isn't that fair?
18   A.   Yes, those are called out in the
19 second sentence of the paragraph on RDX-28.012.
20   Q.   And that is shown in figure 2 as well,
21 isn't it?  Can you point that out for us?
22   A.   Certainly.  If you are referring to
23 the grid of transmitter and receiver electrodes
24 using the language on RDX-28.002, the grid it
25 is specifically referring to, it is

1  specifically referring to with respect to
2  figure 2 is this grid of vertical and
3  horizontal copper wires.
4    Q.   And is it your opinion that the sensor
5  grid of electrodes in SmartSkin as shown in
6  figure 2 could not be implemented as having one
7  layer for the drive electrodes and having a
8  different layer for the sense electrodes?
9    A.   I understand the question.  Could I
10 have the CDX that you referred to or that I
11 referred to earlier in reference to the
12 question and answer you put up, please?
13   Q.   You mean your -- where I said this is
14 what you said was lacking?
15   A.   Yes.
16   Q.   Sure, sure.
17   A.   Thank you.
18   Q.   It is a small fee.  Let me find it.
19 It should be slide 003.  Is that the one you
20 wanted to see, sir?
21   A.   Yes.  Thank you.  No, it was the one
22 in answer to the -- was this the one I
23 referenced in the question you put up?  I can
24 find it.  If you put the question up again, I
25 can find it.  I have the binder in front of me.

1    Q.   Was it from your witness statement?
2  I'm sorry.
3    A.   I believe so.
4    Q.   Okay.  So let's find -- let's see if
5  we can get that back.  Hold on.
6    A.   I have them in front of me now if you
7  want.
8    Q.   You have the paragraph?
9    A.   Yes.  The question is up there and I
10 found the --
11   Q.   Got it.  Great.  Is that what you
12 wanted to refer to, sir?
13   A.   Yes, thank you.
14   Q.   Okay.  Now, my question was, sir, is
15 it your testimony that the sensor grid that is
16 the drive lines and the sense lines that are
17 shown in figure 2 of the SmartSkin reference
18 could not be implemented in a device that had
19 different layers for each?
20   A.   With respect to layers as used in
21 claims 1 and 10, for example?  Yes, that's
22 correct.
23   Q.   Yes.  And your opinion for that is
24 because it is a copper mesh to create the
25 capacitance nodes; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1508

1    A.   These are copper, and that is one of
2 the reasons for my opinion, yes.
3    Q.   But you will agree, won't you, that
4 based on the disclosure of figure 2 in the
5 SmartSkin reference, the use of copper wires in
6 a mutual capacitance device could take on a
7 variety of configurations, couldn't it?
8    A.   You mean if you are using copper
9 wires, could you do them in different ways?
10   Q.   Yes.
11   A.   Generally, yes, I agree, you could use
12 copper in different ways.
13   Q.   Okay.
14   A.   In this system.
15   Q.   Well, specifically, for example, you
16 could use copper wires in a mutual capacitance
17 configuration where the layers for the drive
18 and sense lines are spatially separated,
19 couldn't you?
20   A.   You could use copper wires such that
21 the wires are separated. Those would not meet
22 the layer requirement of the claims.
23   Q.   But you could -- you could use them in
24 separate layers? In other words, outside of a
25 mesh configuration, couldn't you, sir?

Page 1509

1    A.   If you are using layers outside of
2 what it means in the claims, where there are
3 specific characteristics tied to the layers,
4 yes, I agree you could have them spatially
5 separated. That's possible.
6    Q.   We're just talking generally. Apart
7 from the claims right now, one skilled in the
8 art -- it is your testimony, isn't it, that one
9 skilled in the art at the time was aware that
10 copper wires could be used in mutual
11 capacitance, not only in a mesh configuration
12 but on spatially separated layers as well;
13 isn't that true?
14   A.   Independent of the claim language,
15 without attributing the additional
16 characteristics imposed on layers by the
17 claims, yes, I agree they could be spatially
18 separated and if you want to call those layers
19 independent of the claim language, I agree with
20 that statement.
21   Q.   Okay. Let's turn to another document,
22 the related patent application to the SmartSkin
23 reference. You're aware of that reference,
24 sir, right?
25   A.   Yes.

Page 1510

1    Q.   And this is what's been referred to in
2 the case as a Rekimoto Japanese patent
3 application. You're aware of that, sir?
4    A.   I am. I believe he is the lead
5 author.
6    Q.   Let's put on the screen, please,
7 RDX-28.013.
8        Sir, this Rekimoto reference, this is
9 from one of the Sony engineers who also
10 authored or coauthored the SmartSkin article
11 that we talked about earlier. Do you recall
12 that, sir?
13   A.   Yes, I believe so.
14   Q.   And this is one of the references that
15 Motorola relies on as prior art for its
16 position that the asserted claims of the '607
17 patent are invalid in this investigation.
18 You're aware of that, sir?
19   A.   Yes, I'm aware that this is one of the
20 pieces of art that Motorola relies on.
21   Q.   By the way, the prosecution history in
22 this case is pretty voluminous, just in terms
23 of number of pages. Is that correct?
24   A.   It does have a large number of pages.
25   Q.   It has got -- for example, it has got

Page 1511

1 a copy of at least many if not most, possibly
2 all -- I didn't check -- but many of the
3 articles that are cited on the front of the --
4 or towards the beginning of the '607 patent as
5 prior art; is that correct?
6    A.   There are certainly some of them. I
7 also have not checked if all of them are there.
8    Q.   Okay. I counted, and we have been
9 through this, it is over 300 references cited
10 in the front of the '607 patent.
11   A.   I believe that's correct.
12   Q.   And the examiner read many of those
13 references in considering this application. Is
14 that fair?
15   A.   Certainly I would assume the examiner
16 did.
17   Q.   And the vast majority -- you will see,
18 we can put something up, and I will represent
19 to you that at the end of the several pages of
20 references -- why don't we put it up, so I get
21 this right, Ryan.
22        It is page 5 of the '607 patent at the
23 end of the reference list. One more page.
24 Blow that up.
25        Do you see there, sir, it says cited

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1512

1   by the examiner?
2        A.   You mean with -- just the phrase, yes,
3   I see the phrase.
4        Q.   Okay.  Now, if I have it right, and
5   the number is not particularly important, if
6   you look through the list of five pages of
7   references, I think there is about ten or so
8   that are starred as having been cited by the
9   examiner.  And my question simply is it your
10  understanding that those are references that
11  the examiner had found in a search and cited as
12  part of this patent application process?  Is
13  that fair?
14       A.   I think what it does mean is that
15  these were references that were cited by the
16  examiner.  I can't say how they went about
17  finding them, but they were certainly cited.
18       Q.   That's fair enough.  And the majority,
19  maybe all of the rest of the 300-plus
20  references were cited by the applicants.  Is
21  that fair?
22       A.   By that you mean they were provided by
23  the applicant during the prosecution process?
24       Q.   Yes.
25       A.   Yes, I agree with that.

Page 1513

1        Q.   Now, I'm sure you have been through
2   the prosecution history and know it all by
3   heart, as I do, but the citations took place
4   over the course of the prosecution of the '607
5   patent, the citations to -- I'm sorry.  Let me
6   start again.  That's a poor start.
7            You're aware of something called an
8   information disclosure statement, sir?
9        A.   Yes.
10       Q.   Called an IDS, that's where the
11  applicants will send in a form that lists all
12  the references they're aware of.  You are aware
13  of that?
14       A.   Yes.
15       Q.   And I think there was an early one
16  with something less than 300 references on
17  which one of the SmartSkin references, I
18  believe the article that we discussed, was
19  disclosed.  If you don't recall that, it is
20  fine.  If you do --
21       A.   I believe I recall that being
22  disclosed.
23       Q.   And then there were later IDSs that
24  discussed additional references.  At some point
25  toward the end, Rekimoto was disclosed on a

Page 1514

1   separate IDS by the applicants.  Are you aware
2   of that, sir?
3        A.   Which Rekimoto are you referring to
4   now?
5        Q.   The one that -- the Japanese patent
6   application that we looked at.
7        A.   Yes, I believe so.
8        Q.   Now, I didn't see -- and if you did, I
9   would like you to point it out for me -- I
10  didn't see any specific discussion by the
11  applicants about SmartSkin, the article,
12  Rekimoto, the Japanese patent application in
13  particular.  Do you understand my question,
14  sir?
15       A.   I understand.  You are asking me if
16  there is any explicit discussion of those two
17  pieces of art.
18       Q.   Right.  For example, you have seen
19  prosecution histories sometimes, although there
20  is not requirement, an applicant may say here
21  is a particularly pertinent reference out of
22  all of those that are disclosed, not only that,
23  you should focus on these particular portions,
24  and here is why our invention is different than
25  what's disclosed in those paragraphs.

Page 1515

1            Fair enough?
2        A.   I have seen patents that contain that
3   information -- or applications that contain
4   that applications.
5        Q.   Right.  And applicants often sometimes
6   explain why a particular portion of a reference
7   doesn't disclose what they are claiming as
8   their invention.  You have seen that, too, sir,
9   right?
10       A.   Yes.
11       Q.   For example, they may say look at this
12  section on this article, it says X, Y, and Z,
13  and I am one skilled in the art, let me tell
14  you how this is different from what I am
15  claiming as my invention.  Right?  You have
16  seen that before, sir?
17       A.   I haven't seen that specific language,
18  but conceptually, I agree that general concept
19  does exist in patent applications.
20       Q.   There are reasons to do that, for
21  example, you can imagine maybe there is a
22  reference that sounds good and the inventors
23  may want to go out of their way to defuse that
24  before the rejection when the patent examiner
25  sees it?  Is that a possibility or don't you

APLNDC-X0000006434

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1516

1    know?
2        A.    That is certainly a reasonable reason
3    to do that.  I couldn't look into some other
4    applicant's head and see what his reasons were.
5        Q.    It is certainly a reasonable reason to
6    do that to also help the Patent Office a bit
7    when there is a large volume of references for
8    the patent examiner to wade through, isn't that
9    fair?
10       A.    That would be another reason to do it.
11   Again, I mean, I'm not able to look into an
12   applicant's head and predict his intent.
13       Q.    But that's a reasonable explanation as
14   to why you might want to do that?  You have
15   seen that occur in prosecution histories other
16   than the '607, is that fair?
17       A.    I have seen that occur.  I don't -- I
18   can't comment on the intent for why it did
19   occur.
20       Q.    Okay.
21       A.    But it is an explanation that you have
22   postulated and I have no reason to disagree
23   with it.
24       Q.    And going back to where I started, you
25   didn't see any of that in the prosecution

Page 1517

1    history of the '607 patent; is that fair, with
2    respect to SmartSkin or the Rekimoto, the
3    Japanese patent application.  Is that fair,
4    sir?
5        A.    Yes, I think that's fair.
6        Q.    And one of the reasons that, again, if
7    you can't speculate, fine, but one of the
8    reasons that applicants -- well, let me start
9    again.  Let me ask a better question.
10             I take it you have also seen in
11   prosecution histories that there is back and
12   forth on particular references between the
13   patent examiner and the applicant's attorney
14   about the scope of disclosure of particular
15   references; is that correct?
16       A.    Yes.
17       Q.    And I take it you have seen that there
18   could be a rejection based on the examiner's
19   interpretation or reading of a reference and
20   particular portions that he or she thinks are
21   relevant as invalidating art, either alone or
22   together with some other reference.  Is that
23   fair?
24       A.    Yes.
25       Q.    And it is common also to have the

Page 1518

1    inventors come back and say I'm skilled in the
2    art as well, here is the work I'm doing, let me
3    explain to you why someone else skilled in the
4    art, in my opinion, would not read that
5    paragraph to have the same disclosure as you
6    are reading it to have?  Have you seen that?
7        A.    I can't recall if I have specifically
8    seen that, but it certainly sounds like
9    something that could happen.
10       Q.    But, again, none of that discussion
11   occurred in your review from what you have seen
12   of the prosecution history of the '607 patent,
13   is that fair, sir?
14       A.    With respect to these references?
15   With respect to Rekimoto?
16       Q.    Exactly.  With respect to SmartSkin
17   and Rekimoto.
18       A.    Yes, that didn't explicitly happen, I
19   agree.
20       Q.    The first IDS, I can put it on the
21   screen, but my memory of the first IDS in the
22   prosecution history showed a list of other
23   sources and articles that had the web location
24   of the article that was being referenced.
25             Do you recall that, sir?

Page 1519

1        A.    I don't specifically.  Maybe you could
2    put it up.  I don't doubt you, but I don't
3    recall specifically.
4        Q.    Okay.  Do you recall, sir, that there
5    were a couple for which no web site location
6    was provided and one of those was the SmartSkin
7    article?
8        A.    No, again, as I said, I don't recall
9    the specifics of the IDS.  If you pull it up or
10   if you want to represent that that is the case,
11   I am happy to proceed.
12       Q.    Okay.  No, I will represent that
13   that's the case.  If we find a mistake,
14   somebody will correct me.
15             But you are aware, sir, that the
16   inventors in this case at some point prior to
17   filing their patent application were aware of
18   the Sony, they were aware of the Sony web site
19   that contained information about the SmartSkin
20   project that Sony was working on at the time.
21   Do you recall that?
22       A.    Well, given that you have represented
23   that the web link was provided, that would make
24   sense.
25       Q.    I'm representing to you, sir, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1520

1   there was an e-mail between the inventors,
2   which I can show you, and I want to be clear, I
3   am not --
4       A.   I understand.  I thought we were still
5   talking about the IDS.
6       Q.   Let me start back.  It is my fault for
7   the confusion.
8            Segueing away from the prosecution
9   history, going to the record relating to
10  communications with the inventors, you're aware
11  that there was an e-mail from one inventor to
12  the other saying, you know, identifying the
13  SmartSkin article.  Are you aware of that, sir?
14      A.   Yes.
15      Q.   And you're aware, sir, that that
16  e-mail contained a link to the web where the
17  article could be found; is that correct?
18      A.   Yes, I believe so.
19      Q.   Okay.  And that that link showed
20  generally the information about the work that
21  the Sony engineers were doing at the time.  Do
22  you recall that?  You have been to that link,
23  haven't you?
24      A.   I have.
25      Q.   You have seen the SmartSkin article

Page 1521

1   we're talking about is there, haven't you seen
2   that, sir?
3       A.   Yes.
4       Q.   You have seen that that link discloses
5   the patent applications that were in play at
6   the time.  Do you recall that?
7       A.   I don't know.  You mean it lists the
8   patent applications?
9       Q.   Let me -- let me ask a different
10  question.
11           That link is where the video that's
12  been shown in this case is available, you're
13  aware of that, sir?
14      A.   The video?
15      Q.   The video of the SmartSkin?
16      A.   Yes.
17      Q.   Now, let's turn back to the Rekimoto
18  patent application we were discussing earlier.
19  We started with RDX-28.013.  Just to put this
20  back in context, that's the Japanese patent
21  application relating to the work of the Sony
22  engineers who were involved in the SmartSkin
23  project back in the 2003 time frame, sir; is
24  that correct?
25      A.   Sorry, could I have the question

Page 1522

1   again, please?
2       Q.   I will just reask it.  Just for
3   reference sake, this is the Japanese patent
4   application by Mr. Rekimoto, one of the Sony
5   engineers working on the SmartSkin project in
6   the 2002, 2003 time frame; is that correct?
7       A.   Yes, the application date of this
8   appears to be May 21st, 2001.
9       Q.   Okay.  And the publication date, as
10  long as we're talking about dates, is November
11  29th, 2002.  Do you see that in the upper
12  right?
13      A.   Yes.
14      Q.   Okay.  Now, the next slide, to save
15  time, we have put the two side-by-side.  We
16  have put next to figure 2 of the SmartSkin
17  reference, figure 1 of the Rekimoto.
18           Do you see that, sir?
19      A.   I see them side-by-side, yes.
20      Q.   And there is some similarity between
21  the overall configuration and structures of the
22  mutual capacitance devices shown in those two
23  figures, would you say that much?
24      A.   There are similarities, for example, in
25  both definitely use a voltage amplifier in the

Page 1523

1   read circuit.
2       Q.   Okay.  So let's turn to slide
3   RDX-28015.  Now, this is figure 9 from the
4   Rekimoto patent application.  Do you see that,
5   sir?
6       A.   Yes, but to be clear, I remember there
7   were two versions going around.  And I believe
8   the certified version has slightly different
9   language.  Isn't it organic display from the
10  non-certified version and electromagnetic is
11  what it said on the certified version?
12      Q.   We will take a look at that at the
13  break, sir, and confirm.  I don't -- is there a
14  material difference?
15      A.   Well, actually, I think organic is the
16  right language.  I think -- but I do believe
17  just because there are two things floating
18  around, we should make sure if we're talking
19  about the certified one, we're using the right
20  figures.
21           And if the figures are correct, I am
22  happy to proceed.  Either way, I do believe it
23  should really be organic, even if it says
24  electromagnetic.
25      Q.   We will confirm that and make sure

APLNDC-X0000006436

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1524

1  we're talking about the same version that you
2  have in mind.
3       A.   All right.
4            JUDGE ESSEX:  Do you have a bit more
5  with this witness?
6            MR. DeFRANCO:  Yes, Your Honor.
7            JUDGE ESSEX:  Then this might be a
8  good time to take a break.  I will let you
9  confirm that so you can come back and have the
10  right figures.
11            We're in recess until a couple minutes
12  before the hour.  And, Doctor, I urge you not
13  to talk to others about your testimony.
14            THE WITNESS:  I understand, Your
15  Honor.
16            (A recess was taken at 10:41 a.m.,
17  after which the trial resumed at 10:58 a.m.)
18            JUDGE ESSEX:  Go back on the record.
19  Are we ready?
20            MR. DeFRANCO:  Yes, Your Honor.
21            JUDGE ESSEX:  Proceed.
22  BY MR. DeFRANCO:
23       Q.   Let's go back for a second, Doctor, to
24  a topic that we discussed shortly before the
25  break.  That's the disclosure of SmartSkin in

Page 1525

1  the prosecution history.  And Ryan, let's just
2  put up that information disclosure reference
3  that I referred to earlier.  It is JX-005.0077.
4            For the record, sir, this is an
5  example of an information disclosure statement,
6  this particular one is out of the prosecution
7  history for the '607 patent.  You have seen
8  this before; is that right?
9       A.   Yes, I have.
10       Q.   And as you and I discussed, there is a
11  number of references disclosed.  Ryan, if you
12  would go to the next page.  That's the
13  signature from the patent attorney, we can move
14  on to the list of references, it is the first
15  list, and if you turn over to the next page,
16  Ryan, I believe at the top, if you can blow
17  that up, you see that that's the Rekimoto
18  article that we looked at earlier, sir.  Do you
19  see that?
20       A.   Yes.
21       Q.   And later on, I believe there is
22  another copy of this where the boxes are
23  checked off indicating that the examiner
24  considered the references that are disclosed
25  here.  Do you recall that, sir?

Page 1526

1       A.   Not specifically, but I have no reason
2  to disagree.
3       Q.   Okay.  And I referenced web site
4  locations for some of the references that were
5  cited.  You don't see one disclosed here, a web
6  site location for the Sony work that was done
7  including the article and the video that we
8  generally mentioned before, sir, is that
9  correct?
10       A.   You mean outside of the direct
11  reference to the article?  There doesn't appear
12  to be any other reference to Sony here.
13       Q.   Okay.  And we said later on, the
14  Japanese patent application we discussed was
15  also disclosed and considered.  Do you remember
16  that?
17       A.   I remember us talking about the
18  Japanese article.
19       Q.   All right.  Just -- have you seen the
20  video that was available at the time of the
21  SmartSkin?
22       A.   I have seen a video, yes.
23       Q.   It was shown once in this case.  I
24  would like to just bring it up again as long as
25  we're at this point and go through it briefly.

Page 1527

1            (Video playing.)
2            Hold it for one second, Ryan.  What we
3  just saw, sir, with fingers moving, is that
4  sort of the pinch to zoom that we talked about?
5       A.   The gesture is similar to the gesture
6  of the pinch to zoom.  That is not the pinch to
7  zoom obviously.
8       Q.   It is a similar gesture in the way
9  that appears?
10       A.   In terms of the way the fingers move,
11  it appears to be a two-finger gesture that
12  involves changing the spacing between the two
13  fingers.
14       Q.   And there is, there is movement of a
15  figure based on multiple touches on a mutual
16  capacitance device; is that fair, sir?
17       A.   Yes, I agree with that.
18       Q.   Let's keep going with the video,
19  please.
20            (Video playing.)
21            We have manipulation of a different --
22  this is manipulation of a Mac, do you see that,
23  sir, making it larger with two fingers and
24  moving it around?
25       A.   Yes, and you will see the projected

APLNDC-X0000006437

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1528

1   features on the back of his hand because the
2   image is coming from on top.
3       Q.   That's right.  The image itself is
4   projected down but the fingers are actually
5   doing the manipulation through the circuitry
6   that's part of this mutual capacitance device
7   itself; is that fair?
8       A.   The fingers are running on the surface
9   of this opaque device, and then there is
10  circuitry connected to it, specifically the
11  voltage detection circuitry, and then there is
12  associated circuitry to ultimately determine
13  what gets projected from the projector on top.
14      Q.   Okay.  It is not -- this is not a
15  transparent configuration.  Is that what you
16  are saying, sir?
17      A.   That is exactly what I am saying,
18  among other things.
19      Q.   But it is a mutual capacitance with
20  multi-touch as we can see from this video?
21      A.   Yes, I agree with that.
22      Q.   Let's finish it up, Ryan, please.
23          (Video playing.)
24          That's it.  Thanks.
25          So just to follow up on one other

Page 1529

1   point, sir, before the break, let's bring up
2   RDX-3.016.  This is the e-mail.  You have seen
3   this e-mail before, haven't you, sir?  This is
4   an e-mail from the inventor, one of the
5   inventors on the '607 patent, Mr. Strickon, to
6   the Q79 brainstorming groups that included the
7   other two inventors.  You were here for that
8   testimony?
9       A.   I was.  By the way, should this be on
10  the confidential record?  Sorry.
11      Q.   That's probably the case.  Let's take
12  that down.
13      A.   Sorry.  I know it is not my job, but I
14  noticed the C, so --
15      Q.   Yes.  I appreciate that.  We will come
16  back to that.
17          JUDGE ESSEX:  We're going on the
18  confidential record?
19          MR. DeFRANCO:  I don't think it is
20  worth the time, Your Honor.  We will move on.
21          JUDGE ESSEX:  All right.  We're not
22  going on the confidential record, gentlemen.
23          MR. DeFRANCO:  We're going to skip it.
24  Thanks.
25  BY MR. DeFRANCO:

Page 1530

1       Q.   Now, let's go back to RDX-28.015.
2   This is the figure and portion of the text from
3   the Japanese patent application that we were
4   talking about, sir.  Do you recall that before
5   the break?
6       A.   I do.
7       Q.   And you had --
8       A.   This is part of the text, not all of
9   it.
10      Q.   Certainly.  This is part of the text
11  that relates to the figure, figure 9, that is
12  shown there from the Rekimoto Japanese patent
13  application; is that correct, sir?
14      A.   It is part of it.  Really the
15  description associated with figure 9 runs all
16  the way to paragraph 68.
17      Q.   Well, feel free to refer to any other
18  additional text, if you need to.
19      A.   Thank you.
20      Q.   This -- for the record, your question
21  about the source of this, this is the version
22  of the Japanese patent application that was
23  included with the certified file history of the
24  '607 patent.  Are you with me?
25      A.   I understand.

Page 1531

1       Q.   There was in this case exactly as you
2   said, there was a certified translation
3   prepared of the individual prior art
4   references.  And if you prefer to refer to
5   that, I can put that piece up or if this is
6   acceptable, we can work off this slide.  Either
7   way is fine.
8       A.   I can work off this slide, since I
9   know the differences between the two.
10      Q.   Okay.  Now, when we talk about this
11  Rekimoto patent application, you will see there
12  that it refers to figure 9 as it schematically
13  depicts the cross-sectional of a non-contact
14  user input device 1 that is constituted so as
15  to be united with a display device comprising
16  an electroconductive polymer-based light
17  emitting element, which is to say, an organic
18  LED.
19          Do you see that, sir?
20      A.   I do.
21      Q.   And it goes on to say, "as shown in
22  this figure, an electrode layer and a cathode
23  electrode layer comprising an electroconductive
24  polymer are stacked with an insulating layer
25  comprising an organic material therebetween."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1532

1        Do you see that, sir?
2    A.   I do.
3    Q.   And this particular text and the
4 figure in this prior art reference is
5 disclosing the layers of the drive and the
6 sense lines in the prior art; is that correct,
7 sir?
8    A.   No, this is disclosing layers of an
9 organic LED and it says you can modulate an AC
10 signal on to the organic LED to measure
11 capacitance.
12        In fact, the cathode is categorically
13 not transparent, even today.  Nobody knows how
14 to make a transparent cathode for an OLED.  If
15 we did, it would be a huge deal.  I have been
16 working on OLEDs for more than a decade.  There
17 is categorically no transparent cathode layer
18 for an OLED that exists today.
19    Q.   At least this shows a separate layer
20 configuration, wouldn't you say that much, sir?
21    A.   Independent of transparency?
22    Q.   Yes, independent of transparency?
23    A.   Yes, I agree with that.
24    Q.   Okay.  Now, let's bring up RDX-016,
25 please.  Actually, let's first start with

Page 1533

1 question 121 and the answer, so we can get some
2 reference, please, Ryan, in the Doctor's
3 rebuttal witness statement.
4        Now, this simply shows, sir, that in
5 your opinion the glass member limitations are
6 those limitations that require the use of glass
7 or plastic elements in the sensor structure; is
8 that correct?
9    A.   Yes.
10    Q.   So if we go back down, Ryan, to
11 RDX-28.016, this is the paragraph that talks
12 about the layout of the electrodes in the
13 SmartSkin reference and then also the use of
14 transparent ITO to the conductive elements.  Do
15 you see that, sir?
16    A.   The top version does say that other
17 layouts are possible.  The bottom version is
18 from the future work, it is not -- it doesn't
19 actually work in the system disclosed.
20    Q.   Right.  The system disclosed doesn't
21 actually use ITO; is that correct?
22    A.   It doesn't and, in fact, it couldn't.
23    Q.   But it does disclose a possibility of
24 using transparent ITO as electrodes in a mutual
25 capacitance device, doesn't it, sir?

Page 1534

1    A.   Actually, what it says is for future
2 work, the work that should be done is to
3 develop these.  It doesn't say it will work.
4 It doesn't say it can be done.  It says this is
5 the work that needs to be done.  It is
6 discussing future inventions that need to
7 happen.
8    Q.   It talks about at least for these
9 individuals the possibility of their future
10 work including substituting ITO as the
11 conductive material.
12    A.   It says that these are future
13 directions that people could pursue and
14 certainly that list of people would likely
15 include the authors saying we may want to do
16 this.
17    Q.   Okay.  And they actually say we may
18 want to do this in the context of a flat panel
19 display.  Do you see that, sir?
20    A.   By saying it can be mounted in front
21 of a flat panel display?
22    Q.   Yeah.  It says because most of today's
23 flat -- let me back up.
24        This is the -- I am in the bottom
25 portion of the ITO section.  Do you see that?

Page 1535

1    A.   I do.
2    Q.   It says, "this sensor can be mounted
3 in front of a flat panel display or on a
4 rear-projection screen."  Do you see that, sir?
5    A.   I see that.
6    Q.   Okay.  It says, "because most of
7 today's flat-matrix displays rely on
8 active-matrix and transparent electrodes, they
9 can be integrated with SmartSkin electrodes."
10        Do you see that, sir?
11    A.   I do.
12    Q.   Okay.  Now, let's go back to where we
13 were a moment ago, the Rekimoto patent
14 application.  Let's bring up slide 28-017.  And
15 this slide, again, this has the version of the
16 Rekimoto translation that is in the certified
17 prosecution history.  And if there is something
18 else you would like to refer to in that, sir,
19 please do so, of course.
20        Do you see paragraphs 24 and 25 there
21 talk about stacking of an anode electrode layer
22 and a cathode electrode layer?
23    A.   Yes, and that's referring to the
24 discussion of figure 9, which I have already
25 told you is not transparent.

26 (Pages 1532 to 1535)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.  But it goes on to say that the
2  reason for doing this is combining the sensor
3  with an LCD display.  Do you see that, sir?
4    A.    No.  In fact, this is not with an LCD
5  display.  This is with an OLED.  An OLED system
6  is an emissive system that emits down through
7  the glass so the background does not have to be
8  transparent and is, in fact, not transparent.
9  Because we don't know how to make an lower
10  function material that is transparent.  Nobody
11  knows how to do it.
12    Q.    But at least you will agree that these
13  references do disclose ITO for use as a
14  transparent material for use in a mutual
15  capacitance device?
16    A.    This reference?  No, this has no
17  discussion of ITO.
18    Q.    So the SmartSkin article by the same
19  authors of this patent application disclose the
20  use of ITO; is that correct, sir?
21    A.    The SmartSkin article by Rekimoto, who
22  is one of the authors of the article, does say
23  that as future work, it would be desirable --
24  or one direction for future work would be to
25  develop a system using ITO.  It doesn't say how

1  to do that.  Nor does it actually work.
2    JUDGE ESSEX:  Doctor, what do you mean
3  it doesn't actually work?  The Smartphones seem
4  to work every day that I see them.
5    THE WITNESS:  Yes, Your Honor.
6    JUDGE ESSEX:  So it does actually
7  work?
8    THE WITNESS:  No, Your Honor.  With
9  respect to SmartSkin --
10    JUDGE ESSEX:  What is the fact you are
11  talking about it.  You are dancing around it.
12  Tell me what it is.
13    THE WITNESS:  Certainly, Your Honor.
14  If you look at SmartSkin, if we can have figure
15  2 of SmartSkin, I can point out what the issue
16  is, Your Honor.
17    Thank you.  Your Honor, if you look at
18  figure 2 of SmartSkin, figure 2 of SmartSkin
19  uses receivers that are voltage sensing
20  systems.  SmartSkin itself points out that the
21  signal strength that it gets is extremely low.
22    It is an inherent characteristic of
23  using voltage sensing, you are very sensitive
24  to, among other things, the resistivity of the
25  lines.

1    They use copper lines for a reason.
2  They need the very high conductivity of these
3  copper lines.  If you go to ITO, which is 100
4  times less conductive than copper, this system
5  won't function.
6    So in the accused products, it works
7  because they are not -- I don't know if this
8  should be on the confidential record -- it is a
9  general statement, I am not going to refer to
10  any art -- in the accused products and also for
11  that matter in the '607 patent, it works, it is
12  able to meet the requirements of the preamble,
13  et cetera, and still implement transparency and
14  the relevant claims because it doesn't use
15  voltage sensing.  A consequence of this sensing
16  scheme is that it cannot implement a
17  transparent system.
18    JUDGE ESSEX:  What about voltage
19  sensing?
20    THE WITNESS:  I'm sorry, Your Honor?
21    JUDGE ESSEX:  What does it substitute
22  for voltage sensing?
23    THE WITNESS:  So the version that is
24  used in the '607 and as it turns out is also
25  used in the accused products are systems that

1  count charge.  They don't sense voltage.  And
2  that turns out to be critical.
3    JUDGE ESSEX:  Was that known to people
4  of ordinary skill in the art in 2002 or '3?
5    THE WITNESS:  I have never seen
6  anything -- I have not seen any art with
7  respect to use of charge counting in a mutual
8  capacitance system before the '607, Your Honor.
9  So I think that '607 is the first one to show
10  that.
11    JUDGE ESSEX:  All right.  Go ahead.
12  BY MR. DeFRANCO:
13    Q.    We were looking at RDX-28.017.  Do you
14  recall that?
15    A.    Yes.
16    Q.    And you refer to the OLED, the organic
17  LED.  Do you see that?
18    A.    Yes.
19    Q.    It also refers to a liquid crystal
20  display.  Do you see that?
21    A.    I do.
22    Q.    It says "or."  Either one or the
23  other; is that right, sir?
24    A.    Correct, but with respect to figure 9,
25  it is OLED specific.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1540

1    Q.   But it does say it can also be used
2    with a liquid crystal display; is that correct,
3    sir?
4    A.   Independent of figure 9, yes, the
5    words liquid crystal display do appear in this
6    section.
7    Q.   Just one moment.  Let's turn to, back
8    to the '607 patent for just a moment, please.
9    Let's take a look at figure 13.
10        Figure 13, sir, that is the inverted
11   amplifier that deals with N length parasitic
12   capacitance, negating the impact of parasitic
13   capacitance; is that correct, sir.
14   A.   In fact, figure 13 is the amplifier
15   circuit that is used for overall sensing.  One
16   of the things it does do is figures out how to
17   separate out the effect of parasitics.  And the
18   way it does that to get accurate sensing is by
19   counting charge.  Figure 13, this configuration
20   is a circuit that counts charge.
21   Q.   Would you say that's a fairly
22   straightforward or simple circuit that's found
23   generally in textbooks at the time, sir?  Isn't
24   that a fair characterization?
25   A.   You mean that circuit on its own, did

Page 1541

1    it exist?
2    Q.   Yes.
3    A.   Yes.
4    Q.   Okay.  And wouldn't you also say, sir,
5    that one of skill in the art at the time prior
6    to the '607 patent, knew you could sense
7    capacitive charge by using a circuit that could
8    count charge.  Isn't that fair, sir?
9    A.   Prior to the '607, with respect to --
10   with respect to a touchscreen or with respect
11   to just counting charge?
12   Q.   Just generally, sir.
13   A.   So it was known that you could count
14   charge by using a surrogate such as this to
15   count charge.
16   Q.   And would you say as a followup that
17   that would not be known by one skilled in the
18   art that it could be used in a mutual
19   capacitance system, is that what your testimony
20   is?
21   A.   It is my testimony that nobody, prior
22   to the '607, no one figured out -- and there is
23   certainly no evidence of it -- that anybody
24   figured out that you could finally get to use
25   ITO in these mutual capacitance systems that

Page 1542

1    implement multi-touch.
2        And the way to allow the use of ITO,
3    the way to get to a system that could deal with
4    these higher resistivity materials such as ITO
5    is to count charge instead of measuring
6    voltage.
7    Q.   And for your opinions in this case,
8    sir, did you take into account the testimony
9    from at least one of the inventors that the
10   SmartSkin disclosure was at least part of the
11   inspiration for what ultimately came -- became
12   their inventions as claimed in the '607 patent?
13   A.   I did read the testimony.  I believe
14   you are referring to the Strickon testimony?
15   Q.   Yes.
16   A.   I read that.
17   Q.   And you don't dispute that testimony,
18   do you, sir?
19   A.   The testimony is what it is.  I have
20   no basis beyond that.
21   Q.   Okay.  Did you discuss that with
22   Mr. Strickon at all?
23   A.   I have never spoken to Mr. Strickon.
24   Q.   All right.  Thank you for that.  Let's
25   turn to another reference, the other reference

Page 1543

1    we're going to cover today, which is the Perski
2    reference.
3        You're aware that that's another
4    reference that Motorola relies on in this case
5    for its position that the asserted claims of
6    the '607 patent are invalid.  You're aware of
7    that, sir?
8    A.   I'm aware that it is being relied on
9    by Motorola for that purpose.
10   Q.   Let's turn to slide RDX-28.020.
11   Actually, go back to 019, Ryan.  Let's start
12   with that briefly.
13        Just for the record, sir, you have
14   spent a reasonable amount of time with these
15   references.  The filing date of the Perski
16   patent itself, the '455 patent, is January 15th
17   of 2004; is that correct, sir?
18   A.   Yes.
19   Q.   You are aware of that Perski
20   provisional application, the filing date for
21   that is early February of 2003, February 10th
22   or so, sir; is that correct?
23   A.   I'm sorry, where is the date?
24   Q.   There is a couple of dates.
25   A.   There is February 9th on the bottom of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1544

1  that page.
2     Q.   Yeah.  At least on the front page of
3  the document, it says February 9th, 2003.  Do
4  you see that, sir?
5     A.   I do.
6     Q.   Okay.  And there is also a third
7  reference in this group or family.  It is the
8  Morag '662, which we will talk a little bit
9  about later, but you have reviewed that as
10  well, haven't you?
11    A.   Yes.
12    Q.   Now, it is your testimony with respect
13  to this Perski reference, your opinion is that
14  it fails to disclose, enable, or render obvious
15  the multi-touch limitations required by the
16  asserted claims under either of the parties'
17  proposed constructions.  Is that correct, sir?
18    A.   That's correct.
19    Q.   So if we turn to the next slide,
20  RDX-28.020, the limitations not disclosed,
21  that's the fifth bullet point down if I'm
22  counting that correctly, do you see that, it is
23  multi-touch?
24    A.   Yes, that's referring to the preamble
25  limitations.

Page 1545

1     Q.   So by way of comparison, you had a
2  longer list as to what was not disclosed in the
3  SmartSkin references, we're talking about one
4  feature, multi-touch, that you believe is not
5  disclosed in the Perski reference.  Is that
6  fair?
7     A.   We are talking about the preamble
8  based limitations related to multi-touch.
9     Q.   Yes, sir.
10    A.   Okay.
11    Q.   Now, let's show briefly paragraph 74
12  in your rebuttal witness statement.  Okay.  So
13  briefly this is where you characterize
14  multi-touch in the two set of asserted claims
15  here.  For example, with respect to claims 1 to
16  7, you say that the detection of multiple
17  touches or near touches that occur at the same
18  time and at distinct locations where the
19  production of distinct signals representative
20  of the location as required by claim 1 and
21  dependent claims 2 to 7.  Do you see that, sir?
22    A.   I do.
23    Q.   And then with respect to claim 10, you
24  have the characterization that's below that,
25  the recognition of multiple touch events that

Page 1546

1  occur at different locations on the touch panel
2  at the same time at distinct points across the
3  touch panel.
4         Do you see that?
5     A.   Yes.
6     Q.   And you go on to provide a bit of
7  additional information, sir; is that correct?
8     A.   Yes.
9     Q.   Okay.  Now, in your opinion, Perski
10  suffers from the same problems as the prior art
11  to the '607; is that correct?
12    A.   Some of them, yes.
13    Q.   Okay.  Some of them.  And more
14  specifically, in your view, Perski is directed
15  to a single touch device; is that correct?
16    A.   Yes, that's primarily true.
17    Q.   You don't think -- in your opinion, it
18  doesn't disclose multi-touch or the processing
19  required for multi-touch; is that fair?
20    A.   In my opinion, it does not disclose
21  the multi-touch limitations as required
22  therewith by the relevant claims of the '607
23  patent.
24    Q.   Okay.  Let's turn to the next slide.
25  We're going to go through a bit in the

Page 1547

1  remaining time of some slides that show
2  different portions of the disclosure of the
3  Perski references.  Okay?  Are you with me?
4     A.   I am.
5     Q.   All right.  Slide 021, do you see
6  there that it is an excerpt from the Perski
7  specification that says, "the goal of the
8  finger detection algorithm in this method is to
9  recognize all of the sensor matrix junctions
10  that transfer signals due to external finger
11  touch."
12        Do you see that, sir?
13    A.   I do.
14    Q.   "It should be noted that this
15  algorithm is preferably able to detect more
16  than one finger touch at the same time."
17        Do you see that, sir?
18    A.   I do see that language.
19    Q.   No dispute that it explicitly says
20  that the algorithm is preferably able in Perski
21  to detect more than one finger touch at the
22  same time?
23    A.   That language does exist in Perski.
24    Q.   Okay.  Let's go to the next slide,
25  please, slide 22.  A little bit more detail, a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1548

1    little in the provisional application. I just
2    want to be clear. We're going to be going back
3    and forth between these related documents. In
4    the interest of time, to do it more
5    efficiently, I am going to take it a subject
6    matter at a time, but this is from the Perski
7    '808 provisional, the cover page that we looked
8    at, it is Exhibit RX-303 on page 4.
9         Okay? You have seen this document
10   before?
11   A.   I have.
12   Q.   Okay. Do you see, sir, that it says,
13   "the goal of the finger detection algorithm in
14   this method is to recognize all of the sensor
15   matrix junctions that bypass signals due to
16   external finger touch." Do you see that, sir?
17   A.   I do.
18   Q.   It goes on to say, "it should be noted
19   that this algorithm is able to detect more than
20   one finger touch at the same time."
21        That's the same discussion we saw in
22   the other Perski document about being able to
23   detect more than one touch, for example, two
24   touches obviously; is that correct, sir?
25   A.   That's what this particular language

Page 1549

1    says, this further language that specifically
2    says it is too slow.
3    Q.   Okay. Let's go on to slide 023. This
4    is a figure that we have seen earlier in this
5    hearing, sir. I am sure you recognize it out
6    of Perski.
7    A.   Yes, I do.
8    Q.   And do you see that next to that is
9    associated language that relates to the figure
10   2 that's depicted there? It says that right in
11   the text. Do you see that, sir?
12   A.   Yes.
13   Q.   And do you see that it states that a
14   two-dimensional sensor matrix 20 lies in a
15   transparent layer over an electronic display
16   device? Do you see that, sir?
17   A.   Yes.
18   Q.   And it says, "an electric signal 22 is
19   applied to a first conductor line 24 in the
20   two-dimensional sensor matrix."
21        Do you see that, sir?
22   A.   I do.
23   Q.   And this has -- this configuration in
24   Perski, this has drive and sense lines, doesn't
25   it, no doubt?

Page 1550

1    A.   The second embodiment, the version
2    we're talking about here?
3    Q.   Yes, sir.
4    A.   Yes, I agree with that.
5    Q.   Okay, this particular embodiment shows
6    the drive lines, number 22 with that arrow
7    showing an alternating signal being applied.
8    Do you see that?
9    A.   Yes. An AC voltage is applied at 22.
10   Q.   Right. And then the arrow that's
11   exiting, that's the sense line at item 30. Is
12   that correct, sir?
13   A.   That is, that is the particular sense
14   line associated with that node, produces a
15   voltage, and then later on they actually
16   disclose some voltage sensing circuitry for
17   that.
18   Q.   They do disclose voltage sensing
19   circuitry for that, for those sense lines in
20   Perski; is that right?
21   A.   Well, they actually disclose a voltage
22   sensing circuit for another embodiment. That's
23   the only sensing circuit that they actually
24   disclose, but with respect to this, they also
25   say you are sensing the voltage signals coming

Page 1551

1    out.
2    Q.   Okay, fair enough.
3         This particular portion goes on to
4    read, "a finger 26 touches the sensor 20 at a
5    certain position, increases the capacitance
6    between the first conductor line 24 and the
7    orthogonal conductor line 28 which happens to
8    be at or closest to the touch position."
9         Do you see that, sir?
10   A.   Yes.
11   Q.   That's the same concept, mutual
12   capacitance we have been over and over again,
13   the finger touches, it impacts the capacitance,
14   which is detected by the sensing circuit and
15   then the rest of the operation is performed; is
16   that fair, sir?
17   A.   If you are asking me if this is
18   conceptually mutual capacitance, I don't
19   disagree with that.
20   Q.   Now, if we turn over to RDX-24, this
21   is some additional text that goes with that
22   same figure, sir, okay? It says, "a number of
23   procedures for detection are possible."
24        You have seen this before, haven't
25   you?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1552

1    A.   Yes.
2    Q.   It says, "the most simple and direct
3  approach is to provide a signal to each one of
4  the matrix lines in one of the matrix axes, one
5  line at a time, and to read the signal in turn
6  at each one of the matrix lines on the
7  orthogonal axis."  Do you see that?
8    A.   I do.
9    Q.   That is describing generally how the
10  sense operation is implemented in this
11  embodiment of Perski; is that correct?
12    A.   Yes, and in this particular
13  embodiment, it discusses scanning all the way
14  across node by node.
15    Q.   And this is a transparent
16  configuration that's intended or can be
17  displaced over a display device.  Isn't that
18  true?
19    A.   It is transparent as described here.
20  This section doesn't specifically talk about
21  putting it over a display, but it certainly is
22  transparent.
23    Q.   You don't dispute that this Perski
24  device is transparent, do you?
25    A.   No, I do not.

Page 1553

1    Q.   And in terms of these procedures, the
2  specification goes on in Perski and it says
3  this method enables the detection of multiple
4  finger touches.  Do you see that, sir?
5    A.   I do and you will note it doesn't say
6  at the same time there.  And further in the
7  next paragraph, it goes on to say this is too
8  slow.
9    Q.   Okay.  But at least you agree with me
10  in this particular paragraph, it does talk
11  about a transparent device and it talks about
12  how that is implemented in a particular
13  configuration and goes on to say specifically
14  that this method enables the detection of
15  multiple finger touches.  Is that correct?
16    A.   It does, but not at the same time.
17    Q.   Now, let's turn to slide RDX-026,
18  skipping ahead a little bit, Ryan.  We're
19  back again, sir, to the provisional application
20  of Perski.  And there is an excerpt at the top
21  of the provisional application on page 4 along
22  with figure 2 from the provisional application.
23       Do you see that there?
24    A.   Yes, I do.
25    Q.   Now, just briefly, you don't dispute

Page 1554

1  that figure 2 shows a matrix of transparent
2  conductive lines and as we said before there
3  are drive and sense lines shown there?
4    A.   This is indeed a matrix.  I believe
5  there is description of the use of
6  transparency.  And there are indeed drive and
7  sense lines.
8    Q.   Okay.  And if we -- and that's
9  discussed in that portion of the Perski
10  provisional disclosure.  Do you see that in
11  that paragraph?
12    A.   That portion doesn't mention
13  transparency, but I believe it is mentioned
14  somewhere else.
15    Q.   Okay.
16    A.   But that is generally related to
17  figure 2.
18    Q.   Well, let's look at transparency with
19  respect to figure 2.  If we go to the next
20  slide, slide 27, you will see the excerpt at
21  the top, doesn't that disclose transparency?
22  It says, "the present invention utilizes a
23  patterned transparent conductive foil system,
24  used for detecting the location of an
25  electromagnetic stylus on top of a display

Page 1555

1  surface in order to enable multiple and
2  simultaneous finger inputs directly on the
3  display."
4       Do you see that, sir?
5    A.   I do.
6    Q.   So there it is saying for sure with
7  that question, it is transparent, obviously,
8  you don't disagree with that?
9    A.   I don't.
10    Q.   It also discloses that the purpose for
11  that is to enable multiple and simultaneous
12  finger inputs directly on display.  Do you see
13  that, sir?
14    A.   It does say that.  In fact, in the
15  main body, it goes on to say it is too slow.
16    Q.   Okay.  Let's turn to slide 28.  Again,
17  a little bit more about this figure 2.  It
18  says, "the most simple and direct approach is
19  to provide a signal to each of the matrix
20  lines, in one of the matrix axes, one line at a
21  time, and to read the signal at each one of the
22  matrix lines on the orthogonal axis."
23       Do you see that, sir?
24    A.   I do.
25    Q.   Okay.  It says, "it is possible to

APLNDC-X0000006444

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sample a group of reception lines at the same
2    time, and even to sample all reception lines
3    simultaneously, thus reducing the number of
4    lines to N." Do you see that, sir?
5        A.   Thus reducing the number of steps to
6    N?
7        Q.   Yes, sir.
8        A.   Yes, I see that.
9        Q.   Now, I would like to turn for a moment
10   to the Morag provisional, which is, I believe,
11   incorporated by reference in the Perski '455
12   patent.  Is that your understanding, sir?
13       A.   I understand that's what's being
14   claimed, yes.
15       Q.   Okay.  So if we go to the next slide,
16   slide 29, please, Ryan, you have seen this
17   figure 1 from the Morag provisional; is that
18   right, sir?
19       A.   I believe so.  Let me just turn to it,
20   please.  Yes, I see it.
21       Q.   And you have also looked at that text,
22   and there is some highlighted text there in the
23   middle.  I won't read that, but you have seen
24   that before, sir, haven't you?
25       A.   Yes, I have.

1        Q.   Now, if you look at that language in
2    that paragraph, sir, wouldn't you say that
3    generally discusses that there is reception
4    from the sensing lines, there is filtering and
5    amplification of the signal, there is sampling
6    into a digital representation, and then sending
7    that digital representation out to a DSP or
8    digital signal processor; is that right, sir?
9        A.   DSP is digital signal processor, but,
10   I'm sorry, I am looking for the language.
11       Q.   Okay.
12       A.   So it does say it amplifies the
13   signal.  It says it filters out irrelevant
14   frequencies.  It says it samples it into a
15   digital representation.  And it says it
16   forwards it for further digital processing.
17       Q.   And would you agree that the digital
18   representation is processed to determine the
19   position of one or more objects and then that's
20   sent to some other circuitry?
21       A.   Well, that's not described here, but
22   certainly if that were the desired operation,
23   you would -- that would be something you would
24   probably do in the digital domain.
25       Q.   So where it states the digital unit 3

1    is responsible for running the digital
2    processing algorithms, the outcome of the
3    digital process is the position of one or more
4    physical objects, typical stylus, which is
5    forward to the host via interface 7."
6        Do you see that, sir?
7        A.   It is typically but, yes, I see that
8    language.
9        Q.   And it is using the information that's
10   received from the mutual capacitance grid to
11   send the data to the digital processing
12   algorithm so that it can detect the position of
13   more than one physical device.  Isn't that
14   true, sir?
15       A.   Yes, I agree with that.
16       Q.   Okay.  Now, let's take a look at -- at
17   least in terms of that language you don't
18   dispute Perski is talking about how to use an
19   algorithm and associated circuitry to detect
20   multiple touches in a transparent device?
21       A.   You mean Perski by incorporating
22   Morag?
23       Q.   Yes, sir.
24       A.   I understand.  So with respect to the
25   incorporation, in Morag, it certainly says what

1    you do with what comes out of the grid.  And if
2    I didn't answer your question fully --
3        Q.   No, you did, thank you.
4        A.   Okay.
5        Q.   Just want to turn briefly to another
6    version of the Perski figures on which we have
7    added some items.  It is RDX-28030.  I know you
8    have spent significant amount of time with
9    this.  Just for the record and make sure we're
10   on the same page, this is figure 2 from the
11   Perski with some colorization of the drive and
12   sense lines.  Do you see that, sir?  Sense
13   lines are in red.  Drive lines are in blue, one
14   each, in each of these two depictions?
15       A.   I see that.
16       Q.   And in the original Perski, what was
17   the circle that's yellow on top, what did that
18   reflect that was a circle in the drawing as it
19   originally existed?
20       A.   That is generally pointing to a
21   particular node on the figure.
22       Q.   And we have added a node.  Do you see
23   that, a node below each one of those?
24       A.   I see that.
25       Q.   The Perski references we have been

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1560

1    talking about, they disclose the ability to
2    sense two different touches at two different
3    locations on a mutual capacitance transparent
4    device. Isn't that, sir?
5        A.   Not at the same time. Yes, I agree.
6    If you are talking about timing, yes, it does.
7        Q.   So your opinion is that it can detect
8    more than one, just not simultaneously?
9        A.   So there is two possibilities. If it
10   uses the technique disclosed, it is too slow to
11   do it simultaneously. If it uses the so-called
12   faster technique, it is not able to actually
13   detect multiple touches accurately.
14       Q.   Okay. And that is one of the bases on
15   which you, in your opinion, distinguish the
16   Perski references; is that correct?
17       A.   That is something I have considered,
18   yes.
19       Q.   Now, do you remember that any specific
20   disclosure in the '607 patent that teaches the
21   detection of multiple fingers at the exact same
22   time? In other words, is that explicitly
23   discussed anywhere in the '607 patent?
24       A.   If by exact same time, you mean at the
25   same picosecond, no. In fact, that's not a

Page 1561

1    requirement. But what is a requirement is that
2    it appears at the same time to the user. And
3    that's my opinion with respect to claim
4    construction.
5        Q.   I don't want to quibble about times.
6    In terms of what it says in the '607
7    specification, there is no discussion about how
8    the invention gives the ability to detect two
9    touches or multiple touches at the exact same
10   time; is that correct?
11       A.   And by exact, you mean not as
12   perceived by the user but realtime?
13       Q.   Yes, in realtime?
14       A.   I agree with that.
15       Q.   And there is some -- as you said, if
16   there is fingers that are spread apart, not
17   this configuration, if my fingers are spread
18   apart on a device that implemented using the
19   '607 patented technology, there is going to be
20   some time lag there as you were suggesting,
21   isn't there, sir?
22       A.   Not as perceived by the user, but in
23   terms of picosecond differences, for example,
24   yes, absolutely.
25       Q.   Certainly, but that's because of the

Page 1562

1    way that the sense lines are scanned, right,
2    from one side to the other, they are not
3    scanned at exactly the same time. Isn't that
4    correct, sir?
5        A.   If you mean do you read all the nodes
6    simultaneously to the exact fraction, no, you
7    do not.
8        Q.   And I don't remember, you haven't done
9    any tests in this case as to whether a very
10   short, precise touch by two fingers at exactly
11   the same time could be detected by devices that
12   implemented the '607 invention?
13       A.   You mean have I taken a phone and
14   tried that?
15       Q.   Yes. Have you done any -- well, have
16   you done any tests to see whether those two
17   touches could be recognized at an instantaneous
18   point in time?
19       A.   As perceived by me, yes, they clearly
20   are. Are you asking me, have I used some sort
21   of ultra high speed camera to figure out if
22   they are actually perceived within picoseconds
23   of each other, no.
24       Q.   You haven't done any tests in that
25   regard, that's all I am asking?

Page 1563

1        A.   In that regard, no.
2        Q.   So then if we go back to this figure
3    that we're looking at, RDX-28030, there is no
4    discussion, if you look at -- consider those
5    two yellow points or two points of touch in the
6    Perski configuration, there is no discussion in
7    Perski that if there were a single large touch,
8    for an example, it could be recognized as two
9    different touches, if we talk about that
10   hypothetical.
11       A.   I disagree. The Perski reference says
12   I believe you detect node by node and each node
13   corresponds to a touch. So if by large you are
14   allowing it to overlap, that wouldn't
15   necessarily follow.
16       Q.   Let's take a look at column 14, lines
17   15 to 19 of the -- I think the easiest way to
18   do this, Ryan, is to go back to slide RDX-021.
19   Just where we were before, sir, at least there
20   is a specific disclosure in Perski that the
21   algorithm is able to detect more than one
22   finger touch at the same time, do you see that,
23   sir, that's the goal of the Perski reference?
24       A.   That is what it says with regard to
25   the goal in RX-708 at column 14, lines 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1564

1  through 19.
2      Q.   I thought you had said in a portion of
3  your rebuttal witness statement that a single
4  large touch could cause an output signal to
5  detect more than one conductor line and the
6  Perski detection method would register this as
7  two touches instead of one.  Is that right,
8  sir?
9      A.   Perhaps you could point me to it, but
10 that does sound like something I said.
11     Q.   We can look at it, but you don't
12 disagree with that?
13     A.   I don't disagree with that.
14     Q.   Okay.  So going back to Perski again
15 where we started, Perski never discusses that
16 as being a problem; isn't that true, sir?
17     A.   You mean does he say this is a
18 shortcoming of his method?
19     Q.   Yes.
20     A.   With respect to that, no, I don't
21 believe so.  He didn't recognize it, but it is.
22     Q.   You have taken a look at the witness
23 statements of the fact witnesses in this case
24 that relate to the '607 patent, specifically
25 you have read Mr. Hotelling's witness

Page 1565

1  statement, haven't you, sir?
2      A.   Yes, I have.
3      Q.   Okay.  And you actually considered
4  that, I think you may have referenced that in
5  some of your own testimony in the case, but be
6  that as it may, you have read that testimony,
7  haven't you?
8      A.   His witness statement?  Yes, I have.
9      Q.   And in his witness statement, he
10 identifies three classes of touch detection.
11 Do you recall that, sir?
12     A.   Not specifically, but I'm not -- I
13 don't have it in front of me right now.
14     Q.   Okay.  Well, let's put up -- I don't
15 know if you have this, Ryan, but the Hotelling
16 witness statement, question and answer 21.
17         MR. FERGUSON:  Excuse me, Your Honor,
18 I think this is confidential.
19         JUDGE ESSEX:  Well, I don't -- is this
20 Apple confidential?
21         MR. FERGUSON:  This would be Apple
22 confidential.
23         JUDGE ESSEX:  All right.
24         MR. DeFRANCO:  Let me try to do it
25 without putting that on the screen.

Page 1566

1         JUDGE ESSEX:  All right.  You are
2  going to try to avoid going into confidential?
3         MR. DeFRANCO:  I would like to.
4         JUDGE ESSEX:  You want to stay on the
5  public record?
6         MR. DeFRANCO:  Yes, sir.
7         JUDGE ESSEX:  All right.  Go ahead.
8  BY MR. DeFRANCO:
9      Q.   If we talk about a class of touch
10 detections, a touch detection system that takes
11 two touch points and averages them, which I
12 believe is shown as a problem with the prior
13 art in figure 1A.  Do you recall that, where
14 there is a little plus sign between the two?
15     A.   By figure 1A, you are referring to
16 figure 1A of the '607 patent?
17     Q.   Yes.
18     A.   Yes.
19     Q.   Perski is not one -- doesn't suffer
20 from that problem, does it, the ability to not
21 have to average two touch points, right?
22 Clearly Perski could separate, was an advance
23 over that class of touch devices, wasn't it,
24 sir?
25     A.   You are asking me with reference to

Page 1567

1  the node by node scanning method?
2      Q.   Yes.
3      A.   In the node by node scanning method,
4  Perski does not talk about averaging, so he
5  doesn't suffer from that problem.
6      Q.   And you didn't see anything in there
7  that said that Perski needed to average two
8  touches as the prior art did because of
9  limitations in terms of the configuration of
10 the electrodes and processing technology, that
11 sort of thing, correct?
12     A.   I don't believe I saw any discussion
13 of averaging with respect to being a problem in
14 that regard.
15     Q.   Okay.  And if we talk about a second
16 category or class of detection devices, those
17 that suffer from shadowing, you would agree,
18 wouldn't you, that Perski doesn't suffer from
19 the shadowing problem of that second category
20 or class of touchscreen devices, does it?
21     A.   You are talking about the scanning,
22 the node by node scanning version, not the
23 version that actually groups nodes?
24     Q.   Yes, right.
25     A.   Because the grouping one does suffer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1568

1 from it. But the node-by-node scanning one
2 would not suffer from the shadowing behavior.
3         MR. DeFRANCO: One moment, Your Honor.
4 I am trying to avoid the confidential record.
5         JUDGE ESSEX: I understand.
6         MR. DeFRANCO: Your Honor, with that,
7 I am going to finish with the
8 cross-examination -- conclude
9 cross-examination.
10        JUDGE ESSEX: All right.
11        MS. KATTAN: I have no questions, Your
12 Honor.
13        MR. FERGUSON: Your Honor, it might
14 make sense if we take our lunch break now. I
15 think that would speed up the redirect. And
16 that would also then allow the recross to occur
17 right after my redirect and we can take it all
18 in one shot. Get it done quicker.
19        JUDGE ESSEX: All right. That makes
20 some sense.
21        Doctor, we're going to go to recess.
22 Again, let me remind you to discuss anything
23 you want, other than your testimony and the
24 matters contained in your report.
25        All right. We're in recess. We will

Page 1569

1 be back in an hour, about ten until 1:00.
2        (Whereupon, at 11:49 a.m., a lunch
3 recess was taken.)

Page 1570

1         AFTERNOON SESSION
2         (12:50 p.m.)
3         JUDGE ESSEX: All right. Are we
4 ready?
5         MR. FERGUSON: We are, Your Honor.
6         JUDGE ESSEX: All right. Back on the
7 record. Go ahead.
8         REDIRECT EXAMINATION
9 BY MR. FERGUSON:
10    Q.   Good afternoon, Dr. Subramanian.
11    A.   Good afternoon.
12    Q.   I would like to start with claim 1 of
13 the '607 patent, JX-2. And you touched on the
14 preamble of claim 1 several times during your
15 cross-examination. Do you remember that?
16    A.   Yes, I do.
17    Q.   I would like to start by breaking down
18 some of the elements in the preamble, so,
19 Chris, could we start with a transparent
20 capacitive sensing medium. Great.
21        First of all, can you just briefly
22 explain what your opinion is with respect to
23 what that means?
24    A.   Certainly. With respect to this
25 portion of the preamble, the words transparent

Page 1571

1 capacitive sensing medium indicate that the
2 touch panel that we're talking about will
3 comprise something that is transparent and it
4 is going to use capacitive sensing.
5         So those are two requirements of a
6 system that would implement claim 1.
7    Q.   Okay. And now, Chris, let's go and
8 highlight in a different color "detect multiple
9 touches or near touches that occur at a same
10 time and at distinct locations in a plane of
11 the touch panel."
12        And, again, can you explain your
13 opinion with respect to what that claim
14 language means?
15    A.   Certainly. This claim language says,
16 firstly, that we have to be able to detect
17 multiple, which means more than one touches or
18 near touches. And those touches would occur at
19 the same time and be in distinct locations on
20 the plane of the touch panel.
21        Now, what does that mean by distinct
22 locations in a plane of the touch panel? That
23 means we are able to detect when the touches
24 are made in different locations on the plane of
25 the touch panel.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1572

1    We actually get some guidance on what
2  that means from the specification itself and,
3  further, we get guidance from later portions of
4  the preamble of claim 1.
5    Q.   And let's go to that.  Let's use one
6  more color and highlight "to produce distinct
7  signals representative of a location of the
8  touches on the plane of the touch panel for
9  each of the multiple touches."
10   And, again, can you tell us what your
11 opinion is with respect to what that language
12 means?
13   A.   Certainly.  This language requires
14 that the touch panel of claim 1 must be able to
15 produce signals representative of the location
16 of the touches, so it has to produce a signal
17 for the touch, the multiple touches that we
18 have discussed above, that are on the plane of
19 the touch panel, and those signals must be
20 distinct for each of the multiple touches.
21   We get further guidance on what
22 distinct means with respect to the multiple
23 touches by looking at the specification.  In
24 particular, if we look at a section that
25 actually I discussed earlier in the

Page 1573

1  cross-examination portion where we were looking
2  at the section describing the prior art, there
3  was criticisms of the state of the technology
4  at the time, specifically identifying issues
5  associated with averaging and shadowing.
6    And the general problems they have in
7  being able to accurately distinguish multiple
8  touches.  So based on the clear teaching away
9  from the problems of the prior art and the need
10 to solve those problems, put together, the
11 preamble requires, first, that the system be
12 transparent; second, that it be capacitive in
13 terms of the sensing it uses; and, third, that
14 it be able to accurately detect multiple
15 touches.
16   And that specifically means it needs
17 to not suffer from the shadowing, averaging, et
18 cetera, style problems.  And it needs to be
19 able to do them in such a way that it can
20 produce distinct signals representative of the
21 locations and it must be able to do that at a
22 same time.
23   The specification teaches us that at a
24 same time means at the same time as perceived
25 by the user.

Page 1574

1    Q.   Okay.  Now, with that claim language
2  informing your opinions with respect to the
3  prior art, let's take a look at the SmartSkin
4  reference that you were questioned about during
5  the cross-examination.  This is JX-367.  Of
6  course you remember being asked questions about
7  this, right?
8    A.   Yes, I do.
9    Q.   And you have expressed an opinion that
10 the SmartSkin reference does not anticipate the
11 asserted claims of the '607 patent.  Is that
12 right?
13   A.   Yes, I have expressed that opinion.
14   Q.   Okay.  Let's start with looking at
15 figure 2 of the SmartSkin reference.  And this
16 was used during your cross-examination?
17   A.   Yes, it was.
18   Q.   And I want to just set a little bit of
19 groundwork here.  Figure 2 shows the touch
20 panel as used in SmartSkin.  Is that right?
21   A.   That's correct.  This is, in fact, the
22 schematic representation of the SmartSkin touch
23 panel and, in fact, it describes both of the
24 embodiments in terms of how it is set up, both
25 the table embodiment and the tablet embodiment

Page 1575

1  use this.
2    Q.   They both -- both embodiments that are
3  disclosed use this representation which is
4  figure 2?
5    A.   That's correct.
6    Q.   And what material in these embodiments
7  is used for the drive and sense lines that are
8  shown at the top of the figure?
9    A.   The drive and sense lines for both
10 embodiments based on figure 2 are copper.
11   Q.   Is copper transparent?
12   A.   No, copper is not transparent.  In the
13 thicknesses that are used here, it is entirely
14 opaque.
15   Q.   Now, you were shown the SmartSkin
16 video during your cross-examination.  Do you
17 remember that?
18   A.   I do.
19   Q.   What material, to your knowledge, was
20 used for the drive lines and sense lines in
21 that video?
22   A.   I believe the video I was shown was
23 for the tablet version, and that version uses
24 copper for the drive and sense lines.
25   Q.   All right.  And you were asked a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1576

1  number of questions about the conclusion
2  section of the SmartSkin reference, JX-367,
3  that referred to the future work that might be
4  able to be done with respect to indium tin
5  oxide.  Do you remember those questions?
6      A.   I recall the discussion of the future
7  work on indium tin oxide.
8      Q.   Okay.  Can indium tin oxide be
9  substituted for the copper lines that are shown
10 in figure 2 of the SmartSkin reference in a
11 manner that would be simple to implement?
12     A.   No, as I have already said during my
13 cross-examination, you could not take the
14 system of figure 2 and replace the copper with
15 indium tin oxide.  Doing so would result in a
16 non-working system.  It is not a drop-in
17 replacement.  The circuits of figure 2 would
18 not work with an ITO mesh.
19     Q.   Let's talk a little bit about the
20 disclosures of the use of indium tin oxide in
21 the '607 patent versus the disclosure, such
22 that it is, in the SmartSkin reference.
23         So, Chris, can we go back to the
24 patent, please, the '607 patent, JX-2.  And can
25 we put up in the patent column 14, starting at

Page 1577

1  line -- starting at line 44 all the way through
2  column 15, ending at line 23.  Chris, column
3  14, line 44, please.  I think that's different
4  than what you have up there.  Okay, great.
5         And then through column 15, line 23.
6         Can you fix the column 15 a little
7  bit?  There we go.  Thank you.
8         Here is the disclosure.  You were
9  asked a few questions about this in your
10 cross-examination, although not all this
11 material was on the screen.  First of all,
12 let's focus on the disclosure at column 14,
13 line 44, that paragraph, where it discusses the
14 lines that are used in the '607 patent.
15         And I wanted to focus in on the
16 section that discloses the size of the lines.
17 Now, can you tell us by looking at that whether
18 the '607 patent provides any guidance to the
19 reader with respect to the thickness and width
20 of the lines that should be used?
21     A.   Yes, it does.  Specific examples are
22 provided at, for example, starting at line 54,
23 it talks about the pitch of the sensing and
24 driving lines of being about five millimeters,
25 and talks about line widths as well on the

Page 1578

1  order of 1.05 and 2.10 millimeters, so it does
2  provide some examples of the kinds of numbers
3  that could be used.
4      Q.   And then in the next paragraph column
5  14, around line 60, is there a discussion with
6  respect to some of the issues that result when
7  one uses ITO in a touchscreen sensor?
8      A.   Yes, it does.  Specifically it does
9  point out the issues related to transparency
10 and resistivity and talks about how those are
11 typically resolved.
12     Q.   And then you were asked some
13 questions, I think, by His Honor with respect
14 to column 15, the paragraph that begins around
15 line 8 regarding the dead areas and the need to
16 have a uniform optical retarder.  Is that
17 right?
18     A.   That's right.
19     Q.   Again, can you just quickly cover that
20 one more time.
21     A.   Certainly.  With respect to the
22 discussion of dealing with the dead areas
23 between the ITO, the issue is that ITO has a
24 different refractive index than typical polymer
25 materials such as a glue or a plastic.

Page 1579

1         And also different refractive index,
2  for example, than many glasses.  And so if you
3  have a layer that has multiple ITO lines and
4  spaces in between that are either air or filled
5  with a glue or filled with a polymer of some
6  sort, you have a difference in the refractive
7  index in the stripes versus in what are called
8  the dead regions, the spaces between the
9  stripes.
10        The problem with that is then if you
11 have a user looking at the display, he
12 perceives a layering, which depending on how
13 far you are from the display, either shows
14 itself as little bands or even as a shimmer of
15 the display.
16     Q.   Okay.
17     A.   So that's a problem because it results
18 in a poor perception of the quality of the
19 transparency, and the patent describes that and
20 discusses potential ways of dealing with that.
21     Q.   So now, Chris, let's go back to
22 JX-367, the SmartSkin reference, and let's go
23 to page 7.  And can we blow up the paragraph on
24 the right that says use of transparent
25 electrodes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1580

1          Can you read for us the first sentence
2    in this section.
3          A.   Certainly.  The section says, "a
4    transparent SmartSkin sensor can be obtained by
5    using indium tin oxide (ITO) or a conductive
6    polymer."
7          Q.   Is there any other disclosure in the
8    SmartSkin reference about how ITO could be used
9    in a SmartSkin sensor?
10         A.   No, there isn't.  This is suggested as
11   future work and that's why it is not
12   significant discussion.  This is just to say
13   this could be an idea someone could work on,
14   but we don't -- it hasn't been done and it is
15   not disclosed how to do it.
16         Q.   So between the '607 patent disclosure
17   and the SmartSkin reference with respect to a
18   teaching of how to use ITO on a touchscreen
19   device, which one provides more guidance to the
20   person of skill in the art?
21         A.   Well, even with respect to the ITO
22   itself, there is clearly substantially more
23   guidance within the '607 patent.
24         Q.   Let's go back to figure 2 of SmartSkin
25   again.  You can take off the '607 disclosure.

Page 1581

1    Let's blow that back up.
2          Now, Dr. Subramanian, you said on
3    cross-examination that ITO will not work with
4    figure 2.  Do you recall that?
5          A.   I do.
6          Q.   I would like you to provide an
7    overview right now of why you have that belief.
8          A.   Certainly.  As I pointed out in
9    response to His Honor's question, the receivers
10   used in figure 2 -- and these are the only
11   receivers disclosed within the SmartSkin
12   reference, or for that matter in the SmartSkin
13   patent application as well, are voltage
14   amplifiers.  What they do is they are used to
15   determine the voltage on the rows.
16         So, in other words, when the wave
17   signal of figure 2 is applied to what we're
18   calling the drive lines, capacitive coupling
19   results in voltage being present at the end of
20   the sense lines that feed to the receiver.
21         The circuitry of figure 2 is used to
22   measure that voltage.  And we know that because
23   we see these amplifiers shown here and those
24   which are shown as triangles, and that's the
25   classic representation of an amplifier.

Page 1582

1          Q.   Okay.
2          A.   And they are called as such.  They are
3    called amps.
4          Q.   Now, let's juxtapose that with what's
5    disclosed in the '607 patent.  Chris, can you
6    keep this side-by-side.  Let's go to the '607
7    patent and shows figures 12 and 13.
8          Again, at a high level, can you tell
9    us what is disclosed in figures 12 and 13 of
10   the '607 patent?
11         A.   Certainly.  Figures 12 and 13 show
12   conceptually how the sensing is actually done.
13   In particular, what you notice in figure 12, we
14   see a schematic representation of what happens
15   in this mutual capacitance system.
16         The drive signal is shown as 228, and
17   it is applied to the left of this capacitor.
18   That's the two parallel lines.  And you notice
19   it has an arrow going through it.
20         That arrow indicates that it is a
21   variable capacitor.  And let me explain what
22   that means.
23         This capacitance over here represents
24   the capacitance between the drive line and the
25   sense line.  And that capacitance changes

Page 1583

1    depending on whether there is a finger nearby
2    or not.
3          So that's what the arrow means.  The
4    arrow indicates that the value can change.
5          So there is a drive line signal
6    applied on 222.  And it is coupled to the sense
7    line to 224.  And then ultimately feeds to the
8    circuit, 230.
9          230 is the sensing circuit.  And the
10   described sensing circuit of figure 13 would
11   conceptually fit in there and that is, in fact,
12   called out specifically as being a circuit that
13   is going to count charge.
14         So the circuit -- the system described
15   with respect to this mutual capacitance system
16   of the '607 patent is a system that counts
17   charge and uses that to make a determination as
18   to the presence or absence of a finger.
19         Now, that's important because you see
20   that it is using a different metric for doing
21   this determination.  Instead of using voltage,
22   which is what's used in SmartSkin, it uses
23   charge.
24         Q.   Now, can you explain why that is
25   significant when you are using ITO as the

APLNDC-X0000006451

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1584

1  material for the row and sense lines?
2      A.   Certainly.  At a high level, the
3  advantage of using charge over using voltage is
4  you become significantly less sensitive to the
5  resistance of the lines.  Voltage is extremely
6  sensitive to the resistance of the lines.  If
7  you count charge, it is not.
8      I can explain that further.  I could
9  draw it and make it clear.
10      MR. FERGUSON:  Your Honor, with your
11  permission, would we be able to have
12  Dr. Subramanian use the boards here to sketch
13  out his analysis with respect to the use of the
14  counting charge versus voltage?
15      JUDGE ESSEX:  Yes.  I am just
16  wondering how we're going to mic him up.
17      MR. FERGUSON:  I actually have a
18  wireless mic right here, Your Honor.
19      JUDGE ESSEX:  Then proceed.
20      MR. DeFRANCO:  Your Honor, just to
21  state an objection, Your Honor.  If he could
22  just point out where this is in his witness
23  statements, please.
24      JUDGE ESSEX:  Well, I'm going to allow
25  it because I asked the question and we have

Page 1585

1  raised the difference between voltage and
2  charge.  And the difference between the
3  SmartSkin and the others.  So I think it was
4  covered.
5      I don't exactly do cross-examination,
6  but it has become a fair point in our record so
7  I am going to allow it.
8      THE WITNESS:  Thank you, Your Honor.
9  So, Your Honor, I will, on these easels, I will
10  first --
11      JUDGE ESSEX:  One other thing.  If you
12  want to come out so you can actually see what
13  he is doing, any of the attorneys, if your view
14  is impeded, please feel free to leave your seat
15  and find a place where you can watch.
16      MS. KATTAN:  Thank you, Your Honor.
17  BY MR. FERGUSON:
18      Q.   Now, let's just set the stage for the
19  question.  Can you explain for us what the
20  difference is with respect to using a voltage
21  sensor as in SmartSkin versus using a charge
22  counter in the '607 patent and, in particular,
23  why that's important when you are using ITO as
24  the drive and sense line material.
25      A.   Certainly.  To start, it is best if I

Page 1586

1  first explain how at a conceptual level a
2  mutual capacitance system works.  So, Your
3  Honor, I will start by that.
4      In a mutual capacitance system, as
5  everybody has agreed, to my knowledge, in this
6  case, we have rows and we have columns.  And
7  they are, in the cases we're looking at, are in
8  different layers.
9      Now, it turns out when you have two
10  conductors in different layers, there is a
11  capacitance that exists between them.  So I'm
12  going to draw that like this (indicating).
13      These parallel lines are the standard
14  schematic used globally to indicate a
15  capacitance.  In a mutual capacitance system,
16  we have a drive line where we apply a signal.
17  Typically it is an alternating current.  Some
18  sort of current that is time variant.  And I
19  will explain why we do that in a minute.
20      And then on the sense line we have
21  some sort of sensing circuit.  And I am just
22  going to call it S for now.  If Your Honor
23  would like, I can draw a little higher up.
24      JUDGE ESSEX:  No, that's fine.
25      THE WITNESS:  Now the basic concept

Page 1587

1  then at the highest level for this mutual
2  capacitance system is that if we apply a time
3  variant signal here, we want to be able to
4  detect something here (indicating).
5      By the way, the reason we use time
6  variant signals is capacitors will actually
7  allow electrons to flow, if the electrons are
8  time variant.  In other words, if the signal
9  that is applied is varying with time, the
10  capacitor actually allows some current to flow.
11      So this is the conceptual level at
12  which a mutual capacitance system works.  So to
13  explain the difference, the next step then
14  would be for me to work through each of those
15  individually.
16  BY MR. FERGUSON:
17      Q.   Can we do that?  Why don't you
18  explain, with respect to figure 2 of SmartSkin
19  and then figures 12 and 13 of the '607 patent,
20  the differences.
21      A.   Certainly.  So I will start then with
22  figure 2 of SmartSkin to explain how it works.
23  I will leave this up for a second, Your Honor,
24  and I am going to draw over here and then I
25  will flip that up, because I will have

APLNDC-X0000006452

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 everything I need.
2        Just so that we can see what's going
3 on with respect to this intersection point, I
4 am not going to actually draw the intersection
5 point.  Instead, just to make the diagram a
6 little easier to see visually, I am going to
7 draw it like this (indicating).  But, in fact
8 -- and I am going to show the capacitor here
9 (indicating).
10        But, in fact, that represents an
11 intersection point.  They are just on different
12 layers.  Okay.
13        So let's then -- that's the conceptual
14 idea we have over here.  In SmartSkin, a
15 voltage is applied on the drive line and that
16 is called wave signal in SmartSkin.  And this
17 is what happens when the voltage is applied.
18        There are losses within this system.
19 There are -- there is a copper line over here
20 (indicating).  It has some capacitances to the
21 external world.  There is always some parasitic
22 losses in the system.  And there is parasitic
23 losses from the sense line as well.
24        And there is a voltage detecting
25 circuit placed on the other end.  Now, how does

1 the system work?
2        I'm applying a time variant signal to
3 the drive line.  That results in a propagation
4 of electrons through the drive line.  Some
5 fraction of those electrons make it to the
6 sense line.  Not all of them, but some are lost
7 through the parasitic elements.
8        And that net result is a potential is
9 set on the sense line, which is measured by the
10 amplifier in the bottom of the voltage
11 amplifier.  So this is an important point.
12 Conceptually, in fact, fundamentally at a
13 physical level, what a voltage amplifier does
14 is it measures the energy of electrons.
15        It is not counting how many electrons
16 are there.  It is measuring the energy of
17 electrons.  That's what voltage is.  Voltage is
18 a measure of potential energy.
19        So we have electrons over here and
20 this voltage amplifier is determining their
21 energy.  Now, why is that important?
22        This (indicating) is a conductor of
23 some sort, but it is not a perfect conductor.
24 It doesn't have zero resistance.  It has some
25 resistance associated with it.

1        And as I will show you in a minute,
2 that has a tremendous impact on how the system
3 actually works.  But before I do that, I should
4 switch over then to the '607 patent.
5    Q.   Why don't we write -- let's mark the
6 one on the right CDX-30, please, so we can
7 refer to them.
8    A.   All right.
9        (Complainant Exhibit Number CDX-30 was
10 marked for identification.)
11 BY MR. FERGUSON:
12    Q.   So this is -- and why don't we write
13 SmartSkin on the top.
14    A.   (The witness complied.)
15    Q.   Okay.  And let's start with '607 over
16 here (indicating).  Great.  And can you explain
17 how it works in the '607 patent?
18    A.   Certainly.  Again, we have the same
19 general mutual capacitance setup.  So we have a
20 drive line, we have a sense line.  There is a
21 capacitance between them.  There are losses in
22 the system.  And there is an applied voltage
23 here.
24        But in the '607 patent, what we have
25 is we have a charge counting circuit.  Now, why

1 is this important?  This system has the same
2 situation with respect to a voltage being
3 applied, electrons getting through but we are
4 actually looking at something different.
5        Instead of looking at the energy of
6 electrons as we do in CDX-30, here we look at
7 the number of electrons.  We don't care about
8 their energies.  We're just counting their
9 numbers.
10        Now, why is that important?  And why
11 does it relate to what you end up using for the
12 material?  That's the important question.
13    Q.   So let's write CDX-31 there so we
14 know, we have the two demonstratives as it
15 relates to SmartSkin and the '607.  Let's go
16 back to SmartSkin.
17        And can you discuss the material that
18 is used for the drive and sense lines and how
19 that relates to the use of the voltage sensor?
20    A.   Certainly.  If we look at the
21 SmartSkin system, there is a conductor shown
22 here (indicating) for the row and for the
23 column, for the drive line and for the sense
24 line.
25        The conductor that's used in SmartSkin

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1592

1    is copper.  Copper has a very high
2    conductivity.  Its conductivity is on the order
3    of 10 to the 4th siemens per centimeter, so it
4    is very, very conductive, that's 10,000 siemens
5    per centimeter.  It is a very conductive
6    material.  It is actually one of the most
7    conductive materials we have available to us.
8        Q.   Can you write copper right across the
9    top?
10       A.   Certainly, copper.  And this is also
11   copper (indicating).  Now, why is that
12   important?  It turns out that the voltage that
13   is present here (indicating) depends on the
14   resistance of the conductor.
15            Conceptually here is the reason.
16   Electrons don't flow through this like being on
17   a freeway.  In fact, they are bouncing around
18   constantly.
19            JUDGE ESSEX:  It is like a freeway in
20   Washington.
21            THE WITNESS:  Maybe like a freeway in
22   Washington, Your Honor.  So they are bouncing
23   around constantly.
24            The more bouncing -- that is called
25   scattering.  The more scattering they do, the

Page 1593

1    more energy they lose.  So what that means is
2    if I have a very good conductor, I don't lose
3    too much energy in here, and the strength of
4    the signal I am trying to measure over here is
5    moderate.  And, in fact, SmartSkin calls this
6    out.  SmartSkin actually says the signal is
7    weak, so it is already saying it is weak with
8    copper.
9            Now, if I were to replace this with a
10   material that had higher resistance, so lower
11   conductivity, there is much more bouncing and
12   the energy of the electrons that come out gets
13   even lower.
14            And so it is not possible to detect.
15   And this is the reason that you wouldn't want
16   to use -- in fact, you couldn't use ITO in
17   these systems, because ITO is 100 times -- in
18   its best case, is 100 times lower conductivity
19   than copper.
20            JUDGE ESSEX:  Let me ask you this.
21   Charge counter, that's been known to the
22   science before the '607 patent?
23            THE WITNESS:  Yes, Your Honor, but not
24   in --
25            JUDGE ESSEX:  And it is not claimed

Page 1594

1    anywhere in the '607 patent as inventing that.
2            THE WITNESS:  That's correct, Your
3    Honor.  And I don't think the point of the
4    claims -- and my point here is not to say that
5    you need to have a charge counter.  My point is
6    to meet the requirements of the preamble,
7    namely, being able to detect multiple touches
8    at the same time in a transparent system, the
9    way you can get there in the '607 is with the
10   charge counter.  You couldn't do that with
11   SmartSkin.
12            So let's contrast, then, if Your Honor
13   is ready, I can move on to contrast to the
14   '607.
15            JUDGE ESSEX:  All right.
16   BY MR. FERGUSON:
17       Q.   This is CDX-31?
18       A.   This is CDX-31.
19       Q.   Why don't you write ITO, so we know.
20       A.   So in CDX-31, we have ITO.  That is a
21   lower conductivity material.  100 times lower
22   than copper but remember in the charge counter
23   we're not checking energy.  We're not checking
24   the energy of electrons.  We are counting the
25   number of electrons.

Page 1595

1            So even if these electrons are
2    bouncing around a lot and they lose a lot of
3    their energy, we're still able to count them.
4    They may be low energy when they get here, but
5    we are able to count them.
6            So the key result out of this is not
7    the fact that I am using a charge counter
8    versus a voltage counter.  It is the charge
9    counter allows me to have a system that uses
10   ITO and still allows me to meet the
11   requirements of the claim.
12       Q.   Okay.
13            JUDGE ESSEX:  All right.
14            THE WITNESS:  Thank you, Your Honor.
15            JUDGE ESSEX:  Thank you.
16            MR. FERGUSON:  Your Honor, we will
17   have pictures of these made for submission as
18   demonstrative exhibits.
19            JUDGE ESSEX:  All right.
20   BY MR. FERGUSON:
21       Q.   Okay, you have hinted at, in response
22   to His Honor's question, how does this impact
23   your opinions about whether the SmartSkin
24   reference anticipates the claims of the '607
25   patent and, Chris, let's put up claim 1 to use

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  as an example.
2      A.   All the claims of the '607 patent
3  require the use of these transparent layers.
4  There are no transparent layers, and there
5  certainly were none at that time, that had
6  conductivity such that you could make use of a
7  voltage-based sensing scheme.
8          Let's step back and let's look at
9  SmartSkin.  SmartSkin discloses a system that
10  uses copper.  That is the system in the videos.
11  That is the system in figure 2.  That is the
12  two embodiments that they actually discuss
13  within the SmartSkin reference.
14         Those are all opaque.  They all use
15  copper.  In future work, SmartSkin says one of
16  the directions that would be worth looking into
17  is the use of transparent electrodes.  There is
18  no disclosure of how that would actually
19  happen.  There is insufficient disclosure and,
20  in fact, for the very reasons I have mentioned,
21  it would not work.
22     Q.   So as I understand it, SmartSkin
23  discloses an enabling embodiment of a multiple
24  touch sensor, but it is copper; is that right?
25     A.   It is copper and it is not

1  transparent.
2      Q.   So it is not transparent.  So it won't
3  meet that portion of the preamble?
4      A.   It won't meet that portion of the
5  preamble and, in fact, in general, for all the
6  limitations requiring transparency, it does not
7  deliver those.
8      Q.   And with respect to an embodiment in
9  SmartSkin that uses ITO, what is your opinion?
10     A.   Well, my opinion is there is no
11  embodiment that uses ITO.  There is a
12  description of it as potential future work.
13  There is no disclosure of a transparent
14  capacitive sensing medium and all the other
15  requirements related to transparency associated
16  with any of the claims of the '607 patent.
17     Q.   Could a person of ordinary skill in
18  the art have built an ITO-based charge -- an
19  ITO-based sensing system using the disclosure
20  in SmartSkin?
21     A.   No, they couldn't, for the very
22  reasons I have indicated related to the
23  strength of the signal and the problems with
24  voltage sensing.
25     Q.   You were also asked some questions

1  about the disclosure of SmartSkin to the Patent
2  Office and I would want to just touch on that
3  briefly.  Chris, can we go up to JX-005.077.
4  This is the file history.
5          And you recall that this was the
6  information disclosure statement that was first
7  submitted by the inventors to the Patent
8  Office?
9      A.   Yes, I believe so.
10     Q.   Let's go to page 79 and 80.  Now, this
11  information disclosure statement, you can check
12  this, but there are 40 references that the
13  inventors disclosed to the Patent Office in the
14  first IDS.  Does that comport with your
15  understanding?
16     A.   Yes, I believe so.  And we can see
17  that because the last number is A40 on the
18  list.
19     Q.   And SmartSkin, the prior art reference
20  that Motorola is relying upon here, JX-367,
21  that is listed here as A26.  Is that true?
22     A.   That is the 26th on the list, A26.
23     Q.   Let's jump up to JX-1099 through 110.
24  I know you are not an expert in patent law, but
25  you have looked at file histories in the past,

1  have you not?
2      A.   I have.
3      Q.   At the bottom of this page, this is
4  the examiner's name.  Do you agree with that?
5      A.   Yes, it says his name is Kimnhung
6  Nguyen.
7      Q.   What does it say with respect to the
8  date considered?
9      A.   The date was listed as May 11th, 2008.
10     Q.   If we go back to 1100 here, let's pull
11  up the top.  Is there any question that the
12  Patent Office considered the SmartSkin
13  reference in allowing the claims?
14     A.   There is no question the examiner
15  clearly did.  We see the indication of a KN,
16  which would be the initials of Kim Nguyen, the
17  examiner right next to the A26 Rekimoto
18  SmartSkin reference.
19     Q.   Okay.  All right.
20         You were also asked some questions
21  about the Perski '455 patent.  Do you recall
22  that?
23     A.   I do.
24     Q.   Just for reference, Chris, let's pull
25  up RX-708.  Is this the Perski '455 patent that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1600

1  you offered opinions on?
2     A.   Yes, I believe so.
3     Q.   What does Perski '455 disclose with
4  respect to how it senses touches?
5     A.   The Perski '455 system discloses the
6  use of two methods, two broad methods of
7  determining the location of touches.  The first
8  method involves scanning node by node across
9  each intersection point, and it specifically
10  says that is slow.
11        And it goes on to --
12     Q.   I'm sorry.  Go ahead.
13     A.   And it goes on to disclose a faster
14  version.
15     Q.   Let's look at those individually.
16  Let's go to column 14, lines 20 through 43 of
17  Perski, RX-708.
18        Now, what is disclosed here with
19  respect to the number of procedures for
20  detection that are used in Perski?
21     A.   This is related to the node by node
22  detection method.  If you have a mesh that has
23  N rows and M columns, for example -- actually,
24  I said that wrong, we have N columns and M
25  rows, for example, you would end up having at

Page 1601

1  least N times M individual querying procedures.
2     Q.   And let me stop you and ask you to
3  read that into the record at line 31 of column
4  14 of Perski.
5     A.   Certainly.  The statement in Perski
6  that calls out the problem with this technique
7  is specifically at line, starting at line 31
8  where it says, "The disadvantage of such a
9  direct detection method is that it requires an
10  order of N times M steps, where N stands for
11  the number of vertical lines and M stands for
12  the number of horizontal lines.  In fact,
13  because it is typically necessary to repeat the
14  procedure for the second axis, so the number of
15  steps is more typically 2 times N times M
16  steps."
17     Q.   How does that relate if at all to
18  whether this embodiment of Perski can meet the
19  multi-touch limitation in the preamble of claim
20  1 of the '607 patent?
21     A.   In my cross-examination, it was
22  pointed -- I was actually pointed to the
23  sentence immediately after which said that this
24  method enables the detection of multiple finger
25  touches.  However, because of the slowness of

Page 1602

1  the method, it does not enable it at the same
2  time.
3     Q.   And then you said there was a second
4  embodiment disclosed in Perski?
5     A.   There is a second embodiment related
6  to a faster method disclosed after this method.
7     Q.   And let's go -- let's stay in column
8  14 and go to lines 44 through 56.  And this
9  says at the top of line 44, column 14 of
10  Perski, RX-708, "a faster approach is to apply
11  the signal to a group of conductors on one
12  axis."
13        Can you describe what is disclosed
14  with respect to this faster approach?
15     A.   Certainly.  With regard to this faster
16  approach, the idea within this section of
17  Perski is that you can group sets of conductors
18  and use those as a group in the scanning
19  methodology.
20        However, this particular method has a
21  problem that is called out specifically and, in
22  fact, it turns out it is the same problem of
23  the prior art in the '607 references and I
24  quote, reading from line 52, "however, this
25  method may lead to ambiguity on those rare

Page 1603

1  occasions when multiple touches occur
2  simultaneously at specific combinations of
3  locations, and the larger the groups, the
4  greater is the scope for ambiguity."
5        So this shows that in this system, if
6  you use the faster method, you are not able to
7  get multi-touch.  It does propose a third
8  version that is worth talking about as well.
9     Q.   Okay.  Why don't we just move down and
10  talk a little bit about the optimal approach
11  that is disclosed beginning at line 57 of
12  column 14 of Perski.  And what does it disclose
13  there?
14     A.   So this is the three sentences or the
15  three lines, the one sentence that appears as
16  the optimal approach is to combine the above
17  methods, starting with the faster method and
18  switching to the direct approach upon detection
19  of a possible ambiguity.
20        What does this mean?  In this case,
21  that means that if the system detects an
22  ambiguity, and it is not clear how it actually
23  does that, there is no explanation on how you
24  would detect an ambiguity using the faster
25  method.  If the faster method results in an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ambiguity, then, it says, switch to the direct
2    approach and do that, which means overall in
3    the case where you have the ambiguity, you end
4    up spending even more time.
5          This is an important point.  Perski is
6    really targeted at a single touch system that
7    can deal with both stylus-based detection and
8    finger-based detection.  It doesn't intend to
9    deal with multiple touches except on rare
10   occasions.
11         So in all three cases, if you have
12   multiple touches, either you are not able to
13   resolve them, that's the fast method, or it is
14   too slow, that's the slow method, or in the
15   optimal case, you are fast if you have a single
16   touch but the moment you have multiple touches,
17   you become slow.
18   Q.   Okay.  What type of sensing circuitry
19   is disclosed in Perski '455?
20   A.   Perski '455, as I discussed in
21   cross-examination, also uses voltage sensing.
22   The only -- the discussion in relation to this
23   embodiment only talks about the signals in
24   terms of the drive and sense signals and it
25   uses the same language to describe them, which

1    would mean their voltage signals, and the only
2    description of specific circuits is in relation
3    to another embodiment, and that is
4    unequivocally voltage sensing circuitry.
5    Q.   Let's just put up figure 5 of Perski
6    '455, RX-708.  What is shown in figure 5 of the
7    Perski '455 reference?
8    A.   The figure 5 of Perski '455 is the
9    sensing circuitry for another embodiment.  This
10   is not the mutual capacitance embodiment
11   involving rows and columns.  This is a
12   different embodiment.  And I believe this is
13   not what Dr. Wolfe has been referring to.
14         But this is the shown sensing circuit
15   for that embodiment and it is very clearly a
16   voltage sensing circuit.
17   Q.   Is it like the sensing circuit that we
18   have in CDX-31, the '607, or CDX-30, like the
19   SmartSkin?
20   A.   It is not like the sensing circuit of
21   CDX-31, the '607 patent.  You will notice there
22   is no capacitor connected across, which is the
23   key to implementing it as a charge counting
24   circuit.
25         Rather, it is a straight voltage

1    amplifier, similar to that of CDX-30,
2    SmartSkin.
3    Q.   So to summarize, what limitations in
4    claim 1 of the '607 patent do you believe are
5    missing from the Perski reference, '455?
6    A.   The Perski reference misses the
7    multi-touch limitations associated with the
8    preamble of the '607 patent.  It is either
9    unable to detect multiple touches in the fast
10   version or it is unable to do them at the same
11   time in the slow version.
12   Q.   You were asked some questions about
13   the Perski provisional '808 application.
14   That's RX-303.  Chris, can we put that up?
15         Do you recall this on your
16   cross-examination?
17   A.   Yes, I do.
18   Q.   We can do this quickly.  What type of
19   sensing circuitry does the Perski '808
20   provisional application disclose?
21   A.   The description is similar to that of
22   the main Perski.  There is, in fact, less
23   language provided than in the main Perski, but
24   there is no additional disclosure.
25   Q.   Is there any disclosure in the Perski

1    '808 provisional application of any type of
2    sensing circuitry that's different from the
3    voltage sensing circuitry in the Perski '455?
4    A.   No, there isn't.  In fact, there is
5    even less.
6    Q.   And you were also asked some questions
7    about the Morag provisional application, the
8    '662 application.  That's RX-703.  Let's put
9    that up.
10         Do you recall being asked questions
11   about this reference?
12   A.   I do.
13   Q.   Same question.  What type of sensing
14   circuitry does the Morag '662 provisional
15   application disclose?
16   A.   The Morag '662 provisional
17   application, within it and its figures and in
18   the text also only uses the same voltage
19   sensing techniques.  There is no additional
20   disclosure.
21   Q.   That's the voltage sensor similar to
22   the one in SmartSkin?
23   A.   Yes, it is.
24   Q.   Okay.  Is there any disclosure in the
25   Morag provisional '662 application of any other

APLNDC-X0000006457

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   type of sensing circuitry, besides the voltage
2   sensor?
3       A.   No, there isn't.
4           MR. FERGUSON:  Thank you, Your Honor.
5   I have nothing further.
6           JUDGE ESSEX:  All right.
7               RECROSS-EXAMINATION
8   BY MR. DeFRANCO:
9       Q.   Good afternoon, Doctor.
10      A.   Good afternoon.
11      Q.   Just to start, you were asked about
12  the IDS in the '607 patent prosecution history,
13  you were asked to point out the SmartSkin
14  reference.  You were shown the initial IDS
15  where it wasn't checked off, the references
16  weren't checked off and a later IDS where it
17  had been checked off.  You quickly went and
18  said those are the examiner's initials.  Do you
19  recall that?
20      A.   I recall that set of questions.
21      Q.   I believe we covered that exact
22  subject matter on direct examination.  I didn't
23  see anything on -- I'm sorry, on
24  cross-examination.  I didn't see you add any
25  information to that on redirect examination

1   compared to what we talked about on
2   cross-examination.  Did I miss something there,
3   sir?
4       A.   Well, there was one thing.  It pointed
5   out that there is only 40 references in that
6   initial one.
7       Q.   I actually thought we went over that,
8   but that was the point you wanted to bring out?
9       A.   Actually, I didn't ask the questions,
10  so I don't really know what the point was.  I
11  just answered the question.
12      Q.   Okay.  You spent some time, and I want
13  to turn to this in a moment, drawing the
14  distinction between two different measuring
15  techniques, I think you put it in general
16  terms, the voltage and a charge technique,
17  right?
18      A.   Correct.
19      Q.   Now, looking back at your expert
20  reports and your expert witness statement in
21  this case, your testimony you presented before
22  you came to testify, I didn't see any
23  detail on the distinction between these two
24  methods.
25          Do you recall any, sir?

1       A.   You mean discussing the specifics of
2   it?
3       Q.   Yes.
4       A.   No, I don't believe so.  I pointed out
5   in my deposition specifically and in my expert
6   reports why ITO was not a drop-in replacement.
7   It was related to this.
8       Q.   Right.  But there was no discussion of
9   the difference between these two techniques and
10  the detail about how they work and how in that
11  -- in your view or opinion, that impacts the
12  relevance of the prior art that we talked about
13  this morning?
14      A.   If you are asking me, did I do a
15  detailed circuit schematic like this, no, I
16  didn't.
17      Q.   You didn't discuss these, I don't
18  recall you discussing these topics at all, did
19  you, sir, in your direct witness statement?
20      A.   No, that's not true.  I did not
21  specifically talk about the schematics, but I
22  made clear that the big problem with SmartSkin
23  is it could not work because ITO would not be a
24  drop-in replacement.
25      Q.   Okay.  That's as far as you went in

1   your direct witness statement, isn't it, sir?
2       A.   Well, there was some discussion of it,
3   but that was the general gist of it.
4       Q.   That's as far as you went, isn't it,
5   sir?  Should we -- do you want to point us out
6   something more specific than that general
7   discussion?
8       A.   No, that was the gist of it, but it
9   was not just the one sentence.
10      Q.   Okay.  In terms of -- let's put up
11  claim 1, please.  Now, on cross-examination,
12  sir, you went through different pieces of the
13  preamble which you view as a limitation to
14  claim 1; is that correct?
15      A.   That's correct.
16      Q.   You took those a piece at a time; is
17  that right?
18      A.   In my answer -- in the redirect?
19      Q.   Yes, sir.
20      A.   Yes, that's correct.
21      Q.   And I believe, correct me if I am
22  wrong, I believe you said that in your opinion
23  this concept of the charge method for detecting
24  or sensing capacitance was set forth in the
25  preamble somehow or captured by the preamble

APLNDC-X0000006458

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  somehow?
2      A.   No, that's absolutely not what I said.
3      Q.   Okay.  So that then you will agree
4  that that charge method is not a limitation in
5  claim 1; is that fair?
6      A.   I agree it is not my point to say that
7  you need the charge method.  My point is to say
8  that the prior art could not meet the preamble.
9  What it enabled it to be met in '607 is the use
10  of the charge method.
11      Q.   Okay.  Fair enough.
12           So the claim does -- it is not limited
13  to one method or the other.  You agree with
14  that, right?
15      A.   You mean with respect to the sensor?
16      Q.   Yes.
17      A.   Yes, I agree.
18      Q.   All it says is it has to have
19  capacitive monitoring circuitry.  Is that
20  correct, sir?
21      A.   That's correct.  You are referring to
22  the operatively coupled limitation?
23      Q.   Yes.
24      A.   I agree.
25      Q.   And in general terms, the voltage

1  technique that you discussed in the prior art
2  is certainly capacitive monitoring circuitry,
3  isn't it, sir?
4      A.   With respect to the construction that
5  I have provided, yes, I believe it would meet
6  that, but it would not meet the requirements
7  then -- a system using that would not be able
8  to meet the requirements of the preamble, et
9  cetera.
10      Q.   Yes.  And that relates to your
11  interpretation of the ability of how quickly
12  that system could operate, that sort of thing;
13  is that correct?
14      A.   Well, not just the speed.  Also the
15  sensitivity.
16      Q.   Yes.  Those concepts, speed and
17  sensitivity of the patented system versus your
18  discussion of the prior art, there is no
19  discussion of that in the '607 patent.  Isn't
20  that correct?
21      A.   Actually, there is specific discussion
22  of sensitivity with relation to the importance
23  of resistance.
24      Q.   Right.  But that's with respect to the
25  charge method that's disclosed in the '607

1  patent.  Isn't that fair, sir?
2      A.   That's correct.  And that's why it
3  works with the charge method.
4      Q.   Let's turn to column 17 and 18 of the
5  '607 patent.  And if you could blow up the
6  bottom paragraph of the left-hand side, please,
7  and then put that next to -- make that a little
8  smaller, Ryan.  Just take a minute.
9           And then put next to that the first
10  three paragraphs on the other column.  Now, put
11  that to the left.  And why don't we -- it
12  refers there -- we're talking about figure 14.
13  Maybe you can put -- add figure 14 to that,
14  Ryan, and see how you can do with this.
15           Are you there at that portion of the
16  patent, sir?
17      A.   I am.
18      Q.   Let's talk about it a little bit while
19  that is coming up on your screen.  I think at
20  your deposition, you were asked to identify
21  portions of the specification that talked about
22  the circuitry that we're looking at here that
23  would implement the claimed invention.  Do you
24  recall that and you pointed to this part of the
25  specification?

1      A.   I think I pointed to this and also the
2  previous sections, but I believe this was the
3  section I pointed to.
4      Q.   Okay.  And this is where the figure 14
5  that describes the basic elements of the
6  circuitry in the '607 patent are set forth; is
7  that correct?  They are shown in figure 14?
8      A.   Part of them.  I mean, figure 14 also
9  refers back to the previous figures and
10  specifically that's figures 12 and 13.  It says
11  so explicitly.
12      Q.   Right.  Figures 12 and 13, the simple
13  amplifier circuit we looked at before, the
14  inverted amplifier, for example, sir?
15      A.   Yes, that's correct.
16      Q.   Okay.  Now, that's the detail of those
17  portions of the circuitry.  It is shown at that
18  piece of the specification; is that right?  Do
19  you see that?
20      A.   And there is the corresponding text
21  associated with it, yes, I agree.
22      Q.   There is no discussion there of any
23  particular algorithms that could be used to
24  implement the invention to avoid the shadowing
25  or the ability to sense two different touches

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1616

1   at the same time, is there, sir?
2       A.   No, I disagree.  There is other
3   sections, and I did talk about those in my
4   deposition.  There is flow charts, there is
5   actual figures showing the results in terms of
6   detecting the algorithms, and I specifically
7   discussed those.
8       Q.   Okay.  The flow chart, pretty general
9   flow chart.  What I am looking for, sir, there
10  is no mathematical algorithms or other
11  calculations or no specifics about the exact
12  techniques, the rates, the parameters, that the
13  inventors used in any device that they had
14  tested at this time, is there?
15      A.   I think I understand.  If you are
16  asking me, are they exact numbers or code, no.
17  What is provided are flow charts, and actual
18  results in terms of the analysis of data, then
19  that appears in figure 17.
20      Q.   You also mentioned ITO.  You went back
21  to ITO.  Do you recall that?
22      A.   We have been talking about ITO a lot
23  today.
24      Q.   You went back to one of the -- it is a
25  shame I will never need it again -- but you

Page 1617

1   also went back to one of the portions of the
2   specification we talked about on
3   cross-examination.  Do you recall that?
4       A.   I do.
5       Q.   Not to belabor the point, but some of
6   that section talked about some specific
7   measurements of the width; is that correct, of
8   the ITO?
9       A.   Yes, there were some numbers there.
10      Q.   There wasn't any more detail that
11  related to some of the other considerations we
12  talked about this morning like transparency or
13  resistivity; is that correct?
14      A.   That section did not.  The resistivity
15  of ITO is discussed, not in terms of numbers,
16  we're talking about the tradeoffs.
17      Q.   Numbers are important, aren't they,
18  sir?  If you were going to replicate an exact
19  device that somebody would make that proved
20  that it worked conceptually, numbers would be
21  important, wouldn't it?
22      A.   Actually, it turns out in the charge
23  sensing scheme, they are not that important.
24  That's why you can use ITO.
25      Q.   Somebody knowing ITO could be used

Page 1618

1   could do some experimentation, not undue
2   experimentation and make a working product,
3   correct?
4       A.   With respect to '607, that's correct,
5   because being the charge-based sensing, it is
6   not that sensitive to the resistance.
7       Q.   So the charge-based sensing is related
8   now to the transparency -- or the selection,
9   excuse me, of the ITO, the ITO that would be
10  suitable in this invention?
11      A.   That's what we have been saying, yes.
12  That's what I talked about, yeah.
13      Q.   And did you make that statement
14  specifically in your expert report or expert
15  witness statement?  What you just said, is that
16  set forth clearly in any of those materials?
17      A.   The statement that charge-based
18  sensing is specifically related to the
19  transparency was not explicitly called out.
20  However, I explicitly said that you couldn't,
21  in relation to prior art, that you could not
22  use ITO because it would not be a drop in
23  replacement because resistivity is extremely
24  important.
25      Q.   By the way, whether you are using the

Page 1619

1   voltage or charge method, you are still
2   measuring capacity; is that right, capacitance?
3       A.   You are being responsive to
4   capacitance.  If you are asking me, are you
5   actually directly measuring the capacitance,
6   no.  But certainly you are responding to
7   changes in capacitance.
8       Q.   Certainly one of skill in the art at
9   the time knew that ITO was more resistive than
10  copper for sure, right, obviously?
11      A.   Yes, I agree with that.
12      Q.   And I think you said it might have
13  been in response to His Honor's question that
14  one would have known about the amplifier
15  circuit that's shown in figure 13 that was in
16  the prior art as well?
17      A.   Yes, I agree.
18      Q.   Okay.  Also one skilled in the art
19  would know generally about these different
20  techniques that you gave us a bit of
21  information on before, the charge versus
22  voltage techniques in general terms for
23  measuring changes in capacitance?
24      A.   One would know that those equations
25  exist for relating capacitance to voltage and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1620

1  charge.
2     Q.   Okay.  Let's turn to, for a moment now
3  to the Perski reference, okay?  Now, your
4  opinion as to why Perski is not invalidating
5  prior art is because the system did not operate
6  quickly enough to be able to distinguish
7  between two touch points on the transparent
8  mutually conductive touchscreen disclosed in
9  Perski.  Is that fair?
10    A.   Either not fast enough or not without
11 ambiguity.
12    Q.   Okay.
13    A.   There is two possibilities, depending
14 on which version we're talking about.
15    Q.   Now let's go to the portion of Perski
16 that you testified about for a bit.  It is
17 column 14.  And then we will finish up.
18         Okay.  So this portion of column 14,
19 and I think if we start at line -- I don't want
20 to cut it off -- I think if we start at line 15
21 and go down to line 59, that that's the portion
22 of Perski, sir, that you relied upon to
23 distinguish it from the claimed invention.
24 That is the ability of the claimed invention to
25 be able to distinguish between two touch points

Page 1621

1  at one time; is that correct?
2     A.   This is the section we were
3  discussing.  I discussed various sections, but
4  this is the key section that we were discussing
5  earlier.
6     Q.   All right.  Now, you had some general
7  testimony about the failings of Perski to be
8  able to distinguish between two touch points.
9  Do you recall that?
10    A.   Yes.
11    Q.   And that's never explicitly stated in
12 Perski that it can't be done.  I just want to
13 make sure that's not your testimony.  There is
14 no sentence in here that says it can't be done;
15 is that true?
16    A.   Actually, I disagree.  It specifically
17 says at line 52 of the paragraph, of the
18 section you have up, "however, this method may
19 lead to ambiguity on those rare occasions when
20 multiple touches occur simultaneously at
21 specific combinations of locations.  And the
22 larger the groups, the greater the scope for
23 ambiguity."
24    Q.   Now, that says -- would you point to
25 anything else, sir?

Page 1622

1     A.   With respect to this section, that's
2  the only section.
3     Q.   Okay.  And it goes on to say that an
4  optimal approach is to combine the two previous
5  approaches.  Isn't that correct, sir?
6     A.   That's correct.  And I discussed that
7  as well in my redirect.
8     Q.   Now, Perski disclosed -- the method in
9  Perski, the equation, I think, is two times N
10 times M, meaning two times the number of rows
11 and columns.  That's the number of data
12 detection points that could be processed using
13 the Perski method; is that correct?
14    A.   That's the number of steps to get all
15 the data.
16    Q.   Okay.  Now, in your opinion, I take
17 it, it has got something to do with the voltage
18 method that would not be quick enough, you
19 couldn't do it quickly enough to make
20 measurements on a grid of that -- of a given
21 dimension to detect two different points of
22 touch?
23    A.   No, there is two levels to it.  First,
24 Perski itself says that the basic row, column,
25 scanning method, the N by M scanning method is

Page 1623

1  slow, and it says you should use the faster
2  approach.
3         But I do agree, in fact, that the only
4  method disclosed in Perski is voltage and,
5  indeed, with ITO, that is slow.
6     Q.   And in terms of the processing power,
7  you're not saying that there weren't chips,
8  DSPs, for example, that had processing power at
9  this point in time sufficient to process that
10 data in order to detect multiple touches?  Do
11 you understand my question?
12    A.   I do.  You are asking me the speed of
13 sensing out of the panel versus the processing
14 power.
15    Q.   Yes.
16    A.   I am not focused on the processing
17 power.  The slowness is the sensing of the
18 panel.
19    Q.   Okay.  There is no question at that
20 time that the circuitry, DSP or any other
21 circuitry that can be used to do the sensing
22 and the calculation to show that there were
23 multiple touches existed at that point in time?
24    A.   The DSP would not be the limiting
25 factor on the speed.  That's not what I am

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1624

1   claiming.  And there were DSPs available at
2   that time that would have had sufficient speed,
3   were the data available.
4        But the problem is this method doesn't
5   make the data available fast enough.
6        Q.   Okay.  This method being the voltage
7   sensing portion of the method?
8        A.   No, this method being the N by M
9   method of Perski.  You are right, voltage makes
10  things even slower but Perski itself says the N
11  by M method, which is the only method they have
12  in there that claims to be able to detect
13  multiple touches without ambiguity, that is the
14  only method in there that does that and it is
15  slow.  And it says so.
16       Q.   Okay.  If you didn't use the N by M
17  method, wouldn't you agree that if you just
18  used N, you measured the sense lines going
19  across using a sufficiently fast processor,
20  would that be able to detect multiple touches?
21       A.   No, it would not.  It still calls out
22  this method as being slow.  It is saying the
23  only way to get the -- the only fast method
24  that's disclosed with relation to this
25  embodiment is the grouping method.

Page 1625

1        Q.   Okay.  And in your opinion, the
2   grouping method is not sufficient to detect
3   multiple touches?
4        A.   That's correct.  Because it
5   specifically calls out that this method will
6   suffer from the ambiguity problems.
7        Q.   Okay.  Now, you haven't done any
8   calculations to see whether if you went away
9   from the two times N times M method, the
10  processing could still be fast enough, in your
11  opinion, to detect multiple touches, have you?
12       A.   I have done some calculations, but if
13  you are asking me, have I calculated what
14  specific times would be, and given some exact
15  numbers, no, I just calculated for typical
16  display sizes what the numbers would work out
17  to be.
18       MR. DeFRANCO:  One moment, Your Honor.
19  Thank you, Your Honor, that's all I have.
20       JUDGE ESSEX:  All right.  Staff, do
21  you have anything?
22       MS. KATTAN:  No, Your Honor.
23       JUDGE ESSEX:  All right.
24       MR. FERGUSON:  Nothing further, Your
25  Honor.  Thank you.

Page 1626

1        JUDGE ESSEX:  All right.  Very well.
2   Doctor, I think we're done with you
3   for this hearing anyway.  And thank you very
4   much for your testimony.  You are dismissed.
5        THE WITNESS:  Thank you, Your Honor.
6        JUDGE ESSEX:  Mr. Davis?
7        MR. DAVIS:  Your Honor.
8        JUDGE ESSEX:  Good afternoon.
9        MR. DAVIS:  Apple calls as its final
10  witness in its rebuttal case, Dr. Ravin
11  Balakrishnan.
12       JUDGE ESSEX:  Doctor, you may be
13  seated.  I would remind you, you have been
14  sworn earlier in this case and you are still
15  under oath.
16  Whereupon--
17            RAVIN BALAKRISHNAN
18  a witness, called for examination, having previously
19  been duly sworn, was examined and testified further as
20  follows:
21       THE WITNESS:  Yes, I understand.
22            DIRECT EXAMINATION
23  BY MR. DAVIS:
24       Q.   Dr. Balakrishnan, could you turn to
25  CX-568C in the volume 1 of your notebooks.

Page 1627

1        A.   Yes, I have it.
2        Q.   Is this your rebuttal witness
3   statement?
4        A.   Yes, it is.
5        Q.   And could you turn to page 156 of this
6   exhibit.  Is that your signature there, sir?
7        A.   Yes, it is.
8        Q.   Okay.  And does this witness statement
9   contain your answers to the questions contained
10  therein?
11       A.   Yes, it does.
12       Q.   Okay.
13       MR. DAVIS:  Thank you, Your Honor.  I
14  pass the witness.
15       JUDGE ESSEX:  Thank you.
16       MR. VERHOEVEN:  Good afternoon, Your
17  Honor.
18       JUDGE ESSEX:  Good afternoon.
19       MR. VERHOEVEN:  May I approach?
20            CROSS-EXAMINATION
21  BY MR. VERHOEVEN:
22       Q.   Good afternoon, Dr. Balakrishnan.
23       A.   Good afternoon.
24       Q.   I'm going to ask you some questions
25  about your opinions with respect to validity,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  invalidity, with respect to the '430 patent and
2  then my partner is going to ask you about the
3  '828 patent, just so you have some framework.
4     A.   Okay.
5     Q.   And, in particular, on the '430
6  issues, I am going to address two references
7  today.  So the first reference I am going to
8  address is the Malone '870 patent.
9        You have reviewed that patent?
10    A.   Yes, I have.
11    Q.   And could we put up RX-289 for the
12 record.  There we go.  So this is the Malone
13 patent, correct?
14    A.   Yes, it is.
15    Q.   And that's how I am going to refer to
16 it today, if that's okay, I am going to call it
17 the Malone patent.
18    A.   That's fine.
19    Q.   You understand the Malone patent
20 claims priority to an application dated June
21 30th, 1989?
22    A.   I believe so, yes.
23    Q.   And there is no issue here that
24 Malone, in fact, would be considered prior art
25 to the '430 patent; is that correct?

1     A.   I don't believe we made such an
2  assertion.
3     Q.   So you agree that's not an issue?
4     A.   True.
5     Q.   Okay.  And you understand that
6  Respondent, Motorola, has alleged that the
7  Malone patent is an anticipatory reference to
8  the '430 asserted claims?
9     A.   Yes, I do.
10    Q.   And Staff also believes that Malone is
11 an anticipatory reference?
12    A.   I believe that's true.
13    Q.   Okay.  And, finally, you also
14 understand, it is no dispute, that the Malone
15 patent was not considered by the examiner
16 during prosecution of the '430 patent?
17    A.   Yes, that's true.
18    Q.   Okay.  All right.  So let's briefly
19 just look at the Malone patent and go to the
20 issues with respect to it.  Can we go to slide
21 RDX-26.2.  And you have the patent in your
22 binder, correct, sir?
23    A.   Yes, I do.
24    Q.   So you can feel free to look at
25 context if you would like to.

1     A.   Sure.
2     Q.   On Malone '870, it has a background
3  section which is typical for patents, right?
4     A.   Of course.
5     Q.   And I have just displayed that on the
6  screen.  This is column 2, 54 through 61.
7  Background art, it says, "with the increasing
8  power of microprocessors, and of computers
9  generally of any given physical size, there has
10 been a widely recognized need for systems that
11 would permit users who lack sophisticated
12 programming skills to utilize this newly
13 available computational power for a wide range
14 of tasks."  And it talks about different
15 approaches in order to satisfy this need.
16       Do you remember seeing that?
17    A.   Yes.
18    Q.   And then it goes on to talk about a
19 summary of the invention or the invention here.
20 And I have just pulled up an RDX-26.3, a
21 portion from column 5, lines 35 through 45.
22       And here you see it talks about the
23 object lens system.  Do you see that?
24    A.   That's right.
25    Q.   And that's basically the system that's

1  disclosed in this patent, right, to deal with
2  this problem with the prior art, the object
3  lens system?
4     A.   That's what's disclosed in Malone,
5  that's right.
6     Q.   That's right.  And it says, "users of
7  the object lens system can create, modify,
8  retrieve, and display objects that represent
9  many physically or conceptually familiar things
10 such as messages, people, meetings, tasks,
11 manufactured parts, and software bugs.  The
12 system provides an interface to an
13 object-oriented database in the sense that,
14 one, each object includes a collection of
15 fields and field values, two, each object type
16 has a set of actions that can be performed upon
17 it, and, three, the objects are arranged in a
18 hierarchy of increasingly specialized types
19 with each object type inheriting fields,
20 actions, and other properties from its
21 parents."
22       Do you see that?
23    A.   Yes.
24    Q.   And then it continues, and I am just
25 trying to summarize so we have some perspective

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1632

1    here with the general technology, it continues
2    in the patent at column 7, lines 1 through 6,
3    and I have displayed this on slide 26.4, "if an
4    object satisfies the criteria specified in a
5    rule, the rule performs some specified actions.
6    These actions can be general actions such as
7    retrieving, classifying, mailing, and deleting
8    objects or object-specific actions such as
9    loading files or adding events to a calendar."
10        Do you see that?
11   A.   Yes, I do.
12   Q.   So what the Malone system is talking
13   about is an object-oriented system, right?
14   A.   That's right.
15   Q.   You have objects that are based on
16   rules that are specified, right?
17   A.   Sure.
18   Q.   And these objects can do things like
19   retrieve, they can classify, they can mail,
20   they can delete, all kinds of different things,
21   right?
22   A.   They can do those things that are
23   stated there, yes.
24   Q.   And then, for example, if a user uses
25   an object to retrieve something, such as a

Page 1633

1    component, using the object lens system, then
2    there is also a range of actions that can be
3    performed on that object under the Malone
4    patent, right?
5    A.   If a user retrieves an object, it
6    could -- they could then use the system to
7    perform some actions on those objects.
8    Q.   Okay.  Now, if we can go to the next
9    slide, this is RDX-26.5.  What I have done, I
10   think Mr. DeFranco referred to this as a slide
11   within a slide.  This is one, too.  I have just
12   depicted your slide from your witness
13   statement, CDX-8.017.
14        Do you remember this?
15   A.   Yes, I do.
16   Q.   And this is a chart you created to
17   summarize your opinions with respect to this
18   reference, correct, sir?
19   A.   I believe so, yes.
20   Q.   And what we have on the left column,
21   you have just recreated verbatim the language
22   from claim 1 of the '430 patent, correct?
23   A.   That's right.  That's the claim
24   language, yes.
25   Q.   And you have put -- you have

Page 1634

1    highlighted in red the claim language that you
2    believe is not anticipated by Malone; is that
3    correct?
4    A.   The stuff in red, that's correct, yes.
5    Q.   And just in case there is any doubt,
6    you put a big red X on top of it, too?
7    A.   Sure.
8    Q.   Okay.  So I take it from this that the
9    things that are not in red, you did not contest
10   that those things are disclosed in the Malone
11   reference, right?
12   A.   That's right.  Elements A, B, and C,
13   in particular, yes.
14   Q.   So you don't contest that Malone
15   discloses a computer implemented method with
16   one or more properties to an operating system
17   active on a computer with a memory, correct?
18   A.   I contest the portion about
19   dynamically adding support for hardware or
20   software components to an operating system.
21   Q.   That's why I didn't read that part.
22   So I understand the stuff in red you contest.
23   My question is the stuff that's in black in the
24   preamble, and I will read it into the record
25   one more time, that you don't contest, let me

Page 1635

1    read it, "a computer-implemented method with
2    one or more properties to an operating system
3    active on a computer with a memory."  Those
4    elements that are not in red from the preamble,
5    it is correct you do not contest that those can
6    be found in the Malone reference, correct?
7    A.   The "to an operating system" portion
8    is in element D, which I have indicated we are
9    contesting.
10   Q.   Sir, I want to establish for the
11   record whether or not you contest the language
12   in the preamble I just read is disclosed in
13   Malone?
14   A.   I'm contesting the to an operating
15   system portion is not disclosed in Malone, as I
16   have indicated, in element D which mirrors the
17   same language.
18   Q.   I am asking you what you don't
19   contest.  Let me just try one more time.
20   A.   Okay.
21   Q.   I am reading the black language that
22   you have not X'd out in the preamble.  Do you
23   understand what I am doing?
24   A.   Yes, I do.
25   Q.   Let me just say it this way.  The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   black letters in the preamble that are not in
2   red on your slide, with respect to those
3   elements, you do not contest they are found in
4   Malone, right?
5       A.   That's correct.  Except I am saying
6   that the to an operating system portion is
7   actually handled in element D, which we are
8   contesting, so that's the clarification I am
9   trying to make here.
10      Q.   Then if we go to 1A, it says,
11  specifying the target hardware or software
12  component search criteria, including one or
13  more properties.
14           You do not contest that that element
15  is found and disclosed in the Malone '870
16  patent, correct?
17      A.   Element A, no, I do not contest that.
18      Q.   And for element B, querying the
19  operating system to identify one or more
20  hardware or software components that meet the
21  target hardware or software component search
22  criteria, you do not contest that element B of
23  claim 1 of the Malone '870 -- let me withdraw
24  that question.
25           You do not contest that element B of

1   claim 1 of the '430 patent is found in the
2   Malone '870 patent?
3       A.   That is correct, yes.  I will just
4   note that I think that's a typo.
5       Q.   There is a typo.  Can you point it out
6   for His Honor?
7       A.   Just on the heading of the slide, it
8   says, claim 1:  Malone '870.  It should be the
9   '430 patent's claim 1, with respect to the
10  Malone patent.
11      Q.   Lucky for me that's your slide and not
12  mine?
13      A.   It is a typo.
14      Q.   To be clear, the left-hand column is
15  claim 1 of the '430?
16      A.   That's correct.
17      Q.   And you are applying Malone to claim 1
18  of the '430 in CDX-8.17?
19      A.   That's correct.
20      Q.   You do not contest that element B of
21  '430 is disclosed in Malone '870?
22      A.   Element B, that's right.
23      Q.   And if we go to element C, "returning
24  hardware or software components meeting the
25  target hardware or software component search

1   criteria," element C of claim 1 of the '430,
2   you also do not contest is present and
3   disclosed in Malone '870, correct?
4       A.   That is correct, yes.
5       Q.   And then in element D, you only
6   dispute the red -- the elements -- withdraw the
7   question and let me try one more time.
8            With respect to element D of the '430,
9   you are only contesting the limitations within
10  element D that you have indicated in red on
11  this slide, correct?
12      A.   Sure.
13      Q.   Okay.  So basically, if you look at
14  the preamble in element D, what you are
15  contesting is the adding support element; is
16  that right?
17      A.   Adding support for hardware, software
18  components to the operating system, right.
19      Q.   Now, during your first session when
20  you appeared here, we discussed the claim
21  construction as well as the non-infringement
22  issues.  Do you remember that?
23      A.   Yes, I do.
24      Q.   And I am not going to go into that
25  again and repeat it, but one of the subjects

1   that we discussed relatively extensively was
2   the appropriate meaning of the phrase adding
3   support.  Do you remember that?
4       A.   Yes, I do.
5       Q.   And your opinion is that the
6   appropriate construction of adding support for
7   hardware or software components to the
8   operating system is facilitating access to
9   hardware or software components; is that right?
10      A.   That is correct.
11      Q.   And your understanding of facilitating
12  access is that it means to -- enabling other
13  software applications or software elements in
14  the system to be able to access those hardware
15  and software components, right?
16      A.   Via the operating system, that's
17  right, that's the context I am using here.
18      Q.   Okay.  So when we're looking at Malone
19  '870 to see if it meets this element, you would
20  agree the appropriate test is to ask that
21  question, does Malone disclose functionality
22  that facilitates access or enables other
23  applications or software in the system to be
24  able to access hardware or software components,
25  fair?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Through the operating system, in that
2 the adding support, as the claim language
3 clearly says, is adding the support to the
4 operating system.  So not to something else,
5 for example.
6    Q.   But when we're thinking about this
7 word adding support to the operating system,
8 your construction is just to look to see if it
9 facilitates access to hardware or software
10 components, right?
11    A.   The adding support portion, yes, but
12 obviously the whole element of claim D is
13 adding support to the operating system.  So the
14 to the operating system is an important part of
15 this.
16    Q.   You don't think adding support to the
17 operating system requires any software in the
18 operating system, right?
19    A.   It doesn't have to be software per se,
20 no.
21    Q.   You think it could just be a link?
22    A.   It could be a link in a structure that
23 is handled and accessed by the operating
24 system, yes.
25    Q.   Do you think it could be a change in a

1 variable in the operating system, right?
2    A.   It could be some data in an
3 appropriate data structure in the operating
4 system that's changed to enable that access,
5 yes.
6    Q.   So this element will be met if some
7 change in data structure in the operating
8 system happens as a result of these steps?
9    A.   Change in a data structure in the
10 operating system in a structure that is
11 enabling that kind of access to hardware and
12 software within the operating system, yes.
13    Q.   One second, Your Honor.  I am going to
14 skip over some things.  Can we go to RDX-26.14.
15 So let's go look at what Malone discusses
16 focusing in on this adding support element.  It
17 seems to be the one that is the sole element
18 being disputed.
19       So I have put on the screen from
20 RX-289, the Malone patent, column 23, lines 29
21 through 35.  Do you see that up there on the
22 top right?
23    A.   Yes, I do.
24    Q.   And it says, folders are containers
25 and are one of the most powerful features of

1 object lens.  Like thing, users can create
2 instances of folder.  The most important
3 attribute of folders is that they contain a
4 field which contains a list of links to other
5 objects.  Folders also have a type of object
6 that they prefer to contain.  The user is asked
7 to identify this type when a new folder is
8 created.  Finally, folders can also have a
9 selection rule which can be used as a kind of
10 agent on special assignment to collect objects
11 to put into the folder.
12       Do you see that?
13    A.   Yes, I do.
14    Q.   Then the second box, and this is
15 column 6, lines 57 through column 7, line 9,
16 and I am only going to read the highlighted
17 part of this box says, "users of the object
18 lens system can create rule-based agents that
19 provide specifications for processing
20 information automatically on behalf of their
21 users.
22       "When an agent is triggered, it
23 applies a set of rules to a specified
24 collection of objects.  If an object satisfies
25 the criteria specified in a rule, the rule

1 performs some specified action.
2       "These actions can be general actions,
3 such as retrieving, classifying, mailing, and
4 deleting objects or object-specific actions
5 such as loading files or adding events to a
6 calendar.
7       "The agents in object lens are
8 autonomous in the sense that once they have
9 been created, they can take actions without the
10 explicit attention of a human user."
11       Do you see that?
12    A.   Yes, I do.
13    Q.   So in the object lens system described
14 here in the Malone patent, once an object is
15 identified by an agent, there is a large
16 variety of actions that can be performed on the
17 object, correct?
18    A.   Well, a large variety that are within
19 this object lens system, yes.
20    Q.   The object could be retrieved,
21 correct?
22    A.   Within this object lens system, yes.
23    Q.   It could be retrieved and then put
24 into a folder, correct?
25    A.   Within the system, yes.

APLNDC-X0000006466

1    Q.   And that would enable access to
2  whatever object is put into that folder,
3  correct?  In other words, other components
4  would then -- who had access to that folder
5  would then have access to that new object that
6  got put into that folder?
7    A.   Other components within this
8  rule-based object-oriented object lens system,
9  yes, nothing to do with the operating system.
10   Q.   Nothing to do with the operating
11 system.  Okay, we will come back to that in a
12 second.
13        Glad you mentioned that.  We will come
14 back to that.
15        Similarly, this description indicates
16 an object could be loaded.  You could use one
17 of these rules to automatically load an object,
18 right?
19   A.   Sure.
20   Q.   And loading an object, if you had a
21 rule that says if X happens, I want you to load
22 this object, because I want to have access to
23 it if it happens, that would enable access to
24 that object, wouldn't it?
25   A.   It simply says load the object.  It

1  doesn't say whether there is access to it after
2  that.
3    Q.   Yeah, but if I set up one of these
4  folders and used some rules and used an
5  automatic agent, and said, I want you to look
6  for new e-mails and if there is a new e-mail, I
7  want you to move a link to it into a folder I
8  have especially created for myself, that
9  functionality is enabled and disclosed by
10 Malone, right?
11   A.   With the kind of rule that you
12 explained?  Yes.  And within this object lens
13 system, absolutely.
14   Q.   And that would be done in part through
15 a link, wouldn't it?
16   A.   In the example you said, the link is
17 to an e-mail, I believe, you said, in another
18 folder, yes.  But the link is in the folder at
19 the object lens system, yes.
20   Q.   And you admit that if we were to
21 perform -- if we were to take an e-mail
22 example, that that would involve the operating
23 system, wouldn't it?
24   A.   No, it doesn't involve the operating
25 system.  There is no support added for that

1  e-mail within the operating system.
2    Q.   Well, wouldn't you agree that
3  retrieving e-mail involves a system-level call
4  to the operating system?
5    A.   Retrieving e-mail?
6    Q.   Yeah.
7    A.   No, I don't think so, necessarily.  It
8  depends on how you define a system level call.
9    Q.   So it is your testimony that
10 retrieving from a mail system -- let me
11 withdraw the question.
12        Let's take a mail system using this
13 object lens, part of it has a mail system,
14 okay?  And it goes ahead and retrieves mail
15 from a server.  Wouldn't that involve the
16 operating system, sir?
17   A.   It might involve the operating system
18 in that the server may be, you know, managed by
19 an operating system, yes, but the act of the
20 mail supporting that e-mail is not within the
21 operating system per se.
22   Q.   It would require the use of a mailer
23 daemon, right?
24   A.   Depending on the e-mail system, it
25 could require a daemon.

1    Q.   And that's a system level call, right?
2    A.   A daemon is typically a system level,
3  yes.
4    Q.   I'm sorry?
5    A.   A daemon would typically be at the
6  system level.
7    Q.   Operating system level?
8    A.   Sure.
9    Q.   Okay.  Let's go to another portion of
10 Malone.  This is slide RDX-26.15.  And I am
11 displaying column 8, lines 13 through 31.
12        And here there is a little heading at
13 the top of this paragraph, "automatic agents
14 for searching and manipulating networks."  Do
15 you see that?
16   A.   Yes.
17   Q.   This is another section you reviewed
18 for Malone to form your opinion, right?
19   A.   Sure.  Reviewed all of Malone, yes.
20   Q.   And it says, "in addition to
21 summarizing the contents of semi-structured
22 objects, the system can use their structure to
23 perform even more powerful automatic options
24 such as searching and restructuring."
25        Do you see that?  Then it says, "The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    object lens system uses rule-based agents to
2    perform these automatic actions.  For example,
3    figure 20 shows an agent that maintains a
4    folder of overdue tasks.  Every night at
5    midnight, this agent is automatically triggered
6    and searches the all tasks folder," what does
7    that say, "a system-maintained folder that
8    contains all task objects to the local
9    workstation.  When the agent finds tasks whose
10   due date has passed, it moves them into the
11   overdue tasks folder."
12        Do you see that?
13   A.   Yes, I do.
14   Q.   So this is an example where there is a
15   system maintained folder, correct?
16   A.   That's right, an object lens system
17   maintained folder, yes.
18   Q.   System, meaning the operating system?
19   A.   No, I don't believe so.  It is
20   referring here to the object lens system as far
21   as I can tell.
22   Q.   Well, it says the system, doesn't it,
23   sir?
24   A.   It does say system within the context
25   of a paragraph describing the object lens

1    system.
2    Q.   It doesn't say application, it says
3    system?
4    A.   It says system within that context,
5    yes.
6    Q.   And this is describing a system
7    maintained folder that is automatically
8    searched every night, right?
9    A.   It searches the all task folder within
10   this object lens system, yes.
11   Q.   Automatically every night, right?
12   A.   That's what the agent is doing, yes.
13   Q.   And it determines whether some tasks
14   are overdue, right?
15   A.   That's right.
16   Q.   And if the tasks are overdue, it
17   automatically moves them from this folder to
18   another folder, right?
19   A.   If the task's due date has passed and
20   you call it overdue, which is probably okay, it
21   moves it from the all task folder to the
22   overdue task folder within this system, yes.
23   Q.   And a person of ordinary skill in the
24   art would know one way to do that is to use a
25   link, right?

1    A.   One way to do that would be to copy
2    it, which says here it moves them, so I am
3    assuming here that it actually moved the file
4    as opposed to creating a symbolic link, for
5    example.
6    Q.   A person of ordinary skill in the art
7    when you say copy, oftentimes they are just
8    referring to a pointer, right?
9    A.   If you are copying as opposed to
10   creating a symbolic link, it would be actually
11   copying, moving the data over.
12   Q.   Well, another way to do it is to have
13   a pointer, right?
14   A.   That would not be copying.  You would
15   be creating a link to it, yes.
16   Q.   And one way to do this would be to
17   create a link, right?
18   A.   Then it would not be moving it.  It
19   would be creating a link.
20   Q.   Okay.  Moving it is actually more
21   substantial functionality than just having a
22   pointer, right?
23   A.   Not necessarily.  Moving really just
24   means I am copying the bytes over and having a
25   pointer is a different construct.  It is one

1    where you have a link, a piece of data that
2    indicates where the data -- the other data is.
3    It is pointing to that data.  I don't think one
4    is necessarily more complex or difficult
5    construct, the word you used, than the other.
6    Q.   Now, you would agree that by virtue of
7    this functionality disclosed here on column 18,
8    lines 19 through 31, that what's going on here
9    is that overdue tasks are being collected and
10   tracked by the system, aren't they?
11   A.   What is going on here is the agent is
12   automatically at midnight at every night, it is
13   automatically triggering this rule that goes
14   out and looks in this all tasks folder, this
15   particular folder, which is an object lens
16   system maintained folder, and then when it
17   finds tasks in that folder where the due date
18   has passed, it moves them to the overdue task
19   folder.  That's exactly what it says.
20   Q.   And it is an ongoing operation, it is
21   not just a one time deal, it happens every
22   night?
23   A.   It happens once a night, it looks
24   like, yes.
25   Q.   Okay.  So fair to say that using this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1652

1    functionality, overdue tasks are being tracked
2    by the system automatically?
3      A.   I think that's an interpretation you
4    are putting on top of it.  I think this is a
5    very simple thing.  It is every night.  It
6    basically runs this rule within this object
7    lens system that looks for files, it does a
8    very simple comparison.  If the due date has
9    passed, i.e., it is now past that date, it
10   moves it to the overdue task folder.  Is that
11   tracking?  I think tracking may involve more
12   complex things.
13     Q.   A task could be a component?
14     A.   It is a task object.  It doesn't say
15   what it is.
16     Q.   Task object is a software component
17   under the '430 patent, right?
18     A.   It could be a software component.
19     Q.   And this is describing tracking and
20   providing access to task objects, correct?
21     A.   It is not talking about tracking
22   per se.  I don't see that.  It is talking about
23   moving those objects from one folder to the
24   other, if it meets a particular rule, and that
25   rule is that the due date has passed, and it

Page 1653

1    does this every midnight and it is doing it in
2    this object lens system.
3           So I think it is a very simple thing
4    that it is doing.
5      Q.   It is facilitating access to overdue
6    tasks, correct?
7      A.   It is -- it is doing what it is doing.
8    It is moving tasks that are overdue from one
9    folder to another folder within this object
10   lens system.
11     Q.   It is automatic technology that helps
12   a user and facilitates the ability for a user
13   to have access to tasks that the user is
14   supposed to perform that are overdue?  That's
15   what it is describing, isn't it?
16     A.   No, it is describing moving things
17   from one folder to another folder based on the
18   rule.  It doesn't say I am facilitating
19   anything to the user.  It is just a simple move
20   from one folder to another.
21     Q.   Well, but if I am a user and I am
22   using this object lens system, and say I read
23   this and I say, whoa, that's a great idea, I am
24   always delinquent on my tasks, I am going to
25   set this up because I want to know when these

Page 1654

1    particular software components, i.e., task
2    objects that are overdue, I want to know when
3    they occur, this system is facilitating and
4    giving me the ability to access better than
5    before those overdue software components, those
6    overdue task objects, right?
7      A.   I'm sorry for interrupting you there.
8      Q.   No problem.
9      A.   So I don't see this as doing any
10   better.  It has just moved a bunch of folders
11   over -- sorry, a bunch of tasks over from one
12   folder to another.
13          So how is it enabling better access?
14   I think is something like what you said.  I am
15   not sure it is better access.  It is just
16   putting it in another folder that I can then
17   look at and I could have looked at it in the
18   old task folder as well.
19     Q.   So you don't think that's helping a
20   user who has expressed an interest in being
21   reminded of overdue tasks, you don't think that
22   is facilitating access to the software
23   components there?
24     A.   I think it is helping the user.  I
25   don't know that it is facilitating access to an

Page 1655

1    operating system or adding support to an
2    operating system, if that's what you are
3    getting at.  This is a completely different
4    thing.  It is within this object lens system.
5      Q.   Let's move on to RDX-26.16.  This is
6    another excerpt from Malone '870 patent, in
7    particular, RX-289 at column 11, lines 6
8    through 17.
9           It says, "in some cases, agents can
10   take actions automatically on behalf of their
11   users.  For instance, figure 4 shows an example
12   of a simple agent designed to help a user
13   process incoming mail.  When an agent is
14   triggered, it applies a set of rules to the
15   collection of objects in a folder.  The agent
16   in figure 4 is applied to objects in the new
17   mail folder and is triggered by the arrival of
18   new mail.  That is, when mail is retrieved to
19   the workstation, the mail program automatically
20   inserts links to the new messages into the
21   user's new mail folder and these new links
22   trigger the agent.  In the current version of
23   object lens, two other kinds of automatic
24   triggers are available:  Daily to midnight and
25   on the hour."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Do you see that?
2    A.   Yes, I do.
3    Q.   In this example, whenever a new mail
4  is received from the server, a link is created
5  between the new mail objects and the new mail
6  folder, correct?
7    A.   Just give me one moment to reread this
8  paragraph if you don't mind.  Yes, it puts
9  links in the user's new mail folder to those
10 messages, yes.
11   Q.   And new mail objects, those are
12 software components under the '430 patent,
13 right?
14   A.   New mail objects, yeah, they could be
15 software components, sure, except they are not
16 in the operating system.
17   Q.   So under this system, the system looks
18 for new software components that are received
19 at the system level, at the operating system
20 level by the server, and if it finds them, it
21 creates a link, correct?
22   A.   It is not objects that are received at
23 the operating system level.  This is received
24 in the mail, in the mail folder, and then it
25 makes the links.  This has nothing to do with

1  the operating system per se.  The stuff arrives
2  in the mail folder, but the mail program
3  handles that.
4    Q.   The new mail that comes in through the
5  server goes through the operating system,
6  doesn't it, sir?
7    A.   It doesn't necessarily go through the
8  operating system.  The mailer takes care of
9  putting it in the new mail folder.
10   Q.   You mean the mailer daemon?
11   A.   The mailer daemon, that's right.
12   Q.   Which is part of the operating system?
13   A.   The mailer daemon is running within
14 the operating system, as I said earlier.
15   Q.   And this link facilitates access to
16 this new mail, doesn't it, to these new
17 software components?
18   A.   These links facilitate access to those
19 messages, those new messages that have been put
20 into the new mail folder.
21   Q.   All right.  Let's go to -- back to the
22 '430 patent.  I am displaying RDX-26.17.  This
23 is an excerpt from the '430 patent.  I am
24 displaying, for the record, JX-1 at column 12,
25 66 through column 13, line 7.

1    I am also displaying figure 9 and a
2  description of figure 9 at column 2, lines 26
3  through 27.  And I will just walk through this
4  for the record.
5    The bottom box says, figure 9 is an
6  illustration of a smart folder in accordance
7  with a preferred embodiment.  Do you see that?
8    A.   That's right.
9    Q.   Now, you contend that the smart folder
10 that's being illustrated here is an embodiment
11 of claim 1 of the '430 patent, right?
12   A.   That's right.  It is an embodiment of
13 claim 1.  Especially claim 1, elements A, B,
14 and C, and because you have this structure
15 called the object-oriented system locator
16 system, that the '430 patent is all about, that
17 enables this sort of smart foldering.
18   Q.   So the answer is yes, you think figure
19 9 is an embodiment of claim 1 of the '430
20 patent?
21   A.   It is an embodiment in particular of
22 claim 1, elements A, B, and C, in particular.
23   Q.   So you don't believe it is an
24 embodiment of element D?
25   A.   I believe the '430 patent as a whole

1  enables this smart folder embodiment and, you
2  know, given that, and if you had such a system
3  that adds support to the operating system, you
4  could build a smart foldering system like this
5  that may include adding support to the
6  operating system, but this particular one may
7  or may not directly embody claim D necessarily.
8    Q.   Is it --
9    A.   I'm sorry, element D.
10   Q.   I put text on the screen that I read
11 into the record.  Do you see the text?
12   A.   Yes, a preferred embodiment.
13   Q.   You read it, right?
14   A.   That's right.
15   Q.   And you have seen this figure, figure
16 9?
17   A.   Yes, I have.
18   Q.   All right.  I am asking you just about
19 what's on the screen for purposes of this next
20 question.  Are you with me?
21   A.   Okay.
22   Q.   Does what we have got exhibited on the
23 screen constitute an embodiment of claim 1 of
24 the '430 patent, sir?
25   A.   It is one embodiment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1660

1      Q.   Thank you.  So that means in your
2  opinion that this discloses the elements of
3  claim 1 of the '430 patent, right?
4      A.   I think it discloses explicitly
5  elements A, B, and C of the '430 patent.  It
6  doesn't explicitly disclose element D, which is
7  adding support for the hardware and software
8  component to the operating system.
9          Now, the overall structure of the '430
10  patent, the locator system, that, the system
11  itself has the ability to add support to the
12  operating system.  So within that context, the
13  smart folder would work within that context.
14          MR. VERHOEVEN:  One second, Your
15  Honor, if I may.
16  BY MR. VERHOEVEN:
17      Q.   Let's go through the highlighted text
18  in the text box.  It says, "the smart folder
19  then invokes the locator and requests
20  particular documents containing the desired
21  attributes to be collected in the folder."
22          Actually, let me back up because
23  that's in the middle of the discussion.  For
24  the record, I will start at the top.  "Figure 9
25  is an illustration of a smart folder which uses

Page 1661

1  a locator to organize documents, graphic
2  objects, folders, et cetera, which a user is
3  interested in collecting together."
4          So can you explain to His Honor what
5  is that first sentence describing?
6      A.   What that is describing, Your Honor,
7  is that it is a folder much like any folder
8  that you would see on your desktop system like
9  your MacIntosh or Windows system.  And within
10  that there is a locator, a mechanism that's
11  described in the '430 patent to retrieve, to
12  search by properties, to find documents,
13  graphic objects, folders, et cetera, which the
14  user may be interested in collecting together.
15          And what that locator does is goes out
16  and does that search and pulls these objects
17  and puts it in this folder which it is calling
18  a smart folder because it kind of does this on
19  an ongoing, automatic basis.
20      Q.   Okay.  Now, isn't this functionality
21  of monitoring and then going out and moving
22  things into a smart folder the same thing we
23  just looked at in Malone, sir?
24      A.   Not exactly, because this
25  functionality, smart folder functionality in

Page 1662

1  the '430 embodiment is working within the
2  object-oriented system locator framework
3  described in the '430 patent that is all about
4  searching by properties, going out and querying
5  and looking for objects, i.e., components,
6  hardware or software components that match
7  those properties, returning them, and then
8  crucially adding support for those hardware and
9  software components to the operating system,
10  not just putting it in the folder.  That
11  doesn't add support to the operating system.
12          It is just putting it in the folder in
13  this case.  But the context here is working
14  within this broader framework.  In the Malone
15  reference, it is a separate system that doesn't
16  involve the operating system directly.  It is
17  what they call, if I recall the language
18  specifically, it says the object lens system
19  which is a separate system that is specifically
20  designed for this sort of foldering, but does
21  not add support to the operating system once it
22  finds a particular object or document or a
23  folder.
24          It simply puts those things in a
25  folder and then doesn't add support.  And the

Page 1663

1  crucial difference there is adding support for
2  those components, once it has been found.  And
3  that's the difference between the overall
4  framework here --
5          JUDGE ESSEX:  Can you give me an
6  example what support is added when it puts
7  something like this -- is it software that is
8  now part of the operating system?
9          THE WITNESS:  In this case, the
10  software is not necessarily part of the
11  operating system.  So say, for example, it
12  found one of the things it is looking for is a
13  piece of software.
14          It finds it through a search for
15  properties, for example, and it brings it back
16  up, because it returns it as a component, a
17  software component, and puts it in the folder.
18          And that act of putting in the folder
19  itself doesn't necessarily mean I am adding it
20  to the operating system or adding support for
21  it to the operating system, by just putting it
22  in the folder.
23          But now within the context of the '430
24  patent, the '430 patent has the capability to
25  add support for that component, should it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    desire to, to the operating system.  But the
2    Malone patent, Malone reference doesn't talk
3    about adding that support to the operating
4    system.
5        JUDGE ESSEX:  Go ahead.
6    BY MR. VERHOEVEN:
7        Q.   Can you show me -- you are saying this
8    doesn't disclose adding support to the
9    operating system, figure 9?
10       A.   It doesn't directly do that, no.
11       Q.   What about any of the embodiments in
12   the patent, can you show me a particular
13   embodiment in this patent, in the '430 patent
14   in the specification that expressly discloses
15   adding support as you claim to the "operating
16   system"?
17       A.   There is no specific embodiment.  The
18   embodiments, as I understand it, don't have to
19   explain every single element in the claim
20   necessarily.  They are just examples.
21       Q.   So you can't point me to a single
22   embodiment that does what you just said?
23       A.   As an embodiment?  No, not in the --
24   not in the patent.
25       Q.   And if you look at the actual examples

1    that are contained in the specification of the
2    '430 patent that talk about the phrase
3    "preferred embodiment" like figure 9, they
4    don't expressly disclose what you are saying,
5    some specific connection to a specific
6    operating system, do they?
7        A.   It doesn't specifically disclose in
8    the embodiment the notion of adding support to
9    the operating system for that component, but
10   you have got to remember that this system, the
11   entire object-oriented system locator system is
12   designed to add that support.
13       So it is not just about the embodiment
14   expressly disclosing it.  Whereas the Malone
15   reference doesn't talk about adding support to
16   the operating system at all.
17       Q.   Even though you can't point to a
18   single example of the many examples in this
19   patent that describe the preferred embodiment
20   in which there is any discussion of this
21   functionality you are talking about,
22   specifically pointing to adding support to the
23   operating system, is that your testimony?
24       A.   It doesn't directly expressly say
25   that.  Like it doesn't say, you know, support

1    is now added to the operating system if that's
2    the words you are looking for.
3        Q.   Now, if we focus on this ostensibly
4    preferred embodiment, figure 9, the
5    functionality described in the text here in
6    figure 9 is all disclosed in Malone, isn't it,
7    sir?
8        A.   You are talking about the text above?
9        Q.   That's right.  In other words, Malone
10   talks about folders that have similar
11   functionality, doesn't it?
12       A.   One key difference is that this smart
13   foldering in the figure 9 example of the '430
14   patent is being done with a locator that is
15   within the structure of the '430 patent's
16   invention.  It is a locator within the system
17   locator system that is designed to then add
18   support to the operating system, whereas in
19   Malone, from what you have shown me so far and
20   what I have read, it is a rule.  It has nothing
21   to do with -- it is a rule-based system.  It is
22   making a new rule that is doing those searches
23   and putting it in a folder without adding
24   support to the operating system.
25       Q.   You keep saying supports the operating

1    system.  Where is that disclosed in figure 9?
2        A.   It is disclosed in that the locator is
3    within this object-oriented system locator
4    system.  That's the structure I am talking
5    about.  That's one difference in that the
6    locator here is a different -- is not exactly
7    the same thing as the rules that are being used
8    in the Malone patent per se.
9        You asked me if the language matched
10   exactly and I am just pointing out at least one
11   key difference.
12       Q.   Ryan, can we go to RDX-289.  You said
13   Malone doesn't talk about operating system.  I
14   guess you are suggesting Malone is only talking
15   about operating programs, is that what your
16   contention is?
17       A.   I said Malone doesn't talk about
18   adding support to an operating system, which is
19   the requirement in element D of claim 1 of the
20   '430 patent.
21       Q.   Can we go to column 18, please, of
22   RX-289.  Ryan, do you see where I am pointing
23   there, where it says 4?  Can you go from there
24   all the way down to the bottom and pull it out?
25   Do you see item 4 says, system architecture?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1668

1  Do you see that?
2      A.   Yes.
3      Q.   It is not talking about an application
4  program, it is talking about the whole system,
5  isn't it?
6      A.   No, this is talking about the system
7  architecture of the object lens system, which
8  is the focus of the Malone patent.
9      Q.   Right.
10     A.   Of that particular system, the object
11 lens system.
12     Q.   The object lens system isn't
13 characterized in this patent as some sort of
14 application framework, it is talking about
15 entire system within the system architecture,
16 isn't it, sir?
17     A.   No, it is talking about an object lens
18 system, the system, the word system there
19 refers to that particular system.  Not some
20 general system or an operating system.  This is
21 the object lens system.  It is talking about
22 the system architecture of that particular
23 object lens system.
24     Q.   Now, Ryan, do you see where it starts
25 object manager around like 64?  Can you pull

Page 1669

1  that out and then I am going to pull out the
2  carryover paragraph to the next page.
3         So you have read about the object
4  manager before as part of Malone?
5      A.   Yes, I am glad you brought this up
6  because this helps clarify things.
7      Q.   It says, "the heart of the object lens
8  is the object manager."  Do you see that?
9      A.   That's right.
10     Q.   It says, "the object manager is
11 responsible for keeping track of all classes
12 and class-instances and their links to each
13 other.  It also keeps track of the current
14 state of each object and helps the objects
15 handle messages which they receive by providing
16 support functions with their methods."
17        Then it continues, "the object manager
18 provides the forms manager with the information
19 it needs to present a form.  The object manager
20 also handles saving and loading objects from
21 permanent storage in the database.  In the
22 future, the object manager will work with
23 shared database to do object locking and
24 version control."
25        Do you see that?

Page 1670

1      A.   Yes, I do.
2      Q.   Now --
3      A.   All of this is in the context of this
4  object lens system as it clearly says there.
5  Overall architecture of the object lens system.
6      Q.   Now, do you remember in your -- can we
7  save this and go back to the slides, please?
8  Could we go to RDX-26.26, please.
9         Now, you remember when we were going
10 over your opinions with respect to infringement
11 or non-infringement, you used this slide in
12 your witness statement, CDX-1.042?
13     A.   Sure.
14     Q.   And this is your illustration of what
15 you allege the Android operating system is?
16     A.   That's right.  It is a high level
17 overview, yes.
18     Q.   You contend that this, everything in
19 this dotted line is "the operating system,"
20 right?
21     A.   In this -- in this particular system,
22 yes.
23     Q.   Okay.  So you drew this line, right?
24 This didn't come from some document?
25     A.   Sure.

Page 1671

1      Q.   Okay.  What it actually says is
2  application framework, doesn't it?
3      A.   That's the application framework, yes.
4      Q.   Now, you remember you accused the
5  activity manager as being a component that is
6  involved in what you call adding support to the
7  operating system?
8      A.   That's part of it, yes, because it
9  goes -- it is part of it and then it goes and
10 adds support to the operating system itself,
11 yes.
12     Q.   Right.  So the functionality of the
13 activity manager, according to you, in the
14 Android system is operating system
15 functionality, right?
16     A.   The activity manager in conjunction
17 with the package manager and other things along
18 with that.  We have already gone through that.
19     Q.   And the activity manager, similar to
20 the object manager, is something that provides
21 support to all these different objects that are
22 sending messages back and forth; isn't that
23 true, sir?
24     A.   No.  I don't see that as being the
25 same thing because the object lens framework

APLNDC-X0000006473

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   system, the object lens system that the Malone
2   patent talks about is not dealing with the
3   operating system per se.  It is not about
4   adding things so other applications or other
5   software components can facilitate access to it
6   necessarily.
7           It is a system within itself.  So it
8   is facilitating access to things within itself,
9   not to the operating system.
10   Q.    The activity manager, similar to the
11   operating system, keeps track of the current
12   state of objects, right?
13   A.    The activity manager happens to keep
14   track of a particular set of data in Android,
15   yes.
16   Q.    And the activity manager, similar to
17   the object manager in Malone, provides support
18   functions for object-oriented messages that it
19   receives, right?
20   A.    The activity manager provides a
21   connection, it basically manages the active
22   applications that are -- and services that are
23   available out there in Android, yes.
24   Q.    But on the one hand, you call the
25   activity manager part of the operating system,

1   but if you go back to the Malone slide, Ryan,
2   you call the object manager which always
3   manages objects, just like the activity
4   manager, you say you can't -- you haven't
5   proven that that's part of the operating
6   system, that's your distinction?
7   A.    No, the distinction is the object
8   manager in Malone, which I believe you have a
9   slide here, is within the object lens system.
10   And it is very clear even in this paragraph
11   that you brought up, which is a good place to
12   start, the object manager, it is within the
13   context, it says right there, line 61, the
14   object lens system and goes on forward,
15   illustrated in figure 16, and then it talks
16   about the object manager.
17           So the object manager is within the
18   object lens system.  It is not within the
19   operating system.
20   Q.    Where in this patent is there a
21   distinction drawn between operating system and
22   application programs?
23   A.    It doesn't talk about --
24   Q.    Show me.
25   A.    It doesn't talk about the operating

1   system.  This entire thing is set up for an
2   object lens system.  It is a system on its own
3   that handles all these things, which are within
4   this architecture of the object lens system,
5   not the operating system.
6   Q.    I think you said all I need to hear.
7   It is a system on its own, right?
8   A.    That's right, that sits on top.  It
9   has to run on any operating system.  But it has
10   nothing to do with the operating system per se.
11   Q.    It is a system on its own, isn't it?
12   A.    It does not have to do with the
13   operating system per se.  That is my testimony.
14   Q.    What do you mean when you say
15   operating system?
16   A.    The operating system is, for example,
17   in the Android chart that you showed me
18   earlier, that would be the kernel and the
19   structure around that, that deals with things
20   that come in and out of the operating system.
21   Q.    Would it include the functionality of
22   a manager that manages all of the objects and
23   keeps track of them on the system?  Would that
24   be part of the operating system, sir?
25   A.    It would manage -- it potentially

1   could have a manager that manages objects in
2   the operating system, yes.
3   Q.    And here this system, this object lens
4   system, which is its own system, has an object
5   manager that keeps track of the current state
6   of each object.  That means each object on the
7   system, right?
8   A.    Within the object lens system.  There
9   is no disclosure in Malone that the object lens
10   system is an operating system or a replacement
11   for an operating system.  This is a separate
12   system that runs the way that it is with an
13   object manager and does all these things, which
14   we have talked about some of them today.
15   Q.    It is a complete system?
16   A.    It is a system, but it is not one that
17   is an operating system.
18   Q.    How many computer systems do you know
19   that don't have operating systems as part of
20   them?
21   A.    You mean that don't run an operating
22   system?
23   Q.    That don't have a system, not what you
24   would consider an operating system, don't have
25   a kernel, don't have a manager that manages

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  objects?
2      A.   Well, there are some embedded systems
3  on small devices that don't necessarily have an
4  operating system per se, but most have an
5  operating system, yes.
6      Q.   Would you agree that if His Honor
7  concludes that this is describing an operating
8  system and operating system functionality as
9  part of this system, that Malone, assuming that
10  conclusion, that Malone does show adding
11  support?
12      A.   If His Honor concludes that the object
13  lens system is in itself an operating system,
14  which I don't see how His Honor could come to
15  that conclusion by looking at the evidence and
16  reading Malone, it is possible that that would
17  be considered adding support to an operating
18  system, but that's a big if, because the object
19  lens system would have to be an operating
20  system on its own.
21      Q.   Let's move on, on to the second
22  reference related to the '430 patent that I
23  would like to ask you some questions about
24  today.  It is UNIX Find.  Before I go on, I
25  just wanted to do one more thing.  I'm sorry, I

1  forgot it.  I apologize.
2          Can we go to RDX-26.22.  Now, you have
3  seen this before because you have read through
4  this.  Do you remember this step 4 of this
5  example?
6      A.   In Malone?  Yes.
7      Q.   So there is three other steps that
8  aren't particularly relevant to what I want to
9  ask you questions about, if you would like to
10  look at context, that's fine.  I just don't
11  want to take the time to go through them all.
12      A.   Sure, let me quickly skim that if you
13  don't mind.
14      Q.   Sure, take your time.
15      A.   You are saying that's at column 17?
16  That's right.  It is the fourth step of a
17  series of steps.
18      Q.   Have you refamiliarized yourself with
19  this?
20      A.   I haven't read them again right now,
21  but I see the context.
22      Q.   If you need to, go ahead.
23      A.   Sure.
24      Q.   So step 4 in the example is titled
25  automatically selecting and manipulating

1  objects.  And for the record, this is a slide
2  RDX-26.22 and I am displaying column 17, lines
3  47 through 61 of the Malone patent.
4          And it says, "the last step in our
5  example is to add intelligent agents to help
6  search and modify the network nodes.  For
7  instance, figure 16 shows an agent like one you
8  might use to notify you whenever people add
9  arguments that support positions you have
10  entered."
11          Do you see that?
12      A.   Yes.
13      Q.   Now, there is -- the word argument
14  here is used.  That doesn't mean the same thing
15  as when a lawyer uses the word argument, right?
16  Can you explain to His Honor what that means?
17      A.   Just give me a second to read this
18  just to make sure I get the context correct.  I
19  want to make sure of what network of nodes you
20  are talking about here.  Just one second.  In
21  some sense, it is adding arguments of the
22  nature that the lawyer does, but --
23      Q.   Let's take a step back.
24      A.   Sure.
25      Q.   We're talking about object-oriented

1  programming, right?
2      A.   In the overall -- not just
3  programming, an object-oriented system.
4      Q.   System.  And argument is a term of art
5  in object-oriented systems, correct?
6      A.   It could be, yes.
7      Q.   Just like methods are?
8      A.   Sure.
9      Q.   So could you just for the record
10  explain to His Honor what does argument mean in
11  the context of an object-oriented system?
12      A.   In an object-oriented system, it would
13  be a parameter that would be one part of a
14  method, for example.  So you could have a
15  method that says find files and the file would
16  be a parameter which would be the argument.
17  And it is another way of saying parameter.  But
18  I believe here it is doing something slightly
19  different.  It is searching for hypertext
20  information.
21      Q.   It says, "for instance, figure 16
22  shows an agent like one you might use to notify
23  you when people add arguments that support
24  positions you have entered.  This agent is
25  triggered automatically when new objects are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    added to the folder containing the discussion
2    of interest.  Figure 17 shows the rule this
3    agent uses to select the arguments that support
4    a specific person's positions."
5        Do you see that?
6        A.   Right.  Here in figure 16, this looks
7    like an argument in a series of conversations
8    in a hypertext system.  And when it sees that
9    argument, for example, the node types, if you
10   look at step 2 there on column 16, and step 2,
11   lines 60 onwards, it says to define the new
12   node types which have an issue of position and
13   argument.
14       So the word argument here is used as
15   one type of parameter, not all parameters.  You
16   specialize existing object types and so forth.
17   So what this is doing is giving me -- what they
18   are calling an argumentation application.  And
19   the application here is an application that has
20   people adding new discussions in a discussion
21   system, discussion/argumentation system.
22       Q.   This application shows that you can
23   set the system up to notify you and receive a
24   notification in response to a query every time
25   an object meeting a certain criterion is added

1    to the folder selected by the user, correct?
2        A.   Whenever people add a particular
3    argument, yeah, a particular new instance that
4    supports positions you have entered, yes.
5        Q.   Now, if we go back to the smart folder
6    example from '430, it says, "additionally, the
7    smart folder can instruct the locator to notify
8    it when new documents containing the desired
9    attributes are added or removed from the
10   system."  Do you see that, sir?
11       A.   That's right.
12       Q.   And if we go back, isn't that the same
13   thing as what is described in step 4, automatic
14   notification when new objects are added to the
15   folder containing the discussion of interest?
16   It is the same sort of automatic notification
17   that you point to as part of the preferred
18   embodiment in figure 9 of the patent as adding
19   support, isn't it true, sir?
20       A.   No.  The notification here is within
21   this object lens system.  The notification here
22   is mapped to exactly what you showed me in the
23   previous slide in Malone and I believe the
24   abstract or the slide you had up there just
25   before.  It is mapping to exactly that, yes.

1        Q.   This is similar to figure 9 and the
2    associated text from the '430 patent, step 4 in
3    Malone in this example is talking about
4    automatic notification when new objects are
5    added to a folder, correct?
6        A.   Notification is the same sort of
7    notification.  But it is not adding support of
8    the operating system.
9        Q.   Okay.  Setting aside the dispute about
10   what adding support means, in figure 9 which
11   you claim is an embodiment of the invention,
12   the notification functionality described in the
13   text associated with that figure is the same
14   sort of notification that's described in step
15   4, isn't it, sir?
16       A.   One difference would be that that
17   notification in the patent in the embodiment of
18   the patent is that it is within this locator
19   framework that's running in this operating
20   system the patent talks about, whereas here it
21   is within a very different system called the
22   object lens system which we have already gone
23   over.
24       Q.   They both do searches, right?
25       A.   That's right.

1        Q.   They both look for properties?
2        A.   That's right, search is based on
3    properties, yes.
4        Q.   Yes?
5        A.   Yes, we have agreed on that,
6    absolutely.
7        Q.   You don't dispute they are looking for
8    properties?
9        A.   No, I don't.
10       Q.   Search is based on properties, right?
11       A.   Absolutely.
12       Q.   And you don't dispute it returns
13   objects that match, right?
14       A.   That's right.
15       Q.   And here it is saying that it also
16   automatically notifies you, you can set it up
17   and it will be an ongoing service that will
18   facilitate to a user access to these new
19   objects that are added, the user is saying I
20   want to be informed if new objects related to
21   my discussion are added, right?  That's what it
22   is saying?
23       A.   That's right, within the object lens
24   system.  There is no dispute there, yes.
25       Q.   And the object is a software

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  component?
2      A.   In this case, you could say an object
3  is a software component, sure.
4      Q.   And this system is automatically
5  facilitating the user's access to these new
6  objects that are added and putting it into a
7  folder for ease of access, isn't that what this
8  is doing?
9      A.   In the object lens system, absolutely.
10     Q.   Okay.  Let's move on and briefly cover
11 the second reference, which is UNIX Find.  I
12 will put on the screen the first page of UNIX
13 Find.
14          Now we're not going to have a dispute
15 about whether UNIX is an operating system, are
16 we?
17     A.   I hope not.  If you want, we will have
18 one.  We could.
19     Q.   You agree UNIX is an operating system,
20 right?
21     A.   Yes, I do.
22     Q.   Okay.  And one feature in the UNIX
23 operating system is this Find feature, right?
24     A.   Yes, it is one command in the UNIX
25 system, absolutely.

1      Q.   And I have just put the front page of
2  this, which is a depiction of RDX-26 -- I'm
3  sorry, which is a depiction of RX-735.  Is that
4  what it looks like to you?
5      A.   Sure.
6      Q.   And this is the Wait Group's UNIX
7  Primer or Primer Plus, right?
8      A.   I would say Primer, yes.
9      Q.   Primer, okay.  And you have reviewed
10 the document, right?
11     A.   Yes.
12     Q.   And you see the reference date or the
13 copyright date is 1990?
14     A.   Yes.
15     Q.   That's before the '430 patent was
16 filed, right?
17     A.   I believe so, yes.
18     Q.   And this reference, similarly, there
19 is no dispute about whether this constitutes
20 prior art, correct?
21     A.   UNIX is well-known, absolutely.
22     Q.   So you agree it is prior art?
23     A.   Yes.
24     Q.   Okay.  And for the record, you
25 understand that Motorola asserts that this

1  reference, the UNIX Find, is anticipatory of
2  the asserted claims?
3      A.   Yes, I believe so.
4      Q.   And that Staff also is of the position
5  that this reference is anticipatory of the
6  disputed claims as well?
7      A.   I believe that's true, although there
8  was some discussion about the Staff's position
9  changing there, so I am not 100 percent sure
10 what is the latest one.  To my understanding,
11 yes.
12     Q.   Okay.  Let's quickly go through this
13 reference.  I have put up RX-26.30, which is an
14 excerpt from RX-735 at control number 731
15 through 32.  It says, finding files:  Find.
16 "The Find command searches for files that meet
17 some criterion.  You can search for files that
18 have a certain name or are a certain size or
19 files not accessed for a certain number of days
20 or files having a certain number of links, and
21 this is just a partial list.  Once the files
22 are found, you can have the path names printed,
23 and you can have the files themselves printed
24 or removed or otherwise acted upon."
25          Do you see that?

1      A.   Yes.
2      Q.   So this talks about find means
3  searching for things, finding things?
4      A.   That's right.
5      Q.   So you can search for files and you
6  can search by name, right?
7      A.   Yes.
8      Q.   Or by file size?
9      A.   That's right.
10     Q.   Or you can search by the last date by
11 which a file is accessed?
12     A.   Yes.
13     Q.   And you can search for files that have
14 -- by the number of links they have?
15     A.   That's right.
16     Q.   And it says this is just a partial
17 list of the ways you can search for files,
18 right?
19     A.   That's right.
20     Q.   And it clearly says that once you
21 retrieve those files, once the files are found,
22 you can do actions on those files, right?
23     A.   You can do actions on the path names
24 that are returned, yes.
25     Q.   So, for example, you can print, right?

APLNDC-X0000006477
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1688

1      A.    You can print the names, yes.
2      Q.    You can remove the files, right?
3      A.    You could, but you have to do some
4  other actions after that to do that.
5      Q.    And it says, or otherwise -- just
6  generally, it says, or otherwise act upon the
7  files, right?
8      A.    Yes.
9      Q.    Okay.  Then if you go into the body,
10  further into the body of this section, and this
11  is slide RDX-26.31 at Control -- depicting
12  RX-735 at Control No. 732 through 33, we see a
13  delineation of search criteria that are used in
14  connection with the Find command.  Fair?
15      A.    Of course.
16      Q.    And here we have a disclosure of
17  searching using the attribute file name?
18      A.    Yes.
19      Q.    And I am deliberately using the word
20  attribute, because there is a dispute about
21  properties on this, right?
22      A.    Sure.
23      Q.    Let me set the stage on that.  Your
24  primary issue with this reference is that you
25  contend it doesn't disclose doing searches

Page 1689

1  using properties as that word is used in the
2  claims, correct?
3      A.    It does not disclose searching
4  properties as properly construed.  It also
5  doesn't add anything to the operating system.
6      Q.    And this gets back, without rehashing
7  the claim construction cross-examination we
8  did, which I don't intend to repeat, this gets
9  back to whether a property is intrinsic or
10  inherent versus non-inherent or non-intrinsic,
11  right, according to your opinion?
12      A.    It gets back to whether the properties
13  are as the properties added by the object
14  locator system of the '430 patent, which are
15  these non-intrinsic characteristics, yes.
16      Q.    Just so we have -- we refresh
17  ourselves on the parties' positions, is it fair
18  that Motorola -- or withdraw the question.
19          Your opinion is that properties as
20  that word is used in claim 1 is limited to only
21  properties that are non-intrinsic properties,
22  correct?
23      A.    That's right.  The desired attributes
24  that are non-intrinsic to those files or
25  components, yes.

Page 1690

1      Q.    And you contend that a property --
2      A.    If I could just finish.
3      Q.    Certainly, sir.
4      A.    That have been added by -- by the
5  system or the user through this overall object
6  locator system that the '430 patent is
7  describing.
8      Q.    You concede --
9      A.    That's the context.
10      Q.    You concede, outside the context of
11  the '430 patent, when computer scientists are
12  talking about properties of a file, that things
13  like names and file size would be considered
14  properties, right?
15      A.    Outside the '430 patent, the word
16  property is very broad and it can be used in
17  different ways.
18      Q.    So, for example, the name of a file
19  would be a property of a file outside the
20  context of the '430 patent?
21      A.    I think we're talking about the
22  context of the '430 patent here, so I am not
23  sure why we're going outside that, but outside
24  that --
25      Q.    I want to set the stage.  Outside of

Page 1691

1  it, you agree properties can include intrinsic
2  as well as -- what you call intrinsic as well
3  as what you call non-intrinsic properties,
4  fair?
5      A.    I think we used the term intrinsic
6  characteristics, but outside the '430 patent,
7  if properties are defined that way, that's
8  fine.
9      Q.    But you contend that somehow the
10  patent is limited by the intrinsic evidence so
11  that the word properties in the claim doesn't
12  include intrinsic properties but only includes
13  what you call non-intrinsic characteristics of
14  a component?
15      A.    In the '430 patent, properties are
16  those that are added by the locator system and
17  that would not be the intrinsic properties.
18      Q.    You see here this expressly discloses
19  searching by file name, right?
20      A.    That's right.
21      Q.    And your contention is that a file
22  name is not a property?
23      A.    As used in the '430 patent, it is not,
24  it is an intrinsic characteristic.  Every file
25  has a file name in operating systems, so it is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1692

1    not something that's added through this object
2    locator system, for example.
3        Q.   But if you had a system where it
4    didn't have file names per se, maybe just
5    numbers or something, and somebody said, you
6    know what, I want to add a name to a file, and
7    they added a name, that would make it a
8    property under the '430 patent, right?
9        A.   If you had an overall system like
10   described in the '430 patent, there was an
11   object locator system designed to add
12   information, i.e., properties to components, so
13   that they can later be searched and retrieved
14   and support for that are added in the operating
15   system, then, sure, you could add something
16   called name, for example.  But outside that, I
17   don't see how you would do that.
18       Q.   Now, if His Honor considers the issue
19   of claim construction on properties and says,
20   you know what, I think Motorola is right and
21   Apple is wrong, properties can include file
22   names, this discloses properties in connection
23   with the search element of the '430 patent,
24   correct?
25       A.   If His Honor constructs -- construes

Page 1693

1    the term properties to be Motorola's
2    construction, then, you know, that would
3    obviously include names, yes.
4        Q.   And so UNIX Find would disclose
5    properties?
6        A.   If His Honor takes that construction,
7    which I don't believe is the correct
8    construction -- the correct one is that I have
9    discussed at length -- then it would, yes.
10       Q.   Thank you.  Let's go to another page
11   on UNIX Find.  This is RDX-26.32.  And I am
12   displaying RX-735 at control number 733 -- or
13   ending in 733.
14            This is talking about a different way
15   to find using a different parameter, let's say.
16   Correct?
17       A.   Let's say inherent characteristic to
18   keep the same technology -- terminology.
19       Q.   I am trying to stay away from
20   inherent.  I mean, we can argue about that, but
21   let's step aside from that and just say what
22   does this disclose?  It discloses doing a
23   search and finding a file by a different
24   parameter.  Can you tell His Honor what is that
25   parameter?

Page 1694

1        A.   This is a characteristic, inherent
2    characteristic of a file that would just have
3    the last time and date the file was accessed by
4    the system.
5        Q.   And when you say inherent, what you
6    are saying -- do you intend to mean the same
7    thing when you use the word intrinsic?
8    Sometimes I think you have used the word
9    intrinsic.  Sometimes inherent.
10       A.   I mean something not added by this
11   object locator system, yes.
12       Q.   So inherent or intrinsic, what you
13   mean by that is that it must exist as part of
14   the component?
15       A.   The component would have those
16   characteristics as part of it, that it is not
17   something that's added to distinguish from the
18   kind of properties that we're talking about
19   that are non-intrinsic characteristics, it is
20   not something that's added by this locator
21   system that the '430 patent is talking about,
22   that is added to facilitate searching and
23   instantiation subsequently.
24       Q.   It is necessary to the component, it
25   must exist if the component exists, is that

Page 1695

1    what it means?
2        A.   If that component has those
3    characteristics as part of its structure, yes.
4        Q.   Well --
5        A.   So, for example, a file in the UNIX
6    system would have name, would have the last
7    access time and so forth.  That is part of
8    that, the definition of a file in a UNIX
9    system.
10       Q.   Well, I need to understand this
11   because I am confused.  Are you saying that you
12   have a component, let's take any example, let's
13   say it is a file, okay?
14       A.   Okay.
15       Q.   A file is an example of a software
16   component, right?
17       A.   True.
18       Q.   Okay.  You have got a file.  What is
19   going to be inherent to that file?
20       A.   It would be anything that's not added
21   by the object locator system that the '430
22   patent is talking about.  So, for example, the
23   file name or the date or time -- or date and
24   time of access, which that file would typically
25   have anyway.  If it existed as a component,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1696

1  without the use of this object locator system
2  that the '430 patent is talking about.
3      Q.  So the way you are defining -- I just
4  need to understand.  I am confused.
5          Are you saying that a component of a
6  file is something that's got to exist
7  regardless of the system that the file is on or
8  are you saying --
9      A.  Component of the file?
10     Q.  Let me finish.  Or are you saying that
11 we measure whether it is inherent or not based
12 on the system it is operating in?  In other
13 words, is inherency system dependent or system
14 independent?
15     A.  I am not sure I totally understand
16 your question, sir.
17     Q.  Okay.  Let me play from your
18 deposition, you were asked what intrinsic
19 means.
20     A.  Okay.
21     Q.  And maybe we can start from that and
22 then I will follow up with that.
23     A.  Sure.
24     Q.  This is your deposition taken on
25 August 5th, 2011, page 156, 15 through 157, 11.

Page 1697

1      MR. DAVIS:  Your Honor, objection.
2  Improper impeachment.  He hasn't identified
3  anything being impeached here.  If he wants to
4  ask him a question about what's inherent or
5  intrinsic and then if it differs, then he can
6  impeach.
7      JUDGE ESSEX:  I assume he is asking
8  whether it was dependent on the last -- I won't
9  go through everything here -- but he is asking
10 whether it is dependent on the system and those
11 matters, and we will see if it is proper
12 impeachment when it comes up.  But I think he
13 has laid enough information that he can play it
14 and we can look at it.  So you are overruled.
15 Go ahead.
16     (Videotape played and transcribed as
17 follows:)
18     "Question:  What is the distinction
19 again between, you know, the Find command
20 that's running in the background shell program"
21 --
22     (End of video clip played.)
23     MR. VERHOEVEN:  Take that down,
24 please, Ryan.  That's the wrong clip.  Page 156
25 -- Your Honor, may I take one second?

Page 1698

1      JUDGE ESSEX:  Yes, you may.
2      (Videotape played and transcribed as
3  follows:)
4      "Question:  Why is it intrinsic if
5  someone is inputting the data, doesn't
6  intrinsic mean it already exists?
7      "Answer:  I am not sure intrinsic
8  means it already exists.  I think intrinsic
9  would mean at least in the context of what
10 we're talking about here it must exist.  So a
11 file, you know, would have to have a file name.
12 It cannot exist without a file name at least in
13 most operating systems that I'm familiar with."
14     (End of video clip played.)
15 BY MR. VERHOEVEN:
16     Q.  In that excerpt I interpreted what you
17 said it must exist regardless of what system it
18 is, it is an attribute inherent to the
19 component, is that not what you meant?
20     A.  For that example I said, I believe I
21 said for a file it won't exist without a file
22 name, but I didn't mean in any component
23 necessarily.  A file in an operating system
24 would have a file name, yes.
25     Q.  We will go to RDX-26.32 again.  These

Page 1699

1  parameters used in UNIX Find, file last
2  accessed exactly seven days ago, that's not an
3  inherent component or inherent attribute of a
4  software component that must exist?
5      A.  For a file it would exist.
6      Q.  It doesn't have to exist.
7      A.  We're talking about files here.
8      Q.  Let me finish my question.  It doesn't
9  have to exist.  You could design, any good
10 software could design a system that doesn't
11 track the last date of access, those components
12 could exist on a system regardless of this
13 attribute, this is completely optional, isn't
14 it, sir?
15     A.  No, I mean, you are talking here about
16 UNIX Find and UNIX Find system looks for files
17 and files by these different inherent
18 characteristics, file name, type, time or date
19 of last access.  So this is not some random
20 component we're talking about.  This is within
21 UNIX Find.  And, you know, it is your example.
22     Q.  Well, sir, if you are defining
23 inherency or intrinsicness as system dependent,
24 in other words, if the system I have written
25 requires it, then, therefore, it is inherent,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1700

isn't that a complete tautology as to whether something is inherent or not?
A. No, because within that system it would be required and within the UNIX system and the files within the UNIX system, which is what we're talking about here, a file would have these inherent characteristics.
Q. Let's assume there is a software system that was designed and it works fine but it doesn't track last access. Do you follow me?
A. Hypothetical, is that what you are saying?
Q. That's right.
A. Okay. So a hypothetical system --
Q. It works fine, it just doesn't have this parameter. They didn't program it in the last time that a document file, for example, was accessed. You couldn't -- the system didn't automatically do that.
A. It doesn't have it is what you are saying.
Q. Right. But the system can just like UNIX, the system, you could run scrips on it, a scrip is a short program, right?

Page 1701

A. Sure.
Q. And you could create a scrip that would attach the last access parameter to all the files that you in particular that you as a person using this system were using so that you could then track it, do you follow me so far?
A. You would have to build such a system.
Q. You would add the parameter to the existing system through a scrip, do you follow me?
A. The scrip would have to be built such that it would have data structures to be able to add those parameters, track it, select the locator system described in '430 as an example. You would have to build that structure.
Q. So in that system the parameter last access is a property under your definition of property in the '430 patent, correct?
A. If it was built within a system like the locator system in the '430, and you used a scripting system and added all the necessary pieces that made up the equivalent of the '430 patent as object locator system, then maybe that's true, but just a script on its own cannot just attach properties to, as is used in

Page 1702

the '430 patent. That is existing in this locator framework.
Q. Now let's assume that that worked so well that you told your friends about the script you created and lots of people started using it and the publisher of the program realized this is a desirable attribute and when 2.0 version of the program came out, they made it a required attribute.
Now, under your logic all of a sudden this parameter is no longer a property; isn't that true under your logic?
A. So you were talking about scripts and then you changed to programs and so I am not following. Are we talking about the same thing? What exactly are we talking about here?
Q. I am talking about in version 1.0 of the system --
A. Of which system --
Q. The system itself did not require any tracking of this parameter and it did not track the parameter automatically. However, users could add this parameter. Do you follow me so far?
A. And you are talking about a

Page 1703

hypothetical system that you have just built; is that true?
Q. Correct, sir.
A. Okay.
Q. And then for version 2.0 -- and so in version 1.0, you agree that these parameters, you know, last accessed, those are properties because they are not intrinsic to system 1.0. Do you agree?
A. No, I do not agree with that. What I said earlier was if you built a system, this hypothetical system that had the same kind of structure as the object locator system of the '430 patent, which had the capabilities to attach those kinds of properties with subsequent searching, then that might be true, but the way you have described the system that you're hypothetically building, it is unclear what you are building. You can't just simply add things to files without an appropriate system.
Q. Same is true for the '430 disclosure, right?
A. The '430 is talking about an object-oriented locator system.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1704

1    Q.   You say the only thing that are
2  properties that are claimed here are things
3  that users add, all of a sudden they can add
4  them easily on '430 but they can't add them
5  easily in my hypothetical?  What's the
6  difference?
7    A.   The difference is the '430 is talking
8  about an overall architecture in a system that
9  does this.  In your hypothetical you talked
10  about --
11    Q.   My hypothetical is --
12    A.   You didn't let me finish.
13       JUDGE ESSEX:  Come on.
14       MR. VERHOEVEN:  Sorry.
15       THE WITNESS:  I have lost my train of
16  thought here now.
17  BY MR. VERHOEVEN:
18    Q.   Let me try it one more time and I will
19  move on.
20    A.   Sure.
21    Q.   This is a hypothetical.  The
22  hypothetical is that an entity has published an
23  entire system, an entire software system.  That
24  system can do various things such as process
25  documents, but it does not, the system does not

Page 1705

1  require any ability to track the parameter of
2  last accessed date.
3       Do you follow me so far?
4    A.   So you are building a hypothetical
5  system that doesn't have the ability to track
6  last accessed date?  Is that your hypothetical?
7    Q.   It doesn't require it.
8    A.   You said --
9    Q.   The system itself doesn't track it.
10  Got it?
11    A.   Okay, the hypothetical system does not
12  track last access, got it, okay.
13    Q.   But the system allows users to add
14  properties to their components.  Do you follow
15  me?
16    A.   So the system has the capability to
17  support the adding of properties.
18    Q.   Just like the '430 specification.
19    A.   The '430 is more than that but --
20    Q.   And let's say that at least one user
21  wants to be able to track their document files
22  by the last date accessed and so they add a
23  property to those software components that
24  tracks the last date of access.  Do you follow
25  me?

Page 1706

1    A.   If your system is able to add those
2  properties, like in the '430, then, yes.
3    Q.   And under your logic for properties,
4  that would be a property and non-intrinsic,
5  correct?
6    A.   Under the --
7    Q.   Parameter of last access?
8    A.   Sorry.  Under the '430 patent's
9  description of properties, if you had a system
10  of that structure within that locator system
11  and you are representing to me you are building
12  a similar system, if you build a similar system
13  that is able to add those properties, then,
14  sure, you can add those properties.  But it has
15  got to have the same functionality as the '430
16  patent system, which is what I believe you are
17  representing to me is your hypothetical.
18    Q.   So under the hypothetical those would
19  be non-intrinsic properties of the component,
20  right?
21    A.   Under the hypothetical as I just
22  clarified, yes.
23    Q.   Now, let's assume that, go forward in
24  time and the developer of this software system
25  says I want -- people -- this is a popular

Page 1707

1  added parameter that people are using, I want
2  to make it a system requirement for version
3  2.0.
4       And they issue version 2.0 of the
5  system that automatically, every time a
6  component, software component is accessed, it
7  adds a parameter of the date and time when it
8  was last accessed.
9       Do you follow me?
10    A.   So you are still within this
11  hypothetical system?
12    Q.   Correct.
13    A.   That's right.
14    Q.   Version 2.0 though.
15    A.   All right, sure.  New version, okay.
16    Q.   Under your logic, all of a sudden this
17  parameter becomes a non-property as you
18  construe the '430 patent?
19    A.   Because the -- I'm sorry.
20    Q.   Correct?
21    A.   Because those properties in the '430
22  are tagged on to the inherent things, yes.
23    Q.   So isn't it true that when you are
24  parsing what is a property or not a property,
25  it is all system dependent?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1708

1    A.   Well, I think we already went over
2  this.  The properties as we discussed in the
3  context of the '430 patent's locator system is
4  not the random use of the word property, so I
5  think we already went over this in great
6  length, that it is part of the '430 patent's
7  system.
8    Q.   Is this concept of inherency system
9  dependent or not, sir?
10   A.   Different systems would have different
11 things that are inherent, yes, as long as they
12 are not attached, things that are not attached
13 in a dynamic way like in the '430 patent would
14 be inherent.
15   Q.   So we can take any given property,
16 whether it is accessed seven days ago, whether
17 it is an alphabetic name, whether it is
18 virtually anything you can think of, you can
19 design a system that required it but you could
20 also design a system that didn't require it,
21 and under your logic, whether it becomes a
22 property or not is merely a desire constraint
23 of the system?  Isn't that true?
24   A.   Well, I think you can design all kinds
25 of systems.  And you can do all kinds of

Page 1709

1  hypotheticals.  You can call them whatever you
2  want.
3    Q.   So do you agree with me then?
4    A.   I am not sure I agree with you,
5  because in the '430 patent, it is talking about
6  a very specific kind of system that's able to
7  attach these properties to the components and
8  then search for them.  And that is one kind of
9  system.  And what I am saying is you could
10 build such a system, absolutely, that's the
11 whole point of the patent, you can go build
12 something that mimics it, that does similar
13 things, and, sure, then you would be doing the
14 kind of things that the '430 patent does.
15   Q.   So I could take file name and design a
16 system where that's not a requirement, in which
17 case name would be a property under the '430
18 patent, right?
19   A.   If I design a system like the '430
20 patent system.
21   Q.   And I could have --
22   A.   That had the locator framework, that
23 had the ability to add those properties and
24 search for them, yes.  If that was the intent,
25 to build the equivalent of the '430 patent

Page 1710

1  system, sure, you could do that.
2    Q.   So sometimes names are properties?
3    A.   A name could be a property if I added
4  -- so say, for example, in the '430 patent, I
5  may say printer names and I may add that as a
6  property.  That doesn't make it not a property.
7    Q.   And the same logic applies to the
8  parameter of the last accessed date, correct?
9    A.   If the system follows all the things
10 that the '430 patent does, and makes that a
11 property, as opposed to it being inherent to
12 the components of that system, then sure.
13   Q.   And then, again, if properties is not
14 limited to non-intrinsic properties, but
15 includes both intrinsic and non-intrinsic
16 properties, there is no dispute that UNIX Find
17 discloses it?
18   A.   If you use the construction that
19 properties includes everything, then UNIX Find
20 would be finding by properties, yes, in that
21 construct of properties.  That's not the
22 correct construction of properties as used in
23 the '430 patent as I see it.
24   Q.   Thank you, Doctor.
25      MR. VERHOEVEN:  Your Honor, I pass the

Page 1711

1  witness.  I forgot, we have the '828, Mr.
2  Nelson is going to go do that.  I don't think
3  it will be very long, though.
4      MR. NELSON:  Not too long.
5      JUDGE ESSEX:  I think we will take a
6  break before we see Mr. Nelson.  We have run
7  pretty long and I think it is time for our
8  afternoon recess.  We will be back at quarter
9  till.  We're in recess.
10     (A recess was taken at 3:28 p.m.,
11 after which the trial resumed at 3:45 p.m.)
12     JUDGE ESSEX:  Are we ready?
13     MR. NELSON:  I am, Your Honor.
14     JUDGE ESSEX:  Proceed, Mr. Nelson.
15     MR. NELSON:  All right.
16 BY MR. NELSON:
17   Q.   Ryan, can we put up RX-1339, please.
18 I just have a few questions for you about the
19 '828.
20   A.   Okay.
21   Q.   So RX-1339 here, the Bisset patent,
22 5,825,352, you are familiar with this patent,
23 correct?
24   A.   Yes, I am.
25   Q.   And, in fact, the Bisset patent,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    RX-1339, was used by the examiner to reject the
2    majority of the pending claims, including all
3    the independent claims during the prosecution
4    of the '828 patent, correct?
5        A.   Initially, yes.
6        Q.   In fact, if we go to JX-6, page 1407,
7    Ryan, do you see here if we highlight the part
8    in the middle there, a little bit farther under
9    claim rejections, 35 U.S.C Section 102, yes,
10   exactly.
11       So you know what a rejection under 35
12   USC Section 102 is, don't you?
13       A.   As being anticipated by?
14       Q.   The reference anticipates.  In other
15   words, shows all the elements of the pending
16   claim, correct?
17       A.   Of those claims that are being
18   rejected, yes.
19       Q.   Right.  And so the claims that were
20   being rejected at that time were 1 through 3, 6
21   to 8, 23 to 29, 31, and 32, correct?
22       A.   That's correct.
23       Q.   Okay.  So that includes the claims
24   that are asserted here in this action, correct?
25       A.   I believe so, yes.

1        Q.   Okay.  So then in response, if we go
2    to JX-6, 1456, and let's just blow up claim 1
3    there.
4        So you understand that, in response to
5    the rejection that the examiner made under
6    Bisset, the applicant came back and amended the
7    pending claims, correct?
8        A.   That is correct.
9        Q.   And the only amendment that was made
10   was to add the term mathematically to the last
11   element, correct?
12       A.   That was the only addition that was
13   made, although I believe the applicant
14   disagreed with the reasoning given by the
15   patent examiner as to why they needed to make
16   it, but they made it anyway to get it in.
17       Q.   Understood.  But prior to that, the
18   claims said fitting an ellipse to at least one
19   of the pixel groups, correct?
20       A.   That is correct.
21       Q.   And afterwards, it was amended to say
22   mathematically fitting an ellipse to at least
23   one of the pixel groups, correct?
24       A.   That's correct.
25       Q.   And, similarly, if we look at claim

1    10, claim 10 was amended in exactly the same
2    way, correct?
3        A.   In that they added the terminology
4    mathematical, yes.
5        Q.   Right.  And you understand that claim
6    24, the other asserted independent claim, is a
7    means-plus-function claim, correct?
8        A.   That is correct, yes.
9        Q.   And for that the applicant
10   specifically pointed back to the specification,
11   you understand that?
12       A.   For the means, yes.
13       Q.   Yes.  So now if we look at JX-6, 1468
14   and 69, we see the applicant's response.  I am
15   not going to read all this.  We have looked at
16   this a few times.
17       But let me see if this is a fair
18   characterization.  Is it your understanding,
19   Doctor, that when the applicants came back and
20   amended the claims to add the term
21   mathematically, that the applicant's sole basis
22   for distinguishing the Bisset patent was that
23   Bisset did not show the element of
24   mathematically fitting an ellipse to one or
25   more pixel groups?

1        A.   So my understanding of this is that
2    the applicant is basically saying that their
3    understanding of what the office action -- the
4    Patent Office's interpretation, is merely
5    obtaining measured data is the same as fitting
6    an ellipse to the data.  They disagree with
7    that, and, therefore, added the word
8    mathematically fitting.
9        Q.   Right.  And the applicant said that
10   Bisset does not show mathematically fitting an
11   ellipse to one or more pixel groups, correct?
12       A.   Yeah, Bisset doesn't do any kind of
13   fitting at all of ellipses.
14       Q.   Okay.  The applicant didn't say Bisset
15   doesn't show segmenting, correct?
16       A.   That was not in this section of the --
17   of the rejection, or the response, I mean,
18   sorry.
19       Q.   Right.  It didn't say that in the
20   response at all, in response to the rejection
21   to the Bisset, correct?
22       A.   In the pieces I have read, I have not
23   encountered that.  It may be there somewhere
24   but from what I have seen, I have not asserted
25   that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1716

1    Q.   You haven't seen that?  You haven't
2  seen that anywhere if we peruse the file
3  history, I mean, the record will show it and I
4  am not going to go through the file history in
5  detail, but if I represent to you that there
6  were no other bases that the applicant used to
7  distinguish the Bisset patent, you wouldn't
8  have any quibble with that, correct?
9    A.   That's fair.
10    Q.   Okay.  Now, let's look --
11    A.   I'm sorry, in context of the file
12  history.
13    Q.   Yes, in the file history.  I am just
14  talking about what the applicant did.  Now,
15  let's look at RX-351.
16         Now, RX-351 is a thesis, and I will
17  just say the last name, you can help me with
18  the others if you want, but Desai, Mr. Desai,
19  correct?
20    A.   Close enough.
21    Q.   How should I say it?
22    A.   We will go with that.
23    Q.   No, go ahead.
24    A.   It is Desai.  Let's go with Desai as
25  you said.  That's fine.

Page 1717

1    Q.   I appreciate that.  The title of this
2  is: Interpretation of tactile data from an FSR
3  pressure pad transducer using image processing
4  techniques, correct?
5    A.   Of course.
6    Q.   And this is dated November 1994,
7  correct?
8    A.   That is correct, yes.
9    Q.   And you have reviewed the Desai
10  reference in connection with your opinions in
11  this case, correct?
12    A.   Yes.
13    Q.   Okay.  And the Desai reference, at
14  least generally, talks about processing
15  techniques for pixel image data obtained from a
16  touch sensor, correct?
17    A.   I am not sure I would call it a touch
18  sensor.  It is a pressure pad sensor.  It is a
19  pressure sensor.
20    Q.   Right.  A pressure sensor meaning
21  things can come into contact with it and it can
22  sense that pressure, correct?
23    A.   Things could come into contact with
24  it, right, like disks and things like that that
25  they describe in the thesis, yes.

Page 1718

1    Q.   They describe objects, but the same
2  thing would work for fingers, correct?
3    A.   If you want to call a finger an
4  object, and you are not interested in tracking
5  it over time and doing anything more
6  sophisticated than just seeing it touching this
7  transducer, sure.
8    Q.   But at least in general then a portion
9  of the Desai thesis talks about taking that
10  image data that you collect from the sensor and
11  then processing it in some means to get
12  information from it, correct?
13    A.   It takes that pressure data that comes
14  out of the sensor and processing it, yes.
15    Q.   And if we look at page 71 of the Desai
16  thesis, and just for the record that's RX-351,
17  you will agree with me that one of the things
18  that the Desai thesis shows is fitting an
19  ellipse to the image data, correct?
20    A.   That is correct.  What page are we
21  talking about here?
22    Q.   I am talking about 71 first.
23    A.   You have got 79 up there.
24    Q.   No, no, 71 of the thesis.  You are
25  looking at --

Page 1719

1    A.   Oh, I'm sorry, okay.  That's the
2  confusion.  Okay.  Yep, okay, I have got it.
3  Sorry.
4    Q.   And if we look at page 72, in
5  particular 4.22, and if we just blow that up,
6  Ryan, this is at least a pictorial example that
7  shows fitting a rectangle and also fitting an
8  ellipse to some image data, correct?
9    A.   Sure.
10    Q.   And, in fact, if we look at page 76
11  and 77, and let's just take 4.3.4, where it
12  starts there and blow that up and then go to
13  the next page, and just juxtapose that with
14  what's on 77, the whole thing on 77, just put
15  it on top of 77, and if we need to scroll
16  through, we can.
17         And one of the ways that the Desai
18  thesis here on page 76 and 77 talks about
19  fitting an ellipse to the image data is to use
20  a group covariance matrix, correct?
21    A.   Just give me one second to
22  refamiliarize myself with this.  Here they call
23  it the scatter matrix, which becomes the
24  covariance matrix, yes.
25    Q.   So it is that same thing?  In fact, if

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  we look at 4.4, right below 4.4, that sentence,
2  blow it up, it says "the matrix S can also be
3  referred to as the covariance matrix."
4  Correct?
5      A.   That's right.  That's what it says,
6  yes.
7      Q.   That's the scatter matrix that you
8  were talking about?
9      A.   That's right.
10     Q.   Okay.  So we're in agreement there.
11         And from this covariance matrix I do a
12  transform in order to determine the Eigenvalues
13  and the Eigenvectors, correct?
14     A.   Sure.
15     Q.   So what's shown here in the Desai
16  thesis on page 76 and 77 is essentially
17  identical to the ellipse fitting procedure that
18  we saw in column 26 of the '828 patent,
19  correct?
20     A.   It is a similar process.  I'm not sure
21  I would use the word identical.  I would say
22  similar process.
23     Q.   Very similar process, correct?
24     A.   I think that's fair.
25         MR. NELSON:  Thank you.  I have no

1  further questions, Your Honor.
2         MS. KATTAN:  I have no questions, Your
3  Honor.
4         REDIRECT EXAMINATION
5  BY MR. DAVIS:
6      Q.   Your Honor, I would like to start with
7  the '430 patent.
8         So before we get into specific
9  differences between the prior art and the
10  claims of the '430 patent, could you generally
11  describe the framework approach to computer
12  programming discussed in the '430 patent so we
13  have a context for what the patent is talking
14  about?
15     A.   Sure.  Maybe it may be useful to bring
16  up the '430 patent on the screen, and
17  specifically the column 4 of the '430 patent
18  just as a reference.
19         So what -- you asked about framework
20  programming.  And basically prior to the
21  framework programming, the old days, programs
22  running software running on computer systems
23  were linear.  They basically went from the
24  start of the program and they executed line by
25  line until they reached the end of the program

1  with particular logic in that program.
2         And what that meant was the programmer
3  who built that had to know exactly all the
4  variables, all the things that it wanted to do,
5  and the kinds of things that that program was
6  going to process, okay, including appropriate
7  names and so forth.
8         The framework, this is quite a bit
9  different.  The flow of control, remember I
10  said in the old way it is step by step linear
11  flow of control.  And in a framework system or
12  object-oriented system, instead of writing the
13  flow of control in a sequential manner, you
14  basically describe these objects, the kinds of
15  things you wanted to deal with, the types of
16  data, and you built methods that would act on
17  that data.
18         And this is called object-oriented
19  programming.  You had these objects, you had
20  the methods, but the actual flow of control,
21  i.e., the way it processed that code need not
22  have been completely linear.
23         And it was up to the framework, the
24  object-oriented framework within which these
25  objects and methods existed that would decide

1  what gets called when.  And, in fact, the
2  programmer who wrote the objects in the first
3  place may not know what subsequent object or
4  what subsequent code or system may be accessing
5  that.
6         So that was left up to the framework
7  to deal with.  And maybe just to highlight
8  this, I will ask to bring column 4 up.  If you
9  want to highlight lines, let's say, 33 onwards
10  to the bottom of the column, please.
11         And here it talks about programming
12  with frameworks, actually starting at line 44.
13  It talks about a new way of programming.  In
14  fact, it is not like programming at all in the
15  traditional sense.  In old-style operating
16  systems, such as DOS or UNIX, the developer's
17  own program provides all of the structure.  The
18  operating system provides services through
19  system calls.  The developer's program makes
20  the calls when it needs the service and
21  control, i.e., the logic returns when the
22  service has been provided.
23         So this is that flow of control I was
24  talking about in the traditional way of doing
25  things.  And if you go further on lines 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1724

1   onwards, it specifically discusses what happens
2   when frameworks are used where the flow of
3   control changes.  The developer, i.e., the
4   programmer who wrote the code in the first
5   place is not responsible for determining the
6   sequence of the execution.  It is really up to
7   the object to say, okay, I am being accessed,
8   what do I do with this right now, and it is up
9   to this framework to make that flow of control
10  happen.
11     Q.   Okay.  Do you see where it says
12  further down on column 4, approximately line
13  61, routines written by the developer are
14  activated by code the developer did not write
15  and the developer never even sees?
16     A.   That's right.
17     Q.   What does that refer to?
18     A.   So that ties back to what I was saying
19  earlier.  The programmer only writes these
20  objects and the methods for it.  What other
21  code executes or calls those objects, the
22  developer may have no idea who does that.
23  That's really up to the framework to take care
24  of that.
25     Q.   Okay.  How does searching for

Page 1725

1   components based on properties fit into this,
2   if at all?
3      A.   So the '430 patent talks about
4   searching for components.  And it is within
5   this sort of object-oriented framework where
6   you have this framework that has these
7   component objects and methods that work on them
8   and so forth.  And the logic is the same thing,
9   when a -- let me use an example, maybe.
10       Say, for example, in the old system,
11  if I wanted to connect a printer to my
12  computer, what I would have to do is know that
13  I have to load a particular printer driver.  I
14  would typically load that by knowing the
15  driver's name, by asking for it, or loading it
16  from disk, and install that printer driver and
17  then I will have that printer working on my
18  system, if everything goes well.  A lot of
19  times it doesn't.
20       If the printer happens to be on the
21  network, I have to ask my systems administrator
22  what is the name of that printer and how do I
23  access that.  And you will get some cryptic,
24  you know, computer-like name that you would
25  type in and hopefully you will get your

Page 1726

1   printer.
2        In the object-oriented kind of system
3   that's described in the '430 patent, what you
4   would say is I am interested in printers -- I
5   want to print something and I want to print, a
6   color printer that handles PDF files and sends
7   that query out, and the system is able, because
8   of these properties that are attached at
9   different printers and so forth, is able to do
10  that matching.  It may be a slightly imprecise
11  matching.  It may find five different color
12  printers but only one or two that does PDF and
13  pulls out the one that is most appropriate or
14  the best match and makes that available to the
15  user who requested a color printer that prints
16  PDF files.
17       So the difference here is clearly the
18  user who is using this, asking to add a printer
19  in this example, doesn't have to know about the
20  printer's name or load a particular driver
21  manually in any fashion.  It kind of all
22  happens automatically at a higher level of
23  abstraction from a user's perspective, in
24  particular.
25     Q.   And how does the concept of adding

Page 1727

1   support for the hardware or software components
2   to the operating system play into this system?
3      A.   So that plays in because the way this
4   '430 patent is talking about it is it has got
5   some data structures there that maintain what
6   components, whether it is hardware or software,
7   that it can allow access to by other elements,
8   like another user, another piece of software.
9        And basically maintains some data
10  structures that say, okay, these are the active
11  printers, these are the active folders that may
12  be there, and I am going to provide some data
13  to enable me to allow other applications, other
14  users, other software to access those software
15  or hardware components that have previously
16  been searched for and support added for in this
17  data structure.
18       And much like in the Android system
19  where, you know, it uses the activity stack and
20  the package manager to instantiate those, those
21  components.
22     Q.   Can we turn actually now to column 3,
23  lines, say, 36 through 52 or so, if you can
24  bring those up on the screen.
25       Could you explain for us in a little

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   bit more detail what the framework approach is?
2       A.   So here is an example of what a
3   particular framework approach might be.  So,
4   for example, you might have these objects that
5   enable -- so let's use the example in line 50,
6   for example, user interface framework.  So it
7   may provide framework for a programmer to say I
8   want to create a user interface, what the user
9   would see that has windows and scroll bars and
10  menus, but doesn't have to necessarily define
11  those things.  It may say I want to use a
12  particular scroll bar and the system will be
13  able to come back with an appropriate object
14  and instantiate that scroll bar, and it could
15  choose from more than one, if more than one
16  exists.
17      Q.   Okay.  And do you see where it states,
18  "thus, a framework is a set of object classes
19  that collaborate to execute defined sets of
20  computing responsibilities?"
21      A.   Yes.
22      Q.   Can you explain what that means?
23      A.   So this goes back to the overall
24  framework has these multiple objects and these
25  object classes, and the classes are basically

1   the definition of the objects instantiation of
2   a class.  And the framework basically has a
3   bunch of these running and will enable that to
4   execute or basically decide what computation
5   will be done by which object, which is what is
6   meant by computing responsibilities.  Rather
7   than the user saying I want this program to run
8   it, the framework takes care of figuring out
9   which program is going to -- which object is
10  going to run it.
11      Q.   Okay.  Are there any advantages to
12  this approach over the more traditional way of
13  programming?
14      A.   Well, absolutely.  The advantage here
15  is, first of all, the user or the requester
16  doesn't have to know what particular pieces of
17  code need to be loaded or run.  That is left up
18  to the framework to figure that out.
19          It also allows the kinds of things you
20  see on modern phones, the iPhones and Android
21  devices where the user is suddenly given access
22  to all these different applications without
23  necessarily knowing about it a priori.
24          For example, I think in our opening
25  slides or in my tutorial maybe I used the

1   example of on a phone if I clicked on an e-mail
2   link and the system would come back and say you
3   have three different possible e-mail programs
4   that can run this, and you just have to choose
5   one of them.  And the system was able to do
6   that on its own.  The user did not have to load
7   those e-mail clients up front, did not have to
8   even know that they existed before making the
9   request or before clicking that e-mail link.
10      Q.   Are there any particular challenges
11  using this approach to locating target hardware
12  or software?
13      A.   The challenges, first of all, in the
14  early days was users had a complete different
15  mindset.  They were used to procedural
16  programming.  They had to do that flip to
17  understand how to do this, but more importantly
18  the overall framework, as talked about in the
19  '430 patent, which is a particular framework in
20  an operating system to provide access to these
21  different components to a user level system, to
22  a user level usage, the challenges would be to
23  make sure they all kind of worked properly
24  together and that every one of those elements
25  could be searched and searched with

1   appropriately descriptive criteria, that it
2   doesn't require obtuse language that the old
3   systems would require.
4           Say, for example, in the printer
5   example, I could search by saying I want a
6   color printer, rather than requiring, you know,
7   the HP 2225 printer, for example.
8           So it was those kinds of advantages
9   that it gave.  And the challenges were to build
10  a system that actually enabled all of that to
11  happen.
12      Q.   Okay.  Let's turn now to the Malone
13  reference.  And I would like to start off, if
14  we could pull up the background art on column 2
15  starting around line 53 or so, if I could pull
16  that to the bottom.  And then the rest of that
17  section on the top of column 3 down to summary
18  of the invention.  So if we could just blow up
19  those two parts.
20          So do you see in the background art it
21  states that, with increasing power of
22  microprocessors and of computers generally of
23  any given physical size, there has been a
24  widely recognized need for systems that would
25  permit users who lack sophisticated programming

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1732

1  skills to utilize this newly-available
2  computational power for a wide range of tasks.
3  Many different approaches have been taken in
4  order to try to satisfy this need.
5        What is the first approach that the
6  background of the Malone patent identifies?
7     A.   The old style that I was talking
8  about, which is basically -- are you talking
9  about the first new approach, you mean?
10    Q.   So they are talking about many
11 different approaches to satisfy the need.  So
12 can you describe what is meant by one line of
13 approach has tried to obtain the ordinary and
14 often complicated user interface of a computer
15 system's operating system by providing an
16 operating environment within which a user
17 relates to the operating system without
18 directly using the operating system's commands?
19    A.   Sure.  This is, this is talking about
20 an application basically that would sit, like
21 the MacIntosh Finder, which is the example, it
22 is an application level software that would be
23 able to relate to the operating system without
24 necessarily programming at that low level of an
25 operating system.  Unlike like a UNIX Find

Page 1733

1  where you had to sit there at the terminal and
2  do the defining, this MacIntosh Finder provided
3  a one-level higher abstraction to be able to
4  find files, for example.
5     Q.   Do you see where it states on the top
6  of column 3, another approach is described in a
7  recent paper by Malone, and that paper there
8  introduced a concept of semi-structural
9  messages and rules for processing these
10 messages and a system called information lens?
11    A.   That's correct.
12    Q.   Can you explain what that talks about?
13    A.   Yeah, this talks about this notion of
14 adding, say if you have like a MacIntosh
15 Finder, which simply just finds appropriate
16 files, if you give it a particular name or you
17 put files into a folder, what this is adding to
18 that is this notion of rules.
19       And the rules would be, for example,
20 find all files that, you know, have the date of
21 March 2nd, 2011.  It would put that in and
22 these rules could run on their own.
23       And they call this an information lens
24 because the analogy to the physical world would
25 be like a lens, a piece of glass or something

Page 1734

1  that only showed particular things and not
2  others, as a bit of a filter, so to speak.
3     Q.   Okay.  And what does it state about --
4  can you explain the statement, "the approach of
5  operating environments is limited in that they
6  are dependent on specific applications programs
7  to provide access to databases having wide
8  ranges of applicability to users, and the
9  specific applications are not necessarily
10 integrated with the operating environment"?
11 What is that talking about?
12    A.   So this is basically saying that these
13 kinds of operating environments don't have good
14 integration with other applications.  So they
15 are basically talking about it gets data but it
16 doesn't necessarily talk with other
17 applications very well.
18    Q.   Okay.  And what does it identify --
19 what does it say about information lens?
20    A.   It basically says although information
21 lens provides some valuable concepts, i.e.,
22 this notion of rules, it is limited to
23 facilitating e-mail communications and not
24 applicable to general databases.
25    Q.   Okay.  Can you -- first of all, let's

Page 1735

1  turn now to column 18.  And do you remember
2  being asked questions about column 18, and the
3  system architecture there?
4     A.   That's right.
5     Q.   Okay.  Let's pull up from, say, line
6  20 down to the end of the column, column 18.
7  First of all, what is object lens?
8     A.   Object lens is defined in Malone as
9  simply a program.  It is an object-oriented
10 event-driven program, as it states here.
11    Q.   Is it an operating system?
12    A.   Oh, absolutely not.
13    Q.   Can you explain the difference between
14 object lens and a computer operating system?
15    A.   Well, operating system is one way of
16 describing it is the lowest level piece of
17 software that handles all the programs,
18 execution of programs, storage of data, and
19 networking and so forth that is typically on
20 most computer systems.
21       What object lens is, is simply an
22 event-driven application.  It is just sitting
23 on top and it is running to provide the
24 functionality it provides, but it is not an
25 operating system.

APLNDC-X0000006489

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Okay.  And do you see the -- I think
2 you were asked about what system referred to up
3 in line 22 or so, in addition to summarizing
4 the contents of semi-structured objects, the
5 system can use their structure to perform even
6 more powerful, automatic actions such as
7 searching and restructuring.
8         And in that sentence, what does the
9 word system refer to?
10   A.   It is referring to the object lens
11 system.
12   Q.   Why do you think that?
13   A.   Because this whole portion, if you can
14 actually pull back, show me the other part, the
15 stuff before it, if you don't mind.  Actually,
16 what page are we on?
17   Q.   It is column 18.  Why don't we just
18 throw up all of column 18.
19   A.   Yes, it is talking about the system,
20 right?  And all through here it is -- and if
21 you look at the previous column as well, it is
22 talking about the different steps of the object
23 lens system.
24         So this whole page, in fact, is
25 describing the object lens system.  And, in

1 fact, the very next line to the one you
2 suggested, you pointed out, says the object
3 lens system.  So that's the context that this
4 paragraph is within.
5    Q.   Okay.  And do you see, let's -- and is
6 the object lens system part of the computer
7 operating system?
8    A.   No, I think we already went over that.
9 It is an event-driven program.  It is not part
10 of the operating system, absolutely.
11   Q.   Okay.  And do you recall also being
12 asked about column 11, let's pull that up, the
13 first half of column 11.
14        Do you remember being asked about this
15 part of the specification, specifically let's
16 talk about the paragraph starting, in some
17 cases agents can take actions automatically on
18 behalf of their users.
19        First of all, what is meant by users?
20   A.   Users would be, for example, human
21 user or it could be another folder or an
22 application.
23   Q.   Okay.  So would a user be an active
24 computer operating system?
25   A.   No, that's not what it says here.

1    Q.   So would actions being taken
2 automatically on behalf of users facilitate,
3 access of hardware or software components for a
4 computer operating system?
5    A.   Not through the operating system, no.
6 Certainly not adding support for it.
7    Q.   Okay.  Generally speaking, what does
8 Malone, the '870 patent relate to?
9    A.   The Malone patent is basically talking
10 about a particular system, an application-level
11 system, that is giving this rule-based
12 mechanism to do -- it provide users and other
13 applications with the ability to move things
14 between folders, for example.
15        So it basically gives a different view
16 of the data that it has access to.  It is not
17 in any way adding support to an operating
18 system as contemplated in the '430 patent.
19   Q.   Okay.  Do you remember being asked by
20 Mr. Verhoeven whether the terms argument being
21 used in some of the figures related to the term
22 as it is used in specific computer programming
23 context?
24   A.   Yes.
25   Q.   Could you turn to figure 12 of the

1 patent?
2    A.   Could you tell me which CX that is?
3    Q.   Sure, sure, I'm sorry.  So Malone is
4 RX-289.  And let's go ahead and blow up both of
5 those figures.
6         Do you see in figure 12, in figure 12
7 where it states, there is a name, let's use C,
8 text, we should use C for implementation
9 because it provides a nice interface with the X
10 window system.  Although your arguments in --
11 there is a box for text, let's use USP, are
12 valid in general, for us the interface is a
13 standard window -- with a standard window
14 system is crucial.
15        Looking through this and figure 13,
16 does this -- how does this relate, if at all,
17 to what's being described in figure 17?  And if
18 we could bring up figure 17 side-by-side with
19 figures 12 and 13.
20        MR. VERHOEVEN:  Your Honor, I just
21 object and note that none of these discussions
22 of these figures are anywhere in the witness
23 statement.  There has been a very long redirect
24 about operating system that is also not in the
25 witness statement that I haven't objected to,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  but I think at some point I have to draw the
2  line.
3         MR. DAVIS:  Your Honor, if I might
4  respond?
5         JUDGE ESSEX:  I don't think so.  I
6  think you covered these in your
7  cross-examination.  I think the matters were
8  raised in cross-examination.  I think you
9  fairly did raise whether these went to an
10 operating system, were part of an operating
11 system, or involved in an operating system, I
12 recall very lengthy cross-examination on that,
13 and I think this is appropriate redirect for
14 those questions on cross.
15        Anything else you would like to add,
16 Mr. Davis?
17        MR. DAVIS:  No, Your Honor.
18        JUDGE ESSEX:  All right.  Then
19 continue.
20 BY MR. DAVIS:
21   Q.   So does what is being described in
22 figures 12 and 13 relate at all to figure 17?
23   A.   Yes, it does.
24   Q.   Can you describe how it does?
25   A.   So basically figure 17, the way I am

1  seeing it, is basically talking about a type of
2  rule.  And the rule is if a particular
3  argument, and the argument here is a descriptor
4  of the type of content that have positions and
5  so forth, then copy folder to new argument.
6         So this argument here in some ways is
7  similar to the lawyers' argument or a
8  discussion going on.  If you go back to figure
9  12, you see here some example text where it
10 says, although your arguments in let's use
11 LISP, and essentially what happens here is if
12 you look at figure 13, you have got a
13 particular argument and the argument has filled
14 in with the description of good interface with
15 X and it fills in a bunch of other data.
16        And based on the different values in
17 this data, things get moved into a folder, I
18 guess, the new arguments folder in figure, that
19 is shown in figure 17.
20   Q.   Okay.  So could you quickly summarize
21 for us your opinion with regard to what
22 elements, for example, of claim 1 of the '430
23 patent are not disclosed by Malone and why you
24 think that?
25   A.   So Malone, you know, my opinion it

1  discloses claims, sorry, claim 1, elements A to
2  C, but not element D, which is the adding
3  support to an operating system portion, because
4  this, as we have just gone over, this is a
5  programming event for a program.
6         It does not add support for the
7  hardware and software components that are
8  retrieved through the searching in elements A
9  to C to the operating system without rebooting
10 this operating system.  So element D is not
11 met.
12   Q.   Okay.  And is there anything in Malone
13 that -- I'm sorry.
14        I withdraw the question.  Let's turn
15 now to the UNIX reference.  First of all, what
16 is UNIX?
17   A.   UNIX is an operating system.  It is an
18 old operating system.  It has been around since
19 at least the early 1970s.  It has been around
20 for a long time.
21   Q.   How common was its use in the early
22 '90s?
23   A.   It was very common.  It was arguably
24 one of the predominant operating systems at
25 that time, before it was superseded by Windows

1  and Apple's MacIntosh.
2    Q.   Could you describe the find command
3  for us?
4    A.   The find command is one of the simple
5  commands in UNIX.  UNIX, Your Honor, is a
6  command-based system.  It traditionally at that
7  time did not have a graphical interface.  That
8  was added subsequently.
9         So the way you interacted with UNIX is
10 you had a command with a command window so you
11 looked at a window and it had basically a
12 little arrow thing and you typed in commands.
13 And one command could be list all the files in
14 a directory and another command could be find
15 all files that match a particular criteria,
16 like file name equals, you know, has a
17 particular name or a file date equals 21st,
18 January, 1970, for example.
19        So it did that kind of matching.  It
20 was a command-based thing.  So you had to type
21 this in or run it in a script.  It was not
22 something that was particularly user friendly.
23 You had to be in the know, so to speak.  You
24 had to be a computer person generally to use
25 UNIX and use things like UNIX Find.

APLNDC-X0000006491

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1744

1    So that's really an old school way of
2  doing things and very, very direct.  I knew I
3  needed to find a particular thing with a
4  particular piece of information on it, and it
5  would find that it didn't have the kind of
6  general ability to search for things, like in
7  the printer example I gave in the '430 example
8  where you may say I want printers that can
9  support color and PDF.  It would not be able to
10 do anything of that nature.
11    Q.    Would one of ordinary skill in the art
12 at the time of the filing of the application
13 that led to the '430 patent be familiar with
14 UNIX?
15    A.    Oh, absolutely.
16    Q.    Would somebody who is familiar with
17 UNIX be familiar with the find command?
18    A.    Oh, absolutely.  It is one of the few
19 basic commands in UNIX.
20    Q.    Okay.  And was UNIX disclosed in the
21 specification of the '430 patent?
22    A.    Yes, it was.
23    Q.    Okay.  Do you know whether the
24 examiner is considered to be one of ordinary
25 skill in the art?

Page 1745

1    A.    I'm sure he is, absolutely.
2    Q.    And now did the examiner ever reject
3  the claims of the '430 patent during
4  prosecution?
5    A.    He did, yes.
6    Q.    Did he, did he object -- did he reject
7  them based on, based on the prior art?
8    A.    No, he did not reject it based on the
9  prior art.  He asked for better descriptions of
10 the claims, so that it would better match the
11 specification.
12    Q.    Okay.  And how many times did the
13 patentee have to amend the claims in order to
14 overcome the examiner's indefinite rejections?
15    A.    He had to do it at least twice.
16    Q.    Okay.  And going back to the
17 underlying purpose that you described for
18 searching for components that met, based on
19 properties, could you use UNIX to serve that
20 purpose in a framework-based operating system?
21    A.    UNIX in its --
22    Q.    The find command.
23    A.    The find command?  Absolutely not.
24    Q.    Why not?
25    A.    Because it doesn't search by

Page 1746

1  properties.  Like I have already discussed at
2  length, the search criteria in find is simply
3  these inherent characteristics of the
4  components that are already there.  It doesn't
5  search for the properties that could be added
6  by the kind of locator system that the '430
7  patent talks about.
8    And, secondly, they just cannot -- it
9  does not enable adding support to the operating
10 system after it finds those files that it
11 looked for.
12    Q.    Okay.  Let's turn quickly to the '828
13 patent.  So, first, I would like to turn to
14 Desai.  Desai is RX-351.
15    A.    Yes, I have got it.
16    Q.    So could you please -- could you turn
17 to page, let me give you the page.  It is page
18 117 of the --
19    A.    Of the thesis?
20    Q.    Of the thesis.
21    A.    Yes, I am there.
22    Q.    Now, was Desai designed to detect
23 multiple objects?
24    MR. NELSON:  Objection, Your Honor.
25 This is beyond the scope of my

Page 1747

1  cross-examination.  My cross-examination was
2  intentionally very limited in scope.
3    I did not address his opinions
4  concerning what was absent from Desai.  That
5  was in his witness statement.  It is not
6  counsel's opportunity to supplement his record.
7  That's what it is.
8    I addressed his agreement that there
9  was elliptical fitting in Desai, nothing about
10 his opinions concerning what was absent in
11 Desai.  So this is beyond the scope of
12 cross-examination, Your Honor.
13    JUDGE ESSEX:  I believe Mr. Nelson is
14 quite accurate on that.  This is beyond the
15 scope of cross.  Let's strike it.
16    MR. DAVIS:  I will move on, Your
17 Honor.  Just one moment, Your Honor.
18    JUDGE ESSEX:  Absolutely.
19 BY MR. DAVIS:
20    Q.    Do you recall being asked about the
21 Bisset reference?
22    A.    Yes.
23    Q.    Okay.  And the response to the
24 examiner's rejection of the '828 -- of some of
25 the '828 claims based on the Bisset reference?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1748

1    A.   Yes.
2    Q.   In responding to the examiner's
3  rejection, did the patentee rely on any
4  particular way of fitting an ellipse to
5  overcome the Bisset reference?
6    A.   No.
7    Q.   Did the patentee ever indicate that
8  the method disclosed in column 27 of the '828
9  patent was -- I'm sorry.
10       Did the patentee ever address whether
11 or not one could fit an ellipse using the
12 embodiment described in column 27 in response
13 to the office action by the examiner?
14       MR. NELSON:  I am going to make the
15 same objection, Your Honor.  I think we're
16 getting back into claim construction, which I
17 did not do as well.
18       MR. DAVIS:  Your Honor, he asked the
19 grounds for the patentee's response to the
20 rejection.  And I am just attempting to
21 establish the nature of that response.
22       JUDGE ESSEX:  I am not really sure
23 what we're going for here.
24       MR. DAVIS:  You know what, Your Honor,
25 I think I have it from the earlier question and

Page 1749

1  answer.
2        JUDGE ESSEX:  All right.
3        MR. DAVIS:  I will go ahead --
4        JUDGE ESSEX:  Then I will strike it.
5        MR. DAVIS:  I will go ahead and pass
6  the witness.
7        MS. KATTAN:  I have no questions, Your
8  Honor.
9        MR. VERHOEVEN:  Your Honor, I have
10 just three to five minutes.
11          RECROSS-EXAMINATION
12 BY MR. VERHOEVEN:
13   Q.   Put up the '430 patent, column 4.
14 And, Ryan, approximately line 44 through the
15 end on column 4.
16       You were asked on redirect about this
17 paragraph.  Do you remember that?
18   A.   Yes.
19   Q.   And you were directed to the top of
20 the paragraph, or maybe you weren't directed,
21 but somebody mentioned the top of the
22 paragraph, "programming with frameworks
23 requires a new way of thinking for developers
24 accustomed to other types of systems."  Do you
25 see that?

Page 1750

1    A.   Yes.
2    Q.   And you pointed to that as, in your
3  redirect, as the frameworks is somehow the
4  invention here.  Do you remember that?
5        MR. DAVIS:  Object, mischaracterizes
6  his testimony.
7        MR. VERHOEVEN:  I will withdraw it.
8  BY MR. VERHOEVEN:
9    Q.   You remember talking about that,
10 right?
11   A.   I talked about frameworks, yes.
12   Q.   The next sentence says:  "In fact, it
13 is not like programming at all in the
14 traditional sense."  If we could highlight as
15 we're going along here.  "In old-style
16 operating systems such as DOS or UNIX," and
17 then it goes on.  Do you see that?
18   A.   Yes.
19   Q.   Now, DOS and UNIX are what are called
20 procedural software systems, right?
21   A.   Old style.  They were not
22 object-oriented, yes.
23   Q.   They were not object-oriented.  They
24 were procedural as opposed to object-oriented?
25   A.   Back in the day, yes.

Page 1751

1    Q.   And what this paragraph is really
2  talking about, sir, isn't it, is the difference
3  between the old-style procedural software
4  systems and object-oriented software systems?
5    A.   With frameworks, yes.
6    Q.   This discussion of frameworks is in
7  the context of object-oriented frameworks,
8  right?
9    A.   That's correct.
10   Q.   So if you see down here at line 59 --
11 I will grab my pointer, if we could highlight
12 that sentence, Ryan -- rather, the thinking
13 must be in terms of the responsibilities of the
14 objects, which must rely on the framework to
15 determine when the tasks should execute.
16       So this paragraph is saying in the old
17 style you didn't use object-oriented
18 programming.  Now with this framework
19 technology, we're using object-oriented
20 programming, right?
21   A.   Within frameworks, yes.
22   Q.   And then it continues down here,
23 "routines written by the developer are
24 activated by code the developer did not write
25 and that the developer never even sees."  Do

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  you see that?
2      A.  Yes.
3      Q.  That's a discussion of how
4  object-oriented programming works, right?
5      A.  That's correct.  Absolutely.
6      Q.  Okay.  Now, Malone is object-oriented,
7  right?
8      A.  It is an object-oriented system, yes.
9      Q.  Right.
10     A.  Application.
11     Q.  It is the same thing as what this is
12 talking about, object-oriented programming,
13 correct?
14     A.  It is created in the same type of
15 object-oriented setup, yes.
16     Q.  Now, you were asked about this
17 framework, locator framework.  Can we go to
18 claim 1, please.
19         Where in claim 1 is there a limitation
20 of a locator framework?
21     A.  Claim 1 is talking about what the
22 patent is all about, so the whole patent has
23 this locator framework.
24     Q.  Where is there a limitation here that
25 uses the phrase locator framework?

1      A.  It doesn't use that phrase in the
2  claim.
3      Q.  It doesn't.  It uses different words
4  to describe the scope of the invention, right?
5      A.  Well, the scope of the invention is
6  within the context of this overall locator
7  framework that the '430 patent is talking
8  about.
9      Q.  Now, in redirect I thought that you
10 were asked about adding support and what that
11 functionality is here.  And I took some notes,
12 correct me if I am wrong, I thought you said
13 adding support was allowing other applications
14 access to the software components.
15     A.  That's right, once the operating
16 system has that support in, yes.
17     Q.  And the Malone system allows other
18 applications access to software components,
19 doesn't it, sir?
20     A.  But not through the operating system.
21     Q.  Setting aside your dispute with me
22 about whether there is an operating system
23 included in the object lens system, set that
24 aside for me, will you?
25     A.  Sure.

1      Q.  Will you admit for me that setting
2  that aside, at least, that the Malone system
3  allows other applications to access software
4  components?
5      A.  The Malone system, if in your
6  hypothetical, that it is running -- it is not
7  even in the operating system, as I am
8  contending, then, yes, it allows other
9  applications to access files in the file
10 folder, sure.
11     Q.  Now, can we go to the Malone patent,
12 please, Ryan, '870.  This is RX-289.  And if we
13 can go to column 3.  Actually, can we go to
14 column 2 first and can you pull out on column 2
15 the bottom paragraph, just the bottom one.
16 That's fine.  You can do it for background art.
17 That's good, too.
18         Then underneath that put column 3, the
19 two initial -- or go to column 3 and I will
20 tell you what to do.  Can you pull all the way
21 down to the paragraph after summary of the
22 invention, and can we put that all on the same
23 screen?  Or maybe not.  That's fine, Ryan.
24         So you were shown this on redirect,
25 this paragraph, one line of approach has tried

1  to tame the ordinary and often complicated user
2  interface of a computer system's operating
3  system by providing an operating environment
4  within which the user relates to the operating
5  system without directly using the operating
6  system's commands?  Do you remember that?
7      A.  Yes, I do.
8      Q.  And then it says, "the MacIntosh
9  Finder is an example of this approach."  Do you
10 remember that?
11     A.  Yes.
12     Q.  And you said this is an
13 application-based approach?
14     A.  That's right.
15     Q.  Okay.  And then if you go down here,
16 though, it talks about another approach and it
17 says, "the approach of operating environments
18 is limited in that they are dependent on
19 specific applications programs to provide
20 access to databases having wide ranges of
21 applicability to users" -- and this is the
22 clause I would like to focus on -- "and the
23 specific applications are not necessarily
24 integrated with the operating environment."  Do
25 you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1756

1    A.    That's right.
2    Q.    Operating environment is the operating
3  system?
4    A.    No.
5    Q.    It says operating environment, sir?
6    A.    That's right.  If you look back at the
7  previous paragraph that you have highlighted on
8  the left-hand side, it says, user interface of
9  a computer system's operating system by
10  providing an operating environment.  So that
11  clearly distinguishes between the operating
12  system and the operating environment.
13    Q.    Sir, this is one line of approach.
14  And this is discussing another approach.  Do
15  you see that?
16    A.    I'm sorry, I am talking over you.
17    Q.    I'm sorry.
18    A.    That's right, but it is talking about
19  the same kind of operating environment.  It
20  says the approach of operating environments, in
21  your yellow highlighted section, it relates
22  back, I believe, to the same language used just
23  a paragraph before.  And that's what it is
24  saying.  It is not the same as the operating
25  system.  And, in fact, it very clearly

Page 1757

1  distinguishes from the operating system in the
2  previous paragraph.
3    Q.    Isn't it true this paragraph is saying
4  that the prior art approach had a problem in
5  that it wasn't integrated with the operating
6  environment and, sir, isn't it true that the
7  whole purpose of this invention is achieving
8  that integration with the operating
9  environment?
10    A.    With the operating environment, but
11  that's distinct from the operating system as
12  shown in the paragraph on the left-hand side,
13  which comes from column 2 at the bottom.
14    Q.    Now, you say that the Malone reference
15  is limited to application level systems.  Where
16  does it say that in this patent?  Can you show
17  His Honor?
18    A.    Because it says right here, the
19  operating environment, for example, and it
20  talks about applications integrated with the
21  operating environment, and it clearly, as an
22  example, distinguish that, as I just said
23  before, the operating environment, which a user
24  then uses to relate to the operating system, is
25  clearly different from the operating system.

Page 1758

1    Q.    So it is disclosed in the problems of
2  the prior art section?
3    A.    Basically that's the language that it
4  talks about.  And nowhere in the patent does it
5  say this is an operating system or replacement
6  or an integration to the operating system.
7    Q.    Where in the patent, sir, does -- in
8  the description of the invention, where in the
9  preferred embodiment of this patent does it say
10  that this solution is limited to application
11  level systems?
12    A.    It doesn't say that in those words but
13  it does not say it is an operating system
14  solution on it.
15    Q.    It says it is a system.
16    A.    It says it is a system, yes.
17    Q.    It is a stand-alone system?
18    A.    It is a stand-alone system, that it
19  would run on top of an operating system.
20    Q.    It doesn't say it runs on top of an
21  operating system, does it, sir?
22    A.    It doesn't use those words per se but
23  my reading of this patent and one skilled in
24  the art reading this patent would make that
25  understanding, yes.

Page 1759

1    Q.    It just says it is a system?
2    A.    That's what it says, yes.
3    Q.    Thank you.
4    MR. VERHOEVEN:  Your Honor, at this
5  point I don't have any further questions.
6    JUDGE ESSEX:  Mr. Nelson, did you have
7  any further questions?
8    MR. NELSON:  No, nothing from me, Your
9  Honor.
10    JUDGE ESSEX:  Staff?
11    MS. KATTAN:  No, Your Honor.
12    MR. DAVIS:  Nothing, Your Honor.
13    JUDGE ESSEX:  All right.  And I assume
14  that you are resting your rebuttal case?
15    MR. DAVIS:  Yes, Your Honor, with the
16  exception that we need to deal with the
17  exhibits.
18    JUDGE ESSEX:  There is always
19  paperwork to finish.  All right.  Before I
20  close usually, and in this case I am
21  particularly happy to first thank the court
22  reporter and support staff.
23    Oh, pardon me.  You are dismissed and
24  thank you very much.
25    THE WITNESS:  Thank you, Your Honor.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1760

1    JUDGE ESSEX:  Or you can sit there if
2  you want to while I thank the attorneys.  But I
3  am always impressed with the bar that's in
4  front of me and particularly the cooperation.
5  And the attorneys in this case have been no
6  exception to that.
7    You have been outstanding and it is a
8  great pleasure to preside over people such as
9  yourselves, and you have my thanks in this case
10 and we are adjourned.
11    (Whereupon, the below list of exhibits
12 were provided to the court reporter for receipt
13 into evidence:)
14    (Joint Exhibit Numbers JX-463C,
15 JX-479C, JX-533C were received into evidence.)
16    (Joint Exhibit Numbers JX-700C,
17 JX-437, JX-489, JX-525C, JX-527C, JX-532C,
18 JX-542C, JX-543C were received into evidence.)
19    (Respondent Exhibit Number RX-165C was
20 received into evidence.)
21    (Joint Exhibit Numbers JX-701C,
22 JX-525C, JX-540C, JX-543C, JX-544C were was
23 received into evidence.)
24    (Respondent Exhibit Number RX-111C was
25 received into evidence.)

Page 1761

1    (Joint Exhibit Number JX-705C was
2  received into evidence.)
3    (Respondent Exhibit Numbers RX-151C,
4  RX-934, RX-935 were received into evidence.)
5    (Joint Exhibit Numbers JX-702C, JX-001
6  were received into evidence.)
7    (Respondent Exhibit Numbers RX-185C,
8  RX-867 were received into evidence.)
9    (Joint Exhibit Numbers JX-706C,
10 JX-002, JX-005, JX-480C, JX-689C were received
11 into evidence.)
12    (Respondent Exhibit Numbers RX-26C,
13 RX-181C, RX-184C were received into evidence.)
14    (Joint Exhibit Numbers JX-466C,
15 JX-005, JX-006 were received into evidence.)
16    (Respondent Exhibit Numbers RX-1360
17 through RX-1364, RX-1365C, RX-1366, RX-1367C,
18 RX-1368C, RX-1374C were received into
19 evidence.)
20    (Joint Exhibit Numbers JX-467C,
21 JX-001, JX-002, JX-003, JX-005 were received
22 into evidence.)
23    (Respondent Exhibit Number RX-329 was
24 received into evidence.)
25 //

Page 1762

1    (Joint Exhibit Number JX-468C was
2  received into evidence.)
3    (Respondent Exhibit Numbers RX-9C,
4  RX-10C, RX-11C, RX-34C, RX-36C were received
5  into evidence.)
6    (Joint Exhibit Numbers JX-469C,
7  JX-001, JX-004 were received into evidence.)
8    (Respondent Exhibit Numbers RX-156,
9  RX-299, RX-850, RX-922 were received into
10 evidence.)
11    (Joint Exhibit Numbers JX-707C,
12 JX-002, JX-003, JX-367 were received into
13 evidence.)
14    (Respondent Exhibit Numbers RX-158C,
15 RPX-31 were received into evidence.)
16    (Joint Exhibit Numbers JX-471C,
17 JX-001, JX-002, JX-003, JX-007, JX-437, JX-489,
18 JX-524C through JX-527C, JX-532C, JX-540C
19 through JX-543C, JX-545C, JX-546C were received
20 into evidence.)
21    (Respondent Exhibit Numbers RX-142C,
22 RX-861 were received into evidence.)
23    (Joint Exhibit Numbers JX-472C, JX-196
24 were received into evidence.)
25 //

Page 1763

1    (Respondent Exhibit Numbers RX-13C,
2  RX-53, RX-68, RX-144C, RX-154C, RX-1860C,
3  RX-1861C, RX-1862C were received into
4  evidence.)
5    (Joint Exhibit Numbers JX-612C,
6  JX-644C, JX-675C were received into evidence.)
7    (Respondent Exhibit Number RX-1869C
8  was received into evidence.)
9    (Joint Exhibit Numbers JX-001, JX-004
10 were received into evidence.)
11    (Respondent Exhibit Numbers RX-1874C,
12 RDX-08, RX-0289, RX-0601, RX-0735, RX-0882,
13 RX-0884, RX-0922, RX-0994C, RX-1212C, RX-1217C,
14 RX-1796, RX-1874C were received into evidence.)
15    (Joint Exhibit Numbers JX-001,
16 JX-458C, JX-459C, JX-487 were received into
17 evidence.)
18    (Respondent Exhibit Numbers RX-1894C,
19 RDX-13.1-RDX-13.6, RX-882, RX-884, RX-1159,
20 RX-1165, RX-1166, RX-1170, RX-1208, RX-1240,
21 RX-1257, RX-1258, RX-1261, RX-1263 through
22 RX-1282, RX-1284, RX-1285, RX-1893, RX-1894C
23 were received into evidence.)
24    (Complainant Exhibit Number CX-227C,
25 CX-473 were received into evidence.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
APLNDC-X0000006496

Page 1764

1      (Respondent Exhibit Numbers RX-1876C,
2  RX-0904, RX-0906, RX-0914 through RX-0916,
3  RX-1073, RX-1081, RX-1093, RX-1102 through
4  RX-1104, RX-1106, RX-1109, RX-1114C, RX-1117C,
5  RX-1203, RX-1206, RX-1290C, RX-1876C, RX-1897C
6  were received into evidence.)
7      (Joint Exhibit Numbers JX-458C,
8  JX-655C, JX-656C, JX-659C through JX-663C,
9  JX-681C through JX-685C were received into
10  evidence.)
11      (Respondent Exhibit Number RX-1877C,
12  RX-0826C, RX-1376C, RX-1424C, RX-1877C were
13  received into evidence.)
14      (Complainant Exhibit Number CX-113 was
15  received into evidence.)
16      (Respondent Exhibit Numbers RX-1878C,
17  RX-1879C, RX-1424C, RX-1879C were received into
18  evidence.)
19      (Joint Exhibit Numbers JX-655C,
20  JX-656C, JX-659C through JX-662C, JX-681C
21  through JX-685C were received into evidence.)
22      (Respondent Exhibit Numbers RX-1424C,
23  RX-1879C were received into evidence.)
24  //
25  //

Page 1765

1      (Joint Exhibit Numbers JX-002, JX-003,
2  JX-005, JX-006, JX-055, JX-196, JX-367, JX-458C,
3  JX-460C, JX-486C, JX-488C, JX-534C, JX-535C, JX-603C
4  JX-606C, JX-610C, JX-612C, JX-614C, JX-616C, JX-618C
5  JX-620C, JX-622C, JX-624C, JX-626C, JX-630C, JX-632C
6  JX-634C, JX-636C, JX-638C, JX-640C, JX-642C, JX-644C
7  JX-652C, JX-655C, JX-659C, JX-660C, JX-661C, JX-671C
8  JX-673C, JX-675C, JX-680C, JX-681C, JX-684C, JX-685C
9  were received into evidence.)
10      (Respondent Exhibit Numbers RX-1895C,
11  RDX-11.1-11.36C, RX-28C, RX-329, RX-334,
12  RX-557, RX-704C, RX-708, RX-709, RX-710,
13  RX-717, RX-880, RX-927, RX-1049, RX-1895C were
14  received into evidence.)
15      (Joint Exhibit Numbers JX-002, JX-003,
16  JX-005, JX-006, JX-124, JX-132, JX-142, JX-143,
17  JX-147, JX-196, JX-220, JX-245, JX-289, JX-291,
18  JX-347, JX-353, JX-367, JX-401, JX-404 through
19  JX-406, JX-410, JX-419, JX-482C, JX-483C,
20  JX-686, JX-687, JX-690C were received into
21  evidence.)
22  //
23  //
24  //
25  //

Page 1766

1      (Respondent Exhibit Numbers RX-1885C,
2  RDX-9, RX-8, RX-73, RX-279, RX-303, RX-305,
3  RX-329, RX-334, RX-342, RX-350, RX-351, RX-512,
4  RX-558, RX-565, RX-567, RX-625, RX-696, RX-703,
5  RX-705, RX-706, RX-708, RX-709, RX-713, RX-715,
6  RX-717 through RX-721, RX-817 through RX-821,
7  RX-829, RX-830, RX-845, RX-876, RX-877C,
8  RX-878, RX-918, RX-1236, RX-1339, RX-1834,
9  RX-1837, RX-1885C, RX-1888, RX-1887C, RX-0812C,
10  RX-0815C, RX-0994C, RX-1237C, RX-1887C,
11  RX-1796, RDX-15.01-RDX-15.03,
12  RDX-15.05-RDX-15.08, RDX-15.10-RDX-15.18,
13  RDX-15.20, RDX-15.22, RDX-15.25-RDX-15.29,
14  RDX-15.31-RDX-15.61, RDX-15.68-RDX-15.74,
15  RDX-15.81-RDX-15.82, RDX-16.01-RDX-16.03,
16  RDX-16.09-RDX-16.11, RDX-16.22-RDX-16.23,
17  RDX-16.25, RDX-16.29-RDX-16.31, RDX-16.34,
18  RDX-16.37 were received into evidence.)
19      (Joint Exhibit Numbers JX-448C,
20  JX-651C, JX-657C were received into evidence.)
21  //
22  //
23  //
24  //
25  //

Page 1767

1      (Respondent Exhibit Numbers
2  RDX-20.02-RDX-20.11, RDX-20.15-RDX-20.20,
3  RDX-20.30-RDX-20.43, RDX-20.43A,
4  RDX-20.46-RDX-20.47, RDX-20.49-RDX-20.53,
5  RDX-20.56-RDX-20.61, RDX-20.63-RDX-20.71,
6  RDX-20.79-RDX-20.80, RDX-20.82-RDX-20.84,
7  RDX-20.86, RDX-20.88-RDX-20.90,
8  RDX-20.96-RDX-20.97, RDX-20.99-RDX-20.100,
9  RDX-20.103-RDX-20.104, RDX-30, RX-1836 were
10  received into evidence.)
11      (Joint Exhibit Number JX-6, JX-367
12  was received into evidence.)
13      (Respondent Exhibit Number RX-26C,
14  RX-140C, RX-158C, RDX-17.003, RDX-17.004,
15  RDX-17.007, RDX-17.023, RDX-17.025, RDX-18.002,
16  RDX-18.003, RDX-18.004, RDX-18.010, RDX-18.011,
17  RDX-3.016, RDX-20, RDX-26, RDX-28 were received
18  into evidence.)
19      (Complainant Exhibit Numbers
20  CDX-3.001, CX-032C.001, CX-032C.038-.040,
21  CX-032C.075, CX-203C, CX-357, CX-366C, CX-368C,
22  CX-399, CX-403, CX-404, CX-408, CX-415, CX-416,
23  CX-419, CX-420, CX-425, CX-473C, CX-474C,
24  CX-574C, CX-575C were received into evidence.)
25  //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1768

1          (Joint Exhibit Numbers JX-8, JX-437C,
2   JX-478C, JX-479C, JX-491, JX-532C were received
3   into evidence.)
4          (Complainant Exhibit Numbers
5   CDX-008.001-017, CDX-008.025, CDX-008.026,
6   CDX-008.054-058, CDX-008.500-507,
7   CDX-008.509-510, CDX-008.513-516, CX-210,
8   CX-211, CX-212C, CX-213, CX-215, CX-216,
9   CX-384C, CX-391C, CX-550C, CX-568C were
10  received into evidence.)
11         (Joint Exhibit Numbers JX-001, JX-003,
12  JX-004, JX-006, JX-143, JX-196, JX-245, JX-291,
13  JX-464C, JX-469C, JX-472C, JX-491, JX-496C,
14  JX-686, JX-696, JX-702C, JX-705C, JX-15C,
15  JX-668C, JX-557C, JX-692C, JX-645C, JX-646C
16  were received into evidence.)
17         (Complainant Exhibit Numbers CX-576,
18  CX-577, CX-578, CX-579 were received into
19  evidence.)
20         (Joint Exhibit Numbers JX-17C,
21  JX-644C, JX-642C, JX-700C, JX-18C, JX-573C,
22  JX-626C, JX-652C, JX-644C, JX-642C, JX-658C,
23  JX-628C were received into evidence.)
24         (Complainant Exhibit Numbers CX-195,
25  CX-113 were received into evidence.)

Page 1769

1          (Joint Exhibit Numbers JX-701C,
2   JX-704C, JX-19C were received into evidence.)
3          (Complainant Exhibit Numbers CX-224C,
4   CX-226C, CX-227C, CX-228C, CX-229C, CX-230C,
5   CX-240C, CX-241C, CX-242C, CX-244, CX-247C were
6   received into evidence.)
7          (Joint Exhibit Numbers JX-20C,
8   JX-644C, JX-658C, JX-642C, JX-573C, JX-705C,
9   JX-464C, JX-692C were received into evidence.)
10         (Complainant Exhibit Number CDX-11.103
11  was received into evidence.)
12         (Respondent Exhibit Number RX-1869C
13  was received into evidence.)
14         (Joint Exhibit Number JX-702C,
15  JX-706C, JX-466C, JX-001, JX-004 were received
16  into evidence.)
17         (Complainant Exhibit Number CDX-1.032
18  was received into evidence.)
19         (Joint Exhibit Numbers JX-467C,
20  JX-22C, JX-468C, JX-469C, JX-23C, JX-573C,
21  JX-578C, JX-579C, JX-551C, JX-655C, JX-659C,
22  JX-660C, JX-661C, JX-460C, JX-656C, JX-659C
23  were received into evidence.)
24  //
25  //

Page 1770

1          (Complainant Exhibit Numbers CX-051C,
2   CX-052C, CX-054C, CX-055C, CX-056C, CX-057C,
3   CX-061C, CX-067C, CX-073C were received into
4   evidence.)
5          (Joint Exhibit Numbers JX-024C,
6   JX-548C, JX-559C, JX-562C, JX-571C, JX-572C,
7   JX-582C, JX-707C were received into evidence.)
8          (Complainant Exhibit Numbers
9   CDX-9.001-024, CDX-9.026-054, CDX-9.075-083,
10  CDX-9.088-094, CDX-9.096-097, CDX-9.117-118,
11  CDX-30, CDX-31, CX-183C through CX-193C,
12  CX-202C, CX-205C, CX-213, CX-218, CX-240C,
13  CX-214C, CX-295C, CX-297C through CX-299C,
14  CX-306C, CX-512C through CX-517C, CX-522C,
15  CX-536C through CX-543C, CX-553, CX-554,
16  CX-560, CX-561, CX-569C, CX-086C, CX-404,
17  CX-415, CDX-11.023, CDX-11.029, CX-181, CX-600
18  were received into evidence.)
19         (Joint Exhibit Numbers JX-2, JX-5,
20  JX-17C, JX-18C, JX-20C, JX-347, JX-367, JX-401,
21  JX-419, JX-480C, JX-482C, JX-483C, JX-491,
22  JX-528C, JX-530C, JX-690C, JX-461C, JX-462,
23  JX-539C were received into evidence.)
24  //
25  //

Page 1771

1          (Complainant Exhibit Numbers
2   CDX-17.001, CDX-18, CDX-20, CDX-22, CDX-23,
3   CDX-25, CDX-73C, CDX-553, CDX-554, CDX-601
4   through CDX-603 were received into evidence.)
5          (Joint Exhibit Numbers JX-002, JX-003,
6   JX-367, JX-406, JX-458C, JX-663C were received
7   into evidence.)
8          (Whereupon, at 4:45 p.m., the trial
9   concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1772

```
 1        C O N T E N T S
 2   WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
 3   VIVEK SUBRAMANIAN   1437  1438  1570   1608
 4   RAVIN BALAKRISHNAN  1626  1627  1721   1749
 5
 6        AFTERNOON SESSION: 1570
 7
 8        E X H I B I T S
 9   EXHIBIT NO:    MARKED      RECEIVED
10   COMPLAINANT
11   CDX-30.............. 1590
12   CX-227C............................. 1763
13   CX-473............................ 1763
14   CX-113............................ 1764
15   CDX-3.001........................ 1767
16   CX-032C.001................. 1767
17   CX-032C.038-.040.................... 1767
18   CX-032C.075.................... 1767
19   CX-203C........................ 1767
20   CX-357........................ 1767
21   CX-366C....................... 1767
22   CX-368C....................... 1767
23   CX-399....................... 1767
24   CX-403....................... 1767
25   CX-404....................... 1767
```

Page 1774

```
 1   EXHIBIT NO:    MARKED       RECEIVED
 2   COMPLAINANT
 3   CX-384C............................. 1768
 4   CX-391C............................. 1768
 5   CX-550C............................. 1768
 6   CX-568C............................. 1768
 7   CX-576............................. 1768
 8   CX-577............................. 1768
 9   CX-578............................. 1768
10   CX-579............................. 1768
11   CX-195............................. 1768
12   CX-113............................. 1768
13   CX-224C............................. 1769
14   CX-226C............................. 1769
15   CX-227C............................. 1769
16   CX-228C............................. 1769
17   CX-229C............................. 1769
18   CX-230C............................. 1769
19   CX-240C............................. 1769
20   CX-241C............................. 1769
21   CX-242C............................. 1769
22   CX-244............................. 1769
23   CX-247C............................. 1769
24   CDX-11.103.......................... 1769
25   CDX-1.032.......................... 1769
```

Page 1773

```
 1   EXHIBIT NO:    MARKED       RECEIVED
 2   COMPLAINANT
 3   CX-408............................. 1767
 4   CX-415............................. 1767
 5   CX-416............................. 1767
 6   CX-419............................. 1767
 7   CX-420............................. 1767
 8   CX-425............................. 1767
 9   CX-473C............................ 1767
10   CX-474C............................ 1767
11   CX-574C............................ 1767
12   CX-575C............................ 1767
13   CDX-008.001-017.................... 1768
14   CDX-008.025...................... 1768
15   CDX-008.026...................... 1768
16   CDX-008.054-058.................... 1768
17   CDX-008.500-507.................... 1768
18   CDX-008.509-510.................... 1768
19   CDX-008.513-516.................... 1768
20   CX-210............................. 1768
21   CX-211............................. 1768
22   CX-212C............................ 1768
23   CX-213............................. 1768
24   CX-215............................. 1768
25   CX-216............................. 1768
```

Page 1775

```
 1   EXHIBIT NO:    MARKED       RECEIVED
 2   COMPLAINANT
 3   CX-051C............................. 1770
 4   CX-052C............................. 1770
 5   CX-054C............................. 1770
 6   CX-055C............................. 1770
 7   CX-056C............................. 1770
 8   CX-057C............................. 1770
 9   CX-061C............................. 1770
10   CX-067C............................. 1770
11   CX-073C............................. 1770
12   CDX-9.001-024...................... 1770
13   CDX-9.026-054...................... 1770
14   CDX-9.075-083...................... 1770
15   CDX-9.088-094...................... 1770
16   CDX-9.096-097...................... 1770
17   CDX-9.117-118...................... 1770
18   CDX-30............................. 1770
19   CDX-31............................. 1770
20   CX-183C through CX-193C............. 1770
21   CX-202C............................. 1770
22   CX-205C............................. 1770
23   CX-213............................. 1770
24   CX-218............................. 1770
25   CX-240C............................. 1770
```

86 (Pages 1772 to 1775)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1776

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | COMPLAINANT | | |
| 3 | CX-214C.............................. 1770 | | |
| 4 | CX-295C.............................. 1770 | | |
| 5 | CX-297C through CX-299C............. 1770 | | |
| 6 | CX-306C.............................. 1770 | | |
| 7 | CX-512C through CX-517C............. 1770 | | |
| 8 | CX-522C.............................. 1770 | | |
| 9 | CX-536C through CX-543C............. 1770 | | |
| 10 | CX-553.............................. 1770 | | |
| 11 | CX-554.............................. 1770 | | |
| 12 | CX-560.............................. 1770 | | |
| 13 | CX-561.............................. 1770 | | |
| 14 | CX-569C.............................. 1770 | | |
| 15 | CX-086C.............................1770 | | |
| 16 | CX-404.............................1770 | | |
| 17 | CX-415.............................1770 | | |
| 18 | CDX-11.023.......................... 1770 | | |
| 19 | CDX-11.029......................... 1770 | | |
| 20 | CX-181.............................. 1770 | | |
| 21 | CX-600.............................. 1770 | | |
| 22 | CDX-17.001.......................... 1771 | | |
| 23 | CDX-18.............................. 1771 | | |
| 24 | CDX-20.............................. 1771 | | |
| 25 | CDX-22.............................. 1771 | | |

Page 1777

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | COMPLAINANT | | |
| 3 | CDX-23.............................. 1771 | | |
| 4 | CDX-25.............................. 1771 | | |
| 5 | CDX-73C.............................. 1771 | | |
| 6 | CDX-553.............................. 1771 | | |
| 7 | CDX-554.............................. 1771 | | |
| 8 | CDX-601 through CDX-603............. 1771 | | |
| 9 | | | |
| 10 | RESPONDENT | | |
| 11 | RX-165C.............................. 1760 | | |
| 12 | RX-111C.............................. 1760 | | |
| 13 | RX-151C.............................. 1761 | | |
| 14 | RX-934.............................. 1761 | | |
| 15 | RX-935.............................. 1761 | | |
| 16 | RX-185C.............................. 1761 | | |
| 17 | RX-867.............................. 1761 | | |
| 18 | RX-26C.............................. 1761 | | |
| 19 | RX-181C.............................. 1761 | | |
| 20 | RX-184C.............................. 1761 | | |
| 21 | RX-1360 through RX-1364............. 1761 | | |
| 22 | RX-1365C.............................. 1761 | | |
| 23 | RX-1366.............................. 1761 | | |
| 24 | RX-1367C.............................. 1761 | | |
| 25 | RX-1368C.............................. 1761 | | |

Page 1778

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-1374C.............................. 1761 | | |
| 4 | RX-329.............................. 1761 | | |
| 5 | RX-9C.............................. 1762 | | |
| 6 | RX-10C.............................. 1762 | | |
| 7 | RX-11C.............................. 1762 | | |
| 8 | RX-34C.............................. 1762 | | |
| 9 | RX-36C.............................. 1762 | | |
| 10 | RX-156.............................. 1762 | | |
| 11 | RX-299.............................. 1762 | | |
| 12 | RX-850.............................. 1762 | | |
| 13 | RX-922.............................. 1762 | | |
| 14 | RX-158C.............................. 1762 | | |
| 15 | RPX-31.............................. 1762 | | |
| 16 | RX-142C.............................. 1762 | | |
| 17 | RX-861.............................. 1762 | | |
| 18 | RX-13C.............................. 1763 | | |
| 19 | RX-53.............................. 1763 | | |
| 20 | RX-68.............................. 1763 | | |
| 21 | RX-144C.............................. 1763 | | |
| 22 | RX-154C.............................. 1763 | | |
| 23 | RX-1860C.............................. 1763 | | |
| 24 | RX-1861C.............................. 1763 | | |
| 25 | RX-1862C.............................. 1763 | | |

Page 1779

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-1869C.............................. 1763 | | |
| 4 | RX-1874C.............................. 1763 | | |
| 5 | RDX-08.............................. 1763 | | |
| 6 | RX-0289.............................. 1763 | | |
| 7 | RX-0601.............................. 1763 | | |
| 8 | RX-0735.............................. 1763 | | |
| 9 | RX-0882.............................. 1763 | | |
| 10 | RX-0884.............................. 1763 | | |
| 11 | RX-0922.............................. 1763 | | |
| 12 | RX-0994C.............................. 1763 | | |
| 13 | RX-1212C.............................. 1763 | | |
| 14 | RX-1217C.............................. 1763 | | |
| 15 | RX-1796.............................. 1763 | | |
| 16 | RX-1874C.............................. 1763 | | |
| 17 | RX-1894C.............................. 1763 | | |
| 18 | RDX-13.1-RDX-13.6.................. 1763 | | |
| 19 | RX-882.............................. 1763 | | |
| 20 | RX-884.............................. 1763 | | |
| 21 | RX-1159.............................. 1763 | | |
| 22 | RX-1165.............................. 1763 | | |
| 23 | RX-1166.............................. 1763 | | |
| 24 | RX-1170.............................. 1763 | | |
| 25 | RX-1208.............................. 1763 | | |

APLNDC-X0000006500

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1780

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-1240................................ 1763 | | |
| 4 | RX-1257................................ 1763 | | |
| 5 | RX-1258................................ 1763 | | |
| 6 | RX-1261................................ 1763 | | |
| 7 | RX-1263 through RX-1282........... 1763 | | |
| 8 | RX-1284................................ 1763 | | |
| 9 | RX-1285................................ 1763 | | |
| 10 | RX-1893................................ 1763 | | |
| 11 | RX-1894C.............................. 1763 | | |
| 12 | RX-1876C.............................. 1764 | | |
| 13 | RX-0904................................ 1764 | | |
| 14 | RX-0906................................ 1764 | | |
| 15 | RX-0914 through RX-0916............. 1764 | | |
| 16 | RX-1073................................ 1764 | | |
| 17 | RX-1081................................ 1764 | | |
| 18 | RX-1093................................ 1764 | | |
| 19 | RX-1102 through RX-1104............. 1764 | | |
| 20 | RX-1106................................ 1764 | | |
| 21 | RX-1109................................ 1764 | | |
| 22 | RX-1114C.............................. 1764 | | |
| 23 | RX-1117C.............................. 1764 | | |
| 24 | RX-1203................................ 1764 | | |
| 25 | RX-1206................................ 1764 | | |

Page 1781

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-1290C.............................. 1764 | | |
| 4 | RX-1876C.............................. 1764 | | |
| 5 | RX-1897C.............................. 1764 | | |
| 6 | RX-1877C.............................. 1764 | | |
| 7 | RX-0826C.............................. 1764 | | |
| 8 | RX-1376C.............................. 1764 | | |
| 9 | RX-1424C.............................. 1764 | | |
| 10 | RX-1877C.............................. 1764 | | |
| 11 | RX-1878C.............................. 1764 | | |
| 12 | RX-1879C.............................. 1764 | | |
| 13 | RX-1424C.............................. 1764 | | |
| 14 | RX-1879C.............................. 1764 | | |
| 15 | RX-1895C.............................. 1765 | | |
| 16 | RDX-11.1-11.36C.................... 1765 | | |
| 17 | RX-28C.................................. 1765 | | |
| 18 | RX-329................................ 1765 | | |
| 19 | RX-334................................ 1765 | | |
| 20 | RX-557................................ 1765 | | |
| 21 | RX-704C.................................. 1765 | | |
| 22 | RX-708................................ 1765 | | |
| 23 | RX-709................................ 1765 | | |
| 24 | RX-710................................ 1765 | | |
| 25 | RX-717................................ 1765 | | |

Page 1782

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-880................................ 1765 | | |
| 4 | RX-927................................ 1765 | | |
| 5 | RX-1049.............................. 1765 | | |
| 6 | RX-1895C.............................. 1765 | | |
| 7 | RX-1885C.............................. 1766 | | |
| 8 | RDX-9................................ 1766 | | |
| 9 | RX-8.................................... 1766 | | |
| 10 | RX-73.................................. 1766 | | |
| 11 | RX-279................................ 1766 | | |
| 12 | RX-303................................ 1766 | | |
| 13 | RX-305................................ 1766 | | |
| 14 | RX-329................................ 1766 | | |
| 15 | RX-334................................ 1766 | | |
| 16 | RX-342................................ 1766 | | |
| 17 | RX-350................................ 1766 | | |
| 18 | RX-351................................ 1766 | | |
| 19 | RX-512................................ 1766 | | |
| 20 | RX-558................................ 1766 | | |
| 21 | RX-565................................ 1766 | | |
| 22 | RX-567................................ 1766 | | |
| 23 | RX-625................................ 1766 | | |
| 24 | RX-696................................ 1766 | | |
| 25 | RX-703................................ 1766 | | |

Page 1783

| 1 | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 2 | RESPONDENT | | |
| 3 | RX-705................................ 1766 | | |
| 4 | RX-706................................ 1766 | | |
| 5 | RX-708................................ 1766 | | |
| 6 | RX-709................................ 1766 | | |
| 7 | RX-713................................ 1766 | | |
| 8 | RX-715................................ 1766 | | |
| 9 | RX-717 through RX-721............... 1766 | | |
| 10 | RX-817 through RX-821................1766 | | |
| 11 | RX-829................................ 1766 | | |
| 12 | RX-830................................ 1766 | | |
| 13 | RX-845................................ 1766 | | |
| 14 | RX-876................................ 1766 | | |
| 15 | RX-877C.............................. 1766 | | |
| 16 | RX-878................................ 1766 | | |
| 17 | RX-918................................ 1766 | | |
| 18 | RX-1236................................ 1766 | | |
| 19 | RX-1339................................ 1766 | | |
| 20 | RX-1834................................ 1766 | | |
| 21 | RX-1837................................ 1766 | | |
| 22 | RX-1885C.............................. 1766 | | |
| 23 | RX-1888................................ 1766 | | |
| 24 | RX-1887C.............................. 1766 | | |
| 25 | RX-0812C.............................. 1766 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APLNDC-X0000006501

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | RESPONDENT | | |
| 3 | RX-0815C............................... 1766 | | |
| 4 | RX-0994C............................... 1766 | | |
| 5 | RX-1237C............................... 1766 | | |
| 6 | RX-1887C............................... 1766 | | |
| 7 | RX-1796................................. 1766 | | |
| 8 | RDX-15.01-RDX-15.03................. 1766 | | |
| 9 | RDX-15.05-RDX-15.08................. 1766 | | |
| 10 | RDX-15.10-RDX-15.18................. 1766 | | |
| 11 | RDX-15.20............................. 1766 | | |
| 12 | RDX-15.22............................. 1766 | | |
| 13 | RDX-15.25-RDX-15.29................. 1766 | | |
| 14 | RDX-15.31-RDX-15.61................. 1766 | | |
| 15 | RDX-15.68-RDX-15.74................. 1766 | | |
| 16 | RDX-15.81-RDX-15.82................. 1766 | | |
| 17 | RDX-16.01-RDX-16.03................. 1766 | | |
| 18 | RDX-16.09-RDX-16.11................. 1766 | | |
| 19 | RDX-16.22-RDX-16.23................. 1766 | | |
| 20 | RDX-16.25............................. 1766 | | |
| 21 | RDX-16.29-RDX-16.31................. 1766 | | |
| 22 | RDX-16.34............................. 1766 | | |
| 23 | RDX-16.37............................. 1766 | | |
| 24 | RDX-20.02-RDX-20.11................. 1767 | | |
| 25 | RDX-20.15-RDX-20.20................. 1767 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | RESPONDENT | | |
| 3 | RDX-20.30-RDX-20.43................. 1767 | | |
| 4 | RDX-20.43A............................ 1767 | | |
| 5 | RDX-20.46-RDX-20.47................. 1767 | | |
| 6 | RDX-20.49-RDX-20.53................. 1767 | | |
| 7 | RDX-20.56-RDX-20.61................. 1767 | | |
| 8 | RDX-20.63-RDX-20.71................. 1767 | | |
| 9 | RDX-20.79-RDX-20.80................. 1767 | | |
| 10 | RDX-20.82-RDX-20.84................. 1767 | | |
| 11 | RDX-20.86............................. 1767 | | |
| 12 | RDX-20.88-RDX-20.90................. 1767 | | |
| 13 | RDX-20.96-RDX-20.97................. 1767 | | |
| 14 | RDX-20.99-RDX-20.100............... 1767 | | |
| 15 | RDX-20.103-RDX-20.104............. 1767 | | |
| 16 | RDX-30................................. 1767 | | |
| 17 | RX-1836................................. 1767 | | |
| 18 | RX-26C................................. 1767 | | |
| 19 | RX-140C................................ 1767 | | |
| 20 | RX-158C................................ 1767 | | |
| 21 | RDX-17.003............................ 1767 | | |
| 22 | RDX-17.004............................ 1767 | | |
| 23 | RDX-17.007............................ 1767 | | |
| 24 | RDX-17.023............................ 1767 | | |
| 25 | RDX-17.025............................ 1767 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | RESPONDENT | | |
| 3 | RDX-18.002............................ 1767 | | |
| 4 | RDX-18.003............................ 1767 | | |
| 5 | RDX-18.004............................ 1767 | | |
| 6 | RDX-18.010............................ 1767 | | |
| 7 | RDX-18.011............................ 1767 | | |
| 8 | RDX-3.016.............................. 1767 | | |
| 9 | RDX-20................................. 1767 | | |
| 10 | RDX-26................................. 1767 | | |
| 11 | RDX-28................................. 1767 | | |
| 12 | RX-1869C............................... 1769 | | |
| 13 | JOINT | | |
| 14 | JX-463C................................ 1760 | | |
| 15 | JX-479C................................ 1760 | | |
| 16 | JX-533C................................ 1760 | | |
| 17 | JX-700C................................ 1760 | | |
| 18 | JX-437................................. 1760 | | |
| 19 | JX-489................................. 1760 | | |
| 20 | JX-525C................................ 1760 | | |
| 21 | JX-527C................................ 1760 | | |
| 22 | JX-532C................................ 1760 | | |
| 23 | JX-542C................................ 1760 | | |
| 24 | JX-543C................................ 1760 | | |
| 25 | JX-701C................................ 1760 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-525C................................ 1760 | | |
| 4 | JX-540C................................ 1760 | | |
| 5 | JX-543C................................ 1760 | | |
| 6 | JX-544C................................ 1760 | | |
| 7 | JX-705C................................ 1761 | | |
| 8 | JX-702C................................ 1761 | | |
| 9 | JX-001................................. 1761 | | |
| 10 | JX-706C................................ 1761 | | |
| 11 | JX-002................................. 1761 | | |
| 12 | JX-005................................. 1761 | | |
| 13 | JX-480C................................ 1761 | | |
| 14 | JX-689C................................ 1761 | | |
| 15 | JX-466C................................ 1761 | | |
| 16 | JX-005................................. 1761 | | |
| 17 | JX-006................................. 1761 | | |
| 18 | JX-467C................................ 1761 | | |
| 19 | JX-001................................. 1761 | | |
| 20 | JX-002................................. 1761 | | |
| 21 | JX-003................................. 1761 | | |
| 22 | JX-005................................. 1761 | | |
| 23 | JX-468C................................ 1762 | | |
| 24 | JX-469C................................ 1762 | | |
| 25 | JX-001................................. 1762 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-004............................. 1762 | | |
| 4 | JX-707C.......................... 1762 | | |
| 5 | JX-002............................. 1762 | | |
| 6 | JX-003............................. 1762 | | |
| 7 | JX-367............................. 1762 | | |
| 8 | JX-471C.......................... 1762 | | |
| 9 | JX-001............................. 1762 | | |
| 10 | JX-002............................. 1762 | | |
| 11 | JX-003............................. 1762 | | |
| 12 | JX-007............................. 1762 | | |
| 13 | JX-437............................. 1762 | | |
| 14 | JX-489............................. 1762 | | |
| 15 | JX-524C through JX-527C............. 1762 | | |
| 16 | JX-532C.......................... 1762 | | |
| 17 | JX-540C through JX-543C............. 1762 | | |
| 18 | JX-545C.......................... 1762 | | |
| 19 | JX-546C.......................... 1762 | | |
| 20 | JX-472C.......................... 1762 | | |
| 21 | JX-196............................. 1762 | | |
| 22 | JX-612C.......................... 1763 | | |
| 23 | JX-644C.......................... 1763 | | |
| 24 | JX-675C.......................... 1763 | | |
| 25 | JX-001............................. 1763 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-004............................. 1763 | | |
| 4 | JX-001............................. 1763 | | |
| 5 | JX-458C.......................... 1763 | | |
| 6 | JX-459C.......................... 1763 | | |
| 7 | JX-487............................. 1763 | | |
| 8 | JX-458C.......................... 1764 | | |
| 9 | JX-655C.......................... 1764 | | |
| 10 | JX-656C.......................... 1764 | | |
| 11 | JX-659C through JX-663C............. 1764 | | |
| 12 | JX-681C through JX-685C............. 1764 | | |
| 13 | JX-002............................. 1765 | | |
| 14 | JX-003............................. 1765 | | |
| 15 | JX-005............................. 1765 | | |
| 16 | JX-006............................. 1765 | | |
| 17 | JX-055............................. 1765 | | |
| 18 | JX-196............................. 1765 | | |
| 19 | JX-367............................. 1765 | | |
| 20 | JX-458C.......................... 1765 | | |
| 21 | JX-460C.......................... 1765 | | |
| 22 | JX-486C.......................... 1765 | | |
| 23 | JX-488C.......................... 1765 | | |
| 24 | JX-534C.......................... 1765 | | |
| 25 | JX-535C.......................... 1765 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-603C.......................... 1765 | | |
| 4 | JX-606C.......................... 1765 | | |
| 5 | JX-610C.......................... 1765 | | |
| 6 | JX-612C.......................... 1765 | | |
| 7 | JX-614C.......................... 1765 | | |
| 8 | JX-616C.......................... 1765 | | |
| 9 | JX-618C.......................... 1765 | | |
| 10 | JX-620C.......................... 1765 | | |
| 11 | JX-622C.......................... 1765 | | |
| 12 | JX-624C.......................... 1765 | | |
| 13 | JX-626C.......................... 1765 | | |
| 14 | JX-630C.......................... 1765 | | |
| 15 | JX-632C.......................... 1765 | | |
| 16 | JX-634C.......................... 1765 | | |
| 17 | JX-636C.......................... 1765 | | |
| 18 | JX-638C.......................... 1765 | | |
| 19 | JX-640C.......................... 1765 | | |
| 20 | JX-642C.......................... 1765 | | |
| 21 | JX-644C.......................... 1765 | | |
| 22 | JX-652C.......................... 1765 | | |
| 23 | JX-655C.......................... 1765 | | |
| 24 | JX-659C.......................... 1765 | | |
| 25 | JX-660C.......................... 1765 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-661C.......................... 1765 | | |
| 4 | JX-671C.......................... 1765 | | |
| 5 | JX-673C.......................... 1765 | | |
| 6 | JX-675C.......................... 1765 | | |
| 7 | JX-680C.......................... 1765 | | |
| 8 | JX-681C.......................... 1765 | | |
| 9 | JX-684C.......................... 1765 | | |
| 10 | JX-685C.......................... 1765 | | |
| 11 | JX-002............................. 1765 | | |
| 12 | JX-003............................. 1765 | | |
| 13 | JX-005............................. 1765 | | |
| 14 | JX-006............................. 1765 | | |
| 15 | JX-124............................. 1765 | | |
| 16 | JX-132............................. 1765 | | |
| 17 | JX-142............................. 1765 | | |
| 18 | JX-143............................. 1765 | | |
| 19 | JX-147............................. 1765 | | |
| 20 | JX-196............................. 1765 | | |
| 21 | JX-220............................. 1765 | | |
| 22 | JX-245............................. 1765 | | |
| 23 | JX-289............................. 1765 | | |
| 24 | JX-291............................. 1765 | | |
| 25 | JX-347............................. 1765 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APLNDC-X0000006503

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-353.............................. 1765 | | |
| 4 | JX-367.............................. 1765 | | |
| 5 | JX-401.............................. 1765 | | |
| 6 | JX-404 through JX-406............... 1765 | | |
| 7 | JX-410.............................. 1765 | | |
| 8 | JX-419.............................. 1765 | | |
| 9 | JX-482C............................. 1765 | | |
| 10 | JX-483C............................. 1765 | | |
| 11 | JX-686.............................. 1765 | | |
| 12 | JX-687.............................. 1765 | | |
| 13 | JX-690C............................. 1765 | | |
| 14 | JX-448C............................. 1766 | | |
| 15 | JX-651C............................. 1766 | | |
| 16 | JX-657C............................. 1766 | | |
| 17 | JX-6................................ 1767 | | |
| 18 | JX-367.............................. 1767 | | |
| 19 | JX-8................................ 1768 | | |
| 20 | JX-437C............................. 1768 | | |
| 21 | JX-478C............................. 1768 | | |
| 22 | JX-479C............................. 1768 | | |
| 23 | JX-491.............................. 1768 | | |
| 24 | JX-532C............................. 1768 | | |
| 25 | JX-001.............................. 1768 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-003.............................. 1768 | | |
| 4 | JX-004.............................. 1768 | | |
| 5 | JX-006.............................. 1768 | | |
| 6 | JX-143.............................. 1768 | | |
| 7 | JX-196.............................. 1768 | | |
| 8 | JX-245.............................. 1768 | | |
| 9 | JX-291.............................. 1768 | | |
| 10 | JX-464C............................. 1768 | | |
| 11 | JX-469C............................. 1768 | | |
| 12 | JX-472C............................. 1768 | | |
| 13 | JX-491.............................. 1768 | | |
| 14 | JX-496C............................. 1768 | | |
| 15 | JX-686.............................. 1768 | | |
| 16 | JX-696.............................. 1768 | | |
| 17 | JX-702C............................. 1768 | | |
| 18 | JX-705C............................. 1768 | | |
| 19 | JX-15C.............................. 1768 | | |
| 20 | JX-668C............................. 1768 | | |
| 21 | JX-557C............................. 1768 | | |
| 22 | JX-692C............................. 1768 | | |
| 23 | JX-645C............................. 1768 | | |
| 24 | JX-646C............................. 1768 | | |
| 25 | JX-17C.............................. 1768 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-644C............................. 1768 | | |
| 4 | JX-642C............................. 1768 | | |
| 5 | JX-700C............................. 1768 | | |
| 6 | JX-18C.............................. 1768 | | |
| 7 | JX-573C............................. 1768 | | |
| 8 | JX-626C............................. 1768 | | |
| 9 | JX-652C............................. 1768 | | |
| 10 | JX-644C............................. 1768 | | |
| 11 | JX-642C............................. 1768 | | |
| 12 | JX-658C............................. 1768 | | |
| 13 | JX-628C............................. 1768 | | |
| 14 | JX-701C............................. 1769 | | |
| 15 | JX-704C............................. 1769 | | |
| 16 | JX-19C.............................. 1769 | | |
| 17 | JX-20C.............................. 1769 | | |
| 18 | JX-644C............................. 1769 | | |
| 19 | JX-658C............................. 1769 | | |
| 20 | JX-642C............................. 1769 | | |
| 21 | JX-573C............................. 1769 | | |
| 22 | JX-705C............................. 1769 | | |
| 23 | JX-464C............................. 1769 | | |
| 24 | JX-692C............................. 1769 | | |
| 25 | JX-702C............................. 1769 | | |

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-706C............................. 1769 | | |
| 4 | JX-466C............................. 1769 | | |
| 5 | JX-001.............................. 1769 | | |
| 6 | JX-004.............................. 1769 | | |
| 7 | JX-467C............................. 1769 | | |
| 8 | JX-22C.............................. 1769 | | |
| 9 | JX-468C............................. 1769 | | |
| 10 | JX-469C............................. 1769 | | |
| 11 | JX-23C.............................. 1769 | | |
| 12 | JX-573C............................. 1769 | | |
| 13 | JX-578C............................. 1769 | | |
| 14 | JX-579C............................. 1769 | | |
| 15 | JX-551C............................. 1769 | | |
| 16 | JX-655C............................. 1769 | | |
| 17 | JX-659C............................. 1769 | | |
| 18 | JX-660C............................. 1769 | | |
| 19 | JX-661C............................. 1769 | | |
| 20 | JX-460C............................. 1769 | | |
| 21 | JX-656C............................. 1769 | | |
| 22 | JX-659C............................. 1769 | | |
| 23 | JX-024C............................. 1770 | | |
| 24 | JX-548C............................. 1770 | | |
| 25 | JX-559C............................. 1770 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1796

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-562C | 1770 | |
| 4 | JX-571C | 1770 | |
| 5 | JX-572C | 1770 | |
| 6 | JX-582C | 1770 | |
| 7 | JX-707C | 1770 | |
| 8 | JX-2 | 1770 | |
| 9 | JX-5 | 1770 | |
| 10 | JX-17C | 1770 | |
| 11 | JX-18C | 1770 | |
| 12 | JX-20C | 1770 | |
| 13 | JX-347 | 1770 | |
| 14 | JX-367 | 1770 | |
| 15 | JX-401 | 1770 | |
| 16 | JX-419 | 1770 | |
| 17 | JX-480C | 1770 | |
| 18 | JX-482C | 1770 | |
| 19 | JX-483C | 1770 | |
| 20 | JX-491 | 1770 | |
| 21 | JX-528C | 1770 | |
| 22 | JX-530C | 1770 | |
| 23 | JX-690C | 1770 | |
| 24 | JX-461C | 1770 | |
| 25 | JX-462 | 1770 | |

Page 1797

| | EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | JOINT | | |
| 3 | JX-539C | 1770 | |
| 4 | JX-002 | 1771 | |
| 5 | JX-003 | 1771 | |
| 6 | JX-367 | 1771 | |
| 7 | JX-406 | 1771 | |
| 8 | JX-458C | 1771 | |
| 9 | JX-663C | 1771 | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 1798

1   CERTIFICATE OF REPORTER
2 TITLE:  Certain Mobile Devices and Related Software
3 INVESTIGATION NO: 337-TA-750
4 HEARING DATE:    September 30, 2011
5 LOCATION:      Washington, D.C.
6 NATURE OF HEARING: Volume 5
7  I hereby certify that the foregoing/attached
 transcript is a true, correct and complete record of
8 the above-referenced proceedings of the U.S.
 International Trade Commission.
9 Date:  September 30, 2011
10 SIGNED:KAREN BRYNTESON_____
11  Signature of the Contractor of the
  Authorized Contractor's Representative
12  1220 L Street, N.W, Suite 600
  Washington, D.C. 20005
13
14  I hereby certify that I am not the Court
 Reporter and that I have proofread the
15 above-referenced transcript of the proceedings of the
 U.S. International Trade Commission, against the
16 aforementioned Court Reporter's notes and recordings,
 for accuracy in transcription in the spelling,
17 hyphenation, punctuation and speaker identification
 and did not make any changes of a substantive nature.
18 The foregoing/attached transcript is a true, correct
 and complete transcription of the proceedings.
19 SIGNED:JOHN D. LASHER_____
  Signature of Proofreader
20
21  I hereby certify that I reported the
 above-referenced proceedings of the U.S. International
22 Trade Commission and caused to be prepared from my
 tapes and notes of the proceedings a true, correct and
23 complete verbatim recording of the proceedings.
24 SIGNED:KAREN BRYNTESON_____
  Signature of the Court Reporter
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
APLNDC-X0000006505