Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

demonstration of browsing the web on the iPad when it was introduced in January 2010.[376] As stated in the Samsung study, "Apple's focus on this may indicate its recognition of web browsing as a common element that all users of the iPad will take advantage of, regardless of other interests."[377] Apple realized that marketing with a focus on the internet experience may attract a wide variety of consumers, as this functionality will appeal to nearly all buyers.[378]

155.    In addition, Apple headlined iPad as "[a]mazingly thin and light" on its website.[379] Advanced Design, Great Built-in Applications, iOS and iCloud were listed as the key features of iPad.[380]

156.    Samsung has also launched various print ads and TV campaigns for its products. Samsung Galaxy Tab 10.1 banners and posters highlighted Clear Readability, Rich Apps Experience, Fast Web Browsing and Crisp Resolutions as key features of the tablet.[381] A September 2011 Galaxy Tab 10.1 print ad marketed the following features of the tablet:[382]

> Amazingly thin, fast and light. With Android 3.1, Honeycomb and Adobe
> Flash Player. It's the tablet that's changing the tablet.

157.    Similarly, an August 2011 TV commercial for Galaxy Tab pointed out as its benefits that it is "thinner, lighter, faster," and provides an access to millions of web videos with Adobe flash:[383]

> People, it's time for better tablet. It's time to tab. Time for sharper pictures
> and better details. Access to millions more web videos with Adobe flash.
> And better, easier and multi-tasking. The thinner, lighter, faster. Samsung
> GALAXY Tab. That's the wonder of Samsung.

158.    Jared Gosler, Cross Functional Producer at Apple, testified that Apple does not specifically market the "bounceback" functionality and control strip feature to consumers of the iPad.[384] Mr. Gosler also was not aware of any research studies reflecting on whether

---

[376] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '391. [8.3]

[377] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '391. [8.3]

[378] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '394. [8.3]

[379] Apple – iPad, Amazingly thin and light, APLNDC0001322822. [9.22]

[380] Apple – iPad, Amazingly thin and light, APLNDC0001322822. [9.22]

[381] Galaxy Tab Launch in Best Buy on June 8th, Samsung Electronics America, Consumer Business Division, June 2, 2011, SAMNDCA00027416-429 at '426. [9.23]

[382] Competitor Marketing Communication Analysis, August – September 2011, SAMNDCA00228434-609 at '592. [10.1]

[383] Competitor Marketing Communication Analysis, August – September 2011, SAMNDCA00228434-609 at '590. [10.1]

[384] Deposition of Jared Gosler, February 22, 2012, pp. 27, 87, 90. [8.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

consumers purchase the iPad because of its "bounceback" and tap-to-zoom functionalities or the control strip feature.[385]

     159.    Eric Jue, Product Line Manager for the iPod at Apple, also admitted that Apple chose not to market the "bounceback" functionality in its advertising campaigns.[386]  He stated in his deposition:[387]

> A: So there's a user interface feature when you're scrolling through a list, and you get to the bottom of a list, and if you drag your finger up the screen, the -- the user interface pulls up, and if you let go, it bounces back, and it's a visual cue that you're at the end of something. It's a very useful user interface implementation that I don't believe exists on any other device. And it's an Apple first, but you wouldn't base an ad that you would run at the Super Bowl on that.

> Q: Why not?

> A: Because it's not the type of thing that makes for great mass market TV ads.

> Q:Why?

> A: I just don't think don't think something like that is -- is a feature that makes sense for that -- that type of medium. [388]

> …

> A: …it's not a feature that you need to –we felt that we needed to market.
> [389]

> …

> A: It wasn't something we felt we had to blast around the TV. [390]

     160.    Mr. Jue also testified that Apple has not ever specifically marketed the control strip and volume display features of the iPhone to its consumers.[391]  Mr. Jue was not aware of any market research that suggesting consumers purchase the iPhone because of the "bounceback," control strip, volume display and tap to zoom features; or any individual iPhone icon that appears on the iPhone.[392]

---

[385] Deposition of Jared Gosler, February 22, 2012, pp. 89, 91. [8.10]

[386] Deposition of Eric Jue, February 24, 2012, pp. 45-51. [11.20]

[387] Deposition of Eric Jue, February 24, 2012, pp. 18, 45. [11.20]

[388] Deposition of Eric Jue, February 24, 2012, pp. 18, 45. [11.20]

[389] Deposition of Eric Jue, February 24, 2012, pp. 48-49. [11.20]

[390] Deposition of Eric Jue, February 24, 2012, p. 51. [11.20]

[391] Deposition of Eric Jue, February 24, 2012, pp. 87-88, 91-92. [11.20]

[392] Deposition of Eric Jue, February 24, 2012, pp. 108-110. [11.20]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

161.    Mr. Musika appears not to have considered these facts in arriving at his damages conclusions.

### b) Samsung has acceptable, non-infringing alternatives available for the asserted intellectual property.

162.    This Panduit factor asks whether or not acceptable, non-infringing substitutes for the patented invention existed during the period of infringement.  The Grain Processing court discusses the importance of considering non-infringing alternatives:[393]

> Reconstructing the market, by definition a hypothetical enterprise, requires the patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture. […] Within this framework, trial courts, with this court's approval, consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly to recover lost profits in a wide variety of forms. […]  In sum, courts have given patentees significant latitude to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement.

> By the same token, a fair and accurate reconstruction of the "but for" market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the "but for" marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner. Moreover, only by comparing the patented invention to its next-best available alternative(s) - regardless of whether the alternative(s) were actually produced and sold during the infringement - can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right. […] Thus, an accurate reconstruction of the hypothetical "but for" market takes into account any alternatives available to the infringer.

163.    Mr. Musika concluded in his report that "non-infringing substitutes did exist in some periods."[394]  Mr. Musika reports in his Exhibit 20 the amount of time that he has concluded it would take for Samsung to return to the market with a non-infringing alternative: 1 month for

---

[393] *Grain Processing Corporation v. American Maize-Products Company*, CAFC, 185 F.3d 1341, August 4, 1999, p. 7 (citations omitted). [14.3]

[394] Musika Report, p. 39. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the '163 and '381 Patents; 6 months for the '915 Patent; 8 months for the Electronic Device Design Patents and all trade dress; and for the '607 Patent, Mr. Musika concludes that Samsung would have a design around available after December 31, 2010 for the tablets with screens of 8 inches or less, but that Samsung does not have a design around for tablets with screens of 10 inches or larger.[395]

164.   I and my staff have had discussions with Samsung engineers and Samsung's technical experts for the utility patents, and my understanding of the technology and Samsung's design around alternative for each utility patent is summarized in Georgia-Pacific factor 9. The only patents for which Samsung would not have an acceptable design around alternative available within one month of the initial infringement are the '607 and '129 Patents. Therefore, as described below, I consider lost profits for these patents for a limited period of time while Samsung develops its non-infringing alternative.

165.   For all other utility patents, the acceptable, available design arounds that would generally take between two to four weeks to design lead me to conclude that Apple is not entitled to lost profits on these utility patents. Samsung generally announces its products several weeks prior to the first sale of the products. This would trigger the hypothetical negotiation as the announcing of its products would constitute an offer to sell the allegedly infringing products and give Apple notice of Samsung's intent to bring these products to market.

166.   Even if consumers were forced to wait a couple weeks in the "but-for" world versus when products were actually first sold, I conclude that Apple would not have sold any additional products related to this delay. I note that this conclusion may appear different than my conclusion discussed below that Apple would not have made additional sales due to a lack of capacity, even if that capacity constraint would have only shifted the potential sale date by a few weeks. The reason for the apparent difference is that in the case of Samsung's sales, I am analyzing a group of customers that *affirmatively* selected the accused product as their phone of choice, and therefore I conclude that the consumer would have made the same selection even if it was delayed by a couple weeks. However, in the analysis of whether Apple could have made additional sales, I am analyzing a group of customers that *affirmatively* selected to NOT purchase an iPhone. I therefore conclude that the consumer would have made the same selection to NOT purchase an iPhone if the customer would be forced to wait a couple weeks.

---

[395] Musika Report, Exhibit 20. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

167.    As discussed in *Georgia-Pacific* factor 9, Samsung also has acceptable, non-infringing alternatives to every asserted design IP. This is evidenced by the accused products themselves given a) each asserted design IP element is not asserted against several smartphones within the accused product set, b) Samsung's smartphones that are not accused in this lawsuit, and c) smartphones that are sold by other carriers that have not been accused of infringement of Apple's design IP.

168.    As admitted by Mr. Musika,[396] when Samsung has an acceptable, non-infringing alternative, Samsung's redesigned products would enjoy the same sales as the earlier products that Samsung actually sold in the market. Therefore, Apple is not entitled to lost profits during the periods that Samsung has a non-infringing alternative available to it.

### c)    Mr. Musika has not proven that Apple has sufficient capacity for all time periods.

169.    As part of his lost profits analysis, Mr. Musika evaluated "Apple's ability to handle the excess demand created by the need to supply iPhones and iPads in the 'but-for' market ..."[397] This analysis provides a crucial stepping stone for a lost profits calculation because without the capacity to manufacture, supply, and sell more units in the "but for" world, a plaintiff could not claim that it suffered lost profits due to the alleged infringement. While Mr. Musika's analysis, documented in Exhibits 26 (smartphones) and 27 (tablets) to his report, attempts to quantify Apple's ability to handle excess demand, his assumptions lead to an unreliable and overstated result.

170.    The first assumption that Mr. Musika made in his analysis is that any fabricated iPhone or iPad is available for purchase by a U.S. consumer. Exhibits 15 and 16 to the Mark Buckley deposition, the documents on which Mr. Musika's capacity analysis is based,[398] appear to show Worldwide rather than U.S. supply and sales data.[399] This means that while Apple may

---

[396] Musika Report, p. 40. [2.2]

[397] Musika Report, p. 40. [2.2]

[398] Musika Report, Exhibit 26. [2.2]

[399] With respect to the iPad and Buckley Exhibit 15, see Deposition of Mark Buckley, February 23, 2012, pp. 186, 188, 193, 200. [5.2] With respect to the iPhone, a comparison between the section titled "Units Sold In - Cumulative" of Buckley Exhibit 16 and Apple's SEC filings indicates that Exhibit 16 shows Worldwide data. For example, Exhibit 16 indicates that Apple sold 8,398,000 iPhone units in Q3 of FY2010 (calculated by subtracting the Q2 cumulative value from the Q3 cumulative value). Apple's 10Q filing for the same period also shows 8,398,000 units sold. See Exhibit 16 to Buckley Deposition, iPhone Supply and Sales: 2010 – 2011: K Units, APLNDC-Y0000055417. [5.3] *See also* Apple Form 10Q for the Quarter Ending June 26, 2010, p. 35. [5.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

have had excess installed capacity during any given quarter, not all of this capacity could have been used to build devices that would have worked in the U.S. on a U.S. network.[400]

171.    In addition to the incompatibility issues described above, Mr. Musika also assumed that the many iPhone variants, that is iPhones and iPads that are different colors or have different storage capacities, are perfect substitutes.  This assumption implies, for example, that an 8GB iPhone 4 and a 32GB iPhone 4 are interchangeable in the eyes of the consumer; that one can fill demand for the other.  This assumption is questionable, if only due to the price difference in the devices with different storage capacities.[401]

172.    Mr. Tony Blevins, Apple's Vice President of Procurement, discussed this concept during his deposition with respect to the iPad 2:[402]

> Q. So from early March of 2011 until late July of 2011, did Apple have any excess supply of the iPad 2?
>
> A. We would potentially have had some.
>
> Q. Why wouldn't you have used that excess supply to meet the demand for the iPad 2?
>
> A. Because there are multiple SKUs, and you don't necessarily have exactly the right SKU the customers want to buy at the time they want to buy it.
>
> Q. So can you give me an example of that situation with respect to some actual versions of the iPad 2?
>
> A. An example would be that we may have built 64 gigabyte black versions where consumers actually want 16 gigabyte white.  So in aggregate, we could be short, but a specific SKU, we could have excess.

173.    Mr. Musika's analysis further assumed that different iPhone and iPad models would have been interchangeable.  For example, Mr. Musika's analysis combined "Ending Potential Inventory" of the iPhone 3GS with "Ending Potential Inventory" of the iPhone 4 in Apple's fiscal Q3, 2010 through fiscal Q1, 2012 and then assumed that that combined excess

---

[400] During his deposition, Mr. Buckley said that Apple manufactures iPads "for the world there, and [it] has the ability to pretty easily switch from building a product for a U.S. market or a French market or a German market.  That's not a big effort to do."  However, Mr. Buckley did not describe in detail the work required or how long such modifications would take.

[401] For examples of the price difference in certain iPhone and iPad products, see Apple Inc. iPhone US Carrier & Reseller Pricing, February 17, 2012, APLNDC-Y0000051622. [5.5]  *See also* US Price List, APLNDC-Y0000051621. [5.6]

[402] Deposition of Tony Blevins, April 3, 2012, pp. 23-24. [5.7]

inventory would have filled the hypothetical increase in sales in the "but for" world.[403]   Mr. Musika made the same assumption with respect to the iPad and iPad 2 in fiscal Q2, 2011 through fiscal Q1, 2012.[404]   However, if unable to purchase a Samsung product, a customer would not likely have seen older Apple phone or tablet models as interchangeable.

174.     In addition to the problems described above, Mr. Musika's capacity analysis did not take into account that in February, 2011 Apple released the iPhone 4 on Verizon's network in addition to the device that was already available on AT&T's network.[405]   Since he did not make this distinction, his analysis implicitly assumed that an iPhone 4 running on AT&T's network was a perfect substitute for Verizon's iPhone 4.  This assumption is questionable; as discussed in Section IV.A.4.c), customers often show strong preferences for a particular carrier over another.  Mr. Musika's capacity analysis does not make any effort to control for this effect.

175.     Notwithstanding the oversights elucidated above, Mr. Musika concluded that "Apple demonstrated its ability to have capacity to accommodate additional units …"[406]  However, as evidenced above, Mr. Musika's analysis is high-level and not specific enough to draw strong conclusions.  In fact, there is overwhelming evidence, provided by both public documentation as well as Apple's own analyses, that Apple did suffer real supply constraints, despite the availability of Samsung's accused products, with respect to its iPhone and iPad line of products.  The following analysis focuses on the iPhone 4 and iPad 2, the Apple products most temporally relevant to Samsung's accused products.

### (a)   iPhone 4

176.     On June 29, 2010, five days following the June 24 launch of the iPhone 4,[407] market research firm iSuppli stated that "Apple Inc.'s difficulties in satisfying the massive demand for the iPhone 4 [were] raising questions about the company's management of the supply chain and prompting frustrated customers to consider competitors' smart phones …"[408] iSuppli observed that "[t]he huge early demand for the iPhone 4 … has come at some cost to Apple," noting that with 600,000 pre-orders on the first day of availability, "the Apple Store and

---

[403] Musika Report, Exhibits 17.2 and 26. [2.2]

[404] Musika Report, Exhibits 17.2 and 27. [2.2]

[405] Musika Report, p. 13. [2.2]

[406] Musika Report, p. 41. [2.2]

[407] "Preparing for iPhone 4 Launch Day (FAQ)," CNET, June 23, 2010, <http://news.cnet.com/8301-30686_3-20008509-266.html>. [5.11]

[408] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

partner carrier AT&T Inc. very quickly became overwhelmed, prompting both to stop taking orders just one day after the pre-order was available."[409]  Notably, this shortage prompted an apology by the late CEO Steve Jobs.[410]

177.    A senior analyst at iSuppli was quoted as saying that "[c]onsumers, questioning Apple's supply chain management capability, have started looking for alternative devices."[411] Though, as pointed out by iSuppli, "the ambitious plans of Apple's competitors – and even Apple's own stumbles in delivering its much heralded product – probably pose no deterrent to hordes of devoted Apple fans aching to get their hands on the next available iPhone 4."[412]  Still, "the moves from a battle-weary – yet determined – competition to step up its game [were] all too real and could pose a real risk to Apple."[413]

178.

179.



---

[409] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[410] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[411] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[412] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[413] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[414] Worldwide iPhone Q3'10 Performance Summary, July 7, 2010, APL7940000082356-378 at '358. [5.20]

[415] Worldwide iPhone Q3'10 Performance Summary, July 7, 2010, APL7940000082356-378 at '358. [5.20]

[416] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '493. [5.21]



[417] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '493. [5.21]

[418] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '495. [5.21]

[419] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

[420] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

[421] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

[422] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

[423] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



181.    In light Apple's iPhone 4 supply challenges, Peter Oppenheimer, Apple's CFO, reflected on these constraints during the introductory remarks of Apple's Q1 2011 earnings call held on January 18, 2011.    Notably, Mr. Oppenheimer stated that, at the time, Apple "continue[d] to have a sizable backlog, and believe[d] [it] could have sold even more iPhones if [it] had been able to supply them."[425]    These remarks came more than six months after the iPhone 4's release, indicating multiple months during which Apple was unable to meet demand for this device.

182.    During the same earnings call, Tim Cook, Apple's COO at the time, noted that what Apple had been able to do with regard to the supply of its iPhone was "not enough."[426] Apple "still [had] a significant backlog" and was" working around-the-clock to build more" iPhones.[427]    Foreshadowing the success of the Verizon iPhone 4, Mr. Cook said that he was "not going to predict when supply and demand [would] meet" because Apple "believe[d] the reaction and results from the Verizon customers [would] be huge ..."[428]    Mr. Cook's statement

[424] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

[425] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[426] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[427] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[428] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

proved correct; fewer than 24 hours after it was released for preorder on February 3, 2011, Verizon ceased taking such orders for its version of the iPhone 4.[429]

### (b)  iPad 2

183.     Apple released its second generation iPad on March 11, 2011 both online and via retail stores.[430]  Just four days later on March 15, 2011, reports indicated that the shipping delay for new orders had reached four to five weeks.[431]   One analyst, Brian Marshall of Gleecher & Co., characterized the shipping delay: "Five weeks is pretty intense."[432]

184.     Apple's management discussed the short supply of the iPad 2 during an earnings call on April 20, 2011, 40 days after its release.[433]  Mr. Cook stated that, at the time, Apple was "still amazed that [it was] heavily backlogged not only at the end of the quarter but also up to date."[434]   Later on during the same call, Mr. Cook expressed the size of the iPad 2 shortage: "the iPad [2] [had] the mother of all backlogs that [Apple was] working very, very hard to get out to customers as quickly as [it could]."[435]

185.     Potentially exacerbating the constraint on iPad 2 supply, reports surfaced that the plant which manufactured around 20 to 30% of iPad 2s had suffered an explosion two months

---

[429] "Verizon iPhone 4: Sold Out," Mobile Marketing Watch, February 4, 2011, <http://www.mobilemarketingwatch.com/verizon-iphone-4-sold-out-13001/>. [5.14]

[430] "iPad 2 Release Day: How To Get Apple's New Tablet," Huffington Post, <http://www.huffingtonpost.com/2011/03/10/ipad-2-release-day-2011_n_834017.html?view=print>. [5.28]

[431] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[432] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[433] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 1, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29]

[434] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 5, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29]

[435] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 13, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29]  Though the citation identifies the "iPad" as the product for which a large backlog existed, given that the call took place in April of 2011, the month after the launch of the iPad 2, I assume that Mr. Cook was referring to the second-generation of Apple's tablet.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

after the launch.[436]   According to Morgan Stanley analysts, production at the site was halted pending an investigation.[437]

186.    A month subsequent to the explosion, a J.P. Morgan report published June 28, 2011, observed that "no model of iPad 2 [was] available for immediate shipping in ANY of Apple's online stores in its major markets."[438]   (emphasis in original) As J.P. Morgan aptly pointed out, "the shortage of iPad 2[s] provide[d] an opportunity for many vendors … to enjoy some shelf space at retailers."[439]   J.P. Morgan estimated at the time that the shortage would begin easing in 3Q 2011.[440]

### (c)   Testimony of Tony Blevins

187.    Mr. Tony Blevins, Apple's Vice President of Procurement, gave deposition testimony on April 3, 2012.[441]   During his deposition, Mr. Blevins was questioned regarding his declaration of October 13, 2011.   Paragraph five of the declaration notes that "[w]hen the iPhone 4 and iPad 2 were first released, the extraordinarily high level of demand for these new products resulted in a backlog of orders, but this was a temporary issue that was promptly resolved."[442]   Mr. Blevins specifically noted that "when the iPhone 4 was released in June 2010, the extremely high level of demand resulted in a temporary backlog of orders, but this was resolved by November 2010."[443]

188.    Mr. Blevins provided additional commentary, pointing out that, with respect to the iPhone 4, "through September, there was a backlog; in October, the waiting period was about a week, and by November, they were shipping immediately."[444]

---

[436] "Hon Hai Precision: Fire at Chendu Plant Likely to Depress iPad 2 Production," Morgan Stanley, May 22, 2011, p. 1. [5.30]

[437] "Hon Hai Precision: Fire at Chendu Plant Likely to Depress iPad 2 Production," Morgan Stanley, May 22, 2011, p. 1. [5.30]

[438] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[439] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[440] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[441] Deposition of Tony Blevins, April 3, 2012, pp. 2, 10-11. [5.7]

[442] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 2. [5.32]

[443] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 2. [5.32]

[444] Deposition of Tony Blevins, April 3, 2012, p. 14. [5.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

189.    Turning his attention to Apple's 2nd generation tablet, Mr. Blevins wrote that "when the iPad 2 was first released in early March 2011, the tremendous demand resulted in a temporary backlog, but this was promptly resolved.  By the end of April 2011, the time from order to shipment was about one to two weeks, instead of three to four weeks at the end of March."[448]   Three months later, in late July, "Apple had caught up with demand, resulting in shipment within a few days of order placement."[449]

190.    Mr. Blevins interpreted his declaration during deposition, explaining that his written statements "would indicate, prior to July, that there was a waiting time of one to two weeks from the time the order was placed until it was shipped."[450]   By late July, Apple had "enough products available so [that its] customer[s] [could] get[] the product immediately with no wait time at all, which would be [Apple's] objective."[451]   Again, Apple did everything it could to increase supply of the iPad 2 from March until July, 2011.[452]

191.    Aside from describing certain of Apple's supply shortages, Mr. Blevins' declaration also makes an important point about the duration of those shortages.  He states that "[t]hroughout this period [from June to November 2010], Apple continued to receive a large number of orders from customers who were willing to wait for the products to be shipped, and Apple shipped the iPhone 4 to customers as soon as it became available."[453]   The same was true of customers ordering the iPad 2.[454]   Both of these statements are reasonable: customers

---

[445] Deposition of Tony Blevins, April 3, 2012, p. 15. [5.7]

[446] Deposition of Tony Blevins, April 3, 2012, pp. 15-16. [5.7]

[447] Deposition of Tony Blevins, April 3, 2012, p. 17. [5.7]

[448] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

[449] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

[450] Deposition of Tony Blevins, April 3, 2012, p. 20. [5.7]

[451] Deposition of Tony Blevins, April 3, 2012, p. 20. [5.7]

[452] Deposition of Tony Blevins, April 3, 2012, p. 22. [5.7]

[453] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, pp. 2-3. [5.32]

[454] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

who actually placed orders for these products were willing to wait, sometimes for several weeks, for their arrival. In fact, those customers likely would have known whether a backlog existed when placing their orders.

192. However, in the hypothetical situation that excludes Samsung from the marketplace, those customers who did, in fact, brave a backlog in order to secure an Apple product are not the customers relevant to the calculation of lost profits. Rather, it is the marginal customer who, in reality, purchased a Samsung accused smartphone or tablet from among the many available options, including the Apple products that were the subject of supply shortages. These customers, now hypothetically unable to purchase the accused Samsung product, would have chosen between alternatives: buy a different Samsung product, buy an Apple product which may take weeks to arrive, buy another manufacturer's product (e.g., HTC, Motorola, Nokia, RIM, etc.), or, forego the purchase altogether and buy no product at all. It is sales to these customers that must be apportioned among the market players in the lost profit's analysis. And it is these customers, who have already showed a real propensity to purchase non-Apple products, who are unlikely to wait weeks for an Apple product when the market presents a multitude of readily available alternatives.[+]

### (d) Conclusion

193. Apple has not proven that it had sufficient capacity for the entire damages period. For the iPhone 4 and iPad 2, I conclude that Apple does not have sufficient capacity to make any additional sales for at least the periods until Mr. Blevins concluded that Apple's had excess supply. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I do not believe that Apple has sufficient capacity in periods after these dates, but I do not have sufficient data from Apple to determine whether or not Apple has sufficient capacity.

> **4. Even if Mr. Musika were to prove entitlement to lost profits, his lost profits calculations significantly overstate the amount of lost profits.**
>
> > **a) Mr. Musika does not take price elasticity of demand into consideration in his lost profits calculation.**

---

[455] Deposition of Tony Blevins, April 3, 2012, p. 17. [5.7]
[456] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

194.    Mr. Musika is aware that Apple sells the products that were allegedly lost to Samsung at a wholesale price that is significantly higher than the price that Samsung charges its customers.  Exhibit 41.2 to Mr. Musika's report shows that the average sales price of the accused Samsung products is $358.94 while the average sales price for the products that Apple allegedly lost is $628.30.  Apple's prices are 75% higher[457] than Samsung's prices.  It is not reasonable to assume that Samsung's customers would have been willing to spend an additional $269.36[458] on average more than what they actually paid, especially in light of the large number of alternatives. Mr. Musika's failure to take price elasticity of demand into consideration makes his lost profits calculation unreliable.

195.    Strategy Analytics defines the iPhone as a leading-edge premium smartphone.[459] According to Strategy Analytics, Apple is absent from high-volume low-tier device markets.[460] As shown in Figure 30 below, in 2011 Apple mostly operated in $100-$249 and $250+ tier markets.[461]

**Figure 30: Smartphone Cost Segment Share**[462]



_____

[457] ($628.30 / $358.94)

[458] ($628.30 - $358.94)

[459] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]

[460] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]

[461] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

[462] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

196.   Kantar Worldpanel ComTech ("ComTech") has conducted several longitudinal consumer surveys to analyze the mobile phone market in terms of handset pricing.[463] According to a February 2011 study, Apple dominated in the high end price segment (selling price of handset over $170) with the iPhone 4 in the Q2 2010 – Q4 2010 time period.[464]   In a Q2 2010 report, ComTech states that Apple owners spend significantly more on their handset purchase than other smartphone owners.[465]   In particular, "Apple owners deliver a 15% to 150% premium on their initial handset spend… … versus owners of other smartphones."[466]   In a Q3 2010 report, ComTech also concludes that Apple dominates in the over $170 price band segment.[467]   A Q2 2011 study shows that "iOS still carries a premium" price compared to the market average for smartphones.[468]   Similarly, a February 2011 United States mobile phone market study indicates that "iOS has strong leaning toward the premium market, with 66% of sales over $170 versus 50% for Android."[469]   iPhone 4 is the top selling model in the segment with the average selling price of handset over $170.[470]

---

[463] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '967, '969. [10.4]

[464] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '968, '980. [10.4]

[465] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139, '220. [10.5]

[466] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139. [10.5]

[467] ComTech United States Report Q3 2010, Apple Market Research & Analysis, November 19, 2010, APLNDC0002636414-451 at '421. [10.6]

[468] ComTech Global Report Q2 2011, Apple Market Research & Analysis, August 12, 2011, APLNDC0002640687-727 at '696. [4.13]

[469] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54, at '809.9. [8.11]

[470] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9, '809.41. [8.11]

**Figure 31: Handset Spent Overview[471]**




197.    "iOS handsets remain[ed] the most expensive of all OS's" in Q4 2011, according to a ComTech report.[472]  Apple smartphone customers reported spending the most ($206) on their smartphones in 2011 in contrast to other smartphone owners.[473]  More than one-third (35 percent) of Apple owners reported paying full price for their handset compared to just 19 percent of owners paying full price for the industry.[474]  Apple also noted in its internal study that "iPhone is perceived as expensive" phone.[475]

198.    Mr. Joswiak testified that today Apple iPhone line consists of the iPhone 3GS, the iPhone 4, and the iPhone 4S.[476]  The iPhone 3GS is available to AT&T customers on a two-year contract at no cost.[477]  Without a contact, the iPhone 3GS is priced at $399.[478]  The iPhone

---

[471] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.41. [8.11]

[472] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513. [4.12]

[473] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[474] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[475] iPhone and Android Smartphone Buyer Research, APLNDC-Y0000025148-188, at '157. [10.7]

[476] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 243. [9.2]

[477] Deposition of Gregory Joswiak, Volume I, February 23, 2012, pp. 243-244. [9.2]

[478] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 245. [9.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

4 costs $99 on a two-year contract and is available to AT&T, Verizon and Sprint customers.[479] Without a contract, its price is $549.[480]  The iPhone 4S starts at $199 with a two-year contract, and is also available at $299 and $399, depending on memory capacity.[481]  Without a contract, iPhone 4S's price starts at $649 and increases in hundred dollar increments to $849, depending on memory capacity.[482]  Mr. Joswiak also testified that the price to consumer of various models of the iPhone is very similar to the price of the same phones to carriers.[483]

199.    In contrast, Samsung offers a large number of lower-end basic handsets.[484]  In 2011 Samsung mostly operated in <$100 and $100-$249 smartphone cost tier markets, as presented in Figure 30 above.[485]  In a June 8, 2010 System Concepts study commissioned by Samsung, participants of the study commented that one of the benefits of Android is its cost making it available to a broader market than the iPhone.[486]  Smartphone customers find Samsung more affordable than Apple, according to J.D. Power and Associates.[487]

200.    Indeed, an analysis of the sales data for Samsung's accused products reveals that about 30 percent of the accused products are models that have an average wholesale selling price of ███████████

---

[479] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]

[480] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]

[481] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]

[482] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]

[483] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 451. [9.2]

[484] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5073. [8.5]

[485] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

[486] UX Critique by European Professionals, System Concepts, June 8, 2010, SAMNDCA00202869-933 at '919. [10.2]

[487] 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume2, J.D. Power and Associates, November 15, 2011, SAMNDCA00282033-088 at '080. [13.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 32:  STA Smartphones with ASP** ███████████



201.    These products are clearly in a very different market segment than the iPhones, which start at significantly higher wholesale prices.[489]

202.    iPhone owners have relatively higher disposable income compared to the income of smartphone owner on average.[490]  Forty-seven percent of iPhone 3G owners and 50 percent of iPhone 3GS owners have disposable income of more than $100,000.[491]  In contrast, Crowd Science found that Android smartphone users are less affluent than iPhone users.[492]

---

[488] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.41. [8.11]

[489] In February 2012, the carrier price for the iPhone 3GS was $375, the iPhone 4 carrier price was $549, and the iPhone 4S carrier price was $649, $749, and $849 for the 15 GB / 32 GB / 64 GB versions, respectively. (Apple Inc. iPhone – US, Carrier & Reseller Pricing as of February 17, 2012, APLNDC-Y0000051622. [5.5])

[490] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[491] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[492] Email from John Brown to Arthur Rangel, March 16, 2010, 40% of Blackberry Users Willing to Trade in Their Devices for Apple iPhones, March 15, 2010, APLNDC0001414064-066 at '065. [15.28]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 33: iPhone Owners Income Distribution (Three Month Average Ending April 2010)[493]**



203.    In August 2007, Apple conducted an iPhone Consideration Study to "view the US mobile market approximately 30 days after the iPhone launch and understand the reasons why potential buyers chose not to consider or purchase the iPhone and why those still considering purchasing one have not done so yet."[494]   According to the study, the price of the iPhone was the top reason for not considering the purchase of the iPhone by those who purchased a mobile phone in the past 30 days.[495]   Cost of the iPhone was also the top reason for not purchasing the iPhone.[496]   Apple, therefore, concluded that cost was the primary reason the iPhone was not purchased.[497]   In fact, those considering the purchase of the iPhone expected to pay $258 on average versus $117 for those who did not consider purchasing the iPhone.[498]   Similarly, in a January 2009 Global Mobile Phone Market Study commissioned by Apple, cost was a key driver for the lack of iPhone consideration.[499]

---

[493] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[494] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '859. [10.8]

[495] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '870. [10.8]

[496] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '871. [10.8]

[497] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '872, '889. [10.8]

[498] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '877, '889. [10.8]

[499] Global Mobile Phone Market Study - 12 Country Omnibus Study, Apple Market Research & Analysis, January 2009, APLNDC0001256422-504 at '484. [8.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

204.    In a May 2011 Apple study about Apple brand perception, Apple's price across all products was listed as being key Apple brand constrains.[500]  The study noted that "Apple is universally considered to be higher priced than similar brands and not always a strong value for the money to many."[501]

### b)  Mr. Musika includes lost profits for the Galaxy Tab 7.0 (3G), which is not appropriate based on Mr. Musika's own analysis.

205.    Mr. Musika describes his analysis of the tablet market as follows:[502]

> In May 2010, IDC defined tablets "as tablet form factor devices with 7-12in. color displays. They are currently based on ARM processors and run lightweight operating systems such as Apple's iPhone OS and Google's Android OS." This definition was further updated in December 2011 to "move LCD-based devices such as Barnes & Noble's Nook Color into the media tablet category" from the e-reader category. This change was implemented in the third quarter of 2011.  Further, while the Barnes & Noble Nook Color and the Kindle Fire have changed the dynamics of the market, these products by and large compete in a different segment of the tablet market than Samsung and Apple. Accordingly, I have removed their corresponding units from my analysis of IDC's media tablet data.

206.    So, even though most of his calculations simply rely on IDC's and Strategy Analytics' definitions of the markets, Mr. Musika specifically changes the market definition adopted by these companies with respect to the Nook Color and Kindle Fire.  Mr. Musika does not provide any basis for his assertion that the Nook and Kindle Fire "by and large compete in a different segment of the tablet market than Samsung and Apple."  I can only assume that Mr. Musika excluded these products because they are smaller and less expensive than the iPad / iPad 2.  The Nook Color and Kindle Fire are both 7-inch tablets, and their prices are several hundred dollars less than the wifi-only versions of the iPad.[503]

---

[500] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]

[501] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]

[502] Musika Report, p. 19. [2.2]  I have confirmed that Mr. Musika does not include the Kindle Fire and Nook Color units in his lost profits analysis; if he had included those units, then Apple's market share, and Apple's lost profits, would have decreased.

[503] CNet Review, Barnes & Noble NOOKcolor, last updated November 17, 2011, accessed on April 14, 2012 at http://reviews.cnet.com/e-book-readers/barnes-noble-nookcolor/4505-3508_7-34204884.html#reviewPage1. [15.9]  See also CNet Review, Amazon Kindle Fire, last updated November 23, 2011, accessed on April 14, 2012 at http://reviews.cnet.com/tablets/amazon-kindle-fire/4505-3126_7-35022491.html#reviewPage1. [15.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

207.     However, this exact same reasoning applies to the Galaxy Tab 7.0 (3G).  The Galaxy Tab 7.0 is also a 7" tablet (as its name implies).  In addition, this product includes cellular network capabilities, so it lines up against the 3G-enabled versions of the iPad, which typically sell for a couple hundred dollars more than the wifi-only versions.  Indeed, over the period that the Galaxy Tab 7.0 (3G) has been sold for which I have sales data (October 2010 – December 2011), the Galaxy Tab 7.0 (3G) has sold for an average wholesale ASP of about $450, which is about $270 less than the ASP over the sales life of the iPad K48M,[504] which is the version of the original iPad that can access the 3G cellular network.[505]

208.     I agree with Mr. Musika that the Kindle Fire and the Nook Color are not in the same market as the Apple iPad and the Galaxy Tab 10.1, but it is also my opinion that the Galaxy Tab 7.0 (3G) is also in a different market for similar reasons.  Therefore, Mr. Musika has improperly included the Galaxy Tab 7.0 (3G) in his lost profits calculations.

### c)  Mr. Musika incorrectly uses an assumption that 26% of users select a new carrier when purchasing a cell phone in calculating his lost profits damages.

209.     Mr. Musika's Morflo analysis results in an overstated share of smartphone users switching to the iPhone due to his inclusion of lost units on carriers that did not carry an iPhone.  Mr. Musika uses data from a study presenting consumer purchase patterns to conclude that 26 percent of customers that purchased a phone from a carrier that did not carry an iPhone would have considered switching to the iPhone.[506]  Since the majority of Mr. Musika's smartphone lost profits relate to 2010 sales when the iPhone was sold only on AT&T, my discussion below focuses on AT&T being the only carrier, but it applies equally to 2011 when the iPhone starts selling on Verizon and later on Sprint.

210.     I first note that Mr. Musika characterizes the report as a survey of "2,961 respondents' questions in 2010 that recently purchased a cell phone."[507]  This characterization is wrong.  The report is dated February 2010, and the "Research Methodology" clearly states that the interviews of the 2,961 respondents "were conducted in July – October 2009."[508]

---

[504] The ASP of the iPad K48M over the period from calendar Q2 2010 – Q4 2011 is $719. (Schedule 14.2. [1.2])

[505] Deposition of Mark Buckley, February 23, 2012, pp. 232-233. [5.2]

[506] Musika Report, p. 42, Exhibit 28. [2.2]

[507] Musika Report, p. 42. [2.2]

[508] ThinkTech with Google Presentation, Wireless Shoppers 2.0 How Consumers Shop for Wireless Phones Google Complete Clicstream and Survey Based Study. U.S. Feb 2010, p. 3. [5.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Therefore, the study was performed approximately one full year ahead of Mr. Musika's lost profits period.

211.    Second, Mr. Musika does not apply the same adjustment to AT&T as he does to other carriers; instead, Mr. Musika assumes that all customers that purchased a Samsung phone on AT&T would have *remained* on AT&T, and claims that Apple would have made its market share of AT&T sales of Samsung's sales, which ranges from 60 to 68 percent in 2010.[509] If Mr. Musika's conclusion from the study is to be believed, he should have assumed that 26% of these customers would have decided to switch carriers, and therefore by definition they would not have purchased an iPhone since the iPhone is not offered by any other carrier in 2010. He then could have applied Apple's AT&T share to the *remaining* AT&T customers, although as I describe in the Android platform discussion below, even this also would have resulted in too high a calculation.

212.    Third, the 26 percent figure that Mr. Musika relies upon is artificially inflated because it includes a large number of customers that switch carriers simply to purchase an iPhone. Because the survey is done at a time when the iPhone was only offered on AT&T, any smartphone purchaser that wanted the iPhone but wasn't an AT&T customer would have had to switch carriers. Since the iPhone was very successful, several customers did exactly this, and an overall market percentage would reflect a relatively high portion of customers that would be willing to switch (i.e., 26 percent). However, this percentage is not reflective of customers that *did not* switch to the iPhone. I.e., any customer that purchased a Samsung accused product from a carrier other than AT&T made the affirmative decision to NOT buy an iPhone. This population would have had a significantly lower probability of switching to a different carrier versus the overall smartphone purchaser population.

213.    Finally, Mr. Musika includes in his 26 percent figure a category of purchasers that responded "it was a gift for someone not on my wireless plan," which increased his figure from 22 percent to 26 percent.[510] However, when purchasing a smartphone as a gift, which often includes significant monthly charges, gift givers would frequently take into account the carrier that the gift receiver is currently on. Therefore, it is inappropriate to assume that ALL of these gift receivers ended up on a different network as Mr. Musika's calculations assume.

---

[509] Musika Report, pp. 42-43, Exhibit 31. [2.2]

[510] ThinkTech with Google Presentation, Wireless Shoppers 2.0 How Consumers Shop for Wireless Phones Google Complete Clicstream and Survey Based Study. U.S. Feb 2010, p. 3. [5.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

214.    Overall, the study relied upon my Mr. Musika is not a reliable source to use for the purpose that Mr. Musika used the study.  If the study had excluded iPhone purchasers, then it would have been a more meaningful study because the percentages would not have been tainted by the effect of consumers that would purchase an iPhone no matter what – these customers are clearly not in the population that purchases the accused products.

215.    Mr. Musika's analysis understates the importance of the carrier to consumer smartphone choices.  Unlike Apple, Samsung made a commitment to offer its smart phones on every major U.S. carrier.  For example, a June 2010 article discussing the launch of the Galaxy S product line noted that "[i]n this era where most phones are exclusive to one U.S. carrier or another, Samsung announced there will be versions of the phone on all major carriers."[511] Given customers likely prefer to remain on their current carrier, it is unlikely that Samsung's sales of phones for Verizon in 2010 and T-Mobile and Sprint had any significant effect on iPhone sales.  Indeed, a February 2011 Apple presentation states that "82% of Android switchers upgraded within their current carrier, likely to be due to Android availability on different brands and networks."[512]    Another Apple presentation titled "Android Market Overview" and dated Q4 2010 lists several "Key Conclusions," one of which is that "Android growth accelerated in 2H of 2010" with the first sub-bullet under this conclusion indicating that Android is "[g]aining share through expansion to non-iPhone carriers."[513]  I note that recently Apple has started offering its iPhone on additional carriers, likely in response to the impact of consumers' preferences for carriers.

> **d)    Mr. Musika's analysis does not properly take into account platform competition and the fact that Samsung customers chose to not purchase an iPhone.**

216.    Other than making an adjustment based on carrier as described above, Mr. Musika simply applies Apple's market share on a specific carrier if that carrier carries an iPhone and its market-wide market share if that carrier does not carry an iPhone.  This approach completely ignores the important dynamic of platform competition.  In addition, it ignores the reality that there is a segment of the population that simply dislikes Apple's products.

---

[511] Miller, Michael, "Samsung Unveils Galaxy S Line of Android Phones," PC Magazine, June 30, 2010, <http://www.pcmag.com/print_article2/0,1217,a=252368,00.asp?hidPrint=true>. [15.11]
[512] APLNDC00010809 at pp. 9, 48. [8.11]
[513] APLNDC00004618 – 4736 at '4626. [11.23]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

217.   In the smartphone and tablet markets, not only do customers seek a particular brand (e.g. Apple or Samsung) or model (e.g., iPad 2 or Galaxy Tab 7.0), but also a particular operating system or platform.  In this case, there are two major platforms of relevance: Apple's iOS and Google's Android.

218.   A consumer considering the purchase of a smartphone or tablet may prefer a device that runs a particular platform, a theory that has been propounded by Samsung and Apple's experts alike.[514]  For this reason, in the "but for" environment that assumes Samsung had not sold its allegedly infringing products, it is likely that a significant portion of those sales would have been made by manufacturers that also use Google's Android platform.  A smaller fraction would have been made by Apple, which runs its proprietary iOS platform.

219.   This view, which postulates that a smartphone or tablet's operating system holds significant influence over an individual buyer's purchase decision, is also supported by many observers of the technology industry.  For example, a March, 2011 Computerworld article proposed the following: "[i]f you're in the market for a new smartphone, choosing which one to buy has as much to do with the operating system that runs the phone as with the hardware itself."[515]

220.   Another article, published in April, 2011 by Business Insider, illustrated graphically certain consumer's preference for the Android operating system.  Specifically, Business Insider described a smartphone survey that indicated over 56% of respondents who already owned an Android would simply not buy an iPhone instead.[516]

---

[514] Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, August 21, 2011, pp. 30-35. [5.33] *See also* Musika Report, p. 32. [2.2]
[515] "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011, <http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._Windows_Phone_?taxonomyId=mobile+and+wireless&taxonomyId=15>. [5.34]
[516] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs. Android," Business Insider, April 18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



221.   The same survey indicated that over 38% of smartphone buyers considered platform the most important factor when choosing a particular smartphone.[517]   Respondents also chose platform as another important factor in choosing a smartphone close to 50% of the time.[518]

---

[517] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs Android," Business Insider, April 18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

[518] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs Android," Business Insider, April 18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



What is the MOST IMPORTANT factor to you in choosing a particular smartphone?



What are OTHER factors that are important to you in choosing a smartphone? (Check all that apply)

222. This Business Insider study is an interesting study because it looks at a population (Android purchasers) that would be similar to the customers of the accused products. The question specifically to Android users to which 56% said they would not switch to an iPhone