Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 39: Smartphone Revenue Share in the U.S., Q2 2007 Through Q4 2011[644]**



300.    As pictured in the above graph, Apple has also consistently maintained a high proportion of smartphone revenue share since Q2 2007.  Notably, while Samsung's revenue share has also increased, Apple's share jumped to nearly 60% during Q4, 2011, the quarter that saw the release of the iPhone 4S.

---

[644] Schedule 18. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 41: Apple's Share of Realized Handset Industry Profits Worldwide Q1 2008 Through Q4 2011**[646]



302.    The chart above shows Apple's share of realized Worldwide handset profits. This graph depicts not only the consistent growth of Apple's share of industry profits, but also its profit earning power.  In the most recent quarter depicted, again Q4 2011 during which the iPhone 4S was released, Apple earned 75% of handset industry profits Worldwide.

303.    Mr. Musika also points out in his discussion of irreparable harm that "[d]ue to the complexity of the calculation and uncertainty regarding specific amounts tied to new purchases of Apple's products, almost none of the Apple ecosystem sales are captured in the damage calculation."[647]  However, this statement has nothing to do with a discussion of irreparable harm. In fact, Mr. Musika may have had data sufficient to calculate damages from potentially lost sales

---

[646] Schedule 18. [1.2]
[647] Musika Report, p. 30. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

of accessories or lost sales through iTunes, but did not include it in his analysis.[648] If there was any definite harm to Apple from these alleged losses, then the value could easily be calculated. The fact that Mr. Musika chose not to present calculations of certain alleged lost sales does not show that that there exists irreparable harm.

### B.   Apple Is Not Entitled to Lost Profits

304.   As described at length in my disagreements with Mr. Musika, Apple is not entitled to lost profits on the intellectual property at issue in this lawsuit.  I describe the basis for my conclusions below.

#### 1.   Utility Patents

305.   For the asserted utility patents, Samsung has acceptable, non-infringing alternatives available to it.  I discuss these alternatives at length in *Georgia-Pacific* factor 9.

306.   The only utility patent that would take more than one month to design around is the '607 Patent.  However, the first accused product is the Galaxy Tab 7.0 (3G), which was announced on September 16, 2012[649] This announcement would trigger the design around date.  Therefore, the design around would be completed prior to the launch of the Galaxy Tab 10.1.  Further, as I describe above, Samsung is not entitled to lost profits on the Galaxy Tab 7.0 (3G).

307.   Due to the availability of acceptable, non-infringing alternatives and the other reasons described in Section IV.A.3, Apple is not entitled to lost profits on its asserted utility patents.

#### 2.   Design-Related IP

308.   For the asserted Design-Related IP, Samsung has acceptable, non-infringing alternatives available to it.  I discuss these alternatives at length in *Georgia-Pacific* factor 9.

---

[648] See e.g. iTunes Business P&L Q1'12, APLNDC-Y0000051592-598. [2.37]; GAAP Line of Business Reporting, iPad.Acc, Q1 2009 through Q1 2012, APLNDC-Y0000051606-609 [2.38]

[649] Samsung Press Release: Samsung Mobile Expands Galaxy Product Portfolio with Launch of Samsung Galaxy Tab, September 16, 2010, <http://www.samsung.com/us/news/newsPreviewRead.do?news_seq=19537>. [15.33]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

309.   In addition, Mr. Musika has not cited to any evidence demonstrating evidence of demand for "design" and the specific design-related IP at issue.  I have concluded above that Apple's contribution to "design" is at most a small contribution.

310.   Due to the availability of acceptable, non-infringing alternatives and failure to demonstrate demand, as well as the other reasons described in Section IV.A.3, Apple is not entitled to lost profits on its asserted design-related IP.

### C.  Opinions Regarding Samsung's Profits Related to the Design IP

311.   I understand that a remedy that may be available to Apple for Samsung's infringement of the design-related IP is Samsung's profits related to the infringement ("Unjust Enrichment").  Mr. Musika has performed a calculation of Samsung's Unjust Enrichment based on total revenues and based on Samsung's gross margin, but Mr. Musika has not provided any apportionment in his calculations for Samsung's contributions other than the design-related IP.[650]

312.   As described more fully below, I have concluded that Samsung's COGS and operating expenses are deductible expenses as they are related to the sale and manufacture of the accused products.  I have also performed an apportionment that determines the maximum apportionment of Samsung's profits on the accused products to the design-related intellectual property at issue.

### 1.  Samsung's Sales Data

313.   Samsung has produced sales data that include sales data and expense data for STA, SEA, and SEC.[651]  The sales data include monthly data covering the period May 2010 through December 2011 for 30 Samsung products.[652]  For each of the 3 Samsung entities, the

---

[650] Musika Report, pp. 23-25. [2.2]

[651] Exhibit 2620 to Deposition of Timothy Sheppard, March 30, 2012, SAMNDCA00376623-901. [14.1]

[652] The Samsung sales data includes data for the "Galaxy Tab 7.0" and the "Galaxy Tab 8.9."  I understand that the Galaxy Tab 8.9 is not an accused product, therefore I do not include the Galaxy Tab 8.9 in my calculations.  (Musika Report, p. 48. [2.2])  The "Galaxy Tab 7.0" was first sold by SEA in October 2011; based upon a comparison of Mr. Musika's reported sales for the product he calls "Galaxy Tab" in Exhibit 38.1 to Samsung's sales data, it appears that Mr. Musika is including the product "Galaxy Tab 7.0 (3G)" in his calculations, but he is excluding the product "Galaxy Tab 7.0." Therefore, I do not include the profits for the "Galaxy Tab 7.0" in my calculations of Samsung's profits.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

sales data include quantity (in units), sales ($), cost of goods sold (COGS), and operating expenses broken down into major operating expense categories.

314.    SEA and STA are the only Samsung entities that sell into the United States,[653] therefore Samsung's U.S. sales of the accused products are determined by the sales of the accused products by SEA and STA.  Mr. Sheppard testified that STA sells Samsung's mobile phones in the United States and the sales of the tablets are split so that tablets that can connect to a cellular network are sold by STA and those that cannot (e.g., wifi-only tablets) are sold by SEA.[654]

315.    The following figure provides a summary for STA and SEA of the quantity sold, revenue, and ASP for each of the accused products:

**Figure 42: Consolidated SEA and STA Revenue, Quantity, and ASP for Accused Products[655]**

| Product | 2010 | | | 2011 | | | 2010 - 2011 Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Revenue | Quantity | ASP | Revenue | Quantity | ASP | Revenue | Quantity | ASP |
| Acclaim | $69,626,621 | 209,662 | $332 | $6,918,626 | 30,179 | $229 | $76,545,246 | 239,841 | $319 |
| Captivate | $325,163,101 | 732,869 | $444 | $198,540,962 | 658,440 | $302 | $523,704,063 | 1,391,309 | $376 |
| Continuum | $73,338,883 | 173,560 | $423 | $38,720,356 | 146,614 | $264 | $112,059,239 | 320,174 | $350 |
| Droid Charge | $0 | 0 | $0 | $351,465,501 | 699,366 | $503 | $351,465,501 | 699,366 | $503 |
| Epic 4G | $363,131,713 | 702,727 | $517 | $458,714,814 | 1,092,661 | $420 | $821,846,527 | 1,795,388 | $458 |
| Exhibit 4G | $0 | 0 | $0 | $72,952,506 | 283,073 | $258 | $72,952,506 | 283,073 | $258 |
| Fascinate | $468,640,215 | 1,027,206 | $456 | $150,478,565 | 406,820 | $370 | $619,118,780 | 1,434,026 | $432 |
| Galaxy Ace | $0 | 0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 |
| Galaxy Prevail | $0 | 0 | $0 | $258,911,331 | 1,536,840 | $168 | $258,911,331 | 1,536,840 | $168 |
| Galaxy S (i9000) | $0 | 0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 |
| Galaxy S 4G | $0 | 0 | $0 | $395,281,186 | 1,145,702 | $345 | $395,281,186 | 1,145,702 | $345 |
| Galaxy S II 2 (AT&T) | $0 | 0 | $0 | $179,853,040 | 383,661 | $469 | $179,853,040 | 383,661 | $469 |
| Gem | $0 | 0 | $0 | $63,595,570 | 374,101 | $170 | $63,595,570 | 374,101 | $170 |
| Gravity / Gravity Smart | $0 | 0 | $0 | $90,123,928 | 473,669 | $190 | $90,123,928 | 473,669 | $190 |
| Hercules / Galaxy S II (T-Mobile) | $0 | 0 | $0 | $195,794,628 | 432,286 | $453 | $195,794,628 | 432,286 | $453 |
| Indulge | $0 | 0 | $0 | $98,221,588 | 270,612 | $363 | $98,221,588 | 270,612 | $363 |
| Infuse 4G | $0 | 0 | $0 | $360,510,494 | 850,643 | $424 | $360,510,494 | 850,643 | $424 |
| Intercept | $196,295,412 | 857,530 | $229 | $67,358,564 | 380,030 | $177 | $263,653,976 | 1,237,560 | $213 |
| Mesmerize | $56,630,363 | 119,630 | $473 | $204,644,961 | 537,339 | $381 | $261,275,324 | 656,969 | $398 |
| Nexus S | $26,813,136 | 56,000 | $479 | $25,002,235 | 77,885 | $321 | $51,815,371 | 133,885 | $387 |
| Nexus S 4G | $0 | 0 | $0 | $193,031,315 | 504,068 | $383 | $193,031,315 | 504,068 | $383 |
| Replenish | $0 | 0 | $0 | $92,376,320 | 602,887 | $153 | $92,376,320 | 602,887 | $153 |
| Showcase / Galaxy S Showcase (i500) | $15,649,036 | 31,500 | $497 | $88,312,660 | 233,016 | $379 | $103,961,695 | 264,516 | $393 |
| Sidekick | $0 | 0 | $0 | $133,425,648 | 429,240 | $311 | $133,425,648 | 429,240 | $311 |
| Transform | $66,346,493 | 238,640 | $278 | $86,278,041 | 365,330 | $236 | $152,624,535 | 603,970 | $253 |
| Vibrant | $428,544,127 | 973,166 | $440 | $16,615,189 | 47,877 | $347 | $445,159,316 | 1,021,043 | $436 |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | $154,345,456 | 262,099 | $589 | $147,532,169 | 403,521 | $366 | $301,877,625 | 665,620 | $454 |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | $0 | 0 | $0 | $205,516,283 | 480,023 | $428 | $205,516,283 | 480,023 | $428 |
| Total | $2,244,524,556 | 5,384,589 | $417 | $4,180,176,479 | 12,845,883 | $325 | $6,424,701,035 | 18,230,472 | $352 |

## 2.    Samsung's Deductible Expenses

---

[653] Deposition of Jaehwang Sim, March 10, 2012, pp. 119-120, 142-143. [4.5]

[654] Deposition of Timothy Sheppard, January 24, 2012, pp. 26-28, 87. [3.22]

[655] Schedule {15.1}. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

316.  Samsung has provided detailed, monthly sales and expense data for each accused product.  Other than one adjustment that I describe below relating to the COGS reported in the manufacturing section, I understand that the expense data reported in Samsung's financial data are extracted directly from Samsung's SAP financial data.[656]

317.  I have reviewed each category of cost included in the data and have had conversations with Samsung employees[657] to confirm that the expense items included in Samsung's financial data are deductible expenses.

### a)  SEC's Deductible Expenses

318.  Samsung's financial data includes a section titled "Manufacturing" that includes sales data and expense data for SEC and two Chinese manufacturing subsidiaries.[658]  This data includes the accused products that are manufactured to be sold worldwide;[659] therefore, for many accused products the manufacturing quantity is significantly higher than the sales of SEA and SEC.

319.  As discussed by SEC's 30(b)(6) witness on its financial data, Mr. Sim, in its latest financial data productions, Samsung has adjusted the COGS reported in the data in order to "zero out" the manufacturing profits of the Chinese manufacturing subsidiaries.[660]  Mr. Musika has performed adjustments to his calculations in order to reverse the effect of these adjustments.[661]

320.  In my calculations, I rely on SEC's COGS that do not include any adjustment for the Chinese manufacturing subsidiaries.  Samsung's early productions of financial data did not include any adjustment for the Chinese manufacturing subsidiaries;[662] therefore, I rely on the

---

[656] Deposition of Jaehwang Sim, March 10, 2012, pp. 34-35. [4.5]  *See also* Deposition of Timothy Sheppard, February 29, 2012, p. 84. [10.13]  *See also* Deposition of Timothy Sheppard, March 30, 2012, p. 150. [13.3]

[657] Conversation with Dongyul Choi, April 15, 2012.

[658] The Manufacturing section includes data for SEC Korea, SEHZ, and TSTC, the latter two of which are the Chinese manufacturing subsidiaries.  (Deposition of Jaehwang Sim, March 10, 2012, p. 114. [4.5])

[659] Deposition of Jaehwang Sim, March 10, 2012, pp. 112-113. [4.5]

[660] Deposition of Jaehwang Sim, March 31, 2012, pp. 242, 261. [13.4]  *See also* Deposition of Timothy Sheppard, March 30, 2012, pp. 147-148. [13.3]

[661] Musika Report, pp. 49-50. [2.2]

[662] Deposition of Jaehwang Sim, March 10, 2012, pp. 35-37, 43-48. [4.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

COGS reported in Samsung's earlier financial spreadsheets for the purposes of calculating SEC's deductible expense.[663]

321.     To determine whether SEC's reported expenses are deductible, I have reviewed several deposition transcripts of Samsung financial witnesses and had a conversation with Mr. Jaehwang Sim, a Vice President in SEC's Management Support Team, to gain a better understanding of the costs included in the different expense categories.

322.     The largest cost category for SEC is the cost of goods sold for the accused products.  Based on my conversation with Mr. V.P. Sim, I understand that the COGS expense includes direct expenses such as direct labor and royalties and indirect expenses such as indirect manufacturing labor cost and manufacturing overhead such as utility costs.  These costs are necessary for the manufacture of the accused products and are therefore deductible expenses.  I note that it appears Mr. Musika does not contest that COGS will be found to be deductible expenses, as he has performed an Unjust Enrichment calculation taking these COGS into account.[664]

323.     As part of its calculation of the operating expenses (and COGS to a lesser degree), Samsung allocates expenses that are not directly related to a specific product. Samsung's financial witnesses have described that Samsung's allocation methodology follows a three-step allocation process.    Timothy Sheppard, STA's Vice President of Finance and Operations, describes the three-step process as follows:[665]

> First, any expenses that are incurred specifically with respect to a particular model are allocated to that model;
>
> Second, costs that are not specific to a given model are allocated to various cost centers. So, for example, the lease of a building will be allocated to various cost centers. If that allocation can be undertaken on the basis of usage, that method will be used. For example, if the sales team that works with Sprint takes up two thousand square feet of a four thousand square foot building, half of the rent will be allocated to that Sprint sales team. Alternatively, if the usage methodology is not practical, the revenue method will be used.

---

[663] Exhibit 1922 to the Deposition of Timothy Sheppard, March 30, 2012, SAMNDCA00354292-385. [15.14]

[664] Musika Report, pp. 24-25. [2.2]

[665] Declaration of Timothy Sheppard in Support of Samsung's Opposition to Apple's Motion for Rule 37(b)(2) Sanctions for Samsung's Alleged Violations of January 27, 2012 Damages Discovery Order, March 12, 2012, (hereafter, "Sheppard Declaration") p. 8. [4.17]  *See also* Deposition of Timothy Sheppard, February 29, 2012, pp. 60-64, 92-97, 99. [10.13]  *See also* Deposition of Jaehwang Sim, March 10, 2012, pp. 120-121, 134-137. [4.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

The third and final step is to then take common cost centers, for example, the HR department or the accounting group and allocate those costs across devices.

324.     This allocation procedure is used in Samsung's ordinary course of business,[666] and is instituted as part of Samsung's monthly closing process.[667] This type of allocation methodology is a reasonable method to allocate indirect expenses. I note that Apple's 30(b)(6) witness on financial topics testified that Apple itself allocates the majority of its operating expenses by revenue.[668]

325.     Based on my conversation with Dongyul Choi,[669] I understand that the different operating expense categories include:

- GA Expense – Labor Cost: General & Administrative Staff labor cost
- GA Expense – Depreciation: G&A Staff office supplies and depreciation cost
- GA Expense – Others: IT support cost, 3rd party service expense cost
- Sales Expense – Marketing: Advertising, promotion, and sales commissions
- Sales Expense – Paid Commission: Sales expenses related to 3rd party subcontractors[670]
- Sales Expense – Insurance: all Insurance Cost
- Sales Expense – Others: Sales personnel labor cost, transportation cost, service costs.
- R&D Expense – Labor Cost: R&D related labor cost[671]
- R&D Expense – Depreciation: R&D related equipment depreciation
- R&D Expense – Others: R&D material cost, 3rd party R&D costs.[672]

326.     Based on my discussions, these costs are necessary for the manufacture and sale of the accused products and are therefore deductible expenses.

327.     One expense that I requested more information about is whether any litigation expense related to the current lawsuit is included in the expense data. I received financial data

---

[666] Sheppard Declaration, p. 8. [4.17]
[667] Deposition of Timothy Sheppard, February 29, 2012, pp. 65-67, 96-97. [10.13] Deposition of Timothy Sheppard, March 30, 2012, pp. 77-78. [13.3]
[668] Deposition of Mark Buckley, February 23, 2012, p. 104. [5.2]
[669] Conversation with Dongyul Choi, April 15, 2012
[670] Deposition of Jaehwang Sim, March 31, 2012, p. 251. [13.4] *See also* Deposition of Jaehwang Sim, March 10, 2012, pp. 127-129. [4.5]
[671] Deposition of Jaehwang Sim, March 10, 2012, p. 138. [4.5]
[672] Deposition of Jaehwang Sim, March 10, 2012, p. 138. [4.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

that breaks out the legal expense related to this lawsuit that has been allocated to each accused product on a worldwide basis; the allocated lawsuit expense is a component of COGS, therefore I deduct the litigation expenses from the worldwide COGS in my calculations and thereby increase my calculation of profits.

328.   In summary, I have determined that all of the expenses in the Manufacturing section of the financial data are deductible expenses except the expenses related to the current lawsuit that have been allocated to the accused products.

### b)  STA's and SEA's Deductible Expenses

329.   The expense categories included in the financial data are identical between SEA and STA, and Timothy Sheppard verified that the expenses are reported in a similar fashion,[673] so I analyze the deductible expenses of STA and SEA together.  In my discussion below, I will refer to STA, but the SEA treatment is identical.[674]

330.   Similar to SEC, STA's largest expense is COGS.  I understand that the large majority of COGS is the transfer price from SEC to STA, but other expenses such as repair, inventory value adjustments, scrap, and physical inventory adjustments are also included in STA's COGS.[675]   Mr. Sim testified that "When it comes to COGS under STA, it includes purchase cost, purchase price for the products obtained from a manufacturer.  And there is also costs related to importing products, additional costs.  So you can consider this figure in COGS hundred percent direct cost."[676]

331.   Because STA's COGS are directly related to the sale of the accused products, STA's COGS are a deductible expense for the purpose of calculating STA's profit.  However, when calculating the consolidated profitability of SEC, STA, and SEA, the transfer price between SEC and STA is not a deductible expense because it is a cost to STA and revenue to SEC.  Therefore, I do not treat the transfer price as a deductible expense when calculating the profitability including SEC.  I do not make any deduction for the cost categories other than the transfer price in COGS and remove the effect of the STA's and SEA's COGS for the calculation of the consolidated profitability of SEC, STA, and SEA.

---

[673] Conversation with Timothy Sheppard, April 13, 2012.
[674] Conversation with Timothy Sheppard, April 13, 2012. *See also* Deposition of Jaehwang Sim, March 31, 2012, p. 239. [13.4]
[675] Conversation with Timothy Sheppard, April 13, 2012.
[676] Deposition of Jaehwang Sim, March 31, 2012, p. 227. [13.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

332.    Based on the discussion in Mr. Musika's report, I understand that Apple may contest that 100% of the transfer price is a deductible expense when calculating the profitability of SEA and STA.[677]  As Samsung's financial witnesses have explained, the transfer price is set based on an agreement between Samsung and the U.S. government.[678]  Mr. Sheppard testified that "the negotiation for the APA is really a three-party negotiation between the Korean IRS, the U.S. IRS, and Samsung to say based on our economic activity, they hire economists, we hire economists, the Korean government hires economists and says based on the activity STA does, this is a fair and reasonable amount of profit that reflects the activity that STA is doing.  Based on that, that's how the tax is paid."[679]  I do not see any reason why an adjustment would need to be made to the transfer price.

333.    Based on my conversation with Tim Sheppard,[680] I understand that the different operating expense categories include:[681]

- GA Expense – Labor Cost: General & Administrative Staff labor cost (salaries, overtime, bonuses, benefits, etc.)

- GA Expense – Depreciation: All depreciation for fixed assets (computers, office equipment, etc.)

- GA Expense – Others: Travel expenses, telephone expenses, building expenses for accounting, IT, HR, facilities, legal, and management,

- Sales Expense – Logistics Cost: Warehousing and freight (moving products)

- Sales Expense – Paid Commission: Primarily Temporary staff

- Sales Expense – Insurance: Property and general liability insurance.

- Sales Expense – Others:  Travel expenses, telephone expenses, building expenses for sales cost centers

- Operating Expenses – Other: small miscellaneous items.

[BLACK REDACTION BOX]

[678] Deposition of Timothy Sheppard, January 24, 2012, pp. 21-22, 35, 62-63, 82-83, 115-116. [3.22]  *See also* Advance Pricing Agreement between Samsung Electronics American, Inc. and The Internal Revenue Service, S-ITC-007274461 – 476. [4.18]  *See also* Deposition of Timothy Sheppard, February 29, 2012, pp. 123-129. [10.13]

[679] Deposition of Timothy Sheppard, February 29, 2012, pp. 125-126. [10.13]

[680] Conversation with Timothy Sheppard, April 16, 2012.

[681] The financial data includes a Sales Expenses – Marketing line, but the expenses are zero because SEC reimburses STA for marketing expense. (Deposition of Jaehwang Sim, March 31, 2012, pp. 251-252. [13.4]  *See also* Deposition of Timothy Sheppard, March 30, 2012, p. 98. [13.3])

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

334.    Based on my discussions, these costs are necessary for the manufacture and sale of the accused products and are therefore deductible expenses.  Mr. Sheppard testified that STA is "primarily a sales organization."[682]

335.    In summary, I have determined that all of the expenses in the Manufacturing section of the financial data are deductible expenses.

### 3.    Calculation of Samsung's Profits on the Accused Products

336.    I understand that several damages periods may be relevant depending on which design-related intellectual property is found to be found valid and infringed, so I have calculated profits for the entire period of sales of accused products, from the filing of the Complaint on April 15th, 2011,[683] and from the filing of the Amended Complaint on June 16, 2011.[684]  In addition, I understand that the Court may determine that the damages period may be cut-off for certain periods, so I have included monthly calculations of profits for each accused product in Schedules 21.1 – 21.28 at Volume 1, Tab 2 of my report.

337.    In addition to the three different damages periods for which I calculate profits, I also calculate profits for (i) STA and SEA only; and (ii) SEC, STA, and SEA.

338.    In preparing to calculate Samsung's profits on the accused products, I first calculate period totals across all products for the 2010, 2011, the period April 15, 2011 to December 31, 2011, and the period June 16, 2011 to December 31, 2011.  I then aggregate STA and SEA financials by product, report them on a per unit basis, and calculate Manufacturing expenses on a per unit basis.  I then apply the per unit manufacturing expenses and SEA / STA per unit expenses to determine the per unit profitability, and finally multiply by the number of units sold to determine the profit for each accused product.  The calculations of profitability are in the {4} Series of Schedules at Volume 1, Tab 2 of my report.

339.    My calculations of profits on the accused products after deductible expenses are as follows:

---

[682] Deposition of Timothy Sheppard, January 24, 2012, p. 24. [3.22]
[683] Apple Inc.'s' Complaint for Patent Infringement, April 15, 2011. [15.32]
[684] Apple Inc.'s Amended Complaint, June 16, 2011. [2.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 43:  STA and SEA Profit After Deductible Expenses[685]**

| Product | 2010 | 2011 | Total | 4/15-12/31 2011 | 6/16-12/31 2011 |
|---|---|---|---|---|---|
| | [a] | [b] | | [c] | [d] |
| Acclaim | | | | | |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Exhibit 4G | | | | | |
| Fascinate | | | | | |
| Galaxy Ace | | | | | |
| Galaxy Prevail | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S 4G | | | | | |
| Galaxy S II 2 (AT&T) | | | | | |
| Gem | | | | | |
| Gravity / Gravity Smart | | | | | |
| Hercules / Galaxy S II (T-Mobile) | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Intercept | | | | | |
| Mesmerize | | | | | |
| Nexus S | | | | | |
| Nexus S 4G | | | | | |
| Replenish | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | |
| Sidekick | | | | | |
| Transform | | | | | |
| Vibrant | | | | | |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | | | | | |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | | | | | |
| | | | | | |
| **Profit After Deductible Expenses** | | | | | |

---

[685] Schedule {4.2}. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 44:  SEC, STA, and SEA Profit After Deductible Expenses[686]**



| Product | 2010 | 2011 | Total | 4/15-12/31 2011 | 6/16-12/31 2011 |
|---|---|---|---|---|---|
| | [a] | [b] | | [c] | [d] |
| Acclaim | | | | | |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Exhibit 4G | | | | | |
| Fascinate | | | | | |
| Galaxy Ace | | | | | |
| Galaxy Prevail | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S 4G | | | | | |
| Galaxy S II 2 (AT&T) | | | | | |
| Gem | | | | | |
| Gravity / Gravity Smart | | | | | |
| Hercules / Galaxy S II (T-Mobile) | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Intercept | | | | | |
| Mesmerize | | | | | |
| Nexus S | | | | | |
| Nexus S 4G | | | | | |
| Replenish | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | |
| Sidekick | | | | | |
| Transform | | | | | |
| Vibrant | | | | | |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | | | | | |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | | | | | |
| **Profit After Deductible Expenses** | | | | | |

### 4.  Apportionment of Profit to the Design-Related IP at Issue

340.    Determining the profits of the accused products is the first step of the Unjust Enrichment calculation.  Next, the profits should be apportioned to the design-related IP at issue versus everything else that is contributed by Samsung.  I understand that Apple is likely to take the position that Samsung is not entitled to apportion its profits for the asserted design patents; this is a legal issue for which I do not have an opinion.  I calculate an apportionment for each design-related IP group, and leave it to the Court to determine whether I can apply the apportionment for the design patents.

341.    As I have discussed at length in this report, the design-related IP at issue in this lawsuit is a small portion of the total design relevant for the accused products.  In addition,

---

[686] Schedule {4.1}. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

design as a whole is a small portion of the value to consumers of smartphones. Therefore, a proper apportionment is critical to avoid providing a windfall to Apple of the entirety of Samsung's profits.

342.    Even Apple itself highlighted the value of other smartphone features, rather than industrial design, during its licensing discussions with Samsung. During the October 5, 2010 meeting with Samsung, Apple presented a potential licensing framework.[687] According to the presentation, an advanced mobile device would need to license three sets of technology: basic telephony, Apple computing technologies, and advanced iPhone technologies.[688] Specifically, this framework was based on Apple's conclusion that "*Software* creates the largest share of product value."[689] (emphasis in original) Apple further explained that "[o]perating system, applications, user interface, and services are the key to a *differentiated customer experience*."[690] (emphasis in original) In fact, "[s]oftware [had] always been at the heart of Apple's business and intellectual property portfolio."[691]

343.    The evolution of Apple's devices saw both an increase in processing power and miniaturization, resulting in the iPhone and iPad line of products, which Apple characterized as "RF Mobile Computer[s]."[692] Such "Mobile Computers rely upon several key technologies principally developed in the computing industry."[693] The slide below, presented by Apple during the October meeting, specifically highlighted several of these "key technologies."[694]

---

[687] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]
[688] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]
[689] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]
[690] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]
[691] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]
[692] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '890. [14.8]
[693] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '891. [14.8]
[694] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '891. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 45:  Key Technologies for Mobile Computing**



Mobile Computers rely upon several key technologies principally developed in the computing industry

Microprocessor

Modern Operating System w/ Graphical User Interface

Graphics

Apps

Touch

Music

Video

Gaming

344.     These "[m]obile computers create more value for customers – and sell for more – by virtue of the additional technologies that enable them."[695]   By contrast, save for one sole slide,[696] Apple's presentation is devoid of any mention of the value of industrial design as a value driver for smartphones.  Notably, as discussed elsewhere in my report, the slide that does mention Apple's industrial design suggests that Apple was willing to license its design features to Samsung.

345.     The discovery record includes several consumer studies that can be used to determine a maximum apportionment for design as a whole.

### a)  Apportionment to "Design"

346.     In this section, I analyze the importance of design to smartphone buyers and owners in comparison to other smartphone's features and attributes. To perform this analysis, I

---

[695] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '892. [14.8]

[696] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '898. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

use data from (i) iPhone Buyer Surveys commissioned by Apple; (ii) ComTech Reports also commissioned by Apple; and (iii) J.D. Power and Associates Consumer Studies.

### (1) Apple iPhone Buyer Surveys

347.    In this section, I analyze the importance of the iPhone's attractive appearance and design to iPhone buyers in comparison to other features and attributes of the iPhone. I use data from the iPhone Buyer Surveys commissioned by Apple.

348.    According to Apple's summary, Apple Market Research has conducted monthly surveys of iPhone buyers to study the demographics of iPhone purchasers, their purchase decision making, initial use and satisfaction with the iPhone.[697]   As a part of the survey, the respondents were presented with a list of iPhone's features or attributes and asked to rank the importance (e.g. "very important," "somewhat important," "neither important nor unimportant," "somewhat unimportant," "very unimportant," and "don't know") of the iPhone's features in their iPhone purchase decisions.[698]   The list of the iPhone's features or attributes presented to the respondents included such features as "Web capabilities," "Ease of use," "The ability to download and use apps," "Multitasking," and "Attractive Appearance and Design" among others.[699]   The results of the survey were shown as a series of bar graphs for each iPhone's feature or attribute, similar to Figure 46 below:[700]

---

[697] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q2, APLNDC-Y0000026687-807 at '689. [6.6]

[698] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

[699] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

[700] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 46: The Importance of Attractive Appearance and Design in iPhone Purchase Decision[701]**



349.    Apple frequently analyzes the top box ("Very Important") and top-2 boxes ("Very Important" and "Somewhat Important") in its summaries.[702]   I have collected data on the importance of the iPhone's features and attributes in the iPhone purchase decisions from the iPhone Buyer Surveys for the period from Q2 2010 to Q4 2011.  In the first two quarters, respondents were not asked whether "Attractive appearance and design" were important in their purchase decisions.

350.    I have calculated a reasonable apportionment for design by comparing the weight of top box and top-2 box percentages of "attractive appearance and design" to all other features.  As an example, in the Q4 2010 survey, 50 percent of iPhone buyers in the U.S. named the "Attractive appearance and design" as a very important feature in their decision to purchase the iPhone.[703]  In comparison, 80 percent, 77 percent, 69 percent, 68 percent, 57 percent, 55 percent, 53 percent, 47 percent, 36 percent, 27 percent, 17 percent of the respondents considered the "Web capabilities," "Ease of use," "Improved battery life," "The

---

[701] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '277. [3.14]

[702] Footnote 703: iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-278. [3.14]

[703] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '277. [3.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

ability to download and use apps," "Value for price paid", "Multitasking," "5MP camera with LED flash," "Retina Display," "HD video," "Face Time video calling," and "The ability to edit video on the iPhone 4 with iMovie" as very important features, respectively.[704]

351.    Therefore, to analyze the relative importance of the "Attractive appearance and design" in comparison to the other iPhone's features and attributes, I have divided the percent of iPhone survey respondents that named the attractive appearance and design of the iPhone as very important by the cumulative percent of respondents that considered certain iPhone's features as very important: 50% / (80% + 77% + 69% + 68% + 57% + 55% + 50% + 53% + 47% + 36% + 27% +17%).[705]  This methodology indicates that the attractive appearance and design of the iPhone has a 7.9 percent share of the "very important" category, which I use as the apportionment. [706]  I have performed this analysis for each quarter from Q4 2010 to Q4 2011. On average, the attractive appearance and design of the iPhone are considered to be very important in the purchase decision making relative to all other iPhone features and attributes by 7.5 percent of the iPhone buyers. [707]

352.    I have also replicated this analysis for the "Attractive appearance and design" feature ranked as the top-2 box ("very important" and "somewhat important") by respondents in their iPhone purchase decisions.  On average, 8.5 percent of the iPhone buyers considered the attractive appearance and design of the iPhone to be "very important" or ""somewhat important" in the purchase decision making relative to all other iPhone's features and attributes in the Q4 2010 - Q4 2011 time period. [708]

### (2)  ComTech Reports

353.    Apple commissioned ComTech to conduct longitudinal consumer surveys to study "ownership and purchasing of device, carrier connections, billing and usage in the mobile phone market."[709]  In particular, ComTech Reports provide snapshots of consumer handset purchasing by reason for handset choice, as shown on Figure 47 below.[710]

---

[704] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

[705] 8 Series of Schedules. [1.2]

[706] 8 Series of Schedules. [1.2]

[707] 8 Series of Schedules. [1.2]

[708] 8 Series of Schedules. [1.2]

[709] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '936. [14.10]

[710] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 47: Handset Purchase by Priceband and by Reason for Choice[711]**



354.    According to a February 18, 2011 ComTech Report, only two percent of iPhone owners purchased iPhone because of its design and color in Q2 2011 – Q4 2010.[712]   Five percent of respondents listed design and color as the reason for the Android smartphone ownership.[713]   Overall, only four percent of respondents chose a smartphone for the reason of design and color.[714]

355.    I have collected the data on the handset purchase reasons from the ComTech Reports for the period from Q2 2010 to Q4 2011.  On average, 2 percent, 4 percent, and 3 percent of respondents purchased the iPhone, the Android smartphone or any smartphone, respectively, because of the design and color in the Q2 2010 – Q4 2011 time period.[715]   These are additional measures of apportionment of the value of design.

---

[711] 8 Series of Schedules. [1.2]

[712] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957, [14.10]

[713] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957, [14.10]

[714] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957, [14.10]

[715] 8 Series of Schedules. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (3)  J.D. Power and Associates Studies

#### (a)  Weight given to design category

356.    J.D. Power and Associates has conducted Wireless Smartphone Satisfaction Studies to understand attitudes, experiences and behavioral characteristics of smartphone users and determine factors that impact customer satisfaction across smartphone user segments.[716]  In particular, J.D. Power and Associates uses its proprietary model to break down a smartphone into factors and attributes.  One of the attributes that J.D. Power and Associates asks about is "Styling of wireless phone," which falls within the "Physical Design" category along with "Strength and durability," "clarity of display," and "weight of wireless phone."[717]  According to the weightings in the November 2011 J.D. Power and Associates study, a weighting of 20 percent was given to the smartphone's physical design, and within the physical design, 25 percent was assigned to "Styling of wireless phone."[718]  Therefore, styling was assigned a total weight of five percent.  (20% * 25%)

---

[716] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '343. [13.9]

[717] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

[718] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 48:  Smartphone Factors and Attributes**[719]



357.   A March 2011 Power and Associates study included "visual appeal of your wireless phone" within the "physical design" category.  The weighting for the physical design category was 23 percent, and the visual appeal had a 22 percent weighting of the category, which corresponds to a total weighting of about 5 percent of the smartphone (23% * 22%).[720]

358.   These data points are good measures of an appropriate apportionment for design because a third party (J.D. Power and Associates) has determined the weightings and uses the weights in its industry consulting.

---

[719] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

[720] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '380. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*(b)  Survey results*

359.     Similar to Apple's studies, in its March 2011 study, J.D. Power and Associates also analyzed the smartphone selection process.[721]   According to the study, reasons for choosing the smartphone manufactures included "Liked Overall Design / Style" (45%), "Internet Capable" (44%), "Touch Screen" (43%), and others presented in Figure 49 below.[722]

**Figure 49: Reasons for Choosing Handset Brand[723]**



Responses less than 17% not shown.

58   © 2011 J.D. Power and Associates.
The McGraw-Hill Companies, Inc.
All Rights Reserved.

---

[721] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '393-'400. [13.9]

[722] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '395. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

360.    To analyze the importance of the "Overall design/style" relative to the other reasons for choosing a handset brand, I have divided the percent of respondents that listed the overall design/style as a purchase reason by the cumulative percent of respondents that considered other reasons in their smartphone selection process.  I have calculated a 5 percent apportionment based on the survey responses.[724]

### (4)  Conclusion

361.    These consumer surveys discussed in this section provide a relatively consistent range for apportionment of value to design, ranging from 1% to 8.5%.  Based on my review of these surveys, I have concluded that five percent is an appropriate apportionment of value to design as a whole.

### b)  Apportionment of Design to Specific Design-Related IP at Issue

362.    The five percent determined above is a maximum value for design  because, as discussed above, the design-related IP at issue in this lawsuit is only a small portion of the overall design of a smartphone.

363.    The J.D. Power and Associates studies discussed above provide a basis to compare the success of Apple's products relative to the industry.  In the March 2011 study, Apple outperformed all other manufacturers in the physical design factor, scoring 36 index points above the industry average as shown in Figure 50 below.[725]  Apple also exceled in all five attributes of the physical design, including "Visual appeal of wireless phone," "Size of display screen," "Brightness of background display screen lighting," "Weight of wireless phone," and "Size of wireless phone," [726]  In particular, in the "Visual appeal of wireless phone" attribute, Apple performed 0.47 points or 6 percent above the industry average of 8.16 ((8.63 - 8.16) / 8.16).[727]

---

[723] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '395. [13.9]

[724] 9 Series of Schedules. [1.2]

[725] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]

[726] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]

[727] 9 Series of Schedules. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 50: Physical Design Attribute Ratings Compared to Average**[728]

## Physical Design Attribute Ratings Compared to Average

| | Industry Average | Apple | HTC | Palm | Samsung | Motorola | RIM BlackBerry | Nokia |
|---|---|---|---|---|---|---|---|---|
| Physical Design Index | 795 | 831 | 806 | 782 | 780 | 777 | 763 | 761 |
| Visual appeal of wireless phone | 8.16 | 8.63 | 8.28 | 7.87 | 7.95 | 7.89 | 7.79 | 7.57 |
| Size of display screen | 7.93 | 8.37 | 8.16 | 7.32 | 7.90 | 8.24 | 7.34 | 7.34 |
| Brightness of background display screen lighting | 8.14 | 8.45 | 8.27 | 8.15 | 7.93 | 8.09 | 7.82 | 7.80 |
| Weight of phone (including battery) | 7.73 | 8.00 | 7.77 | 7.95 | 7.71 | 7.11 | 7.62 | 7.68 |
| Size of wireless phone | 7.75 | 8.01 | 7.88 | 7.80 | 7.47 | 7.43 | 7.57 | 7.55 |

For handsets used for less than 2 years.

■ = Significantly ABOVE industry Average at 95% Confidence Level (excluding manufacturer).
■ = Significantly BELOW industry Average at 95% Confidence Level (excluding manufacturer).

51  |  © 2011 J.D. Power and Associates,
The McGraw Hill Companies, Inc.
All Rights Reserved



J.D. POWER
AND ASSOCIATES

364.    In the survey asking about reasons for choosing a smartphone, 51 percent of the
respondents indicated a reason that they selected Apple was the overall design/style.[729] This is
6 percent higher than the industry average of 45 percent, as shown in Figure 51 below.[730]   In
relative terms, the respondents valued Apple's overall design/style 13 percent higher than the
overall design/style of all smartphone manufacturers on average in their smartphone selection
process (6% / 45%).

---

[728] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management
Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]
[729] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I – Management
Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]
[730] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management
Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 51: Selection Process Among Smartphone Manufacturers[731]**

## Selection Process Among Smartphone Manufacturers[1,2]

| Reasons for Selecting Handset | Industry Avg | Apple | HTC | Motorola | Nokia | Palm | RIM BlackBerry | Samsung |
|---|---|---|---|---|---|---|---|---|
| Liked overall design/style | 45% | 51% | 49% | 50% | 34% | 42% | 38% | 43% |
| Internet capable | 44% | 48% | 51% | 57% | 18% | 37% | 37% | 39% |
| Touch screen | 43% | 58% | 61% | 58% | 16% | 56% | 11% | 52% |
| Ability to use e-mail accounts | 38% | 40% | 39% | 50% | 14% | 28% | 33% | 28% |
| Generally easy to use | 36% | 45% | 32% | 35% | 26% | 33% | 31% | 30% |
| Wi-Fi capabilities | 35% | 50% | 42% | 43% | 13% | 27% | 18% | 25% |
| Quality of phone/best one | 35% | 49% | 36% | 33% | 23% | 18% | 25% | 23% |
| Quality of display screen | 34% | 41% | 40% | 45% | 17% | 29% | 22% | 32% |
| Digital camera feature | 33% | 34% | 37% | 44% | 27% | 32% | 25% | 34% |
| GPS/Location feature | 32% | 40% | 40% | 50% | 16% | 25% | 19% | 27% |
| Ease of using Internet features | 32% | 44% | 33% | 40% | 11% | 28% | 21% | 21% |
| Ease of using e-mail features | 31% | 40% | 27% | 38% | 10% | 24% | 28% | 20% |

[1] Reasons less than 31% not shown.
[2] Based to all lengths of handset ownership.

365. Based on the above analyses, I conclude that design in total should only be apportioned five percent of Samsung's profits on accused products. What Apple appears to add in value to the design of their products above the average industry participant is only an increase of 6% to 13%. Using an average of 10% better design, this would imply that the value of all the Apple designs to average design value would be 0.5% of profits (5% X 10%).

366. To be conservative, I would apportion 1% of Samsung's profits to possible design elements allegedly taken from Apple.

### c) Apportionment based on design arounds

367. As I describe below in *Georgia-Pacific* factor 9, I have concluded that Samsung had available to it acceptable, non-infringing alternatives for the trademarks, GUI Design Patents, and trade dress. These available alternatives indicate that the true apportionment to Apple's asserted design-related IP is zero (or at most the expense of the design around discussed in *Georgia-Pacific* factor 9).

---

[731] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I – Management Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

368.    In addition, I note that the trademarks at issue are a small part of the total population of trademarks used on Samsung's accused products.  For example, I or my staff has counted the number of icons in the pictures of several accused products included in the Expert Report of Susan Kare; based on this analysis, it appears that Samsung's accused products include between 34 and 60 icons.[732]

### d)   Conclusion on Apportionment

369.    In my opinion, Apple's design-related IP should be apportioned at most to be one percent of Samsung's profits after deductible expenses.

### 5.   Samsung's Unjust Enrichment

370.    As discussed above, STA's and SEA's profits after deductible expenses are negative (losses), therefore STA and SEA did not have any unjust enrichment related to the sales of the accused products.[733]

371.    Applying the maximum apportionment of one percent to Samsung's profits after deduction expenses results in Samsung's Unjust Enrichment related to its infringement of the design-related IP calculated as follows:

**Figure 52:  STA, SEA, and SEC's Unjust Enrichment – Different Time Periods[734]**



| | STA, SEA and SEC Profit After Deductible Expenses | | |
|---|---|---|---|
| | STA, SEA and SEC Profit After Deductible Expenses | Apportionment | Apportioned STA, SEA and SEC Profit After Deductible Expenses |
| | [a] | [b] | [c] |
| 2010 | | | |
| 2011 | | | |
| Total | | | |
| April 15 - December 31, 2011 | | | |
| June 16 - December 31, 2011 | | | |

---

[732] Schedule 17. [1.2]
[733] Schedule 4. [1.2]
[734] Schedule 4. [1.2]