Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**D.  Opinions Regarding Reasonable Royalty Rate**

> **a)  Basic Framework for Calculating Reasonable Royalty Damages for Patent Infringement**

372.    The determination of damages for patent infringement is defined in Section 284 of U.S. Title 35, which states that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." A reasonable royalty is defined as the amount a willing licensor and licensee would bargain for at an arm's length hypothetical negotiation occurring on the date infringement began (e.g. the date of the first sale of the first infringing product).[735]  The hypothetical negotiation is based on the assumption that the patented claims at issue are deemed unquestionably valid and enforceable and will be infringed by the products of the licensee absent a negotiated license.[736]  Thus, for purposes of my analysis, I assume that the accused products infringe the Patents-in-Suit, and that the Patents-in-Suit are valid and enforceable.

373.    There are two factors "central to the reasonable royalty calculation – the royalty base (the product sales which would be subject to the reasonable royalty), and the royalty rate."[737]  Once the royalty rate and the royalty base are determined, it is a simple multiplication exercise.  In addition, prevailing patentees are entitled to pre-judgment interest, calculations for which I will also include in my analysis of total damages.  The award of prejudgment interest should place the patent holder in the same position that it would have enjoyed if the infringer had entered into a license agreement with regular payments.

374.    In calculating the appropriate reasonable royalty rate to apply, I first determined the date of the hypothetical negotiation.  Then I evaluated what the baseline royalty rate should be, analyzed the factors of *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[738]  and the Federal

---

[735] *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, (U.S. Court of Appeals for the Federal Circuit, October 25, 1995), *517 at p. 5. [12.2]; *see also, Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.,* 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1324, p. 15. [12.3]

[736] *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, (U.S. District Court for the District of Delaware, December 30, 1997), *606, p. 45. [12.4]

[737] *Cornell University v. Hewlett-Packard Company*, Case. No. 01-CV01974, (U.S. District Court for the Northern District of New York, May 27, 2008), *4, p. 2. [12.5]

[738] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court of for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Circuit's recent *Lucent Technologies, Inc. v. Gateway, Inc., et al.*[739] decision, and then used my professional judgment to arrive at my opinion as to the reasonable royalty damages. A reasonable royalty to be paid for use of the Patents-in-Suit depends on an evaluation of the business, legal and economic factors that would be considered by the parties in a hypothetical negotiation. In addition, the Supreme Court and Federal Circuit have repeatedly recognized that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation.[740] In calculating a reasonably royalty rate, I considered facts known at the time of the hypothetical negotiation as well as factual developments occurring after the date of the hypothetical negotiation. This is because, for purposes of the hypothetical negotiation, courts may assume that all parties would have known all relevant information. This is also referred to as the "book of wisdom" which I explain in more detail below.[741]

375. A comprehensive list of factors relevant to determining a reasonable royalty in a hypothetical negotiation is set forth in the leading decision of *Georgia-Pacific Corp. v. U.S. Plywood.*[742] In *Georgia-Pacific*, the court identified fifteen factors deemed pertinent to its decision regarding a royalty rate.[743] In performing a hypothetical negotiation analysis, it is important to recognize that some of the *Georgia-Pacific* factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to fit the facts of the case at hand.[744] The *Georgia-Pacific* factors, as well as other factors that I believe bear on the determination of a reasonable royalty in this matter, are discussed below.

376. As part of my analysis, I have also determined the appropriate royalty base. The Federal Circuit ruled that "the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an

---

[739] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[740] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[741] *See e.g., Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, (U.S. Court of Appeals for the Sixth Circuit, April 25, 1978), *1158, p. 4. [12.1]; *Fromson v. Western Litho Plate and Supply Co., et al.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988), *1575, p. 9. [12.8]

[742] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970). [12.6]

[743] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

[744] *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, (U.S. District Court for the District of Delaware, December 30, 1997), *607, p. 45. [12.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

acceptable range (as determined by the evidence)."[745]   In other words, it is always appropriate to use the sales base of the entire device, so long as the value of the invention is weighed in comparison to the other functionalities of the device and the patented feature is a basis for customer demand.[746]   The value of the invention is reflected in the royalty rate analysis that I conduct below, in which I have weighed the value of the invention in accordance with the *Georgia-Pacific* factors.

377.   If it is determined that the "entire market value rule" applies, the magnitude of the rate I arrive at is an acceptable range based on the documents, testimony and information I have reviewed in connection with my analysis.   The royalty rate I have arrived at accounts for the infringing technology as compared to other capabilities.

### (1)  Date of the Hypothetical Negotiation

378.   The date of the hypothetical negotiation is sometime on or before the date of first infringement.[747]   In *Applied Medical Resources, Corp. v. U.S. Surgical Corp.*, the Federal Circuit states that "reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed" and that the court must "identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation at the time that infringement began, not an earlier one."[748]   For purposes of my analysis, I have assumed that infringement began no later than the date Samsung began selling its accused products, which occurred around June 2010.

### (2)  The Book of Wisdom

379.   In evaluating the business, legal and economic factors that the parties would consider in the hypothetical negotiation, I have relied on facts and documents available as of the date of first infringement.   I have also relied on the "Book of Wisdom," a convention whereby the Court, for purposes of determining patent infringement damages, considers facts and evidence "ex post" the date of the hypothetical negotiation.   The seminal Supreme Court

---

[745] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1338-39, p. 26. (Fed. Cir. 2009). [12.3]

[746] *Uniloc USA, Inc. et al. v. Microsoft Corporation*, (U.S. Court of Appeals for the Federal Circuit, January 4, 2011). [12.9]

[747] *Unisplay, S.A. v. American Elec. Sign Co., Inc.*, 69 F.3d 512, (U.S. Court of Appeals for the Federal Circuit, October 25, 1995), *517, p. 5. [12.2]

[748] *Applied Medical Resources, Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, (U.S. Court of Appeals for the Federal Circuit, January 24, 2006), *1361, p. 4. [12.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

decision discussing the use of this Book of Wisdom is *Sinclair Refining v. Jenkins Petroleum Process Co.*, in which Justice Cardozo wrote:

> At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or savings of expense. This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.[749]

380.    Justice Cardozo also wrote that use of the Book of Wisdom does not "charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning."[750] This precedent is important given that the purpose of the hypothetical negotiation construct is to establish a royalty rate adequate to compensate the Apple for actual use made of the invention by the infringer. Judge Markey in *Panduit v. Stahlin Bros. Fibre Works, Inc.* admonished that reasonable royalties after litigation are not necessarily equivalent to royalty rates that might be negotiated in a purely commercial environment.[751]

381.    The Federal Circuit affirmed the use of the Book of Wisdom to adequately compensate the Apple in *Fromson v. Western Litho Plate and Supply Co.*[752] In that case, Fromson was issued the '461 patent for lithographic plates in 1965, before the metro newspaper market had been created. However, the following decade there was a surge in demand for Fromson-type plates, largely due to the emergence of the metro newspaper market. The CAFC held that these events were probative in determining a royalty rate at the time of the hypothetical negotiation.[753] *Fromson* has been cited favorably for the use of the Book of Wisdom in many subsequent cases.[754]

---

[749] *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]

[750] *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]

[751] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, (U.S. Court of Appeals for the Sixth Circuit, April 25, 1978), *1158, p. 4. [12.1]

[752] *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988). [12.8]

[753] *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988), *1575, p. 9. [12.8]

[754] *See, e.g., Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, (U.S. Court of Appeals for the Federal Circuit), *1571-72, pp. 8-9. [12.11]; *Harris Corp. v. Ericsson, Inc.*, 2003 U.S. Dist. LEXIS 12284, (U.S. District Court for the Northern District of Texas, Dallas Division, July 17, 2003). [12.12];

382.    In a recent CAFC decision in *Lucent Technologies., Inc. v. Gateway, Inc.,* Microsoft argued that information about how often a certain feature had in fact been used by consumers of Microsoft products was irrelevant because "such facts postdate the time of the hypothetical negotiation."[755]   The CAFC countered, however, that "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers.  Nor could they since frequency of expected use and predicted value are related."[756]   The CAFC added that "[c]onsideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable."[757]

383.    In *Honeywell Int'l, Inc., et al. v. Hamilton Sundstrand Corp. (HSC),* the Delaware District Court was persuaded that the result dictated by *Fromson* was the most sensible in resolving the conflict of HSC's request to preclude Honeywell from presenting a damages calculation based on sales projections of the accused product that did not exist at the time of the hypothetical negotiation.[758]   The Court stated that *Fromson* promotes flexibility in damage calculations by not erecting an unnecessarily rigid barrier to relevant post-negotiation information, discourages infringement by placing the risk of success on the infringer, protects the *quid pro quo* underlying patent law by preventing a premature valuation of the patent, and permits a damage award more in keeping with the plain language of Section 284 by adequately compensating the plaintiff for the use made of the invention by the defendant.[759]

384.    District courts have also upheld the use of the Book of Wisdom. In *Ariba, Inc. v. Emptoris, Inc.,* the court determined that the "jury may consider the infringer's actual sales and revenue up to the date of trial as part of the 'book of wisdom.'"[760]   In a non-exhaustive list, the court stated that other admissible post-infringement evidence included the "importance of the

---

Cadillac *Prods. v. TriEnda Corp.*, (U.S. District for the Eastern District of Michigan, Southern Division, August 2, 2000). [12.13]; *Wright v. United States*, 53 Fed. Cl. 466, (U.S. Court of Federal Claims, August 28, 2002), *469-70, pp. 5-7. [12.14]; *ResqNet.com, Inc. v. Lansa, Inc*. 594 F.3d 860, (U.S. Court of Appeals for the Federal Circuit, February 5, 2010), *872, p. 20. [12.15]

[755] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[756] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[757] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333-1334, p. 22. [12.3]

[758] *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp. 2d 459, (U.S. District Court for the District of Delaware, July 5, 2005), *469, p. 8. [12.16]

[759] *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp. 2d 459, (U.S. District Court for the District of Delaware, July 5, 2005), *469, p. 8. [12.16]

[760] *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, (U.S. District Court for the Eastern District of Texas, Lufkin Division, July 29, 2008), *917, p. 3. [12.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

technology, the development of products for convoyed sales, and the relative market position of the parties."[761]

385.    Accordingly, for purposes of determining the reasonable royalty adequate to compensate Apple for Samsung's use of the Patents-in-Suit, I have considered facts and evidence that may not have been known as of the date of the hypothetical negotiation.

386.    My interpretation of the Book of Wisdom has been subject to judicial scrutiny in the *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.* matter.   Judge Farnan concluded in a Memorandum Opinion that my methodology is consistent with settled law in the "Book of Wisdom" methodology and, therefore, satisfies the requirements of Rule 702.[762]

### (3)  Baseline Royalty Rate

387.    As a starting point for my analysis of the reasonable royalty rate, I have determined a "Baseline Royalty Rate," which, as I explain in more detail below.  I then analyze qualitative factors to determine what adjustments, if any, to the Baseline Royalty Rate are necessary to ensure that the resulting royalty rate adequately compensates the plaintiff for the actual use made of the inventions by the infringer.

388.    As I stated above, a list of factors relevant to determining a reasonable royalty in a hypothetical negotiation is set forth in the leading decision of *Georgia-Pacific Corp. v. U.S. Plywood*.[763]   In *Georgia-Pacific*, the federal court identified fifteen factors deemed pertinent to its decision regarding a royalty rate.[764]   Consideration of these and other relevant factors can result in the reasonable royalty rate being greater than or less than the Baseline Royalty Rate.

389.    When evaluating whether an adjustment to the Baseline Royalty Rate is necessary, it is important to bear in mind that the characteristic pertaining to each *Georgia-Pacific* factor (e.g., term of the license) is considered *relative to* the characteristic as embodied in the license upon which the Baseline Royalty Rate is based.  This construct is analogous to adjusting the estimated value of a parcel of real estate based on the differing characteristics of a

---

[761] *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, (U.S. District Court for the Eastern District of Texas, Lufkin Division, July 29, 2008), *918, p. 3. [12.17]

[762] *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc. et al*, (U.S. District Court for the District of Delaware, September 28, 2004), *5, p. 3. [12.18]

[763] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970). [12.6]

[764] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

comparable, recently-sold parcel. To the extent that both properties are identical with respect to a given characteristic (e.g., square footage), no adjustment to the estimated value is necessary. Conversely, to the extent that the properties differ with respect to a given characteristic (e.g., more desirable location), an adjustment to the estimated value may be warranted.

390.    My baseline royalties are based on the next best alternative besides practicing the asserted claims of the patents-in-suit to Samsung. A detailed description of the next best non-infringing alternatives is detailed in my discussion of *Georgia-Pacific* factor #9 below. A summary Table of my starting point rates shows the baseline rates as:

**Design Around Costs**

Utility Patents
'002
'163
'381
'891
'915
'607
'129

Cost to Design a New Icon (per Icon)

Cost to Design and Implement a New GUI

Trade Dress (Based on New GUI)
Trade Dress (Device Related)

Electronic Device Design Patents

**b)   *Georgia-Pacific* Factor Analysis**

**(1)   Factor #1—the royalties received by the patentee for the licensing of the Patents-in-suit, proving or tending to prove an established royalty**

391.    The purpose of Factor #1 is to determine (1) whether there exists an *established* royalty for the Patents-in-Suit and, (2) absent such an *established* royalty, whether any offers to license or actual royalties received from licensing the patents-in-suit are probative regarding the determination of a reasonable royalty.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

392.    I have received several agreements from Apple in which Apple is a licensee of technology. A list of these agreements and their respective royalties can be found at Tab 1.3 of my report.

> (a)    *Implications Regarding an Established Royalty for the Patents-in-Suit*

393.    None of the transactions or licenses pertaining to the Patents-in-Suit proves an established royalty.

> (b)    *Absent an Established Royalty, are the Transactions and Licenses for the Patents-in-suit Probative of a Reasonable Royalty?*

394.    Although none of the transactions or licenses pertaining to the Patents-in-Suit proves an established royalty, some of the transactions have implications relevant to the determination of a reasonable royalty.

### (i)    FingerWorks, Inc. Acquisition

395.    FingerWorks, Inc., founded in April of 1999 by Drs. John G. Elias and Wayne Westerman, "developed technology that integrate[d] keyboard, mouse, and gesture-based operations on a single, low-cost, patented substrate called the MultiTouch surface."[765]  While in business, the company's mission was "to be the dominant supplier of gesture and touch based input devices for the Internet, computer, home entertainment, automotive, and industrial markets."[766]  Because "[t]he company founders invented MultiTouch technology while at the University of Delaware," the University owned the inventors' initial patent, which was filed in January of 1999.[767]  As a going concern, FingerWorks paid the University of Delaware a small royalty on its sales of MultiTouch devices under an exclusive license agreement.[768]

396.    Dr. Elias testified that he believed FingerWorks acquired certain patent rights from the University of Delaware in late 2004.[769]  He thought that these rights included the '828 Patent, which claimed priority to U.S. Patent 6,323,846.[770]  Dr. Westerman, however, recalled a slightly different account.  In testimony before the International Trade Commission, he explained

---

[765] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '051-'052. [12.26]
[766] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]
[767] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]
[768] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]
[769] Deposition of John G. Elias, Ph.D., October 13, 2011, pp. 86-87. [12.27]
[770] Deposition of John G. Elias, Ph.D., October 13, 2011, pp. 85-87. [12.27]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

that when Apple bought FingerWorks in early 2005, Apple also purchased the '828 family of patents from the University of Delaware, the original assignee of this line of patents.[771] He also noted that Apple and FingerWorks had entered into another license, valued at "pennies per unit," for a FingerWorks chip, which embodied "a small subset of the technology" developed by FingerWorks.[772] I have not been provided with this agreement.

397. In this matter, Apple produced an Agreement and Plan of Reorganization that appears to describe the FingerWorks acquisition and related transactions.[773] This document, dated February 3, 2005, describes FingerWorks' merger with Tickle Acquisition Corporation, a wholly-owned subsidiary of Apple computer, Inc.[774] Pursuant to the merger, each share of FingerWorks outstanding capital stock was to be converted into the right to receive the following:[775]

$13.5M

| | |
|---|---|
| *minus* | Deferred consideration of $2M to be paid eighteen months later |
| *minus* | Cost to acquire certain patents from the University of Delaware up to $1M |
| *minus* | Any net closing liabilities |
| *minus* | Unpaid principal and interest owed on any loan of up to $200,000 from Apple to FingerWorks to cover ordinary and necessary expenses until the closing of the acquisition |
| *minus* | Payments due to certain holders of FingerWorks common stock, options, warrants, and convertible notes |

---

[771] Exhibit 1155 to Westerman Deposition, Prehearing and Tutorial in the Matter of Certain Mobile Devices and Related Software, September 23, 2011, APLNDC-X0000004562-907 at '620-'621, pp. 292-294. [12.28]

[772] Exhibit 1155 to Westerman Deposition, Prehearing and Tutorial in the Matter of Certain Mobile Devices and Related Software, September 23, 2011, APLNDC-X0000004562-907 at '627-'628, pp. 322-323. [12.28]

[773] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4973. [12.29]

[774] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4978. [12.29]

[775] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4984. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*Divided by*   Total number of outstanding shares of FingerWorks capital stock

398.   Eighteen months after the merger, each share of outstanding FingerWorks capital stock would be worth an additional $2M, minus any losses to certain indemnified parties, divided by the total number of shares of outstanding FingerWorks capital stock.[776] Furthermore, certain of FingerWorks' key employees were to enter into non-competition and non-solicitation agreements and/or enter into employment with Apple Computer, Inc.[777] As a condition to the merger, Drs. Elias and Westerman were to execute non-competition and non-solicitation agreements and accept employment at Apple.[778]

399.   The patents that were to be acquired from the University of Delaware (the "Delaware Patents") included "all patents and applications anywhere in the world with a claim of priority to US Provisional application 60/072,509 (filed January 26, 1998) or US non-provisional application 09/236,513 (filed January 25, 1999), or any parent, continuation, continuation-in-part, divisional, reexamination, reissue, or other patent or application derived from one of the above."[779] Specifically, the agreement named the following U.S. patents: US6,323,846 ("Method and apparatus for integrating manual input")[780] and US2002/0015024 A1 ("Method and apparatus for integrating manual input").[781]

400.   Importantly, the IP referenced in the acquisition agreement is related to certain of the utility Patents-in-Suit. Specifically, the '607 Patent[782] and the '129 Patent[783] reference U.S. Patent 6,323,846. The '607 Patent also references US2002/0015024 A1.[784]

---

[776] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4985. [12.29]

[777] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4978. [12.29]

[778] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '5014. [12.29]

[779] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]

[780] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]

[781] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]

[782] U.S. Patent Number 7,663,607. [2.7]

[783] U.S. Patent Number 7,920,129 B2. [2.9

163

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

401.    Though the acquisition agreement gave no final purchase price for the Delaware Patents, the volume of patents that cite to both US6,323,846 and US2002/0015024 A1 is a helpful indication of value.   Two hundred eighty-five separate U.S. Patents, the original assignees of which cover nearly 50 organizations, reference US6,323,846 as shown by the figure below.   As might be expected, Apple Inc. and Apple Computer, Inc. were the original assignees on a combined 109 of these patents.

**Figure 53: Organizations With Patents That Reference US6,323,846[785]**

| Original Assignee | No. of Patents | Original Assignee | No. of Patents |
|---|---|---|---|
| Apple Inc. | 108 | Apple Computer, Inc. | 1 |
| Cypress Semiconductor Corporation | 36 | Autodesk, Inc. | 1 |
| Synaptics Incorporated | 15 | Avago Technologies ECBU IP (Singapore) Pte. Ltd. | 1 |
| Smart Technologies ULC | 14 | Cirque Corporation | 1 |
| Silverbrook Research PTY LTD | 13 | Cypress Semicondutor Corporation | 1 |
| Exbiblio B.V. | 10 | David H. Chin | 1 |
| Immersion Corporation | 10 | Exbiblio B. V. | 1 |
| NA | 8 | Exbibuo B.V. | 1 |
| AuthenTec, Inc. | 6 | Gilbarco Inc. | 1 |
| Microsoft Corporation | 6 | Kabushiki Kaisha Toshiba | 1 |
| Google Inc. | 4 | Kulite Semiconductor Products, Ic. | 1 |
| QSI Corporation | 4 | Kyocera Mita Corporation | 1 |
| Atrua Technologies, Inc. | 3 | Next Holdings Limited | 1 |
| International Business Machines Corporation | 3 | Perceptive Pixel Inc. | 1 |
| Seiko Epson Corporation | 3 | Promethean Limited | 1 |
| Smart Technologies, Inc. | 3 | Ricoh Company, Ltd. | 1 |
| Elan Microelectronics Corporation | 2 | Shoot the Moon Products II, LLC | 1 |
| Exbiblio, B.V. | 2 | Siemens Aktiengesellschaft; Siemens Technology -to-Business Center LLC | 1 |
| Finger Works, Inc. | 2 | Siemens Technology-To-Business Center, LLC | 1 |
| Keybowl, Inc. | 2 | Silverbrook Research Pty Ltd. | 1 |
| New York University | 2 | Tactile Displays, LLC | 1 |
| Smart Technologies Inc. | 2 | Varatouch Technology Incorporated | 1 |
| Synaptics, Inc. | 2 | Varian Medical Systems Technologies, Inc. | 1 |
| Adrea, LLC | 1 | Xerox Corporation | 1 |

[784] U.S. Patent Number 7,663,607. [2.7]
[785] Patent US6323846, Google Patents, <http://www.google.com/patents/US6323846>. [12.31]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

402.    An additional 47 U.S. patents reference US2002/0015024 A1.  As shown below, the original assignees of these patents spanned close to 20 organizations.

Figure 54: Organizations With Patents That Reference US2002/0015024 A1[786]

| Original Assignee | No. of Patents |
|---|---|
| Apple Inc. | 24 |
| NA | 3 |
| GestureTek, Inc. | 3 |
| Masco Corporation of Indiana | 3 |
| QSI Corporation | 2 |
| Precision Dynamics Corporation | 1 |
| Elan Microelectronics Corporation | 1 |
| Royal College of Art | 1 |
| Cirque Corporation | 1 |
| David H. Chin | 1 |
| WMS Gaming Inc. | 1 |
| Brose Fahrzeugteile GmbH & Co. Kommanditgesellschaft | 1 |
| Microsoft Corporation | 1 |
| N-trig Ltd. | 1 |
| Vimicro Corporation; Wuxi Vimicro Corporation | 1 |
| Tiki'Labs | 1 |
| QUALCOMM Incorporated | 1 |

403.    While FingerWorks was to acquire the Delaware Patents outright from the University of Delaware, Apple agreed to pay the purchase price, which would reduce the payment to the stockholders.[787]  If FingerWorks could not procure the Delaware Patents for $1M or less, Apple reserved the right to take over negotiation of the sale or terminate the

---

[786] Patent US20020015024, Google Patents, <http://www.google.com/patents?id=D4SNAAAAEBAJ& printsec=frontcover&dq=US2002/0015024&hl=en&sa=X&ei=L6uDT5zTHYmQiQKjx8mEBg&ved=0CD QQ6AEwAA>. [12.32]

[787] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '5012. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

acquisition.[788]  Other than the Delaware Patents, Drs. Elias and Westerman had assigned all intellectual property and intellectual property rights used by, or created in connection with, the business to FingerWorks itself.[789]

### (c)  Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty

404.    I do not have enough information to use this factor to determine the value of the patents-in-suit. However, Apple's acquisition of FingerWorks for $13.5 million that includes what appears to be two foundational patents for multi-touch capabilities should be considered as a reasonableness check on any conclusion of value of a non-exclusive license to the '607 Patent and the '129 Patent that all reference one of these two foundational patents.

### (2)  Factor #2—the rates paid by the licensee for the use of other patents comparable to the Patents-in-Suit.

### (a)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

405.    I do not consider these agreements to be probative.  Therefore, this factor is neutral in my determination of the reasonable royalty amount.

### (3)  Factor #3—the nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

406.    The license contemplated in the hypothetical negotiation would be a non-exclusive license for a portfolio of patents only and would not include any transfer of technology or know-how.  Technology transfer agreements, including many of Samsung's and Apple's license agreements discussed above, frequently transfer along with patent rights items such as know-how, technical drawings, specifications, trademarks, and copyrights.

---

[788] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4998. [12.29]

[789] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4998. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

407.   Therefore, this factor would be neutral in relation to the royalty amount as suggested by a non-infringing alternative.

### (4) Factor #4—the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

408.   It is my understanding that Apple has not licensed the Patents-in-Suit.  Apple values the profits it has as an opportunity to earn by distributing and manufacturing its products more than it values the royalty it could earn by licensing to a competitor.

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

409.   This factor would indicate that Apple would not be willing to share any of the costs of the next best alternative to Samsung and indicate that the full amount of these costs would be paid.

### (5) Factor #5—the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter.

410.   When licensing a direct competitor, a licensor may demand a relatively high royalty rate to compensate it for the sales and profits it will potentially lose to the competitor.  In his report, Mr. Musika suggested that "Apple and Samsung directly and aggressively compete in both the smartphone and tablet markets."[790]   However, while Apple and Samsung are competitors in the sense that each sells both smartphones and tablets, among other things, there are two important considerations with respect to this topic.

411.   First, as discussed in Section IV.A.4.d), competition between Apple and Samsung is confounded by the competition between iOS, Apple's mobile operating system, and Android, Google's mobile operating system used on devices made by a multitude of manufacturers including Samsung.  Because consumers often consider the operating system an important selling point, the more fierce competition is not between Apple and Samsung, but iOS

---

[790] Musika Report, p. 71. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

and Android. Once a consumer has decided to opt for Android instead of iOS, then Android devices must compete against each other for that incremental purchase. Samsung, whose smartphones and tablets run Android, competes more heavily with those manufacturers of other Android devices.

412. In addition, Apple and Samsung cater to different consumer demographics. For example, according to a Q4 2010 ComTech United States Report, "iOS ha[d] a strong leaning towards a premium market, with 66% of sales over $170 versus 50% for Android."[791] Specifically, "[l]eading the over $170 segment [was] the iPhone 4 (29%), while several Android models follow[ed] some way behind: HTC Evo 4G (11%), Samsung Epic 4G (6%), Motorola Droid X (5%) and Droid (4%)."[792]

413. Notably, Apple sells its mobile devices at significantly higher ASP than Samsung. According to Mr. Musika, Apple's handset ASP has hovered between $622 and $656 from fiscal Q3 2010 to Q4 2011.[793] Apple's tablets prices were between $575 and $612 beginning in fiscal Q1 2011.[794] On the other hand, Samsung's accused smartphones have sold for between $290 and $417 from calendar Q2 2010 to Q4 2011.[795] Its accused tablets have prices between $374 and $526 from calendar Q4 2010 to Q4 2011.[796] With regard to smartphones specifically, this price difference has manifested itself to consumers in the generally higher price of Apple iOS handsets when compared to Android handsets.[797]

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

414. While Apple and Samsung do generally compete in the smartphone and tablet markets, the considerations described above mitigate the competitive climate. However, in my opinion this factor would indicate that Apple would not be willing to share any of the costs of the next best alternative to Samsung and indicate that the full amount of these costs would be paid.

---

[791] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

[792] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

[793] Musika Report, Exhibit 32. [2.2]

[794] Musika Report, Exhibit 33. [2.2]

[795] Musika Report, Exhibit 37. [2.2]

[796] Musika Report, Exhibit 38. [2.2]

[797] See e.g. ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513. [4.12]; see also ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(6) Factor #6—the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items and the extent of such derivative or convoyed sales.**

415.    There are two key issues with respect to *Georgia-Pacific* factor #6: (1) to what extent did the infringer anticipate collateral or convoyed sales as a result of selling the patented item and what effect such anticipation would have had on the parties' respective bargaining positions at the hypothetical negotiation, and (2) whether such convoyed sales are appropriately included in the royalty base.

416.    It is important to note that, in this case, only if the allegedly infringed IP is the driver of smartphone and tablet sales can the sale of an accessory, or related item, be claimed as a convoyed sale. In essence, the patents, trade dress, and trademarks at issue would have to be a significant basis of demand for Apple's or Samsung's smartphones and tablets for any additional sales to be considered in inclusion of convoyed sales. As shown throughout this report, the IP at issue is clearly not a significant driver of demand. Thus any sales that could be considered convoyed due to the sale of a smartphone or tablet as a whole, cannot be considered convoyed by the specific IP at issue.

417.    As Mr. Musika notes, both Apple and Samsung recognize the value of accessory sales. However, it is not those sales, or loss of those sales, directly that the companies value. Rather, the importance of accessory purchases lies in their effect on future sales of the patented specialties, namely smartphones and tablets. The Samsung document that Mr. Musika cites in his report as evidence of convoyed sales is rather evidence of the important role accessories play in future purchases of Samsung's smartphones and tablets. In fact, the section of that report that Mr. Musika cites is title "Accessory Brand Stickiness," indicating the ability of accessories to keep customers coming back to Apple or Samsung for future purchases.[798]

418.    Whether or not Samsung "referenced the increase in Apple brand loyalty due to the use of iPhone, iPhone 3G and [] iPhone 3GS accessories,"[799] this is simply a statement of the value of accessories and plays no part in determining whether these accessories fall under the definition of convoyed sales. The same is true of other statements made by Mr. Musika in his analysis of convoyed sales, like "'accessories enhance user experience' by facilitating the

---

[798] 2011 Smartphone Portfolio Strategy, May 2010, SAMNDCA00530591-672 at '611. [13.1]
[799] Expert Report of Terry L. Musika, CPA, March 22, 2012, p. 74. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

use of the devices and accessories in the home, in the car, as entertainment and through increasing productivity," or "the use of iPhone accessories was a 'compelling reason for consumer[s] to stay with their current brand.'"[800]  Each of these statements is a judgment of the value of the accessories themselves; they are not evidence that accessory sales are convoyed as a result of the specific features enabled by the intellectual property at issue in this case.

419.    Further, Mr. Musika tries to pass arguments aimed at showing the importance of Apple's ecosystem as arguments that militate in favor of an increased royalty rate due to convoyed sales.[801]  The value of Apple's ecosystem is not a valid argument for the inclusion of convoyed sales in the reasonable royalty calculation.

420.    From Samsung's perspective, as shown by Mr. Musika's citations, the value of accessories lies in the power to drive future sales and brand loyalty.  In fact, from Samsung's point of view, the company would not likely have continued the sale of accessories if they did not create such value; Samsung's sale of accessories in the U.S. has run an operating loss in every quarter from Q1 2010 through Q4 2011.[802]

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

421.    Both Apple and Samsung do make accessory sales that stem from the sales of their respective smartphones and tablets.  However, Mr. Musika's discussion confuses the actual benefits of accessories (i.e., brand stickiness) with convoyed accessory sales, the relevant factor in this case.  For the reasons above, Mr. Musika's assertion that this Georgia Pacific factor "supports a higher reasonable royalty rate …"[803] is not correct; this factor is, in effect, neutral.

### (7)  Factor #7—the duration of the patent and the term of the license.

### (a)  Duration of the patent

422.    The following table summarizes the Patents' filing, issue and expiration dates:

---

[800] Musika Report, p. 74. [2.2]

[801] Musika Report, pp. 74-76. [2.2]

[802] Exhibit 2621 to Sheppard Deposition, Accessories (USA), SAMNDCA00373532-534. [13.2] Note that Mr. Sheppard explained that the accessories profit and loss data was not limited to accessories sold only on the accused products.  Deposition of Timothy Sheppard, March 30, 2012, p.124. [13.3]

[803] Musika Report, p. 76. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 55: Patent Filing, Issue and Expiration Dates**

| Patent | Filing Date | Issue Date | Expiration Date[804] |
|--------|-------------|------------|----------------------|
| '002 | 3/20/1997 | 12/10/2002 | 9/29/2014 |
| '381 | 12/14/2007 | 12/23/2008 | 12/13/2027 |
| '915 | 1/7/2007 | 11/30/2010 | 6/27/2028 |
| '891 | 2/1/2008 | 12/14/2010 | 3/13/2023 |
| '607 | 5/6/2004 | 2/16/2010 | 5/29/2026 |
| '163 | 9/4/2007 | 1/4/2011 | 7/22/2029 |
| '129 | 1/3/2007 | 4/5/2011 | 1/22/2030 |
| 'D790 | 8/20/2007 | 11/23/2010 | 11/22/2024 |
| 'D334 | 7/15/2008 | 6/8/2010 | 6/7/2024 |
| 'D305 | 6/23/2007 | 11/17/2009 | 11/16/2023 |
| 'D087 | 7/30/2007 | 5/26/2009 | 5/25/2023 |
| 'D677 | 11/18/2008 | 6/29/2010 | 6/28/2024 |
| 'D270 | 10/1/2009 | 8/24/2010 | 8/23/2024 |
| 'D889 | 3/17/2004 | 5/10/2005 | 5/9/2019 |

### (b)  Term of the license

Factor # Factor 7 embodies the conventional wisdom that the longer the remaining duration of a patent term, the more willing a hypothetical licensee is to pay a higher royalty rate. This principle rests on the fact that the longer the duration of the patent, the more likely the patent holder is to cultivate goodwill, an intangible economic asset representing the ability of a business to generate income due to business reputation, market position, management, technology, customer relations, and other elusive indicia of earning power, which would almost certainly persist and benefit the patent holder long after the patent expired.[805]

423.    Apple is seeking an injunction is this case. The hypothetical license term is from the date of first infringement through the date of judgment, a period of a little over two years.[806] If Apple seeks royalties post judgment, there will be a new hypothetical negotiation because damages for past infringement are separate and distinct from damages for future acts of infringement and may require different royalty rates given the change in the parties' legal relationship, among other factors.[807]

---

[804] Expiration dates based on discussion with counsel.
[805] *Brunswick v. United States*, 36 Fed. Cl. 204, (U.S. Court of Federal Claims, July 30, 1996), *214, p. 7. [12.20]
[806] The accused products were first sold in June 2010.  (21 Series of Schedules. [1.2])
[807] *Paice LLC v. Toyota Motor Company*, 504 F.3d 1293, (U.S. Court of Appeals for the Federal Circuit, October 18, 2007), *1317, p. 17. [12.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

> ### (c)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

424.    The duration of the patents and the terms of the hypothetical license agreements are sufficiently long in relation to the normal product lifecycle in this industry that this factor would be neutral in my determination of the reasonable royalty amount.

> ### (8)  Factor #8—the established profitability of the product made under the patent, its commercial success and its current popularity.

> #### (a)  Established Profitability

425.    For purposes of determining a reasonable royalty, the most relevant profitability data are the infringer's operating profit projections prepared around the date of the hypothetical negotiation.[808]  Absent such financial projections, the infringer's *ex post* actual operating profit margins, as well as industry operating profit margin data, can be considered.[809]

426.    To date, no detailed profit projections as of the date of the hypothetical negotiation have been produced.  I have calculated Samsung's profits related to the accused products in my analysis of Samsung's profits related to the design-related IP

> #### (b)  .Commercial Success and Current Popularity

427.    According to a 2010 Frost & Sullivan report, Android and Apple are the most successful smartphone brands in the market.[810]   While Apple continues to have the top smartphone, Android has been gaining ground by selling multiple devices from multiple

---

[808] *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (U.S. Court of Appeals for the Federal Circuit, October 6, 1983), *1081, pp. 6-7.  ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.  'Whether, as events unfurled thereafter, [the infringer] would have made an actual profit while paying the royalty determined as of [the date infringement began], is irrelevant.'") (quoting *Panduit*, 575 F.2d, *1164, pp. 6-7). [12.22]

[809] John M. Skenyon, "Proving Patent Damages to a Jury" (absent projections by the infringer, the infringer's actual profits may be used for calculating reasonable royalty damages under the book of wisdom view) [12.23]; *Panduit*, 575 F.2d 1152, *1164, p. 9 ("The licensee-profit element is but one of the measures applicable . . . , and should be based on the customary profit allowed licensees in the industry at that time."). [12.1]

[810] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.8. [10.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

manufacturers through multiple operators.[811]   As of yearend 2010, there were a total of approximately 150 Android smartphones available.[812]   The top three manufacturers in terms of devices were HTC, Samsung, and Motorola.[813]

428.   According to a Canalys report entitled "Worldwide Smart Phones Q1 2009," worldwide smartphone market continued to grow in 2009 and shipments of smartphones with touch-screens almost doubled in Q1 2009 compared with a year ago."[814]

**Figure 56: North America Smartphone Shipments, Q1 2008 and Q1 2009[815]**



---

[811] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.8. [10.9]

[812] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.2. [10.9]

[813] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.2. [10.9]

[814] Worldwide Smart Phones Q1 2009, Quarterly Market Overview, Canalys Expert Analysis for the High-Tech Industry, SAMNDCA00201336-350 at '337. [10.10]

[815] Worldwide Smart Phones Q1 2009, Quarterly Market Overview, Canalys Expert Analysis for the High-Tech Industry, SAMNDCA00201336-350 at '343. [10.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

429.    More than 15 million of the 39.1 million phones sold during Q2 2009 used a touch screen as the primary interface, significantly more than a year ago, when only 3.9 million of the 33.6 million mobile phones sold in Q2 2008 had a touch screen.[816]

430.    US Smartphone sales increased 12.7 percent in 2009 and reached 36.4 million units, as stated in a September 6, 2009 Samsung report entitled "Design for Smartphone US."[817] Smartphones accounted to nearly one in eight of all phones sold, valued at $12 billion in 2009 and were predicted to hit $25 billion in 2014.[818]  According to a ComTech study commissioned by Apple, smartphone ownership reached 35 percent of the US population in Q4 2011, up from 26 percent one year ago.[819]  In Q4 2011, 31 million handsets were sold in the US, with 57 percent of these being smartphones.[820]  IDC projected that 20 percent of the 1.4 billion phone sold in 2013 would be smartphones.[821]  UBS Investment Research analysts forecast the global handset market to grow at a rate of 6.2 percent during 2010-2015, from 1.4 billion to 1.9 billion units.[822]  Key growth drivers in the handset market include emerging markets, driven by increased handset penetration, transition to 3G from 2/2.5G, and increased consumer adoption of smartphones.[823]  UBS analysts explain that increased demand for data on wireless mobile devices has been driving the transition to 3G technologies from 2/2.5G technologies.[824] According to UBS Investment Research, 3G-based devices will have a growth rate of 23 percent during 2010-15 (from 507 million to 1.4 billion units), as opposed to the overall handset market at six percent.[825]

---

[816] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '428. [8.4]

[817] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[818] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[819] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '512. [4.12]

[820] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '512. [4.12]

[821] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[822] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '511. [10.11]

[823] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '511-512. [10.11]

[824] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '512. [10.11]

[825] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '512. [10.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

431.    UBS Investment Research analysts also forecast smartphones to grow at a compounded annual rate of 25 percent during 2010-15, from 272 million (19 percent of handset units) to 808 million (42 percent of total handset units).[826]  UBS Investment Research states that "[w]ith a rich and friendly user interface, high speed wireless connectivity using 3G (or higher), and availability of multimedia content, smartphones have become the platform of choice for consumers for content consumption and connectivity."[827]

Figure 57:  Smartphone Growth, 2010E – 2015E[828]



Chart 33: Smartphone growth

Source: UBS estimates, Gartner IDC

432.    According to Samsung, US Tablet shipments are predicted to grow at 73 percent over next several years, reaching 41.4 million units in 2013.[829]

---

[826] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '513. [10.11]

[827] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '513. [10.11]

[828] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '514. [10.11]

[829] Samsung Galaxy Tab, Samsung Electronics, SAMNDCA00027474-514 at '481. [10.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 58: US Tablet Market Size / Growth**[830]



433. UBS Investment Research analysts also expect the wireless WAN (3/4G) tablet market to have a growth rate of 24 percent during 2010-15, from 28 million to 65 million.[831]

**Figure 59: Tablet (Wireless WAN enabled) Market Forecast, 2011E – 2015E**[832]



Chart 44: Tablet (Wireless WAN enabled) market forecast

Source: UBS estimates

---

[830] Samsung Galaxy Tab, Samsung Electronics, SAMNDCA00027474-514 at '481. [10.12]

[831] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '517. [10.11]

[832] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '517. [10.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

>    (c) *Implications of This Georgia-Pacific Factor Regarding a*
>        *Reasonable Royalty*

434.    This factor would be neutral in relation to my baseline royalty amounts of a non-infringing alternative.

>    **(9) Factor #9—the utility and advantages of the patent property over**
>        **the old modes or devices, if any, that had been used for working**
>        **out similar results**

>        (a) *Utility and Advantages of the Utility Patents and Samsung's*
>            *Available Design Arounds*

>        **(i)    User Interface Utility Patents**

>                (a)    *U.S. Patent No. 6,493,002*

435.    Based on my discussion with Trevor Darrell,[833] I understand that the '002 patent is directed to a "control strip" or "control window" "implemented in a window layer that appears on top of application programming windows that may be generated." According to Apple's expert, this patent covers either (i) the status bar or (ii) the "quick panel" or "notification panel" that slides down from the top by swiping downward (or both).

436.    Based on discussions with Trevor Darrell and Samsung engineers,[834] I understand that there are numerous other applications (such as the music player, e-mail, camera feature, a game, etc.) that could be made to generate a window that partly obscures the notification window and / or the status bar.

437.    Mr. Park indicated that the application that Samsung would choose to generate a window that would partially obscure the notification window and / or the status bar is the music player.[835]

438.    Samsung engineers have estimated that the design around could have been completed in a total of three weeks and four days if Samsung would have known that it may

---

[833] Conversation with Trevor Darrell, April 11, 2012.

[834] Conversation with Trevor Darrell, April 11, 2012. Conversations with Jaewoo Park, April 12, 2012 and April 15, 2010 (with translation assistance from Hoshin Lee).

[835] Conversations with Jaewoo Park, April 12, 2012 and April 15, 2010 (with translation assistance from Hoshin Lee).

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

have been out of the market without the design around.[836]   Based on design around hours provided by the Samsung engineers and wage data provided by Samsung HR,[837] the total cost of the design around is $8,820.[838]

(b)   U.S. Patent No. 7,469,381

439.   Based on my discussions with Dr. Andries Van Dam and Dr. Jeff Johnson,[839] I understand that the '381 Patent covers the "bounceback" feature that indicates to the user when he or she has reached the edge of an electronic document when translating the document on a touch screen display.   According to the claimed method in the '381 Patent, when a user translates an electronic document beyond the edge, an area beyond the edge of the electronic document is displayed and when the user removes his or her finger from the display, the document "bounces back" so that the area beyond the edge of the document is no longer displayed.

440.   I have also reviewed the description of the '381 Patent in the expert report for Apple's infringement expert on the '381 Patent, Dr. Karan Singh.  Dr. Singh describes the '381 Patent as follows:[840]

> This invention provides an elegant and appealing form of visual feedback to a user that there is no more of a document to be seen. For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image. Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display. When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen. This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction

441.   Based on discussions with Jeff Johnson and Samsung engineers,[841] Samsung has already implemented a design-around that uses a different method to indicate to the user

---

[836] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[837] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[838] Schedule 13.4. [1.2]

[839] Conversation with Andries Van Dam, April 11, 2012.  Conversation with Dr. Jeff Johnson, April 16, 2012.

[840] Expert Report of Ravin Balakrishnan, Ph.D. Regarding Infringement of U.S. Patent No. 7,469,381, March 22, 2012, pp. 11-12. [13.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

when he or she has reached the edge of a document.  A blue or orange "glow" will appear at the edge of the document when the user attempts to pan beyond the edge of the document.  No area beyond the edge of the document is displayed – the document simply stops when it reaches the edge, and the "glow" appears.

442.    According to Jeff Johnson,[842] many other design arounds are possible.  For example, the document could tilt, the intensity of the light on the screen could change, or the device could vibrate when an edge of the document is reached.

443.    Samsung engineers have estimated that the design around could have been completed in a total of four weeks and three days if Samsung would have known that it may have been out of the market without the design around.[843]  Based on design around hours provided by the Samsung engineers and wage data provided by Samsung HR,[844] the total cost of the design around is $11,340.[845]

(c)    U.S. Patent No. 7,853,891

444.    Based on my discussion with Trevor Darrell,[846] the '891 patent covers windows that appear on user input and close automatically.  Apple targets the volume window that appears when the volume on a Samsung accused device is changed.  One type of claim in the patent is limited only to windows that do not close in response to user input.  Another type of claim describes windows that may close in response to user input as well as automatically, but the windows must be translucent.  Both types have a limitation that the window must appear at a location independent of a cursor.

445.    I have also reviewed the description of the '891 Patent in the expert report for Apple's infringement expert on the '891 Patent, Dr. Karan Singh.  Dr. Singh describes the '891 Patent as follows:[847]

---

[841] Conversation with Andries Van Dam, April 11, 2012.  Conversation with Jaewoo Park, April 12, 2012 (with translation assistance from Hoshin Lee).

[842] Conversation with Jeff Johnson, April 16, 2012.

[843] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[844] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[845] Schedule 13.1. [1.2]

[846] Conversation with Trevor Darrell, April 11, 2012.

[847] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 123. [13.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

The invention in this patent may be most familiar to mobile device users as a volume adjustment indicator or "pop-up window," depicted below. [Diagram omitted] After appearing briefly (and in the same position on the screen) this type of window then automatically disappears without a user having to, for example, click an "X" button on the corner of the window. The window is displayed independently of a position of a cursor on the screen.

446.     Based on discussions with Trevor Darrell and Samsung engineers,[848] Samsung has already implemented two design arounds that design around all asserted claims of the '891 Patent.  First, the accused ringer volume window disappears on user input.  The volume window in Samsung's phones now closes if it is touched.  Second, the ringer volume window is no longer transparent.  This design around has been implemented in new smartphones sold, and is also distributed via a software update.

447.     Samsung engineers have estimated that the design around could have been completed in a total of three weeks and three days if Samsung would have known that it may have been out of the market without the design around.[849]   Based on design around hours provided by the Samsung engineers and wage data provided by Samsung HR,[850] the total cost of the design around is $8,820. [851]

### (d)     U.S. Patent No. 7,864,163

448.     Based on my discussion with Stephen Gray,[852] Apple's '163 patent describes a method for viewing and navigating a "structured electronic document" (e.g., a web page) on handheld, small-screen devices.  For example, in response to a first tap on a "box" of content, the user is provided an enlarged and centered view of the first "box" ("tap-to-zoom" gesture). While viewing the first, enlarged box, a user can then make a "second gesture" on a second "box" of content and the view will re-center on the second "box" ("tap-to-pan").

---

[848] Conversation with Trevor Darrell, April 11, 2012.  Conversation with Jaewoo Park, April 12, 2012 (with translation assistance from Hoshin Lee).

[849] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[850] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[851] Schedule 13.2. [1.2]

[852] Conversation with Stephen Gray, April 13, 2012.