Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

449.    I have also reviewed the description of the '163 Patent in the expert report for Apple's infringement expert on the '163 Patent, Dr. Karan Singh.  Dr. Singh describes the '163 Patent as follows:[853]

> [The '163 Patent] claims methods and apparatuses for displaying structured electronic documents, such as web pages, on a touch screen display, and navigating in them using touch gestures. The invention of the '163 patent allows a user to navigate easily around a structured electronic document by tapping or double tapping on boxes of content in that document. The '163 patent describes enlarging or translating the electronic document, in response to a tap gesture, so that the tapped box of content is substantially centered on the touch screen display. Tapping on a previously enlarged box can result in zooming back out, including to the original scale. Other gestures, such as a finger swipe or a "depinch" gesture, can also result in translating or scaling of the electronic document.

450.    Based on discussions with Stephen Gray and Samsung engineers,[854] Samsung has already modified the operation of its Galaxy S II phones such that the allegedly infringing behavior identified by Apple's technical expert for the "tap-to-pan" feature has been designed around.  Other design arounds include removing the "tap-to pan" feature entirely, such that the view will not re-center on a second "box" of content in response to a second gesture.

451.    Samsung engineers have estimated that the design around could have been completed in a total of two weeks and two days if Samsung would have known that it may have been out of the market without the design around.[855]  Based on design around hours provided by the Samsung engineers and wage data provided by Samsung HR,[856] the total cost of the design around is $5,880.[857]

### (ii)    Multitouch Utility Patents

#### (a)    U.S. Patent No. 7,663,607

---

[853] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 7. [13.15]

[854] Conversation with Stephen Gray, April 13, 2012.  Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[855] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[856] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[857] Schedule 13.3. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

452.     Based on my discussion with Brian Von Herzen,[858] the '607 patent is a touchscreen hardware patent and covers a two-layer transparent touchscreen capable of detecting multi-touch.     The patent claims cover a specific arrangement of transparent conductive lines/electrodes on two separate layers that are electrically isolated from each other.

453.     I have also reviewed the description of the '607 Patent in the expert report for Apple's infringement expert on the '607 Patent, Dr. Michel Maharbiz.  Dr. Maharbiz describes the '607 Patent as follows:[859]

> [T]he claimed inventions of the '607 Patent relate to a specific configuration of conductive lines and layers that make up the touch panel in a display arrangement. The '607 Patent claims recite an innovative combination of elements including the use of a mutual capacitance touch screen in a truly transparent display that can simultaneously detect and generate signals representing distinct multiple points of actual or near contact and the use of "dummy" visual features (that can be made of the same material as the conductive lines in the display) to enhance the display.

454.     Apple accuses only Samsung's tablets of infringement – the Galaxy Tab 7.0 (3G), the Galaxy Tab 7.0, and the Galaxy Tab 10.1 (WiFi).[860]  The '607 Patent was issued on February 16, 2010[861] and the Galaxy Tab 7.0 (3G) was first sold by STA in October 2010.[862]

455.     Based on discussions with Brian Von Herzen and Samsung engineers,[863] Samsung has a design around option that involves a single layer of transparent conductive lines and therefore falls outside the two-layer arrangement claimed in the '607 patent.

456.     Based upon conversations with a Samsung engineer,[864] the single layer design around has already been completed.  The design work started on July 20, 2010 and was completed in September 2011.  However, the design around work was completed based on a design plan that did not anticipate that the product would be out of the market without the design around.  Samsung has estimated that the design around could have been completed in

---

[858] Conversation with Brian Von Herzen, April 12, 2012.
[859] Expert Report of Michel Maharbiz, Ph.D. Regarding Infringement of U.S. Patent Nos. 7,663,607 and 7,920,129, March 22, 2012, p. 8. [13.13]
[860] Schedule 7.1. [1.2]
[861] U.S. Patent No. 7,663,607 B2. [2.7]
[862] Schedule {10.28}. [1.2]
[863] Conversation with Brian Von Herzen, April 12, 2012.  Conversation with Hoshin Lee, Sun-young Yi, Jaewoo Park, Heonseok Lee, and Jong-wook Shim, April 12, 2012.
[864] Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

a total of six months if it would have known that it may have been out of the market without the design around.

457.    Based on data provided by a Samsung engineer,[865] the total cost of the design around was about ▮▮▮▮▮▮ A single layer panel would cost less to produce than a two-layer panel, and the cost savings per until would be ▮▮▮▮▮▮▮▮

458.    The design around work actually started in July 2010, but I have used the announcement of the Tab 7.0 (3G) on September 16, 2010[866] as the beginning of the six-month period, which means that the design around would have been completed on March 16, 2011. Given there is a period of more than 1 month between the start of the release data of the product (released on November 10, 2010),[867] I have considered the effect of Samsung not having a non-infringing alternative on the reasonable royalty that would be negotiated.

459.    As I describe in Section IV.A.4.b), Apple would not lose any sales related to the sale of the Galaxy Tab 7.0 (3G) because these products are different sized products at very different price points. In addition, the design around would be completed well ahead of the time that the Tab 10.1 was launched on June 8, 2011.[868] Therefore, lost sales by Apple would not be considered by the parties at the hypothetical negotiation. It is my opinion that the parties would consider the design around cost as a license for the Tab 10.1 and would negotiate a reasonable royalty for the Tab 7.0 (3G). I discuss the reasonable royalty rate that the parties would negotiate for the '607 Patent in Section IV.E.

                    (b)    U.S. Patent No. 7,920,129

460.    Based on my discussion with Brian Von Herzen,[869] the '129 patent claims the basic '607 two-layer electrode structure but specifies that the bottom traces (i.e., traces further from the user and closer to the LCD) should be substantially wider than the top electrodes (i.e., electrodes closer to the user) to provide shielding for the thinner top electrodes.

---

[865] Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).
[866] Samsung Press Release: Samsung Mobile Expands Galaxy Product Portfolio with Launch of Samsung Galaxy Tab, September 16, 2010,
       <http://www.samsung.com/us/news/newsPreviewRead.do?news_seq=19537>. [15.33]
[867] Schedule 6.3. [1.2]
[868] Schedule 6.3. [1.2]
[869] Conversation with Brian Von Herzen, April 12, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

461.   I have also reviewed the description of the '129 Patent in the expert report for Apple's infringement expert on the '129 Patent, Dr. Michel Maharbiz.  Dr. Maharbiz describes the '129 Patent as follows:[870]

> [T]he claimed inventions of the '129 Patent relate to a specific configuration of conductive lines that helps prevent electrical interference from the display elements from interfering with the touch sensor conductive lines that are designed to detect the electrical coupling of a finger on the touch screen overlaying the display. The '129 Patent claims recite an innovative combination of elements including the use a wide set of second conductive layers to effectively shield the thinner sense conductive lines from the electrical noise of the display (such as an LCD display). This arrangement permits the designer to eliminate additional layers in the touch sensor, thus reducing costs and overall thickness required to have a viable hand-held computing device.

462.   Apple accuses only Samsung's tablets of infringement – the Galaxy Tab 7.0 (3G), the Galaxy Tab 7.0, and the Galaxy Tab 10.1 (WiFi).[871]  The Galaxy Tab 7.0 (3G) was first sold by STA in October 2010,[872] but the '129 Patent did not issue until April 5, 2011.[873]

463.   Based on discussions with Brian Von Herzen and a Samsung engineer,[874] the design around options discussed above for the '607 patent apply equally to the '129 patent. Like the '607 patent, Samsung's single layer design would effectively design around the '129 patent.[875]

464.   In addition to the single layer design around for the '607 Patent, I understand that a second design around exists in which the width of the bottom traces and top traces would be changed at their points of intersection to avoid the limitation of the claims that the bottom traces are substantially wider.  This design around would be considered a minor revision to an existing

---

[870] Expert Report of Michel Maharbiz, Ph.D. Regarding Infringement of U.S. Patent Nos. 7,663,607 and 7,920,129, March 22, 2012, p. 72. [13.13]

[871] Schedule {7.1}. [1.2]

[872] Schedule {10.28}. [1.2]

[873] U.S. Patent No. 7,920,129 B2. [2.9]

[874] Conversation with Brian Von Herzen, April 12, 2012.  Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).

[875] If the '607 Patent and the '129 Patent are found to be valid and infringed, then the design around would have been completed in March 2011 as described above. However, if the '607 Patent is not found to be valid, enforceable, and infringed, then the design around would not be completed in April 2011. By the issuance of the '129 Patent in April, approximately 9 months of the actual 15 month actual design around period was completed. Even though this is roughly 60 percent of the actual design around period, I estimate that this would reduce the hypothetical design around period by at least 50% to 3 months or less. Therefore, the design around would have been started when the '129 Patent issued on April 5, 2011 and completed by July, 2011. However, given the availability of a second design around, I do not adjust the design around cost for the '129 Patent.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

product and would only require a change of the masks of the ITO layers.[876]  This design around could be implemented if the single layer design around was not completed by the time the '129 Patent was issued.

(c)  U.S. Patent No. 7,844,915

465.  Based on my discussion with Stephen Gray,[877] the '915 patent covers the single finger swipe to scroll and a two or more finger gesture to scale, as well as rubberbanding.

466.  I have also reviewed the description of the '915 Patent in the expert report for Apple's infringement expert on the '915 Patent, Dr. Karan Singh.  Dr. Singh describes the '915 Patent as follows:[878]

> The '915 patent is generally directed to methods and apparatus for responding to user inputs on a touch-sensitive display integrated with a device. The asserted claims of the '915 patent recite methods and apparatus that distinguish between a single-input point that is interpreted as a "scroll operation" and two or more input points that are interpreted as a "gesture operation."

467.  Based on discussions with Stephen Gray and a Samsung engineer,[879] a design around could be implemented by modifying the source code to skip the initial check for one versus two or more touch inputs and, instead, determine whether to scroll, scale, or rotate the view based on the direction of movement over time of all touch input.  Mr. Gray confirmed that this change to the operating system would have no perceptible impact on touchscreen responsiveness.  Based upon time estimates provided by Mr. Park, the total cost of the design around is $10,080.[880]

468.  In addition, Stephen Gray described that Samsung has available additional design around alternatives for the asserted claims of the '915 Patent.  Samsung has already implemented two alternative design arounds for this patent.  First, the blue glow feature described above in the section on the '381 patent can be used to replace the rubberbanding effects described in the '915 Patent.  Second, Samsung has a novel non-infringing alternative to the two-finger scale gesture called tilt zoom, which uses the angle and rotation of the entire

---

[876] Conversation with Brian Von Herzen, April 12, 2012.
[877] Conversation with Stephen Gray, April 13, 2012.
[878] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 68. [13.15]
[879] Conversation with Stephen Gray, April 13, 2012.
[880] Schedule 13. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

touch-sensitive device to scale the view.   Tilt zoom has been implemented in the Samsung's tablets.

*(d)      Other features of Multitouch*

469.    Apple's multitouch utility patents contributions to multitouch technology are at most a small part of the technology necessary to implement multitouch.   For example, the inventors of the asserted multitouch utility patents have admitted in deposition that they did not invent multitouch.

470.    Steve Hotelling, a named inventor on both the '607 Patent and the '129 Patent,[881] testified as follows:[882]

> Q And when you filed your patent application on May 6, 2004, other individuals like John Elias and Wayne Westerman knew how to do other multipoint embodiments; correct?
>
> MR. KRAMER: Objection; calls for speculation; lacks foundation; vague and ambiguous.
>
> THE WITNESS: So I am -- I am aware of John Elias and Wayne Westerman having -- I remember that they had products which I actually used which did allow multiple touches to be detected.
>
> MR. WHITEHURST: Q. So you did not invent detecting multiple touches; did you? MR. KRAMER: Objection; calls for a legal conclusion; lack of foundation.
>
> THE WITNESS: So I -- yeah, as far as, you know, the technical definition of who invented what, I can't -- I'm not qualified to comment on that, but I do remember that I, indeed, used a product from FingerWorks which did, indeed, detect multiple touches.
>
> MR. WHITEHURST: Q. So when you filed the '607 application, it was already known by others how to detect multiple touches; correct?
>
> A Yes.
>
> […]
>
> Q Mr. Hotelling, you were not the first to build a mutual capacitance sensing device; were you?
>
> A No.

---

[881] U.S. Patent No. 7,663,607 B2. [2.7] See *also* U.S. Patent No. 7,920,129. [2.9]
[882] Deposition of Steven Hotelling, October 21, 2011, pp. 27-28, 100-101. [11.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Q Who built a mutual capacitance sensing device before you?

A So specifically I remember at Stanford learning of mutual capacitance sensing, although I don't remember specifically who was the author of the textbook or who actually built such a product.

471.    Andrew Platzer, a named inventor on the '915 Patent, testified as follows:[883]

 Q. So you read at least parts of the '915 patent recently.  Is there anything in the '915 patent that you believed was new as of mid-2005?

A. I don't quite understand. As of mid-2005, no.

[…]

Q. Okay. So can you identify anything in the scrolling code that you believe was new?

A. There were a number of features in the scrolling that I believe were new, such as the locked scrolling and what we would term in the UIKit as "the rubberbanding."

[…]

Q. What is locked scrolling?

A. It -- in UIKit, it is looking at the motion of a finger on a screen and determining whether or not the motion of content should be limited to one direction only.

[…]

Q. And what is -- what is rubberbanding?

A. This is functionality in UIKit when the user is moving content such that the bottom of the content extends above the bottom of the screen and the motion of that content after the user releases their finger.

[…]

Q. Did you invent touchscreen devices?

A. No.

Q. Did you invent the concept of creating an event object in response to user input on a touchscreen device?

A. Not that I know of.

472.    Scott Herz, the other named inventor on the '915 Patent, testified as follows:[884]

---

[883] Deposition of Andrew Platzer, October 18, 2011, pp. 28, 35-36, 125. [11.22]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Q Okay. And what I'm asking you is: In your mind, what do you feel -- and it may be multiple things -- but what do you feel is inventive about the '915 patent?

MR. OLSON: Objection; asked and answered; calls for a legal conclusion.

THE WITNESS: So what I've -- yeah. What I would say -- be able to say confidently is, you know, the -- the kinds of things that I -- that I -- that I worked on, right, the -- the -- I worked on the – the vertical scrolling, making that feel right with your -- with your finger, and -- and worked on making that -- you know, that -- that rubber banding stuff work. That's what I -- you know, that's what I -- that's what I worked on.

473.　　In addition, Michael Tchao, Vice-President Product Marketing iPad at Apple, testified that Apple's multi-touch approach supports ten-finger gesture while some of the other approaches support only two-finger gesture.[885]   He also stated that Apple's multi-touch is superior to multi-touch implementations on other platforms as it is fast and fluid, and creates the "illusion of direct manipulation."[886]   Given Apple's assertions that Samsung infringes Apple's multitouch utility patents, it must be other multi-touch contributions to Apple's products that result in the reported superior performance.

474.　　Apple's damages expert, Mr. Musika, appears to have assumed that the multitouch utility patents have invented multitouch capability and touch gestures, but the contributions of Apple's multitouch patents are not that broad.

### (iii)　Design IP

475.　　For the design IP, Samsung's own accused products provide ample evidence that acceptable, non-infringing alternatives exist.   As can be observed upon inspection of Schedule 6.1 at Volume 1, Tab 2 of my Report, for each asserted element of design IP, Samsung has *at least* eight of the 29 accused products that are not accused of infringement.

476.　　More specifically, for the GUI Design Patents, Apple does not accuse the Nexus products, the Galaxy S II products, and several other smartphones of infringement.   For the Electronic Device Design Patents and the asserted trade dress, there are a wide range of smartphones that are not accused of infringement.   For the asserted trademarks, it varies widely by trademark, but there are a number of accused products that are not accused for each trademark.

---

[884] Deposition of Scott Herz, October 14, 2011, p. 38. [11.24]
[885] Deposition of Michael Tchao, February 21, 2012, pp. 7, 164-165. [10.14]
[886] Deposition of Michael Tchao, February 21, 2012, pp. 164-165. [10.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

477.    Indeed, several of Samsung's top sellers are not accused of all groups of design IP. Samsung has 7 different accused products that have sold more than 1 million units in the United States:[887]

- The Captivate is not accused of infringing the Electronic Device design patents;

- The Epic 4G is not accused of infringing the Electronic Device design patents;

- The Fascinate is accused of infringing one of the Electronic Device design patents (the D677);

- The Galaxy Prevail is not accused of infringing either the GUI design patents or the Electronic Device design patents;

- The Galaxy S 4G is accused of infringing all groups of design IP;

- The Intercept is not accused of infringing the GUI design patents, Electronic Device design patents, or the trade dress (it is accused of infringing one trademark);

- The Vibrant is accused of infringing all groups of design IP.

478.    In addition to the accused products, Samsung sells a wide range of smartphones that have not been accused of *any* infringement of design intellectual property. Based on the same sources that Mr. Musika uses in his Morflo analysis, I have calculated that for the period from Q2 2010 through Q4 2011, between 25 and 30 percent of Samsung's smartphones are not accused of infringement.[888]

479.    Finally, there is a wide range of other smartphones in the marketplace that have been successful that are apparently not infringing Apple's design IP asserted in this lawsuit. I am not aware of Apple asserting its design intellectual property against any other smartphone manufacturer.

480.    I have requested from counsel pictures of the trademark icons used in products that are not accused of infringement. The accused icons make up a small portion of the total icons in the accused products.[889] I summarize the icons that were received below:

---

[887] Schedules 5.1 and 6.1. [1.2]
[888] Schedule 11. [1.2]
[889] Schedule 17. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 60: Alternative Icons for Apple Registered Icon Trademark No. 3,886,196**



**Figure 61: Alternative Icons for Apple Registered Icon Trademark No. 3,889,642**



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 62: Alternative Icons for Apple Registered Icon Trademark No. 3,886,200**



**Figure 63: Alternative Icons for Apple Registered Icon Trademark No. 3,889,685**



**Figure 64: Alternative Icons for Apple Registered Icon Trademark No. 3,886,197**



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Figure 65   Alternative Icon for Apple Registered Icon Trademark No. 3,886,169



Trademark No. 3,886,197          New Notebook Icon

Figure 66:  Alternative Icons for Apple iTunes Store Trademark



Application Serial No. 85/041,463          Nexus S          Transform

481.   As noted above, the Galaxy S II products have not been accused of infringing the GUI Design Patents, but several products accused of infringement of other IP have not been accused of infringing the GUI Design Patents.  In addition, I understand that Samsung sells its smartphones in Korea with a grid of 3 icons wide by 5 icons tall.[890]  The figures below provide the screen images for the Galaxy SII (T-Mobile), which is not accused of infringing the GUI Design Patents, a snapshot of the Korean phone screen showing the 3x5 grid, and the Vibrant, which is accused of infringing the GUI Design Patents:

---

[890] Conversation with Hoshinn Lee, April 16, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 67: Alternative Images for Accused (Vibrant) Screen Image**



Vibrant



Galaxy S II (T-Mobile)



New Screen Image

482.    As demonstrated above, I understand that Samsung could change the number of rows or columns on its GUI and design around the GUI Design Patents.

483.    I have discussed the cost to design new icons or to implement a new GUI on the accused products with a Samsung designer and engineer.[891]   The cost is ███████████ ████████████████████████████████████[892]

484.    In addition to the GUI Design Patents and trademarks described above, Apple's asserted design-related IP includes the Electronic Device Design Patents and the trade dress. If found to be valid and infringed, Apple's Electronic Device Design Patents and trade dress cover some elements of the device itself.  However, for each asserted Electronic Device Design Patent and individual Trade Dress, there are *at least* 14 Samsung products that have been accused of infringement in this lawsuit that are not accused of that specific assertion.[893] Therefore, Samsung has a number of alternatives available to it, regardless of which Trade

---

[891] Conversation with Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee). Conversation with Sun-young Yi and Jaewoo Park, April 16, 2012 (with translation assistance from Hoshin Lee).
[892] Schedule 13.5. [1.2]
[893] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Dress / Electronic Device Design Patents are found to be infringed.  For example, these products are not accused of infringing any Trade Dress or Electronic Device Design Patent:[894]

- Acclaim
- Exhibit 4G
- Gem
- Gravity / Gravity Smart
- Indulge
- Intercept
- Nexus S
- Nexus S 4G
- Replenish
- Sidekick
- Transform

485.    For the tablets, the Tab 7.0 (3G) and Tab 8.9 is not accused of infringing the D889 Patent, and the Tab 8.9 is not accused of asserting the iPad / iPad 2 trade dress.[895]

486.    In addition, Samsung has employed a wide range of smartphone designs in the market that have found to be acceptable and are not accused of infringement in this lawsuit. Further, numerous other smartphone and tablet manufacturers have competed in the marketplace with alternative designs.

487.    These wide range of design alternatives are acceptable alternatives for the devices accused of infringing the Electronic Device Design Patents and trade dress.  Apple has provided no evidence that the "design" referred to by Apple's experts is connected in any way with the specific design-related IP in this lawsuit.  Therefore, I conclude that Samsung has acceptable, noninfringing alternatives for the Electronic Device Design Patents and Apple's trade dress assertions.  Because Samsung had numerous smartphones on the market at all times that do not practice the asserted Electronic Device Design Patents and trade dress, I do not consider design around costs.

---

[894] Schedule 6.1. [1.2]
[895] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

(b) *Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty*

488.    From an economic perspective, the cost of Samsung's next best alternative which are non-infringing ways of offering the same functionality or designing out the functionality if the feature is not desired by their customers is the most that Samsung would be willing to pay Apple and Apple would be entitled to receive. In my opinion, based on all the facts that I have considered, this factor is my starting point in arriving at my reasonable royalty damages and therefore is neutral.

**(10) Factor #10—the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention.**

(a) *The nature of the patented invention*

489.    I have discussed the asserted IP at length in this report.

(b) *The character of the commercial embodiment of it as owned and produced by the licensor*

490.    I understand that Apple has made use of the technology enabled by the Patents-in-Suit in iPhones and iPads.

(c) *The benefits to those who have used the invention*

**(i)      Multi-Touch Functionality**

491.    According a 2009 Samsung Research Presentation, "[t]ouch interaction lets users control their views in a fluid manner, eliminating the notion of a hierarchical drill-up / drill-down navigation."[896]   In its January 21, 2009 presentation entitled "User Experience Design Philosophy" Samsung states that "[t]ouch screen and gesture interface give users more direct control and set a new standard."[897]   In another internal document, Samsung points out finger

---

[896] Samsung Research Presentation, July 2009, SAMNDCA00220268-312 at '303. [10.15]
[897] User Experience Design Philosophy, Samsung, January 21, 2008, SAMNDCA00207427-477 at '466. [11.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

based touchscreens are more accurate and more user-friendly.[898]   Finger-operated touchscreens typically work best on large displays above 3 inches.[899]

### (ii)   Bounce Back Effect

492.   According to a San Jose Mobile Communications Lab presentation, "user might be confused when the page cannot be moved."[900]   Therefore, it is my understanding that a bounce back effect provides good visual user experience.

#### (d)   Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

493.   Based on the cost of design around cost as the starting point for the hypothetical negotiation, this factor is neutral in my determination of the reasonable royalty amount.

### (11) Factor #11—the extent to which the infringer has made use of the invention and any evidence probative of the value of that use

#### (a)   Use of the Invention

494.   Apple asserts that 32 Samsung's smartphone and tablets embody the Patents-in-Suit.[901]

#### (b)   Evidence probative of the value Samsung received from using the Apple Inventions

495.   It is my understanding that 30 Samsung's smartphones and tablets are accused by Apple of using the technology taught by the Patent-in-Suit.[902]   Of these 32 products Samsung has provided data on 28.   STA and SEA sales of these accused products are 18,230,472 units from May 2010 through December 2011.

---

[898] 2009 Mobile US Forecast: M.T.O.C., Samsung Electronics, November 2011, SAMNDCA00218832-902 at '858. [11.2]

[899] 2009 Mobile US Forecast: M.T.O.C., Samsung Electronics, November 2011, SAMNDCA00218832-902 at '858. [11.2]

[900] Bouncing Effect in Browser, San Jose Mobile Communications Lab, SAMNDCA00201327-335 at '328. [11.3]

[901] Musika Report, Exhibit 4. [2.2]

[902] Musika Report, Exhibit 4. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

> ### (c)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

496.    Based on the cost of design around cost as the starting point for the hypothetical negotiation, this factor is neutral in my determination of the reasonable royalty amount.

> ## (12) **Factor #12—the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

> ### (a)  Licenses in which Samsung Licensed Technology to Apple

497.    I have received one license, signed by Apple, but not Samsung, in which Samsung was to license standards essential technology to Apple.  This license is summarized at Schedule 1 at Tab 3 of my report.

> ### (b)  Other Agreements in which Samsung is a Named Party

498.    I have received 41 other agreements in which Samsung was a named party, which can be found at Schedule 2 at Tab 3 of my report.

> ### (c)  Other Agreements in which Apple  is a Named Party

499.    I have received 77 agreements in which Apple is a named party, which can be found at Schedule 1 at Tab 3 of my report.

> ### (d)  Other Agreements

500.    I have received three agreements that involve neither Samsung nor Apple, which can be found at Schedule 3 at Tab 3 of my report.

> ### (e)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

501.    I agree with Mr. Musika "there is no evidence that relates to the portion of the profit or selling price that may be customary in this business to allow for the use of the invention or analogous invention for any of the categories of Apple Intellectual Property in Suit with the limited exception of trademarks to some degree."[903] Therefore, this factor is neutral in my determination of the reasonable royalty amount.

---

[903] Musika Report, p. 86. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(13) Factor #13—the proportion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements added by the infringer.**

*(a) The proportion of the realizable profit that should be credited to the Apple's Inventions*

502. This factor attempts to take into account the relative contribution of the patented feature to the success of the product. It is generally the case that a licensee is less disposed to agree to a high royalty if the patented feature forms only a small part of the product, either physically or economically.[904]

503. Apple asserts that Samsung's smartphone and tablets embody the Patents-in-Suit. However, Samsung's accused products owe much of their value to Samsung's own creative and business inputs, not solely to the use of the Patents-in-Suit. I address each of Samsung's business and technology inputs below in turn.

### (i)   Business Inputs

504. Samsung expends considerable time and effort to bring its products to market. Below is a brief discussion of Samsung's operations that contribute to bringing the accused smartphone and tables to market.

*(a)    Research and Development*

505. Samsung states on its website that "[i]nnovation is crucial to Samsung's business. As new technologies are being constantly introduced to the market, speed is essential for remaining competitive in today's digital era, and new markets have to be pioneered continuously." "With competition in the smart phone space heating up, being able to introduce technology and user interface enhancements quickly is critical," noted Canalys analyst Tim Shepherd. "You also need to be able to integrate them seamlessly into the device to provide a great total user experience."[905]

---

[904] Procter & Gamble Co. v. Paragon Trade Brands, Inc., 989 F. Supp. 547 at 613. [12.4]

[905] Canalys Research Release, Global Smart Phone Shipments Rise 28%, Nokia Retains Lead, but Apple Moves into Number Two Position, November 6, 2008, SAMNDCA00220313-316 at '314. [9.25]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

506.    Each year Samsung invests at least nine percent of its sales revenue in Research and Development activities.[906]   "Samsung is committed to leading technology standardization and securing intellectual property rights."[907]

507.    Samsung's research and development network spans six Samsung centers in Korea and 18 more in nine other countries, including the United States, the United Kingdom, Russia, Israel, India, Japan and China, as well as other research centers and universities.[908] Samsung's Research and Development organization has three layers.[909]   The Samsung Advanced Institute of Technology identifies growth engines for the future and oversees the securing and management of technology.[910]   In turn, Research and Development centers of each business focus on technology that is expected to deliver the most promising long-term results.[911]   Division product development teams are responsible for commercializing products scheduled to hit the market within one or two years.[912]   More than a quarter of all Samsung employees work - 40,000 people - in the Research and Development centers.[913]

(b)    <em>Samsung Marketing and Advertising Efforts</em>

508.    Samsung's marketing and advertising efforts play an important role in promoting Samsung's products and increasing public awareness about them. Nielsen estimated that Samsung spent ████████ on advertising in 2010.[914]   In a Samsung internal presentation entitled "2010 Full Year Media Spend," Samsung stated that its media spending was ████ ████████████████████████████████████████████   In particular, ██████████ was spent on

---

[906] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[907] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[908] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[909] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[910] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[911] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[912] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[913] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/ us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]
[914] Advertising Insights 2010 Product Update, Nielsen, March 4, 2011, SAMNDCA00235833-834 at '833. [11.5]
[915] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '589. [11.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

advertising of Galaxy S and Tablet in 2010.[916]   Nearly                 of Samsung's Galaxy Tab media spending was invested in TV commercials, and the rest was spent on online and print advertising.[917]   Overall, Samsung took the number one position at the most promoted OEM in 2010.[918]

509.   According to a 2010 Samsung presentation, integrated advertising campaign of Galaxy S helped build rapid awareness and purchase interest for the Galaxy series.[919]   In particular, Samsung launched press events and meetings, executed a media focused teaser campaign, developed scalable displays and new smartphone mockups to highlight the brand and products across the Galaxy S lineup, led 61 full training sessions across all carriers, reached over 4,000 sales representatives with training events, and conducted close to 30 webinars to support remote training.[920]

510.   Samsung concluded that the key improvement in the 2010 advertising campaign from 2009 had been in the ads' ability to commutate messages that differentiates Samsung on the marketplace. In particular, one of these differentiating product elements was Samsung's Super AMOLED technology.[921]   According to a Samsung 60-Day Post Launch Report for Infuse 4G, the 4.5" Super AMOLED screen of Infuse 4G smartphone was the top driver for purchase of Infuse 4G.[922]

### (c)    Samsung's Brand

511.   Most people rely on brand when making product purchasing decisions.[923] Samsung actively promotes its brand value - "a key engine of business growth," according to Samsung.[924]   Samsung's brand value was ranked No.19 Best Global Brand in the world and No.

---

[916] Samsung Presentation, SAMNDCA00236898-913 at '912. [11.7]

[917] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '597. [11.6]

[918] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '605. [11.6]

[919] Samsung Galaxy S Results and Key Learning, November 23, 2010, SAMNDCA00235207-246 at '208. [11.8]

[920] Samsung Galaxy S Results and Key Learning, November 23, 2010, SAMNDCA00235207-246 at '212. '214, '216, '242. [11.8]

[921] Samsung Q3 '10 Deep Dive, Galaxy S Campaign Review, November 18, 2010, SAMNDCA00235307-366 at '339. [11.9]

[922] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '820. [4.16]

[923] Design for Messaging Phone, Samsung Design America, July 2008, SAMNDCA00220208-267 at '222. [11.10]

[924] History – Corporate Profile – About Samsung – Samsung, Samsung's History, <http://www.samsung.com/hk_en/aboutsamsung/corporateprofile/history.html>, accessed on March 1, 2012. [11.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

9 in IT industry by Interbrand in 2010.[925]  As stated in an Interbrand "Best Global Brands 2010" report, "Samsung has been on the forefront of digital and design, developing new products and increasing its presence in all its markets. Its sales growth, even in tough economic times, demonstrates its ability to effectively hedge its portfolio of businesses."[926]

### (ii)    Design and Technology Inputs

#### (a)    Super AMOLED Technology

512.    Samsung highlights its Super AMOLED technology in its presentations and on its website. In its June 30, 2010 presentation, Samsung states that Super AMOLED screen on Galaxy S provides best color reproduction, best outdoor readability, and best pixel response.[927] According to a Verizon Executive Meeting presentation, Samsung Galaxy Tab 7's Super AMOLED display improves brightness and outdoor visibility.[928]

513.    Samsung also describes its Super AMOLED technology on its website:[929]

> Samsung's new SUPER AMOLED screen is the world's brightest SUPER AMOLED screen displaying vibrant and vivid colors in HD movies. Even in bright sunlight the screen is perfectly clear so filming outdoors is a breeze. Even filming incredibly fast action scenes or sports are not a problem when using the Galaxy S HD video capture feature.

> Samsung's brilliant SUPER AMOLED screen is a much brighter, less reflective, and slimmer than any general AMOLED screen. The ultra-brilliance of SUPER AMOLED, makes video so astonishingly vivid, your display looks ultra real. The SUPER AMOLED screen comes with free viewing angle & super fast response. The SUPER AMOLED screen reflects 5 times less light, which is an incredible reduction from 20% to 4%. As 80 - 100% of original light is coming through to arrive to your eyes, you can now have a great view even in the outdoors.

514.    Samsung's Super AMOLED technology was highlighted in press releases and media. Media and online reviews praised Droid Charge for its Super AMOLED screen.[930]  For instance, CNET noted, "[i]t is stunning: the sharpness of the AMOLED Plus display really comes through when watching video and colors are rich and pop right off the screen.  Also, as

---

[925] Memo: 2010 Brand Value Rankings by Interbrand, September 16, 2010, SAMNDCA00234695-698 at '698. [11.12]

[926] Best Global Brands 2010, Interbrand, SAMNDCA00234567-630 at '587. [11.13]

[927] Samsung 'Dempsey,' June 30, 2010, SAMNDCA00024963-971 at '964. [11.14]

[928] VZW Executive Meeting, April 20-21st, 2011, SAMNDCA00024794-860 at '820. [11.15]

[929] Samsung Smartphone Technology, <http://www.samsung.com/au/smartphone/technology/super-AMOLED.html>, accessed on March 5, 2012. [11.16]

[930] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '783. [4.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

promised, outdoor visibility is better than with a lot of smartphones, and we were able to read the screen at various angles."[931]

515.    Media and online reviews were also positive for Infuse 4G's Super AMOLED screen.[932]   For example, TechInsights stated in its August 2, 2011 New Report Notice that "[w]ith its sprawling 4.5" "Super AMOLED' display, the Infuse 4G from Samsung plays big brother to their recent large-touchscreen Galaxy model."[933]

516.    TechInsights highlighted Super AMOLED display of Samsung Galaxy GT-i9000 smartphone in its August 31, 2010 Report Notice.[934]   According to TechInsights, Super AMOLED display boasts 20 percent greater brightness, 80 percent less sunlight reflection, and 20 percent lower power consumption."[935]

517.    Third party studies and surveys also pointed to the Super AMOLED display as a feature that differentiates Samsung's products.  Strategy Analytics conducted a blind test when users watched same video trailer simultaneously on devices with Super AMOLED Plus and competitor's display to determine preference.[936]   Strategy Analytics found that "Samsung's Super AMOLED Plus display preferred more than 2 to 1 vs. competitor's display."[937]

518.    Mr. Joswiak also testified that a lot of customers like Samsung's Super AMOLED displays because they appear very vibrant.[938]   Mr. Joswiak agreed that this is "one of the important features that they're [Samsung] selling on."[939]

### (b)    Number of Samsung Patents

519.    In 2009 Samsung was the second top patent winner with 3,611 total numbers of patents.[940] According to a Samsung's 2010 annual report, in 2010 Samsung registered 4,551 patents in US, second in volume only to IBM.[941]

---

[931] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '804. [4.16]

[932] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '784. [4.16]

[933] Email from TechInsights to John Brown, August 2, 2010, TechInsights New Report Notice, August 2, 2010, APLNDC0001524924-925 at '924. [15.30]

[934] Email from TechInsights to John Brown, August 31, 2010, TechInsights New Report Notice, August 31, 2010, APLNDC0001525057-058 at '057. [15.29]

[935] Email from TechInsights to John Brown, August 31, 2010, TechInsights New Report Notice, August 31, 2010, APLNDC0001525057-058 at '057. [15.29]

[936] Samsung, September 16, 2011, SAMNDCA00256983-7025 at '7017. [11.17]

[937] Samsung, September 16, 2011, SAMNDCA00256983-7025 at '7017. [11.17]

[938] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 438-439. [9.3]

[939] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 438-439. [9.3]

[940] Samsung Overview, SAMNDCA00256938-962 at '943. [11.18]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*(b)   Implications of This Georgia-Pacific Factor Regarding a
        Reasonable Royalty*

520.     This factor indicates that the major reasons for Samsung's success in selling the
accused products is not the result of practicing the patents-in-suit but are due to other
contributions of Samsung. However, this factor is neutral based on my choice of baseline royalty
amounts.

### (14) Factor #14—the Opinion Testimony of Experts

521.     I have considered information provided by to be my Trevor Darrell, Andries Van
Dam, Brian Von Herzon, and Stephen Gray.

*(a)   Implications of This Georgia-Pacific Factor Regarding a
        Reasonable Royalty*

522.     I have considered this information in other Georgia Pacific factors. Therefore, this
factor is neutral.

### (15) Factor #15—the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee—who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

523.     The seminal approach for determining a reasonable royalty is the "willing
licensor/willing licensee" approach.  This approach assumes that a reasonable royalty rate with
respect to patent infringement damages should reflect, in part, the amount of money a willing
licensor and willing licensee would negotiate for a license to utilize the invention.  A technique
for estimating such a royalty is to assume that the patentee and infringer, each possessing
similar information that was known and knowable at the time, come together and conduct a
hypothetical negotiation.  In this hypothetical negotiation, each party's strengths, weaknesses
and expectations are considered and form the basis for the opined royalty rate.  This fifteenth
factor in essence synthesizes the fourteen factors discussed above.

---

[941] 2010 Samsung Electronics Annual Report, p. 3. [11.19]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

c)   **Major Facts Known or Knowable to Both Parties at the Hypothetical Negotiation**

524.   Taking into consideration the first fourteen *Georgia-Pacific* factors, the most important facts affecting the parties bargaining position at the hypothetical negotiation can be summarized as follows:

- The parties knew with certainty that Samsung's products infringed the valid and enforceable Patents-in-Suit.

- There are commercially acceptable non-infringing alternatives to the patents-in-suit.

- Apple is not a willing licensor.

- Samsung and Apple are direct competitors.

- Samsung is a major supplier of components to Apple.

(1)   **Summary of *Georgia-Pacific* Factor Analysis**

**Figure 68:  Summary of *Georgia-Pacific* Factors and Their Impact on the Reasonable Royalty Rate**

| *Georgia-Pacific* Factor | Impact on Royalty Rate | Comments |
|---|---|---|
| 1. Royalties received by patentee for licensing the Patents-in-Suit | Neutral | Apple did not produce any licenses to the patents-in-suit. However Apple acquired two foundational patents related to multi-touch functionality in a purchase of the entire FingerWorks company for $13.5 million. This provides a reasonableness check for the value of the '607 and '129, Patents. |
| 2. Rates licensee pays for the use of other comparable patents | Neutral | I found none of the Samsung licenses where Samsung was the licensor of patents probative to the patents-in-suit. |
| 3. Nature and scope of the license. | Neutral | Based on the design around costs for the patents-in-suit, the nature and scope of the license are not relevant. |
| 4. Licensor's established policy regarding licensing. | Increase to full design cost | Apple is not a willing licensor and so would not be willing to take anything less than the cost of a design around to their patents-in-suit. |
| 5. The commercial relationship between the licensor and the licensee. | Increase to full design cost | Apple and Samsung are competitors and so Apple would not be willing to take anything less than the cost of a design around to their patents-in-suit. |
| 6. The effect of sales of the patented product on sales of other products (convoyed sales). | Neutral | There is no proof that the patents-in-suit are primary drivers of Apple's or Samsung's sales of smartphones or tablets and so convoyed sales would not be properly considered in the hypothetical negotiation. |
| 7. The duration of the Patents-in-Suit and the term of the license. | Neutral | The duration of the patents and term of the hypothetical license agreement are longer than a typical product lifecycle in this industry. |
| 8. The established profitability of the product; its commercial success and its current popularity. | Neutral | Based on the design around costs for the patents-in-suit, the established profitability and commercial success of the accused products are not relevant. |
| 9. The utility and advantages of the patent property over the old modes and devices. | Neutral | The design around costs for the patents-in-suit provide a starting point royalty amount for the patents-in-suit. |

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

| *Georgia-Pacific* Factor | Impact on Royalty Rate | Comments |
|---|---|---|
| 10. The nature of the patented feature and its benefits to the user. | Neutral | Based on the design around costs for the patents-in-suit, the nature of the patented feature and its benefits to the user are not relevant. |
| 11. The extent to which the infringer has made use of the Patents-in-Suit and any evidence probative of the value of that use. | Neutral | Based on the design around costs for the patents-in-suit, the extent of use by Samsung is not relevant. |
| 12. Customary royalty rates for this industry. | Neutral | I found no customary royalty rates for this industry. |
| 13. Apportionment of the realizable profit between that which should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | Neutral | Samsung contributes significant value to the accused products that have nothing to do with the patents-in-suit. However, based on the design around costs for the patents-in-suit, this is not relevant to my conclusion. |
| 14. The opinion testimony of experts | Neutral | I have considered this information in other *Georgia Pacific* factors. |

525.     In my opinion, of the fourteen *Georgia-Pacific* factors that are relevant to consider for raising or lowering the reasonable royalty rate no factors tend to lower the reasonable royalty rate, two factors tend to raise the rate to the full cost of the design arounds and twelve factors have a neutral effect.

### d)   Conclusions Regarding Reasonable Royalty

526.     In my opinion, based on all the considerations described above, the reasonable royalty amount should be the full cost of designing around the patents-in-suit.

527.     In addition, for the '607 Patent, the design around cost would only cover the Tab 10.1.  Therefore, the parties would agree to a reasonable royalty that apportions the profits of the other products accused of infringing the '607 Patent (the Galaxy Tab 7.0 (3G) between the parties.  To determine a reasonable apportionment, I follow a methodology similar to that described in my unjust enrichment calculation.

528.     I use data from the iPad Buyer Surveys and iPad Tracking Studies commissioned by Apple.  As a part of the surveys and studies, respondents were asked to name specific features or attributes of the iPad that prompted their iPad purchase.[942]  To analyze the importance of the "Multi-touch screen" of the iPad relative to the other iPad's features that influenced purchase decisions, I have divided the percent of respondents that

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

listed the "Multi-touch screen" as a purchase trigger by the cumulative percent of the survey responses. The results of my apportionment analysis are summarized in Schedule 7.2 at Tab 2 of my report.

529.    Based on this analysis, I conclude that the parties would have agreed to a six percent apportionment of profit to the '607 Patent. Applying this 6 percent apportionment to Samsung's operating profit for the Galaxy Tab 7.0 results in an apportioned profit of $1,395,139.[943] I next divide this profit by the number of units sold to conclude a reasonable royalty rate of $2.10 per unit.[944]

### 2.    Calculation of Royalties Due

530.    Applying the full cost of the design around for the patents-in-suit results in royalties due as follows:

**Design Around Costs**

Utility Patents
'002
'163
'381
'891
'915
'607
'129

Cost to Design a New Icon (per Icon)

Cost to Design and Implement a New GUI

Trade Dress (Based on New GUI)
Trade Dress (Device Related)

Electronic Device Design Patents

531.    For the '607 Patent, an additional royalty payment would be due for the Galaxy Tab 7.0 (3G), calculated as follows:

---

[942] iPad Buyer Survey: Initial US Results, Apple Market Research & Analysis, August 2010, APLNDC-Y0000023361-427 at '386. [3.20]

[943] Schedule 4.1A. [1.2]

[944] Schedule 3.1A. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

| | Units | Royalty Rate | Royalties Due |
|---|---|---|---|
| *5/1/10 - 12/31/11*<br>Galaxy Tab 7.0 (3G) | ██ | $2.10 | ██ |
| *6/16/11 - 12/31/11*<br>Galaxy Tab 7.0 (3G) | | $2.10 | |

**E.   Alternative Reasonable Royalty for Electronic Device Design Patents and Trade Dress**

532.   As I describe in my analysis of *Georgia-Pacific* factor 9, I have concluded that Samsung has available to it acceptable, non-infringing alternatives for the Electronic Device Design Patents and Apple's asserted trade dress.   However, I have also performed an alternative reasonable royalty calculation based on a maximum value for Apple's design.

533.   I described in paragraph 338 above how I arrived at an estimate of the value of Apple's designs in total would be one percent of profits in discussing the amount of unjust enrichment due on Apple's design-related IP. In my opinion, the apportioned profit for Apple's asserted design-related IP is appropriate to use as the basis for a reasonable royalty if the fact finder determines that Samsung did not have a design around available.

534.   To convert to a royalty rate, I have divided the apportioned profit by the number of smartphone and tablet units to determine a per unit royalty rate. I have calculated the per unit rate to be $0.60 for Smartphones and $0.30 for Tablets.[945]

535.   Applying these royalty rates to the royalty base of accused units results in reasonable royalties calculated as follows for the relevant time periods:

---

[945] Schedule 3.1[1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



| | Units | Royalty | Royalties Due |
|---|---|---|---|
| | | [a] | |
| **5/1/10 - 12/31/11** | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |
| | | | |
| **4/15/11 - 12/31/11** | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |
| | | | |
| **6/16/11 - 12/31/11** | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |

536.    It must be understood that these royalties would not be additive to the unjust enrichment remedy for products that are accused of practicing Apple's design patents. These are just alternative remedies to collect the same amount of damages. To the extent there are additional products that are accused of infringing either Apple's asserted trademarks or tradedress then per unit royalty of $0.60 for Smartphones and $0.30 for Tablets are a reasonable royalty for those products.


## V.    Documents, Data and Other Information Considered

537.    Volume 1, Tab 4 contains a complete list of documents I considered in forming my opinions.  In addition, I or my staff also had discussions with the following individuals:

- Trevor Darrell, Ph.D., Samsung's technical expert on the '002 and '891 Patents
- Jeff Johnson, Samsung's non-infringement expert on the '381 Patent
- Andries Van Dam, Ph.D., Samsung's invalidity expert on the '381 Patent
- Brian Von Herzen, Ph.D., Samsung's technical expert on the '607, '129, and '828 Patents
- Stephen Gray, Samsung's technical expert on the '915 and '163 Patents
- Tim Sheppard, Vice President of Finance and Operations at STA
- Dongyul Choi, Manager, Finance Team, Mobile Business Unit at SEC
- Hoshin Lee, Senior Litigation Counsel, SEC
- Sun-young Yi: Senior Designer at Design Strategy Department at SEC
- Jaewoo Park: Assistant Engineer at Android R&D Group 2 at SEC

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

- Heonseok Lee: Senior Engineer at Display Lab Group at SEC
- Jong-wook Shim: Associate at Human Resources Group 1 at SEC

## VI.  Potential Additional Analyses to Perform

538.    My opinions are based on the information received as of the date of my report.  I plan on updating my damages analysis with the most current sales data produced as of the date of my testimony.  I understand that discovery is continuing and I may consider other data produced through discovery to determine whether such other data impact my opinions.  I will consider any criticisms of my opinions or bases for my opinions brought to my attention at my deposition or offered by experts retained by Apple.  Any of this additional information or work may cause me to change my opinions.

## VII.  Qualifications

539.    Volume 1, Tab 5 contains my curriculum vitae which details my qualifications, including a listing of all my publications and testimony.

## VIII.  Compensation

540.    My current billing rate is $795 per hour.


*Michael J Wagner*


Michael J. Wagner