**Contains Attorneys' Eyes Only Information Subject to Protective Order**

HAROLD J. MCELHINNY (SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (SBN 116421)
rkrevans@mofo.com
ERIC J. OLSON (SBN 175815)
ejolson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>　　　　　Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**FILED UNDER SEAL**<br><br>**APPLE INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL FURTHER DISCOVERY AND FOR SANCTIONS FOR VIOLATIONS OF PROTECTIVE ORDER**<br><br>**Date**:　October 1, 2013<br>**Time**:　10:00 a.m.<br>**Place**:　Courtroom 5, 4th Floor<br>**Judge**:　Hon. Paul S. Grewal |

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

*Introduction*

Samsung's opposition argues that the Court should not take any action—nor even permit Apple to take the discovery necessary to fully develop the factual record—with respect to Samsung's and Quinn Emanuel's admitted Protective Order violations (Opp. 1, 9-11). "Reliance on protective orders and the diligence of counsel in observing them is fundamental to litigation between competitors," however, and where a party engages in serious breaches of a protective order, "[s]anctions are needed to preserve the integrity of the system." *Systemic Formulas, Inc. v. Kim*, No. 1:07-cv-159, 2011 WL 9509, *2 (D. Utah Jan. 3, 2011). Here, Samsung's repeated disclosures of highly sensitive licensing information to high-ranking Samsung licensing executives, and its unwillingness to identify or explain the consequences of those disclosures, merit an immediate investigation. Apple respectfully requests that the Court order the requisite discovery, including either production of relevant documents to Apple, or *in camera* review by a third party such as a Discovery Master—and, after the facts are fully known, impose sanctions commensurate with the full consequences of Samsung's and Quinn Emanuel's breaches of the Protective Order,

*Samsung Seeks to Have the Court Ignore the Full Scope of Samsung's Protective Order Violations*

Samsung's opposition brief attempts to cast the Protective Order breaches as not significant, in several ways. *First,* Samsung attempts to belittle Apple's motion as mere "piggy-backing" on Nokia's motion for a protective order. That argument lacks merit. Samsung repeatedly disclosed not only Nokia's confidential information, but also ***Apple's, Siemens's, Philips's, and Sharp's*** highly confidential information to dozens of Samsung employees, including its most senior licensing executives. That Apple wants to understand how Samsung employees used that information—and to seek appropriate remedies—is hardly "piggybacking" on a motion that sought only to prevent the production of additional Nokia documents by Apple in discovery.

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

***Second***, Samsung tries to diminish the gravity of its violations by suggesting that the terms of the Apple-Nokia license agreement were "publicly known." (Opp. 7.) As explained in Apple's opening brief, this is incorrect. Apple and Nokia themselves have always kept those terms confidential, and press accounts varied widely, *e.g.*:

- "Nokia . . . did not disclose the financial terms of the settlement, but said that the agreement would have a 'positive financial impact.'"[1]

- "The exact terms of the Nokia/Apple deal were never publicly released, so it's impossible to say whether the entire €430m came from Steve Jobs' purse or just a portion of it."[2]

- "Apple opted to enter a cross-licensing agreement, which some estimated could involve hundreds of millions of dollars in licensing payments to Nokia. But here's the interesting thing: Nobody knew what the settlement was worth, as Apple did not disclose it in its legal mandated financial filings."[3]

- "But with Apple paying up for what could be as much as much as 5 years of licensing in one lump sum—estimates range from $600 million to as much as $900 million—it gives Nokia some breathing room as it transitions from Symbian to Windows Phone 7."[4]

- "The Finnish phone-maker Nokia could receive a one-off payment of more than €800m (£700m) from Apple and receive further royalties of €8 per iPhone sold in future."[5]

---

[1] Kevin J. O'Brien, "Nokia Settles 2-Year Fight With Apple on Patents," The New York Times (June 14, 2011).

[2] Chris Davies, "Apple Contributes to Nokia's €430m Patent Settlement Income," Slashgear (July 21, 2011), *available at* http://www.slashgear.com/apple-contributes-to-nokias-e430m-patent-settlement-income-21166543/).

[3] Jason Mick, "Apple Fights to Keep Details of Nokia Settlement From the Public," Daily Tech (Oct. 3, 2011), *available at* http://www.dailytech.com/Apple+Fights+to+Keep+Details+of+Nokia+Settlement+From+the+Public/article22909.htm.

[4] Chris Foresman, "Nokia Buries Patent Hatchet with Apple to Help Fund WP7 Switch," Ars Technica (June 14, 2011), *available at* http://arstechnica.com/apple/2011/06/nokia-agrees-to-bury-patent-hatchet-with-apple-for-lump-sum/.

[5] Charles Arthur, "Apple to Pay Nokia Big Settlement Plus Royalties in Patent Dispute," The Guardian (June 14, 2011), *available at* http://www.theguardian.com/technology/2011/jun/14/apple-nokia-patent-case.

As these quotations show, speculation as to what those terms might be varied considerably among analysts—leaving the actual, confirmed terms confidential, valuable information.

Samsung's further argument that Apple "voluntarily disclosed" these terms to Samsung employees (Opp. at 7) is also incorrect. Samsung is referring to disclosures that were expressly requested by a Dutch court for a Dutch litigation. Those disclosures were anonymized to remove the license counter-parties' names, preventing identification of the terms of the agreement with any particular party. The Dutch disclosures were also limited to a group of at most 10 Samsung employees (far fewer than received the information disclosed in breach of the Protective Orders). Moreover, their use was strictly limited to use in that case only, similar to disclosure of confidential information under one of the Court's own protective orders. Thus, the Dutch materials were both restricted and anonymized. As with the press accounts, the Dutch materials provided no way to definitively know the terms of the Apple-Nokia license.

Apple has repeatedly asked Samsung to concede that it did not have definitive confirmation of the terms of the Nokia-Apple license until receiving the improper disclosures, and Samsung has failed to answer these questions. (*See, e.g.*, Declaration of Joseph Mueller in Support of Apple Inc.'s Reply in Support of Motion to Compel Further Discovery and for Sanctions ("Mueller Declaration"), Exhibit A (correspondence to Samsung's counsel).) Moreover, not even Samsung argues that any of the highly confidential Apple-Ericsson, Apple-Sharp, or Apple-Philips information—that was widely disseminated to Samsung employees—was ever publicly known.

*Third,* Samsung further seeks to minimize the Protective Order breaches by arguing that the potential for inadvertent disclosures was heightened given the volume of discovery in this case. But the volume of discovery—which was a function of Samsung's own expansive discovery requests—cannot excuse the repeated disclosures of Apple's (and other parties') highly sensitive licensing information to Samsung licensing executives. Moreover, before the Protective Order breaches can be classified as mere inadvertence, the

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

factual record must be further developed to understand precisely how Samsung employees used the information that they improperly received from Quinn Emanuel.

Indeed, stripped of its rhetoric, Samsung's opposition notably lacks any detail as to what actually happened.  This silence is telling and suggests either that Samsung knows its employees engaged in inappropriate use of the improperly-disclosed information, or that Samsung does not know what its employees did with this information.  Neither explanation suffices at this late stage, months after Nokia first raised the problem—and this only highlights the need for the Court to take action.

### *Samsung Has Failed to Address Critical Issues*

Contrary to Samsung's claim that it has "complied fully" with its obligations to report, investigate, and attempt to remedy its numerous Protective Order violations (Opp. 8), Samsung has failed to report numerous fundamental facts of the underlying violations. Indeed, Samsung's opposition is perhaps most telling in what it does not say.  For example, Samsung does not deny that:

- Samsung misused Apple's highly confidential information, as well as the highly confidential information of at least four third parties (Nokia, Ericsson, Sharp, and Philips) for Samsung's own business and/or litigation advantage;

- Samsung's most senior licensing executive, Dr. Seungho Ahn, used Apple's confidential business information in a licensing negotiation with Nokia, fully aware that it was provided to him improperly by Samsung's outside counsel; and

- the same Samsung licensing executives who have sought to advance the argument that Apple is a so-called "unwilling licensee" of Samsung's declared standards-essential patents had access to the specific financial terms of Apple's licenses to help them formulate Samsung's licensing strategy.

### *Samsung Has Failed to Investigate*

Samsung's assertion that the Court should effectively ignore these serious violations because Samsung can "fully investigate the scope" of its own misconduct (Opp.

1) is undermined by its failure over the last two months to take even basic steps to determine the scope of the violations.  Apple has written letters to Samsung requesting basic information about the scope of Samsung's wrongdoing, but Samsung has wholly failed to provide Apple with the "transparency" that Samsung purports in its brief to have provided Apple and the Court.  For example:

- • Samsung still has not responded to Apple's repeated questions of whether Samsung has disabled the auto-delete function in Samsung's e-mail system for the employees who received, and may have used, Apple's confidential information.  If active, the auto-delete function may have destroyed certain evidence showing how Samsung used the sensitive information that these employees improperly received;[6]

- • Samsung still has not revealed—or apparently investigated at all—how many times Apple's confidential information was forwarded or otherwise communicated by Samsung employees to others;

- • Samsung still has not identified any steps that it has taken to identify and collect internal Samsung e-mails (*i.e.*, all the emails on which Quinn Emanuel was not copied) that discuss the improperly disclosed license information; and

- • Samsung still has not retrieved and forensically quarantined Apple's confidential information—it apparently still remains available to be further disseminated and used by dozens of Samsung employees.[7]

### *Samsung's "Investigation" Proposal Would Not Provide For Any Review Of The Relevant Communications—Or Any Remedy*

Samsung and Nokia's agreed-upon "internal investigation" procedure will not provide the Court or Apple a complete factual record of the violations that have occurred,

---

[6] The Court is familiar with Samsung's auto-delete practices from prior motion practice.  *See, e.g.*, Dkt. No. 1321 (July 25, 2012).

[7] Other examples of unanswered Apple questions are set forth in the letter attached as Exhibit A to the Mueller Declaration.

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

and the procedure provides for no remedies.  At best, the procedure would result—months from now—in a log of documents that contained or referred to *some* improperly disclosed information.  (The procedure provides *no* information regarding Samsung's improper disclosure of Apple-Ericsson, Apple-Siemens, Apple-Sharp, or other confidential information unrelated to Nokia.)  But Apple would not receive even these documents—nor would the Court receive them for *in camera* review.  Thus, the procedure would end with the equivalent of a privilege log, providing only the most limited visibility into the substance of the communications regarding the improperly disclosed information.

This is insufficient: simply put, someone other than Samsung—either Apple, the Court, or both—must review the documents to understand how Samsung employees used the highly confidential information that they repeatedly received.  One appropriate solution would be the appointment of a Discovery Master with the authority to conduct an *in camera* review of the relevant documents and make findings regarding Samsung's use of the improperly disclosed information.[8]  Once the facts are known, an appropriate remedy can be imposed.

### *Samsung Cannot Hide Behind A Privilege Claim*

Citing only irrelevant cases regarding waiver of the privilege through inadvertent production of a parties' own privileged documents, Samsung next argues that the attorney-client privilege and work product doctrine shield the communications relating to the breaches of the Protective Order.  (Opp. 10, n.28.)  That is incorrect.  As Samsung acknowledges, the communications at issue here are part of a series of violations of the Court's Protective Order, in which Apple's and several other parties' highly confidential licensing information was widely disseminated to Samsung employees.  The attorney-client privilege does not allow Samsung to prevent Apple and the Court from discovering

---

[8]   Having conceded that it breached the Protective Order multiple times, Samsung should bear the costs of the Discovery Master.  At a minimum, if costs were initially shared between the parties, the Court should expressly reserve the right to re-allocate costs at the conclusion of the process during any sanctions phase.

the full extent of the Protective Order violations that have occurred—particularly any *continuing* consequences of these breaches.

Where an attorney and client engage in communications that become part of a subsequent unlawful course of action, the crime-fraud exception to the attorney-client privilege applies, and the communications are not subject to the privilege.  *See, e.g.*, *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 337 F. Supp. 2d 862, 868 (N.D. Tex. 2004), *rev'd on other grounds*, 476 F.3d 278 (5th Cir. 2007) (granting, under the crime-fraud exception, access to otherwise privileged communications reflecting violations of a protective order); *cf. In re Grand Jury Investigation*, 445 F.3d 266, 275-80 (3d Cir. 2006) (affirming order compelling production of communications between lawyer and client regarding compliance with subpoena under crime-fraud exception, where there was evidence that, at time of communications, the client may have been engaged in destroying responsive documents); *In re A.H. Robins Co.*, 107 F.R.D. 2, 30 (D. Kan. 1985) ("[W]hen viewed collectively and in tandem with the evidence contained in the Masters' Report, the repeated delays and instances of nonproduction provide support for the application of the crime or fraud exception."); *In re Andrews*, 186 B.R. 219, 220 (Bankr. E.D. Va. 1995) (declining to find privileged communications concerning possibly continuing fraud).

The policy behind the crime-fraud exception is squarely implicated here.  The crime-fraud exception reflects a recognition that the attorney-client privilege is not absolute, and that the legal system has a greater interest in detecting, stopping, and preventing ongoing and future wrongdoing than it has in protecting the confidentiality of attorney-client communications regarding that activity.  *See, e.g.*, McCormack on Evidence § 95 (2002).  Here, Samsung seeks to use the privilege to prevent Apple and the Court from discovering how Samsung used, and more importantly, how Samsung may be able to use in the future, Apple's highly confidential information.  Dr. Ahn's apparent attempt to gain commercial advantage for Samsung by knowingly misusing Apple's confidential

1  information underscores the need to conduct discovery on the extent of Samsung's

2  protective order violations and the past and potential future consequences of those

3  violations.  Moreover, as a general matter, permitting privilege claims to prevent discovery

4  into improper disclosures of information conveyed by a law firm to a client would allow

5  law firms and clients to freely breach protective orders in their communications—assured

6  that with the privilege as a shield, they would never be held accountable for their

7  misconduct.  The crime-fraud exception is intended to defeat such abuse of the privilege.

8       Here, discovery is essential to help foreclose any continuing violations of the

9  Court's Protective Order and to prevent additional future harm to Apple and other parties.

10  Indeed, it is the only way to ensure that the full scope of the violations is uncovered,

11  including whether and how Samsung used its knowledge of Apple's confidential

12  information in its license negotiation with Apple (and others); what steps have been and

13  can be taken to eliminate the risk of further misuse of Apple's confidential information;

14  and what procedures Samsung had in the past and can institute to prevent future occurrence

15  of Protective Order violations.

16       Under these circumstances, the compelling interest in discovering and remedying

17  Samsung's and Quinn Emanuel's violations—and preventing ongoing violations—of the

18  Protective Order involving Apple's highly confidential information trumps any interest

19  Samsung has in protecting the confidentiality of its communications with counsel

20  regarding a litigation brief and an expert report that were filed long ago.[9]  Samsung cannot

---

[9] *Cf. LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, No. 11-cv-04494, 2013 WL 4604746, *4 (N.D. Cal. Aug. 23, 2013) (granting show-cause order for why party should not be held in contempt even where "counsel acted in subjective good faith and did not deliberately violate the Protective Order" because protective order violations "risk[] disrupting defendants' commercial relationships, which is precisely what the Protective Order seeks to avoid"); *Systemic Formulas*, 2011 WL 9509, *1 (sanctioning party who "improperly disclosed [a] highly sensitive customer list; placed it in the hands of a competitive decision maker; [thereby] undermin[ing] the fundamental protections for sensitive information necessary in cases between competitors").

use privilege to shield the consequences—including any continuing consequences—of its admitted breaches of the Protective Order.

### *In Camera Review By The Court Or A Discovery Master*

At the very least, the Court should order *in camera* review—by the Court or a Discovery Master—of the relevant communications to determine the extent to which they discuss Apple's confidential information and reflect misuse of that information, intentional or otherwise. *In camera* review is a "long-standing and routine" procedure "in cases involving claims of privilege," and the standard for granting *in camera* review is lower than the standard for finding the communications unprivileged.[10] *See In re Grand Jury Subpoena Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386-87 (2d Cir. 2003) (citations omitted). Thus, the Court or a Discovery Master could conduct an *in camera* review to determine whether Samsung could properly invoke the privilege—or if instead the crime-fraud exception precludes reliance on the privilege. *See, e.g.*, *Travelers Prop. Cas. v. Centex Homes*, No. C 11–03638, 2013 WL 1320456, *1 (N.D. Cal. Apr. 1, 2013) (conducting *in camera* review to verify claim of privilege). Indeed, in one of the cases Samsung cites (Opp. 10, n.28), *Resolution Trust Corp. v. Dean*, 813 F. Supp. 1426 (D. Ariz. 1993), the Court conducted an *in camera* review before sustaining the claim

---

[10] Because "*in camera* inspection is a smaller intrusion upon the confidentiality of the attorney-client relationship . . . a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *United States v. Zolin*, 491 U.S. 554, 572 (1989); *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1092 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). "Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (internal citations and quotations omitted); *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) (*in camera* review appropriate where there is a "factual basis adequate to support a good faith belief by a reasonable person"); *Dollar Tree Stores, Inc. v. Toyama Partners LLC*, No. 10-0325, 2011 WL 5117565, *2 (N.D. Cal. Oct. 28, 2011). "[M]ore than suspicion" is required, "but less than a preponderance of the evidence," *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996), and "[t]he threshold . . . [is] not . . . a stringent one," *Zolin*, 491 U.S. at 572.

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

for attorney-client privilege.  Here, consistent with this precedent, the Court or a Discovery Master could conduct a similar review.

### *Samsung Offers No Real Explanation For Its Delay In Notifying Apple*

There is a final reason that Samsung's assurances of diligence and transparency cannot be accepted: Samsung provides no plausible explanation for delaying more than two weeks—from at least July 16 to August 1—in notifying Apple of Samsung's Protective Order violations after disclosing its violations to Nokia.  Indisputably, Samsung sufficiently understood its extensive Protective Order breaches by mid-July to communicate the issue to Apple.  In its July 16 letter to counsel for Nokia, Samsung identified specific disclosures to specific Samsung employees.  (*See, e.g.,* Declaration of Thomas D. Pease In Support Of Samsung's Opposition at ¶ 11 ("On July 16, 2013, my partner Robert Becher sent a letter to counsel for Nokia to notify Nokia of Quinn Emanuel's inadvertent disclosure of Nokia's confidential information. In this letter, Quinn Emanuel identified the dates, authors and recipients of each of the emails it had identified to which confidential financial information regarding the license between Apple and Nokia was attached, as well as the contents of the attachments related to the license agreement between Nokia and Apple."); *see also id.* at Ex. A (July 16, 2013 letter).)  Yet Samsung waited until August 1 to inform Apple of these very same disclosures (as well as others).  Even if Samsung had additional information on August 1, it cannot answer this simple question: why did Samsung fail to provide whatever information it had on July 16 to Apple, at the same time Samsung provided that information to Nokia?

A potential (and troubling) explanation for this delay is that Samsung wanted to avoid any scrutiny of its violations at a time when the United States Trade Representative was completing its review of the International Trade Commission's Final Determination in an investigation (Inv. No. 337-TA-794) involving Samsung and Apple—which, like the instant case, involved patent-licensing issues to which the improperly-disclosed

1  information related—and the ITC itself was completing its final determination in a parallel

2  investigation between the parties (Inv. No. 337-TA-796).

3  * * *

4  The known extent of Samsung's and Quinn Emanuel's Protective Order violations

5  is itself egregious. But many questions remain unanswered, and only after the

6  development of a full factual record can the appropriate and necessary remedial action and

7  sanctions be determined. For the foregoing reasons and those in Apple's opening brief,

8  Apple respectfully requests that the Court grant the motion.

Dated:  September 13, 2013

*/s/* William F. Lee
William F. Lee (admitted *pro hac vice*)
(william.lee@wilmerhale.com)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Mark D. Selwyn (SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:   (650) 858-6100

Harold J. McElhinny (SBN 66781)
(HMcElhinny@mofo.com)
Michael A. Jacobs (SBN 111664)
(MJacobs@mofo.com)
Rachel Krevans (SBN 116421)
rkrevans@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone: ( 415) 268-7000

**Contains Attorneys' Eyes Only Information Subject to Protective Order**

Facsimile:  (415) 268-7522

Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on September 13, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5-1.

*/s/* Mark D. Selwyn
Mark D. Selwyn