**Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order**

**United States District Court**
**Northern District of California**

**Apple Inc.**

**v.**

**Samsung Electronics Co., Ltd. et al.**

**Corrected Expert Report of Michael J. Wagner**
**April 20, 2012**
**Volume I**

**LitiNomics**

# Apple Inc. v. Samsung Electronics Co., Ltd. et al.

## Table of Contents

### Corrected Expert Report of Michael J. Wagner

### Volume 1

| Tab # | Description |
|---|---|
| 1 | Corrected Expert Report of Michael J. Wagner |
| 2 | Damages Analysis |
| 3 | License Agreement Matrix |
| 4 | List of Documents Considered |
| 5 | Curriculum Vitae of Michael J. Wagner |
| 6 | Corrected Damages Analysis Based on U.S. Manufacturing Costs |

# Tab 1

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**United States District Court**

**Northern District of California**

**San Jose Division**

**Case No. 11-cv-01846 LHK**

**APPLE INC.**

**v.**

**SAMSUNG ELECTRONICS CO., LTD, SAMSUNG ELECTRONICS**

**AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC**

---

**Corrected Expert Report of**

**Michael J. Wagner**

**April 20, 2012**

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

I.     **INTRODUCTION** ................................................................................................. 1

II.    **SUMMARY OF OPINIONS** ................................................................................ 2

III.   **BACKGROUND AND DESCRIPTION OF THE INVENTIONS** ......................... 7

    A.  PARTIES TO THE LITIGATION ................................................................... 7

        1.   Apple Inc. ...................................................................................... 7

        2.   Samsung Electronics Co., Ltd. ..................................................... 8

        3.   Samsung Electronics America, Inc. .............................................. 9

        4.   Samsung Telecommunications America, LLC ............................. 10

    B.  APPLE'S ASSERTED INTELLECTUAL PROPERTY ................................. 11

        1.   Apple's Utility Patents ................................................................. 11

           a)   User Interface Utility Patents ............................................. 11

           b)   Touchscreen-Related Utility Patents ................................. 13

        2.   Apple's Design Patents ............................................................... 15

           a)   UI Design Patents .............................................................. 15

           b)   Electronic Device Design Patents ..................................... 19

        3.   Apple's Trade Dress at Issue ...................................................... 33

           a)   Original iPhone Trade Dress .............................................. 33

           b)   iPhone 3G Trade Dress ..................................................... 34

           c)   iPhone 4 Trade Dress ........................................................ 34

           d)   iPhone Trade Dress ........................................................... 35

           e)   Trade Dress Registrations ................................................. 35

           f)   85/299,118 Trade Dress Application ................................. 37

           g)   iPad and iPad 2 Trade Dress ............................................ 38

           h)   77/921,838, 77/921,829, and 77/921,869 Trade Dress Applications ................................. 38

        4.   Apple's Trademarks at Issue ...................................................... 40

           a)   Registered Icon Trademarks .............................................. 40

           b)   iTunes Store Trademark ..................................................... 41

           c)   iTunes Eighth Note and CD Design Trademark ................. 42

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

C. Samsung's Allegedly Infringing Products ........................................................................ 42

    1. Samsung Galaxy Smartphones ............................................................................44

    2. Other Samsung Smartphones ..............................................................................46

    3. Tablet Computers ................................................................................................ 47

**IV. BASES FOR OPINIONS** ................................................................................................ 47

A. Disagreements With the Opinions Expressed By Terry L. Musika ...............................48

    1. Mr. Musika's analysis is a     high-level  analysis and is largely divorced from the specific intellectual property that is at issue in this lawsuit. ................................................. 48

        a) Mr. Musika fails to provide evidence of demand for the specific design IP at issue. ....................48

        b) Mr. Musika fails to provide evidence of demand for the specific utility patents at issue. ..............54

    2. Although Mr. Musika claims not to use the entire market value rule, in effect he does. ....... 57

    3. Mr. Musika does not establish Apple's entitle     ment to lost profits related to Samsung's infringement of the intellectual property at issue. ................................................................58

        a) Mr. Musika has not provided sufficient evidence of demand for the intellectual property at issue.60

        b) Samsung has acceptable, non-infri   nging alternatives available    for  the asserted intellectual property. ........................................................................................................................ 76

        c) Mr. Musika has not proven that Apple has sufficient capacity for all time periods. .......................78

    4. Even if Mr. Musika were    to prove  entitlement  to lost  prof its, his lost  profits calculations significantly overstate the amount of lost profits. ..................................................................88

        a) Mr. Musika does not take price     elasticity  of  demand into consideration    in his lost profits calculation. ...................................................................................................·................. 88

        b) Mr. Musika includes lost profits for the Galaxy Tab 7.0 (3G), which is not appropriate based on Mr. Musika's own analysis. ........................................................................................... 94

        c) Mr. Musika incorrectly   uses an assumption t   hat 26% of users select a      new carrier  when purchasing a cell phone in calculating his lost profits damages. .................................95

        d) Mr. Musika's analy sis does not properly  take into  account platform compet ition and the fact that Samsung customers chose to not purchase an iPhone. ...........................................97

        e) Mr. Musika's incremental profitability is overstated, resulting in significantly overstated lost profits.101

    5. Mr. Musika's calculation of Samsung's profits related to the infringement is overstated. ... 101

    6. Mr. Musika's reasonable  royalty analysis relies on unreasonable benchmarks and results in an overstated concluded reasonable royalty rate. ............................................................102

        a) Mr. Musika's cost approach does not provide a r   easonable  value for the intellectual property   at issue. ................................................................................................................. 103

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

b) Mr. Musika's income approach does not provide a reasonable value for the intellectual property at issue. .................................................................................................................. 108

c) The other benchmarks mentioned by Mr. Musika are not relevant to the reasonable royalty analysis. ........................................................................................................................ 114

d) Mr. Musika's analysis does not take into account several data points that would result in a much lower reasonable royalty rate. ................................................................................ 115

e) Mr. Musika takes into account inappropriate considerations in his *Georgia-Pacific* analysis that result in an artificially high royalty rate. ............................................................. 124

f) Mr. Musika's concluded royalty rate is unreasonably high. ........................................... 125

7. Mr. Musika's discussion of the irreparable harm done to Apple is divorced from actual market conditions. ............................................................................................................... 125

B. APPLE IS NOT ENTITLED TO LOST PROFITS ....................................................................................... 131

1. Utility Patents ..................................................................................................................... 131

2. Design-Related IP .............................................................................................................. 131

C. OPINIONS REGARDING SAMSUNG'S PROFITS RELATED TO THE DESIGN IP ........................................ 132

1. Samsung's Sales Data ........................................................................................................ 132

2. Samsung's Deductible Expenses ....................................................................................... 133

a) SEC's Deductible Expenses ............................................................................................. 134

b) STA's and SEA's Deductible Expenses ............................................................................ 137

3. Calculation of Samsung's Profits on the Accused Products .............................................. 139

4. Apportionment of Profit to the Design-Related IP at Issue ................................................ 141

a) Apportionment to "Design" ................................................................................................ 143

b) Apportionment of Design to Specific Design-Related IP at Issue ..................................... 152

c) Apportionment based on design arounds .......................................................................... 154

d) Conclusion on Apportionment ........................................................................................... 155

5. Samsung's Unjust Enrichment ............................................................................................ 155

D. OPINIONS REGARDING REASONABLE ROYALTY RATE ....................................................................... 156

a) Basic Framework for Calculating Reasonable Royalty Damages for Patent Infringement .......... 156

b) *Georgia-Pacific* Factor Analysis ....................................................................................... 163

c) Major Facts Known or Knowable to Both Parties at the Hypothetical Negotiation ...................... 208

d) Conclusions Regarding Reasonable Royalty ..................................................................... 210

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

2.   Calculation of Royalties Due.................................................................................210

E.  Alternative Reasonable Royalty for Electronic Device Design Patents and Trade Dress 211

V.     DOCUMENTS, DATA AND OTHER INFORMATION CONSIDERED ........................................213

VI.    POTENTIAL ADDITIONAL ANALYSES TO PERFORM ...............................................................213

VII.   QUALIFICATIONS ...........................................................................................................213

VIII.  COMPENSATION ...........................................................................................................214

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

## I. Introduction

1.      I have been retained on behalf of Samsung     Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Teleco       mmunications America, LLC     (collectively "Samsung") to provide an opinion regarding       damages resulting from Samsung's alleged infringement of Apple Inc.'s ("Apple")'s U.S. Patent No. 6,493,002 ("the '002 Patent") titled "Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System;" U.S. Patent No. 7,469,381 ("the '381 Patent") titled "List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display;" U.S. Patent     No. 7,844,915 ("the '915 Patent") titled "Application Programming Interfaces      for   Scrolling Operations;" U.S. Patent No. 7,853,891 ("the '891 Patent") titled "Method and Apparatus for Displaying a Window for a User Interface;" U.S. Patent No. 7,663,607    ("the '607 Patent") titled "Multipoint Touchscreen;" U.S. Patent No. 7,864,163 ("the        '163 Patent") titled "Portable Electronic Device, Method, and Graphical User Interface for     Displaying Structured Electronic Documents;" U.S. Patent No. 7,920,129 ("the '129 Patent") titled "Double-Sided Touch-Sensitive Panel With Shield And Drive Combined Layer;" [1] U.S. Patent No. D627,790 ("the 'D790  Patent" titled "Graphical User Interface For a Display Screen or Portion Thereof;" U.S. Patent      No. D617,334 ("the D334 Patent") titled "Graphical User Interface For a Display Screen or Portion Thereof;" U.S. Patent No. D604,305 ("the D305 Patent") titled "Graphical User Interface For a Display Screen or Portion Thereof;" U.S. Patent No. D593,087      ("the 'D087 Patent") titled "Electronic Device;" U.S. Patent No. D618,677 ("the 'D677 Patent") titled "Electronic Device;" U.S. Patent No. D622,270  ("the 'D270 Patent") titled "Electronic Device;" U.S. Patent No. D504,889 ("the 'D889 Patent") titled "Electronic Device;"    [2] Apple's Registered   Trade Dress including U.S. Registrations 3,470,983, 3,457,218, and 3,475,327;    [3] Apple's      Trademarks;[4] alleged Lanham Act violations; and alleged unfair business practices related to Apple's iPad / iPhone trade dress.[5, 6]

---

[1]   Apple Inc.'s Amended Complaint, June 16, 2011, pp. 50-55. [2.1] References in report are to [Volume and Tab].

[2]   Apple Inc.'s Amended Complaint, June 16, 2011, pp. 55-60. [2.1]

[3]   Apple Inc.'s Amended Complaint, June 16, 2011, pp. 41-43. [2.1]

[4]   Apple Inc.'s Amended Complaint, June 16, 2011, pp. 43-44, 46-48. [2.1]

[5]   Apple Inc.'s Amended Complaint, June 16, 2011, pp. 39-41, 44-46, 48-50. [2.1]

[6]   In its Amended Complaint, Apple also asserts U.S. Patent No. 7,812,828 ("the '828 Patent") titled "Ellipse Fitting for Multi-Touch Surfaces." (Apple Inc.'s Amended Complaint, June 16, 2011, pp. 52-53. [2.1]) In his expert report, Apple's damages expert, Terry L. Musika, did not calculate damages for the '828 Patent. (Expert Report of Terry L. Musika, CPA, March 22, 2012 (hereafter "Musika Report"). [2.2]) Apple's survey expert, John R. Hauser, indicates that he was "informed by counsel that the '828

1

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

2.      In  forming the opinions I express in this report, I have assumed that Apple's Patents are valid and enforceable, and that Samsung's accused          products  infringe  these patents.   I have assumed that Apple's Trademarks are valid and that Samsung's accused products infringe these trademarks.  Finally, I have  assumed that Apple's allegations relating to its trade dress will be proven at trial.  I have no  opinion as to whether any of these assumptions dealing with liability issues are appropriate.

3.      My opinions address the following matters:

- My disagreements with the opinions expressed by Terry L. Musika   in the Expert Report of Terry L. Musika, CPA.

- Apple's entitlement to lost profits  from lost sales and lost convoyed sales due to Samsung's alleged infringement of Apple's intellectual property.

- Samsung's profits related to its alleged infringement      of Apple's  design patents, trademarks, and trade dress and the appropriate apportionment of profits to the intellectual property at issue.

- The  reasonable royalty that is adequate to compensate Apple for Samsung's alleged infringement of Apple's intellectual property.

## II.     Summary of Opinions

### A.  Disagreements With the Opinions Expressed By Terry Musika

**1.  Mr. Musika's analysis is a high-level analysis and is largely divorced from the specific intellectual property that is at issue in this lawsuit.**

**a)  Mr. Musika fails to provide evidence of demand for the specific design IP at issue.**

**b)  Mr. Musika fails to provide evidence of demand for the specific utility patents at issue.**

**2.  Although Mr. Musika claims not to use the entire market value rule, in effect he does.**

---

Patent is no longer relevant for the purposes of [his] report."  (Expert Report of John R. Hauser, March 22, 2012 (hereafter, "Hauser Report"), p. 7. [2.33]) Therefore, I do not address the '828 Patent in my report.  However if Messrs. Musika and Hauser subsequently attempt to express an opinion as to damages on the '828 Patent, I expect that I will be allowed to respond to those opinions.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

3.   **Mr. Musika does not establish Apple's entitlement to lost profits related to Samsung's infringement of the intellectual property at issue.**

    a)   **Mr. Musika has not provided sufficient evidence of demand for the intellectual property at issue.**

    b)   **Samsung has acceptable, non-infringing alternatives available for the asserted intellectual property.**

    c)   **Mr. Musika has not proven that Apple has sufficient capacity for all time periods.**

4.   **Even if Mr. Musika were to prove entitlement to lost profits, his lost profits calculations significantly overstate the amount of lost profits.**

    a)   **Mr. Musika does not take price elasticity of demand into consideration in his lost profits calculation.**

    b)   **Mr. Musika includes lost profits for the Galaxy Tab 7.0 (3G), which is not appropriate based on Mr. Musika's own analysis.**

    c)   **Mr. Musika incorrectly uses an assumption that 26% of users select a new carrier when purchasing a cell phone in calculating his lost profits damages.**

    d)   **Mr. Musika's analysis does not properly take into account platform competition and the fact that Samsung customers chose to not purchase an iPhone.**

    e)   **Mr. Musika's incremental profitability is overstated, resulting in significantly overstated lost profits.**

5.   **Mr. Musika's calculation of Samsung's profits related to the infringement is overstated.**

6.   **Mr. Musika's reasonable royalty analysis relies on unreasonable benchmarks and results in an overstated concluded reasonable royalty rate .Lost Profits Capacity Analysis**

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

    a)   **Mr. Musika's cost approach does not provide a reasonable value for the intellectual property at issue.**

    b)   **Mr. Musika's income approach does not provide a reasonable value for the intellectual property at issue.**

    c)   **The other benchmarks mentioned by Mr. Musika are not relevant to the reasonable royalty analysis.**

    d)   **Mr. Musika's analysis does not take into account several data points that would result in a much lower reasonable royalty rate.**

    e)   **Mr. Musika takes into account inappropriate considerations in his Georgia-Pacific analysis that result in an artificially high royalty rate.**

    f)   **Mr. Musika's concluded royalty rate is unreasonably high.**

**B.  Lost Profits related to Patent Infringement:**

    1.   **Lost Profits is not an appropriate measure of damages in this case.**

**C.  Samsung's Profit Related to the Asserted Design-Related Intellectual Property[7]**

    1.   **All of Samsung's operating expenses qualify as deductible expenses with the exception of the legal expenses related to this lawsuit.**

    2.   **A reasonable apportionment of Samsung's profits to Apple's design-related intellectual property at issue is one percent.**

    3.   **Applying the apportionment percentage results in a calculation of Samsung's profits related to its infringement of Apple's design-related intellectual property as follows:**

---

[7]  The calculations presented in this summary and presented in the figures in this report are based on worldwide data for manufacturing expenses.   On the date of my report, Samsung provided additional data to me that included manufacturing expenses limited to accused products sold in the U.S.  I have performed additional calculations with these data that are included as a separate damages model in Tab 6 at Volume 1 of my report.  I do not include the summary of those calculations here.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



|  | STA and SEA Profit After Deductible Expenses | | |
|  | STA, SEA and SEC Profit After Deductible Expenses | Apportionment | Apportioned STA, SEA and SEC Profit After Deductible Expenses |
| --- | --- | --- | --- |
|  | [a] | [b] | [c] |
| 2010 |  |  |  |
| 2011 |  |  |  |
| Total |  |  |  |
| April 15 - December 31, 2011 |  |  |  |
| June 16 - December 31, 2011 |  |  |  |

|  | STA, SEA and SEC Profit After Deductible Expenses | | |
|  | STA, SEA and SEC Profit After Deductible Expenses | Apportionment | Apportioned STA, SEA and SEC Profit After Deductible Expenses |
| --- | --- | --- | --- |
|  | [a] | [b] | [c] |
| 2010 |  |  |  |
| 2011 |  |  |  |
| Total |  |  |  |
| April 15 - December 31, 2011 |  |  |  |
| June 16 - December 31, 2011 |  |  |  |

**D. Reasonable   Royalty:**

    **1.   The reasonable royalty that is adequate to compensate Apple for Samsung's alleged infringement of Apple's asserted intellectual property is summarized as follows:**

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

|  | **Design Around Costs** |
|---|---|
| Utility Patents |  |
| '002 | $9,240 |
| '163 | $5,880 |
| '381 | $11,340 |
| '891 | $8,820 |
| '915 | $10,080 |
| '607 | $1,600,000 |
| '129 | $1,600,000 |
|  |  |
| Cost to Design a New Icon (per Icon) | $420 |
|  |  |
| Cost to Design and Implement a New GUI | $1,152 |
|  |  |
| Trade Dress (Based on New GUI) | $1,152 |
| Trade Dress (Device Related) | $0 |
|  |  |
| Electronic Device Design Patents | $0 |

In addition, a royalty amount would be due for the '607 Patent calculated as follows:

|  | **Units** | **Royalty Rate** | **Royalties Due** |
|---|---|---|---|
| *5/1/10 - 12/31/11* |  |  |  |
| Galaxy Tab 7.0 (3G) | 665,620 | $2.10 | $1,397,802 |
|  |  |  |  |
| *6/16/11 - 12/31/11* |  |  |  |
| Galaxy Tab 7.0 (3G) | 218,341 | $2.10 | $458,516 |

2. **Alternatively, for the Electronic Device Design Patents and Apple's Trade Dress, a reasonable royalty based on Samsung's apportioned profit related to Apple's design-related IP is $0.60 per unit for smartphones and $0.30 per unit for tablets. Applying these royalty rates to the relevant royalty bases results in royalties calculated as follows:**

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

|  | Units | Royalty Rate | Royalties Due |
|---|---|---|---|
| *5/1/10 - 12/31/11* |  |  |  |
| Smartphones | 17,084,829 | $0.60 | $10,250,897 |
| Tablets | 1,145,643 | $0.30 | $343,693 |
| **Total** | **18,230,472** |  | **$10,594,590** |
|  |  |  |  |
| *4/15/11 - 12/31/11* |  |  |  |
| Smartphones | 9,304,458 | $0.60 | $5,582,675 |
| Tablets | 780,734 | $0.30 | $234,220 |
| **Total** | **10,085,192** |  | **$5,816,895** |
|  |  |  |  |
| *6/16/11 - 12/31/11* |  |  |  |
| Smartphones | 6,084,352 | $0.60 | $3,650,611 |
| Tablets | 628,945 | $0.30 | $188,684 |
| **Total** | **6,713,297** |  | **$3,839,295** |

## III.     Background and Description of the Inventions

### A.   Parties to the Litigation

#### 1. Apple   Inc.

4.       Apple Inc.   is a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, California 95014.   [8] Apple is a technology company that "designs, manufactures and markets mobile  communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications." [9] Included in  its product portfolio  are  consumer  electronics devices like iPhone®, iPad®, and iPod®, as well as the Mac® computer product line, Apple TV®, the iOS and Mac OS® X       operating systems, and various other software applications and services. [10] Apple "also sells and delivers  digital content and applications through the iTunes Store®, App Store[SM], iBookstore[SM], and Mac App Store."[11]

---

[8]   Apple Inc.'s Amended Complaint, June 16, 2011, ¶ 6, p. 2. [2.1]
[9]   Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, cover and p. 1. [2.34]
[10]   Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 1. [2.34]
[11]   Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 1. [2.34]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

5.      Apple, incorporated in 1977 as Apple Computer Inc., began selling computers in 1976 with the Apple I.[12]  A few years later, on December 12,  1980, Apple made its initial public offering at $22.00 per share.  [13]   On  January  9, 2007, then CEO Steve Jobs announced that Apple had changed its name from Apple Computer, Inc. to Apple Inc.[14]

6.      According to Apple's 10-K for its fiscal year    ended September 24, 2011, "[t]he Company manages its business primarily on a geographic basis."[15]  As such, Apple's reportable operating segments are the Americas (North and South America), Europe   (Europe, the Middle East, and Africa), Japan, Asia-Pacific (Australia and Asia, excluding Japan) and retail (Apple's retail stores).[16]  Each segment provides similar hardware, software, and services.[17]

7.      During  its  fiscal year ended in September, 2011, Apple earned $25.9B in net income from $108.2B in net sales.   [18]  This represents growth in net sales of 44.9        percent CAGR[19] (Compound Annual Growth Rate) and growth in net income of 65 percent CAGR[20] over the fiscal period from 2007 through 2011.[21]

## 2.   Samsung Electronics Co., Ltd.

8.      Samsung Electronics Co., Ltd. (referred to individually as "SEC")     is  a  Korean corporation with its principal place of business at 416      Maetan-3dong, Yeongtong-gu, Suwon-City, Gyeonggi-do, Korea 443-742.[22]  SEC designs, manufactures, and provides to the  U.S. and world markets a wide range of products, including consumer electronics, computer components, and myriad mobile and entertainment products.       [23]  Today, SEC     manufactures  and  sells

---

[12]  Steve Jobs at Apple: A Timeline, PCWorld, August 24, 2011,
      <http://www.pcworld.com/article/238745/steve_jobs_at_apple_a_timeline.html>. [2.35]
[13]  Frequently Asked Questions, Apple Inc., <http://investor.apple.com/faq.cfm>. [3.1]
[14]  Apple drops 'Computer' from name, Macworld, January 9, 2007,
      <http://www.macworld.com/article/54770/2007/01/applename.html>. [3.2]
[15]  Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 2. [2.34]
[16]  Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 2. [2.34]
[17]  Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 2. [2.34]
[18]  Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 24. [2.34]

[19] 

[20] 

[21]  Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 24. [2.34]
[22]  Samsung Entities' Answer to Apple Inc.'s Amended Complaint, June 30, 2011, p. 35. [10.3]
[23]  Apple Inc.'s Amended Complaint, June 16, 2011, ¶ 7, p. 2. [2.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

semiconductors, LCDs, telecommunication products, and digital media products.[24]  Recently, 13 of Samsung's products, including semiconductors, TFT-LCDs, monitors, and      CDMA mobile phones, have earned the top global market share.[25]

9.      Over the 2011 fiscal year, SEC's Consolidated      Statements of Income show $11.9B in profit on $143.1B in revenue. [26]  This represents a 6.7 percent growth in revenue and a 15.0 percent decline in profit over the 2010 fiscal year.[27]

10.      SEC's consolidated subsidiaries include companies spanning Korea, the Americas (including both Samsung      Electronics America and Samsung Telecommunications America), Europe, Africa, China, and other parts of Asia.[28]

### 3.    Samsung Electronics America, Inc.

11.      Samsung Electronics America, Inc. (referred to individually as "SEA") is      a New York corporation with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.  SEA was formed in 1978    [29] as a subsidiary of SEC and markets, sells, or offers for sale a variety of consumer electronics, including TVs, VCRs, DVD    and MP3 players, and video cameras, as well as memory chips and computer accessories, such as printers, monitors, hard disk drives, and DVD/CD-ROM drives.    [30]  SEA "is focused on continually expanding its position in the U.S. market      while upholding Samsung's mission to provide consumers with innovative products that conv    erge digital technologies and offer exceptional quality, features, performance and value."[31]

---

[24]  Consolidated Financial Statements of Samsung Electronics Co., Ltd. and Subsidiaries, Q3 2011, <http://www.samsung.com/us/aboutsamsung/ir/financialinformation/auditedfinancialstatements/downloads/consolidated/2011_Consolidated_quarter03_all.pdf>, p. 14. [3.3]

[25]  About Samsung, History, 2000 - Present, <http://www.samsung.com/us/aboutsamsung/ corporateprofile/history.html>. [3.4]

[26]  2011 Samsung Electronics Annual Report, Income Statement, <http://www.samsung.com/us/aboutsamsung/ir/financialinformation/auditedfinancialstatements/downloads/consolidated/2011_con_quarter04_soi.pdf>, p. 4. [3.3]

[27]  Revenue Grown Rate = $143.1B / $134.1 B − 1 = .067.  Profit Growth Rate = $11.9B / $14.0B − 1 =0.15.  (2011 Samsung Electronics Annual Report, Income Statement, <http://www.samsung.com/us/aboutsamsung/ir/financialinformation/auditedfinancialstatements/downloads/consolidated/2011_con_quarter04_soi.pdf>, p. 4. [3.3])

[28]  2011 Samsung Electronics Annual Report, <http://www.samsung.com/us/aboutsamsung/ir/ financialinformation/annualreport/downloads/2010/SECAR2010_Eng_Final.pdf>, pp. 12-15. [3.5]

[29]  Samsung Entities' Answer to Apple Inc.'s Amended Complaint, June 30, 2011, p. 2. [10.3]

[30]  Apple Inc.'s Amended Complaint, June 16, 2011, ¶ 8, pp. 2-3. [2.1]

[31]  About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/ businessarea/usdivisions.html>. [3.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

12.      SEA comprises the Consumer Business   Division and the Enterprise Business Division,  both of which are headquartered in Ridgefield Park, New Jersey.       [32]  The North American  Headquarters, which are in Ridgefield Park, as well, "oversee[] the North American Subsidiaries of Samsung       Telecommunications America; Samsung Semiconductor, Inc.; Samsung Information Systems America; and Samsung    Austin Semiconductor."[33]  The North American  Headquarters also oversee Samsung Electronics Canada and Samsung Electronics Mexico.[34]

13.      The Consumer Business Division ("CBD") "offers a full range of award-winning digital products for the home and individual use, including LED, LCD and Plasma       televisions, Blu-ray Disc players, Home Theater Systems, Digital Cameras, Digital Camcorders, Solid State Hard Drives, External Hard Drives and       Portable Audio Devices."[35]  CBD also sells home appliances through its Home Appliance group.[36]

14.      The Enterprise Business Division ("EBD") is an IT company "committed           to serving  the needs of consumers ranging from the home user to the Fortune 500 elite and supporting the valued channel partners who serve [its] customers."       [37]  EBD offers printers, monitors, laptops, digital signage, and projectors, as well.[38]

### 4.   Samsung Telecommunications America, LLC

15.      Samsung Telecommunications America, LLC (referred to individually as "STA") is a Delaware limited liability company with its principal place of business at 1301 East Lookout Drive, Richardson, Texas 75081.   STA was founded in 1996 as a subsidiary of SEC and markets, sells, or offers for sale a variety of personal and business communications devices in

---

[32] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[33] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[34] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[35] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[36] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[37] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

[38] About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/businessarea/usdivisions.html>. [3.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the United States, including cell phones. [39]  STA "researches, develops and markets a variety of personal and business communications products throughout North America, including handheld wireless phones, wireless communications infrastructure systems,   fiber optics and enterprise communication systems."[40]

## B.   Apple's Asserted Intellectual Property

16.      Apple  has asserted a large number of intellectual property elements against Samsung.   I have analyzed each of these IP elements individually, but I frequently address groups of the asserted IP collectively in this report due to the large number of IP elements at issue.  I describe below the logical groups of IP elements that are discussed in this report.

### 1.   Apple's Utility Patents

17.      I address seven utility patents that Apple    has asserted against Samsung.[41]   I group these utility patents as user interface patents and touchscreen-related patents.

#### a)   User Interface Utility Patents

##### (1)  6,493,002 (" '002 Patent"): Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System

18.      U.S. Patent number 6,493,002 was filed on March 20, 1997       and  issued  on December 10, 2002.[42]  Steven Christensen, the named inventor of the '002 Patent, assigned the patent to Apple Computer, Inc.[43]

19.      The abstract of the '002 Patent is reproduced below:[44]

An interactive computer-controlled display system having a processor,   a data display screen, a cursor control  device for interactively positioning a

---

[39]  Apple Inc.'s Amended Complaint, June 16, 2011, ¶ 9, p. 3. [2.1]

[40]  About Samsung, US divisions, no date, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/ businessarea/usdivisions.html>. [3.6]

[41]  As I discuss above, the Musika Report and the Hauser Report do not address the '828 Patent. Therefore, I do not address the '828 Patent in my report.  However, if Messrs. Musika and Hauser subsequently attempt to express an opinion as to damages on the '828 Patent, I expect that I will be allowed to respond to those opinions.

[42]  U.S. Patent No. 6,493,002 B1. [2.3]

[43]  U.S. Patent No. 6,493,002 B1. [2.3]

[44]  U.S. Patent No. 6,493,002 B1. [2.3]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

cursor on the data display screen, and a window generator that generates and displays a window on a data display screen. The window region provides status and control information in one or more data display areas. The individual data display areas may be controlled through the use of controls and indicators on the control strip itself using cursor control keys.

### (2)  7,469,381 (" '381 Patent"): List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display

20.     U.S. Patent number 7,469,381 was filed on December 14, 2007    and issued on December 23, 2008.[45]  Bas Ording, the named inventor of the '381 Patent, assigned the patent to Apple Inc.[46]

21.   The abstract of the '381 Patent is reproduced below:[47]

In accordance with some embodiments, a computer-implemented method for use in conjunction with a device with a        touch  screen  display  is disclosed.  In the method, a movement of an object on or near the touch screen display is detected. In response to detecting the movement, an electronic document displayed on the touch screen display is translated in a first direction. If an edge of    the electronic document is reached while translating the electronic document in the first direction  while the object is still detected on or near the touch screen display,      an area beyond the edge of the document is displayed. After the object is no longer detected on  or  near  the  touch  screen display, the document is translated in a second  direction  until  the  area  beyond the edge of the document is no longer displayed.

### (3)  7,853,891 (" '891 Patent"): Method and Apparatus for Displaying a Window for a User Interface

22.     U.S. Patent number 7,853,891 was filed on February     1, 2008 and issued on December 14, 2010.[48]  Imran Chaudhri and Bas Ording, the named inventors of the '891 Patent, assigned the patent to Apple Inc.[49]

23.     The abstract of the '891 Patent is reproduced below:[50]

Methods   and apparatuses to display windows. In more than one embodiments [sic] of the invention, a window is closed automatically (e.g.,

---

[45]  U.S. Patent No. 7,469,381 B2. [2.4]
[46]  U.S. Patent No. 7,469,381 B2. [2.4]
[47]  U.S. Patent No. 7,469,381 B2. [2.4]
[48]  U.S. Patent No. 7,853,891 B2. [2.6]
[49]  U.S. Patent No. 7,853,891 B2. [2.6]
[50]  U.S. Patent No. 7,853,891 B2. [2.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

after a timer expires, or when a condition or criterion is met, or  a system input is received) without user input. In some examples, the window is translucent so that the portion of another window, when present, is visible under the window. In some examples, the image of the  window is faded out before the window is closed and  destroyed. In some examples, the window does not close in response to any input from a user input device. In some examples, the window is repositioned (or hidden) automatically when another translucent window is displayed. The degree of translucency, the speed for fading out, the discrete levels of translucency for fading out, the time to expire, and/or other parameters for controlling the display of the window may be set by the user or adjusted by the system (or application software progr  ams) automatically according to system conditions or other criteria.

### (4)  7,864,163 (" '163 Patent"): Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents

24.     U.S. Patent number 7,864,163 was filed on September 4, 2007 and issued on January 4, 2011.[51] Bas Ording, Scott Forstall, Greg Christie, Stephen Lemay, Imran  Chaudhri, Richard Williamson, Chris Blumenberg, and Marcel Van Os,    the named inventors of the '163 Patent, assigned the patent to Apple Inc.[52]

25.     The abstract of the '163 Patent is reproduced below:[53]

A computer-implemented method, for use in conjunction with a portable electronic device with a touch screen display, comprises displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content, and detecting a first gesture at a location on the displayed portion of the structured electronic document. A first box in the plurality of boxes at the location of the first gesture is determined. The first box on the touch screen display       is enlarged and  substantially centered.

### b)  Touchscreen-Related Utility Patents

### (1)  7,844,915 (" '915 Patent"): Application Programming Interfaces for Scrolling Operations

---

[51] U.S. Patent No. 7,864,163. [2.8]
[52] U.S. Patent No. 7,864,163. [2.8]
[53] U.S. Patent No. 7,864,163. [2.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

26.    U.S. Patent number 7,844,915 was filed on January 7, 2007 and issued on November 30, 2010.[54]  Andrew Platzer and Scott Herz, the named inventors of the '915 Patent, assigned the patent to Apple Inc.[55]

27.    The abstract of the '915 Patent is reproduced below:[56]

> At least certain embodiments of the present disclosure include an environment with user interface software interacting with a software application. A method for operating through an application programming interface (API) in this environment includes transferring a set bounce call. The method further includes setting at least one of maximum and minimum bounce values. The set bounce call causes a bounce of a scrolled region in an opposite direction of a scroll based on a region past an edge of the scrolled region being visible in a display region at the end of the scroll.

### (2)   7,663,607 (" '607 Patent"): Multipoint Touchscreen

28.    U.S. Patent number 7,663,607 B2 was filed on May 6, 2004 and issued on February 16, 2010.[57]  Steven Hotelling, Joshua Strickon, and Brian Huppi, the named inventors of the '607 Patent, assigned the patent to Apple Inc.[58]

29.    The abstract of the '607 Patent is reproduced below:[59]

> A touch panel having a transparent capacitive sensing medium configured to detect multiple touches or near touches that occur at the same time and at distinct locations in the plane of the touch panel and to produce distinct signals representative of the location of the touches on the plane of the touch panel for each of the multiple touches is disclosed.

### (3)   7,920,129 (" '129 Patent"): Double-Sided Touch-Sensitive Panel with Shield and Drive Combined Layer

30.    U.S. Patent number 7,920,129 was filed on January 3, 2007 and issued on April 5, 2011.[60]  Steve Hotelling and Brian Land, the named inventors of the '129 Patent, assigned the patent to Apple Inc.[61]

---

[54] U.S. Patent No. 7,844,915 B2. [2.5]
[55] U.S. Patent No. 7,844,915 B2. [2.5]
[56] U.S. Patent No. 7,844,915 B2. [2.5]
[57] U.S. Patent No. 7,663,607 B2. [2.7]
[58] U.S. Patent No. 7,663,607 B2. [2.7]
[59] U.S. Patent No. 7,663,607 B2. [2.7]
[60] U.S. Patent No. 7,920,129 B2. [2.9]
[61] U.S. Patent No. 7,920,129 B2. [2.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

31.     The abstract of the '129 Patent is reproduced below:[62]

> A  multi-touch  capacitive  touch sensor panel can be created using a substrate with column and row traces formed          on  either  side  of  the substrate. To shield the column (sense) traces from          the  effects  of capacitive coupling from a modulated Vcom layer in an adjacent liquid crystal display (LCD) or any source of capacitive coupling, the row  traces can be widened to shield the column traces, and     the row traces can be placed closer to the LCD. In particular, the rows can be widened so that there is spacing of about 30 microns between adjacent row traces. In this manner, the row traces can serve the dual functions   of driving the touch sensor  panel,  and  also  the function of shielding the more sensitive column (sense) traces from the effects of capacitive coupling.

## 2.   Apple's Design Patents

32.     Apple has asserted seven design patents against Samsung.   For the purposes of my  discussion  in  this  report, I have grouped together the design patents addressing the graphical user interface ("UI Design Patents") and the design patents addressing elements     of the appearance of electronic devices ("Electronic Device Design Patents").

### a)   UI Design Patents

#### (1)  D627,790 (" 'D790 Patent"): Graphical User Interface For a Display Screen or Portion Thereof

33.     U.S. Design Patent number D627,790 was filed on August 20,   2007 and issued on November 23, 2010. [63]  Imran Chaudhri, the named inventor   of the 'D790 Patent, assigned the patent to Apple Inc.[64]

34.     The 'D790 Patent claims "[t]he ornamental design for a graphical     user interface for a  display screen or portion thereof, as shown and described."   [65]  The patent includes one drawing sheet, the figure of which is reproduced below.

---

[62]  U.S. Patent No. 7,920,129 B2. [2.9]
[63]  U.S. Design Patent No. D627,790 S. [2.10]
[64]  U.S. Design Patent No. D627,790 S. [2.10]
[65]  U.S. Design Patent No. D627,790 S. [2.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 1:   'D790 Patent Drawing Sheet[66]**



35.      The 'D790 Patent explains that "[t]he FIGURE is a  front view of a graphical user interface for a display screen or portion thereof showing [a] new design.  The broken lines of the display screen or portion thereof and other elements form no part of the claimed design."[67]

### (2)  D617,334 (" 'D334 Patent"): Graphical User Interface For a Display Screen or Portion Thereof

36.      U.S. Design Patent number D617,334 was filed on July 15, 2008 and   issued on June 8, 2010. [68]  Imran Chaudhri, the named inventor of the 'D334 Patent, assigned the patent to Apple Inc.[69]

37.      The 'D334 Patent claims "[t]he ornamental design for a graphical    user interface for a display screen or portion thereof, as shown and described."   [70]  The patent includes eight drawing sheets, which are substantially similar to the first drawing sheet, the figure of which is reproduced below.

---

[66]  U.S. Design Patent No. D627,790 S. [2.10]
[67]  U.S. Design Patent No. D627,790 S. [2.10]
[68]  U.S. Design Patent No. D617,334 S. [2.11]
[69]  U.S. Design Patent No. D617,334 S. [2.11]
[70]  U.S. Design Patent No. D617,334 S. [2.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 2:** **'D334 Draw ing Sheet 1** [71] **("a  front  view  of  a graphical user interface for a display screen or portion thereof …"[72])**



38.     The  other  figures  included in the 'D334 Patent show front views of different embodiments of the design.[73]  In these figures, "[t]he broken line showing of the   display screen or portion thereof … is not part of the claimed design."[74]

39.     The patent also notes that[75]

> The  AT&T trademark in the upper left corner of the Figure[s] is the property of AT&T Intellectual Property II, L.P. The YouTube trademark  on the left hand side of the Figures is the property of Google Inc.  The iTunes trademark on the left hand side of the Figures is the property of Apple Inc. The App Store trademark on the bottom of the Figures is the    property of Apple  Inc.   The  Safari  trademark on the bottom of the Figures is the property of Apple Inc.  The iPod trademark on   the bottom right corner of the Figures is the property of Apple Inc.  Trademarks are the property of their respective owners.

---

[71]  U.S. Design Patent No. D617,334 S. [2.11]
[72]  U.S. Design Patent No. D617,334 S. [2.11]
[73]  U.S. Design Patent No. D617,334 S. [2.11]
[74]  U.S. Design Patent No. D617,334 S. [2.11]
[75]  U.S. Design Patent No. D617,334 S. [2.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (3) D604,305 (" 'D305 Patent"): Graphical User Interface For a Display Screen or Portion Thereof

40.     U.S. Design Patent number D604,305 was filed on July 23, 2007 and   issued on November 17, 2009.[76]  Freddy Anzures and Imran Chaudhri, the named inventors of the 'D305 Patent, assigned the patent to Apple Inc.[77]

41.     The 'D305 Patent claims "[t]he ornamental design for a graphical   user interface for a display screen or portion thereof, as shown      and described."[78]  The patent includes two drawing sheets, which are substantially similar to the first drawing sheet, the figure of which is reproduced below.  Note that one of these drawing sheets was filed in color.[79]

**Figure 3:   'D305 Patent Drawing Sheet 1[80] ("a front view of a graphical user interface for a display screen or portion thereof …"[81])**



---

[76] U.S. Design Patent No. D604,305 S. [2.12]
[77] U.S. Design Patent No. D604,305 S. [2.12]
[78] U.S. Design Patent No. D604,305 S. [2.12]
[79] U.S. Design Patent No. D604,305 S. [2.12]
[80] U.S. Design Patent No. D604,305 S. [2.12]
[81] U.S. Design Patent No. D604,305 S. [2.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

42.     The  other  drawing  sheet shows the front view of a second embodiment of the design.[82]  Furthermore,  "[t]he broken line showing of a display screen in both views forms no part of the claimed design."[83]

### b)  Electronic Device Design Patents

### (1)  D593,087 (" 'D087 Patent"): Electronic Device

43.     U.S. Design Patent number D593,087 was filed on July 30, 2007 and    issued on May 26, 2009.[84]  The inventors of the 'D087 Patent, Bartley Andre et al., assigned the patent to Apple Inc.[85]

44.     The 'D087 Patent claims "[t]he ornamental      design  of  an  electronic  device, substantially as shown and described."  [86]  The patent includes twelve   drawing sheets and 48 figures, which are similar to figures one through eight reproduced below.

---

[82] U.S. Design Patent No. D604,305 S. [2.12]
[83] U.S. Design Patent No. D604,305 S. [2.12]
[84] U.S. Design Patent No. D593,087 S. [2.13]
[85] U.S. Design Patent No. D593,087 S. [2.13]
[86] U.S. Design Patent No. D593,087 S. [2.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 4:**   **'D087 Patent Figures 1 and 2** [87] **("a front perspective view of an electronic device …"** **and "a rear perspective view of the electronic device …"**[88]**)**



**FIG. 1**



**FIG. 2**

---

[87]  U.S. Design Patent No. D593,087 S, Sheet 1. [2.13]
[88]  U.S. Design Patent No. D593,087 S, p. 2. [2.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 5:** '**D087 Patent Figures 3 through 8**[89] ("**a front view thereof,**" "**a rear view thereof,**" "**a top view thereof,**" "**a bottom v iew thereof,**" "**a le ft side v iew thereof,**" "**a right side view thereof**"[90])



45.   The 'D087 Patent explains that "[n]one of the broken lines form   a part of the claimed design."[91]  The patent explains further that[92]

> The broken lines showing the remainder of the electronic device are directed to environment.  The broken lines, within the claimed design, in

---

[89]  U.S. Design Patent No. D593,087 S, Sheet 2. [2.13]
[90]  U.S. Design Patent No. D593,087 S, p. 2. [2.13]
[91]  U.S. Design Patent No. D593,087 S, p. 3. [2.13]
[92]  U.S. Design Patent No. D593,087 S, p. 3. [2.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

embodiments 1, 2, and 4 that depict an elongated oval shape and      the broken lines, within the claimed design, in embodiments   2, 3, and 6 that depict a circle shape are superimposed on a continuous surface and are for illustrative purposes only.  The broken lines, within the claimed design, in embodiments 1, 3, and 5 that depict a large rectangular shape, indicate a non claimed shape below the continuous      front surface and are for illustrative purposes only.

### (2)  D618,677 (" 'D677 Patent"): Electronic Device

46.    U.S.  Design  Patent number D618,677 was filed on November 18, 2008 and issued on June 29, 2010. [93]  The inventors of the 'D677 Patent, Bartley Andre et al.,     assigned the patent to Apple Inc.[94]

47.    The 'D677  Patent  claims "[t]he ornamental design of an electronic device, as shown and described."[95]  The patent includes two drawing sheets and eight figures, all of which are reproduced below.

---

[93]  U.S. Design Patent No. D618,677 S. [2.14]
[94]  U.S. Design Patent No. D618,677 S. [2.14]
[95]  U.S. Design Patent No. D618,677 S. [2.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 6:** **'D677 Patent Figures 1 and 2** [96] **("a front perspectiv e v iew of an electronic device …" and "a rear perspective view thereof"[97])**



*FIG. 1*

*FIG. 2*

---

[96]  U.S. Design Patent No. D618,677 S, Sheet 1. [2.14]
[97]  U.S. Design Patent No. D618,677 S. [2.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 7:** **'D677 Patent Figures 3 through 8[98] ("a front view thereof," "a rear view thereof," "a top view thereof," "a bottom v iew thereof," "a  left  side v iew thereof," and "a right side view thereof"[99])**



*FIG. 3*   *FIG. 4*

*FIG. 5*

*FIG. 6*

*FIG. 7*   *FIG. 8*

48.     The 'D677 Patent notes that "[t]he claimed surface of the electronic device is illustrated with the color designation  for the color black."[100] For clarification, the 'D677 Patent states that "the article of manufacture to which the    ornamental design has been applied is an electronic device, media player (e.g., music, video and/or game player), media storage device, a

---

[98] U.S. Design Patent No. D618,677 S, Sheet 2. [2.14]
[99] U.S. Design Patent No. D618,677 S. [2.14]
[100] U.S. Design Patent No. D618,677 S. [2.14]

24

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

personal digital assistant, a communication dev    ice (e.g., cellular phone), a novelty    item  or toy."[101]  Furthermore, "[t]he electronic device is not limited to the scale shown …"[102]

### (3)  D622,270 (" 'D270 Patent"): Electronic Device

49.    U.S. Design Patent number D622,270 was filed   on October 1, 2009 and issued on August 24, 2010. [103]   The inventors of the 'D270 Patent, Bartley Andre et al., assigned the patent to Apple Inc.[104]

50.    The 'D270 Patent claims "[t]he ornamental design for an electronic    device,  as shown and described."[105]  The patent includes five drawing sheets and nine figures, all of which are reproduced below.

---

[101] U.S. Design Patent No. D618,677 S. [2.14]
[102] U.S. Design Patent No. D618,677 S. [2.14]
[103] U.S. Design Patent No. D622,270 S. [2.15]
[104] U.S. Design Patent No. D622,270 S. [2.15]
[105] U.S. Design Patent No. D622,270 S. [2.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 8:** **'D270 Patent Figures 1 and 2** [106] **("a front perspective view of an electronic device …" and "a rear perspective thereof"** [107]**)**



**FIG. 1**



**FIG. 2**

---

[106] U.S. Design Patent No. D622,270 S, Sheet 1. [2.15]
[107] U.S. Design Patent No. D622,270 S, p. 2. [2.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 9:   'D270 Patent Figures 3 and 4[108] ("a front view thereof" and "a rear view thereof"[109])**



FIG. 3                FIG. 4

---

[108] U.S. Design Patent No. D622,270 S, Sheet 2. [2.15]
[109] U.S. Design Patent No. D622,270 S, p. 2. [2.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 10:  'D270 Patent Figures 5 and 6** [110] **("a  left  side  view thereof" and "a right side v    iew thereof"[111])**



**FIG. 5**          **FIG. 6**

**Figure 11:  'D270 Patent Figures 7 and 8** [112] **("a top plan v  iew thereof" and "a   bottom  plan  view thereof"[113])**



**FIG. 7**

**FIG. 8**

---

[110] U.S. Design Patent No. D622,270 S, Sheet 3. [2.15]
[111] U.S. Design Patent No. D622,270 S, p. 2. [2.15]
[112] U.S. Design Patent No. D622,270 S, Sheet 4. [2.15]
[113] U.S. Design Patent No. D622,270 S, p. 2. [2.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 12: 'D270 Patent Figure 9** [114] **("an enlarged elevational view of a representative corner of the electronic device"**[115]**)**



## FIG. 9

51.     The 'D270 Patent explains that "[t]he broken lines show portions of the electronic device which form no part of the claimed design."[116]

### (4)  D504,889 (" 'D889 Patent"): Electronic Device

52.     U.S. Design Patent number D504,889 was filed on March 17, 2004 and     issued on May 10, 2005. [117]   The inventors of the 'D889 Patent, Bartley Andre et al., assigned the patent to Apple Computer, Inc.[118]

53.     The 'D889 Patent claims "[t]he ornamental     design of an electronic device, substantially as shown and described." [119]   The patent includes four drawing sheets and nine figures, all of which are reproduced below.

---

[114] U.S. Design Patent No. D622,270 S, Sheet 5. [2.15]
[115] U.S. Design Patent No. D622,270 S, p. 2. [2.15]
[116] U.S. Design Patent No. D622,270 S, p. 2. [2.15]
[117] U.S. Design Patent No. D504,889 S. [2.16]
[118] U.S. Design Patent No. D504,889 S. [2.16]
[119] U.S. Design Patent No. D504,889 S. [2.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 13: 'D889 Patent Figures 1 and 2** [120] **("a top perspectiv e v iew of an electronic dev ice …" and "a bottom perspective view thereof"[121])**



FIG. 1

FIG. 2

---

[120] U.S. Design Patent No. D504,889 S, Sheet 1. [2.16]
[121] U.S. Design Patent No. D504,889 S. [2.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 14:  'D889 Patent Figures 3 and 4[122] ("a top view thereof" and "a bottom view thereof"[123])**



*FIG. 3*



*FIG. 4*

---

[122] U.S. Design Patent No. D504,889 S, Sheet 2. [2.16]
[123] U.S. Design Patent No. D504,889 S. [2.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 15:** **'D889 Patent Figures 5 through 8** [124] **("a left side v iew thereof," "a right side view thereof," "an upper side view thereof," and "a lower side view thereof"** [125])



*FIG. 5*

*FIG. 6*

*FIG. 7*

*FIG. 8*

---

[124] U.S. Design Patent No. D504,889 S, Sheet 3. [2.16]
[125] U.S. Design Patent No. D504,889 S. [2.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 16:** '**D889 Patent Figure 9** [126] ("**an exemplary diagram of the use of the electronic dev ice thereof the broken lines being show n for illustrativ e puposes [sic]  only and form no part of the claimed design**"[127])



*FIG. 9*

### 3.   Apple's Trade Dress at Issue

54.   Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc. define eight sets of Apple trade dress. [128] Apple alleges that certain of Samsung's products use this trade dress. [129] Descriptions of the Apple trade dress claims at issue in this matter are provided below.

### a)   Original iPhone Trade Dress

---

[126] U.S. Design Patent No. D504,889 S, Sheet 4. [2.16]

[127] U.S. Design Patent No. D504,889 S. [2.16]

[128] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, pp. 1-3. [2.17]

[129] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 20. [2.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

55.     According to Apple, the phrase "Original iPhone Trade   Dress" refers to specific elements of Apple's product design.   Those elements are:[130]

> a rectangular product with four evenly rounded        corners;  a  flat  clear surface covering the front of the product; the appearance of      a  metallic bezel  around  the  flat  clear surface; a display screen under the clear surface;  under the clear surface, substantial black borders above and below the display screen and narrower black borders on  either side of the screen; when the device is on, a matrix of colorful square        icons  with evenly rounded corners within the display screen; and when the device is on, a bottom dock of colorful square    icons  with evenly rounded corners set  off  from  the  other  icons on the display, which does not change as other pages of the user interface are viewed.

### b)   iPhone 3G Trade Dress

56.     Apple's "iPhone 3G Trade Dress" is described in substantially the same manner as its "Original iPhone Trade Dress."   [131]  However, this trade dress claim also includes        the following: "when the device is on, a row of small dots on the display screen …"[132]

### c)   iPhone 4 Trade Dress

57.     Apple's "iPhone 4 Trade Dress" has many of the same elements as the Original iPhone and iPhone 3G trade dress.  However, the     claimed  trade  dress  does  differ  in  certain elements.  Apple's definition of its "iPhone 4 Trade Dress" is reproduced below.[133]

> a rectangular product with four evenly rounded        corners;  a  flat  clear surface covering the front of the product;  a display screen under the clear surface;  under the clear surface, substantial neutral (black or white) borders above and below the display screen and   narrower black borders on either side of the screen; a thin metallic  band around the outside edge of the phone; when the device is on, a row of small dots on the display screen; when the device is on, a matrix of colorful square        icons  with evenly rounded corners within the display screen; and when the device is on, a bottom dock of colorful square    icons  with  evenly  rounded  corners

---

[130] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, pp. 1-2. [2.17]

[131] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 2. [2.17]

[132] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 2. [2.17]

[133] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 2. [2.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

set off from the other icons on the display, which does not change as other pages of the user interface are viewed.

### d) iPhone Trade Dress

58.     Apple's "iPhone Trade Dress" incorporates certain elements of each of the other three iPhone trade dress claims.  Apple's description follows.[134]

> a rectangular product with four evenly rounded corners; a flat clear surface covering the front of the product; a display screen under the clear surface; under the clear surface, substantial neutral (black or white) borders above and below the display screen and narrower neutral borders on either side of the screen; when the device is on, a matrix of colorful square icons with evenly rounded corners within the display screen; and when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off from the other icons on the display, which does not change as other pages of the user interface are viewed.

### e) Trade Dress Registrations

59.     In this matter, Apple has accused certain Samsung products of using three Apple U.S. trade dress registrations: 3,470,983; 3,457,218; 3,475,327.[135]

60.     Apple's Amended Complaint notes that "U.S. Registration 3,470,983 is for the overall design of the product, including the rectangular shape, the evenly rounded corners, the silver edges, the black face, and the display of sixteen colorful icons."[136]  The description of this trade dress claim, maintained on the U.S. Patent and Trademark Office website, states that "[t]he mark consists of the configuration of a rectangular handheld mobile digital electronic device with rounded silver edges, a black face, and an array of 16 square icons with rounded edges."[137]  The description goes further to describe the orientation of the icons ("[t]he top 12 icons appear on a black background, and the bottom 4 appear on a silver background") as well as what each icon depicts. [138]  "The color(s) black, blue, brown, brown-gray, gray-green, green, orange, red, silver, tan, white and yellow is/are claimed as a feature of the mark."[139]  This

---

[134] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, pp. 2-3. [2.17]

[135] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, pp. 3, 20. [2.17]

[136] Apple Inc.'s Amended Complaint, June 16, 2011, p. 41. [2.1]

[137] U.S. Registration Number 3,470,983, July 22, 2008, <http://tess2.uspto.gov>. [2.18]

[138] U.S. Registration Number 3,470,983, July 22, 2008, <http://tess2.uspto.gov>. [2.18]

[139] U.S. Registration Number 3,470,983, July 22, 2008, <http://tess2.uspto.gov>. [2.18]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

registration was filed October 12, 2007, published for opposition May 6, 2008,    and registered July 22, 2008.[140]

61.    U.S. Registration 3,470,983 also includes the following image, which appears to be a photo of the front view of the original iPhone.[141]



62.    Apple's Amended Complaint explains that "U.S. Registration  3,457,218 is for the configuration of a rectangular handheld mobile digital electronic device with rounded corners."[142] The  description of this registration available on the USPTO's website notes simply that "[t]he mark consists of the configuration of a rectangular handheld mobile digital electronic device with rounded corners." [143]   Color is not claimed as part of the registration.     [144]  U.S.   Registration 3,457,218 was filed October 12, 2007, published for opposition April 15, 2008, and registered July 1, 2008.[145]

63.    The   following  image  was provided as part of U.S. Registration Number 3,457,218.[146]



---

[140] U.S. Registration Number 3,470,983, July 22, 2008, <http://tess2.uspto.gov>. [2.18]
[141] U.S. Registration Number 3,470,983, July 22, 2008, <http://tess2.uspto.gov>. [2.18]
[142] Apple Inc.'s Amended Complaint, June 16, 2011, p. 41. [2.1]
[143] U.S. Registration Number 3,457,218, July 1, 2008, <http://tess2.uspto.gov>. [2.19]
[144] U.S. Registration Number 3,457,218, July 1, 2008, <http://tess2.uspto.gov>. [2.19]
[145] U.S. Registration Number 3,457,218, July 1, 2008, <http://tess2.uspto.gov>. [2.19]
[146] U.S. Registration Number 3,457,218, July 1, 2008, <http://tess2.uspto.gov>. [2.19]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

64.     Finally, Apple describes that "U.S Registration 3,475,327 is for a rectangular handheld mobile digital electronic device with a gray rectangular portion in the center, a black band above and below the gray rectangle and on the curved corners, and a silver outer border and side."[147]  The USPTO's description states that "[t]he mark consists of the configuration of a handheld mobile digital electronic device."  [148]  Specifically, this registration  describes the placement of the colors on the outer surface of the device: "[t]he color gray appears as a rectangle at the front, center of the device.  The color black appears on the front of    the device above and below the gray rectangle and on the curved  corners of the device.  The color silver appears as the outer border and sides of the device."  [149]  As the description suggests,   "[t]he color(s) gray, silver and black is/are claimed as a feature of the mark." [150]  This trade dress was filed October 12, 2007, published for opposition May 13, 2008, and registered July 29, 2008.[151]

65.     The following image was included with the registration.[152]



### f)     85/299,118 Trade Dress Application

66.     Apple's Amended Complaint explains that "U.S.           Application  Serial  No. 85/299,118 is for the configuration of a rectangular handheld mobile digital electronic device with evenly rounded corners — the iPhone 4." [153]  The USPTO's description of the mark, which was filed April 19, 2011, explains that color is not a claimed feature.  [154]  "The mark consists of

---

[147] Apple Inc.'s Amended Complaint, June 16, 2011, p. 41. [2.1]
[148] U.S. Registration Number 3,475,327, July 29, 2008, <http://tess2.uspto.gov>. [2.20]
[149] U.S. Registration Number 3,475,327, July 29, 2008, <http://tess2.uspto.gov>. [2.20]
[150] U.S. Registration Number 3,475,327, July 29, 2008, <http://tess2.uspto.gov>. [2.20]
[151] U.S. Registration Number 3,475,327, July 29, 2008, <http://tess2.uspto.gov>. [2.20]
[152] U.S. Registration Number 3,475,327, July 29, 2008, <http://tess2.uspto.gov>. [2.20]
[153] Apple Inc.'s Amended Complaint, June 16, 2011, p. 17. [2.1]
[154] U.S. Application Serial Number 85/299,118, April 19, 2011, <http://tess2.uspto.gov>. [2.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the configuration of a rectangular handheld mobile digital electronic device with rounded corners and a circular convex indentation containing the outline of a square with round corners."[155]

67.     The application includes the following image.[156]



### g)   iPad and iPad 2 Trade Dress

68.     Though defined separately in Apple's Objections and Responses to Samsung's First Set of Interrogatories, the iPad and iPad 2 trade dress contains the same elements.  Those elements are as follows.[157]

> a rectangular product with four evenly rounded        corners;  a flat clear surface covering the front of the product; the appearance of  a metallic rim around the flat clear surface; a display screen under the clear        surface; under the clear surface, substantial neutral (black or  white) borders on all sides of the display screen; and when the device is on, a matrix of colorful square icons with evenly rounded corners within the display screen.

### h)   77/921,838, 77/921,829, and 77/921,869 Trade Dress Applications

69.     Apple's Amended Complaint describes that        "U.S. Application Serial No. 77/921,838 is for the configuration of a digital electronic device with a screen on  the front of the device,  and  a  circle  at  the  bottom center of the front — the iPad."        [158]  Like Application 85/299,118, this application's description does not claim color.        [159]  "The mark consists of a

---

[155] U.S. Application Serial Number 85/299,118, April 19, 2011, <http://tess2.uspto.gov>. [2.21]

[156] U.S. Application Serial Number 85/299,118, April 19, 2011, <http://tess2.uspto.gov>. [2.21]

[157] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 3. [2.17]

[158] Apple Inc.'s Amended Complaint, June 16, 2011, p. 17. [2.1]

[159] U.S. Application Serial Number 77/921,838, January 27, 2010, <http://tess2.uspto.gov>. [2.22]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

configuration of a digital electronic device with a screen on the front of the    device, and a circle at the bottom center of the front."[160]  This application was filed January 27, 2010.[161]

70.    The following image is included.[162]



71.    Apple's "U.S. Application Serial Number 77/921,829 is for a configuration of    a digital electronic device, with a gray screen,  a black border around the screen, a black concave circle at the bottom of the border, and silver sides — also the iPad."    [163]  The description of the application, which was filed on January 27, 2010, notes that "[t]he color(s) black, silver, gray and white is/are claimed as a feature of the mark." [164]  "The mark consists of a  configuration of a digital electronic device, with a gray screen, a black border around the        screen,  and  a  black concave circle at the bottom of the border.  The sides of the device are silver."[165]

72.    The image below is included.[166]



73.    Finally, Apple's "U.S. Application Serial No. 77/921,869 is for the overall    design of the product, including a black screen and silver      casing,  with  thirteen  colorful  square  icons

[160] U.S. Application Serial Number 77/921,838, January 27, 2010, <http://tess2.uspto.gov>. [2.22]
[161] U.S. Application Serial Number 77/921,838, January 27, 2010, <http://tess2.uspto.gov>. [2.22]
[162] U.S. Application Serial Number 77/921,838, January 27, 2010, <http://tess2.uspto.gov>. [2.22]
[163] Apple Inc.'s Amended Complaint, June 16, 2011, p. 17. [2.1]
[164] U.S. Application Serial Number 77/921,829, January 27, 2010, <http://tess2.uspto.gov>. [2.23]
[165] U.S. Application Serial Number 77/921,829, January 27, 2010, <http://tess2.uspto.gov>. [2.23]
[166] U.S. Application Serial Number 77/921,829, January 27, 2010, <http://tess2.uspto.gov>. [2.23]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

arranged in four rows on the face of the screen, and a concave black circle  with the outline of a gray square in the center below the bottom row of icons — again, the iPad." [167]  This application, filed  January  27,  2010,  describes  that "[t]he mark consists of a configuration of a digital electronic device with a black screen and silver casing.  There are thirteen icons consisting of squares with rounded edges arranged in four rows on the face of the screen."  [168]  The application goes on to describe each icon as well as noting that "[b]elow the bottom row of icons is a concave black and gray circle with the outline of a gray square in the center."  [169]  Further, the colors black, silver, white, red, orange, brown, yellow, blue, gray, dark gray, purple,  and green are claimed.[170]

74.    The application displays the image below.[171]



#### 4.   Apple's Trademarks at Issue

75.    Apple asserts three sets of trademarks against Samsung's accused products: the Registered Icon Trademarks, the iTunes Store Trademark, and the iTunes Eighth Note and CD Design Trademark.[172]  Each of these sets is described below.

#### a)   Registered Icon Trademarks

76.    Apple's  Registered Icon Trademarks include "the marks shown in U.S. Registration Nos. 3,886,196; 3,889,642; 3,886,200; 3,889,685; 3,886,169; and 3,886,197."  [173]

---

[167] Apple Inc.'s Amended Complaint, June 16, 2011, p. 17. [2.1]
[168] U.S. Application Serial Number 77/921,869, January 27, 2010, <http://tess2.uspto.gov>. [2.24]
[169] U.S. Application Serial Number 77/921,869, January 27, 2010, <http://tess2.uspto.gov>. [2.24]
[170] U.S. Application Serial Number 77/921,869, January 27, 2010, <http://tess2.uspto.gov>. [2.24]
[171] U.S. Application Serial Number 77/921,869, January 27, 2010, <http://tess2.uspto.gov>. [2.24]
[172] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 20. [2.17]
[173] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 3. [2.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

These Registered Icon Trademarks are displayed    below.   Underneath each icon is the icon's filing date ("Filed"), date on which the application was published for opposition ("Pub."), and the registration date ("Reg.").

| No. 3,886,196[174] No. | 3,889,642[175] No. | 3,886,200[176] |
|---|---|---|
|  |  |  |
| Filed: April 21, 2010 | Filed: April 21, 2010 | Filed: April 21, 2010 |
| Pub.: September 21, 2010 | Pub.: September 28, 2010 | Pub.: September 21, 2010 |
| Reg.: December 7, 2010 | Reg.: December 14, 2010 | Reg.: December 7, 2010 |

| No. 3,889,685[177] No. | 3,886,169[178] No. | 3,886,197[179] |
|---|---|---|
|  |  |  |
| Filed: April 21, 2010 | Filed: April 21, 2010 | Filed: April 21, 2010 |
| Pub.: September 28, 2010 | Pub.: September 21, 2010 | Pub.: September 21, 2010 |
| Reg.: December 14, 2010 | Reg.: December 7, 2010 | Reg.: December 7, 2010 |

### b)   iTunes Store Trademark

77.    The Purple iTunes Store Trademark refers to "the mark shown        in   U.S. Application Serial No. 85/041,463."[180]  This application was filed on May 18, 2010 and published for opposition on April 19, 2011.[181]  This icon is pictured below.[182]

---

[174] U.S. Registration Number 3,886,196, December 7, 2010, <http://tess2.uspto.gov>. [2.25]
[175] U.S. Registration Number 3,889,642, December 14, 2010, <http://tess2.uspto.gov>. [2.26]
[176] U.S. Registration Number 3,886,200, December 7, 2010, <http://tess2.uspto.gov>. [2.27]
[177] U.S. Registration Number 3,889,685, December 14, 2010, <http://tess2.uspto.gov>. [2.28]
[178] U.S. Registration Number 3,886,169, December 7, 2010, <http://tess2.uspto.gov>. [2.29]
[179] U.S. Registration Number 3,886,197, December 7, 2010, <http://tess2.uspto.gov>. [2.30]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



### c)    iTunes Eighth Note and CD Design Trademark

78.     The iTunes Eighth Note and CD Design Trademark refers to "the mark shown in U.S. Registration No. 2,935,038."[183]  This application was filed on March 11, 2004, published for opposition  on  December  28,  2004, and registered on March 22, 2005.     [184]   The mark is reproduced below.[185]



## C.  Samsung's Allegedly Infringing Products

79.     Apple has accused several Samsung smartphones and tablets    of  infringing  its asserted intellectual property.  I reproduce below a summary of Apple's  infringement assertions as reported in the Musika Report:[186]

---

[180] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 4. [2.17]

[181] U.S. Application Serial Number 85/041,463, May 18, 2010, <http://tess2.uspto.gov>. [2.31]

[182] U.S. Application Serial Number 85/041,463, May 18, 2010, <http://tess2.uspto.gov>. [2.31]

[183] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, p. 4. [2.17]

[184] U.S. Registration Number 2,935,038, March 22, 2005, <http://tess2.uspto.gov>. [2.32]

[185] U.S. Registration Number 2,935,038, March 22, 2005, <http://tess2.uspto.gov>. [2.32]

[186] I understand that there is some dispute between the parties as to which Samsung products are accused in this lawsuit.  The inclusion of a product in my analysis should not be taken as an admission that Samsung agrees that the product is properly accused in this case.  Additionally, I understand that there is a dispute between the parties as to whether Samsung is required to produce financial information relating to the Galaxy S II (Skyrocket), Galaxy S II (Epic 4G Touch), and the Galaxy Tab

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 17:  Samsung Devices that Allegedly Infringe Apple Utility and Design Patents[187]**

| Patent | Utility Patents | | | | | | | Design Patents | | | | | | |
| | User Interface | | | | Touchscreen | | | GUI | | | Electronic Device | | | |
| | '002 | '163 | '381 | '891 | '915 | '607 | '129 | D305 | D334 | D790 | D087 | D270 | D677 | D889 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acclaim | ✓ | ✓ | | ✓ | ✓ | | | | | | | | | |
| Captivate | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Continuum | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Droid Charge | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Epic 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Exhibit 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Fascinate | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | ✓ | |
| Galaxy Ace | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | |
| Galaxy Prevail | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Galaxy S (i9000) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Galaxy S 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Galaxy S II (AT&T) | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | ✓ | ✓ | |
| Galaxy S II (i9100) | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | ✓ | ✓ | |
| Galaxy S II (T-Mobile) | ✓ | ✓ | | ✓ | ✓ | | | | | | | | ✓ | |
| Galaxy S Showcase (i500) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | ✓ | |
| Galaxy Tab | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | |
| Galaxy Tab 10.1 (WiFi) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | ✓ |
| Gem | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Gravity Smart | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Indulge | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | | |
| Infuse 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| Intercept | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Mesmerize | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | | | ✓ | |
| Nexus S | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Nexus S 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Replenish | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Sidekick | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Transform | ✓ | ✓ | | ✓ | ✓ | | | | | | | | | |
| Vibrant | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |

10.1 (4G LTE). (Samsung's Opposition to Apple's Motion for Rule 37(b)(2) Sanctions for Samsung's Alleged Violation of January 27, 2012 Damages Discovery Order, March 12, 2012, pp. 15-16. [13.5].) For that reason, I have not included those three products in my analysis.  In the event the Court determines that Samsung must produce financial information relating to the Galaxy S II (Skyrocket), Galaxy S II (Epic 4G Touch), and the Galaxy Tab 10.1 (4G LTE), I will supplement my analysis.
[187] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 18:  Samsung Devices that Allegedly Infringe Apple Trade Dress and Trademarks[188]**

| Patent | Trade Dress | | | | | | | Trademarks | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | '218 | '327 | '983 | iPhone | iPhone 3G | iPhone 4 | iPad / iPad 2 | '038 | '169 | '196 | '197 | '200 | '642 | '685 | '463 (Pending) |
| Acclaim | | | | | | | | | | | | | ✓ | | |
| Captivate | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Continuum | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Droid Charge | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Epic 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Exhibit 4G | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Fascinate | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Galaxy Ace | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Galaxy Prevail | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | | |
| Galaxy S (i9000) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Galaxy S 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Galaxy S II (AT&T) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| Galaxy S II (i9100) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| Galaxy S II (T-Mobile) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | | ✓ | ✓ | | | ✓ | ✓ |
| Galaxy S Showcase (i500) | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Galaxy Tab | | | | | | ✓ | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| Galaxy Tab 10.1 (WiFi) | | | | | | ✓ | | ✓ | | | ✓ | | | ✓ | ✓ |
| Gem | | | | | | | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Gravity Smart | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Indulge | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Infuse 4G | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Intercept | | | | | | | | | | | | | ✓ | | |
| Mesmerize | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Nexus S | | | | | | | | | | | | | ✓ | | |
| Nexus S 4G | | | | | | | | | | | | | ✓ | | |
| Replenish | | | | | | | | | | | | | ✓ | | |
| Sidekick | | | | | | | | | ✓ | | | ✓ | | | |
| Transform | | | | | | | | | | | | | ✓ | | |
| Vibrant | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |

### 1.    Samsung Galaxy Smartphones

80.    Upon the brand's launch in June of 2010, one article stated        that  Samsung's Galaxy S line of smartphones marked the arrival of "a new class        of smartphone that [would]

---

[188] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

deliver a wealth of intelligent, immersive and integrated    experiences for users."[189]  The same article observed that "over 100 mobile operators across the globe [had] selected the Galaxy S as their key smartphone market driver."[190]  The Galaxy S brand was to "be the flagship model of the smartphone range Samsung" began introducing in 2010.[191]

81.    As the table below shows, since Samsung released the Galaxy S i9000 overseas in June of 2010, the company had launched at least nine other phones    bearing the Galaxy S name as of September, 2011.  Apple has alleged that    all of these devices infringe Apple's intellectual property asserted in this matter.[192]

**Figure 19:  Samsung Galaxy S Smartphone U.S. Launch Dates[193]**

| Product | Launch Date | U.S. Carrier |
|---------|-------------|--------------|
| Galaxy S i9000 | 6/2/2010 | Non-U.S. Launch |
| Galaxy S Vibrant | 7/15/2010 | T-Mobile |
| Galaxy S Captivate | 7/18/2010 | AT&T |
| Galaxy S Epic 4G | 8/31/2010 | Sprint |
| Galaxy S Fascinate | 9/8/2010 | Verizon |
| Galaxy S Mesmerize | 10/27/2010 | U.S. Cellular |
| Galaxy S Continuum | 11/11/2010 | Verizon |
| Galaxy S Showcase i500[194] 11/15/2010 | | Cellular South |
| Galaxy S 4G | 2/23/2011 | T-Mobile |
| Galaxy S II | 10/2/2011 | AT&T |

---

[189] "Samsung Galaxy S launches in Europe, hitting US 'later this year'," engadget, June 3, 2010. [3.7]

[190] "Samsung Galaxy S launches in Europe, hitting US 'later this year'," engadget, June 3, 2010. [3.7]

[191] "Samsung Galaxy S launches in Europe, hitting US 'later this year'," engadget, June 3, 2010. [3.7]

[192] Musika Report, Exhibit 4. [2.2]

[193] Schedule 6.3. [1.2] Non-U.S. launches where noted.  Note that several of these products omit the phrase "Galaxy S" from the names of the phones.  I have come to the understanding that the phones listed in the figures above are Galaxy S phones.

[194] Schedule 6.3. [1.2] Note that Apple's Objections and Responses to Samsung's First Set of Interrogatories list separately a "Showcase i500," "Showcase Galaxy S," and "Showcase (Cellular South)."  However, a comparison of the article announcing the release of the Galaxy S Showcase and Samsung's product page suggests that these are all the same device.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

## 2. Other Samsung Smartphones

82.     In addition to the Galaxy S line of smartphones, Samsung also released    myriad other  smartphones  in  2010  and  2011.  All of the smartphones listed in the table below are subject to Apple's allegations of infringement in this matter.[195]

83.     Certain  of  these  devices  occupy the market for mid-range smartphones; the Exhibit 4G, Gravity Smart, [196] and the Transform [197] for example.  Most of them appear to run a variant of the Android operating system.

**Figure 20:  Non-Galaxy S Samsung Smartphone U.S. Launch Dates[198]**

| Product | Launch Date | U.S. Carrier |
|---|---|---|
| Acclaim 7/9/2010 | | U.S. Cellular |
| Intercept 7/11/2010 | | Sprint |
| Transform 10/10/2010 | | Sprint |
| Nexus S | 12/16/2010 | T-Mobile |
| Gem 4/1/2011 | | U.S. Cellular |
| Sidekick 4G[199] 4/20/2011 | | T-Mobile |
| Galaxy Prevail | 4/29/2011 | Sprint |
| Nexus S 4G | 5/8/2011 | Sprint |
| Replenish 5/8/2011 | | Sprint |
| Droid Charge | 5/14/2011 | Verizon |
| Infuse 4G | 5/15/2011 | AT&T |
| Indulge 6/7/2011 | | Cricket Communications |
| Exhibit 4G | 6/22/2011 | T-Mobile |
| Gravity Smart | 6/22/2011 | T-Mobile |
| Galaxy Ace | 2011 | Non-U.S. Launch |

---

[195] Apple Inc.'s Objections and Responses to Samsung Electronics Co., Ltd.'s First Set of Interrogatories to Apple Inc., September 12, 2011, pp. 19-20. [2.17]

[196] "T-Mobile Announces Launch Date for Samsung Exhibit 4G and Gravity SMART," Brighthand, June 15, 2011, <http://www.brighthand.com/default.asp?newsID=17907&news=t-mobile+samsung+exhibit+4g+gravity+smart+android+2.2+2.3+froyo+gingerbread>. [3.9]

[197] "Sprint Launches Android OS-based Samsung Transform, Sanyo Zio," Brighthand, October 10, 2010, <http://www.brighthand.com/default.asp?newsID=17103&news=Google+Android+OS+Sprint+Samsung+Transform+Sanyo+Zio+ID>. [3.10]

[198] Schedule 6.3. [1.2] Non-U.S. launches where noted.

[199] Apple's Objections and Responses list the "Sidekick."  The only Sidekick phone that appears to be manufactured by Samsung is the Sidekick 4G.  Earlier versions of the Sidekick sold by T-Mobile were primarily manufactured by Sharp.  *See, e.g.,* "T-Mobile's Sidekick 4G by Samsung coming this spring," VentureBeat, March 15, 2011, <http://venturebeat.com/2011/03/15/sidekick-4g-announced/>. [3.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### 3. Tablet   Computers

84.      As shown in the table below, Samsung released its first Galaxy Tab  in November of 2010.  Samsung's tablet launched first through T-Mobile, and shortly thereafter through Verizon and Sprint.[200]  An article heralding the release of the Galaxy Tab noted that the device "delivers access to rich content on a seven-inch  touch screen for a truly mobile entertainment experience."[201]

85.      Samsung's more recent tablet, the Galaxy Tab 10.1, made its debut on June 8, 2011 in New York City. [202]  The device was also available via pre-order on that date and was expected to release across the U.S. on June 17, 2011. [203]  An article written upon the device's release noted that the Galaxy Tab 10.1 was an "extra-slim 10-inch Tegra 2   tablet …"[204]  "Tegra 2" refers to the tablet's dual-core Tegra 2 processor.[205]  The Galaxy Tab 10.1 was released with the Android Honeycomb operating system and included front and rear-facing cameras.[206]

**Figure 21:  Samsung Galaxy Tablet Computer U.S. Launch Dates[207]**

| Product Launch | Date |
|---|---|
| Galaxy Tab 7 (3G) | 11/10/2010 |
| Galaxy Tab 10.1 | 6/8/2011 |

## IV.    Bases for Opinions

86.      The following is a discussion of the bases supporting each of my opinions.

---

[200] "T-Mobile Gets First Dibs on Galaxy Tab: November 10th for $400," Gizmodo, October 27, 2010, <http://gizmodo.com/5674534/t+mobile-gets-first-dibs-on-galaxy-tab-november-10th-for-400>. [3.11]

[201] "T-Mobile Gets First Dibs on Galaxy Tab: November 10th for $400," Gizmodo, October 27, 2010, <http://gizmodo.com/5674534/t+mobile-gets-first-dibs-on-galaxy-tab-november-10th-for-400>. [3.11]

[202] "Samsung Galaxy Tab 10.1 on sale at NYC Best Buy today, pre-orders now open," Engadget, June 8, 2011, <http://www.engadget.com/2011/06/08/samsung-galaxy-tab-10-1-on-sale-at-nyc-best-buy-today-up-for-pr/>. [3.12]

[203] "Samsung Galaxy Tab 10.1 on sale at NYC Best Buy today, pre-orders now open," Engadget, June 8, 2011, <http://www.engadget.com/2011/06/08/samsung-galaxy-tab-10-1-on-sale-at-nyc-best-buy-today-up-for-pr/>. [3.12]

[204] "Samsung Galaxy Tab 10.1 on sale at NYC Best Buy today, pre-orders now open," Engadget, June 8, 2011, <http://www.engadget.com/2011/06/08/samsung-galaxy-tab-10-1-on-sale-at-nyc-best-buy-today-up-for-pr/>. [3.12]

[205] "Samsung Galaxy Tab 10.1 official: Tegra 2, Honeycomb, dual cameras (hands-on with video)," Engadget, February 13, 2011, <http://www.engadget.com/2011/02/13/samsung-galaxy-tab-10-1-official-tegra-2-honeycomb-dual-camer/>. [3.13]

[206] "Samsung Galaxy Tab 10.1 official: Tegra 2, Honeycomb, dual cameras (hands-on with video)," Engadget, February 13, 2011, <http://www.engadget.com/2011/02/13/samsung-galaxy-tab-10-1-official-tegra-2-honeycomb-dual-camer/>. [3.13]

[207] Schedule 6.3. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**A.  Disagreements With the Opinions Expressed By Terry L. Musika**

87.     With respect to Mr. Musika's valuation of the damages suffered by  Apple related to Samsung's alleged infringement, I offer the following opinions.

**1.  Mr. Musika's analysis is a high-level analysis and is largely divorced from the specific intellectual property that is at issue in this lawsuit.**

88.     Mr. Musika's analysis is generally at a very high level and       is not tied to the specific intellectual property at issue in this lawsuit.  This is       most evident in Mr. Musika's discussion of the benefits provided by the Design IP.  Mr. Musika consistently refers to "the importance of design in consumer demand" and the importance of design to Apple. [208]  While I do not disagree that design is important to Apple and that consumers do care about what a product looks like, Mr. Musika's discussion is not properly tied to the value of the limited *specific* Design Patents, Trade Dress, and Trademarks at issue in this lawsuit.

89.     It is conceptually wrong to assume that the limited       number of design patents, trade dress and trademarks of Apple  that is a small subset of all of Apple's design intellectual property contains 100% of the value of Apple's design intellectual property.  It is also incorrect to assign the same value to this limited subset of Apple's design intellectual       property, and assign the same royalty rate, whether one item of this bundle of intellectual property is used or all of it is used by Samsung.

**a)  Mr. Musika fails to provide evidence of demand for the specific design IP at issue.**

90.     Mr. Musika claims that he "identified and documented numerous       examples of demand for each item of Apple Intellectual Property In Suit for which Apple is       seeking a lost profit on Exhibits 24 and 25." [209]  His Exhibit 24 contains numerous citations to documents that he claims "demonstrate the importance of design in consumer demand." [210]  The citations in his Exhibit 24 are general citations to the concept that design is valued.  For  example, Mr. Musika's comment #18 on the Exhibit 24 reads, "The iPhone      is a delight to the eye…"[211]  Or, in his comment #53, Mr. Musika quotes Samsung, "Overall, the iPhone 3GS was rated better than

---

[208] Musika Report, pp. 82-84. [2.2]
[209] Musika Report, p. 38. [2.2]
[210] Musika Report, p. 82, Exhibit 24. [2.2]
[211] Musika Report, p. 82, Exhibit 24, Comment #18. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

other devices in overall design…" [212]   These citations do not provide          any evidence that consumers demand the *specific* teachings of Apple's design-related IP at issue in this lawsuit. In several instances, Mr. Musika just presents a picture of a device (such as    an advertisement showing two fingers picking up the iPad 2 or a back of a phone with          logo) in support of his conclusion.[213]

91.    In addition, Mr. Musika appears to ignore ample evidence presented in the documents cited in Exhibit 24 that there are more important factors than design      that affect consumer demand for smartphones and tablets. For   example, Mr. Musika states in  his Exhibit 24, comment #6 that "[b]etween Q4 2010 and Q4 2011, 44-50% of those surveyed           noted attractive appearance and design as a very important attribute           in the iPhone  purchase decision."[214] However, Mr. Musika does not       mention that the importance of "attractive appearance and design" was consistently rated lower in comparison to the importance            of several other features, including easy to use, service and support, trust Apple brand, quality of apps, battery life, good value for price paid, web capabilities,    the ability to download and use apps, and multitasking.[215]

92.    Similarly, in his comment #7, Mr. Musika points out that   "32% of those surveyed in the U.S. liked the physical appearance and design as a reason that swayed them to purchase iPhone over Android." [216]   However, 41 percent and 34 percent of those surveyed in the U.S., respectively, named trust in Apple brand and a desire to easily transfer music, apps, video, contacts, etc., onto iPhone as reasons for buying iPhone after considering Android.[217]

93.    In his comment #8, Mr. Musika states that "[t]he 7th top      reason for buying an iPhone is for better appearance/design (37%); better appearance/design is        listed 10th top reason for buying an Android-based smartphone (27%)." [218]   However, trust   in Apple brand (56%), latest technology (47%), touchscreen (45%), a large variety of apps (42%), ease of   use (42%) and a desire to stay with current servic e provider (38%) were more  frequently mentioned

---

[212] Musika Report, p. 82, Exhibit 24, Comment #53. [2.2]
[213] Musika Report, Exhibit 24, Comments #13, #14, and #29. [2.2]
[214] Musika Report, Exhibit 24, Comment #6. [2.2]
[215] Schedule 8.3. [1.2] Some of these features were not listed in every quarter, but each feature had a higher percentage of survey respondents rating it as "very important" to their purchase decision when the feature was included in the survey.
[216] Musika Report, Exhibit 24, Comment #7. [2.2]
[217] iPhone Owner Study, May 2011, APLNDC-Y0000025024-147 at '060. [3.16]
[218] Musika Report, Exhibit 24, Comment #8. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

than better appearance and design as reasons for buying an iPhone. [219]  Better appearance and design was the last out of 10 top reasons for purchasing an Android-based smartphone.[220]

94.    According to Mr. Musika's comment #45, "Samsung describes "Design" as a main feature of the Galaxy S II in its internal presentation. [221]  However, Design is just one of the Galaxy S II's features highlighted in the presentation. [222]  Samsung also emphasizes the "ultra vivid and bright" display of the Galaxy S II, its "powerfully       fast" performance and "rich and convenient" content. [223]   In fact, in a section entitled "Main Features" of the Galaxy S II, Samsung dedicates only one slide to the description of the Galaxy S II's design, stating that it is "Slim and Light." [224]   The other 10 slides of this section highlight the Super AMOLED Plus display, Dual Core Application Processor, More Powerful Battery,   Ultrafast Download Speeds, Voice Solution and 4 Hubs capabilities of the Galaxy S II.[225]

**(1)  Apple's recognized design lead indicates that the design-related IP at issue is a small element of the "design" that is consistently referenced by Apple's experts.**

95.    Even after Samsung has allegedly incorporated into its products the design-related IP at issue in this lawsuit, Apple still retains  a widely recognized design advantage over Samsung.  This indicates that the importance of design referred to by Mr. Musika and        other Apple experts has little to nothing to do with the specific design-related IP at issue.

96.    There is ample evidence that Apple's iPhones  and iPads are rated significantly higher in overall design than Samsung's smartphones and tablets, even        after Samsung is accused of infringement of the design-related IP.  In an August 2010 report presenting the findings of Strategy Analytics' User Evaluation of the iPhone 4, Strategy Analytics concluded that participants considered the design of the iPhone 4 to be       very appealing.[226]  Strategy Analytics further detailed that "[p]articipants felt the glass casing of the device made it look very sleek and modern, and was an improvement on        the plastic casing of the 3G and       3GS

---

[219] Smartphone Market Study US, January 2011, APLNDC0001434059-154 at '143-144. [3.17]

[220] Smartphone Market Study US, January 2011, APLNDC0001434059-154 at '144. [3.17]

[221] Musika Report, Exhibit 24, Comment #45. [2.2]

[222] Samsung Galaxy S II Presentation, SAMNDCA10775587-624 at '593. [3.19]

[223] Samsung Galaxy S II Presentation, SAMNDCA10775587-624 at '593. [3.19]

[224] Samsung Galaxy S II Presentation, SAMNDCA10775587-624 at '599. [3.19]

[225] Samsung Galaxy S II Presentation, SAMNDCA10775587-624 at '595-'598, '600-'605. [3.19]

[226] Mobile Device User Evaluation: Apple iPhone 4, Strategy Analytics, August 2010, SAMNDCA00252302-329 at '309. [13.6]

models."[227]   Participants also liked the visual appearance of the stainless steel band around the edge of the device. [228]   The iPhone 4 also received high ratings for all    attributes related to the display, including maximum rating for display resolution.[229]

97.    In   2011   Wireless Mobile Phone studies conducted by J.D. Power and Associates, Apple is ranked significantly above the industry average (at 95 percent confidence level) in smartphone  physical design.[230]   According to the studies, "Apple outperforms all other manufacturers in the Physical Design factor" and "sets the bar for the competition with regard to styling and screen quality." [231]   As shown in Figure 22 below, Apple leads in all   physical design attributes, including the visual appeal of wireless phone, size of display screen, brightness of background display screen lighting, and weight and size of wireless phone.[232]

---

[227] Mobile Device User Evaluation: Apple iPhone 4, Strategy Analytics, August 2010, SAMNDCA00252302-329 at '309. [13.6]

[228] Mobile Device User Evaluation: Apple iPhone 4, Strategy Analytics, August 2010, SAMNDCA00252302-329 at '309. [13.6]

[229] Mobile Device User Evaluation: Apple iPhone 4, Strategy Analytics, August 2010, SAMNDCA00252302-329 at '322. [13.6]

[230] 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume2, J.D. Power and Associates, November 15, 2011, SAMNDCA00282033-088 at '064. [13.7]  *See also* 2011 Wireless Traditional Mobile Phone Satisfaction Study, Pre-Release Presentation V1, J.D. Power and Associates, March, 2011, SAMNDCA10340243-265 at '259 and '261. [13.8]  *See also* 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '372, '378, '382. [13.9]

[231] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '384. [13.9]

[232] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '388. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 22:  Physical Design Attribute Ratings Compared to Average[233]**

### Physical Design Attribute Ratings Compared to Average

| | Industry Average | Apple | HTC | Palm | Samsung | Motorola | RIM BlackBerry | Nokia |
|---|---|---|---|---|---|---|---|---|
| Physical Design Index | 795 | 831 | 808 | 782 | 780 | 777 | 763 | 761 |
| Visual appeal of wireless phone | 8.16 | 8.63 | 8.28 | 7.87 | 7.95 | 7.89 | 7.79 | 7.67 |
| Size of display screen | 7.93 | 8.37 | 8.16 | 7.32 | 7.90 | 8.24 | 7.34 | 7.34 |
| Brightness of background display screen lighting | 8.14 | 8.45 | 8.27 | 8.15 | 7.93 | 8.09 | 7.82 | 7.80 |
| Weight of phone (including battery) | 7.73 | 8.00 | 7.77 | 7.95 | 7.71 | 7.11 | 7.62 | 7.68 |
| Size of wireless phone | 7.75 | 8.01 | 7.88 | 7.80 | 7.47 | 7.43 | 7.57 | 7.55 |

For handsets used for less than 2 years.

▓ = Significantly **ABOVE** Industry Average at 95% Confidence Level (excluding manufacturer).
▓ = Significantly **BELOW** Industry Average at 95% Confidence Level (excluding manufacturer).

98.     CNET's iPhone 4 product review praises the "handset's striking design:"[234]

> With iPhone 4, Apple again shows that       it's  a  powerful  player  in  the smartphone wars. It won't be for everyone, and AT&T remains a sticking point, but the handset's striking design, loaded feature set,  and satisfying performance make it the best iPhone yet.

99.     An  iPhone  4S  press  release emphasizes that "iPhone 4S has the same beautifully thin glass and stainless steel design that millions of customers around the world love…"[235]

100.     In an iPad 2 press release, dated March 2, 2011, Apple features "an  entirely new design [of the iPad 2] that is 33 percent thinner and up to 15 percent lighter than the original iPad…." Steve Jobs is quoted as saying, "While   others have been scrambling to copy the first generation iPad, we're launching iPad 2, which moves the bar far ahead of  the competition and will likely cause them to go back to the drawing boards yet again."[236]

---

[233] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '388. [13.9]

[234] iPhone 4.0 Quick Report & Analysis, June 28, 2010, SAMNDCA00024872-941 at '890. [4.1]

[235] Apple Press Info: Apple Launches iPhone 4S, iOS 5 & iCloud, October 4, 2011, <http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html>, accessed on October 10, 2011. [3.23]

[236] "Apple Launches iPad 2," Apple Inc. Press Release, March 2, 2011, <http://www.apple.com/pr/library/ 2011/03/02Apple-Launches-iPad-2.html>, accessed on April 5, 2012. [3.24]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

101.     The attractive design of Apple's iPad is also discussed in a September 25, 2011 New York Times article: "Apple also has a lead in design that will be tough to surmount. People want to own its products because they are so good-looking." [237]  This article is cited as evidence that "attractive appearance and design is a similarly important driver of iPad purchasing decisions" by Sanjay Sood, one of Apple's experts, who addresses the importance of design. [238] Apparently, Mr. Sood did not realize that this article was written long after Samsung is accused of infringing the design-related IP at issue in this lawsuit.

102.     An Argus Insights white paper on the iPad 2 launch draws the same conclusion, "the iPad family will continue to shine, and Apple will keep the lead on style and design." [239] Recently, in a March 12, 2012 interview with the London Evening Standard, Jonathan Ive, Apple's senior vice president of industrial design, explained Apple's goal as "to design and make better products." [240]  "If we can't make something that is better, we won't do it," he said. [241] Apple also highlights the advanced design of its new iPad on its website, stating that "with its advanced design, breakthrough technology, and amazing built-in apps, iPad changes the way you work." [242]

103.     If Mr. Musika's analysis is correct, one would not expect there to be any design advantage to Apple over Samsung because Samsung has used all of the value of Apple's designs according to his approach.

### (2)  The use of smartphone cases minimizes the importance of the design-related IP

---

[237] David Streitfeld, Amazon Has High Hopes for its iPad Competitor, N.Y. Times, September 25, 2011, <http://www.nytimes.com/2011/09/26/technology/anticipated-amazon-tablet-to-take-aim-at-apple-ipad.html?pagewanted=all>, accessed on April 6, 2012. [3.25]

[238] Expert Report of Sanjay Sood, March 22, 2012, p. 24. [4.7] (Hereafter, "Sood Report")

[239] Argus Insights White Paper: iPad 2 Launch Report - Mapping the Customer Experience Landscape for the Tablet Market, April 5, 2011, SAMNDCA00237364-371 at '370. [4.2]

[240] Sir Jonathan Ive: The iMan cometh, Mark Prigg meets Sir Jonathan Ive, the British man behind the design of Apple's iconic products, London Evening Standard, March 12, 2012, <http://www.thisislondon.co.uk/lifestyle/london-life/sir-jonathan-ive-the-iman-cometh-7562170.html>, accessed on April 6, 2012. [4.3]

[241] Sir Jonathan Ive: The iMan cometh, Mark Prigg meets Sir Jonathan Ive, the British man behind the design of Apple's iconic products, London Evening Standard, March 14, 2012, <http://www.thisislondon.co.uk/lifestyle/london-life/sir-jonathan-ive-the-iman-cometh-7562170.html>, accessed on April 6, 2012. [4.3]

[242] Apple - The new iPad - It's brilliant from the outside in, <http://www.apple.com/ipad/>, accessed on April 6, 2012. [4.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

104.     The majority of iPhone owners prefer to    protect their iPhones from any type of damage and use an iPhone case to reduce this risk.  An iPhone case is the most used iPhone accessory in the U.S.  According to the FY11-Q2 and FY11-Q3 iPhone Buyer Surveys, 71 percent of iPhone owners regularly use cases.[243]

**Figure 23: Accessories Regularly Used**[244]





105.     Any protective iPhone cover would diminish the importance of the iPhone   design because certain design elements related to the shape and appearance of the     iPhone  become covered in an iPhone case.  The fact that 71 percent of iPhone owners       prefer to cover their iPhones in cases is evidence of the lack of value these iPhone owners place on at least some of the specific design elements at issue in this lawsuit.

> **b)   Mr. Musika fails to provide evidence of demand for the specific utility patents at issue.**

---

[243] iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q2, APLNDC0000036266-348 at '345. [7.1]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q3, APLNDC0000036172-265 at '262. [7.2]

[244] iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q2, APLNDC0000036266-348 at '345. [7.1]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q3, APLNDC0000036172-265 at '262. [7.2]

106.    A similar criticism applies to Mr. Musika's analysis   of Apple's utility patents.  In Exhibit 25, Mr. Musika presents citations and quotes from documents            that  he  argues demonstrate the "Demand for Utility Patents." [245]   However, it appears that in his Exhibit 25 Mr. Musika attempts to illustrate the utility of features, not of  functionalities taught by the '381, '915, '163 and '607    Patents.[246] Mr. Musika offers little or no evidence in his Exhibit 25 that consumers demand functionalities enabled by '002, '891 and '129 Patents-in-Suit.[247]

107.    Moreover,  many  of the citations in    Exhibit 25 do not provide evidence that consumers demand the limited   *specific*  functionalities  enabled  by  '381, '915, '163 and '607 Patents-in-Suit.  For example, Mr. Musika references 11 commercials for iPhone, iPad, Galaxy Tab, Galaxy S, and Galaxy S II.  [248]   While I do not disagree with Mr. Musika that scrolling and zooming  functions  are  shown  during  the  commercials,  the commercials generally focus on advertising other functionalities of their products.  That is, the iPhone commercial features email and internet capabilities of the iPhone. [249]  In the iPhone 3G commercial, Apple advertises apps available on the iPhone  3G.[250]  In the commercial for the iPhone 4, Apple highlights the iPhone 4's high resolution screen. [251]  In a series of commercials for the Galaxy Tab and Galaxy Tab 10.1, Samsung emphasizes enhanced portability of the    tablet  under  the  campaign  slogan  of "More Possibilities On The Go." [252]    In addition, in the official global TV-commercial for the Galaxy Tab, Samsung advertises Web Browsing, E-reader,  Navigation and Video Conferencing functionalities.[253]  In the "Time to Tab" commercial for Galaxy Tab 10.1, High Resolution Screen, Dual Core Processor, Web Browsing with Adobe Flash and Multitasking capabilities            are highlighted.[254]  In the Samsung Galaxy Tab commercial "It's Go Time!," Samsung again features

---

[245] Musika Report, Exhibit 25. [2.2]

[246] Musika Report, Exhibit 25. [2.2]

[247] Musika Report, Exhibit 25. [2.2]

[248] Musika Report, Exhibit 25. [2.2]

[249] Musika Report, Exhibit 25, Comment #6. [2.2]  *See also* Exhibit 10 to the Declaration of Sissie Twiggs, Apple Television Commercials 2007-2011 (video).

[250] Musika Report, Exhibit 25, Comment #7. [2.2]  *See also* Exhibit 8 to the Declaration of Sissie Twiggs, Apple Television Commercials 2007-2011 (video).

[251] Musika Report, Exhibit 25, Comment #8. [2.2]  *See also* Exhibit 10 to the Declaration of Sissie Twiggs, Apple Television Commercials 2007-2011 (video).

[252] Musika Report, Exhibit 25, Comments #28, #29, and #33. [2.2]  *See also* Samsung Galaxy Tab Official Commercial, <http://www.youtube.com/watch?v=GHPJdqgsJ9g>.  *See also* Time To Tab – Samsung Galaxy Tab 10.1 Global TV Commercial, <http://www.youtube.com/watch?v=QL8ePbYsdc8>.  *See also* [GALAXY Tab 10.1] Official Demo – HD, <http://www.youtube.com/ watch?v=7tfX3Vlz0nI&feature=related>.

[253] Musika Report, Exhibit 25, Comment #28. [2.2]  *See also* Samsung Galaxy Tab Official Commercial, <http://www.youtube.com/watch?v=GHPJdqgsJ9g>.

[254] Musika Report, Exhibit 25, Comment #29. [2.2]  *See also* Time To Tab – Samsung Galaxy Tab 10.1 Global TV Commercial, <http://www.youtube.com/watch?v=QL8ePbYsdc8>.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

High Resolution Screen, Web Browsing, Navigation with   Google Maps, and Video Calling as well as Samsung Media Hub, Battery Life, and Android apps.  [255]  The Official Demo  for Galaxy Tab 10.1 contains a detailed demonstration of such key features of the tablet as the    Android 3.1. Honeycomb Platform, Google Mobile    Services, Samsung TouchWiz, Web Browsing, Battery Life, and Samsung Media Hub.  [256]  Similarly, in the commercial for the Galaxy S II, Samsung highlights its Super AMOLED Plus display,  TouchWiz, Live Panel, and Web Browsing with Adobe Flash capabilities.  [257]  The commercial for the Samsung    Continuum, a Galaxy S phone, focuses on advertising a second screen ticker tape display.[258]

108.    In his Exhibit 25, comment #5, Mr. Musika points out that "[w]hen    asked what was the most important features that prompted purchase of an iPad, multi-touch was the most important reason for 2% of those surveyed (4%   choose this feature as  second-most important, and 3% choose as third-most important).  [259]  However, multi-touch was    the least  frequently mentioned as the most important feature that prompted iPad's purchase. In contrast, portability (9%),  possibility of using computer less (8%), and Wi-Fi capabilities (5%) were the most frequently cited as the top features for wanting the iPad.[260]

109.    Mr. Musika also cites four press releases that highlight "advanced   touch screen gestures capabilities" of Samsung Fascinate, Epic                    4G,  Mesmerize  and  Captivate smartphones.[261]    But Mr.  Musika does not mention that advanced touch screen gestures capability is only one of many features and specifications  highlighted in the press releases.  For example, in a Samsung Fascinate press release, Samsung                 lists  17  key  features  and specifications of the smartphone, including the Android 2.1 platform, Web browsing capabilities, 3G Mobile HotSpot capabilities, Super AMOLED Screen Technology and others.  [262]  In addition,

---

[255] Musika Report, Exhibit 25, Comment #30. [2.2]  *See also* Introducing the Samsung Galaxy Tab - It's Go Time!, <http://www.youtube.com/watch?v=yGKthibnyTE>.

[256] Musika Report, Exhibit 25, Comment #33. [2.2]  *See also* [GALAXY Tab 10.1] Official Demo – HD, <http://www.youtube.com/watch?v=7tfX3Vlz0nI&feature=related>.

[257] Musika Report, Exhibit 25, Comment #34. [2.2]  *See also* GALAXY S II] Official Live Demo – Media, <http://www.youtube.com/watch?v=XA9IcemwkMk&feature=autoplay&list= PL3F63929F54D9A90A&lf=plpp_video&playnext=1>.

[258] Musika Report, Exhibit 25, Comment #31. [2.2]  *See also* Samsung Continuum – A Galaxy S Phone (Verizon),< http://www.youtube.com/watch?v=KIi32R3yciY>.

[259] Musika Report, Exhibit 25, Comment #5. [2.2]

[260] iPad Buyer Survey: Initial US Results, August 2010, APLNDC-Y0000023361-427 at '387. [3.20]

[261] Musika Report, Exhibit 25, Comments #19, #21, #22 and #23. [2.2]

[262] VZW News Release: Verizon Wireless Announces the Samsung Fascinate, A Galaxy S Smartphone, June 28, 2010, SAMNDCA00312249-251. [3.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Samsung details seven lifestyle features. [263] Overall, the advanced touch screen gestures capability is only one of 24 smartphone features described in the press release.[264]

110.    Further, as I discuss in my analysis of *Georgia-Pacific* factor 9, I understand that Apple did not invent the touchscreen or multitouch capabilities on a touchscreen with its Multitouch-Related Utility Patents. [265] Therefore, Mr. Musika's citations to gestures and touchscreen capabilities are not specific to the benefits provided by the utility patents at issue in this lawsuit.

### 2. Although Mr. Musika claims not to use the entire market value rule, in effect he does.

111.    Mr. Musika's report includes a discussion of the Entire Market Value Rule ("EMVR"), and Mr. Musika concludes that:[266]

> The individual accused smartphone and tablet products of Samsung are comprised of a number of patented and un-patented elements. Accordingly, I have considered the effect of the entire market value of the products and elected to structure my royalty damage on an individual per unit basis and not the total revenue of the accused products. Further, as discussed below, I take steps to apportion the overall royalty rate when considering the total profit contributions of the accused products. As reflected in Exhibit 20, I use the number of accused units sold and not revenue as the basis on which to calculate a royalty for each asserted item of Apple Intellectual Property In Suit.

112.    Apparently, Mr. Musika believes that as long as he expresses his royalty rate opinion as a per unit rate, then he is not using the Entire Market Value rule. However, Mr. Musika is invoking the EMVR throughout his report because he continually bases his damages calculation on the entire profit of Apple's and Samsung's smartphones.

113.    In his lost profits calculation, Mr. Musika uses the incremental profitability of Apple's products in his calculation. However, several of the intellectual property elements for which he is calculating lost profits relate to Apple's operating system, iOS – for example, the '381 Patent and the GUI Design Patents. However, Mr. Musika does not limit his lost profit calculation to the profits that Apple would make on the operating system.

---

[263] VZW News Release: Verizon Wireless Announces the Samsung Fascinate, A Galaxy S Smartphone, June 28, 2010, SAMNDCA00312249-251. [3.21]
[264] VZW News Release: Verizon Wireless Announces the Samsung Fascinate, A Galaxy S Smartphone, June 28, 2010, SAMNDCA00312249-251. [3.21]
[265] Discussion with Brian Von Herzen, April 12, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

114.   In his reasonable royalty analysis, Mr. Musika's primary benchmarks are both based on the profit of the entire device.  Mr. Musika's    cost benchmark calculates the profit of Samsung's entire device for the period that he claims it would take for Samsung to design around the asserted intellectual property.  This measure of damages is clearly not related to the value of the intellectual property – in the extreme case, if Samsung were not able to design around a patent, Mr. Musika's methodology would calculate a royalty of 100%    of Samsung's profits even if the patent had no effect whatsoever on the sales of the accused devices.

115.   Mr. Musika's income approach is similarly reliant   on the entire profits of Apple's and Samsung's smartphones and tablets.  For Apple, Mr. Musika essentially compares the profits of Apple's smartphones and tablets to other Apple products and takes this "economic value" and attributes it to the intellectual property at issue in this lawsuit.  Importantly, one of the last steps in Mr. Musika's income approach is to multiply the percentage rate    by the average selling price of the relevant products in order to express it as a dollar per unit.  Simply converting a percentage rate into a dollar per unit rate does not avoid the use of the EMVR.

116.   Further, If Mr. Musika was not using the entire market value rule then one would expect him to have the same royalty rate for a particular   accused piece of intellectual property regardless of which Samsung accused product used that piece of intellectual property.  However, that is not what Mr. Musika does.  For example, in Exhibit 39.2 the royalty rate for accused tablets is $27.75 for the design patents, trade dress, and trademarks.  In Exhibit 39.1, the royalty rate for the exact same intellectual property is $22.50 for accused smartphones.  The reason for the difference is due to the different profitability of these two different product  groups as calculated on Exhibit 39.4.  This demonstrates that a key element in determining the royalty rates that Mr. Musika uses is the full profitability of the accused products.

### 3.   Mr. Musika does not establish Apple's entitlement to lost profits related to Samsung's infringement of the intellectual property at issue.

117.   Upon proof of infringement, Title 35, Section 284    provides that the Court shall award the plaintiff "damages adequate to compensat e for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. [267]  In assessing damages, courts typically determine whether the plaintiff is entitled to lost profits, and if so, the extent of the plaintiff's    lost profits.

---

[266] Musika Report, pp. 52-53. [2.2]
[267] Title 35, U.S.C.A. §284. [14.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

For those sales that are not compensated through lost profits, a reasonable royalty is typically awarded.

118.    Courts have consistently upheld a "but-for" analysis of lost    profits, determining lost profits damages based on the difference between the profits the plaintiff    actually received and the profits the plaintiff would have received in a reconstructed market absent    infringement. A Federal Circuit opinion in the    *Grain Processing Corp. v. Am    erican Maize-Products Co.* provides a discussion of the assessment of lost profits damages:[268]

> To recover lost profits, the patent owner must    show "causation in fact," establishing that "but  for" the infringement, he would have made additional profits. […] When basing the alleged lost    profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales    "but for" the infringement. […] Once the patent owner establishes   a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's "but for" causation claim] is unreasonable    for some or all of the lost sales.
>
> […]
>
> In Aro Manufacturing, the Supreme Court    stated that  the  statutory measure of "damages" is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his    condition would have been if the infringement had not occurred."   […] The determinative question, the Supreme Court stated, is:   "had  the  Infringer  not  infringed, what would the Patent Holder-Licensee have made?" […]The "but    for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would . . . have made.

119.    A seminal case regarding recovery of lost profits for patent infringement    is Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.  [269]   In Panduit, the court held that in order to recover lost profits, the patentee must prove:

- Demand for the patented product;
- Absence of acceptable, non-infringing substitutes;
- Manufacturing and marketing capability to exploit the demand; and
- The amount of lost profits.[270]

---

[268] *Grain Processing Corporation v. American Maize-Products Company,* CAFC, 185 F.3d 1341, August 4, 1999, p. 6 (citations omitted). [14.3]

[269] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156; 1978 U.S. App. LEXIS 11500; 197 U.S.P.Q. (BNA) 726. U.S. Court of Appeals for the Sixth Circuit, April 25, 1978. [12.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

120.     I address my disagreements with Mr. Musika's analysis   of the first three *Panduit* factors in this section, and my disagreements with Mr. Musika's calculation  of the amount of lost profits in the next section.

### a)   Mr. Musika has not provided sufficient evidence of demand for the intellectual property at issue

121.     To determine whether and to what extent Apple lost sales, an analysis        of the demand for the patented feature is the critical   and economically relevant inquiry.  I understand that a 2009 opinion by the   Federal Circuit in *Depuy Spine et al. v. Medtronic Sofam  or Danek, Inc. et al.* indicates that the first Panduit factor is concerned only   with the patented product and the focus on the patented feature goes to the availability of acceptable non-infringing substitutes under the second Panduit factor. [271]   However, I address the importance of the patented   feature in this Panduit factor because if there is no demand for the feature, it can always be removed.

122.     Mr. Musika calculates lost profits for the '381, 607, '915, and '163 Patents; the Electronic Device Design Patents, and all asserted trade dress. [272]  As I discuss in detail above, Mr.  Musika's  evidence of demand for these intellectual property elements is not tied to the specific intellectual property at issue.  Therefore, Mr. Musika has not satisfied the burden        of providing evidence of demand related to the patented feature.

123.     Further, Mr. Musika has not provided any  evidence that consumers would switch to a different smartphone brand or model based on the presence      or absence of  the accused functionalities   or  design.  Apple submitted two different expert reports that discuss the importance of design to Apple's products      [273]  and a third expert conducted two surveys that attempted "to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue." [274]   None of these experts performed any study to determine whether any customers woul d switch their smartphone purchase  decision if the accused functionality was removed, let alone how many would have switched.

---

[270] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156; 1978 U.S. App. LEXIS 11500; 197 U.S.P.Q. (BNA) 726. U.S. Court of Appeals for the Sixth Circuit, April 25, 1978, p. 2. [12.1]

[271] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* CAFC, 567 F.3d 1314, June 1, 2009, pp. 11-12, 21-22. [14.4]

[272] Musika Report, Exhibit 15. [2.2]

[273] Sood Report, p. 2. [4.7]  *See also* Expert Report of Russell S. Winer, March 22, 2012, p. 2. [4.6]

[274] Hauser Report, p. 6. [2.33]

124.     In his surveys, Mr. Hauser uses conjoint analysis to provide an estimate for the value of certain functionalities.[275]   I understand that a properly constructed conjoint analysis can be used to estimate the effect on market share based on the presence and absence of specific functionalities, but apparently Apple did not ask for Mr. Hauser to perform this type of analysis.

### (1)   Limited Value to Functionalities Enabled by the Patents-in-Suit

125.     I have reviewed iPhone / iPad buyer  surveys commissioned by Apple, Samsung consumer surveys and focus groups, and third-party  smartphone studies.  I found that the most important smartphone / iPhone / iPad functionalities  that drive customer purchase decisions are different  from  those  enabled by the Patents-in-Suit.  I also found that the most wanted smartphone features are different from those enabled by the Patents-in-Suit.  In addition, Apple and Samsung have not made use of the technology enabled by the        Patents-in-Suit  in  their marketing and advertising materials.

#### (a)   *Smartphone / iPhone / iPad / Tablet Consumers' Purchasing Factors*

126.     Apple considers customer preferences and consumer     feedback  and  conducts monthly surveys of iPhone buyers. [276]  In its July and November 2007 reports, Apple concluded that "[t]op  features  leading  to an iPhone purchase include advanced capabilities in a well designed convergent device."[277]  The top reason for purchase of an iPhone 3G was    "the need for a combination music, email and Web device."  [278]  "iPhone buyers want[ed] an  easy  to  use integrated device with Web capabilities," Apple noted in its FY2009-Q1 iPhone 3G        Buyer Survey.[279]  Apple reached the same conclusion in later iPhone buyer studies.[280]

---

[275] Hauser Report, p. 8. [2.33]

[276] iPhone Buyer Survey, APLNDC0001218489-608 at '491. [5.36]

[277] iPhone Early Buyer Wave 1 Final Report, Apple Market Research & Analysis, July 2007, APLNDC-Y0000029092-135 at '095. [3.18]  *See also* iPhone Buyer Wave 2 Final Report, November 2007, Apple Market Research & Analysis, November 2007, APLNDC-Y0000029136-204 at '139. [5.37]

[278] iPhone 3G Buyer Survey, Apple Market Research & Analysis, November 14, 2008, APLNDC-Y0000027600-675 at '608. [5.38]  *See also* iPhone 3G Buyer Survey, Apple Market Research & Analysis, FY09-Q1, APLNDC-Y0000026173-256 at '182. [6.1]

[279] iPhone 3G Buyer Survey, Apple Market Research & Analysis, FY09-Q1, APLNDC-Y0000026173-256 at '181. [6.1]

[280] iPhone 3G Buyer Survey, Apple Market Research & Analysis, FY09-Q2, APLNDC-Y0000026257-347 at '266. [6.2]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY09–Q3, APLNDC-Y0000026348-460 at '352. [6.3]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY09-Q4, APLNDC-Y0000026461-573 at '473-478. [6.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

> By far, iPhone buyers want a mobile phone    that combines email, Web, music, and downloadable games and other applications.[281]

> The desire for a combination device that included phone, music,    email, Web, and games and apps was the main purchase motivator for    a large segment of iPhone buyers.[282]

127.    In a February 2010 iPhone Owner Study, Apple stated that "Internet capabilities and being a combination device (phone, Internet, and iPod) were the most important features or attributes at time   of purchase."[283]  According to surveys fielded during FY2010-Q3, a large proportion of iPhone buyers purchased the iPhone because       they wanted a phone with a combination of features, including music, email, Web, downloaded games and                 other applications.[284]    Apple  noted  that "[t]he most important features in the iPhone purchase decisions are  Web capabilities,  ease  of use and a combination device (phone, iPod, internet, etc.)"[285]    In  FY2010-Q4,   FY2011-Q1, and FY2011-Q2 surveys, Apple found that web capabilities,  ease  of use, and the ability to download and use applications were rated the highest in importance by iPhone buyers in their purchase decisions.  [286]  Similarly, according to surveys fielded during FY2011-Q3, the main reason for purchasing the iPhone in the US was a buyer's desire to have a phone that combines music, email, Web, downloaded games and other applications.[287]   In a May 2011 iPhone Owner Survey, ability to access email and the web, ease of use, and sound quality of phone calls were listed as the most important   iPhone features that influenced consumers' purchase decisions.  [288]   In a November 2011 survey, over one-third of respondents  stated  that  they  purchased an iPhone 4S for such specific features as Siri, 8

---

[281] iPhone 3G Buyer Survey, FY09-Q2, Apple Market Research & Analysis, APLNDC-Y0000026257-347 at '261. [6.2]

[282] iPhone Buyer Survey, FY09–Q3, Apple Market Research & Analysis, APLNDC-Y0000026348-460 at '352. [6.3]  *See also* iPhone Buyer Survey, FY10-Q1, Apple Market Research & Analysis, APLNDC-Y0000026574-868 at '578. [6.5]  *See also* iPhone Buyer Survey, FY10-Q2, Apple Market Research & Analysis, APLNDC-Y0000026687-807 at '691. [6.6]

[283] iPhone Owner Study, Apple Market Research & Analysis, February 2010, APLNDC-Y0000024334-548 at '339 and '353. [6.7]

[284] iPhone Buyer Survey, APLNDC0001218489-608 at '493, '497-505. [5.36]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY10-Q3, APLNDC-Y0000027136-255 at '140, '144-152. [6.8]

[285] iPhone Buyer Survey, APLNDC0001218489-608 at '493, '499-498. [5.36]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY10-Q3, APLNDC-Y0000027136-255 at '140. [6.8]

[286] iPhone Buyer Survey, Apple Market Research & Analysis, FY10-Q4, APLNDC-Y0000027256-340 at '261, '266-'272. [3.14]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q2, APLNDC0000036266-348 at '274, '282-286. [7.1]  *See also* iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q1, APLNDC-Y0000027341-422 at '356-'359. [3.15]

[287] iPhone Buyer Survey, Apple Market Research & Analysis, FY11-Q3, APLNDC0000036172-265 at '183. [7.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

megapixel camera with improved optics, and dual-core A5 chip.[289]   The most important features and attributes in purchase decisions also included ease of use, battery life, and faster download speeds.[290]   Overall, "screen quality, ability to access email and the Web, and combining features and functions are the most important attributes in the smartphone purchase decision," according to a January 2011 US Smartphone Market study commissioned by Apple.[291]

128.   Apple also conducts monthly iPad buyer studies.[292]   In an August 2010 iPad Buyer Survey, Apple noted that the desire to own an iPad was based on such product features as being portable, lightweight, Wi-Fi capable, and easy to use.[293]   "Web browsing, email, ebooks, and apps from the App Store were the main activities that made owners want an iPad."[294]   In July 2010, FY10-Q4, FY11-Q1 iPad Tracking studies, Apple pointed out that "portability, Wi-Fi, and entertainment were key features in prompting [iPad] purchase in the US."[295]   In FY2011-Q2 and FY2011-Q3 studies, Apple analyzed purchase decision making and concluded that "[b]rowsing the web, checking personal email, using apps from the App Store, and reading eBooks were the top planned activities that made owners want an iPad."[296]   In addition, "the iPad's portability, Wi-Fi capabilities, and entertainment potential continued to have the greatest appeal to owners."[297]

---

[288] iPhone Owner Study, May 2011, Apple Market Research & Analysis, May 2011, APLNDC-Y0000025024-147 at '063. [3.16]

[289] iPhone 4S Early Buyer Survey, Apple Market Research & Analysis, November 2011, APLNDC-X0000006506-547 at '511, '531. [7.3]

[290] iPhone 4S Early Buyer Survey, Apple Market Research & Analysis, November 2011, APLNDC-X0000006506-547 at '511, '532. [7.3]

[291] Smartphone Market Study US, Apple Market Research & Analysis, January 2011, APLNDC000143059-154 at '063, '083-'085. [3.17]

[292] iPad Tracking Study, Apple Market Research & Analysis, FY11-Q2, APLNDC0000036349-570 at '351. [7.4]

[293] iPad Buyer Survey, Apple Market Research & Analysis, August 2010, APLNDC-Y0000023361-427 at '384, '386-'387. [3.20]

[294] iPad Buyer Survey, Apple Market Research & Analysis, August 2010, APLNDC-Y0000023361-427 at '388-'389. [3.20]

[295] iPad Tracking Study, July 2010 Report, Apple Market Research & Analysis, September 2010, APLNDC-Y0000023428-578 at '490. [7.5]  See also iPad Tracking Study, FY10-Q4 Report, Apple Market Research & Analysis, October 2010, APLNDC-Y0000023579-729 at '641. [7.6]  See also iPad Tracking Study, FY11-Q1 Report, Apple Market Research & Analysis, February 2011, APLNDC-Y0000023730-907 at '816. [7.7]

[296] iPad Tracking Study, FY11–Q2, Apple Market Research & Analysis, May 2011, APLNDC0000036349-570 at '451. [7.4]  See also iPad Tracking Study, FY11–Q3 Report, Apple Market Research & Analysis, August 2011, APLNDC-Y0000024130-333 at '136. [8.1]

[297] iPad Tracking Study, Apple Market Research & Analysis, FY11 – Q2, APLNDC0000036349-570 at '430. [7.4]  See also iPad Tracking Study, FY11–Q3 Report, Apple Market Research & Analysis, August 2011, APLNDC-Y0000024130-333 at '136. [8.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

129.   Samsung also conducts focus groups and    consumer  preference  studies. According to its 2010 Focus Group Interview, "iPhone   owners place  the  most  importance  on reputation, ability to download application and web browsing   capabilities during the purchasing process; design  and  form factor are also important to these consumers." [298] "Android owners place the most importance on phone's uniqueness and cool factor as well   as operating system during the purchasing process; design and form are also somewhat important to        these consumers," according to a Focus Group Interview report. [299] As reported in an  August 4, 2010 Samsung  study  entitled  "Understanding  the iPad Market," iPad owners named portability, iTunes  compatibility and  screen  size of the iPad as main factors that affected their purchase decisions. [300]

130.   Third party observers also noted a range of reasons for purchasing        a smartphone.  A survey by independent app store   GetJar pointed out that embedded content is an increasingly important factor that influences consumers' decisions to buy a smartphone.     [301] GetJar  stated  that  embedded  content is more important in purchase decisions than price, design and touchscreen capability. [302]

131.   ChangeWave Research surveyed     1,212  consumers  who had purchased a smartphone within the six months prior to November 2, 2010 to explain      why  they  chose  their particular model. [303]   iPhone owners named Features/Functionality, Upgrade and Ease of Use/Reliability as the top three reasons why they purchased their new Apple       smartphone. [304] Features/Functionality, Price/Deals and Android OS were ranked as the top three reasons why buyers chose their new Samsung smartphone. [305]

---

[298] Users Mobiles America 2010, April 15, 2010, SAMNDCA00221819-877 at '851. [8.2]

[299] Users Mobiles America 2010, April 15, 2010, SAMNDCA00221819-877 at '851. [8.2]

[300] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '382. [8.3]

[301] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '486. [8.4]

[302] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '486. [8.4]

[303] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '395, '398. [8.6]

[304] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '399. [8.6]

[305] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '399. [8.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 24:  Reasons for Choosing a Smartphone[306]**





132.    In a January 2011 Smartphone Market Study commissioned by Apple, screen quality and size, email and web, combining features/functions, and the OS were named as the most important features and attributes in the smartphone purchase decision.[307] An August 2011 "Smartphone Purchase Influencers at Retail" study highlights the importance of   screen quality, ease of use, and value for price paid in smartphone purchase decisions.[308]

---

[306] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '399. [8.6]

[307] Smartphone Market Study – US, Apple Market Research & Analysis, January 2011, APLNDC0001434059-154 at '083. [3.17]

[308] Smartphone Purchase Influences at Retail, Apple Market Research & Analysis, August 29, 2011, APLNDC0001793637-702 at '657. [13.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

133.     According to a CEA Webinar entitled "State of Tablet Market," portability was the key reason for tablet purchase. [309] Specifically, size, Android OS, and Flash player capabilities were named as top drivers for purchasing the Galaxy Tab.      [310] Resolve Market Research conducted a study on the impact of the iPad  on other media and entertainment devices. [311]  The results of the study indicated that being "an entertaining   and cool device" was the number one reason to own the iPad. [312]  A YUDU Media report also noted that "entertainment (56%)," "cool factor (42%)," "convenience (40%)" and "Apple brand (28%)" were the top reasons for wanting the iPad. [313] Participants of a User Performance and Satisfaction   study conducted by Strategy Analytics rated "Ease of Use" as the most important feature when considering purchasing a tablet device. [314]  "Portability" was the second most important feature, followed by "Display Quality" and "Display Size."[315]

134.     I have, however, noticed that in a January 2009 Global Mobile Phone      Market study, a touchscreen capability of iPhone was ranked    as the second most important factor in iPhone consideration.[316]  Forty-nine percent of US respondents placed a greater importance on this functionality of iPhone. [317]  At the same time, 18 percent of respondents did not consider purchasing an iPhone because they did not    want a smartphone with a touchscreen.[318]  The NPD group also pointed out in its February 2011 study that "[a]s more and    more devices offer touch screen interface, the appeal of touch screens as    an interest driver for tablets seems to have waned over the last year, but the ability to use tablets without a    desktop surface and the slim design seems to be gaining importance in attracting consumers to these devices."[319]

---

[309] CEA Webinar: "State of Tablet Market," Key Slides & Summary, May 5, 2011, SAMNDCA00237209-223 at '215. [8.7]

[310] Post Launch Consumer Insights Summary, March 2011, SAMNDCA00027737-770 at '768. [8.8]

[311] The Apple iPad Trends and Statistics, YUDU Media, SAMNDCA00184496-514 at '498. [13.10]

[312] The Apple iPad Trends and Statistics, YUDU Media, SAMNDCA00184496-514 at '498. [13.10]

[313] The Apple iPad Trends and Statistics, YUDU Media, SAMNDCA00184496-514 at '499. [13.10]

[314] Tablet Device Evaluation, August 2, 2010, User Experience & Strategic Marketing, Samsung Telecommunications of America, Strategy Analytics, SAMNDCA00250930-988 at '974. [13.11]

[315] Tablet Device Evaluation, August 2, 2010, User Experience & Strategic Marketing, Samsung Telecommunications of America, Strategy Analytics, SAMNDCA00250930-988 at '974. [13.11]

[316] Global Mobile Phone Market Study, Apple Market Research & Analysis, January 2009 (Fielded November 2008), APLNDC0001256422-504 at '487. [8.9]

[317] Global Mobile Phone Market Study, Apple Market Research & Analysis, January 2009 (Fielded November 2008), APLNDC0001256422-504 at '487. [8.9]

[318] Global Mobile Phone Market Study, Apple Market Research & Analysis, January 2009 (Fielded November 2008), APLNDC0001256422-504 at '485. [8.9]

[319] The NPD Group: Apple iPad Owner Study II: An Updated Look Into Tablet Awareness Ownership and Usage, February 2011, APL-ITC796-0000502479-588 at '500. [9.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

135.     According to a Q4 2010 ComTech report, only one percent of iPhone owners purchased iPhone because of its design and color. [320]  In a Q1 2011 ComTech report,     two percent of respondents listed design and color as the reason for   ownership.[321]  Similarly, in an Android Market Overview study commissioned by Apple, only one percent of respondents chose the iPhone for the reason of design and color.[322]

136.     It is also my understanding that the smartphone choice is frequently defined by the service provider. [323]   A January 2011 Smartphone market study suggests that smartphone buyers are likely to limit their smartphone c     hoices to their current service provider.   [324]   Mr. Joswiak also agreed that it is a general rule that "consumers are more likely to stick with their carrier provider than they are to switch."[325]

*(b)  Smartphone and Tablet Desired Features*

137.     "Today's smartphone buyers are more ma  instream adopters of  technology" that "have simple needs," according to an Apple internal survey.  [326]   Apple finds that fast internet access is a "key need" of smartphone buyers, while other needs include a        "good" camera, email, some basic Apps, speed and attractive design.   [327]   In a January    2009  Global  Mobile Phone Market Study commissioned by Apple, camera, email and calendar were named as three top capabilities wanted by US smartphone buyers on their   next phone.[328]  A Consumer Inside Framework study conducted between June and July    2010  points out that consumers desire a

---

[320] Deposition of Jared Gosler, February 22, 2012, p. 112. [8.10]  *See also* ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.23. [8.11]

[321] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 422. [9.3]  *See also* ComTech United States - Report Q111, Apple Market Research & Analysis, May 6, 2011, APLNDC0002831037-088 at '058. [4.10]

[322] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 419-420. [9.3]  *See also* Android Market Overview, Apple Market Research & Analysis, CY10-Q4, APLNDC00004618-736 at '646. [11.23]

[323] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 386. [9.3]

[324] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 384. [9.3]  *See also* Smartphone Market Study US, Apple Market Research & Analysis, January 2011, APLNDC0001434059-154 at '083. [3.17]

[325] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 384-385, 440. [9.3]  *See also* Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 60. [9.2]

[326] Point-of-Sale Influence on Smartphone Buyers, July 2011, Apple Market Research & Analysis, July 2011, APLNDC-Y0000025232-304 at '240, '242. [9.5]

[327] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 366. [9.3]  *See also* Point-of-Sale Influence on Smartphone Buyers, July 2011, Apple Market Research & Analysis, July 2011, APLNDC-Y0000025232-304 at '243. [9.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

mobile device with reliable performance (such as memory, processor and battery) and network service, multitasking, most up to date technology (3D, video, photo), and compatibility across devices and services.[329]

138.    Business  users  rated  Ease of Operation as the most important feature of the smartphone, according to J.D. Power and Associates.  [330]  Other smartphone features that   are important to users include Operating System,    Physical  Design, Handset Features and Battery Life.[331]  In particular, customers are more reluctant to let the battery on their phone run out than they would be on other devices, since this would leave them with no form of communication.[332]

**Figure 25:  Smartphone Features Important to Business Uses[333]**



139.    Similarly, a 2010 comScore study found that Ease of Use and Length of Battery Life are most wanted smartphone features.  [334]  New smartphone owners  [335] also ranked Applications, Ease of Use and Internet Access as the most loved features of a smartphone.[336]

---

[328] Global Mobile Phone Market Study - 12 Country Omnibus Study, Apple Market Research & Analysis, January 2009, APLNDC0001256422-504 at '480. [8.9]

[329] CIF US Results Report Final, July 23, 2010, Iconmobile Group, SAMNDCA00225505-611 at '507, '531, '549, '561, '576. [9.6]

[330] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5083. [8.5]

[331] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5183. [8.5]

[332] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '741. [9.4]

[333] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5183. [8.5]

[334] comScore, Using Consumer Insights to Cover Opportunities in Next Generation Mobile Devices, Donovan Mark, CES 2010, SAMNDCA00230720-761 at '756. [9.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 26:  Most Loved Smartphone Features, May 2010[337]**



140.    In  November  2010,  ChangeWave Research queried smartphone buyers on the specific feature they liked best about their smartphones. [338]  Ease of Use was  the top thing new owners liked most about their smartphones, followed by Applications and Screen.[339]

---

[335] New smartphone owners are defined as customers that purchased a smartphone within 6 months prior to May 2010, Samsung Lovemark Mobile & Web Research, June 23, 2010, SAMNDCA00207695-765 at '732. [9.8]

[336] New smartphone owners are defined as customers that purchased a smartphone within 6 months prior to May 2010. Samsung Lovemark Mobile & Web Research, June 23, 2010, SAMNDCA00207695-765 at '736. [9.8]

[337] New smartphone owners are defined as customers that purchased a smartphone within 6 months prior to May 2010, Samsung Lovemark Mobile & Web Research, June 23, 2010, SAMNDCA00207695-765 at '736. [9.8]

[338] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '397. [8.6]

[339] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '397. [8.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 27:  Best Feature of a Smartphone[340]**



141.    Consumers  increasingly  value handsets that can perform more complicated processes.[341]  According to ABI Research, a mobile handset has become an    extension of the user's home computer. [342]   For example, the App store can be accessed from iTunes from a Mac/PC, an iPod and an iPhone.  According to System Concepts, iTunes has played a  key role in the success of the iPhone. [343]   According to the study, iTunes has made the iPhone familiar and easy to use. [344]   According to a Smartphone Market Opportunity Study conducted by Ipsos Marketing, larger screen, multitasking, and portability are named as the most preferred features of a smartphone.[345]

142.    Smartphone users also utilize faster speeds to use more services, such as video calls, web, streaming,  VoIP,  etc.[346]  System Concepts predicts that 4G services may become

---

[340] ChangeWave Research: Consumer New Smart Phone Owners Survey, November 4, 2010, SAMNDCA00235395-419 at '397. [8.6]

[341] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5063. [8.5]

[342] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5063. [8.5]

[343] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '742. [9.4]

[344] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '742. [9.4]

[345] Smartphone Market Opportunity Study Final Report, April 2011, Prepared for Samsung Electronics, SAMNDCA00226589-816 at '697. [9.9]

[346] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '745. [9.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

standard within the next few years. [347]  Smartphone customers also expect  Wi-Fi as a standard capability of a smartphone.[348]

143.    According to a 2010 Focus Group Interview  conducted by Samsung, smartphone users consider Web Browsers to be   critical features because they provide a sense of security and instantaneous access to the world.    [349]  The GPS feature is extremely        important  to smartphone users in the car.[350]  Taking Pictures is considered to be of high importance to users who like to take pictures on the go and send them to their family and friends instantaneously.[351]

144.    A study by Kelsey Group also shows an increase in mobile search activities such as downloading or looking at maps/directions, searching the internet for products and   services, finding  information  about  movies  and other entertainment, and connecting to a social network (Facebook/MySpace) in the past years. [352]  Similarly, according to IBM research, an increasing number of users are researching products they plan to purchase through the mobile web.[353]

145.    A 2011 Wireless Smartphone Satisfaction Study conducted by J.D. Power and Associates  finds  that the top smartphone features desired on owners' future device include memory expansion, push-to-talk capability, touch screens and voice recognition. [354]   According to the study, Apple smartphone users are most interested in further developing their handset's ability to capture and record video and have memory expansion options.[355]

146.    When  asked  about  their top-three favorite features, iPad owners pointed to portability, Wi-Fi connectivity and the ability to surf the web, as found in a February     2011 NPD Group survey. [356]    iPad  owners who purchased the device for themselves appear more

---

[347] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '745. [9.4]

[348] Top Trends for the Next Year and Beyond, System Concepts, 2009 Mobile UX Forecast, SAMNDCA00214739-745 at '745. [9.4]

[349] Users Mobiles America 2010, April 15, 2010, SAMNDCA00221819-877 at '827-828, '840. [8.2]

[350] Users Mobiles America 2010, April 15, 2010, SAMNDCA00221819-877 at '840. [8.2]

[351] Users Mobiles America 2010, April 15, 2010, SAMNDCA00221819-877 at '840. [8.2]

[352] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5060. [8.5]

[353] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5068. [8.5]

[354] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360 and '366. [13.9]

[355] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360 and '367. [13.9]

[356] The NPD Group: Apple iPad Owner Study II: An Updated Look Into Tablet Awareness Ownership and Usage, February 2011, APL-ITC796-0000502479-588 at '489 and '518. [9.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

enthusiastic about Wi-Fi connectivity, ability to surf the web, 3G connectivity and the ability     to watch movies.  Those who received their device as a gift are more likely to rate portability, overall size, ability to read eBooks and the ability to play music.[357]

### (c)   Lack of Patents' Use for Overall Marketing Objectives

147.    As is evidenced in the paragraphs below, Apple and Samsung have made little or no use of the technology enabled by the     Patents-in-Suit in their marketing and advertising materials.

148.    Apple's iPhone 3G and 3GS advertising campaigns focused on applications that fulfill various lifestyles and interests.  Apple realized the importance of applications to iPhone users and highlighted the quality and range of apps available on the iPhone in newspapers   and magazines.[358]  In particular, the iPhone 3GS magazine advertising reads:[359]

> The  iPhone  3GS. With amazing new features like video recording and voice control, plus over 50,000 apps on the App Store. It's the fastest, most powerful iPhone yet.

149.    Apple  specifically  rolled out several newspaper ads showing new apps and explaining how these apps make the   user's life easier.[360]  Apple emphasized that the iPhone has all kinds of apps, including apps for specific genres and     interests.[361]  For example, Apple suggested that iPhone 3GS users make Mother's Day special by  using apps.  The iPhone 3GS ad reads, "From picking the perfect bouquet to booking a spa treatment, there are all kinds of apps on the App Store to help make Mother's Day special this year."[362]

150.    Stephanie Chen, Account Director at Media Arts Lab, testified that the iPhone 3G sustaining campaign [363] "was based around     apps."[364]  "[T]he whole idea was around, like,

---

[357] The NPD Group: Apple iPad Owner Study II: An Updated Look Into Tablet Awareness Ownership and Usage, February 2011, APL-ITC796-0000502479-588 at '547. [9.1]

[358] iPhone Advertising Overview: US Market, APLNDC0001324059-066 at '061-062. [9.10]

[359] iPhone 3GS, APLNDC0001324015. [9.11]

[360] iPhone Advertising Overview: US Market, APLNDC0001324059-066 at '065. [9.10]  *See also* Introducing 16 apps that need no introduction, APLNDC0001323952. [9.12]  *See also* Taking the work out of summer vacation, one app at a time. APLNDC0001324014. [9.13]

[361] iPhone Advertising Overview: US Market, APLNDC0001324059-066 at '065. [9.10]  *See also* Demos – Groceries, APLNDC0001324010. [9.14]  *See also* Show mom she's app-reciated, APLNDC0001323981. [9.15]

[362] Show mom she's app-reciated, APLNDC0001323981. [9.15]

[363] Deposition of Stephanie Chen, March 8, 2012, p. 118. [12.24]

[364] Deposition of Stephanie Chen, March 8, 2012, pp. 21, 28, 121. [12.24]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

'There's an app for that.'  That's where we kind of coined the term or the slogan for it.  And so a lot of it was just showing the breadth of what apps could do on the phone," Ms. Chen stated in her deposition.[365]   The focus of the sustaining advertising for the iPhone 3GS was on more apps.[366]  Ms. Chen explained that Apple "moved on to featuring six apps in one spot."[367]

151.    Apple also dedicated the largest portion of its TV spending to the "There's an App for that" campaign. [368]  According to Samsung, Apple spent $286 million advertising apps available on the iPhone 3G and 3GS.[369]

152.    Apple's advertising campaign for iPhone 4 focused on the FaceTime video calling feature.[370]  The iPhone 4 magazine ad's tagline is "Introducing FaceTime video calling. Smile."   Apple also highlighted Retina Display, Multitasking and HD Video Recording functionalities of iPhone 4 on its website. [371]  Ms. Chen testified that the retina screen, battery and HD video editing were emphasized in Apple advertising for the iPhone 4.[372]

153.    Later, the iPhone 4S advertising campaign featured iPhone 4S's advanced voice recognition technology.[373]  Apple marketed its iPhone 4S as "a phone that can does (sic) almost all things just by voice activation." [374]  The iPhone 4S magazine ad's tagline reads, "You speak. Siri helps. Say hello to the most amazing iPhone yet."[375]

154.    "Despite the myriad of functionality packaged in the iPad, Apple has made the Internet experience the heading feature [of iPad]," according to     an August 4, 2010 Samsung

---

[365] Deposition of Stephanie Chen, March 8, 2012, p. 121. [12.24]

[366] Deposition of Stephanie Chen, March 8, 2012, p. 123. [12.24]

[367] Deposition of Stephanie Chen, March 8, 2012, p. 123. [12.24]

[368] Apple iPhone TV Spending by Marketing Message, December 1, 2011, SAMNDCA00235640-643 at '641. [9.16]

[369] Apple iPhone TV Spending by Marketing Message, December 1, 2011, SAMNDCA00235640-643 at '643. [9.16]

[370] iPhone 4 - Introducing FaceTime video calling. Smile., APLNDC-X0000007673. [9.17]

[371] Apple - iPhone 4 - Video Calls, Multitasking, HD Video, and More, <http://www.apple.com/iphone/>, accessed on July 27, 2011, APLNDC0001218644-645 at '645. [9.18]

[372] Deposition of Stephanie Chen, March 8, 2012, p. 125. [12.24]

[373] "Where's the nearest gas station?" APLNDC-X0000007735. [9.19]  See also "Will I need an umbrella this weekend?" APLNDC-X0000007736. [9.20]  See also "I feel like sushi," APLNDC-X0000007737. [9.21]

[374] Competitor Marketing Communication Analysis, October 2011, SAMNDCA00228621-742 at '624. [12.25]

[375] "Where's the nearest gas station?" APLNDC-X0000007735. [9.19]  See also "Will I need an umbrella this weekend?" APLNDC-X0000007736. [9.20]  See also "I feel like sushi," APLNDC-X0000007737. [9.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

study entitled "Understanding the iPad Market."[376] Apple spent significant time giving a simple demonstration of browsing the web on the iPad when it was introduced in January 2010. [377] As stated in the Samsung study, "Apple's focus on this may indicate its recognition of web browsing as a common element that all  users of the iPad will take advantage of, regardless of other interests."[378] Apple realized that marketing with a focus on the internet  experience may attract a wide variety of consumers, as this functionality will appeal to nearly all buyers.[379]

155.    In addition, Apple headlined iPad as "[a]mazingly thin and light" on its  website.[380] Advanced Design, Great Built-in Applications, iOS and iCloud were listed as the key  features of iPad.[381]

156.    Samsung has also launched various print ads and TV campaigns for its products. Samsung Galaxy Tab 10.1 banners and posters highlighted Clear Readability, Rich Apps Experience, Fast Web Browsing and Crisp Resolutions as key features of  the tablet.[382]  A September 2011 Galaxy Tab 10.1 print ad marketed the following features of the tablet:[383]

> Amazingly thin, fast and light. With Android 3.1, Honeycomb and Adobe
> Flash Player. It's the tablet that's changing the tablet.

157.    Similarly, an August 2011 TV commercial for Galaxy Tab pointed out as its benefits that it is "thinner, lighter, faster," and provides an access to millions of web videos with Adobe flash:[384]

> People, it's time for better tablet. It's time to tab. Time for sharper pictures
> and better details. Access to millions more web videos with Adobe flash.
> And better, easier and multi-tasking. The thinner, lighter, faster. Samsung
> GALAXY Tab. That's the wonder of Samsung.

158.    Jared Gosler, Cross Functional Producer at Apple, testified that Apple  does not specifically market the "bounceback" functionality and control strip feature to consumers of the

---

[376] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '382. [8.3]
[377] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '391. [8.3]
[378] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '391. [8.3]
[379] Understanding the iPad Market, Samsung, August 4, 2010, SAMNDCA00234369-405 at '394. [8.3]
[380] Apple – iPad, Amazingly thin and light, APLNDC0001322822. [9.22]
[381] Apple – iPad, Amazingly thin and light, APLNDC0001322822. [9.22]
[382] Galaxy Tab Launch in Best Buy on June 8th, Samsung Electronics America, Consumer Business Division, June 2, 2011, SAMNDCA00027416-429 at '426. [9.23]
[383] Competitor Marketing Communication Analysis, August – September 2011, SAMNDCA00228434-609 at '592. [10.1]
[384] Competitor Marketing Communication Analysis, August – September 2011, SAMNDCA00228434-609 at '590. [10.1]

iPad.[385] Mr. Gosler also was not aware of any research studies        reflecting on whether consumers purchase the iPad because of its "bounceback" and tap-to-zoom      functionalities or the control strip feature.[386]

159.   Eric Jue, Product Line Manager for the iPod at Apple, also admitted that Apple chose not to market the "bounceback" functionality in its advertising campaigns. [387] He stated in his deposition:[388]

>A: So there's a user interface feature when you're scrolling through a   list, and you get to the bottom of a list, and if you drag your finger up       the screen, the -- the user interface pulls up, and if you       let go, it bounces back, and it's a visual cue that you're at the end of something. It's a very useful user interface implementation that I don't believe exists      on any other device. And it's an Apple first, but you wouldn't base an ad that you would run at the Super Bowl on that.
>
>Q: Why not?
>
>A: Because it's not the type of thing  that makes for great mass market TV ads.
>
>Q:Why?
>
>A: I just don't think don't think something like that is -- is a feature that makes sense for that -- that type of medium. [389]
>
>…
>
>A: …it's not a feature that you need to –we felt that we needed to market. [390]
>
>…
>
>A: It wasn't something we felt we had to blast around the TV. [391]

160.   Mr. Jue also testified that Apple has   not ever specifically marketed the control strip and volume display features of the iPhone to its consumers. [392] Mr. Jue was not aware of any  market  research  that  suggesting  consumers purchase the iPhone because of the

[385] Deposition of Jared Gosler, February 22, 2012, pp. 27, 87, 90. [8.10]
[386] Deposition of Jared Gosler, February 22, 2012, pp. 89, 91. [8.10]
[387] Deposition of Eric Jue, February 24, 2012, pp. 45-51. [11.20]
[388] Deposition of Eric Jue, February 24, 2012, pp. 18, 45. [11.20]
[389] Deposition of Eric Jue, February 24, 2012, pp. 18, 45. [11.20]
[390] Deposition of Eric Jue, February 24, 2012, pp. 48-49. [11.20]
[391] Deposition of Eric Jue, February 24, 2012, p. 51. [11.20]
[392] Deposition of Eric Jue, February 24, 2012, pp. 87-88, 91-92. [11.20]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

"bounceback," control strip, volume display and tap to zoom features; or any individual     iPhone icon that appears on the iPhone.[393]

161.   Mr. Musika appears not to have considered these facts in arriving at his damages conclusions.

### b)   Samsung has acceptable, non-infringing alternatives available for the asserted intellectual property.

162.   This Panduit factor asks whether or not acceptable, non-infringing substitutes for the patented invention existed during the period of infringement.  The Grain Processing     court discusses the importance of considering non-infringing alternatives:[394]

> Reconstructing the market, by definition a        hypothetical  enterprise, requires  the  patentee  to  project economic results that did not occur. To prevent the hypothetical from lapsing into pure        speculation,  this  court requires  sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.        […] Within this framework, trial courts, wi th this court's approval, consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly to recover lost profits in a wide variety of forms. […]  In sum, courts have given patentees significant latitude to prove and recover lost  profits  for  a wide variety of foreseeable economic effects of the infringement.

> By  the same token, a fair and accurate reconstruction of the "but for" market  also must take into account, where relevant, alternative actions the  infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether.   The competitor in the "but for" marketplace is hardly likely to surrender        its  complete market  share when faced with a patent, if it can compete in some other lawful manner.  Moreover, only by comparing the patented invention to its next-best available alternative(s) - regardless of whether the alternative(s) were actually produced and sold during the infringement - can     the court discern  the  market  value of the patent owner's exclusive right, and therefore his expected profit or reward,    had  the  infringer's activities not prevented him from taking full economic advantage of this right. […] Thus, an accurate reconstruction of the hypothetical "but for" market   takes into account any alternatives available to the infringer.

---

[393] Deposition of Eric Jue, February 24, 2012, pp. 108-110. [11.20]

[394] *Grain Processing Corporation v. American Maize-Products Company*, CAFC, 185 F.3d 1341, August 4, 1999, p. 7 (citations omitted). [14.3]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

163.    Mr. Musika concluded in his report that "non-infringing substitutes did exist in some periods."[395]  Mr. Musika reports in his Exhibit 20 the amount of time that he has concluded it would take for Samsung to return to the   market with a non-infringing alternative: 1 month for the '163 and '381 Patents; 6 months for the '915 Patent; 8 months for the Electronic Device Design Patents and all trade dress; and for the '607 Patent, Mr. Musika concludes that Samsung would have a design around available after   December 31, 2010 for the tablets with screens of 8 inches or less, but that Samsung does not have    a design around for tablets with screens of 10 inches or larger.[396]

164.    I and my staff have had discussions with Samsung engineers and Samsung's technical experts for the utility patents, and my understanding of the technology and  Samsung's design around alternative for each utility patent is summarized in Georgia-Pacific factor 9.  The only patents for which Samsung would not have an acceptable design around alternative available within one month of the initial infringement are the '607 and '129 Patents.  Therefore, as described below, I consider lost profits for these patents for a     limited period of time while Samsung develops its non-infringing alternative.

165.    For all other utility patents, the acceptable, available design   arounds that would generally take between two to four weeks to design lead me to conclude that Apple is not entitled to lost profits on these utility patents.  Samsung generally announces its products several weeks prior to the first sale of the products. This would trigger              the hypothetical negotiation as the announcing of its products would constitute an offer to sell the allegedly infringing products and give Apple notice of Samsung's intent to bring these products to market.

166.    Even if consumers were forced to wait a couple weeks in the "but-for" world versus when products were actually first sold, I conclude that Apple would      not have sold any additional products related to this delay.  I note that this conclusion may     appear different than my conclusion discussed below that Apple would not have made additional sales   due to a lack of capacity, even if that capacity constraint would have  only shifted the potential sale date by a few weeks.  The reason for the apparent difference is that in the case of Samsung's sales, I am analyzing a group of customers that *affirmatively* selected the accused product as their phone of choice, and therefore I conclude that the consumer would have made the same selection even if it was delayed by a couple weeks.  However, in the analysis of whether  Apple could have made

---

[395] Musika Report, p. 39. [2.2]
[396] Musika Report, Exhibit 20. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

additional sales, I am analyzing a group of customers that *affirmatively* selected to NOT purchase an iPhone. I therefore conclude that the consumer would have made the same selection to NOT purchase an iPhone if the customer would be forced to wait a couple weeks.

167. As discussed in *Georgia-Pacific* factor 9, Samsung also has acceptable, non-infringing alternatives to every asserted design IP. This is evidenced by the accused products themselves given a) each asserted design IP element is not asserted against several smartphones within the accused product set, b) Samsung's smartphones that are not accused in this lawsuit, and c) smartphones that are sold by other carriers that have not been accused of infringement of Apple's design IP.

168. As admitted by Mr. Musika, [397] when Samsung has an acceptable, non-infringing alternative, Samsung's redesigned products would enjoy the same sales as the earlier products that Samsung actually sold in the market. Therefore, Apple is not entitled to lost profits during the periods that Samsung has a non-infringing alternative available to it.

### c) Mr. Musika has not proven that Apple has sufficient capacity for all time periods.

169. As part of his lost profits analysis, Mr. Musika evaluated "Apple's ability to handle the excess demand created by the need to supply iPhones and iPads in the 'but-for' market ..."[398] This analysis provides a crucial stepping stone for a lost profits calculation because without the capacity to manufacture, supply, and sell more units in the "but for" world, a plaintiff could not claim that it suffered lost profits due to the alleged infringement. While Mr. Musika's analysis, documented in Exhibits 26 (smartphones) and 27 (tablets) to his report, attempts to quantify Apple's ability to handle excess demand, his assumptions lead to an unreliable and overstated result.

170. The first assumption that Mr. Musika made in his analysis is that any fabricated iPhone or iPad is available for purchase by a U.S. consumer. Exhibits 15 and 16 to the Mark Buckley deposition, the documents on which Mr. Musika's capacity analysis is based,[399] appear to show Worldwide rather than U.S. supply and sales data.[400] This means that while Apple may

---

[397] Musika Report, p. 40. [2.2]
[398] Musika Report, p. 40. [2.2]
[399] Musika Report, Exhibit 26. [2.2]
[400] With respect to the iPad and Buckley Exhibit 15, see Deposition of Mark Buckley, February 23, 2012, pp. 186, 188, 193, 200. [5.2]  With respect to the iPhone, a comparison between the section titled

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

have had excess installed capacity during any given quarter, not all of this capacity could have been used to build devices that would have worked in the U.S. on a U.S. network.[401]

171.    In addition to the incompatibility issues    described above, Mr. Musika also assumed that the many iPhone variants, that is iPhones and iPads    that are different colors or have different storage capacities, are perfect substitutes.  This assumption implies, for example, that an 8GB iPhone 4 and a 32GB iPhone 4 are interchangeable    in the eyes of the consumer; that one can fill demand for the other.  This assumption is questionable, if only due to the price difference in the devices with different storage capacities.[402]

172.    Mr. Tony Blevins, Apple's Vice President of Procurement, discussed this concept during his deposition with respect to the iPad 2:[403]

> Q. So from early March of 2011 until late July of 2011, did Apple have any excess supply of the iPad 2?
>
> A. We would potentially have had some.
>
> Q. Why wouldn't you have used that excess supply    to meet the demand for the iPad 2?
>
> A. Because there are multiple SKUs,    and you don't necessarily have exactly the right SKU the customers want to buy at the time they    want to buy it.
>
> Q. So can you give me an example of  that situation with respect to some actual versions of the iPad 2?
>
> A. An example would be that we may have built 64 gigabyte        black versions where consumers actually want 16 gigabyte white.  So        in aggregate, we could be short, but a specific SKU, we could have excess.

---

"Units Sold In - Cumulative" of Buckley Exhibit 16 and Apple's SEC filings indicates that Exhibit 16 shows Worldwide data.  For example, Exhibit 16 indicates that Apple sold 8,398,000 iPhone units in Q3 of FY2010 (calculated by subtracting the Q2 cumulative value from the Q3 cumulative value).  Apple's 10Q filing for the same period also shows 8,398,000 units sold.  See Exhibit 16 to Buckley Deposition, iPhone Supply and Sales: 2010 – 2011: K Units, APLNDC-Y0000055417. [5.3]  *See also* Apple Form 10Q for the Quarter Ending June 26, 2010, p. 35. [5.4]

[401] During his deposition, Mr. Buckley said that Apple manufactures iPads "for the world there, and [it] has the ability to pretty easily switch from building a product for a U.S. market or a French market or a German market.  That's not a big effort to do."  However, Mr. Buckley did not describe in detail the work required or how long such modifications would take.

[402] For examples of the price difference in certain iPhone and iPad products, see Apple Inc. iPhone US Carrier & Reseller Pricing, February 17, 2012, APLNDC-Y0000051622. [5.5]  *See also* US Price List, APLNDC-Y0000051621. [5.6]

[403] Deposition of Tony Blevins, April 3, 2012, pp. 23-24. [5.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

173.    Mr. Musika's analysis further assumed that different iPhone and iPad models would have been interchangeable. For example,    Mr. Musika's analysis combined "Ending Potential Inventory" of the iPhone 3GS with "Ending Potential Inventory" of the iPhone 4    in Apple's fiscal Q3, 2010 through fiscal Q1, 2012 and then    assumed that that combined excess inventory would have filled the hypothetical increase in sales in the "but for" world.    [404]   Mr. Musika made the same assumption with respect to the iPad and iPad 2 in fiscal Q2, 2011 through fiscal Q1, 2012.  [405]  However, if unable to purchase a Samsung product, a    customer would not likely have seen older Apple phone or tablet models as interchangeable.

174.    In addition to the problems described above, Mr. Musika's capacity analysis did not take into account that in February, 2011 Apple released the iPhone 4 on Verizon's network in addition to the device that was already available on AT&T's network.    [406]  Since he did   not make  this  distinction, his analysis implicitly assumed that an iPhone 4 running on AT&T's network was a perfect substitute for Verizon's iPhone 4.  This assumption is questionable; as discussed in Section IV.A.4.c), customers often show strong preferences for a particular carrier over another.  Mr. Musika's capacity analysis does not make any effort to control for this effect.

175.    Notwithstanding the oversights elucidated above, Mr.    Musika concluded that "Apple  demonstrated  its  ability to have capacity to accommodate additional units …"    [407] However, as evidenced above, Mr. Musika's analysis is high-level and not specific enough to draw strong conclusions.  In fact, there is    overwhelming evidence, provided by both public documentation as well as Apple's own analyses, that Apple did suffer real supply constraints, despite the availability of Samsung's accused products, with respect to its iPhone and iPad line of products.  The following analysis focuses on the iPhone 4 and iPad    2, the Apple products most temporally relevant to Samsung's accused products.

### (a) iPhone  4

176.    On June 29, 2010, five days following the June 24 launch of the iPhone    4,[408] market research  firm  iSuppli stated that "Apple Inc.'s difficulties in satisfying the massive demand for the iPhone 4 [were] raising questi    ons about the company's management    of the

---

[404] Musika Report, Exhibits 17.2 and 26. [2.2]
[405] Musika Report, Exhibits 17.2 and 27. [2.2]
[406] Musika Report, p. 13. [2.2]
[407] Musika Report, p. 41. [2.2]
[408] "Preparing for iPhone 4 Launch Day (FAQ)," CNET, June 23, 2010, <http://news.cnet.com/8301-30686_3-20008509-266.html>. [5.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

supply chain and prompting frustrated customer s to consider competitors' smart phones …"[409] iSuppli observed that "[t]he huge early demand for the iPhone 4 … has come at some cost to Apple," noting that with 600,000 pre-orders on the first day of availability, "the Apple Store and partner carrier AT&T Inc. very quickly becam e overwhelmed, prompting both to stop taking orders just one day after the pre-order was available."[410] Notably, this shortage prompted an apology by the late CEO Steve Jobs.[411]

177.    A senior analyst at iSuppli was quoted as saying that "[c]onsumers, questioning Apple's supply chain management capability, have    started looking for alternative devices."[412] Though,  as pointed out by iSuppli, "the ambitious    plans of Apple's competitors – and even Apple's own stumbles in delivering its much heralded product – probably    pose no deterrent to hordes of devoted Apple fans aching to get their hands on the next available iPhone 4."[413]  Still, "the moves from a battle-weary – yet determined – competition to step up its game [were] all too real and could pose a real risk to Apple."[414]

178.

[415]

---

[409] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[410] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[411] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[412] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[413] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[414] "Apple's iPhone 4 Delivery Difficulties in Might Open Up Company to Risk," iSuppli, June 29, 2010, <http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Apples-iPhone-4-Delivery-Difficulties-in-Might-Open-Up-Company-to-Risk.aspx>. [5.12]

[415] Worldwide iPhone Q3'10 Performance Summary, July 7, 2010, APL7940000082356-378 at '358. [5.20]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



179.

180.

---

[416] Worldwide iPhone Q3'10 Performance Summary, July 7, 2010, APL7940000082356-378 at '358. [5.20]

[417] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '493. [5.21]

[418] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '493. [5.21]

[419] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '495. [5.21]

[420] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

[421] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

[422] Worldwide iPhone Q4'10 Performance Summary, October 6, 2010, APL7940001120491-512 at '499. [5.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



181.    In light of Apple's iPhone 4 supply challenges, Peter Oppenheimer, Apple's CFO, reflected on these constraints during the introductory remarks of Apple's Q1 2011 earnings call held on January 18, 2011.  Notably, Mr. Oppenheimer stated that, at the        time,  Apple "continue[d] to have a sizable backlog, and believe[d] [it] could have sold even more iPhones if [it] had been able to supply them." [426]  These remarks came more    than six months after the iPhone 4's release, indicating multiple months during which Apple was unable to meet demand for this device.

182.    During the same earnings call, Tim Cook, Apple's COO at the time, noted that what Apple had been able to do with regard to the supply of its iPhone was "not enough." [427] Apple "still [had] a significant backlog" and was "working around-the-clock to build more" iPhones.[428]  Foreshadowing the success of the Verizon iPhone 4, Mr. Cook said that he was

[423] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

[424] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

[425] Worldwide iPhone Q1'11 Performance Summary, January 5, 2011, APL7940000102312-332 at '320. [5.23]

[426] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[427] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[428] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

"not going to predict when supply and demand [would] meet" because Apple "believe[d] the reaction and results from the Verizon customers [would] be huge …"[429] Mr. Cook's statement proved correct; fewer than 24 hours after it was released for preorder on February 3, 2011, Verizon ceased taking such orders for its version of the iPhone 4.[430]

### (b) iPad 2

183.    Apple released its second generation iPad on March 11, 2011 both online and via retail stores.[431] Just four days later on March 15, 2011, reports indicated that the shipping delay for new orders had reached four to five weeks.[432] One analyst, Brian Marshall of Gleacher & Co., characterized the shipping delay: "Five weeks is pretty intense."[433]

184.    Apple's management discussed the short supply of the iPad 2 during an earnings call on April 20, 2011, 40 days after its release.[434] Mr. Cook stated that, at the time, Apple was "still amazed that [it was] heavily backlogged not only at the end of the quarter but also up to date."[435] Later on during the same call, Mr. Cook expressed the size of the iPad 2 shortage: "the iPad [2] [had] the mother of all backlogs that [Apple was] working very, very hard to get out to customers as quickly as [it could]."[436]

---

[429] "Apple Management Discusses Q1 2011 Results – Earnings Call Transcript," Seeking Alpha, January 18, 2011, <http://seekingalpha.com/article/247197-apple-management-discusses-q1-2011-results-earnings-call-transcript>. [5.13]

[430] "Verizon iPhone 4: Sold Out," Mobile Marketing Watch, February 4, 2011, <http://www.mobilemarketingwatch.com/verizon-iphone-4-sold-out-13001/>. [5.14]

[431] "iPad 2 Release Day: How To Get Apple's New Tablet," Huffington Post, <http://www.huffingtonpost.com/2011/03/10/ipad-2-release-day-2011_n_834017.html?view=print>. [5.28]

[432] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[433] "iPad 2 shortages continue, relief 1-2 months away," Computerworld, March 15, 2011, <http://www.computerworld.com/s/article/9214618/iPad_2_shortages_continue_relief_1_2_months_away>. [5.8]

[434] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 1, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29]

[435] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 5, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29]

[436] "Apple Management Discusses Q2 2011 Results – Earnings Call Transcript," Seeking Alpha, p. 13, <http://seekingalpha.com/article/264616-apple-management-discusses-q2-2011-results-earnings-call-transcript>. [5.29] Though the citation identifies the "iPad" as the product for which a large backlog existed, given that the call took place in April of 2011, the month after the launch of the iPad 2, I assume that Mr. Cook was referring to the second-generation of Apple's tablet.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

185.    Potentially exacerbating the constraint on iPad 2 supply, reports surfaced that the plant which manufactured around 20 to 30% of iPad 2s  had suffered an explosion two months after the launch. [437]  According to Morgan Stanley analysts, production at the    site was halted pending an investigation.[438]

186.    A month subsequent to the explosion, a J.P. Morgan report published June 28, 2011, observed that "no model of iPad 2 [was]      available for immediate shipping in ANY of Apple's online stores in its major markets." [439] (emphasis in original)    As J.P. Morgan aptly pointed out, "the shortage of iPad 2[s] provide[  d] an opportunity for many vendors … to enjoy some shelf space at retailers." [440]  J.P. Morgan estimated at the time    that the shortage would begin easing in 3Q 2011.[441]

### (c)   Testimony of Tony Blevins

187.    Mr. Tony Blevins,  Apple's  Vice President of Procurement, gave deposition testimony on April 3, 2012. [442]  During his deposition, Mr. Blevins was questioned regarding his declaration of October 13, 2011.  Paragraph five of the      declaration notes that "[w]hen the iPhone 4 and iPad 2 were first released, the extraordinarily high level of demand for these new products resulted in a backlog of orders, but this was a      temporary issue that was promptly resolved."[443]  Mr. Blevins specifically noted that "when the iPhone 4  was released in June 2010, the extremely high level of demand resulted in a temporary backlog of orders, but this was resolved by November 2010."[444]

188.    Mr. Blevins provided additional commentary, pointing out that, with respect to the iPhone 4, "through September, there was a backlog; in October, the waiting period was about a

---

[437] "Hon Hai Precision: Fire at Chendu Plant Likely to Depress iPad 2 Production," Morgan Stanley, May 22, 2011, p. 1. [5.30]

[438] "Hon Hai Precision: Fire at Chendu Plant Likely to Depress iPad 2 Production," Morgan Stanley, May 22, 2011, p. 1. [5.30]

[439] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[440] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[441] "Tablets Part 4: Extent of iPad 2 shortage and what we think will happen when it eases – ALERT," J.P. Morgan, June 28, 2011, p. 1. [5.31]

[442] Deposition of Tony Blevins, April 3, 2012, pp. 2, 10-11. [5.7]

[443] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 2. [5.32]

[444] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 2. [5.32]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

week, and by November, they were shipping  immediately."[445] █████████████

████████████████████████████████████████████████████████

███████████████████████████████ ██ █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ ██ ██

████████████████████████████████████████████████████████

███████ █████

189.    Turning his attention to Apple's 2nd generation tablet, Mr. Blevins    wrote that "when the iPad 2 was first released in early March 2011, the tremendous demand resulted in a temporary backlog, but this was promptly resolv  ed.  By the end of   April 2011,  the  time  from order  to  shipment  was  about  one  to two weeks, instead of three or four weeks at the end of March."[449]  Three months later, in late July, "Apple had caught up with demand,        resulting  in shipment within a few days of order placement."[450]

190.    Mr. Blevins interpreted his declaration during deposition, explaining        that  his written statements "would indicate, prior to July, that there was a waiting time        of  one  to  two weeks  from  the  time the order was placed until it was shipped."    [451]  By late July, Apple had "enough products available so [that its] customer[s] [could] get[] the product immediately with no wait time  at all, which would be [Apple's] objective."  [452]  Again, Apple did everything it could to increase supply of the iPad 2 from March until July, 2011.[453]

191.    Aside from describing certain of Apple's supply shortages, Mr.              Blevins' declaration also makes an important point about the duration of those shortages.  He states that "[t]hroughout  this  period  [from  June  to November 2010], Apple continued to receive a large number of orders from customers who were willi  ng to wait for the products  to  be  shipped,  and

[445] Deposition of Tony Blevins, April 3, 2012, p. 14. [5.7]
[446] Deposition of Tony Blevins, April 3, 2012, p. 15. [5.7]
[447] Deposition of Tony Blevins, April 3, 2012, pp. 15-16. [5.7]
[448] Deposition of Tony Blevins, April 3, 2012, p. 17. [5.7]
[449] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]
[450] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]
[451] Deposition of Tony Blevins, April 3, 2012, p. 20. [5.7]
[452] Deposition of Tony Blevins, April 3, 2012, p. 20. [5.7]
[453] Deposition of Tony Blevins, April 3, 2012, p. 22. [5.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Apple shipped the iPhone 4 to customers   as soon as it became available."[454]  The same was true of customers ordering the iPad 2. [455]  Both of these statements are reasonable: customers who actually placed orders for these products were willing to wait, sometimes for several weeks, for their arrival.   In fact, those customers likely would have known whether a backlog existed when placing their orders.

192.     However, in the hypothetical situation that excludes Samsung from the marketplace, those customers who did, in fact, brave a backlog in order to secure an Apple product are not the customers relevant to the calculation of lost profits.  Rather, it is the marginal customer who, in reality, purchased a Samsung accused smartphone or    tablet from among the many available options, including the Apple products that were the  subject of supply shortages.   These customers, now hypothetically unable to purchase the accused Samsung product, would have chosen between alternativ es: buy a different Samsung product, buy an Apple product which may take weeks to arrive, buy another   manufacturer's product (e.g., HTC, Motorola, Nokia, RIM, etc.), or, forego the purchase altogether and buy no product at all.  It is sales to these customers that must be apportioned among the market players in the lost profit's analysis.  And it is these customers, who have     already shown a real propensity to purchase non-Apple products, who are unlikely to wait weeks for an Apple product when the      market presents a multitude of readily available alternatives.

### (d) Conclusion

193.     Apple has not proven that it had sufficient capacity for the entire damages period. For the iPhone 4 and iPad 2, I conclude that Apple does not have sufficient capacity to make any additional sales for at least the periods until Mr.  Blevins concluded that Apple's had excess supply. ███████████████████████████████████████████████████

███████████████████████████████ ██ ████████████████████████████████

██████████████ ███████   I do not believe that Apple has sufficient capacity in periods after these dates, but I do not have sufficient data from Apple to      determine whether or not Apple has sufficient capacity.

---

[454] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, pp. 2-3. [5.32]

[455] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

[456] Deposition of Tony Blevins, April 3, 2012, p. 17. [5.7]

[457] Declaration of Tony Blevins in Support of Apple's Motion for a Preliminary Injunction, October 13, 2011, p. 3. [5.32]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**4.    Even if Mr. Musika were to prove entitlement to lost profits, his lost profits calculations significantly overstate the amount of lost profits.**

      **a)    Mr. Musika does not take price elasticity of demand into consideration in his lost profits calculation.**

194.    Mr. Musika is aware that Apple sells the products that were allegedly        lost to Samsung at a wholesale price that is significantly higher than the price that Samsung charges its customers.  Exhibit 41.2 to Mr. Musika's report     shows that the average sales price of the accused Samsung products is $358.94 while the average sales price for the products that Apple allegedly lost is $628.30.  Apple's prices are 75% higher  [458] than Samsung's prices.  It is not reasonable to assume that Samsung's  customers would have been willing to spend an additional $269.36 [459] on average  more than what they actually paid, especially in light of the large number of alternatives. Mr. Musika's failure to take        price elasticity of demand into consideration makes his lost profits calculation unreliable.

195.    Strategy Analytics defines the iPhone as a leading-edge premium smartphone.[460] According to Strategy Analytics, Apple is absent from high-volume low-tier device markets.  [461] As shown in Figure 30 below, in 2011 Apple mostly operated in $100-$249 and $250+ tier markets.[462]

---

[458] ($628.30 / $358.94)
[459] ($628.30 - $358.94)
[460] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]
[461] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]
[462] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 30: Smartphone Cost Segment Share[463]**



196.    Kantar Worldpanel ComTech ("ComTech") has conducted several longitudinal consumer surveys to analyze the mobile phone market in        terms  of  handset  pricing.[464] According to a February 2011 study, Apple dominated in the high end price segment (selling price of handset over $170) with the iPhone 4 in the Q2 2010 – Q4 2010 time period. [465]  In a Q2 2010 report,  ComTech states  that Apple owners spend significantly more on their handset purchase than other smartphone owners.[466]  In particular, "Apple owners deliver a 15% to 150% premium on their initial handset spend… … versus owners of other smartphones."  [467]  In a Q3 2010 report,  ComTech also concludes that Apple dominates in the over $170 price band segment.[468]  A Q2 2011 study shows that "iOS still carries a premium" price compared      to the market average for smartphones.  [469]  Similarly, a February 2011 United States mobile phone

---

[463] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

[464] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '967, '969. [10.4]

[465] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '968, '980. [10.4]

[466] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139, '220. [10.5]

[467] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139. [10.5]

[468] ComTech United States Report Q3 2010, Apple Market Research & Analysis, November 19, 2010, APLNDC0002636414-451 at '421, '442. [10.6]

[469] ComTech Global Report Q2 2011, Apple Market Research & Analysis, August 12, 2011, APLNDC0002640687-727 at '696. [4.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

market study indicates that "iOS has strong leaning toward the premium market,     with 66% of sales over $170 versus 50% for  Android."[470]  iPhone 4 is the top selling model in the segment with the average selling price of handset over $170.[471]

**Figure 31:  Handset Spend Overview[472]**




197.    "iOS handsets remain[ed] the most expensive of all OS's" in Q4 2011, according to a ComTech report. [473]  Apple  smartphone customers reported spending the most ($206) on their smartphones in 2011 in contrast to other smartphone owners. [474]  More than one-third (35 percent)  of  Apple  owners  reported paying full price for their handset compared to just 19 percent of owners paying full price for the  industry.[475]  Apple also noted in its internal study that the "iPhone is perceived as expensive".[476]

---

[470] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54, at '809.9. [8.11]

[471] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9, '809.41. [8.11]

[472] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.41. [8.11]

[473] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513. [4.12]

[474] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[475] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[476] iPhone and Android Smartphone Buyer Research, APLNDC-Y0000025148-188, at '157. [10.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

198.    Mr. Joswiak testified that as of February, 2012 Apple's iPhone line consists of the iPhone 3GS, the iPhone 4, and the iPhone 4S.    [477]   The iPhone 3GS    is available to AT&T customers on a two-year contract at  no cost.[478]  Without a contact, the iPhone 3GS is priced at $399.[479]  The iPhone 4 costs $99 on a two-year contract and is   available to AT&T, Verizon and Sprint customers.[480]  Without a contract, its price is $549. [481]  The iPhone 4S starts at $199  with a two-year contract, and is also available at $299 and $399, depending on memory capacity.  [482]  Without a contract, iPhone 4S's price starts at $649 and increases in hundred  dollar increments to $849, depending on memory capacity.   [483]   Mr.  Joswiak  also testified that the price to consumer of various models of the iPhone is very similar to the price of the same     phones to carriers.[484]

199.    In contrast, Samsung offers a large number of lower-end   basic handsets.[485]  In 2011 Samsung mostly operated in <$100 and $100-$249 smartphone cost tier markets,     as presented in Figure 30 above. [486]  In a June 8, 2010  System Concepts study commissioned by Samsung, participants of the  study  commented that one of the benefits of Android is its cost making it available to a broader market than the iPhone.     [487]  Smartphone customers     find Samsung more affordable than Apple, according to J.D. Power and Associates.[488]

200.    Indeed,  an analysis of the sales data for Samsung's accused products reveals that  about  30  percent  of  the  accused products are models that have an average wholesale selling price of ▆▆▆▆▆▆▆▆▆

---

[477] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 243. [9.2]
[478] Deposition of Gregory Joswiak, Volume I, February 23, 2012, pp. 243-244. [9.2]
[479] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 245. [9.2]
[480] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]
[481] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]
[482] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]
[483] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]
[484] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 451. [9.3]
[485] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5073. [8.5]
[486] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]
[487] UX Critique by European Professionals, System Concepts, June 8, 2010, SAMNDCA00202869-933 at '919. [10.2]
[488] 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, J.D. Power and Associates, November 15, 2011, SAMNDCA00282033-088 at '080. [13.7]

**Figure 32: STA Smartphones with ASP** ██████████ [89]



201.    These products are clearly in a very different market segment than the iPhones, which start at significantly higher wholesale prices.[490]

202.    iPhone owners have relatively higher disposable income compared to the income of smartphone owner on average.[491]  Forty-seven percent of iPhone 3G  owners and 50 percent of iPhone 3GS owners have disposable  income of more than $100,000.[492]  In contrast, Crowd Science found that Android smartphone users are less affluent than iPhone users.[493]

---

[489] Schedule 15.2. [1.2]

[490] In February 2012, the carrier price for the iPhone 3GS was $375, the iPhone 4 carrier price was $549, and the iPhone 4S carrier price was $649, $749, and $849 for the 16 GB / 32 GB / 64 GB versions, respectively. (Apple Inc. iPhone – US, Carrier & Reseller Pricing as of February 17, 2012, APLNDC-Y0000051622. [5.5])

[491] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[492] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[493] Email from John Brown to Arthur Rangel, March 16, 2010, 40% of Blackberry Users Willing to Trade in Their Devices for Apple iPhones, March 15, 2010, APLNDC0001414064-066 at '065. [15.28]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 33:  iPhone Owners Income Distribution (Three Month Average Ending April 2010)[494]**



203.    In August 2007, Apple conducted an iPhone Consideration Study to "view the US mobile market approximately 30 days after the iPhone launch and understand the   reasons why potential buyers chose not to consider or purchase the iPhone and why    those still considering purchasing one have not done so yet." [495]  According to the study, the price of the    iPhone was the top reason for not considering the purchase of the iPhone by those who purchased a mobile phone in the past 30 days.[496]  Cost of the iPhone was also the top reason for not purchasing the iPhone.[497]  Apple,  therefore, concluded that cost was the primary reason the iPhone was not purchased.[498]  In fact, those considering the purchase of the iPhone expected    to pay $258 on average versus $117 for those who did not consider purchasing the iPhone.  [499]  Similarly, in a January 2009 Global Mobile Phone Market Study commissioned by Apple, cost was a key driver for the lack of iPhone consideration.[500]

---

[494] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[495] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '859. [10.8]

[496] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '870. [10.8]

[497] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '871. [10.8]

[498] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '872, '889. [10.8]

[499] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '877, '889. [10.8]

[500] Global Mobile Phone Market Study - 12 Country Omnibus Study, Apple Market Research & Analysis, January 2009, APLNDC0001256422-504 at '484. [8.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

204.    In a May 2011 Apple study about Apple brand perception, Apple's price    across all products was listed as a key    Apple brand constraint.[501]  The study noted that "Apple is universally considered to be higher priced than similar brands and not always  a strong value for the money to many."[502]

### b)  Mr. Musika includes lost profits for the Galaxy Tab 7.0 (3G), which is not appropriate based on Mr. Musika's own analysis.

205.    Mr. Musika describes his analysis of the tablet market as follows:[503]

> In May 2010, IDC defined tablets "as tablet form factor    devices with 7-12in. color displays. They are currently based on ARM processors and run lightweight operating systems such as    Apple's iPhone OS and Google's Android OS." This definition was further updated in December 2011 to "move LCD-based devices such as Barnes & Noble's  Nook Color into the media tablet category" from the e-reader category. This change was implemented in the third quarter of 2011.  Further, while the Barnes & Noble Nook Color and the Kindle Fire have changed the dynamics    of the market, these products by and large compete in a different segment of the tablet market than Samsung and Apple. Accordingly, I        have removed their corresponding units from my analysis of IDC's media  tablet data.

206.    So,  even  though  most  of his calculations simply rely on IDC's and Strategy Analytics' definitions of the markets, Mr. Musika specifically changes the market          definition adopted by these companies with respect to the Nook Color and Kindle Fire.  Mr. Musika does not provide any basis for his assertion that the Nook and Kindle Fire "by and large compete in  a different segment of the tablet market than Samsung and Apple."  I can only assume that Mr. Musika excluded these products because they  are smaller and less expensive  than the iPad / iPad 2.  The Nook Color and Kindle Fire are both 7-inch tablets, and their prices are several hundred dollars less than the wifi-only versions of the iPad.[504]

---

[501] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]

[502] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]

[503] Musika Report, p. 19. [2.2]  I have confirmed that Mr. Musika does not include the Kindle Fire and Nook Color units in his lost profits analysis; if he had included those units, then Apple's market share, and Apple's lost profits, would have decreased.

[504] CNet Review, Barnes & Noble NOOKcolor, last updated November 17, 2011, accessed on April 14, 2012 at http://reviews.cnet.com/e-book-readers/barnes-noble-nookcolor/4505-3508_7-34204884.html#reviewPage1. [15.9]  See also CNet Review, Amazon Kindle Fire, last updated November 23, 2011, accessed on April 14, 2012 at http://reviews.cnet.com/tablets/amazon-kindle-fire/4505-3126_7-35022491.html#reviewPage1. [15.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

207.    However, this exact same reasoning applies to the Galaxy Tab 7.0 (3G).      The Galaxy Tab 7.0 is also a 7" tablet (as its name implies).  In addition, this         product includes cellular network capabilities, so it lines up against the 3G-enabled versions of the iPad,      which typically sell for a couple hundred dollars more than the wifi-only versions.  Indeed,      over the period that the Galaxy Tab 7.0 (3G) has been sold for which I have sales data (October   2010 – December 2011), the Galaxy Tab 7.0 (3G) has sold for an average wholesale     ASP of about $450,[505] which is about $270 less than the ASP over the sales life of the iPad K48M, [506] which is the version of the original iPad that can access the 3G cellular network.[507]

208.    I agree with Mr. Musika that the Kindle Fire and     the Nook Color are not in the same market as the Apple iPad and the Galaxy Tab 10.1, but it is also my opinion that the Galaxy Tab 7.0 (3G) is also in a different market for similar reasons.  Therefore, Mr. Musika has improperly included the Galaxy Tab 7.0 (3G) in his lost profits calculations.

### c)    Mr. Musika incorrectly uses an assumption that 26% of users select a new carrier when purchasing a cell phone in calculating his lost profits damages.

209.    Mr. Musika's  Mor-Flo  analysis  results in an overstated share of smartphone users switching to the iPhone due to his inclusion of lost units on carriers that    did not carry an iPhone.  Mr. Musika uses data from a study presenting consumer purchase patterns to conclude that 26 percent of customers that purchased a phone from a  carrier that did not carry an iPhone would have considered switching to the iPhone.      [508]  Since the majority of Mr. Musika's smartphone  lost profits  relate to 2010 sales when the iPhone was sold only on AT&T, my discussion  below  focuses on AT&T being the only carrier, but it applies equally to 2011 when the iPhone starts selling on Verizon and later on Sprint.

210.    I first note that Mr. Musika characterizes the         report as a survey of "2,961 respondents' questioned in 2010 that recently purchased a cell phone." [509]  This characterization is wrong.  The report is dated February    2010, and the "Research Methodology" clearly states

---

[505]  Schedules 4.7 and 4.8. [1.2] Calculated as ($154,345,456 + $147,532,169) / (262,099 units + 403,521 units) = $453.53 per unit

[506] The ASP of the iPad K48M over the period from calendar Q2 2010 – Q4 2011 is $719. (Schedule 14.2. [1.2])

[507] Deposition of Mark Buckley, February 23, 2012, pp. 232-233. [5.2]

[508] Musika Report, p. 42, Exhibit 28. [2.2]

[509] Musika Report, p. 42. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

that the interviews of the 2,961 respondents "were conducted in July – October 2009." [510] Therefore, the study was performed approximately one full year ahead of Mr. Musika's lost profits period.

211. Second, Mr. Musika does not apply the same adjustment to AT&T as he does to other carriers; instead, Mr. Musika assumes that all customers that purchased a Samsung phone on AT&T would have *remained* on AT&T, and claims that Apple would have made its market share of AT&T sales of Samsung's sales, which ranges from 60 to 68 percent in 2010.[511] If Mr. Musika's conclusion from the study is to be believed, he should have assumed that 26% of these customers would have decided to switch carriers, and therefore by definition they would not have purchased an iPhone since the iPhone is not offered by any other carrier in 2010. He then could have applied Apple's AT&T share to the *remaining* AT&T customers, although as I describe in the Android platform discussion below, even this also would have resulted in too high a calculation.

212. Third, the 26 percent figure that Mr. Musika relies upon is artificially inflated because it includes a large number of customers that switch carriers simply to purchase an iPhone. Because the survey is done at a time when the iPhone was only offered on AT&T, any smartphone purchaser that wanted the iPhone but wasn't an AT&T customer would have had to switch carriers. Since the iPhone was very successful, several customers did exactly this, and an overall market percentage would reflect a relatively high portion of customers that would be willing to switch (i.e., 26 percent). However, this percentage is not reflective of customers that *did not* switch to the iPhone. I.e., any customer that purchased a Samsung accused product from a carrier other than AT&T made the affirmative decision to NOT buy an iPhone. This population would have had a significantly lower probability of switching to a different carrier versus the overall smartphone purchaser population.

213. Finally, Mr. Musika includes in his 26 percent figure a category of purchasers that responded "it was a gift for someone not on my wireless plan," which increased his figure from 22 percent to 26 percent. [512] However, when purchasing a smartphone as a gift, which often includes significant monthly charges, gift givers would frequently take into account the carrier

---

[510] ThinkTech with Google Presentation, Wireless Shoppers 2.0 How Consumers Shop for Wireless Phones Google Complete Clicstream and Survey Based Study. U.S. Feb 2010, p. 3. [5.1]

[511] Musika Report, pp. 42-43, Exhibit 31. [2.2]

[512] ThinkTech with Google Presentation, Wireless Shoppers 2.0 How Consumers Shop for Wireless Phones Google Complete Clicstream and Survey Based Study. U.S. Feb 2010, p. 6. [5.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

that the gift receiver is currently on.  Therefore, it   is inappropriate to assume that ALL of these gift receivers ended up on a different network as Mr. Musika's calculations assume.

214.    Overall, the study relied upon my Mr. Musika is not a reliable source to use for the purpose that Mr. Musika used the study.  If the study had excluded iPhone purchasers, then it would have been a more meaningful study because     the percentages would not have been tainted by the effect of consumers that would purchase an iPhone no matter what – these customers are clearly not in the population that purchases the accused products.

215.    Mr. Musika's  analysis understates the importance of the carrier to consumer smartphone choices.  Unlike Apple, Samsung made a commitment to offer its smart phones on every major U.S. carrier.  For example, a June 2010  article discussing the launch of the Galaxy S product line noted that "[i]n this era where most phones are exclusive to one U.S. carrier or another, Samsung announced there will be versions of the phone on all major carriers." [513] Given customers likely prefer to remain on their current carrier, it is unlikely that Samsung's sales of phones for Verizon in 2010 and T-Mobile and Sprint had any significant effect on iPhone sales.   Indeed, a February 2011 Apple presentation states that "82% of Android switchers upgraded within their current carrier, likely to be due to Android availability on different brands and networks." [514]    Another Apple presentation titled "Android Market Overview" and dated Q4 2010 lists several "Key Conclusions," one of which is that "Android growth accelerated in 2H of 2010" with the first sub-bullet under this conclusion indicating that Android is "[g]aining share through expansion to non-iPhone carriers."   [515]    I note that recently Apple has started offering its iPhone on additional carriers, likely in response to the impact of consumers' preferences for carriers.

d)    **Mr. Musika's analysis does not properly take into account platform competition and the fact that Samsung customers chose to not purchase an iPhone.**

216.    Other than making an adjustment based on carrier as described       above, Mr. Musika simply applies Apple's market share on a specific carrier if that carrier carries an iPhone and its market-wide market share if that carrier does not carry an iPhone.         This  approach

---

[513] Miller, Michael, "Samsung Unveils Galaxy S Line of Android Phones," PC Magazine, June 30, 2010, <http://www.pcmag.com/print_article2/0,1217,a=252368,00.asp?hidPrint=true>. [15.11]

[514] APLNDC00010809 at pp. 9, 48. [8.11]

[515] APLNDC00004618 – 4736 at '4626. [11.23]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

completely ignores the important dynamic of pla tform competition.  In addition, it ignores the reality that there is a segment of the population that simply dislikes Apple's products.

217.    In the smartphone and tablet markets, not only do customers seek a particular brand (e.g. Apple or Samsung) or model (e.g., iPad 2 or Galaxy Tab 7.0),    but also a particular operating system or platform.  In  this case, there are two major platforms of relevance: Apple's iOS and Google's Android.

218.    A consumer considering the purchase of a smartphone or tablet may prefer a device that runs a particular platform, a theory that has been propounded by Samsung and Apple's experts alike. [516]  For this reason, in the "but    for" environment that assumes Samsung had not sold its allegedly infringing products, it is likely that a significant portion of those sales would have been made by manufacturers that    also use Google's Android platform.  A smaller fraction would have been made by Apple, which runs its proprietary iOS platform.

219.    This view, which postulates that a smartphone or tablet's operating  system holds significant influence over an individual buyer's   purchase decision, is also supported by many observers of the technology industry.  For example, a March, 2011 Computerworld            article proposed the following: "[i]f you're in the market for a    new smartphone, choosing which one to buy has as much to do with the operating system that runs the phone as with the hardware itself."[517]

220.    Another article,  published  in  April, 2011 by Business Insider, illustrated graphically  certain consumer's preference for    the Android operating system.  Specifically, Business Insider described a smartphone survey   that indicated over 56% of respondents who already owned an Android would simply not buy an iPhone instead.[518]

---

[516] Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a
Preliminary Injunction, August 21, 2011, pp. 30-35. [5.33]  *See also* Musika Report, p. 32. [2.2]

[517] "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011,
<http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._
Windows_Phone_?taxonomyId=mobile+and+wireless&taxonomyId=15>. [5.34]

[518] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs. Android," Business Insider, April
18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



221.    The same survey indicated that    over 38% of smartphone buyers considered platform  the  most  important factor when choosing a particular smartphone.    [519]  Respondents also chose platform as another important factor in choosing a smartphone close to 50% of the time.[520]

---

[519] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs Android," Business Insider, April 18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

[520] "The Truth About Smartphones: Our Exclusive Survey on iPhone vs Android," Business Insider, April 18, 2011, <http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1>. [5.35]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order





222. This Business Insider study is an interesting study because it looks at a population (Android purchasers) that would be similar to the customers of the accused products. The question specifically to Android users to which 56% said they would not switch to an iPhone

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

is a minimum adjustment that Musika could have made.  I.e.,  he could have excluded 56%, and then applied his market share approach to the remaining 44%.  A more reliable approach would have excluded any consumer that indicated that pl  atform was an important consideration, i.e. the 38% that said it is the most important factor and the 50% that said it is a factor in purchasing (i.e., 88% total).  This last question is for all smartphone purchasers, so it would be preferable to do a survey specifically geared towards Android (or accused product) purchasers,     but  Apple could have easily done that given they conducted such a study.

### e)   Mr. Musika's incremental profitability is overstated, resulting in significantly overstated lost profits.

223.    Mr. Musika calculates his incremental profitability using worldwide selling prices. However, Apple sells its iPhone for a considerably higher price outside the United States, so Mr. Musika's calculation results in a significantly overstated profit for U.S. sales.    For example, Q3 and Q4 of its fiscal year 2010, using the U.S. selling prices would have    reduced Mr. Musika's lost profits calculations by approximately 16 – 19 percent for smartphones.[521]

224.    In  addition  to using worldwide profit calculations, Mr. Musika fails to deduct marketing and advertising expenses in his incremental profitability analysis. The only operating expense that Mr. Musika deducted in his analysis is sales expense, but his lost profits       model includes a large number of sales to customers on carriers other than the carriers that sell      the iPhone.  If his analysis is correct, it is likely that a significant amount  of additional marketing and advertising would be required to reach such customers.

225.    Therefore, I make a second adjustment to incremental profit by      deducting the marketing / advertising expense.  When both U.S. prices are   used and marketing / advertising expenses are deducted, Mr. Musika's lost profits would be reduced by 19 –     23 percent in Q3 and Q4 of fiscal 2010.[522]

### 5.   Mr. Musika's calculation of Samsung's profits related to the infringement is overstated.

226.    For Apple's design-related intellectual property, I understand   that Apple may be entitled to Samsung's profits related to the      infringement.   Mr. Musika calculates Samsung's

---

[521] Schedule 10.1. [1.2]
[522] Schedule 10.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

profits two ways – the first deducting no expenses and the second based on Samsung's gross margin.

227.    As I describe below, Samsung is entitled to deduct all of its operating expenses in its calculation of the profits related to the infringement of Apple's design-related IP.  Further, the majority of these profits are appropriately apportioned to the other elements of value that Samsung contributes to the sales of the accused products.

### 6.    Mr. Musika's reasonable royalty analysis relies on unreasonable benchmarks and results in an overstated concluded reasonable royalty rate.

228.    As part of his report, Mr. Musika developed   a reasonable royalty framework that he used to calculate the monetary damages to be paid Apple in compensation for a portion of Samsung's alleged infringement.    Specifically,  Mr. Musika explained that in this case, reasonable royalty damages "apply where other forms of damages are not available or cannot be proved with reasonable certainty." [523]  In general, such "reasonable royalty damage amounts are expressed as a reasonable royalty rate times an accused base," [524] for example unit sales or revenue derived from sales of the accused device.  Mr. Musika's accused base consists of "the number of accused units sold and not revenue as the basis on which to calculate a royalty for each asserted item of Apple Intellectual Property In Suit."[525]

229.    With respect to the reasonable royalty rate, Mr. Musika employs three commonly used methods of calculating benchmarks from which to derive a final royalty: the cost  approach, the market approach, and the income approach.  These approaches, and my criticisms thereof, are explained in more detail below.  Once    calculated, Mr. Musika uses these benchmarks to derive his final royalty rates.[526]

230.    It is important to note, as explained in Section IV.A.2, that while Mr. Musika explains that he "considered the effect of the entire market value of the products and   elected to structure my royalty damage on an individual per unit basis and not the total revenue        of the accused products,"[527] each of his royalty benchmarks apportions some measure of   Samsung's accused product revenue as if it were earned as a result of the IP at issue exclusively.   In other

---

[523] Musika Report, p. 52. [2.2]
[524] Musika Report, p. 52. [2.2]
[525] Musika Report, p. 53. [2.2]
[526] Musika Report, Exhibits 46-47. [2.2]
[527] Musika Report, p. 53. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

words, while Mr. Musika's royalty base is not total revenue, his royalty rates are based on his measures of the total market values of the accused products.

### a) Mr. Musika's cost approach does not provide a reasonable value for the intellectual property at issue.

231.    In his Expert Report, Mr. Musika develops a cost-based reference point that serves as one basis for his concluded royalty rate. [528]  Mr. Musika derives this reference point from what he calls "the opportunity cost represented by the amount of lost operating profits incurred by Samsung during the period of time Samsung would have been out of the market developing, designing, testing and implementing an acceptable non-infringing substitute."[529] However, Mr. Musika makes several unreasonable assumptions and omissions in his calculation that materially affect his cost-based reference point.  These points of contention, along with a general overview of Mr. Musika's cost-based approach, are described below.

### (1)  Mr. Musika's Approach in General

#### (a) Sm artphones

232.    Mr. Musika calculates his smartphone reference point using the time period from June, 2010 through December, 2011.[530]  This period begins on the date on which Samsung first sold its accused smartphones in the U.S. and ends on the last date for which Samsung provided data.[531]

233.    First, Mr. Musika derives an "Average Gross Profit per Month for Accused Products" during the time period described above. [532]  He then multiplies that average by four months; the period that he concludes represents the "N[umber] of Months Out of Market."[533]  Mr. Musika "based the period of time Samsung would have been out of the market … on the opinion of Apple's technical experts as identified on Exhibit 20 and Samsung and Apple evidence regarding the amount of time required in the ordinary course to design, develop, test and implement new smartphone and tablet features." [534]  This multiplication results in what Mr.

---

[528] Musika Report, pp. 54-56 and Exhibits 39-39.4. [2.2]
[529] Musika Report, p. 54. [2.2]
[530] Musika Report, Exhibit 39.4. [2.2]
[531] Samsung Financial Data, 2010-2011, SAMNDCA00372946-138 at '946, '949. [14.5]
[532] Musika Report, Exhibit 39.4. [2.2]
[533] Musika Report, Exhibit 39.4. [2.2]
[534] Musika Report, pp. 54-55. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Musika calls "Samsung's Total Loss Due to Redesign," which he divides by the "Total Accused Units Sold" during the prescribed time period to ascertain "Samsung's Cost Value   per Unit Due To Redesign."[535]

234.    From that point, Mr. Musika allocates his Cost Value per Unit between the utility Patents-in-Suit and the design IP at issue.  To do this, he simply assigns 25% of the Cost Value to  the  utility patents, which encompass one type of IP, and 75% to the design IP, which encompasses three types of IP (design patents, trade dress, and trademarks).[536]

235.    Mr.  Musika  accounts  for all design IP as one portfolio with one Cost Value reference point.[537]  However, he further splits the Cost Value per Unit assigned to Apple's utility Patents-in-Suit among all such patents.[538]  This allocation gives Mr. Musika his final Cost Value per Unit reference points.

### (b) Tablets

236.    Mr. Musika uses the same method to calculate his tablet        cost-based  royalty reference  points.   However, in this case he uses the time period October, 2010 through December, 2011.[539]  Again, this period begins on the       date  on  which  Samsung  first  sold  its accused tablets in the U.S. and ends on the last date for which Samsung provided data.[540]

### (2)  Mr. Musika Assumes That Samsung's Accused Products Must be Taken Out of the Market During Redesign

237.    As stated above, Mr. Musika makes the implicit assumption that Samsung would have been "out of the market" while it redesigned its phones to      avoid infringement of Apple's patents.[541]  In  other  words, Mr. Musika claims that Samsung would have lost all sales of its allegedly infringing products while designing around Apple's patents.  It is likely that the large majority of these customers would have purchased another Samsung      smartphone that is not accused or waited until the redesigned smart   phone was available given   the  customers  have already demonstrated a preference for a Samsung smartphone.

---

[535] Musika Report, Exhibit 39.4. [2.2]
[536] Musika Report, Exhibit 39.3. [2.2]
[537] Musika Report, Exhibit 39.1. [2.2]
[538] Musika Report, Exhibit 39.1. [2.2]
[539] Musika Report, Exhibit 39.4. [2.2]
[540] Samsung Financial Data, 2010-2011, SAMNDCA00372946-138 at '119, '949. [14.2]
[541] Musika Report, p. 54. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (3)  Mr. Musika Adopts an Artificial Time Period to Calculate an Overstated Per Unit Cost to Design Around

238.    As described above, Mr. Musika limits his calculation to the timeframe beginning on the first U.S. sale date of the infringing products and ending on the last date for which Samsung provided data.  However, these end points do not accurately reflect the damages period, which would extend from the date of the hypothetical negotiation (i.e. the date on which the accused products were first sold) through the end of trial.  Furthermore, this timeframe does not correspond to the period that would have been covered by the hypothetical license to the patents and other IP at issue.

239.    Assuming the first date of trial is July 30, 2012, and that the trial is scheduled to last thirteen court days, the damages period would extend through the 15th of August, 2012.[542] This extends the period employed by Mr. Musika's analysis by seven months and fifteen days in the case of both smartphones and tablets.  While this difference in time period would not likely have a large impact on Mr. Musika's "Average Gross Profit per Month for Accused Products,"[543] it would have a large impact on "Total Accused Units Sold" which he divides into "Samsung's Total Loss Due to Redesign" to calculate "Samsung's Cost Value per Unit Due To Redesign."[544]

240.    This point is illustrated below using Samsung's actual data.  As the figure shows, calculating Cost Value per Unit using only the first four months of data provided renders much higher estimates than using the entire period as Mr. Musika does.  For example, Samsung's smartphone average Gross Profit is lower, but still comparable when calculated for the first four months only.  However, the number of accused units sold during that period is approximately six times smaller than that sold during the entire period.  The result is a much smaller Cost Value per Unit for Samsung's smartphones.  The same result would be observed if the period were to be extended by seven months and fifteen days; Mr. Musika's Cost Value per Unit would decrease substantially.  Note that this change is not based on any change in the underlying value of the patents and other IP at issue, but rather on the length of the time period selected.

---

[542] Minute Order and Case Management Order, August 25, 2011. [14.6]
[543] If the calculation of Average Gross Profit per Month is limited to the first four months of sales, there would be no impact at all.  If not, any increase in monthly gross profit above the current average would be spread across a larger time period, thus mitigating the upward impact.
[544] Musika Report, Exhibit 39.4. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 34:  Example of the Impact of Time Peri od Length in the Calculation of Samsung's Cost Value per Unit Due to Redesign[545]**



241.    As described in my analysis of    *Georgia-Pacific*  factor 7, the utility and design Patents-in-Suit  expire  no  earlier than September 29, 2014 (the '002 Patent) and at latest January 22, 2030 (the '129 Patent).  Since the hypothetical     negotiation would  yield  a  license that extends through the expiration date of the last to expire of the licensed patents, this would extend  the royalty period by around eighteen years when compared to the period that Mr. Musika uses.  This extension would serve to decrease the Cost Value per Unit even further.

### (4)  Mr. Musika Does Not Include Operating Expenses in His Calculation of the Profit Samsung Would Have Lost While Redesigning Its Accused Products

242.    Instead of using Samsung's Operating Profit, Mr.   Musika begins his calculation with "Average Gross Profit per Month for Accused Products," which deducts from revenue only

---

[545] Schedule 16.2. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Samsung's manufacturing entity's Cost of Goods Sold.   [546] Since Mr. Musika fails to include Operating Expenses in his calculation of "Samsung's Cost Value per Unit Due To Redesign," he is essentially arguing that Samsung would have in curred Operating Expenses on the sale of its accused products even if it had not sold those products.  This assumption is incorrect, because Samsung would not have engaged in the activities that generated those     expenses had it not actually sold those products.

243.   This oversight leads Mr. Musika to overstate Samsung's profit from the sale of accused products and thus overstate "Samsung's Cost Value per Unit Due To     Redesign."  As shown on Mr. Musika's Exhibit 37, his calculation     of Samsung's accused smartphone Gross



respectively.[547]  Comparatively, I have calculated the 2010 STA, SEA, and     SEC Consolidated Operating Profit across the accused smartphones in 2010 as [        ]   [    ] and in 2011 as [              ]   [549] Using the consolidated average selling prices (ASP) of Samsung's accused smartphones [          ]   [               ]   [          ] the appropriate Operating Margins come to [      ]   [            ] in 2010 and 2011.

244.   With  respect to Samsung's accused tablets, Mr. Musika calculates Gross Margins of [              ] for 2010 and 2011 respectively.   [554]  My calculations show Operating Margins of [      ] n 2010[555] and [      ] in 2011.[556]

245.   Clearly, the use of Operating Margins in place of Gross Margins in Mr. Musika's cost approach would have yielded significantly lower Cost Value         per  Unit  estimates.  Interestingly, it appears that Mr. Musika meant to use Operating Profits in his calculation.  He states in his report that he "limited [his] calculation of this cost [the cost to replace or remove the accused  technology]  to the opportunity cost represented by the amount of lost     *operating profits* incurred by Samsung during the period of time Samsung would     have been out of the

---

[546] Musika Report, Exhibits 37 and 38. [2.2]
[547] Musika Report, Exhibit 37. [2.2]
[548] Schedule 4.7. [1.2]
[549] Schedule 4.8. [1.2]
[550] Schedule 4.7. [1.2]
[551] Schedule 4.8. [1.2]
[552]
[553]
[554] Musika Report, Exhibit 38. [2.2]
[555]
[556]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

market …" [557] (emphasis added) While ultimately Mr. Musika uses Gross Profit, the use of Operating Profit would have been the more appropriate measure of profitability in this case.

### b) Mr. Musika's income approach does not provide a reasonable value for the intellectual property at issue.

246.     In addition to the cost approach, Mr. Musika also employed an income approach to derive a reasonable royalty benchmark.  He explained that "[t]he theory behind an income approach is that the value of the patent at issue is equal to the future profitability of the products embodying the patented technology." [558]  Importantly, Mr. Musika noted that Samsung's "net operating income produced through the sale of a smartphone and tablet …" "is not the result of the deployment of any single asset.  Rather it represents a composite return on all assets."[559]

### (1)  Mr. Musika's Approach in General.

247.     Mr. Musika began his "analysis by reviewing the work performed by the international company Interbrand," which "identifies itself as the 'world's largest brand consultancy.'"[560]  Mr. Musika explained that Interbrand releases an "annual valuation and ranking of the top 100 brands in the world," the valuation method of which "is an income based approach" that "starts with a company's over all financial performance and separates the portion of a company's overall performance that relates to the intangible brand." [561]  "Interbrand's actual calculation is: operating profits less taxes less an industry weighted average cost of capital (WACC) equals economic value added (EVA).  Interbrand then applies its own proprietary factor to the total EVA to determine the role of and ultimately the value of a company's brand."[562]

248.     Mr. Musika claims to follow Interbrand's method by first calculating Apple's companywide EVA.  Next he "deduct[s] the amount of the premium earnings that Interbrand has calculated that are due to the value of Apple's overall brand"[563] by (i) multiplying Apple's companywide operating margin by the ratio of Interbrand's brand valuation of Apple to Apple's

---

[557] Musika Report, p. 54. [2.2]
[558] Musika Report, p. 62. [2.2]
[559] Musika Report, p. 62. [2.2]
[560] Musika Report, p. 63. [2.2]
[561] Musika Report, p. 63. [2.2]
[562] Musika Report, pp. 63-64. [2.2]
[563] Musika Report, p. 64. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

market capitalization,[564] which he calls "Brand/Design Value," [565] and (ii) subtracting that value from Apple's companywide EVA.[566]

249.    The resulting "EVA net of brand value" is renamed the "Value of the Company's Other Intangibles" and then subtracted from Apple's iPhone and iPad combined EVA net of brand value.[567]  This value, according to Mr. Musika, is the "Value of iPhone and iPad Combined … Intangibles."\[568]

250.    Mr. Musika replicates this analysis with respect to Samsung's accused products. He  then  calculates  per unit rates for the utility Patents-in-Suit by multiplying his calculated "Value of Intangibles" by the companies' respective combined smartphone   and tablet ASPs.[569] His  per  unit rates for the design IP at issue use the same ASPs, but replace "Value of Intangibles" with "Brand/Design Value."[570]

251.    Finally, Mr. Musika allocates these per unit value among the various items of   IP at issue to derive per unit reference points for each item of IP.[571]  He claims he did so "based on the relative strength of each utility patent …"[572]

252.    While  Mr. Musika's  analysis  is claimed to be based on a reliable methodology, Mr. Musika's application of the methodology leads to an unreliable and overstated result.  I have described my main concerns with this analysis in the paragraphs that follow.

### (2)  Interbrand's Brand Valuation Does Not Measure the Value of Any of the IP at Issue.

253.    The  main  assumption upon which Mr. Musika's income approach relies is that Interbrand's calculation of brand value somehow relates to the design IP  at issue in this matter. However, it doesn't appear that Interbrand's calculation is meant to value design  at all.  Rather, "[t]here are three key aspects that contribute to the [Interbrand Value] assessment: the financial

---

[564] Musika Report, Exhibit 41.5. [2.2]
[565] Musika Report, Exhibit 41.3. [2.2]
[566] Musika Report, Exhibit 41.3. [2.2]
[567] Musika Report, Exhibit 41.3. [2.2]
[568] Musika Report, Exhibit 41.3. [2.2]
[569] Musika Report, Exhibit 41.2. [2.2]
[570] Musika Report, Exhibit 41.2. [2.2]
[571] Musika Report, Exhibit 41. [2.2]
[572] Musika Report, p. 66. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

performance of the branded products or services, the role of brand in     the purchase decision process, and the strength of the brand."[573]

254.    From Interbrand's perspective, "role of brand reflects the portion of demand for a branded product or service that exceeds what the demand     would be for the same product or service if it were unbranded." [574]  This statement indicates that the Interbrand calculation may actually be exclusive of design.  At the very least, Interbrand's measure of brand value includes much more than just design IP.  As Jez Frampton, Interbrand's   Global Chief Executive, said in Interbrand's Best Global Brands 2011 report, "customers interpret [a] brand as a result of every interaction; from culture to product, from environment to communications." [575]  Since Mr. Musika assumes that Interbrand's valuation is, in fact, the value of Apple's design IP, he has vastly overestimated its value.  Indeed, it is not clear that Interbrand's study that is used as the basis for Mr. Musika's design-related IP valuation has *any* connection to design, and certainly not the limited design-related IP at issue in this lawsuit.

255.    Further, the trade names Apple / iPhone / iPad are important sales drivers, indicating that if the Interbrand value does include some element of    design, it would be a very small portion.  A Competitive Tablet Product     Experience report by Samsung   points out that brand is one of "the most important factors  taken into consideration when purchasing a tablet," and that "Apple brand is most desirable compared to     all other brands."[576]  In a March 2011 Samsung Customer Survey, Apple received the highest purchase reason     for brand.[577]  According to ComTech reports commissioned by Apple, the Apple brand remains the top reason for consumers choosing iPhones, with more than one third     stating this as their reason for handset choice. [578]  Greg Joswiak, Apple Vice President of iPod, iPhone and iOS     Product Marketing, also testified that in his experience, the Apple brand is an important reason     for

---

[573] Best Global Brands 2011, Methodology, Interbrand. [5.39]

[574] Best Global Brands 2011, Methodology, Interbrand. [5.39]

[575] Best Global Brands 2011, Interbrand, p. 3. [4.19]

[576] Competitive Tablets Product Experience - Form Factor & Display Size / Aspect Ratio Validation Research Report, August 28, 2011, SAMNDCA00028006-166 at '008. [4.8]

[577] Customer Survey Result, March 11, 2011, SAMNDCA00235804-830 at '809. [4.9]

[578] ComTech United States Report, Q111, Apple Market Research & Analysis, May 6, 2011, APLNDC0002831037-088 at '058. [4.10]  *See also* ComTech Global Report Q311, Apple Market Research & Analysis, November 18, 2011, APLNDC0002473754-796 at '776. [4.11]  *See also* ComTech USA Report Q411, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513 and '526. [4.12]  *See also* ComTech Global Report Q211, Apple Market Research & Analysis, August 12, 2011, APLNDC0002640687-727 at '709. [4.13]  *See also* ComTech USA Report Q211, Apple Market Research & Analysis, August 5, 2011, APLNDC0002640958-1004 at '979. [4.14]  *See also* ComTech USA Report Q311, Apple Market Research & Analysis, November 11, 2011, APLNDC0002641020-069 at '028 and '041. [4.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

purchasing an Apple product. [579]  In a July 2011 STA Post Launch Consumer     Insights study, Samsung found that being "Not Apple Branded" was the major sales deterrent to the Galaxy Tab 10.1.[580]

### (3)  Mr. Musika's Calculation of Brand/Design Value and Value of Intangibles are Misguided.

256.     As explained above, Mr. Musika estimated  Apple's companywide "Brand/Design Value" "by multiplying [Apple's] operating profit by the ratio of its brand value to     market capitalization …" [581]  Notwithstanding the fact that Interbrand's brand value figures represent much more than overall design,  and specifically Apple's design IP at issue, this calculation implies that operating margin and market capitalization     are comparable measures.  From a different perspective, this calculation assumes that "Brand/Design Value" and operating margin share the same relationship, if such a relationship exists, as Apple's brand value and market capitalization.

257.     This, however, is not the case.  Operating margin is  a measure of the profitability of a company's operating activities over a specif ied time period.  Market capitalization,  on the other hand, is calculated by multiplying a com pany's total number of outstanding shares by the value of an individual share.  Thus, market capitalization is the market's valuation of a company, including the value of current and future operations, as well as all real and intangible assets owned by that company.

258.     Since  Mr.  Musika employed an inappropriate calculation of "Brand/Design Value," it follows that his calculation of the value of other intangibles is incorrect as well because it was calculated as EVA minus "Brand/Design Value." [582]     However, what is even more problematic is that Mr. Musika renamed what he initially called "Value of Intangibles," using it to calculate what he concluded was a "Per unit rate for utility patents." [583]  This conversion was both unexplained and not supported by the facts.  As has been acknowledged by Mr. Musika, [584] and discussed in this report, the value of both smartphones and  tablets are derived from a vast

---

[579] Deposition of Gregory Joswiak, Volume II, February 24, 2012 p. 399. [9.3]  *See also* Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 60. [9.2]
[580] Samsung Presentation: STA Post Launch Consumer Insights. July 2011, SAMNDCA00027781-844 at '779. [4.16]
[581] Musika Report, Exhibit 41.3, [2.2]
[582] Musika Report, Exhibit 41.3, [2.2]
[583] Musika Report, Exhibit 41.2, [2.2]
[584] Musika Report, p. 52, [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

array of feature sets not limited to the IP at issue.  Mr.   Musika, ignoring his own assertions, is implicitly claiming that his "Value of Intangibles" is the exclusive result of the specific IP at issue.

### (4)  Mr. Musika's Use of WACC is Inappropriate, and Has No Effect on His Calculation.

259.    Mr. Musika's calculation of industry WACC, which he   uses to determine EVA in his income approach, is not an appropriate measure.  While Interbrand does use in its EVA calculation a "capital charge rate … set by the industry weighted average cost         of capital (WACC)," the brand management firm does not disclose just how    it calculates such a WACC. Given  this  uncertainty,  Mr. Musika simply chose eleven U.S. companies that appeared in Interbrand's 2010 or 2011 top 100 brands report. [585]  Further, these companies were limited to Interbrand's computer software, electronics, or internet services industry categories.[586]

260.    A closer examination of these companies , however, shows that they  are actually very different financially and probably do not provide a useful   industry WACC benchmark.  For example, I have gathered information on   each company's operating margin for the years 2010 and 2011, where available, and compared it to the   corresponding companywide WACC.  While the  company WACCs provided by Mr. Musika ar   e relatively similar to each other, their 2010 operating margins run the gambit from 4.1% for Amazon.com to 38.6% for Microsoft.  [587]  The same is true of 2011; operating margin ranges from 1.8% for Dell to 38.8% for Microsoft.[588]

261.    As part of his income approach, Mr. Musika        also used  the same "Industry Weighted Average Cost of Capital" to calculate Apple's companywide EVA, Apple's iPhone and iPad  combined  EVA, and Samsung's accused product EVA. [589]  However, since WACC is the same for both Apple companywide and iPhone and iPad combined, changes in WACC have no effect on the final result.  In other words, a change in WACC has the same net effect on Apple's companywide EVA net of brand value as it does on Apple's iPhone and iPad combined EVA net of brand value.  Since the former is ultimately subtracted from the latter in Mr. Musika's analysis, the net effect of a change in WACC is no effect on his calculation.  That    is, no matter whether the WACC was 0% or 1000%, Mr. Musika would have derived the same values.

---

[585] Musika Report, Exhibit 41.4, [2.2]
[586] Musika Report, Exhibit 41.4, [2.2]
[587] Schedule 16.1. [1.2]
[588] Schedule 16.1. [1.2]
[589] Musika Report, Exhibit 41.3, [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(5)   Mr. Musika is simply splitting the "economic value" of the iPad and iPhone to the specific IP asserted in this lawsuit.**

262.    In its basic form, Mr. Musika's analysis simply calculates the profitability of the iPhone and the iPad, subtracts the profitability of all   Apple products, and splits that profitability between the utility patents and the design-related IP.  It is simply                not justified and not appropriate to conclude that 100% of this value is related to the limited asserted IP in this case.

**(6)   Mr. Musika's analysis results in an overstated conclusion for the excess profitability of iPad / iPhone versus the company as a whole.**

263.    Mr. Musika's analysis's use of worldwide profitability  for the iPhone and iPad and comparing it to worldwide profitability for all Apple products (which include computers).       First, computers are in a notoriously competitive indus   try, and therefore profitability of Apple as a whole  would  be  expected  to  be  lower regardless of whether the asserted IP was worthless or valuable.   This suggests that the comparison that Mr. Musika's analysis relies upon is meaningless.

264.    Second, as explained elsewhere, the use of worldwide prices for      the U.S. and worldwide significantly overstates the profitability of the iPad        and  iPhone  products  because Apple's U.S. ASP for these products are considerably lower than its worldwide price.  Although I am not aware of Apple producing data on this, in   my experience computer prices are higher in the  U.S.  versus  worldwide,  so using the worldwide data would tend to understate Apple's computer profitability.

265.    Finally, the unreliable nature of Mr. Musika's calculation is demonstrated by     the fact that if Mr. Musika has performed his calculation separately       for iPad and for iPhone, he would have found that the iPad profitability is lower than the overall company profitability,   which would have resulted in his calculation of a negative royalty rate for the asserted IP with respect to the iPad.[590]

**(7)   Mr. Musika uses an understated tax rate for Samsung, and if he had used the correct rate he would have found a negative royalty rate.**

---

[590] Mr. Musika reports an operating income of ███ for iPad in Exhibit 33, compared to the company wide operating income of 30.1%. (Musika Report, Exhibit 33, 41.3. [2.2])

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

████████████████████████████████████

███████████████████████████████████. However, for Apple, Mr. Musika is using the consolidated company's effective tax rate reported in Apple's financial statements. Similar to Apple, Samsung pays taxes in many countries around the world, the primary country being Korea where it is headquartered. If Mr. Musika had applied a similar methodology as for Apple, he would have used a 20% effective tax rate for 2011.[591] If this rate had been used, Mr. Musika's analysis would have calculated a negative value for intangibles for Samsung, which based on Mr. Musika's logic would demonstrate that Samsung derives no value (or negative value) from its use of the asserted utility patents.

### (8) Mr. Musika calculates the maximum royalty rate that Samsung would be willing to pay, but then ignores the rate.

266.    Mr. Musika calculates royalty rate values for Samsung, but then appears to completely ignore those values in his royalty rate conclusion. Given that he is collecting lost profits in his scenarios where he has presented a reasonable royalty, it is unclear why the value he calculates for Apple has any significance to the conclusion.

### c) The other benchmarks mentioned by Mr. Musika are not relevant to the reasonable royalty analysis.

267.    As Mr. Musika explained, "[t]he market approach to the valuation of intellectual property is based on the consideration of other market comparable transactions."[592] In this analysis, Mr. Musika explained that he "reviewed and analyzed both Apple and Samsung's licensing activity and searched the public domain for market comparable rates specific to or comparable to the Apple Intellectual Property In Suit."[593] While Mr. Musika concluded that the three potentially relevant Apple agreements he discovered "do not provide a relevant comparable reference rate for the Apple Intellectual Property In Suit,"[594] he inappropriately turns to Apple's Made for iPhone, iPad, and iPod program as a reference point.[595]

---

[591] Consolidated Financial Statements of Samsung Electronics Co., Ltd. and Subsidiaries as of December 31, 2011, p. 67. [3.5]
[592] Musika Report, p. 56. [2.2]
[593] Musika Report, p. 56. [2.2]
[594] Musika Report, p. 58. [2.2]
[595] Musika Report, p. 60. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

268.    This program, which "made it possible for third parties to manufacture an accessory and with Apple's permission place a 'Made for iPod' logo on the packaging in exchange for a fee …" of $4 per unit, was considered "a floor for the license of any single item of intellectual property contained in the asserted design patents, trade           dress, and trademarks."[596]   Despite his conclusion, Mr. Musika acknowledged that "this license is not a comparable license to any of the Apple Intellectual Property In Suit …"[597]

269.    I share  Mr. Musika's opinion that this license is not comparable.  Most importantly, this license has nothing to do with Apple's design IP at issue.  Mr.           Buckley described this program as follows: "[s]o if I wanted to be a part of it and I made cases for my iPods, I could put that little Made For iPod sticker   on my … product to advertise it being made for iPod." [598]  In short, it is an indefensible assertion that this agreement provides any useful information to the analysis of a reasonable royalty rate in this matter, let alone a per unit royalty floor for any single item of design IP.  Mr. Musika offers no explanation of his assertion and I do not find this license at all relevant to this matter.

### d)   Mr. Musika's analysis does not take into account several data points that would result in a much lower reasonable royalty rate.

270.    Mr. Musika's discussion of the market derivation of a reasonable           royalty benchmark excludes certain     considerations  that would place downward pressure on his suggested royalty rate.  While he postulates that there is "No    Market Rate" for any of the IP at issue,[599] there still exist important circumstances, embodied in both     licensing discussions and agreements that can serve as tests for the reasonableness of Mr. Musika's conclusions.

271.    Mr. Musika begins his market benchmark analysis by proposing five theories on which he bases his discussion.[600]   The first four of these theories serve to characterize Apple as an organization that, as a general principal, does not license its patented technology         to third parties.[601]   For example, as Mr. Musika points out, t he testimony of Apple's former Chief  Patent Counsel, Mr. Richard Lutton,[602] indicates that Apple was not willing to license its design patents

---

[596] Musika Report, pp. 60-61. [2.2]
[597] Musika Report, p. 60. [2.2]
[598] Deposition of Mark Buckley, February 23, 2012, p. 58. [5.2]
[599] Musika Report, Exhibits 46 and 47. [2.2]
[600] Musika Report, pp. 56-57. [2.2]
[601] Musika Report, p. 56. [2.2]
[602] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 8. [14.7]

to Samsung.[603] Mr. Lutton also indicated that Apple was willing to provide   "[a] license to some scope of utility patents …." [604] However, Mr. Musika excluded from his   discussion that Apple viewed Samsung as a valuable partner with which it was willing to work hard       to resolve the alleged infringement.

272.   This fact is evidenced, again, by Mr.   Lutton's testimony.  According to Apple's former Chief Patent Counsel, Apple was "very concerned about       the … theft of intellectual property and … were it not for the relationship between the companies … Apple   would have … proceeded down a different path" and sued Samsung immediately, rather than engaging in discussions.[605]  Mr. Lutton recalled that during a meeting on August 4, 2010 between     the two companies, Apple "wanted to make clear to Samsung that [Apple] viewed [Samsung] as a key partner."[606]  While Apple thought that Samsung was "using, inherently       in the Android-based systems, a lot of utility patents …," Mr. Lutton noted that Apple was "committed to working with [Samsung] to try to find a path through … that both parties   could live with."[607]  Though, as Mr. Lutton explained,  "Apple  never intended to license Apple's design patents to Samsung, … [Apple was]  committed  to working with them on an appropriate license so that they could continue to sell  products that used [Apple's] utility patents in their smartphones …" [608]  Again, Apple took that position "in recognition of [Samsung] as a key partner that … [Apple] wanted to engage … in that negotiation and … take that seriously."[609]

273.   It is clear from Mr. Lutton's testimony     that Apple's relationship with Samsung opened the door to negotiations between the parties.  In order to preserve the fruitful business relationship between them, it is likely that Apple, at a hypothetical negotiation, would have been amenable to a lower licensing rate for Samsung as one       of its "key partners."  Mr. Musika's failure to consider this aspect of the business relationship of the two parties results in a possible overestimation of the reasonable royalty rate.

274.   In addition to the parties' relationship, Mr. Musika also ignored a few important aspects of their 2010 meetings that could have informed his reasonable royalty analysis.  During an October, 2010 licensing discussion with Samsung, Apple began "framing what would be an

---

[603] Musika Report, p. 56. [2.2]
[604] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 53. [14.7]
[605] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 36-37. [14.7]
[606] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 51. [14.7]
[607] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 51-52. [14.7]
[608] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 117. [14.7]
[609] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 117. [14.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

eventual license relationship around the utility patents …"[610]  This framework provided "a set of licensing potential outcomes that the parties might work out on [those] patents."[611]

275.   At an October meeting, Apple modeled "3 types of patent licenses to cover wireless and computing technologies."[612]  Respectively, these three proposed licenses would have covered "[b]asic telephony (e.g. wireless standards, java, processor, graphics, misc HW)," "Apple Computing technologies (e.g. O/S, object oriented, etc.)," and "Advanced iPhone Technologies needed to create an 'advanced' class device (e.g. Touch, GUI, apps, music, etc.)."[613]   Apple noted that "[e]ach license include[d] distinct technologies, so an iPhone advanced mobile class device would require all 3 licenses, while a basic phone would require only the phone license."[614]

276.   This 3-tiered licensing scheme resulted in Apple's proposal of $30 per licensed smartphone, including Android units, and $40 per licensed touchscreen tablet, "[r]educing to $30 over 2 years." [615]  There are two important facts to keep in mind regarding these proposed rates: 1) they represent initial offers by Apple that likely would have been negotiated downward during the course of a normal licensing discussion, and 2) they represent licensing rates that cover a much larger scope of technology than the limited IP at issue in this case.

277.   To elaborate on the second point, based on Apple's 3-tiered proposal, it is clear that the proposed licensing rates encompass much more than just the IP at issue in this matter. Specifically, the accused utility patents disclose technology for touchscreen hardware (the '607 and '129 Patents), touchscreen software (the '915 Patent), and   GUI features (the '002, '891, '381, and '163 Patents). It would appear that    all of the Utility Patents-in-Suit fall into the "Advanced Mobile" category of Apple's licensi ng framework, which includes the "Touch" and "GUI" capabilities needed to make an advanced iPhone-like device.[616]

[610] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]

[611] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]

[612] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[613] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[614] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[615] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '897. [14.8]

[616] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

278.    Furthermore, Apple's proposed "Advanced Mobile" license included technology that is not at issue in this suit.  For example, Apple noted in its   October, 2010 presentation that the advanced class of device delivered both "apps" and "music," [617] technology that   Apple's Patents-in-Suit  do  not  cover.    It  follows from the above that Apple's $30 and $40 royalty proposals greatly overstate the reasonable royalty for at least the Utility Patents-In-Suit because these rates include rights to at least two categories  of irrelevant IP to the hypothetical license in this case, while the remaining category includes the IP at issue in addition  to technology outside of the scope of this matter. This is clear from Apple's second lawsuit they have filed against Samsung, in this same court, that is seeking damages and an injunction of patents that are not at issue in this lawsuit.

279.    While Mr. Lutton often testified that Apple was unwilling to license its design IP to Samsung, Apple's October 5, 2010 presentation suggests otherwise.  As described in the slide deck, Apple was "will[ing] to provide Samsung with a number of    options for obtaining the most cost-effective [as] possible license to [its] patent portfolio."[618]  This included the possibility of four separate and cumulative discounts, as shown in the slide below.[619]

---

[617] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[618] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '900. [14.8]

[619] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '900. [14.8]

**Figure 35: Potential Discounts for Licenses to Apple's Patents**



280.    The fourth possible discount to Samsung, "Not  Using Proprietary Features," was made available because "[s]ome Samsung 'smartphone' products may not adopt [the] distinctive industrial designs, software platforms or feature sets."  [620]  Clearly, the industrial  design was contemplated in the creation of this presentation.  Notably, despite his assertions to the contrary, Mr. Lutton was unable to point to any information  in the October 5, 2010 presentation that indicated that Apple's design patents were not available for license; rather, he could only state that he thought "it was clear in [the parties'] discussions, the context  of [the parties'] discussion, that Apple expected Samsung to change its design."[621]

281.    This information provides a clear maximum to Apple's valuation of its design IP in this specific licensing context.  Apple proposed that those Samsung devices that  steered clear of Apple's proprietary features, the Samsung Bl  ackjack II for example, would receive a  20% discount from the $30 base royalty per smartphone or $40 base  royalty per tablet.[622]  In other

---

[620] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '898. [14.8]

[621] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 186-190. [14.7]

[622] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '901. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

words, Apple valued its proprietary features, which, as described        above, included industrial designs, software platforms, and feature sets, at 20% of $30 for smartphones or 20% of $40 for tablets: $6 and $8 per unit, respectively. This fact is ignored in Mr. Musika's analysis.

282.    Apple confirmed this interpretation by explicitly removing the discount for non-use of proprietary features on a slide that pictures what appear to be two of Samsung's accused products.   This slide indicates that use of Apple's industrial designs, software platforms, or feature sets by Samsung's accused products would eliminate the 20% discount, thus subjecting the devices that use such accused IP to a royalty rate $6 or $8 higher than their non-infringing counterparts.[623]

**Figure 36:  Apple's Proposed Discounts for Samsung's Android-Based Full Touchscreen Devices**



283.    While it is unclear what Apple meant by   the terms "software platforms or feature sets" when describing its proprietary features, it seems likely that    at least certain of the Utility Patents-in-Suit fall within that category.  As described above, Apple's October 5, 2010 licensing

---

[623] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '902. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

discussion concluded that its operating system fell under     the category of "Apple Computing technologies," while touch and GUI fell under "Advanced iPhone Technologies."[624]

284.    It is important to keep in mind the distinction  among these technologies because one of the explicitly stated available discounts is for the "use of an OS largely licensed to Apple patents …"[625]  This may indicate that both touch and GUI are contained within Apple's  definition of "software platforms or feature sets."  However, if this is not the case, it would appear that touch and GUI would fall into the "Apple licensed O/S" category of discounts.  If this is the case (i.e. all utility and design IP at issue were considered either proprietary features or licensed O/S features), then Apple valued the IP at issue at no more than 60% (40% discount     for use of a licensed O/S plus 20% discount for non-use of proprietary features) of the base royalty: $18 per smartphone and $24 per tablet.  Again, these     valuations include a much larger portfolio of technology than what is at issue in this case, indicating that the actual value of the IP at issue  is substantially less than these maximum values.[626]

285.    To provide yet another alternative, if Apple's multi-touch  and GUI Patents-in-Suit are not included in any of the available discounts,    then they could be included in the residual royalty due on a smartphone that was eligible for certain other discounts.     For example, a Samsung smartphone using Windows Mobile 7 would have been subject  to a $9 royalty, under Apple's framework, after accounting for the appropriate discounts.    [627]  This, coupled with the 20% discount for Apple's proprietary features, yields   a $15 maximum royalty for smartphones. Since the tablet base royalty is 33% higher than that for    smartphones ($40 compared to $30), the implied royalty rate would have also been 33% higher: 133% of $15 is $20 per unit.

286.    While, as explained above, Apple's proposed license to Samsung does     imply a maximum royalty, if it is determined that certain Apple IP was not available     for license, then a reasonable  royalty in relation to that IP is not an appropriate remedy.  Mr. Musika, instead of explaining the concept of calculating a reasonable royalty in a situation in  which a royalty never would have materialized, asserts that these circumstances warrant "a very high          but  un-

---

[624] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[625] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '898. [14.8]

[626] Also note that Apple's smartphones are not accused of infringing the '607 and '129 Patents-in-Suit that describe touchscreen hardware.  This also indicates a lower smartphone royalty rate.

[627] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '903. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

quantifiable rate for Apple's asserted design patents and trade dress." [628] Instead of attempting to calculate a reasonable royalty for such IP, Mr. Musika should have concluded simply that the reasonable royalty remedy was not available in this case.

287.    In addition to overlooking the facts described above, Mr. Musika, while he does calculate an implied royalty rate, essentially ignores Samsung's licensing proposal to Apple. This proposal is an indication of Samsung's      starting point for the hypothetical negotiation framework.  As Mr. Musika calculated, Samsung's proposal implied      an approximately $4 to $4.50 per unit license for both Apple and Samsung's smartphones and tablets. [629] Further, as Mr. Musika notes, this is a rate for a portfolio of patents not limited to the Patents-in-Suit. [630] Since the hypothetical negotiation framework assumes an arms-length, bilateral negotiation between the parties involved, it is unreasonable to disregard a rate actually  proposed by one of the relevant entities.

288.    Finally, supplementing the analysis provided above, Samsung      entered into a Confidential Patent License Agreement with Microsoft, effective July 1, 2011, that provided each party a worldwide, nonexclusive license to the ot   her party's entire portfolio of  patents filed on before the end of the license term,    which would extend for seven years.[631] Pursuant to this license, each party was granted the right to make, use, and sell certain licensed products. [632] With  respect  to  Samsung,  the licensed products included both Android smartphones and tablets.[633]

289.    ████████████████████████████████████████
████████████████████████  ██   ████████████████████
████████████████████████████████  ███

---

[628] Musika Report, p. 56. [2.2]
[629] Musika Report, Exhibit 40. [2.2]
[630] Musika Report, Exhibit 40. [2.2]
[631] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '484, '490, '497. [15.12]
[632] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '490. [15.12]
[633] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '489. [15.12]
[634] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '494. [15.12]
[635] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '485. [15.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



290. 

---

[636] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '494. [15.12]

[637] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '506. [15.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

291.    This license may provide a useful benchmark with which to        evaluate  the hypothetical license because it is essentially a license to manufacture and sell smartphones and tablets running the Android operating system.

### e)   Mr. Musika takes into account inappropriate considerations in his *Georgia-Pacific* analysis that result in an artificially high royalty rate.

292.    Mr. Musika consistently refers to Apple's "unwillingness" to  negotiate a license at essentially any price as a basis to argue for a high royalty rate.  [638]  Mr. Musika appears to use this argument to establish a very high royalty rate, even on intellectual property    that has little impact on the sale of either party, as admitted by  Mr. Musika.  In his "Market Approach" section, Mr. Musika states that "Apple's policy is to not license to anyone its        design  elements  as represented by Apple's asserted design patents and trade dress.  Accordingly, this sets a very high but un-quantifiable rate for Apple's asserted design patents and trade dress."[639]

293.    For example, Mr. Musika admits that  Apple would not lose any profits based on Samsung's infringement of the trademark icons, yet he    still concludes that the "reasonable" royalty rate for Samsung's infringement of any trademark icon would be $22 per unit,    stating that "[d]ue to the extreme importance of Apple's design to its corporate success and future, I have  assigned  the  high  end  of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements. Therefore, although Apple has refused to license any of its design related assets and would consider the license of one as injurious as licensing the group, the "Made for iPod" program rate of    $4.00 per unit is considered a floor royalty for the license of any individual item within this group."[640]

294.    Mr. Musika is essentially arguing that Apple would never license the design-related intellectual property, therefore the rate for any element of design-related IP should    be artificially high.  This is  inappropriate for two reasons.  First, if Apple would never have licensed the IP, then a reasonable royalty is not an appropriate remedy in this case.  Indeed, in a recent N.D. of California decision, Judge Phyllis Hamilton granted a  motion for judgment as a matter of

---

[638] Musika Report, pp. 28, 56, 65, 71, 73, Exhibits 42, 43, 45, 46. [2.2]
[639] Musika Report, p. 56. [2.2]
[640] Musika Report, Exhibits 46 and 47. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

law in a copyright matter that the plaintiff is not entitled to actual damages in the form of a hypothetical license.[641]

295.    Even if Apple is entitled to seek a reasonable royalty for the alleged infringement, Mr. Musika is claiming to do so under a *Georgia-Pacific* analysis. However, the 15th factor describes the licensing circumstances clearly, requiring that both parties would be "reasonably and voluntarily trying to reach an agreement" and the licensor "was willing to grant a license."[642] Clearly, Mr. Musika is not following these required assumptions of the *Georgia-Pacific* analysis in his conclusions.

### f)    Mr. Musika's concluded royalty rate is unreasonably high.

296.    As described above, Mr. Musika relies on benchmarks that provide overstated values and are not reliable indicators of the value of the specific intellectual property at issue in this lawsuit. In addition, Mr. Musika does not consider several benchmarks that would have resulted in significantly lower reasonable royalty rates. Therefore, Mr. Musika's concludes a royalty rate that is unreasonably high and would not be agreed to by Samsung, or any other willing licensor.

### 7.    Mr. Musika's discussion of the irreparable harm done to Apple is divorced from actual market conditions.

297.    Mr. Musika asserts that "the damages amounts expressed [in his report] do not represent a complete measure of the total damages that Apple has and will continue to experience due to Samsung's conduct." [643]  However, Mr. Musika offers little to no evidence, beyond cursory conjecture, that such irreparable harm has occurred, is occurring, or will occur in the future. The data, shown in the five figures below, show that Apple is far from suffering irreparable harm.

---

[641] *Oracle USA, Inc., et al. v. SAP AG, et al.,* Order Granting Defendants' Motion for JMOL , and Motion for New Trial; Order Denying Plaintiffs' Motion for New Trial; Order Partially Vacating Judgment, September 1, 2011, p. 10. [15.13]
[642] Musika Report, p. 87. [2.2]
[643] Musika Report, p. 27. [2.2]

**Figure 37: Apple US iPhone Sales by Quarter[644]**



298.    The chart above shows Apple's U.S. iPhone sales by quarter from the release of the first iPhone through Q4 2011.   Apple's iPhone sales enjoyed a relatively steady climb from introduction through Q1 2011.  After a short lull, during which no     new iPhone iterations were released, Apple's smartphone sales skyrocketed    to approximately fifteen million units in the fourth quarter of 2011, the quarter during which the iPhone 4S launched.  As        shown of the graph, this more than doubled the previous record of around seven million units during Q1 2011 with the launch of the Verizon iPhone 4.

---

[644] Schedule 18. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 38: Smartphone Average Selling Prices in the U.S., Q2 2007 Through Q4 2011[645]**



299.     The above chart shows Apple's iPhone ASP alongside Samsung's smartphone ASP from Q2 2007 through Q4 2011.  As illustrated, Apple has maintained a consistent and sizeable premium over Samsung.  In other words, Apple would be hard pressed to argue that its smartphone offering has suffered any price erosion at the hand of Samsung's products.  In fact, Apple's ASP has consistently increased since Q3 2009.

---

[645] Schedule 18. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 39: Smartphone Revenue Share in the U.S., Q2 2007 Through Q4 2011**[646]



300.    As pictured in the above graph, Apple has also consistently    maintained a high proportion of smartphone revenue share since Q2 2007.  Notably, while Samsung's revenue share has also increased, Apple's share jumped to nearly 60% during Q4, 2011, the quarter that saw the release of the iPhone 4S.

---

[646] Schedule 18. [1.2]

**Figure 40: Smartphone Unit Share in the U.S., Q2 2007 Through Q4 2011**[647]



301.    Very similar to the previous c    hart, the above graph shows that Apple has maintained its share of smartphone unit sales over time.  Again, Apple's unit    sales set records in Q4 2011 with the release of the iPhone 4S.

---

[647] Schedule 18. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Figure 41: Apple's Share of Realized Handset    Industry Profits Worldw ide Q1 2008 Through Q4 2011[648]



302.    The chart above shows Apple's share of realized Worldwide handset profits. This graph depicts not only the consistent growth of Apple's share of industry profits, but also its profit earning power.  In the most recent quarter depicted,    again Q4 2011 during which the iPhone 4S was released, Apple earned 75% of handset industry profits Worldwide.

303.    Mr. Musika also points out in his discussion of irreparable  harm that "[d]ue to the complexity of the calculation and uncertainty regarding specific amounts tied to new purchases of Apple's products, almost none of the Apple ecosystem sales are captured in the damage calculation."[649]  However, this statement has nothing to do with a discussion of irreparable harm. In fact, Mr. Musika may have had data sufficient to calculate damages from potentially lost sales

---

[648] Schedule 18. [1.2]
[649] Musika Report, p. 30. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

of accessories or lost sales through iTunes, but did not include it in his analysis. [650]  If there was any definite harm to Apple from these alleged losses, then the value could easily be calculated. The fact that Mr. Musika chose not to present calculations of certain alleged lost sales does not show that that there exists irreparable harm.

### B.  Apple Is Not Entitled to Lost Profits

304.    As described at length in my disagreements with Mr. Musika, Apple is not entitled to lost profits on the intellectual property at issue in this lawsuit.  I describe the basis for my conclusions below.

#### 1. Utility   Patents

305.    For the asserted utility patents, Samsung has          acceptable,  non-infringing alternatives available to it.  I discuss these alternatives at length in *Georgia-Pacific* factor 9.

306.    The only utility patent that would take more than one month to design around is the '607 Patent.  However, the first accused product is     the Galaxy Tab 7.0 (3G), which was announced on September 16, 2010.  [651] This announcement would trigger the design around date.  Therefore, the design around would be completed prior to the launch of the Galaxy Tab 10.1.  Further, as I describe above, Samsung is not entitled to lost profits on the  Galaxy Tab 7.0 (3G).

307.    Due to the availability of acceptable, non-infringing alternatives and the      other reasons described in Section IV.A.3, Apple is not entitled     to lost profits on its asserted utility patents.

#### 2. Design-Related   IP

308.    For the asserted Design-Related IP, Samsung     has  acceptable,  non-infringing alternatives available to it.  I discuss these alternatives at length in *Georgia-Pacific* factor 9.

---

[650] See e.g. iTunes Business P&L Q1'12, APLNDC-Y0000051592-598. [2.37]; GAAP Line of Business Reporting, iPad.Acc, Q1 2009 through Q1 2012, APLNDC-Y0000051606-609 [2.38]
[651] Samsung Press Release: Samsung Mobile Expands Galaxy Product Portfolio with Launch of Samsung Galaxy Tab, September 16, 2010, <http://www.samsung.com/us/news/newsPreviewRead.do?news_seq=19537>. [15.33]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

309.    In addition, Mr. Musika has not cited to any evidence demonstrating evidence of demand for "design" and the specific design-related IP at issue. I have concluded above that Apple's contribution to "design" is at most a small contribution.

310.    Due to the availability of acceptable, non-infringing alternatives and failure to demonstrate demand, as well as the other reasons described in Section IV.A.3, Apple is not entitled to lost profits on its asserted design-related IP.

## C.  Opinions Regarding Samsung's Profits Related to the Design IP

311.    I understand that a remedy that may be available to Apple for Samsung's infringement of the design-related IP is Samsung's profits related to the infringement ("Unjust Enrichment"). Mr. Musika has performed a calculation of Samsung's Unjust Enrichment based on total revenues and based on Samsung's gross margin, but Mr. Musika has not provided any apportionment in his calculations for Samsung's contributions other than the design-related IP.[652]

312.    As described more fully below, I have concluded that Samsung's COGS and operating expenses are deductible expenses as they are related to the sale and manufacture of the accused products. I have also performed an apportionment that determines the maximum apportionment of Samsung's profits on the accused products to the design-related intellectual property at issue.

### 1.  Samsung's Sales Data

313.    Samsung has produced sales data and expense data for STA, SEA, and SEC.[653] The sales data include monthly data covering the period May 2010 through December 2011 for 30 Samsung products.[654] For each of the 3 Samsung entities, the sales data include quantity

---

[652] Musika Report, pp. 23-25. [2.2]

[653] Exhibit 2620 to Deposition of Timothy Sheppard, March 30, 2012, SAMNDCA00376623-901. [14.1]

[654] The Samsung sales data includes data for the "Galaxy Tab 7.0" and the "Galaxy Tab 8.9." I understand that the Galaxy Tab 8.9 is not an accused product, therefore I do not include the Galaxy Tab 8.9 in my calculations. (Musika Report, p. 48. [2.2]) The "Galaxy Tab 7.0" was first sold by SEA in October 2011; based upon a comparison of Mr. Musika's reported sales for the product he calls "Galaxy Tab" in Exhibit 38.1 to Samsung's sales data, it appears that Mr. Musika is including the product "Galaxy Tab 7.0 (3G)" in his calculations, but he is excluding the product "Galaxy Tab 7.0." Therefore, I do not include the profits for the "Galaxy Tab 7.0" in my calculations of Samsung's profits.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

(in units), sales ($), cost of goods sold (COGS), and operating expenses broken down        into major operating expense categories.

314.    SEA and STA are the only Samsung entities that    sell into the United States,[655] therefore Samsung's U.S. sales of the accused products are determined by the sales of the accused products by SEA and STA.  Mr. Sheppard testified that STA sells Samsung's mobile phones in the United States and the sales of the tablets are split so that tablets that can connect to a cellular network are sold by STA and those that    cannot (e.g., wifi-only tablets) are sold by SEA.[656]

315.    The following figure provides a summary for STA and SEA of the quantity sold, revenue, and ASP for each of the accused products:

**Figure 42:  Consolidated SEA and STA Revenue, Quantity, and ASP for Accused Products[657]**

| Product | 2010 | | | 2011 | | | 2010 - 2011 Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Revenue | Quantity | ASP | Revenue | Quantity | ASP | Revenue | Quantity | ASP |
| Acclaim | $69,626,621 | 209,662 | $332 | $6,918,626 | 30,179 | $229 | $76,545,246 | 239,841 | $319 |
| Captivate | $325,163,101 | 732,869 | $444 | $198,540,962 | 658,440 | $302 | $523,704,063 | 1,391,309 | $376 |
| Continuum | $73,338,883 | 173,560 | $423 | $38,720,356 | 146,614 | $264 | $112,059,239 | 320,174 | $350 |
| Droid Charge | $0 | 0 | $0 | $351,465,501 | 699,366 | $503 | $351,465,501 | 699,366 | $503 |
| Epic 4G | $363,131,713 | 702,727 | $517 | $458,714,814 | 1,092,661 | $420 | $821,846,527 | 1,795,388 | $458 |
| Exhibit 4G | $0 | 0 | $0 | $72,952,506 | 283,073 | $258 | $72,952,506 | 283,073 | $258 |
| Fascinate | $468,640,215 | 1,027,206 | $456 | $150,478,565 | 406,820 | $370 | $619,118,780 | 1,434,026 | $432 |
| Galaxy Ace | $0 | 0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 |
| Galaxy Prevail | $0 | 0 | $0 | $258,911,331 | 1,536,840 | $168 | $258,911,331 | 1,536,840 | $168 |
| Galaxy S (i9000) | $0 | 0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 |
| Galaxy S 4G | $0 | 0 | $0 | $395,281,186 | 1,145,702 | $345 | $395,281,186 | 1,145,702 | $345 |
| Galaxy S II 2 (AT&T) | $0 | 0 | $0 | $179,853,040 | 383,661 | $469 | $179,853,040 | 383,661 | $469 |
| Gem | $0 | 0 | $0 | $63,595,570 | 374,101 | $170 | $63,595,570 | 374,101 | $170 |
| Gravity / Gravity Smart | $0 | 0 | $0 | $90,123,928 | 473,669 | $190 | $90,123,928 | 473,669 | $190 |
| Hercules / Galaxy S II (T-Mobile) | $0 | 0 | $0 | $195,794,628 | 432,286 | $453 | $195,794,628 | 432,286 | $453 |
| Indulge | $0 | 0 | $0 | $98,221,588 | 270,612 | $363 | $98,221,588 | 270,612 | $363 |
| Infuse 4G | $0 | 0 | $0 | $360,510,494 | 850,643 | $424 | $360,510,494 | 850,643 | $424 |
| Intercept | $196,295,412 | 857,530 | $229 | $67,358,564 | 380,030 | $177 | $263,653,976 | 1,237,560 | $213 |
| Mesmerize | $56,630,363 | 119,630 | $473 | $204,644,961 | 537,339 | $381 | $261,275,324 | 656,969 | $398 |
| Nexus S | $26,813,136 | 56,000 | $479 | $25,002,235 | 77,885 | $321 | $51,815,371 | 133,885 | $387 |
| Nexus S 4G | $0 | 0 | $0 | $193,031,315 | 504,068 | $383 | $193,031,315 | 504,068 | $383 |
| Replenish | $0 | 0 | $0 | $92,376,320 | 602,887 | $153 | $92,376,320 | 602,887 | $153 |
| Showcase / Galaxy S Showcase (i500) | $15,649,036 | 31,500 | $497 | $88,312,660 | 233,016 | $379 | $103,961,695 | 264,516 | $393 |
| Sidekick | $0 | 0 | $0 | $133,425,648 | 429,240 | $311 | $133,425,648 | 429,240 | $311 |
| Transform | $66,346,493 | 238,640 | $278 | $86,278,041 | 365,330 | $236 | $152,624,535 | 603,970 | $253 |
| Vibrant | $428,544,127 | 973,166 | $440 | $16,615,189 | 47,877 | $347 | $445,159,316 | 1,021,043 | $436 |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | $154,345,456 | 262,099 | $589 | $147,532,169 | 403,521 | $366 | $301,877,625 | 665,620 | $454 |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | $0 | 0 | $0 | $205,516,283 | 480,023 | $428 | $205,516,283 | 480,023 | $428 |
| Total | $2,244,524,556 | 5,384,589 | $417 | $4,180,176,479 | 12,845,883 | $325 | $6,424,701,035 | 18,230,472 | $352 |

## 2.    Samsung's Deductible Expenses

---

[655] Deposition of Jaehwang Sim, March 10, 2012, pp. 119-120, 142-143. [4.5]
[656] Deposition of Timothy Sheppard, January 24, 2012, pp. 26-28, 87. [3.22]
[657] Schedule 15.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

316.   Samsung has provided detailed, monthly sales     and expense data for each accused product.  Other than one adjustment that I describe below relating to the          COGS reported in the "manufacturing" section of Samsung's financial data, I understand that the expense data reported in Samsung's financial data are extracted directly from Samsung's SAP financial database.[658]

317.   I have  reviewed each category of cost included in the data and have had conversations with Samsung employees   [659]  to confirm that the expense items included in Samsung's financial data are deductible expenses.

### a)   SEC's Deductible Expenses

318.   Samsung's financial data includes a section titled "Manufacturing" that includes sales data and expense data for SEC and two Chinese manufacturing subsidiaries.[660]  This data includes the accused products that are     manufactured to be sold worldwide;[661] therefore, for many accused products the manufacturing quantity is significantly higher than the sales of SEA and SEC.

319.   As discussed by SEC's 30(b)(6) witness on its financial data, Mr. Sim, in its latest financial data productions, Samsung has adjusted the COGS reported in the data in order to "zero out" the manufacturing profits of   the Chinese manufacturing subsidiaries.[662]  Mr. Mus ika has  performed adjustments to his calculations in order to reverse the effect of these adjustments.[663]

320.   In my calculations, I rely on SEC's COGS that do not include any adjustment for the Chinese manufacturing subsidiaries.  Samsung's early productions of  financial data did not include any adjustment for the   Chinese manufacturing subsidiaries;[664] therefore, I rely on the

---

[658] Deposition of Jaehwang Sim, March 10, 2012, pp. 34-35. [4.5]  *See also* Deposition of Timothy Sheppard, February 29, 2012, p. 84. [10.13]  *See also* Deposition of Timothy Sheppard, March 30, 2012, p. 150. [13.3]

[659] Conversation with Dongyul Choi, April 15, 2012.

[660] The Manufacturing section includes data for SEC Korea, SEHZ, and TSTC, the latter two of which are the Chinese manufacturing subsidiaries.  (Deposition of Jaehwang Sim, March 10, 2012, p. 114. [4.5])

[661] Deposition of Jaehwang Sim, March 10, 2012, pp. 112-113. [4.5]

[662] Deposition of Jaehwang Sim, March 31, 2012, pp. 242, 261. [13.4]  *See also* Deposition of Timothy Sheppard, March 30, 2012, pp. 147-148. [13.3]

[663] Musika Report, pp. 49-50. [2.2]

[664] Deposition of Jaehwang Sim, March 10, 2012, pp. 35-37, 43-48. [4.5]

134

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

COGS reported in Samsung's earlier financial spreadsheets for the        purposes of calculating SEC's deductible expense.[665]

321.    To determine whether SEC's reported expenses are deductible, I  have reviewed several deposition transcripts of Samsung financial witnesses and had a conversation with Mr.Dongyul Choi, a Manager in SEC's Finance Team, to gain a better        understanding of the costs included in the different expense categories.

322.    The largest cost category for SEC is the cost of goods sold for the accused products.  Based on my conversation with Mr. Choi, I understand that the COGS        expense includes direct expenses, such as  direct labor and royalties, and indirect expenses, such as indirect manufacturing labor cost, manufacturing overhead, and utility costs.  These costs are necessary for the manufacture of the accused  products and are therefore deductible expenses. I note that it appears Mr. Musika does not contest that      COGS will be found to be deductible expenses,  as he has performed an Unjust Enrichment calculation taking these COGS into account.[666]

323.    As part of its calculation of the operating expenses (and        COGS to a lesser degree),  Samsung  allocates expenses that are not directly related to a specific product. Samsung's financial witnesses have described that Samsung's allocation methodology follows a three-step allocation process.  Timothy Sheppard, STA's Vice President of        Finance and Operations, describes the three-step process as follows:[667]

> First, any expenses that are incurred specifically with        respect to a particular model are allocated to that model;
>
> Second, costs that are not specific to a given model are        allocated to various cost centers. So, for example, the        lease of a building will be allocated to various cost centers. If that allocation can be undertaken    on the basis of usage, that method will be used. For example, if the sales team that works with Sprint takes up two thousand square feet of    a four thousand square foot building, half of the rent will be allocated to that

---

[665] Exhibit 1922 to the Deposition of Timothy Sheppard, March 30, 2012, SAMNDCA00354292-385. [15.14]

[666] Musika Report, pp. 24-25. [2.2]

[667] Declaration of Timothy Sheppard in Support of Samsung's Opposition to Apple's Motion for Rule 37(b)(2) Sanctions for Samsung's Alleged Violations of January 27, 2012 Damages Discovery Order, March 12, 2012, (hereafter, "Sheppard Declaration") p. 8. [4.17]  *See also* Deposition of Timothy Sheppard, February 29, 2012, pp. 60-64, 92-97, 99. [10.13]  *See also* Deposition of Jaehwang Sim, March 10, 2012, pp. 120-121, 134-137. [4.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Sprint sales team. Alternatively, if the usage methodology is not practical, the revenue method will be used.

The third and final step is to then take common cost centers, for example, the HR department or the accounting group and allocate those costs across devices.

324.   This allocation procedure is used in Samsung's ordinary course of business, [668] and is instituted as part of Samsung's monthly closing process. [669] This type of allocation methodology is a reasonable method to allocate indirect expenses. I note that Apple's 30(b)(6) witness on financial topics testified that Apple itself allocates the majority of its operating expenses by revenue.[670]

325.   Based on my conversation with Mr. Choi, [671] I understand that the different operating expense categories include:

- GA Expense – Labor Cost: General & Administrative Staff labor cost

- GA Expense – Depreciation: G&A Staff office supplies and depreciation cost

- GA Expense – Others: IT support cost, 3rd party service expense cost

- Sales Expense – Marketing: Advertising, promotion, and sales commissions

- Sales Expense – Paid Commission: Sales expenses related to 3rd party subcontractors[672]

- Sales Expense – Insurance: all Insurance Cost

- Sales Expense – Others: Sales personnel labor cost, transportation cost, service costs.

- R&D Expense – Labor Cost: R&D related labor cost[673]

- R&D Expense – Depreciation: R&D related equipment depreciation

- R&D Expense – Others: R&D material cost, 3rd party R&D costs.[674]

326.   Based on my discussions, these costs are necessary for the manufacture and sale of the accused products and are therefore deductible expenses.

---

[668] Sheppard Declaration, p. 8. [4.17]

[669] Deposition of Timothy Sheppard, February 29, 2012, pp. 65-67, 96-97. [10.13] Deposition of Timothy Sheppard, March 30, 2012, pp. 77-78. [13.3]

[670] Deposition of Mark Buckley, February 23, 2012, p. 104. [5.2]

[671] Conversation with Dongyul Choi, April 15, 2012

[672] Deposition of Jaehwang Sim, March 31, 2012, p. 251. [13.4] *See also* Deposition of Jaehwang Sim, March 10, 2012, pp. 127-129. [4.5]

[673] Deposition of Jaehwang Sim, March 10, 2012, p. 138. [4.5]

[674] Deposition of Jaehwang Sim, March 10, 2012, p. 138. [4.5]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

327.    One expense that I requested more information about is whether any litigation expense related to the current lawsuit is included in the expense data.  I received financial data that breaks out the all litigation expense that has  been allocated to each accused product on a worldwide basis;[675] the allocated lawsuit expense is a component of COGS, therefore I deduct the litigation expenses from the worldwide COGS  in my calculations and thereby increase my calculation of profits.

328.    In summary, I have determined that all of the expenses in the Manufacturing section of the financial data are deductible expenses except the litigation expense that has been allocated to the accused products.

### b)   STA's and SEA's Deductible Expenses

329.    The expense categories included in the financial  data are identical between SEA and STA, and Timothy Sheppard verified that the expenses are reported in   a similar fashion,[676] so I analyze the deductible expenses of STA and SEA together.  In my discussion    below, I will refer to STA, but the SEA treatment is identical.[677]

330.    Similar to SEC, STA's largest expense is COGS.  I understand that the large majority of COGS is the transfer price from SEC to STA, but other expenses such        as repair, inventory value adjustments, scrap,    and  physical inventory adjustments are also included in STA's COGS. [678]   Mr. Sim testified that "When it comes to COGS under STA, it includes purchase cost, purchase price for the products obtained from a manufacturer.  And there is also costs related to importing products, additional costs.  So you can consider this figure in COGS hundred percent direct cost."[679]

331.    Because STA's COGS are directly related to the sale    of the accused products, STA's COGS are a deductible expense for the purpose    of calculating STA's profit.  However, when  calculating  the consolidated profitability of SEC, STA, and SEA, the transfer price between SEC and STA is not a deductible expense because it is a cost to STA and revenue    to SEC.  Therefore, I do not treat the transfer price as a deductible   expense when calculating the

---

[675] Volume 9, Tab 26.
[676] Conversation with Timothy Sheppard, April 13, 2012.
[677] Conversation with Timothy Sheppard, April 13, 2012.  *See also* Deposition of Jaehwang Sim, March 31, 2012, p. 239. [13.4]
[678] Conversation with Timothy Sheppard, April 13, 2012.
[679] Deposition of Jaehwang Sim, March 31, 2012, p. 227. [13.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

profitability including SEC.  I do not make any deduction for the cost categories other than    the transfer price in COGS and remove the effect of the STA's and SEA's COGS for the calculation of the consolidated profitability of SEC, STA, and SEA.

332.    Based on the discussion in Mr. Musika's report, I understand that Apple may contest that 100% of the transfer price is a deductible expense when calculating the profitability of SEA and STA.[680]  As Samsung's financial witnesses have explained, the transfer price is set based on an agreement between Samsung and the U.S. government.[681]  Mr. Sheppard testified that "the negotiation for the APA is really a three-party negotiation between the Korean  IRS, the U.S. IRS, and Samsung to say based on our economic    activity, they hire economists, we   hire economists, the Korean government hires economists and says based on the activity STA does, this is a fair and reasonable amount of profit that reflects the activity    that STA is doing.  Based on that, that's how the tax is paid."[682]  I do not see any reason why an adjustment would need to be made to the transfer price.

333.    Based on my conversation with Tim Sheppard,[683] I understand that the different operating expense categories include:[684]

- GA Expense – Labor Cost: General & Administrative     Staff labor cost (salaries, overtime, bonuses, benefits, etc.)

- GA Expense – Depreciation: All depreciation  for fixed assets (computers, office equipment, etc.)

- GA Expense – Others: Travel    expenses, telephone expenses, building expenses for accounting, IT, HR, facilities, legal, and management,

- Sales  Expense  –  Logistics Cost: Warehousing and freight (moving products)

---

[680] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[681] Deposition of Timothy Sheppard, January 24, 2012, pp. 21-22, 35, 62-63, 82-83, 115-116. [3.22]  *See also* Advance Pricing Agreement between Samsung Electronics American, Inc. and The Internal Revenue Service, S-ITC-007274461 – 476. [4.18]  *See also* Deposition of Timothy Sheppard, February 29, 2012, pp. 123-129. [10.13]

[682] Deposition of Timothy Sheppard, February 29, 2012, pp. 125-126. [10.13]

[683] Conversation with Timothy Sheppard, April 16, 2012.

[684] The financial data includes a Sales Expenses – Marketing line, but the expenses are zero because SEC reimburses STA for marketing expense.  (Deposition of Jaehwang Sim, March 31, 2012, pp. 251-252. [13.4]  *See also* Deposition of Timothy Sheppard, March 30, 2012, p. 98. [13.3])

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

- Sales Expense – Paid Commission: Primarily Temporary staff
- Sales Expense – Insurance: Property and general liability insurance.
- Sales Expense – Others:  Travel expenses, telephone expenses, building expenses for sales cost centers
- Operating Expenses – Other: small miscellaneous items.

334.    Based on my discussions, these costs are necessary for the manufacture and sale of the accused products and are therefore deductible expenses.      Mr. Sheppard testified that STA is "primarily a sales organization."[685]

335.    In summary, I have determined that all of the      expenses in the STA and SEA sections of the financial data are deductible expenses.

### 3.    Calculation of Samsung's Profits on the Accused Products

336.    I understand that several damages periods may be relevant depending  on which design-related intellectual property is found to be valid and infringed, so I have calculated profits for the entire period of sales of accused products, from the filing of   the Complaint on April 15th, 2011,[686] and from the filing of the Amended      Complaint on June 16, 2011.[687]  In addition, I understand that the Court may determine that the damages period may be cut-off for certain periods, so I have included monthly calculations of profits       for each accused product in Schedules 21.1 – 21.28 at Volume 1, Tab 2 of my report.

337.    In addition to the three different damages periods for which I calculate profits, I also calculate profits for (i) STA and SEA only; and (ii) SEC, STA, and SEA.

338.    In preparing to calculate Samsung's profits on the accused products,       I first calculate period totals across all products for the 2010, 2011, the period April      15, 2011 to December 31, 2011, and the period June 16, 2011 to December 31,     2011.  I then aggregate STA and SEA financials by product, report them on a per                unit basis, and  calculate Manufacturing expenses on a per unit basis.  I then apply the per   unit manufacturing expenses and SEA / STA per unit expenses to determine the per unit profitability, and finally multiply by the number of units sold to determine the profit for each accused product.  The calculations of profitability are in the 4 Series of Schedules at Volume 1, Tab 2 of my report.

---

[685] Deposition of Timothy Sheppard, January 24, 2012, p. 24. [3.22]
[686] Apple Inc.'s' Complaint for Patent Infringement, April 15, 2011. [15.32]
[687] Apple Inc.'s Amended Complaint, June 16, 2011. [2.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

339.    My calculations of profits on the accused products after deductible expenses are as follows:

**Figure 43:  STA and SEA Profit After Deductible Expenses**[688]

| Product | 2010 | 2011 | Total | 4/15-12/31 2011 | 6/16-12/31 2011 |
|---|---|---|---|---|---|
| | [a] | [b] | | [c] | [d] |
| Acclaim | | | | | |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Exhibit 4G | | | | | |
| Fascinate | | | | | |
| Galaxy    ce              A | | | | | |
| Galaxy Prevail | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S 4G | | | | | |
| Galaxy S II 2 (AT&T) | | | | | |
| Gem | | | | | |
| Gravity / Gravity Smart | | | | | |
| Hercules / Galaxy S II (T-Mobile) | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Intercept | | | | | |
| Mesmerize | | | | | |
| Nexus S | | | | | |
| Nexus S 4G | | | | | |
| Replenish | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | |
| Sidekick | | | | | |
| Transform | | | | | |
| Vibrant | | | | | |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | | | | | |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | | | | | |
| **Profit After Deductible Expenses** | | | | | |

---

[688] Schedule 4.2. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 44:  SEC, STA, and SEA Profit After Deductible Expenses[689]**



| Product | 2010 | 2011 | Total | 4/15-12/31 2011 | 6/16-12/31 2011 |
|---|---|---|---|---|---|
| | [a] | [b] | | [c] | [d] |
| Acclaim | | | | | |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Exhibit 4G | | | | | |
| Fascinate | | | | | |
| Galaxy    ce          A | | | | | |
| Galaxy Prevail | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S 4G | | | | | |
| Galaxy S II 2 (AT&T) | | | | | |
| Gem | | | | | |
| Gravity / Gravity Smart | | | | | |
| Hercules / Galaxy S II (T-Mobile) | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Intercept | | | | | |
| Mesmerize | | | | | |
| Nexus S | | | | | |
| Nexus S 4G | | | | | |
| Replenish | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | |
| Sidekick | | | | | |
| Transform | | | | | |
| Vibrant | | | | | |
| Galaxy Tab 7.0 (3G) / Galaxy Tab | | | | | |
| Galaxy Tab 10.1 / Galaxy Tab 10.1 (WiFi) | | | | | |
| **Profit After Deductible Expenses** | | | | | |

### 4.  Apportionment of Profit to the Design-Related IP at Issue

340.    Determining the profits of the accused products is the first step      of the Unjust Enrichment calculation.  Next, the profits should be apportioned to the design-related IP at issue versus everything else that is contributed by Samsung.  I understand that Apple is likely to take the position that Samsung is not entitled to apportion its profits for the asserted   design patents; this is a legal issue for which I do not have an opinion.  I calculate an apportionment for each design-related  IP  group, and leave it to the Court to determine whether I can apply the apportionment for the design patents.

341.    As I have discussed at length in this report, the design-related IP at issue in this lawsuit is a small portion of the total design relevant for the accused products.  In addition,

---

[689] Schedule 4.2. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

design as a whole is a small portion of the value to consumers of     smartphones.  Therefore, a proper  apportionment is critical to avoid providing a windfall to Apple of the entirety of Samsung's profits.

342.    Even Apple itself highlighted the value of  other smartphone features, rather than industrial design, during its licensing discussions with Samsung.  During the October 5, 2010 meeting with Samsung, Apple presented a potential licensing framework.  [690]  According to the presentation, an advanced mobile  device would need to license three sets of technology: basic telephony, Apple computing technologies, and advanced iPhone technologies.  [691]  Specifically, this framework was based on Apple's conclusion that "  *Software* creates the largest   share  of product value." [692]  (emphasis in original)  Apple further explained that "[o]perating system, applications,  user  interface,  and services are the key to a  *differentiated customer experience*."[693]  (emphasis in original)  In fact, "[s]oftware [had] always been at     the  heart  of Apple's business and intellectual property portfolio."[694]

343.    The evolution of Apple's devices saw both an increase in processing power and miniaturization, resulting in the iPhone and iPad line of products,   which Apple characterized as "RF Mobile Computer[s]."  [695]   Such "Mobile Computers rely upon several key technologies principally developed in the computing industry." [696]   The slide below, presented by Apple during the October meeting, specifically highlighted several of these "key technologies."[697]

---

[690] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]

[691] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[692] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]

[693] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]

[694] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '889. [14.8]

[695] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '890. [14.8]

[696] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '891. [14.8]

[697] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '891. [14.8]

**Figure 45:  Key Technologies for Mobile Computing**



344.    These "[m]obile computers create more value for customers – and sell for more – by virtue of the additional technologies that enable them." [698]  By contrast, save for one sole slide,[699] Apple's  presentation  is  devoid  of any mention of the value of industrial design as a value driver for smartphones.  Notably, as discussed elsewhere in my report, the  slide that does mention Apple's industrial design suggests that Apple was willing to license its design features to Samsung.

345.    The  discovery  record includes several consumer studies that can be used to determine a maximum apportionment for design as a whole.

### a)   Apportionment to "Design"

346.    In  this  section,  I  analyze the importance of design to smartphone buyers and owners in comparison to other smartphone's features and attributes.   To perform this analysis, I

---

[698] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '892. [14.8]
[699] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '898. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

use data from (i) iPhone Buyer Surveys    commissioned by Apple; (ii) ComTech Reports also commissioned by Apple; and (iii) J.D. Power and Associates Consumer Studies.

### (1)  Apple iPhone Buyer Surveys

347.    In this section, I analyze the importance of the iPhone's attractive appearance and design to iPhone buyers in comparison to other features and attributes of the iPhone. I use data from the iPhone Buyer Surveys commissioned by Apple.

348.    According to Apple's summary, Apple Market Research has    conducted monthly surveys of iPhone buyers to study the demogr    aphics of iPhone purchasers,    their purchase decision making, initial use and satisfaction with the iPhone.    [700] As a part of    the survey, the respondents were presented with a list of iPhone's features or attributes    and asked to rank the importance (e.g. "very important,"    "somewhat  important," "neither important nor unimportant," "somewhat unimportant," "very unimportant," and  "don't know") of the iPhone's features in their iPhone purchase decisions. [701]  The list of the iPhone's features or    attributes  presented  to  the respondents included such features as "Web capabilities," "Ease         of use," "The ability  to download  and  use  apps," "Multitasking," and "Attractive Appearance and Design" among others.[702]   The results of the  survey  were shown as a series of bar graphs for each iPhone's feature or attribute, similar to Figure 46 below:[703]

---

[700] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q2, APLNDC-Y0000026687-807 at '689. [6.6]

[701] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

[702] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

[703] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 46:  The Importance of Attractive Appearance and Design in iPhone Purchase Decision[704]**



349.    Apple frequently analyzes the top box ("Very Important") and top-2 boxes   ("Very Important"  and "Somewhat Important") in its summaries.    [705]  I have collected data on the importance of the iPhone's features and attributes in the iPhone purchase     decisions  from the iPhone Buyer Surveys for the period from Q2 2010 to Q4 2011.       In the first two quarters, respondents were not asked whether "Attractive appearance and design" were  important in their purchase decisions.

350.    I have calculated  a  reasonable apportionment for design by comparing the weight of top box and top-2 box percentages of "attractive appearance and design" to all other features.  As an example, in the Q4 2010 su     rvey, 50 percent of iPhone   buyers in the U.S. named the "Attractive appearance and design" as a very important feature in their decision to purchase the  iPhone.[706]  In comparison, 80 percent, 77 percent, 69 percent, 68 percent, 57 percent, 55 percent, 53 percent, 47 percent, 36 percent, 27 percent,          17 percent of the

---

[704] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '277. [3.14]

[705] Footnote 703:   iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-278. [3.14]

[706] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '277. [3.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

respondents considered the "Web capabilities," "Ease of use,"    "Improved battery life," "The ability to download and use apps," "Value for price paid", "Multitasking,"   "5MP camera with LED flash," "Retina Display," "HD video," "Face Time video calling," and "The ability to edit video on the iPhone 4 with iMovie" as very important features, respectively.[707]

351.    Therefore, to analyze the relative importance of the "Attractive    appearance and design" in comparison to the other iPhone's features and attributes, I    have divided the percent of iPhone survey respondents that named the "attractive appearance and design" of the iPhone as  very  important by the cumulative percent of respondents that considered certain iPhone's features as very important: 50% / (80% + 77% + 69% + 68% + 57% + 55% + 50% + 53% + 47% + 36% + 27% +17%).   [708] This methodology indicates that      the "attractive  appearance  and design" of the iPhone has a 7.9 percent share of the "very important" category, which I use as the apportionment. [709]  I have performed this analysis for     each quarter from Q4 2010 to Q4 2011.  On average, the "attractive appearance and design" of the iPhone are considered to be very important in purchase decision making, relative to all other iPhone features and attributes, by 7.5 percent of the iPhone buyers. [710]

352.    I have also replicated this analysis for the "Attractive     appearance  and  design" feature ranked as the top-2 box ("very import ant" and "somewhat important") by respondents in their iPhone purchase decisions.  On average, 8.5 percent of the  iPhone buyers considered the "attractive appearance and design" of the iPhone to be "very important" or "somewhat important" in purchase decision making, relative to all other iPhone's features and attributes, in the        Q4 2010 - Q4 2011 time period. [711]

### (2) ComTech   Reports

353.    Apple  commissioned  ComTech  to conduct longitudinal consumer surveys to study "ownership and purchasing of device, carrier connections, billing  and usage in the mobile

---

[707] iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256-340 at '267-'285. [3.14]
[708] Schedule 8.4. [1.2]
[709] Schedule 8.4. [1.2]
[710] Schedule 8.4. [1.2]
[711] Schedule 8.3. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

phone market." [712]  In particular, ComTech Reports provide snapshots of consumer handset purchasing by reason for handset choice, as shown on Figure 47 below.[713]

**Figure 47:  Handset Purchase by Priceband and by Reason for Choice[714]**



354.    According to a February 18, 2011 ComTech Report, only two percent of iPhone owners purchased iPhone because of its "design and color" in Q2      2011 – Q4 2010.[715]  Five percent of respondents listed "design and color" as the reason for the Android smartphone ownership.[716]  Overall, only four percent of respondents   chose a smartphone for the reason of "design and color."[717]

---

[712] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '936. [14.10]

[713] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

[714] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

[715] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

[716] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

[717] ComTech United States Pricing Analysis, February 18, 2011, APLNDC0002521932-964 at '957. [14.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

355.     I have collected the data on the handset purchase reasons from the ComTech Reports for the period from Q2 2010 to Q4 2011.  On average, 2 percent, 4 percent, and 3 percent of respondents purchased the iPhone,    the Android smartphone or any smartphone, respectively, because of the "design and color" in the Q2 2010 – Q4 2011 time period.[718]  These are additional measures of apportionment of the value of design.

### (3)  J.D. Power and Associates Studies

#### (a)  Weight given to design category

356.     J.D. Power and Associates has conducted Wireless Smartphone       Satisfaction Studies to understand attitudes, experiences and behavioral characteristics of smartphone users and determine factors that        impact  customer satisfaction across smartphone user segments.[719]  In particular, J.D. Power and Associates uses  its proprietary model to break down a smartphone into factors and attributes.  One of the attributes that J.D. Power and Associates asks about is "Styling of wireless phone," which falls within the "Physical Design" category along with "Strength and durability," "clarity of display," and "weight of wireless phone." [720]  According to the weightings in the November 2011 J.D. Power and Associates study, a weighting of 20 percent was given to the smartphone's physical design, and within the physical design, 25 percent was assigned to "Styling of wireless phone." [721]  Therefore, styling was assigned a total weight of five percent (20% * 25%).

---

[718] Schedules 8.5, 8.6, and 8.7. [1.2]

[719] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '343. [13.9]

[720] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

[721] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 48:  Smartphone Factors and Attributes[722]**





357.   A March 2011 J.D. Power and Associates   study included "visual appeal of your wireless phone" within the "physical design" category.  The weighting for     the physical design category  was  23  percent,  and  the  visual  appeal  had a 22 percent weighting of the category, which corresponds to a total weighting of about 5 percent of the smartphone (23% * 22%).[723]

358.   These  data  points  are  good measures of an appropriate apportionment for design because a third party (J.D. Power and Associates) has determined the weightings and uses the weights in its industry consulting.

---

[722] J.D. Power and Associates 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, November 14, 2011, SAMNDCA00282033-088 at '035 and '062. [13.7]

[723] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '380. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*(b) Survey  results*

359.    Similar to Apple's studies, in its March 2011 study, J.D. Power and Associates also analyzed the smartphone selection      process.[724]  According to the study, reasons for choosing the smartphone manufacturer included "Liked Overall Design / Style" (45%), "Internet Capable" (44%), "Touch Screen" (43%), and others presented in Figure 49 below.[725]

---

[724] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '393-'400. [13.9]
[725] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '395. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 49: Reasons for Choosing Handset Brand**[726]



360.    To analyze the importance of the "Overall design/style"    relative  to  the  other reasons for choosing a handset brand, I have divided the percent of respondents that listed the overall  design/style  as a purchase reason by the cumulative percent of respondents that considered other reasons in their smartphone selection process.  I have calculated a 5   percent apportionment based on the survey responses.[727]

---

[726] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '395. [13.9]

[727] Schedule 9.4. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (4) Conclusion

361.    The consumer surveys discussed in this   section  provide a relatively consistent range for apportionment of value to design, ranging from 1% to 8.5%.  Based on my review of these surveys, I have concluded that five percent is an appropriate apportionment of value to design as a whole.[728]

### b)   Apportionment of Design to Specific Design-Related IP at Issue

362.    The five percent determined above is a maximum value for design  because, as discussed above, the design-related IP at issue in this lawsuit is only a small portion of the overall design of a smartphone.

363.    The J.D. Power and Associates studies discussed    above  provide a basis to compare the success of Apple's products relative to the industry.  In the March 2011 study, Apple outperformed all other manufacturers in the physical design factor, scoring 36 index points above the industry average as shown in Figure 50 below.[729]  Apple also exceled in all five attributes of the physical design, including "Visual appeal of wireless phone," "Size of display screen," "Brightness of background display screen lighting," "Weight of wireless phone," and "Size of wireless phone," [730]  In particular, in the "Visual appeal of wireless phone" attribute, Apple performed 0.47 points or 6 percent above the industry average of     8.16 ((8.63 - 8.16) / 8.16).[731]

---

[728] Schedule 7.1. [1.2]

[729] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]

[730] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]

[731] Schedule 9.3. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 50:  Physical Design Attribute Ratings Compared to Average[732]**

### Physical Design Attribute Ratings Compared to Average

| | Industry Average | Apple | HTC | Palm | Samsung | Motorola | RIM BlackBerry | Nokia |
|---|---|---|---|---|---|---|---|---|
| Physical Design Index | 795 | 831 | 808 | 782 | 780 | 777 | 763 | 761 |
| Visual appeal of wireless phone | 8.16 | 8.63 | 8.28 | 7.87 | 7.95 | 7.89 | 7.79 | 7.67 |
| Size of display screen | 7.93 | 8.37 | 8.16 | 7.32 | 7.90 | 8.24 | 7.34 | 7.34 |
| Brightness of background display screen lighting | 8.14 | 8.45 | 8.27 | 8.15 | 7.93 | 8.09 | 7.82 | 7.80 |
| Weight of phone (including battery) | 7.73 | 8.00 | 7.77 | 7.95 | 7.71 | 7.11 | 7.62 | 7.68 |
| Size of wireless phone | 7.75 | 8.01 | 7.88 | 7.80 | 7.47 | 7.43 | 7.57 | 7.55 |

For handsets used for less than 2 years.

■ = Significantly **ABOVE** Industry Average at 95% Confidence Level (excluding manufacturer).
■ = Significantly **BELOW** Industry Average at 95% Confidence Level (excluding manufacturer).

51 | © 2011 J.D. Power and Associates,
The McGraw-Hill Companies, Inc.
All Rights Reserved.

J.D. POWER
AND ASSOCIATES®

364.    In the survey asking about reasons for choosing a smartphone, 51 percent of the respondents indicated a reason that they selected Apple was the overall design/style. [733]  This is 6 percent higher than the industry average of 45 percent, as shown in Figure 51 below. [734]  In relative terms, the respondents valued Apple's overall   design/style  13 percent  higher  than  the overall design/style of all smartphone manufactu rers  on  average in their smartphone selection process (6% / 45%).

---

[732] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '388. [13.9]

[733] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]

[734] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 51:  Selection Process Among Smartphone Manufacturers[735]**

## Selection Process Among Smartphone Manufacturers[1,2]

| Reasons for Selecting Handset | Industry Avg. | Apple | HTC | Motorola | Nokia | Palm | RIM BlackBerry | Samsung |
|---|---|---|---|---|---|---|---|---|
| Liked overall design/style | 45% | 51% | 49% | 50% | 34% | 42% | 38% | 43% |
| Internet capable | 44% | 48% | 51% | 57% | 18% | 37% | 37% | 39% |
| Touch screen | 43% | 58% | 61% | 58% | 16% | 56% | 11% | 52% |
| Ability to use e-mail accounts | 36% | 40% | 39% | 50% | 14% | 28% | 33% | 28% |
| Generally easy to use | 36% | 45% | 32% | 35% | 26% | 33% | 31% | 30% |
| Wi-Fi capabilities | 35% | 50% | 42% | 43% | 13% | 27% | 18% | 25% |
| Quality of phone/best one | 35% | 49% | 36% | 33% | 23% | 18% | 25% | 23% |
| Quality of display screen | 34% | 41% | 40% | 45% | 17% | 29% | 22% | 32% |
| Digital camera feature | 33% | 34% | 37% | 44% | 27% | 32% | 25% | 34% |
| GPS/Location feature | 32% | 40% | 40% | 50% | 16% | 25% | 19% | 27% |
| Ease of using Internet features | 32% | 44% | 33% | 40% | 11% | 26% | 21% | 21% |
| Ease of using e-mail features | 31% | 40% | 27% | 38% | 10% | 24% | 28% | 20% |

[1] Reasons less than 31% not shown.
[2] Based to all lengths of handset ownership.

365.    Based on the above analyses, I conclude that design in total should only        be apportioned five percent of Samsung's profits on accused products. What Apple  appears to add in value to the design of their products above        the  average  industry  participant  is  only  an increase of 6% to 13%. Using an average of 10% better design, this would imply that the value of all the Apple designs to average design value would be 0.5% of profits (5% X 10%).

366.    To be conservative, I would apportion 1% of Samsung's profits to possible design elements allegedly taken from Apple.

### c)    Apportionment based on design arounds

367.    As I describe below in  *Georgia-Pacific* factor 9, I have concluded that Samsung had  available  to  it  acceptable, non-infringing alternatives for the trademarks, GUI Design Patents, and trade dress.  These available alternatives indicate that the true apportionment      to Apple's asserted design-related IP is zero (or at most the expense of the        design  around discussed in *Georgia-Pacific* factor 9).

---

[735] J.D. Power: 2011 Wireless Consumer Smartphone Satisfaction Study(SM) Volume I - Management

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

368.    In addition, I note that the trademarks at issue are        a small part of the total population of trademarks used on Samsung's accused products.   For example, I or my staff has counted the number of icons in the pictures of several accused products included in the Expert Report of Susan Kare; based on this analysis, it appears that Samsung's accused products include between 34 and 60 icons.[736]

### d)   Conclusion on Apportionment

369.    In my opinion, Apple's design-related IP should be  apportioned at most to be one percent of Samsung's profits after deductible expenses.

### 5.   Samsung's Unjust Enrichment

370.    As  discussed above, STA's and SEA's profits after deductible expenses are negative  (losses), therefore STA and SEA did not have any unjust enrichment related to the sales of the accused products.[737]

371.    Applying the maximum apportionment of one percent to Samsung's profits after deduction  expenses  results in Samsung's Unjust Enrichment related to its infringement of the design-related IP calculated as follows:

**Figure 52:  STA, SEA, and SEC's Unjust Enrichment – Different Time Periods[738]**



| | STA, SEA and SEC Profit After Deductible Expenses | | |
|---|---|---|---|
| | STA, SEA and SEC Profit After Deductible Expenses | Apportionment | Apportioned STA, SEA and SEC Profit After Deductible Expenses |
| | [a] | [b] | [c] |
| 2010 | | | |
| 2011 | | | |
| Total | | | |
| April 15 - December 31, 2011 | | | |
| June 16 - December 31, 2011 | | | |

---

Report, March 2011, SAMNDCA10246338-445 at '396. [13.9]
[736] Schedule 17. [1.2]
[737] Schedule 4. [1.2]
[738] Schedule 4. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### D.  Opinions Regarding Reasonable Royalty Rate

#### a)  Basic Framework for Calculating Reasonable Royalty Damages for Patent Infringement

372.    The determination of damages for patent infringement is defined in Section 284 of U.S. Title 35, which states that "the court shall    award the claimant damages adequate to compensate for the infringement, but in no event less than    a reasonable royalty for the use made of the invention by the  infringer, together with interest and costs as fixed by the court."  A reasonable royalty is defined as the amount a willing licensor and licensee would bargain for at an arm's length hypothetical negotiation occurring on the date infringement began (e.g. the date of the first sale of the first infringing product). [739]  The hypothetical negotiation is based on the assumption that the patented claims at issue are deemed unquestionably valid  and enforceable and will be infringed by the products of the    licensee absent a negotiated license.[740]  Thus, for purposes of my analysis, I assume that the accused products infringe the Patents-in-Suit, and that the Patents-in-Suit are valid and enforceable.

373.    There are two factors "central to the reasonable royalty calculation    – the royalty base (the product sales which would be subject to the reasonable royalty), and      the royalty rate."[741]  Once the royalty rate and the royalty base are determined, it is a simple multiplication exercise.  In addition, prevailing patentees are entitled to pre-judgment interest, calculations for which I will also include in my analysis of total damages.     The award of prejudgment interest should place the patent holder in the same position that it would have enjoyed if the infringer had entered into a license agreement with regular payments.

374.    In calculating the appropriate reasonable royalty rate to apply, I first determined the date of the hypothetical negotiation.  Then I evaluated what the  baseline royalty rate should be, analyzed the factors of    *Georgia-Pacific Corp. v. U.S. Plywood Corp.* [742]   and the Federal

---

[739] *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, (U.S. Court of Appeals for the Federal Circuit, October 25, 1995), *517 at p. 5. [12.2]; *see also, Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.,* 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1324, p. 15. [12.3]

[740] *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, (U.S. District Court for the District of Delaware, December 30, 1997), *606, p. 45. [12.4]

[741] *Cornell University v. Hewlett-Packard Company*, Case. No. 01-CV01974, (U.S. District Court for the Northern District of New York, May 27, 2008), *4, p. 2. [12.5]

[742] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court of for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Circuit's recent *Lucent Technologies, Inc. v. Gateway, Inc., et al.* [743] decision, and then used my professional judgment to arrive at my opinion as to the reasonable royalty damages. A reasonable royalty to be paid for use of the Patents-in-Suit depends on an evaluation of the business, legal and economic factors that would be considered by the parties in a hypothetical negotiation. In addition, the Supreme Court and Federal Circuit have repeatedly recognized that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation. [744] In calculating a reasonably royalty rate, I considered facts known at the time of the hypothetical negotiation as well as factual developments occurring after the date of the hypothetical negotiation. This is because, for purposes of the hypothetical negotiation, courts may assume that all parties would have known all relevant information. This is also referred to as the "book of wisdom" which I explain in more detail below. [745]

375.   A comprehensive list of factors relevant to determining a reasonable royalty in a hypothetical negotiation is set forth in the leading decision of *Georgia-Pacific Corp. v. U.S. Plywood*. [746] In *Georgia-Pacific*, the court identified fifteen factors deemed pertinent to its decision regarding a royalty rate. [747] In performing a hypothetical negotiation analysis, it is important to recognize that some of the *Georgia-Pacific* factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to fit the facts of the case at hand. [748] The *Georgia-Pacific* factors, as well as other factors that I believe bear on the determination of a reasonable royalty in this matter, are discussed below.

376.   As part of my analysis, I have also determined the appropriate royalty base. The Federal Circuit ruled that "the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an

---

[743] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[744] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[745] *See e.g., Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, (U.S. Court of Appeals for the Sixth Circuit, April 25, 1978), *1158, p. 4. [12.1]; *Fromson v. Western Litho Plate and Supply Co., et al.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988), *1575, p. 9. [12.8]

[746] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970). [12.6]

[747] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

[748] *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, (U.S. District Court for the District of Delaware, December 30, 1997), *607, p. 45. [12.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

acceptable range (as determined by the evidence)." [749]   In other words, it is always appropriate to use the sales base of the entire device, so long as the value of the invention is weighed in comparison to the other functionalities of the device and the patented feature is a basis for customer demand.[750]   The value of the invention is reflected in the royalty   rate analysis that I conduct below, in which I have weighed the value of the invention   in accordance with the *Georgia-Pacific* factors.

377.   If it is determined that the "entire market value rule" applies, the magnitude of the rate I arrive at is an acceptable range based on the documents, testimony and information I have reviewed in connection with my analysis.  The royalty rate I have arrived at accounts for the infringing technology as compared to other capabilities.

### (1)  Date of the Hypothetical Negotiation

378.   The date of the hypothetical negotiation is sometime on or before the date of first infringement.[751]  In *Applied Medical Resources, Corp. v. U.S. Surgical Corp.*, the Federal Circuit states that "reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed" and that the   court must "identify the infringement requiring compensation, and evaluate damages based on a hypothetical   negotiation at the time that infringement began, not an earlier one ."[752]   For purposes of my analysis, I have assumed that infringement began no later than the date Samsung began selling   its accused products, which occurred around June 2010.[753]

### (2)  The Book of Wisdom

379.   In evaluating the business, legal and economic factors that the parties would consider in the hypothetical negotiation, I have relied on facts   and documents available as of the date of first infringement.  I have also relied on the "Book of Wisdom," a convention whereby the Court, for purposes of determining patent infringement   damages, considers facts and evidence "ex post" the date of the hypothetical negotiation.  The seminal Supreme Court

---

[749] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1338-39, p. 26. (Fed. Cir. 2009). [12.3]

[750] *Uniloc USA, Inc. et al. v. Microsoft Corporation*, (U.S. Court of Appeals for the Federal Circuit, January 4, 2011). [12.9]

[751] *Unisplay, S.A. v. American Elec. Sign Co., Inc.*, 69 F.3d 512, (U.S. Court of Appeals for the Federal Circuit, October 25, 1995), *517, p. 5. [12.2]

[752] *Applied Medical Resources, Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, (U.S. Court of Appeals for the Federal Circuit, January 24, 2006), *1361, p. 4. [12.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

decision discussing the use of this Book of Wisdom is  *Sinclair Refining v. Jenkins Petroleum Process Co.*, in which Justice Cardozo wrote:

> At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement,     and the  probable  increase of efficiency or savings of expense.  This will generally  be  the case if the trial follows quickly after the issue of the patent.  But a different situation is  presented if years have gone by before the evidence is offered.  Experience is then  available to correct uncertain prophecy.  Here is a book of wisdom that courts may not neglect.  We find no  rule  of law  that sets a clasp upon its pages, and forbids us to look within.[754]

380.     Justice Cardozo also wrote that use of the  Book of Wisdom does not "charge the offender with elements of value non-existent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning."[755]  This precedent is important given that the purpose of the hypothetical negotiation construct     is  to  establish  a royalty rate adequate to compensate the Apple for actual use made of     the invention by the infringer.  Judge Markey in  *Panduit v. Stahlin Bros.  Fibre Works, Inc.*  admonished that reasonable royalties after litigation are not necessarily equivalent to royalty rates that might be negotiated in a purely commercial environment.[756]

381.     The  Federal  Circuit affirmed the use of the Book of Wisdom to adequately compensate the Apple in  *Fromson  v. Western Litho Plate and Supply Co*  .[757]  In that case, Fromson was issued the '461 patent for lithographic plates in 1965, before the metro newspaper market had been created.  However, the following decade there was     a surge  in  demand  for Fromson-type plates, largely due to the emergence of the metro newspaper market.  The CAFC held  that  these events were probative in determining a royalty rate at the time of the

---

[753] Based on product announcement dates.  (Schedule 6.3. [1.2])

[754] *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]

[755] *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, (Supreme Court of the United States, May 29, 1933), *698, p. 6. [12.7]

[756] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, (U.S. Court of Appeals for the Sixth Circuit, April 25, 1978), *1158, p. 4. [12.1]

[757] *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988). [12.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

hypothetical negotiation. [758]   *Fromson* has been cited favorably for the use of the Book of Wisdom in many subsequent cases.[759]

382.   In a recent CAFC decision in   *Lucent Technologies., Inc. v. Gateway, Inc.,* Microsoft argued that information about how often a certain feature had in fact been used by consumers of Microsoft products was irrelevant because "such facts postdate the time of the hypothetical negotiation." [760]   The CAFC countered, however, that "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers.   Nor could they since frequency of expected use and predicted value are related."[761]   The CAFC added that "[c]onsideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court   in assessing whether a royalty is reasonable."[762]

383. In   *Honeywell Int'l, Inc., et al. v. Hamilton Sundstrand Corp. (HSC),*  the Delaware District Court was persuaded that the result dictated by   *Fromson* was the most sensible in resolving the conflict of HSC's request to   preclude Honeywell from presenting   a damages calculation based on sales projections of the accused product that did not exist at   the time of the hypothetical negotiation. [763]   The Court stated that   *Fromson* promotes flexibility in damage calculations by not erecting an unnecessarily         rigid barrier to relevant post-negotiation information, discourages infringement by placing the risk of success   on the infringer, protects the *quid pro quo* underlying patent law by preventing a premature valuation   of the patent, and

---

[758] *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, (U.S. Court of Appeals for the Federal Circuit, August 4, 1988), *1575, p. 9. [12.8]

[759] *See, e.g., Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, (U.S. Court of Appeals for the Federal Circuit), *1571-72, pp. 8-9. [12.11]; *Harris Corp. v. Ericsson, Inc.*, 2003 U.S. Dist. LEXIS 12284, (U.S. District Court for the Northern District of Texas, Dallas Division, July 17, 2003). [12.12]; *Cadillac Prods. v. TriEnda Corp.*, (U.S. District for the Eastern District of Michigan, Southern Division, August 2, 2000). [12.13]; *Wright v. United States*, 53 Fed. Cl. 466, (U.S. Court of Federal Claims, August 28, 2002), *469-70, pp. 5-7. [12.14]; *ResqNet.com, Inc. v. Lansa, Inc.* 594 F.3d 860, (U.S. Court of Appeals for the Federal Circuit, February 5, 2010), *872, p. 20. [12.15]

[760] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[761] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333, p. 22. [12.3]

[762] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.*, 580 F.3d 1301, (U.S. Court of Appeals for the Federal Circuit, September 11, 2009), *1333-1334, p. 22. [12.3]

[763] *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp. 2d 459, (U.S. District Court for the District of Delaware, July 5, 2005), *469, p. 8. [12.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

permits a damage award more in keeping with the plain language of Section 284 by adequately compensating the plaintiff for the use made of the invention by the defendant.[764]

384.    District courts have also upheld the use of the Book of Wisdom. In *Ariba, Inc. v. Emptoris, Inc.*, the court determined that the "jury may consider the infringer's actual sales and revenue up to the date of trial as part of the 'book of wisdom.'"[765]   In a non-exhaustive list, the court stated that other admissible post-infringement evidence included the "importance of the technology, the development of products for convoyed sales, and the relative market position of the parties."[766]

385.    Accordingly, for purposes of determining the reasonable royalty adequate to compensate Apple for Samsung's use of the Patents-in-Suit, I have considered facts and evidence that may not have been known as of the date of the hypothetical negotiation.

386.    My interpretation of the Book of Wisdom has been subject to judicial scrutiny in the *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*   matter.   Judge Farnan concluded in a Memorandum Opinion that my methodology is consistent with settled law in the "Book of Wisdom" methodology and, therefore, satisfies the requirements of Rule 702.[767]

### (3)  Baseline Royalty Rate

387.    As a starting point for my analysis of the reasonable royalty rate, I have determined a "Baseline Royalty Rate," which I explain in more detail below. I then analyze qualitative factors to determine what adjustments, if any, to the Baseline Royalty Rate are necessary to ensure that the resulting royalty rate adequately compensates the plaintiff for the actual use made of the inventions by the infringer.

388.    As I stated above, a list of factors relevant to determining a reasonable royalty in a hypothetical negotiation is set forth in the leading decision of *Georgia-Pacific Corp. v. U.S.*

---

[764] *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp. 2d 459, (U.S. District Court for the District of Delaware, July 5, 2005), *469, p. 8. [12.16]

[765] *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, (U.S. District Court for the Eastern District of Texas, Lufkin Division, July 29, 2008), *917, p. 3. [12.17]

[766] *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, (U.S. District Court for the Eastern District of Texas, Lufkin Division, July 29, 2008), *918, p. 3. [12.17]

[767] *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc. et al*, (U.S. District Court for the District of Delaware, September 28, 2004), *5, p. 3. [12.18]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*Plywood*.[768]  In *Georgia-Pacific*, the federal court identified fifteen factors deemed pertinent to its decision regarding a royalty rate.[769]  Consideration of these and other relevant factors can result in the reasonable royalty rate being greater than or less than the Baseline Royalty Rate.

389.    When evaluating whether an adjustment to the Baseline Royalty Rate is necessary, it is important to bear in mind that the characteristic pertaining to each      *Georgia-Pacific* factor (e.g., term of the license) is considered  *relative to* the characteristic as embodied in the license upon which the Baseline Royalty Rate is based.  This construct is analogous to adjusting the estimated value of a parcel of real estate based on the differing characteristics of a comparable, recently-sold parcel.  To the extent that both properties are identical with respect to a given characteristic (e.g., square footage), no adjustment to the estimated value  is necessary.  Conversely, to the extent that the properties diffe r with respect to a given  characteristic (e.g., more desirable location), an adjustment to the estimated value may be warranted.

390.    My baseline royalties are based on the next best alternative besides practicing the asserted claims of the patents-in-suit to Samsung. A detailed description of the next best non-infringing alternatives is detailed in my discussion of      *Georgia-Pacific* factor #9 below. A summary Table of my starting point rates shows the baseline rates as:

**Design Around Costs**

Utility Patents
'002
'163
'381
'891
'915
'607
'129

Cost to Design a New Icon (per Icon)

Cost to Design and Implement a New GUI

Trade Dress (Based on New GUI)
Trade Dress (Device Related)

Electronic Device Design Patents



---

[768] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970). [12.6]

[769] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### b)   *Georgia-Pacific* Factor Analysis

#### (1)  Factor #1—the royalties received by the patentee for the licensing of the Patents-in-suit, proving or tending to prove an established royalty

391.    The purpose of Factor #1 is to  determine (1) whether there exists an *established* royalty for the Patents-in-Suit and, (2) absent such an *established* royalty, whether any offers to license or actual royalties received from licensing the patents-in-suit are probative regarding the determination of a reasonable royalty.

392.    I have received several agreements from Apple in which Apple is a licensee     of technology. A list of these agreements can be found at Tab 1.3 of my report.

##### (a)  *Implications Regarding an Established Royalty for the Patents-in-Suit*

393.    None of the transactions or licenses pertaining to   the Patents-in-Suit proves an established royalty.

##### (b)  *Absent an Established Royalty, are the Transactions and Licenses for the Patents-in-suit Probative of a Reasonable Royalty?*

394.    Although none of the transactions or licenses     pertaining to the Patents-in-Suit proves an established royalty,  some  of the transactions have implications relevant to the determination of a reasonable royalty.

#### (i)     FingerWorks, Inc. Acquisition

395.    FingerWorks, Inc., founded in April of 1999 by      Drs. John G. Elias and Wayne Westerman, "developed technology that integr   ate[d] keyboard, mouse, and gesture-based operations on a single, low-cost, patented substrate called the MultiTouch surface." [770]  While in business, the company's mission was "to be the dominant supplier of gesture and touch based input devices for the Internet, computer,        home entertainment, automotive, and industrial markets."[771]  Because  "[t]he company founders invented MultiTouch technology while at the University of Delaware," the University owned t   he inventors' initial patent, which   was filed in

---

[770] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '051-'052.
  [12.26]
[771] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

January of 1999.[772] As a going concern, FingerWorks paid the University of Delaware a small royalty on its sales of MultiTouch devices under an exclusive license agreement.[773]

396. Dr. Elias testified that he believed FingerWorks acquired certain patent rights from the University of Delaware in late 2004.[774] He thought that these rights included the '828 Patent, which claimed priority to U.S. Patent 6,323,846.[775] Dr. Westerman, however, recalled a slightly different account. In testimony before the International Trade Commission, he explained that when Apple bought FingerWorks in early 2005, Apple also purchased the '828 family of patents from the University of Delaware, the original assignee of this line of patents.[776] He also noted that Apple and FingerWorks had entered into another license, valued at "pennies per unit," for a FingerWorks chip, which embodied "a small subset of the technology" developed by FingerWorks.[777] I have not been provided with this agreement.

397. In this matter, Apple produced an Agreement and Plan of Reorganization that appears to describe the FingerWorks acquisition and related transactions.[778] This document, dated February 3, 2005, describes FingerWorks' merger with Tickle Acquisition Corporation, a wholly-owned subsidiary of Apple computer, Inc.[779] Pursuant to the merger, each share of FingerWorks outstanding capital stock was to be converted into the right to receive the following:[780]

$13.5M

*minus*    Deferred consideration of $2M to be paid eighteen months later

---

[772] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]

[773] Business Plan Summary, Sans Financial Section, 2001, APLNDC0000043050-068 at '052. [12.26]

[774] Deposition of John G. Elias, Ph.D., October 13, 2011, pp. 86-87. [12.27]

[775] Deposition of John G. Elias, Ph.D., October 13, 2011, pp. 85-87. [12.27]

[776] Exhibit 1155 to Westerman Deposition, Prehearing and Tutorial in the Matter of Certain Mobile Devices and Related Software, September 23, 2011, APLNDC-X0000004562-907 at '620-'621, pp. 292-294. [12.28]

[777] Exhibit 1155 to Westerman Deposition, Prehearing and Tutorial in the Matter of Certain Mobile Devices and Related Software, September 23, 2011, APLNDC-X0000004562-907 at '627-'628, pp. 322-323. [12.28]

[778] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4973. [12.29]

[779] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4978. [12.29]

[780] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4984. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

| | |
|---|---|
| *minus* | Cost to acquire certain patents from the University of Delaware up to $1M |
| *minus* | Any net closing liabilities |
| *minus* | Unpaid principal and interest owed on any loan of up to $200,000 from Apple to FingerWorks to cover ordinary and necessary expenses until the closing of the acquisition |
| *minus* | Payments due to certain holders of FingerWorks common stock, options, warrants, and convertible notes |

| | |
|---|---|
| *Divided by* | Total number of outstanding shares of FingerWorks capital stock |

398.    Eighteen months after the merger, each share      of  outstanding  FingerWorks capital stock would be worth an additional $2M,  minus any losses to certain indemnified parties, divided by the total number of shares of outstanding FingerWorks capital stock.[781]  Furthermore, certain of FingerWorks' key employees were to enter   into non-competition and non-solicitation agreements and/or enter into employment with Apple Computer,    Inc.[782]  As a condition to the merger,  Drs.  Elias  and  Westerman were to execute non-competition and non-solicitation agreements and accept employment at Apple.[783]

399.    The  patents  that were to be acquired from the University of Delaware (the "Delaware Patents") included "all patents and applications anywhere in the world with a claim of priority to US Provisional application 60/072,509 (filed January  26, 1998) or US non-provisional application  09/236,513  (filed  January 25, 1999), or any parent, continuation, continuation-in-part, divisional, reexamination, reissue, or other patent or    application  derived  from  one  of  the above."[784]  Specifically, the agreement named the        following  U.S.  patents:  US6,323,846

[781] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4985. [12.29]

[782] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4978. [12.29]

[783] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '5014. [12.29]

[784] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

("Method and apparatus for integrating manual input")[785] and US2002/0015024 A1 ("Method and apparatus for integrating manual input").[786]

400.    Importantly, the IP referenced in the acquisition agreement is related to certain of the utility Patents-in-Suit.  Specifically, the '607 Patent [787] and the '129 Patent [788] reference U.S. Patent 6,323,846.  The '607 Patent also references US2002/0015024 A1.[789]

401.    Though the acquisition agreement gave no final purchase  price for the Delaware Patents,  the volume of patents that cite to both US6,323,846 and US2002/0015024 A1 is a helpful  indication  of  value.    Two hundred eighty-five separate U.S. Patents, the original assignees of which cover nearly 50 organizations, reference US6,323,846      as  shown by the figure below.  As might be expected, Apple Inc. and Apple Computer, Inc. were the original assignees on a combined 109 of these patents.

---

[785] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]
[786] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4980. [12.29]
[787] U.S. Patent Number 7,663,607. [2.7]
[788] U.S. Patent Number 7,920,129 B2. [2.9
[789] U.S. Patent Number 7,663,607. [2.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 53:  Organizations With Patents That Reference US6,323,846[790]**

| Original Assignee | No. of Patents | Original Assignee | No. of Patents |
|---|---|---|---|
| Apple Inc. | 108 | Apple Computer, Inc. | 1 |
| Cypress Semiconductor Corporation | 36 | Autodesk, Inc. | 1 |
| Synaptics Incorporated | 15 | Avago Technologies ECBU IP (Singapore) Pte. Ltd. | 1 |
| Smart Technologies ULC | 14 | Cirque Corporation | 1 |
| Silverbrook Research PTY LTD | 13 | Cypress Semicondutor Corporation | 1 |
| Exbiblio B.V. | 10 | David H. Chin | 1 |
| Immersion Corporation | 10 | Exbiblio B. V. | 1 |
| NA | 8 | Exbibuo B.V. | 1 |
| AuthenTec, Inc. | 6 | Gilbarco Inc. | 1 |
| Microsoft Corporation | 6 | Kabushiki Kaisha Toshiba | 1 |
| Google Inc. | 4 | Kulite Semiconductor Products, Ic. | 1 |
| QSI Corporation | 4 | Kyocera Mita Corporation | 1 |
| Atrua Technologies, Inc. | 3 | Next Holdings Limited | 1 |
| International Business Machines Corporation | 3 | Perceptive Pixel Inc. | 1 |
| Seiko Epson Corporation | 3 | Promethean Limited | 1 |
| Smart Technologies, Inc. | 3 | Ricoh Company, Ltd. | 1 |
| Elan Microelectronics Corporation | 2 | Shoot the Moon Products II, LLC | 1 |
| Exbiblio, B.V. | 2 | Siemens Aktiengesellschaft; Siemens Technology -to-Business Center LLC | 1 |
| Finger Works, Inc. | 2 | Siemens Technology-To-Business Center, LLC | 1 |
| Keybowl, Inc. | 2 | Silverbrook Research Pty Ltd. | 1 |
| New York University | 2 | Tactile Displays, LLC | 1 |
| Smart Technologies Inc. | 2 | Varatouch Technology Incorporated | 1 |
| Synaptics, Inc. | 2 | Varian Medical Systems Technologies, Inc. | 1 |
| Adrea, LLC | 1 | Xerox Corporation | 1 |

402.    An additional 47 U.S. patents reference US2002/0015024 A1.  As shown below, the original assignees of these patents spanned close to 20 organizations.

---

[790] Patent US6323846, Google Patents, <http://www.google.com/patents/US6323846>. [12.31]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 54:  Organizations With Patents That Reference US2002/0015024 A1**[791]

| Original Assignee | No. of Patents |
| --- | --- |
| Apple Inc. | 24 |
| NA | 3 |
| GestureTek, Inc. | 3 |
| Masco Corporation of Indiana | 3 |
| QSI Corporation | 2 |
| Precision Dynamics Corporation | 1 |
| Elan Microelectronics Corporation | 1 |
| Royal College of Art | 1 |
| Cirque Corporation | 1 |
| David H. Chin | 1 |
| WMS Gaming Inc. | 1 |
| Brose Fahrzeugteile GmbH & Co. Kommanditgesellschaft | 1 |
| Microsoft Corporation | 1 |
| N-trig Ltd. | 1 |
| Vimicro Corporation; Wuxi Vimicro Corporation | 1 |
| Tiki'Labs | 1 |
| QUALCOMM Incorporated | 1 |

403.    While FingerWorks was to acquire the Delaware        Patents outright from the University of Delaware, Apple agreed to pay the        purchase price, which would reduce the payment to the stockholders.[792]  If FingerWorks could not procure the Delaware Patents for $1M or less, Apple reserved the right to take over negotiation of the sale or terminate              the acquisition.[793]   Other than  the  Delaware Patents, Drs. Elias and Westerman had assigned all

---

[791] Patent US20020015024, Google Patents, <http://www.google.com/patents?id=D4SNAAAAEBAJ& printsec=frontcover&dq=US2002/0015024&hl=en&sa=X&ei=L6uDT5zTHYmQiQKjx8mEBg&ved=0CD QQ6AEwAA>. [12.32]

[792] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '5012. [12.29]

[793] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4998. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

intellectual property and intellectual property rights used by, or created in connection with, the business to FingerWorks itself.[794]

### (c) Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty

404.    I do not have enough information to use this factor to determine   the value of the patents-in-suit. However, Apple's acquisition of FingerWorks for $13.5 million that includes what appears to be two foundational patents for multi-touch capabilities should be considered     as a reasonableness check on any conclusion of value of  a non-exclusive license to the '607 Patent and the '129 Patent that all reference one of these two foundational patents.

### (2) Factor #2—the rates paid by the licensee for the use of other patents comparable to the Patents-in-Suit.

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

405.    I  do not consider these agreements to be probative.  Therefore, this factor is neutral in my determination of the reasonable royalty amount.

### (3) Factor #3—the nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

406.    The  license  contemplated  in  the hypothetical negotiation would be a non-exclusive license for a portfolio of patents only and would not  include any transfer of technology or know-how.  Technology transfer agreements,     including many of Samsung's     and Apple's license agreements discussed above, frequently transfer along with patent rights items such as know-how, technical drawings, specifications, trademarks, and copyrights.

### (a) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

407.    Therefore, this factor would be neutral in relation to       the  royalty  amount  as suggested by a non-infringing alternative.

---

[794] Agreement and Plan of Reorganization By and Among Apple Computer, Inc., Tickle Acquisition Corporation, FingerWorks, Inc., et al., February 3, 2005, APLNDC-X0000004973-5041 at '4998. [12.29]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(4) Factor #4—the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

408.    It is my understanding that Apple has not licensed the        Patents-in-Suit.   Apple values the profits it has as an opportunity to earn by  distributing and manufacturing its products more than it values the royalty it could earn by licensing to a competitor.

*(a)   Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty*

409.    This  factor  would  indicate  that  Apple  would not be willing to share any of the costs of the next best alternative to Samsung and indicate that the full amount of these costs would be paid.

**(5) Factor #5—the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter.**

410.    When licensing a direct competitor, a licensor may demand a relatively high royalty rate to compensate it for the sales and profits it will  potentially lose to the competitor.  In his report, Mr. Musika suggested that "Apple and Samsung directly and aggressively compete in both  the smartphone and tablet markets." [795]   However, while Apple and Samsung are competitors  in  the  sense  that  each sells both smartphones and tablets, among other things, there are two important considerations with respect to this topic.

411.    First, as discussed in Section IV.A.4.d),        competition  between  Apple  and Samsung is confounded by the competition between  iOS, Apple's mobile operating system, and Android, Google's mobile    operating  system used on devices made by a multitude of manufacturers including Samsung.  Because consumers often consider the operating system an important selling point, the more fierce competition is not between Apple  and Samsung, but iOS and Android.  Once a consumer has decided to opt for Android instead of iOS, then        Android devices must compete against each other for that incremental purchase.        Samsung,  whose smartphones and tablets run Android, competes more heavily with those manufacturers of other Android devices.

---

[795] Musika Report, p. 71. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

412.    In addition, Apple and Samsung cater to different consumer demographics.  For example, according to a Q4 2010 ComTech United  States Report, "iOS ha[d] a strong leaning towards a premium market, with 66% of sales over $170          versus  50%  for  Android."[796] Specifically, "[l]eading the over $170 segment [was] the iPhone 4 (29%), while    several Android models  follow[ed]  some  way  behind:  HTC Evo 4G (11%), Samsung Epic 4G (6%), Motorola Droid X (5%) and Droid (4%)."[797]

413.    Notably, Apple sells its mobile devices at significantly higher ASP than Samsung. According to Mr. Musika, Apple's handset ASP has hovered between $622 and $656 from fiscal Q3 2010 to Q4 2011.[798]  Apple's tablets prices were between $567 and $612 beginning  in fiscal Q1 2011.[799]  On the other hand, Samsung's accused smartphones have sold for between $290 and $417 from calendar Q2 2010 to Q4 2011. [800]  Its accused tablets have prices between $374 and $526 from calendar Q4 2010 to Q4 2011. [801]  With regard to smartphones specifically, this price difference has manifested itself   to consumers in the generally higher price of Apple iOS handsets when compared to Android handsets.[802]

### (a)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

414.    While Apple and Samsung do generally compete    in  the  smartphone  and  tablet markets, the considerations described above mitigate the competitive climate.  However, in my opinion this factor would indicate that Apple would not be willing to share any of  the costs of the next best alternative to Samsung and indicate that the full amount of these costs would be paid.

**(6) Factor #6—the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items and the extent of such derivative or convoyed sales.**

---

[796] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

[797] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

[798] Musika Report, Exhibit 32. [2.2]

[799] Musika Report, Exhibit 33. [2.2]

[800] Musika Report, Exhibit 37. [2.2]

[801] Musika Report, Exhibit 38. [2.2]

[802] See e.g. ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513. [4.12]; see also ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

415.    There are two key issues with respect to *Georgia-Pacific* factor #6: (1) to what extent did the infringer anticipate collateral or convoyed sales as a result of selling the patented item and what effect such anticipation would have had on the parties' respective bargaining positions at the hypothetical negotiation, and (2) whether such convoyed sales are appropriately included in the royalty base.

416.    It is important to note that, in this case, only if the allegedly infringed IP is the driver of smartphone and tablet sales can the sale of an accessory, or related item, be claimed as a convoyed sale.  In essence, the patents, trade dress, and trademarks at issue would have to be a significant basis of demand for Apple's or Samsung's smartphones and tablets for any additional sales to be considered in inclusion of convoyed sales.  As shown throughout this report, the IP at issue is clearly not a significant driver of demand.  Thus any sales that could be considered convoyed due to the sale of a smartphone or tablet as a whole, cannot be considered convoyed by the specific IP at issue.

417.    As Mr. Musika notes, both Apple and Samsung recognize the value of accessory sales.  However, it is not those sales, or loss of those sales, directly that the companies value.  Rather, the importance of accessory purchases lies in their effect on future sales of the patented specialties, namely smartphones and tablets.  The Samsung document that Mr. Musika cites in his report as evidence of convoyed sales is rather evidence of the important role accessories play in future purchases of Samsung's smartphones and tablets.  In fact, the section of that report that Mr. Musika cites is titled "Accessory Brand Stickiness," indicating the ability of accessories to keep customers coming back to Apple or Samsung for future purchases.[803]

418.    Whether or not Samsung "referenced the increase in Apple brand loyalty due to the use of iPhone, iPhone 3G and [] iPhone 3GS accessories," [804] this is simply a statement of the value of accessories and plays no part in determining whether these accessories fall under the definition of convoyed sales.  The same is true of other statements made by Mr. Musika in his analysis of convoyed sales, like "'accessori es enhance user experience' by facilitating the use of the devices and accessories in the home, in the car, as entertainment and through increasing productivity," or "the use of iPhone accessories was a 'compelling reason for

---

[803] 2011 Smartphone Portfolio Strategy, May 2010, SAMNDCA00530591-672 at '611. [13.1]
[804] Expert Report of Terry L. Musika, CPA, March 22, 2012, p. 74. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

consumer[s] to stay with their current brand.'" [805]   Each of these statements is a judgment of  the value of the accessories  themselves; they are not evidence that accessory sales are convoyed as a result of the specific features enabled by the intellectual property at issue in this case.

419.    Further, Mr. Musika tries to pass arguments aimed at showing the importance   of Apple's ecosystem as arguments that militate in favor of an increased royalty rate due to convoyed sales.[806]   The value of Apple's ecosystem is not a valid argument for the inclusion of convoyed sales in the reasonable royalty calculation.

420.    From Samsung's perspective, as shown by Mr. Musika's citations,     the value of accessories lies in the power to drive future sales and brand loyalty.  In fact, from Samsung's point of view, the company would not likely have continued the sale of accessories      if they did not create such value; Samsung's sale of accessories in the U.S. has run an     operating loss in every quarter from Q1 2010 through Q4 2011.[807]

### (a)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

421.    Both Apple and Samsung do make accessory sales that stem from the sales of their  respective  smartphones  and tablets.   However, Mr. Musika's discussion confuses the actual  benefits of accessories (i.e., brand sti    ckiness) with convoyed accessory sales, the relevant factor in this case.  For the reasons above, Mr. Musika's      assertion that this Georgia Pacific factor "supports a higher reasonable royalty rate …"    [808] is not correct; this factor is, in effect, neutral.

### (7)  Factor #7—the duration of the patent and the term of the license.

### (a)  Duration of the patent

422.    The following table summarizes the Patents' filing, issue and expiration dates:

---

[805] Musika Report, p. 74. [2.2]

[806] Musika Report, pp. 74-76. [2.2]

[807] Exhibit 2621 to Sheppard Deposition, Accessories (USA), SAMNDCA00373532-534. [13.2] Note that Mr. Sheppard explained that the accessories profit and loss data were not limited to accessories sold only on the accused products.  Deposition of Timothy Sheppard, March 30, 2012, p.124. [13.3]

[808] Musika Report, p. 76. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 55:  Patent Filing, Issue and Expiration Dates**

| Patent | Filing Date | Issue Date | Expiration Date[809] |
|---|---|---|---|
| '002 3/20/1997 | | 12/10/2002 | 9/29/2014 |
| '381 12/14/2007 | | 12/23/2008 | 12/13/2027 |
| '915 1/7/2007 | | 11/30/2010 | 6/27/2028 |
| '891 2/1/2008 | | 12/14/2010 | 3/13/2023 |
| '607 5/6/2004 | | 2/16/2010 | 5/29/2026 |
| '163 9/4/2007 | | 1/4/2011 | 7/22/2029 |
| '129 1/3/2007 | | 4/5/2011 | 1/22/2030 |
| 'D790 8/20/2007 | | 11/23/2010 | 11/22/2024 |
| 'D334 7/15/2008 | | 6/8/2010 | 6/7/2024 |
| 'D305 6/23/2007 | | 11/17/2009 | 11/16/2023 |
| 'D087 7/30/2007 | | 5/26/2009 | 5/25/2023 |
| 'D677 11/18/2008 | | 6/29/2010 | 6/28/2024 |
| 'D270 10/1/2009 | | 8/24/2010 | 8/23/2024 |
| 'D889 3/17/2004 | | 5/10/2005 | 5/9/2019 |

*(b)   Term of the license*

Factor # Factor 7 embodies the conventional wisdom that the longer the remaining duration of a patent term, the more          willing  a  hypothetical licensee is to pay a higher royalty rate. This principle rests on the fact that the longer the duration of the patent, the more likely the patent holder is to cultivate goodwill, an intangible economic asset representing  the ability of  a business to generate income due to business reputation, market position, management, technology, customer relations, and other elusive indicia of earning power, which would  almost certainly persist and benefit the patent holder long after the patent expired.[810]

423.    Apple is seeking an injunction is this case. The hypothetical license term is from the date of first infringement through the  date of judgment, a period of a little over two years. [811] If  Apple seeks royalties post judgment, there will be a new hypothetical negotiation because damages for past infringement are separate and distinct from damages for future acts of

---

[809] Expiration dates based on discussion with counsel.

[810] *Brunswick v. United States*, 36 Fed. Cl. 204, (U.S. Court of Federal Claims, July 30, 1996), *214, p. 7. [12.20]

[811] The accused products were first sold in June 2010.  (Schedules 21.2 – 21.28. [1.2])

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

infringement and may require different royalty rates given the change in the parties' legal relationship, among other factors.[812]

### (c) Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

424.    The duration of the patents and the terms of the hypothetical license agreements are sufficiently long in relation to the normal product lifecycle in this industry that this factor would be neutral in my determination of the reasonable royalty amount.

### (8) Factor #8—the established profitability of the product made under the patent, its commercial success and its current popularity.

#### (a) Established Profitability

425.    For purposes of determining a reasonable royalty, the most relevant profitability data are the infringer's operating profit projections prepared around the date of the hypothetical negotiation.[813]  Absent such financial projections, the infringer's *ex post* actual operating profit margins, as well as industry operating profit margin data, can be considered.[814]

426.    To date, no detailed profit projections as of the date of the hypothetical negotiation have been produced.  I have calculated Samsung's profits related to the accused products in my analysis of Samsung's profits related to the design-related IP.

---

[812] *Paice LLC v. Toyota Motor Company*, 504 F.3d 1293, (U.S. Court of Appeals for the Federal Circuit, October 18, 2007), *1317, p. 17. [12.21]

[813] *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (U.S. Court of Appeals for the Federal Circuit, October 6, 1983), *1081, pp. 6-7.  ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.  'Whether, as events unfurled thereafter, [the infringer] would have made an actual profit while paying the royalty determined as of [the date infringement began], is irrelevant.'") (quoting *Panduit*, 575 F.2d, *1164, pp. 6-7). [12.22]

[814] John M. Skenyon, "Proving Patent Damages to a Jury" (absent projections by the infringer, the infringer's actual profits may be used for calculating reasonable royalty damages under the book of wisdom view) [12.23]; *Panduit*, 575 F.2d 1152, *1164, p. 9 ("The licensee-profit element is but one of the measures applicable . . . , and should be based on the customary profit allowed licensees in the industry at that time."). [12.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*(b)  Commercial Success and Current Popularity*

427.    According to a 2010 Frost & Sullivan report, Android and Apple are the most successful smartphone brands in the market.      [815]  While Apple continues to have the top smartphone, Android has been gaining ground by selling       multiple devices from multiple manufacturers through multiple operators. [816]   As of yearend 2010, there were a total of approximately 150 Android smartphones available. [817]  The top three manufacturers  in terms of devices were HTC, Samsung, and Motorola.[818]

428.    According to a Canalys report entitled    "Worldwide Smart Phones Q1 2009," worldwide smartphone market continued to grow in 2009 and shipments of smartphones with touch-screens almost doubled in Q1 2009 compared with a year ago."[819]

---

[815] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.8. [10.9]

[816] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.8. [10.9]

[817] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.2. [10.9]

[818] A Custom Inquiry Engagement for Apple: The Current and Future Effects of Android on the Smartphone Market, Frost & Sullivan, Year End 2010 Update, APLNDC00005708-708.11 at '708.2. [10.9]

[819] Worldwide Smart Phones Q1 2009, Quarterly Market Overview, Canalys Expert Analysis for the High-Tech Industry, SAMNDCA00201336-350 at '337. [10.10]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 56:  North America Smartphone Shipments, Q1 2008 and Q1 2009[820]**



429.    More than 15 million of the 39.1 million phones sold during Q2 2009 used a touch screen as the primary interface, significantly more than a year ago, when only   3.9 million of the 33.6 million mobile phones sold in Q2 2008 had a touch screen.[821]

430.    US Smartphone sales increased 12.7 percent in 2009 and reached    36.4 million units, as stated in a September 6, 2009 Samsung report entitled "Design for Smartphone US."[822] Smartphones accounted to nearly one in eight of all phones   sold, valued at $12 billion in 2009 and were predicted to hit $25 billion in 2014. [823]   According to a ComTech study commissioned by Apple, smartphone ownership reached 35 percent of the US   population in Q4 2011, up from 26 percent one   year ago.[824]   In Q4 2011, 31 million handsets were sold in the US, with 57

---

[820] Worldwide Smart Phones Q1 2009, Quarterly Market Overview, Canalys Expert Analysis for the High-Tech Industry, SAMNDCA00201336-350 at '343. [10.10]

[821] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '428. [8.4]

[822] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[823] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[824] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '512. [4.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

percent of these being smartphones.[825]  IDC projected that 20 percent of the 1.4 billion phone sold in 2013 would be smartphones.[826]  UBS Investment Research analysts forecast the global handset market to grow at a rate of 6.2 percent during 2010-2015, from 1.4 billion to 1.9 billion units.[827]  Key growth drivers in the handset market      include emerging markets, driven by increased handset penetration, transition to 3G from 2/2.5G, and increased consumer adoption of smartphones.[828]  UBS analysts explain that increased   demand for data on wireless mobile devices has been driving the      transition  to  3G technologies from 2/2.5G technologies.[829] According to UBS Investment Research, 3G-     based  devices will have a growth rate of 23 percent during 2010-15 (from 507 million to 1.4 billion units), as opposed to the overall handset market at six percent.[830]

431.   UBS Investment Research analysts also forecast      smartphones  to  grow  at  a compounded annual rate of 25 percent during 2010-15, from 272 million (19  percent of handset units) to 808 million (42 percent of total handset units).[831]  UBS Investment Research states that "[w]ith a rich and friendly user interface, high speed wireless connectivity using   3G (or higher), and availability of multimedia content, smartphones    have become the platform of choice for consumers for content consumption and connectivity."[832]

[825] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '512. [4.12]

[826] Design for Smartphone UX, Samsung Design America (SDA), September 6, 2009, SAMNDCA00204410-494 at '421. [8.4]

[827] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '511. [10.11]

[828] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '511-512. [10.11]

[829] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '512. [10.11]

[830] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '512. [10.11]

[831] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '513. [10.11]

[832] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '513. [10.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 57:  Smartphone Growth, 2010E – 2015E**[833]



432.    According to Samsung, US Tablet shipments are predicted to grow at 73 percent over the next several years, reaching 41.4 million units in 2013.[834]

**Figure 58:  US Tablet Market Size / Growth**[835]



---

[833] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS
Investment Research, March 29, 2011, SAMNDCA00224483-546 at '514. [10.11]

[834] Samsung Galaxy Tab, Samsung Electronics, SAMNDCA00027474-514 at '481. [10.12]

[835] Samsung Galaxy Tab, Samsung Electronics, SAMNDCA00027474-514 at '481. [10.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

433.    UBS Investment Research analysts also expect the wireless WAN (3/4G) tablet market to have a growth rate of 24 percent during 2010-15, from 28 million to 65 million.[836]

**Figure 59:  Tablet (Wireless WAN enabled) Market Forecast, 2011E – 2015E[837]**



Chart 44: Tablet (Wireless WAN enabled) market forecast

Source: UBS estimates

        (c)    *Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty*

434.    This factor would be neutral in relation to  my baseline royalty amounts of a non-infringing alternative.

        **(9)  Factor #9—the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results**

        (a)   *Utility and Advantages of the Utility Patents and Samsung's Available Design Arounds*

        **(i)     User Interface Utility Patents**

        (a)     *U.S. Patent No. 6,493,002*

---

[836] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '517. [10.11]

[837] Best Smartphone and Tablet Play in Semis; Assuming Coverage with Buy Rating, $65 PT, UBS Investment Research, March 29, 2011, SAMNDCA00224483-546 at '517. [10.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

435.    Based on my discussion with Trevor Darrell,[838] I understand that the '002 patent is directed to a "control strip" or "control window" "implemented in a window layer that appears on top of application programming windows that may be generated."  According to Apple's expert, this patent covers either (i) the status bar or (ii) the "quick panel" or    "notification panel" that slides down from the top by swiping downward (or both).

436.    Based on discussions with Trevor Darrell and Samsung           engineers,[839] I understand  that there are numerous other applications (such as the music player, e-mail, camera feature, a game, etc.) that could be made to generate a window that partly obscures the notification window and / or the status bar.

437.    Mr. Park indicated that the application that Samsung would choose to generate a window that would partially obscure the notification window and / or the status bar is the music player.[840]

438.    Samsung engineers have estimated that the design around could have been completed in a total of three weeks and four days if Samsung would have known that it may have been out of the market without the design     around.[841]  Based on design around hours provided by the Samsung engineers and wage data provided by   Samsung HR,[842] the total cost of the design around is $9,240.[843]

*(b)      U.S. Patent No. 7,469,381*

439.    Based on my discussions with Dr. Andries   Van Dam and Dr. Jeff Johnson,[844] I understand that the '381 Patent covers the "bounceback" feature that indicates to the user when he or she has reached the edge of an electronic document when translating the document on a touch screen display.   According to the claimed method in the '381 Patent, when a user

---

[838] Conversation with Trevor Darrell, April 11, 2012.

[839] Conversation with Trevor Darrell, April 11, 2012.  Conversations with Jaewoo Park, April 12, 2012 and April 15, 2010 (with translation assistance from Hoshin Lee).

[840] Conversations with Jaewoo Park, April 12, 2012 and April 15, 2010 (with translation assistance from Hoshin Lee).

[841] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[842] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[843] Schedule 13.4. [1.2]

[844] Conversation with Andries Van Dam, April 11, 2012.  Conversation with Dr. Jeff Johnson, April 16, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

translates an electronic document beyond the edge, an area beyond the edge of the electronic document is displayed and when the user removes his or her finger from the display, the document "bounces back" so that the area beyond the edge of the document is no longer displayed.

440. I have also reviewed the description of the '381 Patent in the expert report for Apple's infringement expert on the '381 Patent, Dr. Ravin Balakrishnan. Dr. Balakrishnan describes the '381 Patent as follows:[845]

> This invention provides an elegant and appealing form of visual feedback to a user that there is no more of a document to be seen. For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image. Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display. When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen. This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction

441. Based on discussions with Jeff Johnson and Samsung engineers, [846] Samsung has already implemented a design-around that uses a different method to indicate to the user when he or she has reached the edge of a document. A blue or orange "glow" will appear at the edge of the document when the user attempts to pan beyond the edge of the document. No area beyond the edge of the document is displayed – the document simply stops when it reaches the edge, and the "glow" appears.

442. According to Jeff Johnson, [847] many other design arounds are possible. For example, the document could tilt, the intensity of the light on the screen could change, or the device could vibrate when an edge of the document is reached.

443. Samsung engineers have estimated that the design around could have been completed in a total of four weeks and three days if Samsung would have known that it may have been out of the market without the design around.[848] Based on design around hours

---

[845] Expert Report of Ravin Balakrishnan, Ph.D. Regarding Infringement of U.S. Patent No. 7,469,381, March 22, 2012, pp. 11-12. [13.14]

[846] Conversation with Andries Van Dam, April 11, 2012. Conversation with Jaewoo Park, April 12, 2012 (with translation assistance from Hoshin Lee).

[847] Conversation with Jeff Johnson, April 16, 2012.

[848] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

provided by the Samsung engineers and wage data provided by   Samsung HR,[849] the total cost of the design around is $11,340.[850]

(c)      U.S. Patent No. 7,853,891

444.    Based on my discussion with Trevor Darrell,  [851] the '891 patent  covers windows that appear on user input and close automatically.  Apple targets the volume window that appears when the volume on a Samsung accused device is changed.  One type of claim   in the patent is limited only to windows that do not close in response to user input.  Another type of claim describes windows that may close in response to user input as well as automatically, but the windows must be translucent.  Both types have a limitation that the window must appear at a location independent of a cursor.

445.    I have  also  reviewed  the description of the '891 Patent in the expert report for Apple's infringement expert on the '891 Patent, Dr. Karan Singh.    Dr. Singh describes the '891 Patent as follows:[852]

> The invention in this patent may be most familiar to mobile    device users as a volume adjustment indicator or "pop-up window,"     depicted  below. [Diagram omitted] After appearing briefly (and in the same position on the screen) this type of window then automatically disappears   without a user having to, for example, click an "X   " button on the corner of the   window. The window is displayed independently of a position of a cursor on     the screen.

446.    Based on discussions with Trevor  Darrell and Samsung engineers,[853] Samsung has already implemented two design arounds that design around all asserted claims of the '891 Patent.  First, the accused ringer volume window disappears on user input.  The volume window in Samsung's phones now closes if it is touched. Second, the ringer volume window is no longer transparent.  This design around has been implemented in new smartphones    sold, and is also distributed via a software update.

---

[849] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[850] Schedule 13.1. [1.2]

[851] Conversation with Trevor Darrell, April 11, 2012.

[852] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 123. [13.15]

[853] Conversation with Trevor Darrell, April 11, 2012.  Conversation with Jaewoo Park, April 12, 2012 (with translation assistance from Hoshin Lee).

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

447.    Samsung engineers have estimated that the design around could have been completed in a total of three weeks and three days if Samsung would have known that it may have been out of the market without the design    around.[854]  Based on design around hours provided by the Samsung engineers and wage data provided by   Samsung HR,[855] the total cost of the design around is $8,820. [856]

*(d)    U.S. Patent No. 7,864,163*

448.    Based on my discussion with Stephen Gray,  [857] Apple's '163 patent describes a method for viewing and navigating a "structured electronic document" (e.g.,     a web page) on handheld, small-screen devices.  For example, in   response to a first tap on a "box" of content, the user is provided an enlarged and centered view of the first "box" ("tap-to-zoom" gesture). While viewing the first, enlarged box, a user can then make a "second gesture" on     a second "box" of content and the view will re-center on the second "box" ("tap-to-pan").

449.    I have also reviewed the description of the '163 Patent in the expert report for Apple's infringement expert on the '163 Patent, Dr. Karan Singh.    Dr. Singh describes the '163 Patent as follows:[858]

> [The '163 Patent] claims methods and apparatuses for displaying structured electronic documents, such as web  pages, on a touch screen display, and navigating in them using touch gestures. The invention of the '163 patent allows a user to navigate easily around a structured electronic document by tapping or double tapping on boxes of content in       that document. The '163 patent describes enlarging        or translating the electronic document, in response to a tap gesture, so that the tapped box of content is substantially centered on the touch screen display. Tapping on a previously enlarged box can result in zooming back out, including  to the original scale. Other gestures, such as a finger swipe or a "depinch" gesture, can also result in translating or         scaling of the electronic document.

450.    Based on discussions with Stephen Gray and Samsung engineers,  [859] Samsung has already modified the operation of its Galaxy S II phones such that the allegedly infringing

---

[854] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[855] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[856] Schedule 13.2. [1.2]

[857] Conversation with Stephen Gray, April 13, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

behavior identified by Apple's technical expert for the "tap-to-pan"   feature has been designed around.  Other design arounds include removing the "tap-to pan" feature entirely, such that the view will not re-center on a second "box" of content in response to a second gesture.

451.    Samsung engineers have estimated that the design around could have been completed in a total of two weeks and two days if Samsung would have known that it may have been out of the market without the design around. [860]  Based on design around hours provided by the Samsung engineers and wage data provided by Samsung HR, [861] the total cost of the design around is $5,880.[862]

<br>

### (ii)    Multitouch Utility Patents

<br>

#### (a)    U.S. Patent No. 7,663,607

452.    Based on my discussion with Brian Von Herzen, [863] the '607 patent is    a touchscreen  hardware patent and covers a two-layer transparent touchscreen capable of detecting multi-touch.    The patent claims cover a specific arrangement of transparent conductive lines/electrodes on two separate layers that are electrically isolated from each other.

453.    I have also reviewed the description of the '607 Patent in the expert report for Apple's infringement expert on the '607 Patent, Dr . Michel Maharbiz.  Dr. Maharbiz describes the '607 Patent as follows:[864]

> [T]he claimed inventions of the '607 Patent relate to a specific configuration of conductive lines and layers that make up the touch panel in a display arrangement. The '607 Patent claims recite an innovative combination of elements including the use of a mutual capacitance touch screen in a truly transparent display that can simultaneously detect and generate signals representing distinct multiple points of actual or near

---

[858] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 7. [13.15]

[859] Conversation with Stephen Gray, April 13, 2012.  Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[860] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).

[861] Conversation with Jaewoo Park and Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).  Conversation with Jong-wook Shim, April 12, 2012 (with translation assistance from Hoshin Lee).

[862] Schedule 13.3. [1.2]

[863] Conversation with Brian Von Herzen, April 12, 2012.

[864] Expert Report of Michel Maharbiz, Ph.D. Regarding Infringement of U.S. Patent Nos. 7,663,607 and 7,920,129, March 22, 2012, p. 8. [13.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

contact and the use of "dummy" visual features (that can be made of the same material as the conductive lines in the display) to        enhance the display.

454.    Apple  accuses  only Samsung's tablets of infringement – the Galaxy Tab 7.0 (3G), and the Galaxy Tab 10.1 (WiFi). [865]  The '607 Patent was issued on February 16, 2010 [866] and the Galaxy Tab 7.0 (3G) was first sold by STA in October 2010.[867]

455.    Based on discussions with Brian Von Herzen and        Samsung  engineers,[868] Samsung has a design around option that involves a single layer of transparent conductive lines and therefore falls outside the two-layer arrangement claimed in the '607 patent.

456.    Based upon conversations with a Samsung   engineer,[869] the single layer design around  has  already been completed.  The design work started on July 20, 2010 and was completed in September 2011.  However, the design around work was completed based on    a design plan that did not anticipate that the product would be out of the        market  without  the design around.  Samsung has estimated that the design around could have been   completed in a total of six months if it would have known that it may have been out of   the market without the design around.

457.    Based on data provided by a Samsung engineer,  [870] the total cost of the design around was about ████████████████████████████████████████████ ████████████████████████████████████

458.    The  design  around  work  actually  started in July 2010, but I have used the announcement of the Tab 7.0 (3G) on September 16, 2010 [871] as the beginning of the six-month period, which means that the design around would have been completed    on March 16, 2011. Given there is a period of more than 1 month between the        start  of  the  release  data  of  the

---

[865] Schedule 6.1. [1.2]

[866] U.S. Patent No. 7,663,607 B2. [2.7]

[867] Schedule 21.27. [1.2]

[868] Conversation with Brian Von Herzen, April 12, 2012.  Conversation with Hoshin Lee, Sun-young Yi, Jaewoo Park, Heonseok Lee, and Jong-wook Shim, April 12, 2012.

[869] Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).

[870] Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).

[871] Samsung Press Release: Samsung Mobile Expands Galaxy Product Portfolio with Launch of Samsung Galaxy Tab, September 16, 2010, <http://www.samsung.com/us/news/newsPreviewRead.do?news_seq=19537>. [15.33]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

product (released on November   10,  2010),[872] I have considered the effect of Samsung not having a non-infringing alternative on the reasonable royalty that would be negotiated.

459.    As I describe in Section IV.A.4.b), Apple would   not lose any sales related to the sale  of  the  Galaxy Tab 7.0 (3G) because these products are different sized products at very different price points.  In addition, the design around would be completed  well ahead of the time that the Tab 10.1 was launched on June 8, 2011.[873]  Therefore, lost sales by Apple would not be considered by the parties at the hypothetical negotiation.  It is  my opinion that the parties would consider the design around cost as a license for the Tab 10.1 and would negotiate a reasonable royalty for the Tab 7.0 (3G).  I discuss the reasonable royalty      rate  that  the  parties  would negotiate for the '607 Patent in Section IV.E.

*(b)     U.S. Patent No. 7,920,129*

460.    Based on my discussion with Brian Von Herzen,   [874] the '129 patent claims   the basic '607 two-layer electrode structure but specifies that the bottom traces (i.e., traces further from the user and closer to the LCD) should be substantially wider than the top electrodes   (i.e., electrodes closer to the user) to provide shielding for the thinner top electrodes.

461.    I have  also  reviewed  the description of the '129 Patent in the expert report for Apple's infringement expert on the '129 Patent, Dr  . Michel Maharbiz.  Dr. Maharbiz describes the '129 Patent as follows:[875]

> [T]he   claimed   inventions of the '129 Patent relate to a specific configuration of conductive lines that helps prevent electrical interference from the display elements from interfering       with  the  touch  sensor conductive lines that are designed to detect the electrical coupling of   a finger on the touch screen overlaying the display.  The  '129 Patent claims recite an innovative combination of elements including the use a  wide set of  second conductive layers to effectively shield the thinner sense conductive lines from the electrical noise of the display (such as an LCD display).  This  arrangement permits the designer to eliminate additional layers in the touch sensor, thus reducing costs and overall thickness required to have a viable hand-held computing device.

---

[872] Schedule 6.3. [1.2]
[873] Schedule 6.3. [1.2]
[874] Conversation with Brian Von Herzen, April 12, 2012.
[875] Expert Report of Michel Maharbiz, Ph.D. Regarding Infringement of U.S. Patent Nos. 7,663,607 and 7,920,129, March 22, 2012, p. 72. [13.13]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

462.     Apple  accuses  only Samsung's tablets of infringement – the Galaxy Tab 7.0 (3G), and the Galaxy Tab    10.1 (WiFi).[876]  The Galaxy Tab 7.0 (3G) was first sold by STA in October 2010,[877] but the '129 Patent did not issue until April 5, 2011.[878]

463.     Based on discussions with Brian Von Herzen and a Samsung engineer,    [879] the design around options discussed above for the '607 patent apply equally to the '129        patent. Like  the  '607  patent,  Samsung's  single layer design would effectively design around the '129 patent.[880]

464.     In addition to the single layer design around for the '607 Patent, I understand that a second design around exists in which the width of the bottom traces and top traces    would be changed at their points of intersection to avoid the limitation of the claims that the bottom traces are substantially wider.  This design around would be considered a minor revision to an existing product and would only require a change of the masks of the ITO  layers.[881]  This design around could be implemented if the single layer design around was not completed by the time the '129 Patent was issued.

(c)     U.S. Patent No. 7,844,915

465.     Based on my discussion with Stephen  Gray,[882] the '915 patent covers the single finger swipe to scroll and a two or more finger gesture to scale, as well as rubberbanding.

466.     I have  also  reviewed  the description of the '915 Patent in the expert report for Apple's infringement expert on the '915 Patent, Dr. Karan Singh.    Dr. Singh describes the '915 Patent as follows:[883]

---

[876] Schedule 6.1. [1.2]

[877] Schedule 21.27. [1.2]

[878] U.S. Patent No. 7,920,129 B2. [2.9]

[879] Conversation with Brian Von Herzen, April 12, 2012.  Conversation with Heonseok Lee, April 12, 2012 (with translation assistance from Hoshin Lee).

[880] If the '607 Patent and the '129 Patent are found to be valid and infringed, then the design around would have been completed in March 2011 as described above.  However, if the '607 Patent is not found to be valid, enforceable, and infringed, then the design around would not be completed in April 2011.  By the issuance of the '129 Patent in April, approximately 9 months of the actual 15 month actual design around period was completed.  Even though this is roughly 60 percent of the actual design around period, I estimate that this would reduce the hypothetical design around period by at least 50% to 3 months or less.  Therefore, the design around would have been started when the '129 Patent issued on April 5, 2011 and completed by July, 2011.  However, given the availability of a second design around, I do not adjust the design around cost for the '129 Patent.

[881] Conversation with Brian Von Herzen, April 12, 2012.

[882] Conversation with Stephen Gray, April 13, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

The '915 patent is generally directed to methods and apparatus for responding to user inputs on a touch-sensitive display integrated with a device. The asserted claims of the '915 patent recite methods and apparatus that distinguish between a single-input point that is interpreted as a "scroll operation" and two or more input points that are interpreted as a "gesture operation."

467.    Based on discussions with Stephen Gray and a Samsung engineer, [884] a design around could be implemented by modifying the source code to skip the initial check for one versus two or more touch inputs and, instead, determine whether to scroll, scale, or rotate the view based on the direction of movement over time of all touch input. Mr. Gray confirmed that this change to the operating system would have no perceptible impact on touchscreen responsiveness. Based upon time estimates provided by Mr. Park, the total cost of the design around is $10,080.[885]

468.    In addition, Stephen Gray described that Samsung has available additional design around alternatives for the asserted claims of the '915 Patent. Samsung has already implemented two alternative design arounds for this patent. First, the blue glow feature described above in the section on the '381 patent can be used to replace the rubberbanding effects described in the '915 Patent. Second, Samsung has a novel non-infringing alternative to the two-finger scale gesture called tilt zoom, which uses the angle and rotation of the entire touch-sensitive device to scale the view. Tilt zoom has been implemented in the Samsung's tablets.

### (d)    Other features of Multitouch

469.    Apple's multitouch utility patents contributions to multitouch technology are at most a small part of the technology necessary to implement multitouch. For example, the inventors of the asserted multitouch utility patents have admitted in deposition that they did not invent multitouch.

470.    Steve Hotelling, a named inventor on both the '607 Patent and the '129 Patent,[886] testified as follows:[887]

---

[883] Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012, p. 68. [13.15]
[884] Conversation with Stephen Gray, April 13, 2012.
[885] Schedule 13.5. [1.2]
[886] U.S. Patent No. 7,663,607 B2. [2.7] See also U.S. Patent No. 7,920,129. [2.9]
[887] Deposition of Steven Hotelling, October 21, 2011, pp. 27-28, 100-101. [11.21]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Q And when you filed your patent application on May 6, 2004,    other individuals like John Elias and Wayne Westerman knew how to do other multipoint embodiments; correct?

MR. KRAMER: Objection; calls for speculation; lacks foundation; vague and ambiguous.

THE WITNESS: So I am -- I am aware of John Elias and Wayne Westerman having -- I remember that they had products   which I actually used which did allow multiple touches to be detected.

MR. WHITEHURST: Q. So you did not invent detecting multiple touches; did you?

MR. KRAMER: Objection; calls for a legal conclusion; lack of foundation.

THE WITNESS: So I -- yeah, as far as,  you know, the technical definition of who invented what, I can't -- I'm not qualified to comment on that, but I do remember that I, indeed, used a product from FingerWorks   which did, indeed, detect multiple touches.

MR. WHITEHURST: Q. So when you filed the      '607  application, it was already known by others how to detect multiple touches; correct?

A Yes.

[…]

Q Mr. Hotelling, you were not the     first  to  build  a  mutual  capacitance sensing device; were you?

A No.

Q Who built a mutual capacitance sensing device before you?

A So specifically I remember at Stanford learning of mutual    capacitance sensing, although I don't remember specifically who was the  author of the textbook or who actually built such a product.

471.    Andrew Platzer, a named inventor on the '915 Patent, testified as follows:[888]

 Q. So you read at least parts of the       '915  patent  recently.   Is there anything in the '915 patent that you believed was new as of mid-2005?

A. I don't quite understand. As of mid-2005, no.

[…]

---

[888] Deposition of Andrew Platzer, October 18, 2011, pp. 28, 35-36, 125. [11.22]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Q.  Okay.  So can  you  identify anything in the scrolling code that you believe was new?

A.  There were  a  number of features in the scrolling that I believe were new, such as the locked scrolling and what we would term in the  UIKit as "the rubberbanding."

[…]

Q. What is locked scrolling?

A. It -- in UIKit, it is looking at the motion      of  a finger on a screen and determining whether or not the motion of content should be limited to one direction only.

[…]

Q. And what is -- what is rubberbanding?

A. This is functionality in UIKit when the user is moving content such that the bottom of the content extends above the bottom of the screen and the motion of that content after the user releases their finger.

[…]

Q. Did you invent touchscreen devices?

A. No.

Q. Did you invent the concept of creating an event object in response to user input on a touchscreen device?

A. Not that I know of.

472.    Scott Herz, the other named inventor on the '915 Patent, testified as follows:[889]

Q Okay. And what I'm asking you is: In your mind, what do you feel -- and it may be multiple things -- but what do you feel is inventive about the '915 patent?

MR. OLSON: Objection; asked and answered; calls for a legal conclusion.

THE WITNESS: So what I've -- yeah. What I would say -- be able to say confidently is, you know, the -- the kinds of things that I -- that I -- that I worked on, right, the -- the -- I worked on the        –  the  vertical  scrolling, making that feel right with your -- with your finger, and -- and worked on making  that  --  you know, that -- that rubber banding stuff work. That's what I -- you know, that's what I -- that's what I worked on.

[889] Deposition of Scott Herz, October 14, 2011, p. 38. [11.24]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

473.    In addition, Michael Tchao, Vice-President Product Marketing iPad at      Apple, testified that Apple's multi-touch approach supports ten-finger gesture while some of    the other approaches support only two-finger gesture.   [890]   He also stated that      Apple's  multi-touch  is superior to multi-touch implementations on other platforms as it is fast and fluid, and creates the "illusion of direct manipulation."   [891]   Given Apple's assertions that Samsung infringes Apple's multitouch utility patents, it must be other multi-touch contributions to Apple's products      that result in the reported superior performance.

474.    Apple's damages expert, Mr. Musika, appears to have assumed that the multitouch  utility patents have invented multitouch capability and touch gestures, but the contributions of Apple's multitouch patents are not that broad.

### (iii) Design    IP

475.    For the design IP, Samsung's own accused products provide ample evidence that acceptable, non-infringing alternatives exist.  As can be observed      upon  inspection  of Schedule 6.1 at Volume 1, Tab 2 of my Report, for each asserted element of design IP, Samsung has *at least* eight of the 29 accused products that are not accused of infringement.

476.    More specifically, for the GUI Design Patents, Apple does  not accuse the Nexus products,  the  Galaxy  S  II products, and several other smartphones of infringement.  For the Electronic Device Design Patents and the asserted trade dress, there are a wide range of smartphones that are not accused of infringement.  For the asserted trademarks, it varies widely by trademark, but there are a number of accused products that are not      accused  for  each trademark.

477.    Indeed, several of Samsung's top sellers are not accused of all groups of design IP.  Samsung has 7 different accused products that have   sold more than 1 million units in the United States:[892]

- The Captivate is not accused of infringing the Electronic     Device  design patents;

- The  Epic  4G  is  not  accused of infringing the Electronic Device design patents;

---

[890] Deposition of Michael Tchao, February 21, 2012, pp. 7, 164-165. [10.14]
[891] Deposition of Michael Tchao, February 21, 2012, pp. 76-77, 164-165. [10.14]
[892] Schedules 5.1 and 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

- The Fascinate is accused of infringing one of the Electronic Device design patents (the D677);

- The Galaxy Prevail is not accused of infringing either the GUI design patents or the Electronic Device design patents;

- The Galaxy S 4G is accused of infringing all groups of design IP;

- The Intercept is not accused of infringing the GUI design patents, Electronic Device design patents, or the trade dress (it is accused of infringing one trademark);

- The Vibrant is accused of infringing all groups of design IP.

478.    In addition to the accused products, Samsung sells a wide range of smartphones that have not been accused of *any* infringement of design intellectual property. Based on the same sources that Mr. Musika uses in his Mor-Flo analysis, I have calculated that for the period from Q2 2010 through Q4 2011, between 25 and 30 percent of Samsung's smartphones are not accused of infringement.[893]

479.    Finally, there is a wide range of other smartphones in the marketplace that have been successful that are apparently not infringing Apple's design IP asserted in this lawsuit. I am not aware of Apple asserting its design intellectual property against any other smartphone manufacturer.

480.    I have requested from counsel pictures of the trademark icons used in products that are not accused of infringement. The accused icons make up a small portion of the total icons in the accused products.[894] I summarize the icons that were received below:

---

[893] Schedule 11.1. [1.2]
[894] Schedule 17. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 60:  Alternative Icons for Apple Registered Icon Trademark No. 3,886,196**



**Figure 61:  Alternative Icons for Apple Registered Icon Trademark No. 3,889,642**



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 62: Alternative Icons for Apple Registered Icon Trademark No. 3,886,200**



**Figure 63: Alternative Icons for Apple Registered Icon Trademark No. 3,889,685**



**Figure 64: Alternative Icons for Apple Registered Icon Trademark No. 3,886,197**



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 65   Alternative Icon for Apple Registered Icon Trademark No. 3,886,169**



Trademark No. 3,886,197                    New Notebook Icon

**Figure 66:  Alternative Icons for Apple iTunes Store Trademark**



Application Serial No. 85/041,463                    Nexus S                    Transform

481.    As noted above, the Galaxy S II products have not been accused of infringing the GUI Design Patents, but several products accused of infringement of     other IP have not been accused of infringing the GUI Design Patents.  In addition, I understand that Samsung sells its smartphones in Korea with a grid of 3 icons wide    by 5 icons tall.[895]  The figures below provide the screen images for the Galaxy SII (T-Mobile), which is not accused of infringing the GUI Design Patents, a snapshot of the Korean phone screen showing the 3x5 grid, and the Vibrant, which is accused of infringing the GUI Design Patents:

---

[895] Conversation with Hoshinn Lee, April 16, 2012.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Figure 67:  Alternative Images for Accused (Vibrant) Screen Image



Vibrant



Galaxy S II (T-Mobile)



New Screen Image

482.  As demonstrated above, I understand that Samsung could change the number of rows or columns on its GUI and design around the GUI Design Patents.

483.  I have discussed the cost to design new icons or to implement a new GUI on the accused products with a Samsung designer and engineer. [896]  The cost is █████████████ ████████████████████████████ [897]

484.  In addition to the GUI Design Patents and trademarks described above, Apple's asserted design-related IP includes the Electronic Device Design Patents and the trade dress. If found to be valid and infringed, Apple's Electronic Device Design Patents and trade dress cover some elements of the device itself.  However, for each asserted Electronic Device Design Patent and individual Trade Dress, there are  *at least*  14 Samsung products that have been accused of infringement in this lawsuit that are not accused of that specific assertion. [898] Therefore, Samsung has a number of alternatives available to it, regardless of which Trade

---

[896] Conversation with Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee). Conversation with Sun-young Yi and Jaewoo Park, April 16, 2012 (with translation assistance from Hoshin Lee).

[897] Schedule 13.6 and 13.7. [1.2]

[898] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Dress / Electronic Device Design Patents are found to      be infringed.  For example, these products are not accused of infringing any Trade Dress or Electronic Device Design Patent:[899]

- Acclaim
- Exhibit    4G
- Gem
- Gravity / Gravity Smart
- Indulge
- Intercept
- Nexus    S
- Nexus S 4G
- Replenish
- Sidekick
- Transform

485.    For the tablets, the Tab 7.0 (3G) and Tab 8.9 are not accused of infringing the D889 Patent, and the Tab 8.9 is not accused of asserting the iPad / iPad 2 trade dress.[900]

486.    In addition, Samsung has employed a wide range of smartphone   designs in the market that have found to be acceptable and are not accused     of infringement in this lawsuit. Further, numerous other smartphone and tablet      manufacturers have competed in the marketplace with alternative designs.

487.    These  wide range of design alternatives are acceptable alternatives for the devices accused of infringing the Electronic Device Design Patents and  trade dress.  Apple has provided no evidence that the "design" referred to   by Apple's experts is  connected in any way with  the  specific  design-related IP in this lawsuit.  Therefore, I conclude that Samsung has acceptable, noninfringing alternatives for the Electronic Device      Design Patents and Apple's trade dress assertions.   Because Samsung had numerous smartphones on the market at all times that do not practice the asserted Electronic Device Design Patents and trade   dress, I do not consider design around costs.

---

[899] Schedule 6.1. [1.2]
[900] Schedule 6.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

> (b) *Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty*

488.    From an economic perspective, the cost of Samsung's next best alternative which are non-infringing ways of offering the same functionality or designing out the functionality if the feature is not desired by their customers is the most that Samsung would be willing to pay Apple and Apple would be entitled to receive. In my opinion, based on all the facts that I have considered, this factor is my starting point in arriving at my reasonable royalty damages and therefore is neutral.

> **(10) Factor #10—the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention.**

> (a) *The nature of the patented invention*

489.    I have discussed the asserted IP at length in this report.

> (b) *The character of the commercial embodiment of it as owned and produced by the licensor*

490.    I understand that Apple has made use of the technology enabled by the Patents-in-Suit in iPhones and iPads.

> (c) *The benefits to those who have used the invention*

> **(i) Multi-Touch        Functionality**

491.    According a 2009 Samsung Research Presentation, "[t]ouch interaction lets users control their views in a fluid manner, eliminating the notion of a hierarchical drill-up / drill-down navigation."[901] In its January 21, 2009 presentation entitled "User Experience Design Philosophy" Samsung states that "[t]ouch screen and gesture interface give users more direct control and set a new standard."[902] In another internal document, Samsung points out finger

---

[901] Samsung Research Presentation, July 2009, SAMNDCA00220268-312 at '303. [10.15]

[902] User Experience Design Philosophy, Samsung, January 21, 2008, SAMNDCA00207427-477 at '466. [11.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

based touchscreens are more accurate and more user-friendly. [903]   Finger-operated touchscreens typically work best on large displays above 3 inches.[904]

### (ii)   Bounce Back Effect

492.   According to a San Jose Mobile Communications Lab   presentation, "user might be confused when the page cannot be moved." [905]   Therefore, it is my understanding that a bounce back effect provides good visual user experience.

### (d)   *Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty*

493.   Based on the cost of design around cost as the starting point for the hypothetical negotiation, this factor is neutral in my determination of the reasonable royalty amount.

### (11) Factor #11—the extent to which the infringer has made use of the invention and any evidence probative of the value of that use

### (a)   *Use of the Invention*

494.   Apple asserts that 32 of Samsung's smartphone and tablets embody the Patents-in-Suit.[906]

### (b)   *Evidence probative of the value Samsung received from using the Apple Inventions*

495.   It is my understanding that 30 Samsung's smartphones and tablets are accused by Apple of using the technology taught by the Patent-in-Suit.[907]   Of these 32 products Samsung has provided data on 28. [908]   STA and SEA sales of these accused products are 18,230,472 units from May 2010 through December 2011.[909]

---

[903] 2009 Mobile US Forecast: M.T.O.C., Samsung Electronics, November 2011, SAMNDCA00218832-902 at '858. [11.2]
[904] 2009 Mobile US Forecast: M.T.O.C., Samsung Electronics, November 2011, SAMNDCA00218832-902 at '858. [11.2]
[905] Bouncing Effect in Browser, San Jose Mobile Communications Lab, SAMNDCA00201327-335 at '328. [11.3]
[906] Musika Report, Exhibit 4. [2.2]
[907] Musika Report, Exhibit 4. [2.2]
[908] Schedule 15.1. [1.2]
[909] Schedule 15.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

(c) *Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty*

496.    Based on the cost of design around cost as the starting point for the hypothetical negotiation, this factor is neutral in my determination of the reasonable royalty amount.

**(12) Factor #12—the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

(a) *Licenses in which Samsung Licensed Technology to Apple*

497.    I have received one license, signed by Apple, but not          Samsung,  in  which Samsung was to license standards essential technology to Apple.  This license is summarized at Schedule 1 at Tab 1.3 of my report.

(b) *Other Agreements in which Samsung is a Named Party*

498.    I  have  received  41  other  agreements in which Samsung was a named party, which can be found at Schedule 2 at Tab 1.3 of my report.

(c) *Other Agreements in which Apple is a Named Party*

499.    I have received 77 agreements in which Apple, or a    related entity, is a named party, which can be found at Schedule 1 at Tab 1.3 of my report.

(d) *Other   Agreements*

500.    I have received three agreements that involve neither Samsung nor Apple, which can be found at Schedule 3 at Tab 1.3 of my report.

(e) *Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty*

501.    I agree with Mr. Musika "there is no evidence that relates to the portion of the profit or selling price that may be customary in this business to allow for the use of the invention or analogous invention for any of the categories of Apple Intellectual    Property in Suit with the

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

limited exception of trademarks to some degree."[910] Therefore, this factor is neutral in my determination of the reasonable royalty amount.

> **(13) Factor #13—the proportion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements added by the infringer.**

> *(a) The proportion of the realizable profit that should be credited to the Apple's Inventions*

502.    This factor attempts to take into account the relative contribution of the patented feature to the success of the product. It is generally the case that a licensee is less disposed to agree to a high royalty if the patented feature forms only a small part of the product, either physically or economically.[911]

503.    Apple asserts that Samsung's smartphone and tablets embody the Patents-in-Suit. However, Samsung's accused products owe much of their value to Samsung's own creative and business inputs, not solely to the use of the Patents-in-Suit. I address each of Samsung's business and technology inputs below in turn.

### (i) Business        Inputs

504.    Samsung expends considerable time and effort to bring its products to market. Below is a brief discussion of Samsung's operations that contribute to bringing the accused smartphone and tables to market.

> *(a)      Research and Development*

505.    Samsung states on its website that "[i]nnovation is crucial to Samsung's business. As new technologies are being constantly introduced to the market, speed is essential for remaining competitive in today's digital era, and new markets have to be pioneered continuously."[912] "With competition in the smart phone space heating up, being able to introduce technology and user interface enhancements quickly is critical," noted Canalys

---

[910] Musika Report, p. 86. [2.2]

[911] Procter & Gamble Co. v. Paragon Trade Brands, Inc., 989 F. Supp. 547 at 613. [12.4]

[912] About Samsung, Research & Development,
<http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>. [11.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

analyst Tim Shepherd.  "You also need to be able to integrate them seamlessly into the device to provide a great total user experience."[913]

506.    Each year Samsung invests at least nine        percent  of  its  sales  revenue  in Research and Development activities.  [914]  "Samsung is committed to leading technology standardization and securing intellectual property rights."[915]

507.    Samsung's  research  and development network spans six Samsung centers in Korea and  18  more  in nine other countries, including the United States, the United Kingdom, Russia, Israel, India, Japan and China, as well    as other  research  centers  and  universities.[916] Samsung's Research and Development organization has three layers.        [917]  The Samsung Advanced Institute of Technology identifies growth engines for the future and oversees the securing and management of technology.  [918]  In turn, Research and Development centers of each business focus on technology that is expect    ed to deliver the   most  promising  long-term results.[919]   Division  product  development teams are responsible for commercializing products scheduled to hit the market within one or    two  years.[920]  More than a quarter of all Samsung employees work - 40,000 people - in the Research and Development centers.[921]

(b)    Samsung Marketing and Advertising Efforts

508.    Samsung's marketing and advertising efforts play an important  role in promoting Samsung's products and increasing public awareness about them. Nielsen estimated        that

---

[913] Canalys Research Release, Global Smart Phone Shipments Rise 28%, Nokia Retains Lead, but Apple Moves into Number Two Position, November 6, 2008, SAMNDCA00220313-316 at '314. [9.25]

[914] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[915] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[916] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[917] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[918] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[919] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[920] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

[921] Research & Development - Our Businesses - About Samsung – Samsung, <http://www.samsung.com/us/aboutsamsung/ourbusinesses/researchdevelopment.html>, accessed on March 1, 2012. [11.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Samsung spent ▮▮▮▮▮▮ on advertising in 2010. [922]  In a Samsung internal presentation entitled "2010 Full Year Media Spend," Samsung stated that its media spending was ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ advertising of Galaxy S and Tablet in 2010. [924]  Nearly ▮▮▮▮▮▮ of Samsung's Galaxy Tab media spending was invested in TV commercials, and the rest was spent    on online and print advertising.[925]  Overall, Samsung took the number one position at the    most promoted OEM in 2010.[926]

509.    According to a 2010 Samsung presentation,   integrated advertising campaign of Galaxy S helped build rapid awareness and purchase interest for the Galaxy    series.[927]  In particular, Samsung launched press events and meetings, executed    a media focused teaser campaign, developed scalable displays and new smartphone mockups to    highlight the brand and  products across the Galaxy S lineup, led 61 full training sessions across all carriers, reached over 4,000 sales representatives  with training events, and conducted close to 30 webinars to support remote training.[928]

510.    Samsung concluded that the key improvement in the  2010 advertising campaign from 2009 had been in the ads' ability to commutate messages   that differentiates Samsung on the  marketplace.  In particular, one of these differentiating product elements was Samsung's Super AMOLED technology.[929]  According to a Samsung 60-Day Post Launch  Report for Infuse 4G, the 4.5'' Super AMOLED screen of Infuse 4G smartphone was the top driver for purchase of Infuse 4G.[930]

*(c) Sam    sung's Brand*

---

[922] Advertising Insights 2010 Product Update, Nielsen, March 4, 2011, SAMNDCA00235833-834 at '833. [11.5]

[923] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '589. [11.6]

[924] Samsung Presentation, SAMNDCA00236898-913 at '912. [11.7]

[925] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '597. [11.6]

[926] Competitive Media Spend Update, Full Year 2010, SAMNDCA00236585-606 at '605. [11.6]

[927] Samsung Galaxy S Results and Key Learning, November 23, 2010, SAMNDCA00235207-246 at '208. [11.8]

[928] Samsung Galaxy S Results and Key Learning, November 23, 2010, SAMNDCA00235207-246 at '212. '214, '216, '242. [11.8]

[929] Samsung Q3 '10 Deep Dive, Galaxy S Campaign Review, November 18, 2010, SAMNDCA00235307-366 at '339. [11.9]

[930] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '820. [4.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

511.    Most people rely on brand when making product purchasing    decisions.[931] Samsung actively promotes its brand value - "a key engine of business growth," according to Samsung.[932]  Samsung's brand value was ranked No.19 Best Global Brand in the world and No. 9 in IT industry by Interbrand in 2010. [933]  As stated in an Interbrand "Best Global Brands  2010" report, "Samsung has been on the forefront of digital and design, developing new products  and increasing its presence in all its markets. Its sales growth, even in    tough economic times, demonstrates its ability to effectively hedge its portfolio of businesses."[934]

### (ii)    Design and Technology Inputs

#### (a)    Super AMOLED Technology

512.    Samsung highlights its Super AMOLED technology in its presentations and on its website.  In its June 30, 2010 presentation, Samsung states that Super AMOLED screen on Galaxy S provides best color reproduction, best outdoor readability, and best pixel response. [935] According to a Verizon Executive Meeting presentation, Samsung    Galaxy Tab 7's Super AMOLED display improves brightness and outdoor visibility.[936]

513.    Samsung also describes its Super AMOLED technology on its website:[937]

> Samsung's new SUPER AMOLED screen is the world's brightest SUPER AMOLED screen displaying vibrant and vivid colors in HD movies. Even in bright sunlight the screen is perfectly    clear so filming outdoors is a breeze.  Even filming incredibly fast action scenes or sports are not a problem when using the Galaxy S HD video capture feature.
>
> Samsung's brilliant SUPER AMOLED screen is a much brighter,    less reflective, and slimmer than any general    AMOLED screen. The ultra-brilliance of SUPER AMOLED, makes video so    astonishingly vivid, your display looks ultra real. The SUPER    AMOLED screen comes with free viewing angle & super fast response. The SUPER    AMOLED screen

---

[931] Design for Messaging Phone, Samsung Design America, July 2008, SAMNDCA00220208-267 at '222. [11.10]

[932] History – Corporate Profile – About Samsung – Samsung, Samsung's History, <http://www.samsung.com/hk_en/aboutsamsung/corporateprofile/history.html>, accessed on March 1, 2012. [11.11]

[933] Memo: 2010 Brand Value Rankings by Interbrand, September 16, 2010, SAMNDCA00234695-698 at '698. [11.12]

[934] Best Global Brands 2010, Interbrand, SAMNDCA00234567-630 at '587. [11.13]

[935] Samsung 'Dempsey,' June 30, 2010, SAMNDCA00024963-971 at '964. [11.14]

[936] VZW Executive Meeting, April 20-21st, 2011, SAMNDCA00024794-860 at '820. [11.15]

[937] Samsung Smartphone Technology, <http://www.samsung.com/au/smartphone/technology/super-AMOLED.html>, accessed on March 5, 2012. [11.16]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

reflects 5 times less light, which is an incredible     reduction from 20% to 4%. As 80 - 100% of original light is coming through to arrive        to your eyes, you can now have a great view even in the outdoors.

514.     Samsung's  Super  AMOLED  technology  was  highlighted  in  press  releases  and media. Media and online reviews praised Droid Charge for its Super     AMOLED screen.[938] For instance, CNET noted, "[i]t is stunning: the sharpness of the AMOLED Plus display really comes through  when  watching  video  and  colors  are  rich  and  pop  right  off  the  screen.  Also,  as promised,  outdoor  visibility  is  better  than  with  a  lot  of  smartphones,  and  we  were  able  to  read the screen at various angles."[939]

515.     Media  and  online  reviews  were  also  positive  for  Infuse  4G's  Super  AMOLED screen.[940]  For example, TechInsights stated in its August 2, 2011 New        Report  Notice  that "[w]ith  its  sprawling  4.5"  "Super  AMOLED'  display,  the  Infuse  4G  from  Samsung  plays  big brother to their recent large-touchscreen Galaxy model."[941]

516.     TechInsights  highlighted  Super  AMOLED  display  of  Samsung  Galaxy  GT-i9000 smartphone  in  its  August  31,  2010  Report  Notice.       [942]  According  to  TechInsights,  Super AMOLED display boasts 20 percent greater brightness, 80 percent less sunlight reflection,   and 20 percent lower power consumption."[943]

517.     Third  party  studies  and  surveys  also  pointed  to  the  Super  AMOLED  display  as  a feature that differentiates Samsung's products.  Strategy Analytics conducted a blind test when users  watched  same video trailer simultaneously on devices with Super AMOLED Plus and competitor's display to   determine  preference.[944]  Strategy Analytics found that "Samsung's Super AMOLED Plus display preferred more than 2 to 1 vs. competitor's display."[945]

---

[938] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '783. [4.16]

[939] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '804. [4.16]

[940] STA Post Launch Consumer Insights, July 2011, SAMNDCA00027781-844 at '784. [4.16]

[941] Email from TechInsights to John Brown, August 2, 2010, TechInsights New Report Notice, August 2, 2010, APLNDC0001524924-925 at '924. [15.30]

[942] Email from TechInsights to John Brown, August 31, 2010, TechInsights New Report Notice, August 31, 2010, APLNDC0001525057-058 at '057. [15.29]

[943] Email from TechInsights to John Brown, August 31, 2010, TechInsights New Report Notice, August 31, 2010, APLNDC0001525057-058 at '057. [15.29]

[944] Samsung, September 16, 2011, SAMNDCA00256983-7025 at '7017. [11.17]

[945] Samsung, September 16, 2011, SAMNDCA00256983-7025 at '7017. [11.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

518.    Mr. Joswiak also testified that a lot of customers  like Samsung's Super AMOLED displays  because  they appear very vibrant.  [946]  Mr. Joswiak agreed that this is "one of the important features that they're [Samsung] selling on."[947]

### (b)    Number of Samsung Patents

519.    In 2009 Samsung was the second top patent winner with  3,611 total numbers of patents.[948] According to a Samsung's 2010 annual report, in 2010      Samsung  registered 4,551 patents in US, second in volume only to IBM.[949]

### (b)   Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

520.    This factor indicates that the major reasons for Samsung's success  in selling the accused products is not the result of practicing the          patents-in-suit  but  are  due  to  other contributions of Samsung. However, this factor is neutral based on my choice of baseline royalty amounts.

### (14) Factor #14—the Opinion Testimony of Experts

521.    I have considered information  provided by to be my Trevor Darrell, Andries Van Dam, Brian Von Herzon, and Stephen Gray.

### (a)   Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

522.    I have considered this information in other Georgia Pacific factors. Therefore, this factor is neutral.

---

[946] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 438-439. [9.3]
[947] Deposition of Gregory Joswiak, Volume II, February 24, 2012, pp. 438-439. [9.3]
[948] Samsung Overview, SAMNDCA00256938-962 at '943. [11.18]
[949] 2010 Samsung Electronics Annual Report, p. 3. [11.19]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(15) Factor #15—the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee—who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

523.    The seminal approach for determining a reasonable royalty       is  the  "willing licensor/willing licensee" approach.  This approach assumes that a reasonable royalty rate with respect to patent infringement damages should re   flect, in part, the amount of money a willing licensor and willing licensee would negotiate for a license to    utilize the invention.   A technique for  estimating  such  a  royalty  is to assume that the patentee and infringer, each possessing similar information that was known and knowable at the time,       come  together  and  conduct  a hypothetical  negotiation.   In this hypothetical negotiation, each party's strengths, weaknesses and expectations are considered and form the basis for the opined royalty rate.  This      fifteenth factor in essence synthesizes the fourteen factors discussed above.

### c)   Major Facts Known or Knowable to Both Parties at the Hypothetical Negotiation

524.    Taking  into  consideration  the first fourteen     *Georgia-Pacific* factors, the m   ost important facts affecting the parties bargaining position at the hypothetical     negotiation can be summarized as follows:

- The parties knew with certainty that Samsung's products infringed the valid and enforceable Patents-in-Suit.
- There  are commercially acceptable non-infringing alternatives to the patents-in-suit.
- Apple is not a willing licensor.
- Samsung and Apple are direct competitors.
- Samsung is a major supplier of components to Apple.

### (1) Summary   of *Georgia-Pacific* Factor Analysis

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 68:  Summary of *Georgia-Pacific* Factors and Their Impact on the Reasonable Royalty Rate**

| *Georgia-Pacific* Factor | Impact on Royalty Rate | Comments |
|---|---|---|
| 1. Royalties received by patentee for licensing the Patents-in-Suit | Neutral | Apple did not produce any licenses to the patents-in-suit. However Apple acquired two foundational patents related to multi-touch functionality in a purchase of the entire FingerWorks company for $13.5 million. This provides a reasonableness check for the value of the '607 and '129, Patents. |
| 2. Rates licensee pays for the use of other comparable patents | Neutral | I found none of the Samsung licenses where Samsung was the licensor of patents probative to the patents-in-suit. |
| 3. Nature and scope of the license. | Neutral | Based on the design around costs for the patents-in-suit, the nature and scope of the license are not relevant. |
| 4. Licensor's established policy regarding licensing. | Increase to full design cost | Apple is not a willing licensor and so would not be willing to take anything less than the cost of a design around to their patents-in-suit. |
| 5. The commercial relationship between the licensor and the licensee. | Increase to full design cost | Apple and Samsung are competitors and so Apple would not be willing to take anything less than the cost of a design around to their patents-in-suit. |
| 6. The effect of sales of the patented product on sales of other products (convoyed sales). | Neutral | There is no proof that the patents-in-suit are primary drivers of Apple's or Samsung's sales of smartphones or tablets and so convoyed sales would not be properly considered in the hypothetical negotiation. |
| 7. The duration of the Patents-in-Suit and the term of the license. | Neutral | The duration of the patents and term of the hypothetical license agreement are longer than a typical product lifecycle in this industry. |
| 8. The established profitability of the product; its commercial success and its current popularity. | Neutral | Based on the design around costs for the patents-in-suit, the established profitability and commercial success of the accused products are not relevant. |
| 9. The utility and advantages of the patent property over the old modes and devices. | Neutral | The design around costs for the patents-in-suit provide a starting point royalty amount for the patents-in-suit. |
| 10. The nature of the patented feature and its benefits to the user. | Neutral | Based on the design around costs for the patents-in-suit, the nature of the patented feature and its benefits to the user are not relevant. |
| 11. The extent to which the infringer has made use of the Patents-in-Suit and any evidence probative of the value of that use. | Neutral | Based on the design around costs for the patents-in-suit, the extent of use by Samsung is not relevant. |
| 12. Customary royalty rates for this industry. | Neutral | I found no customary royalty rates for this industry. |
| 13. Apportionment of the realizable profit between that which should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | Neutral | Samsung contributes significant value to the accused products that have nothing to do with the patents-in-suit. However, based on the design around costs for the patents-in-suit, this is not relevant to my conclusion. |
| 14. The opinion testimony of experts | Neutral | I have considered this information in other *Georgia Pacific* factors. |

525.    In  my opinion, of the fourteen       *Georgia-Pacific* factors that are relevant to consider  for  raising  or lowering the reasonable royalty rate no factors tend to lower the

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

reasonable royalty rate, two factors tend to raise the rate to the full cost of the design arounds and twelve factors have a neutral effect.

### d)   Conclusions Regarding Reasonable Royalty

526.    In my opinion, based on all the considerations described above, the   reasonable royalty amount should be the full cost of designing around the patents-in-suit.

527.    In addition, for the '607 Patent, the design around cost would only cover the Tab 10.1.   Therefore, the parties would agree to a reasonable royalty that apportions the profits     of the other products accused of infringing the '607 Patent (the   Galaxy Tab 7.0 (3G) between the parties.    To determine a reasonable apportionment, I follow a methodology similar to that described in my unjust enrichment calculation.

528.    I use data from the iPad Buyer Surveys and iPad                Tracking  Studies commissioned by Apple.   As a part of the surveys and        studies, respondents  were  asked  to name specific features or attributes of the iPad that prompted their        iPad  purchase.[950]   To analyze  the  importance  of  the  "Multi-touch  screen"  of  the iPad relative to the other iPad's features  that influenced purchase decisions, I have divided the percent of respondents that listed the "Multi-touch screen" as a purchase trigger by the cumulative percent of the survey responses.   The results of my apportionment analysis are summarized in Schedule 7.2 at Tab 2 of my report.

529.    Based on this analysis, I conclude that the parties would have agreed to a six percent apportionment of profit to the '607 Patent.   Applying this 6 percent apportionment        to Samsung's  operating  profit  for the Galaxy Tab 7.0 results in an apportioned profit of $1,395,139.[951]   I next divide  this profit by the number of units sold to conclude a reasonable royalty rate of $2.10 per unit.[952]

### 2.   Calculation of Royalties Due

---

[950] iPad Buyer Survey: Initial US Results, Apple Market Research & Analysis, August 2010, APLNDC-Y0000023361-427 at '386. [3.20]

[951] Schedule 4.1A. [1.2]

[952] Schedule 3.1A. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

530.    Applying the full cost of the design around for     the patents-in-suit results in royalties due as follows:[953]

**Design Around Costs**

Utility Patents
'002
'163
'381
'891
'915
'607
'129

Cost to Design a New Icon (per Icon)

Cost to Design and Implement a New GUI

Trade Dress (Based on New GUI)
Trade Dress (Device Related)

Electronic Device Design Patents

531.    For the '607 Patent, an additional royalty payment would be due for the Galaxy Tab 7.0 (3G), calculated as follows:[954]

| | Units | Royalty Rate | Royalties Due |
|---|---|---|---|
| *5/1/10 - 12/31/11*<br>Galaxy Tab 7.0 (3G) | ■ | $2.10 | ■ |
| *6/16/11 - 12/31/11*<br>Galaxy Tab 7.0 (3G) | ■ | $2.10 | ■ |

## E.   Alternative Reasonable Royalty for Electronic Device Design   Patents and Trade Dress

532.    As I describe in my analysis of     *Georgia-Pacific* factor 9, I have concluded that Samsung has available to it acceptable, non-infringing alternatives for the Electronic Device Design Patents and Apple's asserted trade dress.  However, I have also           performed an alternative reasonable royalty calculation based on a maximum value for Apple's design.

---

[953] Schedule 1. [1.2]
[954] Schedule 2.1A. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

533.    I described in Section IV.C.4 above how I arrived at an estimate of the value of Apple's designs in total would be one percent of profits in discussing the amount of unjust enrichment due on Apple's design-related IP. In my opinion, the apportioned profit for Apple's asserted design-related IP is appropriate to use as the basis for a reasonable royalty if the fact finder determines that Samsung did not have a design around available.

534.    To convert to a royalty rate, I have divided the apportioned profit by the number of smartphone and tablet units to determine a per unit royalty rate. I have calculated the per unit rate to be $0.60 for Smartphones and $0.30 for Tablets.[955]

535.    Applying these royalty rates to the royalty base of accused units results in reasonable royalties calculated as follows for the relevant time periods:[956]



| | Units | Royalty R | oyalties Due |
|---|---|---|---|
| | | [a] | |
| *5/1/10 - 12/31/11* | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |
| *4/15/11 - 12/31/11* | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |
| *6/16/11 - 12/31/11* | | | |
| Smartphones | | $0.60 | |
| Tablets | | $0.30 | |
| **Total** | | | |

536.    It must be understood that these royalties would not be additive to the unjust enrichment remedy for products that are accused of practicing Apple's design patents. These are just alternative remedies to collect the same amount of damages. To the extent there are additional products that are accused of infringing either Apple's asserted trademarks or trade dress then per unit royalty of $0.60 for Smartphones and $0.30 for Tablets are a reasonable royalty for those products.

---

[955] Schedule 3.1. [1.2]
[956] Schedule 2.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

## V.    Documents, Data and Other Information Considered

537.    Volume 1, Tab 4 contains a complete list of documents I considered in forming my opinions.  In addition, I or my staff also had discussions with the following individuals:

- Trevor Darrell, Ph.D., Samsung's technical expert on the '002 and '891 Patents
- Jeff Johnson, Samsung's non-infringement expert on the '381 Patent
- Andries Van Dam, Ph.D., Samsung's invalidity expert on the '381 Patent
- Brian Von Herzen, Ph.D., Samsung's technical expert on the '607,   '129, and '828 Patents
- Stephen Gray, Samsung's technical expert on the '915 and '163 Patents
- Tim Sheppard, Vice President of Finance and Operations at STA
- Dongyul Choi, Manager, Finance Team, Mobile Business Unit at SEC
- Hoshin Lee, Senior Litigation Counsel, SEC
- Sun-young Yi: Senior Designer at Design Strategy Department at SEC
- Jaewoo Park: Assistant Engineer at Android R&D Group 2 at SEC
- Heonseok Lee: Senior Engineer at Display Lab Group at SEC
- Jong-wook Shim: Associate at Human Resources Group 1 at SEC

## VI.    Potential Additional Analyses to Perform

538.    My opinions are based on the information received as of the date of my report.  I plan on updating my damages analysis with the most current sales data produced as of the date of my testimony.  I understand that discovery is continuing and I may consider other         data produced through discovery to determine whether such other data impact my      opinions.  I will consider any criticisms of my opinions or bases   for my opinions brought to my attention at my deposition or offered by experts retained by Apple.  Any of this additional      information or work may cause me to change my opinions.

## VII. Qualifications

539.    Volume 1, Tab 5 contains my curriculum vitae which details my qualifications, including a listing of all my publications and testimony.

213

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

## VIII. Compensation

540.    My current billing rate is $795 per hour.


Michael J. Wagner