Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

is a minimum adjustment that Musika could have made.  I.e., he could have excluded 56%, and then applied his market share approach to the remaining 44%.  A more reliable approach would have excluded any consumer that indicated that platform was an important consideration, i.e. the 38% that said it is the most important factor and the 50% that said it is a factor in purchasing (i.e., 88% total).  This last question is for all smartphone purchasers, so it would be preferable to do a survey specifically geared towards Android (or accused product) purchasers, but Apple could have easily done that given they conducted such a study.

### e)  Mr. Musika's incremental profitability is overstated, resulting in significantly overstated lost profits.

223.    Mr. Musika calculates his incremental profitability using worldwide selling prices.  However, Apple sells its iPhone for a considerably higher price outside the United States, so Mr. Musika's calculation results in a significantly overstated profit for U.S. sales.  For example, Q3 and Q4 of its fiscal year 2010, using the U.S. selling prices would have reduced Mr. Musika's lost profits calculations by approximately 16 – 19 percent for smartphones.[519]

224.    In addition to using worldwide profit calculations, Mr. Musika fails to deduct marketing and advertising expenses in his incremental profitability analysis. The only operating expense that Mr. Musika deducted in his analysis is sales expense, but his lost profits model includes a large number of sales to customers on carriers other than the carriers that sell the iPhone.  If his analysis is correct, it is likely that a significant amount of additional marketing and advertising would be required to reach such customers.

225.    Therefore, I make a second adjustment to incremental profit by deducting the marketing / advertising expense.  When both U.S. prices are used and marketing / advertising expenses are deducted, Mr. Musika's lost profits would be reduced by 19 – 23 percent in Q3 and Q4 of fiscal 2010.[520]

### 5.  Mr. Musika's calculation of Samsung's profits related to the infringement is overstated.

226.    For Apple's design-related intellectual property, I understand that Apple may be entitled to Samsung's profits related to the infringement.  Mr. Musika calculates Samsung's

---

[519] Schedule 10.1. [1.2]
[520] Schedule 10.1. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

profits two ways – the first deducting no expenses and the second based on Samsung's gross margin.

227.    As I describe below, Samsung is entitled to deduct all of its operating expenses in its calculation of the profits related to the infringement of Apple's design-related IP.  Further, the majority of these profits are appropriately apportioned to the other elements of value that Samsung contributes to the sales of the accused products.

**6.    Mr. Musika's reasonable royalty analysis relies on unreasonable benchmarks and results in an overstated concluded reasonable royalty rate.**

228.    As part of his report, Mr. Musika developed a reasonable royalty framework that he used to calculate the monetary damages to be paid Apple in compensation for a portion of Samsung's alleged infringement.   Specifically, Mr. Musika explained that in this case, reasonable royalty damages "apply where other forms of damages are not available or cannot be proved with reasonable certainty."[521]   In general, such "reasonable royalty damage amounts are expressed as a reasonable royalty rate times an accused base,"[522] for example unit sales or revenue derived from sales of the accused device.  Mr. Musika's accused base consists of "the number of accused units sold and not revenue as the basis on which to calculate a royalty for each asserted item of Apple Intellectual Property In Suit."[523]

229.    With respect to the reasonable royalty rate, Mr. Musika employs three commonly used methods of calculating benchmarks from which to derive a final royalty: the cost approach, the market approach, and the income approach.  These approaches, and my criticisms thereof, are explained in more detail below.  Once calculated, Mr. Musika uses these benchmarks to derive his final royalty rates.[524]

230.    It is important to note, as explained in Section IV.A.2, that while Mr. Musika explains that he "considered the effect of the entire market value of the products and elected to structure my royalty damage on an individual per unit basis and not the total revenue of the accused products,"[525] each of his royalty benchmarks apportions some measure of Samsung's accused product revenue as if it were earned as a result of the IP at issue exclusively.  In other

---

[521] Musika Report, p. 52. [2.2]
[522] Musika Report, p. 52. [2.2]
[523] Musika Report, p. 53. [2.2]
[524] Musika Report, Exhibits 46-47. [2.2]
[525] Musika Report, p. 53. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

words, while Mr. Musika's royalty base is not total revenue, his royalty rates are based on his measures of the total market values of the accused products.

### a) Mr. Musika's cost approach does not provide a reasonable value for the intellectual property at issue.

231.    In his Expert Report, Mr. Musika develops a cost-based reference point that serves as one basis for his concluded royalty rate.[526]  Mr. Musika derives this reference point from what he calls "the opportunity cost represented by the amount of lost operating profits incurred by Samsung during the period of time Samsung would have been out of the market developing, designing, testing and implementing an acceptable non-infringing substitute."[527] However, Mr. Musika makes several unreasonable assumptions and omissions in his calculation that materially affect his cost-based reference point.  These points of contention, along with a general overview of Mr. Musika's cost-based approach, are described below.

### (1)  Mr. Musika's Approach in General

#### (a)  Smartphones

232.    Mr. Musika calculates his smartphone reference point using the time period from June, 2010 through December, 2011.[528]  This period begins on the date on which Samsung first sold its accused smartphones in the U.S. and ends on the last date for which Samsung provided data.[529]

233.    First, Mr. Musika derives an "Average Gross Profit per Month for Accused Products" during the time period described above.[530]  He then multiplies that average by four months; the period that he concludes represents the "N[umber] of Months Out of Market."[531]  Mr. Musika "based the period of time Samsung would have been out of the market … on the opinion of Apple's technical experts as identified on Exhibit 20 and Samsung and Apple evidence regarding the amount of time required in the ordinary course to design, develop, test and implement new smartphone and tablet features."[532]  This multiplication results in what Mr.

---

[526] Musika Report, pp. 54-56 and Exhibits 39-39.4. [2.2]
[527] Musika Report, p. 54. [2.2]
[528] Musika Report, Exhibit 39.4. [2.2]
[529] Samsung Financial Data, 2010-2011, SAMNDCA00372946-138 at '946, '949. [14.5]
[530] Musika Report, Exhibit 39.4. [2.2]
[531] Musika Report, Exhibit 39.4. [2.2]
[532] Musika Report, pp. 54-55. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Musika calls "Samsung's Total Loss Due to Redesign," which he divides by the "Total Accused Units Sold" during the prescribed time period to ascertain "Samsung's Cost Value per Unit Due To Redesign."[533]

234.    From that point, Mr. Musika allocates his Cost Value per Unit between the utility Patents-in-Suit and the design IP at issue.  To do this, he simply assigns 25% of the Cost Value to the utility patents, which encompass one type of IP, and 75% to the design IP, which encompasses three types of IP (design patents, trade dress, and trademarks).[534]

235.    Mr. Musika accounts for all design IP as one portfolio with one Cost Value reference point.[535]  However, he further splits the Cost Value per Unit assigned to Apple's utility Patents-in-Suit among all such patents.[536]  This allocation gives Mr. Musika his final Cost Value per Unit reference points.

### (b)  Tablets

236.    Mr. Musika uses the same method to calculate his tablet cost-based royalty reference points.  However, in this case he uses the time period October, 2010 through December, 2011.[537]  Again, this period begins on the date on which Samsung first sold its accused tablets in the U.S. and ends on the last date for which Samsung provided data.[538]

### (2)  Mr. Musika Assumes That Samsung's Accused Products Must be Taken Out of the Market During Redesign

237.    As stated above, Mr. Musika makes the implicit assumption that Samsung would have been "out of the market" while it redesigned its phones to avoid infringement of Apple's patents.[539]  In other words, Mr. Musika claims that Samsung would have lost all sales of its allegedly infringing products while designing around Apple's patents.  It is likely that the large majority of these customers would have purchased another Samsung smartphone that is not accused or waited until the redesigned smartphone was available given the customers have already demonstrated a preference for a Samsung smartphone.

---

[533] Musika Report, Exhibit 39.4. [2.2]
[534] Musika Report, Exhibit 39.3. [2.2]
[535] Musika Report, Exhibit 39.1. [2.2]
[536] Musika Report, Exhibit 39.1. [2.2]
[537] Musika Report, Exhibit 39.4. [2.2]
[538] Samsung Financial Data, 2010-2011, SAMNDCA00372946-138 at '119, '949. [14.2]
[539] Musika Report, p. 54. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (3)  Mr. Musika Adopts an Artificial Time Period to Calculate an Overstated Per Unit Cost to Design Around

238.    As described above, Mr. Musika limits his calculation to the timeframe beginning on the first U.S. sale date of the infringing products and ending on the last date for which Samsung provided data.  However, these end points do not accurately reflect the damages period, which would extend from the date of the hypothetical negotiation (i.e. the date on which the accused products were first sold) through the end of trial.  Furthermore, this timeframe does not correspond to the period that would have been covered by the hypothetical license to the patents and other IP at issue.

239.    Assuming the first date of trial is July 30, 2012, and that the trial is scheduled to last thirteen court days, the damages period would extend through the 15th of August, 2012.[540] This extends the period employed by Mr. Musika's analysis by seven months and fifteen days in the case of both smartphones and tablets.  While this difference in time period would not likely have a large impact on Mr. Musika's "Average Gross Profit per Month for Accused Products,"[541] it would have a large impact on "Total Accused Units Sold" which he divides into "Samsung's Total Loss Due to Redesign" to calculate "Samsung's Cost Value per Unit Due To Redesign."[542]

240.    This point is illustrated below using Samsung's actual data.  As the figure shows, calculating Cost Value per Unit using only the first four months of data provided renders much higher estimates than using the entire period as Mr. Musika does.  For example, Samsung's smartphone average Gross Profit is lower, but still comparable when calculated for the first four months only.  However, the number of accused units sold during that period is approximately six times smaller than that sold during the entire period.  The result is a much smaller Cost Value per Unit for Samsung's smartphones.  The same result would be observed if the period were to be extended by seven months and fifteen days; Mr. Musika's Cost Value per Unit would decrease substantially.  Note that this change is not based on any change in the underlying value of the patents and other IP at issue, but rather on the length of the time period selected.

---

[540] Minute Order and Case Management Order, August 25, 2011. [14.6]

[541] If the calculation of Average Gross Profit per Month is limited to the first four months of sales, there would be no impact at all.  If not, any increase in monthly gross profit above the current average would be spread across a larger time period, thus mitigating the upward impact.

[542] Musika Report, Exhibit 39.4. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 34: Example of the Impact of Time Period Length in the Calculation of Samsung's Cost Value per Unit Due to Redesign**[543]



241.    As described in my analysis of *Georgia-Pacific* factor 7, the utility and design Patents-in-Suit expire no earlier than September 29, 2014 (the '002 Patent) and at latest January 22, 2030 (the '129 Patent).  Since the hypothetical negotiation would yield a license that extends through the expiration date of the last to expire of the licensed patents, this would extend the royalty period by around eighteen years when compared to the period that Mr. Musika uses.  This extension would serve to decrease the Cost Value per Unit even further.

### (4)  Mr. Musika Does Not Include Operating Expenses in His Calculation of the Profit Samsung Would Have Lost While Redesigning Its Accused Products

242.    Instead of using Samsung's Operating Profit, Mr. Musika begins his calculation with "Average Gross Profit per Month for Accused Products," which deducts from revenue only

---

[543] Schedule {16.2}. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Samsung's manufacturing entity's Cost of Goods Sold.[544]   Since Mr. Musika fails to include Operating Expenses in his calculation of "Samsung's Cost Value per Unit Due To Redesign," he is essentially arguing that Samsung would have incurred Operating Expenses on the sale of its accused products even if it had not sold those products.  This assumption is incorrect, because Samsung would not have engaged in the activities that generated those expenses had it not actually sold those products.

243.    This oversight leads Mr. Musika to overstate Samsung's profit from the sale of accused products and thus overstate "Samsung's Cost Value per Unit Due To Redesign."  As shown on Mr. Musika's Exhibit 37, his calculation of Samsung's accused smartphone Gross Profit is ███████████████████████████████████████████████████████████ respectively.[545]   Comparatively, I have calculated the 2010 STA, SEA, and SEC Consolidated Operating Profit across the accused smartphones in 2010 as █████████████ and in 2011 as █████████████████████   Using the consolidated average selling prices (ASP) of Samsung's accused smartphones ████████████████████████████ the appropriate Operating Margins come to ███████████████   in 2010 and 2011.

244.    With respect to Samsung's accused tablets, Mr. Musika calculates Gross Margins of ██████████ for 2010 and 2011 respectively.[552]  My calculations show Operating Margins of ████████████████████[554]

245.    Clearly, the use of Operating Margins in place of Gross Margins in Mr. Musika's cost approach would have yielded significantly lower Cost Value per Unit estimates.  Interestingly, it appears that Mr. Musika meant to use Operating Profits in his calculation.  He states in his report that he "limited [his] calculation of this cost [the cost to replace or remove the accused technology] to the opportunity cost represented by the amount of lost **operating profits** incurred by Samsung during the period of time Samsung would have been out of the

---

[544] Musika Report, Exhibits 37 and 38. [2.2]
[545] Musika Report, Exhibit 37. [2.2]
[546] Schedule {4.3}. [1.2]
[547] Schedule {4.4}. [1.2]
[548] Schedule {4.3}. [1.2]
[549] Schedule {4.4}. [1.2]
[550] ██████████████████
[551] ██████████████████
[552] Musika Report, Exhibit 38. [2.2]
[553] ████████████████████████████
[554] ████████████████████████████

106

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

market …"[555] (emphasis added) While ultimately Mr. Musika uses Gross Profit, the use of Operating Profit would have been the more appropriate measure of profitability in this case.

### b) Mr. Musika's income approach does not provide a reasonable value for the intellectual property at issue.

246.    In addition to the cost approach, Mr. Musika also employed an income approach to derive a reasonable royalty benchmark.  He explained that "[t]he theory behind an income approach is that the value of the patent at issue is equal to the future profitability of the products embodying the patented technology."[556]   Importantly, Mr. Musika noted that Samsung's "net operating income produced through the sale of a smartphone and tablet …" "is not the result of the deployment of any single asset.  Rather it represents a composite return on all assets."[557]

### (1)  Mr. Musika's Approach in General.

247.    Mr. Musika began his "analysis by reviewing the work performed by the international company Interbrand," which "identifies itself as the 'world's largest brand consultancy.'"[558]   Mr. Musika explained that Interbrand releases an "annual valuation and ranking of the top 100 brands in the world," the valuation method of which "is an income based approach" that "starts with a company's overall financial performance and separates the portion of a company's overall performance that relates to the intangible brand."[559]   "Interbrand's actual calculation is: operating profits less taxes less an industry weighted average cost of capital (WACC) equals economic value added (EVA).  Interbrand then applies its own proprietary factor to the total EVA to determine the role of and ultimately the value of a company's brand."[560]

248.    Mr. Musika claims to follow Interbrand's method by first calculating Apple's companywide EVA.  Next he "deduct[s] the amount of the premium earnings that Interbrand has calculated that are due to the value of Apple's overall brand"[561] by (i) multiplying Apple's companywide operating margin by the ratio of Interbrand's brand valuation of Apple to Apple's

---

[555] Musika Report, p. 54. [2.2]
[556] Musika Report, p. 62. [2.2]
[557] Musika Report, p. 62. [2.2]
[558] Musika Report, p. 63. [2.2]
[559] Musika Report, p. 63. [2.2]
[560] Musika Report, pp. 63-64. [2.2]
[561] Musika Report, p. 64. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

market capitalization,[562] which he calls "Brand/Design Value,"[563] and (ii) subtracting that value from Apple's companywide EVA.[564]

249.    The resulting "EVA net of brand value" is renamed the "Value of the Company's Other Intangibles" and then subtracted from Apple's iPhone and iPad combined EVA net of brand value.[565]  This value, according to Mr. Musika, is the "Value of iPhone and iPad Combined … Intangibles."[566]

250.    Mr. Musika replicates this analysis with respect to Samsung's accused products. He then calculates per unit rates for the utility Patents-in-Suit by multiplying his calculated "Value of Intangibles" by the companies' respective combined smartphone and tablet ASPs.[567] His per unit rates for the design IP at issue use the same ASPs, but replace "Value of Intangibles" with "Brand/Design Value."[568]

251.    Finally, Mr. Musika allocates these per unit value among the various items of IP at issue to derive per unit reference points for each item of IP.[569]  He claims he did so "based on the relative strength of each utility patent …"[570]

252.    While Mr. Musika's analysis is claimed to be based on a reliable methodology, Mr. Musika's application of the methodology leads to an unreliable and overstated result.  I have described my main concerns with this analysis in the paragraphs that follow.

### (2)   Interbrand's Brand Valuation Does Not Measure the Value of Any of the IP at Issue.

253.    The main assumption upon which Mr. Musika's income approach relies is that Interbrand's calculation of brand value somehow relates to the design IP at issue in this matter. However, it doesn't appear that Interbrand's calculation is meant to value design at all.  Rather, "[t]here are three key aspects that contribute to the [Interbrand Value] assessment: the financial

---

[562] Musika Report, Exhibit 41.5. [2.2]
[563] Musika Report, Exhibit 41.3. [2.2]
[564] Musika Report, Exhibit 41.3. [2.2]
[565] Musika Report, Exhibit 41.3. [2.2]
[566] Musika Report, Exhibit 41.3. [2.2]
[567] Musika Report, Exhibit 41.2. [2.2]
[568] Musika Report, Exhibit 41.2. [2.2]
[569] Musika Report, Exhibit 41. [2.2]
[570] Musika Report, p. 66. [2.2]

performance of the branded products or services, the role of brand in the purchase decision process, and the strength of the brand."[571]

254.   From Interbrand's perspective, "role of brand reflects the portion of demand for a branded product or service that exceeds what the demand would be for the same product or service if it were unbranded."[572]   This statement indicates that the Interbrand calculation may actually be exclusive of design.   At the very least, Interbrand's measure of brand value includes much more than just design IP.   As Jez Frampton, Interbrand's Global Chief Executive, said in Interbrand's Best Global Brands 2011 report, "customers interpret [a] brand as a result of every interaction; from culture to product, from environment to communications."[573]   Since Mr. Musika assumes that Interbrand's valuation is, in fact, the value of Apple's design IP, he has vastly overestimated its value.   Indeed, it is not clear that Interbrand's study that is used as the basis for Mr. Musika's design-related IP valuation has *any* connection to design, and certainly not the limited design-related IP at issue in this lawsuit.

255.   Further, the trade names Apple / iPhone / iPad are important sales drivers, indicating that if the Interbrand value does include some element of design, it would be a very small portion.   A Competitive Tablet Product Experience report by Samsung points out that brand is one of "the most important factors taken into consideration when purchasing a tablet," and that "Apple brand is most desirable compared to all other brands."[574]   In a March 2011 Samsung Customer Survey, Apple received the highest purchase reason for brand.[575] According to ComTech reports commissioned by Apple, the Apple brand remains the top reason for consumers choosing iPhones, with more than one third stating this as their reason for handset choice.[576]   Greg Joswiak, Apple Vice President of iPod, iPhone and iOS Product Marketing, also testified that in his experience, the Apple brand is an important reason for

---

[571] Best Global Brands 2011, Methodology, Interbrand. [5.39]
[572] Best Global Brands 2011, Methodology, Interbrand. [5.39]
[573] Best Global Brands 2011, Interbrand, p. 3. [4.19]
[574] Competitive Tablets Product Experience - Form Factor & Display Size / Aspect Ratio Validation Research Report, August 28, 2011, SAMNDCA00028006-166 at '008. [4.8]
[575] Customer Survey Result, March 11, 2011, SAMNDCA00235804-830 at '809. [4.9]
[576] ComTech United States Report, Q111, Apple Market Research & Analysis, May 6, 2011, APLNDC0002831037-088 at '058. [4.10]   *See also* ComTech Global Report Q311, Apple Market Research & Analysis, November 18, 2011, APLNDC0002473754-796 at '776. [4.11]   *See also* ComTech USA Report Q411, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513 and '526. [4.12]   *See also* ComTech Global Report Q211, Apple Market Research & Analysis, August 12, 2011, APLNDC0002640687-727 at '709. [4.13]   *See also* ComTech USA Report Q211, Apple Market Research & Analysis, August 5, 2011, APLNDC0002640958-1004 at '979. [4.14]   *See also* ComTech USA Report Q311, Apple Market Research & Analysis, November 11, 2011, APLNDC0002641020-069 at '028 and '041. [4.15]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

purchasing an Apple product.[577]   In a July 2011 STA Post Launch Consumer Insights study, Samsung found that being "Not Apple Branded" was the major sales deterrent to the Galaxy Tab 10.1.[578]

### (3)  Mr. Musika's Calculation of Brand/Design Value and Value of Intangibles are Misguided.

256.    As explained above, Mr. Musika estimated Apple's companywide "Brand/Design Value" "by multiplying [Apple's] operating profit by the ratio of its brand value to market capitalization …"[579]   Notwithstanding the fact that Interbrand's brand value figures represent much more than overall design, and specifically Apple's design IP at issue, this calculation implies that operating margin and market capitalization are comparable measures.   From a different perspective, this calculation assumes that "Brand/Design Value" and operating margin share the same relationship, if such a relationship exists, as Apple's brand value and market capitalization.

257.    This, however, is not the case.   Operating margin is a measure of the profitability of a company's operating activities over a specified time period.   Market capitalization, on the other hand, is calculated by multiplying a company's total number of outstanding shares by the value of an individual share.   Thus, market capitalization is the market's valuation of a company, including the value of current and future operations, as well as all real and intangible assets owned by that company.

258.    Since Mr. Musika employed an inappropriate calculation of "Brand/Design Value," it follows that his calculation of the value of other intangibles is incorrect as well because it was calculated as EVA minus "Brand/Design Value."[580]   However, what is even more problematic is that Mr. Musika renamed what he initially called "Value of Intangibles," using it to calculate what he concluded was a "Per unit rate for utility patents."[581]   This conversion was both unexplained and not supported by the facts.   As has been acknowledged by Mr. Musika,[582] and discussed in this report, the value of both smartphones and tablets are derived from a vast

---

[577] Deposition of Gregory Joswiak, Volume II, February 24, 2012 p. 399. [9.3]  *See also* Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 60. [9.2]

[578] Samsung Presentation: STA Post Launch Consumer Insights. July 2011, SAMNDCA00027781-844 at '779. [4.16]

[579] Musika Report, Exhibit 41.3, [2.2]

[580] Musika Report, Exhibit 41.3, [2.2]

[581] Musika Report, Exhibit 41.2, [2.2]

[582] Musika Report, p. 52, [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

array of feature sets not limited to the IP at issue.  Mr. Musika, ignoring his own assertions, is implicitly claiming that his "Value of Intangibles" is the exclusive result of the specific IP at issue.

### (4)  Mr. Musika's Use of WACC is Inappropriate, and Has No Effect on His Calculation.

259.    Mr. Musika's calculation of industry WACC, which he uses to determine EVA in his income approach, is not an appropriate measure.  While Interbrand does use in its EVA calculation a "capital charge rate … set by the industry weighted average cost of capital (WACC)," the brand management firm does not disclose just how it calculates such a WACC. Given this uncertainty, Mr. Musika simply chose eleven U.S. companies that appeared in Interbrand's 2010 or 2011 top 100 brands report.[583]  Further, these companies were limited to Interbrand's computer software, electronics, or internet services industry categories.[584]

260.    A closer examination of these companies, however, shows that they are actually very different financially and probably do not provide a useful industry WACC benchmark.  For example, I have gathered information on each company's operating margin for the years 2010 and 2011, where available, and compared it to the corresponding companywide WACC.  While the company WACCs provided by Mr. Musika are relatively similar to each other, their 2010 operating margins run the gambit from 4.1% for Amazon.com to 38.6% for Microsoft.[585]  The same is true of 2011; operating margin ranges from 1.8% for Dell to 38.8% for Microsoft.[586]

261.    As part of his income approach, Mr. Musika also used the same "Industry Weighted Average Cost of Capital" to calculate Apple's companywide EVA, Apple's iPhone and iPad combined EVA, and Samsung's accused product EVA.[587]  However, since WACC is the same for both Apple companywide and iPhone and iPad combined, changes in WACC have no effect on the final result.  In other words, a change in WACC has the same net effect on Apple's companywide EVA net of brand value as it does on Apple's iPhone and iPad combined EVA net of brand value.  Since the former is ultimately subtracted from the latter in Mr. Musika's analysis, the net effect of a change in WACC is no effect on his calculation.  That is, no matter whether the WACC was 0% or 1000%, Mr. Musika would have derived the same values.

---

[583] Musika Report, Exhibit 41.4, [2.2]
[584] Musika Report, Exhibit 41.4, [2.2]
[585] Schedule {16.1}. [1.2]
[586] Schedule {16.1}. [1.2]
[587] Musika Report, Exhibit 41.3, [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**(5) Mr. Musika is simply splitting the "economic value" of the iPad and iPhone to the specific IP asserted in this lawsuit.**

262.    In its basic form, Mr. Musika's analysis simply calculates the profitability of the iPhone and the iPad, subtracts the profitability of all Apple products, and splits that profitability between the utility patents and the design-related IP.   It is simply not justified and not appropriate to conclude that 100% of this value is related to the limited asserted IP in this case.

**(6) Mr. Musika's analysis results in an overstated conclusion for the excess profitability of iPad / iPhone versus the company as a whole.**

263.    Mr. Musika's analysis's use of worldwide profitability for the iPhone and iPad and comparing it to worldwide profitability for all Apple products (which include computers).   First, computers are in a notoriously competitive industry, and therefore profitability of Apple as a whole would be expected to be lower regardless of whether the asserted IP was worthless or valuable.   This suggests that the comparison that Mr. Musika's analysis relies upon is meaningless.

264.    Second, as explained elsewhere, the use of worldwide prices for the U.S. and worldwide significantly overstates the profitability of the iPad and iPhone products because Apple's U.S. ASP for these products are considerably lower than its worldwide price.   Although I am not aware of Apple producing data on this, in my experience computer prices are higher in the U.S. versus worldwide, so using the worldwide data would tend to understate Apple's computer profitability.

265.    Finally, the unreliable nature of Mr. Musika's calculation is demonstrated by the fact that if Mr. Musika has performed his calculation separately for iPad and for iPhone, he would have found that the iPad profitability is lower than the overall company profitability, which would have resulted in his calculation of a negative royalty rate for the asserted IP with respect to the iPad.[588]

**(7) Mr. Musika uses an understated tax rate for Samsung, and if he had used the correct rate he would have found a negative royalty rate.**

---

[588] Mr. Musika reports an operating income of ███ for iPad in Exhibit 33, compared to the company wide operating income of 30.1%. (Musika Report, Exhibit 33, 41.3. [2.2])

However, for Apple, Mr. Musika is using the consolidated company's effective tax rate reported in Apple's financial statements.  Similar to Apple, Samsung pays taxes in many countries around the world, the primary country being Korea where it is headquartered.  If Mr. Musika had applied a similar methodology as for Apple, he would have used a 20% effective tax rate for 2011.[589]  If this rate had been used, Mr. Musika's analysis would have calculated a negative value for intangibles for Samsung, which based on Mr. Musika's logic would demonstrate that Samsung derives no value (or negative value) from its use of the asserted utility patents.

### (8)  Mr. Musika calculates the maximum royalty rate that Samsung would be willing to pay, but then ignores the rate.

266.    Mr. Musika calculates royalty rate values for Apple, but then appears to completely ignore those values in his royalty rate conclusion.  Given that he is collecting lost profits in his scenarios where he has presented a reasonable royalty, it is unclear why the value he calculates for Apple has any significance to the conclusion.

### c)  The other benchmarks mentioned by Mr. Musika are not relevant to the reasonable royalty analysis.

267.    As Mr. Musika explained, "[t]he market approach to the valuation of intellectual property is based on the consideration of other market comparable transactions."[590]  In this analysis, Mr. Musika explained that he "reviewed and analyzed both Apple and Samsung's licensing activity and searched the public domain for market comparable rates specific to or comparable to the Apple Intellectual Property In Suit."[591]  While Mr. Musika concluded that the three potentially relevant Apple agreements he discovered "do not provide a relevant comparable reference rate for the Apple Intellectual Property In Suit,"[592] he inappropriately turns to Apple's Made for iPhone, iPad, and iPod program as a reference point.[593]

268.    This program, which "made it possible for third parties to manufacture an accessory and with Apple's permission place a 'Made for iPod' logo on the packaging in

---

[589] Consolidated Financial Statements of Samsung Electronics Co., Ltd. and Subsidiaries as of December 31, 2011, p. 67. [3.5]
[590] Musika Report, p. 56. [2.2]
[591] Musika Report, p. 56. [2.2]
[592] Musika Report, p. 58. [2.2]
[593] Musika Report, p. 60. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

exchange for a fee …" of $4 per unit, was considered "a floor for the license of any single item of intellectual property contained in the asserted design patents, trade dress, and trademarks."[594]   Despite his conclusion, Mr. Musika acknowledged that "this license is not a comparable license to any of the Apple Intellectual Property In Suit …"[595]

269.    I share Mr. Musika's opinion that this license is not comparable.   Most importantly, this license has nothing to do with Apple's design IP at issue.   Mr. Buckley described this program as follows: "[s]o if I wanted to be a part of it and I made cases for my iPods, I could put that little Made For iPod sticker on my … product to advertise it being made for iPod."[596]   In short, it is an indefensible assertion that this agreement provides any useful information to the analysis of a reasonable royalty rate in this matter, let alone a per unit royalty floor for any single item of design IP.   Mr. Musika offers no explanation of his assertion and I do not find this license at all relevant to this matter.

### d)   Mr. Musika's analysis does not take into account several data points that would result in a much lower reasonable royalty rate.

270.    Mr. Musika's discussion of the market derivation of a reasonable royalty benchmark excludes certain considerations that would place downward pressure on his suggested royalty rate.   While he postulates that there is "No Market Rate" for any of the IP at issue,[597] there still exist important circumstances, embodied in both licensing discussions and agreements that can serve as tests for the reasonableness of Mr. Musika's conclusions.

271.    Mr. Musika begins his market benchmark analysis by proposing five theories on which he bases his discussion.[598]   The first four of these theories serve to characterize Apple as an organization that, as a general principal, does not license its patented technology to third parties.[599]   For example, as Mr. Musika points out, the testimony of Apple's former Chief Patent Counsel, Mr. Richard Lutton,[600] indicates that Apple was not willing to license its design patents to Samsung.[601]   Mr. Lutton also indicated that Apple was willing to provide "[a] license to some

---

[594] Musika Report, pp. 60-61. [2.2]
[595] Musika Report, p. 60. [2.2]
[596] Deposition of Mark Buckley, February 23, 2012, p. 58. [5.2]
[597] Musika Report, Exhibits 46 and 47. [2.2]
[598] Musika Report, p. 56. [2.2]
[599] Musika Report, p. 56. [2.2]
[600] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 8. [14.7]
[601] Musika Report, p. 56. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

scope of utility patents …."[602]   However, Mr. Musika excluded from his discussion that Apple viewed Samsung as a valuable partner with which it was willing to work hard to resolve the alleged infringement.

272.   This fact is evidenced, again, by Mr. Lutton's testimony.  According to Apple's former Chief Patent Counsel, Apple was "very concerned about the … theft of intellectual property and … were it not for the relationship between the companies … Apple would have … proceeded down a different path" and sued Samsung immediately, rather than engaging in discussions.[603]   Mr. Lutton recalled that during a meeting on August 4, 2010 between the two companies, Apple "wanted to make clear to Samsung that [Apple] viewed [Samsung] as a key partner."[604]   While Apple thought that Samsung was "using, inherently in the Android-based systems, a lot of utility patents …," Mr. Lutton noted that Apple was "committed to working with [Samsung] to try to find a path through … that both parties could live with."[605]   Though, as Mr. Lutton explained, "Apple never intended to license Apple's design patents to Samsung, … [Apple was] committed to working with them on an appropriate license so that they could continue to sell products that used [Apple's] utility patents in their smartphones …"[606]   Again, Apple took that position "in recognition of [Samsung] as a key partner that … [Apple] wanted to engage … in that negotiation and … take that seriously."[607]

273.   It is clear from Mr. Lutton's testimony that Apple's relationship with Samsung opened the door to negotiations between the parties.  In order to preserve the fruitful business relationship between them, it is likely that Apple, at a hypothetical negotiation, would have been amenable to a lower licensing rate for Samsung as one of its "key partners."   Mr. Musika's failure to consider this aspect of the business relationship of the two parties results in a possible overestimation of the reasonable royalty rate.

274.   In addition to the parties' relationship, Mr. Musika also ignored a few important aspects of their 2010 meetings that could have informed his reasonable royalty analysis.  During an October, 2010 licensing discussion with Samsung, Apple began "framing what would be an

---

[602] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 53. [14.7]
[603] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 36-37. [14.7]
[604] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 51. [14.7]
[605] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 51-52. [14.7]
[606] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 117. [14.7]
[607] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 117. [14.7]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

eventual license relationship around the utility patents …"[608]  This framework provided "a set of licensing potential outcomes that the parties might work out on [those] patents."[609]

275.    At an October meeting, Apple modeled "3 types of patent licenses to cover wireless and computing technologies."[610]  Respectively, these three proposed licenses would have covered "[b]asic telephony (e.g. wireless standards, java, processor, graphics, misc HW)," "Apple Computing technologies (e.g. O/S, object oriented, etc.)," and "Advanced iPhone Technologies needed to create an 'advanced' class device (e.g. Touch, GUI, apps, music, etc.)."[611]  Apple noted that "[e]ach license include[d] distinct technologies, so an iPhone advanced mobile class device would require all 3 licenses, while a basic phone would require only the phone license."[612]

276.    This 3-tiered licensing scheme resulted in Apple's proposal of $30 per licensed smartphone, including Android units, and $40 per licensed touchscreen tablet, "[r]educing to $30 over 2 years."[613]  There are two important facts to keep in mind regarding these proposed rates: 1) they represent initial offers by Apple that likely would have been negotiated downward during the course of a normal licensing discussion, and 2) they represent licensing rates that cover a much larger scope of technology than the limited IP at issue in this case.

277.    To elaborate on the second point, based on Apple's 3-tiered proposal, it is clear that the proposed licensing rates encompass much more than just the IP at issue in this matter. Specifically, the accused utility patents disclose technology for touchscreen hardware (the '607 and '129 Patents), touchscreen software (the '915 Patent), and GUI features (the '002, '891, '381, and '163 Patents).  It would appear that all of the Utility Patents-in-Suit fall into the "Advanced Mobile" category of Apple's licensing framework, which includes the "Touch" and "GUI" capabilities needed to make an advanced iPhone-like device.[614]

---

[608] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]
[609] Deposition of Richard J. Lutton, Jr., July 26, 2011, p. 181. [14.7]
[610] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]
[611] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]
[612] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]
[613] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '897. [14.8]
[614] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

278.    Furthermore, Apple's proposed "Advanced Mobile" license included technology that is not at issue in this suit.  For example, Apple noted in its October, 2010 presentation that the advanced class of device delivered both "apps" and "music,"[615] technology that Apple's Patents-in-Suit do not cover.   It follows from the above that Apple's $30 and $40 royalty proposals greatly overstate the reasonable royalty for at least the Utility Patents-In-Suit because these rates include rights to at least two categories of irrelevant IP to the hypothetical license in this case, while the remaining category includes the IP at issue in addition to technology outside of the scope of this matter. This is clear from Apple's second lawsuit they have filed against Samsung, in this same court, that is seeking damages and an injunction of patents that are not at issue in this lawsuit.

279.    While Mr. Lutton often testified that Apple was unwilling to license its design IP to Samsung, Apple's October 5, 2010 presentation suggests otherwise.  As described in the slide deck, Apple was "will[ing] to provide Samsung with a number of options for obtaining the most cost-effective [as] possible license to [its] patent portfolio."[616]  This included the possibility of four separate and cumulative discounts, as shown in the slide below.[617]

---

[615] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[616] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '900. [14.8]

[617] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '900. [14.8]

**Figure 35: Potential Discounts for Licenses to Apple's Patents**

We will provide Samsung with a number of options for obtaining the
most cost-effective possible license to our patent portfolio



280.    The fourth possible discount to Samsung, "Not Using Proprietary Features," was
made available because "[s]ome Samsung 'smartphone' products may not adopt [the] distinctive
industrial designs, software platforms or feature sets."[618]   Clearly, the industrial design was
contemplated in the creation of this presentation.   Notably, despite his assertions to the
contrary, Mr. Lutton was unable to point to any information in the October 5, 2010 presentation
that indicated that Apple's design patents were not available for license; rather, he could only
state that he thought "it was clear in [the parties'] discussions, the context of [the parties']
discussion, that Apple expected Samsung to change its design."[619]

281.    This information provides a clear maximum to Apple's valuation of its design IP in
this specific licensing context.   Apple proposed that those Samsung devices that steered clear
of Apple's proprietary features, the Samsung Blackjack II for example, would receive a 20%
discount from the $30 base royalty per smartphone or $40 base royalty per tablet.[620]   In other
words, Apple valued its proprietary features, which, as described above, included industrial

---

[618] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010,
    APLNDC00010886-903 at '898. [14.8]

[619] Deposition of Richard J. Lutton, Jr., July 26, 2011, pp. 186-190. [14.7]

[620] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010,
    APLNDC00010886-903 at '901. [14.8]

designs, software platforms, and feature sets, at 20% of $30 for smartphones or 20% of $40 for tablets; $6 and $8 per unit, respectively. This fact is ignored in Mr. Musika's analysis.

282.   Apple confirmed this interpretation by explicitly removing the discount for non-use of proprietary features on a slide that pictures what appear to be two of Samsung's accused products. This slide indicates that use of Apple's industrial designs, software platforms, or feature sets by Samsung's accused products would eliminate the 20% discount, thus subjecting the devices that use such accused IP to a royalty rate $6 or $8 higher than their non-infringing counterparts. [821]

**Figure 36: Apple's Proposed Discounts for Samsung's Android-Based Full Touchscreen Devices**



EXAMPLE 2: Android-based full touch screen devices

| | Samsung Portfolio | Cross license<br>• 20% discount |
|---|---|---|
| | Apple licensed O/S | Completely unlicensed<br>Android OS<br>- No discount |
| | Apple-licensed Processors | n/a |
| | Not Using Proprietary Features | Full touch screen device<br>- No discount |
| | Total | 20% discount |

283.   While it is unclear what Apple meant by the terms "software platforms or feature sets" when describing its proprietary features, it seems likely that at least certain of the Utility Patents-in-Suit fall within that category. As described above, Apple's October 5, 2010 licensing

---

[821] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '902. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

discussion concluded that its operating system fell under the category of "Apple Computing technologies," while touch and GUI fell under "Advanced iPhone Technologies."[622]

284.    It is important to keep in mind the distinction among these technologies because one of the explicitly stated available discounts is for the "use of an OS largely licensed to Apple patents …"[623]  This may indicate that both touch and GUI are contained within Apple's definition of "software platforms or feature sets."   However, if this is not the case, it would appear that touch and GUI would fall into the "Apple licensed O/S" category of discounts.  If this is the case (i.e. all utility and design IP at issue were considered either proprietary features or licensed O/S features), then Apple valued the IP at issue at no more than 60% (40% discount for use of a licensed O/S plus 20% discount for non-use of proprietary features) of the base royalty: $18 per smartphone and $24 per tablet.  Again, these valuations include a much larger portfolio of technology than what is at issue in this case, indicating that the actual value of the IP at issue is substantially less than these maximum values.[624]

285.    To provide yet another alternative, if Apple's multi-touch and GUI Patents-in-Suit are not included in any of the available discounts, then they could be included in the residual royalty due on a smartphone that was eligible for certain other discounts.  For example, a Samsung smartphone using Windows Mobile 7 would have been subject to a $9 royalty, under Apple's framework, after accounting for the appropriate discounts.[625]  This, coupled with the 20% discount for Apple's proprietary features, yields a $15 maximum royalty for smartphones.  Since the tablet base royalty is 33% higher than that for smartphones ($40 compared to $30), the implied royalty rate would have also been 33% higher: 133% of $15 is $20 per unit.

286.    While, as explained above, Apple's proposed license to Samsung does imply a maximum royalty, if it is determined that certain Apple IP was not available for license, then a reasonable royalty in relation to that IP is not an appropriate remedy.  Mr. Musika, instead of explaining the concept of calculating a reasonable royalty in a situation in which a royalty never would have materialized, asserts that these circumstances warrant "a very high but un-

---

[622] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '893. [14.8]

[623] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '898. [14.8]

[624] Also note that Apple's smartphones are not accused of infringing the '607 and '129 Patents-in-Suit that describe touchscreen hardware.  This also indicates a lower smartphone royalty rate.

[625] Exhibit 11 to Lutton Deposition, Samsung-Apple Licensing Discussion, October 5, 2010, APLNDC00010886-903 at '903. [14.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

quantifiable rate for Apple's asserted design patents and tradedress."[626]  Instead of attempting to calculate a reasonable royalty for such IP, Mr. Musika should have concluded simply that the reasonable royalty remedy was not available in this case.

287.    In addition to overlooking the facts described above, Mr. Musika, while he does calculate an implied royalty rate, essentially ignores Samsung's licensing proposal to Apple. This proposal is an indication of Samsung's starting point for the hypothetical negotiation framework.  As Mr. Musika calculated, Samsung's proposal implied an approximately $4 to $4.50 per unit license for both Apple and Samsung's smartphones and tablets.[627]  Further, as Mr. Musika notes, this is a rate for a portfolio of patents not limited to the Patents-in-Suit.[628] Since the hypothetical negotiation framework assumes an arms-length, bilateral negotiation between the parties involved, it is unreasonable to disregard a rate actually proposed by one of the relevant entities.

288.    Finally, supplementing the analysis provided above, Samsung entered into a Confidential Patent License Agreement with Microsoft, effective July 1, 2011, that provided each party a worldwide, nonexclusive license to the other party's entire portfolio of patents filed on before the end of the license term, which would extend for seven years.[629]  Pursuant to this license, each party was granted the right to make, use, and sell certain licensed products.[630] With respect to Samsung, the licensed products included both Android smartphones and tablets.[631]



---

[626] Musika Report, p. 56. [2.2]

[627] Musika Report, Exhibit 40. [2.2]

[628] Musika Report, Exhibit 40. [2.2]

[629] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '484, '490, '497. [15.12]

[630] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '490. [15.12]

[631] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '489. [15.12]

[632] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '494. [15.12]

[633] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-506 at '485. [15.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order





---

[684] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-508 at '494. [15.12]

[685] Confidential Patent License Agreement between Microsoft Corporation and Microsoft Licensing GP and Samsung Electronics Co., Ltd., July 1, 2011, S-794-ITC-005517484-508 at '506. [15.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

291.    This license may provide a useful benchmark with which to evaluate the hypothetical license because it is essentially a license to manufacture and sell smartphones and tablets running the Android operating system.


e)  **Mr. Musika takes into account inappropriate considerations in his *Georgia-Pacific* analysis that result in an artificially high royalty rate.**

292.    Mr. Musika consistently refers to Apple's "unwillingness" to negotiate a license at essentially any price as a basis to argue for a high royalty rate.[636]  Mr. Musika appears to use this argument to establish a very high royalty rate, even on intellectual property that has little impact on the sale of either party, as admitted by Mr. Musika.  In his "Market Approach" section, Mr. Musika states that "Apple's policy is to not license to anyone its design elements as represented by Apple's asserted design patents and trade dress.  Accordingly, this sets a very high but un-quantifiable rate for Apple's asserted design patents and trade dress."[637]

293.    For example, Mr. Musika admits that Apple would not lose any profits based on Samsung's infringement of the trademark icons, yet he still concludes that the "reasonable" royalty rate for Samsung's infringement of any trademark icon would be $22 per unit, stating that "[d]ue to the extreme importance of Apple's design to its corporate success and future, I have assigned the high end of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements. Therefore, although Apple has refused to license any of its design related assets and would consider the license of one as injurious as licensing the group, the "Made for iPod" program rate of $4.00 per unit is considered a floor royalty for the license of any individual item within this group."[638]

294.    Mr. Musika is essentially arguing that Apple would never license the design-related intellectual property, therefore the rate for any element of design-related IP should be artificially high.  This is inappropriate for two reasons.  First, if Apple would never have licensed the IP, then a reasonable royalty is not an appropriate remedy in this case.  Indeed, in a recent N.D. of California decision, Judge Phyllis Hamilton granted a motion for judgment as a matter of

---

[636] Musika Report, pp. 28, 56, 65, 71, 73, Exhibits 42, 43, 45, 46. [2.2]
[637] Musika Report, p. 56. [2.2]
[638] Musika Report, Exhibit 45, 46. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

law in a copyright matter that the plaintiff is not entitled to actual damages in the form of a hypothetical license.[639]

295.    Even if Apple is entitled to seek a reasonable royalty for the alleged infringement, Mr. Musika is claiming to do so under a *Georgia-Pacific* analysis.    However, the 15th factor describes the licensing circumstances clearly, requiring that both parties would be "reasonably and voluntarily trying to reach an agreement" and the licensor "was willing to grant a license."[640] Clearly, Mr. Musika is not following these required assumptions of the *Georgia-Pacific* analysis in his conclusions.

### f)   Mr. Musika's concluded royalty rate is unreasonably high.

296.    As described above, Mr. Musika relies on benchmarks that provide overstated values and are not reliable indicators of the value of the specific intellectual property at issue in this lawsuit.    In addition, Mr. Musika does not consider several benchmarks that would have resulted in significantly lower reasonable royalty rates.    Therefore, Mr. Musika's concludes a royalty rate that is unreasonably high and would not be agreed to by Samsung, or any other willing licensor.

### 7.   Mr. Musika's discussion of the irreparable harm done to Apple is divorced from actual market conditions.

297.    Mr. Musika asserts that "the damages amounts expressed [in his report] do not represent a complete measure of the total damages that Apple has and will continue to experience due to Samsung's conduct."[641]    However, Mr. Musika offers little to no evidence, beyond cursory conjecture, that such irreparable harm has occurred, is occurring, or will occur in the future.    The data, shown in the five figures below, show that Apple is far from suffering irreparable harm.

---

[639] *Oracle USA, Inc., et al. v. SAP AG, et al.,* Order Granting Defendants' Motion for JMOL , and Motion for New Trial; Order Denying Plaintiffs' Motion for New Trial; Order Partially Vacating Judgment, September 1, 2011, p. 10. [15.13]
[640] Musika Report, p. 87. [2.2]
[641] Musika Report, p. 27. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 37: Apple US iPhone Sales by Quarter[642]**



298.    The chart above shows Apple's U.S. iPhone sales by quarter from the release of the first iPhone through Q4 2011.  Apple's iPhone sales enjoyed a relatively steady climb from introduction through Q1 2011.  After a short lull, during which no new iPhone iterations were released, Apple's smartphone sales skyrocketed to approximately fifteen million units in the fourth quarter of 2011, the quarter during which the iPhone 4S launched.  As shown of the graph, this more than doubled the previous record of around seven million units during Q1 2011 with the launch of the Verizon iPhone 4.

---

[642] Schedule 18. [1.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 38: Smartphone Average Selling Prices in the U.S., Q2 2007 Through Q4 2011**[643]



299.    The above chart shows Apple's iPhone ASP alongside Samsung's smartphone ASP from Q2 2007 through Q4 2011.  As illustrated, Apple has maintained a consistent and sizeable premium over Samsung.  In other words, Apple would be hard pressed to argue that its smartphone offering has suffered any price erosion at the hand of Samsung's products.  In fact, Apple's ASP has consistently increased since Q3 2009.

---

[643] Schedule 18. [1.2]