HAROLD J. MCELHINNY (SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (SBN 116421)
rkrevans@mofo.com
ERIC J. OLSON (SBN 175815)
ejolson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522


Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**APPLE INC.'S BRIEF REGARDING APPROPRIATE SANCTIONS FOR SAMSUNG'S PROTECTIVE ORDER VIOLATIONS**<br><br>**Date:**  December 9, 2013<br>**Time:**  10:00 a.m.<br>**Place:**  Courtroom 5, 4th Floor<br>**Judge:**  Hon. Paul S. Grewal |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF SAMSUNG'S AND QUINN EMANUEL'S PROTECTIVE
        ORDER VIOLATIONS .........................................................................................2
        A.    The Protective Order ..................................................................................3
        B.    The Improperly Disclosed and Disseminated Apple Information ...........................4
              1.    The Apple License Terms are Confidential .................................................4
              2.    The Apple-Nokia License Terms Have Not Been Disclosed By
                    Apple or Nokia...................................................................................5
        C.    Samsung's and Quinn Emanuel's Improper Dissemination of Apple
              License Terms and Failure to Timely Disclose Known Breaches of the
              Protective Order .................................................................................7
              1.    Samsung and Quinn Emanuel Block Discovery of Full Extent of
                    Their Protective Order Breaches.................................................................9
        D.    Improper Uses of Apple License Terms .................................................................10
              1.    Samsung's Use of Apple's Confidential Information Against
                    Apple in Litigation and In Licensing Discussions.....................................10
              2.    Samsung's Use of Apple's Confidential Information Against
                    Others ...................................................................................13
                    (a)    Nokia...................................................................................13
                    (b)    Ericsson................................................................................14

III.    THE COURT SHOULD SANCTION SAMSUNG AND QUINN EMANUEL TO
        CURE THE HARM—AND CONTINUING THREAT—TO APPLE AND THE
        OTHER AFFECTED PARTIES, AND TO VINDICATE THE COURT'S
        RULES AND ORDERS. ...........................................................................15
        A.    Remedies To Begin To Cure The Harm And Continuing Threat To Apple..........16
              1.    Public Findings Of Samsung's Misconduct.............................................17
              2.    Bar Against Samsung And Quinn Emanuel For A Period Of Two
                    Years From Entering New Situations Where They Could Misuse
                    Apple Confidential Information.................................................................18
              3.    Bar Against Samsung Pursuing An Injunction In The -630 Case
                    Because Of Its Unclean Hands .................................................................19
              4.    Attorneys' Fees .......................................................................19
        B.    Sanctions To Uphold The Integrity Of The Judicial Process And Deter
              Future Misconduct ...........................................................................20

IV.     CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992)..........................................................................19

*Biocore Medical Techs. Inc. v. Khosrowshahi,*
    1998 WL 919126 (D. Kan. Nov. 6, 1998) ........................................................20

*Brocade Comm. Sys., Inc. v. A10 Networks, Inc.,*
    Case No. 10-3428-PSG, 2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ...................15

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991).............................................................................................15

*Mfr.'s Fin. Co. v. McKey,*
    294 U.S. 442 (1935)..........................................................................................19

*Grace v. Center for Auto Safety,*
    155 F.R.D. 591 (E.D. Mich. 1994) ...................................................................16

*In re Deutsche Bank Trust Co. Americas,*
    605 F.3d 1373 (Fed. Cir. 2010)........................................................................11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
    10 F.3d 693 (9th Cir. 1993) ..............................................................................15

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
    941 F.3d 970 (9th Cir. 1991) ............................................................................18

*Lion Raisins Inc. v. United States,*
    64 Fed. Cl. 536 (Ct. Claims 2005) ...................................................................18

*Minnesota Mining & Mfg. Co. v. Pribyl,*
    259 F.3d 587 (7th Cir. 2001) ............................................................................18

*Shockley v. Arcan, Inc.,*
    248 F.3d 1349 (Fed. Cir. 2001).........................................................................19

*Trenado v. Cooper Tire & Rubber Co.,*
    274 F.R.D. 598 (S.D. Tex. 2011)......................................................................20

STATUTES

35 U.S.C. § 285 .........................................................................................................20

1

## I.    INTRODUCTION

2         By at least December 2012, Samsung and Quinn Emanuel were on clear notice that they

3    had repeatedly circulated Apple's confidential license information to more than 165 individuals

4    not entitled to receive that information under this Court's Protective Order.  Yet, Samsung and

5    its lawyers said **nothing** at the time to Apple or the Court—even though the Protective Order

6    expressly required them to self-report "all known relevant information" concerning these many

7    unauthorized disclosures "immediately"—and did nothing to retrieve that information or prevent

8    its further dissemination or use, even though the Protective Order required them to do so

9    "promptly."  To the contrary, over the next seven months, Samsung and Quinn Emanuel simply

10   maintained their silence while continuing to transmit Apple's confidential license information to

11   Samsung employees and lawyers around the world, including dozens of additional persons not

12   under the Court's Protective Order.

13        All that changed on July 1, 2013, when Nokia filed a sealed motion (in Case No. 12-cv-

14   630) alleging that Samsung had improperly used Apple's and Nokia's confidential license

15   information to secure more favorable terms in negotiations.  Less than two weeks later, Samsung

16   and Quinn Emanuel admitted in a letter **to Nokia** that they had repeatedly violated the Court's

17   Protective Order.  But Samsung and Quinn Emanuel said nothing about those same breaches to

18   Apple or the Court for several additional weeks; *i.e.*, until **after** the U.S. Trade Representative

19   completed his review of the ITC's determination (in Investigation No. 337-TA-794) that certain

20   Apple products should be excluded from the United States in view of a Samsung declared

21   standard-essential patent (which he disapproved).  But even then, Samsung and Quinn Emanuel

22   grossly underreported the full extent of their Protective Order violations.  They then stymied

23   Apple's (and Nokia's) attempts to learn about the scope of the violations by conducting a flawed

24   factual investigation, by failing to comply with the Court-approved Stipulation with Nokia, by

25   filing an entire brief and sixteen declarations *ex parte*, and by erecting multiple roadblocks that

26   prevented Apple from conducting its own investigation—including numerous improper

27

28

assertions of privilege that forced the Court to review thousands of withheld Samsung documents *in camera*.

Apple's own limited investigation has led it to the inescapable conclusions that Samsung and Quinn Emanuel (i) breached the Protective Order **hundreds of times** by sharing Apple's confidential license information with Samsung employees and lawyers around the world (including top Samsung licensing executives); (ii) used the improperly-shared information in connection with the parties' ITC proceedings and license negotiations as well as license negotiations with at least Nokia and Ericsson; and (iii) attempted to keep their many violations hidden from Apple and the Court, until Nokia exposed them.  This conduct confirms the Court's statement in its Order to Show Cause Why Sanctions Are Not Warranted, that "if anything was breached, it was this court's protective order, and that sanctions against Samsung and its attorneys are warranted."  (Dkt. 2689 at 2.)  Indeed, Apple is not aware of a reported decision in which any litigant violated a protective order nearly as many times as Samsung and its lawyers have in this case.

These violations jeopardize the trust that Apple and other litigants regularly place in judicial protective orders.  They also have harmed—and continue to threaten—Apple (and Samsung's other competitors, including Nokia) by arming Samsung with an asymmetrical informational advantage that Samsung can—and apparently **has**—used to its advantage in crafting litigation and licensing positions.  Apple requests sanctions that are tailored to these offenses, that would begin to cure the harm and threat to Apple and to others, and that would help vindicate the importance of compliance with the rules and orders governing the judicial process.

## II.   SUMMARY OF SAMSUNG'S AND QUINN EMANUEL'S PROTECTIVE ORDER VIOLATIONS

Many of the facts surrounding Samsung's and Quinn Emanuel's violations of the Protective Order are set forth in Apple's prior filings.  (*See* Dkts. 2374; 2410, 2557, 2772, 2825.) The full detail regarding those violations is not repeated in this submission, but some of the key facts are summarized below.

**A.     The Protective Order**

On January 30, 2012, at the joint request of the parties, the Court entered a Protective

Order.  (Dkt. 687.)  The "Basic Principle" of that Protective Order is as follows:

> All Protected Material shall be used solely for this case or any related appellate
> proceeding, and not for any other purpose whatsoever, including without
> limitation any other litigation . . . or any business or competitive purpose. . . .
> Protected Material shall not voluntarily be distributed, disclosed or made
> available to anyone except as expressly provided in this Order.

(*Id.* at 5, ¶ 6(a).)

Recognizing the extremely commercially sensitive nature of licensing information, Apple

and Samsung stipulated, and the Court's Protective Order specifies, that information regarding

the "licensing of the Producing Party's intellectual property" is "presumed" to be "sensitive

business information that is trade secret, and/or commercially sensitive, where substantial harm

from disclosure cannot . . . be avoided" without strict limitations on who is permitted to view it.

(*Id.* at 11, ¶ 9(a).)  Specifically, licensing information designated highly confidential under the

Protective Order was only permitted to be disclosed to outside litigation counsel, the Court, the

parties' litigation experts, and their staffs.  (*Id.* at 11, ¶ 9(b).)  The parties agree on the

importance of such protective orders to ensure the confidentiality of sensitive business

information produced in litigation.  (*See* Dkt. 2557-8 [Ahn Dep.] at 15:4-7 ("Q. Would you agree

with me that a protective order helps to ensure that a party's confidential information does not get

into the hands of its competitors?  A.  Yes."); Dkt. 2557-10 [Shim Dep.] at 30:14-31:4; Ex. 22,

[Risher Dep.] at 121:11-122:8.[1])

Finally, the Protective Order requires that, in the event a party improperly discloses

material designated as protected under the Protective Order, it must

> ***immediately notify*** counsel for the Producing Party . . . and ***provide to such***
> ***counsel all known relevant information concerning the nature and***
> ***circumstances of the disclosure***.  The responsible disclosing Party shall also

---

[1]     Exhibits 22-27 referenced herein are attached to the Declaration of Mark Selwyn in
Support of Apple Inc.'s Brief Regarding Appropriate Sanctions.

promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ***ensure that no further or greater unauthorized disclosure and/or use thereof is made***.

(*Id.* at 30, ¶ 18(a) (emphases added).)

## B. The Improperly Disclosed and Disseminated Apple Information

Samsung and Quinn Emanuel repeatedly violated the protective order by disclosing the financial terms of Apple's patent license agreements with several companies that are direct competitors of Apple and Samsung.  These terms were contained in at least two separate documents disseminated by Quinn Emanuel and Samsung.  (*See* Dkt. 2557-4 [Ahn Dep.] at 2-4 (detailing Samsung's disclosures).)  The first was an incompletely redacted report of Samsung's licensing expert, David Teece, which was circulated at least as early as March 22, 2012.  (*Id.*)  The second was an incompletely redacted version of a brief Samsung filed in the ITC linking Apple's licensing terms to Samsung's FRAND positions circulated at least as early as March 22, 2013.  (*Id.*)  It is undisputed that Quinn Emanuel and Samsung broadly disseminated the financial terms of Apple's licenses with (1) Nokia, (2) Ericsson, (3) Philips, and (4) Sharp ("Apple License Terms") to individuals unauthorized to view them under the Court's Protective Order.  (*See id.*)

### 1. The Apple License Terms are Confidential

In addition to the Protective Order's presumption that licensing information is highly confidential, the evidence confirms that the Apple License Terms are actually highly confidential, commercially sensitive information.  Both Apple and Nokia executives testified that these licensing terms are considered to be among the most sensitive pieces of information at their respective companies.  (Ex. 22 [Risher Dep.] at 40:17-20; *id.* at 42:2-4 ("There are a very, very limited number of people at Apple who have access to the Nokia agreement or its terms."); *id* at 133:5-19 (testimony regarding Ericsson, Philips, Sharp licenses); Ex. 23 [Melin Dep.] at 45:23-46:8 (testimony that the Apple-Nokia license terms are "absolutely" considered to be confidential).

Further, the Court has previously confirmed the confidential nature of the Apple-Nokia license by entering a sealing order keeping its financial terms out of the public view during trial. The Court recognized that disclosure of the Apple-Nokia license terms "could result in significant competitive harm to the licensing parties as it would provide insight into the structure of their licensing deals, forcing them into an uneven bargaining position in future negotiations." (Dkt. 1649 at 16.)

Finally, Samsung's own licensing and legal executives likewise testified that Samsung seeks to keep the terms of its licenses confidential because of these very concerns.  (*See* Dkt. 2557-14 [Kim Dep.] at 85:13-19 ("Q. Samsung tries its best to keep the terms of its patent licenses confidential; correct? A. Yes.  Q. That's because Samsung views its patent license terms as very sensitive confidential information; correct? A. Yes. It is important information."); Ex. 24, [Chi Dep.] at 68:1-4.)  Samsung's executives also acknowledged their understanding that other companies in the industry—including Apple—similarly strive to keep the terms of their licenses confidential, and that it is "pretty rare for competitors in the mobile telephone industry to have any information about the financial terms of their rivals' licenses."  (Dkt. 2557-10 [Shim Dep.] at 237:13-23; *see also* Dkt. 2557-14 [Kim Dep.] at 91:3-9.)

### 2. The Apple-Nokia License Terms Have Not Been Disclosed By Apple or Nokia

Notwithstanding the Protective Order's presumption that license terms are presumed highly confidential, and the testimony of Samsung's own witnesses that they regard license terms to be highly confidential, Samsung now appears to argue that the Court should find the Apple-Nokia license terms[2] do not qualify for protection under the Protective Order.

Samsung's first anticipated argument—that Apple's disclosures in the Netherlands litigation of certain information concerning the Apple-Nokia license destroys the confidentiality of the financial terms of that license—is not supported by the factual record.  Apple's

---

[2]    Notably, Samsung does not appear to make any such claim with respect to the remainder of the Apple License Terms (i.e., the financial terms of Apple's licenses with Ericsson, Philips, and Sharp).

anonymized disclosure of certain terms of its patent license agreements in the Netherlands was made at the direction of the Dutch court under strict restrictions.  (Ex. 27 [Kleemans Decl.]).  Indeed, Samsung in-house attorney Daniel Shim, who was responsible for Samsung's Netherlands litigation efforts and received Apple's Netherlands submission, acknowledged that (1) the submissions were made at the direction of the court, (2) the parties' submissions were anonymized, (3) disclosure of Apple's submission within Samsung was limited to nine authorized employees,[3] (4) the information provided by Apple was not to go beyond the nine authorized Samsung recipients, and (5) the information in the parties' submissions was only to be used for purposes of the Dutch proceedings.  (Dkt. 2557-10 [Shim Dep.] at 118:7-120:12, 220:10-221:4, 221:13-223:2.)  Indeed, Mr. Shim acknowledged: "I don't consider the Dutch submissions to be a public source."  (*Id.* at 212:19-23.)  Mr. Shim also conceded that, because Apple's Netherlands disclosures were anonymized, it was not possible to know whether the information listed corresponded to the Nokia license.  (*Id*. at 149:8-15; 212:24-213:10, 222:17-223:223:2.)

Samsung's second anticipated argument—that Apple's disclosure of certain terms of the Apple-Nokia license to the U.S. Securities and Exchange Commission renders that information not "Highly Confidential"—is similarly unsupported.  To the contrary, when the SEC required Apple to submit the financial terms of the Apple-Nokia license, Apple did so subject to a standard request for confidential treatment, and the information was never made public.  (*See, e.g.*, Dkt. 2374-2 [Jason Mick, "Apple Fights to Keep Details of Nokia Settlement From the Public," Daily Tech (Oct. 3, 2011)].)  As reported by the press at the time, "Apple fulfilled that [SEC] request with five pages of non-public confidential information filed on August 1[, 2011]."  (*Id.*)  On August 17 the SEC acknowledged receiving the document and stated that it was "satisfactory."  (*Id.*)  Since that time, the SEC has not approached Apple about making any further (let alone non-confidential) disclosure of the license terms.

---

[3]     Dr. Ahn is not one of the Samsung employees who was included within the group of authorized Samsung recipients of Apple's submission.  (Dkt. 2557-10 [Shim Dep.] at 122:13-20.)

Samsung is also expected to argue that the Apple-Nokia license terms had been leaked to and reported in the press.  This is untrue, as explained in Apple's previous submissions.  (*See* Dkt. 2410-2 at 2-3; *see also* Ex. 23 [Melin Dep.] at 54:25 - 55:2 ("I never saw any press reports that would have accurately represented the financial terms of Nokia Apple agreement.").)

Accordingly, there is no real dispute that the Apple-Nokia license terms were properly designated as highly confidential under the Protective Order.  Further, Samsung does not contest that the remaining Apple License Terms—including the financial terms of Apple's licenses with Philips and Sharp—were highly confidential information properly designated under the Protective Order.

## C. Samsung's and Quinn Emanuel's Improper Dissemination of Apple License Terms and Failure to Timely Disclose Known Breaches of the Protective Order

Samsung's broad dissemination of the Apple License Terms began no later than March 22, 2012 when a Quinn Emanuel lawyer disclosed those terms to ten Samsung employees, and to outside lawyers litigating against Apple in England who were not permitted to see them under the Protective Order.  (Dkt. 2557-7.)  Over the next 15 months, Samsung and its lawyers sent Apple License Terms to at least 220 persons not covered by the Protective Order—*i.e.*, to more than 90 Samsung employees, more than 120 lawyers at 19 law firms, several outside consultants, and an unknown number of individuals at the European Commission. (*See* Dkt. 2557-4 at 2-4 (detailing disclosures); *see also* Dkt. 2557-27 (list of all recipients of information).)

At least as early as December 21, 2012, ***Samsung knew of the Protective Order violations***.  On that date, a Quinn Emanuel lawyer told Mr. Shim to delete a recently-sent copy of the Teece Report because it included terms from Apple's confidential licenses.  (Dkt. 2557-10 [Shim Dep.] at 2.)  But Quinn Emanuel and Samsung said nothing to the approximately 165 individuals who, over the prior eight months, had received the same version of the Teece Report and the same Apple License Terms in other documents as well.

Samsung and Quinn Emanuel also did nothing to prevent further circulation of the same documents containing the Apple License Terms.  As a direct result, after December 21, 2012, Samsung and its lawyers sent Apple's confidential license information to approximately 55 additional persons not under the Protective Order.  (*See* Dkt. 2557-27.)  Even Mr. Shim—who had been told expressly that the copy of the Teece Report he received on December 21, 2012 violated the Protective Order—continued to further circulate that report.  (Dkt. 2557-16, 2557-17.)  In addition, on at least three occasions after December 2012, Quinn Emanuel attorneys distributed some of the same Apple License Terms in a "second" improperly redacted Teece Report sent to Samsung employees and counsel around the world.  (*See* Dkt. 2825-2 [Apple's Response to Samsung's Brief Regarding Privilege] at 13-14.)

Thus, in reckless disregard for the Protective Order, and despite having actual knowledge by December 21, 2012 that the Apple License Terms had been improperly distributed, Samsung and Quinn Emanuel took no steps until July 2013 to (1) investigate the scope of their Protective Order violations, (2) stop additional violations from occurring, or (3) inform Apple or the Court of Samsung's massive breaches.  Had Samsung complied with the Protective Order's requirement to immediately notify Apple of the breach, at least some of the ensuing harm could have been avoided.

The first time Samsung conducted any investigation into the scope of its improper dissemination of the Apple License Terms was in July 2013, after Nokia filed its motion for a protective order in the -630 case.  But even then, rather than comply with the Protective Order's requirement to ***immediately*** inform Apple of its breaches, Samsung delayed notifying Apple for an additional two weeks after disclosing (in a confidential letter), the same disclosures to Nokia.  (Dkt. 2374-3.)  During that two-week period, Samsung tried to elicit Nokia's agreement that Samsung should ***destroy all evidence*** of its Protective Order violations.  Ex. 25 [7/16/13 Letter from Becher to Allen].  Nokia did not agree.  *Id.*  Samsung also used that two-week period to continue to urge the United States Trade Representative not

to disapprove the International Trade Commission's determination in Investigation No. 337-TA-794 to exclude certain Apple products from import into the United States.  On August 3, 2013, the USTR announced his disapproval of the ITC's determination.

### 1. Samsung and Quinn Emanuel Block Discovery of Full Extent of Their Protective Order Breaches

For nearly four months, Apple has sought to discover the full extent of Samsung's and Quinn Emanuel's Protective Order violations.  (*See, e.g.* Dkts. 2374-2 - 2374-6.)  For equally as long, Samsung and Quinn Emanuel have sought to block that inquiry.  Even when the Court ordered them to produce discovery, Samsung and Quinn Emanuel have interposed improper privilege objections and disregarded the Court's instructions.  The result is that much remains unknown regarding the scope of the Protective Order violations.

For example, in response to the Court's October 2, 2013 order to make a complete production of documents referencing the Apple License Terms, Samsung withheld as privileged the entire contents of every single document.  (*See* Dkt. 2557-4 at 9-10.)  Its privilege log contained nothing but boilerplate entries that provided no meaningful description of the subject matter of the withheld communications.  (Dkt. 2538 at 7.)  During depositions ordered by the Court on the topic of Samsung's violations, Samsung prohibited inquiry into, for example, whether Quinn Emanuel attorneys had verbally disclosed the terms of the Apple-Nokia license to Samsung licensing executives.  (*See, e.g.*, Dkt. 2557-15 [Kwak Dep.] at 155:16-60, 157:3-6.)  Thus, Apple was not permitted to obtain full discovery into additional violations that may have occurred.

Likewise, in its October 2, 2013 Order, the Court entered a Stipulation that Samsung and Nokia had jointly negotiated and filed, which imposed a series of investigatory and disclosure deadlines on Samsung.  (Dkt. 2483 at 4-5.)  One purpose of this Stipulation was to uncover additional instances in which Samsung or its counsel transmitted the Apple License Terms.  (Case No. 2012-cv-00630, Dkt. 785 at ¶¶3-5; Dkt. 2538 at 11.)  Judge Koh denied Samsung's request to withdraw the Stipulation.  (Dkt. 2538 at 12.)  Nevertheless, Samsung

still has not complied with the Stipulation, and therefore it remains unknown whether the Stipulation's protocol will uncover additional Protective Order violations.

### D.        Improper Uses of Apple License Terms

Just as the full scope of Samsung's and Quinn Emanuel's unauthorized disclosures remains unknown, the extent of Samsung's improper use of the Apple License Information remains partly unknown because Samsung has asserted the attorney-client privilege to block almost any inquiry into that topic as well.  During depositions, Samsung blocked Apple's questions on topics such as: (1) whether Samsung viewed the Apple-Nokia license as relevant to the amount Samsung believes Apple should pay Samsung for a license (Dkt. 2557-8 [Ahn Dep.] at 112-13); (2) discussions that Samsung licensing employees had about potential licensing offers to Apple (Dkt. 2557-10 [Shim Dep.] at 75-76); (3) how Samsung's licensing executives determined which financial terms they would offer Nokia, and whether Quinn Emanuel attorneys discussed the terms of the Nokia-Apple license with Samsung's Vice President of Licensing, who negotiated licenses with both Nokia and Apple (Dkt. 2557-15 [Kwak Dep.] at 134-37, 155, 157); and (4) the source of Samsung's knowledge of the Apple-Ericsson license, and when Samsung made use of that information. (Dkt. 2557-14 [Kim Dep.] at 56, 61, 62, 71).

But even based on the existing record, it is clear that Samsung made significant use of the Apple License Terms in several contexts, including to develop licensing and litigation strategies against Apple and other companies such as Nokia and Ericsson.

### 1.        Samsung's Use of Apple's Confidential Information Against Apple in Litigation and In Licensing Discussions

The Apple License Terms were disclosed to Samsung licensing and in-house legal executives that were in the best position to use them to Apple's harm.  For example, the Apple License Terms were provided to:

- Seungho Ahn, the head of Samsung's IP Center who oversees all licensing-related activities at Samsung.  Dr. Ahn has led all of Samsung's licensing negotiations with Apple.  In his words: "Basically, the buck stops with me."   (Dkt. 2557-8 [Ahn Dep.] at 11:13-15.)

- James Kwak, Samsung's Vice President of Licensing, who is responsible for negotiating patent licenses and developing Samsung's licensing strategies—including Samsung's negotiations and strategies with respect to Apple, Nokia, Ericsson, and Philips.  (Dkt. 2557-15 [Kwak Dep.] at 10.)

- Clayton Kim, a Samsung executive who was leading Samsung's patent licensing group and helping to manage Samsung's world-wide litigations against Apple.  (Dkt. 2557-14 [Kim Dep.] at 102.)

- Daniel Shim, Senior Litigation Counsel at Samsung—whose responsibilities included coordinating Samsung's FRAND licensing arguments against Apple in litigations between the parties in the United States and abroad.  (Dkt. 2557-10 [Shim Dep.] at 48.)

- Kenneth Korea, Vice President and head of Samsung's U.S. IP Center, whose responsibilities include IP acquisitions, licensing, and litigation.   (Dkt. 2557-9 [Korea Dep.] at 1-4.)

Because these employees are responsible for developing Samsung's licensing strategy with respect to Apple, and with making license offers to Apple, they stood to benefit most from the knowledge of what Apple paid Nokia for a license.

For example, Dr. Ahn—who admittedly told Nokia during the June 2013 Nokia-Samsung license negotiations that he knew the terms of the Apple-Nokia license and that "all information leaks"—was also the principal licensing negotiator with Apple.  Given the overwhelming evidence that Dr. Ahn used the Apple-Nokia license terms in his licensing negotiation against Nokia, it would defy common sense to assume that he did not also use that information when negotiating with Apple.  Other top Samsung licensing executives, like Mr. Kwak, also received the Apple License Terms and also were directly responsible for negotiating a license with Apple.  Even if they did not specifically intend to use the Apple License Terms when formulating Samsung's licensing positions with respect to Apple, these individuals could not have erased their knowledge of those terms when doing so.  *Cf. In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed Cir. 2010) ("'[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.'") (citation omitted).

1       Moreover, a critical issue over the course of the Apple-Samsung litigations—in

2  jurisdictions worldwide—has been whether Samsung has complied with its commitments to

3  license allegedly "standard essential" patents on "fair, reasonable, and non-discriminatory"

4  ("FRAND") terms.  In July 2011 (before the Protective Order breaches began), ████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████

9    ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████

12       That same month, Samsung told the ITC:

13

14            ████████████████████████████████

15            ████████████████████████████████

16            ████████████████████████████████

17  (Dkt. 2557-12 at 29.)

18

19       Discovery during the sanctions proceedings has revealed that Samsung circulated the

20  draft briefing containing this argument to Samsung in-house lawyers and executives, without

21  redacting it.  For example, Daniel Shim, a senior in-house lawyer at Samsung, conceded that he

22  received multiple copies of the Teece Report and multiple versions of a Samsung ITC brief that

23  contained Apple's confidential license information, and that he read these documents ***"with***

24  ***care"*** because his "primary responsibility" was to develop FRAND licensing positions against

25  Apple in cases worldwide.  (Dkt. 2557-10 [Shim Dep.] at 120-21, 167; *id.* at 18, 48, 72-74, 149-

26  52, 154-57, 177.)  Mr. Shim conceded that he cannot "rule out that Samsung used this

27  information to develop FRAND licensing arguments against Apple."  (*Id.*)  Indeed, by having

28

access to the unredacted argument in the draft ITC brief, Samsung personnel like Mr. Shim were allowed to review and approve an argument that had direct monetary implications to the company; this created an informational asymmetry as compared to Apple's in-house team, and gave the Samsung team a clear advantage in deciding whether to approve this argument.

Moreover, since sending Apple its March 2013 letter highlighting the ████████ demand and making the litigation argument comparing that demand to the Apple-Nokia terms, Samsung has not made Apple any other proposal for rights to ████████████ ████ When Apple tried to explore the basis for the ██████████ in the recent depositions, Quinn Emanuel instructed its witnesses not to answer, on the basis that Nokia's outside counsel were present:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

(Dkt. 2557-8 [Ahn Dep.] at 104:23-105:3.) ████████████████████

████████████████████████████████████████

████████████████████████████████████████ (*Id.*

at 112:24-113:9 (confirming ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

### 2.    Samsung's Use of Apple's Confidential Information Against Others

The record also indicates that Samsung has improperly used Apple's confidential license information against other companies as well, including Nokia and Ericsson.

#### (a)    Nokia

The depositions of the Nokia personnel who participated in the June 4, 2013 licensing negotiation meeting between Samsung and Nokia confirm that Samsung used the Apple-Nokia

license terms to its licensing advantage.

Specifically, at the June 4, 2013 negotiation, Dr. Ahn announced that he "knew" the Apple-Nokia license terms, and that he had taken "everything" into account in formulating Samsung's license offer to Nokia.  (Ex. 23 [Melin Dep.] at 59:16-60:8; Ex. 26 [Hakoranta Dep.] at 20:7-13.)  Samsung then offered ███████████████████████████████████ ████████████████████████████ (Ex. 23 [Melin Dep.] at 95:5-96:8, Ex. 26 [Hakoranta Dep.] at 21:16-25.)  ████████████████████████████████████████████████ ████████████████████████ (Ex. 23 [Melin Dep.] at 95:5-96:8.)

Subsequently, Nokia presented its counteroffer.  (*Id.* at 163:8-11.)  As it was doing so, Dr. Ahn laughed at that counteroffer as asking for too great a payment from Samsung to Nokia and recited the terms of the Apple-Nokia license.  (*Id.* at 176:6-18.)  He revealed that his counsel had obtained that agreement in the Apple-Samsung litigation and that he had been informed of those terms.  (*Id.* 172:24-173:20.)  Dr. Ahn added that "all information leaks."  (*Id.*)

At his deposition, Dr. Ahn admitted that he may have told Mr. Melin that the terms of the Apple-Nokia license had become known to him as the result of a "leak."  (Dkt. 2557-8 [Ahn Dep.] at 95 ("I do think I said something that suggests – is suggestive of a leak.").)  But Dr. Ahn claims that he was merely "pretending" to know those terms as a negotiating bluff.  (*Id.* at 83-84 ("I'm hoping to convince him that my numbers are persuasive.  You know, I'm pretending here."); *id.* at 94 ("I don't know as to exactly what I said or didn't say, but I do grant you that I did act as though I was in the know.  I was pretending, yes.").)  In other words, Dr. Ahn either lied to Mr. Melin then, or is lying to Apple and the Court now.

### (b)     Ericsson

There is no dispute that Samsung used the Apple-Nokia license terms in its license negotiations against Ericsson. Clayton Kim testified that when he was leading Samsung's patent licensing group and managing Samsung's worldwide litigations against Apple, he received the terms of the Apple-Ericsson license in an email sent in late 2012 or early 2013 from the Samsung team trying to negotiate a license with Ericsson.  (Dkt. 2557-14 [Kim Dep.] at 53-55.)  Mr. Kim

admitted that Samsung used that same information to develop its licensing strategy against competitors:  "Q. Are you aware of anyone at Samsung who has used the terms of the Apple-Ericsson license to develop a licensing strategy for any Samsung competitor?  MR. STONE: [Objection].  A. Yes."  (*Id.* at 96-100.)  Samsung's counsel then blocked all inquiry into the details of this use and the details of the communication through which Mr. Kim received the Apple-Ericsson license information.  (*Id.*)

### III.   THE COURT SHOULD SANCTION SAMSUNG AND QUINN EMANUEL TO CURE THE HARM—AND CONTINUING THREAT—TO APPLE AND THE OTHER AFFECTED PARTIES, AND TO VINDICATE THE COURT'S RULES AND ORDERS.

The Court has a broad range of powers available to sanction Samsung and Quinn Emanuel for their misconduct.  These powers include the Court's explicit and inherent authority to enforce the Federal Rules of Civil Procedure and the Court's orders thereunder, *see, e.g.,* Fed. R. Civ. P. 37 (expressly authorizing courts to impose a range of sanctions for violations of discovery rules and orders); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (recognizing inherent powers of federal courts include "the ability to fashion appropriate sanction for conduct which abuses the judicial process"); the Court's authority to remedy civil contempt, *see, e.g., In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir 1993) ("Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.  The contempt 'need not be willful,' and there is no good faith exception to the requirement of obedience to a court order."); and the Court's equitable power to issue injunctions to address disclosure of trade secrets, *see, e.g., Brocade Comm. Sys., Inc. v. A10 Networks, Inc.,* Case No. 10-3428-PSG, 2013 WL 890126, at *12 (N.D. Cal. Jan. 23, 2013).

The key imperative for sanctions should be to cure the harm—and continuing threat—to Apple and other companies whose confidential information was wrongly disclosed and used.  In addition, sanctions are necessary to vindicate the Court's and the public's interest in promoting rigorous compliance with the rules of the judicial system, and deterring violations of these rules.

1   Courts have recognized the importance of both goals.  *See, e.g., Grace v. Center for Auto Safety*,

2   155 F.R.D. 591, 602 (E.D. Mich. 1994) ("The imposition of sanctions in this case against Ditlow

3   and Robinson serves the dual purpose of vindicating judicial authority and compensating GM for

4   the expenses caused by Robinson's and Ditlow's willful violation of the protective order.  These

5   two functions: maintaining the integrity of the court and making GM whole for the expenses

6   caused by defense counsel and defendant's misconduct are explained below.").

7        The sanctions set forth below achieve these two goals.  These sanctions are significant,

8   but commensurate with the unprecedented scope of Samsung's and Quinn Emanuel's breaches of

9   the protective order.

10       **A.     Remedies To Begin To Cure The Harm And Continuing Threat To Apple**

11       As Apple's Director of Patent Licensing, Jeffrey C. Risher, testified at his deposition, the

12   disclosure of Apple's protected licensing information both (1) creates an information asymmetry

13   that benefits the recipients of the improper disclosures in their license negotiations with Apple

14   and other companies in the mobile-device industry—the recipients have information that Apple's

15   licensing executives do not;  and (2) undermines the proper functioning of the judicial process on

16   which Apple and other litigants depend.  (Ex. 22 [Risher Dep.] at 127-30.)  Without access to the

17   factual details of Samsung's and Quinn Emanuel's misconduct, Mr. Risher could not speak to the

18   specific harms flowing from this misconduct.  The Court, however, has seen the full record,

19   which strongly suggests that Samsung licensing executives who gained access to highly

20   confidential license information proceeded to use that information in crafting litigation positions

21   and in license negotiations.  This is precisely the "information asymmetry" danger that Mr.

22   Risher and the Court have identified.  (Dkt. 2689 at 3; Dkt. 1649 at 16.)  Moreover, these

23   executives can continue to exploit this asymmetry against Apple and others.

24       To try to explain away this harm, Samsung has attempted to argue that the Apple License

25   Terms were not actually confidential.  But as Apple has explained in earlier briefing and further

26

27

28

discusses below in note 4, each such allegation is groundless.[4]  Samsung has not identified any instance in which Apple or others failed to protect the confidentiality of the information at issue—and indeed, Samsung's proffered examples actually demonstrate the contrary: Apple and its licensing partners have consistently used great care in safeguarding the confidentiality of their licenses.  Moreover, Samsung has not even tried to identify any instance in which Apple, Sharp, or Philips failed to treat their license agreement terms as confidential—and Samsung improperly disclosed those, too.

The real issue is not whether Samsung's misconduct has imposed harm and threat to Apple and others—it plainly has—but rather what to do about it.  Apple proposes below a series of sanctions that are closely tied to the factual record and fully within the Court's powers, and that would begin to cure the harm and threat to Apple.

### 1.     Public Findings Of Samsung's Misconduct

The first set of sanctions would create a record of what Samsung has done, through the Court making the following findings in its sanctions order:

- Samsung and its counsel Quinn Emanuel recklessly violated the Court's protective order by distributing Apple's confidential license information to unauthorized recipients, and by failing to alert Apple and the Court to the breaches in a timely manner.

- Samsung and its counsel Quinn Emanuel misused Apple's confidential business information obtained in breach of the protective order (*e.g.*, in license negotiations; in

---

[4]     ***First***, as to disclosures that Apple made to a Dutch court, Samsung's own supervising litigation counsel—Daniel Shim—conceded that these disclosures were "mandated" by that court; anonymized to prevent definitive confirmation of the terms of any license; and restricted to a limited group that could only use the disclosures for that case.  (Dkt. 2557-10 [Shim Dep.] at 117-121.)  ***Second***, as to disclosures regarding the Apple-Nokia agreement that Apple made to the Securities and Exchange Commission, these were expressly requested by the SEC and submitted with a request for confidential treatment, and there is no evidence that anyone from the SEC ever publicly disclosed them.  (*See* Eric Slivka, "SEC Pressed Apple for Information on Nokia Patent Settlement, MacRumors (October 3, 2011, available at http://www.macrumors.com/2011/10/03/sec-pressed-apple-for-information-on-nokia-patent-settlement/).  ***Third,*** as to certain press accounts estimating some of the monetary terms of the Apple-Nokia agreement: (a) there is no evidence that Apple or Nokia provided information used to inform these estimates; (b) other public estimates varied widely (and incorrectly); and (c) press reports noted how closely Apple and Nokia guarded the terms of their agreement.  (*See, e.g.*, Dkt. 2624 at 1-3 (and citations therein).)

submissions to the International Trade Commission, European Commission, and in a submission to an Italian court).

- Samsung and its counsel Quinn Emanuel engaged in bad faith licensing conduct by using the improperly received information in negotiations with other parties.

- In the 12-630 case, where the issues include whether Samsung has breached its commitment to license its allegedly "standard essential" patents on "fair, reasonable, and non-discriminatory" terms, the jury should be instructed that Samsung breached the Court's protective order and engaged in bad faith licensing conduct with other parties by using improperly received informed pertaining to Apple licenses.

Each of these findings is amply supported by the evidentiary record; the sanction is simply making the public generally and the -630 jury specifically aware of these facts.

## 2. Bar Against Samsung And Quinn Emanuel For A Period Of Two Years From Entering New Situations Where They Could Misuse Apple Confidential Information

The second set of sanctions would prevent Samsung and Quinn Emanuel from entering new situations where they could misuse Apple confidential information, for a period of two years. These sanctions are analogous to injunctions imposed in trade secret cases to prevent further use of confidential information. *See Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 607 (7th Cir. 2001) ("The purpose of a permanent injunction is to protect trade secret owners from the ongoing damages caused by the future use of trade secrets."); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained."); *cf. Lion Raisins Inc. v. United States*, 64 Fed. Cl. 536 (Ct. Claims 2005) (court considering barring the government (the alleged protective-order violator) from using any improperly disclosed documents for any purpose in the instant or future litigations). In particular, Apple requests that the Court:

- Prohibit Dr. Ahn and other Samsung executives (including those responsible for licensing and/or managing Samsung's litigation with Apple) who improperly obtained Apple's and other companies' confidential business information from negotiating any mobile-device licenses for Samsung for the next two years; and

- Prohibit Quinn Emanuel from executing any new protective orders under which it would receive Apple confidential information for a period of two years.

The former sanction would prevent the Samsung recipients from exploiting the informational asymmetry they now hold in mobile-device negotiations for a period of two years, to allow that ill-gotten advantage to abate over that time period.  Other Samsung employees could, of course, negotiate such licenses—and even the recipients of the information could negotiate licenses in the many other industries in which Samsung develops and sells products.

The latter sanction would prevent Quinn Emanuel from executing new protective orders permitting receipt of Apple confidential information for a period of two years, to help ensure that Quinn Emanuel has no new opportunity during that time to continue the pattern of breaches that occurred here.  But recognizing that the -1846 and -630 cases are at an advanced stage, Apple does not seek Quinn Emanuel's disqualification from those cases.

### 3. Bar Against Samsung Pursuing An Injunction In The -630 Case Because Of Its Unclean Hands

"[One] who seeks equity must do equity," *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001) (quoting *Mfr.'s Fin. Co. v. McKey*, 294 U.S. 442, 449 (1935)), and the Federal Circuit has held that parties cannot seek equitable remedies where they have unclean hands.  *See id.* (finding that district court did not abuse its discretion in declining to exercise its power to find equitable intervening rights because defendant did not have clean hands); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038 (Fed. Cir. 1992) ("[A] patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds towards the patentee.").  Accordingly, Apple requests that Court:

- Determine that Samsung is not entitled to an injunction in the -630 case based on the equitable principle of "unclean hands," or at least that Samsung's misconduct militates against entry of an injunction and will need to be considered as part of the Court's equitable analysis if the Court reaches the injunction phase.

### 4. Attorneys' Fees

As the final sanction aimed at curing the harm to Apple from Samsung's and Quinn Emanuel's misconduct, Apple requests that the Court find that the -1846 and -630 are exceptional cases under 35 U.S.C. § 285. At a bare minimum, Samsung should pay Apple's attorneys' fees for the full proceedings relating to the breach and sanctions issues. *See Trenado v. Cooper Tire & Rubber Co.*, 274 F.R.D. 598, 602 (S.D. Tex. 2011) (ordering payment of opposing counsel's attorneys' fees stemming from the protective order violations).

## B. Sanctions To Uphold The Integrity Of The Judicial Process And Deter Future Misconduct

As the Court's Order To Show Cause emphasized, "confidential information remains confidential because counsel and clients alike follow court orders. If parties breach this basic rule, the court's assurances become meaningless." (Dkt. 2483 at 2.) To restore the integrity of the judicial process and deter future misconduct, Apple requests that the Court:

- Reprimand Samsung and Quinn Emanuel for their protective order breaches; and

- Order Samsung and Quinn Emanuel to write letters to the other parties in all their ongoing cases (*i.e.*, all Quinn Emanuel cases, and all Samsung cases— even those in which other counsel represents Samsung) with a protective order, disclosing the fact of their protective order breaches and their reprimands by the Court.

Public reprimands will hold Samsung and Quinn Emanuel accountable for their actions. *See, e.g., Biocore Medical Techs. Inc. v. Khosrowshahi*, 1998 WL 919126 (D. Kan. Nov. 6, 1998) (publicly reprimanding and disqualifying counsel who violated protective order, stating, "This case has become a textbook example of how major litigation should not be conducted, and [counsel's] inability or unwillingness to comply with simple rules has made the entire process more time-consuming, expensive, contentious and protracted than it has needed to be. [Counsel's] violations have continued for far too long. His unwillingness to abide by the terms of the protective order, in a case which involves highly sensitive trade secret claims, has finally 'tainted' the underlying litigation."). It is appropriate that Samsung and Quinn Emanuel inform the other parties in all their ongoing cases of the fact of their reprimands. *See id.* (ordering the

clerk to mail a copy of the order to every court in which the offending attorney was admitted to practice).  This process will both validate the critical importance of compliance with the Court's rules and orders, and deter others from engaging in similar misconduct in the future.

**IV.      CONCLUSION**

For the foregoing reasons, Apple respectfully requests that the Court enter the proposed sanctions against Samsung.

Dated:  December 2, 2013               /s/ William F. Lee
                                       William F. Lee

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on December 2, 2013, to all counsel of record who are deemed to have consented to electronic service via the Court's ECF system per Civil Local Rule 5-1.

/s/ Mark D. Selwyn
Mark D. Selwyn