# EXHIBIT 22

(Unredacted Version of Document Sought To Be Sealed)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE, INC., a California corporation, )
)
Plaintiff, )
)
vs. ) No. 11-CV-01846-LHK
)
SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, )
)
Defendants. )
)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF JEFFREY C. RISHER
Palo Alto, CA
Wednesday, November 20, 2013

REPORTED BY:
SUSAN F. MAGEE, RPR, CCRR, CLR, CSR No. 11661

Job No. 68171

November 20, 2013
10:09 a.m.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF JEFFREY C. RISHER, held at the offices of WILMERHALE, 950 Page Mill Road, Palo Alto, CA 94304, pursuant to Notice before SUSAN F. MAGEE, RPR, CCRR, CLR, CSR No. 11661.

APPEARANCES:

WILMERHALE
Attorneys for Plaintiff Apple, Inc.
60 State Street
Boston, MA 02109
BY: JOSEPH MUELLER, ESQ.

APPLE
One Infinite Loop
Cupertino, CA 95014
BY: IAIN CUNNINGHAM, In-house Counsel

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Defendant Samsung
865 South Figueroa Street
Los Angeles, CA 90017
BY: MICHAEL ZELLER, ESQ.

APPEARANCES (continued):

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Defendant Samsung (continued)
555 Twin Dolphin Drive
Redwood Shores, CA 94065
BY: NATHAN SUN, ESQ.

ALSTON & BIRD
Attorneys for Nokia Corporation
275 Middlefield Road
Menlo Park, CA 94025
BY: RYAN KOPPELMAN, ESQ.
TIMOTHY WATSON, ESQ.

The Videographer:
SEAN McGRATH:
--o0o--

PALO ALTO, CA, WEDNESDAY, NOVEMBER 20, 2013
10:09 a.m.

THE VIDEOGRAPHER: Good morning. This is the start of Disk No. 1 of the videotaped deposition 10:08 of Jeff Risher in the matter Apple Incorporated vs. Samsung Electronics Company Limited, et al., in the U.S. District Court, Northern District of California, San Jose Division, Case No. 5:11-CV-01846-LHK (PSG). 10:09

This deposition is being held at 950 Page Mill Road in Palo Alto, California, on November 20th, 2013, at approximately 10:09 a m.

My name is Sean McGrath from TSG Reporting Incorporated, and I am the legal video specialist. 10:09 The court reporter is Susan Magee in association with TSG Reporting.

Will counsel please introduce yourselves starting with the questioning attorney.

MR. ZELLER: Mike Zeller of Quinn Emanuel 10:09 for Samsung.

MR. SUN: Nathan Sun for Quinn Emanuel.

MR. MUELLER: Joe Mueller, WilmerHale, on behalf of Apple and Mr. Risher. And with me is Iain Cunningham, senior litigation counsel from 10:09

Page 38

in the license agreement itself or the number was related to me contemporaneously with the execution of the license, but it was derived from the license itself in either event.

Q. You're generally aware as you're sitting 10:52 here now that there were public reports about the amount of the up-front payment?

A. I'm aware that there were public reports speculating as to the amount of the up-front payment. 10:52

MR. MUELLER: Objection.

10:52

BY MR. ZELLER: Q. Well, back in the June of 2011 time period, did you see any of the press as it related to the Apple-Nokia licensing agreement?

A. Sure. I mean, did I see it at the time?

Q. Yes. 10:53

A. Yes.

10:53

Page 39

Q. And you're not sure whether you learned the number from reading the agreement?

A. I'm not sure. My -- well, I'm not sure.

Q. And back in this June of 2011 time period, 10:54

Page 40

was it Apple's expectation that the -- all the terms, every single term in that agreement was to be kept confidential?

A. I believe the expectation was that -- and I -- again, I wasn't involved in the negotiation or 10:54 execution of the agreement itself, including the confidentiality provision, but I'm aware that the parties themselves made statements about the fact that the agreement had been executed, which -- which for us typically even in of itself is treated as a 10:55 confidential matter.

And in this case, there were -- I know there were statements directly by the parties that the case had been settled and potentially that there had been payments -- that the agreement implicated 10:55 some payment being made by Apple to Nokia.

Beyond that, the expectation would have been that all of the financial terms and the specifics and all of the other terms of the agreement would be confidential. 10:55

10:55

Page 41

Q. Did Apple and Nokia have any understanding or agreement as to whether or not it was permissible for one or both parties to disclose any terms of the 10:56 Apple-Nokia license during the course of a mediation or settlement discussion with any other party?

A. Can you repeat that?

Q. Sure. I'll even step back a little bit.

Has Apple itself in any context including 10:56 at a mediation or settlement discussion referred in any way to the Apple-Nokia license?

A. Referred in any way?

Q. Brought it up.

A. No. Well, I should say not that I'm aware 10:56 of.

Q. Has any other party ever brought it up?

A. Likely so.

Q. What cases are you aware of that occurring?

A. I'm not aware of any specific case. 10:57

Q. Has Apple ever disclosed any information regarding the Apple-Nokia license in any mediation or settlement discussion with anyone?

A. No.

Q. And please tell me your full basis for that 10:57

thousands and probably not hundreds. I am thinking in particular about -- and it may not even be dozens in terms of -- and I'm thinking particularly about litigation where we would -- because we wouldn't -- we wouldn't produce it unless we absolutely had to 01:14 in litigation.

Q. Well, do you know how many people at the SEC --

A. No.

Q. -- either had it or were entitled to access 01:14 to it?

A. No.

Q. Do you know how many people the Dutch court have access to it or are entitled to have access to it? 01:15

A. No.

Q. Do you have any idea of the number of people working at outside law firms who either have access or are entitled to see the Apple-Nokia license? 01:15

A. No.

Q. So in fact, you can't put my number on that; right?

A. No.

Q. I'm sorry. You agree with me? 01:15

A. I agree.

Q. Are you aware of any misuse of the Netherlands chart or spreadsheet by anyone?

A. I'm not.

Q. And by Samsung? 01:15

A. I'm not.

Q. Directing your attention back to Exhibit 3 for a moment, which is the Business Insider article.

A. Yes.

Q. Did Apple contact the Business Insider or 01:15 this analyst Pierre Ferragu about what's in this article?

A. I don't know, but I would doubt it.

Q. Did Apple do anything in response to this article? 01:16

A. Not to my knowledge.

Q. To your knowledge, did Nokia?

A. I don't know.

Q. Are you aware of any harm that Apple suffered as a result of the information here in the 01:16 Business Insider article?

A. From -- from this article, no.

MR. ZELLER: That's all I have for you. Thank you very much for your time.

MR. MUELLER: So I have a few questions. 01:16

Maybe we can switch seats just so we're not --

MR. ZELLER: Sure, sure. You want to go off the record to do that or --

MR. MUELLER: Sure. Why don't we go off record for a minute. 01:16

THE VIDEOGRAPHER: The time is 1:16 p m., and we are off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is 1:17 p m., and we are on the record. 01:17

EXAMINATION BY MR. MUELLER

Q. Mr. Risher, I just have a few questions for you. The first is I'd like to return to your own 01:17 experience at Apple, and first I want to return to the period in which you were working in litigation.

Do you have that in mind?

A. Yes.

Q. And that was the period from when you 01:17 joined Apple until July of 2013; correct?

A. Correct.

Q. In that period can you give us a rough ballpark estimate as to how many cases you worked on? Order of magnitude? 01:17

A. Hundreds.

Q. And you're familiar with the concept of protective orders?

A. Very.

Q. Were those routine in the cases you worked 01:18 on?

A. Yes.

Q. Does Apple take protective orders seriously?

A. Yes. 01:18

Q. And could you explain a bit more what Apple does to comply with protective orders.

A. Well, we take protective orders particularly seriously because our company -- it's pretty well-known fact that we're a fairly secretive 01:18 company in terms of our product roadmap and what we intend on doing in the future. And to the extent that information is being gathered and produced in discovery in the case, there may be information in documents and e-mails and otherwise that relates to 01:18 things that Apple hasn't released publicly yet.

And so for us in particular, we rely heavily on the protections that are in those orders to give ourselves and our senior executives comfort that, by complying as we always do or always 01:19

endeavor to with our discovery obligations, we're not disproportionately exposing Apple to risk of disclosing information that we -- we maintain great value from the secrecy of our -- maintaining the secrecy of our product pipeline. 01:19

And if that's jeopardized by production of the information in litigation, that can have very, very serious economic and other consequences for us.

Q. I want to focus on the subject of license agreements. 01:19

Did you have occasion over the years to deal with the production of Apple license agreements in litigation?

A. Sure. We routinely -- we are largely a defendant and particularly in patent cases, and we 01:19 routinely are asked by the plaintiffs in those cases to produce in many cases all of our licensing, whether it's relevant to their patent or not.

We try to narrow that down, but where we do -- where we are required to produce information, 01:20 we are very steadfast in only producing it under a protective order for certain and wherever and whenever possible on an "outside attorneys' eyes only" basis so that other parties themselves can't see the contents of our licenses. 01:20

Q. And that's your policy across all cases?

A. Correct.

Q. Now, let me ask you, does Apple have any --

MR. ZELLER: I would object to the leading question. 01:20

BY MR. MUELLER: Q. Does Apple have any particular approach to licenses in terms of what it permits its outside counsel to see? And I'm just asking at a high level.

A. Yes. So we -- there are several categories 01:20 of information, licenses being one of them, source code being another example, where we place limits on who at our outside firms we provide -- are willing to allow access to our license database to -- in order to do the review necessary for the production 01:21 of licenses in patent cases and in other cases.

Q. Even among your own counsel?

A. Correct.

MR. ZELLER: Leading.

BY MR. MUELLER: Q. Now, across all the 01:21 cases you worked on yourself in your time in litigation, are you aware of any instance in which any license was produced absent the confidentiality of a protective order?

A. I can't think of any. Well -- no, I can't 01:21

think of any.

I was pausing on the notion that there might be third-party licenses that we have that don't contain any confidentiality provisions in them so they're not actually confidential, and those 01:21 would have to be -- they would still be produced under a protective order in every instance, so in our view -- and we would still, to the extent that they were our information, we would still attempt to designate them at the highest level of 01:22 confidentiality that was appropriate for that document.

Q. And that was the policy that you helped supervise?

A. Correct. 01:22

Q. And execute?

A. Correct.

Q. And was that policy in place in the period after the execution of the Apple-Nokia agreement?

A. It was. 01:22

Q. And to your knowledge, was it applied to the Apple-Nokia agreement?

A. Very much so. In fact, that agreement in particular because it was our first large SEP-related, though not limited to SEPs, and really 01:22

our first large competitor lawsuit.

We -- up until then we had pretty much, as I say, been a defendant in patent cases from NPEs and some operating companies, but it was the first large litigation that we had against a competitor. 01:22 So that agreement in particular was put under even more strict access limitations than the typical license agreement at Apple.

Q. And what did that mean in terms of access internally by Apple employees? 01:23

A. The number of people who had access to the Nokia license agreement, especially in the -- contemporaneously with its execution, was very, very small. A handful. Literally a handful of people had access to the agreement. Over time because of 01:23 the growth of our -- of the volume of our patent litigation, that's expanded a little bit but not greatly. It's still among the group of licenses that are -- that have very limited restricted access. 01:23

Q. And are you aware of any instance in any of those cases that you worked on in which the Nokia agreement was produced in anything other than the highest confidentiality designation?

A. I'm not aware of any. 01:23

Page 126

Q. And again, you held positions including director of patent litigation?
A. Correct.
Q. Director of commercial litigation?
A. Correct. 01:24
Q. Director of litigation?
A. Yes.
Q. Up until July of 2013?
A. Yes.
Q. And I'll repeat my question. 01:24
Any instance when you had any of those roles in which the Apple-Nokia agreement was produced in anything other than the highest level of confidentiality?
A. Not that I'm aware of. 01:24
Q. Now, you testified earlier today that while working in litigation you also had occasion to participate in certain license negotiations; correct?
A. Yes. 01:24
MR. ZELLER: Leading.
BY MR. MUELLER: Q. How many were there, sir?
A. The overall number of license negotiations that I engaged in during the time that I was in 01:24

Page 127

litigation probably numbers in the hundreds.
Q. And did any of those occur after the negotiation of the Apple-Nokia agreement?
A. Yes, many of them did.
Q. In any of those negotiations, did you or 01:25 anyone else from Apple disclose the financial terms of the Apple-Nokia agreement?
A. No.
Q. And why not?
A. The agreement is confidential, and Apple, 01:25 as it does with its own product pipeline and product information, takes the obligation to maintain confidentiality very seriously. Whether it's our information or third-party information that we have a confidentiality obligation with regard to, we -- 01:25 as much as we require the confidentiality of our information to be observed, we apply that equally to both our own information and the information of others.
Q. And if those confidentiality obligations 01:25 were breached by Apple or by another party, could Apple suffer any harm?
MR. ZELLER: Question calls for speculation.
THE WITNESS: It will depend on the 01:25

Page 128

circumstances of the breach, but absolutely there's harm that could be suffered by a disclosure of confidential information.
BY MR. MUELLER: Q. Could you explain.
A. Well, on two levels -- from our standpoint, 01:26 in the context of information that's protected and designated as confidential under a protective order, there are two levels of harm that we suffer. One is the disclosure of the information itself in the context of a license agreement. For example, if 01:26 it's disclosed to third parties who are not supposed to have access to it, Apple may be put in a position of being in an asymmetric information quandary if we have to negotiate with any third party who knows information about our licenses where we don't have 01:26 corresponding information about their licenses.
In terms of harm from public disclosure, Apple -- so I guess that creates three categories because there's also a harm from the potential for public dissemination of the information. Once it 01:27 leaves the hands of the people who are themselves actually obligated to protect it under the protective order, it can then be disseminated publicly, which creates another kind of harm including that asymmetry information harm with 01:27

Page 129

respect then to all parties, not just the one who may have received the information.
But in the context of protective orders, at a higher level, everything I just described in terms of Apple's desire to maintain the secrecy of its 01:27 product information, we are -- for better or for worse, we are often sued. And in the context of literally having hundreds of lawsuits every year, we are put in a position, based on the discovery obligations we have in those cases, to put that 01:28 information at risk. And we put that information at risk only with the comfort that we get from the court and the other parties who sign under the protective order that not only are there strict guidelines in place to maintain the secrecy of that 01:28 information, but also that there are some teeth to dealing with the potential harm that could come from a breach.
Whether that harm -- whether the underlying harm of accessing the particular information or not 01:28 comes to pass, there's -- there's a separate harm of the actual breach of the protective order in terms of undermining the ability of Apple and other litigants to -- to rely on the sanctity of what's supposed to be protected by a protective order and 01:28

to some extent the ability of the Court to hold up its protective order as the basis under which the liberal discovery between parties is supposed to occur.

Because if you can't rely on the fact that 01:29 you're going to have recourse of some kind that's meaningful, if there's -- if there's a breach of that protective order, then it has a chilling effect. Though we will always comply with our discovery obligations, it has a chilling effect on 01:29 our willingness or our ability to view that protective order as a -- as a mechanism under which we can definitively rely on our information being protected.

So it's -- there's a systemic harm that 01:29 occurs that affects us as a litigant as well as the individualized harm that we would suffer from potentially having third parties or the public glean information that they shouldn't have about our business practices and licenses and financial terms 01:29 and things.

Q. Now, to be clear, Mr. Risher, are you privy to any of the facts concerning Samsung's compliance with the protective order in this case?

A. I am not. 01:30

Q. Everything you've just described about the way Samsung -- I'm sorry. Withdrawn.

Everything you've just described about the way Apple treats confidential information, can you explain how -- I'll withdraw that question. Start 01:30 over.

Everything you've just described about the way in which Apple treated confidential information in litigation, are there any differences with respect to licensing now that you're a director of 01:30 licensing you've seen that side of the equation?

A. There's a difference in that typically there's not a protective order. Instead, there are provisions within the -- within the agreements themselves that are the basis of the 01:30 confidentiality.

But from our perspective, we treat those exactly the same and for many of the same reasons. People need to be able to rely on our ability to maintain their confidences, and that's how we gain 01:31 trust in negotiations, so that can be affected.

But similar to the situation in litigation, we adhere strictly to the provisions of confidentiality that we have in our agreements, and in the licensing negotiation context we don't breach 01:31

those confidentiality obligations.

Q. Over your years in litigation when you participated in certain settlement and license negotiations, did you have occasion to see your colleagues from licensing in action at these same 01:31 discussions?

A. I did.

Q. And in those discussions, did your colleagues from licensing disclose confidential terms subject to these sorts of restrictions? 01:31

MR. ZELLER: Question is vague.

THE WITNESS: No, they did not. And on the contrary, whenever we asked for information from the parties that were sitting across the table from us, my experience, both myself and the colleagues that I 01:31 worked with in those negotiations would always make clear to the other side that we were only asking for information that they could provide to the extent that they weren't going to violate their own confidentiality obligations. 01:32

BY MR. MUELLER: Q. And now you're the director of licensing?

A. Correct.

Q. And has that changed your perspective on these issues at all? 01:32

A. Not in any material way, no.

Q. And you've participated in negotiations since assuming that position?

A. I have.

Q. In any of those discussions have you or 01:32 your colleagues from Apple disclosed financial terms subject to these sorts of restrictions?

A. No.

Q. In any of your license discussions that you've had over the years in both litigation and 01:32 licensing, have you or anyone else from Apple ever disclosed the terms of the Apple-Nokia agreement?

A. No.

Q. Apple-Eriksson agreement?

A. No. 01:32

Q. Apple-Philips agreement?

A. No.

Q. Apple-Sharp agreement?

A. No.

Q. You were asked a few questions earlier 01:32 today by Mr. Zeller about FRAND licensing.

Do you recall that testimony?

A. Yes.

Q. And you were asked in particular what Apple's position is with respect to information 01:33