QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK (PSG)<br><br>**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE WHY SANCTIONS ARE NOT WARRANTED**<br><br>**Date:**   December 9, 2013<br>**Time:**   3:00 p.m.<br>**Place:**   Courtroom 5, 4th Floor<br>**Judge:**  Hon. Paul S. Grewal<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED – WITHOUT HIGHLIGHTING** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

    A.    The Inadvertent Disclosures Of Confidential Information ........................................ 3

    B.    The Proceedings Regarding The Inadvertent Disclosures ......................................... 3

    C.    Samsung's And Quinn Emanuel's Substantial Investigation And Remedial Actions Pertaining To The Inadvertent Disclosures .................................................. 5

    D.    Apple's Recent Inadvertent Disclosures Of Confidential Information ...................... 7

ARGUMENT ............................................................................................................................ 8

I.    THERE IS NO BASIS FOR SANCTIONS UNDER RULE 37(B) ..................................... 8

    A.    Rule 37(b) Does Not Apply To Protective Order Violations .................................... 8

    B.    Even If Rule 37(b) Did Apply To Protective Order Violations, Sanctions Are Not Warranted Against Either Samsung Or Quinn Emanuel ........................... 9

        1.    Any Disclosure Of Confidential Information Was Inadvertent ................... 11

        2.    Samsung Did Not Use The Inadvertently Disclosed Confidential Information .................................................................................................... 13

            (a)    Samsung Did Not Use The Inadvertently Disclosed Confidential Information In Negotiations With Ericsson ............... 13

            (b)    Samsung Did Not Use The Inadvertently Disclosed Confidential Information In Negotiations With Nokia .................. 13

            (c)    In Any Event, Neither Apple Nor Nokia Has Indentified Any Harm .............................................................................................. 17

        3.    Quinn Emanuel At All Times Complied With The Protective Order's Inadvertent-Disclosure Procedures ................................................ 18

    C.    Additional Circumstances Counsel Strongly Against Imposing Sanctions Here ....................................................................................................................... 20

        1.    Samsung Has Already Engaged In An Enormous, Perhaps Unprecedented, Investigation And Remediation Of The Inadvertent Disclosures ...................................................................... 20

        2.    Apple's Recent Inadvertent Disclosures Of Confidential Information Reinforce The Unreasonableness Of Imposing Any Sanction .................... 22

**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE WHY SANCTIONS ARE NOT WARRANTED**

II.     THERE IS NO BASIS FOR SANCTIONS UNDER THE COURT'S INHERENT
        AUTHORITY........................................................................................................... 23

III.    WERE THE COURT TO CONCLUDE THAT SANCTIONS ARE
        WARRANTED, DUE PROCESS REQUIRES ADDITIONAL SUBMISSIONS
        BEFORE IMPOSING SANCTIONS...................................................................... 24

CONCLUSION ....................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Adele v. Dunn*,
    2013 WL 593291 (D. Nev. Feb. 14, 2013) ...............................................................10

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*,
    721 F.3d 1122 (9th Cir. 2013)..................................................................................10

*Batson v. Neal Spelce Assocs., Inc.*,
    765 F.2d 511 (5th Cir. 1985)....................................................................................21

*Beam Sys., Inc. v. Checkpoint Sys., Inc.*,
    1997 WL 423113 (C.D. Cal. July 16, 1997) .............................................................9

*Brocade Communications Systems, Inc. v. A10 Networks, Inc.*,
    2011 U.S. Dist. LEXIS 99932 (N.D. Cal. Sept. 6, 2011)...................................12, 13

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991) .................................................................................................23

*City of Alexandria v. C L E C O, Corp.*,
    __ Fed. Appx. __, 2013 WL 6104147 (5th Cir. Nov. 20, 2013) ...............................24

*In re DeVille*,
    361 F.3d 539 (9th Cir. 2004)....................................................................................11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993)..............................................................10, 11, 12, 17, 21, 22

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012)..................................................................................24

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
    702 F.2d 770 (9th Cir. 1983)................................................................................8, 25

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001)..............................................................................23, 24

*Harrell v. CheckAGAIN, LLC*,
    2006 WL 5453652 (S.D. Miss. July 31, 2006) .......................................................11

*Hyde & Drath v. Baker*,
    24 F.3d 1162 (9th Cir. 1994)..............................................................................11, 21

*Kirzhner v. Silverstein*,
    870 F. Supp. 2d 1145 (D. Colo. 2012) ....................................................................22

*Lahiri v. Universal Music & Video Distr. Corp.*,
    606 F.3d 1216 (9th Cir. 2010) .................................................................23

*Lambright v. Ryan*,
    698 F.3d 808 (9th Cir. 2012), *cert. denied* 133 S. Ct. 2770 (2013) .....................10, 21

*Life Technologies Corp. v. Biosearch Technologies, Inc.*,
    2012 WL 1600393 (N.D. Cal. May 7, 2012) .................................................13

*Lipscher v. LRP Publ'ns, Inc.*,
    266 F.3d 1305 (11th Cir. 2001) ................................................................9

*Mackler Productions, Inc. v. Cohen*,
    225 F.3d 136 (2d Cir. 2000) ...................................................................25

*Miller v. City of Los Angeles*,
    661 F.3d 1024 (9th Cir. 2011) .................................................................23

*Miranda v. S. Pac. Transp. Co.*,
    710 F.2d 516 (9th Cir. 1983) ..................................................................25

*Navellier v. Sletten*,
    262 F.3d 923, 947 (9th Cir. 2001) .............................................................25

*New Alaska Dev. Corp. v. Guetschow*,
    869 F.2d 1298 (9th Cir. 1989) .................................................................23

*O'M & Assocs., LLC v. Ozanne*,
    2011 WL 2160938 (S.D. Cal. June 1, 2011) ...................................................12

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) ..................................................................23

*Rachel-Smith v. FTData, Inc.*,
    247 F. Supp. 2d 734 (D. Md. 2003) ...........................................................22

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ...........................................................................23

*SEC v. Razmilovic*,
    __F.3d __, 2013 WL 6172543 (2d Cir. July 22, 2013) .........................................25

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
    490 F.3d 130 (2d Cir. 2007) ...............................................................10, 25

*Shepherd v. Am. Broadcasting Cos.*,
    62 F.3d 1469 (D.C. Cir. 1995) .................................................................23

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
    685 F.3d 486 (5th Cir. 2012) ...................................................................9

*Systemic Formulas, Inc. v. Kim*,
    2011 WL 9509 (D. Utah Jan. 3, 2011) ...................................................................13

*Tessera, Inc. v. Sony Corp.*,
    2013 WL 5692109 (N.D. Cal. Oct. 18, 2013) .........................................................21

*United States v. Nat'l Med. Enters., Inc.*,
    792 F.2d 906 (9th Cir. 1986) ....................................................................................8

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*,
    689 F.2d 885 (9th Cir. 1982) .............................................................................12, 21

*Wilson v. Kayo Oil Co.*,
    563 F.3d 979 (9th Cir. 2009) ..................................................................................11

*Zambrano v. City of Tustin*,
    885 F.2d 1473 (9th Cir. 1989) ...........................................................................10, 24

## Statutes & Rules

18 U.S.C. § 402 .............................................................................................................23

28 U.S.C. § 1927 ...........................................................................................................23

Fed. R. Civ. P. 37 ..........................................................................................................21

Fed. R. Civ. P. 37(b) ....................................................................8, 9, 10, 21, 22, 23

Fed. R. Civ. P. 37 (b)(2) .......................................................................2, 4, 8, 9

Fed. R. Civ. P. 37(b)(2)(A) .............................................................................................9

Fed. R. Civ. P. 37(b)(2)(A)(vii) .....................................................................................9

Fed. R. Civ. P. 37(b)(2)(C) ..............................................................................10, 21, 25

Fed. R. Crim. P. 42(a) ...................................................................................................23

N.D. Cal. Local Rule 7-3(a) .........................................................................................25

N.D. Cal. Local Rule 37-4(3) .......................................................................................25

## Miscellaneous Authorities

Black's Law Dictionary .................................................................................................19

Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") respectfully submit this response to the Court's November 8, 2013 Order To Show Cause Why Sanctions Are Not Warranted ("OSC").

**<u>INTRODUCTION</u>**

After collateral discovery spanning three continents, millions of documents reviewed, and scores of hard drives imaged and reviewed, the record reflects nothing more than what Quinn Emanuel and Samsung have maintained from the beginning:  an inadvertent release of material covered by the Protective Order (Dkt. 687) that should have been, and was meant to be, redacted from a single expert report before counsel circulated it.  Inadvertent as that oversight was, it is a serious matter, and Samsung and its counsel have treated it seriously.  Per the Stipulation Samsung entered with Nokia and the Court entered as its Order, Quinn Emanuel engaged an outside expert of Nokia's choosing, Stroz Friedberg ("Stroz")—at millions of dollars in expense—to investigate whether the inadvertently disclosed information was used, and to protect against any recurrence. As separately ordered by the Court, Samsung produced high-level officers and senior employees for more than 40 hours of depositions, and submitted thousands of pages of its attorney-client communications for *in camera* review.  The electronic forensic analysis and other discovery has confirmed the discrete, inadvertent nature of the lapse at issue, and the absence of any evidence that the inadvertently produced information was used.  That, we respectfully submit, should be the end of the matter.

Yet Apple and Nokia are urging the Court to take the further, drastic step of imposing sanctions.  There should be no sanctions here.  The revelation of wrongdoing and resulting prejudice that Apple and Nokia kept imagining would surface never materialized.  Copious discovery has turned up no systemic failure by Samsung, much less any intentional disclosure or use of protected material.  Instead, discovery has confirmed that the disclosure—while regrettable—reflected nothing more than an inadvertent error by counsel who overlooked a few lines of protected material when otherwise appropriately redacting across 295 paragraphs and 124 footnotes of an expert report before sending it to their client.  And Nokia's and Apple's evolving theories of misuse and harm have been debunked at every turn.  While this dispute began with

Nokia's assertion that Samsung's Dr. Ahn has used confidential information in a June 4, 2013 negotiating session, the full record confirms that these allegations are not only implausible but factually false. Apple's now-abandoned theory that Samsung had used confidential information to gain an advantage in FRAND negotiations likewise never had the slightest merit.

If sanctions issue here, on these facts, there will be no stopping. Protective orders are routine. Everyone's best efforts remain susceptible to human error. Especially when thousands of lines must be reviewed and redacted throughout years of litigation, a piece of protected information may slip by unnoticed, as happened here. Indeed, at the same time Apple has been railing against the inadvertent disclosure here, its counsel has, within the past month, *repeatedly* filed information covered by the Court's protective order in Case No. 12-630—including source code—in the public record, and on one occasion failed to notify Samsung of its error. Apple's own mistakes illustrate that human error is an unfortunate but not uncommon part of complex litigation such as this. When and if that happens, the judicial response should be proportionate— sufficient to identify and correct the error—not excessive. Awarding sanctions here would encourage opportunistic litigants to launch fresh waves of litigation under the auspices of protective orders, seeking to pin the ultimate expense on their adversaries by way of sanctions.

The circumstances here do not warrant sanctions for multiple reasons. First and foremost, there is no authority for the Court to impose sanctions here. Only Rule 37(b) has been cited as authority, but the Protective Order is not "an order to provide or permit discovery" governed by that Rule. Any resort to the Court's inherent authority as a basis for sanctions would require proof of willfulness or bad faith that is lacking here. Moreover, sanctions would not follow under Rule 37(b) even if the Protective Order came within that Rule. The disclosures were inadvertent, and Samsung thereafter complied with provisions of the Protective Order governing such disclosures. In no respect did Samsung use any inadvertently disclosed information, and neither Apple nor Nokia can show that it has been harmed as a result. Finally, imposition of sanctions would be unjust under the circumstances, especially given that Samsung has, at great burden and expense (detailed *infra*), engaged Stroz to ensure redress and to prevent recurrence, even while incurring further burden and expense to comply with the Court's parallel discovery orders.

**STATEMENT OF FACTS**

**A.    The Inadvertent Disclosures Of Confidential Information**

On July 1, 2013, Nokia filed a motion for a protective order in Case No. 12-630, alerting Samsung and Quinn Emanuel for the first time to the possibility that Samsung employees had obtained information regarding the financial terms of Apple's license with Nokia that was designated as confidential under the Protective Order.  (Decl. of Thomas Pease, Sept. 6, 2013 ("Pease Decl.") ¶¶ 3-4 (Dkt. 2395-03).)  Samsung and Quinn Emanuel promptly investigated Nokia's claim and determined that an expert report of David J. Teece (the "Teece Report") had been incompletely redacted prior to being made available to Samsung personnel via an FTP site on March 24, 2012.  (Pease Decl. ¶¶ 5-8; Decl. of Todd Briggs, Nov. 15, 2013 ¶¶ 2-5, 15 (Dkt. 2807-03).)  Specifically, while Quinn Emanuel attorneys had removed the exhibit to the Teece Report that contained a summary chart of the Apple-Nokia license terms, including information regarding ███████████████████████████████████████████████████████████ running royalties due under a Nokia-Apple license and an Ericsson-Apple license.  (Pease Decl. ¶¶ 6-7.)  Thus, although a March 24, 2012 email from Quinn Emanuel to Samsung employees identified the FTP site as containing non-confidential expert reports and the redacted report was stored in a folder called "Expert Reports\Redacted for Client," the transmitted report did not redact all information concerning the licenses' financial terms.  (*Id.* ¶¶ 5-8.)[1]  At no time prior to July 1, 2013, was Quinn Emanuel aware that the Teece Report available on the FTP site had been incompletely redacted.

**B.    The Proceedings Regarding The Inadvertent Disclosures**

On July 16, 2013, after having conducted an initial investigation into Nokia's assertions, Quinn Emanuel notified Nokia of the inadvertent disclosures it had discovered, including by identifying the authors and recipients of the relevant emails as well as the contents of the

---

[1]  Quinn Emanuel also sent incompletely-redacted versions of the Teece Report to Samsung in-house counsel Daniel Shim in December 2012 and January 2013 (*see* Dkt. No. 2689, at 3 n.15 (citing Tab Nos. 19, 20)), each time believing the report to be fully redacted (Decl. of Alex Baxter, Nov. 15, 2013 ¶¶ 3-6 (Dkt. 2807-01) ("Baxter Decl.").)

attachments that related to the Apple-Nokia license agreement, and also confirmed its offer to discuss appropriate remediation.  (Pease Decl. ¶ 11, Ex. A.)  Quinn Emanuel asked whether Nokia wanted the identified emails containing the inadvertent disclosures deleted as the Protective Order contemplated (Dkt. 687 at 30), but Nokia's counsel requested that they be retained.  (Pease Decl. ¶ 11.)  Quinn Emanuel thus sent a document preservation notice to recipients of the inadvertent disclosures at Samsung.  (*Id.* ¶ 13.)  On August 1, Quinn Emanuel provided further information to Nokia and notified Apple of the results of its initial investigation.  (*Id.* ¶¶ 12-13, Exs. B, C.)

After extensive discussions and three extensions to the deadline for Samsung to file its brief opposing Nokia's motion, Quinn Emanuel and Nokia's counsel successfully negotiated a stipulation, which was filed on August 18 (the "Stipulation") (Case No. 12-630, Dkt. 742), describing search procedures to be conducted to identify documents in the possession of Samsung employees containing information about the Apple-Nokia license.  (Decl. of Robert Becher, Dec. 2, 2013 ¶ 2 ("Becher Decl.").)  Nokia insisted that Stroz serve as the discovery vendor under the Stipulation.  (*Id.*)  Nokia withdrew its Motion for Protective Order in light of the Stipulation.  (*Id.*)  Before the Stipulation could be ordered, however, on August 23, Apple filed a Motion to Compel Further Discovery and For Sanctions for Violations of Protective Order, invoking exclusively Rule 37(b)(2) (Dkt. 2374); Apple sought broad discovery well beyond the already expansive investigation contemplated by the Stipulation, but did not specify the precise sanction sought.  Samsung thereafter remained in regular contact with Apple and Nokia regarding the inadvertent disclosures and continued to provide updated information regarding its investigation.  (Pease Decl. ¶¶ 14-18.)

On October 1, the Court held a hearing on Apple's motion, and on October 2, it entered the Stipulation as its Order but further ordered Samsung to provide several broad categories of discovery by no later than October 16.  (Dkt. 2483 at 5 (the "October 2 Order").)  On October 22, at a hearing following completion of the discovery directed in the October 2 Order and the parties' submission of supplemental briefs (which again did not specify any sanction sought), the Court stated that it was "not yet satisfied that sanctions are warranted in this matter."  (Becher Decl. ¶ 67, Ex. 37 at 89:22-25.)  The Court, however, ordered Samsung to submit the following

-4-

documents for *in camera* review:  (1) all documents responsive to the October 2 Order that were produced to Apple and Nokia with all redactions removed; (2) all documents Samsung had withheld based on privilege or work product; and (3) all non-responsive attachments to responsive parent documents that were produced or logged.  (*Id.* at 94:2-25; *see also* Dkts. 2587, 2588.)  Over the next two weeks, Samsung submitted 23 large volumes containing 275 parent documents and hundreds of additional attachments and translations, as well a 737-page privilege log containing over 1300 individual entries.  (Becher Decl. ¶ 65.)

On November 8, after completing its *in camera* review, the Court entered the OSC in which it identified 11 documents out of the "boxes" of documents submitted *in camera* as potentially supporting violations of the Protective Order.  (Dkt. 2689 at 3.)  The OSC did not cite the authority that would support any sanction.  (*Id.* at 1-5.)  The Court permitted Samsung to take limited offensive depositions, which occurred on November 20 (Apple's 30(b)(6) witness Jeffrey Risher) and November 25 (Nokia's Paul Melin and Eeva Hakoranata), and provided for further briefing on privilege regarding the 11 documents.  (*See* Dkts. 2807, 2824, 2825.)

On November 26, in an effort to bring this dispute to a prompt conclusion, Samsung offered to produce 7 of the 11 documents at issue to Apple and Nokia (the remaining 4 documents are subject to a third-party mediation privilege and other confidentiality claims that Samsung is not in a position to waive), provided that they agree that such production does not constitute a broader waiver of any applicable privilege or protection and that they limit disclosure of the documents to five outside counsel.  (Becher Decl. ¶¶ 47-49; Dkt. 2833.)  Neither Nokia nor Apple accepted the offer.  (Becher Decl. ¶ 49.)

## C.    Samsung's And Quinn Emanuel's Substantial Investigation And Remedial Actions Pertaining To The Inadvertent Disclosures

Samsung has diligently sought to address the concerns raised before the Court, at an estimated cost of approximately $9 million in attorney time that is being borne by Quinn Emanuel and Samsung, as well as over $2 million in billings from Stroz.  (Becher Decl. ¶ 66; Decl. of Colleen Kavanagh, Dec. 2, 2013 ¶ 11 ("Kavanagh Decl.").)  Between September 10 and November 8, Stroz regularly stationed several digital forensics examiners at Samsung's offices in

Suwon, South Korea; a Managing Director or Vice President was also on site for approximately six weeks.  (Kavanagh Decl. ¶¶ 5-6.)  A Quinn Emanuel attorney was also present in Suwon to facilitate Stroz's work throughout this period.  (Becher Decl. ¶ 4.)  Because some of the Korean-based custodians were not in Suwon, Samsung personnel traveled to other cities to collect computers for imaging.  (*Id.* ¶ 8.)

In parallel, Stroz conducted forensic analysis and collections of data for Samsung's U.S.-based custodians, working out of Samsung's office in New Jersey.  (Kavanagh Decl. ¶ 6; Becher Decl. ¶ 4.)  Stroz also dispatched examiners to image each hard disk for 16 U.S.-based custodians in four different locations, and Quinn Emanuel sent a different attorney to each of these sites to facilitate.  (Becher Decl. ¶ 4.)

By October 1, Stroz had already imaged hard disks for 72 computers in the United States and Korea and indexed most of the archived email data for custodians in Korea.  (Kavanagh Decl. ¶ 7; Becher Decl. ¶ 11.)  Following the October 2 Order, however, the scope of work expanded significantly to encompass the production of documents referring to four separate licenses.  Quinn Emanuel thus retained Stroz under a new engagement letter to assist Samsung in complying with the parallel discovery Order.   (Becher Decl. ¶ 11.)  From there, the Stroz team continued to work out of Suwon, and Stroz also sent an examiner to Brussels and Paris to image additional custodians' computers.  (*Id.* ¶ 14.)  Stroz imaged a total of 38.5 terabytes of data on Samsung custodians' hard drives, and, by October 16, it had gathered, imaged, processed *and* run keyword searches on over a terabyte of data.  (Kavanagh Decl. ¶ 8; Becher Decl. ¶ 15.)

Stroz processed and loaded onto its online review system approximately 140 GB of data yielded by the search strings, thereby setting up further review for responsiveness pursuant to the October 2 Order.  (Decl. of Michael McGowan, Dec. 2, 2013 ¶ 7 ("McGowan Decl."); Becher Decl. ¶ 16.)  Quinn Emanuel's review team of over twenty attorneys reviewed a total of 69,862 documents—many in Korean—consisting of over 1,215,336 unique pages.  (Becher Decl. ¶ 16.)  The team then produced 470 documents, totaling 12,988 pages, and further compiled a privilege log, served on October 16, reflecting more than 800 individual entries.  (*Id.*)

After its execution of keyword searches on data from custodians who received the Teece

1   Report and the ITC-related disclosures and still had data available (pursuant to the Stipulation),

2   Stroz turned up a combined total of 85,771 unique documents totaling 1,417,910 pages.  (Becher

3   Decl. ¶ 17.)  All of these documents were then analyzed to determine whether they included the

4   inadvertently-disclosed Teece Report or ITC outline, draft brief or brief.  (*Id.*)  "Pursuant to

5   paragraph 8 of the Stipulation, Stroz Friedberg has concluded that Quinn Emanuel's investigation

6   was adequate and complete."  (Kavanagh Decl. ¶ 12; *see also* Becher Decl. ¶ 56.)  The total

7   amount billed by Stroz through October 2013 is **$2,324,756.20**, consisting of **$892,812.07** for

8   work connected to the first engagement stemming from the Stipulation, and **$1,431,944.13** for the

9   second engagement stemming from the Court's separate discovery order and *in camera* review

10  order; approximately $450,000 remains unbilled for Stroz's work in November 2013.  (Becher

11  Decl. ¶ 11.)

12      Pursuant to the Stipulation, Quinn Emanuel reported to Nokia and Apple as to whether

13  outside law firms that received the inadvertent disclosures in turn used or disclosed protected

14  information regarding Apple's license with Nokia.   (Becher Decl. ¶ 50-51.)  On November 15,

15  Samsung provided Nokia an updated declaration, pursuant to the Stipulation, detailing, over the

16  course of 25 pages, the results to date of Stroz's investigation.  (*Id.* ¶ 50, Ex. 32.)

17      In addition, as required by the October 2 Order, Samsung prepared and produced six of its

18  senior employees for deposition in the United States.  (Becher Decl. ¶¶ 18-23.)  The depositions

19  lasted almost 40 hours.  (*Id.* ¶ 18.)  This thorough and expensive investigation turned up no

20  evidence that the disclosure was anything other than a mistake or that any use was made of the

21  information.  (*Id.* ¶¶ 19-23.)

22      **D.    Apple's Recent Inadvertent Disclosures Of Confidential Information**

23      Meanwhile, Apple itself has demonstrated that lawyers can make mistakes in the handling

24  of confidential information, even at a time when sensitivities concerning the handling of such

25  information were presumably very high.  On November 20, Apple's counsel in Case No. 12-630

26  notified Samsung that Apple had made a "filing error" on November 19 "which involved the

27  failure to properly designate certain exhibits to be filed under seal," including "at least one"

28  exhibit that "contains Google Source Code."  (Decl. of Patrick Curran, Dec. 2, 2013 ¶ 2, Ex. 1

-7-

1  ("Curran Decl.").)  Apple's counsel later explained that the filing included confidential

2  information of Samsung, Google, Microsoft and Novell.  (*Id.*  ¶ 4, Ex. 1.))

3       Following receipt of Apple's counsel's email, Samsung reviewed the public docket in Case

4  No. 12-630 and confirmed that Apple had secured the removal from the public record of the

5  misfiled confidential information.  (Curran Decl. ¶ 6.)  In conducting this review, however,

6  Samsung discovered that a docket entry from *November 5, 2013* (Case No. 12-630, Dkt. 82)

7  indicated that documents publicly filed by Apple had been altered "pursuant to counsel's

8  request."  (Curran Decl. ¶ 6.)  When Samsung asked Apple if this docket entry likewise reflected

9  Apple's misfiling of confidential information, Apple's counsel acknowledged for the first time

10  that there had been a "filing error[]" on "November 5 with respect to a single exhibit."  (*Id.* ¶ 8,

11  Ex. 3.)  Apple's counsel stated that it was unable to determine whether any nonparties had access

12  any of the confidential information that Apple publicly filed.  (*Id.*)

13                                    **ARGUMENT**

14  **I.      THERE IS NO BASIS FOR SANCTIONS UNDER RULE 37(B)**

15       **A.      Rule 37(b) Does Not Apply To Protective Order Violations**

16       Rule 37(b) of the Federal Rules of Civil Procedure is the only authority that has been cited

17  here as a basis for sanctions.  That rule authorizes the imposition of sanctions if a party or its agent

18  "fails to obey an order to *provide* or *permit* discovery, including an order under Rule 26(f), 35, or

19  37(a)."  FED. R. CIV. P. 37(b)(2) (emphasis added).  Rule 26(c) protective orders are not mentioned

20  in Rule 37(b)(2), and the lengthy Advisory Committee notes accompanying Rule 37 are likewise

21  silent as to protective orders which, unlike the other enumerated examples, do not order a party to

22  "provide or permit" specified discovery.   And while the Ninth Circuit has *assumed*—without

23  deciding—that Rule 37(b) sanctions may be ordered for a party's failure to comply with a Rule

24  26(c) protective order,[2] other courts that have fully considered the issue have expressly held to the

25  _____

26      [2]   *See United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 910 (9th Cir. 1986) (assuming,

27  without comment, that protective order violations fall within Rule 37(b)'s authority to sanction "if
   a party fails to comply with a discovery order"); *Falstaff Brewing Corp. v. Miller Brewing Co.*,

28       (footnote continued)

_____

**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE
WHY SANCTIONS ARE NOT WARRANTED**

contrary.[3]

The Protective Order does not compel Samsung or Quinn Emanuel to "provide or permit" specified discovery.  Indeed, unlike a specific discovery order, which typically compels a discrete instance of disclosure, protective orders such as the one at issue govern ongoing conduct across a waterfront of litigation.  Rule 37(b)'s plain language does not contemplate sanctions (monetary or otherwise) as a matter of course for an inadvertent lapse in such circumstances.  It is all the more a stretch where sanctions would take the form of a large monetary award.  To the extent the Court would nonetheless invoke Rule 37(b) as basis for sanctions, it should, if nothing else, proceed with caution and restraint.

**B.      Even If Rule 37(b) Did Apply To Protective Order Violations, Sanctions Are Not Warranted Against Either Samsung Or Quinn Emanuel**

Assuming that the Court has authority under Rule 37(b)(2) to impose sanctions for violations of a protective order (which it does not), the circumstances here do not warrant any sanctions.  Rule 37(b)(2) provides that "if a party … fails to obey an order to provide or permit discovery," a district court "may issue further just orders," FED. R. CIV. P. 37(b)(2)(A); lists examples of orders that the court "may" enter, including "treating as contempt of court the failure to obey [an] order," FED. R. CIV. P. 37(b)(2)(A)(vii); and states that "[i]nstead of or in addition to the [enumerated orders], the court must order a disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified *or other circumstances make an award of expenses unjust*," FED.

---

702 F.2d 770, 784 (9th Cir. 1983) (affirming sanction under Rule 37(b) for violation of protective order without discussing Rule 37(b)'s applicability to protective orders).

[3]      *See, e.g.*, *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001) (reversing Rule 37(b) sanctions award for protective order violation and noting that the Ninth Circuit in *Falstaff* failed to analyze the propriety of the sanctions under Rule 37(b)); *Beam Sys., Inc. v. Checkpoint Sys., Inc.*, 1997 WL 423113, *9 n.3 (C.D. Cal. July 16, 1997) (acknowledging the limited authority supporting imposition of Rule 37(b)(2) sanctions for failure to comply with protective order, but concluding "the language of [Rule 37(b)(2)] suggests otherwise").  *But see Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488-90 (5th Cir. 2012) (holding that protective order at issue was an "order to provide or permit discovery," the violation of which was a proper basis for sanctions under Rule 37(b)(2)).

-9-

1   R. Civ. P. 37(b)(2)(C) (emphasis added).

2       Although district courts have substantial discretion to impose sanctions under Rule 37(b),

3   that Rule "permits the imposition of 'just' sanctions" and thus "the severity of sanction must be

4   commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d

5   130, 140 (2d Cir. 2007); *cf. Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989)

6   (vacating sanction for local rule violation because "any sanction imposed must be *proportionate* to

7   the offense and commensurate with principles of restraint and dignity inherent in judicial

8   power[,]" which "includes a responsibility to consider the usefulness of more moderate penalties

9   before imposing a monetary sanction" ) (emphasis added).

10      Thus, where a protective order is violated, courts often impose only such sanctions as are

11  necessary to "return[] the parties to the same position they were in prior to the violation."

12  *Lambright v. Ryan*, 698 F.3d 808, 826 (9th Cir. 2012), *cert. denied* 133 S. Ct. 2770 (2013)

13  (affirming sanction requiring party to retrieve document that was inadvertently disclosed in

14  violation of protective order); *see also In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,

15  10 F.3d 693, 696 (9th Cir. 1993) (vacating $10,000 fee award for plaintiff's purported violation of

16  protective order where "Defendants' only claimed injuries were self-inflicted, by their own spare-

17  no-expense punitive expedition [following discovery of purported violation], not by [plaintiff's]

18  use of discovery from the first lawsuit in the second); *Adele v. Dunn*, 2013 WL 593291, *5-6 (D.

19  Nev. Feb. 14, 2013) (declining to order sanctions for defendants' improper public disclosure of

20  plaintiff's unredacted medical records where disclosure was unintentional and defendants have

21  "taken appropriate steps to insure this does not occur again").

22      A court may impose civil contempt sanctions only to "(1) compel or coerce obedience to a

23  court order, and/or (2) compensate the contemnor's adversary for *injuries* resulting from the

24  contemnor's noncompliance." *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union,*

25  *Locals 21 & 4*, 721 F.3d 1122, 1131 (9th Cir. 2013) (emphasis added); *see also Dual-Deck*, 10

26  F.3d at 696 ("the award to defendants [for contempt] must be limited to their *actual loss* for

27  injuries which result from the noncompliance") (emphasis added; internal quotation marks

28  omitted).  Thus, where party is no longer in violation of a court order, a civil contempt award is

-10-

improper absent *damages* to the complaining party.  *See*, *e.g.*, *Harrell v. CheckAGAIN, LLC*, 2006 WL 5453652, *5 (S.D. Miss. July 31, 2006) (declining to impose civil contempt sanction for "technical violation of the protective order" where there were no damages to defendant).

The OSC identifies three possible violations of the Protective Order, along with the evidentiary basis for those possible violations.  (Dkt. 2689, at 3 & nn.10-15.)  Samsung herein responds to those purported violations, and respectfully submits that none of the identified grounds supports the imposition of sanctions.[4]

### 1.    Any Disclosure Of Confidential Information Was Inadvertent

There is no longer any dispute that Quinn Emanuel's disclosure of confidential licensing information was inadvertent.  No piece of evidence adduced in the massive discovery conducted either voluntarily or pursuant to the Court's October 2 Order has revealed even the slightest indication that any disclosure was intentional rather than inadvertent, nor does Apple, Nokia or even the OSC allege as much.  Instead, the undisputed record reflects that Quinn Emanuel attorneys inadvertently failed to redact a few lines of confidential licensing information from a voluminous expert report that was otherwise heavily and properly redacted prior to dissemination of that report to Samsung.  (Pease Decl. ¶¶ 6-7.)  This inadvertent disclosure was a regrettable mistake, but mistakes sometimes happen regardless of the precautions employed, particularly in a complex case such as this one when many thousands of documents are prepared and transmitted; indeed, the Protective Order expressly contemplates that inadvertent disclosures will occur and provides procedures for counsel to follow when they do (*see infra*, Part I.B.3).  The inadvertence of the disclosure and the technical nature of any violation counsel strongly against sanctions.  *See*, *e.g.*, *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994) (stating that "good or bad faith may be a consideration in determining whether imposition of sanctions would be unjust" and

---

[4]   To the extent that Apple or Nokia seeks to justify sanctions on grounds other than those specified in the OSC, due process requires that Samsung have the opportunity to respond were the Court to consider imposing sanctions of those grounds.  *See*, *e.g.*, *Wilson v. Kayo Oil Co.*, 563 F.3d 979, 980 (9th Cir. 2009) (reversing sanctions order where court did not provide "sufficient, particularized, advance notice" of all conduct alleged to be sanctionable and limited conduct identified was not sanctionable) (quoting *In re DeVille*, 361 F.3d 539, 549 (9th Cir. 2004)).

reversing portion of award of costs and expenses against counsel where it was "not at all clear that the problems . . . [were] the product of willful behavior"); *Dual-Deck*, 10 F.3d at 695 ("'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply.") (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)); *O'M & Assocs., LLC v. Ozanne*, 2011 WL 2160938, *5 (S.D. Cal. June 1, 2011) (declining to impose civil contempt sanctions because defendant had "not produced clear and convincing evidence of more than a technical violation" of protective order).

Nor did this inadvertent disclosure of an incompletely-redacted document somehow become willful because it was forwarded by and among numerous individuals not authorized under the Protective Order.  The error was in Quinn Emanuel's initial transmission of the incompletely-redacted Teece Report, and that error was inadvertent.  In any event, there is no evidence that the report was distributed *because* it had been incompletely redacted or that any individual who received the report used the confidential information contained therein.

Moreover, when faced with having to defend Apple's own recent disclosures of confidential information (to the *public* no less), Apple's 30(b)(6) witness took quite a different position than Apple has taken against Samsung regarding whether "inadvertent disclosures" violate a protective order.  Apple's witness agreed that the "fact alone" that "there was an inadvertent disclosure of information subject to a protective order … is not enough to tell you one way or the another whether there was a violation of the protective order."  (Becher Decl. ¶ 68, Ex. 38 at 106:5-15.)  He likewise testified with respect to Samsung's and Apple's disclosures that he is "not suggesting that anyone has or hasn't actually committed any violation one way or the other." (*Id*. at 144:9-20.)  Apple's request for broad sanctions against Samsung based on inadvertent disclosures is thus inconsistent even with the standard Apple seeks to apply to its own conduct.[5]

---

[5]  The cases upon which Apple has previously relied are inapposite.  For example, in *Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, 2011 U.S. Dist. LEXIS 99932 (N.D. Cal. Sept. 6, 2011) (Koh, J.), the court principally ordered sanctions based on the defendant's *repeated* (footnote continued)

### 2. Samsung Did Not Use The Inadvertently Disclosed Confidential Information

There is likewise no basis to impose sanctions for "wrongful use" of Apple's confidential information because the record in fact makes clear that Samsung did not in any way use confidential information obtained from the incompletely-redacted Teece Report.

#### (a) Samsung Did Not Use The Inadvertently Disclosed Confidential Information In Negotiations With Ericsson

The OSC identifies four documents that purport to show that Samsung wrongly used the incompletely-redacted Teece Report in "negotiations and arbitrations with Ericsson between May 2012 and May 2013." (Dkt. 2689, at 3 & nn.12-13.) But the undisputed record shows that the "information reflected in these documents that" the court is "concerned about, was provided *by Ericsson* to Samsung and [Samsung's outside counsel Kirkland & Ellis] during a mediation between the parties … for purposes of enabling Samsung to evaluate Ericsson's proposed terms for settling a licensing dispute that is now in litigation" or "was otherwise publicly available." (Decl. of Jennifer Selendy, Nov. 15, 2013 ¶ 7 (Dkt. 2807-13) (emphasis added)). These materials, moreover, do "not relate to the terms of the Apple/Ericsson license or any confidential information subject to the [Protective Order] …." (*Id.*) These negotiations thus provide no basis for sanctions.

#### (b) Samsung Did Not Use The Inadvertently Disclosed Confidential Information In Negotiations With Nokia

Nor do Samsung's "negotiations with Nokia between March 22, 2012 and June 4, 2013"

---

violations of discovery orders requiring the production of source code. *Id.* at *6-10. And while the court also ordered limited monetary sanctions because the defendant had separately violated the protective order by publicly filing the plaintiff's confidential information, the defendant there had *refused to take any remedial measures* after the plaintiff notified it of the public filing. *Id.* at *11-15.

Likewise, in *Life Technologies Corp. v. Biosearch Technologies, Inc.*, 2012 WL 1600393 (N.D. Cal. May 7, 2012), the court found the defendants' lawyers' conduct sanctionable where they had disclosed to their client almost *3,000 pages* of the plaintiffs' confidential "laboratory notebooks," and then, upon discovering the disclosure, failed to notify the plaintiffs until plaintiffs themselves had discovered the disclosure in defendant's production over a year later. *Id.* at *2-3.

And in *Systemic Formulas, Inc. v. Kim*, 2011 WL 9509 (D. Utah Jan. 3, 2011), defendant's counsel used plaintiff's confidential customer list—designated attorneys' eyes only under the protective order—to compile a list of customers his client and the plaintiff had in common, which counsel then intentionally sent his client. *Id.* at *1.

(Dkt. 2689, at 3) reflect any use of Apple's confidential information.

*First*, the OSC first refers to a May 1, 2012 email from Samsung outside counsel Helen Hopson from the Bristows firm in London to Samsung outside counsel at Allen & Overy in Paris, copying several Samsung outside counsel and employees, concerning FRAND issues relating to a draft pleading in the French litigation.  (*See* Dkt. 2689, at 3 n.14 (citing Tab 6).)  This email does not reflect any use of confidential information from the incompletely-redacted Teece Report. Although one of the attachments in Ms. Hopson's email contained an embedded link to the incompletely-redacted Teece Report, Ms. Hopson was *unaware* that the report had not been fully redacted (Decl. of Helen Hopson, Nov. 15, 2013 ¶ 8 (Dkt. 2807-06)), and she had included the link for reasons *unrelated* to the specific terms of any Apple license or to Samsung's negotiation of a license with Apple or any other company (*id.* ¶¶ 5-8).  Additionally, while a draft French pleading attached to the email included the purported terms of the Apple/Nokia license, those terms were drawn from *public sources* and *do not match* the terms in the incompletely-redacted Teece Report.  (Decl. of Laetitia Benard, Nov. 15, 2013 ¶ 5 (Dkt. 2807-16).)  And despite Allen & Overy's receipt of the incompletely-redacted Teece Report, the final version of the French pleading remained unchanged with respect to its recitation of the Apple/Nokia terms.  (*Id.* ¶ 6.)

*Second*, the OSC refers to a chain of emails dated February 2012 to June 2012 between and among various Samsung outside counsel and Samsung employees *concerning a spreadsheet that Apple produced in its litigation against Samsung in the Netherlands* and that sets forth terms of Apple patent licenses.  (Dkt. 2689, at 3 n.14 (citing Tab 222); *see also* Decl. of Daniel Shim, Nov. 15, 2013 ¶ 5 (Dkt. 2807-14) ("Shim Decl."); Decl. of Seongwoo Kim, Nov. 15, 2013 ¶ 3 (Dkt. 2807-09).)  Since that licensing information was derived from the Netherlands litigation, was permitted to be shared with the Samsung employees who received it, and was necessarily *not* derived from the Teece Report, those emails do not constitute use of information designated confidential under the Protective Order.

*Third*, the OSC also refers to the June 4, 2013 license negotiations between Samsung and Nokia, as addressed in Dr. Ahn's deposition testimony and declaration, and Mr. Melin's declaration.  (Dkt. 2689, at 3 n.14.)  These documents contain no evidence that Samsung used any

-14-

1 information inadvertently revealed in the Teece Report at the June 4 meeting.  Further, the recent

2 testimonies of Mr. Melin and Ms. Hakoranta confirm that Nokia's and Apple's allegations

3 concerning Dr. Ahn's alleged use of the inadvertent disclosures are factually incorrect and based

4 only on erroneous conjectures.

5          Mr. Melin stated in his June 28, 2013 declaration that:  "Mr. Ahn of Samsung informed us

6 that he had been told of the financial terms of Nokia's license with Apple.  Mr. Ahn stated that the

7 agreement had been received by Samsung's attorneys in the course of litigation, and that they had

8 provided Samsung's in house team with the terms."  (Case No. 12-630 Dkt. 647, Decl. of Paul

9 Melin, June 28, 2013 ¶ 8 ("Melin Decl.").)  At his deposition, however, Mr. Melin admitted that

10 these allegations were *all* based on conjecture and *not* what Dr. Ahn actually said.  Specifically,

11 Mr. Melin conceded that (i) Dr. Ahn never said he had been "told" the terms of the Apple-Nokia

12 license (Becher Decl. ¶ 69, Ex. 39 at 236:5-17); (ii) Dr. Ahn never said that the Apple-Nokia

13 license had been "received by Samsung's attorneys in the course of litigation" (*id.* at 235:2-6;

14 Melin Decl. ¶ 8); and (iii) Dr. Ahn never said that Samsung's attorneys "had provided Samsung's

15 in-house team with the terms" (Becher Decl. ¶ 69, Ex. 39 at 235:17-236:17; Melin Decl. ¶ 8).

16 Instead, Mr. Melin *inferred* these allegations from Dr. Ahn's generic statements:  "During the first

17 session Dr. Ahn said that he has an idea of what Apple pays to Nokia under our license agreement

18 *which implied that he had been told of the financial terms of Nokia's license with Apple* …."

19 (Becher Decl. ¶ 69, Ex. 39 at 242:15-20 (emphasis added).)  Dr. Ahn "*did not specifically state*

20 *whether this information was told to him personally or to his team* …."  (*Id.* at 236:14-16

21 (emphasis added).)

22          Mr. Melin's testimony is thus consistent with Dr. Ahn's testimony, in that Dr. Ahn has

23 explained that he never said at the June 4 meeting that Apple had produced the Apple-Nokia

24 license in its litigation with Samsung or that Samsung's attorneys had shared the terms with him,[6]

25

26 _____

27 [6]  (Dkt. 2557-08 [Ahn Dep. Tr.] at 95:2-5 ("Q. Is it true that in the June 4th, 2013 meeting you
stated that Apple had produced the Apple-Nokia license in its litigation with Samsung? A. I never
said anything like that."); *see also* Dkt. 2557-15 [Kwak Dep. Tr.] at 139:16-19 (same).)  Nor did

28        (footnote continued)

SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE
WHY SANCTIONS ARE NOT WARRANTED

1   and that he *did not* know for certain the terms of that license, but was simply speculating based on

2   what he had reconstructed from conversations with industry sources and his review of the public

3   record.   (*E.g.*, Decl. of Seungho Ahn, Oct. 21, 2013 ¶¶ 14, 18, 19 (Dkt. 2556-08) ("Ahn Decl.").).

4   Indeed, it is implausible to think that the senior-most licensing executive at a world-leading

5   technology company who is responsible for hundreds of patent cases and fully familiar with

6   protective orders would make the statements that Mr. Melin alleges.  (*See id.* ¶ 22.)  It is far more

7   likely that Mr. Melin, a non-native English speaker (Becher Decl. ¶ 69, Ex. 39 at 158:17-20),

8   misunderstood Dr. Ahn, himself a non-native English speaker (Ahn Decl. ¶ 3).

9        Mr. Melin's further conjectures about Dr. Ahn's knowledge and source of the terms of the

10   Apple-Nokia license are likewise incorrect.  As Samsung has previously explained  (Dkt. 2556),

11   Dr. Ahn recited numbers at the June 4 meeting based on his discussions with industry sources and

12   his review of public information concerning the terms of the license, contained in widely available

13   media reports published in 2011—not the incompletely-redacted Teece Report.  (Ahn Decl. ¶¶ 14,

14   18; *see also* Dkt. 2395 at 5-6 (citing media reports regarding the Apple/Nokia license); Pease

15   Decl. ¶ 20 & Ex. G-K, P-Q).[7]  Nor does any evidence suggest that Dr. Ahn used the license

16   information revealed in the incompletely-redacted Teece Report during his meeting with Nokia.

17   ███████████████████████████  █████████  ████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   ────────────────────

22   Dr. Ahn ever say that Samsung's outside counsel had provided his team with the terms of the
     Apple-Nokia license.  (Dkt. 2557-08 [Ahn Dep. Tr.] at 95:6-9 ("Q. Is it true that in the June 4[th],

23   2013 meeting you stated that Samsung's outside counsel had provided your team with the terms of
     the Apple-Nokia license? A. I never said anything like that."); *see also* Dkt. 2557-15 [Kwak Dep.

24   Tr.] at 139:20-25 (same).)

25        [7]   Dr. Ahn's testimony regarding the public source of his information is confirmed by the
     testimony of the other two Samsung employees who attended the meeting, James Kwak and

26   Indong Kang.  (Ahn Decl. ¶¶ 14, 16, 18-24; Dkt. 2557-08 [Ahn. Dep. Tr.] at 82:15-85:16; Decl. of
     Indong Kang, Oct. 21, 2013 ¶¶ 11, 15-19 (Dkt. 2556-10) ("Kang Decl."); Decl. of Jin Hwan

27   Kwak, Oct. 21, 2013 ¶¶ 10, 12-14 (Dkt. 2556-12); Dkt. 2557-15 [Kwak Dep. Tr. ] at 142:17-
     144:11.

28

**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE
WHY SANCTIONS ARE NOT WARRANTED**



In sum, the record contains no evidence that Dr. Ahn used the inadvertently disclosed information at the June 4 meeting.[8]

          **(c)**      **In Any Event, Neither Apple Nor Nokia Has Indentified Any Harm**

Even if there were evidence of use (which there is not), Apple still has failed to identify any prejudice or harm that it suffered, as would be necessary to justify a contempt award.  *See, e.g.*, *Dual-Deck*, 10 F.3d at 696 ("the award to defendants [for contempt] must be limited to their *actual loss* for injuries which result from the noncompliance") (emphasis added; internal quotation marks omitted).  Indeed, Apple's Rule 30(b)(6) witness—in addition to being unable to identify any use of the Apple-Nokia or Apple-Ericsson licenses (Becher Decl. ¶ 68, Ex. 38 at 81:15-17,

---

[8]  The OSC also identified a July 4, 2013 email from Samsung in-house counsel Indong Kang to his subordinate, Jeheon Han, attaching materials for use in connection with analyzing a potential extension of an Apple-Nokia license.  (Dkt. 2689, at 3 n.10 (Tab 255); *see also* Decl. of Indo Kang, Nov. 15, 2013 ¶¶ 2-4 (Dkt. 2807-07) ("Kang 11/15/13 Decl.").)  Neither that email nor its attachments contains any information taken from the Teece Report, or any information derived from other materials produced pursuant to the Protective Order.  (Kang 11/15/13 Decl. ¶ 7.)

82:15-21, 119:2-6)—could not identify any actual harm or damage that Apple has incurred as a result of Samsung's purported use of either the Apple-Nokia license or the Apple-Ericsson license. (*Id.* at 81:25-82:21, 119:19-22, 142:10-143:13).  And he admitted that he had no reason to think that the inadvertently disclosed information was disseminated publicity or to any unauthorized party.  (*Id.* at 142:17-143:6.)  Moreover, Apple has disclosed the terms of the Apple-Nokia license to courts and regulators without any expectation of confidentiality—thus undermining any argument that it could be harmed by disclosure here.  (*Id.* at 80:11-23, 88:12-18, 89:16-20.)

Nokia likewise has failed to offer any theory of harm.  To the extent it may claim that Samsung used the Apple-Nokia licensing information at the June 4, 2013 meeting to force Nokia into arbitration (as Mr. Melin and Ms. Hakoranta intimated at their depositions), that argument is inconsistent with (i) Ms. Hakoranta's admission that Samsung was attempting to avoid litigation and arbitration at the June 4 meeting (Becher Decl. ¶ 71, Ex. 41 at 40:24-41:17 ); (ii) Mr. Melin's and Ms. Hakoranta's acknowledgement that arbitration was *Nokia's* suggestion and something it considered an option prior to the meeting (*id.* ¶ 69, Ex. 39 at 201:17-202:25; *id.* ¶ 71, Ex. 41 at 48:7-52:4); and (iii) Ms. Hakoranta's admission that Samsung's June 4 offer was an increase over its prior position (*id.* ¶ 71, Ex. 41 at Tr. 57:15-19).  Indeed, Nokia made clear at the June 4 meeting that the only acceptable options were its own offers or arbitration.  (*Id.* ¶ 69, Ex. 42, at 4; *id.* ¶ 69, Ex. 39 at 201:17-202:1; Becher Decl. ¶ 71, Ex. 41 at 48:7-49:11.)  Nokia thus cannot claim that Samsung forced the parties into arbitration or that it has suffered any other harm.

### 3. Quinn Emanuel At All Times Complied With The Protective Order's Inadvertent-Disclosure Procedures

The OSC also suggests (Dkt. 2689, at 3) that sanctions may be warranted because Quinn Emanuel failed to follow the procedures in the Protective Order after the inadvertent disclosure of Apple's confidential information.  Section 18 of the Protective Order provides, in relevant part:

> In the event of a *disclosure* of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such *disclosure* under this Protective Order, the Party responsible for having made such *disclosure*, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Materials have been *disclosed* and provide to such counsel all known relevant information concerning the nature and circumstances of the *disclosure*.

(Dkt. 687, at 30 (emphasis added).)  As noted above, Quinn Emanuel was not aware of the

-18-

possibility of any inadvertent disclosure of Apple confidential information until Nokia filed its motion for a protective order on July 1, 2013. Upon receipt of Nokia's motion, Samsung and Quinn Emanuel immediately commenced an investigation that, by mid-July, had revealed the inadvertent transmission of the incompletely-redacted Teece Report in March 2012. (Pease Decl. ¶ 11.) Quinn Emanuel notified Nokia of its initial findings on July 16, 2013 (*id.* ¶ 11 & Ex. A), and after conducting a further investigation that permitted Quinn Emanuel to provide a meaningful report, it notified Apple of the disclosure on August 1, 2013 (*id.* ¶ 11 & Ex. B). These procedures were consistent with section 18 of the Protective Order, and the OSC does not suggest otherwise.

The OSC, however, suggests that Quinn Emanuel triggered section 18 when, on December 22, 2012, it became aware that it had transmitted an incompletely-redacted copy of the Teece Report to Mr. Shim. (*See* Dkt. 2689, at 3 & n.15 (Tab No. 19).) This is incorrect: While the incompletely-redacted Teece Report was emailed to Mr. Shim on that day, the confidential information it contained was not *disclosed* to Samsung because Quinn Emanuel, within hours, instructed Mr. Shim not to access the email and he promptly acknowledged this instruction. (Baxter Decl. ¶5; *see also* Becher Decl. ¶ 67, Ex. 37 at 59:9-14, 59:24-60:3, 61:2-5, 65:14-66:3.)

A protective order should be read so as to "comply with common sense" by "connect[ing] its prohibitions to its purpose—protection against disclosure of commercial secrets." *Dual-Deck*, 10 F.3d at 695. Here, section 18 addresses the inadvertent "disclosure" of "Discovery Material" (Dkt. 687, at 30), in contrast to other provisions of the Protective Order that address "producing," "distribut[ing]," or "mak[ing] available" such information (*id.* at 3, 5, 23, 27). To "disclose" means to "mak[e] known something that was previously unknown," or to "reve[al] … facts"—that is, to supply another person or party with *actual knowledge* of *particular facts*. BLACK'S LAW DICTIONARY (9th ed. 2009). Applying this plain-language construction, in December 2012 there was a production, albeit immediately retracted, but no "disclosure" that would trigger section 18 because Quinn Emanuel understood that Mr. Shim had not accessed any confidential information.[9]

---

[9] Given the enormous scope of this action and the other Samsung actions around the world involving FRAND issues, Quinn Emanuel attorneys simply did not realize in December 2012 that
   (footnote continued)

Nor, contrary to the suggestion in the OSC (Dkt. No. 2689, at 3 n.15 (Tab No. 20)), is Quinn Emanuel's January 4, 2013 email to Mr. Shim inconsistent with section 18.  Quinn Emanuel had no knowledge that the more fully redacted version of the Teece Report attached to that email was still imperfectly redacted (Decl. of Thomas Pease, Nov. 15, 2013 ¶ 9 (Dkt. 2807-12) ("Pease 11/15/13 Decl."); Baxter Decl. ¶ 6), and there was no requirement in the Protective Order or otherwise that the parties consult on redactions.

Additionally, the OSC is incorrect to suggest (Dkt. 2689, at 3 n.15 (Tab 272)), that Quinn Emanuel violated section 18 after receiving a May 13, 2013 email from Samsung in-house counsel Daniel Shim seeking legal advice regarding certain of Dr. Teece's testimony and opinions in this action.  While that email attached an incompletely-redacted version of the Teece Report,[10] Mr. Shim's questions in his email *did not* relate to that report or to Apple's license agreements and thus the Quinn Emanuel attorney who responded to Mr. Shim had no reason to—and in fact did not—open the Teece Report attached to Mr. Shim's email.  (Baxter Decl. ¶¶ 7-8; *see also* Pease 11/15/13 Decl. ¶¶ 10-11.)  Without knowledge that Samsung had actually received confidential information under the Protective Order, Quinn Emanuel could not have notified Apple of any inadvertent disclosure.

### C.   Additional Circumstances Counsel Strongly Against Imposing Sanctions Here

#### 1.   Samsung Has Already Engaged In An Enormous, Perhaps Unprecedented, Investigation And Remediation Of The Inadvertent Disclosures

Samsung's and Quinn Emanuel's extensive remedial efforts render both unnecessary and

---

the incompletely-redacted version of the Teece Report that had been sent to Mr. Shim might previously have been sent to Samsung and its other counsel (Decl. of Thomas Pease, Dec. 2, 2013 ¶¶ 4-5), and thus they had no knowledge then of a prior disclosure of confidential information that would have triggered obligations under section 18.

[10]  That Mr. Shim attached an incompletely-redacted Teece Report to his May 2013 email is not inconsistent with his acknowledgment of Quinn Emanuel's December 2012 instruction not to access the report as initially attached by Quinn Emanuel.  (Baxter Decl. ¶5; *see also* Becher Decl. ¶ 67, Ex. 37 at 59:9-14, 59:24-60:3, 61:2-5, 65:14-66:3.)  Notably, the filename of the Teece Report that Mr. Shim attached in May 2013—"(Redacted) Expert Report of David J Teece Samsung v Apple.pdf"—is identical to the filename of the incompletely-redacted Teece Report that was available on the FTP site in March 2012.  (Shim Decl. ¶ 6; Pease Decl. ¶ 8.)

1   "unjust" any further penalties for an innocent, inadvertent violation.  The Ninth Circuit has

2   recognized that, where documents inadvertently disclosed have been returned per request, the

3   remedy is sufficient and further penalties need not follow.  *See Lambright*, 698 F.3d 808 (order

4   requiring violator of protective order to retrieve improperly disseminated documents appropriately

5   remedied any harm and restored parties to their prior positions).  In addition, the text of Rule 37(b)

6   itself recognizes that imposition of sanctions in the form of costs is not warranted where

7   "circumstances would make an award of expenses unjust."  FED. R. CIV. P. 37(b)(2)(C).

8   Samsung's and Quinn Emanuel's commitment to affording proper accounting should suffice to

9   resolve this matter without resort to judicial sanctions.  *See, e.g.*, *Hyde & Drath*, 24 F.3d at 1171

10  ("good or bad faith may be a consideration in determining whether imposition of sanctions would

11  be unjust"); *Vertex*, 689 F.2d at 892 (affirming district court's denial of sanctions for single

12  violation of court order where accused party offered evidence that "violation [was] discovered,

13  and steps taken to correct it … *prior to* [aggrieved party's] application" for contempt).

14         Moreover, "[t]he plain language of Rule 37 … provides that only those expenses, including

15  fees, *caused by the failure to comply* may be assessed against the noncomplying party."  *Batson v.*

16  *Neal Spelce Assocs., Inc.,* 765 F.2d 511, 516 (5th Cir. 1985) (finding "extraordinarily large

17  assessment of [alleged] expenses," totaling over $30,000, was "unreasonable on its face")

18  (emphasis added); *see also Tessera, Inc. v. Sony Corp.*, 2013 WL 5692109, *5 (N.D. Cal. Oct. 18,

19  2013) (denying request for over $600,000 in expert fees incurred on "reverse engineering project"

20  designed to investigate alleged violation of court order because such fees were not necessitated by

21  the violation at issue).  The Ninth Circuit has thus held that a party should not recover fees and

22  costs incurred if it chooses to respond to an inadvertent technical violation of a protective order by

23  launching a "spare-no-expense punitive expedition" disproportionate to the claimed violation.

24  *Dual-Deck*, 10 F.3d at 696.  That holding resonates here.  For instance, the insistence that

25  Samsung's good-faith attempts to investigate, report and remedy any alleged harm should result in

26  a wholesale waiver of Samsung's attorney-client privilege (Dkts. 2577-04, 2558-03, 2824, 2825)

27  has needlessly complicated and protracted these proceedings, driving up everyone's costs.  Much

28  the same holds for Apple's accusations.

1    Surely in no prior case have so many resources and expenses been devoted to address an

2  inadvertent disclosure of a single, incompletely-redacted document.  These efforts have served

3  only to confirm what Samsung and Quinn Emanuel have said from the beginning—that the

4  disclosure of confidential information was inadvertent and that such information was not used by

5  Samsung in this action or otherwise.  Particularly in light of Samsung's extensive remedial efforts

6  to date (*see supra* at 5-7), the large fees likely generated by Apple and Nokia in connection with

7  this exercise are precisely the type of "self-inflicted" injuries that are not properly offloaded for

8  Samsung and Quinn Emanuel to pay as sanctions.  *Dual-Deck.*, 10 F.3d at 696.

9       **2.      Apple's Recent Inadvertent Disclosures Of Confidential Information
                  Reinforce The Unreasonableness Of Imposing Any Sanction**

10

11    Apple's recent *public filings* of confidential information in Case No. 12-630 further show

12  that sanctions would be inappropriate here.  Apple (like Samsung) avers that inadvertence is to

13  blame for these "filing errors," thus confirming the commonsense proposition that humans—even

14  lawyers who are keenly aware of confidentiality obligations—make mistakes.  In light of Apple's

15  own unauthorized *public* filings of confidential information while this matter has been pending, it

16  would be particularly unjust to sanction Samsung or Quinn Emanuel for the regrettable but

17  inadvertent disclosure of a single incompletely-redacted document here.  *See, e.g.*, FED. R. CIV. P.

18  37, adv. com. note (1970) (Rule 37(b)'s "unjust" exception applies where "the prevailing party [in

19  the underlying discovery dispute] also acted unjustifiably"); *Rachel-Smith v. FTData, Inc.*, 247 F.

20  Supp. 2d 734, 739 (D. Md. 2003) (award of fees for discovery violation would be "unjust" given

21  history of discovery disputes between parties); *cf. Kirzhner v. Silverstein*, 870 F. Supp. 2d 1145,

22  1152 (D. Colo. 2012) (affirming denial of defendant's motion for attorneys' fees under Rule 37(a)

23  based on magistrate judge's "overall assessment of the conduct of defense counsel").

24    Indeed, Apple's recent experiences show the risk that time-consuming, satellite litigation

25  over sanctions could proliferate were the Court to order sanctions for the inadvertent disclosure

26  here.  In cases of this magnitude where thousands of lines must be reviewed and redacted through

27  years of litigation, it should not come as a surprise that counsel might make a mistake; were such

28  mistakes sufficient to warrant sanctions, sanctions litigation would become routine and the

-22-

1   burdens on the parties and courts would become immense.  Unless sanctions are properly reserved

2   for occasions that truly warranted them, sanctions for one could easily become sanctions for all.

## II.    THERE IS NO BASIS FOR SANCTIONS UNDER THE COURT'S INHERENT AUTHORITY

Outside the limited parameters of Rule 37(b), the Court of course has inherent authority to impose sanctions to police the parties and proceedings before it.  Such sanctions are inappropriate here because they require evidence of bad faith, of which there is none.

As the Supreme Court has cautioned, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991); *see also id.* at 50 ("A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees…."). "Before awarding sanctions under its inherent powers … the court must make an *explicit finding* that counsel's conduct '*constituted or was tantamount to bad faith.*'"  *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648-49 (9th Cir. 1997) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)) (emphasis added).  Conduct "tantamount to bad faith" exists in circumstances involving "willful actions, including recklessness when combined with an additional factor such as frivolous harassment, or an improper purpose."  *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001).  These findings are "especially critical when the court uses its inherent powers to engage in fee-shifting," *Primus*, 115 F.3d at 648, and must be supported by clear and convincing evidence, *see*, *e.g.*, *Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1476-78 (D.C. Cir. 1995); *cf. Lahiri v. Universal Music & Video Distr. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) (declining to decide burden of proof required for sanctions award).[11]

---

[11]   Similarly, any contemplated award of sanctions against Quinn Emanuel pursuant to 28 U.S.C. § 1927 governing "unreasonabl[e] and vexatious[]" conduct by counsel would require an explicit finding that counsel acted with "subjective bad faith."  *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989).  And criminal contempt (which is not at issue here and which would require a separate trial, *see* Fed. R. Crim. P. 42(a)) requires proof *beyond a reasonable doubt* that the person charged *willfully* violated a clear and definite court order.  *See,*
(footnote continued)

1          Consistent with the bad-faith requirement, the Ninth Circuit has repeatedly recognized that

2   inadvertent conduct *cannot* support sanctions under the court's inherent authority.  *Fink*, 239 F.3d

3   at 993 ("the district court may not sanction mere inadvertent conduct" under its inherent

4   authority); *Zambrano*, 885 F.2d at 1485 (vacating sanctions entered pursuant to inherent authority

5   where counsel's conduct "was only inadvertent").  Even "recklessness, without more, does not

6   justify sanctions under a court's inherent power."  *Fink*, 239 F.3d at 993-94.[12]

7          As shown above, after extensive discovery and expert investigation, there is no evidence of

8   bad faith or even willfulness on the part of Quinn Emanuel or Samsung.  To the contrary, there is

9   only proof that the transmission of confidential information at issue resulted from an inadvertent

10   lapse, and "[i]nadvertence is inconsistent with a finding of bad faith."  *City of Alexandria v. C L E*

11   *C O, Corp.*, ___ Fed. Appx. ___, 2013 WL 6104147, *1 (5th Cir. Nov. 20, 2013) (reversing inherent-

12   authority sanction where attorney inadvertently filed a confidential document on the public docket,

13   finding no basis upon which the district court could have substantiated a finding of bad faith).

14   Whatever basis may exist to sanction a party that intentionally disseminates information in

15   violation of a protective order or systematically abdicates good-faith efforts to comply with such

16   an order is not implicated on this record.  Inherent-authority sanctions are not warranted.

17   **III.   WERE THE COURT TO CONCLUDE THAT SANCTIONS ARE WARRANTED,**
**       DUE PROCESS REQUIRES ADDITIONAL SUBMISSIONS BEFORE IMPOSING**
18   **       SANCTIONS**

19          If the Court were to find sanctions warranted notwithstanding the above, due process

20   requires that Samsung be afforded the opportunity to make additional submissions concerning the

---

22   *e.g.*, *Miller v. City of Los Angeles*, 661 F.3d 1024, 1030 (9th Cir. 2011); 18 U.S.C. § 402.
23          [12]   Although the Supreme Court has long held that bad faith or its equivalent is a prerequisite
to an award of sanctions under the court's inherent authority, the Ninth Circuit recently held that,
in certain circumstances, sanctions may issue for a "willful violation" of a court order without a
24   showing of improper purpose.  *See Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1035
(9th Cir. 2012).  To the extent that decision can be reconciled with Supreme Court and prior Ninth
25   Circuit precedent, it does not support reliance on the court's inherent authority here because
nothing in the record could support of finding of willful or deliberate conduct by either Samsung
26   or Quinn Emanuel in violation of the Protective Order.  In any event, *Evon* involved conduct far
more egregious than here, as counsel was "willfully disobedient," intentionally disclosing
27   confidential documents despite knowing that they were subject to a protective order.  *Id.* at 1035.

28

*form* of the sanction prior to issuance of a final order.  The Ninth Circuit has long held that a court may not impose any form of sanctions in the absence of, at minimum, notice and an opportunity to respond.  *See, e.g.*, *Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 522 (9th Cir. 1983) (due process requires "that sanctions should not be imposed without" "notice, an opportunity to respond, and a hearing").  These due process protections include "the opportunity to challenge the reasonableness of the attorney's fees award." *Falstaff Brewing*, 702 F.2d at 784; *see also Mackler Productions, Inc. v. Cohen*, 225 F.3d 136, 146 (2d Cir. 2000) (vacating "compensatory sanction" where district court deprived attorney of due process right to notice and hearing by "failing to provide [him] with an opportunity to challenge the accuracy and reasonableness of [the requested attorneys' fees and costs]").  Thus, "[n]o sanction should be imposed without giving the disobedient party *notice of the particular sanction sought* and an opportunity to be heard in opposition to its imposition." *SEC v. Razmilovic*, __F.3d __, 2013 WL 6172543, *7 (2d Cir. July 22, 2013) (emphasis added).[13]

Here, neither the Court nor the parties requesting sanctions has yet proposed a particular sanction.  Samsung and Quinn Emanuel thus are unable to fully formulate arguments concerning questions that will govern the appropriateness of any ultimate sanction—for instance, whether the proposed sanction is "just" under the circumstances, *Shcherbakovskiy*, 490 F.3d at 140; whether the sanction is "specifically related to the particular 'claim' which was at issue in the order to provide discovery," *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001), and whether any requested attorneys' fees constitute "reasonable expenses … caused by the [alleged] failure" to comply, FED. R. CIV. P. 37(b)(2)(C).  Imposing sanctions without permitting Samsung and Quinn Emanuel an opportunity to respond to a specific proposed sanction would violate due process.

## **CONCLUSION**

No sanctions should be imposed against either Samsung or Quinn Emanuel.

---

[13]   This Court's Local Rule 37-4(3) contemplates a procedure in which a party moving for fees and costs as a sanction first "itemize[s] with particularity" the claimed expenses in a declaration accompanying the motion, after which the nonmoving party is afforded an opportunity to file an Opposition, *see* L.R. 7-3(a).  Apple and Nokia have not yet complied with Local Rule 37-4(3); should they seek to do so, Samsung and Quinn Emanuel are entitled to respond.

DATED:  December 2, 2013       QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By /s/ *Michael T. Zeller*


Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE
WHY SANCTIONS ARE NOT WARRANTED**

## **ATTESTATION**

I, Victoria F. Maroulis, am the ECF User whose ID and password are being used to file this Declaration.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Michael T. Zeller has concurred in this filing.


Dated:  December 2, 2013                    By:  */s/ Victoria F. Maroulis*
                                                 Victoria F. Maroulis

**SAMSUNG'S RESPONSE TO NOVEMBER 8, 2013 ORDER TO SHOW CAUSE
WHY SANCTIONS ARE NOT WARRANTED**