# EXHIBIT 23

(Unredacted Version of Document Sought To Be Sealed)

# In The Matter Of:

*APPLE INC.*
*v.*
*SAMSUNG ELECTRONICS CO., LTD., et al*

———————————————————————

## *PAUL HENRY KRISTIAN MELIN - Vol. 1*
### *November 25, 2013*

———————————————————————

# *HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

———————————————————————

APPLE INC., a California corporation,

        Plaintiff,


      v.                    Case No:
                          11-cv-01846-LHK


SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

        Defendants.

———————————————————————


***THIS ENTIRE TRANSCRIPT IS DESIGNATED
HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY***

Monday, November 25, 2013

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
MR. PAUL HENRY KRISTIAN MELIN

AT:  12.34 PM

Reported by:  Trish Brady, Accredited Realtime Reporter

```
 1                    A P P E A R A N C E S

 2

 3    Appearing on behalf of SAMSUNG, et al:

 4            QUINN EMANUEL URQUHART & SULLIVAN LLP
              865 South Figueroa Street
 5            10th Floor
              Los Angeles, California 90017
 6            Telephone:  213-443-3180
              Email: michaelzeller@quinnemanuel.com
 7
              BY:  MR. MICHAEL T. ZELLER, ESQ.
 8            and MS. RACHEL HERRICK KASSABIAN, ESQ.

 9
      Appearing on behalf of NOKIA and THE WITNESS:
10
              ALSTON & BIRD LLP
11            One Atlantic Center
              1201 West Peachtree Street
12            Atlanta, Georgia, 30309-3424
              Telephone:  404-881-7196
13            Email: randall.allen@alston.com

14            BY:  MR. RANDALL L. ALLEN, ESQ.
              and  MR. BRIAN PARKER MILLER, ESQ.
15
16    Appearing on behalf of APPLE INC.,:

17            WILMER CUTLER PICKERING HALE AND DORR LLP
              1875 Pennsylvania Avenue
18            NW, Washington D.C., 20006
              Telephone: +1 202 663 6327
19            Email: gregory.lantier@wilmerhale.com

20            BY: MR. GREGORY H. LANTIER, ESQ.

21
22    Also Present:

23            MR. RON ANTUSH (In-house Counsel, NOKIA)

24    Legal Videographer:

25            MR. PHILLIP HILL
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 3

```
 1

 2                    I N D E X

 3

 4   Witness (sworn)                        Page No:

 5

 6   MR. PAUL HENRY KRISTIAN MELIN          6

 7

 8   DIRECT EXAMINATION BY MR. ZELLER:          6

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 4

```
 1                   E X H I B I T S

 2

 3    Exhibit No:        Description:              Page No:

 4

 5
         MELIN 1         Document titled "Patent ... ... 165
 6                       License Agreement Meeting,
                         Meeting between Nokia and
 7                       Samsung, Seoul, 4 June 2013,
                         Subject to NDA", Bates
 8                       labelled NOK000001-000005

 9    MELIN 2            Document entitled "Declaration  229
                         of Paul Melin", dated June 28,
10                       2013

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1    (12.34 pm)

 2            VIDEOGRAPHER:  This is the beginning of

 3    videotape number 1, Volume I.  This is the video

 4    operator speaking, Phillip Hill of Merrill Legal

 5    Solutions, New York office at 225 Varick Street,

 6    New York, New York 10014.

 7            Today's date is November 25th, 2013.

 8    The time on the video screen is 12:34 in the

 9    afternoon in Helsinki in Finland.  We are at the

10    Helsinki offices of Bird & Bird to take the

11    videotaped deposition of Paul Melin.  This is

12    taken in the matter of Apple Inc., versus

13    Samsung Electronics Co., Ltd, et al.

14            This is being heard in the United States

15    District Court, Northern District of California,

16    San Jose Division, case number 11-cv-01846-LHK.

17            Please will counsel introduce themselves

18    and state whom they represent.

19            MR. ZELLER:  Mike Zeller on behalf of

20    Samsung.

21            MS. KASSABIAN:  And Rachel Kassabian on

22    behalf of Samsung.

23            MR. ALLEN:  Randall Allen on behalf of

24    Nokia and the witness.

25            MR. LANTIER:  Greg Lantier on behalf of
```

Page 6

```
 1    Apple.
 2              VIDEOGRAPHER:  The court reporter today
 3    is Mrs. Trish Brady on behalf of Merrill Legal
 4    Solutions, London office.  Please will the
 5    court reporter swear in the witness.
 6              MR. PAUL HENRY KRISTIAN MELIN
 7                 Having been duly sworn,
 8                  Testified as follows:
 9              VIDEOGRAPHER:  Thank you very much, sir.
10    Thank you.
11    DIRECT EXAMINATION BY MR. ZELLER:
12              MR. ZELLER:  Good afternoon.
13              A.   Good afternoon.
14              Q.   If you could please tell us your
15    full name for the record?
16              A.   Paul Henry Kristian Melin.  It's
17    Kristian with a "K-r".
18              Q.   And you pronounce it Melin?
19              A.   Melin.
20              Q.   And have you ever gone by any other
21    name?
22              A.   No.
23              Q.   What is your current position with
24    Nokia?
25              A.   I am the chief IP officer.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 7

```
 1              Q.    And how long have you had that

 2   position?

 3              A.    Well, I have had substantially this

 4   role since mid-2010 and this title for

 5   approximately one year.

 6              Q.    How long have you worked for Nokia?

 7              A.    Since August 2007.

 8                    [Interruption.]

 9         MR. ALLEN:  It's OK, we're good thank

10   you.  Thank you.

11         BY MR. ZELLER:

12              Q.    What was your title when you began

13   in August of 2007?

14              A.    Director of technology strategy --

15   I'm sorry, it was 2004, not 2007.

16              Q.    Please tell me what your position

17   was with Nokia when you began in 2004 with the

18   company?

19              A.    Director of technology strategy.

20              Q.    How long did you hold that

21   position?

22              A.    Approximately two years.

23              Q.    What did your title or position

24   become after that two-year period?

25              A.    Director of IPR strategy and
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1    business development.
 2              Q.   And how long did you hold that
 3    title or position?
 4              A.   Approximately two years.
 5              Q.   And then what was your next title
 6    or position?
 7              A.   General manager of patent
 8    licensing.
 9              Q.   Is that the position you held up
10    until 2010, when you became chief IP officer?
11              A.   Yes.  Initially my title was
12    vice president of intellectual property, in 2010.
13              Q.   And generally speaking in these
14    various positions, did you have substantially the
15    same responsibilities or did they change over
16    time?
17              A.   They changed over time.
18              Q.   So then if you would please tell me
19    what were the nature of your responsibilities when
20    you began in 2004?
21              A.   I was in a -- in a group called
22    technology platforms and my responsibility was --
23    was the strategy relating to technology
24    investments and -- and R&D investments overall at
25    Nokia's devices business.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1              Q.   Did you have any role in connection

 2    with patent licensing in that position?

 3              A.   No.

 4              Q.   And then you said your next

 5    position was director of IPR strategy?

 6              A.   IPR strategy and business

 7    development.

 8              Q.   And what was the nature of your

 9    responsibilities in that role?

10              A.   I was responsible for IPR,

11    intellectual property rights related strategies

12    and the business development activities.

13              Q.   Please tell me, just generally

14    speaking, what did that mean?

15              A.   It meant driving their strategy

16    work of their -- Nokia's intellectual property

17    group and participating and -- and being

18    responsible for certain negotiations.

19              Q.   Was patent licensing part of your

20    responsibilities in that position?

21              A.   My responsibilities has to do with

22    patent licensing, but I was not myself responsible

23    for Nokia's patent licensing activities.

24              Q.   And how did patent licensing relate

25    to your job in that director position?
```

```
 1              A.    I participated in some licensing

 2    negotiations.

 3              Q.    Was that the first time in your

 4    career, even before Nokia, in which you had been

 5    involved directly in negotiations for patent

 6    licenses?

 7              A.    Yes.

 8              Q.    In these licensing discussions that

 9    you were involved with in that position, did you

10    have direct contact then with -- with other

11    parties?

12              A.    Yes.

13              Q.    And during that time period,

14    approximately how many different licensing

15    discussions did you have with third parties or

16    outside parties?

17              A.    When you say that time period, can

18    you be more specific what time period you are

19    referring to?

20              Q.    I am referring when you held this

21    position of director of IPR strategy for about

22    that three-year time period?

23              A.    I don't -- don't recall exactly how

24    many -- how many negotiations I participated, but

25    it most likely would be more than five different
```

```
 1    companies.

 2              Q.    And which companies do you recall?

 3              A.    I recall Qualcomm.

 4              Q.    Others?

 5              A.    I may have participated in

 6    discussions with Samsung at that time, but I'm not

 7    sure about that.

 8              Q.    Any others you recall when you were

 9    in that position?

10              A.    Not at this time.

11              Q.    Let me ask more generally,

12    approximately how many companies have you been

13    involved with where you were directly engaged in

14    patent licensing discussions?

15              A.    Now, are you asking again with

16    respect to that specific time period or --

17              Q.    No.  I'm asking during the course

18    of your entire work with Nokia.

19              A.    I have never counted them exactly

20    but that would be more than 30 companies.

21              Q.    I take it at some point, a

22    substantial portion of your responsibilities or

23    the time that you spent in your position started

24    to become direct negotiations with other parties

25    over patent licensing, is that a fair statement?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 12

```
 1              A.   That's right.

 2              Q.   And approximately, when did that

 3    begin?  When did that really become a substantial

 4    part of your -- your role or your time?

 5              A.   Well, when I was director of IPR

 6    strategy and business development, I was not

 7    involved in many different negotiations but being

 8    involved in those few cases was a very substantial

 9    portion of my role already at that time.  But when

10    I became general manager of patent licensing,

11    licensing negotiations became very much my main

12    role.

13              Q.   And you said you may have a memory

14    when you were the director of IPR strategy of some

15    negotiations with Samsung.  Is there -- is there

16    some time when you can recall for sure having your

17    first negotiations with anyone at Samsung over

18    patent licensing?

19              A.   I don't recall when I had my first

20    meeting with Samsung.  That's why I'm not sure

21    whether it was during my time as director of IPR

22    strategy and business development or whether it

23    would have been after I became responsible for

24    Nokia's licensing overall.

25              Q.   Right, and I understand.  I'm --
```

1    I'm trying to find out which is the first when you

2    do recall for certain having discussions with

3    Samsung.  There's one that you said you weren't

4    entirely sure about.  Now I am trying to find out

5    what's your first memory that you do have for

6    sure?

7                A.   I don't -- do not recall any

8    particular dates of those -- those meetings with

9    Samsung.

10               Q.   Do you recall the nature of the

11   discussions?

12               A.   Yes.

13               Q.   What is it you recall about the

14   nature of the discussions?

15               A.   The nature of the discussions was

16   relating to entering into a patent license between

17   Nokia and Samsung.  Primarily the discussions

18   involved standardization products.

19               Q.   And were these negotiations that

20   led to the actual license that -- that has existed

21   between Nokia and Samsung; in other words, the one

22   that's currently under discussion for extension?

23               A.   Well, those discussions first

24   resulted into an agreement between Nokia and

25   Samsung in 2009 and then negotiations were -- were

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 14

```
 1   restarted then and then resulted in the 2010

 2   agreement, but -- but there was this 2009

 3   agreement in between.

 4           Q.   Right.  And -- and part of what

 5   I guess I'm ...

 6           Let me try it this way.  What I'm trying

 7   to find out is -- is: did you personally

 8   participate in the negotiations that resulted in

 9   the 2010 agreement --

10           A.   Yes.

11           Q.   -- between Nokia and Samsung?

12           A.   Yes.

13           Q.   Were you the lead negotiator for

14   that or was there somebody else who was the lead

15   negotiator for Nokia on that?

16           A.   Again, you are now asking about the

17   2010 agreement?

18           Q.   Correct.

19           A.   I believe I was the lead

20   negotiator.  Other people of course also

21   participated in the -- in the discussions, but

22   I had the main responsibility for our negotiation

23   approach.

24           Q.   And who at Samsung did you deal

25   with the most?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1              A.   For the 2010 agreement you ask?

 2              Q.   Correct.

 3              A.   It was a gentleman called Wy T. Lee

 4      if I recall correctly his name.

 5              Q.   Have you had your deposition taken

 6      before?

 7              A.   Yes.

 8              Q.   How many occasions?

 9              A.   I recall three occasions.

10              Q.   What was the first occasion?

11              A.   It was relating to a matter between

12      Nokia and InterDigital.

13              Q.   I'm sorry, Nokia and...?

14              A.   InterDigital.

15              Q.   InterDigital.  And generally, what

16      was the subject matter of your testimony in that

17      deposition?

18              MR. ALLEN:  Mike, how is that relevant

19      to the topics that the court has authorized

20      discovery on?

21              BY MR. ZELLER:

22              Q.   We're going to find out.

23              Please go ahead and answer.

24              MR. ALLEN:  I'm going to -- we're going

25      to limit the deposition today to the subject
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 16

```
 1    matters that the court has authorized you to do

 2    discovery on --

 3              MR. ZELLER:  Are you instructing him not

 4    to answer?

 5              MR. ALLEN:  Just let me finish.  I'm

 6    going to let him describe this generally, but

 7    we're not going to go into detail about

 8    negotiations in depositions with other parties.

 9              BY MR. ZELLER:

10         Q.   Please answer the question.

11         A.   Please repeat the question.

12         Q.   Please tell me, what was the

13    general nature of your testimony in the

14    InterDigital case?

15         A.   It related to patent matters but I

16    don't recall specifically.

17         Q.   Other than it related generally to

18    patent matters, is there anything else you recall

19    about the subject of your testimony?

20         A.   As I sit here today, no.

21         Q.   What was the time period when your

22    deposition was taken?

23         A.   I don't recall.

24         Q.   Was it more than a year ago?

25         A.   Probably, but I don't recall.
```

```
 1            Q.   More than three years ago?

 2            A.   Probably not, but I do not recall

 3    exactly.

 4            Q.   Was that the first time you ever

 5    had your deposition taken?

 6            A.   I believe your question was when

 7    I had my first deposition taken, so, yes, by

 8    definition.

 9            Q.   Do you have a copy of that

10    transcript?

11            A.   No.

12            Q.   Do you know who does?

13            A.   I don't.

14            Q.   What was the second occasion which

15    you had your deposition taken?

16            A.   I don't recall which occurred

17    earlier; the deposition that was taken in

18    connection with Nokia's litigation with HTC or the

19    second time I was deposed in a matter with

20    InterDigital.  But one -- one or the other was the

21    second one.

22            Q.   So you were deposed twice in -- in

23    one of most matters?

24            A.   I have been deposed twice in

25    connection with Nokia's matters with InterDigital
```

1    and once in a matter with respect to HTC.  The

2    first one was with InterDigital.  I don't recall

3    whether the second occasion was with the HTC one

4    or the second time in connection with

5    InterDigital.

6              Q.   Well, focusing on the second

7    occasion in which you were deposed in the

8    InterDigital matter, what was the subject matter

9    of your testimony in that on that occasion?

10             A.   It was relating to patent

11   licensing.

12             Q.   Anything else you recall generally

13   about the subject of it?

14             A.   No.

15             Q.   Did you testify about FRAND in that

16   deposition?

17             A.   The topics may have related to

18   FRAND.

19             Q.   The first time when you were

20   deposed in the InterDigital matter, did it relate

21   to FRAND topics in any way?

22             A.   I don't recall.

23             Q.   In either of those depositions, did

24   you testify about the Nokia/Apple license?

25             A.   I don't recall.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 19

1                    Q.    You don't recall one way or

2        another?

3                    A.    No, I don't recall any of the

4        specific questions.

5                    Q.    Is your -- is your memory that it

6        did not come up?

7                    A.    No, I don't recall the specific

8        questions.

9                    Q.    So the Apple/Nokia license may have

10       been asked about in those depositions, it may not

11       have; you just don't recall one way or another?

12                   A.    That's right.

13                   Q.    What was the subject matter of your

14       testimony in the HTC matter?

15                   A.    It was relating to patent

16       licensing.

17                   Q.    What about patent licensing?

18                   A.    I don't recall the specific topics.

19                   Q.    Well, whether you recall the

20       specific topics, do you recall anything generally

21       about what the nature of your testimony was in the

22       HTC matter as it related to patent licensing?

23                   A.    I recall that there were questions

24       relating to some of Nokia's license agreements

25       and -- and Nokia's licensing practices.  But other

```
 1    than that, I don't recall the specific topics.

 2              Q.   Did you testify about the

 3    Apple/Nokia license in the HTC deposition?

 4              A.   I don't recall whether there were

 5    any specific questions asked relating to that

 6    license.

 7              Q.   In any of these depositions, did

 8    you testify as to the terms of any license that

 9    Nokia has with any third party?

10              A.   I don't recall.

11              Q.   Were any of those depositions

12    compelled by a court?

13              A.   I don't know.

14              Q.   Did Nokia obtain permission from

15    any third party to disclose the terms of any Nokia

16    license with that third party in the course of any

17    of these depositions?

18              A.   I don't recall.

19              Q.   Did it provide notice to any such

20    third party?

21              A.   I don't know.

22              Q.   I take it you don't know who has

23    copies of the second deposition that you did in

24    the InterDigital matter?

25              A.   Yes, I don't know.
```

```
 1              Q.    Is the same true of the HTC

 2    deposition?

 3              A.    Yes.

 4              Q.    What law firm represented you at

 5    the HTC deposition?

 6              A.    I believe it was Alston & Bird, but

 7    I am not quite sure.

 8              Q.    Who represented you in connection

 9    with the InterDigital depositions?

10              A.    Alston & Bird.

11              Q.    Do you have any reason to doubt

12    that they have copies of those transcripts?

13              A.    I don't.

14              Q.    Did the subject of FRAND come up at

15    the HTC deposition?

16              A.    I don't recall.

17              Q.    Is it your expectation that it did?

18              MR. ALLEN:  Objection to the form of the

19    question, calls for speculation.  You may answer

20    his question.

21              A.    Are you asking me to speculate?

22              BY MR. ZELLER:

23              Q.    I am asking you if it is your

24    expectation, based upon all of your knowledge that

25    you have, that the subject of FRAND was the
```

```
 1    subject of -- of questioning at the deposition?

 2              MR. ALLEN:  Same objection.  You may

 3    answer.

 4              A.   That -- the deposition happened and

 5    FRAND either was or was not asked about and I just

 6    don't recall.

 7              BY MR. ZELLER:

 8              Q.   What was your understanding of what

 9    the HTC matter was about?

10              MR. ALLEN:  Objection, asked and

11    answered.

12              BY MR. ZELLER:

13              Q.   No, I'm talking about the case.

14              A.   No, I think you asked about the

15    deposition, and I don't think I understand the

16    question.

17              Q.   What was your understanding of what

18    the dispute was as it related to HTC?

19              A.   There was an International Trade

20    Commission complaint by Nokia against HTC

21    products.

22              Q.   And did these -- any of these

23    patents involve standard essential patents?

24              A.   No.

25              Q.   What was the time period when the
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 23

```
 1   HTC deposition occurred?
 2           A.   I don't recall that, when it
 3   happened.
 4           Q.   Was it in the last year?
 5           A.    It may have been within the last
 6   year, but it may have been a little bit earlier as
 7   well.  I don't recall the exact time.
 8           Q.   When did the second InterDigital
 9   deposition occur?
10           A.    It occurred either before or after
11   the HTC deposition, but I don't recall the exact
12   time.
13           Q.   Did that occur more than a year
14   ago?
15           A.   I don't recall.
16           Q.   Did it occur more than two years
17   ago?
18           A.   I don't think so.
19           Q.   Have you ever testified under oath,
20   in any kind of court proceeding or arbitration,
21   setting aside of course the depositions we have
22   already talked about?
23           A.   Yes.
24           Q.   And what other occasions have you
25   testified under oath?
```

```
 1              A.   At the International Trade
 2   Commission in connection with the matter with
 3   InterDigital.
 4              Q.   When -- when did that testimony
 5   occur?
 6              A.   I don't recall the date.
 7              Q.   Was that within the last year?
 8              A.   Probably was, but I am not quite
 9   sure.
10              Q.   Other than in connection with the
11   InterDigital matter in the ITC, have you ever
12   testified under oath before a court or a
13   arbitration panel, again setting aside the
14   depositions?
15              A.   Yes.
16              Q.   What other occasions?
17              A.   In an arbitration with Motorola and
18   another arbitration with Research In Motion.
19              Q.   And what was the nature, generally
20   speaking, of your testimony in the Motorola
21   arbitration?
22              A.   It was related to a contract
23   dispute.
24              Q.   Did it involve patents in any way?
25              A.   Yes.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 25

```
 1              Q.   Were there patent infringement

 2    claims of -- of any kind asserted?

 3              A.   No.  As I said, it was a contract

 4    dispute.

 5              Q.   Well, they're not mutually

 6    exclusive.  Were there patent infringement claims

 7    of any kind that were asserted?

 8              A.   When you say patent infringement

 9    claims of any kind, can you be more specific?

10    What -- what do you mean with that?

11              Q.   Did any party in those proceedings

12    assert that the other party infringed upon its

13    patents in any way?

14              A.   I don't recall.

15              Q.   What was the nature of your

16    testimony in the -- the RIM arbitration?

17              A.   It was relating to a contract

18    dispute.

19              Q.   Were patent infringement claims

20    asserted by anyone in that case?

21              A.   That depends how one construes

22    patent infringement.

23              Q.   Well, please tell me what, in your

24    view, potentially related to patent infringement

25    in connection with that dispute?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 26

```
 1            A.    That dispute related to -- related

 2    to a dispute about the scope of a license

 3    agreement and therefore related to potential

 4    unauthorized use of patents.

 5            Q.    Were any of the patents in the RIM

 6    matter claimed by any party to be SEPs?

 7            A.    What do you mean with SEPs?

 8            Q.    Were any of them claimed or

 9    asserted by anyone to be standard essential

10    patents, the patents that were at issue

11    potentially in the RIM arbitration?

12            A.    When you say standard essential

13    patents, in what context do you mean standard

14    essential?

15            Q.    I mean that any party asserted or

16    made an argument that any patent was a standard

17    essential patent.  Whether or not it was actually

18    an SEP or not, some party claimed it was.  That's

19    what I mean by that.

20            So with that understanding, were any

21    SEPs involved in the RIM arbitration?

22            A.    I'm not quite sure I still

23    understand the question.  When you say SEPs, are

24    you meaning SEPs as in the standard setting

25    organizations, IPR policies and -- and the meaning
```

```
1    how they define SEPs or, are you including the

2    potential use of -- of defined terms in an

3    agreement that relate to standards?

4           Q.   It's any and all of those and,

5    again, it does not matter whether it's actually an

6    SEP.  I am asking if anyone asserted that any of

7    the patents were SEP whether they, in fact, were

8    or not?

9

                                           But -- but I'm still not

13   sure about what you were actually asking there, so

14   I don't know whether the question -- the answer to

15   your question is "yes" or "no".

16          Q.   Well, you -- I think we're on the

17   same page.  I think you are answering it because

18   again I am not trying to make a determination as

19   to whether or not a patent actually was an SEP.

20   I'm just trying to find out if someone in that

21   dispute asserted at least one patent was SEP and

25   RIM alleged that some patents were licensed, but
```

████   ███████████████████████████

████   ████████████████████████████████

████   ████████████████████████

4                So -- so I will leave it at that.

5                Q.   Did RIM assert that any Nokia

6     patents that were involved, or potentially

7     involved, were subject to FRAND obligations?

8                A.   I don't think that was the subject

9     matter of the dispute, but I do not recall.

10               Q.   Did the arbitration with Motorola

11    pertain, in any way, to FRAND obligations or

12    asserted FRAND obligations?

13               A.   The arbitration related to contract

14    interpretation and not to FRAND obligations

15    per se.

16               Q.   You say per se.  Did, in any way,

17    the issue of FRAND come up in the dispute with

18    Motorola?

19               A.   The license agreement related to

20    certain standards, but I do not recall whether the

21    FRAND obligations came up in the proceedings in

22    any way.

23               Q.   Other than what you've described,

24    were there any other instances in which you

25    testified under oath before any court or in any

```
 1    arbitration?

 2              A.   I can't recall any other instances.

 3              Q.   What was the time period when the

 4    Motorola arbitration occurred?

 5              A.   I believe it was 2010, but I am not

 6    quite sure.

 7              Q.   When was the RIM arbitration?

 8              A.   I don't recall the exact time.

 9              Q.   Was it the last two years?

10              A.   I believe it was within the last

11    three years, but I don't recall the exact time.

12              Q.   Where did the Motorola arbitration

13    take place?

14              A.   New York.

15              Q.   Where did the RIM arbitration take

16    place?

17              A.   Stockholm.

18              Q.   Was your testimony in either of

19    those instances transcribed?

20              A.   I don't know.

21              Q.   Who represented Nokia in the

22    Motorola arbitration?

23              A.   Alston & Bird.

24              Q.   Who represented Nokia in the RIM

25    arbitration?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 30

```
 1              A.   Bird & Bird.

 2              Q.   Other than the instance in which

 3    you submitted a sworn declaration in connection

 4    with the Samsung matter that brings us here today,

 5    have you ever signed a declaration or affidavit

 6    under oath?

 7              A.   I believe I have verified certain

 8    documents relating to Nokia's legal proceedings.

 9    I don't know whether those are classified as being

10    under oath or not.

11              Q.   Have you ever submitted a written

12    statement that was under oath that discussed or

13    related to FRAND in any way?

14              A.   I don't recall.

15              Q.   Have you ever submitted a written

16    statement that was under oath that discussed or

17    related to SEPs in any way?

18              A.   I don't recall.

19              Q.   Have you ever submitted a written

20    statement that was under oath that discussed or

21    related to the Apple/Nokia license in any way,

22    apart from the Samsung case that brings us here

23    today?

24              A.   I don't recall.

25              Q.   Have you ever submitted a written
```

1    statement that was made under oath that discussed

2    or related to any license, any patent license that

3    Nokia has had with anyone, again setting aside the

4    one you submitted in the Samsung case?

5              A.   I don't recall or actually, I --

6    I do recall that in the -- those arbitrations

7    that -- that we have had, I had submitted some

8    statements but I don't recall the subject matter

9    of those statements.

10             Q.   In connection with the

11   arbitrations, did you testify about any Nokia

12   licensing agreements?

13             A.   I don't recall.

14             Q.   So you might have, might not have,

15   you're just not sure?

16             A.   Yes.

17             Q.   In the course of -- I take it from

18   time to time you have been involved in mediations

19   on behalf of Nokia where a mediator or a

20   settlement officer was present?

21             A.   I don't recall having been involved

22   in a mediation myself.

23             Q.   Or any kind of settlement

24   discussion with anyone?

25             A.   I have been in multiple settlement

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 32

1    discussions, but I don't recall having used a

2    mediator.

3              Q.    During the course of settlement

4    discussions that you have had on behalf of Nokia,

5    have you ever disclosed the terms for any license

6    that Nokia has, even if the name of the licensee

7    or licensor was not mentioned?

8              MR. ALLEN:  Mike, let me interpose an

9    objection.  I've let this go on.  We're here today

10   to talk about two subjects authorized by the

11   court.  I'm going to ask you again to rein the

12   discussion back into the two subjects that have

13   been authorized by the court, and I will instruct

14   the witness not to answer further questions unless

15   you bring him back to the case.

16             MR. ZELLER:  This is directly related to

17   the -- the alleged confidentiality of these terms.

18   So I'm trying to find out about disclosure.

19   Instruct him or not, but the question stands.

20             MR. ALLEN:  Fair point.  I think you're

21   asking him about disclosure of any license.  If

22   you want to ask him about disclosure of the

23   Apple/Nokia license, that would be related to the

24   subject matter that the court has authorized.

25             MR. ZELLER:  Are you instructing on that

```
 1    question?

 2              MR. ALLEN:  I will allow the witness --

 3    the witness to answer with regard to the

 4    Apple/Nokia license.

 5              MR. ZELLER:  That's not my question.  My

 6    question is directly relevant.

 7              MR. ALLEN:  Can you explain to me how.

 8    Just help me out here.

 9              MR. ZELLER:  It goes to whether or not

10    Nokia treats these -- these license terms as being

11    confidential and that is a direct question.  So he

12    can -- he can either answer or you can instruct.

13              Q.   Do you need the question read back?

14              A.   I do.

15                   (Record read.)

16              MR. ALLEN:  I will object to the

17    question and I'll instruct the witness; you may

18    answer that question with regard to the

19    Apple/Nokia also only.

20              MR. ZELLER:  That's not the question at

21    hand --

22              MR. ALLEN:  It's --

23              MR. ZELLER:  You are either instructing

24    him on that question or you're not.  I'll ask

25    questions later about Apple/Nokia, but this is a
```

```
 1    directly relevant question and I assure you we're

 2    going to ask for an adverse inference against

 3    Nokia if you instruct him not to answer that

 4    question, and I'm entitled to know it.

 5              Please read it back and either instruct

 6    him not to answer or not.  You -- you're not

 7    allowed to instruct him on a question I have not

 8    asked.  It's that simple.

 9              MR. ALLEN:  I'm going to instruct him

10    the same way again.  You can pose it again if you

11    want, but you'll get the same instruction.

12              BY MR. ZELLER:

13              Q.  Well then, let's make a clear

14    record on this --

15              A.  I don't think I understood the

16    question even.

17              Q.  Have you ever disclosed the terms

18    for any Nokia license to anyone, even if the names

19    of the other party have not been mentioned?

20              A.  When you say the terms of any Nokia

21    license, do you mean all the terms --

22              Q.  Any --

23              A.  -- of such license?

24              Q.  Any terms.

25              A.  So -- so basically you are -- if
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

1      I understand your question correctly, you are

2      asking me whether we have ever disclosed any

3      single term of any of our license agreement, even

4      without disclosing with whom that party --

5                Q.   That's right.

6                A.   -- would be?

7                I want to help you here, so let me --

8      let me -- let me think through, that I answer your

9      question accurately.

█

█

█

█

█

█

█

17               So if, under your question, you

18     understand that to be within the scope that you

19     were asking, whether Nokia has made such

20     statements, then the answer would be yes.

21               Q.   And approximately on how many

22     occasions are you aware of that occurring?

23               A.   As your question does not relate to

24     what terms are made available, but -- but

25     basically contextual information around those

1    terms, I -- I wouldn't be aware of that having

2    happened in any meetings where I myself would not

3    have been present.  I don't recall how many cases

4    that would be.

5              Q.   Do you have a -- do you have an

6    estimate; could you tell me if it's, say, more

7    than five, 10 or some set number?

8              A.   I cannot really estimate this.

9    Basically, I just want to make clear that -- that

10   I am only referring to a situation where we say

11   that -- that these are the generally available

12   royalty terms and we have existing licensees who

13   have accepted substantially these terms, which is

14   a very generic statement.

15             I don't recall specific instances of

16   having said that in -- on many occasions but I --

17   I wouldn't be surprised if that would be more than

18   five.

19             Q.   Are there particular occasions on

20   which you can recall that information being stated

21   or provided to the other party?

22             A.   Yes.

23             Q.   This specific instance you are

24   talking about.  If you please tell me which ones

25   you recall?

```
 1                A.   I recall one meeting with Samsung,

 2     which is the subject matter of this deposition,

 3     where we told Samsung that -- that Nokia has

 4     licensees who are paying certain royalty rates

 5     that were indicated on a PowerPoint slide during

 6     that discussion without disclosing who those

 7     licensees are.

 8                Q.   And when you say the -- that

 9     meeting with Samsung, you are referring to the

10     June 4, 2013 meeting?

11                A.   Yes.

12                Q.   And so we'll come back to that.

13                What other occasions can you recall the

14     information being conveyed to another party?

15                A.   I cannot recall any other specific

16     occasion.

17                Q.   You recall generally that it --

18     that it occurred.  You just can't recall exactly

19     who the other party was?

20                A.   I don't recall that it would have

21     definitely occurred, but -- but the type of

22     generic statement that:  Here are our generically

23     available royalty terms and we have licensees who

24     have accepted these terms... is such a generic

25     thing to say that I -- I wouldn't be surprised if
```

1    we have said that on multiple occasions.  But I

2    don't recall any such specific occasion, apart

3    from this discussion with Samsung.

4              Q.   Is there anyone else at Nokia who

5    you think has information about instances in which

6    that -- that may have occurred?

7              MR. ALLEN:  Objection, calls for

8    speculation.  You may answer his question.

9              A.   I would assume each person who was

10   responsible for license negotiations could --

11   could think of his or her own discussions.  But

12   other than that, I don't know who would have such

13   information.

14             BY MR. ZELLER:

15             Q.   And approximately, how many other

16   people are responsible for license negotiations

17   there at Nokia?

18             A.   We have approximately 10 -- 10

19   individuals whose primary responsibility is patent

20   licensing.

21             Q.   And do all those individuals report

22   to you?

23             A.   Not directly.

24             Q.   Indirectly?

25             A.   Indirectly.  Directly or

1    indirectly, yes.

2              Q.   Has there ever been an instance in

3    which you have ever been told or learned the terms

4    of a license that another party had entered into

5    even if you did not know the name of the other

6    party?

7              MR. ALLEN:  This is getting too far

8    afield.  I'm going to instruct the witness not to

9    answer.

10             BY MR. ZELLER:

11             Q.   It's true you have been told, in

12   the course of settlement discussions or

13   negotiations, the financial terms of other

14   parties' licenses, even if you were not told the

15   names, correct?

16             MR. ALLEN:  We're -- we're not going to

17   get into negotiations or discussions with other

18   parties.  This is a deposition that has been

19   tailored by the court and you're not following it,

20   and I'll instruct the witness not to answer.

21             BY MR. ZELLER:

22             Q.   It's true that you were told the

23   terms, the financial terms of Samsung licenses

24   previously, correct?

25             MR. ALLEN:  I'll let you answer that

```
 1    question.

 2              A.   I don't think I understood the

 3    question.  When you say Samsung's licenses, do you

 4    mean Samsung's licenses with whom?

 5              BY MR. ZELLER:

 6              Q.   Anyone.

 7              A.   So you -- can you then repeat the

 8    question?

 9              Q.   You have been told or learned the

10    terms of Samsung licenses with other parties,

11    correct?

12              MR. ALLEN:  Parties other than Nokia?

13              MR. ZELLER:  Correct.

14              A.   I don't think I have learned any

15    terms of Samsung's licenses with anyone else than

16    Nokia.

17              Q.   You say you don't think.  Are you

18    saying you are denying it?

19              A.   Denying what?

20              Q.   Are you denying that you have been

21    told, or learned, the terms of Samsung's licenses

22    with parties other than Nokia?

23              A.   I don't recall having ever been

24    told any terms of Samsung's licenses with any

25    other party than Nokia.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1              The only thing that I recall is that
 2    there may have been in the public some references
 3    to some terms of Samsung's license with Qualcomm,
 4    which may have become public in the course of some
 5    litigation.  But I don't recall those terms, so I
 6    am not sure whether that would have happened.
 7    That would have been something that I would have
 8    read in the press rather than been told.
 9              Q.   Any other instances?
10              A.   No.
11              Q.   Is the -- do you typically or
12    regularly follow press about licensing agreements
13    in the -- in the industry as part of your job?
14              A.   I generally follow -- follow the
15    press in our industry.
16              Q.   And what kind of publications do
17    you typically follow for that subject?
18              A.   I follow technology industry
19    websites that report news in our sector, such as
20    in gadget.com.
21              Q.   Do you ever ask -- would you ever
22    yourself, as part of your job responsibilities, do
23    searches to find out what kind of publicly
24    available information there is about other
25    parties' licenses?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 42

```
 1              A.   No.  I -- I don't ever recall

 2   having made any particular search relating to

 3   anybody else's licenses.  That is typically highly

 4   confidential information and I wouldn't expect to

 5   find such information.

 6              Q.   Well, you certainly knew that there

 7   was press about Nokia's license with Apple,

 8   correct?

 9              A.   Well, I recall that there has been

10   press speculation about the terms of Nokia's

11   license with Apple, but not information.

12              Q.   Well, that speculation, as you call

13   it, was so accurate that Nokia actually undertook

14   an investigation to find out the source of those

15   press reports, correct?

16              A.   I'm not really aware of any such

17   investigations.  It sounds very surprising to me.

18              Q.   Did Nokia undertake any efforts at

19   all -- call it an investigation, call it what you

20   will -- in order to determine what the source was

21   of the information reported in any of the press

22   reports about the Apple/Nokia license?

23              A.   I'm only aware of press speculation

24   about the terms of the Nokia/Apple license.  I'm

25   not aware of any reason to even attempt to find
```

```
 1    out whether such speculation would be coming, so

 2    it sounds very odd to me.

 3              Q.    I'm not asking if it sounds odd to

 4    you.  Are you denying that Nokia undertook efforts

 5    to find out what the source was of information

 6    concerning the Apple/Nokia license that was

 7    reported in the press; "yes" or "no"?

 8              A.    When you say that was reported in

 9    the press, I don't think the Nokia license

10    agreement terms have ever been reported in the

11    press.  So your question is -- is not structured

12    in a way where it can be answered.

13              Q.    Well, you were aware that there

14    were press reports that said that the upfront

15    payment that Apple made to Nokia under the license

16    was EUR500 million, correct?

17              A.    I am aware that some press reports

18    have speculated about the terms and -- and those

19    speculations may have included a guess of the --

20    of the upfront payment being EUR500 million.  But

21    we have not seen anybody in the press accurately

22    report the financial terms of the Nokia/Apple

23    agreement.  So, we have had no reason to conduct

24    any investigation into a matter that is not a

25    matter.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 44

```
 1          Q.   I am not asking about investigation

 2   at this point.  I am asking a very simple question

 3   let let's break this down.  You saw press reports

 4   that said that the upfront payment that Apple made

 ▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

 6          A.   When you say press reports that

 7   said that the amount was...  Are you saying that

 8   the -- that those would have been reports of a

 9   fact rather than reports representing the estimate

10   of journalists or analysts?

11          Q.   My question is a very simple one.

12          You saw press articles that stated that

13   the upfront payment that Apple made to Nokia was

 ▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15   correct?

16          MR. ALLEN:  Objection to form.

17          MR. LANTIER:  Object to the form.

18          MR. ALLEN:  I think he's asked you for a

19   clarification and you could co-operate and give

20   him one.

21          BY MR. ZELLER:

22          Q.   You saw such articles, did you not?

23          MR. ALLEN:  Same objection.  If you

24   understand his question, you can answer it.

25          A.   Can you repeat the question as a
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 45

```
 1    whole question rather than just as...

 2               BY MR. ZELLER:

 3               Q.   About the time that the Apple/Nokia

 4    license was entered into and announced by a Nokia

 5    press release, you saw press articles about the

 6    license, right?

 7               A.   Yes.

 8               Q.   You saw at least one press article

 9    that said, or purported to say, that Apple's

10    upfront payment to Nokia was ██████████████

11    right?

12               MR. ALLEN:  Same objection.

13               A.   I don't recall seeing any such

14    article.  I -- I remember that there were many

15    articles and -- and their estimate -- their

16    estimates about the royalty terms, if to the

17    extent they even ventured to make such guesses,

18    were wildly all over the place.  So we didn't

19    really need to look into that matter.  So I don't

20    recall any such specific article, seeing such

21    specific article at that time.

22               BY MR. ZELLER:

23               Q.   Going back to the time period when

24    the Apple/Nokia license was -- was entered into,

25    was the amount of the ███████████████ considered
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1    to be confidential by Nokia?

 2              A.   Absolutely.

 3              Q.   Were the other terms considered to

 4    be confidential by Nokia?

 5              A.   Absolutely.

 6              Q.   What other terms?

 7              A.   The entire agreement was highly

 8    confidential.

 9              Q.   So everything was?

10              A.   The only things that we -- we

11    publicly reported was -- were the facts that we

12    entered into a license agreement with Apple and

13    the agreement resolved the pending litigation

14    and -- and there was royalties payable by Apple to

15    Nokia and those royalties included an upfront

16    payment and ongoing royalties.  And all the other

17    terms of the agreement were highly confidential.

18              Q.   I want to make sure we have a clear

19    record.  Are you denying, under oath, that anyone

20    at Nokia ever took steps to learn whether or not

21    information about the Apple/Nokia license was

22    leaked to anybody, "yes" or "no"?

23              MR. ALLEN:  And I'll interpose an

24    objection.  That question has been asked and

25    answered.  This is now for purposes of harassment.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 47

```
 1              MR. ZELLER:  He hasn't answered the
 2     question.  Please answer it.
 3              MR. ALLEN:  He's answered it several
 4     times.  I'll let you answer it again.
 5              A.   I am not aware of any investigation
 6     to whether or not the terms of the Nokia/Apple
 7     agreement would have been leaked into public,
 8     other than in connection with Samsung's
 9     negotiations with Nokia.
10              BY MR. ZELLER:
11              Q.   My question does not use the word
12     "investigation".  Please read my question back and
13     I ask you to focus on my question and tell me
14     "yes" or "no".
15                   (Record read.)
16              A.   When you say anyone at Nokia took
17     any steps, what do you mean with that?
18              I -- I want to help you here and answer
19     very accurately, so I think you need to now
20     explain a little bit more, what do you mean any
21     steps?  What -- what is included in "any steps"?
22              Q.   "Any steps", is there something
23     about those terms that don't make any sense to you
24     in English?
25              MR. LANTIER:  Objection.
```

```
 1              BY MR. ZELLER:

 2         Q.   I'm talking about any action

 3    whatsoever; making a phone call, looking at

 4    e-mails, undertaking any kind of efforts to

 5    determine whether or not the information was

 6    leaked?

 7              MR. ALLEN:  Do you understand his

 8    question?

 9         A.   No, I don't think I understand his

10    question.

11              BY MR. ZELLER:

12         Q.   You understood enough to change the

13    question previously about an investigation, right?

14    That's what you are -- you're latching onto,

15    right?

16              MR. ALLEN:  Objection, argumentative.

17              MR. LANTIER:  Objection.

18              BY MR. ZELLER:

19         Q.   Right?

20         A.   I really want to help you here

21    and -- and understand your question.  Could you

22    read back the question, please?

23              MR. ALLEN:  I don't know that there's a

24    question pending.

25              BY MR. ZELLER:
```

```
 1              Q.   Well, we'll let the record speak

 2      for itself on this.

 3              Are you telling me that no-one at Nokia,

 4      back during the time period after the Apple/Nokia

 5      license was entered into, made any kind of effort

 6      to determine whether or not information about that

 7      license leaked?

 8              MR. LANTIER:  Objection to form.

 9              A.   Did you say at or about the time of

10      the agreement?  I just want to make sure that are

11      you -- are you including the --

12              BY MR. ZELLER:

13              Q.   Yes, we're starting --

14              A.   -- in the scope of the question?

15              Q.   We're starting -- we are starting

16      at or about the time of the agreement, yes, and

17      it's "yes" or "no".

18              MR. ALLEN:  The question is in his

19      court.  Let him answer.

20              A.   You interrupted me, so can I read

21      the -- hear the question again?

22              BY MR. ZELLER:

23              Q.   Read the question back.

24                   (Record read.)

25              A.   I don't think that was the
```

1    question.  You just specified the question

2    being -- to be at or about the time of the

3    entering into the license agreement, and I did not

4    hear that in the question as it was being read to

5    me.  So, please state the question as a whole.

6              Q.   Well, you asked for a clarification

7    and I gave it to you.  So, is there something

8    uncomfortable about this subject for you?

9              MR. ALLEN:  Objection.

10             A.   No.

11             MR. LANTIER:  Objection.

12             MR. ALLEN:  It's argumentative.  Just

13   ask your questions.

14             BY MR. ZELLER:

15             Q.   Isn't it true that at or about the

16   time when the Apple/Nokia license was announced,

17   that at least one person there at Nokia that you

18   are aware of made efforts to find out if the

19   information about that license leaked, "yes" or

20   "no"?

21             A.   No.  I am not aware of anyone

22   making any such efforts as there clearly was no

23   reason to suspect that any such leak would have

24   happened.

25             Q.   And certainly you never directed

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 51

```
1    anyone to do such a thing, you never heard of such

2    a thing; right?

3              MR. ALLEN:  Objection, compound.  You

4    may answer.

5              A.   Can you ask the whole -- a whole

6    question?

7              BY MR. ZELLER:

8              Q.   Certainly you never directed anyone

9    to do anything like that, right?

10             A.   Do anything like what?  Can you ask

11   a whole question?

12             Q.   Earlier, do you recall you were

13   complaining the questions were too long?  Now

14   they're too short.  Is that -- is that really how

15   you want to do this?

16             MR. LANTIER:  Objection.

17             MR. ALLEN:  Objection.

18             A.   I want to answer your questions

19   one -- one at a time.  So, please ask a whole

20   question rather than refer to five questions back.

21   I think I'm entitled to hear a full question and

22   answer to full questions one at a time, please.

23             BY MR. ZELLER:

24             Q.   You never directed anyone to try

25   and learn, at or about the time that the
```

1    Apple/Nokia license was announced, as to whether

2    or not information about that license leaked; you

3    are denying that, aren't you?

4              MR. LANTIER:  Objection.

5              MR. ALLEN:  Join in the objection.

6              A.   Now you asked two questions

7    where -- where "yes" or "no" would be the opposite

8    to the first question, and the second question.

9    Can you ask one question at a time, please?

10             BY MR. ZELLER:

11             Q.   You are denying, under oath, that

12   you ever directed anyone to try and find out if

13   information about the Apple/Nokia license leaked

14   at or about the time that the license was entered

15   into and announced, correct?

16             MR. ALLEN:  Objection to the form.

17             A.   Now, again, you added the "correct"

18   to the end.  So -- so I never instructed anyone to

19   investigate whether information about the

20   Nokia/Apple agreement had leaked because there was

21   simply no reason to suspect that it had before the

22   incident with Samsung.

23             BY MR. ZELLER:

24             Q.   Did anyone at Nokia, any time prior

25   to 2013, ever undertake any effort to learn

```
 1    whether or not information about the Nokia/Apple

 2    license leaked?

 3              A.   I am not aware of any efforts to

 4    analyze whether or not the information had leaked.

 5    There was no reason to suspect it would have

 6    leaked.

 7              Q.   I take it that when you read the

 8    press reports that concerned the $500 million

 9    upfront payment that didn't -- that didn't cause

10    you any -- any concern, is that right?

11              A.   There was no $500 million upfront

12    payment.   ████████████████████████████████████

      ██   █████████

14              Q.   I apologize.  I did misstate.

15              Let me rephrase the question.

16              When you read any of the press reports

17    that said that Apple was making an upfront payment

      ██   ██████████████████   did that cause you any concern?

19              MR. LANTIER:  Objection to form.

20              MR. ALLEN:  Joined.

21              A.   First of all, I don't recall seeing

22    any press reports at or about the time of the

23    agreement that would have included any references

24    to ████████████████████████████████, and

25    nothing that I saw in the press caused me any
```

```
 1    concern because none -- none of the information in

 2    the press was accurately representing the

 3    financial terms of the Nokia/Apple agreement and

 4    there was no reason to suspect that anything would

 5    have leaked.

 6              BY MR. ZELLER:

 7              Q.    ███████████████████████████████

      ███████████████████████████████████████████████

      ███████████████████████████████████████████████

10              MR. LANTIER:  Objection to form.

11              A.    I don't recall anybody expressing

12    any such concern to me.

13              BY MR. ZELLER:

14              Q.    Did anyone ever express to you that

15    they wondered where the information came from?

16              MR. ALLEN:  Objection to the form of the

17    question.  You can answer.

18              A.    I don't recall any such discussion.

19              BY MR. ZELLER:

20              Q.    Did you ever express interest with

21    anyone or to anyone as to where that information

22    came from?

23              MR. ALLEN:  Objection to the form.  You

24    may answer.

25              A.    I never saw any press reports that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 55

```
 1    would have accurately represented the financial

 2    terms of Nokia/Apple agreement, so there was no

 3    reason for me to be concerned of such issues.

 4              BY MR. ZELLER:

 5         Q.   In preparation for your deposition,

 6    did you review the Apple/Nokia license?

 7         A.   No.

 8         Q.   In preparation for your deposition,

 9    did you ask anyone at Nokia as to whether or not

10    there was any concern or discussion about the

11    press reports that said that there was a

      ███                              ███  in the Apple/Nokia

13    license?

14              MR. LANTIER:  Objection to the form.

15              MR. ALLEN:  Joined.

16         A.   Can you repeat the question?

17              BY MR. ZELLER:

18         Q.   Well, let me ask more generally.

19              What did you do to prepare yourself to

20    testify as a corporate representative here today

21    for Nokia?

22              MR. ALLEN:  On which subjects?

23              MR. ZELLER:  On any subjects.

24              MR. ALLEN:  Just so we're clear.  We're

25    offering a corporate representative only on the
```

Page 56

```
 1    two subjects that were authorized by the court.

 2              MR. ZELLER:  I'm not even asking about

 3    topics.  I am trying to find out what he did.  You

 4    want to continue to obstruct, and the witness

 5    wants to continue to obstruct, that's fine.  We

 6    will bring it up with the court.

 7              Q.   I have a very simple question for

 8    you.  Tell me what you did to prepare for this

 9    deposition to testify as a corporate

10    representative for Nokia?

11              MR. ALLEN:  You may answer his question.

12              A.   I met with counsel and I reviewed

13    my earlier declaration and my notes from the

14    meeting with Samsung.

15              BY MR. ZELLER:

16              Q.   Anything else?

17              A.   I think this discussion with

18    counsel covered the topics of the depositions.

19              Q.   I'm not asking if you think it was

20    sufficient or not.  I am asking you, did you do

21    anything else other than what you have answered?

22              A.   Not specifically.  My role covers

23    all matters relating to intellectual property

24    within Nokia.  So -- so the topics are within my

25    normal duties.  So -- so I did not feel the need
```

```
 1    to specifically prepare for -- for this more

 2    than -- more than that.

 3              Q.   So there was nothing else that you

 4    have done than what you have mentioned, correct?

 5              A.   Beyond my normal course of duties

 6    as the head of intellectual property of Nokia, no.

 7              Q.   About how much time did you spend

 8    preparing to testify on Nokia's behalf here today?

 9              A.   About half a day, a bit more maybe.

10              Q.   That was today?

11              A.   That was today and -- and last

12    week.

13              Q.   How much time did you spend today?

14              A.   Since 8.30 in the morning until we

15    started here.

16              Q.   How much time last week?

17              A.   Maybe an hour and a half.

18              Q.   You mentioned that you reviewed

19    your declaration in connection with the Samsung

20    matter, correct?

21              A.   Yes.

22              Q.   And then you also said that you

23    reviewed your notes from the meeting?

24              A.   Yes.

25              Q.   Do you have those notes?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 58

```
 1              A.   Well, we have those notes, but I
 2    don't physically myself have those notes with me
 3    now.
 4              Q.   And what did the notes say?
 5              A.   I don't recall those notes
 6    verbatim.
 7              Q.   Do you recall anything about the
 8    notes?
 9              A.   Yes.
10              Q.   What do you recall about them?
11              A.   I recall that those -- I made those
12    notes for myself and -- and -- and in real-time,
13    in the course of the discussion, I -- I wrote down
14    certain issues that I found helpful for myself to
15    memorialize.
16              Q.   Anything else you remember about
17    them?
18              A.   I remember it was two pages,
19    handwritten.
20              Q.   Anything else?
21              A.   I remember that I marked the key
22    positions taken by Samsung and Nokia at different
23    times during the meeting and -- and the substance
24    of certain comments made by both parties.
25              Q.   Anything else you remember about
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 59

```
 1    the notes?

 2             A.   I don't remember the -- the exact

 3    wordings of the notes.  But I -- I do remember

 4    that I wrote in the notes, for example, Samsung --

 5    the terms of Samsung's offer to Nokia and

 6    I recorded some of the discussions relating to

 7    the -- to the rationale behind Samsung's offer and

 8    Nokia's earlier offer and -- and discussions

 9    between the parties relating to potential

10    arbitration and -- and some of the facts that

11    Samsung mentioned relating to the Nokia/Apple

12    agreement.

13             Q.   When you -- when you say some of

14    the facts that Samsung mentioned relating to the

15    Nokia/Apple agreement, what are you referring to?

16             A.   I am referring to the statements

17    that Dr. Ahn of Samsung made in connection of his

18    offer to Nokia, when he said that -- when he first

19    said that he has an idea about the financial terms

20    of the agreement between Nokia and Samsung and

21    that he has considered everything when making his

22    offer and then later on in the course of the

23    meeting, when he said that -- that not only has he

24    an idea, but he actually knows the financial terms

25    of the Nokia/Apple agreement said that financial
```

```
 1    terms of the Nokia/Apple agreement had been

 2    produced in connection of Samsung's litigations to

 3    outside counsel, that such information is supposed

 4    to be confidential, but all information leaks and

 5    he is aware of those financial terms and he

 6    recited those financial terms back to us and --

 7    and that was discussed in -- in connection of

 8    the -- Samsung's offer to Nokia.

 9              Q.   Anything else that the notes said?

10              A.   Well, the notes -- I think

11    I already mentioned that the notes record the

12    terms of Samsung's offer to Nokia and -- and

13    Nokia's response and -- and then the conclusion of

14    the -- of the meeting.

15              Q.   Anything else?

16              A.   Well, I don't now specifically

17    recall what else the notes themselves included.

18    The notes were not a verbatim record of the entire

19    meeting and they were just made for myself.

20              Q.   I am not asking what they were --

21    if they were verbatim.  I am asking: is there

22    anything else that the notes said?

23              A.   As I sit here, without having the

24    notes in front of me, I don't recall.

25              Q.   And you didn't bring the notes with
```

```
 1   you, correct?

 2            A.   I myself did not bring the notes

 3   with me.  My -- our attorneys do have the notes.

 4            Q.   Why didn't you bring the notes with

 5   you?

 6            A.   I was not asked to bring the notes

 7   with me.

 8            Q.   Well, if I understood you

 9   correctly, you are -- you're saying that you are

10   relying upon them as part of your testimony here

11   today as Nokia's corporate representative,

12   correct?

13            MR. ALLEN:  I object to the form of the

14   question.  Mischaracterizes the witness's

15   testimony.  You may answer his question.

16            A.   That's not what I said.  You asked

17   me how -- what did I -- did I do to prepare for

18   this deposition.  I said I reviewed my notes.

19   Then you asked me questions about the content of

20   those notes and I answered.  I never said that

21   I relied on anything.

22            BY MR. ZELLER:

23            Q.   Are you relying on your notes for

24   your testimony here today as Nokia's corporate

25   representative?
```

```
 1              A.   When you say am I relying on, what

 2    do you mean with "relying on"?  I want to

 3    understand.  Does that have some specific legal

 4    meaning in this connection when you say "relying

 5    on"?

 6              Q.   It's not a specific legal meaning.

 7    I'm trying to find out what the basis of your

 8    testimony is.  Is it true that today, here you are

 9    to testify on behalf of Nokia to certain matters

10    right, you understand that?

11              A.   Yes.

12              Q.   Is a basis for your testimony here

13    today, on the subject of the June 4 meeting, the

14    fact that you have these notes?

15              A.   I was personally present in that

16    meeting.  I remember that meeting vividly and

17    I have contemporaneous notes of that meeting,

18    which are consistent with my recollection of the

19    meeting itself.  I don't need to rely on my notes

20    to remember the meeting.  But those notes are

21    consistent with my own recollection.

22              Q.   Are you relying upon your notes as

23    a basis for your testimony here today?

24              A.   I don't know what you mean when you

25    say relying on as a basis.  I don't know what that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 63

```
 1    meaning is.

 2              I -- I repeat my answer that -- that

 3    I have those notes, I have a recollection

 4    independent of those notes, which is consistent

 5    with those notes, and I am not answering

 6    differently based on merely my own recollection

 7    and -- and based on the notes.  So I would answer

 8    it the same way even without those notes, but

 9    I also have those notes.

10              Q.   Is there some reason why Nokia has

11    not provided the notes to Samsung?

12              MR. ALLEN:  We have not been instructed

13    to do so by the court.  I'll respond to that

14    question.

15              MR. ZELLER:  I'm asking the witness.

16              MR. ALLEN:  And I will -- I will respond

17    to that question.

18              MR. ZELLER:  Are you instructing him not

19    to answer the question?

20              MR. ALLEN:  If you know the answer to

21    his question, you may answer his question.

22              A.   Can you repeat the question,

23    please?

24              BY MR. ZELLER:

25              Q.   Why has Nokia not provided the
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 64

```
 1    notes to Samsung?

 2              A.   I don't know, because it's not my

 3    responsibility to handle the details of production

 4    or non-production of these materials and that is

 5    our attorneys' task.

 6              Q.   Well, you signed a declaration in

 7    connection with this dispute, right?

 8              A.   Yes.

 9              Q.   Why didn't you attach the notes if

10    they are consistent with your recollection and

11    your testimony in the declaration?

12              A.   I was not asked to attach the

13    notes.

14              Q.   Well -- so, it never occurred to

15    you, apart from being asked, as to whether or not

16    these -- these notes that you claim are consistent

17    with your recollection should be attached, right?

18              A.   Issues such as what to specifically

19    include or attach to various materials submitted

20    to court proceedings are issues where we rely

21    on -- on -- on advice from counsel and -- and I --

22    I don't make --

23              MR. ALLEN:  I'll caution you not -- not

24    to disclose your discussions with counsel.

25              A.   I'm not disclosing those
```

```
 1    discussions.

 2              BY MR. ZELLER:

 3              Q.   Were you told not to attach the

 4    notes?

 5              MR. ALLEN:  And I'll caution you, you

 6    are free to answer his question.  I'll caution you

 7    when you respond to his question, take care not to

 8    reveal communications with legal counsel.

 9              A.   I prepared a declaration and that

10    declaration was then submitted.

11              BY MR. ZELLER:

12              Q.   Did you draft the declaration?

13              A.   I had -- I basically -- I gave oral

14    instructions to counsel who assisted me in

15    drafting and then I wrote myself the final form of

16    the declaration.

17              Q.   Who created the first draft in the

18    manner you just described?

19              A.   Attorneys at Alston & Bird.  I

20    don't know who exactly.

21              Q.   You don't know the name of the

22    attorney?

23              A.   No.

24              Q.   How many drafts did you go through?

25              A.   After giving my oral instructions
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 66

```
 1    and receiving the first draft, I believe I edited

 2    the final version directly based on that first

 3    draft.

 4              Q.   What changes did you make?

 5              A.   I don't recall the changes as such.

 6              Q.   Do you recall any change that you

 7    made?

 8              A.   Sorry, I don't recall any specific

 9    change.  I just recall that I -- I -- I wrote

10    the -- the sections relating to what specifically

11    occurred in the meeting myself.

12              Q.   Did it occur to you that if in fact

13    you had documents that corroborated your account

14    that they should be attached?

15              MR. ALLEN:  Objection to the question.

16    I'll instruct the witness when you respond to the

17    question, take care not to reveal attorney/client

18    communication and/or attorney/client work product.

19              You may respond.

20              A.   Can you repeat the question?

21              BY MR. ZELLER:

22              Q.   During the process when you were

23    working on this declaration, did it ever occur to

24    you, in any way, that if -- that if, in fact, you

25    had a document that corroborated your account of
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 67

1    what occurred, that that document should be

2    attached to your declaration?

3              A.   I wrote the declaration under oath.

4    It did not occur to me whether or not there should

5    be additional evidence added to that declaration

6    as such.

7              Q.   Prior to the time that you signed

8    the declaration, had you reviewed your notes to

9    determine whether they were consistent with what

10   you said in the declaration?

11             A.   Yes.

12             Q.   So you were aware of the these --

13   these notes specifically when you were working on

14   the declaration, correct?

15             A.   Yes.

16             Q.   Did you use the notes to draft the

17   declaration?

18             A.   I had the notes at my -- my

19   disposal when -- when writing the declaration.  I

20   don't recall specifically using the notes as such.

21             Q.   Did you make any changes to the

22   declaration based on your notes?

23             A.   No, I don't -- I don't think so.

24   I think I -- I wrote the declaration based on my

25   recollection from the meeting, which was

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 68

```
 1    consistent with my notes.

 2               Q.   Did your colleague Eeva take notes

 3    at the June 4 meeting with Samsung?

 4               A.   Yes.

 5               Q.   Did you review those notes?

 6               A.   I did see those notes in

 7    preparation for this deposition.

 8               Q.   Had you seen them prior to that

 9    time?

10               A.   Yes.

11               Q.   Did you review those notes prior to

12    the time that you signed your declaration in this

13    matter?

14               A.   I did see those notes after the

15    meeting with Samsung, but I do not recall whether

16    I had those notes at my disposal when writing my

17    declaration or not.

18               Q.   What do Eeva's notes say?

19               A.   I do not recall those notes in

20    detail.

21               Q.   Do Eeva's notes mention the

22    substance of any party's statements or comments at

23    the June 4 meeting?

24               MR. ALLEN:   Let me -- let me caution the

25    witness.  Mike, you may not be aware of this but
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 69

```
 1    Ms. Hakoranta is a lawyer, so to the extent that
 2    you can answer his question without revealing any
 3    attorney/client communication, you may do so.
 4              A.   I believe much like my own notes,
 5    her notes memorialized the key positions taken by
 6    the parties in that meeting as well as some of the
 7    pertinent statements made by Samsung and Nokia in
 8    the meeting.
 9              BY MR. ZELLER:
10              Q.   What do the -- the notes that Eeva
11    took say about those statements?
12              MR. ALLEN:  Mike, I'm happy to let him
13    answer this question if you will agree on behalf
14    of Samsung, and I'd have to solicit Apple's
15    agreement as well, that testimony about
16    Ms. Hakoranta's notes would not constitute a
17    waiver.
18              MR. ZELLER:  Well, I -- I'll agree that
19    his testimony is not an independent basis for a
20    waiver.  I think it's already been waived because
21    he's -- he reviewed them in connection with his
22    deposition.  But, you know -- but that's a
23    different issue.  I agree that if he testifies
24    about them, I won't argue that's an independent
25    basis for waiver.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 70

```
 1              MR. ALLEN:  That would be fine for me.

 2              MR. LANTIER:  I won't -- we won't take

 3     the position that answering a question at this

 4     deposition constitutes a waiver.

 5              MR. ALLEN:  Thank you.  You may answer

 6     his question.

 7              A.   Can you repeat the question?

 8              BY MR. ZELLER:

 9              Q.   Sure.  What is it that you recall

10     that Eeva's notes say about what you said were the

11     pertinent statements by the parties?

12              A.   I don't recall those notes

13     verbatim, and they were not intended to be a

14     verbatim record of the meeting either.

15              I do remember that the notes

16     memorialized that Dr. Ahn of -- of Samsung made an

17     offer to Nokia and in connection of making that

18     offer said that he is aware of the terms of the

19     Nokia/Apple license agreement and -- and -- and

20     stated back the financial terms of the Nokia/Apple

21     license agreement to us.

22              Q.   Anything else?

23              A.   I don't recall what -- what else

24     the notes contained.

25              Q.   Do I have your complete
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 71

```
 1    recollection of what the notes say?

 2              MR. ALLEN:  You're talking about

 3    Ms. Hakoranta's notes?

 4              BY MR. ZELLER:

 5         Q.   Correct.

 6         A.   As I sit here today, I don't

 7    remember what else the notes would say.

 8         Q.   I understand.  You have already

 9    said that there are aspects you don't recall, but

10    you have told me some things and all I am trying

11    to find out now is: have you told me everything

12    you can recall about Eeva's notes?

13         A.   I think I have.

14         Q.   Did you make any changes to your

15    declaration, your draft declaration, when you were

16    involved in that process based upon Eeva's notes?

17         A.   No.

18         Q.   Now, how long were Eeva's notes?

19         A.   A few pages.  I don't know.

20         Q.   They were in handwriting, I assume?

21         A.   I believe she made both handwritten

22    and -- and typed notes.

23         Q.   Your notes are in handwriting?

24         A.   Correct.

25         Q.   Are they also typed?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 72

```
 1          A.   No.

 2          Q.   During the course of the June 4

 3   meeting, Dr. Ahn told you terms that you claim to

 4   be highly sensitive and proprietary information

 5   right?

 6          A.   Yes.

 7          Q.   And -- and what is it he said

 8   exactly on that score; the terms that you consider

 9   to be highly sensitive and proprietary?

10          ███   ████████████████████████████████████

    █████████████████████████████████████████████████

    █████████████████████████████████████████████

    █████████████████████████████████████████████

    █████████████████████

15          MR. ALLEN:  Mike, this seem like as good

16   a time as any to designate the transcript of the

17   deposition as Confidential/Attorneys' Eyes Only.

18   Do you have any objection?

19          MR. ZELLER:  Well, I -- it's your right

20   to designate it.  We can talk about what should or

21   shouldn't be designated at some other point.  We

22   won't use the witness's time.

23          MR. ALLEN:  Thank you.

24          BY MR. ZELLER:

25          Q.   Were there any other terms that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 73

```
 1    Dr. Ahn stated, at the June 4 meeting, that you

 2    consider to be highly sensitive and proprietary,

 3    other than the ones you just recited to me now?

 4            A.   My recollection is that Dr. Ahn

 5    only recited the financial terms of the

 6    Nokia/Apple agreement and not any other terms.

 7            Q.   And so if I understand it, the

 8    terms that you described in your earlier answer

 9    are the terms that Dr. Ahn recited that -- that

10    you believe are the confidential and proprietary

11    terms, right?

12            A.   There are other confidential and

13    proprietary terms in the license agreement, but

14    Dr. Ahn recited the financial terms.

15            Q.   Right, and I'm just trying to make

16    sure you have given me all the terms that Dr. Ahn

17    mentioned that you consider to be proprietary and

18    confidential and those were the terms that you

19    mentioned; ███████████████████████████████

   ███████████████████████████████████████████

   ███████         ████   ████████████████████████

   ███████████████████████████████████████████████

   ███████████████████████████████████████████

   ██████  ████████████

25            Q.   Were there any other terms that
```

```
 1    Dr. Ahn said to you or referred to at the June 4

 2    meeting relating to the Apple/Nokia license that

 3    you consider to be confidential and proprietary?

 4              A.   I don't recall any other terms.

 5              Q.   And were you -- were you shocked

 6    when he told you these terms?

 7              A.   Yes.

 8              Q.   Was -- was Eeva shocked?

 9              MR. ALLEN:  Objection, foundation.  You

10    may answer.

11              A.   I -- she appeared to be.  Of course

12    you have to ask herself.

13              BY MR. ZELLER:

14              Q.   Did you and Eeva discuss how

15    shocked you were that Dr. Ahn knew these terms?

16              A.   We were very surprised and

17    certainly we discussed the issue.

18              Q.   And when was the first time you

19    discussed it with Eeva?

20              A.   Well, when -- at the very beginning

21    of the -- of the meeting, when Dr. Ahn started by

22    making his offer, and he made a comment that he

23    has an idea of what Apple pays to Nokia and that

24    he has considered everything in making his -- his

25    offer, we found those comments to be odd and --
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 75

```
 1    and during the first break of the -- during the
 2    meeting we discussed what that might -- might mean
 3    and -- and how peculiar it was that the -- the
 4    kind of --
 5               MR. ALLEN:  I want to caution the
 6    witness again to take care not to reveal to -- for
 7    the deposition confidential attorney/client
 8    communication that you had during the break.  If
 9    you can answer his question without disclosing
10    that, you may do so.
11               A.   Yeah.  So we -- we -- just
12    continuing.  So -- so basically we discussed how
13    peculiar it was that he made these comments and --
14    and we expressed surprise that the -- the amounts
15    that Samsung was offering, if divided by the
16    amount of years covered by the Samsung offer, were
17    so close to the revenues that we recognized under
18    the Apple agreement.
19               BY MR. ZELLER:
20               Q.   My -- my question is a different
21    one.  Dr. Ahn, according to you, recites these --
22    these financial terms of the Apple/Nokia license
23    during the June 4 meeting, right?
24               A.   Yes.
25               Q.   And you were shocked and as you
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

1    understood it Eeva was shocked, right?

2              A.   As I understood it, yes.

3              Q.   And you were very concerned that --

4    that a competitor had this information, right?

5              A.   Yes.

6              Q.   You were concerned immediately

7    during the course of this meeting, right?

8              A.   Yes.

9              Q.   So my question is: when did you and

10   Eeva first discuss the fact that Dr. Ahn,

11   according to you, had this information?

12             MR. ALLEN:  And I'll again caution the

13   witness.  You may respond to his question.  I want

14   to caution you not to disclose any attorney/client

15   privilege or attorney work product information in

16   your answer.  Do you -- do you understand?

17             A.   Yes.

18             MR. ALLEN:  OK.

19             A.   So during the breaks of the

20   meeting, we -- we discussed what we had just heard

21   Dr. Ahn said and confirmed that we had heard the

22   same thing.  So we had that discussion immediately

23   after -- after those comments were made.

24             BY MR. ZELLER:

25             Q.   What else did you and Eeva discuss

```
 1    on that subject?

 2              MR. ALLEN:  Again, the same caution.

 3              A.   I don't think I can reveal the

 4    attorney/client privileged discussions.

 5              BY MR. ZELLER:

 6              Q.   As soon as Dr. Ahn made these

 7    statements during the June 4 meeting, you

 8    immediately believed that it was wrong for him to

 9    have this information; right?

10              A.   Yes.

11              Q.   And so did you immediately report

12    that to anyone at Nokia?

13              A.   Yes.

14              MR. ALLEN:  Objection to the form of the

15    question.  You may answer.

16              BY MR. ZELLER:

17              Q.   Who did you notify?

18              A.   Our general counsel.

19              Q.   When?

20              A.   I don't recall the exact time, but

21    within -- within 24 hours of the meeting,

22    I believe.

23              Q.   Was it before or after you went to

24    dinner with Dr. Ahn and the others at Samsung?

25              A.   I believe it was the following day.
```

```
 1              Q.   You were very concerned that a
 2    competitor had what you considered to be secret
 3    information about a license, right?
 4              A.   Yes.
 5              Q.   Did you take any steps to ensure
 6    that that information wasn't going to be disclosed
 7    by your competitor?
 8              A.   Well, obviously the information
 9    was -- was already in possession of our
10    competitor, and -- and they were actively using
11    the information, so...
12              Q.   So the answer is you didn't take
13    any steps, correct?
14              MR. ALLEN:  Objection to the form of the
15    question.
16              A.   Can you repeat the question?
17              BY MR. ZELLER:
18              Q.   Did you take any steps to ensure
19    that this information that you considered to be
20    secret was not going to be disclosed by Samsung?
21              MR. ALLEN:  Did he personally take any
22    steps, is that what you're asking?
23              MR. ZELLER:  Yeah, that's where I'm
24    starting.
25              MR. ALLEN:  Other than what he has
```

1    already described to you?

2              BY MR. ZELLER:

3              Q.   Please tell me all the steps that

4    you took to ensure that Samsung, in possession of

5    this information that you claim it should not

6    have, was not going to disclose it to others?

7    What did you do?

8              A.   I referred the matter to our

9    counsel and I don't think I can disclose the

10   attorney/client privileged discussions.

11             Q.   Did you do anything else?

12             A.   I personally did not do anything

13   else.

14             Q.   Did you or Eeva say at the meeting

15   to Dr. Ahn, in response to him reciting these

16   terms, according to you, tell him he shouldn't

17   have that information?

18             A.   We didn't need to because he

19   himself said that he knows that he shouldn't have

20   that information.

21             Q.   I didn't ask if you need to.  Did

22   you or Eeva say at the meeting to Dr. Ahn, at any

23   time, that he wasn't supposed to have that

24   information about the terms?

25             A.   Dr. Ahn clearly knew that he

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 80

```
1    shouldn't have the information, he even said so

2    much to us.  So we did not find it necessary to

3    repeat back to him what he had just told us.

4              Q.   I'm not asking what you think was

5    necessary or not.  I want to know what was said or

6    not said at this meeting.  Did you or Eeva say to

7    Dr. Ahn, in words or substance, that the terms of

8    the Apple/Nokia license was information he was not

9    supposed to have; "yes" or "no"?

10             A.   I remember saying that the terms of

11   the Nokia/Apple agreement are confidential and

12   therefore we are not able or willing to discuss

13   those terms and the intent of that statement was

14   that he should also understand himself that they

15   are confidential.

16             Q.   And did you say that before or

17   after Dr. Ahn referenced ███████████████

     █    █████████████████████████████

19             A.   After.

20             Q.   Was it in direct response to what

21   he said?

22             A.   I believe so.

23             Q.   Were those words you said?

24             A.   I don't recall the verbatim words

25   used as such.
```

Merrill Corporation – New York

```
 1              Q.   Did Eeva say anything?

 2              A.   I don't recall.

 3              Q.   At any time during the course of

 4    the dinner that you had with the Samsung people,

 5    did you say to Dr. Ahn that the terms that he had

 6    mentioned of the Apple/Nokia license was

 7    information that he shouldn't have?

 8              A.   I don't recall any such discussion

 9    during the dinner.

10              Q.   How long was the dinner?

11              A.   I don't recall.

12              Q.   It was more than a couple of hours,

13    right?

14              A.   Probably.

15              Q.   And you were aware that after the

16    June 4 meeting, that there was e-mails and letters

17    back and forth between Samsung and Nokia, right?

18              A.   Possibly.

19              Q.   You have seen such letters and

20    e-mails, correct?

21              A.   I have seen various correspondence

22    between Nokia and Samsung, but I don't recall all

23    of the correspondence.

24              Q.   Is there any e-mail or letter from

25    Nokia to Samsung, after the June 4 meeting, up
```

```
 1    until the time that Nokia filed its motion,

 2    relating to the Protective Order that makes any

 3    statement whatsoever about Dr. Ahn reciting the

 4    financial terms of the Apple/Nokia license at the

 5    June 4 meeting?

 6              A.   I don't recall any such e-mail.

 7              Q.   Are you aware of Nokia taking any

 8    steps or making any effort to ensure that this

 9    information that you say Dr. Ahn had about the

10    Apple/Nokia license terms were not used by Samsung

11    any time between the June 4, 2013 meeting and the

12    time that Nokia filed its motion?

13              A.   I don't recall any such things.

14              Q.   Do your notes reflect this

15    statement that you testified to a moment ago that

16    you made at the June 4 meeting, that the terms of

17    the Apple/Nokia license are confidential and that

18    you are therefore not able to discuss those terms?

19              A.   I don't recall.

20              Q.   Are those in Eeva's notes?

21              A.   I don't know.

22              Q.   Do you have any reason as to why

23    that statement is not in the declaration that you

24    signed?

25              A.   Sorry, can you repeat?  Which
```

```
 1    statement?

 2             Q.   The statement that you said you

 3    made at the June 4 meeting to the effect that: you

 4    told Dr. Ahn that the terms of the Apple/Nokia

 5    license are confidential and that you therefore

 6    cannot discuss the terms?

 7             MR. ALLEN:  And your question is: why is

 8    that statement not in his declaration?

 9             BY MR. ZELLER:

10             Q.   Right?

11             A.   My declaration was not intended to

12    be a full, full record of everything that was said

13    or not said in the meeting, so it -- it was not

14    necessary to include it there.

15             Q.   Well, your declaration omits the

16    fact that there was a PowerPoint presentation you

17    used, correct?

18             MR. ALLEN:  Objection to the form of the

19    question.  You may answer his question.

20             A.   I said my declaration was not

21    intended to represent the full record of

22    everything that was said or presented in the

23    meeting.

24             BY MR. ZELLER:

25             Q.   One point that your declaration
```

```
 1    does not mention is that there was a PowerPoint

 2    that you used at this meeting on June 4, 2013,

 3    correct?

 4              MR. ALLEN:  I'm sorry, can you read the

 5    question back?

 6                      (Record read.)

 7              A.   I would need to see the declaration

 8    to verify that.

 9              BY MR. ZELLER:

10              Q.   Does your declaration attach the

11    PowerPoint?

12              A.   I don't think it does.

13              Q.   Why not?

14              A.   It was not deemed to be necessary.

15              Q.   By whom?

16              MR. ALLEN:  Object to the form of the

17    question.  I caution the witness not to disclose

18    any attorney/client communication or

19    attorney/client work product.  To the extent you

20    can respond to the question without doing so, you

21    may do so.

22              A.   I wrote my declaration and did not

23    feel it necessary to attach a PowerPoint in

24    addition to my writing.

25              BY MR. ZELLER:
```

```
 1              Q.   Why?

 2              A.   My declaration speaks for itself.

 3              Q.   Any other reason?

 4              A.   No.

 5              Q.   When you signed your declaration,

 6      you were aware that there was a PowerPoint you had

 7      used at the June 4 meeting, correct?

 8              A.   Yes.

 9              Q.   Did you review the PowerPoint in

10      preparation for your deposition here today?

11              A.   Yes.

12              MR. ZELLER:  We might just take a break.

13      We need to change tapes.

14              VIDEOGRAPHER:  Going off the record.

15      The time is 14:18.  End of tape 1, Volume I in the

16      videotaped deposition of Paul Melin.

17      (2.19 pm)

18                      (Off the record.)

19      (2.29 pm)

20              VIDEOGRAPHER:  This is the beginning of

21      videotape number 2, Volume I in the videotaped

22      deposition of Paul Melin.  Going on the record,

23      the time is 14:29.  Thank you.

24              MR. ZELLER:  Prior to the June 4, 2013

25      meeting between Nokia and Samsung, did Nokia have
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 86

1   ████████████████████████████████████

2            A.   Yes.

3            Q.   And was ████████████████ published

4   by Nokia prior to the June 4, 2013 meeting?

5            MR. ALLEN:  Objection to the form of the

6   question.  You may answer his question.

7            A.   No.

8            BY MR. ZELLER:

9            Q.   Was it publicly disclosed in any

10  way prior to June 4, 2013?

11           A.   No.

12           Q.   Does Nokia consider ████████████

██ ████ to be confidential?

14           A.   Yes.

15           Q.   Did Nokia consider ██████████████

16  to be confidential prior to the June 4, 2013

17  meeting?

18           A.   Sorry, can you repeat?

19           Q.   Did Nokia consider ██████████████

20  to be confidential prior to the June 4, 2013

21  meeting?

22           A.   Yes, and let me just be very

23  specific now.  That -- are you speaking -- Nokia

24  as if ████████████████████████████████

██ ██████████████████████████████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 87

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 88

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 89

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 90



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 93

```
 1    the PowerPoint that you showed?
 2            A.   I may have said that before showing
 3    the PowerPoint, but -- but it's more likely that
 4    I said it while the PowerPoint was being shown in
 5    the background.  But I don't recall exactly.
 6            Q.   Was there anything else that you
 7    said about ███████████████ in any way, at the
 8    June 4 meeting?
 9            A.   Yes.
10            Q.   What else did you say?
11            A.   ████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████
14            Q.   And in the statement that you
15    said -- well, I'm sorry.
16            Was there anything else that you said
17    about ████████████, other than what you have
18    told me, at the June 4 meeting?
19            A.   I don't recall.
20            Q.   Now, this statement that you
21    mentioned that you said, that there were licensees
22    that were smaller than Samsung that were paying
23    ██████████████████████████ was that in
24    response to anything Dr. Ahn or anyone at the
25    meeting said?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 94

1           A.   Yes.

2           Q.   What was it in response to?

3           ██    ███████████████████████████

██ ████████████████████████████████

██ ██████████████████████████████████████

██ ████████████████████████████████████

██ ████████████████████████████████████

██ █████████████████████████████████

9           We -- we were not able to discuss the

10    terms of the Nokia/Apple agreement obviously,

11    it -- it being a confidential agreement.  So -- so

██ ██████████████████████████████████████

██ ███████████████████████████████████

██ ████████████████████████████████████████

██ ████████████████████████████████

██ ███████████████████████████████

██ ████████████████

██ ███████████████████████████████

██ ██████████████████████████████

██ ███████████████████████████████████

██ ███████████████████████████

██ █████████████████████████████████

██ ███████████

██ ██    ████████████████████

██ ███████████████████████████████████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 95

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 96

9        Q.   Any other basis?

10       A.   I think I just described the basis.

11       Q.   And is there any other basis you

12  have for your statement, or do I have your

13  complete testimony on that?

14       A.   Well, I don't correctly recall any

15  other basis.

16

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 97

5            Q.   Did the structure of what Samsung

6    offered correspond to the structure of the

7    Apple/Nokia license?

8            MR. ALLEN:  Objection to the form, you

9    may answer it.

10

15            BY MR. ZELLER:

```
 8              MR. ALLEN:  Objection to the form of the
 9    question.  You may answer.
10              A.    No.
11              BY MR. ZELLER:
```

```
22              MR. ALLEN:  Objection, asked and
23    answered.  You may answer it again.
24              A.    Those are two different licenses
25    with very different scopes and -- and the values
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 99

1    as such are not comparable.

2              BY MR. ZELLER:

3              Q.   Now, you testified that during the

4    course of the meeting Dr. Ahn, you said, made very

5    clear that the Apple/Nokia license was an

6    important issue.  Do you recall that testimony?

7              A.   Yes?

8              Q.   How did he make it very clear?

9    What words did he use?

10             A.   He recited the specific terms of

11   the Nokia/Apple agreement.  He specifically said

12   that he has considered everything in making his

13   offer, with an emphasis on the word "everything",

14   and –– and he said that Samsung considers Apple to

15   be the only comparable competitor in the industry

16   and –– and he took great care in reciting the

17   financial terms of the Nokia/Apple agreement as he

18   claimed to know them during the meeting.

19             Q.   Any other way in which he made it

20   clear, in your view?

21

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 100

1    comparison point, it was clear that -- that that

2    was the context.

3              Q.   Did Dr. Ahn use the words "take it

4    or leave it"?

5              A.   I don't think he used those

6    specific words.  But he said that his offer was

7    valid only on that day.  He said that if -- if we

8    need to take that offer to our management for

9    approvals that could be accommodated.  But other

10   than that if we reject his offer, it would no

11   longer be available.

12             Q.   Do your notes reflect this

13   statement by Dr. Ahn?

14             MR. ALLEN:  Objection to the form of the

15   question.  Which statement?

16             BY MR. ZELLER:

17             Q.   The one you just testified to?

18             A.   I think I testified about multiple

19   statements by Dr. Ahn.  Can you specify your

20   question?

21             Q.   Were any of the statements in your

22   prior answer, which you said Dr. Ahn said,

23   reflected in your notes?  Any of them?

24             MR. ALLEN:  Objection to the form of the

25   question.  You may answer the question.

1          A.   Can -- can I hear back what I just

2    testified as he is making references?

3               (Record read.)

4          I don't recall whether I recorded those

5    specific details in my written notes at the time.

6          Q.   Are any of those statements you

7    claim Dr. Ahn made in your answer reflected in

8    Eeva's notes?

9          MR. ALLEN:  You're just never going to

10   say her last name, are you?

11         BY MR. ZELLER:

12         Q.   It's a little easier this way.

13         A.   I don't recall.

14         Q.   Is there any correspondence with

15   Samsung that supports your view that what Dr. Ahn

16   was offering was on a take it or leave it basis?

17         A.   I think he made that offer in that

18   meeting, and I don't recall any correspondence

19   thereafter relating to that.

20         Q.   Did Nokia send any correspondence,

21   whether an e-mail, letter, or otherwise, anything

22   in writing, confirming what you say was a take it

23   or leave it offer?

24         A.   I don't recall us having done so.

25         Q.   Did you report to anyone at Nokia,

```
 1    other than the general counsel, the statements

 2    that -- that Dr. Ahn made according to your

 3    testimony at the June 4 meeting as it related to

 4    the financial terms of the Apple/Nokia license?

 5              A.   I don't recall reporting to other

 6    people.

 7              Q.   During the course of June you took

 8    a vacation, right?

 9              A.   I was on vacation in July.  I don't

10    recall whether I started my vacation in June.

11    I may have done so, but I don't now recall.

12              Q.   Do you recall Eeva stating in

13    correspondence to Samsung that you and Eeva were

14    going to be on vacation in June?

15              A.   That's quite likely.  In the --

16    in -- the midsummer weekend is in June and that is

17    the biggest national holiday in Finland, so people

18    generally take some vacation around that day

19    whether they actually go on vacation or not.  So,

20    I would -- wouldn't be surprised by that.

21              Q.   So, did you actually take your

22    vacation?

23              MR. ALLEN:  Objection to the form of the

24    question.  A vacation or --

25              BY MR. ZELLER:
```

Page 103

```
 1              Q.   A vacation, yes?
 2              A.   I certainly was on vacation for
 3    the -- for the midsummer.  I don't recall whether
 4    I took a longer vacation already in June or in
 5    July.
 6              Q.   What was the location of the June 4
 7    meeting?
 8              A.   Westin Chosun Hotel in Seoul,
 9    C-h-o-s-u-n.
10              Q.   Any other location?
11              A.   No, that was the location of the
12    meeting.
13              Q.   Who was there?
14              A.   Myself, Eeva Hakoranta from Nokia
15    and Dr. Ahn from Samsung, James Kwak from Samsung,
16    and I believe Indong Kang is the name of the third
17    Samsung person, if I recall correctly.
18              MR. ALLEN:  I-n-d-o-n-g, one word.
19    Kang, K-a-n-g.
20              MR. ZELLER:  Actually, I think he spells
21    it K-o-n-g, but we can -- we can look it up.
22              MR. ALLEN:  Yeah, I think it's K-a-n-g.
23    He's your client, but...
24              BY MR. ZELLER:
25              Q.   Had you met Mr. Kang before the
```

 1    June 4 meeting?

 2              A.   My recollection is that, yes.

 3              Q.   Had you had discussions with him

 4    about a potential license, in other words, were

 5    they substantive discussions you had with him

 6    before that?

 7              A.   I don't recall whether he was

 8    involved in some of the discussions leading to the

 9    2010 agreement.  He may have been or may not have

10    been.

11              Q.   So you are not sure about that?

12              A.   That's right.

13              Q.   Was Mr. Kwak somebody you had met

14    before?

15              A.   I don't recall having met him

16    before that meeting.

17              Q.   Had you met Dr. Ahn before the

18    meeting?

19              A.   Yes.

20              Q.   On how many occasions?

21              A.   I recall one meeting with him

22    before that.

23              Q.   When was that?

24              A.   I don't recall the exact time.  It

25    was a few months before that meeting.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 105

1          Q.    Where did you meet him?

2          A.    At the -- near the Incheon Airport

3     in Seoul.

4          Q.    Where at the airport?

5          A.    Just a hotel next to the airport.

6     I don't remember the name of the hotel.

7          Q.    And what did you discuss at that

8     meeting?

9          A.    I believe in that meeting we

10    discussed the -- the upcoming negotiations for

11    extending the license agreement between Nokia and

12    Samsung.

13         Q.    What else?

14         A.    I don't remember discussing

15    anything else.

16         Q.    How long did it last?

17         A.    That was a short meeting; maybe an

18    hour.

19         Q.    Prior to the June 4 meeting, were

20    there communications between Samsung and anyone at

21    Nokia as it related to the Nokia program rate?

22         ███   ████████████████

███   ██████████████████████████████████████

███   ████████████████████████████████████

███   ████████   ██████████████████████   ██████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

6    effect as far as Nokia is concerned?

7            A.   I don't know.

8            Q.   Was it prior to 2009?

9            A.   I believe so.

10           Q.   Was it prior to 2001?

11           A.   I don't think so.

12           Q.   How, specifically, was the program

13   rate communicated to Samsung prior to the June 4,

15           MR. ALLEN:  Objection to the form of the

16   question.  Foundation.  You may answer it.

17           A.   I don't recall.

18           BY MR. ZELLER:

19           Q.   Who -- who for Nokia did that?

20           A.   I don't recall.

21           Q.   During the course of your

22   preparation for this deposition, did you talk to

23   any of the 10 people who report to you directly or

24   indirectly who are involved with licensing

25   negotiations about the topics you are going to

testify about here today?
A. To the extent the topic relates to our licensing negotiations with Samsung, as Eeva Hakoranta is our head of patent licensing, we have been in obviously constant communication relating to that topic. Specifically for preparation for this deposition I -- I did not talk with my direct reports.
Q. Did you talk to any of your indirect reports?
A. No.
Q. In preparing for today's deposition, did you speak with Eeva?
A. We both spoke to counsel about the preparation. I cannot talk about the content of those discussions with the counsel, but we were present in the same meetings.
Q. And when you say at the same meetings, you mean the same meetings with outside counsel?
A. Yes.
Q. In order to prepare for your testimony here today, did you ask anyone or undertake any effort to determine whether or not Nokia had communicated to Samsung, prior to the

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 108

1    June 4 meeting, that at least one Nokia licensee

▮    ████████████████████████████████

3           A.    I don't think that's covered by the

4    topics for this deposition.  I did not undertake

5    such efforts.

6           Q.    In order to prepare for your

7    testimony here today, did you ask anyone or

8    undertake any effort to determine whether or not

9    Nokia had communicated to Samsung, prior to the

10   June 4 meeting, ████████████████████████████

▮    ███  ███████

12          A.    It would be ridiculous to -- to

13   assume that Nokia would have communicated such a

14   statement to -- to Samsung.

15          Obviously, I did not take any such

16   efforts.

17          VIDEOGRAPHER:  I'm sorry, sir, to

18   interrupt.  Because of the drilling noise, could

19   you put your microphone a bit higher?

20          MR. ZELLER:  This, oh because of the

21   noise out there.

22          MR. ALLEN:  It's upstairs.

23          VIDEOGRAPHER:  Yeah, just put it higher.

24          MR. ZELLER:  Does that help?

25          VIDEOGRAPHER:  The last question is a

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

1    little bit tricky to record on the audio because

2    of the vibration.

3                MR. ZELLER:  OK.

4                VIDEOGRAPHER:  Thank you very much.

5    Could you put your microphone.

6                MR. ALLEN:  OK.

7                BY MR. ZELLER:

8                Q.   Regardless of what you think about

9    it, you did not ask anybody -- let me actually

10   even ask more generally then.

11               In preparation for today's deposition,

12   did you ask anybody at Nokia whether they had had

13   conversations or communications with Samsung

14   before the June 4 meeting about the Apple/Nokia

15   license?

16               A.   I believe the topic for this

17   deposition -- deposition is what happened in the

18   June 4 meeting, so I did not prepare with respect

19   to those topics you just listed there.

20               Q.   Was it your understanding that you

21   are here to testify today about whether the terms

22   of the Apple/Nokia license are confidential?

23               A.   I don't recall now the exact

24   wording of the topic.

25               Q.   Did you undertake any efforts, in

```
 1    order to prepare yourself to testify here today,

 2    about whether the -- whether or not the terms of

 3    the Apple/Nokia license have been kept

 4    confidential?

 5              A.   The issue of our license agreements

 6    and their confidentiality relates to my normal

 7    duties as head of intellectual property for Nokia.

 8    So I did not have to undertake any separate

 9    efforts to prepare for today's deposition in that

10    matter.

11              Q.   And I'm not asking whether you

12    think you needed to prepare or not.  Did you

13    undertake any efforts to prepare to testify here

14    today as to whether or not the Apple/Nokia

15    financial license terms had, in fact, been kept

16    confidential?

17              MR. ALLEN:  Objection, asked and

18    answered.  You can answer it again.

19              A.   Sorry, can you repeat?  Did you

20    again ask about whether I spoke to anybody within

21    Nokia or was this more generally?

22              BY MR. ZELLER:

23              Q.   I'm asking even more generally.

24              Did you undertake any efforts to prepare

25    to testify here today about whether or not the
```

```
 1    Apple/Nokia financial license terms had, in fact,

 2    been kept confidential?

 3              A.   Yes.

 4              Q.   What did you do?

 5              A.   I spoke with counsel about the

 6    instances and -- and actions taken by Nokia in

 7    connection with production of the Nokia/Apple

 8    license agreement in litigation and related

 9    protective orders.

10              Q.   Anything else?

11              A.   I cannot think of anything else

12    right now.

13              Q.   How many times has the Apple/Nokia

14    license been produced by Nokia in litigation?

15              A.   I don't know the exact number.  My

16    understanding is that it -- it would be no more

17    than 10 times or around 10 times.  I -- I don't

18    know exactly.

19              Q.   Apart from the Samsung action, do

20    you know the names of any of those actions?

21              A.   No.

22              Q.   Did you undertake any steps to find

23    out what those other actions were?

24              A.   No.

25              Q.   Did you undertake any steps to find
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 112

```
 1    out whether or not the financial terms of the

 2    Apple/Nokia license have been disclosed in any of

 3    those other litigations?

 4              A.   Yes.

 5              Q.   What did you do?

 6              A.   I spoke with counsel about the

 7    steps Nokia has taken with respect to protective

 8    orders and production of this agreement in

 9    connection with those litigations.

10              Q.   And what was the information that

11    you received and you were relying upon?

12              A.   It was that Nokia has -- has in

13    cases where there have been requests to consent to

14    production of the Nokia/Apple license agreement,

15    Nokia has not consented to such production without

16    obtaining strict protective orders, and -- and in

17    several cases there -- there -- as a result the

18    agreement has not been produced and in cases where

19    it has been produced, strict protective orders

20    have been -- have been issued.

21              Q.   Can you identify any of those

22    actions?

23              A.   I don't recall the actions as such.

24              Q.   You're aware that the terms of the

25    Apple/Nokia license were produced in litigation by
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 113

1    Apple in the Netherlands, correct?

2              MR. LANTIER:  Objection to form.

3              MR. ALLEN:  Join in the objection.

4              A.   I -- I don't recall hearing about

5    the Netherlands.  I don't know.

6              BY MR. ZELLER:

7              Q.   Did you undertake any investigation

8    or take any steps in order to learn information to

9    testify here today about any disclosure that Apple

10   made of the Apple/Nokia license terms in an action

11   between Apple and Samsung in the Netherlands?

12             A.   Not specifically with respect to an

13   action in the Netherlands.

14             Q.   Did you do anything generally?

15             A.   As I already said, I had a

16   discussion with counsel about the steps Nokia has

17   taken to protect the confidentiality on the -- of

18   the terms in cases where either Nokia or -- or a

19   third party has been asking for consent to produce

20   the agreement.

21             Q.   And your understanding of that

22   discussion was that it related to the Netherlands

23   action?

24             A.   I cannot --

25             MR. ALLEN:  Objection, mischaracterizes

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 114

```
 1    the witness's testimony.  You may answer.
 2              A.   Yeah.  I -- I -- I discussed that
 3    in -- generally, not ruling out Netherlands but
 4    not inquiring specifically about Netherlands
 5    either.
 6              BY MR. ZELLER:
 7              Q.   Have you ever been involved or had
 8    any familiarity with litigation in the
 9    Netherlands?
10              A.   I have not been personally involved
11    in litigation in the Netherlands.
12              Q.   Did Nokia consent to Apple
13    producing the financial terms and other terms of
14    the Apple/Nokia license in the Netherlands case?
15              MR. LANTIER:  Objection to form.
16              A.   I don't know.
17              BY MR. ZELLER:
18              Q.   Was it aware of it?
19              A.   Are you asking me or Nokia?
20              Q.   I'm asking whether Nokia was aware
21    of it?
22              MR. LANTIER:  Objection to form.
23              A.   Aware of what?
24              BY MR. ZELLER:
25              Q.   Was Nokia aware that Apple produced
```

1    the financial terms and other terms of the

2    Apple/Nokia license in litigation in the

3    Netherlands?

4            MR. LANTIER:  Objection to form.

5            MR. ALLEN:  Joined.

6            A.   I don't know.

7            BY MR. ZELLER:

8            Q.   Were you aware of it?

9            MR. LANTIER:  Objection to form.

10           A.   I was not.

11           BY MR. ZELLER:

12           Q.   Are you aware that the Netherlands

13   court was given the terms of the Apple/Nokia

14   license, including its financial terms?

15           MR. LANTIER:  Objection to form.

16           A.   I'm not aware of such fact or

17   allegation.

18           BY MR. ZELLER:

19           Q.   That wasn't something counsel told

20   you about?

21           A.   I cannot comment on the content of

22   my discussion with counsel.

23           Q.   Who's the counsel who you described

24   earlier was the source of your information about

25   Nokia's production of the Apple/Nokia license in

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1    other litigations?

 2            MR. ALLEN:  You can answer the question

 3    to the extent that you were relying on counsel to

 4    identify those instances for you.

 5            A.   Right.  So -- so, the counsel that

 6    I discussed to prepare for this deposition were

 7    Randall Allen, Ron Antush and Mr. Miller.

 8            MR. ALLEN:  Parker Miller, Brian.

 9            MR. MILLER:  Brian Parker Miller, to be

10    precise.

11            BY MR. ZELLER:

12            Q.   What obligations of

13    confidentiality, if any, does the Netherlands

14    court have to keep confidential the terms of the

15    Apple/Nokia license, including its financing

16    terms?

17            MR. ALLEN:  Objection, foundation.

18            MR. LANTIER:  Objection to form.

19            A.   I don't know.

20            BY MR. ZELLER:

21            Q.   Does it have any?

22            MR. ALLEN:  Objection, foundation.

23            A.   I don't know.

24            MR. LANTIER:  Objection.

25            BY MR. ZELLER:
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 117

```
 1              Q.   Did you undertake any investigation

 2    to determine whether or not the Netherlands court

 3    has any obligation of confidentiality as it

 4    relates to the disclosure of the Apple/Nokia terms

 5    to it?

 6              MR. LANTIER:  Objection to form.

 7              A.   In preparation for this deposition,

 8    I did not take any action specifically relating to

 9    a court in the Netherlands.

10              BY MR. ZELLER:

11              Q.   Do you generally have an

12    understanding as to whether or not the Netherlands

13    court has any obligation of confidentiality as it

14    relates to information provided to the court?

15              A.   I don't know.

16              Q.   Well, you are aware that some of

17    the information that you relied upon concerning

18    the Samsung licenses was actually stated by

19    Apple's attorneys in the Netherlands case,

20    correct?

21              MR. ALLEN:  Objection, lack of

22    foundation.

23              MR. LANTIER:  Objection to form.

24              A.   No, I was not aware of such a

25    thing.
```

```
 1              BY MR. ZELLER:

 2              Q.   Well, during the course of

 3    negotiations with Samsung, you cited a Samsung

 4    rate of 2.4 per cent, correct?

 5              A.   Yes.

 6              Q.   Where did that come from?

 7              A.   From public materials.

 8              Q.   What public materials?

 9              A.   I don't recall the exact document,

10    but public materials that -- that have been

11    identified in the press covering Samsung's various

12    litigations.

13              Q.   Those were press accounts covering

14    Samsung's litigation with Apple in the

15    Netherlands, correct?

16              MR. ALLEN:  Objection to form.

17              A.   I don't recall seeing any press

18    accounts relating specifically to Samsung's

19    litigation in the Netherlands.

20              BY MR. ZELLER:

21              Q.   What's your understanding as to how

22    the Samsung 2.4 per cent rate became public?

23              A.   I don't know.

24              Q.   Did you think it was odd?

25              A.   Can you repeat?  What -- did
```

1    I think what was odd?  The 2.4 per cent odd?

2    Or -- or --

3            Q.   Did you think it was odd that you

4    were able to find Samsung's 2.4 per cent rate in

5    press accounts?

6            A.   I didn't express any opinion

7    whether it was odd or not.

8            Q.   You think that kind of information

9    is something that might or might not be public?

10           MR. ALLEN:  Objection to the form of the

11   question.  You can answer.

12           A.   I -- I don't know how Samsung

13   considers its -- its royalty rates.  Some

14   companies consider their royalty -- some companies

15   publicly disclose their requested royalty rates.

16   Some companies do not.  So I -- I did not as such

17   consider it odd if -- if Samsung's rate -- rate

18   would be public.  Some companies have chosen to

19   make it -- make it public.

20           BY MR. ZELLER:

21           Q.   Because sometimes royalty rates are

22   public and sometimes they are not, right?

23           MR. ALLEN:  Objection to the form of the

24   question.  You may answer.

25           A.   Some companies consider their

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 120

1    royalty rates to be confidential information and

2    some companies do not.

3            BY MR. ZELLER:

4

6            MR. ALLEN:  Objection to the form of the

7    question.  It's outside the scope.  I instruct the

8    witness not to answer.

9            BY MR. ZELLER:

10           Q.   Does Apple or -- excuse me.

11

13           MR. ALLEN:  Object to the form, I'll let

14   you answer.

15

```
 1                MR. ALLEN:  Objection, asked and
 2       answered.  You may answer it again.
 3                A.   Nokia considers its royalty rates
 4       and licensing structure to be proprietary and
 5       confidential information, disclosed under
 6       non-disclosure agreements.
 7                BY MR. ZELLER:
 8                Q.   Has Nokia ever publicly disclosed
 ▮       ███████████████████████  I'm talking about any
10       instance of it.
11                A.   I'm not aware of Nokia publicly
12       disclosing ████████████████████████████████
 ▮       ██████████████████████████████████████████
 ▮       ██████████████████████████
15                However, Nokia has publicly said that --
16       that it -- it is willing, in certain
17       circumstances, to limit its royalty rate asks
18       relating to certain standards and certain SEPs to
19       2 per cent of the net sales price.
20                Q.   If Apple disclose to the
21       Netherlands court the financial terms of the
22       Apple/Nokia license without any obligation of
23       confidentiality as to the Netherlands court, do
24       you believe that Apple has complied with the
25       license?
```

Page 122

```
 1            MR. ALLEN:  Objection to the form of the

 2    question.

 3            MR. LANTIER:  Objection to form.

 4            MR. ALLEN:  Foundation.

 5            A.   I'm not here to interpret the

 6    license agreement between Nokia and Apple.

 7            BY MR. ZELLER:

 8            Q.   Does Apple have an obligation to

 9    Nokia to obtain consent or provide notice prior to

10    the time that Apple discloses the financial terms

11    of the Apple/Nokia license to anyone without an

12    obligation of confidentiality?

13            MR. ALLEN:  Objection to the form of the

14    question.  Calls for a legal conclusion.

15            A.   I'm not here to interpret the

16    Nokia/Apple license agreement.  The agreement

17    speaks for itself.

18            BY MR. ZELLER:

19            Q.   So you can't answer that question?

20            A.   I don't answer that question.

21            Q.   You say you don't answer it.  Do

22    you know the answer to that question; "yes" or

23    "no"?

24            MR. ALLEN:  Objection to the form of the

25    question.  Calls for a legal conclusion.  To the
```

```
 1    extent you have an independent answer, you may

 2    offer it.

 3              A.   Can you repeat the question?

 4              BY MR. ZELLER:

 5              Q.   Does Apple have an obligation to

 6    inform or obtain the consent from Nokia, prior to

 7    the time it discloses the financial terms of the

 8    Apple/Nokia license, to anyone without an

 9    obligation of confidentiality?

10              MR. ALLEN:  I'm going to object to the

11    form of the question.  It calls for a legal

12    conclusion.  You may answer his question.

13              A.   I'm not here to interpret the

14    Nokia/Apple license agreement.

15              BY MR. ZELLER:

16              Q.   Do you have an understanding of it?

17              MR. ALLEN:  Objection to the form of the

18    question.

19              A.   I am familiar with the Nokia/Apple

20    license agreement.

21              BY MR. ZELLER:

22              Q.   Please tell me your understanding.

23              MR. ALLEN:  What are we talking about

24    now?

25              MR. ZELLER:  You really want to go
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 124

```
 1    through this?  This is so transparently

 2    obstructionist.  There is some ambiguity to you as

 3    to what I'm asking his understanding about, is

 4    that right?  It's unclear to you as well, right,

 5    is that your testimony?  Go ahead and say it with

 6    a straight face.

 7              MR. LANTIER:  Objection to the form.

 8              MR. ZELLER:  Is it?

 9              MR. ALLEN:  Hold on, Mike.  Just slow

10    down for just a second, OK?

11              MR. ZELLER:  He complains if I ask too

12    long a question.  Then if, of course, I ask a

13    follow-up I'm supposed to repeat the whole thing.

14    That's obviously so transparent.  Let's start

15    again.

16              MR. ALLEN:  Whether you think it's

17    transparent or not, treat the witness with

18    respect.  The witness is treating you with

19    respect --

20              MR. ZELLER:  No, he's actually not.

21    Both of you are acting like somehow this is a

22    game.

23              MR. ALLEN:  It's not a game.  This is a

24    very serious matter.

25              MR. ZELLER:  Well, you should take it
```

```
 1    that way.
 2              MR. ALLEN:  We do take it that way and
 3    the only thing I'm asking you is to treat this
 4    witness with respect.  Pose your question --
 5              MR. ZELLER:  When he starts doing it,
 6    I will.  But let me ask the question.
 7              MR. ALLEN:  Your obligation is
 8    independent of anything you think he's doing or
 9    not doing.  Treat him with respect as a
10    professional.  That's all I'm asking you.  You can
11    do that.
12              BY MR. ZELLER:
13         Q.   It was unclear to you what that
14    question was asking, right?
15              MR. ALLEN:  Objection to the form of the
16    question.  I don't even know what question you're
17    asking about now.
18         A.   Neither do I.
19              BY MR. ZELLER:
20         Q.   You can't recall the question now,
21    it's just totally lost to you, is that true?
22         A.   You have -- you have asked seven
23    questions, or something like that, in a row
24    without letting me answer a single one.  So, why
25    don't you now state your question?
```

```
 1             BY MR. ZELLER:

 2             Q.   Do you have an understanding as to

 3    whether or not Apple is obliged to disclose or

 4    inform Nokia prior to the time that it discloses

 5    the terms of the Apple/Nokia license to anyone,

 6    without an obligation of confidentiality?

 7             MR. ALLEN:  Objection to the form of the

 8    question and also calls for a legal conclusion.

 9    You may answer the question.

10             A.   I am familiar with the Nokia/Apple

11    license agreement.  I have an understanding of

12    that agreement.

13             BY MR. ZELLER:

14             Q.   What is that understanding?

15             A.   The agreement speaks for itself.

16             Q.   Do you have an understanding or

17    believe that Apple is obligated to disclose to

18    Nokia prior to the time that it discloses the

19    information of the Apple/Nokia license to any

20    party without an obligation of confidentiality?

21             MR. ALLEN:  Objection to the form of the

22    question.  The question also calls for a legal

23    conclusion.  The witness is not a lawyer.  You may

24    respond to the question.

25             A.   I don't think I can answer that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 127

1    question without disclosing attorney/client

2    privileged communication.

3              BY MR. ZELLER:

4              Q.   Has Nokia made any complaint to

5    Apple regarding Apple's disclosure of the

6    Apple/Nokia license terms to the Netherlands

7    court?

8              MR. LANTIER:  Objection to form.

9              A.   I don't know.

10             BY MR. ZELLER:

11             Q.   Have you made such a complaint?

12             A.   Are you asking me personally?

13             Q.   Yes.

14             A.   I personally have not made such a

15   complaint.

16             Q.   Did you undertake any investigation

17   or do anything to prepare for today's deposition

18   to find out if such a complaint had been made?

19             A.   I did not specifically investigate

20   whether such a complaint had been made.

21             Q.   Has there ever been any

22   communication between Apple and Nokia, as it

23   relates to the disclosure of any of the terms of

24   the Apple/Nokia license, to any other party?

25             MR. LANTIER:  Objection to form.

```
 1            A.   I believe there have.

 2            BY MR. ZELLER:

 3            Q.   On how many occasions?

 4            A.   I don't know.

 5            Q.   What do you know about those

 6   disclosures?

 7            A.   I know that there have been

 8   requests to consent to production of the

 9   Nokia/Apple license agreement in connection with

10   litigation.

11            Q.   How are you aware of that?

12            A.   I have been informed by our

13   attorneys.

14            Q.   In preparation for this deposition?

15            A.   Yes, and otherwise.

16            Q.   Are there any instances in which

17   you can identify where such requests were made?

18            MR. ALLEN:  You mean specific cases?

19            BY MR. ZELLER:

20            Q.   Yes.

21            A.   I don't recall specific cases.

22            Q.   Can you name one?

23            A.   I don't recall specific cases.

24            Q.   I'm not asking about cases.  Is

25   there a single one you can name?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 129

```
 1              A.   I believe I already answered that;
 2     no.
 3              Q.   Did you actually review any such
 4     communications?
 5              MR. ALLEN:  In connection with his
 6     preparation for this deposition?
 7              BY MR. ZELLER:
 8              Q.   Yes.
 9              A.   I did not review such
10     communications specifically in preparation for
11     this deposition.
12              BY MR. ZELLER:
13              Q.   During the course of your
14     preparation for this deposition, did you learn
15     that Apple had disclosed the Apple/Nokia license
16     terms to the SEC?
17              MR. LANTIER:  Objection to form.
18              A.   I am not aware of Apple having
19     disclosed the license terms to the SEC.
20              BY MR. ZELLER:
21              Q.   I take it you have not learned from
22     any source that Apple disclosed the financial
23     terms of the Apple/Nokia license to the SEC?
24              A.   I have --
25              MR. LANTIER:  Objection to form.
```

```
 1              A.   I have not heard that Apple would
 2   have disclosed the financial terms to the SEC.
 3              BY MR. ZELLER:
 4              Q.   Did Apple ask for Nokia's consent
 5   to do so?
 6              A.   I don't know.
 7              Q.   Did it provide notice to Nokia that
 8   it did so?
 9              A.   I don't know.
10              MR. LANTIER:  Objection to form.
11              BY MR. ZELLER:
12              Q.   Does Apple -- well, strike that.
13              Is Apple free to disclose to third
14   parties the financial terms of the Apple/Nokia
15   license agreement?
16              MR. ALLEN:  Objection to the form of the
17   question.  The question also calls for a legal
18   conclusion.  You may answer his question.
19              A.   When you say is Apple free, what do
20   you mean with that?
21              BY MR. ZELLER:
22              Q.   Under the Apple/Nokia license, is
23   it your understanding that Apple has the right to
24   disclose to third parties the financial terms of
25   the Apple/Nokia license agreement?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 131

1              MR. ALLEN:  Objection to the form of the

2     question.  The question also calls for a legal

3     conclusion.  You may answer his question.

4              A.   I am not here to interpret the

5     Nokia license agreement.  The agreement speaks for

6     itself.

7              BY MR. ZELLER:

8              Q.   So you don't know?

9              A.   I did not say that.

10             Q.   You do know and you are refusing to

11     answer, is that right?

12             A.   I did not --

13             MR. ALLEN:  Objection to the form of the

14     question.

15             A.   -- say that either.

16             BY MR. ZELLER:

17             Q.   Please tell me whether you have an

18     understanding, one way or another, as to whether

19     or not Apple is free to disclose to third parties

20     the terms, including the financial terms, of the

21     Apple/Nokia license?

22             MR. ALLEN:  I object to the form of the

23     question.  The question calls for a legal

24     conclusion and the witness is not a lawyer.  He

25     has already told you he can't disclose this

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 132

```
1    information without revealing attorney/client

2    privilege.  This is like the third circle around.

3            BY MR. ZELLER:

4            Q.   Go ahead.

5            A.   I don't think I can answer that

6    question without disclosing attorney/client

7    privileged communication.

8            Q.   You have no understanding, at all,

9    apart from communications you have had with

10   attorneys, is that true?

11           MR. ALLEN:  Objection, argumentative.

12           A.   That's not what I said.

13           BY MR. ZELLER:

14           Q.   Please tell me what your

15   understanding is, separate and apart from your

16   communications with attorneys, as to whether or

17   not Apple is free to disclose the financial terms

18   of the Apple/Nokia license to third parties?

19           MR. ALLEN:  I will object to the form of

20   the question.  The question calls for a legal

21   conclusion, the witness is not a lawyer.

22           A.   I am not here to interpret the

23   Nokia/Apple license agreement.  I don't have a

24   view separate from communications with counsel.

25           BY MR. ZELLER:
```

```
 1              Q.   Does Nokia have any information

 2   regarding whether or not the SEC has any

 3   obligation of confidentiality regarding the

 4   financial terms of the Apple/Nokia license that

 5   Apple disclosed to the SEC?

 6              MR. ALLEN:  Objection to form.

 7              MR. LANTIER:  Objection to form.

 8              MR. ALLEN:  Foundation.  You may answer.

 9              A.   The question assumes that Apple

10   disclosed something to the SEC.  I am not aware of

11   such a fact.

12              BY MR. ZELLER:

13              Q.   You were saying earlier that you

14   consider the financial terms of the Apple/Nokia

15   license to be extremely sensitive, right?

16              A.   Yes.

17              Q.   You would be troubled if you were

18   to learn that Apple had disclosed the Apple/Nokia

19   license terms, those financial terms, to third

20   parties without notifying or obtaining the consent

21   of Nokia, right?

22              MR. LANTIER:  Objection to form.

23              MR. ALLEN:  Objection to the form of the

24   question.

25              A.   I would be troubled if there were
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 134

```
 1     violations of court orders or -- or improper

 2     disclosure of -- of the terms.

 3               BY MR. ZELLER:

 4               Q.   Anything else?

 5               A.   That's not an exhaustive list of

 6     the circumstances that would trouble me.

 7               Q.   Right.  Then I'm asking about a

 8     very particular one.  Would you be troubled to

 9     learn that Apple had disclosed the financial terms

10     of the Apple/Nokia license to third parties

11     without notifying Nokia or obtaining its consent?

12               MR. LANTIER:  Objection to form.

13               A.   I think that would be a

14     hypothetical situation and would call for me to

15     speculate about my emotional response.

16               BY MR. ZELLER:

17               Q.   You are aware that it was reported

18     in the press that -- that Apple had disclosed the

19     financial terms, in fact all the terms of the

20     Apple/Nokia license to the SEC, you are aware of

21     that --

22               MR. LANTIER:  Objection to form.

23               BY MR. ZELLER:

24               Q.   -- right?

25               MR. ALLEN:  Objection to form.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 135

```
 1                A.   I don't recall ever learning about

 2      that.

 3                BY MR. ZELLER:

 4                Q.   Is that something you think you

 5      would forget?

 6                MR. ALLEN:  Objection to the form of the

 7      question.

 8                A.   I don't speculate.  I am not aware

 9      of that happening.

10                BY MR. ZELLER:

11                Q.   Did Nokia ever write and complain

12      to Apple that it had disclosed the financial terms

13      of the Apple/Nokia license to the SEC?

14                A.   I am not aware of such writing or

15      complaint.

16                Q.   And I take it that no-one at Nokia,

17      as far as you know, is aware of the public reports

18      that Apple had disclosed such information to the

19      SEC, is that true?

20                MR. LANTIER:  Objection to form.

21                MR. ALLEN:  Joined.

22                A.   I am not aware of such public

23      reports.

24                BY MR. ZELLER:

25                Q.   Did you undertake any steps to
```

```
 1    learn as to whether any of these other 10 people,

 2    or anyone else within Nokia who deal with

 3    licenses, were aware of this fact?

 4              MR. LANTIER:  Objection to form.

 5              A.   Were aware of what fact?

 6              BY MR. ZELLER:

 7              Q.   Aware of Apple's disclosure of the

 8    Apple/Nokia license terms to the SEC?

 9              MR. ALLEN:  Do you want him --

10              MR. LANTIER:  Objection to form.

11              MR. ALLEN:  -- to assume that that's a

12    fact?  Are you representing to him that that's a

13    fact?

14              MR. ZELLER:  Yeah, I am representing it.

15              A.   Can you repeat the question,

16    please?

17              BY MR. ZELLER:

18              Q.   Did you undertake any steps to find

19    out whether Apple had disclosed the Apple/Nokia

20    license terms to the SEC?

21              A.   I did not take any specific steps

22    to find out about that specific alleged fact.

23              Q.   Did you ask anyone else at Nokia

24    whether they were aware of it?

25              A.   I did not ask anybody within Nokia
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 137

```
 1    specifically whether they were aware of Apple

 2    having disclosed the financial terms of the

 3    Nokia/Apple agreement to the SEC.

 4              Q.   Does Nokia have any information as

 5    to whether or not the SEC has any obligation of

 6    confidentiality with respect to the Apple/Nokia

 7    license terms that Apple disclosed to it?

 8              MR. LANTIER:  Objection to form.

 9              MR. ALLEN:  Joined.

10              A.   I don't know whether Apple has

11    disclosed it, but I'm not aware of -- of -- of --

12    to what extent Nokia individuals would be aware of

13    such of those.

14              BY MR. ZELLER:

15              Q.   In preparation for your deposition,

16    did you speak with anyone at Nokia, setting aside

17    your counsel, anyone actually at Nokia about

18    whether or not Apple had disclosed any of the

19    license terms to third parties?

20              A.   I'm not aware of any improper

21    disclosure of the license terms by Apple and --

22    and -- and if anybody at Nokia would become aware

23    of such improper disclosure, I am sure they would

24    report it to me.

25              Q.   I'm asking you a very different
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 138

```
 1    question.  Please focus on the question.

 2              In preparation for your deposition, did

 3    you speak with anyone at Nokia about whether Apple

 4    had disclosed the license terms to any third

 5    parties?

 6              MR. ALLEN:  Objection, asked and

 7    answered.

 8              A.   Nokia's license agreements and

 9    their confidentiality are a part of my normal

10    course of responsibilities.  I did not

11    specifically make such further inquiries in

12    connection with this issue in preparation for this

13    deposition.

14              BY MR. ZELLER:

15              Q.   Is there someone at Nokia, other

16    than yourself, you believe should be aware of

17    disclosures that Apple has made to third parties

18    of the terms of the Apple/Nokia license?

19              MR. ALLEN:  Objection to the form of the

20    question.

21              A.   Are you referring to disclosures

22    made by Apple with Nokia's consent or some other

23    disclosures?

24              BY MR. ZELLER:

25              Q.   Any disclosures.
```

Page 139

```
 1              A.   I believe Nokia's litigation team

 2    has the responsibility for managing the process

 3    for requesting or consenting to disclosure of

 4    license agreements to various courts.

 5              Q.   And who are you referring to?

 6              A.   I am referring to Ron Antush and

 7    his team.

 8              Q.   Can you spell that name, please?

 9              MR. ALLEN:  A-n-t-u-s-h, the gentleman

10    sitting to my left.

11              BY MR. ZELLER:

12              Q.   OK.  Anyone else?

13              A.   His team has the primary

14    responsibility.

15              Q.   Did you speak to him, or anyone on

16    his team, about any disclosures that Apple had

17    made of the Apple/Nokia license terms?

18              MR. LANTIER:  Objection to form.

19              MR. ALLEN:  Objection, it's asked and

20    answered.  You may answer it again.

21              A.   I cannot disclose the content of

22    attorney/client communication.  I -- I did speak

23    with Mr. Antush in preparation for this

24    deposition.

25              BY MR. ZELLER:
```

```
 1                Q.   Did you discuss the SEC disclosure?

 2                MR. ALLEN:  Objection to the form of the

 3     question.  You may answer.

 4                A.   I did not specifically discuss the

 5     SEC disclosure.

 6                BY MR. ZELLER:

 7                Q.   Did you discuss the Netherlands

 8     court disclosure?

 9                A.   I did not specifically discuss

10     the Netherlands court disclosure.

11                Q.   Return to the June 4 meeting.  How

12     long did it last?

13                A.   A few hours.  I don't recall

14     exactly.

15                Q.   You say a few hours.  Was it more

16     than two?  More than five?

17                A.   I would say between two and five,

18     I believe.

19                Q.   Can you narrow it down?

20                A.   No.

21                Q.   Of that two to five hours, was all

22     of it spent talking with Samsung or were there

23     breaks?

24                A.   There were breaks.

25                Q.   How long were the breaks?
```

```
 1              A.   I don't recall exactly.

 2              Q.   How many breaks were there?

 3              A.   At least two.

 4              Q.   You say at least.  Were there two

 5    or more?

 6              A.   There were two or three.

 7              Q.   How much time in total was spent

 8    actually speaking face-to-face with the Samsung

 9    representatives of that two to five hours?

10              A.   I don't know exactly.  My estimate

11    would be approximately one hour.

12              Q.   How did the meeting begin?

13              A.   We had introductions and -- and

14    Dr. Ahn went straight into business and made his

15    offer to Nokia.

16              Q.   Did anyone else speak during that

17    time period when Dr. Ahn was making the offer?

18              A.   He was the main Samsung

19    representative doing the speaking.  I don't recall

20    whether the others added something or commented.

21              Q.   Did the others -- the other Samsung

22    representatives speak at all during the course of

23    the meeting?

24              A.   I don't recall specifically.  They

25    may well have spoken somewhat, but Dr. Ahn was the
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 142

```
 1   main speaker.
 2            Q.   Do your notes reflect whether or
 3   not the other Samsung representatives said
 4   anything during the course of the meeting?
 5            A.   Not specifically.
 6            Q.   Do you have his notes?
 7            A.   I don't recall.
 8            Q.   How long did this first session
 9   last?
10            A.   I don't recall specifically.
11   I would estimate 10 or 15 minutes.
12            Q.   What was said, other than Dr. Ahn
13   presenting this offer during that first session?
14            MR. ALLEN:  Objection, asked and
15   answered.  You may answer again.
16            A.   Yes, we had introductions and
17   Dr. Ahn made his offer.  He explained the
18   financial terms that he was offering and said
19   that -- that he has done an extensive analysis
20   of -- of all the issues pertaining to the
21   situation and -- and that he has an idea of
22   what -- what Apple pays to Nokia, and that he has
23   considered everything in making his offer.  And he
24   said that this offer is only available for that
25   day, apart from a situation where Nokia needs
```

```
 1    to -- needs to take it back home for management
 2    approvals or the like.  And -- and he made that
 3    offer.
 4              BY MR. ZELLER:
 5              Q.   Prior to the time that Dr. Ahn made
 6    this offer and apart from the introductions, did
 7    you say anything at this meeting during this
 8    session?
 9              A.   This first session?
10              Q.   Yes.
11              A.   I may have asked some clarifying
12    questions so -- to ensure that I understood
13    Samsung's offer.  But apart from that, I don't
14    recall stating anything.
15              Q.   Did you ask those questions during
16    the course of Dr. Ahn making his offer in giving
17    the explanation or was it after?
18              A.   It would have been after.
19              Q.   What questions did you ask?
20              A.   I don't recall.
21              Q.   Do you recall any of them?
22              A.   No.
23              Q.   How many were there?
24              A.   I don't recall.
25              Q.   More than one?
```

```
 1                A.   I don't recall.

 2                Q.   More than five?

 3                A.   I don't recall.

 4                Q.   More than 10?

 5                A.   I don't recall.

 6                Q.   More than 100?

 7                A.   I don't recall.

 8                Q.   So this statement, this explanation

 9     that Dr. Ahn gave, how long did it take of the

10     10 to 15 minutes you say that this first session

11     lasted?

12                A.   Maybe five or ten minutes, I would

13     assume.

14                Q.   Did Dr. Ahn have any written

15     materials that he provided you or showed you in

16     connection with this offer?

17                A.   No.

18                Q.   During the course of these

19     questions that you asked Dr. Ahn, did you ask him

20     anything about the Apple/Nokia license terms?

21                MR. ALLEN:  Did -- excuse me, restate

22     the question again, I'm sorry.

23                BY MR. ZELLER:

24                Q.   During this first session, when you

25     asked questions of Dr. Ahn of the explanation, did
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 145

```
 1    you ask Dr. Ahn anything about the Apple/Nokia

 2    license terms?

 3              A.   I don't recall asking anything

 4    about them.

 5              Q.   So your recollection is that you

 6    did not?

 7              A.   In that first session?

 8              Q.   Correct.

 9              A.   I -- my recollection is that I --

10    I did not.

11              MR. ALLEN:  Mike, when you get to a

12    breaking point, let's take a break.  Are you

13    close?

14              MR. ZELLER:  Yeah, I can -- I can do

15    that in a second, but let me just finish up a few

16    things here to make sure we have a complete

17    testimony.

18              Q.   When Dr. Ahn said, in substance, "I

19    have an idea what Apple pays Nokia", did you ask

20    him what he meant?

21              A.   I found that -- that comment very

22    odd.  But as that was in that first session still

23    made in the -- in the connection of his -- his

24    broader offer and he at that point in the meeting

25    did not yet recite the specific confidential
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 146

```
 1    information, I did not inquire in detail about

 2    that at that point, based on my recollection.

 3           I am not quite sure at what point each

 4    of the things happened before or after the break.

 5    But that's my recollection of the timing.

 6           Q.   And I'm not asking if you inquired

 7    in detail.  Did you ask him anything or say

 8    anything in response to that statement during the

 9    first session?

10           A.   My recollection is that most of

11    that discussion occurred after the break, so I

12    don't recall asking anything prior to the break.

13           Q.   Is there anything else you can

14    recall being said during the first session other

15    than what you have told me?

16           A.   As I sit here today, no.

17           MR. ZELLER:  Why don't we take a few

18    minutes.

19           MR. ALLEN:  OK.

20           VIDEOGRAPHER:  Going off the record.

21           MR. ALLEN:  Just five.

22           VIDEOGRAPHER:  Going off the record.

23    The time is 15:45.  End of tape 2, Volume I of the

24    videotaped deposition of Paul Melin.

25    (3.45 pm)
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 147

```
 1                    (Off the record.)

 2     (3.59 pm)

 3                    VIDEOGRAPHER:  This is the beginning of

 4     videotape number 3, Volume I in the videotaped

 5     deposition of Paul Melin.  Going on the record.

 6     The time is 15:59.  Thank you.

 7                    MR. ALLEN:  Michael, before you get

 8     rolling.  You've asked a couple of questions about

 9     the notes.  As you're aware we have the notes here

10     today.

11                    Nokia is willing to produce those notes,

12     subject to an agreement, and it would have to be

13     an agreement from both Samsung and Apple, that the

14     production of the notes does not constitute a

15     waiver; that the production of the notes would not

16     be used to argue further waiver; and that Samsung

17     does not object to the notes being provided to

18     Apple.  I would -- I would also like to ask if we

19     produce the notes, I don't want the production of

20     the notes to be used to delay the deposition a

21     further day.

22                    MR. ZELLER:  I'll -- I'll think about

23     your proposal.

24                    MR. ALLEN:  Do that.

25                    BY MR. ZELLER:
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 148

```
 1              Q.   There was a break after the -- the
 2    first session at the June 4 meeting?
 3              A.   I didn't hear a question there.
 4              Q.   Well, was there a break after the
 5    first session at the June 4 meeting?
 6              A.   Yes.
 7              Q.   How long did that break last?
 8              A.   It was quite a long break.  Close
 9    to an hour, probably.
10              Q.   Did you ask for it?
11              A.   I think we did.
12              Q.   Why?
13              A.   Because it was quite natural as
14    Samsung extended an offer in the first session of
15    the -- of the meeting and was asking for our
16    response, and he clearly wanted to have an
17    internal discussion before providing such a
18    response.
19              Q.   And when you say an internal
20    discussion, you are referring to a discussion with
21    others at Nokia?
22              A.   I'm referring to a discussion
23    between myself and Eeva Hakoranta.
24              Q.   Anyone else?
25              A.   No.
```

Page 149

```
 1                 Q.   Did you, in fact, get in contact

 2      with anyone else at Nokia other than Eeva?

 3                 A.   No.

 4                 Q.   What was your understanding of what

 5      Eeva's role was at this meeting?

 6                 A.   She was providing legal counsel to

 7      me and also having been involved in the preceding

 8      negotiations with Samsung, she also had the full

 9      context of the ongoing negotiations.

10                 Q.   When you say that she had been

11      involved in the preceding negotiations with

12      Samsung, was she involved in business discussions

13      with Samsung?

14                 A.   When you say business discussions,

15      are you referring to patent licensing discussions?

16                 Q.   Well, I'm saying was she involved

17      in the patent licensing discussions as a business

18      person as opposed to someone providing legal

19      advice?

20                 MR. ALLEN:  Objection to the form of the

21      question.  Foundation.  You may answer.

22                 A.   I don't quite understand what you

23      mean as a business person.

24                 BY MR. ZELLER:

25                 Q.   Was her role in the prior
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 150

```
1    negotiations to provide legal advice?

2              MR. ALLEN:  Same objection.  You may

3    answer.

4              A.   I think you would need to specify

5    which meeting and which particular role you are

6    referring to.

7              BY MR. ZELLER:

8              Q.   I am referring to the prior

9    negotiations.  Would your answer depend on what

10   particular meetings there were as to whether or

11   not she was there to provide legal advice?

12             A.   Maybe it would.  I don't know when

13   you don't specify what meeting you are referring

14   to.

15             Q.   Focusing on the June 4, 2013

16   meeting, was Eeva there for any reason other than

17   to provide legal advice?

18             A.   She -- she was there because she

19   was deeply familiar with the negotiations with

20   Samsung and -- and so she was there both to -- to

21   provide -- provide information and -- and

22   participate in -- in the negotiations as well as

23   provide legal advice.

24             Q.   I take it after or during that

25   first break, you and Eeva spoke?
```

1          A.   Was there a question there?

2          Q.   Yes.

3          A.   I didn't hear a question.

4          Q.   Did you not hear all the words or

5     what is it?

6          A.   I -- I heard that "I take that..."

7     and I heard that there is a statement.  So -- so,

8     was there a question there?

9          Q.   There's a -- something that's

10    called a convention that if someone rises their

11    voice at the end, it's a question.  Is there --

12    are you familiar with that?

13         MR. ALLEN:  Why don't you just phrase

14    the -- phrase it as a question, so it's presented

15    to him, Mike.  Please.

16         BY MR. ZELLER:

17         Q.   Is there -- was there something I

18    didn't ask about the question that was unclear to

19    you?  Is that -- just please tell me.

20         A.   My understanding is that this is

21    being also transcribed and -- and I have been told

22    not to convey messages in depositions by my tone

23    of my voice but rather say things clearly.  I was

24    just asking you to state if you have a question.

25         Q.   Well, you know, what we can do is

1    we can look at the transcript and apparently the

2    court reporter heard my intonation sufficiently to

3    put a question mark at the end of it.  So if you

4    are now going to quarrel about exactly how the

5    question is delivered to you -- is this -- is this

6    typically --

7              MR. ALLEN:  Just stop.

8              MR. ZELLER:  -- what you do during a

9    deposition; "yes" or "no"?

10             MR. ALLEN:  Just stop.  Pose a question

11   to him about the subject matter of the deposition

12   and we'll proceed.

13             BY MR. ZELLER:

14             Q.   Is that something you typically do

15   during a deposition, sir, "yes" or "no"?

16             MR. ALLEN:  Objection to the question,

17   it's argumentative.  Instruct the witness not to

18   answer.  You -- you may answer -- ask a question

19   about the subject matter of the deposition.

20             BY MR. ZELLER:

21             Q.   Did you and Eeva have a discussion

22   on any subject during the first break?

23             A.   Yes.

24             Q.   What did you discuss?

25             MR. ALLEN:  Object to the form of the

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 153



 1    question.  I caution the witness to the extent

 2    that he is responding to the question that he not

 3    reveal any attorney/client privileged --

 4    attorney/client work product or communication.

 5    Subject to that, you may respond to his question.

 6

15              BY MR. ZELLER:

16                  Q.    Anything else?

17                  A.    I believe the rest of the

18    discussion would be attorney/client privileged.

19                  Q.

22                  MR. ALLEN:  Objection, asked and

23    answered.  You may answer it again.

24

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 154

13          BY MR. ZELLER:

14               Q.   Please tell me the -- well, when

15     you said "we" were surprised, who was -- who

16     expressed this exactly first?  Surprised how close

17     that corresponded to the amount, who said that

18     first?

19               A.   I don't recall who said first that

20     they were surprised.  My recollection is that

21     I would have made that calculation.

22               Q.   I didn't ask who made the

23     calculation.  I am asking who uttered those words

24     first?

25               MR. ALLEN:  Objection, asked and

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

1    answered.

2              A.   I don't -- I don't think I said

3    that anybody uttered any specific words.  I said

4    that we were surprised.

5              BY MR. ZELLER:

6              Q.   Did you or Eeva use the words or

7    state in substance that the offer that Samsung

8    made somehow corresponded to the terms of the

9    Apple/Nokia license?  Does -- is that something

10   that was actually said?

11             MR. ALLEN:  Objection, compound.  You

12   may answer his question.

13             A.   Just to clarify, are you asking

14   about the discussions between me and Eeva during

15   the break?

16             BY MR. ZELLER:

17             Q.   Correct.

18             A.   Yes.  I believe we made that

19   notion, ███████████████████████████████████

██  ████████████████████████████████████

██  ███████████████████████

22             Q.   Who said that?  Who used these

23   words?

24             A.   I did not say -- let me specify.

25   Don't put words into my mouth.  I did not say that

```
 1    I said or anybody said those specific words, being

 2    surprised.  I think I said that we both were

 3    surprised and I made that calculation and --

 4    and -- and clearly made the point, ███████████

      █ ██████████████████████████████████████████

      █ ██████████████████████████████████████████

      █ ██████████████████████████████████████████

 8              Q.   Please tell me the words that you

 9    used to convey that to Eeva --

10              A.   I did not --

11              Q.   -- in the break?

12              A.   I did not make verbatim minutes of

13    those internal exchanges.

14              Q.   I am not asking about minutes.  I'm

15    asking:  what did you say?

16              A.   I don't recall those specific

17    words.

18              Q.   What specific words did you use

19    that you recall?

20              A.   I don't recall what specific words

21    I used in that internal discussion.

22              Q.   Do you recall any of the specific

23    words that you used in that discussion on the

24    subject of the Apple/Nokia license?

25              ███  ██████████████████████████████
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 157

5          Q.   Any other words that you used?

6          A.   I don't recall.

7          Q.   What were the words that Dr. Ahn

8    used specifically, and I want to know the actual

9    words that he used during the first session as it

10   related to the Apple/Nokia license?

11         A.   In -- in the first session, as it

12   related to the Apple/Nokia license he said that --

13   that he has an idea of what Apple pays to Nokia

14   under its own license agreement with Nokia.

15         Q.   Those are the words that he used,

16   that he had an idea?

17         A.   In the first session of the

18   meeting, yes.

19         Q.   So those words you do recall

20   specifically, is that true?

21         A.   Yes.

22         Q.   During the -- the course of the

23   last break that you took during this deposition,

24   did you look at any of your notes?

25         A.   No.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 158

```
 1              Q.   Did you look at Eeva's notes?

 2              A.   No.

 3              Q.   Did you review any documents?

 4              A.   No.

 5              Q.   You testified earlier that you and

 6    Eeva discussed the "peculiar comment" that you say

 7    Dr. Ahn made about the Apple/Nokia license, do you

 8    recall that?

 9              A.   Yes.

10              Q.   Did one of you use the words

11    "peculiar comment"?

12              A.   I don't remember whether I used the

13    word "peculiar" or the word "odd" or "surprising"

14    or something of the like.  I believe we had that

15    discussion in the Finnish language and that would

16    depend on how you translate.

17              Q.   Is Finnish your first language?

18              A.   Yes.

19              Q.   Is Finnish Eeva's first language?

20              A.   Yes.

21              Q.   Do you have an understanding as to

22    whether or not Dr. Ahn's first language is

23    English?

24              A.   My understanding is that his first

25    language is Korean, but I am not sure about that.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 159

```
 1          Q.   Anything else that you discussed

 2    with Eeva during that first break other than what

 3    you have testified about?

 4          MR. ALLEN:  I again caution you to take

 5    care not to disclose attorney/client privileged

 6    communications or attorney work product.  Other

 7    than that, you may respond to his question.

 8          A.   My understanding is that the rest

 9    of our conversation was attorney/client

10    privileged.

11          BY MR. ZELLER:

12          Q.   Are you withholding information

13    from your answers based on the attorney/client

14    privilege?

15          MR. ALLEN:  Do you mean, were there

16    other discussions during the break that he is not

17    testifying about here today?

18          MR. ZELLER:  Correct.

19          MR. ALLEN:  OK.  You may answer that.

20          A.   Yes.

21          BY MR. ZELLER:

22          Q.   And when you said in substance to

23    Eeva that the Samsung offer was ████████████████

      ██  ██████████████████████████████████

25    response?
```

```
 1              A.   Surprise -- or not necessarily

 2    surprise to my comment.  I -- I believe she may

 3    have drawn the same conclusion as I did already

 4    earlier.  So we were commonly -- what -- we both

 5    were surprised at the very beginning of that

 6    break.

 7              Q.   Did she say anything in response to

 8    your -- your statement during the break?

 9              A.   I don't recall her specific

10    response.

11              Q.   Did she have a response?

12              A.   I don't recall her specific

13    response, whether it --

14              Q.   I'm not even asking about what it

15    was.  Do you recall whether she had a response?

16              A.   We had a discussion, so she said

17    things, I said things.

18              Q.   What did she say?

19              MR. ALLEN:  Objection, asked and

20    answered.

21              A.   I don't recall what she

22    specifically said.

23              BY MR. ZELLER:

24              Q.   What did she generally say?

25              A.   She expressed surprise, like I did,
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 161

```
 1    both at the -- at the -- the peculiar comment that

 2    Dr. Ahn made as well as the negotiation approach

 3    of Samsung.

 4              Q.   Do you recall any of the words that

 5    she used to convey that?

 6              A.   I don't recall the specific words.

 7              Q.   Do you recall even a single word?

 8              MR. ALLEN:  Objection to the form of the

 9    question.  You may answer.

10              A.   Yeah, I -- again if you want a

11    literal answer to a literal question, I'm sure

12    she used the words "Apple" and "Samsung" and --

13    and other like common words associated with the

14    topic.

15              BY MR. ZELLER:

16              Q.   Any other words?

17              A.   I don't recall.

18              Q.   Is there anything specific that you

19    can testify to as to what she said in her

20    response?

21              MR. ALLEN:  Other than what he has

22    already testified to?

23              BY MR. ZELLER:

24              Q.   He said he didn't know anything

25    specific, so now I am trying to find out, is there
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 162

```
 1    anything specific?

 2              MR. ALLEN:  Objection, asked and

 3    answered.  You may answer.

 4              A.   I did not make a verbatim record of

 5    our internal discussions so I cannot testify

 6    accurately about the specific words she used.

 7              BY MR. ZELLER:

 8              Q.   I am not asking about verbatim

 9    records.  Do you have a recollection?

10              A.   Of what?

11              Q.   Of what words she used after you

12    made this comment about the ███████████████

      ██  ████████████████████████████████

      ██  ████████

15              MR. ALLEN:  Objection, asked and

16    answered.  You may answer his question.

17              A.   I don't have a recollection of the

18    specific words she used.

19              BY MR. ZELLER:

20              Q.   What happened after this break,

21    this first break we have been discussing?

22              A.   We reconvened the meeting.

23              Q.   Were all three Samsung

24    representatives present for that?

25              A.   Yes.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 163

```
 1              Q.   For the entire time?
 2              A.   I don't recall if somebody had a
 3    bathroom break or something, but substantively all
 4    three were present throughout the conversation.
 5              Q.   Was Eeva there for the entire
 6    second session?
 7              A.   Yes.
 8              Q.   What happened first in the second
 9    session?
10              A.   We provided our response to
11    Samsung's offer.
12              Q.   You say "we".  Who provided it?
13              A.   I was the main speaker for Nokia.
14              Q.   Did you provide the response to
15    Samsung's offer or did Eeva provide part of it?
16              A.   I provided the response.  If
17    I omitted something or something was unclear, it's
18    possible that Eeva would have added something to
19    my response.  But I was doing the main speaking on
20    behalf of Nokia.
21              Q.   Did she speak during the second
22    session?
23              A.   I believe she did, but I don't
24    specifically recall.
25              Q.   Please tell me, as best as you can
```

1    recall, exactly what you said when you -- you

2    provided Nokia's response to Samsung's offer

3    during that meeting?

4            A.   I rejected that offer and I told

5    Samsung that -- ████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████████████████

     ████████████████████████████████████████████

     █████████████████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████ So

15   we could not accept it -- that offer.

16            Q.   Did you use the PowerPoint as part

17   of this response?

18            A.   During this second session of the

19   meeting, we did use two pages from a

20   PowerPoint presentation -- or actually three pages

21   if you count in the cover page, but two pages of

22   substance.  And I don't recall whether we managed

23   to show those pages or the first of those pages

24   while I provided our initial response or whether

25   I provided the response and then we showed the

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 165

```
1    pages later.  But -- but two pages were shown

2    during that second session.

3              Q.   I didn't ask whether you used it

4    during the second session.  I asked: when you

5    provided your response that you just described in

6    your testimony, did you use the PowerPoint as part

7    of that response?

8              MR. ALLEN:  Objection, asked and

9    answered.

10             A.   My recollection is that when

11   providing the initial response, I did not use the

12   PowerPoint.

13             BY MR. ZELLER:

14             Q.   When did you first display the

15   PowerPoint during the meeting?

16             A.   During this second session, after

17   providing our initial response.

18             Q.   Would you please mark as exhibit 1

19   a copy of a document entitled "Patent License

20   Agreement Meeting..."  It bears Bates numbers

21   NOK000001 through 5.

22        (Exhibit MELIN 1 marked for identification)

23             And before I give a copy of this to

24   Apple's attorney, I want to make sure we're all on

25   the same page as to whether or not Nokia has any
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

1    issue in terms of providing the information in

2    this document to Apple?

3              MR. ALLEN:  This document has been

4    produced to all parties in this case pursuant to

5    the court's order.

6              Mike, has this document been redacted?

7              MR. ZELLER:  Yeah, we took out the

8    Samsung offer number because we have never

9    consented to the disclosure of that to Apple.

10             MR. ALLEN:  And you left in the Nokia

11   number?

12             MR. ZELLER:  Well, that's why I just

13   asked whether or not you consented.  If you didn't

14   consent I wasn't going to give it to Apple's

15   attorney and we -- we would redact certain terms.

16   That's why I asked.

17             Now, if -- if you have a different view

18   of that we can take a break and I am happy to have

19   anything that Nokia wants redacted from this.

20             MR. ALLEN:  I mean, the document's

21   obviously not complete, but proceed with your

22   questions.

23             MR. ZELLER:  I can guarantee there's

24   only, just for the record --

25             MR. ALLEN:  That's fine.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 167

```
 1            MR. ZELLER:  -- there is only one number
 2    that is -- that's been redacted --
 3            MR. ALLEN:  I saw it.
 4            MR. ZELLER:  -- which, you know, is not
 5    really going to be asked about on the PowerPoint
 6    anyway.
 7            MR. ALLEN:  Sure.  Go ahead.
 8            BY MR. ZELLER:
 9            Q.   Do you recognize what we've marked
10    as exhibit 1?
11            A.   I do.
12            Q.   Please tell us what this is.
13            A.   It's -- it's a copy of the
14    PowerPoint presentation used in the meeting on the
15    -- on the 4th June.
16            Q.   Did you show all these pages, in
17    one way or another, to Samsung or only some of
18    them?
19            A.   During the second session of the
20    meeting we showed the cover page and the two
21    following pages, so the pages marked numbers
22    2 and 3.  And then towards the end of the meeting,
23    we showed pages 4 and 5 as well.
24            Q.   So the first three pages were shown
25    to Samsung during the second session?
```

```
 1            A.   Correct.

 2            Q.   And you showed all three of these

 3   pages after you provided the response that you

 4   just described?

 5            A.   I'm not sure whether we showed the

 6   cover page, but -- but at least pages 2 and 3 we

 7   did show.

 8            Q.   But you showed them only after you

 9   provided the response that you described earlier?

10            A.   That is my recollection.

11            Q.   Who prepared the second and third

12   pages of exhibit 1?

13            A.   I believe we used Eeva's laptop, so

14   it's presented from her laptop.

15            Q.   Who actually drafted or prepared

16   these materials?

17            A.   I'm not sure whether that would

18   require me to disclose attorney/client privileged

19   information.

20            Q.   Did you prepare these pages?

21            A.   I provided input to these pages.

22            Q.   Please tell me who had input into

23   these pages besides yourself?

24            A.   Eeva Hakoranta and

25   Susanna Martikainen.  Potentially others.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 169

```
 1              Q.   Are there others you recall?

 2              A.   No.

 3              Q.   Did you show these three pages of

 4    the PowerPoint, or at least those second and third

 5    pages of the PowerPoint, immediately after you

 6    gave the response that you testified about earlier

 7    or was it later in the second session?

 8              MR. ALLEN:  Object to the form of the

 9    question.

10              A.   Sorry, can you repeat?  I'm having

11    a bit of flu.

12              BY MR. ZELLER:

13              Q.   Sure.  Focusing on those two pages

14    of the PowerPoint that you recall being shown

15    during the second session, namely, the second and

16    third pages of exhibit 1, did you show those pages

17    to Samsung immediately after you gave your

18    response that you testified about earlier or did

19    anything else happen first, before that?

20              A.   My recollection is we provided the

21    response and we had some discussion before we

22    showed these slides.  But I -- I don't exactly

23    recall how long that discussion was before we

24    showed these slides.

25              Q.   What do you recall happening --
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 170

1    well, strike that.

2            When you made your response, did you

3    give your response without interruption by anyone

4    from Samsung or did people at Samsung ask you

5    questions?

6            A.   My recollection is that there were

7    comments and an exchange of views between the

8    Nokia and Samsung teams.  I don't recall that

9    Samsung team would have asked specifically

10   questions from the Nokia team.

11           Q.   Well, please tell me exactly, as

12   best you can recall, what happened when you were

13   giving this response and what the Samsung people

14   said, if anything?

15           A.   My recollection is that we provided

16   the response as I described earlier, rejecting

17   Samsung's offer and explaining that it did not

18   provide sufficient compensation or sufficient

19   value as to the patents covered.  And -- and --

20   and my recollection is that Dr. Ahn was providing

21   a quite immediate response to that where -- where

22   he said that he -- he truly had considered

23   everything in making his offer and expressed that

24   he would not be willing to negotiate around

25   substantively different -- different terms than --

1    than what our offer was.  And that's what -- what

2    my recollection is of the first -- first phase.

3              Q.   Do you recall anyone else at that

4    meeting saying anything other than what you

5    described during what you are calling this first

6    phase of the second session?

7              A.   Yes.

8              Q.   What else?

9              A.   So -- so in this second session, we

10   first rejected Samsung's offer, explained why we

11   believed it was deficient and not providing

12   sufficient value.  And Dr. Ahn was doing the main

13   talking on behalf of Samsung and during that

14   exchange of views we were explaining that we have

15   these smaller licensees who are paying -- paying

16   higher amounts on a per year basis for licenses

17   that are -- are for lesser scope.

18              And we -- during that second session,

19   when we also used these two substantive pages of

20   the pages 2 and 3 of the PowerPoint presentation,

21   we made the points that the -- the situation is or

22   was fundamentally different than the situation at

23   the time of the 2010 agreement we negotiated

24   between Nokia and Samsung, when Nokia's handset

25   revenues were higher than Samsung's revenues.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1    Whereas now, at the time of these negotiations,

 2    Samsung's handset revenues were many times bigger

 3    than Nokia's revenues.

 4              And we also made this -- this comparison

 5    where we showed that the amounts that -- that

 6    ██████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ██████████████████████████████████  or even further

10    if we applied Samsung's purported rate of

11    2.4 per cent, the amounts would be even further.

12              We made the indication that the offer

13    that Nokia had previously extended was already

14    representing a significant compromise and that the

15    Samsung proposal that we, at that time, rejected

16    was but a small fraction of the amounts that would

17    be -- would be due.

18              And when we made these -- these

19    comparisons and -- and -- and statements Dr. Ahn

20    said that Samsung considers Apple to be the only

21    comparable company in the -- in the industry and

22    he laughed at the -- the -- the slide number 3,

23    showing these -- ███████████████████████

24              And -- and at this time, he said that --

25    that he knows what Apple is paying to Nokia,
```

```
 1    that -- that Samsung is in -- in many litigations
 2    and that -- that these license agreements are
 3    produced in connection of those litigations and
 4    while they are supposed to remain confidential,
 5    all information leaks; those were the specific
 6    words I very vividly remember him using.  "All
 7    information leaks."
 8            And -- and he said that -- that they
 9    were not willing to discuss around -- around any
10    other proposal than the one that they had made at
11    the beginning of the meeting and at that time it
12    was very difficult for us to respond because he
13    was making references to the Nokia/Apple license
14    agreement which was highly confidential and we
15    were not able to discuss the terms of that
16    agreement and, therefore, were not able to argue
17    and explain to him how and why the actual terms
18    and scope of that agreement were very different
19    from the license that Samsung was requesting with
20    its offer.
21            And -- and -- and as -- as -- as we were
22    in such a difficult situation we -- we -- based on
23    my recollection we -- we made the point that --
24    that the situation was very different just
25    generally based on public information at the time
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 174

1    of Nokia/Apple agreement in 2011; Nokia's handset

2    sales were significantly higher than they were at

3    the time of this negotiation and also Apple's

4    handset revenues, in 2011, were significantly

5    lower than Samsung's corresponding handset

6    revenues at the time of this negotiation.

7              And -- and -- so those were kind of

8    the -- the arguments that we -- we made and as --

9    as we made those arguments, then...

10             Let me think if I can remember anything

11   else.

12             There was a brief pause as -- as we

13   responded in these very generic terms and -- and

14   I remember this very well because it was

15   surprising to us as we had already expressed

16   surprise amongst ourselves, with Eeva, about the

17   peculiar comment that Dr. Ahn had said in the

18   beginning of the meeting, about having some idea

19   about what -- what Apple pays Nokia, and then

20   during this discussion as there was a pause

21   then -- then Dr. Ahn broke that pause in an

22   unprompted manner.  We didn't ask him anything to

23   elaborate.  He just said, unprompted, that --

24   that -- that ███████████████████████

     █  ██████████████████████████████████

1   ███████████████████████████████████

2          So he clearly indicated that not only

3   did he know the effect or the -- the general

4   amounts of the Nokia license agreement.  He even

5   knew the structure of there being███████████████

██   ███████████████████████and as -- we were very much

7   surprised by that because that, to us, was clear

8   proof that his claim to know the terms of the

9   Nokia/Apple agreement was not mere bluff, but he

10  actually knew those terms in detail.

11         And at that time, when we then said that

12  our expectation of ████████████████████████████

██   ███████████████   as a compromise offer is a genuine

14  expectation by Nokia management, we also said

15  that -- that -- that we do need to see that value

16  clearly reflected in an agreement.

17         We asked whether he would have any

18  flexibility to negotiate ███████████████████████

██   ████████████████████████████████████████████████

██   ███████████████████████████   And he very clearly said

21  that no, he is willing to negotiate around his

22  number but not around -- around anything else.

23  And at that time as it became very clear that we

24  had a very substantial gap in the negotiations,

25  and we -- also under the Nokia/Samsung agreement,

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1   we had certain steps to follow regarding the --
 2   the -- the pending notices and the procedure
 3   required to extend that license agreement we -- we
 4   wanted to have a break before -- before continuing
 5   the negotiations.
 6           So the second session started by us
 7   rejecting Samsung's offer.  There was an exchange
 8   of views of why we believed their offer was not
 9   sufficient, our offer was fully justified, and
10   then Samsung discredited our offer and basically
11   laughed us at the -- at the numbers and made the
12   comparison that Apple is the only comparable
13   they -- they deem appropriate and made it
14   expressly clear that they know exactly the
15   financial terms of the Nokia/Apple agreement and
16   that basically led to an impasse.  It clearly was
17   a situation where we were not able to make further
18   progress, so I recall that we called for a break.
19           Q.   Other than what you testified to,
20   did Dr. Ahn say anything else or use any other
21   words that pertained to the Apple/Nokia license
22   during that second session?
23           A.   I believe during the course of this
24   deposition, I have covered what he said.
25           Q.   I'm asking you other than what you
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 177

```
 1   have testified to, are there any other words or

 2   precise statements you can recall Dr. Ahn made

 3   during the second session?

 4            MR. ALLEN:  Objection, asked and

 5   answered.  You can answer it again.

 6            A.   Other than what I have responded

 7   during the course of this deposition, I don't

 8   recall anything else.

 9            BY MR. ZELLER:

10            Q.   Are there any documents that you

11   are aware of where Samsung said, in words or

12   substance, that it was willing to negotiate only

13   around the number that Dr. Ahn presented?

14            MR. ALLEN:  Did you say are there any

15   documents?

16            MR. ZELLER:  Yes.

17            A.   I am not aware of any such

18   documents.

19            Q.   This statement about the

20   Apple/Nokia license that you testified Dr. Ahn

21   made, did he make it in response to this

22   PowerPoint presentation that we marked as

23   exhibit 1?

24            A.   During the meeting on June 4,

25   Dr. Ahn made, during the first session, these
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 178

```
1    statements about the Nokia/Apple agreement that he

2    has an idea about the financial terms.  Then when

3    we rejected those terms and -- and explained that

4    we have smaller licensees paying more for licenses

5    that have lesser coverage, without referring to

6    these pages on the PowerPoint, based on my

7    recollection at that time, at that time he already

8    again started to refer to Apple as -- as being

9    the -- the only comparable that Samsung

10   recognizes.

11           And then when we discussed in a more

12   detailed way these -- these offers and their

13   correspondence after that discussion there was a

14   break in the -- in the discussion and Dr. Ahn then

15   broke that break by -- by making these specific

16   comments about the financial terms that he were --

17   was aware of; of the Nokia license, Apple

18   agreement.

19           So I did not interpret that as being in

20   response to this PowerPoint.  We had already

21   discussed that and there was kind of a break in

22   the discussion and then he broke that break by --

23   by making this very specific statement that --

24   that gave us proof that he was not bluffing with

25   his claims to have knowledge of the terms.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 179

1            Q.    During the second session when

2    Dr. Ahn made these statements about the

3    Apple/Nokia license that you testified to, did you

4    say anything in response to that?  Did you use

5    words in response?

6            A.    We said that we are not able to

7    discuss the Nokia/Apple license agreement.  Its

8    terms are confidential.

9            Q.    You say "we said".  I am asking

10   you --

11           A.    I said.

12           Q.    Did Eeva say anything, using words,

13   in response to what Dr. Ahn said during the second

14   session as it pertained to the Apple/Nokia

15   license?

16           A.    My recollection of the discussion

17   in general is that I did most of the talking and

18   that Eeva did complement or add to what I was

19   saying at times.  But I don't recall specifically

20   what she said as opposed to what I said.

21           Q.    So the answer to my question is

22   that you are not sure?

23           A.    Can you repeat the question?

24           Q.    Did Eeva say anything, in words, in

25   response to what Dr. Ahn said as it pertained to

```
1    the Apple/Nokia license during the second session?

2              A.   I don't recall.

3              Q.   Is there anything else that you can

4    recall occurring during this second session other

5    than what you have testified here to today?

6              A.   Not that I recall right now.

7              Q.   Directing your attention to

8    exhibit 1, the third page.  That's the one that

9    ends with NO -- NOK, rather, then a series of

10   zeros and 3.  It's entitled, "Illustrative

11   calculations", do you see that?

12             A.   Yes.

13             Q.   You will see that it refers to a

14   Samsung rate of 2.4 per cent and then has an

15   asterisk, do you see that?

16             A.   Yes.

17             Q.   And then further down, you will

18   see:

19             "Samsung's rate of 2.4 per cent was

20   publicly disclosed in Apple litigation."

21             Do you see that?

22             A.   Yes.

23             Q.   What's that referring to?

24             A.   I believe it speaks for itself.

25             Q.   You don't have any understanding as
```

1   to what that Apple litigation is or the

2   circumstances under which it was publicly

3   disclosed?

4           A.   I don't recall what the specific

5   circumstances were.  I just recall that this

6   2.4 per cent was reported in public and -- and our

7   team prepared this slide for the discussion.

8   I did not prepare this slide myself.

9           Q.   Who determined that this

10  information was public?

11          A.   My understanding is that it --

12  it -- it was very clearly public because we

13  wouldn't have had access to it otherwise.

14          Q.   Any other basis?

15          A.   I don't know.

16          Q.   Did you do anything specifically to

17  confirm that the 2.4 per cent rate was, in fact,

18  public?

19          A.   My recollection is that our team

20  reviewed the public documents available from

21  the -- whatever the relevant litigation was and --

22  and -- and confirmed that this was available in

23  public documents.  My understanding is that our

24  team did that work in preparing for this material.

25          Q.   Who on the team did that?

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 182

1          A.    My assumption is that it would have

2    been Susanna Martikainen.

3          Q.    You assume, but don't know?

4          A.    She was responsible for

5    preparation, so I -- I know that she was

6    responsible for it.  I don't know if somebody

7    assisted her there.

8          Q.    Why is it that Nokia was including

9    ███████████████████████████  as reflected on

10   this -- this page of the PowerPoint?  Why was that

11   information being presented to Samsung?

12         A.    █████████████████████████████

13   that we -- we offer in -- in connection of

14   offering licenses under our similar

15   standardization patents.

16         Q.    Any other reason?

17         A.    It is also a royalty rate that --

18   that several licensees have accepted and we

19   believe it fairly reflects the value of the

20   license patent portfolio.

21         Q.    During the course of this meeting

22   on June 4, did anyone ask you who these other

23   licensees were?

24         A.    I don't recall whether the Samsung

25   team asked for it or not but we obviously would

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 183

```
 1    not have answered it because our license

 2    agreements are confidential.

 3              Q.   Did anyone ask any questions about

 4    these other licensees?

 5              A.   I don't recall because Samsung made

 6    very clearly the point that -- that they

 7    considered the only relevant comparable to be

 8    Apple.  There was no extensive discussion about

 9    any other licensees.

10              Q.   Did you convey any information

11    whatsoever to Samsung that would suggest that

12    these other licensees who were paying the -- the

13    ████████████████████████  were comparable to

14    Samsung?

15              MR. ALLEN:  Objection to the form of the

16    question.  Vague.  You may answer it.

17              A.   As I said, I -- I very specifically

18    explained to Samsung that we have smaller

19    licensees than Samsung that are paying royalties

20    that result in higher amounts than the Samsung

21    offer was for licenses that cover less in terms of

22    the licensed patents than what Samsung was

23    requesting.  I did not make any comparison or any

24    claim that these -- these companies would

25    otherwise be comparable to Samsung.
```

```
 1              BY MR. ZELLER:
 2              Q.   Did you make any other statements,
 3    during the course of the June 4 meeting, that in
 4    any way suggested that any of these other
 5    licensees were comparable?  Or have you testified
 6    to the complete information that you gave about
 7    these other licensees?
 8              A.   I didn't understand the latter part
 9    of your question.  Can you clarify?
10              Q.   You have described certain
11    statements that you made regarding these other
12    licensees paying ███████████████   Do you recall
13    that?
14              A.   (Nods).
15              Q.   That's a "yes"?
16              A.   OK.  Let -- let me try to restate,
17    if -- if -- because I'm -- I'm not sure
18    I understand your question --
19              Q.   I'm not -- I'm not trying to ask
20    you to repeat your prior testimony.  I'm just
21    trying to make sure I have your complete
22    testimony.
23              So let me just break it down a little
24    bit and certainly if there's more that you have to
25    say, then, by all means, say it.  But I just want
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 185

```
 1    to take this a lit bit step by step.
 2            You testified a few times already about
 3    statements that you made to Samsung about the
 4    licensees that were paying ███████████     You
 5    mentioned that they were smaller, for example?
 6            A.   No, no, I think you are confusing
 7    two things there.  I said that kind of -- let me
 8    be -- you are confusing now ███████████ and
 9    smaller licensees paying amounts that are higher
10    than the Samsung offer.
11            Q.   OK.  So -- so please break that
12    down for me.  Please -- please explain to me what
13    different statements you made as it related to the
14    other licensees.
15            A.    So as said, I when rejecting
16    Samsung's offer, I said that we have smaller
17    licensees who make payments that amount to higher
18    monetary amounts than the Samsung offer for
19    licensees that -- licenses that have smaller
20    coverage than the one offered or requested by
21    Samsung and when I made that statement, I made no
22    reference to ███████████   I just said
23    smaller licensees, higher payments, less -- lesser
24    coverage.  And when we showed this slide, we
25    illustrated what ███████████   would
```

1    result in terms of payments from Samsung, and my

2    recollection is that when showing this slide we

3    also made the statement that we do have licensees

4    who are paying ███████████████

5              So those were two different statements.

6              Q.   I appreciate that clarification.

7    I think I understand that.

8              So let me just break this up then.

9              With respect to the smaller licensees

10   who you referenced, was there any other

11   information, other than what you have already

12   testified to, that you conveyed in any way to

13   Samsung about those licensees at the June 4

14   meeting?

15             A.   No.

16             Q.   Then focusing on the statement that

17   you made about licensees who were paying the

18   ████████████ that were by reference to this

19   slide in the PowerPoint presentation.  Was there

20   any other information that you conveyed about

21   those licensees other than what you have told me

22   in your testimony?

23             A.   Not that I can recall.

24             Q.   And if I understand the second

25   statement that you are referring to, where you

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1    said that there were licensees who were paying the
 2    ███████████, that was in connection with this
 3    third page of exhibit 1, the PowerPoint?
 4              A.   Yes.
 5              Q.   Did you provide information to
 6    Samsung, in any context, as to whether or not
 7    these other licensees were paying ████████
 8    ██████ were comparable in any way to Samsung?
 9              MR. ALLEN:  Objection, asked and
10    answered.  You may answer the question.
11              MR. ZELLER:  And I'm now -- it's not
12    limited just to the June 4 meeting, so it's clear.
13    I am asking in any context, in any way at any
14    time.
15              MR. ALLEN:  Then I would also object
16    it's outside the scope.  You may answer his
17    question.
18              A.   So, can you repeat the question?
19              BY MR. ZELLER:
20              Q.   Sure.  At any time, including
21    outside the context of the June 4 meeting, did you
22    convey any information to Samsung about these
23    licensees who were -- who were paying ████████
      ███  ███████
25              MR. ALLEN:  Objection to the form of the
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 188

```
 1    question.

 2              A.   I am not aware of any such

 3    information.

 4              MR. ALLEN:  Just let finish.  It is

 5    outside the scope.  I will allow you to answer the

 6    question.  I apologize.  Go ahead.

 7              A.   Yeah, I am not aware of any such

 8    information being provided.

 9              BY MR. ZELLER:

10              Q.   Well, how, in your view, was Apple

11    or -- excuse me, strike that.

12              How, in your view, was Samsung to know

13    whether or not the licensees ██████████████

      ██   ██████ were comparable to Samsung if you provided

15    no information about those licensees?

16              MR. ALLEN:  Objection to the form of the

17    question.  It's vague.  You may answer his

18    question.

19              A.   I don't understand.  I think that

20    sounds like a hypothetical question.  Can -- can

21    you repeat it?

22              BY MR. ZELLER:

23              Q.   Was it your expectation that

24    Samsung would have enough information by you just

25    telling Samsung that there were licensees paying
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 189

1    ████████████████    that Samsung could ascertain

2    whether they in fact were comparable to Samsung?

3                MR. ALLEN:  Objection, foundation.  You

4    may answer the question.

5                A.   Samsung did not ask for any further

6    information based on my recollection.

7                BY MR. ZELLER:

8                Q.   Has it been a typical experience

9    for you, in the context of other licensing

10   negotiations, for the other side to just accept

11   your statement that some other licensees are

12   paying a particular rate?

13               MR. ALLEN:  Objection to the form of the

14   question.  It's outside the scope.  Instruct the

15   witness not to answer.

16               BY MR. ZELLER:

17               Q.   You didn't find that odd?

18               MR. ALLEN:  Objection.

19               BY MR. ZELLER:

20               Q.   Excuse me, if I can finish it.

21               You didn't find that odd, that you just

22   simply made the assertion that there were other

23   licensees who were paying ███████████████

██  ████████   and no other information was being

25   conveyed with it, no questions were asked?

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 190

```
 1              MR. ALLEN:  Objection to the form of the
 2    question, compound.  You may answer it.
 3              A.   It's a -- it's a very clear custom
 4    in the industry that license royalty terms are
 5    highly confidential information and -- and
 6    generally not shared, especially license
 7    agreements relating to particular companies.
 8              So I -- I don't recall actually any
 9    meeting where -- where any details of any
10    particular third-party license would have been
11    specifically discussed in connection with license
12    negotiations.  So I don't find it peculiar at all
13    that -- that there was no further discussion about
14    which -- which companies would be paying what
15    specific royalty term.
16              BY MR. ZELLER:
17              Q.   You know what "FRAND" stands for,
18    right?
19              A.   Yes.
20              Q.   What's the "N" stand for?
21              A.   Sorry?
22              Q.   The "ND", what's the last part of
23    it, the "ND" stand for?
24              A.   Non-discriminatory.
25              Q.   What's that mean to you?
```

```
 1              MR. ALLEN:  Objection to the form of the
 2      question.  It's outside the scope.  Instruct you
 3      not to answer.
 4              BY MR. ZELLER:
 5              Q.   Non-discriminatory means that it's
 6      comparable to other comparable parties, right?
 7              MR. ALLEN:  Same objections.  Instruct
 8      the witness not to answer.
 9              BY MR. ZELLER:
10              Q.   Have you described now the totality
11      of all the information that you conveyed to
12      Samsung as to what licensees were comparable or
13      not comparable to Samsung?
14              MR. ALLEN:  Objection to the form of the
15      question.  Assumes facts not in evidence and
16      mischaracterizes the testimony, but you may answer
17      the question.
18              A.   I have provided my recollection as
19      it pertains to the meeting on June 4.
20              BY MR. ZELLER:
21              Q.   I'm asking is there any other
22      information that you conveyed to Samsung as to
23      whether or not the other licensees were comparable
24      or not comparable to Samsung?
25              MR. ALLEN:  Same objection.  You may
```

```
 1   answer.

 2              A.   Can you repeat the question?

 3              BY MR. ZELLER:

 4              Q.   Is there any other information of

 5   any kind that you conveyed to Samsung as to

 6   whether or not the other licensees were comparable

 7   or not comparable to Samsung?

 8              MR. ALLEN:  Objection to the form --

 9   form of the question.  It assumes a fact not in

10   evidence, and mischaracterizes the testimony.  You

11   may answer his question.

12              A.   I don't recall providing any facts

13   about any particular companies paying any

14   particular royalty rate referenced on this page.

15              BY MR. ZELLER:

16              Q.   Has Nokia itself ever taken a

17   license to any standard essential patent?

18              A.   We have taken licenses under

19   allegedly standard essential patents.

20              Q.   In the course -- and you were

21   personally involved in those negotiations?

22              A.   Yes.

23              Q.   Did you ask information that would

24   allow you to determine whether those existing or

25   prior licensees were in fact comparable to Nokia?
```

```
 1            MR. ALLEN:  I'm going to object to the

 2    form of the question.  It's outside the scope of

 3    the court's directive on the scope of this

 4    discovery.  I'm going to instruct the witness not

 5    to answer.

 6            A.   I have never asked a counterparty

 7    to disclose confidential information in breach of

 8    their confidentiality obligations.

 9            BY MR. ZELLER:

10            Q.   That's not the question I asked.

11            Did you ever ask for information that

12    would allow you to determine whether those

13    existing or prior licensees were in fact

14    comparable to Nokia?

15            MR. ALLEN:  Object to the form of the

16    question.  It's outside the scope.  I instruct the

17    witness not to answer.

18            A.   I'll take the instruction.

19            MR. ALLEN:  Thank you.

20            MR. ZELLER:  I move to strike the last

21    answer.  If he's not going to actually answer my

22    question, the self-serving speech is hardly -- I

23    think it's a waiver so we'll come back and ask

24    that be ordered to answer.

25            A.   I did not say it to you.  I said it
```

```
 1    to him.

 2              MR. ALLEN:  That's fine.  Pose another

 3    question then, Mike.

 4              BY MR. ZELLER:

 5         Q.   So what happened right after the

 6    second session of the June 4 meeting?

 7         A.   We had a break.

 8         Q.   How long did that last?

 9         A.    It was shorter than the first

10    break, but my recollection is that it still was

11    20 minutes or half an hour, something of the like.

12         Q.   How long did the second session

13    last?

14         A.   I think it was longer than the

15    first session.  Probably about half an hour

16    I would estimate.

17         Q.   Did you speak with anyone during

18    the break between the second and third sessions?

19         A.   Yes.

20         Q.   Who did you speak with?

21         A.   Eeva Hakoranta.

22         Q.   Anyone else?

23         A.   No.

24         Q.   Did you communicate with any --

25    with anyone else in any way?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 195

```
 1           A.   No.

 2           Q.   What did you and Eeva discuss

 3    during the break?

 4           MR. ALLEN:  I'm going to interpose an

 5    objection to the extent that the question solicits

 6    attorney/client privileged or attorney/client work

 7    product information.  I caution the witness to not

 8    disclose any such attorney/client or attorney work

 9    product information when you answer the question.

10    Other than that, you may respond to the question.

11           A.   Other than the attorney/client

12    privileged discussion we discussed how to -- how

13    to constructively move the negotiations forward

14    despite this -- this what we considered outrageous

15    move by Samsung to -- to use the financial terms

16    of Apple to obstruct the negotiations.

17           BY MR. ZELLER:

18           Q.   Please tell me exactly what you

19    said to her and she said to you on that subject?

20           A.   I don't recall exact words used.

21    I do remember that we were completely astonished

22    about the nerve of Dr. Ahn and -- and Samsung team

23    in -- in using their confidential information

24    about the financial terms of Nokia/Apple agreement

25    in these negotiations and -- and we found it very
```

```
 1    frustrating and -- and difficult to address as we

 2    were bound by the confidentiality but Samsung

 3    apparently was not.

 4            Q.   I am asking a different question.

 5    What is the first thing that you recall either one

 6    of you saying on this subject during the break?

 7            MR. ALLEN:  Objection, asked and

 8    answered.  You may answer it again.

 9            A.   I don't recall.

10            BY MR. ZELLER:

11            Q.   I'm asking for the words.  I am not

12    asking for characterizations or descriptions or

13    feelings.  I am asking for words that were used

14    during a conversation.

15            MR. ALLEN:  That's why I objected.  He

16    already said that he didn't recall the words.  He

17    gave you his best recollection --

18            MR. ZELLER:  Well, apparently he

19    remembers something.

20            MR. ALLEN:  That's what he's trying to

21    share with you.  That's why we're here.

22            BY MR. ZELLER:

23            Q.   If you really think that's

24    responsive, then you can bring it up with the

25    judge when we argue this.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 197

```
 1              Please tell me what words either one of

 2     you used on this subject about the Apple/Nokia

 3     license during the breaks?

 4              MR. ALLEN:  Objection, asked and

 5     answered.  Argumentative.  You may respond to his

 6     question.

 7              A.   I did not make a verbatim record,

 8     so I don't recall the exact words used.

 9              BY MR. ZELLER:

10              Q.   Do you recall any of the words that

11     were used?

12              A.   Again, if you want to split hairs,

13     I do remember we used words like "Samsung", like

14     "Apple" and -- and -- and the like.  But I don't

15     recall the exact phrases that we used.

16              Q.   Well, you say "and the like".  What

17     other words do you recall being used?

18              A.   "Royalties".  "License".

19     "Agreement".  "Terms".  "Revenues".

20              Do you want me to continue?

21              Q.   Yes.  I want to recall -- I want

22     you to tell me, as best as you can recall, exactly

23     what was said?

24              A.   That discussion was in Finnish.  Do

25     you want -- if you want, I can answer you in
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 198

1    Finnish, so you get the exact words.  Do you want

2    me to start the list in Finnish?

3              MR. ALLEN:  Why don't you, as best you

4    can, answer his question in English.

5              A.  OK.

6              MR. ALLEN:  I'm going to bet money that

7    neither Mike nor I understand Finnish.  I could be

8    wrong about that.

9              A.  Yeah, I'm just -- you asked this

10   for yourself, so -- so I'm just -- I'm not -- I'm

11   trying to be constructive.  So I just wanted, you

12   know, for the record that I am not doing this to

13   be smart ass.  I consider that he is asking for

14   the specific words, so -- so I kind of -- he is

15   forcing me to be a smart ass, so I will do that

16   now in response to his question.

17             Please feel free to interrupt when you

18   have had enough:  "million", "euro", "proposal",

19   "offer", "license", "agreement", "is", "was".

20             BY MR. ZELLER:

21             Q.  Any other words that you can recall

22   either you or Eeva using during the break as it

23   related to the Apple/Nokia license?

24             A.  Yes.

25             Q.  What other words?

```
 1              A.   "Year", "2011", "2013",

 2    "comparable", "no", "yes", "refusal", "response",

 3    "meeting", "portfolio", "patent", "sales", "rate",

 4    "program", "difference", "handset".

 5              Q.   Do you recall the order in which

 6    any of those words were used or which one of you

 7    used which -- which words?

 8              A.   No.

 9              Q.   You have no recollection of any of

10    that, is that true?

11              MR. LANTIER:  Objection to form.

12              MR. ALLEN:  Joined.

13              A.   When you say "any of that",

14    please -- please clarify what you mean by "any of

15    that".

16              BY MR. ZELLER:

17              Q.   I'm trying to find out whether you

18    recall any of the actual conversation, the words

19    that were used between you and Eeva as it related

20    to your discussion during the break regarding the

21    Apple/Nokia license.

22              MR. ALLEN:  Subject to my caution about

23    attorney/client privilege and attorney work

24    product, you may respond to his question.

25              A.   I recall the subject matter of our
```

```
 1    discussion, but not the exact words used.

 2              BY MR. ZELLER:

 3              Q.   Do you recall any of the statements

 4    that you or Eeva made during the break as it

 5    related to that subject?

 6              A.   Not verbatim.

 7              Q.   Do you recall any of it verbatim?

 8              MR. ALLEN:  Other than what he has

 9    already testified to?

10              A.   I don't recall our internal

11    discussion verbatim.

12              BY MR. ZELLER:

13              Q.   Other than what you have testified

14    to, did you and Eeva discuss anything else on the

15    break?

16              MR. ALLEN:  Objection to the form of the

17    question.  To the extent it solicits the

18    disclosure of attorney/client privilege or

19    attorney work product information, I'm going to

20    caution the witness to restrict his answer to

21    exclude any such communication.  Other than that,

22    you may answer.

23              A.   Other than the attorney/client

24    privileged communications, I -- I don't recall

25    anything else.
```

```
 1            BY MR. ZELLER:

 2            Q.   Is there anything that you are

 3    excluding from your answer regarding the

 4    conversations or discussions you had with Eeva

 5    during this break based upon the attorney/client

 6    privilege?

 7            A.   Yes.

 8            Q.   Regarding this portion of the

 9    conversation you did testify about between you and

10    Eeva on this break as it related to the

11    Apple/Nokia license, how long did that discussion

12    last?

13            A.   I don't recall exactly.  I don't

14    think we discussed the matter relating to the

15    Apple license that long, maybe five or ten minutes

16    or less.

17            Q.   What happened then after this third

18    break?

19            A.   We continued the meeting and -- and

20    in order to fulfil the objective of the meeting

21    and -- and to find a constructive way forward, we

22    discussed or -- or explained to Samsung what was

23    our possible and planned content of our extension

24    notification response under the Nokia/Samsung --

25    and -- and we showed page 4 of the PowerPoint,
```

Page 202

```
 1    and -- and explained the content of that page.

 2             Q.   In your answer, you keep on saying

 3    "we".  Please tell me what was the first thing

 4    that was said when the meeting resumed after that

 5    break?

 6             A.   My recollection is that the first

 7    thing that was said was that -- that we -- we

 8    found it unlikely that we would be able to -- to

 9    close the gap in the negotiations, at least at

10    that time, and that it appeared likely that --

11    that an arbitration or -- or something similar

12    would be -- would be necessary and actually an

13    arbitration might be a constructive way for us to

14    approach this topic, and we explained that in the

15    context of our license agreement with Samsung

16    and -- and explained our planned possible content

17    of Nokia's extension of the notification response

18    under the license agreement between Nokia and

19    Samsung in that context.

20             Q.   Who said that?

21             A.   I said that and Eeva may have added

22    something to the discussion in case I missed

23    something or -- or to participate in the

24    conversation, but I was doing the speaking mainly

25    on behalf of Nokia.
```

Page 203

```
 1              Q.   Did Eeva say anything?
 2              A.   Most likely she did, but I don't
 3   recall what she may have said specifically.
 4              Q.   Do you have any recollection of
 5   what she said?
 6              A.   Not specifically.
 7              Q.   Do you have a recollection she did
 8   speak?
 9              A.   Yes, I do have a recollection that
10   she participated in the discussions.  She was not
11   silent throughout the meeting, but I don't recall
12   exactly what she said.
13              Q.   Do you recall any of the topics
14   that she addressed?
15              A.   Not specifically.  She would not
16   have introduced new topics or different topics
17   from the ones being discussed.
18              Q.   Do you recall, even generally, any
19   of the topics that she addressed or discussed
20   during the meeting?
21              A.   My recollection is that she
22   participated in the discussion about why Samsung's
23   offer was not acceptable to Nokia, why Nokia's
24   earlier offers and -- and -- and licensing
25   approach were entirely justified and -- and how we
```

1    could find a constructive way forward by means of

2    arbitration, but I don't recall specifically what

3    she commented on any of those topics.

4             Q.   Other than what you testified as to

5    the -- this third session of the meeting, did

6    anything else happen during that?

7             A.   Are you asking about the third

8    session only?

9             Q.   Yes.

10            A.   Yes.

11            Q.   What else happened?

12            A.   So we made the -- the -- explained

13   the planned content of the extension notification

14   response with financial terms as indicated on

15   page -- page 4 as well as the possibility to -- to

16   resolve a dispute through arbitration and to our

17   surprise Dr. Ahn responded immediately positively

18   to the arbitration.

19            It appeared to us that either he had

20   considered it earlier or he didn't care or need to

21   consider it at length, but he immediately said,

22   "Let's arbitrate."  And -- and -- and it appeared

23   that the Samsung team was in a hurry to end the

24   meeting and we wanted to still explain, by means

25   of using the last page on the PowerPoint, how the

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 205

1    situation had changed substantially between Nokia

2    and Samsung, even during the negotiations that had

3    been ongoing between our teams now, so that

4    Nokia's sales had continued to decline and

5    Samsung's sales had continued to rise.

6              And we explained that if you view it as

7    to -- as to -- in this context, the fact that

8    Nokia had not materially changed its financial

9    request during this period actually meant that we

10   had -- we had made significant movements by not

11   increasing our -- our demands as -- as the sales

12   balance has continued to -- to change.

13             So we made this point and -- and -- and

14   the Samsung team did not really appear to want to

15   listen to this at all.  They just said that, "The

16   meeting is over and you rejected our offer.  Let's

17   arbitrate and now it's time for dinner".

18             So then we concluded the meeting.

19             Q.   Directing your attention to page 4

20   of exhibit 1, this is the page you were referring

21   to in your answer?

22             MR. ALLEN:  Objection to the form of the

23   question.

24             A.   One of the two pages I was

25   referring to in my recent answers.

```
 1              BY MR. ZELLER:
 2              Q.   Well, maybe I should clarify.  Did
 3    you actually show the fifth page?
 4              A.   Yes.
 5              Q.   And you showed the fourth page?
 6              A.   Yes.
 7              Q.   Focusing on the fourth page of the
 8    PowerPoint presentation.  Who prepared this page?
 9              A.   It was shown from Eeva Hakoranta's
10    laptop.  I think it was prepared by the Nokia team
11    responsible for preparing for the negotiation.
12              Q.   Do you know who?
13              A.   Yes.
14              Q.   Who?
15              A.   Eeva Hakoranta and
16    Susanna Martikainen and possibly assisted by
17    others.
18              Q.   Do you know specifically or by name
19    anyone else who did --
20              A.   Other than myself, I don't know
21    anybody else who would have directly reviewed or
22    contributed to this particular page.
23              Q.   And then directing your attention
24    to the last page of exhibit 1.  Do you know who
25    prepared that page?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1             A.   Again, as this whole

 2   PowerPoint presentation, this was shown from

 3   Eeva Hakoranta's laptop.  I don't know who

 4   specifically prepared the information on this

 5   page.

 6             Q.   Other than what you have testified

 7   to, did anything else happen during this third

 8   session of the meeting at June 4?

 9             A.   I don't recall any other

10   discussion.  But one thing I do recall is that the

11   Samsung team participants had these very large

12   smartphones.  I -- I believe they may have been

13   Galaxy Note or -- or -- or something of that like.

14   And I don't know the exact -- exact model number

15   or whatever those were.  But I just remember being

16   impressed by the size of those -- those devices

17   and the fact that they were using a Stylus to

18   write into their -- into their phones during the

19   meeting.

20             I was considering that maybe I should

21   myself obtain one of those devices as it looked

22   like it could almost replace a laptop.  But -- but

23   other than that recollection of being impressed by

24   their -- their devices, I -- I don't remember

25   other things clearly.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 208

```
 1              Q.   Is there anything else that you can

 2   recall occurring during the June 4 meeting other

 3   than what you have testified to?

 4              A.   As I sit here today, I don't

 5   recall.  I don't recall other things.

 6              Q.   Do I have your complete

 7   recollection of everything that happened at the

 8   June 4 meeting as best you can recall it?

 9              A.   As best I can recall it, yes.

10              MR. ALLEN:  Mike, we've been going about

11   an hour and a half.  We've been going about an

12   hour and a half.  Why don't we take a break?

13              MR. ZELLER:  Yeah, sure.  This would be

14   a good -- good time.

15              VIDEOGRAPHER:  Going off the record.

16   The time is 17:18.  End of tape 3, Volume I of the

17   videotaped deposition of Paul Melin.

18   (5.18 pm)

19                   (Off the record.)

20   (5.33 pm)

21              VIDEOGRAPHER:  This is the beginning of

22   videotape number 4, Volume I in the videotaped

23   deposition of Paul Melin.  Going on the record.

24   The time is 17.33.  Thank you.

25              MR. ZELLER:  After -- excuse me.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 209

```
 1              After Dr. Ahn made those statements
 2    about the Apple/Nokia license during the June 4
 3    meeting, you were upset about it, right?
 4              A.   Yes.
 5              Q.   And, in fact, you considered it to
 6    be outrageous what he had done, correct?
 7              A.   Yes.
 8              Q.   And then you went to dinner with
 9    him?
10              A.   Yes.
11              Q.   Who else was at the dinner?
12              A.   It was the Samsung team, myself,
13    Eeva Hakoranta and one additional Samsung
14    representative, Chung Lee if I recall his name
15    right.
16              Q.   During the day of the June 4
17    meeting, did you communicate to anyone at Nokia
18    what Dr. Ahn had said according to you had been
19    disclosed at the June 4 meeting?
20              A.   I don't think so.
21              Q.   About what time did the meeting
22    end?
23              A.   I don't recall exactly at what time
24    we started, so it ended so that we -- we had time
25    to start the dinner at around the normal time,
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 210

```
 1    so -- but there was maybe an hour's car drive to
 2    the dinner place.  So if I have to estimate, maybe
 3    at 6 pm but I really don't know because I don't
 4    remember what time we started.
 5              Q.   So there was a break between the
 6    end of the June 4 meeting and when you started to
 7    have dinner with Dr. Ahn and the other Samsung
 8    representatives?
 9              A.   There was not really a break.
10    We -- we -- we left for the dinner directly from
11    the meeting but -- or more or less directly from
12    the meeting.  Maybe we had time to just quickly
13    have a bathroom break or -- or drop some things
14    into our hotel room.  But we left for the dinner
15    almost immediately thereafter, but it was about an
16    hour's drive to the restaurant.
17              Q.   I take it you had a cellphone with
18    you?
19              A.   Yes.
20              Q.   During this time period, did you
21    have access to e-mail?
22              A.   I don't recall.
23              Q.   Generally speaking, during the
24    June 4, 2013 time period, did you have a device
25    that allowed you to send e-mails?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1                 A.   I had my mobile phone with me, but
 2     I don't recall whether -- whether the data
 3     connection worked for -- for e-mails.  Sometimes
 4     there are difficulties sending e-mail on a mobile
 5     device, so I -- I really don't recall.
 6                 Q.   Eeva had her laptop, right?
 7                 A.   That's right.
 8                 Q.   Now, did -- did Eeva report to
 9     anyone at Nokia what Dr. Ahn said according to you
10     at this meeting about the Nokia/Apple license?
11                 MR. ALLEN:  Objection, foundation.  You
12     may answer.
13                 A.   I don't know.
14                 BY MR. ZELLER:
15                 Q.   Did you instruct her to?
16                 A.   I did not instruct her to report.
17                 Q.   Did she suggest that perhaps you or
18     she should report this outrageous conduct, as you
19     describe it --
20                 MR. ALLEN:  I --
21                 BY MR. ZELLER:
22                 Q.   -- by Dr. Ahn to the Nokia
23     headquarters?
24                 MR. ALLEN:  I apologize, Mike, I didn't
25     mean to interrupt you.  Let me interpose an
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 212

```
 1    objection and caution the witness to the extent

 2    that the question solicits attorney/client

 3    privilege or attorney work product information

 4    that you should not reveal such information in

 5    your answer.  But other than that, you may answer

 6    his question.

 7                A.    Let me just put the context right.

 8                I am responsible for IP matters within

 9    Nokia.  I work at Nokia headquarters.  I was there

10    representing Nokia in this negotiation.  There was

11    no need for me to report back to headquarters as

12    I was the one representing headquarters.

13                BY MR. ZELLER:

14                Q.    You are an officer?

15                A.    In what capacity?  What do you

16    mean?

17                Q.    Are you an officer of any Nokia

18    company?

19                A.    I am not sure kind of what is the

20    legal meaning that you raise when you say that,

21    being an officer.

22                Q.    Regardless of any legal meaning, do

23    you have any understanding or has anyone ever

24    communicated to you, in words or substance, that

25    you are or are not an officer of any Nokia
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 213

```
 1    company?
 2              A.   I am an executive of -- of Nokia.
 3    I have an executive agreement with Nokia.  I am
 4    not a member of the Nokia leadership team.  So,
 5    what do you mean with being an officer?  It's then
 6    a matter of definition and corporate governance.
 7              Q.   Has anyone ever suggested to you
 8    that for purposes of reporting to any governmental
 9    agency that you are an officer of any Nokia
10    company?
11              A.   I don't think so.
12              Q.   Are you aware of any instance in
13    which Nokia has ever identified you to any
14    governmental agency as an officer of any Nokia
15    company?
16              A.   I am not aware of that.
17              Q.   Have you ever been a director of
18    any Nokia company?
19              A.   No.
20              Q.   Are you the person charged with
21    making decisions as to what legal matters to
22    pursue or not to pursue on behalf of Nokia?
23              A.   To a certain extent, yes.
24              Q.   To what extent?
25              A.   To an extent that matters relate to
```

1    intellectual property and to the extent that --

2    that we -- we do not need further reviews or

3    approvals by Nokia's CFO, CEO, general counsel or

4    board of directors.

5            Q.   Do you have ultimate responsibility

6    as to whether or not Nokia seeks to enforce the

7    terms of its license agreements?

8            MR. ALLEN:  Objection to the form of

9    your question.  It's vague and ambiguous.  You may

10   answer his question.

11           A.   Can you clarify what you mean with

12   "ultimate responsibility"?  Do you mean sole

13   responsibility?

14           BY MR. ZELLER:

15           Q.   Well, let's try it this way.  Do

16   you have -- do you have authority over the general

17   counsel in making decisions about what matters to

18   pursue or not pursue in litigation?

19           A.    Not over the general counsel.

20           Q.   At any time on June 4 did you

21   suggest or discuss with Eeva as to one -- whether

22   one of you should inform others at Nokia that

23   Dr. Ahn had made these statements about the

24   Apple/Nokia license?

25           A.   I don't think I can answer that

1    question without disclosing attorney/client

2    privileged information.

3            Q.   So you have no information about

4    that apart from an answer that would disclose

5    attorney/client communications?

6            A.   That's right.

7            Q.   Apart from any context in which you

8    were having a attorney/client communication, did

9    you discuss with anyone, on June 4, the prospect

10   of telling anyone else at Nokia about what you

11   said Dr. Ahn stated about the Apple/Nokia license

12   at the June 4 meeting?

13           MR. ALLEN:  Do you understand that

14   question?  It separates attorney/client privilege,

15   he's asking you other than that?

16           A.   Yeah.

17           MR. ALLEN:  Do you understand the

18   question correctly?

19           A.   Yeah, can you repeat the question?

20           BY MR. ZELLER:

21           Q.   Sure, and I'll break it up into two

22   parts.

23           So setting aside anything that would be

24   attorney/client communication, so setting all

25   those aside, did you have any communication or

```
1    discussions with anyone about the possibility of

2    telling others at Nokia about what Dr. Ahn had

3    said at the June 4 meeting about the Apple/Nokia

4    license?

5              MR. ALLEN:  I'm sorry to complicate it,

6    but you're saying on June 4?

7              MR. ZELLER:  Correct.

8              A.   No.

9              BY MR. ZELLER:

10             Q.   And so at this dinner, did you --

11   did you have anything to drink, any alcohol?

12             A.   I believe so.

13             Q.   And I apologize, I think you told

14   me about how long this -- this dinner lasted.  It

15   was more than two hours?

16             A.   Well, it took one hour for us to

17   drive to the dinner and then we had a dinner.  It

18   was -- it was a Japanese restaurant, so -- so

19   sushi was being prepared, so that takes time.  So

20   I don't remember whether it was more than two

21   hours or less than two hours, but it was a lengthy

22   dinner.

23             Q.   Did you and Eeva at any time,

24   including separately, during the course of this

25   dinner, say anything about what Dr. Ahn had said
```

Page 217

```
 1    about the Apple/Nokia license?

 2              A.   I don't recall that we would have

 3    discussed the -- the negotiations at the dinner.

 4              Q.   Did you discuss that with anyone at

 5    the dinner?

 6              A.   I don't recall that we would have

 7    discussed business matters at the dinner.

 8              Q.   It's your recollection that -- that

 9    in fact you did not discuss anything about the

10    Apple/Nokia license or what Dr. Ahn had said about

11    it?

12              A.   That's my recollection; that during

13    the dinner, we did not really discuss that.

14              Q.   Now, you testified earlier that you

15    did contact the general counsel and tell him --

16    it's a him?

17              A.   Her.

18              Q.   Her, tell the general counsel about

19    what Dr. Ahn said at this meeting.  Do you recall

20    that?

21              A.   I am not sure whether I can answer

22    that question without disclosing attorney/client

23    privilege.

24              MR. ALLEN:  You can answer "yes" or "no"

25    to that question.
```

Page 218

```
 1              A.   So, can you repeat the question?

 2              BY MR. ZELLER:

 3              Q.   Sure.  I'll just -- I'll just ask

 4    it again this way.  At some point, you -- you told

 5    the general counsel or you communicated to the

 6    general counsel what it is that -- that you say

 7    Dr. Ahn said about the Apple/Nokia license at the

 8    June 4 meeting?

 9              A.   Yes.

10              Q.   Did you do that in writing, did you

11    do it orally?  How did you do it?

12              A.   My recollection is that I did it

13    orally.

14              Q.   Did you send any kind of follow-up

15    e-mail or anything in writing?

16              A.   I don't recall.

17              Q.   Do you have any knowledge or

18    information as to whether or not Eeva told anyone

19    else at Nokia about what Dr. Ahn had said as it

20    related to the Apple/Nokia license at the June 4

21    meeting?

22              A.   I don't know.

23              Q.   Do you know if she's ever discussed

24    it with the general counsel?

25              A.   I don't know.
```

Page 219

```
 1              Q.   After you made this initial contact
 2     with the general counsel about the matter, did the
 3     general counsel get back in touch with you?
 4              MR. ALLEN:  It's a "yes" or "no"
 5     subject.
 6              BY MR. ZELLER:
 7              Q.   About that subject?
 8              A.   Yes.
 9              Q.   How long did that take?
10              A.   My recollection is that
11     I communicated to her orally.  So, are you asking
12     how long within a discussion it took her to
13     respond?  Or are you asking something else?  I'm
14     not quite sure I understand the question.
15              Q.   Well, you communicated to her what
16     had occurred at the June 4 meeting, right?
17              A.   Yes.
18              Q.   And then I asked: at some point,
19     did she get back in touch with you about it?
20              MR. ALLEN:  The follow-up communication?
21              MR. ZELLER:  Correct.
22              MR. ALLEN:  OK.
23              A.   Well, as this was quite outrageous
24     of course we have -- we have -- have discussed the
25     matter several times.  I don't recall how long it
```

```
 1    took between the first discussion and the second

 2    discussion.

 3              BY MR. ZELLER:

 4              Q.   Was it a week between the first

 5    discussion and second discussion, less than a

 6    week?  More?

 7              A.   I don't recall specifically, but

 8    I would say it -- it was less than a week.

 9              Q.   And that second communication, that

10    was orally or in writing?

11              A.   I don't recall.

12              Q.   At any time after the June 4

13    meeting, and up until the time that Nokia filed

14    its motion in the Northern District case, did you

15    have any communications with Eeva as it related to

16    what happened at the June 4 meeting?

17              A.   Yes.

18              Q.   How many occasions?

19              A.   I don't recall.

20              Q.   Did you and she discuss what

21    Dr. Ahn said about the Apple/Nokia license?

22              MR. ALLEN:  Let me interpose an

23    objection and caution the witness that in

24    answering the question, you should not reveal any

25    attorney/client privileged or attorney work
```

Page 221

1    product information.  Subject to that, you may

2    respond to the question.

3             A.   OK.  Without commenting on anything

4    that is attorney/client privileged we of course

5    had a ongoing negotiation with Samsung.  We had to

6    also continue that negotiation.  So -- so we did

7    have several discussions about what to do in

8    connection with the Samsung situation.

9             BY MR. ZELLER:

10            Q.   Did any of those discussions relate

11   specifically to what Dr. Ahn had said about the

12   Apple/Nokia license?

13            A.   As what Dr. Ahn said was very much

14   at the core of our negotiations, our discussions

15   did include that matter.

16            Q.   What did you and she discuss about

17   that?

18            A.   I don't think I can reveal that

19   without disclosing attorney/client privileged

20   information.

21            Q.   Are there any communications that

22   you had with Eeva during that time period where,

23   in your view, you would not be disclosing the

24   substance of attorney/client communications?

25            A.   I don't think so.

```
 1              Q.   Do I have -- I have your complete

 2    testimony on that, at least insofar as you believe

 3    you can give it, consistent with the

 4    attorney/client privilege?

 5              A.   I think so.

 6              Q.   As we talked about earlier, you are

 7    generally aware that there were communications

 8    between Nokia and Samsung between the June 4

 9    meeting and the time that Nokia filed the motion

10    about the Protective Order in the Northern

11    District case?

12              A.   I don't recall specifically what

13    communications occurred between that time period.

14              Q.   Did you review any draft

15    communications or comment on any draft

16    communications being sent to Samsung after the

17    June 4 meeting?

18              A.   Do you mean -- do you mean now

19    after the June 4 meeting up to today, or between

20    the June 4 meeting and the filing of the motion

21    or... Can you be more specific?

22              Q.   Just so you have the context here.

23    I am only asking about this time period right now

24    between the June 4 meeting and then when the

25    motion was filed, so I'll change the time period
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 223

```
 1    later but just so we have a context, that's the

 2    time period I'm talking about.

 3              Do you have that in mind?

 4         A.   OK.

 5         Q.   So focusing on this time period

 6    from the June 4 meeting to when Nokia filed the

 7    Protective Order motion, did you review or comment

 8    on any draft communications to Samsung?

 9         A.   Can you remind me what was the date

10    of filing the Protective Order?

11              MR. ALLEN:  July 1.

12              BY MR. ZELLER:

13         Q.   July 1, 2013.

14         A.   So just to be clear, between 4 June

15    and July 1?

16         Q.   Correct.

17         A.   I'm not sure.

18         Q.   In the normal course of your work,

19    do you typically review or comment on draft

20    communications that are going to another party

21    such as Samsung during the course of negotiations?

22         A.   If the communication relates to

23    things like scheduling meetings or -- or details

24    of a negotiation generally, I do not.  To the

25    extent that the communication would convey binding
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 224

1    offers or -- or -- or substantial new terms being

2    discussed, I may.

3           Q.   Do you have any understanding or

4    explanation as to why Nokia's correspondence to

5    Samsung, during this June 4 to July 1 time period,

6    didn't make any reference to what Dr. Ahn said

7    about the Apple/Nokia license at the meeting?

8           A.   Sorry, can you repeat the question?

9           Q.   Sure.  Do you have any

10   understanding or explanation as to why Nokia did

11   not mention in any of its correspondence, during

12   this June 4 to July 1 time period, what it is that

13   Dr. Ahn said about the Apple/Nokia license?

14          A.   First of all, I -- I don't have

15   here all the communication between Nokia and

16   Samsung during that time period, so I cannot

17   verify whether that's an accurate statement, that

18   it was not -- not -- not referred.  But I have no

19   comment to that.

20          Q.   When you say no comment, you don't

21   know?

22          A.   I said I don't have that -- that

23   communication in front of me, so I cannot really

24   comment on that.  I have not reviewed it.  It was

25   not within the scope of this deposition.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 225

```
 1              Q.   You didn't review any of the

 2    communications between Nokia and Samsung to

 3    testify here today?

 4              A.   I believe the topic of testimony

 5    was what happened in the meeting on July --

 6    June 4, not what happened after the meeting on

 7    June 4.  So I did not review materials pertaining

 8    to the time after the meeting.

 9              Q.   I'll represent to you that there

10    were e-mails and letters that Nokia sent to

11    Samsung during the time period after June 4 and

12    before July 1.  With that representation in mind,

13    do you have any explanation or understanding as to

14    why Nokia did not say anything in those written

15    communications about what Dr. Ahn had said about

16    the Apple/Nokia license?

17              A.   I have no comment on that.

18              Q.   What does that mean?

19              A.   I have no comment on that.

20              Q.   Does it mean you don't know?

21              A.   I didn't say that.  I said I have

22    no comment on that.

23              Q.   Please tell me what you know on

24    that subject.

25              A.   On what subject?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 226

```
1              Q.    The subject of why, as

2    I represented to you, Nokia made no mention in its

3    written communications during that time period

4    about what Dr. Ahn said as it relates to the

5    Apple/Nokia license?

6              MR. ALLEN:  I will interpose an

7    objection.  It is outside the scope.  If you have

8    a thought on it, you may answer it.

9              A.    I don't think I can answer that

10   without disclosing attorney/client privileged

11   communication.

12             BY MR. ZELLER:

13             Q.    Are you excluding information from

14   your answer?

15             A.    I am not answering.

16             Q.    I'm entitled to know whether or not

17   you have information or not.  All I am trying find

18   out is is, do you have in fact have information,

19   "yes" or "no", on why, as I have represented to

20   you, Nokia made no mention of that in its written

21   communications during the June 4 to July 1 time

22   period?

23             MR. ALLEN:  I will interpose the same

24   objection.  Do you understand the question?

25             A.    I am not sure I understand the
```

```
 1    question.

 2              MR. ALLEN:  He's -- he's asking you if

 3    you have actual information that would be

 4    responsive to his question and you're simply

 5    declining to answer because of privilege.

 6              BY MR. ZELLER:

 7         Q.   Or if you just don't know.  If you

 8    just don't know, it's a different answer.

 9              MR. ALLEN:  Right.

10         A.   OK.  Now, I think I understand the

11    context.  So, can you repeat the question?

12              BY MR. ZELLER:

13         Q.   Sure.  Just tell me "yes" or "no":

14    do you have actual information or knowledge as to

15    why, as I have represented to you, Nokia did not

16    say anything in its written communications about

17    what Dr. Ahn had said as it relates to the

18    Apple/Nokia license in the written communications

19    that Nokia sent to Samsung after June 4 and before

20    July 1?

21              MR. ALLEN:  You can answer that question

22    "yes" or "no".

23         A.   No.

24              BY MR. ZELLER:

25         Q.   Is there anything else that you can
```

1    recall occurring?  And let me preface this by

2    saying I am not asking you to reveal the substance

3    of any attorney/client communications.  I'm just

4    trying to find out a "yes" or "no" right now.

5            Other than what you have told me, was

6    there anything else that you did during that

7    June 4 to July 1 time period as it related to what

8    Dr. Ahn had said about the Apple/Nokia license?

9            MR. ALLEN:  He's asking you a "yes" or

10   "no" question.

11           A.   I didn't quite understand it that

12   way, so can you repeat it?

13           BY MR. ZELLER:

14           Q.   Sure.  Just by way of background,

15   you told me about instances where you had

16   communications with the general counsel, with --

17   with Eeva, and some of the other things that you

18   did in the aftermath of the June 4 meeting, so I

19   don't want you to repeat all that.

20           Now what I'm just trying to find out is:

21   is there anything else that you did between this

22   June 4 and July 1 time period as it related to

23   what Dr. Ahn said about the Apple/Nokia license?

24           MR. ALLEN:  I'll object to the question,

25   it's outside the scope.  I'll allow you to answer

```
 1   it.

 2              A.   I don't think there was anything

 3   else apart from discussions with counsel.

 4              BY MR. ZELLER:

 5              Q.   Would you please mark as exhibit 2

 6   a multi-page document, actually three pages,

 7   entitled "Declaration of Paul Melin" and it is

 8   dated June 28, 2013.

 9        (Exhibit MELIN 2 marked for identification)

10              And if you can please take a look at

11   exhibit 2, and tell me whether you recognize it?

12              A.   I do.

13              Q.   This is a declaration that you

14   signed on or about June 28, 2013?

15              MR. ALLEN:   June 28.

16              MR. ZELLER:   That's what I thought

17   I said.

18              MR. ALLEN:   Oh, I'm sorry.  I thought

19   you said 20th.

20              BY MR. ZELLER:

21              Q.   No, I meant to say 28th.

22              A.   Yes.

23              Q.   You reviewed this for your

24   deposition here today?

25              A.   Yes.
```

```
 1              Q.   Are there any portions of this

 2   declaration that you recognize as something you

 3   drafted or changed?

 4              A.   This whole declaration is my

 5   declaration.  It was drafted on my instructions,

 6   and I -- I myself wrote substantial proportions of

 7   it.

 8              Q.   Did you write paragraph 8?

 9              A.   Yes, I did.

10              Q.   All the words in paragraph 8?

11              A.   Well, I don't recall whether --

12   whether based on my instruction the first draft

13   would have included some of the words of

14   paragraph 8.  But I -- I do remember that I myself

15   wrote the -- the language as it ended up here.

16              Q.   And the same is true of

17   paragraph 9?

18              A.   Yes.

19              Q.   So paragraphs 8 and 9 are your

20   words, is that correct?

21              A.   Yes.

22              Q.   Focusing your attention on

23   paragraph 8, you say:

24              "... [Dr.] Mr. Ahn [rather] of Samsung

25   informed us that he had been told of the financial
```

```
 1    terms of Nokia's license with Apple."

 2              Do you see that?

 3         A.   Yes.

 4         Q.   First of all, were you aware that

 5    it's -- it's Dr. Ahn, or did you decide it was

 6    Mr. Ahn?

 7         A.   Well, I heard that he is a doctor,

 8    but I -- I -- I did not -- in Finland, we don't

 9    pay that much attention to titles, so I was not

10    that much focusing on whether it is "Mr." or

11    "Dr." here.

12         Q.   It says:

13              "... informed us that he had been

14    told..."

15              Do you see that?

16         A.   Yes.

17         Q.   Who told him that?

18         A.   Sorry?

19         Q.   Why is it written?  It says that he

20    had been told of the financial terms.

21              Do you see that?

22         A.   Yes.

23         Q.   Why is it written in the passive

24    voice?

25         A.   It is written in the passive voice
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 232

1   because Dr. Ahn did not specifically tell who had

2   told him personally of these financial terms.  He

3   said that he was aware of them.  He had been told,

4   but he did not say who specifically told him

5   personally.

6              Q.   And so if I understand you, you are

7   saying that this phrase here:

8              "... that he had been told of the

9   financial terms of Nokia's license with Apple."

10             Tracks the actual language of what

11  Dr. Ahn said during the meeting?

12             MR. ALLEN:  Objection to the form of the

13  question.  Mischaracterizes the testimony.  You

14  may answer his question.

15             A.   Yes, this is not a verbatim record

16  of what was said in the meeting.  Neither is this

17  a quotation from Mr. Ahn.  In substance, he

18  informed us that he had been told of the financial

19  terms of Nokia's license with Apple.

20             BY MR. ZELLER:

21             Q.   Well, are those the words he used,

22  that he had been told?

23             MR. ALLEN:  Objection to the form of the

24  question.  Asked and answered.  You may answer

25  again.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 233

```
 1              A.   Yes.  As I said, this is not a
 2     verbatim quote, so I am not saying that he -- he
 3     would have used the exact words of having been
 4     told.
 5              BY MR. ZELLER:
 6              Q.   With respect to this sentence:
 7              "During that negotiation, Mr. Ahn of
 8     Samsung informed us that he had been told of the
 9     financial terms of Nokia's license with Apple."
10              With respect to any of that language, is
11     any of that the actual phraseology of what Dr. Ahn
12     said?  Or are you paraphrasing it?
13              A.   The "financial terms" is
14     paraphrasing as he said that he knows what Apple
15     pays Nokia and he -- he quoted the specific amount
16     that -- that Apple paid Nokia and is paying to
17     Nokia.  So he did not use the phrase "financial
18     terms".
19              Q.   About the part where it says:
20              "... he had been told..."
21              Is that paraphrasing, or are those words
22     he used?
23              A.   I believe that is paraphrasing.
24              Q.   Directing your attention to the
25     next sentence of paragraph 8 of your declaration,
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 234

```
 1    it says:

 2              "Mr. Ahn stated that the agreement had

 3    been received by Samsung's attorneys in the course

 4    of litigation, and that they had provided

 5    Samsung's in-house team with the terms."

 6              Do you see that?

 7         A.   Yes.

 8         Q.   So focusing on the first part:

 9              "Mr. Ahn stated that the agreement had

10    been received by Samsung's attorneys in the course

11    of litigation..."

12              Is that paraphrasing what Dr. Ahn said,

13    or are any of those his actual words?

14         A.   I believe the words "received by"

15    are paraphrasing as my recollection is that he

16    used the words that the agreement had been

17    produced in litigation.

18         Q.   With respect to that first part of

19    the sentence, is there anything else that was the

20    actual words that Dr. Ahn used?

21         A.   My recollection is that he said

22    that the agreement had been produced to Samsung's

23    attorneys in the course of litigation, but I don't

24    recall verbatim how he said that.

25         Q.   I'm sorry, I am not entirely
```

1    following.  Let me –– let me ask it this way.

2            So the part where it's saying:

3            "... received by Samsung's attorneys in

4    the course of litigation..."

5            That phrase is a –– is a paraphrase?

6            A.   The "received by" is a paraphrase.

7            Q.   Is any of the rest of that sentence

8    a paraphrase?

9            A.   Are you now referring to the –– the

10   part after the comma or ––

11           Q.   I apologize.  You're right.  I'll

12   rephrase that.

13           Just focusing on that first clause of

14   this sentence, is there anything else in there

15   that is a paraphrase?

16           A.   I don't think so.

17           Q.   Focusing then on the second part,

18   the second clause of this sentence:

19           "... and that they had provided

20   Samsung's in-house team with the terms."

21           Are those actual words that Dr. Ahn used

22   or –– or is that a paraphrasing?

23           A.   Yeah, this does not purport to be a

24   quote of a verbatim record.  My recollection is

25   that Dr. Ahn used the words of –– of explaining

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 236

1   first what was referred by their first part of the

2   sentence, that the -- the agreement had been

3   produced to Samsung's attorneys in the course of

4   litigation.

5            Then he explained that -- that -- that

6   of course that information is supposed to be

7   confidential, but all information leaks.  "All

8   information leaks" are the words that

9   I specifically recall him using.  And -- and that

10  was all in the context of an explanation where

11  he -- he stated that he has been made aware of the

12  terms and -- and clearly the Samsung team was

13  aware of the terms.

14           He did not specifically state whether

15  this information was told to him personally or to

16  his team and to him by his team.  But it was clear

17  that the entire team was aware of the terms.

18           Q.   Focusing here on -- on paragraph 8.

19  Is this -- is this, in your view, a correct

20  chronological account of the substance of what

21  Dr. Ahn said or is this not chronological?

22           MR. ALLEN:  You mean, is the gist of the

23  sentence in the order that they were stated in the

24  meeting?

25           BY MR. ZELLER:

```
1              Q.   Correct, right.

2              A.   This does not purport to be a

3    chronological record.  But I believe that the --

4    the different facts listed here occur in the same

5    order as they were discussed in the meeting based

6    on my recollection.

7              Q.   So if I understand you correctly,

8    the order in which the substance of these comments

9    were made are reflected in the order that they

10   occurred in the meeting or have they been

11   reordered in -- in some way?

12             A.   Let me just review it.  This

13   paragraph 8 is not drafted to -- to -- to present

14   the chronological steps in the meeting.

15             The first sentence kind of refers partly

16   to the same matter as -- as the second or the

17   mid-section.  So in -- in terms of chronology, he

18   first informed that he was aware of the terms.

19   Then he stated that the agreement had been

20   produced in litigation, and that was supposed to

21   be confidential but everything leaks and,

22   therefore, he is aware of the terms.  And then

23   after making those statements he recited the

24   financial terms back to us.

25             So this roughly corresponds to the -- to
```

```
 1    the order in which the events happened but the

 2    first sentence is not necessarily entirely

 3    separate from the second.

 4            Q.   Is there some reason that you

 5    drafted this so it was not in chronological order

 6    as you had recalled it from the meeting?

 7            MR. ALLEN:  Objection, mischaracterizes

 8    the testimony.  You may answer.

 9            A.   I did not say that this was not

10    in -- reflecting the chronological order.

11    I drafted this to tell what happened, but I did

12    not attempt to provide a chronological

13    step-by-step record of the -- of the entire

14    meeting here.

15            BY MR. ZELLER:

16            Q.   Is there some reason that you did

17    not put what's recited here in paragraph 8 in the

18    chronological order in which it actually occurred

19    at the meeting?

20            MR. ALLEN:  Same objection.

21            A.   I believe that paragraph 8 does

22    correspond to the chronological order, although

23    it's -- the intent of the language there is not to

24    present the chronological record.

25            BY MR. ZELLER:
```

```
 1              Q.   So paragraph 8, as it's written
 2      here, does accurately reflect the chronology, the
 3      order in which Dr. Ahn had said these things at
 4      the meeting?
 5              A.   Apart from the first and second
 6      sentence partially referring to the same step in
 7      the discussion, this does correspond to the
 8      chronological order in which the events occurred.
 9              Q.   You say "apart".  So it's correct
10      that the -- when you look at the paragraph 8 in
11      its entirety it is not presented in chronological
12      order of what it is that Dr. Ahn said at the
13      meeting, right?
14              A.   No.
15              MR. ALLEN:  Objection, mischaracterizes
16      the testimony.
17              A.   That's not right.  If you look at
18      paragraph 8 in its entirety, it's consistent with
19      the chronological order in which the events
20      happened.
21              BY MR. ZELLER:
22              Q.   So in -- in your view paragraph 8
23      is written in a way chronologically that is
24      consistent with what actually happened
25      chronologically at the meeting insofar as it
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 240

1    related to Dr. Ahn's statements?

2              A.    That's not what I said.

3    Paragraph 8 is not written primarily

4    chronologically, but it is consistent with the

5    chronology of events in the meeting.

6              Q.    By the way, did Dr. Ahn use the

7    word "aware" or "told" with respect to the terms

8    of the Apple/Nokia license?

9              A.    He used several words during the

10   meeting.  First he used the words "I have an

11   idea".  Then after the break, he used the words

12   "I know" and then continued to refer to the terms

13   of the agreement, and then he -- he did explain

14   that the agreement had been produced to outside

15   attorneys, but -- but that -- that all information

16   leaks and -- and therefore he is aware.

17             So I believe he used several different

18   words during the discussion.  I don't recall him

19   using specifically the word "told".

20             Q.    Did he use the word "aware" in

21   connection with the terms of the Apple/Nokia

22   license?

23             A.    I believe he used the words

24   "I know", rather than "I am aware."

25             Q.    Is the -- are the statements that

```
 1   you attribute to Dr. Ahn here in paragraph 8

 2   statements that he made both before and -- I'm

 3   sorry, strike that.

 4            Are these statements that you attribute

 5   to Dr. Ahn in paragraph 8 of your declaration

 6   statements that he made during the first session

 7   of the meeting, the second session of the meeting

 8   or during the course of both?

 9            A.   In the first session of the

10   meeting, Dr. Ahn, based on my recollection, only

11   said that he has an idea of what the financial

12   terms are or -- or what Apple pays Nokia and what

13   I have written in paragraph 8 refers to what

14   happened in the second session in the meeting.

15            Q.   So with respect to what you relate

16   here in paragraph 8, all of it is what Dr. Ahn

17   said occurring the second session?

18            A.   That's my recollection.

19            Q.   Is there anything in your

20   declaration that you see that refers to anything

21   Dr. Ahn said in the first session of the June 4

22   meeting?

23            A.   Other than -- than it being

24   thematically the same thing, that he said in the

25   first meeting that he has an idea of what Apple is
```

1    paying Nokia, being substantively very much the

2    same thing of having been informed of the

3    financial terms, this paragraph 8, when I wrote

4    it, I -- I intended to focus on the second

5    session.

6           Q.   I understand you focused on it.

7    I'm just trying to find out is -- is anything

8    that's reflected here in paragraph 8 something

9    that happened during the first session --

10          MR. ALLEN:  Objection --

11          BY MR. ZELLER:

12          Q.   -- as opposed to the second?

13          MR. ALLEN:  I apologize.  Objection,

14   asked and answered.  You may answer it again.

15          A.   During the first session Dr. Ahn

16   said that he has an idea of what Apple pays to

17   Nokia under our license agreement, which implied

18   that he had been told of the financial terms of

19   Nokia's license with Apple but did not yet verify

20   that in detail.  In the second session of the

21   meeting, he went into much more detail and the

22   paragraph 8 outlines the discussion during that

23   second session.

24          BY MR. ZELLER:

25          Q.   Focusing on paragraph 9, where

1    it says:

2              "Samsung then used the terms of Nokia's

3    license with Apple in an attempt to gain an

4    advantage in the ongoing negotiations between

5    Nokia and Samsung."

6              Do you see that language?

7         A.   Yes.

8         Q.   Is that something that happened

9    during the first session or the second?

10        A.   I would not limit it to any of

11   those sessions.  I cannot -- I don't yet know

12   whether Samsung used the terms even more broadly

13   either before or after the -- the meeting.

14             My understanding is that -- that -- that

15   it's clear that Samsung used that information in

16   the whole meeting and its overall approach in that

17   meeting as the whole offer that they made was

18   clearly based on the -- the information of the

19   Apple agreement.  In terms of explaining the

20   issues and -- and making it clear to us that

21   attempt to gain an advantage occurred after he

22   revealed to us the level of detail that he was

23   aware of.

24        Q.   You say that it was "clearly based"

25   and the like.  Did Dr. Ahn say that he based his

1    offer or Samsung based its offer on the terms of

2    Apple/Nokia license?  Did he actually say that?

3              A.   The words Dr. Ahn used were that

4    that -- that he has considered everything and he

5    used an emphasis on the word "everything" and he

6    made that statement right after commenting of

7    having the knowledge about Nokia's agreement with

8    Apple.

9              So it was clearly implied to us that --

10   that this issue was a major consideration in

11   Samsung's offer.  So in the context of the

12   discussion, it was made very clear to us but he

13   did not verbatim say that the offer would have

14   been based on that.

15             Q.   And what you just described,

16   Dr. Ahn as saying, including the emphasis on the

17   word "everything", was something he stated during

18   the first session of the June 4 meeting, correct?

19             A.   I believe he used that phrase in --

20   both in the first and second sessions of the

21   meeting.

22             Q.   You believe or you recall it that

23   way?

24             A.   I recall it that way.

25             Q.   Focusing on paragraph 9.  This

```
 1    language -- by the way, you drafted the language

 2    in paragraph 9 or you dictated it, right?

 3            A.   I drafted it.

 4            Q.   You use the word "then".  Why is

 5    the word "then" in there?

 6            A.    It's there not to -- to limit

 7    the -- Samsung's views.  It there to -- to

 8    describe in -- in normal language what occurred in

 9    the meeting and it's there to refer that after the

10    things that were described in paragraph 8, Samsung

11    clearly used the information to -- to gain an

12    advantage in the negotiation.  It's not saying

13    that it wouldn't have occurred before or at any

14    other time either.

15            Q.   Turning to the remaining language

16    in paragraph 8.  You say here:

17            "He [referring to Dr. Ahn] mentioned

18    that even if the terms were supposed to remain

19    confidential, all information leaks."

20            Do you see that language?

21            A.   Yes.

22            Q.   And I think you have said already,

23    "all information leaks" are words you recall

24    Dr. Ahn using?

25            A.   Yes.
```

1          Q.   With respect to the other language

2     in that sentence, even if the terms were supposed

3     to remain confidential, is that a paraphrasing of

4     what he said or are any of those his actual words?

5          A.   My recollection is that he either

6     said that the terms are supposed to remain

7     confidential or he said that the agreements were

8     supposed to remain confidential.  I don't recall

9     whether he was referring to the terms or the

10    agreements or the licensees.  But -- but they were

11    supposed to be confidential are the words that he

12    used.

13         Q.   And then you say:

14         "For proof, [Dr.] Ahn even recited the

15    financial terms back to us."

16         I take it that sentence is a paraphrase?

17    You are describing what he said rather than any of

18    the words he actually used?

19         A.   That's right.  That's describing

20    what he -- he did.  It's not to quote him.

21         Q.   And the financial terms you are

22    saying that he recited are the financial terms you

23    testified about earlier with respect to the

24    ███████████████████████████████████and the

25    like?



11          MR. ALLEN:  Objection to the form of the

12   question, vague.

13          MR. LANTIER:  Objection, outside the

14   scope.

15

17          BY MR. ZELLER:

18

22          A.   When you say "royalty rate", what

23   are you really referring to?

24

```
 8              So when you are asking about "effective

 9    royalty rate" I -- I have difficulties

10    understanding what do you mean because this

11    agreement is a complex -- complex and

12    comprehensive set of rights and obligations and --

13    and multiple different elements of financial

14    terms.

15              Q.   I am not asking about effective

16    royalty rate.  I am asking right now about the

17    terms, the actual terms of the agreement.  Please

18    tell me what your understanding is of the actual

19    royalty terms as to what it is that Apple is

20    paying to Nokia under the license?

21              MR. ALLEN:  As it appears in the

22    contract?

23              MR. ZELLER:  Correct.

24              MR. LANTIER:  Objection.

25              A.   I believe the contract speaks for
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 249

```
 1    itself.

 2              BY MR. ZELLER:

 3              Q.   What's the royalty basis that is

 4    set forth in the Apple/Nokia license for what it

 5    is that Apple pays Nokia?

 6              MR. ALLEN:  Objection, vague.  Outside

 7    the scope.  You may answer his question.

 8              A.   Can you specify what do you mean

 9    with "royalty base"?

10              BY MR. ZELLER:

11              Q.   You're not familiar with those --

12    those terms?  You haven't heard those before?

13              A.   Royalty base may have a simple

14    meaning in -- in -- in some agreements.  ██████

██   ████████████████████████████████████████████████

██   ████████████████████████████████████████████

██   ████████████████████████████████████    ██

██   ████████████████████████████████████████████

██   ██████████████████████

20              So when you refer to a royalty base,

21    what are you meaning with that?  Are you meaning

22    something that is in the terms themselves or

23    something that led to the agreement or something

24    that would be an expost evaluation of the effect

25    of the agreement?  I -- there are multiple ways to
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 250

```
 1    understand your question.

 2              Q.   Do you know what the actual royalty

 3    terms are with respect to Apple's obligations

 4    under the Apple/Nokia license?

 5              MR. ALLEN:  Objection, outside the

 6    scope.  You may answer his question.

 7              A.   Yes.

 8              BY MR. ZELLER:

 9              Q.   Please tell me what they are that

10    you know.

11              A.   I don't recall all of the details

12    under the Apple/Nokia agreement, but there was a
```

███  ████████████████████████████████

███  ███████████████████████

███      ███  ██████████████████████

███  ███████████████

███      ███  █████████████████████

███  ████████████████████████████████

███  ██████████████████████

```
20              Q.   We're talking about the Apple/Nokia

21    license that Dr. Ahn, you say, recited the terms

22    of.  Please tell me how under that agreement are

23    the ongoing payments from Apple to Nokia

24    calculated?

25              MR. ALLEN:  Can you not clarify that for
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 251

```
 1    him?  He asked for a clarification.

 2            MR. ZELLER:  I just did clarify it.

 3    It's that agreement.

 4            MR. ALLEN:  If you understand his

 5    question, you can answer it.  I'll object to it,

 6    it's -- it's outside the scope, but you may answer

 7    his question.

 8            A.   This seems to be a memory test now,

 9    but I can -- I can do my best.

10            So my recollection is that the -- the
```



```
21            BY MR. ZELLER:
```

```
24            A.   I don't recall it as I sit here

25    today.
```

1          Q.   Do you have any recollection of it?

2    ████  █████████████████████████

█  ████████████████████████

█  ████████████████████████████

█  █████████

█  ████  ████████████████████

█  ███████████████████████████

█  ██████████████

█  ████  █████████████████████

██  ██████████  █████████████████████████

██  ████████████████████

██  ████  █████████████████████

██  ██████████████████████

14          A.   I don't recall him making such

15   references.

16          Q.   Have you ever read the -- any of

17   the reports by Dr. Teece?  That's T-e-e-c-e.

18          A.   Dr. Teece, if I understand

19   correctly, is a professor who has published a lot

20   of academic research.  I -- I recall having read

21   some of his research, but you have to more

22   specific if you ask about some reports.

23          Q.   Have you read any expert reports

24   that Dr. Teece prepared in any litigation?

25          A.   I don't recall whether I have read

Page 253

```
 1    myself any of those reports.

 2              Q.   But, are you generally aware that

 3    the allegation here is is that information that

 4    was in the Teece Report, in the Northern District

 5    of California, included information about the

 6    Apple/Nokia license terms?

 7              MR. LANTIER:  Objection to form.

 8              MR. ALLEN:  Join the objection.  Are you

 9    saying that's an allegation?

10              MR. ZELLER:  I'm just asking if he's

11    generally aware that that is an allegation, yes.

12              MR. LANTIER:  Object to form.

13              A.   My understanding is that -- that it

14    would be not only an allegation, but an admitted

15    fact that -- that unredacted reports by Dr. Teece

16    was distributed to employees of Samsung.

17              BY MR. ZELLER:

18              Q.   You have never reviewed that report

19    as far as you're aware, the report that's actually

20    at issue?

21              MR. ALLEN:  I'm going to interpose an

22    objection.  This is outside the scope, I'll let it

23    go for a little bit, but we're not going far down

24    this road.  You can answer his question.

25              A.   I don't recall.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 254

```
 1            BY MR. ZELLER:

 2            Q.   Has anyone ever described to you

 3    what the Teece Report says about the Apple/Nokia

 4    license?

 5            MR. ALLEN:   Let me interpose an

 6    objection that it is outside the scope.  I'll

 7    instruct the witness to be cautious not to reveal

 8    communications from counsel that is protected by

 9    the attorney/client privilege or attorney/client

10    work product.  Other than that, you may respond to

11    his question.

12            A.   I don't recall.

13            BY MR. ZELLER:

14            Q.   So often happens after all that.

15            I take it you don't recall reviewing any

16    Teece Report in preparation for your deposition

17    here today?

18            A.   That's right.

19            Q.   Directing your attention back to

20    your declaration, exhibit 2.  In paragraph 9,

21    where you talk here about Samsung attempting to

22    use those terms of the Nokia's license with Apple

23    to gain leverage -- or advantage rather.  By this,

24    are you referring to what you testified to earlier

25    about, in your view, Samsung using the Apple/Nokia
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1    license terms in its offer to Nokia?

 2            MR. ALLEN:  Objection to the extent it

 3    mischaracterizes the testimony, but you may answer

 4    his question.

 5            A.   What I am referring to here is --

 6    is that being on the other side of the table from

 7    Samsung in that negotiation, the situation was

 8    such that Samsung made what was put to us as a

 9    take it or leave it offer effectively and -- and

10    explained to us and made clearly known to us

11    that -- that -- that in coming up with that offer

12    Samsung had considered "everything", using

13    Dr. Ahn's words, and that "everything" included

14    knowledge of the financial terms of the

15    Nokia/Apple agreement and that "everything"

16    included also that Samsung considered Apple to be

17    the only comparable competitor on the market.

18            So all together that message to us was

19    very clearly that Samsung would not move or agree

20    to negotiate around any other financial terms than

21    the ones presented by Samsung and -- and,

22    therefore, it would be our choice being put into

23    this position to either accept Samsung's terms or

24    to accept the prospect of potentially having

25    protracted and expensive disputes about the
```

```
 1    issues.

 2              So -- so I viewed this attempt to be

 3    broadly understood as a whole in the meeting on

 4    June 4 and perhaps beyond, before and after that

 5    meeting but then also specifically I not only

 6    understood as an attempt to argue for why -- why

 7    Nokia should accept Samsung's offer.

 8              BY MR. ZELLER:

 9              Q.   Anything else that you are

10    referring to in this paragraph 9?

11              A.   Not specifically.

12              Q.   Even generally?

13              A.   Well, paragraph 9 was not intended

14    to limit the ways that Samsung could attempt to

15    gain an unfair advantage in these negotiations or

16    any other litigation or negotiations.  So it was

17    not in there to limit anything, but what I just

18    answered were -- reflects what was the intent of

19    what I was trying to convey when writing this

20    paragraph 9.

21              Q.   Other than what you have testified

22    to, do you have any knowledge or information about

23    any use that Samsung has put the terms of the

24    Apple license agreement to?

25              A.   I have read from the press that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 257

```
 1    there are allegations that Samsung would have used

 2    that information in its litigations with Apple,

 3    but I am not aware of the details of those

 4    allegations.

 5             Q.    Any other use that you had

 6    knowledge or information about other than what you

 7    have testified to here today?

 8             A.    As I sit here today, I can't recall

 9    any other such instances.

10             Q.    Directing your attention to

11    paragraph 10 of your declaration.

12             You say here that:

13             "As a result of Samsung learning the

14    terms of Nokia's license with Apple, Nokia now

15    finds itself in exactly the competitive

16    disadvantage I earlier described."

17             Do you see that?

18             A.    I see that.

19             Q.    And here, are you referring to the

20    same -- what you were saying was the same effort

21    by Samsung to gain an advantage in the ongoing

22    negotiations that you are referring to in

23    paragraph 9, or is there something else?

24             A.    This competitive disadvantage

25    referred to in paragraph 10 also refers to the --
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 258

```
1    the broader harm from not being able to rely on

2    protective orders as listed, for example, in

3    paragraph 5.

4              Q.   Anything else?

5              A.   This was not intended to be an

6    exhaustive list of the potential harms.  There may

7    be others.  But what I write in paragraph 10,

8    those were the main things I was referring to.

9              Q.   What else are you referring to in

10   paragraph 10 that you have not already testified

11   to today?

12             A.   Well, the inability to rely on

13   protective orders can have all kinds of harms that

14   I cannot necessarily even think of today, so I was

15   referring to all possible harm that can arise from

16   that.

17             Q.   What, if any, harm has Nokia

18   suffered as a result of what it claims is

19   Samsung's use of the Apple/Nokia license terms

20   apart from what you have already testified to here

21   today?

22             A.   Without limitation, I am spending

23   time on this issue even now, even today.  We still

24   have no agreement with Samsung about the financial

25   terms of their continuing license with Nokia and
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 259

```
 1    we have had to enter into an arbitration which may

 2    cause substantial delay and cost and whatnot.  So

 3    I am not even aware of all the potential harm that

 4    may still come from this.

 5              Q.   Anything else?

 6              A.   I can't think of anything else

 7    right now.

 8              Q.   Has any knowledge or information

 9    come to your attention about any other harm other

10    than what you've described?

11              MR. LANTIER:  Objection to the form.

12              A.   Not that I would have been able yet

13    to draw a linkage between this disclosure and

14    harm.  I am not saying that it would not have

15    occurred already.

16              BY MR. ZELLER:

17              Q.   Other than what you've described

18    here today, is there any other competitive

19    disadvantage to which you believe Nokia has

20    suffered as a result of Samsung learning or using

21    the Apple/Nokia license terms?

22              A.   I believe that's outside the scope

23    of this -- this deposition, so I did not prepare

24    my view on that question yet.

25              Q.   Whether you prepared for it or not,
```

```
 1   are you aware of anything else?

 2              A.   Can you repeat the question?

 3              Q.   Other than what you've described

 4   here today, is there any other competitive

 5   disadvantage to which you believe Nokia has

 6   suffered as a result of Samsung learning or using

 7   the Apple/Nokia license terms?

 8              MR. ALLEN:  I'll join the witness in the

 9   objection that it's outside the scope.  I will

10   allow him to answer it one more time.

11              MR. ZELLER:  I'm asking about his

12   declaration.  If -- if you want to take the

13   position he does not have to answer questions

14   about his declaration, then so be it.  We'll bring

15   him back to answer it.  So you can either answer

16   the question or not.

17              MR. ALLEN:  Mike, just calm yourself

18   down.  I know it's late, everybody's tired.  I

19   said --

20              MR. ZELLER:  It's not late.  It is not

21   late.  He is refusing to answer a question about

22   his own declaration.  He refused to do it or

23   not --

24              MR. ALLEN:  He's answered it, and he's

25   going to answer it again.  Just calm down.
```

```
 1            A.   I would like to understand.  You
 2    know, I think I view this as disrespectful.  I did
 3    not answer anything.  I did not say that I would
 4    not answer your question and you claim that I
 5    refuse to answer.  Why did you say that?
 6            BY MR. ZELLER:
 7            Q.   Because you said it was outside the
 8    scope and you were not going to answer; that's
 9    why.  So is there something unclear about this
10    language in your own declaration --
11            A.   No -- don't --
12            MR. ALLEN:  Let's not argue it.  Let's
13    not argue it.  Let's get a question, we'll give an
14    answer.  We'll move forward.  So just so we're all
15    clear, what's the question that's pending?
16            BY MR. ZELLER:
17            Q.   I'll ask it for at least the third
18    time now, and I am not counting this against time.
19            You used the frame "competitive
20    disadvantage" in your own declaration.  Do you
21    recall that in paragraph 10?
22            A.   Yes.
23            Q.   As you are using those words, is
24    there any competitive disadvantage that you
25    believe Nokia has suffered as a result of
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 262

1     Samsung's learning or using the terms of the

2     Apple/Nokia license other than what you have

3     testified to here today or do I have your complete

4     testimony on that subject?

5               MR. ALLEN:  As of today?

6               A.   Did that -- "as of today", did you

7     agree to include that in your question "as of

8     today" or what is the entire question?

9               BY MR. ZELLER:

10              Q.   You can't answer the question as

11    phrased?

12              A.   Can you repeat it?

13              MR. ZELLER:  Please read it back.

14                   (Record read.)

15              A.   I am not yet aware of the full

16    extent of the competitive disadvantage that --

17    that Nokia has suffered.  Other than what I have

18    testified today, I can't think of any yet proven

19    harm as of today.

20              Q.   In preparation for your deposition

21    here today, did you review any e-mails?

22              A.   No.

23              Q.   Did you review any transcripts?

24              A.   No.

25              Q.   With respect to the notes that Eeva

```
 1    took from the June 4 meeting, did you review her

 2    handwritten notes, her typewritten notes or both?

 3              A.   Both.

 4              Q.   Have you reviewed the

 5    Protective Order entered in the Apple vs. Samsung

 6    case in the Northern District of California?

 7              A.   I don't recall.

 8              Q.   Do you have any knowledge or

 9    information as to its actual terms?

10              A.   I'm not an attorney.  I have a

11    layman's understanding of the -- of the aims.

12              Q.   Well, I'm asking about its actual

13    terms.  Do you have any knowledge or information

14    as to its actual terms without having reviewed it?

15              A.   No.

16              MR. ZELLER:  All right, I think I'm

17    done, but let's just take a minute and I'll look

18    at my notes and see if there is anything further.

19              MR. ALLEN:  Very well.

20              VIDEOGRAPHER:  Going off the record.

21    The time is 18:47.

22    (6.47 pm)

23                     (Off the record.)

24    (6.53 pm)

25              COURT REPORTER:  We are going back on
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 264

1       the record at 18:53.

2              MR. ZELLER:  I have no further questions

3       of this witness at this time.  Also we, we being

4       Samsung, designate this transcript Attorneys' Eyes

5       Only pursuant to the Protective Order.

6              MR. LANTIER:  This is Greg Lantier for

7       Apple.  I have no questions for the witness, but

8       also I would like to designate the transcript

9       Attorneys' Eyes Only on behalf of Apple.

10             MR. ALLEN:  I also have no questions for

11      the witness and I have previously designated the

12      transcript, so we are all set.  That concludes the

13      deposition.

14             COURT REPORTER:  All parties present

15      today requested a rough transcript of this

16      deposition hearing.

17

18

19       (Whereupon the deposition concluded at 6.53 pm)

20

21

22

23

24

25

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 265

```
 1

 2                    CERTIFICATE OF COURT REPORTER

 3

 4     I, TRISH BRADY, an Accredited Realtime Reporter, hereby

 5     certify that the testimony of the witness MR. PAUL HENRY

 6     KRISTIAN MELIN in the foregoing transcript, numbered pages 6

 7     through 264, taken on Monday, November 25, 2013, was

 8     recorded by me in machine shorthand and was thereafter

 9     transcribed by me; and that the foregoing transcript is a

10     true and accurate verbatim record of the said testimony.

11

12     I further certify that I am not a relative, employee,

13     counsel or financially involved with any of the parties to

14     the within cause, nor am I an employee or relative of any

15     counsel for the parties, nor am I in any way interested in

16     the outcome of the within cause.

17

18

19

20

21     Signed:  ........................

22     TRISH BRADY

23     Dated:   ........................

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 266

```
1                    DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to: _____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to: _____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to: _____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change:_____

24   Page No._____Line No._____Change to: _____

25   _____
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 267

```
 1    Reason for change:_____

 2    Page No._____Line No._____Change to: _____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to: _____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to: _____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to: _____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to: _____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to: _____

18    _____

19    Reason for change:_____

20

21    SIGNATURE: _____DATE:_____

22    MR. PAUL HENRY KRISTIAN MELIN

23

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

**A**

**able**
80:12 82:18 94:9
119:4 173:15,16
176:17 179:6 202:8
258:1 259:12
**Absolutely**
46:2,5
**academic**
252:20
**accept**
164:5,15 189:10
255:23,24 256:7
**acceptable**
203:23
**accepted**
35:15 36:13 37:24
182:18
**access**
181:13 210:21
**accommodated**
100:9
**account**
66:13,25 97:20 236:20
**accounts**
118:13,18 119:5
**Accredited**
1:24 265:4
**accurate**
42:13 224:17 265:10
**accurately**
35:9 43:21 47:19 54:2
55:1 162:6 239:2
**acting**
124:21
**action**
48:2 111:19 113:10,13
113:23 117:8
**actions**
111:6,20,23 112:22,23
**actively**
78:10
**activities**
9:12,23

**actual**
13:20 157:8 173:17
199:18 227:3,14
232:10 233:11
234:13,20 235:21
246:4 247:19,21,25
248:17,18 250:2
263:9,12,14
**add**
179:18
**added**
52:17 67:5 141:20
163:18 202:21
**addition**
84:24
**additional**
67:5 209:13
**address**
196:1
**addressed**
203:14,19
**admitted**
253:14
**advantage**
243:4,21 245:12
254:23 256:15
257:21
**adverse**
34:2
**advice**
64:21 149:19 150:1,11
150:17,23
**affidavit**
30:5
**afield**
39:8
**aftermath**
228:18
**afternoon**
5:9 6:12,13
**agency**
213:9,14
**ago**
16:24 17:1 23:14,17

82:15
**agree**
69:13,18,23 89:11
98:19 255:19 262:7
**agreement**
4:6 13:24 14:2,3,9,17
15:1 26:3 27:3,11
28:1,19 35:3 43:10
43:23 46:7,12,13,17
47:7 49:10,16 50:3
52:20 53:23 54:3
55:2 59:12,15,20,25
60:1 69:15 70:19,21
73:6,13 75:18 80:11
88:8 94:8,10,11 95:6
95:12 96:2,7 97:4,11
98:3 99:11,17 104:9
105:11,24 111:8
112:8,14,18 113:20
122:6,16,16 123:14
123:20 126:11,12,15
128:9 130:15,25
131:5,5 132:23 137:3
147:12,13 154:6,12
155:21 156:7 157:14
165:20 171:23
173:14,16,18 174:1
175:4,9,16,25 176:3
176:15 178:1,18
179:7 195:24 197:19
198:19 202:15,18
213:3 234:2,9,16,22
236:2 237:19 240:13
240:14 242:17
243:19 244:7 248:11
248:17 249:15,23,25
250:12,18,22 251:3
255:15 256:24
258:24
**agreements**
19:24 31:12 41:12
110:5 121:6 138:8
139:4 164:11 173:2
183:2 190:7 214:7

246:7,10 249:14
**ahead**
15:23 124:5 132:4
167:7 188:6
**Ahn**
59:17 70:16 72:3 73:1
73:4,9,14,16 74:1,15
74:21 75:21 76:10,21
77:6,24 79:15,22,25
80:7,17 81:5 82:3,9
83:4 93:24 94:12,25
95:5,16 97:12 99:4
99:24 100:3,13,19,22
101:7,15 102:2
103:15 104:17
141:14,17,25 142:12
142:17 143:5,16
144:9,14,19,25 145:1
145:18 153:12 154:2
154:5 157:7 158:7
161:2 170:20 171:12
172:19 174:17,21
176:20 177:2,13,20
177:25 178:14 179:2
179:13,25 195:22
204:17 209:1,18
210:7 211:9,22
214:23 215:11 216:2
216:25 217:10,19
218:7,19 220:21
221:11,13 224:6,13
225:15 226:4 227:17
228:8,23 230:24
231:5,6 232:1,11,17
233:7,11 234:2,9,12
234:20 235:21,25
236:21 239:3,12
240:6 241:1,5,10,16
241:21 242:15
243:25 244:3,16
245:17,24 246:14
250:21 252:6,9,12
**Ahn's**
94:3 158:22 240:1

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 2

255:13
**aims**
263:11
**airport**
105:2,4,5
**al**
2:3 5:13
**alcohol**
216:11
**allegation**
115:17 253:3,9,11,14
**allegations**
27:9 257:1,4
**alleged**
27:25 32:17 53:24
136:22
**allegedly**
192:19
**Allen**
2:14 5:23,23 7:9 15:18
15:24 16:5 21:18
22:2,10 32:8,20 33:2
33:7,16,22 34:9 38:7
39:7,16,25 40:12
44:16,18,23 45:12
46:23 47:3 48:7,16
48:23 49:18 50:9,12
51:3,17 52:5,16
53:20 54:16,23 55:15
55:22,24 56:11 61:13
63:12,16,20 64:23
65:5 66:15 68:24
69:12 70:1,5 71:2
72:15,23 74:9 75:5
76:12,18 77:2,14
78:14,21,25 83:7,18
84:4,16 86:5 88:19
89:23 90:3,19,24
91:15 97:8 98:8,22
100:14,24 101:9
102:23 103:18,22
106:15 108:22 109:6
110:17 113:3,25
115:5 116:2,7,8,17

116:22 117:21
118:16 119:10,23
120:6,13 121:1 122:1
122:4,13,24 123:10
123:17,23 124:9,16
124:23 125:2,7,15
126:7,21 128:18
129:5 130:16 131:1
131:13,22 132:11,19
133:6,8,23 134:25
135:6,21 136:9,11
137:9 138:6,19 139:9
139:19 140:2 142:14
144:21 145:11
146:19,21 147:7,24
149:20 150:2 151:13
152:7,10,16,25
153:22 154:25
155:11 159:4,15,19
160:19 161:8,21
162:2,15 165:8 166:3
166:10,20,25 167:3,7
169:8 177:4,14
183:15 187:9,15,25
188:4,16 189:3,13,18
190:1 191:1,7,14,25
192:8 193:1,15,19
194:2 195:4 196:7,15
196:20 197:4 198:3,6
199:12,22 200:8,16
205:22 208:10
211:11,20,24 214:8
215:13,17 216:5
217:24 219:4,20,22
220:22 223:11 226:6
226:23 227:2,9,21
228:9,24 229:15,18
232:12,23 236:22
238:7,20 239:15
242:10,13 247:11
248:21 249:6 250:5
250:25 251:4 253:8
253:21 254:5 255:2
260:8,17,24 261:12

262:5 263:19 264:10
**allow**
33:2 188:5 192:24
193:12 228:25
260:10
**allowed**
34:7 210:25
**Alston**
2:10 21:6,10 29:23
65:19
**altogether**
251:15
**ambiguity**
124:2
**ambiguous**
214:9
**amended**
250:19
**amendment**
154:6
**AMERICA**
1:10,11
**amount**
44:7 45:25 73:19,21
73:22 75:16 80:18
95:24,25 96:17,23
97:23,25 98:1,2,5,15
98:18 154:10,17
155:19,20 156:5
175:20 185:17
233:15 251:23 252:4
**amounts**
75:14 94:16,21 156:6
171:16 172:5,11,16
175:4 183:20 185:9
185:18
**analysis**
142:19
**analysts**
44:10
**analyze**
53:4
**and/or**
66:18

**Angeles**
2:5
**announced**
45:4 50:16 52:1,15
**annual**
95:23 96:1 97:3,25
98:1,3,4 154:11
175:5,13 247:4
251:15 252:11
**answer**
15:23 16:4,10 21:19
22:3 27:14 32:14
33:3,12,18 34:3,6
35:8,20 38:8 39:9,20
39:25 44:24 47:2,4
47:18 49:19 51:4,18
51:22 54:17,24 56:11
61:15 63:2,7,19,20
63:21 65:6 69:2,13
70:5 73:8 74:10 75:9
76:16 77:15 78:12
83:19 86:6 88:20
89:24 90:3,19 91:1,2
97:9 98:9,23 100:22
100:25 101:7 106:16
110:18 114:1 116:2
119:11,24 120:8,14
121:2 122:19,20,21
122:22 123:1,12
125:24 126:9,25
130:18 131:3,11
132:5 133:8 139:20
140:3 142:15 149:21
150:3,9 152:18,18
153:23 155:12
159:19 161:9,11
162:3,16 177:5
179:21 183:16
187:10,16 188:5,17
189:4,15 190:2 191:3
191:8,16 192:1,11
193:5,17,21,21,24
195:9 196:8 197:25
198:4 200:20,22

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

201:3 202:2 205:21
211:12 212:5,5
214:10,25 215:4
217:21,24 226:8,9,14
227:5,8,21 228:25
232:14,24 238:8
242:14 249:7 250:6
251:5,6 253:24 255:3
260:10,13,15,15,21
260:25 261:3,4,5,8
261:14 262:10
**answered**
22:11 43:12 46:25
47:1,3 56:21 61:20
88:20 98:23 110:18
121:2 129:1 138:7
139:20 142:15
153:23 155:1 160:20
162:3,16 165:9 177:5
183:1 187:10 196:8
197:5 232:24 242:14
256:18 260:24
**answering**
27:17 63:5 70:3
220:24 226:15
**answers**
159:13 205:25
**Antush**
2:23 116:7 139:6,23
**anybody**
42:3 43:21 46:22
54:11 109:9,12
110:20 136:25
137:22 155:3 156:1
206:21
**anyway**
167:6
**apart**
30:22 38:2 64:15 89:3
111:19 132:9,15
142:25 143:6,13
153:6 215:4,7 229:3
239:5,9 258:20
**apologize**

53:14 188:6 211:24
216:13 235:11
242:13
**apparently**
152:1 196:3,18
**appear**
205:14
**appeared**
74:11 202:10 204:19
204:22
**Appearing**
2:3,9,16
**appears**
248:21
**Apple**
1:4 2:16 5:12 6:1 42:7
42:11 43:15 44:4,13
46:12,14 53:17 72:11
74:23 75:18 88:18,22
89:13,18 94:5 95:14
97:4,14 99:14,25
108:10 113:1,9,11
114:12,25 118:14
120:10 121:20,24
122:6,8,10 123:5
126:3,17 127:5,22
129:15,18,22 130:1,4
130:12,13,19,23
131:19 132:17 133:5
133:9,18 134:9,18
135:12,18 136:19
137:1,7,10,18,21
138:3,17,22 139:16
142:22 145:19
147:13,18 153:13
154:11 155:20 156:7
157:1,13 161:12
166:2,9 172:20,25
174:19,24 176:12
178:8,17 180:20
181:1 183:8 188:10
195:16 197:14
201:15 231:1 232:9
232:19 233:9,14,16

241:12,25 242:16,19
243:3,19 244:8
247:10,19 248:3,4,7
248:19 249:5,15,17
249:17 250:14,23
254:22 255:16
256:24 257:2,14
263:5 264:7,9
**Apple's**
45:9 69:14 89:1
117:19 127:5 136:7
165:24 166:14 174:3
250:3
**Apple/Nokia**
19:9 20:3 30:21 32:23
33:4,19,25 42:22
43:6 44:14 45:3,24
46:21 49:4 50:16
52:1,13 55:6,12 74:2
75:22 80:8 81:6 82:4
82:10,17 83:4 95:1
96:18 97:7,19 98:6
98:20 99:5 102:4
109:14,22 110:3,14
111:1,13 112:2,25
113:10 114:14 115:2
115:13,25 116:15
117:4 121:22 122:11
123:8 126:5,19 127:6
127:24 129:15,23
130:14,22,25 131:21
132:18 133:4,14,18
134:10,20 135:13
136:8,19 137:6
138:18 139:17
144:20 145:1 155:9
156:24 157:10,12
158:7 159:24 162:13
176:21 177:20 179:3
179:14 180:1 197:2
198:23 199:21
201:11 209:2 214:24
215:11 216:3 217:1
217:10 218:7,20

220:21 221:12 224:7
224:13 225:16 226:5
227:18 228:8,23
240:8,21 244:2 248:1
248:2 249:4 250:4,12
250:18,20 253:6
254:3,25 258:19
259:21 260:7 262:2
**applied**
94:15 172:6,10
**applying**
89:1
**appreciate**
186:6
**approach**
14:23 161:2 202:14
203:25 243:16
**appropriate**
176:13
**approvals**
100:9 143:2 214:3
**approximately**
7:5,22 8:4 10:14 11:12
12:2 35:21 38:15,18
141:11
**arbitrate**
204:22 205:17
**arbitration**
23:20 24:13,17,18,21
25:16 26:11,21 28:10
28:13 29:1,4,7,12,15
29:22,25 59:10
202:11,13 204:2,16
204:18 259:1
**arbitrations**
31:6,11
**area**
88:25
**argue**
69:24 147:16 173:16
196:25 256:6 261:12
261:13
**argument**
26:16

**argumentative**
48:16 50:12 132:11
152:17 197:5
**arguments**
174:8,9
**article**
45:8,14,20,21
**articles**
44:12,22 45:5,15 54:9
**ascertain**
189:1
**aside**
23:21 24:13 31:3
137:16 215:23,25
247:5,8,20
**asked**
19:10 20:5 22:5,10,14
34:8 44:18 46:24
50:6 52:6 61:6,16,19
64:12,15 88:20 98:22
110:17 121:1 125:22
138:6 139:19 142:14
143:11 144:19,25
147:8 153:22 154:25
160:19 162:2,15
165:4,8 166:13,16
167:5 170:9 175:17
177:4 182:25 187:9
189:25 193:6,10
196:7 197:4 198:9
219:18 232:24
242:14 251:1
**asking**
11:15,17 14:16 21:21
21:23 27:6,13 32:21
35:2,19 43:3 44:1,2
56:2,19,20 60:20,21
63:15 78:22 80:4
98:17,18 110:11,23
113:19 114:19,20
124:3 125:3,10,14,17
127:12 128:24 134:7
137:25 145:3 146:6
146:12 148:15

151:24 154:23
155:13 156:14,15
160:14 162:8 176:25
179:9 187:13 191:21
196:4,11,12,13
198:13 204:7 215:15
219:11,13 222:23
227:2 228:2,9 248:8
248:15,16 250:17
253:10 260:11
263:12
**asks**
121:17
**aspects**
71:9
**ass**
198:13,15
**assert**
25:12 28:5
**asserted**
25:2,7,20 26:9,15 27:6
27:21 28:12
**assertion**
189:22
**assisted**
65:14 182:7 206:16
**associated**
161:13
**assume**
38:9 71:20 108:13
136:11 144:13 182:3
**assumes**
133:9 191:15 192:9
**assumption**
182:1
**assure**
34:1
**asterisk**
180:15
**astonished**
195:21
**Atlanta**
2:12
**Atlantic**

2:11
**attach**
64:9,12,19 65:3 84:10
84:23
**attached**
64:17 66:14 67:2
**attempt**
42:25 238:12 243:3,21
256:2,6,14
**attempting**
254:21
**attention**
180:7 205:19 206:23
230:22 231:9 233:24
254:19 257:10 259:9
**attorney**
65:22 76:15 159:6
165:24 166:15 195:8
199:23 200:19 212:3
220:25 263:10
**attorneys**
61:3 64:5 65:19
117:19 128:13
132:10,16 234:3,10
234:23 235:3 236:3
240:15 264:4,9
**attorney/client**
66:17,18 69:3 75:7
76:14 77:4 79:10
84:18,19 127:1 132:1
132:6 139:22 153:3,4
153:6,18 159:5,9,13
168:18 195:6,6,8,11
199:23 200:18,23
201:5 212:2 215:1,5
215:8,14,24 217:22
220:25 221:4,19,24
222:4 226:10 228:3
254:9,9
**attribute**
241:1,4
**audio**
109:1
**August**

7:7,13
**authority**
214:16
**authorized**
15:19 16:1 32:10,13
32:24 56:1
**available**
35:11,14,24 36:11
37:23 41:24 100:11
142:24 181:20,22
**Avenue**
2:17
**aware**
35:22 36:1 42:16,23
42:25 43:13,17 47:5
50:18,21 53:3 60:5
67:12 68:25 70:18
81:15 82:7 85:6 95:5
112:24 114:18,20,23
114:25 115:8,12,16
117:16,24 121:11
128:11 129:18
133:10 134:17,20
135:8,14,17,22 136:3
136:5,7,24 137:1,11
137:12,20,22 138:16
147:9 177:11,17
178:17 188:2,7
213:12,16 222:7
231:4 232:3 236:11
236:13,17 237:18,22
240:7,16,20,24
243:23 253:2,11,19
257:3 259:3 260:1
262:15
**A-n-t-u-s-h**
139:9

---
**B**
---
**B**
4:1
**back**
32:12,15 33:13 34:5
37:12 45:23 47:12
48:22 49:4,23 51:20

60:6 70:20 80:3
81:17 84:5 101:1
143:1 193:23 212:11
219:3,19 237:24
246:15 254:19
260:15 262:13
263:25
**background**
93:5 228:14
**balance**
205:12
**base**
72:12 249:9,13,20
**based**
21:24 63:6,7 66:2
67:22,24 71:16 89:8
93:12 96:6 146:2
159:13 173:22,25
178:6 189:6 201:5
230:12 237:5 241:10
243:18,24,25 244:1
244:14
**basically**
34:25 35:25 36:9
65:13 75:12 87:8
176:10,16
**basing**
94:7,25
**basis**
62:7,12,23,25 69:19
69:25 72:13 73:23
95:3,18 96:1,9,10,11
96:15 97:3 98:3
101:16 154:11
171:16 175:13
181:14 249:3
**Bates**
4:7 165:20
**bathroom**
163:3 210:13
**bears**
165:20
**began**
7:12,17 8:20

**beginning**
5:2 74:20 85:20 147:3
160:5 173:11 174:18
208:21
**behalf**
2:3,9,16 5:19,22,23,25
6:3 31:19 32:4 57:8
62:9 69:13 163:20
171:13 202:25
213:22 264:9
**believe**
14:19 17:6 21:6 29:5
29:10 30:7 35:14
66:1 69:4 71:21
73:10 77:22,25 80:22
88:6 91:7 95:13
103:16 105:9,22
106:9 109:16 120:11
121:24 126:17 128:1
129:1 138:16 139:1
140:18 153:17,24
155:18 158:14 160:2
163:23 168:13
176:23 180:24
182:19 207:12
216:12 222:2 225:4
233:23 234:14 237:3
238:21 240:17,23
244:19,22 248:25
259:19,22 260:5
261:25
**believed**
77:8 171:11 176:8
**best**
163:25 170:12 196:17
197:22 198:3 208:8,9
251:9
**bet**
198:6
**beyond**
57:5 256:4
**bigger**
172:2
**biggest**

102:17
**billion**
88:25 96:24,25 153:9
154:1,8
**binding**
223:25
**Bird**
2:10 5:10,10 21:6,10
29:23 30:1,1 65:19
**bit**
23:6 47:20 57:9
108:19 109:1 169:11
184:24 185:1 253:23
**bluff**
175:9
**bluffing**
178:24
**board**
214:4
**bound**
196:2
**Brady**
1:24 6:3 265:4,22
**breach**
193:7
**break**
44:3 75:1,8 85:12
145:12 146:4,11,12
148:1,4,7,8 150:25
152:22 155:15
156:11 157:23 159:2
159:16 160:6,8
162:20,21 163:3
166:18 176:4,18
178:14,15,21,22
184:23 185:11 186:8
194:7,10,18 195:3
196:6 198:22 199:20
200:4,15 201:5,10,18
202:5 208:12 210:5,9
210:13 215:21
240:11
**breaking**
145:12

**breaks**
76:19 140:23,24,25
141:2 197:3
**Brian**
2:14 116:8,9
**brief**
174:12
**bring**
32:15 56:6 60:25 61:2
61:4,6 196:24 260:14
**brings**
30:4,22
**broader**
145:24 154:6 258:1
**broadly**
243:12 256:3
**broke**
174:21 178:15,22
**business**
8:1,25 9:6,12 12:6,22
141:14 149:12,14,17
149:23 217:7

---
**C**
---
**C**
2:1
**calculated**
95:23 96:16 250:16,24
**calculation**
96:21 154:21,23 156:3
**calculations**
180:11
**California**
1:1,4 2:5 5:15 253:5
263:6
**call**
42:12,19,19 48:3
134:14
**called**
8:21 15:3 151:10
176:18
**calling**
171:5
**calls**
21:19 38:7 122:14,25

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

123:11 126:8,22
130:17 131:2,23
132:20
**calm**
260:17,25
**cap**
73:23 175:1,5 247:4,5
247:8,20 251:15,15
252:11
**capacity**
212:15
**capped**
72:13
**car**
210:1
**care**
65:7 66:17 75:6 99:16
159:5 204:20
**career**
10:4
**case**
1:7 5:16 16:14 22:13
25:20 30:22 31:4
32:15 114:14 117:19
166:4 202:22 220:14
222:11 263:6
**cases**
12:8 36:3 112:13,17
112:18 113:18
128:18,21,23,24
**categories**
251:19
**cause**
53:9,18 259:2 265:14
265:16
**caused**
53:25
**caution**
64:23 65:5,6 68:24
75:5 76:12,14 77:2
84:17 153:1 159:4
195:7 199:22 200:20
212:1 220:23
**cautious**

254:7
**cellphone**
210:17
**cellular**
251:12
**cent**
87:3,5,12,18 88:13,17
88:23 89:1,14,20
90:8 91:5,25 92:10
93:23 106:4 118:4,22
119:1,4 120:4,12,17
121:19 172:11
180:14,19 181:6,17
182:9 183:13 189:24
**Center**
2:11
**CEO**
214:3
**certain**
9:18 13:2 28:20 30:7
35:10,12 37:4 58:14
58:24 62:9 87:17
121:16,18,18 166:15
176:1 184:10 213:23
**certainly**
42:6 50:25 51:8 74:17
103:2 184:24
**CERTIFICATE**
265:2
**certify**
265:5,12
**CFO**
214:3
**change**
8:15 48:12 66:6,9
85:13 97:2 205:12
222:25 266:3,5,6,8,9
266:11,12,14,15,17
266:18,20,21,23,24
267:1,2,4,5,7,8,10,11
267:13,14,16,17,19
**changed**
8:17 205:1,8 230:3
**changes**

66:4,5 67:21 71:14
**characterizations**
196:12
**characterized**
154:4
**charged**
213:20
**chief**
6:25 8:10
**choice**
255:22
**chosen**
119:18
**Chosun**
103:8
**chronological**
236:20,21 237:3,14
238:5,10,12,18,22,24
239:8,11,19
**chronologically**
239:23,25 240:4
**chronology**
237:17 239:2 240:5
**Chung**
209:14
**circle**
132:2
**circumstances**
121:17 134:6 181:2,5
**cited**
118:3
**claim**
64:16 72:3 79:5 88:22
89:5 101:7 175:8
183:24 261:4
**claimed**
26:6,8,18 96:7 99:18
**claims**
25:2,6,9,19 178:25
258:18
**clarification**
44:19 50:6 186:6
251:1
**clarify**

155:13 184:9 199:14
206:2 214:11 247:15
250:25 251:2
**clarifying**
143:11
**classified**
30:9
**clause**
235:13,18
**clear**
34:13 36:9 46:18
55:24 94:6 95:7 96:5
99:5,8,20,21 100:1
175:7,23 176:14
187:12 190:3 223:14
236:16 243:15,20
244:12 261:15
**clearly**
50:22 79:25 95:10
148:16 151:23 156:4
164:6 175:2,16,20
176:16 181:12 183:6
207:25 236:12
243:18,24 244:9
245:11 255:10,19
**client**
103:23
**close**
75:17 145:13 148:8
154:9,16 202:9
**closer**
175:19
**colleague**
68:2
**combination**
87:11
**come**
19:6 21:14 28:17
37:12 118:6 193:23
259:4,9
**coming**
43:1 255:11
**comma**
235:10

comment
74:22 115:21 145:21
153:12 158:6,11
160:2 161:1 162:12
174:17 222:15 223:7
223:19 224:19,20,24
225:17,19,22
commented
141:20 204:3
commenting
221:3 244:6
comments
58:24 68:22 74:25
75:13 76:23 170:7
178:16 237:8
Commission
22:20 24:2
common
161:13
commonly
160:4
communicate
88:11 91:4,7 194:24
209:17
communicated
106:13 107:25 108:9
108:13 212:24 218:5
219:11,15
communication
66:18 69:3 75:8 84:18
107:5 127:2,22 132:7
139:22 153:4 200:21
215:8,24,25 219:20
220:9 223:22,25
224:15,23 226:11
communications
65:8 105:20 106:2
109:13 129:4,10
132:9,16,24 159:6
200:24 215:5 220:15
221:21,24 222:7,13
222:15,16 223:8,20
225:2,15 226:3,21
227:16,18 228:3,16

254:8
companies
11:1,2,12,20 92:2,12
119:14,14,16,18,25
120:2 183:24 190:7
190:14 192:13
company
1:11 7:18 92:8 95:15
172:21 212:18 213:1
213:10,15,18
comparable
92:9 95:14 99:1,15
172:21 176:12 178:9
183:7,13,25 184:5
187:8 188:14 189:2
191:6,6,12,13,23,24
192:6,7,25 193:14
199:2 255:17
comparison
100:1 172:4 176:12
183:23
comparisons
172:19
compelled
20:12
compensation
170:18
competitive
95:15 257:15,24
259:18 260:4 261:19
261:24 262:16
competitor
76:4 78:2,7,10 99:15
255:17
complain
135:11
complaining
51:13
complains
124:11
complaint
22:20 127:4,11,15,18
127:20 135:15
complement

179:18
complete
70:25 96:13 145:16
166:21 184:6,21
208:6 222:1 262:3
completely
195:21
complex
248:11,11 249:16
complicate
216:5
complied
121:24
compound
51:3 155:11 190:2
comprehensive
248:12
compromise
172:14 175:13
concern
53:10,18 54:1,8,12
55:10
concerned
53:8 55:3 76:3,6 78:1
106:6
concerning
43:6 117:17
concluded
205:18 264:19
concludes
264:12
conclusion
60:13 122:14,25
123:12 126:8,23
130:18 131:3,24
132:21 160:3
conduct
43:23 211:18
confidential
33:11 42:4 46:1,4,8,17
60:4 73:10,12,18
74:3 75:7 80:11,15
82:17 83:5 86:13,16
86:20 87:6,15,19

94:11 109:22 110:4
110:16 111:2 116:14
120:1 121:5 145:25
173:4,14 179:8 183:2
190:5 193:7 195:23
236:7 237:21 245:19
246:3,7,8,11
confidentiality
32:17 110:6 113:17
116:13 117:3,13
121:23 122:12 123:9
126:6,20 133:3 137:6
138:9 193:8 196:2
Confidential/Attorn...
1:16 72:17
confirm
181:17
confirmed
76:21 153:24 181:22
confirming
101:22
confusing
185:6,8
connection
9:1 17:18,25 18:4 21:8
24:2,10 25:25 30:3
31:10 35:13 47:8
57:19 59:17 60:2,7
62:4 64:7 69:21
70:17 92:25 111:7
112:9 128:9 129:5
138:12 144:16
145:23 173:3 182:13
187:2 190:11 211:3
221:8 240:21
consent
112:13 113:19 114:12
122:9 123:6 128:8
130:4 133:20 134:11
138:22 166:14
consented
112:15 166:9,13
consenting
139:3

consider
72:8 73:2,17 74:3
86:12,15,19 87:5
95:14 119:14,17,25
120:4 133:14 198:13
204:21
consideration
244:10
considered
45:25 46:3 59:21
74:24 78:2,19 95:9
99:12 142:23 170:22
183:7 195:14 204:20
209:5 244:4 255:12
255:16
considering
95:10 207:20
considers
99:14 119:13 121:3
172:20
consistent
62:18,21 63:4 64:10
64:16 67:9 68:1
222:3 239:18,24
240:4
constant
107:5
constitute
69:16 147:14
constitutes
70:4
constructive
198:11 201:21 202:13
204:1
constructively
195:13
construes
25:21
contact
10:10 149:1 217:15
219:1
contained
70:24
contemporaneous

62:17
content
61:19 107:15 115:21
139:21 201:23 202:1
202:16 204:13
context
26:13 95:16 100:2
149:9 187:6,13,21
189:9 202:15,19
205:7 212:7 215:7
222:22 223:1 227:11
236:10 244:11
contextual
35:25
continue
56:4,5 197:20 221:6
continued
201:19 205:4,5,12
240:12
continuing
75:12 176:4 258:25
contract
24:22 25:3,17 28:13
248:22,25
contributed
206:22
convention
151:10
conversation
157:4 159:9 163:4
196:14 199:18 201:9
202:24
conversations
109:13 201:4
convey
151:22 156:9 161:5
183:10 187:22
223:25 256:19
conveyed
37:14 186:12,20
189:25 191:11,22
192:5
copies
20:23 21:12

copy
17:9 165:19,23 167:13
core
221:14
corporate
55:20,25 56:9 61:11
61:24 213:6
corporation
1:4,9,10 88:24
correct
14:18 15:2 39:15,24
40:11,13 42:8,15
43:16 44:5,15 52:15
52:17 57:4,20 61:1
61:12 67:14 71:5,24
78:13 81:20 83:17
84:3 85:7 89:9,15
98:13 113:1 117:20
118:4,15 145:8
155:17 159:18 168:1
209:6 216:7 219:21
223:16 230:20
236:19 237:1 239:9
244:18 248:23
correctly
15:4 35:1 61:9 96:14
103:17 215:18 237:7
252:19
correspond
97:6 238:22 239:7
corresponded
95:24 96:17 154:10,17
155:8
correspondence
81:21,23 101:14,18,20
102:13 178:13 224:4
224:11
corresponding
174:5
corresponds
237:25
corroborated
66:13,25
cost

259:2
counsel
2:23 5:17 56:12,18
60:3 64:21,24 65:8
65:14 77:18 79:9
102:1 107:14,16,20
111:5 112:6 113:16
115:19,22,23 116:3,5
132:24 137:17 149:6
214:3,17,19 217:15
217:18 218:5,6,24
219:2,3 228:16 229:3
254:8 265:13,15
count
164:21
counted
11:19
counterparty
193:6
counting
261:18
couple
81:12 147:8
course
11:17 14:20 20:16
23:21 31:17 32:3
39:12 41:4 57:5
58:13 59:22 72:2
74:11 76:7 81:3 88:7
89:12 99:4 102:7
106:21 118:2 124:12
129:13 138:10
141:22 142:4 143:16
144:18 157:22
176:23 177:7 182:21
184:3 192:20 216:24
219:24 221:4 223:18
223:21 234:3,10,23
235:4 236:3,6 241:8
252:6
court
1:1 5:15 6:2,5 15:19
16:1 20:12 23:20
24:12 28:25 32:11,13

32:24 39:19 49:19
56:1,6 63:13 64:20
115:13 116:14 117:2
117:9,13,14 121:21
121:23 127:7 134:1
140:8,10 152:2
263:25 264:14 265:2
**courts**
139:4
**court's**
166:5 193:3
**cover**
120:18,21 164:21
167:20 168:6 183:21
**coverage**
94:20 178:5 185:20,24
**covered**
27:10,23 56:18 75:16
93:13 94:14 97:24
108:3 164:14 170:19
176:24
**covering**
96:24 118:11,13
**covers**
56:22 87:15
**co-operate**
44:19
**created**
65:17
**current**
6:23 98:2
**currently**
13:22 97:2 164:8
**custom**
190:3
**CUTLER**
2:17
**C-h-o-s-u-n**
103:9

--- D ---

**D**
3:2
**data**
211:2

**date**
5:7 24:6 223:9 267:21
**dated**
4:9 229:8 265:23
**dates**
13:8
**day**
57:9 77:25 100:7
102:18 142:25
147:21 209:16
**deal**
14:24 136:2
**decide**
231:5
**decisions**
213:21 214:17
**declaration**
4:9 30:3,5 56:13 57:19
64:6,11 65:9,10,12
65:16 66:23 67:2,3,5
67:8,10,14,17,19,22
67:24 68:12,17 71:15
71:15 82:23 83:8,11
83:15,20,25 84:7,10
84:22 85:2,5 229:7
229:13 230:2,4,5
233:25 241:5,20
254:20 257:11
260:12,14,22 261:10
261:20
**decline**
205:4
**declining**
227:5
**deem**
176:13
**deemed**
84:14
**deeply**
150:19
**Defendants**
1:13
**deficient**
171:11

**define**
27:1
**defined**
27:2
**definitely**
37:21
**definition**
17:8 213:6
**definitions**
27:11
**Delaware**
1:11
**delay**
147:20 259:2
**delivered**
152:5
**demands**
205:11
**denying**
40:18,19,20 43:4
46:19 52:3,11
**departure**
121:13
**depend**
150:9 158:16
**depends**
25:21
**deposed**
17:19,22,24 18:7,20
**deposition**
1:19 5:11 15:5,17,25
16:22 17:5,7,15,17
18:16 20:3,23 21:2,5
21:15 22:1,4,15 23:1
23:9,11 37:2 39:18
55:5,8 56:9 61:18
68:7 69:22 70:4
72:17 75:7 85:10,16
85:22 106:22 107:7
107:13 108:4 109:11
109:17,17 110:9
116:6 117:7 127:17
128:14 129:6,11,14
137:15 138:2,13

139:24 146:24 147:5
147:20 152:9,11,15
152:19 157:23
176:24 177:7 208:17
208:23 224:25
229:24 254:16
259:23 262:20
264:13,16,19 266:1
**depositions**
16:8 18:23 19:10 20:7
20:11,17 21:9 23:21
24:14 56:18 151:22
**describe**
16:6 87:21 91:14 92:5
211:19 245:8
**described**
28:23 65:18 73:8 79:1
87:22 96:10 115:23
165:5 168:4,9 170:16
171:5 184:10 191:10
244:15 245:10
249:15 254:2 257:16
259:10,17 260:3
**describing**
246:17,19
**Description**
4:3
**descriptions**
196:12
**designate**
72:16,20 264:4,8
**designated**
1:16 72:21 264:11
**despite**
195:14
**detail**
16:7 68:20 146:1,7
175:10 242:20,21
243:22
**detailed**
178:12
**details**
64:3 101:5 190:9
223:23 250:11 257:3

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 10

**determination**
27:18
**determine**
42:20 48:5 49:6 67:9
107:24 108:8 117:2
192:24 193:12
**determined**
181:9
**development**
8:1 9:7,12 12:6,22
**device**
210:24 211:5
**devices**
8:25 207:16,21,24
247:10
**dictated**
245:2
**dictionary**
157:3
**difference**
172:8 199:4
**different**
10:14,25 12:7 58:22
69:23 75:20 86:25
87:1 89:3 94:17
95:22 97:13 98:13,14
98:21,24,25 137:25
166:17 170:25,25
171:22 173:18,24
185:13 186:5 196:4
203:16 227:8 237:4
240:17 248:13
**differently**
63:6
**difficult**
173:12,22 196:1
**difficulties**
211:4 248:9
**dinner**
77:24 81:4,9,10
205:17 209:8,11,25
210:2,7,10,14 216:10
216:14,17,17,22,25
217:3,5,7,13

**direct**
3:8 6:11 10:10 11:24
33:11 80:20 107:8
**directed**
50:25 51:8,24 52:12
**directing**
180:7 205:19 206:23
233:24 254:19
257:10
**directive**
193:3
**directly**
10:5 11:13 32:16 33:6
34:1 38:23,25 66:2
106:23 206:21
210:10,11
**director**
7:14,19,25 9:5,25
10:21 12:5,14,21
213:17
**directors**
214:4
**disadvantage**
257:16,24 259:19
260:5 261:20,24
262:16
**disclose**
20:15 64:24 76:14
79:6,9 84:17 88:2
91:9 119:15 121:20
126:3,17 130:13,24
131:19,25 132:17
139:21 159:5 168:18
193:7 195:8 215:4
**disclosed**
32:5 34:17 35:2 78:6
78:20 86:9 88:6
112:2 121:5,8 129:15
129:19,22 130:2
133:5,10,18 134:9,18
135:12,18 136:19
137:2,7,11,18 138:4
180:20 181:3 209:19
**discloses**

122:10 123:7 126:4,18
**disclosing**
35:4 37:6 64:25 75:9
121:12 127:1 132:6
215:1 217:22 221:19
221:23 226:10
**disclosure**
32:18,21,22 113:9
117:4 127:5,23 134:2
136:7 137:21,23
139:3 140:1,5,8,10
166:9 200:18 259:13
**disclosures**
128:6 138:17,21,23,25
139:16
**discovery**
15:20 16:2 193:4
**discredited**
176:10
**discuss**
74:14 76:10,25 80:12
82:18 83:6 94:9
95:21 105:7 140:1,4
140:7,9 152:24 173:9
173:15 179:7 195:2
200:14 214:21 215:9
217:4,9,13 220:20
221:16
**discussed**
30:12,16,20 31:1 60:7
74:17,19 75:2,12
76:20 105:10 114:2
116:6 153:7,11,20
158:6 159:1 178:11
178:21 190:11
195:12 201:14,22
203:17,19 217:3,7
218:23 219:24 224:2
237:5
**discussing**
105:14 106:5 162:21
**discussion**
13:22 31:24 32:12
37:6 38:3 54:18

55:10 56:17 58:13
76:22 81:8 113:16,22
115:22 146:11
148:17,20,20,22
152:21 153:18
156:21,23 158:15
160:16 169:21,23
174:20 178:13,14,22
179:16 181:7 183:8
190:13 195:12
197:24 199:20 200:1
200:11 201:11
202:22 203:22
207:10 219:12 220:1
220:2,5,5 239:7
240:18 242:22
244:12
**discussions**
10:8,15 11:6,14 13:2
13:11,14,15,17,23
14:21 32:1,4 38:11
39:12,17 59:6,8
64:24 65:1 77:4
79:10 104:3,5,8
105:23 106:1 107:16
149:12,14,15,17
153:7 155:14 159:16
162:5 201:4 203:10
216:1 221:7,10,14
229:3
**display**
165:14
**disposal**
67:19 68:16
**dispute**
22:18 24:23 25:4,18
25:25 26:1,2 27:21
28:9,17 64:7 204:16
**disputes**
255:25
**disrespectful**
261:2
**distributed**
253:16

**District**
1:1,1 5:15,15 220:14
222:11 253:4 263:6
**divide**
96:25
**divided**
75:15 97:24 154:8
**Division**
1:2 5:16
**doctor**
231:7
**document**
4:5,9 66:25 67:1 118:9
165:19 166:2,3,6
229:6
**documents**
30:8 66:13 158:3
177:10,15,18 181:20
181:23
**document's**
166:20
**doing**
84:20 97:20 125:5,8,9
141:19 163:19
171:12 198:12
202:24
**DORR**
2:17
**doubt**
21:11
**Dr**
59:17 70:16 72:3 73:1
73:4,9,14,16 74:1,15
74:21 75:21 76:10,21
77:6,24 79:15,22,25
80:7,17 81:5 82:3,9
83:4 93:24 94:3,12
94:25 95:5,16 97:12
99:4,24 100:3,13,19
100:22 101:7,15
102:2 103:15 104:17
141:14,17,25 142:12
142:17 143:5,16
144:9,14,19,25 145:1

145:18 153:12 154:2
154:5 157:7 158:7,22
161:2 170:20 171:12
172:19 174:17,21
176:20 177:2,13,20
177:25 178:14 179:2
179:13,25 195:22
204:17 209:1,18
210:7 211:9,22
214:23 215:11 216:2
216:25 217:10,19
218:7,19 220:21
221:11,13 224:6,13
225:15 226:4 227:17
228:8,23 230:24
231:5,11 232:1,11
233:11 234:12,20
235:21,25 236:23
239:3,12 240:1,6
241:1,5,10,16,21
242:15 243:25 244:3
244:16 245:17,24
246:14 250:21 252:6
252:9,12,17,18,24
253:15 255:13
**draft**
65:12,17 66:1,3 67:16
71:15 222:14,15
223:8,19 230:12
**drafted**
168:15 230:3,5 237:13
238:5,11 245:1,3
**drafting**
65:15
**drafts**
65:24
**draw**
259:13
**drawn**
160:3
**drilling**
108:18
**drink**
216:11

**drive**
210:1,16 216:17
**driving**
9:15
**drop**
210:13
**dual**
87:10
**due**
172:6,17
**duly**
6:7
**duties**
56:25 57:5 110:7
**D.C**
2:18

────────────
**E**
────────────
**E**
2:1,1 3:2 4:1
**earlier**
17:17 23:6 51:12
56:13 59:8 73:8
115:24 133:13 158:5
160:4 164:7 168:9
169:6,18 170:16
203:24 204:20
217:14 222:6 246:23
254:24 257:16
**easier**
101:12
**edited**
66:1
**Eeva**
68:2 69:10 74:8,14,19
76:1,10,25 79:14,22
80:6 81:1 102:12,13
103:14 107:4,13
148:23 149:2 150:16
150:25 152:21
153:20 155:6,14
156:9 158:6 159:2,23
163:5,15,18 168:24
174:16 179:12,18,24
194:21 195:2 198:22

199:19 200:4,14
201:4,10 202:21
203:1 206:9,15 207:3
209:13 211:6,8
214:21 216:23
218:18 220:15
221:22 228:17
262:25
**Eeva's**
68:18,21 70:10 71:12
71:16,18 82:20 92:17
101:8 149:5 158:1,19
168:13
**effect**
83:3 106:6 175:3
249:24
**effective**
247:6,9,16 248:8,15
**effectively**
255:9
**effort**
49:5 52:25 82:8
107:24 108:8 257:20
**efforts**
42:18 43:4 48:4 50:18
50:22 53:3 108:5,16
109:25 110:9,13,24
**either**
18:23 22:5 23:10
29:18 33:12,23 34:5
70:14 113:18 114:5
131:15 172:7 196:5
197:1 198:22 204:19
243:13 245:14 246:5
255:23 260:15
**elaborate**
174:23
**Electronics**
1:9,10 5:13
**elements**
248:13
**else's**
42:3
**Email**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

2:6,13,19
**EMANUEL**
2:4
**emotional**
134:15
**emphasis**
99:13 244:5,16
**emphasized**
95:11
**employee**
265:12,14
**employees**
253:16
**ended**
209:24 230:15
**ends**
180:9
**enforce**
214:6
**engaged**
11:13
**English**
47:24 158:23 198:4
**ensure**
78:5,18 79:4 82:8
143:12
**enter**
259:1
**entered**
39:4 45:4,24 46:12
49:5 52:14 250:18
263:5
**entering**
13:16 50:3
**entire**
1:16 11:18 46:7 60:18
163:1,5 172:7 236:17
238:13 262:8
**entirely**
13:4 93:12 203:25
234:25 238:2
**entirety**
239:11,18
**entitled**

4:9 34:4 51:21 165:19
180:10 226:16 229:7
**ERRATA**
266:1
**especially**
96:4 190:6
**ESQ**
2:7,8,14,14,20
**essential**
22:23 26:9,12,14,17
35:12 87:17 192:17
192:19
**estimate**
36:6,8 44:9 45:15
141:10 142:11
194:16 210:2
**estimates**
45:16
**et**
2:3 5:13
**euro**
53:12 198:18 252:7,13
**euros**
88:25 251:13 252:3,9
**EUR1.2**
96:24 153:9 154:1
██████████
██████████
██████████
██████████
██████████
██████████
██████████
**evaluation**
249:24
**events**
238:1 239:8,19 240:5
**eventually**
105:24
**everybody's**
260:18

**evidence**
67:5 191:15 192:10
**exact**
23:7,11 29:8,11 59:2
77:20 90:9,15 104:24
109:23 111:15 118:9
195:20 197:8,15
198:1 200:1 207:14
207:14 233:3
**exactly**
10:23 11:19 17:3
37:18 65:20 72:8
93:5 95:25 96:17,22
97:18 98:1,7,16
111:18 140:14 141:1
141:10 152:4 153:19
154:16 164:1 169:22
170:11 176:14
195:18 197:22
201:13 203:12
209:23 257:15
**EXAMINATION**
1:19 3:8 6:11
**example**
59:4 185:5 258:2
**exchange**
170:7 171:14 176:7
**exchanges**
156:13
**exclude**
200:21
**excluding**
201:3 226:13
**exclusive**
25:6
**excuse**
120:10 144:21 188:11
189:20 208:25
**executive**
213:2,3
**exhaustive**
134:5 258:6
**exhibit**
4:3 165:18,22 167:10

168:12 169:16
177:23 180:8 187:3
205:20 206:24 229:5
229:9,11 254:20
**existed**
13:20
**existing**
36:12 192:24 193:13
**expect**
42:4
**expectation**
21:17,24 175:12,13
188:23
**expensive**
255:25
**experience**
189:8
**expert**
252:23
**explain**
33:7 47:20 173:17
185:12 204:24
240:13
**explained**
142:17 171:10 178:3
183:18 201:22 202:1
202:14,16 204:12
205:6 236:5 255:10
**explaining**
95:11 170:17 171:14
235:25 243:19
**explanation**
143:17 144:8,25 224:4
224:10 225:13
236:10
**expost**
249:24
**express**
54:7,14,20 119:6
**expressed**
75:14 154:16 160:25
170:23 174:15
247:25
**expressing**

54:11
**expressly**
176:14
**extend**
176:3
**extended**
148:14 172:13
**extending**
105:11
**extension**
13:22 201:23 202:17
204:13
**extensive**
105:25 142:19 183:8
**extent**
45:17 69:1 84:19
107:2 116:3 123:1
137:12 153:1 195:5
200:17 212:1 213:23
213:24,25 214:1
223:25 255:2 262:16
**extremely**
133:15
**Eyes**
1:16 72:17 264:4,9
**e-mail**
81:24 82:6 101:21
210:21 211:4 218:15
**e-mails**
48:4 81:16,20 210:25
211:3 225:10 262:21

———————
**F**
**face**
124:6
**face-to-face**
141:8
**fact**
27:7 44:9 62:14 66:12
66:24 76:10 83:16
87:15 89:13,19 98:12
110:15 111:1 115:16
133:11 134:19 136:3
136:5,12,13,22 149:1
181:17 189:2 192:9

192:25 193:13 205:7
207:17 209:5 217:9
226:18 253:15
**facts**
46:11 59:10,14 191:15
192:12 237:4
**fair**
11:25 32:20
**fairly**
182:19
**false**
89:14
**familiar**
123:19 126:10 150:19
151:12 249:11
**familiarity**
114:8
**far**
39:7 106:6 135:17
253:19,23
**feel**
56:25 84:23 198:17
**feelings**
196:13
**fifth**
206:3
**Figueroa**
2:4
**filed**
82:1,12 220:13 222:9
222:25 223:6
**filing**
222:20 223:10
**final**
65:15 66:2
**financial**
39:13,23 43:22 54:3
55:1 59:19,24,25
60:5,6 70:20 73:5,14
75:22 82:4 97:16
99:17 102:4 110:15
111:1 112:1 114:13
115:1,14 121:21
122:10 123:7 129:22

130:2,14,24 131:20
132:17 133:4,14,19
134:9,19 135:12
137:2 142:18 176:15
178:2,16 195:15,24
204:14 205:8 230:25
231:20 232:2,9,18
233:9,13,17 237:24
241:11 242:3,18
246:15,21,22 247:1
248:13 255:14,20
258:24
**financially**
265:13
**financing**
116:15
**find**
13:1,4 14:7 15:22
27:20 32:18 41:23
42:5,14,25 43:5
50:18 52:12 56:3
62:7 71:11 80:2
111:22,25 119:4
127:18 136:18,22
161:25 189:17,21
190:12 199:17
201:21 204:1 226:17
228:4,20 242:7
**finds**
257:15
**fine**
56:5 70:1 166:25
194:2
**finish**
16:5 145:15 188:4
189:20
**Finland**
5:9 102:17 231:8
**Finnish**
158:15,17,19 197:24
198:1,2,7
**firm**
21:4
**first**

10:3 12:17,19 13:1,5
13:23 15:10 17:4,7
18:2,19 52:8 53:21
59:18 65:17 66:1,2
74:18 75:1 76:10
88:8 106:5 142:8,13
143:9 144:10,24
145:7,22 146:9,14
148:2,5,14 150:25
152:22 154:16,18,19
154:24 157:9,11,17
158:17,19,22,24
159:2 162:21 163:8
164:23 165:14
167:24 169:19 171:2
171:2,5,10 177:25
194:9,15 196:5 202:3
202:6 220:1,4 224:14
230:12 231:4 234:8
234:18 235:13 236:1
236:1 237:15,18
238:2 239:5 240:10
241:6,9,21,25 242:9
242:15 243:9 244:18
244:20
**five**
10:25 36:7,18 51:20
140:16,17,21 141:9
144:2,12 146:21
201:15
**flexibility**
175:18
**Floor**
2:5
**flu**
169:11
**focus**
47:13 138:1 242:4
**focused**
242:6
**focusing**
18:6 150:15 169:13
186:16 206:7 223:5
230:22 231:10 234:8

235:13,17 236:18
242:25 244:25
**follow**
41:12,14,14,17,18
176:1
**following**
39:19 77:25 167:21
235:1
**follows**
6:8
**follow-up**
124:13 218:14 219:20
**forcing**
198:15
**foregoing**
265:6,9
**forget**
135:5
**form**
21:18 44:16,17 49:8
52:16 53:19 54:10,16
54:23 55:14 61:13
65:15 77:14 78:14
83:18 84:16 86:5
88:19 89:23 90:24
97:8 98:8 100:14,24
102:23 106:15 113:2
114:15,22 115:4,9,15
116:18 117:6,23
118:16 119:10,23
120:6,13 122:1,3,13
122:24 123:11,17
124:7 125:15 126:7
126:21 127:8,25
129:17,25 130:10,16
131:1,13,22 132:19
133:6,7,22,23 134:12
134:22,25 135:6,20
136:4,10 137:8
138:19 139:18 140:2
149:20 152:25 161:8
169:8 183:15 187:25
188:16 189:13 190:1
191:1,14 192:8,9

193:2,15 199:11
200:16 205:22 214:8
232:12,23 247:11
253:7,12 259:11
**forth**
81:17 249:4
**forward**
195:13 201:21 204:1
261:14
**found**
58:14 74:25 145:21
195:25 202:8
**foundation**
74:9 106:16 116:17,22
117:22 122:4 133:8
149:21 189:3 211:11
**fourth**
206:5,7
**fraction**
172:16
**frame**
261:19
**FRAND**
18:15,18,21 21:14,25
22:5 28:7,11,12,14
28:17,21 30:13 120:5
190:17
**free**
65:6 130:13,19 131:19
132:17 198:17
**front**
53:13 60:24 224:23
**frustrating**
196:1
**fulfil**
201:20
**full**
6:15 51:21,22 83:12
83:12,21 95:3 149:8
262:15
**fully**
176:9
**functionality**
87:10

**fundamentally**
171:22
**further**
32:14 95:23 138:11
147:16,21 172:9,11
176:17 180:17 189:5
190:13 214:2 263:18
264:2 265:12

——————————
## G
**gadget.com**
41:20
**gain**
243:3,21 245:11
254:23 256:15
257:21
**Galaxy**
207:13
**game**
124:22,23
**gap**
175:24 202:9
**general**
8:7 12:10 16:13 77:18
102:1 175:3 179:17
214:3,16,19 217:15
217:18 218:5,6,24
219:2,3 228:16
**generally**
8:13 9:13 11:11 15:15
16:6,17 18:12 19:20
24:19 36:11 37:17
41:14 55:18 87:8
102:18 109:10
110:21,23 113:14
114:3 117:11 160:24
173:25 190:6 203:18
210:23 222:7 223:24
253:2,11 256:12
**generic**
36:14 37:22,24 174:13
**generically**
37:22
**gentleman**
15:3 139:9

**genuine**
175:13
**Georgia**
2:12
**getting**
39:7
**gist**
236:22
**give**
44:19 91:11 165:23
166:14 170:3 222:3
261:13
**given**
73:16 115:13
**giving**
65:25 94:6,6 143:16
170:13
**go**
15:23 16:7 32:9 65:24
102:19 123:25 124:5
132:4 167:7 188:6
253:23
**goes**
33:9
**going**
15:22,24,24 16:6,7
32:11 34:2,9 39:8,16
45:23 78:6,20 79:6
85:14,22 101:9
102:14 106:25
123:10 146:20,22
147:5 152:4 166:14
167:5 193:1,4,21
195:4 198:6 200:19
208:10,11,15,23
223:20 253:21,23
260:25 261:8 263:20
263:25
**good**
6:12,13 7:9 72:15
208:14,14
**governance**
213:6
**governmental**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 15

213:8,14
**grant**
248:3
**great**
99:16
**Greg**
5:25 264:6
**GREGORY**
2:20
**gregory.lantier@wi...**
2:19
**group**
8:21 9:17
**GSM**
87:11
**guarantee**
166:23
**guess**
14:5 43:19
**guesses**
45:17

**H**

**H**
2:20 4:1
**hairs**
156:25 197:12
**Hakoranta**
69:1 103:14 107:4
148:23 168:24
194:21 206:15
209:13
**Hakoranta's**
69:16 71:3 206:9
207:3
**HALE**
2:17
**half**
57:9,17 88:25 194:11
194:15 208:11,12
**hand**
33:21
**handle**
64:3
**handset**

171:24 172:2,7 174:1
174:4,5 199:4
**handwriting**
71:20,23
**handwritten**
58:19 71:21 263:2
**happen**
169:19 204:6 207:7
**happened**
22:4 23:3 36:2 41:6
50:24 109:17 146:4
162:20 163:8 170:12
194:5 201:17 204:11
208:7 220:16 225:5,6
238:1,11 239:20,24
241:14 242:9 243:8
**happening**
135:9 169:25
**happens**
254:14
**happy**
69:12 166:18
**harassment**
46:25
**harm**
258:1,15,17 259:3,9
259:14 262:19
**harms**
258:6,13
**head**
57:6 107:4 110:7
**headquarters**
211:23 212:9,11,12
**hear**
49:21 50:4 51:21
101:1 148:3 151:3,4
**heard**
5:14 51:1 76:20,21
130:1 151:6,7 152:2
231:7 249:12
**hearing**
113:4 264:16
**held**
8:9 10:20

**help**
33:8 35:7 47:18 48:20
108:24
**helpful**
58:14
**Helsinki**
5:9,10
**Henry**
1:20 3:6 6:6,16 265:5
267:22
**HERRICK**
2:8
**higher**
94:21 108:19,23
164:10 171:16,25
174:2 183:20 185:9
185:17,23
**highly**
1:16 42:3 46:7,17 72:4
72:9 73:2 173:14
190:5
**Hill**
2:25 5:4
**hold**
7:20 8:2 124:9
**holiday**
102:17
**home**
143:1
**hotel**
103:8 105:5,6 210:14
**hour**
57:17 105:18 141:11
148:9 194:11,15
208:11,12 216:16
**hours**
77:21 81:12 140:13,15
140:21 141:9 216:15
216:21,21
**hour's**
210:1,16
**HTC**
17:18 18:1,3 19:14,22
20:3 21:1,5,15 22:9

22:18,20 23:1,11
**hurry**
204:23
**hypothetical**
134:14 188:20

**I**

**idea**
59:19,24 74:23 142:21
145:19 153:13
157:13,16 174:18
178:2 240:11 241:11
241:25 242:16
**identification**
165:22 229:9
**identified**
118:11 213:13
**identify**
112:21 116:4 128:17
**illustrated**
185:25
**Illustrative**
180:10
**immediate**
170:21
**immediately**
76:6,22 77:8,11 169:5
169:17 204:17,21
210:15
**impasse**
176:16
**implementing**
87:10
**implied**
242:17 244:9
**important**
95:7 99:6
**impressed**
207:16,23
**impression**
94:7,25
**improper**
134:1 137:20,23
**inability**
258:12

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 16

**Incheon**
105:2
**incident**
52:22
**include**
64:19 83:14 221:15
251:11 262:7
**included**
43:19 46:15 47:21
53:23 60:17 230:13
248:5 253:5 255:13
255:16
**includes**
248:6 249:18
**including**
27:1 49:11 94:22
115:14 116:15
131:20 182:8 187:20
216:24 244:16
**increase**
99:22
**increasing**
205:11
**independent**
63:4 69:19,24 123:1
125:8
**indicated**
37:5 164:9 175:2
204:14
**indication**
172:12
**indirect**
107:10
**indirectly**
38:24,25 39:1 106:24
**individuals**
38:19,21 137:12
**Indong**
103:16
**industry**
41:13,15,18 99:15
172:21 190:4
**inference**
34:2

**inform**
123:6 126:4 214:22
**information**
35:25 36:20 37:14
38:5,13 41:24 42:4,5
42:11,21 43:5 46:21
48:5 49:6 50:19 52:2
52:13,19 53:1,4 54:1
54:15,21 60:3,4 72:4
76:4,11,15 77:9 78:3
78:6,8,11,19 79:5,17
79:20,24 80:1,8 81:7
82:9 87:15,19 89:8
91:11 112:10 113:8
115:24 117:14,17
119:8 120:1 121:5
126:19 132:1 133:1
135:18 137:4 146:1
150:21 159:12 166:1
168:19 173:5,7,25
181:10 182:11
183:10 184:6 186:11
186:20 187:5,22
188:3,8,15,24 189:6
189:24 190:5 191:11
191:22 192:4,23
193:7,11 195:7,9,23
200:19 207:4 212:3,4
215:2,3 218:18 221:1
221:20 226:13,17,18
227:3,14 236:6,7,8
236:15 240:15
243:15,18 245:11,19
245:23 253:3,5
256:22 257:2,6 259:8
263:9,13
**informed**
128:12 230:25 231:13
232:18 233:8 237:18
242:2
**infringed**
25:12
**infringement**
25:1,6,8,19,22,24

**initial**
94:4 164:24 165:11,17
219:1
**Initially**
8:11
**input**
168:21,22
**inquire**
146:1
**inquired**
146:6
**inquiries**
138:11
**inquiring**
114:4
**insofar**
222:2 239:25
**instance**
30:2 36:23 39:2
121:10 213:12
**instances**
28:24 29:2,19 36:15
38:5 41:9 87:18
111:6 116:4 128:16
228:15 257:9
**instruct**
32:13,19 33:12,17
34:3,5,7,9 39:8,20
66:16 89:24 90:25
120:7 152:17 189:14
191:2,7 193:4,16
211:15,16 254:7
**instructed**
52:18 63:12
**instructing**
16:3 32:25 33:23
63:18
**instruction**
34:11 193:18 230:12
**instructions**
65:14,25 230:5
**intellectual**
8:12 9:11,16 56:23
57:6 110:7 214:1

**intended**
70:13 83:11,21 242:4
256:13 258:5
**intent**
80:13 238:23 256:18
**InterDigital**
15:12,14,15 16:14
17:20,25 18:2,5,8,20
20:24 21:9 23:8 24:3
24:11
**interest**
54:20
**interested**
265:15
**internal**
148:17,19 156:13,21
162:5 200:10
**International**
22:19 24:1
**interpose**
32:8 46:23 195:4
211:25 220:22 226:6
226:23 253:21 254:5
**interpret**
122:5,15 123:13 131:4
132:22 178:19
**interpretation**
28:14
**interrupt**
108:18 198:17 211:25
**interrupted**
49:20
**interruption**
7:8 170:3
**intonation**
152:2
**introduce**
5:17
**introduced**
203:16
**introductions**
141:13 142:16 143:6
**investigate**
52:19 127:19

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

**investigation**
42:14,19 43:24 44:1
47:5,12 48:13 113:7
117:1 127:16
**investigations**
42:17
**investments**
8:24,24
**involve**
22:23 24:24
**involved**
10:5,9 11:13 12:7,8
13:18 26:21 28:6,7
31:18,21 71:16 104:8
106:24 114:7,10
149:7,11,12,16
192:21 265:13
**in-house**
2:23 234:5 235:20
**IP**
6:25 8:10 212:8
**IPR**
7:25 9:5,6,10 10:21
12:5,14,21 26:25
88:24
**issue**
26:10 28:3,17 69:23
74:17 95:7 99:6
110:5 138:12 166:1
244:10 253:20
258:23
**issued**
112:20
**issues**
55:3 58:14 64:18,20
96:3 142:20 243:20
256:1
**ITC**
24:11
**I-n-d-o-n-g**
103:18

_____ **J** _____

**James**
103:15

**Japanese**
216:18
**job**
9:25 41:13,22
**join**
52:5 113:3 253:8
260:8
**Joined**
53:20 55:15 115:5
135:21 137:9 199:12
**Jose**
1:2 5:16
**journalists**
44:10
**judge**
196:25
**July**
102:9 103:5 223:11,13
223:15 224:5,12
225:5,12 226:21
227:20 228:7,22
**June**
4:7,9 37:10 62:13 68:3
68:23 72:2 73:1 74:1
75:23 77:7 81:16,25
82:5,11,16 83:3 84:2
85:7,24 86:4,10,16
86:20 87:3,6 88:1,10
88:16 91:16 92:21,23
93:8,18 102:3,7,10
102:14,16 103:4,6
104:1 105:19 106:13
108:1,10 109:14,18
140:11 148:2,5
150:15 167:15
177:24 182:22 184:3
186:13 187:12,21
191:19 194:6 207:8
208:2,8 209:2,16,19
210:6,24 214:20
215:9,12 216:3,6
218:8,20 219:16
220:12,16 222:8,17
222:19,20,24 223:6

223:14 224:5,12
225:6,7,11 226:21
227:19 228:7,18,22
229:8,14,15 241:21
244:18 252:7 256:4
263:1
**justice**
164:13
**justified**
93:12 176:9 203:25

_____ **K** _____

**Kang**
103:16,19,25
**Kassabian**
2:8 5:21,21
**keep**
98:4 116:14 120:12
202:2
**kept**
110:3,15 111:2
**key**
58:21 69:5
**kind**
23:20 25:2,7,9 31:23
41:16,23 48:4 49:5
54:8 75:4 119:8
154:5 174:7 178:21
185:7 192:5 198:14
212:19 218:14
237:15
**kinds**
258:13
**knew**
42:6 74:15 79:25
175:5,10
**know**
17:12 20:13,21,22,25
27:14 29:20 30:9
34:4 38:12 39:5
48:23 62:24,25 63:20
64:2 65:20,21 69:22
71:19 80:5 82:21
88:14 90:9,15,16,17
90:23 96:7 99:18

106:7 111:15,18,20
113:5 114:16 115:6
116:19,23 117:15
118:23 119:12
122:22 125:16 127:9
128:4,5,7 130:6,9
131:8,10 135:17
137:10 141:10
150:12 151:25 157:8
161:24 167:4 175:3,8
176:14 181:15 182:3
182:5,6 188:12
190:17 198:12
206:12,18,20,24
207:3,14 210:3
211:13 218:22,23,25
224:21 225:20,23
226:16 227:7,8
240:12,24 243:11
250:2,10 260:18
261:2
**knowing**
94:5
**knowledge**
21:24 178:25 218:17
227:14 244:7 255:14
256:22 257:6 259:8
263:8,13
**known**
255:10
**knows**
59:24 72:10 79:19
172:25 233:14
**Korean**
1:9 158:25
**Kristian**
1:20 3:6 6:6,16,17
265:6 267:22
**Kwak**
103:15 104:13
**K-a-n-g**
103:19,22
**K-o-n-g**
103:21

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

K-r
6:17

**L**

L
2:14
labelled
4:8
lack
117:21
language
158:15,17,19,22,25
230:15 232:10
233:10 238:23 243:6
245:1,1,8,15,20
246:1 261:10
Lantier
2:20 5:25,25 44:17
47:25 48:17 49:8
50:11 51:16 52:4
53:19 54:10 55:14
70:2 113:2 114:15,22
115:4,9,15 116:18,24
117:6,23 122:3 124:7
127:8,25 129:17,25
130:10 133:7,22
134:12,22 135:20
136:4,10 137:8
139:18 199:11
247:13 248:24 253:7
253:12 259:11 264:6
264:6
laptop
168:13,14 206:10
207:3,22 211:6
large
207:11
lasted
144:11 216:14
latching
48:14
late
260:18,20,21
laughed
172:22 176:11

law
21:4
lawyer
69:1 126:23 131:24
132:21
layman's
263:11
lead
14:13,14,19
leadership
213:4
leading
88:8 104:8 105:24
leak
50:23
leaked
46:22 47:7 48:6 49:7
50:19 52:2,13,20
53:2,4,6 54:5
leaks
60:4 173:5,7 236:7,8
237:21 240:16
245:19,23
learn
46:20 51:25 52:25
113:8 129:14 133:18
134:9 136:1
learned
39:3 40:9,14,21
129:21
learning
135:1 257:13 259:20
260:6 262:1
leave
28:4 95:18,20 99:23
100:4 101:16,23
255:9
led
13:20 176:16 249:23
Lee
15:3 209:14
left
139:10 166:10 210:10
210:14

legal
2:24 5:4 6:3 30:8 62:3
62:6 65:8 122:14,25
123:11 126:8,22
130:17 131:2,23
132:20 149:6,18
150:1,11,17,23
212:20,22 213:21
length
204:21
lengthy
216:21
lesser
94:19 164:11 171:17
178:5 185:23
letter
81:24 101:21
letters
81:16,19 225:10
letting
125:24
let's
34:13 44:3 124:14
145:12 204:22
205:16 214:15
261:12,12,13 263:17
level
243:22
leverage
254:23
liability
1:11
license
4:6 13:16,20 18:24
19:9,24 20:3,6,8,16
26:2 27:10 28:19
30:21 31:2,2 32:5,21
32:23 33:4,10 34:18
34:21,23 35:3 38:10
38:16 39:4 41:3 42:7
42:11,22,24 43:6,9
43:15 44:14 45:4,6
45:24 46:12,21 49:5
49:7 50:3,16,19 52:1

52:2,13,14 53:2 55:6
55:13 70:19,21 73:13
74:2 75:22 78:3 80:8
81:6 82:4,10,17 83:5
94:19 95:1,22 96:19
96:24 97:7,10,13,19
98:6,20 99:5 102:4
104:4 105:11,23,24
109:15,22 110:3,5,15
111:1,8,14 112:2,14
112:25 113:10
114:14 115:2,14,25
116:15 121:22,25
122:6,11,16 123:8,14
123:20 126:5,11,19
127:6,24 128:9
129:15,19,23 130:15
130:22,25 131:5,21
132:18,23 133:4,15
133:19 134:10,20
135:13 136:8,20
137:7,19,21 138:4,8
138:18 139:4,17
144:20 145:2 153:10
155:9 156:24 157:10
157:12,14 158:7
159:24 164:7,11
165:19 173:2,13,19
175:4 176:3,21
177:20 178:17 179:3
179:7,15 180:1
182:20 183:1 190:4,6
190:10,11 192:17
197:3,18 198:19,23
199:21 201:11,15
202:15,18 209:2
211:10 214:7,24
215:11 216:4 217:1
217:10 218:7,20
220:21 221:12 224:7
224:13 225:16 226:5
227:18 228:8,23
231:1 232:9,19 233:9
240:8,22 242:17,19

243:3 244:2 248:1,2
248:3,20 249:4 250:4
250:21 253:6 254:4
254:22 255:1 256:24
257:14 258:19,25
259:21 260:7 262:2
**licensed**
27:11,25 183:22
**licensee**
32:6 88:17 89:20 91:5
108:1
**licensees**
35:11,15 36:12 37:4,7
37:23 88:12 90:7
91:8,12,24 93:21
94:19,22 164:10
171:15 178:4 182:18
182:23 183:4,9,12,19
184:5,7,12 185:4,9
185:14,17,19,23
186:3,9,13,17,21
187:1,7,23 188:13,15
188:25 189:11,23
191:12,23 192:6,25
193:13 246:10
**licenses**
10:6 35:12 39:14,23
40:3,4,10,15,21,24
41:25 42:3 98:24
117:18 136:3 171:16
178:4 182:14 183:21
185:19 192:18
**licensing**
8:8 9:2,19,22,23,24
10:1,8,14 11:14,25
12:10,11,18,24 18:11
19:16,17,22,25 31:12
38:20 41:12 106:24
107:3,4 120:19 121:4
149:15,17 189:9
203:24
**licensor**
32:7
**limit**

15:25 121:17 243:10
245:6 256:14,17
**limitation**
258:22
**limited**
1:11 187:12
**limits**
87:16
**Line**
266:3,6,9,12,15,18,21
266:24 267:2,5,8,11
267:14,17
**linkage**
259:13
**list**
134:5 198:2 258:6
**listed**
109:19 237:4 258:2
**listen**
205:15
**lit**
185:1
**literal**
161:11,11
**litigation**
17:18 41:5 46:13
111:8,14 112:25
114:8,11 115:2
118:14,19 128:10
139:1 180:20 181:1
181:21 214:18 234:4
234:11,17,23 235:4
236:4 237:20 252:24
256:16
**litigations**
60:2 112:3,9 116:1
118:12 173:1,3 257:2
**little**
23:6 47:20 101:12
109:1 184:23 253:23
**LLC**
1:11
**LLP**
2:4,10,17

**location**
103:6,10,11
**London**
6:4
**long**
7:1,6,20 8:2 51:13
71:18 81:10 105:16
124:12 140:12,25
142:8 144:9 148:7,8
169:23 194:8,12
201:11,15 216:14
219:9,12,25
**longer**
100:11 103:4 194:14
**look**
45:19 103:21 152:1
157:24 158:1 229:10
239:10,17 263:17
**looked**
207:21
**looking**
48:3
**Los**
2:5
**lost**
125:21
**lot**
252:19
**lower**
174:5 252:3
**LTE**
87:11
_____
**M**
**machine**
265:8
**main**
12:11 14:22 141:18
142:1 163:13,19
171:12 258:8
**major**
244:10
**making**
35:13 48:3 50:22
53:17 59:21 70:17

74:22,24 82:8 99:12
101:2 141:17 142:23
143:16 154:2 170:23
173:13 178:15,23
213:21 214:17
237:23 243:20
252:14
**managed**
164:22
**management**
100:8 143:1 175:14
**manager**
8:7 12:10
**managing**
139:2
**manner**
65:18 174:22
**mark**
152:3 165:18 229:5
**marked**
58:21 165:22 167:9,21
177:22 229:9
**market**
255:17
**Martikainen**
168:25 182:2 206:16
**match**
98:6
**material**
181:24
**materially**
205:8
**materials**
64:4,19 118:7,8,10
144:15 168:16 225:7
**matter**
5:12 15:11,16 17:19
18:1,8,8,20 19:13,14
19:22 20:24 22:9
24:2,11 26:6 27:5
28:1,9 30:4 31:8
32:24 37:2 43:24,25
45:19 57:20 68:13
79:8 110:10 124:24

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 20

152:11,19 199:25
201:14 213:6 219:2
219:25 221:15
237:16
**matters**
16:1,15,18 17:23,25
56:23 62:9 212:8
213:21,25 214:17
217:7
**mean**
9:14 25:10 26:7,13,15
26:19 34:21 40:4
47:17,20 62:2,24
75:2 107:19 128:18
130:20 149:23
153:14 154:5 159:15
166:20 190:25
199:14 211:25
212:16 213:5 214:11
214:12 222:18,18
225:18,20 236:22
247:16 248:10 249:8
**meaning**
26:24,25 62:4,6 63:1
212:20,22 249:14,21
249:21
**means**
184:25 191:5 204:1,24
**meant**
9:15 145:20 205:9
229:21
**mediation**
31:22
**mediations**
31:18
**mediator**
31:19 32:2
**meet**
105:1
**meeting**
4:6,6 12:20 37:1,9,10
56:14 57:23 58:23
59:23 60:14,19 62:13
62:16,16,17,19,20

66:11 67:25 68:3,15
68:23 69:6,8 70:14
72:3 73:1 74:2,21
75:2,23 76:7,20 77:7
77:21 79:14,22 80:6
81:16,25 82:5,11,16
83:3,13,23 84:2 85:7
85:25 86:4,17,21
87:3,7 88:1,11,16
91:16 92:21,24 93:8
93:18,25 94:4 95:16
99:4,18 101:18 102:3
103:7,12 104:1,16,18
104:21,25 105:8,9,17
105:19 106:14 108:1
108:10 109:14,18
140:11 141:12,23
142:4 143:7 145:24
148:2,5,15 149:5
150:5,13,16 157:18
162:22 164:3,19
165:15,20 167:14,20
167:22 171:4 173:11
174:18 177:24
182:21 184:3 186:14
187:12,21 190:9
191:19 194:6 199:3
201:19,20 202:4
203:11,20 204:5,24
205:16,18 207:8,19
208:2,8 209:3,17,19
209:21 210:6,11,12
211:10 215:12 216:3
217:19 218:8,21
219:16 220:13,16
222:9,17,19,20,24
223:6 224:7 225:5,6
225:8 228:18 232:11
232:16 236:24 237:5
237:10,14 238:6,14
238:19 239:4,13,25
240:5,10 241:7,7,10
241:14,22,25 242:21
243:13,16,17 244:18

244:21 245:9 252:7
256:3,5 263:1
**meetings**
13:8 36:2 107:17,19
107:19 150:10
223:23
**Melin**
1:20 3:6 4:5,9,9 5:11
6:6,16,18,19 85:16
85:22 146:24 147:5
165:22 208:17,23
229:7,9 265:6 267:22
**member**
213:4
**memorialize**
58:15
**memorialized**
69:5 70:16
**memory**
12:13 13:5 19:5 251:8
**mention**
68:21 84:1 224:11
226:2,20
**mentioned**
32:7 34:19 54:9 57:4
57:18 59:11,14 60:11
73:17,19 81:6 89:9
92:22 93:21 185:5
245:17
**mere**
175:9
**merely**
63:6
**Merrill**
5:4 6:3
**message**
95:20 255:18
**messages**
151:22
**met**
56:12 103:25 104:13
104:15,17
**Michael**
2:7 147:7

michaelzeller@quin...
2:6
**microphone**
108:19 109:5
**midsummer**
102:16 103:3
**mid-section**
237:17
**mid-2010**
7:4
**Mike**
5:19 15:18 32:8 68:25
69:12 72:15 124:9
145:11 151:15 166:6
194:3 198:7 208:10
211:24 260:17
**Miller**
2:14 116:7,8,9,9
**million**
43:16,20 44:5,14
45:10 53:8,11,12,18
53:24 54:8 55:12
72:11,13 80:17 97:1
97:3 157:2 174:24
175:1,12 198:18
247:2,3 248:6 250:13
251:11,13,16 252:11
**mind**
223:3 225:12
**minute**
263:17
**minutes**
142:11 144:10,12
146:18 156:12,14
194:11 201:15
**mischaracterizes**
61:14 113:25 191:16
192:10 232:13 238:7
239:15 255:3
**missed**
202:22
**misstate**
53:14
**mobile**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

87:9,13 89:2 211:1,4
**mode**
87:10
**model**
207:14
**moment**
82:15
**Monday**
1:18 265:7
**monetary**
89:17 91:9 92:3,13
94:22 185:18
**money**
97:20 198:6
**months**
104:25
**morning**
57:14
**motion**
24:18 82:1,12 220:14
222:9,20,25 223:7
**Motorola**
24:17,20 28:10,18
29:4,12,22
**mouth**
155:25
**move**
193:20 195:13,15
255:19 261:14
**movements**
205:10
**multimode**
87:9
**multiple**
31:25 38:1 99:25
100:18 248:13
249:25
**multi-page**
229:6
**multi-year**
88:7
**mutually**
25:5

**N**

**N**
2:1 3:2 190:20
**name**
6:15,21 15:4 32:6 39:5
65:21 87:22 101:10
103:16 105:6 128:22
128:25 139:8 206:18
209:14
**names**
34:18 39:15 90:17
111:20
**narrow**
140:19
**national**
102:17
**natural**
148:13
**nature**
8:19 9:8 13:10,14,15
16:13 19:21 24:19
25:15
**ND**
190:22,23
**NDA**
4:7
**near**
105:2
**necessarily**
160:1 238:2 258:14
**necessary**
80:2,5 83:14 84:14,23
202:12
**need**
33:13 45:19 47:19
56:25 62:19 79:18,21
84:7 85:13 100:8
150:4 175:15 204:20
212:11 214:2 247:15
**needed**
110:12
**needs**
142:25 143:1
**negotiate**
170:24 175:18,21

177:12 255:20
**negotiated**
171:23
**negotiation**
14:22 96:5 161:2
174:3,6 206:11
212:10 221:5,6
223:24 233:7 245:12
255:7
**negotiations**
9:18 10:2,5,24 11:24
12:7,11,15,17 13:19
13:25 14:8 16:8
38:10,16 39:13,17
47:9 88:8 89:13
105:10 106:25 107:3
118:3 149:8,9,11
150:1,9,19,22 172:1
175:24 176:5 189:10
190:12 192:21
195:13,16,25 202:9
205:2 217:3 221:14
223:21 243:4 256:15
256:16 257:22
**negotiator**
14:13,15,20
**neither**
125:18 198:7 232:16
**nerve**
195:22
**net**
87:12 121:19
**Netherlands**
113:1,5,11,13,22
114:3,4,9,11,14
115:3,12 116:13
117:2,9,12,19 118:15
118:19 121:21,23
127:6 140:7,10
**never**
11:19 50:25 51:1,8,24
52:18 54:25 61:20
64:14 101:9 166:8
193:6 253:18

**new**
1:10 5:5,6,6 29:14
89:19 203:16 224:1
**news**
41:19
**nine**
96:24 154:9
**nine-year**
153:10 154:1
**Nods**
184:14
**noise**
108:18,21
**NOK**
180:9
**Nokia**
2:9,23 4:6 5:24 6:24
7:6,17 10:4 11:18
13:17,21,24 14:11,15
15:12,13 20:9,14,15
22:20 28:5 29:21,24
31:3,11,19 32:4,6
33:10 34:3,18,20
35:10,19 37:3 38:4
38:17 40:12,16,22,25
42:13,18 43:4,9,15
44:5,13 45:4,10 46:1
46:4,15,20 47:9,16
49:3 50:17 52:24
54:7 55:9,21 56:10
56:24 57:6 58:22
59:5,18,20 60:8,12
62:9 63:10,25 69:7
70:17 72:12 74:23
77:12 81:17,22,25
82:1,7,12 85:25,25
86:4,12,15,19,23,24
87:2,5,16 88:2,11,12
88:16,17,24 90:7
91:5 93:13 94:15
97:2,11,14 98:2
101:20,25 103:14
105:11,21,21,22
106:6,19 107:25

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 22

108:1,9,13 109:12
110:7,21 111:6,14
112:7,12,15 113:16
113:18 114:12,19,20
114:25 120:4,11,24
121:3,8,11,15 122:6
122:9 123:6 126:4,18
127:4,22 130:7 131:5
133:1,21 134:11
135:11,16 136:2,23
136:25 137:4,12,16
137:17,22 138:3,15
141:15 142:22,25
145:19 147:11
148:21 149:2 153:13
157:13,14 163:13,20
164:8 165:25 166:10
166:19 170:8,10
171:24 172:6,13,25
174:19,24 175:4,14
175:19 178:17 182:8
185:25 192:16,25
193:14 202:18,25
203:23 205:1,8
206:10 209:17 211:9
211:22 212:9,9,10,17
212:25 213:2,3,4,9
213:13,14,18,22
214:6,22 215:10
216:2 218:19 220:13
222:8,9 223:6 224:10
224:15 225:2,10,14
226:2,20 227:15,19
233:15,16,17 241:12
242:1,17 243:5
247:20 248:3,4,6,7
248:20 249:5,17,17
250:14,23 255:1
256:7 257:14 258:17
258:25 259:19 260:5
261:25 262:17
**Nokia's**
8:25 9:16,23 12:24
17:18,25 19:24,25

30:8 42:7,10 57:8
59:8 60:13 61:11,24
87:8 94:14 115:25
130:4 138:8,22 139:1
164:2 171:24 172:3,6
172:9 174:1 202:17
203:23 205:4 214:3
224:4 231:1 232:9,19
233:9 242:19 243:2
244:7 254:22 257:14
**Nokia/Apple**
18:24 42:24 43:22
47:6 52:20 53:1 54:3
55:2 59:11,15,25
60:1 70:19,20 73:6
80:11 94:8,10 95:6
95:12 96:2,7 98:3
99:11,17 111:7
112:14 122:16
123:14,19 126:10
128:9 132:23 137:3
173:13 174:1 175:9
176:15 178:1 179:7
195:24 211:10
255:15
**Nokia/Samsung**
175:25 201:24
**NOK000001**
165:21
**NOK000001-000005**
4:8
**nominal**
98:1,15,17
**nominally**
153:11
**non-disclosure**
121:6
**Non-discriminatory**
190:24 191:5
**non-monetary**
175:19 248:4
**non-production**
64:4
**normal**

56:25 57:5 110:6
138:9 157:3 209:25
223:18 245:8
**Northern**
1:1 5:15 220:14
222:10 253:4 263:6
**Note**
207:13
**notes**
56:13 57:23,25 58:1,2
58:4,5,8,12 59:1,3,4
60:9,10,11,17,18,22
60:24,25 61:2,3,4,6
61:18,20,23 62:14,17
62:19,20,22 63:3,4,5
63:7,8,9,11 64:1,9,13
64:16 65:4 67:8,13
67:16,18,20,22 68:1
68:2,5,6,11,14,16,18
68:19,21 69:4,5,10
69:16 70:10,12,15,24
71:1,3,7,12,16,18,22
71:23 82:14,20 92:14
92:17 100:12,23
101:5,8 142:2,6
147:9,9,11,14,15,17
147:19,20 157:24
158:1 262:25 263:2,2
263:18
**notice**
20:19 122:9 130:7
**notices**
176:2
**notification**
201:24 202:17 204:13
**notify**
77:17
**notifying**
133:20 134:11
**notion**
155:19
**November**
1:18 5:7 265:7
**no-one**

49:3 135:16
**number**
5:3,16 36:7 85:21 89:3
90:9,15 111:15 147:4
166:8,11 167:1
172:22 175:22
177:13 207:14
208:22
**numbered**
265:6
**numbers**
165:20 167:21 176:11
**NW**
2:18

### O

**oath**
23:19,25 24:12 28:25
30:6,10,12,16,20
31:1 46:19 52:11
67:3
**object**
33:16 44:17 61:13
84:16 120:13 123:10
131:22 132:19
147:17 152:25 169:8
187:15 193:1,15
228:24 251:5 253:12
**objected**
196:15
**objection**
21:18 22:2,10 32:9
38:7 44:16,23 45:12
46:24 47:25 48:16,17
49:8 50:9,11 51:3,16
51:17 52:4,5,16
53:19 54:10,16,23
55:14 66:15 72:18
74:9 77:14 78:14
83:18 86:5 88:19
89:23 90:24 97:8
98:8,22 100:14,24
102:23 106:15
110:17 113:2,3,25
114:15,22 115:4,9,15

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

116:17,18,22,24
117:6,21,23 118:16
119:10,23 120:6
121:1 122:1,3,13,24
123:17 124:7 125:15
126:7,21 127:8,25
129:17,25 130:10,16
131:1,13 132:11
133:6,7,22,23 134:12
134:22,25 135:6,20
136:4,10 137:8 138:6
138:19 139:18,19
140:2 142:14 149:20
150:2 152:16 153:22
154:25 155:11
160:19 161:8 162:2
162:15 165:8 177:4
183:15 187:9,25
188:16 189:3,13,18
190:1 191:1,14,25
192:8 195:5 196:7
197:4 199:11 200:16
205:22 211:11 212:1
214:8 220:23 226:7
226:24 232:12,23
238:7,20 239:15
242:10,13 247:11,13
248:24 249:6 250:5
253:7,8,22 254:6
255:2 259:11 260:9
**objections**
191:7
**objective**
201:20
**obligated**
126:17
**obligation**
117:3,13 121:22 122:8
122:12 123:5,9 125:7
126:6,20 133:3 137:5
**obligations**
28:7,11,12,14,21
116:12 193:8 248:12
249:16 250:3

**obliged**
126:3
**obstruct**
56:4,5 195:16
**obstructionist**
124:2
**obtain**
20:14 122:9 123:6
207:21
**obtaining**
112:16 133:20 134:11
**obviously**
78:8 94:10 107:5
108:15 124:14
166:21 182:25
**occasion**
15:10 17:14 18:3,7,9
37:16 38:2
**occasions**
15:8,9 23:24 24:16
35:22 36:16,19 37:13
38:1 104:20 128:3
220:18
**occur**
23:9,13,16 24:5 66:12
66:23 67:4 237:4
**occurred**
17:16 23:1,10 29:4
37:18,21 38:6 64:14
66:11 67:1 146:11
219:16 222:13
237:10 238:18 239:8
243:21 245:8,13
259:15
**occurring**
35:22 180:4 208:2
228:1 241:17
**odd**
43:2,3 74:25 118:24
119:1,1,3,7,17
145:22 158:13
189:17,21
**offer**
59:5,7,8,18,22 60:8,12

70:17,18 74:22,25
75:16 94:4,7,12,15
94:25 95:10,17,24
96:23 97:19,25 98:7
98:21 99:13,22,23
100:6,8,10 101:17,23
123:2 141:15,17
142:13,17,23,24
143:3,6,13,16 144:16
145:24 148:14 153:8
153:10,21,25 154:2,3
155:7 159:23 162:13
163:11,15 164:2,4,6
164:6,13,14,15 166:8
170:17,23 171:1,10
172:12 173:20
175:13 176:7,8,9,10
182:13 183:21
185:10,16,18 198:19
203:23 205:16
243:17 244:1,1,11,13
255:1,9,11 256:7
**offered**
87:9 97:6,24 98:15
164:8 185:20
**offering**
35:12 55:25 75:15
101:16 142:18 156:5
182:14
**offers**
178:12 203:24 224:1
**office**
5:5 6:4
**officer**
6:25 8:10 31:20
212:14,17,21,25
213:5,9,14
**offices**
5:10
**oh**
108:20 229:18
**OK**
7:9 76:18 109:3,6
124:10 139:12

146:19 159:19
184:16 185:11 198:5
219:22 221:3 223:4
227:10
**omits**
83:15
**omitted**
163:17
**once**
18:1
**ones**
36:24 73:3 203:17
255:21
**ongoing**
46:16 149:9 205:3
221:5 243:4 249:18
249:19 250:13,15,23
257:21
**operator**
5:4
**opinion**
119:6
**opposed**
149:18 179:20 242:12
**opposite**
52:7
**oral**
1:19 65:13,25
**orally**
218:11,13 219:11
220:10
**order**
42:20 82:2 107:22
108:6 110:1 113:8
166:5 199:5 201:20
222:10 223:7,10
236:23 237:5,8,9
238:1,5,10,18,22
239:3,8,12,19 263:5
264:5
**ordered**
193:24
**orders**
111:9 112:8,16,19

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

134:1 258:2,13
**organizations**
26:25
**outcome**
265:16
**outlines**
242:22
**outrageous**
195:14 209:6 211:18
219:23
**outside**
10:16 60:3 89:25
90:25 107:19 120:7
187:16,21 188:5
189:14 191:2 193:2
193:16 226:7 228:25
240:14 247:13 249:6
250:5 251:6 253:22
254:6 259:22 260:9
261:7
**overall**
8:24 12:24 243:16

**P**

**P**
2:1,1
**page**
3:4 4:3 27:17 164:21
165:25 167:20 168:6
180:8 182:10 187:3
192:14 201:25 202:1
204:15,15,25 205:19
205:20 206:3,5,7,8
266:3,6,9,12,15,18
266:21,24 267:2,5,8
267:11,14,17
**pages**
58:18 71:19 164:19,20
164:21,23,23 165:1,1
167:16,21,21,23,24
168:3,6,12,20,21,23
169:3,5,13,16,16
171:19,20 178:6
205:24 229:6 265:6

**paid**
174:24 233:16
**panel**
24:13
**paragraph**
230:8,10,14,17,23
233:25 236:18
237:13 238:17,21
239:1,10,18,22 240:3
241:1,5,13,16 242:3
242:8,22,25 244:25
245:2,10,16 254:20
256:10,13,20 257:11
257:23,25 258:3,7,10
261:21
**paragraphs**
230:19
**paraphrase**
235:5,6,8,15 246:16
**paraphrasing**
233:12,14,21,23
234:12,15 235:22
246:3
**Parker**
2:14 116:8,9
**part**
9:19 12:4 14:4 41:13
41:22 61:10 138:9
163:15 164:16 165:6
184:8 190:22 233:19
234:8,18 235:2,10,17
236:1
**partially**
239:6
**participants**
207:11
**participate**
14:8 150:22 202:23
**participated**
10:1,24 11:5 14:21
203:10,22
**participating**
9:17
**particular**

13:8 36:19 42:2 134:8
150:5,10 189:12
190:7,10 192:13,14
206:22
**parties**
10:11,15,16 11:24
16:8 39:14,18 40:10
40:12,22 41:25 58:24
59:9 69:6 70:11
130:14,24 131:19
132:18 133:20
134:10 137:19 138:5
138:17 166:4 191:6
264:14 265:13,15
**partly**
237:15
**parts**
215:22
**party**
20:9,15,16,20 25:11
25:12 26:6,15,18
34:19 35:4 36:21
37:14,19 39:4,6
40:25 113:19 126:20
127:24 223:20
**party's**
68:22
**passive**
231:23,25
**patent**
4:5 8:7 9:2,19,22,23
9:24 10:5 11:14,25
12:10,18 13:16 16:15
16:18 18:10 19:15,17
19:22 25:1,6,8,19,22
25:24 26:16,17 27:19
27:21,22 31:2 38:19
94:14 107:4 149:15
149:17 165:19
182:20 192:17 199:3
**patents**
22:23,23 24:24 25:13
26:4,5,10,10,13 27:7
27:10,11,25 28:2,6

35:13 87:17 164:14
170:19 182:15
183:22 192:19
**Paul**
1:20 3:6 4:9 5:11 6:6
6:16 85:16,22 146:24
147:5 208:17,23
229:7 265:5 267:22
**pause**
174:12,20,21
**pay**
231:9
**payable**
46:14 89:18 251:18
**paying**
37:4 88:12,17,22
89:13,20 90:7 91:5,8
91:25 92:3,9,13
93:22 94:21,22 108:2
108:10 153:13
171:15,15 172:25
174:25 178:4 183:12
183:19 184:12 185:4
185:9 186:4,17 187:1
187:7,23 188:13,25
189:12,23 190:14
192:13 233:16 242:1
247:20 248:20
**payment**
43:15,20 44:4,13
45:10,25 46:16 53:9
53:12,17,24 54:9
55:12 72:11 73:20,21
80:18 174:25 246:24
247:2 248:5 249:18
250:13 251:12
**payments**
164:10 185:17,23
186:1 249:19 250:14
250:15,23
**pays**
74:23 94:5 142:22
145:19 157:13
174:19 233:15

241:12 242:16
247:10 249:5
**peace**
154:4
**Peachtree**
2:11
**peculiar**
75:3,13 153:12 158:6
158:11,13 161:1
174:17 190:12
**pending**
46:13 48:24 176:2
261:15
**Pennsylvania**
2:17
**people**
14:20 38:16 81:4
102:6,17 106:23
136:1 170:4,13
**period**
7:24 10:13,17,18,22
11:16 16:21 22:25
29:3 45:23 49:4
105:25 106:3 141:17
205:9 210:20,24
221:22 222:13,23,25
223:2,5 224:5,12,16
225:11 226:3,22
228:7,22
**permission**
20:14
**person**
38:9 50:17 103:17
149:18,23 213:20
**personally**
14:7 62:15 78:21
79:12 114:10 127:12
127:14 192:21 232:2
232:5 236:15
**pertain**
28:11
**pertained**
91:24 176:21 179:14
179:25

**pertaining**
142:20 225:7
**pertains**
191:19
**pertinent**
69:7 70:11
**phase**
171:2,6
**Phillip**
2:25 5:4
**phone**
48:3 89:2 211:1
**phones**
207:18
**phrase**
151:13,14 232:7
233:17 235:5 244:19
**phrased**
262:11
**phraseology**
233:11
**phrases**
197:15
**physically**
58:2
**PICKERING**
2:17
**place**
29:13,16 45:18 210:2
**Plaintiff**
1:5
**planned**
201:23 202:16 204:13
**platforms**
8:22
**please**
5:17 6:4,14 7:16 8:18
9:13 15:23 16:10,11
16:12 25:23 34:5
36:24 47:2,12 48:22
50:5 51:19,22 52:9
63:23 79:3 95:3
96:21 123:22 131:17
132:14 136:16 138:1

139:8 151:15,19
153:19 154:14 156:8
163:25 165:18
167:12 168:22
170:11 185:11,12,12
195:18 197:1 198:17
199:14,14 202:3
225:23 229:5,10
248:17 250:9,22
262:13
**pm**
1:22 5:1 85:17,19
146:25 147:2 208:18
208:20 210:3 263:22
263:24 264:19
**point**
11:21 32:20 44:2
72:21 83:25 100:1
121:13 145:12,24
146:2,3 156:4 173:23
183:6 205:13 218:4
219:18
**points**
171:21
**policies**
26:25
**portfolio**
93:13 94:14 182:20
199:3
**portion**
11:22 12:9 201:8
**portions**
230:1
**pose**
34:10 125:4 152:10
194:2
**position**
6:23 7:2,16,21,23 8:3
8:6,9 9:2,5,20,25
10:9,21 11:9,23 70:3
255:23 260:13
**positions**
8:14 58:22 69:5
**positively**

204:17
**possession**
78:9 79:4
**possibility**
204:15 216:1
**possible**
163:18 201:23 202:16
258:15
**possibly**
81:18 206:16
**potential**
26:3 27:2 59:9 104:4
258:6 259:3
**potentially**
25:24 26:11 27:23
28:6 168:25 255:24
**PowerPoint**
37:5 83:16 84:1,11,23
85:6,9 93:1,3,4
164:16,20 165:6,12
165:15 167:5,14
169:4,5,14 171:20
177:22 178:6,20
182:10 186:19 187:3
201:25 204:25 206:8
207:2
**practices**
19:25
**preceding**
149:7,11
**precise**
116:10 177:2
**preface**
228:1
**preparation**
55:5,8 68:7 85:10
106:22 107:7,15
109:11 117:7 128:14
129:6,10,14 137:15
138:2,12 139:23
182:5 254:16 262:20
**prepare**
55:19 56:8 57:1 61:17
107:22 108:6 109:18

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

110:1,9,12,13,24
116:6 127:17 168:20
181:8 259:23
**prepared**
65:9 168:11,15 181:7
206:8,10,25 207:4
216:19 252:24
259:25
**preparing**
57:8 107:12 181:24
206:11
**present**
2:22 31:20 36:3 62:15
97:20 107:17 162:24
163:4 237:13 238:24
264:14
**presentation**
83:16 164:20 167:14
171:20 177:22
186:19 206:8 207:2
**presented**
83:22 151:14 168:14
177:13 182:11
239:11 255:21
**presenting**
142:13
**president**
8:12
**press**
41:8,12,15 42:7,10,15
42:21,23 43:7,9,11
43:14,17,21 44:3,6
44:12 45:5,5,8 53:8
53:16,22,25 54:2,9
54:25 55:11 118:11
118:13,17 119:5
134:18 256:25
**previously**
39:24 48:13 172:13
264:11
**price**
87:13 121:19
**primarily**
13:17 240:3

**primary**
38:19 139:13
**prior**
52:24 67:7 68:8,11
85:24 86:4,10,16,20
88:1,10,15 100:22
105:19 106:8,10,13
107:25 108:9 122:9
123:6 126:4,18 143:5
146:12 149:25 150:8
184:20 192:25
193:13
**privilege**
76:15 132:2 159:14
199:23 200:18 201:6
212:3 215:14 217:23
222:4 227:5 254:9
**privileged**
77:4 79:10 127:2
132:7 153:3,7,18
159:5,10 168:18
195:6,12 200:24
215:2 220:25 221:4
221:19 226:10
**probably**
16:25 17:2 24:8 81:14
148:9 194:15
**procedure**
176:2
**proceed**
152:12 166:21
**proceeding**
23:20
**proceedings**
25:11 28:21 30:8
64:20
**process**
66:22 71:16 139:2
**produce**
113:19 147:11,19
**produced**
60:2 111:14 112:18,19
112:25 114:25 166:4
173:3 234:17,22

236:3 237:20 240:14
**producing**
114:13
**product**
66:18 76:15 84:19
153:4 159:6 195:7,9
199:24 200:19 212:3
221:1 251:18 254:10
**production**
64:3 111:7 112:8,14
112:15 115:25 128:8
147:14,15,19
**products**
13:18 22:21
**professional**
125:10
**professor**
252:19
**program**
86:1,3,12,15,19,24,25
87:2,6,9,21,23,24
88:3,13,18,23 89:20
90:8 91:6,25 92:10
93:7,11,17,23 94:16
94:23 105:21 106:2,4
106:12 108:2,10
120:12,17,25 121:9
121:12 172:7,23
182:9,12 183:13
184:12 185:4,8,22,25
186:4,18 187:2,7,23
188:13 189:1,23
199:4
**progress**
176:18
**pronounce**
6:18
**proof**
175:8 178:24 246:14
**property**
8:12 9:11,16 56:23
57:6 110:7 214:1
**proportions**
230:6

**proposal**
97:12 147:23 172:15
173:10 198:18
**proprietary**
72:4,9 73:2,10,13,17
74:3 121:4
**prospect**
215:9 255:24
**prospective**
35:11
**protect**
113:17
**protected**
254:8
**protective**
82:2 111:9 112:7,16
112:19 222:10 223:7
223:10 258:2,13
263:5 264:5
**protracted**
255:25
**proven**
262:18
**provide**
20:19 122:9 130:7
150:1,11,17,21,21,23
163:14,15 164:6
170:18 187:5 238:12
**provided**
36:21 63:11,25 117:14
144:15 147:17
163:10,12,16 164:2
164:24,25 165:5
168:3,9,21 169:20
170:15 188:8,14
191:18 234:4 235:19
**providing**
148:17 149:6,18 154:6
165:11,17 166:1
170:20 171:11
175:18 192:12
**public**
41:2,4 47:7 89:8 118:7
118:8,10,22 119:9,18

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

119:19,22 135:17,22
173:25 181:6,10,12
181:18,20,23
**publications**
41:16
**publicly**
41:23 46:11 86:9
88:23 89:1 119:15
121:8,11,15 180:20
181:2
**publish**
120:24
**published**
86:3 252:19
**purport**
235:23 237:2
**purported**
45:9 172:10
**purposes**
46:25 213:8
**pursuant**
166:4 264:5
**pursue**
213:22,22 214:18,18
**put**
108:19,23 109:5 152:3
155:25 212:7 238:17
255:8,22 256:23

—————— Q ——————
**Qualcomm**
11:3 41:3
**quarrel**
152:4
**question**
16:10,11 17:6 21:19
21:20 22:16 26:23
27:14,15 28:2 32:19
33:1,5,6,11,13,17,18
33:20,24 34:1,4,7,16
35:1,9,17,23 38:8
40:1,3,8 43:11 44:2
44:11,24,25 45:1
46:24 47:2,11,12,13
48:8,10,13,21,22,24

49:14,18,21,23 50:1
50:1,4,5 51:6,11,20
51:21 52:8,8,9 53:15
54:17 55:16 56:7,11
61:14,15 63:14,17,19
63:21,21,22 65:6,7
66:15,17,20 69:2,13
70:3,6,7 75:9,20 76:9
76:13 77:15 78:15,16
83:7,19,19 84:5,17
84:20 86:6,6 88:20
89:24 90:4,19,25
91:20,21 98:9 100:15
100:20,25,25 102:24
106:16 108:25 116:2
119:11,24 120:7
122:2,14,19,20,22,25
123:3,11,12,18
124:12 125:4,6,14,16
125:16,20,25 126:8,9
126:22,22,24 127:1
130:17,17,18 131:2,2
131:3,14,23,23 132:6
132:20,20 133:9,24
135:7 136:15 138:1,1
138:20 140:3 144:22
148:3 149:21 151:1,3
151:8,11,14,18,24
152:3,5,10,16,18
153:1,2,5 155:12
159:7 161:9,11
162:16 169:9 179:21
179:23 183:16 184:9
184:18 187:10,17,18
188:1,6,17,18,20
189:4,14 190:2 191:2
191:15,17 192:2,9,11
193:2,10,16,22 194:3
195:5,9,10 196:4
197:6 198:4,16
199:24 200:17
205:23 212:2,6 214:9
214:10 215:1,14,18
215:19 217:22,25

218:1 219:14 220:24
221:2 224:8 226:24
227:1,4,11,21 228:10
228:24 232:13,14,24
247:12 249:7 250:1,6
251:5,7 253:24
254:11 255:4 259:24
260:2,16,21 261:4,13
261:15 262:7,8,10
**questioning**
22:1
**questions**
19:4,8,23 20:5 32:14
33:25 50:13 51:13,18
51:20,22 52:6 61:19
125:23 143:12,15,19
144:19,25 147:8
166:22 170:5,10
183:3 189:25 260:13
264:2,7,10
**quickly**
210:12
**QUINN**
2:4
**quite**
21:7 24:8 26:22 29:6
102:15 146:3 148:8
148:13 149:22
170:21 219:14,23
228:11
**quotation**
232:17
**quote**
233:2 235:24 246:20
**quoted**
233:15

—————— R ——————
**R**
2:1
**Rachel**
2:8 5:21
**raise**
212:20
**Randall**

2:14 5:23 116:7
**randall.allen@alsto...**
2:13
**rate**
73:20 86:1,3,13,15,19
86:24 87:6,9,14,21
87:23,25 88:3,13,18
88:23 89:1,14,20
90:8 91:6,25 92:3,10
92:13 93:7,11,17,23
94:16,23 105:21
106:5,13 108:2,11
118:4,22 119:4,17,17
120:5,12,17 121:12
121:17 172:10
180:14,19 181:17
182:9,12,17 183:13
184:12 185:4,8,22,25
186:4 189:1,12,23
192:14 199:3 247:7
247:10,16,19,21,22
247:25 248:9,16
252:8,13
**rates**
37:4 86:25 87:2 106:2
119:13,15,21 120:1
120:25 121:3,9,13
172:7,23 186:18
187:2,8,24 188:14
**rationale**
59:7
**read**
33:13,15 34:5 41:8
47:12,15 48:22 49:20
49:23,24 50:4 53:7
53:16 84:4,6 101:3
252:16,20,23,25
256:25 262:13,14
**really**
12:3 36:8 42:16 45:19
48:20 51:14 123:25
167:5 196:23 205:14
210:3,9 211:5 217:13
224:23 247:23

Merrill Corporation - New York

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

**Realtime**
1:24 265:4
**real-time**
58:12
**reason**
21:11 42:25 43:23
50:23 52:21 53:5
54:4 55:3 63:10
82:22 85:3 150:16
182:16 238:4,16
266:5,8,11,14,17,20
266:23 267:1,4,7,10
267:13,16,19
**recall**
10:23 11:2,3,8 12:16
12:19 13:2,7,10,13
15:4,9 16:16,18,23
16:25 17:2,16 18:2
18:12,22,25 19:1,3,7
19:11,18,19,20,23
20:1,4,10,18 21:16
22:6 23:2,7,11,15
24:6 25:14 28:9,20
29:2,8,11 30:14,18
30:24 31:5,6,8,13,21
32:1 36:3,15,20,25
37:1,13,15,17,18,20
38:2 40:23 41:1,5
42:1,9 45:13,20
51:12 53:21 54:11,18
58:5,7,10,11 60:17
60:24 66:5,6,8,9
67:20 68:15,19 70:9
70:12,23 71:9,12
74:4 77:20 80:24
81:2,8,11,22 82:6,13
82:19 92:1,16,19
93:5,19 95:1 96:14
99:6 101:4,13,18,24
102:5,10,11,12 103:3
103:17 104:7,15,21
104:24 106:17,20
109:23 112:23 113:4
118:9,17 125:20

128:21,23 135:1
140:13 141:1,19,24
142:7,10 143:14,20
143:21,24 144:1,3,5
144:7 145:3 146:12
146:14 154:19
156:16,19,20,22
157:6,19 158:8 160:9
160:12,15,21 161:4,6
161:7,17 163:2,24
164:1,22 169:1,14,23
169:25 170:8,12
171:3 176:18 177:2,8
179:19 180:2,4,6
181:4,5 182:24 183:5
184:12 186:23 190:8
192:12 195:20 196:5
196:9,16 197:8,10,15
197:17,21,22 198:21
199:5,18,25 200:3,7
200:10,24 201:13
203:3,11,13,18 204:2
207:9,10 208:2,5,5,8
208:9 209:14,23
210:22 211:2,5 217:2
217:6,19 218:16
219:25 220:7,11,19
222:12 228:1 230:11
234:24 236:9 240:18
244:22,24 245:23
246:8 250:11 251:17
251:24 252:2,4,14,20
252:25 253:25
254:12,15 257:8
261:21 263:7
**recalled**
238:6
**received**
112:11 234:3,10,14
235:3,6
**receiving**
66:1
**recite**
145:25

**recited**
60:6 73:3,5,9,14 97:17
99:10 237:23 238:17
246:14,22 250:21
**recites**
75:21
**reciting**
79:15 82:3 99:16
**recognize**
155:20 167:9 229:11
230:2
**recognized**
75:17
**recognizes**
178:10
**recognizing**
96:1 97:2 98:2 154:10
156:7
**recollection**
62:18,21 63:3,6 64:10
64:17 67:25 71:1
73:4 104:2 145:5,9
146:2,5,10 154:20
162:9,17 165:10
168:10 169:20 170:6
170:15,20 171:2
173:23 178:7 179:16
181:19 186:2 189:6
191:18 194:10
196:17 199:9 202:6
203:4,7,9,21 207:23
208:7 217:8,12
218:12 219:10
234:15,21 235:24
237:6 241:10,18
246:5 251:10 252:1
**reconvened**
162:22
**record**
6:15 33:15 34:14
46:19 47:15 49:1,24
60:11,18 70:14 83:12
83:21 84:6 85:14,18
85:22 101:3 109:1

146:20,22 147:1,5
162:4 166:24 197:7
198:12 208:15,19,23
232:15 235:24 237:3
238:13,24 262:14
263:20,23 264:1
265:10
**recorded**
59:6 101:4 265:8
**records**
162:9
**redact**
166:15
**redacted**
166:6,19 167:2
**refer**
27:12 51:20 87:23,24
178:8 240:12 245:9
249:20 252:9
**reference**
185:22 186:18 224:6
252:12
**referenced**
80:17 186:10 192:14
**references**
41:2 53:23 99:25
101:2 173:13 252:15
**referred**
74:1 79:8 224:18
236:1 252:10 257:25
**referring**
10:19,20 36:10 37:9
59:15,16 89:17
138:21 139:5,6
148:20,22 149:15
150:6,8,13 178:5
180:23 186:25
205:20,25 235:9
239:6 245:17 246:9
247:1,23 254:24
255:5 256:10 257:19
257:22 258:8,9,15
**refers**
86:1 180:13 237:15

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

241:13,20 257:25
**reflect**
82:14 92:14,17 100:12
142:2 239:2
**reflected**
100:23 101:7 175:16
182:9 237:9 242:8
**reflecting**
94:13 238:10
**reflects**
182:19 256:18
**refusal**
199:2
**refuse**
261:5
**refused**
260:22
**refusing**
131:10 260:21
**regard**
33:3,18
**regarding**
127:5 133:2,3 153:20
176:1 184:11 199:20
201:3,8
**Regardless**
109:8 212:22
**regularly**
41:12
**rein**
32:11
**reject**
100:10
**rejected**
164:4 171:10 172:15
178:3 205:16
**rejecting**
170:16 176:7 185:15
**relate**
9:24 18:20 27:3 35:23
213:25 221:10
241:15
**related**
9:11 16:15,17 18:17

19:22 22:18 24:22
25:24 26:1,1,3 28:2
28:13,19 30:13,17,21
31:2 32:16,23 102:3
105:21 111:8 113:22
157:10,12 185:13
198:23 199:19 200:5
201:10 218:20
220:15 228:7,22
240:1
**relates**
107:2 110:6 117:4,14
120:19 127:23
223:22 226:4 227:17
**relating**
8:23 13:16 15:11
18:10 19:15,24 20:5
25:17 30:8 42:2
56:23 59:6,9,11,14
66:10 74:2 82:2 94:5
101:19 106:2 107:6
117:8 118:18 121:18
190:7 201:14
**relative**
265:12,14
**release**
45:5
**relevant**
15:18 33:6 34:1 99:25
181:21 183:7
**relied**
61:21 117:17
**rely**
62:19 64:20 258:1,12
**relying**
61:10,23 62:1,2,4,22
62:25 112:11 116:3
**remain**
173:4 245:18 246:3,6
246:8
**remaining**
245:15
**remember**
45:14 58:16,18,21,25

59:2,3 62:16,20
70:15 71:7 80:10
105:6,14 158:12
173:6 174:10,14
195:21 197:13
207:15,24 210:4
216:20 230:14
**remembers**
196:19
**remind**
223:9
**reordered**
237:11
**repeat**
16:11 40:7 44:25
55:16 63:2,22 66:20
70:7 78:16 80:3
82:25 86:18 97:23
110:19 118:25 123:3
124:13 136:15
169:10 179:23
184:20 187:18
188:21 192:2 215:19
218:1 224:8 227:11
228:12,19 260:2
262:12
**rephrase**
53:15 235:12
**replace**
207:22
**report**
38:21 41:19 43:22
77:11 101:25 106:23
137:24 211:8,16,18
212:11 253:4,18,19
254:3,16
**reported**
1:24 42:21 43:7,8,10
46:11 89:2 134:17
181:6
**reporter**
1:24 6:2,5 152:2
263:25 264:14 265:2
265:4

**reporting**
102:5 213:8
**reports**
42:15,22 43:14,17
44:3,6,8,9 53:8,16,22
54:25 55:11 107:8,10
135:17,23 252:17,22
252:23 253:1,15
**represent**
5:18 83:21 225:9
**representation**
225:12
**representative**
55:20,25 56:10 61:11
61:25 141:19 209:14
**representatives**
141:9,22 142:3 162:24
210:8
**represented**
21:4,8 29:21,24 55:1
226:2,19 227:15
**representing**
44:9 54:2 136:12,14
172:14 212:10,12
**request**
205:9
**requested**
94:20 119:15 164:8,12
185:20 264:15
**requesting**
139:3 173:19 183:23
**requests**
87:16 112:13 128:8,17
**require**
168:18
**required**
176:3
**research**
24:18 252:20,21
**resolve**
204:16
**resolved**
46:13
**respect**

11:16 18:1 92:5
109:18 112:7 113:12
124:18,19 125:4,9
137:6 186:9 233:6,10
234:18 240:7 241:15
246:1,23 250:3
262:25
**respond**
63:13,16 65:7 66:16
66:19 76:13 84:20
126:24 153:5 159:7
173:12 195:10 197:5
199:24 219:13 221:2
254:10
**responded**
174:13 177:6 204:17
**responding**
153:2
**response**
60:13 79:15 80:20
93:24 94:2,3 134:15
146:8 148:16,18
159:25 160:7,10,11
160:13,15 161:20
163:10,14,16,19
164:2,17,24,25 165:5
165:7,11,17 168:3,9
169:6,18,21 170:2,3
170:13,16,21 177:21
178:20 179:4,5,13,25
198:16 199:2 201:24
202:17 204:14
**responsibilities**
8:15,19 9:9,20,21
11:22 41:22 138:10
**responsibility**
8:22 14:22 38:19 64:3
139:2,14 214:5,12,13
**responsible**
9:10,18,22 12:23
38:10,16 182:4,6
206:11 212:8
**responsive**
196:24 227:4

**rest**
153:17 159:8 235:7
**restarted**
14:1
**restate**
144:21 184:16
**restaurant**
210:16 216:18
**restrict**
200:20
**result**
112:17 183:20 186:1
257:13 258:18
259:20 260:6 261:25
**resulted**
13:24 14:1,8 89:2
97:25
**resumed**
202:4
**Return**
140:11
**reveal**
65:8 66:17 75:6 77:3
153:3 212:4 220:24
221:18 228:2 254:7
**revealed**
243:22
**revealing**
69:2 132:1
**revenue**
154:11 156:7
**revenues**
75:17 88:24 171:25,25
172:2,3 174:4,6
197:19
**review**
55:6 68:5,11 85:9
129:3,9 158:3 222:14
223:7,19 225:1,7
237:12 262:21,23
263:1
**reviewed**
56:12 57:18,23 61:18
67:8 69:21 181:20

206:21 224:24
229:23 253:18 263:4
263:14
**reviewing**
254:15
**reviews**
214:2
**ridiculous**
88:21 89:4,7 108:12
**right**
12:1,25 14:4 19:12
35:5 45:6,11 48:13
48:15,19 51:2,9
53:10 62:10 64:7,17
72:5,19 73:11,15
75:23 76:1,4,7 77:9
78:3 81:13,17 83:10
91:16,18 98:21 102:8
104:12 111:12 116:5
119:22 120:11 124:4
124:4 125:14 130:23
131:11 133:15,21
134:7,24 180:6
190:18 191:6 194:5
209:3,15 211:6,7
212:7 215:6 219:16
222:23 227:9 228:4
235:11 237:1 239:13
239:17 244:6 245:2
246:19 248:16
254:18 259:7 263:16
**rights**
9:11 248:12 249:16
**RIM**
25:16 26:5,11,21 27:9
27:22,25 28:5 29:7
29:15,24
**rise**
205:5
**rises**
151:10
**road**
253:24
**role**

7:4 9:1,9 12:4,9,12
56:22 149:5,25 150:5
**rolling**
147:8
**Ron**
2:23 116:7 139:6
**room**
210:14
**rough**
264:15
**roughly**
237:25
**routinely**
35:11
**row**
125:23
**royalties**
46:14,15,16 72:12
89:18 95:25 175:6
183:19 197:18
246:24 247:3 248:7
252:10
**royalty**
35:10,14,16 36:12
37:4,23 45:16 73:20
73:22,24 80:18 87:16
91:9 92:3,13 119:13
119:14,15,21 120:1
121:3,13,17 174:25
182:17 190:4,15
192:14 247:6,9,16,19
247:22,24 248:9,16
248:19 249:3,9,13,20
250:2 251:11,12,15
251:18,23 252:2,13
**ruling**
114:3
**running**
72:12 73:20,22,23
174:25 175:6 246:24
247:3 248:6 251:12
251:14,23 252:10,13
**R&D**
8:24

**S**

**S**
2:1 4:1
**sales**
87:12 89:2 121:19
172:8,9,9 174:2
199:3 205:4,5,11
**Samsung**
1:9,9,10 2:3 4:7 5:13
5:20,22 11:6 12:15
12:17,20 13:3,9,17
13:21,25 14:11,24
30:4,22 31:4 37:1,3,9
38:3 39:23 40:10
52:22 56:14 57:19
58:22 59:4,11,14,17
59:20 63:11 64:1
68:3,15 69:7,14
70:16 75:15,16 77:24
78:20 79:4 81:4,17
81:22,25 82:10 85:25
88:2,2,11,16 91:4,8
91:23 92:1,2,8,9,12
93:22 94:20 95:13,15
96:23 97:5,11,18,24
97:25 98:20 99:14,22
101:15 102:13
103:15,15,17 105:12
105:20,22 106:13
107:3,25 108:9,14
109:13 111:19
113:11 117:18 118:3
118:3,22 119:12
140:22 141:8,18,21
142:3 147:13,16
148:14 149:8,12,13
150:20 153:21 155:7
156:5 157:1 159:23
161:3,12 162:13,23
164:5,9,9,12,13
166:8 167:17,25
169:17 170:4,4,8,9
170:13 171:13,24
172:15,20 173:1,19

176:10 177:11 178:9
180:14 182:11,24
183:5,11,14,18,19,20
183:22,25 185:3,10
185:18,21 186:1,13
187:6,8,22 188:12,14
188:24,25 189:1,2,5
191:12,13,22,24
192:5,7 195:15,22
196:2 197:13 201:22
202:15,19 204:23
205:2,14 207:11
209:12,13 210:7
221:5,8 222:8,16
223:8,21 224:5,16
225:2,11 227:19
230:24 233:8 236:12
243:2,5,12,15 244:1
245:10 253:16
254:21,25 255:7,8,12
255:16,19,21 256:14
256:23 257:1,13,21
258:24 259:20 260:6
263:5 264:4
**Samsung's**
40:3,4,15,21,24 41:3
47:8 59:5,7 60:2,8,12
94:16 95:24 96:5
98:7 118:11,14,18
119:4,17 143:13
153:8 163:11,15
164:2,5 170:17
171:10,25 172:2,7,9
172:10 174:5 176:7
180:19 185:16
203:22 205:5 234:3,5
234:10,22 235:3,20
236:3 244:11 245:7
255:23 256:7 258:19
262:1
**San**
1:2 5:16
**saw**
44:3,12,22 45:5,8

53:25 54:25 167:3
**saying**
40:18 44:7 61:9 80:10
92:1 98:4 133:13
149:16 171:4 179:19
196:6 202:2 216:6
228:2 232:7 233:2
235:2 244:16 245:12
246:22 253:9 257:20
259:14
**says**
231:12,19 233:19
234:1 243:1 254:3
**scheduling**
223:23
**scope**
26:2 35:18 49:14
89:25 90:25 120:7
154:7 164:11 171:17
173:18 187:16 188:5
189:14 191:2 193:2,3
193:16 224:25 226:7
228:25 247:14 249:7
250:6 251:6 253:22
254:6 259:22 260:9
261:8
**scopes**
98:25
**score**
72:8
**screen**
5:8
**se**
28:15,16
**search**
42:2
**searches**
41:23
**SEC**
129:16,19,23 130:2
133:2,5,10 134:20
135:13,19 136:8,20
137:3,5 140:1,5
**second**

17:14,19,21 18:3,4,6
20:23 23:8 52:8
124:10 145:15 163:6
163:8,21 164:18
165:2,4,16 167:19,25
168:11 169:4,7,15,15
171:6,9,18 176:6,22
177:3 179:1,13 180:1
180:4 186:24 194:6
194:12,18 220:1,5,9
235:17,18 237:16
238:3 239:5 241:7,14
241:17 242:4,12,20
242:23 243:9 244:20
**secret**
78:2,20 120:12
**sections**
66:10
**sector**
41:19
**see**
68:6,14 84:7 175:15
180:11,13,15,18,21
231:2,15,21 234:6
241:20 243:6 245:20
257:17,18 263:18
**seeing**
45:13,20 53:21 118:17
**seeks**
214:6
**seen**
43:21 68:8 81:19,21
**self-serving**
193:22
**send**
101:20 210:25 218:14
**sending**
211:4
**sense**
47:23
**sensitive**
72:4,9 73:2 133:15
**sent**
222:16 225:10 227:19

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

sentence
233:6,25 234:19 235:7
235:14,18 236:2,23
237:15 238:2 239:6
246:2,16
Seoul
4:7 103:8 105:3
SEP
26:18 27:6,7,19,21,23
separate
110:8 132:15,24 238:3
251:18
separately
96:4 216:24
separates
215:14
SEPs
26:6,7,21,23,24 27:1
28:3 30:17 120:18,20
120:22 121:18
series
180:9
serious
124:24
session
142:8,13 143:8,9
144:10,24 145:7,22
146:9,14 148:2,5,14
157:9,11,17 163:6,9
163:22 164:18 165:2
165:4,16 167:19,25
169:7,15 171:6,9,18
176:6,22 177:3,25
179:1,14 180:1,4
194:6,12,15 204:5,8
207:8 241:6,7,9,14
241:17,21 242:5,9,15
242:20,23 243:9
244:18
sessions
194:18 243:11 244:20
set
36:7 248:12 249:4,16
264:12

setting
23:21 24:13 26:24
31:3 137:16 215:23
215:24 247:5,8,20
settlement
31:20,23,25 32:3
39:12
seven
125:22
share
196:21
shared
190:6
shares
94:16
SHEET
266:1
shocked
74:5,8,15 75:25 76:1
short
51:14 105:17
shorter
194:9
shorthand
265:8
show
164:23 167:16 168:7
169:3,16 206:3
showed
93:1 144:15 164:25
167:20,23 168:2,5,8
169:22,24 172:5
185:24 201:25 206:5
showing
93:2 172:23 186:2
shown
93:4 165:1 167:24
169:14 206:9 207:2
side
189:10 255:6
SIGNATURE
267:21
signed
30:5 64:6 67:7 68:12

82:24 85:5 229:14
265:21
significant
172:14 205:10
significantly
174:2,4
silent
203:11
similar
155:19 156:6 159:23
182:14 202:11
similarity
162:12
simple
34:8 44:2,11 56:7
249:13
simply
52:21 189:22 227:4
single
35:3 125:24 128:25
161:7
sir
6:9 108:17 152:15
sit
16:20 60:23 71:6
146:16 208:4 251:19
251:24 257:8
sitting
139:10
situation
36:10 134:14 142:21
142:25 171:21,22
173:22,24 176:17
205:1 221:8 255:7
size
207:16
slide
37:5 172:22 181:7,8
185:24 186:2,19
slides
169:22,24
slow
124:9
small

172:16
smaller
92:2,12 93:22 94:18
164:10 171:15 178:4
183:18 185:5,9,16,19
185:23 186:9
smart
198:13,15
smartphones
207:12
sole
214:12
solicit
69:14
solicits
195:5 200:17 212:2
Solutions
5:5 6:4
somebody
14:14 104:13 163:2
182:6
somewhat
141:25
soon
77:6 99:21
sorry
7:15 15:13 66:8 82:25
84:4 86:18 93:15
108:17 110:19
144:22 169:10
190:21 216:5 224:8
229:18 231:18
234:25 241:3 247:7
sounds
27:22 42:17 43:2,3
188:20
source
42:14,20 43:5 115:24
129:22
South
2:4
speak
49:1 107:13 137:16
138:3 139:15,22

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

141:16,22 163:21
194:17,20 203:8
**speaker**
142:1 163:13
**speaking**
5:4 8:13 9:14 24:20
86:23 141:8,19
163:19 202:24
210:23
**speaks**
85:2 122:17 126:15
131:5 180:24 248:25
**specific**
10:18 11:16 19:4,7,18
19:20 20:1,5 25:9
36:15,23 37:15 38:2
45:20,21 62:3,6 66:8
86:23 87:14 95:8,19
99:10 100:6 101:5
121:14 128:18,21,23
136:21,22 145:25
155:3 156:1,16,18,20
156:22 160:9,12
161:6,18,25 162:1,6
162:18 173:5 178:15
178:23 181:4 190:15
198:14 222:21
233:15 252:22
**specifically**
16:16 56:22 57:1
60:16 64:18 66:10
67:13,20 99:11
106:12 107:6 113:12
114:4 117:8 118:18
127:19 129:10 137:1
138:11 140:4,9
141:24 142:5,10
157:8,20 160:22
163:24 170:9 179:19
181:16 183:17
190:11 203:3,6,15
204:2 206:18 207:4
220:7 221:11 222:12
232:1,4 236:9,14

240:19 256:5,11
**specified**
50:1
**specify**
100:19 150:4,13
155:24 249:8
**speculate**
21:21 134:15 135:8
**speculated**
43:18
**speculation**
21:19 38:8 42:10,12
42:23 43:1
**speculations**
43:19
**speech**
193:22
**spell**
139:8
**spells**
103:20
**spend**
57:7,13
**spending**
258:22
**spent**
11:23 140:22 141:7
**split**
156:25 197:12
**spoke**
107:14 110:20 111:5
112:6 150:25
**spoken**
141:25
**stand**
190:20,23
**standard**
22:23 26:9,12,13,16
26:24 35:12 87:17
192:17,19
**standardization**
13:18 182:15
**standards**
27:3,12 28:20 87:1,12

121:14,18
**stands**
32:19 190:17
**start**
124:14 198:2 209:25
**started**
11:23 57:15 74:21
102:10 176:6 178:8
209:24 210:4,6
**starting**
49:13,15,15 78:24
105:23
**starts**
125:5
**state**
5:18 50:5 91:20
125:25 151:24 155:7
236:14
**stated**
36:20 44:12 70:20
73:1 117:18 215:11
234:2,9 236:11,23
237:19 244:17
**statement**
11:25 30:12,16,20
31:1 36:14 37:22
80:13 82:3,15,23
83:1,2,8 89:15,17
92:15,18,23,23 93:14
93:20 94:4 95:4
96:12 100:13,15
108:14 144:8 146:8
151:7 160:8 177:19
178:23 185:21 186:3
186:16,25 189:11
224:17 244:6
**statements**
31:8,9 35:20 59:16
68:22 69:7,11 70:11
77:7 92:20 100:19,21
101:6 102:1 172:19
177:2 178:1 179:2
184:2,11 185:3,13
186:5 200:3 209:1

214:23 237:23 240:1
240:25 241:2,4,6
**States**
1:1 5:14
**stating**
102:12 143:14
**step**
185:1,1 239:6
**steps**
46:20 47:17,21,21,22
78:5,13,18,22 79:3
82:8 111:22,25 112:7
113:8,16 135:25
136:18,21 176:1
237:14
**step-by-step**
238:13
**Stockholm**
29:17
**stop**
152:7,10
**straight**
124:6 141:14
**strategies**
9:11
**strategy**
7:14,19,25 8:23 9:5,6
9:15 10:21 12:6,14
12:22
**Street**
2:4,11 5:5
**strict**
112:16,19
**strike**
130:12 170:1 188:11
193:20 241:3 247:7
**striking**
162:12
**strikingly**
155:19 156:6 159:23
**structure**
73:22 97:5,6,10,12
121:4 175:5
**structured**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 34

43:11
**structures**
98:14
**Stylus**
207:17
**subject**
4:7 15:16,25 16:19
18:8,13 19:13 21:14
21:25 22:1 28:7,8
31:8 32:24 37:2
41:17 50:8 62:13
77:1 147:12 152:11
152:19,22 153:5
156:24 195:19 196:6
197:2 199:22,25
200:5 219:5,7 221:1
225:24,25 226:1
262:4
**subjects**
32:10,12 55:22,23
56:1
**submitted**
30:3,11,15,19,25 31:4
31:7 64:19 65:10
**subscriber**
251:12
**substance**
58:23 68:22 80:7 92:8
145:18 155:7 156:4
159:22 164:22
177:12 212:24
221:24 228:2 232:17
236:20 237:8
**substantial**
11:22 12:3,8 175:24
224:1 230:6 259:2
**substantially**
7:3 8:14 36:13 95:17
205:1
**substantive**
104:5 171:19
**substantively**
35:16 95:22 96:6
163:3 170:25 242:1

**suffered**
258:18 259:20 260:6
261:25 262:17
**sufficient**
56:20 164:7 170:18,18
171:12 176:9
**sufficiently**
152:2
**suggest**
183:11 211:17 214:21
**suggested**
89:12 184:4 213:7
**SULLIVAN**
2:4
**supports**
101:15
**supposed**
60:3 79:23 80:9
124:13 173:4 236:6
237:20 245:18 246:2
246:6,8,11
**sure**
11:7 12:16,20 13:4,6
21:7 24:9 26:22
27:13 29:6 31:15
41:6 46:18 49:10
70:9 73:16 104:11
106:1 137:23 145:16
146:3 157:1 158:25
161:11 165:24 167:7
168:5,17 169:13
179:22 184:17,21
187:20 208:13
212:19 215:21
217:21 218:3 219:14
223:17 224:9 226:25
227:13 228:14
251:19
**surprise**
75:14 160:1,2,25
174:16 204:17
**surprised**
36:17 37:25 74:16
102:20 154:9,15,16

154:20 155:4 156:2,3
160:5 175:7
**surprising**
42:17 158:13 174:15
**Susanna**
168:25 182:2 206:16
**sushi**
216:19
**suspect**
50:23 52:21 53:5 54:4
**swear**
6:5
**sworn**
3:4 6:7 30:3

───────────

**T**

**T**
2:7 4:1 15:3
**table**
255:6
**tailored**
39:19
**take**
5:10 11:21 20:22
29:13,15 31:17 53:7
65:7 66:17 68:2 70:2
75:6 78:5,12,18,21
85:12 95:18,20 97:19
99:23 100:3,8 101:16
101:22 102:18,21
108:15 113:8 117:8
124:25 125:2 129:21
135:16 136:21 143:1
144:9 145:12 146:17
150:24 151:6 159:4
166:18 185:1 193:18
208:12 210:17 219:9
229:10 246:16
254:15 255:9 260:12
263:17
**taken**
5:12 15:5 16:22 17:5,7
17:15,17 58:22 69:5
111:6 112:7 113:17
192:16,18 265:7

**takes**
216:19
**talk**
32:10 72:20 106:22
107:8,9,15 254:21
**talked**
23:22 222:6
**talking**
22:13 36:24 48:2 71:2
91:15,18 121:9
123:23 140:22
171:13 179:17 223:2
250:20
**tape**
85:15 146:23 208:16
**tapes**
85:13
**task**
64:5
**team**
95:13 139:1,7,13,16
170:9,10 181:7,19,24
181:25 182:25
195:22 204:23
205:14 206:10
207:11 209:12 213:4
234:5 235:20 236:12
236:16,16,17
**teams**
170:8 205:3
**technology**
7:14,19 8:22,23 41:18
**Teece**
252:17,18,24 253:4,15
254:3,16
**TELECOMMUNI...**
1:11
**Telephone**
2:6,12,18
**tell**
6:14 7:16 8:18 9:13
16:12 25:23 36:6,24
47:13 56:8 79:3,16
94:12 95:3 96:21

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

123:22 131:17
132:14 151:19
153:19 154:14 156:8
163:25 167:12
168:22 170:11
195:18 197:1,22
202:3 217:15,18
225:23 227:13
229:11 232:1 238:11
248:18 250:9,22
**telling**
49:3 188:25 215:10
216:2
**ten**
144:12 201:15
**term**
35:3 87:20 154:1
190:15
**terminals**
87:10,13 251:13
**terms**
20:8,15 27:2 32:5,17
33:10 34:17,20,21,24
35:10,13,14,16,24
36:1,12,13 37:23,24
39:3,13,23,23 40:10
40:15,21,24 41:3,5
42:10,24 43:10,18,22
45:16 46:3,6,17 47:6
47:23 54:3 55:2 59:5
59:19,24 60:1,5,6,12
70:18,20 72:3,8,25
73:5,6,8,9,11,13,14
73:16,18,25 74:4,6
74:15 75:22 79:16,24
80:7,10,13 81:5 82:4
82:10,16,18 83:4,6
87:20 94:8,10 95:6,8
95:12,22 96:6 97:16
98:6 99:10,17 102:4
109:21 110:2,15
111:1 112:1,24
113:10,18 114:13,13
115:1,1,13,14 116:14

116:16 117:4 121:21
122:10 123:7 126:5
127:6,23 129:16,19
129:23 130:2,14,24
131:20,20 132:17
133:4,14,19,19 134:2
134:9,19,19 135:12
136:8,20 137:2,7,19
137:21 138:4,18
139:17 142:18
144:20 145:2 153:9
153:21 155:8 159:24
162:14 166:1,15
170:25 173:15,17
174:13 175:8,10
176:15 178:2,3,16,25
179:8 183:21 186:1
190:4 195:15,24
197:19 204:14 214:7
224:1 231:1,20 232:2
232:9,19 233:9,13,18
234:5 235:20 236:12
236:13,17 237:17,18
237:22,24 240:7,12
240:21 241:12 242:3
242:18 243:2,12,19
244:1 245:18 246:2,6
246:9,15,21,22 247:1
247:25 248:5,14,17
248:17,19 249:12,22
250:3,21 251:11
253:6 254:22 255:1
255:14,20,23 256:23
257:14 258:19,25
259:21 260:7 262:1
263:9,13,14
**test**
251:8
**testified**
6:8 23:19,25 24:12
28:25 82:15 99:3
100:17,18 101:2
158:5 159:3 161:22
169:6,18 176:19

177:1,20 179:3 180:5
184:5 185:2 186:12
200:9,13 204:4 207:6
208:3 217:14 246:23
254:24 256:21 257:7
258:10,20 262:3,18
**testifies**
69:23
**testify**
18:15,24 20:2,8 31:11
55:20 56:9 57:8 62:9
107:1 109:21 110:1
110:13,25 113:9
161:19 162:5 201:9
225:3
**testifying**
159:17
**testimony**
15:16 16:13,19 18:9
19:14,21 24:4,20
25:16 29:18 61:10,15
61:24 62:8,12,23
64:11 69:15,19 96:13
98:5 99:6 102:3
107:23 108:7 114:1
124:5 145:17 165:6
184:20,22 186:22
191:16 192:10 222:2
225:4 232:13 238:8
239:16 255:3 262:4
265:5,10
**thank**
6:9,10 7:9,10 70:5
72:23 85:23 109:4
147:6 193:19 208:24
**thematically**
241:24
**thing**
37:25 41:1 51:1,2
76:22 117:25 124:13
125:3 196:5 202:3,7
207:10 241:24 242:2
**things**
46:10 71:10 82:13

145:16 146:4 151:23
160:17,17 185:7
207:25 208:5 210:13
223:23 228:17 239:3
245:10 258:8
**think**
22:14,15 23:18 27:16
27:17 28:8 32:20
34:15 35:8 38:5,11
40:2,14,17 43:9
44:18 47:19 48:9
49:25 51:21 56:17,19
60:10 67:23,24 69:20
71:13 77:3 79:9 80:4
84:12 92:22 96:10,18
97:1,17 100:5,18
101:17 103:20,22
106:11 108:3 109:8
110:12 111:11
118:24 119:1,3,8
124:16 125:8 126:25
132:5 134:13 135:4
147:22 148:11 150:4
155:2 156:2 174:10
185:6 186:7 188:19
193:23 194:14
196:23 201:14
206:10 209:20
213:11 214:25
216:13 221:18,25
222:5 226:9 227:10
229:2 235:16 245:22
258:14 259:6 261:2
262:18 263:16
**third**
10:15 20:9,15,16,20
103:16 113:19
130:13,24 131:19
132:2,18 133:19
134:10 137:19 138:4
138:17 168:11 169:4
169:16 180:8 187:3
194:18 201:17 204:5
204:7 207:7 261:17

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 36

third-party
190:10
thought
226:8 229:16,18
three
15:9 17:1 29:11 90:14
141:6 162:23 163:4
164:20 167:24 168:2
169:3 229:6
three-year
10:22
time
5:8 8:16,17 10:3,13,17
10:18,22 11:6,10,16
11:23 12:4,9,16,21
16:21 17:4,19 18:4
18:19 22:25 23:7,12
29:3,8,11 31:18,18
45:3,21,23 49:4,9,16
50:2,16 51:19,22,25
52:9,14,24 53:22
57:7,13,16 67:7 68:9
68:12 72:16,22 74:18
77:20 79:23 81:3
82:1,11,12 85:15,23
88:10 91:18 101:5
104:24 105:25
122:10 123:7 126:4
126:18 141:7,17
143:5 146:23 147:6
163:1 171:23 172:1
172:15,24 173:11,25
174:3,6 175:11,23
178:7,7 187:14,20
202:10 205:17
208:14,16,24 209:21
209:23,24,25 210:4
210:12,20,24 214:20
216:19,23 220:12,13
221:22 222:9,13,23
222:25 223:2,5 224:5
224:12,16 225:8,11
226:3,21 228:7,22
245:14 258:23

260:10 261:18,18
263:21 264:3
times
47:4 58:23 111:13,17
111:17 172:2 179:19
185:2 219:25
timing
146:5
tired
260:18
title
7:4,12,23 8:3,5,11
titled
4:5
titles
231:9
today
6:2 15:25 16:20 30:4
30:23 32:9 55:20
57:8,10,11,13 61:11
61:24 62:8,13,23
71:6 85:10 107:1,23
108:7 109:21 110:1
110:14,25 113:9
146:16 147:10
159:17 180:5 208:4
222:19 225:3 229:24
251:20,25 254:17
257:7,8 258:11,14,21
258:23 259:18 260:4
262:3,5,6,8,18,19,21
264:15
today's
5:7 107:12 109:11
110:9 127:17
told
37:3 39:3,11,14,22
40:9,21,24 41:8 65:3
71:10,11 72:3,10
74:6 80:3 83:4 88:16
93:18 95:5,9 115:19
131:25 146:15
151:21 164:4 186:21
216:13 218:4,18

228:5,15 230:25
231:14,17,20 232:2,3
232:4,8,18,22 233:4
233:8,20 236:15
240:7,19 242:18
tone
151:22
topic
107:2,6 109:16,24
161:14 202:14 225:4
topics
15:19 18:17,21 19:18
19:20 20:1 56:3,18
56:24 106:25 108:4
109:19 203:13,16,16
203:19 204:3
total
97:23 141:7 154:4
totality
191:10
totally
89:3 125:21
touch
219:3,19
Tracks
232:10
Trade
22:19 24:1
tranche
252:5
transcribed
29:19 151:21 265:9
transcript
1:16 17:10 72:16
152:1 264:4,8,12,15
265:6,9
transcripts
21:12 262:23
translate
158:16
transparent
124:14,17
transparently
124:1

treat
124:17 125:3,9
treating
124:18
treats
33:10
tricky
109:1
Trish
1:24 6:3 265:4,22
trouble
134:6
troubled
133:17,25 134:8
true
21:1 39:11,22 50:15
62:8 88:15 89:4
125:21 132:10
135:19 157:20
199:10 230:16
265:10
truly
170:22
try
14:6 51:24 52:12
184:16 214:15
trying
13:1,4 14:6 27:18,20
32:18 56:3 62:7
71:10 73:15 161:25
184:19,21 196:20
198:11 199:17
226:17 228:4,20
242:7 256:19
Turning
245:15
twice
17:22,24
two
7:22 8:4 23:16 29:9
32:10,12 52:6 56:1
58:18 90:12 98:24
140:16,17,21 141:3,4
141:6,9 164:19,21

165:1 167:20 169:13
171:19 185:7 186:5
205:24 215:21
216:15,20,21
**two-year**
7:24
**type**
37:21
**typed**
71:22,25
**typewritten**
263:2
**typical**
189:8
**typically**
41:11,17 42:3 87:21
152:6,14 223:19
**T-e-e-c-e**
252:17

**U**

**ultimate**
214:5,12
**UMTS**
87:11
**unauthorized**
26:4
**unclear**
124:4 125:13 151:18
163:17 261:9
**uncomfortable**
50:8
**understand**
12:25 22:15 26:23
35:1,18 44:24 48:7,9
48:21 62:3,10 71:8
73:7 76:16 80:14
98:12 149:22 184:8
184:18 186:7,24
188:19 198:7 215:13
215:17 219:14
226:24,25 227:10
228:11 232:6 237:7
242:6 250:1 251:4
252:18 261:1

**understanding**
22:8,17 26:20 109:20
111:16 113:21
117:12 118:21
123:16,22 124:3
126:2,11,14,16
130:23 131:18 132:8
132:15 149:4 151:20
153:8,20,25 158:21
158:24 159:8 180:25
181:11,23 212:23
224:3,10 225:13
243:14 247:6,9,18
248:10,18 253:13
263:11
**understood**
34:15 40:2 48:12 61:8
76:1,2 143:12 154:4
256:3,6
**undertake**
42:18 52:25 107:24
108:4,8 109:25 110:8
110:13,24 111:22,25
113:7 117:1 127:16
135:25 136:18
**undertaking**
48:4
**undertook**
42:13 43:4
**unfair**
256:15
**unit**
251:13 252:3,4,8,10
252:13
**United**
1:1 5:14
**units**
251:14
**unprompted**
174:22,23
**unredacted**
253:15
**upcoming**
105:10

**upfront**
43:14,20 44:4,13
45:10,25 46:15 53:9
53:11,17,24 54:9
55:12 72:11 73:19,21
80:18 174:25 246:24
247:2 248:5 249:18
250:13 251:11
**upset**
209:3
**upstairs**
108:22
**URQUHART**
2:4
**use**
26:4 27:2 47:11 67:16
72:22 87:21 95:19
99:9 100:3 155:6
156:18 158:10
164:16,19 165:6,11
176:20 179:4 195:15
233:17 240:6,20
245:4 254:22 256:23
257:5 258:19
**uses**
157:3
**uttered**
154:23 155:3

**V**

**v**
1:7
**vacation**
102:8,9,10,14,18,19
102:22,24 103:1,2,4
**vague**
183:16 188:17 214:9
247:12 249:6
**valid**
100:7
**value**
93:12 94:13 97:20
98:5,7,18,19,20
164:7,13 170:19
171:12 175:12,15,19

182:19
**values**
98:25
**Varick**
5:5
**various**
8:14 64:19 81:21
118:11 139:4
**ventured**
45:17
**verbatim**
58:6 60:18,21 70:13
70:14 80:24 156:12
162:4,8 197:7 200:6
200:7,11 232:15
233:2 234:24 235:24
244:13 265:10
**verified**
30:7
**verify**
84:8 224:17 242:19
**version**
66:2
**versus**
5:12
**vibration**
109:2
**vice**
8:12
**video**
5:3,8
**Videographer**
2:24 5:2 6:2,9 85:14
85:20 108:17,23,25
109:4 146:20,22
147:3 208:15,21
263:20
**videotape**
5:3 85:21 147:4
208:22
**videotaped**
1:19 5:11 85:16,21
146:24 147:4 208:17
208:22

**view**
25:24 99:20 101:15
132:24 166:17
188:10,12 205:6
221:23 236:19
239:22 254:25
259:24 261:2
**viewed**
256:2
**views**
170:7 171:14 176:8
245:7
**violations**
134:1
**vividly**
62:16 173:6
**voice**
151:11,23 231:24,25
**Volume**
5:3 85:15,21 146:23
147:4 208:16,22
**vs**
263:5

**W**

**waived**
69:20
**waiver**
69:17,20,25 70:4
147:15,16 193:23
**want**
32:22 34:11 35:7 36:9
46:18 47:18 48:20
49:10 51:15,18 56:4
62:2 75:5 76:13 80:5
123:25 136:9 147:19
154:5 156:25 157:8
161:10 165:24
184:25 197:12,20,21
197:21,25,25 198:1
205:14 228:19
260:12
**wanted**
148:16 176:4 198:11
204:24

**wants**
56:5 166:19
**Washington**
2:18
**wasn't**
78:6 79:23 115:19
166:14
**way**
14:6 18:21 19:1,11
24:24 25:13 28:11,16
28:22 30:13,17,21
34:10 43:12 63:8
66:24 86:10 93:7
99:19 101:12 125:1,2
131:18 167:17
178:12 184:4 186:12
187:8,13 194:25
201:21 202:13 204:1
214:15 218:4 228:12
228:14 235:1 237:11
239:23 240:6 244:23
244:24 245:1 265:15
**ways**
249:25 256:14
**websites**
41:19
**week**
57:12,16 220:4,6,8
**weekend**
102:16
**went**
77:23 141:14 209:8
242:21
**weren't**
13:3
**West**
2:11
**Westin**
103:8
**we'll**
37:12 49:1 152:12
193:23 260:14
261:13,14
**we're**

7:9 15:22,24 16:7
27:16 32:9 34:1
39:16,16 49:13,15
55:24,24 91:15
165:24 196:21
250:20 253:23
261:14
**we've**
167:9 208:10,11
**whatnot**
259:2
**whatsoever**
48:3 82:3 183:11
**wildly**
45:18
**willing**
80:12 95:21 99:22
121:16 147:11
170:24 173:9 175:21
177:12
**WILMER**
2:17
**wireless**
87:17
**withholding**
159:12
**witness**
2:9 3:4 5:24 6:5 32:14
33:2,3,17 39:8,20
56:4 63:15 66:16
68:25 75:6 76:13
84:17 89:24 91:1
120:8 124:17,18
125:4 126:23 131:24
132:21 152:17 153:1
189:15 191:8 193:4
193:17 195:7 200:20
212:1 220:23 254:7
260:8 264:3,7,11
265:5
**witness's**
61:14 72:22 114:1
**wondered**
54:15

**word**
47:11 95:11 99:13
103:18 157:1,1,2
158:13,13 161:7
240:7,19,20 244:5,17
245:4,5
**wording**
109:24
**wordings**
59:3
**words**
13:21 80:7,23,24 92:7
95:19 96:18 99:9
100:3,6 104:4 151:4
154:23 155:3,6,23,25
156:1,8,17,18,20,23
157:3,5,7,9,15,19
158:10 161:4,6,12,13
161:16 162:6,11,18
173:6 176:21 177:1
177:11 179:5,12,24
195:20 196:11,13,16
197:1,8,10,13,17
198:1,14,21,25 199:6
199:7,18 200:1
212:24 230:10,13,20
232:21 233:3,21
234:13,14,16,20
235:21,25 236:8
240:9,10,11,18,23
244:3 245:23 246:4
246:11,18 255:13
261:23
**work**
9:16 11:18 66:18
76:15 84:19 153:4
159:6 181:24 195:6,8
199:23 200:19 212:3
212:9 220:25 223:18
254:10
**worked**
7:6 211:3
**working**
66:23 67:13

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 39

**wouldn't**
36:1,17 37:25 42:4
  102:20 181:13
  245:13
**write**
135:11 207:18 230:8
  258:7
**writing**
67:19 68:16 84:24
  101:22 135:14
  218:10,15 220:10
  256:19
**written**
30:11,15,19,25 101:5
  144:14 225:14 226:3
  226:20 227:16,18
  231:19,23,25 239:1
  239:23 240:3 241:13
**wrong**
77:8 198:8
**wrote**
58:13 59:4 65:15 66:9
  67:3,24 84:22 230:6
  230:15 242:3
**Wy**
15:3

_____
          **X**
**X**
3:2 4:1

_____
          **Y**
**Yeah**
75:11 78:23 103:22
  108:23 114:2 136:14
  145:14 161:10 166:7
  188:7 198:9 208:13
  215:16,19 235:23
**year**
7:5 16:24 23:4,6,13
  24:7 72:13,14 73:23
  97:3 98:15 153:11
  155:21 171:16 175:1
  199:1 251:14,16
**years**

7:22 8:4 17:1 23:16
  29:9,11 75:16 96:25
  97:24
**York**
1:10 5:5,6,6 29:14
  89:19

_____
          **Z**
**Zeller**
2:7 3:8 5:19,19 6:11
  6:12 7:11 15:21 16:3
  16:9 21:22 22:7,12
  32:16,25 33:5,9,20
  33:23 34:12 38:14
  39:10,21 40:5,13
  44:21 45:2,22 47:1
  47:10 48:1,11,18,25
  49:12,22 50:14 51:7
  51:23 52:10,23 54:6
  54:13,19 55:4,17,23
  56:2,15 61:22 63:15
  63:18,24 65:2,11
  66:21 69:9,18 70:8
  71:4 72:19,24 74:13
  75:19 76:24 77:5,16
  78:17,23 79:2 83:9
  83:24 84:9,25 85:12
  85:24 86:8 89:6 90:1
  90:6,22 91:3,17,22
  97:15 98:11 99:2
  100:16 101:11
  102:25 103:20,24
  106:18 108:20,24
  109:3,7 110:22 113:6
  114:6,17,24 115:7,11
  115:18 116:11,20,25
  117:10 118:1,20
  119:20 120:3,9,16
  121:7 122:7,18 123:4
  123:15,21,25 124:8
  124:11,20,25 125:5
  125:12,19 126:1,13
  127:3,10 128:2,19
  129:7,12,20 130:3,11
  130:21 131:7,16

132:3,13,25 133:12
  134:3,16,23 135:3,10
  135:24 136:6,14,17
  137:14 138:14,24
  139:11,25 140:6
  143:4 144:23 145:14
  146:17 147:22,25
  149:24 150:7 151:16
  152:8,13,20 153:15
  154:13 155:5,16
  159:11,18,21 160:23
  161:15,23 162:7,19
  165:13 166:7,12,23
  167:1,4,8 169:12
  177:9,16 184:1
  187:11,19 188:9,22
  189:7,16,19 190:16
  191:4,9,20 192:3,15
  193:9,20 194:4
  195:17 196:10,18,22
  197:9 198:20 199:16
  200:2,12 201:1 206:1
  208:13,25 211:14,21
  212:13 214:14
  215:20 216:7,9 218:2
  219:6,21 220:3 221:9
  223:12 226:12 227:6
  227:12,24 228:13
  229:4,16,20 232:20
  233:5 236:25 238:15
  238:25 239:21
  242:11,24 247:17
  248:23 249:2,10
  250:8 251:2,21
  253:10,17 254:1,13
  256:8 259:16 260:11
  260:20 261:6,16
  262:9,13 263:16
  264:2
**zeros**
180:10

_____
          **$**

_____
          **1**
**1**
2:18 4:5 5:3 85:15
  165:18,22 167:10
  168:12 169:16
  177:23 180:8 187:3
  205:20 206:24
  223:11,13,15 224:5
  224:12 225:12
  226:21 227:20 228:7
  228:22 252:13
**1.2**
96:25 154:8
**10**
36:7 38:18,18 106:23
  111:17,17 136:1
  142:11 144:4,10
  257:11,25 258:7,10
  261:21
**10th**
2:5
**100**
144:6
**10014**
5:6
**11-cv-01846-LHK**
1:7 5:16
**12.34**
1:22 5:1
**12:34**
5:8
**1201**
2:11
**133**
97:1 157:2
**134**
97:3
**14:18**
85:15
**14:29**
85:23
**15**
142:11 144:10
**15:45**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

146:23
**15:59**
147:6
**165**
4:5
**17.33**
208:24
**17:18**
208:16
**18:47**
263:21
**18:53**
264:1
**1875**
2:17

---

**2**

**2**
4:9 85:21 87:3,5,12,18
88:13,17,23 89:1,14
89:20 90:8 91:5,25
92:10 93:23 106:4
120:4,12,17 121:19
146:23 167:22 168:6
171:20 182:9 183:13
189:24 229:5,9,11
254:20
**2.19**
85:17
**2.29**
85:19
**2.4**
118:4,22 119:1,4
172:11 180:14,19
181:6,17
**20**
194:11 251:13
**20th**
229:19
**20006**
2:18
**2001**
105:23 106:10
**2002**
105:23

**2004**
7:15,17 8:20
**2007**
7:7,13,15
**2009**
13:25 14:2 88:9
105:25 106:8
**2010**
8:10,12 14:1,9,17 15:1
29:5 104:9 171:23
**2011**
174:1,4 199:1 250:19
**2013**
1:18 4:7,10 5:7 37:10
52:25 82:11 84:2
85:24 86:4,10,16,20
87:3,7 88:1,16,25
106:14 150:15 199:1
210:24 223:13 229:8
229:14 265:7
**202**
2:18
**213-443-3180**
2:6
**225**
5:5
**229**
4:9
**24**
77:21
**25**
1:18 265:7
**25th**
5:7
**264**
265:7
**28**
4:9 229:8,14,15
**28th**
229:21

---

**3**

**3**
147:4 167:22 168:6
171:20 172:22

180:10 208:16
251:13 252:3,7,9
**3.45**
146:25
**3.59**
147:2
**30**
11:20
**30309-3424**
2:12

---

**4**

**4**
4:7 37:10 62:13 68:3
68:23 72:2 73:1 74:1
75:23 77:7 81:16,25
82:5,11,16 83:3 84:2
85:7,24 86:4,10,16
86:20 87:3,6 88:1,10
88:16 91:16 92:21,23
93:8,18 102:3 103:6
104:1 105:19 106:13
108:1,10 109:14,18
140:11 148:2,5
150:15 167:23
177:24 182:22 184:3
186:13 187:12,21
191:19 194:6 201:25
204:15 205:19 207:8
208:2,8,22 209:2,16
209:19 210:6,24
214:20 215:9,12
216:3,6 218:8,20
219:16 220:12,16
222:8,17,19,20,24
223:6,14 224:5,12
225:6,7,11 226:21
227:19 228:7,18,22
241:21 244:18 252:7
256:4 263:1
**4th**
167:15
**404-881-7196**
2:12

**5**

**5**
165:21 167:23 258:3
**5.18**
208:18
**5.33**
208:20

---

**6**

**6**
3:6,8 210:3 265:6
**6.47**
263:22
**6.53**
263:24 264:19
**6327**
2:18
**663**
2:18

---

**8**

**8**
230:8,10,14,19,23
233:25 236:18
237:13 238:17,21
239:1,10,18,22 240:3
241:1,5,13,16 242:3
242:8,22 245:10,16
**8.30**
57:14
**865**
2:4

---

**9**

**9**
96:25 230:17,19
242:25 244:25 245:2
254:20 256:10,13,20
257:23
**90017**
2:5