# EXHIBIT 26

## (Unredacted Version of Document Sought To Be Sealed)

# In The Matter Of:

*APPLE INC.*
*v.*
*SAMSUNG ELECTRONICS CO., LTD., et al*

———————————————————————

*EEVA KAARINA HAKORANTA - Vol. 1*
*November 25, 2013*

———————————————————————

# *HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

_____

APPLE INC., a California corporation,

Plaintiff,


v.                              Case No:
                                11-cv-01846-LHK


SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,


Defendants.


_____


***THIS ENTIRE TRANSCRIPT IS DESIGNATED
HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY***


Monday, November 25, 2013


VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
MS. EEVA KAARINA HAKORANTA


AT:  7.04 PM


Reported by:  Trish Brady, Accredited Realtime Reporter

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA — 11/25/2013

Page 2

```
 1              A P P E A R A N C E S

 2     Appearing on behalf of SAMSUNG, et al:

 3              QUINN EMANUEL URQUHART & SULLIVAN LLP
                865 South Figueroa Street
 4              10th Floor
                Los Angeles, California 90017
 5              Telephone:  213-443-3180
                Email: michaelzeller@quinnemanuel.com
 6
                BY:  MR. MICHAEL T. ZELLER, ESQ.
 7              and MS. RACHEL HERRICK KASSABIAN, ESQ.

 8
       Appearing on behalf of NOKIA and THE WITNESS:
 9
                ALSTON & BIRD LLP
10              One Atlantic Center
                1201 West Peachtree Street
11              Atlanta, Georgia, 30309-3424
                Telephone:  404-881-7196
12              Email: randall.allen@alston.com

13              BY:  MR. RANDALL L. ALLEN, ESQ.
                and  MR. BRIAN PARKER MILLER, ESQ.
14
15     Appearing on behalf of APPLE INC.,:

16              WILMER CUTLER PICKERING HALE AND DORR LLP
                1875 Pennsylvania Avenue
17              NW, Washington D.C., 20006
                Telephone: +1 202 663 6327
18              Email: gregory.lantier@wilmerhale.com

19              BY: MR. GREGORY H. LANTIER, ESQ.

20

21     Also Present:

22              MR. RON ANTUSH (In-house Counsel, NOKIA)

23

24     Legal Videographer:

25              MR. PHILLIP HILL
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1

 2                        I N D E X

 3

 4

 5   Witness (sworn)                           Page No:

 6

 7   MS. EEVA KAARINA HAKORANTA                   5

 8

 9   DIRECT EXAMINATION BY MR. ZELLER:            5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 4

```
 1    (7.04 pm)

 2            VIDEOGRAPHER:  This is the beginning of

 3    videotape number 1, Volume I.  This is the video

 4    operator speaking, Phillip Hill of Merrill Legal

 5    Solutions, New York office at 225 Varick Street,

 6    New York, New York 10014.

 7            Today's date is November 25, 2013.  The

 8    time on the video screen is 19:04, Helsinki time

 9    in Finland.  We are at the Helsinki office of

10    Bird & Bird to take the videotaped deposition of.

11    Eeva Hakoranta.  This is taken in the matter of

12    Apple Inc., vs Samsung Electronics Co., Ltd.,

13    et al.

14            This is being heard in the United States

15    District Court, Northern District of California,

16    San Jose Division, case number 11-cv-01846-LHK.

17            Please will counsel introduce themselves

18    and state whom they represent.

19            MR. ZELLER:  Mike Zeller for Samsung.

20            MS. KASSABIAN:  Rachel Kassabian for

21    Samsung.

22            MR. ALLEN:  Randall Allen, and I'm here

23    with my partner Parker Miller on behalf of Nokia

24    and the witness.

25            MR. LANTIER:  Greg Lantier on behalf of
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    Apple.
 2              VIDEOGRAPHER:  The court reporter today
 3    is Mrs. Trish Brady on behalf of Merrill Legal
 4    Solutions, London office.  Please will the
 5    court reporter swear in the witness.
 6              MS. EEVA KAARINA HAKORANTA
 7                Having been duly sworn,
 8                 Testified as follows:
 9              VIDEOGRAPHER:  Thank you, sir.
10    DIRECT EXAMINATION BY MR. ZELLER:
11              MR. ZELLER:  Could you please tell us
12    your full name for the record?
13         A.    Eeva Kaarina Hakoranta.
14         Q.    And have you ever gone by any other
15    names?
16         A.    No.
17         Q.    You are currently employed by
18    Nokia?
19         A.    Yes.
20         Q.    How long have you been with Nokia?
21         A.    Seven years.
22         Q.    And during the entirety of those
23    seven years, have you been involved with patent
24    and licensing on behalf of Nokia?
25         A.    Can you repeat the question?
```

```
 1            Q.    Sure.  During that entire

 2    seven-year period, have you had involvement with

 3    Nokia's patent licensing?

 4            A.    Yes, I have.

 5            Q.    And if I understand things

 6    correctly, you are an attorney?

 7            A.    To my education, yes.

 8            Q.    Are you a member of any Bar?

 9            A.    The Finnish Bar.

10            Q.    And you are currently a member of

11    the Finnish Bar?

12            A.    No.  As the law in Finland goes,

13    you are only when you are actively practicing in

14    private practice.

15            Q.    And I take it you are not actively

16    practicing in private practice today?

17            A.    Not today.

18            Q.    When was the last time that you

19    actively practiced in private practice?

20            A.    Seven years ago.

21            Q.    And if you please tell us what your

22    current title is with Nokia?

23            A.    I am director, head of patent

24    licensing.

25            Q.    And how long have you had that
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1   title or position?

 2              A.   A little more than a year.

 3              Q.   And I take it that was your title

 4   when you attended a meeting with Samsung on

 5   June 4, 2013?

 6              A.   That is correct.

 7              Q.   And as of that time, was there

 8   someone you reported to?

 9              A.   Yes.

10              Q.   Who?  Who was your direct report at

11   that time?

12              A.   Paul Melin.

13              Q.   As of that June 4, 2013 time, did

14   anyone report to you directly?

15              A.   Yes.

16              Q.   How many people?

17              A.   Six people.  Strictly speaking,

18   seven, but one is on maternity leave.

19              Q.   And do all of these six, strictly

20   speaking seven people, work on patent licensing

21   matters?

22              A.   They do.

23              Q.   Have you ever had any discussions

24   with anyone at Nokia about what occurred at the

25   June 4, 2013 meeting with Samsung other than
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 8

```
 1    Mr. Melin?

 2            A.    What time period did you inquire?

 3            Q.    Any time?

 4            A.    Yes.

 5            Q.    Who else have you discussed the

 6    June 4, 2013 meeting with, apart from Mr. Melin of

 7    course?

 8            A.    Are you now inquiring to who I have

 9    discussed it within -- that is employed with

10    Nokia?

11            Q.    Correct.  I am not asking about

12    outside attorneys at this point.  I am trying to

13    find out about people who actually worked for

14    Nokia.

15            MR. ALLEN:  Are you including in-house

16    counsel?

17            BY MR. ZELLER:

18            Q.    Yes, I am.

19            A.    I have discussed it with the

20    litigation team and within the licensing group.

21            Q.    Who on the litigation team have you

22    discussed it with?

23            A.    A number of people.

24            Q.    Who do you recall?

25            A.    Ron Antush, Richard Vary.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1              MR. ALLEN:  V-a-r-y.

 2              A.   Todd Leitstein.

 3              BY MR. ZELLER:

 4              Q.   Anyone else you remember on the

 5    litigation team?

 6              A.   Clemens Heusch.

 7              Q.   Anyone else?

 8              A.   I believe that's it.

 9              Q.   Who on the licensing team have you

10    discussed the June 4 meeting with?

11              A.   I have discussed it with

12    Susanna Martikainen, who works with this project.

13              Q.   Anyone else?

14              A.   Yes, we have discussed it within

15    our team meetings, with the entire team.

16              Q.   Who do you recall by name?

17              A.   Do you want me to list

18    everything -- everybody?

19              Q.   Everyone who you can recall having

20    discussions with about the June 4 meeting who was

21    on the licensing team.

22              A.   Who was on the licensing team?  OK.

23              In addition to Ms. Martikainen,

24    Emma Soininen, Robert Gray, Sonja London,

25    Deanna de Jong, Jesse Tu, and then some people on
```

```
 1    the technical team.
 2              Q.   Anyone else you recall by name?
 3              A.   Within the licensing team?
 4              Q.   Well, you said some people on the
 5    technical team, so I assume you are including
 6    that.
 7              I am trying to get an inventory of
 8    people who you spoke with concerning the June 4
 9    meeting with Samsung.  And, so is there anyone
10    else you recall having those discussions with or
11    communications with by name?
12              A.   Yes, there are other people as
13    well.
14              Q.   Who else do you recall by name?
15              A.   Mika -- I forget Mika's last name
16    now.  But Janne Vestrinen and I might have
17    discussed also with Jan Sandstrom.  At least those
18    who I would say I recall by name.
19              Q.   Were any of the communications that
20    you had with people within Nokia that concerned or
21    discussed the June 4 meeting with Samsung,
22    included in e-mail or otherwise put in writing?
23              A.   I would imagine, yes.
24              Q.   It's your expectation that at least
25    some of those communications were in writing?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1            MR. ALLEN:  Some of her communications?
 2            BY MR. ZELLER:
 3            Q.  Well, going either way.  Some of
 4      those communications that she had with the other
 5      people that she's mentioned as it related to the
 6      June 4 meeting?
 7            A.   No, not that I -- I -- did you mean
 8      my communications?
 9            Q.   I mean either communications that
10      you sent to them or that they sent to you on that
11      subject.
12            A.   I have no recollection.
13            Q.   You said in your answer that you
14      imagine that there was, so I'm trying to
15      understand what your answer was.
16            Is it your expectation that one or more
17      of the communications that you had relating to the
18      June 4 meeting that you had with other people
19      within Nokia was in writing?
20            MR. ALLEN:  Objection, asked and
21      answered.  You may answer it again.
22            A.   It's not my expectation.
23            BY MR. ZELLER:
24            Q.   What do you mean by when you said
25      you imagined that there were such written
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    communications?

 2              A.   You were inquiring whether any of

 3    the communications regarding this matter were in

 4    writing and that was the question that I was

 5    responding to.

 6              Q.   And you don't recall, one way or

 7    another, whether any of those communications were

 8    in writing?

 9              MR. ALLEN:  With the people internal to

10    Nokia?

11              BY MR. ZELLER:

12              Q.   Correct.

13              A.   Is that a question?

14              Q.   It is.

15              A.   Can you repeat it?

16              Q.   And you don't recall, one way or

17    another, whether any of those communications were

18    in writing?

19              A.   Are you now asking to my

20    communications with the other people within Nokia?

21              Q.   Yes.

22              A.   No, I don't recall that they would

23    have been particularly in writing.

24              Q.   Did you ever draft any documents or

25    memos or otherwise put in writing what it is that
```

1   occurred at the June 4, 2013 meeting with -- with

2   Samsung?

3           A.   Are you inquiring to whether I made

4   notes in that meeting?

5           Q.   I'm asking if you wrote anything.

6   It could include notes, it could include any other

7   writings.  Please tell me all of the writings that

8   you created, at any time, that described the

9   substance of the June 4, 2013 meeting with

10  Samsung?

11          A.   I made notes in the meeting.

12          Q.   Anything else?

13          A.   No, I don't think I made any other

14  documents.

15          Q.   Did you put into writing, in any

16  kind of written communication with anyone, the

17  substance of the June 4, 2013 meeting whether

18  that's inside or outside of Nokia?

19          MR. ALLEN:  Objection, asked and

20  answered.  You may answer it again.

21          A.   I have communicated with external

22  counsel.

23          BY MR. ZELLER:

24          Q.   Did any of those e-mails describe

25  the substance of what occurred at the June 4

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 14

```
 1    meeting?
 2              MR. ALLEN:  You can answer that question
 3    "yes" or "no".  I'm going to caution the witness
 4    not to disclose any communications with -- the
 5    contents of any communications with external
 6    counsel.
 7              A.   Yes.
 8              BY MR. ZELLER:
 9              Q.   When was the first occasion on
10    which you did that?
11              A.   I cannot recall precisely, but
12    I would imagine it was very soon after the
13    meeting.
14              Q.   How soon after the June 4 meeting?
15              A.   It could have been the same day or
16    the day after, or a couple of days after.
17              Q.   Well, you say it could have been.
18    Do you recall that?
19              A.   I don't recall exactly at what time
20    that communication took place.
21              Q.   Do you recall generally?
22              A.   Yes, I did say that it was very
23    soon after the meeting.
24              Q.   Who was the communication to?
25              A.   Mr. Allen.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1              Q.   Anyone else?

 2              A.   Possibly Mr. Allen and potentially

 3    Jane Mutimear of Bird & Bird.

 4              Q.   Anyone else?

 5              A.   I don't recall precisely.  It's

 6    possible that there were other people from

 7    Bird & Bird and Alston & Bird copied on that

 8    e-mail.

 9              Q.   Do you recall anyone else?

10              A.   Like I said, I don't have an exact

11    recollection of when that e-mail was written.

12              Q.   Were the notes that you prepared in

13    connection with the June 4 meeting handwritten

14    notes, typewritten or both?

15              A.   I made both.

16              Q.   Did you create both the typewritten

17    and the handwritten notes during the course of the

18    June 4 meeting?

19              A.   I did.

20              Q.   Were you principally taking your

21    notes on a laptop computer?

22              MR. ALLEN:  Objection to the form of the

23    question.  It is vague.  You may answer.

24              A.   I started with my computer and

25    I kept taking notes with my computer throughout
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    the meeting, but I also took notes on a pen and a

 2    paper.

 3              BY MR. ZELLER:

 4              Q.   Were the typewritten notes a

 5    reflection of your handwritten notes or are they a

 6    separate set of notes?

 7              A.   No, the typewritten notes would not

 8    be a -- how did you ask?

 9              Can you repeat the question?

10              Q.   Whether they were a separate set of

11    notes.  Let me just back up.

12              Sometimes people will take their

13    handwritten notes and then prepare a typewritten

14    version.  But it sounds like, and correct me if

15    I am wrong, that what you did is that you took

16    typewritten notes as well as handwritten notes and

17    your typewritten notes were not intended to be a

18    reflection of your handwritten notes?

19              MR. ALLEN:  Object to the form of the

20    question as vague.  You may answer it.

21              A.   They were not separate notes.

22    I took notes from the same meeting, the same

23    substance.  The typed-written notes represent the

24    entirety of the substance covered during the

25    meeting.  The handwritten notes are complementing.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1            BY MR. ZELLER:

 2            Q.   When did you start taking the

 3   handwritten notes during the meeting?

 4            A.   I recall after we had had the first

 5   break.

 6            Q.   Did you take any handwritten notes

 7   before the first break?

 8            A.   I don't think so.

 9            Q.   Is it your usual practice to take

10   both handwritten notes and typewritten notes?

11            A.   I often do that.

12            Q.   I didn't ask if it's often.  Is it

13   your usual practice?

14            A.   I often do that.

15            Q.   How often?

16            A.   Relatively often.

17            Q.   50 per cent of the time or more?

18            A.   50 per cent of the time might be

19   correct.

20            Q.   Did you review either sets of your

21   notes for this deposition?

22            MR. ALLEN:  And object to the form of

23   the question.  To the extent that counsel is

24   trying to encroach on attorney/client

25   communication or attorney/client work product,
```

```
 1    what documents counsel determines to show a

 2    witness in preparation for the deposition is

 3    protected.  If you are asking something other than

 4    that, I will permit the witness to answer the

 5    question.

 6              BY MR. ZELLER:

 7              Q.   Did you review any documents --

 8    just tell me "yes" or "no" -- did you review any

 9    documents in preparation for your deposition here

10    today?

11              MR. ALLEN:  You can answer that question

12    "yes" or "no".

13              A.   Yes.

14              BY MR. ZELLER:

15              Q.   Did any of those documents refresh

16    your recollection?

17              A.   Not really.

18              Q.   You say "not really".  Did they, in

19    any way, refresh your recollection?

20              A.   No, they didn't.

21              Q.   I take it you attended the June 4,

22    2013 meeting with Samsung?

23              A.   Yes.

24              Q.   Who else was there?

25              A.   Paul Melin and on Samsung's side
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    Mr. Ahn, Mr. Kwak and Mr. Kang.

 2            Q.   Were you present for the entirety

 3    of the meeting?

 4            A.   Yes, I was.

 5            Q.   Were all three Samsung

 6    representatives present for the entirety of the

 7    meeting?

 8            A.   Yes, except for the breaks.

 9            Q.   What was the first thing that

10    happened at the meeting?

11            A.   Well, the first thing that happened

12    at the meeting was that Mr. Ahn explained he

13    didn't want to litigate with Nokia and wanted to

14    present an offer.

15            He then proceeded to tell us that he

16    knew the terms of our license with Apple and he

17    also told us he understood that they were in

18    principle confidential, but stated that there's a

19    lot of litigation going and all information leaks.

20    And then he gave us an offer.

21            Q.   And what you described here, are

22    those words that Dr. Ahn used, either the actual

23    words or in substance what he said?

24            A.    In substance what he said.  I don't

25    recall verbatim what he said but that's definitely
```

```
 1    in substance what he said.

 2              Q.   And focusing on this first part of

 3    the meeting, the June 4 meeting.  About how long

 4    did that portion of it take?

 5              A.   It was very quick.  Ten to

 6    15 minutes I would say.

 7              Q.   And what you just described as

 8    Dr. Ahn's statements, these are statements that he

 9    made during this first session that lasted about

10    ten to 15 minutes at the June 4 meeting?

11              A.   Yes.  He also stated -- and this

12    I remember verbatim -- that he had considered

13    everything.

14              Q.   And this is also something he said,

15    along with the other statements that you testified

16    to, during that first ten to 15-minute session?

17              A.   Yes.

18              Q.   Is there anything else that you can

19    recall Dr. Ahn saying during the course of the

20    first session at the June 4 meeting?

21              A.   He said, you know, some other

22    things because this took just a couple of minutes

23    for me to state this.  So, yes, he would have said

24    other things.  In substance, that is what it

25    boiled down to.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1            Q.   Do you recall him saying anything
 2   else during the course of that first session at
 3   the June 4 meeting other than what you have
 4   testified to?
 5            A.   I do recall that he was addressing
 6   Mr. Melin about sort of that it was time for them
 7   to -- to meet.  He spoke quite a bit about a lot
 8   of litigation going on at Samsung.  He mentioned,
 9   several times, that he would rather settle with
10   Nokia than litigate on top of all the other
11   litigation that he had going in Samsung and
12   I think he mentioned -- he might have mentioned
13   discovery in -- in the context of addressing that
14   this information he possessed was of confidential
15   nature.
16            Q.   Anything else that you can recall
17   Dr. Ahn saying during the first session of the
18   June 4 meeting?
19            A.   He did say something about the
20   offer.  He wanted to make an offer and it was only
21   on table right then and there.  It was a take it
22   or leave it offer.  He characterized it as a total
23   peace, and he did say that if we wanted to take it
24   home and consider, it would be possible but
25   otherwise, he said it's only on table now.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 22

```
 1                 Q.    Anything else that you can recall

 2    Dr. Ahn saying during the first session of the

 3    June 4 meeting?

 4                 A.    There could have been something

 5    else, but I believe that's the substance.

 6                 Q.    Is there anything else you recall

 7    during the first session?

 8                 A.    That's the substance.

 9                 Q.    I'm not asking about the substance.

10                 Is there anything else that you can

11    recall Dr. Ahn saying during this first session at

12    the June 4 meeting or do I have your complete

13    recollection on that?

14                 A.    Right now, I think you have my

15    complete recollection.

16                 Q.    And at the end of this first

17    session, the parties took a break from the

18    meeting?

19                 A.    Yes.

20                 Q.    And about how long did that break

21    last?

22                 A.    It was a longish break.  It could

23    have lasted from half an hour to an hour.

24                 Q.    Focusing on that first session of

25    the June 4 meeting before the break, did -- is it
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
1    your recollection that Dr. Ahn used the word

2    "knew", that he "knew" the terms of the license

3    with Apple?

4              MR. ALLEN:  That he used that specific

5    word?

6              BY MR. ZELLER:

7              Q.   Right, that he used the word

8    "knew".

9              A.   I think he did.

10             Q.   That's your best recollection?

11             A.   Yes.

12             Q.   And is it your best recollection

13   that he used the word "discovery" during the

14   course of this first session?

15             A.   He definitely talked about a lot of

16   litigation.

17             Q.   Do you remember him using, though,

18   the word "discovery"?

19             A.   I have a recollection that he would

20   have used it.

21             Q.   It's your best recollection he did?

22             A.   It's my recollection.

23             Q.   During the course of this first

24   session, did Dr. Ahn use the terms "take it or

25   leave it" to describe his offer?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 24

```
 1              A.   I'm not sure that he used those

 2     terms.  He said he wants to make an offer and it's

 3     only on the table now, today.

 4              Q.   Have you had any discussions with

 5     anyone at Nokia in which you described or someone

 6     else described what Dr. Ahn did as a "take it or

 7     leave it" offer using those words?

 8              A.   Within Nokia?

 9              Q.   Yes.

10              A.   Well, I would have had the

11     discussions that we have in the licensing team.

12              Q.   Did one of those discussions

13     include Mr. Melin?

14              A.   Yes.

15              Q.   Was Mr. Melin the person who

16     described this offer as a take it or leave it

17     offer by Dr. Ahn?

18              A.   He could have been.

19              Q.   Did anyone on the Samsung side use

20     the words "take it or leave it" to describe the

21     offer that was being presented?

22              A.   I don't recall.

23              Q.   During the course of that first

24     break at the June 4 meeting, did you have a

25     conversation with Mr. Melin?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 25

```
 1              A.   Yes.
 2              Q.   Did you have a conversation or any
 3    communications with anyone else who works for
 4    Nokia other than Mr. Melin during that break?
 5              A.   No.
 6              Q.   Did Mr. Melin, to your knowledge,
 7    contact anyone else?
 8              A.   No.
 9              Q.   Without going into the substance of
10    what I -- well, let me actually back up for a
11    second.
12              When you had the discussion with
13    Mr. Melin during the break, were you acting in the
14    capacity of a legal advisor?
15              A.   I would say I was.
16              Q.   Was any of the communications you
17    had with Mr. Melin for the purpose of you giving
18    him legal advice?
19              A.   I regularly do when we do
20    negotiations together.  So, yes.
21              Q.   With respect to the discussions you
22    had with Mr. Melin during the break, were any of
23    those communications, in your view, for purposes
24    other than legal advice?  In other words, are
25    there parts of that conversation you believe that
```

```
1    you can testify about without violating attorney

2    client privilege?

3              MR. ALLEN:  Do you understand his

4    question?

5              A.   I'm not sure that I could.

6              BY MR. ZELLER:

7              Q.   Let me -- let me try it just a

8    slightly different way to make sure we are on the

9    same page.

10             Setting aside those instances where you

11   understood Mr. Melin and you were discussing

12   matters for the purposes of legal advice, were

13   there other things that you discussed during the

14   break?

15             A.   Possibly, yes.

16             Q.   Please tell me what -- what you and

17   Mr. Melin discussed that would not intrude upon

18   your role as a legal advisor?

19             A.   I'm not sure that I can do that

20   without violating the attorney/client privilege.

21             Q.   Let me just ask some general

22   questions and if you can please just tell me "yes"

23   or "no" and we can then decide where to go from

24   there.

25             During the break, did you and Mr. Melin
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 27

```
1    discuss in any way what it is that Dr. Ahn had

2    said during the first session?

3           MR. ALLEN:  You can answer that question

4    "yes" or "no".

5           A.   Yes.

6           BY MR. ZELLER:

7           Q.   Did you discuss between yourselves

8    what Dr. Ahn had said about that he knew the terms

9    of the license with Apple; again, just "yes" or

10   "no" at this point?

11          A.   Yes.

12          Q.   When Dr. Ahn said this during

13   the -- during this first session as you testified

14   to, were you surprised when he said this?

15          A.   Yes.

16          Q.   And did you convey that to

17   Mr. Melin?

18          A.   Yes.

19          Q.   And how did you -- how did you

20   convey that to Mr. Melin?  Did you say, "I was

21   surprised" or did you use some other words?

22          A.   I don't recall the words I used,

23   but I was definitely surprised.

24          Q.   Did Mr. Melin say he was surprised?

25          A.   Yes.
```

```
 1              Q.   And what words did he use to convey

 2    this during the first break?

 3              A.   I can't recall the exact words.

 4              Q.   Do you recall the substance of what

 5    he said?

 6              A.   He was surprised.

 7              Q.   Did he comment on Dr. Ahn saying

 8    that he, Dr. Ahn, knew the terms of the license?

 9              MR. ALLEN:  Did he comment on that

10    specific word or that concept?

11              BY MR. ZELLER:

12              Q.   The -- the specific word.

13              A.   I don't know that he commented on

14    that specific word.

15              Q.   You just don't have a recollection

16    one way or another?

17              A.   No, I don't.  I don't recall

18    verbatim what the discussion was.

19              Q.   Did he comment on Dr. Ahn having

20    this information about the terms of the Apple

21    license?

22              A.   Yes.

23              Q.   And what did he say?

24              A.   He was surprised how it was

25    possible that they had this information.
```

```
 1            Q.   And as at the time of this first
 2    break, did you have an understanding of what those
 3    terms were that Dr. Ahn said that he knew?
 4            A.   Can you repeat the question?
 5    I don't think I heard you.
 6            Q.   Sure.  I'm -- I'm focusing as of
 7    the time of this first break, after the first
 8    session of the June 4 meeting.  Did you have an
 9    understanding at that time of what terms Dr. Ahn
10    said that he knew?
11            A.   I don't think we did.
12            Q.   At some point, did you come to have
13    an understanding as to what those terms were that
14    Dr. Ahn said that he knew?
15            A.   Yes.
16            Q.   And that was later in the meeting?
17            A.   Yes, I believe so.
18            Q.   Did -- did you and -- well, I'm
19    sorry.  Did Mr. Melin comment in any way on the
20    fact that Dr. Ahn had said that this information
21    came about through discovery?
22            MR. ALLEN:  Did he comment on that
23    during the first break, is that what you're asking
24    her?
25            BY MR. ZELLER:
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1            Q.   Correct.

 2            A.   During the first break?  Yes, I

 3     believe he -- he did.

 4            Q.   And what do you recall Mr. Melin

 5     saying on that subject during the first break?

 6            A.   I don't recall verbatim but we were

 7     equally surprised, both of us, and we discussed

 8     it.

 9            Q.   Please tell me, as best as you can

10     recall, what you and Mr. Melin discussed during

11     that first break on that subject about information

12     from discovery.

13            A.   We discussed the possibility that

14     that information had actually leaked through

15     discovery so that they had it in their possession.

16     We were frustrated because we were not in a

17     position to comment on that information because we

18     take our confidentiality obligations relatively

19     seriously -- actually, quite seriously.

20            Q.   Anything else you can recall

21     discussing with Mr. Melin on that subject during

22     the first break?

23            A.   Broadly speaking, that was the

24     subject that we discussed.

25            Q.   I understand.  I'm trying to find
```

```
 1    out, have you given me your complete recollection

 2    of what you and Mr. Melin discussed on that

 3    subject during the first break?

 4              A.   I'm not sure that I can respond to

 5    everything I recall without violating the

 6    attorney/client privilege.

 7              Q.   Setting aside attorney/client

 8    communications and apart from what you have

 9    already told me in your testimony, do I have your

10    complete recollection as to what you and Mr. Melin

11    discussed regarding Dr. Ahn's point about

12    discovery during the course of the first break?

13              A.   Right now, you have.

14              Q.   And you used the word "frustrated"

15    in your answer.  Was that a word that you or

16    Mr. Melin actually used?

17              A.   In that meeting?

18              Q.   Mmm mm.

19              A.   No, I don't think so.

20              Q.   Focusing on this first session that

21    you have already talked about, where Dr. Ahn spoke

22    and the things that he said as you testified

23    about, did Mr. Melin say anything during the

24    course of the first session at the June 4 meeting?

25              A.   I am sure he did.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1            Q.   Do you recall anything?

 2            A.   Not anything, you know, in -- in

 3    particular.  It was more or less Mr. Ahn who spoke

 4    most.

 5            Q.   Is there anything that you can

 6    recall Mr. Melin saying during the first session

 7    of the June 4 meeting?

 8            A.   I recall that he requested a break

 9    after we had received the offer.

10            Q.   Do you recall anything else that he

11    said?  And again I'm talking just about the first

12    session right now.

13            A.   Nothing particular.  It was normal

14    negotiation dialog.

15            Q.   Do you recall, generally, anything

16    else that Mr. Melin said during the first session

17    other than what you have told me about?

18            A.   I'm a little confused about your

19    questions.

20            Q.   I'm just trying to make sure, do

21    I have your complete recollection as to everything

22    that Mr. Melin said during the first session of

23    the June 4 meeting?

24            A.   I suppose you do.

25            Q.   And you said that there was normal
```

```
 1    negotiation dialog?

 2              A.   Yes.

 3              Q.   Do you recall anything of what

 4    Mr. Melin said that fell into the category of

 5    normal negotiation dialog?  [Pause.]

 6              I'm sorry, did you answer?  I may not

 7    have heard it.

 8              A.   I -- I didn't answer.

 9              Q.   Oh, OK.  Is there anything that you

10    can recall that falls into this category of normal

11    negotiation dialog that you mentioned that you can

12    remember Mr. Melin saying during the first

13    session?

14              A.   Are you asking, inquiring to whom

15    it was said, things like that?

16              Q.   Well, if -- if you can recall those

17    things, yes, please.  I am just trying to make

18    sure I understand and have your testimony on

19    everything that you can remember Mr. Melin saying

20    during the first session or if I have your

21    complete recollection.

22              MR. ALLEN:  You'd better break that.

23              A.   OK, he would have introduced

24    himself, you know, to all the people and he would

25    have politely responded to any questions and
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 34

```
 1    things like that.

 2              BY MR. ZELLER:

 3              Q.   Were there questions that were

 4    asked of him in the first session?

 5              A.   I don't specifically recall.

 6              Q.   Do you remember that it occurred?

 7              A.   I don't specifically remember.

 8              Q.   Did you say anything during the

 9    course of the first session?

10              A.   I think I did, yes.

11              Q.   What did you say during the course

12    of the first session?

13              A.   I introduced myself to Mr. Ahn and

14    I might have asked a clarifying question or -- or

15    two.

16              Q.   Do you recall any of the questions

17    that you asked?

18              A.   I don't specifically recall.

19              Q.   During the first session as you

20    testified when Dr. Ahn said that he knew the terms

21    of the license with Apple, did you or Mr. Melin

22    say anything in response to that during the first

23    session?

24              A.   I don't think we did.

25              Q.   When Dr. Ahn said, as you testified
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

1   earlier, that information came from discovery, did

2   you or Mr. Melin say anything in response to that

3   during the first session?

4           A.   I don't think we did.

5           Q.   When it was conveyed by Dr. Ahn

6   that this was a take it or leave it offer, in

7   substance, did you or Mr. Melin say anything in

8   response to that during the first session?

9           A.   Yes.  We thanked for the offer and

10  asked for a break to assess it.

11          MR. ALLEN:  Mike, I think Phil is trying

12  to get your attention.

13          VIDEOGRAPHER:  Sorry, just because of

14  the noise of the drilling, could you put the

15  microphone a bit higher and, madam, could you move

16  your bottle.

17          A.   Oh, sorry.

18          VIDEOGRAPHER:  Thank you very much.  But

19  if you could try and speak up a bit because of the

20  vibration caused by the drilling.  Thank you very

21  much.  Sorry to interrupt.

22          MR. ALLEN:  Thank you.

23          BY MR. ZELLER:

24          Q.   Did you or Mr. Melin say anything

25  else, other than what you just mentioned, in

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 36

```
 1      response to the offer that Samsung had made during

 2      the first session?

 3              A.   I don't think we did during the

 4      first session.

 5              Q.   And the first session ended by

 6      Mr. Melin asking for a break?

 7              A.   Yes.

 8              Q.   And then you had the break that we

 9      testified -- that you testified about previously?

10              A.   Yes.

11              Q.   And then I take it there was

12      another session at the June 4 meeting?

13              A.   Yes.

14              Q.   With the Samsung representatives?

15              A.   Yes.

16              Q.   And how long did the second session

17      last?

18              A.   Not particularly long.  I would say

19      half an hour to an hour.

20              Q.   And what's the first thing you can

21      remember happening at the second session of the

22      June 4 meeting?

23              A.   We thanked the Samsung team for the

24      offer.

25              Q.   When you say "we", who -- who said
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 37

 1   that?

 2             A.   Mr. Melin was leading the

 3   negotiation, he spoke.

 4             Q.   And then what happened next?

 5             A.   We went into discussing the offer.

 6   We rejected it and explained our reasons for it.

 7             Q.   Was this something that Mr. Melin

 8   said or was this something that you also said

 9   something about?

10             A.   Mr. Melin was speaking to that.

11             Q.   And please tell me as best as you

12   can recall what Mr. Melin said on the subject of

13   the Samsung offer?

14             A.   He said it was an improvement from

15   their previous offer, but we had some challenges

16   with it.

17             Q.   Anything else you can recall him

18   saying on the subject of the Samsung offer?

19             A.   Yes.

20             Q.   What else do you remember?

21             A.   ███████████████████████████████

██  ████████████████████████████████████████

██  █████████████████████████████  ████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████

1   ███████████████████████████████████, and

2   we wanted to illustrate our points with a few

3   slides which we showed to the Samsung team in that

4   second session.

5           Q.   This was a PowerPoint presentation?

6           A.   Yes.

7           Q.   And how many pages of PowerPoint

8   presentation were shown to the Samsung

9   representatives during this second session?

10          A.   I believe four or five.

11          Q.   And did you or Mr. Melin show the

12  pages from the PowerPoint after he said that there

13  were other licensees with less coverage that were

14  paying, or was that done at the same time when the

15  PowerPoint pages were being shown?

16          A.   I don't specifically recall whether

17  it was simultaneous or subsequent.  I would

18  probably think he first spoke and then we showed

19  the slide.

20          Q.   Is there anything else that you can

21  recall Mr. Melin saying prior to the time that the

22  PowerPoint pages were shown during the second

23  session?

24          MR. ALLEN:  Objection to the form of the

25  question, misstates testimony.  You may answer his

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    question.

 2              A.   Can you repeat, Randall?

 3              MR. ALLEN:  I objected to the question

 4    because it misstates testimony, but you may answer

 5    his question.

 6              BY MR. ZELLER:

 7              Q.   I'll -- I'll rephrase it.

 8              MR. ALLEN:  It was the "else".

 9              MR. ZELLER:  Yeah, I understand

10    I appreciate that.

11              Q.   One -- one thing that Mr. Melin

12    said was -- is that Samsung's offer, the one that

13    was presented during the first session, was an

14    improvement over the prior offer.

15              A.   (Nods).

16              Q.   Is that correct?

17              A.   Yes.

18              Q.   And was that -- was that a true

19    statement in your view, that it was an

20    improvement?

21              A.   To their previous offer, I believe

22    so.

23              Q.   Is there any written correspondence

24    or documents from Samsung that you are aware of

25    that said, in words or substance, that the offer
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 40

```
1    that was made at the June 4 meeting was take it or

2    leave it?

3              A.    They never made it in writing.

4              Q.    Has Samsung ever said, in any kind

5    of written communications to Nokia, that any offer

6    that Samsung has made is on a take it or leave it

7    basis?

8              A.    Were you asking whether written or

9    oral?

10             Q.    Has Samsung ever said in a written

11   communication that any offer it's ever made,

12   whether that offer was in writing or made orally,

13   was on a take it or leave it basis?

14             A.    It would be difficult for me to

15   respond to a question addressing "ever".  I only

16   have experience of this one negotiation with

17   Samsung.

18             Q.    Are you aware of any such instance?

19             MR. ALLEN:  In writing?

20             BY MR. ZELLER:

21             Q.    Correct.

22             A.    In writing, I am not aware of any

23   such instance in writing.

24             Q.    During the course of the June 4

25   meeting, did the subject of arbitration come up?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 41

```
 1              A.   Yes, it did.

 2              Q.   Who raised that first?

 3              A.   Well, in the course of that meeting

 4    Mr. Ahn raised it first because he said he had

 5    considered everything before making an offer and

 6    he specifically also mentioned that he had

 7    considered arbitration.

 8              Q.   And what was your understanding of

 9    Samsung's offer that was conveyed during the first

10    session of the June 4 meeting as it pertained to

11    arbitration?

12              A.   Can you clarify the question?

13              Q.   Sure.  Was it your understanding

14    that Samsung was proposing arbitration, rejecting

15    arbitration or something else?

16              A.   Samsung was proposing the offer to

17    avoid litigation and arbitration.

18              Q.   What else do you recall about the

19    terms of Samsung's offer that was made there at

20    the June 4 meeting?

21              A.   I thought we already went over

22    this, but...

23              Q.   Well, I -- you didn't mention what

24    the actual suggested or proposed terms were, so

25    now I'm trying to find that out.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 42

1              Do you recall?

2              A.   Do you want me to tell you what

3    they offered?

4              Q.   Right, I want to understand what

5    you recall about the proposal that Samsung made.

6        ███   ███   ████████████████

███   ██████████████████

8              MR. ALLEN:  Mike, this seems like a good

9    place to designate the transcript in this matter

10   as Confidential/Attorneys' Eyes Only.

11             MR. MILLER:  Highly.

12             MR. ALLEN:  Highly

13   Confidential/Attorneys' Eyes Only.  Parker wants

14   me to call it highly confidential.

15             MR. MILLER:  Under the Protective Order.

16             MR. ZELLER:  We can debate that for

17   hours afterwards.

18             MR. ALLEN:  But we won't.

19             BY MR. ZELLER:

20             Q.   Is there anything else that you can

21   recall about the terms of Samsung's offer that

22   Dr. Ahn conveyed during the first session of the

23   June 4 meeting?

24             A.   Like I said, he mentioned that the

25   offer was only on the table that day.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1                Q.   I'm trying to find out if there is
 2     any additional specific terms of Samsung's offer
 3     that Dr. Ahn conveyed during that first session
 4     that you haven't already told me about?
 5                A.   No, I don't think so.
 6                Q.   Do we still have copies of
 7     exhibit 1?  Is exhibit 1 a copy of the PowerPoint
 8     presentation that Nokia showed Samsung during the
 9     June 4 meeting?
10                MR. ALLEN:  I will just point out so
11     that the record is clear, as I did in the earlier
12     deposition, that this document has been redacted
13     on page 003.  I don't think anybody is suggesting
14     that was in the original document.
15                BY MR. ZELLER:
16                Q.   That's correct.
17                A.   It looks like the document that we
18     showed.
19                Q.   Directing your attention to the
20     third page.  Do you see where it says:
21                ███████████████████████████████
22                In two different places, do you see
23     that?
24                A.   Yes.
25                Q.   Did you or Mr. Melin make any
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 44

```
 1    ████████████████████████████████    during

 2    the course of the June 4 meeting?

 3              A.   When we showed this slide, we did.

 4              Q.   Apart from showing the slide, was

 5    there any statement or comment made about the

 6    ███████████████████████

 7              ████   ██████████████████████████

 8    ██████████████████████████████

 9              Q.   Was anything else said about the

10    ████████████████████

11              A.   I don't specifically recall.

12              Q.   Do you recall if anything else was

13    said?

14              A.   I don't specifically recall.

15              Q.   I'm not asking specifically.  Do

16    you have any recollection that anything else was

17    said even if you can't recall what it was?

18              A.   My response is I don't specifically

19    recall.

20              Q.   I am not asking if you specifically

21    recall.  Please tell me anything else that you

22    recall, even generally, being said about the

23    ████████████████████████    during the course of the

24    June 4, 2013 meeting?

25              MR. ALLEN:  Object to the form of the
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

```
 1    question.  It's asked and answered.  You can

 2    answer it again.

 3              A.   Right now -- right now, I do not

 4    recall.

 5              BY MR. ZELLER:

 6              Q.   During the course of the June 4

 7    meeting, did you or Mr. Melin convey any

 8    information about who these other licensees were

 9    paying the ███████████

10              A.   No, we did not.

11              Q.   Did anyone from Samsung ask?

12              A.   I don't think they did.

13              Q.   Did you say anything about the

14    PowerPoint pages during the course of the June 4

15    meeting or was it only Mr. Melin?

16              A.   Mr. Melin was speaking to my

17    recollection.

18              Q.   So I take it you don't recall

19    saying anything about any of the information in

20    the PowerPoint, is that correct?

21              A.   No, I don't recall.

22              Q.   Directing your attention back to

23    page 3, you will see here where it says:

24              "Samsung's rate of 2.4 per cent was

25    publicly disclosed in Apple litigation."
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 46

```
 1                 Do you see that?

 2           A.   Yes.

 3           Q.   Do you have an understanding as to

 4    what that's referring to?

 5           A.   Yes.

 6           Q.   What's your understanding?

 7           A.   It is referring to an expert report

 8    which has been cited widely.

 9           Q.   It had been cited in the press?

10           A.   Yes.

11           Q.   And what was being cited was a

12    statement by Apple's attorneys that it made --

13    that they made rather during the course of

14    litigation with Samsung; right?

15           MR. ALLEN:  Objection, form.

16           A.   I don't think so.  I think it was

17    an expert statement --

18           BY MR. ZELLER:

19           Q.   What's your --

20           A.   -- that was cited.

21           Q.   I'm sorry, I didn't mean to cut you

22    off there.

23                 What's your understanding of what

24    litigation that was?

25           A.   It was a litigation between Samsung
```

```
 1    and Apple.

 2              Q.   Do you know which particular

 3    litigation?

 4              A.   I cannot recall.

 5              Q.   Do you remember what country it was

 6    in?

 7              A.   In the US.

 8              Q.   Were you the one who tracked down

 9    this information about Samsung's rate of

10    2.4 per cent was publicly disclosed in Apple

11    litigation?

12              A.   I was not.

13              Q.   Do you know who did?

14              A.   Yes.

15              Q.   And who was that?

16              A.   That was people in the litigation

17    team and in -- in our licensing team.

18              Q.   Do you know specifically by name

19    who did?

20              A.   Susanna Martikainen.

21              Q.   Is there anything else that you can

22    recall Mr. Melin saying during the time period

23    when any of the pages in the PowerPoint were up at

24    the June 4 meeting?

25              A.   I believe we also made a reference
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
1     to public sales figures of Apple and Nokia at the

2     time the Apple license was done and that was to

3     point out that there are differences.  We were not

4     in a position to comment on any details, but we

5     did make a reference to the public -- publicly

6     disclosed sales figures.

7              Q.   Is there anything else you can

8     remember Mr. Melin saying during the course of the

9     time when any of the PowerPoint pages were up at

10    the meeting?

11             A.   Any of the PowerPoint pages, yes.

12             Q.   What else?

13             A.   We offered a solution to Samsung.

14    We wanted to discuss our potential response

15    regarding extension of the agreement and we

16    explained the options and also suggested that we

17    might consider an additional option, which was to

18    arbitrate.

19             Q.   And are you referring to a

20    particular page of the PowerPoint?

21             A.   Yes, I am.

22             Q.   Which one, please?

23             A.   I am referring to slide number 4.

24             Q.   And was that -- that comment made

25    during the second session of the -- excuse me --
```

```
 1       of the June 4 meeting or did that happen later on?

 2             A.   I don't have a specific

 3       recollection of that.

 4             Q.   Looking at page 4 of this

 5       PowerPoint, you will see that there is an option

 6       2(b) that refers to the option of voluntary

 7       binding arbitration?

 8             A.   Yes.

 9             Q.   Is this a proposal that Nokia was

10       making?

11             A.   Yes.

12             Q.   Prior to the time of the June 4

13       meeting, had Nokia offered arbitration as an

14       option?

15             A.   No, I don't think so.

16             Q.   Had -- had Nokia made a decision

17       prior to the June 4 meeting that it would

18       potentially offer to Samsung arbitration as an

19       option?

20             A.   We had not made a decision.

21             Q.   But I take it it was discussed in

22       advance of the meeting, though?

23             A.   We were considering it because the

24       parties were so far apart in the negotiation.

25             Q.   And I take it that was something
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

1    that, at least internally there at Nokia, you were

2    considering as being potentially beneficial as an

3    option to offer to Samsung?

4              MR. ALLEN:  I'm going to object to the

5    form of the question as outside the scope and

6    instruct the witness not to answer with regard to

7    her internal deliberations about negotiating

8    strategy.  You can answer all questions about what

9    was discussed at the June 4 meeting.

10             BY MR. ZELLER:

11             Q.   Well, prior to the June 4 meeting,

12   was Samsung proposing arbitration?

13             A.   No, I don't think so.

14             Q.   Was Nokia the first party at the

15   June 4 meeting to propose as a actual option

16   arbitration?

17             A.   Yes --

18             MR. ALLEN:  Objection, asked and

19   answered.  I apologize for the interruption.

20             A.   Yes, I believe so.

21             BY MR. ZELLER:

22             Q.   Was there anything that happened at

23   the June 4, 2013 meeting that caused Nokia to

24   offer option 2(b) of arbitration?

25             A.   Yes, we did think that the parties

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

1    seemed too far apart.

2           Q.   Was there anything else that, in

3    your view, prompted Nokia to offer arbitration as

4    a -- as an option to Samsung?

5           MR. ALLEN:  I'm going to again interpose

6    an objection as outside the scope and caution the

7    witness not to reveal the internal deliberations

8    and licensing strategy.  But you can describe

9    any -- to Mr. Miller any of the discussions that

10   occurred at the June 4 meeting.

11          BY MR. ZELLER:

12          Q.   Can you answer the question?

13          A.   What was the question?

14          Q.   Apart from the parties being so far

15   apart, was there anything else that prompted

16   Nokia --

17          MR. ALLEN:  Sorry about that, Mike.

18   I think I called you Mr. Miller.  Mr. Zeller.

19          BY MR. ZELLER:

20          Q.   Apart from the parties being so far

21   apart, was there anything else that prompted Nokia

22   to put on the table arbitration as an option, as

23   reflected here in the PowerPoint?

24          MR. ALLEN:  Object to the question, it's

25   outside the scope.  I caution the witness not to

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

1    reveal the internal licensing strategy of Nokia if

2    you can -- if you can respond to his question by

3    describing what was discussed at the meeting on

4    June 4.

5              A.   In the meeting, no.

6              BY MR. ZELLER:

7              Q.   When was page 4 of the PowerPoint

8    drafted?  Was it drafted before the June 4 meeting

9    or did you draft it during the course of the

10   meeting?

11             A.   I don't fully recall.

12             Q.   Do you recall preparing any portion

13   of this PowerPoint actually during the meeting?

14             MR. ALLEN:  You would include in that

15   during the breaks?

16             MR. ZELLER:

17             Q.   Yes, at any time.

18             A.   Yes.

19             Q.   Did you prepare this option 2(b)

20   portion during any part of the June 4 meeting?

21             A.   I don't think so.

22             Q.   So focusing still on this second

23   session of the June 4 meeting, we have talked

24   about what Mr. Melin said and then that there were

25   discussions with this PowerPoint as part of the

```
 1    discussions.  Is there anything else that you can
 2    recall being said by Mr. Melin during the second
 3    session so far other than what you have already
 4    mentioned?
 5              A.   I'm not entirely sure what I have
 6    mentioned to you, but generally I think you have
 7    the core of it.
 8              Q.   During the time period when
 9    Mr. Melin was showing any of these pages of the
10    PowerPoint during the second session, did anyone
11    from Samsung say anything in response?
12              A.   Yes.  I believe there was a dialog
13    at least when we presented the possible contents
14    of the response.
15              Q.   You are talking about the part
16    where Mr. Melin was talking about how Samsung's
17    proposal was an improvement from the prior offer
18    but it was being rejected, about that portion of
19    it?
20              A.   No, I --
21              MR. ALLEN:  Objection, mischaracterizes
22    the testimony.  You may answer.
23              A.   I wasn't talking about that
24    portion.  I was talking about our offer.
25              BY MR. ZELLER:
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 54

1             Q.   I'm sorry, it may be I'm not

2     entirely following.  When you say "our offer",

3     was -- was an offer made by Nokia in the second

4     session?

5             A.   Well, we wanted to discuss our

6     potential response to Samsung, so perhaps not

7     verbatim an offer, but a potential response and

8     Samsung did comment on the potential response.

9             Q.   Please tell me what you recall

10    Samsung saying during the second session?

11            A.   During the second session.  OK.

12    ███████████████████████████████████████

   ██ ███████████████████████████████████

   ██ ██████████████████████████████████

   ██ ██████████████████████████  ██████████████

   ██ ████████████████████████████████████████████

   ██ ████████████████████████████████████████

   ██ ███████████████████████████████████████

   ██ ██████████████████████████████

   ██ █████████████

21            I recall that we explained that it is

22    ████████████████████████████████████████

   ██ ████████████████████████████████████

   ██ ████████████████████████████  and I recall

25    Mr. Ahn saying that he had some flexibility, but

```
 1    it was around his figure, not ours.  And then

 2    I also recall that he accepted the arbitration as

 3    an option.

 4              Q.   And when you say Dr. Ahn accepted

 5    the arbitration as an option, was this in response

 6    to Nokia first offering arbitration as an option

 7    as you talked about before?

 8              A.   Yes.  He said he would not accept

 9    option number 1 or option number 2, so he

10    basically then said, "Let's arbitrate."

11              Q.   During the course of your answer,

12    you were using the phrase "we" explained or "we"

13    said.  Did Mr. Melin make these statements that

14    you testified to?

15              A.   I believe he did.  He was leading

16    the negotiation and he was -- he was speaking.

17              Q.   At any time during the course of

18    this June 4 meeting, did Mr. Melin express in any

19    way disappointment or frustration over the fact

20    that Samsung was accepting arbitration as an

21    option?

22              MR. ALLEN:  Objection to the form of the

23    question, it's vague.

24              A.   Can you clarify?

25              MR. ALLEN:  You may answer.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 56

```
 1              A.   Can you clarify your question?

 2              BY MR. ZELLER:

 3              Q.   Was it your understanding that

 4    Mr. Melin was opposed to arbitration as an option?

 5              A.   Well, we were there to negotiate a

 6    license deal, so obviously it's always much better

 7    if you can do a deal.  But arbitration to bridge

 8    the gap, if you are not likely to reach a deal,

 9    was not anything that Mr. Melin expressed being

10    opposed to.

11              Q.   Did -- did your understanding --

12    strike that.

13              Do you have any reason to think that

14    Dr. Ahn's statements about the Apple/Nokia license

15    during the course of the June 4 meeting had any

16    relationship to Nokia offering arbitration as an

17    option?

18              MR. ALLEN:  Which, which statements

19    about the Apple/Nokia cases?

20              BY MR. ZELLER:

21              Q.   Any.  Any statements about the

22    Apple/Nokia license.

23              A.   Well, it was quite clear to us that

24    Mr. Ahn thought that he knew what Apple was paying

25    us and would quantify his offer accordingly and we
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 57

```
1    were not in a position to comment on various

2    aspects which differentiate the situations between

3    Nokia and Apple when the license agreement was

4    done and between Nokia and Samsung in the current

5    licensing negotiation.

6              So in that context, I would say, yes, it

7    contributed to arbitration being a viable option

8    because the gap remained big.

9         Q.   A gap that existed prior to the

10   June 4 meeting, right?  An even larger gap that

11   existed prior to the June 4 meeting?

12        A.   There was a gap prior to the June 4

13   meeting, but there was a gap in the June 4 meeting

14   as well after they presented the offer.

15        Q.   The gap between the parties prior

16   to the June 4 meeting was larger than the gap that

17   existed at the June 4 meeting after Samsung had

18   made its initial offer?

19        A.   That's true.

20        Q.   Did Dr. Ahn, at any time, state

21   what he knew the terms of the Apple license -- the

22   Apple/Nokia license were?

23        A.   Yes, he did.

24        Q.   Did he say this during the first

25   session?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 58

1          A.   I believe he specified them later.

2          Q.   When you say "later", what session?

3          A.   I believe the second session.

4          ██   ███████████████████████████

██    ██   █████████████████████████████

██   █████████████████████████████████████

██   █████████████████████████████████████

██   ████████████████

██    ██   ████████████████████████████████

██   ██████████████████

██    ██   ███████████████████████████

██    ██   █████████████████████████████████████

██   ██████████████████████████████████

██    ██   ██████████████████████

██    ██   ████████████████████████████████

██   ████████████████████████████

██    ██   ██████████████████████████████

██   ████████████████████

██    ██   █████████████████████    ██████████████

██   ██████████████████████████████████████

██   ██████████████████████████████████████

██   ██████████████████████

██        ████████████████    ██████████████████████

██   ████████████████    ████████████████    ██████████████

██   █████████████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 59



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA — 11/25/2013

```
 1   describe the ████████████ amount?

 2          A.   I don't remember whether he used

 3   the word "royalty".  Probably not.  I think he

 4   talked about what Apple pays.

 5          Q.   And when Dr. Ahn said this during

 6   the second session, as you have been testifying,

 7   was it in response to anything that Mr. Melin

 8   said?

 9          A.   No, it wasn't.

10          Q.   So when in the -- when in the

11   sequence, when in the order of the second session

12   did Dr. Ahn say these things?  Was it before or

13   after the PowerPoint or during it?

14          A.   I think it probably was during it

15   at some point.  We showed several slides while the

16   dialog was pending.

17          Q.   Which of the slides?

18          A.   I don't remember specifically.

19          Q.   Was it in response to the

20   ████████████████████

21          A.   It could have been.

22          Q.   Is it your recollection that it

23   was?

24          A.   It's possible.

25          Q.   I am not asking if it's possible.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

```
 1    I am asking you about your memory.  Do you

 2    remember it being in response to the ████████████

      █   ████████████

 4             MR. ALLEN:  Objection, asked and

 5    answered.  You may answer it again.

 6             A.   I believe it could have been when

 7    we discussed slide number 3, which includes the

 8    ████████████████████████████

 9             BY MR. ZELLER:

10             Q.   Other than what you have testified

11    to what, if anything else, did Dr. Ahn say during

12    the second session?

13             A.   I don't know that he said much

14    else.  I think we have covered most of it.

15             Q.   Is there anything else you do

16    remember --

17             A.   Right now --

18             Q.   Or do I have you complete --

19             A.   --  right now, I don't.

20             Q.   Is there anything else that you can

21    recall Mr. Melin saying during this second session

22    that you haven't testified to or do I have your

23    complete -- complete recollection as to what he

24    said during the second session?

25             A.   I do recall that before we ended
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

1    the meeting I think there was an exchange about

2    comparing Samsung and Apple in -- in terms of unit

3    sales, and I believe we pointed out that Samsung

4    was bigger than Apple.

5              Q.   Unit sales.  And when you say "we"

6    pointed out that Samsung was bigger than Apple,

7    that was something Mr. Melin said?

8              A.   Yes, I believe so.

9              Q.   During that second session, was

10   there anything else that was said about Samsung

11   and Apple apart from that?

12             A.   I don't think so.

13             Q.   At any time during the course of

14   the June 4 meeting, did Mr. Melin say, in words or

15   substance, that Nokia had licensees that were

16   paying ███████████████████

17             A.   Yes.

18             Q.   And was that in connection with the

19   smaller companies that you were mentioning

20   earlier?

21             A.   Yes, I believe so.

22             Q.   Did he say anything else about any

23   licensees ██████████████████████ apart

24   from the smaller companies?

25             A.   No, I don't think so.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 63

```
 1              Q.    Apart from that, that statement

 2    that Mr. Melin made about smaller companies paying

 3    ███████████████        was there any information that

 4    was conveyed by Nokia to Samsung during the June 4

 5    meeting as to anyone or any company that was

 6           ███████████████████████

 7              A.    That was a long question.

 8              Q.    Sure.

 9              A.    Can you repeat it?

10              Q.    Sure.  You have already told me

11    about the statement that Mr. Melin made where he

12    said, in effect, that there were smaller companies

13    that were -- that were paying ████████████████████

██      ████████████    Do you recall that?

15              A.    (Nods).

16              Q.    I'm sorry, you need to verbalize.

17              A.    Yes, yes.

18              Q.    So setting that aside, was there

19    any statements or any other information that was

20    conveyed about whether or not there were other

21    licensees, or any licensees, that were paying the

22    ███████████████        was that the complete statement?

23              A.    We said we have licensees that are

24    paying ████████████████████

25              Q.    And this was during the second
```

```
 1    session?

 2              A.   Yes, I believe so.

 3              Q.   Did you give any information

 4    about -- about those licensees?

 5              A.   No, we didn't.

 6              Q.   Did he say that they were smaller?

 7              A.   We said we have smaller companies

 8    paying more than Samsung was offering for licenses

 9    which were less covering than the one Samsung has.

10              Q.   So there was one statement on this

11    subject or two?

12              MR. ALLEN:  Objection to the form of the

13    question.  It's vague.  You may answer the

14    question.

15              A.   It might have been one statement or

16    it might have been two statements, but those

17    matters were conveyed.

18              MR. ALLEN:  Mike, let's do a time check.

19    Where are we at?  Rachel, did you get a time

20    report there?

21              MS. KASSABIAN:  It says one hour 40.

22              MR. ZELLER:  I've been timing it and I

23    have an hour and 36.

24              MS. KASSABIAN:  Yeah.

25              VIDEOGRAPHER:  Well, we have shot
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 65

```
 1    one hour and 40 minutes since this deposition

 2    began.

 3            MS. KASSABIAN:  I think he was including

 4    the few minutes where he introduced --

 5            MR. ZELLER:  Right, he's including the

 6    introduction.  I don't think it's going to --

 7            MS. KASSABIAN:  When he started

 8    talking he --

 9            MR. ALLEN:  Let's -- we got a few more

10    minutes.  Let's go ahead.

11            MS. KASSABIAN:  OK.

12            BY MR. ZELLER:

13            Q.   This statement about smaller

14    companies paying more with less covering, that

15    was -- what was -- what was Mr. Melin comparing it

16    to?  Was he comparing it to ███████████ or

17    something else?

18            MR. ALLEN:  Objection to the form of the

19    question, foundation.  You may answer.

20            A.   Can you clarify your question?

21            BY MR. ZELLER:

22            Q.   Well, you said that smaller

23    companies are paying more with less covering.  Do

24    you recall that?

25            A.   Yes.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 66

```
 1              Q.    More than what?

 2              A.    We were discussing Samsung's offer

 3     and the reasoning why we rejected it.

 4              Q.    Is it a true statement that there

 5     are companies paying ██████████████████████

 6              A.    Yes.

 7              Q.    Who are they?

 8              MR. ALLEN:  Object to the form of the

 9     question.  It's outside the scope.  I instruct the

10     witness not to answer the question.

11              BY MR. ZELLER:

12              Q.    Other than what you have testified

13     to, is there anything else that you can recall

14     occurring during the second session of the June 4

15     meeting or do I have your complete recollection on

16     that now?

17              A.    I believe you have my complete

18     recollection as of now.

19              Q.    And then what happened after the

20     second session?

21              A.    There was a break.

22              Q.    And did you and Mr. Melin discuss

23     anything pertaining to the meeting during the

24     break?

25              A.    I don't really recall.
```

```
 1              Q.   Do you recall having any

 2    discussions with Mr. Melin during that break after

 3    the second session as it related to the

 4    Apple/Nokia license in any way?

 5              MR. ALLEN:  Just let me just interpose

 6    an objection to the extent your question calls for

 7    the witness to disclose attorney/client privilege

 8    or attorney work product information.  I caution

 9    the witness not to do so in -- in her answer.

10    Other than that, you may answer the question.

11              BY MR. ZELLER:

12              Q.   And just to clarify, I'm only

13    asking "yes" or "no" at this point.

14              A.   No.

15              BY MR. ZELLER:

16              Q.   Again, it makes it easier.

17              And then was there another session at

18    the meeting?

19              A.   You know, I don't really have a

20    clear recollection, you know.  I think the second

21    break might have been, you know, very much at the

22    end of the meeting.

23              Q.   Let me try it this way.  Do you

24    recall the substance of anything that occurred

25    further at the June 4 meeting after that second
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

Page 68

```
 1    break?

 2              A.   In addition to what we have already

 3    discussed, I don't think I do.

 4              Q.   And so I take it that at this point

 5    I have your complete recollection of what occurred

 6    at the June 4 meeting?

 7              A.   Yes, except that they invited us to

 8    dinner.

 9              Q.   And apart from that, that would --

10    is there anything else you can recall occurring at

11    the June 4 meeting other than of course what you

12    have already told me today?

13              A.   Right -- right now, I don't think

14    so.

15              Q.   And then you did go to dinner?

16              A.   We did go to dinner.

17              Q.   All right.  Well, I'm almost out of

18    time, but let me just take a minute, check my

19    notes and see if there is anything I have as a

20    short follow-up.

21              MR. ALLEN:  Thanks.

22              VIDEOGRAPHER:  Going off the record.

23    The time is 20:46.

24    (8.46 pm)

25                      (Off the record.)
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

1    (8.54 pm)

2              COURT REPORTER:  We are back on the

3    record at 20:54.

4              MR. ZELLER:  So we are, I think, at our

5    allotted time and I have no further questions for

6    this witness for at least today.

7              Obviously there are disputes that may or

8    may not arise between the parties that we will

9    discuss, but we will leave that all for another

10   day.

11             MR. LANTIER:  I have no questions and as

12   an abundance of caution, I'll designate the

13   transcript on behalf of Apple and we will review

14   it and designate it as appropriate.

15             MR. ALLEN:  And when you say designate

16   it, do you mean Highly Confidential/Attorneys'

17   Eyes Only?

18             MR. LANTIER:  That's correct.

19             MR. ALLEN:  I have no questions either

20   and I think I have already designated this

21   deposition as Highly Confidential/Attorneys' Eyes

22   Only.

23             MR. ZELLER:  And also, just so it is

24   clear because I think you are right, I don't

25   remember offhand how we specifically designated

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

1    the first transcript of Mr. Melin.  But Samsung

2    designates that transcript as Highly

3    Confidential/Attorneys' Eyes Only under the

4    Protective Order in case there was any question

5    about that.

6              MR. ALLEN:  I think we all did.

7              MR. ZELLER:  I think the only issue is

8    we may have said "designated" and I don't remember

9    how clear we were because there is actually a

10   difference.  So also with respect to this

11   transcript we also designate this transcript

12   Highly Confidential/Attorneys' Eyes Only.

13             COURT REPORTER:  All parties present

14   today requested a rough transcript of this

15   deposition hearing.  The witness is to read and

16   sign.

17

18

19     (Whereupon the deposition concluded at 8.56 pm)

20

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF COURT REPORTER

 3

 4     I, TRISH BRADY, an Accredited Realtime Reporter, hereby

 5     certify that the testimony of the witness MS. EEVA KAARINA

 6     HAKORANTA in the foregoing transcript, numbered pages 6

 7     through 70, taken on Monday, November 25, 2013, was recorded

 8     by me in machine shorthand and was thereafter transcribed by

 9     me; and that the foregoing transcript is a true and accurate

10     verbatim record of the said testimony.

11

12     I further certify that I am not a relative, employee,

13     counsel or financially involved with any of the parties to

14     the within cause, nor am I an employee or relative of any

15     counsel for the parties, nor am I in any way interested in

16     the outcome of the within cause.

17

18

19

20

21     Signed:  ........................

22     TRISH BRADY

23     Dated:   ........................

24

25
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 72

```
1                    DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to: _____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to: _____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to: _____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change:_____

24   Page No._____Line No._____Change to: _____

25   _____
```

1    Reason for change:_____

2    Page No._____Line No._____Change to: _____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to: _____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to: _____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to: _____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to: _____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to: _____

18   _____

19   Reason for change:_____

20

21   SIGNATURE: _____DATE:_____

22   MS. EEVA KAARINA HAKORANTA

23

24

25

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 1

**A**

**abundance**
69:12
**accept**
55:8
**accepted**
55:2,4
**accepting**
55:20
**Accredited**
1:24 71:4
**accurate**
71:9
**acting**
25:13
**actively**
6:13,15,19
**actual**
19:22 41:24 50:15
58:16
**addition**
9:23 68:2
**additional**
43:2 48:17
**addressed**
37:24
**addressing**
21:5,13 40:15
**advance**
49:22
**advice**
25:18,24 26:12
**advisor**
25:14 26:18
**ago**
6:20
**agreement**
48:15 57:3
**ahead**
65:10
**Ahn**
19:1,12,22 20:19
21:17 22:2,11 23:1
23:24 24:6,17 27:1,8

27:12 28:7,8,19 29:3
29:9,14,20 31:21
32:3 34:13,20,25
35:5 41:4 42:22 43:3
54:13,18,25 55:4
56:24 57:20 60:5,12
61:11
**Ahn's**
20:8 31:11 56:14
**al**
2:2 4:13
**Allen**
2:13 4:22,22 8:15 9:1
11:1,20 12:9 13:19
14:2,25 15:2,22
16:19 17:22 18:11
23:4 26:3 27:3 28:9
29:22 33:22 35:11,22
38:24 39:3,8 40:19
42:8,12,18 43:10
44:25 46:15 50:4,18
51:5,17,24 52:14
53:21 55:22,25 56:18
58:23 61:4 64:12,18
65:9,18 66:8 67:5
68:21 69:15,19 70:6
**allotted**
69:5
**Alston**
2:9 15:7
**AMERICA**
1:10,11
**amount**
54:17 58:6,22 59:5,9
59:15 60:1
**Angeles**
2:4
**annual**
58:6 59:16,17,23
**annually**
59:22
**answer**
11:13,15,21 13:20
14:2 15:23 16:20

18:4,11 27:3 31:15
33:6,8 38:25 39:4
45:2 50:6,8 51:12
53:22 55:11,25 58:24
61:5 64:13 65:19
66:10 67:9,10
**answered**
11:21 13:20 45:1
50:19 58:24 61:5
**Antush**
2:22 8:25
**anybody**
43:13
**apart**
8:6 31:8 44:4 49:24
51:1,14,15,20,21
62:11,23 63:1 68:9
**apologize**
50:19
**Appearing**
2:2,8,15
**Apple**
1:4 2:15 4:12 5:1
19:16 23:3 27:9
28:20 34:21 45:25
47:1,10 48:1,2 56:24
57:3,21 58:5 60:4
62:2,4,6,11 69:13
**Apple's**
46:12
**Apple/Nokia**
56:14,19,22 57:22
67:4
**appreciate**
39:10
**appropriate**
69:14
**approximately**
54:17
**arbitrate**
48:18 55:10
**arbitration**
40:25 41:7,11,14,15
41:17 49:7,13,18

50:12,16,24 51:3,22
55:2,5,6,20 56:4,7,16
57:7
**aside**
26:10 31:7 63:18
**asked**
11:20 13:19 34:4,14
34:17 35:10 45:1
50:18 54:23 58:24
61:4
**asking**
8:11 12:19 13:5 18:3
22:9 29:23 33:14
36:6 40:8 44:15,20
60:25 61:1 67:13
**aspects**
57:2
**assess**
35:10
**assume**
10:5
**Atlanta**
2:11
**Atlantic**
2:10
**attended**
7:4 18:21
**attention**
35:12 43:19 45:22
**attorney**
6:6 26:1 67:8
**attorneys**
8:12 46:12
**attorney/client**
17:24,25 26:20 31:6,7
67:7
**available**
54:19
**Avenue**
2:16
**avoid**
41:17
**aware**
39:24 40:18,22

**B**

**back**
16:11 25:10 37:24
38:1 45:22 54:15
69:2
**Bar**
6:8,9,11
**basically**
55:10
**basis**
40:7,13
**began**
65:2
**beginning**
4:2
**behalf**
2:2,8,15 4:23,25 5:3
5:24 69:13
**believe**
9:8 22:5 25:25 29:17
30:3 38:10 39:21
47:25 50:20 53:12
54:12 55:15 58:1,3
58:11,18,19 59:10
61:6 62:3,8,21 64:2
66:17
**beneficial**
50:2
**best**
23:10,12,21 30:9
37:11
**better**
33:22 56:6
**big**
57:8
**bigger**
62:4,6
**billion**
42:6
**binding**
49:7
**Bird**
2:9 4:10,10 15:3,3,7,7
15:7

**bit**
21:7 35:15,19
**boiled**
20:25
**bottle**
35:16
**Brady**
1:24 5:3 71:4,22
**break**
17:5,7 22:17,20,22,25
24:24 25:4,13,22
26:14,25 28:2 29:2,7
29:23 30:2,5,11,22
31:3,12 32:8 33:22
35:10 36:6,8 66:21
66:24 67:2,21 68:1
**breaks**
19:8 52:15
**BRIAN**
2:13
**bridge**
56:7
**Broadly**
30:23

**C**

**C**
2:1
**California**
1:1,4 2:4 4:15
**call**
42:14
**called**
51:18
**calls**
67:6
**cap**
59:15,16,17,19,23
**capacity**
25:14
**capped**
58:7,15 59:20,22
**case**
1:7 4:16 70:4
**cases**

56:19
**category**
33:4,10
**cause**
71:14,16
**caused**
35:20 50:23
**caution**
14:3 51:6,25 67:8
69:12
**cent**
17:17,18 43:21 44:1,6
44:10,23 45:24 47:10
60:20 61:2,8 62:16
63:14 66:5
**Center**
2:10
**CERTIFICATE**
71:2
**certify**
71:5,12
**challenges**
37:15
**change**
72:3,5,6,8,9,11,12,14
72:15,17,18,20,21,23
72:24 73:1,2,4,5,7,8
73:10,11,13,14,16,17
73:19
**characterized**
21:22
**check**
64:18 68:18
**cited**
46:8,9,11,20
**clarify**
41:12 55:24 56:1
65:20 67:12
**clarifying**
34:14
**clear**
43:11 56:23 59:18
67:20 69:24 70:9
**Clemens**

9:6
**client**
26:2
**come**
29:12 40:25
**comment**
28:7,9,19 29:19,22
30:17 44:5 48:4,24
54:8 57:1 58:8
**commented**
28:13
**communicated**
13:21
**communication**
13:16 14:20,24 17:25
40:11
**communications**
10:11,19,25 11:1,4,8,9
11:17 12:1,3,7,17,20
14:4,5 25:3,16,23
31:8 40:5
**companies**
37:22 62:19,24 63:2
63:12 64:7 65:14,23
66:5
**company**
1:11 63:5
**comparing**
62:2 65:15,16
**complementing**
16:25
**complete**
22:12,15 31:1,10
32:21 33:21 61:18,23
61:23 63:22 66:15,17
68:5
**computer**
15:21,24,25
**concept**
28:10
**concerned**
10:20
**concerning**
10:8

concluded
70:19
confidential
19:18 21:14 42:14
confidentiality
30:18
Confidential/Attorn...
1:16 42:10,13 69:16
69:21 70:3,12
confused
32:18
connection
15:13 58:21 59:8,12
62:18
consider
21:24 48:17
considered
20:12 41:5,7 54:14
considering
49:23 50:2
contact
25:7
contents
14:5 53:13
context
21:13 57:6
contributed
57:7
conversation
24:25 25:2,25
convey
27:16,20 28:1 45:7
conveyed
35:5 41:9 42:22 43:3
63:4,20 64:17
copied
15:7
copies
43:6
copy
43:7
core
53:7
corporation

1:4,9,10
correct
7:6 8:11 12:12 16:14
17:19 30:1 39:16
40:21 43:16 45:20
69:18
correctly
6:6
correspondence
39:23
counsel
2:22 4:17 8:16 13:22
14:6 17:23 18:1
71:13,15
country
47:5
couple
14:16 20:22
course
8:7 15:17 20:19 21:2
23:14,23 24:23 31:12
31:24 34:9,11 40:24
41:3 44:2,23 45:6,14
46:13 48:8 52:9
55:11,17 56:15 62:13
68:11
court
1:1 4:15 5:2,5 69:2
70:13 71:2
coverage
38:13
covered
16:24 61:14
covering
37:23 64:9 65:14,23
create
15:16
created
13:8
current
6:22 57:4
currently
5:17 6:10
cut

46:21
CUTLER
2:16

## D

D
3:2
date
4:7 73:21
Dated
71:23
day
14:15,16 42:25 69:10
days
14:16
de
9:25
deal
56:6,7,8
Deanna
9:25
debate
42:16
decide
26:23
decision
49:16,20
Defendants
1:13
definitely
19:25 23:15 27:23
Delaware
1:11
deliberations
50:7 51:7
deposition
1:19 4:10 17:21 18:2,9
43:12 65:1 69:21
70:15,19 72:1
describe
13:24 23:25 24:20
51:8 60:1
described
13:8 19:21 20:7 24:5,6
24:16

describing
52:3 59:4
designate
42:9 69:12,14,15
70:11
designated
1:16 69:20,25 70:8
designates
70:2
details
48:4
determines
18:1
dialog
32:14 33:1,5,11 53:12
60:16
difference
70:10
differences
48:3
different
26:8 43:22
differentiate
57:2
difficult
40:14
diminished
38:1
dinner
68:8,15,16
direct
3:9 5:10 7:10
Directing
43:19 45:22
directly
7:14
director
6:23
disappointment
55:19
disclose
14:4 67:7
disclosed
45:25 47:10 48:6

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 4

**discovery**
21:13 23:13,18 29:21
30:12,15 31:12 35:1
**discuss**
27:1,7 48:14 54:5
66:22 69:9
**discussed**
8:5,9,19,22 9:10,11,14
10:17,21 26:13,17
30:7,10,13,24 31:2
31:11 49:21 50:9
52:3 61:7 68:3
**discussing**
26:11 30:21 37:5 66:2
**discussion**
25:12 28:18
**discussions**
7:23 9:20 10:10 24:4
24:11,12 25:21 51:9
52:25 53:1 67:2
**disputes**
69:7
**District**
1:1,1 4:15,15
**Division**
1:2 4:16
**document**
43:12,14,17
**documents**
12:24 13:14 18:1,7,9
18:15 39:24
**DORR**
2:16
**Dr**
19:22 20:8,19 21:17
22:2,11 23:1,24 24:6
24:17 27:1,8,12 28:7
28:8,19 29:3,9,14,20
31:11,21 34:20,25
35:5 42:22 43:3 55:4
56:14 57:20 60:5,12
61:11
**draft**
12:24 52:9

**drafted**
52:8,8
**drilling**
35:14,20
**duly**
5:7
**D.C**
2:17

---
E
---

**E**
2:1,1 3:2
**earlier**
35:1 43:11 62:20
**easier**
67:16
**education**
6:7
**Eeva**
1:20 3:7 4:11 5:6,13
71:5 73:22
**effect**
63:12
**either**
11:3,9 17:20 19:22
69:19
**Electronics**
1:9,10 4:12
**Email**
2:5,12,18
**EMANUEL**
2:3
**Emma**
9:24
**employed**
5:17 8:9
**employee**
71:12,14
**encroach**
17:24
**ended**
36:5 61:25
**entire**
1:16 6:1 9:15
**entirely**

53:5 54:2 59:17
**entirety**
5:22 16:24 19:2,6
**equally**
30:7
**ERRATA**
72:1
**ESQ**
2:6,7,13,13,19
**et**
2:2 4:13
████
██
██████
███████████
██████
████
**everybody**
9:18
**exact**
15:10 28:3 59:3,6,7
**exactly**
14:19 58:4
**EXAMINATION**
1:19 3:9 5:10
**exchange**
62:1
**excuse**
48:25
**exhibit**
43:7,7
**existed**
57:9,11,17
**expectation**
10:24 11:16,22
**expected**
58:7
**expecting**
54:16
**experience**
40:16
**expert**
46:7,17

**explained**
19:12 37:6,24 48:16
54:13,16,21 55:12
**express**
55:18
**expressed**
56:9
**extension**
48:15
**extent**
17:23 67:6
**external**
13:21 14:5
**Eyes**
1:16 42:10,13 69:17
69:21 70:3,12
**e-mail**
10:22 15:8,11
**e-mails**
13:24

---
F
---

**fact**
29:20 55:19
**falls**
33:10
**far**
49:24 51:1,14,20 53:3
**fell**
33:4
**Figueroa**
2:3
**figure**
55:1
**figures**
48:1,6
**financially**
71:13
**find**
8:13 30:25 41:25 43:1
**Finland**
4:9 6:12
**Finnish**
6:9,11
**first**

14:9 17:4,7 19:9,11
20:2,9,16,20 21:2,17
22:2,7,11,16,24
23:14,23 24:23 27:2
27:13 28:2 29:1,7,7
29:23 30:2,5,11,22
31:3,12,20,24 32:6
32:11,16,22 33:12,20
34:4,9,12,19,22 35:3
35:8 36:2,4,5,20
38:18 39:13 41:2,4,9
42:22 43:3 50:14
55:6 57:24 70:1
**five**
38:10
**flexibility**
54:25
**Floor**
2:4
**focusing**
20:2 22:24 29:6 31:20
52:22
**following**
54:2
**follows**
5:8
**follow-up**
68:20
**foregoing**
71:6,9
**forget**
10:15
**form**
15:22 16:19 17:22
38:24 44:25 46:15
50:5 55:22 58:23
64:12 65:18 66:8
**foundation**
65:19
**four**
38:10
**front**
58:6
**frustrated**

30:16 31:14
**frustration**
55:19
**full**
5:12
**fully**
52:11
**further**
67:25 69:5 71:12

### G

**gap**
56:8 57:8,9,10,12,13
57:15,16
**general**
26:21
**generally**
14:21 32:15 44:22
53:6
**Georgia**
2:11
**give**
64:3
**given**
31:1
**giving**
25:17
**go**
26:23 65:10 68:15,16
**goes**
6:12
**going**
11:3 14:3 19:19 21:8
21:11 25:9 37:25
50:4 51:5 65:6 68:22
**good**
42:8
**grant**
37:24 38:1 54:15
**Gray**
9:24
**Greg**
4:25
**GREGORY**
2:19

gregory.lantier@wi...
2:18
**group**
8:20

### H

**H**
2:19
**Hakoranta**
1:20 3:7 4:11 5:6,13
71:6 73:22
**HALE**
2:16
**half**
22:23 36:19
**handwritten**
15:13,17 16:5,13,16
16:18,25 17:3,6,10
**happen**
49:1
**happened**
19:10,11 37:4 50:22
66:19
**happening**
36:21
**head**
6:23
**heard**
4:14 29:5 33:7
**hearing**
70:15
**Helsinki**
4:8,9
**HERRICK**
2:7
**Heusch**
9:6
**higher**
35:15
**highly**
1:16 42:11,12,14
69:16,21 70:2,12
**Hill**
2:25 4:4
**home**

21:24
**hour**
22:23,23 36:19,19
64:21,23 65:1
**hours**
42:17

### I

**illustrate**
38:2
**imagine**
10:23 11:14 14:12
**imagined**
11:25
**improvement**
37:14 39:14,20 53:17
**include**
13:6,6 24:13 52:14
**included**
10:22
**includes**
61:7
**including**
8:15 10:5 54:15 65:3,5
**information**
19:19 21:14 28:20,25
29:20 30:11,14,17
35:1 45:8,19 47:9
63:3,19 64:3 67:8
**initial**
57:18
**inquire**
8:2
**inquiring**
8:8 12:2 13:3 33:14
**inside**
13:18
**instance**
40:18,23
**instances**
26:10
**instruct**
50:6 66:9
**intended**
16:17

**interested**
71:15
**internal**
12:9 50:7 51:7 52:1
**internally**
50:1
**interpose**
51:5 67:5
**interrupt**
35:21
**interruption**
50:19
**introduce**
4:17
**introduced**
33:23 34:13 65:4
**introduction**
65:6
**intrude**
26:17
**inventory**
10:7
**invited**
68:7
**involved**
5:23 71:13
**involvement**
6:2
**in-house**
2:22 8:15
**issue**
70:7

---
**J**
---
**Jan**
10:17
**Jane**
15:3
**Janne**
10:16
**Jesse**
9:25
**Jong**
9:25
**Jose**

1:2 4:16
**June**
7:5,13,25 8:6 9:10,20
10:8,21 11:6,18 13:1
13:9,17,25 14:14
15:13,18 18:21 20:3
20:10,20 21:3,18
22:3,12,25 24:24
29:8 31:24 32:7,23
36:12,22 40:1,24
41:10,20 42:23 43:9
44:2,24 45:6,14
47:24 49:1,12,17
50:9,11,15,23 51:10
52:4,8,20,23 55:18
56:15 57:10,11,12,13
57:16,17 62:14 63:4
66:14 67:25 68:6,11

---
**K**
---
**Kaarina**
1:20 3:7 5:6,13 71:5
73:22
**Kang**
19:1
**Kassabian**
2:7 4:20,20 64:21,24
65:3,7,11
**kept**
15:25
**kind**
13:16 40:4 54:19
**knew**
19:16 23:2,2,8 27:8
28:8 29:3,10,14
34:20 56:24 57:21
**know**
20:21 28:13 32:2
33:24 47:2,13,18
61:13 67:19,20,21
**knowledge**
25:6
**Korean**
1:9
**Kwak**

19:1

---
**L**
---
**L**
2:13
**Lantier**
2:19 4:25,25 69:11,18
**laptop**
15:21
**larger**
57:10,16
**lasted**
20:9 22:23
**law**
6:12
**leading**
37:2 55:15
**leaked**
30:14
**leaks**
19:19
**leave**
7:18 21:22 23:25 24:7
24:16,20 35:6 40:2,6
40:13 69:9
**legal**
2:24 4:4 5:3 25:14,18
25:24 26:12,18
**Leitstein**
9:2
**let's**
55:10 64:18 65:9,10
**liability**
1:11
**license**
19:16 23:2 27:9 28:8
28:21 34:21 42:7
48:2 56:6,14,22 57:3
57:21,22 67:4
**licensees**
37:21 38:13 44:7 45:8
62:15,23 63:21,21,23
64:4
**licenses**
37:23 64:8

**licensing**
5:24 6:3,24 7:20 8:20
9:9,21,22 10:3 24:11
47:17 51:8 52:1 57:5
**limited**
1:11
**Line**
72:3,6,9,12,15,18,21
72:24 73:2,5,8,11,14
73:17
**list**
9:17
**litigate**
19:13 21:10
**litigation**
8:20,21 9:5 19:19 21:8
21:11 23:16 41:17
45:25 46:14,24,25
47:3,11,16
**little**
7:2 32:18
**LLC**
1:11
**LLP**
2:3,9,16
**London**
5:4 9:24
**long**
5:20 6:25 20:3 22:20
36:16,18 63:7
**longish**
22:22
**Looking**
49:4
**looks**
43:17
**Los**
2:4
**lot**
19:19 21:7 23:15

---
**M**
---
**machine**
71:8
**madam**

35:15
**making**
41:5 49:10
**management**
54:16
**Martikainen**
9:12,23 47:20
**maternity**
7:18
**matter**
4:11 12:3 42:9
**matters**
7:21 26:12 64:17
**mean**
11:7,9,24 46:21 69:16
**meet**
21:7
**meeting**
7:4,25 8:6 9:10,20
  10:9,21 11:6,18 13:1
  13:4,9,11,17 14:1,13
  14:14,23 15:13,18
  16:1,22,25 17:3
  18:22 19:3,7,10,12
  20:3,3,10,20 21:3,18
  22:3,12,18,25 24:24
  29:8,16 31:17,24
  32:7,23 36:12,22
  40:1,25 41:3,10,20
  42:23 43:9 44:2,24
  45:7,15 47:24 48:10
  49:1,13,17,22 50:9
  50:11,15,23 51:10
  52:3,5,8,10,13,20,23
  55:18 56:15 57:10,11
  57:13,13,16,17 62:1
  62:14 63:5 66:15,23
  67:18,22,25 68:6,11
**meetings**
9:15
**Melin**
7:12 8:1,6 18:25 21:6
  24:13,15,25 25:4,6
  25:13,17,22 26:11,17

26:25 27:17,20,24
29:19 30:4,10,21
31:2,10,16,23 32:6
32:16,22 33:4,12,19
34:21 35:2,7,24 36:6
37:2,7,10,12 38:11
38:21 39:11 43:25
45:7,15,16 47:22
48:8 52:24 53:2,9,16
55:13,18 56:4,9 60:7
61:21 62:7,14 63:2
63:11 65:15 66:22
67:2 70:1
**member**
6:8,10
**memory**
61:1
**memos**
12:25
**mention**
41:23
**mentioned**
11:5 21:8,12,12 33:11
  35:25 41:6 42:24
  53:4,6
**mentioning**
62:19
**Merrill**
4:4 5:3
**MICHAEL**
2:6
**michaelzeller@quin...**
2:5
**microphone**
35:15
**Mika**
10:15
**Mika's**
10:15
**Mike**
4:19 35:11 42:8 51:17
  64:18
**Miller**
2:13 4:23 42:11,15

51:9,18
**million**
58:6,7,22 59:4,9,10,13
  60:1
**minute**
68:18
**minutes**
20:6,10,22 65:1,4,10
**mischaracterizes**
53:21
**misstates**
38:25 39:4
**mm**
31:18
**Mmm**
31:18
**Monday**
1:18 71:7
**monetary**
54:22
**money**
54:19
**move**
35:15
**Mutimear**
15:3

---

**N**

**N**
2:1 3:2
**name**
5:12 9:16 10:2,11,14
  10:15,18 47:18
**names**
5:15
**nature**
21:15
**necessarily**
54:22
**need**
63:16
**negotiate**
56:5
**negotiating**
50:7

**negotiation**
32:14 33:1,5,11 37:3
  40:16 49:24 54:20
  55:16 57:5
**negotiations**
25:20
**never**
40:3
**New**
1:10 4:5,6,6
**nine-year**
42:7
**Nods**
39:15 63:15
**noise**
35:14
**Nokia**
2:8,22 4:23 5:18,20,24
  6:22 7:24 8:10,14
  10:20 11:19 12:10,20
  13:18 19:13 21:10
  24:5,8 25:4 40:5
  43:8,21 48:1 49:9,13
  49:16 50:1,14,23
  51:3,16,21 52:1 54:3
  55:6 56:16 57:3,4
  62:15 63:4
**Nokia's**
6:3
**normal**
32:13,25 33:5,10
**Northern**
1:1 4:15
**notes**
13:4,6,11 15:12,14,17
  15:21,25 16:1,4,5,6,7
  16:11,13,16,16,17,18
  16:21,22,23,25 17:3
  17:6,10,10,21 68:19
**November**
1:18 4:7 71:7
**number**
4:3,16 8:23 48:23 55:9
  55:9 59:13 61:7

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA - 11/25/2013

numbered
71:6
NW
2:17

**O**

object
16:19 17:22 44:25
  50:4 51:24 66:8
objected
39:3
objection
11:20 13:19 15:22
  38:24 46:15 50:18
  51:6 53:21 55:22
  58:23 61:4 64:12
  65:18 67:6
obligations
30:18
obviously
56:6 69:7
occasion
14:9
occurred
7:24 13:1,25 34:6
  51:10 67:24 68:5
occurring
66:14 68:10
offer
19:14,20 21:20,20,22
  23:25 24:2,7,16,17
  24:21 32:9 35:6,9
  36:1,24 37:5,13,15
  37:18 39:12,14,21,25
  40:5,11,12 41:5,9,16
  41:19 42:21,25 43:2
  49:18 50:3,24 51:3
  53:17,24 54:2,3,7,12
  56:25 57:14,18 66:2
offered
42:3,6 48:13 49:13
offering
55:6 56:16 64:8
offhand
69:25

office
4:5,9 5:4
Oh
33:9 35:17
OK
9:22 33:9,23 42:6
  54:11 65:11
operator
4:4
opposed
56:4,10
option
48:17 49:5,6,14,19
  50:3,15,24 51:4,22
  52:19 53:3,5,6,9,9,21
  56:4,17 57:7
options
48:16
oral
1:19 40:9
orally
40:12
order
42:15 60:11 70:4
original
43:14
outcome
71:16
outside
8:12 13:18 50:5 51:6
  51:25 66:9

**P**

P
2:1,1
page
3:5 26:9 43:13,20
  45:23 48:20 49:4
  52:7 72:3,6,9,12,15
  72:18,21,24 73:2,5,8
  73:11,14,17
pages
38:7,12,15,22 45:14
  47:23 48:9,11 53:9
  71:6

paid
58:5
paper
16:2
Parker
2:13 4:23 42:13
part
20:2 52:20,25 53:15
particular
32:3,13 47:2 48:20
  59:15
particularly
12:23 36:18
parties
22:17 49:24 50:25
  51:14,20 57:15 69:8
  70:13 71:13,15
partner
4:23
parts
25:25
party
50:14
patent
5:23 6:3,23 7:20
Paul
7:12 18:25
Pause
33:5
paying
37:22 38:14 44:8 45:9
  56:24 62:16,23 63:2
  63:6,13,21,24 64:8
  65:14,23 66:5
pays
58:5 60:4
peace
21:23
Peachtree
2:10
pen
16:1
pending
60:16

Pennsylvania
2:16
people
7:16,17,20 8:13,23
  9:25 10:4,8,12,20
  11:5,18 12:9,20 15:6
  16:12 33:24 47:16
period
6:2 8:2 47:22 53:8
permit
18:4
person
24:15
pertained
41:10
pertaining
66:23
Phil
35:11
Phillip
2:25 4:4
phrase
55:12
PICKERING
2:16
place
14:20 42:9
places
43:22
Plaintiff
1:5
please
4:17 5:4,11 6:21 13:7
  26:16,22 30:9 33:17
  37:11 44:21 48:22
  54:9
pm
1:22 4:1 68:24 69:1
  70:19
point
8:12 27:10 29:12
  31:11 43:10 48:3
  60:15 67:13 68:4
pointed

62:3,6
**points**
38:2
**politely**
33:25
**portion**
20:4 52:12,20 53:18
  53:24
**position**
7:1 30:17 48:4 57:1
**possessed**
21:14
**possession**
30:15
**possibility**
30:13
**possible**
15:6 21:24 28:25
  53:13 60:24,25
**Possibly**
15:2 26:15
**potential**
48:14 54:6,7,8
**potentially**
15:2 49:18 50:2
**PowerPoint**
38:5,7,12,15,22 43:7
  45:14,20 47:23 48:9
  48:11,20 49:5 51:23
  52:7,13,25 53:10
  60:13
**practice**
6:14,16,19 17:9,13
**practiced**
6:19
**practicing**
6:13,16
**precisely**
14:11 15:5
**preparation**
18:2,9
**prepare**
16:13 52:19
**prepared**

15:12
**preparing**
52:12
**present**
2:21 19:2,6,14 70:13
**presentation**
38:5,8 43:8
**presented**
24:21 39:13 53:13
  57:14
**press**
46:9
**previous**
37:15 39:21
**previously**
36:9
**principally**
15:20
**principle**
19:18
**prior**
38:21 39:14 49:12,17
  50:11 53:17 57:9,11
  57:12,15
**private**
6:14,16,19
**privilege**
26:2,20 31:6 67:7
**probably**
38:18 60:3,14
**proceeded**
19:15
**product**
17:25 67:8
**program**
43:21 44:1,6,10,23
  45:9 60:20 61:3,8
  62:16,23 63:3,6,13
  63:22,24 65:16 66:5
**project**
9:12
**prompted**
51:3,15,21
**proposal**

42:5 49:9 53:17
**propose**
50:15
**proposed**
41:24
**proposing**
41:14,16 50:12
**protected**
18:3
**Protective**
42:15 70:4
**public**
48:1,5
**publicly**
45:25 47:10 48:5
**purpose**
25:17
**purposes**
25:23 26:12
**put**
10:22 12:25 13:15
  35:14 51:22

## Q

**quantify**
56:25
**question**
5:25 12:4,13 14:2
  15:23 16:9,20 17:23
  18:5,11 26:4 27:3
  29:4 34:14 38:25
  39:1,3,5 40:15 41:12
  45:1 50:5 51:12,13
  51:24 52:2 55:23
  56:1 58:24 59:1 63:7
  64:13,14 65:19,20
  66:9,10 67:6,10 70:4
**questions**
26:22 32:19 33:25
  34:3,16 50:8 69:5,11
  69:19
**quick**
20:5
**QUINN**
2:3

**quite**
21:7 30:19 56:23
  59:16,18

## R

**R**
2:1
**Rachel**
2:7 4:20 64:19
**raised**
41:2,4
**Randall**
2:13 4:22 39:2
**randall.allen@alsto...**
2:12
**rate**
43:21 44:1,6,8,10,23
  45:9,24 47:9 60:20
  61:3,8 62:16 63:3,6
  63:13,22 65:16 66:5
**rates**
62:23 63:24
**reach**
56:8
**read**
70:15
**really**
18:17,18 66:25 67:19
**Realtime**
1:24 71:4
**reason**
56:13 72:5,8,11,14,17
  72:20,23 73:1,4,7,10
  73:13,16,19
**reasoning**
66:3
**reasons**
37:6 54:13
**recall**
8:24 9:16,19 10:2,10
  10:14,18 12:6,16,22
  14:11,18,19,21 15:5
  15:9 17:4 19:25
  20:19 21:1,5,16 22:1
  22:6,11 24:22 27:22

28:3,4,17 30:4,6,10
30:20 31:5 32:1,6,8
32:10,15 33:3,10,16
34:5,16,18 37:12,17
38:16,21 41:18 42:1
42:5,21 44:11,12,14
44:17,19,21,22 45:4
45:18,21 47:4,22
52:11,12 53:2 54:9
54:18,21,24 55:2
58:17,20,21 59:3,6,7
59:12,21,24 61:21,25
63:14 65:24 66:13,25
67:1,24 68:10
**received**
32:9
**recollection**
11:12 15:11 18:16,19
22:13,15 23:1,10,12
23:19,21,22 28:15
31:1,10 32:21 33:21
44:16 45:17 49:3
60:22 61:23 66:15,18
67:20 68:5
**record**
5:12 43:11 68:22,25
69:3 71:10
**recorded**
71:7
**redacted**
43:12
**reference**
44:1 47:25 48:5 59:15
**referring**
46:4,7 48:19,23
**refers**
49:6
**reflected**
51:23
**reflection**
16:5,18
**refresh**
18:15,19
**regard**

50:6
**regarding**
12:3 31:11 48:15
**regularly**
25:19
**rejected**
37:6 53:18 54:12 66:3
**rejecting**
41:14
**related**
11:5 67:3
**relating**
11:17
**relationship**
56:16
**relative**
71:12,14
**relatively**
17:16 30:18
**remained**
57:8
**remember**
9:4 20:12 23:17 33:12
33:19 34:6,7 36:21
37:20 47:5 48:8
54:15 58:13 59:14
60:2,18 61:2,16
69:25 70:8
**repeat**
5:25 12:15 16:9 29:4
39:2 63:9
**repeated**
54:13
**rephrase**
39:7 59:1
**report**
7:10,14 46:7 64:20
**reported**
1:24 7:8
**reporter**
1:24 5:2,5 69:2 70:13
71:2,4
**represent**
4:18 16:23

**representatives**
19:6 36:14 38:9
**requested**
32:8 70:14
**required**
54:22
**respect**
25:21 70:10
**respond**
31:4 40:15 52:2
**responded**
33:25
**responding**
12:5
**response**
34:22 35:2,8 36:1
44:18 48:14 53:11,14
54:6,7,8 55:5 60:7,19
61:2
**reveal**
51:7 52:1
**review**
17:20 18:7,8 69:13
**Richard**
8:25
**right**
21:21 22:14 23:7
31:13 32:12 42:4
45:3,3 46:14 57:10
61:17,19 65:5 68:13
68:13,17 69:24
**Robert**
9:24
**role**
26:18
**Ron**
2:22 8:25
**rough**
70:14
**royalty**
59:25 60:3

─────── S ───────
**S**
2:1

**sales**
37:25 48:1,6 62:3,5
**Samsung**
1:9,9,10 2:2 4:12,19
4:21 7:4,25 10:9,21
13:2,10 18:22 19:5
21:8,11 24:19 36:1
36:14,23 37:13,18,25
38:3,8 39:24 40:4,6
40:10,17 41:14,16
42:5 43:8 44:8 45:11
46:14,25 48:13 49:18
50:3,12 51:4 53:11
54:6,8,10,23 55:20
57:4,17 62:2,3,6,10
63:4 64:8,9 70:1
**Samsung's**
18:25 39:12 41:9,19
42:21 43:2 45:24
47:9 53:16 66:2
**San**
1:2 4:16
**Sandstrom**
10:17
**saying**
20:19 21:1,17 22:2,11
28:7 30:5 32:6 33:12
33:19 37:18 38:21
45:19 47:22 48:8
54:10,25 59:12 61:21
**says**
43:20 45:23 64:21
**scope**
50:5 51:6,25 66:9
**screen**
4:8
**second**
25:11 36:16,21 38:4,9
38:22 48:25 52:22
53:2,10 54:3,10,11
58:3 60:6,11 61:12
61:21,24 62:9 63:25
66:14,20 67:3,20,25
**see**

43:20,22 45:23 46:1
49:5 54:17 68:19
**sent**
11:10,10
**separate**
16:6,10,21
**sequence**
60:11
**seriously**
30:19,19
**session**
20:9,16,20 21:2,17
22:2,7,11,17,24
23:14,24 27:2,13
29:8 31:20,24 32:6
32:12,16,22 33:13,20
34:4,9,12,19,23 35:3
35:8 36:2,4,5,12,16
36:21 38:4,9,23
39:13 41:10 42:22
43:3 48:25 52:23
53:3,10 54:4,10,11
57:25 58:2,3 60:6,11
61:12,21,24 62:9
64:1 66:14,20 67:3
67:17
**set**
16:6,10 58:20
**sets**
17:20
**setting**
26:10 31:7 63:18
**settle**
21:9
**seven**
5:21,23 6:20 7:18,20
**seven-year**
6:2
**SHEET**
72:1
**short**
68:20
**shorthand**
71:8

**shot**
64:25
**show**
18:1 38:11
**showed**
38:3,18 43:8,18 44:3
60:15
**showing**
44:4 53:9
**shown**
38:8,15,22
**side**
18:25 24:19
**sign**
70:16
**SIGNATURE**
73:21
**Signed**
71:21
**simultaneous**
38:17
**sir**
5:9
**situations**
57:2
**six**
7:17,19
**slide**
38:19 44:3,4 48:23
61:7
**slides**
38:3 60:15,17
**slightly**
26:8
**smaller**
37:22 44:8 62:19,24
63:2,12 64:6,7 65:13
65:22
**Soininen**
9:24
**solution**
48:13
**Solutions**
4:5 5:4

**Sonja**
9:24
**soon**
14:12,14,23
**sorry**
29:19 33:6 35:13,17
35:21 46:21 51:17
54:1 63:16
**sort**
21:6
**sounds**
16:14
**South**
2:3
**speak**
35:19
**speaking**
4:4 7:17,20 30:23
37:10 45:16 55:16
**specific**
23:4 28:10,12,14 43:2
49:2
**specifically**
34:5,7,18 38:16 41:6
44:11,14,15,18,20
47:18 58:17,20,21
59:12 60:18 69:25
**specified**
58:1
**spoke**
10:8 21:7 31:21 32:3
37:3 38:18
**start**
17:2
**started**
15:24 65:7
**state**
4:18 20:23 57:20
**stated**
19:18 20:11
**statement**
39:19 44:5 46:12,17
63:1,11,22 64:10,15
65:13 66:4

**statements**
20:8,8,15 55:13 56:14
56:18,21 63:19 64:16
**States**
1:1 4:14
**strategy**
50:8 51:8 52:1
**Street**
2:3,10 4:5
**strictly**
7:17,19
**strike**
56:12
**subject**
11:11 30:5,11,21,24
31:3 37:12,18 40:25
64:11
**subsequent**
38:17
**substance**
13:9,17,25 16:23,24
19:23,24 20:1,24
22:5,8,9 25:9 28:4
35:7 39:25 62:15
67:24
**suggested**
41:24 48:16
**suggesting**
43:13
**SULLIVAN**
2:3
**suppose**
32:24
**sure**
6:1 24:1 26:5,8,19
29:6 31:4,25 32:20
33:18 41:13 53:5
59:16,18 63:8,10
**surprised**
27:14,21,23,24 28:6
28:24 30:7
**Susanna**
9:12 47:20
**swear**

5:5
sworn
3:5 5:7

**T**

**T**
2:6
**table**
21:21,25 24:3 42:25
  51:22
**take**
4:10 6:15 7:3 16:12
  17:6,9 18:21 20:4
  21:21,23 23:24 24:6
  24:16,20 30:11 35:6
  36:11 40:1,6,13
  45:18 49:21,25 68:4
  68:18
**taken**
4:11 71:7
**talked**
23:15 31:21 52:23
  55:7 60:4
**talking**
32:11 53:15,16,23,24
  65:8
**team**
8:20,21 9:5,9,15,15,21
  9:22 10:1,3,5 24:11
  36:23 38:3 47:17,17
**technical**
10:1,5
**TELECOMMUNI...**
1:11
**Telephone**
2:5,11,17
**tell**
5:11 6:21 13:7 18:8
  19:15 26:16,22 30:9
  37:11 42:2 44:21
  54:9
**ten**
20:5,10,16
**terms**
19:16 23:2,24 24:2

27:8 28:8,20 29:3,9
29:13 34:20 41:19,24
42:21 43:2 57:21
58:10,13 62:2
**testified**
5:8 20:15 21:4 27:13
  31:22 34:20,25 36:9
  36:9 55:14 61:10,22
  66:12
**testify**
26:1
**testifying**
60:6
**testimony**
31:9 33:18 38:25 39:4
  53:22 71:5,10
**Thank**
5:9 35:18,20,22
**thanked**
35:9 36:23
**Thanks**
68:21
**thing**
19:9,11 36:20 39:11
**things**
6:5 20:22,24 26:13
  31:22 33:15,17 34:1
  60:12
**think**
13:13 17:8 21:12
  22:14 23:9 29:5,11
  31:19 34:10,24 35:4
  35:11 36:3 38:18
  43:5,13 45:12 46:16
  46:16 49:15 50:13,25
  51:18 52:21 53:6
  56:13 58:14 60:3,14
  61:14 62:1,12,25
  65:3,6 67:20 68:3,13
  69:4,20,24 70:6,7
**third**
43:20
**thought**
41:21 54:23 56:24

**three**
19:5
**time**
4:8,8 6:18 7:7,11,13
  8:2,3 13:8 14:19
  17:17,18 21:6 29:1,7
  29:9 38:14,21 47:22
  48:2,9 49:12 52:17
  53:8 55:17 57:20
  62:13 64:18,19 68:18
  68:23 69:5
**times**
21:9
**timing**
64:22
**title**
6:22 7:1,3
**today**
5:2 6:16,17 18:10 24:3
  68:12 69:6 70:14
**Today's**
4:7
**Todd**
9:2
**told**
19:17 31:9 32:17 43:4
  63:10 68:12
**top**
21:10
**total**
21:22
**tracked**
47:8
**transcribed**
71:8
**transcript**
1:16 42:9 69:13 70:1,2
  70:11,11,14 71:6,9
**Trish**
1:24 5:3 71:4,22
**true**
39:18 57:19 66:4 71:9
**try**
26:7 35:19 67:23

**trying**
8:12 10:7 11:14 17:24
  30:25 32:20 33:17
  35:11 41:25 43:1
**Tu**
9:25
**two**
34:15 43:22 64:11,16
**typed-written**
16:23
**typewritten**
15:14,16 16:4,7,13,16
  16:17 17:10

**U**

**understand**
6:5 11:15 26:3 30:25
  33:18 39:9 42:4
**understanding**
29:2,9,13 41:8,13 46:3
  46:6,23 56:3,11
**understood**
19:17 26:11
**unit**
62:2,5
**United**
1:1 4:14
**URQUHART**
2:3
**use**
23:24 24:19 27:21
  28:1 58:15 59:25
**usual**
17:9,13

**V**

**v**
1:7
**vague**
15:23 16:20 55:23
  64:13
**value**
37:24 38:1 54:15,17
  54:22,24
**Varick**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

Page 13

4:5
**various**
57:1
**Vary**
8:25
**verbalize**
63:16
**verbatim**
19:25 20:12 28:18
  30:6 54:7 71:10
**version**
16:14
**Vestrinen**
10:16
**viable**
57:7
**vibration**
35:20
**video**
4:3,8
**Videographer**
2:24 4:2 5:2,9 35:13
  35:18 64:25 68:22
**videotape**
4:3
**videotaped**
1:19 4:10
**view**
25:23 39:19 51:3
**violating**
26:1,20 31:5
**Volume**
4:3
**voluntary**
49:6
**vs**
4:12
**V-a-r-y**
9:1

_____
**W**
**want**
9:17 19:13 42:2,4
**wanted**
19:13 21:20,23 38:2

48:14 54:5
**wants**
24:2 42:13
**Washington**
2:17
**wasn't**
53:23 60:9
**way**
11:3 12:6,16 18:19
  26:8 27:1 28:16
  29:19 37:25 55:19
  67:4,23 71:15
**went**
37:5 41:21
**West**
2:10
**widely**
46:8
**WILMER**
2:16
**witness**
2:8 3:5 4:24 5:5 14:3
  18:2,4 50:6 51:7,25
  66:10 67:7,9 69:6
  70:15 71:5
**word**
23:1,5,7,13,18 28:10
  28:12,14 31:14,15
  58:15,16,19 59:17,25
  60:3
**words**
19:22,23 24:7,20
  25:24 27:21,22 28:1
  28:3 39:25 58:20
  59:3,6,8 62:14
**work**
7:20 17:25 67:8
**worked**
8:13
**works**
9:12 25:3
**writing**
10:22,25 11:19 12:4,8
  12:18,23,25 13:15

40:3,12,19,22,23
**writings**
13:7,7
**written**
11:25 13:16 15:11
  39:23 40:5,8,10
**wrong**
16:15
**wrote**
13:5

_____
**X**
**X**
3:2

_____
**Y**
**Yeah**
39:9 64:24
**year**
7:2 54:18
**years**
5:21,23 6:20
**York**
1:10 4:5,6,6

_____
**Z**
**Zeller**
2:6 3:9 4:19,19 5:10
  5:11 8:17 9:3 11:2
  11:23 12:11 13:23
  14:8 16:3 17:1 18:6
  18:14 23:6 26:6 27:6
  28:11 29:25 34:2
  35:23 39:6,9 40:20
  42:16,19 43:15 45:5
  46:18 50:10,21 51:11
  51:18,19 52:6,16
  53:25 56:2,20 59:2
  61:9 64:22 65:5,12
  65:21 66:11 67:11,15
  69:4,23 70:7

_____
**0**
**003**
43:13

_____
**1**
**1**
2:17 4:3 43:7,7 55:9
**10th**
2:4
■■■
■■
**10014**
4:6
**11-cv-01846-LHK**
1:7 4:16
**1201**
2:10
**15**
20:6,10
**15-minute**
20:16
**1875**
2:16
**19:04**
4:8

_____
**2**
**2**
43:21 44:1,6,10,23
  55:9 60:20 61:2,8
  62:16 63:14 66:5
**2(b)**
49:6 50:24 52:19
**2.4**
45:24 47:10
**20:46**
68:23
**20:54**
69:3
**20006**
2:17
**2013**
1:18 4:7 7:5,13,25 8:6
  13:1,9,17 18:22
  44:24 50:23 71:7
**202**
2:17
**213-443-3180**

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
EEVA KAARINA HAKORANTA – 11/25/2013

2:5
**225**
4:5
**25**
1:18 4:7 71:7

---
**3**
---
**3**
45:23 61:7
**30309-3424**
2:11
**36**
64:23

---
**4**
---
**4**
7:5,13,25 8:6 9:10,20
  10:8,21 11:6,18 13:1
  13:9,17,25 14:14
  15:13,18 18:21 20:3
  20:10,20 21:3,18
  22:3,12,25 24:24
  29:8 31:24 32:7,23
  36:12,22 40:1,24
  41:10,20 42:23 43:9
  44:2,24 45:6,14
  47:24 48:23 49:1,4
  49:12,17 50:9,11,15
  50:23 51:10 52:4,7,8
  52:20,23 55:18 56:15
  57:10,11,12,13,16,17
  62:14 63:4 66:14
  67:25 68:6,11
**40**
64:21 65:1
**404-881-7196**
2:11

---
**5**
---
**5**
3:7,9
**50**
17:17,18
**500**
54:18

---
**6**
---
**6**
71:6
**6327**
2:17
**663**
2:17

---
**7**
---
**7.04**
1:22 4:1
**70**
71:7

---
**8**
---
**8.46**
68:24
**8.54**
69:1
**8.56**
70:19
**865**
2:3

---
**9**
---
**90017**
2:4