QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO. 11-cv-01846-LHK (PSG)<br><br>**DECLARATION OF SEUNGHO AHN IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE INC.'S MOTION TO COMPEL FURTHER DISCOVERY AND FOR SANCTIONS FOR VIOLATIONS OF PROTECTIVE ORDER**<br><br>**Date**:  October 22, 2013<br>**Time**:  10:00 a.m.<br>**Place**:  Courtroom 5, 4th Floor<br>**Judge**:  Hon. Paul S. Grewal |

I, Seungho Ahn, declare:

1.    I am an Executive Vice President and Head of the Intellectual Property Center at Samsung Electronics Co., Ltd. and have held this position since the summer of 2010.  One of my responsibilities is to oversee Samsung's license negotiations, including its negotiations with Nokia Corporation ("Nokia").

2.    I hold an undergraduate degree in Polymer Engineering from Seoul National University in South Korea; a master's degree in Metallurgical Engineering from Seoul National University in South Korea; a Ph.D in Materials Engineering from the University of Illinois, Urbana-Champaign; and a J.D. from Santa Clara University.

3.    English is not my first language.  Although I am able to read, write and communicate to a large extent in English, I am not able to fully express myself in English and am most comfortable communicating in Korean.  For instance, when I go to English language movies I cannot understand everything that is being said, because the actors speak too fast.  I am also told by native English speakers that my speech is highly accented.  In my day to day work activities at Samsung, I primarily speak Korean with my colleagues.  I am more comfortable with written English than I am with spoken English.

4.    I have been involved directly or indirectly in the negotiation of hundreds of licenses during my time at Samsung.  As part of this work, my team and I try to stay on top of industry licensing intelligence relevant to our business, including by gathering information available in the marketplace about who is paying how much for what technology.  This is an important part of my job and also for those on my team.  This is particularly true when it comes to smartphones and the major portfolios our competitors have developed and acquired in recent years because of the contentious licensing and litigation activity in this business.  My team and I try to stay abreast of press reports, analyst reports and other news regarding our competitors and our industry.  We make it a point to talk to lawyers, consultants and industry participants to learn what we can.

5.    I have a general familiarity with the inadvertent disclosure issue that the Court is currently considering.  I have cooperated fully in the investigation, including by preserving my documents, making my computer available to be imaged, providing an interview to Samsung VP

1   Ken Korea, and traveling to California to sit for a deposition last week that lasted nearly nine

2   hours, including breaks.

3       6.      I do not remember receiving or reviewing any emails from Quinn Emanuel

4   containing instructions for accessing a version of a Teece Report via a File Transfer Protocol site,

5   nor do I remember receiving or reviewing any emails or attachments from other outside counsel

6   attaching a version of the Teece Report.  I receive hundreds of emails each day, and often dozens

7   of emails each day just from Quinn Emanuel.  It is my general practice not to read emails or even

8   open attachments where the email has many addressees of which I am just one.  I do not remember

9   reading any emails or other documents reciting the terms of the Apple/Nokia license, or learning

10  those terms from any discussions, nor do I know with certainty what those terms are from any

11  other source.

12      7.      I do not remember receiving or reviewing any emails or attachments from Quinn

13  Emanuel regarding Samsung's International Trade Commission ("ITC") public interest brief, nor

14  do I remember receiving or reviewing any emails or attachments from fellow Samsung employees

15  attaching the ITC public interest brief, or discussing it with anyone.

16      8.      I understand that Nokia has asserted that I made certain statements during a June 4,

17  2013 meeting with Paul Melin, Nokia's Chief Intellectual Property Officer, to the effect that the

18  terms of the Apple-Nokia license were known to me.  Because, as I understand it, Nokia's counsel

19  has refused to permit Samsung's employees to view Mr. Melin's declaration, I have not reviewed

20  it.

21      9.      The sequence of events at this June 4, 2013 meeting was as follows:  I met with

22  Paul Melin and Eeva Hakoranta of Nokia on June 4, 2013 in connection with ongoing license

23  negotiations between Samsung and Nokia.  Principle engineer Indong Kang and Vice President

24  James Kwak of Samsung also attended the meeting.  The discussions took place in Seoul, Korea,

25  and were in English.

26      10.     ████████████████████████████████████████

27  ██████████████████████████████████████████████████

28  ████████████████████████████████████████

1  colleagues Mr. Kang and Mr. Kwak.  After that, Nokia requested that we take a break from the

2  meeting so that Nokia could think about Samsung's offer.  The break lasted approximately one

3  hour.

4      11.    After the break, Mr. Melin showed us a PowerPoint presentation reflecting the

5  terms of its counteroffer.   The PowerPoint included a chart with proposed royalty payments that I

6  thought were far too big.  I asked Mr. Melin, why should we be paying so much?

7

8

9

10      12.    So I asked Mr. Melin just who exactly was paying that much.  Mr. Melin said

11  words to the effect of, "It is a certain company that is of a comparable size to Samsung."  I then

12  replied words to the effect of, "Well, within the smartphone industry, when you talk about a

13  company that is comparable to Samsung, you must mean Apple."  Mr. Melin then put on an

14  awkward face, but he did not actually deny my statement.

15      13.    So, it was clear to me that Mr. Melin was telling me what he claimed were the

16  terms of Nokia's license with Apple, and was doing so in order to get Samsung to pay more than

17  Samsung was prepared to offer, based on his claim that Apple was paying that much.

18      14.    But based on published media reports, and what I had been told by lawyers (not

19  Samsung's lawyers) and others in the industry, the numbers Mr. Melin was citing to me seemed

20  too high.  I did not believe that Apple was paying that much.  I thought that Mr. Melin was

21  bluffing, so I bluffed back.  I told Mr. Melin that that is not what Apple was paying.  I acted as

22  though I  knew what Apple was paying, and said that it was my understanding that Apple was

23  actually paying Nokia less.

24      This was my estimation.  I

25  didn't actually know what Apple was paying.

15.     Mr. Melin did not deny my comments.  Based on Mr. Melin's reaction to my comments, I believed my estimate must be close to the actual numbers.  Mr. Melin seemed to be mulling over my comments, again with an awkward look on his face.  He then said words to the effect of, "Why don't we take another break," without responding to anything I had said.

16.     During that break I commented to my colleagues who had accompanied me to the meeting, Indong Kang and James Kwak, that I must have been pretty close to the actual Apple/Nokia licensing terms based on Mr. Melin's reaction.  Approximately 40 minutes or so later, we got back together.  Ultimately, Mr. Melin said words to the effect of, "Let us discontinue talking for the day," and, the meeting ended.  We then all went to dinner, and had a good time together.  The dinner lasted more than two hours.

17.     At no point during the meeting, or the subsequent dinner, did Mr. Melin tell me that we should not have known those Apple/Nokia license terms, nor that he was displeased at my comments.  Likewise, to my knowledge, at no point between June 5, 2013 and July 1, 2013, when Nokia filed its motion for a protective order, did anyone from Nokia contact me or Samsung to ask us about this or express any concern about this, or ask me what my source for this information was.  There were a number of communications from Nokia during this time period, yet none of them mentioned this issue.

18.     I have never seen the Apple-Nokia license agreement.  To this day, I do not know its terms, nor has anyone shared them with me.  But based on Mr. Melin's facial expression after I shared my estimation with him at the June 4, 2013 meeting, I believe that those figures must be close to the actual figures.

19.     As discussed above, my estimate ████████████████████ came from multiple media reports and discussions with non-Samsung lawyers and representatives of other companies who have negotiated with Samsung.  These lawyers included lawyers representing patent trolls, as well as lawyers hoping to be hired by Samsung and in-house counsel from other companies.  When Nokia and Apple settled in 2011, virtually everybody within the

industry was interested in it.  So upon the parties settling, there were many public reports about what the probable royalty terms were.  Whenever industry people would get to see each other the settlement terms were often a point of discussion and speculation.  And so, based upon all the things that I'd come across in the media and publications -- many of which I had personally read -- and my talking with people in the industry, I had come up with my estimate.

20.    In my experience, it is commonplace for a license that results in a release of a claim for past damages to contain a one-time payment for the past damages and a quarterly or annual royalty payment going forward and that is exactly how the Apple-Nokia license has been described in the press.

21.    To my knowledge, no outside counsel representing Samsung in its various litigations around the world against Apple has ever told me the terms of the Apple-Nokia license.

22.    I am certain that I did not tell Mr. Melin at the June 4, 2013 meeting that I received Apple/Nokia licensing terms from my outside counsel in the Apple/Samsung case, because it is not true, and because it would be a very foolish thing to say.  I hold a J.D. from an American law school, Santa Clara University, and until I moved to Korea approximately ten years ago I was a member of the California Bar.  I am well aware of the importance of protective orders in United States litigation.  I have been responsible directly or indirectly for the supervision of hundreds of patent litigations.  In most, if not all of them, a protective order is entered.   These invariably cover license terms which I know from experience are highly confidential and sensitive information. The confidentiality of this type of license information is as important to Samsung as it is to any other technology company.   It would be incredibly reckless for me to have made such a comment to Nokia.  It would amount to my admitting to an adversary that our outside counsel and Samsung had violated a protective order protecting the adversary's information and that I was attempting to use the information gained by such a violation to negotiate license terms.   The idea that I would violate a protective order is simply wrong, and the idea that I would tell my adversary that I and my outside counsel had violated it and furthermore were violating it in that very instance by trying to profit from its use is preposterous.  While Mr. Melin did appear embarrassed and may regret effectively confirming my estimate with his facial expression, I nevertheless cannot understand

1    why he would say such a thing.  I can only imagine that he must have misunderstood me.

2         23.     I may have used the word "leak" at the June 4th, 2013 meeting with Nokia, or some

3    other word to reference the idea that all information gets out, though I don't recall the precise

4    phrase I used.  I do believe that there may have been some sort of leak due to the contemporaneous

5    media reports outlining the terms of the Apple-Nokia license.  But I cannot be certain of this.  It

6    has in fact been my own experience that information gets out.  I know this from my own

7    experience and I recounted to Mr. Melin a situation a few years ago where Samsung had entered

8    into a confidential settlement with another company and very shortly thereafter everyone in the

9    industry seemed to know it.

10        24.     I do not know the specific terms of Apple's licenses with Ericsson, Sharp, or

11   Philips, nor do I remember ever knowing them, or being informed of them in any written

12   document or conversation.

13

14        I declare under penalty of perjury under the laws of the United States that the foregoing is

15   true and correct.  Executed in Suwon, South Korea, on October 21, 2013.

16

17                                                    _/s/ Seungho Ahn_____
                                                     Seungho Ahn, Ph.D
18

19

20

21

22

23

24

25

26

27

28

1

**ATTESTATION**

2

  I, Victoria Maroulis, am the ECF user whose ID and password are being used to file the

3

foregoing document.   I hereby attest pursuant to Civil L.R. 5-1 that concurrence in the electronic

4

filing of this document has been obtained from Seungho Ahn, Ph.D.

5

6

        */s/ Victoria F. Maroulis*

7

        Victoria F. Maroulis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28