QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:   (650) 801-5000
Facsimile:   (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO. 11-cv-01846-LHK (PSG)<br><br>**FILED UNDER SEAL**<br><br>**DECLARATION OF INDONG KANG IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE INC.'S MOTION TO COMPEL FURTHER DISCOVERY AND FOR SANCTIONS FOR VIOLATIONS OF PROTECTIVE ORDER**<br><br>**Date**:    October 22, 2013<br>**Time**:    10:00 a.m.<br>**Place**:    Courtroom 5, 4th Floor<br>**Judge**:   Hon. Paul S. Grewal |

02198.51855/5576923.6

I, Indong Kang, declare:

1.     I am a Director in Samsung's IP Center who is responsible for licensing at Samsung Electronics Co., Ltd. ("Samsung") and have held this position since 2006.   I have worked for Samsung since 1989.   One of my responsibilities is to develop licensing strategies and engage in licensing-related negotiations, including negotiations with Nokia Corporation ("Nokia").   I have personal knowledge of the facts set forth in this declaration and, if called upon as a witness, I could and would testify to such facts under oath.

2.     I obtained an undergraduate degree from Chungang University in South Korea in 1989, a Masters of Intellectual Property in 1995 from the University of New Hampshire, and a J.D. from the University of New Hampshire in 2007.

3.     I have been involved, directly or indirectly, in the negotiation of hundreds of licenses during my time at Samsung.   My day-to-day job responsibilities include devoting time to staying on top of industry intelligence and information gathering.   I review public sources of information to determine the amounts companies are paying, or receiving, for particular types of technology, including public information sources about the smartphone industry and the major portfolios our competitors have developed or acquired in recent years.   It is important to my job to speak with transactional counsel, consultants and industry participants to learn whatever we can so that I have as much information as possible before engaging in licensing negotiations.

4.     I understand that I never received any emails from Quinn Emanuel containing instructions for accessing the Teece Report via a File Transfer Protocol ("FTP") site, nor any emails attaching the Teece Report itself.

5.     I do not remember receiving or reviewing any emails or attachments from Quinn Emanuel regarding Samsung's International Trade Commission ("ITC") public interest brief, nor do I remember receiving or reviewing any emails or attachments from fellow Samsung employees and other outside counsel attaching the ITC public interest brief, or discussing it with anyone. While emails show that I forwarded the ITC public interest brief to Dr. Seungho Ahn ("Dr. Ahn") and James Kwak of Samsung, I do not recall doing so.

6.     I do not remember reading any emails or other documents reciting the precise terms

1  of the Apple/Nokia license, or learning those terms from any discussions, nor do I know with

2  certainty what those terms are from any other source.

3      7.      Dr. Ahn and I met with Paul Melin and Eeva Hakoranta of Nokia on June 4, 2013

4  in connection with the ongoing license negotiations between Samsung and Nokia.    James Kwak,

5  a Samsung Vice President, also attended the meeting.    The discussions took place in Seoul,

6  Korea, and were in English.

7      8.      ███████████████████████████████████

8  ███████████████████████ ████████████████████

9  ████████████████████████████████████████████

10  ████████████████████    After Dr. Ahn made this offer, Nokia requested that we take

11  a break from the meeting so that Nokia could consider Samsung's offer.    The break lasted about

12  an hour.

13      9.      After the break, Mr. Melin showed us a PowerPoint presentation with a chart with

14  Nokia's proposed royalty terms as a counteroffer.    In response, Dr. Ahn asked Mr. Melin why

15  Samsung should have to pay that much.    ███████████████████████

16  ██████████████████████████████████████████

17  ██████████████████████ ███████████████████████

18  ████████████ █████████████████████████.

19      10.     Dr. Ahn asked Mr. Melin who was paying that much, and Mr. Melin said that it

20  was a company "of comparable size" to Samsung.    Dr. Ahn then pointed out that Mr. Melin must

21  be referring to Apple.    Mr. Melin did not deny it.

22      11.     Dr. Ahn then told Mr. Melin that this was not consistent with Dr. Ahn's

23  understanding.  ██████████████████████████████

24  ████████████████████████    Dr. Ahn made a generalized

25  reference to public sources and people in the industry including lawyers as the source of his

26  information.

27      12.     Again, Mr. Melin did not deny Dr. Ahn's comments about his understanding of

28  what Apple was paying.    He then asked for another break.

13.     Mr. Melin returned approximately 40 minutes later and indicated that the meeting should conclude for the day.    The meeting ended.    We then all went to dinner and had a good time together, during which we ate sushi, drank Soju, and discussed our families and personal lives.   It was a very friendly dinner that lasted over two hours.

14.     At no point during the meeting, or the dinner, did Mr. Melin claim that Dr. Ahn had said or done anything inappropriate or that the Apple/Nokia license terms that were discussed should not be known to Samsung.   As far as I know, at no point between June 5, 2013 and July 1, 2013, when Nokia filed its motion for a protective order, did anyone from Nokia contact me or anyone else at Samsung to ask us about this incident or express any concern about it.   Indeed, Samsung and Nokia exchanged additional correspondence later in June—including letters from Nokia dated June 13, 25 and 27, 2013—and participated in a telephone conference to continue our negotiations, yet Nokia never made any complaints or otherwise mentioned this issue.   Attached hereto as Exhibit A is Nokia's June 13, 2013 letter referencing the June 4 meeting and summarizing our discussions.   As can be seen, this confirming letter does not mention this issue at all.

15.     I recall various media publications in 2011, contemporaneous with the Apple/Nokia settlement, that contemplated the upfront payment from Apple to Nokia as being around 500 million Euros.   I specifically recall a *Business Insider* article that discussed the 500 million Euro payment, as well as an *AppleInsider* article on this topic discussing the Apple/Nokia license terms. From time to time I read both websites in the course of performing my duties at Samsung.   In addition, I recall that a Nokia Annual Report for 2011 posted a 450 million Euro revenue item that appeared to reflect the Apple/Nokia upfront payment, after taxes.   Finally, virtually everyone within our industry was interested in the Apple/Nokia settlement and resulting license agreement, and the probable royalty terms were often discussed and speculated about during this time.

16.     I recall that there were numerous reports and publications in 2011 about the probable royalty terms of the Apple/Nokia settlement, estimating it at around 100 million Euros annually.

17.     I have never seen the Apple/Nokia license agreement.    I do not know its precise

1    and actual terms to this day, nor has anyone shared them with me.

2           18.     At no point during the June 4, 2013 meeting did I hear Dr. Ahn tell Mr. Melin that

3    he had received Apple/Nokia licensing terms from his outside counsel in the Apple/Samsung case.

4    Nor does it sound like something Dr. Ahn would say.

5           19.     I do not know the specific terms of Apple's licenses with Ericsson, Sharp, or

6    Philips, nor do I remember ever knowing them, or being informed of them in any written

7    document or conversation.

8

9           I declare under penalty of perjury under the laws of the United States that the foregoing is

10   true and correct.    Executed in Suwon, South Korea, on October 21, 2013.

11

12                                                  */s/Indong Kang*
                                                    Indong Kang
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, Victoria Maroulis, am the ECF user whose ID and password are being used to file the foregoing document.   I hereby attest pursuant to Civil L.R. 5-1 that concurrence in the electronic filing of this document has been obtained from Indong Kang.


  */s/ Victoria F. Maroulis*
Victoria F. Maroulis