# Exhibit 39
# Unredacted Version of Document Sought to be Sealed

# In The Matter Of:

*APPLE INC.*
*v.*
*SAMSUNG ELECTRONICS CO., LTD., et al*

———————————————————————

*PAUL HENRY KRISTIAN MELIN – Vol. 1*
*November 25, 2013*

———————————————————————

# HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

1    notes to Samsung?

2            A.   I don't know, because it's not my

3    responsibility to handle the details of production

4    or non-production of these materials and that is

5    our attorneys' task.

6            Q.   Well, you signed a declaration in

7    connection with this dispute, right?

8            A.   Yes.

9            Q.   Why didn't you attach the notes if

10   they are consistent with your recollection and

11   your testimony in the declaration?

12           A.   I was not asked to attach the

13   notes.

14           Q.   Well -- so, it never occurred to

15   you, apart from being asked, as to whether or not

16   these -- these notes that you claim are consistent

17   with your recollection should be attached, right?

18           A.    Issues such as what to specifically

19   include or attach to various materials submitted

20   to court proceedings are issues where we rely

21   on -- on -- on advice from counsel and -- and I --

22   I don't make --

23           MR. ALLEN:  I'll caution you not -- not

24   to disclose your discussions with counsel.

25           A.   I'm not disclosing those

```
 1    discussions.

 2              BY MR. ZELLER:

 3              Q.   Were you told not to attach the

 4    notes?

 5              MR. ALLEN:  And I'll caution you, you

 6    are free to answer his question.  I'll caution you

 7    when you respond to his question, take care not to

 8    reveal communications with legal counsel.

 9              A.   I prepared a declaration and that

10    declaration was then submitted.

11              BY MR. ZELLER:

12              Q.   Did you draft the declaration?

13              A.   I had -- I basically -- I gave oral

14    instructions to counsel who assisted me in

15    drafting and then I wrote myself the final form of

16    the declaration.

17              Q.   Who created the first draft in the

18    manner you just described?

19              A.   Attorneys at Alston & Bird.  I

20    don't know who exactly.

21              Q.   You don't know the name of the

22    attorney?

23              A.   No.

24              Q.   How many drafts did you go through?

25              A.   After giving my oral instructions
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1    and receiving the first draft, I believe I edited

 2    the final version directly based on that first

 3    draft.

 4              Q.   What changes did you make?

 5              A.   I don't recall the changes as such.

 6              Q.   Do you recall any change that you

 7    made?

 8              A.   Sorry, I don't recall any specific

 9    change.  I just recall that I -- I -- I wrote

10    the -- the sections relating to what specifically

11    occurred in the meeting myself.

12              Q.   Did it occur to you that if in fact

13    you had documents that corroborated your account

14    that they should be attached?

15              MR. ALLEN:  Objection to the question.

16    I'll instruct the witness when you respond to the

17    question, take care not to reveal attorney/client

18    communication and/or attorney/client work product.

19              You may respond.

20              A.   Can you repeat the question?

21              BY MR. ZELLER:

22              Q.   During the process when you were

23    working on this declaration, did it ever occur to

24    you, in any way, that if -- that if, in fact, you

25    had a document that corroborated your account of
```

1    what occurred, that that document should be

2    attached to your declaration?

3            A.   I wrote the declaration under oath.

4    It did not occur to me whether or not there should

5    be additional evidence added to that declaration

6    as such.

7            Q.   Prior to the time that you signed

8    the declaration, had you reviewed your notes to

9    determine whether they were consistent with what

10   you said in the declaration?

11           A.   Yes.

12           Q.   So you were aware of the these --

13   these notes specifically when you were working on

14   the declaration, correct?

15           A.   Yes.

16           Q.   Did you use the notes to draft the

17   declaration?

18           A.   I had the notes at my -- my

19   disposal when -- when writing the declaration.  I

20   don't recall specifically using the notes as such.

21           Q.   Did you make any changes to the

22   declaration based on your notes?

23           A.   No, I don't -- I don't think so.

24   I think I -- I wrote the declaration based on my

25   recollection from the meeting, which was

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 87



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 89

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 90



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN — 11/25/2013

Page 95

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 96

9        Q.   Any other basis?

10       A.   I think I just described the basis.

11       Q.   And is there any other basis you

12  have for your statement, or do I have your

13  complete testimony on that?

14       A.   Well, I don't correctly recall any

15  other basis.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 97

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬

5            Q.   Did the structure of what Samsung

6    offered correspond to the structure of the

7    Apple/Nokia license?

8            MR. ALLEN:  Objection to the form, you

9    may answer it.

■ ▬▬▬   ▬▬   ▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬

■    ▬▬▬▬▬▬▬

■    ▬▬   ▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬

■    ▬▬   ▬▬   ▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬   ▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 98

8        MR. ALLEN:  Objection to the form of the

9    question.  You may answer.

10        A.    No.

11        BY MR. ZELLER:

22        MR. ALLEN:  Objection, asked and

23    answered.  You may answer it again.

24        A.    Those are two different licenses

25    with very different scopes and -- and the values

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 99

```
 1    as such are not comparable.

 2             BY MR. ZELLER:

 3             Q.    Now, you testified that during the

 4    course of the meeting Dr. Ahn, you said, made very

 5    clear that the Apple/Nokia license was an

 6    important issue.  Do you recall that testimony?

 7             A.    Yes?

 8             Q.    How did he make it very clear?

 9    What words did he use?

10             A.    He recited the specific terms of

11    the Nokia/Apple agreement.  He specifically said

12    that he has considered everything in making his

13    offer, with an emphasis on the word "everything",

14    and -- and he said that Samsung considers Apple to

15    be the only comparable competitor in the industry

16    and -- and he took great care in reciting the

17    financial terms of the Nokia/Apple agreement as he

18    claimed to know them during the meeting.

19             Q.    Any other way in which he made it

20    clear, in your view?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 158

```
 1                Q.   Did you look at Eeva's notes?

 2                A.   No.

 3                Q.   Did you review any documents?

 4                A.   No.

 5                Q.   You testified earlier that you and

 6      Eeva discussed the "peculiar comment" that you say

 7      Dr. Ahn made about the Apple/Nokia license, do you

 8      recall that?

 9                A.   Yes.

10                Q.   Did one of you use the words

11      "peculiar comment"?

12                A.   I don't remember whether I used the

13      word "peculiar" or the word "odd" or "surprising"

14      or something of the like.  I believe we had that

15      discussion in the Finnish language and that would

16      depend on how you translate.

17                Q.   Is Finnish your first language?

18                A.   Yes.

19                Q.   Is Finnish Eeva's first language?

20                A.   Yes.

21                Q.   Do you have an understanding as to

22      whether or not Dr. Ahn's first language is

23      English?

24                A.   My understanding is that his first

25      language is Korean, but I am not sure about that.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1              Q.    Anything else that you discussed

 2    with Eeva during that first break other than what

 3    you have testified about?

 4              MR. ALLEN:  I again caution you to take

 5    care not to disclose attorney/client privileged

 6    communications or attorney work product.  Other

 7    than that, you may respond to his question.

 8              A.    My understanding is that the rest

 9    of our conversation was attorney/client

10    privileged.

11              BY MR. ZELLER:

12              Q.    Are you withholding information

13    from your answers based on the attorney/client

14    privilege?

15              MR. ALLEN:  Do you mean, were there

16    other discussions during the break that he is not

17    testifying about here today?

18              MR. ZELLER:  Correct.

19              MR. ALLEN:  OK.  You may answer that.

20              A.    Yes.

21              BY MR. ZELLER:

22              Q.    And when you said in substance to

23    Eeva that the Samsung offer was ███████████████
```

████  ███████████████████████████████████

████  ██████████████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

1    that -- that Samsung is in -- in many litigations

2    and that -- that these license agreements are

3    produced in connection of those litigations and

4    while they are supposed to remain confidential,

5    all information leaks; those were the specific

6    words I very vividly remember him using.  "All

7    information leaks."

8              And -- and he said that -- that they

9    were not willing to discuss around -- around any

10   other proposal than the one that they had made at

11   the beginning of the meeting and at that time it

12   was very difficult for us to respond because he

13   was making references to the Nokia/Apple license

14   agreement which was highly confidential and we

15   were not able to discuss the terms of that

16   agreement and, therefore, were not able to argue

17   and explain to him how and why the actual terms

18   and scope of that agreement were very different

19   from the license that Samsung was requesting with

20   its offer.

21              And -- and -- and as -- as -- as we were

22   in such a difficult situation we -- we -- based on

23   my recollection we -- we made the point that --

24   that the situation was very different just

25   generally based on public information at the time

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 174

1    of Nokia/Apple agreement in 2011; Nokia's handset

2    sales were significantly higher than they were at

3    the time of this negotiation and also Apple's

4    handset revenues, in 2011, were significantly

5    lower than Samsung's corresponding handset

6    revenues at the time of this negotiation.

7              And -- and -- so those were kind of

8    the -- the arguments that we -- we made and as --

9    as we made those arguments, then...

10             Let me think if I can remember anything

11   else.

12             There was a brief pause as -- as we

13   responded in these very generic terms and -- and

14   I remember this very well because it was

15   surprising to us as we had already expressed

16   surprise amongst ourselves, with Eeva, about the

17   peculiar comment that Dr. Ahn had said in the

18   beginning of the meeting, about having some idea

19   about what -- what Apple pays Nokia, and then

20   during this discussion as there was a pause

21   then -- then Dr. Ahn broke that pause in an

22   unprompted manner.  We didn't ask him anything to

23   elaborate.  He just said, unprompted, that --

24   that -- that ███████████████████████

     █  ███████████████████████████████████

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 175

2      So he clearly indicated that not only

3  did he know the effect or the -- the general

4  amounts of the Nokia license agreement.  He even

5  knew the structure of there being ██████████████

██  ██████████████████████ and as -- we were very much

7  surprised by that because that, to us, was clear

8  proof that his claim to know the terms of the

9  Nokia/Apple agreement was not mere bluff, but he

10  actually knew those terms in detail.

11      And at that time, when we then said that

12  our expectation of ████████████████████████████

██  ██████████████ as a compromise offer is a genuine

14  expectation by Nokia management, we also said

15  that -- that -- that we do need to see that value

16  clearly reflected in an agreement.

17      We asked whether he would have any

18  flexibility to negotiate ██████████████████████

██  ████████████████████████████████████████████████

██  ██████████████████████████ And he very clearly said

21  that no, he is willing to negotiate around his

22  number but not around -- around anything else.

23  And at that time as it became very clear that we

24  had a very substantial gap in the negotiations,

25  and we -- also under the Nokia/Samsung agreement,

```
 1    we had certain steps to follow regarding the --
 2    the -- the pending notices and the procedure
 3    required to extend that license agreement we -- we
 4    wanted to have a break before -- before continuing
 5    the negotiations.
 6              So the second session started by us
 7    rejecting Samsung's offer.  There was an exchange
 8    of views of why we believed their offer was not
 9    sufficient, our offer was fully justified, and
10    then Samsung discredited our offer and basically
11    laughed us at the -- at the numbers and made the
12    comparison that Apple is the only comparable
13    they -- they deem appropriate and made it
14    expressly clear that they know exactly the
15    financial terms of the Nokia/Apple agreement and
16    that basically led to an impasse.  It clearly was
17    a situation where we were not able to make further
18    progress, so I recall that we called for a break.
19              Q.   Other than what you testified to,
20    did Dr. Ahn say anything else or use any other
21    words that pertained to the Apple/Nokia license
22    during that second session?
23              A.   I believe during the course of this
24    deposition, I have covered what he said.
25              Q.   I'm asking you other than what you
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 188

```
1    question.
2            A.   I am not aware of any such
3    information.
4            MR. ALLEN:  Just let finish.  It is
5    outside the scope.  I will allow you to answer the
6    question.  I apologize.  Go ahead.
7            A.   Yeah, I am not aware of any such
8    information being provided.
9            BY MR. ZELLER:
10           Q.   Well, how, in your view, was Apple
11   or -- excuse me, strike that.
12           How, in your view, was Samsung to know
13   whether or not the licensees ████████████████
     ██  ████   were comparable to Samsung if you provided
15   no information about those licensees?
16           MR. ALLEN:  Objection to the form of the
17   question.  It's vague.  You may answer his
18   question.
19           A.   I don't understand.  I think that
20   sounds like a hypothetical question.  Can -- can
21   you repeat it?
22           BY MR. ZELLER:
23           Q.   Was it your expectation that
24   Samsung would have enough information by you just
25   telling Samsung that there were licensees paying
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 189

```
 1      ██████████████, that Samsung could ascertain

 2      whether they in fact were comparable to Samsung?

 3              MR. ALLEN:  Objection, foundation.  You

 4      may answer the question.

 5              A.   Samsung did not ask for any further

 6      information based on my recollection.

 7              BY MR. ZELLER:

 8              Q.   Has it been a typical experience

 9      for you, in the context of other licensing

10      negotiations, for the other side to just accept

11      your statement that some other licensees are

12      paying a particular rate?

13              MR. ALLEN:  Objection to the form of the

14      question.  It's outside the scope.  Instruct the

15      witness not to answer.

16              BY MR. ZELLER:

17              Q.   You didn't find that odd?

18              MR. ALLEN:  Objection.

19              BY MR. ZELLER:

20              Q.   Excuse me, if I can finish it.

21              You didn't find that odd, that you just

22      simply made the assertion that there were other

23      licensees who were ████████████████████

██      ████████ and no other information was being

25      conveyed with it, no questions were asked?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1              MR. ALLEN:  Objection to the form of the
 2    question, compound.  You may answer it.
 3              A.   It's a -- it's a very clear custom
 4    in the industry that license royalty terms are
 5    highly confidential information and -- and
 6    generally not shared, especially license
 7    agreements relating to particular companies.
 8              So I -- I don't recall actually any
 9    meeting where -- where any details of any
10    particular third-party license would have been
11    specifically discussed in connection with license
12    negotiations.  So I don't find it peculiar at all
13    that -- that there was no further discussion about
14    which -- which companies would be paying what
15    specific royalty term.
16              BY MR. ZELLER:
17              Q.   You know what "FRAND" stands for,
18    right?
19              A.   Yes.
20              Q.   What's the "N" stand for?
21              A.   Sorry?
22              Q.   The "ND", what's the last part of
23    it, the "ND" stand for?
24              A.   Non-discriminatory.
25              Q.   What's that mean to you?
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

Page 191

```
 1              MR. ALLEN:  Objection to the form of the

 2     question.  It's outside the scope.  Instruct you

 3     not to answer.

 4              BY MR. ZELLER:

 5              Q.   Non-discriminatory means that it's

 6     comparable to other comparable parties, right?

 7              MR. ALLEN:  Same objections.  Instruct

 8     the witness not to answer.

 9              BY MR. ZELLER:

10              Q.   Have you described now the totality

11     of all the information that you conveyed to

12     Samsung as to what licensees were comparable or

13     not comparable to Samsung?

14              MR. ALLEN:  Objection to the form of the

15     question.  Assumes facts not in evidence and

16     mischaracterizes the testimony, but you may answer

17     the question.

18              A.   I have provided my recollection as

19     it pertains to the meeting on June 4.

20              BY MR. ZELLER:

21              Q.   I'm asking is there any other

22     information that you conveyed to Samsung as to

23     whether or not the other licensees were comparable

24     or not comparable to Samsung?

25              MR. ALLEN:  Same objection.  You may
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1          BY MR. ZELLER:
 2             Q.   Is there anything that you are
 3   excluding from your answer regarding the
 4   conversations or discussions you had with Eeva
 5   during this break based upon the attorney/client
 6   privilege?
 7             A.   Yes.
 8             Q.   Regarding this portion of the
 9   conversation you did testify about between you and
10   Eeva on this break as it related to the
11   Apple/Nokia license, how long did that discussion
12   last?
13             A.   I don't recall exactly.  I don't
14   think we discussed the matter relating to the
15   Apple license that long, maybe five or ten minutes
16   or less.
17             Q.   What happened then after this third
18   break?
19             A.   We continued the meeting and -- and
20   in order to fulfil the objective of the meeting
21   and -- and to find a constructive way forward, we
22   discussed or -- or explained to Samsung what was
23   our possible and planned content of our extension
24   notification response under the Nokia/Samsung --
25   and -- and we showed page 4 of the PowerPoint,
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 202

```
 1    and -- and explained the content of that page.

 2              Q.   In your answer, you keep on saying

 3    "we".  Please tell me what was the first thing

 4    that was said when the meeting resumed after that

 5    break?

 6              A.   My recollection is that the first

 7    thing that was said was that -- that we -- we

 8    found it unlikely that we would be able to -- to

 9    close the gap in the negotiations, at least at

10    that time, and that it appeared likely that --

11    that an arbitration or -- or something similar

12    would be -- would be necessary and actually an

13    arbitration might be a constructive way for us to

14    approach this topic, and we explained that in the

15    context of our license agreement with Samsung

16    and -- and explained our planned possible content

17    of Nokia's extension of the notification response

18    under the license agreement between Nokia and

19    Samsung in that context.

20              Q.   Who said that?

21              A.   I said that and Eeva may have added

22    something to the discussion in case I missed

23    something or -- or to participate in the

24    conversation, but I was doing the speaking mainly

25    on behalf of Nokia.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

```
 1              Q.   Did Eeva say anything?

 2              A.   Most likely she did, but I don't

 3    recall what she may have said specifically.

 4              Q.   Do you have any recollection of

 5    what she said?

 6              A.   Not specifically.

 7              Q.   Do you have a recollection she did

 8    speak?

 9              A.   Yes, I do have a recollection that

10    she participated in the discussions.  She was not

11    silent throughout the meeting, but I don't recall

12    exactly what she said.

13              Q.   Do you recall any of the topics

14    that she addressed?

15              A.   Not specifically.  She would not

16    have introduced new topics or different topics

17    from the ones being discussed.

18              Q.   Do you recall, even generally, any

19    of the topics that she addressed or discussed

20    during the meeting?

21              A.   My recollection is that she

22    participated in the discussion about why Samsung's

23    offer was not acceptable to Nokia, why Nokia's

24    earlier offers and -- and -- and licensing

25    approach were entirely justified and -- and how we
```

```
 1              Q.   Do I have -- I have your complete

 2    testimony on that, at least insofar as you believe

 3    you can give it, consistent with the

 4    attorney/client privilege?

 5              A.   I think so.

 6              Q.   As we talked about earlier, you are

 7    generally aware that there were communications

 8    between Nokia and Samsung between the June 4

 9    meeting and the time that Nokia filed the motion

10    about the Protective Order in the Northern

11    District case?

12              A.   I don't recall specifically what

13    communications occurred between that time period.

14              Q.   Did you review any draft

15    communications or comment on any draft

16    communications being sent to Samsung after the

17    June 4 meeting?

18              A.   Do you mean -- do you mean now

19    after the June 4 meeting up to today, or between

20    the June 4 meeting and the filing of the motion

21    or... Can you be more specific?

22              Q.   Just so you have the context here.

23    I am only asking about this time period right now

24    between the June 4 meeting and then when the

25    motion was filed, so I'll change the time period
```

```
 1    later but just so we have a context, that's the

 2    time period I'm talking about.

 3              Do you have that in mind?

 4         A.   OK.

 5         Q.   So focusing on this time period

 6    from the June 4 meeting to when Nokia filed the

 7    Protective Order motion, did you review or comment

 8    on any draft communications to Samsung?

 9         A.   Can you remind me what was the date

10    of filing the Protective Order?

11              MR. ALLEN:  July 1.

12              BY MR. ZELLER:

13         Q.   July 1, 2013.

14         A.   So just to be clear, between 4 June

15    and July 1?

16         Q.   Correct.

17         A.   I'm not sure.

18         Q.   In the normal course of your work,

19    do you typically review or comment on draft

20    communications that are going to another party

21    such as Samsung during the course of negotiations?

22         A.   If the communication relates to

23    things like scheduling meetings or -- or details

24    of a negotiation generally, I do not.  To the

25    extent that the communication would convey binding
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 224

```
 1    offers or -- or -- or substantial new terms being
 2    discussed, I may.
 3            Q.   Do you have any understanding or
 4    explanation as to why Nokia's correspondence to
 5    Samsung, during this June 4 to July 1 time period,
 6    didn't make any reference to what Dr. Ahn said
 7    about the Apple/Nokia license at the meeting?
 8            A.   Sorry, can you repeat the question?
 9            Q.   Sure.  Do you have any
10    understanding or explanation as to why Nokia did
11    not mention in any of its correspondence, during
12    this June 4 to July 1 time period, what it is that
13    Dr. Ahn said about the Apple/Nokia license?
14            A.   First of all, I -- I don't have
15    here all the communication between Nokia and
16    Samsung during that time period, so I cannot
17    verify whether that's an accurate statement, that
18    it was not -- not -- not referred.  But I have no
19    comment to that.
20            Q.   When you say no comment, you don't
21    know?
22            A.   I said I don't have that -- that
23    communication in front of me, so I cannot really
24    comment on that.  I have not reviewed it.  It was
25    not within the scope of this deposition.
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 225

```
 1            Q.   You didn't review any of the
 2   communications between Nokia and Samsung to
 3   testify here today?
 4            A.   I believe the topic of testimony
 5   was what happened in the meeting on July --
 6   June 4, not what happened after the meeting on
 7   June 4.  So I did not review materials pertaining
 8   to the time after the meeting.
 9            Q.   I'll represent to you that there
10   were e-mails and letters that Nokia sent to
11   Samsung during the time period after June 4 and
12   before July 1.  With that representation in mind,
13   do you have any explanation or understanding as to
14   why Nokia did not say anything in those written
15   communications about what Dr. Ahn had said about
16   the Apple/Nokia license?
17            A.   I have no comment on that.
18            Q.   What does that mean?
19            A.   I have no comment on that.
20            Q.   Does it mean you don't know?
21            A.   I didn't say that.  I said I have
22   no comment on that.
23            Q.   Please tell me what you know on
24   that subject.
25            A.   On what subject?
```

```
 1    following.  Let me –– let me ask it this way.

 2                So the part where it's saying:

 3                "... received by Samsung's attorneys in

 4    the course of litigation..."

 5                That phrase is a –– is a paraphrase?

 6          A.    The "received by" is a paraphrase.

 7          Q.    Is any of the rest of that sentence

 8    a paraphrase?

 9          A.    Are you now referring to the –– the

10    part after the comma or ––

11          Q.    I apologize.  You're right.  I'll

12    rephrase that.

13                Just focusing on that first clause of

14    this sentence, is there anything else in there

15    that is a paraphrase?

16          A.    I don't think so.

17          Q.    Focusing then on the second part,

18    the second clause of this sentence:

19                "... and that they had provided

20    Samsung's in-house team with the terms."

21                Are those actual words that Dr. Ahn used

22    or –– or is that a paraphrasing?

23          A.    Yeah, this does not purport to be a

24    quote of a verbatim record.  My recollection is

25    that Dr. Ahn used the words of –– of explaining
```

```
 1      first what was referred by their first part of the

 2      sentence, that the -- the agreement had been

 3      produced to Samsung's attorneys in the course of

 4      litigation.

 5              Then he explained that -- that -- that

 6      of course that information is supposed to be

 7      confidential, but all information leaks.  "All

 8      information leaks" are the words that

 9      I specifically recall him using.  And -- and that

10      was all in the context of an explanation where

11      he -- he stated that he has been made aware of the

12      terms and -- and clearly the Samsung team was

13      aware of the terms.

14              He did not specifically state whether

15      this information was told to him personally or to

16      his team and to him by his team.  But it was clear

17      that the entire team was aware of the terms.

18          Q.  Focusing here on -- on paragraph 8.

19      Is this -- is this, in your view, a correct

20      chronological account of the substance of what

21      Dr. Ahn said or is this not chronological?

22              MR. ALLEN:  You mean, is the gist of the

23      sentence in the order that they were stated in the

24      meeting?

25              BY MR. ZELLER:
```

```
 1              Q.   Correct, right.

 2              A.   This does not purport to be a

 3    chronological record.  But I believe that the --

 4    the different facts listed here occur in the same

 5    order as they were discussed in the meeting based

 6    on my recollection.

 7              Q.   So if I understand you correctly,

 8    the order in which the substance of these comments

 9    were made are reflected in the order that they

10    occurred in the meeting or have they been

11    reordered in -- in some way?

12              A.   Let me just review it.  This

13    paragraph 8 is not drafted to -- to -- to present

14    the chronological steps in the meeting.

15              The first sentence kind of refers partly

16    to the same matter as -- as the second or the

17    mid-section.  So in -- in terms of chronology, he

18    first informed that he was aware of the terms.

19    Then he stated that the agreement had been

20    produced in litigation, and that was supposed to

21    be confidential but everything leaks and,

22    therefore, he is aware of the terms.  And then

23    after making those statements he recited the

24    financial terms back to us.

25              So this roughly corresponds to the -- to
```

```
 1              Q.   So paragraph 8, as it's written

 2    here, does accurately reflect the chronology, the

 3    order in which Dr. Ahn had said these things at

 4    the meeting?

 5              A.   Apart from the first and second

 6    sentence partially referring to the same step in

 7    the discussion, this does correspond to the

 8    chronological order in which the events occurred.

 9              Q.   You say "apart".  So it's correct

10    that the -- when you look at the paragraph 8 in

11    its entirety it is not presented in chronological

12    order of what it is that Dr. Ahn said at the

13    meeting, right?

14              A.   No.

15              MR. ALLEN:  Objection, mischaracterizes

16    the testimony.

17              A.   That's not right.  If you look at

18    paragraph 8 in its entirety, it's consistent with

19    the chronological order in which the events

20    happened.

21              BY MR. ZELLER:

22              Q.   So in -- in your view paragraph 8

23    is written in a way chronologically that is

24    consistent with what actually happened

25    chronologically at the meeting insofar as it
```

Page 240

```
 1    related to Dr. Ahn's statements?

 2              A.    That's not what I said.

 3    Paragraph 8 is not written primarily

 4    chronologically, but it is consistent with the

 5    chronology of events in the meeting.

 6              Q.    By the way, did Dr. Ahn use the

 7    word "aware" or "told" with respect to the terms

 8    of the Apple/Nokia license?

 9              A.    He used several words during the

10    meeting.  First he used the words "I have an

11    idea".  Then after the break, he used the words

12    "I know" and then continued to refer to the terms

13    of the agreement, and then he -- he did explain

14    that the agreement had been produced to outside

15    attorneys, but -- but that -- that all information

16    leaks and -- and therefore he is aware.

17              So I believe he used several different

18    words during the discussion.  I don't recall him

19    using specifically the word "told".

20              Q.    Did he use the word "aware" in

21    connection with the terms of the Apple/Nokia

22    license?

23              A.    I believe he used the words

24    "I know", rather than "I am aware."

25              Q.    Is the -- are the statements that
```

```
 1    you attribute to Dr. Ahn here in paragraph 8

 2    statements that he made both before and -- I'm

 3    sorry, strike that.

 4             Are these statements that you attribute

 5    to Dr. Ahn in paragraph 8 of your declaration

 6    statements that he made during the first session

 7    of the meeting, the second session of the meeting

 8    or during the course of both?

 9             A.   In the first session of the

10    meeting, Dr. Ahn, based on my recollection, only

11    said that he has an idea of what the financial

12    terms are or -- or what Apple pays Nokia and what

13    I have written in paragraph 8 refers to what

14    happened in the second session in the meeting.

15             Q.   So with respect to what you relate

16    here in paragraph 8, all of it is what Dr. Ahn

17    said occurring the second session?

18             A.   That's my recollection.

19             Q.   Is there anything in your

20    declaration that you see that refers to anything

21    Dr. Ahn said in the first session of the June 4

22    meeting?

23             A.   Other than -- than it being

24    thematically the same thing, that he said in the

25    first meeting that he has an idea of what Apple is
```

```
 1    paying Nokia, being substantively very much the

 2    same thing of having been informed of the

 3    financial terms, this paragraph 8, when I wrote

 4    it, I -- I intended to focus on the second

 5    session.

 6              Q.   I understand you focused on it.

 7    I'm just trying to find out is -- is anything

 8    that's reflected here in paragraph 8 something

 9    that happened during the first session --

10              MR. ALLEN:   Objection --

11              BY MR. ZELLER:

12              Q.   -- as opposed to the second?

13              MR. ALLEN:   I apologize.  Objection,

14    asked and answered.  You may answer it again.

15              A.   During the first session Dr. Ahn

16    said that he has an idea of what Apple pays to

17    Nokia under our license agreement, which implied

18    that he had been told of the financial terms of

19    Nokia's license with Apple but did not yet verify

20    that in detail.  In the second session of the

21    meeting, he went into much more detail and the

22    paragraph 8 outlines the discussion during that

23    second session.

24              BY MR. ZELLER:

25              Q.   Focusing on paragraph 9, where
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN – 11/25/2013

```
 1    it says:

 2               "Samsung then used the terms of Nokia's

 3    license with Apple in an attempt to gain an

 4    advantage in the ongoing negotiations between

 5    Nokia and Samsung."

 6               Do you see that language?

 7          A.   Yes.

 8          Q.   Is that something that happened

 9    during the first session or the second?

10          A.   I would not limit it to any of

11    those sessions.  I cannot -- I don't yet know

12    whether Samsung used the terms even more broadly

13    either before or after the -- the meeting.

14               My understanding is that -- that -- that

15    it's clear that Samsung used that information in

16    the whole meeting and its overall approach in that

17    meeting as the whole offer that they made was

18    clearly based on the -- the information of the

19    Apple agreement.  In terms of explaining the

20    issues and -- and making it clear to us that

21    attempt to gain an advantage occurred after he

22    revealed to us the level of detail that he was

23    aware of.

24          Q.   You say that it was "clearly based"

25    and the like.  Did Dr. Ahn say that he based his
```

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY
PAUL HENRY KRISTIAN MELIN - 11/25/2013

Page 265

1

2              CERTIFICATE OF COURT REPORTER

3

4    I, TRISH BRADY, an Accredited Realtime Reporter, hereby

5    certify that the testimony of the witness MR. PAUL HENRY

6    KRISTIAN MELIN in the foregoing transcript, numbered pages 6

7    through 264, taken on Monday, November 25, 2013, was

8    recorded by me in machine shorthand and was thereafter

9    transcribed by me; and that the foregoing transcript is a

10   true and accurate verbatim record of the said testimony.

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the parties to

14   the within cause, nor am I an employee or relative of any

15   counsel for the parties, nor am I in any way interested in

16   the outcome of the within cause.

17

18

19

20

21   Signed:  .......................

22   TRISH BRADY

23   Dated:   .......................

24

25