# EXHIBIT E

UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Paul S. Grewal, Magistrate Judge

| | |
|---|---|
| APPLE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )    No. C 11-1846 LHK (PSG) |
| | ) |
| SAMSUNG ELECTRONICS CO., LTD., | ) |
| a Korean corporation; SAMSUNG | ) |
| ELECTRONICS AMERICA, INC., a | ) |
| New York corporation; SAMSUNG | ) |
| TELECOMMUNICATIONS AMERICA, | ) |
| LLC, a Delaware limited | ) |
| liability company, | ) |
| | ) |
| Defendants. | ) |

San Jose, California
Monday, December 9, 2013

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES**:

For Plaintiff Apple, Inc.:
                    Morrison & Foerster
                    425 Market Street
                    San Francisco, California  94105
           BY:  **HAROLD J. MCELHINNY**, Esq.

(Appearances continued on next page)

Transcribed By:        Candace Yount, CSR# 2737, RMR, CCRR
                       Contracted Court Reporter/Transcriber
                       candace.yount@gmail.com

Computerized Transcription By Eclipse

**APPEARANCES (Continued):**

For Plaintiff Apple, Inc.
(Continued)                 Wilmer Cutler Pickering Hale & Dorr LLP
                           950 Page Mill Road
                           Palo Alto, California 94304
                  BY:      **MARK D. SELWYN**

                           Wilmer Cutler Pickering Hale & Dorr LLP
                           60 State Street
                           Boston, MA 02109
                  BY:      **JOSEPH J. MUELLER**


For Defendant Samsung:
                           Quinn, Emanuel, Urquhart & Sullivan LLP
                           865 S. Figueroa Street
                           Tenth Floor
                           Los Angeles, California  90017-2543
                  BY:      **JOHN B. QUINN, Esq.**
                           **MICHAEL T. ZELLER, Esq.**
                           **DANIEL C. POSNER, Esq.**
                           **ROBERT J. BECHER, Esq.**

For Nokia:
                           Alston & Bird LLP
                           275 Middlefield Road
                           Suite 150
                           Menlo Park, California  94025
                  BY:      **RANDALL L. ALLEN, Esq.**
                           **RYAN W. KOPPELMAN, Esq.**

```
 1  Monday - December 9, 2013                          2:56 p.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4          THE COURT:  This matter has been specially set.

 5          THE CLERK:  Yes, Your Honor.

 6      Calling Apple, Inc. versus Samsung Electronics, et al.,

 7  Case Number CV-11-1846 LHK, matter on for Order to Show Cause.

 8      Counsel, please state your appearances.

 9          MR. QUINN:  Good afternoon, Your Honor.  John Quinn,

10  Mike Zeller, Dan Posner, Rob Becher for Samsung.

11          THE COURT:  Good afternoon.  Welcome.

12          MR. McELHINNY:  Good afternoon, Your Honor.  Harold

13  McElhinny of Morrison & Foerster on behalf of Apple.

14          THE COURT:  Mr. McElhinny, good afternoon.

15          MR. McELHINNY:  Thank you.

16          MR. SELWYN:  Good afternoon, Your Honor.  Mark Selwyn

17  from Wilmer Cutler on behalf of Apple and with me is my partner

18  Joe Mueller.

19          THE COURT:  Mr. Selwyn, good afternoon to you and your

20  colleagues as well.

21          MR. ALLEN:  Good afternoon, Your Honor.  Randall Allen

22  on behalf of Nokia.  I'm here with my partner Ryan Koppelman.

23          THE COURT:  Welcome back, Mr. Allen.

24          MR. ALLEN:  Thank you.

25          THE COURT:  All right.  I believe we all understand
```

1    the -- the purpose at hand.

2        As you all undoubtedly are aware, I recently issued an

3    Order to Show Cause regarding sanctions in this matter.

4        I believe my order has laid out the basic parameters of

5    what I would like to discuss today and, in particular, I would

6    like to emphasize and make sure that we cover at least the

7    following issues in our time together:

8        I want to understand more specifically from Samsung the

9    circumstances surrounding the initial disclosure of the

10   insufficiently redacted Teece report on or about March 24 or

11   March 25 of 2012.

12       I'd also like to make sure we cover and flesh out whatever

13   remaining details remain concerning the June 29, 2012, analysis

14   of the Dutch spreadsheet that I believe is also referenced in

15   my order.

16       Third, I'd like to cover the specific circumstances

17   surrounding Mr. Shim's interactions and exchanges with

18   Mr. Eden, Mr. Pease and Mr. Baxter in December of 2012 and

19   January of 2013.

20       I'd also like to make sure we cover the information we

21   have learned since we last gathered regarding Dr. Ahn's

22   interactions with Mr. Melin and his colleague at Nokia.

23       Finally, I'd like to make sure we cover, and I very much

24   appreciate the parties' input, on this Court's authority under

25   Rule 37 to issue sanctions for the conduct that has been

1  identified, and what limitations, if any, there are under that

2  authority.

3      There may be other issues we need to address.  I'm eager

4  to spend whatever time we can on them but I'd like to make sure

5  we at least cover the issues I've identified just now.

6      With that, Mr. Quinn, the order is directed to you and

7  your clients, so I'll begin with you, sir.

8          **MR. QUINN:**  Thank you, Your Honor.

9      In the Court's Order to Show Cause, the Court identified

10 three potential violations of the Protective Order.  And the

11 Court also identified the evidence and conduct of which it

12 thought potentially supported findings of violations of the

13 Protective Order.  And I'd like to at least in the first

14 instance, Your Honor, address myself to -- to those issues.

15     The three potential violations were the disclosures

16 themselves; second a potential or alleged use of the

17 information covered by the Protective Order; and, third,

18 (inaudible) compliance or lack thereof with respect to the

19 provisions of the Protective Order governing what should happen

20 in the event that there was an inadvertent disclosure.

21     And I'll begin with the -- the disclosures themselves,

22 Your Honor.  And I think it's in -- This is obviously a --

23 There's a certain amount of heat and aggressive advocacy which

24 comes through in the briefs, and I think we all understand the

25 background to that.

 1      But just in terms of orienting ourselves as to what we're

 2   talking about here, I think it's first perhaps useful to

 3   recognize that we're talking about inadvertent disclosures.

 4      There is no evidence that anyone deliberately, with a

 5   purpose of sharing information that should not be shared at any

 6   time disclosed that information.  We are talking about

 7   inadvertent disclosures.  That's the first sort of preliminary

 8   orienting comment I would make.

 9      I do not understand either Nokia or Apple to be claiming

10   at any point, as I understood it, that there was anything else

11   other than an inadvertent disclosure.

12      Second, we are talking about some number of lines in three

13   paragraphs of a heavily redacted lengthy opening report of an

14   expert.  And that's all.  And there were exhibits to that which

15   were -- which have detailed information concerning license

16   terms.  Those were appropriately removed.

17      What was left in the body, buried in a very lengthy

18   report, were unfortunately some financial information, not

19   complete information, but some financial information.  I think

20   the Court knows what was -- what was left in and what wasn't,

21   that were included and were disclosed.

22      So that's the body of what -- That's basically, you know,

23   what the battle ground is here.

24      At Page 7 of Apple's brief, we find the following

25   statement (reading):

1          "At least as early as December 21, 2012, Samsung

2      knew of the Protective Order violations and said

3      nothing to the 165 people who had received Apple's

4      confidential information."

5      Your Honor, that is simply not supported by any evidence

6  that's been adduced.  It's simply not true.

7      The only evidence is that there was one error that was

8  known of and was caught.  An associate made an error.  A second

9  associate caught it.  Within hours, the recipient was told not

10 to read the document.

11     We now know as a result of the investigation that Samsung

12 undertook before this Court was involved last summer, Your

13 Honor -- and I'll address that further -- that it had been put

14 on that FTP site the preceding March and had been shared with a

15 large number of people.

16     It is simply not accurate to say that as of December 21,

17 we knew that that had happened.  That simply had not been

18 discovered.

19         THE COURT:  It was certainly the case, though, that

20 your firm knew that an insufficiently redacted report had been

21 disclosed in December 2012.

22         MR. QUINN:  Yes.  We -- We learned about the

23 transmittal; that's the one I'm referring to.

24         THE COURT:  You also just mentioned, Mr. Quinn, that

25 at some point thereafter, an attorney with your firm contacted

1  Mr. Shim and instructed him to delete the report; correct?

2          **MR. QUINN:**  Instructed him not to read it.  And the

3  Court --

4          **THE COURT:**  How -- How was that instruction delivered?

5          **MR. QUINN:**  The Court has -- And we're talking about

6  communications between lawyers on both sides, Your Honor.  The

7  Court has that exchange of e-mails.

8          **THE COURT:**  I actually don't.

9          **MR. QUINN:**  Well --

10          **THE COURT:**  This is my question.  And I don't believe

11  I'd worry about traipsing into --

12          **MR. QUINN:**  Right.

13          **THE COURT:**  -- any controversial territory when we

14  talk about the form of the communication.

15      The declarations suggest that the instruction Mr. Shim was

16  given in some form other than an e-mail.  And when I'm

17  talking -- What I'd like to understand is, if it wasn't --

18  Well, first of all, was it in an e-mail or not; and, second, if

19  it wasn't, how was it communicated?

20          **MR. QUINN:**  My recollection, Your Honor -- And I'm

21  looking to -- I want to make sure I respond accurately.

22          **THE COURT:**  Mr. Zeller, maybe you can shed some light

23  on that.

24          **MR. QUINN:**  There's a Supplemental Declaration of

25  Mr. Pease --

 1          **THE COURT:**  Correct.

 2          **MR. QUINN:**  -- dated November 17th, 2013, which

 3  attaches an e-mail, Your Honor.  The e-mail exchange --

 4          **THE COURT:**  Can I took a look at it?

 5          **MR. QUINN:**  I'm sorry?

 6          **THE COURT:**  Can I take a look at it, if you have a

 7  copy?  The version I was studying in chambers just didn't have

 8  that.

 9          **MR. ZELLER:**  Let me look for it.

10          **THE COURT:**  Go ahead, Mr. Zeller.

11                    (Pause in proceedings.)

12          **THE COURT:**  Just give me a moment, Mr. Quinn.

13          **MR. QUINN:**  Yeah.

14                    (Pause in proceedings.)

15          **THE COURT:**  All right.  Thank you.

16          **MR. McELHINNY:**  Excuse me, Your Honor.  I just wanted

17  to state for the record so that there's no confusion.

18      They have just handed up to you a declaration with an

19  attached e-mail.

20      We do not have that, do not have the underlying e- mail

21  which Your Honor has just read or reread.

22          **THE COURT:**  I understand, Mr. McElhinny.

23          **MR. McELHINNY:**  Thank you.

24          **THE COURT:**  It's noted.

25      Just go ahead, Mr. Quinn.

1      **MR. QUINN:**  For the record, I believe that was

2  previously filed with the Court and it is a privileged

3  communication between lawyers.

4      Now, let me be -- I hope the Court appreciates my

5  earnestness when I say that one disclosure of information that

6  should not have been disclosed is unacceptable and should not

7  have happened, and that's a lesson that, speaking for our firm,

8  we have taken to heart.

9      But, Your Honor, there is a -- I do need to address,

10  because it's like a drumbeat that's sounded in the briefs filed

11  by Nokia and Apple, the number of times, hundreds of times,

12  they reference disclosures or forwarding of this information.

13  As I say, one is -- one was too much and there was no question

14  that it's very unfortunate that this was, in fact, forwarded.

15      But in Apple's brief, if the Court -- over the Court

16  notice -- they use a defining term, "Apple confidential terms,"

17  which picks up the brief in the ITC, which Mr. Lee told us last

18  time -- the Court asked Mr. Lee, I think the Court will recall,

19  directly, "Is that at issue here?"  And Mr. Lee said, "No, it

20  isn't, for the reasons that we discussed the last time."

21      So there is, I -- I submit, a certain amount of piling on

22  here in terms of the number of disclosures, the multiple times,

23  because they're counting not only the Teece report which is

24  what we should be focusing on here, but also counting the

25  poorly unfortunately wrongly redacted brief in the ITC, which

1   is the subject of a different proceeding altogether and is

2   not -- was not a violation of this Court's Protective Order.

3   And I can expand on that if that still becomes an issue in this

4   case.

5            **THE COURT:**  Mr. Quinn, I -- I would like to just make

6   sure I further understand and appreciate the specifics of the

7   disclosure that were candidly made.

8       In particular, in your brief, in a footnote, you reference

9   a further disclosure of an insufficiently redacted report in

10  January of 2013?

11           **MR. QUINN:**  Yes, Your Honor.

12           **THE COURT:**  I am un -- unable to, in comparing the

13  copies or versions of the report that I received with others,

14  figure out exactly what was insufficiently redacted in that

15  January 2013 report.

16           **MR. QUINN:**  The Ericsson information.

17           **THE COURT:**  Okay.

18           **MR. QUINN:**  So after the discovery of the improperly

19  redacted December report, sadly, and to all our chagrin, when

20  it was redacted, Nokia information, Nokia-Apple information was

21  removed.  There was still Ericsson information that was then

22  sent to Mr. Shim.

23      But if I can turn, Your Honor, again to this phenomenon

24  of -- of the transmission of this document and what it means

25  the multiple times.

1    It shouldn't be a surprise to us that, in a digital age,

2    when it's so easy to forward a document and to hit "Send" and

3    pull it up in a directory, that things do get sent and then get

4    resent and get forwarded again.

5    My point is, Your Honor, this was -- There were reasons

6    why the Teece report, if properly redacted, would properly be

7    shared.

8    There were multiple cases sending around the world

9    involving dozens of lawyers.  And as I'm sure the Court can

10   imagine, it was very important that the positions that Samsung

11   takes in different courts be coordinated so that we weren't

12   tripping over ourselves in different courtrooms and saying

13   different things.

14   So the fact that something is forwarded multiple times and

15   to different lawyers and to different jurisdictions in itself

16   isn't a surprise.

17   **THE COURT:**  Perhaps not, Mr. Quinn, but you would

18   agree, wouldn't you, that your -- your explanation would

19   suggest that the individuals who were looking at this redacted

20   report were involved exclusively in litigations in various

21   jurisdictions.

22   My understanding is that the disclosures went beyond that.

23   People who weren't involved in litigation, per se, but had

24   other purposes for the information.

25   **MR. QUINN:**  Well, it certainly went --

1          **THE COURT:**  It may not be improper.  I'm just trying

2    to --

3          **MR. QUINN:**  Yeah.  No.

4          **THE COURT:**  -- properly characterize --

5          **MR. QUINN:**  They made an issue about, when it went to

6    Williams & Connolly, for example, before they appeared.  And I

7    don't know if that's what the Court is --

8          **THE COURT:**  Well --

9          **MR. QUINN:**  -- getting --

10         **THE COURT:**  -- I'm getting at the licensing

11   executives.

12         **MR. QUINN:**  I mean, it was -- It did -- That's true,

13   Your Honor.

14        But they -- The evidence on that is that -- and we adduced

15   this forensic evidence before -- Dr. Ahn, it was forwarded to

16   him, the forensic evidence shows, didn't open it.

17        Mr. Clock, you know, as of that June 4 meeting, didn't

18   open it.  The third participant in that meeting, they hadn't

19   opened it.  That's the forensic evidence.

20        This thing did get forwarded around, but the forensic

21   evidence is that those people involved in meeting with Nokia,

22   you know, simply hadn't opened it.

23        I mean, there are reasons that -- the Teece report is a

24   very lengthy report.  It covers a lot of different issues.  The

25   Nokia -- The terms of the Nokia-Apple license are hardly the

1    focus of that report.  It's a dinky, tiny part of the report.

2        And I think the way -- One way the Court can assure itself

3    that this was not forwarded for an improper purpose, is, the

4    Court knows, because the Court's done the hard work of looking

5    over those privileged documents, there's not a single document

6    that says, "Oh, my gosh, take a look at Paragraph 295.  Look

7    what we've got."  There's nothing that calls attention to that.

8    Anywhere.  It wasn't why that thing was forwarded.  It wasn't

9    the subject of interest.

10        We previously filed with the Court declarations from the

11   law firms all around the world, and they talked about why they

12   used that, why it was of interest.  And the record is, that

13   isn't what -- the terms of the Apple-Nokia license wasn't the

14   reason that was sent around, and that isn't the reason people

15   received it.  There just wasn't pay dirt there.

16        If that had been what was going on here, one would

17   certainly expect to see someone somewhere call attention to it,

18   and we don't, in thousands of documents.

19        So that, I submit, in terms of the evidence regarding the

20   first violation, we have a -- I think, a gross overstatement by

21   Apple that as of December 21, 2012, we knew of the Protective

22   Order violations, said nothing to the 165 people.

23        We knew of one -- When we knew -- When we learned that

24   about that one, we did the right thing.

25        The second --

1       **THE COURT:**  Before you turn to the second, Mr. Quinn.

2       **MR. QUINN:**  Right.

3       **THE COURT:**  Going back to the response in December of

4  2012.

5       **MR. QUINN:**  Yes.

6       **THE COURT:**  It would appear that in light of the

7  instruction given to Mr. Shim not to use that opening report,

8  Mr. Shim didn't comply with that instruction.

9     Is that fair?

10      **MR. QUINN:**  I -- I don't believe there's any reason to

11  think he didn't comply with that instruction.

12      **THE COURT:**  Well, he certainly circulates an

13  insufficiently redacted copy of that report on multiple

14  occasions after that day; correct?

15      **MR. QUINN:**  My understanding is that sometime later,

16  he did circulate a copy.  It's -- We discussed this somewhat

17  last time.  He even sent it back to Quinn Emanuel, but it is

18  not clear that it was that copy of the report, because there's

19  evidence that the lawyer in England at Bristow's in the

20  meantime sent a copy to Mr. Shim.

21     So it can't be said that the very copy he got from us, and

22  as to which he received instructions, he continued to

23  circulate.  And that's . . .  There isn't evidence of that,

24  Your Honor.

25      **THE COURT:**  So, for example, on May 13th of 2013,

1  Mr. Shim doesn't send a copy of the insufficiently redacted

2  report to various lawyers at your firm?

3          MR. QUINN:  He did.  I said -- Yes, he did, Your

4  Honor.

5          THE COURT:  Okay.

6          MR. QUINN:  He did.  But sadly that's --

7          THE COURT:  That's a use after the instruction; right?

8          MR. QUINN:  He did submit it to us.

9          THE COURT:  And that's a use after he confirmed that

10  he would comply with your instruction; right?

11          MR. QUINN:  Your Honor, the context in which he

12  provided that to us had nothing to do with the issue of the

13  Nokia-Apple license.

14      I mean, it -- it was -- He was asking for some advice on a

15  different issue.  And our lawyer didn't even open up the

16  attachment, because it was irrelevant to what he was asking

17  about.

18      What I can't tell the Court is whether that copy he sent

19  to us was the copy that we had the exchange about that he got

20  in December or whether it's a copy that he got later.

21      I mean, no questions, he forwarded a copy of the report to

22  us.  And -- But that -- It wasn't a subject of discussion.  The

23  Quinn Emanuel lawyer didn't even -- and this is, I think,

24  undisputed in the electronic record -- didn't even open it up.

25  I, frankly -- And if it's important, I can get some help here.

1   I don't recall what the question was that he was asking that he

2   sent that but it had absolutely nothing to do with this

3   license.

4        THE COURT:  Well, let me -- let me perhaps focus --

5   focus our discussion on what is specifically weighing on my

6   mind on this, which is that at least, you know, like, five, six

7   months after an in-house attorney at Samsung told your

8   attorneys that he would comply with the instruction and refrain

9   from using that insufficiently redacted report, he is

10  circulating additional copies of that report, which at least,

11  as I reviewed the documents again, were insufficiently

12  redacted.

13      And in that context, at some point, it seems to me

14  somewhere along the way, someone should have realized, whether

15  it was the Quinn Emanuel attorney or Mr. Shim himself, I would

16  suggest, that there was a problem here that needed to be

17  corrected.  And I'm just trying to figure out --

18        MR. QUINN:  Right.

19        THE COURT:  -- whether I'm not appreciating the facts

20  correctly or whether there's some other explanation.

21        MR. QUINN:  What I can say to that, Your Honor -- and

22  again I can get some help on this if it's important -- he did

23  send it back to us in May, but we didn't even look at it.

24      We didn't -- The electronic record is, we didn't open the

25  attachment -- We had -- We didn't look to see, "Wait a second,

 1  is this a completely redacted or an incompletely redacted?  Is

 2  this what we saw before we sent him or not?"  It just -- It

 3  wasn't necessary in order to answer his question.

 4       So it was transmitted to us.  If the mere transmission is

 5  use, then we've got a problem.  But I'm -- What I'm

 6  representing to the Court -- and then I can flesh this out --

 7  that that transmission to us had nothing to do with this

 8  particular issue.  It wasn't read by us.  We had no reason to

 9  think he was sending us back an improperly redacted report.

10  The only way you would know is to open it up, lengthy document,

11  and check through it.

12       And who does that, frankly?  You know, you're a busy

13  lawyer.  There's an attachment that doesn't relate to anything

14  that you're being asked.  You can do your work, give your

15  advice, without opening it.

16       Hindsight's 20-20.  I certainly wish somebody had done

17  that.  We only know now with the aid of Stroz, that the

18  attachment -- what the attachment was.  But -- But we didn't

19  know.  I mean, there's a lot of things I wish we did know,

20  which we didn't know.

21           THE COURT:  Your -- I believe your brief says that you

22  didn't know -- you being your firm --

23           MR. QUINN:  Yeah.

24           THE COURT:  -- didn't know that there was an

25  insufficiently redacted version of the Teece report on the FTP

1   site until June or July of this year; correct?

2          **MR. QUINN:**   That is correct, Your Honor.  Because what

3   happened is that in -- in June, Nokia made its motion and filed

4   that declaration from Mr. Melin.

5          We jumped on it.  We agreed to retrain Stroz.

6          In a series of letters, which Mr. Becher wrote to Nokia,

7   and ultimately Nokia and Apple in June, July and August,

8   detailed what we had found before the Court was ever involved.

9          In fact, Your Honor, most of the evidence, what we're

10  talking about now, Mr. Becher disclosed before the Court was

11  ever involved.  The fact that it was on the FTP site, we found

12  that.  We told them.  We gave them the charts.  We told them --

13  We gave them the e-mail, who had access.

14         We told them about the -- the exchange in December.  We

15  told them about the . . .  You know, actually, Mr. Pease had

16  sent it out on April 5th, 2012, after it was put on the FTP

17  site.  We told them that.

18         The May 13th, 2013, transmission from Mr. Shim to Quinn

19  Emanuel, we told them that.

20         Most of the material things on which they rely, we told

21  them we learned as a result of our investigation as soon as

22  the -- It went into motion as soon as Nokia made this -- made

23  its motion.

24         So, for Apple to say . . . as it does in its brief on

25  Page 2, that "Samsung attempt -- attempted to keep their many

1  violations hidden from Apple and the Court until Nokia exposed

2  them."  Attempted to keep their many violations hidden from

3  Apple and the Court until Nokia exposed them.

4      Your Honor, there's no evidence at all to support that.

5  That's, again, a gross -- Now, I realize we're the ones that

6  have erred here and it ill behooves me to be on the offensive

7  here, but they think they're playing tennis without a net.

8  They think they can make statements like that and sign a brief

9  with impunity, because we made a mistake.

10      That is simply not true.  We jumped on it as soon as Nokia

11  made its motion.  We learned what we learned and then began

12  writing a series of letters.  As we learned things, we

13  disclosed them to counsel.

14      If I can just back up, Your Honor, and talk about the

15  other -- I talked about --

16          **THE COURT:**  Go ahead.

17          **MR. QUINN:**  -- the first --

18          **THE COURT:**  Go ahead.

19          **MR. QUINN:**  -- potential violation the Court

20  identified; that is, the inadvertent disclosure itself.

21      The Court said, second, was concerned that there's a

22  potential violation concerning use of the information.  And the

23  Court identified in the Order to Show Cause the evidence that

24  raised a concern in the Court's mind, including the documents

25  and the reference to -- I mean, the discussions on June 4

 1   between Mr. Melin and Dr. Ahn.

 2       I appreciate, Your Honor, that the Court got boxes of

 3   documents, and, you know, in your solitary -- in your function

 4   in reviewing those documents, you'd have to read them, four

 5   corners of the documents, to some degree, if I can suggest,

 6   just cold, without context.

 7       We have filed a response to the Order to Show Cause,

 8   discussed those documents, and I hope we have succeeded, and I

 9   hope the Court will correct me if I -- if there's an issue

10   here.

11       I hope we have succeeded in explaining what those

12   documents are, explaining the context, and explaining that none

13   of them show any evidence of use.

14       Four of the documents that the Court identified relate to

15   Ericsson information.

16       I trust that we were able to make it sufficiently clear to

17   the Court that that information was obtained by Samsung by

18   means other than discovery in this action.  That information

19   was obtained by us by means but it's not subject to the

20   Protective Order.

21       The Court has the declaration of Kirkland & Ellis on that

22   score where that information came from.  It simply was not --

23   What was done with that, the activity that was involved -- I

24   think the Court knows what I'm referring to -- that is not a

25   use in violation of Protective Order because that information

1  was never subject to the Protective Order.

2      Second, the Court also called out that spreadsheet that --

3  from the Netherlands, the action in the Netherlands.  At the

4  request of the Court in the Netherlands, both sides exchanged

5  schedules setting forth the terms in detail, much more detail

6  than is in the Teece report, of all their UTMS and LTE

7  licenses, in great detail.

8      That -- There were nine individuals, including the

9  senior -- you know, not Dr. Ahn but the other senior licensing

10  people, Clock, Clayton Kim, Mr. Shim, who were entitled to see

11  that.

12      And guess what?  There's only one that sticks out there as

13  a -- you know, the 800-pound gorilla.  I mean, they say

14  anonymized, but it's pretty clear what it is.

15      There's only one, Your Honor, that's expressed in euros,

16  that same big one.  It didn't take a lot of ingenuity or

17  imagination to figure out what that is.

18      Now, they cite the testimony of Mr. Shim saying he

19  couldn't be a hundred percent sure that that was the

20  Apple-Nokia license.  That was, sadly, a distortion of

21  Mr. Shim's testimony.

22      Mr. Shim's testimony was, "It's anonymized."  You know, I

23  can't be a hundred percent sure, but I'm reasonably certain to

24  a reasonable degree of certainty what that was.

25      That is information that wasn't subject to the Protective

 1  Order.  We have that information.

 2          THE COURT:  Mr. Quinn, Mr. Shim's deposition certainly

 3  suggests that he didn't recall how he figured out what those

 4  terms were and who they belonged to; correct?

 5      As I read the transcript, he seemed to be uncertain of

 6  that and, yet, six days later, something like that, we have a

 7  declaration where he has a much clearer memory of how he came

 8  up with that licensee.

 9      So how am I to reconcile the deposition and the

10  declaration?

11          MR. QUINN:  Well, I think there might actually be some

12  relevant Shim errata to the deposition transcript.

13      I mean, Your Honor has the document.

14                      (Counsel confer.)

15          MR. QUINN:  Your Honor has -- It's actually one of the

16  documents that the Court identified in the Order to Show Cause;

17  it's Tab 222.

18          THE COURT:  Um-hmm.

19          MR. QUINN:  The e-mail -- It is an e-mail from

20  Mr. Shim.  It's contemporaneous.  This is long before lawyers

21  were involved in these proceedings involved, where he says what

22  he says.

23      Now, his deposition is taken a year later and he can't

24  remember, but we don't need to rely on his -- his memory.  We

25  have this contemporary e-mail where he calls out in this

1    document what it is.

2         This document is not subject to the Protective Order in

3    this case.  He's entitled to see it.  He's writing to Clayton

4    Kim, who's entitled to see it.  He's telling him what I think

5    what this is.  This is not a violation of the -- of the

6    Protective Order.

7         The Court also identified an exchange of e-mails between a

8    lawyer in London at the Bristow's firm, and a lawyer in Paris

9    at Allen & Overy, where the lawyer in Paris had circulated a

10   proposed draft of a brief for comment.

11        The lawyer in London responded to this and embedded in the

12   response, unfortunately, is a copy of the -- is a copy of the

13   improperly redacted Teece report.

14        But you have a dec -- You have declarations from both

15   lawyers, the English lawyer and the French lawyer, the English

16   lawyer saying, "I didn't even know -- I didn't know it was

17   improperly redacted and, besides, it had nothing to do with the

18   comments -- that -- that issue had nothing to do with the

19   comments I was giving."

20        You have a declaration from the French lawyer which

21   says -- and the document itself shows -- that it recites terms

22   from the Apple-Nokia license in a draft which are different

23   than what's in the Teece report.

24        And guess what?  As filed, you know, after getting the

25   communication from the British lawyer with this document

1  embedded, no changes are made in that regard.  The document

2  ends up being filed with the erroneous information that the

3  French lawyer already had in the draft.

4      In other words, it had no impact.  It wasn't . . .  It was

5  attached, but it wasn't like somebody tweaked the argument,

6  changed it, changed the terms because of what was in there.

7  Nobody saw it.

8      You have the declarations from both those lawyers.  You

9  know they didn't see it because they didn't correct the terms.

10 They didn't change what was in the draft.  It's just -- It's

11 not an issue.

12     There were a few other documents in the 11 identified in

13 the Order to Show Cause.  I hope we've addressed them, Your

14 Honor.

15     We, by the way, offered -- similar to an offer we've made

16 many times in these proceedings -- to share those documents

17 with Nokia and Apple, except for the Ericsson ones where, you

18 know, there are third-party rights we can't waive and they're

19 standing on their rights.  We've offered to share with them.

20 They declined that offer.

21     So I -- I -- I can't underscore my -- I can't emphasize

22 enough, Your Honor, my desire to clear up any questions the

23 Court may have concerning what these 11 documents are and why

24 they don't show any evidence of use that are referenced in the

25 OSC.

1       The Court also referenced Mr. Melin's declaration and the

2    exchange on June 4th of this year.

3       This all started with Mr. Melin's declaration, Mr. Melin's

4    very disturbing declaration, which was -- if you go back and

5    look at it -- very conclusory terms, very broad terms.

6       Mr. Ahn's told me the terms of the Apple-Nokia li -- It

7    doesn't say what Mr. Ahn said.  Short declaration, very broad

8    terms.

9       And, then, after Mr. Ahn testified and Mr. Ahn submitted a

10   declaration, I really thought we'd see something from

11   Mr. Melin, but we didn't.  We took his deposition and now we

12   know why, we know why we didn't see another declaration from

13   Mr. Melin.  And now we know why that declaration was so

14   general.

15      What was Mr. Melin's testimony in Helsinki?  His testimony

16   was that Dr. Ahn never said he had been told the terms of the

17   Apple-Nokia license.

18          THE COURT:  Mr. Quinn, as a predicate to Mr. Melin's

19   deposition testimony, isn't it important, he said he didn't

20   write his declaration; isn't that correct?

21          MR. QUINN:  You know, it wouldn't -- it wouldn't

22   surprise me if he did write his declaration, Your Honor.  Maybe

23   I've been practicing too long, but he signed it.

24          THE COURT:  He did sign it.

25          MR. QUINN:  He did sign it.  And we were all, all of

1    us -- I'm speaking for myself here -- pretty concerned when we

2    saw that.  I know this Court was and was eager to find out what

3    the story was.

4        My point is, we now know Mr. Melin's own account of this.

5    Dr. Ahn never said he had been told the terms of the

6    Apple-Nokia license.  Dr. Ahn never said that Quinn Emanuel had

7    gotten the Apple-Nokia license in the course of the litigation.

8    Dr. Ahn never said that Samsung's outside attorneys had

9    provided that information to inside people at Samsung.  It was

10   all -- It turns out that was all Mr. Melin's conjecture,

11   inference, interpretation, implication from what Dr. Ahn said.

12       **THE COURT:**  Would you go so far as to suggest that

13   Mr. Melon perjured himself with that declaration?

14       **MR. QUINN:**  You know, I -- I have been a big believer,

15   Your Honor, in the idea there's a misunderstanding.

16       It's hard to reconcile his declaration with his deposition

17   testimony.  But his testimony -- I mean, it's pretty clear.  He

18   said -- and this is at Page 242 of the deposition -- I quote

19   (reading):

20           "During the first session, Dr. Ahn said that he

21       has an idea of what Apple pays to Nokia under the

22       license agreement, which implied that he had been told

23       of the financial terms of Nokia's license with Apple."

24       That's entirely consistent with Dr. Ahn's testimony.

25   Dr. Ahn's testimony was, "I wanted them to believe that I

1    knew."

2        It's a totally different story.  We've spent millions of

3    dollars pursuing this and they're going to ask -- The people

4    who submitted this declaration, sponsored this witness, made

5    these kinds of statements under Rule 11 in their briefing, are

6    asking you that we should pay their fees, after pretty much all

7    this evidence that I have described to you, we had given them

8    before the Court ever got involved, most of what they rely on.

9        This is -- And it -- And it's not as if, in terms of

10   Mr. Melin's testimony, his credibility, it's not like this was

11   a long time ago, like Mr. Shim a year later, year and a half

12   later.  This is June 4th.  It wasn't that long ago.

13       This is something that he led us to believe, they led us

14   to believe, was earthshaking, was astonishing, shocking to

15   them.  And it turns out the testimony is something completely,

16   completely different.

17       So that -- I -- I believe I've discussed the evidence, the

18   documents, and the incidents regarding use -- potential use

19   that the Court indicated was concerned about in the Order to

20   Show Cause.

21       I'd like to turn now to the various claims which have, you

22   know, mutated over time that Apple and Nokia have made, the

23   very creative theories about how -- you know, which have

24   changed, about how we have allegedly used this information.

25       And we'll -- You'll first recall at our last hearing,

 1   Mr. Lee argued that Mr. Shim -- Mr. Shim had asked on

 2   December 21, 2012, for that Teece report so that he could frame

 3   an offer that would buttress Samsung's position in -- in -- you

 4   know, in terms of FRAND and setting up Apple as an unwilling

 5   licensee.

 6          We showed, and it's now undisputed, that that offer, which

 7   included the big number, not the small one, the big one, was

 8   made on December 18th, 2012, three days before Mr. Shim made

 9   the request for the Teece report.  That evidence is undisputed.

10   That's in the Korea declaration; that's in the letter from

11   Mr. Chee in March, March 22nd, that averts back to it.  It's

12   even in Apple's ITC brief that we had made that offer.

13          And still Apple's writing a brief and submitting a brief

14   to this Court saying -- referring to it as an alleged prior

15   offer.

16          I don't know whether the Court took note of that phrase,

17   but there is simply -- the undisputed evidence.  They could

18   have submitted a declaration if they had somebody that -- you

19   know, that came afterwards.  There's no evidence from them.

20   It's unanswered.

21          And this is just . . .  This theory is dead, this theory

22   of use.

23          Well, then we heard . . .  We heard, "Well, you know, it's

24   in the same -- it's the same number.  It's too much of a

25   coincidence that it's the same number."

1      It's not the same number.  Different currencies, which are

2  a difference of a couple of hundred million dollars.

3      And I will point out to the Court that at that time we had

4  finished a trial in the first Samsung-Apple go-around.

5  Unfortunately, we lost.  And at that time, we had pending a

6  motion for remitter, seeking to remit the jury verdict to,

7  guess what, $500 million.  That's a matter of public record.

8  So . . .  I mean, the Court can connect the dots.

9      Then -- To me, it's . . .  It's unaccountable to me that

10  they continue to make this argument based on the coincidence of

11  the numbers.  Set aside the currency thing.  Set aside that the

12  dates don't work.  Set aside everything else.  That number

13  isn't in the Teece report.  It was improperly redacted.  It's

14  not there.

15      So wherever Dr. Ahn, however he came up with that number,

16  he didn't get it out of the Teece report.

17      It is, by the way, in the business -- in the reporting of

18  Business Insider, where a financial analyst went through

19  Nokia's financials and figured out there was a payment and made

20  some projections.  And the Court has seen those numbers.

21      And what Dr. Ahn says he said is on all fours with that.

22  It's not on all fours with what's in the license.

23                  (Pause in proceedings.)

24      MR. QUINN:  Then -- Then our adversaries -- you know,

25  the creative lawyers on the other side -- said, "Well, you --

1   you used this information to craft your arguments regarding

2   FRAND in the ITC proceeding that, you know, you want to set us

3   up so that -- You wanted to argue that, well, you're going to

4   make an offer.  We reject that.  And you want to be in a

5   position to say that wasn't in good faith.  You're an unwilling

6   licensee, because, look, after all, you're paying Nokia this

7   much."

8        And we pointed out that was separately produced in the ITC

9   proceeding.  We were entitled to do that.  It doesn't take a

10  rocket scientist, even a lawyer -- That's sort of what a FRAND

11  analysis is, is you look -- Is there discrimination?  Is it

12  fair?

13       I mean, to decide that, you kind of have to know what the

14  other terms of licenses are out there.

15       And -- And then Mr. Lee got up and said the second time

16  around, "Well, what happened is, it was -- it shouldn't have

17  leaped from this proceeding to the ITC proceeding, and it was

18  disclosed here first."

19       It turns out that's not true.  It was produced in the ITC

20  on February 19th, 2012 -- undisputed -- before there ever was a

21  Teece report, redacted or unredacted.  And we were absolutely

22  entitled to use that.

23       I mean, Apple gave us those licenses for the express

24  purpose of enabling us to evaluate our positions regarding

25  FRAND, what they were paying others, and we share similar kind

1   of information.

2       In fact, Your Honor, we were entitled under the Protective

3   Order.  We could have told our client, "Make the offer on these

4   terms exactly."  And as long as we didn't say where that came

5   from, we could do that.  That's under Section 6(e), legal

6   advice, or ability to give legal advice.

7       We -- This did not require that we -- You know, to come up

8   with this FRAND position did not require sharing with the

9   client.

10          **THE COURT:**  Mr. Quinn, on that point, I understand

11  from your briefing that that's not what happened here.  You're

12  not suggesting you gave that advice; are you?

13          **MR. QUINN:**  No.  In fact --

14          **THE COURT:**  You're simply saying you could.

15          **MR. QUINN:**  We could.  In fact, I'm representing we

16  didn't.  But we could.

17      So then, ever resourceful, our adversary's next fallback

18  position is that we used it to frame the offer to Nokia on

19  June 4th; that Dr. Ahn came in, he made a much larger offer

20  than the one he had made before.

21      I mean, Mr. Melin put that to rest.  Mr. Melin's testimony

22  is that the two licenses were different in scope in terms of

23  the types and quality and variety of IP that was covered.  In

24  structure, he said, quote-unquote, entirely different and that

25  the values were not comparable.

1      So, at the end of the day, there simply is no evidence

2   that this was used.

3                    (Pause in proceedings.)

4      **MR. QUINN:**  I touched a little bit the third concern

5   the Court had about whether there's compliance with the

6   inadvertent disclosure provisions of the Protective Order.

7   I -- I touched on that a little bit.

8      **THE COURT:**  I want to go back to that as well,

9   Mr. Quinn.

10     **MR. QUINN:**  Yeah.

11     **THE COURT:**  Let me -- Let me -- Let me turn in

12  particular to the events -- Well, let's begin with the events

13  of March of 2012.

14     In the record, throughout this voluminous record, you make

15  the point repeatedly that the initial redaction, or failure to

16  redact properly, I guess is the right way to put it, was --

17  was -- was inadvertent.  That assertion is made; it's been

18  repeated many times.

19     What evidence do I have in this record regarding the

20  circumstances surrounding that?  I -- I don't -- Perhaps I've

21  overlooked it but I don't understand what proof there is

22  regarding who made the redactions, what processes were

23  followed, who was responsible for posting and updating to the

24  FTP site, things of that nature.

25     **MR. QUINN:**  Right.  I'm going to need some help on

1  this, Your Honor.

2          THE COURT:  Okay.  That's fair.

3          MR. QUINN:  We have Mr. Pease in the audience, Your

4  Honor.

5          THE COURT:  All right.  Mr. Pease.

6          MR. QUINN:  He's come out from New York.

7          MR. PEASE:  Afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. PEASE:  So the March FPT posting of the redacted

10  report.

11      The redacted report was created by Alex Baxter, an

12  associate in our office, who was working on our team.  He's a

13  conscientious associate, and he went through, he redacted most

14  of it.  He missed I think it's three paragraphs that contained

15  the information.  Removed the chart at the end but he did miss

16  those three paragraphs.

17          THE COURT:  Was -- Mr. Pease, was Mr. Baxter working

18  alone on this project?  I've heard conflicting descriptions of

19  the number of people that are responsible for this initial

20  redaction effort.

21          MR. PEASE:  Well, I think I can explain why you're

22  confused and what the story is.

23      So, Mr. Baxter, I believe, did that redacted version

24  alone.  He provided it to one of my partners, named Todd

25  Briggs.  Mr. Briggs was responsible for taking all of the

 1  different redacted expert reports, putting them on the FTP site

 2  and making that available to the client.

 3           THE COURT:  Mr. Berge (phonetic) was the one who

 4  circulated the e-mail on March 24 --

 5           MR. PEASE:  Correct.

 6           THE COURT:  -- 25.  Okay.

 7           MR. PEASE:  Then -- So three -- three weeks later or

 8  so, maybe even less than that, there was a request to me to

 9  circulate a copy of the redacted Teece report to a narrow

10  subset of people.

11       And so at that time, I asked a different associate,

12  Mr. Eden, to -- I said, "Can you get a copy of the redacted

13  report that was sent out?"  Because I wasn't involved at all at

14  the time of the original report.  "You've got copy of the

15  redacted reported and just double-check.  Please let me know if

16  it's okay for me to send this to the client."

17       And it wasn't just report; there were a couple other

18  things.

19       And so hours went by and then he got back to me, and he

20  said, "Yeah, I kept it out.  This is good to go."  So that's

21  why we sent that out to the client at that point on April 5th,

22  and that's an e-mail that came from me.

23       And so I think that, in one of my declarations, I refer to

24  independent verification by two associates.  In fact, that's

25  what I'm referring to, because it's -- there was the FTP

 1  site -- And the issue with the FTP site, Your Honor, that stuff

 2  gets put up on an FTP site but then 10 days later, it's gone.

 3  Right?  It's not like you can just go back to the FTP site and

 4  find what's there.

 5          THE COURT:  Why is it gone?

 6          MR. PEASE:  Just the way it works.  It doesn't say

 7  that, you know, you can reuse these FTP sites.

 8      I think through forensics you're able to tell what was

 9  there, and that's what we've done as part of the Stroz process.

10      But just going back, when you look at the e-mail record,

11  you just see an e-mail from Todd Briggs with a password.  You

12  can't just go back and see -- You can't -- Like today, you

13  can't go to that FTP site and find that document.  Somebody

14  else has used that FTP site probably 50 times over since then.

15          THE COURT:  So are you suggesting, Mr. Pease, then,

16  that even though Mr. Briggs circulated the e-mail with the link

17  to the FTP site in late March, March 25th, 25th, I believe,

18  some 10 days or thereabouts thereafter, that FTP site was no

19  longer accessible to anybody inside Samsung?

20          MR. PEASE:  That's my understanding, Your Honor.  I

21  mean, I'll defer --

22          THE COURT:  Do I -- Do I have any evidence of that in

23  the record?

24          MR. BECHER:  Your Honor, I don't think there's any

25  evidence in the record of the exact duration of the

1  availability of the FTP site.  It is accurate that the FTP site

2  did not last forever.  It was --

3      **THE COURT:**  Okay.  Well, let me accept Mr. Becher's

4  representation and then ask:

5      Would that suggest perhaps why Mr. Shim was unable to

6  simply return to the FTP site in December and secure a copy of

7  the redacted report for himself?

8      **MR. PEASE:**  It's possible, Your Honor.  I just know --

9  And when I say 10 days, I'm speaking of my own experience where

10  I've set up FTP sites for different purposes and different

11  clients.  And I know that sometimes the client takes the time

12  getting it and then they complain that it's no longer there and

13  we have to redo it.

14      **THE COURT:**  Okay.  Now, once these materials were

15  posted on March 25th, 2012, to the FTP site, was anyone at

16  Quinn Emanuel responsible for further maintaining or updating

17  that site, or at that point was it in the client's hands and

18  the client was responsible for whatever distributions and

19  maintenance that took place?

20      **MR. PEASE:**  That's a good question.  I don't actually

21  know.  I mean I think the FTP site would be accessible to

22  anyone who had --

23      **THE COURT:**  Breed access.

24      **MR. PEASE:**  -- credentials to get to it --

25      **THE COURT:**  Yeah, sure.

1          MR. PEASE:  -- yeah.

2          THE COURT:  Okay.  But at least as far as you all

3   know, no one at Quinn Emanuel was actively maintaining a fixed

4   FTP site beyond that initial period of time?

5          MR. PEASE:  Not that I know of, Your Honor, no.

6          THE COURT:  All right.  And if I understand your

7   explanation of Mr. Baxter and Mr. --

8          Is it Eden?  Am I pronouncing --

9          MR. PEASE:  Eden.

10          THE COURT:  -- it correct?

11          -- Mr. Eden's role, you're saying that in -- in between

12   March and perhaps April, the -- those two -- those two

13   redaction efforts -- I'll just -- I'll use that term -- were

14   essentially taking place in parallel.  It wasn't as if Mr. Eden

15   was working with Mr. Baxter, checking his work, reviewing the

16   accuracy of the redactions, that sort of thing.

17          MR. PEASE:  No, they were separated in time.  I said

18   to Mr. Eden, "Please double-check and make sure I can send this

19   stuff to the client."

20          THE COURT:  All right.  Now, Mr. Shim apparently was

21   instructed if we fast -- To take your advantage of your --

22          MR. PEASE:  Yeah, absolutely.

23          THE COURT:  -- time at the podium, huh, Mr. Pease?

24          If we fast forward to December 2012, as I understand it,

25   Mr. Shim was instructed on December 22nd, in fact, to -- not to

1  use that insufficiently redacted report --

2      **MR. PEASE:**  Um-hmm.

3      **THE COURT:**  -- after Mr. Baxter discovered it on the

4  Saturday morning.

5      **MR. PEASE:**  Right.

6      **THE COURT:**  Does that sound right?  Okay.

7      And you received conversation from Mr. Shim that, in fact,

8  he understood Roger and things moved forward from there.

9      Did anyone in this redaction group have any awareness

10 of -- of the FTP site at all?

11     **MR. PEASE:**  No.  At that point, Your Honor, it was

12 something like eight or nine months later.  And it's been --

13 The protocol we file to do redacted reports over the course of

14 this case and the parallel IPC case have varied at times.  Now,

15 we now have a protocol that's generally in place where we send

16 them redacted versions of our reports, they --

17     **THE COURT:**  Right.

18     **MR. PEASE:**  -- send us redacted versions of their

19 reports.  We sign off on them and then they can go to the

20 client.

21     And you have a very high degree of certainty that you're

22 not going to miss something.  I mean, maybe you'll miss some

23 third-party information.

24     **THE COURT:**  And I want to get to that protocol in just

25 a minute, Mr. Pease, but perhaps I might also ask you this:

 1        If this FTP site just kind of went away 10 days or

 2   thereabouts --

 3            MR. PEASE:  Um-hmm.

 4            THE COURT:  -- after it was first set up in March of

 5   2012, how were people within Samsung able to secure and

 6   circulate copies of that report over and over again throughout

 7   2012?

 8            MR. PEASE:  Well, I think there's a -- You could

 9   speculate.  I mean, there's lot of different ways.  I mean --

10            THE COURT:  That's what I unfortunately have to do and

11   I'm trying to figure out what --

12            MR. PEASE:  I sent --

13            THE COURT:  -- I can prove.

14            MR. PEASE:  On April 5th, I sent a copy to some of the

15   people at Samsung as well as people at other law firms.

16        I didn't know after that what those people had done with

17   the version I sent.

18            THE COURT:  Okay.  And this is --

19            MR. PEASE:  And so --

20            THE COURT:  -- the version Mr. Eden had given you to

21   go ahead and circulate.

22            MR. PEASE:  Right.  And which presumably is the same

23   version that Mr. Baxter put on the FTP site.  Frankly, I don't

24   know how Mr. Eden got the redacted version for me.  We had a

25   share drive with a lot of different things on it.  But he got

1  me copies of the papers that the client had requested and

2  signed off it was okay to send it.

3          THE COURT:  Okay.

4          MR. PEASE:  So -- But given the scope -- And these

5  cases are so different than most cases.  I mean, we have a huge

6  distribution lists at our client.  In fact, you -- it's

7  something you asked Mr. Quinn about.  You asked about the

8  licensing people.

9      I mean, it's true there are people within Samsung whose

10 jobs are denominated as licensing people but they're actively

11 involved in managing us from the litigation standpoint.  They

12 edit our briefs, they make suggestions.  They want to know what

13 the positions are that we're going to raise.

14     You know, it's just like having two or even more than two

15 groups within Samsung that all have a say in kind of how these

16 arguments get framed.

17     And that's why -- It's not like the licensing people are

18 simply concerned with formulating terms for licenses and the

19 litigation people are managing us.  It's like you've got a lot

20 of different groups all who have a say in what we do as lawyers

21 in the context of these cases.

22         THE COURT:  So if I could go back to the point you

23 raised a minute ago regarding the protocol or the custom --

24 I'll use that term --

25         MR. PEASE:  Right.

1          **THE COURT:**  -- of the parties exchanging proposed

2   redacted versions of sensitive materials before circulating.

3       In this particular time period, my understanding is the

4   Rebuttal Report was, in fact, redacted and then sent to Apple

5   for approval.  Apple approved it and there was never an issue

6   regarding that.

7       Why wasn't that same procedure filed with respect to the

8   opening report?

9          **MR. PEASE:**  I don't know, Your Honor.  In fact, I've

10  gone back and looked, actually.  And there was correspondence

11  back and forth between the parties, endless correspondence,

12  frankly, about preparation of redacted reports based on the

13  assumption that, you know, the parties were going to be allowed

14  to share properly redacted versions of these reports with their

15  clients.

16      The exchanges, though, that I've seen only had us, for

17  example, identifying Samsung confidential information in

18  Apple's reports, and Apple identifying . . .

19          **THE COURT:**  Well, wouldn't that procedure presumably

20  work -- would have worked here?

21          **MR. PEASE:**  It absolutely would have.

22          **THE COURT:**  Okay.  But what you're saying -- If I

23  could, so -- So -- But what you're saying is, while this

24  procedure of custom and practice was followed in large part,

25  there was no requirement the parties had signed up for to do

1   this before they circulated it.

2         In other words --

3         **MR. PEASE:**  No.  In fact, we didn't refine that.  At

4   some point -- And maybe -- I mean, this is pure speculation.

5         In the ITC, I think it's common to do this because you

6   have to submit public versions of briefs and reports and things

7   like that.

8         And so the ITC lawyers -- In the franking (phonetic),

9   we're kind of unique in that we cut across both these cases.

10  We're just as actively involved in these Northern District of

11  California cases as we are in the ITC cases.

12        And so I don't know what the genesis was for our adoption

13  of a protocol where both sides weigh in on redactions.  I just

14  know that, at the time of the initial reports, we hadn't

15  adopted that protocol.  By the time of the rebuttal and then

16  supplemental reports, we had.

17        **THE COURT:**  All right.  It strikes me that regardless

18  of what else we may or may not be able to agree upon here

19  today, had that procedure been followed, we can all agree we

20  wouldn't be here; right?

21        **MR. PEASE:**  I think that's right.  I mean, I think

22  we're all doing our best to follow that procedure.  It's a

23  procedure that makes sense and that's one we're following now.

24  Just in the early stages of this case, it hadn't resolved

25  itself to that.

 1            THE COURT:  All right.  Thank you, Mr. Pease.

 2            MR. PEASE:  You're welcome.

 3            THE COURT:  I think I understand your points.

 4       Mr. Quinn, I interrupted you or asked you a question

 5   before you were about to complete your thought.  Why don't you

 6   go ahead.

 7            MR. QUINN:  I'm turning now to the -- the third

 8   potential violation of Protective Order the Court identified,

 9   and that is Samsung's compliance with the inadvertent

10   disclosure procedures specified in the -- in the Protective

11   Order.

12       The one inadvertent disclosure that we knew of was the

13   December 22 transmittal to Mr. Shim.  We immediately did what

14   we did.

15       The question can be raised:  Should you have let Apple,

16   Nokia, know at that point about this exchange?

17       And I think the answer to that, Your Honor, is the

18   Protective Order uses -- draws a distinction between production

19   of a document and disclosure of a document.

20       And what I would say is, this was produced to Mr. Shim,

21   but based on what happened, we had no reason to believe that it

22   was disclosed to him, that he saw or that he read it.  And, in

23   fact, neither Apple -- If we can imagine a document that is

24   disclosed, that's produced but not read, neither Apple nor

25   Nokia have ever taken the position, that I'm aware of, that

1    that triggers a reporting requirement.

2        In fact, Apple recently, as the Court knows, has disclosed

3    information on the Court's website, Samsung's information, and

4    didn't tell us.  They -- We discovered it.  We went back after

5    they told us about one.  You know, they put our -- You know,

6    they talked about the number of people we disclosed information

7    to.  They disclosed our source code to the public.  And we're

8    told there is no way we'll ever know how many people saw that.

9        But we looked into that and we found out a few days before

10   they had disclosed something else and they didn't call us and

11   report that.

12       So I submit that this is not a -- an instance where we

13   failed to comply, just, you know, having told Mr. Shim what we

14   told him and having received the response, that there was no

15   obligation to report that.

16       **THE COURT:**  And so your view, the obligation to report

17   that to Apple was triggered only in July of 2013?

18       **MR. QUINN:**  I would say not when we receive Nokia's

19   motion, because we received Nokia's motion and we're -- don't

20   know what Mr. Melin's talking about.  We're scratching our

21   heads.

22       And where that then started a process which certainly did

23   trigger that obligation to give notice.

24       I mean, at that point, it was Nokia who is claiming that

25   it was being harmed.  Apple was served with Nokia's motion

1   immediately.  They were aware of the issue.  We didn't hear a

2   thing from them.

3        So, I mean, they criticize us for not copying them on

4   the -- on the first letters that we sent to Nokia and, you

5   know, we can debate about whether that's -- there's some

6   validity to that, but whether we delayed a couple weeks

7   involving Apple in that process or not.

8        We thought Nokia was the one they were claiming was hurt.

9   Apple, we didn't hear boo from Apple.  In fact, we didn't hear

10  boo from Apple until after this extended process with Nokia

11  where we negotiated a stipulation, we're going to hire Stroz at

12  our expense and all the rest of it.  Stipulation finally gets

13  signed off and Apple comes in and files its motion.

14       That's the first reason we had to think that they were

15  dissatisfied with the process as it was going down.

16                  (Pause in proceedings.)

17       **MR. QUINN:**  Now, in terms of the sanctions, Your

18  Honor, the -- these were -- these were simultaneous briefs, so

19  we haven't had a chance to respond in writing to their various

20  sanctions requests.

21       Between Nokia and Apple, I think they have asked for every

22  kind of sanction that -- under the sun, from finding that in

23  both patent cases -- their attorneys' fees should be awarded in

24  both patent cases.

25       **THE COURT:**  They didn't ask for you to be flogged or

1  tarred and feathered.

2         MR. QUINN:  Not yet.  But they asked for some things

3  that are worse.  They asked for some things that I think are

4  worse, Your Honor, in terms of our personal and professional

5  reputation.  You know, letters, correspondence, filings,

6  notices, you know, adverse inferences, jury instructions.

7  There's quite a laundry list there.

8         Many of these things, there is no legal authority for;

9  they don't cite legal authority for them.  Many of these things

10  I -- with respect, Your Honor, I don't think the Court has

11  authority to do.  Many of them are flatly contrary to law.

12         And in terms of the sanctions, what we would request is,

13  if we could, please, Your Honor, have an opportunity to respond

14  in writing to this litany of sanctions that they're asking for.

15         THE COURT:  Well, we'll see if we need to cross that

16  bridge, Mr. Quinn.

17         I would like to hear from Apple and Nokia and not keep

18  everyone here until the wee hours of the night, so I'll

19  certainly give you a full opportunity for rebuttal but I think

20  I understand your position on these key issues.

21         If you have further point on these points -- on these

22  issues, I'm happy to hear it.

23         MR. QUINN:  Okay.  I'm -- I think I'm done for now on

24  everything other than the sanctions issue.  I am concerned

25  about whether I've got a record on -- on the various requests

1  for sanctions.

2      So if -- if the Court doesn't think that it's appropriate

3  to give us a chance to respond in writing, then I feel

4  obligated to say some things about each of these requests.  I

5  don't know if the Court wants me to do that now.

6          **THE COURT:**  Well --

7          **MR. QUINN:**  I do have things to say.

8          **THE COURT:**  I do -- I know you do.  And -- And I guess

9  I would just as soon address that issue.  I'll give you a

10 chance, before we conclude the proceedings, in your rebuttal.

11         **MR. QUINN:**  All right.  Thank you, Your Honor.

12         **THE COURT:**  Thank you.

13     All right.  Let's hear from Apple and then I'd like to

14 hear from Nokia.

15         **MR. McELHINNY:**  Good afternoon, Your Honor.  Harold

16 McElhinny.

17     First, I would start by apologizing that Mr. Lee could not

18 be here today.  As the Court may know, he had a conflict.

19 Because we couldn't rearrange the hearing despite the Court's

20 willingness to do that, I have to come in and talk.  But,

21 unfortunately, what we have to do is, we actually have to

22 divide the arguments since Mr. Selwyn knows the facts at a

23 level.

24     I really want to briefly respond at the highest level

25 in -- in the way that Mr. Quinn set up a context.

1      We -- We are here because of a massive Protective Order

2  violation.  I mean, the -- the numbers are just stunning.  I

3  mean, disclosures to over 200 people who should not have had

4  access, 90 Samsung internal employees who should not have had

5  access.  1300 privileged documents on their privilege list, you

6  know, as far as we can tell, contain some or all of the

7  information.

8      And what we're talking about -- I got in trouble with,

9  Your Honor, the first time I appeared before Your Honor on this

10  case because I was trying to talk about the fact that Samsung's

11  corporate ethic and the FTC proceeding that they had been

12  facing, and employees eating documents, and -- and Your Honor

13  took correctly the position that that wasn't before you, it

14  wasn't part of the case.

15      And now you've been with this case for a long time and --

16  and --

17          THE COURT:  It only feels that way, Mr. McElhinny.

18          MR. McELHINNY:  I know.  Well, I was young when I

19  started this case, Your Honor.

20      But what we've got in this particular motion is, we've got

21  a perfect storm.  I mean, we have a law firm that advertises

22  itself as taking pride in a sort of a win-at-any-cost basis,

23  and we have a company, Samsung, who -- whose corporate ethic is

24  that it is above the law of any Court in any country in terms

25  of what it is willing to do in order to get an advantage.

1      Frankly, I think their brief that they filed -- First, I

2  was going to call it an embarrassment but I actually think it's

3  terrifying.  It starts off with a sort of traditional, I would

4  say, misleading characterization of the facts that Mr. Selwyn's

5  going to address.

6      It starts with a statement of the law where the critical

7  Ninth Circuit case is only mentioned only in a footnote.

8      But -- But it takes the position -- it takes the position

9  that this Court lacks the power to enforce its own Protective

10  Order.  And -- And that's the part that I think is terrifying.

11      We -- We are in a situation right now where the Quinn

12  Emanuel firm is holding thousands and thousands of pages of

13  Apple incredibly confidential information.

14      And the position that they've told you is that despite

15  what happened here, whether it was inadvertent or any of the

16  facts that Your Honor has access to that I don't, there is

17  nothing you can do to police that order.

18      And if that is true -- There's two things wrong with that.

19  You know, it can't be true.  I mean, if it was true, the whole

20  regime under which we litigate cases in this country, the

21  ability of this Court to provide a fair forum would not be

22  possible.

23      But the fact that they are comfortable even asserting that

24  position puts all of that information that they have, from us

25  and from everyone else who was relying on a Court-ordered

1  Protective Order, to produce documents to that law firm.  It

2  puts them at a huge risk and it puts the lawyers that represent

3  them in an impossible, impossible situation to go to corporate

4  executives and say, "Our system works."

5          THE COURT:  Mr. McElhinny, I'm not sure I -- your

6  position is correct.  But I think your position is slightly

7  different; right?  I mean, if you read their papers, what

8  they're saying is this Court's authority to enforce its

9  Protective Order may come from its inherent authority.  It may

10  come from the vexatious litigation standards as well under

11  Title 28.  What it doesn't do or where it doesn't come from is

12  under Section -- Rule 37(b).

13      Isn't that a different --

14          MR. McELHINNY:  I actually --

15          THE COURT:  -- position?

16          MR. McELHINNY:  -- think they take two positions.  I

17  think they say you have no authority under 37(b).  But I think

18  they say you have no authority to punish -- as I read their

19  order -- any violation of a Protective Order unless the party,

20  who in this case is us, who doesn't have access to the

21  evidence, doesn't have -- can prove some level of

22  intentionality --

23          THE COURT:  That characterization, I might agree with

24  you.

25          MR. McELHINNY:  All right.  But -- But if that's

1  right -- If that's right, if I have to go to the executives of

2  the companies that I represent and say, "I'm going to give your

3  incredibly valuable" -- everybody agrees this information was

4  incredibly useful and valuable -- "and I'm going to turn it

5  over to a law firm that publicly takes the position that unless

6  we prove that violations of this Protective Order were done

7  intentionally, without access to any of the evidence, we have

8  no control over their behavior.

9      I can't do that.  And, Your Honor, I -- Frankly, I'm just

10 going to say Your Honor can't -- as I know you've said a

11 million times when people come in here and say, "This is too

12 valuable.  We can't turn it over," every judge in the world has

13 said, "This is how our system works.  These are the orders.

14 The attorneys who appear in front of me are officers of the

15 Court and you can rely on the system."

16         **THE COURT:**  Mr. McElhinny, let me ask you this.

17     Let's assume for the moment that the record has shown that

18 what happened here, whatever else you might say about it, was a

19 giant screw-up, but a screw-up, not a conspiracy, not an

20 intentional plot to distribute confidential Apple-Nokia

21 information.

22     If this was a screw-up, albeit in the context of an

23 intensely, you know, contested lawsuit, doesn't -- doesn't

24 that -- don't I have to take that under consideration under

25 even 37.

1    **MR. McELHINNY:**  Let me -- I want to come -- I don't

2    want to accept that hype -- I will respond to Your Honor's

3    questions, which is there are screw-ups and there are

4    screw-ups.

5         When people -- I mean, we have negligent law.  We have all

6    sorts --

7         **THE COURT:**  Yeah.

8         **MR. McELHINNY:**  -- of law that says, you do something,

9    if the effect of it is so significant or so powerful or so --

10   that some sort of remedial action has to be done.  And how do

11   you form that is difficult.

12        We have to propose sanctions to Your Honor when Your Honor

13   knows the factual record and we don't know it, where we don't

14   know how the evidence in all of the cases where you -- So it's

15   hard to figure out what those sanctions are, but -- but I

16   submit that when you're talking about this level of disclosure,

17   and the fact that evidence actually was, in fact, used, that

18   the answer is -- the fact if the first person did it

19   inadvertently -- in fact, now we're hearing that every

20   associate who looked at this did the same mistake

21   inadvertently, independently, that -- it may go to the level of

22   what the appropriate sanctions is but it cannot go to the fact

23   that the -- that the -- the breaches were not remedied.

24        **THE COURT:**  Well, I think the case law is fairly clear

25   under 37(b) that mere negligence is sufficient to trigger

1  whatever sanction may be appropriate.

2          **MR. McELHINNY:**  But let me jump into that part.

3          **THE COURT:**  Go ahead.

4          **MR. McELHINNY:**  Because -- I don't know how many

5  violations there are.  I mean, I -- Let me make this really

6  clear.

7      Apple -- because I can only speak for Apple -- we were

8  enormously grateful that Your Honor undertook to do the

9  in-camera inspection of all these documents.  Not every judge

10  would have done that.  It took a lot of time.  I know that it

11  took a lot of effort, and -- and in terms of getting towards

12  some relief, we were very grateful for that.

13      But -- But we do know that Your Honor, as Mr. Quinn said,

14  is not in a position to appreciate the significance of all of

15  those documents.

16      So we do know that even this, because of a related thing,

17  the -- the excessive use of the attorney-client privilege, the

18  filing documents under seal without serving us, serving us with

19  redacted briefs, Your Honor hasn't ruled on all those filings

20  yet so we don't know what's going to become public ultimately.

21      But at this point in the trial -- Mr. Quinn says we're

22  playing tennis without a net.  I'm playing tennis without a

23  racket or a ball.  I'm playing tennis based on somebody's

24  description of where the ball is coming, and trying to -- to be

25  fair, and trying not to lose my own personal credibility by

1    asking for sanctions that are, you know, unjustified.

2        And the way I get there, is, I get there, that no many

3    hundreds of violations there may have been, who -- who

4    circulated within who, how it got to lawyers in other

5    countries, if you -- if you, you know, tabulated it on a

6    violation-by-violation basis, no matter what that grand total

7    is, in this record, I find three absolutely intentional

8    violations that justify -- any one of them would have justified

9    the motion severe sanctions.

10       One Your Honor is obviously all over because you discussed

11   it with them this morning and that's the December-January

12   communications with Shim.

13       I don't want to misstate the record because I don't have

14   the record.  I didn't see it documented, but at least as I

15   understood it, there was no coordinate -- there was no proof in

16   the record of any specific communication with Mr. Shim asking

17   him not to look at these documents.

18       And -- And if it's there, it tells us one of two things.

19       We do know that after that communication allegedly was

20   made, as Your Honor pointed out, Shim is sending the same

21   unredacted report -- it's got the same file title -- and he's

22   sending it internally at Samsung, he's sending it to licensing

23   executives, he's sending it to lawyers overseas.

24       We know one of two things has to be true:  Either the

25   whole story's made up, and he was never told this, or he

1   ignored it.  And -- And that's intentionality at either point

2   in this process.

3        The disclosure may have been -- I mean, to defend Quinn on

4   this point, the disclosure may have been inadvertent and maybe

5   they called the guy up, you know.  I didn't know there was an

6   e-mail and I don't -- still don't know if there's an e-mail.

7   But maybe they contacted him and said, "This is a terrible

8   mistake.  Don't even open this."

9        But if they did that, we know that Shim did not follow

10  that direction, because we know from the chronologies that he

11  continued to send this report around to people to whom that

12  information was incredibly critical.

13           **THE COURT:**  As did others at Samsung after that point

14  in time.

15           **MR. McELHINNY:**  Completely -- That is an intentional

16  violation by Samsung at least.  It's either a misstatement from

17  Quinn or it's an intentional violation from Samsung on this

18  record that -- If that was the only thing that had happened

19  here, it would justify the most severe sanctions that this

20  Court can hand out.  But it's not.

21       We -- We have the doctor on Nokia meeting.  And, again --

22  Your Honor has -- You know, you have before you what has to be

23  the strangest declaration I have ever seen filed in litigation.

24       You have a senior executive from Samsung telling this

25  Court under oath that he's a liar.  But what he says is, "I'm

1    not lying to you.  I was lying to my potential business

2    partners because I was attempting to deceive them into thinking

3    that I have this incredible confidential information which, by

4    the way, I did have."

5         And so we -- we've got a weird thing going on there, I

6    mean, in terms of the credibility functions.  I -- But -- But

7    to take Dr. Ahn's story that you're not the person he's lying

8    to, and to discount what the Nokia people have actually said in

9    their depositions and under their declaration about Dr. Ahn's

10   use of this material, I think it can't be done on this record.

11        And if Ahn did say, "All information leaks," and then

12   you've had, you know, either identical or incredibly similar

13   information for the purpose of giving them the impression that

14   he knew their inside top secret business information, that's an

15   intentional violation of this Protective Order.

16        **THE COURT:**  Would it be enough in your view on that

17   point, Mr. McElhinny, that direct reports to Dr. Ahn were made

18   aware of this information?  If we could at least establish that

19   point, would that be sufficient?

20        **MR. McELHINNY:**  The -- The -- This is -- This is where

21   I don't have the facts and I don't have the depositions.  And

22   please don't give them to me.  I mean, I don't -- You know, to

23   have this go off into a satellite litigation of years and

24   years, you know, that happens to fall into Samsung's strategy

25   on these issues, and that's not -- But -- But if, in fact,

1    Dr. Ahn didn't open these reports that were sent to him, the

2    question is, why didn't he?

3        And the answer to that is everybody in the licensing

4    group, everybody who sat around and had the strategy about how

5    to deal with this, knew the information.

6        And the answer was, when -- when Mr. Shim was asked

7    directly in his deposition, "Can you represent to the Court

8    that this information was not used in licensing negotiations,"

9    he said, "I cannot do that."

10        Where do the presumptions go here?  I mean, that's --

11    that's -- that's the issue.  But that's the second intentional

12    violation.  I mean, we have . . .  Anyway.

13        The third one, which I haven't heard discussed here yet,

14    sort of danced around at the end, is, Nokia files this motion

15    on July 1.

16        All right.  They have to do it, you know.  Nobody knows

17    where it's coming from.  We never heard about this.  We're

18    going to do an investigation.

19        On July 16th, they send a letter -- Quinn sends a letter

20    to Nokia admitting Protective Order violations, and they do not

21    copy Apple.

22        But as Your Honor pointed out in an order, they also said

23    to Nokia, "Let us destroy all of the evidence of these

24    communications," and Nokia said no.

25        I'm not a criminal lawyer.  I don't know where obstruction

1   of justice Starts.  It certainly would have started if they had

2   destroyed the documents.  Whether simply making the offer gets

3   you to that line, I don't know the answer.

4       But when you have a Protective Order that says "disclose

5   immediately," I just sat here and -- and heard, you know,

6   lawyers say, "Producing isn't disclosure."  That's nuts.  I

7   mean, it's just plain nuts.  But it doesn't protect what they

8   did in July.

9           THE COURT:  Are you saying that their obligation was

10  only triggered in July?

11          MR. McELHINNY:  No, I'm not.  I'm saying as of

12  July 16th, when they sent a letter to Nokia saying, "We

13  violated the Protective Order," and didn't send it to Apple and

14  suggested the destruction of evidence, that is, frankly, one of

15  the most serious violations of a Protective Order I've ever

16  heard of.

17          THE COURT:  At a minimum, it's deliberate behavior.

18          MR. McELHINNY:  It is certainly deliberate behavior.

19  It is -- It is -- It is intentional.  And, again, you would

20  have to put blinders on to ignore the complete chronological

21  overlap between the delay in getting the information to Apple

22  and the decision-making process that was going on in the ITC

23  and the USITR at exactly the same time.

24      So, Mr. Selwyn needs to get up and he needs to talk about

25  the details of all of this.

1      But -- But the question of whether -- how serious this

2   matter is, I think it is -- it couldn't be more serious.

3      On the sanctions issue, without going into the specifics,

4   there are two different institutional interests concerned here.

5   Your Honor also pointed this out in your order.

6      Apple has it's own institutional interest.  Apple is a

7   victim in this.  We try the victim.  I know we accuse us (sic)

8   of wrongdoing and all this, because that's the classic defense.

9      But Apple is a victim here.  Apple is entitled to remedies

10   under the Protective Order.

11      Frankly, we are not in a position, given our limited

12   access to the information, to know how much to ask for.  I

13   mean, I -- I know Your Honor was joking, but flogging, you

14   know, conceivably might have been the right answer here if it

15   would make somebody pay attention to these kinds of orders, and

16   as officers of the Court to admit wrongdoing and to come

17   forward and cure the problem rather than to litigate it.

18      But what I know Your Honor has the eye on -- your eye on

19   is the Court's institutional interest, and I started with that

20   and I'll close with that, which is, we need these orders to

21   work in order to provide a fair forum for litigation.

22      And the problem -- It's like professional sports.  I mean,

23   you know, when people used to rely on sportsmanship so that

24   people wouldn't take -- enforcing drugs.  You know, you got to

25   the point where it didn't work anymore and sanctions had to be

1   put into place because you couldn't rely on professionalism.

2       And I'm afraid that's the place where we are now.  People

3   are not going to be willing to take people's word for this.

4       Back in the day, when I was younger, I had the great honor

5   of serving as a member of what they called the Review Committee

6   of the State Bar Court, and that was before it was reorganized.

7   That was the body that did judicial discipline in California.

8       And we looked at all the cases.  And one of the things

9   that we learned very quickly was that the most dangerous cases

10  were those that involved lawyers who could not and would not

11  admit that they had violated the rules, and lawyers who -- who

12  took the position that they could sort of outlitigate the

13  system.

14      And the reason that those were the most dangerous is

15  because they have the greatest risk of recurrence.

16      The facts that are given here now, if -- if Quinn and

17  Samsung walk away from this, if there are not serious remedies,

18  if there are not serious penalties for this, it really does

19  undercut the entire system.  It shows that -- that a cavalier

20  show-no-same, show-no-fear attitude works, and it sets the bar

21  for attorney behavior before this court.

22      I'm going to turn it over to Mr. Selwyn who --

23          **THE COURT:**  Okay.  Thank you, Mr. McElhinny.

24      We'll hear from Mr. Selwyn next.

25      Go ahead, Mr. Selwyn.  Good afternoon.

1          **MR. SELWYN:**  Good afternoon.

2      Your Honor, I plan to address the issues in three parts.

3  First, I'll respond to Mr. Quinn's characterization of the

4  facts in more detail than Mr. McElhinny did.

5      Second, I will respond on the legal issues.

6      And, third, in light of the facts and the relevant law,

7  I'll address why each of the sanctions that Apple recommends is

8  appropriate and tailored to the violations that have occurred.

9      Let me begin, if I may, with the response to Samsung's

10 characterization of the facts.

11     Let me begin if I may with a response to Samsung's

12 characterization of the facts.  From the first moment Samsung

13 told anyone about the massive breaches that have happened

14 higher, Samsung has attempted to minimize and obscure the

15 violations.

16     According to Samsung, having 220 people in 19 law firms

17 spread in 10 countries around the world learn the specifics of

18 the Apple-Nokia license and Apple's licenses with other

19 competitors is merely quoting inadvertent violation of the

20 Protective Order.

21     Your Honor, the first step in fixing any problem is to be

22 honest about the size and the nature of the problem, and we're

23 still waiting for Samsung to do that.

24     On this point of inadvertence, that's not a fair

25 characterization of what has transpired.  Samsung and Quinn

1   Emanuel have demonstrated a reckless disregard for compliance

2   with the Protective Order and let me explain why.

3       There's no dispute that multiple attorneys at Quinn

4   Emanuel and Samsung knew as of December 2012 the Teece

5   report -- which, mind you, by that point had already been

6   circulated to 165 unauthorized recipients -- they knew it was

7   improperly redacted and that it contained financial terms from

8   four commercially sensitive Apple patent License Agreements.

9       Samsung says in their briefing, a Quinn Emanuel associate

10  realized within hours that the documents sent on December 21st,

11  2012, to Mr. Daniel Shim at Samsung contained Apple

12  confidential information.

13      Samsung claims that no one at Quinn Emmanuel realized at

14  that time that the same incompletely redacted Teece report had

15  been previously sent to Samsung.

16      **THE COURT:**  On that point, Mr. Selwyn, I want to get

17  your views, and, again, I appreciate you do not have the same

18  visibility into these documents that certainly I do, and

19  perhaps Samsung does.

20      I thought we just heard a few minutes ago during Samsung's

21  presentation that at least one associate was responsible for

22  redacting both the version posted on the FTP site as well as

23  the version which was sent to Mr. Shim in December.

24      Did I hear that correctly?

25      **MR. SELWYN:**  Yes.

1     **THE COURT:**  So that would suggest that at least one

2     attorney of record in this case at the firm understood that

3     there was a problem with the FTP site in December; right?

4     **MR. SELWYN:**  And I would go beyond that, Your Honor.

5     This was a preexisting redacted document.  We have to

6     dwell on that for a moment.  It had the same file name as the

7     improperly redacted Teece report that was on the FTP site nine

8     months earlier in March of 2012.

9     And the attorneys at Quinn Emanuel who were responsible in

10    sending the Teece report to Mr. Shim in December 2012 knew it

11    was a preexisting redacted report.

12    They didn't do any redaction in December of 2012.  You

13    haven't heard any evidence of that.  They took a preexisting

14    redacted report and sent it.

15    **THE COURT:**  Well, they didn't do any further

16    redactions at least until after they had sent the copy to

17    Mr. Shim.

18    **MR. SELWYN:**  We'll get to that, yes.

19    Now, since the only purpose for preparing a redacted

20    version of a document is to send it to persons not entitled to

21    access the unredacted confidential version, those Quinn Emanuel

22    attorneys had to have known that it, in fact, had been sent

23    earlier to Samsung and to others.  That's not conduct that can

24    be downplayed as inadvertent.

25    What we're talking about here at a minimum -- at a

1   minimum -- is a failure to investigate.  And Samsung's failure

2   to investigate whether the same incompletely redacted version

3   had been sent to Samsung earlier than December 2012 was not

4   deliberate, then at least it was reckless or willfully blind.

5        Quinn Emanuel lawyers say they told Mr. Shim that the

6   Teece report contained Apple confidential information and that

7   Mr. Shim confirmed that he had deleted the report without ever

8   opening it.

9        But Mr. Shim, he admits he received the document.  He says

10  nothing about deleting it in the declaration filed with this

11  Court, at least as far as we can see.

12           THE COURT:  Oh, he says he can't remember; right?

13           MR. SELWYN:  Well, that part was redacted from our

14  version.

15           THE COURT:  I'll tell you right now that's what he

16  told me.

17           MR. SELWYN:  Well, that's -- If you look at Pages 225

18  and 226 of his deposition testimony, I think you'll find

19  something consistent with that.

20       We haven't seen any documents produced in this case that

21  evidences Mr. Shim's deletion of the document as he was

22  purportedly required to do.

23       And for all of the forensic work that Samsung claims to

24  have been -- have done in the last several months, all the

25  money that it has spent, it hasn't provided us with a shred of

1  forensic evidence to suggest that, in fact, Mr. Shim deleted

2  the document.

3       And even after it admits that it knew the Teece report

4  that it sent to Samsung was improperly redacted, Quinn Emanuel

5  sent a new version of the Teece report, still containing

6  Apple's highly confidential information, not once, not twice,

7  but three further times, beginning with the redacted version

8  sent on January 4th, 2013.

9       Your Honor, a Protective Order violation is not

10 inadvertent when, after you know that you have sent your

11 adversary's confidential information to your own client, you

12 don't -- you don't investigate whether you did it before, you

13 do nothing to change your procedures, and you take so little

14 care to avoid doing it again that it happens not once, not

15 twice, but three more times.

16      **THE COURT:**  Mr. Selwyn, now, let's assume for the sake

17 of this part of our conversation that it was simply a further

18 screw-up.  One screw-up plus another screw-up still equals a

19 screw-up; right?  Or is it something more in your opinion?

20      **MR. SELWYN:**  It is something more because after it's

21 been done once, twice, three times, you can no longer call it a

22 screw-up.

23      After the first screw-up, you have a duty to investigate.

24 You have a duty to figure out what dissemination of that

25 document has occurred.

1      Quinn Emanuel should have asked:  What was the source of

2  that document?  What was the source of the redacted document

3  that I know I sent in error?  Who received that redacted

4  document previously?

5      If they had asked themselves those two questions in

6  December of 2012, boy, we could have avoided a lot of this.

7      This was no mere technical violation of the Protective

8  Order.  The information Quinn Emanuel gave to its licensing and

9  litigation executives is some of Apple's most confidential

10 information.

11     As Mr. Risher testified in his deposition, this is the

12 type of information that even within Apple very, very few

13 people have access to.  It's information that's indisputably

14 directly relevant to Samsung's licensing negotiations with

15 Apple and several Apple competitors, as well as directly

16 relevant to Samsung's litigation strategy in this case and

17 others on the FRAND issue.

18         **THE COURT:**  It's also the kind of information that you

19 all actually agreed was worthy of an appeal to the Federal

20 Circuit and a reversal of the District Judge; correct?

21         **MR. SELWYN:**  Well, it's actually information that

22 didn't require that because it was information of the nature

23 that Judge Koh agreed should be sealed.  This very License

24 Agreement, the parties, Apple and Nokia, moved to have sealed

25 before trial and Judge Koh agreed.

1      In Document Number 1649, citing the Electronics Arts case,

2  she wrote that (reading):

3          "Disclosure of these license terms could result

4          in significant competitive harm to the licensing

5          parties as it would provide insight into the structure

6          of the licensing deals, forcing them into an uneven

7          bargaining position in future negotiations."

8      That is exactly what has occurred.  The information has

9  been disclosed, and now that very risk has manifested itself.

10 There's nothing that could be described as merely technical in

11 these violations.

12     Samsung also argues and said in its brief several times

13 that what was improperly redacted was just a few lines.  We

14 heard that again and again.

15     Even that is untrue, Your Honor.  It's, in fact, eight

16 separate paragraphs.  It's not just a few lines.  It's

17 Paragraphs 190 to 193, Paragraphs 89, 111, 215, 265.

18 There's -- There's no dispute about that.  I don't know where

19 we get that it's just a few lines.

20     Incredibly, Samsung characterizes its Protective Order

21 violations as discrete.  That's not correct, either.  The

22 undisputed record confirms that Samsung's and Quinn Emanuel's

23 violations are far from a single isolated incident.

24     If this were a single isolated incident, no chance we

25 would be here.  It's the repetition over and over again leading

1  to hundreds of unauthorized recipients.

2      This --

3          **THE COURT:**  Mr. --

4          **MR. SELWYN:**  -- actually --

5          **THE COURT:**  Mr. Selwyn, I'm sorry for interrupting

6  you.

7      I wanted to ask you:  Do you have any problem, and should

8  this Court have any problem, with parties undertaking the

9  effort . . . to circulate widely materials that are -- that are

10  redacted but not approved by the other side?

11      Where I'm going with this is -- is really this notion that

12  you all are proceeding at your own peril in circulating

13  information that is redacted or otherwise shielded and avoids

14  the problems of a Protective Order, and if you screw up, that's

15  something that you're going to have to ultimately pay for.

16      Do you -- Do you think that's something I ought to weigh

17  in my analysis at all?

18          **MR. SELWYN:**  Well, I think that's correct, that the

19  proper procedure and the one that we followed with respect to

20  IC -- ITC materials is to send them to Samsung in the proposed

21  redacted form for approval before sending them to --

22          **THE COURT:**  Is Mr. Quinn --

23          **MR. SELWYN:**  -- our client.

24          **THE COURT:**  -- or Mr. Pease correct that there was no

25  formal agreement here between the parties in this case?

1     **MR. SELWYN:**  I don't have anything written to that

2  effect.  I do know that our practice was to send copies of what

3  we wanted to send to the clients in proposed redacted form to

4  Samsung before we would send it to the client.  The mere

5  designation on the document as Confidential Samsung Business

6  Information, even if widely overbroad, was enough such that we

7  felt compelled to share it with Samsung --

8          **THE COURT:**  If nothing else, it's an inexpensive --

9      **MR. SELWYN:**  -- before sending it to --

10          **THE COURT:**  -- CYA; right?

11     **MR. SELWYN:**  Well, it's that and parties may have

12  different perspectives on what's confidential within a

13  document.

14     Let me talk a little bit about the chronology here.

15     The first draft Teece report to have been sent to

16  unauthorized recipients was not March 24th in the FTP site, it

17  was March 21st, 2012.  It was a draft Teece report.

18     We know that from Mr. Becher's October 21st, 2013,

19  declaration at Paragraphs 41 through 44 in Exhibit T.

20     We don't know much about this document.  We had not seen

21  this.  We don't know what was not properly redacted but we do

22  know that on that date, three days before the final report was

23  posted on the FTP, there was an improperly redacted Teece

24  report that was disseminated.

25          **THE COURT:**  And that was disseminated by e-mail in

1  attachment; correct?

2       **MR. SELWYN:**  Correct.  Correct.  And again we don't

3  know if it was more than eight paragraphs, fewer than eight

4  paragraphs.  We don't have any visibility to that whatsoever.

5       Then we have the final Teece report on March 24th, 2012.

6  We have the second redacted -- redacted in a different way --

7  Teece report in January of 2013.

8       Then we have multiple versions of outline and draft

9  submissions to the ITC in March and April of 2013.

10      Let me just pause for a minute on the ITC issue because I

11  think Mr. Quinn has generated some confusion.

12      The executed Apple-Nokia agreement was produced by Apple

13  on January 5th, 2012, in the 1846 case with Bates numbers for

14  the 1846 case.

15      The same documents with the same Bates numbers from this

16  case was Samsung's trial Exhibit CX446 at the ITC hearing.  It

17  was deemed cross-produced in the ITC on February 1st, 2012, by

18  Paragraph 22nd to Judge Gildea's Order Number 25.

19      That document is subject to this Court's Protective Order.

20  To be sure it's also subject to the ITC's Protective Order.

21      But the notion that Your Honor can't weigh in on that

22  dissemination of Apple's confidential information because it

23  occurred in the ITC, in an ITC brief, is just incorrect.

24      There were at least 35 separate and improper disclosures

25  of the Teece report.  At least eight disclosures of the Teece

1  report by Quinn Emanuel attorneys, 27 more further

2  disseminations of the Teece report by Samsung in its outside

3  law firms around the world.  And these -- this data's just

4  taken from Mr. Becher's declarations.

5      We have at least five of Quinn Emanuel's attorneys who

6  improperly sent Apple's confidential information, at least 220

7  unauthorized recipients.

8      These numerous unauthorized disclosures reflect not

9  inadvertence but a systemic failure to comply with the

10 Protective Order.  And we emphasize the word "systemic" because

11 even after Samsung discovered that Mr. Shim had received

12 Apple's confidential information, it put by its own admission

13 no system in place to avoid a repeat.

14     Fourth, Quinn Emanuel claims that it fully complied with

15 the Protective Order's notification requirements.  That in our

16 view is a very troublesome claim when you consider the

17 chronology of events that have occurred here.

18     Section 18 of Your Honor's Protective Order requires that

19 (reading):

20         "In the event a party improperly discloses

21     material designated as protected under the Protective

22     Order, it must immediately notify counsel for the

23     producing party and provide to such counsel all known

24     relevant information concerning the nature and

25     circumstances of the disclosure."

1        Immediately notify, not notify when it pleases you.

2    Provide all known relevant information, not provide just the

3    information that you want.

4        The failure to immediately notify Apple and Nokia in

5    December 2012 and in the subsequent seven-month delay after

6    that indisputably allowed further dissemination and misuse

7    against Apple and Nokia.  We have records of further

8    dissemination to 65 unauthorized people.

9        That delay also impacts indisputably the availability of

10   evidence.  As we know, e-mails were deleted through auto

11   deletion functions and employees left Samsung and were no

12   longer available.

13       On July 16th, Samsung notified Nokia of the breach,

14   including by, to quote Samsung's December 2nd brief (reading):

15       ". . . Identifying the authors and recipients of the

16       relevant e-mails, as well as the contents of the

17       attachments that related to the Apple-Nokia License

18       Agreement."

19       Again ignoring Section 18 of the Protective Order, Samsung

20   failed to inform Apple at the same time Nokia was informed.

21       Now, Samsung suggests in its brief that there was a reason

22   for that, there was a reason it waited, and that's to provide

23   Apple with a meaningful report.

24       But there's no explanation, no explanation has been

25   offered to Your Honor this morning, why it could not have

1  provided Apple the same notice that Nokia received on

2  July 16th.

3      Let me suggest to you, Your Honor, that that delay was a

4  deliberate one and it was a calculated one.

5      During those two and a half weeks, the United States trade

6  representative was determining whether to veto the ITC's

7  Exclusion Order against Apple, and Samsung was arguing to the

8  USDR that it should not do such a veto.

9      And when Quinn Emanuel finally sent its notification on

10  August 1st in a letter to me that was marked "Outside Counsel's

11  Eyes Only," we immediately recognized the potential gravity of

12  the breach.

13      And almost immediately, I sent back a note to Quinn

14  Emanuel asking whether I could share the letter with my client.

15  We got more delay.  I asked twice more.

16      The next morning, which was the same day that the decision

17  from the USDR was due, a Quinn Emanuel partner sent me the

18  following e-mail (reading):

19          "Mark, sorry for the delay.  I am looking into

20      this.  Why do you want to share the letters with

21      Apple?"

22          "Why do you want to share the letters with

23      Apple?"

24      On August 3rd, the USDR issued its decision.  And on

25  August 4th, I received the following e-mail from the same

1    partner (reading):

2              "You may share the letters --

3              "Mark, you may share the letters with Apple."

4        The morning after we got the decision.  That chronology,

5    in our view, speaks volumes.

6        Samsung says there's no evidence that anyone used the

7    improperly disclosed confidential information.  We know that's

8    not true, either.  There's substantial evidence that Samsung

9    used this information against Apple.

10        There's no dispute that Samsung's in-house attorneys

11    reviewed and approved -- reviewed and approved a FRAND argument

12    against Apple that it could not have reviewed, could not have

13    approved, had Samsung -- had Quinn Emanuel and Samsung complied

14    with the Court's Protective Order.

15        And I'm referring now to the portion of that draft brief

16    which we have submitted to Your Honor that was disclosed

17    improperly to many, many folks at Samsung.

18        We have very strong circumstantial evidence that Samsung

19    licensing and litigation executives used Apple's confidential

20    information for licensing strategy against Apple.

21        As we detail in our sealed brief, the strong

22    circumstantial evidence -- And, to be sure, it is

23    circumstantial evidence.  We don't have visibility to all of

24    the documents, but the strong circumstantial evidence is that

25    Samsung framed its license offers to Apple based on that

 1  improperly disclosed license information.

 2          THE COURT:  And so, Mr. Selwyn, I want to make sure I

 3  understand Apple's position on that point as clearly as I can.

 4          MR. SELWYN:  Yeah.

 5          THE COURT:  You're saying that the cross-designation

 6  of the production under the ITC Protective Order did not in any

 7  way, shape or form authorize Samsung to have access to that

 8  License Agreement in the ITC proceeding.

 9          MR. SELWYN:  Samsung's outside counsel, for sure,

10  could have access to the License Agreement --

11          THE COURT:  Okay.

12          MR. SELWYN:  -- in the ITC proceeding.

13          THE COURT:  But Samsung itself, of course, would have

14  no right.

15          MR. SELWYN:  No right whatsoever.

16          THE COURT:  Okay.

17          MR. SELWYN:  They had no right to receive the

18  information that was in that draft brief to review and approve

19  that argument that was submitted to the ITC to justify the

20  FRAND offered that was made.

21                      (Pause in proceedings.)

22          MR. SELWYN:  On this issue of harm, Samsung has been

23  able to negotiate with Apple and to craft a litigation strategy

24  with knowledge of Apple's license terms with Nokia and with

25  other competitors.

1       And Samsung may yet use the improperly gained information

2  in future negotiations with other licensees -- licensors of

3  Apple's.  Samsung's licensing executives -- and Mr. Pease just

4  explained that the litigation and licensing team, they work

5  very closely with one another -- they're now armed with

6  knowledge regarding the license terms of some of Apple's

7  biggest competitors.  And those improper disclosures have

8  created an information asymmetry that gives Samsung an unfair

9  advantage in license negotiations.

10      So none of the factual predicates of Samsung's argument

11  against sanctions are supportable.  Violations were not

12  inadvertent.  They were not merely technical.  They were not

13  discrete.

14      Samsung and Quinn Emanuel did not fully comply with the

15  Protective Order's requirements.

16      Let me turn now to the legal issues.

17      Samsung makes the argument to this Court that it doesn't

18  have the power and it shouldn't use that power to issue

19  sanctions in these circumstances.

20      The law is not so impractical and so weak as Mr. Quinn

21  suggests that it would overlook misconduct that has occurred.

22  The law fully supports the imposition of severe sanctions based

23  on the facts before you.

24      As the Court has previously emphasized, protective orders

25  serve a vital function in the functioning of the judicial

1  process.  And just as Samsung has seriously misinterpreted the

2  Protective Order, so too it has seriously misinterpreted the

3  controlling law requiring violations of the Protective Order.

4      First, Samsung argues that the Court cannot apply

5  Rule 37(b)(2) to violations of Protective Order.  It relies on

6  an Eleventh Circuit case to suggest that Rule 37(b)(2) does not

7  apply --

8          **THE COURT:**  Let's --

9          **MR. SELWYN:**  -- to Protective Orders.

10         **THE COURT:**  -- assume for the moment that I choose to

11 follow Ninth Circuit precedent rather than Lisher (phonetic);

12 okay?

13     Let me -- Let me ask you:  Do you believe that under 37(b)

14 I have all the authority that I need to order the sanctions

15 that you are requesting; that I don't have to go to inherent

16 authority or any of the other powers that --

17         **MR. SELWYN:**  Yes.  You have the authority under

18 37(b)(2) to apply the sanctions that we have requested.  The

19 Court also has its inherent authority to do so.

20     But, yes, 37(b)(2) does give the Court that authority.

21     I'll just cite for Your Honor a Ninth Circuit case that is

22 not cited in Samsung's brief, which is the Westinghouse

23 Electric Corporation case, 992 F 2d 932, which makes it very

24 clear that (reading):

25         "37(b)(2)" -- and I'm quoting -- "should provide

1            comprehensively for enforcement for all discovery

2            orders, including Rule 26 Protective Orders."

3        So I don't think that there's any fair dispute on that

4    question.

5        Samsung next argues that a finding of bad faith is

6    required and cannot be shown here.  That, too, we believe

7    misstates the law of the Ninth Circuit.  Bad faith is clearly

8    not required in order for sanctions to be imposed.  Your Honor

9    can certainly consider bad faith in determining what sanctions

10   are appropriated, but they are not a threshold requirement.

11            THE COURT:  And you specifically distinguish

12   willful -- willful or deliberate behavior from bad faith under

13   that precedent.

14        I mean, my point is, the Ninth Circuit draws that

15   distinction; correct?  You don't have to actually find bad

16   faith.  That is a malicious intent regarding the outcome as

17   opposed to deliberate steps taken in advance of the -- of that

18   outcome.

19            MR. SELWYN:  In the Rule 37 context, you don't need

20   any of those three.

21            THE COURT:  Right.

22            MR. SELWYN:  You don't need bad faith; you don't need

23   willful conduct.

24        And I refer Your Honor to the Hyde & Drath against Baker

25   case, 24 F 3d 1162, where the Court said (reading):

1            "The fact that there is no evidence that" the

2        plaintiffs "acted in bad faith does not immunize it

3        from sanctions.  We have not required a finding of bad

4        faith on the part of the attorney before imposing

5        sanctions under Rule 37."

6        In any event, although it's not necessary to find bad

7   faith, there's ample evidence of bad faith here:

8        We have Samsung's failure to quarantine Apple's

9   confidential information; Samsung's failure to notify Apple on

10  a timely basis; Samsung's suggestion to Nokia that it could

11  delete information before providing notice to Apple; Samsung's

12  improper assertion of privilege of the deposition of employees,

13  improper assertion of privilege with respect to every single

14  document that was produced to Your Honor; Samsung's submission

15  of briefs and declarations on an ex-parte basis here.

16       At a minimum, Samsung has shown reckless disregard for the

17  Court's Protective Order and under the law that is equivalent

18  to bad faith.

19                    (Pause in proceedings.)

20       **MR. SELWYN:**  Let me turn lastly to the basis for our

21  sanctions requests.  And I want to specifically address the

22  sanctions that Apple seeks and focus in particular on why those

23  sanctions are appropriate under the circumstances here.

24       The sanctions that Apple requests would serve multiple

25  purposes:

1      First, they would begin to cure the harm and the

2 continuing threat to company's whose licensing information has

3 been leaked.

4      Second, they would help to vindicate the courts and the

5 public interest in promoting rigorous compliance with

6 Protective Orders.

7      And, third, they would help to deter in the future the

8 type of action -- or, rather, the type of inaction in which

9 Samsung and Quinn Emanuel engaged in here.

10      Apple requests four sanctions intended to cure the harm to

11 Apple and address a continuing threat.

12      First, the Court should make public in its sanctions order

13 certain findings about Samsung's conduct.  Each of these

14 findings is well supported by the record and would serve an

15 important benefit of making the public aware of Samsung's

16 misconduct.

17      First, the finding should describe Samsung's and Quinn

18 Emanuel's misconduct in violations of the Protective Order.

19           **THE COURT:**  Mr. Selwyn, I have your papers on this and

20 I really do want to focus us on what's most troubling to me.

21      You in your papers and now here today don't seem to draw a

22 heck of a lot distinction between Quinn Emanuel and Samsung in

23 terms of the sanctions to be meted out.  I appreciate that the

24 effect of some of these four sanctions may be different for one

25 or the other.

1      Could you speak to, in your view, who really is culpable

2   here?  Are they equally culpable or not?

3         MR. SELWYN:  Well, it's -- it's very hard to put a

4   percentage it.  And because we don't have visibility to all of

5   the documents, it's especially so.

6      We do know that in large part this would not have occurred

7   if Samsung had done the proper investigation at the right time.

8         THE COURT:  Now, you're saying Samsung or Quinn

9   Emanuel?

10         MR. SELWYN:  I'm sorry.  Quinn Emanuel at the right

11   time, and that's December of 2012, even giving Quinn Emanuel

12   the benefit of the doubt with respect to the earlier

13   disclosures.  But at the very least, by December, there was

14   knowledge that required a duty to investigate.

15      But we also know, because the recipients of the

16   information were themselves sophisticated people -- in fact,

17   Dr. Ahn is a member of the California Bar -- that they had

18   duties as well.  And they knew the importance of Protective

19   Orders and the obligations that are imposed by Protective

20   Orders.

21      And if you look at the depositions that we took of each of

22   the Samsung employees, they were very cognizant of what the

23   Protective Orders require, and themselves in patent cases

24   insist upon Protective Orders to protect their own confidential

25   information.

```
 1        So the thought that they would not recognize -- that none

 2   of the hundreds of people would recognize, as Samsung has

 3   argued, that this was highly sensitive licensing information of

 4   Apple and other parties is . . . beyond belief.

 5                        (Pause in proceedings.)

 6        THE COURT:  I think I understand your position on the

 7   individual sanctions you've requested in light of the papers

 8   you've submitted.

 9        But I want to ask you to focus on the authority of this

10   Court to address the injunction, 12630.

11        MR. SELWYN:  Yes.

12        THE COURT:  I believe you request certain remedies

13   from -- from me that would impact Samsung's ability to secure

14   an injunction from Judge Koh, and I'm unclear as to my

15   authority to do that.

16        MR. SELWYN:  Correct.  The reason we have requested

17   that is because the equitable powers of this Court and the

18   well-established standard that one who seeks equity must do

19   equity.

20        And in our brief, we have cited to Your Honor multiple

21   Federal Circuit courts -- Federal Circuit cases where those

22   equitable principles were invoked under circumstances of

23   unclean hands to deny the other party one of the -- one of the

24   benefits that it was seeking from the Court.

25        In this instance, Samsung is seeking to take advantage of
```

1   the -- taken advantage of knowledge of Apple's confidential

2   information.  It has the potential if not the actual ability to

3   craft FRAND negotiate -- FRAND arguments to benefit it, not

4   only in the 630 case, not only in the 1846 case, but in cases

5   around the world.

6       **THE COURT:**  And you -- If I were to agree with you,

7   you're suggesting that I have the authority to cabin or

8   restrict their ability to secure that equitable relief from Her

9   Honor?  This sounds to me like a Judge Koh issue is what I'm

10  getting at.

11      **MR. SELWYN:**  Well, I think at a minimum, Your Honor,

12  you can issue a report to Judge Koh describing your

13  recommendation and the bases, therefore, under which the Court

14  should invoke its equitable power to limit Samsung's ability to

15  seek an injunction under these circumstances.

16      **THE COURT:**  All right.  Well, Mr. Selwyn, as I said, I

17  think I understand the remainder of the points from your papers

18  so I do want to hear from Nokia --

19      **MR. SELWYN:**  Thank you.

20      **THE COURT:**  -- before I return to Mr. Quinn.  Thank

21  you.

22      Mr. Allen.

23      **MR. ALLEN:**  Thank you, Your Honor.

24      It seems like I ought to turn first to the -- to the

25  June 4th meeting.

```
 1        In his remarks, Mr. Quinn quoted a portion of Mr. Melin's
 2   deposition from that meeting.  And he quoted, I believe, a
 3   portion from the -- The meeting was divided into segments
 4   separated by breaks.
 5        He quoted a portion of the meeting from the first -- or a
 6   portion of the deposition from the first portion where
 7   Mr. Melin testified that Mr. Ahn simply said in the first
 8   portion, "I have an idea what Nokia and Apple" -- what --
 9   excuse me -- "what Apple paid to Nokia."
10        He didn't quote the testimony from Mr. Melin's deposition
11   after the break, which I think is more pertinent to the issue
12   that the Court's concerned about.  And I don't believe that any
13   of it is -- is troubled by the Protective Order.
14        I'll read it to the Court.  It begins at Page 172,
15   Line 24, and this is Mr. Melin's testimony (reading):
16            "A.  And -- And at this time" -- this time being
17        in the second portion of the meeting -- "he said" --
18        "he" is Mr. or Dr. Ahn -- "he said that he knows what
19        Apple is paying to Nokia; that -- that Samsung is
20        in -- in mini litigations and that -- that these
21        License Agreements are produced in connection with
22        these litigations.  And while they are supposed to
23        remain confidential, all information leaks."
24        Those were the specific words I vividly remembered him
25   using, "all information leaks."
```

1      Now, Mr. Quinn described a few things that -- that

2  Mr. Melin did not say.  And I think I agree with him on most of

3  these.

4      Mr. Melin did not say, either in his declaration or his

5  testimony, that it was Quinn Emanuel that conveyed information

6  or that it was this litigation that the information was leaked

7  in.  Certainly one could have surmised that from the -- from

8  the circumstances.

9      He also did not say that the outside counsel communicated

10  the information directly to Mr. Ahn.  He said that it was

11  communicated to his team.

12      The way that Mr. Ahn described what he knew was, he said,

13  "I am aware.  I know the terms of the license."

14      So I -- I think it's -- it's -- it's a little bit

15  disingenuous to -- to conclude that the -- the testimony of

16  Mr. Melin or Miss Eeva Hakoranta, who was his colleague at the

17  meeting, somehow now shatters what the Court, I think, has been

18  troubled about all along, and it's not just -- I mean, it

19  certainly is the -- the use of the information in connection

20  with those negotiations, but it was also the cavalier attitude.

21      I think there was a suggestion that --

22          **THE COURT:**  But I don't recall reading in the

23  Protective Order a prohibition against cavalier attitudes.  I

24  have to focus on disclosure and use of protected information;

25  right?  Am I right?  Of course.

1          **MR. ALLEN:**  Absolutely.

2          **THE COURT:**  Yeah.  So -- So it seems to me as I read

3  that deposition transcript, Mr. Melin paints a very different

4  picture of the precision with which Mr. -- or Dr. Ahn uses

5  certain terms in that conversation.

6       How am I not to consider that?  How can I ignore that in

7  weighing all this evidence?

8          **MR. ALLEN:**  Well, I think -- I think there's a few

9  things that -- that were communicated in the course of that

10  meeting that are relevant here.

11      First of all, the suggestion, as I just read to you, by

12  Mr. Ahn that these licenses are disclosed in litigation --

13          Let me make sure I get it -- I get it precisely right.

14              "They're produced in those litigations, and

15          while they are supposed to remain confidential, all

16          information leaks."

17      Now, I say that's cavalier.  I think what it evidences is

18  knowledge.  "I know I'm not supposed to have this stuff."  And

19  we've heard countless times that he's a U.S.-trained lawyer.

20  He knows about Protective Orders.

21      It's -- I think the phrase that was used was it was -- it

22  was improbable.  I think that was -- Implausible, excuse me.

23  It was implausible to think that he would have done this

24  because he was a U.S.-trained lawyer.

25      I think this communicates that that is exactly what he

```
 1  did, that he knew that he was not supposed to have this

 2  information.  He was making a power play in negotiations, and

 3  he communicated to it in exactly that way so there would be no

 4  doubt in the -- in the minds of the people that he was meeting

 5  with that he knew.

 6          THE COURT:  Mr. Allen, there's a very simple

 7  explanation for that, though, that Samsung has offered.

 8  Dr. Ahn says he was simply pretending.

 9          MR. ALLEN:  I think that's implausible, Your Honor.

10      Normally, I'm not a -- I'm not a big poker player.  I'm

11  not even a remotely good poker player.

12      But I -- I don't think the practice is to bluff about what

13  people's cards are while they're holding them.  I think the

14  purpose is to bluff about what your own cards are.

15      And so I think it's -- I think it's implausible to --

16          THE COURT:  I'm not sure you play much poker at all,

17  Mr. Allen, because I don't understand that but --

18                          (Laughter)

19          MR. ALLEN:  I don't.  I don't.

20      But -- But that would be -- that would be me bluffing you

21  about what -- about the hand you're holding.

22      That is what Dr. Ahn is saying that he was doing.  He was

23  bluffing Nokia about the terms of their own license that were

24  certainly known to them.  And I think it's an implausible

25  explanation to suggest that.
```

```
1        And so what we're left with is, he was bluffing them about
2   the fact that he had gotten it in connection with these
3   litigations.  That turned out to be true.
4        He was bluffing them about the precise terms of the
5   license that he quoted to them.  That turned out to be true.
6   And it turned out to be -- It turned out to match the
7   information that he obtained from his counsel.
8        So it seems an implausible explanation that -- that he not
9   only bluffed, he bluffed perfectly.
10       Nokia recited exactly what happened at the meeting and, as
11  it turns out, they were correct in their description.  That --
12  That to me is an implausible explanation of what happened here.
13       Your Honor, if -- if I could -- And I'm happy to talk
14  about the June 4th meeting at length if you want.  I --
15           THE COURT:  No.  I think I understand your position
16  from your papers on that meeting.
17       I would very much like to hear more from you, Mr. Allen,
18  about the remedy you're seeking in particular.
19       But I may be jumping ahead.  You have other prejudices you
20  want to highlight --
21           MR. ALLEN:  Well --
22           THE COURT:  -- because I'm eager to hear it.
23           MR. ALLEN:  Your Honor, what I wanted to start off
24  with is the stipulated order and that is part of the relief
25  we're seeking.
```

1        In the Court's November 8th order, the Court said that it

2   still doesn't have a complete picture of what's going on.

3        We -- Certainly nobody out here other than potentially

4   Samsung has the picture that the Court has, but we're

5   particularly disadvantaged.  I mean, at this stage of the case,

6   we still don't have the Teece report.  There's been no redacted

7   copy of the Teece report produced to us in this case.  The only

8   documents that have been produced to us are blacked-out

9   e-mails.  So we have nothing to have an understanding of

10  what -- of what's transpired here.

11          **THE COURT:**  How -- But Samsung tells me that they've

12  made offers to give them to you as long as you don't get greedy

13  and ask for everything else.  Why don't you take him up on

14  that?  Save us all the trouble from having to work through some

15  pretty complicated privilege issues.

16          **MR. ALLEN:**  Well, they haven't offered to produce the

17  Teece report to us.  They've never made that offer to us.

18       So what they've offered to produce to us, subject to an

19  agreement that -- that we would not argue for further waiver,

20  are selected documents that the Court identified in the show

21  cause order.

22       And our only point to them is -- and I have a problem with

23  a lot of the argument that has occurred here today -- is,

24  Samsung is making selective disclosures.  They are disclosing

25  bits and pieces of the record that they believe advantage their

 1  position.  And -- And we didn't accept that offer because there

 2  needs to be a full disclosure of the record.

 3       **THE COURT:**  Mr. Allen, are you saying that in

 4  supplying the Court with even one privileged communication,

 5  they have effectively waived or given up the right to claim

 6  privilege over other documents which may be less favorable to

 7  their position?

 8       **MR. ALLEN:**  No, sir, Your Honor, I'm not saying that.

 9  And I'm not really talking about the in-camera review at all.

10       But -- But let's -- let's think about the argument that --

11  that they're advancing in general, and it's an argument, the

12  theme of which Mr. Quinn, I think, went back to again today.

13       And he certainly -- I think he started off the same way

14  today that he started off the last hearing.

15       And I -- I had it in -- quoted from the last hearing.  He

16  says (reading):

17            "For them this is a free shot."  Us.  "It's a

18       free shot."

19       I'll just pause to remind the Court.  We didn't not come

20  here seeking sanctions.  We came here trying to protect further

21  disclosure of our information that Samsung was seeking.

22       We didn't file a sanctions motion.  We sought -- We filed

23  a motion for a Protective Order.  So we weren't coming for a

24  free shot.  We were trying to stop the hemorrhaging.

25       He says -- He said in the last hearing, made basically the

1  same argument today (reading):

2          "There is no evidence of use.  There is no

3      evidence that there is anything other than inadvertent

4      disclosure."

5      And then they block our ability to view the evidence that

6  they're -- that they're describing here.  They -- They -- They

7  bar us from doing -- or from -- from investigating that.

8      That's not a mere denial of intent, and it's been

9  thematic, certainly thematic in the argument you heard today,

10 and it was thematic in their brief, but, that we're good guys.

11 Made a mistake, but we're Good Guys.  We did -- We did -- We

12 did make a mistake but we did what we did with a pure heart."

13     And -- And I think it's -- I think it's improper for them

14 to be making those arguments and then to say, "You have to

15 trust our reading of the documents.  You don't need to see

16 those documents.  Just accept our characterization of those

17 documents."

18     I believe, Your Honor -- and we've argued this to the

19 Court -- that's a waiver.

20     Let me give -- Let me give two examples of that, that I

21 think are helpful.  One of them we've heard a fair amount of

22 discussion about today.  This is the December 2012 Shim story.

23 That -- The description of that event in their brief is

24 "Information that it contained" -- this is the -- the . . . the

25 e-mail.

1           "A.   Information it contained was not disclosed

2      to Samsung because Quinn Emanuel within hours

3      instructed Mr. Shim not to access the e-mail, and he

4      promptly acknowledged those instructions."

5      So they're telling us their narrative of what happened,

6 but they're refusing to show us the documents which evidence

7 what happened.

8      That -- That's an -- That's widely recognized as an unfair

9 issue injection, the use of that -- of that information.

10          **THE COURT:**  Again, I'll ask the question I was asking

11 a few minutes ago.

12      Your view is they've waived, and on that basis, you're

13 entitled to see the materials; right?

14          **MR. ALLEN:**  Yes, Your Honor.  At this stage of the

15 case, I was simply suggesting that one -- one e-mail doesn't

16 weigh for the whole case.  It's the conduct in the defense of

17 the case that waives the entire -- their claim of privilege of

18 the entire record of these events because they've used the

19 record to characterize their conduct, to characterize not just

20 a denial of their intent, but to characterize and color their

21 conduct.

22      They go -- They go on to say, and this is, I believe,

23 the -- the comeback e-mail from Mr. Shim in May of '13

24 (reading):

25              "Mr. Shim's questions in his e-mails did not

 1          relate to the report or to Apple's License Agreement

 2          and, thus, the Quinn Emanuel attorney who responded to

 3          Mr. Shim had no reason to and, in fact, did not open

 4          the Teece report."

 5          Well, how in the world am I supposed to know that's true?

 6    How am I supposed to test the veracity of that statement if I

 7    have none of the documents that they're actually referring to

 8    in their -- in their brief and in the Baxter declaration?

 9          I will say today may be the first time I heard -- and I

10    want to be -- I mean, I'm trying to be respectful about lawyers

11    who've been involved in this and we're not here to -- to -- I'm

12    not trying to cause any pain for any associates at Quinn

13    Emanuel.  I was an associate myself once and had sufficient

14    pain to recall it.

15          That it was -- That it was Mr. Baxter who did the initial

16    redaction.

17          I had been led to believe it was Mr. Baxter that had

18    discovered the Shim -- for -- the Shim e-mail and called it

19    back in December of 2012.

20          Having heard that tonight, I will say I've got some

21    followup questions.  I mean, I want to know how is it that the

22    person who did the original redaction that was circulated

23    around fairly widely is also the person that found -- figured

24    out the fact that the material had not been properly redacted

25    before it was circulated?

1        We also heard some discussion today, again, around the

2   same time frame, the communications between Quinn and -- and

3   the UK law firm, Bristow's law firm.

4        And the brief describes the fact that -- and there's a

5   declaration to support it -- the fact that the UK lawyer was

6   unaware that the document that she was communicating to Allen &

7   Overy, the French firm, was improperly redacted.

8        How am I supposed to test that?

9        Then it goes on to argue (reading):

10            "She had included the link for reasons unrelated

11            to the specific term of any Apple license or to

12            Samsung's negotiation of a license with Apple or any

13            other company."

14       Oh.  Again, how are we supposed to know what happened

15   without this information, yet the only thing that I have to go

16   by is -- is Samsung's description of the events based upon

17   their reading of the e-mails at issue.

18            THE COURT:  So, Mr. Allen, just, again, to put a fine

19   point on your -- on your position here.

20            MR. ALLEN:  I'm apparently not putting a fine enough

21   point on it.

22            THE COURT:  Well, let me see if I can help, if I

23   might.

24       I understand your advocacy.  I'm just trying to make sure

25   I understand it as clearly as I need to.

1     You're essentially saying Samsung, Quinn, they had -- they

2  have a call here to make.  They could either maintain the

3  privilege and stand or fall based on the documents that were

4  produced consistent with the maintenance of that privilege, or

5  they could put the documents before the Court and, in doing so,

6  they need to give you the same access.

7     Is that basically it?

8        MR. ALLEN:  It is basically it.  I want to draw one

9  distinction.

10     I believe that -- that providing the Court in-camera

11  review for the purpose of determining the existence or

12  nonexistence of privilege, I set that aside.

13        THE COURT:  I would, too, so I think with we at least

14  agree on that point.

15        MR. ALLEN:  All of these instances that I'm citing to

16  you are instances where Samsung has made arguments in their

17  brief.  So they're advancing positions based on their

18  characterizations of the events, based upon their reading of

19  the documents.

20     And -- And once you go past that point, I think they've

21  lost the ability to -- to -- to claim privilege to the

22  documents relating to these events generally.

23     Once they say, as -- as Mr. Quinn said, "There is no

24  evidence of use," well, then, aren't we allowed to see the

25  evidence to determine whether they're correct in their

1  characterization that there is no evidence of use?

2      Once they say, "There is no evidence of anything other

3  than inadvertent disclosure," aren't we allowed to see the

4  evidence that they're talking about that relates to their claim

5  that there's no evidence of anything other than inadvertent

6  disclosure?  I think the law clearly says that we are.

7      And I -- I think that they've gone much further than a

8  mere denial, which the law says they can make, and they've

9  injected issues into this case for the purposes of defending

10  themselves and coloring their conduct, and we're entitled to

11  see that information.

12      And it's -- it is one of the -- the sanctions that we've

13  asked for, Your Honor, that, in addition -- What I just gave

14  you was a waiver argument.

15      So if you find that the documents are not privileged, none

16  of this makes any difference.  If you find they are privileged,

17  they've waived them.

18      Even if you found -- And I don't think there's much

19  question about the fact that they waived them.

20      Even if you found that they were privileged and they

21  hadn't waived them, it's an appropriate sanction, given how we

22  got to where we are today, to order the disclosure of those

23  documents so that we can get to the bottom of this and --

24          THE COURT:  Does Rule 37 allow me to puncture the

25  attorney-client privilege?

1          **MR. ALLEN:**  Yes, sir, it does.

2       Your Honor, I -- I'm trying to think of the case and, I

3  apologize, I don't have it on the tip of my tongue.

4       Rule 37 does allow you to puncture the -- the

5  attorney-client privilege as a sanction.  I'm trying to think

6  of the language that -- that -- I mean, well, first of all, I

7  think it's Judge Scalia and I apologize I don't recall the

8  case.

9       You can dismiss the case.  Rule 37 would allow you to

10  dismiss the case as a civil sanction.

11       And -- And I think the finding is that if you can dismiss

12  the case, you can certain met out lesser remedies along the way

13  that the Court deems are appropriate to address the issues that

14  are before it.

15       I was talking about the Bristow's exchange, and I just

16  want to make just one more point because I think it's -- I

17  think it's a -- There's an imbalance issue in one of the

18  arguments that Samsung is advancing.

19       I think they've advanced -- they didn't do it so much

20  today but they've advanced in the past that you can figure out

21  the terms of the Nokia-Apple license from the public

22  information.

23       But the argument that they make in connection with the

24  Bristow's disclosure is that it included the purported terms --

25  And this is a quote from the brief (reading):

1            "They included the purported terms of the

2        Apple-Nokia license."

3        "Which terms" in the French brief.

4            "Those terms were drawn from public sources and

5        do not match the terms of the incompletely redacted

6        Teece report."

7        So somehow or another, the public sources don't match the

8    Teece report when it's advantageous for them not to match them,

9    but otherwise the public sources do match the Teece report when

10   it's convenient for them to match the Teece report.

11       There's a -- There's an inconsistency in their -- in their

12   approach, but -- but it's important to recognize that they

13   haven't cited to you a single news article that describes the

14   terms of the Nokia-Apple license.

15       They haven't cited to you -- And I'm talking about the

16   complete terms of the Nokia-Apple license.  They haven't

17   described to you or cited to you a single news article that

18   describes the terms of the Nokia-Apple license as described by

19   Dr. Ahn in that meeting on June 4th.

20       I want to back up, if I could, for just a second, Your

21   Honor.

22       I said I wanted to talk about the -- the stipulated order.

23   I -- I said we didn't come here seeking sanctions, we came here

24   seeking a Protective Order to stop further disclosure.

25       We did, in connection with that Protective Order,

1  ultimately negotiate a stipulation with Samsung and that

2  stipulation was entered by the Court on October 2.

3      The -- The stipulated order process was designed to be the

4  beginning of the fact-finding mission, not the end of the

5  fact-finding mission.

6      And like -- You know, like all things, we all have such

7  grand intentions when we start.  It was a collaborative process

8  where we were going to work with Quinn Emanuel to develop a

9  protocol where we could go and get all the information, collect

10 the information.  Stroz Friedberg was going to create a log

11 describing all of the information.  And then we were going to

12 decide if we had something to fight about or not.

13     Now, within the last several days, I think that Samsung

14 has filed a motion, the second such motion it's filed, seeking

15 relief from the stipulated order provision requiring the

16 creation of a log.

17     I think right after the October 2 order issued, they

18 appealed that to Judge Koh seeking relief and she denied their

19 relief.  And now they've filed another administrative motion

20 seeking the exact same kind of relief.

21     We filed -- We think that's an inappropriate -- It's

22 inappropriate for a lot of reasons but it's an inappropriate

23 mechanism for them to use.  We filed this afternoon a motion to

24 strike that recent pleading.

25     But I want -- I want to talk just a second about why.

1       The -- The purpose of the -- of the log that Stroz

2  Friedberg was supposed to create was to give us some visibility

3  of what had happened, to help us understand the depth and

4  breadth because, by this time, by the time we negotiated that,

5  they had made their initial disclosures to us and we knew that

6  there was a bigger problem than certainly even we had

7  anticipated as a result of the June 4th meeting.

8       The log that -- And this is set forth in Paragraph 7, I

9  believe it is, of the -- of the stipulated order.

10      The log was supposed to contain a description of the

11 communications at issue, and I'll quote, quote (reading):

12            "Sufficient to understand the nature of the use

13       or reference to the disclosed information."

14      It is interesting to me that nobody ever hesitated to call

15 it disclosed information before.  I find it, frankly, sort of a

16 little bit silly that we're having a conversation today about

17 whether it was disclosed or not.  It was disclosed.

18      But the -- the Privilege Log that they created fails that

19 charge in the stipulated order in two material respects:

20      First, it contains no description of the communication at

21 issue sufficient to understand the nature of the use or the

22 reference of the disclosed information;

23      Two, it was created by Quinn Emanuel.

24      The purpose of bringing in Stroz Friedberg was to have

25 some third party come in to prepare that log, to -- to help

 1   give comfort that it completely and accurately described the

 2   information in as nonadversarial a way as possible.

 3        Now --

 4        **THE COURT:**  Mr. Allen, when you (inaudible) up the

 5   books on the other side of the room and pointed out these

 6   concerns that you have, what did they tell you.

 7        **MR. ALLEN:**  They -- They told us they were distracted

 8   by what was going on here in the Court; that they got

 9   sideswiped by the Court's -- sideswiped is not their word.

10   They got overtaken by events and they were unable to complete

11   the -- the . . . stipulated order in the time that was set out

12   in the stipulated order.

13        Then when we came back to the issue after some time had

14   passed and they had provided all the information to Your Honor

15   in camera, they said that they took the position that the --

16   that the Privilege Log was sufficient to satisfy the

17   obligations under the --

18        **THE COURT:**  So why isn't that Privilege Log sufficient

19   or adequate, counsel?

20        **MR. ALLEN:**  For the two reasons I just cited.  Number

21   one, it wasn't prepared by Stroz Friedberg.  It wasn't prepared

22   by a third party.

23        But, more importantly, the Privilege Log doesn't give us

24   any ability to determine the nature or use of the -- or

25   reference to the disclosed information.

1      And that was a critical point, because we knew we were

2   going to be operating off of a -- a flat log, a sort of a

3   one-dimensional description of the documents.  And we knew we

4   were going to have to engage with Quinn Emanuel and having a

5   debate about what should we get, what could we get.  And we

6   knew that it was likely we were going to be coming to Your

7   Honor to explain our basis for obtaining that information.

8      So the -- I said to you that the -- the -- the stipulated

9   order process was the beginning and not the end.

10      There's two ways to go forward from this.  Way one is for

11   them to complete the stipulated order as it's described in

12   the -- in -- to complete the log as it's described in the

13   stipulated order.  Then we'll go through the negotiation

14   process.

15      I think we've leaped over that.  And way two, I think,

16   is -- is the way to go, and that is to make a finding that they

17   have -- either don't have a privilege, that they waived the

18   privilege, or that as a sanction they lose the privilege and

19   that those documents be produced.  If the documents are

20   produced, I don't need a log to have a debate with Quinn

21   Emanuel about whether or not we get those documents or not.

22      I want to pause here because I'm -- I'm mindful from

23   having had the pleasure to be here with Your Honor that you

24   are -- you are keen to find a resolution, an end to this.  And

25   I'm -- I'm . . .  I accept that.  I'm tired of writing briefs

1  over holidays and doing all that sort of stuff.

2      But we set this process in motion to have some

3  understanding of what had occurred so that we could make an

4  assessment about what the proper thing to do was to do for

5  Nokia.

6      And as I stand here today, whatever it is, four months

7  after we started with the stipulated order process, I don't

8  know anything.  I know the same things I knew before.  I'm --

9  Well, I'll take one exception to that.  I did not know that it

10  was Quinn Emanuel, and I did not know that the disclosure was

11  as pervasive as it was.

12      But we all now know that.  We all now know that they used

13  the information in their negotiations with Nokia.  I mean,

14  I . . . I don't see a legitimate debate on the credible of the

15  two stories at issue that -- that challenges that.

16      But I don't know the extent of the -- the internal

17  communications within Samsung about this information.  I don't

18  know how pervasive it was transmitted.

19      I mean, if you look at the -- the representations that

20  have been made so far by Samsung, I'm led to believe that --

21  that what they're looking for and what they did with Stroz

22  Friedberg under their sort of second retention letter, was they

23  were looking for instances of specific communications of the

24  Teece report, and they were looking for specific communications

25  of the ITC brief.

1    And one of the things that the -- that the stipulated

2 order makes clear is, those can be foundational and -- and

3 information derived from them may simply be repeated in an

4 e-mail.  May not have the report attached to it.  It could be

5 in notes of a meeting.  It could be any number of places.

6    And what we were trying to understand from the stipulated

7 order process is, where did -- where did that go?  Where --

8 What's the -- What's the thicket where you're going to find all

9 of the different permutations of that information?  And that's

10 what we're still trying to get to today.

11    And so I -- I take it that -- that we've been at this for

12 a bit, but I would also suggest to the Court that it's -- we're

13 not done.  You said in your November 8th order that we don't

14 know entirely what happened.  We may never know entirely what

15 happened.

16    But there's a lot that -- that we can learn from those

17 documents and we ought to have the right to learn them.

18    And I'm not here making some litigation play.  I'm trying

19 to get to the bottom of this as best I can.  That's what I've

20 been instructed to do by my client.  And I think we're entitled

21 at this stage to have some understanding of -- of what

22 happened.

23    And so I -- I simply suggest that -- that this process

24 today, and wherever we go from here, that it not foreclose one

25 way or the other the completion of that stipulated order

1  process because we have set in -- in motion a process to get as

2  close to the bottom of it as we can, and I ask the Court's

3  indulgence to allow us to finish it and have a better

4  understanding of -- of what happened.

5      So if you . . .  To quickly touch on them -- and I'm happy

6  to answer any questions the Court has -- the -- the --

7          **THE COURT:**  Are you really suggesting I enjoin Quinn

8  Emanuel from suing your client for 10 years.

9          **MR. ALLEN:**  Yes, sir, I absolutely am.

10         **THE COURT:**  That doesn't strike you as a bit of an

11  overreach?

12         **MR. ALLEN:**  Here I am and --

13         **THE COURT:**  In some ways you've given Mr. Quinn the

14  ultimate compliment; haven't you?

15         **MR. ALLEN:**  I had that thought and that's an

16  unfortunate side effect of the result.

17      I'm sure Mr. Quinn is entitled to many compliments.

18  That's not one of the ones that I intended to give him.

19      There's a lot of litigation going on in this industry.

20  And -- And -- And one of the things that we ought to be able to

21  do is engage in the litigation in good faith and not have to

22  worry about this stuff.

23      And I'm not suggesting that there's a world in which

24  lawyers aren't going to worry about things.  But there can be

25  no litigation with Nokia and Quinn Emanuel that this issue

1  isn't going to be on the forefront of everybody's mind.

2      And -- And we ought not be subjected to that process any

3  longer.  There's no reason for us to be subjected to that

4  process.  I wouldn't be surprised if Mr. Quinn said he'd

5  consent to that.  I think that's -- that's a -- I mean, if you

6  look at the forms of relief that we've asked for, I don't think

7  any of them or Draconian.  I take it, Your Honor, that that's

8  an unusual one.

9      If the Court thinks that 10 years is not the right length

10 of time, I take the Court's instruction.

11     But we ought not be subjected to that kind of -- that kind

12 of worry, that kind of trouble, and the -- and the additional

13 cost that this history is going to bring to that future

14 litigation.

15     I think there's even now in the record sufficient

16 information for the Court to make a finding that Samsung has

17 misappropriated Nokia's confidential business information.  I

18 think there's sufficient in the -- information in the record

19 now for the Court to order that Samsung be required to divulge

20 the allegedly privileged documents that they have relating to

21 this disclosure issue.

22     I think there's sufficient evidence in the record now for

23 the Court to award Nokia its attorneys' fees to this point, and

24 I'm not suggesting that this process is over.  I think we're at

25 that point now and I think we've made the record for it, and we

1  ask the Court in all sincerity for that relief.

2      Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Allen.

4      Mr. Quinn.

5          MR. QUINN:  Your Honor, Mr. Zeller can address the

6  issue concerning Stroz and the preparation of the log in

7  further detail.

8      The issue was, and the reason for the motion, which is

9  different relief than we asked for before, is that Stroz

10  doesn't have the capability to do that.

11      I mean, up until a few taste ago, what they told us, they

12  intended to hire a team of temp lawyers to go and prepare this

13  log.  And --

14          THE COURT:  So now the consultants hired by the

15  lawyers are going to go hire their own lawyers.

16          MR. QUINN:  We're 2.5 million -- They're 2.5 million

17  into us.  So they want to hire some temp lawyers to review

18  documents that this Court has reviewed, that we have reviewed,

19  the log had been prepared, and, you know, it didn't seem right

20  to us.

21      They then came back to us and said, "Well, we'll use our

22  own staff.  We'll use our own people," because we objected to

23  the temp lawyers.

24      The Court will see our motion that we made.  We're just

25  wondering -- We think at this point that this is more money,

1  that this -- We're past the point that we need to have another

2  log prepared.

3       The issue's been raised about the Court's authority under

4  Rule 37(b).  I heard what the Court said about, "Let's assume

5  that I'm going to follow Ninth Circuit authority."

6       I would just point out, we've got an Eleventh Circuit

7  case -- we've got cases in the Ninth Circuit that don't assume

8  without discussing, without deciding, that under -- The

9  Sanctions Committee awarded under Rule 37(b) --

10          **THE COURT:**  From the trench where I sit looking up on

11  high, I call that an affirmance, not an assumption; right?

12          **MR. QUINN:**  No.  I understand.  But it's not a -- I

13  mean, the law progresses.

14          **THE COURT:**  Yeah, but I'm not in a position to

15  progress on that one; right?  The Circuit has told me how to

16  proceed; right?

17          **MR. QUINN:**  Well, I would say it's not a holding.

18  They're -- Neither one of them are holdings.  And the recital

19  of the case is what it is, but there's no discussion of the

20  issue.

21       And I think we've got the better of the textual argument

22  because, you know, under Rule 37(b) it's got to relate to an

23  order to provide or permit discovery.  And we rely on the

24  Lipscher case in the Eleventh Circuit where the Court does a

25  close analysis of that.  So there's a textual argument.

1        In addition, I submit there's a policy argument.  Under

2   Rule 37(c), you're typically dealing with an order directing

3   somebody to do something, you know, Answer to Interrogatories

4   or whatever it is.

5        Rule 37(c) is pretty unforgiving, as the Court's pointed

6   out.  You don't need a willfulness.  Negligence is enough.  And

7   the burden -- the assumption is there's going to be attorneys'

8   fees unless the Court finds it's not good cause.

9        That's a very different situation than here.  We have a

10  Protective Order that's going to govern lots of lots of conduct

11  over a long period of time by lots and lots of lawyers and a

12  lot of different circumstances.

13       I submit that it's -- it's appropriate that a different

14  standard apply to that, that we shouldn't have the same

15  automatic there's a presumption there's going to be a fee

16  award.

17       We do point out that there's a contrary case out of the

18  Fifth Circuit now where the Court analyzed it, but that --

19  that's my pitch on -- on Rule 37, Your Honor.

20                    (Pause in proceedings.)

21       **MR. QUINN:**  You know, I think businessmen in

22  negotiations do bluff.  They may even bluff about what they

23  know about what the other guy's hand is.

24       Dr. Ahn's account is that Mr. Melin was bluffing about

25  what his deal was.  They're both -- They both realized in the

1   background these can't be discriminatory, that they need to be

2   aligned.  So there are motivations on both sides to -- to

3   bluff.  I mean, it's a negotiation.

4        That doesn't -- I don't jump to the conclusion that either

5   one of these gentlemen were lying in saying what they said.

6   They -- You know, businessmen when they negotiate aren't

7   necessarily -- usually aren't under oath.

8        Now, we again keep hearing this type of argument, Your

9   Honor.  Our first response is, when we found out about this,

10  let's destroy all the evidence.

11       Your Honor, that -- there is -- that's just a gross

12  misstatement.  If you look at Mr. Becher's letter to Mr. Allen

13  on July 16th, Mr. Becher confirms the conversation that he had

14  (reading):

15            "The Protective Order requires that you take

16       corrective action and remediate."

17       Mr. Becher, taking this literal, asked him, "Do you want

18  us to?"  Nokia said, "No."

19       So we confirmed that, that -- the instruction that, "You

20  don't want us to delete it."

21       You know, that's just a -- a distortion of a written

22  record we can all look at.  We were not advocating destroying

23  evidence.

24       This is what I mean by playing tennis without a net, if

25  they think they can get up there and say these kinds of things

1  about these lawyers when it's so demonstrably not true.

2          **THE COURT:**  Why isn't it a problem, Mr. Quinn, that

3  the Apple folks weren't copied on that letter?

4          **MR. QUINN:**  I think it is a problem.  I think it is a

5  problem.

6      I think we got sidetracked.  Nokia filed a motion; it's

7  served on Apple.  I certainly wish, I mean, Apple had been

8  copied on that so I think it is a problem.

9      In terms of -- I mean, we can -- we can all agree that

10  we -- this whole system assumes that these Protective Orders

11  will work and that people will respect them.  I mean, we

12  certainly agree with that.

13      Apple's 30(b)(6) witness, we asked him, "Do you have any

14  reason to think that what happened here would undermine

15  reliance on Protective Orders?"  You know, the man deals with

16  Protective Orders and licensing all the time.  His answer was

17  no.

18      "Also, can you identify any harm that Apple has suffered

19  as a result of these events?"  His answer was no.

20                  (Pause in proceedings.)

21          **MR. QUINN:**  It is true, up until now, we haven't sort

22  of named associates in the courtroom, but it is true that the

23  same associate did the redaction.  The FTP site in March and

24  then, nine months later -- It's actually the associate who

25  caught the problem with the transmission to Mr. Shim.  It's not

```
 1   the one who -- the first one.  It's the second one.  That's the
 2   same person.
 3        It's nine months later, and so . . . he doesn't remember.
 4   He didn't remember that he's the one that redacted this.
 5        Busy guy.  Responsible for redacting a number of different
 6   expert reports.  Hindsight's 20-20.  I'll sit in judgment on
 7   that guy now.
 8        It's very easy for Mr. Selwyn to get up here and say,
 9   "Darn it, you know, we got him.  We should have remembered that
10   nine months ago he's the one that redacted that."
11        All of us ask ourselves, can we be absolutely certain, you
12   know, many, many, many months later, busy lawyer, lots of
13   documents, lots of redacting, that you would have remembered
14   that?
15        You know, I actually think if he had remembered it, he
16   would have done something about it.
17            THE COURT:  Well, I think at our last or one of our
18   previous gatherings, I pointed out that if anybody seemed to
19   act responsibly in December, it was this associate.
20            MR. QUINN:  Yeah.  He's -- He's -- He's the one that
21   caught it and said, "This isn't right."
22            THE COURT:  But here's my problem or my question to
23   you:  He put others on notice that there was a problem.  He
24   asked them specifically for input on this issue, and I wasn't
25   provided with any response to suggest that senior people who
```

 1   were informed that there was an issue with the --

 2             MR. QUINN:  Well --

 3             THE COURT:  0with the report respond to him in any

 4   way.

 5             MR. QUINN:  Well, what he reported was, something had

 6   gone to Mr. Shim that shouldn't have gone to Mr. Shim.  He

 7   reported that.

 8        He didn't report -- And, again, it's very easy now to say,

 9   should have investigate, should have put two and two together,

10   should have remembered, that this is -- you know, this is the

11   same document that had been sent out before.

12        Now . . .  Now, that's -- Mr. Selwyn refers to, you know,

13   we have a duty -- there was a failure to investigate.

14        You know, put bluntly, Your Honor, I'm not aware of any

15   authority there's a failure -- that there's an obligation to

16   investigate.

17        I'm not aware of any authority that says that, in that

18   circumstance, if somebody's forgot that it converts what was an

19   inadvertent -- was originally back in March inadvertent into

20   something that's purposeful or that anything happened in the

21   meantime into something that's knowing, willful, intentional.

22             THE COURT:  When he tells a senior associate and a

23   passionate on the case, "Here's the situation.  What do you

24   think?"

25        Don't you think there's at least an obligation to respond

 1  to that associate or further investigate the matter?

 2       **MR. QUINN:**  Well, I think what was said was something

 3  went to Mr. Shim.  A document was transmitted to Mr. Shim that

 4  had information in it that it shouldn't have had in it.

 5       There was no discussion about -- You know, it's easy to

 6  say now, you know, where did that come from?  You know, has

 7  anybody ever seen that before?

 8       Basically what Mr. Selwyn is arguing for is that we were

 9  on inquiry notice that there was an inadvertent violation.

10  Because I still haven't heard anybody claim that anything that

11  happened in the spring, in the FTP site, or anything like that,

12  was anything other than completely inadvertent.

13       So we're a couple removes here from intentional wrongful

14  conduct.  At most, giving full credit to Mr. Selwyn's argument,

15  he's saying we were on inquiry notice.  Had we investigated and

16  asked the right questions and done the right things, we would

17  have learned that it had been sent out before.

18       I don't think that converts it into anything other than

19  inadvertent violation.  There's nothing in the Protective Order

20  about, you know, if you know or have reason to know or if

21  you -- you know, or a duty to investigate.

22       Obviously, we wish that had happened.  But in terms of the

23  culpability of the individual's conduct, I don't think it makes

24  any difference.  He just simply didn't remember.

25       **THE COURT:**  Doesn't the Protective Order, though, say

 1  you've got to tell the other side, in this case Apple,

 2  precisely so that Apple or anyone in their position can incent

 3  or move that needle a little bit?

 4       **MR. QUINN:**  Yeah.  When there is a inadvertent

 5  disclosure.  I mean, you -- you have to give notice.  And --

 6  And here, there wasn't.  I mean, we caught it immediately, and

 7  we got the confirmation that we got.

 8       I -- I -- I made the assertion when I was up here before

 9  that neither Nokia or Apple have ever in the course of this

10  proceeding maintained that if a document is disclosed that

11  shouldn't -- or produced that shouldn't be and isn't read, that

12  that doesn't trigger the reporting obligation.

13       And they still haven't maintained that.

14       I think that's an extreme position.

15       So we still view that as a situation where there was no

16  reporting obligation at that point.

17       Again, Mr. Selwyn knows -- had to have known, that we had

18  to have known that it had been sent to others.  There's --

19  there's no reason to believe that's true.

20       **THE COURT:**  Well, to flesh out Mr. Selwyn's point a

21  little further:  The report -- The copy of the report that was

22  sent back to Mr. Shim in December had to come from somewhere.

23  It wasn't created on the spot or on the fly.  The timing

24  confirms that fact.

25       **MR. QUINN:**  Right.

1          **THE COURT:**  So it was obviously produced from some

2    depository or source in the firm; right?

3          **MR. QUINN:**  Right.  That's the inquiry notice.  But

4    that doesn't -- that doesn't render the conduct anything other

5    than inadvertent.  We don't have -- I submit, in terms of this

6    Protective Order, our culpability, our conduct, is not made any

7    worse by the fact that nobody put two and two together; that

8    this was sent and nobody said to think, you know, "Oh, my gosh,

9    where did this come from?  Has anybody ever seen this before?"

10         Again, we all wish that had happened.

11         **THE COURT:**  And you're suggesting, Mr. Quinn, that

12   this entire structure, where you have lawyers scattered all

13   over the globe, different offices of the firm, different

14   offices of the client, where certain redactions are created by

15   one person, sent to another for distribution to yet another

16   group.  You have requests for redacted versions several months

17   later sent to other people.

18         This distributed nature, this fragmented nature of the

19   organization, you think that's irrelevant to the -- to the

20   inquiry I have to undertake here?

21         **MR. QUINN:**  I mean, obviously, that explains why

22   there -- it explains and it is relevant to why there were

23   multiple . . . disclosures.

24         **THE COURT:**  What I'm getting at --

25         **MR. QUINN:**  And it's --

1          **THE COURT:**  -- is why shouldn't the Court look to the

2    way this entire operation was set up in the first place in --

3    in asking whether or not there was negligence or some other

4    level of culpability in the way things played out?

5          **MR. QUINN:**  Well, I mean, this is -- I mean, what

6    happens here, Your Honor, is -- you know, I hate to say it.

7    I -- You know, so many documents redacted, so many documents

8    transmitted.  I'm glad we found out about this.  I genuinely

9    am, because it gave us an chance to institute some procedures

10   in our firm.

11         But I doubt that there's any firm in this country that

12   hasn't had something like this happened to them.  You know, we

13   had Melin's -- you know, Nokia's motion and Melin's declaration

14   that causes us to get to the bottom of this.

15         But is there anybody here in this courtroom who thinks

16   they don't live in a glass house?

17         Apple lives in a glass house.  I mean, Apple has twice now

18   in the last month published, you know, confidential

19   information.  We didn't hear any response to that.  They didn't

20   think it was necessary to give us notice, at the very same time

21   they're making arguments to this court.

22         Look, I agree, people have to rely -- When something says

23   redacted, and it's sent, no lawyer on the other side of the

24   world or even in the same law firm is going to think, "Well,

25   I've got to double-check this.  I better read it again to make

1  sure it was properly redacted."  That doesn't happen.  As a

2  practical matter --

3           **THE COURT:**  My question is shouldn't it happen,

4  especially in cases like this that are such high stakes that

5  consume so many resources in markets an in the Court.

6           **MR. QUINN:**  Well --

7           **THE COURT:**  Shouldn't there be a standard that says

8  you should be doing that.

9           **MR. QUINN:**  Well, the "that" is, and certainly in our

10  case, two eyes on every redaction.  I mean, that's our policy

11  here.

12     They developed between the time of the opening -- I'm

13  informed 0before the opening Teece reports and the rebuttal

14  reports a procedure was agreed to which apparently they had

15  been following the ITC to exchange redacted versions of the

16  reports.  That wasn't in place.  Obviously that's a -- that

17  would be a very useful measure and that would be what --

18  prevented what happened here.

19     But to create a rule that says in hindsight we're going to

20  make a judgment about, you know, what a young person did and

21  the fact that, you know, the hard-working person who didn't

22  think to go back and look, I think is pretty harsh.

23           **THE COURT:**  Yeah.  I -- I might agree with you that

24  that would be harsh.  I guess I'm -- I'm more focused on

25  what . . . more senior people did or didn't do in response to

1   that young person's inquiry, what the seniormost people did or

2   didn't do in setting up this whole operation so that if the

3   entire sanctity of the Protective Order stands or falls on one

4   junion associate's good judgment late at night on a given

5   document, that strikes me that perhaps we ought to be aspiring

6   to a higher standard, at least in cases like where the stakes

7   are so high.

8           MR. QUINN:  I'm sure people wish they -- they had that

9   one back.

10      I mean, what Mr. Pease was -- I mean, he's filed

11  declarations what he was told, you know, and to compound this,

12  you know, he's out of the office that day moving his home, his

13  family, and he gets a phonecall or an e-mail, I don't know

14  which it was, and was told an document improperly went out.

15      You know, we can all sit in judgment on that after the

16  fact, and it's very easy to make these kinds of charges.

17      But we see how simple this -- this is -- I mean, how easy

18  it is for confidential -- this type of thing to happened.

19          THE COURT:  Apple and Nokia may ultimately regret what

20  they asking for here, is what you're really saying.

21          MR. QUINN:  Look, you know, I don't wish this on

22  anybody, to tell you the truth, even them.

23          THE COURT:  Fair enough.

24                  (Pause in proceedings.)

25          MR. QUINN:  We did -- We did send a letter to the ITC

1    and copied Apple on August 1st.

2         You know, that didn't -- We did send a letter to the ITC

3    reporting disclosure.  Apple was copied on that.  So the period

4    of time we're talking about is -- is maybe a couple of weeks.

5         They have this theory about how this two-week period was

6    the period where the trade representative was considering.

7         I don't get it, Your Honor.  I just -- I mean, that

8    suggests a diabolical purpose in our minds, that somehow we're

9    going to sit on this, and how's this going to make a difference

10   as to whether the trade representative is going to veto the ITC

11   proceeding or not.  You know, to me, that's -- that's

12   illustrative of the kind of grasping at straws we see to try to

13   come up with some -- some theory of use or some -- some

14   benefit.

15        Mr. Selwyn asserts strong evidence that we used to frame

16   our FRAND offer but did not respond to our showing that that

17   predated that offer, that those numbers predated the Shim

18   correspondence.

19        They talk about an information asymmetry.  Your Honor, in

20   the Netherlands, they agreed that all our key -- top key

21   licensing people, unexcluded, could get this chart that has far

22   more detail in it.

23        Now, they're -- they say, "Well, you're only supposed to

24   use it for the Dutch proceeding."  But at the same time Apple

25   tells us you can't build a barrier down in your mind.  Once --

1  Once Samsung knows this, they know this for all purposes.

2  Well, they can't have it both ways.

3      I mean, our people have seen all their major -- Our key

4  licensing people have seen all their major license terms.  And

5  they -- they agreed to that.

6      There's a debate.  The Court has declarations from

7  Mr. Wortman, our lawyer, and Mr. Kleemer, their lawyer as to

8  what confidentiality obligations attached to that.  But the

9  fact is, it was disclosed.

10     There isn't an information asymmetry.  We disclosed all

11 ours to them; they disclosed all theirs to us.

12                    (Pause in proceedings.)

13         MR. QUINN:  In terms of the Court's inherent power.

14 We're outside Rule 37.  I just wanted to point out there's one

15 troublesome Ninth Circuit decision, the Yvonne (phonetic) case,

16 where there's some language in it that suggests --

17         THE COURT:  Tough to swear at the Supreme Court; isn't

18 it?

19         MR. QUINN:  Yeah.

20     There's some language in it that says -- suggests that,

21 you know, nonwillful conduct can be -- But if you look at the

22 facts of the case and what the Court found the lawyer did, he

23 was meeting a -- The Court found that the lawyer was trying to

24 meet a filing deadline and made a deliberate decision not to

25 comply with the order and just filed the documents in the

1  public record.

2      I mean, that -- Notwithstanding what the Court says, the

3  facts of that case was, it's actually bad faith, willful

4  violation.

5      In terms of Mr. Melin's testimony, yeah, he's all over the

6  lot in -- in his testimony.  I don't think anybody can give

7  any -- I don't think anyone can have any confidence that

8  Mr. Melin claims, you know -- At least based on Mr. Melin's

9  testimony, I don't think you have any confidence that Mr. Ahn

10  said, you know, "We got it from the lawyers.  The lawyers gave

11  it to us."

12      He's all over the place on that.

13      Now, Nokia says, "We're not here.  We don't want to

14  prolong this."  I submit they do want to prolong it.  They say,

15  "We're just here to stop the hemorrhaging."

16      Remember the last hearing, there was a discussion about --

17  Part of the focus of the last hearing was what foreign law

18  firms and in what courts has this been filed?  And there's two

19  courts where it's been filed, one in Brussels, one in Milan.

20      And we said there's a procedure you can swap those out.

21      If Nokia just wanted to stop the hemorrhaging, you would

22  think that when we approached them and said, "Let's withdraw

23  these documents -- the documents from the court in Milan, let's

24  get a properly redacted document," that they would respond to

25  us.

1      It took weeks to get a response from them.  Weeks.  When

2   they don't have a -- they're having too much fun with this

3   proceeding, frankly.

4      They show -- This is our key, important information.  It's

5   outrageous that it's on file in an Italian court, but they

6   won't respond to our requests about, how do we withdraw this?

7            **THE COURT:**  I take it those filings remain with those

8   agencies?  They have not been withdrawn?

9            **MR. ALLEN:**  They have now been.

10           **THE COURT:**  They have now been withdrawn.

11           **MR. ALLEN:**  Yes.  We finally got consent -- It was

12   actually Apple.

13           **THE COURT:**  I see.

14           **MR. ALLEN:**  But we finally got consent, because, under

15   the local procedures there, we had to have their consent to do

16   it, so the parties agreed upon a newly redacted form of the

17   Teece report, and those have now been filed.

18           **THE COURT:**  Thank you.

19           **UNIDENTIFIED SPEAKER:**  I accept the apology.

20           **MR. QUINN:**  There was an argument made about the ITC

21   and the cross-production, and I'm not sure whether the thrust

22   of that was an argument that it's a violation of the Protective

23   Order -- the disclosure of the ITC draft brief was a violation

24   of this Court's Protective Order.

25      I would just point our that, under Paragraph -- It gets

1    kind of metaphysical now.

2         Under this Court's Protective Order, any information that

3    we already have, that we properly get, is not subject to the

4    Protective Order.  We properly got that information in the ITC

5    case.

6         And also under ITC Order Number 25 in the ITC case, it

7    carves out from a cross-production provision all third-party

8    materials.  Nokia materials would be third-party materials.  So

9    it doesn't even apply there.

10                    (Pause in proceedings.)

11        MR. QUINN:  Your Honor, I don't know.  Has the Court

12   given some thought about whether I'll have a chance in writing

13   to respond to the sanctions request?

14        THE COURT:  I will, to the extent I entertain the

15   additional sanctions not identified previous, I will give

16   opportunity to write to respond.

17        I need to be mindful of everybody's time here, so . . .

18        MR. QUINN:  Okay.  Well, then, I apologize, Your

19   Honor.  I think I've got to respond to the laundry list that's

20   on the table then.

21        THE COURT:  No.  I'm saying you will get a res -- you

22   will get a chance to respond.

23        MR. QUINN:  I will get a chance to respond.

24        THE COURT:  Yes.

25        MR. QUINN:  Okay.  To the various sanctions that have

1  been proposed.  Thank you, Your Honor.

2          **THE COURT:**  Mr. Selwyn, anything you want to respond

3  for Apple?

4          **MR. SELWYN:**  Very quickly, yes.

5      A few points, if I may.  First, Samsung should take no

6  comfort in the deposition testimony of Mr. Risher.  Samsung

7  quotes Mr. Risher's testimony in its brief that he's not

8  suggesting that anyone has or hasn't actually committed any

9  violation one way or the other.  You just heard that repeated.

10     Mr. Risher has not seen any facts regarding Samsung's

11  disclosures, many of which are confidential business

12  information.  He was specifically asked this question

13  (reading):

14          "Mr. Risher, are you privy to any of the facts

15      concerning Samsung since compliance with the

16      Protective Order in this case?

17      **"A.**  I have not."

18     He was not opining, I mean, one way or the other because

19  he didn't have any of the information about the conduct that's

20  before Your Honor.

21     Second point, I was, I thought, very careful not to name

22  any names, and I did not intend to do so.  I'm not sitting in

23  judgment of the associate.  I don't think that would be right,

24  quite frankly.

25     But what I do think is that somebody should have asked

1  those two questions.  What was the source of the document?  And

2  who has received it?

3      It could have been any of them, but somebody should have

4  asked that question.

5      Mr. Quinn says there's no law that requires inquiry

6  notice.  This is just commonsense.  As officers of the Court,

7  we do have that obligation to investigate, in this instance,

8  where there has a breach of the Protective Order.  It would not

9  have been difficult to do.

10      Third point.  On the Apple-Nokia agreement in its

11  production in the ITC, Mr. Quinn just said that the cross-use

12  would not apply because a third-party was not involved.

13      That's just not right.  Apple is the producing party of

14  the Agreement and, therefore, had the right to produce the

15  Agreement.  Apple, on the Agreement, might have been required

16  to seek Nokia's consent but the cross-use provision clearly

17  applied in this instance.

18      The letter to the ITC that Mr. Quinn just referenced

19  having been sent on August 1st, that -- that's true.  They did

20  on August 1st send a letter to the ITC and to Apple's outside

21  counsel about the violation that had occurred.

22      They did not notify the United States trade representative

23  on August 1st.  They designated the letter they sent to the ITC

24  a Outside Counsel's Eyes Only, and that's why I asked the Quinn

25  partner whether I could share it with my client and got the

1  answer back after several requests, "Why would you want to

2  share the letter with your client?"

3      On the timing of the production -- I'm sorry.

4      On the timing of the refiling of the Teece report in Italy

5  and Figi, the comp -- the report that we got and were asked to

6  evaluate had itself lack of redaction, so there was some back

7  and forth with Samsung's counsel on that.  We agreed on a

8  version and it has been resubmitted.

9      The last point with respect to the Dutch proceeding, the

10 parties, with the approval of the Court in that matter, had a

11 clear understanding of what the limits were on the use of the

12 information and who could have access to that information?

13     The reason the parties agreed that it would be anonymized

14 is so that you couldn't do the kind of linking that the

15 disclosure in this case has now allowed the hundred or so

16 Samsung employees to do.

17     We agreed on that because the Court required the

18 production of some license information, the rules in the

19 Netherlands are such that you cannot prohibit a party's

20 employees from seeing confidential information, so we reached

21 that agreement.  We're not asking Your Honor to enforce the

22 Dutch agreement.  Obviously, we have to go to the Netherlands

23 to do that.

24     But we did have an understanding; we did have an

25 agreement.  And that agreement does not allow or sanction the

1    conduct that has occurred in this matter.

2        Thank you.

3            **THE COURT:**  Thank you, Mr. Selwyn.

4        Mr. Allen, I'll give you a further word if you wish.

5            **MR. ALLEN:**  Very quickly, Your Honor.

6        Just a few points.

7        On a couple of occasions today, Mr. Quinn has said that

8    certain things are not contested.

9        One of -- One of them that he just pointed to was neither

10   Nokia nor Apple contest the fact that if information is

11   transmitted but, somehow or another, a determination's made

12   that it's not open, that that doesn't trigger a reporting

13   obligation.

14       I want to be clear about this.  If our licensing

15   information is sent to one of our competitors, that triggers a

16   reporting obligations.  So let's not have any more discussion

17   about that's not in dispute.

18       Likewise, the suggestion was made at the outset of the

19   hearing that there's no dispute that this was inadvertent.  I

20   can't embrace that.  I don't know what the facts are.

21       I will say that it's odd to me that the Teece report

22   contains -- partially redacted Teece report transmitted the

23   Nokia-Apple license information to Samsung.

24       And then I go over to the ITC -- I'm not involved in

25   either one of these cases -- and the ITC document is

1  transmitted to Samsung.  Also, improperly redacted to include

2  the Nokia-Apple license information, all overlapping a time

3  when Nokia and Samsung are involved in negotiations.

4       I don't know what happened there, but that's odd to me, so

5  I can't accept the fact that there's -- that everybody buys in

6  to the inadvertent disclosure theory.

7       Last point.  For the first time today, I've heard the

8  suggestion that somehow or another, we just that Stroz

9  Friedberg can create the log that -- that has been on the books

10 for 60 -- no, about 90 days now.

11      The first time I hear that is in this courtroom today.  If

12 that's the problem, if that's reason we haven't created the

13 log, I think if we'd heard that earlier, we could have found a

14 way to work it out.

15           **THE COURT:**  All right.  Thank you --

16      **MR. ALLEN:**  Thank you.

17           **THE COURT:**  -- Mr. Allen.

18      **MR. McELHINNY:**  One brief point, Your Honor?

19           **THE COURT:**  Go ahead, Mr. --

20      **MR. McELHINNY:**  Thank you.

21      I'm not going to repeat the stuff about the intentional

22 violations, and this is not an attempt to blame an associate.

23 We're focused on much more serious things.

24      The only point I want to make is, the language of the

25 Protective Order, and disclosures, require Samsung and Quinn to

1  immediately notify counsel for the producing party and to

2  provide to such counsel all know relevant information

3  concerning the nature and circumstances of that disclosure.

4      That has not happened as of today.

5          **THE COURT:** All right. Thank you.

6      Oh. Mr. Pease, you may add a word as well.

7          **MR. PEASE:** I'll try and be very brief, Your Honor.

8          **THE COURT:** Go ahead.

9          **MR. PEASE:** When it comes to the December disclosure,

10  we're not pointing a finger at the associate. I mean, the

11  associate we do think did the right thing.

12      He works for me. I take responsibility for what happened.

13      But I can tell you, I don't want to reveal what was in the

14  communications between us, but I understood at the time this

15  was an issue of a different version, that Mr. Eden, who's the

16  one who sent it the night before, was on the train heading back

17  to his home for the Christmas holidays.

18      What I thought had happened -- and I didn't realize this

19  wasn't the case until the Nokia motion was filed -- is that he

20  simply grabbed some sort of work in progress or something like

21  that off the chairside.

22      Mr. Baxter, who's much more familiar with that chairside

23  for those documents, realized that, you know, and they didn't

24  wait for me.

25      So the next morning, they saw that there was an issue.

1   They asked -- They e-mailed me.  I was moving, didn't respond.

2   To their credit they waited 20 minutes, 30 minutes, and then

3   contacted Mr. Shim directly.  And then Mr. Shim, I think,

4   responded four minutes later, saying, you know, that he hadn't

5   seen it, wouldn't, and would delete it.

6       If he had said something else, such as, you know, "It's

7   too late.  I sent it around," we may have taken a different

8   approach.  We thought at that point it had been contained.

9           THE COURT:  Why not just tell Apple?  Why don't you

10  just get yourself out of this whole jam by telling Apple?

11          MR. PEASE:  You know, no one saw it as a jam at that

12  point.  It's almost like me picking up somebody else's pa --

13  one of my -- I go into one of my partners' office and I pick up

14  his papers for a case that I'm by accident and say, "Oh, hey,

15  these are yours," and hand it back to him.  It's like that.

16      I mean, you know, would that trigger Protective Order

17  disclosure?  I don't know.  Do I wish, given everything that's

18  gone on, that we had done so?  Sure.  But, you know, at the

19  time, it seemed contained and it seemed to have been resolved.

20      You know -- And these -- Like, you talk about protocols

21  and the ways we ought to manage things.  I mean, we're talking

22  about this internally and there's no easy answer.

23      I mean, I know one of the guys that works for me now was

24  in the software business before, and they had, like, actual

25  release documents, where you could know exactly who had a

1  document, and what state it's in, and never make any mistakes

2  what version you're working on.

3      I mean, the Outlook-based system we use doesn't lend

4  itself to that so well.  And this is something we are thinking

5  about, but we hadn't come up with a perfect solution.

6      As you can see over the course of the case, even by the

7  next set of reports, it had evolved to the point where Apple

8  and Samsung were exchanging proposed redactions to one another,

9  and that's a system that has worked well.

10     But that very first report, we both contemplated that we

11  were both sending redacted versions to our clients, but we

12  didn't exchange those redactions or our own reports, only for

13  the others.

14     Could it have been done better?  Sure.

15     But, again we -- we didn't perceive the issue at the time.

16     And just one thing.  You had asked about the January 4th

17  disclosure.  Frankly, I don't know why that disclosure was

18  made.

19     Mr. Eden had taken it upon himself to further redact that

20  report.  My inclination at the time was not to send the report

21  out.  The client was no longer asking for it.  I think he felt

22  badly that the client had asked for something and he hadn't

23  responded because on January 4th he had sent it out.  But

24  nobody looked at it.

25     It came as a surprise to everyone.

1          **THE COURT:**  All right.  Thank you.

2          **MR. PEASE:**  You're welcome.

3          **THE COURT:**  All right.  Let me outline how we're going

4   to proceed from here.  You've obviously given me all plenty to

5   think about.  I want to give it more careful consideration

6   rather than just shooting from the hip.

7       So, with that, I'm going to take these matters under

8   submission.

9       To address Mr. Quinn's concerns -- and, frankly,

10  anticipating any concerns that come from this side of the room,

11  I'm going to give everybody 10 pages by Friday to tell me

12  anything more you want to tell me about anything.  That gives

13  you all fair notice and due process and all that good stuff.

14  Friday, 5 o'clock, 10 pages, tell me what you want.  Everybody

15  can that advantage of that same opportunity.

16      All right.  With that, I wish you all good evening.

17              (Court adjourned at 5:54 p.m.)

18

19

20

21

22

23

24

25

UNDER SEAL

### CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____

Candace Yount, Transcriber

Thursday, December 12, 2013