# EXHIBIT 5

EX PARTE RE-EXAMINATION                                    Docket No. 106842803600

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Ex Parte Re-Examination of:
U.S. Patent No. 7,844,915

Control No.: 90/012,332                        Confirmation No.: 5963

Filed: May 30, 2012                            Art Unit: 3992

For:  APPLICATION PROGRAMMING               Examiner: M. J. Yigdall
      INTERFACES FOR SCROLLING
      OPERATIONS

## RESPONSE UNDER 37 CFR § 1.550 AND 37 CFR § 1.111 TO NON-FINAL OFFICE ACTION IN EX PARTE REEXAMINATION

MS Ex Parte Reexam
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Madam:

### INTRODUCTORY COMMENTS

This is in response to the non-final Office Action dated December 19, 2012 (Paper No. 20121012) (hereinafter the "Office Action").  A response was initially due on February 19, 2013.  A one-month extension of time was granted on January 17, 2013, extending the due date to March 19, 2013.  Accordingly, this response is timely filed.  Reconsideration and allowance of the claims under reexamination, in light of the remarks presented herein, are respectfully requested.

**Remarks/Arguments** begin on page **2** of this paper.

Control No.: 90/012,332                    2                    Docket No. 106842803600

# REMARKS

Claims 1-21 of U.S. Patent No. 7,844,915 (hereinafter the "'915 Patent") are subject to reexamination.  Claims 1-21 stand rejected.

## I.    SUBSTANCE OF THE INTERVIEW

Patent Owner Apple, Inc. (hereinafter "Patent Owner") thanks Examiner Yigdall, Supervisor Pathak, and Examiner Ralis (collectively the "Examiners") for the courtesy of the personal interview of March 14, 2013.  In addition to the Examiners, inventor Andrew Platzer, Dr. Jason Nieh, Jason Skinder, Peter Yim, Andrew Monach, and Brian Ho were present for the interview.  No exhibits or demonstrations were conducted.  All of the claims of the '915 Patent were discussed. With respect to prior art references, Japanese Pub. No. 2000-163031A to Nomura et al. (English translation) (hereinafter "Nomura") and U.S. Patent No. 7,724,242 to Hillis et al. ("Hillis") were discussed.

### A.    The "distinguishing" claim element

Discussion during the interview focused on an element found in each of the independent claims: "distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation" ("the distinguishing element").

With reference to representative independent claim 1, Patent Owner's representatives noted that the claim is directed to a machine (*i.e.*, computer) implemented method.  Accordingly, a person of ordinary skill in the art would understand that the distinguishing element is directed to a step performed by the computer, rather than a user-performed step or just a functional result. Specifically, the computer must perform a test that distinguishes (*i.e.*, recognizes a difference) between a) a single input point and b) two or more input points.  That is, the computer must include logic or algorithms that allow it to identify a single input point and treat that differently than instances in which two or more input points are applied.  The computer would include logic that

would invoke a scroll operation when a single input point is identified.  The computer would also include logic that would invoke a gesture operation when two or more input points are identified.

Discussion then turned to Nomura.  Dr. Nieh explained how Nomura disclosed a computer with logic that does not distinguish (*i.e.*, recognize a difference) between a) a single input point and b) two or more input points.  Rather, the computer disclosed in Nomura involved distinguishing between i) two input points and ii) <u>not</u> two input points.  Mathematically and logically, a test that distinguishes between a) one and b) two or more is <u>not</u> equivalent to a test that distinguishes between i) two and ii) not two.  Patent Owner's representatives made clear that a computer performing the test of Nomura <u>does not</u> perform the test recited in the '915 Patent claims.

The Examiners noted that Nomura disclosed performing scroll operations in response to a single input point and gesture operations in response to two input points, even though the algorithms described in Nomura involved distinguishing between i) two and ii) not two.  The Examiners questioned whether this should be viewed according to a species-genus relationship based on two being a species of the genus of "two or more."  Patent Owner's representatives emphasized that the distinguishing element would be viewed by a person of ordinary skill as a singular test that must be performed by the computer, rather than a genus of possible operations to be performed (*e.g.*, gesturing on two, gesturing on three, and so forth).

The Examiners also noted that claim 1 included the term "comprising."  The Examiners questioned whether this opened the claimed method to read on tests such as Nomura's test of i) two or ii) not two.  Patent Owner's representatives clarified that the use of "comprising" would allow a claimed method to include other tests and other operations.  "Comprising" does not, however, obviate the language of the distinguishing element.[1]  That is, the computer implemented method must still include performance of a test that distinguishes between a) one and b) two or more, regardless of whether the computer implemented method includes additional tests or operations.

---

[1] *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007).

Control No.: 90/012,332                              4                         Docket No. 106842803600

### B.      The lack of specific tests in Hillis

After Nomura, discussion turned to Hillis.  Patent Owner's representatives focused on how Hillis disclosed panning and gesture operations performed via gesture matching touch-input to a gesture dictionary without specific disclosure of any logical test involving the number of input points.  The Examiners noted that Hillis disclosed panning being performed specifically with one finger[2] and questioned whether this necessarily disclosed a test that distinguished a) one input point from b) two or more input points.  Patent Owner's representatives noted that this level of disclosure was substantially equivalent to or even less specific than disclosures of a one-finger scrolling operation in Nomura, which clearly did not involve a test that distinguished a) one input point from b) two or more input points.  Patent Owner's representatives emphasized that the claims require the computer to perform the recited <u>test</u> and not merely the operations of scrolling on one input point and gesturing on two input points.

The Examiners indicated that they would consider these arguments further, upon receipt of this response.  No final agreement was reached during the interview.

## II.     GROUND 4: CLAIM REJECTIONS UNDER 35 USC § 103 IN VIEW OF NOMURA AND RUBINE

Claims 1, 5-8, 12-15, and 19-21 stand rejected under 35 USC 103(a) as unpatentable over Nomura in view of Dean Harris Rubine, "The Automatic Recognition of Gestures," CMU-CS-91-202, December 1991 (hereinafter "Rubine").

Patent Owner respectfully submits that Nomura and Rubine, separately or in combination, do not disclose or suggest each element of the rejected claims.  Nomura does not disclose "distinguishing between a single input point . . . and two or more input points."  Nomura also does not disclose the event recognition and object-oriented software architecture claimed in the '915 Patent.  Rubine fails to address these deficiencies.  Moreover, Patent Owner submits that there

---

[2] *See* Hillis at 8:44-48.

Control No.: 90/012,332                  5                  Docket No. 106842803600

would be no motivation to combine Nomura and Rubine or other rationale to support a conclusion of obviousness.

## A.      Background of the '915 Patent

Before addressing the specific issues raised by the Office Action, Patent Owner provides a brief description of the '915 Patent.  This response references the declaration of Jason Nieh, Ph.D. Dr. Nieh is an Associate Professor of Computer Science at Columbia University and Co-Director of the Software Systems Laboratory at Columbia University.  Dr. Nieh is a person of at least ordinary skill in the art for the purposes of the '915 Patent.

The subject matter claimed in the '915 Patent was invented during the development of Apple's iconic iPhone.  The '915 Patent is generally directed to a specific method for scrolling and gesturing on a touch-sensitive display integrated into a device.  The method of the '915 Patent distinguishes contact made by single input point (*e.g.*, one finger) on the touch-sensitive display from contact made by two or more input points (*e.g.*, multi-finger).  In distinguishing the nature of the contact, the method of the '915 Patent creates an event object based on input on the display and interprets whether that event object should invoke a scroll call or a gesture call.  A scroll call is issued if the event object was created in response to a single point input.  A gesture call is issued if the event object was created in response to a multi-point input.

The Background section of the specification explains that various devices such as electronic devices, computing systems, portable devices, and handheld devices have software applications and application programming interfaces or "APIs" that interface between the software applications and user interface software to provide a user of the device with certain features and operations.[3]  The specification further explains that various types of electronic devices, such as portable devices and handheld devices, have a limited display size, user interface, and/or processing capability which limit the ease of use of the devices.  User interfaces of devices implement APIs to provide requested functionality and features, such as scrolling, selecting, gesturing, and animating operations for a display of the device.  The '915 Patent explains that one issue with these user interfaces is that they

Control No.: 90/012,332                    6                    Docket No. 106842803600

can have difficulty interpreting the various types of user inputs and providing the intended functionality associated with the user inputs.[4]

The '915 Patent proposes a method for responding to a user input of a device, such as a portable electronic device (*e.g.*, cellular phone, media player, or multi-touch tablet device), in order to implement and distinguish between various desired input operations for a user interface, such as a one-finger scrolling operation and a multi-finger gesture operation.[5]

## B.    The claims of the '915 Patent

The claims of the '915 Patent are generally directed to the particular method for implementing scrolling and gestures on a device, as discussed above. Specifically, each independent claim requires distinguishing whether contact involved a single input point or multiple input points. That is, the claims require particularly identifying a single input point, when present. Claim 1, for example, recites:

> determining whether the event object invokes a scroll or gesture operation by ***distinguishing between a single input point*** applied to the touch-sensitive display that is interpreted as the scroll operation ***and two or more input points*** applied to the touch-sensitive display that are interpreted as the gesture operation;

The claims also require that the method be implemented using a particular software architecture or framework. Specifically, the claims recite creating an event object based on user input. Ultimately, scroll calls and gesture calls result from a determination made using the event object. Claim 1, for example, recites:

> creating an ***event object*** in response to the user input;

> determining whether the ***event object*** invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

---

[3] '915 Patent at 1:7-8, 33-37.
[4] '915 Patent at 1:48-55.
[5] '915 patent at 6:20-60.

issuing at least one *scroll or gesture call* based on invoking the scroll or gesture operation;

responding to at least one *scroll call*, if issued, by *scrolling* a window having a *view associated with the event object* based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input; and

responding to at least one *gesture call*, if issued, by *scaling* the *view associated with the event object* based on receiving the two or more input points in the form of the user input.

Accordingly, the claims of the '915 Patent are directed to a specific method for implementing scrolling and gestures on a device. The method requires a particular determination of whether there is a single touch or a multi-touch input and the creation and use of a particular software element: an event object.

## C.    The contrast between the claimed subject matter of the '915 Patent and Nomura

Nomura fails to disclose or suggest the following elements of the rejected claims: (1) how a device distinguishes between the number of input points; and (2) the use of an "event object" or an "at least one scroll or gesture call," as detailed below.

### 1.    *Nomura does not disclose "distinguishing between a single input point . . . and two or more input points"*

Independent claims 1, 8, and 15 of the '915 Patent each recite, "distinguishing between a single input point…and two or more input points." Nomura fails to teach or suggest this limitation, as the system disclosed in Nomura <u>does not</u> and <u>cannot</u> distinguish between a single input point and two or more input points.

The rejection is premised on Nomura's disclosure that both gesture operations (*e.g.*, zoom-in) and scroll operations can be performed on a map display. But a reference's disclosure of both scroll operations and gesture operations is not the same as a disclosure of distinguishing between a single input and two or more input points. Treating these two different disclosures as being

Control No.: 90/012,332                  8                  Docket No. 106842803600

identical confuses the result (*i.e.*, scroll and gesture operations) with the mechanism for achieving that result (*i.e.*, distinguishing one input point from multiple input points).  A device with both scroll operations and gesture operations may be implemented without distinguishing between a single input point and two or more input points, as Nomura itself demonstrates.

The algorithm for Nomura's scroll and gesture operations involve(s) a gesture recognition process that distinguishes <u>exactly</u> two, and <u>only</u> two, input points.  The method described in Nomura, however, does not, and cannot, involve distinguishing exactly one input point.  Rather, the algorithm of Nomura implements a scroll as the default operation when there are *not* two input points, assuming all other conditions are met.  In contrast, the claimed subject matter involves performing a test that distinguishes one input point versus two or more input points.  If there is one input point, the input is interpreted as a scroll operation.  Otherwise, if there is *not* one input point (*i.e.*, two or more input points), the input is interpreted as a gesture operation.

The manner in which Nomura distinguishes input points is clear from its flow charts.  A detailed description of those flow charts, illustrating the disclosed process for processing inputs, follows.[6]

---

[6] *See* Nomura at ¶ 0150, Figs. 33, 34, 37.

Control No.: 90/012,332                    9                    Docket No. 106842803600



Fig. 33

Start
S10.   Is there an input?
S20.   Is unit in picture-taking mode?
S30.   Picture-taking processing
S40.   Is unit in memo input mode?
S50.   Memo input processing
S52.   Is unit in view folder mode?
S54.   View folder processing
S60.   Is there contact of a finger on the touch panel?
{A}

Fig. 33 above is a flow chart depicting Nomura's algorithm for initial handling of an input. At Figure 33 step S10, Nomura's unit checks "Is there an input?"  According to Nomura, input could include finger movement, pen input, taking a picture, or like input.[7]  If there is an input, the unit checks whether it is in picture-taking mode, memo input mode, or view folder mode at S20, S40, and S52, respectively.[8]  If the answer is "No" to all of these (meaning "normal input mode"), it

---

[7] *See* Nomura at ¶ 0150.
[8] *See* Nomura at ¶¶ 0150-0155, Fig. 33.

Control No.: 90/012,332                    10                    Docket No. 106842803600

then asks at S60 "Is there contact of a finger on the touch panel?"[9]  Assuming there is finger

contact, the steps of Figure 34 are performed.[10]



Fig. 34

[First column]
End
S180. Page-turning processing
End

[Second column]
(A)
S70.  Is there contact on an icon on the toolbar?
S90.  Is there contact on the input mark?
S110. Is there contact with two items?
S140. Is the contact point moving?
S150. Is contact pressure and/or contact surface area above specified values?
S160. Is the display a map image?
S170. Scroll processing
End

[Third column]
S80.  Various icon processing
S100. Input mark operation processing

Fig. 34 is a flow chart depicting Nomura's algorithm for handling finger input.  The unit

checks at Figure 34, S70 "Is there contact on an icon on the toolbar?" and then S90 "Is there contact

---

[9] *See* Nomura at ¶ 0156, Fig. 33.

on the input mark?"[11]  If the answer is "No" to both of these, the unit then performs the key input

point test, as relied upon by Examiner, in S110.

In S110 ("Is there contact with two items?"), the unit checks whether "there is contact with

two points on the touch panel."[12]  If "Yes," meaning there is contact with two points, Nomura

discloses that, if a map image is being displayed, map operation processing is performed.[13]  If there

are *not* two contact points, then detection of movement, contact area, and contact pressure are

analyzed at S140 and S150.[14]  If the contact surface area and contact pressure are "above a

prescribed value" at S150, then S160 checks if the image displayed is a map image.[15]  If the image

is a map image, scroll processing is performed at S170.[16]  Otherwise, it is a regular book image and

page-turning processing is performed at S180.[17]  Figure 37 discloses a flow chart of map operation

processing, including "zoom-in" and "zoom-out" processing, but includes no further test for the

number of input points.[18]  Moreover, several of the determinations made in Figure 37 refer to

parameters relating to the movement of two fingers: "calculate change in distance between two

points" (S310); "did the distance between the two points become larger" (S320); "did the distance

between the two points get reduced" (S340).

Thus, one of ordinary skill would recognize that step S110 of Fig. 34 is the *only*

determination performed in Nomura that relates to the number of input points and distinguishing

between scroll and gesture operations.[19]  (Nieh Decl. ¶ 16.)  Step S110 is a determination of whether

precisely *two* input points are detected.[20]  (Nieh Decl. ¶ 16.)  If and only if two input points are

detected, a gesture operation (*e.g.*, zoom-in) occurs.  (Nieh Decl. ¶ 16.)  If exactly two input points

---

[10] *See* Nomura at ¶¶ 0156, Figs. 33-34.
[11] *See* Nomura at ¶ 0157-0158, Fig. 34.
[12] *See* Nomura at ¶ 0159, Fig. 34.
[13] *See id.*
[14] *See* Nomura at ¶ 0160, Fig. 34.
[15] *See id.*
[16] *See id.*
[17] *See id.*
[18] *See* Nomura at ¶¶ 0170-0172, Fig. 37.
[19] *See* Nomura at Figs 33, 34, 37.
[20] *See* Nomura at ¶¶ 0159-0160, Fig. 34.

are not detected, the number of inputs is *not* tested again but a scroll operation occurs as the default condition.  (Nieh Decl. ¶ 16.)

Thus, in Nomura, the processing of a single input point is handled <u>no differently</u> than the processing of three, or more input points, assuming other conditions (*e.g.*, movement and pressure) are the same.  (Nieh Decl. ¶ 17.)  In other words, the device described in Nomura tests for precisely a two input point contact, but not a one input point contact.  (Nieh Decl. ¶ 17.)  Consequently, user inputs involving three or more input points (assuming all other conditions are met) would result in the same scroll operations as gestures involving a single input point.  (Nieh Decl. ¶ 17.)  As a result, Nomura fails to disclose distinguishing between a single input point and more than one input point, as recited in all independent claims of the '915 Patent.

A person of ordinary skill would not have been motivated to modify Nomura's method of distinguishing due to practical differences in the preferred default condition.  (Nieh Decl. ¶ 18.)  As Nomura focuses on map processing applications, a skilled artisan may want the unit to default to the more common situation (scrolling) for efficiency.   (Nieh Decl. ¶ 18.)  A skilled artisan would thus specifically test for and identify the more unusual action (zoom-in).   (Nieh Decl. ¶ 18.)  Thus, the skilled artisan may test for the two-finger zoom-in rather than the default scroll.  (Nieh Decl. ¶ 18.)  In addition, accidentally zooming-in and zooming-out a map unexpectedly is more disruptive to the user, and thus it would be more important for Nomura to specifically identify this two-finger gesture.  (Nieh Decl. ¶ 18.)  The default action (not two input points) would be scrolling, which is far less disruptive to a user.   (Nieh Decl. ¶ 18.)  As a result, a person of ordinary skill would not have been motivated to modify Nomura's unit to perform the distinguishing claimed in the '915 patent.

<ol start="2">
<li><em>Nomura does not disclose creating event objects or other software architecture or framework elements that provide for scrolling and scaling calls</em></li>
</ol>

Nomura also does not disclose the software architecture exemplified by the "event object," "scroll call," and "gesture call" claim elements.  (Nieh Decl. ¶ 19.)  Unlike the '915 Patent, Nomura

Control No.: 90/012,332                    13                    Docket No. 106842803600

is completely silent as to the software architecture used to implement scrolling and zooming.  (Nieh Decl. ¶ 19.)

The '915 Patent is directed to an application programming interface with event recognition in an object-oriented environment.[21]  Nomura does not disclose an object-oriented environment, nor is such an environment inherent.  Without exhaustively listing all possibilities, Nomura could instead be implemented using assembly code without any higher-level programming abstractions or procedural programming and/or a message-passing mechanism without the use of event objects.

The Office Action properly acknowledges that Nomura does not disclose an event object. But the Office Action does not fully note the extent of Nomura's lack of disclosure, which extends to the rest of the '915 Patent's software architecture: how to use the event object, scroll calls, gesture calls, or views associated with an event object.  Indeed, Nomura's disclosure is inconsistent with the recited "view associated with the event object."  The '915 Patent describes a user interface system and an API that keeps track of which window or view is contacted by a user input by associating event objects with a view.[22]  The function call corresponding to the user input, *e.g.*, a gesture call, is sent to the software application associated with the view such that it is not necessary to determine which application should be activated each time a user input is received on a particular area of the display.[23]

In contrast, the Nomura publication does not disclose features such as associating a view with an event object and a software application.  Unlike the '915 Patent, the Nomura system must determine each time a user input is received which application should be activated depending on the area of the input.  For example, as illustrated in Figure 34 of Nomura, the system must determine which application or element of the UI is touched without a pre-registered event handling system that associates event objects with views.[24]  As an additional example, Nomura appears to provide a

---

[21] *See, e.g.*, '915 patent 1:7-8 ("This disclosure relates to application programming interfaces that provide scrolling operations").

[22] *See, e.g.*, '915 patent at 7:4-26.

[23] *See, e.g.*, *id.* at 12:29-54.

[24] *See, e.g.*, Nomura at FIG. 34, S160 ("Is the display a map image?").

fixed set of functionality, which contrasts with general purpose "event objects."[25]  Nomura's algorithm could be implemented using assembly code without any higher-level programming abstractions.  (Nieh Decl. ¶ 19.)  Nomura could also be implemented with procedural programming and/or a message-passing mechanism without the use of event objects.  (Nieh Decl. ¶ 19.)  A person of ordinary skill in the art would understand that Nomura does not disclose a system with an event object or other features of the '915 Patent.

Thus, Nomura fails to disclose the event object, scroll calls, gesture calls, and the view associated with an event object recited in the '915 claims.  It would not have been obvious to a person of ordinary skill in the art to modify this reference using other disclosures, as discussed below.

### D.    Modifying Nomura in view of Rubine does not render the '915 Patent obvious

A combination of Nomura and Rubine would not render the '915 Patent obvious for at least the following four reasons.

### 1.    *Rubine does not disclose "distinguishing between a single input point . . . and two or more input points."*

Rubine does not disclose "distinguishing between a single input point . . . and two or more input points."  Rubine is silent on distinguishing input points and the Office Action does not cite to Rubine for this limitation.  Rather, the Office Action relies solely on the disclosure of Nomura for this element.  Accordingly, Rubine does not address the deficiency in Nomura with respect to this element.

### 2.    *Rubine does not disclose using object-oriented programming for gestures*

The Office Action attempts to fill in Nomura's gaps with respect to the "event object," "scroll call," and "gesture call" claim elements with Rubine by asserting that a person of ordinary

---

[25] *See, e.g.*, Nomura at ¶ 0146.

Control No.: 90/012,332                 15                 Docket No. 106842803600

skill "would have been prompted to provide Nomura with an object-oriented system for handling user interface gestures such as described in Rubine."[26]

But the Office Action improperly conflates objects and gestures, which appear in separate and distinct embodiments of Rubine.  Notably, Rubine only provides an enabling disclosure of event objects that are created in response to a **single-path mouse input**, rather than "**one or more input points applied to a touch-sensitive display …**" as recited in each independent claim.

Rubine mentions three distinct applications: GDP, GSCORE, and MDP.  *See* Rubine at chapter 8.  The MDP application is "a non-object-oriented system" that does not employ Rubine's GRANDMA system, and consequently cannot encompass creating an event object.[27]  (Nieh Decl. ¶ 21.)  GDP and GSCORE, on the other hand, are built with the GRANDMA system, but "the gestures used are all single-path gestures drawn with a mouse."[28]  (Nieh Decl. ¶ 21.)  Thus, GDP and GSCORE do not include multi-path (multiple input point) gestures.  (Nieh Decl. ¶ 21.)  Rubine provides no enabling disclosure of creating an event object in response to multiple inputs.

### 3.    *Rubine does not disclose gesture calls*

As explained above, Nomura does not teach or suggest gesture calls.  Rubine also does not disclose gesture calls.  Neither GDP nor GSCORE, the only applications mentioned by Rubine built using the GRANDMA toolkit,[29] has any disclosure of "scrolling a window having a view" or "scaling the view … based on receiving the two or more input points in the form of the user input."[30]  Instead, in GDP and GSCORE, the "gestures used are all single-path gestures drawn with a mouse."[31]

---

[26] *See* Office Action at 19, 23, and 26; *see also* Office Action at 18-19, 22-23, and 25-26 (citing Rubine at 105, 120-21, 133, 4-5, and 8-9).
[27] *See* Rubine at 181, lines 11-15.
[28] *See* Rubine at 163, lines 6-7.
[29] *see* Rubine at 163, lines 6-7.
[30] *See* Rubine at 165.
[31] *See* Rubine at 163, lines 6-7.

Control No.: 90/012,332                 16                 Docket No. 106842803600

> 4.    *A person of ordinary skill in the art would not have been motivated to combine Nomura with Rubine.*

Fourth, a person of ordinary skill in the art would not have been motivated to combine Nomura and Rubine.  The Examiner[32] relies solely on Rubine's speculative assertions on pages 120-21 as a motivation to combine, but this fails to take into account the contrary teaching of Nomura.[33]

Nomura was directed to a specialized device that consists of a closed hardware and software system.  (Nieh Decl. ¶ 21.)  In contrast, Rubine's GRANDMA system was intended to be general purpose.  (Nieh Decl. ¶ 21.)  Such a system may have greater "flexibility," as cited by the Examiner in support of motivation to combine, but that flexibility comes with a cost, including a performance cost.[34]  (Nieh Decl. ¶ 21.)  Adding Rubine's GRANDMA abstractions and event hierarchy to Nomura would likely reduce the device's speed.  (Nieh Decl. ¶ 21.)  As Rubine itself acknowledges, the GRANDMA system "requires a great deal of mechanism" and thus cannot be implemented as "cheaply and quickly" as Rubine's own non-object oriented MDP system.[35]  (Nieh Decl. ¶ 21.)

The Examiner's cited flexibility refers to the theoretical possibility that GRANDMA might be able to "support many different input devices simultaneously."[36]  Similarly, the statement that GRANDMA's "[e]vent hierarchy imposes structure on events without imposing device dependencies," further quoted by the Examiner in support of motivation to combine,[37] also refers to GRANDMA's alleged potential simultaneously to utilize different types of peripheral hardware input:

> Due to item 1 above [i.e., the statement quoted by the Examiner], GRANDMA can support many different input devices in addition to just a single keyboard and mouse. Each device needs to integrate the set of event classes which it raises into GRANDMA's Event hierarchy.[38]

---

[32] *See* Office Action at 19, 23, 26.
[33] *See* MPEP 2143.01.II (entire teaching of each of the references being combined must be considered in assessing motivation to combine).
[34] *See* Rubine at 121, lines 13-16.
[35] *See* Rubine at 181, lines 11-15.
[36] *See* Rubine at 121, lines 13-16.
[37] *See* OA at 19, 23, and 26.
[38] Rubine at 121, lines 13-16.

Control No.: 90/012,332                  17                  Docket No. 106842803600

Thus, the simultaneous use of peripheral hardware is key to Rubine.

In contrast, Nomura explicitly **teaches away** from simultaneous use of a variety of input hardware:

> With the present invention, because various types of operation can be input using movement history, hardware such as buttons on the case or a keyboard does not need to be prepared, enabling provision of a more compact mobile information device.[39]

The value of simultaneous input peripherals in the large desktop computer system of Rubine[40] would not benefit the compact and specialized electronic book of Nomura.[41]  (Nieh Decl. ¶ 22.)  Thus, a person of ordinary skill would not have been motivated to combine Nomura with Rubine.  (Nieh Decl. ¶ 22.)

Rubine also is challenging to combine with Nomura because Rubine does not employ a "touch-sensitive display," as recited in the claims.[42]  Instead, Rubine uses a "Sensor Frame," which was a frame mounted on the CRT display of a Silicon Graphics workstation.[43]  The frame detects fingertips "approximately one half inch **in front** of the display."[44]  In addition, Rubine's GDP and GSCORE applications are single path gestures **drawn with mouse input**, not using finger input.[45]  Thus, it would not have been obvious for a person of ordinary skill to combine Rubine's use of a sensor (or mouse) with the touch-surface of Nomura.

Rubine also teaches away from the proposed combination with Nomura, as Rubine explains that GRANDMA should not be used in a real-world gesture application, such as that found in Nomura.  Rubine states:

> **GRANDMA, however, is not useful as a base for future development**. It is purely a research system, built as a platform for experimenting with input in user interface

---

[39] Nomura at ¶ 0011; *see also id.* at ¶¶ 0012 and 0081.
[40] *See* Rubine at 95, lines 8-9.
[41] *See* Nomura at ¶ 0011; *see also id.* at ¶¶ 0012 and 0081.
[42] *See* Rubine at 79.
[43] *See id.*
[44] *See id.*
[45] *See id.*

Control No.: 90/012,332                    18                    Docket No. 106842803600

toolkits.  Its output facilities are ***totally inadequate for real applications***.
GRANDMA was built solely by and for the author, who has no plans to maintain it.[46]

Given this teaching, a person of ordinary skill in the relevant time frame would not have
been motivated to combine the event object creation in Rubine's GRANDMA toolkit with Nomura,
as Nomura was directed at a commercial product intended for real-world applications.[47]

Indeed, contrary to the Examiner's statements, Rubine touts the simple advantages of a *non-
object oriented* approach to a "gesture-based … program":

> MDP is gesture-based drawing program that takes multi-finger Sensor Frame
> gestures as input. Though primarily a demonstration of multi-path gesture
> recognition, MDP also shows how gestures can be incorporated ***cheaply and quickly***
> into ***a non-object-oriented system***. This is in ***contrast to GRANDMA***, ***which***,
> whatever its merits, ***requires a great deal of mechanism*** (an object-oriented user
> interface toolkit with appropriate hooks) before gestures can be incorporated.[48]

A person of ordinary skill in the relevant time frame would not have been motivated to
combine the event object creation in Rubine's GRANDMA toolkit with Nomura for this additional
reason, as the ability to incorporate gestures "cheaply and quickly" through a non-object oriented
approach would have been far more advantageous in Nomura's real-world, commercial product.[49]

### E.    Secondary considerations support a conclusion of non-obviousness

Patent Owner notes the substantial secondary considerations supporting the non-obviousness
of the claims of the '915 Patent.  These considerations include the failure of others, evidence of
copying demonstrated in litigation, and the unprecedented commercial success of the iPhone.

---

[46] Rubine at 232, lines 3-6 (emphasis added).
[47] *See* Nomura at ¶ 0007.
[48] Rubine at 181, lines 11-15 (emphasis added).
[49] *See* Nomura at ¶ 0007.

Control No.: 90/012,332                    19                    Docket No. 106842803600

**F.    Dependent claims 5-7, 12-14, and 19-21 also would not have been obvious over a combination of Nomura and Rubine**

Dependent claims 5-7, 12-14, and 19-21, are not obvious for the same reasons described above.  In addition, dependent claims 5, 12, and 19 also are allowable because each of these claims recites that "determining whether the event object invokes a scroll or gesture operation is based on ***receiving a drag user input for a certain time period***."  (Emphasis added).

Nothing in Nomura teaches or suggests this feature.  Rather, as discussed in greater detail previously, Nomura discloses that "When there is contact with two points on the touch panel," the unit performs map operation processing (e.g., zoom-in) if a map image is displayed.[50] When "there are not contact points," the unit checks whether there is movement and if there is movement, processing details are determined based on "contact area" and "contact pressure."[51]

Thus, Nomura only determines whether to scroll or gesture based on whether there is a two input point contact on the touch panel.  When there are *not* two input points, Nomura further uses motion, contact surface area, and contact pressure.  An analysis of motion, contact surface area, and contact pressure is not an analysis of drag input.  (Nieh Decl. ¶ 23.)  Notably, Nomura does *not* use *time* or *duration* in its determination.

The Examiner relies on two passages in Nomura as the basis for his rejection, paragraphs 0010 and 193.[52]  Neither passage, however, supports the Examiner's conclusion.

Paragraph 0010 states:

> The movement history of fingers contacting the display area is a concept including a passage of time element and is distinguished from an operation of simply touching an input mark or the like with a finger that does not include a passage of time element.

---

[50] *See* Nomura at ¶ 159; Figure 34.
[51] *See* Nomura at ¶¶ 160-162; Figure 34.
[52] *See* Office Action at 28.

sf-3250929

Control No.: 90/012,332                    20                    Docket No. 106842803600

While detection of motion may include "a passage of time element," it does not include the recited limitation of determining whether the drag *duration* is above or below any particular threshold.  (Nieh Decl. ¶ 21.)

As for paragraph 0193,[53] it is irrelevant, as it relates to search operations using so-called "logical products."[54]  Such search operations occur only upon "contact on a search tag."[55]  Nomura makes clear that logical product search processing is separate and distinct from distinguishing between scroll and gesture operations.[56]

For the reasons stated above, Patent Owner respectfully requests that the rejections of claims 1, 5-8, 12-15, and 19-21 under 35 U.S.C. § 103(a) over Nomura in view of Rubine be withdrawn.

## III.     GROUND 1: CLAIM REJECTIONS UNDER 35 USC § 102 AS ANTICIPATED BY HILLIS

Independent claims 1, 8, and 15 of the '915 Patent, and dependent claims 5-7, 12-14, and 19-21, stand rejected as anticipated by Hillis.[57]  The patentee respectfully traverses this rejection for the following reasons.

### A.     Hillis does not involve "distinguishing between one input point and two or more input points"

As discussed in Nomura, a device could "determine" whether to scroll or gesture without distinguishing between *one* input point and two or more input points.  Nomura instead performs a test for precisely *two* input points.

Hillis is silent on this test.  In Hillis, the Office Action fails to identify *anything* that discloses the "determining" limitation recited in the claims.  The Office Action's analysis relies on

---

[53] Nomura at ¶ 0193 reads: "Furthermore, this is not limited to simultaneous contact of fingers, but output of search information that is a logical product for contact by fingers within a specified amount of time would also be acceptable."
[54] *See* Nomura at ¶¶ 0191-92 and 0078-79 and Fig. 13.
[55] *See* Fig. 38, steps 430 and 450; Fig. 36, step 220; ¶¶ 0166 and 0175-76.
[56] *See* Nomura at Fig. 34 and ¶¶ 0159-161; *id.* ¶¶ 0170-73 and Fig. 37.
[57] *See* Office Action at 4-13.

Control No.: 90/012,332                           21                    Docket No. 106842803600

the disclosure at col. 7:46-65 of Hillis.[58]  Yet nothing in this cited passage, or in Figures 1A and 2A that it discusses, discloses that the number of inputs is used to distinguish between scroll and gesture operations.

While Hillis does refer to a "predetermined pattern" at column 7, lines 46-65, the Office Action fails to identify any disclosure for whether that pattern corresponds to the number of input points.  Hillis states that it uses "the mapping 126c to identify the action 126b associated with the gesture that was identified in step 208."[59]  And Figure 1A further states that the operation of mapping makes use of a "gesture dictionary 126A."  But Hillis does not explain how these blocks actually operate, let alone disclose (as required for anticipation) that the number of inputs is used to distinguish between scroll and gesture operations.

Distinguishing between one input point and two or more input points is *not* inherent. Hillis's "gesture dictionary 126A," for example, may be implemented without using the number of input points at all.  And, even if Hillis used input points, a system could instead distinguish exactly two, and only two, input points, as explained above (and as disclosed in Nomura).  (Nieh Decl. ¶ 25.)  Such a test would not distinguish exactly one input point, as recited in the '915 Patent claims.

## B.      Hillis does not disclose an "event object"

The Office Action also fails to identify any portion of the Hillis reference that discloses an "event object" or gesture and scroll calls as recited in the claims.  As discussed above, the Office Action recognizes that there cannot be the recited "event object" in the absence of an object-oriented environment in Nomura, given that the Office Action combined Nomura with Rubine in an effort to find disclosure of an event object.[60]  Yet the Office Action's anticipation analysis of Hillis purports to find disclosure of creating an event object in the following sentence:  "[T]he table 122 provides a machine readable output to the computer 126, which is representative of the position,

---

[58] *See* Office Action at 5, 7 and 9-10.
[59] *See* Hillis at 7:63-65.
[60] *See* Office Action at 18-19, 22-23, and 25-26.

Control No.: 90/012,332                    22                    Docket No. 106842803600

size, shape, and timing of each contact region, or contains information from which this information can be calculated or derived."[61]

The Office Action, however, fails to explain how "machine readable output" from one separate electronic device to another constitutes or even suggests an event object. "Machine readable output" is a non-specific term that does not require any higher-level programming abstractions and certainly not event objects in particular. (Nieh Decl. ¶ 26.) As with Nomura, Hillis could be implemented using assembly code without any higher-level programming abstractions. (Nieh Decl. ¶ 26.) Similarly, Hillis could be implemented with procedural programming and/or a message-passing mechanism without the use of event objects. (Nieh Decl. ¶ 26.)

Hillis also fails to disclose other features of the software that involve event objects recited in the '915 patent, such as the "view associated with an event object." (Nieh Decl. ¶ 27.) For example, Hillis describes "pan[ning] the imagery," but that is not equivalent to scrolling a view associated with an event object. (Nieh Decl. ¶ 27.) At most, it discloses scrolling; it does not disclose a "view associated with an event object." (Nieh Decl. ¶ 27.)

### C.    Hillis does not disclose a "touch-sensitive display"

Hillis also does not disclose a "touch-sensitive display." (Nieh Decl. ¶ 28.) The Office Action points to col. 1, lines 29-36 and col. 3, lines 21-24 of Hillis as purportedly disclosing a "touch-sensitive display."[62] The first passage, however, merely states that the overall "*system …* *responds to user touch.*"[63] The second says only that the system facilitates "user manipulation of the imagery as a whole."[64] Neither of these statements indicates that the *display itself* responds to touch.

The Office Action cites to the system of Hillis FIG 1A.[65] That system projects images from a projector onto a "table."[66] The "display surface 124" is the surface onto which images are

---

[61] *See* Office Action at 4-5,7 and 9 (citing Hillis at 7:15-20).
[62] *See* Office Action at 4, 6-7 and 9.
[63] *See* Hillis at 1:29-36 (emphasis added).
[64] *See* Hillis at 3:21-24.
[65] Office Action at pages 4-5.

Control No.: 90/012,332                           23                           Docket No. 106842803600

projected.  That surface is *not* a touch sensitive display.  By way of analogy, a typical laptop during the relevant time frame does not have a "touch-sensitive display" merely because the laptop has a touch-sensitive rectangle below the keyboard, because it is that rectangle and not the display that is touch-sensitive.

Consequently, the Office Action has not adequately explained how Hillis meets the "touch-sensitive display" limitation recited in claim elements [a] and [c].

### D.      Hillis does not disclose an "integrated device"

Each independent claim recites, in claim element [a], a "touch-sensitive display that is *integrated*" with the device, data processing system, or apparatus.  (Emphasis added).

A person of skill in the art would view a "touch-sensitive display" as "integrated" with a device only if it forms a single physical unit with that device.  This meaning is fully consistent with the '915 Patent.  For example, the '915 Patent discloses a number of examples of integrated touch-sensitive displays in Figures 4, 5A, 6A, 28, 29, 30A, and 30B.  Every one of these examples includes a touch-sensitive display in the same physical housing with the rest of the device.  Additionally, in column 6, lines 13-15, the '915 Patent explains: "In some embodiments, the display device and input device are *integrated* while in other embodiments the display device and input device are separate devices."  Thus, "integrated" implies that a device is in a single physical housing.

Hillis, by contrast, fails to disclose an integrated device.  (Nieh Decl. ¶ 28.)  Hillis's device is generally referred to as a "system," one component of which is a large table and a separate component of which is a display.  For example, Hillis's Figure 1A depicts its display mechanism as a projector.  Of note, Figure 1B illustrates the physical size of the Hillis system, which allows for five different people to stand around the system while one of them interacts with it.

---

[66] *See, e.g.*, Figures 1A, 1C, and 2:63-65 ("The system 120 includes a table 122 with a display surface 124, computer 126, and projector 128.").

Nor would a person of ordinary skill in the relevant time frame have been motivated to modify Hillis' disclosure so as to make a "touch-sensitive display that is integrated" with the device, data processing system, or apparatus.  Hillis emphasized multi-user interaction, as shown in Figure 1B.  Large physical size was important to Hillis, as it permitted multiple people to look at the projected images simultaneously.  For example, Hillis noted that, even if an LCD display were to be used, it would be "mounted in a vertical orientation and affixed to a wall or other supporting structure."[67]  Although handheld displays were known at the time of Hillis' filing, Hillis fails to discuss them in the context of its disclosure.

### E.      Dependent claims 5-7, 12-14, and 19-21 also are not anticipated by Hillis

Dependent claims 5-7, 12-14, and 19-21 are not anticipated for the same reasons as claims 1, 8, and 15.  In addition, dependent claims 5, 12, and 19 are not anticipated by Hillis because it does not disclose "determining whether the event object invokes a scroll or gesture operation is based on *receiving a drag user input for a certain time period*."  (Emphasis added).

The Office Action relies on the following two passages in Hillis for a purported disclosure of this feature:

> In step 202, the table 122 detects and monitors the position, size, shape, and timing of the current contact region. Namely, the table 122 provides a machine readable output to the computer 126, which is representative of the position, size, shape, and timing of each contact region, or contains information from which this information can be calculated or derived. The timing output may be satisfied, for example, by the table 122 providing its output in real time. Also in step 202, the computer 126 stores a position history for each contact region. The position history provides a record of how each contact region moves or and/or changes shape over time. . . .

> In step 208, the computer 126 determines whether activity of the current contact matches a predetermined pattern, and therefore constitutes a "gesture." Step 208 repeats continually, utilizing some or all of the position, position history (movement), velocity, and force information from steps 202, 204, 206. More particularly, in step 208

---

[67] *See* Hillis at 4:1-3.

> the computer 126 compares the history of contact position, size,
> movement, velocity, and/or force to the dictionary 126a of
> predetermined gestures to determine if the user has performed any of
> these gestures.[68]

The first of these passages merely establishes that Hillis records the variation over time of "how each contact region moves or and/or changes shape."  This information is referred to as "position history."  The second of these passages states that the position history may be compared to the gesture dictionary 126a.  Neither passage explains how the position history is used in carrying out matching using a gesture dictionary.  (Nieh Decl. ¶ 31.)   And neither passage indicates it is the *duration* of a *drag* above a certain time period that distinguishes a scroll from a gesture.  (Nieh Decl. ¶ 31.)  Consequently, Hillis does not anticipate claims 5, 12, and 19 for this additional reason.

For the reasons stated above, Patent Owner respectfully requests that the rejections of claims 1, 5-8, 12-15, and 19-21 under 35 U.S.C. § 102(e) as anticipated by Hillis be withdrawn.

## IV.    GROUNDS 2 AND 5: A COMBINATION OF LIRA WITH EITHER HILLIS OR NOMURA IN VIEW OF RUBINE WOULD NOT RENDER CLAIMS 2, 9, AND 16 OBVIOUS

Dependent claims 2, 9, and 16 of the '915 Patent stand rejected as obvious over a combination of Lira with either Hillis or Nomura and Rubine.[69] The patentee respectfully traverses these rejections for the following reasons.

### A.    Lira does not teach or suggest the additional features recited in claims 2, 9, and 16

Lira does not teach "rubberbanding a scrolling region displayed within the window by a predetermined maximum displacement when the scrolled [or scrolling] region exceeds a window edge based on the scroll," as recited in dependent claims 2, 9, and 16.

---

[68] *See* Office Action at 11-12 (citing Hillis at 7:15-25 and 46-55).
[69] *See* Office Action at 14-15 and 30-31.

Control No.: 90/012,332                  26                  Docket No. 106842803600

The Office Action relies on Lira's disclosure in connection with Figure 14B to argue that this reference discloses the additional features recited in claims 2, 9, and 16.[70] Lira's disclosure, however, does not teach or suggest these features for several reasons.

First, Lira does not disclose performing rubberbanding "when the scrolled [or scrolling] region exceeds a window edge based on the scroll."  Lira discloses a method for scrolling a single column of a reformatted webpage on a mobile device.[71]  The method involves reconfiguring the webpage into columns so that the page could be more easily viewed on a small screen.[72]  For convenience, the PDA display would be re-centered to a column, so that the column was aligned with the display.  This re-centering method is illustrated in Figure 14B.

---

[70] *See* Office Action at 14-15 and 30-31.
[71] *See* Lira at 11:27-12:2; 12:30-13:2.
[72] *See, e.g.*, Lira at 13:14-17; 14:29-15:5; 15:18-21.

Control No.: 90/012,332                    27                    Docket No. 106842803600



Lira discloses a recentering functionality and a method for realigning or reformatting webpage content so that it can fit more easily into a small screen.[73] Lira is concerned with what happens while navigating within a webpage.  It does not disclose what will or should happen if and when the user tries to scroll past the edge of the page.  Lira further discloses that this re-centering functionality occurs whether or not the edge of the content (*i.e.*, webpage) is reached.[74]  Thus, Lira does not disclose when the scrolled [or scrolling] region "exceeds a window edge based on the scroll."

---

[73] *See* Lira at 1:15-2:3; 15:18-25.
[74] *See, e.g.*, Fig. 14B.

Moreover, Lira does not disclose *anything* that occurs in the "region outside the content." In the '915 Patent, "rubberbanding" is described as follows: "If a user scrolls content of the display making a region past the edge of the content visible in the display, then the displacement value limits the maximum amount for the **region outside the content**. At the end of the scroll, the content slides back making the **region outside of the content** no longer visible on the display."[75]

### B.    Lira's recentering is incompatible with both Hillis and Nomura

Second, a person of ordinary skill in the relevant time frame would not have been motivated to combine Lira with Hillis or Nomura plus Rubine in the manner proposed by the Office Action.

In Lira, new content is revealed from the direction of the scroll ; as the stylus moves <u>down</u> in Figure 14B, new content appears from **below**. By contrast, in both Hillis and Nomura, new content is revealed from the direction **opposite** to the direction of the scroll or pan. Nomura's Figure 8, for example, illustrates that if the finger moves *up*, new content appears from **below**.[76]

Since new content is revealed in *opposing* ways in Lira versus either Hillis or Nomura, the recentering approach of Lira is incompatible with the scrolling or panning disclosed in Nomura and Hillis. If hypothetically Lira and Hillis (or Nomura) were combined, content from the direction of the scroll would be revealed, instead of bringing back content opposite the direction of the scroll, as one would expect from the recited "rubberbanding" limitation. Thus, a person of ordinary skill would not have been motivated to combine Lira with either Hillis or Nomura.

---

[75] *See* '915 Patent at 7:62-67 (emphasis added).

[76] *See* Nomura at ¶ 0067 ("As shown in Fig. 8, when a finger is placed on the screen and moved in the desired direction while pressing a finger on the screen (map scroll gesture), *a map moved in the direction of movement of the finger* and the same distance as the moved finger is displayed.") (emphasis added); Hillis at 8:44-53 ("[When] the user has initiated a pan gesture by drawing a finger across the display surface at a particular velocity, … the computer 126 *continues* (FIG. 2, step 222) *to pan the imagery in the initiated direction* at the velocity implied by the gesture at the time the finger was lifted until a stopping or slowing naturally occurs (step 224).") (Emphasis added.)

Control No.: 90/012,332                     29                     Docket No. 106842803600

### C.     A person of ordinary skill also would not have been motivated to combine Lira with Nomura in view of Rubine because a map does not have a boundary that requires recentering

Third, Nomura only performs scrolling in connection with a map display.[77] Yet Nomura's large scale maps – such as detailed city maps – *see, e.g.*, Nomura at Fig. 8 – would almost never require a user to have a "scrolled [or scrolling] region [that] exceeds a window edge based on the scroll." The map would keep scrolling virtually endlessly in each direction. Consequently, there would not have been a reason to implement a recentering approach such as that disclosed in Lira with the large scale maps shown in Nomura, nor does Nomura suggest where such a "recentering" would be focused.

For the reasons stated above, Patent Owner respectfully requests that the rejections of claims 2, 9, and 16 under 35 U.S.C. § 103(a) over Hillis or Nomura and Rubine in view of Lira be withdrawn.

## V.     GROUNDS 3 AND 6: CLAIMS 3-4, 10-11, AND 17-18 WOULD NOT HAVE BEEN OBVIOUS OVER A COMBINATION OF MAKUS WITH EITHER HILLIS OR NOMURA IN VIEW OF RUBINE

Dependent claims 3-4, 10-11, and 17-18 of the '915 Patent stand rejected as obvious over a combination of Makus with Hillis or Nomura plus Rubine.[78] The Patent Owner respectfully traverses these rejections for the following reasons.

### A.     Makus does not disclose or suggest "attaching scroll indicators" as recited in claims 3-4, 10-11, and 17-18

Each of dependent claims 3-4, 10-11, and 17-18 recites, in relevant part, "***attaching*** scroll indicators." (Emphasis added). This attachment takes place during the execution of the method of

---

[77] *See* Nomura at Fig. 34, steps 160 and 170 and ¶¶ 0159-161.
[78] *See* Office Action at 15-17 and 32-34.

the invention; initially the scroll indicators are not there, and then they show up and potentially go away under program control.[79]

In contrast, Makus appears to disclose scroll indicators that are either are present or not present from the outset.  A decision is made *in advance* whether to display a scroll bar or not: "Since there are *likely* many such categories and subcategories, scroll bar 76 is employed to enable the user to access those categories and subcategories that are not currently shown on the display."[80] Makus thus does not "attach" scroll indicators based on user input.

**B.      A person of ordinary skill also would not have been motivated to combine Makus with Nomura in view of Rubine because scrolled maps do not need scroll indicators**

Second, a person of ordinary skill in the relevant time frame also would not have been motivated to combine Makus with Nomura plus Rubine in the manner proposed by the Office Action.

The Office Action states that:

A person of ordinary skill in the art would have been prompted to attach scroll indicators to a content edge of the window or view in Nomura in order to illustrate, for example, [i] the relative position of the view or [ii] to provide access to more content than what fits on the screen at one time, as Makus suggests.[81]

In Nomura, however, scroll processing occurs only in connection with displays of maps.[82] Nomura contemplates having a user scroll through map images, such as detailed city maps.[83]  Maps do not use scroll indicators to "illustrate the relative position of a view," as suggested by the Office Action.  For example, commercially available map systems generally do *not* use scroll indicators

---

[79] *See* '915 Patent at 6:61-7:3 ("In some embodiments, user input in the form of a mouse/finger down causes the scroll indicators to be displayed on the display edge, content edge, or window edge of the scrolled region. If a mouse/finger up is then detected, the scroll indicators are faded out from the display region, content edge, or window edge of the scrolled region."), 11:14-33, Fig. 11.
[80] *See* Makus at 9:30-33.
[81] *See* Office Action at 33 and 34 (numerals in brackets added).
[82] *See* Nomura at Fig. 34, steps 160 and 170 and ¶¶ 0159-161.
[83] *See, e.g.*, Nomura at Fig. 8.

even today.  Maps likewise have no need of scroll indicators "to provide access to more content than what fits on the screen at one time," as alternatively suggested by the Office Action.

In contrast to the motivation indicated by the Office Action, the main use of scroll indicators in touch systems is to indicate a relative position to a user in a long document such as an address book, a word processing document, or the text of an e-book.  The transient appearance (and disappearance) of scroll indicators, as taught in the '915 Patent at 6:61-7:3, performs this guidance function in such documents without consuming screen real estate.  A person of ordinary skill would not find this nearly as useful for maps, as maps generally have no starting position from which relative position can be measured.

Consequently, there would simply have been no reason to combine attaching scroll indicators (even if such a procedure were disclosed in Makus) with the maps shown in Nomura – and thus the Office Action's motivation to combine[84] these references is insufficient to support a *prima facie* case of obviousness.

### C.     A person of ordinary skill also would not have been motivated to combine Makus with Hillis

Third, a person of ordinary skill in the relevant time frame also would not have been motivated to combine Makus with Hillis in the manner proposed by the Office Action.

The Office Action states that:

A person of ordinary skill in the art would have been prompted to attach scroll indicators to a content edge of the window or view in Hillis in order [i] to illustrate, for example, the relative position of the view using 'an appropriately convenient scale,' as Hillis suggests, or [ii] to provide access to more content than what fits on the screen at one time, as Makus suggests.[85]

Both of the motivations to combine cited by the Office Action are insufficient to support a *prima facie* case of obviousness.  First, the reference to an "appropriately convenient scale" in

---

[84] *See* Office Action at 33 and 34.

Control No.: 90/012,332                         32                         Docket No. 106842803600

Hillis, on which the Office Action relies[86], has no relationship to Hillis's disclosure of panning. Rather, the reference relates to the use of a "slider mode" to interpolate between different image layers.  Because nothing is being scrolled in "slider mode," this disclosure would not motivate one of ordinary skill to add scroll indicators.

Nor does Hillis have any need of scroll indicators to "provide access to more content than what fits on the screen at one time," as alternatively suggested by the Office Action.  Hillis already discloses alternate ways to access more content: pan to see the additional content or use of the "slider mode" to view different layers.

And, as discussed above, the value of scroll indicators for the user is to determine where the user is in a document such as an address list.  In contrast, Hillis's display is used for maps, aerial photographs, or integrated circuits.[87] Navigation in these kinds of images is normally based on the features being displayed rather than on where one's position lies percentage-wise with respect to the whole.

Consequently, there would have been no reason to combine attaching scroll indicators (even if such a procedure were disclosed in Makus) with the types of documents disclosed in Hillis – and thus the Office Action's motivation to combine[88] these references also is insufficient to support a *prima facie* case of obviousness.

For the reasons stated above, Patent Owner respectfully requests that the rejections of claims 3, 4, 10, 11, 17, and 18 under 35 U.S.C. § 103(a) over Hillis or Nomura and Rubine in view of Makus be withdrawn.

---

[85] *See* Office Action at 16 and 17 (numerals in brackets added).
[86] *See* Office Action at 16:38-39.
[87] *See* Hillis at 1:39-46.
[88] *See* Office Action at 16 and 17.

Control No.: 90/012,332                    33                    Docket No. 106842803600

## CONCLUSION

In view of the above, each of the claims under reexamination in this application is believed to be in immediate condition for allowance.  Accordingly, the Examiner is respectfully requested to withdraw the outstanding rejections of the claims and to issue a reexamination certificate.  If it is determined that a telephone conference would expedite the prosecution of this application, the Examiner is invited to telephone the undersigned at the number given below.

In the event the U.S. Patent and Trademark office determines that an extension and/or other relief is required, applicant petitions for any required relief including extensions of time and authorizes the Commissioner to charge the cost of such petitions and/or other fees due in connection with the filing of this document to **Deposit Account No. 03-1952** referencing **Docket No. 106842803600**.  However, the Commissioner is not authorized to charge the cost of the issue fee to the Deposit Account.

Dated:  <u>March 19, 2013</u>                    Respectfully submitted,

By <u>      /Peter J. Yim/      </u>
Peter J. Yim
   Registration No.: 44,417
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-6373

sf-3250929