# EXHIBIT 12



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,332 | 05/30/2012 | 7844915 | P4895USREX1/106842803600 | 5963 |

20872        7590        05/02/2014

MORRISON & FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO, CA 94105-2482

| EXAMINER |
|---|
| YIGDALL, MICHAEL J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/02/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

BRYAN CAVE LLP
1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,332*.

PATENT NO. *7,844,915*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

Control Number:  90/012,332
Filing Date:  May 30, 2012
Appellant(s):  Apple Inc.

_____
Peter J. Yim
For Appellant

## EXAMINER'S ANSWER

This is in response to the appeal brief filed on February 26, 2014.

Application/Control Number: 90/012,332                                        Page 2
Art Unit: 3992

**(1) Grounds of Rejection to Be Reviewed on Appeal**

Every ground of rejection set forth in the Office action mailed on July 26, 2013 from

which the appeal is taken is maintained by the examiner except for the grounds of rejection (if

any) listed under the subheading "Withdrawn Rejections."  New grounds of rejection (if any) are

provided under the subheading "New Grounds of Rejection."

Thus, the following grounds of rejection are applicable to the appealed claims:

Claims 1, 5-8, 12-15 and 19-21 are rejected under 35 U.S.C. § 102(e) as anticipated by

Hillis.  Claims 2, 9 and 16 are rejected under 35 U.S.C. § 103(a) as unpatentable over Hillis in

view of Lira.  Claims 3, 4, 10, 11, 17 and 18 are rejected under 35 U.S.C. § 103(a) as

unpatentable over Hillis in view of Makus.

Claims 1, 5-8, 12-15 and 19-21 are rejected under 35 U.S.C. § 103(a) as unpatentable

over Nomura in view of Rubine.  Claims 2, 9 and 16 are rejected under 35 U.S.C. § 103(a) as

unpatentable over Nomura in view of Rubine and further in view of Lira.  Claims 3, 4, 10, 11, 17

and 18 are rejected under 35 U.S.C. § 103(a) as unpatentable over Nomura in view of Rubine

and further in view of Makus.

<u>New Grounds of Rejection</u>

(No new grounds of rejection are made.)

<u>Withdrawn Rejections</u>

(No rejections are withdrawn.)

Application/Control Number: 90/012,332                                    Page 3

Art Unit: 3992

### (2) Response to Argument

<u>Section VII.B of the Appellant's Brief</u>

The appellant contends that the examiner's construction of the "distinguishing" limitation is unreasonable and flawed.  See the appellant's brief at pages 11-12.

The examiner respectfully disagrees.  As the appellant appreciates, claims under reexamination are given the broadest reasonable interpretation consistent with the specification. See MPEP § 2111.  The "broadest reasonable interpretation" standard is the correct standard in reexamination proceedings because the patentee is given the opportunity to amend the claims. See *In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984).

Here, each of independent claims 1, 8 and 15 of the '915 patent recites:

> determining whether the event object invokes a scroll or gesture operation by <u>distinguishing</u> between <u>a single input point</u> applied to the touch-sensitive display <u>that is interpreted as the scroll operation</u> and <u>two *or* more input points</u> applied to the touch-sensitive display <u>that are interpreted as the gesture operation</u> ....

(Emphasis added.)  Thus, each of the independent claims recites distinguishing between (1) a single input point that is interpreted as a scroll operation and (2) two *or* more input points that are interpreted as a gesture operation.

Therefore, giving the claims the broadest reasonable interpretation, an algorithm in the prior art that distinguishes between (1) a single input point that is interpreted as a scroll operation and (2) two input points *or* more than two input points that are interpreted as a gesture operation would meet the language of the claims.  Likewise, an algorithm that distinguishes between (1) a single input point that is interpreted as a scroll operation and (2) two input points that are interpreted as a gesture operation would meet the language of the claims.

Application/Control Number: 90/012,332                                      Page 4
Art Unit: 3992

Accordingly, the Office action reasoned that both Nomura and Hillis teach the claimed "distinguishing" limitation.  Specifically, Nomura teaches distinguishing between a single input point that is interpreted as a scroll operation (e.g., "moving one finger") and two or more input points that are interpreted as a gesture operation (e.g., "two fingers moving apart" and "two fingers moving toward each other") (see Nomura at ¶ [0053]).  Likewise, Hillis teaches distinguishing between a single input point that is interpreted as a scroll operation (e.g., "drawing a finger across the display surface") and two or more input points that are interpreted as a gesture operation (e.g., "placing his fingertips on the display surface and moving them in an outwardly separating manner") (see Hillis at column 8, lines 44-48 and column 3, lines 42-46).

The appellant contends that the examiner's conclusions are based on a "rigid formula" and a "mechanical interpretation of the isolated word 'or' in the 'distinguishing' limitation, ignoring its context in the larger phrase."  The patent owner argues that the claims relate "to the act of distinguishing between a single input point and two or more input points" and "not [to the] 'two or more input points' by themselves."  See the appellant's brief at pages 12-13.

However, the examiner submits that the analysis set forth in the Office action specifically considers the "distinguishing" limitation in the context of the claims as a whole.  As noted above, the "distinguishing" limitation is part of "determining whether [an input] invokes a scroll or gesture operation."  A plain reading of the claims is that the "determining" step or the "means for determining" includes distinguishing between an input (consisting of "a single input point") that is interpreted as a scroll operation and an input (consisting of "two or more input points") that is interpreted as a gesture operation.  In other words, the claimed "act of distinguishing" relates to distinguishing between an input that is interpreted as a scroll operation and an input that is

Application/Control Number: 90/012,332                                      Page 5
Art Unit: 3992

interpreted as a gesture operation. The condition for the input interpreted as a gesture operation

is that the input consists of two *or* more input points.

     As pointed out in the advisory action, the Federal Circuit stated, "We have consistently

interpreted the word 'or' to mean that the items in the sequence are alternatives to each other."

*Schumer v. Laboratory Computer Systems Inc.*, 308 F.3d 1304, 1311, 64 USPQ2d 1832, 1838

(Fed. Cir. 2002). The Federal Circuit further held, "When a claim covers several structures or

compositions, either generically or as alternatives, the claim is deemed anticipated if any of the

structures or compositions within the scope of the claim is known in the prior art." *Brown v. 3M*,

265 F.3d 1349, 60 USPQ2d 1375, 1376 (Fed. Cir. 2001).

     Here, the word "or" in the claimed "two or more input points" is reasonably interpreted to

mean that the items "two" and "more" are alternatives. In other words, the alternatives are "two

input points" and "more than two input points." The condition is met and the limitation deemed

anticipated if any of these alternatives are shown in the prior art and "interpreted as a gesture

operation" such as recited in the claims. Indeed, as set forth above, Nomura clearly teaches an

input consisting of two input points that is interpreted as a gesture operation (e.g., "two fingers

moving apart" and "two fingers moving toward each other") (see Nomura at ¶ [0053]).

Likewise, Hillis clearly teaches an input consisting of two input points that is interpreted as a

gesture operation (e.g., "placing his fingertips on the display surface and moving them in an

outwardly separating manner") (see Hillis at column 3, lines 42-46). Thus, both Nomura and

Hillis teach the limitation as claimed.

     The examiner respectfully submits that the appellant's reference to De Morgan's law is

misplaced. See the appellant's brief at page 13. Applying De Morgan's law to the claimed "two

or more input points" would imply that the logical *negation* of the statement "two or more input

points" is the same as "not two input points and not more than two input points." However, there

is no negation recited in the claims.

Nonetheless, the appellant argues that the "distinguishing" limitation "could be rewritten

as 'distinguishing between a single input point and two input points *and* distinguishing between a

single input point and more than two input points,' without changing its meaning" (brief at page

13). The examiner respectfully disagrees. Such a rewriting would narrow the meaning of the

claims. If the claims were rewritten as the appellant proposes, then the claims would recite an

input that necessarily consists of more than two input points (e.g., three input points), rather than

an input that consists of two *or* more input points.


The appellant argues that the examiner "suggested that the 'distinguishing' limitation can

be satisfied by a device that distinguishes two input points from an arbitrary number of input

points," and further argues that such an interpretation "would read 'single input point' out of the

claim entirely." See the appellant's brief at page 14.

However, the appellant's argument mischaracterizes the examiner's position. As set

forth above, giving the claims the broadest reasonable interpretation means that an algorithm in

the prior art that distinguishes between (1) a single input point that is interpreted as a scroll

operation and (2) two input points *or* more than two input points that are interpreted as a gesture

operation would meet the language of the claims, as would an algorithm that distinguishes

between (1) a single input point that is interpreted as a scroll operation and (2) two input points

that are interpreted as a gesture operation. The examiner's interpretation does not read "single

input point" out of the claims.

Application/Control Number: 90/012,332                                          Page 7
Art Unit: 3992

The appellant contends that the examiner "disregards the understanding of those of
ordinary skill in the art" and "ignores the evidence of how one of ordinary skill in the art would
understand the claims." Namely, the appellant refers to the declaration of Dr. Jason Nieh filed
on March 19, 2013, the declaration of Dr. Scott Klemmer filed on October 28, 2013 and an
excerpt of trial testimony from Dr. Karan Singh in the *Apple Inc. v. Samsung Electronics Co.*
litigation, and argues that the examiner "completely ignored these understandings of those of
ordinary skill in the art." See the appellant's brief at pages 14-16.

However, the examiner respectfully disagrees. The examiner's conclusions are based on
the evidence as a whole.

With respect to the Nieh declaration, the examiner accepted Dr. Nieh's explanation of the
algorithm shown in Figures 33, 34 and 37 of the Nomura reference. The algorithm starts with
steps S10 ("Is there an input?") and S60 ("Is there contact of a finger on the touch panel?") and
proceeds to step S110 ("Is there contact with two items?"). Step S110 checks whether the input
comprises two input points. See the Nieh declaration at ¶ 16. If the input comprises two input
points (the "Y" branch), the algorithm proceeds to step S130 ("Map operation processing") and
to the gesture processing shown in Figure 37. Otherwise, if there are not two input points (the
"N" branch), the algorithm proceeds to step S170 ("Scroll processing").

Thus, Dr. Nieh asserts that the algorithm of Nomura would interpret two input points as a
gesture operation and would interpret all other inputs, including a single input point and further
including "three or more input points," as a scroll operation. See the Nieh declaration at ¶ 17.
The examiner submits that such an understanding shows that the algorithm of Nomura is indeed
within the scope of the claims: An input consisting of a single input point is interpreted as a

Application/Control Number: 90/012,332                                    Page 8
Art Unit: 3992

scroll operation, and an input consisting of two input points is interpreted as a gesture operation.

As noted above, the claims do not recite an input that necessarily consists of more than two input

points (e.g., three input points).  Rather, the claims recite an input consisting of two *or* more

input points that is interpreted as a gesture operation.

      The Klemmer declaration does not address the Nomura reference, but Dr. Klemmer

asserts in general that an algorithm "interpreting three input points as a scroll [operation] would

not reasonably meet the distinguishing limitation."  See the Klemmer declaration at ¶ 12.  Dr.

Singh offers essentially the same opinion (see the appellant's brief at page 15).  However, the

examiner respectfully points out that an input consisting of three input points is not a limitation

of the claims.  Dr. Klemmer goes on to assert:

> If one of ordinary skill were asked to express the distinguishing limitation as
> pseudo-code, it would be reasonable to express the limitation as:
>
> if (1 input point) {interpret as a scroll operation}
>
> if (>1 input point) {interpret as a gesture operation}

(Klemmer declaration at ¶ 13.)  The examiner does not dispute the accuracy of Dr. Klemmer's

pseudo-code.  However, the examiner submits that Dr. Klemmer's algorithm is not the *only*

implementation that would anticipate the claims under the *broadest* reasonable interpretation.

Namely, an algorithm in the prior art that distinguishes between (1) a single input point that is

interpreted as a scroll operation and (2) two input points *or* more than two input points that are

interpreted as a gesture operation would meet the language of the claims, as would an algorithm

such as Nomura's that distinguishes between (1) a single input point that is interpreted as a scroll

operation and (2) two input points that are interpreted as a gesture operation.

Application/Control Number: 90/012,332                                              Page 9
Art Unit: 3992

As the appellant appreciates, the examiner must weigh the probative value of the Nieh

and Klemmer declarations.  See MPEP § 716.01(c).  The expert declarations are one source of

information, but the "best source" of information for construing the claims is the specification.

See MPEP § 2111.01.  Therefore, as set forth in the advisory action, the opinions of Dr. Nieh and

Dr. Klemmer were weighed and considered in the context of the specification.

Namely, there are no examples in the specification of a gesture operation that results

from an input consisting of more than two (e.g., three) input points.  Likewise, the assertions of

Dr. Nieh and Dr. Klemmer are made without reference to the specification.  While the Klemmer

declaration proposes pseudo-code for the "distinguishing" limitation (¶ 13), the '915 patent itself

does not describe a particular algorithm for distinguishing between a single input point and two

or more input points (see below).  In the case of a means-plus-function limitation, for example,

the specification must disclose an algorithm to perform the recited function even if a person of

ordinary skill in the art would have been able to devise one.  See *In re Katz Interactive Call

Processing Pat. Lit.*, 639 F.3d 1303, 97 USPQ2d 1737, 1748 (Fed. Cir. 2011).

The appellant contends that "a person of ordinary skill [in the art] reading the claims,

specification, and prosecution history would understand the 'distinguishing' limitation to

describe a test that distinguishes one input point from more than one input point."  The appellant

argues, based on the pseudo-code set forth in the Klemmer declaration (¶ 13), that the limitation

describes "an atomic test condition, namely, that any of a plurality of input points be interpreted

as a gesture operation."  The appellant concludes that such an interpretation is consistent with the

use of the term "plurality" interchangeably with the words "two or more" in the specification.

See the appellant's brief at pages 16-18.

Application/Control Number: 90/012,332                                          Page 10
Art Unit: 3992

However, the examiner notes that there is no description in the '915 patent of a particular "atomic test" for distinguishing between a single input point and two or more input points. That is to say, the specification does not describe a particular algorithm for distinguishing between a single input point and two or more input points. The term "distinguishing" is nowhere found in the specification of the '915 patent, nor was the term recited in the claims as originally filed. Rather, the specification describes that a single input point "may be" interpreted as a scroll operation and that two or more input points "may be" interpreted as a gesture operation:

> FIG. 1 is flow chart of a method for responding to a user input of a device. The method 100 includes receiving a user input at block 102. The user input may be in the form of an input key, button, wheel, touch, or other means for interacting with the device. The method 100 further includes creating an event object in response to the user input at block 104. The method 100 further includes determining whether the event object invokes a scroll or gesture operation at block 106. For example, a single touch that drags a distance across a display of the device may be interpreted as a scroll operation. In one embodiment, a two or more finger touch of the display may be interpreted as a gesture operation. In certain embodiments, determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period.

('915 patent at column 6, lines 32-46; emphasis added.)

The examiner's interpretation of the "distinguishing" limitation is consistent with the specification. As noted above, a plain reading of the claims is that the "determining" step or the "means for determining" includes distinguishing between an input that is interpreted as a scroll operation and an input that is interpreted as a gesture operation. The input that is interpreted as a scroll operation consists of "a single input point," and the input that is interpreted as a gesture operation consists of "two *or* more input points." Nomura and Hillis teach the same. Even if the term "plurality" were substituted for the claimed "two or more," Nomura and Hillis would teach the limitation because "two input points" is within the scope of a "plurality" of input points.

Accordingly, the examiner respectfully submits that the appellant's construction of the "distinguishing" limitation is not the *broadest* reasonable interpretation consistent with the specification.  Whereas the appellant argues that the original examination of the '915 patent confirms the appellant's "one/more than one" or "atomic test" construction (see the appellant's brief at pages 17-18), there is nothing to suggest that the "distinguishing" element was added to the claims to define a "one/more than one" or "atomic test."  Rather, the amendment was made after the attorney argued that the "determining" step (or the "means for determining") "simply [distinguishes] between the scroll operation and the gesture operation without having to select an object or icon to define the operation."  See the interview summary mailed on June 21, 2010 in U.S. App. No. 11/620,717.  Here, the examiner's interpretation is consistent with the statements made in the original examination of the '915 patent.

The appellant notes that the patent owner "made multiple statements" in the instant proceeding "construing the 'distinguishing' limitation and clearly disavowing any scope not covered by that construction."  See the appellant's brief at pages 18-19.

Nonetheless, while the examiner acknowledges the role of such disclaimer in the courts, the Office employs a different standard for construing the claims.  Namely, as noted above, claims under reexamination are given the broadest reasonable interpretation consistent with the specification.  Construing the claims broadly is not unfair to the patentee because the patentee is given the opportunity to amend the claims.  See *In re American Academy of Science Tech Center*, 367 F.3d 1359, 70 USPQ2d 1827 (Fed. Cir. 2004).

Application/Control Number: 90/012,332                                           Page 12
Art Unit: 3992

Section VII.C.1 of the Appellant's Brief

The appellant contends that Nomura does not teach the "distinguishing" limitation,

arguing that Nomura "is capable of identifying only two input points and cannot distinguish or

identify other numbers."  See the appellant's brief at pages 19-20.

However, the examiner respectfully submits that "identifying" the number of input points

is not a limitation of the claims.  As noted above, the claims recite distinguishing between an

input (consisting of "a single input point") that is interpreted as a scroll operation and an input

(consisting of "two *or* more input points") that is interpreted as a gesture operation.  Nomura

teaches a finger movement detector 10 "for detecting the movement history of fingers on the

display area … for input of operations by the user such as zoom-in, zoom-out, rotate, scroll and

the like" (see Nomura at ¶ [0049]).  Zooming and rotating are examples of gesture operations;

scrolling is a scroll operation.  Nomura further teaches an operations details determination part

30 for determining whether the input is a scroll or gesture operation:

> The operations details determination part 30 judges the operation details input
> by the user based on the finger movement history detected by the finger
> movement detector 10.  Specifically, the operations details determination part
> 30 judges finger movement history detected by the finger movement detector
> 10 of two fingers moving apart as input of a map image zoom-in operation.
> Furthermore, for example, the operations details determination part 30 judges
> finger movement history detected by the finger movement detector 10 of two
> fingers moving toward each other as input of a map image zoom-out
> operation.  Furthermore, the operations details determination part 30 judges
> finger movement history detected by the finger movement detector 10 of one
> finger rotating with another finger as an axis as input of a map image rotate
> operation.  Furthermore, for example, the operations details determination part
> 30 judges finger movement history detected by the finger movement detector
> 10 of action of moving one finger as input of a map scroll operation.

(Nomura at ¶ [0053]; emphasis added.)  Thus, Nomura teaches distinguishing between an input

consisting of a single input point (i.e., one finger) that is interpreted as a scroll operation and an

Application/Control Number: 90/012,332                                      Page 13
Art Unit: 3992

input consisting of two *or* more input points (i.e., two fingers) that is interpreted as a gesture

operation (i.e., a zoom-in, zoom-out or rotate operation).

     As set forth in the Office action, the examiner generally agrees with Dr. Nieh that based

on Figure 34, the processing of *three* or more input points in Nomura apparently would be the

same as the processing of a single input point (see the Nieh declaration at ¶ 17).   However, the

examiner points out that Nomura does not actually describe a scroll operation resulting from an

input of three or more input points, and instead consistently shows that a *single* input point (i.e.,

"moving one finger" or "a finger") is what results in a scroll operation (see Nomura at ¶ [0053]

and ¶ [0067]).   Moreover, none of the claims recites an input that necessarily consists of more

than two (e.g., three) input points.   Rather, the claims recite an input consisting of two *or* more

input points that is interpreted as a gesture operation, such as the "two fingers moving apart" or

the "two fingers moving toward each other" described in Nomura (¶ [0053]).

     The appellant contends that Nomura does not teach an "event object," arguing that

Nomura does not describe the "object-oriented elements" of the claims and "nowhere discusses

objects and calls, the hallmarks of an object-oriented architecture."   The appellant contends that

"a call is an object that can be issued and responded to," and argues that a call "therefore differs

from Nomura's 'processor,' which performs actions."   See the appellant's brief at page 20.

     However, the examiner respectfully points out that the test for obviousness is what the

combined teachings of the references would have suggested to those of ordinary skill in the art.

One cannot show non-obviousness by attacking references individually where the rejections are

based on combinations of references.   See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (C.C.P.A.

1981); *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).

Application/Control Number: 90/012,332                                          Page 14
Art Unit: 3992

     Specifically, the Office action reasoned that "creating an event object in response to the user input" in Nomura would have been obvious in combination with Rubine. Nomura teaches that "detection data" from the finger movement detector 1110 is input to the processor 1100 (see Nomura at ¶ [0139]), but does not explicitly describe "creating an event object" in response to the user input. Nonetheless, Rubine teaches creating an event object in response to user input. Namely, Rubine describes an object-oriented programming system known as GRANDMA (see Rubine at page 95). Rubine describes that gesture input in GRANDMA "is handled by objects" (see Rubine at page 128). Rubine further teaches, "When input occurs, it is represented as an event" (Rubine at page 105). The input events (i.e., the gestures) are represented as objects. For example, Rubine states, "Input events are full-blown objects" (Rubine at page 120), and further describes the handling of "GestureEvent" objects in the GRANDMA system (see Rubine at page 133). Thus, the teachings of Rubine would have suggested "creating an event object in response to the user input" in Nomura to those of ordinary skill in the art.

     Moreover, the examiner respectfully points out that "object-oriented" is not a limitation of the claims. A "call" is not necessarily an "object" in the object-oriented (programming) sense. The specification of the '915 patent does not define the term "call" to mean "object," but instead describes calls in terms of "function calls or messages" (see the '915 patent at column 5, lines 12-19). Thus, the Office action reasoned that Nomura teaches the claimed "issuing at least one scroll or gesture call" in terms of *calling* at least one of the zoom-in processor 42, the zoom-out processor 44, the rotation processor 46 and the scroll processor 48 (see Nomura at ¶ [0054]). A person of ordinary skill in the art would understand that the "call" is not the processor itself, but rather the transfer of execution or the transfer of control *to* the processor. As set forth in the

Application/Control Number: 90/012,332                                    Page 15
Art Unit: 3992

Office action, for example, Nomura describes that "[when] the user performs various types of

finger operation[s] on the display … the CPU 1010 executes the operation indicated by the user

based on the input details" (see Nomura at ¶ [0137]).

Specifically, the "scroll call" in Nomura is the transfer of execution or the transfer of

control to the scroll processor 48.  Nomura describes that when called, the scroll processor 48

"performs the necessary processing" for a scroll operation "corresponding to the movement of

one finger" (see Nomura at ¶ [0056]).  Likewise, the "gesture call" in Nomura is the transfer of

execution or the transfer of control to the zoom-in processor 42, the zoom-out processor 44 or

the rotation processor 46.  When called, each of these processors "performs [the] necessary

processing" for a gesture operation "corresponding to the distance that two fingers are moved

apart" or "moved toward each other," or "corresponding to the angle of rotation" (see Nomura at

¶ [0055]).  Thus, the examiner respectfully submits that Nomura teaches or suggests a "scroll

call" and a "gesture call" such as recited in the claims.

The appellant further contends that Rubine does not teach the "distinguishing" limitation

or the "creation of a gesture call object in response to *multiple* inputs," arguing that Rubine does

not describe a system "that is *both* object-oriented and responsive to multiple inputs."  See the

appellant's brief at pages 20-21.

However, the examiner respectfully points out that the Office action does not rely on the

Rubine reference for teaching the "distinguishing" limitation or the claimed "receiving a user

input [that] is one or more input points."  As set forth in the Office action, Nomura teaches

receiving an input consisting of "one or more input points" on a touch panel 1060 and display

screen 1070 (see Nomura at ¶ [0130]).  Nomura further teaches distinguishing between an input

Application/Control Number: 90/012,332                                        Page 16
Art Unit: 3992

consisting of a single input point and an input consisting of two or more input points (see
Nomura at ¶ [0053]).  Thus, Nomura teaches an input consisting of "multiple" input points.  The
teachings of Rubine would have suggested "creating an event object" in response to that input.
As noted above, Nomura further teaches "issuing at least one scroll or gesture call" in response
to that input.  Thus, the combined teachings of Nomura and Rubine would have suggested the
claimed features to those of ordinary skill in the art.  The examiner notes that the "creation of a
gesture call object" is not a limitation of the claims.

The appellant contends that a person of ordinary skill in the art "would not have been
motivated to combine Nomura with Rubine" because the references "attempt to solve different
problems using different trade-offs," arguing that "computer systems can store and manage data
in a wide variety of ways" and that "nothing in Nomura suggests any concerns regarding data
management."  The appellant concludes therefore that there is no rationale and no *prima facie*
case of obviousness.  See the appellant's brief at pages 21-22.

However, the examiner respectfully disagrees.  A person of ordinary skill in the art would
have been prompted to combine the teachings of Nomura and Rubine so as to manage Nomura's
"detection data" in a way that is both structured and flexible.  Specifically, a person of ordinary
skill in the art would have been prompted to represent the "movement history, contact pressure,
and contact area of the finger" that defines the input event (see Nomura at ¶ [0139]) in the form
of an "event object" such as described in Rubine (see Rubine at page 120).

For example, as set forth in the Office action, Rubine describes at least one "motivation"
for an object-oriented programming system for gesture input:

Application/Control Number: 90/012,332                                    Page 17
Art Unit: 3992

> A single idea motivated the author to use object-oriented toolkits to construct
> gesture-based systems: gestures should be associated with objects on the
> screen.  Just as an object's class determines the messages it understands, the
> author believed the class could and should be used to determine which
> gestures an object understands.  The ideas of inheritance and overriding then
> naturally apply to gestures. … Thus, the author created GRANDMA.

(Rubine at page 95).  Rubine further describes that the object-oriented system allows display

views to have any number of event handlers, where input events are "automatically routed to the

appropriate handler," and allows different views to share the same event handler (see Rubine at

page 121).  Thus, the input event objects described in Rubine are flexible.

Rubine further suggests that an event object would simply "impose structure" (e.g., a data

structure) on the input event (see Rubine at page 120).  Thus, as reasoned above, a person of

ordinary skill in the art would have been prompted to "impose structure" on the input event

"detection data" described in Nomura (see Nomura at ¶ [0139]) in a way that is both structured

and flexible.  Therefore, "creating an event object in response to the user input" in Nomura

would have been obvious to those of ordinary skill in the art in light of Rubine.

Moreover, the examiner respectfully submits that the existence of a "wide variety" of

other known options, such as "structures" (see the appellant's brief at page 22), would not have

discouraged those of ordinary skill in the art from combining the teachings of Nomura and

Rubine.  "A person of ordinary skill has good reason to pursue the known options within his or

her technical grasp.  If this leads to the anticipated success, it is likely the product not of

innovation but of ordinary skill and common sense."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

398, 421, 82 USPQ2d 1385, 1397 (U.S. 2007).

Application/Control Number: 90/012,332                                      Page 18
Art Unit: 3992

The appellant further argues that secondary considerations "such as commercial success, the existence of a long-felt need for the invention, and copying of the invention, further support a finding of non-obviousness."  See the appellant's brief at pages 22-23.

However, as set forth in the Office action, evidence of secondary considerations must be factually supported with actual proof and must establish a nexus with the claimed invention.  See MPEP §§ 716.01(c) and 716.01(b).  Here, the appellant refers only generally to "evidence … of the iPhone's commercial success and Samsung's efforts to copy it" presented in the *Apple v. Samsung* litigation (brief at page 22).  The appellant does not attempt to show, for example, that the commercial success of the iPhone is due to the claimed features of the '915 patent and not to unclaimed features.  See MPEP § 716.03.  Likewise, more than the mere fact of copying Apple's iPhone is necessary to make that action (of copying) significant.  See MPEP § 716.06.  Thus, the examiner respectfully submits that the appellant's general assertion of non-obviousness based on secondary considerations is of little probative value.

### Section VII.C.2 of the Appellant's Brief

The examiner notes that claim 8 is directed to "[a] machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method."  The appellant argues that the construction of the "distinguishing" element of that method "as a test between one and more than one input" is "particularly true" for claim 8, arguing that "the instructions stored on a medium according to claim 8 would have to include the predefined set of instructions that dictate the logic by which the computer operates under all circumstances."  See the appellant's brief at pages 23-24.

Application/Control Number: 90/012,332                                    Page 19
Art Unit: 3992

However, the examiner respectfully submits that a plain reading of claim 8 is that the "determining" step includes distinguishing between an input consisting of "a single input point" that is interpreted as a scroll operation and an input consisting of "two *or* more input points" that is interpreted as a gesture operation. Giving the claim the broadest reasonable interpretation consistent with the specification, instructions in the prior art that cause a data processing system to distinguish between (1) a single input point that is interpreted as a scroll operation and (2) two input points *or* more than two input points that are interpreted as a gesture operation would meet the language of the claim, as would instructions that cause the data processing system to distinguish between (1) a single input point that is interpreted as a scroll operation and (2) two input points that are interpreted as a gesture operation. The claim does not recite an input that necessarily consists of more than two (e.g., three) input points.

As set forth in the Office action, Nomura teaches a machine-readable storage medium storing executable program instructions for a data processing system (see Nomura at ¶ [0132] and ¶ [0134]). Nomura further teaches that the instructions cause the data processing system to distinguish between a single input point that is interpreted as a scroll operation (e.g., "moving one finger") and two or more input points that are interpreted as a gesture operation (e.g., "two fingers moving apart" and "two fingers moving toward each other") (see Nomura at ¶ [0053]). Thus, Nomura teaches instructions for interpreting an input consisting of "two *or* more input points" as a gesture operation. In other words, the instructions stored on the machine-readable storage medium of Nomura are capable of interpreting an input consisting of "two *or* more input points" as a gesture operation such as recited in claim 8.

Application/Control Number: 90/012,332                                      Page 20
Art Unit: 3992

Section VII.C.3 of the Appellant's Brief

The appellant contends that Nomura does not teach the limitation that "determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period" such as recited in claims 5, 12 and 19.  The appellant argues that Nomura's consideration of time "occurs only *after* the device … has invoked the appropriate gesture."  See the appellant's brief at page 24.

However, the examiner respectfully disagrees.  As set forth in the Office action, Nomura specifically describes:

> Using the present invention, the user can input at least one operation selected from rotate, zoom-in, zoom-out, and scroll of a map image displayed in the display area <u>through the movement history</u> of his fingers.
>
> The <u>movement history</u> of fingers contacting the display area is a concept including a <u>passage of time</u> element and is <u>distinguished</u> from an operation of <u>simply touching</u> an input mark or the like with a finger that does not include a passage of time element.

(Nomura at ¶ [0009] and ¶ [0010]; emphasis added.)

In Nomura, mere contact of one or more input points without movement is not enough to signal a scroll or gesture operation.  Instead, interpreting an input as a scroll or gesture operation is based on the movement history of the one or more input points moving or "dragging" for some amount of time (i.e., the "passage of time" element).  The tests for movement or dragging are illustrated, for example, in Figure 34 at step S140 ("Is the contact point moving?") and in Figure 37 at steps S320 ("Did the distance between the two [contact] points become larger?") and S340 ("Did the distance between the two [contact] points get reduced?").

Application/Control Number: 90/012,332                                        Page 21
Art Unit: 3992

Step S140 is part of the algorithm for interpreting an input as a scroll operation that proceeds to step S170 ("Scroll processing"). Likewise, steps S320 and S340 are part of the algorithm for interpreting an input as a gesture operation that proceeds to step S330 ("Zoom-in processing") or step S350 ("Zoom-out processing"). See Nomura at Figures 34 and 37. Thus, Nomura teaches the limitation that "determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period" such as recited in claims 5, 12 and 19.

The examiner notes that Nomura further contemplates testing for "contact by fingers within a specified amount of time" (see Nomura at ¶ [0193]).

Section VII.D.1 of the Appellant's Brief

The appellant contends that Hillis does not teach the "distinguishing" limitation, arguing that Hillis "does not distinguish one input point from more than one input point." The appellant further argues that Hillis does not teach "the one/more than one algorithm of the '915 patent." The appellant acknowledges the description of a "scroll with one input [point]" and a "gesture with two [input points]" in Hillis, but contends that Hillis "nowhere discloses how to distinguish these or other gestures from each other." See the appellant's brief at pages 25-26.

However, the examiner respectfully disagrees. As noted above, there is no description in the '915 patent of a particular "one/more than one" algorithm. A plain reading of the claims is that the "determining" step or the "means for determining" includes distinguishing between an input (consisting of a "single input point") that is interpreted as a scroll operation and an input (consisting of "two *or* more input points") that is interpreted as a gesture operation. As set forth in the Office action, Hillis teaches distinguishing between an input consisting of a single input

Application/Control Number: 90/012,332                                    Page 22
Art Unit: 3992

point that is interpreted as a "pan" or scroll operation (i.e., "drawing a finger across the display

surface") (see Hillis at column 8, lines 44-48) and an input consisting of two or more input points

that is interpreted as a gesture operation (i.e., "placing his fingertips on the display surface and

moving them in an outwardly separating manner") (see Hillis at column 3, lines 42-46).

Hillis further teaches how the scroll and gesture operations are "distinguished." First,

Hillis precisely detects and tracks the number of input points:

> In step 201, the user initiates (and the display/computer detects) the user's
> physical contact with the display surface 124. Without any intended
> limitation, the illustrated embodiment of the sequence 200 performs one
> instance of the (repeating) steps 202-204 for each such contact initiated. The
> contact of step 201 is referred to as the "current" contact. In one gesture
> recognition scheme, the computer 126 tracks a predetermined number of
> distinct contact locations (such as two). If the computer identifies another
> contact location (such as a third), the computer 126 ignores it until the user
> releases a sufficient number of the existing contact locations.

(Hillis at column 7, lines 4-14; emphasis added.) Then, Hillis determines whether the one or

more input points match a predetermined pattern:

> In step 208, the computer 126 determines whether activity of the current
> contact matches a predetermined pattern, and therefore constitutes a "gesture."
> Step 208 repeats continually, utilizing some or all of the position, position
> history (movement), velocity, and force information from steps 202, 204, 206.
> More particularly, in step 208 the computer 126 compares the history of
> contact position, size, movement, velocity, and/or force to the dictionary 126a
> of predetermined gestures to determine if the user has performed any of these
> gestures. As long as the current contact continues, but no gesture has been
> detected, step 208 repeats (via 208a). … In contrast, if step 208 detects that
> the user has initiated a gesture (208c), the computer in step 214 utilizes the
> mapping 126c to identify the action 126b associated with the gesture that was
> identified in step 208.

(Hillis at column 7, lines 46-65.) The patterns and actions described in Hillis include "panning,

zooming, rotating, and the like" (see Hillis at column 8, lines 4-8). Zooming and rotating are

examples of gesture operations; panning is a scroll operation.

Application/Control Number: 90/012,332                                      Page 23
Art Unit: 3992

Thus, Hillis teaches an algorithm for distinguishing between a single input point (i.e., one finger) that is interpreted as a scroll operation (i.e., panning) and two *or* more input points (i.e., two fingers) that are interpreted as a gesture operation (i.e., zooming or rotating).  As reasoned above, giving the claims the broadest reasonable interpretation, an algorithm in the prior art that distinguishes between (1) a single input point that is interpreted as a scroll operation and (2) two input points *or* more than two input points that are interpreted as a gesture operation would meet the language of the claims.  Likewise, an algorithm that distinguishes between (1) a single input point that is interpreted as a scroll operation and (2) two input points that are interpreted as a gesture operation would meet the language of the claims.  Accordingly, the teachings of Hillis anticipate the "distinguishing" limitation as claimed.

Moreover, the examiner respectfully submits that the appellant's argument that "gestures could be associated with two inputs, and scrolls with any other number" is not what Hillis describes (see the appellant's brief at page 26).  Rather, Hillis describes that "the computer 126 tracks a predetermined number of distinct contact locations (such as two)" and states, "If the computer identifies another contact location (such as a third), the computer 126 ignores it until the user releases a sufficient number of the existing contact locations" (Hillis at column 7, lines 9-14).  Thus, Hillis teaches that an input consisting of more than two (e.g., three) input points would be interpreted the same as an input consisting of two input points.

The appellant contends that Hillis does not teach an "event object" or "any of the other object-oriented limitations of the '915 patent," arguing that the "position history" and "detected force" described in Hillis is not an "event object."  The appellant further contends that Hillis

Application/Control Number: 90/012,332                                   Page 24
Art Unit: 3992

"does not disclose the other hallmarks of an object-oriented framework," arguing that Hillis does

not teach a "view associated with the event object."  See the appellant's brief at page 26.

However, the examiner respectfully disagrees.  As set forth in the Office action, Hillis

teaches creating "a machine readable output" that "is representative of the position, size, shape,

and timing of each contact region," and creating "a position history for each contact region" that

"provides a record of how each contact region moves and/or changes shape over time" (see Hillis

at column 7, lines 15-25).  The "machine readable output" and "position history" are created in

step 202 in response to the user input (see Hillis at FIG. 2A).  Thus, Hillis teaches "creating an

event object in response to the user input" such as recited in the claims.

The examiner notes that the claims do not specify or limit what constitutes an "event

object," nor does the specification of the '915 patent define the term "event object."  At best, the

specification describes, "A multi-touch driver of the device receives the user input and packages

the event into an event object" (see the '915 patent at column 12, lines 30-32).  Thus, a

reasonable interpretation is that the claimed "event object" is an entity or "package" of data

representing the user input event.  The "machine readable output" and "position history" created

in step 202 of Hillis, representing the position, size, shape and timing of each input point (see

Hillis at column 7, lines 15-25), is such an entity.  Accordingly, giving the claims the broadest

reasonable interpretation consistent with the specification, Hillis teaches "creating an event

object in response to the user input."

The examiner further notes that the term "object-oriented" is nowhere found in the

specification or claims of the '915 patent.  Likewise, an "object-oriented framework" is not a

limitation of the claims.  Hillis teaches that "the presentation of imagery by the display" is

Application/Control Number: 90/012,332                                    Page 25
Art Unit: 3992

updated in response to the scroll or gesture operation (see Hillis at column 7, line 65 to column 8,

line 1).  Specifically, Hillis describes that the display "pan[s] the imagery" in response to a user

"drawing a finger across the display surface" (Hillis at column 8, lines 44-52).  Hillis further

describes that "a closer, more detailed view of the displayed imagery" is presented in response to

a user "placing his fingertips on the display surface and moving them in an outwardly separating

manner" (Hillis at column 3, lines 42-49).  Thus, with respect to the claimed "view associated

with the event object," the part of the imagery in Hillis that is panned, zoomed or otherwise

updated in response to the user input is the "view associated with the event object."

The appellant contends that Hillis does not teach a "touch-sensitive display."  Namely,

the appellant argues that Hillis "describes a system that projects an image *onto* a touch-sensitive

surface" that "is not a display," concluding that the display in Hillis "is *not* responsive to touch."

See the appellant's brief at page 27.

However, the examiner respectfully submits that the appellant's argument is contrary to

the teachings of Hillis.  As set forth in the Office action, Hillis clearly teaches "[an] interactive

display system, including a touch sensitive display" (Hillis at Abstract; emphasis added).  Hillis

states, for example, that "[the] table 122 detects touch input from human users as applied to the

display surface 124" (Hillis at column 3, lines 4-7).  Hillis further describes "various approaches

to detect when and where a user touches the display surface" (Hillis at column 4, lines 17-19).

Thus, Hillis teaches a "touch-sensitive display" such as recited in the claims.

Turning to the system 120 illustrated in FIG. 1A of Hillis, the examiner agrees that the

projector 128 *projects* an image onto the display surface 124 of table 122.  One does not look

into the projector to view the image; the image is *displayed* on the *display* surface 124.  For

Application/Control Number: 90/012,332                                    Page 26
Art Unit: 3992

example, FIG. 1B "shows several users operating an interactive, touch detecting display 11 …

such that each user can view the display surface 12, which shows imagery of interest to the

users" (Hillis at column 3, lines 33-36).  Here, the "touch detecting display 11" responds to

touch.  The examiner notes that Hillis further contemplates other "display technologies … such

as LCDs, OLEDs, or plasma displays" (see Hillis at column 4, lines 3-6).

The appellant contends that Hillis does not teach a display that is "integrated" with the

device, data processing system, or apparatus.  The appellant construes the term "integrated" to

mean "combined in a single physical unit."  See the appellant's brief at pages 27-28.

First, however, the examiner notes that the physical housing of the display and the

device, data processing system, or apparatus is not a limitation of the claims.

Second, the examiner respectfully submits that contrary to the appellant's argument, the

Office action does not construe the term "integrated" to mean "necessary" in a way that would be

"inconsistent with the ordinary meaning of the term" (see the appellant's brief at page 28).

Rather, the Office action reasoned that the display surface 124 and the computer 126 of Hillis are

"integrated" into a single interactive display system 120.  The display surface 124, the computer

126 and the projector 128 are "combined" into the interactive display system 120 and operate

together as a "unit" or as a "whole" (see Hillis at FIG. 1A and column 2, lines 63-66).  Thus,

consistent with the specification and the ordinary meaning of the term, Hillis teaches a display

that is "integrated" with the device, data processing system, or apparatus.

Application/Control Number: 90/012,332                                    Page 27
Art Unit: 3992

Section VII.D.2 of the Appellant's Brief

The appellant argues that Hillis "does not disclose any programming instructions that dictate the logic by which the computer operates under *all circumstances*, and not just in one given instance, for the same reasons discussed above with respect to Nomura in Section VII.C.2." See the appellant's brief at pages 28-29.

However, the examiner respectfully disagrees. As set forth in the Office action, Hillis teaches a machine-readable storage medium storing executable program instructions that, when executed, cause a data processing apparatus to perform a method (see Hillis at column 5, lines 48-59). Claim 8 further recites that the "determining" step includes distinguishing between an input consisting of "a single input point" that is interpreted as a scroll operation and an input consisting of "two *or* more input points" that is interpreted as a gesture operation. As noted above, Hillis teaches distinguishing between an input consisting of a single input point that is interpreted as a scroll operation (e.g., "drawing a finger across the display surface") and an input consisting of two or more input points that is interpreted as a gesture operation (e.g., "placing his fingertips on the display surface and moving them in an outwardly separating manner") (see Hillis at column 8, lines 44-48 and column 3, lines 42-46). Thus, Hillis teaches instructions for the "distinguishing" limitation such as recited in claim 8.

Moreover, the examiner respectfully points out that none of the claims recites an input that necessarily consists of more than two (e.g., three) input points. Still, Hillis teaches that such an input would be interpreted the same as an input consisting of two input points (see Hillis at column 7, lines 9-14).

Application/Control Number: 90/012,332                                              Page 28
Art Unit: 3992

Section VII.D.3 of the Appellant's Brief

The appellant contends that Hillis does not teach the limitation that "determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period" such as recited in claims 5, 12 and 19.  The appellant argues that the examiner "never explains" how the "movement" and "velocity" described in Hillis describe a "drag user input for a certain time period."  See the appellant's brief at page 29.

However, the examiner respectfully disagrees.  In Hillis, interpreting an input as a scroll or gesture operation is based on "the timing of each contact region" and "a record of how each contact region moves and/or changes shape over time" (see Hillis at column 7, lines 15-25; emphasis added).  A contact (i.e., an input point) that moves or "drags" over a period of time constitutes "receiving a drag user input for a certain time period."  As noted above, Hillis further describes that interpreting the input as a scroll or gesture operation is based on the movement, velocity and force of the drag:

> In step 208, the computer 126 determines whether activity of the current contact matches a predetermined pattern, and therefore constitutes a "gesture." Step 208 repeats continually, utilizing some or all of the position, position history (movement), velocity, and force information from steps 202, 204, 206. More particularly, in step 208 the computer 126 compares the history of contact position, size, movement, velocity, and/or force to the dictionary 126a of predetermined gestures to determine if the user has performed any of these gestures.  As long as the current contact continues, but no gesture has been detected, step 208 repeats (via 208a). … In contrast, if step 208 detects that the user has initiated a gesture (208c), the computer in step 214 utilizes the mapping 126c to identify the action 126b associated with the gesture that was identified in step 208.

(Hillis at column 7, lines 46-65; emphasis added.)  As set forth in the Office action, the velocity of the contact represents the change in the position of the contact over a period of time.  Thus, the examiner respectfully submits that Hillis teaches the limitation that "determining whether the

Application/Control Number: 90/012,332                                      Page 29
Art Unit: 3992

event object invokes a scroll or gesture operation is based on receiving a drag user input for a

certain time period" such as recited in claims 5, 12 and 19.

<u>Section VII.E of the Appellant's Brief</u>

The appellant contends that Lira does not teach "rubberbanding a scrolling region

displayed within the window by a predetermined maximum displacement when the scrolling

region exceeds a window edge based on the scroll" such as recited in claims 2, 9 and 16.  The

appellant argues that the "snapping" described in Lira is not "rubberbanding" because it "works

in a fundamentally different way."  See the appellant's brief at pages 30-31.

However, the examiner respectfully disagrees.  The specification of the '915 patent

describes "rubberbanding" in terms of "rubberbanding a scrolled region by a predetermined

maximum displacement when the scrolled region exceeds a display edge" (see the '915 patent at

column 5, lines 35-40).  Here, the appellant argues that the rubberbanding "prevents a user from

scrolling the content further" and "solves the specific problem of a user's scrolling to a region

outside the content" (see the appellant's brief at pages 30-31).  On that basis, the appellant argues

that Lira "does not disclose what happens if the user tries to scroll past the edge of the page"

(brief at page 31).  However, as set forth in the Office action, the "region outside the content" is

not a limitation of the claims.  The claims do not recite "preventing" the user from scrolling.

Lira teaches snapping or "rubberbanding" a column of a page in a display window 1205

based on whether the user's horizontal scrolling of the column exceeds a threshold:

> Referring to Fig. 14B, in another implementation, the vertical alignment
> control is enabled when the user lifts the pen 1200 from the display 1205.
> This causes the logical column 1220 to snap into alignment with the display
> window 1205 as the user stops scrolling.  The user can adjust the snap
> sensitivity by, for example, setting the alignment control to snap to the nearest

> logical column based on a user-defined snap threshold.  If the user's scrolling
> does not exceed the threshold, which indicates an intention to continue to
> view the text column 1220, the display 1205 centers the logical column 1210
> as the pen 1200 is lifted from the screen.  If the user's scrolling exceeds the
> threshold, which indicates an intention to move beyond the boundary of the
> logical column 1220, the display is snapped to the adjacent or repositioned
> column.  In other implementations, no snapping occurs when the user's
> scrolling exceeds the threshold.  The snap-on-column feature can also be
> animated to provide an appearance of movement as the display scrolls to the
> correct column-viewing position.

(Lira at page 15, lines 18-31.)  When the user's scrolling does not exceed the threshold, the

column is re-centered and snapped back "into alignment with the display window 1205."  When

the user's scrolling exceeds the threshold and "[moves] beyond the boundary" of the column, the

display window 1205 is snapped to the next nearest column.  Thus, Lira teaches "rubberbanding"

a column of the page.

The examiner respectfully submits that the appellant's argument that the snapping

described in Lira relates to "internal edges" of the page and not to "the edge of the content" is

immaterial (see the appellant's brief at page 31).  The claims recite "a window edge" rather than

a "content" edge.  Moreover, the test for obviousness is what the combined teachings of the

references would have suggested to those of ordinary skill in the art.  See *In re Keller*, 642 F.2d

413, 425, 208 USPQ 871, 881 (C.C.P.A. 1981).

As set forth in the Office action, Lira describes that the columns of the page are sized

such that "[the] width of each logical column is less than or equal to the display window width"

(see Lira at page 11, lines 10-17).  Therefore, in the case where the width of the logical column is

equal to or the same as the width of the display window 1205, the snapping or "rubberbanding"

is performed when the user's horizontal scrolling of the column "exceeds a window edge based

on the scroll" such as recited in claims 2, 9 and 16.  Thus, the teachings of Lira would have

Application/Control Number: 90/012,332                                    Page 31
Art Unit: 3992

suggested "rubberbanding a scrolling region displayed within the window by a predetermined

maximum displacement when the scrolling region exceeds a window edge based on the scroll" to

those of ordinary skill in the art.

The appellant contends that a person of ordinary skill in the art "would not have been

motivated to combine Lira with Nomura or Hillis," arguing that the scrolling described in Lira

"is incompatible" with that of Nomura and Hillis because "[a] downward motion in Lira results

in the display of new content from below … while the same motion in both Nomura and Hillis

results in the display of new content from above."  The appellant further argues that the snapping

and re-centering teachings of Lira "relate to internal boundaries within the content" that are not

described in Hillis or Nomura.  The appellant concludes therefore that there is no rationale and

no *prima facie* case of obviousness.  See the appellant's brief at pages 31-32.

However, the examiner respectfully disagrees.  As the Lira reference suggests, the

snapping (i.e., "rubberbanding") feature would "provide an appearance of movement as the

display scrolls to the correct [viewing] position" (see Lira at page 15, lines 29-31).  A person of

ordinary skill in the art would have been prompted to incorporate such a feature into Hillis or

Nomura.  Specifically, as set forth in the Office action, a person of ordinary skill in the art would

have been prompted to implement the teachings of Hillis or Nomura such that the "scrolled" or

"panned" area is automatically and visually snapped back into alignment with the window based

on whether the scrolling exceeds a threshold.

The direction of the scrolling in Lira as compared to the direction of the scrolling in Hillis

or Nomura would not have prevented a person of ordinary skill in the art from combining the

*teachings* of the references.  In fact, choosing the direction of the scrolling (or the direction from

Application/Control Number: 90/012,332                                      Page 32
Art Unit: 3992

which "new content" is displayed) would have been within the level of ordinary skill.  A person

of ordinary skill is also a person of ordinary creativity, not an automaton.  See *KSR Int'l Co. v.*

*Teleflex Inc.*, 550 U.S. 398, 421, 82 USPQ2d 1385, 1397 (U.S. 2007).

　　　Likewise, even if the teachings of Lira were limited to "internal boundaries within the

content" (see the appellant's brief at page 31), a person of ordinary skill in the art could have

implemented the snapping or "rubberbanding" feature for an internal boundary within the

content that is displayed in Hillis or Nomura.  For example, both references describe the display

of maps and geographic imagery (see Nomura at Figure 8 and ¶ [0067]; Hillis at FIG. 1B and

column 3, lines 36-40).  The examiner respectfully submits that it would have been obvious to

those of ordinary skill in the art to implement the snapping or "rubberbanding" feature for a

logical boundary within such maps (e.g., at the boundary of a geographical area), analogous to

the logical columns of the pages described in Lira (see Lira at page 15, lines 18-31).


　　　The appellant argues that secondary considerations "such as commercial success, the

existence of a long-felt need for the invention, and copying of the invention, support a finding of

non-obviousness for claims 2, 9 and 16."  See the appellant's brief at pages 32-33.

　　　However, as set forth in the Office action and reiterated above, evidence of secondary

considerations must be factually supported with actual proof and must establish a nexus with the

claimed invention.  See MPEP §§ 716.01(c) and 716.01(b).  Here, the appellant refers only

generally to "evidence … of the iPhone's commercial success and Samsung's efforts to copy it"

presented in the *Apple v. Samsung* litigation (brief at page 32).  The appellant does not attempt to

show, for example, that the commercial success of the iPhone is due to the claimed features of

the '915 patent and not to unclaimed features.  See MPEP § 716.03.  Likewise, more than the

Application/Control Number: 90/012,332                                        Page 33
Art Unit: 3992

mere fact of copying Apple's iPhone is necessary to make that action (of copying) significant.

See MPEP § 716.06.  Thus, the examiner respectfully submits that the appellant's assertion of

non-obviousness based on secondary considerations is of little probative value.


    <u>Section VII.F of the Appellant's Brief</u>

    The appellant contends that Makus does not teach "attaching scroll indicators" such as

recited in claims 3, 4, 10, 11, 17 and 18.  The appellant argues that "[unlike] the '915 patent," the

scroll bars of Makus "do not appear dynamically when a user begins to scroll the content" and

therefore are not "attached."  See the appellant's brief at page 33.

    However, the examiner respectfully disagrees.  The claims do not specify that the scroll

indicators "appear dynamically when a user begins to scroll the content."  Indeed, the claims do

not specify *when* the scroll indicators are "attached" at all.  In the Makus reference, the scroll bar

76 (i.e., the "scroll indicator") is attached when the user touches the display screen 28 "causing a

list 74 of [items] to be displayed" (see Makus at column 8, lines 59-64).  The scroll bar 76 is then

displayed (i.e., "attached" to the display) because more items are included in the list 74 "than can

be displayed in the available space on display screen 28 at one time" (see Makus at column 8,

line 64 to column 9, line 1).  As set forth in the Office action, Makus illustrates the "before" and

"after" of attaching the scroll bar 76 to the display in FIG. 4 and FIG. 5, respectively.  Thus, the

teachings of Makus would have suggested "attaching scroll indicators" such as recited in the

claims to those of ordinary skill in the art.


    The appellant contends that a person of ordinary skill in the art "would not have been

motivated to combine Makus with Nomura or Hillis," arguing that Nomura and Hillis do not

Application/Control Number: 90/012,332                                     Page 34
Art Unit: 3992

"require scroll indicators for navigation" since Nomura teaches "navigating a map by scrolling"
and Hillis describes "panning to navigate a map." The appellant argues, "Scroll indicators are
often used on mobile devices to indicate a relative position to a user in a long document." The
appellant contends that such a feature "is not as useful for maps" such as described in Nomura
and Hillis because maps "do not have a fixed starting position and are not generally accessed
sequentially." The appellant concludes therefore that there is no rationale and no *prima facie*
case of obviousness. See the appellant's brief at pages 34-35.

However, the examiner respectfully disagrees. The test for obviousness is what the
combined teachings of the references would have suggested to those of ordinary skill in the art.
See *In re Keller*, 642 F.2d 413, 425, 208 USPQ 871, 881 (C.C.P.A. 1981). A person of ordinary
skill in the art would understand that the maps displayed in Hillis and Nomura have a length and
a width. The part of the map that is viewable to the user would change as the map is panned or
scrolled; a "scroll indicator" such as described in Makus would show, for example, the relative
position of that view with respect to the size or dimensions of the full map. Thus, as set forth in
the Office action, "attaching scroll indicators" to the maps of Nomura and Hillis would have
been obvious to those of ordinary skill in the art.

With respect to the appellant's argument that the further teaching of a "slider tool" in
Hillis "does not justify combining it with Makus" (see the appellant's brief at page 34), the
examiner respectfully disagrees. The slider mode described in Hillis includes attaching a slider
tool to the display such as a "linearly moveable slider bar 560" that "observes an appropriately
convenient scale" (see Hillis at FIG. 5B and column 16, lines 29-39). The slider bar 560 is a
form of a "scroll indicator." Thus, Hillis teaches "attaching a scroll indicator" to the display. To

Application/Control Number: 90/012,332                                    Page 35
Art Unit: 3992

the extent that the "slider mode" of Hillis is separate from the description of panning or scrolling

a map, the Office action cited the Makus reference.  As noted above, Makus teaches a scroll bar

76 (see Makus at FIG. 5) that would show, for example, the relative position of the part of the

map that is viewable to the user with respect to the size or dimensions of the full map.  Thus, as

set forth in the Office action, "attaching scroll indicators" to the maps of Hillis would have been

obvious to those of ordinary skill in the art.

      The appellant argues that secondary considerations "such as commercial success, the

existence of a long-felt need for the invention, and copying of the invention, support a finding of

non-obviousness for claims 3, 4, 10, 11, 17 and 18."  See the appellant's brief at page 35.

      However, as set forth in the Office action and reiterated above, evidence of secondary

considerations must be factually supported with actual proof and must establish a nexus with the

claimed invention.  See MPEP §§ 716.01(c) and 716.01(b).  Here, the appellant refers only

generally to "evidence … of the iPhone's commercial success and Samsung's efforts to copy it"

presented in the *Apple v. Samsung* litigation (brief at page 35).  The appellant does not attempt to

show, for example, that the commercial success of the iPhone is due to the claimed features of

the '915 patent and not to unclaimed features.  See MPEP § 716.03.  Likewise, more than the

mere fact of copying Apple's iPhone is necessary to make that action (of copying) significant.

See MPEP § 716.06.  Thus, the examiner respectfully submits that the appellant's assertion of

non-obviousness based on secondary considerations is of little probative value.

Application/Control Number: 90/012,332                                      Page 36
Art Unit: 3992

     For the above reasons, it is believed that the rejections should be sustained.


     Respectfully submitted,

     /Michael J. Yigdall/
     Primary Examiner, Art Unit 3992


     Conferees:

     /Stephen J. Ralis/
     Primary Examiner, Art Unit 3992

     /SUDHANSHU PATHAK/
     Supervisory Patent Examiner, Art Unit 3992



**Requirement to pay appeal forwarding fee:**  In order to avoid dismissal of the instant appeal in

any application or *ex parte* reexamination proceeding, 37 CFR 41.45 requires payment of an

appeal forwarding fee within the time permitted by 37 CFR 41.45(a), unless appellant had timely

paid the fee for filing a brief required by 37 CFR 41.20(b) in effect on March 18, 2013.