# EXHIBIT 13

EX PARTE RE-EXAMINATION                   Docket No.: 106842803600(P4895USREX1)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reexamination of:
Andrew PLATZER et al.

Reexam Control No.: 90/012,332                    Confirmation No.: 5963

U.S. Patent No.:  7,844,915                       Art Unit:  3992

Filing Date:  May 30, 2012                        Examiner:  M. J. Yigdall

For:   APPLICATION PROGRAMMING
       INTERFACES FOR SCROLLING
       OPERATIONS

## REPLY BRIEF

MS Appeal Brief – Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Madam:

This is an appeal from a Final Office Action, dated July 26, 2013, and an Advisory Action, dated November 20, 2013, rejecting claims 1-21 of U.S. Patent No. 7,844,915 ("the '915 patent"). Appellant Apple Inc. ("Appellant" or "Patent Owner") filed its Notice of Appeal on December 26, 2013 and its Appeal Brief on February 26, 2014.  The Examiner filed his Answer Brief on May 2, 2014.  This Reply Brief is timely under 37 C.F.R. § 41.41 and accompanied by the appeal forwarding fee under 37 C.F.R. § 41.20(b)(4). Additionally, a request for oral hearing, and appropriate fees, are filed herewith.

Control No.: 90/012,332                    2     Docket No.: 106842803600(P4895USREX1)

# TABLE OF CONTENTS

I.     INTRODUCTION……………………………………………………………... 4

II.    ARGUMENT………………………………………………………………... 5

    A.    The References Do Not Teach the "Distinguishing" Limitation (All Claims)……… 5

        1.    The broadest reasonable construction of the "distinguishing" limitation refers to a test that distinguishes between one input and more than one input……………………………………………... 5

        2.    The Examiner's proposed construction, which ignores the understanding of those skilled in the art and the Patent Owner's disclaimers, cannot be correct…………………………………………… 8

        3.    Nomura does not disclose the "distinguishing" limitation………………… 14

        4.    Hillis does not disclose the "distinguishing" limitation…………………… 14

    B.    The References Do Not Teach the "Event Object" Limitation (All Claims)……… 16

        1.    The broadest reasonable construction of the "event object" limitation requires object-oriented programming………………………… 16

        2.    The Examiner's construction of "event object" is unreasonable………….. 17

        3.    The combination of Nomura and Rubine does not disclose the claimed "event object"…………………………………………………... 18

        4.    One would not have been motivated to combine Nomura and Rubine……. 19

        5.    Hillis also does not disclose the claimed "event object"…………………. 20

III.    HILLIS, WHETHER ALONE OR IN COMBINATION, DOES NOT DISCLOSE A "TOUCH-SENSITIVE DISPLAY" LIMITATION (CLAIMS 1, 8, & 15)……………… 21

IV.    HILLIS, WHETHER ALONE OR IN COMBINATION, DOES NOT DISCLOSE THE "INTEGRATED" DISPLAY LIMITATION (ALL CLAIMS)…………………………… 22

V.    THE REFERENCES DO NOT TEACH THE "DRAG INPUT" LIMITATION (CLAIMS 5, 12, & 19)..……………………………………………... 24

Control No.: 90/012,332 3 Docket No.: 106842803600(P4895USREX1)

VI.     THE REFERENCES DO NOT TEACH THE "RUBBERBANDING"
        LIMITATION (CLAIMS 2, 9, & 16)……………………………………………………… 26

VII.    THE REFERENCES DO NOT TEACH THE "ATTACHING SCROLL
        INDICATORS" LIMITATION (CLAIMS 3, 4, 10, 11, 17, & 18)……………………….. 29

VIII.   CONCLUSION……………………………………………………………….... 32

Control No.: 90/012,332            4     Docket No.: 106842803600(P4895USREX1)

## I.  INTRODUCTION

The Examiner's Answer confirms that the Board should reverse the pending rejections.  The Examiner does not rebut Appellant's arguments that Nomura[1] and Hillis,[2] whether alone or in combination with other references, do not disclose all limitations of the '915 patent claims.  Indeed, the Examiner fails to address several of Appellant's arguments at all.

In its Appeal Brief, Appellant explained that the "broadest reasonable interpretation" of the "distinguishing" limitation in all claims refers to a test that distinguishes between one input and more than one input.[3]  This is consistent with the understanding of no fewer than three professors skilled in the art, the plain claim language, the specification, and the prosecution history.[4]  In advancing a different construction, the Examiner continues to ignore the understanding of one of ordinary skill in the art and discounts the only record evidence of how one skilled in the art would actually construe the "distinguishing" limitation.[5]

The Examiner's arguments for the remaining limitations (*e.g.,* that an "event object" need not be object-oriented,[6] that a projector positioned over a table is both a "touch-sensitive display" and "integrated,"[7] that "rubberbanding" can encompass something that does *not* snap back after reaching a predetermined maximum displacement,[8] or that a bar for sliding *between layers* is a "form of a 'scroll indicator'"[9]) fare no better.  Because the cited references do not teach multiple claim limitations of the '915 patent, Appellant respectfully urges the Board to reverse.

---

[1] Japanese Pub. No. 2000-163031A.
[2] U.S. Patent No. 7,724,242.
[3] *See* Appeal Br. at 10.
[4] *See id.* at 14-19.
[5] *See* Answer at 7-9 (rejecting Drs. Nieh and Klemmer's constructions in favor of the "evidence as a whole," and ignoring Dr. Singh's opinion entirely).
[6] *See id.* at 24 (construing "event object" instead as "an entity or 'package' of data representing the user input").
[7] *See id.* at 25 ("[T]he [E]xaminer agrees that the projector 128 *projects* an image onto the display surface 124 of table 122.").
[8] *See id.* at 30 ("When the user's scrolling [in Lira] exceeds the threshold . . . , the display window 1205 is snapped to the next nearest column.").
[9] *Id.* at 34.

Control No.: 90/012,332                5    Docket No.: 106842803600(P4895USREX1)

## II.    ARGUMENT

### A.    The References Do Not Teach the "Distinguishing" Limitation (All Claims).

All independent claims require:

> determining whether the event object invokes a scroll or gesture
> operation by **distinguishing between a single input point** applied to
> the touch sensitive display that is interpreted as the scroll operation
> **and two or more input points** applied to the touch-sensitive display
> that are interpreted as the gesture operation . . . .[10]

The plain language of this limitation requires distinguishing between (i) one input point and (ii) more than one input point. The Examiner, however, believes that an algorithm that distinguishes between (i) one input point and (ii) two input points—but not, *e.g.*, three input points—would satisfy this limitation.[11] The Examiner's interpretation is not the broadest reasonable interpretation in light of the specification for several reasons, as discussed below.

### 1.    The broadest reasonable construction of the "distinguishing" limitation refers to a test that distinguishes between one input and more than one input.

The "broadest reasonable interpretation" standard governs the construction of the "distinguishing" limitation during reexamination.[12] "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification."[13] "The plain meaning of a term means the ordinary and customary meaning given to the term by those of ordinary skill in the art at the time of the invention."[14] The broadest reasonable

---

[10] (Emphasis added.)
[11] Answer at 3.
[12] *See* MPEP § 2258(I)(G).
[13] MPEP § 2111.01(I).
[14] *Id.*

Control No.: 90/012,332                6      Docket No.: 106842803600(P4895USREX1)

construction of a limitation must be consistent with both the specification and "the interpretation that those skilled in the art would reach."[15]

Applying these maxims, the broadest reasonable construction of the "distinguishing" limitation refers to a test that distinguishes between one input and more than one input. As Dr. Scott Klemmer of the University of California, San Diego (formerly of Stanford University) has explained: "If one of ordinary skill were asked to express the distinguishing limitation as pseudo-code, it would be reasonable to express [it] as:

> if (1 input point) {interpret as a scroll operation};
>
> if (>1 input point) {interpret as a gesture operation}[.]"[16]

This pseudo-code distinguishes one input point from all numbers greater than one. In other words, the limitation describes an "atomic test condition, namely, that any plurality of input points be interpreted as a gesture operation."[17] Dr. Klemmer further explained that one of ordinary skill "would not reasonably interpret the distinguishing limitation as something substantially different" from this test.[18] No fewer than three professors—Dr. Scott Klemmer, Dr. Karan Singh of the University of Toronto, and Dr. Jason Nieh of Columbia University—have confirmed that this is the appropriate construction for the "distinguishing" limitation, after reviewing the '915 patent's claims and specification.[19]

This construction also is required by the plain claim language. Claim 8, for example, refers to a "machine readable storage medium" with instructions for performing the recited method. This method includes the "determining" step, with its "distinguishing" limitation. The instructions on that medium would dictate the logic by which a computer responds under *all circumstances*, not

---

[15] *See* MPEP § 2111; *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*).
[16] Klemmer Decl. ¶ 13.
[17] *Id.* ¶ 16.
[18] *Id.* ¶ 11.
[19] *See* Appeal Br. at 15; Klemmer Decl. ¶¶ 7-17; Nieh Decl. ¶¶ 15-17; Response to Final Office Action, dated Oct. 28, 2013, at 7-8 (quoting Singh trial testimony).

sf-3432677

just in isolated instances.[20]  Restated, one of ordinary skill in the art would understand that a
medium that stored instructions for performing **only a portion** of the "distinguishing" limitation
(*e.g.*, interpreting one input point as a scroll operation and two input points as a gesture operation)
would not satisfy claim 8.

Appellant's interpretation is fully consistent with the '915 patent specification.  The
specification uses the phrase "two or more" interchangeably with the term "plurality."[21]  This
equivalence, which is consistent with Federal Circuit precedent,[22] confirms that the "distinguishing"
limitation contrasts "a single input point" with "two or more input points," *i.e.*, a "plurality."

When describing the distinguishing step, the specification also describes a single test for
differentiating one from two or more:

> The method 100 further includes determining whether the event object
> invokes a scroll or gesture operation at block 106.  For example, **_a_**
> single touch that drags a distance across a display of the device may
> be interpreted as a scroll operation.  In one embodiment, **_a_** two or
> more finger touch of the display may be interpreted as a gesture
> operation.[23]

This test contrasts "**_a_** single touch" with "**_a_** two or more finger touch" to determine which operation
to invoke.  The term "**_a_** two or more finger touch" describes a type of input, *i.e.*, more than one
finger, rather than two different categories of input to be evaluated separately.  This is consistent
with Dr. Klemmer's "atomic" test condition.

---

[20] *See* Klemmer Decl. ¶¶ 19-20.
[21] *Compare* '915 patent at 5:45-48 ("The gesture operations also include performing a rotation transform to rotate an
image or view in response to a user input having two or more input points."), *with id.* at 7:4-8 ("[G]esture operations
include responding to at least one gesture call, if issued, by rotating a view associated with the event object based on
receiving a plurality of input points in the form of the user input.").
[22] *See, e.g., Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1328 (Fed. Cir. 2001) ("[W]e find no reason
to give 'plurality . . . of projections' any definition other than its ordinary definition of 'two or more.'"); *cf.*
*Commonwealth Sci. and Indus. Research Org. v. Buffalo Tech. (USA) Inc.*, 542 F.3d 1363, 1384-85 (Fed. Cir. 2008)
(using the terms "two or more," "plurality of," "multiple," and "at least two" interchangeably).
[23] '915 patent at 6:38-43 (emphasis added).

Control No.: 90/012,332                  8      Docket No.: 106842803600(P4895USREX1)

Appellant's interpretation also is consistent with the original prosecution history.  The original examiner of the '915 patent added the "distinguishing" limitation via an examiner's amendment when allowing the claims, explaining:

> [The cited references] fail to teach or suggest . . . distinguishing between _**a**_ single input point and _**a**_ two or more input points applied to a touch-sensitive display, wherein a single input point is interpreted as a scroll operation and two or more input points are interpreted as a gesture operation.[24]

The Examiner's paraphrasing of "two or more input points" as "_**a**_ two or more input points" confirms that the "distinguishing" limitation makes a single distinction between a single input and more than one input.

Finally, the Patent Owner's own construction of the "distinguishing" limitation during reexamination is persuasive.  In its October 28, 2013 Response to Final Office Action, the Patent Owner emphasized that "any reasonable interpretation of the distinguishing limitation requires an algorithm that interprets a single input point as a scroll operation and that interprets any input having greater than one input point . . . as a gesture operation."[25]  These statements during reexamination, which are part of the public record, inform the public's understanding as to the broadest reasonable construction of the '915 patent claims.[26]

> **2.      The Examiner's proposed construction, which ignores the understanding of those skilled in the art and the Patent Owner's disclaimers, cannot be correct.**

As in the Final Office Action and Advisory Action, the Examiner maintains in his Answer that the broadest reasonable construction of the "distinguishing" limitation encompasses:

---

[24] U.S. Pat. App. No. 11/620,717, Notice of Allowance, dated July 20, 2010, ¶ 4 (emphasis added).

[25] Response to Final Office Action, dated Oct. 28, 2013, at 8-9.

[26] *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (citing *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("We have stated on numerous occasions that a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation.")); *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078-79 (Fed. Cir. 2003) (reexamination statements may limit scope of unamended claims).

sf-3432677

Control No.: 90/012,332                 9        Docket No.: 106842803600(P4895USREX1)

> an algorithm . . . that distinguishes between (1) a single input point that
> is interpreted as a scroll operation and (2) two input points *or* more
> than two input points that are interpreted as gesture operation . . . .

[or]

> an algorithm that distinguishes between (1) a single input point that is
> interpreted as a scroll operation and (2) two input points that are
> interpreted as gesture operation . . . .[27]

Restated, the Examiner's proposed construction would allow the claims to encompass a system in which a single input was interpreted as a scroll operation, two input points were interpreted as gesture operation, but three or more inputs were interpreted as a scroll operation—or not at all.[28] The Examiner's construction cannot represent the broadest reasonable construction of the "distinguishing" limitation for multiple reasons:

   ***First,*** the Examiner's construction wholly ignores the requirement that claims be construed from the ***perspective of one of ordinary skill in the art***. Although emphasizing that the "broadest reasonable construction" standard applies during reexamination and that the specification is the "best source" for determining the meaning of a claim term,[29] the Examiner never once acknowledges that the broadest reasonable construction standard must be applied from that perspective.

   The requirement that claims be construed from the perspective of one skilled in the art is black letter law, with multiple cases emphasizing this principle. In *Phillips v. AWH Corp.*, for example, the *en banc* Federal Circuit explained that:

> The Patent and Trademark Office ("PTO") determines the scope of the
> claims in patent applications not solely on the basis of the claim
> language, but upon giving claims their ***broadest reasonable***

---

[27] Answer at 3, 6, 8, 23; *see* Final Office Action, dated July 26, 2013, at 4; Advisory Action, dated Nov. 20, 2013, at 3.

[28] Answer at 13 (interpreting claims to cover Nomura, in which "the processing of *three* or more input points . . . would be the same as the processing of a single input point"), 23 (interpreting claims to cover Hillis, in which "the computer ignores [a third contact location] until the user releases a sufficient number of existing contact locations" (citation omitted)).

[29] Answer at 3, 9.

Control No.: 90/012,332         10     Docket No.: 106842803600(P4895USREX1)

> **construction "in light of the specification as would be interpreted by one of ordinary skill in the art."**[30]

The MPEP is in accord, explaining that "[t]he broadest reasonable interpretation of the claims must . . . be consistent with the interpretation that those skilled in the art would reach."[31] The Federal Circuit has expressly relied on this principle in reversing rejections based on constructions that did not reflect the understanding of one skilled in the art.[32]

By refusing to acknowledge (much less apply) this requirement, the Examiner's construction does not reflect the understanding of one skilled in the art and cannot be the broadest reasonable construction.

**_Second,_** the Examiner erred by rejecting the opinions of Drs. Klemmer, Nieh, and Singh that Appellant's construction of the "distinguishing" limitation is correct. The Examiner implicitly concedes that Dr. Nieh's and Dr. Klemmer's opinions are reasonable, admitting that he "does not dispute the accuracy of Dr. Klemmer's pseudo-code" and that he "accept[s] Dr. Nieh's explanation of the algorithm shown in [Nomura]."[33] Nevertheless, the Examiner rejects Dr. Nieh's and Dr. Klemmer's constructions based on his personal assessment of "the evidence as a whole."[34] The Examiner does so despite offering **_no evidence of his own_** reflecting the alleged understanding of one skilled in the art,[35] and despite Dr. Klemmer's opinion that the Examiner's construction would be unreasonable to one of ordinary skill in the art.[36]

The Examiner's rationale for discounting Dr. Nieh's and Dr. Klemmer's opinions is plainly wrong. While the Examiner contends that "the assertions of Dr. Nieh and Dr. Klemmer [were] made without reference to the specification," both professors expressly stated that they read and

---

[30] 415 F.3d at 1316 (quoting *In re Am. Acad. Of Sci. Tech. Ctr.,* 367 F.3d 1359, 1364 (Fed. Cir. 2004) (emphasis added).
[31] MPEP § 2111.01.
[32] *See, e.g., In re Cortright,* 165 F.3d 1353, 1358-59 (Fed. Cir. 1999) (reversing rejection where Board's construction of "restore hair growth" did not reflect interpretation of one of ordinary skill in the art).
[33] *Id.* Answer at 7, 8.
[34] *Id.* at 7.
[35] *Cf.* MPEP § 2144.02 ("[W]hen an examiner relies on a scientific theory, evidentiary support for the existence and meaning of that theory must be provided.").
[36] Klemmer Decl. ¶¶ 11, 14.

sf-3432677

Control No.: 90/012,332               11       Docket No.: 106842803600(P4895USREX1)

considered the specification (which includes column 6, lines 38-43, discussed above) in arriving at their conclusions.[37]  As for Dr. Singh, the Examiner offers no justification for ignoring his opinions whatsoever.[38]  Because the **only** record evidence of how one of ordinary skill in the art would construe the "distinguishing" limitation supports Appellant's construction, that construction must be correct.

      ***Third***, the Examiner misreads the use of the word "or" as supporting his construction.  In particular, the Examiner continues to interpret "or" mechanically and in isolation, rather than in the context of the entire limitation (*i.e.*, "***distinguishing between*** a single input point . . . ***and*** two or more input points"[39]).  But a term "cannot be defined by some ordinary meaning isolated from the proper context . . . ."[40]  The Examiner's approach also runs contrary to the principles of claim construction, which require that "[a] claim must be read in accordance with the precepts of English grammar."[41]  The Federal Circuit has expressly cautioned against attempting to construe a claim term "in the abstract, out of its particular context."[42]

      As in the Advisory Action, the Examiner again contends that two Federal Circuit decisions—*Brown v. 3M* and *Schumer v. Laboratory Computer Systems, Inc.*—support his construction that "two *or* more" presents alternatives (*i.e.,* "two" and "more than two").[43]  But the Examiner makes no attempt to respond to Appellant's explanations in its Appeal Brief as to why both *Brown* and *Schumer* are unsupportive.

      As Appellant explained in its Appeal Brief, *Brown* involved a very specific situation— claims to an explicit alternative structure.  The claims at issue in *Brown* were directed to a database

---

[37] Nieh Decl. ¶ 4 ("I have read and understood the technical content of the '915 Patent . . . ."); Klemmer Decl. ¶ 3 (same).

[38] *See* Answer at 7 (acknowledging Dr. Singh's trial testimony, but never referring to it again).

[39] (Emphasis added.)

[40] *TAP Pharms. Prods., Inc. v. OWL Pharms., L.L.C.*, 419 F.3d 1346, 1354 (Fed. Cir. 2005).

[41] *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

[42] *Phillips*, 415 F.3d at 1321.

[43] *Compare id.* at 5 (discussing *Brown v. 3M*, 265 F.3d 1349 (Fed. Cir. 2001) and *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304 (Fed. Cir. 2002)), *with* Advisory Action at 5 (raising virtually identical arguments, both in substance and form).

Control No.: 90/012,332                12     Docket No.: 106842803600(P4895USREX1)

containing "at least one of two-digit, three-digit, or four-digit year-date representations."[44] Although holding that the claims would be satisfied by any one of those date representations, the Federal Circuit did not declare that "or" must always be construed similarly.

Unlike the claims in *Brown*, the "distinguishing" limitation does not involve a series of alternative structures. The phrase "two or more" instead is embedded within a larger phrase, *i.e.*, "distinguishing between a single input point . . . and two or more input points." The '915 patent claims therefore relate to the ***act of distinguishing*** between a single input point and two or more input points as a ***group***—not just between a single input point and two input points, or a single input point and more than two input points.

*Schumer* also is readily distinguishable. In *Schumer,* the claim required that "one of the following elements [be] different . . ." and then listed several alternatives separated by "or."[45] The context of the claim therefore clearly indicated that only one of the listed alternatives needed to be present. This is in contrast to the "distinguishing" limitation of the '915 patent claims, which requires "distinguishing between a single input point . . . and two or more input points."

**<u>Fourth</u>**, the Examiner also does not meaningfully address the impact of claim 8's express recitation of a "machine readable storage medium." As discussed above and also in the Appeal Brief,[46] one of ordinary skill in the art would never implement instructions on a storage medium for performing only a portion of the "distinguishing" limitation (*e.g.*, interpreting one input point as a scroll operation and two input points as a gesture operation, but not accounting for more than two input points). Besides arguing that his construction of "two or more" is the broadest reasonable construction, the Examiner does not try to explain why such an implementation would be logical, practical, or desirable.[47] The Board can reverse the rejection of claims 8-14, all of which recite the "machine readable storage medium," on this basis alone.

---

[44] 265 F.3d at 1352.
[45] 308 F.3d at 1311.
[46] Appeal Br. at 23, 28-29.
[47] *See* Answer at 19 ("Giving the claim the broadest reasonable interpretation consistent with the specification, . . . instructions . . . that cause a data processing system to distinguish between (1) a single input point that is interpreted

Control No.: 90/012,332                     13     Docket No.: 106842803600(P4895USREX1)

*__Fifth__*, although contending that "there is no description in the '915 patent of a particular atomic test for distinguishing between a single input point and two or more input points," the Examiner does not address the specification's discussion of "*__a__* single touch" versus "*__a__* two or more finger touch" at all.

As discussed above and also in the Appeal Brief (at 17), the phrase "*__a__* two or more finger touch" confirms that "two or more" means "more than one finger"—and not two different categories of input to be evaluated separately (*i.e.*, "two" and "more than two").

*__Sixth__*, the Examiner misunderstands the import of the original prosecution history.  In the Notice of Allowance, the original examiner paraphrased the claim language "two or more input points" as "*__a__* two or more input points."  This paraphrasing reveals how that examiner understood this phrase within the "distinguishing" limitation, *i.e.*, as an atomic *__group__*.  The original examiner did not understand "two or more" to refer to alternatives, as the current Examiner now proposes.  Accordingly, and contrary to the Examiner's position, the "distinguishing" limitation "*__was__* added to the claims to define a 'one/more than one' or 'atomic test.'"[48]

*__Seventh__*, the Examiner does not respond to Appellant's authority that a patent owner's statements during reexamination also can limit the scope of unamended claims.[49]  Although arguing that "[c]onstruing the claims broadly is not unfair to the patentee because the patentee is given the opportunity to amend the claims," the Examiner does not address the impact of Appellant's statements on claim scope at all.  Because disclaimer and estoppel principles apply equally during original prosecution and reexamination,[50] Appellant's repeated statements regarding the appropriate construction of the "distinguishing" limitation should be persuasive.

---

as a scroll operation and (2) two input points that are interpreted as a gesture operation [would meet the language of the claim].  The claim does not recite an input that necessarily consists of more than two (*e.g.,* three) input points.").
[48] Answer at 11 (emphasis added).
[49] *See* Appeal Br. at 18-19.
[50] *See Ex parte Jacobus*, No. 2009-997, 2009 WL 2137370, at *4-5 (B.P.A.I. Jul. 16, 2009) (in view of appellant's "strenuous[]" reexamination arguments regarding claim scope, reversing examiner's rejection of claims as based on erroneous construction).

sf-3432677

Control No.: 90/012,332                14      Docket No.: 106842803600(P4895USREX1)

### 3.     Nomura does not disclose the "distinguishing" limitation.

Nomura discloses an algorithm for distinguishing between two input points and not-two input points.  The Examiner concedes that "based on Figure 34 [of Nomura], the processing of *three* or more input points in Nomura apparently would be the same as the processing of a single input point."[51]  Because the "distinguishing" limitation requires that the algorithm distinguish between one input point, on the one hand, and more than one input points, on the other hand, Nomura does not disclose this limitation.  The Examiner does not dispute that Nomura does not teach the "distinguishing" limitation, applying Appellant's construction.

The references that the Examiner proposes to combine with Nomura—Rubine[52] (ground 4), Lira[53] (ground 5), and Makus[54] (ground 6)—do not cure this deficiency, and the Examiner does not contend otherwise.  Accordingly, the rejections of claims 1-21 in light of Nomura, whether alone or in combination with other references, should be reversed.

### 4.     Hillis does not disclose the "distinguishing" limitation.

Hillis discloses a system for projecting images on a large, touch-sensitive table and controlling the presentation of the images through "user performed touch."[55] Figure 1B depicts users around the table, and Figure 1C depicts a side view of the tabletop projection display:

---

[51] Answer at 13 (citation omitted).
[52] Dean Harris Rubine, The Automatic Recognition of Gestures, CMU-CS-91-202 (Dec. 1991) (unpublished Ph.D. dissertation, Carnegie Mellon University).
[53] Int'l Pub. No. WO 03/081458.
[54] U.S. Pat. No. 6,757,673.
[55] *See* Hillis at 1:29-31, 2:60-3:3.

Control No.: 90/012,332                    15    Docket No.: 106842803600(P4895USREX1)



FIG. 1B                                  FIG. 1C

The system interprets user gestures by "determin[ing] whether activity of the current [user] contact [with the table] matches a predetermined pattern."[56]  The pattern may use any of a variety of factors, including position, movement, velocity, or force, to choose the operation from a dictionary of gestures.[57]  In response to these gestures, the system may take certain actions, such as "panning, zooming, rotating, and the like."[58]

Even applying the Examiner's construction, Hillis still would not disclose "distinguishing" between one input and two or more inputs.  Hillis discloses only a general gesture identification scheme based on position, movement, velocity, and force of input points—not a specific test for one input versus more than one input.[59]  Matching these various factors against a "gesture dictionary" to determine which action to take does not constitute "distinguishing" one input from more than one input, and Hillis does not explain how these gestures would be distinguished (whether based on number of input points or otherwise).  The Examiner also argues that Hillis discloses distinguishing a third input point because it "ignores" a third contact location until another is released.[60]  But this is a precursor step that takes effect before gestures are identified through

---

[56] *Id.* at 7:46-47.
[57] *Id.* at 7:51-54; *see also* Nieh Decl. ¶ 25.
[58] Hillis at 8:4-8.
[59] *Id.* at 7:51-54; Nieh Decl. ¶ 25.
[60] Answer at 23 (quoting Hillis at 7:9-14).

Control No.: 90/012,332                 16      Docket No.: 106842803600(P4895USREX1)

matching in the gesture dictionary.[61]  As a result, it does not remedy Hillis's failure to disclose any specific "distinguishing" algorithm.  Hillis therefore cannot anticipate any claim of the '915 patent (ground 1).

The references that the Examiner proposes to combine with Hillis—Lira (ground 2) and Makus (ground 3)—do not cure this deficiency, and the Examiner does not contend otherwise.  Accordingly, the rejections of claims 1-21 in light of Hillis, whether alone or in combination with other references, should be reversed.

### B.      The References Do Not Teach the "Event Object" Limitation (All Claims).

#### 1.      The broadest reasonable construction of the "event object" limitation requires object-oriented programming.

Each independent claim of the '915 patent requires "creating an *event object* in response to user input."  As the use of the word "object" implies, the broadest reasonable construction of "event object" requires the use of object-oriented programming.

This interpretation is consistent with the plain meaning of the term and the understanding of one of ordinary skill in the art.  According to the Microsoft Press Computer Dictionary, "object" means:

> 1.  Short for object code (machine-readable code).  2.  *In object-oriented programming, a variable comprising both routines and data that is treated as a discrete entity.* . . . [62]

As Dr. Nieh also has explained, the phrase "event object" does not encompass assembly code, procedural programming, message-passing mechanisms, or mere machine-readable output.[63]

---

[61] *See* Hillis at 7:9-14, 7:46-55.

[62] Microsoft Press Computer Dictionary (5th ed. 2002) at 372.  The first definition, which refers to machine code or compiled or assembled source code, obviously does not apply.

[63] *See* Nieh Decl. ¶¶ 19, 26 (distinguishing "event object" from assembly code, procedural programming, message-passing mechanisms, and mere machine-readable output).

Control No.: 90/012,332                    17     Docket No.: 106842803600(P4895USREX1)

This interpretation of "event object" also is consistent with the '915 patent claim language and specification.  The claims refer to a "scroll call" or "gesture call" (*i.e.*, routine) and a "view associated with the event object" (*i.e.*, data).  The specification also suggests that the event object involves both routines and data:

> In certain embodiments, a user input in the form of two or more points is received by a display of a device.  A multi-touch driver of the device receives the user input and packages the event into an ***event object***.  A window server receives the event object and determines whether the event object is a gesture event object.  If the window server determines that a gesture event object has been received, then user interface software issues or transfers the ***handle gesture call*** at block 1302 to a software application associated with the view.  The software application confirms that a gesture event has been received and passes the ***handle gesture call*** to a library of the user interface software.[64]

**2.     The Examiner's construction of "event object" is unreasonable.**

The Examiner contends that "a reasonable interpretation . . . [of] the claimed 'event object' is an entity or 'package' of data representing the user input event."[65]  The Examiner's construction is unreasonably broad for several reasons.

First, it does not recognize the plain meaning of the word "object" to one of ordinary skill in the art, as discussed above.  The Examiner's construction essentially would allow any ***user input data*** to qualify as an "event object."  Second, it ignores the claims' references to scroll and gesture "calls" and "views associated with the event object."  Finally, the Examiner bases his construction on a single excerpt from the specification referring to "receiv[ing] the user input and packag[ing] the event into an event object."[66]  By doing so, the Examiner ignores the specification's subsequent references to "gesture calls."  For all of these reasons, the Examiner's construction cannot reflect the broadest reasonable construction.

---

[64] '915 patent at 12:30-38 (emphasis added).
[65] Answer at 24.
[66] *Id.* (citing '915 patent at 12:30-32).

### 3.    The combination of Nomura and Rubine does not disclose the claimed "event object."

The combination of Nomura and Rubine forms the basis for grounds 4, 5, and 6.  The
Examiner implicitly concedes that Nomura does not disclose "event objects," as he relies on Rubine
for this disclosure instead.[67]

But the combination of Nomura and Rubine (ground 4) also cannot disclose the claimed
"event object."  Per the plain language of the independent claims, an event object is "created in
response to [the received] user input."  Next, it is "determin[ed] whether the ***event object invokes*** a
scroll or ***gesture operation*** by distinguishing between a single input point applied to the touch
sensitive display that is interpreted as a scroll operation and ***two or more input points applied to the
touch sensitive display that are interpreted as a gesture operation***."[68]  "[A]t least one scroll or
gesture call [is issued] based on invoking the scroll or gesture operation."

Rubine refers to three distinct applications—MDP, GDP, and GSCORE.[69]  The MDP
application involves multi-path gestures, but is programmed in C (a procedural language) and
therefore does not involve event objects.[70]  GDP and GSCORE, by contrast, involve only single-
path gestures using a mouse.[71]  GDP and GSCORE are built in Objective C (an object-oriented
language) using the GRANDMA system.[72]

Combining Nomura and Rubine therefore would not result in the claimed "event objects."
The combined system would lack an "event object [that] invokes a gesture operation" based on
interpreting "two or more input points applied to the touch sensitive display . . . as a gesture
operation."  This is because the allegedly corresponding functionality in Rubine, MDP, is not

---

[67] *See id.* at 13-14 (emphasizing reliance on alleged obviousness in light of Nomura and Rubine, rather than alleged
anticipation by Nomura alone); *see also* Nieh Decl. ¶ 19 (explaining that Nomura does not disclose event objects).
[68] (Emphasis added.)
[69] *See* Rubine at 163; Nieh Decl. ¶ 20.
[70] *See* Rubine at 163; Nieh Decl. ¶ 20.
[71] *See* Rubine at 22; Nieh Decl. ¶ 20.
[72] *See* Rubine at 163; Nieh Decl. ¶ 20.

Control No.: 90/012,332                    19     Docket No.: 106842803600(P4895USREX1)

object-oriented.  The combined system therefore would use an event object only for scrolling, but not gesturing.

The references that the Examiner proposes to further combine with Nomura and Rubine—Lira (ground 5) and Makus (ground 6)—do not cure this deficiency, and the Examiner does not contend otherwise.  Accordingly, the rejections of claims 1-21 in light of Nomura and Rubine, whether alone or in combination with other references, should be reversed.

### 4.    One would not have been motivated to combine Nomura and Rubine.

The Examiner maintains that one would have been motivated to combine Nomura and Rubine in order to "manage Nomura's 'detection data' in a way that [was] both structured and flexible."[73]  As Appellant explained in its Appeal Brief (at 21-22), however, the Examiner points to nothing in Nomura identifying any data management concerns that would have prompted this combination.

Moreover, because Nomura is a closed, specialized hardware system, its user would have been most focused on efficiency and performance.[74]  Users of Rubine's general purpose system, by contrast, would have been focused on flexibility at the expense of performance.[75]  These different purposes would have taught away from the proposed combination by rendering Nomura unsatisfactory for its intended purpose[76] and changing its principle of operation.[77]  Although the

---

[73] Answer at 16.

[74] *See* Nieh Decl. ¶ 21.

[75] *See id.*

[76] *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984); MPEP § 2143(01)(V); *accord In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.").

[77] *See In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959) (reversing rejection where the "suggested combination of references would . . . change . . . the basic principles under which the [primary reference] construction was designed to operate"); MPEP § 2143(01)(VI).

sf-3432677

Control No.: 90/012,332                20        Docket No.: 106842803600(P4895USREX1)

Federal Circuit has held that such trade-offs can render a patent non-obvious for lack of motivation to combine,[78] the Examiner does not address this performance trade-off at all.

Finally, secondary considerations demonstrate the non-obviousness of the '915 patent claims.  As Appellant explained in its Appeal Brief (at 22-23), the Patent Owner presented substantial evidence of the iPhone's commercial success and Samsung's efforts to copy it during the *Apple v. Samsung* litigation.  The jury's verdict and large damages award in the Patent Owner's favor were based on this evidence, at least in part.

Although the Examiner suggests that Appellant has offered no evidence linking the iPhone's commercial success to the '915 patent, Dr. Nieh's declaration does exactly that.  As he explained:

> It is my understanding that the iPhone practices the claimed subject matter of the '915 patent. Moreover, I believe that the patented feature contributed to the widely acclaimed usability and intuitiveness of the iPhone's touch-driven interface.[79]

### 5.    Hillis also does not disclose the claimed "event object."

Hillis forms the basis for grounds 1, 2, and 3.  Like the combination of Nomura and Rubine, Hillis also does not disclose the claimed "event objects."

The Examiner implicitly concedes that Hillis alone (ground 1) does not disclose an "event object," if construed to require object-oriented programming.[80]  The Examiner instead repeats his argument that "machine readable output" and "position history" "representing the position, size, shape[,] and timing of each input point" constitute an "entity" or "'package' of data representing [a] user input event."[81]  As Appellant explained in its Appeal Brief (at 26), however, Hillis does not provide "machine readable output" "representing the user's input event" as a single "package."  In

---

[78] *See, e.g.*, *Winner Int'l. Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000) ("Trade-offs often concern what is feasible, not what is, on balance, desirable.  Motivation to combine requires the latter.").
[79] Nieh Decl. ¶ 13.
[80] *See id.* ¶¶ 26-27 (explaining that Hillis does not disclose event objects or views associated with an event object).
[81] *Compare* Answer at 24 *with* Final Office Action, dated Mar. 19, 2013, at 15.

sf-3432677

Control No.: 90/012,332                21      Docket No.: 106842803600(P4895USREX1)

particular, the "detected force" information is provided as machine-readable output separately from the "position history" information.[82]

The references that the Examiner proposes to further combine with Hillis—Lira (ground 2) and Makus (ground 3)—do not cure this deficiency, and the Examiner does not contend otherwise. Accordingly, the rejections of claims 1-21 in light of Hillis, whether alone or in combination with other references, should be reversed.

## III.  HILLIS, WHETHER ALONE OR IN COMBINATION, DOES NOT DISCLOSE A "TOUCH-SENSITIVE DISPLAY" LIMITATION (CLAIMS 1, 8, & 15)

Independent claims 1, 8, and 15 each refer to "receiving . . . a user input" applied to or on a "touch-sensitive display."  Figures 4 and 5A-5C of the '915 patent depict a touch-sensitive display:



The Examiner contends that Hillis discloses this limitation, but this is incorrect.  Hillis discloses a projector (128) that projects an image onto a table (122) with a display surface (124):

---

[82] Hillis at 7:15-25, 41-45 (explaining that "position history" information is provided at step 202, but "detected force" information is provided at step 206 of Fig. 2A).

Control No.: 90/012,332                    22     Docket No.: 106842803600(P4895USREX1)



Although Hillis's Abstract refers to a "touch-sensitive display," the table surface 124 in Hillis does not correspond to the claimed display. The projector in Hillis, and not the display, displays the image but is not responsive to touch.[83]  While the Examiner notes that Hillis refers to other display technologies, "such as LCDs, OLEDs, and plasma displays,"[84] nothing in Hillis indicates that any of these other display technologies are touch-sensitive.

## IV.    HILLIS, WHETHER ALONE OR IN COMBINATION, DOES NOT DISCLOSE THE "INTEGRATED" DISPLAY LIMITATION (ALL CLAIMS)

Independent claims 1, 8, and 15 each refer to a touch-sensitive display that is "integrated" with the device, data processing system, or apparatus.  The broadest reasonable interpretation of "integrated" in the context of the '915 patent claims and specification refers to being combined into a single physical unit.  This is consistent both with the plain meaning of "integrated" and the understanding of one of ordinary skill in the art.  For example, the American Heritage Dictionary defines "integrate" as:

---

[83] *See* Nieh Decl. ¶ 28.
[84] Answer Br. at 26 (citing Hillis at 4:3-6).

Control No.: 90/012,332                23     Docket No.: 106842803600(P4895USREX1)

> 1. *To make into a whole* by bringing all parts together; *unify*.
> 2.a. To join with something else; unite.  b. To make part of a larger
> unit. . . .[85]

This interpretation also is consistent with the specification.  Figure 29 depicts device 2950,

and Figures 30A and 30B depict device 3070:



FIG. 29              FIG. 30A              FIG. 30B

The specification then explains that "[t]he device 2950 may be a cellular telephone or a

device which is an *integrated PDA and a cellular telephone* or a device which is an *integrated*

*media player and a cellular telephone* or a device which is both an entertainment system (*e.g.* for

playing games) and a cellular telephone . . . ."[86]  The specification also explains that "[t]he device

3070 may be a *cellular telephone integrated with a media player* which plays MP3 files, such as

MP3 music files."[87]  Finally, the specification continues that, "[i]n some embodiments, the display

device and input device are integrated while in other embodiments the display device and input

device are separate devices."[88]

The Examiner suggests that Hillis discloses an "integrated" system.  According to the

Examiner:

---

[85] Am. Heritage Dictionary (3d ed. 1992) at 937.
[86] '915 patent at 19:7-13 (emphasis added).
[87] *Id.* at 19:66-20:2 (emphasis added).
[88] *Id.* at 6:14-16.

> The display surface 124, the computer 126 and the projector 128 are
> "combined" into the interactive display 120 and operate together as a
> "unit" or as a "whole" (*see* Hillis at FIG. 1A and column 2, lines 63-
> 66).[89]

Figure 1A of Hillis (depicted above), however, plainly demonstrates that Hillis's components are
***not*** combined into a single physical unit.  The projector 128 is separate from the computer 126,
which is separate from the table 122 and display surface 124.  These "various hardware
components" communicate over "interconnections"[90] and need not touch (or even exist) in the same
room.  Despite the Examiner's reference to the specification, the cited excerpt (column 2, lines 63-
66) never mentions the words "combined," "unit," or "whole" to describe Hillis's system.  Hillis
therefore does not disclose the "integrated" display limitation required by all claims.

## V.     THE REFERENCES DO NOT TEACH THE "DRAG INPUT" LIMITATION (CLAIMS 5, 12, & 19)

Claims 5, 12, and 19 require that "determining whether the event object invokes a scroll or
gesture operation is based on receiving a drag input for a certain period of time."  The Examiner
alleges that Figures 34 and 37 of Nomura and the disclosures of Hillis at column 7 disclose this
limitation.

***Nomura.***  The Examiner's belief that Nomura teaches the "drag input" limitation continues
to be based on his contradictory interpretations of Nomura.  As Dr. Nieh has explained, Figure 34 of
Nomura discloses a flow chart.[91]  At step S110, the system determines whether "there [is] contact
with two items."[92]  Based on that determination (and ***only*** that determination), the system proceeds
down one of two branches:  the "N" branch (S140, S150, S160, S170, and S180), or the "Y" branch

---

[89] Answer at 26.
[90] Hillis at 2:60-63.
[91] Nieh Decl. ¶ 16.
[92] *Id.*

Control No.: 90/012,332                      25     Docket No.: 106842803600(P4895USREX1)

(S120 and S130).[93]  The first path may result in a scroll operation, and the second path may result in a gesture operation in Figure 37.[94]

At page 7 of his Answer, the Examiner expressly "accept[s] Dr. Nieh's explanation of [this] algorithm."  At page 20 of his Answer, however, the Examiner points to steps S140 ("Is the contact point moving?"), S320 ("Did the distance between the two points become larger?"), and S340 ("Did the distance between the two points get reduced?") as allegedly satisfying the "drag input" limitation.  The Examiner's contention cannot be correct, as the decision as to whether to proceed down the scroll (N) branch or gesture (Y) branch already occurred at step S110.  It is undisputed that S140, S320, and S340 all occur downstream of the determination at step S110.  Moreover, even assuming otherwise, steps S140, S320, and S340 only refer to movements or distances—but not movements or distances over *"a certain time period."*  For this reason as well, Nomura cannot disclose the "drag input" limitation.

Almost as an aside, the Examiner continues to emphasize that Nomura also "contemplates testing for 'contact for fingers within a specified amount of time'" at paragraph 193.[95]  The Examiner's selective excerpt from this paragraph is both irrelevant and misleading.   Paragraph 193 relates to a "search processing" embodiment in which the user can search for information concerning, *e.g.*, "South India" and "Lodging" by depressing both categories at the same time.[96]  The entirety of paragraph 193 makes this clear:

> Furthermore, this is not limited to the simultaneous contact of fingers, but *output of search information* that is a logical product for contact by fingers within a specified amount of time would also be acceptable.[97]

**_Hillis_.**  Also incorrect is the Examiner's belief that Hillis teaches the "drag input" limitation.[98]  The Examiner cites Hillis's references to "move[ment] [of] the contact region . . . over

---

[93] *Id.*
[94] *Id.*
[95] Answer at 21.
[96] Nomura ¶¶ 192-196; *see also* ¶¶ 76-79 (describing search processing functionality).
[97] *Id.* ¶ 193 (emphasis added).
[98] *See* Answer at 28.

sf-3432677

Control No.: 90/012,332                26     Docket No.: 106842803600(P4895USREX1)

time," "the timing of each contact region," "velocity," and "force" as allegedly disclosing this limitation.[99]   None of these teachings, however, discloses receipt of a drag input for a "certain period of time."   As the Examiner implicitly concedes, "velocity . . . represents the change in the position of [a] contact over a period of time"[100]—but not necessarily a "*certain*" period of time. The rejections of claims 5, 12, and 19 therefore should be reversed.

## VI.    THE REFERENCES DO NOT TEACH THE "RUBBERBANDING" LIMITATION (CLAIMS 2, 9, & 16)

Dependent claims 2, 9, and 16 of the '915 patent recite "rubberbanding a scrolling region displayed within the window by a predetermined maximum displacement when the scrolling region exceeds a window edge based on the scroll."   As the Examiner agrees, the specification describes rubberbanding as setting a "predetermined maximum displacement when the scrolled region exceeds a display edge," which prevents a user from scrolling the content further.[101]   "If a user scrolls content of the display making a region past the edge of the content visible in the display, then the displacement value limits the maximum amount for the region outside the content."[102] Rubberbanding therefore is directed to and solves the specific problem of a user's scrolling to a region outside the content.

Repeating his arguments from the final Office Action, the Examiner continues to argue that Lira discloses the "rubberbanding" limitation.[103]   Lira describes a method of reformatting content into columns for improved viewing on a small-sized display.[104]   As a user navigates the columns, the method assesses whether the user has exceeded a specified threshold.   If the user scrolls past that

---

[99] *Id.* (quoting Hillis at 7:15-25, 46-65).
[100] *Id.*
[101] '915 patent at 5:36-39; *see* Answer at 29 ("The specification of the '915 patent describes 'rubberbanding' in terms of 'rubberbanding a scrolled region by a predetermined maximum displacement when the scrolled region exceeds a display edge' (*see* the '915 patent at column 5, lines 35-40).").
[102] *Id.* at 7:62-65.
[103] *Compare* Answer at 29-33 ("Therefore, in the case where the width of the logical column . . . ") *with* Final Office Action, dated July 26, 2013, at 18-21 ("Therefore, in the case where the width of the column . . . ").
[104] *See* Lira at Abstract.

Control No.: 90/012,332                    27     Docket No.: 106842803600(P4895USREX1)

threshold, "the display is snapped to the adjacent or repositioned column."[105]  Otherwise, the display "centers [on] the logical column."[106]  As Figure 14B from Lira illustrates:



FIG. 14B

The Examiner agrees that this is how the system of Lira operates.  As the Examiner concedes:

> ***When the user's scrolling [in Lira] does not exceed the threshold, the column is re-centered and snapped back "into alignment with the display window 1205."***  When the user's scrolling exceeds the threshold and "[moves] beyond the boundary" of the column, the display window 1205 is snapped to the nearest column.[107]

Lira cannot disclose the "rubberbanding" limitation.  The Examiner's error continues to arise from his conflation of "rubberbanding" with "snapping"—regardless of direction, and regardless of whether a maximum threshold is reached.  The Examiner's implicit construction of "rubberbanding"

---

[105] Answer at 30 (quoting Lira at 15, lines 18-31).
[106] *Id.* (quoting Lira at 15, lines 24-25).
[107] *Id.* ¶ 193 (emphasis added).

Control No.: 90/012,332                    28     Docket No.: 106842803600(P4895USREX1)

as permitting an accelerated movement to *another region*, rather than constraining movement beyond the *current region*, reverses the term's actual meaning in the context of the '915 patent.

When the "rubberbanding" limitation is properly understood, Lira does not teach this limitation. Unlike in the '915 patent, when the user in Lira exceeds the scrolling threshold, the system of Lira does *not* prevent further scrolling by setting a maximum displacement value for the scrolled content. Rather than snap back to the same column, Lira teaches that the display window should "snap" to the next region of content, *i.e.*, the adjacent column. This effect is the precise opposite of rubberbanding.

In its Appeal Brief (at 31), Appellant explained why one of ordinary skill in the art would not have been motivated to combine Lira with either Nomura or Hillis. Among other things, Lira's method of scrolling is incompatible with that of either Nomura or Hillis. A downward motion in Lira causes new content from below to be displayed.[108] By contrast, the same motion in Nomura and Lira results in the display of new content from above.[109] The Examiner does not dispute this incompatibility, but only conclusorily alleges that it "would not have prevented a person of ordinary skill in the art from combining the *teachings* of the references."[110]

Appellant also previously explained that there would have been no reason to combine Nomura or Hillis, which discloses displaying images such as maps,[111] with Lira, which involves navigating a document with internal boundaries such as a webpage.[112] Stretching to justify the combination, the Examiner posits that the "rubberbanding" feature could be applied to a "logical boundary within such maps (*e.g.*, at the boundary of a geographical area)."[113] But the Examiner offers no evidence that maps are routinely (or ever) logically divided in such a manner.

---

[108] Lira at Fig. 14B.
[109] Nomura ¶ 0067; Hillis at 8:44-53.
[110] Answer at 31.
[111] *See* Nomura ¶ 0057 (describing use with "map image"); Hillis at 3:31 (referring to "imagery such as a photograph or map").
[112] *See* Lira at 1 (referring to "content correspond[ing] to a hypertext markup language ('HTML') page").
[113] Answer at 32.

Control No.: 90/012,332                29    Docket No.: 106842803600(P4895USREX1)

Finally, secondary considerations again demonstrate the non-obviousness of the '915 patent claims.  In response, the Examiner again suggests that Appellant has offered no evidence linking the iPhone's commercial success to the '915 patent.  As discussed above, however, Dr. Nieh's declaration did exactly that in his declaration.[114]  For at least the preceding reasons, the rejections of claims 2, 9, and 16 involving Lira (grounds 2 and 5) should be reversed.

## VII.    THE REFERENCES DO NOT TEACH THE "ATTACHING SCROLL INDICATORS" LIMITATION (CLAIMS 3, 4, 10, 11, 17, & 18)

Dependent claims 3, 4, 10, 11, 17, and 18 of the '915 patent recite "attaching scroll indicators to" a content or window edge.  As the '915 patent explains, these scroll indicators are attached to the display in response to "user input in the form of a mouse/finger down" and fade out when "a mouse/finger up is then detected."[115]

The Examiner continues to argue that Makus discloses the "attaching scroll indicator" limitation.  Makus relates to the display of hierarchical data in list form on a personal digital assistant ("PDA").[116]  The Examiner does not dispute that the system of Makus employs scroll bars on lists only when there is more data included in a list "than can be displayed in the available space on display screen 28 at one time."[117]  Unlike the '915 patent, Makus's bars do not appear dynamically when a user begins to scroll the content.

The scroll bars in Makus, which are not "attached," therefore cannot satisfy the "attaching scroll indicators" limitation.  The Examiner disagrees, pointing to Figures 4 and 5 of Makus as allegedly disclosing "before" and "after" illustrations.[118]  The Examiner misunderstands these figures.  They do not relate to the attachment of a scroll bar to the same list, but instead the appearance (or not) of a scroll bar on different lists depending on whether more information is

---

[114] *See* Nieh Decl. ¶ 13.
[115] '915 patent at 6:64-7:3.
[116] *See* Makus at 1:13-17, 6:24-41, 8:51-9:1.
[117] *Id.* at 8:64-66.
[118] Answer at 33.

Control No.: 90/012,332       30     Docket No.: 106842803600(P4895USREX1)

available than can be displayed.  Because Makus's scroll bars depend on the predetermined amount
of content to display rather than on a user action, there is no need to "attach" them:



*FIG. 4*          *FIG. 5*

      As in his final Office Action, the Examiner still does not show why one of ordinary skill
would be motivated to combine Makus with the other references.  As Apple explained in its Appeal
Brief (at 34), map display systems like those in Nomura and Hillis do not require scroll indicators
for navigation.  This is because maps lack a fixed starting position and are generally not accessed
sequentially.  While the Examiner notes that maps have "a length and a width,"[119] this does not
explain why user interface elements that show relative position would be important to map users.

      While the Examiner also asserts that the "slider bar 560 is a form of a 'scroll indicator,'" this
is obviously incorrect.[120]  As depicted below, Hillis's slider tool allows users to move between
different layers of content, not to scroll through a single layer:[121]

---

[119] *Id.* at 34.
[120] *Id.*
[121] *See* Makus at 8:32-39.

Control No.: 90/012,332                    31     Docket No.: 106842803600(P4895USREX1)



*FIG. 5B*

Finally, secondary considerations again demonstrate the non-obviousness of the '915 patent claims.  In response, the Examiner again suggests that Appellant has offered no evidence linking the iPhone's commercial success to the '915 patent.  As discussed above, however, Dr. Nieh's declaration did exactly that in his declaration.[122]  For at least the preceding reasons, the rejections of claims 3-4, 10-11, and 17-18 involving Makus (grounds 3 and 6) should be reversed.

$$* \quad * \quad * \quad * \quad *$$

---

[122] *See* Nieh Decl. ¶ 13.

Control No.: 90/012,332                    32     Docket No.: 106842803600(P4895USREX1)

## VIII.   CONCLUSION

The cited references fail to disclose multiple limitations of the claims of the '915 patent. These include the "distinguishing," "event object," "touch-sensitive" and "integrated" display, "drag input," "rubberbanding," and "attach[ed] scroll indicators" limitations.  Because the cited references can neither anticipate nor render obvious any claims of the '915 patent, Appellant respectfully urges the Board to reverse the pending rejections of claims 1-21.

Appellant authorizes the Commissioner to charge the cost of any petitions or other fees due relating to the filing of this document to **Deposit Account No. 03-1952** referencing **Docket No. 106842803600**.

Date:  July 2, 2014                    Respectfully submitted,

                                       By /Brian B. Ho/
                                       Brian B. Ho
                                           Registration No. 60,199
                                       MORRISON & FOERSTER LLP
                                       425 Market Street
                                       San Francisco, California  94105-2482

sf-3432677