# Exhibit 1

| | |
|---|---|
| 1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | Charles K. Verhoeven (Cal. Bar No. 170151) |
| 2 | charlesverhoeven@quinnemanuel.com |
| | 50 California Street, 22nd Floor |
| 3 | San Francisco, California 94111 |
| | Telephone: (415) 875-6600 |
| 4 | Facsimile: (415) 875-6700 |
| 5 | Kathleen M. Sullivan (Cal. Bar No. 242261) |
| | kathleensullivan@quinnemanuel.com |
| 6 | Kevin P.B. Johnson (Cal. Bar No. 177129) |
| | kevinjohnson@quinnemanuel.com |
| 7 | Victoria F. Maroulis (Cal. Bar No. 202603) |
| | victoriamaroulis@quinnemanuel.com |
| 8 | 555 Twin Dolphin Drive 5th Floor |
| | Redwood Shores, California 94065 |
| 9 | Telephone: (650) 801-5000 |
| | Facsimile: (650) 801-5100 |
| 10 | |
| | Susan R. Estrich (Cal. Bar No. 124009) |
| 11 | susanestrich@quinnemanuel.com |
| | Michael T. Zeller (Cal. Bar No. 196417) |
| 12 | michaelzeller@quinnemanuel.com |
| | 865 S. Figueroa St., 10th Floor |
| 13 | Los Angeles, California 90017 |
| | Telephone: (213) 443-3000 |
| 14 | Facsimile: (213) 443-3100 |
| 15 | Attorneys for SAMSUNG ELECTRONICS |
| | CO., LTD., SAMSUNG ELECTRONICS |
| 16 | AMERICA, INC. and SAMSUNG |
| | TELECOMMUNICATIONS AMERICA, LLC |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | | |
|---|---|---|
| APPLE INC., a California corporation, | | CASE NO. 11-cv-01846-LHK |
| | Plaintiff, | |
| | vs. | **DECLARATION OF SAM LUCENTE IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR A PERMANENT INJUNCTION AND DAMAGES ENHANCEMENT, AND APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED), NEW TRIAL, AND AMENDED JUDGMENT** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | | |
| | Defendants. | |

I, Sam Lucente, hereby declare as follows:

1. My name is Sam Lucente. I received my Bachelors of Science in Design (with high distinction) from the College of Design, Architecture, Art and Planning of the University of Cincinnati in 1981. I have worked for over thirty years as an industrial designer in the technology industry. I am currently employed as the Designer and Principal of Lucente Design, LLC. Lucente Design offers consulting and advice to clients on complex design problems. I have previously worked as a designer for IBM Corporation, Netscape Corporation and Hewlett-Packard Corporation. In addition, I have served as a consultant for numerous other companies in the information technology and consumer electronics industries. A copy of my current Curriculum Vitae is attached as Exhibit A, which contains a complete listing of my education and experience.

2. I am the author of several articles in the area of industrial design and I frequently lecture about design at industry conferences and universities. A partial list of my design-related publications and speaking engagements can be found on my Curriculum Vitae attached as Exhibit A.

3. I am a member of the Industrial Designers Society of America (IDSA), and served as the At-Large Director from 2009 to 2011.

4. I am also the named inventor on thirty-five technology-related patents in the United States.

5. I previously submitted several expert reports in this action. The first, dated March 22, 2012, concerned my opinions regarding the invalidity of several Apple design patents. My report of April 16, 2012 included my opinions regarding the non-infringement of Samsung's accused devices.

6. I have been asked by counsel for Samsung to offer my opinions regarding whether various Samsung mobile device designs infringe on several design patents owned by Apple — namely the D618,677 and D604,305 patents.

-1-

Case No. 11-cv-01846-LHK
DECLARATION OF SAM LUCENTE

7. I understand that Apple brought claims against Samsung for infringement of the D'677 patent and that the jury entered a verdict of infringement as to the following Samsung products:

Galaxy S II (AT&T)

Galaxy S II (i9100)

Galaxy S II (T-Mobile)

Galaxy S II (Epic 4G Touch)

Galaxy S II (Skyrocket)

Infuse 4G

Mesmerize

Fascinate

Galaxy S Showcase

Galaxy S 4G

Galaxy S (i9000)

Vibrant

8. I also understand that the jury found that the Samsung Galaxy Ace did not to infringe the D'677 patent.

9. I understand that the Patent Act, 35 U.S.C. § 289, defines infringement as the following:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

10. I understand that whether design patent infringement has occurred is determined using the standard stated by the Supreme Court in *Gorham Co. v. White*, 81 U.S. 511, 528 (1872):

1    [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually
2    gives, two designs are substantially the same, if the resemblance is such as to deceive
3    such an observer, inducing him to purchase one supposing it to be the other, the first
4    one patented is infringed by the other.

5   11.   I also understand that the Federal Circuit has stated that the ordinary observer is
6 deemed to be familiar with the prior art such that the infringement test is whether an ordinary
7 observer, familiar with the prior art, would be deceived into believing the accused design is the
8 same as the patented design.  *Egyptian Goddess, Inc. v. Swisa Inc.*, 543 F.3d 665, 681 (Fed. Cir.
9 2008) (en banc) (whether accused design could "be viewed as so similar to the claimed design that
10 a purchaser familiar with the prior art would be deceived by the similarity between the claimed
11 and accused designs, "inducing him to purchase one supposing it to be the other.'")

**Design Arounds for the D'677 Patent**

14   12.   I have analyzed the D618,677 design patent in preparing this declaration.   I have also
15 reviewed the rebuttal expert report and trial testimony of Apple's expert, Mr. Peter Bressler.
16   13.   The D'677 patent specifies that the design uses the color black and I understand that
17 means the scope of its claim is limited to that color.   From my review of transcripts in this matter,
18 it is clear that Apple and Mr. Bressler have conceded that the D'677 is limited to covering black
19 devices.   During the design patent claim construction hearing, Apple counsel made the following
20 statement:

> It's -- just to give a simpler example, let's say that you -- and we actually have this in these patents.   Let's say that you show the front face -- you have the identical design, but on one case you show the front face in black, in another case you don't have any indication of the color on the front face.   In the first patent where the front face is shown in black, <u>you are narrowing that claim to an electronic device by saying whatever else is true of the front face, it must be black.   That's a limitation of this claim.</u>   In the second patent, it's identical except that the front face is not shown black, there is no claim as to what color the front face is, and a phone -- let's say we're talking about smartphones -- a device that met the claim otherwise, no matter what color it was, would meet that second claim.   <u>It wouldn't meet the first claim unless the front face was black.</u>

1  7/24/12 Hearing Tr. 14:14-15:8 (emphasis added).  At trial, Mr. Bressler corroborated that the
2  D'677 patent was limited to the color black across the entire front face:  "[Y]ou can see from the
3  shading what's being claimed in this design is the front face of an electronic device that is the
4  color black."  Trial Tr. at 1014:2-8.  I also understand that the Court instructed the jury that the
5  surface shading on D'677 represents the color black.  Dkt. 1901 (Inst. No. 43).

6   14.  I have examined physical specimens of each version of the iPhone and each of the
7  Samsung devices listed in paragraphs 8 and 9 above, in the form in which they were presented into
8  evidence at trial.  I also have analyzed PX 7 and PX 8, which are Apple exhibits that purport to
9  depict the Samsung accused devices and the Apple products.  I understand that only the black
10  versions of the accused Samsung devices were admitted as exhibits, which is consistent with
11  Apple's claims, the images in PX 7, and the Court's instructions.

12   15.  For purposes of making this declaration, I have analyzed the white versions of two of
13  the black Samsung phones found to infringe the D'677 patent, the Galaxy S II (T-Mobile) (SGH-
14  T989) and the Galaxy S II Epic 4G Touch (SPH-D710).  In addition, I have reviewed new design-
15  arounds of the Galaxy S II (T-Mobile) (SGH-T989) and the Galaxy S II Epic 4G Touch (SPH-
16  D710) phones with light gray metallic color on the front face, and I will refer to these design
17  around phones collectively as the "Gray Metallic Versions."

18   16.  It is my opinion that neither the pre-existing white versions nor the Gray Metallic
19  Versions can be found to infringe the D'677 patent.  Each of the white versions and the Gray
20  Metallic Versions presents an overall visual impression that would look distinctly different than
21  the D'677 design to the hypothetical ordinary observer.  In other words, the hypothetical ordinary
22  observer who is familiar with the prior art would not be deceived into believing that any of the
23  Gray Metallic Versions is the same design as the D'677 patent, such that it would induce the
24  observer to purchase one, believing it to be the other.

25   17.  Because the D'677 patent claims the color black, it has a claim scope that is limited to
26  that color.  Each of the white versions and the Gray Metallic Versions employs a non-black color
27  to the mask area around the display screen.  By definition, anything other than black is not
28  claimed by the D'677 patent and should not be found to infringe.

18. Moreover, using a non-black color for the mask creates a completely different visual impression on the ordinary observer that differentiates the white versions and Gray Metallic Versions from the D'677 patent. Once a non-black color is used for the mask, the front surface no longer appears as a continuous black surface as described by Mr. Bressler and as shown on the D'677 patent. Rather, the impression on the ordinary observer is that of a black rectangular area (display) within a border of a contrasting color (mask). So, with either non-black color the observer will notice a clear demarcation between the central display element and the surrounding portion of the front face that comprises the white or gray metallic colored mask. The D'677 patent does not give this impression; rather, the overall impression is of a uniform black color extending across the entire front face, including all the design elements on the front face. Unlike the white and Gray Metallic versions, the D'677 patent does not make so clear a visual cue to the observer of where the boundary is for the central display element.

19. The use of a non-black color for the mask area on the Gray Metallic Versions causes the design elements in the mask region to more readily stand out to the ordinary observer. For example, the receiver on the white versions and the Gray Metallic Versions is finished in perforated polished chrome so that it stands out very distinctly from the white or gray mask area. In each of these phones, it is quite noticeable that the receiver element is differently shaped, protrudes slightly above the glass surface, and is much closer to the top edge of the design than is the small, recessed lozenge shaped element located above the display in the D'677 patent. This element in the D'677 patent is also uniform in color with the remainder of the front face, causing it to blend into the overall, homogenous design. The shape of the receivers on the Gray Metallic Version phones are also visually distinct from the D'677 design; the Galaxy S II (T-Mobile) has an almost trapezoidal shape and the Galaxy S II has a longer thinner form and both have numerous circular holes in them. In addition, the camera sensor apertures on the white and Gray Metallic Version phones appear as distinct black holes or circles against the surrounding white or metallic light gray mask areas. These contrasting colors serve to make those elements stand out more prominently to an ordinary observer as compared to the uniform black face of the D'677 patent.

20. That the ordinary observer would notice the difference between black and non-black designs is further supported by the way that consumers purchase costly electronic devices, especially those that are purchased in conjunction with a cellular service contract. In my experience, ordinary consumers of expensive electronic devices, including cellular telephones and other handheld electronic devices, typically do research for a period of time before making a purchase and most sales of cellular phones are assisted by a sales professional who explains available models, features, and service plans. Also, it is common for products to be released in different colors to suit different consumer preferences, and in my experience consumers are adept at distinguishing between various colored models, including between black and non-black models and even models in different shades of the same color. Indeed, the human eye is capable of distinguishing thousands of different hues.

21. For all these reasons, it is my opinion that the pre-existing white versions and the new Gray Metallic Versions of the Galaxy S II (T-Mobile) (SGH-T989) and the Galaxy S II Epic 4G Touch (SPH-D710) create a substantially different overall appearance than the design shown in the D'677 patent. An ordinary observer, giving such attention as a purchaser of electronic devices usually gives, would not find the designs to be substantially the same, and would not be deceived into purchasing the white or Gray Metallic Versions of the Galaxy S II (T-Mobile) (SGH-T989) or the Galaxy S II Epic 4G Touch (SPH-D710) thinking them to be the D'677 design.

**Design Arounds for the D'305 Patent**

22. Apple accused several Samsung products of infringing the D'305 patent, among other design patents related to graphical user interface designs. My rebuttal expert report in this matter contained my analysis of the D'305 patent and my opinion that the accused devices were non-infringing. Ultimately, I did not testify at trial, but I understand that the jury returned a verdict of infringement for each of the following phones, among others: Droid Charge (Model No. SCH-I510), Epic 4G (Model No. SPH-D700), and Infuse 4G (Model No. SGH-I997). I will refer to these three phones as the D'305 Accused Phones.

1    23.    Apple accused only the applications screens on the D'305 Accused Phones.  I have
2 analyzed the user interfaces and applications screens of the D'305 Accused Phones, along with the
3 pictures of the Samsung phones that Apple submitted at trial, and note that Apple accused only
4 applications screens on Accused Phones running a prior software version.  That older version of
5 the applications screen showed icons uniformly placed on colorful squares with rounded corners,
6 sometimes called "containers."  The updated version of the device software, Firmware Version
7 2.3.6, shows applications screens with many of the same icons, but the square containers with
8 rounded corners have been omitted and the icons have many different shapes and a different look.
9 This distinction can be seen in the images below of a Samsung Infuse 4G running the older
10 software version (as pictured in Apple's trial exhibit PX7) and the same model of phone running
11 Firmware Version 2.3.6 with redesigned icons and a substantially different overall appearance:



**LEFT: Accused Version of Samsung Infuse 4G (PX7.45)**
**RIGHT: Design Around Version of Samsung Infuse 4G (Firmware Version 2.3.6)**

25    24.    I understand that Apple only accused D'305 Accused Phones running on Firmware
26 Version 2.3.5 or earlier, which displayed applications screens with icons having square containers.
27 I understand that Firmware Version 2.3.6 updated those applications screens to remove the
28 containers from behind the icons.

25.     I understand that according to Apple's expert, Dr. Susan Kare, having uniform square icons with rounded corners was an integral part of the overall impression of the D'305 design, and why she believed the D'305 Accused Products infringed it.   In describing the D'305 patent at trial, Dr. Kare's first comment about the overall impression of the design was that it was a "regular grid of icons that are square with rounded corners."   Tr. at 1367:12-13.   In describing the D'305 Accused Phones, Dr. Kare based her infringement opinion in part on the application screen having a grid of a "colorful mix of icons that are square with rounded corners."   Tr. at 1375:5-6.

26.     Dr. Kare's emphasis on the rounded square icon shape in the D'305 patent is further corroborated by her testimony and opinions about third party graphical user interface designs that she believed are non-infringing alternatives.   For example, Dr. Kare testified that the user interface design of the Blackberry Torch 9850, pictured below, is a non-infringing alternative to the D'305 patent because it "doesn't look confusingly similar" to the patent.   Tr. at 1404:16-1405:7.   In particular, Dr. Kare testified that "just by having the batch of icons not on a consistent shape, it just – it looks different.   You see more background."   Tr. at 1404:16-1405:7.



**Blackberry Torch 9850 (PX158A)**

1      27.     Dr. Kare also identified a number of other designs in her expert report that she opined
2  were non-infringing alternatives to the D'305 patent.  For example, Dr. Kare stated that the
3  applications screen of the Pantech Pocket phone was one of a number of "visually distinctive,
4  alternative approaches to showing a set of icons on a phone screen." (Dkt. 1021-1 at para. 46).
5  Dr. Kare presented this example, along with others, to argue that user interfaces for phones need
6  not "feature icons shaped like those in the Design Patents and the iPhone Devices." *Id.*  As can be
7  seen in the image below, the Pantech Pocket is very similar to the updated design of the Samsung
8  accused phones, in that it has a dock of four icons set off at the bottom of the screen and a 4 x 4
9  grid of icons at the top of the screen, some of which have rounded square shapes or containers and
10 some of which do not.



**Pantech Pocket (Dkt 1021-1 at Exhibit 9).**

23     28.     Dr. Kare also offered the Meizu M8 user interface design as an alternative to the D'305
24 patent, stating that it had an overall visual impression that was "clearly distinct" from the iPhone
25 and Apple's design patents.  *See* Dkt No. 1021-1 at ¶ 52.



**Meizu M8 (Dkt 1021-1 at fig. 13 & ex. 13.)**

29.   Based on my own analysis of the updated interface of the D'305 Accused Phones, the D'305 patent, the iPhone designs, and the testimony, opinions, and admissions of Dr. Kare, it is my opinion that Firmware Version 2.3.6 and the updated applications screens create a substantially different overall appearance than the design shown in the D'305 patent.  Thus, it is my opinion that an ordinary observer, giving such attention as a purchaser of electronic devices usually gives, would not find the designs to be substantially the same, and would not be deceived into purchasing the D'305 Accused Phones thinking them to be the D'305 design.

30.   Finally, it is my understanding that all of the Samsung devices found to infringe D'305, including the D'305 Accused Phones discussed herein, have been discontinued and are no longer manufactured or sold by Samsung.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October 19, 2012, at San Francisco, California.

Sam Lucente

# Exhibit A

# Samuel Anthony Michael Lucente, II
Curriculum Vitae

ADDRESS
    Lucente Design, LLC
    954 Lincoln Blvd, San Francisco, CA 94129
    415-706-4617
    sam@lucente.com

EDUCATION
    University of Cincinnati, Cincinnati, OH
    College of Design, Architecture, Art and Planning (DAAP)
    **B.S. in Design**                                                             **1981**
    Honors: Magna Cum Laude

    Art Center College of Design
    Design classes, no degree                                              **1980**

    IBM Systems Research Institute
    Computer Science classes, no degree                          **1980's**

AWARDS
    Fast Company's Masters of Design
    University of Cincinnati's Top 100 Alumni
    BusinessWeek's Champions of Innovation
    America's I.D. Forty
    International Design Excellence Awards including GOLD, SILVER, BRONZE
    I.D. Annual Design Review Awards – Best of Category, Design Distinctions
    Appliance Manufacturer Excellence in Design
    Industrie Forum Awards, Germany
    Ministry of International Trade and Industry, Japan
    Compasso d'Oro, Italy
    Smithsonian National Design Museum – permanent collection
    Museum of Modern Art (MoMA), New York – permanent collection
    San Francisco Museum of Modern Art SFMOMA – permanent collection

RELATED EXPERIENCE
    Lucente Design, LLC
    **Designer and Principal**                                                 **2011 – Present**
    Work brings proven world class design approaches to bear on complex
    problems for society, organizations and the design profession at large;
    supports the Industrial Designers Society of America, the Design
    Management Institute and the Corporate Design Foundation to help
    articulate the value of design to business.

    Expert engagement with Quinn Emanuel Urquhart & Sullivan, LLP; Apple
    v Samsung

1

**Samuel Anthony Michael Lucente, II**
Curriculum Vitae

Consulting engagement with Crown Equipment Company; assist Crown Design in the understanding of interaction/user experience business.

Currently sits on the Design Advisory Board at Pepsico's Frito-Lay Division.

Lead designer of the Fitness Court for the National Fitness Campaign, www.nfchq.com.

Hewlett-Packard Company
**Vice President, Design**                                             2003 – 2010
Work entailed building a community of over 300 design professionals that use design as a strategic business tool; built a design practice globally touching every division based on an integrated design approach using state-of-the-art design capabilities to create experiences that inspire customers, embody the brand, drive revenue and generates operational efficiencies; managed the HP Design Council and HP's external design firms to build lasting, competitive advantage for the company.

Sam Lucente, sole proprietor d.b.a. Lucente Design, Inc.
**Designer and Principal**                                             1999 – 2002
Various design consulting work across many areas of research, development and marketing in the information technology and consumer electronics industries.

Formed a separate partnership to develop user interface designs and associated patent numbers 6,583,800 and 7559039.

Netscape Corporation
**Director of User Experience in the Technology Group**                1996-1998
Worked on the user experience of future products and technology playing a critical role in the conceptualization of 'Constellation', an advanced technology and design effort that won Best of Show at Comdex in 1996; previously, as Director of the User Experience Group, staffed and managed a team of 30 designers responsible for the user interface of client and server products including Netscape's browser and email offerings.

IBM Corporation
**Program Manager, Strategic Design**                                  1981-1996
Led the ThinkNEXT advanced design and development team which was responsible for a number of highly successful design, branding and technological innovations; was the lead industrial designer on the ThinkPad 560 and 710, also known as "The Butterfly," and pioneered the "Leapfrog" limited production concept tablet computer; worked as both designer and manager at the corporate headquarters, division and department level leading large teams of designers and human factors

2

**Samuel Anthony Michael Lucente, II**
Curriculum Vitae

engineers; was the key liaison with IBM's external design consultant, Richard Sapper.

SELECTED PUBLICATIONS AND PRESENTATIONS

Frequent speaker and lecturer at conferences and universities; numerous patents assigned to Hewlett-Packard Company, IBM, self and others.

| | |
|---|---|
| Speaker at Design Management/Europe 15, Amsterdam | **2011** |
| Keynote speaker at Seminário Internacional IDEA/Brasil 2011, São Paulo | **2011** |
| Keynote speaker at the Management Business Conference, Kellogg School of Management, Evanston, IL | **2008** |
| Keynote speaker at the WORLDDESIGN Conference, San Francisco, CA | **2007** |
| Speaker at the TED Conference, Monterey, CA | **1996** |
| *The Holy Grail of Design Measurement* Design Management Review Volume 22, Issue 2, pages 6–16, June 2011 | **2011** |
| *Designing a Natural Computer* INNOVATION FALL 1993 | **1993** |

MEMBERSHIPS

Industrial Designers Society of America (At-large-director in 2009)
Design Management Institute

PATENTS

| Number | Date | Description |
|---|---|---|
| 7559039 | 7/7/2009 | Continuation-in-Part from US Patent No. 6,583,800, Method and device for finding, collecting and acting upon units of information |
| D574377 | 8/5/2008 | Kiosk |
| D548278 | 8/7/2007 | Printer |
| D523090 | 6/13/2006 | Adhesive printable skin for a portable electronic device (2) |
| D522064 | 5/30/2006 | Adhesive printable skin for a portable electronic device |
| D518093 | 3/28/2006 | Printer |
| 20060062953 | 3/23/2006 | Adhesive cover systems for articles |
| 7712413 | 2/23/2006 | Printable cover systems for articles |
| D512736 | 12/13/2005 | Projector |
| D509507 | 9/13/2005 | Combination scanner, and camera |
| D508511 | 8/16/2005 | Camera |

**Samuel Anthony Michael Lucente, II**
Curriculum Vitae

| | | |
|---|---|---|
| D507267 | 7/12/2005 | Handheld computer |
| D504129 | 4/19/2005 | Laptop computer |
| 6583800 | 6/24/2003 | Method and device for finding, collecting and acting upon units of information |
| D450005 | 11/6/2001 | Kernel |
| D446209 | 8/7/2001 | Netport |
| D384948 | 10/14/1997 | Personal computer hinge cam |
| D384948 | 10/14/1997 | Personal computer hinge cam |
| D380458 | 7/1/1997 | Portable personal computer |
| D376352 | 12/10/1996 | Personal computer with fractionated keyboard |
| D372465 | 8/6/1996 | Personal computer with extended keyboard |
| D372471 | 8/6/1996 | Keyboard |
| D372471 | 8/6/1996 | Keyboard |
| D372472 | 8/6/1996 | Fractionated keyboard |
| D371766 | 7/16/1996 | Portable personal computer |
| D369789 | 5/14/1996 | Docking station for portable personal computer |
| 5432720 | 7/11/1995 | Rotatable pen-based computer |
| D356549 | 3/21/1995 | Computer housing |
| 5287245 | 2/15/1994 | Computer having ejectable keyboard ejected by damping device |
| D339796 | 9/28/1993 | Combined flat panel display and folding stand with user interface control and stylus therefore |
| 5216579 | 6/1/1993 | Rack based packaging system for computers with cable, cooling and power management module |
| D291806 | 9/8/1987 | Multiple control element unit for data processing apparatus |
| D290363 | 6/16/1987 | Computer display or the like |
| D285445 | 9/2/1986 | Cursor for a graphics tablet |
| 4577187 | 3/18/1986 | Display workstation |