REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# EXHIBIT 1

## (Public Redacted Version)

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**United States District Court**
**Northern District of California**

**Apple Inc.**

**v.**

**Samsung Electronics Co., Ltd., et al.**

**Rebuttal Expert Report of Michael J. Wagner**
**for Third Trial on Damages**

**November 06, 2015**

**Volume I**

**LitiNomics**

**2.    Samsung's profits after deductible expenses are calculated as follows:[4]**

| Product | Samsung's Profits (Summation Method) | Samsung's Profits (Per Unit Method) |
|---|---|---|
| Fascinate | | |
| Galaxy S 4G | | |
| Mesmerize |  | |
| Showcase / Galaxy S Showcase (i500) | | |
| Vibrant | | |
| | | |
| **Total Samsung's Profits After Deductible Expenses** | | |

**D.    Reasonable Royalty:**

**1.    The reasonable royalty that is adequate to compensate Apple for Samsung's alleged infringement of Apple's asserted intellectual property is summarized as follows:[5]**

<u>**Design Around Costs**</u>

<u>Utility Patents</u>

| | |
|---|---|
| '163 | $5,880 |
| '381 | $11,340 |
| '915 | $10,080 |

D'305 Patent

| | |
|---|---|
| Cost to Design and Implement a New GUI | $1,152 |
| *Icons to Re-Design for D'305 Patent* | |
| Fascinate | 49 |
| Galaxy S 4G | 60 |
| Mesmerize | 45 |
| Showcase / Galaxy S Showcase (i500) | 45 |
| Vibrant | 52 |
| Total Icons to Re-Design for D'305 Patent | 251 |
| Design Around Cost for Designing a New Icon | $420 |

| | |
|---|---|
| D'087 Patent | $0 |
| D'677 Patent | $0 |

---

[4]  Schedule 4.2-3T. [1.6]
[5]  Schedule 1-3T. [1.6]

and Apple have not proven that Apple had sufficient capacity in periods after these dates, but I do not have sufficient data from Apple to determine whether or not Apple had sufficient capacity.

    **4.**    **Even if Ms. Davis were to prove entitlement to lost profits, her calculations significantly overstated the amount of lost profits.**

        **a)**    **Ms. Davis did not take price elasticity of demand into consideration in her lost profits calculation.**

157.    Ms. Davis was aware that Apple sells the products that were allegedly lost to Samsung at a wholesale price that is significantly higher than the price that Samsung charges its customers.  Exhibit 41.2-S to Ms. Davis's report showed that the average sales price of the accused Samsung products is $348.01 while the average sales price for the products that Apple allegedly lost is ▮▮▮▮  Apple's prices are ▮▮▮ ▮▮▮▮ than Samsung's prices.  It is not reasonable to assume that Samsung's carrier customers would have been willing to spend an additional ▮▮▮[325] on average more than what they actually paid, especially in light of the large number of alternatives.  Ms. Davis's failure to take price elasticity of demand into consideration made her lost profits calculation unreliable.

158.    The same result holds if end customer prices are examined, instead of wholesale (carrier) prices.  Strategy Analytics defines the iPhone as a leading-edge premium smartphone.[326]  According to Strategy Analytics, Apple is absent from high-volume, low-tier device markets.[327]  As shown in Figure 21 below, in 2011, Apple mostly operated in the $100-$249 and $250+ tier markets.[328]

---

[324] (▮▮▮▮▮ / $348.01) = ▮▮▮▮▮
[325] ▮▮▮ - $348.01) = ▮▮▮▮▮
[326] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]
[327] Apple – Competitive and Strategic Intelligence, Strategy Analytics, July 20, 2011, SAMNDCA00225633-640 at '639. [9.24]
[328] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

**Figure 21:  Smartphone Cost Segment Share[329]**



159.   Kantar Worldpanel ComTech ("ComTech") has conducted several longitudinal consumer surveys to analyze the mobile phone market in terms of handset pricing.[330] According to a February 2011 study, Apple dominated in the high end price segment (selling price of handset over $170) with the iPhone 4 in the Q2 2010 – Q4 2010 time period.[331]  In a Q2 2010 report, ComTech states that Apple owners spend significantly more on their handset purchase than other smartphone owners do.[332]  In particular, "Apple owners deliver a 15% to 150% premium on their initial handset spend… … versus owners of other smartphones."[333]  In a Q3 2010 report, ComTech also concludes that Apple dominates in the over $170 price band segment.[334]  A Q2 2011 study shows that "iOS still carries a premium" price compared to the market average for smartphones.[335]  Similarly, a February 2011 United States mobile phone

---

[329] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

[330] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '967, '969. [10.4]

[331] ComTech United States Pricing Analysis, Apple Market Research & Analysis, February 18, 2011, APLNDC0002521965-2005 at '968, '980. [10.4]

[332] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139, '220. [10.5]

[333] ComTech Market Overview Q2 2010, Apple Market Research & Analysis, APLNDC0002621134-238 at '139. [10.5]

[334] ComTech United States Report Q3 2010, Apple Market Research & Analysis, November 19, 2010, APLNDC0002636414-451 at '421, '442. [10.6]

[335] ComTech Global Report Q2 2011, Apple Market Research & Analysis, August 12, 2011, APLNDC0002640687-727 at '696. [4.13]

market study indicates that "iOS has strong leaning toward the premium market, with 66% of sales over $170 versus 50% for Android."[336]   iPhone 4 is the top selling model in the segment where the average selling price of a handset is over $170.[337]

**Figure 22:  Handset Spend Overview[338]**




160.   "iOS handsets remain[ed] the most expensive of all OS's" in Q4 2011, according to a ComTech report.[339]   Apple smartphone customers reported spending the most ($206) on their smartphones in 2011, in contrast to other smartphone owners, including Samsung customers ($139).[340]   Based on this, consumers that purchased iPhones paid 48% more than consumers that purchased Samsung smartphones.[341]   More than one-third (35 percent) of Apple owners reported paying full price for their handset, compared to just 19 percent of owners

---

[336] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54, at '809.9. [8.11]

[337] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9, '809.41. [8.11]

[338] ComTech United States Report Q410, Apple Market Research & Analysis, February 11, 2011, APLNDC00010809-809.54 at '809.9. [8.11]

[339] ComTech USA Report Q4 2011, Apple Market Research & Analysis, February 10, 2012, APLNDC-Y0000148505-555 at '513. [4.12]

[340] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[341] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9] ($206 / $139 – 1 = 48%)

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

paying full price for the industry.[342]   Apple also noted in a market research study that the "iPhone is perceived as expensive."[343]

161.    Mr. Joswiak testified that as of February, 2012 Apple's iPhone line consisted of the iPhone 3GS, the iPhone 4, and the iPhone 4S.[344]   The iPhone 3GS is available to AT&T customers on a two-year contract at no cost.[345]   Without a contact, the iPhone 3GS is priced at $399.[346]   The iPhone 4 costs $99 on a two-year contract and is available to AT&T, Verizon and Sprint customers.[347]   Without a contract, its price is $549.[348]   The iPhone 4S starts at $199 with a two-year contract, and is also available at $299 and $399, depending on memory capacity.[349]   Without a contract, iPhone 4S's price starts at $649 and increases in hundred dollar increments to $849, depending on memory capacity.[350]   Mr. Joswiak also testified that the price to consumer of various models of the iPhone is very similar to the price of the same phones to carriers.[351]

162.    In contrast, Samsung offered lower priced phones.[352]   In 2011, Samsung mostly operated in <$100 and $100-$249 smartphone cost tier markets, as presented in Figure 21 above.[353]   In a June 8, 2010 System Concepts study commissioned by Samsung, participants of the study commented that one of the benefits of Android is its cost, making it available to a broader market than the iPhone.[354]   Smartphone customers find Samsung more affordable than Apple, according to J.D. Power and Associates.[355]

---

[342] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '360. [13.9]

[343] iPhone and Android Smartphone Buyer Research, APLNDC-Y0000025148-188, at '157. [10.7]

[344] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 243. [9.2]

[345] Deposition of Gregory Joswiak, Volume I, February 23, 2012, pp. 243-244. [9.2]

[346] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 245. [9.2]

[347] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]

[348] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 247. [9.2]

[349] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]

[350] Deposition of Gregory Joswiak, Volume I, February 23, 2012, p. 248. [9.2]

[351] Deposition of Gregory Joswiak, Volume II, February 24, 2012, p. 451. [9.3]

[352] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, November 10, 2008, SAMNDCA00214969-5201 at '5073. [8.5]

[353] 2011 Wireless Smartphone Satisfaction Study, Management Report, J.D. Power and Associates, March, 2011, SAMNDCA10246338-445 at '362. [13.9]

[354] UX Critique by European Professionals, System Concepts, June 8, 2010, SAMNDCA00202869-933 at '919. [10.2]

[355] 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, J.D. Power and Associates, November 15, 2011, SAMNDCA00282033-088 at '080. [13.7]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

163.    Indeed, an analysis of the sales data for the products at issue in the Third Trial reveals that all five of the products have an average wholesale selling price of less than ▇ in 2011, the year in which I expect Ms. Davis to calculate lost profits:

**Figure 23:  Products at Issue in Third Trial with ASP Less than ▇ in 2011**[356]



| Product | 2011 Total | |
|---|---|---|
| | Quantity | ASP |
| Fascinate | | |
| Galaxy S 4G | | |
| Mesmerize | ▇ | |
| Showcase / Galaxy S Showcase (i500) | | |
| Vibrant | | |
| Total Smartphone Products with ASP < ▇ | ▇ | ▇ |
| Total Smartphone Products | ▇ | |
| Smartphone Products with ASP < ▇ as a Percent of Total | *100.0%* | |

164.    iPhone owners have relatively higher disposable income compared to the income of smartphone owners on average.[357]  Forty-seven percent of iPhone 3G owners and 50 percent of iPhone 3GS owners have disposable income of more than $100,000.[358]  In contrast, Crowd Science found that Android smartphone users are less affluent than iPhone users.[359]

---

[356] Schedule 15.1-3T. [1.6]

[357] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[358] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[359] Email from John Brown to Arthur Rangel, March 16, 2010, 40% of Blackberry Users Willing to Trade in Their Devices for Apple iPhones, March 15, 2010, APLNDC0001414064-066 at '065. [15.28]

Figure 24:  iPhone Owners Income Distribution (Three Month Average Ending April 2010)[360]



165.    In August 2007, Apple conducted an iPhone Consideration Study to "view the US mobile market approximately 30 days after the iPhone launch and understand the reasons why potential buyers chose not to consider or purchase the iPhone and why those still considering purchasing one have not done so yet."[361]   According to the study, the price of the iPhone was the top reason for not *considering* the purchase of the iPhone by those who purchased a mobile phone in the past 30 days.[362]   "Price of the iPhone" was also the top reason for not *purchasing* the iPhone.[363]   Apple, therefore, concluded that cost was the primary reason the iPhone was not purchased.[364]   In fact, those considering the purchase of the iPhone expected to pay $258 on average, versus $117 for those who did not consider purchasing the iPhone.[365]   Similarly, in a January 2009 Global Mobile Phone Market Study commissioned by Apple, cost was a key driver for the lack of iPhone consideration.[366]

---

[360] iPhone 4.0 Quick Report & Analysis, Samsung Electronics, June 28, 2010, SAMNDCA00024872-941 at '880. [4.1]

[361] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '859. [10.8]

[362] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '870. [10.8]

[363] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '871. [10.8]

[364] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '872, '889. [10.8]

[365] iPhone Consideration Study, Topline Report, Apple Market Research & Analysis, August 2007, APLNDC0001218857-891 at '877, '889. [10.8]

[366] Global Mobile Phone Market Study - 12 Country Omnibus Study, Apple Market Research & Analysis, January 2009, APLNDC0001256422-504 at '484. [8.9]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

166.    In a May 2011 Apple study about Apple brand perception, Apple's price across all products was listed as a key Apple brand constraint.[367]  The study noted that "Apple is universally considered to be higher priced than similar brands and not always a strong value for the money to many."[368]

        **(1)  Ms. Davis's analysis did not take into account the price segments targeted by the specific products at issue in the Third Trial.**

167.    Ms. Davis reported the iPhone as selling for a wholesale ASP of ████ over the damages period.[369]  The products at issue in the Third Trial sell for a ███████ ASP.

168.    The price differences for the products at issue in the Third Trial are ████ in the months during which I expect Ms. Davis to calculate lost profits – April and May 2011.  I have calculated the total sales and ASPs of the products at issue in the Third Trial from April 15, 2011 – May 29, 2011 as follows:

**Figure 25:  Consolidated STA and SEA Revenue, Quantity, and ASP for Products at Issue in the Third Trial – April to May 2011[370]**



| Product | April 15, 2011 - May 29, 2011 | | |
| --- | --- | --- | --- |
| | Revenue | Quantity | ASP |
| Fascinate | | | |
| Galaxy S 4G | | | |
| Mesmerize | | | |
| Showcase / Galaxy S Showcase (i500) | | | |
| Vibrant | | | |
| **Total Smartphones** | | | |

169.    As shown by the figure, the average wholesale ASP of the five phones in the period April 15, 2011 to May 29, 2011 is ██████████████████.  Ms. Davis did not account for the ████ price differences between the iPhone and the products for which she calculated lost profits damages for the April and May 2011 period.

---

[367] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]
[368] Apple Brand Perception and Measures Research, Apple Market Research & Analysis, May 2011, APLNDC0001386830-899 at '855. [15.31]
[369] Davis Second Trial Report, Exhibit 41.2-S. [2.2]
[370] Schedule 15.3-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

170.    The Samsung phones at issue in the Third Trial compete in a different price segment than the iPhone during the period April to May 2011.[371]  The phone that was launched closest to the April to May 2011 lost profits period is the Galaxy S 4G, launched in February 2011.[372]  STA's March 2011 launch recap discusses the Galaxy S4G and one other smartphone (the Galaxy S Indulge), highlighting competition with other *Android* smartphones and never mentioning the iPhone in its discussion of the success of the phones in the first few months after launch.[373]  Indeed, the document never even mentions the iPhone, and the only mention of Apple is with respect to the iPad.[374]  In the March 2011 STA launch recap, the discussion of the Galaxy S 4G focuses on the Galaxy S Vibrant, T-Mobile MyTouch, and Motorola Atrix 4G as the competitive devices.[375]  Further, the "Strengths" discussed for the phone include fast data speeds, customized user interface, impressive camera, solid performance across the board, crystal clear voice calls, and the vivid color / vibrant / bright screen.[376]

171.    Ms. Davis's analysis did not properly account for the significant price differences between the products at issue in the Third Trial and the iPhone.  Therefore, her analysis significantly overstated the extent of lost sales to Apple.

> **b)  Ms. Davis did not account for differences in attributes of the phones at issue in the Third Trial that would make it unlikely for customers to switch to an iPhone.**

172.    Ms. Davis did not account for key differences in attributes of the phones at issue in the Third Trial that would make it unlikely for customers to switch to an iPhone, such as screen quality, size, and type (e.g., Super AMOLED); processor performance; the Android operating system; and 4G capability, amongst others.  Each of these considerations is an important demand driver for smartphones, particularly relative to the importance of the

---

[371] I note that the while the ▮▮▮▮▮▮▮▮▮▮▮▮ to Apple's prices, this appears to be driven by the ▮▮▮▮▮▮▮▮▮▮▮▮▮  The ASP for the Vibrant for the full year 2011 is ▮▮▮▮ similar to the other Galaxy S phones sold during this period. (Schedule 15.1-3T. [1.6])

[372] Schedule 6.3-NT. [1.6]

[373] Samsung Presentation: STA Post Launch Consumer Insights Summary, March 2011, SAMNDCA00027737-770. [8.8]

[374] Samsung Presentation: STA Post Launch Consumer Insights Summary, March 2011, SAMNDCA00027737-770 at '760. [8.8]

[375] Samsung Presentation: STA Post Launch Consumer Insights Summary, March 2011, SAMNDCA00027737-770 at '740 – '747. [8.8]

[376] Samsung Presentation: STA Post Launch Consumer Insights Summary, March 2011, SAMNDCA00027737-770 at '743. [8.8]

functionalities covered by the patents at issue in the Third Trial.   Several reviews, press releases, and other articles highlight and emphasize specific features of the Samsung products that are differentiators from the iPhone:

- **Vibrant:**  A CNet.com review describes the "Good" aspects of the Vibrant as follows: "The Samsung Vibrant boasts a brilliant Super AMOLED touch screen and comes preloaded with a number of entertainment goodies, including a full-length copy of 'Avatar.' The Android-based smartphone also offers 16GB of internal memory, full wireless options, and great call quality."[377]

- **Fascinate:** A CNet.com review describes the "Good" aspects of the Fascinate as follows: "The Samsung Fascinate offers a gorgeous Super AMOLED touch screen, a 1GHz processor, and a great multimedia experience. The smartphone can be used as a mobile hot spot."[378]

- **Mesmerize:** A CNet.com review describes the "Good" aspects of the Mesmerize as follows: "The Samsung Mesmerize boasts a beautiful Super AMOLED touch screen and a 1GHz Hummingbird processor. The smartphone's 5-megapixel camera takes excellent photos and video."[379]

- **Galaxy S 4G:** A CNet.com review describes the "Good" aspects of the Galaxy S 4G as follows: "The Samsung Galaxy S 4G has 4G connectivity, a front-facing camera for video calls, and a larger battery. Android 2.2 offers impressive data speeds and good call quality. Other highlights include a rich and vibrant Super AMOLED touch screen and a 5-megapixel camera with 720p HD video recording."[380]   In addition, the product name itself emphasizes its 4G capabilities.

173.    All of the products at issue in the Third Trial run the Android OS and include a 4-inch Super AMOLED display.[381]   Ms. Davis did not explain why Samsung customers that purchased one of these phones due to a large (e.g., 4-inch) Super AMOLED display or 4G

---

[377] CNET, "Samsung Vibrant (T-Mobile) Review," July 13, 2010, <http://www.cnet.com/products/samsung-vibrant-t-mobile/>, accessed October 26, 2015. [7.4]

[378] CNET, "Samsung Fascinate Review," September 7, 2010, <http://www.cnet.com/products/samsung-fascinate/>, accessed October 26, 2015. [7.5]

[379] CNET, "Samsung Mesmerize (U.S. Cellular) Review," November 9, 2010, <http://www.cnet.com/products/samsung-mesmerize-us-cellular/>, accessed October 26, 2015. [7.6]

[380] CNET, "Samsung Galaxy S 4G Review," February 24, 2011, <http://www.cnet.com/products/samsung-galaxy-s-4g/>, accessed October 26, 2015. [7.7]

[381] CNET, "Samsung Vibrant (T-Mobile) Review," July 13, 2010, <http://www.cnet.com/products/samsung-vibrant-t-mobile/>, accessed October 26, 2015. [7.4]  *See also* CNET, "Samsung Fascinate Review," September 7, 2010, <http://www.cnet.com/products/samsung-fascinate/>, accessed October 26, 2015. [7.5]  *See also* CNET, "Samsung Mesmerize (U.S. Cellular) Review," November 9, 2010, <http://www.cnet.com/products/samsung-mesmerize-us-cellular/>, accessed October 26, 2015. [7.6]  *See also* CNET, "Samsung Galaxy S 4G Review," February 24, 2011, <http://www.cnet.com/products/samsung-galaxy-s-4g/>, accessed October 26, 2015. [7.7]  *See also* "Samsung Showcase," Samsung Data Sheet, 2010,

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



189.    This Business Insider study is interesting because, among other things, it looks at a population (Android purchasers) that would be similar to the customers of the accused products.  At a minimum, Ms. Davis could have accounted for the fact that 56% of Android purchaser respondents indicated that they would not switch to an iPhone.  For example, she could have excluded 56%, and then applied her carrier adjustment and market share approach to the remaining 44%.  A more reliable approach would have excluded any consumer that indicated that platform was an important consideration, i.e., the 38% that said it is the most important factor and the 50% that said it is a factor in purchasing (i.e., 88% total).  This last question did not distinguish between the platform of the smartphone purchaser, so it would be preferable to do a survey specifically geared towards Android (or accused product) purchasers. But Apple could have easily performed such a study, given that it retained Dr. Hauser to conduct a study ostensibly to examine customer preferences for Samsung phones.

### e)  Ms. Davis's incremental profitability was overstated, resulting in significantly overstated lost profits.

190.    Ms. Davis calculated incremental profitability using Apple's worldwide selling prices.  However, as evidenced by the sales data produced by Apple, Apple sells its iPhones for

a considerably higher price outside the United States.   Therefore, Ms. Davis's calculation resulted in a significantly overstated profit for U.S. sales.   For example, in the calendar quarter for which I expect Ms. Davis to have calculated lost profits (Q2 2011), ███████████ ████████████████████████████████████████████████████████[397]  If U.S. standard costs are used, ███████████████████████████████████████████████ ███████████████████████[398]

191.     In addition to using worldwide profit calculations, Ms. Davis failed to deduct marketing and advertising expenses in her incremental profitability analysis.   The only operating expense that Ms. Davis deducted in her analysis is sales expense, but her lost profits model includes a large number of sales to customers on carriers other than the carriers that sold the iPhone.   If her analysis was correct, it is likely that a significant amount of additional marketing and advertising would have been required to reach such customers.

192.     Therefore, I make a second adjustment to incremental profit by deducting the marketing / advertising expense.   When both U.S. prices are used and marketing / advertising expenses are deducted, █████████████████████████████████████████████ ██  █████  If U.S. standard costs are used, ████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████

f)     **Ms. Davis's analysis assumed that the jury agrees that Apple is entitled to lost profits and that the jury will agree with her proposed design around periods.**

193.     I expect that Ms. Davis's lost profits calculations will include lost profits for the '915 Patent, from the notice date (April 15, 2011) through the full duration of her design around period of six months, which ends on May 29, 2011.[401]   Per the Court's ruling, the design around

---

[397] Schedule 10.1-NT. [1.6]  I've also calculated the adjusted profitability for other periods that Ms. Davis included in her lost profits calculations in this Schedule.
[398] Schedule 10.6-3T. [1.6]
[399] Schedule 10.1-NT. [1.6]  I've also calculated the adjusted profitability for other periods that Ms. Davis included in her lost profits calculations in this Schedule.
[400] Schedule 10.6-3T. [1.6]
[401] My opinions on damages necessarily assume that Apple's patents are valid and infringed.  However, I am aware that the Patent Trial and Appeal Board has recently completed reexamination of the '915 Patent and has rejected the claims as invalid. (USPTO Mailing of Decision on Request for Rehearing, September 24, 2015. [7.9]) It is my understanding that the invalidity of the '915 Patent is inconsistent with an award of lost profits, or other form of damages, for infringement of the '915 Patent.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### (a)  Patents asserted by Apple against HTC[464]

239.    As I discuss below in Section V.A.6.c)(3), Apple's Patent License and Settlement Agreement with HTC listed the litigations that were settled by the Agreement.  I have researched the U.S. litigations and identified the U.S. patents that were asserted by Apple against HTC.  Apple has asserted a total of 32 different patents against HTC, four of which are also at issue in this litigation (of which only three are relevant to the Third Trial) and included in Ms. Davis's income approach analysis.[465]   Therefore, Apple has asserted 29 patents against HTC that Ms. Davis has not included in her income approach analysis relevant to the Third Trial, which is reflective of the broad scope of Apple's patent portfolio beyond the patents at issue in this lawsuit.

240.    Notably, Ms. Davis's analysis assigned 100% of the "excess" profitability of the iPhone to the IP at issue in this litigation and she assigned none of the "excess" profitability to the rest of Apple's patent portfolio.  This is not a realistic assumption, and results in a significant overstatement of the royalty rate for the patents at issue in the Third Trial.

### (6)  Ms. Davis's analysis resulted in an overstated conclusion for the excess profitability of iPhone versus Apple as a whole.

241.    Ms. Davis's use of worldwide profitability for the iPhone and comparing it to worldwide profitability for all Apple products (which include computers) overstated Ms. Davis's concluded values.  First, computers are in a notoriously competitive industry, and therefore profitability of Apple as a whole would be expected to be lower regardless of whether the asserted IP was worthless or valuable.  This suggests that the comparison that Ms. Davis's analysis relied upon was of little utility because it did not control for this difference.

242.    Second, as explained in Section V.A.4.e), the use of worldwide financials ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████.  Although I am not aware of Apple producing data on this, in my experience computer prices are higher in the U.S. versus worldwide, so using the worldwide data would also tend to understate Apple's computer profitability.

---

[464] I understand that the Court conditionally struck my discussion of the HTC agreement, leaving the possibility that Apple may open the door to discussion of the HTC agreement if it makes certain arguments at trial.  I do not intend to offer any opinions relating to the HTC agreement unless the Court determines that Apple has opened the door to such discussions.

[465] Schedule 27-NT. [1.6]

246.     ███████████████████████████████████████

███████████████████████, Ms. Davis used Apple's audited financials.  This is inconsistent with her decision to use a 0.5% percent tax rate for Samsung instead of the effective tax rate reported in its audited financials.

247.     In my opinion, for the purposes of this calculation, Ms. Davis should have used the effective tax rate reported in Apple's and Samsung's audited financials for *both* calculations. It does not make sense to do so for one company and not the other.  If Ms. Davis had used Samsung's effective tax rate, her calculation would have determined that Samsung derives no value (or negative value) from its use of the asserted utility patents.

### (8)   Ms. Davis calculated the maximum royalty rate that Samsung would be willing to pay, but then ignores the rate.

248.     Ms. Davis calculated royalty rate values for Samsung, but then appeared to completely ignore those values in her royalty rate conclusion.  Given that she was collecting lost profits in her scenarios where she has presented a reasonable royalty, it is unclear why the value she calculates for Apple has any significance to the conclusion.  The competitive effect between Samsung and Apple has already been accounted for in her lost profits calculation. Therefore, for the units for which Ms. Davis calculated a reasonable royalty, the value to Apple should not be a significant consideration, and instead the value to Samsung should be the primary driver of her concluded royalty rate.

### c)   Ms. Davis's analysis did not take into account several data points that would result in a much lower reasonable royalty rate.

249.     As Ms. Davis explained, "[t]he market reference point considers whether other comparable transactions exist that may be used to evaluate the proper royalty rate."[471]   In this analysis, Ms. Davis concluded that "my review of the licenses and discussions detailed above did not identify any license that is comparable to the license that Samsung would need to enter into for the asserted Apple Intellectual Property.  I did not identify any other directly comparable licenses."[472] Other than the HTC agreement, which I discuss below, I agree with Ms. Davis that none of the agreements that she discusses are comparable to the hypothetical negotiation.

---

[471] Davis Second Trial Report, p. 79. [2.2]
[472] Davis Second Trial Report, p. 84. [2.2]

270.    This license may provide a useful benchmark with which to evaluate the hypothetical license because it is essentially a license to manufacture and sell smartphones and tablets running the Android operating system.

### (3)   Apple / HTC Patent License and Settlement Agreement[512]

271.    Ms. Davis addressed the Patent License and Settlement Agreement that Apple and HTC entered into in November 2012 ("Apple/HTC Agreement") in a footnote, concluding that the Agreement does not change her opinion and comparing it to the Nokia settlement agreement.[513]  I disagree with Ms. Davis's opinion for several reasons.

272.    First, Nokia is widely considered to have a strong portfolio of patents essential to practice cellular communications standards, ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████[514]

273.    Second, HTC was Samsung's closest Android competitor during the damages period.  Therefore, the licensing dynamic between Apple and HTC is much closer to the licensing dynamic between Apple and Samsung at the time of the hypothetical negotiation, as compared to the dynamic between Apple and Nokia.

274.    Third, Apple had asserted two of the utility patents at issue in the Third Trial (the '381 and '915 Patents) against HTC.[515]  Therefore, the Apple/HTC Agreement explicitly provided a license to these patents,.  Based on this and my discussion below, it is my opinion that Ms. Davis should have revised her concluded royalty rates based on the Apple/HTC Agreement.

275.    I discuss the terms of the Apple/HTC Agreement below.███████████████ ███████████████████████████████████████████████████████████████████

---

[512] I understand that the Court conditionally struck my discussion of the HTC agreement, leaving the possibility that Apple may open the door to discussion of the HTC agreement if it makes certain arguments at trial.  I do not intend to offer any opinions relating to the HTC agreement unless the Court determines that Apple has opened the door to such discussions.

[513] Davis Second Trial Report, p. 82. [2.2]  *See also* Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383. [16.11]

[514] Davis Second Trial Report, pp. 81-82. [2.2]

[515] Schedule 27-NT. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

*(a)  Terms of the Apple/HTC Agreement*

276.    HTC and Apple entered into a ten year Patent License and Settlement Agreement, effective November 2012, which provided a worldwide, nonexclusive, irrevocable, non-sublicensable, and nontransferable license to the other party's patents.[516]  The license grant includes a carve-out for Apple's design patents, which were specifically not included in the Agreement.[517]  The Agreement states that "any and all utility Patents and utility models" are not to be considered Design Patents under the terms of the license.[518]  In addition, nine patents were specifically identified as not being covered by HTC's license grant, although if HTC were to reacquire such patents in the future, such reacquired patent(s) would fall under the Agreement.[519] ██████████████████████████████████████████████████████
███████████████████████████████████████████████[520]

277.    Under the Agreement, Apple received a "fully paid up, royalty-free" license to the HTC patents,[521] ████████████████████████████████████████████
████████████████████████

---

[516] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '242, '245, '249-'252, '257. [16.11]

[517] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '245, '254. [16.11]

[518] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '247. [16.11]

[519] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '245, '381. [16.11]

[520] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '244-'245, '248, '250-251. [16.11]

[521] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '250. [16.11]

[522] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '255. [16.11]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order



278.

279.

---

[523] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3
Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '255. [16.11]
[524] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3
Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '264. [16.11]



280.   Special circumstances arise for HTC mobile products found to meet the definitions of "Cloning," "Cloned Features," and "Cloned Products," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[530]   Under the Agreement, a feature is considered a "Cloned Feature" when:   1) Apple's patents are literally infringed by the human interface that has a distinctive visual appearance of an HTC mobile device; 2) the same patent is literally practiced by a significant feature of the human interface of an Apple mobile device that has a distinctive visual appearance; and 3) the non-functional visual appearance in the HTC device is "substantially similar" to that in an Apple device.[531]   The non-functional visual appearance, along with functional aspects, is referred to in the Agreement as "Distinctive Apple User Experience."[532]   Notably, functionality and related methods (for example, "pinch to zoom") are not considered a Distinctive Apple User Experience.[533]   To be considered a Cloned Feature, such feature must have been created by HTC and not provided to HTC as part of the Android

---

[525] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '264. [16.11]

[526] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '264 – '265. [16.11]

[527] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '263-'265, '274. [16.11]

[528] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '274. [16.11]

[529] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '274. [16.11]

[530] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '244, '254, '265, '273. [16.11]

[531] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[532] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[533] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

Mobile OS or other third party software.[534]   Additionally, Apple must have introduced the Distinctive Apple User Experience prior to HTC or any third party, and could not have granted a license to any third parties for use of the feature without additional payment required.[535]   Finally, there must be an alternative appearance to the Distinctive Apple User Experience reasonably available to HTC that implements and realizes the functional, cost and performance advantages of the feature covered by the Covered Patent that would not be considered Cloned Features.[536] All of these elements must be present for a feature to be determined to be a Cloned Feature, with products containing such features identified as Cloned Products.[537]

281.    If a dispute arises regarding a Cloned Feature / Cloned Product, the issue can be resolved by the parties or escalated to an arbitrator.[538]   The Agreement states that HTC can agree to an additional payment to cover the Cloned Feature, although no dollar amount is provided.[539]   Additionally, if the dispute results in the involvement of an arbitrator who finds in Apple's favor, Apple is specifically granted the right to seek an injunction if HTC either fails to, or refuses to, implement a suitable design alternative.[540]

282.    The agreement also sets forth that all Litigation and Opposition Proceedings that the parties are engaged in will be dismissed[541] and that both parties waive claims to past damages for the Covered Patents.[542]

---

[534] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[535] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[536] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[537] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[538] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '265-'266. [16.11]

[539] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[540] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '266. [16.11]

[541] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '243, '252-'253, '279-'281. [16.11]

[542] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '255. [16.11]

*(b)  Patents asserted by Apple against HTC*

283.    The Apple/HTC Agreement lists all of the litigations between Apple and HTC that were settled by the Agreement.[543]   I have researched all of the U.S. litigations listed in the Apple/HTC Agreement and compiled a summary of all the patents that were found to have been asserted by Apple against HTC in these litigations.   The summary of my research can be found in Schedule 27-NT at Tab 6 of my report.   Apple has asserted a total of 32 U.S. patents against HTC in these actions, four of which have been at issue in this litigation, including the '381 Patent and the '915 Patent.

*(c)* ██████████████████████████████

284.   ████████████████████████████████████████████
████████████████████████████████████   The Agreement provides a license to HTC for the utility patents at issue in the Third Trial.   There are restrictions on exact cloning of features, such that HTC cannot implement a feature in exactly the way that Apple has previously implemented the feature.   However, these cloning restrictions apparently do not cover "pinch to zoom" functionality, do not cover any feature provided to HTC within the Google Android system, and only cover situations where HTC had available alternatives that would provide the same functional, cost, and performance advantage.[544]   Therefore, the cloning restrictions have little effect on the utility patents at issue in the Third Trial.

285.    The three utility patents at issue in the Third Trial are a small portion of Apple's patent portfolio even after netting the value of HTC's patent portfolio against Apple's patent portfolio.   As I discuss above, Apple had asserted 32 unique patents against HTC in various litigations.   The three utility patents are a small subset of the IP specifically asserted against HTC, and an even smaller portion of Apple's entire patent portfolio.

286.    As I discuss in my *Georgia-Pacific* analysis below, I have concluded a significantly lower reasonable royalty due to Apple based on the availability to Samsung of acceptable, noninfringing alternatives.   Nonetheless, this alternative measure of a royalty rate would serve as a cap for the amount that Samsung would be willing to pay, especially considering i) the number of utility patents (three) at issue in the Third Trial relative to the

---

[543] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '252-254, '278-285. [16.11]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

number licensed in the Apple/HTC Agreement, and ii) ███████████████████
████████████████████████████████████████████

287.    I note that Ms. Davis's concluded cumulative royalty rate of $7.14 per unit for the three utility patents at issue in the Third Trial is ███████████████████████
████████████████████████████████████

> **d)   Ms. Davis took into account inappropriate considerations in her *Georgia-Pacific* analysis that resulted in an artificially high royalty rate.**

288.    Ms. Davis referred to Apple's "unwillingness" to negotiate a license at essentially any price as a basis to argue for a high royalty rate.[545]  For example, in her "Market Approach" section, Ms. Davis stated that "Apple's policy is not to license its design intellectual property, including its design patents.  This is confirmed by Apple refusing to offer a license to its design elements as well as its directives regarding Samsung's copying during discussions between Apple and Samsung.  Apple's policy sets a high, but un-quantifiable, rate for the design patents at issue in the new trial."[546]  Ms. Davis appeared to use this argument to establish a very high royalty rate, even on intellectual property that has little impact on the sales of either party, as admitted by Ms. Davis.

289.    For example, Ms. Davis admitted that Apple would not lose any profits based on Samsung's infringement of the D'305 Patent, yet she still concludes that the "reasonable" royalty rate for Samsung's infringement of any design element would be $24 per unit, stating that:[547]

> Due to the extreme importance of Apple's design to its corporate success and future, I have assigned the high end of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements. Therefore, although Apple has refused to license any of its design related assets and would consider the license of one as injurious as licensing the group, the "Made for iPod" program rate of $4.00 per unit is considered a floor royalty for the license of any individual item within this group.

---

[544] Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

[545] Davis Second Trial Report, pp. 79, 90, Exhibits 42, 43. [2.2]

[546] Davis Second Trial Report, p. 79. [2.2]

[547] Davis Second Trial Report, Exhibit 46-S and Exhibit 47-S. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

recently-sold parcel.  To the extent that both properties are identical with respect to a given characteristic (e.g., square footage), no adjustment to the estimated value is necessary. Conversely, to the extent that the properties differ with respect to a given characteristic (e.g., more desirable location), an adjustment to the estimated value may be warranted.

352.    My Baseline Royalties are based on the next best alternative besides practicing the asserted claims of the patents-in-suit to Samsung. A detailed description of the next best non-infringing alternatives is detailed in my discussion of *Georgia-Pacific* factor 9 below. A summary table shows the Baseline Royalty as:[617]

| | **Design Around Costs** |
|---|---|
| Utility Patents | |
| '163 | $5,880 |
| '381 | $11,340 |
| '915 | $10,080 |
| | |
| D'305 Patent | |
| Cost to Design and Implement a New GUI | $1,152 |
| | |
| *Icons to Re-Design for D'305 Patent* | |
| Fascinate | 49 |
| Galaxy S 4G | 60 |
| Mesmerize | 45 |
| Showcase / Galaxy S Showcase (i500) | 45 |
| Vibrant | 52 |
| Total Icons to Re-Design for D'305 Patent | 251 |
| | |
| Design Around Cost for Designing a New Icon | $420 |
| | |
| D'087 Patent | $0 |
| | |
| D'677 Patent | $0 |

---

[616] *Georgia-Pacific Corp. v. U.S. Plywood Corporation*, 318 F. Supp. 1116, (U.S. District Court for the Southern District of New York, May 28, 1970), *1120, p. 4. [12.6]
[617] Schedule 1-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### b) *Georgia-Pacific* Factor Analysis

**(1) Factor #1—the royalties received by the patentee for the licensing of the Patents-in-Suit, proving or tending to prove an established royalty.**

353.    The purpose of Factor #1 is to determine (1) whether there exists an *established* royalty for the Patents-in-Suit and, (2) absent such an *established* royalty, whether any offers to license or actual royalties received from licensing the Patents-in-Suit are probative regarding the determination of a reasonable royalty.

354.    I have reviewed several agreements from Apple in which Apple is a licensor of technology.  I discussed certain license agreements in my Original Report that I found were probative of the reasonable royalty that would be paid for certain of the patents at issue in this case, but those license agreements were not found to be probative of the royalty rate for the patents at issue in the Third Trial.

355.    In my declaration filed on June 7, 2012, I discussed certain license agreements that were produced either slightly ahead of or subsequent to the filing of my Original Report that I found were probative of the reasonable royalty that would be paid for certain of the patents at issue in this case.[618]  However, those license agreements were not found to be probative of the royalty rate for the patents at issue in the Third Trial.

356.    As I discuss in Section V.A.6.c)(3), I conclude that the Apple/HTC Agreement ██████████████████████████████████████████████████████████  However, given the availability to Samsung of acceptable, noninfringing alternatives, I conclude that this license is not probative of a reasonable royalty for the patents at issue in the Third Trial.[619]

---

[618] Declaration of Michael J. Wagner in Support of Samsung's Motion to Strike Expert Testimony Based on Undisclosed Facts and Theories, June 7, 2012.

[619] I understand that the Court conditionally struck my discussion of the HTC agreement, leaving the possibility that Apple may open the door to discussion of the HTC agreement if it makes certain arguments at trial.  I do not intend to offer any opinions relating to the HTC agreement unless the Court determines that Apple has opened the door to such discussions.

### (a)  Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty

357.    Other than the Apple/HTC Agreement, I have not found any of the agreements in which Apple is a licensor of technology to be probative of the reasonable royalty for the patents at issue in the Third Trial.  Therefore, this factor is neutral in my determination of the reasonable royalty amount.

### (2)  Factor #2—the rates paid by the licensee for the use of other patents comparable to the Patents-in-Suit.

358.    I have not found any of the agreements in which Samsung is a licensee of technology to be probative of the reasonable royalty for the patents at issue in the Third Trial. Therefore, this factor is neutral in my determination of the reasonable royalty amount.

### (3)  Factor #3—the nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

359.    The license contemplated in the hypothetical negotiation would be a non-exclusive license for a portfolio of patents only and would not include any transfer of technology or know-how.  Technology transfer agreements frequently transfer along with patent rights items such as know-how, technical drawings, specifications, trademarks, and copyrights.

### (a)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

360.    This factor would be neutral in relation to the royalty amount as suggested by a non-infringing alternative.

### (4)  Factor #4—the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

361.    Ms. Davis contended that "Apple's overall policies and practice regarding the licensing of the New Trial Patents indicate Apple's preference for using its patents exclusively as opposed to licensing its patents (no matter the price of the license)."[620]   While I agree that

---

[620] Davis Second Trial Report, p. 90. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Apple values the profits it has an opportunity to earn by selling its products more than it values the royalty it could earn by licensing to a competitor, Ms. Davis's statement is unrealistic. Apple has licensed its patents, including the three utility patents at issue in the Third Trial, to its competitor HTC, as discussed in Section V.A.6.c)(3).[621]

### (a)  Implications of This Georgia-Pacific Factor Regarding a Reasonable Royalty

362.    This factor would indicate that Apple would not be willing to share any of Samsung's costs to implement the next best alternative, and that the full amount of these costs would be paid.

### (5)  Factor #5—the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter.

363.    When licensing a direct competitor, a licensor may demand a relatively high royalty rate to compensate it for the sales and profits it will potentially lose to the competitor.  In her report, Ms. Davis agreed that "Apple and Samsung are vigorous direct competitors in the smartphone and tablet market."[622]  However, while Apple and Samsung are competitors in the sense that each sells smartphones, among other things, there are two important considerations with respect to this topic.

364.    First, as discussed in Section V.A.4.d), competition between Apple and Samsung is confounded by the competition between iOS, Apple's mobile operating system, and Android, Google's mobile operating system used on devices made by a multitude of manufacturers including Samsung.  Because consumers often consider the operating system an important selling point, the more fierce competition is not between Apple and Samsung, but iOS and Android.  Once a consumer has decided to opt for Android instead of iOS, then Android devices must compete against each other for that incremental purchase.   Samsung, whose smartphones and tablets run Android, competes more heavily with those manufacturers of other Android devices.

---

[621] I understand that the Court conditionally struck my discussion of the HTC agreement, leaving the possibility that Apple may open the door to discussion of the HTC agreement if it makes certain arguments at trial.  I do not intend to offer any opinions relating to the HTC agreement unless the Court determines that Apple has opened the door to such discussions.

[622] Davis Second Trial Report, p. 91. [2.2]

### (ii)   Design IP

413.   For the design IP, Samsung's own accused products provide ample evidence that acceptable, non-infringing alternatives exist.   As can be observed upon inspection of Schedule 6.1-JV-3T at Volume 1, Tab 6 of my Report, Samsung has several products that were not found to infringe or were never accused of infringing the design patents at issue in the Third Trial.

414.   More specifically, for the D'305 Patent, the following phones were never accused of infringement: the Exhibit 4G, Galaxy Ace, Galaxy Prevail, Galaxy SII (AT&T), Galaxy S II (i9100), Galaxy S II (T-Mobile), Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), Intercept, Nexus S 4G, Replenish and Transform.[692]

415.   For the D'677 Patent, 12 smartphones at issue in this litigation were never accused of infringement, including the Captivate, Continuum, and Epic 4G (all designated as Galaxy S smartphones).[693]   The Galaxy Ace was found by the jury to not infringe the D'677 Patent.

416.   For the D'087 Patent, five smartphones were found by the jury to not infringe the D'087 Patent: Galaxy SII (AT&T), Galaxy S II (i9100), Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and the Infuse 4G.[694]   In addition, another 17 smartphones at issue in this litigation were never accused of infringement, including the Captivate, Continuum, and Epic 4G (all designated as Galaxy S smartphones).[695]

417.   In addition to the products that have been at issue in this litigation, Samsung sells a wide range of smartphones that have not been accused of *any* infringement of design intellectual property.

418.   Finally, there is a wide range of other smartphones in the marketplace that have been successful that are apparently not infringing Apple's design IP asserted in this lawsuit.  I am not aware of Apple asserting its design intellectual property against any other smartphone manufacturer.

---

[692] Schedule 6.1-JV-3T. [1.6]
[693] Schedule 6.1-JV-3T. [1.6]
[694] Schedule 6.1-JV-3T. [1.6]
[695] Schedule 6.1-JV-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

(a)    D'305 Patent

419.    As noted above, the Galaxy S II products have not been accused of infringing the D'305 Patent.  In addition, I understand that Samsung sells its smartphones in Korea with a grid of 3 icons wide by 5 icons tall.[696]   The figures below provide the screen images for the Galaxy SII (T-Mobile), which has not been accused of infringing the D'305 Patent; a snapshot of the Korean phone screen showing the 3x5 grid; and the Captivate, which is one of the products at issue in the Third Trial that was found to infringe the D'305 Patent:

**Figure 36:  Alternative Images for Captivate Screen**



Captivate



Galaxy S II (T-Mobile)



New Screen Image

420.    As demonstrated above, I understand that Samsung could change the number of rows or columns on its GUI (as in the right image above) and that would design around the D'305 Patent.

421.    I have discussed the cost to design new icons or to implement a new GUI on the accused products with a Samsung designer and engineer.[697]   The cost is less than $500 per icon and is $1,152 for the GUI interface.[698]

---

[696] Conversation with Hoshin Lee, April 16, 2012.
[697] Conversation with Sun-young Yi, April 12, 2012 (with translation assistance from Hoshin Lee).
    Conversation with Sun-young Yi and Jaewoo Park, April 16, 2012 (with translation assistance from Hoshin Lee).
[698] Schedule 13.6-NT and Schedule 13.4-NT. [1.6]

156

422.     In addition, I understand that Samsung could modify the icons to remove the square "container" that surrounds the icons (as in the image for the Galaxy S II), which would also design around the D'305 Patent.

423.     I summarized the relevant information to calculate the cost to remove the container for every icon on the phones found to infringe the D'305 Patent in my Original Report for the First Trial.   For example, I rely upon the images of the application screens for the 5 smartphones that are at issue in the Third Trial that Dr. Kare included in her expert report.[699] In my Original Report, I summarized the number of icons on the application screens of each of these 5 phones: 49 icons for the Fascinate, 60 icons for the Galaxy S 4G, 45 icons for the Mesmerize, 45 icons for the Galaxy S Showcase (i500), and 52 icons for the Vibrant, for a total of 251 icons.[700]  I also calculated the cost to re-design an icon of $420 per icon in my Original Report.[701]

424.     I note that Ms. Davis agreed that Samsung has design arounds available for the D'305 Patent that could be implemented in less than a month (0.5 months).[702]

*(b)     D'677 Patent*

425.     All five smartphones at issue in the Third Trial were found to infringe the D'677 Patent.   As I discussed in my Original Report, there are several phones that were never accused of infringing the D'677 Patent that provide design alternatives for Samsung.   Notably, three other phones that were at issue in this litigation are Galaxy S phones but were never accused of infringing the D'677 Patent: the Captivate, the Continuum, and the Epic 4G.[703]   As Ms. Davis has stated, the Galaxy S phones have been successful products in the market.

426.     In addition, Samsung has employed a wide range of smartphone designs in the market that have been found to be acceptable and are not accused of infringement in this lawsuit.   Further, numerous other smartphone and tablet manufacturers have competed in the marketplace with alternative designs.

---

[699] Expert Report of Susan Kare, March 22, 2012, Exhibits 15-27. [15.51]
[700] Original Report, Schedule 17.
[701] Schedule 13.6-NT. [1.6]
[702] Davis Second Trial Report, Exhibit 39.3-S and Exhibit 20-PT. [2.2]
[703] Schedule 6.1-JV-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

427.    This wide range of designs are acceptable alternatives for the devices accused of infringing the D'677 Patent.  These products have been successful on the market, and Apple has provided no evidence that the "design" referred to by Apple's experts is connected in any way with the specific design features of the D'677 Patent.  Therefore, I conclude that Samsung has acceptable, noninfringing alternatives for the D'677 Patent.  Because Samsung had numerous smartphones on the market at all times that do not practice the D'677 Patent, I do not consider design around costs.

428.    In addition to the evidence discussed above and the fact that several noninfringing phones have been sold in the marketplace, there is additional evidence of the available design alternatives for the D'677 Patent.  For example, Ms. Davis agreed that Samsung has design arounds available for the D'677, although she contends that it would take up to 8 months to implement the design around.[704]

### (c)    D'087 Patent

429.    Two of the products at issue in the Third Trial were found to infringe the D'087 Patent.  However, five smartphones were found by the jury to not infringe the D'087 Patent: Galaxy SII (AT&T), Galaxy S II (i9100), Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and the Infuse 4G.[705]  In addition, another 17 smartphones at issue in this litigation were never accused of infringement, including the Captivate, Continuum, and Epic 4G (all designated as Galaxy S smartphones).[706]

430.    Therefore, Samsung had several design alternatives available to it, including several Galaxy S II phone designs.  Give the popularity of the Infuse 4G and the Galaxy S II phones, switching to these alternative designs would likely have had minimal to no impact on sales performance.

431.    I have included below a figure that compares the Vibrant and the Galaxy S 4G to four of the products found to not infringe the D'087 Patent:

---

[704] Davis Second Trial Report, Exhibit 39.3-S and Exhibit 20-PT. [2.2]
[705] Schedule 6.1-JV-3T. [1.6]
[706] Schedule 6.1-JV-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 37:  Design Alternatives for D'087 Patent[707]**



| Vibrant (JX 1010) | Galaxy S 4G | Galaxy S II (AT&T) | Infuse 4G | Galaxy S II (Epic 4G Touch) | Galaxy S II (Skyrocket) |

*(b)   Implications of this Georgia-Pacific Factor Regarding a Reasonable Royalty*

432.   From an economic perspective, the cost of Samsung's next best alternative which are non-infringing ways of offering the same functionality or designing out the functionality if the feature is not desired by its customers is the most that Samsung would be willing to pay Apple and that Apple would be entitled to receive.  In my opinion, based on all the facts that I have considered, this factor is my starting point in arriving at my reasonable royalty damages and therefore is neutral.

---

[707] "Samsung Vibrant," Android Central, <http://www.androidcentral.com/samsung-vibrant>, accessed April 15, 2012. [15.43]  *See also* "Samsung Galaxy S 4G Drops Today," AndroidSPIN, February 23, 2011, <http://androidspin.com/2011/02/23/samsung-galaxy-s-4g-drops-today/>, accessed July 29, 2011. [3.29]  *See also* "Samsung Galaxy S II AT&T Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Galaxy-S-II-AT-T_id5639>, accessed April 16, 2012. [10.26]  *See also* "Samsung Infuse 4G announced for AT&T; 1.2 GHz, Super AMOLED Plus," BGR, January 5, 2011, <http://www.bgr.com/2011/01/05/samsung-infuse-4g-announced-for-at-1-2-ghz-super-amoled-plus/>, accessed April 16, 2012. [10.24]  *See also* "Samsung Epic 4G Touch Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Epic-4G-Touch_id5537>, accessed May 2, 2012. [16.3]  *See also* "Samsung Galaxy S II Skyrocket Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Galaxy-S-II-Skyrocket_id6515>, accessed May 2, 2012. [16.4]

licensor and willing licensee would negotiate for a license to utilize the invention.  A technique for estimating such a royalty is to assume that the patentee and infringer, each possessing similar information that was known and knowable at the time, come together and conduct a hypothetical negotiation.  In this hypothetical negotiation, each party's strengths, weaknesses and expectations are considered and form the basis for the opined royalty rate.  This fifteenth factor in essence synthesizes the fourteen factors discussed above.

### c) Major Facts Known or Knowable to Both Parties at the Hypothetical Negotiation

465.   Taking into consideration the first fourteen *Georgia-Pacific* factors, the most important facts affecting the parties' bargaining position at the hypothetical negotiation can be summarized as follows:

- The parties knew with certainty that Samsung's products infringed the valid and enforceable patents at issue in the Third Trial.
- There are commercially acceptable non-infringing alternatives to the patents at issue in the Third Trial.
- Apple is not a willing licensor, at least with regards to its design patents.
- Samsung and Apple are direct competitors.
- Samsung is a major supplier of components to Apple.

### (1) Summary of *Georgia-Pacific* Factor Analysis

**Figure 38:  Summary of *Georgia-Pacific* Factors and Their Impact on the Reasonable Royalty Rate**

| | *Georgia-Pacific* Factor | Impact on Royalty Rate | Comments |
|---|---|---|---|
| 1. | Royalties received by patentee for licensing the Patents-in-Suit. | Neutral | Other than the Apple/HTC Agreement, I found none of Apple's licenses where Apple was the licensor of technology probative of the royalty rate for the patents at issue in the Third Trial. |
| 2. | Rates licensee pays for the use of other comparable patents. | Neutral | I found none of the Samsung licenses where Samsung was the licensee of patents probative of the royalty rate for the patents at issue in the Third Trial. |
| 3. | Nature and scope of the license. | Neutral | Based on the design around costs for the patents at issue in the Third Trial, the nature and scope of the license are not relevant. |
| 4. | Licensor's established policy regarding licensing. | Increase to full design cost | Apple is not a willing licensor, at least with regards to its design patents, and so would not be willing to take anything less than the cost of a design around to the patents at issue in the Third Trial. |

---

[750] 2010 Samsung Electronics Annual Report, p. 3. [11.19]

| *Georgia-Pacific* Factor | Impact on Royalty Rate | Comments |
|---|---|---|
| 5.  The commercial relationship between the licensor and the licensee. | Increase to full design cost | Apple and Samsung are competitors and so Apple would not be willing to take anything less than the cost of a design around to the patents at issue in the Third Trial. |
| 6.  The effect of sales of the patented product on sales of other products (convoyed sales). | Neutral | There is no proof that the patents at issue in the Third Trial are primary drivers of Apple's or Samsung's sales of smartphones, and so convoyed sales would not be properly considered in the hypothetical negotiation. |
| 7.  The duration of the Patents-in-Suit and the term of the license. | Neutral | The duration of the patents and term of the hypothetical license agreement are longer than a typical product lifecycle in this industry. |
| 8.  The established profitability of the product; its commercial success and its current popularity. | Neutral | Apple has not demonstrated that the established profitability is relevant to the hypothetical negotiation.  Based on the design around costs for the patents at issue in the Third Trial, the commercial success of the accused products are not relevant. |
| 9.  The utility and advantages of the patent property over the old modes and devices. | Neutral | The design around costs for the patents at issue in the Third Trial provide a starting point royalty amount for the patents-in-suit. |
| 10.  The nature of the patented feature and its benefits to the user. | Neutral | Based on the design around costs for the patents at issue in the Third Trial, the nature of the patented feature and its benefits to the user are not relevant. |
| 11.  The extent to which the infringer has made use of the Patents-in-Suit and any evidence probative of the value of that use. | Neutral | Based on the design around costs for the patents at issue in the Third Trial, the extent of use by Samsung is not relevant. |
| 12.  Customary royalty rates for this industry. | Neutral | I found no customary royalty rates for this industry. |
| 13.  Apportionment of the realizable profit between that which should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | Neutral | Samsung contributes significant value to the accused products that have nothing to do with the patents at issue in the Third Trial. However, based on the design around costs as my starting point, this is not relevant to my conclusion. |
| 14.  The opinion testimony of experts. | Neutral | I have considered this information in other *Georgia Pacific* factors. |

466.    In my opinion, of the fourteen *Georgia-Pacific* factors that are relevant to consider for raising or lowering the reasonable royalty rate, no factors tend to lower the reasonable royalty rate, two factors tend to raise the rate to the full cost of the noninfringing alternatives, and twelve factors have a neutral effect.

### d)    Conclusions Regarding Reasonable Royalty

467.    In my opinion, based on all the considerations described above, the reasonable royalty amount should be the full cost of designing around the patents-in-suit.

## 2. Calculation of Royalties Due[751]

468.    Applying the full cost of the design around for the patents-in-suit results in royalties due as follows:[752]

|  | **Design Around Costs** |
|---|---|
| Utility Patents | |
| '163 | $5,880 |
| '381 | $11,340 |
| '915 | $10,080 |
| | |
| D'305 Patent | |
| Cost to Design and Implement a New GUI | $1,152 |
| *Icons to Re-Design for D'305 Patent* | |
| Fascinate | 49 |
| Galaxy S 4G | 60 |
| Mesmerize | 45 |
| Showcase / Galaxy S Showcase (i500) | 45 |
| Vibrant | 52 |
| Total Icons to Re-Design for D'305 Patent | 251 |
| | |
| Design Around Cost for Designing a New Icon | $420 |
| | |
| D'087 Patent | $0 |
| | |
| D'677 Patent | $0 |

# VI.    Documents, Data and Other Information Considered

469.    I included a complete list of the documents that I had considered at the time of my Original Report at Volume 1, Tab 4 of that report, and I identified additional documents that I considered in connection with forming my opinions for the Second Trial report at Volume 1, Tab 4 of that report.  In addition, I have identified additional documents that I have considered for this report at Volume 1, Tab 4 of this report.  In addition, I or my staff have had discussions with the following individuals:

- Trevor Darrell, Ph.D., Samsung's technical expert on the '002 and '891 Patents

[751] My opinions on damages necessarily assume that Apple's patents are valid and infringed.  However, I am aware that the Patent Trial and Appeal Board has recently completed reexamination of the '915 Patent and has rejected the claims as invalid. (USPTO Mailing of Decision on Request for Rehearing, September 24, 2015. [7.9]) It is my understanding that the invalidity of the '915 Patent is inconsistent with an award of reasonable royalty, or other form of damages, for infringement of the '915 Patent

[752] Schedule 1-3T. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

# Appendix

1.     I understand that the Court has struck several opinions offered by Ms. Davis in her Second Trial Report.  I expect that Ms. Davis will abide by the Court's orders.  However, given my report is due on the same day as Ms. Davis's report, I include in this Appendix my discussion of several opinions offered by Ms. Davis in her Second Trial Report that were previously struck by the Court. Unless otherwise noted, these sections are only relevant if Ms. Davis does not abide by the Court's orders.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer the particular opinions that I address in this Appendix.

## I.     Background and Description of the Inventions

### A.   Apple's Asserted Intellectual Property

#### 1.   Apple's Utility Patents

##### a)   7,469,381 ("'381 Patent"): List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display

###### (1)  Ms. Davis's '381 Patent Description[1]

2.     In her Second Trial Report, Ms. Davis described the '381 Patent as follows:[2]

> The '381 Patent covers a device with a "rubber banding" or "bounce back" function, an effect that users associate with Apple's user interface. It relates to letting a user know when he or she has reached the edge of an electronic document on a screen. For example, it covers a method for displaying an electronic document and translating the document in response to object movement, such as a gesture from a finger. When the user drags a document past the edge of the document with a finger, an area beyond the edge is displayed. This provides a visual indicator to the user that the user reached the edge of the document. When the user releases the finger such that the device no longer detects movement, the page snaps back so the area beyond the edge is no longer displayed.

---

[1]   I understand that the Court struck Ms. Davis's descriptions of the patent that were different from Mr. Musika's descriptions.  I expect that Ms. Davis will abide by the Court's order.  However, given that my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's patent descriptions.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[2]   Davis Second Trial Report, p. 8. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

3.      I note that Ms. Davis claimed that users associate a "rubber banding" or "bounce back" effect with Apple's user interface, but she did not cite to any evidence supporting this claim.  I am not aware of any evidence that supports Ms. Davis's claim.

### b)   7,864,163 ("'163 Patent"): Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents

#### (1)  Ms. Davis's '163 Patent Description[3]

4.      In her Second Trial Report, Ms. Davis described the '163 Patent as follows:[4]

> The '163 Patent covers a device with a "tap-to-zoom" function. It relates to allowing a user to double tap to enlarge and center on one portion of a document, then gesture on a different portion of the document to center on that portion. For example, it covers a method that includes enlarging and translating a document to substantially center on a first box based on detecting a gesture at that box's location, then translating the document so that a second box is substantially centered based on detecting a second gesture at that second box's location.

5.      I note that Ms. Davis did not claim that the effect of the '163 Patent is associated by users with the "Apple user interface," as she has claimed for the '381 Patent and the '915 Patent.

### c)   7,844,915 ("'915 Patent"): Application Programming Interfaces for Scrolling Operations

#### (1)  Ms. Davis's '915 Patent Description[5]

6.      In her Second Trial Report, Ms. Davis described the '915 Patent as follows:[6]

---

[3]  I understand that the Court struck Ms. Davis's descriptions of the patent that were different than Mr. Musika's descriptions.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's patent descriptions.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[4]  Davis Second Trial Report, p. 9. [2.2]

[5]  I understand that the Court struck Ms. Davis's descriptions of the patent that were different than Mr. Musika's descriptions.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's patent descriptions.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[6]  Davis Second Trial Report, p. 9. [2.2]

The '915 Patent covers a device with a "scroll vs. gesture" function on a touchscreen display. It relates to scrolling on a touch-sensitive display and distinguishing between scrolling and other actions. For example, it covers a method that includes creating an "event object" in response to the user's touch, and distinguishing between a single input point from the user, which the device interprets as invoking a "scroll operation," and two or more input points from the user, which the device interprets as invoking a "gesture operation." A scroll operation scrolls (e.g., translates) the view associated with the event without scaling (zooming in or out), while a "gesture operation" scales the view but may do more than that (e.g., "rotate"). One example of a gesture operation is "pinch to zoom." A two-finger movement that combines scaling and scrolling is a "gesture operation" because it can scale. Users see these actions as scrolling, pinching, and zooming, and associate them with Apple's user interface.

7.      I note that Ms. Davis claimed that users see one-finger and two-finger actions as scrolling, pinching, and zooming and associate them with Apple's user interface, but she did not cite to any evidence supporting this claim.  I am not aware of any evidence that supports Ms. Davis's claim.

## I.      Bases for Opinions

### A.   Disagreements with the Opinions Expressed by Julie L. Davis

#### 1.   Even if Ms. Davis were to prove entitlement to lost profits, her calculations significantly overstated the amount of lost profits.

##### a)   Ms. Davis adjusted the design around periods to begin upon the earliest potential notice dates under 35 U.S.C. §287, instead of at first infringement.[7]

8.      Ms. Davis adjusted Mr. Musika's lost profits calculations to begin the design around period to start at the date that Judge Koh determined to be the earliest potential notice dates under 35 U.S.C. §287 supported by the evidence.[8]   However, this approach is inconsistent with legal precedent that describes how lost profits in the context of patent damages are to be calculated.  For example, the *Panduit* decision, which is the only decision

---

[7]   I understand that the Court struck Ms. Davis's calculations based on design around periods starting at the notice date.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's design around periods.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[8]   Davis Second Trial Report, pp. 23-25. [2.2]

cited by Ms. Davis in her discussion of lost profits, states the following about the calculation of lost profits:[9]

> But the present statutory rule is that only "damages" may be recovered. These have been defined by this Court as "compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without [**6] regard to the question whether the defendant has gained or lost by his unlawful acts." Coupe v. Royer, 155 U.S. 565, 582, 39 L. Ed. 263, 15 S. Ct. 199. They have been said to constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 552, 29 L. Ed. 954, 6 S. Ct. 934. The question to be asked in determining damages is "how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?" [Citing Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 471, 116 USPQ 167, 168 (5th Cir., 1958).]

9.      The Panduit court is clear that the "but-for" damages must be calculated comparing the actual profits made (with infringement) to the profits absent infringement. However, Ms. Davis's calculations violated this principle.  Her calculations were based on a "but-for" world where Samsung would have infringed until notice under 35 U.S.C. §287 was given, and only then would it have stopped infringement and started to design around the patent.  Therefore, her "but-for" scenario did not factor out infringement, only infringement for a period.  As an example, for the '915 Patent, Ms. Davis's calculations assumed that Samsung would infringe the '915 Patent from the time that it issued, on November 30, 2010,[10] until notice of the Patent under 35 U.S.C. §287 was given on April 15, 2011,[11] after which time Samsung would begin to design around.  This does not make sense.

10.     Ms. Davis's approach was also inconsistent with the concept of notice under 35 U.S.C. §287 as strictly a limitation on the period for which damages can be collected.  Ms. Davis appeared to believe that notice under 35 U.S.C. §287 and infringement was the same thing. Ms. Davis used the earliest potential notice dates under 35 U.S.C. §287 to affect her calculations, but I understand that failure to provide notice under 35 U.S.C. §287 should not affect the damages in any given period, but instead should only affect the period for which damages can be collected.

---

9   *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156; 1978 U.S. App. LEXIS 11500; 197 U.S.P.Q. (BNA) 726. U.S. Court of Appeals for the Sixth Circuit, April 25, 1978. [12.1]
10  U.S. Patent No. 7,844,915 B2. [2.5]
11  Apple, Inc. v. Samsung Electronics Co., Ltd., et al., Order Re: Damages, March 1, 2013, p. 18. [5.17]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

11.     Ms. Davis's position that it is "illogical" to have Samsung "begin designing around the New Trial Patents before Samsung actually became aware of Apple's patents"[12] would be inconsistent with the very position that Ms. Davis has taken in situations where the patentee has marked its products with the patent.  For example, if Apple had chosen to mark its products, then under Ms. Davis's assumption, the notice period under 35 U.S.C. §287 would have started at first infringement.  This would have been the case regardless of whether Samsung had "actually become aware of Apple's patents."  Therefore, Ms. Davis's stated opinion that the design around period should start at the earliest potential date of notice under 35 U.S.C. §287 implicitly contemplates the design around period starting prior to when a company has actually became aware of a patent in the event that the patentee has complied with the statutory marking requirement.  This is exactly the "illogical" result that Ms. Davis complained of in this case.

12.     Finally, Ms. Davis's approach to starting the design around period upon notice under 35 U.S.C. §287, instead of first infringement, was inconsistent with the approach that she has taken with respect to her calculation of a reasonable royalty.  Ms. Davis was clear that she agreed with using the date of first infringement as the hypothetical negotiation date for all intellectual property asserted regardless of whether notice under 35 U.S.C. §287 had been given (or even whether the patent had issued).[13]  Ms. Davis provided no justification for this inconsistency.

13.     Ms. Davis anticipated this criticism and, in fact, performed alternative calculations using the date of first sale to trigger the design around periods.[14]  However, she stated her opinion that she agreed with Mr. Musika's approach and she found starting the design around period ahead of notice under 35 U.S.C. §287 to be "illogical."[15]  As I discuss above, I believe that it is Ms. Davis's analysis using the notice dates under 35 U.S.C. §287 to be "illogical" and inconsistent with legal precedent.

14.     As demonstrated by a comparison of Exhibit 17.1-PT-H to Exhibit 17.1-PT-J in her Second Trial Report, Ms. Davis's beginning the design around period at the earliest potential notice dates under 35 U.S.C. §287 has a significant effect on damages, increasing the damages she calculated for Apple for the 13 products at issue in the Second Trial to

---

[12]  Davis Second Trial Report, p. 26. [2.2]
[13]  Davis Second Trial Report, p. 86. [2.2]
[14]  Davis Second Trial Report, pp. 25-26, 48-49. [2.2]
[15]  Davis Second Trial Report, p. 26. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

$620,877,833, instead of the $379,776,091 that she calculated when the design around period starts at first infringement.[16]  These calculations reflect the fact that all of Ms. Davis's design around periods would have ended prior to the earliest potential notice dates under 35 U.S.C. §287 for all patents except the '915 Patent, which issued on November 30, 2010.[17]  Because Ms. Davis used a 6-month design around period for the '915 Patent,[18] the design period ends on May 29, 2011 in Ms. Davis's calculations, which is about 1.5 months after the April 15, 2011 earliest potential notice date under 35 U.S.C. §287.[19]

   **b)  If Ms. Davis seeks lost profits for either the D'677 or D'087 Patents, Ms. Davis's analysis did not account for the fact that Samsung could have sold alternative versions.[20]**

15.    If Ms. Davis seeks lost profits based on the D'677 Patent, her analysis would not account for the fact that Samsung has a noninfringing alternative available to it: change the color of the face of the phone to a color other than black (e.g., white or gray).  Peter Bressler, Apple's expert for the D'677 Patent, discussed this alternative, noninfringing design in his September 30, 2011 declaration.[21]

16.    I have included below a figure that compares the Vibrant to a white version of the Samsung Galaxy SII:

---

16  Davis Second Trial Report, Exhibit 17.1-PT-H and Exhibit 17.1-PT-J. [2.2]
17  U.S. Patent No. 7,844,915 B2. [2.5]
18  Davis Second Report, Exhibit 20-PT. [2.2]
19  Apple, Inc. v. Samsung Electronics Co., Ltd., et al., Order Re: Damages, March 1, 2013, p. 18. [5.17]
20  If Ms. Davis limits her lost profits calculations to the '915 Patent, then this section is not relevant to rebutting Ms. Davis's lost profits calculations.  However, this discussion of noninfringing alternatives is relevant to my reasonable royalty analysis.
21  Reply Declaration of Peter W. Bressler in support of Apple's Motion for a Preliminary Injunction, September 30, 2011, pp. 19-21. [16.17]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 1:    Design Alternative for D'677 Patent - Color**[22]





Vibrant (JX 1010)                            Samsung Galaxy SII T-Mobile

17.    The white Galaxy SII depicted in the Figure above was released on April 28, 2011, as confirmed by Mr. Bressler's declaration.[23]

18.    There is some evidence that a small portion of customers have a preference for color.  For example, in the surveys performed by ComTech for Apple, an average of 4% of consumers indicated that "Design / Color" was the reason for purchase in the 2010 to 2011 time period.[24]  Therefore, I do not dispute that a small portion of consumers might purchase a different phone if a white or gray smartphone was sold in place of a black smartphone.  However, at a minimum, Ms. Davis should have accounted for the fact that this alternative would have dramatically reduced the portion of consumers that purchased the smartphones found to infringe the D'677 Patent that would have switched to a different phone.

19.    If Ms. Davis seeks lost profits based on the D'087 Patent, her analysis would not account for the fact that Samsung has a noninfringing alternative available to it: use designs similar to phones that the jury found did not infringe the D'087 Patent.  As I discuss in *Georgia-Pacific* factor 9, the jury determined that five phones did not infringe the D'087 Patent.  The phones found to not infringe were four Galaxy S II phones and the Infuse 4G, which were

---

[22]  "Samsung Vibrant," Android Central, <http://www.androidcentral.com/samsung-vibrant>, accessed April 15, 2012. [15.43]  *See also* T-Mobile, "Samsung Galaxy S II," <http://www.t-mobile.co.uk/common/img/products/phones/samsung/galaxy-s-ii-white/galaxy_s_ii_white_SC_large_second.jpg>, accessed July 12, 2013. [16.7]

[23]  Phone Arena, "Samsung Galaxy S II Spec," < http://www.phonearena.com/phones/samsung-galaxy-s-ii_id5106>, accessed July 12, 2013. [16.8]  This is also confirmed by an Exhibit submitted by Apple (Reply Declaration of Peter W. Bressler in Support of Apple's Motion for a Preliminary Injunction, September 30, 2011, Exhibit 56. [16.17])

[24]  Schedule 8.6-NT. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

popular phones for which Samsung had significant sales.  Therefore, Samsung could have used designs similar to these phones to avoid infringement of the D'087 Patent.

20.     I have included below a figure that compares the Vibrant and the Galaxy S 4G to four of the products found to not infringe the D'087 Patent:

**Figure 2:     Design Alternatives for D'087 Patent[25]**



| Vibrant (JX 1010) | Galaxy S 4G | Galaxy S II (AT&T) | Infuse 4G | Galaxy S II (Epic 4G Touch) | Galaxy S II (Skyrocket) |

> **c)  Ms. Davis's analysis assumes that the jury agrees that Apple is entitled to lost profits on all patents for which Apple seeks lost profits and that the jury will agree with all of her proposed design around periods.**

21.     In her Second Trial Report, Ms. Davis's lost profits calculations included lost profits for all four of the patents for which she calculated lost profits, as well as for the full duration of her design around periods.  The jury may conclude that profits are only suitable for a subset of the patents or for a shorter design period than that assumed by Ms. Davis.

---

[25] "Samsung Vibrant," Android Central, <http://www.androidcentral.com/samsung-vibrant>, accessed April 15, 2012. [15.43]  *See also* "Samsung Galaxy S 4G Drops Today," AndroidSPIN, February 23, 2011, <http://androidspin.com/2011/02/23/samsung-galaxy-s-4g-drops-today/>, accessed July 29, 2011. [3.29]  *See also* "Samsung Galaxy S II AT&T Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Galaxy-S-II-AT-T_id5639>, accessed April 16, 2012. [10.26]  *See also* "Samsung Infuse 4G announced for AT&T; 1.2 GHz, Super AMOLED Plus," BGR, January 5, 2011, <http://www.bgr.com/2011/01/05/samsung-infuse-4g-announced-for-at-1-2-ghz-super-amoled-plus/>, accessed April 16, 2012. [10.24]  *See also* "Samsung Epic 4G Touch Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Epic-4G-Touch_id5537>, accessed May 2, 2012. [16.3]  *See also* "Samsung Galaxy S II Skyrocket Specs," PhoneArena.com, <http://www.phonearena.com/phones/Samsung-Galaxy-S-II-Skyrocket_id6515>, accessed May 2, 2012. [16.4]

22.     If Ms. Davis seeks lost profits for patents beyond the '915 Patent, or for periods beyond the April 15, 2011 through May 29, 2011 period, then I understand that Ms. Davis would be in violation of the Court's orders on design around periods.  Therefore, I have not attempted to estimate how Ms. Davis would perform such calculations.  However, in the event Ms. Davis seeks lost profits beyond the '915 Patent or beyond the April 15, 2011 through May 29, 2011 period in violation of the Court's order, I will supplement my analysis with calculations of the amounts by which Ms. Davis overstates damages, if permitted by the Court. This would be the case if the jury determines that Apple is not entitled to lost profits on all patents or for Ms. Davis's full design around periods, similar to the calculations that I presented in my Second Trial Report.  By way of example, if Ms. Davis calculates lost profits for the '381 Patent, then Ms. Davis's lost profits calculations relating to the '381 Patent (most likely the lost profits she calculates for the months of August and September 2010) should not be awarded if the jury determines that Apple is not entitled to lost profits for the '381 Patent.  Similar calculations could be performed for the '163 Patent, the '915 Patent, and the design patents, conditioned on the calculations performed by Ms. Davis.

### 2.   Ms. Davis's calculation of Samsung's profits is overstated.

#### a)   Ms. Davis introduced a new calculation of Samsung's profits that she labels "incremental profits," basing her calculation on an artificial naming convention used in financial data produced by Samsung.[26]

23.     In her Second Trial Report, Ms. Davis included calculations of Samsung's profits based on "incremental profits."[27]  Mr. Musika never performed any damages calculations of Samsung's profits using anything other than gross profit and revenue, so this is a newly disclosed calculation.

24.     Further, I disagree with Ms. Davis's usage of a "fixed" or "variable" accounting designation to determine the appropriateness of deducting expenses in the context of the

---

[26] I understand that the Court struck Ms. Davis's calculations based on incremental profits.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's incremental profits calculation.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[27] Davis Second Trial Report, pp. 64, 72-73. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

calculation of Samsung's profits as a damages remedy for design patent infringement.   The Court set forth its test for the deductibility of expenses in the first trial in its jury instructions:[28]

> If you find infringement by any Samsung defendant, Apple is entitled to all profit earned by that defendant on sales of articles that infringe Apple's design patents. Profit is determined by deducting certain expenses from gross revenue. Gross revenue is all of the infringer's receipts from the sale of articles using any design found infringed. Apple has the burden of proving the infringing defendant's gross revenue by a preponderance of the evidence.
>
> Expenses can include costs incurred in producing the gross revenue, such as the cost of the goods. Other costs may be included as deductible expenses if they are directly attributable to the sale or manufacture of the infringing products resulting in a nexus between the infringing products and the expense. Samsung has the burden of proving the deductible expenses.

25.     Ms. Davis stated that she agreed "with Mr. Musika that a 'fixed cost has no direct relationship to the volume of product produced or sold. In order for a fixed cost to be assigned to a product, the cost must be allocated on some systematic and rational basis."[29]  However, there are numerous examples of fixed costs that are directly related to a particular phone and do not need to be allocated, such as R&D expense related to a phone, a sales team dedicated to a particular phone, advertisements and marketing expenses for a phone, production molds for a phone, and numerous other expenses.  Ms. Davis's statement simply does not make accounting or economic sense.   Using fixed vs. variable expenses to distinguish between deductible expenses has no bearing on the instructions the Court gave in the first trial as to what deductible expenses are.

26.     In addition, Ms. Davis concluded that certain categories of expenses included in the financial data produced by Samsung (fixed expenses, R&D, and admin expenses) were not explained to her satisfaction for her to conclude they are deductible.[30]  Ms. Davis apparently believed that Samsung has to explain every financial document to her satisfaction before she will agree that an expense is deductible.  This is not appropriate.  Both Ms. Davis and I have based our damages calculations upon another set of financial documents.  With respect to those financial documents, Samsung has explained the expenses in deposition, I have

---

[28]  Revised Final Jury Instructions, August 20, 2012, p. 66. [15.39]  I express no opinion on the correctness of this instruction.
[29]  Davis Second Trial Report, p. 72. [2.2]
[30]  Davis Second Trial Report, pp. 72-73. [2.2]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

explained the expenses in my report, and Apple has had the opportunity to question Samsung financial witnesses about the expense categories.  As I explained in my Rebuttal Report for the First Trial, at the First Trial, in my Rebuttal Report to Ms. Davis in the Second Trial, at the Second Trial, and again in this report in my discussion of deductible expenses, the expense categories included by Samsung are directly attributable to the sale or manufacture of the infringing products.

27.     Ms. Davis concluded that only costs labeled "variable" in PX28 are directly associated with the sale of the infringing products, and therefore "fixed" costs should be ignored in calculating Samsung's profits.  Ms. Davis did not even include all expense categories included in Cost of Goods Sold because she excludes "COGS-Direct Cost-Depreciation Cost (Fixed)," "COGS-Direct Cost-Molds Cost (Fixed)," "COGS-Expenses-Other," and "COGS-Indirect Cost-Expenses (Operation Division)."  It should be noted that two of these four cost categories in COGS are even labeled "Direct."  The word "variable" does not appear in the jury instructions from the first trial related to Defendant's Profits.  The jury instruction states only that costs can include the "cost of the goods."  As an accountant, Ms. Davis could have used her judgment to understand several of these expense categories. For example, Ms. Davis excluded the category "COGS – Direct Cost – Molds Cost (Fixed)" simply because it has the term "Fixed" at the end.  However, production molds are clearly necessary to manufacture the phones, so it simply doesn't make sense to exclude such an expense category from deductible expenses just because the word "Fixed" appears in the name of the field. I believe that all of Samsung's cost of goods sold is properly deducted to determine Samsung's profits.

28.     Ms. Davis appeared to equate the term "direct" and "variable" when used with the word "cost."  Ms. Davis appeared to subtract only what she believed to be direct costs that are labeled variable by Samsung.  However, the concept of direct cost and variable cost are separate concepts in cost accounting.  For example, the leading cost accounting textbook in the United States explains that costs can be direct and variable, and also direct and fixed.[31]

29.     Ms. Davis did not consider any research and development costs or general maintenance costs to be directly associated with the production or sale of the accused products.  This does not make any sense from an economic standpoint.   If the product was never developed or improved over time, it would never have been sold.  It is incorrect not to include all

---

[31]  Horngren, Charles T., Srikant M. Datar, and George Foster, "Cost Accounting: A Managerial Emphasis," Prentice Hall, 11th Edition, 2003, p. 36. [5.10]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the costs needed to design and produce the accused products as relevant costs to determine Samsung's profits.

30.     Finally, it is important to note that for a large enough quantity, or a long enough time period, every company cost is variable.  If Ms. Davis was assessing the incremental cost of a couple of additional units, then I would not have any major disagreements with her analysis of "incremental profitability." However, Ms. Davis calculated the incremental profit for entire models of smartphones and a significant portion of Samsung's smartphone sales.  This is a very different analysis, and apparently Ms. Davis does not appreciate the difference.

31.     It is simply unrealistic to assume that the costs that Ms. Davis treated as fixed are fixed for the scope of sales that Ms. Davis analyzed.  Even if the correct measure of profitability is incremental profitability, for the scope of sales that are at issue in the infringer's profit calculation, a substantial portion (if not all) of the operating costs would be variable.  As an example, Ms. Davis treated all "Direct Commercial Sales – Marketing" expenses as fixed. While this may be appropriate when considering a few additional units, it is certainly not an appropriate assumption when analyzing an entire product line, such as the Galaxy S 4G.

### (1)  Ms. Davis calculated "incremental profitability" for the wrong period.[32]

32.     In her Second Trial Report, Ms. Davis's summary chart (and individual smartphone charts) of her "incremental profitability" for the seven products at issue in the Second Trial that were found to infringe design patents used sales data for all periods.[33]  It is not limited in time to the period for which Samsung's profits can be collected based on the Court's March 1, 2013 Order on notice date.  The profitability of smartphones is highest when they are introduced, and because of their short product life (approximately one to two years), profitability drops rapidly.  Ms. Davis ignored this reality of the smartphone market by calculating the "incremental profits" for the seven products from their introduction date, rather than from the notice date.

---

[32]  I understand that the Court struck Ms. Davis's calculations based on incremental profits.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's incremental profits calculation.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

[33]  Davis Second Trial Report, Exhibit 50.2-PT thru Exhibit 50.9-PT. [2.2]  I have confirmed that Ms. Davis has included all sales by comparing the units reported for each of the seven smartphones to the total units that Ms. Davis reports in her Exhibit 37.1-PT.

33.      The figure below compares the launch date of the five products at issue in the Third Trial and the date of earliest potential notice for the relevant design patent(s) that each product infringes:

**Figure 3:   Product Launch Dates and Earliest Potential Date of Notice – Products Found to Infringe Design Patents[34]**

| Product | Product Launch Date | Date of First Notice |
|---|---|---|
| Fascinate | 9/8/2010 | 4/15/2011 |
| Galaxy S 4G | 2/23/2011 | 4/15/2011 |
| Showcase / Galaxy S Showcase (i500) | 11/15/2010 | 4/15/2011 |
| Mesmerize | 10/27/2010 | 4/15/2011 |
| Vibrant | 7/15/2010 | 4/15/2011 |

34.      All but the Galaxy S 4G had already been on the market for at least five months prior to the April 15, 2011 date of notice.

35.      Given that Samsung's profitability prior to April 15, 2011 is not relevant to any damages calculation presented by Ms. Davis, her analysis of incremental profitability from product launch likely overstated Samsung's "incremental profit."  If Ms. Davis calculates Samsung's profits based on incremental profitability in violation of the Court's order, I will prepare calculations using the appropriate notice period if permitted by the Court.

### 3.   Ms. Davis's discussion of "irreparable harm" was not appropriate in her report.[35]

36.      Ms. Davis included a discussion of irreparable harm in her report.  I understand that the Court has already ruled on Apple's motion for a permanent injunction.  Therefore, it is not clear why Ms. Davis included this discussion.  I have addressed irreparable harm in two declarations, one filed on August 21, 2011, in connection with Apple's motion for a preliminary injunction, and one filed on October 19, 2012, in connection with Apple's motion for a

---

[34]   Schedule 6.4-3T. [1.6]

[35]   I understand that the Court struck Ms. Davis's discussion of irreparable harm.  I expect that Ms. Davis will abide by the Court's order.  However, given my report is due on the same day as Ms. Davis's report, I have retained my discussion of Ms. Davis's discussion of irreparable harm.  This section is only relevant if Ms. Davis does not abide by the Court's order.  In any event, my ultimate opinions do not change whether or not Ms. Davis is permitted to offer this particular testimony.

permanent injunction.[36]  I incorporate by reference both of these declarations in their entirety in this section.

37.    I include below the limited discussion of irreparable harm that I included in my original expert report.

38.    The data, shown in the five figures below, demonstrate that Apple is far from suffering irreparable harm.

**Figure 4:    Apple US iPhone Sales by Quarter[37]**



39.    The figure above shows Apple's U.S. iPhone sales by quarter from the release of the first iPhone through Q4 2011. ███████████████████████████ ███████████████████████████████████████ during which no new iPhone iterations were

---

[36]  Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, August 21, 2011. [5.33]  *See also* Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Permanent Injunction, October 19, 2012.
[37]  Schedule 14.1. [1.6]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

released, ████████████████████████████████████████████████

████████████████████████████████████████████████████  As shown in the

figure, ██████████████████████████████████████████████████████

████████████████████████████████

**Figure 5:    Smartphone Average Selling Prices in the U.S., Q2 2007 Through Q4 2011**[38]



40.    The above figure shows Apple's iPhone ASP alongside Samsung's smartphone
ASP from Q2 2007 through Q4 2011.  As illustrated, Apple has maintained ████████████
██████████████████████████.  In other words, Apple would be hard pressed to argue that its
smartphone offering has ██████████████████████████████████████████.  In fact,
██████████████████████████████████.

---

[38]  Schedule 18-NT. [1.6]

**Figure 6:    Smartphone Revenue Share in the U.S., Q2 2007 Through Q4 2011**[39]



41.    As pictured in the above figure, Apple has also ████████████
████████████████████████████████████ Notably, while Samsung's revenue
share has also increased, Apple's share ██████████████████████████████
████████████████████

---

[39]  Schedule 18-NT. [1.6]

**Figure 7:    Smartphone Unit Share in the U.S., Q2 2007 Through Q4 2011**[40]



42.    Very similar to the previous figure, the figure above shows that Apple has ███████████████████████████████████████████. Again, Apple's unit sales ██████████ in Q4 2011 with the release of the iPhone 4S.

---

[40]  Schedule 18-NT. [1.6]

**Figure 8:** **Apple's Share of Realized Handset Industry Profits Worldwide Q1 2008 Through Q4 2011**[41]



43.     The figure above shows Apple's share of realized worldwide handset profits. This figure depicts not only the ████████████████████████████████ ██████████████████     In the most recent quarter depicted, again Q4 2011 during which the iPhone 4S was released, ██████████████████████████████.

44.     Ms. Davis also mentioned in her discussion of irreparable harm that she did not include in her lost profits calculations several additional revenue sources connected to sales of the iPhone.[42]  However, this discussion has nothing to do with a discussion of irreparable harm. In fact, Ms. Davis may have had data sufficient to calculate damages from potentially lost sales of accessories or lost sales through iTunes, but did not include it in her analysis.[43]  If there was

---

[41]  Schedule 18-NT. [1.6]
[42]  Davis Second Trial Report, pp. 29-30, 33. [2.2]
[43]  iTunes Business P&L Q1'12, APLNDC-Y0000051592-598. [2.10] *See also* GAAP Line of Business Reporting, iPad.Acc, Q1 2009 through Q1 2012, APLNDC-Y0000051606-609 at '608 – '609 [2.11]

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED
Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

any definite harm to Apple from these alleged losses, then the value could easily be calculated. The fact that Ms. Davis chose not to present calculations of certain alleged lost sales does not show that that there exists irreparable harm.

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                    **Schedule 10.6-3T**

**Apple Product Profitability**

**iPhone Profitability Comparison Using  U.S. Prices and U.S. Standard Costs, Q3 2010, Q2 2011 - Q4 2011**

| *Calendar Quarter* | *Q3 2010* | *Q2 2011* | *Q3 2011* | *Q4 2011* |
|---|---|---|---|---|

[a] US Sales
  Revenue
  Units
  ASP

[b] Worldwide (Per Unit Basis)
  COGS
[c]   Standard Cost (U.S. Standard Cost)
    Variances
    Royalties
    Others
  Total COGS

  Gross Profit

  Operating Expenses
    Sales Expense
    Distribution Expense
  Ms. Davis's Calculation of Incremental Profit

    Marketing/Advertising
  Ms. Davis's Incremental Profit Less Marketing/Advertising



**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                    Schedule 10.6-3T
**Apple Product Profitability**
**iPhone Profitability Comparison Using  U.S. Prices and U.S. Standard Costs, Q3 2010, Q2 2011 - Q4 2011**

| Calendar Quarter | Q3 2010 | Q2 2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| **Difference in Ms. Davis's Incremental Profits Calculation Using U.S. Prices** | | | | |
| Ms. Davis's Incremental Profit (Using U.S. Prices and U.S. Standard Costs) | | | | |
| [d] Ms. Davis's Incremental Profit as Calculated (Using Worldwide Prices) | | | | |
| | | | | |
| **Difference in Ms. Davis's Incremental Profits Calculation Using U.S. Prices and Deducting Marketing/Advertising Expenses** | | | | |
| Ms. Davis's Incremental Profit Less Marketing/Advertising (Using U.S. Prices and U.S. Standard Costs) | | | | |
| [d] Ms. Davis's Incremental Profit as Calculated (Using Worldwide Prices and Worldwide Standard Costs) | | | | |

**_Note_** :

[c]   Mark Buckley defines ASC as "Average standard cost." See Deposition of Mark Buckley, February 23, 2012, p. 174. [5.2] See also APLNDC-Y0000051357-362 at '358. [15.1]

**_Sources_** :

[a]   Schedule 10.1-NT.
[b]   Schedule 10.3-NT.
[c]   APLNDC0003149809-814 at '809-811. [15.6]
[d]   Davis Second Trial Report, Exhibit 32-S2. [2.2]

Highly Confidential - Attorneys Eyes Only - Subject to Protective Order
REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                          **Schedule 15.1-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue, Quantity and Average Price Summary for the 5 Products in the Third Trial**

| Product | 2010 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | Revenue | Quantity | ASP | Revenue | Quantity | ASP |
| | [a] | [b] | | [c] | [d] | |
| *Smartphones* | | | | | | |
| Fascinate | | | | | | |
| Galaxy S 4G | | | | | | |
| Mesmerize | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | |
| Vibrant | | | | | | |
| **Total Smartphones** | | | | | | |
| | | | | | | |
| *Smartphones* | | | | | | |
| Fascinate | | | | | | |
| Galaxy S 4G | | | | | | |
| Mesmerize | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | |
| Vibrant | | | | | | |
| **Total Smartphones** | | | | | | |

*Sources*:
[a] Schedule 15.4-3T
[b] Schedule 15.4-3T
[c] Schedule 15.4-3T
[d] Schedule 15.4-3T
[e] Schedule 15.4-3T
[f] Schedule 15.4-3T
[g] = [a] + [c] + [e]
[h] = [b] + [d] + [f]

Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order
REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**　　　　　　　　　　　　　　　　　　　　　　**Schedule 15.3-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue, Quantity and Average Price Summary for the '915 Design Around Period**

| Product | April 2011 | | May 2011 | | April 15, 2011 - May 29, 2011 | | |
|---|---|---|---|---|---|---|---|
| | Revenue | Quantity | Revenue | Quantity | Revenue | Quantity | ASP |
| | [a] | [a] | [a] | [a] | [b] | [b] | |
| *Smartphones* | | | | | | | |
| Fascinate | | | | | | | |
| Galaxy S 4G | | | | | | | |
| Mesmerize | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | | |
| Vibrant | | | | | | | |
| **Total Smartphones** | | | | | | | |

**Notes:**

[b]  Equals April 2011 prorated by the number of infringing days in the month plus May 2011 prorated to the number of infringing days in the month.

| | *April 2011* |
|---|---|
| Last Day of Month | 4/30/2011 |
| Period Start Date | 4/15/2011 |
| Infringing Days | 16 |
| % Period Covered | 53% |

| | *May 2011* |
|---|---|
| First Day of Month | 5/1/2011 |
| Period End Date | 5/29/2011 |
| Infringing Days | 29 |
| % Period Covered | 94% |

**Source:**

[a]  Schedule 15.4-3T.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order
REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                                               Schedule 15.4-3T
**Samsung Financial Summary**
**Samsung STA and SEA Revenue and Quantity Monthly Breakout**

| Product | Source | | 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | May | June | July | August | September | October | November | December |
| [a] STA & SEA Revenue | | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |
| [a] STA & SEA Units | | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |

*Sources*:
[a] Schedule 21.1-3T to Schedule 21.5-3T.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order
**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                                                       **Schedule 15.4-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue and Quantity Monthly**

| Product | Source | 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | January | February | March | April | May | June | July | August | September |
| [a] STA & SEA Revenue | | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |
| [a] STA & SEA Units | | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |

*Sources*:
[a]  *Schedule 21.1-3T to Schedule 21.5-3T.*

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                                                                         **Schedule 15.4-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue and Quantity Monthl**

|  |  | 2011 | | | 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Product | Source | October | November | December | January | February | March | April | May | June |
| [a] STA & SEA Revenue |  | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |
| [a] STA & SEA Units |  | | | | | | | | | |
| Fascinate | Schedule 21.1-3T | | | | | | | | | |
| Galaxy S 4G | Schedule 21.2-3T | | | | | | | | | |
| Mesmerize | Schedule 21.3-3T | | | | | | | | | |
| Showcase / Galaxy S Showcase (i500) | Schedule 21.4-3T | | | | | | | | | |
| Vibrant | Schedule 21.5-3T | | | | | | | | | |
| **Total** | | | | | | | | | | |

*Sources*:
[a] Schedule 21.1-3T to Schedule 21.5-3T.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order
**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**



**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**                                          **Schedule 15.4-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue and Quantity Monthl**

| Product | Source | 2010 Total | 2011 Total | Q1 - Q2 2012 Total | Total |
|---|---|---|---|---|---|
| [a] STA & SEA Revenue | | | | | |
| Fascinate | *Schedule 21.1-3T* | | | | |
| Galaxy S 4G | *Schedule 21.2-3T* | | | | |
| Mesmerize | *Schedule 21.3-3T* | | | | |
| Showcase / Galaxy S Showcase (i500) | *Schedule 21.4-3T* | | | | |
| Vibrant | *Schedule 21.5-3T* | | | | |
| **Total** | | | | | |
| | | | | | |
| [a] STA & SEA Units | | | | | |
| Fascinate | *Schedule 21.1-3T* | | | | |
| Galaxy S 4G | *Schedule 21.2-3T* | | | | |
| Mesmerize | *Schedule 21.3-3T* | | | | |
| Showcase / Galaxy S Showcase (i500) | *Schedule 21.4-3T* | | | | |
| Vibrant | *Schedule 21.5-3T* | | | | |
| **Total** | | | | | |

***Sources*** :
[a] *Schedule 21.1-3T to Schedule 21.5-3T.*

Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order
REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

**Apple Inc. v. Samsung Electronics Co., Ltd., et al.**　　　　　　　　　　　　**Schedule 15.5-3T**
**Samsung Financial Summary**
**Samsung STA and SEA Revenue, Quantity and Average Price Summary for Specific Months**

| Product | August - September, 2010 | | | April - October, 2011 | | |
|---|---|---|---|---|---|---|
| | Revenue | Quantity | ASP | Revenue | Quantity | ASP |
| | [a] | [a] | | [a] | [a] | |
| *Smartphones* | | | | | | |
| Fascinate | | | | | | |
| Galaxy S 4G | | | | | | |
| Mesmerize | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | |
| Vibrant | | | | | | |
| **Total Smartphones** | | | | | | |

*Note*:

*In her Second Trial report, Ms. Davis calculated lost profits for the '381, '915, '163, and D'677 Patents, but not the D'305 Patent.   The Court subsequently ruled that the design around periods begin at the date of first infringement, and therefore the '915 patent was the only patent for which lost profits could be sought under Ms. Davis's methodology. This schedule is only relevant if Ms. Davis does not abide by the Court's order.*

*Source*:

[a] *Schedule 15.4-3T.*