# EXHIBIT 3
# Unredacted Version of Document Sought to Be Sealed

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK |
| Plaintiff, | **OPENING EXPERT REPORT OF JULIE L. DAVIS, CPA (01/15/2018)** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

prepared by Mr. Musika in connection with the first trial in this matter and discussed it with Invotex/SRR.  Mr. Musika's methodology was careful to distinguish among remedies.  For example, Mr. Musika calculated either Samsung's infringer's profits or a reasonable royalty, but not both, for any specific unit sale that infringed a valid Apple design patent and a valid Apple utility patent.  Thus, Mr. Musika ensured that no specific unit sale would be assigned to more than one theory of recovery.  **Exhibit 16-R2** (read together with **Exhibits 15-R2** and **20-R2**) describes the overall approach used to achieve this result.  I have adopted and followed Mr. Musika's methodology for purposes of this report.  Thus, for any unit that infringed a valid patent and for which I calculated damages under one theory (e.g., Samsung's infringer's profits), I did not also calculate an award of damages under a different theory (e.g., reasonable royalty).

## III.    MATERIALS CONSIDERED

21.     My opinions are based upon information available to me as of the date of this report.  I, and professionals working under my direction, have relied upon and examined documents produced by the parties, testimony, transcripts, and exhibits, along with publicly available information.  I and the professionals working under my direction have reviewed the expert reports and supplements prepared by Mr. Musika and the documents cited in the text and exhibits of those reports.  I have reviewed Mr. Musika's trial testimony and demonstrative aids.  In combination, the staff at Invotex/SRR and/or my staff have also considered all the documents identified in **Exhibits 3** and **3-S** to Mr. Musika's reports.  **Exhibit 3-PT** lists additional documents, including the trial transcripts and trial exhibits, that were considered in connection with the preparation of my August 23, 2013 report.  In addition, I attended and testified at the November 2013 damages trial, considered the witness testimony, trial exhibits, and demonstratives presented at that trial, and also reviewed additional documents in connection with the preparation of my November 6, 2015 / February 26, 2016 report as reflected in prior **Exhibit 3-R**.

22.     In connection with forming my conclusions in connection with my August 23, 2013, report, I spoke with the following current or former Apple employees.

- Mark Buckley, Finance Manager II;

- Elisa De Martel, Senior Manager of Worldwide FP&A;

- Henri Lamiraux, Vice President of Engineering for iOS;

- Anuj Saigal, Director of Supply Demand Management;

- Rory Sexton, Vice President of Supply Demand Management;

- Tang Tan, Senior Director of iPhone Product Design; and

- Boris Teksler, former Director of Patent Licensing & Strategy.

23.     In addition, I held discussions with the following experts retained on behalf of Apple.

- Ravin Balakrishnan ('381 Patent);

- John Hauser (conjoint analysis; '381,'163 Patents); and

- Karan Singh ('163 Patent).

23A.     In connection with forming my conclusions contained in this opening expert report, I also spoke with Apple employees Tony Blevins, Vice President of Procurement, Richard Howarth, Senior Director of Industrial Design, and Greg Joswiak, Vice President of Product Marketing, as well as Apple's retained experts Alan Ball (D'677 and D'087 Patents) and Dr. Susan Kare (D'305 Patent).  I also reviewed Apple's and Samsung's written discovery responses directed to the scope of the article of manufacture served in the fourth quarter of 2017, certain documents produced during the fourth quarter of 2017, and the depositions of Apple and Samsung witnesses on related topics taken during the fourth quarter of 2017, all of which have been included in the statement of materials considered included as **Exhibit 3-R2**.

24.     My opinions are based on my skills, knowledge, experience, education, and training, as well as information gathered by and/or provided to me as of the date of this report.  It is usual and customary for experts to consider and/or rely upon sources of information such as those identified above in forming damages opinions.

88.     [Reserved]

## VIII.   MONETARY DAMAGES

### A.     Use of Mr. Musika's Methodology

89.     In preparing this report, I have been mindful of the limitations placed by the Court on modifications to the sources and methods used to calculate damages, particularly where the article of manufacture is identified as the smartphones as a whole, which was the basis on which Samsung's profits were previously calculated by both Apple's and Samsung's experts in connection with the original trial and the damages retrial in November of 2013.[96]  Prior to the July/August 2012 Trial and again at the November 2013 Trial, the Parties stipulated to the identification of the products at issue, the number of units of each product sold (including for each product that the jury concluded infringed Apple's Patents), and the revenues associated with the sales of those products.  Consistent with Mr. Musika's prior reports and my own, I rely upon those figures for my damages calculations.

89A.     I understand that Apple asserts that Samsung's smartphones are the article of manufacture to which Samsung applied Apple's patented designs when Samsung infringed, while Samsung asserts that something less than Samsung's smartphones is the article of manufacture.  I have reviewed the conclusions drawn by Apple's design experts Alan Ball and Dr. Susan Kare that the articles of manufacture to which Samsung applied Apple's patented designs are the Samsung phones, in their entirety, found to infringe Apple's design patents.  I discuss certain market-related, economic, and accounting evidence related to their conclusions below.  Based on this evidence, the history of this litigation, and the conclusions drawn by Apple's design experts Mr. Ball and Dr. Kare, I have prepared a calculation of the money damages to which Apple is entitled for Samsung's infringement of the 2018 Remand Trial Patents based on Samsung's sale of infringing smartphones in their entirety using the same damages model and methodologies described in the expert reports and supplements prepared by Mr. Musika for the July/August 2012

---

[95] [Reserved]

[96] [Reserved]

Trial, and that I previously used in connection with the damages retrial in November 2013.  I have used the same models and software tools, including certain Access databases and Excel spreadsheets prepared previously by Invotex in connection with the preparation of Mr. Musika's reports, supplements, and trial testimony.  I have worked with the same staff at Invotex (now at SRR) that Mr. Musika used to support him in his analysis of Apple's damages.  And, except as described below, I have used as inputs the same data that Mr. Musika used as inputs to his model.

90.     As Mr. Musika noted in his Original Expert Report, he created a methodology and a model that could be adjusted to address differences regarding which products were included, which intellectual property was included, and the date on which Samsung had actual notice of Apple's patent.[97]  Thus, it was possible, working with SRR, to use Mr. Musika's methods and the tools he had prepared to update the calculation of damages to address the circumstances presented in the 2018 Remand Trial.

91.     In preparing the calculation of money damages presented in this report, the only changes I have made to Mr. Musika's calculations are the changes described below, each of which arose from various court orders described in more detail below.

91A.    On May 18, 2015, the Federal Circuit "affirm[ed] the jury's verdict on the design patent infringements, the validity of two utility patent claims, and the damages awarded for the design and utility patent infringements appealed by Samsung."[97A]  However, the Federal Circuit "reverse[d] the jury's findings that the asserted trade dresses are protectable," vacate[d] the jury's damages awards against the Samsung products that were found liable for trade dress dilution[,] and remand[ed] for further proceedings consistent with this opinion."[97B][97C]  Following the Supreme Court's remand, I understand that the Court concluded that a new trial on design patent issues should occur and that Samsung would be permitted to present evidence and argue that, for the infringing smartphones, the articles of manufacture to which Samsung applied Apple's

---

[97] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, pp. 25-26, ¶ 89.

[97A] Dkt. 3271:  *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 989 (Fed. Cir. 2015).

[97B] Dkt. 3271: *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 989 (Fed. Cir. 2015).

[97C] [Reserved]

referring back to the information in those subsections when relevant to other issues that I discuss later, including, at a minimum, the analysis of the article of manufacture and the analysis of reasonable royalties.)

103.     Mr. Musika concluded that there is significant demand for Apple's and Samsung's smartphones that practice the technology of the 2018 Remand Trial Patents.  I agree.  There is substantial demand in the U.S. marketplace for iPhones, which were among the most popular mobile devices sold in the marketplace between 2010 and 2012.  Although it is likely that demand for the parties' smartphones is driven by a multitude of factors, I am also aware of substantial evidence that illustrates the demand for the particular benefits of the 2018 Remand Trial Patents.  As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 25-R2** details examples of demand for technology of the '381 and '163 Patents as they relate to both smartphones and tablets. As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 24-R** details examples of demand for and importance of design in selling smartphones.  The sources of evidence summarized in these exhibits include the following:  Apple advertising materials, Samsung advertising materials, Samsung product development and planning documents, Samsung strategy documents, survey data, third-party market and consumer analysis, testimony and email from representatives of the parties, and other evidence related to the patents and products at issue.  I agree with Mr. Musika's conclusion that these documents reflect substantial demand for the iPhone and the patented features.

104.     In addition to the evidence discussed in **Exhibits 24-R** and **25-R2**, Mr. Musika and I have reviewed the results of two consumer surveys performed by Dr. John Hauser, a professor at Massachusetts Institute of Technology.  I have also spoken with Dr. Hauser.  For both smartphones and tablets, Dr. Hauser was asked "to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue."[118] Using conjoint analysis, Dr. Hauser concluded that "for both smartphones and tablets, Samsung

---

[118] For both smartphones and tablets, Dr. Hauser tested the '915 patent alone, and a combination of the '381, '163, and '915 Patents.  *See* Expert Report of John R. Hauser, dated Mar. 22, 2012, pp. 6-7.

consumers are willing to pay a significant price premium for the tested features that are covered by the patents at issue."[119]  These test results support the conclusion that there is demand for the technology of the utility patents at issue in the 2018 Remand Trial.

105.   As one example of the evidence that reflects demand for the iPhone and patented features in the product, consider a report by Gravity Tank discussed as item 61 of **Exhibit 25-R2** and item 69 of **Exhibit 24-R**.  Gravity Tank was a consultant hired by Samsung to evaluate the strategy for introducing a touchscreen smartphone in the United States and elsewhere.  Gravity Tank told Samsung in 2008 that "[p]undits tell us that the iPhone is a revolution" that was hailed for "its beauty and functionality."[120]  It praised Apple's "screen centric design" that "has set the standard" in the category.[121]  Consumers described the product and interface as "whimsical," in part because "lists bounce."[122]  Consumers also commented that the iPhone "changed their notion of what a phone can and should be" and that they see the phone as "enjoyable, engaging and cool."[123]

106.   Other examples include internal Samsung emails and documents recognizing that the iPhone revolutionized the industry with its beautiful design and superior functionality.  A September 2007 Samsung document, for example, discussed in items 68 and 95 of **Exhibit 24-R**, noted that the iPhone was a key factor expected to "shape handsets in the coming five years," identifying that the iPhone's "beautiful design" and "easy and intuitive UI" could contribute to its

---

[119] Expert Report of John R. Hauser, dated Mar. 22, 2012, p. 7.

[120] PX36.20: Gravity Tank, Touch Portfolio, dated Dec. 2008 (SAMNDCA00191811–SAMNDCA00191987 at SAMNDCA00191830).

[121] PX36.31: Gravity Tank, Touch Portfolio, dated Dec. 2008 (SAMNDCA00191811–SAMNDCA00191987 at SAMNDCA00191841).  *See also* PX37.2: Gravity Tank, Touch Portfolio: Key Takeaways, dated Dec. 24, 2008 (SAMNDCA10805169–SAMNDCA10805175 at SAMNDCA10805170) ("recognize iPhone's screen-centric design as the touch phone standard").

[122] PX36.36: Gravity Tank, Touch Portfolio, dated Dec. 2008 (SAMNDCA00191811–SAMNDCA00191987 at SAMNDCA00191846).

[123] PX36.22, 36:  Gravity Tank, Touch Portfolio, dated Dec. 2008 (SAMNDCA00191811–SAMNDCA00191987 at SAMNDCA00191832 and SAMNDCA00191846).

remedy to address unique aspects of the harms caused by infringement of design patents.[200A]  I understand that the analysis of infringer's profits under § 289 proceeds in two steps: "First, identify the 'article of manufacture' to which the infringed design has been applied.  Second, calculate the infringer's total profit made on that article of manufacture."[200B]  I analyze each step below and have concluded that an award of damages in the form of Samsung's profits as described and calculated below reflects a reasonable and appropriate remedy in the present circumstances.[201][202]

### 1.    Article of Manufacture

140A.  I understand that the Court has identified the following four factors that will be used to determine the "article of manufacture" for the purpose of § 289:

> (1) The scope of the design claimed in the plaintiff's patent, including the drawing and written description;
>
> (2) The relative prominence of the design within the product as a whole;
>
> (3) Whether the design is conceptually distinct from the product as a whole;
>
> (4) The physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately.[202A]

140B.  The four factors incorporate a wide amount of relevant information that reflects some topics that are primarily issues for someone who designs products or relevant articles and other topics that reflect how companies structure their businesses, market and sell their products and how those products are received or used by consumers.  I have no experience as a product

---

[200A] *See Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 432-33 (2016).

[200B] *Samsung Electronics Co. v. Apple Inc.*, 137 S. Ct. 429, 434 (2016).

[201] [Reserved]

[202] [Reserved]

[202A] Dkt. 3530:  Order Requiring New Trial On Design Patent Damages, dated Oct. 22, 2017, at p. 35.

designer, and I am relying on the work and analysis of two design experts, Alan Ball and Dr. Susan Kare, when it comes to topics and information associated with those disciplines.  I have experience and have done analysis regarding Apple and Samsung, how they sell their products and how those products were received in the market during the damages period.

140C.  As noted above, I have spoken to Alan Ball and Dr. Susan Kare, two of Apple's experts on the topic of design and design patents.  Each has evaluated Apple's patented designs, has evaluated the Samsung smartphones found to infringe Apple's patents, and has evaluated information relevant to the topics stated above.  I understand from each of them that they have concluded that the article of manufacture to which Samsung applied the designs of the D'305, D'677, and D'087 Patents is the Samsung smartphones found to infringe those patents in their entirety.  I have relied on their conclusions in my analysis of Samsung's total profits in connection with the damages calculations included in this report.  As discussed below, the evidence from the parties' business models, accounting activity, and marketing conduct provides additional information relevant to the four factors stated above, which support Mr. Ball's and Dr. Kare's conclusions that the article of manufacture to which Apple and Samsung applied the patented designs are the smartphones as a whole.

140D.  **Factor 1** ("The scope of the design claimed in the plaintiff's patent, including the drawing and written description.").  I have relied on the work and opinions of Alan Ball and Dr. Susan Kare, who have concluded that the scope of the design patents, including the drawings and written description, supports a conclusion that the article of manufacture is the smartphones as a whole.

140E.  **Factor 2** ("The relative prominence of the design within the product as a whole.").  Materials that I previously reviewed in connection with this case, including in connection with my opinions stated in Paragraphs 103, 105 to 107, 110, and 234 to 237, and in **Exhibit 24-R**, regarding demand for Apple's patented designs (including the designs of the D'305, D'087, and D'677 Patents), support Mr. Ball's and Dr. Kare's conclusions that the patented designs play a prominent role in Apple's and Samsung's products as a whole.  As noted above, the sources of

l.    **Factor #12:    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

244.    Mr. Musika did not identify any evidence that relates to the portion of the profit or of the selling price that may be customary in this business for the use of the invention or analogous inventions for the 2018 Remand Trial Patents.  My review did not identify anything Mr. Musika overlooked.  Therefore, I agree with Mr. Musika that this factor would not provide an indication as to an appropriate royalty rate.

m.    **Factor #13:    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

245.    In my discussion of the income method above, I have addressed the portion of the realizable profit that should be credited to each utility patent in **Exhibit 41-R**.  Mr. Musika found that the conjoint study and results conducted by Dr. Hauser also support the conclusion that customers are willing to pay a premium for the features enabled by the utility patents.  I agree.

246.    Mr. Musika concluded that the portion of the realizable profit that relates to the asserted design patents and trademarks is based on the portion of Apple's profit that is attributable to its brand.  The realizable profit attributed to the brand is the same amount for each individual design element as the total group of asserted design-related intellectual property.  The dilution to Apple's brand due to the infringement of Apple's distinctive design is the same whether it is caused by one or the group of design-related intellectual property.  Therefore, it is inappropriate to accumulate additional damages based on each act of infringement of the design-related intellectual property because each design element has the same economic benefit associated with Apple's brand.  The license for the asserted design patents and trademarks would be negotiated on a total portfolio as opposed to an individual basis.  As discussed above and for the reasons stated in Mr. Musika's report, I agree.

**n.      Factor #14:      The opinion testimony of qualified experts.**

247.    This report reflects my opinions in this matter.  I have also spoken to the following experts and have read their expert reports:

- Ravin Balakrishnan, Specialty – Human Computer Interaction – '381 Patent;

- John Hauser, Specialty – Conjoint Analysis – '915 Patent, '381 Patent, and '163 Patent; and

- Karan Singh, Specialty – Human Computer Interaction – '163 Patent.

- Alan Ball, Specialty – Industrial Design – D'677 Patent, D'087 Patent.

- Dr. Susan Kare, Specialty – Graphical User Interface Design – D'305 Patent.

248.    I have also reviewed the expert reports, declarations, and deposition testimony of Mr. Musika and Mr. Wagner.

**o.      Factor #15:      The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

249.    The hypothetical negotiation date is the date of first infringement, which is the point at which the date of first sale and the issuance of the asserted Apple Intellectual Property intersect.  I agree with Mr. Musika that the market circumstances that would impact or influence each potential hypothetical negotiation date would be the same.  **Exhibit 44-R** outlines the issue date, date of first sale, and hypothetical negotiation dates for each element of the asserted Apple Intellectual Property.

250.    In **Exhibit 43-R,** Mr. Musika summarized his conclusions on each of the *Georgia-Pacific* factors and the impact on each item of the asserted Apple Intellectual Property.  In

**Description of Apple's Asserted Utility Patents**

| Patent | Title | Apple Technical Expert | Infringing Product Type 1/ | Detailed Description | Patent Qualitative Ranking 2/ | Benefits of Patent 1/ | Potential Design Around | Number of Months Out of Market 3/ |
|---|---|---|---|---|---|---|---|---|
| '002 | Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System | Alex Snoeren | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 1 | User friendly and non-intrusive basis of displaying information. | See Georgia Pacific Factor 9. | No time given; assumed less than a month. |
| '891 | Method and Apparatus for Displaying a Window for a User Interface | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 1 | Non-obtrusive way to convey information to the user. | See Georgia Pacific Factor 9. | No time given; assumed less than a month. |
| '381 | List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display | Ravin Balakrishnan | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 2 | Solves two problems; (1) differentiates reaching the edge of an electronic document versus a frozen screen, and (2) preventing navigation away from data and ending up in blank space often referred to as the "dessert fog." | See Georgia Pacific Factor 9. | 1 Month 4/ |
| '915 | Application Programming Interfaces for Scrolling Operations | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 3 | Interpretation of multiple touches to perform different functions. | See Georgia Pacific Factor 9. | 6 months |
| '163 | Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 2 | Quick and effective basis to refocus the display. | See Georgia Pacific Factor 9. | 1 month |
| '607 | Multipoint Touchscreen | Michel Maharbiz | Tablets | See report section titled Apple's Utility Patents. | 4 | Allows for the interpretation of multiple simultaneous touches. | See Georgia Pacific Factor 9. | Products with screens 10 inches or larger: no design around. Products with screens 8 inches or less: design around after 12/31/10. |
| '129 | Double-Sided Touch-Sensitive Panel with Shield and Drive Combined Layer | Michel Maharbiz | Tablets | See report section titled Apple's Utility Patents. | 2 | Shields touch sensors from noise created by LCD screen. | See Georgia Pacific Factor 9. | Products with screens 10 inches or larger: no design around. Products with screens 8 inches or less: design around after 12/31/10. |

**Sources/Notes:**
1/ Discussions with counsel as well as Apple's technical experts: Ravin Balakrishnan, Michel Maharbiz, Karan Singh, and Alex Snoeren.
2/ I have assigned a rating of 1 through 4 on each patent based on my discussions with technical experts and representatives of Apple (Henri Lamiraux on the '381, '915, and '163 patents; Steve Hotelling on the '607 and '129 patents). A rating of 4 is of greatest relative weight and 1 is the lowest relative weight. In assigning a rating, I have considered and used my discussions with experts, discussions with Apple personnel, the design around time, degree of program integration, and the results of the John Hauser's Conjoint Analysis (with respect to the '607, '915, '163, and '381 patents).
3/ Design around times were provided by Apple representatives identified in note 2. No design around is deemed to be commercially acceptable by any expert. Design around or removal of the infringing aspect is based on an option with the purpose of establishing a degree of difficulty in attempting to work around the patent and not whether it was suitable or acceptable.
4/ On August 24th, 2011, a Dutch court ruled that Samsung was guilty of infringing one of Apple's patents (EP 868) pertaining to user interface for scrolling and moving digital objects on the Galaxy S, S II and Ace. Samsung announced on October 12, 2011 that an upgraded version of the three Galaxy smartphones will be released to avoid the infringement. I have used 1 month for the purpose of the design around period to be conservative.
Judgment, District Court The Hague, The Netherlands, 24 August 2011, docket numbers: 396957 / KG ZA 11-730 and 396959 / KG ZA 11-731 of Apple Inc. v. Samsung Electronics Co. LTD et al. and
http://www.reuters.com/article/2011/10/12/us-samsung-smartphones-netherlands-idUSTRE79B1W020111012.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 46-R**

## Reasonable Royalty Rates - Smartphones

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| 6,493,002 | No Market Rate 3/ | $0.28-$2.17 | $   0.33 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $   1.09 |
| 7,469,381 | No Market Rate 3/ | $0.52-$4.03 | $   0.62 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $   2.02 |
| 7,663,607 | | | | | |
| 7,844,915 | No Market Rate 3/ | $0.80-$6.20 | $   0.95 | The quantitative reference points range from $0.80-$6.20 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $   3.10 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 3588-1   Filed 02/14/18   Page 15 of 16
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 46-R

**Reasonable Royalty Rates - Smartphones**

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| 7,853,891 | No Market Rate 3/ | $0.28-$2.17 | $   0.33 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $   1.09 |
| 7,864,163 | No Market Rate 3/ | $0.52-$4.03 | $   0.62 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $   2.02 |
| 7,920,129 | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    EXHIBIT 46-R

**Reasonable Royalty Rates - Smartphones**

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| D627,790<br>D617,334<br>D604,305<br>D618,677<br>D504,889<br>D593,087<br>D622,270<br>3,886,196<br>3,889,642<br>3,886,200<br>3,889,685<br>3,886,169<br>3,886,197<br>85/041,463 (Pending)<br>2,935,038 | No Market Rate. See Exhibit 40-R. | $9.00-$24.00 per Unit. See Exhibit 41-S. | $       14.25 | The quantitative reference points range from $9.00-$24.00 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the design patents and trademarks are of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for the design patents trademarks as a whole is the high end of the reference range. 5/ | $       24.00 |

**Sources/Notes:**

1/ See Exhibit 41-R.

2/ See Exhibit 39-R.

3/ No market rate provided for Apple utility patents. Licensing discussions and proposals by both Apple and Samsung involved a portfolio of unspecific patents. See Exhibit 40-R.

4/ The U.S. Treasury Department utilizes an interquartile range methodology in evaluating an accepting royalty rates that are considered comparable and acceptable for use in transfer pricing. A range of proposed data points are divided into four quartiles and the highest and lowest quartiles are removed to produce a resulting range of acceptable comparable royalty rates. The 50 percent is the mid point in the range and still leaves 50% of excess profits.

5/ Due to the extreme importance of Apple's design to its corporate success and future, I have assigned the high end of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only