# EXHIBIT F

No. 15-777

# In the Supreme Court of the United States

---

SAMSUNG ELECTRONICS CO., LTD., ET AL., PETITIONERS

*v.*

APPLE INC.

---

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT*

---

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING NEITHER PARTY**

---

SARAH T. HARRIS
  *General Counsel*
NATHAN K. KELLEY
  *Solicitor*
THOMAS W. KRAUSE
  *Deputy Solicitor*
SCOTT C. WEIDENFELLER
BRIAN T. RACILLA
LORE A. UNT
WILLIAM LAMARCA
  *Associate Solicitors*
  *United States Patent and*
    *Trademark Office*
  *Alexandria, Va. 22313*

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
BENJAMIN C. MIZER
  *Principal Deputy Assistant*
    *Attorney General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
GINGER D. ANDERS
  *Assistant to the Solicitor*
    *General*
MARK R. FREEMAN
TYCE R. WALTERS
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

Section 289 of the Patent Act of 1952 provides that whoever "applies [a] patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale," or "sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied," shall be "liable to the [patent] owner to the extent of his total profit." 35 U.S.C. 289. The question presented is as follows:

Whether, when a defendant infringes a design patent by including the patented design in a multi-component product that is sold to the public, the patent holder is entitled to recover the defendant's entire profit realized from sales of the finished product.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States.........................................................1
Statement .........................................................................................1
Summary of argument .................................................................7
Argument..........................................................................................9
   I.   Section 289 authorizes a patent owner to recover
       an infringer's total profit from an infringing article
       of manufacture ...............................................................10
       A.  Section 289 does not permit apportionment
           based on the extent to which the infringer's
           profit on the relevant "article of manufacture"
           was attributable to the infringing design .............11
       B.  Petitioners identify no sound basis for con-
           struing Section 289 to allow an award of less
           than the infringer's total profit from the rele-
           vant article of manufacture ....................................14
  II.   To calculate the total profit due under Section
       289, the factfinder must identify the "article of
       manufacture" to which the infringing design has
       been applied, and that article will not always be
       the finished product sold to end-users .......................16
       A.  The relevant "article of manufacture" for
           purposes of Section 289 may be a component
           of a multi-component product ...............................17
           1.   The term "article of manufacture" is broad
                enough to include components of a complete
                product...............................................................17
           2.   Section 289 does not limit the types of articles
                that may qualify as the relevant "article of
                manufacture"....................................................18
           3.   The judicial and administrative understanding
                of the term "article of manufacture" has long
                included components of products...................19

(III)

IV

Table of Contents—Continued:                                    Page

      4.  Treating the complete product as the
          relevant "article of manufacture" in
          every case would often produce greatly
          disproportionate infringement liability .......... 23
    B.  Identifying the relevant "article of manufacture"
       is a task for the finder of fact under the totality
       of the circumstances ................................................ 25
    C.  The Court should remand this case for further
       proceedings .............................................................. 31
Conclusion.................................................................................. 34

**TABLE OF AUTHORITIES**

Cases:

*Adams, Ex parte*, 84 Off. Gaz. Pat. Office 311 (1898) ........ 21

*Alaska Dep't of Envtl. Conservation* v. *EPA*,
   540 U.S. 461 (2004)................................................................ 31

*American Fruit Growers, Inc.* v. *Brogdex Co.*,
   283 U.S. 1 (1931) ................................................................ 18

*Amini Innovation Corp.* v. *Anthony Cal., Inc.*,
   439 F.3d 1365 (Fed. Cir. 2006)............................................ 30

*Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989).................................................................. 2

*Brand, Ex parte*, 83 Off. Gaz. Pat. Office 747 (1897) .......... 22

*Brower, Ex parte*, 4 Off. Gaz. Pat. Office 450 (1873).......... 22

*Bush & Lane Piano Co.* v. *Becker Bros.*:
   222 F. 902 (2d Cir. 1915) ..................................... 20, 28, 29
   234 F. 79 (2d Cir. 1916) ............................13, 20, 21, 27, 29

*Carey* v. *Piphus*, 435 U.S. 247 (1978) .................................. 15

*Catalina Lighting, Inc.* v. *Lamps Plus, Inc.*,
   295 F.3d 1277 (Fed. Cir. 2002)............................................ 14

*Commil USA, LLC* v. *Cisco Sys., Inc.*, 135 S. Ct.
   1920 (2015) .............................................................................. 24

V

Cases—Continued:                                          Page

*Dobson* v. *Dornan*, 118 U.S. 10 (1886).................................. 11

*Dobson* v. *Hartford Carpet Co.*, 114 U.S. 439 (1885).... 11, 12

*Egyptian Goddess, Inc.* v. *Swisa, Inc.*, 543 F.3d 665
(Fed. Cir. 2008), cert. denied, 556 U.S. 1167
(2009).................................................................. 3, 28, 30

*Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230
(2009)............................................................................ 23

*Gorham Co.* v. *White*, 81 U.S. (14 Wall.) 511
(1872)..................................................2, 3, 18, 26, 30

*Graver Tank & Mfg. Co.* v. *Linde Air Prods. Co.*,
339 U.S. 605 (1950)............................................... 29

*Hadden, In re*, 20 F.2d 275 (D.C. Cir. 1927)...................... 18

*Hana Fin., Inc.* v. *Hana Bank*, 135 S. Ct. 907 (2015) ....... 30

*Horvath* v. *McCord Radiator & Mfg. Co.*, 100 F.2d
326 (6th Cir. 1938), cert. denied, 308 U.S. 581 (1939)...... 31

*Hruby, In re*, 373 F.2d 997 (C.C.P.A. 1967)........................ 17

*Johnson* v. *Johnston*, 60 F. 618 (C.C.W.D. Pa. 1894) ........ 18

*Kapp, Ex parte*, 83 Off. Gaz. Pat. Office 1993 (1898) ......... 22

*Kellman* v. *Coca-Cola Co.*, 280 F. Supp. 2d 670 (E.D.
Mich. 2003)...................................................................... 4

*Lorillard* v. *Pons*, 434 U.S. 575 (1978) ................................ 23

*Markman* v. *Westview Instruments, Inc.*, 517 U.S.
370 (1996)...................................................................... 28

*Medtronic, Inc.* v. *Mirowski Family Ventures, LLC*,
134 S. Ct. 843 (2014) .................................................. 31

*Nike, Inc.* v. *Wal-Mart Stores, Inc.*, 138 F.3d 1437
(Fed. Cir. 1998), cert. denied, 528 U.S. 946 (1999) .......... 13

*Nordock, Inc.* v. *Systems Inc.*, 803 F.3d 1344
(Fed. Cir. 2015), petition for cert. pending,
No. 15-978 (filed Jan. 28, 2016)..................................... 5

*Pullman Couch Co.* v. *Union*, 39 U.S.P.Q. 100
(D. Md. 1938) ................................................................ 22

VI

Cases—Continued:                                          Page

*Riley* v. *California*, 134 S. Ct. 2473 (2014)............................. 5

*SEC* v. *Teo*, 746 F.3d 90 (3d Cir.), cert. denied,
  135 S. Ct. 675 (2014) ............................................... 31

*Schnell, In re*, 46 F.2d 203 (C.C.P.A. 1931) .......................... 3

*Sheldon* v. *Metro-Goldwyn Pictures Corp.*,
  309 U.S. 390 (1940)................................................. 27

*Simpson* v. *Davis*, 12 F. 144 (E.D.N.Y. 1882) .................... 22

*SmithKline Diagnostics, Inc.* v. *Helena Labs. Corp.*,
  926 F.2d 1161 (Fed. Cir. 1991)............................... 30

*Tilghman* v. *Proctor*, 125 U.S. 136 (1888) ......................... 14

*Untermeyer* v. *Freund*, 58 F. 205 (2d Cir. 1893)............... 12

*WMS Gaming Inc.* v. *WPC Prods. Ltd.*, 542 F.3d 601
  (7th Cir. 2008)...................................................... 13

*Wal-Mart Stores, Inc.* v. *Samara Bros.*, 529 U.S. 205
  (2000) ................................................................... 2

*Young* v. *Grand Rapids Refrigerator Co.*, 268 F. 966
  (6th Cir. 1920)................................................. 21, 28

Statutes and regulation:

Act of Feb. 4, 1887, ch. 105, 24 Stat. 387 ............................ 12

  § 1, 24 Stat. 387................................................... 12

  § 2, 24 Stat. 388................................................... 14

Patent Act of July 8, 1870, ch. 230, § 55, 16 Stat. 206 ........ 14

Patent Act of 1952:

  35 U.S.C. 2(a)(1)..................................................... 1

  35 U.S.C. 2(b)(8) .................................................... 1

  35 U.S.C. 101........................................................ 17

  35 U.S.C. 112(b)...................................................... 3

  35 U.S.C. 171.................................... 1, 17, 19, 21

  35 U.S.C. 171(a) ..................................................... 2

  35 U.S.C. 171(b).................................................. 2, 3

VII

Statutes and regulation—Continued:        Page

35 U.S.C. 271 ................................................................ 3

35 U.S.C. 283 .............................................................. 14

35 U.S.C. 284 ....................................................... 4, 5, 14

35 U.S.C. 289 ......................................................... *passim*

Rev. Stat. § 4929 (1878) ........................................... 21

15 U.S.C. 1125(a) ....................................................... 2

17 U.S.C. 504(b) ....................................................... 13

37 C.F.R. 1.153(a) ..................................................... 3

Miscellaneous:

*Black's Law Dictionary*:

(1st ed. 1891) ................................................. 17

(10th ed. 2014) .............................................. 17

8 Donald S. Chisum, *Chisum on Patents* (2014) .... 2, 3, 4, 18

P.J. Federico, *Commentary on the New Patent Act*,
75 J. Pat. & Trademark Off. Soc'y (1993) ........................ 13

H.R. Rep. No. 1966, 49th Cong., 1st Sess. (1886)... 12, 16, 25

Giuseppe Macri, *Patent Trolls Are Already Abusing
the Apple v. Samsung Ruling*, InsideSources
(Oct. 1, 2015), http://www.insidesources.com/
patent-trolls-are-already-abusing-the-apple-v-
samsung-ruling/ ................................................... 24

1 James A.H. Murray, *A New English Dictionary*
(1888) .............................................................. 17

*Patent Law Codification and Revision:  Hearings
on H.R. 3760 Before Subcomm. No. 3 of the Comm.
on the Judiciary*, 82d Cong., 1st Sess. (1951) ................. 13

1 William C. Robinson, *The Law of Patents for Use-
ful Inventions* (1890) ........................................... 18

S. Rep. No. 206, 49th Cong., 1st Sess. (1886) ..................... 12

*The American Heritage Dictionary* (3d ed. 1992) ............. 11

VIII

Miscellaneous—Continued:                           Page

   11 *The Oxford English Dictionary* (1st ed. 1933)............. 11

U.S. Patent & Trademark Office, *Manual of Patent*
   *Examining Procedure* (rev. 9th ed. 2015) ............... 2, 3, 28

*Webster's New International Dictionary of the*
   *English Language* (W.T. Harris ed., 1917)..................... 17

# In the Supreme Court of the United States

———————

No. 15-777

SAMSUNG ELECTRONICS CO., LTD., ET AL., PETITIONERS

*v.*

APPLE INC.

———————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FEDERAL CIRCUIT*

———————

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING NEITHER PARTY**

———————

## INTEREST OF THE UNITED STATES

This case involves the proper interpretation of 35 U.S.C. 289, which mandates the award of an infringer's "total profit" as a remedy for infringement of a design patent issued pursuant to 35 U.S.C. 171. The United States Patent and Trademark Office (PTO) is responsible for issuing patents and—through the Secretary of Commerce—advising the President on issues of patent policy. See 35 U.S.C. 2(a)(1) and (b)(8). Several other agencies of the federal government also have a strong regulatory interest in the efficacy of the patent system. The United States therefore has a substantial interest in the Court's disposition of this case.

## STATEMENT

1. a. Since 1842, the patent laws have authorized the issuance of patents not only for useful inventions,

(1)

2

but also for ornamental designs. *Gorham Co.* v. *White*, 81 U.S. (14 Wall.) 511, 524 (1872). Section 171(a) of Title 35 of the United States Code provides that "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. 171(a). A patentable design is "not an abstract impression, or picture," but rather "an aspect given to * * * [an] article of manufacture" that "gives a peculiar or distinctive appearance to the manufacture." *Gorham*, 81 U.S. at 524-525. Design patents thus protect the innovative appearance given to an article of manufacture, "fill[ing] a gap between copyright protection for authors and patent protection for inventors in the mechanical arts."[1] 8 Donald S. Chisum, *Chisum on Patents* § 23.02, at 23-6 (2014) (*Chisum*). "To qualify for protection, a design must present an aesthetically pleasing appearance that is not dictated by function alone, and must satisfy the other criteria of patentability," such as novelty and non-obviousness. *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989); see 35 U.S.C. 171(b).

A design patent must contain a single claim stating that the patent claims an "ornamental design" for a particular "article" of manufacture, "as shown" in drawings contained in the specification. PTO, *Manual of Patent Examining Procedure (MPEP)* § 1503.01,

---

[1] Design patents are also distinct from trade dress, which protects a distinctive visual appearance of a product as a unique signifier of the source of goods. Design patents protect designs without regard to whether consumers associate a specific design with a particular source of goods. See 15 U.S.C. 1125(a); *Wal-Mart Stores, Inc.* v. *Samara Bros.*, 529 U.S. 205, 214 (2000).

3

Subsec. III (rev. 9th ed. 2015); see 37 C.F.R. 1.153(a). Subject to the definiteness requirement applicable to all patent applications, 35 U.S.C. 112(b), a design patentee has "substantial latitude" in designating the article to which the design is intended to be applied. *MPEP* § 1503.01.

In defining the scope of the claimed design, the patent applicant may use drawings, figures, or photographs, as well as a written description. In a drawing, the design itself is depicted in solid black lines, while broken lines are used to depict structures that are not part of the claimed design but are necessary to show the design's environment. See *MPEP* § 1503.02. A patented design may be a surface design such as an "ornament, impression, print, or picture," or it may be the "design for a shape or configuration for an article of manufacture." *In re Schnell*, 46 F.2d 203, 209 (C.C.P.A. 1931).

b. A design patent is infringed when a defendant makes, uses, offers to sell, or sells a product containing a design that is substantially similar to the patented design. *Gorham*, 81 U.S. at 528; *Egyptian Goddess, Inc.* v. *Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc), cert. denied, 556 U.S. 1167 (2009); see 35 U.S.C. 171(b), 271. In determining whether infringement has occurred, the factfinder focuses on whether the accused article "embod[ies] the patented design or any colorable imitation thereof." See *Egyptian Goddess*, 543 F.3d at 678 (citation omitted; brackets in original).[2]

---

[2] "In virtually all the reported cases, the accused article is of the same nature as the patented one." 8 *Chisum* § 23.05[2], at 23-186. If a design were applied to an article different from the one claimed in the patent, the existence of infringement would turn on the nature

4

If the defendant in a design-patent case is found liable for infringement, the patent holder has a choice of remedies. Section 284, which applies to both utility and design patents, authorizes an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. 284. Section 289, the provision at issue in this case, establishes an alternative remedy for infringement of a design patent:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

35 U.S.C. 289. Section 289 further provides that the availability of this remedy does not "prevent, lessen, or impeach any other remedy which an owner of an

─────────────────────

of the design and the articles in question. If the design involves surface ornamentation, such as a drawing intended to be placed on a watch face, a clock emblazoned with the same design might be infringing. *Id.* at 23-186 n.2. But if the design is for the shape of a particular article, then transposing that design to a different article might result in a "substantial change in the appearance of the design," thereby "avoiding any question of infringement." *Id.* § 23.05[2], at 23-186; see *Kellman* v. *Coca-Cola Co.*, 280 F. Supp. 2d 670 (E.D. Mich. 2003) (no infringement when defendant reproduced a design for the shape of a hat as a two-dimensional picture on t-shirts).

5

infringed patent has under [the Patent Act], but he shall not twice recover the profit made from the infringement." *Ibid.*; see *Nordock, Inc.* v. *Systems Inc.*, 803 F.3d 1344, 1353 (Fed. Cir. 2015) (a design patentee must choose between damages under Section 284 and profits under Section 289), petition for cert. pending, No. 15-978 (filed Jan. 28, 2016).

2. Petitioners Samsung Electronics Co., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, Samsung) compete with respondent Apple Inc. in the market for smartphones—that is, "cell phone[s] with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity." *Riley* v. *California*, 134 S. Ct. 2473, 2480 (2014); see Pet. App. 4a-5a. As relevant here, respondent holds three design patents related to its 2007 iPhone. Those patents claim a black rectangular round-cornered front face of a phone; a phone's front face as well as a bezel surrounding the face's rim; and a grid of sixteen colorful icons on a black screen. Pet. App. 19a-20a.

In 2011, respondent sued petitioners for patent infringement, alleging that various Samsung smartphones infringed Apple's design and utility patents and diluted Apple's trade dresses. Pet. App. 4a. After a trial, a jury found, *inter alia*, that petitioners had infringed respondent's design patents. *Id.* at 57a-61a.[3]

Invoking Section 289, respondent sought an award of petitioners' "total profits" from the sale of the in-

---

[3] The jury also found dilution of respondent's trade dresses and infringement of its utility patents. Pet. App. 4a. The court of appeals affirmed the utility-patent verdict and damages, and vacated the trade-dress verdict. *Ibid.* Those rulings are not at issue here.

6

fringing phones.  Petitioners asserted two objections to that measure of relief.  First, petitioners argued that, under "basic causation principles," they should be liable only for profits attributable to the infringing design, as opposed to other attributes of the phones.  Pet. App. 27a, 133a.  Second, petitioners argued in their pretrial brief that "profits disgorgement [must] be limited to the 'article of manufacture' to which a patented design is applied," and that the relevant "article[s] of manufacture" in this case were components of the phones, rather than the phones themselves.  D. Ct. Doc. No. 1322, at 19 (July 25, 2012) (Pets. Trial Br.).  Petitioners submitted proposed jury instructions that embodied those principles, but the district court rejected the proposed instructions on the ground that "there's no apportionment for Samsung profits in design patent cases."  J.A. 246.

The district court instructed the jury that "[i]f you find infringement by any Samsung defendant  * * *  you may award Apple that Samsung Defendant's total profit attributable to the infringing products."  Pet. App. 165a.  The jury awarded respondent all the profits that petitioners had received on sales of the infringing phones.  Pet. 16.  After a partial retrial on damages resulting from errors not relevant here, the district court entered a final judgment awarding respondent nearly $1 billion in damages for design-patent infringement and trade-dress dilution.  Pet. App. 5a.

3. The Federal Circuit affirmed the jury's finding of design-patent infringement and the award of petitioners' total profit on the infringing phones.  Pet. App. 26a-29a.  The court first rejected petitioners' argument that the award under Section 289 should

7

have been limited to profits attributable to the infringement, holding that "the clear statutory language [of Section 289] prevents us from adopting a 'causation' rule." *Id.* at 28a. The court next rejected petitioners' argument that, for purposes of calculating the appropriate award under Section 289, the infringing "article[s] of manufacture" were the phones' exterior shells and the array of icons displayed on the phones' screens rather than the phones as sold to the public. *Id.* at 29a. The court concluded that "[t]he innards of [petitioners'] smartphones were not sold separately from their shells as distinct articles of manufacture to ordinary purchasers," and that respondent was therefore entitled to petitioners' entire profits from the infringing phones. *Ibid.*

### SUMMARY OF ARGUMENT

I. Section 289 states that a person who applies a patented design "to any article of manufacture for the purpose of sale," or who sells "any article of manufacture to which" the patented design has been applied, "shall be liable to the [patent] owner to the extent of his total profit." 35 U.S.C. 289. That language unambiguously permits a patent holder to recover the infringer's entire profits from the "article of manufacture" to which the design was applied, regardless of the extent to which those profits are attributable to the infringing design. The history of Section 289's development confirms that understanding.

II. Although Section 289 entitles the patent holder to recover the infringer's "total profit" on the "article of manufacture" to which the design was applied, that "article of manufacture" will not always be the finished product that is sold in commerce. Rather, the relevant article will sometimes be a component of the

8

ultimate item of sale.  In such cases, the patentee is entitled only to the infringer's total profit for that component, not its total profit for the finished item.

A.  Section 289's text and history establish that an "article of manufacture" may be a component of a product as sold.  During the late nineteenth and early twentieth centuries, the Patent Office and the courts construed the term "article of manufacture," as used in Section 289's predecessor, to include components that were intended to be sold and used only as parts of a larger product.  Congress should be understood to have adopted that construction when it reenacted the "total profit" remedy as Section 289 in the Patent Act of 1952.  35 U.S.C. 289.

The Federal Circuit's contrary approach, under which the relevant "article of manufacture" is invariably the entire product as sold, would result in grossly excessive and essentially arbitrary awards.  Under that approach, when the plaintiff's patented design is applied to a component of a multi-component product, the award will turn substantially on the scope and profitability of *other* components as to which no infringement occurred.  To be sure, Section 289's "total profit" standard, which precludes any inquiry into what portion of the profits on a particular "article of manufacture" are attributable to the infringing design, may sometimes produce awards that exceed the commercial benefit that the infringer derived by appropriating the patented design.  But there is no reason to exacerbate those effects, which follow inevitably from the unambiguous statutory text, by adopting an overbroad reading of the term "article of manufacture."

9

B.  Identifying the relevant "article of manufacture" entails a case-specific analysis of the relationship among the design, the product, and any components. The factfinder should identify the article in which the design prominently features, and that most fairly may be said to embody the defendant's appropriation of the plaintiff's innovation.  Relevant considerations include the scope of the claimed design, the extent to which the design determines the appearance of the product as a whole, the existence of unrelated, conceptually distinct elements in the product, the extent to which various components can be physically separated from the product as a whole, and the manner in which the components were manufactured. While the plaintiff bears the ultimate burden of establishing the infringer's total profit, the defendant, as the manufacturer or seller of the product in question, should bear the burden of identifying any component that it views as the relevant article of manufacture.

C.  This Court should remand the case to allow the courts below to determine whether a new trial is warranted.  Although the district court's jury instructions equated the term "article of manufacture" with the finished smartphones, it is unclear whether petitioners produced evidence supporting their assertions that components of the phones should be considered the relevant articles of manufacture.  The lower courts should be permitted to make that determination in the first instance.

## ARGUMENT

Under Section 289, whoever "applies [a] patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale * * * shall be liable to the owner to the extent of his total profit."

10

35 U.S.C. 289.  This case presents the question whether, when an infringing design is embodied in a multicomponent product, the "total profit" awarded may ever be less than the infringer's total profit on the complete product as it was sold to end-users.  The answer to that question is yes.

Once the relevant "article of manufacture" has been identified, Section 289 renders the infringer liable for *all* its profits *for that article*; the court or jury may not award a lower amount on the theory that only a portion of those profits are attributable to the patented design.  Contrary to the Federal Circuit's apparent conclusion, however, the relevant "article of manufacture" need not always be the finished product as sold to end-users.  Where the relevant "article of manufacture" is a component or portion of a multicomponent product, the infringer's "total profit" for that "article" may be less than its profit for the finished item of sale.

## I. SECTION 289 AUTHORIZES A PATENT OWNER TO RECOVER AN INFRINGER'S TOTAL PROFIT FROM AN INFRINGING ARTICLE OF MANUFACTURE

Section 289 establishes a disgorgement remedy in cases where an infringer has sold an "article of manufacture" to which a patented design has been applied.  As we explain below (see pp. 16-31, *infra*), the relevant "article of manufacture" will sometimes be the entire product as sold in commerce, but it will sometimes be only a component or portion of that product.  Once the relevant "article of manufacture" has been identified, however, Section 289 makes the infringer liable for *all* the profits it received from sales of that article, even if the article's other attributes contributed to those profits.

11

A. **Section 289 Does Not Permit Apportionment Based On The Extent To Which The Infringer's Profit On The Relevant "Article Of Manufacture" Was Attributable To The Infringing Design**

1. Section 289 provides that whoever "applies the patented design \* \* \* to any article of manufacture for the purpose of sale," or "sells or exposes for sale any article of manufacture to which such design" has been applied, "shall be liable to the owner to the extent of his total profit." 35 U.S.C. 289. The phrase "total profit" is not ambiguous: "total" means the "entirety." *The American Heritage Dictionary* 1892 (3d ed. 1992); 11 *The Oxford English Dictionary* 176 (1st ed. 1933) (defining "total" as "whole, entire"). The source of the "total profit" to which the patent holder is entitled is equally clear. The conduct that triggers liability under Section 289 is (1) applying a patented design to an "article of manufacture for the purpose of sale," or (2) selling an article to which the design has been applied. The "total profit" for which the seller of infringing goods is liable is therefore the total profit from the sale of the article of manufacture to which the design has been applied.

2. The historical development of Section 289 and its statutory predecessors confirms that understanding. Section 289's "total profit" standard reflects Congress's rejection of a series of decisions in which this Court had held that a design patentee was entitled to recoup only those profits that were "attributable to the use of the infringing design" itself. *Dobson* v. *Dornan*, 118 U.S. 10, 17 (1886); see *Dobson* v. *Hartford Carpet Co.*, 114 U.S. 439, 444 (1885) (*Dobson I*). The defendants in the *Dobson* cases had sold carpets with infringing designs. The Court held that the de-

12

fendants were liable for only nominal damages because the patentees were unable to establish the portion of their lost profits that was attributable to the patented design, as opposed to the unpatented aspects of the carpet. *Dobson I*, 114 U.S. at 444.

In response, Congress enacted a "new rule of recovery for design patents." S. Rep. No. 206, 49th Cong., 1st Sess. 2 (1886). The Act of February 4, 1887 (1887 Act), ch. 105, 24 Stat. 387, provided that any person who applied a patented design "to any article of manufacture for the purpose of sale" would be "liable in the amount of two hundred and fifty dollars," and if the "total profit made by him  *  *  *  exceeds the sum of two hundred and fifty dollars, he shall be further liable for the excess of such profit." § 1, 24 Stat. 387. The House Report explained that the new provision would abrogate the *Dobson* decisions and would permit the patentee to recover the "infringer's entire profit on the article." H.R. Rep. No. 1966, 49th Cong., 1st Sess. 3 (1886) (*House Report*); see *id*. at 1-2 (discussing *Dobson I*). Congress deemed that change necessary and appropriate because, although the design of an article like a carpet "sells the article," *id*. at 3, patentees would find it difficult to establish the portion of an infringer's profit that was "directly due to the *appearance* of those articles as distinguished from their material, their fabric, [and] their utility," *id*. at 2. Accordingly, in the ensuing decades, courts understood the 1887 Act's "manifest purpose" to be "to declare that the measure of profits recoverable on account of the infringement should be considered to be the total net profits upon the whole article." *Untermeyer* v. *Freund*, 58 F. 205, 212 (2d Cir. 1893);

13

*Bush & Lane Piano Co.* v. *Becker Bros.*, 234 F. 79, 83 (2d Cir. 1916) (*Piano II*).

In 1952, when Congress reenacted the "total profit" standard in Section 289, it did not materially alter the statutory text or suggest any disagreement with the settled understanding of that language.[4] See *Patent Law Codification and Revision:  Hearings on H.R. 3760 Before Subcomm. No. 3 of the Comm. on the Judiciary*, 82d Cong., 1st Sess. 109-110 (1951) (statement of P.J. Federico, U.S. Patent Office) (explaining that a materially similar draft of the statute "merely puts [the design-patent provisions] in [their] place without attempting to make any changes in the statute"); accord P.J. Federico, *Commentary on the New Patent Act*, 75 J. Pat. & Trademark Off. Soc'y 161, 202-203 (1993).  The Federal Circuit has accordingly recognized that Section 289, like its predecessor, entitles a design-patent owner to an infringer's entire profits from the sale of the infringing article of manufacture.  See, *e.g.*, *Nike, Inc.* v. *Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1441 (1998), cert. denied, 528 U.S. 946 (1999).[5]

---

[4] While the 1887 Act was limited to knowing infringement, Congress omitted the knowledge requirement in Section 289.  35 U.S.C. 289.

[5] Section 289's "total profit" measure of recovery is unique in intellectual property law.  In copyright and trademark cases, the plaintiff is entitled to recover the infringer's profits only to the extent they are attributable to the infringement.  17 U.S.C. 504(b); *WMS Gaming Inc.* v. *WPC Prods. Ltd.*, 542 F.3d 601, 607 (7th Cir. 2008).  In utility-patent cases, the Patent Act does not permit the recovery of an infringer's profits.  The patent laws previously authorized that remedy, however, and the Court construed the relevant provision to encompass only those profits attributable to

14

**B. Petitioners Identify No Sound Basis For Construing Section 289 To Allow An Award Of Less Than the Infringer's Total Profit From The Relevant Article Of Manufacture**

Petitioners contend (Br. 34) that "recoverable profits under Section 289 are limited to those attributable to infringement of the patented design." That argument is unpersuasive.

1. Petitioners rely primarily on Section 289's second paragraph, which states that "[n]othing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but *he shall not twice recover the profit made from the infringement*." 35 U.S.C. 289 (emphasis added); see 1887 Act § 2, 24 Stat. 388 (similar).  That language clarifies that, while Section 289 supplements the generally applicable remedies authorized by other Patent Act provisions, it does not permit the patentee to combine those remedies to obtain a double recovery.  A design patentee (like a utility patentee) may seek an injunction, 35 U.S.C. 283, or "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty," 35 U.S.C. 284.  Section 289's second paragraph accordingly specifies that, if the patentee obtains the infringer's profits under Section 289, it may not recover additional monetary damages under Section 284 for the same acts of infringement.  See *Catalina Lighting, Inc.* v. *Lamps Plus, Inc.*, 295 F.3d 1277, 1291 (Fed. Cir. 2002).

---

the infringement.  Patent Act of July 8, 1870, ch. 230, § 55, 16 Stat. 206; see *Tilghman* v. *Proctor*, 125 U.S. 136, 146 (1888).

15

In petitioners' view, the second paragraph's reference to "profit made from the infringement" has the additional function of implicitly limiting the "total profit" recoverable under Section 289 to profit attributable to the infringing design. Br. 34. That construction should be rejected because it places the two paragraphs of Section 289 at cross-purposes with each other. Congress enacted the "total profit" standard now contained in Section 289's first paragraph to relieve the patentee of the burden of demonstrating the portion of the infringer's profit that is attributable to the infringement. See p. 12, *supra*.

2. Petitioners also rely (Br. 35-39) on "traditional principles of causation and equity," arguing that Section 289 is not sufficiently clear to abrogate the common-law rule that "compensation is limited to 'the injury *caused* to plaintiff by defendant's breach of duty.'" Br. 36 (quoting *Carey* v. *Piphus*, 435 U.S. 247, 254-255 (1978)). Petitioner's reliance on those background principles is misplaced. The whole point of the "total profit" standard is to provide a measure of recovery different from, and in many cases more expansive than, the award that traditional causation principles would produce. To be sure, in cases where the relevant "article of manufacture" is not sold separately but is instead a component of a larger product, identifying the infringer's profit on that article may require an inquiry that is functionally similar to a traditional causation analysis. There is nevertheless a significant conceptual and practical difference between the profit attributable to the infringing *article* and the profit attributable to the *infringement*.

16

## II. TO CALCULATE THE TOTAL PROFIT DUE UNDER SECTION 289, THE FACTFINDER MUST IDENTIFY THE "ARTICLE OF MANUFACTURE" TO WHICH THE INFRINGING DESIGN HAS BEEN APPLIED, AND THAT ARTICLE WILL NOT ALWAYS BE THE FINISHED PRODUCT SOLD TO END-USERS

To calculate the "total profit" for which the infringer is liable, the factfinder must first identify the "article of manufacture" to which the patented design has been applied. 35 U.S.C. 289. The court below appears to have assumed that the relevant "article of manufacture" is necessarily the final product as sold in commerce. Pet. App. 29a. That is incorrect.

When Congress first adopted the "total profit" standard, it was responding to concerns raised about a specific set of products—carpets, wallpaper, and the like—that are composed of a single component. *House Report* 3; see pp. 11-12, *supra*. When an infringing design is applied to that sort of product, there is only one possible "article of manufacture"—the complete product as sold to end-users. But nothing in Section 289's text or history suggests that the relevant "article of manufacture" must invariably be the product as sold. To the contrary, the term "article of manufacture" literally encompasses all manufactured objects—both complete products and components—and it has historically been understood to include both. When the product whose sale gives rise to infringement liability is made up of multiple components, the factfinder must determine whether the "article of manufacture" to which the defendant has applied the patented design is the entire product as sold, or a component of that product.

17

A. **The Relevant "Article Of Manufacture" For Purposes Of Section 289 May Be A Component Of A Multi-Component Product**

1. *The term "article of manufacture" is broad enough to include components of a complete product*

The term "manufacture" broadly includes "[a]ny useful product made directly by human labor, or by the aid of machinery directed and controlled by human power." *Black's Law Dictionary* 751 (1st ed. 1891); accord *Black's Law Dictionary* 1109 (10th ed. 2014). The phrase "article of" denotes an example of a category of things: "[s]omething considered by itself and as apart from other things of the same kind or from the whole of which it forms a part; also, a thing of a particular class or kind." *Webster's New International Dictionary of the English Language* 131 (W.T. Harris ed., 1917) (example: "an *article* of merchandise"); accord 1 James A.H. Murray, *A New English Dictionary* 471 (1888). The phrase "article of manufacture" therefore encompasses any item that is made by human labor, including manufactured items that are not sold as separate commodities but instead function as components of a larger product.

That conclusion is reinforced by the construction given to the identical phrase in Section 171, which authorizes the PTO to issue patents on designs for "article[s] of manufacture." 35 U.S.C. 171. That provision, in turn, echoes Section 101, which provides that an inventor may obtain a utility patent on any "new and useful  * * *  manufacture." 35 U.S.C. 101. Courts have long understood Section 171's reference to an "article of manufacture" to include any article that would fall within the definition of "manufacture" under Section 101. See *In re Hruby*, 373 F.2d 997,

18

1000 (C.C.P.A. 1967); *In re Hadden*, 20 F.2d 275, 276 (D.C. Cir. 1927); 8 *Chisum* § 23.03[2], at 23-12 to 23-13. And this Court has construed the term "manufacture," as used in Section 101, broadly to include "anything made for use from raw or prepared materials." *American Fruit Growers, Inc.* v. *Brogdex Co.*, 283 U.S. 1, 11 (1931) (citation omitted); see *Johnson* v. *Johnston*, 60 F. 618, 620 (C.C.W.D. Pa. 1894). As a leading treatise explained in 1890, the term "manufacture" is "comprehensive" enough to encompass "the parts of a machine considered separately from the machine itself, all kinds of tools and fabrics, and every other vendible substance which is neither a complete machine nor produced by the mere union of ingredients." 1 William C. Robinson, *The Law of Patents for Useful Inventions* § 183, at 270 (1890).

### 2. *Section 289 does not limit the types of articles that may qualify as the relevant "article of manufacture"*

Although Section 289 refers to the "sale" of an "article of manufacture," it does not suggest that the article must always be the entire product as sold. The relevant "article of manufacture" under Section 289 is one to which the patented design has been "applied," *i.e.*, one in or on which the design is embodied or displayed. See *Gorham Co.* v. *White*, 81 U.S. (14 Wall.) 511, 524-525 (1872). With respect to some multi-component products, the finished product as sold in commerce is most naturally viewed as the article to which the patented design is "applied." That will be so if the "peculiar or distinctive appearance" (*id.* at 525) that constitutes the design predominates when viewing all the components in combination. In other cases, however, it is more natural to say that the de-

19

sign has been applied to a single component, or to a set of components that together are only a portion of the product as sold.

Section 289 states that an infringer who applies a patented design to an "article of manufacture for the purpose of sale," or who "sells  *  *  *  any article of manufacture" to which the patented design has been applied, is liable for his total profit.  35 U.S.C. 289. Because the award of profits is premised on the "sale" of the "article of manufacture," the relevant "article" must be capable of being sold.  But if a particular component is otherwise naturally characterized as the "article of manufacture" to which the patented design has been applied, the sale of the complete product in commerce is properly viewed as a sale of the component as well, since title to the component is transferred as an incident of the larger sale.

### 3. The judicial and administrative understanding of the term "article of manufacture" has long included components of products

In the decades preceding Congress's enactment of Section 289 in the Patent Act of 1952, the courts and the Patent Office construed the term "article of manufacture," as used in the statutory predecessors to Sections 289 and 171, to include components of larger products.  Congress should be understood to have adopted that prevailing interpretation when it reenacted the "total profit" remedy in Section 289.

a. In the early twentieth century, courts of appeals occasionally addressed the proper measure of profits under the 1887 Act when the defendant applied an infringing design to a multi-component product.  Those courts recognized that the phrase "article of manufacture" included manufactured articles that functioned

20

as components of a product, and that determining the relevant "article" for purposes of calculating profits involved a case-specific inquiry.

In 1915 and 1916, the Second Circuit held, in a pair of cases known as the *Piano Cases*, that a piano case—*i.e.*, the outer body of a piano, which gives the piano its shape and houses its strings and hammers—that was "sold with and as part of a piano" was the relevant "article of manufacture" for purposes of calculating profits. *Piano II*, 234 F. at 81; see *Bush & Lane Piano Co.* v. *Becker Bros.*, 222 F. 902 (1915) (*Piano I*). The defendant had sold pianos embodying the plaintiff's ornamental design for a piano case, and the district court awarded the "profits on the piano proper." *Piano I*, 222 F. at 904. In reversing that decision, the court explained that it was necessary to determine "the article to which the design was applied" by examining "the relation to the business whole of the part embodying the patent * * * from all viewpoints, technical, mechanical, popular, and commercial." *Piano II*, 234 F. at 81 (internal quotation marks omitted).

Applying that framework to the evidence before it, the Second Circuit concluded that the "article to which the patented design had been applied was the piano case." *Piano II*, 234 F. at 82. The court acknowledged that there was no "separate market" for the piano case standing alone, divorced from the piano mechanism. *Id.* at 83. It found, however, that the piano case was a distinct "article of manufacture" because the patentee's innovation did not extend to the piano's mechanism, which served a function distinct from that of the case. *Id.* at 81-82. Drawing an analogy to a "patent for a 'book binding' * * * manu-

21

factured with and for [a single] book," the court explained that, although the binding would have "no separate commercial existence" apart from the literary work embodied in the book, it would be absurd to award the patentee of the binding all profits from sales of the book. *Ibid.*

Similarly in *Young* v. *Grand Rapids Refrigerator Co.*, 268 F. 966 (1920), the Sixth Circuit held that the relevant "article of manufacture" was a door latch sold as part of a refrigerator. *Id.* at 973-974. The plaintiff held a patent on a design for the latch, and the defendant sold refrigerators containing a latch that infringed the design. While acknowledging that the refrigerator containing the latch was "sold" as a "unitary article," the court stated that "it is not seriously contended that all the profits from the refrigerator belonged to [the plaintiff]." *Id.* at 974.

b. Both before and after the enactment of the 1887 Act, the Patent Office and the courts understood the term "article of manufacture," as used in the Patent Act's provisions governing the issuance of design patents, to permit the issuance of a patent on a component of a product, even when that component would not be sold separately. See Rev. Stat. § 4929 (1878) (authorizing the Patent Office to issue a design patent for any "original design" for an "article of manufacture"); 35 U.S.C. 171.

During the nineteenth and early twentieth centuries, the Patent Office did not issue design patents on products with parts that a user would ordinarily detach or move, on the ground that the composite product would not embody a single, unitary appearance that could be patented as a design. See *Ex parte Adams*, 84 Off. Gaz. Pat. Office 311, 311 (1898). The

22

Office repeatedly emphasized, however, that an inventor could obtain a design patent on a component part of such a product, regardless of whether that component could be sold or used separately. The Office thus treated the component itself as an "article of manufacture" that could be the subject of a design patent. See *ibid.* ("The several articles of manufacture of peculiar shape which when combined produce a machine or structure having movable parts may each separately be patented as a design."). The Patent Office opined on that basis that an inventor could obtain a design patent on designs for one "member or jaw of a pair of tongs," *Ex parte Kapp*, 83 Off. Gaz. Pat. Office 1993, 1994 (1898); a glass bottle stopper designed to be used with a particular inkstand, *Ex Parte Brower*, 4 Off. Gaz. Pat. Office 450, 450 (1873); and each of two castings "adapted to interlock and form a joint" in a bedstead, *Ex Parte Brand*, 83 Off. Gaz. Pat. Office 747, 748 (1897).

Courts took the same view. In *Pullman Couch Co.* v. *Union*, 39 U.S.P.Q. 100 (D. Md. 1938), the district court held that a furniture post that "is not sold, and can not profitably be sold" separately from the complete sofa, was nonetheless a "separate article" of manufacture because it was manufactured independently of the rest of the sofa. *Id.* at 104; see *Simpson* v. *Davis*, 12 F. 144, 145-146 (E.D.N.Y. 1882) (stating in dicta that a cap of a railing post was likely a "distinct article" because it was manufactured by itself, even though it was "never used except in connection with other parts" of the post).

c. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute

23

without change." *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 239-240 (2009) (quoting *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978)).   Although questions concerning what product or portion of a product should be considered the relevant "article of manufacture" did not arise frequently in the decades preceding the passage of the Patent Act of 1952, courts and the Patent Office consistently recognized that items sold only as part of a larger product could count as "article[s] of manufacture."   Congress should be understood to have adopted that construction in reenacting the "total profit" remedy as Section 289 in the Patent Act of 1952.

### 4. Treating the complete product as the relevant "article of manufacture" in every case would often produce greatly disproportionate infringement liability

The Federal Circuit concluded that respondent was entitled to recover petitioners' entire profits from their sales of infringing smartphones because "[t]he innards of [petitioners'] smartphones were not sold separately from their shells as distinct articles of manufacture to ordinary purchasers."   Pet. App. 29a. The court thus appeared to adopt a categorical rule that the relevant "article of manufacture" under Section 289 is always the finished product sold to end-users.   That construction of Section 289 will often generate grossly disproportionate awards.   Because the term "article of manufacture" is readily susceptible of a narrower construction, the Federal Circuit's approach should be rejected.

From a potential defendant's perspective, the consequences of the Federal Circuit's rule could be draconian.   That rule would mandate an award of total

24

profit on the finished product even if the patented design appears only on a single component that represents a small fraction of the innovation reflected in the sold product and of that product's overall commercial appeal. That measure of total profit (*e.g.*, on sales of refrigerators) will often bear no meaningful relationship to the gain the defendant has realized by appropriating a patented design (*e.g.*, on a latch). And because patent infringement is a strict-liability tort, a manufacturer could suffer that consequence even if it did not deliberately copy the patented design.

In addition, many complex technological products have multiple components that could implicate distinct patented designs. If a single finished product infringed multiple design patents, the Federal Circuit's approach could allow each patentee to seek an award of the total profits on the product. That concern is exacerbated by the possibility that patent-assertion entities could use the threat of an award of profits on the whole product "as a sword" to extract settlements, "even when their claims are frivolous." *Commil USA, LLC* v. *Cisco Sys., Inc.*, 135 S. Ct. 1920, 1930 (2015); see Giuseppe Macri, *Patent Trolls Are Already Abusing the Apple v. Samsung Ruling*, InsideSources (Oct. 1, 2015), http://www.insidesources.com/patent-trolls-are-already-abusing-the-apple-v-samsung-ruling/.

To be sure, even in cases involving unitary (*i.e.*, single-component) items of sale, Section 289's "total profit" standard may sometimes produce awards that are disproportionate to the commercial significance of the patented design. Congress adopted the "total profit" standard in the 1887 Act out of concern that, even when a patented design in fact drives the demand for a particular unitary article, the potential

25

difficulty of proving the profits attributable to the design may unfairly deprive the patentee of any meaningful recovery. *House Report* 3. But while Congress acted to prevent under-compensation of design patentees, Section 289's "total profit" standard has an evident potential to over-compensate plaintiffs in some cases. Where the relevant "article of manufacture" is the finished product as sold in commerce, Section 289 does not permit the infringer to show that some or most of its profit is attributable to aspects of the product (*e.g.*, the quality of the materials used to create it, or the skill with which it is manufactured) other than the patented design. See pp. 11-15, *supra*.

The risk of disproportionate awards would be reduced still further if Section 289 allowed such inquiries in unitary-article cases. But Congress's decision to foreclose apportionment of profits in that circumstance provides no legal or logical basis for requiring infringers to disgorge their entire profits on sales of multi-component products simply because a single component incorporated a patented design. The practical harms wrought by the Federal Circuit's interpretation are likely to be much more extreme than any that may occur in unitary-article cases, and the text of Section 289 provides a sound basis for distinguishing between the two situations.

### B. Identifying The Relevant "Article Of Manufacture" Is A Task For the Finder Of Fact Under The Totality Of The Circumstances

1. a. Calculating the award of total profit under Section 289 requires the factfinder to identify the "article of manufacture" to which the patented design has been applied. 35 U.S.C. 289. A patentable design is one that "gives a peculiar or distinctive appearance

26

to the manufacture, or article to which it may be applied." *Gorham*, 81 U.S. at 525.  In some cases it will be clear that the patented design "gives a peculiar or distinctive appearance" only to a component (*e.g.*, a refrigerator latch) of a larger product sold in commerce, rather than to the product as a whole.  There will sometimes be legitimate doubt, however, whether a patented design is best viewed as affecting the appearance of the sold product as a whole or only the appearance of a component or other portion of that product.  If the design in question is the shape of the Volkswagen Beetle, for example, one might reasonably say either that the design determines the appearance of the automobile's body or that it determines the appearance of the car as a whole.

In conducting this inquiry, the factfinder's overarching objective should be to identify the article that most fairly may be said to embody the defendant's appropriation of the plaintiff's innovation.  That framework anchors the inquiry in Section 289's purpose, which is to provide the patentee with a remedy for (and to prevent the infringer from profiting from) the unlawful appropriation.  In determining whether the relevant article is the entire product or a component, the factfinder therefore should keep in mind the scope of the plaintiff's innovation and should identify the article in which the patented design prominently features, without unnecessarily sweeping in aspects of the product that are unrelated to that design.

That approach is not inconsistent with Section 289's elimination of the requirement that the patentee demonstrate that the profits in question are attributable to the infringement.  In Section 289, Congress deviated from that general rule of causation because it

27

was concerned that applying that principle to design patents would often under-compensate patentees. See pp. 12, 24-25, *supra*. Congress did not render the infringer liable for its total profit on the final sold product, however, but only for its total profit on the "article of manufacture" to which the patented design was wrongfully applied. In cases where the identity of the relevant "article of manufacture" is otherwise open to reasonable dispute, the factfinder may legitimately consider which characterization would appropriately compensate (rather than over-compensate) the patentee for the contribution of the patented design to the value of the infringer's finished product. See, *e.g.*, *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 402-408 (1940) (discussing principles applied by equity courts in awarding profits for patent and copyright infringement). When a product is composed of distinct components, choosing the article that most fairly embodies the plaintiff's invention will help to ensure that "neither party will have what justly belongs to the other." *Id.* at 408.

b. The "article of manufacture" inquiry entails a case-specific examination of the relationship among the design, any relevant components, and the product as a whole. See *Piano II*, 234 F. at 81. Several considerations are relevant to the inquiry.

*First*, the scope of the design claimed in the plaintiff's patent, including the drawing and written description, provides insight into which portions of the underlying product the design is intended to cover, and how the design relates to the product as a whole.[6]

---

[6]  In an infringement suit, the court determines the proper construction of the patent claims, and the jury determines, based on the court's construction, whether the defendant has infringed the

28

See, *e.g.*, *Piano I*, 222 F. at 903-904; *Grand Rapids Refrigerator*, 268 F. at 974. In addition, the patent identifies the article of manufacture that the patentee views as the article to which the design is applied. *MPEP* § 1503.01. In some cases, the patent will indicate that the design is intended to be applied to a component of the product. See *Piano I*, 222 F. at 904 (relying on fact that inventor "received a patent for a 'piano case' and not for a piano"). But the factfinder should not treat the patent's designation of the article as conclusive. The inventor of a piano-case design, for instance, should not be able to obtain profits on the piano as a whole simply by characterizing his invention as an "ornamental design for a piano."

*Second*, the factfinder should examine the relative prominence of the design within the product as a whole. If the design is a minor component of the product, like a latch on a refrigerator, or if the product has many other components unaffected by the design, that fact suggests that the "article" should be the component embodying the design. Conversely, if the design is a significant attribute of the entire product, affecting the appearance of the product as a whole, that fact might suggest that the "article" should be the product.

*Third*, and relatedly, the factfinder should consider whether the design is conceptually distinct from the product as a whole. As the Second Circuit explained

---

patent. See *Egyptian Goddess, Inc.* v. *Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc), cert. denied, 556 U.S. 1167 (2009); see also *Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). In identifying the relevant "article of manufacture" under Section 289, the jury can similarly take into account the court's construction of the claims.

29

in *Piano II*, a book binding and the literary work contained within it "respond to different concepts; they are different articles." 234 F. at 82. If the product contains other components that embody conceptually distinct innovations, it may be appropriate to conclude that a component is the relevant article.

*Fourth*, the physical relationship between the patented design and the rest of the product may reveal that the design adheres only to a component of the product. If the design pertains to a component that a user or seller can physically separate from the product as a whole, that fact suggests that the design has been applied to the component alone rather than to the complete product. See, *e.g.*, *Piano I*, 222 F. at 904; *Brand*, 83 Off. Gaz. Pat. Office at 748. The same is true if the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately (for instance, for replacement purposes). See, *e.g.*, *Piano II*, 234 F. at 81.

2. The task of identifying the relevant article of manufacture is properly assigned to the finder of fact. Context-specific judgments about the relationship of the design to the article as a whole—the design's effect on the product's appearance, the components' physical separability, how the components are manufactured—are quintessentially factual in nature. Cf. *Graver Tank & Mfg. Co.* v. *Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) (application of doctrine of equivalents in the utility-patent context is a question of fact because it involves consideration of the "purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform"); see

30

*Hana Fin., Inc.* v. *Hana Bank*, 135 S. Ct. 907, 910-911 (2015) (holding that whether two trademarks "create the same, continuing commercial impression so that consumers consider both as the same mark" is a question for the jury) (quotation marks omitted).

Under established law, the question whether a design patent has been infringed is one for the jury. See *Egyptian Goddess, Inc.* v. *Swisa, Inc.*, 543 F.3d 665, 680-683 (Fed. Cir. 2008) (en banc), cert. denied, 556 U.S. 1167 (2009); *Amini Innovation Corp.* v. *Anthony Cal., Inc.*, 439 F.3d 1365, 1371-1372 (Fed. Cir. 2006). In making that determination, the jury must compare two designs to decide whether "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, * * * the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other." *Gorham*, 81 U.S. at 528. Treating the identification of the relevant "article of manufacture" as a jury question is consistent with the jury's role in determining design-patent infringement, and with this Court's longstanding recognition "across a variety of doctrinal contexts that, when the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer." *Hana Fin.,* 135 S. Ct. at 911.

3. The defendant should bear the burden of producing evidence that the relevant "article of manufacture" in a particular case is a portion of an entire product as sold. The plaintiff bears the ultimate burden of establishing the amount of the defendant's total profit. See *SmithKline Diagnostics, Inc.* v. *Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991); cf.

31

*Horvath* v. *McCord Radiator & Mfg. Co.*, 100 F.2d 326, 330 (6th Cir. 1938), cert. denied, 308 U.S. 581 (1939).  But once the plaintiff has shown that the defendant profited by exploiting a product containing the plaintiff's patented design, the defendant should be required to identify, through the introduction of admissible evidence, the component that the defendant asserts is the article to which the design was applied.  Cf. *SEC* v. *Teo*, 746 F.3d 90, 112 (3d Cir.) (once government establishes existence of tainted profits, defendant has burden of production to identify untainted portions), cert. denied, 135 S. Ct. 675 (2014). The defendant, as the manufacturer or seller of the accused product, has superior knowledge of the identity of the product's components, as well as of some of the factors relevant to the "article" determination, including the physical relationship between the design and the product; the manner in which the product is manufactured; and the extent to which the product reflects the innovations of parties other than the plaintiff.  See *Alaska Dep't of Envtl. Conservation* v. *EPA*, 540 U.S. 461, 494 n.17 (2004) (placement of burden of production may turn on which party has "peculiar means of knowledge" of the facts in question) (citation omitted); accord *Medtronic, Inc.* v. *Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851 (2014).

### C. The Court Should Remand This Case For Further Proceedings

In this case, the district court instructed the jury that, "[i]f you find infringement[,]  * * *  you may award Apple [the] total profit attributable to the infringing products."  Pet. App. 165a.  That instruction equated the relevant "article of manufacture" with the accused phones as a whole, rather than permitting the

32

jury to determine whether the phone itself or some portion thereof was the "article of manufacture" to which the patented design had been applied. Petitioners contend (Br. 58) that a new damages trial is therefore necessary. It is unclear, however, whether petitioners presented evidence at trial to support their assertion that the relevant articles of manufacture were components of the phones. The Court should therefore remand this case to allow the lower courts to determine whether a new trial is warranted.

In the district court, petitioners contended that under the *Piano Cases*, the "outer case of a functional product" is a separate "article of manufacture." Pets. Trial Br. 21. Petitioners accordingly asked the court to instruct the jury that "[t]he article to which Apple's design was applied may be the same as or different from Samsung's devices as sold," and that "[w]here the article of manufacture is a case or external housing of the device, then only the profits from the sale of the case or external housing of the device should be awarded." J.A. 207. It is not clear, however, whether petitioners satisfied their burden of producing evidence to support their arguments.

In their brief in this Court (Br. 54-56), petitioners rely primarily on testimony that respondent's patented designs extended only to aspects of the phones' physical appearance, rather than to the entire external design of the phones. Petitioners also observe (Br. 1) that the phones contain many components—such as the technology governing their functions—that are unrelated to the infringing designs.[7] Petitioners have

---

[7] While petitioners were precluded from presenting certain evidence (Pets. Br. 20), that evidence appears to have related primari-

33

not, however, identified record evidence or argument concerning other factors, such as the extent to which users or sellers can physically separate the relevant components from the other parts of the phones, the manner in which the components were manufactured, and the extent to which the designs effectively determined the entire appearance of the phones.[8]  See pp. 27-29, *supra*.  Rather than examine the trial record to determine whether petitioners presented sufficient evidence to support their proposed jury instruction, the Court should remand this case to permit the lower courts to determine whether a new trial is warranted.

---

ly to apportioning the profits attributable to the infringement.  See J.A. 25-55, 67-85.

 [8]  It is also unclear whether petitioners argued below, as they do in this Court (Br. 55-56), that the design for the grid of colorful icons was applied to "the display screen that sits beneath a smartphone's glass front face."  Petitioners' trial brief and proposed jury instructions discussed only the two designs relating to the external casing of the phones, and did not separately discuss the article to which the icon grid was applied. Pets. Trial Br. 19-22.

34

## CONCLUSION

The judgment of the court of appeals should be vacated and the case remanded for further proceedings.

Respectfully submitted.

SARAH T. HARRIS
  *General Counsel*
NATHAN K. KELLEY
  *Solicitor*
THOMAS W. KRAUSE
  *Deputy Solicitor*
SCOTT C. WEIDENFELLER
BRIAN T. RACILLA
LORE A. UNT
WILLIAM LAMARCA
  *Associate Solicitors*
  *United States Patent and*
    *Trademark Office*

DONALD B. VERRILLI, JR.
  *Solicitor General*
BENJAMIN C. MIZER
  *Principal Deputy Assistant*
    *Attorney General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
GINGER D. ANDERS
  *Assistant to the Solicitor*
    *General*
MARK R. FREEMAN
TYCE R. WALTERS
  *Attorneys*

JUNE 2016