# EXHIBIT 2

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>   Plaintiff,<br><br> vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>   Defendants. | Case No. 11-cv-01846-LHK |

**REPLY EXPERT REPORT OF ALAN D. BALL REGARDING "ARTICLE OF MANUFACTURE" FOR THE SAMSUNG PRODUCTS FOUND TO INFRINGE U.S. PATENTS D618,677 AND D593,087**

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................................. 1

**SUMMARY OF OPINIONS** ................................................................................................. 1

**MATERIALS CONSIDERED** ............................................................................................... 1

**RELEVANT LEGAL PRINCIPLES** ..................................................................................... 1

**FACTOR 1** ............................................................................................................................. 2

    Mr. Lucente's Description of the Patents-in-Suit as "Limited" and "Narrow" is Inaccurate.................... 2

    Apple's D'677 Patent ......................................................................................................... 2

        Mr. Lucente's Consideration of The Figures in the D'677 Patent is Flawed................... 2

        The Prosecution History Does Not Support Mr. Lucente's Opinions ................................. 3

        The Infringement Verdict Does Not Support Mr. Lucente's Opinions ............................... 4

        Mr. Lucente's Consideration of Alternative Designs Is Not Informative........................... 4

        Mr. Lucente Ignores the Title, Written Description, and Prior Art ................................... 5

    Apple's D'087 Patent ......................................................................................................... 6

        Prosecution History ........................................................................................................ 6

        The Infringement Verdict ............................................................................................... 6

        Alternative Designs ......................................................................................................... 6

**FACTOR 2** ............................................................................................................................. 7

    Prominence in Advertising................................................................................................. 9

    Design of the Infringing Phones ........................................................................................ 10

    Prominence When Used by Ordinary Observers .................................................................. 10

    Mr. Lucente Ignores Elements of the Claimed Designs to Conclude they are Not Prominent ........... 11

    Mr. Lucente's Consideration of Other Components ............................................................. 11

    Responses to Mr. Lucente's Other Criticisms .................................................................... 12

**FACTOR 3** ............................................................................................................................. 13

    Mr. Lucente's Flawed Analogies....................................................................................... 14

    The Existence of Many Components Alone Does Not Suggest the Claimed Designs Are
    Conceptually Distinct From the Product as a Whole ............................................................ 16

    Advertising Shows the Prominence of the Claimed Designs ................................................. 17

- i -

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Alleged Distinctions Between Infringing Phones ................................................................. 18

Responses to Mr. Lucente's Other Criticisms ................................................................... 18

**FACTOR 4** ...................................................................................................................... **19**

Samsung's Failure to Produce the Articles of Manufacture Separate from the Infringing
Products............................................................................................................................ 20

Design of the Infringing Phones ...................................................................................... 20

The Infringing Phones Are the Articles Samsung Manufactures That Embody the Claimed
Designs............................................................................................................................ 21

Whether Users or Sellers Can Physically Separate the Alleged Articles of Manufacture ................... 23

The iPhone........................................................................................................................ 25

Sales and Manufacturing ................................................................................................. 25

**SAMSUNG'S COPYING** ................................................................................................ **26**

**SUPPLEMENTATION** ................................................................................................... **26**

**EXHIBITS TO BE USED AT TRIAL** ............................................................................ **27**

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

## INTRODUCTION

1.   This report contains my response to opinions set forth in the Expert Report of Sam Lucente (the "Lucente Report") dated January 29, 2018.

2.   I have reviewed the Lucente Report. Nothing in the report changes the opinions set forth in my Opening Report.

3.   For the reasons explained below and in my Opening Report, my opinion remains that the articles of manufacture to which Samsung applied the design protected by U.S. Patent D618,677 (the D'677 patent) are the entire phones found to infringe the D'677 patent, and that the articles of manufacture to which Samsung applied the design protected by U.S. Patent D593,087 (the D'087 patent) are the entire phones found to infringe the D'087 patent.

## SUMMARY OF OPINIONS

4.   For the reasons discussed in this report and my Opening Report, it remains my opinion that for each of the Infringing Products, the article of manufacture to which Samsung applied the D'087 and/or D'677 designs are the phones found to infringe those patents in their entirety.

## MATERIALS CONSIDERED

5.   In reaching the opinions outlined in this report, in addition to the materials considered in connection with my Opening Report, I have considered the Lucente Report, exhibits thereto, and documents cited therein.

## RELEVANT LEGAL PRINCIPLES

6.   As stated in my Opening Report, I have been informed and understand that the test governing the identification of the article of manufacture in this case is the four-factor test as set forth in the District Court's October 22, 2017 Order Requiring New Trial.

7.   Mr. Lucente discusses a brief filed by the United States Solicitor General in connection with these proceedings. I have been informed and understand that the Solicitor General's brief is not law.

8.   Though I understand it is not law, I have reviewed the Solicitor General's brief relied on by Mr. Lucente. The statements in that brief regarding how the four-factor test might be applied do not change my opinion that the articles of manufacture to which Samsung applied the D'087 and D'677 designs were the entire phones found to infringe those patents. To the contrary, the Solicitor General's approach supports my conclusion. For example, the Solicitor General stated that when identifying the article of manufacture "the factfinder's over-arching objective should be to identify the article that most fairly may be said to embody the defendant's appropriation of the plaintiff's innovation." (Brief for United States as Amicus Curiae in *Samsung Elecs. Co., Ltd. v. Apple Inc.*, Case No. 15-777, at 26.) For the reasons stated in my Opening Report and below, the entire infringing phones as a whole are the articles that most fairly may be said to embody Samsung's appropriation of the D'087 and D'677 designs.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**FACTOR 1**

9.   I do not believe Mr. Lucente has correctly applied Factor 1 as articulated by the District Court, and I disagree with his opinions regarding this factor.

10.  Factor 1 requires consideration of "[t]he scope of the design claimed in [Apple's] patent, including the drawing and written description," yet Mr. Lucente essentially ignores everything in the patent other than the solid lines in the figures, and treats the article of manufacture as limited to **only** the portion of the design that is shown in solid lines. I disagree with this approach since it fails to recognize that the article of manufacture (clearly shown in the patent drawings and described in the written description to be an 'electronic device' or cellphone) is the infringing phone to which Samsung applied the patented design, not just a portion of the phone. If Mr. Lucente's reasoning were correct, what is claimed by the patent would always dictate the article of manufacture to which the claimed design is applied and there would be no need to consider other factors. Mr. Lucente's analysis is also inconsistent with the District Court's statement, in the context of Factor 1, that "the relevant article of manufacture may extend beyond the scope of the claimed design." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 17.)

**Mr. Lucente's Description of the Patents-in-Suit as "Limited" and "Narrow" is Inaccurate**

11.  Mr. Lucente refers to the "limited scope of the D'677 patent, as well as the limited scope of the D'087." (Lucente Report ¶ 66.) In my experience, the "scope" of a patent refers to the breadth of protection offered by that patent. There is often a direct relationship between the use of broken lines in a patent and its breadth of protection. In design patents, broken lines are used to indicate portions of the design that are not part of the claimed design, and this use of broken lines generally increases the breadth of protection of the patent. Broken lines can be used to add context that aid in understanding the claimed design and how it relates to a product as a whole. Mr. Lucente's opinion that the use of broken lines in the D'677 and D'087 patents 'narrows' or 'limits' the scope or breadth of protection of these patents is incorrect.

12.  I also disagree with Mr. Lucente that the scope **of the claimed design** (the portions of the drawings shown in black solid lines) is "narrow" or "limited." The designs claimed in the D'087 and D'677 patents cover a very large portion of the ornamental design of an electronic device. The claimed portion is the most important, prominent, and determinative portion of the ornamental design and, as discussed below and in my Opening Report, has an enormous effect on the overall appearance of the device it is applied to.

**Apple's D'677 Patent**

**Mr. Lucente's Consideration of The Figures in the D'677 Patent is Flawed**

13.  As discussed in my Opening Report, each of the figures in the D'677 patent shows an entire electronic device, and all of the figures together show all angles of that electronic device. In my opinion, it is an error for Mr. Lucente to ignore the broken lines that make up part of these figures. The broken lines are important and provide context that a DOSA would consider to understand the scope of the design and that would inform the DOSA's understanding that the design shown is being applied to an entire electronic device.

14.  Mr. Lucente suggests that the only reason for the broken lines in the D'677 patent is that they are necessary in order to show what is claimed. (Lucente Report ¶ 90.) I disagree. In my experience, it is not necessary or "common" to show views in which no part of the claimed design is visible. A DOSA certainly would not need to see the back view of the electronic device shown in the D'677 patent in order to clearly and definitively understand the bounds of what is claimed, this can clearly

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

be seen in the top, bottom and side views. The inclusion of views that do not show the claimed design indicates that the inventor/designer understood and intended the design to be applied to an entire electronic device.

15.   While, as stated above, I understand the Solicitor General's brief is not law, Mr. Lucente's failure to consider the broken lines as part of his article of manufacture analysis is contrary to his own reliance on that brief, which states that "the scope of the design claimed in the plaintiff's patent, including the drawing and written description, provides insight into which portions of the underlying product the design is intended to cover, **and how the design relates to the product as a whole**." By dismissing the broken lines, Mr. Lucente focuses only on what is claimed and ignores the patent's explicit guidance on how the claimed design relates to the product as a whole.

16.   Mr. Lucente's reliance on "rulings" from the Supreme Court, Federal Circuit, and District Court as part of his analysis regarding the drawings in the D'677 patent does not change my opinion. (Lucente Report ¶¶ 64-66.) I have been informed and understand that the quotes Mr. Lucente relies on are not rulings or claim constructions, and they do not purport to define the scope of the design of the D'677 patent under Factor 1 as it has been articulated by the District Court; they are simply statements provided as background information in those opinions. The District Court provided the claim construction for the D'677 patent, which I understand was affirmed on appeal and which I considered in my analysis as indicated in my Opening Report. As noted there, the claim construction makes clear that the patent claims an ornamental design "of an electronic device." (Dkt. 1447, Order Amending Design Patent Claim Construction (July 29, 2012) at 2.)

17.   Mr. Lucente also states that "Mr. Bressler testified that the scope of the D'677 design is limited to the particular black front face of the device." (Lucente Report ¶ 67.) That is an incomplete and inaccurate characterization. Mr. Bressler testified that "what's being claimed in this design is the front face of an electronic device that is black in color." (Dkt. 1611 at 1014-1016.) Mr. Bressler did not say that the scope of the D'677 design was "limited," and, like the District Court's claim construction, Mr. Bressler noted that the claimed design is for "an electronic device."

18.   Mr. Lucente also incorrectly paraphrases a brief filed by Apple to suggest that the design of the D'677 patent "was intended for" only the front face of the iPhone. (Lucente Report ¶ 70.) Apple's filing states that the claim was "directed to" the distinctive front face of the iPhone. (Dkt. 86, Apple's Motion for Preliminary Injunction (July 1, 2011) at 7.) It is apparent from the figures in the D'677 patent that the design was **intended for** an electronic device. The designers of the iPhone have also confirmed that the D'677 patent was "a design patent for an iPhone." (De Iuliis 2011 Dep. 164:18-165:3; *see also* Dkt. 1547 at 474 (Stringer) ("This is a patent document that describes iPhone.").)

**The Prosecution History Does Not Support Mr. Lucente's Opinions**

19.   Mr. Lucente's reliance on the prosecution history does not change my opinion regarding the relevant articles of manufacture. Mr. Lucente concludes that the prosecution history "further supports [his] opinion that the design claimed in the patent, including as it would be seen by a designer of skill in the art, is a design for the front face of a product, and not the entire product." (Lucente Report ¶ 71.) But there is no dispute that the claimed design is what is shown in solid lines. To the extent Mr. Lucente is suggesting that the prosecution history supports his conclusion that the **articles of manufacture** to which the design was meant to apply are limited to "the front face of a product," I disagree. An examination of the complete prosecution history supports my opinion that the D'677 design as shown in the patent was applied to an entire phone.

20.   Application No. 29/328,018, from which the D'677 patent (and the D'087 patent) issued, was filed on November 18, 2008, as a division of Application No. 29/282,834, which was a continuation of Application No. 29/270,888.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

21.   Application No. 29/270,888 shows a design for an electronic device, depicted in drawings and photographs, shown here[1]:



Drawings from patent application 29/270,888.



Photos from patent application 29/270,888.

22.   Thus, it is clear that from the beginning, the design claimed by the D'677 patent was intended to be applied to an entire electronic device, not only a portion thereof.

**The Infringement Verdict Does Not Support Mr. Lucente's Opinions**

23.   I disagree that the jury's infringement finding supports a conclusion "that the front face of the infringing Samsung phones is the article of manufacture to which the D'677 design was applied." (Lucente Report ¶ 77.) As stated in my Opening Report, I understand the jury concluded that the Fascinate, Galaxy S i9000, Galaxy S 4G, Galaxy S II (AT&T), Galaxy S II (i9100), Galaxy S II (T-Mobile), Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S Showcase, Infuse 4G, Mesmerize, and Vibrant phones all infringed the D'677 patent. Accordingly, those phones all fall within the scope of the claimed design. This supports my opinion that the articles of manufacture to which Samsung applied the D'677 design are the entire Infringing Phones.

**Mr. Lucente's Consideration of Alternative Designs Is Not Informative**

24.   Mr. Lucente's discussion of alternative designs does not change my opinion regarding either the scope of the claimed design or the articles of manufacture to which Samsung applied the claimed design.

---

[1]   Due to the poor image quality in the produced version of the prosecution history for Application No. 29/270,888 (SAMNDCA00405876), I obtained the images shown here from the publicly-available prosecution history.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

25. That the jury concluded the Galaxy Ace did not infringe the D'677 patent means only that that specific phone was not within the scope of the claimed design. As discussed above, the jury concluded that twelve other phones were within the scope of the claimed design.

26. Mr. Lucente also discusses "white" phones as potential alternatives. I have been informed and understand that the parties stipulated before the original trial as to which phone sales were within the scope of the trial. I have further been informed and understand that Samsung contends the jury's award includes damages for phone models with white edges. To the extent the jury included white phones within its prior verdict, I have been informed and understand that I am bound by that finding.

**Mr. Lucente Ignores the Title, Written Description, and Prior Art**

27. As explained in my Opening Report, Factor 1 says to consider the written description and figures of the patent. Consistent with that, a DOSA would look to information intrinsic to the patent to help understand the scope of the design, including the title, written description, figures, and cited prior art.

28. I do not agree with Mr. Lucente's suggestion (Lucente Report ¶ 91) that the guidance of the MPEP regarding the role of a design patent title should be disregarded. I have been informed and understand that the MPEP as quoted in my Opening Report remains in effect. Further, the inventors and examiners at the time the D'677 patent was prosecuted would have been subject to those guidelines. This indicates that the inventor and examiner thought "Electronic Device" was an accurate and informative title. While no single factor is dispositive, the title of the D'677 patent—"Electronic Device"—suggests that the article of manufacture embodying the claimed design is the entire electronic device, not just a portion thereof.

29. That Apple has other patents with the same title is irrelevant. (Lucente Report ¶ 94, Exhibit 5.) Multiple designs can be applied to "electronic devices." Without explanation or consideration of anything beyond what is shown in the solid lines, Mr. Lucente concludes that the patents he refers to at paragraph 94 are each "applied to a different physical thing or things." (Lucente Report ¶ 95.) As discussed, above, to the extent Mr. Lucente is assuming that the article of manufacture is limited to what is claimed in solid lines, I believe his analysis is improper.

30. Mr. Lucente also wrongly dismisses the written description of the D'677 patent, alleging that "[a] patentee's election of such wording reveals nothing about the scope of the *design* being claimed." (Lucente Report ¶ 98.) This is contrary both to how a DOSA would understand the patent and to the District Court's clear direction that Factor 1 should include consideration of the written description.

31. It is also incorrect, in my opinion, to dismiss the written description of the D'677 patent because it was written before the Supreme Court's decision. (Lucente Report ¶ 98.) I have been informed and understand that the Supreme Court's decision was that, for a multicomponent product, an article of manufacture may be either the entire product as sold or a component thereof. The Supreme Court did not articulate a test for identifying the article of manufacture and did not opine on the role of a patent's written description in the analysis. The District Court announced its four-factor test after the Supreme Court's decision and specifically included consideration of the written description of the patents in this case as part of Factor 1.

32. If anything, the fact that the inventors wrote the written description of the D'677 patent before any dispute arose regarding "article of manufacture" as it relates to this litigation, confirms it is a pure articulation of what the inventors and examiner believed the design was meant to be applied to and is unaffected by any knowledge of the import these words would later have.

33. As discussed in my Opening Report, the written description of the D'677 patent states that the figures are views "of an electronic device" and that the "the article of manufacture to which the ornamental design has been applied is an electronic device." This supports my conclusion that

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Factor 1 suggests the article of manufacture as contemplated by the inventors and shown in the patent is an entire electronic device.

34.     Finally, in my opinion Mr. Lucente improperly ignores the prior art. Mr. Lucente disagrees that the prior art references are "appropriately considered … as part of factor one" (Lucente Report ¶ 99), but does not explain why. His conclusion is contradicted by the fact that Mr. Lucente himself relies on the prosecution history, which includes the cited prior art. As discussed in my Opening Report, the prior art cited by the D'677 patent provides further support for my opinion that the articles of manufacture in this case are the entire Infringing Phones.

**Apple's D'087 Patent**

35.     Mr. Lucente makes the same analytical mistakes with respect to the D'087 patent as he does with the D'677 patent. (Lucente Report ¶ 125.) For example, he ignores the broken lines in the patent, which provide context and illustrate to a DOSA that the patent is for a design that is being applied to an entire electronic device. And he ignores the patent's title ("Electronic Device") and written description, in direct contravention of the language of Factor 1. (Lucente Report ¶ 124.) These errors lead him to disagree with my conclusion that "the article to which the claimed design is applied is not limited to the solid lines" (Lucente Report ¶ 125 (quoting Opening Report ¶ 146)), even though the Court has said expressly that "the relevant article of manufacture may extend beyond the scope of the claimed design" (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 17).

36.     The various quotes Mr. Lucente relies on as supposedly confirming his view of the scope of the D'087 patent as "limited"—from this Court, the Federal Circuit, and Apple's witnesses—do nothing more than describe the claimed design. The quote he cites from Apple's 2011 motion for a preliminary injunction (Lucente Report ¶ 108) makes clear that the front face design has been applied to an iPhone—not to an iPhone lens, or display, or housing. (Dkt. 86, Apple's Motion for a Preliminary Injunction (July 1, 2011) at 11 ("The D'087 patent . . . is also directed to the distinctive facial appearance of Apple's instantly-recognized iPhone.").)

**Prosecution History**

37.     As with the D'677 patent, my opinion is unchanged by Mr. Lucente's discussion of the prosecution history of the D'087 patent. Mr. Lucente concludes that the prosecution history "further supports" his opinion "that the design in the patent . . .is for the design of the front face and bezel, and not the entire product." (Lucente Report ¶ 109.) But, as set forth above, this is both undisputed and incomplete. Nothing in Mr. Lucente's report shows that the prosecution history implied in any way that the D'087 design was not created as a design that would be applied to entire phones. To the contrary, as discussed above (¶¶ 19-22), it is clear from the original application that the D'087 was intended to be applied to an entire electronic device.

**The Infringement Verdict**

38.     As stated in my Opening Report, I understand the jury found that the Vibrant, Galaxy S 4G, and Galaxy S i9000 phones all infringed the D'087 patent. Accordingly, those phones all fall within the scope of the claimed design. This supports my opinion that Samsung applied the D'087 patent to those phones rather than to components thereof.

**Alternative Designs**

39.     As with the D'677 patent, Mr. Lucente's discussion of alternative designs does not change my opinion regarding either the scope of the D'087 design or the articles of manufacture to which Samsung applied that design. (Lucente Report ¶¶ 116-122.) I do not find it informative that the jury

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

found some phones not to infringe the D'087 patent; as set forth above, the jury did conclude that three other phones did infringe the patent, and the question at this stage is to which article of manufacture did Samsung apply the D'087 design for **those** phones.

40.   Similarly, it is unsurprising and not at all notable that a phone without a bezel would not infringe the D'087 patent. (Lucente Report ¶¶ 120-121.) It simply does not follow that the D'087 design is therefore "narrow and limited" or that the article of manufacture is somehow influenced by this observation.

41.   As with the D'677 patent, Mr. Lucente tries to explain away the Court's prior claim construction of the D'087 patent, but he cannot. Mr. Lucente notes that the exact identity of the article of manufacture is a question for a new jury, but that does not contradict the Court's claim construction that the article of manufacture extends beyond the portion claimed in solid lines in the patent. (Dkt. 1425, Order Regarding Design Patent Claim Construction (July 27, 2012) at 8; Dkt. 1447, Order Amending Design Patent Claim Construction (July 29, 2012) at 2.) And Mr. Lucente offers no response whatsoever to the Court's statement that the patent "claims the ornamental design of an electronic device." (Dkt. 1425, Order Regarding Design Patent Claim Construction (July 27, 2012) at 8; Dkt. 1447, Order Amending Design Patent Claim Construction (July 29, 2012) at 2.)

Green also

**FACTOR 2**

42.   I disagree with Mr. Lucente's application of and conclusions regarding Factor 2, which is "the relative prominence of the design within the product as a whole." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 35.)

43.   Mr. Lucente states that there are "numerous other components of the Samsung phones and in the Samsung phones that are unaffected by" the D'087 and D'677 designs and "accordingly, that these designs are not prominent, relatively speaking, within Samsung's phones as a whole." (Lucente Report ¶ 159.) I disagree.

44.   I do not believe that prominence is dictated by whether or not there are other components unaffected by the design. Mr. Lucente relies on the Solicitor General's brief for this standard. As discussed above, I am informed and understand that the Solicitor General's brief is not law. However, even if this language is considered, it indicates that the claimed designs of the D'677 and D'087 were applied by Samsung to the Infringing Phones as a whole.

45.   The Solicitor General's brief states that "[i]f the design is a minor component of the product, like a latch on a refrigerator, or if the product has many other components unaffected by the design, that fact suggests that the 'article' should be the component embodying the design. Conversely, if the design is a significant attribute of the entire product, affecting the appearance of the product as a whole, that fact might suggest that the "article" should be the product." (Brief for the United States as Amicus Curiae Supporting Neither Party, Case No. 15-777, at 28.)

46.   The claimed designs of the D'087 and D'677 patents are each a significant attribute of the Infringing Phones, not a minor component. The designs comprise the front face of those phones, which is the most prominent side of a smartphone, and dominate the overall visual impression of the phone. When viewed by a user during use, the claimed designs comprise nearly the entire appearance.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER





| The latch on a refrigerator is a minor component and not very prominent compared to the overall refrigerator design. | The D'677 design or D'087 design as seen applied to the Samsung Galaxy S 4G is overwhelmingly prominent, basically comprising the entire appearance as the smartphone is held in the user's hand. |
|---|---|

47.    The D'087 and D'677 designs not only dominate the overall visual impression of the Infringing Phones, they do affect the appearance of other sides of the phone. The front face that extends edge-to-edge with the specific proportions and rounded corners dominates the overall visual impression of each Infringing Phone. Because the front face is connected to the sides, which are connected to the back, these specific proportions strongly influence the overall shape of the phones.

48.    It is Mr. Lucente's opinion that the D'677 design only "appears" when the screen is off and that its prominence is therefore limited. (Lucente ¶ 164.) I disagree. As a preliminary matter, any product with a display screen, like a smartphone, will have different states (e.g., on, off, asleep). A DOSA would understand that where a design patent shows a display screen, the display screen is going to show different images, or be off. Under Mr. Lucente's reasoning, any protected design of a product with a prominent display screen (television, computer display, tablet, laptop, etc.) could not be considered prominent relative to the product as a whole. Putting this aside, consumers throughout their day regularly observe their phones in "off" or "sleep" modes, which Mr. Lucente does not dispute show the D'677 design. The elements of the D'677 design, including the overall shape and relative proportions, edge-to-edge display, black border, and rounded corners are all visible when the phone is on, off or asleep.

49.    I have watched Jonathan Ive in *Objectified*, which Mr. Lucente cites (Lucente Report ¶ 163), and do not believe it supports his conclusion that the D'677 and D'087 designs are not prominent. Mr. Ive states that one issue encountered during the design of products is "physically how do you connect

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

to the product, for example, something like the iPhone, everything defers to the display." Mr. Ive's statement is consistent with my opinion that the front face is prominent because it is the primary point of interaction with a smartphone. The fact that "everything defers to the display" supports my opinion that the D'677 and D'087 designs, both of which feature a display screen that takes up most of the front face of the phone, are very prominent. In fact, the D'677 and D'087 designs were new in part because they featured a screen-centric design, unlike other phones (e.g., feature phones, flip phones, sliders) that were prevalent at the time the iPhone was introduced. Further, Mr. Ive was speaking specifically about the development of the original iPhone, which practices both the D'087 and D'677 patents. The fact that deference was given to the display during the design of the phone indicates that the D'677 and D'087 designs did influence other aspects of the iPhone.


**Prominence in Advertising**

50.   As explained in my Opening Report, I believe the manner in which Samsung (and Apple) chose to advertise and package their phones confirms that the front side, including the D'087 and D'677 designs, are extremely prominent.

51.   The advertisements selected by Mr. Lucente (and the others I have seen) clearly show that the front side of the Infringing Phones is the most prominent, much more so than the other sides. At paragraph 167 of his report, Mr. Lucente shows 18 different images of various Samsung phones as they appear in Samsung advertisements. (SAMNDCA00311361; SAMNDCA00311364; SAMNDCA00311405; SAMNDCA00358953; SAMNDCA00311777; SAMNDCA00359045.) Of the 18 images, 14 clearly show the front of a phone (12 images only show the front and two show a front perspective with a sliver of the side visible). Only one of the images shows a side view, and it appears next to a front view of the same product. Only three images show the back of the phone, and all three of these images are partially obstructed by an image showing the front of a phone. I have not seen, nor has Mr. Lucente identified, any advertisement of an Infringing Phone that shows an image of a back or side view unaccompanied by a front view.

52.   The fact that the phones are "on" in the advertisements selected by Mr. Lucente does not diminish the prominence of the front face of the phones or the D'087 and D'677 designs. All elements of the D'087 and nearly all elements of the D'677 design are still visible in these advertisements.

53.   Mr. Lucente also points out that Samsung's advertisements and packaging promote components and features like camera, connection speed, and media hub. (Lucente Report ¶¶ 195-196.) As discussed below (¶ 71), I do not believe these other features are appropriately considered as part of the analysis of this factor. Even if considered, however, the fact that the text describing these features is accompanied by a picture of the front face of the phone, and that the picture dominates the advertisements, confirms that design—and specifically the design of the front face of these phones—is very prominent. *See* ¶ 99.

54.   Apple's advertising of iPhones that practice the D'087 and D'677 patents also confirms that the front face, and these designs, are very prominent relative to the phones as a whole. (Opening Report ¶¶ 213-214.)

55.   Mr. Lucente states that Apple has shown various parts of the exterior of the iPhone, iPhone 3G, and iPhone 4S in advertisements. This does not change the fact that the majority of Apple's advertisements for these phones feature the front face of the phone, frequently as the only image shown. Even in the samples he provides (Lucente Report ¶ 175), the side and back views are **in addition** to the front face of the iPhone. In two of the three advertisements, the back view is also obscured by the placement of the image of the front view. As is the case for the Infringing Phones; I have not seen, and Mr. Lucente has not identified, any advertisements of the iPhone, iPhone 3G, iPhone 3GS, iPhone 4, or iPhone 4S that show the back or side view without also showing the front view.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

56.   Mr. Lucente also provides snapshots from Apple's website to show that recent iPhones (not the versions discussed in my Opening Report as iPhones that practice the D'087 and D'677 patents) have been advertised with images of their back. For example, Mr. Lucente uses an image of the back of an iPhone 8, which was just released in 2017. That image, which appears on a webpage amongst many other images showing the front of the phone, was included to highlight the fact that, unlike the previous version of the iPhone, the back of the iPhone 8 is manufactured from glass. This does not suggest the back is the more prominent side but rather that there was something new about the back of this particular generation Apple was trying to highlight.

**Design of the Infringing Phones**

57.   Mr. Lucente says that display sizes have gotten larger over time "so the sides and backs become even more important for creating new overall designs." (Lucente Report ¶ 169.) As discussed in my Opening Report, the iPhone was the first successful phone with a front face dominated by a capacitive touch display and very minimal (one) buttons. I have not seen any evidence to suggest that the sides and backs of the Infringing Phones were utilized to create "new overall designs." Even if Mr. Lucente's statement were true, it would not mean that the sides and backs became more prominent, only that they may have more specific design details. For all the reasons discussed in my Opening Report and above, it remains my opinion that the front of the phone is the most prominent side and that the D'087 and D'677 designs are very prominent within the Infringing Phones.

58.   I further disagree with Mr. Lucente that an "industrial designer's focus is on other aspects of the device, such as the sides, rear and battery cover." (Lucente Report ¶ 170.) This blanket statement is inconsistent with my experience and with the testimony of Samsung's witnesses, who confirmed that Samsung's phones were designed as a whole and with a focus on having a holistic appearance. (Opening Report ¶¶ 225-229.) There is no indication that the designers of the Infringing Phones focused on the specific aspects Mr. Lucente identifies. Rather, these components were designed as part of overall phones.

59.   I further disagree with Mr. Lucente's claim that the back and sides are "the areas that the designers modify to meet carrier requirements, such as for logos." (Lucente Report ¶ 170.) The placement of a logo does not indicate whether the D'087 and D'677 designs are prominent. In any case, of the 12 phones found to infringe the D'677 patent, 8 of them display carrier logos on the front. (Opening Report, Exhibit E.) Of the 3 phones found to infringe the D'087 patent, 2 display carrier logos on the front. (Opening Report, Exhibit E.) To the extent Mr. Lucente believes the placement of logos is an indication of how prominent the view of the phone is, this suggests that it was the front view of the Infringing Phones that the carriers considered most prominent.

**Prominence When Used by Ordinary Observers**

60.   As explained in my Opening Report, the front face of the Infringing Phones is most prominent to the user. It is the only face that must be seen to operate the phone. Nearly everything a user can do with a smartphone requires interacting with its front face. For example, dialing phone numbers, typing or reading email or SMS messages, playing games, watching videos, surfing the web, and using GPS all involve interaction with the front of the device.

61.   Mr. Lucente states that "people see the sides and backs of phones at least as often" as the front faces and offers as an example "when someone talks on their phone, the back of the phone or the protective case is most visible." (Lucente Report ¶ 171.) I disagree. A user talking on the phone (holding it up to an ear) does not see the phone at all. A person observing a user talking on the phone in this manner would not see the phone either because it is obscured by the user's hand.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Further, many people talk on smartphones using headphones or in speaker mode while holding the device face up.

62.   Mr. Lucente also tries to downplay the relative prominence of the front face and the D'087 and D'677 designs by claiming the front face is not visible when the phones are "put into a pocket or purse or placed face down on a table." (Lucente Report ¶ 171.) If placed in a pocket or purse, no part of the phone is visible, so no aspect is more or less prominent than any other. In my experience, phones are most often not placed face down on a table to avoid scratching the glass front. Placing a phone face down is often used as a gesture to signify that the user is not distracted by the phone. In other words, by removing the most prominent side of the phone from view, the user is indicating that the phone is not a consideration.

63.   As Mr. Lucente acknowledges, many smartphone users also put protective cases on their phones. A typical phone case obscures all sides of the phone except for the front face which remains unobstructed because it is the most prominent and necessary for the operation of the phone.

64.   Mr. Lucente relies on the use of protective cases to differentiate the appearance of the sides and backs of phones. I understand that the article of manufacture test instructs us to consider the relative prominence of the design within the product as a whole. The protective cases that Mr. Lucente pictures as evidence that other sides of the phone are prominent are not part of the Infringing Products but rather accessories for those products. As shown in the images at paragraph 172 of Mr. Lucente's report, these accessories hide from view the sides and back of the phone, confirming that the front side is the most frequently viewed and most prominent.

**Mr. Lucente Ignores Elements of the Claimed Designs to Conclude they are Not Prominent**

65.   As discussed above, I disagree with Mr. Lucente's characterization of both the D'677 patent and the scope of the design claimed by that patent as "limited." The claimed designs apply to a large portion of the ornamental design of the Infringing Products and have an enormous effect on the overall appearance of those products.

66.   Mr. Lucente appears to suggest that the claimed elements of the D'677 design, including the specific dimensions of the front face, the rounded corners, and black color should be ignored because there are other phones that have "rounded rectangular front faces" and that do not infringe. (Lucente Paragraph ¶ 179.) I believe this is a misunderstanding of Factor 2, which requires an evaluation of a design's prominence within the infringing product. The design of non-infringing phones is not relevant to this factor.

67.   The fact that other phones have different designs that may also be prominent does not diminish the prominence of the D'677 design within the Infringing Phones.

**Mr. Lucente's Consideration of Other Components**

68.   In my opinion, whether one "can substantially alter the overall appearance of Samsung's infringing phones without altering the front face design" (Lucente Report ¶ 181) is irrelevant. The question is how prominent the D'087 and D'677 designs are within the Infringing Phones as they actually look.

69.   Similarly, the jury found that the phones infringed, not just a portion of the phones. This is fully consistent with my opinion that the accused designs are relatively prominent within the Infringing Phones.

70.   Mr. Lucente's reference to a different Apple design patent (Lucente Report ¶ 182) is also irrelevant to the question of whether the D'677 and D'087 designs are prominent within the infringing phones. Mr. Lucente states that because the patent is "on the entire external appearance of the iPhone's enclosure … the external design of the product cannot be altered without affecting the design

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

shown in the patent." (Lucente Report ¶ 182.) But the ability to affect the designs of hypothetical products says nothing about the prominence of the D'677 and D'087 designs in the Infringing Phones. To the extent Mr. Lucente is suggesting that the entire appearance of a product must be claimed in order to conclude a design is prominent, I disagree. Further, different designs claimed in different patents may apply to the same article of manufacture.

71.     Finally, Mr. Lucente considers the relative prominence of the patented designs as compared to components in the Infringing Products, including "chips, circuit boards, batteries, SIM cards, SD cards, frames, cameras, accelerometers, wires, ports, speakers, and more." He then concludes that these "internal aspects" of the phones "confirm that the black front face plays at most only a partial role in the **visual impression of the device overall**." (Lucente Report ¶ 187.) This makes no sense. As the label "internal aspects" indicates, these components exist **within** the Infringing Phones. The majority of the components that comprise the Infringing Phones, including the components Mr. Lucente lists, are not visible at all and therefore play no role (or, to the extent visible, a very small role) in the visual impression of the overall device.

72.     Mr. Lucente quotes from the oral argument before the Supreme Court. (Lucente Report ¶ 188.) I have been informed and understand that statements made at oral argument are not the law. Further, the exchange Mr. Lucente quotes does not refer to the prominence of the appropriated design relative to the entire appearance of the product. A design patent by definition can only protect ornamental features of a product. Because the Supreme Court concluded that when dealing with multi-components such as smartphones, the article of manufacture can be **either** the entire product or a component thereof, I do not find this exchange informative.

**Responses to Mr. Lucente's Other Criticisms**

73.     Mr. Lucente criticizes my report for "treat[ing] each of the products as if it has misappropriated the entire look and feel of the iPhone." (Lucente Report ¶ 194.) I set forth clearly in my Opening Report which Samsung products infringed which patents-in-suit and analyzed them accordingly. However, because the patented designs are so prominent when applied to smartphones, even the Samsung phones that only infringe the D'677 patent have an overall appearance that is strikingly similar to the iPhone.

74.     Mr. Lucente also dismisses some of the product reviews I discussed because they comment on phones that infringe all three of the design-patents-in suit (the Vibrant and Galaxy S i9000 phones) (Lucente Report ¶ 197.) These Galaxy S phones were some of the earliest phones to appropriate Apple's designs. Accordingly, I do not find it surprising that their similarity to the iPhone was more talked about in the press. As subsequent Infringing Phones came onto the market, the shock of Samsung's appropriation of the protected design had subsided somewhat. In any case, Mr. Lucente is wrong that the reviews are limited to these products. The reviews cited in my report also include reviews of the Mesmerize, Fascinate, and Galaxy S II phones. (Opening Report ¶ 123.) For example, a May 9, 2011 review states "[i]f the Samsung Galaxy S II looks familiar it's because it resembles Apple's popular iPhone 4." (PX6.4.)

75.     Further, as explained in my Opening Report, many of these reviews commented specifically on precise features of the claimed designs that these reviewers reference when describing the overall similarity of the Infringing Phones to the iPhone:

    a.    "The rounded curves at the corners …. and the chrome-colored metallic border around the display." *Wired*, July 15, 2010. (PX6.1)

    b.    "The chrome-like border, edge to edge glass display (overlaying black plastic), and curved candy bar shape … ." *Laptop*, July 20, 2010. (PX6.1)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

    c.   "Front face dominated by glass and a black surround … ." *MobileTechReview*, July 21, 2010 (PX6.2)

    d.   "[F]ront silver frame" *Digital Trends*, July 30, 2010 (PX6.2)

    e.   "[R]oughly the same size and shape as an iPhone…" *Electronista*, August 15, 2015 (PX6.3)

    f.   "Chrome edge around the screen… ." *TechRepublic*, September 16, 2010. (PX6.3)

76.    The Wall Street Journal even used the word "prominent" to describe the bezel on Samsung's infringing Vibrant: "The T-Mobile Vibrant has rounded corners and a prominent border that make it look very much like last year's iPhone3GS model." (PX6.2.)

77.    The fact that the reviewers homed in on these design elements as the basis for concluding they looked like the iPhone, and not on other design elements such as the home button or the backs of the phones, shows that others perceived these designs as prominent within the devices.

78.    For the reasons stated above and in my Opening Report, my opinion remains that the D'087 and D'677 designs are very prominent within the Infringing Phones as a whole and that this factor suggests the articles of manufacture to which Samsung applied those designs are the entire Infringing Phones.


## FACTOR 3

79.    In my opinion, Mr. Lucente has not correctly applied the third factor of the District Court's test: "whether the design is conceptually distinct from the product as a whole." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017).) For that reason and others, as explained below, I disagree with his conclusions as to this factor.

80.    I believe Mr. Lucente conflates the question of whether the D'677 and D'087 designs are conceptually distinct from Samsung's Infringing Phones as a whole with the separate question of whether the components Mr. Lucente alleges are the articles of manufacture are conceptually distinct from other individual components of the Infringing Phones. For example, Mr. Lucente states that "the many features and components of a complex multicomponent product like a smartphone are conceptually distinct from one another, even though such products are designed and engineered to function as an integrated finished product" and that he does "not believe it is justified to conclude that the front face [or] bezel … of a smartphone are conceptually indistinct from all the other components, features, and innovations." (Lucente Report ¶ 222.)

81.    In Mr. Lucente's view, it appears, **every** component of any multicomponent product would be conceptually distinct from every other component, and therefore, if a design patent claims only a portion of the product, it will always be said to be conceptually distinct from other portions of that product. I do not believe this is an appropriate understanding of "conceptually distinct" under Factor 3. If it were, then no design utilized in a multicomponent product ever could be considered to have been applied to the product as a whole. Yet I have been informed and understand that the Supreme Court concluded that a design can be applied either to "a product sold to a consumer" or "a component of that product." *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 435 (2016).

82.    Mr. Lucente sometimes does appear to reach conclusions about "the design[s]" rather than about the components to which he alleges the designs correspond. (*See* Lucente Report ¶ 230.) But Mr. Lucente offers little to bolster these conclusions beyond his comparison of components to other components; he says little about design. To the extent he means to assert that a design that claims part of a product necessarily is distinct from other product components, I disagree. That reasoning would lead to the conclusion that even a design for a single-component product like a dinner plate

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

would be conceptually distinct from the entire product if the design claims only a portion of the product—for example, the plate's outer rim. That, in turn, implies that a design for a plate's outer rim is not "applied to" the entire plate. Yet I have been informed and understand that the Supreme Court observed that "[i]n the case of a design for a single-component product, such as a dinner plate, the product is the 'article of manufacture' to which the design has been applied." *Samsung Elecs. Co.*, 137 S. Ct. at 432.

### Mr. Lucente's Flawed Analogies

83. The District Court's article of manufacture test requires consideration of factual issues specific to the patents and infringing products at issue. As a general matter, I believe that relying on hypotheticals, especially hypotheticals that are incomplete in that they do not provide specific information about the hypothetical patent or product at issue, can be misleading. I also believe there are a number of specific flaws with the particular analogies on which Mr. Lucente relies.

84. Mr. Lucente repeatedly analogizes to what he calls "the book binding example." (*See* Lucente Report ¶ 223.) I think Mr. Lucente is wrong to rely on that example, which comes from the Solicitor General's brief. As described above, I have been informed and understand that the Solicitor General's brief is not law.

85. I do not believe the comparison to a book and book binding applies to the facts of this case. Mr. Lucente compares the glass front face and bezel of a smartphone to the front cover of a book. (Lucente Report ¶ 226.) But a book can be opened and is meant to be used primarily when open, such that the book binding is hardly visible. A smartphone, by contrast, always remains "closed," and its content is **only** viewable through the front face of the phone. So, while a consumer generally views a book's binding only when not using the book, a consumer using a smartphone views the phone's front face and bezel both while using the phone and while not using it.

86. Mr. Lucente also relies on the book binding example in criticizing my focus on whether the D'677 and D'087 designs are "integral" to the product as a whole. I do not think this analogy is appropriate for the facts of this case for a number of reasons. For example, while Mr. Lucente does not appear to dispute my conclusion that they are integral to the product, he asserts that whether they are integral is not "a reliable criterion," because "[a] book without its binding would simply be a stack of loose papers." (Lucente Report ¶ 250.) But those loose papers, and the content written on them, still can be read and still transmit the exact same ideas that they would transmit when bound. By contrast, the content within a smartphone would be inaccessible without the front face. For that reason, the D'677 and D'087 designs are "integral" to a smartphone as a whole in a way that a design for book binding is not integral to the book as a whole.

87. Another analogy Mr. Lucente discusses is that of a design for a piano case. Based on his report, I understand that the example came from another court case and involved design patent D37,501. (Lucente Report ¶ 223c, d.) I have been informed and understand that decision is not part of the test I have been asked to apply. Even if considered, I believe this example supports my conclusion that the article of manufacture to which Samsung applied the D'087 and D'677 designs are the Infringing Phones as a whole. At the time of the *Bush & Lange Co. v. Becker Brothers* case (1916), it **was** common in the piano industry that internal piano mechanisms were sold separately from the cases. This allowed different mechanisms to be used in the same case, or different cases on the same mechanism. This is very different from the smartphone industry, and the Infringing Phones, where the "cases" are not disassociated from the internals and used with other internals or vice versa. Rather, for the Infringing Phones, the claimed design is being applied to a unitary device.

88. Further, as shown in Mr. Lucente's report, the title of the D37,501 patent is "Piano Case," and the patent claims "[t]he ornamental design for a piano-case, as shown." The patent nowhere claims a design for a piano or identifies a piano as an example of the article of manufacture to which the design could be applied. Given that the D'677 and D'087 patents both claim the ornamental design

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

"of an electronic device," the piano case example, if anything, suggests that the article of manufacture for these two patents is likely to be an electronic device.



89.  I note that Mr. Lucente appears to agree with me that the D'677 and D'087 designs have no standalone utility and "are dependent on a larger finished product for their usefulness." (Lucente Report ¶ 225.) But Mr. Lucente asserts that "asking if the design would have value or utility on its own apart from the product also leads to the wrong result," based on a statement from another court that book binding alone would have no separate commercial existence. (Lucente Report ¶ 251.) Again, I have been informed and understand that this statement from another court is not the law of this case.

90.  Even if it were relevant, however, I do not think it would relate to my point regarding the extreme lack of utility of the individual components I understand Samsung asserts to be the articles of manufacture here. As I quoted in my Opening Report, Samsung witnesses not only stated that a glass front face and bezel would have no value or utility outside a phone, but also that it was hard even to picture those components separately from the rest of the phone. For example, Samsung executive Justin Denison stated: "I'm just having a hard time picturing what a flat front face of a phone by itself is. I'm not sure that that's something I can hold." (Denison 2017 Dep. 73:12-17.) Based on my experience, I believe consumers would have no trouble picturing book binding separated from the rest of a book.

91.  Separate from the book binding example, Mr. Lucente asserts that the fact that "[t]he glass front face and bezel would . . . have no value as individual components separate from the rest of an infringing device" is "a compelling indication" that the D'677 and D'087 designs are different concepts than are the products that utilize those designs. (Lucente Report ¶ 225.) I disagree. What Mr. Lucente misses, in my view, is that the designs and the products are **co-dependent** on one another. Without the area claimed by the D'677 and D'087 designs, there is not and cannot be a "finished product." Just as the designs themselves are useless without the product, the Infringing Products are useless without these designs. As I stated in my Opening Report, the Infringing Products without the claimed designs would not even be a solid form. (Opening Report ¶ 220.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Consumers could derive no benefit from such an incomplete product, which I believe they would be unlikely even to recognize as a smartphone.

92.   As explained in my Opening Report, Samsung designed its infringing phones as complete products, rather than as a series of individual components, with a focus on giving its phones a holistic appearance. (Opening Report ¶¶ 225-229.) Sketches from Samsung's designers confirm as much (DX682.021):



93.   Mr. Lucente does not disagree that Samsung emphasized a holistic design approach, but he considers this approach irrelevant. He equates this approach with "wearing a matching suit jacket, pants, shirt, shoes, and tie." (Lucente Report ¶ 252.) I disagree with this analogy. Those individual pieces of an outfit can be worn separately and with other pieces to create different outfits, and the wearer can mix and match at his option. A clothing designer does not design a shirt or tie expecting it will be integrated into only one outfit and will be incapable of use outside of that outfit. Yet Samsung's witnesses confirmed that they designed phones as a whole, with the expectation that each individual component would be subsumed within the product. (*See, e.g.*, J. Kim 2017 Dep. 89:4-17 (testifying that when designing the infringing Galaxy S II phones, Mr. Kim "made efforts to make it look like one and [not] look complex"); Denison 2017 Dep. 93:11-18 (describing "holistic design" as meaning that "Samsung is bringing together the thousands of technology, the hundreds of parts, the millions of lines of code, to create, you know, a beautiful end product")."

**The Existence of Many Components Alone Does Not Suggest the Claimed Designs Are Conceptually Distinct From the Product as a Whole**

94.   Many of the observations Mr. Lucente makes, including that smartphones have "[d]istinct [c]omponents and [i]nnovations" (Lucente Report ¶¶ 227-229); that Samsung advertises multiple phone features (Lucente Report ¶¶ 240-242); that carriers require different features (Lucente Report ¶ 243); and that the Infringing Phones have different "technical specifications and componentry" (Lucente Report ¶ 244) establish nothing more than that the Infringing Phones have multiple components or features. For the reasons discussed above (¶¶ 80-82), I do not think it is appropriate under the third factor to ask simply whether the patented design is something different than one or more of the components within the product utilizing the design. These observations are therefore largely irrelevant to a proper analysis of Factor 3 and, to the extent they are considered, do not support a conclusion that the D'087 and D'677 designs are conceptually distinct from the Infringing Phones.

95.   For example, Mr. Lucente discusses the fact that smartphones can experience software updates without affecting their design. (Lucente Report ¶ 228.) If anything, the fact that the software can change but the design of the product cannot confirms that the design is integral and not conceptually distinct from the product as a whole.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

96.    Similarly, while Mr. Lucente relies on the fact that Samsung's user manuals are "several hundred pages long just to give an introduction to the various parts, features, and functions of the smartphones" (Lucente Report ¶ 231; APLNDC-Y0000065097-304; APLNDC-Y0000065725-907; APLNDC-Y0000061629-794; APLNDC-Y0000058528-807; APLNDC-Y0000061795-969; SAMNDCA00018395-8642; S-ITC-003304098-4299; APLNDC-Y0000060900-1177; APLNDC-Y0000058808-9008; S-ITC-003298165-370; S-ITC-003300462-619; APLNDC-Y0000059792-948; SAMNDCA00009582-9786; APLNDC-Y0000060544-694; APLNDC-Y0000057975-8148; SAMNDCA00017928-18146), nowhere do those user guides discuss or introduce the design of the smartphone or the front face or bezel as distinct from the phones as a whole.

97.    Mr. Lucente also discusses that consumers "value" the ability to have all-in-one devices and "expect their products … to function well." (Lucente Report ¶ 229.) These observations have nothing to do with whether the D'087 and D'677 patents are conceptually distinct from the Infringing Phones Samsung incorporated them into. That consumers might also value other features, such as increased memory, is also not evidence of conceptual distinctiveness. Mr. Lucente's observations in this regard (Lucente Report ¶¶ 245-246) appear again to reflect Mr. Lucente's erroneous opinion that the existence of features other than design, even intangible ones, render any design "conceptually distinct."

98.    Mr. Lucente also emphasizes that Apple has obtained other design and utility patents that are embodied in the iPhone, besides the three patents at issue in this case. (Lucente Report ¶¶ 238-239, Exhibits 5 and 6.) I note that Mr. Lucente has not shown any evidence that all these patents are actually practiced by the iPhone, and does not suggest they are practiced by the Infringing Phones. He contends that the existence of those patents renders it "inconsistent for Mr. Ball . . . to describe the iPhone as a unitary product from which the patented designs are conceptually *in*distinct." (Lucente Report ¶ 239.) But I believe it is Mr. Lucente who has erred in apparently concluding that where a product incorporates multiple inventions, each of those inventions must be conceptually distinct from the product as a whole. This reasoning would suggest that any design patent for a product containing non-design features or other designs cannot be "applied to" the product as a whole. For the reasons given in my Opening Report and herein, I disagree.

**Advertising Shows the Prominence of the Claimed Designs**

99.    Mr. Lucente discusses Samsung's advertisements and concludes that they have "focused on features of the phones that are unrelated to the patented D'677 and D'087 designs." I disagree, based on a review of both Samsung's advertisements generally and the example ads Mr. Lucente shows in his report. Mr. Lucente notes that these ads mention features such as the phone's thinness, its large display screen, its processor, its camera, and its operating system. (Lucente Report ¶¶ 241-242.) But strikingly, these features are mentioned in small text next to a large image of the front of the phone. Not only does this support my view that the phone's front face is prominent, *see* ¶¶ 50-51 above, but it also demonstrates that it is difficult to separate the product (and its features) from the claimed designs. Even an advertisement that explicitly touts features other than the phone's design clearly shows off those designs. This front view of the phone is what consumers associate with the product as a whole, and so any advertisement for the product and any of its features is likely to show that view. Notably, every Samsung phone advertisement shown in Mr. Lucente's entire report shows the front of a Samsung phone. (SAMNDCA00311361; SAMNDC00311364; SAMNDCA00311405; SAMNDCA00358953; SAMNDCA00311777; SAMNDCA00359045; SAMNDCA00311548; SAMNDCA00312148; SAMNDCA00357213; SAMNDCA00311766; SAMNDCA00358882.)

100.   Mr. Lucente also addresses Apple's advertising for the iPhone. While I understand the inquiry for the third factor focuses on Samsung's phones, I disagree with Mr. Lucente that Apple's advertising indicates that "Apple viewed the 'concept' of the front face of the iPhone as different from the whole of the phone design." (Lucente Report ¶ 247.) The front face of the iPhone—including its overall

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

shape, rounded corners, and glass front extending edge-to-edge—is a constant that has defined the overall identity of the phone. It is thus unsurprising that when a new model of the iPhone was released, with that same identifying design, Apple would focus on marketing the model's new features. None of this advertising in any way indicated that the front face no longer was the identity of the phone; to the contrary, just as Samsung did, Apple consistently displayed the phone's front face in its advertisements and even published guidelines emphasizing that it was to be shown "front and center in all layouts." (*See* Opening Report ¶ 213.)

**Alleged Distinctions Between Infringing Phones**

101.    Mr. Lucente asserts that "[e]ven among the two relevant phones found to infringe all three patents, they are made distinct even from each other by (i) changing the visual appearance in the *back* of the phone, (ii) changing the appearance of the home screens, and (iii) updating the speed of connectivity." (Lucente Report ¶ 248.) I understand his point (which I disagree with) to be that the designs must be distinct from the phones as a whole if even two phones that share these three designs can look at all different from one another based on other differences. To support his point, Mr. Lucente offers the following images of the Galaxy S Vibrant and the Galaxy S 4G:



102.    Based on my experience as an industrial designer, I do not believe an ordinary observer would view the two phones above as distinct. Consistent with my analysis above, the front faces of these phones are their most prominent features, and the other differences are negligible. Thus, to me, the images provided by Mr. Lucente support the conclusion that the design for the front of these phones is not conceptually distinct from the phones as a whole, because that design would drive an ordinary observer to view the phones as substantially similar, despite the other differences Mr. Lucente cites. The jury's verdict finding infringement by both of these phones confirms my view.

**Responses to Mr. Lucente's Other Criticisms**

103.    Mr. Lucente criticizes me as "overstating the ability of Apple's industrial designers to create whatever designs they want without component and manufacturing constraints." (Lucente Report ¶ 253.) Mr. Lucente does not cite to any portion of my opening report where I allegedly made this bold assertion, and I do not believe I did. Instead, my point was and is that Apple's design vision drove the development of technology to make that vision possible. That is what I understand Apple Vice President of Procurement Tony Blevins to have meant when he said: "Everything is subservient to that design, which makes my job really, really hard. That means instead of buying something available off the shelf and choosing the best off-the-shelf component, we almost exclusively design things that are unique and differentiated because they must be to fit in that final design." (Blevins 2017 Dep. 196:6-12.) This approach is consistent with a conception of design as representing the product, not as being distinct from it.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

104.   Mr. Lucente appears to misunderstand my point in noting that Samsung never sold or advertised the components Samsung alleges are the articles of manufacture separately from the infringing phones as a whole. (*See* Opening Report ¶ 230; Lucente Report ¶ 255.) My opinion is not that the thing sold necessarily always is the article of manufacture. Rather, I believe Samsung's consistent focus in sales and advertising on the infringing phones, and not on their individual components, demonstrates that Samsung conceives of the phones as entire products and views the patented designs as integrated within the products as a whole.

105.   I am not dissuaded from that view by Mr. Lucente's point that some internal Samsung documents apparently refer to the front face by a particular name (e.g., identifying what Mr. Lucente calls the glass front face as the "Window"). (Lucente Report ¶ 256 & n.126; SAMNDCA30000518 at SAMNDCA30000519; SAMNDCA30001556 at SAMNDCA30001557; SAMNDCA30002235 at SAMNDCA30002236; SAMNDCA30002630 at SAMNDCA30002631; SAMNDCA30003283 at SAMNDCA30003284; SAMNDCA30005139 at SAMNDCA30005140; SAMNDCA30005537 at page 2; SAMNDCA30005538 at SAMNDCA30005539; SAMNDCA30005937 at SAMNDCA30005938; SAMNDCA30006228 at SAMNDCA30006229; SAMNDA30007769 at SAMNDCA30007770.) For one thing, I find it telling that neither any Samsung employees nor Mr. Lucente himself actually has used that name to refer to the component Samsung alleges is the article of manufacture. (Opening Report ¶ 232; Lucente Report ¶ 30 (identifying the articles of manufacture with descriptions rather than the names apparently used in Samsung documents).) Just because something has a name, that does not mean it is generally conceived of as having distinct relevance, relative to a product it is integrated within. The fact that Samsung's employees and Mr. Lucente either are unaware of or choose not to use the names assigned to these components indicates that they are not conceived of as having a relevant existence outside of Samsung's phones.

106.   Finally, Mr. Lucente's discussion of Factor 3 contains numerous propositions that are not related to Factor 3 of the article of manufacture test (or any other factor) as I understand the Court's test. For example, I do not see any relevance to media reports regarding Apple's efforts to preserve iPhone battery life (Lucente Report ¶ 228 & n.94), to Apple's decision to purchase Samsung's "miniaturization technology" (Lucente Report ¶ 235), or to Apple's 2017 advertisements for the iPhone X (Lucente Report ¶ 253), which I understand was released over five years after the first trial in this case.

107.   For the reasons stated above and in my Opening Report, my opinion continues to be that the D'677 and D'087 designs are not conceptually distinct from Samsung's infringing phones as a whole.


**FACTOR 4**

108.   I disagree with Mr. Lucente's analysis of and conclusions regarding Factor 4. Mr. Lucente notes that "each of the articles of manufacture is a physically separate component." (Lucente Report at page 82.) In a multi-component product, every component will be physically separate from the finished product as a whole at some point in time. If that were the relevant inquiry, there would be no reason to consider this factor.

109.   Along the same lines, every multicomponent product can be deconstructed to reveal its individual components. Where, as here, the only way to physically separate the alleged articles of manufacture from the remainder of the infringing product is to "break" or destroy the product, it is my opinion that this factor weighs in favor of concluding that the entire product is the article of manufacture.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**Samsung's Failure to Produce the Articles of Manufacture Separate from the Infringing Products**

110. I have been informed and understand that in connection with this litigation, Apple requested that Samsung produce the articles of manufacture it identified for each and every Infringing Phone. I also understand that, although Samsung agreed to do so, it has only produced the alleged articles of manufacture for 4 of the 12 phones found to infringe the D'087 patent or the D'677 patent and that the components it has produced have been provided only for inspection in Samsung's counsel's offices or in the presence of Samsung's counsel.

111. I further understand that the alleged articles of manufacture that were provided for inspection are the same components that Samsung technician Bob Nelson required assistance from a third-party to separate from the phones. (*See* Opening Report ¶ 245.)

112. The fact that Samsung has not provided the alleged articles of manufacture for 8 of the phones found to infringe the D'677 patent, and is unwilling to allow counsel for Apple to take possession of any of the alleged articles of manufacture that it has successfully separated from an infringing product, indicates to me that separating these components from the Infringing Phones is extremely difficult. It also confirms that Samsung is not able to obtain these articles of manufacture from its vendors as separate components, as Mr. Lucente implies.

**Design of the Infringing Phones**

113. As explained in my Opening Report, to the extent how the Infringing Phones were designed is relevant to an analysis of "[t]he physical relationship between the patented design and the rest of the product," the evidence shows that the front face and bezel were not designed to be separated. (Opening Report ¶ 242.)

114. Mr. Lucente states that the "designers who created the front face and bezels of the D'677 and D'087 products were simply not responsible for the entirety of those products" such as the "internal components" or "software coding." (Lucente Report ¶ 274.) I do not think it is accurate to refer to "designers who created the front face and bezels" of the Infringing Phones since, as explained in my Opening Report, those components were not designed separately from the rest of the Infringing Phones.

115. Further, Industrial Design is unique as compared to some of the other disciplines Mr. Lucente identifies, such as engineering or programming. Industrial Design's role in developing consumer products is one of conception and the integration of diverse technologies and disciplines, not unlike a conductor leading an orchestra, which consists of all the other disciplines, and is responsible for bringing all the various elements together in order to impart form onto them.

116. Mr. Lucente's claim that "at the level of industrial design, the exterior of the phones are designed as multiple components, not unitary shells" (Lucente Report ¶ 275) is inconsistent with the evidence. As discussed in my Opening Report, Samsung witnesses explained that designers at Samsung work to create overall phone designs and that front faces and bezels are not designed as separate components. (D. Kim 2017 Dep. 40:14-16; Sheppard 2017 Dep. 132:21-25.)

117. The excerpts from what appear to be CAD drawings and an unidentified document cited by Mr. Lucente do not suggest otherwise. (Lucente Report ¶ 275; SAMNDCA00507896; SAMNDCA00507897; SAMNDCA00508305) In my experience, CAD drawings such as these would likely be created after a design concept was developed, prototyped, tested, and refined, as part of the manufacturing documentation process. The unlabeled document likewise does not appear to me to be a design document, but some sort of technical requirement or manufacturing guideline.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

118.   The designer sketches shown at paragraph 351 of Mr. Lucente's Report (DX682;
       SAMNDCA00197773) demonstrate how a designer conceived of an entire phone design in its
       holistic form, not just a single component in isolation. This is consistent with the testimony of
       Samsung's witnesses and with my own experience.

119.   The holistic nature of Samsung's phone designs is reaffirmed by the fact that when Samsung
       presents new phone designs to carriers, it does so by presenting them with mock-ups of the entire
       phones. (Blackard 2017 Dep. at 69:24-70:7, 71:3-12.) These mock-ups are non-functional, physical
       renderings of the entire product.

120.   I have been informed and understand that Samsung produced for inspection in California some of
       the mock-ups developed in connection with the Infringing Phones and I have been provided with
       photographs taken of those mock-ups by counsel. I further understand that these mock-ups were
       not labeled to indicate which mock-ups were developed in connection with which infringing phones,
       but is clear from photographs that these mock-ups are presented as entire, unified devices, and not
       separate components. Photographs taken of these mock-ups are attached as Exhibit A to this
       report. Two are shown below:

 

Photographs of Samsung Mock-Up Model 038

**The Infringing Phones Are the Articles Samsung Manufactures That Embody the Claimed
Designs**

121.   The fact that the Infringing Phones are manufactured from separate components (Lucente Report
       ¶¶ 276-277) is not informative to the article of manufacture analysis in and of itself. As discussed
       above, all multi-component products are manufactured from separate components. The relevant
       consideration as set forth in Factor 4 is "[t]he physical relationship between the patented design
       and the rest of the product, including … whether the **design is embodied** in a component that is
       manufactured separately from the rest of the product…." The components Mr. Lucente has
       identified do not meet this standard.

122.   Mr. Lucente agrees with Samsung's allegation that the article of manufacture for the phones found
       to infringe the D'677 patent is "the black, round-cornered, glass front face of each phone." (Lucente
       Report ¶ 30.) He then identifies the "Window" part referred to in Samsung's "specifications for
       approval" as "correspond[ing] exactly with the black glass front face [he] ultimately identified as the
       article of manufacture for D'677 for each product." (Lucente Report ¶ 278.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

123. The "Window" part or "front face" that Mr. Lucente has identified as the article of manufacture for the D'677 patent does not "correspond" to or embody the D'677 design, at least because the vast majority of that component is not black. Instead, as the name "Window" implies, the vast majority is a large, clear transparent square. Below is a photograph of the "front face" that Samsung has produced as the alleged article of manufacture for the Galaxy S II Epic 4G Touch which infringed the D'677 patent as compared to Figure 3:



Photograph of Alleged Article of Manufacture
for Galaxy S II Epic 4G Touch



Figure 3 of the D'677 Patent

124. I have reviewed the specification for approval documents identified at footnote 138 of Mr. Lucente's report and confirmed that for each Infringing Phone, the "Window" component that Samsung and Mr. Lucente have alleged is the article of manufacture for the D'677 patent is predominantly a large, transparent rectangle. (SAMNDCA30000518 at SAMNDCA30000519; SAMNDCA30001556 at SAMNDCA30001557; SAMNDCA30002235 at SAMNDCA30002236; SAMNDCA30002630 at SAMNDCA30002631; SAMNDCA30003283 at SAMNDCA30003284; SAMNDCA30005139 at SAMNDCA30005140; SAMNDCA30005537 at page 2; SAMNDCA30005538 at SAMNDCA30005539; SAMNDCA30005937 at SAMNDCA30005938; SAMNDCA30006228 at SAMNDCA30006229; SAMNDA30007769 at SAMNDCA30007770.) This component therefore does not embody the D'677 design. Because the component that Mr. Lucente and Samsung have identified does not embody the design, this component alone cannot be the article of manufacture for the D'677 patent.

125. Mr. Lucente also agrees with Samsung's allegation that the article of manufacture for the phones found to infringe the D'087 patent is "the round-cornered, glass front face and surrounding rim or bezel of each phone." (Lucente Report ¶ 30.) As Mr. Lucente acknowledges (Lucente Report ¶ 280), these are two separate components. I have seen no evidence that these two components alone are ever combined into an "article of manufacture." Rather, they are always combined in a phone.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**Whether Users or Sellers Can Physically Separate the Alleged Articles of Manufacture**

126.   Factor 4 also requires consideration of "whether the design pertains to a component that a **user or seller** can physically separate from the product as a whole."

127.   The components Mr. Lucente identifies as the alleged articles of manufacture are clearly not designed or manufactured to be physically separated from the Infringing Phones by the user.

128.   It is telling that Mr. Lucente has identified components **other than** the alleged articles of manufacture, such as the battery and SIM card, that "were designed and manufactured to include various components that could be easily removed by the user" as shown in a user guide. (Lucente Report ¶ 282.) I note that the user guide shown in Mr. Lucente's report (APLNDC-Y0000058528) is for the Galaxy S Epic 4G (not the Galaxy S II Epic 4G Touch), which does not infringe either the D'087 patent or the D'677 patent. In any case, as discussed in my Opening Report, Samsung's user guides do not instruct users how to separate either the front face or bezel of their phones. Thus, in contrast to the components identified, Mr. Lucente's alleged articles of manufacture are **not** designed or manufactured to be physically separated from the rest of the device by users.

129.   The only reason Mr. Lucente cites for separating the components he alleges are the articles of manufacture from the rest of an Infringing Phone is for the purposes of repair. (Lucente Report ¶ 283.) The end goal of such repairs, however, is to return the phone to its original, complete state with Samsung's alleged articles of manufacture physically attached.

130.   The fact that the glass front face and bezel may be removed for purposes of repair does not, in my opinion, support a conclusion that these components are physically separable in a way that supports a finding that the individual components are the articles of manufacture. Mr. Lucente does not cite any material from Samsung instructing a user how to remove and repair either the glass front face or bezel from any of the Infringing Products. Instead, he cites manuals provided to "authorized repair technicians" showing "varying degrees of disassembly." (Lucente Report ¶ 287; SAMNDCA30004595-SAMNDCA30005046; S-ITC-003710999 to S-ITC-003711102; S-ITC-003712934-S-ITC-003713028; S-ITC-003714501-S-ITC-003714586.) It is not clear how these guides specifically relate to the articles of manufacture Mr. Lucente has identified as a majority of the images he has chosen to show do not appear to be any of the components he has identified as the article of manufacture (Lucente Report. ¶ 287.) In any event, the fact that these instructions are intended specifically for authorized repair technicians confirms that the components Mr. Lucente identifies as the article of manufacture are not components **users** can separate.

131.   Consistent with this point, Mr. Blackard testified that Samsung encourages users to seek out authorized repair providers and **not** try to conduct repairs that require removing parts by themselves. (Blackard Dep. at 149:9-14 ("Of course, we're not going to promote, hey, when your screen cracks, you know, we want you to buy this part and go figure it out. We try to intercept those problems when they occur, send them to professionals who know how to do that.").) And Mr. Sheppard confirmed that front faces and bezels are "not sold to the end consumer" separately in a way that would enable them to repair these components themselves. (Sheppard 2017 Dep. at 57:3-8.)

132.   This is consistent with the fact that if a user intentionally separates the components Mr. Lucente alleges are the articles of manufacture, it will void the warranty. It is also consistent with the fact that the repair kits Mr. Lucente refers to are provided by third-parties, not Samsung. It is clear Samsung does not encourage or want its users to separate the front face or bezel from the Infringing Phones.

133.   The only evidence of any seller separating the components that Samsung alleges are the articles of manufacture is the separation that Samsung did in connection with this litigation. As explained in my Opening Report, that required assistance from a third-party with specialized equipment, (further

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

confirming that these parts are not separable in the ordinary course and not designed or manufactured with the intent that they would be separated by users or sellers.

134.   I am also not persuaded that Mr. Lucente's alleged articles of manufacture are physically separable from the Infringing Phones based on evidence that Apple and others "tore down" these devices. Mr. Lucente does not show any evidence that these torn down phones were put back together in working condition. As discussed above, any multi-component product is capable of being broken down into its constituent parts. Further, Apple, or the "early-adopters" that Samsung's witnesses testified are usually behind such teardowns are not average users. (Wang 2017 Dep. 41:11-42:19.) In any case, the teardowns do not show that the specific components Mr. Lucente has identified as the articles of manufacture are physically separable from the Infringing Phones.

135.   The Apple tear-down that Mr. Lucente cites (Lucente Report ¶ 284, DX2519) does not show any components that correspond to the articles of manufacture Mr. Lucente has identified. Similarly, none of the third-party tear downs Mr. Lucente cites (Lucente Report ¶ SAMNDCA30000001-SAMNDCA0000053) shows the component he has identified as the "glass front face" or "Window" component separated in the manner shown in Exhibit 8 to Mr. Lucente's report. In all the cited teardowns, even the lowest level of disassembly shows the "front face" still combined with the display screen, circuitry, and other components. This is true even of the example Mr. Lucente features in his report (SAMNDCA30000009-SAMNDCA30000016):





The "Glass Front Face" Mr. Lucente Has Identified as the Article of Manufacture for the Galaxy S 4G, D'677 patent (Lucente Report, Exhibit 8 at 50)

Image from Samsung Galaxy S 4G Teardown in Mr. Lucente's Report (annotated)

136.   Mr. Lucente's reliance on third-party repair kits (Lucente Report ¶ 289, SAMNDCA30007944-SAMNDCA30008049) is similarly flawed. Many of the repair kits cited are not for phones found to infringe either the D'087 or D'677 patent. Of those that are, the majority are not for the "front glass," but are for LCD assemblies that include the front glass, display screen and other circuitry and components. (See, e.g., SAMNDCA30007960.) I also find it notable that none of these repair kids are provided by or authorized by Samsung.

137.   Likewise, **none** of the videos or articles Mr. Lucente cites at paragraph 290 of his report (SAMNDCA30008050-SAMNDCA30008125; SAMNDCA30008154-SAMNDCA30008173) shows the "glass front face" alone being separated from any of the phones found to infringe the D'087 or D'677 patent. The lowest-level of disassembly shown in those videos includes components beyond

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

that which Mr. Lucente says are the articles of manufacture. (*See* SAMNDCA30008074-8077; SAMNDCA3000808086-8089; SAMNDCA3000808090-8093; SAMNDCA3000808094-8097; SAMNDCA3000808098-8101; SAMNDCA3000808102-8105; SAMNDCA3000808106-8109; SAMNDCA3000808110-8113; SAMNDCA3000808154-8157; SAMNDCA3000808158-8161; SAMNDCA3000808162-8165; SAMNDCA3000808166-8169; SAMNDCA3000808170-8173.)

138. If anything, the evidence cited by Mr. Lucente confirms that users cannot separate his alleged articles of manufacture alone from the Infringing Phones.

### The iPhone

139. As discussed in my Opening Report, the iPhone was designed, manufactured, and sold to be a unitary product. Removing the glass front face or the glass front face and bezel from the iPhone would render the product unusable and would likely destroy the product.

140. For the same reasons discussed above with respect to the Infringing Phones, I do not think the fact that "Apple's iPhones are also multicomponent products" (Lucente Report ¶ 291) or the other observations Mr. Lucente makes regarding the iPhone (Lucente Report ¶¶ 292-301) are informative to Factor 4.

141. That Apple's phones have multiple components or have utility patents protecting other inventions in its phones says nothing about the physical separability of the glass front face or bezel.

142. I disagree with Mr. Lucente that the technical documents at paragraph 297 (APLNDC-MCO-000001-077; APLNDC-MCO-000146-231) show that the glass front face and bezel were "separately designed." As discussed in my Opening Report, these components were not designed separately. These technical specification documents show how various pieces come together in order to realize the design vision reflected in the D'087 and D'677 patents.

### Sales and Manufacturing

143. As explained in my Opening Report, Samsung is in the business of manufacturing and selling complete phones. While it may source the components that Samsung has identified as the articles of manufacture from other vendors, the articles that Samsung itself manufactures are the Infringing Phones.

144. Contrary to Mr. Lucente's claims (Lucente Report ¶ 303), I have not seen any evidence that Samsung, Samsung's suppliers, carriers, or other partners have actually sold Samsung's alleged articles of manufacture as separate components.

145. I understand that Samsung purchases its alleged articles of manufacture as parts of subassemblies, and not as individual components.

146. I understand that Samsung's corporate representative was unable to say whether Samsung had ever sold anything it would describe as the article of manufacture in this case. (Sheppard 2017 Dep. at 21:9-12.)

147. With respect specifically to the glass front face of the Infringing Phones, Samsung's corporate representative testified that that part was not ever sold to consumers or to carriers. Rather, Samsung would replace damaged screens itself as a service to carriers. (Sheppard 2017 Dep. at 55:2-56:14.)

148. I believe under Mr. Lucente's logic, any component of a multicomponent device would be "capable of being sold separately as well." (Lucente Report ¶ 303.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

149.   While evidence of actual separate sales is not required under Factor 4, the fact that there is not reliable evidence of sales of these components by Samsung, and that only unauthorized third-parties on sites such as eBay or Amazon sell them to consumers, suggests to me that these components are not the articles of manufacture.

150.   Contrary to Mr. Lucente's suggestion (Lucente Report ¶ 303), it is not my opinion that an article of manufacture less than the entire product must be discrete modular components in modular products. I do think a proper analysis under Factor 4 must take into consideration more than just whether the component is, at some point, separated from the finished product, including whether there is a separate market for the alleged articles of manufacture. Here, there is no separate market for the components that Samsung has identified. The only reason to obtain one of those components separate from an Infringing Phone is to incorporate it into the phone. The market for these components is therefore the same as the market for the Infringing Phones.

151.   Contrary to Mr. Lucente's assertion (Lucente Report ¶ 307), the "piano case" case he relies on **did** conclude there was a separate market for piano cases apart from piano internals. As discussed above (¶ 87), at the time of that case pianos and their cases were purchased separately and consumers had the ability to mix and match. That is a very different scenario than with the Infringing Products where consumers cannot choose the design of the product separately from its functionality.

## SAMSUNG'S COPYING

152.   I have been informed and understand that the District Court has suggested evidence of copying is relevant to at least Factor 2 and potentially other factors of the article of manufacture test. (Dkt. 3528 at 13:6-13.)

153.   For the reasons stated in my Opening Report, I believe Samsung's copying of the claimed designs is relevant both to the prominence of those designs within the Infringing Products (Opening Report ¶¶ 206-208) and the lack of conceptual distinctiveness between those designs and the Infringing Phones as a whole (Opening Report ¶¶ 234-235).

154.   I do not agree with Mr. Lucente's recitation of the history of mobile phone design. (Lucente Report ¶¶ 336-362.) I understand that Samsung's own damages expert has agreed that the iPhone "revolutionized" the smartphone market. (Wagner 2013 Trial Testimony, Dkt. 2841 at 1045:17-18.) I have also been informed and understand that some of the evidence Mr. Lucente has cited has been excluded by the Court in this matter as evidence of Samsung's alleged independent design of iPhone-like designs. (Dkt. 2708 at 2-5.)

155.   There is almost an infinite number of potential designs for smartphones and for smartphones with large touch-screen displays. The striking similarity of the Infringing Phones to the appropriated designs despite the existence of, and what Mr. Lucente cites as Samsung's consideration of alternative designs, confirms that Samsung copied Apple when it chose to use the specific designs claimed by the D'677 and D'087 patents. Given the vast number of design possibilities (as well as Samsung's desire to make something like the iPhone), such similarities are not coincidence.

## SUPPLEMENTATION

156.   I reserve the right to revise, supplement, or amend my opinions in light of any additional information that I might receive after the date of this report, including but not limited to rebuttal reports submitted by Samsung.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**EXHIBITS TO BE USED AT TRIAL**

157.   If called as a witness at trial, I expect to rely upon visual aids and demonstrative exhibits that
illustrate the bases of my opinions. These visual aids and demonstrative exhibits may include, for
example, drawings and other excerpts from the patents-in-suit; illustrations or photos of Apple's
iPhones and Samsung's infringing phones; excerpts from interrogatory responses, requests for
admission, deposition testimony, deposition exhibits, or documents cited in this report; and charts,
diagrams, videos, and animated or computer-generated video.


Dated:  February 9, 2018                    _____

                                            Alan D. Ball, IDSA

# EXHIBIT A

































