# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.   11-cv-01846-LHK<br><br>**REPLY EXPERT REPORT OF SUSAN KARE REGARDING "ARTICLE OF MANUFACTURE" FOR THE SAMSUNG PRODUCTS FOUND TO INFRINGE U.S. PATENT D604,305** |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ....................................................................................................1
II.  QUALIFICATIONS ................................................................................................1
III. MATERIALS CONSIDERED ................................................................................1
IV.  RELEVANT LEGAL PRINCIPLES .......................................................................1
V.   MULTI-COMPONENT PRODUCTS MAY BE MOST NATURALLY VIEWED AS THE ARTICLE OF MANUFACTURE ..........................................2
VI.  "ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS FOUND TO INFRINGE APPLE'S D'305 PATENT .....................2
VII. FACTOR 1: "THE SCOPE OF THE DESIGN CLAIMED IN APPLE'S PATENT, INCLUDING THE DRAWING AND WRITTEN DESCRIPTION" .....................................................................................................3
VIII. FACTOR 2: "THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A WHOLE" ..........................................................8
IX.  FACTOR 3: "WHETHER THE DESIGN IS CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE" ..........................................11
X.   FACTOR 4: "THE PHYSICAL RELATIONSHIP BETWEEN THE PATENTED DESIGN AND THE REST OF THE PRODUCT" ........................14
XI.  SAMSUNG'S COPYING OF APPLE'S DESIGNS ............................................16
XII. SUPPLEMENTATION .........................................................................................17
XIII. EXHIBITS TO BE USED .....................................................................................17
XIV. SUMMARY AND CONCLUSION ......................................................................17

# REPLY EXPERT REPORT OF SUSAN KARE

## I. INTRODUCTION

1. I submit this Reply Expert Report in connection with certain design patent claims being asserted by Apple Inc. in this case. This report is further support of my opinion with respect to identifying the "article of manufacture" for the Samsung products that have been determined to infringe U.S. Patent D604,305.

2. Samsung has submitted Rebuttal Reports from Samuel Lucente and Michael Wagner, each dated January 29, 2018. The report will address my views on the matters expressed in the Samsung reports to the extent they may relate to the opinion I hold with regard to the D'305 patent.

## II. QUALIFICATIONS

3. My qualifications and background are set forth in Section III of my opening Expert Report dated January 15, 2018.

## III. MATERIALS CONSIDERED

4. In forming the opinions set forth in this report I considered the expert reports that have been served in this action to date (including the materials cited and discussed in those reports), the materials identified in this report and the materials considered in preparing my opening expert report.

## IV. RELEVANT LEGAL PRINCIPLES

5. I am not a lawyer or an expert in the law of design patents, and I do not intend to debate legal issues with Samsung's experts. I note, however, that Mr. Lucente quotes and relies upon certain commentary on the four-factor test that is found in an amicus brief submitted by the Solicitor General. (*See, e.g.*, January 29, 2018 Expert Report of Sam Lucente ¶¶ 41, 223, 324.) I am informed that such commentary was not adopted or endorsed by either the Supreme Court or by the District Court, and that as such the commentary is not necessarily applicable to the correct understanding and application of the four-factor test. Regardless, considering the principles from the Solicitor General's brief as discussed by Mr. Lucente does not change my opinion.

## V. MULTI-COMPONENT PRODUCTS MAY BE MOST NATURALLY VIEWED AS THE ARTICLE OF MANUFACTURE

6. Mr. Lucente devotes a section of his report to the observation that smartphones "are complex products that are made up of thousands of components and embody at least tens of thousands of innovations," although he offers no evidence for these numbers. (Lucente Report ¶¶ 42-52.) He notes that many wireless communication patents enable smartphones to operate on cellular networks. (*Id*. ¶ 47.) He further observes that Samsung has obtained a large number of United States patents, although he does not identify any Samsung patents allegedly practiced by any of the infringing Samsung phones. (*Id*. ¶ 48.)

7. However, as Mr. Lucente also recognizes, the Supreme Court was well aware of the fact that smartphones are multi-component products, and further that they may embody patented inventions in addition to those at issue in this case. (*Id*. ¶¶ 44, 52.) As noted by the District Court, the Solicitor General's brief also recognized that for "some multi-component products, the finished product as sold in commerce is most naturally viewed as the article to which the patented design is 'applied.'" (Dkt. 3530, October 22, 2017 Order Requiring New Trial on Design Patent Damages at 13.) Since the Supreme Court concluded that the article of manufacture could be either a multi-component product or a component of that product, the facts described by Mr. Lucente in Section V of his report do not shed light on the article of manufacture inquiry. Rather, they merely confirm that smartphones are multi-component products that must be analyzed pursuant to the four-factor test adopted by the District Court.

## VI. "ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS FOUND TO INFRINGE APPLE'S D'305 PATENT

8. For the reasons discussed in my opening report and this reply report, my opinion is unchanged and continues to be that for each of the products found to infringe the D'305 patent, the article of manufacture to which Samsung applied the claimed design is the phones in their entirety.

## VII. FACTOR 1: "THE SCOPE OF THE DESIGN CLAIMED IN APPLE'S PATENT, INCLUDING THE DRAWING AND WRITTEN DESCRIPTION"

9. Mr. Lucente's discussion of Factor 1 is largely directed to a discussion of what is shown within the solid lines of the drawings of the patents-in-suit. He asserts that the "scope" of all three Apple patents-in-suit is limited to the "matter depicted in solid lines." (Lucente Report ¶ 58.) With respect to the D'305, however, Mr. Lucente refers not to *solid* lines, but rather asserts that the scope is limited to "the content inside the broken line boundary." (*Id*. ¶ 127.) Either way, I disagree with Mr. Lucente's opinions that the scope of the patent is "limited," or that what is shown in solid lines defines the article of manufacture to which the design was applied. My understanding is that an assessment of Factor 1 must take into account the entirety of the patent (e.g., "including the … written description," as stated by the Court). In my opinion, Mr. Lucente's starting assumption that the only thing to be considered under Factor 1 is solid lines is flawed and undermines the entirety of his analysis of Factor 1. As the District Court has stated, "the scope of the claimed design is not alone dispositive." (October 22, 2017 Order at 20.) My understanding of Factor 1, and the other three factors as well, is that no single factor is dispositive of the article of manufacture inquiry, and that the purpose of all of the factors together is "to help the factfinder perform its task of identifying the article of manufacture to which the patented design was applied …." (*Id*.) Mr. Lucente's focus virtually exclusively on what is within solid lines in the drawings causes him to lose sight of this ultimate "task."

10. Mr. Lucente asserts that, because "[t]he broken line showing of a display screen in both views … forms no part of the claimed design," the claimed design is therefore "narrow." (Lucente Report ¶¶ 60 – 61 (internal quotations omitted).) Here again Mr. Lucente ignores the terms of Factor 1 which call for considering more than just the drawing. Moreover, Mr. Lucente never explains what he means by his "narrow" characterization.

11. In paragraph 132 of his report Mr. Lucente claims that in my 2012 trial testimony I "confirmed" his opinion regarding the scope of the D'305 patent. Mr. Lucente states as follows:

> Apple's GUI design expert Dr. Susan Kare confirmed that the scope of the design is limited to the array of icons, because it is limited to

3

|   |   |
|---|---|
| 1 | "the rectangular area that's within the dotted line that goes around the outside." |
| 2 | |

(Dkt. 1612, Aug. 7, 2012 Trial Transcript at 1367.)

In fact, the question I was answering, and my testimony, was about "the features in Figure 1 that contribute to the overall visual impression it creates." (Dkt. 1612, Aug. 7, 2012 Trial Transcript at 1367:6-8.) Nowhere did I suggest, nor do I believe, that the D'305 patent is "limited" in scope. This testimony also did not address the article of manufacture to which Samsung applied the patented D'305 design.

12. Mr. Lucente then goes on in paragraph 132 to state that Judge Koh "relied on" my testimony in the Court's October 22, 2017 Order, implying that the Court has ruled that the scope is "limited." The Court has, as I described in my opening report, issued a claim construction order for the D'305 patent. I do not agree, however, with Mr. Lucente's implication that the Court has already made findings regarding Factor 1 as it relates to the article of manufacture inquiry, which I understand is for the jury to consider.

13. In paragraphs 142 to 147 Mr. Lucente discusses certain Samsung phones that employ application screens and were neither accused of infringing the D'305 nor adjudicated to infringe the D'305. Mr. Lucente asserts, without explanation, that the existence of these "alternative designs" for an application screen supports his opinion that the scope of the D'305 patent is narrow. I do not agree that the designs identified by Mr. Lucente, which post-date the D'305 patent and were not considered by the Patent Office during prosecution or by the jury during the 2012 trial, have any bearing on the scope of the D'305 patent.

14. In paragraph 148 of his report Mr. Lucente asserts that my opening report "provided a variety of reasons for why the scope of the design patents should be ignored or disregarded …." Notably, however, Mr. Lucente fails to cite a single passage from my opening report supporting his assertion, and in fact my report does no such thing.

15. In paragraph 149 of his report Mr. Lucente asserts his disagreement with my opinions, but refers to and does not disagree with my statement that the use of the term display screen in the D'305 patent indicates that the inventors intended the screen to be part of an

4

electronic device. In fact, Mr. Lucente appears to agree with the observation that a display screen is often a component of an electronic device. Mr. Lucente complains that this observation does not identify the scope of the claim, but that misses the point, which is that the recognition that the claimed design was intended for use in an electronic device is one item of evidence supporting the conclusion that the article of manufacture to which the design is applied is an electronic device, and in this case the phone. Designing for a display screen causes the designer to consider the whole environment – what is around the screen, contrast, etc., which reinforces my opinion that the infringing phones in their entirety are the articles of manufacture.

16. Mr. Lucente's assertion that the article of manufacture "*cannot possibly* be larger than the display screen" because it is a design for a display screen is just another example of circular reasoning unsupported by any analysis – moreover, it ignores the fact that, in setting the issue for trial, the District Court has held that the article of manufacture *could possibly* be the entire phone. (Lucente Report ¶ 149 (emphasis added).) Accordingly, the article of manufacture could be larger than just the display screen, and an experienced designer would take into account where her design work "lives." Under Mr. Lucente's approach, the solid lines in any design patent would alone define the article of manufacture to which the design is applied. If that were an appropriate application of Factor 1, one would never need to consider any other factors.

17. In paragraph 150, Mr. Lucente complains that my statement that the D'305 design is intended for dynamic use in an electronic device is not "consistent with the facts," but he then acknowledges that "the design claimed in the D'305 image was intended to be used in a smartphone …." He goes on to say that this "does not indicate therefore that the design is for an entire smartphone," but that is neither what I said nor what is necessary to conclude, as I do, that the article of manufacture to which Samsung applied the D'305 design is the phone as a whole. (*Id.* ¶ 150.) Moreover, the way the D'305 design is organized suggests a complete device. Mr. Lucente states that "Dr. Kare … incorrectly states that the design is much broader in scope," but fails to cite any such passage in my report. (*Id.*) This is one of many examples of Mr. Lucente setting up a straw man to knock down, rather than addressing what I actually say in my report.

18.      In paragraph 151 of his report Mr. Lucente asserts that my opinion in the present proceeding is contrary to the opinion I testified to in the 2012 trial, but Mr. Lucente is mistaken. He takes a single word out of context and does not understand the difference between the current task – identifying the article of manufacture to which the D'305 design was applied by Samsung – and the infringement and validity issues litigated in 2012. Nothing in the 2012 trial testimony Mr. Lucente cites supports his statement that in 2012 my opinion was that "the D'305 patent was just an ornamental image or piece of 'art'…." (*Id*. ¶151.) Likewise, Mr. Lucente's quote from my April 16, 2012 rebuttal report, which was discussing a different patent (the D'790) and was addressing Mr. Lucente's opinion that the D'790 patent was invalid because the icons claimed in that patent were functional, is in no way contrary to my opinion that Samsung has applied the D'305 design to the infringing phones.

19.      In paragraph 151, Mr. Lucente actually agrees with my opinion, stating that the "D'305 patent was an image designed for human interaction." In other words, Mr. Lucente agrees with me that the D'305 was "intended for dynamic use in an electronic device." (*Id*. ¶ 150 (internal quotations omitted).) This is in no way inconsistent with the view that, for infringement, the issue is whether an ordinary observer would consider the design of Samsung's application screen to be substantially similar to the D'305 design. (*See id*. ¶¶ 134-139.) Nor is it inconsistent with the conclusion that, for validity, the design claimed by the D'305 patent was not *dictated by function* although the icons of the design would be related to functionality when implemented in an actual device.

20.      In paragraph 152, Mr. Lucente asserts that my analysis of the prior art is "misguided," but offers no explanation or rationale for his conclusory statement. I continue to think that recognizing that the cited prior art overwhelmingly comprises phones and other electronic devices is helpful to understanding and identifying the article of manufacture to which Samsung has applied the D'305 design.

21.      Mr. Lucente addresses the prosecution history in paragraph 153 of his report but once again conflates Factor 1 with nothing more than the drawing in the patent. Mr. Lucente does not explain his bare assertion that the fact that the original patent application was split up into

1  multiple applications somehow affects the scope of the D'305 patent itself. His citation to other
2  Apple patents not at issue here is unexplained; Mr. Lucente fails to identify any single Apple
3  patent and explain how any such patent is relevant to the scope of the D'305 patent.  As stated in
4  my original report the fact that the patent examiner did not reject the D'305 design or make any
5  comments at all that might have limited its scope is more significant.

6        22.      In paragraph 154 of his report Mr. Lucente criticizes my reference to the Manual
7  of Patent Examining Procedure because it has not been updated following the Supreme Court
8  decision.  However, Mr. Lucente does not indicate how he thinks the MPEP should be updated, or
9  identify anything incorrect or out of date in the portion of the MPEP that my report quoted.  The
10 MPEP simply stated, in substance, that an article to which a claimed design is applied may have
11 structure that is not part of the claimed design.  This is entirely consistent with the Supreme
12 Court's conclusion that a design can be applied to either "a product sold to a consumer" or to "a
13 component of that product."

14       23.      Moreover, I do not agree with Mr. Lucente's claim that "in the context of
15 computer-generated icons, the MPEP has said that the 'screen' or 'display panel' is the proper
16 article of manufacture."  (Lucente Report ¶ 154.)  In my opinion, the portion of the MPEP cited
17 by Mr. Lucente merely states that if a design for computer-generated icons is embodied on a
18 computer screen or display, then the statutory requirement of patentability that a design be "for"
19 an article of manufacture is met.  The MPEP does not say that the article of manufacture to which
20 a design for icons can be applied is *only*, or is limited to, a display panel.  That a display panel
21 may be a necessary part of an article of manufacture does not mean that the article cannot be the
22 product of which that panel is a part.

23       24.      In paragraph 155 Mr. Lucente once again incorrectly conflates the D'305's
24 drawing with the article of manufacture, ignoring anything else in the patent and its prosecution
25 history and cited prior art.  The intentions of Apple's designers are consistent with and
26 corroborate other evidence showing that the D'305 design was intended for use in an electronic
27 device rather than for a stand-alone display unconnected to anything else.
28

7

## VIII. FACTOR 2: "THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A WHOLE"

25. In his opening comments on Factor 2, Mr. Lucente quotes from the Solicitor General's brief. (Lucente Report ¶ 157; *see also id.* ¶ 199.) As noted above, my understanding is that statements in this brief that were not adopted by the District Court are not the law in this case. In any event, since the D'305 design is not merely a "minor component," I do not agree that the quoted commentary supports Mr. Lucente's conclusions.

26. In paragraph 198, Mr. Lucente states that his analysis and opinions "above" also apply to the D'305 patent. Although Mr. Lucente is apparently referring to his discussion of the D'677 and D'087 patents, he does not identify any specific statement regarding those two patents that supposedly applies to the D'305 patent.

27. Mr. Lucente's opening comments also appear to rewrite Factor 2, changing the comparison from "the product as a whole" to "all the other aspects of the finished product." (*Id.* ¶ 158.) This revision of the factor as expressed by the Court leads Mr. Lucente incorrectly to compare the D'305 (and other) designs to various components and functional features of the infringing phones, rather than to consider the prominence of the D'305 design to the phone as a whole.

28. In paragraphs 200 to 206, Mr. Lucente discusses the home screen and the application screens on the infringing Samsung phones. As discussed in my opening report I disagree that the application screens are "relatively unimportant." Rather, they are the screens that users interface with repeatedly as they use the various apps on their phones; in this way, the application screens are a central feature of the user experience and a gateway to the functionality of the entire phone. They are the place where the user first encounters her range of options.

29. Mr. Lucente contends that "users typically add icons to the home screen so they can access other frequently used apps," although he cites no authority for this "typical" practice. (*Id.* ¶ 204.) In any event, that the phones may be modified after they have been purchased by a consumer is not relevant to the question of what *Samsung* did, i.e., what article of manufacture did *Samsung* apply the claimed design to.

30. I disagree with Mr. Lucente's unexplained comment that because some of the infringing phones have different design features other than their common infringing use of the D'305 design, the D'305 design is not a prominent part of the design. Notably, Mr. Lucente does not assert that the different features he refers to are prominent at all, much less more prominent than, or even equally prominent as, the D'305 design.

31. In his section on "Other Unaffected Components," Mr. Lucente misleadingly quotes the Solicitor General's brief as if it had concluded that the Samsung "products have 'many other components unaffected by the design' of the patented array of icons, and 'that fact suggests that the "'article'" should be the component embodying the design.'" (*Id.* ¶ 207.) In fact, the brief was not discussing the Samsung infringing phones, and the Solicitor General made no such finding as suggested by Mr. Lucente.

32. Mr. Lucente claims that the design of the application screen can be changed to a non-infringing alternative without changing other aspects or components of the Samsung phones. Assuming that is true, it says nothing about the prominence of the D'305 design or, indeed, the prominence of the allegedly non-infringing design. In fact, both could be prominent design features within the phone as a whole.

33. Mr. Lucente's discussion of Samsung's advertising does not alter my opinion. Whether or not Samsung ads also included images of other aspects of the infringing phones does not change the fact that images of the phone displaying the infringing D'305 design were used and highlighted in advertisements. If the D'305 design was not prominent, it would not have been included at all. The test does not require that no other design features are also prominent, or even that the patented design be the most prominent, but simply considers whether it is prominent within the product as a whole. The Merriam-Webster dictionary defines "prominent" as "readily noticeable: conspicuous."[1] This confirms my understanding that prominence relates to the visual aspect of a product design, not to non-visual features or functions. Clearly, more than one design feature can be "readily noticeable" or "conspicuous." Moreover, the fact that the D'305 design was patentable, and thus by definition new and novel, suggests that it is a prominent, readily

---

[1] https://www.merriam-webster.com/dictionary/prominent

9

1  noticeable, conspicuous aspect of the phones' design, as opposed to other aspects that may be
2  commonplace or familiar.

3     34.   Mr. Lucente disagrees with what he calls my focus on the iconic design of the
4  iPhone and the distinctiveness of the D'305 design. (Lucente Report ¶¶ 214, 216.) While it is of
5  course true that the issue is Samsung's use of the Apple designs, I believe it is appropriate to
6  consider the iconic nature of the iPhone design, of which the D'305 is a prominent part, in
7  evaluating the prominence of that design when it is appropriated by Samsung and applied to the
8  infringing Samsung phones. The fact that the iPhone home screen became iconic is powerful
9  evidence that the D'305 design as embodied in Samsung's infringing phones is in fact a
10 prominent design feature.

11    35.   Another argument Mr. Lucente offers for his view that it is irrelevant that Apple's
12 designs have obtained iconic status (without disputing that they actually are iconic) is that "A
13 physical thing doesn't change into something larger because the design becomes popular or well
14 known" and that "Intent, popularity, and advertising cannot alter the physical nature of an object."
15 (*Id.* ¶ 215.) But I have never asserted or implied that any article grew physically larger when the
16 D'305 design reached iconic status. Rather, my point simply was and is that the prominence of
17 that design is demonstrated by the ubiquity with which it is shown in popular images of a
18 smartphone. Contrary to Mr. Lucente's implication in paragraph 215, this is perfectly consistent
19 with the Supreme Court's understanding of an article of manufacture as "a thing made by hand."

20    36.   Mr. Lucente separately claims that I have "conflate[d] the value or prominence of
21 the overall 'user interface' with the value or prominence of one screen of icons . . . ." (Lucente
22 Report ¶ 218.) Mr. Lucente cites no portion of my report and offers no explanation to support
23 this claim, which is belied by my opening report.

24    37.   The prominence of the D'305 design within the device as a whole was recognized
25 even before it acquired its iconic status. In an early review in CNET.com, the authors wrote:

26        The iPhone's display is the handset's design showpiece and is
          noteworthy for not only what it shows, but also how you use it.
27        … The display, interface, video quality, audio quality--all of it is
          meticulously refined and beautiful.
28

(Apple iPhone review, June 30, 2007, https://www.cnet.com/products/apple-iphone/review/.)

## IX. FACTOR 3: "WHETHER THE DESIGN IS CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE"

38. In my opinion, Mr. Lucente's entire discussion of Factor 3 is not well-founded in large part because he has rewritten the factor as expressed by the Court. The District Court stated that Factor 3 involves the question "whether the design is conceptually distinct from the product as a whole." As stated at the top of page 66 of his report however, Mr. Lucente addresses the very different question of whether "the patented designs are conceptually distinct from *other parts* of the smartphones." (Emphasis added.) Accordingly, Mr. Lucente's opinion that "the many features and components of a complex multicomponent product like a smartphone are conceptually distinct from one another" (Lucente Report ¶ 222; *see also* ¶¶ 224, 262, 263) misses the point and is not relevant to an assessment of Factor 3. If Mr. Lucente's revised version of Factor 3 applied, then a multi-component product would never be the article of manufacture, contrary to the conclusion of the Supreme Court that the article of manufacture *can be* either the entire product or a component thereof. Moreover, just as prominence of a design speaks to visual aspects of a product as noted above, for this factor as well the focus is on visual design, not other features or hidden components that Mr. Lucente discusses.

39. Once again, Mr. Lucente quotes from the Solicitor General's brief, which I have been informed and understand is not the law to be applied in this case. (*Id.* ¶ 223.)

40. In my opinion, Mr. Lucente also misconstrues and misapplies Factor 3 when he asserts that "the designs for discrete components are not, and cannot be, the *same ideas or concepts* as the much more complicated finished products those designs are associated with." (*Id.* ¶ 225 (emphasis added).) The test does not require that the concepts be the "same," as Mr. Lucente puts it. As I understand Factor 3, we are to consider the conceptual relationship between the patented design and the product as a whole. As stated in my opening report, in my opinion the D'305 design is conceptually related, i.e., not distinct, from the Samsung smartphones that embody the design.

41. In similar fashion to his discussion of Factor 2, Mr. Lucente begins his discussion of Factor 3 and the D'305 patent with a statement that his opinion "is based on *much the same* evidence and reasoning" as for the D'677 and D'087 patents. (*Id.* ¶ 258; cf. ¶ 196. (emphasis added).) Again, Mr. Lucente does not identify any specific statement regarding those two patents that supposedly applies to the D'305 patent.

42. Mr. Lucente asserts his ultimate conclusion that the "design of the icon array in the application menus at issue corresponds to a different concept than the entirety of each phone." (*Id.* ¶ 259.) But Mr. Lucente never states what those two supposedly different (not "distinct") concepts are. Mr. Lucente attempts to support his assertion by noting that Samsung applied the D'305 design to a variety of phones, but this does not demonstrate the absence of a conceptual connection between the D'305 design as appropriated by Samsung and each of those phones. Mr. Lucente also cites testimony by Samsung designer Jee-Yeun Wang that she had not seen the Galaxy S1 phones while designing the user interface. But Ms. Wang's testimony does not contradict her admission (ignored by Mr. Lucente) that she knew she was designing for a phone and took that into consideration. (Dec. 20, 2017 Deposition Transcript of Jee-Yeun Wang at 55:15-24 (agreeing that she took into consideration "the size of the display screen of the phone" while "designing the Galaxy S II backbone").) This is not surprising: consistent with my discussion in my opening report (¶¶ 35-42), any professional designer tasked with designing a display would immediately think about the entire product it would be part of and consider that product as she worked. This is also consistent with Mr. Lucente's testimony in his 2012 report that "icon layout, icon container and icon metaphors" were "factors related to design problem solving" that "drove Samsung's overall design solution" for the "accused products." (April 17, 2012 Corrected Rebuttal Expert Report of Sam Lucente at 10.) Mr. Lucente fails to square this testimony with his new opinions.

43. In paragraph 260, Mr. Lucente offers a hodgepodge of comments, none of which affect my opinion. Mr. Lucente actually agrees with one of my important observations, which is that the infringing application screen, in his words, "acts as a portal" to the functionality of the phone. (Lucente Report ¶ 261.) As stated in my opening report, "the application screens are the

12

1 | jumping point for accessing all applications. This is key to the user experience. Conceptually it
2 | is inseparable from the product as a whole from the user's perspective." (January 15, 2018
3 | Expert Report of Susan Kare Regarding "Article of Manufacture" for the Samsung Products
4 | Found to Infringe US Patent D604,305 ¶ 107.)

5 |       44.     Also in paragraph 260, Mr. Lucente accuses me of "conflating the functionality of
6 | the menu screen with the ornamental aspects of the design," because I noted that the D'305 patent
7 | protects a design for the graphical user interface, which is the "user's primary interaction when
8 | operating the device." (internal quotations omitted). But this fact is relevant to an assessment of
9 | the D'305 design itself, because it further demonstrates that the design is always associated with
10 | an electronic device and was designed with that full concept in mind. Mr. Lucente does not and
11 | cannot dispute this.

12 |       45.     In paragraph 264, Mr. Lucente refers to, but does not identify, "numerous
13 | differences in aspects of the phones that are conceptually distinct …." Nor does Mr. Lucente
14 | state what those allegedly distinct concepts are. Similarly, Mr. Lucente asserts that the infringing
15 | phones could be made not to infringe by substituting a non-infringing application screen design.
16 | (*See* Lucente Report ¶ 265.) But this observation says nothing about whether either the original
17 | design or the alternative design, or both, are conceptually distinct from the phone as a whole.

18 |       46.     In paragraph 266, Mr. Lucente discusses the fact that the iPod Touch also used the
19 | D'305 design. Once again, this observation fails to undermine my opinion that the D'305 design
20 | is not conceptually distinct from the phones Samsung applied it to. The iPod Touch is not a
21 | phone, as Mr. Lucente states, but it is an electronic device and, other than phone functionality, it
22 | bore a close relationship to the original iPhone. The D'305 design, as embodied in both the
23 | iPhone and the iPod Touch, played a similar functional and aesthetic role, and in both products it
24 | was conceptually related to the entire device.

25 |       47.     Mr. Lucente's response to paragraph 105 of my opening report refers to a
26 | supposed "working assumption" of mine that, in fact, is nowhere to be found in my report. Mr.
27 | Lucente conspicuously fails to mention, much less rebut, the real point of paragraph 105 in my
28 |

1  report that the D'305 design echoes many design features of both the iPhone and the Samsung
2  infringing phones, demonstrating the conceptual relationship to the product as a whole.

### X.  FACTOR 4: "THE PHYSICAL RELATIONSHIP BETWEEN THE PATENTED DESIGN AND THE REST OF THE PRODUCT"

48.  In a similar fashion as he did for other factors, Mr. Lucente begins his discussion of the D'305 patent and Factor 4 with a statement that his analysis "is substantially the same as for D'677 and D'087 and relies on much the same evidence." (Lucente Report ¶ 312.) Mr. Lucente nowhere explains, however, how his discussion of the components of the front face and bezel of the Samsung phones (*e.g., id*. ¶¶ 275, 277, 280, 284-287, 289, 292, 297) relates to the D'305 patent, or how the alleged physical separability of the components Samsung claims are the articles of manufacture for the D'677 and D'087 patents relate to the different item that Samsung has identified as the article of manufacture for the D'305 patent.

49.  Mr. Lucente then makes a number of observations that have nothing to do with what the Court directed us to consider under Factor 4. For example, his claim that the design of the application menu for the D'305 patent "occurred separately" from the hardware design (*id*. ¶ 313; *but see* discussion of Ms. Wang's testimony in paragraph 42 above) is irrelevant to whether the alleged article of manufacture is physically separable. Similarly, that Samsung later changed the design of the application screens on some of its phones (*id*. ¶¶ 314-315) says nothing about the article of manufacture to which Samsung applied the design. Likewise, that the phone may be turned off, or other non-infringing screens may be displayed at certain times (*id*. ¶¶ 316-317) does not demonstrate that "the design pertains to a component that a user or seller can *physically separate* from the product as a whole." (October 22, 2017 Order at 35.)

50.  Mr. Lucente, adopting the position taken by Samsung in its interrogatory responses dated November 29, 2017, contends that the article of manufacture is the display screen "only for the time the D'305 design is being shown." (Lucente Report ¶ 320; *see* Samsung's Objections And Responses To Plaintiff Apple's First Set Of Interrogatories Regarding Articles Of Manufacture, at 24.) Thus, Mr. Lucente and Samsung insist that the display screen is *not* the article of manufacture during periods of time that some other design is being displayed or the

phone is off.  However, Mr. Lucente cites no evidence whatsoever that the *display screen while showing the D'305 design* can be physically separated from the phones as a whole, or that it is manufactured separately, or that it can be, or ever has been, sold separately.  In fact, the very thing that Mr. Lucente says is the article of manufacture – the display screen *while showing the D'305 design* – only exists as an integral aspect of a complete, functional phone in the form manufactured and sold by Samsung.  This is confirmed by Mr. Lucente's identification of "the component to which the D'305 design has been applied" as the "'Core' in the approval documents …." (Lucente Report ¶ 319.)  The "Core" does not embody or display the D'305 design.  Nor does Mr. Lucente offer any evidence that the "Core" alone has been separated from the infringing phones by users, or that the "Core" is sold separately by Samsung.  Likewise, none of the teardowns or repair videos cited by Mr. Lucente at paragraphs 283 to 290 show the article of manufacture as contended by Samsung and Mr. Lucente.  Even those that identify the display combine it with other parts and components – the example cited at paragraph 285 concludes: "The front panel is adhered to the AMOLED display, so they must be replaced as one expensive unit." (*See* SAMNDCA30000015.)  For these reasons, as well as those discussed in my opening report, Factor 4 also supports the conclusion that the article of manufacture is the phones in their entirety.

51.     Mr. Lucente criticizes my report for supposedly suggesting that the D'305 design, as opposed to the component that embodies it, is not separable from the product. (Lucente Report ¶ 320.)  In his next paragraph, however, Mr. Lucente contradicts himself, asserting that "the design is separable." (*Id*. ¶ 321.)  More importantly, Mr. Lucente misunderstands the significance of the evidence cited in my report that the Samsung designers used a dummy frame in designing the graphical user interface that includes the D'305 design.  The point is that the designers intended their design for the infringing Samsung phones; it was not merely an abstract ornamentation for no particular purpose.  The intended use of the design is relevant to the article of manufacture inquiry. (*See* October 22, 2017 Order at 20.)

52.     The circular nature of Mr. Lucente's reasoning and conclusions, evident throughout his report, is illustrated in paragraph 320.  He argues that the D'305 design "adheres"

15

to or is applied to the display screen, and then offers this tautology: "The relevant *article* of manufacture, as I understand it, is the *article* to which the patented design was applied." (Lucente Report ¶ 320 (emphasis added).)

53. The District Court found that "how the product is sold can be considered by the factfinder in determining the relevant article of manufacture." (October 22, 2017 Order at 19.) Samsung's infringing phones were sold as complete products, not as discrete components or in some modular fashion. As such, it is fair to conclude that the article of manufacture to which Samsung applied the D'305 design is the complete phone in its entirety.

## XI.   SAMSUNG'S COPYING OF APPLE'S DESIGNS

54. Mr. Lucente devotes a separate section of his report to the evidence demonstrating that Samsung copied Apple's iPhone in the products found to infringe one or more of the D'305, D'677 and D'087 patents. Mr. Lucente argues that the District Court ruled that copying evidence is not relevant to the article of manufacture inquiry. While I am not, as noted earlier, a lawyer, I am informed and understand that although the District Court declined to accept intent to copy as a separate factor, evidence of copying may nevertheless be relevant to one or more of the factors in the four-factor test. (*See, e.g.*, October 12, 2017 Hearing Transcript at 13.) For example, copying may shed light on how prominent Samsung considered the patented designs to be (Factor 2) and on whether the copied design is conceptually distinct from the product as a whole (Factor 3). While my opinion in this case is grounded in my experience and expertise as a designer, the evidence of Samsung's copying discussed in my opening report is consistent with my conclusions. My opinion would not change if the copying evidence was excluded from my analysis of the four-factor test.

55. I am not persuaded by Mr. Lucente's effort to minimize the import of the evidence of Samsung's copying. (Lucente Report ¶¶ 336-362.) Significantly, the three Apple design patents-in-suit were found to be valid at the 2012 trial, despite presentation of much of the evidence recited in Mr. Lucente's report. Moreover, the images at paragraph 344, 350 and 355 confirm the substantial shift in design after introduction of the iPhone in 2007. In his concluding paragraph 362, Mr. Lucente lumps together Apple, Samsung and LG in "the years since 2007,"

1  completely ignoring the fact that it was Apple that in 2007 revolutionized the design of
2  smartphones with the iPhone.

3  **XII.   SUPPLEMENTATION**
4       56.    I reserve the right to supplement this report with new information and/or
5  documents that may be discovered or produced in this case.

6  **XIII.  EXHIBITS TO BE USED**
7       57.    I anticipate using as exhibits during trial certain documents and things referenced
8  or cited in this report or accompanying this report.  I also anticipate using other demonstrative
9  exhibits or things at trial.

10 **XIV.   SUMMARY AND CONCLUSION**
11      58.    For the reasons discussed in my opening and reply reports, it is my opinion that the
12 article of manufacture to which Samsung applied Apple's patented design is the entire phone for
13 each Samsung phones found to infringe the D'305 patent, and not just a component or
14 components of the phone such as "the display screen while displaying the single, patented array
15 of GUI icons," as Samsung contends.  The infringing phones, in their entirety, are the things that
16 Samsung sold and that embody Samsung's use of Apple's patented D'305 design.  In my opinion,
17 this conclusion is most consistent with the "over-arching objective … to identify the article that
18 most fairly may be said to embody [Samsung's] appropriation of [Apple's] innovation." (October
19 22, 2017 Order at 13 (quotations omitted).)  The infringing phones are "most naturally viewed as
20 the article to which the patented design is applied.  (*Id*. (quotations omitted).)

Dated: February 9, 2018         *Susan D. Kare*
                                      SUSAN KARE

la-1371977