# EXHIBIT C
## (Filed Under Seal)

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11
12

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK |
| Plaintiff, | **REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

13
14
15
16
17
18
19
20
21
22

SUBJECT TO PROTECTIVE ORDER

23
24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

    A.    Scope Of Opinions In Reply Expert Report.......................................... 1

II.   ARTICLE OF MANUFACTURE OPINIONS.................................................... 2

    A.    The 2018 Rebuttal Report Supports a Conclusion that the Relevant "Article of Manufacture" in this Case Is the Entire Smartphone. [Wagner ¶¶ 260-351] .................................................................................................... 2

    B.    The Evidence Discussed in My 2018 Opening Report and the 2018 Rebuttal Report Support a Conclusion That the Entire Smartphone Is the Relevant Article of Manufacture.................................................. 3

        1.    Mr. Wagner ignores evidence demonstrating the prominence of Apple's patented designs in Apple's and Samsung's smartphones as a whole ................................................................................ 3

        2.    Mr. Wagner's discussion of alternative designs does not shed light on the prominence of Apple's patented designs. [Wagner ¶¶ 277-294] ........................................................................................ 8

        3.    The evidence supports a conclusion that Samsung's recognition of the advantages provided by Apple's designs played a role in Samsung's decision to apply Apple's patented designs to the infringing products ............................................................ 11

        4.    Following adoption of Apple's patented designs, Samsung's market share rose dramatically.............................................................. 12

            a.    Apple's sales and market share are irrelevant.............................. 13

            b.    Samsung's adoption of the Android operating system does not explain Samsung's market share gains .................................. 18

            c.    Exhibit 11.2-PT relies on data produced by Samsung and third-party IDC ...................................................................... 19

        5.    Evidence relating to Apple's and Samsung's marketing documents, sales, and profit accounting supports Apple's position that the article of manufacture is the whole phone ................................. 20

    C.    Mr. Wagner's Alternative Calculation of "Total Profits" Based on Samsung's Asserted Article(s) of Manufacture  [Wagner ¶¶ 391-451]................ 22

        1.    Criticisms Applicable to All Surveys.......................................... 25

        2.    Mr. Wagner's Approach Using Dr. Reibstein's Survey ........................... 28

        3.    Mr. Wagner's Approach Using J.D. Power Surveys ............................. 28

        4.    Mr. Wagner's Component Cost Approach.............................................. 34

            b.    Cost Approach – Critiques Applicable to Both Methods.............. 35

            c.    Cost Approach – SDC Data ...................................................... 38

            d.    Cost Approach – STA Replacement Data.................................... 41

        5.    Mr. Wagner's Approach Using a Nielsen Survey.................................... 44

**TABLE OF CONTENTS**
(continued)

Page

D.  Mr. Wagner's "Corroborating Quantitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits  [Wagner ¶¶ 463-505] ........................................................................................ 47

1.  Strategy Analytics Survey of ████████████ .................................. 47

2.  ComTech Reports ........................................................................ 49

3.  Mr. Wagner's Discussion of Other Surveys Regarding iPhone's Functionalities [Wagner ¶¶ 75-102]............................................ 50

4.  iPhone Versus iPod Touch Profit Comparison  [Wagner ¶¶ 476-499] ............................................................................................ 53

5.  Comparison of the Profit per Unit for Infringing Smartphones by Design Patent to the Least Profitable Infringing Smartphone [Wagner ¶¶ 500-505] ................................................................. 56

E.  Mr. Wagner's So-Called "Corroborating Qualitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits [Wagner ¶¶ 506-564] ....................................................................... 58

III.  REPLY OPINIONS REGARDING DEDUCTIONS OR MODIFICATIONS ASSOCIATED WITH PRIOR CALCULATIONS THAT ARE INCLUDED FOR THE FIRST TIME IN THE 2018 REBUTTAL REPORT. ............................. 60

A.  Mr. Wagner's Opinions Regarding "Total Profits" Using Fewer Than All the Phones Found by the Jury to Infringe Apple's Design Patents..................... 60

1.  Mr. Wagner has no basis to eliminate from his damages calculation units that the prior jury found to infringe................................. 60

b.  Mr. Wagner Improperly Removes ███████████ That The Jury Found to Infringe Apple's D'677 Patent............................. 61

c.  Even if units reflecting white products should be excluded, Mr. Wagner's method for doing so is wrong ............................... 62

IV.  MY CALCULATION OF SAMSUNG'S PROFITS FOR THE INFRINGING PRODUCTS IS APPROPRIATE BECAUSE THE COSTS THAT I HAVE EXCLUDED CANNOT RELIABLY BE DIRECTLY ATTRIBUTED TO ANY SAMSUNG PRODUCT. ......................................................................... 63

B.  I Appropriately Exclude SEC's Operating Expenses from My Calculation of Samsung's Infringer's Profits. [2018 Rebuttal Report ¶¶ 120-125]................ 63

C.  I Appropriately Excluded STA and SEA's Operating Expenses From My Infringer's Profits Calculation. [2018 Rebuttal Report ¶¶ 126-127] .................. 64

D.  Comparison of My Calculated Operating Margin to Samsung's Audited Financial Statements for the Telecommunications Segment Does Not Demonstrate the Reliability of Samsung's Data [Wagner ¶ 124]........................ 64

E.  It is Appropriate to Apply SEC's Gross Profit Percentage to Revenues of STA and SEA................................................................................. 64

F.  My Reasonable Royalty Analysis is Reasonable and Appropriate..................... 65

**C.    Mr. Wagner's Alternative Calculation of "Total Profits" Based on Samsung's Asserted Article(s) of Manufacture  [Wagner ¶¶ 391-451]**

59.    Calculating profits is a task routinely performed by accountants.  When evaluating the profitability of a product or specific tangible item sold by a company, the general approach that accountants follow is to identify the revenue obtained by the company that sells the item, and then to deduct certain costs and expenses associated with the sale of the product.  This is one of the tasks to which both my Original Report and Mr. Wagner's prior reports were directed, following specific legal instructions provided by the Court in connection with the jury instructions.  A summary of my profit calculations for the infringing units at issue in the 2018 Trial is attached as Exhibit 58-R2.

60.    In his expert report, Mr. Wagner contends that "Samsung is entitled to deduct all of its operating expenses in its calculation of profits from its sales of products found to infringe the D'677, D'087, and D'305 Patents."[62]  I disagree with this contention and have set forth my criticisms of Mr. Wagner's calculations of the profits on the phones as a whole in a number of places, including my deposition testimony on August 26, 2013, and December 2, 2015, at pages 255-305, 354-450, and 535-567 of my deposition transcript, and in my 2013 trial testimony, at pages 690-703 and 1161-1179 of the trial transcript.

61.    Mr. Wagner's current effort to calculate Samsung's total profits for the articles of manufacture identified by Samsung differs markedly from the approach taken by both of us in calculating profits on the entire phones.

62.    Mr. Wagner's approach to calculating total profits for the articles of manufacture identified by Samsung does not identify any revenues associated with the alleged articles of manufacture or any specific tangible item.  Nor does it deduct any directly attributable costs recorded by STA or SEC in connection with the manufacture of the infringing products that are specific to the alleged articles of manufacture.[63]  It does not deduct any expenses that Mr. Wagner

---

[62] 2018 Rebuttal Rpt. ¶ 121.

[63] The Court's instructions limit the deductions in the determination of "total profits" to costs that are "directly attributable" to the sale of the product, as discussed more completely in my 2018 Opening Report.

claims are directly attributable to the sales of the alleged articles of manufacture.  It does not identify any profits, tracked in any accounting or other database by Samsung, that are specific to the alleged articles of manufacture.

63.     To the contrary, what Mr. Wagner purports to calculate are the revenues and profits from Samsung's sale of each of the smartphones as a whole.  In performing this calculation, Mr. Wagner improperly deducts costs that are not "directly attributable" to the sale or manufacture of Samsung's phones (as discussed in my prior deposition and trial testimony referenced in Paragraph 61 and Section IV below), resulting in a significantly understated calculation of Samsung's profits on the phones as a whole.  This error affects all of his calculations because it affects the base from which he works.  He then attributes a portion of these understated profits on the entire phones (as he calculated those profits) to the components that Samsung alleges are the articles of manufacture based on various approaches discussed below. Unlike information on the sales and profits for the smartphones as a whole, this exercise does not rely on or derive primarily from Samsung's internal business documents, records, or presentations specific to the articles of manufacture that Samsung has identified.

64.     I find the methods applied by Mr. Wagner to be unreliable.  As one indicia of the unreliability of his approach, I note that his methods, even when applied to the same number of units, produce calculations of Samsung's profits ranging from ███████████████████████. That is, one of his methods produces a calculation that is more than ██████████ than another of his methods.  Yet he does not appear to consider either of these figures or the methods used to produce them to be more or less reliable.  The variance among his approaches is even more extreme when examined on a product by product or patent by patent basis.

65.     Four of Mr. Wagner's approaches to the calculation of Samsung's profits on the alleged articles of manufacture rely upon survey data—third-party surveys and a survey conducted in 2018 by Dr. Reibstein, the latter of which has been excluded by the Court.[64]  The survey approaches included in the 2018 Rebuttal Report are not a calculation of profits for a

---

[64] Dkt. 3585 (Feb. 8, 2018): Order Granting Motion to Strike Dr. Reibstein's Report.

separate tangible component, such as a separate article of manufacture.  Instead, they reflect an incomplete and inaccurate attempt to apportion profits based on the alleged value or importance of features to consumers by dividing the actual profits obtained from the sale of the smartphone as a whole (as calculated by Mr. Wagner) among one or more features of the product.  These features are not specific to any tangible article of manufacture, and do not correspond specifically to any of the articles of manufacture that Samsung has identified.  Further, most of these features are not directly associated with any tangible component of a smartphone at all.

66.    I understand that it is not appropriate in this case to apportion profits as a method to calculate total profits under 35 U.S.C. § 289 (which governs damages for design patents) using survey evidence about what consumers value.  As discussed in part in the 2018 Opening Report, I understand that, on August 24, 2012, the jury returned a verdict finding that 26 Samsung products infringed Apple's design and/or utility patents, and that those patents were valid.  I further understand that the jury found that six of Samsung's products diluted Apple's unregistered and registered trade dresses, and that those trade dresses were famous.  The jury returned an award of $1,049,393,540 in Apple's favor.

67.    I understand that during those proceedings, Samsung pursued an "apportionment" theory of damages.  Specifically, I understand that Samsung argued that Apple's damages for infringement of its design patents should be limited to the relative value of the infringed designs to consumers who purchased Samsung's infringing phones.  For instance, Mr. Wagner argued that "design as a whole is a small portion of the value to consumers of smartphones … Therefore, a *proper apportionment* is critical to avoid providing a windfall to Apple of the entirety of Samsung's profits."[65]  To that end, Mr. Wagner reviewed various third-party surveys—including two of the J.D. Power and Associates ("J.D. Power") studies that he uses here—to "analyze the importance of design to smartphone buyers and owners in comparison to other smartphone's features and attributes."[66]

---

[65] *See* Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 341.

[66] *See* Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 346.

68.     I understand that the district court ultimately concluded that the apportionment method of calculating damages for design patents was inappropriate under 35 U.S.C. § 289.[67]  I further understand that the United States Court of Appeals for the Federal Circuit upheld the district court's decision on this point and confirmed that such apportionment is not a proper method for calculating design patent damages.[68]  Thereafter, during the appeal to the United States Supreme Court, "Samsung abandoned its apportionment argument, and thus interpretation of the term 'article of manufacture' was the only issue before the U.S. Supreme Court."[69]

69.     In light of this history, I understand that the calculation of the total profit on an article of manufacture should not be an apportionment of profits based on the alleged "value" or "importance" of the infringing designs, because the Court has previously excluded that approach.[70]  None of Mr. Wagner's approaches using surveys are a calculation of actual profits for a specific article of manufacture.  Instead, each apportions the profits on Samsung's entire phones to features of that phone based upon survey-based estimates of the relative value of those features, and then assumes that some of those features correspond to certain articles of manufacture.

### 1.     Criticisms Applicable to All Surveys

70.     Leaving aside whether an apportionment methodology is appropriate or permissible here, Mr. Wagner's effort to apportion Samsung's profit based on the alleged value or

---

[67] Dkt. 1157 (June 30, 2012): Order Granting-In-Party and Denying-In-Part Motions to Exclude Expert Testimony at 8-9.

[68] *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1001–02 (Fed. Cir. 2015).

[69] Dkt. 3530 (Oct. 22, 2017): Order Requiring New Trial at 10.

[70] Dkt. 1157 (June 30, 2012) Order Granting-in-Part and Denying-in-Part Motions to Exclude Expert Testimony at 9 ("Because Mr. Wagner's apportionment of damages with respect to Apple's design patent infringement claims is contrary to law, it is unreliable under FRE 702 and *Daubert* and unduly prejudicial under FRE 403."); Dkt. 3530 (Oct. 22, 2017): Order Requiring New Trial at 9 ("[T]he Federal Circuit held that, as recognized in *Nike*, 138 F.3d 1437, Congress rejected apportionment for design patent damages under § 289."), 10 ("Samsung abandoned its apportionment argument, and thus interpretation of the term 'article of manufacture' was the only issue before the U.S. Supreme Court."); Dkt. 3271 (Sept 1, 2015): Federal Circuit Opinion at 26 ("The Act of 1887, specific to design patents, removed the apportionment requirement").

importance of features to consumers using various surveys[71] does not appear to provide a reliable basis for calculating total profits specific to the articles of manufacture identified by Samsung.

71.    None of the surveys were specifically designed to calculate Samsung's total profits on, or even to estimate the value of, the articles of manufacture Samsung has identified. The pre-existing surveys from J.D. Power and others do not focus on the specific articles of manufacture that Samsung identified in fall 2017.  None of the surveys showed any survey-taker a visual image of, or described or identified, the articles of manufacture that Samsung has identified.

72.    More specifically, the surveys (1) do not expressly focus on the designs at issue, whether via visual images or by description, ███████████████████████████ ███████████████ that Mr. Wagner appears to contend are related to the relevant designs; (2) do not expressly focus on the components Samsung has identified as the relevant articles of manufacture, whether via visual images or by description, instead ████████████████████ ██████████████ that Mr. Wagner appears to contend are related to the relevant articles of manufacture and/or the relevant components; (3) ████████████████████████ ███████████████; and (4) do not expressly focus on Samsung's profits or revenues, or even consumers' willingness-to-pay for features, ███████████████ ██████████████ Mr. Wagner does not offer any reliable way to know whether, how, or to what degree consumers themselves would recognize the categories of features that he uses in his calculation as being related to the specific articles of manufacture that Samsung has identified.

73.    Read in full, the purpose of the third-party surveys was not to establish an absolute or monetary value for any tangible object or any of the features that Mr. Wagner assumes may have some relationship to what Samsung has identified as the relevant articles of manufacture.  A major purpose of the surveys, when performed by J.D. Power and Nielsen and as reflected in

---

[71] By addressing these surveys, I am not conceding that they are properly part of proceedings.  Given the Court's ruling striking Dr. Reibstein's report, I understand Apple believes that Mr. Wagner cannot rely on Dr. Reibstein's survey or Dr. Reibstein's opinion that the J.D. Power and Nielsen surveys can be used to estimate value, or offer the calculations he has based on Dr. Reibstein's survey and Dr. Reibstein's opinions regarding the J.D. Power and Nielsen surveys.  (2018 Rebuttal Report, ¶¶ 408, 453.)

survey reports, was ███████████████████████████████████████

████████████████████████████████████████████████████████[72].

Furthermore, trying to use such surveys to apportion component value among ████████

█████████████████████████████████████████████████████████████

████      For example, ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████, rather

than Samsung's profits).

74.      Mr. Wagner does not provide an explanation for why he believes the surveys are a

reliable basis for apportioning Samsung's profits on the infringing phones to the articles of

manufacture Samsung has identified, despite the differences between the purpose of the surveys

and the issues here.  It does not appear that Mr. Wagner has the independent ability or expertise to

make that assessment.  While he previously relied on opinions from Dr. Reibstein on this issue,

the Court struck Dr. Reibstein's report.

75.      Further, Mr. Wagner uses ██████████████████████████████████

████████████████████████  when apportioning the profits Samsung obtained from the sale of

the phones to the articles of manufacture, even though consumer decision making is affected by

the differences in the choices available to the consumer.  Where consumers are presented with

two options that are effectively the same or highly similar with respect to one criterion, that

aspect is likely to have less importance in the choice between the two items.  If all car

manufacturers offered only blue cars, color would not reflect a factor that influences a consumer's

purchasing decision.  In adopting the designs that Apple had patented and used, Samsung

eliminated the competitive advantage that Apple could obtain by the exclusive use of that design,

undermining the ability of Apple to use the styling, beauty, or physical design of the product as a

distinctive factor by which to distinguish its products for consumers.  Mr. Wagner's use of the

---

[72] *See e.g.*, SANDCA10246338 at SANDCA10246343 ("████████████████████████████████████████")

surveys cannot and does not take account of this circumstance, both because he uses surveys that were done after Samsung had started to infringe and because he makes no effort to account for these factors.

### 2.     Mr. Wagner's Approach Using Dr. Reibstein's Survey. [Wagner ¶¶ 394-404]

76.     Under this first method, Mr. Wagner calculated the Samsung profits he believed should be apportioned to the articles of manufacture alleged by Samsung based on the results of a survey conducted by Dr. Reibstein in 2018 and Dr. Reibstein's analysis of those survey results. I understand that the Court has issued an order striking Dr. Reibstein's survey and thus, this approach is no longer relevant. Therefore, I reserve my criticisms of it.

### 3.     Mr. Wagner's Approach Using J.D. Power Surveys. [Wagner ¶¶ 405-417]

77.     I do not find the J.D. Power surveys to be an appropriate basis from which to apportion profits based on the alleged value or importance of features to consumers. Notably, the 2011 J.D. Power surveys were the primary source for the apportionments previously included in Mr. Wagner's first report in spring of 2012, which the Court excluded. Mr. Wagner now relies, for the first time, on J.D. Power surveys from 2012. I understand that neither was available in prior proceedings. Mr. Wagner also notes that the 2012 surveys "likely overlap the damages period,"[73] but does not definitively establish that they do, and thus their relevance appears limited.

78.     Mr. Wagner appears to have relied on Dr. Reibstein for the proposition that the J.D. Power surveys (and Nielsen survey discussed below) "can be used to estimate value."[74] But the Court struck Dr. Reibstein's report, and Mr. Wagner's report does not provide an independent or adequate basis to justify the use of these surveys as a method to "estimate value," let alone apportion profits on the basis of that value. Moreover, even with the J.D. Power surveys, Mr. Wagner's selection of items to include appears to have been based on opinions provided by Dr. Reibstein contained in the report that was struck. Additionally, Mr. Wagner adjusts his

---

[73] 2018 Rebuttal Report, ¶ 407.

[74] 2018 Rebuttal Report, ¶¶ 408, 453.

percentages and calculations for at least the D'305 Patent[75] based on information from Dr. Reibstein's survey. These calculations are not appropriate or reliable because I understand that Mr. Wagner presumably can no longer rely on Dr. Reibstein's survey and opinions, which the Court struck.

79.    Further, the J.D. Power surveys were not designed to address the value of any specific article of manufacture, or to measure or reflect the value of any specific tangible item in the comparison to the other tangible items that together make up the entire smartphone. They do not track any of the language included in Samsung's identification of the relevant articles of manufacture, they did not reflect any visual presentation of such articles of manufacture, and they do not track or refer to any of the factors identified by the Court for use in identifying the articles of manufacture. Accordingly, they do not appear to provide a reliable basis to either (1) identify the relevant articles of manufacture or (2) apportion profits from the sale of the entire phone to the articles of manufacture Samsung has identified.

80.    Mr. Wagner uses the J.D. Power survey data from 2012 "to estimate value," based on Dr. Reibstein's opinions, without explaining what he or Dr. Reibstein specifically means by "value," or how it is related to Samsung's total profits on what Samsung identifies as the relevant articles of manufacture.[76]

81.    According to Mr. Wagner, the J.D. Power surveys were designed to 

does not explain how "                          " or the "                          " is equivalent, or even related, to Samsung's profits on what it has identified as the relevant articles of manufacture.

---

[75] See, for example, Schedules 36.3-4T, 35.5-4T, 36.7-4T, 36.9-4T, 37.3-4T, and 37.5-4T, which are partially reproduced in other summaries.

[76] 2018 Rebuttal Report, ¶ 408.

[77] 2018 Rebuttal Report, ¶ 418

[78] 2018 Rebuttal Report, ¶ 406.

1

82.    The survey response options ███████████████████████████

2 ███████████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████

5 █████████████████████████████████████████████████████████,

6 application of Mr. Wagner's approach leads to odd results regarding how profit is apportioned,

7 which he never tries to explain.  Using the ███████████████████ calculated by Mr.

8 Wagner and the September 2012 J.D. Power survey as the basis for evaluation, use of the J.D.

9 Power survey results in the following apportionment of profits to each of the following

10 ██████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████

14 ███████████████████████████████████████████[79]  Many of these

15 categories are mutually exclusive.  None of them exist as a tangible article of manufacture within

16 the infringing Samsung smartphones.  Mr. Wagner does not explain how these categories reflect a

17 rational way to apportion profits on a tangible article of manufacture.

18

19

83.    I believe the surveys are of limited reliability for purposes of calculating

Samsung's total profit on what Samsung has identified as the relevant articles of manufacture.  To

20 the extent they show anything meaningful about design, they confirm the importance of design to

21 consumers, the advantage that Apple had over Samsung and other competitors with respect to

22 design, and that the products that infringed Apple's design patents were more highly-rated by

23 consumers than Samsung products that did not adopt Apple's patented designs.

24

25

26

27

28

---

[79] 2018 Rebuttal Report, Schedule 36.7-4T.

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

84.     First, the J.D. Power surveys Mr. Wagner relied on previously confirm the importance of design during the relevant period, because "liked overall design/style" is the top and most frequently identified criteria among the J.D. Power list of "reasons for choosing handset brand," and was an area in which Apple was rated more favorably than Samsung.[80]



### Selection Process Among Smartphone Manufacturers[1,2]

| Reasons for Selecting Handset | Industry Avg. | Apple | HTC | Motorola | Nokia | Palm | RIM BlackBerry | Samsung |
|---|---|---|---|---|---|---|---|---|
| Liked overall design/style | 45% | 51% | 49% | 50% | 34% | 42% | 38% | 43% |
| Internet capable | 44% | 48% | 51% | 57% | 18% | 37% | 37% | 39% |
| Touch screen | 43% | 58% | 61% | 58% | 16% | 56% | 11% | 52% |
| Ability to use e-mail accounts | 36% | 40% | 39% | 50% | 14% | 28% | 33% | 28% |
| Generally easy to use | 36% | 45% | 32% | 35% | 26% | 33% | 31% | 30% |
| Wi-Fi capabilities | 35% | 50% | 42% | 43% | 13% | 27% | 18% | 25% |
| Quality of phone/best one | 35% | 49% | 36% | 33% | 23% | 18% | 25% | 23% |
| Quality of display screen | 34% | 41% | 40% | 45% | 17% | 29% | 22% | 32% |
| Digital camera feature | 33% | 34% | 37% | 44% | 27% | 32% | 25% | 34% |
| GPS/Location feature | 32% | 40% | 40% | 50% | 16% | 25% | 19% | 27% |
| Ease of using Internet features | 32% | 44% | 33% | 40% | 11% | 26% | 21% | 21% |
| Ease of using e-mail features | 31% | 40% | 27% | 38% | 10% | 24% | 28% | 20% |

[1] Reasons less than 31% not shown.
[2] Based on all lengths of handset ownership.

Smartphone Selection Process

Reasons for Choosing Handset Brand

| | |
|---|---|
| Liked overall design/style | 45% |
| Internet capable | 44% |
| Touch screen | 43% |
| Ability to use e-mail accounts | 36% |
| Generally easy to use | 36% |
| Wi-Fi capabilities | 35% |
| Quality of phone/best one | 35% |
| Quality of display screen | 34% |
| Digital camera feature | 33% |
| GPS/Location feature | 32% |
| Ease of using Internet features | 32% |
| Ease of using e-mail features | 31% |
| Plays music/MP3 files | 30% |
| Liked size of phone | 29% |
| Latest technology | 29% |
| Easy to understand/navigate menu system | 28% |
| Able to connect to Internet at higher speeds | 26% |
| Variety | 26% |
| Reliability of phone | 26% |
| Bluetooth capabilities | 25% |
| Speakerphone feature | 25% |
| Keyboard style (Qwerty) | 24% |
| Integrated application store | 24% |
| Plays games | 24% |
| Ability to use multiple e-mail accounts | 22% |
| Operating system platform | 20% |
| PDA/PIM functionality | 20% |
| Phone was discounted/reduced price | 19% |
| Captures/plays video images | 19% |
| Durability of phone | 18% |
| Lightweight | 18% |
| Ease of holding | 17% |

Responses less than 17% not shown.

☐ = Service plan promotion/price related.   ☐ = Physical quality related.

© 2011 J.D. Power and Associates.
The McGraw-Hill Companies, Inc.
All Rights Reserved.

J.D. POWER
AND ASSOCIATES

[80] 2018 Opening Report, ¶ 140G.

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

85.     In November 2011, J.D. Power recognized that "Apple continues to be ranked highest in overall satisfaction among the covered smartphone manufacturers…performing significantly above the industry average," and "as was the case in previous volumes" Apple outranked its competition in all categories, including Physical Design.[81]  Meanwhile, during that same period, Samsung was "struggling significantly" in all four factors considered in the J.D. Power survey.[82]  Notably, Mr. Wagner cites an excerpt about what features Apple owners wanted improved,[83] and design was not one of them.[84]

86.     The 2011 J.D. Power surveys also show ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████

87.     The Vibrant, a product that infringed the D'677 patent, the D'087 patent, and the D'305 patent, scored 8.77, highest among the Samsung products and well above products such as the Samsung Intercept (which did not infringe a design patent) or the Samsung Moment (which was not accused of infringing a design patent) at 7.89 and 7.77, respectively.[86]

---

[81] PX69.41: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA 10246378).

[82] PX69.41: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA 10246378).

[83] 2018 Rebuttal Report, ¶ 102.

[84] PX69.23: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246360).

[85] J.D. Power 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, dated Nov. 15, 2011 (SAMNDCA0028206 –SAMNDCA00282088  at SAMNDCA00282074, SAMNDCA00282075.

[86] PX69.108: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246445).



88.

[87] J.D. Power and Associates, 2012 Wireless Smartphone Satisfaction Study Vol. 1, March 2012, SAMNDCA30008512–SAMNDCA3008628 at SAMNDCA3008627-628) [22.4].

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

89.     These results reinforce the benefit that Apple obtained from its use of the patented designs, and the benefit Samsung obtained when it infringed (in comparison to its use of designs that did not infringe).

### 4.    Mr. Wagner's Component Cost Approach.  [Wagner ¶¶ 431-451]

90.     In paragraphs 431 to 451 of his report, Mr. Wagner describes his "cost approach" as "one of the three primary methods of valuation," citing an article from the American Institute of Certified Public Accountants.[88]  Mr. Wagner cites no other accounting or economic literature in support of his method.  The same article defines "cost approach" as "a general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset."[89]  The article speaks primarily to

---

[88] 2018 Rebuttal Report, ¶ 431, fn. 648.

[89] American Institute of Certified Public Accountants, Inc., "Valuation Services, VS Section 100," p. 32, <https://www.aicpa.org/InterestAreas/ForensicAndValuation/Resources/Standards/Downloadable Documents/SSVS_Full_Version.pdf>, accessed February 1, 2018.

1
2
the use of costs to evaluate value in the context of valuing intangible assets.  It does not address the specific approach taken by Mr. Wagner here.

3
4
5
91.     Mr. Wagner is not using the cost to value an asset.  Rather, he is purporting to use cost data as a proxy for determining the profit that Samsung actually made on the components that Samsung alleges are the relevant articles of manufacture.

6
7
8
9
10
11
12
13
14
15
16
17
92.     Even if Mr. Wagner's component cost approach were an appropriate method by which to determine profits on an article of manufacture in this case, it is critical to apply the method using sufficiently relevant and reliable data.  Important considerations in this case include:  (1) whether the data is drawn from the same source and integrates reliably; (2) whether it is drawn from the same and relevant time periods; (3) whether it was created and used by the company in the normal course of business; (4) how many observations are available; and (5) whether the data has been and can be rigorously reviewed.  These criteria are important when deciding if one can obtain a reliable calculation of profits.  Mr. Wagner's two cost approaches—using a combination of data from Samsung Display Co. (SDC data), Samsung Telecommunications America (STA data), and Samsung Electronics Co. (SEC data)—do not meet these criteria and do not provide a reliable indication of total profits on Samsung's alleged articles of manufacture.

18
19
**b.     Cost Approach – Critiques Applicable to Both Methods**

20
21
22
23
24
25
26
93.     A significant deficiency applicable to both of Mr. Wagner's cost approach calculations is the failure to use a single data set drawn from verified data over consistent periods.  This arises from the fact that Samsung does not track any of the alleged articles of manufacture in the regular course of business, as discussed in greater detail above.[90]  Samsung has repeatedly emphasized the importance of taking financial data directly from the accounting database—referred to as the SAP system—when calculating the revenues, costs, expenses and profits for Samsung products.[91]  However, the SAP system does not track sales, costs, or profits for any of

27
[90] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 20-21.

28
[91] Trial Transcript, dated Aug. 16, 2012, pp. 3003-3004, 3029-3030; Declaration of Timothy Sheppard, dated March 12, 2012, ¶ 34; Deposition of Dongwook Kim, dated Dec. 22,

the articles of manufacture identified by Samsung. ██████████████████████████

████████████████████████████████[92] As a result, the cost approach identified

in the 2018 Rebuttal Report resorts to a series of disparate sources to conduct the analysis.

94.     Both of Mr. Wagner's separate analyses—using SDC and STA data—rely initially

on SEC's bill of materials to determine the total material cost of each infringing smartphone.

However, the bill of materials is not consistent with the data Mr. Wagner uses to calculate profit

and Mr. Wagner does not address the discrepancies.  Such discrepancies initially pointed out in

the tables and analysis contained in the supplemental report of Terry Musika in which he showed

the variation in the material costs in the bill of materials as compared to the cost data from which

Mr. Wagner calculates profits.[93]  Similar problems appear in the present data.  For example,

according to Mr. Wagner's calculations, the bill of materials indicates that the total material cost

of the ████████████████████████.[94]  However, the spreadsheet Mr. Wagner used to

calculate profits indicates the material cost for the ████████████████████████

██.[95]  Mr. Wagner does not explain the discrepancies in his data sources, which render them

unreliable and incompatible for combined analysis.

95.     The bill of materials data is also internally inconsistent and includes significant,

unexplained variations.  For example, ████████████████████████████████

████████████████████████████████████████████████████████

2017, pp. 61 ("This is data that came out of the [S.A.P.] system, hence reliable"), 84 ("I assume
he pulled this from the [S.A.P.] system and the information here would be more than a hundred
percent reliable.").

[92] 2018 Opening Report, Ex. 37.1-R2, p.2; Deposition of Timothy Sheppard, dated Dec.
14, 2017, pp. 130-131, 134-136;  Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 72-74,
88-93; Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 46-48, 71-72, 76-77, 89.

[93] Supplemental Expert Report of Terry L. Musika, CPA, dated May 8, 2012, ¶¶ 36-37,
Exhibit 52-S, Exhibit 52.1-S.

[94] 2018 Rebuttal Report, Schedule 38.8-4T; SAMNDCA30000054_HIGHLY
CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsx. ██████████████████████████

[95] DX 676.022, lines 45, 48.

█████[96]  Mr. Wagner has made no attempt to control for outliers or investigate why these variations occur.  On the contrary, he has further exacerbated the variability by introducing mathematical errors in averaging monthly costs for several products.  For example, Mr. Wagner's Schedule 38.6-4T states that ████████████████████████████████████ ██████████████████████████████ ████.[97]  In fact, the bill of materials lists ███ ██████████████████████████████████████████████████████████████

96.     Mr. Wagner's two cost approach methods also produce inconsistent results, which calls into question the validity of both methods.  Although Mr. Wagner's approaches both utilize the same calculation of Samsung's entire profits and the same alleged articles of manufacture, Mr. Wagner's total damages figure for the D'677 patent using the SDC cost data ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████  As one specific example, the profits attributable to the D'305 patent's alleged article of manufacture for the Galaxy S 4G are ████████████ when using the STA repair data than the SDC data, but the profits for the D'677 patent are ████████████ when using the STA data than the SDC data.[99] Some of this variation is driven by Mr. Wagner's methodological inconsistencies.  When using the STA replacement data, Mr. Wagner splits ████████████████████████████████████ ████████████████████████████████.[100]  When using the SDC data, on the other hand, Mr. Wagner's analysis uses only ████████████ of the same display assemblies' cost, and disregards the remaining ████████████ of the cost.[101]  Mr. Wagner's approaches do not produce consistent results that apply across multiple periods, multiple products, and multiple patents.

[96] 2018 Rebuttal Report, Schedules 38.4-4T, line 33, and 38.8-4T, lines 16-19.

[97] 2018 Rebuttal Report, Schedule 38.6-4T, line 132.

[98] SAMNDCA30000054_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsx, tab "BOM Data," lines 101,829 & 120,579 & 121092.

[99] 2018 Rebuttal Report, Schedules 3.8-4T and 3.9-4T.

[100] 2018 Rebuttal Report, Schedule 38.1B-4T.

[101] 2018 Rebuttal Report, Schedule 38.1A-4T.

### c.   Cost Approach – SDC Data

97.   I find Mr. Wagner's use of the SDC data to perform his profit allocation to be unreliable.  Notably only extremely limited information is available about this data.  It was produced at the end of discovery, in Korean (without a translation), by a separate company (Samsung Display Co.), in circumstances in which Apple was not permitted to ask questions about how it was created or the data that was presented.  This by itself calls into question the reliability of this data for Mr. Wagner's purposes.

98.   Disparate data sets.  Because neither SEC nor STA had any data on the costs for the alleged articles of manufacture during the relevant period,[102] Mr. Wagner's analysis uses data from a separate company, Samsung Display Corporation.  He then applies the SDC data to perform calculations using two other data sets.  Mr. Wagner first compares it to an SEC bill of materials.  He then applies that resulting percentage to his calculation of profits derived from an entirely different data set drawn from STA and SEC.  Only the last set of data was generated from Samsung's financial system, which Samsung has stated was used to create the company's audited financials.[103]

99.   Mr. Wagner has not shown that these data sets are consistent with one another.  He has made no effort to show that the SDC data matches to the information in SEC's system that he uses to calculate the "entire profits" on the infringing smartphones.  Nor has Mr. Wagner shown that it matches to the bill of materials data used by him to calculate the total material cost for each device.

100.   Mr. Wagner's lack of explanation is particularly problematic because there appear to be significant anomalies among between these data sets.  As discussed above, there is evidence that the bill of materials data and the data used to calculate profits are different in material ways.  Additionally, the SDC data is inconsistent with the SEC bill of materials data.  For example, in

---

[102] Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 72, 76-77.

[103] Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 133-134; Declaration of Hyangsook Park Regarding Authenticity of Samsung Display Co. Ltd. Document, dated Dec. 22, 2017, pp. 1-2; Deposition of Dongwook Kim, dated Dec. 22, 2017, p. 83; Declaration of Timothy Sheppard, dated March 12, 2012, ¶ 34.

April 2012, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ The bill of materials produced by SEC, on the other hand, identifies the
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr.
Wagner does not explain this ▮▮▮▮▮▮▮▮▮, or any of the similar discrepancies that exist
for every product in every month, as summarized in **Exhibit 55-R2** attached to this report.

101.    A separate anomaly exists with respect to the SDC data.  The SDC data includes
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is not
consistent with the information on STA's sales or the information on SEC manufacturing activity.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Additionally, Mr. Wagner has not explained why the
SDC data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮.

---

[104] **Exhibit 55-R2**; 2018 Rebuttal Report, Schedule 38.2-4T, cell J25;
SDC000001_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.XLSX, tab 24, line
110.

[105] **Exhibit 55-R2**; SAMNDCA30000054_HIGHLY CONFIDENTIAL - ATTORNEYS'
EYES ONLY.xlsx, tab "BOM Data," line 47,296.

[106] 2018 Rebuttal Report, Schedules 38.2-4T and 38.3-4T; SDC000001_HIGHLY
CONFIDENTIAL - ATTORNEYS' EYES ONLY.XLSX.

[107] Because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 2018 Rebuttal Report ¶
442.

[108] DX 676, pp. 11, 23, 91; PX 180, pp. 11, 23, 80.

[109] DX 676, pp. 9, 12, 24, 27, 92; PX 180, pp. 9, 12, 24, 27, 81.

[110] DX 676, pp. 90-91; PX 180, pp. 79-80.

102.  <u>Disparate time periods and limited observations</u>.  Mr. Wagner's analysis uses data taken from different time periods.  The data sets that he uses to calculate Samsung's profits and the total material cost for each device span from July 2010 to June 2012.[111]  In contrast, the data provided by SDC ███████████████████████████████████████████ ██████████  There is no effort to reconcile this, particularly in light of the lack of consistency between the data sets discussed above.

103.  <u>Not created in the normal course of business</u>.  ████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████

104.  <u>No opportunity for Apple or others to test the data</u>.  Samsung produced the SDC data on the last day of discovery at the close of business.[114]  By producing the data after the final depositions in this case, Samsung foreclosed Apple's ability to test the reliability and accuracy of the data through cross-examination, including by asking questions about how to evaluate the data, how the data was prepared, or whether it is reliable.  There is no indication that it was ever audited or that it could be.[115]  When Apple asked to obtain information from the person who created it, I understand that Samsung told Apple's attorneys that the preparer had no more information than could be found in the declaration that accompanied the data.  However, Mr. Wagner interviewed the declarant, because he needed more information about the data.[116]  Notably, the potential for errors is not hypothetical.  In prior efforts to produce sales and cost

---

[111] DX 676; SAMNDCA30000054_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsx, tab "BOM Data."

[112] SDC000001_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.XLSX, tab 1, columns H-J, line 5.

[113] Declaration of Hyangsook Park Regarding Authenticity of Samsung Display Co. Ltd. Document, dated Dec. 22, 2017, p. 2 ("SDC000001 . . . was created on December 5, 2017 by myself").

[114] Dkt. 3542: Case Management Order, dated November 30, 2017, p. 1.

[115] Declaration of Hyangsook Park Regarding Authenticity of Samsung Display Co. Ltd. Document, dated Dec. 22, 2017, p. 1 ("SDC does not report the type of data included in the SDC Document to investors, regulatory bodies, the press, or business analysts.").

[116] 2018 Rebuttal Report, ¶ 438.

112.   <u>No opportunity for Apple or others to test the data</u>.  Samsung produced the spreadsheet of STA replacement data on which Mr. Wagner relies only after Mr. Sheppard, the financial witness from STA, was deposed.[128]  Thus, Apple could not seek clarification or information on the spreadsheet from a witness who was responsible for the data or employed by Samsung's U.S. subsidiary.  Samsung has provided no way to verify or identify how the data was prepared or whether it was accurate.[129]  Past productions of data extracted from Samsung's SAP system required verification and investigation by various teams over several days in an attempt to establish its accuracy, as well as seven iterations to address numerous problems.[130]  There is no indication that similar scrutiny or quality control was applied here.

113.   Given the problems identified above, I do not believe the information provided is sufficient to provide an objective measure for an allocation of profits based on the costs for the alleged articles of manufacture that Samsung has identified.

### 5.   Mr. Wagner's Approach Using a Nielsen Survey.  [Wagner ¶¶ 452-460]

114.   As discussed above, Mr. Wagner uses the Nielsen survey for purposes apportionment, like the previously excluded use of the J.D. Power survey.  Mr. Wagner does not offer a reason to distinguish the Nielsen survey from how he previously used the J.D. Power survey.  Similarly, as discussed above, Mr. Wagner relied on Dr. Reibstein for the proposition that the Nielsen survey can be used "to assess the value of features associated with the [articles of manufacture] identified in Samsung's interrogatory responses.[131]  But the Court struck Dr.

---

[127] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 123, 138, 148-149, 158-159, 164-166; Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 96-97 (SEC data), 124-125, 153-154 (STA data); Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 77-78.

[128] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 9-10, 78-79; Sheppard Declaration, dated March 12, 2012, ¶¶ 2, 5.

[129] Samsung's witnesses who testified about the STA spreadsheet used by Mr. Wagner (SAMNDCA30010151.xlsx) were unable to answer basic questions about the document and data. Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 153-154; Dongwook Kim, pp. 77-78.

[130] Deposition of Timothy Sheppard, dated March 30, 2012, pp. 64-65, 89-90, 131-133, 150-151; 2018 Opening Report, ¶¶ 146-155.

[131] 2018 Rebuttal Report, ¶ 453.

Reibstein's report, and Mr. Wagner's report does not provide an independent or adequate basis to justify the use of this survey to "assess the value" of features, let alone apportion profits on the basis of that value.

115. Further, the Nielsen survey ██████████████████████████ ████████████████████████████████ The page of the Nielsen survey cited by Mr. Wagner focuses ███████████████████████████████ ████████████████████████████████ ██████████████████. Mr. Wagner has not done anything to show how the relevant metrics would apply for purchasers of Samsung's infringing smartphones.

116. Like the other surveys, the page of the Nielsen survey cited by Mr. Wagner ███ ████████████████████████████ ████████████████████████. [132] Indeed, the Nielsen survey █████████████████████ ████████████████████████████" Like the other surveys, the Nielsen survey language does not track Samsung's identification of the relevant articles of manufacture in its interrogatory response. Mr. Wagner admits as much, identifying what he believes to be ██████████████████████ █████████.[133] Mr. Wagner does not explain why he believes that (1) ████████ ██████████ lines up with the article of manufacture for the D'305 patent, or (2) ███ ███████████████████████ lines up with the article of manufacture for both the D'677 and D'087 patents. Mr. Wagner also admits that the Nielsen survey ████████ ████████████████████████████

---

[132] 2018 Rebuttal Report, Fig. 73.

[133] 2018 Rebuttal Report, ¶ 456.

.”[134]   Absent such a connection, Mr. Wagner does not adequately explain why he assumes that ▮▮▮▮▮▮▮▮ relates to the specific Samsung-alleged articles of manufacture, let alone reliably supports apportionment of total profits on the phone to Samsung's identification of the relevant articles of manufacture in its interrogatory response.

117.    The Nielsen survey data on which Mr. Wagner relies from August 2012 also would not have been available at the time of the original trial, let alone when the relevant sales were made, to aid in any evaluation of damages.

118.    Notwithstanding these deficiencies, Mr. Wagner uses the Nielsen Survey to "calculate a value for the total profit related to the AOM."[135]  Mr. Wagner does little to explain why he apparently believes the "value" of "features associated with the AOM" is a useful proxy for the calculation of Samsung's profits on the article of manufacture.[136]

119.    The relevant page of the Nielsen survey does not state that it can or should be ▮▮▮▮▮▮▮▮▮▮ Instead, the Nielsen survey appears ▮▮▮▮▮▮▮▮▮ (based on the table that appears immediately after the page on which Mr. Wagner relies).  Leaving aside the differences between the surveyed features and what Samsung has identified as the relevant articles of manufacture, ▮▮▮▮▮▮▮▮ obviously are different from Samsung's profits.

120.    Leaving aside whether apportionment is appropriate, I do not believe that the Nielsen survey provides a reliable basis to apportion profits from the entire phone to the articles of manufacture Samsung has identified.

---

[134] 2018 Rebuttal Report, ¶ 456.

[135] 2018 Rebuttal Report, ¶ 453.

[136] Wagner 20189 Report, ¶ 453.

**D.**   **Mr. Wagner's "Corroborating Quantitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits  [Wagner ¶¶ 463-505]**

121.   Mr. Wagner's discussion of "quantitative evidence" suffers from the same fundamental problem inherent in his apportionment and allocation analyses.  Mr. Wagner does not calculate the "total profits" made from the sale of any component or set of components contained within Samsung's infringing smartphones.  Instead, Mr. Wagner chooses numbers and percentages to apportion profits that Samsung made from its sales of smartphones as a whole, while improperly using smartphone *features* as a substitute for the physical components that Samsung alleges are the articles of manufacture.

**1.**   **Strategy Analytics Survey of Feature Priority List**

122.   Mr. Wagner discusses a Strategy Analytics report from April 2012 regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as purported corroboration for his allocation based on other surveys with respect to the D'305 patent.[137]  Rather than performing an accounting of profits based on the sale of articles of manufacture, Mr. Wagner is again engaging in apportionment based on the alleged value or importance of smartphone features to consumers, which suffers from all the flaws that I discussed earlier in this report.  Even as an apportionment exercise, Mr. Wagner's approach suffers from numerous methodological flaws.

123.   Mr. Wagner does not explain how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are equivalent, or even related, to Samsung's total profits on what it has identified as the relevant article of manufacture. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

124.   The Strategy Analytics survey ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[137] 2018 Rebuttal Report, ¶¶ 464-471.

125.    The features that Mr. Wagner believes are relevant to calculating profits based on Samsung's asserted "display panel" article of manufacture ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ███████████████████████████████████ ██████████████████████████████████████ ██████████ Mr. Wagner appears to have arbitrarily selected a survey and response because they included ████████████

126.    In addition, the ████████████████ in the Strategy Analytics survey, and its █████████████████████████████████████, results in an arbitrary percentage output that varies based solely on ████████████████████████████. For example, if Strategy Analytics had asked about only ████████████████████████████████. Making that one adjustment in the Strategy Analytics' survey format would ███████Mr. Wagner's calculation of Samsung's profits by ██████████████████

127.    The results of Mr. Wagner's analysis using the Strategy Analytics survey are inconsistent with his analysis using the J.D. Power survey.  For example, the Strategy Analytics survey ████████████████████████████████████ In contrast, Mr. Wagner's calculation using the J.D. Power survey ███████████████████ ████████ The J.D. Power survey ██████████████████████████████████ ███████████████████ The Strategy Analytics survey includes nothing similar.  Mr. Wagner does not explain or investigate the notable differences between these surveys.

---

[138] 2018 Rebuttal Report, Fig. 80.

[139] 2018 Rebuttal Report, Schedule 37.7-4T.

[140] 2018 Rebuttal Report, Schedule 37.7-4T.

128.     In sum, the survey does not address Samsung's profit or establish the monetary value of any specific component or feature.  Rather, the survey attempts ████████████████████████████████████████████████.  It is thus difficult to understand why Mr. Wagner assumes that the non-monetary ██████████████████████████████████████████████████████ are equivalent or directly related to Samsung's profits on the specific article of manufacture Samsung has identified for the D'305 patent.

## 2.     ComTech Reports

129.     Mr. Wagner discusses ComTech Reports regarding consumer "reason for choice" as purported corroboration for his allocation based on other surveys.[141]  The same comments that apply to Mr. Wagner's use of the Strategy Analytics survey apply equally to his use of the ComTech Reports.[142]  These reports have nothing to do with a calculation of revenues, less deductible costs, generated from the sale of articles of manufacture.

130.     Mr. Wagner does not explain how "reason for choice" is equivalent, or even related, to Samsung's profits on what it has identified as the relevant articles of manufacture.  As with the Strategy Analytics surveys, the ComTech surveys did not ask about articles of manufacture, but rather features and capabilities of certain aspects of smartphones.  The ComTech surveys also used a list of features that results in an arbitrary assignment of percentages based on the number of features included in the survey.  The survey response options are not limited to physical components or articles, but instead include intangible features like (1) Contract Price and (2) Easy to Use.  The ComTech surveys are inappropriate tools to use in this apportionment analysis based on the alleged value or importance of smartphone features to consumers.

---

[141] 2018 Rebuttal Report ¶¶ 472-475.

[142] The Court also previously excluded efforts to use the ComTech reports to apportion total profits.  (*See* Dkt No. 1157: Order Granting-in-Part and Denying-in-Part Motions to Exclude Expert Testimony; Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 355.)

131.     Further, I understand that the ComTech survey response that corresponds to "design/color" is an outlier, most likely attributable to flaws in the way ComTech conducted the survey and presented its questions to the survey respondents, including that it also asked about attributes that could be confused with design, such as "Brand/model."[143]   As Mr. Schiller testified at trial, Apple's iPhone Buyer surveys have consistently shown that on average about 85% of iPhone customers ranked "attractive appearance and design" in the "Top 2" boxes of "very important" and "somewhat important" to their decision to purchase an iPhone.[144]   Samsung's own surveys also show that the majority of Samsung and Apple smartphone customers expressed a preference for the smartphone color black (74.4% males, 50.5% females) as compared to white (14.5% males, 27.6% females) or any other color.[145]   If Mr. Wagner had used either of these survey results, instead of an outlier survey result selectively taken from ComTech, his calculation of Samsung's Profits would have been hundreds of millions of dollars higher.

132.     In sum, the ComTech Reports do not address Samsung's profit or establish the monetary value of any specific product or feature.  Nor do they identify any single feature that allegedly drives consumer satisfaction or consumer decision making for a specific product.  It is not an appropriate source to use for the analysis of total profits in this case.

### 3.     Mr. Wagner's Discussion of Other Surveys Regarding iPhone's Functionalities [Wagner ¶¶ 75-102]

133.     Mr. Wagner cites numerous other surveys and studies as purported support for the proposition that the intellectual property at issue here has limited value without using them to perform a specific apportionment.[146]

---

[143] Deposition of Art Rangel, dated Mar. 2, 2012, pp. 78-85, 101-104; *see also* Deposition of Greg Joswiak, dated Feb. 24, 2012, pp. 410-412, 415-424; Chip Lutton, Dep. Tr. dated Jul. 26, 2011, at 268-269, 276-279.

[144] Schiller Trial Testimony at 634-637, dated Aug. 3, 2012 (Schiller testimony explaining survey methodology and interpreting the results); *see also* Deposition of Greg Joswiak, Dep. Tr., dated Feb. 24, 2012, at 410-412, 415-424.

[145] PX 185.13.

[146] 2018 Rebuttal Report, ¶¶ 75-102.

134.     These surveys and studies actually confirm that the style and design of a smartphone is a significant purchase driver and impacts overall customer satisfaction.  As Mr. Wagner points out, "design and form [factor]" are important to iPhone owners during the purchasing process, and Android owners also place importance on "design and form" during the purchasing process.[147]  In his discussion of the Consumer Insider Framework study,[148] Mr. Wagner omits any reference to ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████     As another example, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

███████     Even Samsung's own documents recognized the impact of physical design on consumer satisfaction:[151]

they are specifically used for **Internet browsing.**

- According to JD Powers, **physical design** is one of the **top attributes** that affect customer **satisfaction.**
  - This suggests that finding a **handset** that is **attractive** to the consumer is a **key factor** in that consumer's handset **purchase decision.**
  - Creating **distinct** handset designs helps **attract** consumers who have a **preference** for **different** handset **designs.**
    - Note: This makes it **difficult** to **develop consistent UI** design for varying handset form factors and screen sizes, from high-end handsets to low-end handsets.

---

[147] 2018 Rebuttal Report, ¶ 80.

[148] 2018 Rebuttal Report, ¶ 94.

[149] CIF US Results Report Final, July 23, 2010, Iconmobile Group (SAMNDCA00225505 at 531 (emphasis added)).

[150] 2018 Opening Report, **Exhibit 24-R**.

[151] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969 at SAMNDCA00215065).

135.     Similarly, one of the surveys on which Mr. Wagner relies reinforces that



136.     Similarly, Samsung's own "2009 Mobile UX Forecast" presentation reinforces the importance of the visual design of smartphones.  The objective of the research project was to gain insight from the competition and develop a UX strategy for 2009.[153]  At that time, Samsung was "increasing focus on visual design of product."[154]  Samsung recognized that hardware design trends were moving toward a "simple form factor."[155]  The presentation states that one key development solution for the upcoming year was a "[c]ompelling physical design that supports

---

[152] Samsung Lovemark Mobile & Web Research: Lovemarks, dated June 23, 2010 (SAMNDCA00207695-SAMNDCA00207765 at SAMNDCA00207731) [9.8].

[153] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969- SAMNDCA00215201 at SAMNDCA00214970) [8.5].

[154] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215056).

[155] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215188).

screen-based interface optimization and standardization."[156]  Following this presentation, Samsung adopted Apple's patented designs reflected in the iPhone.

137.     Similarity in style and design of a smartphone is a critical factor when analyzing purchase drivers across manufacturers and models.  Style and design is eliminated from the consumer decision making process when, for example, a consumer is choosing between two Apple iPhones, or an Apple iPhone and a Samsung smartphone that adopted Apple's patented designs.

138.     Mr. Wagner opines that Apple's representations during licensing negotiations in October 2010 are relevant to the determination of Apple's damages.[157]  I disagree.  I understand that the October 2010 meeting was previously excluded by this Court.[158]  Further, I see no relevance of the pre-suit licensing negotiations in calculating "total profits" for an article of manufacture.

### 4.     iPhone Versus iPod Touch Profit Comparison  [Wagner ¶¶ 476-499]

139.     In comparing the iPhone and iPod touch,[159] Mr. Wagner opines that the "difference in profitability is a reasonable estimate of the amount of profitability due to the phone calling features and additional features (unrelated to the AOM) of the iPhone."[160] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This conclusion is inconsistent with Mr. Wagner's opinions and analyses using survey data.  For example, his analysis using a JD Power & Associates survey ascribes only 1.35% to features

---

[156] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215187.)

[157] 2018 Rebuttal Report, ¶ 85.

[158] Dkt. No. 1889 (Aug. 21, 2012): Trial Exhibit List.

[159] 2018 Rebuttal Report, ¶¶ 476-499.

[160] 2018 Rebuttal Report, ¶ 492.

[161] 2018 Rebuttal Report, ¶¶ 492, 498.

████████████████████████████████████████████ These inconsistencies show

the unreliability of Mr. Wagner's approaches. ████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████

140.    Mr. Wagner's comparison of the iPhone and iPod touch is not useful because it compares products marketed to different consumers in different product categories.  Mr. Wagner does not provide any evidence that customers, particularly the carrier customers to whom Samsung sells, consider the two products to be substitutes for one another.  The products have similarities, but are sold to different customer groups for different purposes.

141.    For example, analysts widely observed that the iPod touch was marketed at a lower price and to a younger demographic in order to provide a lower cost entry point to Apple's ecosystem.  A 2009 report from mobile analytics firm Flurry concluded:

> As all industry eyes look to the iPhone, the iPod Touch is quietly building a loyal base among the next generation of iPhone users, positioning Apple to corner the smartphone market not only today, but also tomorrow.  In terms of Life Stage Marketing, the practice of appealing to different age-based segments, Apple is using the iPod Touch to build loyalty with pre-teens and teens, even before they have their own phones (think: McDonalds' Happy Meal marketing strategy).  When today's young iPod Touch users age by five years, they will already have iTunes accounts, saved personal contacts to their iPod Touch devices, purchased hundreds of apps and songs, and mastered the iPhone OS user interface. This translates into loyalty and switching costs, allowing Apple to seamlessly "graduate" young users from the iPod Touch to the iPhone.[163]

Similarly, a 2009 article in Ars Technica observed:  "[T]he iPod touch is serving an even more strategic role in popularizing the iPhone OS platform with a younger generation obsessed with

---

[162] 2018 Rebuttal Report, Schedules 36.9-4T & 36.10-4T, lines 20 & 45.

[163] http://flurrymobile.tumblr.com/post/113359476620/flurry-smartphone-industry-pulse-november-2009

social networking and gaming. When the Facebook generation is ready to graduate to a smartphone, chances are good that they will choose the platform on which they're already hooked."[164]  A 2010 article in Geek.com observed: "Why do parents and kids love the iPod touch?  The reasons are simple.  Parents appreciate the gizmo's sweet $199 price point and the fact there are no monthly fees attached to it."[165]

142.    Mr. Wagner also ignores that consumers purchased the iPod touch and iPhone in different ways.  The first generations of iPhones were typically subsidized by carriers, like AT&T.[166]  In contrast, for purchasers of the unsubsidized iPod touch, the cost was born up-front by the consumer paying full price.  Mr. Wagner does not consider whether or how these different purchasing mechanisms impact consumer pricing or comparative profit margins.

143.    More generally, Mr. Wagner has not shown why his analysis of *Apple's* profits on various products is informative when calculating *Samsung's* profits on its own products to which it applied the patented designs.[167]  Mr. Wagner has not explained why Apple's pricing strategy and profit margins are sufficiently comparable to Samsung's strategy and margins.  In fact, the evidence shows the two company's profit margins differ for a number of reasons that vary by product.[168]

144.    Mr. Wagner's analysis of these products also does not actually calculate profits that Samsung earned on the alleged article of manufacture, but instead apportions the share of profits he believes to be attributable to the patented design.

---

[164] https://arstechnica.com/gadgets/2009/12/ipod-touch-is-gateway-drug-to-iphone-for-facebook-generation/

[165] https://www.geek.com/games/the-apple-brainwash-get-them-while-theyre-young-with-the-ipod-touch-1039571/

[166] Aug. 13 2012 Trial Transcript, pp. 2133:23-2134:6

[167] Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 79-80 ("Can you think of any reason that Samsung would ever use Apple cost and revenue data to calculate profits on any Samsung smartphone product? . . . I've been in this field 10-plus years, including my time in college, but I've never heard of calculating profits in the manner that you describe.").

[168] E.g., PX 58.14 ███████████████

1

2

**5.     Comparison of the Profit per Unit for Infringing Smartphones by Design Patent to the Least Profitable Infringing Smartphone [Wagner ¶¶ 500-505]**

3     145.     Mr. Wagner's comparison of profit per unit to identify the least profitable

4     infringing smartphone is not a useful approach for looking at the specific contribution of the

5     design patents to the products.[169]   It does not focus on whether or how the patented designs are

6     applied to an article of manufacture.   It does not consider any specific article of manufacture or

7     component.   It does not calculate the total profit that Samsung made on the sale of an article of

8     manufacture.

9     146.     Even if Mr. Wagner's approach were appropriate, it suffers from several

10     methodological flaws.   For example, his calculations are based on the operating margin, which

11     reflects a number of categories of costs that Mr. Wagner has admitted in his prior reports reflect

12     indirect costs and allocations rather than a measure of profit specific to the smartphone.[170]   An

13     improved analysis would utilize gross margin.   Although I disagree with Mr. Wagner's analysis, I

14     have recalculated the results using gross margin, rather than operating margin with the corrections

15     described below.   The results and calculations are summarized in **Exhibit 57-R2, 57.1-R2, and**

16     **57.2-R2**.   The gross profits are not well correlated to the operating profit calculation performed

17     by Mr. Wagner and the overall effect is different.

18     147.     Mr. Wagner's analysis also does not properly account for outliers.   He

19     acknowledges the importance of doing so when he disregards products with negative numbers,

20     like the Gem.[171]   He also acknowledges the potential for confounding variables when he runs an

21     alternate calculation controlling for the numbers of months in the sales cycle.[172]   But he otherwise

22     makes no adjustments or investigation regarding potential outliers or other variables.   This sets an

23     artificially low ceiling on Mr. Wagner's results.   Mr. Wagner's analysis is driven by specific

24     _____

25     [169] 2018 Rebuttal Report ¶¶ 500-505.

26     [170]   Corrected Expert Report of Michael J. Wagner, dated Apr. 20, 2012, ¶ 323 ("As part of its calculation of the operating expenses (and COGS to a lesser degree), Samsung allocates expenses that are not directly related to a specific product.").

27     [171] 2018 Rebuttal Report, ¶¶ 501.

28     [172] 2018 Rebuttal Report, ¶¶ 503-505.

phones (Continuum and Galaxy S2 Skyrocket) that fall well outside the range of profits for the other products.[173]  Eliminating one or both of these outliers from their respective calculations would result in very different conclusions about the value of the designs, even using Mr. Wagner's approach.  Mr. Wagner did not describe any investigation into why these sizeable differences are present and whether they arise from unusual changes in the operating expenses or periods involved.  In the analysis using gross profits for the products, I have corrected for this by eliminating Gem as an outlier in the analysis regarding the D'305 patent.  When this occurs, the

██████████████████████████████████████████████████████████████

of the average amounts stated for the other infringing products.  Similarly, with respect to the D'677 patent analysis, using gross profit identifies no clear outliers and the lowest per unit gross margin is ████████████████████████████

148.    A different analysis looking at profits also shows that Mr. Wagner's assumption that the patented design is responsible for only the lowest common denominator of profit is inappropriate.  In **Exhibit 54-R2**, I calculated and compared the profit earned by Samsung on its infringing and non-infringing devices.  As **Exhibit 54-R2** shows, the devices incorporating the patented designs earned a substantially higher profit than those that did not infringe an asserted design patent.

149.    Mr. Wagner's calculation is also not consistent with the other analyses in his report.  Mr. Wagner's conclusion that the least profitable infringing smartphone's profit per unit can be considered the maximum profit attributable to the article of manufacture is based solely on the fact that the infringing smartphones all incorporate the relevant article of manufacture as a common element.[174]  However, if correct, that same reasoning could apply to every other feature the phones have in common, including the ability to make calls, send texts, receive emails, browse the Internet, take pictures, store data, operate on a battery, etc.  Thus, Mr. Wagner is

---

[173] 2018 Rebuttal Report, Figures 91-92.

[174] 2018 Rebuttal Report, ¶ 500.

essentially arguing that all of those features are collectively worth no more than ▮ in profit.[175]

However, that contradicts his earlier conclusions based on his survey-based analysis.  For

example, citing to a J.D. Power survey, Mr. Wagner ascribed ▮ of each product's profit to its

▮[176]  Mr. Wagner's analysis of the iPhone and iPod touch concluded that 80-

84% of the iPhone's profit is attributable to mainly the ability to make a telephone call or send a

text message.[177]  However, all of these features are common to all of the infringing products, and

thus should not exceed ▮ of the total profit (if Mr. Wagner's reasoning in this section is

correct).  These inconsistencies show that Mr. Wagner's analysis is inherently flawed.

**E.      Mr. Wagner's So-Called "Corroborating Qualitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits [Wagner ¶¶ 506-564]**

150.    Mr. Wagner's "qualitative evidence" is irrelevant and unhelpful when performing

a calculation of Samsung's profits based on the article of manufacture to which Samsung applied

the patented designs.

151.    Mr. Wagner's "evidence" consists mainly of generalized discussions about

smartphone features and other intellectual property related to smartphones.[178]  These generalized

statements provide no information about the revenues or deductible costs of any tangible goods

relevant to the articles of manufacture at issue in this case.  Mr. Wagner fails to indicate how

generalized consumer statements regarding "importance" of cameras, operating platform, battery

life, processor speed, and other features has anything to do with the calculation of "total profits"

based on the sale of the alleged articles of manufacture.  Regardless, as discussed above,

numerous surveys and consumer research demonstrate the importance of design to consumers'

decision making.

152.    Mr. Wagner cites two documents—presentations from Samsung and ▮—that

▮, and he emphasizes that

---

[175] 2018 Rebuttal Report, Figure 92.

[176] 2018 Rebuttal Report, Schedules 36.3-4T & 36.4-4T.

[177] 2018 Rebuttal Report ¶¶ 492, 498.

[178] 2018 Rebuttal Report ¶¶ 510-514, 522-540, 548-561.

none of these categories are named for or focused solely on the patented designs.[179]  First, Mr. Wagner's discussion of the Samsung presentation ignores that nearly every photograph or still included in the document prominently features the D'677, D'087, and/or D'305 patented designs, regardless of the category Samsung ascribed to it.[180]  Thus, the Samsung presentation provides further evidence of the patented designs' prominence within the products as a whole and supports my opinion.  Second, the Nielsen document and categories therein ███████████████ ██████████████████████████ █████████████ presentation does not address the question at issue here.

153.    Mr. Wagner recites statistics regarding Samsung's and Apple's total marketing expenditures.[182]  He does not draw any conclusions or state any opinions regarding those statistics.  They are irrelevant to the question at issue here, which is what the article of manufacture is and how to calculate Samsung's profits made on it.

154.    Mr. Wagner's attempt to derive profit numbers based on memory capacity in different iPhone models also has no relationship to any article of manufacture.[183]  The calculation does not address the identification of the article of manufacture or how Samsung's profits specific to that article of manufacture should be calculated.  Mr. Wagner does not attempt to show how the calculations are related to the issues in this case.

155.    Mr. Wagner discusses and relies on an October 5, 2010 presentation titled "Samsung-Apple Licensing Discussion."[184]  I understand that this presentation has been excluded by the Court, and I do not think it has any relevance to the questions presented in this trial.[185]

---

[179] 2018 Rebuttal Report, ¶¶ 515-517.

[180] Samsung Mobile, "Apple iPone TV Spending by Marketing Message," Dec. 2010 (SAMNDCA00235640-643 at 641-642).

[181] 2018 Rebuttal Report ¶¶ 515-516; Nielsen, Nielsen Q2 2012 Insight for Samsung, August 2012 (SAMNDCA30008344-374 at 356).

[182] 2018 Rebuttal Report, ¶¶ 518-521.

[183] 2018 Rebuttal Report, ¶¶ 541-547.

[184] 2018 Rebuttal Report, ¶¶ 507-509.

[185] Dkt. No. 1889 (Aug. 21, 2012): Trial Exhibit List.

**III.   REPLY OPINIONS REGARDING DEDUCTIONS OR MODIFICATIONS ASSOCIATED WITH PRIOR CALCULATIONS THAT ARE INCLUDED FOR THE FIRST TIME IN THE 2018 REBUTTAL REPORT.**

    **A.   Mr. Wagner's Opinions Regarding "Total Profits" Using Fewer Than All the Phones Found by the Jury to Infringe Apple's Design Patents**

        **1.   Mr. Wagner has no basis to eliminate from his damages calculation units that the prior jury found to infringe. [Wagner ¶¶ 382-390]**

156.   Mr. Wagner has improperly removed from his calculation of Samsung's Profits over █████████████████ that the prior jury previously adjudicated as infringing Apple's D'677 patent.  Mr. Wagner explains his decision to remove these previously adjudicated units as follows: (1) the D'677 patent covers only "black" phones, (2) Samsung launched a "white" version of its Galaxy S II phones before June 30, 2012 (*i.e.*, before the end of the damages period), and therefore (3) the jury's verdict in 2012 may have included "white" Galaxy S II units that do not infringe the D'677 patent.[186]  Mr. Wagner admits, however, that Samsung never produced sales information showing how many "white" units, if any, STA actually sold to carriers and consumers within the damages period.[187]  Mr. Wagner also admits that Samsung never raised a defense to infringement at the 2012 trial based on the inclusion of "white" phones, and never presented the jury with the means to deduct any "white" units from its verdict.[188]  Nor does he disagree that the full set of unit sales presented in my 2018 Opening Report and in prior reports were presented to the jury as a part of JX1500 and have consistently been used as a measure of the relevant units subject to the infringement verdict thereafter.  As explained in more detail below, I disagree with Mr. Wagner's attempt at this stage to unilaterally remove from the verdict approximately ███████████ that the jury previously found to infringe Apple's D'677

---

[186] 2018 Rebuttal Report, ¶¶ 382-390.

[187] 2018 Rebuttal Report, ¶ 388 ("I understand the 9th and 10th letters of each product's model number (SKU) signifies the color of the model and, more specifically, the letters 'ZW' refer to white models."); *id*. ¶ 389 ("Samsung did not produce STA and SEA financials at the SKU level.").

[188] 2018 Rebuttal Report, ¶ 386 ("the fact that Samsung started selling white versions of these phones at the end of 2011 was never an issue raised for trial").

1

2

patent.  I also disagree with Mr. Wagner's calculation of profits after excluding those █████████

██ .

3

4

**b.     Mr. Wagner Improperly Removes ████████████ That The Jury Found to Infringe Apple's D'677 Patent**

5

6

7

157.     Until his 2018 Rebuttal Report, both Mr. Wagner and I have properly treated all units included on JX1500 as infringing units as decided in the August 2012 verdict that was thereafter affirmed by the Federal Circuit.

8

9

10

11

12

158.     At the August 2012 trial, I understand the Mr. Musika and Mr. Wagner relied on PX180, DX676, and/or JX1500 to identify how many units of each accused product Samsung sold.  As I explained to the jury at the 2013 damages trial, Mr. Wagner, Mr. Musika and I agreed on the number of infringing units that Samsung sold during the damages period based on the units sales reported in these documents.[189]

13

14

15

16

17

18

19

20

21

22

159.     Samsung and Mr. Wagner have both acknowledged that the jury returned a verdict for Apple, finding that all the Galaxy S II products infringed Apple's D'677 patent, and awarded Apple damages for the Galaxy S II units without any exclusions based on color.  In a declaration that Mr. Wagner submitted to the Court on January 20, 2016, in connection with supplemental damages proceedings, Mr. Wagner confirmed that the jury had awarded Apple damages on all Galaxy S II units contained in JX1500.[190]  In that declaration, Mr. Wagner acknowledged that the Court had previously held that it would "calculate a per-unit supplemental damages amount by dividing the jury award for a given product by the number of sales of that product encompassed within the jury award."[191]  Mr. Wagner then calculated that per-unit supplemental damages amount for each of the Galaxy S II products by taking the jury award and dividing it by all

23

24

25

[189] Dkt. 2840: Transcript of Nov. 14, 2013 Hearing at 635:3-7.

26

27

[190] Dkt. 1931: Amended Verdict Form; Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.

28

[191] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 13 (emphasis added).

1
2
3
4

Galaxy S II units contained in JX1500,[192] confirming that the jury verdict encompassed all Galaxy S II sales.  Mr. Wagner also stated that "I understand that the parties agree on these calculations."[193]  Thus, according to Mr. Wagner, all Galaxy S II units contained in JX1500 infringed Apple's D'677 patent.

5
6
7

160.    Mr. Wagner's decision to remove ████████████████████ from total stated in JX1500 and to refuse to include them in his calculations of Samsung's profits is inconsistent with the 2012 jury verdict and inconsistent with Mr. Wagner's own prior analysis of that verdict.

8
9

**c.      Even if units reflecting white products should be excluded, Mr. Wagner's method for doing so is wrong.**

10
11
12
13
14
15
16
17
18
19
20
21
22

161.    As noted above, I disagree that any units previously determined to infringe by the jury should be removed from the damages analysis.  Even if this exclusion were permitted, Mr. Wagner's method for doing so is improper and unreliable.  Mr. Wagner admits that he does not have data to show the number of white phones actually sold by STA, if any, during the damages period.[194]  Accordingly, he resorts to using a different data set from SEC.  More specifically, he claims to use the number of SEC white units that were manufactured and sent to STA as a proxy for the number of white units STA sold to carriers and the timing of those sales.  I do not agree that any such direct correlation can be assumed and Mr. Wagner's attempt to tie together the timing of the events is not explained or justified.  To the extent SEC's data on manufacturing is used as a proxy, the proper approach would be to take the total number of white units manufactured before June 30, 2012, divided by the total number of units manufactured for each of the Galaxy SII products before June 30, 2012.  The resulting percentage would be applied to the profits for the specific products.  I have prepared a calculation that reflects this approach applied

23
24
25

[192] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.  *See also* Dkt. 3354-20: Schedule 2: Products Eligible for Supplemental Damages: Damages Per Unit, dated Jan. 20, 2016, at p. 7.

26

[193] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.

27
28

[194] This itself is inconsistent with Samsung's prior statements about the ability of the SAP system to track all sales of the infringing products to carriers; Mr. Wagner does not explain why the correct data is not available or why Samsung did not provide it to him.

financial data to calculate STA's and SEA's profitability."[198]  In addition to the opinions set forth in my 2018 Opening Report, I have previously responded to these opinions in my deposition testimony on August 26, 2013 at pages 260-275 of my deposition transcript.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein.

**F.    My Reasonable Royalty Analysis is Reasonable and Appropriate.  [Wagner ¶¶ 134-685]**

168.    Mr. Wagner contends that my reasonable royalty analysis "relied on unreasonable benchmarks and resulted in an overstated concluded royalty rate."[199]  Mr. Wagner has included the same criticism in his prior expert reports.  I have previously responded to these opinions extensively in my deposition testimony on August 26, 2013 and December 2, 2015 and in my 2013 trial testimony.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein..

Dated:  February 9, 2018                    _____

                                                            JULIE L. DAVIS

---

[198] 2018 Rebuttal Report, ¶¶ 130-131.

[199] 2018 Rebuttal Report, p. 69.