# Exhibit A

## Confidential Version of Document Sought to Be Sealed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE, INC., a California corporation<br><br>                      Plaintiff,<br><br>       v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                 Defendants. | Case No. 11-cv-01846-LHK |

**EXPERT REPORT OF SAM LUCENTE**

Contains Material Designated Highly Confidential

# I.   QUALIFICATIONS

1.   A brief summary of my work history and qualifications follows.

2.   I received a Bachelor of Science in Design with high distinction from the College of Design, Architecture, Art and Planning (DAAP) of the University of Cincinnati in 1981.  DAAP is consistently ranked as a top design school, number one in 1981 and currently number two.[1]  At the University, I was President of the Alpha Lambda Delta National Honor Society and was inducted into the Mortar Board National College Senior Honor Society.  Later in my career, I was selected as one of the top 100 alumni of the University.[2]

3.   I have worked for over thirty years as a designer primarily in the technology industry.  I have previously worked as a designer for IBM Corporation, Netscape Corporation, and Hewlett-Packard Corporation.  In addition, I have served as a consultant or co-founder for other companies in the information technology, fitness, medical, and consumer electronics industries on issues related to industrial and user interface design.  A copy of my current Curriculum Vitae is attached as Exhibit 1, which contains a listing of my education and experience.

4.   I am the author of several articles in the area of design and I have lectured about design at industry conferences and universities and served as a judge in various design competitions.  A partial list of my design-related publications and speaking engagements can be found on my Curriculum Vitae.

5.   I am a member of the Industrial Designers Society of America (IDSA), initially as Student Chapter President at the University of Cincinnati and serving as the At-Large Director from 2009 to 2011.  During this time, I led an effort to redefine IDSA's business strategy.  In 2011, I represented IDSA internationally, at the Industrial Design Excellence Awards (IDEA) Brazil Awards as a design judge.  Earlier, in 2005, I spearheaded a conference with IDSA entitled "The Other Six Billion People," inviting leading designers and design organizations from across the globe to focus on design solutions for underserved countries.

6.   I am a member of the Interaction Design Association (IxDA) dedicated to the discipline of interaction design.

7.   I have been recognized by Fast Company as a Master of Design and by Bloomberg Businessweek's Champions of Design.  I have received numerous domestic and international design awards including IDEA Gold, Silver and Bronze Awards, iF and Red Dot Awards in Germany, MITI awards in Japan and the coveted Compasso d'Oro in Italy.  My design work is in the permanent collections at the Museum of Modern Art (MoMA) in New York, the Cooper Hewitt Smithsonian Design Museum in New York, the San Francisco Museum of

---

[1]   https://www.di.net/articles/americas-best-architecture-schools-2016/.

[2]   http://magazine.uc.edu/famousalumni.html.

Contains Material Designated Highly Confidential

Modern Art (SFMOMA) and others internationally.  My art is also in the permanent collection at MoMA.  Both my design and art has been in several exhibitions world-wide.

8.  I am the named inventor on thirty-five technology-related patents in the United States, including design patents.

9.  From 1981 to 1996, I worked at IBM Corporation ("IBM") in various roles ranging from designer to manager.  In the early 1980s, I worked on the industrial design of IBM rack systems, desktop computers, displays, tablets, laptops, and peripherals such as keyboards and mice.  I was the only industrial designer to receive IBM's Outstanding Innovation Award for my work on a CAD/CAM system.  Later, I became the design manager of the Data Systems Division managing a team of human factors engineers, industrial designers, and graphic designers.

10.  From 1987 to 1996, as Program Manager of Strategic Design world-wide, I was part of the design team that developed IBM's first designs that would ultimately become the IBM ThinkPad.  During this project, I designed various laptop and tablet computers.  I then became the lead designer on several IBM ThinkPad laptop computers, personally influencing the development of the IBM TrackPoint, a cursor control device that replaced a trackpad or mouse.  Other design projects included the IBM ThinkPad 701C "Butterfly," with an innovative keyboard that unfolded when the device was opened, and the extremely successful IBM 360, which was another ThinkPad known for its keyboard design.  The 701C is shown here.



11.  I also collaborated on the breakthrough Leapfrog Computer integrating voice and pen-based touch interaction with conventional keyboard input.  The Leapfrog Computer is shown here.



Contains Material Designated Highly Confidential

12.     From 1996 to 1998, I was the Director of User Experience in the Technology Group at Netscape Corporation, where I was primarily focused on the graphical user interface design of web browsers and email.  Over a two-year period, I formed a team of 40 user interface designers and human factors engineers.  That work included studying and creating user interactions with graphical user interfaces.

13.     I then ran my own design consultancy from 1998 to 2003, where I designed a number of different products and concepts, predominately involving user interfaces and wearable devices.

14.     From 2003 to 2010, I worked at Hewlett Packard ("HP") as Vice President of Design.  As the leader of all design at HP, I began with a team of approximately 30 designers, eventually creating a global design practice of over 300 design professionals touching every business division.  This included the industrial design, user interface design and usability of hardware and software offerings.  I also managed the HP Design Council and HP's external design firms.

15.     I was personally involved in designing key products at HP.  This included software applications, enterprise computing systems, desktop computers, laptop computers, printers, tablets, handheld Personal Digital Assistants (PDAs), early smartphones, and numerous other peripheral products, including many that used touch-based display screens for user input.  During my time at HP, I was also directly involved in two major branding efforts that touched all visual expressions of the company.  The printer shown below used recyclable plastics, common user interactions, and consistent controls.  The recently announced laptop below uses the new HP logo created during the second of the two branding projects.  Additional smartphone, tablet and graphical user interface design concepts are also shown.



16.     While at HP, I made a practice of attending the Consumer Electronics Show (CES) each year and personally walking the entire exhibit floor to see all the

Contains Material Designated Highly Confidential

products that were being introduced and displayed that year.  HP also presented many products at CES.

17.    Since my time at HP, I have worked on a variety of design projects as an independent consultant, including designing mobile apps for both iOS and Android and working with a prosthetics company.

18.    Based on these and other experiences, I believe that I am qualified to give opinions as a designer skilled in the art with respect to the designs and products at issue here.  Due to my work with other designers over the course of my career, I also believe I am qualified to give an opinion about what would be understood by one skilled in the art of designing electronic devices, components, and graphical user interfaces such as those at issue in this case.

19.    I also believe that I am qualified to give opinions about how an ordinary observer or consumer would perceive the devices and designs in question.  As a professional working in the areas of both industrial design and user interface design, I have over thirty years of experience aligning a product's hardware and software aesthetic attributes with consumer perceptions.  It has been my profession to design mass-produced products to be attractive, useful, and profitable.  My ability to understand product attributes that define a successful visual impression with consumers is based on years of user research and the iterative design of thousands of information technology and consumer electronics products.

20.    As both designer and manager, I have spent considerable time leading or participating in hundreds of consumer research projects to better understand consumers and their perception of product designs both in person and on the Internet.  These efforts utilized a wide range of both qualitative and quantitative methodologies conducted live and online, including preference and other studies, product walkthroughs, interviews, surveys, focus groups, and usability testing. This work was within the areas of design research and marketing research directed at both the design of products and their market potential.  Some specific examples involved examining consumers' use and preference of various handheld devices and laptops and their keyboard configurations or the design of touch interfaces for printers.  One example of this work was a consumer study I spearheaded that involved an immersive consumer feedback project to enter homes and live alongside families to understand how they interacted with their technology.  This work was highlighted in Bloomberg Businessweek where I was referred to as "The Ethnographer."[3]

21.    I also have spent considerable time studying consumer brand preference and the effect of design in communicating brand to consumers.  My work with consumer

---

[3]  https://www.bloomberg.com/news/articles/2006-06-18/sam-lucente-the-ethnographer.

Contains Material Designated Highly Confidential

perception spans the product development cycle from early product exploration to high volume, mass production of millions of products sold worldwide.

22.     Additional images of some of the product designs and artwork described above are included in Exhibit 2.

23.     My past work submitting written reports or offering deposition testimony as an expert design witness includes prior work in this case as well as in *BlackBerry Ltd. v. Typo Products, LLC*, Northern District of California, 2014, Case No. 3:14-cv-00023.

24.     I am being compensated at my standard rate of $650 per hour, and I am being compensated regardless of the substance of my opinions or the outcome of this case.

## II.     ASSIGNMENT

25.     I have been asked to identify the article or articles of manufacture to which the D618,677, D593,087, and/or D604,305 patented designs have been applied for the Samsung products that will be a part of the upcoming trial.

26.     I understand that the chart below is a summary of the jury verdict regarding Samsung products found to infringe or not infringe the Apple design patents at issue here.  I have been informed that the Galaxy S (i9000) and Galaxy SII (i9100), though found to infringe, will not be assessed for damages at the upcoming trial.

|  | Design Patents | | |
| --- | --- | --- | --- |
| Samsung Products | D'677 | D'087 | D'305 |
| Captivate (JX 1011) | | | Y |
| Continuum (JX 1016) | | | Y |
| Droid Charge (JX 1025) | | | Y |
| Epic 4G (JX 1012) | | | Y |
| Fascinate (JX 1013) | Y | | Y |
| Galaxy Ace (JX 1030) | N | | |
| Galaxy S (i9000) (JX 1007) | Y | Y | Y |
| Galaxy S 4G (JX 1019) | Y | Y | Y |
| Galaxy S II (AT&T) (JX 1031) | Y | N | |
| Galaxy S II (i9100) (JX 1032) | Y | N | |
| Galaxy S II (T-Mobile) (JX 1033) | Y | | |
| Galaxy S II (Epic 4G Touch) (JX 1034) | Y | N | |
| Galaxy S II (Skyrocket) (JX 1035) | Y | N | |

5

Contains Material Designated Highly Confidential

| | | | |
|---|---|---|---|
| Gem (JX 1020) | ██████ | | Y |
| Indulge (JX 1026) | ██████ | | Y |
| Infuse 4G (JX 1027) | Y | N | Y |
| Mesmerize (JX 1015) | Y | ███ | Y |
| Showcase (JX 1017) | Y | ███ | Y |
| Vibrant (JX 1010) | Y | Y | Y |

27.     I have also been asked to provide responses to the reports submitted on Apple's behalf by Alan Ball, Susan Kare, and Julie Davis with respect to the same issues.

28.     I understand that I may be asked to attend a deposition or speak at trial in this case regarding the content of this report and my opinions in this case.  I also understand that I may prepare and use additional visual aids if I am asked to speak at trial and I reserve the right to do that, particularly in light of the fact that, as I am informed, the expert witnesses retained by Apple will be given an opportunity to submit reply reports after receiving this report.  I reserve the right to review those reply reports and provide any clarifying or supplemental opinions, including supporting materials, I believe may be needed.

## III.   SUMMARY OF OPINIONS

29.     For the reasons explained in this report, my ultimate opinions regarding the articles of manufacture to which the D'677, D'087, and D'305 patents were applied is that in every instance, they were applied to components of the Samsung smartphones, not to entire finished products.

30.     I reviewed Samsung's written description of what it has contended are the articles of manufacture and I believe it accurately captures the components I identified as those to which the designs were applied:

> For D'677, "the black, round-cornered, glass front face of each phone."

> For D'087, "the round-cornered, glass front face and surrounding rim or bezel of each phone."

> For D'305, "the display screen while displaying the single, patented array of GUI icons."[4]

---

[4]   Samsung's Objections And Responses To Apple's First Set Of Interrogatories Regarding Articles Of Manufacture, November 29, 2017, pages 5, 15, and 24.

Contains Material Designated Highly Confidential

## IV.   LEGAL PRINCIPLES APPLIED

31.     I have been informed of, and have reviewed, the following statutes and legal principles and have been asked to apply them in forming my opinions.

32.     I understand that the Patent Act, 35 USC § 289, provides the following remedy for infringement of a design patent:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

33.     I understand that the Patent Act, 35 USC § 171, provides the following standard for obtaining a design patent from the U.S. Patent Office:

> (a) In General.— Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

34.     I understand that a trial was conducted in this case in July and August 2012 in which Apple accused various Samsung phones of infringing the D'677, D'087, and/or D'305 patents.  I understand that the jury found that these patents were infringed as to some phones, as reflected in the chart above.

35.     I understand that a second trial was held in November 2013 to recalculate design patent damages on some of the same phones.

36.     I understand that the United States Supreme Court subsequently granted Samsung's request to address the following question:  "Where a design patent is applied to only a component of a product, should an award of infringer's profits be limited to those profits attributable to the component?"  (Samsung's Petition for a Writ of Certiorari, *Samsung Electronics Co., Ltd. v. Apple, Inc.*, Supreme Court, December 14, 2015, page i.)

37.     I understand that the United States Supreme Court ruled in Samsung's favor and stated the following principles, which apply to this case:

a.      "'Article of manufacture' has a broad meaning.  An 'article' is just 'a particular thing.'  J. Stormonth, A Dictionary of the English Language 53 (1885) (Stormonth); see also American Heritage Dictionary, at 101 ("[a]n individual thing or element of a class; a particular object or item").  And 'manufacture' means 'the conversion of raw materials by the hand, or by

Contains Material Designated Highly Confidential

machinery, into articles suitable for the use of man' and 'the articles so made.'  Stormonth 589; see also American Heritage Dictionary, at 1070 ('[t]he act, craft, or process of manufacturing products, especially on a large scale' or '[a] product that is manufactured').  An article of manufacture, then, is simply a thing made by hand or machine." (*Samsung Electronics Co., Ltd. v. Apple Inc*., 137 S.Ct. 429, Supreme Court 2016, pages 434-435.)

b.      "So understood, the term 'article of manufacture' is broad enough to encompass both a product sold to a consumer as well as a component of that product.  A component of a product, no less than the product itself, is a thing made by hand or machine.  That a component may be integrated into a larger product, in other words, does not put it outside the category of articles of manufacture."  (*Ibid*., page 435.)

c.      "[F]or the reasons given above, the term 'article of manufacture' is broad enough to embrace both a product sold to a consumer and a component of that product, whether sold separately or not.  Thus, reading 'article of manufacture' in § 289 to cover only an end product sold to a consumer gives too narrow a meaning to the phrase."  (*Ibid*., page 436.)

d.      "Arriving at a damages award under § 289 thus involves two steps.  First, identify the 'article of manufacture' to which the infringed design has been applied.  Second, calculate the infringer's total profit made on that article of manufacture."  (*Ibid*., page 434.)

e.      "Section 289 allows a patent holder to recover the total profit an infringer makes from the infringement.  It does so by first prohibiting the unlicensed 'appli[cation]' of a 'patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale' or the unlicensed sale or exposure to sale of 'any article of manufacture to which [a patented] design or colorable imitation has been applied.'  35 U.S.C. § 289.  It then makes a person who violates that prohibition 'liable to the owner to the extent of his total profit, but not less than $250.  Ibid. 'Total,' of course, means all.  See American Heritage Dictionary 1836 (5th ed. 2011) ('[t]he whole amount of something; the entirety').  The 'total profit' for which § 289 makes an infringer liable is thus all of the profit made from the prohibited conduct, that is, from the manufacture or sale of the 'article of manufacture to which [the patented] design or colorable imitation has been applied.'"  (*Ibid*. page 434.)

f.      "In the case of a design for a single-component product, such as a dinner plate, the product is the 'article of manufacture' to which the design has been applied.  In the case of a design for a multicomponent product, such as a kitchen oven, identifying the 'article of manufacture' to which the design has been applied is a more difficult task."  *(Ibid*., page 432.)

Contains Material Designated Highly Confidential

38.     I understand that, after the U.S. Supreme Court decision, the District Court made the following statements, among others, regarding the jury instructions that were given to the jury in the prior trial:

a.      "[T]he instructions that were read to the jury did not indicate that the article of manufacture could be less than the entirety of each infringing Samsung phone, and implied that the article of manufacture was the entirety of each infringing Samsung phone."  (Document No. 3509, July 28, 2017, Order Re: Waiver of Article of Manufacture Issue and New Trial on Design Patent Damages, page 20.)

b.      "The emphasis on the total profit attributable to the 'infringing products' indicates that the jury instructions contemplated an award of the profit earned for the entirety of each infringing Samsung phone, and did not contemplate the possibility of a smaller article of manufacture."  (*Ibid*.)

c.      "However, there is no jury instruction that informed the jurors that there is a difference between the products sold to consumers and the article of manufacture under § 289.  Indeed, Final Jury Instruction 54's statement that profits may be awarded as to the 'infringing products' suggests that the article of manufacture being sold is an infringing product.  Final Jury instruction 53 similarly implies that Apple can obtain all profits on the infringing products, and does not mention the possibility of a smaller article of manufacture.  See Final Jury Instructions at 71 ("Apple can elect to prove either actual damages, known as compensatory damages, or it may elect to prove the defendant's profits as its measure of potential recovery with respect to the sale of each unit of an infringing product.").  Thus, jurors would have no way of knowing that the article of manufacture could be something less than the product that is sold to consumers, and the instructions themselves strongly imply that profits should be awarded on the entirety of Samsung's infringing phones.  Accordingly, the references to the "sale of the article" in Final Jury Instruction 54 does not mean that the jury could find an article of manufacture that was less than the entirety of each infringing Samsung phone."  (*Ibid*., pages 20-21.)

39.     I understand that the District Court has also stated that "a properly instructed jury may have found that the relevant article of manufacture for each of the design patents was something less than the entire phone."  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, page 34.)

40.     I understand that the District Court accordingly has ordered a new trial on damages for the D'677, D'087, and D'305 patents and adopted a four-factor test to be used to identify the articles of manufacture in this case as the first step in determining damages.  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, pages 19-21 and 35.)

a. **Factor 1** – "The scope of the design claimed in the plaintiff's patent, including the drawing and written description;"

b. **Factor 2** – "The relative prominence of the design within the product as a whole;"

c. **Factor 3** – "Whether the design is conceptually distinct from the product as a whole; and"

d. **Factor 4** – "The physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately."

41. I also understand that the District Court adopted its four-factor test based on a brief written by the United States Solicitor General. I understand that the Solicitor General's brief was submitted to the U.S. Supreme Court in June 2016 as part of the proceedings in this case, and stated the following regarding the four-factor test:

a. "In conducting this inquiry, the factfinder's over-arching objective should be to identify the article that most fairly may be said to embody the defendant's appropriation of the plaintiff 's innovation. That framework anchors the inquiry in Section 289's purpose, which is to provide the patentee with a remedy for (and to prevent the infringer from profiting from) the unlawful appropriation. In determining whether the relevant article is the entire product or a component, the factfinder therefore should keep in mind the scope of the plaintiff's innovation and should identify the article in which the patented design prominently features, without unnecessarily sweeping in aspects of the product that are unrelated to that design." (Brief for the United States as Amicus Curiae Supporting Neither Party, submitted in June 2016 in *Samsung Electronics Co., Ltd. v. Apple Inc.*, United States Supreme Court, Case No. 15-777, page 26.)

b. "In cases where the identity of the relevant 'article of manufacture' is otherwise open to reasonable dispute, the factfinder may legitimately consider which characterization would appropriately compensate (rather than over-compensate) the patentee for the contribution of the patented design to the value of the infringer's finished product. See, e.g., Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 402-408 (1940) (discussing principles applied by equity courts in awarding profits for patent and copyright infringement). When a product is composed of distinct components, choosing the article that most fairly embodies the plaintiff 's invention will help to ensure that 'neither party will have what justly belongs to the other.' Id. at 408." (*Ibid.*, page 27.)

Contains Material Designated Highly Confidential

c.    **Factor 1** – "First, the scope of the design claimed in the plaintiff's patent, including the drawing and written description, provides insight into which portions of the underlying product the design is intended to cover, and how the design relates to the product as a whole. See, e.g., Piano I, 222 F. at 903-904; Grand Rapids Refrigerator, 268 F. at 974. In addition, the patent identifies the article of manufacture that the patentee views as the article to which the design is applied. MPEP § 1503.01. In some cases, the patent will indicate that the design is intended to be applied to a component of the product. See Piano I, 222 F. at 904 (relying on fact that inventor "received a patent for a 'piano case' and not for a piano"). But the factfinder should not treat the patent's designation of the article as conclusive. The inventor of a piano-case design, for instance, should not be able to obtain profits on the piano as a whole simply by characterizing his invention as an 'ornamental design for a piano.'" (*Ibid.*, pages 27-28.)

d.    **Factor 2** – "Second, the factfinder should examine the relative prominence of the design within the product as a whole. If the design is a minor component of the product, like a latch on a refrigerator, or if the product has many other components unaffected by the design, that fact suggests that the 'article' should be the component embodying the design. Conversely, if the design is a significant attribute of the entire product, affecting the appearance of the product as a whole, that fact might suggest that the 'article' should be the product." (*Ibid.*, page 28.)

e.    **Factor 3** – "Third, and relatedly, the factfinder should consider whether the design is conceptually distinct from the product as a whole. As the Second Circuit explained in Piano II, a book binding and the literary work contained within it 'respond to different concepts; they are different articles.' 234 F. at 82. If the product contains other components that embody conceptually distinct innovations, it may be appropriate to conclude that a component is the relevant article." (*Ibid.*, pages 28-29.)

f.    **Factor 4** – "Fourth, the physical relationship between the patented design and the rest of the product may reveal that the design adheres only to a component of the product. If the design pertains to a component that a user or seller can physically separate from the product as a whole, that fact suggests that the design has been applied to the component alone rather than to the complete product. See, e.g., Piano I, 222 F. at 904; Brand, 83 Off. Gaz. Pat. Office at 748. The same is true if the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately (for instance, for replacement purposes). See, e.g., Piano II, 234 F. at 81." (*Ibid.*, page 29.)

Contains Material Designated Highly Confidential

## V. SMARTPHONES ARE MADE UP OF MANY COMPONENTS AND INNOVATIONS, SEPARATELY CONCEIVED, MANUFACTURED, AND SOLD

42.     Finished consumer products range from single-component to multicomponent, and from simple to complex.  It is typically the case that as a product increases in complexity, the number of components increases as well.



43.     Smartphones (including both Samsung's and Apple's) are complex products that are made up of thousands of components and embody at least tens of thousands of innovations.

44.     I understand that the Supreme Court has said that "a smartphone" is "a 'cell phone with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity.'"  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 - Supreme Court 2016, page 433.)

45.     The smartphones involved in this case have a wide variety of capabilities and can function as an Internet browser, music player, video player, GPS unit, camera, calculator, messenger, organizer, gaming system, and media storage, not to mention as a phone.[5]  According to one publication, smartphones are "millions of times more powerful than all of NASA's combined computing in 1969."[6]

---

[5]   See the discussion below in Section IX.

[6]   Tibi Puiu, *Your smartphone is millions of times more powerful than all of NASA's combined computing in 1969*, ZME Science, September 10, 2017, https://www.zmescience.com/research/technology/smartphone-power-compared-to-apollo-432/

Contains Material Designated Highly Confidential

46.     It was estimated in 2012 that more than 250,000 patents could be practiced by a single smartphone[7] and that 16% of all active U.S. patents related to smartphones.[8]  Another study put the number of granted smartphone-related patents at 300,000 between 2006 and 2012.[9]  And an estimate of more recent patent filings says that "[b]y the end of 2015, approximately 27% of patent[s] granted in the US were mobile related."[10]

47.     There are thousands of patents related solely to wireless communication standards such as LTE, GSM, CDMA, and so on, which enable smartphones from different manufacturers to operate on the same cellular network.[11]

48.     Samsung is a leading patentee in the United States.  Between 2006 and 2016, Samsung was consistently ranked as #2 in patents granted by the U.S. Patent Office.[12]  It obtained more new patents than every other organization except for

---

[7]   Michael Risch, *Software Patents and the Smartphone*, PrawfsBlawg (November 15, 2012), http://prawfsblawg.blogs.com/prawfsblawg/2012/11/software-patents-and-the-smartphone.html (noting the "oft repeated statistic: that there are 250,000 patents that might be infringed by any given smartphone"); David Drummond, *When Patents Attack Android* (August 3, 2011), https://googleblog.blogspot.com/2011/08/when-patentsattack-android.html.

[8]   Daniel O'Connor, *One In Six Active U.S. Patents Pertain To The Smartphone*, Project Disco (October 17, 2012), http://www.project-disco.org/intellectual-property/one-in-six-active-u-s-patents-pertain-to-the-smartphone/.

[9]   Charles V. Trappey, Amy J.C. Trappey & Yu-Hui Wang, *Are patent trade wars impeding innovation and development?*, 46 World Patent Information 64-72 (2016) ("According to Fordham CLIP patent study of the smartphone industry, the number of granted smartphone-related utility and design patents exceeded 300,000 between 2006 and 2012.")

[10]   Chetan Sharma, "Mobile Patents Landscape 2016," http://www.chetansharma.com/mobile-patents-landscape-2016/.

[11]   SAMNDCA30011460 to SAMNDCA30011646 (articles and studies related to standard essential patents).

[12]   "Patenting by Organizations 2006", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_06.htm; "Patenting by Organizations 2007", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_07.htm; "Patenting by Organizations 2008", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_08.htm; "Patenting by Organizations 2009", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_09.htm; "Patenting by Organizations 2010", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_10.htm; "Patenting by Organizations 2011", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_11.htm; "Patenting by Organizations (Utility Patents) 2012, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_12.htm; "Patenting by Organizations (Utility Patents) 2013, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_13.htm; "Patenting by Organizations (Utility Patents) 2014,

IBM.  During this period, Apple obtained far fewer patents.  According to the Patent Office, it was never among the top ten, and was usually much lower.[13]  The following graphic shows a comparison of patents granted during the time frame, with several other software and mobile companies included.[14]



49.     Samsung devotes substantial money each year to research and development and employs thousands of people, including engineers, software developers, manufacturing technicians, and designers to create its smartphones.[15]  From 2005-2010, it spent $35 billion in research and development.[16]

50.     Reflecting the complexity of the devices, and the substantial research and development efforts that went into creating them, Samsung's phones have

---

U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_14.htm; "Patenting by Organizations (Utility Patents) 2015, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_15.htm; "Top 300 Organizations Granted U.S. Patents in 2016," IPO, May 30, 2017, http://www.ipo.org/wp-content/uploads/2017/05/2016_Top-300-Patent-Owners.pdf.

[13]     According to citations in the previous footnote.

[14]     Attached as Exhibit 3.

[15]     Document No. 1610, August 3, 2012 Trial Testimony, pages 883-884; SAMNDCA30015885 (Chart showing number of Samsung personnel in various categories including Design and Development, from 2010 to 2012); conversations with Minhyouk Lee and Jeeyeun Wang.

[16]     Document No. 1610, August 3, 2012 Trial Testimony, pages 883-884; SAMNDCA30015885.

thousands of components and many thousands of innovations.[17]  The components are sourced from different manufacturers and assembled by Samsung.[18]

51.     Apple's Vice President of Procurement, Tony Blevins, testified in deposition that Apple's iPhones similarly have thousands of components, sourced from different vendors and assembled at Foxconn (also known as Hon Hai Precision).[19]

52.     Among the many thousands of innovations and patents embodied in a typical smartphone, Apple has stated that it applied for 200 additional patents on the first iPhone.[20]  In addition to the three design patents under review in this case, the Supreme Court stated that "Apple secured many design patents in connection with the release" of the iPhone.  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 - Supreme Court 2016, page 433.)

## VI.     FOUR-FACTOR ANALYSIS

53.     With the above background and context in mind, I have considered each of the District Court's four factors below.  Because I took a comprehensive approach to my analysis, I believe that many of the materials I considered are relevant to more than one factor, and I relied on them as such.  Although I may discuss particular materials with respect to only one factor or patent for the sake of avoiding repetition, I reserve the right to discuss those materials in the context of other factors and patents where helpful at deposition or at trial.  I have also individually analyzed and considered each phone with respect to each patent and my opinions are the same for each, unless I have specified otherwise.

## VII.     FACTOR 1 – APPLE'S DESIGN PATENTS HAVE LIMITED SCOPE

54.     Factor 1 is "[t]he scope of the design claimed in the plaintiff's patent, including the drawing and written description."  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, pages 19-21, 35.)

---

[17]   See discussion below, Sections IX and X.

[18]   See discussion below, Section X.

[19]   December 17, 2017 Tony Blevins Deposition Transcript, page 108 (identifying Hon Hai Precision as assembler for first generation iPhone); page 112 (identifying Hon Hai Precision as assembler of thousands of parts and components for iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S); page 118 ("Hon Hai Precision Industrial uses the trade name Foxconn.").

[20]   Joint Exhibit 1091 and Plaintiff's Exhibit 142.

Contains Material Designated Highly Confidential

55.    In my understanding, design patents protect ornamental designs, not functional capabilities, and so they are distinct from utility patents.[21]

56.    I understand that the District Court provided the following preliminary jury instruction at the 2012 trial:  "There are two basic types of patents in the United States: utility patents and design patents.  In general terms, a 'utility patent' protects the way an article is used and works.  It also protects a method or process of making or doing something.  On the other hand, a 'design patent' protects the way an article looks.  A design patent protects the ornamental design of an article of manufacture.  'Ornamental design' means the shape of the design and/or the surface decoration on the design."  (Document No. 1427, July 27, 2012, Preliminary Jury Instructions, page 19.)

57.    I understand that the District Court previously instructed that "[u]nlike utility patents, a design patent can only have one claim.  That claim covers all the figures in the patent. . . . Each design patent contains multiple drawings to illustrate the claimed design.  The scope of the claim encompasses the design's visual appearance as a whole."  (Document No. 1903, August 21, 2012, Final Jury Instructions, page 59.)

58.    I understand that design patents traditionally use broken lines to disclaim parts of designs or products that are not part of the design that the applicant seeks to patent and therefore are not part of the claimed invention or part of the scope of the design that becomes a patent issued by the U.S. Patent Office.[22]  In other words, as I understand it, the scope of the inventions for the D'677, D'087, and D'305 patents are limited to the material or matter depicted in solid lines.

59.    I understand that before the 2012 trial, the parties discussed how to understand and construe Apple's design patent claims, including for the D'677, D'087, and D'305 patents.  I understand that Apple agreed that its design patents did not claim anything shown in broken lines.  The following quote comes from a document titled Apple's Opening Design Patent Claim Construction Brief, Document No. 1089-03, June 12, 2012, page 2:

> **Broken lines in D'305, D'334, D'087, and D'677 patents.**
> For these four patents, the Court should instruct the jury that "broken lines in the patent figures form no part of the claimed design."  *See* MPEP § 1503.02 (broken lines used to indicate "[s]tructure  that  is  not  part  of  the  claimed  design . . .

---

[21]    35 USC § 171 ("Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.").

[22]    "A broken line disclosure is understood to be for illustrative purposes only and forms no part of the claimed design."  (Design Patent Application Guide, https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/design-patent-application-guide.)

Contains Material Designated Highly Confidential

[including] any portion of an article in which the design is embodied or applied to that is not considered part of the claimed design."). (*See also* Mazza Decl. Ex. 1 at 1 ("The broken line showing of a display screen in both views form no part of the claimed design."); Ex. 2 at 1 ("The broken line showing of the display screen or portion thereof in all views is not part of the claimed design."); Ex. 3 at 3 ("None of the broken lines form a part of the claimed design.").)

Although the D'677 patent does not include a specific statement regarding its broken lines, the Court has previously noted that "there is no reasonable alternative interpretation of the broken lines in this patent" aside from showing unclaimed matter, and that Samsung agrees with this interpretation. (Dkt. No. 452 at 17 (distinguishing cases where broken lines have been found to indicate something other than an unclaimed aspect); Mazza Decl. Ex. 4.) In fact, a broken line disclaimer statement was included in the application as filed. (Mazza Decl. Ex. 6 at APLNDC00030455.) It was not intentionally omitted from the patent as issued by the PTO. (*Id.* at APLNDC00030641 (statement remains after final amendment).)

60.   I understand that the District Court previously instructed the jury that the broken lines used in each of the three Apple design patents "constitute unclaimed subject matter" (Document No. 1903, August 21, 2012, Final Jury Instructions, pages 59-60):

   a.   "The broken lines in the D'677 Patent constitute unclaimed subject matter."

   b.   "The broken lines in the D'087 Patent constitute unclaimed subject matter."

   c.   "The broken line showing of a display screen in both views [of the D'305 Patent] forms no part of the claimed design."

61.   For these reasons, and as further explained below, it is my opinion that the scope of the designs claimed in Apple's patents are narrow, and limited to the specific parts of products identified in Section III of this report, not entire products.

### D'677

**The Patent Drawings**

62.   The scope of the design in the D'677 patent is limited to the content in solid lines. Below are the drawings as included in the patent:

Contains Material Designated Highly Confidential



63.     Only a specific rectangular front face, limited to the color black, is claimed in the patent.[23]

64.     I understand the Supreme Court ruled that the D'677 patent covers "a black rectangular front face with rounded corners."  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 433.)

65.     I understand that the Federal Circuit Court of Appeals similarly ruled that "[t]he D'677 patent does not claim a bezel but instead shows a black, highly polished, reflective surface over the entire front face of the phone.  The D'677 patent disclaims the sides and back of the device."  (*Apple Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314 – Court of Appeals, Federal Circuit 2012, page 1317.)

66.     I understand that the District Court similarly ruled that "[t]he D'677 patent claims a design for a 'black, rectangular front glass face with rounded corners' and does not claim the surrounding rim (bezel), the circular home button on the front, or the sides, top, bottom, or back of the device."  (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31.)  I also understand that the District Court relied on this description of the limited scope of the D'677 patent, as well as the limited scope of the D'087 and D'305 patents, as part of the evidence that supported Samsung's proposed jury instruction that an article of manufacture could be a component of a phone, rather than the entire device, which warranted a new trial.  (*Ibid.* pages 32-33 ("The testimony about the various components of

---

[23]     For example, Apple's Response to Samsung's Request for Admission No. 33, November 29, 2017, page 17, stated regarding Apple's prior design patent expert Peter Bressler: "Apple admits that Mr. Bressler testified that the 'dotted lines' exclude what is 'not being claimed in this patent' and that 'the only thing being claimed is the area in the solid lines.'"

Contains Material Designated Highly Confidential

the phones at issue, *together with the design patents themselves*, is enough to support Proposed Jury Instruction 42.1.").)

67.     Apple's design patent expert Mr. Bressler testified that the scope of the D'677 design is limited to the particular black front face of the device:

> **Q.**  Okay. Using these eight figures of the '677 patent, can you walk the jury through the design that is claimed by these pictures?
>
> **A.**  Yes. Perhaps since it was just discussed, you can see from the shading that what's being claimed in this design is the front face of an electronic device that is black in color.  If you notice the diagonal lines, or diagonal hatching that runs from one corner to the other, or all the way across the front face, those are a convention for indicating that it's reflective or transparent or translucent.  And in this particular case, I see that it's transparent because you can see at a rectangular, or what we're presuming to be a display area that is centered in that rectangular field that's defined that it goes end to end across the face as transparent.
>
> **Q.**  And what figure are we looking at here, Mr. Bressler?
>
> **A.**  I'm sorry. We are -- I tend to talk off of figure 1 because to me, all of the elements are seen in there.  But for referencing the things I'm saying, you could also look at figure 3 that shows it on a straight on view.  But you shouldn't not look at the other views because, for instance, figure 5 and 8 and 7 and 6 show the side and end views, and because there is a single, solid line there, those are indicating that all it's claiming is that front face.  Okay.  And the other convention is that the broken lines, or what you might call dotted lines, that are showing other illustrated portions are illustrating portions of what might be a design but are not being claimed in this patent.  So the only thing being claimed is the area in the solid lines.  A couple other details that I wanted to point out, which you can see both in figure 3 and figure 1.  As I mentioned, there is this rectangular, I think I mentioned, there's a rectangular display area centered in the device that has lateral borders on either side that are thin on the side and then they're wider on the top and bottom, and there is a lozenge shaped ear slot, basically, or receiver slot in the upper border area.
>
> And the dotted lines are even a little bit on the face there where they're defining an area that's not being claimed.
>
> So when you look at this face, it doesn't matter to you what is in that space because nothing is being claimed there.

Contains Material Designated Highly Confidential

**Q.** And are you referring there to the white circle inside the dotted lines?

**A.** Yes.

**Q.** Okay. What do these figures tell you about the shape of the front face of the device that's claimed?

**A.** It's indicating that the shape of the front face of this device is a very specific rectangular proportion as indicated on the drawings, as you can see perhaps in figure 3, the length and width proportion in comparison to the curves on the corners, that's to provide a very specific impression or design.

(Document No. 1611, August 6, 2012 Trial Transcript, pages 1014-1016.)

68.   The District Court also quoted portions of this testimony in requiring a new trial. (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31 ("Apple's expert Peter Bressler stating that 'all [the D'677 patent is] claiming is that front face'.")

69.   Richard Howarth, an Apple designer who I understand was Apple's designated representative on this topic, similarly testified in his deposition that "[w]hat I believe is depicted here is the thing that we design -- is the front cover of an electronic device.  So it's a -- or the front part of an electronic device." (December 19, 2017 Richard Howarth Deposition Transcript, pages 73-74.)  "Q. And as you understand it, the D'677 is not claiming any of the interior components of an electronic -- electronic device, correct?  A. Claiming. It's not showing – it's not trying to protect those, I think.  It's protecting the design of the front glass of the product -- or the front -- front of the product." (*Ibid.* page 99.) "[D]o any of the three design patents that we've been discussing --the D'677, the D'087, Figures 9 through 16, or the D'305 -- protect or claim any of the numerous functionalities that the first iPhone was capable of?  A. I don't think so." (*Ibid.* page 105.)

70.   At an earlier stage in this case, Apple itself stated that the design was intended for the ornamental appearance of the front face of the iPhone, not the entire product. (Document 86, July 1, 2011 Apple's Motion for a Preliminary Injunction, page 7 ("The D'677 patent … is directed to the ornamental appearance of the Apple iPhone's distinctive *front face*").)

**Prosecution History**

71.   During the prosecution of the D'677 patent, Apple stated to the US Patent Office that it was only seeking to claim as its invented design the front face of a device,

Contains Material Designated Highly Confidential

and not the entire device.[24]  Apple originally included four sets of drawings encompassing four different designs.  The Patent Office described them as embodiments covering "a front surface of an electronic device," a "partial front surface and partial upper edge of an electronic device," "an electronic device," and "a front surface and upper edge of an electronic device."[25]  Apple was restricted to choosing one embodiment as the different groups were considered to be patentably distinct, and Apple chose the one for "a front surface of an electronic device."[26]  Apple specified that the features shown in broken lines "form no part of the claimed design," thereby limiting the entire scope of the patent to the claimed portions of the front face.[27]  This further supports my opinion that the design claimed in the patent, including as it would be seen by a designer of skill in the art, is a design for the front face of a product, and not the entire product.

72.  As I mentioned before, during design patent claim construction proceedings in this case, Apple admitted that it was an inadvertent mistake that the D'677 patent did not state expressly in words that the broken lines constituted unclaimed subject matter because Apple had made that clear during prosecution of the patent.

73.  It is my opinion that the scope of the D'677 patent is limited to the material shown in solid lines pertaining to the black front face of a product, and excluding the home button.

**Basis For Findings Of Infringement**

74.  I understand that a prior jury found that certain of the Samsung products identified above infringe the D'677 patent.  I also understand that those findings were based on similarities between the material claimed in solid lines in Apple's design patent and the corresponding features of Samsung's phones, regardless of the appearance of any other features of Samsung's phones.

75.  I understand that the parties exchanged answers to written requests during this case.  In one of those requests, Samsung asked Apple to explain its claim that certain Samsung smartphones infringed Apple's D'677 patent.  In response, Apple gave an overview of its design patent infringement claims, stating that "the asserted Apple designs are substantially the same in overall visual appearance as *the corresponding portion* of each accused Samsung product."  (Apple's Response to Samsung's Interrogatory No. 72, March 10, 2012, page 96.)  Specifically for D'677, Apple wrote that it believed there was infringement

---

[24]  Joint Exhibit 1064, pages 178-202.

[25]  *Ibid.*, page 178.

[26]  *Ibid.*, pages 193-202.

[27]  *Ibid.*, page 200.

Contains Material Designated Highly Confidential

because "[e]ach accused Samsung product incorporates *a front face* that is substantially the same in overall visual appearance as the design claimed in the D'677 Patent." (*Ibid.*, at page 111.)  In its side-by-side visual comparisons, Apple also excluded images of the D'677 patent that lacked any solid lines, saying that "drawings that consist entirely of dotted lines are omitted," further indicating that they were irrelevant.  (*Ibid.*, page 111.)

76.     The trial testimony of Apple's design patent expert, Mr. Bressler, acknowledged the same limitations on the D'677 patent.  Mr. Bressler testified:

> **Q.** Could you walk us through the basis for your opinion that the Galaxy S 4G phone infringed the D'677 patent under the test that you explained to us before the break?
>
> **A.** Yes. The Galaxy S 4G has a flat, uninterrupted surface that is rectangular in proportions described in the '677 patent; it runs edge to edge across the front of the phone and is transparent and is black; and it has a display that is centered on the face of the phone and a lozenge shaped speaker slot, and I find those features to be substantially the same.
>
> **Q.** Now, I see that the Galaxy S 4G has a little bump sticking out of the bottom of the back of the phone. Do you see that?
>
> **A.** I do.
>
> **Q.** Did you consider that in your analysis as to whether it had the same design as the '677 design?
>
> **A.** It was not part of the claimed design.
>
> **Q.** So you didn't consider it?
>
> **A.** I looked at it but did not consider it as part of my analysis.
>
> **Q.** And can you remind us why it is not part of the claimed design, and, therefore, not part of your analysis?
>
> **A.** Because it is the back of the phone and this patent is specifically for the face of the phone.

(Document No. 1611, August 6, 2012 Trial Transcript, pages 1050-1051.)

77.     Accordingly, where the prior jury found that Samsung's phones infringed the D'677 patent, it did so based on similarities between the front face of those phones and the material in the D'677 patent that is shown in solid lines.  This further supports my opinion that the scope of the D'677 is limited, and that the

Contains Material Designated Highly Confidential

front face of the infringing Samsung phones is the article of manufacture to which the D'677 design was applied.

**Non-Infringing Alternative Designs**

78.     I have considered alternative designs that do not infringe the D'677 patents, and they confirm that the scope of the design claimed in the D'677 patent is limited to the front face of a phone.

79.     First, I understand that Apple accused the Samsung Galaxy Ace (Joint Exhibit 1030) of infringing the D'677 patent, and the jury in 2012 decided that the Galaxy Ace did not infringe the patent.  (Document No. 1931, July 24, 2012, Amended Jury Verdict, page 5.)[28]



80.     I understand that after trial, Apple filed a motion asking the District Court to rule that the Galaxy Ace was an infringing product, despite the jury's verdict.[29]  The District Court upheld the jury's non-infringement verdict based on differences between the front face of the Galaxy Ace and the D'677 patent:  "the Galaxy Ace phone has a rectangular center button, prominent ornamentation, and wide lateral borders."  (Document No. 2219, January 29, 2013, Order Granting In Part And Denying In Part Motion For Judgment As A Matter Of Law, page 10.)

81.     This highlights how narrow and limited the D'677 design is.  The patent does not cover anything other than the design for the front face of a product, does not cover

---

[28]   Additional images are from http://www.samsung.com/galaxyace/ace_gallery.html#; SAMNDCA30015613.  (In various instances in my report, I refer to just the identification number in the file name of a document (or the "beginning Bates number" as I understand it is called), but in each instance I am intending to refer to the entire document with that file name.)

[29]   Document No. 1989, Apple Inc.'s Motion For Judgment As A Matter Of Law (Renewed), New Trial, And Amended Judgment, September 21, 2012, pages 13-14.

the home button area, and does not cover the rounded rectangular form generally, but rather only the specific rounded rectangular form shown in the patent.

82. Second, I understand that Apple has admitted that by changing the color of the mask on the front face of an infringing Samsung device from black to white, the device becomes non-infringing for D'677, further demonstrating the limited scope of the patented design. I understand that Apple previously filed a declaration in this case from its design patent expert, Mr. Bressler, who gave the opinion that a white-faced version of Samsung's Galaxy S II i9100 phone was an alternative, non-infringing design for D'677. (Document No. 279, September 30, 2011, Reply Declaration of Peter W. Bressler in Support of Apple's Motion for a Preliminary Injunction, paragraph 87.) Mr. Bressler said that "a front surface that is not flat (e.g., Exs. 50-52; 67), clear (e.g., Exs. 50-55), or **black** (e.g., Exs. 50; 53; 56-57)" is an alternative design. (*Ibid.*) He attached the following image to his declaration (Document No. 281-10, Bressler Exhibit 56):



83. I understand that Mr. Bressler opined elsewhere that Samsung had already created non-infringing alternative designs for certain Galaxy S II phones accused of infringing the D'677 patent by offering them with white faces instead of black. (Document No. 1140-31, Declaration Of Peter W. Bressler, FIDSA, In Support Of Apple's Response To Samsung's Opening Memorandum Regarding Design Patent Claim Construction, June 26, 2012, page 30.) Mr. Bressler stated that "Samsung's Galaxy S II line of phones comes in white versions," and he included an image of a Galaxy S II Epic 4G Touch with a white face as an example of the non-infringing alternative. (*Ibid.*, page 31.)

84. Earlier in this case, I provided written declarations where I described several white-faced and grey-faced non-infringing alternative designs for several Galaxy SII phones, including the T-Mobile, Skyrocket, and Epic 4G Touch versions. I understand these declarations were most recently filed as Document Numbers 3307-2 and 3307-3. A copy of the declarations is attached to my report as Exhibit 4. I incorporate those opinions here by reference.

Contains Material Designated Highly Confidential

85.     I understand that there are also a variety of Samsung phones at issue in this case that Apple did not claim infringed the D'677 patent.  I believe this provides additional information confirming the limits on the scope of the patent.  For example, the following products were not accused of infringement despite having flat, black, glass front faces that are generally rectangular and almost all having rounded corners.  (Top row: Transform, Nexus S 4G, Galaxy Prevail, Captivate. Bottom row: Epic 4G, Continuum.  Images taken from Plaintiff's Exhibit 7):



**Responses to the Ball Report**

86.     In addressing the first factor in his report, Mr. Ball mostly discusses elements that are *not* part of the claimed design.  Mr. Ball appears to justify doing this in paragraph 146 of his report, where he says that "[w]hile the solid lines and broken lines indicate claimed and unclaimed subject matter, respectively, the article of manufacture to which the claimed design is applied is not limited to the solid lines.  The District Court has said that 'the relevant article of manufacture may extend beyond the scope of the claimed design.'"  (Ball Report, paragraph 146, which is quoting Document No. 3530, October 22, 2017, Order Requiring New Trial, page 17.)

87.     As stated by the District Court, however, the first factor considers "[t]he scope of the design *claimed* in the plaintiff's patent."  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, pages 13, 19, and 35.)  Mr. Ball quotes part of a paragraph in the District Court's order related to the four-factor test in general, but omits the remainder of the District Court's paragraph, which stated this, relevant to the first factor:  "At the same time, the Court agrees with Samsung that '[t]he statute cannot be administered without first ascertaining the scope of the design claimed by the patent.'  Samsung Response at 3.  As a result, the scope of the design patent must be a central consideration for the factfinder when determining the relevant article of manufacture for the purpose of § 289."  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, page 17.)

Contains Material Designated Highly Confidential

88.     Because the first factor involves the scope of the design claimed by the patents, I believe that Mr. Ball has not appropriately considered this step in forming his opinions, and has instead focused on considerations that do not relate to the scope of the design claimed in the D'677 patent.  Mr. Ball admits the patent is limited to the area in solid lines:  "The electronic device seen in the eight patent figures is drawn in solid and broken lines.  The solid lines indicate the claimed areas and the broken lines indicate unclaimed areas."  (Ball Report, paragraph 162.)  I do not agree with his conclusion that this first factor suggests that the relevant article of manufacture is Samsung's entire phone even though the scope of the patent is limited to the black front face of a phone.

89.     I disagree with Mr. Ball's opinion that a designer of skill in the art viewing the D'677 patent would conclude that "the claimed design is for an electronic device such as a phone, not just part of an electronic device."  (Ball Report, paragraph 163.)  The claimed area, as discussed above and as Mr. Ball admits, is only the black front glass face.  (*Ibid.*, paragraph 142.)  A designer of skill in the art would conclude what the patent clearly shows, which is that Apple is claiming only a portion or component of a product as its invention in the patent and that the rest of the product's enclosure, while shown for context, is unclaimed and not a part of the claimed design.

90.     For similar reasons, I disagree with Mr. Ball's opinion that "The only credible reason these views [of the back of the product], which do not show the claimed design, were included is that they indicate the entire 'electronic device' to which the design is applied.  It is my opinion that these views have been included by the inventor/designer, even though they do not show the claimed areas, because they completely show the entire 'electronic device' which is the 'article of manufacture' of the design patent."  (Ball Report, paragraphs 151, 162.)  Again, while the larger product enclosure may be shown for context, it is common to show views from all angles in a design patent so that there is no doubt about the bounds of the *claimed* portion of the design.  Without a view of the back of the product in D'677 (or D'087), there could be reasonable doubt about the scope of the claim and whether it extends through to the back of the product.  Far from expanding the scope of the design or the article it is applied to, the completely unclaimed back drawings confirm how *limited* the scope of the patent is.

91.     I disagree with Mr. Ball's reliance on the title of the D'677 patent – "Electronic Device."  I understand that the design patent chapter of the Manual of Patent Examining Procedure (the MPEP) has not been updated since the U.S. Supreme Court issued its opinion in this case defining the phrase "article of manufacture."[30]  As I understand it, the test for identifying an article of

---

[30]   The version of the MPEP currently on the US Patent Office's website (https://www.uspto.gov/web/offices/pac/mpep/index.html) states that it is the "Ninth Edition, Revision 07.2015, Last Revised November 2015".

Contains Material Designated Highly Confidential

manufacture is the one stated by the District Court in this case, following the Supreme Court's decision, and not what older language in the MPEP says.

92.     In addition, the MPEP indicates that design patentees have "substantial latitude" in picking the titles of their patents.[31]  Apple alone chose the term "Electronic Device" for the D'677 patent.  As the Solicitor General explained for this factor, "the factfinder should not treat the patent's designation of the article as conclusive.  The inventor of a piano-case design, for instance, should not be able to obtain profits on the piano as a whole simply by characterizing his invention as an 'ornamental design for a piano.'" (U.S. Brief, page 28.)

93.     As I understand it, the Supreme Court ruled that the D'677 patent covers "a black rectangular front face with rounded corners," not an entire electronic device. (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 433.)

94.     I understand that Apple has other design patents relating to the iPhone, some of which claim the entire external design of an enclosure and some of which claim only small components of an enclosure, and yet Apple refers to each of them as "Electronic Device" in the patent titles.[32]  Examples are below:



D580,387[33]                                 D586,800[34]

---

[31]    MPEP Chapter 1503.01

[32]    Exhibit 5 to this report contains a summary of various such Apple design patents. SAMNDCA00373540 to SAMNDCA00373793; SAMNDCA30011656 to SAMNDCA30011783.

[33]    SAMNDCA00373548

[34]    SAMNDCA00373556

27

Contains Material Designated Highly Confidential



**D627,778**[35]    **D763,253**[36]

**D747,310**[37]    **D790,535**[38]

**D789,926**[39]    **D773,453**[40]

95.    In my opinion, designs for a smartphone enclosure, a glass face, a bezel, a charging port, a home button, a camera aperture, and a SIM card slot, which are what these Apple design patents claim, are not all applied to the same physical thing or "article of manufacture."  Each of Apple's patents claiming designs for those components relates and is applied to a different physical thing or things—

---

[35]    SAMNDCA00373704

[36]    SAMNDCA30011736

[37]    SAMNDCA30011721

[38]    SAMNDCA30011767

[39]    SAMNDCA30011759

[40]    SAMNDCA30011749

Contains Material Designated Highly Confidential

even though each says it is a design for an "Electronic Device."  In other words, in view of how Apple has pursued partial patent claims, I believe one has to look beyond the repetitive title and formulaic written claim recitation to the patent drawings in order to understand what is actually within the scope of the patent.  I understand that some patentees use this practice of "partial claiming" in order to increase the chances that at least one of their patents will be found infringed by a competitor.  The more narrow the subject matter being claimed, the fewer similarities are needed between the patentee and competitor's products to get an infringement finding.

96.     In explaining the four-factor test for identifying an article of manufacture, the Solicitor General explained that "In cases where the identity of the relevant 'article of manufacture' is otherwise open to reasonable dispute, the factfinder may legitimately consider which characterization would appropriately compensate (rather than over-compensate) the patentee for the contribution of the patented design to the value of the infringer's finished product. … When a product is composed of distinct components, choosing the article that most fairly embodies the plaintiff's invention will help to ensure that neither party will have what justly belongs to the other."  (U.S. Brief, page 27.)  In my opinion, the articles of manufacture that I have identified most fairly embody Apple's patented inventions.  The entire phones identified by Mr. Ball, Dr. Kare, and Ms. Davis, on the other hand, do not reflect the limited scope of those inventions.

97.     I have therefore considered the title of the D'677 patent, but it does not change my opinion that "[t]he scope of the *design* claimed in the patent" is limited to a *component* of an electronic device, namely the black glass front face.

98.     For the same reasons given above, it is my opinion that use of the phrase "article of manufacture" in the written description for the D'677 patent likewise does not alter "[t]he scope of the design claimed in the [D'677] patent."  A patentee's election of such wording reveals nothing about the scope of the *design* being claimed, and at the stage of obtaining a patent, the patentee has no incentive to select a more narrow, and more accurate, phrasing.  Moreover, I understand that Apple chose the language and obtained the patent prior to the Supreme Court's decision in this case ruling that an article may be a component of the finished end product sold to consumers.  If the patent title or description were conclusive, I do not see why the Supreme Court would have allowed the case to continue for this patent or the others.

99.     I also disagree that Mr. Ball has appropriately considered prior art references as part of factor one.  Mr. Ball writes that because the prior art presented by Samsung previously related to electronic devices, that "[t]his indicates to me that Samsung's own experts recognized that the claimed design applies to an electronic device such as a phone, not just one part of an electronic device or phone, and that the entire electronic device or phone is the article of manufacture."  (Ball Report, paragraph 173.)  Samsung's expert noted that he was considering only the portions and components of the prior art that corresponded

Contains Material Designated Highly Confidential

with the *claimed* portions of Apple's patents in rendering his opinions about invalidity — indeed, he showed only the front view of the patents and repeatedly compared it to the "front face[s]" of all the prior art references.[41]  I also find Mr. Ball's reference to Mr. Anders' report unconvincing.  Mr. Anders simply said a person of skill in the art would have several years experience designing electronic devices.[42]  Such a designer would necessarily have experience designing the *components* of such devices.  This says nothing about what the claim scope of a particular patent is.  I do not believe any inference can be made that Samsung's experts previously conceded in any way to Apple's view of the articles of manufacture here.

**D'087**

### The Patent Drawings

100.   As with the D'677 patent, the scope of the design claimed in the D'087 patent is limited to the content in solid lines.  That claimed content covers only a rectangular front face and a surrounding bezel.  In different embodiments, different combinations of elements on the front face are claimed, but in no embodiment is anything other than the front face and/or bezel claimed.  I understand that Apple asserted, and the prior jury found, infringement of only one embodiment claimed in the D'677 patent, which is shown in the following drawings (figures 9 through 16):[43]



---

   41   Sherman Report, March 23, 2012, pages 31-48.

   42   Anders Report, April 16, 2012, page 15.

   43   Mr. Bressler used "figures 9 through 16 of the D'087 patent" to give his infringement opinions.  (Document No. 1611, August 6, 2012 Trial Transcript, page 1057.)

Contains Material Designated Highly Confidential

101.    I understand that the Supreme Court has said that the D'087 patent covers "a rectangular front face with rounded corners and a raised rim."  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 433.)

102.    I understand that the Federal Circuit Court of Appeals likewise said that "[t]he D'087 patent claims a bezel surrounding the perimeter of the phone's front face and extending from the front of the phone partway down the phone's side.  The parts of the side beyond the bezel, as well as the phone's back, are disclaimed, as indicated by the use of broken lines in the patent figures."  (*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314 – Court of Appeals, Federal Circuit 2012, page 1317.)

103.    I understand that the District Court similarly ruled recently that "[t]he D'087 patent claims a rectangular front face with rounded corners, with a bezel, but without black shading, and does not claim the sides, back, top, and bottom of the device or the home button."  (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31.)

104.    Apple's design expert Mr. Bressler confirmed that the scope of the design claimed in the D'087 patent is limited to the front face and bezel:

> **Q.**  Okay. Could we look at the second embodiment?
>
> And, Thomas, if you could put up on the screen side by side the pages that show the eight figures for the second embodiment, which is figures 9 through 16.
>
> And you'll find those in your binder as well, Mr. Bressler?
>
> **A.**  Yes, I have them.
>
> **Q.**  So could we see the actual figures.  Great.
>
> Using the drawings that are incorporated into the claims of the '087 patent, could you walk the jury through the design that is claimed by these figures?
>
> **A.**  Yes.
>
> This design is claiming the front face, the flat front face and the bezel of an electronic device.  As you can see by the broken lines, again, it's not claiming the body.  It's claiming the bezel and the front face.
>
> That front face is a rectangular design with rounded corners in the proportions and the scale, length to width and proportional ratios that are being shown here in the drawing.

Contains Material Designated Highly Confidential

And it includes a rectangular display, as did the other patent, with narrow borders on either side and wider borders top and bottom.

And it shows that rectangular front face area as not having any specification. It doesn't have diagonal cross action, it doesn't have sheeting. So that flat front surface could be any color. It could be transparent. It could be anything. Nothing is being specified.

The other part of it to notice is in the side views that, again, this is specifying a front face and bezel that are absolutely flat.

(Document No. 1611, August 6, 2012 Trial Transcript, pages 1018-19.)

105.   I understand the District Court quoted a portion of this testimony in describing the limited scope of this patent.  (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31 ("Bressler stating that the D'087 patent is 'not claiming the body.  It's claiming the bezel and the front face.'"))

106.   In its response to a written request from Samsung, Apple stated the following:  "Apple admits that Mr. Bressler testified that '[a]s you can see by the broken lines, again, it's not claiming the body.  It's claiming the bezel and the front face.'"[44]

107.   Richard Howarth, an Apple designer who I understand to be Apple's designated representative on this topic, agreed that the scope of the D'087 patent claimed "the front -- the front and bezel of this electronic device."  (Dec. 19, 2017 Richard Howarth Deposition Transcript, page 88.)  "Q. So you can't tell me 'yes,' 'no,' or 'I don't know' as to whether or not the Figures 9 through 16 of the D'087 patent protect anything other than the front cover and the bezel?  A. I believe that they -- that they protect the front cover and the bezel of -- of the product -- of the -- of the product, yes.  Q. Do they claim or protect any other part of the product?  A. It doesn't look like there's anything specified in these -- in these patents -- in this patent."  (*Ibid*., page 91.)  "Q.  Do you see any interior components shown in the drawings Figures 9 through 16?  A No, I don't."  (*Ibid.*, page 100.)

108.   As with the D'677 patent, at an earlier stage in this case, Apple stated that the D'087 design was for the ornamental appearance of the front face of the iPhone, not the entire design.  (Document 86, July 1, 2011 Apple's Motion for a Preliminary Injunction, page 11 ("The D'087 patent … is also directed to the distinctive facial appearance of Apple's instantly-recognized iPhone.").)

---

[44]   Apple's Response to Samsung's Request for Admission No. 34, November 29, 2017, page 17.

Contains Material Designated Highly Confidential

**Prosecution History**

109.    During the prosecution of the D'087 patent, Apple made clear to the US Patent Office that it was only seeking to claim as its invented design the front face and surrounding bezel portion of a device, and not an entire electronic device enclosure.  Early in the application process, Apple submitted 96 figures showing a variety of embodiments, some showing a whole enclosure in solid lines and others showing only portions, such as the front face and bezel.[45]  The Patent Office issued a non-final rejection, stating that some of Apple's drawings covered an "electronic device" while others covered "a first front panel with bevelled edge for an electronic device."[46]  The Patent Office required Apple to make an election of which claim it would pursue, but could not include "a change in scope, from a complete electronic device to a beveled front panel" in the same patent because it "creates a patentably distinct design."[47]  The Patent Office also stated that "reducing certain design features to broken lines creates patentably distinct designs."[48]  Apple elected to pursue only those drawings claiming a front face and bezel.[49]  This further supports my opinion that the design in the patent, including as it would be seen by a designer of skill in the art, is for the design of the front face and bezel, and not the entire product.

110.    Apple specified that the broken lines disclaimed all aspects of the device other than the front face and bezel.  This is reflected in the written description of the D'087 patent, which states that "[n]one of the broken lines form a part of the claimed design."[50]

111.    Based on all of this, it is my opinion that the scope of the D'087 patent is limited to the material shown in solid lines pertaining to the front face and bezel of a product.

**Basis For Findings Of Infringement**

112.    I understand that a prior jury found that certain of the Samsung products identified above infringe the D'087 patent.  I also understand that those findings were based on similarities between the material claimed in solid lines in Apple's design patent and the corresponding features of Samsung's smartphones, regardless of the appearance of any other features of Samsung's smartphones.

---

[45]    Joint Exhibit 1062, pages 86-109.

[46]    *Ibid.*, page 128.

[47]    *Ibid.*, page 129.

[48]    *Ibid.*

[49]    *Ibid.* pages 153-165.

[50]    Joint Exhibit 1041

Contains Material Designated Highly Confidential

113.  In response to the same written request for information from Samsung mentioned before, Apple stated that certain of Samsung's smartphones infringed the D'087 patent because "[e]ach accused Samsung product incorporates *a front face and bezel* that is substantially the same in overall visual appearance as the design claimed in the D'087 Patent."  (Apple's Response to Samsung's Interrogatory No. 72, March 10, 2012, page 99.)  In its side-by-side visual comparisons, Apple similarly excluded images of the D'087 patent that lacked any solid lines, saying that "drawings that consist entirely of dotted lines are omitted," further indicating that they were irrelevant to Apple's infringement position.  (*Ibid.*)  As seen, images from the back perspective were omitted:



114.  The trial testimony of Apple's design patent expert, Mr. Bressler, acknowledged the same limitations on the D'087 patent.  Mr. Bressler testified:

> **Q.** Now, you said earlier that you concluded that the Galaxy S 4G also infringed the D'087 patent; right?
>
> **A.** That's correct.
>
> **Q.** Could you -- you can hold the phone up for the jury if you like. Could you describe for the jury the basis for your conclusion that the design as claimed by these eight figures of the D'087 patent is infringed by the Galaxy S 4G telephone?
>
> **A.** I believe that, looking at the continuous flat face that is in the length to width proportions described in this patent and the curved corners and the centered display and the bezel, I believe all of those elements are present in the design of the S 4G in my hand, and, therefore, that this device infringes that patent.

(Document No. 1611, August 6, 2012 Trial Transcript, pages 1057-1058.)

115.  Accordingly, I understand that the prior jury found that the Samsung phones identified earlier infringed the D'087 patent based on similarities between the

Contains Material Designated Highly Confidential

front face and bezel of those phones and the material in the D'087 patent that is shown in solid lines.

**Non-Infringing Alternative Designs**

116.   I have considered alternative designs that do not infringe the D'087 patent, and they confirm my opinion that the scope of the design claimed in the D'087 patent is limited to the front face and surrounding bezel of a phone and does not extend to any other components.

117.   First, I understand that, in addition to the Vibrant and Galaxy S 4G, Apple accused the following phones of infringing the D'087 patent:

 

**Galaxy SII (AT&T)**          **Galaxy SII (Epic 4G Touch)**

 

**Galaxy SII (Skyrocket)**            **Infuse 4G**

118.   I understand that the jury in 2012 decided that these four phones did *not* infringe the D'087 patent.

Contains Material Designated Highly Confidential

119.  I understand that after trial, Apple filed a motion asking the District Court to rule that these four phones did infringe the D'087, despite the jury's verdict.[51]  The District Court upheld the jury's non-infringement verdict based on differences in the *front face and bezel* (or lack thereof) of the phones listed above and the claimed portion of the D'087 patent:  "The Galaxy S II phones and the Infuse phone have either bezels distinct from the D'087 Patent's bezel, or no bezel, as well as front-face icons, writing, and logos, and different corner shapes." (Document No. 2219, January 29, 2013, Order Granting In Part And Denying In Part Motion For Judgment As A Matter Of Law, page 10.)

120.  Second, I understand that Apple's design patent expert, Mr. Bressler, acknowledged that by doing nothing more than removing the bezel from an infringing Samsung device, the device becomes non-infringing for D'087.[52]

121.  Third, I understand that Apple has not claimed that the iPhone 4 embodies the D'087 patent for the reason that the iPhone 4 does not have the bezel depicted in that patent.  (Document No. 1611, August 6, 2012 Trial Transcript, pages 1023-1024 (Mr. Bressler stating that "the iPhone 4 does not embody the design of the '087 patent" because "it does not have a bezel that directly surrounds the front face."  It instead "has a band that goes around the edge … so you don't really see a clear bezel").)

122.  All of this highlights how narrow and limited the D'087 design is.  The patent does not cover anything other than the ornamental design for the front face and bezel of a product, does not cover the home button area (in the relevant embodiment), and does not cover the rounded rectangular form generally, but rather only the specific rounded rectangular form shown in the patent.

**Responses to Ball Report**

123.  Many of the critiques I raised above for the D'677 patent apply equally here as well.  I will not repeat all of them, but note the following.

124.  For the reasons stated above, I disagree with Mr. Ball that the broad title of the patent determines or broadens the scope of the *design* actually claimed in the patent.  As shown in the drawings, by use of broken lines, as confirmed in the written description and on the other bases already explained, the claim is limited to the front face and bezel portions of a product.

125.  Mr. Ball offers reasons for why the article should be broader than that claim, but Mr. Ball admits the claim is limited to the matter in solid lines:  "The electronic

---

[51]  Document No. 1989, Apple Inc.'s Motion For Judgment As A Matter Of Law (Renewed), New Trial, And Amended Judgment, September 21, 2012, pages 13-14.

[52]  Document No. 1611, August 6, 2012, Trial Transcript at 1121:7-10 (Bressler testifying:  "Q.  [T]he absence of a bezel takes you out of substantial similarity, doesn't it?  A.  In the '087 patent it does.").

Contains Material Designated Highly Confidential

device seen in the 48 patent figures is drawn in solid and broken lines.  The solid lines indicate the claimed areas and the broken lines indicate unclaimed areas." (Ball Report, paragraph 151.)  And so, I disagree with Mr. Ball's statement for this factor that "[w]hile the solid lines and broken lines indicate claimed and unclaimed subject matter, respectively, the article of manufacture to which the claimed design is applied is not limited to the solid lines." (*Ibid.* at page 146.) Again, the purpose of the first factor is to determine the scope of the claimed design.  Mr. Ball's description of the actual drawings in the D'087 patent acknowledges that the claim is limited to a front face and bezel only.

126.   I disagree with Mr. Ball's reliance on the District Court's prior claim construction instruction for the D'087 patent, which previously included the phrase "article of manufacture."  (Ball Report, paragraph 144.)  As mentioned above, I understand that the District Court has already determined that the prior jury was improperly instructed with regard to what an "article of manufacture" is, and that the new jury is expected to be given the task of identifying the articles of manufacture using the new test adopted by the Court, rather than having the Court instruct that the entire product is the relevant article of manufacture.

**D'305**

**The Patent Drawings**

127.   The scope of the design in the D'305 patent is limited to the content inside the broken line boundary.  Below is one of the replacement drawings as shown in the patent:



**FIG. 1**

128.   Only an image showing a single array of icons is claimed.  A second image showing the same design in black and white is also included in the patent, but was not used by Apple at the 2012 trial.  (Document No. 1612, August 7, 2012 Trial Transcript, pages 1366-1367, 1373; Plaintiff's Demonstrative Exhibit 14A.6 to 14A.23.)

129.   I understand that the Supreme Court has said that the D'305 patent covers "a grid of 16 colorful icons on a black screen."  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 433.)

Contains Material Designated Highly Confidential

130. I understand that the District Court ruled recently that "[t]he D'305 patent claims a design for a grid of sixteen colorful icons on a screen on a mobile device as part of a graphical user interface, and does not claim any other aspect of the device." (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31.)

131. The title of the D'305 patent, unlike for D'677 and D'087, more appropriately reflects that the image is applied to only a portion of a product – "A Graphical User Interface for a Display Screen or Portion Thereof."

132. Apple's GUI design expert Dr. Susan Kare confirmed that the scope of the design is limited to the array of icons, because it is limited to "the rectangular area that's within the dotted line that goes around the outside." (Document No. 1612, August 7, 2012 Trial Transcript, page 1367.) I understand that the District Court also relied on this quote from Dr. Kare in determining that a new trial should be held. (Document No. 3530, October 22, 2017, Order Requiring New Trial, page 31 ("Apple expert Susan Kare stating that the D'305 patent is limited to 'the rectangular area' represented by the phone's screen").)

133. Richard Howarth, who I understand to be Apple's designated representative on this topic, testified about D'305 as follows: "Q  It's -- it's only one part of the appearance of the user interface of an iPhone, right?  A That – that's right, yeah. There's lots of -- it goes much deeper than this." (Dec. 19, 2017 Richard Howarth Deposition Transcript, page 92.)

**Basis For Findings Of Infringement**

134. I understand that a prior jury found that the Samsung products identified earlier infringe the D'305 patent. I also understand that those findings were based on similarities between the material claimed within the broken line boundary in Apple's design patent and corresponding features of Samsung's phones, regardless of the appearance of any other features of Samsung's phones.

135. With regard to the same written requests discussed earlier, Apple wrote that it believed there was infringement of the D'305 patent because "[e]ach accused Samsung product incorporates *an array of icons* that is substantially the same in overall visual appearance as the design claimed in the D'305 Patent." (*Ibid.*, page 144.)

136. The trial testimony of Dr. Kare acknowledged the same limitations on the D'305 patent. Dr. Kare limited her infringement analysis to the application menus of the Samsung phones, excluding all other aspects and components of the devices and their graphical user interfaces. (Document No. 1612, August 7, 2012 Trial Transcript, pages 1421-1424 (Dr. Kare considered only the "Samsung application screen" and disregarded the "start-up screen," "unlock screen," and "home screen of the Samsung phone[s]").)

137. I also understand that Apple "asked that body style not be included" in trial exhibits for the D'305 patent, and that the District Court granted that request by

Contains Material Designated Highly Confidential

excluding exhibits depicting the "overall phone" when D'305 patent infringement comparisons were being made, allowing only "screen-to-screen shots." (Document No. 1612, August 7, 2012 Trial Transcript, pages 1372-1373.)

138.   I also understand that Apple's attorney stated to the jury during the 2012 trial that only the Samsung application menus were accused of infringing D'305: "A little practical piece of advice.  You will have these phones, the Samsung phones in the jury room, and when you want to look at this issue, the way to navigate on a Samsung phone is you turn it on, and that will bring up the home screen.  And then when you get to the home screen, if you touch the blue button with the four white dots down in the corner, that will bring up the app screen and it's the app screen that we are accusing and you can compare that to the patent.  We are not accusing the home screen.  It's the app screen that we have accused."  (Document No. 1997, August 21, 2012 Trial Transcript, pages 4097-4098 (Apple attorney addressing the jury in his closing statements).)

139.   Accordingly, I understand that the prior jury found that the Samsung phones identified earlier infringed the D'305 patent based on similarities between the application menus of those phones and the claimed material in the D'305 patent within the broken line boundary.

**Prosecution History**

140.   I understand that Apple originally sought to patent 194 different screen images.[53] The Patent Office indicated that the images made up 128 patentably distinct groups of subject matter and required an election from Apple.[54]  Apple selected a single image depicting a single array of icons.[55]  I understand, therefore, that Apple relinquished any right to cover or protect those additional screen images through the D'305 patent, which further supports the conclusion that the D'305 patent is limited in scope to a single screen image in a graphic user interface, and not the whole interface or other screens of the interface.  Further, the patent examiner required an amendment to the patent description to make clear that the area outside the broken lines "forms no part of the claimed design."[56]  That amended language remains in the patent.[57]

141.   Based on all of this, it is my opinion that the scope of the D'305 patent is limited to the material shown within the broken line boundary, which is one image from a graphical user interface.

---

[53]   Joint Exhibit 1063, pages 3-77; Joint Exhibit 1042.

[54]   *Ibid.*, pages 117-124.

[55]   *Ibid.*, pages 125-128.

[56]   *Ibid.* page 212.

[57]   Joint Exhibit 1042.

Contains Material Designated Highly Confidential

**Non-Infringing Alternative Designs**

142.    I have considered alternative designs for the D'305 patent that are non-infringing, and they confirm that the scope of the design claimed in the D'305 patent is limited to a single array of icons with rounded square shapes on only one screen page.

143.    In connection with the proceedings in this case, I provided declarations explaining that Samsung phones implementing Firmware Version 2.3.6 or higher produce an applications menu on the phone where the rounded square backgrounds on the icons are removed, such that the icons do not have uniform background shapes.[58] I incorporate those opinions here by reference.  Below is an image of the Infuse 4G before and after the design around (from my prior declaration):

 

**LEFT: Accused Version of Samsung Infuse 4G (Plaintiff's Exhibit 7.45)**
**RIGHT: Design Around Version of Samsung Infuse 4G (Firmware Version 2.3.6)**

144.    I understand that a Droid Charge that incorporated the design around, and which I inspected, was submitted as an exhibit to the District Court.[59]

---

[58]   Exhibit 4.

[59]   (Document No. 3354-4, January 20, 2016, Declaration of Carl Anderson In Support Of Samsung's Opposition To Apple's Motion For Supplemental Damages And Prejudgment Interest, pages 10-11; Document No. 3354-10, January 20, 2016, Exhibit 6 to the Declaration of Carl Anderson: Physical Exhibit.)

Contains Material Designated Highly Confidential

 

**LEFT: Accused Version of Droid Charge (Plaintiff's Exhibit 7.8)**
**RIGHT: Design Around Version of Droid Charge (Firmware Version 2.3.6)**

145.   I understand that phones implementing the firmware update were on sale prior to the trial in July and August 2012 and that Apple did not accuse any such phones of infringing the D'305 patent.

   Droid Charge - SCH-I510: May 4, 2012

   Epic 4G - SPH-D700: March 7, 2012

   Infuse 4G - SGH-I997: June 5, 2012[60]

146.   I understand that Apple did not accuse any Galaxy S II phones of infringing the D'305 patent even though they were accused of infringing other patents.  I previously provided an opinion that such phones were non-infringing alternatives for the D'305 patent because their application menus used icons that did not have consistent rounded square shapes or backgrounds, and I incorporate those opinions again here.

---

[60]   Samsung's Second Supplemental Objections and Responses to Apple's First Set of Interrogatories Regarding Articles of Manufacture, December 21, 2017, Response No. 3, page 53.

Contains Material Designated Highly Confidential



**S II (AT&T)**     **S II (T-Mobile)**     **S II (Epic 4G Touch)**     **S II (Skyrocket)**

147.   I also understand that there were various other devices at issue in this case that Apple did not contend infringed the D'305.  They include the Galaxy Ace, Transform and Exhibit 4G, and they further support my opinion as to the narrow scope of the D'305 patent:



**Galaxy Ace**          **Transform**          **Exhibit 4G**

**Responses to Kare Report**

148.   I disagree with Dr. Kare's opinions for the first factor.  Dr. Kare acknowledges that the District Court already found that "the broken line in both views of the D'305 patent is not part of the claimed design."  (Kare Report, paragraph 66.)  Nevertheless, Dr. Kare uses almost identical language and quotes as Mr. Ball to argue that the District Court has said the article of manufacture may extend beyond the scope of the claimed design.  The first factor, however, still requires one to examine the scope of the claimed design.  Dr. Kare, like Mr. Ball, has

42

Contains Material Designated Highly Confidential

provided a variety of reasons for why the scope of the design patents should be ignored or disregarded, but that appears to be directly contrary to the first factor.

149.    I disagree with Dr. Kare's opinions that the patent somehow indicates that the article of manufacture is an entire electronic device. First, Dr. Kare states that the term display screen indicates that the inventors intended the display screen to be part of an electronic device. That does not identify the scope of the claim in the patent, as is required by the first factor, but is rather merely an observation that a display screen is often a component of a larger, multicomponent, often complex, electronic device. But a component of a larger product can be an article of manufacture, even if the component is necessary for the device to function as intended. In my experience, most products are not designed to have unnecessary parts. A kitchen oven, for example, is made of many parts that are normally found only within kitchen ovens, and serve no discernible purpose outside that finished product, yet the U.S. Supreme Court, as I understand, stated that the components of a kitchen oven could be separate articles of manufacture. The fact that Apple itself said the D'305 ornamental design was only for a display screen when obtaining its patent further shows that the article of manufacture is not an entire product and cannot possibly be larger than the display screen.

150.    Second, Dr. Kare relies on the specific icons in the D'305 patent as an indication that the design is "intended for dynamic use in an electronic device such as a smartphone," rather than being "merely an arrangement of colorful placeholder images that might be applied to any number of things." (Kare Report, paragraphs 67-68.) Again, I do not agree that this is consistent with the facts or pertinent in determining what the scope of the D'305 claim is or how it was applied to Samsung's applications menus. That the design claimed in the D'305 image was intended to be used in a smartphone does not indicate therefore that the design is for an entire smartphone. A single screen depicting "a grid of 16 colorful icons on a black screen," as the U.S. Supreme Court put it, is not an entire smartphone or even a substantial part of one. It is one, very specific ornamental design, which Dr. Kare articulates in detail. (Kare Report, paragraph 43.) It is this narrow definition of the ornamental design that protected the design itself, yet Dr. Kare, much like Mr. Ball, incorrectly states that the design is much broader in scope. Again, a component that is intended for use in a finished product, such as one knob or one image on a display screen on a kitchen oven, does not then make the kitchen oven the only possible article of manufacture. Instead, it shows that the knob or display screen is a component of the oven, just as the applications menu of the Samsung phones is just one of many thousands of features, including numerous other screens, of those smartphones.

151.    Third, Dr. Kare relies on quotes from certain experts, including me, indicating that the D'305 patent was intended for application to electronic devices such as smartphones. I first note that at the time of my prior report and at the 2012 trial, Dr. Kare was of the opinion that the D'305 patent was just an ornamental image or piece of "art" and that one should not consider the product in considering the

Contains Material Designated Highly Confidential

design.[61]  Her opinion now is not only contrary to that earlier opinion, but I disagree with her conclusions.  As I indicated before, my opinion is that the D'305 patent was an image designed for human interaction, which has been confirmed by Apple's representative design witness.[62]  That is entirely consistent with my further opinion that the D'305 image is intended for use in one *component* of a smartphone, and only for the very limited time that the component (the particular screen) shows the patented array of icons.  For example, just as a windshield is designed for use in a car, and not some other product, it is still a component of a larger finished product.

152.    Fourth, I believe Dr. Kare's reliance on prior art is misguided.  Looking at the finished products that will incorporate a particular display screen does not affect the scope of the design claimed in the D'305 patent, or the article of manufacture to which that design is applied.  (Kare Report, paragraphs 73-76.)

153.    Fifth, for the reasons above, I disagree with Dr. Kare's statement that the "prosecution file of the D'305 patent does not affect analysis of the scope of the design claimed in the patent."  (Kare Report, paragraph 77.)  Dr. Kare admits that 193 out of 194 of the figures in the original patent application were cancelled.  In other words, Apple gave up its right to seek to protect any of those user interface images through the D'305 patent.  It also confirms that the scope of the D'305 patent is a single image, and is not representative of the appearance of a larger, or other screens or portions, of a graphical user interface.  Instead, as with the D'677 and D'087 patents, Apple separately patented many other images and individual icons from a graphical user interface, confirming the limited scope of the one image here.[63]

154.    Sixth, for the reasons I've given above, it is my opinion that Dr. Kare, in her Report at paragraph 70, should not rely on the Manual of Patent Examining Procedure as far as it relates to an article of manufacture extending beyond the claim scope because the MPEP has not been updated to reflect the recent Supreme

---

[61]    Document No. 1612, August 7, 2012 Trial Transcript, pages 1370, 1427; April 16, 2012 Kare Report, page 10 ("the design as shown in the patent itself, and not products that may embody the design, is the proper basis for evaluating a design patent"); *ibid.* (Dr. Kare referred to a related patent and said that functionality of the design was not known because the "Patent itself does not indicate one way or another how the bottom row of icons would actually function in a GUI"); Document No. 1843, August 17, 2017 Trial Transcript, page 3475 ("Q.  You didn't consider, as part of your analysis for your expert opinion, how a user would interact with those icons was part of your analysis, did you?  A.  No.")

[62]    December 19, 2017 Richard Howarth Deposition, page 152 ("Q. And generally speaking, what's your understanding of what human interface does? A. My understanding is that the -- the HI team designed the look and feel of the -- of the operating system, the way that those -- the way that you interact with the product through the screen.")

[63]    Exhibit 5.

Contains Material Designated Highly Confidential

Court's opinion.  Nevertheless, in the context of computer-generated icons, the MPEP has said that the "screen" or "display panel" is the proper article of manufacture:[64]

> *A. General Principle Governing Compliance With the "Article of Manufacture" Requirement.*  Computer-generated icons, such as full screen displays and individual icons, are 2-dimensional images which alone are surface ornamentation. See, e.g., *Ex parte Strijland,* 26 USPQ2d 1259 (Bd. Pat. App. & Int. 1992) (computer-generated icon alone is merely surface ornamentation). The USPTO considers designs for computer-generated icons embodied in articles of manufacture to be statutory subject matter eligible for design patent protection under 35 U.S.C. 171. Thus, if an application claims a computer-generated icon shown on a computer screen, monitor, other display panel, or a portion thereof, the claim complies with the "article of manufacture" requirement of 35 U.S.C. 171. Since a patentable design is inseparable from the object to which it is applied and cannot exist alone merely as a scheme of surface ornamentation, a computer-generated icon must be embodied in a computer screen, monitor, other display panel, or portion thereof, to satisfy 35 U.S.C. 171. See MPEP § 1502.

> "We do not see that the dependence of the existence of a design on something outside itself is a reason for holding it is not a design 'for an article of manufacture.'" See *In re Hruby,* 373 F.2d 997, 1001, 153 USPQ 61, 66 (CCPA 1967) (design of water fountain patentable design for an article of manufacture). The dependence of a computer-generated icon on a central processing unit and computer program for its existence itself is not a reason for holding that the design is not for an article of manufacture.

This further supports my view that the scope of the D'305 design corresponds to the article of manufacture it was applied to.

155.   Finally, I disagree that Apple's designers' intentions for the D'305 image have a bearing on the four-factor analysis adopted by the District Court or the articles of manufacture in *Samsung's* phones to which *Samsung* applied a similar design. (Kare Report, paragraphs 78-82.)  In addition to the reasons stated above, including Dr. Kare and Mr. Howarth's prior testimony, the drawings in the D'305 patent show that the claim is for a design whose scope was bounded by broken lines, and that all other aspects of any product or device that might have the D'305 displayed within it are disclaimed.

---

[64]   MPEP 1504.01(a)

Contains Material Designated Highly Confidential

**Conclusion**

156.   It is my opinion that for all three patents and for each corresponding Samsung product, the scope of the design claimed in that patent corresponds directly with the component articles of manufacture identified in Section III.  I disagree with Apple's experts' conclusions that factor 1 indicates that the entire phone is the proper article of manufacture.  Rather, consideration of factor 1 shows that Apple's designs have limited scope; Samsung's phones were found infringing based solely on similarities in product components that correspond to the partial patented designs; and those same product components, identified in Section III, are the articles of manufacture to which the designs were applied.

## VIII.   FACTOR 2 – THE RELATIVE PROMINENCE OF EACH DESIGN IS LOW WITHIN THE PHONE AS A WHOLE

157.   This factor considers "[t]he relative prominence of the design within the product as a whole."  I understand from the Solicitor General's brief regarding this factor that "[i]f the design is a minor component of the product, like a latch on a refrigerator, or if the product has many other components unaffected by the design, that fact suggests that the 'article' should be the component embodying the design."  (U.S. Brief, page 28.)

158.   I understand that the factor is also aimed at the prominence of the *design*, not the prominence of the component to which the design is applied.  In other words, this factor asks how prominent is the particular patented design (which in this case is a specific rounded rectangular design (for D'677), a specific front face with bezel (for D'087), and a screen depicting a specific array of 16 icons (for D'305)).  I understand that the factor is not addressing the size of the design, but its prominence in relation to all the other aspects of the finished product.

159.   In my opinion, there are numerous other components of the Samsung phones and in the Samsung phones that are unaffected by the partial D'677, D'087, and D'305 designs.  It is my opinion, accordingly, that these designs are not prominent, relatively speaking, within Samsung's phones as a whole such that the designs can be said to have been applied to entire products rather than components.

160.   For each patent below, I considered the relative prominence of the design within the overall outward visual appearance of the whole finished product.  I then considered the relative prominence of the design in relation to the whole physical finished product, including componentry.

### D'677

161.   In my opinion, relative to each finished product as a whole, the patented black front face design is not a major component of the product and does not dominate the overall outward appearance of the finished product or affect the design of the many other components in the smartphones.

Contains Material Designated Highly Confidential

162.   As to the overall visible design of each product, the front face is a minor component of the external visual appearance of the device.  The design is also a minor component of each product as a whole, and each product has many other components that are unaffected by the D'677 design.  I explain my reasons for reaching these conclusions below, starting first with the relative prominence of the design in relation to the rest of the external appearance.

**Designed For Screens To Be On**

163.   In general, smartphones are meant to be used and looked at with their screens turned on.  Jony Ive of Apple has stated that in designing the iPhone, everything was meant to "defer[] to the display," such that the other aspects of the phone design were to take a back seat to the many images and content that appear on the phone's display, such as web pages on the Internet, videos, pictures, maps, games, clocks, the many images included within applications, etc.[65]

164.   The D'677 design is limited to the color black across the entire face, which only appears when the screen is turned off.  This limits the prominence of the design in the smartphones which were found to infringe the D'677.

165.   In general, the black front glass faces of smartphones are essentially neutral, like TV screens (when turned off).  The rest of the external design, as well as the vast user interface, plays a substantial part in creating the overall appearance of the products.

**Other Aspects of the External Appearance**

166.   I have considered the relative prominence of the sides and backs of the phones here, which are unaffected by the D'677 design, and find them to be important to the overall design of the product's enclosure as a whole, for the reasons given below.

167.   I have also considered advertising and marketing materials for the Samsung phones found to infringe D'677 to understand the relative prominence of the D'677 design.[66]  In general, the advertising did not feature the black, front face

---

[65]   Jonathan Ive, *Objectified* (2009).

[66]   I generally reviewed advertising and marketing materials identified in the following page ranges in Samsung's Second Supplemental Response to Apple's Interrogatory Nos. 1-3 Regarding Articles of Manufacture, December 21, 2017: SAMNDCA00357159-9048; SAMNDCA00311654; SAMNDCA00311579-586; SAMNDCA00312556-565; SAMNDCA00241588-659; SAMNDCA00246395-472; SAMNDCA00311349-548; SAMNDCA00311661-684; SAMNDCA00311719-729; SAMNDCA00311758; SAMNDCA00311764-976; SAMNDCA00312018-122; SAMNDCA00312124-133; SAMNDCA00312152-153; SAMNDCA00312201-205; SAMNDCA00312235-40; SAMNDCA00312245-59; SAMNDCA00312263-66; SAMNDCA00312270-79;

Contains Material Designated Highly Confidential

design of the D'677 patent.  Instead, where the front face was visible, the advertising and marketing material predominantly showed the phones with their display screens on, set to the non-infringing home screens or some other image. The materials also highlighted other physical aspects of the phones such as the thinness of the phone or the dimensions or quality of the display.  Numerous other components and features were also featured in the advertisements and submittals to carriers, such as the camera, connection speed, and media hub, and the images also included non-infringing alternatives (such as the white front face option).[67]



168.  Even the ad highlighted in Mr. Ball's report shows the phone with the screen on, instead of a blank, black face as Apple accused it and the other D'677 phones,[68]

---

SAMNDCA00312282-84; SAMNDCA00312288-98; SAMNDCA00312301-304; SAMNDCA00312306-316; SAMNDCA00312337; SAMNDCA00312338-39; SAMNDCA00312340-394; SAMNDCA00312499; SAMNDCA00312508; SAMNDCA00312766-851.  I considered these materials with respect to D'087 and D'305 as well.

[67]  SAMNDCA00311361; SAMNDCA00311364; SAMNDCA00311405; SAMNDCA00358953; SAMNDCA00311777; SAMNDCA00359045.

[68]  Plaintiff's Exhibit 7.

Contains Material Designated Highly Confidential

and the phone is displaying the non-infringing home screen.  The ad predominantly shows off the thinness of the device, the size and quality of the display, the 4G speed, the brand, and the carrier.[69]



169.    For smartphone designers, as display sizes have gotten larger over time for mobile devices, including in 2010-2012, there has been increasingly less space for a designer to work on the front face of a device, and so the sides and backs become even more important for creating new overall designs.[70]  This is made all the more important for a handheld device where users can easily look at all aspects of the phone's enclosure with a turn of the hand.  When designing many products like a laptop or a TV, designers have some ability to hide unsightly details on the bottom or back of the product, such as vents, screw holes, and numerous ports.[71]




170.    This is not an option for the designer of a smartphone.  Since the product is handheld the industrial designer must design each component – glass front face, bezel, sides, rear, and battery cover so that each is aesthetically pleasing to the extent possible.  The Samsung designers hide user replaceable components under an easy to remove battery cover, for example.  And, because the images that appear on the glass cover are driven largely by the graphical user interface designer, the industrial designer's focus is on other aspects of the device, such as

---

[69]    December 13, 2012 Drew Blackard Deposition Transcript, pages 112-114.

[70]    Conversation with Jinsoo Kim; Discussion of design trends in Section XIII below;

[71]    VIZIO D48-D0 D-Series 48" Class Full Array LED Smart TV (Black), images from Amazon.com.

Contains Material Designated Highly Confidential

the sides, rear and battery cover.  These are also the areas that the designers modify to meet carrier requirements, such as for logos.

171.    Also, in normal use, people see the sides and backs of phones at least as often, if not more, than the black front faces which correspond to the patented design.  For example, when someone talks on their phone, the back of the phone or the protective case is most visible.  When not in active use, the D'677 front face often is not visible because the relevant phones are often put into a pocket or purse or placed face down on a table.  When users or observers do see the front face of a smartphone, it is most often when using the phone—looking at web pages, pictures or a map, or using an app such as Instagram, Facebook, or YouTube, or viewing any of the countless other images and features of the phones.  During those times, the front face of the phones is not black, and the phones do not display the specific rounded black rectangle claimed by the D'677 patent.

172.    The majority of smartphone users apply protective cases to their phones,[72] and each protective case can provide a very different look and feel to the phone without altering the front face.  They do so by altering the look and feel of the sides and back of the phones.  This confirms my opinion that the front face does not dictate the appearance of the whole product, otherwise there would be little to no distinction between phones based on their back housing or their thinness, but that is demonstrably not the case.[73]

---

[72]    For example, Plaintiff's Exhibit 143.82.

[73]    **Spring Season** (https://www.ebay.com/p/for-Samsung-I777-Galaxy-S2-Attain-Spring-Season-Sense-Protector-Case-Cover/1819221330?iid=201758645665&var=5017838 62326); **Brushed Aluminum** (https://www.ebay.com/itm/AT-T-SAMSUNG-GALAXY-S2-II-BRUSHED-ALUMINUM-PLATE-ACRYLIC-CASE-SILVER/110841471114?hash=item19 ceaaa08a:g:6EQAAOSwB4NWxvko); **Flowers on Yellow** (https://www.ebay.com/ itm/Protector-Case-for-AT-T-Samsung-Galaxy-S-2-i777-Flowers-on-Yellow-Diamond-Cover /170877192548?_trkparms=aid%3D555018%26algo%3DPL.SIM%26ao%3D2 %26asc%3D49893%26meid%3D7cea307ea5674cd8ae60864fcd16339f%26pid%3D100005% 26rk%3D3%26rkt%3D6%26sd%3D382185985167%26itm%3D170877192548&_trksid=p 2047675.c100005.m1851.)

Contains Material Designated Highly Confidential



173.    At most, considering even just the exterior portions of the phones in this case, the front face — while entirely black — is just one of several aspects of the design that are independent of one another, all of which have an effect on the overall appearance of the phone.  In my opinion, the D'677 design is one of various designs visible when viewing a phone, and it is not responsible for, or particularly prominent within, the overall look of the phone.

**Apple's Marketing And Advertising**

174.    Apple itself has relied on the reality that changes to design other than the front face affect the design as a whole, as seen in the changes they have made over time to the design of aspects other than the front face that have led them to advertise their phone as having a completely new design.[74]  For example, when Apple released the iPhone 4, it touted a completely "new design" and highlighted the back and sides of the device, not the front face, which remained largely unchanged.[75]  Steve Jobs' announcement at MacWorld for the iPhone 4 highlighted all aspects of the phone's design *other than* the front face of the phone.  Instead, the back surface and the iPhone 4 bezel with its antennae functionality, were highlighted, and certain parts, such as the bezel, even shown separated from the products.

175.    In marketing materials, Apple has showed various parts of the iPhone's exterior, not just the portions that correspond to the claimed designs in D'677 or D'087.  For example, these ads for the iPhone, iPhone 3G, and iPhone 4S:

---

[74]    For example, compare the images of iPhone products in Plaintiff's Exhibit 8, pages 3, 5, and 9.

[75]    SAMNDCA30008228 (iPhone 4 announcement).

Contains Material Designated Highly Confidential



176. Apple's phone offerings have also continued to be advertised by using designs other than those on the front surface. For example, Apple's ads display the backs and sides of the phones, or showing the front face with the display screens *on*, rather than off and black:[76]



177. While the relative prominence of the D'677 patent in the iPhone is not under consideration, the fact that Apple itself actually advertises the sides and backs of

---

[76] https://www.apple.com/iphone-8/; https://www.apple.com/shop/buy-iphone/iphone-7;

Contains Material Designated Highly Confidential

phones confirms my opinion that both Mr. Ball and Dr. Kare have overstated the prominence of the patented designs by equating them with the entire products.

**Limited Scope of Apple's Design Impacts Prominence**

178.  Understanding the claims of the patent is also important in considering the prominence of the patented design.  The District Court previously instructed the jury that the "scope of the claim … does not cover a general design concept." (Document 1903, August 21, 2012, Final Jury Instructions, page 59.)  Apple also previously admitted, as I understand it, that Apple does not own the idea of a rounded rectangular front face, or of minimalist design, which bear on the prominence of its patented design.  (Document No. 1843, August 17, 2012 Trial Transcript, page 3609 (Peter Bressler testifying:  "Q. The use of a rectangular shape with rounded corners for an electronic device, that's not something Apple owns, is it, sir?  A.  That general description certainly is not.  The specific design that they produced is.").)  The D'677 design does not cover the general idea of a rounded rectangular shape, but only the specific implementation of that in the D'677 patent.

179.  This is significant when considering the prominence of the D'677 patent in Samsung's phones.  Below, I compare one Samsung phone which was found to infringe the D'677, the Galaxy S II (AT&T), and several additional phone designs that do not infringe the D'677 patent, including the Galaxy Ace, LG Prada, and F700 phones.  Apple's design expert, Peter Bressler, had the opinion that the F700 and the LG Prada were substantially different designs than D'677.[77]  For the LG Prada, it was the chrome button at the bottom of the front face, the different length and width proportions, and the rounding of the corners.[78]  These products all have rounded rectangular front faces but are non-infringing—and comparing these products to the infringing Samsung phone illustrates that the specific rounded rectangular form that is shown in the D'677 is not among the most prominent factors contributing to the phones' overall appearance.  Instead, components separate from the portions of the front face covered by the D'677 patent are what most prominently make all of these phones distinct from one another.  Here is a comparison of an infringing phone with the Galaxy Ace:

---

[77]   Document No. 1611, August 6, 2012 Trial Transcript, pages 1182-1183, 1185-1186 (F700).

[78]   *Ibid.*, pages 1118-1119; Document No. 1843, August 17, 2012 Trial Transcript, pages 3600-3601.

Contains Material Designated Highly Confidential



**Galaxy S II (AT&T)**          **Galaxy Ace**

180.    And here is the comparison showing four smartphones:



**Galaxy S II (AT&T)**      **Galaxy Ace**          **LG Prada**          **F700**

Contains Material Designated Highly Confidential



**Separately Alterable Components**

181.   It is also my opinion that one can substantially alter the overall appearance of Samsung's infringing phones without altering the front face design, which further shows that the D'677 design is not relatively prominent.

182.   Consider, for example, the design patent that Apple obtained on the entire external appearance of the iPhone's enclosure.  For that patent, the external design of the product cannot be altered without affecting the design shown in the patent.



**D580,387[79]**

183.   By contrast, the D'677 is a partial design.  One can alter many aspects of the phone without affecting the design of the front face at all.  Also important, the D'677 patent disclaims the Apple home button, which is one of the only visual elements on the front face of an Apple phone.  Ignoring that feature, as I must in order to consider just the D'677 design, the prominence of the blank black screen becomes even more diminished in my opinion.

184.   So, although the front face is visible and large in size, its "relative prominence" is low because the design only relates to the appearance of one component of the phone's external design and is not visible to users or others when the phone is turned on or otherwise hidden from view.

---

[79]   SAMNDCA00373548

185.    In addition, Apple's infringement positions further confirm this opinion.  As described for the first factor, Apple limited its infringement arguments to the discrete portions of the Samsung phones that it believed embodied the patented D'677 design, rather than claiming that Samsung's entire phones were similar to the iPhone.  Apple and its expert witnesses limited their descriptions of infringement to the "corresponding portion" or part of the Samsung phone, namely the "front face," ignoring all differences in the remainder of the products.  The narrowness of Apple's own infringement positions further supports my opinion that the patented designs are not relatively prominent in Samsung's phones.

**Other Unaffected Components**

186.    I now turn to considering the prominence of the design relative to the entire phone, including its componentry.

187.    In my opinion, the black front face of the Samsung smartphones is an even more minor component when considering the finished product as a whole.  Smartphones contain thousands of components that do not relate to the D'677 design.[80]  Since the inception of smartphones, the internal aspects have included hundreds and often many thousands of other components, including chips, circuit boards, batteries, SIM cards, SD cards, frames, cameras, accelerometers, wires, ports, speakers, and more.[81]  These observations confirm not only that the black front face plays at most only a partial role in the visual impression of the device overall, but the Samsung products also have "many other components unaffected by the design" of the black front face, which is another consideration put forward in the Solicitor General's brief.  (U.S. Brief, page 28.)

188.    The record that I have reviewed confirms this conclusion.  For example, I understand that Chief Justice John Roberts of the U.S. Supreme Court had the

---

[80]    December 17, 2017 Tony Blevins Deposition Transcript, page 119 ("Q. Focusing on the first iPhone, just generally speaking, how many manufacturers did Apple use to manufacture the thousands of components that went into the first iPhone?  A. I don't know specifically, but there would have been in the range of ▆▆ or so.  Q. Was the same range true for the iPhone 3G?  A. The same general range would apply.  Q. The same general range applied, then, for the iPhone 3GS?  A. Yes.  Q. Is the same true for the iPhone 4?  A. Yes.  Q. And is the same true for the iPhone 4S?  A. Yes."); Conversation with Jinsoo Kim; Conversations with personnel at Gumi manufacturing facility.

[81]    December 17, 2017 Tony Blevins Deposition Transcript, page 119 (Apple uses "in the range of ▆▆" manufacturers to build the "thousands of components" in the original iPhone, the iPhone 3G, the iPhone 3GS, the iPhone 4, and the iPhone 4S); Conversation with personnel at Gumi facility.  See also the discussion in Section X.

following exchange with Apple's attorney when this case was argued in the Supreme Court:

> CHIEF JUSTICE ROBERTS: I --maybe I'm not grasping the difficulties in the case.  It seems to me that the design is applied to the exterior case of the phone.  It's not applied to the --all the chips and wires, so why
>
> MR. WAXMAN: That's right.
>
> CHIEF JUSTICE ROBERTS: So
>
> MR. WAXMAN: That's absolutely right.  And, you know, of course you can't get a design patent on something that the consumer can't see.[82]

189.    I understand that Apple's attorney went on to argue that the article of manufacture should still be the entire phone, but this interaction further supports my view that the designs here, including the D'677 design, are not applied to any of the numerous internal components of the phones.

190.    Mr. Howarth, Apple's design witness, admitted that the patent did not depict or cover the many internal components of smartphones.  (December 19, 2017 Richard Howarth Deposition Transcript at page 100.) " Q. Do you see anything in the D'677, the D'087 or the D0 -- excuse me – '305 that protects or depicts the processor?  A. Not in these patents -- these three patents, no.  Q. Do you see anything in those three patents that protect the functionality of Internet connectivity?  A. I don't think these three particular patents are trying to -- are trying to do that.  Q. Is the same true for email functions?"; (Ibid., page 101) "Q. Do any of the three design patents that we've been discussing -- the D'677, the D'087 or the D'305 -- protect anything concerning email functions? MR. MUELLER: Again, by "protect" – I hate to keep saying this, but just so the record --MR. ZELLER: Claim. MR. MUELLER: Claim. MR. ZELLER: I think we'll stipulate we're those are interchangeable. He's used the word "protect" --THE WITNESS: Right. MR. ZELLER: -- so that's part of the reason I'm using it. THE WITNESS: Okay. I don't think so. Q. Is there anything in the D'677, the D'087 or the D'305 that claims or protects Siri?  A. I don't think so, and -- no, I don't think."

### D'087

191.    Based on further examination, my reasoning and opinion for the D'087 patent is the same as for the D'677 patent.  The design of a front face and bezel do not

---

[82]   Transcript of Oral Argument in *Samsung Electronics Co., Ltd., et al., v. Apple, Inc.*, No. 15-777, Washington D.C., October 11, 2016, page 40, https://www.supremecourt.gov/oral_arguments/argument_transcripts/2016/15-777_1b82.pdf.

Contains Material Designated Highly Confidential

dominate the overall appearance of either the Vibrant or Galaxy S 4G phones such that they overpower the design features of other aspects of those products. The relative prominence of the design in the D'087 patent is limited to the front face and bezel portions of the products' external appearances, and does not extend to any other aspects or components of the devices, whether external or internal.

192.   The same materials and evidence apply here as in the D'677 discussion above, namely that the D'087 design applied to the front of these devices is intended to be less noticed than the display screens turned on and showing content; that Apple obtained additional design patents where the claimed design *does* dictate the entire external look of the phone's enclosure unlike the partial design here; that both Samsung and Apple highlight, through advertising and other means, the other aspects of the outer appearance of their products, including the sides, backs, and unclaimed display screen images; Apple's statements that the front face and bezel are discrete design features that can be viewed in isolation; and users apply cases to the sides and backs of their phones without altering the front and bezel, creating substantially different looking devices without affecting the D'087 design.

193.   In my opinion, the D'087 products therefore have "many other components unaffected by the design" of their blank front face and bezel.

**Responses to Ball Report**

194.   One overarching criticism I have of Mr. Ball's report is that it treats each of the products as if it has misappropriated the entire look and feel of the iPhone.  I disagree that this is true for any of the Samsung phones, but especially in light of how the vast majority of them were found to infringe only one of the patents. Even assuming that all three patents, in combination, protected the overall look and feel of the iPhone, that would, at most, apply to 2 of the 16 products in the upcoming trial.  Mr. Ball provides no basis for the assumption that any one of the patents alone encompasses the entire look and feel of the iPhone.

> **One Patent**: Captivate, Continuum, Droid Charge, Epic 4G, Galaxy S II (AT&T), Galaxy S II (Epic 4G Touch); Galaxy S II (Skyrocket); Galaxy S II (T-Mobile), Gem, Indulge (10 products)
>
> **Two Patents**: Fascinate, Infuse, Mesmerize, Showcase (4 products)
>
> **Three Patents**: Galaxy S 4G, Vibrant (2 products)

195.   I also disagree with the way Mr. Ball has construed and selected Samsung advertising and marketing materials.  (Ball Report, paragraph 200.)  In my review, Samsung's marketing materials consistently feature a variety of aspects of the phone's external and GUI design, not just the front of the phone.  Also, with respect to D'677 and D'087, the marketing materials almost never show the phones with the display screens turned off so that the front faces are black all the way across.  Instead, the ads almost always show the display screens turned on,

Contains Material Designated Highly Confidential

displaying something other than the application menu.  As an example, the one image Mr. Ball includes of a black-front face in marketing material is one out of a dozen images in that document.  The other images show the home screen, the phone's profile and camera, and maps.  The material also touts the device's thinness, processor, camera resolution, wireless sync, front-facing camera, proximity sensor, 4G Sprint network, video streaming, media hub, and latest Android platform.[83]

196.    Mr. Ball also relies on product packaging, but that packaging, like Samsung's other marketing materials, presents consumers with all the same features and images as just described, not the blank black face of the product.  (Ball Report, paragraph 201.)

197.    Mr. Ball also relies to a large extent on what he says is the prominence of the D'677 and D'087 design for the iPhone.  I understand that the inquiry is meant to consider the Samsung devices.  Whether the front face of the iPhone is prominent *within the iPhone* is not indicative of that component's prominence in a different product.  And Mr. Ball's examples of comments that certain Samsung phones resemble the iPhone are limited to the Vibrant and the Galaxy S i9000 (Ball Report, paragraph 204-208), both of which are in the minority because they infringe all three of the patents, unlike the majority of the products, which infringe one.  Mr. Ball does not explain how comments about those phones, which are on one end of the spectrum, apply to all the phones found to infringe, in many cases, just one patent.

### D'305

198.    My analysis and opinions above also applies to the D'305 patent.  I will not repeat all those points here, but will address several issues unique to D'305.

199.    In my opinion, the patented array of icons in the D'305 patent is a "minor component of the [Samsung] products."

### Home Screen Versus Application Menu

200.    The accused screen is not the home screen of any Samsung phone;  it is the application screen or application menu.  I understand that Apple has distinguished the application menu it claims to infringe the D'305 patent from the home screen of those same products.  I understand that Apple showed the following image in the 2012 trial.  I also understand that Apple stated to the jury:  "We are not accusing the home screen.  It's the app screen that we have accused."  (Document No. 1997, August 21, 2012 Trial Transcript, page 4098.)

---

[83]   SAMNDCA00311971

Contains Material Designated Highly Confidential



201.    In contrast to the array of GUI icons appearing on the application menus shown above, the *home screens* of the Captivate, Continuum, Droid Charge, Epic 4G, Fascinate, Galaxy S 4G, Gem, Indulge, Infuse 4G, Mesmerize, Showcase, and Vibrant (the "App Menu Infringing Phones") do not show an array of GUI icons having a rounded rectangular appearance or a black background.

Contains Material Designated Highly Confidential



202.    The home screen is the screen users see after unlocking their phones and the screen they return to if they press the "home" button or soft key.[84]

203.    Apple and its experts have stated that various iPhones show the D'305 design in their user interface.  The iPhone user interface is different than that used in the App Menu Infringing Phones, however, because the iPhone has only one level of icon menus.

204.    The app menu screens in the App Menu Infringing Phones are relatively unimportant based on the design of the Samsung UX.  Unlike the combined app menu screen/home screen of iPhones, the app menu screen on the App Menu Infringing Phones is not the "home base" screen.  Consistent with the Android user experience, if the user wants to reach the app menu screen, the user must first turn on and unlock the phone (if the lock feature is used), then select the app menu icon from the home screen.  However, accessing the app menu screen is neither the only nor the fastest way to access apps on Android phones.  The home screen has some apps pre-installed, such as phone and email.  In addition, users typically add icons to the home screen so they can access other frequently used

---

[84]   I relied on my hands-on experience with each smartphone.  This was confirmed in my conversation with Jeeyeun Wang and in Dr. Kare's prior trial testimony where she was walked through the start up process of a Samsung smartphone. (Document No. 1612, August 7, 2012 Trial Transcript, pages 1421-1424.)

Contains Material Designated Highly Confidential

apps more efficiently.  Because the home screen, and its adjacent screens, which can be accessed by swiping left or right from the primary home screen, require no taps to access upon unlocking the phone, accessing apps through these screens is faster than tapping through to the app menu.  Users can also access apps through notifications or through other apps, for example, by clicking on a link in an email or social media app to reach a website.[85]

205.     The App Menu Infringing Phones also included at least hundreds of GUI screens other than the app menu screen, not including use of third party content or the Internet.  As is evident from using the App Menu Infringing Phones, their GUI screens are voluminous, including multiple screens with different graphics for reviewing and sending email, setting and responding to alarms, using the calculator, using the music player, entering and accessing calendar information, making and responding to phone calls and sending and reviewing text messages, among many others.  Indeed, of the 1000+ pages of presentations that were created by Samsung's UX team to describe the graphical user interface, only eleven pages relate to the accused app menu screen.[86]  As the principal designer of the global UX for the App Menu Infringing Phones testified: "There are thousands of frames of screens that compose the UX [user experience]."[87]

206.     The application menu design in the App Menu Infringing Phones is not a prominent part of the design of the larger graphical user interface, much less the entire design of the phones.  Even among phones found to infringe the D'305 patent, there are noticeable design differences in other aspects of the phones, other than the single array of patented icons.  For example, the Droid Charge, Continuum, and Gem all have distinct overall shapes and designs, as well as distinct home screens and user interface screens, despite each of them having one type of screen, the app menu, that was found to infringe D'305.

**Other Unaffected Components**

207.     The products have "many other components unaffected by the design" of the patented array of icons, and "that fact suggests that the 'article' should be the component embodying the design."  (U.S. Brief, page 28.)  One indication of this is that the D'305 design can be altered without altering the design of any other

---

[85]   Conversation with Jeeyeun Wang; personal experience with the devices; SAMNDCA30010925 to SAMNDCA30010964 (home screen and application menu GUI backbone).

[86]   The full set of presentations is SAMNDCA30010317 to SAMNDCA30011459 and the pages showing the accused application menu are SAMNDCA30010942 to SAMNDCA30010951.

[87]   December 20, 2017 Deposition Transcript of Jeeyeun Wang, page 56.

Contains Material Designated Highly Confidential

aspect or component of the product, including both the physical and graphical aspects.

208.    As described above, I previously provided an opinion that the application menu design on the Samsung phones can be changed to a non-infringing alternative design through a firmware update without changing any other aspect or component of the Samsung smartphone.[88]  That firmware update does nothing more to the app menu design than remove the square containers from behind the icons.

209.    As discussed above, Apple and its witness's infringement position for the D'305 patent is another indication that the claimed design is independent of many other components in the smartphones.  Apple based its infringement position on being able to look at the Samsung application menus in isolation, ignoring all other aspects of the phones, both hardware and graphical.

**Advertising**

210.    I have also considered advertising, marketing, and packaging materials for the App Menu Infringing Phones and have seen that they predominantly feature other aspects and components of the phones apart from the application menu.

211.    In my opinion, Dr. Kare did not select representative advertising or fairly construe the advertising in her report.  For example, Dr. Kare showed just one image from the following piece of marketing collateral:



212.    The advertisement is not only one of the few that shows the application menu, it also shows a host of other aspects of the Fascinate phone, both external and

---

[88]    Exhibit 4

Contains Material Designated Highly Confidential

graphical, including parts of the external design, the processor, and the display screen showing the home screen, Swype keyboard, Google mobile services, and social networking.[89]

213.    The typical advertising I have seen for the products is similar to the Best Buy circular below, where the Fascinate is shown among other devices, with preference given to the homescreen, camera and side profile to show the device's thinness.  The ads also highlight various other components and features of the product.[90]



---

[89]    SAMNDCA00312148 to SAMNDCA00312149.  The same is true for SAMNDCA00312145, which Kare references.  The fonearena.com image also appears to be for the Galaxy S (i9000) which was sold overseas, so it relates to foreign packaging for a product that I understand will not be a part of the upcoming trial.

[90]    SAMNDCA00357213.  Another example is SAMNDCA00357265, which shows the homescreen in the single stock shot of the Fascinate.  Other advertisements appear in SAMNDCA00357159-9048, SAMNDCA00311654, SAMNDCA00311579-586, and SAMNDCA00312556-565.  And Samsung marketing materials at the following ranges also highlight numerous other aspects of the phones:  SAMNDCA00241588-659; SAMNDCA00246395-472; SAMNDCA00311349-548; SAMNDCA00311661-684; SAMNDCA00311719-729; SAMNDCA00311758; SAMNDCA00311764-976; SAMNDCA00312018-122; SAMNDCA00312124-133; SAMNDCA00312152-153; SAMNDCA00312201-205; SAMNDCA00312235-40; SAMNDCA00312245-59; SAMNDCA00312263-66; SAMNDCA00312270-79; SAMNDCA00312282-84; SAMNDCA00312288-98; SAMNDCA00312301-304; SAMNDCA00312306-316; SAMNDCA00312337; SAMNDCA00312338-39; SAMNDCA00312340-394; SAMNDCA00312499; SAMNDCA00312508;SAMNDCA00312766-851.

Contains Material Designated Highly Confidential

**Responses to Kare Report**

214.    I disagree with Dr. Kare's focus on the Apple phones and what she calls the
        "iconic 'look and feel' of the iPhone" in arriving at opinions related to the second
        factor.  As an initial matter, I understand that the second factor looks to the
        relative prominence of the design within the *Samsung* product as a whole, and the
        ultimate inquiry of the four-factor test is to determine the articles of manufacture
        to which *Samsung* applied the patented designs.

215.    Further, I understand that the Supreme Court stated that an article of manufacture
        is a thing made by hand.  A physical thing doesn't change into something larger
        because the design becomes popular or well known.  Intent, popularity, and
        advertising cannot alter the physical nature of an object.

216.    For similar reasons, I disagree with Dr. Kare's conclusions regarding the use of
        square icons in cartoons.  Most of the images simply show squares in a grid,
        something not covered by the D'305 patent.  Dr. Kare's report also states that
        "[t]he distinctive design of the D'305 is already interwoven in the culture to mean
        smartphone."  (Kare Report, paragraph 85.)  But it does not follow that the
        appearance of a single grid of icons that appears several layers deep in Samsung's
        user interface is a particularly prominent aspect of that smartphone.

217.    Dr. Kare also says "the packaging of many of the infringing Samsung phones
        showcased images displaying the patented design of the D'305 patent."  She only
        shows one phone, however, which was sold only overseas and which is not, to my
        understanding, at issue here.  (Kare Report, paragraph 95.)  The images of
        packaging in the Ball report also contradict this statement by Dr. Kare.  (Ball
        Report, paragraph 201.)  None show the applications menu, and instead they all
        feature the home screens or other aspects of the phones.  (*Ibid.*)

218.    I also believe that Dr. Kare conflates the value or prominence of the overall "user
        interface" with the value or prominence of one screen of icons, which in the
        Samsung phones is not even the main set of icon screens.

**David Reibstein's Opinions**

219.    I am informed that expert witness David Reibstein has considered the second
        factor and has also come to the conclusion, as I have, that this factor weighs in
        favor of component parts being the proper articles of manufacture.  I have
        reviewed his opinions and believe they support the conclusions I have
        independently made here.

**Conclusion**

220.    It is my opinion that for all three patents and for each Samsung smartphone, the
        relative prominence of the design within the product as a whole is limited,
        supporting the conclusion that Apple's designs were applied only to the
        component articles of manufacture identified in Section III.  I disagree with Apple

and its witnesses' conclusions that the second factor reasonably indicates that the entire phone is in any instance the proper article of manufacture.

## IX.    FACTOR 3 – THE PATENTED DESIGNS ARE CONCEPTUALLY DISTINCT FROM OTHER PARTS OF THE SMARTPHONES

221.    I understand that this factor looks to "[w]hether the design is conceptually distinct from the product as a whole."

222.    In my opinion, the many features and components of a complex multicomponent product like a smartphone are conceptually distinct from one another, even though such products are designed and engineered to function as an integrated finished product.  Based on the reasons given below, I do not believe it is justified to conclude that the front face, bezel, and/or application menu of a smartphone are conceptually indistinct from all the other components, features, and innovations in these incredibly powerful, diverse, and sophisticated products.  Particularly considering everything else that goes into a smartphone, Apple's partial designs are not conceptually equivalent to entire phones.

223.    I understand that the Solicitor General proposed this factor based on the analogy of a book used in a prior case:

a.    "As the Second Circuit explained in *Piano II*, a book binding and the literary work contained within it 'respond to different concepts; they are different articles.' 234 F. at 82.  If the product contains other components that embody conceptually distinct innovations, it may be appropriate to conclude that a component is the relevant article."  (U.S. Brief, pages 28-29.)

b.    I understand that the example of the book was taken from a case called *Bush & Lane Co. v. Becker Bros.*, 234 F. 79 – Second Circuit Court of Appeals, pages 81-82, which said that "A patent for a 'book binding' cannot, either justly or logically, be so identified with the entire book as to give all the profits on a work of literary genius to the patentee of a binding, although the binding was manufactured with and for that one book, and has no separate commercial existence.  The binding and the printed record of thought respond to different concepts; they are different articles."

c.    I understand that in that case, the Second Circuit Court of Appeal applied that reasoning to a design patent for a piano case and stated that "the ornamented and infringing casing, which attracted the customer's eye," was a separate concept, and therefore a separate article of manufacture, from "the piano mechanism, which pleased the ear."  (*Bush & Lane Co. v. Becker Bros.*, 234 F. 79 – Second Circuit Court of Appeals, page 82.) And so, according to the court, the "whole piano" was not the appropriate article of manufacture, even though the ornamented piano case and the

66

Contains Material Designated Highly Confidential

unornamented internal mechanisms were sold together as a single, finished product.  (*Ibid.*, pages 81-82.)

d.  I understand that the image below shows the design patent (D37,501) that the court was considering in that case, which was found to be a separate article of manufacture from the piano mechanism hidden within:





224.  Applying the same reasoning here with respect to the Samsung phones, I believe that the designs for the front face, bezel, and array of icons in the application menu respond to different concepts than the many other components and features of the smartphones, even if those components are manufactured with and for the same end product, and even if those components had no separate commercial existence apart from the phones.

225.  In considering this factor, I also understand that the word "conceptually" means "in terms of a concept or abstract idea,"[91] and that "distinct" means "distinguishable to the eye or mind as being discrete or not the same"[92] or "[r]ecognizably different in nature from something else of a similar type."[93]  In other words, I understand this factor to ask whether the design for a glass front face, bezel, or array of icons is different in nature or distinguishable as a separate concept or idea from the rest of the product.  In my opinion, the answer is yes. Designs for these components, even if they are integrated as part of a finished product, are separate and distinguishable ideas or concepts from entire finished products.  As both Mr. Ball and Dr. Kare have both stated, the designs on their own would be useless; they require a host of other components and thousands of other features to be of any use.  That is because they are not the same concept or idea as an entire smartphone.  They are not equivalent ideas, but are separate and distinct, even if they are dependent on a larger finished product for their

---

91  https://en.oxforddictionaries.com/definition/conceptually.

92  https://www.merriam-webster.com/dictionary/distinct.

93  https://en.oxforddictionaries.com/definition/distinct.

Contains Material Designated Highly Confidential

usefulness.  For Mr. Ball, "[t]he glass front face and bezel would … have no value as individual components separate from the rest of an infringing device."  (Ball Report, paragraph 222.)  For Dr. Kare, the "image of the user interface itself would be useless."  (Kare Report, paragraph 113.)  Mr. Ball and Dr. Kare believe these observations support their opinions for factor 3, but I believe they do just the opposite.  They are a compelling indication that the designs for discrete components are not, and cannot be, the same ideas or concepts as the much more complicated finished products those designs are associated with.

226.   This is the same conclusion I understand the Second Circuit Court of Appeals came to when considering the hypothetical patent on a book binding.  Even though the binding was made for a specific book, and had no usefulness aside from the printed material inside, the binding responded to a different *concept* than the literary work contained on the pages of the book.  I find this analogy very apt for a smartphone.  A book's binding is much like the external housing or shell of a smartphone.  The glass front face and bezel are like the front cover of a book, not even comprising the rear cover of a book.  Those designs are conceptually distinct from the many other aspects of the phone, such as the printed circuit boards, memory chips, and other internal components and innovations in the phones.

## D'677 and D'087

### Distinct Components and Innovations

227.   Consumers don't buy smartphones to mount them on a wall next to their artwork.  They buy them for their "smarts".  Artwork has little to no utility. It is on the other end of the spectrum from consumer products like smartphones.  As much as some designers would like to create pure works of art, designing products for mass manufacture is a constrained problem solving process.  Mr. Ball notes this in his report.  (Ball Report, paragraph 44 ("An Industrial Designer is driven to create a solution that answers the user's needs and desires—and serves the goal of promoting product identity—while meeting cost, technology, manufacturing, and competitive market requirements.")  Much like the contents of a book, the internal components of a smartphone are smart—unlike the glass front face and bezel or the single image on a display.  These component designs, as noted by Mr. Ball, are driven by relatively mundane materials requirements, manufacturing processes and other constraints.  And, as a product matures, as did personal computers, then laptops and now smartphones, the design problem-solving approach becomes even more constrained and less differentiated.

228.   And, these products, like many consumer products, need to be upgraded or replaced by consumers to accommodate the ever smarter components.  Often, this can be done with little to no impact on the external parts like the glass front face, the bezel or a single image on a screen.  The opposite can happen too.  A simple

Contains Material Designated Highly Confidential

change in software can make the device run more slowly without ever affecting the design.[94]

229.    Consumers value the ability to access music, email, messaging, calendars, videos, Internet, and calling all in one device.  That's what Steve Jobs advertised at MacWorld 2007.[95]  Consumer research and surveys also show that consumers consider discrete components and features separately and assign them different values.  Features like WiFi, 4G connectivity, battery, processor, media storage, apps, app store, operating system, camera, GPS, display screen, and speakers are all discrete components, features, and concepts that consumers readily recognize.[96]  Consumers expect their products, especially pricey electronics, to function well, not just embody an aesthetic design.[97]

230.    Each of the Samsung smartphones that was found to infringe contains thousands of physical components and tens of thousands of inventions and features.  The

---

[94]  NPR, Apple Says It Slows Older iPhones To Save Their Battery Life, December 21, 2017, https://www.npr.org/sections/thetwo-way/2017/12/21/572538593/apple-says-it-slows-older-iphones-to-save-their-battery-life.  Washington Post, Apple slows your iPhone as the battery ages, but doesn't give you a cheap way to replace it, December 20, 2017, https://www.washingtonpost.com/news/the-switch/wp/2017/12/20/apple-slows-your-iphone-as-the-battery-ages-but-doesnt-give-you-a-cheap-way-to-replace-it/?utm_term=.c92e60a17967.

[95]  Joint Exhibit 1093 (MacWorld 2007 video).

[96]  For example, Plaintiff's Exhibit 143; Plaintiff's Exhibit 145; Plaintiff's Exhibit 146; Defendants' Exhibit 572; Defendant's Exhibit 592.

[97]  November 2, 2012 Philip Schiller Deposition Transcript, page 483 ("[A] number of factors went into importance of the original iPhone and its innovation to consumers when we launched it.  The appearance and design, the way it, quote, looked, certainly was an extremely important factor in what customers thought about it, what it did for them and the features it had was also of great importance to customers as well"); page 493 ("Q. Is it true that web capabilities, ease of use, and apps are key features in the decision to purchase an iPhone? A. Yes, I believe it is true…"); page 504 ("There is the look of the product, the design, and there is the ease of use and how it works. Both are important."); December 21, 2017 Greg Joswiak Deposition Transcript, page 26 ("Q … as part of the evolution of the iPhone, from the first iPhone up through the iPhone 4S, what were the key functional features that you understood, as a marketing person, were key features to consumers? A. Yeah. So, some of the basics always were evergreen, if you will, again, about what an iPhone does, how an iPhone worked. We would with each new generation of iPhone, of course, try to explain what was new and better about this generation than the generation it replaced, whether that was the, moving from Edge to 3G, or whether that was, you know, you know, offering Facetime, as we talked about, or Siri, those all helped to differentiate the different generations"); page 27 ("Q. From a marketing perspective, it was important to continue to add more and better functionality to the, to the product, right? A. Yeah.") page 160 ("Q. And you'll agree that it's critical for the iPhone's success that it have great functionality, right? A. Again, a lot of things are important to the iPhone's success, and, as I've said, certainly, great functionality is certainly part of that success.").

Contains Material Designated Highly Confidential

design of the front glass face and bezel of the phones at issue corresponds to a different concept than the other components of the phones, both external and internal, such as the camera, back cover, processor, battery, SD card, speakers, accelerometer, display element, buttons, GPS, and other technological aspects.

231.   As just one example of this incredible amount of innovation packaged into a small device, the user manuals for the products each have to be approximately several hundred pages long just to give an introduction to the various parts, features, and functions of the smartphones:

| User Guides | | | |
|---|---|---|---|
| **Products** | **Model No.** | **Pages** | **Document #** |
| Captivate | SGH-I897 | 203 | APLNDC-Y0000065097-304 |
| Continuum | SCH-I400 | 185 | APLNDC-Y0000065725-907 |
| Droid Charge | SCH-I510 | 159 | APLNDC-Y0000061629-794 |
| Epic 4G | SPH-D700 | 266 | APLNDC-Y0000058528-807 |
| Fascinate | SCH-I500 | 170 | APLNDC-Y0000061795-969 |
| Galaxy S 4G | SGH-T959 | 243 | SAMNDCA00018395-8642 |
| Galaxy S II (AT&T) | SGH-I777 | 197 | S-ITC-003304098-4299 |
| Galaxy S II (T-Mobile) | SGH-T989 | 273 | APLNDC-Y0000060900-1177 |
| Galaxy S II (Epic 4G Touch) | SPH-D710 | 199 | APLNDC-Y0000058808-9008 |
| Galaxy S II (Skyrocket) | SGH-I727 | 201 | S-ITC-003298165-370 |
| Gem | SCH-I100 | 152 | S-ITC-003300462-619 |
| Indulge | SCH-R910 | 153 | APLNDC-Y0000059792-948 |
| Infuse 4G | SGH-I997 | 200 | SAMNDCA00009582-9786 |
| Mesmerize | SCH-I500 | 147 | APLNDC-Y0000060544-694 |
| Showcase | SCH-I500 | 170 | APLNDC-Y0000057975-8148 |
| Vibrant | SGH-T959 | 215 | SAMNDCA00017928-18146 |

And the patented designs play little, if any role, in the user guides, which instead focus on numerous other aspects of the exterior, interior, and graphical user interface of the devices.  This confirms my opinions for factor 2 as well.

232.   In my own experience at several major consumer product companies, I know that developing finished products is a collaborative effort that requires many people from different teams working together.  Design is just one aspect of the endeavor and relies on the work and innovation of numerous non-designers.

233.   It took numerous engineers, product developers, software programmers to create the underlying operating system and the components that go into the smartphones here.  As part of my analysis, I travelled to Korea to visit first hand Samsung's design and manufacturing facilities and to speak with a number of professionals in the industrial and graphical design departments, as well as those involved in procurement and manufacturing.  My visit included a tour of Samsung's design

Contains Material Designated Highly Confidential

facility in Seoul, Korea as well as a manufacturing facility in Gumi, where the smartphones relevant to this case were assembled.  Related to design and component procurement, I spoke to Senior Vice President Minhyouk Lee, Vice President Jinsoo Kim, Senior Designer Jeeyeun Wang, Senior Designer Hyoung Shin Park, Principal Professional DongWook Kim, and user interface designers Ae-Jeong Suh, Gyeng Tae Park, Ji-Won Lee, and Seung-Wook Nam.  At the manufacturing facility, I spoke to Si-Yeon Park (Senior Professional), In-Kyu Park (Senior Professional), Jung-A Park (Associate), Ju-Hee Ham (Professional), and Yong-Sung Kim (Principal Professional).

234.    The Samsung designers I spoke with identified numerous specialized teams of people who were involved in creating the products Samsung released.  While industrial designers are tasked with creating a visually appealing shell or enclosure for the technology inside, that technology is separately developed and actively publicized to consumers.[98]  In my experience and based on my work in this case, I am convinced that smartphone consumers understand the conceptual distinction between a design for a portion of an outer casing and a smartphone's myriad other features and components.

235.    In fact, it was Samsung, due to its innovative research and development, that enabled Apple and others to package lots of functionality into a small device.  Samsung was able to miniaturize the components needed for a smartphone, manufactured to Apple specifications, so they could fit in a pocket or purse.  Apple bought nearly a quarter of the components for the iPhone from Samsung (as measured by cost).[99]  In fact, Apple paid "billions of dollars to Samsung for [] processors" showing the high value Apple placed on being able to leverage Samsung's miniaturization technology.[100]  Indeed, the applications processor was referred to as the "main processor" and "brain" of the device, which Apple turned

---

[98]    APLNDC-Y0000066834-837; APLNDC-Y0000066888-891; APLNDC-Y0000066901-905; APLNDC-Y0000066756-760; APLNDC-Y0000066802-806; APLNDC-Y0000066740-744; APLNDC-Y0000066838-841; APLNDC-Y0000066768-770; APLNDC-Y0000066852-854; APLNDC-Y0000066867; APLNDC-Y0000066729-732; APLNDC-Y0000066749-751; APLNDC-Y0000066883-887; APLNDC-Y0000066846-848; APLNDC-Y0000066874-878; APLNDC-Y0000066898-900; APLNDC-Y0000066797-801; APLNDC-Y0000066855-857 (white design around); APLNDC-Y0000066879-882 (titanium design around).  The same occurs for Apple products.  SAMNDCA30010147; SAMNDCA30008220; SAMNDCA30008174-30008219; SAMNDCA00367283-285; SAMNDCA00367279-285; SAMNDCA00367298-299; SAMNDCA00019617-623).

[99]    Document No. 1611, August 6, 2012 Trial Transcript, page 969; December 17, 2017 Tony Blevins Deposition Transcript, pages 187-188 (█████████████████████████ ██████████████████████████████████████).

[100]    Document No. 1611, August 6, 2012 Trial Transcript, page 981.

to Samsung to produce.[101]  Apple designers were essentially responsible for creating a "shell" to house those components.

236.   Not surprisingly then, separate teams within Apple, as at Samsung, were tasked with creating the various aspects and components of Apple's phones. Scott Forstall, Senior Vice President of iOS, testified about Apple's efforts to develop their phone product and stated that Apple knew there were going to be "a lot of people that were going to have to be involved, a lot of groups."[102]  Forstall was put in charge of the software team, which was one of "many teams."[103]  Forstall recruited top engineers and they took over a whole building on the Apple campus that they called the "dorm" because engineers were working there "all the time. They were there at night.  They were there on weekends."[104]  Forstall's team worked with the hardware team to create the user interface.[105]  Another witness, Emilie Kim, a software engineer at Apple, described how she spent three years working on the photos and camera apps, for which there were "[a] couple hundred thousand lines of code."[106]

237.   All of this was done separately from the design work for the front face and bezel. Concluding that the design of one or two external components are conceptually indistinguishable from all the other aspects of the phones puts the credit for the product in the hands of a few industrial designers at the expense of the hundreds of other inventors and innovators who made these products what they are.

238.   As discussed, smartphones embody hundreds of thousands of discrete innovations.  On the design side, Apple obtained patents on discrete aspects of its phones, such as the bezel, SD card cover, home button, volume buttons, and camera aperture.[107]  Each was put forward to the US Patent Office as a distinct design invention, or a "new, original, and ornamental design for an article of manufacture."  (35 U.S.C. § 171.)

239.   I understand that Apple also obtained a number of utility patents related to the iPhone,[108] which means that Apple successfully represented to the US Patent Office that these were each a "new and useful process, machine, manufacture, or composition of matter," or a "new and useful improvement thereof."  (35 USC

---

[101]  *Ibid.*, page 969.

[102]  Document No. 1610, August 3, 2012 Trial Transcript, page 741.

[103]  *Ibid.*, pages 741-742.

[104]  *Ibid.*, page 745.

[105]  *Ibid.*, pages 745-746.

[106]  Document No. 1842, August 16, 2012 Trial Transcript, pages 3173-3176.

[107]  Exhibit 5.

[108]  I have summarized a selection of these in Exhibit 6.

Contains Material Designated Highly Confidential

101.)  In my opinion, it is inconsistent for Mr. Ball and Dr. Kare to describe the iPhone as a unitary product from which the patented designs are conceptually *in*distinct where Apple had previously told the US Patent Office, hundreds of times, that its devices contained numerous *different and distinct* patentable innovations and ideas, most of which are unrelated to the glass front face and bezel of the device.[109]

**Advertising**

240.  Samsung's ad campaigns have focused on features of the phones that are unrelated to the patented D'677 and D'087 designs.  For example, features such as voice-to-text, speed of the phone, camera, and the thinness of the smartphone are highlighted—none of which have to do with the front cover of the phone in its blank, black state.[110]

241.  In addition, third-party sellers of Samsung's phones, such as carriers and retail stores, have also emphasized numerous discrete innovations in the smartphones. The following marketing material for the Infuse 4G on the AT&T network included a description that the smartphone was the nation's thinnest, had a large Super AMOLED display (which the ad shows displaying the non-infringing homescreen), a 1.2 gigahertz processor, an 8MP camera, a movie player and a wifi hotspot. [111]



---

[109]  Exhibit 6.

[110]  See my discussion above in Section VIII.

[111]  SAMNDCA00311766

Contains Material Designated Highly Confidential

242. The following retail ad from a Best Buy circular is also typical.  In just a small space on the news page, the ad highlights the 4G connection speed, Android operating system, 4.5" display, 8MP camera, carrier, and homescreen widgets for the Galaxy SII Epic 4G Touch:[112]



**Network Carrier Requirements**

243. During the time that Samsung was selling these phones, Samsung and other phone manufacturers received requests for proposals from cell carriers like AT&T and Verizon.  These included lists of literally *thousands* of discrete features that the phones were required to include to be sold on the carriers' networks.[113]

**Differences in Functionality**

244. Even among phones found to infringe D'677 and D'087, there are numerous differences in the phones due to differences in aspects of the phones that are conceptually distinct from the front face, including their technical specifications and componentry.[114]

245. Another example of design being conceptually distinct from the entire phone is that Apple charges more for phones with more memory, even though the design

---

[112]   SAMNDCA00358882.

[113]   December 13, 2017 Drew Blackard Deposition Transcript, pages 26-27, 42, 62-67; SAMNDCA00377580-8917; SAMNDCA30008790-10146; SAMNDCA30010154-10316.

[114]   Generally see the documents at SAMNDCA30015517-SAMNDCA30015792, which include public phone specifications for the various smartphones at issue in this case, as well as others, indicating a wide breadth of functionality and diversity even among phones with similar design elements.

aspects are the exact same.[115]  In other word, consumers understand that the product's memory corresponds to a different concept than the design, and they can place different values on those concepts and features.  Apple has also focused its marketing and advertising campaigns on features that have nothing to do with the D'677 and D'087 designs, including, for example, Siri, the app market, the ability to take videos, and FaceTime.[116]

246.    Another example is that even where Apple has introduced a new model of the iPhone without materially altering the physical appearance from the previous model, such as upgrading the 3G to the 3GS, the alteration of internal componentry, software, and modified functionality were offered to consumers as a new product and allowed Apple to receive a higher price on the newer model.[117] If the D'677 and D'087 designs were conceptually indistinct from the whole product, consumers presumably would not have valued the 3GS more than the 3G, or the iPhone 4S more than the iPhone 4.

247.    It is also clear that Apple viewed the "concept" of the front face of the iPhone as different from the whole of the phone design.  When Apple announced the iPhone 4, it touted an "all new design" even though the phone still had the same front face.[118]

248.    Even among the two relevant phones found to infringe all three patents, they are made distinct even from each other by (i) changing the visual appearance in the

---

[115]   December 17, 2017 Tony Blevins Deposition Transcript, page 220 (Apple offers "different configurations that have different memory at different price points"); February 23, 2012 Deposition of Gregory Joswiak, page 243.

[116]   SAMNDCA30008228 (iPhone 4 announcement); APLNDC0001323877-880; APLNDC0001323956-968; APLNDC-Y0000048858-860; APLNDC-WH-A0000026147-148; SAMNDCA30010147-150; SAMNDCA00367283-285; December 21, 2017 Greg Joswiak Deposition Transcript, page 26 ("Q … as part of the evolution of the iPhone, from the first iPhone up through the iPhone 4S, what were the key functional features that you understood, as a marketing person, were key features to consumers? A. […] We would with each new generation of iPhone, of course, try to explain what was new and better about this generation than the generation it replaced, whether that was the, moving from Edge to 3G, or whether that was, you know, you know, offering Facetime, as we talked about, or Siri, those all helped to differentiate the different generations.")

[117]   Also compare the designs of Joint Exhibit 1001 (iPhone 3G) with Joint Exhibit 1002 (iPhone 3GS).

[118]   SAMNDCA30008228 (iPhone 4 announcement); CNET review: "With iPhone 4, Apple again shows that it's a powerful player in the smartphone wars.  It won't be for everyone, and AT&T remains a sticking point, but the handset's striking design, loaded feature set, and satisfying performance make it the best iPhone yet."  iPhone 4.0 Quick Report & Analysis, June 28, 2010, SAMNDCA00024872-941 at '890.

Contains Material Designated Highly Confidential

*back* of the phone, (ii) changing the appearance of the home screens, and (iii) updating the speed of connectivity.[119]



| Vibrant | Galaxy S 4G |

This further corroborates my opinion for factor two as well because, despite infringing all three patents, and therefore purportedly having all of what Mr. Ball and Dr. Kare call the look and feel of the iPhone applied to them, these devices they are still capable of obviously distinct appearances through their other prominent features, the home screens and back casings being chief among them.

**Responses to Ball Report**

249.   As I mentioned above, I disagree with Mr. Ball's analysis for this factor because I disagree with his understanding of a conceptual difference and do not believe he is applying this factor in line with its genesis in the book binding example. Instead, Mr. Ball seems to use as his guide whether the component appears physically separate from the whole product or is physically separable from it, like an accessory or interchangeable part.  (Ball Report, paragraphs 217-219.)  I do not know where Mr. Ball arrived at these criteria nor do I agree that they are the proper consideration here.  I agree that the components and accessories he has pointed out are conceptually distinct from the products as a whole, but for much more fundamental reasons.  The control panel on the HP Photosmart 6520 printer[120] is distinct from the remainder of the product on a conceptual level, as opposed to a physical or visual level, because it performs different functions and plays a different role in the overall product from the other parts.  Even within the display panel on the printer, the display screen itself responds to a different idea (presenting images and allowing finger input) than the casing around it (which

---

[119]   APLNDC-Y0000066740 (Galaxy S 4G specifications); APLNDC-Y0000066797 (Vibrant specifications); SAMNDCA30015782; SAMNDCA30015784; SAMNDCA30015623; SAMNDCA30015625.

[120]   I note that this was a printer I helped to design while at HP, and Apple asked to sell it in its stores.

Contains Material Designated Highly Confidential

provides a protective housing for the display and hides the wires inside).  Factor two already considered the visual aspects of the design, and factor four the physical aspects.  I believe this factor is intended to consider something else.

250.   Mr. Ball then shifts his focus to whether the designs are "integral" to the product as a whole, such that it is "difficult to imagine the infringing phones existing separately from these designs"  (Ball Report, paragraphs 220-221.)  Mr. Ball concludes that "[w]ithout either of the claimed designs, the infringing product would not even be a solid form—it would simply be five sides and an open face."  (*Ibid.*)  I do not know where Mr. Ball arrived at this measure of conceptual distinctness.  A book without its binding would simply be a stack of loose papers.  Asking whether the binding is "integral" to the book leads to the opposite conclusion than the Second Circuit Court of Appeals and Solicitor General reached.  I therefore do not think that is a reliable criterion.

251.   Likewise, asking if the design would have value or utility on its own apart from the product also leads to the wrong result.  (Ball Report, paragraph 222-223.)  As the Second Circuit Court of Appeals recognized, "A patent for a 'book binding' cannot, either justly or logically, be so identified with the entire book as to give all the profits on a work of literary genius to the patentee of a binding, although the binding was manufactured with and for that one book, and *has no separate commercial existence*."  (*Bush & Lane Co. v. Becker Bros*., 234 F. 79 – Second Circuit Court of Appeals, pages 81-82.)  In other words, asking about the independent value and functionality of individual components leads to the wrong conclusion.

252.   Mr. Ball's consideration of what he calls "having a holistic appearance" is also a criterion I do not understand or agree with for this factor.  (Ball Report, paragraph 227-229).  Mr. Ball quotes various Samsung designers who said they worked exclusively on the entire exterior of certain phones and sought to give the phones a cohesive appearance.  In my experience, it is a fundamental goal of good industrial and GUI design to give a product a "holistic appearance" rather than a disjointed one.  But this just means, at a simplified level, that all the parts match, like wearing a matching suit jacket, pants, shirt, shoes, and tie.  When the design or outfit is holistic, it often provides for a more pleasing aesthetic appearance, but it does not prevent people from being able to distinguish, either at a physical, visual, or conceptual level, between shirts and pants.  I therefore do not agree that any emphasis by Samsung designers on a holistic design approach is relevant here.[121]

---

[121]   This is consistent with what I understand Mr. Denison was explaining with regard to the goal of "bringing together the thousands of technology, the hundreds of parts, the millions of lines of code, to create, you know, a beautiful end product."  (Ball Report, paragraph 228 9 (quoting from the December 20, 2017 Justin Denison Deposition Transcript, page 93.)  Even in the finished product, those "thousands of technology," "hundreds of parts," and "millions of lines of code" respond to different ideas.

253.    I also believe that Mr. Ball is overstating the ability of Apple's industrial designers to create whatever designs they want without component and manufacturing constraints.  Mr. Ball quotes from a procurement specialist, but Apple itself and its designers have made statements reflecting that their designs are subject to feasibility and manufacturing restrictions, as is my professional experience.  For example, a recent Apple ad states that "Our vision has always been to create an iPhone that is entirely screen. … With iPhone X, that vision is now a reality.  Say hello to the future."[122]  Due to this new "Innovative Technology" Apple says the new display can "follow the curves of the design, all the way to the elegantly rounded corners."  (*Ibid.*)  In other words, Apple designers are constrained, at the very least, by the technology available to them.



254.    In addition to limitations due to display technology, Apple also designed the iPhone with other manufacturing constraints in mind, as indicated, for example, in an email from Richard Howarth to Jony Ive discussing ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████         These examples further confirm to me that even for designers who have a strong design vision or goal, they also have to consider restraints at the component level.  Designers are restrained by technology.  Product design, including for smartphones, evolves over time in response to technology; designers have restraints.[125]

255.    In the same way, selling a product as a whole, rather than as components, does not indicate to me that the components are conceptually inseparable from the entire

---

[122]   https://www.apple.com/iphone-x/?afid=p238%7Cs7AkblcwL-dc_mtid_20925d2q3 9172_pcrid_221626740472&cid=wwa-us-kwgo-iphone-slid--

[123]   APLNDC0003040119-124

[124]   February 9, 2012 Douglas Satzger Deposition Transcript, pages 96-100.

[125]   See my discussion in Section XIII.  I also confirmed this in conversations with Jinsoo Kim, Jeeyeun Wang, and Minhyouk Lee, who described how Samsung designers worked closely with product development teams so that designers could respond quickly to changes in technology from the engineers.

Contains Material Designated Highly Confidential

product or that the article of manufacture must be the product as sold.  (Ball Report, paragraphs 230-233.)  This seems to come close to the very error that I understand led to a new trial, namely that the focus was on how the product was sold, rather than on the physical part of it that the design was applied to.

256.   Further, contrary to Ball's next assertion, I have seen evidence that Samsung does use terms internally that identify the component articles of manufacture here, even if not every Samsung deposition witness was familiar with those specific terms. (Ball Report, paragraph 232.)[126]  Just as at Apple, Samsung has different personnel responsible for component procurement and manufacture as opposed to sales and marketing, graphic design, and so forth.  It is not surprising that certain Samsung witnesses may not have known these terms, or may not have been able to name components without context.

257.   For all the reasons above, I think Mr. Ball's analysis of the designs within the iPhone is also misguided and replaces a conceptual factor with a physical and visual one.

## D'305

258.   My opinion for the D'305 phones is based on much the same evidence and reasoning as for the products found to infringe the D'677 and D'087 patents.

259.   The design of the icon array in the application menus at issue corresponds to a different concept than the entirety of each phone.  Other components of the phones, both external and internal, such as the camera, back cover, processor, battery, SD card, speakers, accelerometer, display element, buttons, GPS, and other technological aspects, are distinct innovations from the single D'305 screen image.  Samsung designer Jeeyeun Wang testified that she never saw the Galaxy S1 phones while designing aspects of the user interface.[127]  The infringing application menu was also applied to a variety of exterior designs, clearly not designed to connect and relate to the exterior of a single phone as Apple has stated that its menu screen and exterior related to each other (even though designed by different designers).

260.   Dr. Kare nevertheless comes to the conclusion that the D'305 design is conceptually inseparable from the entire phone because the "user's primary interaction when operating the device is through the graphical user interface, the design for which has been found to infringe the D'305 patent."  (Kare Report at page 107.)  This is wrong as a practical matter for the Samsung devices because the home screens were not accused of infringing D'305.  Unlike the iPhone,

---

[126]   See the discussion below for Factor 4 regarding the specification for approval documents for Samsung's front face, bezel, and display components, which use specific part codes and terminology, such as "Window," "Core," and "Front Cover."

[127]   December 20, 2017 Jeeyeun Wang Deposition Transcript, pages 51-52.

Contains Material Designated Highly Confidential

which has only one set of icon screens, the Samsung devices have two.  Kare is also conflating the functionality of the menu screen with the ornamental aspects of the design, which are all that can be protected through a design patent.  And finally, even if the D'305 design provides functionality to the product, even necessary functionality in the case of the iPhone, that does not make the D'305 design an indistinct idea or concept from the entire phone.  It means simply that the menu plays a necessary role in the product, not that it and the product are incapable of being conceived of separately.  A driver must interact with the steering wheel and pedals to operate most vehicles, yet the driver knows that the steering wheel and pedals are different concepts from the engine, transmission, air conditioner, brakes, etc., and even more so the entire assembled car.  This is true even if the internal components that propel the vehicle cannot be seen without looking below the external design.  Moreover, iPhone users can execute iPhone operations without accessing the home screen depicted in the D'305 patent.

261.   Within the user interface, the application menu acts as a portal, like the elevator in a building.  The elevator is a distinct concept from the building as a whole, even if the elevator is a means by which a visitor accesses the various parts of the building.  And for the Samsung devices, that menu is like a back up elevator that is rarely used.

**Advertising**

262.   As mentioned above with regard to D'677 and D'087, the marketing and advertising for the Samsung smartphones focused on a number of discrete features other than the application menu.

**Carrier Requirements**

263.   As with the D'677 and D'087, the carrier requirement documents further show that the phones have thousands of features that are distinct from the design of the application menus.

**Differences Among D'305 Phones**

264.   As with the D'677 and D'087, even among phones found to infringe D'305, there are numerous differences in aspects of the phones that are conceptually distinct from the accused icon array.[128]

265.   Related to the variety in the Samsung phones is the fact that even a single infringing phone can be made non-infringing by altering just the array of icons in the applications screen, and no other elements.  (For example, updating to Firmware 2.3.6, as in the examples discussed above for Infuse 4G and Droid Charge.)

---

[128]   See the sources in footnote 99.

Contains Material Designated Highly Confidential

**Devices Other Than Phones That Use D'305**

266.   That the D'305 image is conceptually distinct from the whole smartphone is also evident from Apple's own iPod Touch.  I understand that Apple stated in a written response to a Samsung information request in this case that "[t]he patented design of the D'305 patent is embodied in at least the original iPhone, iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, and *all generations of the iPod Touch*."[129]  The screen and the phone are conceptually different.  The iPod Touch is not a phone—and yet it uses the D'305 design.  The iPhone is a conglomeration of different features, functions, and devices—phone, picture camera, video camera, etc.  One of the things that phone contains is a screen, which is an input/output device.  The display screen, and even more so the D'305 image on it, are conceptually different from, and much less than, the phone as a whole.  They are included within it, but are not equivalent to it.

**Responses to Kare Report**

267.   I disagree with Dr. Kare's working assumption that if hardware and GUI designers work together to make a finished product that is "developed together and designed to work together seamlessly," then the whole product should be the article of manufacture.  (Kare Report, paragraph 105.)  I believe that is the aim of all good finished products, including kitchen ovens.  But whether a finished product is designed to work well as an integrated whole or not, the components within the finished product do not lose their conceptual distinctiveness.  A binding that matches a book's contents perfectly still responds to a separate idea.  A piano case that was designed perfectly to hide the works within is still a separate concept from the product as a whole.

268.   Dr. Kare states that "[t]he graphical user interface has no value apart from the infringing phones as a whole."  (Kare Report, paragraph 108.)  The same is true of the components of most multicomponent products.  A book's cover, a steering wheel, an oven knob, all of these have little to no value in the normal case, unless integrated into a finished product.  I do not see in the language of the third factor any consideration of whether a component is necessary to a finished product or has no value apart from it.  I believe Dr. Kare's inquiry leads to the odd conclusion that a component can never be a separate article of manufacture unless it is an unnecessary part of a finished product.

269.   Dr. Kare also states that "Samsung's copying efforts, described above, included the entirety of the iPhone, noting that certain Samsung phones were found to infringe not only the D'305 patent but also one or both of the D'087 and D'677 patents as well."  (Kare Report, paragraph 110.)  I have addressed the issue of alleged copying at greater length below.  I note here that Dr. Kare ignores that for six of the phones at issue, only the D'305 patent was infringed, and only two products infringed all three patents.  I also note that Apple did not assert any

---

[129]   Apple's Response to Samsung's Interrogatory No. 1, March 8, 2012, page 2.

Contains Material Designated Highly Confidential

patents on the entire design of the iPhone, nor any other aspect of the user interface.  I therefore do not agree that Dr. Kare's copying narrative, even if accurate, means that the entire phone is the article of manufacture.  As I discussed for the second factor, I disagree that Samsung's intent or the popularity of the iPhone are relevant to this factor, or that they can change the physical thing to which a design was applied.

**David Reibstein's Opinions**

270.    I am informed that expert witness David Reibstein has considered the third factor and has also come to the conclusion, as I have, that this factor weighs in favor of component parts being the proper articles of manufacture.  I have reviewed his opinions and believe they further support the conclusions I have independently made here.

**Conclusion**

271.    It is my opinion that for all three patents and for each of the Samsung smartphones, considering whether the design is conceptually distinct from the product as a whole supports my conclusion that the articles of manufacture are the components identified in Section III.  Apple's narrow patented designs are simply not conceptually equivalent to entire smartphones.  I disagree with Apple's experts' conclusions that they are.

## X.    FACTOR 4 – EACH OF THE ARTICLES OF MANUFACTURE IS A PHYSICALLY SEPARATE COMPONENT

272.    This factor looks to "[t]he physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately."  (Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, page 35.)

273.    It is my opinion that all three patented designs pertain to components that are physically distinct from the rest of the components in the smartphones.  Those components are separable, separately manufactured, and can be separately sold, particularly for replacement purposes.

### D'677 and D'087

**Component Design**

274.    From conception through to final production, the Samsung phones are the product of different teams working on different components and features.  Industrial designers work on external components, UX designers work on the software experience, graphical designers work on the visual elements of the user interface,

Contains Material Designated Highly Confidential

engineers work on internal components, programmers work on software coding, and so on.[130]  The industrial designers who created the front face and bezels of the D'677 and D'087 products were simply not responsible for the entirety of those products.

275.  Even at the level of industrial design, the exterior of the phones are designed as multiple components, not unitary shells.[131]



---

[130]  Conversations with Jeeyeun Wang, Minhyouk Lee, Jinsoo Kim, Yongseok Bang, Hyoung Shin Park; December 20, 2017 Jeeyeun Wang Deposition Transcript, pages 51-52; SAMNDCA30015885.

[131]  Top row from left to right: SAMNDCA00507896 and SAMNDCA00507897 (Galaxy S4G/Vibrant bezel and front glass face); SAMNDCA00507897 (Infuse 4G front glass face).  Bottom:  SAMNDCA00508305 (Infuse 4G front face).  I also considered conversations with Jinsoo Kim, Yongseok Bang and Minhyouk Lee, as well as direct witness statements from Yongseok Bang and Minhyouk Lee in the International Trade Commission proceeding called In the Matter of Certain Electronic Digital Media Devices and Components Thereof, Investigation No. 337-TA-796.

Contains Material Designated Highly Confidential

**Manufacturing**

276.    The Samsung phones are also manufactured from thousands of separate components.  The glass front faces and bezels are sourced from separate entities other than Samsung Electronics Company, and are put together into sub-assemblies, which Samsung purchases.[132]  Samsung engineering drawings show exploded views of products, exhibiting their multicomponent construction.[133] Manufacturing work guide documents show the process of creating sub-assemblies and then assembling full products.[134]

277.    For D'677 and D'087, I reviewed manufacturing specification for approval documents from Samsung, and spoke about them with DongWook Kim who had firsthand knowledge of them.[135]  The documents include images of component parts of Samsung's phones prior to assembly.  I understand that Samsung sourced and bought various separate components from vendors who manufactured the components and in some instances attached them together into sub-assemblies that Samsung would then attach to other sub-assemblies to create final, finished products.[136]  An example of the specification for approval document for the Galaxy SII (T-Mobile) is below:[137]

---

[132]    Conversations with manufacturing personnel at Gumi; conversation with DongWook Kim; December 14, 2017 Tim Sheppard Deposition Transcript, pages 110-111.

[133]    SAMNDCA30007924-SAMNDCA30007941; SAMNDCA30005047-SAMNDCA30005138.

[134]    SAMNDCA30003537-SAMNDCA30004594.

[135]    SAMNDCA30000056 to SAMNDCA30003536 and SAMNDCA30005937 to SAMNDCA30007923 (component approval documents).

[136]    December 22, 2017 Dongwook Kim Deposition Transcript, pages 43-46; Conversation with DongWook Kim; December 14, 2017 Tim Sheppard Deposition Transcript, pages 33-36; SAMNDCA30000055 (spreadsheet listing vendor sources of front glass, display, and bezel components); SAMNDCA30003537 to SAMNDCA30004594 (manufacturing work guides for sub-assemblies and full assemblies).

[137]    SAMNDCA30005937

Contains Material Designated Highly Confidential



278.　　In each instance, the black front glass face is listed as "Window" and is shown with internal part numbers.  In my opinion, these Window parts correspond exactly with the black glass front face I ultimately identified as the article of manufacture for D'677 for each product.[138]

---

[138]　SAMNDCA30000518 (Fascinate, SCH-I500, "Atlas"); SAMNDCA30001556 (Galaxy S2 (AT&T), SGH-I777); SAMNDCA30001835 (Infuse 4G, SGH-I997, "Dempsey"); SAMNDCA30002235 (Galaxy S 4G, SGH-T959V, "Vibrant+"); SAMNDCA30002630 (Galaxy S2 (T-Mobile), SGH-T989, "Hercules"); SAMNDCA30003283 (Galaxy S2 (Epic 4G Touch), SPH-D710, "Gaudi"); SAMNDCA30005139 (Vibrant, SGH-T989, "Behold3"); SAMNDCA30005537 (Showcase, SCH-I500 ACG, "Atlas"); SAMNDCA30005538 (Mesmerize, SCH-I500 USCC, "Atlas"); SAMNDCA30005937 (Galaxy S2 (T-Mobile)); SAMNDCA30006228 (Galaxy S2 (Skyrocket), SGH-I727, "Celox"); SAMNDCA30007769 (Galaxy S2 (Skyrocket), SGH-I727, "Celox").

Contains Material Designated Highly Confidential

279.   I note that these are different than the white glass front faces identified in other specification documents that relate to non-infringing design arounds.[139]

280.   For the two D'087 smartphones, Galaxy S 4G and Vibrant, the Window component also corresponds exactly with the front glass face portion I ultimately identified as one of the articles of manufacture for D'087.  An additional piece, the bezel, which I ultimately identified as the other article of manufacture for D'087, is shown in several separate manufacturing testing and approval documents and assigned a part number.[140]



281.   At the 2012 trial, various witnesses talked about the component parts within a finished smartphone product.  Justin Denison, Samsung's Chief Strategy Officer spoke about the display, speakers, microphones, and input keys, calling them some of the "main components in a phone."  (Document No. 1610, August 3, 2012 Trial Transcript, pages 868-872.)  Denison also talked about how the display screen is separate from "the bezel, if there's a bezel, or the frame if there's a unibody frame."  (*Ibid.* pages 871-872.)  He also talked about the front glass face as a separate component, saying "there's a piece of glass and then underneath that is a display and you have to glue that on top."  (*Ibid.* page 872.)  Samsung's expert witness Itay Sherman also spoke to the fact that "there are a lot of components that reside below the surface" of the phone's glass face and that a black mask is used "to hide them."  (Document No. 1840, August 14, 2012 Trial Transcript, pages 2610-2611.).

---

[139]   SAMNDCA30001452; SAMNDCA30006520 to SAMNDCA30007768.

[140]   SAMNDCA30002183 (listing bezel as part GH98-18774A for Galaxy S 4G, SGH-T959V); SAMNDCA30007873 (listing bezel as part GH98-17252A for Vibrant, SGH-T989).  I have attached as Exhibit 7 a summary exhibit of select pages of the approval documents for each phone, including for white design-arounds.

Contains Material Designated Highly Confidential

**User Replaceable Components**

282.    The Samsung D'677 and D'087 products were designed and manufactured to
include various components that could be easily removed by a user, including the
battery cover, battery, SIM card, and SD card.  These removable and replaceable
parts were seen by Samsung as a product differentiator in the marketplace.[141]
User guides for the Samsung smartphones highlight these removable and
replaceable components,[142] as seen in this example for the Epic 4G.[143]



**User Repairable Components**

283.    Additional parts were designed and manufactured to be repairable if they broke.
While these parts were not designed to be as easily removable as the battery, for
example, there is abundant evidence that pieces such as the glass front face, bezel,

---

[141]    Yongseok Bang

[142]    APLNDC-Y0000062778-976; APLNDC-Y0000065097-304 APLNDC-
Y0000065725-907; APLNDC-Y0000065725-907 APLNDC-Y0000061629-794 APLNDC-
Y0000058528-807; APLNDC-Y0000064209-490 APLNDC-Y0000061795-969
SAMNDCA00018395-8642; APLNDC-Y0000059544-791; APLNDC-Y0000062522-777 S-
ITC-003304098-4299; APLNDC-Y0000061178-379; APLNDC-Y0000060900-1177;APLNDC-
Y0000058808-9008; S-ITC-003298165-370; S-ITC-003300462-619; APLNDC-Y0000062191-
348; APLNDC-Y0000065428-557; SAMNDCA00011452-618; APLNDC-Y0000059792-948;
APLNDC-Y0000065558-724; SAMNDCA00009582-9786; APLNDC-Y0000060695-899;
APLNDC-Y0000063660-861; APLNDC-Y0000060544-694; APLNDC-Y0000064946-5096;
APLNDC-Y0000057975-8148; APLNDC-Y0000066556-728; SAMNDCA00017928-18146;
APLNDC-Y0000057320-538; APLNDC-Y0000056940-7319.

[143]    APLNDC-Y0000058528

Contains Material Designated Highly Confidential

and display screen on the Samsung phones were separable and repairable, even after assembly.[144]

284.   Apple conducted tear downs and disassemblies of Samsung products.  During the 2012 trial, I understand that during the questioning of Apple executive Scott Forstall, the jury saw "detailed teardown analyses" of the Samsung Vibrant, and that such a disassembly included "breaking out each component and looking both at hardware components and the actual boards that are used."  (Document No. 1610, August 3, 2012 Trial Transcript, pages 769-772; Defendants' Exhibit 2519.)[145]



285.   Third parties have also conducted step-by-step pictorial teardowns of Samsung's smartphones, and I have considered these as well,[146] such as this teardown of the Galaxy S 4G on the iFixit.com site:[147]

---

[144]   For example, December 14, 2017 Tim Sheppard Deposition Transcript, pages 25-66, 105, as well as the third party videos and repair parts referenced below.

[145]   APLNDC0002868462

[146]   SAMNDCA30000001 to SAMNDCA30000053

[147]   SAMNDCA30000009

Contains Material Designated Highly Confidential



286.   As part of my work in this case, I also disassembled Samsung devices and inspected other phones that had been disassembled by Samsung.[148]  A few representative images are below:

   

**Galaxy S 4G**                  **Galaxy S2 (Epic 4G Touch)**

287.   Service and repair manuals also exist for each of the Samsung products, providing instructions to authorized repair technicians how to diagnose and repair each smartphone, including varying degrees of disassembly.[149]  Below are representative images from the service manual for the Vibrant:[150]

---

148   Attached as Exhibit 8 is a compilation of photos of the disassembled products I examined, with full sets of components and sub-assemblies, as well as the individual components I considered to be (or capable of being) the articles of manufacture.

149   SAMNDCA30004595 to SAMNDCA30005046; S-ITC-003710999 to S-ITC-003711102; S-ITC-003712934 to S-ITC-003713028; S-ITC-003714501 to S-ITC-003714586

150   S-ITC-003714501

Contains Material Designated Highly Confidential



288.    I understand that Samsung supports in-warranty and out-of-warranty repairs of components, including the glass and display screen, by authorized vendors.[151] Samsung's Vice President of Procurement, Tim Sheppard, testified about seeing Samsung phones being repaired and had seen "millions of devices in separation".[152]

289.    Third parties also sell repair kits on websites such as Amazon and eBay.[153]  For example, this black front glass replacement kit for the Galaxy S II Skyrocket for $4.99.[154]

---

[151]    December 14, 2017 Tim Sheppard Deposition Transcript, pages 25-66, generally.

[152]    *Ibid.*, pages 25-27.

[153]    SAMNDCA30007944 to SAMNDCA30008049

[154]    SAMNDCA30008004



290.   And third parties have also created videos and articles showing how to disassemble and repair various Samsung products, including front glass face and display screen repair.[155]

**Examples from Apple**

291.   Apple's iPhones are also multicomponent products.[156]   The D'677 and D'087 patents have different inventors with different skill sets than D'305, showing that the designs were conceived separately from each other.   In addition, Apple's utility patents related to the iPhone have different inventors from the design patents, showing that other components were also separately conceived.[157]

292.   For example, Apple received a utility patent related to how the bezel would connect with the back housing of the iPhone, and the patent lists three individuals who are not on Apple's design patents.[158]

---

[155]   SAMNDCA30008050 to SAMNDCA30008125; SAMNDCA30008154 to SAMNDCA30008173

[156]   Apple's Response to Samsung's Request for Admission Regarding Article of Manufacture No. 37, November 29, 2017, page 19 (admitting that "Apple's Phones incorporate multiple components").

[157]   Exhibits 5 and 6.

[158]   SAMNDCA00365600 (U.S. Patent No. 7,688,574, titled "Cold Worked Metal Housing For A Portable Electronic Device").

Contains Material Designated Highly Confidential



293.   Like Samsung, the components that make up the iPhone are manufactured by different vendors and then assembled separately.  For Apple, the front glass face was sourced from Dow Corning ██████████████████████████████████████████████████████████████████████.[159]  These components are then assembled at Foxconn in China.[160]  As already mentioned, the iPhone 4 announcement from MacWorld even showed the separate manufacture of the glass and bezel.[161]

294.   Tony Blevins, Apple's Vice President of Procurement, testified at the 2012 trial and stated that he was responsible for "acquiring necessary components" for Apple's iPhones and he showed the jury a disassembled iPhone 4's internal motherboard or "major logic board" and the baseband processor on it, which was supplied by Qualcomm and Intel.  (Document No. 1842, August 16, 2012 Trial Transcript, page 3165-3168.)  Blevins testified that there were "900 to 1,000 parts total" in the iPhone, though he appears to agree now that there are even more than that.  (*Ibid.* page 3168.)  In 2012, Blevins had "300 people in [his] organization" that reported to him to source components.  (*Ibid.*, page 3165.)

295.   Apple's expert witness regarding damages, Terry Musika, testified about the Samsung division that manufactured "components" such as "processor[s]," "memory chips," "touchscreen[s]," and "flash memory" for various phone

---

[159]   December 17, 2017 Tony Blevins Deposition Transcript, pages 110-111 (Dow Corning and ████████ supplied cover glass); *ibid.* pages 88-89 (████████████████████████████████████████); *ibid.* pages 55-56 ████████████████████████████████████████  *ibid.* pages 109-110 (Mr. Blevins did not recall display suppliers changing for iPhone 3G; iPhone 3GS; iPhone 4, or iPhone 4S).

[160]   December 17, 2017 Tony Blevins Deposition Transcript, page 108 (identifying Hon Hai Precision as assembler for first generation iPhone), page 112 (identifying Hon Hai Precision as assembler for iPhone 3G and iPhone 3GS, identifying Hon Hai Precision and Pegatron as assemblers for iPhone 4 and iPhone 4S), page 118 ("Hon Hai Precision Industrial uses the trade name Foxconn.").

[161]   SAMNDCA30008228.

makers, including Apple.  (Document No. 1839, August 13, 2012 Trial Transcript, pages 2148-2153.)

296.  Chris Stringer, one of the inventors named on the D'677 and D'087 patents, testified about the separate manufacture of components for the iPhone, including "producing the glass," "putting the glass in close proximity to hardened steel," and separately "machining" a "high grade of steel" for bezels at volumes that were "unprecedented at that time."  (Document No. 1547, July 31, 2012 Trial Transcript, pages 494-495.)  Mr. Stringer also indicated that the iPhone's exterior was designed separately from the "components or the internal elements of the phone."  (*Ibid.*, page 496.)

297.  Separate components, including the glass front face, bezel, and display screen, had to be separately designed and engineered, down to uniform specifications:[162]



298.  Also like Samsung, Apple provided warranty and repair services, including for the glass and display screen on its devices.  Apple informs consumers how to obtain repair services on its website for each generation of the iPhone.[163]  Apple also has service manuals with instructions on how to disassemble its phones.  I have visited an Apple store and spoken to an employee about how I could have an iPhone screen repaired in the store while I wait.[164]

---

[162]   APLNDC-MCO-000001-077; APLNDC-MCO-000146-231

[163]   SAMNDCA30015836-856.

[164]   Visit to Apple store in San Francisco in December 2017.

Contains Material Designated Highly Confidential

299.   Third parties also sell replacement parts for the iPhone on sites like Amazon and eBay.[165]

300.   And third party sources, including websites, show how to fix and/or disassemble iPhones or have performed teardown services.[166]

301.   Prior to my work on this report, around 2014, I also personally disassembled an Apple iPhone and inspected its components.

**Sales to End Users**

302.   In my opinion, Apple's experts are incorrect in applying the fourth factor by focusing on whether Samsung is selling components to end users.  I understand that the District Court's test asks only "if the component can be sold separately," without regard to the party making the sale or the identity of the purchaser.  The Solicitor General's articulation of the test asks "if the component can be sold separately (*for instance, for replacement purposes*)."  (U.S. Brief, page 29.)  That similarly does not place a limitation on the time of the sale or the identity of the party making the sale and gives "replacement purposes" as an example, which is separate from the sale of a finished product to an end user.

303.   I think it is abundantly clear that the component parts I have identified here (front glass face, bezel, and display screen) can all be sold separately.  Samsung sources these parts from other vendors, and the parties designate each component with a separate parts number.  Although the components are transferred as parts of sub-assemblies, they are certainly capable of being sold separately as well.  For example, one of the vendors selling sub-assemblies to Samsung could purchase the component from a sub-vendor.  Having been manufactured separately, catalogued individually, and approved as an independent component, it is clear that the components are capable of being sold separately.  And as I noted above, they sometimes are, in the context of repairs.

**Responses to Ball Report**

304.   Ball relies for his opinion on the bases that

- Samsung never separately sold component articles of manufacture to consumers,

---

[165]   SAMNDCA30015793-SAMNDCA30015835

[166]   SAMNDCA30008126-SAMNDCA30008153; SAMNDCA00024754; SAMNDCA00019412-19429; SAMNDCA00019430-449; SAMNDCA00019450-460; SAMNDCA00011038-1046; SAMNDCA00019461-478; SAMNDCA00019531-533; APL7940003072395-2517.

- Samsung never instructed users to separate the components from the products or use them separately, and

- Training and specialized tools are required to disassemble the smartphones.  (Ball Report, pages 60-67.)

305.   These points do not change my opinions.  The articles of manufacture need not be sold separately *to end consumers*.  I understand that the Supreme Court stated the following basic principle:  "[T]he term 'article of manufacture' is broad enough to embrace both a product sold to a consumer and a component of that product, *whether sold separately or not*.  Thus, reading 'article of manufacture' in § 289 to cover only an end product sold to a consumer gives too narrow a meaning to the phrase."  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 433.)  I have observed that the phrase used in the statute and described by the Supreme Court is "article of manufacture" and not "article of sale."

306.   For this reason, I believe Mr. Ball applies a fundamentally flawed understanding of an article of manufacture to his analysis when he includes in his short list of opinions that "Samsung's use of the Apple designs was directed towards full, unitary products."  (Ball Report, paragraph 8.)  And when he says, "[s]imply put, Samsung was in the business of making and selling complete phones, and used Apple's patented designs for the infringing phones that it sold."  (*Ibid.*)  I likewise disagree with Ms. Davis' opinions relying on the fact that Samsung sold finished products and accounted for profits at that level.  (Davis Report, pages 50-62.)  In my experience, that is far and away the most common way to sell and account for multicomponent products.  The consideration also has nothing to do with the scope of the claimed design or how the design was used by the infringing party.  Instead, this consideration seems to have been a key focus of Apple's experts because it leads to the conclusion that the entire product is the article of manufacture regardless of the scope of the design involved.

307.   I also understand that the Solicitor General explained this factor as follows:  "If the design pertains to a component that a user or seller can physically separate from the product as a whole, that fact suggests that the design has been applied to the component alone rather than to the complete product.  See, *e.g.*, *Piano I*, 222 F. at 904; *Brand*, 83 Off. Gaz. Pat. Office at 748.  The same is true if the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately (for instance, *for replacement purposes*)."  (U.S. Brief, page 29.)  Nowhere in the Solicitor General's description have I found a requirement of a separate sale to an end user.  I understand that it is not required that the component have a separate commercial existence.  (U.S. Brief, pages 20-21.)  Instead, the Solicitor General appears to have given several examples of how a design can pertain to a component rather than an entire product.  In the example of the book, the binding did not have to have "a separate commercial existence," for the pianos, there was no separate market for piano cases apart from entire pianos, and for the refrigerator, the refrigerator containing

Contains Material Designated Highly Confidential

the latch was "sold" as a "unitary article,"[167] yet the articles of manufacture were distinct from the entire products for purposes of damages in each case.  I therefore do not agree that there is any reason to consider the entire phone the article of manufacture simply because the Samsung smartphones are not "assembled cafeteria-style at purchase."  (Kare Report, paragraph 106.)  That appears to me to be a misapplication of factor four as I understand it, and would seem to limit the applicability of this factor to a few outlier examples, like a Lego store or Build-A-Bear workshop.  In my experience complex, multicomponent products are rarely sold cafeteria-style.

308.    Even though not sold to end users by Samsung as part of a build-your-phone-at-home experience, I considered the evidence discussed above that the front glass, bezel, and display screens *are* sold separately, both for purposes of supplying components to Samsung for assembly into finished products and for repairing those products.  I understand this to be in line with what the Solicitor General proposed as relevant considerations:  "The same is true if the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately (for instance, for replacement purposes)."  (U.S. Brief, page 29.)

309.    I also do not agree that it matters whether Samsung instructed users to take the phones apart.  I do not find that consideration or criteria anywhere in the four-factor test proposed by the Solicitor General or adopted by the District Court.  And for good reason.  Multicomponent products are meant to be used while assembled, but that does not mean that a design cannot be applied only to a component of that finished product.  Again, the examples above of a book and binding, piano and case, and refrigerator and latch are instructive.  I would not expect a book to come with instructions on how to remove the binding, and so on, yet I understand that those components can all be separate articles from the finished and assembled product.  As another example, I understand that the Supreme Court indicated that a kitchen oven is a multicomponent product and that depending on the design involved, the article of manufacture might be a component of that oven.  (*Samsung Electronics Co., Ltd. v. Apple Inc*., 137 S.Ct. 429 - Supreme Court 2016, page 432.)  I have reviewed images of a kitchen oven and a corresponding user manual and have confirmed that among the many components in the oven, the manufacturer does not instruct the owner on how to remove anything beyond a few discrete parts, like the racks.[168]

---

[167]    *Young v. Grand Rapids Refrigerator Co*., 268 F. 966 - Court of Appeals for the Sixth Circuit 1920 ("The ornamental design of the shell added something to the attractiveness of the unitary article sold; but it is not seriously contended that all the profits from the refrigerator belonged to Young.")

[168]    SAMNDCA30015857-883

Contains Material Designated Highly Confidential

310. Similarly, for a complex, multicomponent product like a Tesla car, users are sold an assembled end product and are not instructed to dismantle it, yet it is still made up of many components, like a windshield, motors, steering wheel, door handles, etc. Like the kitchen oven, the manual does not instruct the user how to disassemble the car.[169] In fact, most users will likely take their vehicle to a trained technician for repairs if a component is damaged or malfunctions. Nevertheless, simply because the windshield, for example, is something that a trained technician might fix does mean that it could never be an article of manufacture. In the same way, I do not agree that because the Samsung smartphones are assembled well, so that the front glass does not fall off during normal use, for example, that the components under consideration here cannot be discrete articles of manufacture to which partial designs were applied.

311. Mr. Ball's opinions appear to be based on the misconception that an article of manufacture is only something that can be "disaggregated from the full products in ways like designs for discrete modular components in modular product systems can be." (Ball Report, paragraph 7.) I believe that is an unwarranted limitation that I cannot find anywhere in the District Court's test. The Supreme Court only separated between single-component and multicomponent products. I have not seen any support for a definition of an article of manufacture that makes it equivalent to "modular product systems" or to components that are separable because they are "modular."

## D'305

312. My analysis for the D'305 design is substantially the same as for D'677 and D'087 and relies on much the same evidence. I incorporate those opinions here and provide some additional comments below.

313. I understand that the design of the application menu for the D'305 products occurred separately from the hardware design of the products. In fact, Samsung's GUI designer Jeeyeun Wang testified that she never saw the external design of the Galaxy S devices while she was designing the user interface for those phones.[170]

314. I also understand that the application menus can be redesigned thru an update in the source code without having to alter any other aspect of the product. The fact that the software can be altered without having to alter the physical display is further support that the entire display screen is not properly considered the article of manufacture, but that it is only the article of manufacture for the D'305 design while it is displaying that image.

315. According to its interrogatory responses, Samsung implemented such changes to the following phones on the following dates:

---

[169] SAMNDCA30015271-5472

[170] December 20, 2017 Jeeyeun Wang Deposition Transcript, pages 51-52.

Contains Material Designated Highly Confidential

Droid Charge - SCH-I510: May 4, 2012

Epic 4G - SPH-D700: March 7, 2012

Infuse 4G - SGH-I997: June 5, 2012.[171]

316.   I've also observed that the patented array of icons on the applications menu can be removed from the display screen by simply turning off the device or changing the image on the screen, including by going to the home screen.

317.   From my experience and analysis, I believe that the vast majority of a Samsung phone's life is spent either turned off or showing screens other than the application menu.[172]  Even among icon menus, the home screen is where users place their most frequently accessed icons, not the applications menu, which is a back-end index that Android, but not the iPhone, has.

318.   Also, although software and other physical components (such as a battery and processor) may be needed for the phone to create the patented D'305 image, the image is not *applied* to any of those other physical components in any way; rather those components are part of the process by which the design is applied (temporarily) to the display screen.  I understand that for designs created through temporary moving media, such as moving water or moving light, that the patented design relates only to the physical thing actually displaying the ornamental image, not any supporting components that might be needed.[173]  I also understand that software code cannot be an article of manufacture to the extent that it is not a physical thing to which a design can be applied.

319.   As with the D'677 and D'087 patents, I have relied on the same manufacturing approval documents, teardowns, service manuals, third party repair websites, videos, and kits, CAD files, engineering documents, and other Apple and Samsung documents listed above.  In particular, the manufacturing specification for approval documents have confirmed for me that the component to which the D'305 design has been applied is the display screen.  This specific component is listed as "Core" in the approval documents and is shown with internal part numbers.  In my opinion, these Core parts correspond exactly with the display screen I ultimately identified as the article of manufacture for D'305 for each product (for the time that the image is actually being displayed or applied to the

---

[171]   Samsung's Response to Apple's Interrogatory Regarding Articles of Manufacture No. 3, December 21, 2017, at page 53.

[172]   Conversation with Jeeyeun Wang and other user interface designers; SAMNDCA30010317 to SAMNDCA30011459 (GUI guidelines); Reibstein Report.

[173]   *In re Hruby*, 373 F.2d 997 - Court of Customs and Patent Appeals 1967, pages 998-999.

Contains Material Designated Highly Confidential

screen).[174]  Below is a sample of the approval for the Continuum showing the Core:[175]



**Responses to Kare Report**

320.     I disagree with Dr. Kare's assessment that the D'305 design cannot relate to a component, as opposed to the whole Samsung phone, because the design cannot exist on its own.  (Kare Report, paragraph 114.)  The fourth factor does not

---

[174]     SAMNDCA30000056 (Gem, SCH-I100, "Max"); SAMNDCA30000181 (Continuum, SCH-I400, "Garnet"); SAMNDCA30000518 (Fascinate, SCH-I500, "Atlas"); SAMNDCA30000972 (Droid Charge, SCH-I510, "Stealth"); SAMNDCA30001334 (Indulge, SCH-R910, "Forte"); SAMNDCA30001834 (Captivate, SGH-I897, "Kepler"); SAMNDCA30001835 (Infuse 4G, SGH-I997, "Dempsey"); SAMNDCA30002235 (Galaxy S 4G, SGH-T959V, "Vibrant+"); SAMNDCA30002914 (Epic 4G, SPH-D700, "Victory"); SAMNDCA30005139 (Vibrant, SGH-T989, "Behold3"); SAMNDCA30005537 (Showcase, SCH-I500 ACG, "Atlas"); SAMNDCA30005538 (Mesmerize, SCH-I500 USCC, "Atlas");

[175]     SAMNDCA30000181

Contains Material Designated Highly Confidential

mention *designs* being separable, but *components* being physically separable, and whether the design "adheres" to such a component. My opinion is that the D'305 design at most "adheres" to a physically separable and separately manufactured component, namely a display screen. And my opinion is also that the design only "adheres" to that component for a limited period of time because the nature of graphical user interface designs is that they are temporal and fleeting, otherwise the smartphone could only ever show one screen. The relevant article of manufacture, as I understand it, is the article to which the patented design was applied. The user interface on the Samsung phones is undeniably vast.[176] It cannot all adhere or be applied to the display screen at the same time. The article of manufacture for purposes of D'305 then, in my opinion, is best described as the display screen, and only for the time the D'305 design is being shown, otherwise the display screen is an article of manufacture to which a different design is being applied.

321.    Further, as Dr. Kare recognizes, the images from the user interface of the Samsung phones, including the applications menu, was created on a display or "dummy frame" that is separate from the rest of the phone. (Kare Report, paragraphs 105, 109 (citing to December 20, 2017 Wang Deposition Transcript pages 35-36, 39-40 and also describing the process of Apple's own GUI designers using a "prototype iPhone display".) In other words, the design is separable, and not physically contingent, on any other part of the Samsung smartphone.

**Conclusion**

322.    It is my opinion that for all three patents and for each Samsung product, considering the physical relationship between the patented design and the rest of the product supports the conclusion that Apple's designs were applied only to the component articles of manufacture identified in Section III. I disagree with Apple and its witnesses' conclusions that factor 4 reasonably indicates that the entire phone is in any instance the proper article of manufacture.

## XI.    SUMMARY OF MY FOUR-FACTOR ANALYSIS

323.    After conducting my independent analysis above, the four factors in the District Court test have led me to the conclusion that the articles of manufacture here are the components of the Samsung phones identified in Section III, and not the entire phones themselves. The scope of each design patent is limited to the specific components I have identified as the articles of manufacture. The designs have limited prominence within the products as a whole—they do not affect the appearance of the product as a whole given the numerous other visual components unaffected by the narrow designs and the hundreds of other components unaffected by Apple's patented designs. The designs are readily distinguishable at a conceptual, and not just a visual or physical, level from the product as a

---

[176]   Conversation with Jeeyeun Wang;  SAMNDCA30010317 to SAMNDCA30011459 (twenty four documents comprising the GUI guidelines).

whole because the designs relate to discrete aspects of finished products that have many other components and features.  And the designs relate to components that are manufactured and sold separately prior to phone assembly, and which are physically separable after purchase as well, including in the context of repairs.  I believe my analysis and opinions correctly apply the District Court's four factor test, while those of Mr. Ball, Dr. Kare and Ms. Davis do not.

324.   In addition, I believe my opinions are in line with the Solicitor General's statements in proposing this four factor test, including the following:

a.   "In conducting this inquiry, the factfinder's over-arching objective should be to identify the article that most fairly may be said to embody the defendant's appropriation of the plaintiff 's innovation.  That framework anchors the inquiry in Section 289's purpose, which is to provide the patentee with a remedy for (and to prevent the infringer from profiting from) the unlawful appropriation."  (U.S. Brief, page 26.)

b.   "In cases where the identity of the relevant 'article of manufacture' is otherwise open to reasonable dispute, the factfinder may legitimately consider which characterization would appropriately compensate (rather than over-compensate) the patentee for the contribution of the patented design to the value of the infringer's finished product."  (*Ibid*. page 27.)

c.   "When a product is composed of distinct components, choosing the article that most fairly embodies the plaintiff's invention will help to ensure that 'neither party will have what justly belongs to the other.'"  (*Ibid*., page 27.)

325.   It is clear to me that the articles identified in Section III most fairly can be said to embody Apple's patented designs, and Samsung's use of those designs.  Those same components are what Apple argued were substantially similar to its designs when asserting infringement.  That further supports my opinion that these are the articles to which Apple's designs were applied.

326.   I also believe my analysis is in line with the following statement by the U.S. Supreme Court, because, as I've discussed above, the infringement here was established based on similarities between the components I have identified above and the claimed portions of the patented designs, ignoring all other aspects of the Samsung smartphones:

a.   "Section 289 allows a patent holder to recover the total profit an infringer makes from the infringement.  It does so by first prohibiting the unlicensed 'appli[cation]' of a 'patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale' or the unlicensed sale or exposure to sale of 'any article of manufacture to which [a patented] design or colorable imitation has been applied.'  35 U.S.C. § 289.  It then makes a person who violates that prohibition 'liable to the

Contains Material Designated Highly Confidential

owner to the extent of his total profit, but not less than $250.  Ibid.
'Total,' of course, means all.  See American Heritage Dictionary 1836 (5th
ed. 2011) ('[t]he whole amount of something; the entirety').  The 'total
profit' for which § 289 makes an infringer liable is thus all of the profit
made from the prohibited conduct, that is, from the manufacture or sale of
the 'article of manufacture to which [the patented] design or colorable
imitation has been applied.'" (*Samsung Electronics Co., Ltd. v. Apple
Inc.*, 137 S.Ct. 429, Supreme Court 2016, at page 434.)

## XII.  SAMSUNG'S ALTERNATIVE PROPOSED ARTICLE OF MANUFACTURE TEST

327.   I understand that Samsung has proposed an alternative test for identifying the
article of manufacture from that adopted by the District Court.[177]  I am informed
and understand that under Samsung's test, one would consider the scope of the
design claim and the corresponding part or portion of the accused product that is
accused of infringement.

328.   Using Samsung's proposed alternative test, I would come to the same conclusions
as above regarding the articles of manufacture.

## XIII.  APPLE'S COPYING ALLEGATIONS

329.   The Ball, Kare, and Davis reports devote a considerable amount of space to
allegations that Samsung copied Apple's designs.  For the reasons below, I do not
believe those opinions respond to the four-factor test, are useful, or are based in
history.

330.   I understand that Apple asked the District Court to include the following factor in
the test for identifying the article of manufacture:

a.   "The defendant's reasons for appropriating the patented design, including
whether the defendant did so in an effort to replicate a product as a
whole."  (Document No. 3522, September 8, 2017, Apple's Opening Brief
In Response To The Court's July 28, 2017 Order, page 6.)

331.   I understand that the District Court rejected this proposed factor after concluding
that it was irrelevant to determining what article of manufacture a design had been
applied to:

a.   "Apple's fourth proposed factor, the infringer's intent in copying the
patented design, finds no support in the text of the statute.  Apple cites no
authority in its briefs to support the inclusion of this factor.  In fact, the
predecessor to § 289 contained a knowledge requirement, but Congress

---

[177]   Samsung's Opening Brief Pursuant to Order of July 28, 2017 Regarding Necessity of
New Trial on Design-Patent Damages, Dkt. No. 3521 at page 8.

removed the knowledge requirement when it passed the 1952 Patent Act. See Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1290 (Fed. Cir. 2002); Mark A. Lemley, *A Rational System of Design Patent Remedies*, 17 Stan. Tech. L. Rev. 219, 223 & n.19 (2013) (explaining history of knowledge requirement).  Moreover, the article of manufacture inquiry is a factual one: to which article of manufacture was the patented design applied?  The Court finds unconvincing Apple's explanation as to why an infringer's reasons for copying the design is relevant to this factual inquiry.  As a result, the Court declines to include the infringer's intent as a factor in the article of manufacture test."

(Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages, pages 17-18.)

332.   Based on this ruling, I do not think that any allegations of copying are relevant to determining the article of manufacture under the Court's test.

333.   Even if the District Court had allowed allegations of copying to be a part of the test, and even if there was a basis to conclude that there was copying of the patented designs, I do not think this would significantly affect the analysis. Despite Mr. Ball and Dr. Kare's decision to devote so much space to their allegations, I do not agree that the reasons for using a patented design can alter the thing to which that design was applied.  Whether infringement was the result of copying or was inadvertent does not change the scope of the infringement or the portions of the infringing product that embody the patented design.  As I've discussed above, Apple and its witnesses, including Dr. Kare, limited their infringement opinions to discrete portions of the design of Samsung products, asking the jury to ignore differences in all other aspects.

334.   Finally, even if copying were a relevant, material consideration, Mr. Ball's and Dr. Kare's assertions of copying do not change my opinion.  I do not agree with their recitation of the events.

335.   I understand that the prior jury did not issue a verdict on the issue of copying.  I also understand that the patent infringement analysis does not include any consideration or conclusion of copying.  My understanding is, accordingly, that a verdict of infringement does not equal a finding of copying.

336.   I find that Mr. Ball's and Dr. Kare's presentation of the history of design at Samsung is contradicted by numerous sources, including my own understanding of the history of smartphones, as well as my investigation of Samsung sources. Regarding the overall state of smartphones leading up to the iPhone, the following diagram more accurately depicts the design evolution.  This is based on comprehensive research and my experience in the technology industry. Following the design of large brick forms prior to 1992, the IBM Simon clearly defined the path forward with a touch screen, icons in a grid and a similar GUI dock some 15 years prior to D'305 patent.  In fact, virtually all the "firsts" noted

Contains Material Designated Highly Confidential

separately as part of the first generation iPhone were implemented on other smartphones prior to the its release.  Furthermore, although slightly smaller, the LG Prada was actually the first capacitive touchscreen, not the iPhone.  Other devices such as the Pidion BM-200 had large resistive touch screen.  These phones initiated the trend towards larger, flat, touch-based screens with a silver or black bezel.  The progression, as with most technologies, was an evolution.



Contains Material Designated Highly Confidential



337.    As noted in the previous diagram, in the years leading up to 2007, there was a
        general trend toward devices having larger, capacitive touch displays.  This
        coincided with devices having increased functionality related to the display, such
        as messaging, multimedia, and more (SAMNDCA00321667):

Contains Material Designated Highly Confidential



338.    Within Samsung, some designers engaged in forward-looking product planning for mobile devices.  Their task was to look several years out at the upcoming technology and to plan products for those developments.  The team observed the trend toward larger display sizes, in conjunction with increased computing power and Internet usage, and recognized that the next generation of products would largely do away with buttons and controls on the front face in place of a much larger touchscreen display.  The Samsung designers began a detailed design investigation in late 2005 and had created final mockups and a presentation for Samsung executives by mid-2006.[178]  This design work and parallel efforts in defining Samsung's technology and innovation platform led to major advances in smartphone components, including displays.  These presentations and models were preserved in photos and multiple visual slide presentations.[179]

339.    One of the designs that gained the most attention was the Q-Bowl design by Hyoung Shin Park.  It featured a rounded rectangular form factor, a bezel surrounding the front face, a flat, black, continuous front face, a single control button at the bottom of the device, and a rounded shape in the profile.[180]

---

[178]    Conversation with Hyoung Shin Park.

[179]    SAMNDCA00320997-1027; SAMNDCA00321032-320; SAMNDCA00321339-817; SAMNDCA00321829-844; SAMNDCA00321846-50; SAMNDCA00321856; SAMNDCA00321891-908; SAMNDCA00321911-215.

[180]    SAMNDCA00321382; Document 1970-28, Direct Witness Statement of Hyoung Shin Park in International Trade Commission in the Matter of Certain Electronic Digital Media

Contains Material Designated Highly Confidential



340.    Samsung applied for and obtained a Korean design registration for the design in late 2006, prior to the iPhone being announced.[181]



341.    Several other concepts were designed as part of the MPCP project, and Korean and U.S. counterpart patents dating back to late 2006 were issued for those designs as well.[182]

---

Devices and Components Thereof, Investigation No. 337-TA- 796; Interview with Hyoung Shin Park.

[181]    SAMNDCA00255357

[182]    SAMNDCA00321382; APLNDC0003038605; APLNDC0003038614.

Contains Material Designated Highly Confidential



**Bowl**                                         **Vessel**

**D560,192**                                     **D559,220**

342.    In 2005 and 2006, other manufacturers were independently recognizing the same trend as Samsung, including LG.  LG submitted a design for the LG Prada to the iF design awards and received the highest design award, winning the "Best of the Best Award" for the phone in September 2006.  From my own experience submitting designs to iF, I know that LG likely submitted the LG Prada into the design competition prior to September.  The LG Prada included an edge-to-edge flat, rectangular black surface with a capacitive touch display (as noted earlier), speaker slot, and button control at the bottom (Joint Exhibit 1093):



Contains Material Designated Highly Confidential



343.    There was, therefore, a convergence of design occurring in 2005-2007, in large part due to research and development that Samsung was doing to make display technology work for touch devices.  Samsung was approached by Synaptic during this time to incorporate touch into their products, and so Samsung was well aware of the new technology that would enable designs like the Q-Bowl to work.[183]

344.    Over the course of the years leading up to 2006, Samsung had manufactured a wide variety of phones, yet a trend towards a combination of black screens and silver bezels had emerged.[184]

---

[183]    Conversations with Jeeyeun Wang and Minhyouk Lee.

[184]    Exhibit __; SAMNDCA30015505-SAMNDCA30015516.

Contains Material Designated Highly Confidential



345.   Beginning with the Q-Bowl design, which was mass produced as the F700,
       Samsung introduced a number of flat-faced touchscreen smartphones.[185]

---

[185]   SAMNDCA30015517-SAMNDCA30015792; Defendant's Exhibit 684.

Contains Material Designated Highly Confidential

346.  Other manufacturers were all doing so as well.[186]  I have included as Exhibit 9 a timeline of phone development to show the progression in the industry to larger touchscreen surfaces.

347.  That the entire industry was converging on the same essential products, features, and designs was not lost on Apple.  In an email chain from April 2010 called "iPhone 'firsts'", Apple advertising personnel emailed each other in advance of a "product innovations discussion" where they wanted to discuss "iPhone's historical milestones" and list those things that "the iPhone was the first to incorporate."[187]  One marketing person listed "first phone to incorporate a full touchscreen face," "first phone to have a multitouch interface/gestures," "first phone to have robust apps + apps store," and "first phone to incorporate a proximity sensor."  The marketers wanted feedback from the product team.  Steve Sinclair responded with the following email, admitting that he didn't know how many things they could come up with that they legitimately did first, despite being the first to do something to commercial success:

> Hey Michael,
> It's tough to approach this with the criteria being "first".  I don't know how many things we can come up with that you could legitimately claim we did first.  Certainly we have the first commercially successful versions of many features, but that's different than launching something to market first.
> Can we nuance this so it isn't about shipping a feature first?
>
>   -the first phone to incorporate a full touchscreen face
>
> Not true http://en.wikipedia.org/wiki/LG_Prada_(KE850)
>
>   -the first phone to have a multitouch interface/gestures
>
> I think this may be true, but I haven't been able to confirm.
>
>   -the first phone to have robust apps + apps store
>
> Palm had well over 10,000 apps in its ecosystem back in 2005ish and some of the games for

---

[186]  APLNDC0001531954; Defendant's Exhibit 712; Defendant's Exhibit 709; Defendant's Exhibit 2627; APLNDC0002868430;  also see phones sold alongside the Samsung phones in Best Buy ads (for example, paragraph 167 above).

[187]  Defendant's Exhibit No. 578 (APL-ITC796-0000119763)

Contains Material Designated Highly Confidential

both Nokia and Palm phones weren't that bad - definition of "robust" is a hard for me to judge. There have been app and music stores from other vendors and wireless carriers before the App Store, including from Nokia. None have been anywhere near as successful, but they existed before ours.

-the first phone to incorporate a proximity sensor

Not sure about this one - there were proximity sensors available for mobile phones from suppliers in 2004, but I can't find which phones actually used them.

And before anyone asks, the accelerometer was put into Nokia 5500 phones back in 2006.

I'll keep thinking about it and see if I can come up with some "firsts" that are defendable. What it really comes down to is that we're usually first at doing it "right"!

Steve

348.   By this time, Samsung had introduced a number of smartphones, including the Omnia, which ran a Windows-based operating system.  Samsung was not satisfied with the product and at a meeting with a head Samsung executive and Samsung designers, the executive described the need to create a better UX, or user experience.  He did not direct that anyone copy.  Instead, he used the iPhone as an example of a product with what was considered a good UX and criticized the Windows-based Omnia for having a poor UX.  Mr. Ball, Dr. Kare and Ms. Davis take statements from that meeting out of context, or simply misquote them, to paint a picture that does not square with the reality of design trends at that time. (Ball Report, paragraph 121; Kare Report, paragraph 100; Davis Report, paragraph 140H, footnote 202N.)  Samsung's frustrations clearly stemmed from problems with the operating systems it was using, which were making for a poor user experience, the "crisis of design" was about designing an operating system. The executive *praised* the industrial designs it was creating. (Plaintiff's Exhibit 40.)  The Samsung executive *criticized* the idea that Samsung should reduce the size of its phones or follow carrier advice to "make something like the iPhone"; instead directing designers to "make Screen Size bigger" and fix problems with the operating system.  (Plaintiff's Exhibit 40.)



Omnia (Plaintiff's Exhibit 36.61)

349. Apple never accused the Omnia of infringement and Samsung's executive said he had "confidence in our products' H/W [hardware], in their exterior design, and in their quality." (Plaintiff's Exhibit 40.)

350. The industrial design of Samsung's flagship phones already incorporated the black screen and silver trim from Samsung's historical design language:



(Plaintiff's Exhibit 36)

351. In the fall of 2009, Samsung designer Minhyouk Lee began work on the design of what became the Galaxy S series.[188]  He had previously worked at Samsung Motor Company and was inspired by the curves and bold chrome accents of vintage cars.  His sketches reflected this more stylized and dramatic approach.[189]

---

[188]   Direct Witness Statement of Minhyouk Lee in International Trade Commission in the Matter of Certain Electronic Digital Media Devices and Components Thereof, Investigation No. 337-TA-796 (referred to also as "Minhyouk Lee ITC Witness Statement").

[189]   Defendant's Exhibit 682; SAMNDCA00197773 (sketchbook).

Contains Material Designated Highly Confidential



352.   The prototype models that Lee had designed still retained the curvature in the glass and the variation in the bezel.[190]



353.   Unfortunately, using curved glass was not feasible at the time, and the sculpted back and chrome treatment interfered with internal components and did not withstand the reliability testing.  As a result, more stylized, prominent design features were muted to make the design acceptable for mass production.[191]

354.   The Galaxy S design that ultimately came out of Minhyouk Lee's work retained the essence of his design vision, though it was restrained in various ways for manufacturability.[192]

---

[190]   APLNDC-Y0000233783

[191]   Minhyouk Lee ITC Witness Statement.

[192]   *Ibid.*



355.   At this time, Samsung was already an established phone designer and
manufacturer, and within its body of phone offerings, it had already developed a
design language utilizing a silver bezel to surround a black screen, which it
continued.



Contains Material Designated Highly Confidential

356.    Based on my interview with Mr. Minhyouk Lee and my interview with Mr. Yongseok Bang, my review of their witness statements, my review of the products, the historical design trends within the industry and within Samsung, I do not believe that the Galaxy S1 and S2 designs were the result of any copying of the iPhone.

357.    I believe that the history of Samsung's icon menu followed much the same development.  During the same MPCP project described above, user interface designers were considering what future products would look like from a GUI perspective.  By at least mid-2006, the designers had determined that a grid of rounded square icons would be optimal, and that the large screen could accommodate video playing and other multimedia functions.[193]



358.    The Samsung application menus also incorporated icons that reflected historically used icons for such functions as phone, settings, notes, and music, among others:

---

[193]    SAMNDCA00321552; SAMNDCA00321576.

Contains Material Designated Highly Confidential



Samsung M4300 (2005)

OS/2 (1992)

(LG KS20) (Sept. 2007)

BlackBerry 7130e (Nov. 2005)

LG U960 (May 2007)

BlackBerry 8700g (April 2006)

Windows Mobile 5.0 (2005)

BlackBerry 8703e (2006)

Samsung SGH 800 (1999)

BlackBerry 8700c (Nov. 2005)

Samsung SCH-X800 (2003)

Sharp Zaurus SL-5600 (2003)

Samsung  (CDMA 2000)

Windows Mobile 6.0 (Feb. 2007)

Windows Mobile 5.0 (2005)

Samsung SCH-X650 (Aug. 2002)

Samsung SCH-U420 (2006)

SonyEricsson K800 (June 2006)

Sony Q4 T290 (2004)

Samsung SGH-F700 (Feb. 2007)

GEOS (1986)

Windows Vista (Jan. 2007)

GeoWorks (1990-2002)

Photoshop (2006)

Mac OS (1995-1999)

Samsung SGH-Z130 (Jan. 2005)

Contains Material Designated Highly Confidential

359. Use of a dock of four icons dates back to the IBM Simon device, and can be seen in other devices, such as the 4 hard buttons on the Bluebird Pidion. Use of rounded squares dated back to Samsung's MPCP project, as well as the use of that shape as a standard icon shape in symbol language.

360. Based on my conversations with Jeeyeun Wang, my review of her trial testimony, my review of the GUI designs at issue, and my review of historical design trends, I do not believe the Galaxy S1 graphical user interface with the result of copying. In fact, by just removing the square backgrounds, and not altering the icons at all, the design moves to a non-infringing, substantially different design.



361. As further confirmation of the novelty of Samsung's design efforts, Samsung submitted a number of its designs to the United States Patent Office, which certified them, like Apple's patents, as "new, novel, and ornamental" designs.[194] For example, the D638,815 patent shown below that relates to the Fascinate, Mesmerize, and Showcase design.[195]  Although these phones were found to infringe the D'677 patent by the jury, the Patent Office had previously considered other Apple design patents on the iPhone (for example D558,757, D615,083), as well as smartphones by other manufacturers (for example LG and HTC) and found that the design below was patentably distinct.  I understand that juries considering patent infringement and invalidity are allowed to come to different conclusions than the U.S. Patent Office, but this was confirmatory evidence to me that Samsung was seeking to develop new designs, not to copy Apple's designs, and that the Patent Office agreed that Samsung's designs were indeed worthy of

---

[194] SAMNDCA00201013; SAMNDCA00201017; SAMNDCA00201029; SAMNDCA00201037; SAMNDCA00201078; SAMNDCA00201086; SAMNDCA00201095; SAMNDCA00201123; SAMNDCA00201136; SAMNDCA00201151; SAMNDCA00201160; SAMNDCA00201168; SAMNDCA00201189; SAMNDCA00201211; SAMNDCA00201216.

[195] SAMNDCA0035643.

Contains Material Designated Highly Confidential

being called "new, novel, and ornamental" under the Patent Act's requirement for issuing a design patent.  35 U.S.C. § 171.



362.    In the years since 2007, when Apple, Samsung, LG, and others were each independently using a basic flat-faced, rounded rectangular form factor for a smartphone, that design quickly became "ubiquitous," as Mr. Ball agrees.  (Ball Report, paragraph 58.)  That ubiquity stemmed from many manufacturers arriving at the same functional design solutions.  The basic design elements that have become "ubiquitous" are the natural choices of designers doing good design work.

## XIV.    THE 2012 JURY'S INFRINGEMENT VERDICTS

363.    I disagree with Mr. Ball and Dr. Kare's opinions that the jury verdict form from the 2012 trial provides a proper basis to determine what the articles of manufacture are for the design patents here.

364.    For D'677 and D'087, Mr. Ball relies on the 2012 jury verdict form for his opinion that "the jury believed that Samsung had applied the claimed designs to the infringing phones" in their entirety, because the "jury was not provided with any of the components that Samsung alleges are the articles of manufacture separated from the rest of the phone," or because the "verdict form identifies the infringing Samsung 'products,' not merely components of those products, where it asks about infringement …."  (Ball Report, paragraphs 135-138.)

365.    Dr. Kare uses almost identical language and images to reach the same conclusion with respect to D'305.  (Kare Report, paragraphs 60-61.)

366.    As I've stated above, I understand that the District Court concluded that the first jury was never properly instructed that an article of manufacture could be anything less than an entire Samsung product, and so I do not believe the jury's verdict can provide any indication of what the relevant article of manufacture is for any of the patents.

367.    It is my opinion that even though sales of specific phones were found to be infringing, the infringement findings were based on similarities only between the

claimed aspects of the patent and the corresponding portion or component of the Samsung phones.

368.   I understand that the Solicitor General's brief has explained that "[b]ecause the award of profits is premised on the 'sale' of the 'article of manufacture,' the relevant 'article' must be capable of being sold.  But if a particular component is otherwise naturally characterized as the 'article of manufacture' to which the patented design has been applied, the sale of the complete product in commerce is properly viewed as a sale of the component as well, since title to the component is transferred as an incident of the larger sale."  (U.S. Brief, page 19.)

369.   I also note that both Mr. Ball and Dr. Kare include this opinion before beginning their analysis of the Court's four-factor test, further confirming that even they do not believe it is properly a part of the four-factor test.

370.   For these reasons, I disagree with Mr. Ball and Dr. Kare's opinions that the infringement verdict form (as opposed to Apple's own limited claims of infringement) provides any basis to conclude that the article of manufacture in each case must be the whole phone.  I understand that while a whole product can be considered "infringing," that is no indication of which part of the product is actually the article of manufacture for purposes of determining what *damages* are appropriate for the infringement.  I understand that this is consistent with the Supreme Court's opinion, which recognized that "several Samsung *smartphones* did infringe" but that the jury's award of "the entire profit Samsung made from its sales of the infringing *smartphones*" was improper and that it was necessary to "identify[] the relevant article of manufacture at the first step of the § 289 damages inquiry," even if the infringement verdict was listed next to product names.  (*Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429 – Supreme Court 2016, page 436.)

## XV.   CONCLUSION

371.   For the reasons given above, it is my opinion that the articles of manufacture for each patent are the components identified in Section III.

## XVI.   SUPPLEMENTATION

372.   I reserve the right to supplement and amend my opinions should I receive additional information, including in response to the opinions in the forthcoming reply reports of Mr. Ball, Dr. Kare, and Ms. Davis.


Dated: January 29, 2018                          _____

                                                          Sam Lucente

Contains Material Designated Highly Confidential

## MATERIALS CONSIDERED

| | |
|---|---|
| **Design-Patents-in-Suit and File Histories** | U.S. Patent D593,087 (JX1041) APLNDC00030426; U.S. Patent D604,305 (JX1042) APLNDC00030421; U.S. Patent D618,677 (JX1043) APLNDC00032473; File History for D'087 Patent (JX1062) APLPROS0000010774;  File History for D'677 Patent (JX1064) APLPROS0000011597; File History for D'305 Patent (JX1063) APLPROS0000011134; Application 29/270,888 SAMNDCA00405876 |
| **Samsung Design Patents** | SAMNDCA00201013; SAMNDCA00201017; SAMNDCA00201029; SAMNDCA00201037; SAMNDCA00201078; SAMNDCA00201086; SAMNDCA00201095; SAMNDCA00201123; SAMNDCA00201136; SAMNDCA00201151; SAMNDCA00201160; SAMNDCA00201168; SAMNDCA00201189; SAMNDCA00201211; SAMNDCA00201216; SAMNDCA00373548; SAMNDCA00373556; SAMNDCA00373704; SAMNDCA30011736; SAMNDCA30011721; SAMNDCA30011767; SAMNDCA30011759; SAMNDCA30011749; SAMNDCA0035643 |
| **Devices** | Captivate (JX 1011) ; Continuum (JX 1016) ; Droid Charge (JX 1025) ; Epic 4G (JX 1012) ; Fascinate (JX 1013) ; Galaxy Ace (JX 1030) ; Galaxy S (i9000) (JX 1007) ; Galaxy S 4G (JX 1019) ; Galaxy S II (AT&T) (JX 1031) ; Galaxy S II (i9100) (JX 1032) ; Galaxy S II (T-Mobile) (JX 1033); Galaxy S II (Epic 4G Touch) (JX 1034); Galaxy S II (Skyrocket) (JX 1035); Gem (JX 1020); Indulge (JX 1026); Infuse 4G (JX 1027); Mesmerize (JX 1015); Showcase (JX 1017); Vibrant (JX 1010); iPhone, iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S |
| **Deposition Transcripts and Witness Statements** | February 9, 2012 Douglas Satzger Deposition Transcript; November 2, 2012 Philip Schiller Deposition Transcript; December 13, 2012 Drew Blackard Deposition Transcript; December 14, 2017 Tim Sheppard Deposition Transcript; December 17, 2017 Tony Blevins Deposition Transcript; Dec. 19, 2017 Richard Howarth Deposition Transcript; December 20, 2017 Jeeyeun Wang Deposition Transcript; December 20, 2017 Justin Denison Deposition Transcript; December 21, 2017 Greg Joswiak Deposition Transcript; Witness Statement of Minhyouk Lee in the International Trade Commission proceeding called In the Matter of Certain Electronic Digital Media Devices and Components Thereof, Investigation No. 337-TA-796; Witness Statement of Yongseok Bang in the International Trade Commission proceeding called In the Matter of Certain Electronic Digital Media Devices and |

Contains Material Designated Highly Confidential

|  | Components Thereof, Investigation No. 337-TA-796; Witness Statement of Hyoung Shin Park in International Trade Commission in the Matter of Certain Electronic Digital Media Devices and Components Thereof, Investigation No. 337-TA-796 |
|---|---|
| **Expert Reports** | January 15, 2018 Expert Report of Alan Ball; January 15, 2018 Expert Report of Susan Kare; January 15, 2018 Expert Report of Julie Davis; March 23, 2012 Expert Report of Itay Sherman; April 16, 2012 Expert Report of Susan Kare; April 16, 2012 Expert Report of Robert Anders |
| **Court Filings/Orders** | Samsung's Petition for a Writ of Certiorari, *Samsung Electronics Co., Ltd. v. Apple, Inc.*, Supreme Court, December 14, 2015; Brief for the United States as Amicus Curiae Supporting Neither Party, submitted in June 2016 in *Samsung Electronics Co., Ltd. v. Apple Inc.*, United States Supreme Court, Case No. 15-777; Transcript of Oral Argument in *Samsung Electronics Co., Ltd., et al., v. Apple, Inc.*, No. 15-777, Washington D.C., October 11, 2016 |
| **Documents from this Litigation** | Document No. 1547, July 31, 2012 Trial Transcript; Document No. 1610, August 3, 2012 Trial Testimony; Document No. 1611, August 6, 2012 Trial Transcript; Document No. 1612, August 7, 2012 Trial Transcript; Document No. 1839, August 13, 2012 Trial Transcript; Document No. 1842, August 16, 2012 Trial Transcript; Document No. 1843, August 17, 2012 Trial Transcript; Document No. 1931, July 24, 2012, Amended Jury Verdict; Document No. 1989, September 21, 2012, Apple Inc.'s Motion For Judgment As A Matter Of Law (Renewed), New Trial, And Amended Judgment; Document No. 1997, August 21, 2012 Trial Transcript; Document No. 3509, July 28, 2017, Order Re: Waiver of Article of Manufacture Issue and New Trial on Design Patent Damages; Document No. 3521, Samsung's Opening Brief Pursuant to Order of July 28, 2017 Regarding Necessity of New Trial on Design-Patent Damages; Document No. 3530, October 22, 2017, Order Requiring New Trial on Design Patent Damages; Document No. 3354-4, January 20, 2016, Declaration of Carl Anderson In Support Of Samsung's Opposition To Apple's Motion For Supplemental Damages And Prejudgment Interest; Document No. 3354-10, January 20, 2016, Exhibit 6 to the Declaration of Carl Anderson: Physical Exhibit; Declaration Of Peter W. Bressler, FIDSA, In Support Of Apple's Response To Samsung's Opening Memorandum Regarding Design Patent Claim Construction, June 26, 2012 |
| **Written Discovery** | Apple Inc.'s Objections and Responses to Samsung's Fourth Set of Interrogatories, March 10, 2012;  Samsung's Objections And Responses To Apple's First Set Of Interrogatories |

Contains Material Designated Highly Confidential

Regarding Articles Of Manufacture, November 29, 2017;
Apple's Objections and Responses to Samsung's First Set of
Requests for Admission Regarding Article of Manufacture,
November 29, 2017; Samsung's Second Supplemental
Objections and Responses to Apple's First Set of
Interrogatories Regarding Articles of Manufacture, December
21, 2017.

**Samsung User Guides**   APLNDC-Y0000062778-976; APLNDC-Y0000065097-304
APLNDC-Y0000065725-907; APLNDC-Y0000065725-907
APLNDC-Y0000061629-794 APLNDC-Y0000058528-807;
APLNDC-Y0000064209-490 APLNDC-Y0000061795-969
SAMNDCA00018395-8642; APLNDC-Y0000059544-791;
APLNDC-Y0000062522-777 S-ITC-003304098-4299;
APLNDC-Y0000061178-379; APLNDC-Y0000060900-
1177;APLNDC-Y0000058808-9008; S-ITC-003298165-370;
S-ITC-003300462-619; APLNDC-Y0000062191-348;
APLNDC-Y0000065428-557; SAMNDCA00011452-618;
APLNDC-Y0000059792-948; APLNDC-Y0000065558-724;
SAMNDCA00009582-9786; APLNDC-Y0000060695-899;
APLNDC-Y0000063660-861; APLNDC-Y0000060544-694;
APLNDC-Y0000064946-5096; APLNDC-Y0000057975-8148;
APLNDC-Y0000066556-728; SAMNDCA00017928-18146;
APLNDC-Y0000057320-538; APLNDC-Y0000056940-7319.

**Conversations**   **Gumi Manufacturingn Facility**
Mr. Si-Yeon Park
Mr. In-Kyu Park
Ms. Jung-A Park
Ms. Ju-Hee Ham
Mr. Yong-Sung Kim

**SEC Design**
Jeeyeun Wang
Jinsoo Kim
Yongseok Bang
Minhyouk Lee
Ae-Jeong Suh
Gyeng Tae Park
Ji-Won Lee
Seung-Wook Nam
Hyoung Shin Park

**SEC Procurement**
Dong-Wook Kim

**Experts**
Michael Wagner

Contains Material Designated Highly Confidential

| | |
|---|---|
| | Dave Reibstein |
| **Third Party Teardown, Disassembly, and Sales Materials** | SAMNDCA30000009; SAMNDCA30007944 to SAMNDCA30008049; SAMNDCA30008004; SAMNDCA30008050 to SAMNDCA30008125; SAMNDCA30008154 to SAMNDCA30008173; SAMNDCA30015793-SAMNDCA30015835 |
| **Trial Exhibits** | Plaintiff's Exhibit 8; Plaintiff's Exhibit 40; Plaintiff's Exhibit 142; Plaintiff's Exhibit 143.82; Plaintiff's Exhibit 145; Plaintiff's Exhibit 146; Defendant's Exhibit 572; Defendant's Exhibit No. 578; Defendant's Exhibit 592; Joint Exhibit 1001; Joint Exhibit 1002; Joint Exhibit 1041; Joint Exhibit 1042; Joint Exhibit 1062; Joint Exhibit 1063; Joint Exhibit 1064; Joint Exhibit 1091; Joint Exhibit 1093; Plaintiff's Demonstrative Exhibit 14A.6 to 14A.23; Defendant's Exhibit 682; Defendant's Exhibit 684 |
| **Advertising and Marketing Materials** | SAMNDCA00311361; SAMNDCA00311364; SAMNDCA00311405; SAMNDCA00358953; SAMNDCA00311777; SAMNDCA00359045; SAMNDCA30008228; SAMNDCA00312148; SAMNDCA00357213; SAMNDCA00357265; SAMNDCA00357159; SAMNDCA00311654; SAMNDCA00311579; SAMNDCA00312556; SAMNDCA00241588; SAMNDCA00246395; SAMNDCA00311349; SAMNDCA00311661; SAMNDCA00311719; SAMNDCA00311758; SAMNDCA00311764; SAMNDCA00312018; SAMNDCA00312124; SAMNDCA00312152; SAMNDCA00312201; SAMNDCA00312235; SAMNDCA00312245; SAMNDCA00312263; SAMNDCA00312270; SAMNDCA00312282; SAMNDCA00312288; SAMNDCA00312301; SAMNDCA00312306; SAMNDCA00312337; SAMNDCA00312338; SAMNDCA00312340; SAMNDCA00312499; SAMNDCA00312508; SAMNDCA00312766; SAMNDCA00311971; SAMNDCA00358882; https://www.apple.com/iphone-8/; https://www.apple.com/shop/buy-iphone/iphone-7; https://www.apple.com/iphone-x/?afid=p238%7Cs7AkblcwL-dc_mtid_20925d2q39172_pcrid_221626740472&cid=wwa-us-kwgo-iphone-slid-- |
| **Public Articles and Materials** | U.S. PTO Manual of Patent Examining Procedure; Tibi Puiu, *Your smartphone is millions of times more powerful than all of NASA's combined computing in 1969*, ZME Science, September 10, 2017, https://www.zmescience.com/research/technology/smartphone-power-compared-to-apollo-432/; Michael Risch, *Software Patents and the Smartphone*, PrawfsBlawg |

Contains Material Designated Highly Confidential

(November 15, 2012), ; David Drummond, *When Patents Attack Android* (August 3, 2011; Daniel O'Connor, *One In Six Active U.S. Patents Pertain To The Smartphone*, Project Disco (October 17, 20120; Charles V. Trappey, Amy J.C. Trappey & Yu-Hui Wang, *Are patent trade wars impeding innovation and development?*, 46 World Patent Information 64-72 (2016); Chetan Sharma, "Mobile Patents Landscape 2016,"; NPR, Apple Says It Slows Older iPhones To Save Their Battery Life, December 21, 2017; Washington Post, Apple slows your iPhone as the battery ages, but doesn't give you a cheap way to replace it, December 20, 2017; CNET review: iPhone 4.0 Quick Report & Analysis, June 28, 2010; Patenting by Organizations 2006", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_06.htm; "Patenting by Organizations 2007"; U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_07.htm; "Patenting by Organizations 2008", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_08.htm; "Patenting by Organizations 2009", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_09.htm; "Patenting by Organizations 2010", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_10.htm; "Patenting by Organizations 2011", U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_11.htm; "Patenting by Organizations (Utility Patents) 2012, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_12.htm; "Patenting by Organizations (Utility Patents) 2013, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_13.htm; "Patenting by Organizations (Utility Patents) 2014, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_14.htm; "Patenting by Organizations (Utility Patents) 2015, U.S. Patent and Trademark Office, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_15.htm; "Top 300 Organizations Granted U.S. Patents in 2016," IPO, May 30, 2017, http://www.ipo.org/wp-content/uploads/2017/05/2016_Top-300-Patent-Owners.pdf.

| | |
|---|---|
| **Engineering and Manufacturing Materials** | Samsung Engineering Drawings, SAMNDCA30007924-SAMNDCA30007941, SAMNDCA30005047-SAMNDCA30005138; Samsung Manufacturing Documents, SAMNDCA30003537-SAMNDCA30004594; Manufacturing Specification for Approval Documents, SAMNDCA30000056 |

125

Contains Material Designated Highly Confidential

to SAMNDCA30003536, SAMNDCA30005937; Information on Assemblies, SAMNDCA30000055 , SAMNDCA30003537 to SAMNDCA30004594; Apple CAD Design Files, APLNDC-MCO-000001-077, APLNDC-MCO-000146-231; Mid-2006 Samsung Design Materials, SAMNDCA00320997-1027, SAMNDCA00321032-320, SAMNDCA00321339- 817, SAMNDCA00321829-844, SAMNDCA00321846-50, SAMNDCA00321856, SAMNDCA00321891-908, SAMNDCA00321911-215, SAMNDCA00321552, SAMNDCA00321576; Q-Bowl design, SAMNDCA00321382, SAMNDCA00255357; Samsung 2006 MPCP Project Designs, SAMNDCA00321382; APLNDC0003038605; APLNDC0003038614; Minhyouk Lee Sketchbook, SAMNDCA00197773; information on design teams and development, APLNDC-Y0000066834-837, APLNDC-Y0000066888-891, APLNDC-Y0000066901-905, APLNDC-Y0000066756-760, APLNDC-Y0000066802-806, APLNDC-Y0000066740-744, APLNDC-Y0000066838-841, APLNDC-Y0000066768-770, APLNDC-Y0000066852-854, APLNDC-Y0000066867, APLNDC-Y0000066729-732, APLNDC-Y0000066749-751, APLNDC-Y0000066883-887, APLNDC-Y0000066846-848, APLNDC-Y0000066874-878, APLNDC-Y0000066898-900, APLNDC-Y0000066797-801, APLNDC-Y0000066855-857, APLNDC-Y0000066879-882, SAMNDCA30010147,  SAMNDCA30008220, SAMNDCA30008174-30008219, SAMNDCA00367283; Specification Documents, APLNDC-Y0000066740, APLNDC-Y0000066797, SAMNDCA30015782, SAMNDCA30015784, SAMNDCA30015623, SAMNDCA30015625; Design Schematics, SAMNDCA00507896 and SAMNDCA00507897, SAMNDCA00507897, SAMNDCA00508305;  2005-2007 Industry Design Materials, SAMNDCA30015505-SAMNDCA30015516, SAMNDCA30015517-SAMNDCA30015792, APLNDC0001531954; APLNDC0002868430.

**Other Materials**          Samsung Graphical User Interface Materials, SAMNDCA30010925 to SAMNDCA30010964, SAMNDCA30010317 to SAMNDCA30011459; Dictionaries, https://en.oxforddictionaries.com, https://www.merriam-webster.com, https://en.oxforddictionaries.com; Carrier Requirements Documents, SAMNDCA00377580-8917, SAMNDCA30008790-10146, SAMNDCA30010154-10316, SAMNDCA30015517-SAMNDCA30015792; information on products for comparative analysis, Images of Kitchen Oven, SAMNDCA30015857-883, Tesla Manual, SAMNDCA30015271-5472; SAMNDCA00365600 (U.S.

Contains Material Designated Highly Confidential

Patent No. 7,688,574, titled "Cold Worked Metal Housing For A Portable Electronic Device"); Images of Samsung Galaxy Ace, SAMNDCA30015613; information on Apple repair offerings, SAMNDCA30015836-856; Email from Richard Howarth to Jony Ive discussing design, APLNDC0003040119-124; Design Patent Application Guide, https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/design-patent-application-guide; Manual of Patent Examining Procedure, Ninth Edition, Revision 07.2015, Last Revised November 2015; Jonathan Ive, Objectified (2009); VIZIO D48-D0 D-Series 48" Class Full Array LED Smart TV (Black), images from Amazon.com; information on protective cases, https://www.ebay.com/p/for-Samsung-I777-Galaxy-S2-Attain-Spring-Season-Sense-Protector-Case-Cover/1819221330?iid=201758645665&var=501783862326; https://www.ebay.com/itm/Protector-Case-for-AT-T-Samsung-Galaxy-S-2-i777-Flowers-on-Yellow-Diamond-Cover/170877192548?_trkparms=aid%3D555018%26algo%3DPL.SIM%26ao%3D2%26asc%3D49893%26meid%3D7cea307ea5674cd8ae60864fcd16339f%26pid%3D100005%26rk%3D3%26rkt%3D6%26sd%3D382185985167%26itm%3D170877192548&_trksid=p2047675.c100005.m1851; https://www.ebay.com/itm/AT-T-SAMSUNG-GALAXY-S2-II-BRUSHED-ALUMINUM-PLATE-ACRYLIC-CASE-SILVER/110841471114?hash=item19ceaaa08a:g:6EQAAOSwB4NWxvko.

| | |
|---|---|
| **Apple Patents** | Listed in Exhibits 5 and 6 |
| **Smartphone Devices and Historical Information** | Listed in Exhibit 9 |
| **Disassembled Smartphones and Component Parts** | Shown in Exhibit 8 |