# EXHIBIT 2
# Unredacted Version of Document Sought to Be Sealed

1

2

3

4

5

6

7

8

9       UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA

11      SAN JOSE DIVISION

12

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.   11-cv-01846-LHK |
| Plaintiff, | **REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

21

22

SUBJECT TO PROTECTIVE ORDER

23

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................... 1

    A.   Scope Of Opinions In Reply Expert Report .............................................. 1

II.  ARTICLE OF MANUFACTURE OPINIONS ....................................................... 2

    A.   The 2018 Rebuttal Report Supports a Conclusion that the Relevant "Article of Manufacture" in this Case Is the Entire Smartphone. [Wagner ¶¶ 260-351] ............................................................................................................ 2

    B.   The Evidence Discussed in My 2018 Opening Report and the 2018 Rebuttal Report Support a Conclusion That the Entire Smartphone Is the Relevant Article of Manufacture ................................................................ 3

        1.   Mr. Wagner ignores evidence demonstrating the prominence of Apple's patented designs in Apple's and Samsung's smartphones as a whole ............................................................................................. 3

        2.   Mr. Wagner's discussion of alternative designs does not shed light on the prominence of Apple's patented designs. [Wagner ¶¶ 277-294] .................................................................................................... 8

        3.   The evidence supports a conclusion that Samsung's recognition of the advantages provided by Apple's designs played a role in Samsung's decision to apply Apple's patented designs to the infringing products ........................................................................ 11

        4.   Following adoption of Apple's patented designs, Samsung's market share rose dramatically ............................................................... 12

            a.   Apple's sales and market share are irrelevant .............................. 13

            b.   Samsung's adoption of the Android operating system does not explain Samsung's market share gains .................................. 18

            c.   Exhibit 11.2-PT relies on data produced by Samsung and third-party IDC ...................................................................... 19

        5.   Evidence relating to Apple's and Samsung's marketing documents, sales, and profit accounting supports Apple's position that the article of manufacture is the whole phone ................................. 20

    C.   Mr. Wagner's Alternative Calculation of "Total Profits" Based on Samsung's Asserted Article(s) of Manufacture  [Wagner ¶¶ 391-451] ................ 22

        1.   Criticisms Applicable to All Surveys ....................................................... 25

        2.   Mr. Wagner's Approach Using Dr. Reibstein's Survey .......................... 28

        3.   Mr. Wagner's Approach Using J.D. Power Surveys ............................... 28

        4.   Mr. Wagner's Component Cost Approach ................................................ 34

            b.   Cost Approach – Critiques Applicable to Both Methods .............. 35

            c.   Cost Approach – SDC Data ........................................................... 38

            d.   Cost Approach – STA Replacement Data ...................................... 41

        5.   Mr. Wagner's Approach Using a Nielsen Survey .................................... 44

**TABLE OF CONTENTS**
(continued)

Page

D. Mr. Wagner's "Corroborating Quantitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits  [Wagner ¶¶ 463-505] ........................................................................................... 47

    1. Strategy Analytics Survey of Feature Priority List ................................... 47

    2. ComTech Reports ..................................................................................... 49

    3. Mr. Wagner's Discussion of Other Surveys Regarding iPhone's Functionalities [Wagner ¶¶ 75-102] ........................................................ 50

    4. iPhone Versus iPod Touch Profit Comparison  [Wagner ¶¶ 476-499] ........................................................................................................... 53

    5. Comparison of the Profit per Unit for Infringing Smartphones by Design Patent to the Least Profitable Infringing Smartphone [Wagner ¶¶ 500-505] ............................................................................... 56

E. Mr. Wagner's So-Called "Corroborating Qualitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits [Wagner ¶¶ 506-564] ........................................................................... 58

III. REPLY OPINIONS REGARDING DEDUCTIONS OR MODIFICATIONS ASSOCIATED WITH PRIOR CALCULATIONS THAT ARE INCLUDED FOR THE FIRST TIME IN THE 2018 REBUTTAL REPORT. ................................. 60

A. Mr. Wagner's Opinions Regarding "Total Profits" Using Fewer Than All the Phones Found by the Jury to Infringe Apple's Design Patents ..................... 60

    1. Mr. Wagner has no basis to eliminate from his damages calculation units that the prior jury found to infringe ................................................ 60

        b. Mr. Wagner Improperly Removes ███████ That The Jury Found to Infringe Apple's D'677 Patent ................................ 61

        c. Even if units reflecting white products should be excluded, Mr. Wagner's method for doing so is wrong ............................... 62

IV. MY CALCULATION OF SAMSUNG'S PROFITS FOR THE INFRINGING PRODUCTS IS APPROPRIATE BECAUSE THE COSTS THAT I HAVE EXCLUDED CANNOT RELIABLY BE DIRECTLY ATTRIBUTED TO ANY SAMSUNG PRODUCT. ............................................................................. 63

B. I Appropriately Exclude SEC's Operating Expenses from My Calculation of Samsung's Infringer's Profits. [2018 Rebuttal Report ¶¶ 120-125] ................. 63

C. I Appropriately Excluded STA and SEA's Operating Expenses From My Infringer's Profits Calculation. [2018 Rebuttal Report ¶¶ 126-127] .................. 64

D. Comparison of My Calculated Operating Margin to Samsung's Audited Financial Statements for the Telecommunications Segment Does Not Demonstrate the Reliability of Samsung's Data [Wagner ¶ 124] ........................ 64

E. It is Appropriate to Apply SEC's Gross Profit Percentage to Revenues of STA and SEA ...................................................................................... 64

F. My Reasonable Royalty Analysis is Reasonable and Appropriate ..................... 65

1  I.      **INTRODUCTION**[1]

2          A.      **Scope Of Opinions In Reply Expert Report**

3          1.      As discussed in my Opening Expert Report of Julie L. Davis, CPA (01/15/2018)

4  ("2018 Opening Report"), I understand that the Court imposed limits on the scope of discovery

5  and the scope of the parties' damages calculations in connection with the 2018 Remand Trial.  I

6  understand that the Court stated that it saw "no reason for the damages experts to change" or for

7  their "economic computations . . . to change," except as they relate to opinions specifically

8  directed to what the article of manufacture to which the design was applied is and the profits

9  associated with those articles (if they are something less than the whole smartphone).[2]  Consistent

10 with the Court's guidance, I have structured my Reply Report to isolate "new" opinions from

11 "old" opinions when responding to Mr. Wagner's January 29, 2018, Rebuttal Expert Report

12 ("2018 Rebuttal Report").  With respect to criticisms or opinions that have not changed from

13 prior reports by Mr. Wagner, I have not sought to repeat the rebuttal and comments previously

14 made at trial or in deposition testimony and instead rely on that material, consistent with the prior

15 trials.  With respect to new opinions raised for the first time in the 2018 Rebuttal Report or

16 matters pertaining to the identity of the articles of manufacture or the calculation of damages for

17 them, I provide my opinions below.

18         2.      First, in Section II below, I respond to Mr. Wagner's new opinions and new

19 economic computations that relate to the article of manufacture question, including my opinions

20 in response to the new material in the 2018 Rebuttal Report.

21         3.      Second, the 2018 Rebuttal Report also includes a limited number of new opinions

22 and new economic computations that do not relate to the article of manufacture question.  I

23 understand Mr. Wagner could have included, but did not include, these new opinions and

24 computations in his prior expert reports.  In the event the Court allows Mr. Wagner to present

25 those new opinions and computations to the jury, I separately address those issues in Section III

26 below.

---

27         [1] For a list of Documents Considered, see **Exhibit 3-R2.1**.

28         [2] Dkt. 3546: Transcript of Proceedings on November 30, 2017, at pp. 7, 19.

4.      Finally, in Section IV below, I respond to Mr. Wagner's prior opinions contained in the 2018 Rebuttal Report.  Consistent with the Court's guidance regarding the limited scope of discovery for the 2018 Remand Trial, I reserve my right to present the same opinions and responses to those opinions that I presented at deposition or at trial previously, which are reflected in my prior reports, deposition testimony, and trial testimony.  For the parties' convenience, I provide cross-references to my prior trial and deposition testimony on those issues in a number of circumstances.

## II.      ARTICLE OF MANUFACTURE OPINIONS

### A.      The 2018 Rebuttal Report Supports a Conclusion that the Relevant "Article of Manufacture" in this Case Is the Entire Smartphone. [Wagner ¶¶ 260-351]

5.      Mr. Wagner's opinions in his 2018 Rebuttal Report do not change my opinions about the appropriateness of calculating an infringer's profits award based on the "total profits" that Samsung made from selling the infringing smartphones, which Mr. Wagner and I both agree are the only products sold by Samsung on which revenues, costs, or profits are separately available.

6.      As I explained in my 2018 Opening Report, Samsung does not sell components to carriers and consumers.  It sells smartphones.  Samsung does not separately track or account for revenues, costs, and profits on the sale of components.  It does track these financial metrics for the sale of smartphones.  The 2018 Rebuttal Report appears to concede this point, as Mr. Wagner does not present a calculation of revenues, deductible costs, or profits based on the physical components Samsung has alleged is the article of manufacture.  Instead, Mr. Wagner uses Samsung's accounting data to calculate a profit based on Samsung's sale of whole smartphones, and then uses various methods to allocate profits to *aspects* of Samsung's infringing smartphones, including in some circumstances intangible features and concepts that Mr. Wagner purports to equate with physical smartphone components.

7.      As discussed in detail below, I disagree with Mr. Wagner's calculation of Samsung's profit on the sale of whole smartphones and his methodologies for determining the profit that Samsung made on the components that Samsung alleges are the relevant articles of

manufacture, as they suffer from numerous flaws, unsupported assumptions, as well as gaps in the information and sources that he used.  These deficiencies make Mr. Wagner's methods unsuitable and unreliable for calculating "total profits" on the sale of any alleged article of manufacture in this case.

8.      In short, none of Mr. Wagner's new opinions and economic computations relating to the article of manufacture change my opinions as expressed in my 2018 Opening Report, including my opinions supporting the conclusion that the relevant article of manufacture is the smartphone as a whole and my calculation of Samsung's profits from the sale of those phones.

9.      I respond to Mr. Wagner's specific criticisms of my opinions relating to the article of manufacture in the subsections that follow.[3]

**B.      The Evidence Discussed in My 2018 Opening Report and the 2018 Rebuttal Report Support a Conclusion That the Entire Smartphone Is the Relevant Article of Manufacture.**

10.      Mr. Wagner criticizes my opinion that certain evidence regarding the marketing, sale, and accounting for the smartphones supports the conclusion that the article of manufacture is the entire smartphone.  For the reasons discussed below, I believe those criticisms are misdirected, and the available evidence cited by Mr. Wagner and myself supports the conclusion of Apple's design experts that Samsung applied the infringing designs to the smartphones as a whole.

**1.      Mr. Wagner ignores evidence demonstrating the prominence of Apple's patented designs in Apple's and Samsung's smartphones as a whole.  [Wagner ¶¶ 262-276]**

11.      Mr. Wagner's response to my discussion of the evidence regarding Factor 2 of the article of manufacture test fails to address the prominence of Apple's patented designs in Apple's and Samsung's smartphone products as a whole.  Mr. Wagner instead selectively attempts to criticize certain documents that I referenced in my 2018 Opening Report.

---

[3] As I note in the Introduction, I also disagree with Mr. Wagner's continued use of his prior calculation methodologies, including his deduction of all costs derived from Samsung's sales spreadsheets to arrive at what he describes as Samsung's "operating profits."  Because my criticisms of his prior methodologies remain the same, and have been disclosed to Samsung through my prior trial and deposition testimony in this matter, I address those points in Section IV.

12.     Mr. Wagner contends that the documents I pointed to that showcased the front face of the iPhone (and hence Apple's patented designs) are not "probative of prominence" because "these statements are not tied to the specific designs at issue in this case."[4]  I disagree.  Simply because an advertisement or review does not specifically describe in words the phone's front face or bezel does not mean the designs are not a prominent portion of the product.  To the contrary, the evidence cited in my 2018 Opening Report specifically relates to Apple's patented designs because those ads and reviews prominently showcase the front image of the products, which both of Apple's design experts have said reflect Apple's patented designs.

13.     Mr. Wagner's attempted distinction between "design generally" and the patented designs is unavailing.  It does not address the fact that the patented designs are prominently displayed in the advertisements, reviews, and other documents referenced in my 2018 Opening Report.

14.     Mr. Wagner states that "the D'087 and D'677 patents only claim a portion of the exterior design."[5]  As I noted in my 2018 Opening Report, I understand from Apple's design experts that the relevant patents reflect what a consumer sees from the front of the product when the product is either turned on or turned off.  Mr. Wagner also claims that "the D'305 patent does not relate to the exterior design of the products at all, but instead only one specific arrangement of icons on a specific graphical user interface screen."[6]  I defer to the design experts on questions concerning the scope of the patented designs, but it is apparent from the multiple citations and documents that I referenced that the screen from which a consumer launches applications is a visual element of the iPhone to which consumers return frequently and is a gateway to the functions provided by Samsung's products.  Documents, such as PX44, further reflect the fact that Samsung devoted significant design effort to the icons and icon layout associated with this

---

[4] 2018 Rebuttal Report, ¶ 262.

[5] 2018 Rebuttal Report, ¶ 264.

[6] 2018 Rebuttal Report, ¶ 264.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

screen, adopting directions for improvement that made the visual images more like Apple's patented design.

15.     Mr. Wagner responds to the evidence I presented showing that Apple and Samsung showcased Apple's patented designs on their phones in their advertising and marketing literature by stating that it "is not remarkable" for a company to display images of the front face of a smartphone in marketing materials.[7]  Whether Mr. Wagner thinks it is "remarkable" or not, the evidence reflects a conscious decision by Apple to focus on the visual design of its product in advertising, as a part of its philosophy of emphasizing the product as hero in marketing communications.[8]  Apple's approach to marketing is not surprising since even Mr. Benner—a Samsung marketing employee stated—"appearance is an aspect of choice in almost every decision."[9]

16.     In his 2018 Rebuttal Report, Mr. Wagner admits that a phone's front face and display screen are prominent features commonly promoted by manufacturers and highlighted by third parties.  He cites to three CNET articles reviewing Samsung phones not at issue in this case. Mr. Wagner's description of the articles is telling: "a review by CNET of the Samsung Eternity written on November 19, 2008 included a picture of the phone that *prominently* featured its front face" and "a review by CNET of the Samsung Bound written in May 2009 *prominently* featured the phone's display screen throughout the review."[10]  Mr. Wagner notes that the third article "featured the phone's front face."[11]  These statements support the conclusion drawn by Apple's design experts that Apple's patented designs – including the front face and display screen – are prominent aspects of the infringing smartphones.  Both Samsung's and Apple's marketing and advertising materials repeatedly used images of the exterior of the phone, typically focusing on

---

[7] 2018 Rebuttal Report, ¶ 265.

[8] 2018 Opening Report, ¶ 140F.

[9] Dkt. 1887-3:  Timothy Benner Trial Testimony (by deposition), dated Aug. 10, 2012, at 38:04-38:07.

[10] 2018 Rebuttal Report, ¶ 265 (emphasis added).

[11] 2018 Rebuttal Report, ¶ 265.

the front face and display screen, thereby emphasizing the design to customers.  The fact that this was "common practice" even before the original iPhone was launched bolsters the conclusion that the outward design is a prominent aspect of smartphones.

17.     Mr. Wagner also focuses on the discussion of non-patented features in articles and reviews discussing the iPhone.[12]  Such discussion misses the point and ignores the repeated statements in the same articles and reviews about the products' visual design.  When Apple launched the iPhone, Apple's products had a distinctive and novel look and appearance that no other smartphone on the market had.  The market, including consumers, critics, and competitors, took notice.  Contrary to Mr. Wagner's criticism that the comments on iPhone's design did not relate to the patented designs, the 2007 Wall Street Journal Article discusses several aspects that relate to the patented design:  "almost its entire surface is covered by a huge, vivid 3.5-inch display," "no physical keyboard," and "[t]he display is made of a sturdy glass."[13]  Mr. Wagner also overlooks the fact that the 2007 Time magazine article naming the iPhone the Invention of the Year prominently featured on the front page of the magazine a visual image of the front face of the iPhone that also reflected the icon layout, contrary to Mr. Wagner's opinion that "nothing in the section indicates that it is discussing the front face of the phone."[14]

18.     Numerous Samsung documents produced in this matter reflect the fact that the iPhone redefined what a smartphone should look like, leading consumers to move away from traditional phones and the designs that Samsung had been producing.[15]  Mr. Wagner dismisses statements about public acclaim of the iPhone's "beautiful design" and "sleek product design" as

---

[12] 2018 Rebuttal Report, ¶¶ 268-270.

[13] PX134: The Wall Street Journal, Testing Out the iPhone, dated June 27, 2007.

[14] 2018 Rebuttal Report, ¶ 270.

[15] PX40: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA102473; PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010); PX36: Gravity Tank, Touch Portfolio, dated Dec. 17, 2008 (SAMNDCA00191811–SAMNDCA00191987; PX39: Alkon Instructions from the CEO (SAMNDCA20012936–SAMNDCA20012942 at SAMNDCA20012936) ("improve UX with reference to iPhone 3GS").

"not tied to the specific designs at issue" in this case.[16]  These comments ignore the fact that the iPhone had a distinctive appearance that differentiated it from other smartphones on the market, and which were covered by Apple's patented designs.[17]

19.     Mr. Wagner also attempts to support his positions by citing to the 2012 trial testimony of one of Apple's experts, Peter Bressler.[18]  Read in full, Mr. Bressler's testimony supports the conclusion that the patented designs were reflected in the iPhone.[19]  Notably, when discussing Mr. Bressler's opinions, Mr. Wagner omitted reference to those portions of Mr. Bressler's testimony that point out that the patented design of the front face and bezel "is exactly the same as embodied in [the i]Phone."[20]

20.     In his 2018 Rebuttal Report, Mr. Wagner appears to suggest that the D'305 design in Samsung's infringing phones is not prominent because the image is used as Samsung's app screen as opposed to its home page.[21]  Nonetheless, Samsung chose to showcase the D'305 design in its own marketing and packaging materials, particularly for the Galaxy S product line, which was the first of the series of infringing products that Samsung marketed using Apple's patented designs.[22]

---

[16] 2018 Rebuttal Report, ¶¶ 271, 274.

[17] *E.g.*, PX35.1: Email from James Botello, dated Dec. 14, 2008 (SAMNDCA10247689–SAMNDCA10247704 at SAMNDCA10247689 ("AT&T comments regarding our proposed icons are that they appear very 'cartoonish'/animated…. iPhone icons…are in contained square [sic] which appear more organized and consistent.  We would like to request our designers take this into consideration when proposing/designing icons….").

[18] 2018 Rebuttal Report, ¶¶ 274-275.

[19] Apple v. Samsung Transcript of Proceedings, August 6, 2012, Volume 4, pp. 1014-1016; 1018-1019.

[20] Apple v. Samsung Transcript of Proceedings, August 6, 2012, Volume 4, pp. 1021-2023.

[21] 2018 Rebuttal Report, ¶ 276

[22] *E.g.*, PX174.2: Wired Magazine, First Look: Samsung Vibrant Rips Off iPhone 3G Design, Dated Jul. 15, 2010 ("[T]he square icons are, again, very similar in their looks to the iPhone 3G's.").

1

**2.     Mr. Wagner's discussion of alternative designs does not shed light on the prominence of Apple's patented designs. [Wagner ¶¶ 277-294]**

2

3        21.     Mr. Wagner's discussion of alternative designs conflates two separate issues, the

4    prominence of a patented design in the context of an actual product and the marketplace in which

5    that product is sold, and the ability for a party to adopt an alternative to a patented design.  These

6    are distinct and unrelated issues.

7        22.     The prior jury has already resolved the question of whether any of the patented

8    designs were "dictated by function."  The jury concluded that they were not.[23]

9        23.     Samsung nonetheless adopted Apple's patented designs and applied them to the

10   infringing products.  Samsung continued using those designs after Apple told Samsung that it was

11   "copying the iPhone,"[24] even though, as Mr. Wagner concludes, Samsung had multiple

12   alternatives.  Samsung continued to use the designs after Apple filed suit.

13       24.     Samsung did so even though Mr. Wagner has opined that it would cost Samsung

14   essentially zero (i.e., no cost), to change the designs protected by the D'677 and D'087 patents,

15   and it would cost Samsung a small amount of money to change the design protected by the D'305

16   patent.  I disagree with the estimates of the cost to design around, but Samsung has apparently

17   conveyed to Mr. Wagner its conclusion that it could have moved away from the patented design

18   with a modest additional investment.

19       25.     Samsung's decision to continue to use the designs despite the availability of

20   inexpensive or free alternatives is evidence of the prominence and/or importance of the design in

21   the eyes of consumers and Samsung.  The chronology and events discussed in my 2018 Opening

22   Report appear to reflect an economic decision by Samsung to continue using the designs

23   protected by Apple's patents despite the availability of alternatives due to a competitive benefit

24   from the infringement.

25

26   _____

27       [23] Dkt. 1903: Final Jury Instructions at 70; Dkt. 1931: Amended Verdict Form.

28       [24] PX52.17: Samsung's Use of Apple Patents in Smartphones (APLNDC0000110 – APLNDC00001125 at APLNDC00001114).

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

26. Mr. Wagner's discussion of the square "containers" claimed in the D'305 patent also illustrates the prominence and importance of the design in Samsung's phones. While a design without "containers" surrounding the icons would not infringe the D'305 patent, Mr. Wagner fails to recognize that Samsung's own designer indicated that the elimination of the square containers was disfavored.[25] Moreover, Samsung's decision to retain the design protected by the D'677, even as it eliminated the square containers, demonstrates the prominence of the D'677 patent.

27. Similarly, Mr. Wagner's discussion of the BlackBerry Torch is not compelling. As Mr. Wagner admits, BlackBerry's market share was plummeting during the relevant period.[26] The alternative presented by the Torch was not equally attractive to consumers.

28. In Figures 25 and 26 in his 2018 Rebuttal Report, Mr. Wagner compares the Infuse 4G to three other Samsung phones (Captivate, Epic 4G, and Indulge). He argues that the Captivate, Epic 4G, and Indulge were design alternatives to the D'677 patent during the relevant damages period and they were "commercially successful."[27] He then states that "[t]hese design alternatives indicate that the design shown in the D'677 Patent has little or no prominence, to consumers or otherwise."[28] I disagree. First, Mr. Wagner fails to point out that while the Captivate, Epic 4G, and Indulge did not infringe the D'677 patent, they were found to infringe the D'305 patent. Thus, these phones were not complete design-arounds to the design patents at issue in this case. Second, the availability of alternative designs says nothing about the prominence of Apple's patented designs *in the Samsung products that were found to infringe*. Third, on a larger scale, the Samsung phones that did not infringe the D'677 patent were not as "commercially successful" as those that did infringe.

---

[25] PX35.1: Email from James Botello, dated Dec. 14, 2008 (SAMNDCA10247689-SAMNDCA10247704 at SAMNDCA10247689) ("AT&T comments regarding our proposed icons are that they appear very 'cartoonish'/animated…. iPhone icons…are in contained square [sic] which appear very 'cartoonish'/animated…. iPhone icons…are in contained square [sic] which appear more organized and consistent. We would like to request our designers take this into consideration when proposing/designing icons….")

[26] 2018 Rebuttal Report, Figure 43.

[27] 2018 Rebuttal Report, ¶ 290.

[28] 2018 Rebuttal Report, ¶ 293.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29.     To illustrate this point, I created a chart that compares the total revenue and total gross profit between June 2010 and June 2012 for each of the following: (1) Samsung products that infringed the D'677 patent and in some instances also the D'305 patent, (2) Samsung products that infringed the D'305 patent and did not infringe the D'677 patent, and (3) Samsung products for which Samsung produced sales and profit data in this case that did not infringe any asserted design patent.[29]



[29] Source information for this graphic comes from **Exhibit 37.1-R2**.

31.     I also note that Mr. Wagner did not include any discussion of alternative designs to the D'087 patent.  Thus, Mr. Wagner's discussion of non-infringing alternatives apparently does not apply to the phones that the jury found to infringe the D'087 patent.

> **3.     The evidence supports a conclusion that Samsung's recognition of the advantages provided by Apple's designs played a role in Samsung's decision to apply Apple's patented designs to the infringing products.  [Wagner ¶¶ 295-297]**

32.     Despite having numerous alternatives, Samsung adopted Apple's patented designs. Documents from Samsung's files between 2008 and 2011 reflect Samsung's conclusion that Apple had acquired a competitive advantage through the use of its patented designs.

33.     In paragraphs 295-297 of his 2018 Rebuttal Report, Mr. Wagner attempts to reinterpret internal emails that show Samsung was in a "crisis of design" and viewed the difference between the iPhone and Samsung's phones as "truly that of Heaven and Earth."[31]  But, Mr. Wagner's characterization cannot alter the evidence and the competitive context that I have discussed.  Between 2008 and 2010, Samsung was losing market share to Apple, and Samsung's management believed that changing this trend was important to Samsung's business.  During the February 2010 Samsung Mobile Communications Division meeting, Samsung's Head of Mobile Division stressed that "the iPhone's emergence means the time we have to change our methods has arrived."[32]  Mr. Shin went on to emphasize the importance of design, saying "[t]he look and feel of a product matters most."[33]  Carriers were also telling Samsung that it needed to "make

---

[30] **Exhibit 54-R2**.

[31] PX 40.5: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102377).

[32] PX 40.5: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102377).

[33] PX 40.3: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102375).

something like the iPhone."[34]  Samsung's adoption of the patented designs was part of the response to this "crisis of design."[35]

34.     In paragraph 297, Mr. Wagner discusses the March 2010 Samsung presentation I referenced in my 2018 Opening Report.  Mr. Wagner selects two sentences from the 132-page presentation that he believes support his position that Samsung did not copy Apple's designs.[36] But he ignores the overall approach of the document – Samsung compared Apple's iPhone designs to Samsung's prototype and repeatedly concluded as part of their "Directions for Improvement" to adopt approaches taken from the iPhone.  Mr. Wagner cites a single entry on page 131, noting that one of the "directions for improvement" is to "Remove a feeling that iPhone's menu icons are copied by differentiating design."[37]  This supports my opinion, because the same slide states that the Galaxy S (i9000) icons look too much like the iPhone – "Strong impression that iPhone's icon concept was copied."[38]

35.     Mr. Wagner did not address the other evidence I cited in paragraphs 106-110 of my 2018 Opening Report relating to Samsung's decisions to adopt Apple's patented designs.[39]

**4.     Following adoption of Apple's patented designs, Samsung's market share rose dramatically.  [Wagner ¶¶ 298-336]**

36.     Mr. Wagner seeks to criticize my citation to Samsung's dramatic increase in U.S. smartphone market share that occurred following Samsung's introduction of the infringing

---

[34] PX 40.2: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102374).

[35] PX 40.5: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102377).

[36] 2018 Rebuttal Report, ¶ 297.

[37] PX44.131: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010)

[38] PX44.131: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010).

[39] *See also* PX47.1: Email chain re China GDI Evaluation (May 2010) (SAMNDCA10159856 at SAMNDCA10159856) ("Not just the shape, but even the packaging looks like it copied the iPhone too much"); PX47.15: Email chain re China GDI Evaluation (May 2010) (SAMNDCA10159856 at SAMNDCA10159867) ("on first impression the feeling is similar to the iPhone and it seems like our company lacks its own distinct character")

Galaxy S smartphones at the end of Q2 2010 and the beginning of Q3 2010. I find none of Mr. Wagner's explanations helpful in understanding Samsung's market share increases.

### a.    Apple's sales and market share are irrelevant

37.    First, Mr. Wagner observes that Samsung's "unit share" doubled from 2.4% in Q3 2009 to 5.7% in Q1 2010, and its "revenue share" tripled from 1.7% in Q3 2009 to 5.2% in Q4 2010[40] (although Mr. Wagner's reference to Q4 2010 appears to be a mistake, as his 5.2% number correlates to Q1 2010). These reference points miss the broader picture. Mr. Wagner does not dispute the central point that Samsung's unit market share between Q3 2008 and Q2 2010 was at historic lows, remaining at or below 5.7% for eight consecutive quarters, when it jumped from 5.0% in Q2 2010 to 14.2% in the next quarter.[41] The fact that Samsung's U.S. smartphone market share in that time period fluctuated at percentages between 1.5% and below 6% does not establish that Samsung had begun to experience real U.S. smartphone market share growth by the end of Q1 2010 (March 31).

38.    To the contrary, Samsung's executives strongly stated their belief in Q1 2010 that Samsung's mobile phone division was headed in the wrong direction, was struggling to compete effectively with the iPhone, and was losing market share to Apple. In a February 2010 email, Samsung's head of the mobile phone division (JK Shin) was telling his executives that Samsung faced a "crisis of design," that the iPhone had "become the standard," that "[i]nfluential figures outside the company come across the iPhone, and they point out that 'Samsung is dozing off,'" and that Samsung's carriers—its largest customers—were urging Samsung to "make something like the iPhone."[42]

39.    Mr. Shin's email reflects dissatisfaction with Samsung's smartphone offerings in Q1 2010, which is inconsistent with Mr. Wagner's attempt to portray Samsung as experiencing a

---

[40] 2018 Rebuttal Report, ¶ 299.

[41] 2018 Rebuttal Report, Schedule 18-NT.

[42] PX40.2, PX40.5: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA102374, SAMNDCA102377).

period of flourishing market share growth.  Mr. Shin compared the user experience of the iPhone with Samsung's "Omnia," which did not infringe Apple's D'305 GUI patent, as the difference between "Heaven and Earth."[43]

40.     These are the phones that Samsung had been selling in Q1 2010 and earlier:[44]



41.     Months later, Samsung launched its infringing Galaxy S smartphones that used Apple's patented designs.  Among the earliest Galaxy S products that Samsung launched were the Galaxy S i9000 and Vibrant, which analysts stated bore a striking resemblance to the iPhone 3GS, and which infringed all three of Apple's design patents (Apple's D'305 GUI design, D'677 black front face, and D'087 bezel).[45]  Other Galaxy S products followed that also adopted Apple's patented designs.[46]

---

[43] PX40.2: Email chain re: Summary of Executive-Level Meeting Supervised by Head of Division (February 10) (SAMNDCA10247373–SAMNDCA10247378 at SAMNDCA10247374).

[44] PX3.2: Timeline comparison of Apple and Samsung Smartphones.

[45] PX174.1: Wired Magazine, First Look: Samsung Vibrant Rips Off iPhone, dated July 15, 2010  (noting that the "Vibrant's industrial design is shockingly similar to the iPhone 3G"); PX6.1-PX6.2: Summary of Press Reports Regarding Samsung Phone Designs (press reports noting Samsung's "edge to edge glass display (overlying black plastic)" and its appearance that is "easily [] mistaken for the iPhone 3GS").

[46] PX3.3: Timeline comparison of Apple and Samsung Smartphones.

Apple iPhone Announced — Jan. 9, 2007 | Galaxy S i9000 Jun. 2010 | Vibrant T959 Jul. 2010 | Mesmerize i500 Oct. 2010 | Galaxy S 4G T959V Feb. 2011

42.    In contrast to the increase in market share from 2.4% to 5.7% that Mr. Wagner points to between Q3 2009 and Q1 2010, Samsung's market share after Q2 2010 rose dramatically, climbing from 5.0% in Q2 2010 to 14.2% in Q3 2010.  Samsung's market share continued to climb with the release of additional infringing products.[47]  Mr. Wagner does not dispute these facts, which remain true whether one looks at "unit" market share or "revenue" market share, as Mr. Wagner's own calculations show.  As shown on Schedule 18-NT of the 2018 Rebuttal Report, Samsung's "unit share" increased from 5.0% to 14.2% from Q2 2010 and Q3 2010, while its "revenue share" increased from 4.5% to 13.6% for that same quarter.  Nor does Mr. Wagner dispute that introduction of Samsung's infringing Galaxy S II products, the second major product line that adopted Apple's D'677 patented design, resulted in a second major jump in 2011.  This is true both when measured as unit share, the most commonly reported measure, or revenue share.

---

[47] 2018 Rebuttal Report, Schedule 18-NT.

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

15





43.     Second, Mr. Wagner contends that, if Samsung's adoption of Apple's patented designs contributed to its success, one would expect Samsung's market share gains to come at Apple's expense.  This conclusion does not follow, and does not account for the general growth in the smartphone market at the time.  In Q2 2010, the smartphone market was experiencing a period of rapid growth as more and more consumers began switching from feature phones to smartphones.  This pattern and trend of smartphone adoption and market inflection between 2010 and 2011 is demonstrated in my **Exhibit 12**.  Apple and Samsung were therefore both competing for first-time smartphone purchasers within the damages period, as well as for consumers who were abandoning other platforms and manufacturers, such as RIM/Blackberry.[48]  In this market context, one would not expect to see Samsung's gains in *market share* to correlate with a decrease

---

[48] *See, e.g.*, 2018 Rebuttal Report, Figure 42 ("Share of Smartphone Unit Sales by OS – iOS, Android, and BlackBerry OS, 2008 – 2011").

in Apple's *unit sales*, as Mr. Wagner attempts to suggest through his use of Figures 28 and 29. The relevant comparison is to look at Samsung's smartphone *market share* before and after its infringement to see if the infringement resulted in a greater *share* of new customers.  When one looks at Samsung's market share in this time period, one sees a dramatic increase from 5% to 14% within a single quarter (Q3 2010), correlating to the time when Samsung began adopting Apple's patented designs (and utility patents).

44.     The same concepts apply to Mr. Wagner's comparison between Apple's and Samsung's average selling prices (ASPs) before and after Samsung's infringement, which Mr. Wagner presents in Figures 30 and 31.  Average selling prices are influenced by a broad range of factors.

45.     A more helpful comparison is to look at how Samsung's ASPs and per-unit gross profits changed as Samsung began adopting Apple's patented designs.  I have compared the ASPs and per-unit gross profits that Samsung made on its sales of smartphones that adopted Apple's patented designs, and those that did not.  This comparison shows that Samsung's smartphones that infringed Apple's patented designs ████████████████████████████████████ ████████████████████████████████████████

46.     Similarly misleading is Mr. Wagner's side by side comparison of Samsung's and Apple's market shares, as reflected in Figures 32 to 35, which I do not believe provides a helpful point of comparison.  Because both Apple and Samsung were competing for new smartphone purchasers (as well as for consumers migrating from other manufacturers, like RIM/Blackberry), one would not expect to see a one-to-one correlation between Samsung's market share gains and Apple's market share losses.  Given this specific market context, Samsung's dramatic market share gains after Q2 2010 are not inconsistent with Apple's market share growth in the same time period, as both companies would have realized market share gains at the expense of less popular U.S. phone manufacturers.  Samsung's own analysis of the market confirms this point.  In an internal document dated from Q4 2011, Samsung observed that the U.S. smartphone market had

---

[49] *See* **Exhibit 54-R2**.

1
2
3
switched from being a "Three Horse Race" to "becoming a[] Two Horse Race Between Apple & Samsung," as less popular phone manufacturers that did not adopt Apple's patented designs suffered market share losses to both Apple and Samsung.[50]

4
5
6
7
47.     Mr. Wagner's analysis of Apple's share of handset industry profits, as reflected in Figures 36 and 37, does not provide a meaningful comparison either.  Again, the relevant comparison is Samsung's market share gains in the U.S. smartphone market, not Apple's profit share.  This follows from the same analysis discussed in the paragraphs above.

8
9
**b.      Samsung's adoption of the Android operating system does not explain Samsung's market share gains**

10
11
12
13
14
15
48.     Mr. Wagner also suggests that Samsung's gains in U.S. smartphone market share following the launch of the Galaxy S devices were attributable to Samsung's adoption of the Android operating system, and not Samsung's infringement of Apple's patents.  Mr. Wagner's comments ignore the evidence already discussed of demand for Apple's patented designs, and the strong influence that physical appearance and design had on purchasing decisions in this time frame, as reflected in numerous contemporaneous documents.

16
17
18
19
20
21
22
23
24
49.     Mr. Wagner relies on a Business Insider survey purporting to show that 38% of respondents stated that "Platform" was the most important factor to them in choosing a particular smartphone.[51]  But there is no indication that participants in the survey were asked to consider or assign a ranking to the physical appearance or design of their smartphone, as the J.D. Power survey did.  The factors disclosed by Business Insider that were included in the survey were "Platform," "Features," "App Selection," "Easy data migration," "Price," "Cellular carrier offers it," and "Other."[52]  Therefore, Mr. Wagner's discussion of the Business Insider survey does not allow one to draw any conclusions about how physical appearance and design ranked in importance.

25
26
27
28
[50] PX60.8: STA Competitive Situation Paradigm Shift, dated Feb. 16, 2012 (SAMNDCA11547401 – SAMNDCA11547470 at SAMNDCA11547408).

[51] 2018 Rebuttal Report, ¶ 318.

[52] 2018 Rebuttal Report, Figure 38.

50.     In addition, the Business Insider survey showed a distinct bias toward Android purchasers.  The survey notes that "[m]ost of our survey participants read about this survey on our site" and "[s]ome found it on Android fan sites (which probably accounts for the higher-than-market-share percentage of Android users)."[53]  The survey also showed a bias toward existing smartphone owners, with 94.7% of survey participants stating that they already had a smartphone.  This is substantially higher than the 60% of smartphone versus feature phone market share numbers reported by IDC, which was based on historical market share data.[54]  In other words, the Business Insider survey was not representative of the U.S. smartphone market, did not take into consideration the interests of first-time smartphone purchasers, and was biased toward smartphone owners who had previously decided to purchase a smartphone that used the Android operating system.

51.     Further, the adoption of Android cannot explain the degree to which Samsung improved its market share compared with other smartphone makers that adopted the Android operating system, but did not adopt Apple's patented designs.  After adopting Apple's designs, Samsung narrowed the market to a "Two Horse Race," which reflects the significance of factors different from the adoption of the Android operating system, such as design.[55]

        c.       **Exhibit 11.2-PT relies on data produced by Samsung and third-party IDC**

52.     Mr. Wagner does not dispute that ███ of the gain achieved in Samsung's first quarter turnaround between Q2 2010 and Q3 2010 reflected purchases of Samsung's infringing smartphones.[56]  Mr. Wagner contends that I should have also presented numbers specific only to those infringing smartphones that adopted Apple's design patents.  The outcome is the same — ███ — given the high volume of the Samsung smartphones that infringed Apple's design

---

[53] http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1/#st-android-owners-say-they-are-going-to-stick-with-android-when-they-buy-their-next-phone-12

[54] *See* **Exhibits 12 and 12.1**.

[55] PX60.8: STA Competitive Situation Paradigm Shift, dated Feb. 16, 2012 (SAMNDCA11547401 – SAMNDCA11547470 at SAMNDCA11547408).

[56] *See* 2018 Rebuttal Report at p. 147, fn. 516.

1
2
3
4

patents.  Over the entire infringing period from Q2 2010 and Q1 2012, the percentage would change from ▮▮▮ for all infringing smartphones, to ▮▮▮ for smartphones that infringed Apple's design patents.[57]

5
6

>    **5.    Evidence relating to Apple's and Samsung's marketing documents, sales, and profit accounting supports Apple's position that the article of manufacture is the whole phone. [Wagner ¶¶ 337-351]**

7
8
9

53.    Mr. Wagner appears to agree with the analysis in my 2018 Opening Report that "Apple and Samsung generally sell smartphones rather than component parts."  That supports a conclusion that the relevant article of manufacture is the smartphone as a whole.

10
11
12
13
14
15

54.    Another relevant inquiry is whether Samsung separately tracks profits on the articles of manufacture that Samsung has identified in this case, not whether third parties (such as Dow Corning or Hon Hai Precision Industries) track the cost of certain components separately.  Regarding this point, recent discovery in this case has confirmed that Samsung does not separately track profits on the components that Samsung has identified as the alleged articles of manufacture.[58]

16
17
18
19
20
21

55.    Mr. Wagner's failure to provide a profit calculation derived from separate revenues, costs, or expenses for the articles of manufacture that Samsung has identified supports the conclusion of Apple's design experts that the relevant article of manufacture is the smartphone as a whole.  Companies tend to structure their accounting and financial systems to capture information that they believe is important to the operation of their business and that reflect the products that they manufacture and sell.

22
23

56.    Samsung is a sophisticated company with a series of accounting and other databases that track financial information.  As discussed more fully below, in his 2018 Rebuttal

24
25
26

_____

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27
28

[58] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 130-131, 134-136;  Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 71-74, 88-93; Deposition of Dongwook Kim, dated Dec. 21, 2017, pp. 46-48, 71-72, 76-77, 89.

Report, Mr. Wagner starts with the profits from the whole smartphone, and then resorts to the use of a number of external, incomplete, and/or mistimed sources of data to allocate as portion of those smartphone profits to the articles of manufacture identified by Samsung.[59]  Mr. Wagner presumably resorts to these external and indirect sources of information because Samsung did not track profits from the alleged articles of manufacture.[60]

57.     As a result, Mr. Wagner relies on external surveys, information obtained from third-party companies, and information from the wrong time frame as inputs to his estimates.  As described below, Mr. Wagner's estimates and the errors inherent in them help demonstrate that he cannot reliably calculate the profits for the alleged articles of manufacture.[61]  Mr. Wagner's inability to point to or use data collected in the normal course of STA's or SEC's business that are specific to the identified articles of manufacture supports the conclusion that the relevant articles of manufacture are the smartphones as a whole.

58.     Similarly, Mr. Wagner relies on transfers of components used as a part of warranty service provided by Samsung.  The point of this service was to restore a complete smartphone to its original condition.  Mr. Wagner does not provide any evidence that this warranty work was a significant part of the Samsung's business or that it contributed in any manner similar to the sale of smartphones as completed products.

---

[59] Section II.C.4

[60] Deposition of Justin Denison, dated Dec. 20, 2017, p. 30 ("Generally speaking, we're selling the fully manufactured and assembled product when we sell a product to a channel partner who then sells it to an end customer."); Deposition of Timothy Sheppard, dated Dec. 14, 2017, p. 134 ("I don't think I know the answer to that question of what the profit is for just an individual piece of glass. It wasn't sold on a finished good as a separate item."); Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 135-136 ("Q And you don't have that data whether or not I pick another collection of components or another phone, right? This isn't a [sic] I'm picking the wrong -- I'm selecting the wrong item; it's not something you can do for a component within a finished good? . . . A I think – I'm not aware of data or a process that could -- I don't know."); Deposition of Kyuhyun Han, dated Dec. 20, 2017, p. 72 ("When we close our mobile phone businesses and look into the profitability of it, mobile phones are what we look at mostly. So, I don't recall ever paying much attention to parts."); Deposition of Kyuhyun Han, dated Dec. 20, 2017, p. 72 ("Selling tablets and smartphones are our main business, so their sales, their profit -- profit and loss are important.").

[61] Section II.C.

C.  **Mr. Wagner's Alternative Calculation of "Total Profits" Based on Samsung's Asserted Article(s) of Manufacture  [Wagner ¶¶ 391-451]**

59.     Calculating profits is a task routinely performed by accountants.  When evaluating the profitability of a product or specific tangible item sold by a company, the general approach that accountants follow is to identify the revenue obtained by the company that sells the item, and then to deduct certain costs and expenses associated with the sale of the product.  This is one of the tasks to which both my Original Report and Mr. Wagner's prior reports were directed, following specific legal instructions provided by the Court in connection with the jury instructions.  A summary of my profit calculations for the infringing units at issue in the 2018 Trial is attached as Exhibit 58-R2.

60.     In his expert report, Mr. Wagner contends that "Samsung is entitled to deduct all of its operating expenses in its calculation of profits from its sales of products found to infringe the D'677, D'087, and D'305 Patents."[62]  I disagree with this contention and have set forth my criticisms of Mr. Wagner's calculations of the profits on the phones as a whole in a number of places, including my deposition testimony on August 26, 2013, and December 2, 2015, at pages 255-305, 354-450, and 535-567 of my deposition transcript, and in my 2013 trial testimony, at pages 690-703 and 1161-1179 of the trial transcript.

61.     Mr. Wagner's current effort to calculate Samsung's total profits for the articles of manufacture identified by Samsung differs markedly from the approach taken by both of us in calculating profits on the entire phones.

62.     Mr. Wagner's approach to calculating total profits for the articles of manufacture identified by Samsung does not identify any revenues associated with the alleged articles of manufacture or any specific tangible item.  Nor does it deduct any directly attributable costs recorded by STA or SEC in connection with the manufacture of the infringing products that are specific to the alleged articles of manufacture.[63]  It does not deduct any expenses that Mr. Wagner

---

[62] 2018 Rebuttal Rpt. ¶ 121.

[63] The Court's instructions limit the deductions in the determination of "total profits" to costs that are "directly attributable" to the sale of the product, as discussed more completely in my 2018 Opening Report.

claims are directly attributable to the sales of the alleged articles of manufacture. It does not identify any profits, tracked in any accounting or other database by Samsung, that are specific to the alleged articles of manufacture.

63.     To the contrary, what Mr. Wagner purports to calculate are the revenues and profits from Samsung's sale of each of the smartphones as a whole. In performing this calculation, Mr. Wagner improperly deducts costs that are not "directly attributable" to the sale or manufacture of Samsung's phones (as discussed in my prior deposition and trial testimony referenced in Paragraph 61 and Section IV below), resulting in a significantly understated calculation of Samsung's profits on the phones as a whole. This error affects all of his calculations because it affects the base from which he works. He then attributes a portion of these understated profits on the entire phones (as he calculated those profits) to the components that Samsung alleges are the articles of manufacture based on various approaches discussed below. Unlike information on the sales and profits for the smartphones as a whole, this exercise does not rely on or derive primarily from Samsung's internal business documents, records, or presentations specific to the articles of manufacture that Samsung has identified.

64.     I find the methods applied by Mr. Wagner to be unreliable. As one indicia of the unreliability of his approach, I note that his methods, even when applied to the same number of units, produce calculations of Samsung's profits ranging from ██████████████. That is, one of his methods produces a calculation that is more than ████████ than another of his methods. Yet he does not appear to consider either of these figures or the methods used to produce them to be more or less reliable. The variance among his approaches is even more extreme when examined on a product by product or patent by patent basis.

65.     Four of Mr. Wagner's approaches to the calculation of Samsung's profits on the alleged articles of manufacture rely upon survey data—third-party surveys and a survey conducted in 2018 by Dr. Reibstein, the latter of which has been excluded by the Court.[64] The survey approaches included in the 2018 Rebuttal Report are not a calculation of profits for a

---

[64] Dkt. 3585 (Feb. 8, 2018): Order Granting Motion to Strike Dr. Reibstein's Report.

separate tangible component, such as a separate article of manufacture.  Instead, they reflect an incomplete and inaccurate attempt to apportion profits based on the alleged value or importance of features to consumers by dividing the actual profits obtained from the sale of the smartphone as a whole (as calculated by Mr. Wagner) among one or more features of the product.  These features are not specific to any tangible article of manufacture, and do not correspond specifically to any of the articles of manufacture that Samsung has identified.  Further, most of these features are not directly associated with any tangible component of a smartphone at all.

66.     I understand that it is not appropriate in this case to apportion profits as a method to calculate total profits under 35 U.S.C. § 289 (which governs damages for design patents) using survey evidence about what consumers value.  As discussed in part in the 2018 Opening Report, I understand that, on August 24, 2012, the jury returned a verdict finding that 26 Samsung products infringed Apple's design and/or utility patents, and that those patents were valid.  I further understand that the jury found that six of Samsung's products diluted Apple's unregistered and registered trade dresses, and that those trade dresses were famous.  The jury returned an award of $1,049,393,540 in Apple's favor.

67.     I understand that during those proceedings, Samsung pursued an "apportionment" theory of damages.  Specifically, I understand that Samsung argued that Apple's damages for infringement of its design patents should be limited to the relative value of the infringed designs to consumers who purchased Samsung's infringing phones.  For instance, Mr. Wagner argued that "design as a whole is a small portion of the value to consumers of smartphones … Therefore, a *proper apportionment* is critical to avoid providing a windfall to Apple of the entirety of Samsung's profits."[65]  To that end, Mr. Wagner reviewed various third-party surveys—including two of the ▮▮▮▮▮▮▮▮▮▮▮▮▮ studies that he uses here—to "analyze the importance of design to smartphone buyers and owners in comparison to other smartphone's features and attributes."[66]

---

[65] *See* Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 341.

[66] *See* Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 346.

68.     I understand that the district court ultimately concluded that the apportionment method of calculating damages for design patents was inappropriate under 35 U.S.C. § 289.[67]  I further understand that the United States Court of Appeals for the Federal Circuit upheld the district court's decision on this point and confirmed that such apportionment is not a proper method for calculating design patent damages.[68]  Thereafter, during the appeal to the United States Supreme Court, "Samsung abandoned its apportionment argument, and thus interpretation of the term 'article of manufacture' was the only issue before the U.S. Supreme Court."[69]

69.     In light of this history, I understand that the calculation of the total profit on an article of manufacture should not be an apportionment of profits based on the alleged "value" or "importance" of the infringing designs, because the Court has previously excluded that approach.[70]  None of Mr. Wagner's approaches using surveys are a calculation of actual profits for a specific article of manufacture.  Instead, each apportions the profits on Samsung's entire phones to features of that phone based upon survey-based estimates of the relative value of those features, and then assumes that some of those features correspond to certain articles of manufacture.

### 1.     Criticisms Applicable to All Surveys

70.     Leaving aside whether an apportionment methodology is appropriate or permissible here, Mr. Wagner's effort to apportion Samsung's profit based on the alleged value or

---

[67] Dkt. 1157 (June 30, 2012): Order Granting-In-Party and Denying-In-Part Motions to Exclude Expert Testimony at 8-9.

[68] *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1001–02 (Fed. Cir. 2015).

[69] Dkt. 3530 (Oct. 22, 2017): Order Requiring New Trial at 10.

[70] Dkt. 1157 (June 30, 2012) Order Granting-in-Part and Denying-in-Part Motions to Exclude Expert Testimony at 9 ("Because Mr. Wagner's apportionment of damages with respect to Apple's design patent infringement claims is contrary to law, it is unreliable under FRE 702 and *Daubert* and unduly prejudicial under FRE 403."); Dkt. 3530 (Oct. 22, 2017): Order Requiring New Trial at 9 ("[T]he Federal Circuit held that, as recognized in *Nike*, 138 F.3d 1437, Congress rejected apportionment for design patent damages under § 289."), 10 ("Samsung abandoned its apportionment argument, and thus interpretation of the term 'article of manufacture' was the only issue before the U.S. Supreme Court."); Dkt. 3271 (Sept 1, 2015): Federal Circuit Opinion at 26 ("The Act of 1887, specific to design patents, removed the apportionment requirement").

importance of features to consumers using various surveys[71] does not appear to provide a reliable basis for calculating total profits specific to the articles of manufacture identified by Samsung.

71.     None of the surveys were specifically designed to calculate Samsung's total profits on, or even to estimate the value of, the articles of manufacture Samsung has identified. The pre-existing surveys from ████████ and others do not focus on the specific articles of manufacture that Samsung identified in fall 2017.  None of the surveys showed any survey-taker a visual image of, or described or identified, the articles of manufacture that Samsung has identified.

72.     More specifically, the surveys (1) do not expressly focus on the designs at issue, whether via visual images or by description, instead including categories of tangible and intangible features that Mr. Wagner appears to contend are related to the relevant designs; (2) do not expressly focus on the components Samsung has identified as the relevant articles of manufacture, whether via visual images or by description, instead including categories of tangible and intangible features that Mr. Wagner appears to contend are related to the relevant articles of manufacture and/or the relevant components; (3) include both physical and intangible aspects, features, and/or functions of the products; and (4) do not expressly focus on Samsung's profits or revenues, or even consumers' willingness-to-pay for features, instead focusing on consumer reactions or preferences.  Mr. Wagner does not offer any reliable way to know whether, how, or to what degree consumers themselves would recognize the categories of features that he uses in his calculation as being related to the specific articles of manufacture that Samsung has identified.

73.     Read in full, the purpose of the third-party surveys was not to establish an absolute or monetary value for any tangible object or any of the features that Mr. Wagner assumes may have some relationship to what Samsung has identified as the relevant articles of manufacture.  A major purpose of the surveys, when performed by ████████████████ and as reflected in

---

[71] By addressing these surveys, I am not conceding that they are properly part of proceedings.  Given the Court's ruling striking Dr. Reibstein's report, I understand Apple believes that Mr. Wagner cannot rely on Dr. Reibstein's survey or Dr. Reibstein's opinion that the J.D. Power and Nielsen surveys can be used to estimate value, or offer the calculations he has based on Dr. Reibstein's survey and Dr. Reibstein's opinions regarding the J.D. Power and Nielsen surveys.  (2018 Rebuttal Report, ¶¶ 408, 453.)

survey reports, was to provide a systematic set of different factors by which to compare the relative performance of different smartphone manufacturers and different smartphones.[72] Furthermore, trying to use such surveys to apportion component value among a variety of separate and often intangible features requires careful consideration of the features covered in the survey.  For example, the number and type of physical and intangible aspects, features, and/or functions included in the surveys seemingly would have a significant impact on the relative values established (leaving aside the apparent focus on consumer value and/or preferences, rather than Samsung's profits).

74.     Mr. Wagner does not provide an explanation for why he believes the surveys are a reliable basis for apportioning Samsung's profits on the infringing phones to the articles of manufacture Samsung has identified, despite the differences between the purpose of the surveys and the issues here.  It does not appear that Mr. Wagner has the independent ability or expertise to make that assessment.  While he previously relied on opinions from Dr. Reibstein on this issue, the Court struck Dr. Reibstein's report.

75.     Further, Mr. Wagner uses the absolute values obtained from these surveys for each feature defined as a percentage when apportioning the profits Samsung obtained from the sale of the phones to the articles of manufacture, even though consumer decision making is affected by the differences in the choices available to the consumer.  Where consumers are presented with two options that are effectively the same or highly similar with respect to one criterion, that aspect is likely to have less importance in the choice between the two items.  If all car manufacturers offered only blue cars, color would not reflect a factor that influences a consumer's purchasing decision.  In adopting the designs that Apple had patented and used, Samsung eliminated the competitive advantage that Apple could obtain by the exclusive use of that design, undermining the ability of Apple to use the styling, beauty, or physical design of the product as a distinctive factor by which to distinguish its products for consumers.  Mr. Wagner's use of the

---

[72] *See e.g.*, SANDCA10246338 at SANDCA10246343 ("Determine relative performance of the major smartphone manufacturers.")

surveys cannot and does not take account of this circumstance, both because he uses surveys that were done after Samsung had started to infringe and because he makes no effort to account for these factors.

### 2. Mr. Wagner's Approach Using Dr. Reibstein's Survey. [Wagner ¶¶ 394-404]

76.     Under this first method, Mr. Wagner calculated the Samsung profits he believed should be apportioned to the articles of manufacture alleged by Samsung based on the results of a survey conducted by Dr. Reibstein in 2018 and Dr. Reibstein's analysis of those survey results.  I understand that the Court has issued an order striking Dr. Reibstein's survey and thus, this approach is no longer relevant.  Therefore, I reserve my criticisms of it.

### 3. Mr. Wagner's Approach Using ▮▮▮▮▮▮▮▮ [Wagner ¶¶ 405-417]

77.     I do not find the ▮▮▮▮▮▮▮ to be an appropriate basis from which to apportion profits based on the alleged value or importance of features to consumers.  Notably, the 2011 J.D. Power surveys were the primary source for the apportionments previously included in Mr. Wagner's first report in spring of 2012, which the Court excluded.  Mr. Wagner now relies, for the first time, on ▮▮▮▮▮▮▮▮ I understand that neither was available in prior proceedings.  Mr. Wagner also notes that the 2012 surveys "likely overlap the damages period,"[73] but does not definitively establish that they do, and thus their relevance appears limited.

78.     Mr. Wagner appears to have relied on Dr. Reibstein for the proposition that the ▮▮▮▮▮▮▮▮ survey discussed below) "can be used to estimate value."[74]  But the Court struck Dr. Reibstein's report, and Mr. Wagner's report does not provide an independent or adequate basis to justify the use of these surveys as a method to "estimate value," let alone apportion profits on the basis of that value.  Moreover, even with the ▮▮▮▮▮▮▮ Mr. Wagner's selection of items to include appears to have been based on opinions provided by Dr. Reibstein contained in the report that was struck.  Additionally, Mr. Wagner adjusts his

---

[73] 2018 Rebuttal Report, ¶ 407.

[74] 2018 Rebuttal Report, ¶¶ 408, 453.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

percentages and calculations for at least the D'305 Patent[75] based on information from Dr. Reibstein's survey.  These calculations are not appropriate or reliable because I understand that Mr. Wagner presumably can no longer rely on Dr. Reibstein's survey and opinions, which the Court struck.

79.    Further, the ████████████ were not designed to address the value of any specific article of manufacture, or to measure or reflect the value of any specific tangible item in the comparison to the other tangible items that together make up the entire smartphone.  They do not track any of the language included in Samsung's identification of the relevant articles of manufacture, they did not reflect any visual presentation of such articles of manufacture, and they do not track or refer to any of the factors identified by the Court for use in identifying the articles of manufacture.  Accordingly, they do not appear to provide a reliable basis to either (1) identify the relevant articles of manufacture or (2) apportion profits from the sale of the entire phone to the articles of manufacture Samsung has identified.

80.    Mr. Wagner uses the ████████████ data from 2012 "to estimate value," based on Dr. Reibstein's opinions, without explaining what he or Dr. Reibstein specifically means by "value," or how it is related to Samsung's total profits on what Samsung identifies as the relevant articles of manufacture.[76]

81.    According to Mr. Wagner, the ████████████



---

[75] See, for example, Schedules 36.3-4T, 35.5-4T, 36.7-4T, 36.9-4T, 37.3-4T, and 37.5-4T, which are partially reproduced in other summaries.

[76] 2018 Rebuttal Report, ¶ 408.

[77] 2018 Rebuttal Report, ¶ 418

[78] 2018 Rebuttal Report, ¶ 406.

82.     The survey response options are not limited to physical components or articles, but instead include intangible features like ███████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ Because of the inclusion of these intangible categories, application of Mr. Wagner's approach leads to odd results regarding how profit is apportioned, which he never tries to explain. ██████████████████████████ calculated by Mr. Wagner and the September 2012 J.D. Power survey as the basis for evaluation, use of the J.D. Power survey results in the following apportionment of profits to each of the following ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Many of these categories are mutually exclusive.  None of them exist as a tangible article of manufacture within the infringing Samsung smartphones.  Mr. Wagner does not explain how these categories reflect a rational way to apportion profits on a tangible article of manufacture.

83.     I believe the surveys are of limited reliability for purposes of calculating Samsung's total profit on what Samsung has identified as the relevant articles of manufacture.  To the extent they show anything meaningful about design, they confirm the importance of design to consumers, the advantage that Apple had over Samsung and other competitors with respect to design, and that the products that infringed Apple's design patents were more highly-rated by consumers than Samsung products that did not adopt Apple's patented designs.

---

[79] 2018 Rebuttal Report, Schedule 36.7-4T.

84.    First, the J.D. Power surveys Mr. Wagner relied on previously confirm the importance of design during the relevant period, because "liked overall design/style" is the top and most frequently identified criteria among the J.D. Power list of "reasons for choosing handset brand," and was an area in which Apple was rated more favorably than Samsung.[80]



| Reasons for Selecting Handset | Industry Avg. | Apple | HTC | Motorola | Nokia | Palm | RIM BlackBerry | Samsung |
|---|---|---|---|---|---|---|---|---|
| Liked overall design/style | 45% | 51% | 49% | 50% | 34% | 42% | 38% | 43% |
| Internet capable | 44% | 48% | 51% | 57% | 18% | 37% | 37% | 39% |
| Touch screen | 43% | 58% | 61% | 58% | 16% | 56% | 11% | 52% |
| Ability to use e-mail accounts | 36% | 40% | 39% | 50% | 14% | 28% | 33% | 28% |
| Generally easy to use | 36% | 45% | 32% | 35% | 26% | 33% | 31% | 30% |
| Wi-Fi capabilities | 35% | 50% | 42% | 43% | 13% | 27% | 18% | 25% |
| Quality of phone/best one | 35% | 49% | 36% | 33% | 23% | 18% | 25% | 23% |
| Quality of display screen | 34% | 41% | 40% | 45% | 17% | 29% | 22% | 32% |
| Digital camera feature | 33% | 34% | 37% | 44% | 27% | 32% | 25% | 34% |
| GPS/Location feature | 32% | 40% | 40% | 50% | 16% | 25% | 19% | 27% |
| Ease of using Internet features | 32% | 44% | 33% | 40% | 11% | 26% | 21% | 21% |
| Ease of using e-mail features | 31% | 40% | 27% | 38% | 10% | 24% | 28% | 20% |

[1] Reasons less than 31% not shown.
[2] Based on all lengths of handset ownership.

1

2

3

4

85.     In November 2011, J.D. Power recognized that "Apple continues to be ranked

highest in overall satisfaction among the covered smartphone manufacturers…performing

significantly above the industry average," and "as was the case in previous volumes" Apple

outranked its competition in all categories, including Physical Design.[81]  Meanwhile, during that

same period, Samsung was "struggling significantly" in all four factors considered in the J.D.

Power survey.[82]  Notably, Mr. Wagner cites an excerpt about what features Apple owners wanted

improved,[83] and design was not one of them.[84]

---

[81] PX69.41: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA 10246378).

[82] PX69.41: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA 10246378).

[83] 2018 Rebuttal Report, ¶ 102.

[84] PX69.23: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246360).

[85] J.D. Power 2011 U.S. Wireless Mobile Phone Study Results Presentation Volume 2, dated Nov. 15, 2011 (SAMNDCA0028206 –SAMNDCA00282088  at SAMNDCA00282074, SAMNDCA00282075.

[86] PX69.108: J.D. Power, 2011 Wireless Smartphone Satisfaction Study, dated Mar. 2011 (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246445).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



89.     These results reinforce the benefit that Apple obtained from its use of the patented designs, and the benefit Samsung obtained when it infringed (in comparison to its use of designs that did not infringe).

### 4.     Mr. Wagner's Component Cost Approach.  [Wagner ¶¶ 431-451]

90.     In paragraphs 431 to 451 of his report, Mr. Wagner describes his "cost approach" as "one of the three primary methods of valuation," citing an article from the American Institute of Certified Public Accountants.[88]  Mr. Wagner cites no other accounting or economic literature in support of his method.  The same article defines "cost approach" as "a general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset."[89]  The article speaks primarily to

---

[88] 2018 Rebuttal Report, ¶ 431, fn. 648.

[89] American Institute of Certified Public Accountants, Inc., "Valuation Services, VS Section 100," p. 32, <https://www.aicpa.org/InterestAreas/ForensicAndValuation/Resources/Standards/DownloadableDocuments/SSVS_Full_Version.pdf>, accessed February 1, 2018.

1   the use of costs to evaluate value in the context of valuing intangible assets.  It does not address
2   the specific approach taken by Mr. Wagner here.

3       91.    Mr. Wagner is not using the cost to value an asset.  Rather, he is purporting to use
4   cost data as a proxy for determining the profit that Samsung actually made on the components
5   that Samsung alleges are the relevant articles of manufacture.

6       92.    Even if Mr. Wagner's component cost approach were an appropriate method by
7   which to determine profits on an article of manufacture in this case, it is critical to apply the
8   method using sufficiently relevant and reliable data.  Important considerations in this case
9   include:  (1) whether the data is drawn from the same source and integrates reliably; (2) whether
10  it is drawn from the same and relevant time periods; (3) whether it was created and used by the
11  company in the normal course of business; (4) how many observations are available; and
12  (5) whether the data has been and can be rigorously reviewed.  These criteria are important when
13  deciding if one can obtain a reliable calculation of profits.  Mr. Wagner's two cost approaches—
14  using a combination of data from Samsung Display Co. (SDC data), Samsung
15  Telecommunications America (STA data), and Samsung Electronics Co. (SEC data)—do not
16  meet these criteria and do not provide a reliable indication of total profits on Samsung's alleged
17  articles of manufacture.

18          **b.    Cost Approach – Critiques Applicable to Both Methods**

19      93.    A significant deficiency applicable to both of Mr. Wagner's cost approach
20  calculations is the failure to use a single data set drawn from verified data over consistent periods.
21  This arises from the fact that Samsung does not track any of the alleged articles of manufacture in
22  the regular course of business, as discussed in greater detail above.[90]  Samsung has repeatedly
23  emphasized the importance of taking financial data directly from the accounting database—
24  referred to as the SAP system—when calculating the revenues, costs, expenses and profits for
25  Samsung products.[91]  However, the SAP system does not track sales, costs, or profits for any of

26  _____

27      [90] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 20-21.

28      [91] Trial Transcript, dated Aug. 16, 2012, pp. 3003-3004, 3029-3030; Declaration of
    Timothy Sheppard, dated March 12, 2012, ¶ 34; Deposition of Dongwook Kim, dated Dec. 22,

the articles of manufacture identified by Samsung, as used in more than ███████ of the products at issue, which generated ███████ As a result, the cost approach identified in the 2018 Rebuttal Report resorts to a series of disparate sources to conduct the analysis.

94.     Both of Mr. Wagner's separate analyses—using SDC and STA data—rely initially on SEC's bill of materials to determine the total material cost of each infringing smartphone. However, the bill of materials is not consistent with the data Mr. Wagner uses to calculate profit and Mr. Wagner does not address the discrepancies.  Such discrepancies initially pointed out in the tables and analysis contained in the supplemental report of Terry Musika in which he showed the variation in the material costs in the bill of materials as compared to the cost data from which Mr. Wagner calculates profits.[93]  Similar problems appear in the present data.  For example, according to Mr. Wagner's calculations, the bill of materials indicates that the total material cost of the Fascinate in July 2010 was ███████ However, the spreadsheet Mr. Wagner used to calculate profits indicates the material cost for the Fascinate in July 2010 was only █████ ███ Mr. Wagner does not explain the discrepancies in his data sources, which render them unreliable and incompatible for combined analysis.

95.     The bill of materials data is also internally inconsistent and includes significant, unexplained variations.  For example, the average per-unit "total material" cost of the Droid ████████████████████████████████████████████████████

---

2017, pp. 61 ("This is data that came out of the [S.A.P.] system, hence reliable"), 84 ("I assume he pulled this from the [S.A.P.] system and the information here would be more than a hundred percent reliable.").

[92] 2018 Opening Report, Ex. 37.1-R2, p.2; Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 130-131, 134-136;  Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 72-74, 88-93; Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 46-48, 71-72, 76-77, 89.

[93] Supplemental Expert Report of Terry L. Musika, CPA, dated May 8, 2012, ¶¶ 36-37, Exhibit 52-S, Exhibit 52.1-S.

███████████████████████████████████████████

[95] DX 676.022, lines 45, 48.

2012.[96]  Mr. Wagner has made no attempt to control for outliers or investigate why these variations occur.  On the contrary, he has further exacerbated the variability by introducing mathematical errors in averaging monthly costs for several products.  For example, Mr. Wagner's Schedule 38.6-4T states that the average per-unit cost for the Infuse 4G's display assembly

███████████████████████████  ████  ██████████████████████████████████
██████████████████████████████████████████████████████  ████████████

96.      Mr. Wagner's two cost approach methods also produce inconsistent results, which calls into question the validity of both methods.  Although Mr. Wagner's approaches both utilize the same calculation of Samsung's entire profits and the same alleged articles of manufacture, Mr. Wagner's total damages figure for the D'677 patent using the SDC cost data is ████████████

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

Some of this variation is driven by Mr. Wagner's methodological inconsistencies.  When using the STA replacement data, Mr. Wagner splits 100% of the display assembly cost between the articles of manufacture for the D'305 and D'677 patents.[100] ██████████████████████

█████████████████████████████████████████████████████████████████████
███████████████████████████████████  Mr. Wagner's approaches do not produce consistent results that apply across multiple periods, multiple products, and multiple patents.

---

[96] 2018 Rebuttal Report, Schedules 38.4-4T, line 33, and 38.8-4T, lines 16-19.

[97] 2018 Rebuttal Report, Schedule 38.6-4T, line 132.

██████████████████████████████████████████████████████████

[99] 2018 Rebuttal Report, Schedules 3.8-4T and 3.9-4T.

[100] 2018 Rebuttal Report, Schedule 38.1B-4T.

[101] 2018 Rebuttal Report, Schedule 38.1A-4T.

**c.      Cost Approach – SDC Data**

████ ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ This by itself calls into question the reliability of this data for Mr. Wagner's purposes.

98.      Disparate data sets.  Because neither SEC nor STA had any data on the costs for the alleged articles of manufacture during the relevant period,[102] Mr. Wagner's analysis uses data from a separate company, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████ Only the last set of data was generated from Samsung's financial system, which Samsung has stated was used to create the company's audited financials.[103]

99.      Mr. Wagner has not shown that these data sets are consistent with one another.  He has made no effort to show that the ████████████████████████████████ that he uses to calculate the "entire profits" on the infringing smartphones.  Nor has Mr. Wagner shown that it matches to the bill of materials data used by him to calculate the total material cost for each device.

100.      Mr. Wagner's lack of explanation is particularly problematic because there appear to be significant anomalies among between these data sets.  As discussed above, there is evidence that the bill of materials data and the data used to calculate profits are different in material ways.  Additionally, ████████████████████████████████████████ For example, in

---

[102] Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 72, 76-77.

[103] Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 133-134; Declaration of Hyangsook Park Regarding Authenticity of Samsung Display Co. Ltd. Document, dated Dec. 22, 2017, pp. 1-2; Deposition of Dongwook Kim, dated Dec. 22, 2017, p. 83; Declaration of Timothy Sheppard, dated March 12, 2012, ¶ 34.



Wagner does not explain this four-fold discrepancy, or any of the similar discrepancies that exist for every product in every month, as summarized in **Exhibit 55-R2** attached to this report.

[108] DX 676, pp. 11, 23, 91; PX 180, pp. 11, 23, 80.

[109] DX 676, pp. 9, 12, 24, 27, 92; PX 180, pp. 9, 12, 24, 27, 81.

[110] DX 676, pp. 90-91; PX 180, pp. 79-80.

102. <u>Disparate time periods and limited observations</u>.  Mr. Wagner's analysis uses data taken from different time periods.  The data sets that he uses to calculate Samsung's profits and the total material cost for each device span from July 2010 to June 2012.[111]  In contrast, ███████

████████████████████████████████████████████████████████████

There is no effort to reconcile this, particularly in light of the lack of consistency between the data sets discussed above.

103. <u>Not created in the normal course of business</u>.  ████████████████

████████████████████████████████████████████████████████████

████████████████

104. <u>No opportunity for Apple or others to test the data</u>.  Samsung produced ████████

██ on the last day of discovery at the close of business.[114]  By producing the data after the final depositions in this case, Samsung foreclosed Apple's ability to test the reliability and accuracy of the data through cross-examination, including by asking questions about how to evaluate the data, how the data was prepared, or whether it is reliable.  There is no indication that it was ever audited or that it could be.[115]  When Apple asked to obtain information from the person who created it, I understand that Samsung told Apple's attorneys that the preparer had no more information than could be found in the declaration that accompanied the data.  However, Mr. Wagner interviewed the declarant, because he needed more information about the data.[116]  Notably, the potential for errors is not hypothetical.  In prior efforts to produce sales and cost

---

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[113] Declaration of Hyangsook Park Regarding Authenticity of Samsung Display Co. Ltd. Document, dated Dec. 22, 2017, p. 2 ("SDC000001 . . . was created on December 5, 2017 by myself").

[114] Dkt. 3542: Case Management Order, dated November 30, 2017, p. 1.

████████████████████████████████████████████████████████████

[116] 2018 Rebuttal Report, ¶ 438.

data, Samsung needed to go through multiple iterations of its revenue and cost data in an effort to create a spreadsheet free of errors and anomalies.[117]

105.    Given the foregoing problems, Mr. Wagner's cost approach using ███████ does not satisfy the objective criteria needed to be considered a reliable way to allocate profits based on the costs associated with the alleged articles of manufacture on which Samsung relies.

### d.    Cost Approach – STA Replacement Data

106.    Because neither SEC nor STA had any data on the costs for any of the alleged articles of manufacture, Mr. Wagner relies on data from STA regarding replacement parts used in repairs as a basis to allocate a portion of Samsung's profits on sales of whole devices.  Mr. Wagner's calculation using this STA data suffers from defects equivalent to those that affect the ███████████████████████████████████████████████████ opportunity Apple had to depose someone who worked in the STA finance organization.

107.    Disparate data sets.  I understand that Mr. Wagner's approach uses data from different companies prepared for different purposes.  The source of the STA replacement data does not appear to be the same as for the SEC bill of materials data or the data used to calculate Samsung's profit.[118]  These separate data sets involve fundamentally different activities. Samsung has claimed that, although the spreadsheets Mr. Wagner used to calculate profits were created for the purposes of this litigation, the underlying data is used to ███████████ ████████████████[119]  The source of the bill of materials data is unclear, and it does not match the data used to calculate Samsung's profit, as discussed above.  Nonetheless, the bill of materials data at least relate to the products that were later offered for sale to consumers.[120]  In contrast, the STA data relate to replacement parts, not material used in the manufacturing of the

---

[117] 2018 Opening Report, ¶¶ 146-155.

[118] Deposition of Dongwook Kim, dated Dec. 22, 2017, p. 83.

[119] Declaration of Timothy Sheppard, dated March 12, 2012, ¶ 34.

[120] Deposition of Dongwook Kim, dated Dec. 22, 2017, p. 62; Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 130-131.

products that infringed, and was prepared for a different purpose as a separate data set.[121]  No effort has been made to ensure that these different data sets are consistent with one another. Additionally, the STA repair data relates to transfers that occurred between STA and Samsung's "manufacturing legal entities," rather than sales to any external party.[122]  Internal transfers between companies often involve adjustments for transfer pricing, and Mr. Wagner does not address how he accounted for this issue or how it affects the usefulness of the information for purposes of the analysis.[123]  Further, STA did not sell standalone replacement parts to carriers or consumers, but rather provided a broader repair service to carriers, creating a different commercial context from the sale of smartphones.[124]

108.    <u>Disparate time periods and limited observations</u>.  Mr. Wagner's calculation using STA data mixes data from different time periods.  The data used to calculate profit and SEC bill of materials data span from ███████████████████████████████████████████ ███████████████████████████████  which extends far beyond the damages period.[125] Moreover, the actual data points are sporadic and incomplete, and in fact nearly all the data falls outside the relevant damages periods.  As shown in the table below, Samsung's data on replacement parts is nearly all dated after ██████████  the end of the period for which Mr. Wagner's profit calculation was prepared.

109.    Moreover, the STA repair data provides very limited information about the products at issue.  For seven products, Samsung produced no data at all.  This is, for example, true of the largest selling product ████████████████████  For five additional products, Samsung produced data for only ████████████████████  purportedly covered by the data set.  For the remaining four products, there is data for ███████████████  A summary of

---

[121] Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 78, 85; Han, pp. 118-119, 127.

[122] Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 80-82, 91.

[123] Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 123-125, 128-129; Han, pp. 91, 114-117.

[124] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 54-58, 62-65.

[125] **Exhibit 56-R2:** SAMNDCA30010151_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.XLSX.

these issues follows:[126]



110.     Mr. Wagner has not addressed these deficiencies or shown how or why the very

limited sample that he has used is representative for the products for which he has data, or why it

is representative and would apply to the more than ████████████████████████████

████████████████████████████████████

111.     <u>Not created in the normal course of business</u>.  There is no evidence that the STA

data on which Mr. Wagner relies was created in the ordinary course of business.  It appears to

have been prepared solely for litigation.[127]

112.   <u>No opportunity for Apple or others to test the data</u>.  Samsung produced the spreadsheet of STA replacement data on which Mr. Wagner relies only after Mr. Sheppard, the financial witness from STA, was deposed.[128]  Thus, Apple could not seek clarification or information on the spreadsheet from a witness who was responsible for the data or employed by Samsung's U.S. subsidiary.  Samsung has provided no way to verify or identify how the data was prepared or whether it was accurate.[129]  Past productions of data extracted from Samsung's SAP system required verification and investigation by various teams over several days in an attempt to establish its accuracy, as well as seven iterations to address numerous problems.[130]  There is no indication that similar scrutiny or quality control was applied here.

113.   Given the problems identified above, I do not believe the information provided is sufficient to provide an objective measure for an allocation of profits based on the costs for the alleged articles of manufacture that Samsung has identified.

**5.   Mr. Wagner's Approach Using a ▇▇▇▇▇▇▇▇ [Wagner ¶¶ 452-460]**

114.   As discussed above, Mr. Wagner uses the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Mr. Wagner does not offer a reason to distinguish the Nielsen survey from how he previously used the ▇▇▇▇▇▇ ▇▇▇▇▇▇  Similarly, as discussed above, Mr. Wagner relied on Dr. Reibstein for the proposition that the Nielsen survey can be used "to assess the value of features associated with the [articles of manufacture] identified in Samsung's interrogatory responses.[131]  But the Court struck Dr.

---

[127] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 123, 138, 148-149, 158-159, 164-166; Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 96-97 (SEC data), 124-125, 153-154 (STA data); Deposition of Dongwook Kim, dated Dec. 22, 2017, pp. 77-78.

[128] Deposition of Timothy Sheppard, dated Dec. 14, 2017, pp. 9-10, 78-79; Sheppard Declaration, dated March 12, 2012, ¶¶ 2, 5.

[129] Samsung's witnesses who testified about the STA spreadsheet used by Mr. Wagner (SAMNDCA30010151.xlsx) were unable to answer basic questions about the document and data. Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 153-154; Dongwook Kim, pp. 77-78.

[130] Deposition of Timothy Sheppard, dated March 30, 2012, pp. 64-65, 89-90, 131-133, 150-151; 2018 Opening Report, ¶¶ 146-155.

[131] 2018 Rebuttal Report, ¶ 453.

Reibstein's report, and Mr. Wagner's report does not provide an independent or adequate basis to justify the use of this survey to "assess the value" of features, let alone apportion profits on the basis of that value.

---

[132] 2018 Rebuttal Report, Fig. 73.

[133] 2018 Rebuttal Report, ¶ 456.

1

2

3

4

5

6

7

8

9



118.     Notwithstanding these deficiencies, Mr. Wagner uses the ███████ to "calculate a value for the total profit related to the AOM."[135]  Mr. Wagner does little to explain why he apparently believes the "value" of "features associated with the AOM" is a useful proxy for the calculation of Samsung's profits on the article of manufacture.[136]

119.     The relevant page of the ████████ does not state that it can or should be

120.     Leaving aside whether apportionment is appropriate, I do not believe that the ████████ provides a reliable basis to apportion profits from the entire phone to the articles of manufacture Samsung has identified.

---

[134] 2018 Rebuttal Report, ¶ 456.

[135] 2018 Rebuttal Report, ¶ 453.

[136] Wagner 20189 Report, ¶ 453.

**D.**   **Mr. Wagner's "Corroborating Quantitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits  [Wagner ¶¶ 463-505]**

121.   Mr. Wagner's discussion of "quantitative evidence" suffers from the same fundamental problem inherent in his apportionment and allocation analyses.  Mr. Wagner does not calculate the "total profits" made from the sale of any component or set of components contained within Samsung's infringing smartphones.  Instead, Mr. Wagner chooses numbers and percentages to apportion profits that Samsung made from its sales of smartphones as a whole, while improperly using smartphone *features* as a substitute for the physical components that Samsung alleges are the articles of manufacture.

**1.**   ▮▮▮▮▮▮▮▮▮  **Survey of Feature Priority List**

122.   Mr. Wagner discusses a ▮▮▮▮▮▮ report from April 2012 regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Rather than performing an accounting of profits based on the sale of articles of manufacture, Mr. Wagner is again engaging in apportionment based on the alleged value or importance of smartphone features to consumers, which suffers from all the flaws that I discussed earlier in this report.  Even as an apportionment exercise, Mr. Wagner's approach suffers from numerous methodological flaws.

123.   Mr. Wagner does not explain how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are equivalent, or even related, to Samsung's total profits on what it has identified as the relevant article of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[137] 2018 Rebuttal Report, ¶¶ 464-471.

125.    The features that Mr. Wagner believes are relevant to calculating profits based on ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

appear to be related to design, but rather the clarity or number of pixels on the display.  Nor do they refer to the actual or entire physical display panel itself, as distinct from features that a display panel might have.  Mr. Wagner does not explain why these features of a specific type of display screen are interchangeable with the article of manufacture that Samsung identified for the D'305 Patent.  Mr. Wagner appears to have arbitrarily selected a survey and response because they included the word ██████

██  ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

██  ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████ ██

██████████████████████████████████████

██████████████████ ████████████████████

████████ ████████████████████████████

████████████████████████████████████

██████████████

<hr>

[138] 2018 Rebuttal Report, Fig. 80.

[139] 2018 Rebuttal Report, Schedule 37.7-4T.

[140] 2018 Rebuttal Report, Schedule 37.7-4T.

1

2

3

4

5

6

7

8

### 2.    ComTech Reports

9

10    129.    Mr. Wagner discusses ComTech Reports regarding consumer "reason for choice"

as purported corroboration for his allocation based on other surveys.[141]  The same comments that

11    apply to Mr. Wagner's use of the Strategy Analytics survey apply equally to his use of the

12    ComTech Reports.[142]  These reports have nothing to do with a calculation of revenues, less

13    deductible costs, generated from the sale of articles of manufacture.

14    130.    Mr. Wagner does not explain how "reason for choice" is equivalent, or even

15    related, to Samsung's profits on what it has identified as the relevant articles of manufacture.  As

16    with the Strategy Analytics surveys, the ComTech surveys did not ask about articles of

17    manufacture, but rather features and capabilities of certain aspects of smartphones.  The

18    ComTech surveys also used a list of features that results in an arbitrary assignment of percentages

19    based on the number of features included in the survey.  The survey response options are not

20    limited to physical components or articles, but instead include intangible features like

21    (1) Contract Price and (2) Easy to Use.  The ComTech surveys are inappropriate tools to use in

22    this apportionment analysis based on the alleged value or importance of smartphone features to

23    consumers.

24

25

26    _____

[141] 2018 Rebuttal Report ¶¶ 472-475.

27    [142] The Court also previously excluded efforts to use the ComTech reports to apportion
total profits.  (*See* Dkt No. 1157: Order Granting-in-Part and Denying-in-Part Motions to Exclude

28    Expert Testimony; Corrected Expert Report of Michael Wagner, dated Apr. 20, 2012, ¶ 355.)

131.    Further, I understand that the ComTech survey response that corresponds to "design/color" is an outlier, most likely attributable to flaws in the way ComTech conducted the survey and presented its questions to the survey respondents, including that it also asked about attributes that could be confused with design, such as "Brand/model."[143]   As Mr. Schiller testified at trial, Apple's iPhone Buyer surveys have consistently shown that on average about 85% of iPhone customers ranked "attractive appearance and design" in the "Top 2" boxes of "very important" and "somewhat important" to their decision to purchase an iPhone.[144]   Samsung's own surveys also show that the majority of Samsung and Apple smartphone customers expressed a preference for the smartphone color black (74.4% males, 50.5% females) as compared to white (14.5% males, 27.6% females) or any other color.[145]   If Mr. Wagner had used either of these survey results, instead of an outlier survey result selectively taken from ComTech, his calculation of Samsung's Profits would have been hundreds of millions of dollars higher.

132.    In sum, the ComTech Reports do not address Samsung's profit or establish the monetary value of any specific product or feature.  Nor do they identify any single feature that allegedly drives consumer satisfaction or consumer decision making for a specific product.  It is not an appropriate source to use for the analysis of total profits in this case.

### 3.    Mr. Wagner's Discussion of Other Surveys Regarding iPhone's Functionalities [Wagner ¶¶ 75-102]

133.    Mr. Wagner cites numerous other surveys and studies as purported support for the proposition that the intellectual property at issue here has limited value without using them to perform a specific apportionment.[146]

---

[143] Deposition of Art Rangel, dated Mar. 2, 2012, pp. 78-85, 101-104; *see also* Deposition of Greg Joswiak, dated Feb. 24, 2012, pp. 410-412, 415-424; Chip Lutton, Dep. Tr. dated Jul. 26, 2011, at 268-269, 276-279.

[144] Schiller Trial Testimony at 634-637, dated Aug. 3, 2012 (Schiller testimony explaining survey methodology and interpreting the results); *see also* Deposition of Greg Joswiak, Dep. Tr., dated Feb. 24, 2012, at 410-412, 415-424.

[145] PX 185.13.

[146] 2018 Rebuttal Report, ¶¶ 75-102.

134.    These surveys and studies actually confirm that the style and design of a smartphone is a significant purchase driver and impacts overall customer satisfaction.  As Mr. Wagner points out, "design and form [factor]" are important to iPhone owners during the purchasing process, and Android owners also place importance on "design and form" during the purchasing process.[147]

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████      Even Samsung's own documents recognized the impact of physical design on consumer satisfaction:[151]

- they are specifically used for **internet browsing**.
- According to JD Powers, **physical design** is one of the **top attributes** that affect customer **satisfaction**.
    - This suggests that finding a **handset** that is **attractive** to the consumer is a **key factor** in that consumer's handset **purchase decision**.
    - Creating **distinct** handset designs helps **attract** consumers who have a **preference** for **different** handset **designs**.
        - Note: This makes it **difficult** to **develop consistent UI** design for varying handset form factors and screen sizes, from high-end handsets to low-end handsets.

---

[147] 2018 Rebuttal Report, ¶ 80.

[148] 2018 Rebuttal Report, ¶ 94.

[149] CIF US Results Report Final, July 23, 2010, Iconmobile Group (SAMNDCA00225505 at 531 (emphasis added)).

[150] 2018 Opening Report, **Exhibit 24-R**.

[151] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969 at SAMNDCA00215065).

135.   Similarly, one of the surveys on which Mr. Wagner relies reinforces that Apple

136.   Similarly, Samsung's own "2009 Mobile UX Forecast" presentation reinforces the importance of the visual design of smartphones.  The objective of the research project was to gain insight from the competition and develop a UX strategy for 2009.[153]  At that time, Samsung was "increasing focus on visual design of product."[154]  Samsung recognized that hardware design trends were moving toward a "simple form factor."[155]  The presentation states that one key development solution for the upcoming year was a "[c]ompelling physical design that supports

---

[152] Samsung Lovemark Mobile & Web Research: Lovemarks, dated June 23, 2010 (SAMNDCA00207695-SAMNDCA00207765 at SAMNDCA00207731) [9.8].

[153] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969- SAMNDCA00215201 at SAMNDCA00214970) [8.5].

[154] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215056).

[155] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215188).

screen-based interface optimization and standardization."[156]  Following this presentation, Samsung adopted Apple's patented designs reflected in the iPhone.

137.    Similarity in style and design of a smartphone is a critical factor when analyzing purchase drivers across manufacturers and models.  Style and design is eliminated from the consumer decision making process when, for example, a consumer is choosing between two Apple iPhones, or an Apple iPhone and a Samsung smartphone that adopted Apple's patented designs.

138.    Mr. Wagner opines that Apple's representations during licensing negotiations in October 2010 are relevant to the determination of Apple's damages.[157]  I disagree.  I understand that the October 2010 meeting was previously excluded by this Court.[158]  Further, I see no relevance of the pre-suit licensing negotiations in calculating "total profits" for an article of manufacture.

### 4.    iPhone Versus iPod Touch Profit Comparison  [Wagner ¶¶ 476-499]

139.    In comparing the iPhone and iPod touch,[159] Mr. Wagner opines that the "difference in profitability is a reasonable estimate of the amount of profitability due to the phone calling features and additional features (unrelated to the AOM) of the iPhone."[160]  Based on his calculations, Mr. Wagner concludes that ███████████████████████████████ ██████████████████████████████████████████████  This conclusion is inconsistent with Mr. Wagner's opinions and analyses using survey data.  For example, his analysis using a ███████████████████████████████

---

[156] 2009 Mobile UX Forecast: M.T.O.C., Samsung Electronics Co., LTD, Nov. 10, 2008 (SAMNDCA00214969-SAMNDCA00215201 at SAMNDCA00215187.)

[157] 2018 Rebuttal Report, ¶ 85.

[158] Dkt. No. 1889 (Aug. 21, 2012): Trial Exhibit List.

[159] 2018 Rebuttal Report, ¶¶ 476-499.

[160] 2018 Rebuttal Report, ¶ 492.

[161] 2018 Rebuttal Report, ¶¶ 492, 498.

████████████████████████████████████ These inconsistencies show the unreliability of Mr. Wagner's approaches.  The allocation of more than ████████ of the iPhone to "the ability to make a telephone call or send a text message" lacks an adequate basis in light of the differences between the markets for the products.

140.    Mr. Wagner's comparison of the iPhone and iPod touch is not useful because it compares products marketed to different consumers in different product categories.  Mr. Wagner does not provide any evidence that customers, particularly the carrier customers to whom Samsung sells, consider the two products to be substitutes for one another.  The products have similarities, but are sold to different customer groups for different purposes.

141.    For example, analysts widely observed that the iPod touch was marketed at a lower price and to a younger demographic in order to provide a lower cost entry point to Apple's ecosystem.  A 2009 report from mobile analytics firm Flurry concluded:

> As all industry eyes look to the iPhone, the iPod Touch is quietly building a loyal base among the next generation of iPhone users, positioning Apple to corner the smartphone market not only today, but also tomorrow.  In terms of Life Stage Marketing, the practice of appealing to different age-based segments, Apple is using the iPod Touch to build loyalty with pre-teens and teens, even before they have their own phones (think: McDonalds' Happy Meal marketing strategy). When today's young iPod Touch users age by five years, they will already have iTunes accounts, saved personal contacts to their iPod Touch devices, purchased hundreds of apps and songs, and mastered the iPhone OS user interface. This translates into loyalty and switching costs, allowing Apple to seamlessly "graduate" young users from the iPod Touch to the iPhone.[163]

Similarly, a 2009 article in Ars Technica observed:  "[T]he iPod touch is serving an even more strategic role in popularizing the iPhone OS platform with a younger generation obsessed with

---

[162] 2018 Rebuttal Report, Schedules 36.9-4T & 36.10-4T, lines 20 & 45.

[163] http://flurrymobile.tumblr.com/post/113359476620/flurry-smartphone-industry-pulse-november-2009

social networking and gaming. When the Facebook generation is ready to graduate to a smartphone, chances are good that they will choose the platform on which they're already hooked."[164]  A 2010 article in Geek.com observed: "Why do parents and kids love the iPod touch?  The reasons are simple.  Parents appreciate the gizmo's sweet $199 price point and the fact there are no monthly fees attached to it."[165]

142.  Mr. Wagner also ignores that consumers purchased the iPod touch and iPhone in different ways.  The first generations of iPhones were typically subsidized by carriers, like AT&T.[166]  In contrast, for purchasers of the unsubsidized iPod touch, the cost was born up-front by the consumer paying full price.  Mr. Wagner does not consider whether or how these different purchasing mechanisms impact consumer pricing or comparative profit margins.

143.  More generally, Mr. Wagner has not shown why his analysis of *Apple's* profits on various products is informative when calculating *Samsung's* profits on its own products to which it applied the patented designs.[167]  Mr. Wagner has not explained why Apple's pricing strategy and profit margins are sufficiently comparable to Samsung's strategy and margins.  In fact, the evidence shows the two company's profit margins differ for a number of reasons that vary by product.[168]

144.  Mr. Wagner's analysis of these products also does not actually calculate profits that Samsung earned on the alleged article of manufacture, but instead apportions the share of profits he believes to be attributable to the patented design.

---

[164] https://arstechnica.com/gadgets/2009/12/ipod-touch-is-gateway-drug-to-iphone-for-facebook-generation/

[165] https://www.geek.com/games/the-apple-brainwash-get-them-while-theyre-young-with-the-ipod-touch-1039571/

[166] Aug. 13 2012 Trial Transcript, pp. 2133:23-2134:6

[167] Deposition of Kyuhyun Han, dated Dec. 20, 2017, pp. 79-80 ("Can you think of any reason that Samsung would ever use Apple cost and revenue data to calculate profits on any Samsung smartphone product? . . . I've been in this field 10-plus years, including my time in college, but I've never heard of calculating profits in the manner that you describe.").

[168] E.g., PX 58.14 ("Apple iPhone 4 Hardware Costs Similar to Galaxy S, But ASP Premium Driving GM Gap").

1

2

### 5. Comparison of the Profit per Unit for Infringing Smartphones by Design Patent to the Least Profitable Infringing Smartphone [Wagner ¶¶ 500-505]

3        145.    Mr. Wagner's comparison of profit per unit to identify the least profitable

4   infringing smartphone is not a useful approach for looking at the specific contribution of the

5   design patents to the products.[169]  It does not focus on whether or how the patented designs are

6   applied to an article of manufacture.  It does not consider any specific article of manufacture or

7   component.  It does not calculate the total profit that Samsung made on the sale of an article of

8   manufacture.

9        146.    Even if Mr. Wagner's approach were appropriate, it suffers from several

10  methodological flaws.  For example, his calculations are based on the operating margin, which

11  reflects a number of categories of costs that Mr. Wagner has admitted in his prior reports reflect

12  indirect costs and allocations rather than a measure of profit specific to the smartphone.[170]  An

13  improved analysis would utilize gross margin.  Although I disagree with Mr. Wagner's analysis, I

14  have recalculated the results using gross margin, rather than operating margin with the corrections

15  described below.  The results and calculations are summarized in **Exhibit 57-R2, 57.1-R2, and**

16  **57.2-R2**.  The gross profits are not well correlated to the operating profit calculation performed

17  by Mr. Wagner and the overall effect is different.

18        147.    Mr. Wagner's analysis also does not properly account for outliers.  He

19  acknowledges the importance of doing so when he disregards products ███████████████████

20  ████████████████   He also acknowledges the potential for confounding variables when he runs an

21  alternate calculation controlling for the numbers of months in the sales cycle.[172]  But he otherwise

22  makes no adjustments or investigation regarding potential outliers or other variables.  This sets an

23  artificially low ceiling on Mr. Wagner's results.  Mr. Wagner's analysis is driven by specific

24  ———————————————

25        [169] 2018 Rebuttal Report ¶¶ 500-505.

26        [170]  Corrected Expert Report of Michael J. Wagner, dated Apr. 20, 2012, ¶ 323 ("As part of its calculation of the operating expenses (and COGS to a lesser degree), Samsung allocates expenses that are not directly related to a specific product.").

27        [171] 2018 Rebuttal Report, ¶¶ 501.

28        [172] 2018 Rebuttal Report, ¶¶ 503-505.

phones █████████████████████████ that fall well outside the range of profits for the other products.[173]  Eliminating one or both of these outliers from their respective calculations would result in very different conclusions about the value of the designs, even using Mr. Wagner's approach.  Mr. Wagner did not describe any investigation into why these sizeable differences are present and whether they arise from unusual changes in the operating expenses or periods involved.  In the analysis using gross profits for the products, I have corrected for this by eliminating ████ as an outlier in the analysis regarding the D'305 patent.  When this occurs, the results are not 9%, as Mr. Wagner states.  Rather, the lowest per unit gross margin is above ████ ██████████████████████ for the other infringing products.  Similarly, with respect to the D'677 patent analysis, using gross profit identifies no clear outliers and the lowest per unit gross margin is ████████████████ of other products.

148.    A different analysis looking at profits also shows that Mr. Wagner's assumption that the patented design is responsible for only the lowest common denominator of profit is inappropriate.  In **Exhibit 54-R2**, I calculated and compared the profit earned by Samsung on its infringing and non-infringing devices.  As **Exhibit 54-R2** shows, the devices incorporating the patented designs earned a █████████████████████████████████████ ██████████

149.    Mr. Wagner's calculation is also not consistent with the other analyses in his report.  Mr. Wagner's conclusion that the least profitable infringing smartphone's profit per unit can be considered the maximum profit attributable to the article of manufacture is based solely on the fact that the infringing smartphones all incorporate the relevant article of manufacture as a common element.[174]  However, if correct, that same reasoning could apply to every other feature the phones have in common, including the ability to make calls, send texts, receive emails, browse the Internet, take pictures, store data, operate on a battery, etc.  Thus, Mr. Wagner is

---

[173] 2018 Rebuttal Report, Figures 91-92.

[174] 2018 Rebuttal Report, ¶ 500.

essentially arguing that all of those features are collectively worth no more than ███ in profit.[175] However, that contradicts his earlier conclusions based on his survey-based analysis.  For example, citing to a █████████████████████████████████████████████████ ██████████████ Mr. Wagner's analysis of the iPhone and iPod touch concluded that 80-84% of the iPhone's profit is attributable to mainly the ability to make a telephone call or send a text message.[177]  However, all of these features are common to all of the infringing products, and thus should not exceed ███ of the total profit (if Mr. Wagner's reasoning in this section is correct).  These inconsistencies show that Mr. Wagner's analysis is inherently flawed.

**E.     Mr. Wagner's So-Called "Corroborating Qualitative Evidence" Does Not Support Mr. Wagner's Approaches for Calculating Samsung's Profits [Wagner ¶¶ 506-564]**

150.    Mr. Wagner's "qualitative evidence" is irrelevant and unhelpful when performing a calculation of Samsung's profits based on the article of manufacture to which Samsung applied the patented designs.

151.    Mr. Wagner's "evidence" consists mainly of generalized discussions about smartphone features and other intellectual property related to smartphones.[178]  These generalized statements provide no information about the revenues or deductible costs of any tangible goods relevant to the articles of manufacture at issue in this case.  Mr. Wagner fails to indicate how generalized consumer statements regarding "importance" of cameras, operating platform, battery life, processor speed, and other features has anything to do with the calculation of "total profits" based on the sale of the alleged articles of manufacture.  Regardless, as discussed above, numerous surveys and consumer research demonstrate the importance of design to consumers' decision making.

152.    Mr. Wagner cites two documents—presentations from Samsung and ████—that categorize marketing messages from Apple and other smartphone OEMs, and he emphasizes that

---

[175] 2018 Rebuttal Report, Figure 92.

[176] 2018 Rebuttal Report, Schedules 36.3-4T & 36.4-4T.

[177] 2018 Rebuttal Report ¶¶ 492, 498.

[178] 2018 Rebuttal Report ¶¶ 510-514, 522-540, 548-561.

none of these categories are named for or focused solely on the patented designs.[179]  First, Mr. Wagner's discussion of the Samsung presentation ignores that nearly every photograph or still included in the document prominently features the D'677, D'087, and/or D'305 patented designs, regardless of the category Samsung ascribed to it.[180]  Thus, the Samsung presentation provides further evidence of the patented designs' prominence within the products as a whole and supports my opinion. ███████████████████████████████████████

████████████████████████████ ██ ████████████████████████████████

███████████████

153.    Mr. Wagner recites statistics regarding Samsung's and Apple's total marketing expenditures.[182]  He does not draw any conclusions or state any opinions regarding those statistics.  They are irrelevant to the question at issue here, which is what the article of manufacture is and how to calculate Samsung's profits made on it.

154.    Mr. Wagner's attempt to derive profit numbers based on memory capacity in different iPhone models also has no relationship to any article of manufacture.[183]  The calculation does not address the identification of the article of manufacture or how Samsung's profits specific to that article of manufacture should be calculated.  Mr. Wagner does not attempt to show how the calculations are related to the issues in this case.

155.    Mr. Wagner discusses and relies on an October 5, 2010 presentation titled "Samsung-Apple Licensing Discussion."[184]  I understand that this presentation has been excluded by the Court, and I do not think it has any relevance to the questions presented in this trial.[185]

---

[179] 2018 Rebuttal Report, ¶¶ 515-517.

[180] Samsung Mobile, "Apple iPone TV Spending by Marketing Message," Dec. 2010 (SAMNDCA00235640-643 at 641-642).

[181] 2018 Rebuttal Report ¶¶ 515-516; Nielsen, Nielsen Q2 2012 Insight for Samsung, August 2012 (SAMNDCA30008344-374 at 356).

[182] 2018 Rebuttal Report, ¶¶ 518-521.

[183] 2018 Rebuttal Report, ¶¶ 541-547.

[184] 2018 Rebuttal Report, ¶¶ 507-509.

[185] Dkt. No. 1889 (Aug. 21, 2012): Trial Exhibit List.

**III.   REPLY OPINIONS REGARDING DEDUCTIONS OR MODIFICATIONS ASSOCIATED WITH PRIOR CALCULATIONS THAT ARE INCLUDED FOR THE FIRST TIME IN THE 2018 REBUTTAL REPORT.**

    **A.   Mr. Wagner's Opinions Regarding "Total Profits" Using Fewer Than All the Phones Found by the Jury to Infringe Apple's Design Patents**

        **1.   Mr. Wagner has no basis to eliminate from his damages calculation units that the prior jury found to infringe. [Wagner ¶¶ 382-390]**

156.   Mr. Wagner has improperly removed from his calculation of Samsung's Profits over ▮▮▮▮▮▮▮▮▮▮ that the prior jury previously adjudicated as infringing Apple's D'677 patent.  Mr. Wagner explains his decision to remove these previously adjudicated units as follows: (1) the D'677 patent covers only "black" phones, (2) Samsung launched a "white" version of its Galaxy S II phones before June 30, 2012 (*i.e.*, before the end of the damages period), and therefore (3) the jury's verdict in 2012 may have included "white" Galaxy S II units that do not infringe the D'677 patent.[186]  Mr. Wagner admits, however, that Samsung never produced sales information showing how many "white" units, if any, STA actually sold to carriers and consumers within the damages period.[187]  Mr. Wagner also admits that Samsung never raised a defense to infringement at the 2012 trial based on the inclusion of "white" phones, and never presented the jury with the means to deduct any "white" units from its verdict.[188]  Nor does he disagree that the full set of unit sales presented in my 2018 Opening Report and in prior reports were presented to the jury as a part of JX1500 and have consistently been used as a measure of the relevant units subject to the infringement verdict thereafter.  As explained in more detail below, I disagree with Mr. Wagner's attempt at this stage to unilaterally remove from the verdict approximately ▮▮▮▮▮▮▮▮ that the jury previously found to infringe Apple's D'677

---

[186] 2018 Rebuttal Report, ¶¶ 382-390.

[187] 2018 Rebuttal Report, ¶ 388 ("I understand the 9th and 10th letters of each product's model number (SKU) signifies the color of the model and, more specifically, the letters 'ZW' refer to white models."); *id.* ¶ 389 ("Samsung did not produce STA and SEA financials at the SKU level.").

[188] 2018 Rebuttal Report, ¶ 386 ("the fact that Samsung started selling white versions of these phones at the end of 2011 was never an issue raised for trial").

patent.  I also disagree with Mr. Wagner's calculation of profits after excluding those ▮▮▮▮▮▮ units.

        **b.**     **Mr. Wagner Improperly Removes ▮▮▮▮▮ Units That The Jury Found to Infringe Apple's D'677 Patent**

157.    Until his 2018 Rebuttal Report, both Mr. Wagner and I have properly treated all units included on JX1500 as infringing units as decided in the August 2012 verdict that was thereafter affirmed by the Federal Circuit.

158.    At the August 2012 trial, I understand the Mr. Musika and Mr. Wagner relied on PX180, DX676, and/or JX1500 to identify how many units of each accused product Samsung sold.  As I explained to the jury at the 2013 damages trial, Mr. Wagner, Mr. Musika and I agreed on the number of infringing units that Samsung sold during the damages period based on the units sales reported in these documents.[189]

159.    Samsung and Mr. Wagner have both acknowledged that the jury returned a verdict for Apple, finding that all the Galaxy S II products infringed Apple's D'677 patent, and awarded Apple damages for the Galaxy S II units without any exclusions based on color.  In a declaration that Mr. Wagner submitted to the Court on January 20, 2016, in connection with supplemental damages proceedings, Mr. Wagner confirmed that the jury had awarded Apple damages on all Galaxy S II units contained in JX1500.[190]  In that declaration, Mr. Wagner acknowledged that the Court had previously held that it would "calculate a per-unit supplemental damages amount by dividing the jury award for a given product by the number of sales of that product encompassed within the jury award."[191]  Mr. Wagner then calculated that per-unit supplemental damages amount for each of the Galaxy S II products by taking the jury award and dividing it by all

---

[189] Dkt. 2840: Transcript of Nov. 14, 2013 Hearing at 635:3-7.

[190] Dkt. 1931: Amended Verdict Form; Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.

[191] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 13 (emphasis added).

1
2
3
4

Galaxy S II units contained in JX1500,[192] confirming that the jury verdict encompassed all Galaxy S II sales.  Mr. Wagner also stated that "I understand that the parties agree on these calculations."[193]  Thus, according to Mr. Wagner, all Galaxy S II units contained in JX1500 infringed Apple's D'677 patent.

5
6
7

160.    Mr. Wagner's decision to remove ███████ Galaxy S II units from total stated in JX1500 and to refuse to include them in his calculations of Samsung's profits is inconsistent with the 2012 jury verdict and inconsistent with Mr. Wagner's own prior analysis of that verdict.

8
9

**c.      Even if units reflecting white products should be excluded, Mr. Wagner's method for doing so is wrong.**

10
11
12
13
14
15
16
17
18
19
20
21
22

161.    As noted above, I disagree that any units previously determined to infringe by the jury should be removed from the damages analysis.  Even if this exclusion were permitted, Mr. Wagner's method for doing so is improper and unreliable.  Mr. Wagner admits that he does not have data to show the number of white phones actually sold by STA, if any, during the damages period.[194]  Accordingly, he resorts to using a different data set from SEC.  More specifically, he claims to use the number of SEC white units that were manufactured and sent to STA as a proxy for the number of white units STA sold to carriers and the timing of those sales.  I do not agree that any such direct correlation can be assumed and Mr. Wagner's attempt to tie together the timing of the events is not explained or justified.  To the extent SEC's data on manufacturing is used as a proxy, the proper approach would be to take the total number of white units manufactured before June 30, 2012, divided by the total number of units manufactured for each of the Galaxy SII products before June 30, 2012.  The resulting percentage would be applied to the profits for the specific products.  I have prepared a calculation that reflects this approach applied

23

---

24
25

[192] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.  *See also* Dkt. 3354-20: Schedule 2: Products Eligible for Supplemental Damages: Damages Per Unit, dated Jan. 20, 2016, at p. 7.

26

[193] Dkt. 3354-18: Wagner Declaration in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest, ¶ 14.

27
28

[194] This itself is inconsistent with Samsung's prior statements about the ability of the SAP system to track all sales of the infringing products to carriers; Mr. Wagner does not explain why the correct data is not available or why Samsung did not provide it to him.

to the amount of revenues and gross profits that I calculated as part of my Amendment and included it as **Exhibits 18-R2-S-A to 18.7-R2S-A** to this report.

162.    I thus disagree with both the decision to deduct and the manner in which Mr. Wagner has attempted to apply the deductions.

**IV.    MY CALCULATION OF SAMSUNG'S PROFITS FOR THE INFRINGING PRODUCTS IS APPROPRIATE BECAUSE THE COSTS THAT I HAVE EXCLUDED CANNOT RELIABLY BE DIRECTLY ATTRIBUTED TO ANY SAMSUNG PRODUCT.**

163.    As noted in the introduction, I am replying to address those portions of Mr. Wagner's report that discuss the identity of the article of manufacture and how to calculate damages if the article of manufacture is something other than the smartphones as a whole.  Both Mr. Wagner and I have previously submitted reports, been deposed, and provided testimony on the proper calculation of profits on the smartphones as a whole, which both Mr. Wagner and I have previously referred to as "total profits" and which Mr. Wagner now refers to as "entire profits."  Mr. Wagner includes in his report comments about this calculation that are either verbatim or nearly verbatim to his prior reports.  In an effort to recognize the limited nature of the expert discovery that has been ordered in connection with this trial, I do not repeat my prior responses to these restated portions of Mr. Wagner's report.

**B.    I Appropriately Exclude SEC's Operating Expenses from My Calculation of Samsung's Infringer's Profits. [2018 Rebuttal Report ¶¶ 120-125]**

164.    In his expert report, Mr. Wagner contends that "Samsung is entitled to deduct all of its operating expenses in its calculation of profits from its sales of products found to infringe the D'677, D'087, and D'305 Patents."[195]  I have previously responded to these opinions in my deposition testimony on August 26, 2013 and December 2, 2015 at pages 255-305, 354-450, 535-567 of my deposition transcript, and in my 2013 trial testimony at pages 690-703 and 1161-1179 of the trial transcript.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein.

---

[195] 2018 Rebuttal Report, ¶ 121.

**C.      I Appropriately Excluded STA and SEA's Operating Expenses From My Infringer's Profits Calculation. [2018 Rebuttal Report ¶¶ 126-127]**

165.    Mr. Wagner criticizes me for excluding STA and SEA's operating expenses from my infringer's profits damages calculation.[196]  I have excluded these expenses from my calculations of Samsung's infringer's profits for reasons similar to those that apply to SEC's operating expenses and which I have discussed at length in the trial and deposition testimony cited above.  I have specifically addressed this issue in my deposition testimony on August 26, 2013 at pages 260-273.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein.

**D.      Comparison of My Calculated Operating Margin to Samsung's Audited Financial Statements for the Telecommunications Segment Does Not Demonstrate the Reliability of Samsung's Data [Wagner ¶ 124]**

166.    In his report, Mr. Wagner claims that the reliability of Samsung's financial data is demonstrated by comparing the operating profit that I calculated from Samsung's financial data ▮▮▮▮▮▮ to the operating profit reported in Samsung's annual reports for its telecommunications segments (14.9% in 2011; 10.9% in 2010).[197]  I disagree and find this opinion nonsensical for two reasons.  First, Mr. Wagner provides no basis to conclude that the operating profit margins for the telecommunications segment of Samsung's overall business is relevant or probative of the profitability of the specific phones at issue in this litigation.  Second, even if this were a relevant comparison, Mr. Wagner's claim that "the operating profit rates in Samsung's financials are consistent with the operating profit that [I] calculated for all products at issue in this litigation" is not true.  My calculated rate of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**E.      It is Appropriate to Apply SEC's Gross Profit Percentage to Revenues of STA and SEA**

167.    Mr. Wagner contends that the "application of SEC's gross profit percentage to STA and SEA is not reliable" and "Ms. Davis's discussion did not explain why she did not simply calculate Samsung's consolidated gross profits by relying upon STA's and SEA's

---

[196] 2018 Rebuttal Report, ¶¶ 126-127.

[197] 2018 Rebuttal Report, ¶ 124.

financial data to calculate STA's and SEA's profitability."[198]  In addition to the opinions set forth in my 2018 Opening Report, I have previously responded to these opinions in my deposition testimony on August 26, 2013 at pages 260-275 of my deposition transcript.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein.

     **F.**    **My Reasonable Royalty Analysis is Reasonable and Appropriate.  [Wagner ¶¶ 134-685]**

    168.   Mr. Wagner contends that my reasonable royalty analysis "relied on unreasonable benchmarks and resulted in an overstated concluded royalty rate."[199]  Mr. Wagner has included the same criticism in his prior expert reports.  I have previously responded to these opinions extensively in my deposition testimony on August 26, 2013 and December 2, 2015 and in my 2013 trial testimony.  I incorporate that testimony as if set forth fully here, including the documents and witness deposition testimony cited therein..

Dated:  February 9, 2018

_____
JULIE L. DAVIS

---

[198] 2018 Rebuttal Report, ¶¶ 130-131.

[199] 2018 Rebuttal Report, p. 69.

REPLY EXPERT REPORT OF JULIE L. DAVIS, CPA (02/09/2018)
Case No. 11-cv-01846-LHK

Apple Inc. v. Samsung Electronics Co., LTD., et al.     **EXHIBIT 3-R2.1**
Documents Considered List

| Bates Beg. | Bates End | Document Description |
|---|---|---|
| | | |
| **Apple Production** | | |
| APLNDC0001793663 | APLNDC0001793663 | |
| **Samsung Production** | | |
| SAMNDCA 10246338 | SAMNDCA 10246343 | |
| SAMNDCA 10246360 | SAMNDCA 10246360 | |
| SAMNDCA 10246378 | SAMNDCA 10246378 | |
| SAMNDCA 10246395 | SAMNDCA 10246395 | |
| SAMNDCA 10246396 | SAMNDCA 10246396 | |
| SAMNDCA00207695 | SAMNDCA00207695 | |
| SAMNDCA00214969 | SAMNDCA00215065 | |
| SAMNDCA00214970 | SAMNDCA00214970 | |
| SAMNDCA00215056 | SAMNDCA00215056 | |
| SAMNDCA00215187 | SAMNDCA00215187 | |
| SAMNDCA00215188 | SAMNDCA00215188 | |
| SAMNDCA00225505 | SAMNDCA00225505 | |
| SAMNDCA00235640 | SAMNDCA00235643 | |
| SAMNDCA00282063 | SAMNDCA00282063 | |
| SAMNDCA00282074 | SAMNDCA00282075 | |
| SAMNDCA30008344 | SAMNDCA30008374 | |
| SAMNDCA30008395 | SAMNDCA30008395 | |
| SAMNDCA30008517 | SAMNDCA30008517 | |
| SAMNDCA30008627 | SAMNDCA30008662 | |
| SAMNDCA00402075 | SAMNDCA00402075 | |
| SAMNDCA004875335 | SAMNDCA004875335 | |
| **Trial Documents** | | |
| n/a | n/a | Plaintiff's Exhibits: 39, 47 |
| n/a | n/a | Trial Exhibit List, dated Aug. 21, 2012 (Dkt. No. 1889) |
| **Depositions** | | |
| n/a | n/a | Deposition Transcript of Julie Davis, August 26, 2013 |
| n/a | n/a | Deposition Transcript of Julie Davis, December 2, 2015 |
| n/a | n/a | March 30, 2012 Deposition of Timothy Sheppard |
| **Expert Reports** | | |
| n/a | n/a | Expert Report of David Reibstein, dated January 29, 2018 |
| n/a | n/a | Rebuttal Expert Report of Michael Wagner, volumes 1-24, dated January 29, 2018 (including documents cited therein) |
| **Legal** | | |
| n/a | n/a | Feb. 8, 2018 Order Graning Motion to Strike Dr. Reibstein's Report |
| n/a | n/a | Nov. 30, 2017 Case Management Order |
| n/a | n/a | Jan. 20, 2016 Declaration and Exhibits of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for Supplemental Damages and Prejudgment Interest (Dkt. 3354-3, 18, 19, 20) |
| n/a | n/a | Jan. 20, 2016 Exhibit B to Declaration of Wagner in Support of Opposition to Apple's Motion for Supplemental Damages, Schedule 2: Products Eligible for Supplemental Damages: Damages Per Unit (Dkt. 3354-20) |
| | | Transcript of Proceedings held on Nov. 14, 2013 Dkt. 2810 |
| n/a | n/a | Sept. 1, 2015 Federal Circuit Opinion |
| n/a | n/a | 2012-06-30 Order Granting-In-Part and Denying-In-Part Motions to Exclude Expert Testimony (Dkt. 1157) |
| n/a | n/a | Mar. 12, 2012 Declaration of Timothy Sheppard |
| **Websites** | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.    **EXHIBIT 3-R2.1**

Documents Considered List

| Bates Beg. | Bates End | Document Description |
|---|---|---|
| n/a | n/a | American Institute of Certified Public Accounts, Inc., "Valuation Services, VS Section 100," <https://www.aicpa.org/InterestAreas/ForensicAndValuation/Resources/Standards/DownloadableDocuments/SSVS_Full_Version.pdf>, accessed February 1, 2018. |
| n/a | n/a | http://flurrymobile.tumblr.com/post/113359476620/flurry-smartphone-industry-pulse-november-2009 |
| n/a | n/a | https://arstechnica.com/gadgets/2009/12/ipod-touch-is-gateway-drug-to-iphone-for-facebook-generation/ |
| n/a | n/a | https://www.geek.com/games/the-apple-brainwash-get-them-while-theyre-young-with-the-ipod-touch-1039571/ |
| n/a | n/a | http://fortune.com/2015/07/15/apple-ipod-touch/ |
| n/a | n/a | https://thenextweb.com/apple/2017/07/27/the-ipod-touch-is-a-gateway-drug/ |
| n/a | n/a | http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1/#st-android-owners-say-they-are-going-to-stick-with-android-when-they-buy-their-next-phone-12 |
| n/a | n/a | https://www.cnet.com/news/apple-offers-students-free-ipod-touch-with-mac-purchase/; https://gizmodo.com/5547179/buy-a-mac-get-a-free-ipod-touch-if-youre-a-student |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                    EXHIBIT 18-R2S-B

**Apple's Damages per Samsung Product**
**Adjusted for Color 3/**
**(Samsung's Profits [Revenue] and Reasonable Royalty)**
See Damages Period Below 1/

| Product | Samsung's Profits 2/ | Reasonable Royalty 2/ | Total |
|---|---|---|---|
| Captivate | | | |
| Continuum | | | |
| Droid Charge | | | |
| Epic 4G | | | |
| Fascinate | | | |
| Galaxy S (i9000) | | | |
| Galaxy S 4G | | | |
| Galaxy S II (AT&T) | | | |
| Galaxy S II (Epic 4G Touch) | | | |
| Galaxy S II (i9100) | | | |
| Galaxy S II (Skyrocket) | | | |
| Galaxy S II (T-Mobile) | | | |
| Galaxy S Showcase (i500) | | | |
| Gem | | | |
| Indulge | | | |
| Infuse 4G | | | |
| Mesmerize | | | |
| Vibrant | | | |
| **Total** | | | |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for D'677 design patent; and June 16, 2011 for the '163 patent and D'305 and D'087 design patents.

2/ EXHIBIT 18.2-R2S-B.

3/ Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and Galaxy S II (T-Mobile) adjusted to remove prior units based on color.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    EXHIBIT 18.1-R2S-B

**Apple's Damages per Samsung Product**
**Adjusted for Color 3/**
**(Samsung's Profits [Gross Profit] and Reasonable Royalty)**
See Damages Period Below 1/

| Product | Samsung's Profits 2/ | Reasonable Royalty 2/ | Total |
|---------|----------------------|----------------------|-------|
| Captivate | | | |
| Continuum | | | |
| Droid Charge | | | |
| Epic 4G | | | |
| Fascinate | | | |
| Galaxy S (i9000) | | | |
| Galaxy S 4G | | | |
| Galaxy S II (AT&T) | | | |
| Galaxy S II (Epic 4G Touch) | | | |
| Galaxy S II (i9100) | | | |
| Galaxy S II (Skyrocket) | | | |
| Galaxy S II (T-Mobile) | | | |
| Galaxy S Showcase (i500) | | | |
| Gem | | | |
| Indulge | | | |
| Infuse 4G | | | |
| Mesmerize | | | |
| Vibrant | | | |
| **Total** | | | |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for D'677 design patent; and June 16, 2011 for the '163 patent and D'305 and D'087 design patents.

2/ EXHIBIT 18.3-R2S-B.

3/ Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and Galaxy S II (T-Mobile) adjusted to remove prior units based on color.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes Only

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes Only

Prepared by Stout Risius Ross

Exhibit 18.2-ADS-8

DX-HBIT.18.3-ADD-6

Apple Inc. v. Samsung Electronics Co., LTD., et al.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes Only

Prepared by Stout Risius Ross

Samsung's Profits [Gross Profit] Adjusted for Color and Reasonable Royalty Summary 1/
In USD

**Apple's Damages Per Patent Per Samsung Product**
**Adjusted for Color [7/]**
**(Samsung's Profits [Revenue], and Reasonable Royalty)**

| Patent: | '381<br>a/ | D'677 Alone<br>b/ | D'305 or D'087<br>or D'677 [1]<br>b/ | '163 | Total<br>a/ |
|---|---|---|---|---|---|
| Damages Period: | 08/04/2010<br>to<br>04/14/2011 or<br>06/15/2011[5,6] | 04/15/2011<br>to<br>06/15/2011[2] | 06/16/2011<br>to<br>06/30/2012[3] | 06/16/2011<br>to<br>06/30/2012 | 08/04/2010<br>to<br>06/30/2012 |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Fascinate | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S4G | | | | | |
| Galaxy S II (AT&T) | | | | | |
| Galaxy S II (Epic 4G Touch) | | | | | |
| Galaxy S II (i9100) | | | | | |
| Galaxy S II (Skyrocket) | | | | | |
| Galaxy S II (T-Mobile) | | | | | |
| Galaxy S Showcase (i500) | | | | | |
| Gem | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Mesmerize | | | | | |
| Vibrant | | | | | |
| **Total** | | | | | |

Sources:
a/ EXHIBIT 18-R2S-B.
b/ EXHIBIT 18.2-R2S-B.

Notes:

[1] 10 products infringe the D'677 Patent.  12 products infringe the D'305 Patent.  The Galaxy S4G and Vibrant infringe the D'087 Patent.

[2] The D'677 is the only design patent eligible for damages from April 15, 2011 to June 15, 2011.

[3] All three Apple design patents are eligible for damages from June 16, 2011 to June 30, 2012.  In this case, Apple seeks Samsung's profits from sales of products that infringe Apple's design patents.  However, Apple may only recover that form of damages once per unit.  Thus, no matter how many design patents were infringed by any unit, the damages in this column reflect only one award of Samsung's profits for that unit.

[4] "No Double Recovery" indicates that units that infringed this patent in this time period also infringed one or more design patents and thus no further damages may be awarded.

[5] Grey reflect adjustments to account for satisfaction through prior judgment.

[6] 381 royalties end 04/14/2011 for products that also infringe the D'677 Patent. '381 royalties end 06/15/2011 for products that do not infringe the D'677 Patent but infringe the D'305 and/or D'087 Patents.

[7/] Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and Galaxy S II (T-Mobile) adjusted to remove prior units based on color.

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                    EXHIBIT 18.5-R2S-B

**Apple's Damages Per Patent Per Samsung Product**
**Adjusted for Color** [7/]
**(Samsung's Profits [Gross Profit], and Reasonable Royalty)**

| Patent: | '381 a/ | D'677 Alone b/ | D'305 or D'087 or D'677 [1] b/ | '163 | Total a/ |
|---|---|---|---|---|---|
| Damages Period: | 08/04/2010 to 04/14/2011 or 06/15/2011 [5,6] | 04/15/2011 to 06/15/2011 [2] | 06/16/2011 to 06/30/2012 [3] | 06/16/2011 to 06/30/2012 | 08/04/2010 to 06/30/2012 |
| Captivate | | | | | |
| Continuum | | | | | |
| Droid Charge | | | | | |
| Epic 4G | | | | | |
| Fascinate | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S4G | | | | | |
| Galaxy S II (AT&T) | | | | | |
| Galaxy S II (Epic 4G Touch) | | | | | |
| Galaxy S II (i9100) | | | | | |
| Galaxy S II (Skyrocket) | | | | | |
| Galaxy S II (T-Mobile) | | | | | |
| Galaxy S Showcase (i500) | | | | | |
| Gem | | | | | |
| Indulge | | | | | |
| Infuse 4G | | | | | |
| Mesmerize | | | | | |
| Vibrant | | | | | |
| **Total** | | | | | |

Sources:
a/ EXHIBIT 18.1-R2S-B.
b/ EXHIBIT 18.3-R2S-B.

Notes:

[1] 10 products infringe the D'677 Patent. 12 products infringe the D'305 Patent. The Galaxy S4G and Vibrant infringe the D'087 Patent

[2] The D'677 is the only design patent eligible for damages from April 15, 2011 to June 15, 2011.

[3] All three Apple design patents are eligible for damages from June 16, 2011 to June 30, 2012. In this case, Apple seeks Samsung's profits from sales of products that infringe Apple's design patents. However, Apple may only recover that form of damages once per unit. Thus, no matter how many design patents were infringed by any unit, the damages in this column reflect only one award of Samsung's profits for that unit.

[4] "No Double Recovery" indicates that units that infringed this patent in this time period also infringed one or more design patents and thus no further damages may be awarded.

[5] Grey reflect adjustments to account for satisfaction through prior judgment.

[6] 381 royalties end 04/14/2011 for products that also infringe the D'677 Patent. '381 royalties end 06/15/2011 for products that do not infringe the D'677 Patent but infringe the D'305 and/or D'087 Patents.

[7/] Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), and Galaxy S II (T-Mobile) adjusted to remove prior units based on color.

Prepared by Stout Risius Ross                                    Submitted Under Seal; Highly Confidential;
                                                                Outside Counsel Eyes' Only

EXHIBIT 18.6-R2S-B

Apple Inc. v. Samsung Electronics Co., LTD., et al.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes Only

**Samsung's Profits [Revenue] Adjusted for Color 1/, 2/**
In USD

**Samsung's Profits**



Galaxy S II (Epic 4G Touch)
Less Est. Revenue for Color (35%

Galaxy S II (Skyrocket)
Less Est. Revenue for Color (38%

Galaxy S II (T-Mobile)
Less Est. Revenue for Color (24%

Subtotal - 3 Phones
Less Est. Revenue for Color

**Notes:**
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for D'677 design patent; and June 16, 2011 for the '163 patent and D'305 and D'087 design patents.
2/ White units estimated by dividing white units manufactured by total units manufactured in the damages period.  See SAMNDCA30010153.

Prepared by Stout Risius Ross

EXHIBIT 18.7-R2S-8

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Samsung's Profits [Gross Profit] Adjusted for Color 1/, 2/**
In USD

**Samsung's Profits**

Galaxy S II (Epic 4G Touch)
Less Est. Gross Profit for Color (35%)

Galaxy S II (Skyrocket)
Less Est. Gross Profit for Color (38%)

Galaxy S II (T-Mobile)
Less Est. Gross Profit for Color (24%)

Subtotal - 3 Phones
Less Est. Gross Profit for Color



**Notes:**
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for D'677 design patent; and June 16, 2011 for the '163 patent and D'305 and D'087 design patents.
2/ White units estimated by dividing white units manufactured by total units manufactured in the damages period.  See SAMNDCA3001015 3

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes Only

Prepared by Stout Risius Ross

EXHIBIT 54-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al.

## Comparison of Sales and Profitability of Samsung Infringing Products
### June 2010 to June 2012

| | Units (in Thousands) | Total Revenue (in Millions) | Total Gross Profit (in Millions) | Avg. Sales Price Per Unit | Avg. Gross Profit Per Unit |
|---|---|---|---|---|---|
| **Products that Infringed the D'677 Patent and in Some Instances also the D'305 Pa** | | | | | |
| Fascinate | | | | | |
| Vibrant | | | | | |
| Galaxy S II (AT&T Edition, 4G) | | | | | |
| Galaxy S II (T-Mobile edition) | | | | | |
| Galaxy S II (Epic 4G Touch) | | | | | |
| Mesmerize | | | | | |
| Galaxy S Showcase | | | | | |
| Galaxy S II (Skyrocket) | | | | | |
| Galaxy S 4G | | | | | |
| Infuse 4G | | | | | |
| Galaxy S (i9000) | | | | | |
| Galaxy S II (i9100) | | | | | |
| **Products that Infringed the D'305 Patent and Did Not Infringe the D'677 Patent** | | | | | |
| Epic 4G | | | | | |
| Droid Charge | | | | | |
| Indulge | | | | | |
| Captivate | | | | | |
| Continuum | | | | | |
| Gem | | | | | |
| **Products that Did Not Infringe an Asserted Design Patent** | | | | | |
| Nexus S 4G | | | | | |
| Transform | | | | | |
| Intercept [3] | | | | | |
| Exhibit 4G | | | | | |
| Galaxy Prevail | | | | | |
| Replenish | | | | | |
| Galaxy Ace | | | | | |
| **TOTAL** | | | | | |

**Note/Sources:**
[1] Per Exhibit 37.1-R2.
[2] Products shaded in gray are identified in Wagner Figure 25 and or 26.
[3] Intercept Gross Profit per Exhibit 37.1-S2.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Prepared by Stout Risius Ross

EXHIBIT 55-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al.

## Comparison of Mr. Wagner's Display Module Cost Data

| Product | Display Assembly Material 1/ 2/ | Display Module Average Cost (SDC Data) 1/ | | | Display Module Average Cost (BOM Data) 2/ | | | |
|---|---|---|---|---|---|---|---|---|
| | | Apr-11 | Oct-11 | Apr-12 | Average | Apr-11 | Oct-11 | Apr-12 | Average |
| Fascinate | GH96-04784A | | | | | | | | |
| Galaxy S 4G | GH96-05004A | | | | | | | | |
| Mesmerize | GH96-04952A | | | | | | | | |
| Showcase / Galaxy S Showcase I500 | GH96-04951A | | | | | | | | |
| Vibrant | GH96-04669A | | | | | | | | |
| Captivate | GH96-04760A | | | | | | | | |
| Continuum | GH96-04796A | | | | | | | | |
| Droid Charge | GH96-05070A | | | | | | | | |
| Epic 4G | GH96-04788A | | | | | | | | |
| Gem | GH96-04658A | | | | | | | | |
| Indulge | GH96-05012A | | | | | | | | |
| Infuse 4G | GH96-05099A | | | | | | | | |
| Galaxy S II 2 AT&T | GH96-05288A | | | | | | | | |
| Hercules / Galaxy S II T-Mobile | GH96-05524A, GH96-05447A, GH96-05525A, GH96-05211A | | | | | | | | |
| Epic 4G Touch / Galaxy S II Epic 4G Touch | GH96-05449A, GH96-05177A | | | | | | | | |
| Galaxy S2 Skyrocket / Galaxy S II Skyrocket | GH96-05463A, GH96-05526A, GH96-05327A, GH96-05527A | | | | | | | | |

**Sources/Notes:**
1/ Wagner 2018 Report, Schedules 38.2-4T & 38.3-4T; SDC000001_HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY.XLSX.
2/ Wagner 2018 Report, Schedule 38.4-4T; SAMNDCA30000054_HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY.xlsx. Mr. Wagner's Schedule 38.4-4T incorrectly calculated the Average Display Module Cost for the Hercules / Galaxy S II T-Mobile in October 2011 and April 2012 and for the Infuse 4G in October 2011. Those calculations have been corrected for the purposes of this exhibit.

Prepared by Stout Risius Ross

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

EXHIBIT 56-82

Apple Inc. v. Samsung Electronics Co., LTD., et al.

## STA and SEA U.S. Sales of Infringing Smartphones 1/
Units in Thousands, Revenue in Millions USD

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Prepared by Stout Risius Ross
Page 1 of 2

| Infringing Smartphones | Replacement Cost Data Points 2/ | | Data | 2Q | | | | 2010 3Q | | | | 4Q | | | Yt Total | | | 1Q 2011 | | | 2Q | | | |
| | Total | 6/1/2010 - 6/26/2012 | | Jun | Jul | Aug | Sep | Oct | Nov | Dec | | | Jan | Feb | Mar | Apr | May | Jun | |

EXHIBIT 56-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al

**STA and SEA U.S. Sales of Infringing Smartphones 1/**
Units in Thousands, Revenue in Millions USD

| Infringing Smartphones | Data | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | YE Total | Jan | Feb | Mar | Q1 | Apr | May | Jun | 2Q | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2011 | | | | | | | | | | 2012 | | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Prepared by Stout Risius Ross
Page 2 of 2

EXHIBIT 57-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Profit Comparison Among Infringing Phones**
**Summary of Gross and Operating Profit Comparison for Products Found to Infringe Design Patents**

| | Time Period Used for Product Comparison | Mr. Wagner's Operating Profit — Minimum Phone Percentage of Phone Profit Per Unit, Weighted Average | Gross Profit — Minimum Phone Percentage of Phone Profit Per Unit, Weighted Average |
|---|---|---|---|
| Profit Comparison for Products Found to Infringe the D305 Patent | May 2010 - June 2012 | | |
| Profit Comparison for Products Found to Infringe the D677 and D087 Patents | May 2010 - June 2012 | | |

**Notes :**
*Calculations based on the Wagner 2018 Report, Schedule 41.1-4T.*

**Sources:**
*[a] Wagner 2018 Report, Schedule 41.1-4T.*
*[b] Exhibit 57.1-R2*
*[c] Exhibit 57.2-R2*

Prepared by Stout Risius Ross

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

EXHIBIT 57.1-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Profit Comparison Among Infringing Phones**
**Gross Profit Comparison for Products Found to Infringe the D'305 Patent, May 1st, 2010 - June 30, 2012**



| Product | Gross Profit | Units Sold | Profit Per Unit | Units Sold % of Total (Profit >$0) | Minimum Phone Profit Per Unit (≤$0) | Minimum Phone Percentage of Phone Profit Per Unit (>$0) |
|---|---|---|---|---|---|---|
| Fascinate | | | | | | |
| Epic 4G | | | | | | |
| Vibrant | | | | | | |
| Mesmerize | | | | | | |
| Indulge | | | | | | |
| Galaxy S 4G | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | |
| Infuse 4G | | | | | | |
| Droid Charge | | | | | | |
| Captivate | | | | | | |
| Continuum | | | | | | |
| Gem | | | | | | |
| **Total Excluding Gem** | | | | | | |
| [5] Total Excluding Gem, Minimum, and Products with Negative Profits | | | | | | |
| [6] Simple Average | | | | | | |
| [7] Weighted Average Excluding Products with Negative Profits | | | | | | |

*Notes:*

Based on the Wagner 2018 Report, Schedule 41.2-4T.

[1] Equals Gross Profit divided by Units Sold.
[2] Equals Units Sold divided by Total Excluding Gem, Minimum, and Products with Negative Profits.
[3] Equals the minimum Profit Per Unit excluding negative Profit Per Unit amounts.
[4] Equals Minimum Phone Profit Per Unit (>$0) divided by Profit Per Unit.
[5] Equals the sum of all products excluding products with negative profits and the product with the lowest profit per unit.
[6] Equals the simple average of Minimum Phone Percentage of Phone Profit Per Unit (>$0).
[7] Equals the weighted average of Minimum Phone Percentage of Phone Profit Per Unit (>$0) weighted by Units Sold % of Total (Profit >$0).

*Sources:*

[a] Exhibit 37.1-R2.

Prepared by Stout Risius Ross

Submitted Under Seal: Highly Confidential;
Outside Counsel Eyes' Only

EXHIBIT 57.2-R2

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Profit Comparison Among Infringing Phones**
**Gross Profit Comparison for Products Found to Infringe the D'677 and D'087 Patent, May 1st, 2010 - June 30, 2012**

May 1, 2010 - June 30, 2012

| Product | Gross Profit | Units Sold | Profit Per Unit | Units Sold % of Total (Profit >$0) | Minimum Phone Profit Per Unit (>$0) | Minimum Phone Percentage of Phone Profit Per Unit (>$0) |
|---|---|---|---|---|---|---|
| Fascinate | | | | | | |
| Epic 4G Touch / Galaxy S II (Epic 4G Touch) | | | | | | |
| Vibrant | | | | | | |
| Mesmerize | | | | | | |
| Galaxy S 4G | | | | | | |
| Hercules / Galaxy S II (T-Mobile) | | | | | | |
| Showcase / Galaxy S Showcase (i500) | | | | | | |
| Infuse 4G | | | | | | |
| Galaxy S II 2 (AT&T) | | | | | | |
| Galaxy S2 Skyrocket / Galaxy S II (Skyrocket) | | | | | | |
| [5] Total Excluding Minimum | | | | | | |
| [6] Simple Average | | | | | | |
| [7] Weighted Average | | | | | | |

**Notes:**
Based on the Wagner 2018 Report, Schedule 41.3-4T.
[1] Equals Gross Profit divided by Units Sold.
[2] Equals Units Sold divided by Total Excluding Minimum.
[3] Equals the minimum Profit Per Unit excluding negative Profit Per Unit amounts.
[4] Equals Minimum Phone Profit Per Unit (>$0) divided by Profit Per Unit.
[5] Equals the sum of all products excluding products with negative profits and the product with the lowest profit per unit.
[6] Equals the simple average of Minimum Phone Percentage of Phone Profit Per Unit (>$0).
[7] Equals the weighted average of Minimum Phone Percentage of Phone Profit Per Unit (>$0) weighted by Units Sold % of Total (Profit >$0).

**Sources:**
[a] Exhibit 37.1-R2.

Prepared by Stout Risius Ross

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                    **EXHIBIT 58-R2**

**Samsung Infringing Units, Revenues and Gross Profit - by Product 4/**
**04/15/2011 to 06/30/2012**

| | Samsung Profits Units 1/ | Samsung Profits (Revenues) 1/,2/ | Samsung Profits (Gross Profit) 1/,3/ |
|---|---|---|---|
| Captivate | | | |
| Continuum | | | |
| Droid Charge | | | |
| Epic 4G | | | |
| Fascinate | | | |
| Galaxy S (i9000) | | | |
| Galaxy S4G | | | |
| Galaxy S II (AT&T) | | | |
| Galaxy S II (Epic 4G Touch) | | | |
| Galaxy S II (i9100) | | | |
| Galaxy S II (Skyrocket) | | | |
| Galaxy S II (T-Mobile) | | | |
| Galaxy S Showcase (i500) | | | |
| Gem | | | |
| Indulge | | | |
| Infuse 4G | | | |
| Mesmerize | | | |
| Vibrant | | | |

**Sources/Notes:**

1/ Workpaper 18.4-R2S.

2/ Exhibit 18-R2S.

3/ Exhibit 18.1-R2S.

4/ Excludes any units where lost profits previously awarded by a jury.

Prepared by Stout Risius Ross

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only