# EXHIBIT 1

```
 1            IN THE SUPREME COURT OF THE UNITED STATES
 2      - - - - - - - - - - - - - - - - - x
 3      SAMSUNG ELECTRONICS CO.,          :
 4      LTD., ET AL.,                     :
 5                Petitioners             :  No. 15-777
 6           v.                           :
 7      APPLE, INC.,                      :
 8                Respondent.             :
 9      - - - - - - - - - - - - - - - - - x
10                            Washington, D.C.
11                            Tuesday, October 11, 2016
12
13           The above-entitled matter came on for oral
14   argument before the Supreme Court of the United States
15   at 10:05 a.m.
16   APPEARANCES:
17   KATHLEEN M. SULLIVAN, ESQ., New York, N.Y.; on behalf of
18      the Petitioners.
19   BRIAN H. FLETCHER, ESQ., Assistant to the Solicitor
20      General, Department of Justice, Washington, D.C.;
21      for United States, as amicus curiae, supporting
22      neither party.
23   SETH P. WAXMAN, ESQ., Washington, D.C.; on behalf of the
24      Respondent.
25
```

1  the Patent Act, before 1946, permitted an award of the
2  infringer's profits.  And in those cases, very often a
3  patent would apply to part of a larger product sold in
4  commerce, and the fact-finder would say you're entitled
5  to the profits that are attributable to the infringing
6  part, but not the whole machine.
7              JUSTICE KENNEDY:  This is Justice -- Justice
8  Ginsburg's question.  Is that -- is your answer to her,
9  adequately summarized, the test that you propose at
10 page 9 of your brief relevant considerations include?
11             MR. FLETCHER:  So I think the test we
12 propose at page 9 goes to the first of the two questions
13 that I was speaking to, which is what's the article of
14 manufacture to which the design has been applied?  Once
15 the fact-finder makes that judgment, that's the test
16 that we proposed, and that's, I think, I took to be
17 Justice Sotomayor's question.
18             I understood Justice Ginsburg to be asking
19 once the fact-finder decides that the relevant article
20 is, say, the windshield on the boat or the cup-holder on
21 the car, how do they separate out the part of the
22 profits that are attributable to that component from the
23 whole.
24             And as to that question, we haven't briefed
25 it in a lot of detail, but I was trying to explain to

1  Justice Ginsburg that there are analogous problems that
2  courts have confronted in other areas of law.  One was
3  utility patent damages, as I described.  Another one is
4  discussed at some length in this Court's decision in the
5  Sheldon case under the Copyright Act.  That was a case
6  where the copyright was on a script --
7            JUSTICE KENNEDY:  Would expert witnesses be
8  called on in order to show part one or part two or both?
9            MR. FLETCHER:  I -- I would think very often
10 both.
11           JUSTICE KENNEDY:  And what would those
12 expert witnesses -- who would they be?  What would they
13 say?
14           MR. FLETCHER:  So I think it will depend
15 on -- on the circumstances of the case.
16           JUSTICE KENNEDY:  In this case.
17           MR. FLETCHER:  In this case, I think someone
18 familiar with the industry, someone who had worked in
19 the industry, either at -- a manufacture of a smartphone
20 company, or someone who is familiar with the market for
21 smartphones and who could speak to on the first question
22 how smartphones are put together, how they are
23 manufactured, how they're used by the users, the extent
24 to which the components of a smartphone are separable.
25           And then on the second question, the one

1   that Justice Ginsburg was asking, I think they would --
2   the experts would probably be speaking -- or could be
3   speaking to some of the issues that Your Honor raised in
4   your question in the Sullivan, which is things like
5   consumer surveys, to what extent do the various
6   components of a smartphone drive consumer demand and
7   contribute to the value of the phone.
8           CHIEF JUSTICE ROBERTS:  Well, one of the
9   things that was mentioned was cost in terms of that.  I
10  don't understand how that helps on this question.  It
11  would seem to me the higher the cost, the less it
12  contributed to profits.
13          MR. FLETCHER:  So I think, Mr. Chief
14  Justice, it will depend on the case.  Sometimes you --
15  you might try to build up the share of the profits from
16  the bottom up by saying, what's the cost of each of
17  these components, and then what share of the revenue is
18  attributable to each of these components.  And then you
19  say this component is 10 percent of the cost and 20
20  percent of the revenue, and we -- we do a bottom-up
21  calculation and try to do it that way.
22          Courts haven't always done that.  Sometimes
23  that won't be feasible.  Sometimes instead they've --
24  they've done a more impressionistic approximation and
25  said the total profits on this product are $10 million,

1   and we think that the component at issue here, based on

2   expert testimony, is responsible for a quarter or

3   25 percent.

4           CHIEF JUSTICE ROBERTS:  But you said based

5   on expert testimony.  What would -- what would they be

6   talking about?

7           MR. FLETCHER:  So I think the -- the Sheldon

8   case that's cited on page 27 of our brief from this

9   Court that was a Copyright Act case but discussed these

10  problems sort of generally discussed how you apportion

11  the portion -- the profits from a movie that are

12  attributable to the script as opposed to the actors or

13  the directors or other things.  And they had experts who

14  were familiar with the industry and who said the script

15  is important but, really, a lot of the value and

16  particularly for a movie like this comes from other

17  things.

18          And there were various expert testimonies

19  that gave varying percentages, and the Court ended up

20  saying that the court below had awarded 20 percent of

21  the total profits from the movie, and this Court

22  affirmed that award and said that's a reasonable

23  approximation.

24          We're not -- never going to be able to get

25  to certainty, but on these sorts of profits questions

1  and these sorts of remedies questions, a reasonable

2  approximation is good enough, and it's certainly better

3  than awarding all or nothing.  And courts have been able

4  to come to those reasonable approximations by using

5  expert testimony in some of the ways that we've

6  discussed.

7          JUSTICE KAGAN:  Mr. Fletcher, could you

8  speak about this VW Bug example, because as -- as I

9  understand Ms. Sullivan's answer, she said, well, that

10 distinctive appearance, that distinctive shape, it's

11 just -- it's still -- the article is only the body of

12 the car.  And -- and you say, no, there's a real

13 question as to whether it is being -- the design is

14 being applied to the car itself.

15         So how would you go about thinking about

16 that question, or how is a fact-finder supposed to, and

17 under what instructions?

18         MR. FLETCHER:  So we think the basic

19 question for the fact-finders, what's the article of

20 manufacture to which the design has been applied.  We

21 think the fact-finder should bear in mind this Court's

22 observation in Gorham.  It's 1871, first design patent

23 case that the -- what a design is, is it's the thing

24 that gives the distinctive appearance to an article of

25 manufacture.

1               And the point we're making with the VW Bug
2    example is that in some cases, that's going to be very
3    easy.  If the patented design is for a refrigerator
4    latch, no one is going to think that the latch gives the
5    distinctive appearance to the entire refrigerator.
6               JUSTICE KAGAN:  Right.  But let's talk about
7    the hard cases.
8               MR. FLETCHER:  Right.  So the hard cases,
9    like the Bug, one can reasonably say that it's either
10   the body or the car.  Then we've given the Court four
11   factors, and we think the fact-finder or a jury, if the
12   jury is the fact-finder, ought to be instructed on those
13   factors.  And so we say you should compare the scope of
14   the patented design as shown in the drawings in the
15   patent, how prominently that design features in the
16   accused article, whether there are other conceptually
17   distinct innovations or components in the article that
18   are not part of or associated with the patented design,
19   and finally the physical relationship between the
20   patented design and the rest of the article.
21              JUSTICE KENNEDY:  If you were a juror, how
22   would you decide the Beetle case, or what experts would
23   you want to hear?
24              MR. FLETCHER:  I would want to hear as -- as
25   to the article, what's the article --

1              JUSTICE KENNEDY:  Shouldn't have given you
2    that second option.
3              MR. FLETCHER:  I -- I do think it's a
4    factual question.  I do think you'd want to hear from
5    experts who can speak to the question of how is the
6    Beetle put together, and what other parts of the -- the
7    Beetle --
8              CHIEF JUSTICE ROBERTS:  How is the Beetle
9    put together?  It's put together like every other car.
10   I mean, I don't see how that's going to tell you whether
11   the shape of the body is distinctive or not.
12             MR. FLETCHER:  Well, I think you'd also want
13   to know, to put it in terms of all four factors, that
14   the scope of the claim design covers the whole article,
15   but not the interior of the car.  There are design
16   features in the interior that the driver sees that
17   aren't the body of the article.
18             As to the second factor, how prominent is
19   the design feature, I think that's one that cuts in
20   favor of finding that the design does cover the whole
21   article.
22             Then the third one is conceptually distinct
23   innovations, and I think that one cuts the other way.
24   There are going to be lots of other features of the car
25   or innovations in the car -- the engine, the steering

1  system, things like that -- that's an area where you
2  might want to hear adverse testimony.
3              JUSTICE SOTOMAYOR:  But that's the first
4  part of the test.
5              MR. FLETCHER:  Correct.
6              JUSTICE SOTOMAYOR:  That's the article of
7  manufacture.
8              So now take the second part of the test and
9  apply it to the Bug.
10             MR. FLETCHER:  So supposing that we've
11 decided that the Bug -- the relevant article in the Bug
12 is just the body of the Bug.
13             JUSTICE SOTOMAYOR:  Exactly.
14             MR. FLETCHER:  Then I think the question is
15 the best way to determine that, at least that I can
16 think of right now, would be consumer surveys addressed
17 to, to what extent are people who buy Bugs making their
18 purchasing decisions based on the look of the car, and
19 to what extent are they instead valuing other things
20 like --
21             JUSTICE KAGAN:  So you think that that
22 question is not relevant to the first question.  In
23 other words, suppose I think that people who buy VW Bugs
24 buy them because of the look of the car.
25             MR. FLETCHER:  Yes.

1              JUSTICE KAGAN:  But you think that that's
2    only relevant at question 2 rather than at question 1,
3    which is the question of whether it's the body or the
4    whole car that the design is being applied to?
5              MR. FLETCHER:  I do.  I think that's the
6    statute -- the way the statute reads.  It says you get
7    profits from the article of manufacture.  And so,
8    logically, I think the way to approach it would be
9    identify the article and then let the patent-holder make
10   the argument that even though the article may be just a
11   part of the product sold -- and here, maybe it's just
12   the case of the front face -- really, that's what sells
13   it.  And so that that test still lets the patent-holder,
14   in a case where it is the design of the article that's
15   selling the whole product, still recover a very
16   substantial portion of the profits --
17             JUSTICE ALITO:  But this hypothetical is --
18             MR. FLETCHER:  -- in a different way.
19             JUSTICE ALITO:  This hypothetical is not
20   helpful to me, because I can't get over the thought that
21   nobody buys a car, even a Beetle, just because they like
22   the way it looks.  What if it, you know, costs, I think,
23   $1800 when it was first sold in the United States?  What
24   if it cost $18,000?  What if it got 2 miles per gallon?
25   What if it broke down every 50 miles?

1  similar to what was in a VW Beetle that was in a Jeep or
2  a Porsche and say, oh, this must be a VW.  But somebody
3  who looked at the exterior of a Jeep that copied the
4  iconic side profile of the VW Beetle might very well say
5  that, and a jury would take that into account.
6         JUSTICE KENNEDY:  Is the approach -- is the
7  approach that you're discussing fairly described as
8  "apportionment," or is that a bad word?
9         MR. WAXMAN:  That is a really bad word.  And
10 if there's a -- I mean, in some --
11        JUSTICE KENNEDY:  What other -- what -- what
12 word would you use to describe your approach?
13        MR. WAXMAN:  What is the thing, the article
14 of manufacture, to which the design is applied for
15 purposes of sale in order to give it a distinctive and
16 pleasing appearance.  Apportionment is what their
17 expert, Mr. Wagner, tried to do in his report saying the
18 total profits on the phone are X hundreds of millions of
19 dollars, but I find that only one percent of consumers
20 buy phones because of the front face of the phone either
21 off or on.
22        JUSTICE KENNEDY:  But once you've identified
23 the relevant article, then it seems to me necessarily
24 what you're doing is apportioning profits.  I just don't
25 see how we can get away from that word.

1            MR. WAXMAN: Yes. In this sense, Justice
2    Kennedy, the vernacular sense of "apportionment," once
3    you -- if you -- if the jury answers the question at
4    step 1 and says no, no, no, the article of manufacture
5    is the refrigerator latch or the cup-holder, how do we
6    determine total profits from the sale of that thing?
7    You do have to engage in a kind of an apportionment that
8    looks to how much did it cost to make the cup-holder and
9    what is the -- you know, what is the profit margin for
10   the car or the refrigerator or something like that.
11   That, it seems to me, is the way that you would do it if
12   you found it.
13           So, you know, in this case it's a little
14   difficult to figure out what the alternative article of
15   manufacture would be. I mean, in the trial court even
16   before the trial judge, they never even suggested what
17   the article of manufacture could be for the 305 patent,
18   the graphical user interface. And --
19           JUSTICE ALITO: Listing factors is not
20   helpful unless the jury or whoever the fact finder is
21   knows what the determination must -- what determination
22   must be made. The factors are helpful in making the
23   determination.
24           Now what you just said about the article of
25   manufacture is, it is the thing to which the design is

1   applied.  Is that -- is that basically what you said?
2              MR. WAXMAN:  What I would tell the jury is
3   quoting the statute and this Court's decision in 1872
4   decision in Gorham, is that the article of manufacture
5   is the thing to which the design is applied for purposes
6   of sale, and to which it gives distinctive and pleasing,
7   attractive appearance.  That's all you're trying to find
8   out --
9              JUSTICE ALITO:  Yeah, but in a physical
10  sense -- that -- you can answer it easily, and that's
11  what the Chief Justice was talking about.  It's applied
12  to the outside in a physical sense.  But you mean it in
13  a different sense, and I don't really understand what --
14  what that means.  Once you get beyond the pure -- where
15  is the design applied?  Is it applied to the inside?
16  No.  It's applied to the outside.
17             MR. WAXMAN:  Well, the design, by
18  definition, applies to the outside.  It has to apply to
19  something that --
20             JUSTICE ALITO:  Okay.  So when you say what
21  it's applied to, you're not talking about it in terms of
22  the physical world, so what is -- what are you talking
23  about?
24             MR. WAXMAN:  The jury is being asked to
25  decide was this -- if you find that this was a -- that