# EXHIBIT A

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendants. | Case No. 11-cv-01846-LHK |

**OPENING EXPERT REPORT OF ALAN D. BALL REGARDING "ARTICLE OF MANUFACTURE" FOR THE SAMSUNG PRODUCTS FOUND TO INFRINGE U.S. PATENTS D618,677 AND D593,087**

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

SUMMARY OF OPINIONS .............................................................................................. 1

BACKGROUND, EDUCATION, AND QUALIFICATIONS ........................................... 2

MATERIALS CONSIDERED ............................................................................................ 4

RELEVANT LEGAL PRINCIPLES .................................................................................. 5

OVERVIEW OF CASE HISTORY RELATING TO THE D'677 AND D'087 PATENTS .............................. 6

THE DESIGNER OF ORDINARY SKILL IN THE ART (DOSA) ................................. 7

THE ORDINARY OBSERVER ........................................................................................... 8

MOBILE PHONE DESIGN BEFORE THE iPHONE ...................................................... 9

APPLE'S INTRODUCTION OF THE iPHONE ............................................................... 11

APPLE'S D'087 PATENT ................................................................................................... 16

    Title, Claim, Written Description, and Figures ............................................................. 16

    Claim Construction ....................................................................................................... 20

    Prior Art References ...................................................................................................... 20

    Apple Products That Practice the D'087 Patent ........................................................... 20

APPLE'S D'677 PATENT ................................................................................................... 21

    Title, Claim, Written Description, and Figures ............................................................. 21

    Claim Construction ....................................................................................................... 24

    Prior Art References ...................................................................................................... 24

    Apple Products That Practice the D'677 Patent ........................................................... 24

SAMSUNG'S APPROPRIATION OF APPLE'S DESIGNS ............................................ 25

SAMSUNG'S INFRINGING PRODUCTS ....................................................................... 29

"ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS FOUND TO
INFRINGE APPLE'S D'087 AND D'677 PATENTS ........................................................ 31

    Factor 1: "The Scope of the Design Claimed in Apple's Patent, Including the Drawing and
    Written Description" ...................................................................................................... 33

        The D'087 patent ..................................................................................................... 33

        The D'677 patent ..................................................................................................... 35

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

The Prior Art     37

    Apple's development of the D'087 and D'677 patents ................................................................. 38

Factor 2: "The Relative Prominence of the Design Within the Product as a Whole" .......................... 39

    Visual analysis of Samsung's infringing phones .................................................................... 39

        Samsung phones found to infringe the D'087 patent ................................................. 40

        Samsung phones found to infringe the D'677 patent ................................................. 40

    How ordinary observers perceived Samsung's infringing phones ................................................. 42

    Samsung's copying shows the designs were prominent ............................................................ 49

    The D'087 and D'677 designs are prominent in Apple's iPhones ................................................ 50

Factor 3: "Whether the Design Is Conceptually Distinct from the Product as a Whole" ...................... 54

    Examples demonstrating conceptual distinctness ................................................................. 54

    The D'087 and D'677 designs are not conceptually distinct from the infringing phones as a whole     56

    Samsung designed the infringing phones as whole products with a focus on having a holistic appearance ........................................................................................ 57

    Samsung's sales, advertising and other activities also conceive of the infringing phones holistically     58

    Samsung copied the D'087 and D'677 designs in an effort to copy the iPhone as a whole ......... 58

    The D'087 and D'677 designs are fully integrated into and not conceptually distinct from Apple's iPhones59

Factor 4: "The Physical Relationship Between the Patented Design and the Rest of the Product"     60

    Users use the infringing products as a whole, and cannot separate the glass front face and/or bezel without breaking the product ..................................................................... 60

    Samsung manufactured the infringing products as a whole .......................................................... 62

    Samsung (and others) sold the infringing products as a whole, and cannot separate the glass front face and/or bezel without breaking the product ............................................................ 63

    Apple's iPhones were designed, manufactured, sold, and used as unitary products .................. 65

**CONCLUSION** .............................................................................................................. 67

**SUPPLEMENTATION** .................................................................................................... 68

**EXHIBITS TO BE USED AT TRIAL** ............................................................................... 68

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**TABLE OF EXHIBITS**

**Curriculum Vitae** ................................................................................................ **Exhibit A**

**List of Materials Considered** ............................................................................ **Exhibit B**

**Summary of Prior Art Cited by D'087 Patent** .............................................. **Exhibit C**

**Summary of Prior Art Cited by D'677 Patent** .............................................. **Exhibit D**

**Photos of Phones Found to Infringe D'087 and/or D'677 Patents** ...........................................**Exhibit E**

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

## INTRODUCTION

1.     I have been retained as an expert in this case by counsel for Apple Inc. If I am called as a witness, I expect to testify regarding the subject matter set forth in this report.

2.     I have been asked to provide my opinions with respect to identifying the "article of manufacture" for the Samsung products that were found to infringe U.S. Patents D618,677 (the D'677 patent) and D593,087 (the D'087 patent).

3.     I am being paid at my standard consulting rate of $300 per hour for my work performed in connection with this litigation. My compensation in this case does not depend in any way upon the substance of my opinions or the outcome of this litigation. I have no financial interest in, or affiliation with, the parties in this case.

## SUMMARY OF OPINIONS

4.     For the reasons discussed in this report, it is my opinion that the articles of manufacture to which Samsung applied the patented design of Apple's D'677 patent are the Samsung phones found to infringe that patent, in their entirety. Those Samsung phones are: Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S II, AT&T (JX1031); Galaxy S II, i9100 (JX1032); Galaxy S II, T-Mobile (JX1033); Galaxy S II, Epic 4G Touch (JX1034); Galaxy S II, Skyrocket (JX1035); Galaxy S Showcase, i500 (JX1017); Infuse 4G (JX1027); Mesmerize (JX1015); and Vibrant (JX1010).

5.     Similarly, it is my opinion that the articles of manufacture to which Samsung applied the patented design of Apple's D'087 patent are the Samsung phones found to infringe that patent, in their entirety. Those Samsung phones are: Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); and Vibrant (JX1010).

6.     In forming these opinions, I made three over-arching observations.

7.     First, the patented D'677 and D'087 designs were embodied into the Samsung infringing phones in fundamental ways. The claimed designs relate to the front face—clearly the most important side of the phone and the side that is visible to the user when performing critical operations (like dialing phone numbers, reading messages or web content, and launching core software applications), and prominently featured in Samsung's advertising and packaging. These are not designs that could be physically disaggregated from the full products in ways like designs for discrete modular components in modular product systems can be.

8.     Second, Samsung's use of the Apple designs was directed towards full, unitary products: namely, the infringing phones. Samsung assembled various components and manufactured them into full, unitary products. Samsung marketed those products to consumers as full, unitary products— Samsung did not, for example, encourage users to break the products apart into constituent parts and use them separately. And indeed, actual use by end users was of unitary products. Simply put, Samsung was in the business of making and selling complete phones, and used Apple's patented designs for the infringing phones that it sold.

9.     Third, it is clear from my analysis that Apple created the patented D'677 and D'087 designs to make the iPhone attractive, compelling, and desirable to consumers, and in doing so created a larger product identity—a phenomenon that Apple promotes with its "product as hero" approach— that is consistent with Apple's reputation for design excellence. Samsung then applied those patented designs to increase their sales by achieving the same goals: making the infringing phones attractive and desirable to users, and associating the infringing Samsung phones with the identity that Apple created for the iPhone.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

10.     I have reached these conclusions by reviewing key facts, evidence, and testimony and applying the District Court's four-factor article of manufacture test to that evidence, as explicated in this report. I have also relied on my experience and expertise as an industrial designer.


## BACKGROUND, EDUCATION, AND QUALIFICATIONS

11.     I am an Industrial Designer and Inventor. I am the founder and president of A.B.I.D. Inc. (Alan Ball Industrial Design), a product design consulting firm. I have over 30 years of experience designing industrial, medical, and consumer products for clients ranging from start-ups to Fortune 500 companies. My expertise includes product design, human factors (ergonomics), graphics and packaging design, and user interface design. I am a named inventor on 57 U.S. Design Patents and 11 U.S. Utility Patents. I am an active member of the Industrial Designers Society of America.

12.     I have a Bachelors of Industrial Design (B.I.D.) from Syracuse University. This is a five-year program offered by the School of Visual and Performing Arts. The curriculum included art and design studio courses, math and physics courses, technology and engineering courses, marketing and business courses, and psychology/human factors courses.

13.     For over 30 years, I have worked as an Industrial Design consultant. During this time, I have worked as a full-time staff designer in a large consultancy, as well as a freelance designer. I founded two design consultancies and served as the managing director of a third. I managed large interdisciplinary design teams and served as the sole designer on many projects. In my current position at A.B.I.D., I provide traditional product design services to clients, pursue my own speculative-product inventions, and provide design expert witness services.

14.     I possess many years of product design experience over a broad range of products, including medical equipment, laboratory instrumentation, handheld computers, power tools, residential kitchen appliances, toys, electronic equipment, industrial products, sports equipment, and pet products. I have experience designing products that are manufactured by methods including plastic injection molding, sheet metal fabrication, stamping and forming, and die casting, to name a few.

15.     The D'087 and D'677 patents claim ornamental designs for an "Electronic Device." I have designed many electronic devices over the last thirty years. I have selected a few to describe in the next few paragraphs that are relevant in demonstrating my expertise.

16.     In the late 1980s and early 1990s, I designed a series of short-distance radio communications (CB radios) phones, both vehicle mount and personal phones. These products were precursors to mobile phones as we know them today, and used primarily in areas without a wireless infrastructure in place.

17.     In the mid-1990s, while a designer and design director at my form Altitude, I designed mobile phones for Ericsson (now Sony Mobile Communications Inc.). These cell phones were 'candy bar' style phones, and featured colorful designs to appeal to fashion conscious users, looking for an alternative to the business-like phone designs ubiquitous in the market at that time.

18.     In the mid-1990s, I designed a series of disposable mobile phones for Polaroid Inc., which utilized their innovative flat battery technology developed for their instant cameras. It is my understanding that these designs were not brought to market due to sustainability and cost constraints.

19.     I have designed a number of electronic devices for Kensington, including a Gravis USB game controller, a touchpad computer peripheral device, and various USB webcams.

20.     Between 1992 and 2000, I designed a number of handheld data terminals and barcode scanning devices for Symbol Electronics (now Motorola). Many of these products featured VOIP telephony technology. These were primary industrial products, designed for ruggedness, reliability and ease

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

of use. Many of these designs were used by USPS and other delivery and logistics companies for shipping management.




Symbol PPT-4600 Data Terminal and Scanner.                PingTel Xpressa VOIP Phone.

21.     I designed the Xpressa IP Business Phone system for Pingtel Corporation in 2000. This office phone featured a user-friendly and intuitive 'PDA' like computer system and display to allow the user to download and run phone specific 'apps.' This design won an IDSA Gold award for design excellence in 2002.

22.     In 2002, I designed a handheld electronic device which was an electronic Scrabble dictionary for Franklin Consumer Electronics.




Franklin Scrabble Electronic Dictionary.            Pepper Computer PepperPad Tablet computer.

23.     In 2006, I designed a tablet computer called the PepperPad for Pepper Computing Inc. This tablet was one of the first tablet computers designed specifically for 'couch top' computing. The design featured a patented, innovative, split-keypad design to allow the user to type while maintaining a solid grip on the product. The PepperPad had a large landscape display with stylus for data entry, and an integrated camera, cursor control pad, scroll wheel, stereo speakers and articulated stand. The device won an 'Innovations Showcase Award' at the annual Consumer Electronics Show in 2004. For over fifteen years I have designed, through my company A.B.I.D. Inc., electric kitchen appliances for Cuisinart, a division of Conair Corporation. The many products I have designed include Baby Food Makers, Blenders, Coffee Makers, Countertop Cooking Appliances, Food

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Processors, Griddles, Grills, Ice Cream Makers, Pizza Ovens Pressure Cookers, Rice Cookers, Slow Cookers, Stand Mixers, Toasters, and Toaster Ovens.

24.    Additional details of my education, work experience, publications, patents, awards and honors, and prior engagements as an expert are disclosed in my curriculum vitae, a copy of which is attached as Exhibit A.

**MATERIALS CONSIDERED**

25.    In reaching the opinions outlined in this report, I have considered documents including the following:  the D'677 and D'087 patents, the prosecution histories and cited prior art for the D'677 and D'087 patents, documents filed in this litigation, deposition testimony of various Apple and Samsung employees, information provided in discovery responses from Apple and Samsung, Samsung's infringing products, Apple's products that practice the D'677 and D'087 patents, information contained in documents and things produced by Apple and Samsung in this litigation, certain publicly available materials relevant to the D'677 and D'087 patents and Samsung's infringing products, and the documents discussed or cited in this report.

26.    Among the depositions I reviewed were the depositions of Apple and Samsung employees that I understand occurred during a period of discovery intended specifically for the parties to gather information relevant to the article of manufacture inquiry:

| Witness | Date | Company | Current Title |
|---------|------|---------|---------------|
| Drew Blackard | December 13, 2017 | Samsung | Senior Director of Product Marketing, Mobile Division of SEA |
| Tim Sheppard | December 13, 2017 | Samsung | Vice President of Supply Chain Logistics, SEA |
| Jinsoo Kim | December 19, 2017 | Samsung | Vice President, Corporate Design Center, SEC |
| Jeeyeun Wang | December 20, 2017 | Samsung | Principal Designer, UX Innovation Team, SEC |
| Kyuhyun Han | December 20, 2017 | Samsung | Professional, Business Operations Group within Mobile Communication Division, SEC |
| Justin Denison | December 20, 2017 | Samsung | Senior Vice President of Product Marketing for Mobile Phones and IoT, SEA |
| Dongwook Kim | December 22, 2017 | Samsung | Principal Professional, Mobile Communication Division, SEC |
| Tony Blevins | December 17, 2017 | Apple | Vice President of Procurement |

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

| Richard Howarth | December 19, 2017 | Apple | Senior Director, Design Team |
| Greg Joswiak | December 21, 2017 | Apple | Vice President of Product Marketing |

27.    I have also spoken with Apple employees Tony Blevins, Richard Howarth, and Greg Joswiak, as well as Apple experts Julie Davis (damages) and Susan Kare (D'305 patent).

28.    A list of materials that I considered in arriving at the opinions described in this report is attached as Exhibit B.


**RELEVANT LEGAL PRINCIPLES**

29.    I am not a lawyer, and I have not been asked to offer an opinion on the law. I have been informed of the following applicable legal principles and asked to apply them to my analysis.

30.    I have been informed and understand that Section 289 of the Patent Act (35 U.S.C. § 289) provides the following damages remedy for design patent infringement:

> "Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties."

31.    I have been informed and understand that the Supreme Court has stated that: "Arriving at a damages award under §289 … involves two steps. First, identify the 'article of manufacture' to which the infringed design has been applied. Second, calculate the infringer's total profit made on that article of manufacture." *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 434 (2016).

32.    I have been informed and understand that the Supreme Court has also stated that:

> "'Article of manufacture' has a broad meaning. An 'article' is just 'a particular thing'. J. Stormonth, A Dictionary of the English Language 53 (1885) (Stormonth); see also American Heritage Dictionary, at 101 ('[a]n individual thing or element of a class; a particular object or item'). And 'manufacture' means 'the conversion of raw materials by the hand, or by machinery, into articles suitable for the use of man' and 'the articles so made.' Stormonth 589; see also American Heritage Dictionary, at 1070 ('[t]he act, craft, or process of manufacturing products, especially on a large scale' or '[a] product that is manufactured'). An article of manufacture, then, is simply a thing made by hand or machine."

*Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 434-435 (2016).

33.    I have been informed and understand that the Supreme Court has further stated that an article of manufacture may be either a product sold to a consumer or a component of that product. *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 435 (2016).

34.    I have been informed and understand that the District Court has stated in this case that the test for determining the article of manufacture shall be the following four factors:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

a.  "The scope of the design claimed in the plaintiff's patent, including the drawing and written description";

b.  "The relative prominence of the design within the product as a whole";

c.  "Whether the design is conceptually distinct from the product as a whole"; and

d.  "The physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately."

(Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017).)

35.  I have been informed and understand that the District Court has further stated that Apple shall bear the burden of persuasion (or proof) on identifying the relevant article of manufacture and proving the amount of total profit on the sale of that article. The District Court has also stated that Apple shall bear an initial burden of production (or coming forward with evidence) on identifying the relevant article of manufacture and proving the amount of total profit on the sale of that article. If Apple satisfies its burden of production on these issues, the burden of production shifts to Samsung to come forward with evidence of an alternative article of manufacture and any deductible expenses. (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017).)

**OVERVIEW OF CASE HISTORY RELATING TO THE D'677 AND D'087 PATENTS**

36.  On April 15, 2011, Apple sued Samsung Electronics Co. Ltd. (SEC), Samsung Electronics America, Inc. (SEA), and Samsung Telecommunications America, LLC (STA) for infringement of certain design patents, utility patents, and trade dresses. Apple's design patents asserted in the original complaint included U.S. Patent D618,677. (Dkt. 1, Complaint.)

37.  On June 16, 2011, Apple filed an amended complaint in which it asserted U.S. Patent D593,087. (Dkt. 75, Amended Complaint.)

38.  On July 27, 2012, the District Court provided claim constructions for Apple's D'677 and D'087 patents. (Dkt. 1425, Order Regarding Design Patent Claim Construction.) The District Court amended its claim constructions for the D'677 and D'087 patents on July 29, 2012. (Dkt. 1447, Order Amending Design Patent Claim Construction.)

39.  The District Court's claim constructions, as amended, are:

a.  "The D'677 Patent claims the ornamental design of an electronic device as shown in Figures 1-8. The broken lines in the D'677 Patent constitute unclaimed subject matter. The use of 'solid black surface shading' on the D'677 Patent represents the color black. The use of oblique line shading on the D'677 Patent is used to show a transparent, translucent, or highly polished or reflective surface." (Dkt. 1425, Order Regarding Design Patent Claim Construction, p.9 (July 27, 2012); Dkt. 1447, Order Amending Design Patent Claim Construction, p.2 (July 29, 2012).)

b.  "The D'087 Patent claims the ornamental design of an electronic device as shown in Figures 1-48. The broken lines in the D'087 Patent constitute unclaimed subject matter. Thus, the D'087 Patent claims the front face, a 'bezel encircling the front face of the patented design [that] extends from the front of the phone to its sides,' and a flat contour of the front face, but does not claim the rest of the article of manufacture." (Dkt. 1425,

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Order Regarding Design Patent Claim Construction, p.8 (July 27, 2012); Dkt. 1447, Order Amending Design Patent Claim Construction, p.2 (July 29, 2012).)

40.   A jury trial was held from July 30 through August 24, 2012. The District Court instructed the jury on claim construction, infringement, validity, and other issues involved in that trial. (Dkt. 1903, Final Jury Instructions (Aug. 21, 2012).) The jury reached an Amended Verdict on August 24, 2012:

   a.   The jury found that Apple's D'677 and D'087 patents are not invalid. (Dkt. 1931, Amended Verdict, p.9.)

   b.   The jury found that three Samsung smartphone products infringed Apple's D'087 patent: Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); and Vibrant (JX1010). (Dkt. 1931, Amended Verdict, p.6.)

   c.   The jury found that twelve Samsung smartphone products infringed Apple's D'677 patent: Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S II, AT&T (JX1031); Galaxy S II, i9100 (JX1032); Galaxy S II, T-Mobile (JX1033); Galaxy S II, Epic 4G Touch (JX1034); Galaxy S II, Skyrocket (JX1035); Galaxy S Showcase, i500 (JX1017); Infuse 4G (JX1027); Mesmerize (JX1015); and Vibrant (JX1010). (Dkt. 1931, Amended Verdict, p.6.)

41.   I understand that a partial retrial on certain damages issues was held from November 12 through 21, 2013. The District Court again provided instructions to the jury, and those instructions included the District Court's claim constructions for the D'677 patent. (Dkt. 2784, Final Jury Instructions, p.37 (Nov. 18, 2013).) I understand that the 2013 trial involved determining damages for thirteen Samsung products found to infringe Apple's D'677 patent (as well as other patents). (Dkt. 2822, Jury Verdict, pp. 1-2.)

42.   I understand that, after the appeals process, the jury's infringement and validity findings stand. On October 22, 2017, the District Court ordered a new trial limited to determining damages for certain Samsung products found to infringe Apple's D'677 and D'087 patents (and other Apple patents). (Dkt. 3530, Order Requiring New Trial.) In that order, the District Court set forth a test for identifying the "articles of manufacture" to which Samsung has applied Apple's patented designs and calculating damages for design patent infringement under Section 289, which I have described above.


**THE DESIGNER OF ORDINARY SKILL IN THE ART (DOSA)**

43.   Design is the act of conceiving and defining a plan, form, and/or structure of an item to be made. Industrial Design is the professional art of designing an item, product, or system to be produced through processes of modern fabrication or mass production. The creative act of design takes place in advance of the physical act of making the item, unlike craft-based design, in which design is determined by the craftsperson during the creation of the item.

44.   An Industrial Designer is driven to create a solution that answers the user's needs and desires— and serves the goal of promoting product identity—while meeting cost, technology, manufacturing, and competitive market requirements. Successful industrial designs appropriately integrate aesthetics, functionality, human factors, sustainability, and manufacturability. The Industrial Design process typically starts with research to understand user needs and available technology, then involves ideation and conceptualization of multiple design solutions that are developed, prototyped, and evaluated. Eventually, a single design concept is selected, refined, and documented for production engineering and manufacturing. Industrial Designers can work as individuals or as part of a team of designers, and as part of an inhouse corporate design group or in a design consulting company that provides design services to multiple companies.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

45. Industrial Design education is interdisciplinary, typically requiring 4-5 years of studio-based design courses plus art, liberal arts, technology, psychology, and business courses. Industrial Designers often focus on specialties, some of which are Exhibit Design, Product Design, Graphic Design, User Interface (UI) Design, User Experience Design (UX), Transportation Design, and Design Thinking. In my over 30 years as a consulting Industrial Designer, my work has included all of these areas of Industrial Design.

46. I understand that Peter Bressler, Apple's expert regarding infringement and validity of the D'677 and D'087 patents, testified that a DOSA for the D'677 and D'087 patents would have at least a Bachelor's degree in Industrial Design or Product Design and two or more years of work experience as an Industrial Designer, including experience designing electronic devices. (Dkt. 1843, Trial Tr. 3590 (Aug. 17, 2012).) I agree with that characterization.

47. I have considered the DOSA's perspective in my analysis below, including in my analysis of the District Court's four factors for determining the article of manufacture to which Samsung applied the D'677 and D'087 designs.


**THE ORDINARY OBSERVER**

48. It is helpful to illuminate the article of manufacture analysis, including the four factors provided by the District Court, by considering the perspective of an ordinary observer and how an ordinary observer would have encountered Samsung's infringing products.

49. An Industrial Design consultant is hired by companies to create successful designs for new products. To accomplish this goal, it is essential that the Industrial Designer understand the intended users or purchasers and their ability to perceive and use the product being designed. To develop this ability, an Industrial Designer is trained in techniques used to gain insight and understanding into users' or purchasers' needs and desires related to the product being designed. This ability is further developed over time as a designer gains experience designing products. The cumulative experience in understanding user and purchaser behavior I have obtained over 30 years as an Industrial Design consultant gives me the necessary expertise to opine regarding an ordinary observer's ability to recognize the importance of a design to a product.

50. Insight into the ordinary observer to be considered in this case can be gained by observing how the Samsung phones found to infringe the D'677 and D'087 patents were marketed and sold and who the intended users were. I understand that most of the infringing phones were sold by Samsung directly to carriers such as AT&T, Verizon, Sprint, and T-Mobile, who in turn sold the phones to individual consumers. (Blackard Dep. 47:5-49:7.) Samsung also sold the infringing phones to retailers such as Wal-Mart and Best Buy to sell to individual consumers, and enterprises such as American Airlines for use by their employees. (Blackard Dep. 126:15-128:1.)

51. An ordinary observer would have encountered the Samsung infringing products in a number of ways, including through seeing and holding the phones, seeing others using the phones, seeing the phones in print and television advertising, seeing the phones online either through Samsung's websites or carrier websites or e-commerce websites, seeing the phones displayed in stores, and seeing the phones in their packaging.

52. I have considered these scenarios and insights I have gained through my expertise as an Industrial Designer into ordinary observers in my article of manufacture analysis, including my analysis of the District Court's four factors.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**MOBILE PHONE DESIGN BEFORE THE IPHONE**

53.    When Apple introduced the iPhone in January 2007, over ten years ago, mobile phones and smartphones looked very different than they do today.

54.    Many of the phones on the market were 'candybar' phones. These phones were narrow, tall, and relatively thin. The display was at the top of the front face, with a numeric keypad and other controls below the display. The candybar design was simple without any sliding or folding parts, and a relatively small screen. This format was very similar to the handsets found in wireless home phones.



'Candybar' phones from 2006

Left to right: Sony Ericsson Nokia 6070, Nokia 6080, Nokia 2310, Motorola SLVR, Sony Ericsson k310,
Benq Siemens s68, Motorola SLVR L7, Sony Ericsson K800i, Nokia 6300

55.    In 2006 there were also many 'flip phones' on the market. These phones featured a two-piece body with a hinge, allowing the phone to be 'flipped' opened for use, and closed to a smaller shape when not in use. When open, the top portion contained a display and the bottom a keypad. Some of these phones had a secondary display on the back surface of the upper portion to display notifications or data when the phone was closed.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Flip phones from 2006
Left to right: Nokia 6131, Nokia 6125, Motorola KRZR, Motorola PEBL, Motorola RZR,
Sony Ericsson W300, Nokia 6085

56. 'Smartphones' were available in 2006, but they looked very different from the smartphones we are familiar with today.



Smartphones from 2006
Left to right: Nokia e61, Treo 680, Motorola Q, Sony Ericsson W950, Hiptop 3, HTC TyTN,
Blackberry Pearl, Samsung  Blackjack

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

As can be seen, most of these smartphones looked like PDAs (personal digital assistants) or texting devices, like the RIM Blackberry. These smartphones were wider than a candybar phone, and had larger displays as compared to 'candybar' or 'flip' phones and a full alpha-numeric keyboard. Many of these phones also featured a stylus for selecting and entering data on the display. Some of these designs featured a two-piece housing that allowed the display to be slid or pivoted into an open position and exposed the keyboard. These smartphones were premium devices, often marketed toward professionals who needed a full keyboard.

57.     There were other phones available that were different form the phones mentioned above. Some of these were 'sliders', similar to a flip phone but with a sliding mechanism rather than a hinge.



Sliders and unorthodox phones from 2006
Left to right: Nokia 3250, Nokia 5200, LG KG800, Nokia 7380, Nokia N93, Samsung d900i

58.     Others were specialty phones, maybe designed for fashion or with a lot of articulation for photography or recording video. Once again, these designs look very different form the ubiquitous smartphone designs available today.

**APPLE'S INTRODUCTION OF THE iPHONE**

59.     It was this environment into which the iPhone was announced by Steve Jobs, co-founder of Apple, in January of 2007 at Apple's MacWorld event.

60.     Apple has been known for its focus on design since its founding. Steve Jobs has been praised for creating in Apple "an organization that actually cares about design more than technology." (APLNDC-Y0000234836 at APLNDC-Y0000234837.) An article in the *New York Times* that described Mr. Jobs as "Designer First, C.E.O. second," stated: "He thought about design … . In fact, we went beyond thinking about it. He obsessed over it—every curve, every pixel, every ligature, every gradient." (APLNDC-Y0000234831 at APLNDC-Y0000234832.)

61.     The result of Mr. Jobs's focus was to create a company whose "strategy is to control the design and development of the hardware and software for all of its products," including by creating products

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

with "innovative industrial design." (APL-ITC796-0000206845 (Apple Inc. 2010 10k) at APL-ITC796-0000206848.)

62.   Many companies have Engineering develop a package of internal components and then Industrial Design create a design to accommodate the components. Apple has always pursued the integration of design, engineering and software to create an inseparable unity, embodied in a consumer product. At Apple, the design vision comes first, and then Engineering and Manufacturing work very hard to create a functional technical solution to enable the design. (Conversation with Tony Blevins.)

63.   By January 2007, Apple was already known for its innovative and award-winning design in the computer industry, and also known for the iPod line of digital music players. The iPhone was described as "combining three products—a revolutionary mobile phone, a widescreen iPod® with touch controls, and a breakthrough Internet communications device with desktop-class email, web browsing, searching and maps—into one small and lightweight handheld device." (APLNDC- WH-A0000026142.)

64.    The design of the iPhone was unlike anything before it. Unlike the 'sliders' and 'flip' phone of the day, the iPhone was a single monolithic shape, sized to fit the users hand. The entire front face was glass, with rounded corners and a large display which ran edge to edge, and a single circular button below, and a small slit like speaker above. The front face was black, and surrounded by a simple and elegant chrome bezel. As one iPhone designer testified, the iPhone was "one of the first phones that I can remember or, you know, products at that time that were kind of one cohesive thing rather than bits of – like flip phones that had different enclosures, different parts and stuff. [The iPhone] was like one – one thing." (Whang 2011 Dep. 55:3-56:3.)

65.   From the day it was released the iPhone design was seen as beautiful and distinctive, and was universally recognized as an innovative Apple product. Its simple and elegant bezel, unique edge-to-edge glass front surface, and minimal refined front face introduced a striking new icon to the field of design. It is this distinctive bezel and front face that is embodied in the D'087 and D'677 patents.

66.   According to Apple marketing executive Phil Schiller, as a result of its focus on design, "[o]ne of the things the market looks at from Apple is beautiful products. It's one of the things we're known for. It's one of the things we strive to create, and I think it's part of who Apple is. We create beautiful products." (Dkt. 1610 at 637.) Mr. Schiller's statement underscores how product design can help create a product identity—and indeed, corporate identity—in which goodwill can reside.

67.   I understand that when designing the iPhone, as with Apple's other products, design drove the process. (Howarth 2017 Dep. 181:6-13.) When designing the iPhone, Apple's designers sought to create the impression of simplicity, quiet, and calm, in part to visually communicate the ease of using the iPhone. The value of the iPhone is communicated through the design's refined appearance and sophisticated use of materials, attributable to the Apple designers' painstaking attention to detail. (Stringer August 2011 Dep. 167:11-168:4, 178:1-17.)

68.   Obviously, designing a product as refined as the iPhone, with as few visual elements, requires significant design skill and restraint. I understand that the iPhone's exemplary design was facilitated by Apple's practice of allowing its designers to maintain authority over the appearance of the products throughout the entire production process, working with and enfranchising engineering resources to accomplish the design goal. (Conversation with Tony Blevins; Blevins 2017 Dep. 196:6-12 ("Everything is subservient to that design[.]"); 198:7-13 ("The external design and appearance dictates everything else about the phone that you fit in that design envelope and those design requirements.").)

69.   During its creation, Apple's designers and executives recognized that the iPhone design was revolutionary.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

    a. Chris Stringer, one of the lead designers of the iPhone, explained that his team was "looking for a new, original, and beautiful object, something that would really wow the world." (Dkt. 1547 at 484.) According to Mr. Stringer, when Apple designed the iPhone they "came up with something that was breathtaking. It was a revolution." (Dkt. 1547 at 494.)

    b. Phil Schiller, Apple's Senior Vice President of Worldwide Marketing, testified that the iPhone "was this entirely new kind of device." (Dkt. 1610 at 598; Dkt. 2842 at 821 ("[B]ack in 2007, the most popular phones were all phones that had physical keyboards," Apple "coming up with a full glass screen … was very foreign and different to everybody.").)

    c. Tony Blevins, Apple's Vice President of Procurement, testified that when he saw the original iPhone he "was stunned": "It's hard to imagine that it's common in the marketplace today, but if you turn back the clock at the time that the iPhone was developed, there was -- nothing on the market even came close to what the device could do. All of us were really, really excited." (Blevins 2017 Dep. 194:15-23.)

    d. Greg Joswiak, Apple's Vice President of Product Marketing, testified that "[t]he iPhone was a revolutionary product. … It was going to change everything, and it did, and so we, everything from the way it looked and the way it worked was different than people had ever seen in a phone before." (Joswiak 2017 Dep. 126:9-24.)

70. Following the announcement of the iPhone in January 2007, its beauty and distinctive appearance was immediately praised in many articles, including the following:

    a. *TIME* called the iPhone "pretty": "Jonathan Ive, Apple's head of design, the man who shaped the iMac and the iPod, squashed the case to less than half an inch thick, and widened it to what looks like a bar of expensive chocolate wrapped in aluminum and stainless steel. The iPhone is a typical piece of Ive design: an austere, abstract, platonic looking form that somehow also manages to feel warm and organic and ergonomic." (APLNDC-Y0000055301 at APLNDC-Y0000055302.)

    b. A *New York Times* review of the iPhone dated January 11, 2007, entitled "Apple Waves Its Wand at the Phone," noted that "[a]s you'd expect of Apple, the iPhone is gorgeous." It likened Apple's creation of the iPhone to the work of "the fairy godmother in 'Cinderella'": transformation of a "homely and utilitarian object, like a pumpkin or a mouse, into something glamorous and amazing . . ." (PX133.)

71. After the iPhone was released in June 2007, industry reactions remained positive, and continued to praise the iPhone's design:

    a. CNET praised the iPhone as "a lovely device" with a "sleek design": "[T]he iPhone boasts a brilliant display, trim profile, and clean lines (no external antenna of course), and its lack of buttons puts it in a design class that even [LG and HTC phones] can't match. You'll win envious looks on the street toting the iPhone, and we're sure that would be true even if the phone hadn't received as much media attention as it has." (APLNDC-Y0000235785 at APLNDC-Y0000235785-786.)

    b. A *Wall Street Journal* article dated June 27, 2007, entitled "Testing Out the iPhone," stated that "designers have struggled to balance screen size, keyboard usability and battery life . . . . [T]he iPhone is, on balance, a beautiful and breakthrough handheld computer," and that "[t]he iPhone is simply beautiful." To demonstrate this the article also showed the iPhone compared to other smartphones available at the time, including a Samsung phone (PX134.1-PX134.3):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



c. A *New York Times* article dated June 27, 2007, described the iPhone as "a tiny, gorgeous hand-held computer," and stated that "[t]he phone is so sleek and thin, it makes Treos and Blackberrys look obese." (APLNDC-Y0000233341).

d. A Korea JoonsAng Daily Internet article dated February 18, 2008, entitled "Apple iPhone Tops List of Innovative inventions," which reported the results of a survey of 599 Korean CEOs by Samsung Economic Research Institute, stated that CEOs indicated that the "iPhone's sleek design caught their eye." (APLNDC-Y0000233345.)

72. The iPhone's distinctive design specifically received widespread acclaim and accolades:

a. The iPhone received multiple design awards such as the International Design Excellence Award (IDEA) for Best in Show in 2008 (APLNDC-Y0000148044); an International Forum Product Design Award in 2008 (APLNDC-Y0000233322); and the Design and Art Direction Black Pencil award in 2008 (PX157).

b. *TIME* named the iPhone its "Invention of the Year," citing its first reason for doing so because "[t]he iPhone is pretty." (PX135.1.) *TIME* stated that: "Most high-tech companies don't take design seriously. They treat it as an afterthought. Window-dressing. But one of Jobs' basic insights about technology is that good design is actually as important as good technology. All the cool features in the world won't do you any good unless you can figure out how to use said features, and feel smart and attractive while doing it." (PX135.1.) The cover of the magazine is shown below (PX135.3):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



c.   The influential technology blog Engadget named the iPhone one of its "Ten Gadgets That Defined the Decade", stating that the iPhone constituted a "sea change" and observed that "as we close out the decade . . . world-class industrial design is a given. The game has changed." (APLNDC-Y0000142002.)

73.   The iPhone is not merely an example of excellence in industrial design, its beauty has pushed it into the realm of art. iPhones have been displayed in exhibitions and added to the permanent collections of several museums:

a.   Permanent Collection, San Francisco Museum of Modern Art (APL7940001435803);

b.   Designs of the Year, London Design Museum, 2008 (APL7940001440844);

c.   Triennial, Cooper Hewitt, Smithsonian Design Museum, 2010 (APLNDC0002169993);

d.   Stylectrical: On Electro-Design That Makes History, Museum for Kunst und Gewerbe (Arts & Crafts), August 26, 2011, through January 15, 2012 (APLNDC-Y0000142052):

74.   A testament to the iPhone's recognized iconic design is the United States Patent and Trademark Office's use of iPhone-shaped displays in an exhibit showcasing Steve Jobs' numerous patents and trademarks. (PX142):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



USPTO exhibit celebrating the patents of Steve Jobs, November 23, 2011.

75.    In conjunction with the original iPhone, Apple also received numerous patents, including the design patents-in-suit. (JX1091.) As Mr. Schiller has testified, "[t]hese inventions are part of what differentiate our product, that we try to create products that are beautiful." (Dkt. 2842 at 837:21-23.)

**APPLE'S D'087 PATENT**

    **Title, Claim, Written Description, and Figures**

76.    U.S. Patent D593,087, hereafter referred to as the D'087 patent, is titled "**ELECTRONIC DEVICE**." The application, 29/282,833, was filed on July 30, 2007 (as a continuation of application 29/270,880 filed on January 5, 2007). The D'087 patent was assigned to Apple Inc.

77.    The claim of the D'087 patent is "[t]he ornamental design of an electronic device, substantially as shown and described."

78.    The D'087 patent includes forty-eight figures, in six groups of eight, which show six embodiments of a design for an electronic device.

79.    The written description of the D'087 patent states:

    The broken lines showing the remainder of the electronic device are directed to environment. The broken lines, within the claimed design, in embodiments **1**, **2**, and **4** that depict an elongated oval shape and the broken lines, within the claimed design, in embodiments **2**, **3**, and **6** that depict a circle shape are superimposed on a continuous surface and are for illustrative purposes only. The broken lines, within the claimed design, in embodiments **1**, **3**, and **5** that depict a large rectangular shape, indicate a non claimed shape below the continuous front surface and are for illustrative purposes only. None of the broken lines form a part of the claimed design.

80.    Figure 1 is a "front perspective", with the front face facing up, of an ornamental design of an electronic device. Figure 2 is a "rear perspective", with the back surface facing up, of the same design. Figures 3-8 are orthographic views showing the front, rear, top, bottom, left side, and right side of the same design. These figures are shown here, with the orthographic views arranged in standard third-angle projection:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Figures 1 through 8 from D'087 patent.

81.  In Figures 1-8, the top surface, with surrounding bezel, is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken lines to indicate that it is unclaimed. The rectangular screen and the capsule-shaped speaker aperture on the front surface is unclaimed.

82.  Figure 9 is a "front perspective," with the front face facing up, of a second embodiment of the ornamental design of an electronic device. Figure 10 is a "rear perspective," with the back surface facing up, of the same embodiment. Figures 11-16 are orthographic views showing the front, rear, top, bottom, left side, and right side of this second embodiment. These figures are shown here, with the orthographic views arranged in standard third-angle projection:



Figures 9 through 16 from D'087 patent.

83.  In Figures 9-16, the top surface, with surrounding bezel, is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken lines to indicate that it is unclaimed. The rectangular screen on the front surface is claimed, and the capsule-shaped speaker aperture and the round button are unclaimed.

84.  Figure 17 is a "front perspective," with the front face facing up, of a third embodiment of the ornamental design of an electronic device. Figure 18 is a "rear perspective," with the back surface facing up, of the same embodiment. Figures 19-24 are orthographic views showing the front, rear,

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

top, bottom, left side, and right side of this third embodiment. These figures are shown here, with the orthographic views arranged in standard third-angle projection:



Figures 17 through 24 from D'087 patent.

85.   In Figures 17-24, the top surface, with surrounding bezel, is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken lines to indicate that they are unclaimed. The capsule shaped-speaker aperture on the front surface is part of the claimed design, but the circular button and rectangular screen are unclaimed.

86.   Figure 25 is a "front perspective," with the front face facing up, of a fourth embodiment of the ornamental design of an electronic device. Figure 26 is a "rear perspective," with the back surface facing up. Figures 27-30 are orthographic views showing the front, rear, top, bottom, left side, and right side of this fourth embodiment. These figures are shown here, with the orthographic views arranged in standard third angle projection:



Figures 25 through 32 from D'087 patent.

87.   In Figures 25-32, the top surface, with surrounding bezel, is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken lines to indicate that they are unclaimed. The rectangular screen and circular button on the front surface are claimed and the capsule-shaped speaker aperture is unclaimed.

- 18 -

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

88.   Figure 33 is a "front perspective," with the front face facing up, of a fifth embodiment of the ornamental design of an electronic device. Figure 34 is a "rear perspective," with the back surface facing up, of the same design. Figures 35-40 are orthographic views showing the front, rear, top, bottom, left side, and right side of this fifth embodiment. These figures are shown here, with the orthographic views arranged in standard third-angle projection:



Figures 33 through 40 from D'087 patent.

89.   In Figures 33-40, the top surface, with surrounding bezel, is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken lines to indicate that they are unclaimed. The capsule-shaped speaker aperture and the circular button on the front surface are claimed and the rectangular screen is unclaimed.

90.   Figure 41 is a "front perspective," with the front face facing up, of a sixth embodiment of the ornamental design of an electronic device. Figure 42 is a "rear perspective," with the back surface facing up, of the same design. Figures 43-48 are orthographic views showing the front, rear, top, bottom, left side, and right side of this sixth embodiment. These figures are shown here, with the orthographic views arranged in standard third-angle projection:



Figures 41 through 48 from D'087 patent.

91.   In Figures 41-48, the top surface, with surrounding bezel is shown in black lines to indicate that it is being claimed. The back and portions of the sides are shown in broken line to indicate that it is

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

unclaimed. The rectangular screen and capsule shaped speaker aperture circular button on the front surface are claimed and the round button is unclaimed.

92.   As I note above, the portions of the products depicted in broken lines are not claimed. But those broken-line diagrams do provide context for the claimed portions, indicating that the claimed design shown is being applied to an entire electronic device. (Howarth 2017 Dep. at 178:10-18 ("Q. What guidance do we get from them about the article of manufacture, these three patents? A. That they're products. They're a phone. … [T]here's images of it right here as well of -- of a full device.").)

**Claim Construction**

93.   I understand that the District Court has construed the claim of the D'087 patent as follows:

> "The D'087 Patent claims the ornamental design of an electronic device as shown in Figures 1-48. The broken lines in the D'087 Patent constitute unclaimed subject matter. Thus, the D'087 Patent claims the front face, a 'bezel encircling the front face of the patented design [that] extends from the front of the phone to its sides,' and a flat contour of the front face, but does not claim the rest of the article of manufacture."

(Dkt. 1425, Order Regarding Design Patent Claim Construction, p.8 (July 27, 2012); Dkt. 1447, Order Amending Design Patent Claim Construction, p.2 (July 29, 2012); *see also* Dkt. 1903, Final Jury Instruction No. 43, at p. 59 (Aug. 21, 2012).)

**Prior Art References**

94.   I have reviewed the prosecution history and prior art references cited by the D'087 patent.

95.   There are 102 prior art references cited on the face of the D'087 patent. 56 are U.S. patent documents (including 48 design patents), 6 are foreign patent documents, and 40 are references from other publications.

96.   I have reviewed each of the publicly available references and have attached as Exhibit C a chart summarizing them.

**Apple Products That Practice the D'087 Patent**

97.   I understand that the named inventors of the D'087 patent were Apple designers who worked on the original iPhone, and that they invented the claimed design in connection with their work in conceiving and developing the original iPhone. (Dkt. 1547 at 471-474 (Stringer); Dkt. 1841 at 2838 (Howarth); De Iullis 2011 Dep. 150:10-151:10.)

98.   In my opinion, at least the following Apple products practice the design claimed in the D'087 patent: the original iPhone, the iPhone 3G, and the iPhone 3GS. These iPhones have an overall visually appearance that is substantially the same as the claimed design. As can be seen in the photos below, each of these iPhones has the straight edges and rounded corners, the glass front face extending from edge-to-edge of the device, and the same relative proportions, and a bezel of equal width surrounding on all sides as is claimed by the D'087 patent:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



iPhone (1st generation)                    iPhone 3G

iPhone 3GS

99.  Two of the named inventors on the D'087 patent have confirmed that the original iPhone, the
     iPhone 3G, and the iPhone 3GS each practice the D'087 patent, but that the iPhone 4 and the
     iPhone 4S do not. (Dkt. 1547 at 473 (Stringer); Howarth 2017 Dep. 51:12-52:15.)

**APPLE'S D'677 PATENT**

### Title, Claim, Written Description, and Figures

100. U.S. Patent D618,677, hereafter referred to as the D'677 patent, is titled "**ELECTRONIC DEVICE**."
     The application was filed on November 18, 2008 (as a continuation of a patent application
     29/270,888 filed on January 5, 2007), and the D'677 patent issued June 29, 2010. The D'677
     patent was assigned to Apple Inc.

101. The claim of the D'677 patent is "[t]he ornamental design of an electronic device, as shown and
     described."

102. The written description of the D'677 patent states:

     The claimed surface of the electronic device is illustrated with the color designation for
     the color black.

     The electronic device is not limited to the scale shown herein. As indicated in the title,
     the article of manufacture to which the ornamental design has been applied is an
     electronic device, media player (e.g., music, video, and/or game player), media storage
     device, a personal digital assistant, a communication device (e.g., cellular phone), a
     novelty item or toy.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

103.   The D'677 patent includes eight figures which show an electronic device. Figure 1 is a "front perspective", with the front face facing up.



**FIG. 1**

104.   Figure 2 is a "rear perspective" with the back surface facing up.



**FIG. 2**

105.   Figures 3-8 are orthographic views which show the front, rear, top, bottom, left side, and right side of an electronic device. These figures are shown here in standard orthographic third angle projection:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Figures 3 through 8 from D'677 patent.

106.   Figures 1 through 8 include two perspective views and six orthographic views of an entire 'electronic device'. These views are sufficient to allow a designer of ordinary skill in the art to make and use an entire 'electronic device' which embodies the claimed design.

107.   The top surface is shown in black lines to indicate what it is being claimed. The back and sides are shown in broken line to indicate that it is unclaimed. The rectangular screen and capsule shaped speaker aperture circular button on the front surface are claimed, and the round button is unclaimed.

108.   As I note above, the portions of the products depicted in broken lines are not claimed. But those broken-line diagrams do provide context for the claimed portions, indicating that the claimed design shown is being applied to an entire electronic device. (Howarth 2017 Dep. at 178:10-18 ("Q. What guidance do we get from them about the article of manufacture, these three patents? A. That they're products. They're a phone. … [T]here's images of it right here as well of -- of a full device.").)

- 23 -

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

109.  I note that it is not uncommon for design patent to depict both claimed and unclaimed elements. Samsung has patents for designs of electronic devices that similarly denote unclaimed materials with dotted lines. Samsung's designer Jinsoo Kim confirmed that Samsung design patents, including some of his own, disclaim certain materials with dotted lines. (J. Kim 2017 Dep. 52:9-15, 90:25-91:4.)

### Claim Construction

110.  I understand that the District Court has construed the claim of the D'677 patent as follows:

> "The D'677 Patent claims the ornamental design of an electronic device as shown in Figures 1-8. The broken lines in the D'677 Patent constitute unclaimed subject matter. The use of 'solid black surface shading' on the D'677 Patent represents the color black. The use of oblique line shading on the D'677 Patent is used to show a transparent, translucent, or highly polished or reflective surface."

(Dkt. 1447, Order Amending Design Patent Claim Construction, p.2 (July 29, 2012) (emphasis added); *see also* Dkt. 1425, Order Regarding Design Patent Claim Construction, p.9 (July 27, 2012); Dkt. 1903, Final Jury Instruction No. 43, at p. 59 (Aug. 21, 2012); Dkt. 2784, Final Jury Instruction No. 29, at p. 37 (Nov. 18, 2013).)

### Prior Art References

111.  I have reviewed the prosecution history and prior art references cited by the D'677 patent.

112.  There are 112 prior art references cited on the face of the D'677 patent. 73 are U.S. patent documents (including 63 design patents), 6 are foreign patent documents, and 33 are references from other publications. Many of these references are also listed on the face of the D'087 patent.

113.  I have reviewed each of the publicly available references and have attached as Exhibit D a chart summarizing them.

### Apple Products That Practice the D'677 Patent

114.  I understand that the named inventors of the D'677 patent were Apple designers who worked on the original iPhone, and that they invented the claimed design in connection with their work in conceiving and developing the original iPhone. (Dkt. 1547 at 471-474 (Stringer); Dkt. 1841 at 2838 (Howarth); De Iuliis 2011 Dep. 164:18-165:3.)

115.  In my opinion, at least the following Apple products practice the design claimed in the D'677 patent: the original iPhone, the iPhone 3G, the iPhone 3GS, the iPhone 4, and the iPhone 4S. These iPhones have an overall visually appearance that is substantially the same as the claimed design. As can be seen in the photos below, each of these iPhones has the straight edges and rounded corners, the black front face, the glass front face extending from edge-to-edge of the device, and the same relative proportions claimed by the D'677 patent:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



iPhone (1st generation)                    iPhone 3G

iPhone 3GS                          iPhone 4

iPhone 4S

116.   Two of the named inventors on the D'677 patent have confirmed that the original iPhone, iPhone
       3G, the iPhone 3GS, the iPhone 4, and the iPhone 4S each practice the D'677 patent. (Dkt. 1547 at
       474, 507 (Stringer); Howarth 2017 Dep. 49:3-50:10.)

**SAMSUNG'S APPROPRIATION OF APPLE'S DESIGNS**

117.   Before the launch of the iPhone, Samsung's phones—like others in the industry—featured different
       form factors, often with antennas and external buttons or keyboards. These are photographs of
       some of Samsung's phones before the iPhone (PX3A.1):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



118.   Documents provided by Samsung show that after the iPhone launch Samsung took notice of the iPhone's design.

    a.   A September 2007 Samsung document reported on the "iPhone Effect" and observed that among the "Factors that Could Make iPhone a Success" was its "beautiful design." (PX34 at 16.)

    b.   A December 2008 presentation done by Gravity Tank in collaboration with Samsung described the iPhone as "a revolution," stating that its "[s]creen-centric design has set the standard for touch," and remarking that the iPhone is "beautiful," and that "[t]he whole phone is the screen." (PX36 at 20, 31.) The presentation also stated that "Apple has overtaken Samsung as the most stylish brand overall." (PX36 at 32.) Throughout the presentation are images of the iPhone. (*E.g.*, PX36 at 20-24, 29, 36.)

119.   Samsung designed many smartphones after the introduction of the iPhone. These designs were varied, with large touch displays, and did not look much like the iPhone design. These are photographs of some of Samsung's phones launched after the iPhone but before the launch of Samsung's infringing products (PX3A.2):



120.   I understand that during the time these phones were released, Samsung's share of the U.S. smartphone market was declining. (PDX34B.9.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

121.   In February 2010, an internal email was sent to Samsung's mobile communications division summarizing an "Executive-Level Meeting Supervised by Head of Division." (PX40.) The email states that "[t]he iPhone has become the standard" and that the division head was hearing things like "[l]et's make something like the iPhone." (PX40 at 3.) He observed that "[t]he look and feel of a product matters most," and that Samsung was experiencing "a crisis of design." (PX40 at 3, 5.)

122.   These are photographs of some of the infringing phones that Samsung released after the iPhone (PX3A.3):



123.   When Samsung released its infringing products, commentators remarked on the striking similarities to Apple's iPhone. Many of the commentators noted the similarities between the designs of the phones.

   a.   A *PCWorld* article reviewing the Samsung Galaxy S phone indicated that the reviewer was "surprised by how familiar it looked," explaining that the Galaxy S "design is actually very iPhone 3GS-like." (PX6.1.)

   b.   A *Washington Post* article reviewing the Samsung Vibrant phone observed that "the Vibrant resembles an iPhone 3GS." (PX6.1.)

   c.   A *Wired* article reviewing the Samsung Vibrant phone and titled "First Look: Samsung Vibrant Rips Off iPhone 3G Design" stated that "[t]he Vibrant's industrial design is shockingly similar to the iPhone 3G: The rounded curves at the corners, the candybar shape, the glossy, black finish and the chrome-colored metallic border around the display." (PX174.1; PX6.1.) The article also described the Vibrant as having a "derivative design" and stated that "there's little to make the phone notable, apart from its striking similarity to the iPhone." (PX174.1-2; PX6.1.) The article included photos of the two phones side-by-side, saying "[c]heck out the photo of the Samsung Vibrant next to the iPhone 3G below." (PX174.2; PX6.1.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



d.  A *Laptop* article reviewing the Samsung Vibrant phone stated that "[a]t a glance, the chrome-like border, edge to edge glass display (overlying black plastic), and curved candy bar shape of the Vibrant could easily be mistaken for the iPhone 3GS." (PX6.1-.2.)

e.  A *MobileTechReview* article reviewing the Samsung Vibrant phone stated that "[a]t first glance, the Vibrant looks like a thinner iPhone 3GS, complete with curved plastic back and a front face dominated by glass and a black surround." (PX6.2.)

f.  A *Wall Street Journal* article reviewing two Samsung phones, including the Vibrant, stated that "[t]he T-Mobile Vibrant has rounded corners and a prominent border that make it look very much like last year's iPhone 3GS model." (PX6.2.)

g.  An *AndroidCentral* review of the Samsung Vibrant phone stated that "[t]he Samsung Vibrant inevitably will be compared to previous versions of the iPhone, thanks to its rounded corners and plastic shell." (PX6.2.) It also stated: "Don't worry that it sort of looks like the iPhone." (PX6.2.)

h.  A *Digital Trends* review of the Samsung Vibrant phone stated that "[w]ith its front silver frame, the smooth, rounded Vibrant bears a resemblance to the first iPhone." (PX6.2.)

i.  A review of the Samsung Vibrant phone by *The Review Crew* noted: "Samsung's Galaxy S Vibrant is one sleek looking phone. In fact when I first unboxed it at the office many walked by and asked if it was an iPhone." (PX6.3.)

j.  A *TechRepublic* review of the Samsung Vibrant phone observed that it "has an attractive — if not flashy — look. The designers were obviously mimicking the look of the old iPhone (pre-iPhone 4) with the chrome edge around the screen and the plastic backing." (PX6.3.)

k.  A *Pocketnow* review of the Samsung Vibrant phone stated that the Vibrant was "the most blatant iPhone clone we've seen so far. The hardware, the software UI all scream iPhone clone." (PX6.4.)

l.  A *PC World* review of the Samsung Mesmerize phone observed that "its sleek and streamlined design feels very reminiscent of the iPhone 3GS." (PX177.1; PX6.4.)

m.  A *TechRepublic* review of the Samsung Fascinate phone stated "The Fascinate is remarkably slim and attractive. It is reminiscent of the iPhone 4 in that regard, although not made of the same top-notch materials." (PX6.3.)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

    n.  A *PCWorld* article describing the Samsung Galaxy S II phone stated: "If the Samsung Galaxy S II looks familiar it's because it resembles Apple's popular iPhone 4" (PX6.4.)

124.  Apple's designers and executives testified that they also noticed the similarities and were shocked when Samsung introduced phones that copied the design of Apple's iPhones.

    a.  Christopher Stringer, an Apple designer who worked on the original iPhone, testified it was "plain to see" that Apple had "been ripped off" by Samsung. (Dkt. 1547 at 509-510.)

    b.  Richard Howarth, another iPhone designer, similarly testified that "[i]t was shocking how -- how blatant it seemed that they had been, quite brazen. It was a clear ripoff." (Howarth 2017 Dep. 177:17-20.)

    c.  Tony Blevins described his reaction to first seeing Samsung sell phones that looked like the iPhone as "shock," "disbelief" and "anger": "They copied us. They didn't innovate. They copied us." (Blevins 2017 Dep. 208:25-210:5; *id.* at 214:4-7 ("What I believe is Samsung produced a number of phones that were direct copies and knockoffs of Apple phones ….").)

    d.  Phil Schiller testified that upon seeing a Samsung Galaxy S phone, his "first thought was, wow, they've completely copied the i[P]hone." (Dkt. 2842 at 850; *id.* at 868 ("What I recall at the time was seeing a photo of [the Vibrant] and reading a story about it and feeling that they're – that Samsung is now on a strategy of copying our entire product line.").)

125.  I understand that after Samsung's introduced the infringing phones, thereby taking the identity Apple had created for the iPhone and trying to apply it to its own phones, Samsung's share of the U.S. smartphone market increased dramatically. (PDX34B.9; Dkt. 1839 at 2043-2045.)

126.  I understand that in August 2010, Apple representatives met with Samsung representatives and gave a presentation regarding "Samsung's Use of Apple Patents in Smartphones" that included slides regarding the similarity between the design of Samsung's Galaxy S phones and the iPhone. (PX52.1, .17-19.)

**SAMSUNG'S INFRINGING PRODUCTS**

127.  I understand that a jury found that twelve Samsung phones infringe the D'677 patent (Dkt. 1931, Amended Verdict at 6):



Fascinate (JX1013)      Galaxy S i9000 (JX1007)      Galaxy S 4G (JX1019)

Galaxy S II, AT&T (JX1031)      Galaxy S II, i9100 (JX1032)      Galaxy S II, T-Mobile (JX1033)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Galaxy SII Epic 4G Touch (JX1034)    Galaxy S II Skyrocket (JX1035)    Galaxy S Showcase, i500 (JX1017)

Infuse 4G (JX1027)    Mesmerize (JX1015)    Vibrant (JX1010)

128. I understand that a jury found that three Samsung phones also infringe the D'087 patent (Dkt. 1931, Amended Verdict at 6):



Galaxy S i9000 (JX1007)    Galaxy S 4G (JX1019)    Vibrant (JX1010)

129. I understand that there were no sales of either the Galaxy S i9000 (JX1007) or Galaxy S II, i9100 (JX1032) in the United States during the relevant period and that the jury at the upcoming trial will not be asked assess damages for these two products. However, I have included them in my analysis for the sake of completeness since they were found by a jury to infringe the D'677 and D'087 patents.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**"ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS FOUND TO INFRINGE APPLE'S D'087 AND D'677 PATENTS**

130.  I have been asked to provide my opinion regarding the identity of the "article of manufacture" to which Samsung applied the D'087 and D'677 patents' claimed designs. In addressing this question, I have considered the facts, testimony, and evidence in this case and applied the four-factor test set forth by the District Court. I understand that all four factors should be considered and one cannot, for example, simply stop the inquiry at the scope of the claimed design.

131.  I have separately analyzed the article of manufacture for each Samsung product found to infringe the D'087 patent and for each Samsung product found to infringe the D'677 patent. However, because there is much overlap in the evidence and analysis for the products found to infringe these patents, I address them in many places together in my analysis below.

132.  For the reasons discussed in this report, it is my opinion that the infringing Samsung phones, in their entirety, are the things to which the patented designs have been applied, and therefore the entire phones are the articles of manufacture.

133.  As explained below, each and every one of the four factors individually supports my opinion that the articles of manufacture are the Samsung infringing phones in their entirety. It is also my opinion that the four factors, considered collectively, lead to the same conclusion.

134.  I disagree with Samsung's contention that just a component, or components, of the infringing phones should be considered the article of manufacture.

    a.  I understand that, for the products found to infringe the D'087 patent, Samsung contends that the article of manufacture "consists of the round-cornered, glass front face and surrounding rim or bezel of each phone." (Samsung's Objections & Responses to Apple's First Set of Interrogatories Regarding Articles of Manufacture, Response to Interrogatory No. 2, at p.15 (Nov. 29, 2017).)

    b.  I understand that, for the products found to infringe the D'677 patent, Samsung contends that the article of manufacture "consists of the black, round-cornered, glass front face of each phone." (Samsung's Objections & Responses to Apple's First Set of Interrogatories Regarding Articles of Manufacture, Response to Interrogatory No. 1, at p.5 (Nov. 29, 2017).)

I disagree with Samsung's definitions of the articles of manufacture because, for the reasons explained in this report, Samsung applied the D'087 and D'677 designs to the infringing phones and the phones, in their entirety, are the articles of manufacture.

135.  As an initial matter, I understand that a jury found that three Samsung phones infringe the D'087 patent and twelve infringe the D'677 patent. I have shown these phones previously in this report in paragraphs 127 and 128. I have also obtained all of these phones and inspected them.

136.  I understand that the jury was shown pictures of the infringing phones and was provided with the actual phones in person while conducting deliberations. The jury was not provided with any of the components that Samsung alleges are the articles of manufacture separated from the rest of the phone.

137.  Excerpts from the jury verdict form are shown below. For both the D'087 and D'677 patents, the verdict form identifies the infringing Samsung "products," not merely components of those products, where it asks about infringement "[f]or each of the following **products**" and lists each "Accused Samsung **Product**." It is my opinion that this indicates that the jury believed that Samsung had applied the claimed designs to the infringing phones.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

5.  **For each of the following products, has Apple proven by a preponderance of the evidence that Samsung Electronics Co. (SEC) and/or Samsung Telecommunications America (STA) has infringed the D'677 Patent?**

(Please answer in each cell with a "Y" for "yes" (for Apple), or with an "N" for "no" (for Samsung).  Do not provide an answer for any cell that is blacked out.)

| Accused Samsung Product | Samsung Electronics Co., Ltd. | Samsung Telecommunications America, LLC |
|---|---|---|
| Fascinate (JX 1013) | Y | Y |
| Galaxy Ace (JX 1030) | N | |
| Galaxy S (i9000) (JX 1007) | Y | |
| Galaxy S 4G (JX 1019) | Y | Y |
| Galaxy S II (AT&T) (JX 1031) | Y | Y |
| Galaxy S II (i9100) (JX 1032) | Y | |
| Galaxy S II (T-Mobile) (JX 1033) | Y | Y |
| Galaxy S II (Epic 4G Touch) (JX 1034) | Y | Y |
| Galaxy S II (Skyrocket) (JX 1035) | Y | Y |
| Galaxy S Showcase (i500) (JX 1017) | Y | Y |
| Infuse 4G (JX 1027) | Y | Y |
| Mesmerize (JX 1015) | Y | Y |
| Vibrant (JX 1010) | Y | Y |

6.  **For each of the following products, has Apple proven by a preponderance of the evidence that Samsung Electronics Co. (SEC) and/or Samsung Telecommunications America (STA) has infringed the D'087 Patent?**

(Please answer in each cell with a "Y" for "yes" (for Apple), or with an "N" for "no" (for Samsung).  Do not provide an answer for any cell that is blacked out.)

| Accused Samsung Product | Samsung Electronics Co., Ltd. | Samsung Telecommunications America, LLC |
|---|---|---|
| Galaxy S (i9000) (JX 1007) | Y | |
| Galaxy S 4G (JX 1019) | Y | Y |
| Galaxy S II (AT&T) (JX 1031) | N | N |
| Galaxy S II (i9100) (JX 1032) | N | |
| Galaxy S II (Epic 4G Touch) (JX 1034) | N | N |
| Galaxy S II (Skyrocket) (JX 1035) | N | N |
| Infuse 4G (JX 1027) | N | N |
| Vibrant (JX 1010) | Y | Y |

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

Dkt. 1931, Amended Verdict at 6

138. Consistent with the jury's verdict, an analysis of the four factors set forth by the District Court demonstrates that the articles of manufacture to which Samsung applied the D'087 and D'677 designs are the infringing phones in their entirety.

**Factor 1: "The Scope of the Design Claimed in Apple's Patent, Including the Drawing and Written Description"**

139. The first factor that I considered in my article of manufacture analysis is "the scope of the design claimed in Apple's patent, including the drawing and written description." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 35.)

140. For the reasons discussed below, it is my opinion that every section of the D'087 patent indicates that the article of manufacture to which the claimed design is applied is an entire electronic device, such as a phone, and not just a portion of the device. This factor therefore supports my conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'087 patent.

141. For similar reasons, it is also my opinion that every section of the D'677 patent indicates that the article of manufacture to which the claimed design is applied is an entire electronic device, such as a phone, and not just a portion of the device. This factor therefore supports my conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'677 patent.

**The D'087 patent**

142. As noted earlier in this report, the title of the D'087 patent is "**ELECTRONIC DEVICE**." It does not refer to only a portion of an electronic device. I understand that a design patent's title refers to an article of manufacture. I further understand that according to the Manual for Patent Examining Procedure (MPEP), the title of a design patent "may be directed to the entire article embodying the design while the claimed design shown in full lines in the drawings may be directed to only a portion of the article." (MPEP § 1503.01.) That is the case with the D'087 patent where the title indicates that the article of manufacture embodying the design is the entire electronic device, while the claimed design when in full lines is directed to only a portion of the article.

143. The claim of the D'087 patent is for "[t]he ornamental design of an **electronic device**, substantially as shown and described." It does not say that the claim is for the ornamental design of only a portion of an electronic device. This suggests that the claimed design is meant to cover a design that is applied to an entire electronic device, not just a portion. The claim of the D'087 suggests that the entire electronic device that the claimed design is applied to is the article of manufacture.

144. The District Court has construed the claim of the D'087 patent as follows:

> "The D'087 Patent claims the ornamental design of **an electronic device** as shown in Figures 1-48. The broken lines in the D'087 Patent constitute unclaimed subject matter. Thus, the D'087 Patent claims the front face, a 'bezel encircling the front face of the patented design [that] extends from the front of the phone to its sides,' and a flat contour of the front face, but does not claim **the rest of the article of manufacture**."

(Dkt. 1425, Order Regarding Design Patent Claim Construction (July 27, 2012) at 8; Dkt. 1447, Order Amending Design Patent Claim Construction (July 29, 2012) at 2.)

145. In its claim construction of D'087 patent, the District Court refers to "the ornamental design of **an electronic device**." This indicates that the claimed design is applied to an electronic device, not just a component of the device. The Court's claim construction later states that the patent does not claim "the rest of the article of manufacture." This makes clear that the article of manufacture is not

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

limited to just the claimed portions of the electronic device, and it includes the unclaimed portions of the electronic device as well.

146. While the solid lines and broken lines indicate claimed and unclaimed subject matter, respectively, the article of manufacture to which the claimed design is applied is not limited to the solid lines. The District Court has said that "the relevant article of manufacture may extend beyond the scope of the claimed design" and that "[t]his principle is evident from the text of § 289," which says that "'[w]however during the term of a patent for design … applies the patented design … to any article of manufacture ….'" (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 17.)

147. Further, the District Court's claim construction is clear that the claimed design is for "an electronic device" as shown in the figures. The D'087 patent includes 48 figures. The figures show all views of the entire product, in six embodiments of the design. The figures do not show only a portion, or component or components, of the device.

148. The first eight figures of the D'087 patent, showing the first embodiment of the design are shown here. The rest of the figures were shown previously in this report in paragraphs 80-90.



Figures 1 through 8 from D'087 patent.

149. The written description of the D'087 patent states, for example, that "FIG. 1 is a front perspective view **of an electronic device** in accordance with the present invention," and the other figures provide different views "thereof." There is no written indication in the description of the 48 figures that suggests they are showing only a portion of an electronic device. All of the figures indicate that the claimed design is applied to the electronic device as a whole.

150. Every figure in the D'087 patent shows an entire electronic device, and together the figures show all sides of the electronic device including the front, rear, top, bottom, left, and right sides.

151. The electronic device seen in the 48 patent figures is drawn in solid and broken lines. The solid lines indicate the claimed areas and the broken lines indicate unclaimed areas. The front (or top) surface of the device and the surrounding bezel is drawn in solid lines can be seen in all of the figures except those which primarily show the back of the product (figures 2, 4, 10, 12, 18, 20, 26, 28, 34, 36, 42, and 44). The only credible reason these views, which do not show the claimed design, were included is that they indicate the entire "electronic device" to which the design is applied. It is my opinion that these views have been included by the inventor/designer, even though they do not show the claimed areas, because they completely show the entire "electronic device" which is the "article of manufacture" of the design patent.

152. I understand that a Designer of Ordinary Skill in the Art (DOSA) must be able to make and use the design being claimed by the patent. It is my opinion that a DOSA, seeing the drawings in the D'087 patent would recognize that the claimed design is for an electronic device such as a phone, not just part of an electronic device. A DOSA would recognize if the claimed design, shown in solid black

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

lines, was applied to an electronic device, as clearly shown in the patent drawings, the article of manufacture would clearly be the entire electronic device.

### The D'677 patent

153. As noted earlier in this report, the title of the D'677 patent is "**ELECTRONIC DEVICE.**" It does not refer to only a portion of an electronic device. I understand that a design patent's title refers to an article of manufacture. I further understand that according to the MPEP, the title of a design patent "may be directed to the entire article embodying the design while the claimed design shown in full lines in the drawings may be directed to only a portion of the article." (MPEP § 1503.01.) That is the case with the D'677 patent where the title indicates that the article of manufacture embodying the design is the entire electronic device, while the claimed design when in full lines is directed to only a portion of the article.

154. The claim of the D'677 patent is for "[t]he ornamental design of **an electronic device**, as shown and described." It does not say that the claim is for the ornamental design of only a portion of an electronic device. This indicates that the claimed design is meant to cover a design that is applied to an entire electronic device, not just a portion. The claim of the D'677 indicates that the entire device that the claimed design is applied to is the "article of manufacture".

155. The District Court has construed the claim of the D'677 patent as follows:

> "The D'677 Patent claims the ornamental design **of an electronic device** as shown in Figures 1-8. The broken lines in the D'677 Patent constitute unclaimed subject matter. The use of solid black surface shading on the D'677 Patent represents the color black. The use of oblique line shading on the D'677 Patent is used to show a transparent, translucent, or highly polished or reflective surface."

(Dkt. 1447, Order Amending Design Patent Claim Construction (July 29, 2012) at 2(emphasis added); *see also* Dkt. 1425, Order Regarding Design Patent Claim Construction (July 27, 2012) at 9; Dkt. 1903, Final Jury Instructions (Aug. 21, 2012) at No. 43, p. 59; Dkt. 2784, Final Jury Instructions (Nov. 18, 2013) at No. 29, at p. 37.)

156. While the solid lines and broken lines indicate claimed and unclaimed subject matter, respectively, the article of manufacture to which the claimed design is applied is not limited to the solid lines. The District Court has said that "the relevant article of manufacture may extend beyond the scope of the claimed design" and that "[t]his principle is evident from the text of § 289," which says that "'[w]however during the term of a patent for design … applies the patented design … to any article of manufacture ….'" (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 17.)

157. The Manual of Patent Examining Procedure (MPEP) states that:

> "The two most common uses of broken lines are to disclose the environment related to the claimed design and to define the bounds of the claim. Structure that is not part of the claimed design, but is considered necessary to show the environment in which the design is associated, may be represented in the drawing by broken lines. **This includes any portion of an article in which the design is embodied or applied to that is not considered part of the claimed design**." (MPEP § 1503.02)

This instruction makes clear that the article of manufacture to which the claimed design is applied may include portions depicted by broken lines.

158. As Michael Carmichael, an expert with experience at the PTO explained, "[t]he PTO maintains a distinction between a claimed design and the article the design is applied to or embodied in: '[t]he distinction must be maintained between the ornamental design and the article in which the design is

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

embodied.'" An article of manufacture embodying a claimed design may have additional features, for example." Carmichael Report dated April 16, 2012, paragraph 78.

159.   Further, the District Court's claim construction is clear that the claimed design is for "an electronic device" as shown in the figures (all of which show the design being applied to an electronic device as a whole), and not only a component or components of the device.

160.   The D'677 patent includes eight figures. The written description states, for example, that "FIG. 1 is a front perspective view **of an electronic device** in accordance with the present invention," and the other figures provide different views "thereof." There is no written indication in the description of the eight figures that they are showing only a portion of an electronic device. All of the figures indicate that the claimed design is applied to the electronic device as a whole.



Figures 1 through 8 for D'677 patent.

161.   Every figure in the D'677 patent shows an entire electronic device. The figures show all sides of the electronic device including the front, rear, top, bottom, left, and right sides of the electronic device or phone.

162.   The electronic device seen in the eight patent figures is drawn in solid and broken lines. The solid lines indicate the claimed areas and the broken lines indicate unclaimed areas. The front (or top) surface of the device is drawn in solid lines, best seen in Figures 1 and 3. Figures 5, 6, 7, and 8 show the claimed portion as a single black line, as the front (or top) surface would be seen in these views. Figures 2 and 4 show the entire electronic device, but do not show any of the claimed areas. The only credible reason these views, which do not show the claimed design, were included is that they indicate the entire "electronic device" to which the claimed design is applied. It is my opinion that these views have been included by the inventor/designer, even though they do not show the claimed areas, because they completely show the entire "electronic device" which is the "article of manufacture" to which the design is being applied.

163.   I understand that a DOSA must be able to make and use the design being claimed by the patent. It is my opinion that a DOSA, seeing the drawings in the D'677 patent would recognize that the claimed design is for an electronic device such as a phone, not just part of an electronic device. A DOSA would recognize if the claimed design, shown in solid black lines, was applied to an electronic device, as clearly shown in the patent drawings, the article of manufacture would clearly be the entire electronic device.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

164.  The written description of the D'677 patent also states that "[t]he claimed surface **of the electronic device** is illustrated with the color designation for the color black." Once again, this describes the claimed design as being applied to an electronic device, not a portion of an electronic device.

165.  The written description of the D'677 patent further states:

> "The electronic device is not limited to the scale shown herein. As indicated in the title, **the article of manufacture to which the ornamental design has been applied is an electronic device**, media player (e.g., music, video, and/or game player), media storage device, a personal digital assistant, a communication device (e.g., **cellular phone**), a novelty item or toy."

This section of the written description clearly states that the article of manufacture is an electronic device, and gives examples of the types of devices this may include. It explicitly describes that the article of manufacture may be a phone. At no point does the D'677 patent describe or suggest that the article of manufacture is anything less than an entire electronic device.

166.  The Samsung products that have been found to infringe the D'677 patent are all electronic devices. (J. Kim 2017 Dep. 55:15-56:7 (Samsung designer agreeing all the infringing phones are electronic devices).) All of the examples of the article of manufacture in the written description of the D'677 patent apply to the infringing Samsung smartphones in their entirety.

        **The Prior Art**

167.  I have examined the prior art references listed by the D'087 and D'677 patents. In my opinion, the prior art considered during the prosecution of the patent can help illuminate what the article of manufacture is.

168.  A summary of the publicly available prior art references listed by the D'087 patent is attached as Exhibit C. A summary of the publicly available prior art references listed by the D'677 patent is attached as Exhibit D.

169.  The prior art design patents cited by the D'087 and D'677 provide additional information relevant to the article of manufacture inquiry. Like the D'087 and D'677 patents, these references claim ornamental designs and were subject to the same requirements as the D'087 and D'677 patents, including the requirement that they identify an article of manufacture to which the claimed design may apply.

170.  Of the 48 design patent references listed on the D'087 patent, 45 clearly show designs that are applied to articles of manufacture that are complete devices. Only 3 of these patents show a design patent directed to something less than an entire product, as indicated in their titles, written description and drawings.

171.  Of the 63 design patent references listed on the D'677 patent, 59 clearly show designs in which the entire device is the article of manufacture. Only 4 of these patents show a design patent directed to something less than an entire product, as indicated in their titles, written description and drawings.

172.  Thus, the great majority of the prior art design patents cited by the D'087 and D'677 patents are for designs applied to entire devices. It is my opinion this indicates that the inventors/designers and the examiner of the D'087 and D'677 patents recognized that the entire device was the article of manufacture and were comparing the designs in these patents to other patents similarly directed to entire devices. This is also how a DOSA would understand the D'087 and D'677 patents, in light of the cited prior art.

173.  In an earlier phase of this case, Samsung's experts wrote reports and testified at trial claiming that the D'087 and D'677 patents were invalid as anticipated, obvious, and functional, and not infringed

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

(as noted above, the jury disagreed and found the patents not invalid). In these reports, Samsung's experts relied on several prior art references that were phones and/or electronic devices. (Sherman Report dated March 23, 2012, p. 32 (alleging D'677 design was anticipated by "prior art design patents and devices"); Sherman Report dated March 23, 2012, p. 64 ("In considering Apple's infringement claims concerning the D'087 patent, I examined the design patent in comparison to other prior art design patents and handset designs.").) In fact, Samsung's expert Itay Sherman defined the universe of relevant prior art by stating that since those patents claim "a design patent for an 'Electronic Device,' prior art references do not have to relate to mobile handsets but rather to any other electronic device, including but not limited to PDAs, tablets, media players, etc." (Sherman Report dated March 23, 2012, pp. 32, 65.) They did not cite prior art that was just a glass front face, just a glass front face plus bezel, or any other part of a phone. This indicates to me that Samsung's own experts recognized that the claimed design applies to an electronic device such as a phone, not just one part of an electronic device or phone, and that the entire electronic device or phone is the article of manufacture.

174. Itay Sherman, Samsung's expert regarding infringement and validity of the D'677 and D'087 patents, also testified that a DOSA for the D'677 and D'087 patents would have "experience in designing **mobile handsets** or generally **devices** that have touchscreens." (Dkt. 1840, Trial Tr. at 2577 (Aug. 14, 2012).) Robert Anders, another Samsung expert who opined regarding infringement of the D'677 and D'087 testified that a DOSA for those patents would have "experience In designing **electronic devices**." Expert Report of Robert John Anders, IDSA dated April 16, 2012, at 15. These references to full devices, and not only portions such as glass front faces and/or bezels, again indicate that a DOSA would view the entire device or mobile handset as the article of manufacture to which the D'087 and D'677 designs are applied based on a reading of the patents and their prosecution histories including the cited prior art.

### Apple's development of the D'087 and D'677 patents

175. Additional evidence from Apple also supports that the D'087 and D'677 patents both describe an ornamental design for an entire electronic device, such as a smartphone.

176. As discussed above, Apple's designers invented the claimed designs as part of their work in inventing and developing the original iPhone. Apple's designers envisioned and described their claimed design for a particular product—the iPhone—and did not merely describe or claim a design in the abstract. In other words, they created the D'087 and D'677 designs to be applied to an electronic device such as a phone, as reflected in the D'087 and D'677 patents. (Howarth 2017 Dep. 176:4-15 ("Q. Now, you've said the article of manufacture for each of these three patents is a product like a phone; is that right? A. Right. Q. How does that compare to the way the design group operates? I mean, how does that focus on the product compare to the wok you do? A. We're all about the product. We're not in – we're not – we don't design individual parts. Our goal is to create a thing, a tool, a whole product that people can use so that – so that they can do things that they couldn't before"); *id.* at 167:11-19 ("A … We start with a goal. We start with a product, and then we see how to achieve it. So we get all the components that we can and try and make them do what we need them to do and still be a compelling product, and you can't do that with off-the-shelf parts. Q. And when you refer to this product that is the goal, what are you referring to? A. Well, the iPhone in this case."); PX163 (early iPhone sketches by Christopher Stringer); PX165 (CAD design of early iPhone model); PX166 (CAD design of early iPhone model).)

177. As also discussed above, Apple's original iPhone, iPhone 3G, and iPhone 3GS practice both the D'087 and D'677 patents and the iPhone 4 and iPhone 4S also practice the D'677 patent. For each of those products, Apple applied the claimed design to the entire smartphone product and not merely to a component or components of the product.

178. Richard Howarth, Apple's Senior Director of Design and one of the inventors of the D'087 and D'677 patents, testified that the article of manufacture for each patent is the phone as a whole.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

a.  Howarth 2017 Dep. 174:18-24 ("Q. What is the article of manufacture to which that design is applied – A. An iPhone. Q. -- in the context of this [D'087] patent? A. A phone. Q. A product? A. Yes, a product.").

b.  Howarth 2017 Dep. 173:10-174:1 ("Q And could you read that sentence [from the D'677 patent] out loud? A. 'As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device, media player, music, video and/or game player, media storage device, a personal digital assistance, a communication device, e.g., cellular phone, a novelty item or a toy.' Q. And what is that list a list of?  A. Products, things, you know, electronic devices. Q. So the claim is directed to a design; is that right? A. Yes. Q. But the patent specifically says the article of manufacture is what? A. A product, the -- the phone.").

c.  Howarth 2017 Dep. 178:10-18 ("Q. What guidance do we get from them about the article of manufacture, these three patents? A. That they're products. They're a phone. I mean, it's -- what guidance? It says -- it says that there's a -- it's an electronic device. Ornamental design of an electronic device. It's -- there's -- there's images of it right here as well of -- of a full device. I mean, that's some of the -- is that what you mean?").)

179.   Daniele De Iullis, another inventor of the D'087 and D'677 patents testified that "the purpose [of the D'087 patent] is to patent the design of one of [Apple's] products … In this particular case, it's the first-generation iPhone." (De Iullis 2011 Dep. 150:10-151:10.) He likewise confirmed the D'677 is "a design patent for an iPhone." (De Iullis 2011 Dep. 164:18-165:3.)

**Factor 2: "The Relative Prominence of the Design Within the Product as a Whole"**

180.   The second factor that I considered in my article of manufacture analysis is "the relative prominence of the design within the product as a whole." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017) at 35.)

181.   For the reasons discussed below, it is my opinion that the design claimed in the D'087 patent— including the overall shape of the front face of the phone, including the straight edges and rounded corners, the glass front face extending from edge-to-edge of the device, and the surrounding bezel which extends around the edge to the sides—is very prominent within the infringing Samsung products as a whole.

182.   It is similarly my opinion that the design claimed in the D'677 patent—including the overall shape of the front face of the phone, including the straight edges and rounded corners, the glass front face extending from edge-to-edge of the device, and the black front face—is very prominent within the infringing Samsung products as a whole.

183.   This factor therefore supports my conclusion that the articles of manufacture to which Samsung applied the D'087 and D'677 designs are the Samsung infringing phones in their entirety.

**Visual analysis of Samsung's infringing phones**

184.   I have examined all of the infringing Samsung phones. I have held every phone in my hand and carefully examined each phone from all sides. I have considered how an ordinary observer would see the phone and use the phone. I have also studied photographs of the infringing phones from all sides, including from angles similar or the same as those seen in the patent drawing figures. Photographs of the infringing phones from the angles shown in the D'087 and D'677 patents are attached as Exhibit E.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**Samsung phones found to infringe the D'087 patent**

185.   The jury found that three Samsung smartphones—the Galaxy S, i9000 (JX1007), the Galaxy S 4G (JX1019), and the Vibrant (JX1010)—infringe the D'087 patent. I have examined these three phones, which are shown here:



Galaxy S i9000 (JX1007)          Galaxy S 4G (JX1019)          Vibrant (JX1010)

186.   The D'087 design—including the overall shape of the front face of the phone, including the relative proportions, straight edges and rounded corners, the glass front face extending from edge-to-edge of the device, and the surrounding bezel which extends around the edge to the sides—is very prominent in these three infringing Samsung phones, and contributes greatly to their overall appearance. These are primary design features that are noticed quickly when looking at the products and contribute significantly to the look of the infringing phones as a whole. The claimed design influences the shape and size of other portions of the infringing phones, for example by defining the general shape of the device. The claimed design also serves to differentiate the infringing phones from other phone designs (see paragraphs 53-75, 117-122 above).

187.   Having examined the three Samsung phones that the jury found to infringe the D'087 patent, it is my opinion that the D'087 design is extremely prominent within the infringing products as a whole, and this factor supports the conclusion that the article of manufacture is the entire infringing phone.

**Samsung phones found to infringe the D'677 patent**

188.   The jury found that the same three Samsung smartphones shown above—the Galaxy S, i9000 (JX1007), the Galaxy S 4G (JX1019), and the Vibrant (JX1010)—infringe the D'677 patent. I have examined these phones in regard to the D'677 patent as well.

189.   The jury also found that the Samsung Galaxy S phones Fascinate (JX1013), Showcase (JX1017), and Mesmerize (JX1015) infringe the D'677 patent. I have examined these phones, which are shown here, in regard to the D'677 patent:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Galaxy S
Fascinate (JX1013)

Galaxy S
Showcase (JX1017)

Galaxy S
Mesmerize (JX1015)

190.   The jury also found that Samsung Galaxy SII phones—Galaxy S II AT&T (JX1031), Skyrocket (JX1035), and Infuse 4G (JX1027)—infringe the D'677 patent. I have examined these phones, which are shown here, in regard to the D'677 patent:



Galaxy S II
AT&T (JX1031)

Galaxy S II
Skyrocket (JX1035)

Galaxy S II
Infuse 4G (JX1027)

191.   The jury also found that additional Samsung Galaxy SII phones—Galaxy S II i9100 (JX1032), Galaxy S II T-Mobile (JX1033), and Galaxy S II Epic 4G Touch (JX1034)—infringe the D'677 patent. I have examined these phones, which are shown here, in regard to the D'677 patent:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER









| Galaxy S II i9100 (JX1032) | Galaxy S II T-Mobile (JX1033) | Galaxy S II Epic 4G Touch (JX1034) |
| --- | --- | --- |

192. The D'677 design—including the overall shape of the front face of the phone, including the relative proportions, straight edges and rounded corners, the glass front face extending from edge-to-edge of the device, and the black front face—is very prominent in these twelve infringing Samsung phones, and contributes greatly to their overall appearance. These are primary design features that are noticed quickly when looking at the products and contribute significantly to the look of the infringing phones as a whole. The claimed design influences the shape and size of other portions of the infringing phones, for example by defining the general shape of the device. The claimed design also serves to differentiate the infringing phones from other phone designs (see paragraphs 53-75, 117-122 above).

193. Having examined the twelve Samsung phones that the jury found to infringe the D'677 patent, it is my opinion that the D'677 design is extremely prominent within the infringing products as a whole, and this factor supports the conclusion that the article of manufacture is the entire infringing phone.

**How ordinary observers perceived Samsung's infringing phones**

194. I have also considered the perspective of ordinary observers in assessing the prominence of the D'087 and D'677 designs within Samsung's infringing phones. I reviewed and considered internal Samsung documents, deposition testimony, and comments made by industry reviewers and consumers as evidence relevant to how an ordinary observer would perceive the asserted D'087 and D'677 designs with respect to the Samsung infringing products as a whole. This evidence provides further support for my opinion that the infringing designs of the D'087 and D'677 patents are hugely prominent within the Samsung infringing products as a whole.

195. As discussed previously in this report, prior to the introduction of the iPhone, smartphones typically had numeric keypads and/or QWERTY keyboards. Many also had either a 'flip' or 'slider' form factor. The user often controlled the phone with a cursor control device or a stylus on the screen, with data entry through the keyboard or keypad. Sometimes these features were on the front of the phone and sometimes they were on the side. A sliding smartphone actually changed shape, depending on how it was being used at the time. The front of these phones greatly determined their overall design, but other features and articulating parts beside the front surface contributed to the overall design.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

196.   The iPhone was the first successful smartphone to use a large capacitive touchscreen, through which the user controlled the phone and entered data. This eliminated the need for a keyboard, key pad, cursor control buttons, and stylus. The entire front surface of the iPhone was a display and an input device.

197.   The same is true of the infringing Samsung phones. Virtually all of the interaction the user has with the infringing phones is done through the front face of the phone. The user must interact with the front face in order to unlock the infringing phones, make phone calls, read or write text messages, browse the web, etc.

198.   The front face of the infringing phones is clearly the most important, most viewed, and most manipulated side of the devices, and the appearance of the front side, more than any other side or even all sides together, determines the overall design of the smartphone in the eyes of an ordinary observer.

199.   Both the D'087 and D'677 patents claim ornamental designs of the front face, which is clearly the most prominent side of the infringing Samsung phones. Both of these designs cover the entire surface area of the front face of the phone. This is by far the most important viewpoint of the entire device. It is the perspective that is most often viewed when the phone is being used. An ordinary observer would recognize the product by looking at the front surface, not the back or sides.

200.   A consumer's first interaction with the infringing products commonly would have been through marketing from Samsung. When Samsung marketed the infringing phones, it did so in a way that showcased the front faces, including the D'087 and D'677 designs.

   a.   The following advertisement for Samsung's Infuse 4G phone is illustrative (SAMNDCA00311548):



   The views of the device shown in the advertisement are from angles identical to two of the figures in the D'677 patent. The largest, most salient image is a head-on view of the front face, which embodies the D'677 design.

   b.   Similarly, marketing collateral for the Galaxy S II Epic 4G Touch prominently featured the phone's front face including the D'677 design (SAMNDCA00311971):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



c.  A television advertisement featuring a Galaxy S II user conversing with friends who are waiting in line to purchase a new iPhone also shows the prominence of the D'677 design. The Galaxy S II user remarks on the phones "sleek design" as the commercial zooms in on the following shot of the Galaxy S II side-by-side with the iPhone (SAMNDCA00311579):



The fact that this advertisement shows this view of the phones and identifies these phones by prominently displaying their front faces—and featuring the area claimed by the D'677 patent—demonstrates the prominence of the D'677 design in the product as a whole.

- 44 -

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

    d.   Advertisements such as the following Vibrant advertisement prominently display the D'087 design. Again, the fact that Samsung chose to feature the front face of the phone and surrounding bezel, including the D'087 design, and to the exclusion of any other sides of the phone is further evidence that the claimed designs are hugely prominent to the product as a whole (SAMNDCA00311510 at SAMNDCA00311519):



201.  Ordinary observers also would have encountered Samsung phones in their packaging. Photos of the infringing phones in their packaging are here:



The Galaxy S phones, including the Fascinate, the Showcase, and the Mesmerize,

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

shown in their display packaging.



The Galaxy S i9000, the Galaxy S 4G, and the Vibrant,
shown in their display packaging.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



The Galaxy S II, Skyrocket, and Infuse phones,
shown in their display packaging.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



The Galaxy S II i9100, Galaxy S II T-Mobile, and Epic 4G Touch,
shown in their display packaging.

202.   The packaging for many of the infringing phones shows the front face of the phone on the outside of the box, and the packaging for all of the infringing phones is designed to showcase the front face of the phone, to the exclusion of all other sides, when the top cover of the box is removed. The claimed designs are therefore the first and only thing a purchaser sees of the infringing devices when the box is first opened.

203.   The design of the packaging to clearly show the front face of the phone, over any other side of the phone, demonstrates that the front face of the phone communicates much of the overall design of the phone in the eyes of a purchaser (ordinary observer). It is my opinion that the design of this packaging is evidence of the importance of the appearance of the front face of the phone, with its ornamental design clearly being the most prominent contributor to the overall design of the phone.

204.   The prominence of the D'087 and D'677 designs to Samsung's phones as a whole is further confirmed by industry reviews. When Samsung released the infringing phones, several articles recognized the claimed design features as integral to the products as a whole and cited those designs as a basis for their overall similarity to iPhone models that embodied the D'087 and D'677 designs.

    a.   A *PCWorld* review of Samsung's Galaxy S phone dated June 29, 2010 observed that "[t]he design is actually very iPhone 3GS-like with an all black, shiny plastic body and minimal buttons on the phone's face." (PX6.1.)

    b.   A *Wired*.com article titled "First Look: Samsung Vibrant Rips Off iPhone 3G Design," published on July 15, 2010, stated that the "Vibrant's industrial design is shockingly

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

similar to the iPhone 3G: The rounded curves at the corners, the candybar shape, the glossy, black finish and the chrome-colored metallic border around the display." It also featured side-by-side photos of the two phones from a view that prominently shows the D'087 and D'677 designs (PX174 at APLNDC-Y0000236157):



c. A *Laptop* review of the Vibrant, dated July 20, 2010, stated that "[a]t a glance, the chrome-like border, edge to edge glass display (overlying black plastic), and curved candy bar shape of the Vibrant could easily be mistaken for the iPhone 3GS." (PX6.1-2.)

d. A *MobileTechReview* article dated July 21, 2010, stated that "[a]t first glance, the Vibrant looks like a thinner iPhone 3GS, complete with curved plastic back and a front face dominated by glass and a black surround." (PX6.2.)

e. A *Wall Street Journal* article dated July 22, 2010, observed that the "Vibrant has rounded corners and a prominent border that make it look very much like last year's iPhone 3GS model." (PX6.2.)

f. A *TechRebublic* review dated September 15, 2010 remarked "[t]he designers [of the Vibrant] were obviously mimicking the look of the old iPhone (pre-iPhone4) with the chrome edge around the screen and the plastic backing.") (PX6.3.)

205. As discussed above (paragraph 137), the jury concluded that Samsung's smartphone "products" infringed the D'087 and D'677 patents. This further supports my opinion that the claimed designs are prominent within the phones.

**Samsung's copying shows the designs were prominent**

206. Samsung's choice to copy the D'087 and D'677 designs is also evidence of their prominence. In order to compete with the iPhone's success, Samsung misappropriated its most iconic designs.

207. In Apple's presentation to Samsung about Samsung's use of Apple's patents, Apple showed Samsung a slide showing an iPhone next to a Samsung Galaxy S phone (I note that while the photo is labeled "Apple iPhone 4," the image of the iPhone in the slide appears to be of an iPhone 3GS) (PX52.17):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



208.  The fact that Apple would use images of the front face of the iPhone and Galaxy S—both of which embody the D'677 and D'087 designs—to make its point that Samsung was misappropriating its designs further shows that was the most prominent view of the phone. Boris Teksler, Apple's Director of Patents and Patent Licensing, stated that this presentation showed "the remarkable similarity of the two products" including the "overall appearance." (Dkt. 1695 at 1960-1961.)

**The D'087 and D'677 designs are prominent in Apple's iPhones**

209.  While I understand the inquiry for the second factor focuses primarily on whether the D'087 and D'677 designs are prominent in Samsung's infringing phones as a whole, I have also been asked to consider whether the D'087 and D'677 designs are prominent in the Apple phones that practice those patents. In my opinion, they are.

210.  The D'677 design is prominent in Apple's original iPhone, iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S. Again, this can be seen from a visual inspection of the products:



iPhone (1st generation)                              iPhone 3G

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



iPhone 3GS                                              iPhone 4

iPhone 4S

The particular rounded corners and straight edges, the glass front face extending from edge-to-edge of the device, and the black front face are primary features that stand out and dominate when viewing and using the products. They define the iconic "look and feel" of the iPhone, which differentiated the iPhone from other mobile phone designs (see paragraphs 53-75 above).

211.   The D'087 design is prominent in Apple's original iPhone, iPhone 3G, and iPhone 3GS. As shown in the images above, the particular rounded corners and straight edges, the glass front face extending from edge-to-edge of the device, and the bezel are primary features that stand out and dominate when viewing and using the products. Again, they define the iconic "look and feel" of the iPhone, which differentiated the iPhone from other mobile phone designs (see paragraphs 53-75 above).

212.   Apple viewed the claimed D'087 and D'677 designs as extremely important to the iPhone as a whole when developing a new smartphone. When Apple developed the iPhone, it started from the overall design for the product as a whole—as reflected in the D'087 and D'677 designs—and then made everything else fit to those designs. (See paragraphs 66-68 above.) As Vice President of Procurement Tony Blevins testified, "[e]verything is subservient to that design …That means instead of buying something available off the shelf and choosing the best off-the-shelf component, we almost exclusively design things that are unique and differentiated because they must be to fit in that final design." (Blevins 2017 Dep. 196:6-12; Stringer August 2011 Dep. 47:3-4, 48:10-13 ("We always invent manufacturing solutions for our designs. … In all the  instances when we have shipped a product, we have conceived of manufacturing solutions such that the design can be manufactured.").)

213.   The importance of the designs claimed by the D'677 and D'087 patents is also evident in Apple's marketing of the iPhone. Apple has referred to its approach to advertising using the phrase "product as hero." This approach focused on design and made the product as a whole the central feature of all advertisements.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

a.  As Apple marketing executive Phil Schiller testified, "the most important [thing] we do at Apple is to create a **product** … and we want to showcase those products as prominently as we can." (Dkt. 1610 at 639.) Mr. Schiller also stated that the reason "product as hero" works for Apple is "because the product is really beautiful and really unique." (Dkt. 2842 at 824.)

b.  Guidelines for advertisements of the iPhone state: "In all iPhone marketing communications, **the product is the hero**. Show it front and center in all layouts." (APLNDC0002008363 at APLNDC0002008368.) These guidelines also provide "hero images" of the iPhone to be used in advertisements, each of which prominently shows the front face of the iPhone:





c.  The "product as hero" approach remained Apple's strategy across the generations of the iPhone. (APLNDC0002155318 at APLNDC0002155320; APLNDC0002155335 at APLNDC0002155336; APLNDC0002203457 at APLNDC0002203459; APLNDCY-0000236364 at APLNDCY-0000236368; APLNDC0002876270 at APLNDC0002876304.) iPhone advertisements, such as the one displayed below, consistently featured the phone itself as the largest, most prominent aspect, showing a "hero image" that showcased the front face including the D'087 and D'677 designs (PX130; *see also* PX11.3-4, 11.12-14; PX12; PX127):

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



d.  Greg Joswiak, Apple's Vice President of Product Marketing, testified that the purpose of Apple's advertising was not to showcase or market particular functionalities or features of Apple's iPhones, but to market phones as a whole. (Joswiak 2017 Dep. 88:4-11 (describing advertisements discussing apps available for Apple's products and explaining that "what this was about, right, is driving the sales of the iPhone . . . We wanted to sell more iPhones"); *id.* at 91:4-10 ("And in the end, of course, that was what our hope was, that this would help encourage you to buy an iPhone."); *id.* at 101:9-14 ("The principal reason for this is to promote the iPhone, right? It's to get you to want to purchase the iPhone, and these are some of the cool things that you can do with your iPhone and get for your iPhone, which would hopefully make you want to buy an iPhone, if you didn't already have one.").)

214.  Apple's packaging also focuses on the front face of the phone. An image of the front face on the outside of the packaging and when a purchaser removes the top of the box, the first thing that is visible is the front face of the phone and the surrounding bezel. The phone is nestled into the packaging in a way that emphasizes the front face and bezel:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



iPhone 3GS and Packaging

**Factor 3: "Whether the Design Is Conceptually Distinct from the Product as a Whole"**

215.   The third factor that I considered in my article of manufacture analysis is "whether the design is conceptually distinct from the product as a whole." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017).)

216.   For the reasons discussed below, it is my opinion that the D'087 and D'677 designs are not conceptually distinct from the infringing Samsung products as a whole; they are completely integrated into the products as a whole. This factor therefore supports my conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'087 and D'677 patents.

**Examples demonstrating conceptual distinctness**

217.   To evaluate whether a design is conceptually distinct from a product, I find it useful to consider some examples. The HP Photosmart 6520 printer is a helpful reference:

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



The control panel of this printer looks similar to the claimed portion of the D'677 patent. But "conceptually," the control panel is distinct from the rest of the product. It looks stuck onto the device, almost floating in front of the rest of the printer. It is easy to conceive of the control panel as a thing separate from the rest of the device, or to imagine the entire control panel removed from the remainder of the printer, potentially to be used like a remote control. This is a good example of a design that is conceptually distinct from the product as a whole.

218. Another example of a design that is conceptually distinct from the rest of a product is that of Motorola's "moto mods" on the moto z phone:



Moto Z front face with Moto Mod (APLNDC-WH0004001352)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER



Polaroid Insta-Share Printer   moto smart speaker with   moto insta-share projector

Select Moto Mods (APLNDC-WH0004001352 at APLNDC-WH0004001359)

The "moto mods" allow users to pick and choose among different phone backs (with different functionalities). It is easy to conceive of these backs as separate accessories distinct from the front face of the phone, and vice versa.

219. Other examples may include designs in which there is an expectation or convention in the industry that the portion of the claimed design is expected to work with other products or parts of products. Many stick-goods (e.g., brooms, mops) are designed so the handle or pole can and will be dissociated from the end and used with other handles.

### The D'087 and D'677 designs are not conceptually distinct from the infringing phones as a whole

220. Unlike the examples above, the D'087 and D'677 designs are not conceptually distinct from the infringing phones as a whole. To the contrary, these designs are integral to the overall devices. It is difficult to imagine the infringing phones existing separately from these designs. Without either of the claimed designs, the infringing product would not even be a solid form—it would simply be five sides and an open face.

221. Perhaps the most obvious reason the D'087 and D'677 designs are not "conceptually distinct" from the Samsung infringing products as a whole is that without the portions claimed by those patents, the infringing products would not be phones at all. Both the D'087 and D'677 patents cover the front face of the infringing phones. If the infringing products did not have the glass front face that embodies these designs, they would be unrecognizable and would have no use or value. Samsung's designer Jinsoo Kim agreed that without the front glass "you can't use [the phone] as a phone, so there's no usability." (J. Kim 2017 Dep. 62:25-63:8.)

222. The glass front face and bezel would also have no value as individual components separate from the rest of an infringing device. When Samsung executive Justin Denison was asked if the flat front face would function separately from the phone, he stated: "I'm just having a hard time picturing what a flat front face of a phone by itself is. I'm not sure that that's something I can hold." (Denison 2017 Dep. 73:12-17.) Other Samsung witnesses confirmed that, apart from the infringing devices as a whole, the glass front face is "not usable to a consumer." (J. Kim 2017 Dep. 62:13-24; *see also* D. Kim 2017 Dep. 30:5-19 ("I don't think the consumers will be able to do much with just the glass. … If it's separated, I don't think it will be of any use to consumers.").) They also stated that the bezel alone has "no role to play" separate from the rest of the phone. (J. Kim 2017 Dep. 102:17-103:15.) According to Jinsoo Kim, in order for these components "to work" and serve their intended purpose, "[t]hey have to be assembled as designed." (J. Kim Dep. 76:8-17.)

223. I am not aware of any instance in which a consumer has used the glass front face or bezel of an infringing Samsung device separately from the rest of the device. Samsung has also not identified any such instance. (*See, e.g.,* J. Kim 2017 Dep. 75:25-76:7 ("Q. Are you aware of any instance in

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

which a consumer has used the phones [found to infringe the D'087 patent] without the bezel on them? A. Not to my knowledge. Q. Are you aware of any instance in which a consumer has used the phones [found to infringe the D'087 patent] without the glass front face plus surrounding bezel? A. The same. Not to my knowledge.").

224. As discussed above (paragraph 137), the jury found that the products in their entirety infringe the D'087 and D'677 patents. This further supports my opinion that neither the claimed designs nor the components that Samsung alleges to be the articles of manufacture are conceptually distinct from the infringing phones as a whole.

**Samsung designed the infringing phones as whole products with a focus on having a holistic appearance**

225. Samsung's design approach for the infringing phones also indicates that the D'087 and D'677 designs are not conceptually distinct from the products as a whole.

226. Samsung's approach to designing its mobile phones is to design complete phones, not to design components in isolation that are later combined. As Samsung's corporate representative Drew Blackard testified, Samsung "create[s] consumer electronic **products** including mobile handsets." (Blackard Dep. 120:12-19.)

227. This approach of designing phones as complete products was the approach Samsung used when designing the infringing phones. There was no designer or design team devoted to designing the glass front face and/or bezel separate from the infringing phones as a whole. (J. Kim 2017 Dep. 97:25-98:10 ("[T]here was nobody who worked on just the front face."); *id.* at 101:1-8 ("[T]here is no designer that works on designing the bezels alone.").) Rather, designers worked on complete phone designs and referred to designs of phones holistically.

   a. Samsung designer Bo-Ra Kim testified that "[a]s far as the Infuse 4G project is concerned, I handled it, and I handled it by myself … I designed it by myself." (B. Kim 2012 Dep. 16:3-9.) Mr. Kim also stated there came a time when "the exterior hardware of the phone, **the design of it**, had been selected." (B. Kim 2012 Dep. 71:19-72:10.)

   b. Samsung designer Jinsoo Kim testified that he personally designed the infringing Galaxy S II phones and provided direction for the design of other infringing phones. Mr. Kim confirmed that he "worked in the mobile **product** design team," where his job was "to design mobile **phones**." (J. Kim 2017 Dep. 15:2-22, 30:18-31:12; Dkt. 1841 2787:23-2788:8.) In that role, Mr. Kim "designed the outside appearance of the exterior," which included all "the parts you can see on the exterior," and was not limited to any particular aspects or components. (J. Kim 2017 Dep. 42:14-24, 97:4-24.)

228. Testimony of Samsung's witnesses also confirms that when designing the infringing products, Samsung's designers took into consideration the overall design of the whole product. They sought to create "one design" that was not complex and that "integrated" the form factors of the phone. They also acknowledged that considering the overall design is important for ensuring that certain components do not become limitations on the design of the product and that the product can have "one design."

   a. Samsung designer Jinsoo Kim testified that when the infringing phones were designed "Samsung consider[ed] overall design." (J. Kim 2017 Dep. 30:18-31:12, 86:11-24.) As Mr. Kim explained, Samsung considered the overall design of theses phones because "it's elementary to get an overall constitution, then design." (J. Kim 2017 Dep. 86:25-87:9.)

   b. Mr. Kim stated that "various components can become constraint[s] to a design," and it's necessary to find a "way to avoid those constraints" to "create a combination that will

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

present one design" and make various parts and pieces "not appear complex." (J. Kim 2017 Dep. 87:10-89:3.)

c.  When he designed the infringing Galaxy S II phones, Mr. Kim "made efforts to make it look like one and [not] look complex." (J. Kim. 2017 Dep. 89:4-17.)

d.  Justin Denison, SEA's Senior Vice President of Marketing for Mobile Phones and IoT Things, testified about Samsung's philosophy of "holistic design," and explained that "holistic design" means that "Samsung is bringing together the thousands of technology, the hundreds of parts, the millions of lines of code, to create, you know, a beautiful end product." (Denison 2017 Dep. 93:11-18.)

229.  The fact that Samsung designed the infringing phones as complete products rather than as separate components, and focused on overall product design with an emphasis on making the infringing phones look like "one," further supports my opinion that the D'087 and D'677 designs are integral to and not conceptually distinct from the Samsung infringing phones in their entirety.

**Samsung's sales, advertising and other activities also conceive of the infringing phones holistically**

230.  Samsung's sales and advertising of the infringing phones also conceive of the infringing phones as complete products. As discussed below (paragraphs 254-260), Samsung's main business is selling complete, finished products. Samsung never advertised the components that Samsung alleges are the articles of manufacture separately from the infringing phones as a whole. As discussed above, the front faces of Samsung's phones are prominently featured in Samsung's advertisements, but in a manner where they are being shown as part of a complete, finished product. This further supports my opinion that these designs are not conceptually distinct from the devices.

231.  Also as discussed below (paragraphs 241-249), Samsung only instructs its users to use the phones as a whole.

232.  Another indication that Samsung conceived of the D'087 and D'677 designs as part of whole phones, and not pertaining to separate components only, is that Samsung does not internally have terms to identify the components it claims are the article of manufacture in this case. When handed the component that Samsung has identified as the article of manufacture for the D'677 patent, one Samsung designer testified that she did not know what it was called and had never seen that component separate from an entire phone. (Wang 2017 Dep. 34:19-35:36:4.) Another Samsung witness, when asked whether particular Samsung phones had a round-corndered glass front face, responded "the glass front face [is] a component of any Samsung smartphone," responded: "I don't know what [a] glass front face is." (Han 2017 Dep. 57:25-58:6.)  A third Samsung witness stated that the components Samsung contends are the articles of manufacture in this case were "not immediately recogniz[able]" to him and testified that he would "not know how to refer to" or "identify [] with specifc words" those components. (Denison 2017 Dep. 78:20-24, 80:12-13, 81:1-3, 81:20-21.)

233.  When asked about Samsung's infringing phones, Apple's designer noted that the D'087 and D'677 designs are "not distinct" from the phones; they are "part of the product." (Howarth 2017 Dep. 179:18-179:23.)

**Samsung copied the D'087 and D'677 designs in an effort to copy the iPhone as a whole**

234.  The fact the D'087 and D'677 designs are intertwined with the phones as a whole and not conceptually distinct is further demonstrated by the manner in which Samsung appropriated the patented designs. As discussed above, Samsung had phones with numerous different designs and form factors before it launched the infringing products. When it copied Apple's designs, Samsung

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

did not borrow discrete elements of these designs but applied them to Samsung's phones in a manner that made the entire phones look like the iPhone (PX3.3):



235.   The similarities between the infringing phones and the iPhone, including design features such as the flat, black front faces, the glass front face extending edge-to-edge, the relative proportions, and the rounded corners, make the products overall look extremely similar. As noted above, product reviewers and others recognized these similarities when Samsung released the infringing products and cited them as a basis for concluding that Samsung's phones as a whole resembled the iPhone.

**The D'087 and D'677 designs are fully integrated into and not conceptually distinct from Apple's iPhones**

236.   While I understand the inquiry for the third factor focuses on whether the D'087 and D'677 designs are conceptually distinct from Samsung's infringing phones, I have also been asked to consider whether the D'087 and D'677 designs are conceptually distinct from the Apple phones that practice those patents. In my opinion, they are not.

237.   Apple did not conceive of the glass front face or bezel separately from the iPhone. When Apple designed the iPhone, it conceived of and designed the product as a whole—not as a combination of individual components or parts.

    a.   As Richard Howarth, one of the lead designers of the original iPhone and named inventor on both the D'087 and D'677 patents put it: "We're all about the product. We're not in – we're not – we don't design individual parts. Our goal is to create a thing, a tool, a whole product … ." (Howarth 2017 Dep. 176:11-15.) Components like the bezel are only "part of a design" or "overall concept," and while Apple "might focus on the bezel for a little part of some time during the design process … it's all in the effort of creating the product." (Howarth 2017 Dep. 170:7-25.)

    b.   Dan De Iuliis, another iPhone designer and inventor named in the D'087 and D'677 patents, confirmed the group "design[s] products in their entirety." (De Iuliis 2011 Dep. 140:10-23.) He explained that Apple doesn't separate its designs into features: "[Y]ou design something in its entirety. It has to work together. There has to be a – elements that are sympathetic to each other. So it's not a laundry list of features that make a design." (De Iuliis 2011 Dep. 171:15-24.)

    c.   When asked about only specific elements of the iPhone's design including its "rectangular shape with four evenly rounded corners," Jonathan Ive, the lead of the group

- 59 -

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

that designed the iPhone testified that "I as a designer struggle to – to be able to sort of parse out and separate all of those – you know, those different aspects of the design." (Ive 2011 Dep. 102:18-103:16.) According to Mr. Ive, "design and the product itself are inseparable." (Ive 2011 Dep. 51:3-12.)

d.   Apple marketing executive Greg Joswiak confirmed that the design team worked to design the entire phone and that when designs were shown to executives for input, it was as a complete product, not just components. (Joswiak 2017 Dep. 139:12-19 ("Q. And were you shown different variations of this, this cover, the surface that's claimed here [in the D'677 patent]? A. Well, the product itself. I wouldn't look at this as just a cover. We looked at various designs for what would become the initial iPhone. Not so much a cover. There's not somebody working on covers. You know, there's people working on iPhones.").)

238.   Indeed, Apple's design for the phone as a whole dictated the manufacture of the individual components. (Blevins 2017 Dep. 196:6-12 ("Everything is subservient to that design, which makes my job really, really hard. That means instead of buying something available off the shelf and choosing the best off-the-shelf component, we almost exclusively design things that are unique and differentiated because they must be to fit in that final design."); *id.* at 198:7-13 ("The external design and appearance dictates everything else about the phone that you fit in that design envelope and those design requirements."); Dkt. 1547 at 494-495 (designer Chris Stringer testifying regarding manufacturing challenges due to iPhone design).)

**Factor 4: "The Physical Relationship Between the Patented Design and the Rest of the Product"**

239.   The fourth factor that I considered in my article of manufacture analysis is "the physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately." (Dkt. 3530, Order Requiring New Trial (Oct. 22, 2017).)

240.   As discussed below, the Samsung products found to infringe the D'087 and D'677 patents are all monolithic, unitary devices. They are manufactured to be sold and used as monolithic, unitary devices. The physical relationship between the patented designs and the rest of the product therefore supports my conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'087 and D'677 patents.

**Users use the infringing products as a whole, and cannot separate the glass front face and/or bezel without breaking the product**

241.   For each Samsung product found to infringe the D'677 patent, the D'677 design does not pertain to a component that a user can physically separate from the product as a whole during normal use of the product. The same is true for the Samsung products found to infringe the D'087 patent: the D'087 design does not pertain to a component that the user can physically separate during normal use of the product.

242.   Samsung's infringing phones were designed and intended to be used as a whole, including with the glass front face and bezel. They were not designed under the assumption that the glass front faces or bezels would be used separately from the rest of the phone. (J. Kim 2017 Dep. 100:16-25 ("I do not believe Samsung would have designed under the assumption that these [front faces] would be used separately."); *id.* at 101:19-102:2 ("I don't think the – it was designed with the – under the assumption that the bezel would be separated in its usage.").)

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

243. Consistent with the manner in which they were designed, as Samsung's user manuals show and Samsung's witnesses confirmed, Samsung told consumers to use the infringing phones as a whole. I am aware of no instance in which Samsung ever instructed a user to physically separate the glass front face or bezel from the rest of the phone or to use those components separate from the rest of the phone.

   a. The user manuals for the infringing phones do not contain any instructions regarding how to remove the glass front face or bezel. (S-ITC-007284514 (Fascinate); S-ITC-000122664 (Showcase); SAMNDCA00018395 (Galaxy S 4G); SAMNDCA630-00922823 (Galaxy S II, AT&T); S-ITC-000018872 (Galaxy S II, Epic 4G Touch); SAMNDCA630-00924419 (Galaxy S II, Skyrocket); S-ITC-003723510 (Galaxy S II, T-Mobile); SAMNDCA00009582 (Infuse 4G); S-ITC-007283163 (Mesmerize); SAMNDCA00017928 (Vibrant); SAMNDCA10712069 (Galaxy S i9000); SAMNDCA630-04328647 (Galaxy S II i9100).)

   b. Samsung corporate representative Drew Blackard agreed that "Samsung does not encourage individual customers to break apart their phones," explaining "[i]t's not something …we promote." (Blackard 2017 Dep. 146:18-147:12.) The only components Mr. Blackard identified as components that Samsung instructed its consumers to remove from any of the infringing phones were removal batteries and expandable memory. He contrasted these items, which he described as "value proposition[s]," with removing a cracked screen which he described as "a problem … not a feature." (*Id.* at 147:22-149:24.)

   c. Samsung designer Jinsoo Kim testified that Samsung has not made available to the public information regarding how to remove the glass front face or bezel from the infringing phones. (J. Kim 2017 Dep. 74:6-75:24.) In other words, instructing users how to take those components off the infringing phones is not something Samsung would do and, as Mr. Kim stated, "there is no official material made by Samsung" instructing users how to do it. (*Id.* at 60:15-23.)

244. I understand that Samsung contends that a user could theoretically separate the glass front face and/or bezel from the infringing phones and has cited certain third-party websites that provide instructions on how to repair and replace these components. (Samsung's Second Supplemental Response to Interrogatory No. 1.) One of these websites describes replacing the "Samsung Galaxy S II Front Glass/Digitizer" as "[v]ery difficult." (APLNDC-WH0004000959.) It warns: "This procedure is very hard. You must have good experience to do this!!!" (*Id.*) The site also indicates the repair involves separate 15 steps and will take 25-35 minutes. (*Id.*) If anything, the degree of difficulty explained on this website suggests that this part is not separable in any reasonable way by a consumer.

245. Samsung's own experience separating the glass front face and bezel from the infringing phones for purposes of this litigation proves that it would be extremely difficult, if not impossible, for the average consumer to do. Samsung corporate representative Tim Sheppard testified that the components Samsung alleges are the articles of manufacture were separated from four of the infringing devices for purposes of this litigation by Bob Nelson, a Samsung employee and "qualified repairperson" with "a significant number of years of training," but that to successfully separate those components Mr. Nelson "needed some help" from a third-party company with "specialty equipment." (Sheppard 2017 Dep. 28:18-29, 160:4-161:24.) Mr. Sheppard confirmed that "a significant amount of disassembly" was required to separate the phones into these components and that it "would have been very difficult for the average consumer" to disassemble. (Sheppard 2017 Dep. 160:4-161:24.)

246. Another Samsung corporate representative who has worked for Samsung for 21 years, Dongwook Kim, stated that he would not know how to separate the glass front face or bezel from any of the infringing phones. (D. Kim Dep. 30:20-23, 35:4-6.) Mr. Kim also testified that "a special tool" and

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

likely "special training is needed" to separate the glass front face from the infringing phones. (*Id.* at 31:11-32:13.) He stated he is not aware of any instance in which anyone outside of Samsung has ever removed the glass front face and bezel from any of the infringing phones. (*Id.* at 34:6-13.)

247.  Samsung's witnesses testified that there may be some small number of users who can separate the glass front face and/or bezel from the infringing phones. However, it is clear that such separation does not occur during the normal use of these products and that Samsung does not intend these components to be separated from the remainder of the device. As discussed above, the phones would not function as intended if the glass front face were removed, and there would be no use for the glass front face or surrounding bezel if they were separated from the rest of the phone.

248.  Even assuming a user could separate the glass front face and/or bezel from the infringing phones, there would be no reason to do so (other than to repair or replace those components to recreate an entire phone), and many reasons not to. It would also make no sense, as the glass front face and/or bezel would serve no purpose if they were separated from the phone. There is no separate use for the glass front face or bezel apart from being used in the infringing phones, and separating the glass front face and/or bezel from the phone (if it were even possible) would render the phone non-functional. In other words, doing so would break the phone.

249.  Separating the glass front face and/or bezel from the infringing phones would also void the warranty. The Samsung warranties for the infringing phones do not cover "defects or damage resulting from … misuse, abnormal use, abnormal conditions … unusual physical, electrical or electromechanical stress," "cosmetic damage," "damage resulting from the use of Product in conjunction or connection with …equipment not furnished or approved by SAMSUNG," or "defects or damages resulting from improper … operation." (APLNDC-WH0004002616 (Fascinate); APLNDC-WH0004002915 (Galaxy S II, Epic 4G Touch); APLNDC-WH0004002640 (Skyrocket); APLNDC-WH0004002891 (Infuse 4G); APLNDC-WH0004002899 (Galaxy S II, T-Mobile); S-ITC-000122664 at  S-ITC-000122824 (Showcase); SAMNDCA00018395 at SAMNDCA00018623 (Galaxy S 4G); SAMNDCA630-00922823 at SAMNDCA630-00923010 (Galaxy S II, AT&T); S-ITC-007283163 at S-ITC-007283308 (Mesmerize); SAMNDCA00017928 at SAMNDCA00018131 (Vibrant).) As Samsung's corporate representative Tim Sheppard confirmed, the language in these warranties implies that intentional breaking apart of components from the rest of the phone would void the warranty. (Sheppard 2017 Dep. 60:3-61:3.) User manuals similarly warn: "Do not disassemble, modify, or repair your device | Any changes or modifications to your device can void your manufacturer's warranty. For service, take your device to a Samsung Service Centre." (SAMNDCA630-04328647 at SAMNDCA630-04328660.) This further proves that Samsung does not intend for users to take apart the infringing phones and that the components Samsung has identified as the articles of manufacture are not meant to be separated from the rest of the device once the phone is manufactured.

**Samsung manufactured the infringing products as a whole**

250.  Any multi-component product contains parts that are manufactured separately. This is a common characteristic of any mass-produced product, including the infringing phones.

251.  To manufacture the infringing phones, I understand Samsung took components and sub-assemblies from various sources. While these components and sub-assemblies themselves may have been manufactured elsewhere or by other companies, Samsung took these components and used them to manufacture complete, finished phones.

252.  I understand that many of the components used in the manufacture of these devices serve no purpose other than to be combined into the specific product they were made for. Each part or piece has to perform a specific function, and this requires that they are manufactured in a particular way, in a particular material. For example, the glass front face used in each of the infringing phones was made specifically for that phone (D. Kim 2017 Dep. 40:14-16), and "would only have worked on" the

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

phone for which it was made (Sheppard 2017 Dep. 132:21-25). This demonstrates that these components are not meant to be separated from the end product and that, even though they may be manufactured and provided by third parties, they are made specifically and solely for the purpose of being incorporated into a larger article of manufacture—the phone.

253. The end result of Samsung's manufacturing process was to create the infringing phones, which, to carriers, retailers, and end users appear monolithic and inseparable.

> **Samsung (and others) sold the infringing products as a whole, and cannot separate the glass front face and/or bezel without breaking the product**

254. For each Samsung product found to infringe the D'087 and D'677 patents, the D'087 and D'677 designs do not pertain to components that a seller can physically separate from the product as a whole in the normal course.

255. I understand from Julie Davis that STA's primary business is selling smartphones as complete phones, not selling specific components.

256. Samsung's witnesses confirmed that Samsung's mobile division is in the business of selling phones as a whole, not components of phones.

   a. Samsung corporate representative Kyuhyun Han stated that "[s]elling tablets and smartphones are our main business." (Han 2017 Dep. 72:16-18.)

   b. Samsung executive Justin Denison testified at trial that STA sold "mobile **phones** and other equipment." (Dkt. 1610 at 791-792.)

   c. Another Samsung executive, Tim Sheppard, when asked what STA does similarly testified that it "sells **handsets**." (Dkt. 2842 at 953.)

257. Samsung manufactured and then sold each and every one of the infringing products as a whole. Most of the infringing phones were sold by Samsung directly to carriers such as AT&T, Verizon, Sprint, and T-Mobile, who in turn sold the phones to individual consumers. (Blackard 2017 Dep. 47:5-49:7.) Some of the infringing phones were sold to retailers, such as Wal-Mart and Best Buy, who in turn sold the phones to individual consumers or to enterprises, such as American Airlines, who provided the phones to their employees. (Blackard 2017 Dep. 126:15-128:1.) In all instances, the phones were sold as complete, finished products. (Blackard 2017 Dep. 128:2-7; Sheppard 2017 Dep. 134:20-22; D. Kim 2017 Dep. 22:25-23:5.)

   a. Samsung's corporate representative Tim Sheppard testified that Samsung Electronics in Korea transferred "finished product[s]" to Samsung's U.S. entity. (Sheppard 2017 Dep. 155:13-156:7.) He stated that when STA then "sold phones to carriers or consumers, we didn't sell it as a modular kit to assemble at home; we sold a finished product." (*Id.* at 134:20-22.)

   b. Drew Blackard, another Samsung corporate representative, confirmed that for each of the channels Samsung sold to—carriers, retail locations, individual customers, and enterprises— Samsung sold "complete phones." (Blackard 2017 Dep. 128:2-7.)

   c. Samsung designer Jinsoo Kim also confirmed the infringing products "would have been sold as finished products." (J. Kim 2017 Dep. 26:2-8.)

   d. Justin Denison, SEA's Senior Vice President of Marketing for mobile phones, testified that "[g]enerally speaking, [Samsung's] selling the fully manufactured and assembled product when we sell a product to a channel partner who then sells it to an end

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

customer." (Denison 2017 Dep. 30:18-24.) He explained that Samsung put together "fully
assembled device[s]" that were ultimately sold to end users. (*Id.* at 31:6-32:12.)

258.   I understand from Ms. Davis that each of the phones for which she has been asked to calculate
damages was sold as a complete phone, that Samsung's sales records and sales databases
indicate that Samsung sold the infringing phones as a whole and that the financial records
Samsung introduced at trial showed revenues and profits for complete phones. (DX676; DX753.76;
JX1500.) Mr. Sheppard's testimony confirmed as much. (Dkt. 1842 at 3005 (explaining that DX676
was generated by "extract[ing] the data model by model"); *id.* at 3009-3010 (DX753.076 reflected
revenue earned from carriers that Samsung "sell[s] the phones to"); Dkt. 2842 at 968 (DX676
"shows revenue, sales, and costs **for products**").) I also understand from Ms. Davis that the
primary exhibit on which she relies (and on which Samsung relied) to calculate the profits for the
infringing products show revenues, costs, and profits for the products as a whole and not for any
individual components.

259.   I understand from Ms. Davis that although Samsung has separate divisions that sell certain
components, such as microprocessors, to other OEMs, those components are not relevant here.
Outside the repair context, Samsung has never sold glass front faces or bezels for the infringing
phones separately from the phones themselves. (Shepard 2017 Dep. 55:20-56:11, 58:4-59:9,
63:18-64:3, 65:15-23; D. Kim 2017 Dep. 23:6-17; J. Kim 2017 Dep. 71:17-20; Denison 2017 Dep.
54:11-21.)

260.   The only reason Samsung would have sold glass front faces or bezels separate from phones was
for the purpose of repair—in other words, to make the products whole again. This further indicates
that these components are not intended to be separated from the phones. When the glass front
face or bezel is damaged or broken, Samsung encourages users to seek out authorized repair
providers so that the broken components can be replaced and the phones can be returned to
complete, finished form. (Blackard 2017 Dep. 147:22-149:14.)

261.   Samsung's marketing was also directed to selling the infringing phones as a whole. For example,
Samsung's print and television advertisements were for the infringing phones as a whole, not
components of those phones. I am aware of no instance in which Samsung advertised a glass front
face or bezel separate from the infringing phones.

   a.   With respect to the components Samsung that has identified as the alleged articles of
manufacture, Mr. Blackard testified that outside of the repair context, Samsung has "not
marketed [] the component itself to end-users," rather, they have only been advertised as
"part of the overall value proposition" of the whole phone." (Blackard 2017 Dep. 162:9-
163:1.)

   b.   Justin Denison, SEA's Senior Vice President of Marketing for mobile phones, also
testified that he was unaware of any advertisements for the components Samsung has
alleged are the articles of manufacture. (Denison 2017 Dep. 86:16-88:4.)

   c.   Samsung designer Jinsoo Kim testified that "[t]here were no instances of separate
advertisement" of the glass front face of the infringing phones. (J. Kim 2017 Dep. 64:19-
23.) Mr. Kim also testified that Samsung has not advertised either the bezel or the glass
front face with surrounding bezel. (*Id.* at 74:6-14.)

262.   Network providers (such as AT&T, Verizon, Sprint, and T-Mobile) and retailers (such as Wal-Mart
and Best Buy) also sold the infringing products as a whole to consumers. I am aware of no instance
in which a network provider or retailer separated the glass front face and/or bezel from an infringing
Samsung phone or sold such a component to a consumer. It would make no sense for them to do
so.

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**Apple's iPhones were designed, manufactured, sold, and used as unitary products**

263. While I understand the inquiry for the fourth factor focuses on the physical relationship between the D'087 and D'677 designs (or the articles of manufacture Samsung alleges those designs have been applied) and Samsung's infringing phones, I have also been asked to consider the physical relationship between the D'087 and D'677 designs and the Apple products that practice those patents.

264. As with the Samsung infringing phones, Apple's iPhones incorporate the D'087 and D'677 designs into monolithic, unitary devices. The iPhones were designed and manufactured to be unitary products that were not intended to be separated into components by sellers or users, and removing the glass front face and/or bezel would destroy the iPhone and require repair.

265. Apple designed the iPhone—including the glass front face and bezel—to be a unitary whole and to function as a single unitary product, not as a combination of modular parts.

   a. Howarth 2017 Dep. 170:7-25 ("Q. What role does the final product play or the goals for the final product play in this design process? A. The -- the end product is always what we want to get to. We want to -- we want to design a fantastic product. The goal is to -- is to create a product that reaches customers and that is a tool that can improve their lives. So it's -- you know, or fulfill some function that they find useful. Q. So let's take as an example the bezel. During the design process will someone go off and just work on bezels? A. As a -- no, there's no -- I mean, usually what happens is the bezel will be part of a design, like an overall concept, and so it would be a part, and -- and we might focus on the bezel for a little part of some time during the design process, but it's all in -- it's all in the effort of creating the product.").

   b. Howarth 2017 Dep. 176:11-15 ("We're all about the product. We're not in -- we're not -- we don't design individual parts. Our goal is to create a thing, a tool, a whole product that people can use so that -- so that they can do things that they couldn't before.")

   c. Howarth 2017 Dep. 168:8-17 ("Q. And for that final process, what comes out of that manufacturing? A. A product, a product that you can use. The iPhone fully functioning. Q. And what does Apple ship?  A. iPhones[.]  Q. Bezels? Stand-alone components? A. No, no. No. It ships products that people use every day. There's no -- yeah. We wouldn't ship just a bezel.").

266. As Tony Blevins, Apple's Vice President of Procurement, explained, Apple is not a manufacturer of "front faces," "display screens," or "bezels" of iPhones. (Blevins 2017 Dep. 201:6-14.) Instead, Apple sought to transform components into a singular object of great value and beauty. The goal, and the result of the manufacturing process, was to create a complete and unitary product—the iPhone.

   a. Blevins 2017 Dep. 198:24-199:12 ("Q. Are you familiar with the managing concept of Apple referred to as transformation? A. Yes. Q. What is that concept? A. That's our philosophy where we take a wide variety of components, assemblies, and subassemblies that otherwise would not have value or utility, and we transform them in such a way to reach our objectives of a final product that will surprise and delight, and so the overall concept we use is that of transformation, that you take things that have no value independently or individually, and you transform them into such a way that they have tremendous value.").

   b. Blevins 2017 Dep. 200:12-19 ("[W]e take each of those unique components, assemblies, and subassemblies that otherwise would not have value, utility, and we transform them in such a way so that the create the end device that, again, we think has tremendous value.").

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

267.  I understand that at no point during the design of the iPhone did Apple consider a design that would enable the user to change or remove the bezel or glass front face. Apple does not instruct users to remove the glass front face or bezel. (Conversation with Tony Blevins.)

268.  Apple sold the iPhone products as a whole. Apple did not separately sell the glass front face or bezel of an iPhone, except to repair damaged products—in other words, to make the product whole again. (Blevins 2017 Dep. 201:15-20.) Apple did not separately record or calculate profits on the glass front face or bezel. (Blevins 2017 Dep. 201:21-202:4.)

269.  Apple intended for consumers to use, and consumers do use, the iPhone as a whole. There is no separate use for the glass front face or the bezel, other than as a part of the phone as a whole.

   a.  Blevins 2017 Dep. 198:17-20 ("Q. Are any components in the iPhone operable when they – when they are removed from the iPhone? A. To my knowledge, no. The only exception I could think of would be headphones.").

   b.  Howarth 2017 Dep. 119:3-10 ("So it's made up -- the product is made up of these separate components, but they're no good on their own. I mean, it's -- it's when they're together that they're good. So you could physically separate it if you're stripping one apart and taking it to pieces, but it wouldn't be any good. It's when it comes together that it's a product.").

270.  Apple designed its iPhones so that components such as the glass front face and bezel could not be removed or the product disassembled.

   a.  Blevins Dep. 204:25-205:12 ("Q: How about the display glass? How easy or difficult was it to remove and replace the display glass on the original iPhone?  A: Exceptionally difficult. Q: How – how so? Was any special equipment required?  A: A significant amount of special equipment was required in order to attempt to disassemble. We would have what we called material attrition, which would mean in addition to the part that you were attempting to replace, you would irreparably damage a large number of other parts that would then have to be replaced.").

   b.  Blevins 2017 Dep. 205:25-206:10 (Q. How about for the bezel? How easy or difficult was it to remove and replace the bezel on the original iPhone? A. It was very, very difficult. Q. Why was that? A. Because removing the bezel would generally cause damage to all of the contingent components, including the display, the backing closure, various flexes because, again, we started with an original design concept that just didn't leave the room for repair.").

271.  Apple does not and did not intend or provide for customers to perform repairs or disassemble iPhones themselves. (Blevins 2017 Dep. 206:17-21 ("Q. At any time has Apple ever provided instructions to consumers on how to disassemble an iPhone?  A. Absolutely not. We've specifically not done that."); id. at 207:1-6 ("Q. At any time has Apple encouraged consumers to disassemble their iPhones to remove any components on the front face of the iPhone?  A. Absolutely not. In fact, even an attempt to do such a thing would totally and completely void the warranty.").)

272.  Trying to remove components such as the glass front face or bezel would destroy the product. (Howarth 2017 Dep. 119:16-22 ("Q. I'm asking whether or not the user or seller can physically separate the design shown in the '677 design patent from the product as a whole. Is that something that's possible? A. It's possible if you wanted to destroy the product.").)

273.  The purpose of Apple's repair program was not to provide components to users, but to restore whole products to usable status. (Howarth 2017 Dep. 168:22-169:5 ("Q. What is the purpose of the repair program? A. To fix a broken part on your iPhone. Q. And what ideally comes out of the repair process? A. A brand – well, a fully functioning iPhone, hopefully. So you get – you might have an

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

iPhone. You break a part on it, and you want it to be replaced with a part that's working so that you get a working product.").)

274. Regarding Samsung's infringing phones, Apple designer and inventor Richard Howarth testified that the D'677 design is integral to and not separate from the entire product—just like in Apple's iPhone. (Howarth 2017 Dep. 179:24-180:14 ("Q. And, finally, let's look at the fourth factor, the physical relationship between the patented design and the rest of the product, and let's start with including whether the design pertains to a component that a user or seller can physically separate. In normal use of the Samsung products, can the design be separated? A. It -- it seemed to me that those – I mean, it's the same as ours, the same as our phone. It looked like it was an integral part of the housing of the -- of the product if we're talking about the bezel and the glass. They're not separate parts. They're parts of a whole, parts of a product that would be -- without it, it would be – probably wouldn't work as well, if at all.").)


**CONCLUSION**

275. As discussed above, all four of the District Court's factors individually and collectively support a conclusion that the article of manufacture Samsung applied the D'087 and D'677 designs to are the infringing phones in their entirety.

276. The intrinsic evidence of the D'087 and D'677 patents, including their titles, claims, written descriptions, and figures, indicate that the claimed designs are applied to an electronic device as a whole.

277. The D'087 and D'677 designs are very prominent within the Samsung infringing phones. These designs are embodied by the face of the phones—the most important side from the perspective of an ordinary observer and the side that Samsung has chosen to emphasize in its advertising and packaging.

278. The D'087 and D'677 designs are not conceptually distinct from the infringing phones themselves. Samsung designed the infringing phones holistically, not as separate components. The phones would have no utility if the components that Samsung alleges are the article of manufacture were removed, and those components have no utility other than as parts of the infringing devices.

279. The D'087 and D'677 designs are also not physically separable from the phones in their ordinary use. Samsung manufactured the infringing phones to be complete, unitary devices, and users use the phones as a whole. If the components that Samsung alleges are the articles of manufacture could be separated from the infringing phones, it would break the phones. Samsung (or an authorized third party) repairs or replaces the glass front face and/or bezel only for the purpose of repairing broken phones—in other words, to make the product whole again.

280. For the reasons discussed above, it is my opinion that the articles of manufacture to which Samsung applied the patented design of Apple's D'677 patent are the Samsung phones found to infringe that patent, in their entirety. Those Samsung phones are: Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S II, AT&T (JX1031); Galaxy S II, i9100 (JX1032); Galaxy S II, T-Mobile (JX1033); Galaxy S II, Epic 4G Touch (JX1034); Galaxy S II, Skyrocket (JX1035); Galaxy S, Showcase, i500 (JX1017); Infuse 4G (JX1027); Mesmerize (JX1015); and Vibrant (JX1010).

281. Similarly, it is my opinion that the articles of manufacture to which Samsung applied the patented design of Apple's D'087 patent are the Samsung phones found to infringe that patent, in their entirety. Those Samsung phones are: Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); and Vibrant (JX1010).

CONTAINS MATERIAL DESIGNATED HIGHLY CONFIDENTIAL —
OUTSIDE ATTORNEYS' EYES ONLY SUBJECT TO PROTECTIVE ORDER

**SUPPLEMENTATION**

282.   I reserve the right to revise, supplement, or amend my opinions in light of any additional information that I might receive after the date of this report, including but not limited to rebuttal reports submitted by Samsung.

**EXHIBITS TO BE USED AT TRIAL**

283.   If called as a witness at trial, I expect to rely upon visual aids and demonstrative exhibits that illustrate the bases of my opinions. These visual aids and demonstrative exhibits may include, for example, drawings and other excerpts from the patents-in-suit; illustrations or photos of Apple's iPhones and Samsung's infringing phones; excerpts from interrogatory responses, requests for admission, deposition testimony, deposition exhibits, or documents cited in this report; and charts, diagrams, videos, and animated or computer-generated video.


Dated:  January 15, 2018                    _____

                                            Alan D. Ball, IDSA

# EXHIBIT A

**Alan D. Ball, IDSA**
Industrial Designer, Inventor, and Design Expert.

50 Francesca Ave, Somerville, MA 02144-2002
Phone: 617.718.9342.
Email: alball@abidstudio.com. Website: www.abidstudio.com

**Expert Witness Employment:**

2017-present    **Pono Paani v. Belkin**, Civil Action No. 1:17-cv-00054-SS, United States District Court, Western District of Texas, Austin Division.

Hired by Meyertons, Hood, Kivlin, Kowert & Goetzel (MHKKG) as expert witness for plaintiff Pono Paani. Case pending.

2016-present    **Nike Inc. v. Skechers USA Inc.**, Case No. IPR2017-00621, United States Patent and Trademark Office Before the Patent Trial and Appeal Board.

Hired by Banner & Witcoff, LTD. as expert for patent owner Nike. Case pending.

2016-present    **Snap-On, L.P. v. Harbor Freight**, Case No. 2:16-cv-01265-LA, United States District Court, Eastern District of Wisconsin, Milwaukee Division.

Hired by Quinn Emanuel Urquhart & Sullivan, LLP as expert for defendant Harbor Freight. Services include expert declaration opposing injunction and testimony. Case settled.

2015-present    **Hinrichs v. Beats Electronics, LLC**, Case No. BC 533089, Superior Court of The State of California, County of Los Angeles.

Hired by Morrison & Foerster LLP as expert for defendant Beats. Case pending.

2015-present    **C&A Marketing Inc. v. GoPro Inc.**, Complaint for Patent Infringement of D730,423; Case No. 1:15-cv-7854-RMB-JS, United States District Court, District of New Jersey.

Hired by Morrison & Foerster LLP as expert witness for plaintiff C&A Marketing. Case settled.

2015-16    **Schluter Systems, L.P. v. Imre Batori and Progress Profiles**, Complaint for Patent Infringement of D706,459; Civ. Act No. 1:15cv144 (CMH/IDD), United States District Court for the Eastern District of Virginia, Alexandria Division.

Hired by Fish & Richardson P.C. (Dallas) as expert witness for plaintiff Schluter Systems. Expert services included initial consultation, photography of evidence, production of infringement report and invalidity report, and deposition prep. Case settled.

2015    **Hamilton Beach, petitioner v. Courtesy Products, patent owner,** Cases IPR2014-01257 and 01258, United States Patent and Trademark Office, before the Patent Trial and Appeal Board.

Hired by Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (Washington DC) as expert for patent owner Courtesy Products. Expert services included initial consultation and production of declaration. Case settled.

2014-15     **Caterpillar, Inc., petitioner, V. Miller International, Ltd., patent owner.** Case IPR2015-00416**,** Patent D673,982 S, United States Patent and Trademark Office, before the Patent Trial and Appeal Board.

       Hired by Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (Washington DC) as expert witness for petitioner Caterpillar, Inc. Expert services included initial consultation and production of declaration of obviousness. PTAB decision found the patent invalid due as obvious.

2014-present    **Pass and Seymour, Inc., Opposer, v. Lutron Electronics Co., Inc., Applicant**, Application Nos. 85/298,572,85/298,600, 85/298,606, Mark: Product Configuration for Light Dimmer Switch Opposition Nos. 91208865 (parent),91212529, 91212524. United States Patent and Trademark Office before The Trademark Trial and Appeal Board

       Hired by McCarter English as expert for opposer. Expert services include production of reports, declaration and testimony regarding functionality of wall switch design. Case pending.

2014-present    **Dyson, Inc. v. SharkNinja Operating LLC**, Case No. 1:14-cv-00779, United States District Court for the Northern District of Illinois, Eastern Division.

       Hired by Jones Day as expert for defendant. Expert services include production of declaration and reports regarding design patent invalidity, claim construction and non-infringement. Case pending.

2014-15     **SkyHawke Technologies, LLC petitioner v. L&H Concepts, LLC patent owner**, Cases IPR2014-00437 & IPR2014-00438, United States Patent and Trademark Office, before the Patent Trial and Appeal Board.

       Hired by Fish & Richardson P.C. (Austin) as expert for US 5,779,566 patent owner L&H Concepts, LLC. Expert services included consultation, production of declaration of non-obviousness, and deposition. PTAB decision found certain claims unpatentable due to obviousness.

2014       **Sunlight Supply Inc. v. Maverick Sun Inc.**, Complaint for Patent Infringement, Trademark Infringement, Trade Dress Infringement, Unfair Competition, and False Designation of Origin Case No. 2:13-cv-2052, United States District Court Western District of Washington at Seattle.

       Hired by Betts Patterson Mines (Seattle) as expert witness for defendant Maverick Sun. Expert services included initial consultation, photography of evidence, production of patent invalidity/functionality report and design patent/trade dress non-infringement report. Case settled.

2013-14     **Nokia Corporation et al. v. HTC Corporation et al.**, In the Matter of Certain Portable Electronic Communication Devices, Including Mobile Phones and Components Thereof, Investigation Number 337-TA-847. United States International Trade Commission, Washington DC, before the Honorable Thomas B. Pender, Administrative Law Judge.

       Hired by Finnegan, Henderson, Farabow, Garrett & Dunner, LLP (Washington DC) as expert witness for the defendant, HTC. Expert services included initial consultation, preparation and presentation of Technology Tutorial for the ITC, and partial production of Expert Non-Infringement Report. Case settled.

| 2013-14 | **Ethicon Endo-Surgery, Inc. et al. v. Covidien Inc., et al.**, 11-cv-871 (S.D. Ohio). Served as the expert witness for the plaintiff, Ethicon, concerning alleged infringement of design patents US D661,801; US D661,802; US D661,803; and US D661,804. |

Hired by Patterson Belknap Webb & Tyler LLP (NYC) as expert witness for plaintiff Ethicon. These design patents claim an ornamental design for a user interface for a surgical instrument. Expert services included initial consultation, photography of evidence, production of Expert Infringement Report and Expert Validity Report (rebuttal), Deposition, ongoing expert consultation, and Direct Examination preparation.

| 2012 | **Emerson Electric Company v. Anaheim Manufacturing Company**, In the Matter of Certain Food Waste Disposers and Components and Packaging Thereof, Investigation Number 337-TA-838. United States International Trade Commission, Washington DC, before the Honorable Thomas B. Pender, Administrative Law Judge. |

Hired by Dechert LLP (Philadelphia) as expert witness for defendant Anaheim. Expert services included production of Expert Reports concerning design patent invalidity, Expert Report Rebuttal concerning non-infringement of design patent and trade dress, Deposition, production of Direct Examination report and Testimony Preparation. Plaintiff withdrew the all complaints one day before trial.

| 2012 | **Samsung Electronics (UK) LTD. v Apple Inc.**, Case No: HC 11 C 03050, In the High Court of Justice, Chancery Division Patents Court. |

Hired by Morrison & Foerster LLP (San Francisco) and Freshfields Bruckhaus Deringer, (London) as Expert Witness for Apple computer regarding the alleged infringement of the Samsung Galaxy Tab(s) of Registered Community Design #000181607-001. Expert services included production of Expert reports and 2 days of testimony before the High Court.

## Design Employment:

| 2002-present | Alan Ball Industrial Design, Inc. (A.B.I.D.), Somerville, Massachusetts, President. |
| 2006-present | Margit Manufacturing Company, Somerville MA, President |
| 2011-2013 | Respirgames Inc., Somerville MA, Director of Product Development. |
| 2000-2002 | Ziba Boston LLC, Arlington, Massachusetts, Managing Director. |
| 1994-2000 | Shinola LLC, Somerville, MA, Founder and President. |
| 1992-2000 | Altitude Inc., Somerville, Massachusetts, Founder and Principal, Director of Design. |
| 1991-1992 | Herbst Lazar Bell, Inc., Cambridge, Massachusetts, Freelance Industrial Designer. |
| 1988-1991 | Design Continuum, Inc., Boston, Massachusetts, Industrial Designer. |
| 1987-1988 | Group Four Design Inc., Avon, Connecticut, Industrial Designer. |

## Education:

| 2008 | IDSA Expert Witness Certification Seminar, Reston, VA. |

1981-1987      Syracuse University, Syracuse NY, Bachelors of Industrial Design, Minor in Information Studies, 1987. Magna Cum Laude.


**Awards, Honors and Other Activities:**

2007      DIMe Mexican Design Industry Congress, featured keynote speaker.

2005      Best in Category, 2nd Annual HomeWorld Business® Housewares Design Awards, CSC-650 Slow Cooker, Cuisinart Inc.

2004      Innovations CES Design and Engineering Showcase Award, PepperPad Handheld Tablet Computer, Pepper Computer Inc.

2002      IDSA/BusinessWeek IDEA Gold Award, Xpressa IP Business Telephone, Pingtel Corporation.

2000      IDSA/BusinessWeek IDEA Silver Award, DeWalt Worksite Radio/Charger, Black and Decker, Inc.

2000      IDSA/BusinessWeek IDEA Silver Award, ID Research Process, PDT 7200 Barcode Scanner Terminal, Symbol Technologies, Inc.

1999      IDSA/BusinessWeek IDEA Bronze Award, Brita Cascade Water Filtration Pitcher, the Clorox Company.

1998      IDSA/BusinessWeek IDEA Gold Award, P300 Phaser Barcode Scanning Terminal, Symbol Technologies, Inc.

1998      IDSA/BusinessWeek IDEA Silver Award, LS2100 Hotshot Retail Barcode Scanner, Symbol Technologies, Inc.

1998      IDSA/BusinessWeek IDEA Silver Award, Cyclone Retail Scanner Concept, Symbol Technologies, Inc.

1998      IDSA/BusinessWeek IDEA Bronze Award, LeashLight Dog Leash w/integrated flashlight, Black and Decker, Inc.

1998      Bronze Bean Award: IDSA Boston Chapter, Award for leadership and contribution to the local design community.

1997      IDSA/BusinessWeek IDEA Gold Award, DLL 5010M Laser Barcode Scanner, Symbol Technologies, Inc. and Datalogic S.p.A.

1997      IDSA/BusinessWeek IDEA Bronze Award, Snake Light Outdoor Lanterns, Black and Decker, Inc.

1997      IDSA/BusinessWeek IDEA Bronze Award, DeWalt 12.0 Volt Flexible Floodlight, Black and Decker, Inc.

1997      IDSA NE Regional Conference Serious Fun Syracuse NY. Featured Speaker.

1997      Industrie Forum (iF) Seal for Design Excellence, PPT4600 Plato Barcode Scanning Terminal, Symbol Technologies, Inc.

1997      Industrie Forum (iF) Seal for Design Excellence, LS4000 Eclipse Retail Barcode Scanner, Symbol Technologies, Inc. and Datalogic S.p.A.

1996      IDSA/BusinessWeek IDEA Gold Award, PPT4600 Plato Barcode Scanning Terminal, Symbol Technologies, Inc.

| 1996 | IDSA/BusinessWeek IDEA Silver Award, LS4000 Eclipse Retail Barcode Scanner, Symbol Technologies, Inc. |
| 1996 | IDSA/BusinessWeek IDEA Silver Award, PDT 4000 Zircon Barcode Scanning Terminal, Symbol Technologies, Inc. |
| 1987 | IDSA Student Merit Award. |

**US Design Patents (57):**

| 2012 | D690,992 | Beverage Filter Stand, Eternal East (HK) Ltd. (Bonavita). |
| 2010 | D611,760 | Blender, Cuisinart (Conair Corporation). |
| 2009 | D586,807 | Hand-held Computer, Pepper Computer. |
| 2008 | D561,758 | Hand-held Computer, Pepper Computer. |
| 2008 | D575,578 | Slow Cooker, Cuisinart (Conair Corporation). |
| 2008 | D575,579 | Slow Cooker, Cuisinart (Conair Corporation). |
| 2008 | D559,133 | Temperature Probe, Cuisinart (Conair Corporation). |
| 2007 | D553,427 | Food Processor, Cuisinart (Conair Corporation). |
| 2006 | D521,314 | Control knob for toaster, Cuisinart (Conair Corporation). |
| 2006 | D522,308 | Cooker, Cuisinart (Conair Corporation). |
| 2006 | D529,491 | Handheld Computer, Pepper Computer. |
| 2006 | D530,146 | Standmixer, Cuisinart (Conair Corporation). |
| 2006 | D532,644 | Toaster oven, Cuisinart (Conair Corporation). |
| 2006 | D533,390 | Toaster oven, Cuisinart (Conair Corporation). |
| 2006 | D534,189 | Frozen food maker, Cuisinart (Conair Corporation). |
| 2006 | D534,190 | Frozen food maker, Cuisinart (Conair Corporation). |
| 2006 | D554,637 | Handheld Computer, Pepper Computer. |
| 2005 | D510,675 | Coffee Urn, Cuisinart (Conair Corporation). |
| 2005 | D511,643 | Cooker, Cuisinart (Conair Corporation). |
| 2005 | D512,058 | Hand-held Computer, Pepper Computer. |
| 2005 | D507,149 | Blender Base, Cuisinart (Conair Corporation). |
| 2004 | D492,770 | Inhalation device, Glaxo Group Limited. |
| 2004 | D492,771 | Mouthpiece for an inhalation device, Glaxo Group Limited. |
| 2004 | D492,993 | Mouthpiece for an inhalation device, Glaxo Group Limited. |
| 2004 | D492,994 | Mouthpiece for an inhalation device, Glaxo Group Limited. |
| 2004 | D493,222 | Mouthpiece for an inhalation device, Glaxo Group Limited. |
| 2004 | D494,673 | Inhalation device, Glaxo Group Limited. |
| 2004 | D494,674 | Actuator body for an inhalation device, Glaxo Group Limited. |
| 2004 | D495,414 | Inhalation device, Glaxo Group Limited. |
| 2004 | D496,455 | Actuator body for an inhalation device, Glaxo Group Limited. |

| 2004 | D497,988 | Actuator body for an inhalation device, Glaxo Group Limited. |
| 2004 | D498,840 | Inhalation device, Glaxo Group Limited. |
| 2004 | D507,149 | Consumer blender base design, Cuisinart (Conair Corporation). |
| 2003 | D480,475 | Actuator body for an inhalation device, Glaxo Group Limited. |
| 2001 | D437,027 | Water filter reservoir, The Clorox Company. |
| 2001 | D438,524 | Telephone base, Pingtel Inc. |
| 2001 | D445,627 | Coffee maker, Black & Decker Inc. |
| 2001 | D445,795 | Game controller precision button, Acco Brands, Inc. |
| 2001 | D450,687 | Scroll wheel for a telephone base, Pingtel Inc. |
| 2001 | D451,091 | Bezel for a telephone base, Pingtel Inc. |
| 2000 | D418,714 | Water filtration pitcher, The Clorox Company. |
| 2000 | D419,027 | Water filtration pitcher, The Clorox Company. |
| 2000 | D425,980 | Hand-held tissue examination device, Assurance Medical, Inc. |
| 2000 | D435,084 | Water filter, The Clorox Company. |
| 2000 | D445,627 | Electric coffee maker housing, Black and Decker. |
| 1999 | D408,566 | Flexible Flashlight, Black and Decker Inc. |
| 1999 | D410,117 | Combination light and retractable leash, Black & Decker Inc. |
| 1999 | D414,171 | Optical Scanner, Symbol Technologies Inc. |
| 1999 | D416,247 | Game pad for laptop computers, Acco Brands, Inc. |
| 1999 | D417,934 | Combined mop head with squeegee, Easy Day Manufacturing Company. |
| 1998 | D391,250 | Ring mounted optical scanner, Symbol Technologies Inc. |
| 1997 | D378,295 | Binoculars, Essecson Associates, Inc. |
| 1997 | D382,359 | Miniature Lantern, Black and Decker Inc. |
| 1997 | D385,075 | Electric Iron, Black and Decker Inc. |
| 1997 | D388,076 | Optical Scanner, Symbol Technologies Inc. |
| 1996 | D370,478 | Combined optical scanner and portable terminal, Symbol Technologies Inc. |
| 1996 | D372,772 | Portable fan, Black and Decker Inc. |

**U.S. Utility Patents (11)**

| 2008 | 7,325,413 | Ice cream maker & dispenser apparatus, Cuisinart (Conair Corporation). |
| 2007 | 7,224,345 | Pad computer, Pepper Computer. |
| 2000 | 6,024,054 | Combined retractable leash and flashlight, Black & Decker Inc. |
| 2000 | 6,058,548 | Removable cleaning element from mop, Easy Day Manufacturing Company. |
| 2000 | 6,098,886 | Glove-mounted System for reading bar code symbols, Symbol Technologies. |
| 1999 | 5,950,020 | Folding photographic method and apparatus, Polaroid Corporation. |
| 1999 Inc. | 5,979,764 | Hand-held electronic apparatus with pivoting display, Symbol Technologies |

| 1999 | 6,003,187 | Combination mop and wiper, Easy Day Manufacturing Company. |
| 1999 | 6,003,472 | Combined retractable leash and flashlight, Black & Decker Inc. |
| 1998 | 5,763,865 | Bar code reader terminal module, Symbol Technologies Inc. |
| 1997 | 5,610,386 | Portable optical scanning system, Symbol Technologies Inc. |

**Professional Affiliations:**

| 1983-present | Member Industrial Designs Society of America (IDSA). |
| 2004-present | Member, Design Management Institute (DMI). |
| 1994-present | Member, American Institute of Graphic Artists (AIGA). |
| 2004- 2008 | Member, Toastmasters International. |
| 1994-1999 | Member Color Marketing Group (CMG). |

# EXHIBIT B

## List of Materials Considered

### Design-Patents-in-Suit and File Histories

| | |
|---|---|
| U.S. Patent D593,087 (JX1041) | APLNDC00030426 |
| U.S. Patent D604,305 (JX1042) | APLNDC00030421 |
| U.S. Patent D618,677 (JX1043) | APLNDC00032473 |
| File History for D'087 Patent (JX1062) | APLPROS0000010774 |
| File History for D'677 Patent (JX1064) | APLPROS0000011597 |
| Application 29/270,888 | SAMNDCA00405876 |

### Devices (In-Person and Photographs)

Galaxy S 4G (JX1019)
Vibrant (JX1010)
Galaxy S i9000 (JX1007)
Galaxy S Fascinate (JX1013)
Galaxy S Showcase (JX1017)
Galaxy S Mesmerize (JX1015)
Galaxy S II AT&T (JX1031)
Galaxy S II Skyrocket (JX1035)
Galaxy S II Infuse 4G (JX1027)
Galaxy S II i9100 (JX1032)
Galaxy S II T-Mobile (JX1033)
Galaxy S II Epic 4G Touch (JX1034)
iPhone (JX1000)
iPhone 3G (JX1001)
iPhone 3GS (JX1002)
iPhone 4 (JX1003)
iPhone 4S

### Deposition Transcripts

Blackard, Drew (December 13, 2017)
Blevins, Tony (December 17, 2017)
Denison, Justin (December 20, 2017)
Han, Kyuhyun (December 20, 2017)
Howarth, Richard (December 19, 2017)
Joswiak, Greg (December 21, 2017)
Kim, Dongwook (December 22, 2017)
Kim, Jinsoo (December 12, 2017)
Sheppard, Timothy (December 14, 2017)
Wang, Jee-Yeun (December 20, 2017)
Andre, Bartley (October 26, 2011)
Coster, Daniel (October 27, 2011)

De Iuliis, Daniele (October 21, 2011)
Ive, Jonathan  (December 1, 2011)
Ive, Jonathan  (February 7, 2012)
Kerr, Duncan (October 26, 2011)
Kim, Bo-Ra (January 11, 2012)
Kim Jinsoo (February 2, 2012)
Lee, Gi Young (February 16, 2012)
Lee, MinHyouk (February 12, 2012)
Lee, SungSik (March 1, 2012)
Nishibori, Shin (May 2, 2012)
Park, Hyoung Shin (March 3, 2012)
Park, Hyoung Shin (February 29, 2012)
Rohrbach, Matt (October 24, 2011)
Ryu, Dongseok (February 29, 2012)
Satzger, Douglas (November 8, 2011)
Song, Hangil (February 8, 2012)
Wang, Jinsoo (February 2, 2012)
Whang, Eugene (October 27, 2011)
Zorkendorfer, Rico (October 21, 2011)
Bressler, Richard (April 24, 2012)
Howarth, Richard (October 31, 2011)
Kare, Susan (April 27, 2012)
Lucente, Sam (May 9, 2012)
Sherman, Itay (September 15, 2011)
Sherman, Itay (April 20, 2012)
Sherman, Itay (April 21, 2012)
Stringer, Christopher (August 3, 2011)
Stringer, Christopher (November 4, 2011)

## Expert Reports

Expert Report of Nicholas P. Godici, March 22, 2012
Expert Report of Mark Lehto, March 22, 2012
Expert Report of Sam Lucente, March 22, 2012
Expert Report of Itay Sherman, March 23, 2012
Expert Report of Robert John Anders, IDSA
(including Corrected Part D), April 16, 2012
Rebuttal Expert Report of Peter W. Bressler, FIDSA,
April 16, 2012
Expert Report of James T. Carmichael, April 16, 2012
Rebuttal Expert Report of Dr. Alan Hedge, April 16,
2012
Rebuttal Expert Report of Susan Kare, April 16, 2012
Peter W. Bressler Expert Report, March 22, 2012
Corrected Expert Report of Itay Sherman March 23,
2012

2

Susan Kare Expert Report, March 22, 2012
Sam Lucente Report, March 23, 2012
Henry Urbach Expert Report, March 22, 2012
Expert Report of Russell S. Winer, March 22, 2012
Expert Report of Sanjay Sood, March 22, 2012

## Court Filings/Orders

Docket 1, Complaint
Docket 75, Amended Complaint
Docket 1425, Order Regarding Design Patent Claim
Construction
Docket 1447, Order Amending Design Patent Claim
Construction
Docket 1903, Final Jury Instructions
Docket 1931, Amended Verdict Form
Docket 2220, Order Granting in Part and Denying in
Part Motion for Judgment as a Matter of Law
Docket 2784, Final Jury Instructions
Docket 2822, Jury Verdict
Docket 3530, Order Regarding New Trial on Design
Patent Damages
Samsung Elecs. Co. v. Apple Inc., 137 S. Ct. 429
(2016)

## Written Discovery

Apple Inc.'s First Set of Requests for Admission
Regarding Articles of Manufacture to Defendants
Samsung Electronics Co., LTD., Samsung Electronics
America, Inc., And Samsung Telecommunications
America, LLC (Nos. 1-304)
Samsung's Objections And Responses To Plaintiff
Apple Inc.'s First Set Of Requests For Admission
Regarding Articles Of Manufacture (Nos. 1-304)
Samsung's First Set of Requests for Admission to
Apple Regarding Article of Manufacture (Nos. 1-46)
Apple's Objections and Responses to Samsung's First
Set of Requests for Admission Regarding Article of
Manufacture (Nos. 1-46)
Plaintiff Apple Inc.'s First Set of Interrogatories
Regarding Articles of Manufacture to Defendants
Samsung Electronics Co., LTD., Samsung Electronics
America, Inc., and Samsung Telecommunications
America, LLC (Nos. 1-9)

Samsung's Objections and Responses to Plaintiff
Apple Inc.'s First Set of Interrogatories Regarding
Articles of Manufacture (Nos. 1-9)

Samsung Supplemental Responses to Apple's First Set
of Interrogatories Regarding Articls of Manufacture
(Nos. 1-9)

Samsung's First Set of Interrogatories to Apple
Regarding Article of Manufacture (Nos. 1-11)

Apple's Objections and Responses to Samsung's First
Set of Interrogatories Regarding Article of
Manufacture (Nos. 1-11)

Apple's Supplemental Objections And Responses To
Samsung's First Set Of Interrogatories Regarding
Article Of Manufacture (No. 1)

Samsung's Second Set of Interrogatories to Apple
Regarding Article of Manufacture (Nos. 12-13)

Apple's Objections and Responses to Samsung's
Second Set of Interrogatories Regarding Article of
Manufacture
(Nos. 12-13)

Apple Inc.'s Second Set of Interrogatories Regarding
Articles of Manufacture to Defendants Samsung
Electronics Co., LTD., Samsung Electronics America,
Inc., and Samsung Telecommunications America,
LLC (Nos. 10-18)

Samsung's Responses to Apple's Second Set of ROGs
(Nos. 10-18)

Apple Inc.'s Third Set of Interrogatories Regarding
Articles of Manufacture to Defendants Samsung
Electronics Co., LTD., Samsung Electronics America,
Inc., and Samsung Telecommunications America,
LLC (No. 19)

Samsung's Responses And Objections To Apple's
Third Set Of Interrogatories Regarding Articles Of
Manufacture (No. 19)

Samsung's Second Set of Requests for Admission to
Apple Regarding Article of Manufacture (Nos. 47-52)

Apple's Objections And Responses To Samsung's
Second Set Of Requests For Admission Regarding
Article Of Manufacture (Nos. 47-52)

Samsung's Responses to Apple's First RFPs (Nos. 1-3)

## Other Materials

Transcripts from 2012 Trial
Transcripts from 2013 Trial

Prior Art Cited by D'087 Patent (Listed in Exhibit C)

Prior Art Cited by D'677 Patent (Listed in Exhibit D)

MPEP § 1503.01-02

PX3A – Photos of Samsung and Apple Devices

PX6 – Summary of Press Reports Regarding Samsung
Phone Designs

PX11 – iPhone and iPad advertisements

PX12 – iPhone television advertisements

PX17 – Summary of iPhone and iPad News Coverage

| | |
|---|---|
| PX34 - Translation of Presentation: Feasibility Review on Standalone AP Business for Smart Phone Market | SAMNDCA10809390 |
| PX36 Presentation: Touch Portfolio Rollout Strategy Recommendation Based on Consumer Insight | SAMNDCA00191811 |
| PX 40 - Translation of Email from Bong-Hee Kim regarding Summary of Executive-Level Meeting Supervised by Head of Division (February 10) | SAMNDCA10247373 |
| PX47 - Translation of Email from Saejin Cha regarding China GDI evaluation and attachments | SAMNDCA10159856 |
| PX52 - Presentation: Samsung's Use of Apple Patents in Smartphones | APLNDC00001103 |
| PX60 - Presentation: STA Competitive Situation Paradigm Shift | SAMNDCA11547401 |
| PX127 – How to TV ad for iPhone | APLNDC-X0000007535 |
| PX 129 – iPhone ad | APLNDC-X0000007531 |
| PX130 – iPhone 3G ad | APLNDC-X0000007557 |
| PX133 - "Apple Waves Its Wand at the iPhone," by David Pogue, New York Times, January 11, 2007 | APLNDC-Y0000235973 |
| PX134 - "Testing Out the iPhone," by Walter S. Mossberg and Katherine Boehert, The Wall Street Journal, June 27, 2007 | APLNDC-Y0000234932 |
| PX135 - "Best Inventions of 2007," by Lev Grossman, Time, November 1, 2007 | APLNDC-Y0000146961 |
| PX142 "Patent Office Highlights Jobs's Innovations," New York Times | APLNDC-Y0000233352 |
| PX157 – D&D Design Award | |
| PX163 – Phone sketch | APLNDC0001278008 |
| PX165 – CAD phone model | |
| PX166 – CAD phone model | |
| PX174 - "First Look: Samsung Vibrant Rips Off iPhone 3G Design," by Priya Ganapati, Wired, July 15, 2010 | APLNDC-Y0000236157 |
| PX 177 "Samsung Mesmerize: A Top-Notch Galaxy Phone," by Armando Rodriguez, PC World, November 23, 2010 | |

| | |
|---|---|
| PX196 - Premium & Mass Design Preference Study | SAMNDCA00176172 |
| DX676 – Financial Spreadsheet | SAMNDCA00402074 |
| DX753 – Samsung Financial Statements | |
| JX1091 – MacWorld 2007 Video | APLNDC-Y0000066914 |
| JX1500 – Samsung Financials | |
| PDX34B.9 – Graph of Samsung's Market Share | |
| Permanent Collection, San Francisco Museum of Modern Art | APL7940001435803 |
| Designs of the Year, London Design Museum, 2008 | APL7940001440844 |
| 10-K Annual Report Pursuant to Section 13 and 15(d) Filed on 10/27/2010 | APL-ITC796-0000206845 |
| Apple Competitive Device Survey | APLNDC0001531935 |
| iPhone 3GS Launch Kit | APLNDC0002008363 |
| iPhone Advertising Guidelines | APLNDC0002155318 |
| iPhone 3G Advertising Guidelines | APLNDC0002155335 |
| Triennial, Cooper Hewitt, Smithsonian Design Museum, 2010 | APLNDC0002169993 |
| iPhone Marketing Communications | APLNDC0002203457 |
| Apple Competitive Device Survey | APLNDC0002230186 |
| Email – Subject: Competitive Phone Tracker 02/25 | APLNDC0002230186 |
| iPhone 4S Marketing Guide | APLNDC0002876270 |
| Apple – Pres Info – Apple Reinvents the Phone with iPhone | APLNDC-WH-0000026142 |
| iFixit – Samsung Epic 4G Touchscreen Replacement | APLNDC-WH0004000947 |
| iFixit – Samsung Galaxy S II Font Glass Digitizer Replacement | APLNDC-WH0004000959 |
| Samsung Galaxy S II Take Apart Repair Guide | APLNDC-WH0004000969 |
| iFixit - Samsung Galaxy S Vibrant LCD Screen Replacement | APLNDC-WH0004000971 |
| Samsung Galaxy S 2 repair services | APLNDC-WH0004000981 |
| Cellphonerepair - Samsung Galaxy S 2 Screen Replacement & Repair | APLNDC-WH0004000988 |
| iFixit – Solved: Samsung Galaxy S screen repair | APLNDC-WH0004000993 |
| Moto mods | APLNDC-WH0004001352 |
| Fascinate Warranty | APLNDC-WH0004002616 |
| Skyrocket Warranty | APLNDC-WH0004002640 |
| Infuse 4G Warranty | APLNDC-WH0004002891 |
| Galaxy S II T-Mobile Warranty | APLNDC-WH0004002899 |
| Galaxy S II Epic 4G Touch Warranty | APLNDC-WH0004002915 |
| Science/Technology: iPhone Launch – The New York Times | APLNDC-Y0000055081 |
| Apple's New Calling: The iPhone –Printout – Time | APLNDC-Y0000055301 |
| Harvard Business School Design Thinking and Innovation at Apple | APLNDC-Y0000134928 |
| Ten Gadgets that Defined the Decade -- Engadget | APLNDC-Y0000142002 |

6

| | |
|---|---|
| WANTED: Apple Products for the National Design Museum's Collections | APLNDC-Y0000142051 |
| Exhibition of Apple Design Debuts in German Museum | APLNDC-Y0000142052 |
| Invention of the Year: The iPhone – Best Inventions of 2007 - TIME | APLNDC-Y0000146961 |
| IDEA 2008 Best – Industrial Designers Society of America - IDSA | APLNDC-Y0000148044 |
| iF – International Forum Design Hannover: Homepage | APLNDC-Y0000233322 |
| Apple's iPhone Tops List of Innovative Inventions | APLNDC-Y0000233345 |
| Samsung Galaxy S: How Does it Measure Up to the Competition? | APLNDC-Y0000233425 |
| Steve Jobs: Designer First, C.E.O. Second | APLNDC-Y0000234831 |
| How Jobs Put Passion Into Products | APLNDC-Y0000234856 |
| Apple buffs Marketing Savvy to a High Shine | APLNDC-Y0000234859 |
| Apple, Hoping for Another iPod, Introduces Innovative Cellphone | APLNDC-Y0000234863 |
| Apple Unveils all-in-one iPhone Cell Phone Will Have Music, Internet Capabilities, Camera and More | APLNDC-Y0000234867 |
| Apple iPhone Review – Watch CNET's Video Review | APLNDC-Y0000235785 |
| Apple Unveils all-in-one iPhone | APLNDC-Y0000235904 |
| iPhone Advertising Guidelines | APLNDC-Y0000236364 |
| Samsung INFUSE 4G User Manual | SAMNDCA00009582 |
| Samsung Vibrant Galaxy S User Manual | SAMNDCA00017928 |
| Galaxy S 4G User Manual (T-Mobile) | SAMNDCA00018395 |
| Now You See it. Now You Don't AT&T Samsung Infuse Ad | SAMNDCA00311548 |
| Television Ad for Galaxy S II | SAMNDCA00311579 |
| Television Ad for Galaxy S II | SAMNDCA00311654 |
| Big Screen Ticket Samsung Infuse | SAMNDCA00311758 |
| Epic 4G Touch Marketing Materials | SAMNDCA00311971 |
| Samsung Galaxy S GT-I9000 | SAMNDCA10712069 |
| iFixit – Galaxy S teardown guide | SAMNDCA30000009 |
| Fixez.com Galaxy S II Epic 4G teardown guide | SAMNDCA30000017 |
| iFixit Samsung Epic 4G teardown guide | SAMNDCA30000026 |
| TechRepublic Epic 4G Touch teardown | SAMNDCA30000034 |
| iFixt Galaxy S II Teardown | SAMNDCA30000038 |
| Galaxy S II Teardown | SAMNDCA30000046 |
| Vibrant marketing materials GOT IT | SAMNDCA00311510 |
| Television Ad for Galaxy S II | SAMNDCA00311582 |
| Samsung Galaxy S II AT&T User Manual | SAMNDCA630-00922823 |
| Skyrocket User Manual | SAMNDCA630-00924419 |
| Samsung Galaxy Galaxy S II GT-I9100 | SAMNDCA630-04328647 |
| Samsung Epic 4G User Guide | S-ITC-000018872 |

| | |
|---|---|
| Showcase User Manual | S-ITC-000122664 |
| Galaxy S II T-Mobile User Manual | S-ITC-003723510 |
| Samsung Mesmerize User Manual | S-ITC-007283163 |
| Samsung Fascinate User Manual | S-ITC-007284514 |

# EXHIBIT C

Summary of Prior Art Cited by D'087 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US D420,354 | US Design Patent | Light Emitting Strip for a Pager | The ornamental design for a light emitting strip for a pager, as shown and described. | Portions of electronic notebook – front, top, and side perspectives, as well as an exploded perspective | Yes |
| US D563,929 | US Design Patent | Cellular Phone | The ornamental design for a cellular phone, as shown. | Entire cellular phone | Yes |
| US D563,432 | US Design Patent | DMB MP3 Player | The ornamental design for a DMB MP3 player, as shown and described. | Entire DMB MP3 player | No |
| US D562,285 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | Yes |
| US D561,782 | US Design Patent | MP3 Player | The ornamental design for a MP3 player, as shown and described. | Entire MP3 player | Yes |
| US D561,204 | US Design Patent | Media Player | The ornamental design for a media player, substantially as shown and described. | Entire media player | No |
| US D561,153 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D560,686 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D560,683 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, as shown and described. | Entire portable media player | Yes |
| US D558,792 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D558,758 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | Yes |
| US D558,757 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D558,756 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D558,460 | US Design Patent | Digital Photo Frame | The ornamental design for a digital photo frame, as shown. | Entire digital photo frame | Yes |
| US D557,238 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D556,211 | US Design Patent | Hand-Held Mixed Media Player | The ornamental design for a hand-held mixed media player, as shown and described. | Entire media player | No |
| US D554,098 | US Design Patent | Mobile Phone | The ornamental design for mobile phone, as shown. | Entire mobile phone | Yes |
| US D548,747 | US Design Patent | Media Device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D548,732 | US Design Patent | Front Panel of a Housing for a Portable Computing Device | The ornamental design for a front panel of a housing for a portable computing device, as shown and described. | Portions of portable computing device - front and side perspectives | No |
| US D546,313 | US Design Patent | Mobile phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D541,785 | US Design Patent | Cellular phone | The ornamental design for a cellular phone, as shown and described. | Entire cellular phone | Yes |
| US D541,299 | US Design Patent | Media device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D541,298 | US Design Patent | Media device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D538,822 | US Design Patent | Electronic device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D536,962 | US Design Patent | Container | The ornamental design for a "container," as shown and described. | Entire container | Yes |
| US D536,691 | US Design Patent | Cellular phone | I claim the ornamental design for cellular phone, as shown and described. | Entire cellular phone | No |
| US D535,281 | US Design Patent | Sound Recording and Reproducing Apparatus | The ornamental design for a sound recording and reproducing apparatus, as shown and described. | Entire apparatus | No |

Summary of Prior Art Cited by D'087 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US D534,143 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D532,791 | US Design Patent | MP3 Player | The ornamental design for a MP3 player, as shown and described. | Entire MP3 player | No |
| US D529,045 | US Design Patent | Portable Multi Media Player | The ornamental design for a portable multi media player, as shown. | Entire portable media player | No |
| US D528,561 | US Design Patent | Media Player | The ornamental design for a media player, substantially as shown and described. | Entire media player | No |
| US D528,542 | US Design Patent | Handheld Information Handling System | We claim, the ornamental design for a handheld information handling system, as shown and described. | Entire handheld information handling system | No |
| US D520,020 | US Design Patent | Portable Multimedia Player | The ornamental design for a portable multimedia player, as shown. | Entire portable media player | No |
| US D519,523 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, as shown and described. | Entire portable media player | No |
| US D519,116 | US Design Patent | Mobile Computer | The ornamental design for a mobile computer, as shown and described. | Entire mobile computer | No |
| US D505,950 | US Design Patent | Handheld Computing Device | The ornamental design for a handheld computing device, as shown and described. | Entire handheld computing device | No |
| US D504,889 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D502,173 | US Design Patent | Housing for Electronic Device | We claim the ornamental design for a housing for electronic device, as shown and described. | Housing of electronic device | No |
| US D499,423 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, substantially as shown and described. | Entire portable media player | No |
| US D498,754 | US Design Patent | Personal Digital Assistant | The ornamental design for a personal digital assistant, as shown and described. | Entire portable media device | No |
| US D489,731 | US Design Patent | Portable Media Player | The ornamental design for the portable media player, as shown and described. | Entire portable media device | No |
| US D456,023 | US Design Patent | Display | The ornamental design for a display, as shown and described. | Entire display device | No |
| US D424,535 | US Design Patent | Data Terminal for Replies from Customers | The ornamental design for a data terminal for replies from customers, as shown and described. | Entire data terminal device | No |
| US D337,569 | US Design Patent | Electronic Notebook for Data Entry | The ornamental design for an electronic notebook for data entry, as shown and described. | Entire electronic notebook | No |
| US D289,873 | US Design Patent | Flat Panel Display for Personal Computer | The ornamental design for a flat panel display for personal computer, substantially as shown. | Entire panel display | No |
| US D514,590 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D514,121 | US Design Patent | Digital Audio Player with Sliding Cover | The ornamental design for digital audio player with sliding cover, as shown and described. | Entire digital audio player | No |
| US D507,003 | US Design Patent | Portable Multimedia Playback Apparatus | The ornamental design for a portable multimedia playback apparatus, as shown and described. | Entire playback apparatus | No |
| US Appl. No. 29/270,887, Andre, et al., Electronic Device (1.8.2007) | US Design Patent Application | Electronic Device | We claimed the ornamental design for an electronic device substantially as shown and described. | Entire device | No |
| US Appl. No. 29/282,834, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,187, Andre et al., Electronic Device (8.31.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/324,262, Andre et al., Electronic Device (9.9.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/324,137, Andre et al., Electronic Device (9.6.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/324,130, Andre et al., Electronic Device (9.5.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/319,433, Andre et al., Electronic Device (6.9.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |

Summary of Prior Art Cited by D'087 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US Appl. No. 29/319,377, Andre et al., Electronic Device (6.6.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/319,239, Andre et al., Electronic Device (6.5.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/306,950, Andre et al., Electronic Device (4.18.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/306,334, Andre et al., Electronic Device (4.7.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/284,308, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,288, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,276, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,272, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,271, Andre et al., Electronic Device (9.4.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,269, Andre et al., Electronic Device (9.4.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,188, Andre et al., Electronic Device (8.31.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/282,832, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/282,831, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US 7,303,424 | US Utility Patent | Battery Cover Assembly for Portable Electronic Device | 1. A battery cover assembly, comprising:… | N/A | No |
| US 2008/0004085 | US Utility Patent Application | Keypad Battery Pack Mobile Terminal Available for Different Keypad Battery Packs, and Method of Changing Keypad Battery Packs, and Method of Changing Keypad of Mobile Terminal | 1. A keypad battery pack having a first surface and a second surface and including a battery therein, the keypad battery pack comprising: a keypad formed on the first surface; and a battery terminal formed on the second surface. | N/A | No |
| US 2007/0082718 AI | US Utility Patent Application | Curved Sliding-Type Portable Communication Apparatus and Sliding Device Thereof | 1. A sliding-type portable communication apparatus comprising… | N/A | No |
| US 2006/0281501 AI | US Utility Patent Application | Battery Cover Latching Assembly for Portable Electronic Device | 1. A portable electronic device comprising… | N/A | No |
| US 2005/0130715 AI | US Utility Patent Application | Portable Terminal Unit | 1. A portable terminal unit comprising… | N/A | No |
| US 2004/0223004 AI | US Utility Patent Application | System and Method for Implementing a Landscape User Experience in a Handheld Computing Device | A hand-held computing device comprising… | N/A | No |
| US 2004/0166907 AI | US Utility Patent Application | Portable Radiotelephone | 1. A portable radiotelephone comprising … | N/A | No |
| US 2004/0132499 AI | US Utility Patent Application | Portable Terminal | 1. A portable terminal comprising… | N/A | No |
| KR 30-0452432 | Foreign Patent Document | Mobile Phone | N/A | N/A | No |
| ZL200730148767.X, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, 19 pgs. Notification and Request for Invalidation of Chinese Patent | Foreign Patent Document | N/A | N/A | N/A | No |

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| ZL2007300148751.9, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, | Foreign Patent Document | N/A | N/A | N/A | No |
| Notification and Request for Invalidation of Chinese Patent ZL20073018719.0, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, 19 pgs. | Foreign Patent Document | N/A | N/A | N/A | No |
| KR 30-0422221 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| KR 30-0394921 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| JP 1250487 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| JP 1159881 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| EM 5691570005 | Foreign Patent Document | Mobile Phone | N/A | N/A | No |
| Mobiz Apple iPhone Review, posted Apr. 30, 2007, [online], [retrieved on Nov. 5, 2008], Retrieved from Internet ,<URL: http://mobchina.blogspot.com/2007_04_01_archive.html>.* | News Article | Apple iPhone | N/A | N/A | No |
| iPod U2 Special Edition, downloaded from http://ipod.wikia.com/wiki/IPod_U2_Special_Edition, Oct. 2004. | News Article | Apple iPod | N/A | N/A | No |
| "Apple Introduces the U2 iPod," Apple Corporation press Release, http://www.apple.com/pr/library/2004/oct/26u2ipod.html , Oct. 26, 2004. | News Article | Apple iPod | N/A | N/A | No |
| Hilon LG DMB MP3 FM35, posted Jun. 26, 2006, [online], [retrieved on Dec. 26, 2008], Retrieved from Internet, <URL: http://hilon.com.cn.autobak/a88100005549>, 18 pgs. | News Article | | N/A | N/A | No |
| Meizu M8, posted Jan. 29, 2007, [online], [retrieved on Sep. 13, 2007], Retrieved from Internet ,<URL:http://www.engadget.com>. | News Article | Apple iPhone | N/A | N/A | No |
| eFashion Magazine, Jun. 1, 2005, vol. No. 119, p. 45, China. | News Article | Electronic device | N/A | N/A | No |
| eFashion Magazine, Apr. 2006, vol. No. 172, p. 26, China. | News Article | Mobile phones | N/A | N/A | No |
| eFashion Magazine, 2004, vol. No. 12, p. 60, China. | News Article | Pocket PC | N/A | N/A | No |
| Samsung F490, announced Jan. 2008, [online], [retrieved on Jan. 18, 2008], Retrieved from Internet ,<URL: http://www.gsmarena.com>. | Product Announcement | Samsung 490 | N/A | N/A | No |
| LG KF700, announced Feb. 2008, [online], [retrieved on Mar. 21, 2008], Retrieved from Internet ,<URL: http://www.gsmarena.com>. | Product Announcement | LG KF700 | N/A | N/A | No |

Summary of Prior Art Cited by D'087 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| Tinnos PDA, posted May 19, 2006, [online], [retrieved on Aug. 22, 2007], Retrieved from Internet <URL:http://www.mobilewhack.com>. | Product Announcement | Tinnos PDA | N/A | N/A | No |
| Samsung F700, announced Feb. 2007, [online], [retrieved on Feb. 8, 2007], Retrieved from Internet <URL:http://www.gsmarena.com>. | Product Announcement | Samsung F700 | N/A | N/A | No |
| Philips S900, announced Jun. 2006, [online], [retrieved on Feb. 20, 2007], Retrieved from Internet ,<URL:http://www.gsmarena.com>. | Product Announcement | Philips S900 | N/A | N/A | No |
| LG KE850 Prada, announced Jan. 2007, [online], [retrieved on Feb. 20, 2007], Retrieved from Internet <URL:http://www.gsmarena.com>. | Product Announcement | LG KE850 Prada | N/A | N/A | No |
| Apple iPhone, announced Jan. 2007, [online], [retrieved on Mar. 12, 2007], Retrieved from Internet ,<URL:http://www.gsmarena.com>. | Product Announcement | Apple iPhone | N/A | N/A | No |
| U.S. Appl. No. 29/284,310, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | | Not Publicly Available | |
| U.S. Appl. No. 29/284,312, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | | Not Publicly Available | |

# EXHIBIT D

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US D589,979 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | Yes |
| US D586,800 | US Design Patent | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire electronic device | Yes |
| US D584,738 | US Design Patent | MP3 Player | We claim the ornamental design for MP3 player, as shown and described. | Entire MP3 Player | Yes |
| US D581,922 | US Design Patent | Electronic Device | The ornamental design of an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D580,387 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D579,930 | US Design Patent | Mobile Internet Device | The ornamental design for a mobile internet device, as shown and described. | Entire mobile internet device | Yes |
| US D574,015 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown. | Entire digital audio player | Yes |
| US D573,143 | US Design Patent | Portable Terminal | The ornamental design for a portable terminal, as shown and described. | Entire portable terminal | Yes |
| US D568,309 | US Design Patent | Housing for a Portable Computing Device | The ornamental design for a housing for a portable computing device, as shown and described. | Portions of housing of a portable computing device – front, side, and isometric | Yes |
| US D560,192 | US Design Patent | Mobile Phone | The ornamental design for the mobile phone, as shown and described. | Entire mobile phone – Figures show all angles of a complete mobile phone, including with keyboard slide drawn out | No |
| US D559,220 | US Design Patent | Mobile Phone | The ornamental design for the mobile phone, as shown and described. | Entire mobile phone | No |
| US D514,590 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D514,121 | US Design Patent | Digital Audio Player with Sliding Cover | The ornamental design for digital audio player with sliding cover, as shown and described. | Entire digital audio player | No |
| US D507,003 | US Design Patent | Portable Multimedia Playback Apparatus | The ornamental design for a portable multimedia playback apparatus, as shown and described. | Entire playback apparatus | No |
| US D469,413 | US Design Patent | Headrest or Seat Back Entertainment Display | The ornamental design of a headrest or seat back entertainment display, as shown and described. | Entire display | Yes |
| US D458,252 | US Design Patent | Internet Appliance | The ornamental design for the internet appliance, as shown and described. | Entire internet appliance | Yes |
| US D455,433 | US Design Patent | Portion of a Portable Computer Device | The ornamental design for a portion of a portable computer device, as shown and described. | Portion of a portable computer device – front screen portion only | Yes |
| US D410,440 | US Design Patent | Vehicle Maintenance Manger | The ornamental design for a vehicle maintenance manager, as shown. | Entire vehicle maintenance manager | Yes |
| US D563,929 | US Design Patent | Cellular Phone | The ornamental design for a cellular phone, as shown. | Entire cellular phone | Yes |
| US D563,432 | US Design Patent | DMB MP3 Player | The ornamental design for a DMB MP3 player, as shown and described. | Entire DMB MP3 player | No |
| US D562,285 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | Yes |
| US D561,782 | US Design Patent | MP3 Player | The ornamental design for a MP3 player, as shown and described. | Entire MP3 player | Yes |
| US D561,204 | US Design Patent | Media Player | The ornamental design for a media player, substantially as shown and described. | Entire media player | No |
| US D561,153 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D560,686 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D560,683 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, as shown and described. | Entire portable media player | Yes |
| US D558,792 | US Design Patent | Digital Audio Player | The ornamental design for a digital audio player, as shown and described. | Entire digital audio player | No |
| US D558,758 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | Yes |

Summary of Prior Art Cited by D'677 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US D558,757 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D558,756 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D558,460 | US Design Patent | Digital Photo Frame | The ornamental design for a digital photo frame, as shown. | Entire digital photo frame | Yes |
| US D557,238 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D556,211 | US Design Patent | Hand-Held Mixed Media Player | The ornamental design for a hand-held mixed media player, as shown and described. | Entire media player | No |
| US D554,098 | US Design Patent | Mobile Phone | The ornamental design for mobile phone, as shown. | Entire mobile phone | Yes |
| US D548,747 | US Design Patent | Media Device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D548,732 | US Design Patent | Front Panel of a Housing for a Portable Computing Device | The ornamental design for a front panel of a housing for a portable computing device, as shown and described. | Portions of portable computing device - front and side perspectives | No |
| US D546,313 | US Design Patent | Mobile phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D541,785 | US Design Patent | Cellular phone | The ornamental design for a cellular phone, as shown and described. | Entire cellular phone | Yes |
| US D541,299 | US Design Patent | Media device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D541,298 | US Design Patent | Media device | We claim the ornamental design for a media device, substantially as shown and described. | Entire media device | No |
| US D538,822 | US Design Patent | Electronic device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D536,962 | US Design Patent | Container | The ornamental design for a "container," as shown and described. | Entire container | Yes |
| US D536,691 | US Design Patent | Cellular phone | I claim the ornamental design for cellular phone, as shown and described. | Entire cellular phone | No |
| US D535,281 | US Design Patent | Sound Recording and Reproducing Apparatus | The ornamental design for a sound recording and reproducing apparatus, as shown and described. | Entire apparatus | No |
| US D534,143 | US Design Patent | Mobile Phone | The ornamental design for a mobile phone, as shown and described. | Entire mobile phone | No |
| US D532,791 | US Design Patent | MP3 Player | The ornamental design for a MP3 player, as shown and described. | Entire MP3 player | No |
| US D529,045 | US Design Patent | Portable Multi Media Player | The ornamental design for a portable multi media player, as shown. | Entire portable media player | No |
| US D528,561 | US Design Patent | Media Player | The ornamental design for a media player, substantially as shown and described. | Entire media player | No |
| US D528,542 | US Design Patent | Handheld Information Handling System | We claim, the ornamental design for a handheld information handling system, as shown and described. | Entire handheld information handling system | No |
| US D520,020 | US Design Patent | Portable Multimedia Player | The ornamental design for a portable multimedia player, as shown. | Entire portable media player | No |
| US D519,523 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, as shown and described. | Entire portable media player | No |
| US D519,116 | US Design Patent | Mobile Computer | The ornamental design for a mobile computer, as shown and described. | Entire mobile computer | No |
| US D505,950 | US Design Patent | Handheld Computing Device | The ornamental design for a handheld computing device, as shown and described. | Entire handheld computing device | No |
| US D504,889 | US Design Patent | Electronic Device | We claim the ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US D502,173 | US Design Patent | Housing for Electronic Device | We claim the ornamental design for a housing for electronic device, as shown and described. | Housing of electronic device | No |

Summary of Prior Art Cited by D'677 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US D499,423 | US Design Patent | Portable Media Player | The ornamental design for a portable media player, substantially as shown and described. | Entire portable media player | No |
| US D498,754 | US Design Patent | Personal Digital Assistant | The ornamental design for a personal digital assistant, as shown and described. | Entire portable media device | No |
| US D489,731 | US Design Patent | Portable Media Player | The ornamental design for the portable media player, as shown and described. | Entire portable media device | No |
| US D456,023 | US Design Patent | Display | The ornamental design for a display, as shown and described. | Entire display device | No |
| US D424,535 | US Design Patent | Data Terminal for Replies from Customers | The ornamental design for a data terminal for replies from customers, as shown and described. | Entire data terminal device | No |
| US D337,569 | US Design Patent | Electronic Notebook for Data Entry | The ornamental design for an electronic notebook for data entry, as shown and described. | Entire electronic notebook | No |
| US D289,873 | US Design Patent | Flat Panel Display for Personal Computer | The ornamental design for a flat panel display for personal computer, substantially as shown. | Entire panel display | No |
| US Appl. No. 29/282,833, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic device | The ornamental design for an electronic device, substantially as shown and described. | Entire electronic device | No |
| US Appl. No. 29/324,262, Andre et al., Electronic Device (9.9.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/324,137, Andre, et al., Electronic Device (9.6.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/324,130, Andre et al., Electronic Device (9.5.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/319,433, Andre et al., Electronic Device (6.9.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/319,377, Andre et al., Electronic Device (6.6.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/319,239, Andre et al., Electronic Device (6.5.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/306,950, Andre et al., Electronic Device (4.18.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/306,334, Andre et al., Electronic Device (4.7.2008) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, as shown and described. | Entire device | No |
| US Appl. No. 29/284,308, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,288, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,276, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,272, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,271, Andre et al., Electronic Device (9.4.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,269, Andre et al., Electronic Device (9.4.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/284,188, Andre et al., Electronic Device (8.31.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/282,832, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US Appl. No. 29/282,831, Andre et al., Electronic Device (7.30.2007) | US Design Patent Application | Electronic Device | The ornamental design for an electronic device, substantially as shown and described. | Entire device | No |
| US 7,409,059 | US Utility Patent | Portable Terminal Unit | 1. A portable terminal unit comprising… | N/A | No |
| US 7,303,424 | US Utility Patent | Battery Cover Assembly for Portable Electronic Device | 1. A battery cover assembly, comprising:… | N/A | No |
| US 7,042,712 | US Utility Patent | Extended Stand Computer System with Retractable Keyboard | 1. An apparatus, comprising… | N/A | Yes |
| US 2008/0004083 | US Utility Patent Application | Portable Information Terminal | 1. A portable information terminal comprising… | N/A | No |

Summary of Prior Art Cited by D'677 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| US 2008/0004085 | US Utility Patent Application | Keypad Battery Pack Mobile Terminal Available for Different Keypad Battery Packs, and Method of Changing Keypad Battery Packs, and Method of Changing Keypad of Mobile Terminal | 1. A keypad battery pack having a first surface and a second surface and including a battery therein, the keypad battery pack comprising: a keypad formed on the first surface; and a battery terminal formed on the second surface. | N/A | No |
| US 2007/0082718 AI | US Utility Patent Application | Curved Sliding-Type Portable Communication Apparatus and Sliding Device Thereof | 1. A sliding-type portable communication apparatus comprising… | N/A | No |
| US 2006/0281501 AI | US Utility Patent Application | Battery Cover Latching Assembly for Portable Electronic Device | 1. A portable electronic device comprising… | N/A | No |
| US 2005/0130715 AI | US Utility Patent Application | Portable Terminal Unit | 1. A portable terminal unit comprising… | N/A | No |
| US 2004/0223004 AI | US Utility Patent Application | System and Method for Implementing a Landscape User Experience in a Handheld Computing Device | A hand-held computing device comprising… | N/A | No |
| US 2004/0166907 AI | US Utility Patent Application | Portable Radiotelephone | 1. A portable radiotelephone comprising … | N/A | No |
| US 2004/0132499 AI | US Utility Patent Application | Portable Terminal | 1. A portable terminal comprising… | N/A | No |
| JP 2004-290256 | Foreign Patent Document | N/A | N/A | N/A | No |
| ZL200730148767.X, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, 19 pgs. Notification and Request for Invalidation of Chinese Patent | Foreign Patent Document | N/A | N/A | N/A | No |
| ZL2007300148751.9, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, 19 pgs. | Foreign Patent Document | N/A | N/A | N/A | No |
| Notification and Request for Invalidation of Chinese Patent ZL20073018719.0, Patent Reexamination Board of the State Intellectual Property Office of the PRC and English translation, mailed Dec. 11, 2008, 19 pgs. | Foreign Patent Document | N/A | N/A | N/A | No |
| KR 30-0422221 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| KR 30-0394921 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| JP 1250487 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| JP 1159881 | Foreign Patent Document | Mobile Media Player | N/A | N/A | No |
| EM 5691570005 | Foreign Patent Document | Mobile Phone | N/A | N/A | No |
| Meizu M8, posted Jan. 29, 2007, [online], [retrieved on Sep. 13, 2007], Retrieved from Internet <URL:http://www.engadget.com>. | News Article | Apple iPhone | N/A | N/A | No |
| eFashion Magazine, Jun. 1, 2005, vol. No. 119, p. 45, China. | News Article | Electronic device | N/A | N/A | No |
| eFashion Magazine, Apr. 2006, vol. No. 172, p. 26, China. | News Article | Mobile phones | N/A | N/A | No |
| eFashion Magazine, 2004, vol. No. 12, p. 60, China. | News Article | Pocket PC | N/A | N/A | No |

Summary of Prior Art Cited by D'677 Patent

| Prior Art Reference | Reference Type | Title | Claim (If Applicable) | Figures (Design Patents/Applications) | Cited by Examiner |
|---|---|---|---|---|---|
| Tinnos PDA, posted May 19, 2006, online], [retrieved on Aug. 22, 2007], Retrieved from Internet <URL:http://www.mobilewhack.com>. | Product Announcement | Tinnos PDA | N/A | N/A | No |
| Samsung F700, announced Feb. 2007, [online], [retrieved on Feb. 8, 2007], Retrieved from Internet ,<URL:http://www.gsmarena.com>. | Product Announcement | Samsung F700 | N/A | N/A | No |
| Philips S900, announced Jun. 2006, [online], [retrieved on Feb. 20, 2007], Retrieved from Internet <URL:http://www.gsmarena.com>. | Product Announcement | Philips S900 | N/A | N/A | No |
| LG KE850 Prada, announced Jan. 2007, [online], [retrieved on Feb. 20, 2007], Retrieved from Internet ,<URL:http://www.gsmarena.com>. | Product Announcement | LG KE850 Prada | N/A | N/A | No |
| Apple iPhone, announced Jan. 2007, [online], [retrieved on Mar. 12, 2007], Retrieved from Internet <URL:http://www.gsmarena.com>. | Product Announcement | Apple iPhone | N/A | N/A | No |
| U.S. Appl. No. 29/284,310, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | | Not Publicly Available | |
| U.S. Appl. No. 29/284,312, Andre et al., Electronic Device (9.5.2007) | US Design Patent Application | Electronic Device | | Not Publicly Available | |

# EXHIBIT E

# Fascinate



# Galaxy S (i9000)



# Galaxy S 4G



# Galaxy S II (AT&T)



# Galaxy S II (i9100)



# Galaxy S II (T-Mobile)



# Galaxy S II (Epic 4G Touch)



# Galaxy S II (Skyrocket)



# Galaxy S Showcase (i500)



# Infuse 4G



# Mesmerize



# Vibrant

