# EXHIBIT B

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**United States District Court**

**Northern District of California**

**San Jose Division**

**Case No. 11-cv-01846 LHK**

**APPLE INC.**

**v.**

**SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC**

---

**Rebuttal Expert Report of Michael J. Wagner**

**for 2018 Trial on Damages**

**January 29, 2018**

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the back-up materials and the key financial spreadsheets that Mr. Musika, Ms. Davis, and I relied upon. Further, Apple had the opportunity to depose financial witnesses for both STA and SEA after the March 21st production, the last production of which Ms. Davis complains about errors in the data.

- Ms. Davis's treatment of Samsung's data was inconsistent with her treatment of Apple's data:

    o As I pointed out in my Supplemental Report, Apple's data included changes from production to production, yet Ms. Davis did not call that data into question.[236]

    o Ms. Davis stated that Apple cannot provide financial information as granular as revenue by model, but Ms. Davis had no problem with this and simply accepted Apple's high level calculations. By contrast, Samsung produced an extensive dataset of financial data by model, by month for U.S. sales.

    o Most importantly, the Apple data upon which Ms. Davis relied to calculate U.S. profitability was worldwide data. This is not only unreliable data for her intended purpose, it is also known to overstate the selling price, as I discuss elsewhere in my report. I discussed this issue in my Original Report and at trial, so Ms. Davis was well aware of the issue, yet she has made absolutely no adjustment to her calculations to account for this fact.

- Ms. Davis complained that the financial data was produced solely for use in this litigation. However, that is the norm for data relied upon by damages experts, and certainly is the norm for the cases in which I have served as the damages expert. Indeed, such data is generally the most reliable data because it is tailored to products at issue in this case. I note that further evidence that this data is the most reliable data comes from the fact that Samsung produced numerous other financial documents kept in the ordinary course of business in both the course of discovery and in response to the motion to compel, yet Apple's experts chose to continue to rely upon the very data that Ms. Davis complained about.

- Ms. Davis cited to testimony where SEC's financial witness refuses to disclose whether Samsung uses standard costs or actual costs to calculate COGS. However, she did not explain why this has any effect on her analysis whatsoever. Whether the costs are recorded as actual cost or a standard cost + a variance, the net cost is identical and there is no impact on the COGS.

### (1) Samsung's audited financials confirm that Ms. Davis's opinion that Samsung's financial data is unreliable is incorrect.

124.    The profitability reported by Samsung in the financial documents on which Ms. Davis and I rely is consistent with Samsung's reported profitability in its audited financials. As

---

[236] Supplemental Expert Report of Michael J. Wagner, May 11, 2012, p. 12.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Ms. Davis calculated, Samsung's operating profit is ██████ for all products at issue in the litigation.[237]   Samsung's 2011 audited financial statements report segment information for different segments, including the Telecommunications segment.  Samsung reported a 14.9% operating profit margin for the Telecommunications segment in 2011.[238]   In 2010, Samsung reported an operating profit margin of 10.9% for the Telecommunications segment.[239]   The operating profit rates in Samsung's financials are consistent with the operating profit that Ms. Davis calculated for all products at issue in the litigation.[240]   Therefore, this data belies any notion that Samsung is somehow underreporting the profitability that it earned on the products found to infringe.

### (2)  Effect of excluding SEC's operating expenses.

125.    I have calculated (using the financial data for U.S. sales) the amounts by which Ms. Davis has overstated Samsung's profits by excluding SEC's operating expenses for the sixteen products at issue in the 2018 Trial that were found to infringe design patents, as follows:

---

[237] Davis 2018 Report, Exhibits 50-S. [2.2]

[238] Samsung reported 8,269,798 in operating profit and 55,534,042 in revenue from external customers (in millions of Korean Won) for the Telecommunications segment. (2011 Samsung Electronics Annual Report, <http://www.samsung.com/us/aboutsamsung/ir/financialinformation/annualreport/downloads/2010/SEC AR2010_Eng_Final.pdf>, p. 75. [3.5])

[239] Samsung reported 4,359,254 in operating profit and 40,069,950 in revenue from external customers (in millions of Korean Won) for the Telecommunications segment. (2011 Samsung Electronics Annual Report, <http://www.samsung.com/us/aboutsamsung/ir/financialinformation/annualreport/downloads/2010/SEC AR2010_Eng_Final.pdf>, p. 76. [3.5])

[240] Davis 2018 Report, Exhibits 50-S. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

features, such that HTC cannot implement a feature in exactly the way that Apple has previously implemented the feature.  However, these cloning restrictions apparently do not cover "pinch to zoom" functionality, do not cover any feature provided to HTC within the Google Android system, and only cover situations where HTC had available alternatives that would provide the same functional, cost, and performance advantage.[399]  Therefore, the cloning restrictions have little effect on the utility patents at issue in the 2018 Trial.

239.    The two utility patents at issue in the 2018 Trial are a small portion of Apple's patent portfolio even after netting the value of HTC's patent portfolio against Apple's patent portfolio.  As I discuss above, Apple had asserted 32 unique patents against HTC in various litigations.  The two utility patents are a small subset of the IP specifically asserted against HTC, and an even smaller portion of Apple's entire patent portfolio.

240.    As I discuss in my *Georgia-Pacific* analysis below, I have concluded a significantly lower reasonable royalty due to Apple based on the availability to Samsung of acceptable, noninfringing alternatives.  Nonetheless, this alternative measure of a royalty rate would serve as a cap for the amount that Samsung would be willing to pay, especially considering i) the number of utility patents (two) at issue in the 2018 Trial relative to the number licensed in the Apple/HTC Agreement, and ii) the royalty rate only applied to future sales and HTC was not required to pay based on past sales.

241.    I note that Ms. Davis's concluded cumulative royalty rate of $4.04 per unit for the two utility patents at issue in the 2018 Trial is not supported by the royalty rate that Apple achieved in the Apple/HTC agreement for its entire utility patent portfolio.

### B.  Samsung's Profits Related to the Article of Manufacture for the Design Patents

242.    As I described above in Section I, one purpose for the 2018 Trial is to calculate the damages due for the 16 products that were found to infringe at least one design patent.  In addition to damages under Section 284, products found to infringe a design patent can be awarded damages under Section 289, which states:

> Whoever during the term of a patent for a design, without license of the
> owner, (1) applies the patented design, or any colorable imitation thereof,

---

[399]    Patent License and Settlement Agreement between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd and Apple Inc., November 11, 2012, APLNDC-Y0000408242-383 at '273. [16.11]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

243.    Judge Koh has concluded that the test for determining the article of manufacture to which the design has been applied for the purpose of § 289 shall be the following four factors.[400]

- The scope of the design claimed in the plaintiff's patent, including drawing and written description;

- The relative prominence of the design within the product as a whole;

- Whether the design is conceptually distinct from the product as a whole; and

- The physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately.

244.    As I describe in further detail below, I understand that the parties disagree on the articles of manufacture to which the design has been applied (the "AOM") for the D'305, D'677, and D'087 Patents.  In short, Apple contends that the AOM is the entire phone for each of the design patents at issue, whereas Samsung contends that it is something less than the entire device.  Therefore, in this section, I first lay out my understanding of Apple's and Samsung's positions relating to the AOM for each design patent, then discuss the entire profit from sales of products found to infringe at least one design patent, then discuss different approaches to determine the total profit related to the AOM identified by the parties.

## 1.    Apple's and Samsung's Positions on the Article of Manufacture

245.    In this section, I summarize my understanding of the parties' positions about the articles of manufacture to which the design has been applied for each design patent.

---

[400] Order Requiring New Trial on Design Patent Damages, October 22, 2017, p. 35. [20.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### a)  Apple's Position

246.    Based upon Apple's interrogatory responses and its expert reports, I understand that Apple's position is that the article of manufacture to which the design is applied is the entire phone for each of the design patents at issue.

247.    In its response to an interrogatory asking Apple to identify the article of manufacture to which it contends Samsung applied a patented design, Apple responded as follows:[401]

> The articles of manufacture to which Samsung applied the D'677 patent are the Samsung phones adjudicated to infringe the D'677 Patent according to the August 24, 2012 Amended Jury Verdict in this case (Dkt. 1931). The articles of manufacture to which Samsung applied the D'087 Patent are the Samsung phones adjudicated to infringe the D'087 Patent according to the August 24, 2012 Amended Jury Verdict in this case (Dkt. 1931). The articles of manufacture to which Samsung applied the D'305 Patent are the Samsung phones adjudicated to infringe the D'305 Patent according to the August 24, 2012 Amended Jury Verdict in this case (Dkt. 1931).

> As demonstrated by the jury's infringement verdict, Samsung applied Apple's patented designs to the Samsung phones adjudicated to infringe the D'677 Patent, D'087 Patent, and D'305 Patent according to the August 24, 2012 Amended Jury Verdict in this case (Dkt. 1931) (the "Infringing Phones") for the purpose of sale. The Infringing Phones, in their entirety, are the things that may most fairly be said to embody Samsung's appropriation of Apple's patented designs.

248.    In addition, Apple's experts opined that the AOM for each patent is the entire phone.  Mr. Ball opines that the articles of manufacture to which Samsung applied the patented design of the D'677 Patent are the Samsung phones found to infringe that patent, in their entirety.[402]  Similarly, Mr. Ball opines that the articles of manufacture to which Samsung applied the patented design of the D'087 Patent are the Samsung phones found to infringe that patent, in their entirety.[403]  In forming these opinions, Mr. Ball made three observations:[404]

---

[401] Apple's Second Supplemental Objections and Responses to Samsung's First Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory No. 1, pp. 3-4. [21.2]

[402] Opening Expert Report of Alan D. Ball Regarding "Article of Manufacture" for the Samsung Products Found to Infringe U.S. Patents D618,677 and D593,087, January 15, 2018, p. 1. [21.3]

[403] Opening Expert Report of Alan D. Ball Regarding "Article of Manufacture" for the Samsung Products Found to Infringe U.S. Patents D618,677 and D593,087, January 15, 2018, p. 1. [21.3]

[404] Opening Expert Report of Alan D. Ball Regarding "Article of Manufacture" for the Samsung Products Found to Infringe U.S. Patents D618,677 and D593,087, January 15, 2018, p. 1. [21.3]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

First, the patented D'677 and D'087 designs were embodied into the Samsung infringing phones in fundamental ways. The claimed designs relate to the front face—clearly the most important side of the phone and the side that is visible to the user when performing critical operations (like dialing phone numbers, reading messages or web content, and launching core software applications), and prominently featured in Samsung's advertising and packaging. These are not designs that could be physically disaggregated from the full products in ways like designs for discrete modular components in modular product systems can be.

Second, Samsung's use of the Apple designs was directed towards full, unitary products: namely, the infringing phones. Samsung assembled various components and manufactured them into full, unitary products. Samsung marketed those products to consumers as full, unitary products—Samsung did not, for example, encourage users to break the products apart into constituent parts and use them separately. And indeed, actual use by end users was of unitary products. Simply put, Samsung was in the business of making and selling complete phones, and used Apple's patented designs for the infringing phones that it sold.

Third, […] Apple created the patented D'677 and D'087 designs to make the iPhone attractive, compelling, and desirable to consumers, and in doing so created a larger product identity—a phenomenon that Apple promotes with its "product as hero" approach—that is consistent with Apple's reputation for design excellence. Samsung then applied those patented designs to increase their sales by achieving the same goals: making the infringing phones attractive and desirable to users, and associating the infringing Samsung phones with the identity that Apple created for the iPhone.

249.    Dr. Kare opines that the articles of manufacture to which Samsung applied the patented design of the D'305 Patent are the Samsung phones found to infringe that patent, in their entirety.[405]

### b)  Samsung's Position

250.    For each design patent at issue, I understand that Samsung's position is that the article of manufacture to which the design has been applied is something less than the entire phone.  I discuss the specific AOM for each design patent below.

### (1)  D'677 Patent

251.    For the D'677 Patent, I understand that Samsung contends the AOM is the black, round-cornered, glass front face of each infringing phone.

---

[405] Expert Report of Susan Kare Regarding "Article of Manufacture" for the Samsung Products Found to Infringe U.S. Patent D604,305, January 15, 2018, p. 1. [21.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

252.    In its interrogatory response asking Samsung to identify the AOM for the D'677 Patent, Samsung responded as follows:[406]

> Samsung contends that with respect to the D'677 patent, the Article of Manufacture for the Fascinate (JX 1013), Galaxy S 4G (JX 1019), Galaxy S II (AT&T) (JX1031), Galaxy S II (T-Mobile) (JX 1033), Galaxy S II (Epic 4G Touch) (JX 1034), Galaxy S II (Skyrocket) (JX 1035), Infuse 4G (JX 1027), Mesmerize (JX 1015), Showcase (JX 1017), and Vibrant (JX 1010) (as limited to the model and designs embodied in each enumerated exhibit and not to any unadjudicated alternative designs) consists of the black, round-cornered, glass front face of each phone.

253.    In addition, in my conversation with Sam Lucente, he confirmed that his opinion is that Samsung's interrogatory response correctly states the Article of Manufacture to which the D'677 patented design is applied.[407]

### (2)  D'087 Patent

254.    For the D'087 Patent, I understand that Samsung contends the AOM is the round-cornered, glass front face and surrounding rim or bezel of each infringing phone.

255.    In its interrogatory response asking Samsung to identify the AOM for the D'087 Patent, Samsung responded as follows:[408]

> Samsung contends that with respect to the D'087 patent, the Article of Manufacture for the Galaxy S 4G (JX 1019) and the Vibrant (JX 1010) (as limited to the model and designs embodied in each enumerated exhibit and not to any unadjudicated alternative designs) consists of the round-cornered, glass front face and surrounding rim or bezel of each phone.

256.    In addition, in my conversation with Sam Lucente, he confirmed that his opinion is that Samsung's interrogatory response correctly states the Article of Manufacture to which the D'087 patented design is applied.[409]

### (3)  D'305 Patent

---

[406] Samsung's Second Supplemental Objections and Responses to Plaintiff Apple Inc.'s First Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory No. 1, December 21, 2017, p. 2. [21.5]

[407] Conversation with Sam Lucente, January 29, 2018.

[408] Samsung's Second Supplemental Objections and Responses to Plaintiff Apple Inc.'s First Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory No. 2, December 21, 2017, pp. 20-21. [21.5]

[409] Conversation with Sam Lucente, January 29, 2018.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

257.    For the D'305 Patent, I understand that Samsung contends the AOM is the display screen while displaying the single, patented array of GUI icons or, alternatively, the display screen.

258.    In its interrogatory response asking Samsung to identify the AOM for the D'305 Patent, Samsung responded as follows:[410]

> Samsung contends that with respect to the D'305 patent, the Article of Manufacture for the Captivate (JX 1011), Continuum (JX 1016), Droid Charge (JX 1025), Epic 4G (JX1012), Fascinate (JX 1013), Galaxy S 4G (JX 1019), Gem (JX 1020), Indulge (JX 1026), Infuse 4G (JX 1027), Mesmerize (JX 1015), Showcase (JX 1017), and Vibrant (JX 1010) (as limited to the model and designs embodied in each enumerated exhibit and not including any unadjudicated alternative designs) consists of the display screen while displaying the single, patented array of GUI icons.

> […]

> Alternatively, if the relevant article of manufacture is not the display screen while displaying the single, patented array of GUI icons, the relevant article of manufacture is at most the display screen.

259.    In addition, in my conversation with Sam Lucente, he confirmed that his opinion is that Samsung's interrogatory response correctly states the Article of Manufacture to which the D'305 patented design is applied.[411]

### 2.    Rebuttal Opinions to Ms. Davis's "Supporting" Opinions with respect to Article of Manufacture

260.    In addition to relying up the opinions of Apple's experts addressing Article of Manufacture that the entire phone is the appropriate article of manufacture, Ms. Davis includes an 11-page section in which she offers opinions that she contends "support" the other experts' conclusions.  In relevant part, Ms. Davis states:[412]

> The four factors incorporate a wide amount of relevant information that reflects some topics that are primarily issues for someone who designs products or relevant articles and other topics that reflect how companies structure their businesses, market and sell their products and how those products are received or used by consumers. I have no experience as a

---

[410] Samsung's Second Supplemental Objections and Responses to Plaintiff Apple Inc.'s First Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory No. 3, December 21, 2017, pp. 38, 45. [21.5]

[411] Conversation with Sam Lucente, January 29, 2018.

[412] Davis 2018 Report, pp. 50-51. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

product designer, and I am relying on the work and analysis of two design experts, Alan Ball and Dr. Susan Kare, when it comes to topics and information associated with those disciplines. I have experience and have done analysis regarding Apple and Samsung, how they sell their products and how those products were received in the market during the damages period.

As noted above, I have spoken to Alan Ball and Dr. Susan Kare, two of Apple's experts on the topic of design and design patents. Each has evaluated Apple's patented designs, has evaluated the Samsung smartphones found to infringe Apple's patents, and has evaluated information relevant to the topics stated above. I understand from each of them that they have concluded that the article of manufacture to which Samsung applied the designs of the D'305, D'677, and D'087 Patents is the Samsung smartphones found to infringe those patents in their entirety. I have relied on their conclusions in my analysis of Samsung's total profits in connection with the damages calculations included in this report. As discussed below, the evidence from the parties' business models, accounting activity, and marketing conduct provides additional information relevant to the four factors stated above, which support Mr. Ball's and Dr. Kare's conclusions that the article of manufacture to which Apple and Samsung applied the patented designs are the smartphones as a whole.

261.     While Ms. Davis does not address the first factor for identifying the AOM, she precedes to discuss evidence that she contends supports that the entire phone is the AOM under Factors two, three, and four.[413]  In this section, I address points raised by Ms. Davis in her "supporting" opinions section relating to the AOM.

### a)   Ms. Davis's discussion of design is not tied to the specific designs at issue.

262.     In her discussion of Factor 2 of the AOM test ("the relative prominence of the design within the product as a whole"), Ms. Davis discusses the importance of design generally to the iPhone, but these statements are not tied to the specific designs at issue in this case and therefore are not probative of prominence.  For example, the statements that Ms. Davis calls out in her discussion includes statements discussing "beautiful design" and "sleek product design," which appear to apply to design in general, rather than the specific designs at issue.

263.     Ms. Davis admits that the design patents at issue don't claim the entire design of either the iPhone or Samsung's phones.  For example, she states: "I understand from Mr. Ball and Dr. Kare that the three design patents individually and collectively reflect elements of the

---

[413] Davis 2018 Report, pp. 51-61. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

visual image that a user or consumer sees while looking at the front face of the iPhone when the iPhone is turned off or when the iPhone is turned on and is presenting the application screens."[414]

264.    I understand the D'087 and D'677 patents only claim a portion of the exterior design.[415]   Further, I understand the D'305 patent does not relate to the exterior design of the products at all, but instead only one specific arrangement of icons on a specific graphical user interface screen.  Therefore, evidence related to "design" *generally* does not show the extent of relevant consumer value at issue in this case.

265.    The sources cited by Ms. Davis focus on design generally, and do not provide evidence of "the relative prominence of the design within the product as a whole."  For example, Ms. Davis first cites to evidence that Apple "repeatedly used images of the front face of the iPhone in its marketing and advertising materials in order to emphasize and illustrate the attributes of Apple's patented designs," and she also cites to third party and Samsung documents using equivalent visual images to identify Apple's iPhone.[416]   However, the fact that articles or reviews include a picture of the product is not remarkable, and does not speak to the prominence of the patented design.  Reviews of Samsung's phones included images of the front face of the phone even prior to the time that Samsung was first found to infringe the design patents at issue as well as for Samsung phones that were never accused of infringement.  For instance, a review by CNET of the Samsung Eternity written on November 19, 2008 included a picture of the phone that prominently featured its front face.[417]   Similarly, a review by CNET of the Samsung Bound written in May 2009 prominently featured the phone's display screen throughout the review.[418]   Another review by CNET of the Samsung Flight written in November 2009 also featured the phone's front face.[419]   It is a common practice to show products in consumer product reviews, and including images of products provides no evidence about prominence of the design.

---

[414] Davis 2018 Report, p. 52. [2.2]

[415] Order Requiring New Trial on Design Patent Damages, October 22, 2017, p. 31.  [20.2]

[416] Davis 2018 Report, pp. 52-53. [2.2]

[417] Kent German, "Samsung Eternity (AT&T) Review," CNET, November 19, 2008, <https://www.cnet.com/products/samsung-eternity-at-t/review/>, accessed January 22, 2018. [20.11]

[418] Flora Graham, Samsung B2700 Bound Review, CNET, May 15, 2009, <https://www.cnet.com/uk/products/samsung-b2700-bound/review/>, accessed January 25, 2018. [22.13]

[419] Kent German, "Samsung Flight Review," CNET, November 19, 2009, <https://www.cnet.com/products/samsung-flight/review/>, accessed January 25, 2018. [22.14]

266.    Ms. Davis cites to Phil Schiller's testimony about the "product as a hero" marketing message.[420]   However, this discussion is about the entire product, not the specific design elements covered by the design patents at issue, and is therefore unsupportive of her discussion about prominence of the patented design.

267.    Ms. Davis cites to "public acclaim and consumer demand for Apple's patented designs reflected in the iPhone" as evidence that "Apple's patented designs had a significant effect on consumer perceptions of smartphones as a whole."[421]   However, the second does not follow from the first.  Ms. Davis is making a leap in logic that is not supported by the evidence she cites.  She states that "[p]rominent technology reviewers commented favorably on the appearance of the iPhone's front face in published product reviews of the iPhone."[422]   Her support for this statement is three articles in her footnote 202G, in which she includes excerpts of the discussion.  However, a fulsome read of her citations demonstrates that the discussion has little to nothing to do with the design aspects covered by the design patents at issue.

268.    Ms. Davis's first citation is a June 27, 2007 Wall Street Journal article, in which she cites that the "iPhone is simply beautiful."  However, the full section of the article that she is citing discusses hardware aspects other than the front face or functionality in support of it being "beautiful:"[423]

> Hardware: The iPhone is simply beautiful. It is thinner than the skinny Samsung BlackJack, yet almost its entire surface is covered by a huge, vivid 3.5-inch display. There's no physical keyboard, just a single button that takes you to the home screen. The phone is about as long as the Treo 700, the BlackBerry 8800 or the BlackJack, but it's slightly wider than the BlackJack or Treo, and heavier than the BlackBerry and BlackJack.
>
> The display is made of a sturdy glass, not plastic, and while it did pick up smudges, it didn't acquire a single scratch, even though it was tossed into Walt's pocket or briefcase, or Katie's purse, without any protective case or holster. No scratches appeared on the rest of the body either.
>
> There are only three buttons along the edges. On the top, there's one that puts the phone to sleep and wakes it up. And, on the left edge, there's a volume control and a mute switch.

---

[420] Davis 2018 Report, p. 52. [2.2]
[421] Davis 2018 Report, p. 53. [2.2]
[422] Davis 2018 Report, p. 53. [2.2]
[423] Walter S. Mossberg and Katherine Boehret, "Testing Out the iPhone," The Wall Street Journal, June 27, 2007, APLNDC-Y0000234932-936 at '933. [20.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

269.   Ms. Davis's second citation is a January 2007 New York Times article.  While this article discusses the look of the front face of the phone, Ms. Davis cuts off her citation before a discussion of many other unrelated design aspects of the phone, including its sides and back and its operating system in general:[424]

> As you'd expect of Apple, the iPhone is gorgeous. Its face is shiny black, rimmed by mirror-finish stainless steel. The back is textured aluminum, interrupted only by the lens of a two-megapixel camera and a mirrored Apple logo. The phone is slightly taller and wider than a Palm Treo, but much thinner (4.5 by 2.4 by 0.46 inches).
>
> You won't complain about too many buttons on this phone; it comes very close to having none at all. The front is dominated by a touch screen (320 by 480 pixels) operated by finger alone. The only physical buttons, in fact, are volume up/down, ringer on/off (hurrah!), sleep/wake and, beneath the screen, a Home button.
>
> The iPhone's beauty alone would be enough to prompt certain members of the iPod cult to dig for their credit cards. But its Mac OS X-based software makes it not so much a smartphone as something out of "Minority Report."

270.   Ms. Davis's third and final citation is to a Time magazine article.  She includes a portion of the section labeled "The iPhone is pretty," but nothing in the section indicates that it is discussing the front face of the phone.  The one example in the section is about the airplane icon in the status bar when in airplane mode:[425]

> 1. The iPhone is pretty
>
> Most high-tech companies don't take design seriously. They treat it as an afterthought. Window-dressing. But one of Jobs' basic insights about technology is that good design is actually as important as good technology. All the cool features in the world won't do you any good unless you can figure out how to use said features, and feel smart and attractive while doing it.
>
> An example: look at what happens when you put the iPhone into "airplane" mode (i.e., no cell service, WiFi, etc.). A tiny little orange airplane zooms into the menu bar! Cute, you might say. But cute little touches like that are part of what makes the iPhone usable in a world of useless gadgets. It speaks your language. In the world of technology, surface really is depth.

---

[424] David Pogue, "Apple Waves Its Wand at the Phone," The New York Times, January 11, 2007, APLNDC-Y0000235973-976 at '973-974. [20.13]

[425] Lev Grossman, "Invention of the Year: The iPhone," TIME, November 1, 2007, APLNDC-Y0000146961-962. [20.14]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

271.   Finally, Ms. Davis discusses various Samsung documents that she concludes "noted the significance of the iPhone's appearance to the iPhone's success."[426]  Similar to other documents cited by Ms. Davis, these documents are not tied to the specific design features covered by the designs at issue.

272.   For example, Ms. Davis first discusses a September 2007 presentation that she states "observed that the iPhone's 'beautiful design' was one of the 'Factors that Could Make iPhone a Success.'"[427]  Beyond the fact that this is an observation that it *could* make iPhone a success, Ms. Davis doesn't present any evidence that the "beautiful design" being discussed in the presentation has anything to do with Apple's designs at issue and therefore that it speaks to the prominence of those designs.

273.   Ms. Davis next cites a September 2008 internal Samsung email that she summarizes as stating "implementation of sleek product design as shown by iPhone would be what is considered by product planning and sales as the greatest appealing factor."[428]  I first note that Ms. Davis takes the quote out of context.  The email that she cites is discussing two alternative types of touch screens (C-Type vs. R-Type), and the email discusses three advantages to the C-Type, and of these three advantages, the senders say that the sleek design would have the greatest appealing factor: "The C-type has 3 advantages: sleek exterior appearance in product design; better sensitivity of the touch screen; and multi-touch. Of these, I am thinking that the implementation of sleek product design as shown by iPhone would be what is considered by product planning and sales as the greatest appealing factor."[429]  Ms. Davis's citation of this document misleadingly suggests that sleek product design would be considered as the greatest appealing factor of all factors, not just the three particular advantages of a particular implementation of a touchscreen.

274.   In addition, this evidence is not tied to the specific designs at issue.   I understand, for example, that Apple does not claim a monopoly on a "sleek product design", to the contrary, I understand Apple's expert Peter Bressler made clear that it does not.[430]  Later in

---

[426] Davis 2018 Report, p. 53. [2.2]

[427] Davis 2018 Report, p. 54. [2.2]

[428] Davis 2018 Report, p. 54. [2.2]  *See also* Email chain re: "Relaying the CEO's opinions on touch method and call to a meeting," SAMNDCA11374409-414 at '410. [20.15]

[429] Davis 2018 Report, p. 54. [2.2]  *See also* Email chain re: "Relaying the CEO's opinions on touch method and call to a meeting," SAMNDCA11374409-414 at '410. [20.15]

[430] Apple v. Samsung Transcript of Proceedings, August 6, 2012, Volume 4, pp. 1014-1016; 1018-1019. [24.30]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the email chain, it appears that the same email sender (DongHoon Chang) elaborates on the three advantages of the C-Type in more detail, stating for the advantage relating to sleek design: "Use of reinforced glass allows the sleek product appearance and realization of slim dimensions."[431]   I understand that Apple's designs at issue do not cover use of reinforced glass, and they do not cover the thickness of the phone ("slim dimensions"), so it appears that this citation has nothing to do with the prominence of Apple's designs at issue.  Finally, an email from 2008 from a single Samsung employee is not particularly probative of what consumers in 2011 and 2012 based purchasing decisions on.

275.    Ms. Davis next cites a December 2008 study by GravityTank for two statements – one about the iPhone being hailed for "its beauty and functionality," and another noting that Apple's "Screen centric design has set the standard for touch" and had "come to equal what's on trend and cool for many consumers."[432]   Again, Ms. Davis does not correlate "beauty" or "cool[ness]" to the specific Apple designs at issue.  Further, I understand that Apple does not claim a monopoly on "screen-centric" designs, beauty or coolness.    Again, to the contrary, Mr. Bressler testified that the hardware designs at issue are limited to specific components designed in specific ways.[433]

276.    Finally, Ms. Davis cites a presentation by The Boston Consulting Group, which she summarizes as noting "'Apple's sleek and intuitive user interface has been a key driver of its value proposition,' including its 'clean, beautiful interface' and 'clean menu screens.'"[434]   This discussion is one point made in the "Software and content" section, which is one of five "secrets behind [Apple's] success" discussed in the presentation.  Therefore, the mention of "clean menu screens" in the document does not imply a significant effect on the prominence of the designs at issue.  In addition, Apple uses the D'305 in a different way (for its home screen) than Samsung does (for its app screen, which needs to be accessed from the home screen before the D'305 image would be displayed).  Therefore, the importance of the D'305 Patent to Apple and its interface does not imply a similar importance to Samsung's phones.

---

[431] Email chain re: "Relaying the CEO's opinions on touch method and call to a meeting," SAMNDCA11374409-414 at '412. [20.15]

[432] Davis 2018 Report, p. 54. [2.2] *See also* "Touch Portfolio Rollout Strategy Final Presentation," Samsung, December 17, 2008, SAMNDCA00191811-987 at '830, '841. [21.7]

[433] Apple v. Samsung Transcript of Proceedings, August 6, 2012, Volume 4, pp. 1014-1016; 1018-1019. [24.30]

[434] Davis 2018 Report, p. 54. [2.2] *See also* "Lessons from Apple," The Boston Consulting Group, November 3, 2010, SAMNDCA00274819-854 at '831. [21.8]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

### b) Ms. Davis's discussion of prominence of the patented design ignores that there are acceptable design arounds available.

277.    Ms. Davis's discussion of the prominence of the patented design ignores that Samsung had acceptable, noninfringing design arounds available to it.  The availability of acceptable design arounds implies that the design aspects covered by Apple's design patents at issue are not significant elements, and certainly diminishes the prominence of the patented design in the product as a whole.

278.    In terms of the availability of acceptable, noninfringing designs, Apple's experts have offered damages opinions based upon an assumption that Samsung could design around the design patents in a way that would be acceptable to consumers.  For example, Ms. Davis continues to offer opinions based on a "cost value reference point" which is based on the amount of time that it would take for Samsung to design out the infringing features and designs.[435]  In her Exhibit 39.3-R, Ms. Davis lists design around times of a half month for the D'305 Patent and 8 months for both the D'677 and D'087 Patents.[436]  Ms. Davis's "cost value reference point" reflects no reduction in profits after the design around periods she assumes, implying that the design arounds would be acceptable to consumers.  Further, when Apple's experts calculated lost profits for design patents in prior reports, they similarly assumed that it would take 8 months to design around the D'677 Patent and the D'087 Patent, and then Samsung would return to the market with an acceptable product to consumers.[437]  For the D'305 Patent, Apple's experts did not even calculate lost profits, likely due to the short design around period for that patent.[438]

279.    Similarly, I have offered reasonable royalty opinions that are based upon the understanding that Samsung could design around the design patents at issue in a way that would be acceptable to consumers.  For example, my discussion in *Georgia-Pacific* factor 9 explains the design alternatives available to Samsung.  I incorporate that discussion in this section by reference.

---

[435] Davis 2018 Report, p. 82. [2.2]

[436] Davis 2018 Report, Exhibit 39.3-R. [2.2]

[437] Expert Report of Terry L. Musika, CPA, March 22, 2012, p. 42, Exhibit 20. [12.9] *See also* Expert Report of Julie Davis, August 23, 2013, p. 49, Exhibit 20-PT. [20.6]  Note: the D'087 Patent was not at issue in the Second Trial, so Ms. Davis did not include the design around time for the D'087 Patent in her Exhibit 20-PT.

[438] Expert Report of Terry L. Musika, CPA, March 22, 2012, Exhibit 20. [12.9]  *See also* Expert Report of Julie Davis, June 24, 2013, Exhibit 20-PT.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

280.    With respect to the D'305 Patent, Dr. Susan Kare, Apple's infringement expert for the D'305 Patent in prior trials and its AOM expert for the D'305 Patent in this trial, has offered testimony about the narrow design covered by the D'305 Patent.   For example, the D'305 Patent clearly pictures rows of four icons.[439]   Dr. Kare testified that Apple's iPhone 3GS and iPhone 4 provided the same overall impression as the D'305 and that she looked at the "overall grid, the rows of four icons, the shape of the icons, the square with rounded corners, the mix of icon styles from very symbolized to stylized to very detailed, […] the separate little icons at the bottom and the light type reversed out."[440]   Dr. Kare also testified about her opinion of the similarity of the overall visual appearance of the D'305 patent to the Fascinate, again mentioning the rows of four icons.[441]   Dr. Kare's testimony supports that limiting the rows to three icons would avoid infringement of the D'305 Patent.

281.    In addition, I understand that Samsung could modify the icons to remove the square "container" that surrounds the icons (as in the image for the Galaxy S II), which would also design around the D'305 Patent.   In her testimony describing the D'305 Patent and comparing the D'305 to the iPhone and the Fascinate, Dr. Kare testified that she considered a "regular grid of icons that are square with rounded corners;" "the shape of the icons, the square with rounded corners;" and "the colorful mix of icons that are square with rounded corners."[442] Dr. Kare later testified about why the presence of three small dots at the top of the screen did not affect her conclusion: "And the grid and the shape and the way the icons fill the screen is what you really notice primarily in the overall impression."[443]   Finally, Dr. Kare testified about a non-infringing screen image, that of the Blackberry Torch, and her reasons for finding it to provide a noninfringing alternative as follows: "And in this screen, you can see that just by having the batch of icons not on a consistent shape, it just – it looks different.   You see more background."[444]   I have copied the image of the Blackberry Torch that Dr. Kare used in her trial demonstratives in the figure below.

---

[439] U.S. Design Patent No. D604,305 S. [2.12] [20.6]

[440] Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, pp. 1369-1370. [16.12]

[441] Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, pp. 1374-1375. [16.12]

[442] Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, pp. 1367, 1369-1370, 1374-1375. [16.12]

[443] Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, p. 1381. [16.12]

[444] Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, pp. 1404-1405. [16.12]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 23:  Blackberry Torch Image Used by Dr. Kare as Non-Infringing Screen[445]**



282.    Apple never accused the four Galaxy S II phones (Galaxy S II (AT&T), Galaxy S II (Epic 4G Touch), Galaxy S II (T-Mobile), and the Galaxy S II (Skyrocket)) of infringing the D'305 Patent.[446]  Dr. Kare's testimony supports that removing the "containers" surrounding the icons, in a fashion similar to the GUI of the Galaxy S II products, would fully design around the D'305 Patent, as demonstrated in the Figure below.

---

[445] PDX14 at PDX14A.30. [16.16]  *See also* Apple v. Samsung Transcript of Proceedings, Volume 5, August 7, 2012, pp. 1404-1405. [16.12]
[446] Schedule 6.1-4T. [1.6]

Figure 24:  Comparison of Screens for Captivate (Found to Infringe the D'305 Patent) and the Galaxy S II (AT&T) and Galaxy S II (Epic 4G Touch) (Not Accused of Infringing the D'305 Patent)[447]


Captivate


Galaxy S II (AT&T)


Galaxy S II (Epic 4G Touch)

283.    Based on this discussion, I understand that Samsung could change the number of rows or columns on its GUI, or remove the square look of the icons, and that would design around the D'305 Patent, indicating only a fairly narrow design at issue and therefore of little or no prominence.

284.    With respect to the D'677 Patent, testimony by Apple's infringement expert indicates at least three specific alternatives: change the top and bottom edges to be rounded, use a white front face instead of black, or move the speaker slot to the top edge of the device. As discussed below, I understand that any of these changes would avoid infringement of the D'677 Patent.

285.    Peter Bressler, Apple's expert for the D'677 Patent, discussed the first of these as an alternative, noninfringing design for the D'677 Patent.[448]  Mr. Bressler also distinguished the Nokia Fingerprint phone from the D'677 Patent based on the distinctly rounded shape, relative to the straight ends of the D'677's rectangular shape:[449]

---

[447] Plaintiff's Exhibit No. 7: Accused Products, PX7.4, PX7.24, and PX7.30. [22.15]

[448] Reply Declaration of Peter W. Bressler in support of Apple's Motion for a Preliminary Injunction, September 30, 2011, p. 19. [16.17]

[449] Declaration of Peter W. Bressler in Support of Apple's Opposition to Samsung's Motion for Summary Judgment, May 29, 2012, p. 12. [24.28]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

> As an initial matter, the disclosure of the Fingerprint phones is incomplete, because no full front view is unavailable [sic]. But even from the incomplete disclosure, distinctive visual differences are immediately apparent.
>
> In particular, the Fingerprint phone has a distinctly rounded overall shape. Its top and bottom ends are rounded and its shoulders are gently sloped. This visual impression stands in stark contrast to the straight ends of the D'677 design's rectangular shape and its evenly curved corners. The Fingerprint phone is also significantly narrower in width in proportion to the D'677 design.

286.    With respect to speaker placement, Mr. Bressler provided testimony at trial suggesting that the movement of the speaker to the top edge of the device would serve to distinguish a smartphone design from the D'677 Patent:[450]

> Q. I only have so much time with you, so we have to make sure we cover everything.
>
> On the JP 683 Patent, 26.87, could you please summarize for the jury the differences between this design and the '677 and '087 Patents?
>
> A. Yes.  I believe the '638 Patent is substantially different from either of those two patents most dramatically because the front face is not flat, which creates an extraordinarily different overall impression.
>
> In addition to that, it is not drawn depicting a transparent face around the display, nor is it depicting black.
>
> There is a smaller speaker slot that is up at the very top edge, which is not certainly [sic] the same.
>
> And the frame around it is a tape perked enclosure that is thinner at the top and at the bottom than it is presenting wider where the display is protruding from the front.

287.    With respect to color, as discussed in more detail above, Samsung contends that the AOM to which the D'677 Patent was applied is the "black, round-cornered, glass front face of each phone."[451]   The black aspect of this AOM is corroborated by Peter Bressler, Apple's expert for the D'677 Patent, who identified phones using a non-black face as an alternative, noninfringing design.[452]

---

[450] Apple v. Samsung Transcript of Proceedings, August 17, 2012, Volume 11, pp. 3597-3598. [16.18]

[451] Samsung's Second Supplemental Objections and Responses to Plaintiff Apple Inc.'s First Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory No. 1, December 21, 2017, p. 2. [21.5]

[452] Reply Declaration of Peter W. Bressler in support of Apple's Motion for a Preliminary Injunction, September 30, 2011, pp. 19-21. [16.17]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

288.    Therefore, I understand that any of these three alternative designs would avoid infringement of the D'677 Patent.

289.    I have included below two figures that compare the Infuse 4G to other Samsung phones (all of which are at issue in the 2018 Trial) that embody these design alternatives:

**Figure 25:  Design Alternatives for D'677 Patent – Rounded Top and Bottom**





Infuse 4G (JX1027)
(Found to Infringe D'677)

Captivate (JX1011)

Epic 4G (JX1012)

**Figure 26:  Design Alternatives for D'677 Patent – Speaker Placement**









Infuse 4G (JX1027)

(Found to Infringe D'677)

Epic 4G (JX1012)

Indulge (PX7.44)

290.    All of these phones were launched in 2010 or 2011.[453]   Further, these products were commercially successful.[454]

291.    I have included a figure below showing the white version of the Samsung Galaxy SII:

---

[453] Schedule 6.3-NT. [1.6]

[454] ███████████████████████████████████████████████████████████ Schedule 15.1-NT. [1.6] *See also* Schedule 41.2-4T. [1.6])

**Figure 27: Samsung Galaxy S II in White**[455]



292.    The white Galaxy SII depicted in the Figure above was released on April 28, 2011, as confirmed by Mr. Bressler's declaration.[456]

293.    These design alternatives indicate that the design shown in the D'677 Patent has little or no prominence, to consumers or otherwise.

294.    Ms. Davis's analysis ignores design alternatives and their implications about the prominence of the Apple designs at issue, despite ample evidence (including her own assumptions) that such design alternatives exist and would be acceptable to customers.

### c) Ms. Davis's assertion that Samsung made a "conscious effort" to adopt design elements included in the iPhone is not supported by the documents she cites.

295.    Ms. Davis notes that "Samsung's adoption of Apple's patented designs appears to reflect a conscious effort to adopt technology and design elements included in the iPhone to compete with the iPhone."[457]   The technologies in Samsung's phones are not a part of the Apple designs at issue and, if anything, her statement undermines her conclusion regarding the prominence of those designs.   Moreover, not only does reference to design in general fail to address the specific designs at issue, much of the evidence Ms. Davis cites tends to refute an

---

[455] T-Mobile, "Samsung Galaxy S II," <http://www.t-mobile.co.uk/common/img/products/phones/samsung/galaxy-s-ii-white/galaxy_s_ii_white_SC_large_second.jpg>, accessed July 12, 2013. [16.7]

[456] Phone Arena, "Samsung Galaxy S II Spec," <http://www.phonearena.com/phones/samsung-galaxy-s-ii_id5106>, accessed July 12, 2013. [16.8]  This is also confirmed by an Exhibit submitted by Apple (Reply Declaration of Peter W. Bressler in Support of Apple's Motion for a Preliminary Injunction, September 30, 2011, Exhibit 56. [16.17])

[457] Davis 2018 Report, p. 55. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

inference that Samsung made a "conscious effort" to adopt the patented designs at issue in the 2018 trial "to compete with the iPhone."

296.    For example, Ms. Davis cites to an email dated February 11, 2012 summarizing an internal Samsung meeting attended by the head of Samsung's Mobile Division, Mr. Shin, at which she states he "pronounced a "'crisis of design" at Samsung."[458]  However, a review of the entire email shows that Mr. Shin expressed "confidence in our products H/W [i.e., hardware], in their exterior design, and in their quality."[459]  While the email indicates that Mr. Shin compared the UX, or "user experience," of the iPhone to a Samsung phone called the Omnia and was critical of the Omnia UX,[460]  I understand that the Omnia used a Windows-based operating system which has not been successful in the marketplace, and not the highly successful Android operating system that Samsung started to use for most all of its smartphones,[461] including the ones at issue in the 2018 Trial.  Ms. Davis also claims that Mr. Shin stated, Samsung needs to "make something like the iPhone."[462]  That is not what the email says. Rather, the email indicates that, in the context of talking about things he had heard from carriers, Mr. Shin said, "I hear things like this: 'Let's make something like the iPhone.'"[463]  The email does not state that Mr. Shin gave any direction to "make something like the iPhone."  To the contrary, the email states Mr. Shin cautioned that "[a] company goes out of business because of its own success factors" and that "Samsung's success factors are diligence, sincerity, and acting in an exemplary manner. The kind that says yes to whatever a carrier wants. . . ."[464]

297.    Ms. Davis next cites to an internal Samsung document titled "Relative Evaluation Report on SI, iPhone," which she describes as a "detailed 132-page feature-by-feature comparison of Samsung's proposed smartphone, then known as the S1, to Apple's iPhone."[465] Ms. Davis claims that on page 122 of the document "Samsung recommended adopting an icon layout design that looks more similar to Apple's designs."[466]  The "direction for improvement" on page 122, however, is to "[e]ither change the colors of bordering rectangle frames according to

---

[458] Davis 2018 Report, p. 55, n. 202N, citing PX40. [2.2]
[459] Plaintiff's Exhibit No. 40, SAMNDCA10247373-378 at '377. [22.16]
[460] Plaintiff's Exhibit No. 40, SAMNDCA10247373-378 at '374. [22.16]
[461] Schedule 18.1-4T. [1.6]
[462] Davis 2018 Report, p. 55, n.202N. [2.2]
[463] Plaintiff's Exhibit No. 40, SAMNDCA10247373-378 at '374. [22.16]
[464] Plaintiff's Exhibit No. 40, SAMNDCA10247373-378 at '374. [22.16]
[465] Davis 2018 Report, p. 55, n. 202N, citing PX44. [2.2]
[466] Davis 2018 Report, p. 55, footnote 202N. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

a consistent pattern for uniform feel, or remove the rectangular frame and use the icons only for a clean and uniform feel,"[467] neither of which, I understand, would make the icons look "more similar" to the Apple icons.  Furthermore, the "direction for improvement" on page 131 of the document is to "Remove a feeling that iPhone's menu icons are copied by differentiating design."[468]  If anything, this demonstrates a belief that sales would be improved by differentiating the icons from the iPhone, something Samsung did with the Galaxy SII phones, with little or no impact on sales.

### d) Ms. Davis's discussion of market share is not tied to the specific design features at issue and fails to consider other market considerations.

298.    Ms. Davis includes a simplistic analysis of Samsung's market share in her discussion of Factor 2, claiming that Samsung's market share was declining significantly and then began to increase after the infringing phones were released.  Her discussion is as follows:[469]

> Prior to the introduction of the infringing smartphones, Samsung's market share was declining significantly as reflected in Exhibit 11.2-PT. After Samsung began selling the infringing smartphones, Samsung's U.S. smartphone market share (as measured by independent sources) turned around in a dramatic way, growing from 5% to over 14% in a single quarter. Samsung's infringing smartphones reflected approximately 90% percent of the gain achieved in this first quarter turn around, and reflected approximately 61% of Samsung's smartphones sales overall from the beginning of the second quarter of 2010 through the end of the first quarter of 2012.

299.    Ms. Davis's analysis is contradicted by the data that she presents.  For example, Samsung's market share was at its lowest in Q3 2009, and significantly increased by Q1 2010. For example, Samsung's unit share more than doubled from 2.4% unit share in Q3 2009 to a 5.7% unit share in Q1 2010, and Samsung's revenue share tripled from a 1.7% revenue share in Q3 2009 to a 5.2% revenue share in Q4 2010.[470]  Therefore, the increase in share discussed by Ms. Davis started long before the release of the Galaxy S phones.  Not coincidentally, the

---

[467] Plaintiff's Exhibit No. 44: Relative Evaluation Report on S1, iPhone, March 2, 2010, SAMNDCA00203880-4010 at '4001. [21.12]
[468] Plaintiff's Exhibit No. 44: Relative Evaluation Report on S1, iPhone, March 2, 2010, SAMNDCA00203880-4010 at '4010. [21.12]
[469] Davis 2018 Report, pp. 55-56. [2.2]
[470] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

start of the increase occurred in Q4 2009, the first quarter in which Samsung sold smartphones with the Android operating system,[471] as I discuss in more detail below.

300.    Further, the suggestion that Samsung's market success is driven by the designs at issue is certainly not supported by a more complete analysis of the market.  I discuss below several additional factors that Ms. Davis's simplistic analysis glosses over.

### (1)  Samsung's increase in market share has no apparent effect on Apple's sales and market share.

301.    Ms. Davis states that "Samsung's adoption of Apple's patented designs on Samsung's infringing smartphones contributed to Samsung's ability to compete against Apple in the smartphone market and sell more smartphone products."[472]    However, if Samsung incorporated Apple's design, and such incorporation of design was the reason for Samsung's success, it would be expected that Samsung's gain would come at the expense of Apple.  That is far from the case.  Even as Samsung's share increased through the release of the original Galaxy S phones and the second generation Galaxy S II phones, Apple's sales continued to steadily increase, and there is not any evidence that its share of the market has been impacted, as the Figures below demonstrate.

302.    Apple first released the original iPhone on June 29, 2007.[473]   Since that first launch, Apple's iPhone line of products has followed a relatively consistent release pattern, at least for those devices released on AT&T's network.  Since the first launch, Apple has upgraded the product on a yearly basis: the iPhone 3G, 3GS, and 4 were released on July 11, 2008, June 19, 2009, and June 24, 2010 respectively.[474]   The Verizon model of the iPhone 4 was first sold on February 10, 2011, slightly more than seven months after the iPhone 4 was first released on AT&T's network.[475]  Apple then launched the iPhone 4S on October 14, 2011.[476]

---

[471] Schedule 18-NT and 18.1-4T. [1.6]

[472] Davis 2018 Report, p. 55. [2.2]

[473] Samra, Sandy, "The History of the iPhone," Bright Hub, May 19, 2011, <http://www.brighthub.com/mobile/iphone/articles/82615.aspx>, accessed August 3, 2011. [21.13]

[474] Samra, Sandy, "The History of the iPhone," Bright Hub, May 19, 2011, <http://www.brighthub.com/mobile/iphone/articles/82615.aspx>, accessed August 3, 2011. [21.13]

[475] "Verizon Wireless & Apple Team Up to Deliver iPhone 4 on Verizon," Verizon Wireless, January 11, 2011, < http://news.verizonwireless.com/news/2011/01/pr2011-01-11a.html>, accessed April 9, 2012. [21.14]

[476] "Apple Launches iPhone 4S, iOS 5 & iCloud," Apple Press Info, Apple, October 4, 2011, <http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html>, accessed October 10, 2011. [21.15]

303.    With each new device (following the original release), the iPhone's sales were reinvigorated.  As the Figure below shows, the underlying data of which was produced by Apple and used by Ms. Davis in her market share analysis,[477] Apple's U.S. sales are boosted following the release of each new iPhone.  Further, as illustrated in the Figures below, historically Apple's sales have generally dropped shortly prior to a new release, increased significantly in the quarter of the new release, and declined in the quarters subsequent to the release.

**Figure 28: Apple US iPhone Sales by Quarter[478]**



---

[477] Ms. Davis's market share figure sources to "IDC Worldwide Quarterly Mobile Phone Tracker, Q1-2012." (Davis 2018 Report, p. 56. [2.2])
[478] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 29: Apple US iPhone Sales by Quarter (with release of Galaxy S Date)[479]**



304.     The figures above show Apple's U.S. iPhone sales by quarter from the release of the first iPhone through Q4 2011.  Apple's iPhone sales enjoyed a relatively steady climb from introduction through Q1 2011.  After a short lull, during which no new iPhone iterations were released, Apple's smartphone sales skyrocketed to approximately fifteen million units in the fourth quarter of 2011, the quarter during which the iPhone 4S launched.  As shown in the figure, this more than doubled the previous record of around seven million units during Q1 2011 with the launch of the Verizon iPhone 4.

---

[479] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 30: Smartphone Average Selling Prices in the U.S., Q2 2007 Through Q4 2011[480]**



---

[480] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 31: Smartphone Average Selling Prices in the U.S., Q2 2007 Through Q4 2011 (with Release of Galaxy S Date)[481]**



305.    The above figures show Apple's iPhone ASP alongside Samsung's smartphone ASP from Q2 2007 through Q4 2011.  As illustrated, Apple has maintained a consistent and sizeable premium over Samsung.  In other words, Apple would be hard pressed to argue that its smartphone offering has suffered any price erosion at the hand of Samsung's products.  In fact, Apple's ASP has consistently increased since Q3 2009.

306.    The limited impact of Samsung's smartphone sales on Apple can be seen when comparing market shares over time.  As Figure 32 demonstrates, Apple increased its market share above 20 percent following the release of the iPhone 3G in July 2008 and has largely remained in the 20 percent to 30 percent market share range ever since.  Notably, Apple remained in this market share range for a full two years prior to Samsung's introduction of the Galaxy S in July 2010, and also in the five quarters following the release of the Galaxy S.  In the

---

[481] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

last quarter of 2011, Apple released the iPhone 4S and its market share jumped to about 45 percent.

**Figure 32: Smartphone Unit Share in the U.S., Q2 2007 Through Q4 2011**[482]



---
[482] Schedule 18-NT. [1.6]

**Figure 33: Smartphone Unit Share in the U.S., Q2 2007 Through Q4 2011 (with Release of Galaxy S Date)[483]**



307.    As pictured in the above figure, Apple has consistently maintained a high proportion of smartphone revenue share since Q2 2007.  While Samsung's revenue share has also increased, Apple's share jumped to nearly 60% during Q4 2011, the quarter in which the iPhone 4S was released.

308.    Further, in Q3 2010, the quarter in which Ms. Davis comments that Samsung's market share "turned around in a dramatic way, growing from 5% to over 15% in a single quarter," Apple's market share *also* increased in that quarter.  This growth by Apple in the same quarter that Ms. Davis focuses on for the effect of Samsung's "adoption of Apple's patented designs" contradicts Ms. Davis's assertion that the "adoption of Apple's patented designs" drove sales.  As I explained above, if the growth was due to the patented designs and the release of products that looked like Apple's phones, one would expect Samsung's growth to come at the

---

[483] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

expense of Apple.  That was not the case in Q3 2010, or any other quarter in the periods that Ms. Davis and I analyzed.

309.    The success of the iPhone and limited impact of Samsung on Apple's iPhone sales is further demonstrated by Apple's share of metrics that manufacturers value the most: revenue and profit.

310.    When measured in revenue, Apple's share of smartphone sales is higher than its unit share due to the consistent price margin that Apple has maintained over its smartphone competitors such as Samsung, as illustrated in Figure 30.  Following the release of the iPhone 3G in July 2008, Apple's share of smartphone revenue remained in a range of about 25 to 40 percent until the release of the iPhone 4S.  The observed increases and decreases in market share on a revenue basis follow the pattern of Apple sales described above with dips prior to the launch of a new iPhone model, followed by a spike at launch, and then a subsequent decline – accounting for movement within a range.  Similar to its unit share, Apple remained in this range for a full two years ahead of the release of the Galaxy S in June 2010 and has remained in the same range following the release of the Galaxy S.  In Q4 2011, Apple's share of smartphone revenue increased to nearly 60 percent, while Samsung's market share dipped on a revenue basis to just over 16 percent.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 34: Smartphone Revenue Share in the U.S., Q2 2007 Through Q4 2011[484]**



---

[484] Schedule 18-NT. [1.6]

**Figure 35: Smartphone Revenue Share in the U.S., Q2 2007 Through Q4 2011(with Release of Galaxy S Date)[485]**



311.   Very similar to the unit share figure, the figure above shows that Apple has maintained its share of smartphone revenue sales over time.  Apple's revenue sales set records in Q4 2011 with the release of the iPhone 4S, and Apple's revenue share also increased in Q3 2010.

312.   Apple additionally has increased its share under another market metric –profits. As the Strategy Analytics data[486] in Figure 36 illustrate, Apple has consistently increased its share of handset industry profits.  Strategy Analytics estimates that as of the first quarter of

---

[485] Schedule 18-NT. [1.6]

[486] IDC's data does not include data on manufacturer profit for smartphones.  Strategy Analytics produces a report that estimates operating profits by manufacturer for handset manufacturers on a worldwide basis.  Although it would be preferable to rely on a data source limited to the U.S. sales of smartphones, the Strategy Analytics report is the most consistent provider of profit data that I have reviewed.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

2011, 53.4 percent of handset industry profit belonged to Apple's iPhone, rising to 75 percent of total industry profits in Q4 2011.[487]

**Figure 36: Apple's Share of Realized Handset Industry Profits Worldwide Q1 2008 Through Q4 2011**[488]



---

[487] Schedule 18-NT. [1.6]  Another source confirms Apple's nearly 75 percent profit share in Q4 2011. (Dediu, Horace, "First: Apple's rank in mobile phone profitability and revenues," Asymco, February 3, 2012, <http://www.asymco.com/2012/02/03/first-apples-rank-in-mobile-phone-profitability-and-revenues/>. [21.16])
[488] Schedule 18-NT. [1.6]

**Figure 37: Apple's Share of Realized Handset Industry Profits Worldwide Q1 2008 Through Q4 2011 (with Release of Galaxy S Date)[489]**



313.    The figure above shows Apple's share of realized worldwide handset profits. This figure depicts not only the consistent growth of Apple's share of industry profits, but also its profit earning power.   In the most recent quarter depicted, again Q4 2011 during which the iPhone 4S was released, Apple earned 75% of handset industry profits worldwide.

314.    The consistent trend of Apple's market share in the face of competition by Samsung and other handset manufacturers, as well as the success of the iPhone 4S, indicates that Samsung's sales of smartphones did not have a significant effect on Apple.   Further, Ms. Davis's analysis of Samsung's share does not provide support that Samsung's success was tied to Apple's patented designs.

> **(2)  Ms. Davis's analysis does not consider the effect of the Android operating system.**

___
[489] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

315.    Ms. Davis's analysis of market share fails to consider the effect of the introduction of the Android operating system on the market.  As I describe in this section and elsewhere in the report, a smartphone's operating system is a top purchase consideration.  And, as I demonstrate below, Samsung's growth in the market is part of the overall Android growth, along with other handset manufacturers that have adopted the Android operating system.

### (a)  A smartphone's operating system is a top purchase consideration

316.    The smartphone purchasing decision often comes down to a choice between the open source Android operating system, which runs on a multitude of handsets, and Apple's proprietary iOS, which runs exclusively on Apple's products.   As a comprehensive Computerworld OS comparison article pointed out, "[i]f you're in the market for a new smartphone, choosing which one to buy has as much to do with the operating system that runs the phone as with the hardware itself."[490]  According to the same article, the three top platforms are iOS, Android, and Microsoft's Windows Phone 7.[491]  Ultimately, the author concludes, "any one of these platforms will serve you well,"[492] each catering to the preference of a certain audience.  For the Android OS, the article notes that: "[f]or its features, customization options and openness, Android has no peer."[493]

317.    A February 2012 article notes that smartphone OS competition was down to iOS and Android, with other platforms, such as Blackberry and Windows Phone, thought to be vying for third place.[494]

---

[490] Gralla, Preston, "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011, <http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._Windows_Phone_?taxonomyName=Mobile+and+Wireless&taxonomyId=15>. [21.17]

[491] Gralla, Preston, "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011, <http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._Windows_Phone_?taxonomyName=Mobile+and+Wireless&taxonomyId=15>. [21.17]

[492] Gralla, Preston, "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011, <http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._Windows_Phone_?taxonomyName=Mobile+and+Wireless&taxonomyId=15>. [21.17]

[493] Gralla, Preston, "Smartphone OS shootout: Android vs. iOS vs. Windows Phone," Computerworld, March 17, 2011, <http://www.computerworld.com/s/article/9214206/Smartphone_OS_shootout_Android_vs._iOS_vs._Windows_Phone_?taxonomyName=Mobile+and+Wireless&taxonomyId=15>. [21.17]

[494] Lunden, Ingrid, "Nielsen: As U.S. Nears Smartphone Majority, It's A Two-Horse Race Between Android and Apple's iOS," March 29, 2012, http://techcrunch.com/2012/03/29/nielsen-as-u-s-nears-smartphone-majority-its-a-two-horse-race-between-android-and-apples-ios/, accessed April 22, 2012. [21.18]

318.    In a Business Insider survey that received over 2,000 responses from Android and iOS smartphone users, approximately 38 percent of respondents indicated that "Platform" was the most important factor and another 50 percent replied that "Platform" was one of the "other" factors considered in choosing a smartphone:

Figure 38:  Business Insider Survey Results – Most Important Factor[495]



318.

[495] Blodget, Henry and Leah Goldman, "The Truth About Smartphones: Our Exclusive Survey on iPhone vs. Android," Business Insider, April 18, 2011, Figure 8, <http://www.businessinsider.com/smartphone-survey-results-2011-4#most-smartphone-buyers-say-platform-and-features-are-the-most-important-factors-that-make-them-buy-a-particular-smartphone-8> and http://www.businessinsider.com/smartphone-survey-results-2011-4#other-factors-that-matter-include-features-platform-app-selection-price-ease-of-migrating-data-from-ones-current-platform-and-availability-at-ones-mobile-carrier-9, accessed April 21, 2012. [21.19]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 39:  Business Insider Survey Results – Other Factors[496]**



319.    One explanation for consumers' preference for Android is that Android operators and manufacturers have spent significant advertising dollars on Android, which serves to elevate the importance of the Android platform to smartphone consumers.  For example, an Apple presentation titled "Android Market Overview" and dated Q4 2010 notes that Android operators and handset manufacturers had a "[n]early 9 to 1 Spend Ratio over iPhone Advertising."[497]

320.    This level of advertising for the platform, along with the Google brand association, helps to create a branded platform that can compete with Apple's platform.  The resulting preference for the Android platform means that many of the customers that select an

---

[496] Blodget, Henry and Leah Goldman, "The Truth About Smartphones: Our Exclusive Survey on iPhone vs. Android," Business Insider, April 18, 2011, Figure 9, <http://www.businessinsider.com/smartphone-survey-results-2011-4#most-smartphone-buyers-say-platform-and-features-are-the-most-important-factors-that-make-them-buy-a-particular-smartphone-8> and http://www.businessinsider.com/smartphone-survey-results-2011-4#other-factors-that-matter-include-features-platform-app-selection-price-ease-of-migrating-data-from-ones-current-platform-and-availability-at-ones-mobile-carrier-9, accessed April 21, 2012. [21.19]

[497] "Android Market Overview," Apple Market Research & Analysis, CY10-Q4, APLNDC00004618-736 at '626. [23.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Android phone (such as the Samsung phones at issue) would not consider a smartphone with a different operating system (such as the iPhone).

*(b)   Samsung's growth is a part of Android's overall growth*

321.    Ms. Davis's discussion focuses on the impact of Samsung on Apple's sales, but ignores that a number of other manufacturers of phones running Android OS have experienced substantial growth in market share over the same period.  As shown in Figure 40 (created using the same data relied upon by Ms. Davis[498]), Android's market share has risen over time.  In fact, Android's market share surpassed that of iOS in Q4 2009, more than 6 months before Samsung introduced the Galaxy S.

**Figure 40: Share of Smartphone Unit Sales by OS – iOS and Android, 2008 - 2011[499]**



322.    A similar picture emerges when viewed in terms of revenue share:

---

[498]Ms. Davis's market share figure sources to "IDC Worldwide Quarterly Mobile Phone Tracker, Q1-2012."
   (Davis 2018 Report, p. 56. [2.2])
[499] Schedule 18.8-4T. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 41: Share of Smartphone Revenue by OS – iOS and Android, 2008 - 2011[500]**



323.    As seen in Figure 40 and Figure 41, sales of Android smartphones took off in the year preceding the release of the Galaxy S. Prior to 2011, the only mobile phone carrier to sell the iPhone was AT&T through an exclusive contract with Apple.[501]   Thus, subscribers of Verizon, Sprint or T-Mobile (three of the four major U.S. carriers) were unable to get an iPhone for use on those carriers during that time.[502]  Apple's exclusive deal with AT&T meant that it was only able to address a portion of the U.S. mobile phone subscriber base – just above 26 percent

---

[500] Schedule 18.7-4T. [1.6]

[501] Smith, Chris, "Sprint to offer Apple's iPhone 5 alongside AT&T, Verizon – report," AppleInsider, August 23, 2011,
   <http://www.appleinsider.com/articles/11/08/23/apple_to_launch_iphone_5_simultaneously_with_att_v erizon_and_sprint.html>. [23.2]

[502] Smith, Chris, "Sprint to offer Apple's iPhone 5 alongside AT&T, Verizon – report," AppleInsider, August 23, 2011,
   <http://www.appleinsider.com/articles/11/08/23/apple_to_launch_iphone_5_simultaneously_with_att_v erizon_and_sprint.html>. [23.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

as of the end of 2010 according to one source.[503]  Verizon, Sprint and T-Mobile, carriers that I understand have introduced Android smartphones, covered approximately 55 percent of the U.S. mobile phone subscriber base as of the end of 2010 according to the same source.[504] Apple recognized this issue in a presentation titled "Android Market Overview" dated Q4 2010 that lists several "Key Conclusions," one of which is that "Android growth accelerated in 2H of 2010."  The first sub-bullet under this conclusion indicates that Android is "[g]aining share through expansion to non-iPhone carriers."[505]  It is not surprising that smartphones using the Android operating system were able to gain acceptance and market share despite Apple's iPhone (using iOS) being in the market longer – most smartphone buyers did not have the option of purchasing an iPhone on carriers from 2008 through the end of 2010.

324.    Adding BlackBerry (formerly Research in Motion, or RIM) into the Figures above demonstrates that Android's growth came at the expense of BlackBerry, not Apple.

---

[503] Malik, Om, "What AT&T and T-Mobile Merger Means for Innovation," GigaOM, March 21, 2011, < http://gigaom.com/2011/03/21/what-att-and-t-mobile-merger-means-for-innovation/>. [23.3]

[504] Malik, Om, "What AT&T and T-Mobile Merger Means for Innovation," GigaOM, March 21, 2011, < http://gigaom.com/2011/03/21/what-att-and-t-mobile-merger-means-for-innovation/>. [23.3]

[505] "Android Market Overview," Apple Market Research & Analysis, CY10-Q4, APLNDC00004618-736 at '626. [23.1]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 42: Share of Smartphone Unit Sales by OS – iOS, Android, and BlackBerry OS, 2008 - 2011[506]**



---

[506] Schedule 18.8-4T. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 43: Share of Smartphone Revenue by OS – iOS and Android, 2008 - 2011[507]**



325.    Based on the IDC data relied upon by Ms. Davis and me, Samsung first sold Android smartphones in Q4 2009,[508] which is the quarter in which Samsung's sales start to increase from its lowest point.[509]   As shown in Figure 44 below, Samsung's growth after Q3 2009 can be directly linked to sales of smartphones with the Android operating system.

---

[507] Schedule 18.7-4T. [1.6]
[508] Schedule 18.1-4T. [1.6]
[509] Schedule 18-NT. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 44: Samsung's Unit Share by Operating System, 2008 - 2011[510]**



326.    Other Android manufacturers also benefitted from the rise of the Android operating system, including HTC, LG Electronics, and Huawei Technologies.  Each of these businesses markedly increased its presence in the 2008 to 2011 period, making the marketplace for smartphones all the more competitive.   The growth of these other manufacturers follows a similar pattern to the growth by Samsung that Ms. Davis attributes to "adoption of Apple's design patents."  U.S. Market share data from IDC for Samsung and these three companies is shown in Figure 45.  I note that these companies enjoyed a similar increase in market share to Samsung over the time period analyzed by Ms. Davis, providing further evidence of the importance of the Android platform.

---

[510] Schedule 18.1-4T. [1.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Figure 45: Share of Smartphone Units – HTC, LG, Huawei, and Samsung, 2008 - 2011**[511]



327.     Ms. Davis's analysis disregards the effect of the Android operating system in her analysis, which leads her to draw an inappropriate conclusion with respect to the significance of Apple's patented designs.

### (3)  Ms. Davis's statistics cited in her market share discussion are misleading and overstated.

328.     In her discussion of market share, Ms. Davis includes the following statement: "Samsung's infringing smartphones reflected approximately 90% percent of the gain achieved in this first quarter turn around, and reflected approximately 61% of Samsung's smartphones sales overall from the beginning of the second quarter of 2010 through the end of the first quarter of

---

[511] Schedule 18.3-4T. [1.6]

2012."[512]  Ms. Davis cites to footnote 202R, which does not include any sources or back-up for her calculations, nor does it explicitly state what data she is using for her percentages.[513]

329.   I have attempted to replicate her numbers, and I believe I understand that the calculations she performs to arrive at her percentages.  As I discuss below, the percentages she presents are misleading for several reasons.

330.   First, in her first calculation, Ms. Davis only looks at the infringing sales as a percentage of the *growth* in Samsung's sales.[514]  This is necessarily larger than just looking at the percentage of *all* Samsung sales.  Given that as new products are released, older products are not promoted as heavily or no longer sold, it does not make sense and is unreliable in methodology to do a comparison limiting only to the growth in sales.

331.   Second, in her calculation of the numerator for both of her calculations, Ms. Davis appears to use units for all of the products found to infringe, regardless of whether the product was found to infringe a design patent or not.  Given she does not source her number, it is impossible to tell exactly what she is calculating.  However, it appears that she must be using products that were found to infringe utility patents and not design patents.

332.   For example, Ms. Davis states that "[b]etween Q2 2010 and Q1 2012, Samsung sold █████████████████████████████████████████████████████████████
███████[515]  I calculate the total units for all the products found to infringe design patents in Schedule 20.1-4T at Volume 1, Tab 6 of my report; for the period May 2010 through March 2012, Samsung (STA) sold ████████units that were found to infringe a design patent.  It appears that Ms. Davis's calculation of ██████████ units includes products that were not found to infringe a design patent.[516]  Given that her section is attempting to address the importance of

---

[512] Davis 2018 Report, p. 56. [2.2]
[513] Davis 2018 Report, p. 56, footnote 202R. [2.2]
[514] In her footnote 202R, Ms. Davis uses a denominator calculated based on the difference between Samsung's Q3 2010 sales ████████ and Samsung's Q2 2010 Sales ██████████.  (Davis 2018 Report, p. 56, footnote 202R. [2.2] *See also* Schedule 18.6-4T. [1.6])
[515] Davis 2018 Report, p. 56, footnote 202R. [2.2]
[516] Although she rounds to the nearest thousand units, it appears that Ms. Davis's Exhibit 37.1-R2 confirms that she is including all infringing phones (including phone that were not found to infringe any design patents).  Using page 4 of Ms. Davis's Exhibit 37.1-R2, I subtracted the total infringing smartphone units for Q2 2012 from total infringing smartphone units for Q2 2010 through Q2 2012, which appears to be the number Ms. Davis is using: ██████████████████.  These units report both infringing smartphones (she says 18 Products, which includes two products with no sales) and also the Exhibit 4G, Galaxy Ace, Galaxy Prevail, Nexus S 4G, Replenish, and Transform.  (Davis 2018 Report, Exhibit 37.1-R2, Page 4 of 4. [2.2])  Ms. Davis could have used page 2 of her Exhibit to

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Apple's design patents to the infringing product sales, it is misleading to use units from products that were found to infringe a utility patent but *not* a design patent in the calculation. If she had used only the units of products found to infringe design patents, her percentage would be significantly lower.

333.    Finally, Ms. Davis's analysis blends together all three design patents, and includes units if a product infringes any of the three design patents. Given that she is attempting to address the importance of each design patent, blending together the design patents is misleading, resulting in an overstated percentage. For example, I have calculated totals for products found to infringe the D'305 Patent, the D'677 Patent, and the D'087 Patent in Schedules 20.2-4T, 20.3-4T, and 20.4-4T at Volume 1, Tab 6 of my report. For the D'677 Patent, over the period that Ms. Davis calculates her percentage (Q2 2010 through Q1 2012), Samsung sold ████████ units of products found to infringe the D'677 Patent.[517] Comparing this number to the total Samsung sales of ████████ units reported by Ms. Davis over this period,[518] products found to infringe the D'677 Patent represent only ██████ of the units sold by Samsung in the period analyzed by Ms. Davis.[519] Therefore, more than ███ of Samsung's sales were products not found to infringe the D'677 Patent.

334.    The D'087 Patent is an even smaller portion of the sales. Over the period that Ms. Davis calculates her percentage (Q2 2010 through Q1 2012), Samsung sold ████████ units of products found to infringe the D'087 Patent.[520] Comparing this number to the total Samsung sales of ████████ units reported by Ms. Davis over this period,[521] products found to infringe the D'087 Patent represent only ████ of the units sold by Samsung in this period.[522] Therefore, more than ████ of Samsung's sales were products *not* found to infringe the D'087 Patent.

335.    While the sales of products found to infringe the D'035 Patent represent a higher proportion of Samsung's sales in the early quarters of Ms. Davis's period, Samsung removed

---

calculate the units for just the 16 products at issue in the 2018 trial (or 18 products if you include the two products with no sales), e.g. the products that were found to infringe a design patent (two of which had no sales), and she would have calculated a number the same as mine when rounded: ████████

[517] Schedule 20.3-4T. [1.6]
[518] Davis Report, p. 56. [2.2]
[519] 8,761,619 / 29,456,757 = 29.7%.
[520] Schedule 20.4-4T. [1.6]
[521] Davis Report, p. 56. [2.2]
[522] 2,350,423 / 29,456,757 = 8.0%.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

the infringing design in later quarters with little or no impact on sales.  For example, the Galaxy S II products launched in September and October 2011 were never accused of infringing the D'305 Patent.[523]  In the last two quarters of Ms. Davis's analysis (the quarters during which the Galaxy S II phones were sold), Samsung's sales of phones found to infringe the D'305 Patent represented only ███ of Samsung's total sales in Q4 2011 and ███ in Q1 2012.[524]  Further, as summarized in Schedule 18.3-4T at Volume 1, Tab 6 of my report, Samsung's unit share ██████████████████████████ indicating that the absence of the design found to infringe the D'305 Patent had little or no impact on sales.

### (4)  Conclusion with respect to Ms. Davis's market share analysis

336.    Based on these comparisons, it is clear that Ms. Davis's conclusion based on her simplistic analysis focusing only on Samsung's market share is contradicted by a more complete analysis of market trends. Further, Ms. Davis's analysis doesn't demonstrate that Samsung's infringement of the design patents at issue drove Samsung's sales.

### e)  Ms. Davis's focus on the fact that Apple and Samsung market and sell a fully assembled product does not address Factors 3 and 4.

337.    Ms. Davis's discussion of Factor 3 ("Whether the design is conceptually distinct from the product as a whole.") and Factor 4 ("The physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately") first cites back to her discussion of Factor 2, which I have addressed above.[525]

338.    Ms. Davis proceeds to discuss evidence from the "business models, accounting activity, and marketing conduct of Apple and Samsung" that she contends supports the conclusions of Apple's AOM experts.[526]  The evidence cited by Ms. Davis can be generally summarized as Ms. Davis pointing out that Apple and Samsung generally sell smartphones rather than component parts.  However, she does not properly explain how the evidence she

---

[523] Schedules 6.1-4T and 6.3-NT. [1.6]
[524] Q4 2011: ████████████████████     Q1 2012: ██████████████████ (Schedule 20.2-4T and 18.6-4T. [1.6])
[525] Davis 2018 Report, p. 57. [2.2]
[526] Davis 2018 Report, p. 57. [2.2]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

discusses at length has a significant influence on the identification of the AOM.  Further, Ms. Davis's analysis focuses exclusively on Apple and Samsung, and not on other parties involved in the manufacture and sale of components related to the patented designs.

339.    For example, Factor 3 asks whether the design is conceptually distinct from the product as a whole.  I understand that Dr. Lucente addresses this Factor in detail, and I do not respond at length to Ms. Davis's discussion.  I note that it is not clear why the go-to-market strategy of Apple and Samsung affects this inquiry.  I understand that both Apple and Samsung are involved in the design of the window glass, but the manufacturing and sale of the window glass is done by a third party.  Tony Blevins of Apple testified that Dow Corning has supplied cover glass to Apple for the first iPhone, the iPhone 3G, the iPhone 3GS, the iPhone 4, and the iPhone 4S.[527]  Dow Corning likely tracks revenue and profitability of the cover glass it sells to Apple and other handset manufacturers.  Similarly, Mr. Blevins testified that Hon Hai Precision (also known as Foxconn) and, in later generations, Catcher Technologies manufactured the bezel for the iPhone, iPhone 3G, and iPhone 3GS.[528]  These third parties would also likely track the revenue and profitability of the bezel they sell to Apple.

340.    For Factor 4, there are several specific prongs to the inquiry after "including:"

- whether the design pertains to a component that a user or seller can physically separate from the product as a whole;
- whether the design is embodied in a component that is manufactured separately from the rest of the product; or
- if the component can be sold separately.

341.    Ms. Davis's discussion doesn't appear to directly address any of these elements. For example, Ms. Davis does not appear to address the first two prongs – whether the design pertains to a component that a user or seller can physically separate from the product as a whole and whether the design is embodied in a component that is manufactured separately from the rest of the product.

342.    With respect to the last prong, Ms. Davis focuses on the fact that STA generally doesn't sell window glass to its end customers.  However, this element is not about the standard practice of STA, but *if* the component *can* be sold separately.  Dongwook Kim testified about sales of the window glass and the display module to SEA, explaining that the display module is

---

[527] Deposition of Tony Blevins, December 17, 2017, pp. 26-27. [23.4]
[528] Deposition of Tony Blevins, December 17, 2017, pp. 86-89. [23.4]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

ordered by SEA from the manufacturing legal entities, and the window glass is ordered from a mobile communications customer service organization within SEC.[529]   Mr. Kim also testified about a spreadsheet that reflects window glass purchases by SEA.[530]   Samsung produced a spreadsheet that lists the components that make up the AOMs, and identifies the supplier of each component.[531]   Sales from the suppliers to Samsung are sales of the components related to the AOM.

343.   Further, Timothy Sheppard testified about a service offered by STA to the major carriers in which STA would replace damaged glass on a display module:[532]

> Q The item that's in there for the box D710, the Sprint Galaxy S II Epic 4G Touch, did you ever sell that -- STA, did it ever sell it to consumers? Apart from this reclamation process, did it ever sell it to consumers?
>
> A To the best of my knowledge, no screens were sold direct to consumers, but we did sell the service to the carriers, to the main carriers like Sprint, T-Mobile, AT&T.
>
> Q The service being we'll repair phones, correct?
>
> A No. The service being that we'll specifically replace the damaged screen -- or the damaged glass on your screen as a separate service from repair to a phone.
>
> Q And the "we" is STA, correct?
>
> A And the "we" is STA.
>
> […]
>
> Q Okay. Let me just ask it using carriers as the purchaser. Did you ever sell the object that is in that box to carriers for the i500?
>
> A So the same answer as last time. So they could have purchased the service of having this replaced, but we did not sell the individual component to them. So they had to buy the service and they would get

---

[529] Deposition of Dongwook Kim, December 22, 2017, pp. 80-82. [23.5]

[530] Deposition of Dongwook Kim, December 22, 2017, pp. 73-78, 84-85. [23.5]

[531] SAMNDCA30000055_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xls. *See also* Deposition of Dongwook Kim, December 22, 2017, pp. 80-81. [23.5] *See also* Samsung's Second Supplemental Objections and Responses to Plaintiff Apple Inc.'s First Set of Interrogatories Regarding Articles of Manufacture, Response to Interrogatory Nos. 1-3, December 21, 2017, pp. 16, 19, 34, 37, 54, 57. [21.5] *See also* Samsung's Supplemental Responses and Objections to Plaintiff Apple Inc.'s Second Set of Interrogatories Regarding Article of Manufacture, Response to Interrogatory Nos. 10-12, December 21, 2017, pp. 5-7. [24.27]

[532] Deposition of Timothy Sheppard, December 14, 2017, pp. 55-56, 58. [23.6]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

this individual component as a replacement screen rather than buying a whole new screen.

So if I compare it to this, buying this whole thing, this is expensive, compared to just replacing the glass if you have a perfectly good working panel. So we would sell the service of the glass replacement and they would use – we would use the preexisting panel and greatly reduce the cost for everybody on the repairs.

344.    I spoke with Mr. Sheppard, and he confirmed that a service like the service he described in his deposition was offered to each of the major carriers, including Sprint, AT&T, Verizon, T-Mobile, and US Cellular.[533]

345.    In addition, I toured the manufacturing plant in Gumi, South Korea on January 17, 2018. I watched the manufacturing process on the second floor of Building C that was producing Galaxy Note 8 smartphones. I saw the window glass and display panel being connected to the back panel with robots. The rear assembly started with screws and then was pushed together after glue was applied. Then there was a series of function tests performed. The final packaging was separated from the assembly where the accessories were included in the final packaging. These accessories were purchased from a separate supplier.[534]

346.    The manufacturing process that I witnessed this month is more automated than the manufacturing process used to manufacture the accused smartphones. There have been more functional tests added including a water test and a battery leakage test. Some of the functional tests were previously done manually.  Also the final packaging was not separated from assembly. The number of accessories that I saw added to the final packaging is the same as when the accused smartphones were manufactured.[535]

347.    The window glass and display panel are manufactured separately in Vietnam.[536] The window glass is purchased from a company in China.[537]

> **(1)  Ms. Davis's comment that past trials did not include a separate calculation for an AOM other than the entire phone is irrelevant.**

---

[533] Conversation with Timothy Sheppard, January 27, 2018.
[534] Conversation with Si-Yeon Park on January 17, 2018.
[535] Conversation with In-Kyu Park on January 17, 2018.
[536] Conversation with Si-Yeon Park on January 17, 2018.
[537] Conversation with Dong-Wook Kim on January 18, 2018.

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

348.    In her discussion of Factors 3 and 4, Ms. Davis includes the following statement:[538]

> In the November 2013 Trial at which I testified and in connection with the damages expert reports of Michael Wagner, Samsung did not present a separate calculation for an article of manufacture other than the smartphone as a whole. Both Apple's and Samsung's prior summary of Apple's damages based on Samsung's profits used only the smartphones as a whole as the basis for the calculation.

349.    In her first paragraph after this section, Ms. Davis includes a similar statement: "[a]s discussed above, I have proceeded based on the conclusion that the article of manufacture is Samsung's smartphones as a whole. This conclusion is consistent with how Mr. Musika addressed the issue in 2012, how Mr. Wagner addressed the issue in 2012, 2013, and 2015/2016, and how I addressed the issue in 2013 and 2015/2016."[539]

350.    Ms. Davis's statements about past trials and analyses presented are not relevant to the identification of the Article of Manufacture.  My understanding of the reason for the 2018 Trial is due to a change in the law relating to section 289 and the Article of Manufacture.  I understand that after the previous trials in this case, Samsung appealed certain issues to the United States Supreme Court.  The Supreme Court issued an opinion in this case, stating in part:[540]

> This case involves the infringement of designs for smartphones.   The United States Court of Appeals for the Federal Circuit identified the entire smartphone as the only permissible 'article of manufacture' for the purpose of calculating § 289 damages because consumers could not separately purchase components of the smartphones.   The question before us is whether that reading is consistent with § 289.  We hold that it is not.
>
> […]
>
> Arriving at a damages award under § 289 thus involves two steps.   First, identify the 'article of manufacture' to which the infringed design has been applied.   Second, calculate the infringer's total profit made on that article of manufacture."

---

[538] Davis 2018 Report, p. 61. [2.2]
[539] Davis 2018 Report, p. 62. [2.2]
[540] *Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S.Ct. 429, Supreme Court 2016, at page 432, 434. [20.3]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

351.    I understand that the District Court subsequently issued an order to "set forth the method for determining the relevant article of manufacture for the purpose of § 289," and ordered a new trial on both the relevant article of manufacture and on damages.[541]

### 3.    Opinions Regarding Samsung's Profits from Sales of Products Found to Infringe the D'677, D'087, and D'305 Patents

352.    One input relevant to calculating the total profit related to the articles of manufacture identified by the parties is the profit that Samsung earned on the 16 phones found to infringe at least one design patent.   To differentiate the profit on the entire phone from the total profit related to the article of manufacture, I will refer to the profit that Samsung earns on the entire phone as "Samsung's Entire Profits."   Ms. Davis has performed a calculation of Samsung's Entire Profits based on total revenues, based on Samsung's gross margin, and based on Samsung's "incremental profit."[542]   As described more fully below, I have concluded that Samsung's COGS and operating expenses are deductible expenses as they are related to and necessary for the sale and manufacture of the accused products.

### a)    Samsung's Sales Data

353.    Samsung has produced updated sales data and expense data for STA, SEA, and SEC.[543]   The sales data include monthly data covering the period May 2010 through June 2012 for 33 Samsung products.[544]   For each of the 3 Samsung entities, the sales data include quantity (in units), sales ($), cost of goods sold (COGS), and operating expenses broken down into major operating expense categories.

354.    SEA and STA are the only Samsung entities that sell into the United States.[545] Therefore Samsung's U.S. sales of the accused products are determined by the sales of the accused products by SEA and STA.   Mr. Sheppard testified that STA sells Samsung's mobile phones in the United States.[546]   Therefore, SEA does not sell any devices in the United States

---

[541] Order Requiring New Trial on Design Patent Damages, October 22, 2017, pp. 2, 35. [20.2]
[542] Davis 2018 Report, pp. 62-64. [2.2]
[543] SAMNDCA00422828.
[544] I understand that the product referred to as "Galaxy Tab (JX 1036)" in the Amended Jury Verdict is the product referred to as "Galaxy Tab 7.0 (3G)" in Samsung's sales data.  Therefore, I have used this data in my analysis, which matches with the data used by Ms. Davis in her analysis.
[545] Deposition of Jaehwang Sim, March 10, 2012, pp. 119-120, 142-143. [4.5]
[546] Deposition of Timothy Sheppard, January 24, 2012, pp. 26-28, 86-87. [3.22]

Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

Michael J. Wagner