# EXHIBIT A

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4     _____

 5     Apple Inc.,                      *

 6     a California corporation         *

 7     v.                               *    Case

 8     Samsung Electronics Co., Ltd.,*       No. 11-cv-01846-LHK

 9     a Korean business entity,        *

10     et al.                           *

11     _____

12

13      HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

14

15              Video Deposition of Alan D. Ball

16              Tuesday, February 13, 2018

17         Wilmer Cutler Pickering Hale and Dorr LLP

18              60 State Street - 26th Floor

19              Boston, Massachusetts 02109

20

21     Reported By:

22     J. Edward Varallo, RMR, CRR

23     Registered Professional Reporter

24     Job No. 2816442

25     Pages 1 - 165
```

Page 1

**Page 14**

1 manufacture analysis in this case?
2      MS. FRAZIER: Objection, form.
3   A.   I don't understand that question.
4   Q.   Well, why is it in the report?
5   A.   I think it's helpful to the court, these    10:46
6 observations. I made these observations having
7 applied the test that they told us to and I believe
8 that this is a helpful summary of my opinions
9 regarding the article of manufacture question.
10   Q.   Well, let's ask about -- I'll ask you a    10:47
11 few questions about your understanding of the
12 factors. What is your understanding of the first
13 factor for the article of manufacture test?
14   A.   (Pause) Can you repeat the question?
15   Q.   Sure. I'll just rephrase it.    10:48
16      You understand that the first factor is
17 the scope of the design claimed in the plaintiff's
18 patent, including the drawings and written
19 description. Right?
20   A.   Yeah, the scope of the design claimed in    10:48
21 Apple's patent including the drawing and written
22 description I believe is how it appears in the
23 order.
24   Q.   And what is your understanding of the
25 word "claimed"?    10:48

**Page 15**

1   A.   The word "claimed" is the design that's
2 claimed by the patent.
3   Q.   And you understand that's a legal term
4 of art. Right?
5   A.   I understand it has a legal meaning.    10:49
6   Q.   And you understand that this first
7 factor regarding the claim is a central
8 consideration for the article of manufacture
9 determination. Right?
10      MS. FRAZIER: Objection.    10:49
11   A.   Could you repeat that question?
12   Q.   You understand and agree that the first
13 factor we just discussed is a central consideration
14 for the article of manufacture determination.
15 Correct?    10:49
16   A.   Well, I --
17      MS. FRAZIER: Same objection.
18   A.   I understand that it's important because
19 the court has explained that that's one of four
20 factors to consider, and so I think it's, like the    10:49
21 other three, an important consideration that the
22 court has asked us to consider.
23   Q.   If you misapplied the first factor in
24 your analysis in this case, you'll agree that your
25 article of manufacture analysis is flawed on a    10:50

**Page 16**

1 central consideration of the test. Right?
2      MS. FRAZIER: Objection, calls for a
3 legal conclusion.
4   A.   I don't understand that hypothetical.
5 I think my application was correct and helpful.    10:50
6   Q.   I want you to assume that you misapplied
7 the first factor. You'll agree with me that in that
8 case, your analysis is flawed on a central
9 consideration of the article of manufacture test.
10 Correct?    10:50
11      MS. FRAZIER: Objection, calls for a
12 legal conclusion.
13   A.   No.
14   Q.   Tell me in the context of a design
15 patent, what is claimed in such a design patent?    10:50
16 How do you go about interpreting the claim?
17   A.   I think the first thing you would do is
18 you would read the patent. You would look at the
19 patent, you would look at the words in the patent,
20 you would look at the drawings in the patent; you'd    10:51
21 understand the drawings through some of the words.
22 You would understand the drawings through the
23 expertise that a designer of ordinary skill in the
24 art would bring in looking at those and make a
25 determination about what is the overall design    10:51

**Page 17**

1 that's claimed in that drawing and how that overall
2 design is applied to a product. And primarily there
3 are drawings that show that and there are other
4 things intrinsic to the design patent that help a
5 designer of ordinary skill in the art to interpret    10:51
6 those drawings.
7   Q.   And what is your basis for believing
8 that the patent is interpreted in light of -- by
9 virtue of the designer with ordinary skill in the
10 art? What did you mean by that?    10:52
11      MS. FRAZIER: Objection, misstates
12 testimony.
13   A.   Well, I understand that when we look at
14 design patents, there's laws or standards about how
15 those drawings are interpreted and whether you're    10:52
16 talking about whether those drawings would fully
17 enable a designer to make and use the design or
18 whether those drawings completely document the
19 design or any other insight we're looking to as to
20 what the overall three-dimensional design that's    10:52
21 being shown in the drawings is. It's helpful to
22 consider and I believe the law says that the person
23 you should consider is a designer of ordinary skill
24 in the art.
25   Q.   Well, that's my question. What law are    10:53

Page 62

```
 1  smartphone, into a unitary smartphone?
 2      Q.  Yes, that's what I'm asking you.
 3      A.  Yes, okay.
 4      Q.  So when you use the term unitary,
 5  however, you're not talking when it's in its            12:20
 6  disassembled form because then there's a thousand of
 7  those.  Right?  You're talking about unitary only
 8  once it's completely assembled for use by the end
 9  user?
10      A.  I'm talking about the smartphones that         12:20
11  Samsung made that appropriated the protected
12  designs.  They may be consisting of lots of
13  different parts, but the design is what brings it
14  all together into a product.  And isn't it
15  remarkable that a product that has so many parts      12:21
16  inside is, through design, brought into a beautiful
17  simple unitary form that is so delightful for a user
18  to use?
19      Q.  And is that an opinion that you're
20  offering in this case?                                 12:21
21      A.  I think that I just -- I said that.
22  I mean, I do believe that that's a notable aspect to
23  some of the designs that we're talking about here.
24  That design brings it all together and basically
25  gives all the disparate aspects form to the point     12:21
```

Page 63

```
 1  where the design is what is recognized as the phone.
 2  It's very important.
 3      Q.  And when you say it's very important,
 4  it's very important to your article of manufacture
 5  analysis you applied in this case.  Right?            12:21
 6      A.  It's very important in understanding the
 7  essence of what a smartphone is.
 8      Q.  Will you please turn to page 7 of your
 9  expert report, starting with paragraph 43 through
10  47.  If you can explain, how are those paragraphs     12:22
11  relevant to the analysis of the article of
12  manufacture factors that the District Court has
13  articulated?
14      A.  Well, in a number of ways.  One of the
15  things I try to do when I'm asked to write a report   12:23
16  as an expert is try to explain the aspects of
17  industrial design in such a way that other people
18  can understand what an industrial designer is and
19  what an industrial designer does.  It's not always
20  understood in our society how our products get       12:23
21  designed and who does that, and so part of my
22  explanation here is I'm trying to explain the nature
23  of design and the nature of how products are
24  designed and who does that.
25          And then specifically I'm speaking a bit     12:23
```

Page 64

```
 1  about the fact that when we look at design patents,
 2  we need to think about who is it that we're
 3  considering that's interpreting the teachings of
 4  that patent, the drawings.  And it's been my
 5  experience in other cases that when we're talking    12:24
 6  about understanding a design patent, the DOSA,
 7  designer of ordinary skill in the art, is a helpful
 8  concept to consider what is being taught and how
 9  that would be understood by somebody through the
10  eyes of a designer of ordinary skill in the art.     12:24
11          So I've tried to sort of start generally
12  help with some understanding of design and then work
13  into explaining, you know, what a DOSA is, designer
14  of ordinary skill in the art, D-O-S-A.
15      Q.  In rendering your opinions in this case      12:24
16  and your analysis of the article of manufacture, did
17  you apply the standard of designer of ordinary skill
18  in the art?
19      A.  Yes, I considered how a designer of
20  ordinary skill in the art would interpret the design 12:25
21  patents.
22      Q.  I turn your attention to page 8 of your
23  expert report.
24      A.  Yes.
25      Q.  You see under the heading Ordinary          12:25
```

Page 65

```
 1  Observer and that runs from paragraphs 48 to 51.
 2      A.  Yes.
 3      Q.  And if I asked you the same questions I
 4  just asked you about the DOSA section, you'd give me
 5  the same answers?                                    12:25
 6          MS. FRAZIER:  Objection.
 7          MR. ZELLER:  Well, I can reask it if
 8  it's --
 9          THE WITNESS:  Yeah, reask it.
10  BY MR. ZELLER:                                       12:25
11      Q.  So please tell me what the factors
12  you're discussing here in paragraphs 48 through 51
13  apply to.
14      A.  Sure.  Well, I think that the ordinary
15  observer is an idea or a construct that is used when 12:26
16  we consider infringement tests for design patents
17  and it's basically, my understanding is it's
18  designed as the typical purchaser of those kinds of
19  products at a particular time that's relevant to the
20  patents in the accused product.  And there we're     12:26
21  saying rather than a designer of ordinary skill in
22  the art who might see different levels of detail,
23  how would an ordinary observer experience these
24  designs or these products?  And when we do that, we
25  think about, well, who is that person?  What's their 12:26
```

17 (Pages 62 - 65)

Page 66

```
 1  motivation to buy a phone?  What kinds of stores
 2  might they see it?  How do the people selling it
 3  represent their phone to an ordinary observer?
 4          And I think it's a very helpful
 5  construct just to think about how these phones are      12:27
 6  seen by the people who end up buying and using them
 7  in public.  And so I believe that when we want to
 8  consider some of the factors, that's a very helpful
 9  lens to look through as to how an ordinary observer
10  would perceive some of these factors.                   12:27
11          MS. FRAZIER:  And if I may just
12  interrupt briefly to clarify the record, I believe
13  it's 48 through 52, the Ordinary Observer section.
14          MR. ZELLER:  He says "These scenarios
15  and insights," so that's why I excluded it.  I think    12:27
16  it was, but in any event --
17          THE WITNESS:  I don't understand this
18  issue.
19          MR. ZELLER:  It's okay.
20          THE WITNESS:  I was taking about the            12:27
21  ordinary observer.
22          MS. FRAZIER:  Section, correct?
23          MR. ZELLER:  Yes.  We'll just say the
24  section, however he interprets it.
25          THE WITNESS:  Yeah, I was talking about         12:27
```

Page 67

```
 1  48 through 52.
 2          MR. ZELLER:  Okay.
 3  BY MR. ZELLER:
 4      Q.  And what you just discussed was what you
 5  applied in your analysis for the four factors.  Is     12:28
 6  that true?
 7      A.  Well, that was part of it.  It wasn't
 8  the totality of it, but that's part of it.  There's
 9  many factors and many things I considered and
10  applied when appropriate.                              12:28
11          MR. ZELLER:  Please mark as Exhibit 6 a
12  copy of Order Requiring New Trial on Design Patent
13  Damages issued by Judge Koh and filed October 22,
14  2017.
15          (Ball Deposition Exhibit 6 marked for          12:28
16  identification.)
17  BY MR. ZELLER:
18      Q.  Do you recognize this document?
19      A.  Yeah, I believe so.
20      Q.  And it's something that you reviewed           12:29
21  prior to the time that you signed your expert
22  reports in this case?
23      A.  Yes.
24      Q.  And you understand that this is the
25  court's order on the four-factor test.  Right?         12:29
```

Page 68

```
 1      A.  I believe that the four-factor test is
 2  part of this order requiring a new trial.
 3      Q.  On damages.  Right?
 4      A.  On design patent damages.
 5      Q.  So is there anything in this order that        12:29
 6  you saw that tells you to apply the criterion of
 7  designer of ordinary skill in the art as part of the
 8  article of manufacture test?
 9      A.  I don't recall that that was in this
10  order.  I don't know.                                  12:30
11      Q.  Well, please take a look at page 35.
12      A.  Okay.
13      Q.  You see where it says "The test for
14  determining the article of manufacture for the
15  purpose of Section 289 shall be the following four     12:30
16  factors" and then you see four bullet points there.
17  Right?
18      A.  Yes.
19      Q.  Do you understand that that is the test
20  that the court has ordered to be applied to            12:30
21  determine what the article of manufacture is in this
22  case for purposes of determining damages?  Correct?
23      A.  Yes.
24      Q.  Now, please tell me where in those
25  factors you believe that it was appropriate to apply   12:30
```

Page 69

```
 1  a standard of designer of ordinary skill in the art.
 2  Please tell me which factors specifically of the
 3  four.
 4      A.  Well, okay, could you ask me the
 5  question again?  I want to make sure I'm answering    12:31
 6  it correctly.
 7      Q.  In doing your analysis, you applied a
 8  standard of designer of ordinary skill in the art.
 9  Right?
10      A.  Yes.                                          12:31
11      Q.  In which of these four bullet point
12  factors, if any, is that standard shown?
13          MS. FRAZIER:  Objection.
14  BY MR. ZELLER:
15      Q.  What is it relevant to?  What is it           12:31
16  relevant to, which factor or factors?
17          MS. FRAZIER:  Objection.
18      A.  Well, that's two different questions, so
19  which one would you like me to answer?
20      Q.  Well, I'll start with a very simple one.      12:31
21  Is there anything that you see listed here in the
22  four factors that tells you to apply as part of your
23  analysis the standard of designer of ordinary skill
24  in the art?
25      A.  Well, when I read the first factor, it        12:32
```

```
 1  talks about the scope of the design in the
 2  plaintiff's patent, and I know that's a design
 3  patent, and I know that it's an accepted practice
 4  that when we look at design patents we consider what
 5  a designer of ordinary skill in the art would be          12:32
 6  taught or learn or understand is being claimed in
 7  that patent.  So in order for me to understand the
 8  scope, it's very helpful and I think quite
 9  reasonable to consider a designer of ordinary skill
10  in the art.  That word isn't in that sentence, but I     12:32
11  think the context of the sentence is a very
12  reasonable way to interpret the patent.  I don't
13  know how else you would.  What other person would we
14  consider is looking at the patent?  I think the
15  designer of ordinary skill in the art is a very          12:32
16  reasonable way to do that.
17      Q.   Is the designer of ordinary skill
18  standard relevant to any of the other three factors
19  in your analysis?
20      A.   Yes.                                            12:33
21      Q.   Which ones?
22      A.   Well, I think after a designer of
23  ordinary skill in the art looks at the design in the
24  patent and understands what the design that is being
25  protected, what the invention of that patent is,         12:33
                                                           Page 70
```

```
 1  then I think that point of view is also helpful in
 2  the next two, to consider among other things in the
 3  next two factors.  You know, I think a designer of
 4  ordinary skill in the art would see relative
 5  prominence of the design within the product of the       12:33
 6  whole.  They would have some interpretation of that,
 7  having understood the design, and they would see --
 8  you know, have some opinion on conceptual
 9  distinctness at issue, which is number 3.  So I
10  think those are factors that I considered in my         12:34
11  understanding.  I don't see how you couldn't,
12  because you need to have an understanding of what
13  the design is in order to consider those things.
14      Q.   In the analysis that you applied in this
15  case, was the designer of ordinary skill in the art     12:34
16  standard relevant to your evaluation of factor 4?
17      A.   I think that some of it also would apply
18  there but perhaps in a different way.
19      Q.   How so?
20      A.   When a designer designs a product like         12:34
21  the smartphone, be it the Apple designers designing
22  the iPhone or Samsung designers designing the
23  Galaxy, they conceive of the phone in a holistic
24  manner.  They draw whole phones.  They design a
25  solution for the entire phone.  They don't design       12:35
                                                           Page 71
```

```
 1  parts or pieces in a piecemeal fashion with little
 2  regard to how they all go together.  If anything,
 3  they come up with the overall design of the phone
 4  again as a unitary or holistic design and then in
 5  subsequent phases where they're refining that design    12:35
 6  or documenting that design in such a way it can be
 7  manufactured, then they'll start to look at part
 8  breakup and things that have to happen in order to
 9  assemble or put the phone together that still serve
10  and preserve that overall cohesive, holistic design.   12:35
11           And so I think a designer of ordinary
12  skill in the art, you know, somebody who is
13  designing phones or other similar electronic
14  devices, their expertise is relevant to
15  understanding that aspect of factor 4.                  12:36
16      Q.   And what you just described was what you
17  used in analyzing what the article of manufacture is
18  in this case.  Correct?
19           MS. FRAZIER:  Objection, misstates
20  testimony.                                              12:36
21      A.   No.  I think that's one aspect of what
22  I've used.  I've used a number of different things
23  as explained in my report.  But you asked me whether
24  the understanding of a DOSA was used in factor 4,
25  and I say in some certain degree, yes, but a little    12:36
                                                          Page 72
```

```
 1  differently maybe than some of the other factors.
 2      Q.   Directing your attention then to your
 3  next section, Ordinary Observer, please tell me
 4  which of the four factors that discussion is
 5  relevant to.                                            12:36
 6      A.   Well, I've considered it.  (Pause)  I
 7  think that the idea of the ordinary observer is very
 8  helpful when we are considering the second factor
 9  and the third factor and to some degree the fourth
10  factor, and in a peripheral way some aspect of the     12:38
11  first, but more so the second and third and aspects
12  of the fourth.
13      Q.   And when you did your analysis to
14  determine what the article of manufacture was in
15  this case, you applied this ordinary observer          12:38
16  standard to the factors as you just described them.
17  Correct?
18      A.   Among other things.  I mean, I think
19  that in considering how an ordinary observer would
20  perceive the design that Samsung applied to their      12:39
21  phones that was protected by the Apple patents, I
22  think it's helpful to consider how an ordinary
23  observer, a purchaser, user of the phones would
24  perceive that, yes.
25      Q.   What was your basis for applying the          12:39
                                                          Page 73
```

**Page 74**

1  ordinary observer test to these four factors that
2  Judge Koh set out?
3      MS. FRAZIER: Objection, vague.
4   A.  Well, I don't think I applied the
5  ordinary observer test. I accepted the jury's      12:39
6  finding that these phones infringed. I just thought
7  that the point of view of an ordinary observer, you
8  know, how they would react to looking at these
9  phones and understanding these phones, was an
10  enlightening or insightful way to consider these    12:40
11  factors, and I've done that. And I've also done
12  that in other ways like how did the press see it and
13  how does Samsung's own advertising portray the
14  phones? So it was one of many sort of lenses in
15  which I considered these four factors.             12:40
16   Q.  I'm asking about one particular standard
17  that you used in your analysis, which is the
18  ordinary observer test. Please tell me how you came
19  to decide to use the ordinary observer test for the
20  article of manufacture.                            12:40
21      MS. FRAZIER: Objection, vague,
22  misstates prior testimony.
23   A.  I didn't use the ordinary observer test.
24  I considered designs as they might be perceived by
25  an ordinary observer or a purchaser of smartphones  12:40

**Page 75**

1  in the appropriate time period.
2   Q.  So tell me, is the ordinary observer
3  section part of your analysis of the four factors?
4  Yes or no.
5      MS. FRAZIER: Objection, asked and       12:41
6  answered.
7   A.  My understanding in consideration of the
8  ordinary observer, which I've explained in the
9  section titled Ordinary Observer, was one of the
10  ways that I considered the four factors or some of  12:41
11  the four factors. And I think that that's a very
12  reasonable and helpful lens to sort of look at some
13  of these ideas such as the prominence of the
14  appropriated design or the conceptual distinction.
15  And so I did that. And I also did it through the    12:41
16  eyes of some other entities to be as thorough as
17  possible in my analysis.
18   Q.  I am focusing on your use of the
19  ordinary observer test. Is it part of your analysis
20  of the four factors? Yes or no.                    12:42
21      MS. FRAZIER: Objection, misstates prior
22  testimony.
23   A.  My consideration of how an ordinary
24  observer would perceive the infringing phones and
25  how they would perceive the design applied to them  12:42

**Page 76**

1  is part of my four-factor test.
2   Q.  You will not find anywhere in Judge
3  Koh's order, Exhibit 6, any directive to apply the
4  ordinary observer test. Right?
5   A.  I don't recall her specifically using   12:42
6  that language and I don't accept that describing me
7  as applying the ordinary observer test is accurate
8  to what I've said I've done.
9   Q.  So nowhere else in your report did you
10  rely upon the ordinary observer standard when you   12:42
11  went through the factors, the four factors that
12  Judge Koh articulated in her order requiring new
13  trial?
14      MS. FRAZIER: Objection, misstates prior
15  testimony.                                         12:43
16   A.  I don't understand your question.
17   Q.  Are you saying that you do not refer in
18  any other portions of your report to the ordinary
19  observer standard other than that section we've just
20  been describing and discussing?                    12:43
21      MS. FRAZIER: Same objection.
22   A.  Well, I've tried to describe what my
23  understanding of an ordinary observer is and why it
24  might be helpful in this case in which I've applied
25  the four factors, and I've tried to consider that in 12:43

**Page 77**

1  my application of the four factors. There may be
2  some other element in my report where I've referred
3  to ordinary observer that I don't recall at this
4  moment. Maybe I -- Maybe there's an instance in my
5  reply report where I mention it.                   12:43
6      But you've used repeatedly "ordinary
7  observer standard" or "ordinary observer test," and
8  I think that that's not accurate to my consideration
9  of the ordinary observer and how they would perceive
10  these. There may be some other meaning that you're  12:44
11  intending there that I'm not fully agreeing that I
12  applied in the way you might be suggesting.
13   Q.  You understand that ordinary observer is
14  a standard, a legal standard that is applied for
15  determination of infringement in design patent     12:44
16  cases. Right?
17   A.  The ordinary observer test I think is
18  part of design patent law. I don't know if it's
19  Gorham and White, also maybe Egyptian Goddess refers
20  to that, and part of that is understanding an      12:44
21  ordinary observer.
22   Q.  I don't think you're answering my
23  question. You understand that ordinary observer is
24  a legal standard that is applied for the
25  determination of infringement in design patent     12:45

**Page 78**

1  cases. Correct?
2       MS. FRAZIER: Objection, asked and
3  answered.
4    A.   Well, I understand that in design patent
5  infringement we consider the ordinary observer and            12:45
6  there's an ordinary observer test which is used to
7  describe the law that we're supposed to apply in an
8  infringement analysis. Part of that is what is an
9  ordinary observer? And so I've tried to explain
10 what I think an ordinary observer is or how we might          12:45
11 find that that is a helpful lens through which to
12 look into these four factors.
13   Q.   Point to me the factors where
14 infringement is relevant. Take a look at the last
15 page of Judge Koh's order, page 35, where she lays            12:45
16 out the four factors. Where is infringement
17 mentioned?
18       MS. FRAZIER: Objection, compound.
19   A.   That's a difficult question for me to
20 answer because I understand that the very nature of           12:46
21 this document is prefaced on the fact that there are
22 phones that have been found by a jury to infringe,
23 and infringement has been established, and that's
24 not part of the question of the four factors.
25 That's a given. And now we're being asked to apply            12:46

**Page 79**

1  these four factors to enlighten the question of what
2  is the article of manufacture. So I guess all of
3  them would assume that there's infringement that has
4  happened.
5    Q.   Well, if infringement is a given, please        12:46
6  explain for me then paragraph 52: "I have
7  considered these scenarios and insights I have
8  gained through my expertise as an industrial
9  designer into ordinary observers in my article of
10 manufacture analysis, including my analysis of the     12:46
11 District Court's four factors."
12       MS. FRAZIER: Objection, vague.
13   A.   I think that's what I've been doing all
14 along. I think that when we ask certain questions
15 related to the four factors, considering how a        12:47
16 purchaser or user of the product might answer those
17 questions is helpful in enlightening and in our
18 attempt to answer and respond to the four factors
19 that the judge has asked us to.
20   Q.   Please tell me your full basis for that       12:47
21 statement.
22   A.   I wanted to be thorough and look at as
23 many different aspects to fairly consider this.
24       I think ultimately because we're talking
25 about damages, which relates to money, and we're      12:47

**Page 80**

1  talking about purchasers, who are basically paying
2  for these phones, and part of the money they're
3  paying is profit and yes, damages has something to
4  do with profit, that it seems reasonable that they
5  are considered somehow in these questions. Since      12:48
6  these designs are designed to be used by these
7  people, I think that's a very appropriate audience
8  to consider when we're considering aspects of those
9  designs. So I think it's common sense.
10   Q.   Beyond common sense, do you have any          12:48
11 other basis?
12       MS. FRAZIER: Objection, misstates
13 testimony.
14   A.   I don't understand. Could you ask me
15 that question again?                                  12:48
16   Q.   Do you have any other basis other than
17 what you've already described or is that your
18 complete answer?
19   A.   I don't know. I believe that there has
20 been found to be infringement, which suggests to me   12:48
21 that the jury considered the ordinary observer in
22 their considering infringement and found that there
23 was. So that to me suggests that we're on the right
24 path to consider an ordinary observer and how they
25 perceive these designs.                               12:49

**Page 81**

1    Q.   You understand --
2    A.   There may be some other element I'm not
3  remembering now, but it seems so straightforward and
4  reasonable and I'm not thinking of other aspects.
5    Q.   You've given me your complete testimony    12:49
6  so far as you can do so now. Right?
7    A.   At the moment. Maybe there's another
8  element I'm forgetting or doesn't come to mind right
9  now, so I would reserve the right to recall that at
10 some point, but I think I've given you a reasonably  12:49
11 thorough answer.
12   Q.   Is it your understanding that
13 infringement is part of the four factors for article
14 of manufacture?
15   A.   Can you define what "part of the four     12:49
16 factors" means?
17   Q.   Is infringement relevant to any of the
18 four factors that Judge Koh has articulated for
19 determination of what is the article of manufacture?
20       MS. FRAZIER: Objection, asked and         12:50
21 answered.
22 BY MR. ZELLER:
23   Q.   Please tell me specifically whether it's
24 factor 1, factor 2, factor 3, factor 4, some
25 combination thereof?                              12:50

1   A.   All of the factors I think help us
2  understand what the article of manufacture is of a
3  product that has been found to infringe a design
4  patent.  So the fact that we are here considering
5  this, infringement has been determined, and I         12:50
6  believe that is the relevancy.  If there was a
7  product that was found not to infringe, I don't know
8  why we would be doing the article of manufacture
9  exercise.
10     Q.   Do you believe that the standards for        12:51
11  infringement are relevant to the standards for
12  determining what an article of manufacture is as
13  Judge Koh has articulated and set forth on page 35
14  of her order?
15     A.   Which standards are you referring to?        12:51
16          MS. FRAZIER:  Objection.
17  BY MR. ZELLER:
18     Q.   I'm referring to the -- You understand
19  ordinary observer is an infringement standard.
20  Right?                                                12:51
21          MS. FRAZIER:  Objection, calls for a
22  legal conclusion.
23     A.   My understanding is the ordinary
24  observer test is a test that we consider when we're
25  talking about infringement.  I understand an          12:51

Page 82

1  ordinary observer is defined as being a purchaser of
2  this type of product in the time frame that's
3  appropriate to the case.
4     Q.   You acknowledge that there is nowhere in
5  Judge Koh's order that she states or even suggests    12:52
6  that an infringement standard such as ordinary
7  observer is relevant to her four factors for article
8  of manufacture.  Right?
9          MS. FRAZIER:  Objection, vague,
10  compound, asked and answered.                         12:52
11     A.   I, I don't understand.  Can you rephrase
12  that?
13     Q.   You earlier described the reasons why
14  you believed that this ordinary observer standard
15  for infringement is relevant to the four-factor      12:52
16  analysis for article of manufacture and among other
17  things, you said it's just common sense.  Do you
18  recall that?
19          MS. FRAZIER:  Objection, misstates prior
20  testimony.                                            12:52
21     A.   I haven't said anything about ordinary
22  observer standard, which is a phrase you've
23  introduced.  Okay?  I'm talking about an ordinary
24  observer.  I'm talking about a purchaser of these
25  smartphones.  And I think it's really helpful when   12:52

Page 83

1  we consider the four factors to consider how the
2  person who buys the phone views the design and sees
3  that the appropriated design is so prominent on the
4  front face and can recognize the phone for what it
5  is just by looking at that one view of the phone.  I  12:53
6  think that's very relevant.  And ordinary observer
7  is a very helpful idea to consider when we're
8  considering these factors.  I also understand that
9  infringement was determined by a jury and I'll
10  assuming that they grappled with the ordinary        12:53
11  observer test and that's been done.
12     Q.   Are there any court rulings that you can
13  point me to that adopt your view that ordinary
14  observer is relevant to the article of manufacture
15  determination?                                       12:53
16     A.   I don't know.  I'm not a lawyer.
17     Q.   You don't cite anything in your report,
18  do you?
19     A.   Nothing comes to mind at the moment.
20     Q.   Well, you can look at your report           12:54
21  itself.  It doesn't cite anything, does it, in that
22  section?
23     A.   (Pause)  What was the question?
24     Q.   Are there any court rulings that you can
25  point me to that adopt or endorse your view that    12:54

Page 84

1  ordinary observer is relevant to the article of
2  manufacture determination set forth by Judge Koh?
3          MS. FRAZIER:  Objection, calls for a
4  legal conclusion.
5     A.   No, I don't believe there is.  But I        12:54
6  think it's a particularly helpful way of
7  understanding some aspects of the four factors,
8  because those are the people who buy and use these
9  products.
10     Q.   And I think you've been saying, and        12:54
11  correct me if I'm wrong, that the ordinary observer
12  you consider in this context to be the purchasers of
13  smartphones?
14     A.   Yeah, I think that that is a good
15  understanding.  I believe that some of the other   12:55
16  experts had opined on that and I agree with that.
17     Q.   So what is your expertise in
18  understanding consumer behavior insofar as it
19  relates to smartphones?
20     A.   Well, I've been designing products for    12:55
21  thirty years.  Designed many electronic products.
22  I've designed telephony equipment, radio equipment,
23  computers, and as part of that process we understand
24  the people we're designing the products for.
25     Q.   Do you have any empirical data to         12:55

Page 85

22 (Pages 82 - 85)

INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please
Follow the directions below. If additional pages are necessary, please furnish
Them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make,
Insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet,
Above the designated "Signature" line and return the transcript to your attorney.

ERRATA SHEET

| Page | Line | | |
|------|------|---|---|
| 18 | 8 | Change: replace "ordinary observer" with "Designer of Ordinary Skill in the Art | Reason: misspoke |
| 56 | 5 | Change: strike "unilithic" | Reason: transcription error |
| 66 | 20 | Change: change "taking" to "talking" | Reason: transcription error |
| 98 | 21 | Change: change "capacity" to "capacitive" | Reason: transcription error |
| 109 | 19 | Change: it should read "It's such, I think, irrelevant argument… | Reason: correct punctuation |
| 110 | 24 | Change: should read "So this design patent case is a piano case." | Reason: transcription error |

Subject to the above   changes, I certify that the transcript is true and correct.

No changes have been made.   I certify that the transcript is true and correct.

_____          ___3/9/18_____
(signature)                                      (date)