# EXHIBIT E
# CONFIDENTIAL VERSION
# OF DOCUMENT SOUGHT
# TO BE SEALED

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK<br><br><br>**EXPERT REPORT OF SUSAN KARE REGARDING "ARTICLE OF MANUFACTURE" FOR THE SAMSUNG PRODUCTS FOUND TO INFRINGE U.S. PATENT D604,305** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................. 1

II.  SUMMARY OF OPINION ................................................................................. 1

III.  BACKGROUND, EDUCATION, AND Qualifications................................... 1

IV.  MATERIALS CONSIDERED ........................................................................... 4

V.  RELEVANT LEGAL PRINCIPLES ................................................................. 5

VI.  OVERVIEW OF RELEVANT CASE HISTORY............................................. 6

VII.  FUNDAMENTALS OF DESIGNING A GRAPHICAL USER INTERFACE
WITH ICONS FOR AN ELECTRONIC DEVICE ......................................... 7

VIII.  THE D'305 PATENT AND APPLE'S IPHONE ............................................... 9

IX.  SAMSUNG'S INFRINGING PRODUCTS ..................................................... 14

X.  "ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS
FOUND TO INFRINGE APPLE'S D'305 PATENT........................................ 17

XI.  CONCLUSION .................................................................................................. 30

XII.  SUPPLEMENTATION ..................................................................................... 30

XIII.  EXHIBITS TO BE USED.................................................................................. 31

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

**EXPERT REPORT OF SUSAN KARE**

**I.      INTRODUCTION**

1.      I submit this Expert Report in connection with certain design patent claims being asserted by Apple Inc. in this case.  I have been asked to provide my opinion with respect to identifying the "article of manufacture" for the Samsung products that have been determined to infringe U.S. Patent D604,305.

**II.     SUMMARY OF OPINION**

2.      For the reasons discussed in this report, it is my opinion that the articles of manufacture to which Samsung applied the patented design of Apple's D'305 patent are the Samsung phones found to infringe that patent, in their entirety.  Those Samsung phones are: Captivate (JX1011); Continuum (JX1016); Droid Charge (JX1025); Epic 4G (JX1012); Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S Showcase, i500 (JX1017); Gem (JX1020); Indulge (JX1026); Infuse 4G (JX1027); Mesmerize (JX1015); and Vibrant (JX1010).  My opinion is based on the evidence in this case and is consistent with my experience working on and knowledge regarding other user interfaces that were applied to other products.

**III.    BACKGROUND, EDUCATION, AND QUALIFICATIONS**

3.      I am an icon designer and user interface graphic designer.  Since 1987, I have owned and run my design studio in San Francisco, Susan Kare Design, which provides icon, user interface graphics, branding, and corporate identity design services.  Since 2015 and to the present, I have also served as a creative director at Pinterest.

4.      I received a Bachelor of Arts degree in fine arts and English from Mount Holyoke College in 1975.  I graduated Summa Cum Laude and was elected to membership in the Phi Beta Kappa Society.

5.      After receiving my Bachelor of Arts degree, I studied graphic design as part of my fine arts curriculum in graduate school at New York University, and I received my Master of Arts degree in 1976.  I was granted a Ph.D. in fine arts in 1978 from New York University.

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

6. After receiving my Masters and Ph.D. degrees, I received a Rockefeller Fellowship to work at the Fine Arts Museums of San Francisco.

7. Overall, I have some 35 years of experience in the field of icon design and user interface graphic design. (A copy of my curriculum vitae is attached as Exhibit 1.) From 1982 through 1985, I worked for Apple Computer, Inc., first as a graphic artist in the Macintosh software group, and then as a creative director. While at Apple, I created most of the graphical elements of the original Macintosh computer's user interface, including virtually all of its icons and typefaces. From 1986 through 1988, I was the creative director at NeXT, Inc., where I managed the development of that company's graphic identity and other marketing materials.

8. Since leaving NeXT in 1988, I have worked as an independent user interface graphic designer. My work in that capacity has included designing the screen appearance for Microsoft Windows 3.0, including numerous icons and other graphic elements such as buttons, scroll bars, and Solitaire cards. Subsequently I designed icons for user interfaces on behalf of a variety of clients, including images for over 300 functions in Autodesk's AutoCAD and a symbol set for IBM's OS/2 operating system. In the early 1990s, I was an employee at General Magic, which developed a handheld communicator, and I provided the graphics for the highly visual user interface of that touch screen device. I co-founded Glam Media in 2003 and worked as its creative director, along with providing website graphics and design for its lifestyle-oriented site, through 2008.

9. Since I started working on icon design at Apple Computer in 1982, I have designed thousands of icons for user interfaces on behalf of hundreds of clients, including Fortune 500 companies as well as startup companies. I have created graphical user interfaces for a broad range of software programs and products, such as AutoCAD (Autodesk), Studio 8 (Electronic Arts), watches (Swatch and Fossil), and over 1000 virtual gifts for Facebook.

10. I have also worked as a digital font designer, starting in 1983. I designed most of the bitmap fonts that shipped with the original Macintosh in 1984, including the fonts named Chicago, New York, Geneva, Monaco, and Cairo. Subsequently, I designed other bitmap fonts for clients including Fossil and Danger Research, and a number that were sold online by Atomic

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

Media.  My experience in font design includes fonts for user interfaces that require a combination of graphic elements and type.

11.     As a creative director at Pinterest, my work has included a total icon redesign for its iOS application in 2016, and the development of multiple other icon sets.  I have been a member of the Core Experience group, reviewing new user interface directions.  I have also worked on various Pinterest corporate identity projects, and graphic design for the company's new café in San Francisco.

12.     In 2001, I was one of six individuals to receive the Chrysler Design Award, which celebrates "the achievements of individuals who have consistently championed seminal works of architecture and design, and significantly influenced modern American culture."

13.     In 2003, I was appointed by the Secretary of the Treasury to the Citizens Coinage Advisory Committee.  I was recommended to the Secretary by House Minority Leader Nancy Pelosi, in accordance with Public Law 108-15, to fill one of four positions recommended by Congressional leadership.

14.     In 2016, examples of my early sketches for icons in graphic user interfaces were acquired by the New York Museum of Modern Art and the San Francisco Museum of Modern Art.  Some of those are works on paper, and others are digital.

15.     In April 2018, I will receive the AIGA Medal.  Originally the American Institute of Graphic Arts, AIGA is now known as "AIGA, the professional association for design."[1]  The AIGA Medal is awarded in recognition of an individual's "exceptional achievements, services or other contributions to the field of design and visual communication."

16.     My expertise in icon development and user interface graphics is the result of various skills that I have honed over the years while solving design problems for clients.  For example, effective design of a graphical user interface employing icons requires me to understand the needs and characteristics of the user and the designated functionality of those images.  Effective GUI design depends on effective visual communication, so that a user understands and

---

[1]  www.aiga.org/about/

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

remembers the intended association between an icon's image and its purpose. Icons in a GUI can be used to represent a variety of visual affordances: symbols for applications, tools, files, controls, etc. Also, design of an icon-rich graphical interface requires fundamental visual design skills along with an understanding of the overall digital environment in which the icons function, and how they will be perceived in context by users. It is both an aesthetic and practical challenge, and is often not limited to the boundaries of a screen. Finally, it is also necessary to know how to present type and corresponding symbols in a way that optimizes a user's understanding at a glance.

17.     I have spent most of my career as a designer developing, evaluating, and iterating user interface graphics for average users. Through my practical experience, I have gained an understanding of how icons and user interface graphics are interpreted and assimilated by average users. This understanding enhances my ability to identify graphic elements that are meaningful and memorable for the average user, non-technical users in particular.

18.     Prior to my work for Apple in the earlier phases of this lawsuit in 2012, I had not testified as an expert or been retained as an expert in any previous lawsuit. Since 2012, I have been retained as a consulting expert witness in two other matters. I did not testify or submit expert reports in either.

19.     I expect to testify at trial concerning the opinions discussed in this report, as well as my bases for them, such as my knowledge, experience, and expertise concerning the creative process of icon design and the design of graphical user interfaces for electronic devices. I also expect to rebut any opinions I disagree with that are provided by Samsung's expert(s) with respect to the subject matter of this report.

20.     I am being compensated for my work in connection with this matter at my normal consulting rate of $675 per hour. I am being separately reimbursed for all out-of-pocket expenses. No part of my compensation is dependent upon the outcome of this litigation or the opinions that I express.

## IV.     MATERIALS CONSIDERED

21.     In forming the opinions set forth in this report, I considered and relied upon my

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

education, background, and experience.  I also have reviewed the D'305 patent, as well as the

other documents or reference materials cited or listed in this report.  In addition, I have evaluated

photographs and physical samples of the Samsung Phones found to infringe the D'305 patent, as

well as certain iPhones.  In forming my opinions, I have also reviewed and considered the

materials listed in Exhibit 2 of this report.  I have also reviewed my earlier expert report in this

litigation, as well as the deposition and trial testimony I provided at the earlier stages of this case.

Finally, I have also been able to speak with Richard Howarth, Tony Blevins, and Greg Joswiak,

to enhance first-hand my understanding of the iPhone design and manufacturing process at Apple.

22.     I reserve the right to rely upon any additional information or materials that may be

provided to me, or that are relied upon by any of Samsung's experts or witnesses, if called to

testify or to give additional opinions regarding this matter.

23.     I have been informed that expert discovery in this phase of the lawsuit is still

ongoing, and I will consider additional facts and material produced through discovery to

determine whether such additional material has an impact on my opinions.  I may amend or

supplement this report as necessary based on such additional information.

## V.     RELEVANT LEGAL PRINCIPLES

24.     I have been informed of the following applicable legal principles and asked to

apply them to my analysis.

25.     I have been informed that Section 289 of the Patent Act provides the following

damages remedy for design patent infringement:

> Whoever during the term of a patent for a design, without license of
> the owner, (1) applies the patented design, or any colorable
> imitation thereof, to any article of manufacture for the purpose of
> sale, or (2) sells or exposes for sale any article of manufacture to
> which such design or colorable imitation has been applied shall be
> liable to the owner to the extent of his total profit, but not less than
> $250, recoverable in any United States district court having
> jurisdiction of the parties.

26.     Accordingly, it is necessary to identify the "article of manufacture" to which the

infringed design has been applied.  I understand that "article of manufacture" has a broad

meaning.  An "article" is just "a particular thing."  And "manufacture" means "the conversion of

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

raw materials by the hand, or by machinery, into articles suitable for the use of man" and "the articles so made." "An article of manufacture, then, is simply a thing made by hand or machine." *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 434-435 (2016).

27.    I understand that an article of manufacture may be either a product sold to a consumer or a component of that product.

28.    I understand that the Court has decided that the following four factors are to be considered in for determining the article of manufacture:

> **(i)**    the scope of the design claimed in the patent, including the drawing and written description;
>
> **(ii)**    the relative prominence of the design within the product as a whole;
>
> **(iii)**    whether the design is conceptually distinct from the product as a whole; and
>
> **(iv)**    the physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately.

## VI.    OVERVIEW OF RELEVANT CASE HISTORY

29.    On April 15, 2011, Apple sued Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC for infringement of certain design patents, utility patents, and trade dresses.  Apple's asserted design patents included U.S. Patent No. D604,305.

30.    On July 27, 2012, the Court provided the following claim construction for Apple's D'305 patent:

> "The D'305 Patent claims the ornamental design for a graphical user interface for a display screen or portion thereof, as shown in Figures 1-2.  The broken line showing of a display screen in both views forms no part of the claimed design."

31.    A jury trial was held from July 30 to August 24, 2012.  The jury reached an Amended Verdict on August 24, 2012.  As related to the D'305 patent:

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

- The jury found that Apple's D'305 patent is not invalid.

- The jury found that thirteen Samsung smartphones infringed Apple's D'305 patent:  Captivate (JX1011); Continuum (JX1016); Droid Charge (JX1025); Epic 4G (JX1012); Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S Showcase, i500 (JX1017); Gem (JX1020); Indulge (JX1026); Infuse 4G (JX1027); Mesmerize (JX1015); and Vibrant (JX1010).

32.     I understand that the jury also found that certain Samsung phones, including some of the foregoing phones, infringed Apple's D'677 and D'087 patents.  The following chart summarizes the findings with respect to the three Apple design patents now at issue:

LIST OF INFRINGING PHONES

| | D'305 | D'677 | D'087 |
|---|---|---|---|
| Captivate | YES | | |
| Continuum | YES | | |
| Droid Charge | YES | | |
| Epic 4G | YES | | |
| Fascinate | YES | YES | |
| Galaxy S (i9000) | YES | YES | YES |
| Galaxy S 4G | YES | YES | YES |
| Galaxy S Showcase (i500) | YES | YES | |
| Galaxy S II (AT&T) | | YES | |
| Galaxy S II (i9100) | | YES | |
| Galaxy S II (T-Mobile) | | YES | |
| Galaxy S II (Epic 4G Touch) | | YES | |
| Galaxy S II (SkyRocket) | | YES | |
| Gem | YES | | |
| Indulge | YES | | |
| Infuse 4G | YES | YES | |
| Mesmerize | YES | YES | |
| Vibrant | YES | YES | YES |

(Dec. 21, 2017 Deposition Transcript of Greg Joswiak ("Joswiak Dep. Tr.") Ex. 1; Dec. 19. 2017 Deposition Transcript of Richard Howarth ("Howarth Dep. Tr.") Ex. 1.)

33.     A partial retrial on certain damages issues was held during November 13-21, 2013. The 2013 trial involved determining damages for thirteen Samsung products found to infringe

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Apple's D'677 and D'305 patents, as well as certain Apple utility patents.

34.     I understand that, after the appeals process, the jury's infringement and validity findings stand undisturbed, and I am to accept and apply them in my work for the current phase of this lawsuit.  On October 22, 2017, the Court ordered a new trial limited to determining damages for the eighteen Samsung products found to infringe Apple's D'677, D'087, and D'305 patents (noting that some of those products were found to infringe certain Apple utility patents as well). In that order, the Court set forth the test that I referenced above for identifying the "articles of manufacture" to which Samsung has applied Apple's patented designs.

## VII.   FUNDAMENTALS OF DESIGNING A GRAPHICAL USER INTERFACE WITH ICONS FOR AN ELECTRONIC DEVICE

35.     The process of designing a graphical user interface for an electronic device using icons is one of creative problem-solving and involves developing visual components.  It often involves the marriage of metaphor and aesthetics, meaning and craft.  Creating the part of the device with which users interact is an iterative and collaborative process. Many sources of information and decision-makers are involved: software engineers, product designers, product managers, industrial designers, and marketing managers.  It is far from "only" an artistic endeavor, because software and hardware are all essential to the finished product.

36.     An icon is a symbol – a visual affordance that may enable a user to interact with an electronic device.  Icons can of course appear on physical buttons or digital drawings of buttons. A group of icons on a screen can represent a variety of concepts and opportunities to interact. Images are differentiated from each other so they can be recognized at a glance.  A designer developing of a set of icons for a device might differentiate them from each other (or those in other products) by varying the shapes, colors, or sizes, etc., or using the arrangement of icons to add meaning to subgroups.

37.     Sometimes an icon is a fairly literal illustration of a user interface element that functions as something in particular (e.g., a clock or document).  Alternatively, an icon may instead make use of a metaphor to communicate an abstract concept or verb (e.g., "copy" or "like").  Concrete nouns are typically easier to portray in an icon because there is a physical

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

image to render.

38.     The first step in designing a graphical user interface for an electronic device is to understand the device itself – the product to which the design of the interface will be applied. It is critical to understand the function of the device, and how it is intended to work. Rarely, if at all, would a designer of a visual user interface set out to create a device-independent set of graphics. It is also necessary to know the technical constraints that might affect the design, such as pixel dimensions and resolution, bit depth/color palette, and constraints such as type of screen.  It is necessary to consider physical factors of the device, and who is expected to use it (i.e., everyday consumers or trained professionals, for example), where and when the device is typically to be used (indoors or outdoors, day or night), among many other factors.

39.     When designing a graphical user interface, the designer must consider each function for which an image is required, and consider what visual metaphors might be used to represent that concept. This is the "design problem" to solve: How best to identify and create an image so that a wide audience will be able to recognize and remember the function represented by that image?

40.     Design of a GUI may also need to take into account any marketing or design considerations typically found in a creative brief.  These considerations might include the intended "personality" of the product itself; the target audience; the desired style of the user interface graphics; and the competitive landscape (e.g., the goal of being differentiated from competitors in some way).  All of these factors can influence the development of a GUI con beyond the need for the clear and memorable communication of an idea.

41.     Additional factors may influence the development of the final visual appearance of a GUI.  Aesthetics are a prime consideration, but issues mandated by a mobile phone environment might include limited screen real estate, touch screen "hit" area space requirements, the relationship of the industrial design to the user interface, and creative issues or goals provided by a client's marketing organization.  Moreover, because the graphical user interface is to be applied to a particular electronic device, such as a phone, the designer must be aware of any technical requirements or constraints of the product, such as displaying every feature necessary to make a

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1   functional phone.  An additional consideration might be optimizing for a user's perception of ease

2   of use, which may affect the desired number and density of icons within a space.

3   42.   Within the screen dimensions, design options are unlimited. A graphical user

4   interface designer is freed from the limitations of mechanical buttons and switches. Icon images

5   can be presented on uniform shapes, for example, flat "tiles" or virtual "buttons"; any shapes are

6   possible. Buttons might also be shaped like the symbols they contain, or occupy visible grid or

7   other delineated framework.  Color palette might be determined by branding considerations or

8   used to indicate categories of applications or features.  Overall visual style (e.g., a two-

9   dimensional or three-dimensional look, hand drawn effect, palette and texture, etc.) might be

10  driven by marketing issues such as target audience or price point.  Though individuals design

11  icons, the path to a device UI is typically a collaborative process, with design alternatives

12  presented and a final icon set chosen in tandem with a requestor, client, or other decision maker.

13  **VIII.   THE D'305 PATENT AND APPLE'S IPHONE**

14  43.   In the D'305 patent, icons are pictured on a display screen.  (APLNDC00030421-

15  425.)  The width:height ratio of the display screen is approximately 1:1.5.  There is a 4 x 3 array

16  (4 columns, 3 rows) on a black background, with an additional row of icons in a gray gradient

17  area at the bottom of the screen.  (*See* Figure 1 from the D'305 patent, reproduced below.)

18  Approximately the top 80% appears as a solid black background containing the 4 x 3 array.

19  Against the black background, the 12 icons, which vary in color, in the top portion provide a

20  bright contrast and appear virtually illuminated against the black.  The lower approximately 20%

21  of the screen has a gray gradient-patterned background containing the additional row of icons—

22  the main effect being that the top part and lower part of the screen appear as separate, bounded

23  areas, setting off the icons in the lower part as a separate group.  The icons in the D'305 patent

24  have the shape of squares with rounded corners.  Under each icon there is gray text that names the

25  application represented by the icon.  There is a band across the top of the screen displaying

26  information: signal strength, carrier name, time, and battery charge status.

27

28

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**



**D'305 Patent Fig. 1**

44.     I have examined the user interface graphics of an iPhone running iOS version

2.2.1.  To do so I have examined an iPhone itself as well as "screen capture" images of an iPhone

home screen.  (Exhibit 3.)

45.     The overall visual appearance of the iPhone screen is substantially the same as the

designs shown in the D'305 Patent.[2]  The iPhone displays a grid of icons in the top portion of the

screen.  There are four columns and three full rows of icons, with a partial fourth row of icons.[3]

---

[2] *See* Joswiak Dep. Tr. at 20:22 – 21:2 (identifying the D'305 Patent design as "the [user
interface] for our iPhones and iPod Touch … Actually, this one in particular is the iPhone"); *id.* at
21:8 ("[T]his was the UI for our iPhones"); *id.* at 24:15 – 16 ("It is the graphical user interface of
an iPhone."); Howarth Dep. Tr. at 22:11 – 14 (testifying that the D'305 Patent design "looks like,
to me, the -- the graphical user interface that's shipped with the iPhone, that shipped on -- that was
the way that you controlled the iPhone.").

[3]  The number of rows visible in the top portion of the screen can be reduced to three rows by
moving some icons onto a second "page," as shown in Figure 4(b).

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

There is a separate row of four icons along the bottom of the screen on a gray gradient-patterned background filling approximately the bottom 20% of the screen.

46.     When the iPhone is configured to display icons on additional "pages," the separate row of four icons along the bottom of the screen does not change when the user views the additional pages.

47.     The iPhone screen is 480 pixels tall and 320 pixels wide, measuring 3.5 inches (diagonal) with a pixel density of 163 pixels per inch.[4]  Each icon appears to be a smooth (anti-aliased) rounded rectangle that is 57 x 57 pixels; each individual tiny pixel is a point of light that together with others creates an image.  The combination of pixels of many shades creates the perception of smooth, versus jagged, button edges.  The black background of pixels blends seamlessly with the black border of the phone itself, so the 16 icons are a bright contrast and appear virtually illuminated against the black.  As in the D'305 patent, many icons show a curved reflection of a light source that creates a shiny, arc-shaped effect over the top half of the icon; this is visible on all icons except Calendar, Camera, Maps, Calculator, Notes, Safari, and Contacts. (*See* Figures 4(a) and 4(b), below; Exhibit 3.)

---

[4] http://support.apple.com/kb/SP2

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

 

**Figure 4(a)**
**iPhone Screenshot (Home Screen)**

**Figure 4(b)**
**iPhone Screenshot (With Three Icons Moved to Separate "Page")**

48.     Each iPhone icon is labeled with pale gray, sans-serif, approximately 12 point anti-aliased text (upper and lowercase).  The baseline of the text is 14 pixels below the lower edge of the icon.

49.     There is a distinctive, overall graphical consistency to the iPhone screen.  Indeed, the iPhone screen has itself become iconic as a universal image for a smartphone.  The button-like icons are all shaped as squares with rounded corners.  Images are either cropped by this shape (e.g., Notes), or a discrete image is set within the rectangle, which acts as a background (e.g., Clock).  Although graphic styles vary between the individual icons (e.g., a stylized phone image for Phone, but photorealistic images for Photos and Camera), the uniform shape and precise placement in a grid provides a sense of organization and unity.  There is more vertical space than horizontal space between icons, but because of the text, the amount of black space that runs vertically and horizontally between the icons appears similar.  There is additional black background above and below the grid of icons to afford screen real estate for additional elements (e.g., time and battery life above, page indicator below).  Another distinctive feature is the gray

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

panel at the bottom of the screen that sets off four icons in a separate group; the distinctive green

Phone icon anchors the far left.

50.    I have also examined an iPhone 3GS and an iPhone 4, each running iOS version

5.0.1, and I have used Adobe Photoshop to examine screen capture images from the devices.

(Exhibits 4, 5.)  The overall visual appearance of the iPhone 3GS and iPhone 4 screens is

substantially the same as the design shown in the D'305 patent.[5]

 

**Figure 5**
**iPhone 3GS Screenshot (Home Screen)**

**Figure 6**
**iPhone 4 Screenshot (Home Screen)**

51.    The user interface graphics of the iPhone 3GS and iPhone 4—the shape,

arrangement and spacing of the icons—is consistent with the original iPhone, but there are some

small changes.  (See Figures 5 and 6, above.)  The iPhone 3GS screen has the same size and

---

[5] See Joswiak Dep. Tr. at 20:22 – 21:2 (identifying the D'305 Patent design as "the [user interface] for our iPhones and iPod Touch … Actually, this one in particular is the iPhone"); id. at 21:8 ("[T]his was the UI for our iPhones"); id. at 24:15 – 16 ("It is the graphical user interface of an iPhone."); Howarth Dep. Tr. at 22:11 – 14 (testifying that the D'305 Patent design "looks like, to me, the -- the graphical user interface that's shipped with the iPhone, that shipped on -- that was the way that you controlled the iPhone.").

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

resolution as the original iPhone, but the 3.5 inch (diagonal) screen of the iPhone 4 has a higher resolution of 940 x 640, for a pixel density of 326 pixels per inch.  Rather than a gray gradient-patterned background for the bottom portion of the screen, there is a rectangular, reflective surface that creates a virtual shelf, which serves as a base for the row of icons.  The background is not black, but rather has a gray gradient with scattered water droplets.  The anti-aliased text below the icons is white with a drop shadow.

## IX.   SAMSUNG'S INFRINGING PRODUCTS

52.   As noted above, the following Samsung Phones were found by the jury to infringe the D'305 patent:

- Captivate
- Continuum
- Droid Charge
- Epic 4G
- Fascinate
- Galaxy S 4G
- Galaxy S i9000
- Gem
- Indulge
- Infuse 4G
- Mesmerize
- Galaxy S Showcase (i500)
- Vibrant

I understand that Samsung's infringement was found by the jury to be willful.

53.   Photographs of the applications screens of each of the infringing Samsung Phones are contained in Exhibits 6 through 18.  I have examined each of the phones themselves.  I have also examined screen capture images of the applications screens of the Droid Charge, Fascinate, Mesmerize, and  Galaxy S i9000 (the only four phones from which I could obtain screen capture images created using the phones' built-in operating system).  (Exhibits 19, 20, 21, 22.)

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

 

**Figure 20 (*See* Exhibit 18)**
**Vibrant Applications Screen**
**(Page 1 of Applications)**

**Figure 21 (*See* Exhibit 9)**
**Epic 4G Applications Screen**
**(Page 1 of Applications)**

54.     The applications screens of the Samsung Phones address the same design problem addressed by the iPhone Devices and the D'305 patent: how to present a set of application icons on a touch screen device.  The icons in the applications screens displayed by the Samsung Phones use varying graphic illustration styles in a similar fashion as do the icons used by the iPhone Devices and contained in the D'305 patent.  As with the iPhone Devices and the D'305 patent, the consistent use of rounded, square-shaped icons in a grid layout unifies the icons in producing an overall visual appearance as a group.

55.     Thus, it appears that Samsung copied the design of the GUI patented in the D'305 patent and embodied in the iPhone.  For example, a December 14, 2008 email compares proposed icons for Samsung projects referred to as "Eternity" and "Genie" with the icons of the iPhone. (PX35.)  The e-mail refers to comments from AT&T that Samsung's proposed icons "appear very 'cartoonish'/animated which is okay if we are targeting a more youthful/tween audience," and that "iPhones icons are colorful and vibrant, however they are in contained square[s] which

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

1   appear more organized and consistent." The e-mail author stated that "[w]e would like to request

2   our designers take this into consideration when proposing/designing icons and also take into

3   consideration the target audience the device is for." Embedded in the email are the

4   "Icons/MainMenu" for "Eternity & Genie," juxtaposed against the "iPhone Icons/Main Menu,"

5   and the contrast between the two styles is apparent. The existence of this side-by-side

6   comparison between the iPhone's icons and Samsung's icons in December 2008 suggests that

7   Samsung was influenced or guided by the iPhone in designing the applications screens for the

8   Samsung Phones, which I understand were released beginning in July 2010.

9        56.      In February 2010, Samsung's Head of Mobile Division declared that the success of

10  the iPhone confronted Samsung with "a crisis of design." (PX40.) This appears to have spurred

11  the effort to copy the iPhone. In a document dated March 2, 2010 and titled "Relative Evaluation

12  Report on S1, iPhone," there are multiple pages that directly compare the iPhone's icon grid with

13  icon grids that look very similar to the applications screens of the Samsung Phones analyzed

14  above. (PX44 at SAMNDCA00203922, 00203930, 00204001, 00204006, 00204010.) The

15  document identifies elements of the iPhone design that are effective and uses them as a point of

16  comparison to the Samsung designs. For example, the document states about the iPhone, it uses

17  light to provide "three dimensionality [and] a luxurious feel." (*Id*. at SAMNDCA00204010.) In

18  contrast, it states about the use of light by the "GT-i9000", the icons lack "three dimensional

19  effect," and it identifies "Directions for Improvement" that include "Insert effects of light for a

20  softer, more luxurious icon implementation." (*Id*.) This reference to "effects of light" may be a

21  reference to the shiny, arc-shaped effect appearing in many icons on the iPhone Devices, the

22  D'305 patent, and the Samsung Phones. The existence of this side-by-side comparison between

23  the iPhone's icons and Samsung's icons suggests that Samsung was influenced or guided by the

24  iPhone in designing the applications screens for the Samsung Phones.

25       57.      Another example is a document dated March 22, 2010 and titled "The First

26  Usability Evaluation Results for Spring Bound Vins-Q. (SPH-M910)." (S-ITC-000118719-775.)

27  That document includes side-by-side visual comparisons of the iPhone icons and screen designs

28  with icons and screen designs similar to the Samsung Phones analyzed above. In particular, there

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

are graphics that show the Samsung and Apple icons for Clock (or Alarm Clock), Camera, Calculator, and Settings.  (S-ITC-000118722-723.)  The existence of this side-by-side comparison between the iPhone icons and Samsung's icons suggests that Samsung was been influenced by the iPhone in designing the applications screens for the Samsung Phones.  This document also contains particular examples of alternative icons for Phone, Contacts, Clock/Alarm, Gallery, Music, and Camera that are very different than the icons used in the Samsung Phones.  (S-ITC-000118722.)[6]

## X.  "ARTICLE OF MANUFACTURE" ANALYSIS FOR SAMSUNG PRODUCTS FOUND TO INFRINGE APPLE'S D'305 PATENT

58.     I have considered and analyzed the relevant facts in this case and applied the four-factor test set forth by the Court in order reach to my opinion regarding the identity of the "article of manufacture" to which Samsung applied the claimed design of the D'305 patent.

59.     For the reasons discussed in this report, it is my opinion that the article of manufacture to which Samsung applied Apple's patented design is the entire phone for each Samsung phone found to infringe the D'305 patent, and not a partial phone: a component or components of the phone such as "the display screen while displaying the single, patented array

---

[6] There are multiple additional documents that reflect efforts to copy the iPhone, including in particular the GUI design: PX46.16, 46.23, 46.29, 46.34 (May 2010); PX194 (internal Samsung e-mail from March 2010): "CEO Gee Sung Choi strongly pointed out Samsung UX's mindset of 'clinging to the past generation.'  This is being interpreted as an instruction to think about and decide all matters from the perspective of the user. . . . The most representative example is obviously the iPhone. . . . I am not saying to make a UX that is exactly identical to the iPhone, but I am saying to learn the wisdom of the the [sic] iPhone and recognize the standard (?) of the industry which was set by them already."; SAMNDCA20003761-20003857 at SAMNDCA20003802 ("Amethyst, iPhone Usability Test Result" – March 2010) shows comparison between "Amethyst" ("Icon size: irregular") and "iPhone" ("Icon size: regular and standard") and says "Improvement | Set the standard icon size"; S-ITC-010477381-010477490 (PX219 in 630 trial – May 2010) – Document includes numerous "direction[s]" for "[i]mprovement" of Samsung's "Kepler" phone, with the iPhone as the comparison throughout. For example, S-ITC-010477385 directs shading bottom of menu page to indicate those icons are fixed, as iPhone does; S-ITC-010477409 "Grow the image of the icon and fit it in the square frame without any blank margins" (matching description of iPhone). Other documents reflect that Samsung was executing on its goal to make its user interface more like the iPhone. See PX41.179 (July 2010) "Design new containers to differentiate from iPhone"; PX41.192 ("Container too iPhone like"); PX179 at 179.13 (April 2010 Samsung document entitled "Research & Study: Competitor's GUI study"  states: "Samsung's GUI has Apple-like design feel."

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1   of GUI icons," as Samsung contends.  The infringing phones, in their entirety, are the things that

2   may most fairly be said to embody Samsung's use of Apple's patented D'305 design.  Samsung's

3   asserted article of manufacture – "the display screen while displaying" the patented design of the

4   D'305 patent – is integral to the Samsung phones and a prominent feature necessarily used in

5   order to operate them.  One, it is a display screen that does not stand alone but rather is powered

6   by the phone and enables a user to operate the phone.  Two, even when not seen, the infringing

7   applications screen is part of the typical use case of the phone.  It is revisited repeatedly during

8   use.  And three, the D'305 design is emblematic of the entire phone.

9       60.     As noted above, a jury found that thirteen Samsung phones infringe the D'305

10   patent:  the Captivate (JX1011); Continuum (JX1016); Droid Charge (JX1025); Epic 4G

11   (JX1012); Fascinate (JX1013); Galaxy S, i9000 (JX1007); Galaxy S 4G (JX1019); Galaxy S

12   Showcase, i500 (JX1017); Gem (JX1020); Indulge (JX1026); Infuse 4G (JX1027); Mesmerize

13   (JX1015); and Vibrant (JX1010).  I understand that the evidence considered by the jury included

14   pictures of the infringing phones, and that the jury was provided with the actual phones while

15   conducting their deliberations.  To my knowledge, the jury was not provided with any of the

16   components that Samsung alleges are the articles of manufacture separated from the rest of the

17   phone.  The jury's verdict identifies the infringing Samsung "products," not merely the

18   applications screens, when it found infringement "[f]or each of the following products" and listed

19   each "Accused Samsung Product":

20

21

22

23

24

25

26

27

28

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

For each of the following products, has Apple proven by a preponderance of the evidence that Samsung Electronics Co. (SEC) and/or Samsung Telecommunications America (STA) has infringed the D'305 Patent?

(Please answer in each cell with a "Y" for "yes" (for Apple), or with an "N" for "no" (for Samsung).  Do not provide an answer for any cell that is blacked out.)

| Accused Samsung Product | Samsung Electronics Co. Ltd. | Samsung Telecommunications America, LLC |
|---|---|---|
| Captivate (JX 1011) | Y | Y |
| Continuum (JX 1016) | Y | Y |
| Droid Charge (JX 1025) | Y | Y |
| Epic 4G (JX 1012) | Y | Y |
| Fascinate (JX 1013) | Y | Y |
| Galaxy S (i9000) (JX 1007) | Y | |
| Galaxy S 4G (JX 1019) | Y | Y |
| Galaxy S Showcase (i500) (JX 1017) | Y | Y |
| Gem (JX 1020) | Y | Y |
| Indulge (JX 1026) | Y | Y |
| Infuse 4G (JX 1027) | Y | Y |
| Mesmerize (JX 1015) | Y | Y |
| Vibrant (JX 1010) | Y | Y |

That suggests that the jury understood that Samsung applied the claimed design of the D'305 patent to Samsung's infringing phones as a whole.

61.     An analysis of the four factors set forth by the Court confirms that the articles of manufacture to which Samsung applied the D'305 design are the infringing phones in their entirety.  I should note that although certain facts and items of evidence are discussed under one or more of the four factors, many of the facts are relevant to more than one factor even if not repeated or cross-referenced in every instance.

**Factor 1: "The Scope of the Design Claimed in Apple's Patent, Including the Drawing and Written Description"**

62.     The first factor considered in the article of manufacture analysis is "the scope of the design claimed in Apple's patent, including the drawing and written description."  For the reasons discussed below, it is my opinion that the scope of the design claimed in the D'305 patent

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

is consistent with my conclusion that the article of manufacture to which the claimed design is applied is an entire electronic device that requires a graphical user interface, such as a phone, and not just a portion of the device. This factor therefore supports the conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'305 patent.

**The D'305 patent**

63.     The title of the D'305 patent is "GRAPHICAL USER INTERFACE FOR A DISPLAY SCREEN OR PORTION THEREOF."  Similarly, the claim of the D'305 patent is for "The ornamental design for a graphical user interface for a display screen or portion thereof, as shown and described."

64.     The Court has construed the claim of the D'305 patent as follows: "The D'305 Patent claims the ornamental design for a graphical user interface for a display screen or portion thereof, as shown in Figures 1-2. The broken line showing of a display screen in both views forms no part of the claimed design."

65.     The D'305 patent's title and claim, and the Court's claim construction all support my opinion. A "graphical user interface for a display screen" is something intended only for, and useful only for, an electronic device of some kind. Likewise, the reference to a "display screen" confirms that this is a design intended for an electronic device that would power the screen. A design for a display could only be viewed as part of an electronic device that is turned on. The statement that the design is "for" a display screen indicates that the inventors intended their design to be part of, *i.e.*, applied to, an electronic device that would require and incorporate a display screen. It is neither an independent product nor, say, a graphic to be printed on fabric.

66.     While the Court noted that the broken line in both views of the D'305 patent is not part of the claimed design, that observation does not mean that the article of manufacture is so limited. Nothing in the Court's claim construction or in the four-factor test would limit the article of manufacture to which the claimed design is applied to the solid lines. Indeed, if the article of manufacture was limited to the boundaries of the claimed design there would be no need to consider factors two, three and four – factors that the Court obviously decided should be considered. The Court has said that "the relevant article of manufacture may extend beyond the

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

scope of the claimed design" and that "This principle is evident from the text of § 289," which

provides that "'Whoever during the term of a patent for design … applies the patented design …

to any article of manufacture ….'"

67.     The D'305 patent includes two figures.  The written description states that "FIG. 1

is a front view of a graphical user interface for a display screen or portion thereof showing our

new design," and that "FIG. 2 is a front view of a second embodiment thereof."  The figures are

further confirmation that the claimed design is intended to be applied to, or integrated into, an

electronic device, specifically a smartphone.  Each of the individual icons making up the claimed

design demonstrate this, including for example, the icons for "Phone," "Mail," "Safari" (a web

browser), "Text," and "YouTube," among others.  Rather than depicting generic icons, for

example, the D'305 design uses icons that convey specific functionalities.  The figures of the

D'305 patent thus indicate that the design is not merely an arrangement of colorful placeholder

images that might be applied to any number of things, but rather specific applications intended to

be applied to a smartphone.[7]

68.     It is my opinion that a designer reading the D'305 patent would recognize that the

design claimed in the D'305 patent is intended for dynamic use in an electronic device such as a

smartphone.

69.     The Samsung products that have been found to infringe the D'305 patent are all

smartphones.  I understand that Samsung contends that the article of manufacture is limited to

"the display screen while displaying the single, patented array of GUI icons," and does not extend

to the device of which that display screen is a part and the operation of which is controlled by the

graphical user interface shown in the patent.  I disagree for the reasons discussed in this report; I

also expect to address Samsung's contentions in a reply report according to the schedule set by

---

[7]  *See, e.g.*, Joswiak Dep. Tr. at 23:17-24 (Q. Does any part of what you see in D'305 show an
entire phone or device?  A. It does.  I mean, these icons launch things that are part of the phone.
For example, that phone icon launches the communication aspect of an iPhone.  The camera icon
launches the camera of the iPhone.  This is a UI that doesn't exist on its own; it exists as part of
the iPhone."); Howarth Dep. Tr. at 175:23-176:3 ("I mean, this is specifically to design the
iPhone. There's a -- there's a camera button on there so that you can access the camera and a
phone so that you can phone. I mean, this is the -- this is the way you use our product.")

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

the Court.

70.     As noted, the Court has said that "the relevant article of manufacture may extend beyond the scope of the claimed design."  In addition, the Manual of Patent Examining Procedure explains that the article of manufacture to which the claimed design is applied may include portions depicted by broken lines:  "Structure that is not part of the claimed design, but is considered necessary to show the environment in which the design is associated, may be represented in the drawing by broken lines.  This includes any portion of an article in which the design is embodied or applied to that is not considered part of the claimed design."

71.     Samsung's own experts from earlier phases of this case have also recognized that the claimed design of the D'305 patent was intended for application to electronic devices such as the iPhone and other smartphones.  For example:

- Samsung expert witness Sam Lucente stated his opinion that "rectangular display, the icon grid, the icon dock, and the size, shape and number of the icons, and the status indicators, the icons (themselves), the words under an icon, all on a graphical user interface are fundamental, functional elements *for human-computer interaction*."  (March 23, 2012 Expert Report of Sam Lucente at 24 (emphasis added).)  Mr. Lucente thus recognized that claimed design was not just an abstract image but rather was intended to be applied to a device "*for human-computer interaction*."

- Samsung expert witness Mark Lehto likewise recognized that the patented design was to be applied to a phone such as the iPhone:  "The specific arrangement shown of four rows and four columns in the rectangular display area provides easy access and readily identified control and display elements when implemented in an rectangular viewing area equal to or larger than that of the iPhone."  (March 22, 2012 Expert Report of Mark Lehto at 22.)

- Mr. Lehto further recognized that the arrangement of icons in the D'305 design was directly connected to the usability of the "device" for which it was intended:  the icons located in the bottom row of the design "controls perform common

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

functions likely to be used by a large proportion of users, so placing them in this lower row, close to where the thumb normally rests when holding the device clearly serves a functional purpose by increasing usability of the device." (*Id.* at 23.)

- Mr. Lehto also noted that the patented design was intended to facilitate "operating the device:" "the placement of a dock of frequently used controls on the bottom end of the display screen is the most convenient location to access when operating the device with a single hand." (*Id.* at 24.)

- Mr. Lehto also opined that the shape of the icons – squares with rounded corners – related to the application of the design to an electronic device: "the consistent form of the elements therefore has a functional purpose. For an electronic device with a touch screen, such as the iPhone, iPad, or iPod, this would imply that shapes of this type are all tappable. That is, tapping the shape will cause a function of the device to be activated." (*Id.*) [8]

72.    These statements confirm that just because the claimed design may not encompass the entire article does not mean that only the claimed portions can be considered the article of manufacture. The article of manufacture can and often does contain other, unclaimed features.

**Cited prior art**

73.    I have reviewed the patent prior art cited on the face of the D'305 patent. Most of the cited patent references, including those cited by the patent examiner, refer to or depict electronic devices such as phones or other mobile communication devices, computers, digital cameras, data processors, a medical monitor**,** an image processing machine, a handheld terminal, and a multimedia controller. Some of these references were cited by the Patent Examiner and

---

[8] Although the foregoing statements from the Lehto report were in reference to Apple's D'790 patent, Mr. Lehto stated that they applied equally to the D'305 design: "The D'305 patent includes what appears to be the same rectangular arrangement of elements as the D'790 design. The rectangular arrangement of square interface elements in the D'305 design plays an important functional role, as discussed above in reference to the D'790 patent. Thus, D'305 design is functional for all the reasons set forth above." (*Id.* at 25.)

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1    some by the inventors, indicating that both viewed the claimed design as being applied to an

2    electronic device, such as a phone.  In my opinion, a designer of ordinary skill in the art

3    considering the cited references would similarly view the D'305 patent in the same way.

4         74.    More than half a dozen of the cited references are design patents obtained by

5    Samsung.  These patents further serve to support my opinion that the article of manufacture for

6    the D'305 patent is an electronic device, specifically a phone.  To take just one example, U.S.

7    Patent No. D559,261 is assigned to Samsung Electronics Co., Ltd., and the named inventors are

8    Min-Hwa Jung and Ho Kim.  The D'261 patent is entitled "Generated Image for Display on a

9    Portable Telephone."  Like the D'305 patent, Samsung's D'261 patent claims only the

10   "ornamental design for a generated image for display on a portable telephone," as shown below:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



75.     Although the claim is limited to the design within the rectangle shown above, the drawings actually make clear that the product to which the design is applied is a portable phone, as shown here in Figure 1 of the D'261 patent:

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**



FIG.1

76.     The D'261 Samsung patent, and the other Samsung patents cited on the face of the D'305 patent, are further confirmation for my opinion that it is not ambiguous – the article of manufacture to which the design claimed in the D'305 patent is applied is the entire phone.

**The prosecution history**

77.     The prosecution file of the D'305 patent does not affect analysis of the scope of the design claimed in the patent.  The application originally included 194 figures, and the examiner imposed a restriction requirement, dividing the 194 embodiments into 128 groups.  In

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

the application that ultimately issued as the D'305 patent, the applicants elected the single figure that became figure 2 of the D'305 patent, and cancelled the other 193 figures. Figure 1, the color version of figure 2, was added during prosecution according to Patent Office procedures for color figures. Other than these technical matters, the application was approved and the examiner did not make any substantive comments on the claimed design itself.

### Apple's development of the D'305 patent

78.     Additional evidence also supports that the D'305 patent describes an ornamental design intended for application in an entire electronic device, such as a smartphone. Apple's designers invented the claimed design as part of their work in inventing and developing the original iPhone. Apple's designers envisioned and described their claimed design for a particular product—the iPhone—and did not merely describe or claim a design in the abstract. In other words, they created the D'305 design to be applied to an electronic device such as a phone, just as Samsung has done in the case of its infringing phones.[9]

79.     Imran Chaudhri, one of the inventors of the D'305 patent, testified that he knew that the icons and home screen he was working to design was intended for the phone that later was named the iPhone. (Oct. 14, 2011 Deposition Transcript of Imran Chaudhri at 123:1-24:7.) In laying out the design of the screen, his goal was to make the device easier and faster to use. (*Id.* at 135:5-39:3.) The design of the phone icon, for example, was effective to communicate to users that the icon would launch the phone function of the device. (*Id.* at 170:23-172:11.)

80.     Freddy Anzures, another inventor of the D'305 patent, testified that from the start of his work that led to the D'305 design, he knew that he was "going to be working on a phone." (Oct. 18, 2011 Deposition of Freddy Anzures at 10:11-20.) Mr. Anzures elaborated on how integral the D'305 design was to the product it was designed for, the iPhone:

- "the team really worked hard to come up with something that, even though it was a completely new product, that was counterbalanced by this very familiar and intuitive visual look so that it wouldn't scare anyone." (*Id.* at 57:8-13.)

---

[9] *See* paragraphs 95 to 98 below regarding Samsung's design process.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

1   •     For example, the gear of the settings icon was intended "to show that this was the

2       way to get to the insides of the phone."  (*Id*. at 182:7-183:9.)

3   •     Likewise, one reason that the "dock" was located at the bottom of the design was

4       so "it can be reached by the user's thumb while still holding the device with one

5       hand."  (*Id*. at 89:23-90:9.)

6       81.      Mr. Anzures explained that the goal for the icon design and display was "to create

7   things for the products to kind of marry that familiarity in what they see in the real world into

8   something that's on the product."  (*Id*. at 63:13-64:4.)

9       82.      As discussed above, Apple's original iPhone, iPhone 3G, iPhone 3GS, and

10  iPhone 4 practice the D'305patent.  For each of those products, Apple applied the claimed design

11  to the entire smartphone product and not merely to a component or components of the product.

12  **Factor 2: "The Relative Prominence of the Design Within the Product as a Whole"**

13      83.      The second factor considered in the article of manufacture analysis is "the relative

14  prominence of the design within the product as a whole."  For the reasons discussed below, it is

15  my opinion that the D'305 design is one of the most prominent features of the infringing products

16  as a whole.  This factor therefore supports the conclusion that the article of manufacture is the

17  entire phone for each Samsung phone found to infringe the D'305 patent.

18      84.      The D'305 design is prominent in Apple's original iPhone, iPhone 3G, iPhone

19  3GS, and iPhone 4.  The unique array of colorful icons making up the GUI is a feature that stands

20  out and dominates when viewing and using the iPhone products.  They are a significant part of

21  what defines the iconic "look and feel" of the iPhone.

22      85.      The design claimed in the D'305 patent has become so iconic that it is often used

23  to represent the concept of a smartphone.  In a quick sketch, or when creating an image with just a

24  few strokes, the D'305 design has become a visual shorthand to illustrate a smartphone.  Also,

25  stylized versions of the D'305 are now commonly represented in generic smartphone images in

26  clip art, and in cartoons in popular culture.  See below for examples of stylized images of the

27  D'305 design, for example:

28

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1

2

3

4

5

6

7



8

9

10

11

12

13

14

15



16

17

18

19

20

21

22

23

24

25




26

27

28

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**





These examples demonstrate the prominence of the D'305 design as an identifying aspect of the product as a whole.  The distinctive design of the D'305 is already interwoven in the culture to mean smartphone.  Even Homer Simpson's smartphone reflects the D'305 design.

86.    The prominence of the D'305 design is also evident in Apple's marketing of the

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

iPhone.  Apple's advertising showcased the product as a whole and often featured D'305 design (as well as others).  Apple adopted a strategy to emphasize its products in marketing, what it called the "product as hero" approach.[10]  Greg Joswiak, Apple's Vice President of Product Marketing testified about the role of the D'305 design in Apple's advertising:  "It's the launching point for the, for launching your apps off an iPhone, and we most often used it as the identity of the hero image, if you will, of the iPhone."  (Joswiak Dep. Tr. at 25:14 – 17.)  The emphasis on the product was reflected in the guidelines for advertisements of the iPhone.  Those guidelines state:  "In all iPhone marketing communications, the product is the hero.  Show it front and center in all layouts."  (APLNDC0002008363-2008405 at APLNDC0002008368.)  The guidelines also provided "hero images" of the iPhone to be used in advertisements, each of which prominently shows the front face of the iPhones:

 Hero Image



---

[10] Dkt. 2841 (Nov. 15, 2013 Trial testimony of Phil Schiller) at 824:8-22 ("Q:  Are you familiar with an instruction "product as hero"?  A. Yes.  Q. What is product as hero, sir?  A. It's a saying we use in marketing at apple that when we're marketing our product, it's all about the product. We want the customer to see the product, understand it, hopefully love it like we do.  So we make most all of our marketing have the product as the hero of the ad.  It's not screens with people.  It's not lifestyle situations.  It's the product that's most focused on in all the marketing.  Q. And why does that work for you?  A. Because the product is really beautiful and really unique.  Those are the things that allow us to have this entire marketing strategy."); *see also* Joswiak Dep. Tr. at 100:25-101:4 ("[A]ny time we have the iPhone as the hero, you know, it's, I like that.  I think it shows the beauty of the iPhone, as well as showing you these apps, and it's just something I always liked.").

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

The following advertisement is exemplary (PX11.2):



Twice as fast.        Half the price.

In addition, PX12 summarizes television advertisements for the iPhone, and many of the ads for the iPhone, iPhone 3G and iPhone 3GS featured views of the D'305 design, including the ads entitled "Never Been," "Calamari," "How To" (also PX127), "Surprised," "Watered Down," "All These Years," "Amazing OK Go," "Instead," "All the Parts," "The Winger," "Brilliant," "Music Store," "Bet," "Facebook," "Cars," "The Great Thing," "Vicinity," "Work Friendly," "Unslow," "Lonely Planet," "Cro-Mag," "Everyone," "Loopt," "Game Changer," "Shazam," "Urban Spoon," "Check," "Fix," "Read," "Student," "Office," "Itchy," "Break In," "Skateboard," "Travel," "Nature Lovers, Pizza Lovers," "Avid," "Dine In, Dine Out," "Voice Control," "Share," "Copy and Paste," "Pass Test, Pass Time," "Gift," "Song," "Multipeople," "Where's the Movie," "12 Apps of Christmas," "Family Travel," "Backpacker," "Dog Lover," "Shopper," "Concert," "Commute," and "Family Man." (*See* PX12 underlying evidence.)

87.     Apple's packaging also featured images of the iPhone's D'305 design, as shown in the following photograph of the box for an iPhone:

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1

2

3

4

5

6

7

8

9



10    88.    The prominence of the D'305 design is also evident in images of the iPhone found

11  in popular media.  PX14 summarizes 11 appearances of the iPhone in television shows from 2007

12  to 2010.  Of the 11 examples listed, 10 include images of the GUI design patented by the D'305

13  patent.  PX17 summarizes news coverage of the iPhone; many of the news items featured images

14  of the iPhone displaying the patented D'305 design.  (*See* "Apple Unveils All-In-One iPhone," by

15  Ellen Lee, San Francisco Chronicle, January 9, 2007; "Apple Waves Its Wand at the Phone," by

16  David Pogue, New York Times, January 11, 2007; "Testing Out the iPhone," by Walter S.

17  Mossberg and Katherine Boehret, The Wall Street Journal, June 27, 2007; "Best Inventions of

18  2007," by Lev Grossman, Time, November 1, 2007; "Newer, Faster, Cheaper iPhone," by Walter

19  S. Mossberg, Wall Street Journal, July 9, 2008; "Apple's New iPhone 3G; Still Not Perfect, but

20  Really Close," by Edward Baig, USA Today, July 10, 2008; "Upgrade Makes Great iPhone Even

21  Better," by Edward Baig, USA Today, June 18, 2009; "Thinner, Faster, Smarter iPhone Raises

22  the Stakes," by Walter S. Mossberg, Wall Street Journal, June 20, 2010; "Review: Apple Makes

23  All the Right Calls on iPhone 4," by Edward Baig, USA Today, June 24, 2010.)  These include

24  Time Magazine's award of Invention of the Year honors to the iPhone.  (PX135.)

25    89.    One of Apple's experts for the 2012 trial, Mr. Musika, prepared a table, Exhibit

26  24, that details examples of demand for and importance of design in selling smartphones.  The

27  sources of evidence summarized in this exhibits include the following:  Apple advertising

28

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1  materials, Samsung advertising materials, Samsung product development and planning

2  documents, Samsung strategy documents, survey data, third-party market and consumer analysis,

3  testimony and email from representatives of the parties, and other evidence related to the patents-

4  in-suit, including the D'305 patent, and the infringing Samsung products.  Many of the items on

5  the table specifically cited the user interface design and/or icons, including numbers 1, 3, 20, 21,

6  22, 24, 27, 48, 71, 74, 77,78, 82-86, 88, 89, 91, 95, and 97.  (A copy of the Musika exhibit is

7  attached hereto as Exhibit 23.)

8       90.    It is also apparent that Apple considered the claimed design of the D'305 patent to

9  be a prominent and important feature of the iPhone as a whole, as well as of the infringing

10  Samsung phones.  Apple made a presentation to Samsung in August 2010, soon after Samsung

11  introduced the first of its infringing phones.  (PX52.)  Apple's presentation included a slide

12  entitled "Samsung Copying iPhone," which showed an image of the Galaxy S product displaying

13  the infringing design of the D'305 patent, side by side with an image of an iPhone 3GS with

14  home screen displayed, as shown here:

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

91.     Apple's contemporaneous reference to "Samsung Copying iPhone," supported by images of Apple and Samsung phones displaying the patent D'305 design, supports my view that the D'305 design is a prominent feature of the iPhone as well as of Samsung's infringing phones. Boris Teksler, then Apple's Director of Patents and Patent Licensing, testified that this presentation relied on the patented GUI design to convey "the remarkable similarity of the two products, all the way from the overall appearance of the product down to the arrangement, the four-by-four arrangement of the icons, the similarity of the icons, the persistent dock that you have at the bottom that doesn't change with the screens."  (Dkt. 1695 (Aug. 10, 2012 Trial Transcript) at 1960:18-1961:5.)

92.     While the exterior design of the infringing Samsung phones is also a prominent feature of the infringing products, the design of the graphical user interface in the infringing Samsung phones is a comparably prominent feature.  At the time when the iPhone was still a relatively new product, and when Samsung began to introduce its infringing phones in 2010 and 2011, the unique design for a graphical user interface claimed by the D'305 patent, and appropriated by the infringing Samsung phones, was a striking feature of those products.  The patented GUI design, together with the exterior design also patented by Apple and infringed by Samsung, was a prominent aspect of the overall design of the infringing Samsung phones.  The overall effect of the hardware and graphical user interface makes a distinctive whole – both as patented by Apple and infringed by Samsung.

93.     The unique GUI design of the D'305 patent dominates the perspective that is most often viewed when the phone is being used.  An ordinary observer would recognize the product by seeing the striking design of the GUI.

94.     I also reviewed and considered internal Samsung documents, deposition testimony, and comments made by industry reviewers and consumers as evidence relevant to how an ordinary observer would perceive the infringing design of the D'305 patent with respect to the Samsung infringing products as a whole.  This evidence provides further support for my opinion that the infringing design of the D'305 patent is quite important to the Samsung infringing products as a whole.

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

95.     When Samsung marketed the infringing phones, it did so in a way that showcased not only the exterior design of the phones but also the infringing design of the graphical user interface.  For example, the packaging of many of the infringing Samsung phones showcased images displaying the patented design of the D'305 patent:



http://www.fonearena.com/blog/19963/samsung-galaxy-s-unboxing-pictures.html

In another example, marketing materials for the Fascinate included images of the phone displaying the infringing design of the D'305 patent:

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    (SAMNDCA00312148.  *See also* SAMNDCA00312145.)

16
17        96.    When Samsung released the infringing phones, several articles recognized the

18    claimed design of the GUI as integral to the products as a whole and as a basis for their overall

19    similarity to the iPhone.  Examples of this include a Wired magazine article dated July 15, 2010,

20    entitled "First Look: Samsung Vibrant Rips Off iPhone 3G Design."  The Wired article depicted

21    the Samsung Vibrant phone side-by-side with the iPhone and noted that "the square icons are,

22    again, very similar in their looks to the iPhone 3G's."  (PX174.)  A review of the Samsung

23    Galaxy S in Techradar.com, dated July 20, 2011, depicted the application screen of the infringing

24    phone and commented that "the Samsung Galaxy S and iPhone 3G/3GS could very easily have

25    been separated at birth"  (APLNDC-Y0000237361-71.)  PX6 summarizes additional press reports

26    commenting on the design of the Samsung infringing phones; in particular a PCWorld article

27    dated June 29, 2010, entitled "Samsung Galaxy S: How Does It Measure Up to the

28    Competition?," includes an image of the phone displaying the infringing D'305 design (PX175),

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

1   and a July 20, 2010 review of the Samsung Vibrant in Laptop Magazine likewise featured an

2   image of the phone presenting the infringing D'305 design.

3       **Samsung's design of the infringing phones**

4       97.    Samsung's design approach for the infringing phones also indicates that the D'305

5   design is prominent within the products as a whole.  Samsung expert witness Sam Lucente

6   reviewed all of the evidence and concluded that "icon layout, icon container and icon metaphors"

7   were "factors related to design problem solving" that 'drove Samsung's overall design solution"

8   for the "accused products."  (April 17, 2012 Corrected Rebuttal Expert Report of Sam Lucente at

9   10.)

10      98.    Samsung designer Jinsoo Kim testified that "Samsung consider[ed] overall design"

11  when designing the infringing phones.  (Dec. 19, 2017 Deposition Transcript of Jinsoo Kim ("J.

12  Kim Dep. Tr.") at 30:18-31:12, 86:11-24.)  Samsung's designers sought to create "one design."

13  (*id*. at 87:10-88:24.)  Samsung designer Jeeyuen Wang testified that when designing a user

14  interface, she knew she was designing for a phone and would take took into consideration the size

15  of the display screen and the number of pixels available on the display.  (Dec. 20, 2017

16  Deposition Transcript of Jee-Yeun Wang ("Wang Dep. Tr.") at 55:15-24.)

17      99.    Justin Denison, Samsung America's Senior Vice President of Marketing for

18  Mobile Phones, explained Samsung's philosophy of "holistic design," "how in this particular case

19  Samsung is bringing together the thousands of technology, the hundreds of parts, the millions of

20  lines of code, to create, you know, a beautiful end product."  (Dec. 20, 2017 Deposition

21  Transcript of Justin Denison ("Denison Dep. Tr.") at 93:11-18.)

22      100.   Samsung's executives also recognized the importance of the user interface design

23  to the products as a whole.  In a February 2010 internal email circulated within Samsung's mobile

24  communications division summarizing an "Executive-Level Meeting Supervised by Head of

25  Division," Samsung concluded that "The iPhone has become the standard," and they needed to

26  "make something like the iPhone."  (PX40.)  Samsung's Head of Mobile Division stated:  "when

27  our UX is compared to the unexpected competitor Apple's iPhone, the difference is truly that of

28  Heaven and Earth.  It's a crisis of design."  (*Id*.)  A March 2010 Study by the Mobile Marketing

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

Group noted that "high-end consumers … focus not only on the external design but on the UX design and usability."  (SAMNDCA00196646-196827 at SAMNDCA00196658.)  As noted above, another internal Samsung study document from March 2010 contained multiple pages that directly compare the iPhone's icon grid with icon grids that look very similar to the applications screens of the Samsung Phones analyzed above.  (PX44.)

101.    A number of studies commissioned by Samsung also focused on the prominence of the user interface design claimed in the D'305 patent.  A Boston Consulting Group presentation prepared for Samsung entitled "Lessons from Apple" dated November 3, 2010, and discussed in item 83 of Exhibit 24-S (Exhibit 23), notes that "Apple's sleek and intuitive user interface has been a key driver of its value proposition," including its "clean, beautiful interface" and "clean menu screens."[11]

**Factor 3: "Whether the Design Is Conceptually Distinct from the Product as a Whole"**

102.    The third factor considered in the article of manufacture analysis is "whether the design is conceptually distinct from the product as a whole."  For the reasons discussed below, it is my opinion that the D'305 is not conceptually distinct from the product as a whole; it is completely integrated into the product as a whole.  This factor therefore supports the conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'305 patent.

103.    The concept of the design claimed by the D'305 patent is a graphical user interface for use in the iPhone.  Rather than being conceptually distinct, the claimed design was always conceived as being fully integrated into the iPhone.  Richard Howarth, a twenty-plus year Apple employee and senior member of the industrial design team, testified regarding the D'305 design: "this is specifically to design the iPhone.  There's a -- there's a camera button on there so that you can access the camera and a phone so that you can phone.  I mean, this is the -- this is the way

---

[11] PX54.13 ("Apple's sleek and intuitive user interface has been a key driver of its value proposition . . . Clean, beautiful interface. Clean menu screens. Intuitive, user-friendly navigation & visual elements).

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

you use our product." (Howarth Dep. Tr. at 175:23-176:3.) Greg Joswiak also testified to the

conception connection between the D'305 design and the phone:

> **Q.** Does any part of what you see in D'305 show an entire phone or device?
>
> **A.** It does. I mean, these icons launch things that are part of the phone. For example, that
>
> phone icon launches the communication aspect of an iPhone. The camera icon launches
>
> the camera of the iPhone. This is a UI that doesn't exist on its own; it exists as part of the
>
> iPhone.

(Joswiak Dep. Tr. at 23:17-24.)

104.    Likewise, Samsung's infringing use of the D'305 design was conceived from the

beginning of the development of the infringing phones as intended for and integrated into those

infringing phones, and not some distinct purpose or use. (*See* testimony of J. Wang, cited above.)

105.    The bitmap features of the D'305 design for the GUI echo the physical features of

the iPhone and the infringing devices, illustrating that the patented design is conceptually integral

to the products that incorporate it. Discussing the iPhone, Richard Howarth explained that on the

front of the product , "the bezel is continuous to hold the whole product together, visually as well

as physically" because the visuals are part of what unites the product. The D'305 design is part of

the total conceptual whole of the "unboxing" experience that Apple created for the consumer.

The consumer opens the package to reveal a refined product that is sleek, shiny and smooth;

every element is essential. When the consumer turns it on, the resulting aesthetic experience is a

continuation. The icons of the D'305 GUI – with their high resolution, photorealism, and

simulated metallic texture – emulate the metallic, shiny surface of the phone's exterior. Mr.

Howarth described how during the phone's development, Steve Jobs delighted in the role of

design "middleman" so graphic designers had "the latest" from industrial designers, and vice

versa. Because the GUI group worked above the industrial design group, Howarth quoted Jobs as

saying, e.g., "Can I borrow this and take it upstairs?" — and sharing the latest drawing or

prototype, which would ensure a consistent point of view on visual design. Thus, the rounded

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

1  rectangular shape of the icons in the D'305 screen design is repeated on the physical home button.

2  The former was designed by the user interface team, while the latter was designed by the

3  industrial design team, with the result illustrating their close collaboration.  And the black

4  background of the D'305 GUI design matches the black face of the phone, seamlessly integrating

5  the physical hardware with the software.  In addition, the D'305 GUI design implements the

6  multi-touch functionality that was introduced with the iPhone.  The design language of the GUI

7  pairs with the visual characteristics of the phone's industrial design.  In fact, the GUI designers

8  were able to design icons within a virtual mockup of the hardware bezel on their monitors, and

9  were simultaneously able to view the development of the D'305 design on a prototype iPhone

10  display (powered by an attached circuit board).  From the outset, the D'305 was designed in

11  tandem with the hardware.  At Apple, the hardware and software for a product are not thought of

12  as two different realms, but rather are developed together and designed to work together

13  seamlessly.

14      106.    When viewing the D'305 design, an ordinary observer would recognize that it is

15  not merely a collection of shapes and colors, but rather a holistic design for a device interface.

16  The D'305 design is always associated with a phone (whether Apple's iPhone or Samsung's

17  infringing phones), never separately.  It is not a product assembled cafeteria-style at purchase.

18      107.    The D'305 design corresponds to portions of the product a user must manipulate to

19  use the phone as a whole.  The user's primary interaction when operating the device is through

20  the graphical user interface, the design for which has been found to infringe the D'305 patent.  In

21  the iPhone, "It's the fundamental starting point for using an iPhone, launching the apps.  It's

22  obviously part of the identity of the iPhone."  (Joswiak Dep. Tr. at 24:24 – 25:1.)  The same is

23  true of the infringing Samsung phones—the application screens are the jumping point for

24  accessing all applications.  This is key to the user experience.  Conceptually it is inseparable from

25  the product as a whole from the user's perspective.

26      108.    The graphical user interface has no value apart from the infringing phones as a

27  whole.  Indeed, yet another reason the design of the GUI is not "conceptually distinct" from the

28  infringing products as a whole is because without the graphical interface one could not operate

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

the product or access any of its other features.  Apple's Vice President of Procurement, Tony

Blevins, put it this way:  "Well, as a matter of fact, all of the components in an iPhone are

essential or it won't function.  We don't put them in there for no reason.  Every component is

necessary. … Every component is necessary in order for the device to function, and if the device

isn't functioning, then there is no active user interface."  (Dec. 17, 2017 Deposition Transcript of

Tony Blevins at 221:7-20.)[12]

109.    Samsung's design of the infringing phones indicates that the D'305 design is not

conceptually distinct from the phone as a whole.  Jeeyuen Wang, who was involved in the GUI

design for some of the infringing phones, testified that when designing user interface screens at

Samsung she uses a "dummy frame"  – an LCD device with a power cable and protective frame –

to view her designs.  (Wang Dep. Tr. at 35:19-36:14, 39:11-40:1.)  That the infringing GUI

designs were developed using this type of emulator confirms that the intention was always for

these designs to be an integral part of the phones themselves.  As noted above, Samsung also

employed a holistic design process to the phones found to infringe.  See paragraph 97 above.

110.    Likewise, Samsung's copying efforts, described above, included the entirety of the

iPhone, noting that certain Samsung phones were found to infringe not only the D'305 patent but

also one or both of the D'087 and D'677 patents as well.  When Samsung's Head of Mobile

Division pronounced that Samsung faced "a crisis of design," the solution did not focus on any

single component.  Rather, it was, "make something like the iPhone."  (PX40.)

---

[12] *See also* Howarth Dep. Tr. at 175:15 – 176:3 ("**Q.**  Can you use a user interface outside of the
phone itself?  **A.**  No.  No, there would be no use.  I mean, this is specifically to design the
iPhone.  There's a -- there's a camera button on there so that you can access the camera and a
phone so that you can phone.  I mean, this is the -- this is the way you use our product."); Joswiak
Dep. Tr. at 20:20-21:23 ("I mean, the display screens don't exist just on their own, right?  They
are part of a product.  This is the UI for our iPhones and iPod Touch. . . . Actually, this one in
particular is the iPhone.  **Q.**  So, the language where it says, for a display screen or portion
thereof, as shown and described, in your view, is incorrect?  **A.**  Well, again, UIs don't float by
themselves, right?  They are part of a product, and this was the UI for our iPhones."; *id.* at 23:9-
11 ("Again, UIs don't exist on their own.  They exist as part of a product.  This exists as part of
the iPhone."); *id.* at 24:3-16 ("**A.**  Again, it's self-evident that UIs don't exist just on their own.
They exist as part of products.")

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**Factor 4: "The Physical Relationship Between the Patented Design and the Rest of the Product"**

111.    The fourth factor considered in the article of manufacture analysis is "the physical relationship between the patented design and the rest of the product, including whether the design pertains to a component that a user or seller can physically separate from the product as a whole, and whether the design is embodied in a component that is manufactured separately from the rest of the product, or if the component can be sold separately."  For the reasons discussed below, it is my opinion that this factor supports the conclusion that the article of manufacture is the entire phone for each Samsung phone found to infringe the D'305 patent.

112.    The graphical user interface that embodies the D'305 design in the Samsung products is not a physical thing, and therefore does not have a separate physical existence apart from the phones in which it is found.  How would it be possible to separate, and sell, the screen represented by the D'305?  It is the glowing, backlit face of the phone.  The Samsung phones determined to infringe the D'305 patent are all unitary devices.  The phones are not modular, and are not designed to be taken apart by consumers or the typical user (who is not a hardware engineer).  In particular, the graphical user interface that embodies the D'305 design is not a static image; it exists as software – a coded set of instructions to the processor – and does not exist apart from, and cannot be separated from, the infringing Samsung phones.

113.    The physical relationship between the portion of the infringing phones that embody the patented D'305 design – the graphical user interface on the application screens – and the rest of the product is entirely integrated and inseparable.  Without the patented GUI, the rest of the product would be useless.  Conversely, an image of the user interface itself would be useless.  The GUI is not separate from the rest of the product, it is inextricably bonded with the product.  In fact, the notion of physically separating the GUI from the thing on which it operates and interacts makes little or no sense.

114.    I understand that Samsung contends that a user could separate the display screen from the infringing phones, and that this somehow demonstrates that the infringing GUI design is separable.  I disagree, and Samsung's contention does not show that the *patented design* is

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

separable.  Neither part is useful without the other.  The patented D'305 design itself simply cannot be separated from the phone – it is either displayed on the phone, or it does not exist.  There is nothing separable or physically distinct about it.  Moreover there would be no reason to try to separate the GUI from the rest of the phone, as it would make no sense because the GUI would serve no purpose if separated from the phone it is intended to interact with. There is no separate use for the patented design of the GUI apart from being used in the infringing phones.

115.     Samsung sold the infringing products as a whole, and does not sell the infringing GUI embodying the D'305 patent separate from the rest of the phone.  Samsung's witnesses confirmed that Samsung's mobile division is in the business of selling phones, not components of phones, and certainly not graphical user interfaces.  For each Samsung product found to infringe the D'305 patent, the D'305 design is not a component that a buyer or seller can physically separate from the product as a whole in the normal course.[13]

116.     Samsung's marketing was also directed to selling the infringing phones as a whole. For example, Samsung's print and television advertisements were for the infringing phones as a

---

[13] *See*, e.g., Dec. 13, 2017 Deposition Transcript of Drew Blackard ("Blackard Dep. Tr.") at 128:2-7 ("Q. For each of those channels that you've described -- carriers, retail locations, individual customers, enterprise -- Samsung sells finished phones, correct?  A. Yeah, we would sell, you know, complete phones to those people.)  *Id*. at 157:14-23 ("Q. The phone division, sir. The phone division does not sell displays to individual customers, correct?  A. Yeah. In my recollection, we don't have like a direct display that a consumer will buy. We sell direct displays to companies who can provide them via end products or, you know, other ways.  Q. But not to individual customers, right?  A. Not to my knowledge.").

Dec. 14, 2017 Deposition Transcript of Timothy Sheppard at 56:20-57:8: ("Q. The object that's in there [the box with the Droid Charge components], did you ever sell that to Verizon?  A. This individual component would have not been sold separately without the glass to Verizon. But they would have been able to purchase the service from Samsung for us to replace the glass and recover this component; or if the glass was good, sell them this part of the component.  Q. And I take it that the answer is also true that you -- you didn't sell anything to consumers, that object was not sold to consumers?  A. This individually, no. This level of repair component was not sold to the end consumer, correct.").  *Id*. at 134:20-22 ("A. Well, when we sold phones to carriers or consumers, we didn't sell it as a modular kit to assemble at home; we sold a finished product.")

Dec. 22, 2017 Deposition Transcript of Dongwook Kim at 23:6-21:  ("Q. Has Samsung ever sold any part or component of these infringing phones separately from the phones themselves? …A. Though I don't think we sell parts directly, I think we do sell to service parts.  Q. What do you mean that Samsung does not sell parts directly?  A. These parts are -- the parts are important parts to the models, and my understanding is that there is a ban on selling them separately.")

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

1   whole, not components of those phones.[14]  I am aware of no instance in which Samsung

2   advertised the infringing GUI embodying the D'305 design separate from the infringing phones.[15]

3        117.    I am not aware of Samsung or any sellers ever separating the infringing GUI from

4   a phone.  While Samsung alleges that the GUI with the infringing D'305 design can be deleted

5   from the phone, that particular copy of the GUI will then no longer exist – it is not separated, it is

6   destroyed in that hypothetical.  In my view, destroying the patented design does not establish that

7   it could exist separately.

8   **XI.     CONCLUSION**

9        118.    For the reasons discussed in this report, it is my opinion that the article of

10   manufacture to which Samsung applied Apple's patented design is the entire phone for each

11   Samsung phones found to infringe the D'305 patent, and not just a component or components of

---

13   [14] *See*, e.g., Blackard Dep. Tr. at 160:18-161:25 ("Q. Again, setting aside the repair program for
14   broken phones, Samsung does not market the components in the third box to end customers for
   phones, correct? … A. What do you mean by "market the components"? I mean, we don't -- we
15   do market the components. We market display quality and resolution. We market screen
   durability and strength. We market our design innovation.  Q. (BY MR. MUELLER) And you
16   market all that as part of a phone. I'm saying you don't market those as stand-alone components,
   correct? … A. Yes, as -- as stand-alone individual items, you know. We tend to only market the
17   ones that we talked about before.  Q. (BY MR. MUELLER) Batteries and memory?  A. In this
   time frame.  Q. The last box here is A0000029CDCB34. And what's in this box, sir?  A. Looks
18   like a display glass and a display panel.  Q. And, again, the same question: Samsung hasn't
   marketed those components as stand-alone components for phone users, correct? … A. Yeah. I
19   mean not beyond the scope that we previously talked about for -- for repairs and as kind of
   individual value adds.")  *Id.* at 162:9-163:1 ("Q. Samsung has not marketed these components as
20   stand-alone components to phone users, correct? … A. Yeah. I mean, I'll just repeat what I said
   there, is that we obviously market the components to companies as display divisions and other
21   divisions. We have marketed components to consumers.  We've marketed these components to
   consumers as their individual attributes; we have not marketed like the component itself to end-
22   users.  Q. (BY MR. MUELLER) To end-users have been marketed in the context of the phone,
23   right? … A. Yes. It would be part of the overall value proposition.").

25   [15] *See* J. Kim Dep. Tr. at 92:22-93:3 ("Q. Has Samsung ever advertised the graphical user
   interface of the infringing phones shown on Exhibit 8 separately from the rest of the
26   phones?  …A. I don't think I've seen the icon being advertised separately.")

27   Denison Dep. Tr. 86:16-21 ("Q.  Have you ever seen an ad depicting something that looks like
   the part in the fourth box?  A. I cannot remember an advertisement that shows the piece of the
28   phone that's shown in the fourth box.")

**CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

the phone such as "the display screen while displaying the single, patented array of GUI icons," as Samsung contends.  The infringing phones, in their entirety, are the things that Samsung sold and that embody Samsung's use of Apple's patented D'305 design.

## XII.   SUPPLEMENTATION

119.    I reserve the right to supplement this report with new information and/or documents that may be discovered or produced in this case.

## XIII.   EXHIBITS TO BE USED

120.    I anticipate using as exhibits during trial certain documents and things referenced or cited in this report or accompanying this report.  I also anticipate using other demonstrative exhibits or things at trial.


Dated:  January 15, 2018        _____
                                 Susan D. Kare, Ph.D.

la-1368636