# EXHIBIT G

World Patent Information 46 (2016) 64–72

Contents lists available at ScienceDirect

# World Patent Information

journal homepage: www.elsevier.com/locate/worpatin




# Are patent trade wars impeding innovation and development?



Charles V. Trappey [a], Amy J.C. Trappey [b, *], Yu-Hui Wang [c]

[a] Department of Management Science, National Chiao Tung University, Hsinchu, Taiwan
[b] Department of Industrial Engineering and Engineering Management, National Tsing Hua University, Hsinchu, Taiwan
[c] Department of Information and Finance Management, National Taipei University of Technology, Taipei, Taiwan

**ARTICLE INFO**

Article history:
Received 6 October 2015
Received in revised form
10 June 2016
Accepted 15 June 2016
Available online 24 June 2016

Keywords:
Patent trade war
Anti-competitive
Patent pools
Innovation management
Trade-related aspects of intellectual property rights (TRIPS)

**ABSTRACT**

When patents support anti-competitive conduct, innovation can be damaged not only by lack of market access but by the prohibitive costs of litigation. The creation of patent barriers is inconsistent with IP protection and enforcement agreed upon under the World Trade Organization and trade-related aspects of intellectual property rights ('TRIPS'). The study uses the US Apple v HTC IP legal case to investigate anti-competitive market behavior and trade barriers. The research provides a formal patent analytic methodology and the case analysis result. The research method tests whether patent conflicts and technical trade barriers are significantly encouraged by existing IP laws.

© 2016 Elsevier Ltd. All rights reserved.

## 1. Introduction

Under certain conditions, patent wars can create market trade barriers when used with cartels, patent pools that refuse licenses, and are supported by discriminatory competition laws that favor import injunctions instead of litigation. In 2010, a smartphone case *Apple v HTC* [1] filed in conjunction with a complaint to the United States International Trade Commission ('ITC') stated that the Taiwan High Tech Computer Corporation ('HTC') smartphone using the Google Android operating system was in direct violations of 10 patents owned by Apple [2]. This initial complaint was followed by over two years of litigation and additional complaints (four ITC investigations involving 45 patents, one appeal and seven district court civil suits). A settlement was reached where only one patent owned by Apple (US5,946,647) with two claims were found as an infringement by HTC and resulted in a limited injunction of imports [3]. To prevent the injunction, HTC's best option was to settle out-of-court with Apple to avoid further market entry delays to HTC's smartphone and end the high cost of continuing litigation. There has been academic discussion that Apple's patents were overly broad, should have been brought to jury litigation to eliminate invalid patents, and that the patent settlement supported unwarranted patent claims that limited innovation [4].

For the consumer electronics industry, and smart phones specifically, patent pools and cross-licensing are commonly used to avoid the re-design of essential components which are re-used in the design of new generation phones. Smaller manufacturers creating new and innovative products rely on the licensing of fundamental and essential patents that comply with global communications standards (also called standard essential patents, SEPs). By denying small innovators access to patents accepted by the International Standards Organization, patent pools could arguably violate Section 2 of the *Sherman Act 1890* by monopolizing trade [5]. Apple, in addition to ITC complaints and district court cases, also filed an anti-trust case against HTC [6]. When patents are used as means for anti-competitive conduct and to create market barriers, innovation by smaller companies is potentially damaged by lack of market access and the prohibitive costs of litigation. The creation of aggressive patent barriers is clearly inconsistent with IP protection and enforcement agreed upon under the World Trade Organization and trade-related aspects of intellectual property rights ('TRIPS') [7]. Thus, the key research questions in this study are:

(1) Was there anti-competitive behavior underlying the patent trade war between Apple and HTC?

* Corresponding author.
 E-mail addresses: trappey@faculty.nctu.edu.tw (C.V. Trappey), trappey@ie.nthu.edu.tw (A.J.C. Trappey), isecho@ntut.edu.tw (Y.-H. Wang).

http://dx.doi.org/10.1016/j.wpi.2016.06.004
0172-2190/© 2016 Elsevier Ltd. All rights reserved.

(2) Was the US International Trade Commission (ITC) being abused by Apple to file complaints without foundation to purposely and willfully block the importation of HTC products?
(3) Were the creations of patent pools limiting innovation for global smartphone development?
(4) Did patent trade wars between smartphone companies limit innovation and development?

The topics covered in this research include the *Apple v HTC* smartphones case in the US, an investigation of anti-competitive market behavior, and trade barriers. The research structure of the paper includes (1) Patents as Trade Barriers, (2) Injunction, Litigation, and Royalties, (3) Smartphone Patent Wars and Final Settlement, (4) Patent Pools and Marginalization, and (5) The Impact of Patent Wars on Innovation and Development. The research will provide sufficient background to help policy makers determine if patent trade wars, breakthrough innovation patent conflicts, and technical trade barriers are sufficiently protected by existing IP laws. The results provide an objective analysis to help resolve legal arguments that patent trade wars threaten the fair trade of consumer electronic IP.

## 2. Patent trade wars and patent trade barriers

The ITC ruled on December 19, 2011 [3] that the ongoing dispute with Apple and HTC resulted in the infringement of two claims (claim 1 and claim 8) for only one Apple patent (US5,946,647). The remedy was a limited exclusion order where HTC phone's user interfaces with Google Android operating system (OS) was to be refurbished before being allowed into the US market. The wars waged by Apple against smartphone suppliers mostly targeted the design and manufacture of Android OS smartphones. As shown by Fig. 1, Apple used ITC investigations and the US district court cases to seek injunctions which increased the litigation costs for both companies for a period of 2 years [8]. The first research question explores whether the tactics used by Apple created an anti-competitive trade barrier for HTC to enter the US market [9].

The history of the litigation begins with Apple suing HTC in the Delaware District Court [1] in the year 2010 for 10 patents that were believed to infringe on Apple's hardware and software patents designed for mobile communication devices. The patents were developed in part by the Apple subsidiary NeXT which created the object-oriented programming and software that defines the processes underlying many of the patents. HTC applied for a transfer of venue from Delaware to the Northern District of California pursuant to 28 USC s 1404. Apple insisted that they were trying to consolidate the case with an ongoing case against Nokia that was being prosecuted in Delaware [1]. However, the Delaware Court ruled that under 28 USC s 1659 that district court claims involving parallel ITC proceedings [10] must be stayed pending the outcome of ITC action. The strategy used by Apple to simultaneously file for district court litigation, continuous ITC complaints with different patents, arguments for changes of venue, added two years to the settlement timeline. During the period of litigation, Apple more than tripled its market share to 53% in the year 2012 [11]. When the smartphone patent wars started in 2010, HTC and Samsung held 15% of the US market which was equivalent to Apple's market share [12]. On December 19, 2011, the ITC ruled partially in favor of Apple's complaint and noted infringement of claim 1 and claim 8 for patent US 5,946,647 [3]. The ITC, however, issued a limited exclusion order with no bond that allowed HTC to refurbish the Android OS smartphones sold to consumers under warranty. The final ITC ruling was important since it was one of the few cases where the consumer and the effect of the exclusion on smartphone product access in the US market were considered [13].

### 2.1. Anti-competitive behavior

Reviewing the timeline of Fig. 1, the complex and intense lawsuits pursued only ended in a request to fix the HTC product under warranty without penalty. There are no official estimates of the



**Fig. 1.** The litigation timeline of US smartphone cases between Apple and HTC, modified based on [8].

costs associated with pursuing these complicated lawsuits and complaints since public disclosure is not available from the Trade Commission. HTC within two months of the first complaint decision filed a counter-complaint with the ITC claiming that Apple infringed on 5 HTC patents [14]. HTC was unsuccessful with the complaint and no patents were found to be infringed by the ITC. Apple, to further strengthen its case against HTC and users of the Android based smartphones, combined forces with Microsoft and others to purchase the Nortel network patent pool for US$ 4.5 billion dollars [15]. Although feared by some businesses to be an anti-competitive purchase, judges in the US and Canada claimed there was no antitrust risk in the sale [15]. Apple pursued new civil law suits against HTC in Delaware after the purchase of the patent pool. Once again, arguments were made for a change of venue to California and the District Courts of Delaware called for a stay until the new ITC cases was settled [1,16].

Google became involved in defending the Android operating system by licensing patents to HTC and other smartphone companies that were locked in continuing lawsuits with Apple. Google purchased the Motorola Mobility patent pool for US$ 12.5 million which gave the company an advantage to use software and hardware to integrate smartphones with other devices and networks [17]. After the purchase, HTC again tried to counter sue and filed an ITC complaint but failed in both cases [18,19].

**In conclusion for Research Question 1 (Was there anti-competitive behavior underlying the patent trade war between Apple and HTC?), there is no evidence. There was nothing illegal under US law with the action taken by Apple in its efforts to preserve their smartphone brand equity and to protect their patents.** Apple did enlarge its market share when litigation delayed the entry of competing smartphones. Their actions to file complaints with the ITC were within their right as patent holders to defend their patent claims. The HTC market entry delay was not a great success story for Apple even though their market share was increased. The patents Apple put forth were found to be weak and overly broad and not upheld by the ITC adjudicator.

Instead of using the market strategy to license its technology to others, Apple fought to preserve all rights under their patents and to block the emergence of the Android operating system over their own operating system. Further, many of the patents put forward to challenge HTC's use of the Android system were ineffective. Apple had to join forces with Microsoft to form a patent pool and Google also had to purchase patents and form alliances with Android users. The overall impact of the patent trade war was to eliminate invalid patents or overly broad and weak patent claims through the investigative legal processes and commit more companies to form alliances and license essential patent technologies. Thus, the patent war effectively caused technology and market consolidations toward generally accepted smartphone products complying with 3G/4G standards.

### 2.2. The mechanics of an ITC injunction

The second research question explores whether the US International Trade Commission was being used by Apple to press complaints without foundation to purposely and willfully block the importation of HTC products. The US International Trade Commission Investigations are an alternative means for US companies to avoid civil court patent infringement litigation by claiming unfair trade practices that disrupt the local market through import trade [20]. Companies in the US may suspect that a competitor is infringing on their patents and will weigh the cost of litigation versus the odds of winning a favorable outcome in a jury based US District Court trial [13]. Indeed, if a case can be fast-tracked as an unfair trade practice, the burden is then shifted to the US government (and the US tax payers since trade is being protected) rather than onto the company to adjudicate the intellectual property infringement dispute. By claiming unfair competition, the US International Trade Commission, reporting to the President and the Congress, must investigate a US company's claims that there is a patent, trademark, or copyright infringement that is potentially monopolizing and harming the domestic market [21]. The ITC is not a court for litigation. Rather, the US Trade Administration is a branch of the US Federal government that investigates complaints concerning foreign imports that are claimed to violate a domestic company's intellectual property or injure its trade, report on international trade and competition, and maintain the US tariff schedule.

Clearly, if a US company wishes to minimize the risk of litigation and lower costs, then an appealing strategic starting point is to make a Federal claim that there is a foreign IP import violation injuring the firm. By making the IP violation claim as broad as possible and including imports, there is less chance that the Administrative Law Judge ('ALJ') will find a basis to dismiss the merits of the case in the public interests of the US consumer [13]. If there is a favorable ruling by the ALJ, there are no damages awarded but the ITC then informs the US Customs Bureau to place an injunction on the import of products (or products containing components) that are the subject of the complaint. These products may be seized and destroyed. Statistics from the ITC show that over half of all injunctions during the year 2011 were for consumer electronic items with business process patent rather than traditional patents such as those used for pharmaceuticals [22]. However, there is increasing concern of the use of the ITC to block imports between domestic companies and to use the ITC as the preferred venue for settling IP trade disputes instead of the Federal Courts [23].

The mechanics of the ITC investigation follows a very simple and short time schedule (less than 6 months) compared to preparing for and litigating in a Federal District Court. A US company may also file for simultaneous litigation in District Court but typically a stay of litigation is called for and the trial follows the ITC investigation and injunction. If the ITC investigation is favorable, then the results are forwarded to the District Court for a jury trial pursuing damages caused to the company's loss of market share from previous imports of infringing products.

Apple used the ITC complaint process legally and fairly as did HTC since they are a registered US company with a sales and marketing division in the State of Washington. There was no willful motive shown that Apple was only determined to delay the launch of the HTC Android smartphone when introduced in the year 2010. Apple's success with the ITC to investigate complaints and to win the limited injunction on imports did secure and increase Apple's share of the market and did delay HTC's market entry. Even though there are arguments that this is a controversial approach that arguably decreases competition and fair trade [24], Apple had every right to defend its patents regardless if it delayed HTC's market entry. They successfully filed valid complaint applications to the Trade Commission that warranted investigation as was their right under the law. Apple used 45 patents to initiate four ITC investigations. The end result of the ITC investigation ended in a settlement after only two claims for one patent were supported which effectively delayed the market entry of the first generation HTC smartphone. The same strategy was simultaneously being used by Apple to sue Samsung and Motorola at great costs. If the ITC had failed to support Apple's complaints because they were baseless and repetitive, then there would be evidence that the administrative and judicial processes were being misused. **There is no evidence from the research to support the second research question that Apple was abusing the ITC system as a means to delay**

**HTC's market entry. The legal action taken by Apple was not viewed as a technical trade barrier against imports.**

### 2.3. Barriers to smartphone market entry

Smartphones were first introduced in 1992 [25]. The rapid growth of the smartphone market started in early 2000, and were referred to as portable, hand-held third generation ('3G') telecommunications devices that adopted innovations in broadband Internet access [26]. In essence, a smartphone is a handheld mini-computer with an operating system that may be operated while being transported. Most of the patents and technologies used in smartphone were created over the last 20 years by portable computer designers, portable phone designers, digital camera designers, and Internet service providers [27]. According to Fordham CLIP patent study of the smartphone industry, the number of granted smartphone-related utility and design patents exceeded 300,000 between 2006 and 2012 [28]. Since smartphones are considered to be short lifecycle consumer products, the market demand and prediction of its maturity in a given market are very difficult to determine. The inability to estimate market size increases the risk of introducing new consumer electronic products [29]. For most smartphones, the time span from introduction of the product to maturity can be less than two years and often can be as short as one year. Delays in market entry by trade injunctions can seriously damage a company's brand equity. The delay of the introduction of a new product using ITC patent injunctions or litigation filed by competitors can eliminate the product from the market even if an appeal overturns the injunction or the litigation is unwarranted. There will already be next generation products in the marketplace by the time the litigation is settled. Since so many patents are involved in the creation of a smartphone, most designers buy into patent pools to reduce the risk of infringement [30]. Patent pools facilitate the re-use of SEPs, which enables engineers to focus on the creation of new designs and new features (e.g., user interfaces and applications) that better differentiate the phone in the marketplace.

### 2.4. Are patent pools necessary?

The third research question explores whether the creation of patent pools were limiting innovation for global smartphone development. Patent Pools are created when there are different competing factions among technology developers. Often, there are dominant patent holders that form strategic SEP pools or alliances which smartphone suppliers depend on to license and adopt essential SEP functions into new smartphone designs. If the pools are willing to cross license (exchange technologies), using reasonable and non-discriminatory terms, then there is less likelihood of patent barriers being created and patent wars erupting. Patent pools only create problems when non-reasonable and discriminatory terms are used to block innovation and new product market entry [31]. At the beginning of the patent trade war between Apple and HTC, Apple had no desire to join a patent pool. However, as the cases progressed and the weaknesses of Apple's patent claims were disclosed, they found it necessary to form a patent alliance with other major players, such as Microsoft, to purchase Nortel Networks patents covering smartphone communication technologies.

Standard Essential Patents (SEPs) [32] are those patents that are needed to comply with a globally accepted standard of industrial design and communications interfaces. The Institute of Electrical and Electronics Engineers defined a standard as a set of patents that are critical for cross-licensing and for implementation in consumer electronics such as smartphones. Without a pool of critical patents for design and re-use, it is impossible to keep pace with the consumer's insatiable desire for newer and more sophisticated electronic devices. The ability for a single smartphone supplier to develop all required technologies for a smartphone independently is practically infeasible. A recent study reported that approximately US$ 120 must be paid for a stack of patent royalties for an average US$ 400 smartphone. The entire royalties cost about the same as the total cost of physical components for building a smartphone [33]. Essential patents are traded through design houses or patent pools and licensed either independently or through consortiums. The ability to design and re-use patented communications and other essential technologies through licensing has resulted in the quick development of a large variety of new and creative smartphone designs. Without these patent pools licensing portfolios of SEPs, there would be only one or two major smartphone suppliers dominating the global market.

Reasonable and Non-discriminatory Terms [34] are set by standard setting organizations that require that patents to be included in the standard essential set and that the patentees agree to license to other innovators at rates that are reasonable and non-discriminatory. However, there is a great leeway to the definition of "reasonable" which has led to many disputes over the computation of reasonable license royalties. Setting the terms as a standard contract under generally accepted principles may be a means to avoid injunctions used as market barriers. There is little WIPO involvement in setting member product standards and non-discriminatory terms for licensing. Members have the right to bring a complaint forward to the WTO for dispute settlement if discriminatory licensing practices are creating unfair trade barriers.

From the viewpoint of companies, if a smartphone requires licensing many essential patents prior to construction (e.g., patents of LTE cellular functionalities for 4G mobile phones) then the risk of introducing a new product with a one year life cycle may not be worth the fundamental research and development effort [34]. The threat of litigation will push small smartphone companies to license SEPs and direct research innovation to niche areas, such as outer designs, user interfaces, and applications [33]. Winners of the legal patent battles (after settlements through negotiation and licensing) are using the outcomes to maintain leading market positions in the US which can be argued are not in the best interest of the consumer [35]. Even though the ITC is mandated to use Section 337 investigations in the public interest, there is often a failure of the investigations to review the impact of their actions on global innovation and multilateral trade. For example, Taiwan's HTC Android smartphone was prohibited from import. The ITC administrative law judges placed general exclusion orders for injunctive relief against all smartphones with Android software including Motorola and Samsung and several other companies that have significant investment interests (manufacturing plants, research facilities, retail, and marketing operations) in the US.

Originally, where the ITC was mandated to protect US companies from foreign IP infringement, large US companies with large litigation budgets are attacking other US firms and foreign direct investment firms to delay their import of competing products. Apple, which manufactures its products overseas, was attacking other US companies (HTC; foreign direct investment, Samsung; foreign direct investment, and Motorola) that also manufacture overseas and import into the US. There has been debate that the ITC is protecting too many American firms that are more willing to invest in litigation than innovation to grow market share [23]. The argument can be extended to say that Apple inflated its claims to the ITC (Fig. 2) by using widely diverse patents with broad technical content difficult to resolve within the time frame and the budget allowed by the ITC. Another view is that the argument lacks foundation since in principle the patent holder has the first right to defend their IP rights even if the trade of others is disrupted by the



Fig. 2. Lattice diagram depicting the unstructured litigation used during the patent war.

infringement investigations.

Patent US6,343,263 holds a claim by Apple that covers all voice, telephone, and instant video signal processing systems on computers. Apple's claim in 2002 was that the patent also covers voice, telephone, instant video signal processing system using application software and an interface to interconnect with Wide Area Network service providers. The patent claims are written in such broad terms that any smartphone that attempts to use an application program to process Internet signals in real time are potentially in violation of the patent. The patent in question dates back to the NeXT computer of 1988 [36] and over time, standard setting groups such as IEEE have made great strides replacing the overly broad claims of Apple's patents by developing better patents that use alternative processes and are specific to their application and are available to anyone under reasonable and non-discriminatory claims. However, any company that tries to use a paste function to download from text or images from a wide area network potentially infringes on Apple's patent which was originally not invented for smartphones but for computer workstations.

Likewise, Apple's patent US5,946,647 of 1999 enables automatic detection of phone numbers and file identifiers means that any computer that can detect its own data structures and then follow through with a command execution to order the structure potentially infringes on the patent. Android phones detect callers and create lists to generate automatic call back features and is thus claimed to infringe on this patent. Thus, generally accepted and widely used features such as phone lists and call back lists, search engines that scan caller lists, and commonly used data structures that have become commonplace were being challenged by Apple's arguably over broad patent claims.

Apple made no attempt to inform competitors of potential infringement and actively pursued ITC injunctions using such a wide range of patents that any small innovator of a new smartphone would simply give up the attempt to enter the market rather than face injunctions and civil district court jury trails where the damages might outweigh the cost of the infringement. Even though there is open access Android code that executes code differently from claims made in Apple's patents and even though these computer functions used to label content and to open other applications is wide-spread on most computers, Apple persisted with broad based patent claims litigation that often failed but delayed the entry of competing products that arguably did infringe on their IP rights. Applications to open e-mail programs, link phone callers with e-mail contacts, place information on calendars, were all under dispute. Although HTC in 2010 would only have needed two or three months to design a new algorithm that had no process similarity to the Apple patent claim, a simple notification to HTC would have saved the US taxpayers a significant amount of money and allowed the introduction of another innovative product choice in the marketplace. That strategy however, was contrary to Apple's longstanding business policy to control all aspects of its operating system and to deny licenses to manufacturers of clones.

Even if HTC had to eliminate Apple-like linking features from its smartphones, they still would have been able to offer the consumer a new feature, and a new product choice, and at a different price point. The ITC was arguably allowing a dominant IP holder to monopolize a product but Apple held valid patents worthy of review. Patents should protect innovation, not restrict the ability of other manufacturers from making similar products that do not clearly infringe on existing IP. Steve Jobs declared that he was willing to stage thermonuclear war against Google if they persisted with enabling smartphones to use Android to continuously access the Internet [37]. Apple's patent litigation impacted the market share of every smartphone vendor but in the long run acted as a catalyst for change between manufacturers. The patent war created a greater incentive for manufacturers to work together when creating short product life cycle electronic products. There is growing awareness that it is too wasteful to wage patent wars when money spent on research and development builds a bigger market for all players.

## 3. Injunction, litigation, and royalties

US firms evaluating litigation weigh the costs and risks associated with the settlement. If a patent suit is brought forth in the US, then the trial becomes a civil suit with a trial by jury. When a company is weighing the option of presenting complex disputes over patents to a jury, there are several aspects to consider. First, there can be a country of origin prejudice whereas the US jury may be biased against a foreign firm and award an unreasonable and discriminatory settlement. There is also the issue of brand loyalty, where a jury member will be naturally inclined to support the

product of their choice even though there is valid evidence provided to discredit the brand for infringing upon a patent.

The *Apple v HTC* case does not exhibit the normal business process of weighing of options to litigate but an obvious declaration of war against Google and the Android operating system and all smartphones using the Android operating system [37]. As noted by several authors, Apple was determined to wage war a patent war rather than license [38]. In terms of market strategy, the most efficient means to win a market war is to deny the public access to the product. Without a product, opposing companies cannot gain market share. The casualties in a smartphone war are those companies that lose sales and market share. Apple effectively used the US International Trade Commission Investigation as a primary means to claim IP infringement to obtain import injunctions against HTC. If HTC was manufacturing its smartphones in the US, Apple's strategy would not have worked. HTC has a subsidiary company in the US and manufactures smartphones in Taiwan and China. Apple, likewise, is a US company that manufacturers its smartphones in Taiwan and China. In both cases, each company is a major importer of smartphones. HTC, on the other hand, is a major licensee of US companies such as Qualcomm and supports the use of the US Google Android software. Apple had the largest portfolio of smartphone related patents but HTC is a significant licensee of US patents. Was the ITC following their mission investigating cases that were not clearly domestic and favored one domestic company to increase imports (US revenue outflows) in an investigation that potentially harmed the IP license revenue inflows for US firms? Should a clearer distinction been made by the ITC to determine whether this was really a domestic company being harmed by imports by a foreign firm? Apple has far greater foreign operations and import trade with China and Taiwan than HTC. However, HTC has very substantial domestic license agreements with US firms. For all of the Apple ITC cases, there was no economic analysis provided on the impact to US foreign direct investment and trade as a result of Apple successfully winning an injunction against HTC. In fact, the injunction won by Apple increased the trade deficit by increasing imports of iPhones and decreasing HTC's licensing fee and royalties to major US firms including Qualcomm, Motorola, and Google. Regardless of how this argument is construed, Apple had the right to defend its patents, to maintain its monopoly, even if it created an unfavorable trade imbalance. Companies were still free to innovate and create new solutions to increase trade opportunities.

## 4. Smart phone patent wars and Final Settlement

According to both USPTO annual US patent activity report and None Practice Entity (NPE) litigation statistics [33,39], both granted utility patents and patent infringement suits have sharply increased since 2010. The increasing IP legal activities are commonly recognized as the results of smartphone patent applications and grants during the same period of time account for more than 20% of the USPTO patents [40].

### 4.1. Waging war

In order to better understand the strategy used by Apple that delayed HTC's product entry into the market, a lattice diagram [41–43] is used (Fig. 2). The diagram maps the similarity of the patents used in the investigations and cases over time. Lattice diagrams are useful for determining if litigants are using a "shot-gun" approach rather than a structured litigation approach. The links identify whether or not there are similar and better related patents (less broad and arguably stronger patents) being used across the investigations and cases to build and support the case argument. If there are few links between the circles, then most of the patents being used in the cases and ITC complaints are unrelated (which makes the case very difficult for the defendant if the plaintiff's patents are easily defended). The size of the circles identifies the number of patents from a single case or investigation that is being linked to other cases and investigations. As Fig. 2 demonstrates, the plaintiffs used a "shot-gun" approach and tossed in as many relevant patents as possible to support their compliant with the ITC. There are only three weak links and one poor link over the litigation time frame.

Therefore, the noteworthy results of the lattice analysis are that neither company used a consistent cluster of patents to link cases or ITC investigations. At most, cases have only a single patent in one case to link to another case (*Apple v HTC*, #1 → #3 or *HTC v Apple*; #8 → #9). The linkage is even weaker for *Apple v HTC* #2 → #6. The diagram supports the claim that each case and each investigation used unrelated and broad patent claims that were difficult to defend and significantly increased the cost of litigation. For Case #4, HTC petitioned the ITC to move the venue to California due to the difficulties of travelling from Taiwan to the East Coast of the US. Apple was within their rights to defend their patents (even though they were slowly losing the war) and to argue for a venue in their best interest even if it made it difficult for HTC to coordinate court and investigative appearances. The ITC agreed with Apple to maintain the Delaware venue.

Each case uses a new set of patents to be contested which strategically complicates the defense of the infringement for HTC. HTC was only able to fight back with stronger patent infringement claims after Google purchased patents from Motorola Mobility and licensed those patents from Google. Previously, Google was using the open source Android operating system and supplying it for free to smartphone developers. Goggle, as an Internet content provider had no previous background in the development of computers and computer interfaces and therefore no related patents. Therefore, the payment of US$ 12.5 billion for patents to counter further suits by Apple and others challenging the Android operating system was a necessary investment. The investment in patents however, increased the license fees to HTC for each Android system used but ended the war between Apple and made it difficult for Apple to attack other licensed users of the Android operating system.

### 4.2. The Final Settlement

On November 11, 2012, Apple and HTC announced they have settled their global disputes over IP patent infringement. The war started in March 2010 with numerous law suits and complaints filed in Delaware district court and US International Trade Commission (ITC) that lasted for 32 months. At the end of the patent war, Apple and HTC signed a 10 year patent licensing agreement [44]. Both Apple and HTC CEOs have openly stated that they welcome the settlement, which allows both companies to focus more on their product development and innovation and less on their legal disputes. The legal disputes started with the initial cases 1:10cv00166 and 1:10cv00167, Delaware and 337-TA-710, USITC in March 2010. In addition to these cases, Apple and HTC were simultaneously fighting litigation battles in the UK and German courts over a range of products (smartphones, tablets, hand-held devices) with claims of violating the opponent's IP [38]. HTC's sister company, VIA technologies, joined the patent war by suing Apple in 2011. Nonetheless, four days after the Apple HTC settlement, VIA technologies (and S3 Graphics, an HTC subsidiary company) also reached a settlement with Apple on November 15, 2012. The ITC and Federal Court in the US successfully managed twelve law suits, including one anti-trust case (*Apple v HTC*). After the war, Apple was left with only one patent (US5,946,647) that was

successfully upheld by the courts as an infringement by HTC.

### 4.3. The rational behind the settlement [45]

After the patent war, Android operating system products (mobile phone, tablets, and electronic handheld devices) had captured 75% of the global consumer market. Recognizing this trend, Apple sought co-existence by finding ways to cooperate with Android solutions and providers that controlled the majority of the consumer market. Other specific outcomes of the settlement are summarized as follows.

1. Apple wanted to change their corporate image as the largest Android enemy in the smartphone world. The most effective action would be finding ways to dismiss the complicated and "piled up" legal disputes. Apple signed patent cross-licensing agreements with IBM, Microsoft and Nokia (non-Android) to avoid the accusation of monopolizing trade under Sherman Antitrust Act. At the beginning, Apple had no agreement with Android companies. Apple seeking patent licensing settlements with Android-based HTC after the war was a desirable market strategy to recoup losses from litigation
2. Apple' litigation slowed the growth of Android smartphone market share. There are now many enemies of Apple that the company must learn to live with after Android became the global standard. According to the Trend Force report [46], Samsung held a much larger smartphone global market share (32% in 2013 and 28% in 2014) compared to Apple's market share (16% in 2013 and 2014). Other Android-based mobile phone companies particularly in China including Lenovo, Huawei, ZTE, became major market threats to Apple. Apple had no choice but to return to R&D (instead of patent wars) as their best market strategy.
3. Settling the patent litigation and removing HTC as Apple's top litigation target helped end the war for HTC. HTC used what they call a "Transfer-and-Stay" procedure, removing itself as Apple's immediate legal target. This left Apple to focus their immediate concerns on their largest Android-based opponent, Samsung.
4. HTC also made efforts to reference prior art and challenged the validity of Apple's patents. In Apple's ITC complaints, the majority of Apple's patents were not successful in winning the patent infringement cases. While Apple had limited successes in the ITC investigations (although causing serious market entry delays for HTC), Apple realized that their best interests would be served by settling the patent license disputes and seeking to gain revenues from license payments for long term market development.
5. HTC purchased a large number of patents from other companies to increase their IP portfolio which enabled the company to enter into favorable cross-licensing agreements with Apple. HTC has actively licensed IP from other companies, such as S3 Graphics, HP, ADC, and Nokia. These patents consist of standard essential patents for mobile communications and technologies, which are beneficial to both HTC and Apple and are increasing the popularity of smartphones.
6. Apple established a licensing payment scheme with HTC which formed the basis for future licensing agreements with other Android-based companies.

The key outcomes from *Apple v HTC* include:

1. The cross-licensing agreement content is critical. For example, in *Apple v Nokia*, Apple used its touch panel technology in exchange for Nokia's communication patent licenses, which are essential patents for mobile device advancement.
2. Smart phone companies, particularly in China, are growing rapidly. Apple, HTC and other global smartphone companies are seeking cooperation and global alliances in the IP and technology development to ensure future success.
3. Both Apple and HTC were spending so much time and effort on litigation, their decreased investment in research severely limited innovation and development of new patents for the next generation product designs.

## 5. Patent Pools and Marginalization

Apple broke no laws protecting its patents which delayed HTC's US market entry to their benefit. The intent to maliciously delay market entry has never been demonstrated. Even though there is a wide consensus that Apples patent attorneys were persistent with their negotiations with the United States Patent and Trade Mark Office, they succeeded in being awarded broad patents but these patents were difficult to defend. Apple had every legal right to forego the joining of patent pools to uphold the patent rights granted to their company. No company, not HTC, or others involved in the patent wars alleged conspiracy on Apple's claims or the justifiable ITC evaluation of their registered patents. There were no baseless repetitive claims or abuse of the US judicial process. Apple was not harassing competitors and no competitor (including HTC) made that claim. All of Apple's lawsuits and complaints were made in good faith to protect their patent rights.

Unlike the case of *California Transport v Trucking Unlimited* [47], Apple was not making baseless repetitive claims and did not abuse the judicial process. In fact, Apple followed the rule of law to their advantage to dominate market share as allowed by their patents. However, innovation is hard to stop. Even though a company may successfully stop a competitor from intellectual property infringement, there is always a new way or a new product that can be invented. Even the glimpse of an idea, supported by the opportunities of a global market, will drive innovation forward. No patent will ever be secure from competitive innovation. Patent trade barriers are least likely to stop the ongoing search for new innovations by companies that are not directly involved in the patent trade wars. What occurred during the *Apple v HTC* patent war was the confirmation of a global smartphone market where the Android operating system was rapidly becoming the dominant standard. Inventors on the sidelines aggressively began to innovate for the next generation of smartphones. The marketplace also started to self-organize as patent pools were formed and settlements were reached. The companies that were not innovating were those companies that were directly involved in the patent trade wars and were diverting R&D expenses toward litigation. New patents that were being created at the edge of the battlefield were driving innovation forward and tearing down trade barriers at a faster rate since the global market potential was justified by the intensity of the litigation. Smaller companies (integrated circuit and software design houses) found new opportunities by joining and selling specialized patents through the rapidly growing patent pools. **The third research question, were the creations of patent pools limiting innovation for global smartphone development, is not supported by the research. Rather, patent pools were validating the sustainability of the market and consolidating high value patents and removing weak patents from the marketplace.**

## 6. The Impact of Patent Wars on Innovation and Development

In order to explore the final research question whether patent trade wars are limiting innovation and development, a search was conducted using Thomson Innovation software. If the third

generation ('3G') patent wars were impeding innovation, then there would have been a delay in the emergence of the next generation of fourth generation ('4G') patents for smartphones. The 4G smartphones utilize a technology called Long Term Evolution ('LTE') designed to achieve higher speeds and capacity for transmitting content using smartphones [48]. According to the report made by European mobile communications device industry group, the Global Mobile Suppliers Association, the number of mobile operators that have launched commercial LTE network services had risen to 113 in 51 countries as of November 2012, and increased to 209 in 75 countries at the end of 2013. The market for high performance 4G-enabled smart phones has been established by the service providers. Hence, the number of patented inventions and innovations from the 4G technology developments are growing rapidly, driven by the global consumer demand for more and faster access to mobile content (video, gaming applications, mobile TV) and communications. Since 2009, three European and US license administrators including Via Licensing Corp., Sisvel S.p.A., MPEG LA, LLC, have expressed their intentions to form LTE patent pools for LTE standard essential patent licenses. After 3 years of industry-wide discussion and negotiation, Via Licensing officially launched an LTE patent pool in October 2012 [49]. Reported on Via Licensing's official website, Via is providing standard essential patents supplied by twelve global 4G smartphone innovators [50].

Using the keywords for the three key technologies of LTE (carrier aggregation, MIMO-OFDMA, and SC-FDMA), three patent search strategies were defined to measure the patent growth rate for 4G patents. The search strategies are listed as follows [51].

1. CTB = ("carrier aggregation" OR "carrier aggregate");
2. CTB = ((("multi input multi output" OR "multi-input multi-output" OR MIMO OR "multiple input multiple output" OR "multiple-input multiple output") AND (("Orthogonal Frequency Division" ADJ Multipl*) OR OFDM or OFDMA)) OR ("MIMO-OFDM" OR "MIMO/OFDM" OR "MIMO-OFDMA" OR "MIMO/OFDMA"));
3. CTB = ("Single carrier Frequency Division Multiple Access" OR "Single-carrier FDMA" OR "SC-FDMA" OR "SCFDMA");

From the above search, there were 6,042, 15,625, and 20,453 patent records (repeatedly counted when patents are granted in multiple countries) found in the Derwent World Patents Index patent databases. Three companies leading the technology for "carrier aggregation" patents are LG Electronics (South Korea), ZTE Corporation (China), and Qualcomm (USA). For MIMO-OFDM and SC-FDMA technologies, InterDigital and Qualcomm are the major patent holders. The patent informatics indicate the technology companies are actively pursuing research and development and filing patent applications to secure intellectual property for the next generation innovative 4G smartphones. Apple and HTC are no longer leading technology innovators in mobile smartphone development. The patent wars between manufacturers did not impede the innovation efforts in the mobile smartphone industry. ***In conclusion, there is no support for Research Question 4. The earlier patent trade wars did not limit the innovation and development of smartphones. The market has become better organized through the use of patent pools.***

## 7. Conclusions

This research explored the *Apple v HTC* smartphone patent trade war and legal processes as an in depth case study. Four research questions were formed and the critical facts and implications were investigated to draw conclusions. The research found that Apple and HTC did not violate anti-competitive behavior laws nor abuse the US International Trade Commission's administrative system. The patent disputes and complaints where finally settled according to the law. Apple did use the ITC complaints and Federal District lawsuits in combination to successfully protect its patent rights and exploit its full market advantages. The research findings support the observation that the creation of patent pools in 3G/4G smartphone technologies will not limit innovation for global smartphone development. In fact, given the nature of a smartphone's short product life cycle and the huge number of SEPs required for new designs, patent pools and reasonable licensing agreements encourage technology innovations and rapidly increase new product development. Finally, after a thorough investigation of *Apple v HTC* patent trade war cases, the research shows that patent trade wars are a crucial regulatory concern of the US IP law and trade administrative system. The legal process strengthens the patenting process by confirming the validity of patents and patent claims. In conclusion, patent trade wars do not limit innovation and development. Patent trade wars stimulate industry alliances through the creation of patent pools, enhance the robustness of the global patent and IP system, and support innovation by protecting innovators' rights.

## Acknowledgement

This research is partially supported by the funding from the Ministry of Science and Technology of Taiwan (MOST 104-2218-E-007-015-MY2, MOST 104-2221-E-007-058-MY3 and NSC 102-2410-H-009-053-MY3).

## References

[1] Apple v High Tech Computer Corp. et al, Case Nos. 10-166, 10-167, 10–544 (D. Del.).
[2] Apple v HTC (2010) US ITC Fed. Reg. 17434 Inv. No. 337-TA-710 (1st complaint).
[3] The International Trade Commission, Section 337 of the Tariff Act of 1930, 19 USC 1337.
[4] M. LaBelle, Against settlement of (some) patent cases, Vanderbilt Law Rev. 67 (2) (2014) 375–441.
[5] Sherman Act, 15 USC s 2.
[6] Case 1:12-cv-00686, Virginia Eastern District Court.
[7] The Agreement on Trade-related Aspects of Intellectual Property Rights, Annex 1C to the Marrakesh Agreement Establishing the World Trade Organization, 1994.
[8] Science & Technology Policy Research and Information Center, National Applied Research Laboratories, Observation of HTC vs. Apple Global Patent Litigation, 2012. Available at: http://iknow.stpi.narl.org.tw/post/Read.aspx?PostID=7549 (accessed May 2015).
[9] S.G. Coronas, Competition Law in Australia, fifth ed., 2010.
[10] In the Matter of Certain Personal Data and Mobile Communications Devices and Related Software, ITC Inv. No. 337-TA-710.
[11] J. Yarow, Apple Takes 53% of the U.S. Smartphone Market, It's Most Ever, 2012. Avaiabla at: http://www.businessinsider.com/apple-us-marketshare-2012-12#ixzz3QwaPxqP5 (accessed November 2014).
[12] Bharani, Nokia and RIM losing. Samsung HTC and Apple Gaining Marketshar, 2011. Available at: http://www.91mobiles.com/blog/nokia-and-rim-losing-samsung-htc-and-apple-gaining-marketshare.html (access October 2014).
[13] R.N. Herrington, B.P. Rogers, Shock and awe: the increasing popularity and intrinsic value of an ITC injunction, IP Litig. 16 (1) (2010).
[14] Apple v HTC and S3 Graphics, In the Matter of Certain Portable Electronic Devices and Related Software, ITC Inv. No. 337-TA-721.
[15] P. Brickley, Nortel Patent $4.5-Billion Patent Sale to Apple, Microsoft, Others Approved, 2011. Available at: http://online.wsj.com/articles/SB10001424052702303812104576440161959082234 (accessed October 2014).
[16] In the Matter of Certain Portable Electronic Devices and Related Software, ITC Inv. No. 337-TA-797.
[17] D. Goldman, Google Seals $13 Billion Motorola Buy, 2012. Available at: http://money.cnn.com/2012/05/22/technology/google-motorola/ (accessed Nov 2014).
[18] Case 1:10-cv-00788, Delaware District Court, ITC 337-TA-808.
[19] Apple v HTC and S3 Graphics, In the Matter of Certain Electronic Devices with Communication Capabilities Components Thereof and Related Software ITC Inv. No. 337-TA-808.
[20] US International Trade Commission, 19 USC s 1337.

[21] International Trade Commission, Section 337 Investigation, 2009. Available at: http://www.usitc.gov/intellectual_property/documents/337_faqs.pdf (accessed Nov 2014).

[22] US International Trade Commission, Operation 2: Intellectual Property Import Investigations, 2011. Available at: http://www.usitc.gov/press_room/annual_reports_2011.htm (accessed October 2014).

[23] M. Norris, Blocking blocks at the border: examining standard-essential patent litigation between domestic companies at the ITC, Minn. Law Rev. 98 (2) (2014) 713–744.

[24] R.W. Hahn, H.J. Singer, Assessing bias in patent infringement cases: a review of international trade commission decisions, Harv. J. Law Technol. 21 (2) (2008) 457–508.

[25] J. Yang, The use and abuse of patents in the smartphone wars: a need for change, J. Law, Technol. Internet 5 (2014) 239–258.

[26] V.S. Jain, S. Jain, L. Kurup, A. Gawade, Overview on generations of network: 1G,2G,3G,4G,5G, Int. J. Comput. Technol. Appl. 5 (5) (2014) 1789–1794.

[27] M. Lloyd, D. Spielthenner, G. Mokdsi, The Smartphone Patent Wars, 2011. Available at: http://www.griffithhack.com.au/Assets/1956/1/GH_Smartphones_final.pdf (accessed Nov 2014).

[28] J.R. Reidenberg, N.C. Russell, M. Price, A. Mohan, Patents and Small Participants in the Smartphone Industry, 2015. Fordham Center on Law and Information Policy (CLIP) Report, sponsored by WIPO and published on 2015/1/15.

[29] C.V. Trappey, C. Wu, An evaluation of the time-varying extended logistic, simple logistic, and gompertz models for forecasting short product life cycles, Adv. Eng. Inf. 22 (4) (2008) 421–430.

[30] A.J.C. Trappey, C.V. Trappey, L.W.L. Chen, A.Y.T. Wang, Computer supported comparative analysis of technology portfolios for LTE-a patent pools, in: Proceedings, the 2016 20th IEEE International Conf on Computer Supported Cooperative Work in Design (CSCWD 2016), Nanchang, China, May 4-6, 2016, 2016.

[31] F. Taghaboni-Dutta, A.J.C. Trappey, C.V. Trappey, H.Y. Wu, An exploratory RFID patent analysis, Manag. Res. News 32 (12) (2009) 1163–1176.

[32] IEEE-SA, IEEE Standards Board Meeting Information. Available at: http://standards.ieee.org/about/sasb/meetings.html. (accessed May 2015).

[33] A. Armstrong, J.J. Mueller, T.D. Syrett, The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones, 2014. Royalty Stack Working Paper.

[34] K. Maldonado, Breaching RAND and reaching for reasonable: Microsoft v. Motorola and standard-essential patent litigation, Berkeley Technol. Law J. 29 (4) (2012) 419–464.

[35] M. Black, Innovation and consumers as casualties of war in global technology patent battles, Transnatl. Law Contemp. Problems 22 (1) (2013) 81–204.

[36] Nextworld Magazine, The Short History of NeXT, 2014. Available at: http://simson.net/ref/NeXT/aboutnext.htm (accessed May 2014).

[37] J. Lowensohn, Jobs' 'Thermonuclear Qar' Quote - Fair Game in Court, 2012. Available at: http://www.cnet.com/news/jobs-thermonuclear-war-quote-fair-game-in-court-judge-says/ (accessed Oct 2014).

[38] Mike Loyd, Doris Spielthenner, George Modski, The Smartphone Patent Wars, 2011. http://www.iam-magazine.com/blog/articles/GriffithHackSmartphonesReportFinal.pdf (accessed Oct 2014).

[39] PatentFreedom.com, Litigations over Time, 2015. Available at: https://www.patentfreedom.com/about-npes/litigations/ (accessed Dec 2015).

[40] C. Sharma, Mobile Patents Landscape: an In-depth Quantitative Analysis, 2013. Available at: http://www.chetansharma.com/Mobile_Patnets_Landscape_2013_Chetan_Sharma_Consulting.pdf (accessed Dec 2015).

[41] G. Birkhoff, Lattice Theory, American Math. Society College Publishers, Providence, 1973.

[42] N. Ko, J. Yoon, W. Seo, Analyzing interdisciplinarity of technology fusion using knowledge flows of patents, Expert Systems with Applications, An Int. J. 41 (4) (2014) 1955–1963.

[43] C. Lee, J. Jeon, Y. Park, Monitoring trends of technological changes based on the dynamic patent lattice: a modified formal concept analysis approach, Technol. Forecast. Soc. Change 78 (4) (2011) 690–702.

[44] Case 5:11-cv-01846-LHK, Document 2182-5, Filed12/05/12 (Patent License and Settlement Agreement).

[45] Confidential interviews with HTC managers and attorneys, Taiwan; amy J.C. Trappey (PI) 'dynamic IP monitoring and analysis of engineering research innovations and the strategic Promotion of IP commercialization' (2014) Ministry of Science and Technology Research Plan (NSC 103-2218-E-007-007), Taiwan.

[46] Trend Force, Global Smartphone Shipments in 2014 Totaled 1.167B with Samsung and Apple as First and Second, 2015. Available at: http://www.dramexchange.com/WeeklyResearch/Post/5/3954.html.

[47] California Motor Transport v Trucking Unlimited 404 US 508, 1972.

[48] T. Kosaka, C. Kerr, Advanced technologies in LTE/LTE-advanced. 15 NTT DOCOMO, Tech. J. 2 (2012).

[49] T. Kosaka, C. Kerr, Establishment of LTE patent pool. 14 NTT DOCOMO, Tech. J. 4 (2012).

[50] Via Licensing. (2014). Available at: http://www.vialicensing.com/lte/index.aspx. (accessed Oct 2014).

[51] Thomsen Innovation, Derwent World Patents Index Database, 2014. Available at: http://ip.thomsonreuters.com/product/derwent-world-patents-index (accessed Nov 2014).