1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3      SAN JOSE DIVISION

4

5

6 APPLE INC., A CALIFORNIA  ) C-11-01846 LHK
  CORPORATION,      )

7          ) SAN JOSE, CALIFORNIA
       PLAINTIFF,  )

8          ) MAY 15, 2018
     VS.     )

9          ) VOLUME 2
  SAMSUNG ELECTRONICS CO., LTD., )

10 A KOREAN BUSINESS ENTITY;  ) PAGES 257 - 518
  SAMSUNG ELECTRONICS AMERICA, )

11 INC., A NEW YORK CORPORATION; )
  SAMSUNG TELECOMMUNICATIONS  )

12 AMERICA, LLC, A DELAWARE   )
  LIMITED LIABILITY COMPANY,  )

13          )
       DEFENDANTS.  )

14 _____ )

15

16     TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE LUCY H. KOH

17    UNITED STATES DISTRICT JUDGE

18

19

20     APPEARANCES ON NEXT PAGE

21

22 OFFICIAL COURT REPORTERS:  LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

23          IRENE RODRIGUEZ, CSR, CRR, CMR
           CERTIFICATE NUMBER 8074

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
    TRANSCRIPT PRODUCED WITH COMPUTER

1      <u>APPEARANCES</u>

2

3      FOR PLAINTIFF          WILMER, CUTLER, PICKERING,
       APPLE:                 HALE AND DORR
4                             BY:  WILLIAM F. LEE
                                   JOSEPH J. MUELLER
5                                  SARAH R. FRAZIER
                              60 STATE STREET
6                             BOSTON, MASSACHUSETTS  02109

7                             BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
8                             PALO ALTO, CALIFORNIA  94304

9                             BY:  AMY K. WIGMORE
                              1875 PENNSYLVANIA AVENUE, N.W.
10                            WASHINGTON, D.C.  20006

11                            MORRISON & FOERSTER
                              BY:  NATHAN B. SABRI
12                            425 MARKET STREET, 32ND FLOOR
                              SAN FRANCISCO, CALIFORNIA  94105

13

14     ALSO PRESENT:          NOREEN KRALL
                              CYNDI WHEELER
15                            THOMAS LEE

16

17

18

19

20

21

22

23

24

25

```
 1      APPEARANCES (CONTINUED)

 2

 3      FOR DEFENDANT          QUINN, EMANUEL, URQUHART & SULLIVAN
        SAMSUNG:               BY:  JOHN B. QUINN
 4                                  WILLIAM C. PRICE
                                    SCOTT L. WATSON
 5                             865 SOUTH FIGUEROA STREET, 10TH FLOOR
                               LOS ANGELES, CALIFORNIA  90017
 6
                               BY:  VICTORIA F. MAROULIS
 7                                  BRETT J. ARNOLD
                               555 TWIN DOLPHIN DRIVE
 8                             SUITE 560
                               REDWOOD SHORES, CALIFORNIA  94065
 9

10      ALSO PRESENT:          CHRIS GRANT
                               KEN KOTARSKI
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          INDEX OF PROCEEDINGS

2

3     OPENING STATEMENT BY MR. LEE              P. 281

4     OPENING STATEMENT BY MR. QUINN            P. 310

5

6              INDEX OF WITNESSES

7     PLAINTIFF'S

8     **GREG JOSWIAK**
           DIRECT EXAM BY MR. LEE               P. 360
9          CROSS-EXAM BY MR. PRICE              P. 389
           REDIRECT EXAM BY MR. LEE             P. 414
10         RECROSS-EXAM BY MR. PRICE            P. 416

11    **RICHARD HOWARTH**
           DIRECT EXAM BY MR. MUELLER           P. 418
12         CROSS-EXAM BY MR. QUINN              P. 447
           REDIRECT EXAM BY MR. MUELLER         P. 463
13         RECROSS-EXAM BY MR. QUINN            P. 466

14    **TONY BLEVINS**
           DIRECT EXAM BY MS. WIGMORE           P. 468
15         CROSS-EXAM BY MS. MAROULIS           P. 482
           REDIRECT EXAM BY MS. WIGMORE         P. 488
16

17    **JUNWON LEE**
           VIDEOTAPED DEPOSITION                P. 490
18

19    **ALAN BALL**
           DIRECT EXAM BY MS. WIGMORE           P. 492
20

21

22

23

24

25

```
 1

 2                      INDEX OF EXHIBITS

 3                              MARKED      ADMITTED

 4      PLAINTIFF'S

 5      32, 152, 125                        369
        133                                 376
 6      134                                 378
        4029                                279
 7      17A                                 380
        135                                 381
 8      130                                 383
        174                                 386
 9      1                                   427
        157                                 433
10      52                                  490
        3A                                  500
11

12      DEFENDANTS'

13      578                                 400
        572                                 407
14      4540                                409
        2519                                412
15      2627                                412
        712                                 413
16      4549                                484
        4573                                486
17      4545                                487
        4546 & 4547                         487
18
        JOINT
19
        1000, 1001, 1002, 1003,            360
20      1007, 1010, 1011, 1012,
        1013, 1015, 1016, 1017,
21      1019, 1020, 1025, 1026,
        1027, 1031, 1032, 1033,
22      1034, 1035, 1041, 1042,
        1043, 5000, 5001, 5002,
23      5003, 5004, 5005, 5006,
        5007, 5008, 5009, 5010,
24      5011, 5012, 5013, 5014,
        AND 5015
25      1087                                369
```

```
1    SAN JOSE, CALIFORNIA                    MAY 15, 2018

2                    P R O C E E D I N G S

3        (JURY OUT AT 9:04 A.M.)

4            THE COURT:  GOOD MORNING, WELCOME.

5            MR. LEE:  GOOD MORNING, YOUR HONOR.

6            MR. QUINN:  GOOD MORNING.

7            THE CLERK:  PLEASE BE SEATED.

8        COUNSEL, IF YOU'LL PLEASE STATE YOUR APPEARANCES FOR

9    TODAY.

10           THE COURT:  ACTUALLY, SHOULD WE WAIT AND BRING IN OUR

11   JURORS, OR WAS THERE AN ISSUE THAT YOU WANTED TO DISCUSS

12   OUTSIDE OF THE PRESENCE OF THE JURY?

13           MR. LEE:  NO.

14           THE CLERK:  YOUR HONOR, I BELIEVE THEY WANTED TO USE

15   THE MONITORS IN THE GALLERY AND THEY HAVE SOME CONFIDENTIAL

16   EXHIBITS.

17       IS THAT GOING TO BE A PROBLEM?

18           MR. QUINN:  WE HAVE ONE THAT'S CONFIDENTIAL, YOUR

19   HONOR.

20           THE COURT:  OKAY.

21           MR. QUINN:  I UNDERSTAND THERE'S A WAY THAT WE CAN

22   BLOCK THAT, OR --

23           THE COURT:  OKAY.  THE WAY WE'VE DONE IT IN THE PAST

24   IS THAT IT'S ONLY ON THE ATTORNEY'S MONITORS AND THE JURY'S

25   MONITORS, AND IT'S NOT ON THE PUBLIC MONITORS.  WOULD THAT
```

```
1    BE -- BUT I DON'T KNOW IF THIS CONFIGURATION -- CAN ANYONE SEE

2    THE MONITORS THAT ARE ON THE COUNSEL TABLE?

3              THE CLERK:  THEY MAY HAVE TO TURN THEM.

4              THE COURT:  WOULD YOU TURN THEM, PLEASE, SO THAT NO

5    ONE IN THE AUDIENCE CAN SEE THEM, AND I THINK THAT'S WHAT WE

6    WILL DO.  THAT'S WHAT WE'VE DONE IN THE PAST.

7         WILL THAT BE SUFFICIENT PROTECTION?

8              MR. QUINN:  YES, YOUR HONOR.

9              THE COURT:  ANY OTHER ISSUES WE NEED TO TAKE CARE OF

10   OUTSIDE THE PRESENCE OF THE JURY?

11        I'M GOING TO RETURN THIS TIMER TO MS. MASON.  SHE'S GOING

12   TO BE THE TIMEKEEPER.

13        WHAT ELSE?

14             MR. LEE:  YOUR HONOR, WE HAVE PROVIDED YOU WITH A

15   LIST OF JOINT EXHIBITS.

16             THE COURT:  YOU SAW THAT.

17             MR. LEE:  WE AGREED THEY CAN BE PRE-ADMITTED.  IF

18   YOU'LL JUST LET US KNOW WHEN YOU WANT US TO DO THAT, WE'LL DO

19   IT THEN.

20             THE COURT:  I THINK IT WOULD BE HELPFUL TO DO THAT IN

21   THE PRESENCE OF THE JURY, SO ONCE WE'RE IN APPLE'S CASE IN

22   CHIEF, WHY DON'T YOU JUST, AT THAT POINT, JOINTLY MOVE.

23        NOW, DID YOU WANT TO READ ALL THESE NUMBERS OR JUST --

24             MR. LEE:  IN THE INTEREST OF TIME, I WOULD RATHER

25   JUST JOINTLY MOVE THE JOINT EXHIBITS ON THE LIST.
```

```
 1              THE COURT:  THAT'S FINE.

 2              MR. LEE:  WE CAN MARK THE LIST FOR IDENTIFICATION.

 3              THE COURT:  ACTUALLY, WE DON'T EVEN NEED TO DO THAT

 4    NECESSARILY.  WE'LL JUST ADD IT TO THE FINAL JOINT ADMITTED

 5    EXHIBIT LIST --

 6              MR. LEE:  OKAY.

 7              THE COURT:  -- THAT GETS SENT TO THE JURY DURING

 8    DELIBERATIONS.

 9          NOW, THE JURY BINDERS, DO --

10              THE CLERK:  THEY'RE OVER THERE, YOUR HONOR.  THEY

11    NEED TO BE PASSED OUT.

12              THE COURT:  OKAY.  SO WHEN WE BEGIN, WE'LL HAVE TO

13    READ THE PRELIMINARY JURY INSTRUCTIONS FIRST.  OKAY?

14              MR. LEE:  OKAY.

15              THE COURT:  ANYTHING ELSE THAT WE SHOULD -- OUR LAST

16    JUROR JUST ARRIVED, SO WE ARE READY TO GO.

17          ANYTHING ELSE THAT WE SHOULD DO?

18              MR. LEE:  NOTHING FOR APPLE, YOUR HONOR.

19              MR. QUINN:  NOTHING FOR SAMSUNG, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  THEN LET'S BRING IN OUR JURY.

21          (PAUSE IN PROCEEDINGS.)

22          (JURY IN AT 9:07 A.M.)

23              THE COURT:  GOOD MORNING AND WELCOME.

24          PLEASE TAKE A SEAT.

25              THE CLERK:  YOUR HONOR, IF COUNSEL CAN PLEASE STATE
```

```
 1      THEIR APPEARANCES FOR TODAY.

 2              MR. LEE:  GOOD MORNING, YOUR HONOR.  FOR APPLE,

 3      BILL LEE, JOE MUELLER, AMY WIGMORE, AND NATE SABRI.

 4              MR. QUINN:  GOOD MORNING, YOUR HONOR.  FOR SAMSUNG,

 5      JOHN QUINN, BILL PRICE, VICKY MAROULIS, AND WITH US AT THE

 6      TABLE TODAY IS SCOTT WATSON.

 7              THE COURT:  ALL RIGHT.  GOOD MORNING.

 8      WELCOME.  SO YOU HAVE JURY BINDERS.  THOSE HAVE BEEN

 9      APPROVED BY THE PARTIES AND PROVIDED TO ASSIST YOU DURING THIS

10      TRIAL.

11              IF YOU OPEN UP YOUR JURY BINDERS, YOU WILL FIND

12      PRELIMINARY JURY INSTRUCTIONS.  YOU CAN KEEP THOSE THROUGHOUT

13      THE TRIAL.  WE WILL COLLECT THEM AT THE END OF THE CASE AND

14      GIVE YOU FINAL JURY INSTRUCTIONS.

15              EVEN THOUGH YOU HAVE A HARD COPY, I AM REQUIRED TO READ

16      THESE TO YOU.

17              SO IF YOU WOULD TURN TO YOUR PRELIMINARY JURY INSTRUCTIONS

18      TAB, LET'S START WITH NUMBER 1, DUTY OF THE JURY.

19              MEMBERS OF THE JURY, YOU ARE NOW THE JURY IN THIS CASE.

20      IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.

21              THESE INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS TO HELP

22      YOU UNDERSTAND THE PRINCIPLES THAT APPLY TO CIVIL TRIALS AND TO

23      HELP YOU UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.  YOU WILL

24      BE ALLOWED TO KEEP THIS SET OF INSTRUCTIONS TO REFER TO

25      THROUGHOUT THE TRIAL.  THESE INSTRUCTIONS ARE NOT TO BE TAKEN
```

1    HOME AND MUST REMAIN IN THE JURY ROOM WHEN YOU LEAVE IN THE

2    EVENINGS.  AT THE END OF THE TRIAL, THESE INSTRUCTIONS WILL BE

3    COLLECTED, AND I WILL GIVE YOU A FINAL SET OF INSTRUCTIONS.  IT

4    IS THE FINAL SET OF INSTRUCTIONS THAT WILL GOVERN YOUR

5    DELIBERATIONS.

6         IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN

7    THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT

8    TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER

9    YOU AGREE WITH IT OR NOT.

10        YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

11   DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS THAT

12   YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.

13   YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

14        PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING I

15   MAY SAY OR DO THAT I HAVE AN OPINION REGARDING THE EVIDENCE OR

16   WHAT YOUR VERDICT SHOULD BE.

17        IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

18   AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL

19   IMPORTANT.

20        NUMBER 2.

21        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

22   FACTS ARE CONSISTS OF:

23        THE SWORN TESTIMONY OF ANY WITNESS;

24        THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE; AND,

25        ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

1          NUMBER 3.

2          IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

3   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

4   ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING

5   WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

6          1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE.

7   THE LAWYERS ARE NOT WITNESSES.  WHAT THEY WILL SAY IN THEIR

8   OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS

9   INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT

10  EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE

11  WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

12         2.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

13  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

14  BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

15  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S

16  RULING ON IT.

17         NUMBER 3.  TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN,

18  OR THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE

19  AND MUST NOT BE CONSIDERED.  IN ADDITION, SOME EVIDENCE MAY BE

20  RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I INSTRUCT YOU TO

21  CONSIDER CERTAIN EVIDENCE ONLY FOR A LIMITED PURPOSE, YOU MUST

22  DO SO AND YOU MAY NOT CONSIDER THAT EVIDENCE FOR ANY OTHER

23  PURPOSE.

24         BLESS YOU.

25         NUMBER 4.  ANYTHING THAT YOU SEE OR HEAR WHEN THE COURT

1    WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

2    SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

3         NUMBER 4.

4         SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE.

5         WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN

6    ADMITTED ONLY FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY

7    FOR THAT LIMITED PURPOSE AND FOR NO OTHER.

8         NUMBER 5.

9         EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

10   IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

11   WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

12   CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

13   WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

14   KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

15   WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.

16   IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY

17   EVIDENCE.

18        NUMBER 6.

19        THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

20   RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

21   OFFERS ON EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE

22   THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT

23   LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION

24   MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE

25   OBJECTION, THE QUESTION CANNOT BE ANSWERED, AND THE EXHIBIT

1    CANNOT BE RECEIVED.

2         WHATEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

3    IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT

4    HAVE BEEN.

5         SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

6    RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

7    MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

8    CONSIDER THE STRICKEN EVIDENCE FOR ANY PURPOSE.

9         NUMBER 7.

10        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

11   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

12   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

13   NONE OF IT.

14        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

15   INTO ACCOUNT:

16        1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

17   HEAR OR KNOW THE THINGS TESTIFIED TO;

18        2.  THE WITNESS'S MEMORY;

19        3.  THE WITNESS'S MANNER WHILE TESTIFYING;

20        4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF

21   ANY;

22        5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

23        6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

24   TESTIMONY;

25        7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

1    OF THE ALL THE EVIDENCE; AND,

2         8.   ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

3         SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

4    CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

5    DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

6    HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

7    THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT, BUT

8    REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

9    BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT

10   DIFFERS FROM OTHER TESTIMONY.

11        HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

12   TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

13   CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.

14        ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED

15   UNTRUTHFULLY ABOUT SOME THING, BUT TOLD THE TRUTH ABOUT OTHERS,

16   YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

17        THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

18   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

19   WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

20   MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

21        NUMBER 8.

22        THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

23   DIFFERENT TESTIMONY ON A PRIOR OCCASION MAY BE CONSIDERED,

24   ALONG WITH ALL OTHER EVIDENCE, IN DECIDING WHETHER OR NOT TO

25   BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE THE TESTIMONY

1    OF THE WITNESS AND FOR NO OTHER PURPOSE.

2         NUMBER 9.

3         I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

4         FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL, AND DO NOT

5    DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

6    JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

7    CASE.

8         SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

9    THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

10   THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

11   INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

12   THE COURSE OF YOUR JURY DUTY.  THUS, UNTIL THE END OF THE CASE

13   OR UNLESS I TELL YOU OTHERWISE:

14        DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

15   ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

16   THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING

17   THE CASE IN PERSON, IN WRITING, BY PHONE OR ELECTRONIC MEAN,

18   VIA E-MAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG,

19   WEBSITE, OR APPLICATION, INCLUDING, BUT NOT LIMITED TO,

20   FACEBOOK, YOUTUBE, TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, OR

21   ANY OTHER FORMS OF SOCIAL MEDIA.  THIS APPLIES TO COMMUNICATING

22   WITH YOUR FELLOW JURORS UNTIL I GIVE YOU THE CASE FOR

23   DELIBERATION, AND IT APPLIES TO COMMUNICATING WITH EVERYONE

24   ELSE, INCLUDING YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA

25   OR PRESS, AND THE PEOPLE INVOLVED IN THE TRIAL, ALTHOUGH YOU

1       MAY NOTIFY YOUR FAMILY AND YOUR EMPLOYER THAT YOU HAVE BEEN

2       SEATED AS A JUROR IN THE CASE, AND HOW LONG YOU EXPECT THE

3       TRIAL TO LAST.  BUT, IF YOU ARE ASKED OR APPROACHED IN ANY WAY

4       ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST

5       RESPOND THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER

6       AND REPORT THE CONTACT TO THE COURT.

7            BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

8       INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT:  DO

9       NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

10      COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT; DO NOT DO

11      ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

12      INTERNET, OR USING OTHER REFERENCE MATERIALS; AND DO NOT MAKE

13      ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

14      CASE ON YOUR OWN.  DO NOT VISIT OR VIEW ANY PLACE DISCUSSED IN

15      THIS CASE, AND DO NOT USE INTERNET PROGRAMS OR OTHER DEVICES TO

16      SEARCH FOR OR VIEW ANY PLACE DISCUSSED DURING THE TRIAL.  ALSO,

17      DO NOT DO ANY RESEARCH ABOUT THIS CASE, THE LAW, OR THE PEOPLE

18      INVOLVED -- INCLUDING THE PARTIES, THE WITNESSES OR THE

19      LAWYERS -- UNTIL YOU HAVE BEEN EXCUSED AS JURORS.  IF YOU

20      HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS CASE IN THE

21      MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS POSSIBLE.

22           THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS CASE

23      DECIDED ONLY ON EVIDENCE THAT HAS BEEN PRESENTED HERE IN COURT.

24      WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH, AND THE

25      ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE TRIAL

1    PROCESS.  IF YOU DO ANY RESEARCH OR INVESTIGATION OUTSIDE THE

2    COURTROOM OR GAIN ANY INFORMATION THROUGH IMPROPER

3    COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY

4    INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT

5    BEEN TESTED BY THE TRIAL PROCESS.  EACH OF THE PARTIES IS

6    ENTITLED TO A FAIR TRIAL BY AN IMPARTIAL JURY, AND IF YOU

7    DECIDE THE CASE BASED ON INFORMATION NOT PRESENTED IN COURT,

8    YOU WILL HAVE DENIED THE PARTIES A FAIR TRIAL.  REMEMBER, YOU

9    HAVE TAKEN AN OATH TO FOLLOW THE RULES, AND IT IS VERY

10   IMPORTANT THAT YOU FOLLOW THESE RULES.

11        A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE

12   FAIRNESS OF THESE PROCEEDINGS.  IF ANY JUROR IS EXPOSED TO ANY

13   OUTSIDE INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

14        I URGE YOU TO PAY CLOSE ATTENTION TO THE TRIAL TESTIMONY

15   AS IT IS GIVEN.  DURING DELIBERATIONS, YOU WILL NOT HAVE A

16   TRANSCRIPT OF THE TRIAL TESTIMONY.

17        IF AT ANY TIME YOU CANNOT HEAR OR SEE THE TESTIMONY,

18   EVIDENCE, QUESTIONS OR ARGUMENTS, LET ME KNOW SO THAT I CAN

19   CORRECT THE PROBLEM.

20        IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

21   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

22   UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

23   THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU.  WHEN YOU

24   LEAVE, YOUR NOTES SHOULD BE LEFT IN THE JURY ROOM.  NO ONE WILL

25   READ YOUR NOTES.  THEY WILL BE DESTROYED AT THE CONCLUSION OF

1    THE CASE.

2         WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

3    MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

4    YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

5    YOUR FELLOW JURORS.

6         NUMBER 11.

7         THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT WILL BE READ

8    TO YOU.  YOU MUST, THEREFORE, TREAT THESE FACTS AS HAVING BEEN

9    PROVED.

10        NUMBER 12.

11        A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

12   BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

13   TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

14   QUESTIONS AND ANSWERS ARE RECORDED.

15        INSOFAR AS POSSIBLE, YOU SHOULD CONSIDER DEPOSITION

16   TESTIMONY PRESENTED TO YOU IN COURT IN LIEU OF LIVE TESTIMONY

17   IN THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

18        NUMBER 13.

19        EVIDENCE MAY BE PRESENTED TO YOU IN THE FORM OF ANSWERS OF

20   ONE OF THE PARTIES TO WRITTEN INTERROGATORIES SUBMITTED BY THE

21   OTHER SIDE.  THESE ANSWERS WERE GIVEN IN WRITING AND UNDER OATH

22   BEFORE THE TRIAL IN RESPONSE TO QUESTIONS THAT WERE SUBMITTED

23   IN WRITING UNDER ESTABLISHED COURT PROCEDURES.  YOU SHOULD

24   CONSIDER THE ANSWERS, INSOFAR AS POSSIBLE, IN THE SAME WAY AS

25   IF THEY WERE MADE FROM THE WITNESS STAND.

1        NUMBER 14.

2        SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE, ARE

3   PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE OPINIONS.

4        SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER

5   TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH

6   WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

7   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

8   AND ALL THE OTHER EVIDENCE IN THE CASE.

9        NUMBER 15.

10       LANGUAGES OTHER THAN ENGLISH MAY BE USED DURING THIS

11  TRIAL.

12       WITNESSES WHO DO NOT SPEAK ENGLISH, OR ARE MORE PROFICIENT

13  IN ANOTHER LANGUAGE, TESTIFY THROUGH AN OFFICIAL COURT

14  INTERPRETER.  ALTHOUGH SOME OF YOU MAY KNOW KOREAN, IT IS

15  IMPORTANT THAT ALL JURORS CONSIDER THE SAME EVIDENCE.

16  THEREFORE, YOU MUST ACCEPT THE INTERPRETER'S TRANSLATION OF THE

17  WITNESS'S TESTIMONY.  YOU MUST DISREGARD ANY DIFFERENT MEANING.

18       NUMBER 16.  YOU MUST NOT MAKE ANY ASSUMPTIONS ABOUT A

19  WITNESS OR A PARTY BASED SOLELY ON THE USE OF AN INTERPRETER TO

20  ASSIST THAT WITNESS OR PARTY.

21       NUMBER 17.

22       SOME EVIDENCE MAY BE SEALED FROM THE PUBLIC BECAUSE IT

23  CONTAINS HIGHLY CONFIDENTIAL BUSINESS INFORMATION OF THE

24  PARTIES.  YOU MUST NOT DRAW ANY INFERENCES ABOUT THE NATURE OF

25  THE EVIDENCE OR GIVE ANY GREATER OR LESSER WEIGHT TO THE

1    EVIDENCE BASED ON WHETHER IT WAS SEALED.

2         NUMBER 18.

3         FROM TIME TO TIME DURING THE TRIAL, IT MAY BECOME

4    NECESSARY FOR ME TO TALK WITH THE ATTORNEYS OUT OF THE HEARING

5    OF THE JURY, EITHER BY HAVING A CONFERENCE AT THE BENCH WHEN

6    THE JURY IS PRESENT IN THE COURTROOM, OR BY CALLING A RECESS.

7         PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE

8    WORKING.

9         THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT

10   INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

11   BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION

12   AND ERROR.

13        OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

14   LENGTH OF THESE CONFERENCES TO A MINIMUM.  I MAY NOT ALWAYS

15   GRANT AN ATTORNEY'S REQUEST FOR A CONFERENCE.  DO NOT CONSIDER

16   ANY GRANTING OR DENYING A REQUEST FOR A CONFERENCE AS ANY

17   INDICATION OF MY OPINION OF THE CASE OR OF WHAT YOUR VERDICT

18   SHOULD BE.

19        NUMBER 19.

20        THIS CASE INVOLVES DISPUTES RELATING TO UNITED STATES

21   UTILITY AND DESIGN PATENTS.  BEFORE SUMMARIZING THE POSITIONS

22   OF THE PARTIES AND THE LEGAL ISSUES INVOLVED IN THE DISPUTE,

23   LET ME TAKE A MOMENT TO EXPLAIN WHAT PATENTS ARE AND HOW THEY

24   ARE OBTAINED.

25        PATENTS ARE GRANTED BY THE UNITED STATES PATENT AND

1    TRADEMARK OFFICE (SOMETIMES CALLED "THE PTO").  THERE ARE TWO

2    BASIC TYPES OF PATENTS IN THE UNITED STATES:  UTILITY PATENTS

3    AND DESIGN PATENTS.  IN GENERAL TERMS, A "UTILITY PATENT"

4    PROTECTS THE WAY AN ARTICLE IS USED AND WORKS.  IT ALSO

5    PROTECTS A METHOD OR PROCESS OF MAKING OR DOING SOMETHING.

6         ON THE OTHER HAND, A "DESIGN PATENT" PROTECTS THE WAY AN

7    ARTICLE LOOKS.  A DESIGN PATENT PROTECTS THE ORNAMENTAL DESIGN

8    OF AN ARTICLE OF MANUFACTURE.  "ORNAMENTAL DESIGN" MEANS THE

9    SHAPE OF THE DESIGN AND/OR THE SURFACE DECLARATION ON THE

10   DESIGN.

11        A VALID UNITED STATES PATENT GIVES THE PATENT OWNER THE

12   RIGHT TO PREVENT OTHERS FROM MAKING, USING, OFFERING TO SELL,

13   OR SELLING THE PATENTED INVENTION WITHIN THE UNITED STATES, OR

14   FROM IMPORTING IT INTO THE UNITED STATES, DURING THE TERM OF

15   THE PATENT WITHOUT THE PATENT HOLDER'S PERMISSION.  A VIOLATION

16   OF THE PATENT OWNER'S RIGHTS IS CALLED INFRINGEMENT.

17        A PATENT INCLUDES WHAT IS CALLED A "SPECIFICATION."  FOR A

18   UTILITY PATENT, THE SPECIFICATION MUST CONTAIN A WRITTEN

19   DESCRIPTION OF THE CLAIMED INVENTION TELLING WHAT THE INVENTION

20   IS, HOW IT WORKS, HOW TO MAKE IT, AND HOW TO USE IT SO OTHERS

21   SKILLED IN THE FIELD WILL KNOW HOW TO MAKE OR USE IT.

22        THE SPECIFICATION CONCLUDES WITH ONE OR MORE NUMBERED

23   SENTENCES.  THESE ARE THE PATENT "CLAIMS."  WHEN THE PATENT IS

24   EVENTUALLY GRANTED BY THE PTO, THE CLAIMS DEFINE THE BOUNDARIES

25   OF ITS PROTECTION AND GIVE NOTICE TO THE PUBLIC OF THOSE

1    BOUNDARIES.

2         FOR A DESIGN PATENT, THE SPECIFICATION MUST CONTAIN ONE OR

3    MORE DRAWINGS OF THE DESIGNS, AS WELL AS A DESCRIPTION OF THE

4    DRAWINGS, AND IT SERVES AS A SINGLE CLAIM.  THE "CLAIM" FOR

5    DESIGN PATENTS GENERALLY REFERS TO THE DRAWINGS AND HOW THEY

6    ARE DESCRIBED.

7         NUMBER 20.

8         THERE ARE TWO APPLE UTILITY PATENTS INVOLVED IN THIS

9    TRIAL:  UNITED STATES PATENT NUMBERS 7,469,381, AND 7,864,163.

10   UTILITY PATENTS ARE OFTEN REFERRED TO BY THEIR LAST THREE

11   DIGITS, SO APPLE'S UTILITY PATENTS MAY BE REFERRED TO IN

12   SHORTHAND AS THE '381 AND '163 PATENTS.

13        THERE ARE THREE APPLE DESIGN PATENTS INVOLVED IN THIS

14   TRIAL.  UNITED STATES PATENT NUMBERS D 618,677, D 593,087, AND

15   D 604,305.  DESIGN PATENTS ARE OFTEN REFERRED TO BY THEIR LAST

16   THREE DIGITS, SO THE DESIGN PATENTS HERE MAY BE REFERRED TO IN

17   SHORTHAND AS THE D'677, D'087, AND D'305 PATENTS.

18        NUMBER 21.

19        TO HELP YOU FOLLOW THE EVIDENCE, I WILL NOW GIVE YOU A

20   SUMMARY OF THE POSITIONS OF THE PARTIES WITH RESPECT TO THE

21   PATENT CLAIMS.

22        THE PARTIES IN THIS CASE ARE APPLE, INC., TO WHICH I WILL

23   REFER AS "APPLE," AND SAMSUNG ELECTRONICS COMPANY, LIMITED,

24   SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG

25   TELECOMMUNICATIONS AMERICA, LLC, TO WHICH I WILL REFER

1      COLLECTIVELY AS "SAMSUNG" UNLESS I THINK IT IS IMPORTANT TO

2      DISTINGUISH BETWEEN THESE ENTITIES FOR THE PURPOSE OF A

3      SPECIFIC INSTRUCTION.

4          THE CASE INVOLVES TWO UTILITY -- I'M SORRY -- TWO

5      UNITED STATES UTILITY PATENTS AND THREE UNITED STATES DESIGN

6      PATENTS OWNED BY APPLE.

7          DURING A PRIOR PROCEEDING, A JURY FOUND THE '381, '163,

8      D'677, D'087, AND D'305 PATENTS VALID AND THAT EACH OF THESE

9      PATENTS IS INFRINGED BY A PRODUCT MARKED WITH AN "X" IN THE

10     CHART ON THE NEXT PAGE.  YOUR SOLE JOB IN THIS TRIAL IS TO

11     DETERMINE THE AMOUNT OF DAMAGES TO BE AWARDED TO APPLE FOR

12     SAMSUNG'S INFRINGEMENT OF THESE PATENTS.

13         AS YOU WILL HEAR IN THE FINAL JURY INSTRUCTIONS, YOU WILL

14     HAVE TO DETERMINE THE ARTICLES OF MANUFACTURE TO WHICH SAMSUNG

15     APPLIED APPLE'S PATENTED DESIGNED TO DETERMINE THE DESIGN

16     PATENTS' DAMAGES.  NEITHER THE COURT NOR THE UNITED STATES

17     PATENT AND TRADEMARK OFFICE HAS DETERMINED THE ARTICLES OF

18     MANUFACTURE IN THIS CASE.

19         NUMBER 22.

20         THE TRIAL WILL NOW BEGIN.  FIRST, EACH SIDE MAY MAKE AN

21     OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.  IT

22     IS SIMPLY TO HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE

23     EVIDENCE WILL SHOW.

24         THE PRESENTATION OF EVIDENCE WILL THEN BEGIN.  WITNESSES

25     WILL TAKE THE WITNESS STAND AND THE DOCUMENTS WILL BE OFFERED

1    AND ADMITTED INTO EVIDENCE.

2         APPLE WILL START BY PRESENTING ITS DAMAGES CONTENTIONS.

3    APPLE'S WITNESSES WILL BE QUESTIONED BY APPLE'S COUNSEL IN WHAT

4    IS CALLED DIRECT EXAMINATION.

5         AFTER THE DIRECT EXAMINATION OF A WITNESS IS COMPLETED,

6    SAMSUNG HAS AN OPPORTUNITY TO CROSS-EXAMINE THE WITNESS.  APPLE

7    HAS THE BURDEN TO PERSUADE OF ITS DAMAGES BY A PREPONDERANCE OF

8    THE EVIDENCE.  PROOF BY A PREPONDERANCE OF THE EVIDENCE MEANS

9    THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT SOMETHING IS

10   MORE LIKELY TRUE THAN NOT TRUE.

11        AFTER APPLE HAS PRESENTED ITS WITNESSES, SAMSUNG WILL CALL

12   ITS WITNESSES, WHO WILL ALSO BE EXAMINED AND CROSS-EXAMINED.

13   SAMSUNG WILL PRESENT ITS EVIDENCE OF WHAT IT BELIEVES APPLE'S

14   DAMAGES TO BE.

15        APPLE WILL HAVE THE OPTION TO PUT ON REBUTTAL EVIDENCE TO

16   ANY EVIDENCE OFFERED BY SAMSUNG.

17        BECAUSE THE EVIDENCE IS INTRODUCED PIECEMEAL, YOU NEED TO

18   KEEP AN OPEN MIND AS THE EVIDENCE COMES IN AND WAIT FOR ALL THE

19   EVIDENCE BEFORE YOU MAKE ANY DECISIONS.  IN OTHER WORDS, YOU

20   SHOULD KEEP AN OPEN MIND THROUGHOUT THE ENTIRE TRIAL.

21        AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL GIVE YOU

22   FINAL INSTRUCTIONS ON THE LAW THAT APPLIES TO THE CASE, AND THE

23   ATTORNEYS WILL MAKE CLOSING ARGUMENTS.  CLOSING ARGUMENTS ARE

24   NOT EVIDENCE.  AFTER THE INSTRUCTIONS AND CLOSING ARGUMENTS,

25   YOU WILL THEN DECIDE THE CASE.

1          ALL RIGHT.  DOES THE PLAINTIFF WISH TO GIVE AN OPENING

2     STATEMENT?

3               MR. LEE:  WE DO, YOUR HONOR.

4               THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  THE TIME,

5     MS. MASON?

6               THE CLERK:  9:30, YOUR HONOR.

7               THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  YOU HAVE

8     UNTIL 10:15.

9          **(MR. LEE GAVE HIS OPENING STATEMENT ON BEHALF OF APPLE.)**

10              MR. LEE:  GOOD MORNING.  AS I SAID YESTERDAY, MY NAME

11    IS BILL LEE, AND TOGETHER WITH MY COLLEAGUE, JOE MUELLER,

12    AMY WIGMORE, AND NATE SABRI, I REPRESENT APPLE.

13         WITH US TODAY FROM APPLE ARE GREG JOSWIAK, THE VICE

14    PRESIDENT OF PRODUCT MARKETING; RICHARD HOWARTH, THE SENIOR

15    DIRECTOR OF THE APPLE DESIGN TEAM AND ONE OF THE INVENTORS OF

16    THE PATENTS THAT YOU'RE GOING TO SEE; TONY BLEVINS, THE VICE

17    PRESIDENT OF PROCUREMENT; AND, NOREEN KRALL, WHO YOU MET

18    YESTERDAY, A VICE PRESIDENT IN THE LEGAL DEPARTMENT.

19         LET ME BEGIN BY REITERATING OUR THANKS TO YOU FOR TAKING

20    YOUR TIME TO HEAR WHAT WE HAVE TO SAY AND FOR DECIDING THE

21    ISSUES THAT ARE BEFORE YOU.  WE UNDERSTAND THAT JURY SERVICE

22    IMPOSES SUBSTANTIAL BURDENS UPON YOU PERSONALLY.  IN ADVANCE,

23    APPLE, SAMSUNG, ALL OF THE LAWYERS THANK YOU.

24         WE ARE HERE TODAY BECAUSE THE UNITED STATES PATENT OFFICE

25    GRANTED APPLE FIVE PATENTS THAT PROTECT THE DESIGNS AND

1        INVENTIONS THAT APPLE MADE WHEN IT INVENTED THE IPHONE.

2             WE ARE HERE TODAY BECAUSE ANOTHER JURY, AS HER HONOR HAS

3        TOLD YOU, SITTING IN THIS SAME COURTHOUSE, DETERMINED THAT

4        THOSE PATENTS WERE VALID, AND THAT SAME JURY DECIDED THAT

5        SAMSUNG HAD INFRINGED THOSE PATENTS.

6             THOSE ISSUES, AS YOU NOW KNOW, WERE CONCLUSIVELY AND

7        FINALLY DECIDED.

8             IN THIS TRIAL, YOU WILL LEARN THAT SAMSUNG SOLD MILLIONS

9        AND MILLIONS OF INFRINGING PHONES.  THOSE MILLIONS AND MILLIONS

10       OF PHONES WERE SOLD WITHOUT APPLE'S PERMISSION.

11            IN FACT, YOU WILL LEARN THAT APPLE WENT TO SAMSUNG AND

12       SAID, "PLEASE STOP."

13            AND SAMSUNG KEPT SELLING MILLIONS AND MILLIONS OF PHONES.

14            YOU WILL ALSO LEARN THAT SAMSUNG PROFITED GREATLY FROM ITS

15       SALE OF INFRINGING PHONES.  FROM ITS INFRINGEMENT OF JUST THE

16       THREE DESIGN PATENTS THAT HER HONOR REFERRED YOU TO, SAMSUNG

17       MADE MORE THAN $3.3 BILLION IN REVENUES AND $1 BILLION IN TOTAL

18       PROFITS, AND THOSE AMOUNTS DON'T INCLUDE WHAT SAMSUNG RECEIVED

19       FOR ITS MILLIONS OF ACTS OF INFRINGEMENT OF THE TWO UTILITY

20       PATENTS.

21            AS A RESULT OF THE INFORMATION YOU WILL RECEIVE, YOU WILL

22       BE ASKED TO DECIDE ONE BASIC QUESTION:  WHAT SHOULD SAMSUNG PAY

23       FOR ITS INFRINGEMENT OF APPLE'S PATENTS?

24            SO LET ME BEGIN BY DESCRIBING TO YOU HOW WE GOT HERE.  THE

25       EVENTS THAT LED TO THIS LAWSUIT BEGAN IN 2004 WHEN APPLE

1    DECIDED TO DEVELOP THE IPHONE.  AFTER SEVERAL YEARS OF HARD

2    WORK AND INVESTMENT OF OVER A BILLION DOLLARS, APPLE INTRODUCED

3    THE ORIGINAL IPHONE IN 2007 AND APPLIED FOR THE PATENTS TO

4    PROTECT ITS DESIGNS AND INVENTIONS.

5         THE EVENTS CONTINUED FROM 2010 TO 2012 WHEN SAMSUNG SOLD

6    THE INFRINGING PHONES AND ENDED WHEN THE EARLIER JURY DECIDED

7    THE ISSUES OF INFRINGEMENT AND VALIDITY.

8         NOW, AS YOU MAY HAVE GUESSED FROM WHAT I JUST SAID AND

9    WHAT YOU HEARD YESTERDAY, LAWSUITS CAN TAKE A LONG TIME.  THAT

10   IS WHY WE'RE ASKING YOU TO EVALUATE AND CONSIDER EVENTS THAT

11   OCCURRED SEVERAL YEARS AGO.

12        BUT THOSE EVENTS ARE STILL CRITICALLY IMPORTANT TODAY, AND

13   AS A RESULT, FOR THE NEXT FEW MINUTES, I'M GOING TO ASK YOU TO

14   STEP BACK IN TIME WITH ME SO WE CAN LOOK AT THE EVENTS IN THEIR

15   HISTORICAL CONTEXT.

16        NOW, SEVERAL OF YOU HAVE APPLE PRODUCTS, AS WE KNOW FROM

17   YESTERDAY.  OTHERS MAY HAVE SEEN APPLE PRODUCTS.

18        BUT WHAT YOU MAY NOT KNOW IS HOW APPLE GOES ABOUT CREATING

19   ITS PRODUCTS.

20        YOU WILL LEARN THAT AT ITS CORE, APPLE IS AND HAS ALWAYS

21   BEEN A COMPANY FOCUSSED ON DESIGN.  DESIGN IS AT THE HEART OF

22   APPLE.  DESIGN IS AT THE HEART OF THIS CASE.  AND I ASK YOU TO

23   KEEP THAT WORD, "DESIGN," IN MIND.

24        YOU WILL LEARN THAT IN DESIGNING PRODUCTS, APPLE PUTS

25   DESIGN BEFORE EVERYTHING ELSE.  APPLE, FIRST AND FOREMOST,

1    WANTS TO MAKE BEAUTIFUL PRODUCTS.  IT FIRST AND FOREMOST WANTS

2    TO MAKE PRODUCTS THAT PEOPLE, LIKE YOU, WANT TO PURCHASE, BUT

3    MORE IMPORTANTLY, USE.

4         THIS FOCUS ON DESIGN HAS BEEN A HALLMARK OF APPLE FROM THE

5    OUTSET.  IT LED TO PRODUCTS FOR WHICH APPLE HAS BEEN BEST

6    KNOWN.

7         THERE WAS THE ORIGINAL MACINTOSH COMPUTER IN 1984, THE

8    IMAC IN 1998, THE IPOD IN 2001, THE POWERBOOK IN 2003, THE

9    MACBOOK IN 2006.

10        ALL OF THESE PRODUCTS, WHEN THEY CAME TO MARKET, WERE

11   PRAISED FOR THEIR UNIQUE DESIGNS.  ALL OF THEM WERE SUCCESSFUL

12   BECAUSE OF THEIR DESIGNS.

13        WHY HAS APPLE FOCUSSED ON DESIGN?  THE REASON IS SIMPLE.

14   APPLE HAS LONG RECOGNIZED THAT DESIGN IS CRITICAL TO

15   ESTABLISHING A PRODUCT IDENTITY AND DISTINCTIVENESS.  THE

16   DESIGNS OF THE IMAC AND THE IPOD ON THE SCREEN WERE AT THE

17   HEART OF THOSE PRODUCTS' IDENTITY.  DESIGN BROUGHT EVERYTHING

18   TOGETHER.

19        WHAT THAT MEANS IS THAT APPLE'S DESIGNS WERE INTENDED TO

20   BRING TOGETHER UNDERLYING TECHNOLOGY IN A CENTRAL IMAGE THAT

21   PEOPLE COULD IDENTIFY WITH, ASSOCIATE WITH, AND PEOPLE WANTED

22   TO USE.

23        IN SHORT, DESIGN IS WHAT MADE THOSE PRODUCTS ICONIC.

24        THIS WAS ALSO TRUE OF THE IPHONE.  TODAY WE THINK OF

25   SMARTPHONES, WE OFTEN THINK OF DEVICES THAT LOOK LIKE THE

1    IPHONE.  BUT THIS IS WHY IT'S CRITICALLY IMPORTANT FOR US TO

2    STEP BACK IN TIME.

3          DO YOU REMEMBER WHAT CELL PHONES LOOKED LIKE IN 2006?

4    THIS IS WHAT CELL PHONES LOOKED LIKE IN 2006 BEFORE THE

5    INTRODUCTION OF THE IPHONE.  THERE WERE MANY, MANY DIFFERENT

6    KINDS.

7          AS YOU CAN SEE, THERE WERE ALL DIFFERENT SHAPES AND SIZES.

8    THERE WERE FLIP PHONES, THERE WERE SLIDERS, THERE WERE

9    KEYBOARDS, THERE WERE LOTS OF BUTTONS.

10          NOW, MANY OF THESE PHONES WERE USED TO MAKE PHONE CALLS,

11   SEND TEXT MESSAGES, BROWSE THE INTERNET, TAKE PHOTOS, THE SAME

12   THINGS YOU COULD DO WITH YOUR SMARTPHONE TODAY.

13          BUT THEY LOOKED VERY DIFFERENT FROM WHAT WE THINK OF AS A

14   SMARTPHONE TODAY.

15          THE EVIDENCE WILL SHOW THAT THE IPHONE CHANGED ALL OF

16   THAT.  YOU WILL HEAR FIRSTHAND FROM PEOPLE WHO WERE THERE AT

17   THE TIME AND INVOLVED IN THE DEVELOPMENT OF THE IPHONE.

18          GREG JOSWIAK, WHO I JUST INTRODUCED TO YOU, IS THE VICE

19   PRESIDENT OF PRODUCT MARKETING.  HE HAS BEEN AT APPLE FOR OVER

20   30 YEARS.  HE WILL TELL YOU THAT IN THE EARLY 2000'S, APPLE WAS

21   A COMPUTER COMPANY.  IT HAD NEVER MADE A PHONE BEFORE.

22          BUT IT DECIDED TO TRY TO MAKE THE IPHONE.  APPLE WANTED TO

23   MAKE A BETTER PHONE, A DIFFERENT PHONE, A MORE BEAUTIFUL PHONE,

24   BETTER THAN THE FLIP PHONES AND THE SLIDERS AND WHAT HAD BEEN

25   ON THE MARKET BEFORE.

1          APPLE WANTED TO MAKE A PHONE WITH A BETTER DESIGN, A

2     BETTER USER EXPERIENCE.

3          SO IT TOOK A HUGE RISK.  IT WAS A COMPUTER COMPANY THAT

4     DECIDED TO MAKE A SMARTPHONE WITH A DESIGN THAT THE MARKETPLACE

5     HAD NEVER SEEN BEFORE.

6          IT INVESTED FOUR YEARS OF WORK, NIGHT AND DAY, OVER A

7     BILLION DOLLARS OF MONEY, AND BROUGHT THE IPHONE TO MARKET.

8          YOU WILL HEAR FROM RICHARD HOWARTH, ONE OF THE LEAD

9     DESIGNERS FOR THE ORIGINAL IPHONE.  HE STILL WORKS AT APPLE

10    TODAY AND IS A SENIOR DIRECTOR ON THE DESIGN TEAM.

11         HE IS ALSO AN INVENTOR ON TWO OF THE THREE DESIGN PATENTS

12    THAT YOU WILL SEE THAT ARE IN YOUR NOTEBOOKS.

13         HE WILL TELL YOU THE STORY OF HOW APPLE, OVER A PERIOD OF

14    YEARS, DESIGNED THE IPHONE.  HE WILL TELL YOU HOW APPLE'S

15    ENGINEERS AND DESIGNERS WORKED TOGETHER TO COME UP WITH

16    SOMETHING THAT WAS BEAUTIFUL, INTUITIVE, AND CUSTOMERS WANTED

17    TO USE.

18         AND YOU WILL HEAR FROM TONY BLEVINS, THE VICE PRESIDENT

19    FOR PROCUREMENT.  HE WAS RESPONSIBLE FOR SOURCING, GETTING THE

20    COMPONENTS THAT GO INTO THE IPHONE.  MR. BLEVINS WILL TELL YOU

21    HOW APPLE MADE THESE COMPONENTS COME TOGETHER IN A SINGLE

22    PRODUCT WITH A SINGLE ICONIC DESIGN.

23         AND YOU WILL LEARN THAT THE RESULT OF APPLE'S INVESTMENT

24    EFFORT AND INNOVATION WAS THE IPHONE.

25         THE END RESULT WAS REVOLUTIONARY.  AS YOU WILL LEARN,

1    SAMSUNG'S OWN WITNESSES CONCEDE THAT IT WAS REVOLUTIONARY.

2         AS YOU PROBABLY RECOGNIZE, THIS IS WHAT THE ORIGINAL

3    IPHONE LOOKED LIKE.  IT HAD A SHRIEK DESIGN, A RECTANGULAR

4    SHAPE WITH ROUNDED CORNERS.  THERE WERE NO KEYBOARDS, BUTTONS,

5    OR ANTENNAS PROTRUDING FROM THE PHONE.  THERE WAS NO FLIP

6    PHONE.  THERE WAS NO SLIDER.

7         INSTEAD, THE IPHONE HAD A GLASS FRONT FACE EXTENDING FROM

8    EDGE TO EDGE ACROSS THE ENTIRE PHONE.  IT HAD A DISTINCTIVE

9    FRONT FACE, THE STRIKING SURFACE WHERE EVERYTHING WOULD HAPPEN.

10        THERE WAS A METALLIC RIM, WHICH YOU'LL HEAR REFERRED TO AS

11   A BEZEL, SURROUNDING THE EDGE OF THE PHONE, AND THERE WAS A

12   GRAPHICAL USER INTERFACE, DISPLAYED AS A GRID OF COLORFUL ICONS

13   REPRESENTING THE DIFFERENT APPLICATIONS, THE APP, ON THE PHONE.

14        NOW, CREATING A NEW DESIGN, A BEAUTIFUL PHONE, WAS NOT THE

15   ONLY WAY APPLE SOUGHT TO IMPROVE THE USER EXPERIENCE.

16        WITH A NEW SCREEN-CENTRIC DESIGN ALSO CAME OPPORTUNITIES

17   TO CREATE NEW AND INTERESTING WAYS TO USE YOUR PHONE, TO

18   INTERACT WITH YOUR PHONE.  AND AS YOU WILL LEARN, APPLE ALSO

19   INVENTED AN INTEGRATED NEW, INTUITIVE, FUN FEATURES THAT MADE

20   THE IPHONE EASIER FOR FOLKS LIKE YOU AND ME TO USE.

21        NOW, TODAY IT SEEMS COMMONPLACE TO HAVE A SMARTPHONE THAT

22   LOOKS SOMETHING LIKE THIS (INDICATING).  BUT AT THE TIME IT WAS

23   REVOLUTIONARY.

24        AND AS I SAID, YOU DON'T HAVE TO TAKE APPLE'S WORD FOR IT.

25   YOU DON'T HAVE TO TAKE MY WORD FOR IT.

1        YOU WILL LEARN THAT THE IPHONE TOOK THE WORLD BY STORM

2   WHEN IT WAS INTRODUCED IN 2007.  THE IPHONE, AND IN PARTICULAR

3   THE DESIGN -- REMEMBER THAT WORD -- OF THE IPHONE WAS PRAISED

4   BY INDUSTRY REVIEWERS, ARTIST, CONSUMERS, AND EVEN SOME

5   COMPETITORS.

6        ON THE SCREEN NOW IS AN ARTICLE FROM "THE NEW YORK TIMES"

7   THAT APPEARS SHORTLY AFTER THE IPHONE WAS INTRODUCED BY A WELL

8   KNOWN AND WELL RESPECTED COMMENTATOR.  HE SAID, "REMEMBER THE

9   FAIRY GODMOTHER IN 'CINDERELLA.'  SHE'D WAVE HER WAND AND TURN

10  SOME HOMELY UTILITARIAN OBJECT INTO SOMETHING GLAMOROUS AND

11  AMAZING.  EVIDENTLY, SHE LIVES IN SOME BACK ROOM AT APPLE."

12       "THE NEW YORK TIMES" REVIEWER WENT ON TO SAY, "THE IPHONE

13  IS GORGEOUS.  ITS FACE IS SHINY BLACK, RIMMED BY MIRROR

14  FINISHED STAINLESS STEEL."

15       HERE IS ANOTHER REVIEW OF THE IPHONE AT THAT TIME.  THIS

16  FROM THE "WALL STREET JOURNAL."  IT SAID, "AMONG OTHER THINGS,

17  THE IPHONE IS SIMPLY BEAUTIFUL."

18       AND AT THE END OF THE YEAR, "TIME MAGAZINE" NAMED THE

19  IPHONE THE BEST INVENTION OF THE YEAR IN 2007 AND GAVE THE

20  REASONS WHY.  THE NUMBER ONE REASON, "THE IPHONE IS PRETTY."

21       ALL OF THESE PUBLICATIONS RECOGNIZED THE IPHONE NOT JUST

22  FOR WHAT IT COULD DO, BUT FOR HOW IT LOOKED, FOR ITS DESIGN.

23       THE RECOGNITION OF THE IPHONE'S INNOVATIVE DESIGN DID NOT

24  STOP WITH THE MEDIA.  THE IPHONE ALSO RECEIVED AWARDS FOR ITS

25  DESIGN, INCLUDING THE INTERNATIONAL DESIGN EXCELLENCE AWARD,

1    AND IT ALSO RECEIVED THE DESIGNER'S AND ART DIRECTOR'S GOLD

2    PENCIL AWARD, ONE OF THE HIGHEST ACHIEVEMENTS IN THE DESIGN

3    FIELD FOR A PRODUCT.

4         THE IPHONE'S DESIGN WAS SO HIGHLY REGARDED, IT ACTUALLY

5    MADE ITS WAY INTO THE PERMANENT COLLECTION OF MUSEUMS.  THE

6    IPHONE DESIGN IS IN THE SAN FRANCISCO MUSEUM OF MODERN ART, AND

7    IT HAS MADE ITS WAY TO THE SMITHSONIAN DESIGN MUSEUM IN

8    NEW YORK.

9         NOW, WE DON'T SAY ALL OF THIS TO YOU JUST TO GIVE APPLE A

10   PAT ON THE BACK.  WE ARE NOT HERE TO TELL YOU THAT APPLE

11   INVENTED EVERY TYPE OF SMARTPHONE, OR EVEN THE FIRST

12   SMARTPHONE.  IT CANNOT.  AND I WOULD NEVER SUGGEST THAT TO YOU.

13        OTHER COMPANIES HAD SOME TERRIFIC PHONES.  THEY HAD PHONES

14   WITH SOME OF THE SAME FEATURES, PHONES WITH DIFFERENT DESIGNS.

15        HAVING DIFFERENT TYPES OF PHONES WITH DIFFERENT DESIGNS IS

16   GOOD FOR COMPETITION AND GOOD FOR ALL OF US.

17        BUT WHAT APPLE DID IS IT INVENTED GROUNDBREAKING DESIGNS

18   FOR ITS SMARTPHONES, DIFFERENT FROM WHAT HAD COME BEFORE, AND

19   THAT IS WHAT SAMSUNG USED MILLIONS AND MILLIONS AND MILLIONS OF

20   TIMES.

21        NOW, APPLE TOOK STEPS TO PROTECT THE IPHONE'S DESIGN.  IT

22   APPLIED FOR AND RECEIVED DESIGN AND UTILITY PATENTS.

23        AS HER HONOR INSTRUCTED YOU, THESE ARE ISSUED BY THE

24   UNITED STATES PATENT AND TRADEMARK OFFICE.  IT RECOGNIZED THESE

25   INVENTIONS AS DESIGNS.

1          THESE ARE THE THREE DESIGNS YOU WILL HEAR ABOUT DURING THE

2    COURSE OF THE EVIDENCE.  THEY WERE ALL INVENTED BY APPLE'S

3    DESIGNERS.  THEY WERE ALL INVENTED IN THE DEVELOPMENT OF THE

4    IPHONE.  THEY WERE ALL PART OF THE GREAT RISK THESE DESIGNERS

5    AND ENGINEERS TOOK.

6          THE FIRST IS THE D'677 PATENT, ON THE SCREEN, BUT ALSO IN

7    YOUR NOTEBOOK.

8          MR. HOWARTH IS ONE OF THE INVENTORS ON THIS PATENT.  IT

9    CLAIMS, AS YOU CAN SEE, AND IT I QUOTE, "THE ORNAMENTAL DESIGN

10   OF AN ELECTRONIC DEVICE AS SHOWN AND DESCRIBED IN THE PATENT."

11         AS YOU'LL LEARN, THE D'677 PATENT COVERS THE CORE SURFACE

12   ON WHICH EVERYTHING HAPPENS ON THE IPHONE.  THE SPECIFIC

13   RECTANGULAR SHAPE OF THE PORTIONS, THE ROUNDED CORNERS, THE

14   GLASS FRONT FACE THAT EXTENDED EDGE TO EDGE, AND THAT STRIKING

15   BLACK COLOR ON THE FRONT SURFACE.  THAT BLACK FRONT FACE IS THE

16   PLATFORM ON WHICH ALL APPLICATIONS EVENTUALLY APPEARED.

17         IT IS A WONDERFUL EXAMPLE OF HOW A DISTINCT DESIGN CAN

18   BRING TOGETHER EVERYTHING INTO A CENTRAL DESIGN THAT CAN BE

19   USED INTUITIVELY AND EASILY.

20         ON THE SCREEN NOW IS APPLE'S D'087 PATENT.  MR. HOWARTH IS

21   AN INVENTOR ON THIS AS WELL.  IT COVERS THE RECTANGULAR SHAPE

22   AND PROPORTIONS, THE ROUNDED CORNERS, GLASS FRONT FACE THAT

23   EXTENDED EDGE TO EDGE, AND A BEZEL, THE METAL RIM THAT GOES

24   AROUND THE DEVICE.

25         NOW, YOU MAY HAVE NOTICED THAT THIS PATENT IS SIMILAR TO

1    THE FIRST ONE, AND IT IS.  THE MAIN DIFFERENCE IS THAT THIS

2    PATENT REQUIRES THE BEZEL, THE METALLIC RIM.  THE D'677 PATENT

3    COVERS SIMILAR DESIGNS, WHETHER THERE'S A BEZEL OR NOT, AND THE

4    D'677 PATENT IS SPECIFICALLY DIRECTED TO THE BLACK STRIKING

5    SURFACE.

6         THE TWO DESIGN PATENTS, THE D'305, IT CLAIMS THE

7    ORNAMENTAL DESIGN FOR A GRAPHICAL USER INTERFACE AS SHOWN AND

8    DESCRIBED IN THE PATENT.

9         THERE IS DRAWINGS AND FIGURES IN EACH OF THE THREE PATENTS

10   THAT YOU'LL HAVE BEFORE YOU.  A GRAPHICAL USER INTERFACE, A

11   GUI.  A GUI, REFERS TO THE IMAGES DISPLAYED ON AN ELECTRONIC

12   DEVICE THAT ALLOW THE USER TO INTERACT WITH THAT DEVICE.

13        AS YOU WILL LEARN, THE D'305 CONCERNS THE IPHONE'S

14   GRAPHICAL USER INTERFACE DESIGN, INCLUDING THE ARRANGEMENT OF

15   COLORFUL ICONS IN A GRID ON THE BLACK BACKGROUND.

16        EACH OF THESE PATENTS COVERS A CORE, FUNDAMENTAL ELEMENT

17   OF THE ORIGINAL IPHONE DESIGN.

18        IN SOME OF THE INFRINGING PHONES, SAMSUNG APPLIED THE

19   D'677 BLACK FRONT FACE.  IN SOME OF THE INFRINGING PHONES, THEY

20   APPLIED THE FRONT FACING BEZEL.  IN SOME OF THE INFRINGING

21   PHONES, THEY APPLIED THE D'305.

22        IN EVERY INFRINGING PHONE, THEY USED THE DESIGN OF ONE OF

23   THESE APPLE PATENTS AND THEY INFRINGED THOSE APPLE PATENTS.

24        NOW, LET ME TURN TO THE UTILITY PATENTS BRIEFLY AND

25   INTRODUCE YOU TO THEM.

1          WITH THE CHANGES IN THE SMARTPHONES CAME OPPORTUNITIES TO

2     IMPROVE THE USER EXPERIENCE, AND APPLE DID JUST THAT.

3          AS HER HONOR INSTRUCTED YOU, DESIGN AND UTILITY PATENTS

4     ARE DIFFERENT.  DESIGN PATENTS PROTECT THE ORNAMENTAL DESIGN,

5     THE CREATIVE DESIGN THAT THE INVENTORS HAVE COME UP WITH.

6          UTILITY PATENTS COME UP WITH -- COVER DIFFERENT WAYS, NEW

7     WAYS OF MAKING THINGS AND DOING THINGS.

8          THEY ARE DIFFERENT TYPES OF PATENTS AND, IMPORTANTLY FOR

9     YOU, THEY HAVE DIFFERENT TYPES OF REMEDIES FOR INFRINGEMENT

10    UNDER THE LAW.

11         NOW, THE FIRST APPLE UTILITY PATENT IS THE '381 PATENT.

12    WE'LL REFER TO IT AS THE BOUNCEBACK PATENT.  YOU PROBABLY HAVE

13    SEEN BOUNCEBACK IN YOUR OWN PHONES.

14         THIS PATENT COVERS A FEATURE FOR A TOUCHSCREEN DEVICE.

15    WHEN YOU'RE SCROLLING THROUGH A LIST OR A WEB PAGE AND YOU

16    SCROLL PAST THE END AND YOU LIFT YOUR FINGER, IT BOUNCES BACK

17    TO THE END OF THE WEB PAGE SO YOU KNOW YOU'VE REACHED THE END.

18         IT'S A FUN AND INTUITIVE WAY TO TELL THE USER WHAT'S GOING

19    ON.  IT ALSO LETS THEM KNOW THAT THEY'RE AT THE END OF THE LIST

20    AND THAT'S ALL THERE IS.

21         TODAY THE BOUNCEBACK FEATURE IN 2018, THE BOUNCEBACK

22    FEATURE SEEMS COMMONPLACE.  IN 2007, IT WAS NEW, DIFFERENT, AN

23    INVENTION, AND THE PATENT OFFICE SO.

24         THE OTHER UTILITY PATENT IS THE '163 PATENT.  YOU'LL HEAR

25    IT REFERRED TO AS DOUBLE TAB TO ZOOM.  TO USE THIS FEATURE, YOU

1    TAKE THE PHONE AND YOU JUST TAP ONCE ON THE ARTICLE OR THE WEB

2    PAGE THAT YOU WANT TO SEE AND IT WILL AUTOMATICALLY CENTER IT

3    ON THE SCREEN.  YOU TAP ONCE AGAIN AND YOU CAN MOVE TO ANOTHER

4    ARTICLE ON THE PAGE.

5         ON A SMALL SCREEN, NOT YOUR BIG COMPUTER SCREEN, ON A

6    SMALL SCREEN, THIS WAS A CONVENIENT WAY TO ALLOW PEOPLE TO USE

7    AND READ ARTICLES AND MOVE AMONG ARTICLES OF INTEREST.

8         AGAIN, COMMONPLACE TODAY BUT NOT SO IN 2007, AS THE PATENT

9    OFFICE SAID.

10        YOU WILL HEAR FROM TWO OF APPLE'S EXPERT WITNESSES, RAVIN

11   BALAKRISHNAN AND KAREN SINGH.  THEY WILL TALK ABOUT THESE

12   UTILITY PATENTS.  BOTH ARE PROFESSORS OF COMPUTER SCIENCE AT

13   THE UNIVERSITY OF TORONTO.  BOTH WILL DEMONSTRATE FOR YOU HOW

14   THE INVENTIONS WORK, AND THEY WILL SHOW YOU THE SAMSUNG PHONES

15   THAT THE JURY FOUND INFRINGED THESE PATENTS.

16        NOW, THAT'S A SUMMARY OF THE APPLE SIDE OF THE STORY.

17        BUT WE'RE NOT HERE TODAY JUST BECAUSE APPLE DESIGNED A NEW

18   PRODUCT.  NOT JUST BECAUSE, IN OUR VIEW, AND SAMSUNG'S VIEW,

19   APPLE REVOLUTIONIZED THE SMARTPHONE MARKET.

20        WE ARE HERE TODAY, LADIES AND GENTLEMEN, BECAUSE THE

21   MANNER IN WHICH ONE COMPETITOR, AMONG OTHER COMPETITORS,

22   REACTED TO THE IPHONE.

23        SO LET ME TURN YOU NOW TO WHAT SAMSUNG WAS DOING BEFORE

24   AND AFTER THE IPHONE WAS INTRODUCED.

25        UNLIKE APPLE, SAMSUNG WAS IN THE PHONE MARKET BEFORE

1       JANUARY OF 2007.  THIS SLIDE SHOWS A SELECTION OF WHAT SOME OF

2       SAMSUNG'S PHONES LOOKED LIKE BEFORE THE IPHONE WAS ANNOUNCED.

3       AS YOU CAN SEE, THESE PHONES -- THEY HAD OTHERS -- THESE PHONES

4       HAD ANTENNAS, BUTTONS, AND KEYBOARDS.  THEY DON'T LIKE LOOK THE

5       SMARTPHONES WE KNOW TODAY.

6            YOU WILL LEARN FROM THE EVIDENCE THAT SAMSUNG'S REACTION

7       TO THE IPHONE CAME IN THREE STAGES.

8            STAGE 1.  IT OCCURRED AFTER THE IPHONE WAS INTRODUCED IN

9       2007.  SAMSUNG WAS SKEPTICAL THE IPHONE WOULD BE SUCCESSFUL.

10      SAMSUNG DID NOT THINK THAT A COMPUTER COMPANY WHO HAD NEVER

11      MADE A PHONE BEFORE COULD MAKE A COMPETITIVE SMARTPHONE.

12      SAMSUNG QUESTIONED WHETHER THE IPHONE WOULD BE SUCCESSFUL.

13      SAMSUNG THOUGHT IT COULD CONTINUE WITH ITS PHONES AND ITS

14      DESIGNS WITHOUT NEEDING SPECIFICALLY TO REFER TO THE IPHONE.

15           BUT STAGE 2 BEGAN IN 2008, ABOUT ONE YEAR LATER.  SAMSUNG

16      HIRED A CONSULTANT TO STUDY THE IPHONE.  AS YOU CAN SEE, THE

17      CONSULTANT CONCLUDED THAT THE IPHONE'S, QUOTE, "SCREEN-CENTRIC

18      DESIGN HAS SET THE STANDARD FOR TOUCH.  IT'S BEAUTIFUL.  THE

19      WHOLE PHONE IS THE SCREEN."

20           SAMSUNG'S CONSULTANT, ONE YEAR AFTER THE IPHONE WAS

21      INTRODUCED, IS TELLING SAMSUNG THAT THE PHONE'S DESIGN IS OF

22      CENTRAL IMPORTANCE.

23           NOW, WE'VE HIGHLIGHTED JUST A FEW OF THESE DOCUMENTS.

24      THESE ARE ALL SAMSUNG INTERNAL DOCUMENTS, SECRET DOCUMENTS THAT

25      WE OBTAINED ONLY AS A RESULT OF THIS LITIGATION.  I'LL MOVE

1    THROUGH THEM QUICKLY IN THE INTERESTS OF TIME THIS MORNING.

2    YOU WILL HAVE IN THE JURY ROOM THE DOCUMENTS FULLY, AND YOU

3    WILL BE ABLE TO LOOK AT THEM FULLY.

4         SO IN STAGE 2, SAMSUNG REALIZED THAT THE IPHONE HAD

5    CHANGED THE MARKETPLACE.  WHAT DID IT DO?

6         FOR THE NEXT TWO YEARS, IT TRIED TO COMPETE WITH ITS OWN

7    DESIGN, AND ON THE SCREEN NOW YOU WILL SEE SOME OF THOSE

8    DESIGNS.

9         YOU CAN SEE THAT SAMSUNG WAS MOVING TOWARDS LARGER

10   SCREENS.  IT HEARD ITS CONSULTANT ON WHAT APPLE HAD DONE.

11        BUT THESE PHONES STILL HAD BUTTONS, NOT AS MANY AS BEFORE.

12   THE ANTENNAS WERE GONE.  THIS WAS SAMSUNG'S ATTEMPT TO RESPOND

13   TO THE INFORMATION FROM ITS CONSULTANT.  THIS WAS SAMSUNG'S

14   ATTEMPT TO BRING ITS OWN DESIGNS TO COMPETE WITH THE IPHONE

15   DESIGN IN THE MARKETPLACE.

16        HOW DID THE MARKET REACT TO STAGE 2?

17        ON THE SCREEN NOW IS A MARKET SHARE CHART, AND THE MARKET

18   SHARE CHART TELLS US VERY IMPORTANT INFORMATION.  IT SHOWS WHAT

19   HAPPENED TO SAMSUNG'S SHARE OF THE SMARTPHONE MARKET IN STAGE 1

20   AND STAGE 2, THE YEARS IMMEDIATELY FOLLOWING THE IPHONE.

21        WHEN THE IPHONE WAS INTRODUCED, SAMSUNG HAD 10 PERCENT OF

22   THE U.S. MARKET.  BY EARLY 2010, THE END OF STAGE 2, IT HAD

23   LOST HALF OF THAT.

24        SAMSUNG'S EXECUTIVES REALIZED THAT THEY HAD A PROBLEM.

25   THE IPHONE WAS A HUGE SUCCESS, A MUCH BIGGER SUCCESS THAN THEY

1        ANTICIPATED.

2              SAMSUNG KNEW IT HAD TO MAKE CHANGES, AND IT KNEW IT HAD TO

3        MAKE THOSE CHANGES FAST.

4              THAT BRINGS US TO STAGE 3.

5              AS YOU WILL LEARN, IN 2010, SAMSUNG SET OUT TO MAKE NEW

6        PHONES, NEW PHONES THAT USED APPLE'S DESIGNS AND USED APPLE'S

7        INNOVATIONS AND INFRINGED APPLE'S PATENTS.

8              YOU WILL NOT HAVE TO TAKE MY WORD FOR IT.  I'M GOING TO

9        TAKE YOU NOW THROUGH SAMSUNG'S OWN INTERNAL DOCUMENTS.  AGAIN,

10       I'LL DO IT QUICKLY, BUT YOU WILL HAVE ALL OF THEM FULLY TO

11       REVIEW IN THE JURY ROOM, AND YOU CAN JUDGE WHETHER THE EXCERPTS

12       I'M SHOWING YOU ARE FAIR AND REPRESENTATIVE.

13             ON FEBRUARY 10, 2010, THE BEGINNING OF WHAT I'M CALLING

14       STAGE 3, SAMSUNG HAD A SUMMIT MEETING.  THIS IS THREE YEARS

15       AFTER THE IPHONE WAS ANNOUNCED, THREE YEARS.

16             J.K. SHIN, WHO WAS THE HEAD OF SAMSUNG'S ENTIRE PHONE

17       DIVISION, CALLED A MEETING OF HIS SENIOR MANAGEMENT AND HE

18       ADMONISHED THEM.  WHAT DID HE SAY AT THE MEETING?  HE SAID, AND

19       I'M NOW QUOTING WHAT HE SAID, "I HEAR THINGS LIKE THIS:  LET'S

20       MAKE SOMETHING LIKE THE IPHONE."

21             "THE IPHONE HAS BECOME THE STANDARD."

22             "IF YOU COMPARE THE UX," THAT'S USER EXPERIENCE, "WITH THE

23       IPHONE, IT'S A DIFFERENCE BETWEEN HEAVEN AND EARTH."

24             "IT'S A CRISIS OF DESIGN."

25             SAMSUNG'S WORDS, NOT MINE.  SAMSUNG'S WORDS EIGHT YEARS

1     AGO.  NOT A CRISIS OF FEATURES, NOT A CRISIS OF TECHNOLOGY, NOT

2     A CRISIS OF SOFTWARE APPLICATIONS, NOT A CRISIS OF COMPONENT; A

3     CRISIS OF DESIGN.

4         SO WHAT WAS SAMSUNG'S SOLUTION TO THE CRISIS?  MAKE

5     SOMETHING LIKE THE IPHONE, AND THAT IS PRECISELY WHAT SAMSUNG

6     DID.

7         ON THE SCREEN NOW IS AN INTERNAL DOCUMENT FROM SAMSUNG

8     DATED JUST ONE MONTH LATER, ONE MONTH AFTER THE CRISIS OF

9     DESIGN SUMMIT, MARCH OF 2010.

10        IT'S A SIDE BY SIDE COMPARISON BETWEEN A SAMSUNG PHONE IN

11    DEVELOPMENT ON THE LEFT AND AN IPHONE ON THE RIGHT.  THE

12    DOCUMENT COMPARES THE TWO, AS YOU CAN SEE.  IT COMPARES THE

13    IPHONE, AS YOU CAN SEE.

14        WHAT DOES THE DOCUMENT RECOMMEND FOR IMPROVING THE SAMSUNG

15    PHONE?  TO SET THE STANDARD ICON SIZE, JUST LIKE THE IPHONE, AS

16    YOU'LL SEE AT THE BOTTOM.

17        THIS DOCUMENT, PX 44 THAT YOU'LL HAVE, LITERALLY HAS

18    COMPARISON AFTER COMPARISON AFTER COMPARISON.

19        HERE IS A PAGE FROM PX 44.  IT'S ANOTHER SIDE BY SIDE

20    COMPARISON, AGAIN, COMPARING THE BLACK PHONE SCREEN WITH THE

21    ICONS.  IT NOTES THAT THE IPHONE'S ICONS ARE HIGHLY INTUITIVE

22    AND SAMSUNG'S ARE NOT.  IT'S HARD TO TELL WHAT SAMSUNG'S ICONS

23    MEAN.

24        AT THE BOTTOM, DIRECTION FOR IMPROVEMENT:  CHANGE TO MORE

25    HIGHLY INTUITIVE ICONS, JUST LIKE THE IPHONE.

1          AND ONE MORE PAGE FROM THE SAME DOCUMENT ON THE SCREEN

2     NOW.  THIS PAGE IS LOOKING AT THE DOUBLE TAP TO ZOOM FEATURE

3     FROM THE IPHONE.  THE DIRECTION FOR IMPROVING THE SAMSUNG PHONE

4     IN DEVELOPMENT AT THE BOTTOM:  ADD THE DOUBLE TAP TO ZOOM

5     FEATURE.  MAKE IT JUST LIKE THE IPHONE.

6          WITHIN A FEW MONTHS -- REMEMBER THAT FEBRUARY 2010 IS WHEN

7     THEY HAD THIS SUMMIT MEETING -- WITHIN A FEW MONTHS, SAMSUNG

8     CAME TO MARKET WITH THE FIRST OF THE INFRINGING PHONES.  THOSE

9     PHONES INCORPORATED THE DESIGNS OF THE THREE DESIGN PATENTS

10    THAT ARE BEFORE YOU.  THEY INCORPORATED THE FEATURES THROUGH

11    UTILITY PATENTS BEFORE YOU.

12         REMEMBER, IT TOOK APPLE SEVERAL YEARS, MANY HOURS OF WORK

13    BY MANY SCIENTISTS AND ENGINEERS AND DESIGNERS, AND OVER A

14    BILLION DOLLARS TO DEVELOP THE IPHONE.

15         SAMSUNG RECOGNIZED THEY HAD A CRISIS OF DESIGN AND IN FOUR

16    MONTHS, FOUR MONTHS, CAME UP WITH THE INFRINGING PHONES.

17         THE RESULT WAS, AS I JUST SAID, THE INFRINGING PHONES OUT

18    ON THE MARKET, AND THEY'RE ON THE SCREEN NOW.  AS YOU'LL LEARN,

19    THERE WERE 18 DIFFERENT MODELS THAT INFRINGED OVER AN EXTENDED

20    PERIOD OF TIME.

21         THIS SLIDE SHOWS SOME OF THE NEW PHONES THAT WERE

22    INTRODUCED IN JUNE OF 2010.  YOU CAN SEE THE REMARKABLE

23    SIMILARITY FROM THE SHAPE OF THE PHONE TO THE ROUNDED CORNERS

24    TO THE ICONS TO THE BEZELS.

25         LET ME SHOW YOU THE PROGRESSION OF SAMSUNG PHONES VERY

1    QUICKLY AGAIN.  THIS IS WHAT THE PHONES LOOKED LIKE BEFORE THE

2    IPHONE; THIS IS WHAT THE PHONES LOOKED LIKE DURING STAGE 1 AND

3    STAGE 2; AND THIS IS WHAT THE PHONES LOOKED LIKE WHEN STAGE 3

4    WAS COMPLETE (INDICATING).

5         NOW, APPLE WAS NOT THE ONLY ONE TO NOTICE THAT SAMSUNG'S

6    NEW PHONES LOOKED JUST LIKE THE IPHONES.  YOU WILL SEE THAT THE

7    INDUSTRY AND THE MARKETPLACE REACTED AND HAD SOMETHING TO SAY

8    ABOUT APPLE'S USE -- SAMSUNG'S USE OF APPLE'S PATENTED DESIGNS.

9         A "P.C. WORLD" ARTICLE ON THE SCREEN RIGHT NOW REVIEWING

10   ONE OF THE INFRINGING PHONE, THE GALAXY S, SAID THE REVIEWER

11   WAS, QUOTE, "SURPRISED BY HOW FAMILIAR IT LOOKED AND OBSERVED

12   THAT THE GALAXY S DESIGN WAS ACTUALLY VERY IPHONE 3GS-LIKE."

13        A "WIRED" REVIEW WAS EVEN MORE EXPLICIT.  THE CAPTION, THE

14   TITLE, "FIRST LOOK:  SAMSUNG VIBRANT RIPS OFF IPHONE 3G

15   DESIGN."

16        AND IT SAYS, THE "VIBRANT'S INDUSTRIAL DESIGN IS

17   SHOCKINGLY SIMILAR TO THE IPHONE 3G."  IT EVEN NOTED THE

18   SIMILARITIES IN THE ROUNDED CURVES OF THE CORNER, THE GLOSSY

19   FRONT BLACK FINISH, THE CHROME-COLORED METALLIC BORDER.

20        THE VIBRANT IS ONE OF THE INFRINGING PHONES.

21        NOW, AS YOU MAY EXPECT, APPLE WAS NOT HAPPY THAT SAMSUNG

22   DECIDED TO USE ITS DESIGNS AND INVENTIONS.  ONE MONTH AFTER THE

23   FIRST PHONE WAS INTRODUCED, APPLE WENT TO MEET WITH SAMSUNG.

24   APPLE MADE A PRESENTATION TO SAMSUNG.  TWO PAGES OF THAT

25   PRESENTATION ARE ON THE SCREEN RIGHT NOW, AND AS YOU WILL

1      LEARN, APPLE SAID, "PLEASE STOP COPYING THE IPHONE."

2           DIDN'T ASK FOR MONEY, JUST SAID "PLEASE STOP COPYING."

3           SAMSUNG DID NOT.

4           WHAT DID THEY DO?  THEY DOUBLED DOWN AND SOLD MILLIONS AND

5      MILLIONS MORE OF INFRINGING PHONES.

6           AND YOU'LL -- IN FACT, YOU WILL LEARN THAT SAMSUNG

7      CONTINUED TO INFRINGE FOR TWO YEARS.  DURING THAT TIME, IT

8      INTRODUCED 18 MODELS OF INFRINGING PHONES.  DURING THAT TIME,

9      IT RECEIVED $3.3 BILLION IN REVENUES FOR INFRINGING THESE

10     PATENTS.

11          WHAT HAPPENED TO SAMSUNG'S MARKET SHARE AFTER IT LAUNCHED

12     THE INFRINGING PHONES?  WELL, AGAIN, THE GRAPH TELLS US

13     EVERYTHING WE NEED TO KNOW.  ITS MARKET SHARE JUMPED FROM

14     5 PERCENT TO 20 PERCENT, DOUBLE WHERE IT WAS BEFORE THE IPHONE

15     CAME TO MARKET.

16          NOW, THE ISSUE BEFORE YOU IS DAMAGES.  THE ISSUE BEFORE

17     YOU IS DAMAGES BECAUSE ANOTHER JURY HAS DETERMINED INFRINGEMENT

18     AND VALIDITY.

19          AS I SAID EARLIER, THERE ARE TWO TYPES OF REMEDIES:  ONE

20     FOR DESIGN PATENTS, ONE FOR UTILITY PATENTS, BOTH DEFINED BY

21     HER HONOR, BOTH DEFINED BY CONGRESS.

22          FOR DESIGN PATENT INFRINGEMENT, THERE IS A SPECIAL TYPE OF

23     REMEDY.  APPLE IS ENTITLED TO RECEIVE SAMSUNG'S TOTAL PROFIT ON

24     THE ARTICLE OF MANUFACTURE TO WHICH SAMSUNG APPLIED THE

25     PATENTED DESIGNS.

1          NOW, I KNOW THAT SOUNDS LIKE A MOUTHFUL, AND IT IS.  BUT I

2     EXPECT THAT HER HONOR WILL INSTRUCT YOU THERE'S TWO STEPS TO

3     THIS.

4          THE FIRST IS TO IDENTIFY THE ARTICLE OF MANUFACTURE.

5          NOW, LADIES AND GENTLEMEN, THE PATENTED DESIGN AND THE

6     ARTICLE OF MANUFACTURE ARE TWO DIFFERENT THINGS.  IT'S A

7     CRITICALLY IMPORTANT DISTINCTION.  ON THE ONE HAND, YOU HAVE

8     THE DESIGN.  IT IS THE CREATIVE, ORNAMENTAL THING THAT THE

9     DESIGNER HAS COME UP WITH THAT COULD BE APPLIED TO A THING.

10         ON THE OTHER HAND, YOU HAVE THE ARTICLE OF MANUFACTURE.

11    IT IS THE THING TO WHICH THE DESIGN HAS BEEN APPLIED.

12         YOU WILL BE ASKED TO DETERMINE, FOR EACH OF THE DESIGNS

13    WHICH THE PATENT OFFICE HAS FOUND TO BE INNOVATIVE AND NEW,

14    WHAT THING SAMSUNG APPLIED APPLE'S PATENTS TO.

15         AND WE EXPECT HER HONOR WILL INSTRUCT YOU THAT YOU SHOULD

16    CONSIDER FOUR FACTORS, AND WE'LL WALK THROUGH THOSE FOUR

17    FACTORS WITH YOU DURING THE COURSE OF THE EVIDENCE.

18         FOR NOW LET ME SAY THIS:  APPLE DESIGNED THE PHONES.

19    APPLE INVENTED A NEW PHONE.  APPLE MADE PHONES.  APPLE MARKETED

20    PHONES.  APPLE SOLD PHONES.

21         SAMSUNG DESIGNED PHONES.  SAMSUNG MADE PHONES.  SAMSUNG

22    MARKETED PHONES.  SAMSUNG SOLD PHONES.  SAMSUNG APPLIED APPLE'S

23    PATENTED DESIGNS TO THE INFRINGING PHONES.

24         YOU WILL HEAR FROM TWO APPLE EXPERTS WHO WILL WALK YOU

25    THROUGH THE FOUR FACTORS.

1          ALAN BALL HAD BEEN DESIGNING COMPUTER PRODUCTS FOR

2     DECADES.  HE STUDIED THE D'677 AND THE '087 PATENTS, AS WELL AS

3     THE SAMSUNG PRODUCTS THAT INFRINGED THEM.

4          SUSAN KARE IS A GRAPHIC DESIGNER WHO SPECIALIZES IN

5     GRAPHICAL USER INTERFACE AND ICON DESIGN.  SHE ACTUALLY WAS THE

6     ICON DESIGNER FOR THE ORIGINAL MACINTOSH COMPUTER, THE ONLY

7     ICON DESIGNER FOR THAT COMPUTER.

8          SHE STUDIED THE D'305 PATENT AND THE SAMSUNG PRODUCTS

9     FOUND TO INFRINGE.

10          THEY WILL EXPLAIN TO YOU HOW SAMSUNG APPLIED APPLE'S

11     PATENTED DESIGNS TO INFRINGING PHONES AS A WHOLE AND WHY THE

12     ARTICLES OF MANUFACTURE IS AND ARE THE PHONES.

13          NOW, WHEN SAMSUNG'S LAWYERS GET UP HERE AND ARGUE THE

14     EVIDENCE, THEY'RE GOING TO POINT TO THE MANY FEATURES OF

15     SAMSUNG'S PHONES, THEIR PROCESSORS, THEIR GPS, THEIR DESIGNS.

16          THEY'RE 100 PERCENT RIGHT.  I DON'T DISAGREE FOR A SECOND.

17     BUT IT HAS NOTHING TO DO WITH THE ISSUE THAT YOU ARE TO DECIDE.

18          PHONES SOLD BEFORE THE IPHONE HAD PROCESSORS, THEY HAD

19     CAMERAS, THEY HAD GPS.  BUT THEY HAD DIFFERENT DESIGNS.

20          SAMSUNG COULD HAVE SOLD PHONES WITH ALL OF THOSE FEATURES,

21     BUT WITH DIFFERENT DESIGN, AND WE WOULDN'T HAVE COMPLAINED.

22     SAMSUNG COULD HAVE USED ANY DESIGN IN THE WORLD.

23          IN A FEW MINUTES, I EXPECT THAT SAMSUNG WILL SHOW A SLIDE

24     WITH DIFFERENT DESIGNS OF PHONES THAT COULD BE USED INSTEAD OF

25     THE IPHONE.

1          THAT, TOO, IS IRRELEVANT.  WHY?  BECAUSE THEY CHOSE TO USE

2     THE INFRINGING DESIGNS THAT INFRINGED THE PATENTS THAT COVER

3     THE IPHONE.

4          NOW, SAMSUNG WILL ALSO TRY TO CONVINCE YOU THAT IT APPLIED

5     THE PATENTED DESIGN TO ONLY CERTAIN COMPONENTS OF THE

6     INFRINGING PHONES, LIKE THE GLASS FRONT FACE, THE BEZEL, OR THE

7     DISPLAY SCREEN.

8          I ASK YOU TO LISTEN CLOSELY TO THAT EVIDENCE.  FIRST,

9     THESE ARTICLES OF MANUFACTURE ARE NOT THE RESULT OF DESIGN

10    ENGINEERS OR DESIGN FOLKS DETERMINING THE ARTICLES OF

11    MANUFACTURE.  IT IS A LEGAL POSITION TAKEN BY THE LAWYERS, AS

12    YOU WILL LEARN.

13         BUT THINK ABOUT IT PRACTICALLY.  PEOPLE USE THESE PHONES

14    AS A WHOLE.  THEY DON'T USE GLASS FRONT FACES ALONE.  THEY

15    DON'T USE BEZELS ALONE.  THEY DON'T USE DISPLAY SCREENS ALONE.

16    DESIGN IS WHAT TIES IT ALL TOGETHER.

17         NOW, WHEN SAMSUNG'S LAWYERS PRESENT EVIDENCE TO YOU THIS

18    MORNING AND DURING THE COURSE OF THE TRIAL THAT THE ARTICLE OF

19    MANUFACTURE IS JUST A SMALL COMPONENT, LET ME ASK YOU TO DO OR

20    REMEMBER THREE THINGS.

21         THE FIRST IS, THIS IS AN EFFORT TO MINIMIZE THE DAMAGES,

22    TO SUGGEST TO YOU THAT THEY SHOULD ONLY PAY A FRACTION, A

23    SMALL, TINY, TINY FRACTION OF WHAT THEY RECEIVED FOR THEIR

24    INFRINGEMENT.

25         SECOND, ONE OF THE GREAT PARTS OF OUR JURY SYSTEM IS THAT

1    IT BRINGS TOGETHER FOLKS LIKE YOU, FOLKS WHO CAN BRING YOUR

2    COMMON SENSE AND COLLECTIVE WISDOM TO BEAR ON WHAT MAY APPEAR

3    LIKE COMPLICATED ISSUES, BUT REALLY ARE RESOLVED BY COMMON

4    SENSE.

5         WHEN SAMSUNG HAD A CRISIS OF DESIGN, WAS IT APPLYING

6    APPLE'S DESIGNS, JUST THE GLASS FRONT FACES?  JUST THE BEZELS?

7    JUST THE DISPLAY SCREENS?  NO.  IT WAS APPLYING THEM TO PHONES.

8         AND, THIRD, I'D ASK YOU TO DO THIS:  COMPARE WHAT SAMSUNG

9    IS TELLING YOU TODAY TO WHAT ITS DOCUMENTS, ITS INTERNAL

10   DOCUMENTS SAID TEN YEARS AGO.  YOU WILL SEE THAT THEY'RE NOT

11   THE SAME.

12        AS HER HONOR WILL INSTRUCT YOU, WE EXPECT, AFTER YOU

13   IDENTIFY THE ARTICLE OF MANUFACTURE, THE SECOND STEP IN DESIGN

14   PATENT DAMAGES IS TO COMPUTE THE TOTAL PROFIT.

15        THE WORD IS TOTAL PROFIT.  WHEN YOU APPLY SOMEONE ELSE'S

16   PATENTED DESIGN AND YOU GO OUT AND SELL AN ARTICLE OF

17   MANUFACTURE, AS SAMSUNG DID HERE, THEY ARE ENTITLED TO THE

18   TOTAL PROFITS THAT THE INFRINGER RECEIVED.  THAT IS WHAT THE

19   LAW REQUIRES.

20        TO CALCULATE APPLE -- SAMSUNG'S TOTAL PROFITS ON THE

21   PHONES FOUND TO INFRINGE, APPLE ENLISTED THE HELP OF

22   JULIE DAVIS, A CERTIFIED PUBLIC ACCOUNTANT AND A VERY

23   EXPERIENCED DAMAGES EXPERT.  SHE TOOK THE REVENUE, THE 3.3

24   BILLION I JUST MENTIONED TO YOU, AND THEN USED SAMSUNG'S OWN

25   BOOKS AND ACCOUNTING RECORDS, TO THE EXTENT THAT SAMSUNG MADE

OPENING STATEMENT BY MR. LEE

1    THEM AVAILABLE TO US, AND DEDUCTED THE COSTS OF GOODS SOLD TO

2    REACH SAMSUNG'S PROFITS ON THE INFRINGING PHONES.

3         ON THE SCREEN NOW IS THE INFORMATION SHE USED.  YOU WILL

4    SEE, AS I SAID, THAT SAMSUNG HAD $3.3 BILLION IN REVENUES JUST

5    FOR INFRINGEMENT OF THE DESIGN PATENTS.  THIS DOESN'T INCLUDE

6    THE UTILITY PATENTS.

7         MS. DAVIS SUBTRACTED THE COST OF GOODS SOLD AND COMPUTED

8    TOTAL PROFITS OF A LITTLE MORE THAN A BILLION DOLLARS.  THAT IS

9    WHAT WE'RE ASKING FOR FOR THE INFRINGEMENT OF THE DESIGN

10   PATENTS.

11        IS IT A LOT OF MONEY?  IT IS FOR SURE.  I'M NOT HERE TO

12   TELL YOU DIFFERENTLY.

13        BUT PUT IT IN CONTEXT.  SAMSUNG INFRINGED MILLIONS AND

14   MILLIONS AND MILLIONS OF TIMES.  AFTER APPLE ASKED THEM TO

15   STOP, SAMSUNG DOUBLED DOWN AND KEPT INFRINGING.

16        SAMSUNG, AS I SAID, SOLD OVER $3.3 BILLION OF PRODUCT AND

17   REVENUES, AND THEY'RE GOING TO COME IN AND TELL YOU, AS THEY

18   DID YESTERDAY, THAT IT WOULD BE A RESULT REQUIRED BY LAW TO

19   HAVE THEM RETURN $28 MILLION AND LET THEM KEEP $3.2 BILLION.

20        NOW, SAMSUNG IS GOING TO OFFER YOU A WITNESS TO TRY TO

21   SUGGEST THAT IT SHOULD RETAIN $3.2 BILLION, TO TRY TO CONVINCE

22   YOU THAT SAMSUNG SHOULD ONLY PAY A SMALL FRACTION OF THAT

23   $3.3 BILLION OF REVENUE.

24        HERE ARE THE IMPORTANT FACTS TO YOU:  HE AGREES ON

25   $3.3 BILLION OF REVENUE.  HE AGREES ON THE COST OF GOODS SOLD.

1           THE ONLY DIFFERENCE BETWEEN THE TWO IS HE WOULD LIKE TO

2    DEDUCT SOME ADDITIONAL EXPENSES.

3           BUT AS YOU WILL LEARN WHEN THE COURT INSTRUCTS YOU AT THE

4    END WE EXPECT, YOU CAN ONLY DEDUCT ADDITIONAL COSTS IF THEY'RE

5    DIRECTLY ATTRIBUTABLE TO THE INFRINGING PRODUCTS.

6           SAMSUNG'S EXPERT CANNOT DO THAT.  WHY?  BECAUSE SAMSUNG

7    DIDN'T GIVE HIM THE INFORMATION TO DO SO.  THEY DIDN'T GIVE IT

8    TO APPLE.  THEY DIDN'T GIVE IT TO MS. DAVIS.  THEY DIDN'T GIVE

9    IT TO THEIR OWN EXPERT.

10          AND THEY WILL NOT BE ABLE TO TELL YOU THAT ANY OF THESE

11   OTHER EXPENSES ARE DIRECTLY RELATED, DIRECTLY ATTRIBUTABLE TO

12   THE INFRINGING PRODUCTS, WHICH IS WHAT THE LAW REQUIRES.

13          NOW, THE SECOND TYPE OF PATENT IS THE UTILITY PATENT.  ON

14   THE SCREEN NOW ARE THE MODELS OF PHONES THAT INFRINGE THE

15   UTILITY PATENTS.

16          LET ME JUST SAY THIS QUICKLY.  MS. DAVIS WILL EXPLAIN TO

17   YOU THAT THE DAMAGES REMEDY FOR THESE PATENTS IS A REASONABLE

18   ROYALTY.  IT'S WHAT THE PARTIES MIGHT HAVE NEGOTIATED HAD THEY

19   NEGOTIATED OVER THE AMOUNT SAMSUNG SHOULD PAY FOR USING THESE

20   PATENTS.  IT'S A LITTLE BIT LIKE YOU'RE NEGOTIATING RENT FOR AN

21   APARTMENT AND YOU AGREE UPON WHAT YOU'LL PAY FOR USE OF THE

22   APARTMENT.

23          THESE PATENTS ARE IMPORTANT.

24          BUT AS YOU'LL LEARN, THE LAW IS DIFFERENT FOR UTILITY

25   PATENTS, AND AS A RESULT, THE AMOUNT APPLE IS ASKING FOR FOR

1    THESE UTILITY PATENTS IS A REASONABLE ROYALTY OF APPROXIMATELY

2    $5 MILLION.

3        THAT SOUNDS LIKE A LOT LESS.  IT IS A LOT LESS.  WHY?

4    BECAUSE THESE WERE IMPORTANT FEATURES, IMPORTANT FEATURES THAT

5    THEY USED MANY, MANY TIMES.

6        BUT THESE WERE NOT THE FEATURES THAT BROUGHT THE PHONE

7    TOGETHER.  THESE WERE NOT THE FEATURES THAT WERE THE SOLUTION

8    TO THE CRISIS OF DESIGN.  THESE WERE THE FEATURES THAT, AFTER

9    THEY DECIDED THE CRISIS OF DESIGN WAS TO COPY THE IPHONE, WERE

10   ADDED TO MAKE STILL MORE MONEY.

11       AND WE'LL ASK FOR A REASONABLE ROYALTY FOR THESE TWO

12   PATENTS THAT THE JURY HAS ALSO FOUND TO BE INFRINGED.

13       SO LET ME END WHERE I BEGAN, BY THANKING YOU IN ADVANCE

14   FOR YOUR TIME AND ATTENTION.  THIS IS AN IMPORTANT CASE FOR

15   APPLE.  IT IS A SPECIAL CASE FOR APPLE.  IT IS IMPORTANT AND

16   SPECIAL BECAUSE DESIGN, AS I SAID, HAS BEEN AT THE HEART OF

17   APPLE'S IDENTITY AND IT HAS BEEN AT THE HEART OF THE IPHONE.

18   IT IS WHAT THE PATENT OFFICE RECOGNIZED.  IT IS WHAT THE FIRST

19   JURY FOUND WAS INFRINGED AND VALID.

20       THROUGHOUT THIS TRIAL, WE'RE GOING TO DO OUR VERY BEST TO

21   BRING YOU INSIDE OF APPLE AND LOOK AT THE DESIGN PROCESS SO YOU

22   CAN UNDERSTAND JUST WHY THAT'S TRUE.

23       AND THROUGHOUT THIS TRIAL, I'M GOING TO DO MY BEST TO

24   BRING YOU INSIDE SAMSUNG TO SHOW YOU HOW THEY REACTED IN

25   STAGE 1, STAGE 2, BUT MOST IMPORTANTLY, IN STAGE 3.

1          AND AFTER ALL THAT EVIDENCE IS IN, WE'LL COME BACK TO YOU

2     AT THE END OF THE WEEK, WE HOPE, AND ASK YOU TO AWARD APPLE THE

3     DAMAGES TO WHICH IT'S ENTITLED UNDER THE LAW AND TO HOLD

4     SAMSUNG RESPONSIBLE FOR HAVING USED AND INFRINGED THESE

5     FUNDAMENTAL APPLE PATENTS.

6          THANK YOU.

7          THE COURT:  WOULD YOU LIKE TO TAKE THE BREAK NOW?  I

8     DON'T WANT TO INTERRUPT IN THE MIDDLE OF YOUR PRESENTATION.

9          WHAT WOULD YOU PREFER?  WE CAN START NOW AND THEN TAKE OUR

10    BREAK, OR WHAT WOULD YOU PREFER?

11         MR. QUINN:  I'D PREFER TO TAKE A BREAK NOW.

12         THE COURT:  ALL RIGHT.  LET'S TAKE A BREAK NOW.

13    WE'LL TAKE A 15 MINUTE BREAK NOW AND THEN CONTINUE WITH

14    SAMSUNG'S OPENING STATEMENT.

15         DO NOT RESEARCH OR DISCUSS THE CASE.  THANK YOU FOR YOUR

16    PATIENCE AND YOUR SERVICE.

17         (JURY OUT AT 10:15 A.M.)

18         THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

19    LEFT THE COURTROOM.

20         I WOULD LIKE TO MARK YOUR LIST OF PRE-ADMITTED JOINT

21    EXHIBITS AS A DOCUMENT SO WE DON'T HAVE TO READ ALL THESE

22    NUMBERS INTO THE RECORD.

23         WHAT NUMBER MAKES SENSE?  I MEAN, IT WON'T HAVE TO GO TO

24    THE JURY.

25         MR. LEE:  RIGHT.

1          THE COURT:  THIS WAS JUST MORE SO THAT THE TRANSCRIPT

2     WILL RECORD WHAT'S BEEN ADMITTED.

3          MR. LEE:  WHY DON'T WE MARK IT AS A FOR

4     IDENTIFICATION SO IT DOESN'T HAVE A NUMBER, AND IT'LL BE CLEAR

5     ON THE RECORD THAT IT'S JUST A LIST.

6          THE COURT:  ALL RIGHT.  AND THEN WE'RE GOING TO HAVE,

7     WHAT, MS. MASON THEN FILE IT?

8          MR. LEE:  THAT WOULD BE GREAT.

9          THE COURT:  OKAY.

10          MS. MAROULIS:  THAT'S FINE, YOUR HONOR.  THANK YOU.

11          THE COURT:  ALL RIGHT.  THAT'S WHAT WE'LL DO.  I

12     GUESS AT THE BEGINNING OF YOUR CASE, YOU CAN JUST ASK -- I WANT

13     THE JURORS TO HEAR THAT IT'S BEEN ADMITTED.

14          MR. LEE:  YES.

15          THE COURT:  OKAY.  THANK YOU.  LET'S TAKE OUR BREAK.

16          MR. LEE:  THANK YOU.

17          THE CLERK:  COURT'S IN RECESS.

18          (RECESS FROM 10:16 A.M. UNTIL 10:36 A.M.)

19          (JURY IN AT 10:36 A.M.)

20          THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

21     ALL RIGHT.  WHAT'S THE TIME, MS. MASON?

22          THE CLERK:  10:36, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  YOU HAVE

24     45 MINUTES.

25          **(MR. QUINN GAVE HIS OPENING STATEMENT ON BEHALF OF**

1    **SAMSUNG.)**

2              MR. QUINN:  GOOD MORNING, LADIES AND GENTLEMEN.  MY

3    NAME IS JOHN QUINN.

4         YESTERDAY THE COURT AND MR. PRICE SPOKE TO YOU ABOUT THE

5    IMPORTANCE OF KEEPING AN OPEN MIND AND NOT MAKING DECISIONS

6    UNTIL YOU'VE HEARD ALL THE EVIDENCE.  MR. PRICE MENTIONED THAT

7    AT EVERY STAGE OF THIS CASE, LIKE IN THIS OPENING STATEMENT,

8    WE'RE GOING TO GO SECOND.  SO IT'S VERY IMPORTANT TO US THAT

9    YOU BE ABLE TO DO THAT.  WE'RE COUNTING ON YOU TO BE ABLE TO DO

10   THAT.

11        FOR EXAMPLE, AT THIS POINT, I IMAGINE THAT AFTER MR. LEE'S

12   PRESENTATION YOU PROBABLY KIND OF HAVE THE IMPRESSION THAT

13   APPLE INVENTED THE SCREEN-CENTRIC TOUCHSCREEN IPHONE AND THAT

14   SAMSUNG WAS KIND OF MIRED IN A WORLD OF FLIP PHONES OR SLIDER

15   PHONES, DIFFERENT KINDS OF PHONES, UNTIL IT COPIED APPLE.

16        AND I KIND OF HAVE THE IMPRESSION THAT MAYBE YOU'RE

17   THINKING THAT APPLE HAS A PATENT ON THE SMARTPHONE ITSELF, AND

18   I WANT TO TALK ABOUT ALL THOSE THINGS, AND I WANT TO SHOW YOU

19   THAT THOSE THINGS SIMPLY ARE NOT TRUE.

20        BUT FIRST I WANT TO FOCUS ON THE PATENT THAT WE'RE HERE

21   ABOUT, THAT BROUGHT US HERE, AND WHAT THIS CASE IS REALLY

22   ABOUT, BECAUSE APPLE'S DESIGN PATENTS DO NOT COVER THE ENTIRE

23   PHONE.  THEY'RE SEEKING THE PROFITS ON THE ENTIRE PHONE, BUT

24   THEY DON'T COVER THE ENTIRE PHONE, AND THEY ARE IMPLIED -- THEY

25   ARE APPLIED ONLY TO CERTAIN COMPONENTS, AND THEY'RE ENTITLED TO

1      THE PROFITS ONLY ON THE THOSE COMPONENTS, NOT ON THE ENTIRE

2      PHONE.  NOT ON ANYTHING THAT'S INSIDE THE SAMSUNG PHONE AND

3      ONLY PART OF THE OUTSIDE OF THE PHONE.

4           THIS IS APPLE'S '677 PATENT UP HERE ON THE SCREEN.  IT'S A

5      PATENT THAT'S APPLIED TO A BLACK, RECTANGULAR FRONT FACE WITH A

6      ROUNDED CORNER.  IT COVERS ONLY WHAT IS IN THE SOLID LINES THAT

7      YOU SEE THERE.  IT ONLY COVERS THE SOLID LINES.

8           IT DOESN'T COVER ANYTHING IN THE DOTTED LINES.  THE SOLID

9      LINES AND DOTTED LINES, YOU'RE GOING TO SEE A LOT OF THAT.

10     THAT'S KIND OF A CONVENTION IN THE PATENT WORLD.  THE CLAIM OF

11     THE PATENT IS WHAT IS IN THE SOLID LINES.

12          AND WHAT THAT PATENT COVERS IS THIS, THIS GLASS FRONT FACE

13     (INDICATING).  THIS IS FROM THE SAMSUNG GALAXY 4G, S 4G THAT

14     WAS FOUND TO INFRINGE.  THIS IS JOINT EXHIBIT 5007.  THIS IS

15     THE ARTICLE TO WHICH THIS PATENT IS APPLIED (INDICATING).  THIS

16     IS THE ARTICLE OF MANUFACTURE UNDER THE TEST.

17          THIS IS APPLE'S '087 PATENT WE'LL LOOK AT NOW, AND IT'S A

18     DESIGN THAT IS APPLIED TO A FRONT FACE WITH A BEZEL.  AGAIN,

19     ONLY THE SOLID LINES ARE WHAT IS CLAIMED IN THE PATENT.

20     NOTHING IN THE DOTTED LINES IS CLAIMED.

21          AND WHAT THAT PATENT COVERS IS THE COMBINATION OF THIS,

22     THE BEZEL AND THE GLASS FRONT -- RECTANGULAR FRONT FACE WITH

23     ROUNDED CORNERS (INDICATING).

24          THIS IS FROM THAT SAME SAMSUNG PHONE THAT WAS FOUND TO

25     INFRINGE (INDICATING).

1          THIS IS THE COMPONENT TO WHICH THIS PATENT WAS APPLIED

2     (INDICATING).

3          AND THIS IS THE '305 PATENT, AND IT'S A DESIGN FOR ICONS

4     DISPLAYED AS PART OF A GRAPHICAL USER INTERFACE.

5          AND IF WE COULD -- THIS APPEARS -- THAT'S FROM THE PATENT,

6     THAT'S THE ILLUSTRATION.  YOU SEE THE BORDERS AROUND THERE.

7     NOTHING OUTSIDE THAT IS COVERED BY THE PATENT.  IT'S ONLY THAT

8     ARRAY OF ICONS.

9          THIS, WHICH I'M HOLDING HERE, IS A DISPLAY SCREEN

10    (INDICATING).  THIS IS THE ARTICLE OF MANUFACTURE TO WHICH THAT

11    DESIGN PATENT IS APPLIED.  IT DOESN'T APPEAR ANYWHERE ELSE IN

12    ANY SAMSUNG PHONE.

13         AND WE WILL SHOW YOU THAT APPLE IS ONLY ENTITLED TO THE

14    PROFITS SAMSUNG MADE FROM THESE THREE OBJECTS WHICH I JUST

15    SHOWED YOU.  THOSE ARE THE COMPONENTS TO WHICH THE DESIGN WAS

16    APPLIED.

17         THESE DESIGNS APPEAR NOWHERE ELSE IN SAMSUNG'S PHONES;

18         APPLE IS NOT ENTITLED TO THE PROFITS ON OTHER COMPONENTS

19    WHERE THOSE DESIGNS DON'T APPEAR; AND,

20         APPLE IS CERTAINLY NOT ENTITLED TO THE PROFITS ON THE

21    WHOLE PHONE AS THEY WOULD LIKE TO HAVE YOU BELIEVE.

22         NOW, THE MAIN REASON WE ARE HERE IS THAT SAMPLE OF THE

23    PHONES THAT SAMSUNG SOLD IN A 25-MONTH PERIOD BACK BETWEEN 2010

24    AND 2012 USED, IT TURNS OUT, MINOR DESIGN DETAILS THAT APPLE

25    HAD THE EXCLUSIVE RIGHT TO USE.

1          AS I WILL SHOW YOU, IT CAN BE VERY DIFFICULT TO TELL

2     WHAT'S PERMITTED AND WHAT'S NOT PERMITTED BECAUSE THE SCOPE OF

3     THESE DESIGN PATENTS, THE SCOPE OF THEM, WHAT'S COVERED, IS SO

4     VERY NARROW.

5          AND THAT'S A VERY IMPORTANT ISSUE HERE BECAUSE MR. LEE

6     SHOWED YOU THAT FOUR FACTOR TEST, HOW YOU DETERMINE WHAT THE

7     ARTICLE OF MANUFACTURE IS.

8          AND THE VERY FIRST POINT -- AND I WILL COME BACK TO THIS

9     AND TALK ABOUT IT, MR. LEE DIDN'T REALLY TALK ABOUT IT MUCH --

10    IS THE SCOPE OF THE CLAIM.  THAT'S THE FIRST FACTOR.  AND APPLE

11    SHOWED YOU CHARTS WITH FLIP PHONES, PHONES WITH SLIDER

12    KEYBOARD, CANDY BAR SHAPED PRIOR TO 2007, PERHAPS SUGGESTING

13    THAT IT HAD THE EXCLUSIVE RIGHT TO HAVE THESE SCREEN-CENTRIC

14    TOUCHSCREEN PHONE DESIGNS AND THAT EVERYONE ELSE HAD TO COMPETE

15    WITH APPLE USING THOSE OTHER KINDS OF PHONES.

16         APPLE'S THREE DESIGN PATENTS THAT WE JUST LOOKED AT ARE

17    NOWHERE NEAR THAT BROAD.

18         IN FACT, APPLE WAS NOT EVEN THE FIRST TO COME TO MARKET

19    WITH A SCREEN-CENTRIC TOUCHSCREEN PHONE.  THAT WAS ANOTHER

20    KOREAN COMPANY, LG.  YOU DON'T HAVE TO TAKE MY WORD FOR IT.

21    LET'S LOOK AT WHAT A SAMSUNG MARKETING EXECUTIVE SAID IN AN

22    INTERNAL E-MAIL WHERE HE WROTE -- SOMEBODY HAD SAID, GIVE ME A

23    LIST, SOME OTHER APPLE EMPLOYEE HAD SAID GIVE ME A LIST OF

24    THINGS THAT WE, APPLE, REFERS TO INVENT.  AND THIS WAS HIS

25    RESPONSE.  HE SAID, "I DON'T KNOW HOW MANY THINGS WE CAN COME

1          UP WITH THAT YOU CAN LEGITIMATELY CLAIM WE DID FIRST."

2                AND HE POINTED OUT, FOR EXAMPLE, THAT IT SIMPLY WASN'T

3     TRUE THAT THE IPHONE WAS THE FIRST PHONE WITH A FULL

4     TOUCHSCREEN FACE.  AND THERE'S A LINK THERE.  AND IF YOU CLICK

5     ON THAT LINK, YOU GET TO THE LG PRODUCT.  THE LG PRODUCT.

6                AND MR. SINCLAIR IN THIS E-MAIL POINTS OUT THAT IT WAS LG,

7     ANOTHER KOREAN COMPANY, THAT WAS ACTUALLY THE FIRST TO MAKE A

8     SCREEN-CENTRIC TOUCHSCREEN PHONE.

9                AND THE PRADA WAS NOT THE ONLY TOUCHSCREEN PHONE THAT

10    EXISTED BEFORE APPLE ANNOUNCED THE IPHONE.

11               HERE ARE SOME OTHER PHONES THAT ALL PRE-DATE THE

12    ANNOUNCEMENT OF THE IPHONE.

13               APPLE SHOWED YOU THAT "TIME MAGAZINE" COVER WITH APPLE --

14    FROM 2007 WITH THE IPHONE.  BUT BY THE TIME OF 2010 WHEN THESE

15    PHONES WERE INTRODUCED, THE SAMSUNG PHONES THAT WE'RE TALKING

16    ABOUT HERE IN THIS CASE, BY THE TIME THAT WAS -- BY 2010,

17    TOUCHSCREEN PHONES WERE EVERYWHERE IN THE MARKETPLACE, IN PART

18    BECAUSE THAT TOUCHSCREEN TECHNOLOGY HAD GOTTEN BETTER AND

19    BETTER.

20               BY 2010 WHEN THE SAMSUNG PHONES IN THIS CASE WERE

21    RELEASED, ALL OF APPLE'S COMPETITORS HAD SCREEN-CENTRIC

22    TOUCHSCREEN PHONES.

23               FOR EXAMPLE, HERE ARE PHONES FROM NOKIA, LG AND BLACKBERRY

24    STARTING IN 2007.  REMEMBER, THE IPHONE IS ANNOUNCED IN JANUARY

25    OF 2007.

1          AND HERE ARE SOME OTHER PHONES THAT CAME OUT BEFORE THE

2     FIRST SAMSUNG PHONE IN THIS CASE, FROM OTHER COMPETITORS.

3          APPLE DIDN'T HAVE THE RIGHT TO STOP THIS EVOLUTION.  THIS

4     IS WHAT HAPPENS IN A COMPETITIVE MARKET.  COMPANIES ADAPT TO

5     WHAT CONSUMERS WANT.

6          FOR EXAMPLE, WHEN A COMPANY LIKE SAMSUNG COMES OUT WITH A

7     LARGER SCREEN SIZE AND CONSUMERS LIKE IT, COMPETITORS TAKE

8     NOTICE AND THEN THEY COME OUT WITH THEIR OWN VERSIONS OF LARGER

9     SCREEN PHONES.  THERE'S NOTHING WRONG WITH THAT.  THIS IS A

10    NATURAL EVOLUTION OF WHAT HAPPENS IN THE MARKETPLACE.

11         AND SAMSUNG WAS A COMPETITOR IN THAT MARKET, TOO, AND A

12    PARTICIPANT IN THIS EVOLUTION.

13         HERE IS A BOARD I WOULD LIKE TO SHOW YOU OF VARIOUS

14    SAMSUNG PHONES AND DESIGNS BEFORE THE IPHONE AND AFTER THE

15    IPHONE.

16              MR. LEE:  YOUR HONOR, YOUR HONOR HAS RULED ON

17    INDEPENDENT DEVELOPMENT.  SAMSUNG PHONES BEFORE THE IPHONE CAME

18    TO MARKET HAVE NOTHING TO DO WITH WHAT YOUR HONOR'S ALLOWED IN

19    THE CASE.

20              MR. QUINN:  YOUR HONOR, I'M RESPONDING TO THE

21    SUGGESTION THAT WAS MADE IN THE OPENING STATEMENT THAT WE

22    COMPLETELY CHANGED THE SHAPE OF OUR PHONES.  I'M RESPONDING TO

23    THAT.  THIS IS --

24              MR. LEE:  YOUR HONOR, THIS IS --

25              MR. QUINN:  THIS WAS ON OUR LIST OF DISCLOSURE FOR

1        OPENING.

2               MR. LEE:  YOUR HONOR, WE WERE VERY CLEAR THAT

3        INDEPENDENT DEVELOPMENT HAS BEEN EXCLUDED BY YOUR HONOR.

4               MR. QUINN:  THAT'S NOT WHAT IT'S BEING OFFERED FOR,

5        YOUR HONOR.

6               THE COURT:  GIVE ME ONE MOMENT, PLEASE.

7           CAN YOU TAKE THAT DOWN WHILE I'M LOOKING IT UP.  LET'S

8        STOP THE CLOCK.  WHAT'S THE TIME NOW?

9               THE CLERK:  10:46, YOUR HONOR.

10              THE COURT:  OKAY.

11          (PAUSE IN PROCEEDINGS.)

12              THE COURT:  IS THERE A PARTICULAR -- LET'S HAVE THE

13       JURY LEAVE THE ROOM, PLEASE.

14          (JURY OUT AT 10:46 A.M.)

15              THE CLERK:  PLEASE BE SEATED.

16              THE COURT:  I DON'T SEE THIS SLIDE IN OUR OPENING

17       SLIDES.  CAN YOU TELL ME WHAT NUMBER IT IS?

18              MR. QUINN:  39 I'M TOLD, YOUR HONOR.

19              THE COURT:  OKAY.

20              MR. QUINN:  AND I'M TOLD THERE WAS NO OBJECTION TO

21       IT.

22              MR. LEE:  NO.  YOUR HONOR, WE TOLD THEM, IN OUR MEET

23       AND CONFER, WAS THAT YOUR HONOR HAD RULED ON THINGS BEFORE AND

24       WE WERE NOT GOING TO PUT THEM IN THE HIGH PRIORITY OBJECTIONS.

25          AND IF YOU LOOK AT SLIDE 11 AND 12, WHICH IS WHERE

1    MR. QUINN IS NOW, THERE IS BOTH THE F700 AND THE VESSEL ON THE

2    TIMELINE WHICH WAS EXCLUDED BY YOUR HONOR IN MOTION IN LIMINE

3    NUMBER 1.

4         AND AS WE SAID TO SAMSUNG, THEY KEEP PUTTING THE F700 ON

5    THE TIMELINES.  SO WE TOLD THEM WE CAN'T PUT THAT ON THE HPO'S

6    EVERY EVENING.  WE STAND ON MOTION IN LIMINE RULING NUMBER 1.

7         TO THE EXTENT THEY WANT TO SAY HERE'S A NON-INFRINGING

8    ALTERNATIVE, THAT'S ONE THING.  TO THE EXTENT THERE'S A

9    TIMELINE, WHICH IS WHAT HE JUST SAID, AND SAID THIS IS WHAT

10   SAMSUNG HAS DEVELOPED BEFORE THE IPHONE, THE F700 AND THE

11   VESSEL ARE BOTH ON THIS CHART.

12            MR. QUINN:  YOUR HONOR, THIS EXHIBIT WAS EXHIBITED

13   AND ADMITTED IN THE 2012 TRIAL.  AND WHEN WE WERE HERE BEFORE

14   YOUR HONOR ABOUT TEN DAYS AGO, MR. LEE, I UNDERSTOOD HIM TO

15   SAY, HE WAS ASKED POINTBLANK WHETHER HE HAD ANY OBJECTION TO

16   THIS DOCUMENT AND HE SAID NO.

17            MR. LEE:  I SAID -- WHAT I SAID, AND I THINK I WAS

18   PRECISE, WAS TO THE EXTENT IT'S BEING USED TO SHOW A

19   NON-INFRINGING ALTERNATIVE, WE DON'T OBJECT.  TO THE EXTENT

20   IT'S BEING USED TO SHOW A TIMELINE OF DEVELOPMENT, WE DO

21   OBJECT, WHICH IS WHAT WE DID IN 2013, AND WE --

22            THE COURT:  I DON'T SEE A SPECIFIC OBJECTION TO

23   SDX 39.

24            MR. LEE:  NO, YOUR HONOR.  WHEN WE MET --

25            THE COURT:  YOU OBJECTED TO SDX 11 THROUGH 13.

1           MR. LEE:  YES.

2           THE COURT:  AND THEN I DID SUSTAIN AS TO SDX 11, ONLY

3    AS TO THE F700, AND I SUSTAINED AS TO SDX 12 AND 13, I THINK

4    THAT'S BEEN REMEDIED.

5           SO -- ALL RIGHT.  IT'S OVERRULED.

6           ARE THERE ANY OTHER -- I'D LIKE TO DO THIS NOW.  IS THERE

7    ANYTHING ELSE THAT YOU ARE --

8           MR. LEE:  YOUR HONOR, I'M A LITTLE CONCERNED ABOUT

9    THE LAWYERS DESCRIBING WHAT THE PATENT COVERS, BUT I THINK WE

10   MAY HAVE MOVED BEYOND THAT AND THAT'S FOR YOUR HONOR.

11          THE COURT:  WELL, THIS IS NOT CLOSING.

12          MR. LEE:  YEAH.

13          THE COURT:  THIS IS NOT CLOSING ARGUMENT.  IT SOUNDS

14   LIKE CLOSING ARGUMENT TO ME.  BUT YOU ARGUED A BIT AS WELL IN

15   YOURS, SO --

16          MR. LEE:  THE ANSWER IS NONE, YOUR HONOR.  NOTHING.

17          THE COURT:  I'M SORRY?

18          MR. LEE:  NOTHING ELSE THAT WE CAN ANTICIPATE NOW.

19          THE COURT:  WELL, IF YOU ANTICIPATE ANYTHING NOW, I

20   WANT YOU TO TELL ME RIGHT NOW.  I DON'T WANT YOU TO INTERRUPT

21   MR. QUINN AGAIN.

22          MR. LEE:  NOTHING ELSE.

23          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE, BRING OUR

24   JURY BACK.

25          THE CLERK:  YES, YOUR HONOR.

1           THE COURT:  I WOULD -- LET ME JUST -- CAN WE HAVE THE

2      DOOR CLOSED A MINUTE.

3           I WOULD SAY THE FIRST 15 MINUTES WERE CLOSING ARGUMENT.

4      THIS SHOULD BE OPENING STATEMENT SO PLEASE, PLEASE KEEP IN

5      MIND, THIS IS OPENING STATEMENTS, NOT CLOSING ARGUMENT.

6      EVERYTHING AT THE BEGINNING WAS ALL CLOSING ARGUMENT.

7           ALL RIGHT.  LET'S GO AHEAD, PLEASE, AND BRING OUR JURY IN.

8           (JURY IN AT 10:50 A.M.)

9           THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

10     PLEASE CONTINUE.  THE TIME IS 10:50.

11          MR. QUINN:  THANK YOU.

12          YOU WILL HAVE THIS DOCUMENT THAT WILL COME INTO EVIDENCE,

13     AND YOU WILL HAVE IT WITH YOU IN THE JURY ROOM.  AND YOU CAN

14     SEE THAT SAMSUNG WAS A COMPETITOR IN THAT MARKET, TOO, AND

15     PARTICIPATED IN THIS EVOLUTION TOWARDS SCREEN-CENTRIC DESIGNS,

16     TOWARDS TOUCH FACE PHONES, BEFORE AND AFTER THE IPHONE WAS

17     INTRODUCED, AND SAMSUNG OFFERED A VARIETY OF PHONES.  YES, THEY

18     OFFERED SOME FLIP PHONE, THEY OFFERED SOME SLIDER PHONES, BUT

19     THEY ALSO OFFERED THESE KINDS OF PHONES.

20          AND JUST LIKE OTHER PHONE MAKERS, IN THE THREE YEARS

21     BETWEEN 2007 AND 2010 WHERE THE PHONES THAT WE'RE TALKING ABOUT

22     IN THIS CASE WERE INTRODUCED, SAMSUNG CONTINUED TO OFFER A

23     VARIETY OF TOUCHSCREEN PHONES.

24          THE WHOLE PHONE MAKING INDUSTRY WAS MOVING IN THIS

25     DIRECTION.

1           IT TURNS OUT THAT THE SCOPE OF APPLE'S DESIGN PATENTS ARE

2     EXTREMELY NARROW.  LET ME SHOW YOU.

3           A JURY DECIDED THAT SAMSUNG WAS PERMITTED TO COMPETE WITH

4     APPLE USING THE LOOK OF THIS PHONE (INDICATING).  I'M HOLDING

5     IT UP.  IT'S JX, JOINT EXHIBIT, 130.  THE GALAXY ACE.  IT WAS

6     RELEASED IN 2011 AND APPLE PREVIOUSLY ACCUSED THIS PHONE OF

7     INFRINGEMENT, OF INFRINGING ITS '677 PATENT.  THERE'S AN IMAGE

8     UP ON THE SCREEN.  ITS PATENT ON THE DESIGN --

9               THE COURT:  EXCUSE ME.  I'M SORRY.  WHAT'S THE TIME

10    NOW?  10:52?

11              THE CLERK:  YES, YOUR HONOR.

12              MR. QUINN:  IT'S THE SCOPE OF THE CLAIM, YOUR HONOR.

13              THE COURT:  I'D LIKE THE JURY TO STEP OUTSIDE,

14    PLEASE.

15         (JURY OUT AT 10:53 A.M.)

16              THE COURT:  I BELIEVE THERE WAS AN IN LIMINE RULING

17    THAT WE'RE NOT GOING TO GET INTO ALL THE PRIOR TRIALS AND

18    VERDICTS.  IS THAT NOT THE CASE?

19         SO WHAT -- ARE WE NOW GOING TO GO THROUGH AND RELITIGATE

20    THE PREVIOUS VERDICTS?  THAT'S -- THAT WASN'T THE SCOPE OF WHAT

21    THIS TRIAL IS ABOUT.

22              MR. QUINN:  NO.  BUT THE POINT WAS --

23              THE COURT:  HOW MANY OTHER -- LET ME KNOW, HOW MANY

24    OTHER TIMES ARE YOU GOING TO GO INTO PRIOR VERDICTS?  WHAT

25    OTHER PRIOR VERDICTS WILL BE --

 1              MR. QUINN:  FOR EACH PATENT --

 2              THE COURT:  I'D LIKE TO SEE YOUR OPENING STATEMENT.

 3     CAN I SEE YOUR OPENING STATEMENT?  I'D LIKE TO SEE WHAT ELSE IS

 4     GOING TO BE COVERED.  WHAT OTHER VERDICTS ARE WE GOING TO BE

 5     TALKING ABOUT?

 6              MR. QUINN:  I CAN -- I CAN GIVE A COPY OF IT TO YOUR

 7     HONOR.

 8              THE COURT:  YES, PLEASE.  WHAT OTHER VERDICTS WILL BE

 9     DISCUSSED?

10              MR. QUINN:  THE POINT IS, YOUR HONOR, FOR EACH OF THE

11     PATENTS, TO ILLUSTRATE HOW NARROW THEY ARE, WE'D LIKE THE JURY

12     TO SEE WHAT HAS BEEN FOUND NOT TO INFRINGE AND WHAT HAS BEEN

13     FOUND TO INFRINGE.

14              THE COURT:  SO WHAT PREVIOUS VERDICTS WILL ALSO BE

15     DISCUSSED?  WHAT OTHER PREVIOUS VERDICTS ARE IN HERE?

16              MR. QUINN:  THE COURT HAS MY COPY OF THE --

17              THE COURT:  OKAY.  I'LL GIVE IT BACK TO YOU.  CAN YOU

18     JUST LET ME KNOW.  I THOUGHT YOU HAD AN EXTRA COPY.  I DIDN'T

19     REALIZE THAT WAS YOUR ONLY ONE.  SORRY.

20         WHAT OTHER PREVIOUS VERDICTS WILL WE BE DISCUSSING ABOUT?

21     I THOUGHT THERE WAS SPECIFICALLY A MOTION IN LIMINE THAT WE ARE

22     NOT GOING TO GET INTO ALL THE PRIOR LITIGATION, BUT IF WE ARE,

23     THEN I JUST WOULD LIKE TO KNOW IN ADVANCE.

24              MR. QUINN:  SO WHAT WE WOULD PROPOSE TO DO, YOUR

25     HONOR, IS REFER TO THE GALAXY ACE, WHICH IS JOINT EXHIBIT 1030;

1        AND THEN --

2                THE COURT:  JUST ANY OTHER VERDICTS, PLEASE.

3        OH, PLEASE TAKE A SEAT.

4        WHAT OTHER VERDICTS WILL WE BE GETTING INTO?

5                MR. QUINN:  IT'S ONLY DESIGN VERDICTS -- THINGS --

6    THE GALAXY ACE IS NOT INFRINGING.  IT IS THE LIABILITY VERDICT

7    IN THIS CASE, YOUR HONOR.

8                THE COURT:  ALL RIGHT.  WAS THERE ANY OTHER VERDICTS

9    THAT YOU WERE GOING TO GET INTO?

10        I MEAN, DURING YESTERDAY'S JURY SELECTION --

11                MR. QUINN:  WELL, THE GALAXY --

12                THE COURT:  -- JURY SELECTION, MR. PRICE STARTED

13    PREVIEWING SAMSUNG'S DAMAGES THEORY AND ASKING THE JURY, DID

14    THEY THINK THAT WAS OKAY?  DID THEY THINK THAT WAS GOOD, BAD?

15    THAT WASN'T PROPER JURY SELECTION.  THAT'S NORMALLY NOT DONE.

16        SO IT DID HEIGHTEN MY CONCERN ABOUT WHETHER THINGS LIKE

17    THIS WOULD BE DONE.

18        SO --

19                MR. QUINN:  RIGHT.  WELL, WE'D REFER TO THE FACT THAT

20    THE --

21                THE COURT:  SO JUST -- I'M SORRY.  ARE THERE ANY

22    OTHERS, OTHER THAN GALAXY ACE?

23                MR. QUINN:  YES.

24                THE COURT:  OKAY.  WHAT ARE THEY?  CAN YOU JUST LET

25    ME KNOW WHICH ONES THEY ARE?

```
 1              MR. QUINN:  YES, ON THE CAPTIVATE.

 2              THE COURT:  OKAY.

 3              MR. QUINN:  ON THE '305.

 4              THE COURT:  OKAY.

 5              MR. QUINN:  THAT WAS FOUND TO INFRINGE, THAT'S THE

 6     SUBJECT OF THIS CASE.

 7              THE COURT:  OKAY.  I'M ACTUALLY --

 8              MR. QUINN:  AND THEN THE GALAXY S II --

 9              THE COURT:  I'M SORRY.  THE ONES THAT ARE ALREADY

10     PART OF THE JURY INSTRUCTIONS, THOSE ARE ALREADY PART OF THE

11     JURY INSTRUCTIONS.

12         I'M MORE INTERESTED IN KNOWING WHICH ONES THAT ARE NOT

13     PART OF THE JURY INSTRUCTIONS, THAT HAVE BEEN EXCLUDED, WILL BE

14     COMING UP IN YOUR OPENING STATEMENT.

15              MR. QUINN:  THE GALAXY S.

16              THE COURT:  GALAXY ACE, GALAXY S.

17              MR. QUINN:  GALAXY S II, WHICH WAS FOUND NOT TO

18     INFRINGE.

19              THE COURT:  OKAY.

20              MR. QUINN:  SO THOSE ARE THE THREE.

21              THE COURT:  I JUST HEARD TWO, GALAXY ACE AND

22     GALAXY S II.  IS THAT CORRECT?  IS THERE ONE MORE?

23              MR. QUINN:  THERE IS ONE MORE, WHICH IS --

24          (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

25              MR. QUINN:  THE INFUSE 4G, YOUR HONOR.
```

```
 1                THE COURT:  OKAY.

 2                MR. QUINN:  THAT'S IT.  THOSE THREE WERE FOUND NOT TO

 3        INFRINGE THE DESIGN PATENTS.

 4                THE COURT:  OKAY.

 5            ALL RIGHT.  LET ME ASK, MR. LEE, WHAT IS YOUR POSITION ON

 6        THIS?

 7                MR. LEE:  YOUR HONOR, IF I COULD BRING YOU TO DOCKET

 8        NUMBER 3734, YOUR HONOR HAS -- REMEMBER THAT YOU RULED ON

 9        SOMETHING LIKE THIS?

10            THIS WAS THEIR OPENING SLIDE NUMBER 8 THAT I HAVE HERE,

11        AND I'M HAPPY TO GIVE IT TO YOUR HONOR.

12            BUT IN DOCKET 3734, ON THE SECOND PAGE WHERE YOU'RE RULING

13        ON APPLE'S OBJECTIONS, SLIDE NUMBER 8 WAS SPECIFICALLY THE

14        SLIDE THAT COMPARED NON-INFRINGING WITH INFRINGING.

15            SO WE BRIEFED TO YOUR HONOR THE FACT THAT COMPARING

16        NON-INFRINGING PHONES TO INFRINGING PHONES HAD NOTHING TO DO

17        WITH EITHER CLAIM CONSTRUCTION, WHICH IS YOUR HONOR'S

18        BAILIWICK, AND IT WAS AN EFFORT TO RELITIGATE THE QUESTION OF

19        INFRINGEMENT, AND YOUR HONOR SUSTAINED THAT OBJECTION.

20            SO THE -- I DIDN'T GET UP TO OBJECT BECAUSE I PROMISED NOT

21        TO, BUT THIS IS PRECISELY WHAT YOUR HONOR RULED ON IN DOCKET

22        3734.  THIS WAS A COMPARISON OF THE GALAXY ACE TO THE

23        GALAXY S I 9000, AND WE SPECIFICALLY BRIEFED TO YOUR HONOR HOW

24        THIS IS JUST AN EFFORT TO TRY TO REVISIT INDIRECTLY

25        INFRINGEMENT.
```

1              MR. QUINN:  AS TO THE GALAXY ACE, I BELIEVE THERE'S A

2      RULING THAT THE GALAXY ACE CAN COME INTO EVIDENCE.

3              OUR POINT IS NOT THAT WE'RE TRYING TO RELITIGATE

4      INFRINGEMENT.  OUR POINT IS THAT THESE DESIGN PATENTS ARE VERY

5      NARROW.  THAT CAN BE SEEN BY LOOKING AT THE PHONES THAT ARE THE

6      SUBJECT OF THIS CASE THAT WERE FOUND TO INFRINGE, AND LOOKING

7      AT OTHER PHONES THAT ARE NON-INFRINGING.

8              IT GOES TO FACTOR 1 IN THE SCOPE OF THE CLAIM.

9              THE COURT:  ALL RIGHT.  I WILL ALLOW THIS.

10             ARE THERE ANY OTHER VERDICTS THAT YOU'RE PLANNING TO GET

11     INTO IN YOUR OPENING STATEMENT?

12             MR. QUINN:  NO.  NO, YOUR HONOR.

13             THE COURT:  DO YOU WANT TO JUST DOUBLE-CHECK IT JUST

14     TO MAKE SURE?

15             MR. LEE:  YOUR HONOR --

16             THE COURT:  I'M SORRY.

17             MR. LEE:  THIS SLIDE THAT WAS JUST ON THE SCREEN

18     WASN'T SERVED ON US.  THE FIRST TIME I'M SEEING IT IS NOW.  WE

19     GOT REVISED SLIDES YESTERDAY, AND THIS SLIDE WAS NOT IN THE

20     PACK.

21             THE COURT:  WHAT'S THE NUMBER?

22             MR. QUINN:  IT'S EXHIBIT 7.

23             THE COURT:  WAIT.  WHAT'S THE NUMBER OF THAT?

24             MR. LEE:  WHAT'S THE NUMBER?

25             MR. KOTARSKI:  THIS IS EXHIBIT 7, PAGE 16.

 1              MR. WATSON:  THIS IS APPLE'S EXHIBIT, PAGE 7.

 2              THE COURT:  I'M SORRY.  I HAVE THIS, WHICH I BELIEVE

 3    TO BE THE --

 4              MR. LEE:  FINAL VERDICT --

 5              THE COURT:  -- SAMSUNG OPENING SLIDES.  SO WHERE IS

 6    IT IN HERE?

 7              MS. MAROULIS:  YOUR HONOR, IT'S AN ACTUAL EXHIBIT,

 8    AND THE PARTIES AGREED THAT WE'LL IDENTIFY THE EXHIBIT, BUT WE

 9    DON'T NEED TO HAVE IT.  SO PX 7 WAS ONE OF THE EXHIBITS THAT WE

10    INCLUDED IN OUR DISCLOSURES.  IT WAS APPLE'S EXHIBIT THAT WAS

11    ADMITTED IN PRIOR TRIALS.

12              THE COURT:  OKAY.  SO I DON'T HAVE A COMPLETE LIST?

13    I DON'T HAVE A COMPLETE SET OF ALL THE SLIDES YOU'RE USING

14    DURING OPENING STATEMENT AND NEITHER DOES APPLE, SO HOW WERE

15    THEY SUPPOSED TO DO THEIR OBJECTIONS?

16        I RULED ON THIS ON SATURDAY.  I WAS ASSUMING THAT THIS WAS

17    THE COMPLETE SET.

18              MS. MAROULIS:  YOUR HONOR, THIS IS ONE OF THE SLIDES

19    THAT WE HAVE.  AND THE RECORD IS -- THIS AN ACTUAL EXHIBIT.

20    PX 7 WAS IN THE CASE.  SO THERE'S A NUMBER OF EXHIBITS -- FOR

21    EXAMPLE, MR. LEE SHOWED THE CRISIS OF DESIGN E-MAIL.  HE DID

22    NOT EXCHANGE IT AHEAD OF TIME BECAUSE THAT WAS ON THE LIST.  SO

23    EXHIBITS WERE LISTED BY NUMBER.

24        THE SLIDES WERE THINGS THAT WERE MADE FOR THIS TRIAL AND

25    APPLE MADE THAT FOR THIS TRIAL.

1        MR. LEE:  YOUR HONOR, THAT'S CORRECT.  SO I THINK WE

2   CAN SET THAT ASIDE NOW THAT I UNDERSTAND WHAT THE SLIDE WAS.

3        MY BIGGEST CONCERN IS THAT WE NOT BE REVISITING THE

4   VERDICTS ON INFRINGEMENT BY COMPARING TO NON-INFRINGING

5   PRODUCTS.

6        THE COURT:  THAT'S FINE.  I WILL ALLOW -- YOU KNOW,

7   THIS CRISIS OF DESIGN IS IN APPLE'S OPENING SLIDE.  I'M NOT

8   SURE WHAT YOU'RE REFERRING TO, THAT'S NOT IN --

9        MS. MAROULIS:  I'M SORRY, YOUR HONOR.  I MAY HAVE NOT

10  SEEN IT WITHOUT MY GLASSES, BUT THEY DID DISCLOSE THE EXHIBITS,

11  AND WE DISCLOSED THE EXHIBITS.

12       THE COURT:  NO.  BUT THEY DISCLOSED ALL OF THEIR

13  SLIDES.  EVERYTHING THAT THEY'VE SHOWN HAS BEEN DISCLOSED.

14  CORRECT?

15       I JUST -- I DIDN'T REALIZE THAT YOU WEREN'T DISCLOSING ALL

16  YOUR SLIDES.

17       MS. MAROULIS:  YOUR HONOR, I THINK MR. LEE CONFIRMED

18  THE PARTIES'S AGREEMENT THAT WE DISCLOSED THE SLIDES, BUT NOT

19  IF YOU PULL OUT THE EXHIBITS FROM THE TRIAL DIRECTOR

20  APPLICATION.

21       THE COURT:  ALL RIGHT.  WAS THAT THE AGREEMENT?

22       MR. LEE:  YES, YES.

23       THE COURT:  OKAY.  ALL RIGHT.  WELL, THAT'S FINE

24  THEN.

25       ALL RIGHT.  IT WOULD BE HELPFUL IN THE FUTURE JUST TO KNOW

1    IN ADVANCE SO THAT THERE COULD BE OBJECTIONS AND THESE COULD BE

2    RULED ON IN ADVANCE.  THAT WAS THE WHOLE POINT OF DOING THIS

3    EARLY AND DOING THIS IN ADVANCE, TO AVOID THIS FROM HAPPENING.

4         WHAT ELSE ARE YOU GOING TO SHOW THAT'S NOT IN YOUR SLIDES?

5    LET'S JUST GO THROUGH THEM RIGHT NOW.  I DON'T WANT TO HAVE TO

6    GO THROUGH THIS AGAIN.

7         ARE THERE ANY OTHERS, PLEASE?

8              MR. WATSON:  PX 40.

9              THE COURT:  OKAY.  ANY OTHERS, PLEASE?

10             MR. WATSON:  IF I CAN GET TO IT.

11        KEN CAN PROBABLY DO IT FASTER.

12        IT'S THE CRISIS OF DESIGN.

13             MR. LEE:  THAT'S FINE.

14             THE COURT:  ALL RIGHT.  ANYTHING ELSE, PLEASE?

15             MR. KOTARSKI:  EXHIBIT 4554.

16             MR. QUINN:  APPLE BREAKDOWN OF COSTS BY PRODUCT.

17        (DISCUSSION OFF THE RECORD.)

18             THE COURT:  OKAY.  I'M SORRY.  I COULDN'T HEAR WHAT

19    THE NUMBERS ARE.  I KNOW THERE'S 40.

20        AND WHAT ARE THE OTHERS, PLEASE?

21             MR. KOTARSKI:  4554.

22             THE COURT:  4554.  OKAY.  THANK YOU.

23        ANY OTHERS?

24             MR. KOTARSKI:  2519, WHICH IS THE MINI TEARDOWN OF

25    THE GALAXY 4S.

```
 1              THE COURT:  OKAY.  ANY OTHERS --

 2              MR. QUINN:  JUST THE PATENTS, YOUR HONOR.

 3              THE COURT:  -- THAT ARE DIFFERENT FROM YOUR SDX 1, 5,

 4    AND 7?  SEPARATE FROM THOSE?

 5              MR. KOTARSKI:  CORRECT, THE ONLY THING WE SHOWED WAS

 6    THE FIGURE FROM THE PATENT, WHICH I BELIEVE WAS PAGE 6 OF

 7    EXHIBIT 1042.

 8              THE COURT:  OKAY.  SO PX 40, 4554, 2519, AND PATENT

 9    FIGURE 1.  ANYTHING ELSE?

10              MR. KOTARSKI:  AND THEN EXHIBIT 7.

11              THE COURT:  OKAY.  THANK YOU.  ANYTHING ELSE?

12         ANY OBJECTIONS TO THOSE?

13              MR. LEE:  YOUR HONOR, TO THE APPLE INFORMATION, YES.

14    DURING THE HIGH PRIORITY OBJECTIONS, WE OBJECTED TO A SLIDE

15    THAT WAS COMPARING THE DAMAGES REMEDY UNDER 289 TO HOW APPLE

16    COMPLIES WITH THE APP PRINCIPLES AND YOUR HONOR SUSTAINED OUR

17    OBJECTION.

18              THE COURT:  I DID.

19              MR. LEE:  AND NOW THEY WANT TO JUST -- I MEAN, USING

20    THE HIGH PRIORITY OBJECTIONS, WE CAN'T GET EVERYTHING.  SO NOW

21    THEY WANT TO PUT UP THE APPLE INFORMATION.  THESE ARE APPLE'S

22    FINANCIAL RECORDS, ALLOCATION INFORMATION.

23              THE COURT:  WHAT, PX 2519?  WHICH EXHIBIT?

24              MR. QUINN:  THE OBJECTION TO THAT WAS OVERRULED, YOUR

25    HONOR.  THAT WAS DX 4554.
```

1          (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

2              THE COURT:  ALL RIGHT.  WHAT ARE THE OBJECTIONS TO

3      ANY?  WE CAN WORK THESE OUT NOW SO THIS WILL BE THE ONLY

4      INTERRUPTION.

5          (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

6              MR. LEE:  YOUR HONOR, YOU HAVE ADDRESSED DX 4554, YOU

7      HAVE ADDRESSED THAT AND OVERRULED OUR OBJECTION IN DOCKET 3734.

8              THE COURT:  ALL RIGHT.  ARE THERE ANY OUTSTANDING

9      OBJECTIONS, OR NOT?

10             MR. LEE:  NO, YOUR HONOR.  IT'S JUST -- YOU KNOW, THE

11     QUESTION -- THE HARD PART FOR US, I THINK, IS WHEN YOU

12     SUSTAINED AN OBJECTION, FOR INSTANCE, TO SLIDE 8 ON THE BASIS

13     THAT IT WAS REVISITING INFRINGEMENT, THEY HAVEN'T TOLD US

14     ORALLY WHAT THEY'RE GOING TO PUT IN THE SLIDE.  I UNDERSTOOD --

15     I PROMISED THAT I WOULDN'T GET UP AGAIN, BUT IT CREATES SOME

16     CONFUSION ON OUR PART.

17         IT OUGHT NOT BE FOR EITHER OF US THAT IF YOUR HONOR RULES

18     THAT EVIDENCE IS EXCLUDED IN ONE FORM --

19             THE COURT:  I MEAN, I DID SUSTAIN THEM BECAUSE THEY

20     SEEMED ALL LIKE INFRINGEMENT SLIDES.

21             MR. LEE:  YES.

22             THE COURT:  OKAY.  THAT'S WHY THEY WERE SUSTAINED.

23         NOW, SAMSUNG'S CORRECT, THEY CAN TALK ABOUT NON-INFRINGING

24     ALTERNATIVES, BUT I DID SUSTAIN THE OBJECTIONS TO 2, 4, 6, AND

25     8, THE ORIGINAL 2, 4, 6, AND 8.

1           MR. LEE:  AND THE DIFFERENCE IS, YOUR HONOR, USING IT

2    AS A NON-INFRINGING ALTERNATIVE IS ONE THING.

3           TALKING ABOUT WHAT THE JURY DECIDED IN THE FIRST INSTANCE

4    AND THAT THEY DECIDED THAT ONE WAS INFRINGING AND ONE WASN'T,

5    THERE ARE LOTS OF PARTS OF THE JURY VERDICT WE'D LOVE TO USE,

6    BUT I DON'T THINK IT'S GOING TO BENEFIT ANYBODY TO SPEND TIME

7    OM THAT COLLATERAL EXERCISE.

8           MR. QUINN:  YOUR HONOR, WE'RE GOING TO STAY

9    ABSOLUTELY CLEAR --

10          THE COURT:  WELL, WHY ARE YOU MENTIONING PREVIOUS

11   VERDICTS?  IF YOU JUST SAY IT'S A NON-INFRINGING ALTERNATIVE, I

12   DON'T THINK SAMSUNG -- OR APPLE CAN OBJECT BECAUSE I DID SAY

13   IT'S PERMISSIBLE FOR THAT PURPOSE.

14          MR. QUINN:  THE POINT IS THAT --

15          THE COURT:  YEAH.

16          MR. QUINN:  -- IT ILLUSTRATES THE NARROWNESS OF THE

17   PATENT, THAT WE CAN DO THIS.

18          THE COURT:  RIGHT.  BUT YOU CAN SAY IT AS A

19   NON-INFRINGING ALTERNATIVE WITHOUT GETTING INTO A PRIOR JURY

20   CAME UP WITH THIS VERDICT.

21       DO YOU SEE WHAT I'M SAYING?

22          MR. QUINN:  OKAY.  I UNDERSTAND THE POINT.

23          THE COURT:  THERE IS A DISTINCTION THERE, AND I DID

24   SUSTAIN THE OBJECTIONS TO THOSE SLIDES, WHICH IS WHY I'M

25   DISAPPOINTED THAT -- DISAPPOINTED THAT YOU'RE DOING IT ANYWAY.

1           BUT ALL RIGHT.

2           WELL, LET'S TALK ABOUT -- WHAT IS THE GAP ISSUE?

3                MR. QUINN:  I THINK MR. LEE HAS SAID THAT THERE --

4      THERE'S NOT AN ISSUE.

5                THE COURT:  THAT'S BEEN RESOLVED?  SO IS THERE ANY

6      OTHER PROBLEM OR OBJECTION OR CONCERN THAT YOU HAVE WITH PX 40,

7      4554, 2519 BEING USED, OR EXHIBIT 7?  IF THERE'S ANY OBJECTION,

8      I'D LIKE TO RESOLVE IT NOW AND NOT HAVE THE JURY STEP OUT ONE

9      MORE TIME.

10               MR. LEE:  NO, YOUR HONOR.

11               THE COURT:  OKAY.  AND THERE'S NOTHING ELSE YOU'RE

12     GOING TO BE USING; CORRECT?

13          YOU KNOW, THE REASON WHY I PUT A LIMIT ON SLIDES IS THAT

14     IN THE FIRST TRIAL, SAMSUNG SUBMITTED 500 SLIDES FOR YOUR

15     CLOSING ARGUMENTS AND THE PARTIES THEN DID OBJECTIONS TO 500

16     SLIDES, WHICH OBVIOUSLY WERE NOT USED.  AND SO IT CREATED AN

17     INCREDIBLE BURDEN ON THE COURT AND THE PARTIES TO BE LITIGATING

18     500 SLIDES WHICH YOU WERE NOT GOING TO USE.

19          SO THAT'S WHY I THOUGHT LET'S KEEP IT NARROW, WHATEVER

20     YOU'RE ACTUALLY GOING TO USE, LET'S LIMIT THE NUMBER AND WE CAN

21     LITIGATE THAT.  AND PERHAPS WE SHOULD REACH A DIFFERENT

22     AGREEMENT ON CLOSING, THAT IF YOU'RE GOING TO USE A SLIDE, EVEN

23     IF IT'S AN ACTUAL EXHIBIT, THAT THOSE SHOULD BE EXCHANGED AND

24     WE SHOULD LITIGATE THAT SO WE CAN AVOID THIS HAPPENING IN

25     CLOSING ARGUMENTS.  CAN WE DO THAT?  LET'S DO THAT.

1          MR. QUINN:  ALL RIGHT.  VERY WELL.

2          THE COURT:  LET'S DO THAT.  THAT WAY THERE'S EXACT

3     CLARITY ABOUT WHAT'S GOING TO BE USED, AND WE CAN ACTUALLY

4     DECIDE THIS ALL IN ADVANCE TO AVOID THIS KIND OF DISRUPTION TO

5     YOUR --

6          MR. QUINN:  JUST TO BE CLEAR, YOUR HONOR, WE DID

7     IDENTIFY THE EXHIBITS.  WE DID IDENTIFY THE EXHIBITS THAT WE

8     WOULD BE USING.

9          THE COURT:  WAS THAT DONE?

10          MR. LEE:  BOTH OF US --

11          MS. MAROULIS:  YES, YOUR HONOR.

12          MR. LEE:  WE HAD A SET OF DEMONSTRATIVES.

13          THE COURT:  OKAY.

14          MR. LEE:  AND THEN WE GAVE A LIST OF EXHIBITS THAT WE

15     MIGHT USE, AND THEN -- I THINK THE PLACE WHERE WE DEPARTED IS

16     THAT WHEN YOUR HONOR ASKED TO SEE OUR SLIDES FOR THE OPENING,

17     WE ACTUALLY GAVE YOU THE COPIES OF THE SLIDES WITH THE CALLOUTS

18     FROM THE EXHIBITS THAT WE WERE GOING TO USE SO YOU HAD A

19     COMPLETE SET OF EVERYTHING.

20          THE COURT:  YES, I HAVE THAT.

21          MR. LEE:  AND THEY DIDN'T.  SO WE JUST OUGHT TO BE ON

22     THE SAME PLAYING FIELD FOR CLOSING.  THAT'S ALL.

23          MR. QUINN:  ABSOLUTELY.

24          THE COURT:  FOR CLOSING, I WOULD LIKE YOUR SLIDES TO

25     BE EVERYTHING YOU'RE PLANNING TO USE AND LET'S LITIGATE THAT

1        JUST TO AVOID ANY DISRUPTION.

2              MS. MAROULIS:  ABSOLUTELY, YOUR HONOR.  WE'LL DO

3        THAT.

4              THE COURT:  SO FOR THE CLOSING, EXCHANGE ANYTHING

5        THAT YOU'RE GOING TO SHOW, EVEN IF IT IS A SLIDE OF AN EXHIBIT.

6              MS. MAROULIS:  ABSOLUTELY.

7              THE COURT:  JUST SO WE'RE ON THE SAME PAGE.

8              MS. MAROULIS:  IF YOUR HONOR NEEDS, I CAN HAND UP THE

9        LIST OF DISCLOSURES THAT WE SENT TO APPLE LISTING THE EXHIBITS,

10       BUT WE UNDERSTAND THAT YOUR HONOR WOULD LIKE TO HAVE THE

11       CALLOUTS ALSO PRE-SUBMITTED.

12             THE COURT:  WELL, YOU KNOW, I AM DISAPPOINTED THAT I

13       SUSTAINED THE OBJECTION ABOUT THE NON-INFRINGEMENT VERDICT AND

14       IT'S COMING UP ANYWAY IN THE OPENING STATEMENT.

15             SO I GUESS WHEN YOU REFER TO THE GALAXY S II AND 4G, IF

16       YOU WOULD JUST CONSIDER IT MORE A NON-INFRINGING ALTERNATIVE

17       VERSUS GOING INTO WHAT A PRIOR JURY -- BECAUSE OTHERWISE THEY

18       CAN GET INTO WILLFULNESS.

19             DO YOU WANT THEM TO GET INTO WILLFULNESS OF THAT PREVIOUS

20       JURY VERDICT?

21             MR. QUINN:  NO.

22             THE COURT:  I DON'T THINK SO.  OKAY.  SO IF I'M GOING

23       TO OPEN IT FOR YOU, I'M GOING TO OPEN IT FOR THEM AND THEY'RE

24       GOING TO HEAR EVERYTHING THAT THAT PRIOR JURY FOUND, WHICH I

25       WOULD SUSPECT BOTH SIDES DON'T WANT.

1            MR. QUINN:  OKAY.  SO CAN WE SEE IT'S UNDISPUTED, FOR

2      EXAMPLE, THAT WE CAN USE THE GALAXY --

3            THE COURT:  WHAT'S THE LANGUAGE?

4            MR. LEE:  I THINK HE'S SAYING SAMSUNG IS GOING TO

5      OFFER EVIDENCE THAT THIS IS A NON-INFRINGING ALTERNATIVE.  AT

6      THE END OF THE DAY, A WITNESS HAS TO GET ON THE STAND AND SAY

7      THIS IS AN ALTERNATIVE THAT WAS AVAILABLE THAT WAS

8      NON-INFRINGING, RIGHT?

9            MR. QUINN:  WELL, IT'S A -- THIS IS SOMETHING

10     THAT'S --

11           THE COURT:  WELL, WHAT EVIDENCE WILL YOU BE USING

12     OTHER THAN THE JURY VERDICT?  WILL THERE BE A WITNESS WHO

13     SAID --

14           MR. QUINN:  WELL, THAT'S PART OF THE COURT RECORD

15     THAT THE GALAXY ACE IS -- WE COULD PUT IN A REQUEST TO TAKE

16     JUDICIAL NOTICE, I GUESS.

17           THE COURT:  WHAT ARE YOU GOING TO BE CHALLENGING,

18     JUST THE AVAILABILITY AND WHETHER IT WAS DEVELOPED AT THE TIME?

19     OR YOU'RE NOT CHALLENGING THAT IT'S ACTUALLY A NON-INFRINGING

20     ALTERNATIVE, WHICH IT IS.

21           MR. LEE:  YEAH.  YOUR HONOR, TO THE EXTENT THAT WHAT

22     THEY OFFER IS -- THEY OFFER EVIDENCE THAT IT'S A NON-INFRINGING

23     ALTERNATIVE AVAILABLE AT THE TIME, 2010 TO 2012, WE WON'T

24     OBJECT AND WE'RE NOT GOING TO -- IF -- NON -- IT'S ONE THING TO

25     SAY IT'S UNDISPUTED.  BUT TO THE EXTENT THEY OFFER EVIDENCE

1     THAT SAYS IN 2010, THIS WAS AVAILABLE, IT'S A NON-INFRINGING

2     DESIGN ALTERNATIVE, WE'RE NOT GOING TO OBJECT, AND WE'RE NOT

3     GOING TO DISPUTE.

4          BUT IT IS -- I MEAN, I THINK ON BOTH SIDES OF THE AISLE

5     HERE, IF WE START OPENING UP THE JURY VERDICT, I JUST THINK

6     IT'S --

7              THE COURT:  IF YOU DO, THEN IT'S ALL COMING IN.

8              MR. LEE:  YEAH.

9              THE COURT:  IT'S ALL GOING TO COME IN.

10             MR. LEE:  YEAH.  I THINK I MIGHT BE OKAY WITH THIS,

11    BUT --

12             THE COURT:  DO YOU WANT TO DO THAT?  DO YOU WANT TO

13    OPEN THE DOOR TO THE WHOLE JURY VERDICT, I'LL LET IT ALL COME

14    IN.  WHAT WOULD YOU LIKE?  YOU'VE OPENED THE DOOR.  WOULD YOU

15    LIKE TO OPEN IT COMPLETELY AND JUST GO AHEAD AND --

16             MR. QUINN:  THE ONLY EVIDENCE THAT THESE ARE

17    NON-INFRINGING ALTERNATIVES IS THE PRIOR JURY'S DETERMINATION.

18    WE -- WE CAN'T PUT A WITNESS ON THE STAND TO SAY THIS IS WHAT

19    THE VERDICT WAS.

20             THE COURT:  WELL, NO.  BUT WHETHER IT WAS AVAILABLE,

21    I THINK THAT'S FAIR GAME TO HAVE A WITNESS TO SAY THAT SAMSUNG

22    ACTUALLY COULD HAVE IMPLEMENTED THIS IN 2010, 2011, 2012.

23             MR. QUINN:  WELL, THIS IS WHEN THOSE PHONES CAME OUT.

24    I GUESS --

25             THE COURT:  THEN THAT WOULD -- THAT WOULD DO THAT.

1           BUT I WOULD PREFER THAT WE NOT GET INTO THIS IS WHAT A

2    PRIOR JURY VERDICT WAS.

3                MR. QUINN:  I UNDERSTAND.  I UNDERSTAND.

4                THE COURT:  AND --

5                MR. QUINN:  BUT I WOULD LIKE TO BE ABLE TO SAY WE

6    COULD USE THESE.

7                THE COURT:  I THINK THAT'S FAIR.

8                MR. QUINN:  I WON'T SAY IT'S BEEN DETERMINED.

9                THE COURT:  I THINK THAT'S COMPLETELY FAIR.

10               MR. QUINN:  ALL RIGHT.  OKAY.

11               THE COURT:  YEAH, OKAY.  ALL RIGHT.  ARE WE ALL ON

12   THE SAME PAGE?  ANYTHING ELSE THAT MIGHT BE UNEXPECTED?  I'D

13   LIKE TO DEAL WITH IT NOW.  NOTHING ELSE?

14               MR. QUINN:  NO.

15               THE COURT:  OKAY.  THANK YOU.

16               MR. QUINN:  YOUR HONOR, MAY I HAVE A COUPLE MORE

17   MINUTES ON MY TIME?

18               THE COURT:  NO.  I'VE STOPPED THE CLOCK.

19               MR. QUINN:  ALL RIGHT.

20               THE COURT:  YEAH, WE'VE STOPPED THE CLOCK.

21               MR. QUINN:  ALL RIGHT.  THANK YOU.

22          (JURY IN AT 11:13 A.M.)

23               THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

24   SEAT.

25          PLEASE GO AHEAD.

1          MR. QUINN:  THANK YOU, YOUR HONOR.

2      THANK YOU FOR BEARING WITH US.

3          SO I WAS TALKING ABOUT OTHER DESIGNS AND HOW THEY SHOW THE

4      NARROW SCOPE OF APPLE'S DESIGN PATENTS, AND WE LOOKED AT

5      THIS -- I SHOWED YOU THIS GALAXY ACE, AND IT WILL COME INTO

6      EVIDENCE, AND THIS IS A DESIGN THAT COULD HAVE BEEN USED.

7          AND WHEN YOU COMPARE THAT TO SOME OF THE INFRINGING PHONES

8      AT ISSUE IN THIS CASE, THE S I9000, WHICH IS JOINT

9      EXHIBIT 1007, THERE'S A COPY OF AN IMAGE UP ON THE SCREEN, I'M

10     HOLDING ONE HERE (INDICATING), WHEN YOU COMPARE THEM, YOU'LL

11     SEE IT'S HARD TO TELL THE DIFFERENCES.  THE DIFFERENCES ARE

12     VERY, VERY NARROW, AND THAT GIVES YOU SOME IDEA ABOUT WHAT THE

13     SCOPE OF THE PROTECTION IS.

14         LET'S TAKE A LOOK AT ANOTHER ONE OF APPLE'S PATENTS, THE

15     '305 PATENT.  HERE IT IS ON THE GRAPHICAL USER INTERFACE, THAT

16     ICON ARRAY, WHICH IS THE FIGURE SHOWN IN THE LOWER RIGHT.

17         NOW, LET ME SHOW YOU THE ICONS ON THE SAMSUNG PHONE --

18     ANOTHER SAMSUNG PHONE, ANOTHER DESIGN THAT WE COULD USE, AND

19     THIS IS THE SAMSUNG CAPTIVATE.  THIS IS PX 7 (INDICATING).

20         THAT WE COULD USE.  AS YOU CAN SEE, THE APPLICATION -- YOU

21     CAN SEE HERE THE APPLICATION SCREEN OF THAT CAPTIVATE PHONE,

22     AND IT ALSO HAD VARIOUS ICONS ARRANGED IN COLUMNS, 4-BY-4 GRIDS

23     WITH THE WORDS UNDERNEATH LIKE THE OTHER -- LIKE THE '305.

24         LET ME SHOW YOU ANOTHER SAMSUNG PHONE IN THIS CASE.  THIS

25     IS THE GALAXY S II (INDICATING).

1          WHAT WE JUST SHOWED YOU, THE GALAXY CAPTIVATE, THAT'S ONE

2     OF THE PHONES THAT WAS FOUND TO INFRINGE.  THIS NOW UP ON THE

3     SCREEN IS THE GALAXY S II.  THIS WAS AN ALTERNATIVE THAT WE

4     COULD USE.  IT ALSO HAS THE SAME NUMBER OF COLUMNS, THE WORDS

5     WRITTEN UNDERNEATH THE ICONS.

6          LOOKING AT THEM, THE DIFFERENCES ARE VERY SUBTLE.  THE

7     FIRST ONE INFRINGES.  THAT'S ONE OF THE PHONES IN THIS CASE.

8     THIS ONE WAS ONE THAT'S AVAILABLE FOR US TO USE.  THE WHOLE

9     WORLD COULD USE THIS PARTICULAR DESIGN.

10         THE DIFFERENCE, BY THE WAY, IS THE ICONS IN THE CAPTIVATE,

11    THE ONE FOUND TO INFRINGE, HAVE THESE LITTLE CONTAINERS AROUND

12    THEM YOU'LL SEE.

13         AND THE ONES ON THE EPIC, YOU KNOW, THE GALAXY S II DON'T

14    HAVE THEM.

15         THE WHOLE WORLD CAN USE THAT PARTICULAR DESIGN.

16         NOW, THE BEZEL PATENT, HERE'S THE THIRD APPLE PATENT,

17    AGAIN, THE SUBJECT WE'RE TALKING ABOUT IS HOW NARROW THESE ARE

18    COMPARED TO OTHER THINGS THAT COULD BE DONE, AND THIS IS THE

19    '087, THE PATENT THAT INCLUDES THE FRONT FACE AND THE BEZEL.

20         HERE'S A PHONE, THE VIBRANT THAT'S IN THIS CASE, FOUND TO

21    INFRINGE.  IT'S JX 1010.  I'M HOLDING IT UP HERE, AND THERE'S A

22    COPY ON THE SCREEN (INDICATING).

23         AND HERE'S A PHONE, THE INFUSE 4G, A COPY UP ON THE

24    SCREEN, WHICH WAS AVAILABLE, IT'S ANOTHER DESIGN WE COULD USE

25    (INDICATING).  IT DOESN'T INFRINGE.

1          SO WHEN YOU LOOK AT THESE AND WHEN YOU HAVE A CHANCE TO

2     LOOK AT THEM, YOU'LL SEE THE DIFFERENCES ARE VERY, VERY SUBTLE

3     AND VERY, VERY NARROW.

4          AGAIN, THIS IS THE FIRST FACTOR IN THAT TEST, WHAT IS THE

5     RELEVANT ARTICLE OF MANUFACTURE?  THE FIRST FACTOR IS WHAT'S

6     THE SCOPE OF THE CLAIM?

7          AND THIS LEADS ME TO ANOTHER CLARIFICATION I WANTED TO

8     MAKE ABOUT WHAT WAS GOING ON IN THIS MARKETPLACE DURING THIS

9     TIME PERIOD.  APPLE SHOWED YOU A GRAPH THAT SUGGESTED THAT

10    SAMSUNG'S SALES INCREASED BECAUSE SOME OF ITS PHONES USED THE

11    DESIGNS WE'RE TALKING ABOUT IN THIS CASE.  REMEMBER THAT?

12         THERE'S TWO PROBLEMS WITH THAT SUGGESTION.  FIRST, AS

13    YOU'VE SEEN, THE SAMSUNG PHONES IN THIS CASE, IN THIS CASE, DID

14    NOT REPRESENT A SUDDEN REVOLUTION IN SAMSUNG'S DESIGNS.

15    SAMSUNG WAS DEVELOPING TOUCHSCREEN, SCREEN-CENTRIC DESIGNS

16    GOING BACK BEFORE THAT IPHONE.

17         THE SECOND PROBLEM WITH THAT IS THAT THE EVIDENCE WILL

18    SHOW THAT THESE MINOR, INFRINGING DIFFERENCES DID NOT CAUSE

19    PEOPLE TO BUY SAMSUNG PHONES.  THEY DID NOT DRIVE SALES.

20         THE REASON WHY SAMSUNG'S SALES TOOK OFF WILL BE CLEAR.

21    IT'S BECAUSE SAMSUNG SWITCHED TO THE GOOGLE ANDROID OPERATING

22    SYSTEM, WHICH BECAME THE MOST FAMOUS, MOST WIDELY USED

23    OPERATING SYSTEM IN THE WORLD.  THAT SWITCH TO ANDROID AND

24    OTHER INNOVATIONS THAT SAMSUNG MADE, SUCH AS 4G CAPABILITY,

25    LARGER SCREENS, FASTER PROCESSORS, AND THE AVAILABILITY OF ALL

1    OF -- TO BE ABLE TO USE ALL CELLULAR CARRIER, NOT JUST AT&T,

2    THAT IS WHAT DROVE SAMSUNG'S SALES.  NOT BY COPYING, USING

3    THESE LITTLE DESIGNS, THESE VERY SMALL DESIGNS.

4         HERE IS A CHART THAT ILLUSTRATES THIS.  WE CAN SEE THAT IN

5    MID-2010, RIGHT AT THE TIME SAMSUNG'S SALES STARTED TO CLIMB,

6    SAMSUNG LAUNCHED PHONES WITH TWO THINGS APPLE DID NOT HAVE:  A

7    4-INCH SCREEN AND 4G CELLULAR CONNECTION.

8         AT NO TIME DURING THIS PERIOD DID APPLE SELL A PHONE WITH

9    4G OR A SCREEN LARGER THAN 3.5 INCHES.

10        IN AUGUST 2011, SAMSUNG LAUNCHED AN EVEN BIGGER SCREEN,

11   ONE THAT WAS 4.5 INCHES.

12        YOU'LL ALSO HEAR THAT IN THIS TIME PERIOD, SAMSUNG BEGAN

13   TO SPEND MASSIVELY ON MARKETING AND ADVERTISING AND THAT,

14   REMEMBER, SAMSUNG SOLD PHONES ON ALL MAJOR CARRIERS.  IF YOU

15   WANTED AN IPHONE AND YOU DIDN'T HAVE AT&T PRIOR TO

16   FEBRUARY 2010, IT SIMPLY WAS NOT AVAILABLE.

17        NOW, MS. DAVIS, THEIR EXPERT, APPLE'S EXPERT WHO CREATED

18   THAT CHART THAT MR. LEE SHOWED YOU, TESTIFIED, WE ASKED HER AT

19   HER DEPOSITION, THAT SHE COULD NOT SAY THAT THESE SMALL DESIGNS

20   ON THESE SMALL COMPONENTS ACCOUNTED FOR THE INCREASE IN SAMSUNG

21   SALES.

22        SO THE QUESTION HERE FOR YOU, AS YOU'VE HEARD, IS WHAT IS

23   THE REMEDY FOR USING SMALL DESIGN DETAILS THAT APPLE OWNS,

24   DESIGN DETAILS APPLIED TO SMALL PARTS OF THE PHONE?

25        EVERYONE, INCLUDING APPLE, AGREES THAT THE REMEDY IS NOT

1    PUNISHMENT.  THE REMEDY UNDER THE LAW, THE REMEDY UNDER THE LAW

2    IS THE PROFIT THAT SAMSUNG MADE ONLY FROM THE SAMSUNG ARTICLE

3    OF MANUFACTURE TO WHICH THAT DESIGN WAS APPLIED.

4         EVERYONE AGREES THAT APPLE IS NOT ENTITLED TO PROFITS ON

5    ARTICLES OF MANUFACTURE TO WHICH THE DESIGN WAS NOT APPLIED.

6         APPLE AND SAMSUNG ALSO AGREE THAT AN ARTICLE OF

7    MANUFACTURE IS ANYTHING MADE BY HAND OR MACHINE, BUT

8    DETERMINING WHAT THE ARTICLE OF MANUFACTURE IS THAT THE DESIGNS

9    WERE APPLIED TO WILL REQUIRE APPLYING THAT FOUR FACTOR TEST

10   THAT MR. LEE SHOWED YOU, AND I WILL TALK ABOUT THAT.

11        APPLE SAYS THE ARTICLE OF MANUFACTURE IS NOT THE GLASS

12   FRONT FACE, THE BEZEL OR THE DISPLAY SCREEN THAT I SHOWED YOU.

13   APPLE SAYS IT'S THE WHOLE PHONE.  THEY GET THE PROFITS ON THE

14   WHOLE PHONE, INCLUDING THE HUNDREDS OF COMPONENTS INSIDE THE

15   PHONE, ALL THE DIFFERENT FEATURES, EVEN THOUGH THOSE NARROW

16   DESIGNS ONLY COVER A BEZEL, A FLAT FRONT FACE, AND ONE PAGE OF

17   THE GRAPHICAL USER INTERFACE.

18        IN THESE PATENTS, YOU'LL SEE NOTHING COVERING ANYTHING,

19   ANY OF THE COMPONENTS INSIDE THE PHONE.  NO APPLE WITNESS WILL

20   TELL YOU THAT ANY OF THESE DESIGN PATENTS ARE APPLIED TO

21   ANYTHING INSIDE THE PHONE.  THEY DON'T EVEN COVER THE ENTIRE

22   EXTERIOR OF THE PHONE.

23        APPLE EVEN SEEKS PROFITS ON FEATURES THAT SAMSUNG PHONES

24   HAD THAT APPLE DID NOT HAVE AT THE TIME.  FOR EXAMPLE, THE S 4G

25   HAD A NUMBER OF FEATURES THAT THE FIRST IPHONE DID NOT HAVE,

1    GPS, A VIDEO CAMERA, 4G, A 4-INCH SCREEN.

2         THE FIRST IPHONE HAD NONE OF THESE INVENTIONS.

3         BUT TODAY, IN THIS TRIAL, APPLE IS ASKING YOU TO AWARD

4    PROFITS ATTRIBUTABLE TO THESE THINGS THAT SAMSUNG HAD AND THAT

5    APPLE DID NOT HAVE.

6         OBVIOUSLY A SMARTPHONE CONSISTS OF MANY, MANY INVENTIONS.

7    THERE ARE MANY DIFFERENT ARTICLES OF MANUFACTURE IN A

8    SMARTPHONE, A GPS, A BATTERY, A SPEAKER, A CAMERA, A GAMING

9    DEVICE, A VIDEO PLAYER.  THE LIST GOES ON AND ON.

10        APPLE SEEKS THE PROFITS ON THE ENTIRE SAMSUNG PHONE,

11   INCLUDING ALL THESE COMPONENTS WHICH REALLY ARE, EACH OF THEM,

12   ARTICLES OF MANUFACTURE IN THEIR OWN RIGHT.  I MEAN THAT

13   LITERALLY.  SOMEBODY MANUFACTURED THEM, EACH OF THEM.

14        YET APPLE IS ASKING FOR THE PROFITS ON ALL OF THOSE

15   THINGS, INSIDE, ALL THE OUTSIDE, EVEN THOUGH YOU'VE SEEN THESE

16   PATENTS ONLY COVER PART OF THE OUTSIDE.

17        IN FACT, I WILL SHOW YOU THAT APPLE IS ASKING FOR MORE --

18   EVEN MORE THAN THE PROFITS ON THE SAMSUNG PHONE.  APPLE IS

19   ASKING YOU TO AWARD PROFITS THAT SAMSUNG NEVER MADE ON THOSE

20   PHONES.

21        APPLE MAKES THIS CLAIM, HOW CAN THEY PERSUADE YOU THAT

22   THEY SHOULD GET THE PROFITS ON THE WHOLE PHONE, BY DISTORTING

23   THE DEFINITION OF ARTICLE OF MANUFACTURE.

24        AND ONE OF THE WITNESSES WE WILL CALL IN THIS CASE IS

25   MR. SAM LUCENTE, AND LET ME TELL YOU A LITTLE BIT ABOUT HIM.

1    YOU CAN'T SEE HIS PONYTAIL IN THE PICTURE THERE, BUT YOU'LL

2    HEAR THAT HE HAS WORKED AS A DESIGN ENGINEER, A DESIGNER FOR

3    OVER 30 YEARS.  HE GRADUATED WITH A BACHELOR OF SCIENCE IN

4    DESIGN WITH HIGH DISTINCTION FROM THE COLLEGE OF DESIGN OF THE

5    UNIVERSITY OF CINCINNATI, A VERY HIGHLY RATED DESIGN SCHOOL.

6         HE'S HAD A CAREER IN INDUSTRIAL DESIGN, WAS A LEAD

7    DESIGNER ON THE IBM THINK PAD COMPUTER.

8         HE WILL GIVE YOU AND WILL TESTIFY AS TO AN EXAMPLE OF A

9    PRODUCT THAT IS SOLD AS A WHOLE, LIKE A PHONE IS SOLD AS A

10   WHOLE, BUT HAS DIFFERENT ARTICLES OF MANUFACTURE:  A KITCHEN

11   OVEN.  IN AN OVEN, THERE'S AN EXTERIOR CASE IN AN OVEN AND

12   THERE ARE MANY DESIGN CHOICES THAT HAVE TO BE MADE ABOUT THAT

13   EXTERIOR.  FOR EXAMPLE, SHOULD IT HAVE PHYSICAL DIALS, OR THESE

14   DAYS SHOULD THE OVEN HAVE A TOUCHSCREEN.  ARE THE BURNERS

15   SQUARE OR CIRCULAR?  THERE ARE LOTS OF DESIGN AND DECLARATION

16   CHOICES THAT HAVE TO BE MADE FOR THAT CASE.  BUT THE EXTERIOR

17   OF THAT OVEN IS A DIFFERENT ARTICLE OF MANUFACTURE FROM THE

18   INSIDE.

19        INSIDE ARE PARTS OF SOME THINGS.  IT'S A MACHINE FOR

20   BAKING AND ROASTING, SEPARATE ARTICLES OF MANUFACTURE, A BAKING

21   ELEMENT, A TEMPERATURE SENSOR, AN OVEN LIGHT BULB, THE RACKS,

22   THE FAN, ALL THESE DIFFERENT ARTICLES OF MANUFACTURE.  THEY'RE

23   ALL PART OF AN OVEN, BUT THEY'RE ALL SEPARATE.

24        AND THE CASE MAY CONTAIN DIFFERENT TYPES OF OVENS.  YOU

25   MIGHT HAVE ONE ON A LOW MARKET OVEN THAT DOES JUST LIMITED

 1      THINGS.  YOU MIGHT HAVE A PREMIUM MODEL.  YOU MIGHT HAVE A

 2      RESTAURANT MODEL.

 3           NO ONE WOULD THINK, AND THE EVIDENCE WON'T SUPPORT THE

 4      NOTION THAT THE DESIGN OF THE WHOLE EXTERIOR WOULD ENTITLE ONE

 5      TO THE PROFITS ON ALL OF THE COMPONENTS INSIDE.

 6           IT'S THE SAME, MR. LUCENTE WILL TELL YOU, AS A BOOK WITH A

 7      COVER.

 8                MR. LEE:  YOUR HONOR, YOU EXCLUDED THIS.

 9                MR. QUINN:  NOT THE BOOK.

10                MR. LEE:  THE BOOK.

11                MR. QUINN:  I DON'T BELIEVE SO, YOUR HONOR.

12                THE COURT:  IT'S 11:25.  WHAT'S THE -- WHAT'S THE

13      EXHIBIT NUMBER, PLEASE?

14                MR. QUINN:  THERE WASN'T A SLIDE ON THIS.  THERE'S NO

15      SLIDE.

16                THE COURT:  NO, NO, BUT THE EXHIBIT NUMBER FOR THE

17      OBJECTION?

18                MR. LEE:  YOUR HONOR, THERE WERE --

19                MR. QUINN:  THERE WASN'T A SLIDE, YOUR HONOR, BUT

20      MR. LUCENTE --

21                THE COURT:  I UNDERSTAND.  BUT WHAT WAS THE OBJECTION

22      TO THE LUCENTE EXHIBIT?

23                MR. LEE:  YOUR HONOR, THERE WERE OBJECTIONS TO

24      OPENING SLIDES THAT HAD THINGS OTHER THAN PHONES AND YOUR HONOR

25      EXCLUDED THEM.

1          AND THEN YOUR HONOR RULED ALSO IN LIMINE REFERRING TO SOME

2     OF THESE OTHER EXAMPLES THAT HAVE COME OUT OF OTHER CASES,

3     OTHER BRIEFS, INCLUDING WE SPECIFICALLY BRIEFED THE BOOK

4     EXAMPLE.

5          SO THERE'S BEEN AN IN LIMINE RULING, PLUS EXCLUSION OF THE

6     SLIDES AND WE JUST --

7               MR. QUINN:  YOUR HONOR, THIS IS THE EVIDENCE --

8     MR. LUCENTE TESTIFIED TO THIS.

9               THE COURT:  OKAY.  I'M SORRY.  LET'S JUST -- LET'S GO

10    AHEAD, PLEASE.

11              MR. QUINN:  MR. LUCENTE WILL TELL YOU IT'S LIKE A

12    BOOK WITH A COVER, A COVER MAY HAVE A PARTICULAR DESIGN.  IT IS

13    SOLD ATTACHED TO THE BOOK ITSELF.  BUT THE COVER IS A DIFFERENT

14    ARTICLE OF MANUFACTURE THAN THE CREATIVE STORY AND CHARACTERS

15    IN THE BOOK.  AND THE DESIGN FOR THE COVER, HE WILL TELL YOU,

16    DOES NOT ENTITLE SOMEONE TO THE RIGHTS TO THE WHOLE BOOK.

17         AND HE WILL CONTRAST A BOOK WITH A DINNER PLATE.  WITH A

18    DINNER PLATE, IF YOU THINK OF IT, THE DESIGN IS THE PLATE

19    ITSELF.  IN THE MIDDLE OF A PLATE WITH A DESIGN IS A PLATE.

20    IT'S THE WHOLE THING.  IT'S THE WHOLE THING.

21         AND HE WILL EXPLAIN THAT THE SAMSUNG PHONES, WHICH HAVE

22    THIS EXTERIOR CONTAINER THAT HOUSES MULTIPLE DEVICES, MULTIPLE

23    ARTICLES OF MANUFACTURE, ARE LIKE A KITCHEN OVEN.

24         AND APPLE'S DESIGNS ARE NOT APPLIED TO ANY OF THE THINGS

25    INSIDE THE PHONE, OR EVEN ALL THE THINGS ON THE OUTSIDE.

1              A SMARTPHONE, OF COURSE, COMBINES MANY, MANY SMALL

2      ELECTRONIC DEVICES, MANY ARTICLES OF MANUFACTURE, ALL IN A

3      CASE.  IT'S A PORTABLE COMPUTER.

4              AND THERE'S A HISTORY TO THIS.  IF WE CAN GO TO SLIDE 25.

5              A COMPUTER, YOU KNOW, BACK SOME YEARS AGO, A COMPUTER, YOU

6      HAD A DESKTOP COMPUTER, IT HAD A MONITOR, A KEYBOARD, A MODEM,

7      SPEAKERS ATTACHED.  IT MIGHT HAVE A SEPARATE CAMERA, A

8      MICROPHONE FOR MAKING VIDEO CALLS.  ALL THESE ARE SEPARATE

9      ARTICLES OF MACHINE.

10             AS THE COMPONENTS GOT SMALLER, THEY COULD BE PUT IN A

11     SMALLER CASE TO CONTAIN ALL THESE DEVICES.  THE PORTABLE

12     COMPUTER BECAME SMALLER AND BECAME A LAPTOP.  IT'S ILLUSTRATED

13     ON SLIDE 26.

14             ALL THOSE ARTICLES OF MANUFACTURE THAT USED TO BE OUTSIDE

15     ARE NOW INSIDE THE LAPTOP.  ELECTRONICS MADE THIS POSSIBLE.

16             AND MR. LUCENTE, BY THE WAY, HEADED AND WAS THE LEAD

17     DESIGNER OF A GROUP AT IBM THAT DEVELOPED A MILESTONE LAPTOP

18     COMPUTER, THE IBM THINK PAD.  IT COMBINED DESIGN AND THE LATEST

19     ELECTRONICS.  IT WAS CONSIDERED A STUNNINGLY COMPACT DESIGN.

20     IT'S FEATURED IN THE MUSEUM OF MODERN ART IN NEW YORK AND

21     SAN FRANCISCO, AND THE SMITHSONIAN INSTITUTION AS WELL.  AND HE

22     WILL DESCRIBE WHAT GOES INTO CREATING A SELF-CONTAINED DEVICE

23     THAT CONTAINS MANY, MANY DIFFERENT INVENTIONS AND MANY ARTICLES

24     OF MANUFACTURE.

25             AFTER THE LAPTOP, THINGS CONTINUED TO SHRINK.  AND WITH

1    THE SMARTPHONE, YOU NO LONGER NEEDED A KEYBOARD AND A MOUSE

2    BECAUSE THE TOUCHSCREEN PERFORMS THAT FUNCTION.  THERE ARE NOW

3    HUNDREDS OF ARTICLES OF MANUFACTURE THAT ARE NOW INSIDE THE

4    SMARTPHONE.

5        THE ONLY WAY THAT APPLE COULD COME UP WITH A CLAIM TO A

6    WHOPPING BILLION DOLLARS NUMBER AND GET THE PROFITS ON

7    EVERYTHING IT DID NOT INVENT, MANUFACTURE, OR EVEN IMAGINE, IS

8    TO CLAIM THAT THE ARTICLE OF MANUFACTURE TO WHICH ITS DESIGNS

9    WERE APPLIED, THOSE NARROW DESIGNS, IS THE WHOLE PHONE.

10       NOT ONLY DOES THIS MAKE NO SENSE, IT'S CONTRARY TO THE

11   LAW.

12       THE COURT WILL TELL YOU, AND MR. LEE REFERRED TO THIS, THE

13   FACTORS TO LOOK AT IN DECIDING WHAT IS THE PROPER ARTICLE OF

14   MANUFACTURE?

15       AND MR. LEE PUT THIS UP HERE, BUT HE DIDN'T TALK ABOUT IT.

16   HE DIDN'T WALK YOU THROUGH THESE FACTORS WHICH ARE THE THINGS

17   THAT YOU HAVE TO CONSIDER IN DECIDING WHAT IS THE PROPER

18   ARTICLE OF MANUFACTURE, AND I WOULD LIKE TO GO THROUGH THESE

19   WITH YOU.

20       FACTOR 1, THE SCOPE OF THE DESIGN.  IT'S THE SCOPE OF THE

21   DESIGN CLAIMED IN THE PATENT.  YOU SEE THAT.  "CLAIM" IS A TERM

22   OF ART IN THE PATENT WORLD.  IT'S WHAT DESCRIBES WHAT THE

23   INVENTION IS.  APPLE SUGGESTS IT'S THE WHOLE PHONE.

24       BUT AS YOU WILL SEE, NONE OF THESE PATENTS CLAIM A WHOLE

25   PHONE.

1          HERE, FOR EXAMPLE, IS THE '677 PATENT.  WE SAW THAT.  THE

2     CLAIM IS LIMITED TO THE BLOCK ROUND CORNERED, RECTANGULAR FRONT

3     FACE.

4          YOU'LL RECALL AGAIN, THE DOTTED LINES AREN'T PART OF IT.

5     SO IT'S JUST THE SHADED AREA ON THE FRONT.

6          IT DOESN'T INCLUDE WHAT YOU SEE IN THE LOWER RIGHT, THAT

7     DOTTED AREA, THE BACK AND THE SIDES.

8          IT COVERS NOTHING INSIDE THE PHONE.  IF YOU LOOK AT THE

9     PATENT, YOU WON'T SEE ANY DESCRIPTION, ANY CLAIM FOR ANY

10    COMPONENT OR ANYTHING INSIDE.  IT'S JUST THE SOLID LINES.

11         WE TALKED ABOUT THE DIFFERENT, DIFFERENT PATENTS,

12    DIFFERENT ALTERNATIVE DESIGNS THAT SAMSUNG HAD AVAILABLE TO IT

13    THAT ILLUSTRATES HOW NARROW THESE PATENTS ARE.

14         THAT'S FACTOR NUMBER -- THE FIRST FACTOR.

15         THE SECOND FACTOR, RELATIVE PROMINENCE.  IT'S THE RELATIVE

16    PROMINENCE OF THE DESIGN AS APPLIED TO SAMSUNG PHONES AS A

17    WHOLE, INCLUDING ALL ITS OTHER FEATURES.  IT'S NOT THE

18    PROMINENCE IN APPLE'S PHONES, ALTHOUGH APPLE MAY TRY TO SUGGEST

19    THAT.

20         THE -- YOU'LL LEARN THAT THAT ICON DEADLINE IN THE '305

21    PATENT, FOR EXAMPLE, IS NOT -- ALTHOUGH IT'S THE HOME PAGE ON

22    THE IPHONE, IT'S NOT THE HOME PAGE ON THE SAMSUNG PHONES.  IT'S

23    SIMPLY NOT A PROMINENT PART OF THE PRODUCT.

24         AS FOR THE '677 PATENT, THERE HAVE BEEN DOZENS OF PHONES

25    IN THE MARKET WITH BLACK FACES.  THE PARTICULAR PATENTED APPLE

1    DESIGN IS NOT RELATIVELY -- NOT RELATIVELY PATENT -- PROMINENT.

2         THE BEZEL DESIGN, APPLE SEEMS TO SAY THAT THEY THINK THE

3    BEZEL MAKES THE PHONE.  WE SAY THE BEZEL DESIGN IS A DESIGN FOR

4    THE BEZEL.  IT'S THE BEZEL PROFITS THAT APPLE SHOULD RECEIVE,

5    NOT THE WHOLE PHONE.

6         CONCEPTUAL DISTINCTNESS, THE DESIGN FOR THESE PARTS OF A

7    SMARTPHONE ARE CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A

8    WHOLE.  THIS IS OBVIOUS.

9         SO APPLE TRIES TO CHANGE THE SUBJECT.

10        AND, AGAIN, THE WORDS HERE MATTER.  I'D EMPHASIZE THE

11   WORDS OF THESE FACTORS.  WE HOPE YOU'LL FOCUS ON THE WORDS.

12        APPLE SAYS IF TWO THINGS ARE RELATED, THEY'RE NOT

13   CONCEPTUALLY DISTINCT.

14        BUT YOU'LL SEE, FOR EXAMPLE, A CAR AND A STEERING WHEEL,

15   APPLE WILL SAY, ARE NOT CONCEPTUALLY DISTINCT BECAUSE THEY'RE

16   BOTH RELATED TO CARS.

17        BUT THAT IS NOT THE WORD OF THE FACTOR WE'RE SUPPOSED TO

18   FOCUS ON.

19        AND THEN LAST IS THE PHYSICAL RELATIONSHIP.  I DON'T HAVE

20   TIME TO GO THROUGH IT ALL, BUT BASICALLY IS IT SEPARATED?  CAN

21   YOU SEPARATE IT?  CAN YOU BUY IT SEPARATELY?  AND YOU'LL HEAR

22   THAT THESE COMPONENTS CAN ALL BE SEPARATED.  THEY'RE PHYSICALLY

23   SEPARATED.

24        APPLE SAID, MR. LEE SAID YOU CAN'T EVEN USE THEM

25   SEPARATELY.  WELL, YOU LOOK AT THOSE FACTORS.  THERE'S NOTHING

1    IN THERE THAT SAYS CAN IT BE USED SEPARATELY AS PART OF THE

2    TEST?  THAT ISN'T IT.

3          LET ME SHOW YOU AN EXAMPLE OF A DISASSEMBLED SAMSUNG PHONE

4    THAT WE DID.  ON THE TOP, THERE'S THE GLASS FRONT FACE WITH

5    SAMSUNG'S NAME ON IT.  I SHOWED YOU THIS EXAMPLE FROM THE

6    GALAXY 4G, THE '677 DESIGN IS APPLIED TO THAT GLASS.  IT IS

7    APPLIED TO THIS GLASS (INDICATING).

8          THE GLASS IS MANUFACTURED SEPARATELY BY SUPPLIERS, SUCH AS

9    BEIL CRYSTAL MANUFACTURING AND UNITED LENS.

10         SOMETIMES PEOPLE REPLACE THAT WHEN THEY REPLACE THE GLASS.

11   IT CAN BE PHYSICALLY SEPARATED.

12         SECOND, ON THE LEFT IS THE BEZEL.  WE LOOKED AT THIS

13   BEZEL.  THIS IS SEPARATELY PURCHASED AND MANUFACTURED.  SAMSUNG

14   BOUGHT THIS BEZEL FROM MULTIPLE MANUFACTURERS.

15         THE DISPLAY SCREEN, IT'S HERE.  IT'S A SEPARATE PART

16   (INDICATING).  APPLE'S DESIGN, WHEN IT APPEARS, APPEARS ON THIS

17   PART.

18         WHAT WE'VE BEEN LOOKING AT THERE IS A SAMSUNG PHONE THAT

19   WE TORE DOWN FOR ILLUSTRATION.

20         APPLE ITSELF BUYS SAMSUNG PHONES AND TEARS THEM DOWN AS

21   WELL AND STUDIES THEM IN DETAIL TO LEARN WHAT THE DIFFERENT

22   PARTS ARE.  ONE OF THESE PHONES IN THIS CASE IS THE SAMSUNG

23   VIBRANT.  AFTER THE VIBRANT CAME OUT, APPLE PURCHASED ONE AND

24   DID SOMETHING -- DID ONE OF THESE TEARDOWNS AND YOU CAN SEE THE

25   SUMMARY OF WHAT APPLE DOES.

1          APPLE, LIKE ANY COMPETITOR, STUDIES ITS COMPETITORS'

2     PRODUCTS IN DETAIL.  THEY'RE ANALYZING IT IN DETAIL.

3          AND IT SHOWED -- THIS SHOWS THE PROCESS THAT APPLE USES IN

4     DISASSEMBLING IT, DISASSEMBLING THE SAMSUNG PHONE INTO ALL

5     THOSE DIFFERENT COMPONENT PARTS, AND IT GOES EVEN INTO THE

6     SUBMODULES AND IT SENDS PARTS TO DIFFERENT TEAMS.  YOU'LL SEE

7     APPLE NOTES THAT THE CAMERA MODULE IS WITH THE CAMERA TEAM FOR

8     FURTHER ANALYSIS.

9          THEN ON ANOTHER PAGE, WE CAN SEE THAT THE TOUCH DISPLAY

10    ASSEMBLY IS WITH THE DISPLAY TEAM FOR FURTHER ANALYSIS.

11         THESE ARE, BY THE WAY, THESE RED LINES AND ARROWS WERE IN

12    APPLE'S DOCUMENTS.  WE DIDN'T PUT THEM THERE.

13         THE POINT IS APPLE'S OWN DOCUMENTS MAKE IT CLEAR THAT THE

14    VARIOUS COMPONENTS CAN BE PHYSICALLY SEPARATED FROM THE PHONE

15    AS A WHOLE.  APPLE EVEN HAS DIFFERENT TEAMS WITHIN APPLE FOR

16    THESE COMPONENTS.

17         FOLKS, THIS IS NOT A DINNER PLATE.  THIS IS A COMPLEX

18    DEVICE WITH MANY DIFFERENT COMPONENTS.

19         NOW, I WANT TO JUMP FORWARD TO TALK ABOUT DAMAGES, THE

20    PROFITS.  UP TO NOW, WE'VE BEEN TALKING ABOUT WHAT'S THE

21    RELEVANT ARTICLE OF MANUFACTURE.

22         APPLE'S EXPERT, MS. DAVIS, CLAIMS THAT THE AMOUNT THAT'S

23    OWED, THE PROFITS ON THE WHOLE PHONE, IS $1.1 BILLION.  SHE

24    ASSUMES THAT THE RELEVANT ARTICLE OF MANUFACTURE IS THE WHOLE

25    PHONE.

1          NOW, SHE OFFERS NO OPINION AT ALL ON WHETHER THAT'S TRUE.

2     SHE WAS GIVEN THAT ASSUMPTION.

3          AND SHE DIDN'T CALCULATE THE PROFITS ON ANYTHING LESS THAN

4     THE WHOLE PHONE.  SHE DIDN'T TRY TO FIGURE OUT WHAT WOULD THE

5     PROFITS BE ON THESE SUBCOMPONENTS, AND WE WILL SHOW YOU THROUGH

6     OUR EXPERT, MR. WAGNER, WHAT THE PROFITS WOULD BE ON THESE

7     ACTUAL COMPONENTS.

8          AND EVEN IN DOING THE CALCULATIONS SHE DID, SHE INFLATED

9     THE NUMBERS BY FAILING TO DEDUCT IMPORTANT COSTS.

10         SO LET'S TALK A LITTLE BIT ABOUT PROFITS.  PROFITS, OF

11    COURSE, YOU'VE GOT REVENUE, GROSS REVENUES, AND FROM THAT YOU

12    DEDUCT COSTS YOU INCUR IN DESIGNING, MANUFACTURING, AND

13    SELLING.

14         AND WHAT'S REMARKABLE IN THIS CASE IS THAT THE EXPERTS

15    DON'T REALLY DISAGREE ON THE TYPE OF COSTS THAT ARE NECESSARY

16    TO CREATE REVENUE.  APPLE'S EXPERT AGREES THAT SAMSUNG SPENDS

17    MONEY ON ADVERTISING, ET CETERA, AND THAT APPLE SPENDS MONEY ON

18    SALES PEOPLE.

19         THESE COSTS ARE DIRECTLY ATTRIBUTABLE TO SELLING THE

20    SAMSUNG PHONES AND GETTING THOSE REVENUES.  THEY ARE NECESSARY.

21         BUT YET, IN CALCULATING THE PROFITS ON THE ENTIRE PHONE,

22    YOU WILL LEARN THAT MS. DAVIS DOES NOT DEDUCT A PENNY OF THESE

23    COSTS.  SHE DOESN'T DEDUCT A PENNY OF MARKETING, A PENNY OF

24    ADVERTISING.  SHE DEDUCTS ZERO.  AND HERE'S HER TESTIMONY.

25         SHE SAID SHE WOULD SUBTRACT -- HER THEORY IS KIND OF

1    INTERESTING.  SHE SAID SHE WOULD SUBTRACT THEM IF THOSE COSTS

2    WEREN'T SHARED WITH ANOTHER PRODUCT, LIKE ANOTHER MODEL OF

3    PHONE.  BUT BECAUSE THE COSTS ARE SHARED WITH OTHER PHONES, SHE

4    IGNORES THEM IN CALCULATING THE PROFITABILITY OF THE PHONES

5    HERE.

6         SHE WOULD SAY, FOR EXAMPLE, THAT IF A SALES PERSON SOLD

7    THE PHONES AT ISSUE IN THIS CASE AND ONLY THOSE PHONES, SHE

8    WOULD DEDUCT ALL THOSE COSTS, ALL OF THE SALARIES, ALL OF THE

9    MARKETING AND SALES COSTS.

10        BUT SHE WOULD SAY THAT IF THE SALES PERSON SOLD THESE

11   PHONES AND ONE OTHER MODEL OF PHONE, THEN SHE WOULD DEDUCT NONE

12   OF THOSE COSTS.  UNDER HER METHOD, WE DON'T GET A DEDUCTION FOR

13   ANY OF THAT IN CALCULATING THE PROFITS.

14        THERE'S NO DISPUTE THAT THIS WAS MONEY THAT WAS ACTUALLY

15   SPENT.  AND THIS WAS KIND OF REMARKABLE, BECAUSE FIGURING OUT

16   HOW TO SHARE COST ACROSS PRODUCTS TO GENERATE REVENUE IS

17   SOMETHING THAT ACCOUNTANTS LIKE MS. DAVIS DO EVERY SINGLE DAY.

18        APPLE ITSELF DOES THIS IN THE ORDINARY COURSE OF BUSINESS

19   WHEN IT TRIES TO FIGURE OUT HOW PROFITABLE ITS PROFITS ARE.

20        AND MS. DAVIS ACKNOWLEDGED THIS.  THERE'S A -- IF WE GO TO

21   SLIDE 34, SHE TESTIFIED, YES, THERE IS A WAY TO DO THIS.  THIS

22   IS A WAY TO ALLOCATE COSTS ACROSS PRODUCTS.

23        BUT SHE SAID SHE DIDN'T DO IT, AND SHE ACKNOWLEDGED THAT

24   APPLE ACTUALLY DOES THIS ITSELF.  BUT SHE WOULDN'T DO IT.  IN

25   FIGURING OUT THE PROFITABILITY OF THE SAMSUNG PRODUCTS.

1        WE HAVE A CONFIDENTIAL DOCUMENT THAT CANNOT BE SHOWN TO

2   THE AUDIENCE, AND I UNDERSTAND WE HAVE A WAY OF DISPLAYING

3   THAT, BUT IT'S AN INTERNAL APPLE -- WE WON'T -- IT'S AN

4   INTERNAL APPLE DOCUMENT WHERE THEY SHOW THIS TYPE OF INTERNAL

5   PRODUCT LINE ACCOUNTING WHICH APPLE ITSELF DOES.

6        IF MS. DAVIS HAD SUBTRACTED THE COSTS SHE WOULD HAVE, SHE

7   WOULD HAVE FOUND THAT THE ENTIRE PROFIT ON THE WHOLE PHONES WAS

8   NOT 1.1 BILLION.  IT WOULD BE $370 MILLION.

9        BUT YOU DON'T STOP THERE, BECAUSE THE ARTICLE OF

10  MANUFACTURE TO WHICH THE PHONES ARE APPLIED IS NOT THE ENTIRE

11  PHONE, BUT THE SEPARATELY MANUFACTURED GLASS FRONT FACE, BEZEL,

12  AND DISPLAY SCREEN TO WHICH THOSE DESIGNS HAVE BEEN APPLIED,

13  AND THERE'S A WAY TO CALCULATE THE PROFITS ON COMPONENTS.  IT'S

14  THE COMPONENT COST APPROACH.

15       MS. DAVIS, THEIR EXPERT, ACKNOWLEDGED YOU COULD DO THIS.

16       BUT SHE SAID SHE DIDN'T DO IT.

17       YOU'LL MEET OUR EXPERT, MR. WAGNER.

18       IF WE CAN LOOK AT SLIDE 35.

19       HE CALCULATED THE PROFITS ON THE INDIVIDUAL COMPONENTS TO

20  WHICH THE DESIGNS WERE APPLIED.  HE'LL EXPLAIN THE METHOD.  HE

21  STARTED WITH THE GROSS REVENUES, THEN HE REMOVES THE COSTS AND

22  EXPENSES TO COME UP WITH THE PROFITS ON THE ENTIRE PHONE.

23       AND THEN, JUST LIKE APPLE AND SAMSUNG DO, HE DEDUCTS

24  ADVERTISING COSTS, MARKETING COSTS, R&D COSTS.  MS. DAVIS IS

25  THE ONLY ONE WHO DIDN'T DO THAT.

1          AND THEN HE USES THE COMPONENT COST APPROACH TO FIGURE

2     OUT, TO PRORATE THAT AND FIGURE OUT WHAT THE PROFITS ARE ON

3     THESE INDIVIDUAL COMPONENTS.

4          IT'S NO SURPRISE THAT THE AMOUNT OF PROFIT ALLOCATED TO

5     THE COMPONENTS, WHEN YOU DO THE PROPER DEDUCTION OF THE COSTS

6     THAT SHOULD BE DEDUCTED THAT MS. DAVIS DID NOT DO, AND THEN YOU

7     ALLOCATE THAT TO THE COMPONENTS TO WHICH APPLE'S DESIGNS WERE

8     APPLIED, YES, IT'S A MUCH LOWER NUMBER.  THE NUMBER IS

9     $28,085,061.

10         I'M NOT GOING TO TALK TO YOU MUCH ABOUT THE UTILITY

11    PATENTS.  APPLE IS SEEKING $5 MILLION ON ITS OWN CALCULATIONS

12    FOR THOSE UTILITY PATENTS.  BUT I WANT TO TALK TO YOU ABOUT

13    THIS ALLEGATION AND THE DOCUMENT THAT MR. LEE QUOTED TO YOU

14    SUGGESTING THAT SAMSUNG WAS DELIBERATELY COPYING APPLE'S

15    PRODUCTS.

16         YOU REMEMBER MR. LEE PULLED A COUPLE OF PHRASES FROM A

17    PRESENTATION IN FEBRUARY OF 2010 BY THE HEAD OF SAMSUNG'S

18    MOBILE DIVISION, MR. SHIN, AND YOU HEARD MR. LEE QUOTE LANGUAGE

19    WHERE MR. SHIN SAID THAT WHEN SAMSUNG'S USER INTERFACE IS

20    COMPARED TO THE IPHONE, IT'S THE DIFFERENCE BETWEEN HEAVEN AND

21    EARTH, AND THAT IT'S A CRISIS OF DESIGN.  YOU REMEMBER THAT

22    PHRASE.

23         WHAT MR. LEE DIDN'T TELL YOU IS THAT IN THAT VERY

24    DOCUMENT, MR. SHIN WAS REFERRING TO A SAMSUNG PHONE CALLED THE

25    OMNIA.  HERE'S A PICTURE OF IT.  MR. LEE DID NOT TELL YOU THAT

1    THE OMNIA USED THE MICROSOFT WINDOWS OPERATING SYSTEM FOR

2    PHONES THAT WAS NOT SUCCESSFUL.  WHO EVEN REMEMBERS ANYMORE

3    THAT THERE EVER WAS A WINDOWS PHONE OPERATING SYSTEM?  IT WAS A

4    FLOP AND MICROSOFT DISCONTINUED IT.

5        BUT SAMSUNG HAD USED IT IN THE OMNIA, AND YOU'LL SEE IN

6    THAT DOCUMENT THAT MR. SHIN WAS CRITICIZING THAT MICROSOFT

7    OPERATING SYSTEM, THE UX.

8        AND IN THAT DOCUMENT, HE SAID THE DIFFERENCE BETWEEN

9    WINDOWS AND THE APPLE OPERATING SYSTEM WAS THE DIFFERENCE

10   BETWEEN HEAVEN AND EARTH.

11       HE WASN'T TALKING ABOUT BEZELS.  HE WASN'T TALKING ABOUT

12   SCREENS.  HE WASN'T TALKING ABOUT ANYTHING OTHER THAN THE UX,

13   THE USER EXPERIENCE, THE OPERATING SYSTEM.

14       HE ALSO DIDN'T TELL YOU THAT THIS PRESENTATION WAS IN

15   FEBRUARY OF 2010 BEFORE SAMSUNG SWITCHED ALL ITS PHONES TO THE

16   MOST FAMOUS OPERATING SYSTEM IN THE WORLD NOW, ANDROID.

17       MR. LEE ALSO TOLD YOU THAT IN THE SAME PRESENTATION,

18   MR. SHIN SAID THAT U.S. PHONE CARRIERS WERE TELLING HIM TO

19   "MAKE SOMETHING LIKE THE IPHONE."

20       DO YOU REMEMBER THAT?

21       BUT, AGAIN, MR. LEE LEFT OUT OF THAT DOCUMENT SOMETHING

22   VERY, VERY IMPORTANT.  MR. SHIN, IN THAT DOCUMENT, SAID SAMSUNG

23   SHOULD NOT DO WHAT THE CARRIERS WERE TELLING IT TO DO.  HE

24   SAID, "A COMPANY GOES OUT OF BUSINESS BECAUSE OF ITS OWN

25   SUCCESS FACTORS.  SAMSUNG'S SUCCESS FACTORS ARE DILIGENCE,

1    SINCERITY, AND ACCOUNTING IN AN EXEMPLARY MANNER.  THE KIND

2    THAT SAYS YES TO WHATEVER THE CARRIER WANTS, THAT'S A SHORTCUT

3    TO GOING OUT OF BUSINESS."

4         MR. LEE LEFT YOU WITH THE IMPRESSION THAT HE WAS SAYING

5    MAKE SOMETHING LIKE THE IPHONE WHEN ACTUALLY, IF YOU LOOK AT

6    THE DOCUMENT, HE WAS SAYING WE CAN'T GIVE -- THAT'S WHAT THE

7    CARRIERS ARE SAYING.  WE CAN'T DO THAT.  WE NEED TO FOCUS --

8    AND YOU'LL SEE IT IN THE DOCUMENT, WE HAVE IT -- WE NEED TO

9    FOCUS ON WHAT WE DO BEST, THE SCREENS AND OUR DISPLAYS.  HE

10   SAYS, SAYING YES TO WHATEVER THE CARRIER WANTS, MAKING

11   SOMETHING LIKE THE IPHONE IS A SHORTCUT TO GOING OUT OF

12   BUSINESS.

13        HE DESCRIBES -- HE SAYS, INSTEAD WE NEED TO FOCUS ON OUR

14   MOST IMPORTANT ASSET, WHICH IS THE SCREEN SIZE, AND WHAT

15   SAMSUNG DID WAS TO COMPETE WITH APPLE BY DOING THINGS LIKE

16   INCREASING THE SIZE OF ITS SCREENS, SOMETHING APPLE REFUSED AND

17   REFUSED TO DO UNTIL THE PUBLIC SPOKE AND DEMANDED LARGER

18   SCREENS.

19        THIS IS AN EXAMPLE ABOUT WHY WE REALLY HOPE YOU FOLKS, WE

20   ASK YOU FOLKS TO KEEP AN OPEN MIND UNTIL YOU'VE HEARD ALL THE

21   EVIDENCE.

22        APPLE'S CLAIM OF COPYING HERE IS JUST IN THIS CASE TO

23   DISTRACT AND INFLAME YOU AND TO MAKE YOU ANGRY AT SAMSUNG AND

24   TO CAUSE YOU TO WANT TO PUNISH US AND TO DISTRACT YOU FROM THE

25   FACT, YES, WE WERE FOUND TO INFRINGE.  YES, WE OWE PROFITS.

1       BUT THE LAW -- YOU WILL HEAR, WE OWE PROFITS ON THE

2  ARTICLES OF MANUFACTURE TO WHICH APPLES DESIGNS WERE APPLIED,

3  AND YOU DETERMINE WHAT THAT ARTICLE OF MANUFACTURE IS BY

4  LOOKING AT THOSE FOUR FACTORS THAT MR. LEE DIDN'T TALK TO YOU

5  ABOUT.

6       AND WE'LL ASK YOU TO PLEASE LISTEN TO THE EVIDENCE CLOSELY

7  AND FOCUS ON WHAT'S IN THERE, WHAT'S IN THOSE FOUR FACTORS AND

8  WHAT ISN'T.

9       AND IF -- AND IF YOU FOCUS ON THE EVIDENCE AND YOU CAN

10 KEEP AN OPEN MIND, I'M CONFIDENT AT THE END THAT YOU'LL BE ABLE

11 TO RETURN A VERDICT, A DAMAGES VERDICT FOR SURE, BUT MORE ALONG

12 THE LINES OF WHAT SAMSUNG IS TALKING ABOUT.

13      THANK YOU VERY MUCH.

14           THE COURT:  CALL YOUR FIRST WITNESS, PLEASE.

15           MR. LEE:  YOUR HONOR, APPLE CALLS GREG JOSWIAK.

16           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17      **(PLAINTIFF'S WITNESS, GREG JOSWIAK, WAS SWORN.)**

18           THE WITNESS:  I DO.

19           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

20      AND ONCE YOU'RE SEATED, IF YOU COULD STATE AND THEN SPELL

21 YOUR FULL NAME FOR THE RECORD.

22           THE WITNESS:  MY NAME IS GREG JOSWIAK.  MY LAST NAME

23  IS SPELLED J-O-S, AS IN SAM, W-I-A-K.  FIRST NAME GREG,

24  G-R-E-G.

25           MR. LEE:  YOUR HONOR, TWO THINGS.  WE JUST WANTED TO

1    MAKE SURE ALL THE FACT WITNESSES LEAVE THE COURTROOM.

2            THE COURT:  OH, YES.  ARE THERE ANY FACT WITNESSES?

3    THEY SHOULD LEAVE THE COURTROOM, PLEASE.  EXPERTS CAN REMAIN.

4        ALL RIGHT.  YOUR TIME IS NOW --

5            MR. LEE:  AND, YOUR HONOR, AT THIS TIME WE WOULD

6    OFFER THE EXHIBITS THAT ARE --

7            THE COURT:  WAIT, WAIT.  THIS IS GOING TO BE BILLED

8    ON YOUR TIME.  SO IT'S 11:47.  GO AHEAD, PLEASE.

9            MR. LEE:  WE WOULD OFFER THE EXHIBITS ON EXHIBIT A

10   MARKED FOR IDENTIFICATION, WHICH ARE THE JOINT EXHIBITS THE

11   PARTIES HAVE AGREED TO.

12           THE COURT:  ALL RIGHT.  THOSE ARE ADMITTED.

13       (JOINT EXHIBITS 1000, 1001, 1002, 1003, 1007, 1010, 1011,

14   1012, 1013, 1015, 1016, 1017, 1019, 1020, 1025, 1026,

15   1027, 1031, 1032, 1033, 1034, 1035, 1041, 1042, 1043, 5000,

16   5001, 5002, 5003, 5004, 5005, 5006, 5007, 5008, 5009, 5010,

17   5011, 5012, 5013, 5014, AND 5015 WERE ADMITTED IN EVIDENCE.)

18                         **DIRECT EXAMINATION**

19   BY MR. LEE:

20   Q.   GOOD MORNING.

21   A.   GOOD MORNING.

22   Q.   WOULD YOU INTRODUCE YOURSELF TO THE LADIES AND GENTLEMEN

23   OF THE JURY.

24   A.   HI.  MY NAME IS GREG JOSWIAK.  PEOPLE CALL ME JOZ.  SO YOU

25   MAY HEAR THAT THROUGHOUT THE DAY.  I'M VICE PRESIDENT OF

1       MARKETING AT APPLE.

2       Q.   FOR HOW LONG HAVE YOU WORKED AT APPLE?

3       A.   NEXT MONTH I'M GOING TO CELEBRATE BY 32ND ANNIVERSARY.

4       Q.   AND WHAT POSITIONS HAVE YOU HELD AT APPLE?

5       A.   I GOT HIRED AT APPLE RIGHT OUT OF COLLEGE.  I GRADUATED

6       FROM THE UNIVERSITY OF MICHIGAN WITH A COMPUTER ENGINEERING

7       DEGREE.

8            I STARTED AND KIND OF WORKED MY WAY UP.  I STARTED IN TECH

9       SUPPORT, WORKED THERE FOR A COUPLE YEARS, STARTED MANAGING THAT

10      ORGANIZATION.

11           THEN I MOVED INTO OUR DEVELOPER ORGANIZATION AND WAS

12      MANAGING INFORMATION, BOTH TECHNICAL AND MARKETING.

13           AND THEN I WENT TO OUR THIRD PARTY DEVELOPERS, PEOPLE WHO

14      PROGRAM FOR THE MAC.

15           AND THEN WELL OVER 20 YEARS AGO, I MOVED INTO PRODUCT

16      MARKETING, AND I'VE HAD VARIOUS ROLES WITHIN PRODUCT MARKETING.

17      Q.   AND WHAT IS THE DISCIPLINE OR THE FIELD OF PRODUCT

18      MARKETING?

19      A.   IT'S DIFFERENT AT EVERY COMPANY.  FOR APPLE, PRODUCT

20      MARKETING IS A COMBINATION OF PRODUCT MANAGEMENT AND PRODUCT

21      MARKETING.  SO WE'RE THE FOLKS THAT WORK WITH OUR EXECUTIVE

22      TEAM, OUR DESIGNERS AND ENGINEERS, DECIDING WHAT ARE THE

23      PRODUCTS WE'RE GOING TO CREATE, WHAT ARE THE FEATURES WE WANT

24      TO HAVE, PRICES WE WANT TO HIT, AND THEN YOU WORK WITH THE

25      DESIGNERS AND ENGINEERS ON THE DEVELOPMENT OF THOSE PRODUCTS

1        BRINGING A MARKET PERSPECTIVE INTO THAT PROCESS.

2              AND THEN IN THE SECOND PART, THE PRODUCT MARKETING PART,

3        WE'RE BRINGING -- WE'RE HELPING LAUNCH PRODUCTS.  WE'RE TELLING

4        THE PRODUCT'S STORY AND SO IN THAT WAY, WE'RE KIND OF APPLE'S

5        VOICE BACK TO THE MARKET.

6        Q.   SO IN THE FIRST PART, YOU'RE INVOLVED IN DEVELOPMENT OF

7        NEW PRODUCTS?

8        A.   THAT'S CORRECT.

9        Q.   AND IN THE SECOND PART, YOU'RE INVOLVED IN MARKETING THOSE

10       PRODUCTS TO THE MARKETPLACE?

11       A.   THAT'S CORRECT.

12       Q.   COULD YOU DESCRIBE TO US IN GENERAL, WHEN APPLE DECIDES TO

13       MAKE A NEW PRODUCT, WHAT IS THE DEVELOPMENT PROCESS AT APPLE

14       FOR DEVELOPING THAT NEW PRODUCT?

15       A.   WELL, FIRST THING, WE WANT TO DECIDE WHAT WE WANT TO

16       BUILD, AND ONCE WE DO, IT REALLY ALL STARTS WITH DESIGN.  WE

17       WORK WITH OUR DESIGN TEAM AND THEY START THE DESIGN PROCESS.

18       Q.   AND DOES APPLE HAVE A TEAM THAT'S RESPONSIBLE FOR PRODUCT

19       DESIGN?

20       A.   WE DO.  THEY'RE OUR INDUSTRIAL DESIGN TEAM, INDUSTRIAL

21       DESIGN, AND WE CALL THEM ID FOR SHORT.

22       Q.   HOW LONG HAS APPLE HAD AN INDUSTRIAL DESIGN TEAM?

23       A.   WELL, I'VE BEEN THERE FOR A LONG TIME, AND CERTAINLY AS

24       LONG AS I CAN REMEMBER.

25       Q.   WHAT IS THE ROLE OF THE DESIGN TEAM?

1      A.   THEY'RE THE TEAM THAT IS -- THEY'RE ACTUALLY KIND OF THIS

2      WONDERFUL COMBINATION OF BOTH DESIGNERS AND TECHNICAL FOLKS

3      BECAUSE AS YOU'VE HEARD US SAY BEFORE, DESIGN ISN'T JUST HOW IT

4      LOOKS, IT'S HOW IT WORKS.  AND THEY COME UP WITH THESE

5      BEAUTIFUL DESIGNS THAT WILL BE OUR HERO PRODUCTS.

6      Q.   DID YOU EVER WORK WITH APPLE'S FOUNDER, STEVE JOBS?

7      A.   I DID, QUITE CLOSELY.

8      Q.   DID HE INFLUENCE APPLE'S APPROACH TO DESIGN?

9      A.   VERY MUCH SO.  HE WAS A VERY, VERY, VERY BIG BELIEVER IN

10     DESIGN, AND DESIGN IS REALLY -- AGAIN, HE CREATED THAT DNA OF

11     DESIGN BEING SO IMPORTANT TO THE COMPANY AND THAT ALL GREAT

12     PRODUCTS START WITH DESIGN.

13     Q.   BEFORE THE IPHONE, WERE THERE ANY PRODUCTS FOR WHICH APPLE

14     PAID PARTICULAR ATTENTION ON DESIGN?

15     A.   OH, ABSOLUTELY.  WE'VE HAD A HISTORY OF ICONIC PRODUCTS

16     AND, AGAIN, THAT'S SOMETHING THAT STEVE HAD CREATED THE DNA OF

17     THE COMPANY, AND CERTAINLY WHEN HE RETURNED TO THE COMPANY IN

18     1997, HE BROUGHT EVEN MORE VIGOR TO.

19     Q.   THERE SHOULD BE A NOTEBOOK BEFORE YOU.  DO YOU HAVE IT?

20     A.   I DO.

21     Q.   LET ME TURN YOU TO TAB 1 AND PUT ON THE SCREEN PDX 2.3.

22     A.   I SEE.

23     Q.   YOU CAN USE THE HARD COPY OR WHAT'S ON THE SCREEN.

24          THE CLERK:  IT'S ONLY ATTORNEY AND WITNESS AT THIS

25     POINT.

```
 1              MR. LEE:  YEAH.  SO WE NEED TO SWITCH BACK SO THE

 2    JURY CAN SEE.

 3              THE CLERK:  FOR THE JURY?

 4              MR. LEE:  OH, YOUR HONOR?

 5              THE COURT:  YES.

 6              MR. LEE:  I THINK YOU MAY HAVE TO DO IT.

 7              THE COURT:  I HAVE TO DO IT?

 8              MR. LEE:  I THINK -- OR MS. MASON.

 9              THE COURT:  MS. MASON CONTROLS THAT.  IS IT NOW ON?

10              THE CLERK:  IT SHOULD BE.

11              THE COURT:  IS IT ON THE PUBLIC SCREEN.

12              THE WITNESS:  NOW IT IS.

13              MR. LEE:  NOW IT IS.

14              THE COURT:  OKAY.

15    BY MR. LEE:

16    Q.   ALL RIGHT.  DO YOU HAVE IT?

17    A.   I SEE IT.

18    Q.   CAN YOU TELL US WHICH PRODUCTS APPLE GAVE PARTICULAR

19    ATTENTION TO THE ISSUE OF DESIGN?

20    A.   WELL, THIS IS SHOWING SOME OF OUR, AGAIN, INNOVATIVE,

21    ICONIC PRODUCTS THAT CERTAINLY DESIGN WAS A HUGE PART OF THEIR

22    SUCCESS.  THAT WAS THE ORIGINAL MAC IN 1984; IT WAS THE IMAC IN

23    1998, A YEAR AFTER STEVE HAD COME BACK; THE IPOD IN 2001; BOTH

24    OUR POWERBOOK AND MACBOOK PORTABLE COMPUTERS IN 2003 AND 2006;

25    AND, OF COURSE, THE IPHONE IN 2007.
```

1    Q.   AND SET ASIDE THE IPHONE FOR A SECOND.  WERE YOU INVOLVED

2    IN THE PRODUCT MARKETING ASPECTS OF ANY OF THESE EARLIER

3    PRODUCTS?

4    A.   YEAH, I WAS CERTAINLY INVOLVED VERY DIRECTLY IN THE IPOD,

5    THE POWERBOOK IN 2003, AND THE IPHONE IN 2007.

6    Q.   WOULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

7    WHAT WERE THE EVENTS THAT LED APPLE TO DECIDE TO DEVELOP A

8    SMARTPHONE?

9    A.   YEAH.  WE HAD BECOME QUITE SUCCESSFUL WITH OUR IPOD MUSIC

10   PLAYER AND ONE OF THE THINGS THAT WE KNEW WAS A GIGANTIC THREAT

11   TO THE MUSIC PLAYER, THE IPOD MUSIC PLAYER, WAS IN THE PHONE

12   GUYS COULD FIGURE OUT HOW TO CREATE A GREAT MUSIC EXPERIENCE ON

13   A PHONE.  WELL, THAT WOULD BE A BIG THREAT TO THE IPOD BECAUSE

14   WHO WOULD WANT TO CARRY TWO DEVICES IF YOU COULD JUST CARRY

15   ONE?

16       SO WE STUDIED THE PHONE MARKET A LOT, WE KEPT FOLLOWING

17   THAT MARKET.  AND THROUGH THAT PROCESS, WE DECIDED THAT WE

18   COULD MAKE A BETTER PHONE OURSELVES.

19   Q.   NOW, AT THE TIME THAT YOU MADE THIS DECISION, HAD APPLE

20   EVER SOLD A PHONE?

21   A.   NO, NEVER.

22   Q.   HAD APPLE BEEN A COMPUTER AND IPOD COMPANY?

23   A.   THAT IS CORRECT.

24   Q.   ALL RIGHT.  AND WHAT STEPS DID APPLE TAKE TO DEVELOP THE

25   PHONE?

1    A.   WELL, A LOT.  I MEAN, WE HAD TO INVENT A GREAT NUMBER OF

2    TECHNOLOGIES, INVENT A GREAT NUMBER OF NEW WAYS OF DOING THINGS

3    THAT JUST HADN'T BEEN DONE BEFORE BECAUSE WE WEREN'T TRYING TO

4    CREATE WHAT WAS ALREADY ON THE MARKET.  WE WERE TRYING TO

5    CREATE SOMETHING THAT WAS ENTIRELY NEW.

6    Q.   NOW, YOU WERE HERE FOR MR. QUINN'S OPENING THIS MORNING?

7    A.   I WAS, YEAH.

8    Q.   AND HE SUGGESTED THAT APPLE WAS CLAIMING IT THAT INVENTED

9    ALL SMARTPHONES.  HAS APPLE EVER MADE THAT CLAIM, THAT IT

10   INVENTED ALL SMARTPHONES?

11   A.   NO, NEVER.  SMARTPHONES EXISTED BEFORE WE CAME UP WITH THE

12   IPHONE.  WE JUST DID IT IN A UNIQUE WAY.

13   Q.   NOW, HOW LONG DID IT TAKE APPLE TO DEVELOP THE IPHONE?

14   A.   WELL, IT DEPENDS WHEN YOU START THE CLOCK, BECAUSE WE WERE

15   WORKING ON SO MANY OF THESE TECHNOLOGIES FOR USE.  FOR EXAMPLE,

16   MULTITOUCH, WE STARTED, YOU KNOW, BACK IN AT LEAST 2003, IF NOT

17   EARLIER.

18       WE FORMED A MORE -- YOU KNOW, THE BEGINNINGS OF A MORE

19   FORMAL PHONE EFFORT, IF YOU WILL, IN LATE 2004.

20   Q.   AND WHAT WAS THE GROUP WORKING ON AT THE POINT IN TIME

21   WHEN THEY DECIDED TO START DEVELOPING THE IPHONE?

22   A.   WELL, AGAIN, WE HAD THIS MULTITOUCH TECHNOLOGY.  AS I

23   SAID, WE HAD STUDIED THE PHONE MARKET, AND IT WAS STEVE WHO HAD

24   THE IDEA THAT WE COULD TAKE THIS INCREDIBLE MULTITOUCH

25   TECHNOLOGY THAT WE HAD AND APPLY IT TO A PHONE DESIGN AND HAVE

1      SOMETHING WHEN WE COMBINED IT WITH OTHER ELEMENTS OF OUR

2      DESIGN, WE WOULD HAVE SOMETHING THAT WOULD BE QUITE UNIQUE IN

3      THE MARKET.

4      Q.   OVER THE THREE- OR FOUR-YEAR PERIOD, APPROXIMATELY HOW

5      MUCH DID APPLE INVEST IN DEVELOPING THE IPHONE?

6      A.   CERTAINLY WELL OVER A BILLION DOLLARS, BUT THAT'S PROBABLY

7      A LIGHT ACCOUNTING BECAUSE WE WERE REALLY RISKING EVEN MORE.

8      WE PUT AN ALL HANDS ON DECK EFFORT TO MAKE THIS IPHONE.

9      Q.   WAS THE DECISION TO PURSUE THE IPHONE A RISKY DECISION FOR

10     THE COMPANY?

11     A.   IT WAS.  IT WAS HUGE BECAUSE WE WERE IN A MARKET TO, AS

12     YOU NOTED BEFORE, WE HAD NEVER SOLD A PHONE AND THIS WAS A

13     MARKET OF ESTABLISHED PLAYERS WHO HAD BEEN IN THE PHONE MARKET

14     FOR A LONG TIME.  AND WE WERE GOING TO DO SOMETHING IN A

15     RADICALLY DIFFERENT WAY THAT HAD BEEN DONE BEFORE, AND THERE'S

16     A RISK THAT GOES WITH THAT.

17          ON TOP OF THAT, AS I SAID, WE TOOK ELEMENTS FROM ALL OVER

18     OUR DEVELOPMENT AND ENGINEERING COMMUNITY AND BROUGHT THEM OFF

19     OF OUR PRODUCTS TO CREATE THE IPHONE.

20          SO WE WERE REALLY RISKING EVERYTHING THAT WAS MAKING APPLE

21     SUCCESSFUL AT THAT TIME ON THIS BIG EFFORT FOR THE IPHONE AND

22     IF IT WASN'T SUCCESSFUL, WE REALLY WERE BETTING THE COMPANY.

23     Q.   SO LET ME TAKE THE CLOCK -- WIND THE CLOCK BACK FOR US.

24          DO YOU REMEMBER WHAT PHONES LOOK LIKE BEFORE THE IPHONE

25     CAME TO MARKET?

1    A.   I DO.

2    Q.   AND WHAT TYPES OF CHARACTERISTICS DID THEY HAVE?

3    A.   WELL, THEY WERE ALL DIFFERENT SHAPES AND SIZES.  THERE

4    WERE ONES THAT WERE FLIP PHONES, THERE WERE ONES THAT WERE

5    SHAPED LIKE CANDY BARS, THERE WERE SLIDERS THAT HAD A KEYBOARD

6    POP OUT.  THERE WERE CERTAINLY THE BEGINNINGS OF SMARTPHONES.

7         GENERALLY THEY HAD THE FRONT HALF WAS COVERED ON A SMALL

8    DISPLAY, AND THE OTHER HALF WAS A QWERTY, A CHICLET KEYBOARD.

9    BUT THERE WERE CERTAINLY ALL SORTS OF DIFFERENT DESIGNS.

10        MR. LEE:  YOUR HONOR, MAY I APPROACH THE WITNESS?

11        THE COURT:  GO AHEAD, PLEASE.

12   BY MR. LEE:

13   Q.   LET ME GIVE YOU A FEW PHYSICAL EXHIBITS.  I'M GOING TO

14   HAVE YOU TALK ABOUT THEM.  YOU CAN JUST HOLD THEM UP FOR THE

15   JURY.

16   A.   OKAY.

17   Q.   YEAH.

18   A.   YEAH, SO THIS IS MORE THAT CANDY BAR DESIGN WE TALKED

19   ABOUT.

20        THE COURT:  ARE THESE ADMITTED EXHIBITS?

21        MR. LEE:  THESE ARE PX 32, PX 125, PX 152, AND

22   JX 1087, WHICH WE WOULD OFFER INTO EVIDENCE.

23        THE COURT:  ANY OBJECTION?

24        MR. PRICE:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  THEY'RE ADMITTED.

1            (PLAINTIFF'S EXHIBITS 32, 125, 152, AND JOINT EXHIBIT 1087

2     WERE ADMITTED IN EVIDENCE.)

3            THE COURT:  GO AHEAD, PLEASE.

4     BY MR. LEE:

5     Q.   DO YOU HAVE THEM?  NOW THAT YOU HAVE THEM BEFORE YOU,

6     COULD YOU DESCRIBE JUST GENERALLY THE CHARACTERISTICS OF THE

7     PHONES THAT WERE BASICALLY DOMINATING THE MARKETPLACE BEFORE

8     THE IPHONE CAME TO MARKET?

9     A.   YEAH.  AGAIN, THIS WOULD BE MORE OF A CANDY BAR STYLE

10    PHONE, AGAIN, A SMALL KEYPAD, SMALL SCREEN, A CAMERA CERTAINLY.

11    A LOT OF FEATURES WE ENDED UP, QUITE HONESTLY, WITH THE IPHONE

12    PACKAGED IN A COMPLETELY DIFFERENT WAY.

13           THIS WAS THE BEGINNINGS OF A SMARTPHONE.  THIS WAS THE

14    MOST POPULAR AT THE TIME.  THIS WAS A BLACKBERRY.  THEY'RE A

15    SMALL KEYPAD, OR KEYBOARD, I SHOULD SAY, AND THE SMALL SCREEN.

16    AGAIN, THIS IS, YOU KNOW, ONE OF THE THINGS, OF COURSE, WE WERE

17    SEEKING TO CHANGE IS NOT HAVE A KEYBOARD THERE ALL THE TIME,

18    BUT HAVE A KEYBOARD THERE WHEN YOU NEED IT TO BE (INDICATING).

19           THIS WAS SAMSUNG'S VERSION OF A SIMILAR DESIGN.

20    Q.   WHAT WAS APPLE TRYING TO ACHIEVE WITH ITS NEW DESIGN?

21    A.   WELL, AGAIN, WE WERE TRYING TO DO SOMETHING THAT WAS

22    COMPLETELY DIFFERENT THAN WHAT HAD EXISTED, AND ONE OF THE

23    THINGS THAT WE WANTED TO DO WAS CERTAINLY HAVE A BEAUTIFUL

24    PRODUCT.  THAT WAS IMPORTANT.  WE DIDN'T THINK ANY OF THESE

25    WERE BEAUTIFUL PRODUCTS (INDICATING).

```
 1          WE WANTED TO HAVE SOMETHING THAT YOU COULD INTERACT WITH

 2     ENTIRELY ON THE FRONT FACE AND HAVE THIS SOFTWARE CONTROL WHAT

 3     WAS ON THE SCREEN AND HAVE THE THINGS THAT YOU NEED AT THE TIME

 4     APPEAR, BUT THE THINGS THAT YOU DIDN'T NEED, NOT THERE.

 5          FOR EXAMPLE, THAT KEYBOARD.  WHY SHOULD A KEYBOARD HAVE TO

 6     OCCUPY HALF THAT PRODUCT IF YOU ONLY USE THAT KEYBOARD A

 7     CERTAIN AMOUNT OF TIME.  SO WHY NOT JUST PRESENT THE USER WITH

 8     A KEYBOARD WHEN IT'S NEEDED AND HAVE IT GO AWAY WHEN IT'S NOT

 9     BEING USED FOR OTHER THINGS.

10          MR. LEE:  YOUR HONOR, MAY I APPROACH WITH ANOTHER

11     PHYSICAL EXHIBIT.

12          THE COURT:  GO AHEAD, PLEASE.

13          MR. LEE:  THIS IS JX 1000, WHICH IS ALREADY IN

14     EVIDENCE.

15     Q.   USING JX 1,000, WOULD YOU EXPLAIN TO THE JURY WHAT THE

16     DESIGN FEATURES THAT APPLE INCORPORATED INTO THE IPHONE?

17     A.   THIS IS AN APPLE IPHONE 3G.  THIS IS OUR SECOND IPHONE.

18     SO, AGAIN, YOU SEE THAT WE HAVE THE EDGE TO EDGE GLASS FRONT,

19     BLACK FACE, CERTAINLY THE BEZEL THAT GOES AROUND.  THIS ONE IS

20     NOT ON THE INTERFACE.  AGAIN, COMPLETELY FEELS GREAT IN YOUR

21     HAND, BEAUTIFUL PHONE.  YOU KNOW, EVEN BEAUTIFUL FROM THE SIDE,

22     WHICH WAS QUITE -- FOR ITS TIME, IT WAS QUITE GORGEOUS.

23     Q.   NOW, THE EARLIER PHONES COULD DO THINGS LIKE MAKE CALLS;

24     CORRECT?

25     A.   THAT'S CORRECT.
```

1    Q.   TEXT MESSAGES; CORRECT?

2    A.   CORRECT.

3    Q.   DO SOME BROWSING ON THE INTERNET; CORRECT?

4    A.   CORRECT.

5    Q.   ALL RIGHT.

6    A.   TAKE PICTURES.  THERE WERE A BUNCH OF THINGS.

7    Q.   WHAT DID THE DESIGN DO OF THE APP PHONE FOR ALL OF THOSE

8    FEATURES?

9    A.   YEAH.  IT BROUGHT IT ALL TOGETHER; RIGHT?  WE DID IT IN A

10   COMPLETELY DIFFERENT WAY, A UNIQUE WAY AS CERTAINLY I'M SURE

11   WE'LL TALK ABOUT MORE.

12   Q.   YOU KNOW THE TERM GRAPHICAL USER INTERFACE?

13   A.   I DO INDEED.

14   Q.   WHAT IS THE RELATIONSHIP BETWEEN GRAPHICAL USER INTERFACE

15   AND THE REST OF THE PRODUCT?

16   A.   IT'S HOW YOU INTERACT WITH THE DEVICE USING GRAPHICAL

17   ELEMENTS THAT ARE DISPLAYED ON THE SCREEN SO THAT YOU CAN, IN

18   OUR CASE, FOR EXAMPLE, TAP ON AN ICON AND HAVE IT OPEN AN APP.

19   Q.   NOW, WHEN A CONSUMER BUYS AN IPHONE OR BOUGHT AN IPHONE,

20   DOES IT HAVE TO INSTALL THE GRAPHICAL USER INTERFACE?

21   A.   THAT'S CORRECT.  YOU TURN IT ON AND IT'S THERE.

22   Q.   CAN THEY REMOVE THE GRAPHICAL USER INTERFACE?

23   A.   NO.

24   Q.   IN MAKING THE DESIGN OF THE IPHONE A HIGH PRIORITY, DID

25   YOU ENCOUNTER ANY CHALLENGES?

1     A.   OH, MORE THAN WE COULD PROBABLY EVER COUNT.

2     Q.   ALL RIGHT.

3     A.   I MEAN, IT WAS -- WE WERE INVENTING SO MANY THINGS, OUR

4     DESIGNERS, OUR ENGINEERS WERE HAVING TO OVERCOME ALL KINDS OF

5     WAYS TO FIGURE OUT HOW TO DO THINGS, ESPECIALLY IN THIS WORLD

6     IN WHICH YOU INTERACT WITH JUST THE FRONT FACE.

7     Q.   NOW, YOU WERE HERE WHEN MR. QUINN GAVE HIS OPENING AND

8     TALKED ABOUT CERTAIN COMPONENTS OF THE IPHONE?

9     A.   UM-HUM.

10    Q.   LET ME ASK YOU THIS:  DOES APPLE SELL, OR HAS IT EVER

11    SOLD, GLASS FRONT FACES SEPARATELY FROM THE COMPLETE PHONE?

12    A.   NO.

13    Q.   HAS IT EVER SEPARATELY SOLD BEZELS SEPARATE FROM THE

14    PHONE?

15    A.   NO.

16    Q.   HAS IT EVER SOLD DISPLAY SCREENS SEPARATELY FROM THE

17    PHONE?

18    A.   NO.

19    Q.   COULD THE GLASS FRONT FACE OF THE IPHONE, THE IPHONE 3G,

20    3GS, AND 4 BE USED SEPARATELY FROM THE PHONE?

21    A.   NO.

22    Q.   COULD THE BEZEL OF ANY OF THOSE PHONES BE USED SEPARATELY

23    FROM THE PHONE?

24    A.   NO.

25    Q.   COULD THE DISPLAY SCREEN BE USED SEPARATELY FROM THE

1    PHONE?

2    A.   NO, OF COURSE NOT.

3    Q.   IF A CUSTOMER TRIED TO DISASSEMBLE IT THE WAY THAT

4    MR. QUINN HAD ON THE SCREEN, WOULD YOU TELL THE LADIES AND

5    GENTLEMEN OF THE JURY, WHAT WOULD THAT DO TO THE WARRANTY FOR

6    THE PHONE?

7    A.   WE DIDN'T DESIGN IT TO BE DISASSEMBLED BY A CONSUMER, SO

8    IT WOULD VOID THE WARRANTY, AND QUITE HONESTLY, THEY WOULD

9    PROBABLY BREAK THE IPHONE.

10   Q.   IT WOULD VOID THE WARRANTY?

11   A.   UM-HUM.

12        MR. LEE:  YOUR HONOR, IT'S THE NOON HOUR.  DO YOU

13   WANT ME TO STOP HERE?

14        THE COURT:  WHAT WAS JX 10887.  I DON'T SEE THAT ON

15   THE LIST, OR DID I GET THAT NUMBER WRONG?

16        MR. LEE:  LET ME CHECK.  IT'S THE LG CHOCOLATE.  IT'S

17   RIGHT HERE (INDICATING).

18        THE COURT:  ALL RIGHT.  I DON'T SEE THAT ON THE JOINT

19   EXHIBIT LIST, SO YOU'LL HAVE TO SUPPLEMENT.

20        MR. LEE:  I'LL OFFER IT AT THIS POINT.

21        THE COURT:  IT'S BEEN ADMITTED.  THAT'S 10887.

22        MR. SABRI:  YOUR HONOR, IT'S ON THE PLAINTIFF'S

23   EXHIBIT LIST.  IT JUST HAD THE JX NUMBER BECAUSE IT'S FROM THE

24   2012 ONE.

25        THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND TAKE OUR

1    LUNCH BREAK.  IT'S 12:01.  ACTUALLY, WE'LL SEE YOU BACK AT

2    1:05.

3          THANK YOU.  DO NOT RESEARCH OR DISCUSS THE CASE.  THANK

4    YOU FOR YOUR PATIENCE AND SERVICE.

5          AND YOU MAY STEP DOWN DURING THE BREAK.

6          (JURY OUT AT 12:02 P.M.)

7             THE COURT:  ALL RIGHT.  I HAD THE NUMBER WRONG.  I

8    HAD 10887, BUT IT'S 1087, CORRECT?

9             MR. SABRI:  THAT'S RIGHT, YOUR HONOR.

10            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  LET'S TAKE

11   OUR BREAK NOW.

12            MR. LEE:  THANK YOU.

13         (THE LUNCH RECESS WAS TAKEN FROM 12:03 P.M. UNTIL

14   1:08 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1                         **AFTERNOON SESSION**

2          (JURY OUT AT 1:08 P.M.)

3              THE COURT:  TWO JURORS ARE IN THE RESTROOM, SO IT'LL

4    BE JUST A MINUTE.

5          (PAUSE IN PROCEEDINGS.)

6          (JURY IN AT 1:09 P.M.)

7              THE CLERK:  PLEASE BE SEATED.

8              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

9    SEAT.

10         THE TIME IS 1:09 -- 1:10.

11         GO AHEAD, PLEASE.

12   BY MR. LEE:

13   Q.   GOOD AFTERNOON, MR. JOSWIAK.  LET ME TURN TO A SLIGHTLY

14   DIFFERENT SUBJECT, OR POINT IN TIME.

15         WHEN WAS THE IPHONE FIRST PUBLICLY INTRODUCED?

16   A.   IT WAS FIRST PUBLICLY INTRODUCED IN EARLY JANUARY OF 2007.

17   Q.   AFTER THE IPHONE WAS INTRODUCED, DID IT ATTRACT ANY

18   ATTENTION FROM REVIEWERS AND COMMENTATORS?

19   A.   A LOT.  A LOT.

20   Q.   TURN, IF YOU WOULD, IN THE NOTEBOOK BEFORE YOU TO TAB 3,

21   WHICH IS PLAINTIFF'S EXHIBIT 133.

22   A.   I SEE IT.

23   Q.   DO YOU HAVE THAT BEFORE YOU?

24   A.   I DO.

25   Q.   WHAT IS IT?

1    A.   THIS IS A REVIEW FROM "THE NEW YORK TIMES" FROM A VERY

2    HIGHLY RESPECTED REVIEWER, DAVID POGUE.  THIS IS HIS FIRST

3    IMPRESSION FROM HAVING SEEN THAT IPHONE WHEN WE INITIALLY

4    UNVEILED IT IN SAN FRANCISCO.

5         MR. LEE:  YOUR HONOR, IF I CAN CLARIFY, THE NOTEBOOK

6    THAT I'M REFERRING TO IS THE DIFFERENT FROM THE JUROR'S

7    NOTEBOOKS.  IT'S THE WITNESS NOTEBOOK THAT HE'S LOOKING AT.

8         WE OFFER PX 133, YOUR HONOR.

9         THE COURT:  ALL RIGHT.  IT'S -- ANY OBJECTION?  IT'S

10   NOT BEING OFFERED FOR ITS TRUTH.

11        MR. QUINN:  I WAS JUST GOING TO SAY, FOR THE LIMITED

12   PURPOSE AND NOT THE TRUTH, FINE.

13        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

14        GO AHEAD, PLEASE.

15        (PLAINTIFF'S EXHIBIT 133 WAS ADMITTED IN EVIDENCE.)

16        MR. LEE:  COULD WE HAVE PX 133 ON THE SCREEN.

17   Q.   WHAT WAS THE REVIEWER?

18   A.   DAVID POGUE, AGAIN, A VERY, VERY FAMOUS REVIEWER.

19   Q.   AND LOOKING AT THE HIGHLIGHTED PORTION, WHAT DOES HE SAY

20   ABOUT THE IPHONE UPON ITS PROCEED INDUCTION?

21   A.   HE SAYS, "REMEMBER THE FAIRY GODMOTHER IN CINDERELLA.

22   SHE'D WAVE HER WAND AND TURN SOMETHING HOMELY UTILITARIAN

23   OBJECT, LIKE A PUMPKIN OR A MOUSE, INTO SOMETHING GLAMOROUS AND

24   AMAZING LIKE A CARRIAGE OR FULLY ACCESSORIZED COACHMAN."

25   Q.   DOES HE SPECIFICALLY IDENTIFIES THE DESIGN FEATURES THAT

1      HE'S REFERRING TO?

2      A.   HE DOES, YES.  HE CALLS THEM OUT SPECIFICALLY.

3      Q.   IF WE MOVE DOWN IN THE ARTICLE TO THE NEXT TO THE LAST

4      PARAGRAPH.  WHAT ARE THE DESIGN FEATURES THAT MR. POGUE IS

5      SPECIFICALLY REFERRING TO?

6      A.   HE SAYS, "AS YOU WOULD EXPECT FROM APPLE, THE IPHONE IS

7      GORGEOUS.  ITS FACE IS SHINY BLACK, RIMMED BY A MIRROR-FINISH

8      STAINLESS STEEL.  THE BOX IS TEXTURED ALUMINUM, INTERRUPTED

9      ONLY BY THE LENS OF A 2-MEGAPIXEL CAMERA AND A MIRRORED APPLE

10     LOGO."

11     Q.   TURN TO TAB 4 IN YOUR NOTEBOOK, WHICH IS PX 134.  CAN YOU

12     TELL US WHAT THAT IS?

13     A.   THIS WAS AN ACTUAL REVIEW OF THAT FIRST IPHONE.  THIS WAS

14     BY "THE WALL STREET JOURNAL," BY A REVIEWER WALT MOSSBERG, WHO

15     WAS ARGUABLY THE, AT THE TIME THE BIGGEST TECH REVIEWER THAT

16     THERE WAS, AND THIS WAS ABOUT HIS INITIAL USE OF THE IPHONE.

17     WE GAVE IT TO HIM TWO WEEKS BEFORE HE PUBLISHED THIS TO BE ABLE

18     TO TRY IT OUT BEFORE THE IPHONE WAS RELEASED.

19              MR. LEE:  YOUR HONOR, WE OFFER PX 134.

20              THE COURT:  IS IT ALSO NOT BEING OFFERED FOR THE

21     TRUTH OF THE MATTER ASSERTED?  ANY OBJECTION?

22              MR. PRICE:  NO, YOUR HONOR.  AT SOME POINT WE WOULD

23     REQUEST THAT THE JURY BE TOLD WHAT THAT MEANS.

24              THE COURT:  IT'S NOT BEING OFFERED FOR THE TRUTH OF

25     WHAT'S ASSERTED.

```
 1              ALL RIGHT.  IT'S ADMITTED.  GO AHEAD, PLEASE.

 2              (PLAINTIFF'S 134 EXHIBIT WAS ADMITTED IN EVIDENCE.)

 3     BY MR. LEE:

 4     Q.   NOW, MR. JOSWIAK, WE'LL BRING IT UP ON THE SCREEN.  I'M

 5     GOING TO CALL YOUR ATTENTION TO A COUPLE DIFFERENT PLACES.

 6              WHAT DOES HE MENTION AS ONE OF THE REASONS THAT HE FINDS

 7     THE IPHONE SO INTERESTING?

 8     A.   THAT IT'S BEAUTIFUL.  "THE IPHONE IS, ON BALANCE, A

 9     BEAUTIFUL AND BREAKTHROUGH HANDHELD COMPUTER."

10     Q.   AND IF I COULD TURN TO PAGE 5 OF THIS ARTICLE, WHAT DOES

11     HE SAY ABOUT THE USER EXPERIENCE FOR THE IPHONE?

12     A.   I'LL USE HIS WORD, "THE IPHONE IS A WHOLE NEW EXPERIENCE

13     AND A PLEASURE TO USE."

14     Q.   TURN, IF YOU WOULD, TO TAB 5 IN YOUR BINDER, WHICH IS

15     PX 4029.

16              DO YOU HAVE IT BEFORE YOU?

17     A.   I DO.

18     Q.   WHAT IS IT?

19     A.   THIS IS THE SAME REVIEWER WE TALKED ABOUT A MOMENT AGO,

20     DAVID POGUE FOR "THE NEW YORK TIMES," AGAIN, A WELL RESPECTED

21     REVIEWER.  THIS IS HIS REVIEW.  SAME THING, WE GAVE HIM THE

22     DEVICE TWO WEEKS BEFORE WE PUBLISHED IN ORDER TO BE ABLE TO TRY

23     IT OUT.

24              MR. LEE:  WE OFFER PX 4029, YOUR HONOR, FOR THE SAME

25     PURPOSE, THE FACT THAT IT WAS PUBLISHED RATHER THAN THE TRUTH.
```

```
1                THE COURT:  ALL RIGHT.  ANY OBJECTION?

2                MR. PRICE:  NO, YOUR HONOR.

3                THE COURT:  ALL RIGHT.  IT'S ADMITTED.

4           (PLAINTIFF'S EXHIBIT 4029 WAS ADMITTED IN EVIDENCE.)

5                THE COURT:  GO AHEAD, PLEASE.

6       BY MR. LEE:

7       Q.   TURN, IF YOU WOULD, IT'S ON PAGE 1, WHAT DID MR. POGUE SAY

8       ABOUT THE IMPACT OF THE IPHONE ON THE MARKETPLACE?

9       A.   LIKE A LOT OF PEOPLE, HE SAID THE IPHONE WAS

10      REVOLUTIONARY.

11      Q.   IN THE VERY NEXT PARAGRAPH, WHAT DID HE POINT TO AS MAKING

12      IT REVOLUTIONARY?

13      A.   AGAIN, LIKE MR. MOSSBERG, HE CALLS OUT THAT "THE IPHONE IS

14      A TINY GORGEOUS HANDHELD COMPUTER WHOSE SCREEN IS A SLAB OF

15      TOUCH-SENSITIVE GLASS."

16      Q.   IF I GO DOWN THREE MORE PARAGRAPHS, WHAT DOES HE SAY ABOUT

17      THE IPHONE?

18      A.   "IT'S FAST, BEAUTIFUL, MENU-FREE AND DEAD SIMPLE TO

19      OPERATE."

20      Q.   NOW, I FOCUSSED YOU ON THREE REVIEWS.  WERE THERE OTHERS?

21      A.   MORE THAN I CAN COUNT.  INITIALLY WE GAVE IT TO A HANDFUL

22      OF PEOPLE TO PUBLISH BEFORE WE SHIPPED.

23      Q.   TURN, IF YOU WOULD, TO TAB 6 IN YOUR BINDER.  DO YOU FIND

24      PX 17A?

25      A.   I SEE.
```

```
 1    Q.   WHAT IS IT?

 2    A.   IT'S A SUMMARY OF, A BRIEF SUMMARY OF SOME OF THE COVERAGE

 3    THAT WE GOT ON HOW BEAUTIFUL AND REVOLUTIONARY THE IPHONE IS.

 4              MR. LEE:  WE OFFER PX 17A FOR THE SAME PURPOSE, YOUR

 5    HONOR.

 6              THE COURT:  NOT FOR THE TRUTH ASSERTED IN THE

 7    EXHIBIT; CORRECT?

 8              MR. LEE:  FOR THE FACT THAT THE STATEMENTS WERE MADE.

 9              THE COURT:  ALL RIGHT.  ANY OBJECTION, MR. PRICE?

10              MR. PRICE:  NO, YOUR HONOR.

11              THE COURT:  IT'S ADMITTED.

12         (PLAINTIFF'S EXHIBIT 17A WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14    BY MR. LEE:

15    Q.   TURN, IF YOU WOULD, TO TAB 7 IN YOUR NOTEBOOK.

16    A.   I SEE IT.

17    Q.   CAN YOU TELL US WHAT IT IS?

18    A.   ONE OF MY FAVORITES.

19    Q.   YEAH.

20    A.   THIS IS "TIME MAGAZINE," WHO LABELED THE IPHONE THE BEST

21    INVENTION OF 2007.  AND EVEN MORE IMPORTANTLY, IN WORDS I LOVE

22    THAT WERE SO PROPHETIC, WHICH IS THAT IT'S THE PHONE THAT

23    CHANGED PHONES FOREVER.

24              MR. LEE:  YOUR HONOR, WE OFFER PX 135 FOR THE SAME

25    PURPOSE.
```

1              THE COURT:  NOT FOR ITS TRUTH, BUT JUST THAT IT WAS

2    PUBLISHED.

3          ANY OBJECTION?

4              MR. PRICE:  NO OBJECTION.

5              THE COURT:  IT'S ADMITTED.

6          (PLAINTIFF'S EXHIBIT 135 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MR. LEE:

9    Q.   MR. JOSWIAK, DO YOU SEE WHAT I HAVE IN MY HAND?

10   A.   I DO.

11   Q.   CAN YOU TELL US WHAT IT IS?

12   A.   THAT'S THE ACTUAL HARD COPY ISSUE OF THAT "TIME MAGAZINE"

13   THAT HAD US AS THE INVENTION OF THE YEAR AND PROCLAIMING US THE

14   PHONE THAT FOREVER CHANGED PHONES.

15   Q.   AND YOU'RE LOOKING AT THE COPY?

16   A.   I AM.

17   Q.   AND IN THE ARTICLE ITSELF, WERE REASONS GIVEN FOR WHY THE

18   IPHONE WAS THE INVENTION OF THE YEAR?

19   A.   THERE WERE A NUMBER, AND THE NUMBER ONE HERE IS THAT "THE

20   IPHONE IS PRETTY," AND THEN A PARAGRAPH ALL ABOUT THE DESIGN.

21   Q.   AND THIS ONE IS YOUR PERSONAL FAVORITE BECAUSE?

22   A.   IT IS, BECAUSE IT -- LEV GROSSMAN REALLY SAW WHAT A BIG

23   DEAL THIS WAS AND WHY THIS WAS A REVOLUTIONARY THING.

24          AND AGAIN, YOU'VE GOT TO REMEMBER AT THE TIME THERE WERE

25   PEOPLE WHO WERE STILL NAY SAYERS.  THERE WERE PEOPLE WHO DIDN'T

1     THINK THAT THE IPHONE WOULD BE SUCCESSFUL.  AND LEV WAS ABLE TO

2     SEE THAT, NO, THIS IS FOREVER GOING TO CHANGE EVERYTHING, AND

3     HE WAS RIGHT.

4     Q.   LET ME SWITCH TOPICS AND TALK ABOUT THE MANNER IN WHICH

5     THE IPHONE WAS MARKETED OR ADVERTISED.  OKAY?

6     A.   OKAY.

7     Q.   DID YOU HAVE A PHILOSOPHY IN ADVERTISING OR MARKETING THE

8     IPHONE?

9     A.   WE DID.  OUR PHILOSOPHY WAS THAT THE IPHONE IS THE HERO,

10    RIGHT, THAT THE -- THE IMAGES OF THE FRONT OF THE IPHONE, THE

11    WAY THAT THE GRAPHICAL USER INTERFACE LOOKED ON THE IPHONE,

12    THAT THE IPHONE ITSELF WAS THE WAY THAT WE WANTED TO ADVERTISE,

13    SHOW, AND HAVE OUR PARTNERS ADVERTISE THE PHONE.  AGAIN, WE

14    CALLED IT THE PRODUCT AS HERO.

15    Q.   AND IN IMPLEMENTING THE PRODUCT IS HERO PHILOSOPHY, WHAT

16    IMAGES DID YOU TRY TO FOCUS UPON IN ADVERTISING?

17    A.   ALWAYS THE FRONT FACE.  WE'D ALWAYS HAVE THE FRONT FACE OF

18    THE IPHONE.  YOU KNOW, NEARLY ALWAYS THE HOME SCREEN AS WELL.

19    THERE COULD BE AN ADDITIONAL SHOT AS WELL TO SHOW YOU WHAT YOU

20    WOULD GO TO FROM THE HOME SCREEN, FOR EXAMPLE, IT MIGHT SHOW,

21    YOU KNOW, A VIDEO APP OR THINGS THAT YOU MIGHT GET TO FROM THE

22    HOME SCREEN.  BUT IT WAS ALWAYS ABOUT SHOWING THE FRONT OF THE

23    IPHONE.

24    Q.   TURN, IF YOU WOULD, TO TAB 9 IN YOUR NOTEBOOK, WHICH IS

25    PX 130.

1    A.   I SEE.

2    Q.   CAN YOU TELL US WHAT THIS IS?

3    A.   THAT'S A PRINT ADVERTISEMENT FOR THE SECOND IPHONE, THE

4    IPHONE 3G, AND, AGAIN, TO THE POINT IT SHOWS THE HERO IMAGE ON

5    THE LEFT OF THE FRONT OF THE IPHONE.

6         MR. LEE:  YOUR HONOR, WE OFFER PX 130.

7         MR. PRICE:  NO OBJECTION.

8         THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  IT'S

9    ADMITTED.

10        (PLAINTIFF'S EXHIBIT 130 WAS ADMITTED IN EVIDENCE.)

11   BY MR. LEE:

12   Q.   WE'LL BRING IT UP ON THE SCREEN.  COULD YOU BRIEFLY

13   EXPLAIN TO THE MEMBERS OF THE JURY HOW THIS IMPLEMENTS THE

14   PRODUCT AS HERO ADVERTISING PHILOSOPHY?

15   A.   YEAH, WE WERE AGAIN CELEBRATING THE IPHONE.  WE WERE

16   CELEBRATING THIS -- IT'S KIND OF A PICTURE IS WORTH A THOUSAND

17   WORDS.  THIS IS THE BEAUTIFUL DESIGN.  THIS IS THE DESIGN

18   THAT'S EASY TO USE.  IT'S BEAUTIFUL.  IT'S DISTINCTIVE.  IT'S

19   DIFFERENT.

20   Q.   AND DID YOU IMPLEMENT THIS PHILOSOPHY IN MARKETING AND

21   ADVERTISING FOR THE IPHONE AND THE IPHONE 3GS AND THE IPHONE 4?

22   A.   YES, WE DID.

23   Q.   ALL RIGHT.  CONSISTENTLY?

24   A.   VERY CONSISTENTLY.

25   Q.   WHAT WAS THE REASON YOU DID IT CONSISTENTLY?

1    A.   AGAIN, WE THOUGHT THAT THAT WAS THE MOST IMPORTANT THING

2    TO SHOW WAS THAT DESIGN, THE FACT THAT THE IPHONE ITSELF WAS

3    THE HERO.  IT WAS -- YOU KNOW, WE DIDN'T NEED A SPOKESPERSON.

4    WE WANTED THE IPHONE TO BE THE STAR.  WE WANTED TO SHOW PEOPLE

5    THAT WHAT WE HAD WAS VERY DIFFERENT THAN WHAT HAD EXISTED

6    BEFORE.

7    Q.   NOW, YOU UNDERSTAND THAT THERE ARE FIVE PATENTS AT ISSUE

8    IN THIS CASE THAT SAMSUNG WAS FOUND TO INFRINGE THOSE PATENTS;

9    CORRECT?

10   A.   I DO.

11   Q.   I WANT TO TAKE YOU BACK TO THE PERIOD OF TIME 2010 TO

12   2012.

13        CAN WE DO THAT?

14   A.   UM-HUM.

15   Q.   WAS SAMSUNG A COMPETITOR OF APPLE AT THE TIME?

16   A.   YEAH.  IT'S INTERESTING BECAUSE IN EARLY 2010, NOT SO

17   MUCH, RIGHT?  THEY WERE A SMALL PART OF THE MARKET.

18        BUT BY MID TO LATE 2010, THEY HAD BECOME ARGUABLY OUR

19   BIGGEST COMPETITOR.

20   Q.   BY THE END OF 2010, WERE THEY YOUR BIGGEST COMPETITOR?

21   A.   THEY WERE.

22   Q.   LET ME SHOW YOU PDX 2.4, WHICH IS AT TAB 1 OF YOUR BINDER,

23   AND I'LL PUT IT ON YOUR SCREEN.

24   A.   TAB 1 YOU SAID?

25   Q.   TAB 1.

1      A.   OKAY.

2      Q.   THIS IS A LIST OF THE PHONES FOUND TO INFRINGE THE APPLE

3      PATENTS.

4           WERE YOU FAMILIAR WITH THESE PHONES AT THE TIME THEY WERE

5      INTRODUCED?

6      A.   I WAS.

7      Q.   DID THESE PHONES COMPETE WITH THE IPHONE THAT WAS BEING

8      SOLD AT THE TIME?

9      A.   ABSOLUTELY.

10     Q.   DO YOU RECALL SEEING THE GALAXY S PHONE, OR AN IMAGE OF

11     ONE, AT THE TIME IT FIRST CAME TO MARKET?

12     A.   I DO.

13     Q.   AND WHAT WAS YOUR REACTION?

14          MR. PRICE:  OBJECT TO RELEVANCE, YOUR HONOR.

15          THE COURT:  OVERRULED.

16          THE WITNESS:  LIKE A LOT OF FOLK AT APPLE, AND

17     CERTAINLY FOLKS WHO HAD WORKED ON THE IPHONE, WE WERE PRETTY

18     ANGRY ABOUT IT.  WE FELT THAT THEY HAD TAKEN WHAT WE HAD

19     DESIGNED AND WERE SHIPPING IT.

20     BY MR. LEE:

21     Q.   DID THE REVIEWING COMMITTEE ALSO COMMENT UPON THAT

22     QUESTION?

23     A.   THEY DID INDEED.

24     Q.   TURN, IF YOU WOULD, TO TAB 15 IN YOUR NOTEBOOK, WHICH IS

25     PX 174.

1          DO YOU HAVE THAT BEFORE YOU?

2     A.   I DO.

3     Q.   WHAT IS IT?

4     A.   THIS IS AN ARTICLE FROM "WIRED," WHICH WAS, AGAIN, IS AND

5     WAS A POPULAR TECH MAGAZINE.  AND IT'S CALLING OUT THE FACT

6     THAT THE SAMSUNG VIBRANT RIPS OFF IPHONE 3G DESIGN?

7          MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT.  THIS

8     SEEMS TO BE BEING OFFERED FOR THE TRUTH.  I MOVE TO STRIKE THE

9     REMARK, AND I'M GOING TO OBJECT TO THE EXHIBIT.

10         MR. LEE:  LET ME OFFER IT, YOUR HONOR, FIRST.  I

11    THINK I CAN TAKE CARE OF IT.

12         THE COURT:  THE OBJECTION IS OVERRULED.

13       BUT GO AHEAD.

14         MR. LEE:  YOUR HONOR, WE OFFER PX 174 FOR THE SAME

15    PURPOSE, THE FACT THAT IT WAS PUBLISHED.

16         THE COURT:  AND NOT FOR THE TRUTH OF THE MATTER

17    ASSERTED.

18         MR. LEE:  TRUE.

19         THE COURT:  ALL RIGHT.  ANY OBJECTION?

20         MR. PRICE:  I OBJECT FOR THE PURPOSE IT'S BEING

21    OFFERED, WHICH APPEARS TO BE THE TRUTH.

22         THE COURT:  ALL RIGHT.  WELL, OVERRULED.

23       GO AHEAD.  IT'S ADMITTED.

24       (PLAINTIFF'S EXHIBIT 174 WAS ADMITTED IN EVIDENCE.)

25

1       BY MR. LEE:

2       Q.   IF YOU CAN BRING UP THE FIRST PAGE, THE TITLE IS "SAMSUNG

3       VIBRANT RIPS OFF IPHONE 3G DESIGN."

4            DO YOU SEE THAT?

5       A.   I DO.

6       Q.   LET'S SEE WHAT REVIEWER SAID.

7       A.   "THE VIBRANT'S INDUSTRIAL DESIGN IS SHOCKINGLY SIMILAR TO

8       THE IPHONE 3G:  THE ROUNDED CURVES AT THE CORNERS, THE CANDY

9       BAR SHAPE, THE GLOSSY, BLACK FINISH AND THE CHROME-COLORED

10      METALLIC BORDER AROUND THE DISPLAY."

11      Q.   NOW, MR. JOSWIAK, JUST A COUPLE MORE QUESTIONS.

12           YOU WERE IN THE COURTROOM FOR MR. QUINN'S OPENING;

13      CORRECT?

14      A.   CORRECT.

15      Q.   YOU HEARD HIM TALK ABOUT AN INCREASE IN MARKET SHARE WHEN

16      SAMSUNG STARTED TO USE THE ANDROID OPERATING SYSTEM; CORRECT?

17      A.   CORRECT.

18      Q.   CAN YOU TELL US, HOW DID SAMSUNG'S INCREASE IN MARKET

19      SHARE COMPARE TO OTHER COMPETITORS WHO HAD ANDROID OPERATING

20      SYSTEMS, BUT WHO DIDN'T USE APPLE'S DESIGNS?

21      A.   YEAH, THEY CERTAINLY WEREN'T --

22           MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT AS LACK

23      OF FOUNDATION.  THIS APPEARS TO BE EXPERT TESTIMONY.

24           MR. LEE:  THEY HAD A PRODUCT MARKET, YOUR HONOR.

25           THE COURT:  LAY A FOUNDATION OF HOW HE KNOWS ABOUT

1      COMPETITORS' MARKET SHARE, PLEASE.

2      BY MR. LEE:

3      Q.   AS THE VICE PRESIDENT OF PRODUCT MARKETING, DID YOU FOLLOW

4      COMPETITORS' MARKET SHARES?

5      A.   ABSOLUTELY.

6      Q.   DID YOU FOLLOW SAMSUNG'S MARKET SHARE?

7      A.   ABSOLUTELY.

8      Q.   DID YOU FOLLOW THE MARKET SHARES OF OTHER COMPETITORS

9      USING THE ANDROID SYSTEM?

10     A.   YES, WE DID.

11     Q.   CAN YOU TELL US, HOW DID THE INCREASE IN SAMSUNG'S MARKET

12     SHARE WITH THE INFRINGING PHONES COMPARE TO OTHER PHONE

13     MANUFACTURERS USING THE ANDROID SYSTEM WHO DIDN'T USE APPLE'S

14     DESIGNS?

15     A.   THEY WERE BENEFITING DISPROPORTIONATELY.

16          MR. PRICE:  SORRY, YOUR HONOR.  I OBJECT.  THERE'S A

17     LACK OF FOUNDATION AS TO THAT TESTIMONY.

18          THE COURT:  OVERRULED.

19     BY MR. LEE:

20     Q.   YOUR ANSWER IS?

21     A.   THEY WERE BENEFITING DISPROPORTIONATELY.  THEY WERE DOING

22     BETTER THAN OTHER ANDROID USERS.

23     Q.   RIGHT.  USING APPLE'S DESIGNS?

24     A.   THAT'S CORRECT.

25          MR. LEE:  ALL RIGHT.  THANK YOU.

1          NOTHING FURTHER, YOUR HONOR.

2              THE COURT:  ALL RIGHT.  TIME IS NOW 1:24.

3                        **CROSS-EXAMINATION**

4    BY MR. PRICE:

5    Q.   GOOD AFTERNOON, MR. JOSWIAK.

6    A.   HI, MR. PRICE.  NICE TO SEE YOU AGAIN.

7              MR. PRICE:  YOUR HONOR, CAN WE PROVIDE MR. JOSWIAK

8    WITH A BINDER EXHIBIT.

9              THE COURT:  ALL RIGHT.  PLEASE GO AHEAD.  TIME IS

10   1:24.  GO AHEAD, PLEASE.

11             THE WITNESS:  THANK YOU.

12   BY MR. PRICE:

13   Q.   AND MY NAME IS BILL PRICE.

14   A.   NICE TO SEE YOU AGAIN.

15   Q.   NICE TO MEET YOU.

16        I WANT TO ASK YOU ABOUT ONE OF THE EXHIBITS YOU WERE SHOWN

17   RIGHT TOWARDS THE END, I THINK IT WAS A DEMONSTRATIVE, PDX 2.4.

18        I WANT YOU TO TAKE A LOOK AT THAT.

19        KEN, CAN WE --

20             MR. KOTARSKI:  MS. MASON, CAN YOU SWITCH?

21   BY MR. PRICE:

22   Q.   AND IT'S RIGHT THERE, BUT I WANT TO CALL YOUR ATTENTION

23   TO, DO YOU SEE THERE ARE THESE PHONES AND THEY HAVE THESE ICONS

24   ON THEM?  DO YOU SEE THAT?

25   A.   I DO.

1   Q.   OKAY.  AND IT'S TRUE, IS IT NOT, THAT THESE PAGES ARE NOT

2   THE HOME PAGES ON THE SAMSUNG PHONES?  THAT IS, WHEN YOU START

3   THE PHONE, THIS IS NOT WHAT YOU SEE; CORRECT?

4   A.   THIS IS THE WAY YOU WOULD LAUNCH APPLICATIONS, MUCH LIKE

5   YOU WOULD ON THE IPHONE.

6   Q.   SO THAT MEANS THE ANSWER TO MY QUESTION WAS, YES, THAT

7   WHEN YOU TURN THE SAMSUNG PHONE ON, YOU DON'T SEE THIS PAGE;

8   CORRECT?

9   A.   AND MY ANSWER STAYS THE SAME.  THIS IS THE WAY YOU WOULD

10  LAUNCH THE APPS.  THIS IS -- THEY HAVE A DIFFERENT START, FIRST

11  EXPERIENCE.  BUT THIS IS THE WAY YOU HAVE TO GO TO TO LAUNCH

12  THE APPS.

13  Q.   THAT'S WHAT I WANTED TO ASK.  THE FRONT PAGE IS THERE;

14  RIGHT?

15  A.   OFTEN TIMES.

16  Q.   AND IF YOU LOOK AT THE FOUR HERE, GALAXY S II, DO YOU SEE

17  THESE, THE LAST FOUR?

18  A.   I DO.

19  Q.   NOW, IS IT YOUR UNDERSTANDING THAT IN TERMS OF REVENUE

20  THAT THESE PHONES ARE ABOUT 60 PERCENT OR SO OF THE REVENUE OF

21  THE PHONES THAT ARE INVOLVED IN THIS CASE?

22  A.   SORRY, MR. PRICE.  I DON'T HAVE THE REVENUE LIST.

23  Q.   OKAY.  LET ME SEE IF WE CAN MAKE ONE THING CLEAR THOUGH.

24  YOU SEE THESE ICONS HERE?

25  A.   I DO.

1    Q.   THEY DON'T INFRINGE ANY APPLE PATENTS, DO THEY?

2    A.   I UNDERSTOOD THAT THEY WERE NOT FOUND TO HAVE INFRINGED.

3    Q.   OKAY.  AND YOU HAVE BEEN TALKING -- YOU WERE TALKING IN

4    YOUR DIRECT ABOUT --

5    A.   AND YOU MEAN THE '305, I ASSUME.

6    Q.   YES, THE IPHONES.

7    A.   YES, JUST TO BE SPECIFIC.

8    Q.   YES?

9    A.   THEY DID INFRINGE OTHER THINGS.

10   Q.   SURE.  WELL, IN FACT, I WANTED TO LOOK AT THAT.  YOU

11   LOOKED AT THOSE 16 PHONES, AND I DON'T KNOW IF WE'RE GOING TO

12   GET INTO THIS DETAIL WITH YOU, BUT 11 OF THESE INFRINGE ONLY

13   ONE OF THE 3 DESIGN PATENTS; RIGHT?

14   A.   I DON'T KNOW THE EXACT COUNT OF WHAT THE JURY FOUND TO

15   INFRINGE.

16   Q.   AND DO YOU RECALL AROUND FOUR OF THEM INFRINGED TWO?

17   A.   I REMEMBER THAT A LOT OF THEM INFRINGED THE '677, THE

18   D'677.  I DON'T HAVE THE EXACT LIST OF WHAT THE JURY FOUND TO

19   HAVE INFRINGED.

20   Q.   OKAY.  I'LL ADDRESS THAT WITH SOMEONE ELSE.

21        YOU WERE TALKING ABOUT WHAT APPLE WANTED TO ACCOMPLISH

22   WITH ITS DESIGN AND DIDN'T LIKE SLIDERS, IT DIDN'T LIKE THE

23   DESIGN OF THE CANDY -- WHAT DO THEY CALL IT?

24   A.   THE CANDY BAR.

25   Q.   THE CANDY BAR.

1          LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 1012.

2          MAY I APPROACH, YOUR HONOR?

3              THE COURT:  YES.  IS THIS A JOINT EXHIBIT, OR --

4              MR. PRICE:  NO.  THIS IS A -- OH, YEAH, THIS IS A

5     JOINT EXHIBIT.

6              THE COURT:  IT'S A JX.  OKAY.  THANK YOU.

7     BY MR. PRICE:

8     Q.   AND IF YOU'D LOOK AT -- SPEAK LOUDLY HERE -- DO YOU

9     RECOGNIZE THIS AS THE SAMSUNG EPIC 4G (HANDING)?

10    A.   I DO.

11    Q.   YEAH.  AND YOU JUST DID SOMETHING WITH IT.  CAN YOU SHOW

12    THE JURY WHAT YOU DID WITH THAT PHONE?

13    A.   (INDICATING.)

14    Q.   AND WHAT DID YOU JUST DO?

15    A.   IT'S A SLIDER (INDICATING).  THIS IS IT OPEN.

16    Q.   AND IF APPLE PRODUCED A DESIGN LIKE THAT, STEVE JOBS WOULD

17    ROLL OVER IN HIS GRAVE; RIGHT?

18    A.   I DON'T WANT TO TESTIFY TO WHAT STEVE WOULD DO WHILE HE'S

19    PASSED AWAY.  THAT'S KIND OF RUDE.

20    Q.   THIS IS NOT THE DESIGN --

21    A.   IT'S CERTAINLY NOT THE DESIGN THAT WE WOULD HAVE DONE.

22    Q.   RIGHT.  SO IF YOU PICK THAT UP, IT'S YOUR UNDERSTANDING --

23    IS IT YOUR UNDERSTANDING THAT, HOWEVER, APPLE IS SEEKING ALL OF

24    THE PROFITS ON THIS PHONE?

25    A.   WELL, AGAIN, MY UNDERSTANDING IS THAT'S THE REMEDY THERE

1      IS FOR DESIGN PATENT VIOLATIONS.

2      Q.   IT'S THE ENTIRE PHONE IS THE ARTICLE OF MANUFACTURE;

3      RIGHT?

4      A.   AND WE ASSERT THAT IT IS.

5      Q.   WELL, LET ME ASK YOU ABOUT THAT.  DID YOU LOOK AT THE FOUR

6      FACTOR TEST?

7      A.   OF COURSE.

8      Q.   YOU DID AN ANALYSIS UNDER THAT?

9      A.   I'VE CERTAINLY LOOKED AT IT.

10     Q.   IF WE COULD PUT UP, IT'S SDX 29, THAT'S THE TEST, AND YOU

11     WERE ASKED SOME QUESTIONS IN YOUR DIRECT EXAMINATION ABOUT

12     SELLING THE IPHONE.

13          AND FIRST LET ME ASK YOU, DO YOU UNDERSTAND WHETHER OR NOT

14     THESE FACTORS APPLY TO THE IPHONE OR TO THE SAMSUNG PHONES?

15     A.   WELL, AGAIN, I THINK -- FIRST OF ALL, I THINK YOU'RE GOING

16     TO HAVE SOMEBODY SPEAK IN A LITTLE MORE DETAIL ABOUT THE TEST.

17     CERTAINLY MY UNDERSTANDING IS IT APPLIES TO BOTH.

18     Q.   AH.  SO WHEN IT SAYS, FOR EXAMPLE, THE RELATIVE PROMINENCE

19     OF THE DESIGN WITHIN THE PRODUCT AS A WHOLE, ISN'T IT YOUR

20     UNDERSTANDING THAT THAT MEANS IN THE SAMSUNG PRODUCT?

21     A.   WELL, AGAIN, CERTAINLY, AGAIN, WE SAW, AS YOU SAW IN THAT

22     IMAGE THAT YOU HAD JUST SHOWN OF THE INFRINGING PHONES, THERE

23     WERE SAMSUNG IMAGES, ILLUSTRATIONS, THE SAME WAY THEY WERE

24     SHOWING THEIR PRODUCTS WERE VERY SIMILAR TO HOW WE WERE SHOWING

25     OURS.

1    Q.   I'M SORRY.  I MIGHT NOT HAVE BEEN CLEAR.  WHEN YOU APPLY

2    THIS FACTOR, ISN'T IT TRUE THAT WHAT YOU'RE APPLYING IT TO IS

3    THE SAMSUNG PRODUCTS, THE RELATIVE PROMINENCE OF THE DEADLINE

4    WITHIN THE SAMSUNG PRODUCTS?

5    A.   I'M SORRY, MR. PRICE, I WAS TRYING TO ANSWER THAT.  EVEN

6    SAMSUNG WAS SHOWING THAT PROMINENCE IN THE DESIGN IN THE WAY

7    THEY WERE MARKETING AND SHOWING THEIR PHONES.

8    Q.   SO THE ANSWER TO MY QUESTION IS, YES, YOU WERE LOOKING AT

9    SAMSUNG?

10   A.   AS I SAID, IT APPLIED TO BOTH.

11   Q.   AND YOU HAD TALKED ABOUT WHETHER OR NOT -- YOU WERE ASKED

12   QUESTIONS ABOUT WHETHER OR NOT IF SOMEONE TOOK THE IPHONE AND

13   TOOK THE WINDOW GLASS OFF, OR THE GLASS --

14   A.   UM-HUM.

15   Q.   -- WHETHER OR NOT THAT WOULD VOID THE WARRANTY?

16   A.   CORRECT.

17   Q.   DO YOU RECALL THAT?

18   A.   YES.

19   Q.   YOU WERE ASKED WHETHER OR NOT THE WINDOW GLASS COULD BE

20   USED SEPARATELY; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  AND YOU WERE ASKED WHETHER OR NOT IT WAS SOLD TO

23   CONSUMERS SEPARATELY; CORRECT?

24   A.   CORRECT.

25   Q.   OKAY.  NOW, I WANT YOU TO LOOK AT FACTOR 4, WHICH TALKS

1    ABOUT THE PHYSICAL RELATIONSHIP.

2         DO YOU SEE THAT THERE'S A QUESTION OF WHETHER OR NOT THE

3    COMPONENT CAN PHYSICALLY BE SEPARATE FROM THE PRODUCT AS A

4    WHOLE?  DO YOU SEE THAT?

5    A.   I DO.

6    Q.   AND WHETHER THE DESIGN IS EMBODIED IN A COMPONENT THAT IS

7    MANUFACTURED SEPARATELY FROM THE REST OF THE PRODUCT.

8         DO YOU SEE THAT?

9    A.   I DO.

10   Q.   AND THE GLASS OF THE IPHONE IS MANUFACTURED SEPARATELY

11   FROM THE REST OF THE PRODUCT; RIGHT?  YOU BUY THE GLASS?

12   A.   PRIOR TO IT BEING ASSEMBLED.

13   Q.   AND THAT'S TRUE WITH SAMSUNG, TOO, AS FAR AS YOU KNOW;

14   CORRECT?

15   A.   AS FAR AS I KNOW, AGAIN, PRIOR TO IT BEING ASSEMBLED INTO

16   A PHONE.

17   Q.   AND THE COMPONENT, THAT GLASS, THAT CAN BE SEPARATED FROM

18   THE PHONE AS A WHOLE; CORRECT?

19   A.   NOT IN NORMAL USE.

20   Q.   BUT THAT WASN'T MY QUESTION, SIR.

21        THE QUESTION IS:  CAN IT BE PHYSICALLY SEPARATED FROM THE

22   PRODUCT AS A WHOLE?

23   A.   AGAIN, FOR A REPAIR, FOR EXAMPLE.  BUT NOT FOR NORMAL USE.

24   Q.   SO YOU KNOW OF CASES, FOR EXAMPLE, WHERE THE APPLE FRONT

25   GLASS IS SEPARATED; RIGHT?

1    A.   AGAIN, FOR REPAIR ONLY TO GET IT BACK TO WHERE IT STARTED.

2    Q.   BUT PHYSICALLY, ONE CAN DO THAT IF YOU HAVE THE RIGHT

3    TOOLS; RIGHT?

4    A.   NOT A CONSUMER.  AS WE TALKED ABOUT THIS MORNING, IT WOULD

5    VIOLATE THE WARRANTY.  THAT'S SOMETHING FOR PROFESSIONAL REPAIR

6    ONLY, AGAIN, TO GET YOU BACK TO WHERE YOU STARTED.

7    Q.   IS THIS LIMITED TO -- WHERE DOES IT SAY THAT A CONSUMER

8    HAS TO BE ABLE TO DO IT?

9    A.   I THINK IT CERTAINLY SEEMS TO BE CLEAR THAT WE'RE TALKING

10   ABOUT NORMAL USE.  I CAN -- I CAN TAKE ATOMS OUT OF THINGS

11   ABNORMALLY.  THAT DOESN'T MAKE THEM SEPARABLE.

12   Q.   WOW, I'M IMPRESSED.  I CAN'T DO THAT.

13        HOWEVER, DO YOU KNOW THERE ARE FACILITIES, FOR EXAMPLE,

14   WITH SAMSUNG PHONES THAT ACTUALLY SEPARATE THE GLASS FROM THE

15   PRODUCT; RIGHT?  IT'S SEPARABLE.

16   A.   AGAIN, THESE VIOLATING PRODUCTS, THE INFRINGING PRODUCTS,

17   I DON'T THINK IT WAS NORMAL USE TO REMOVE THOSE AS WELL.

18   Q.   AGAIN, THE ANSWER TO MY QUESTION IS IT'S ACCEPTABLE;

19   RIGHT?

20   A.   THE ANSWER IS IT'S NOT ACCEPTABLE BY A NORMAL USER.

21   Q.   OKAY.  LET ME CHANGE TOPICS HERE FOR A SECOND.

22        YOU BEGAN BY -- I WON'T SAY YOU BEGAN, BUT EARLY ON YOU

23   STARTED TALKING ABOUT HOW APPLE HAD SPENT BILLIONS ON

24   TECHNOLOGY, WORKING ON TECHNOLOGY FOR YEARS TO CREATE THE

25   IPHONES; CORRECT?

1    A.   I SAID CERTAINLY OVER A BILLION.

2    Q.   I DIDN'T MEAN TO MISQUOTE YOU.

3         DID YOU SPEND A BILLION ON THE GLASS SCREEN?

4    A.   AGAIN, I DON'T KNOW THE PROPORTIONMENT OF THAT DEVELOPMENT

5    DOLLARS.

6    Q.   WELL, YOU MENTIONED THAT WHAT YOU WANTED TO DO -- WELL,

7    WAS INVENT -- YOU WERE WORKING ON TECHNOLOGY FOR YEARS; RIGHT?

8    A.   WE WERE.

9    Q.   AND YOU SAID YOU WERE WORKING ON NEW TECHNOLOGIES FOR

10   YEARS; RIGHT?

11   A.   CORRECT.

12   Q.   AND YOU WEREN'T GOING TO TAKE THE TECHNOLOGY THAT WAS IN

13   ONE OF THOSE OLD BLACKBERRIES AND JUST PUT IT INTO A PRETTY

14   CASE; RIGHT?

15   A.   THERE WERE SOME COMPONENTS THAT COULD BE -- OR FEATURES AT

16   LEAST, LIKE A CAMERA MODULE, FOR EXAMPLE, THAT MIGHT HAVE

17   EXISTED SOMEWHERE ELSE.

18        BUT THE IMPORTANT THING WE WERE TRYING TO DO WAS, AGAIN,

19   DESIGN A PRODUCT THAT WAS VERY DISTINCT FROM WHAT EXISTED IN

20   THE MARKET BEFORE.

21   Q.   AND CERTAINLY OVER THE YEARS APPLE HAS HEAVILY MARKETED

22   SOME OF THE NEW TECHNOLOGIES THAT IT CAME OUT WITH TO BE

23   DISTINCTIVE; CORRECT?

24   A.   WE HAVE.

25   Q.   I MEAN, FOR EXAMPLE, YOU HEAVILY MARKETED SIRI?

1    A.   WE'VE MARKETED IT.  I DON'T KNOW ABOUT HEAVILY, BUT WE

2    HAVE MARKETED IT.

3    Q.   DO YOU KNOW HOW MUCH YOU SPENT ON ADVERTISING THAT?

4    A.   I DON'T HAVE THAT IN FRONT OF ME, MR. PRICE.

5    Q.   IN RELATION TO SPOKES PEOPLE, OR SOME ACTORS WHO WERE IN

6    COMMERCIALS ABOUT THAT?

7    A.   OVER TIME THERE HAVE BEEN.

8    Q.   AND YOU HEAVILY MARKETED FACETIME?

9    A.   AGAIN, I DON'T KNOW ABOUT HEAVILY, BUT WE CERTAINLY HAVE

10   MARKETED IT.

11   Q.   SO YOU HAVE MARKETED -- EACH TIME THE IPHONE HAS COME OUT

12   WITH A NEW ITERATION, APPLE HAS MARKETED SOME OF THE NEW

13   FUNCTIONALITY IN THAT NEW PHONE; CORRECT?

14   A.   EVERY TIME ACTUALLY.  NEW FEATURES ARE CERTAINLY

15   IMPORTANT.

16   Q.   AND NEW FEATURES HELP SELL PHONES?

17   A.   THEY'RE CERTAINLY PART OF THAT, YES.

18   Q.   NOW, EARLIER YOU WERE TALKING ABOUT, YOU SAID THAT YOU

19   CONCEDED APPLE DID NOT INVENT THE SMARTPHONE, THERE WERE SOME

20   SMARTPHONES BEFORE IT; CORRECT?

21   A.   THAT'S NOT A CLAIM WE EVER MADE.

22   Q.   YOU DID MENTION, THOUGH, THAT APPLE HAD MADE -- SIDE TO

23   SIDE -- THERE WAS A FLAT GLASS -- I MEAN THE GLASS FACE THAT

24   YOU COULD USE TOUCH; CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   AND IT'S ALSO TRUE THAT APPLE WASN'T THE FIRST TO INVENT

2    THAT; CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   OKAY.  AND, IN FACT, LET ME SHOW YOU WHAT IS MARKED AS

5    EXHIBIT 1093, WHICH IS JOINT TRIAL EXHIBIT 1093, THIS IS THE

6    PRADA, AND YOU'VE SEEN THAT BEFORE; RIGHT (HANDING)?

7    A.   YEAH, I REMEMBER IT.

8    Q.   AND THAT HAS A FRONT THAT'S FRONT GLASS TO GLASS SCREEN;

9    RIGHT?

10   A.   IT DOES.

11   Q.   IN FACT, LET ME SHOW YOU IN YOUR BINDER, IF YOU'LL LOOK AT

12   EXHIBIT 1093, AND DO YOU RECOGNIZE THAT AS AN E-MAIL STRING --

13   AND BY THE WAY, THAT'S --

14   A.   I DON'T HAVE THAT.

15   Q.   DX -- SORRY.

16        (PAUSE IN PROCEEDINGS.)

17             MR. PRICE:  MY APOLOGIES.  IT'S DX 578.

18             THE WITNESS:  ALL RIGHT.

19   BY MR. PRICE:

20   Q.   AND DO YOU SEE THAT'S AN INTERNAL APPLE DOCUMENT; RIGHT?

21   A.   I DO.

22   Q.   AND YOU'VE SEEN THIS DOCUMENT BEFORE; CORRECT?

23   A.   LET ME LOOK AT IT, IF YOU DON'T MIND, MR. PRICE.

24        (PAUSE IN PROCEEDINGS.)

25             THE WITNESS:  I BELIEVE I HAVE.

1    BY MR. PRICE:

2    Q.   AND MR. SINCLAIR WAS SOMEONE WHO WORKED UNDER YOU AT THE

3    TIME AS A PROJECT MANAGER?

4    A.   THAT'S CORRECT.

5              MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 578 INTO

6    EVIDENCE.

7              THE COURT:  ANY OBJECTION?

8              MR. LEE:  NO OBJECTION.

9              THE COURT:  IT'S ADMITTED.

10       (DEFENDANTS' EXHIBIT 578 WAS ADMITTED IN EVIDENCE.)

11             THE COURT:  GO AHEAD, PLEASE.

12   BY MR. PRICE:

13   Q.   AND IF WE LOOK AT THE SECOND PAGE OF THAT E-MAIL STRING,

14   DO YOU SEE THERE'S AN E-MAIL, IT'S MR. SINCLAIR WRITING TO

15   MICHAEL.

16       DO YOU KNOW WHO MICHAEL IS?

17   A.   I DO NOT.  I DON'T SEE THE MICHAEL ON THIS E-MAIL CHAIN.

18       OH, SORRY.  IT'S CONTINUED ON THIS NEXT PAGE.

19   Q.   YES.

20   A.   I ASSUME THAT'S TO MICHAEL LEWIS, WHO'S ON THIS LIST

21   FURTHER DOWN.

22   Q.   AND APPLE WAS THINKING ABOUT DOING A SORT OF MARKETING

23   CAMPAIGN ABOUT WHAT IT HAD DONE FIRST; CORRECT?

24   A.   I WASN'T ON THIS E-MAIL CHAIN, SO I'M GOING TO -- IF

25   YOU'LL GIVE ME JUST A SECOND TO TAKE A QUICK LOOK.

1    Q.   WELL, IF YOU DON'T RECALL, LET ME CALL YOUR ATTENTION TO

2    WHAT WE HAVE UP HERE.  AND YOU SEE, "HEY MICHAEL, IT'S TOUGH TO

3    APPROACH THIS WITH THE CRITERIA BEING 'FIRST.'  I DON'T KNOW

4    HOW MANY THINGS WE CAN COME UP WITH THAT YOU COULD LEGITIMATELY

5    CLAIM WE DID FIRST.  CERTAINLY WE HAVE THE FIRST COMMERCIALLY

6    SUCCESSFUL VERSIONS OF MANY FEATURE, BUT THAT'S DIFFERENT THAN

7    LAUNCHING SOMETHING TO MARKET FIRST."

8         AND THEN HE GIVES THE EXAMPLE OF THE FIRST PHONE TO

9    INCORPORATE A FULL TOUCHSCREEN FACE BEING THE PRADA.

10        DO YOU SEE THAT?

11   A.   I DO.

12   Q.   AND YOU WERE TALKING ABOUT -- WE LOOKED AT SOME OF THESE

13   REVIEWS AND COMMENTS IN 2007 WHEN THE IPHONE FIRST CAME OUT, IT

14   MADE QUITE A SPLASH; CORRECT?

15   A.   IT DID.

16   Q.   BUT YOU KNEW THAT THERE WAS GOING TO BE COMPETITION FROM

17   OTHER PHONES, NOT SLIDE PHONES, NOT CANDY PHONES OR FLIP

18   PHONES, BUT YOU KNEW THERE WAS GOING TO BE COMPETITION FOR

19   PHONES THAT HAD FULL TOUCHSCREEN FACES, THAT ELIMINATED THOSE

20   PHYSICAL BUTTONS; RIGHT?

21   A.   I DISAGREE WITH THAT.

22   Q.   YOU KNEW THAT --

23   A.   WE LOOKED AT ALL PHONES.  THE PHONE MARKET WAS ABOUT A

24   BILLION UNITS A YEAR AND WE LOOKED AT ALL PHONES, LITERALLY, AS

25   COMPETITION.

1          IF YOU REMEMBER, WE MADE A VERY BOLD CLAIM, WHICH WAS THAT

2     WE WERE GOING TO, IN THE FIRST CALENDAR YEAR, TRY TO GET A

3     1 PERCENT MARKET SHARE IN PHONES, NOT SMARTPHONE PHONES.  WE

4     WERE LOOKING AT ALL PHONES AS COMPETITION.  SMARTPHONES WERE

5     JUST IN THE EARLY DAYS OF TAKING OFF.  YOU COULDN'T RELY ON

6     JUST BEING IN THE SMARTPHONE MARKET.  WE WERE IN THE PHONE

7     MARKET.

8     Q.   I DIDN'T ASK THE QUESTION RIGHT.  YOU KNEW THAT AMONG THE

9     PHONES YOU WOULD BE COMPETING WITH IN THE FUTURE, YOU EXPECTED

10    WOULD BE PHONES THAT ELIMINATED THAT KEYBOARD AND INCORPORATED

11    FULL TOUCHSCREEN FACE?

12    A.   TO YOUR POINT ABOUT THE PRADA, WE KNEW THAT PHONES LIKE

13    THIS EXISTED.  WE KNEW THAT PEOPLE WOULD CERTAINLY COME AFTER

14    US WITH COMPETITIVE DESIGNS.  WE HAVE BELIEVED IN FAIR

15    COMPETITION.  THAT'S COOL.  AS LONG AS THEY WEREN'T COPYING

16    WHAT WE WERE DOING, THAT WAS FINE.

17    Q.   BY 2010, THREE YEARS AFTER YOU INTRODUCED THE IPHONE;

18    RIGHT?

19    A.   RIGHT.

20    Q.   BY THAT TIME, THERE WERE A NUMBER OF PHONES, A LOT OF

21    PHONES ACTUALLY IN THE MARKET THAT HAD A FULL TOUCHSCREEN FACE

22    WHERE THE FRONT GLASS COVERED THE ENTIRE FACE SO THAT YOU

23    DIDN'T HAVE A PHYSICAL KEYBOARD; RIGHT?

24    A.   THERE WERE, THAT'S CORRECT.

25    Q.   AND THE FIRST SAMSUNG PHONE THAT'S INVOLVED IN THIS CASE

1    IT'S YOUR UNDERSTANDING CAME OUT IN ABOUT JULY 2010; RIGHT?

2    A.   THAT SOUNDS RIGHT.

3    Q.   AND BY 2010, BY JULY 2010, APPLE HAD COME UP WITH AN

4    ENTIRELY -- A TOTALLY NEW DESIGN FOR THE IPHONE 4; RIGHT?

5    A.   WELL, IT CERTAINLY BUILT OFF THE DESIGN THAT WE HAD WITH

6    THE IPHONE 3 -- THE IPHONE, IPHONE 3G AND 3GS.  IT CERTAINLY

7    HAD SOME BRAND NEW DESIGN ELEMENTS AS FAR AS THE WAY IT LOOKED

8    ON ONE SIDE, THE WAY IT LOOKED ON THE BACK.  BUT IT CERTAINLY

9    WAS BUILDING OFF OF THE SUCCESS WE HAD.  AND CERTAINLY IF YOU

10   LOOK AT THE FRONT OF AN IPHONE 4, YOU KNEW IT WAS AN IPHONE.

11   Q.   WELL, LET ME ASK IT THIS WAY:  WAS THERE SOMETHING CALLED

12   A KEYNOTE ADDRESS IN 2010?

13   A.   THERE WAS INDEED.

14   Q.   AND WHEN WAS THAT?

15   A.   2010, IT WOULD HAVE BEEN JUNE OF 2010.

16   Q.   AND MR. JOBS SPOKE?

17   A.   OF COURSE.

18   Q.   YOU WERE THERE?

19   A.   I WAS.

20   Q.   THERE WAS A BIG SCREEN; RIGHT?

21   A.   YEP.  AND HE SAID ALL GREAT NEW DESIGN.

22   Q.   IT ACTUALLY SAID ALL NEW DESIGN; CORRECT?

23   A.   I THINK IT DID.

24   Q.   AND THAT ALL NEW DESIGN INCLUDED THE SAME FLAT SCREEN ON

25   THE FRONT; RIGHT?

1    A.   IT DID, WITH ITS BEAUTIFUL, RECTANGLE, ROUNDED CORNERS.

2    Q.   AND YOU TESTIFIED UNDER OATH, YOU CONSIDERED THIS A,

3    QUOTE, "ALL NEW DESIGN;" RIGHT?

4    A.   I'M SAYING WHAT HE CALLED IT, A NEW DESIGN.

5    Q.   I'M SAYING THAT IN YOUR SWORN TESTIMONY IN DEPOSITION, YOU

6    DESCRIBED THE IPHONE 4 AS AN "ALL NEW DESIGN;" CORRECT?

7    A.   SURE, SURE.

8    Q.   AND THAT ALL NEW DESIGN, WHAT MR. JOBS SHOWED WAS THAT THE

9    SIDES WERE DIFFERENT; RIGHT?

10   A.   YEP.

11   Q.   AND THAT THE BEZEL WAS DIFFERENT; RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   NOT THE SAME BEZEL THAT'S INVOLVED IN THIS CASE; CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   THAT THE BACK WAS DIFFERENT?

16   A.   THAT'S CORRECT.

17   Q.   YOU'RE HERO HAD CHANGED.  IT HAD AN ALL NEW DESIGN BEFORE

18   THE SAMSUNG PHONES EVER CAME OUT?

19   A.   WELL, AGAIN IT BUILT OFF THE DESIGN THAT WE HAD.  IT BUILT

20   OFF THE SAME RECTANGULAR SHAPE, THE ROUNDED CORNERS.  IT BUILT

21   OFF THE SAME DESIGN WE HAD WITH THE GRID OF ICON, THE HOME

22   PAGES, WHAT WE EVENTUALLY CALLED THE HOME SCREEN.  SO IT

23   CERTAINLY BUILT OFF THE SUCCESS WE HAD.

24   Q.   AND MY QUESTION WASN'T WHETHER IT BUILT OFF -- MY QUESTION

25   IS WHETHER IT WAS, AS YOU CHARACTERIZED IT TO THE PUBLIC AND AS

1      YOU HAD PREVIOUSLY UNDER OATH, AN ALL NEW DESIGN.  THAT'S AN

2      ACCURATE WAY TO DESCRIBE IT; RIGHT?

3      A.   AS I SAID, IT WAS A GREAT NEW DESIGN.  IT CERTAINLY,

4      AGAIN, BUILT OFF OF WHAT WE HAD DONE BEFORE.

5      Q.   WHEN APPLE CAME OUT -- SORRY.  WHEN SAMSUNG WAS OUT IN

6      JULY OF 2010 WITH ITS FIRST PHONE, APPLE WAS LIMITED TO AT&T;

7      CORRECT?

8      A.   IN THE UNITED STATES, WE WERE SHIPPING ONLY WITH AT&T.

9      Q.   IPHONE, IPHONE 3G, THE IPHONE 3GS WERE ALL --

10     A.   IN THE UNITED STATES.

11     Q.   -- AT AT&T; CORRECT?

12     A.   IN THE UNITED STATES.

13     Q.   AND THE VERIZON MARKET WASN'T OPEN UNTIL FEBRUARY 2011;

14     RIGHT?

15     A.   THAT'S CORRECT.

16     Q.   SPRINT WAS IN OCTOBER 201; RIGHT?

17     A.   THAT'S CORRECT.

18     Q.   T-MOBILE WAS JUNE 2012; CORRECT?

19     A.   THAT'S CORRECT.

20     Q.   AND WE TALKED ABOUT ANDROID PHONES.  ANDROID PHONES ARE

21     THE POST POPULAR OPERATING SYSTEM IN THE WORLD; CORRECT?

22     A.   THAT'S CORRECT, BY VOLUME.

23     Q.   AND APPLE ACTUALLY DID STUDIES IN THE 2010, 2011 TIMEFRAME

24     AS TO WHY CONSUMERS WOULD PICK ANDROID OVER APPLE; CORRECT?

25     A.   I'M SURE WE DID.

1    Q.   IF YOU'D LOOK AT, IN YOUR BINDER, EXHIBIT 572.

2         AND DO YOU RECOGNIZE THAT AS A PREFERENCE STUDY?

3    Q.   AND TAKE A LOOK AT THE SECOND AND THIRD PAGE WHERE IT SAYS

4    SMARTPHONE MARKET IN U.S., APPLE MARKET RESEARCH AND ANALYSIS.

5    JANUARY 2011.

6         DO YOU SEE THAT?

7    A.   I DO.

8              MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 572 INTO

9    EVIDENCE, IN PARTICULAR, IT IS GOING TO BE -- I'D LIKE TO MOVE

10   IN PAGES 6 AND 82.  I BELIEVE 6 IS STILL MARKED AS

11   CONFIDENTIAL.

12             THE COURT:  YOU ONLY WANT TO ADMIT TWO PAGES OUT OF

13   THIS MARKET?

14             MR. PRICE:  I THINK THAT'S THE WAY WE APPROACHED IT

15   BEFORE.

16             THE COURT:  OKAY.  6 AND WHAT'S THE OTHER PAGE?

17             MR. PRICE:  22.  I'M SORRY, 82.

18             MR. KOTARSKI:  MR. PRICE, YOU ALSO WANT PAGE 3?

19             MR. QUINN:  I'M SORRY, PAGE 3.

20             THE COURT:  OKAY.  SHOULD WE USE THE NUMBER ON THE

21   TOP WHERE IT SAYS 572.003.

22             MR. PRICE:  YEAH, 572.003, THE TITLE PAGE, 572.006,

23   AND 572.082.

24             THE COURT:  OKAY.

25             MR. LEE:  YOU'RE NOT ADMITTING THE WHOLE DOCUMENT?

1           MR. PRICE:  I'LL MOVE INTO EVIDENCE THE WHOLE

2    DOCUMENT.

3           THE COURT:  THAT MIGHT BE EASIER.  ALL RIGHT.  IT'S

4    ADMITTED.

5        YOU HAVE NO OBJECTION TO THE WHOLE DOCUMENT BEING

6    ADMITTED.

7           MR. LEE:  NO OBJECTION.

8           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

9        (DEFENDANTS' EXHIBIT 572 WAS ADMITTED IN EVIDENCE.)

10          THE COURT:  GO AHEAD, PLEASE.

11   BY MR. PRICE:

12   Q.  IF WE CAN PUT UP 572.003, THIS IS THE TITLE; CORRECT?

13   JANUARY 2011; RIGHT?  DO YOU SEE THAT?

14   A.  I DO.

15   Q.  IF WE LOOK AT 572.006, THIS IS A STUDY THAT APPLE DID TO

16   TRY TO FIGURE OUT, YOU KNOW, WHY THE CONSUMERS WERE MAKING

17   CERTAIN CHOICES; CORRECT?

18   A.  I DON'T KNOW THE MOTIVATION TO IT, BUT IT'S STUDIED, THE

19   TITLE WOULD SUGGEST, IT WAS A SMARTPHONE MARKET STUDY.  I DON'T

20   KNOW WHO ASKED FOR IT.

21   Q.  IT SAYS HERE ON PAGE 6, "SMARTPHONE BUYERS ARE LIKELY TO

22   LIMIT CHOICES TO THEIR CURRENT SERVICE PROVIDER.  THIS WAS A

23   KEY REASON ANDROID BUYERS SAID THEY BOUGHT AN ANDROID DESPITE

24   CONSIDERING THE IPHONE."

25          DO YOU SEE THAT?

1      A.   I SEE THAT.

2      Q.   IF WE TURN TO EXHIBIT -- I'M SORRY, PAGE 82.

3      A.   82 IS THE TOP ONE?

4      Q.   IT SAYS TOP REASONS FOR BUYING AN ANDROID AMONG THOSE WHO

5      CONSIDERED AN IPHONE, AND THAT'S 572.082.

6           AND FIRST YOU SEE THAT ONLY 25 PERCENT OF RECENT ANDROID

7      BUYERS EVEN CONSIDERED AN IPHONE.

8           DO YOU SEE THAT?

9      A.   I'M SORRY.  IT'S -- 082 AT THE TOP.

10     Q.   YEAH, YOU CAN LOOK AT YOUR MONITOR THERE.  DO YOU SEE

11     THAT?

12     A.   I DO SEE THAT.

13     Q.   OKAY.  AND IF YOU LOOK AT THE RESULTS, YOU SEE THAT

14     48 PERCENT WANTED TO STAY WITH THE CURRENT PROVIDER, 36 PERCENT

15     TRUSTED THE GOOGLE BRAND?

16     A.   JUST GIVE ME A MINUTE, MR. PRICE.  I WANT TO READ THIS.

17          OKAY.

18     Q.   IT'S TRUE THAT THE SAMSUNG PHONES HAD LARGER SCREENS;

19     CORRECT?

20     A.   THAT IS TRUE, THEY DID OFFER SOME LARGER SCREENS.

21     Q.   IT'S TRUE THAT THE SAMSUNG PHONES HAD TURN BY TURN GPS

22     NAVIGATION; CORRECT?

23     A.   THAT'S CORRECT.

24     Q.   AND APPLE PHONES DID NOT -- THAT IS, SAMSUNG HAD THAT

25     BEFORE APPLE DID; CORRECT?

1    A.   THAT'S -- BUILT IN, THAT IS CORRECT.

2    Q.   AND AT THIS TIME -- IN 2010, 2012, SAMSUNG WAS ALSO

3    HEAVILY MARKETING ITS PHONES; RIGHT?

4    A.   I DON'T RECALL WHAT THEIR MARKETING BUDGET WAS.  IT WASN'T

5    SOMETHING I WAS PRIVY TO.  WHAT KIND OF ADS THEY RAN, I WISH I

6    COULD REMEMBER TO TELL YOU WHAT THEY WERE RUNNING.  BUT

7    CERTAINLY THEY WERE RUNNING ADS.

8    Q.   WELL, IF YOU LOOK AT EXHIBIT 4540, THIS IS AN APPLE

9    DOCUMENT THAT CAME BY YOUR -- RAN ACROSS YOUR DESK WHICH TALKED

10   ABOUT A SAMSUNG BRAND UPDATE BASED ON EXTERNAL INDUSTRY

11   INFORMATION?  DO YOU SEE THAT?

12   A.   I SEE THAT.

13        MR. PRICE:  MOVE EXHIBIT 4540 INTO EVIDENCE, YOUR

14   HONOR.

15        THE COURT:  ANY OBJECTION?

16        MR. LEE:  NO OBJECTION.

17        THE COURT:  IT'S ADMITTED.

18   (DEFENDANTS' EXHIBIT 4540 WAS ADMITTED IN EVIDENCE.)

19        THE COURT:  GO AHEAD, PLEASE.

20   BY MR. PRICE:

21   Q.   AND IF WE GO TO PAGE 4, DO YOU SEE IT TALKS ABOUT HOW MUCH

22   SAMSUNG WAS SPENDING IN TERMS OF ADVERTISING IN THE YEARS 2011,

23   '10, AND '12.

24        DO YOU SEE THAT?

25   A.   I DO SEE THAT.

1    Q.   AND THESE ARE IN THE MILLIONS.  AND YOU SEE THAT SAMSUNG

2    WAS SPENDING BILLIONS ON ADVERTISING; CORRECT?

3    A.   I ASSUME THEY WERE SPENDING A LOT OF MONEY.  THAT WASN'T A

4    SAMSUNG DOCUMENT.  THIS WAS SOME ANALYST GUESSING HOW MUCH THEY

5    WERE SPENDING, JUST TO BE CLEAR.

6    Q.   THIS WAS AN INTERNAL PRESENTATION AT APPLE?

7    A.   NO, I'M QUOTING THE SOURCE.  THE SOURCE IS ASYMCO.COM, SO

8    THEY WERE PUTTING SOMETHING THAT'S OUT ON THE WEB BASICALLY UP

9    HERE.

10   Q.   AND YOU BELIEVED THIS TO BE TRUE AT THE TIME IT WAS

11   PRESENTED WITHIN APPLE; RIGHT?

12   A.   I WISH I COULD TELL YOU I COULD BELIEVE THE NUMBERS.  I

13   DON'T KNOW.  I DIDN'T -- WE DIDN'T CREATE THOSE NUMBERS.  THEY

14   WERE REPORTING SOMETHING THEY'D SEEN ON THE WEB.

15   Q.   DID YOU HAVE AN EXPERIENCE OR ANY COMMUNICATION SAYING

16   THAT SAMSUNG SEEMED TO BE KIND OF AN ALL CYLINDERS WHEN IT CAME

17   TO ADVERTISING AND MARKETING ITS PHONES?

18   A.   WE CERTAINLY MAY HAVE.  I DON'T RECALL.

19   Q.   YOU KNEW THAT SAMSUNG WAS ACTUALLY SPENDING MONEY TO

20   ADVERTISE THESE PHONES; RIGHT?

21   A.   CERTAINLY.

22   Q.   DO YOU KNOW WHETHER OR NOT A PENNY OF MARKETING ON THESE

23   PHONES HAS BEEN DEDUCTED BY YOUR EXPERT IN CALCULATING

24   SAMSUNG'S PROFITS?

25   A.   AGAIN, I BELIEVE THE TEST THAT WE'RE GIVEN IS DIRECT

1    COSTS, AND I DON'T KNOW IF THOSE ARE CONSIDERED DIRECT COSTS,

2    BUT I'LL LEAVE THAT TO THE EXPERTS.

3    Q.   AND FINALLY, I'M TRYING TO LIMIT MY TIME WITH YOU.

4    A.   TAKE YOUR TIME, I'M ENJOYING IT.

5    Q.   I KNOW YOU'D LIKE ME TO.

6         ONE THING APPLE DID IS IT DID COMPETITIVE ANALYSES WHERE

7    IT WOULD LOOK AT PHONES IN THE COMPETITIVE MARKETPLACE AND LOOK

8    AT THE VARIOUS COMPONENTS; CORRECT?

9    A.   REPEAT THAT.  SORRY.  WE DID WHAT?

10   Q.   APPLE WOULD LOOK AT COMPETITIVE PHONES IN THE MARKETPLACE?

11   A.   SURE.

12   Q.   AND THEY WOULD BREAK THEM DOWN AND LOOK AT THEIR

13   COMPONENTS?

14   A.   CORRECT.

15   Q.   AND IF YOU LOOK AT EXHIBIT 2519, THAT IS AN EXAMPLE OF

16   THAT; CORRECT?  IT'S EXHIBIT 2519, DX 2519?

17   A.   I GOT IT.

18   Q.   DO YOU HAVE IT?  IT'S AN APPLE DOCUMENT THAT SAYS MANY

19   TEARDOWNS, SAMSUNG GALAXY S.

20        DO YOU SEE THAT?

21   A.   I DO.

22        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 2519 INTO IS

23   EVIDENCE.

24        MR. LEE:  NO OBJECTION.

25        THE COURT:  IT'S ADMITTED.

1          (DEFENDANTS' EXHIBIT 2519 WAS ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3      BY MR. PRICE:

4      Q.   AND THE TEARDOWN WOULD BE ALSO THINGS SUCH AS -- IF YOU

5      LOOK AT PAGE 8.008.

6      A.   008.

7      Q.   DO YOU SEE THERE'S A DISASSEMBLY SHOWING SOMETHING THAT

8      SHOULD GO TO THE CAMERA TEAM FOR FURTHER ANALYSIS, IT'S GOT THE

9      PCB ASSEMBLY FRONT, ET CETERA.

10             DO YOU SEE THAT?

11     A.   I DO.

12     Q.   HAVE YOU SEEN THIS DOCUMENT BEFORE?

13     A.   I'M SURE I HAVE OVER TIME.

14     Q.   AND IF YOU ALSO LOOK AT EXHIBIT 4719.

15             I DIRECTED YOU TO THE WRONG EXHIBIT.

16             I'M SORRY.  EXHIBIT 2627.

17             DO YOU RECOGNIZE THIS AS AN APPLE INTERNAL DOCUMENT?  A

18     TRADE SHOW REPORT?

19     A.   I BELIEVE IT WOULD BE.  I DON'T RECOGNIZE THE DOCUMENT,

20     BUT I'LL TAKE YOU ON YOUR WORD THAT THIS IS THAT.

21             MR. QUINN:  YOUR HONOR, I'LL MOVE EXHIBIT 2627 INTO

22     EVIDENCE.

23             MR. LEE:  NO OBJECTION.

24             THE COURT:  IT'S ADMITTED.

25         (DEFENDANTS' EXHIBIT 2627 WAS ADMITTED IN EVIDENCE.)

```
1                 THE COURT:  GO AHEAD, PLEASE.

2       BY MR. PRICE:

3       Q.   AND FINALLY, IF YOU LOOK AT EXHIBIT 712.

4            DO YOU SEE THAT'S AN INTERNAL APPLE DOCUMENT FROM THE NEW

5       TECH CORE TEAM, THE SUBJECT COMPETITIVE PHONE TRACKER?

6            DO YOU SEE THAT?

7       A.   I SEE THAT'S WHAT IT'S TITLED.

8       Q.   AND THERE ARE PHOTOGRAPHS OF VARIOUS PHONES IN THE MARKET

9       IN THAT DOCUMENT; CORRECT?

10      A.   I SEE THAT.

11                MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 712 INTO

12      EVIDENCE.

13                THE COURT:  ANY OBJECTION?

14                MR. LEE:  NO OBJECTION, YOUR HONOR.

15                THE COURT:  IT'S ADMITTED.

16         (DEFENDANTS' EXHIBIT 712 WAS ADMITTED IN EVIDENCE.)

17                THE COURT:  GO AHEAD, PLEASE.

18                MR. PRICE:  THANK YOU VERY MUCH FOR YOUR TIME, SIR.

19                THE WITNESS:  THAT'S IT.

20                THE COURT:  ALL RIGHT.  THE TIME IS 1:52.

21           WHAT WAS THE LAST -- THE LAST EXHIBIT WAS 712 THAT WAS

22      ADMITTED; CORRECT?

23                MR. PRICE:  YES, YOUR HONOR.

24                THE COURT:  ALL RIGHT.  THANK YOU.

25                MR. LEE:  JUST A FEW QUESTIONS.
```

1                        **REDIRECT EXAMINATION**

2       BY MR. LEE:

3       Q.   MR. PRICE ASKED YOU ABOUT COMPETITIVE INTELLIGENCE

4       GATHERING.  DO YOU RECALL THAT?

5       A.   I CERTAINLY DO.

6       Q.   IS THERE A DIFFERENCE BETWEEN COMPETITIVE INTELLIGENCE

7       GATHERING AND COPYING IN YOUR EXPERIENCE?

8       A.   A BIG DIFFERENCE.

9       Q.   WHAT'S THE DIFFERENCE?

10      A.   WE TRACK COMPETITION ALL THE TIME.  WE DO TEAR THEM APART

11      TO SEE WHAT THEY LOOK LIKE, BUT WE DON'T COPY THEM.  THAT'S THE

12      DIFFERENCE BETWEEN DOING IT RIGHT AND DOING IT WRONG.

13      Q.   MR. PRICE ASKED YOU A NUMBER OF QUESTIONS ABOUT WHETHER

14      WHAT APPLE HAD DONE AND WHETHER APPLE WAS FIRST.

15           DO YOU RECALL THOSE?

16      A.   I DO.

17      Q.   IS IT YOUR UNDERSTANDING THAT FOR THE FIVE PATENTS HERE,

18      THE PATENT AND TRADEMARK OFFICE ISSUED FIVE PATENTS?

19      A.   I UNDERSTAND THAT, YES, AND THOSE WERE UNIQUE TO US.

20      Q.   AND THE JURY FOUND THOSE PATENTS VALID AND THE PATENT

21      OFFICE CORRECT IN THE FIRST CASE?

22      A.   THAT'S CORRECT.

23      Q.   NOW, MR. PRICE PUT A BUNCH OF DOCUMENTS INTO EVIDENCE AND

24      ASKED YOU A SERIES OF QUESTIONS.  SOME OF THEM ADDRESSED

25      SAMSUNG AS A COMPETITOR; CORRECT?

```
1     A.   THAT'S CORRECT.

2     Q.   WHAT WAS SAMSUNG COMPETING WITH APPLE IN SELLING?

3     A.   PHONES.

4     Q.   DID A SINGLE PAGE OF THOSE DOCUMENTS TALK ABOUT

5     COMPETITION IN SELLING GLASS FRONT FACES?

6     A.   NOT A SINGLE PAGE.

7     Q.   BEZELS?

8     A.   NEVER.

9     Q.   DISPLAY SCREENS?

10    A.   NO.

11    Q.   NOT A SINGLE PAGE?

12    A.   NOT A SINGLE PAGE.

13    Q.   NOW, LAST QUESTION:  MR. JOSWIAK, WOULD APPLE HAVE HAD ANY

14    OBJECTION TO SAMSUNG SELLING ANDROID-BASED PHONES IF IT HADN'T

15    TAKEN APPLE'S DESIGNS?

16    A.   OF COURSE NOT.

17         MR. MUELLER:  THANK YOU.

18    NOTHING FURTHER, YOUR HONOR.

19         THE COURT:  ALL RIGHT.  TIME IS 1:54.

20    DO YOU HAVE ANY FURTHER CROSS?

21         MR. PRICE:  I DO, YOUR HONOR.

22         THE COURT:  OKAY.  TIME IS --

23         MR. PRICE:  BASED UPON THAT LAST QUESTION --

24         THE COURT:  THE TIME IS 1:54.  GO AHEAD.

25    /    /    /
```

1                        **RECROSS-EXAMINATION**

2      BY MR. PRICE:

3      Q.   BASED UPON THAT LAST QUESTION, IN FACT, APPLE OBJECTED TO

4      SAMSUNG SELLING PHONES THAT DID NOT INFRINGE ON THE '677

5      DESIGN, EVEN THOUGH APPLE CLAIMED IT DID; RIGHT?

6      A.   I DON'T KNOW WHAT YOU'RE REFERENCING.

7      Q.   YOU KNOW WHAT APPLE HAS CLAIMED THAT SAMSUNG INFRINGED.

8      YOU KNOW THOSE PHONES; RIGHT?

9      A.   RIGHT.

10     Q.   AND YOU KNOW THAT APPLE CLAIMS CERTAIN PHONES INFRINGED

11     THAT '677 PATENT AND THEY DIDN'T?

12     A.   I'M AWARE THAT THE JURY DIDN'T FIND ALL OF THEM TO HAVE

13     INFRINGED.

14     Q.   AND YOU --

15     A.   BUT CERTAINLY THERE'S A NUMBER OF THEM THAT THEY DID.

16     THOSE ARE THE ONES WE'RE TALKING ABOUT.

17     Q.   AND YOU ACCEPT THAT AS TRUE, THAT SOME OF THE PHONES THAT

18     APPLE ACCUSED OF INFRINGING THAT '677 PATENT, IN FACT, DID NOT

19     AND APPLE DIDN'T OWN THE RIGHT TO USE THOSE DESIGNS; RIGHT?

20     A.   AND AS I'M SURE YOU RECALL, THEY WERE ACCUSED OF

21     INFRINGING MULTIPLES.  SOME VIOLATE '677, SOME VIOLATED '087,

22     SOME '305.  THERE WERE VARIOUS PATENTS BEING ASSERTED.

23     Q.   SO THE ANSWER TO MY QUESTION IS YES?

24     A.   TO THE '677.

25               MR. PRICE:  THAT WAS MY QUESTION.

1      THANK YOU.

2           THE COURT:  ALL RIGHT.  TIME IS 1:55.  ANY FURTHER

3    REDIRECT?

4           MR. LEE:  NOTHING FURTHER, YOUR HONOR.

5           THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

6    AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

7           MR. LEE:  THE WITNESS MAY BE EXCUSED.

8           THE COURT:  NOT SUBJECT TO RECALL.

9           MR. LEE:  NOT SUBJECT TO RECALL.

10          THE COURT:  DO YOU AGREE WITH THAT, MR. PRICE?

11          MR. PRICE:  I DO, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

13   TRIAL TESTIMONY.  YOU'RE FREE TO LEAVE.

14          THE WITNESS:  THANK YOU, YOUR HONOR.

15          THE COURT:  CALL YOUR NEXT WITNESS, PLEASE.

16          MR. LEE:  YOUR HONOR, OUR NEXT WITNESS IS

17   MR. HOWARTH, AND MR. MCELHINNY IS GOING TO DO THE EXAMINATION.

18          THE COURT:  ALL RIGHT.  COME FORWARD, PLEASE.

19       WE'RE PROVIDING THE PHOTOS WITH EACH WITNESS IN CASE YOU

20   WANT TO TAKE ANY NOTES ON THEIR PHOTOS SO YOU CAN ASSOCIATE A

21   PHOTO WITH A PERSON JUST BECAUSE THERE WILL BE A NUMBER OF

22   WITNESSES TESTIFYING DURING THE TRIAL.

23       ALL RIGHT.  GO AHEAD, PLEASE, AND SWEAR HIM IN.

24          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND, SIR.

25          **(PLAINTIFF'S WITNESS, RICHARD HOWARTH, WAS SWORN.)**

1          THE WITNESS:  I DO.

2          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

3     AND THEN ONCE YOU'RE SEATED, PLEASE STATE AND THEN SPELL

4  YOUR FULL NAME FOR THE RECORD.

5          THE WITNESS:  MY NAME IS RICHARD HOWARTH.  THAT'S

6  R-I-C-H-A-R-D.  H-O-W-A-R-T-H.

7          THE COURT:  ALL RIGHT.  TIME IS NOW 1:56.

8     GO AHEAD, PLEASE.

9          MR. MUELLER:  THANK YOU, YOUR HONOR.  JOE MUELLER FOR

10 APPLE.  MAY I PROCEED?

11         THE COURT:  GO AHEAD, PLEASE.

12                    **DIRECT EXAMINATION**

13 BY MR. MUELLER:

14 Q.   GOOD MORNING, MR. HOWARTH.  COULD YOU PLEASE INTRODUCE

15 YOURSELF TO THE LADIES AND GENTLEMEN OF THE JURY?

16 A.   GOOD AFTERNOON.  MY NAME IS RICHARD HOWARTH.  I'VE BEEN

17 PART OF THE APPLE DESIGN TEAM FOR 22 YEARS.  I LIVE IN, I LIVE

18 IN SAN FRANCISCO WITH MY FAMILY.  I HAVE GOT INTO LITTLE KIDS,

19 SIX AND FOUR.  AND I'VE BEEN IN AMERICA FOR ABOUT 25 YEARS.

20 Q.   SIR, YOU WORK AT APPLE.  WHAT'S YOUR POSITION?

21 A.   I'M A SENIOR DIRECTOR OF THE INDUSTRIAL DESIGN GROUP.

22 Q.   FOR HOW LONG HAVE YOU WORKED AT APPLE?

23 A.   TWENTY-TWO YEARS.

24 Q.   I'M SORRY.  AND FOR THE ENTIRE 22-YEAR PERIOD, HAVE YOU

25 BEEN ON THE DESIGN TEAM?

1     A.   YES, THAT'S RIGHT.

2          THE COURT:  CAN YOU ADJUST THE MICROPHONE, PLEASE.

3     THANK YOU.

4          THE WITNESS:  SORRY.  IS THAT BETTER?

5          MR. MUELLER:  THAT'S GREAT.

6          THE WITNESS:  SORRY ABOUT THAT.

7     BY MR. MUELLER:

8     Q.   AS A MEMBER OF THE DESIGN TEAM, WHAT ARE SOME OF THE

9     PRODUCTS THAT YOU'VE WORKED ON?

10    A.   I'VE WORKED ON ALL OF THEM FOR 22 YEARS BECAUSE WE'RE A

11    TEAM, AND WE WORK ON ALL THE PRODUCTS.  BUT THAT GOES FROM THE

12    ORIGINAL IMAC ALL THE WAY THROUGH TO IPOD, POWERBOOK, MACS,

13    IPHONES AND BEYOND.

14    Q.   WERE YOU INVOLVED WITH THE DEVELOPMENT OF THE ORIGINAL

15    IPHONE?

16    A.   YES.

17    Q.   AND WHAT IN PARTICULAR WAS YOUR ROLE IN THAT PROJECT?

18    A.   I WAS ONE OF THE TWO LEAD INDUSTRIAL DESIGNERS ON THE

19    IPHONE PROJECT.

20    Q.   NOW, COULD YOU TELL US A BIT ABOUT THE ROLE OF THE DESIGN

21    TEAM IN GENERAL AT APPLE?

22    A.   YEAH.  IT'S A CENTRAL ROLE AND IT'S -- IT'S CRUCIAL

23    BECAUSE DESIGN IS VERY CENTRAL AT APPLE.  AND SO OUR ROLE IS

24    TO, TO ACT AS A CENTRAL FACILITY FOR ALL OF THE IDEAS THAT WE

25    HAVE AS A COMPANY.

1          SO WE'LL WORK WITH LOTS OF DIFFERENT TEAMS AT APPLE, LIKE

2     ENGINEERING AND OPERATIONS AND, YOU KNOW, MARKETING AND

3     EVERYBODY TO PUT ALL THE IDEAS TOGETHER INTO A PRODUCT.

4     Q.   HOW MANY FOLKS ARE ON THE DESIGN TEAM?

5     A.   I THINK THERE'S ABOUT 22-ISH.

6     Q.   NOW, IF WE COULD TURN BACK THE CLOCK A BIT, DID YOU WORK

7     ON DESIGN FOR OTHER COMPANIES BEFORE JOINING APPLE?

8     A.   I DID.  MY FIRST JOB WAS AT IDEO, I-D-E-O, PRODUCT

9     DEVELOPMENT.  SO IT'S A CONSULTANCY IN PALO ALTO.

10    Q.   AND WHAT ARE SOME EXAMPLES OF THE TYPES OF PRODUCTS THAT

11    YOU WORKED ON AT IDEO?

12    A.   THEY WERE PRODUCTS, CONSUMER PRODUCTS, SO SMALL THINGS

13    LIKE SUNGLASSES FOR NIKE, LIKE AN IRON PANASONIC, AND THEN, AND

14    THEN, LIKE, COMPUTER PERIPHERALS AND THINGS FOR DELL.  ALL

15    SORTS OF HOME AND CONSUMER PRODUCTS.

16    Q.   AND HOW DOES YOUR DESIGN EXPERIENCE AT APPLE COMPARE WITH

17    YOUR PRIOR WORK IN THIS FIELD?

18    A.   YEAH.  IT'S REALLY DIFFERENT.

19         SO AT IDEO, WE WERE -- COMPANIES WOULD COME TO IDEO WITH

20    AN IDEA OF WHAT THEY WANTED TO DESIGN, AND WE WOULD DESIGN IT

21    FOR THEM.

22         AND THEN -- AND THEN THAT WOULD BE IT, AND THEY WOULD GO

23    OFF AND MAKE IT, THE COMPANIES, WHOEVER THEY WERE.

24         BUT AT APPLE, IT STARTS RIGHT FROM THE BEGINNING.  YOU

25    KNOW, THE CREATION OF WHAT THE PRODUCT NEEDS TO BE, AND THE WAY

1      THAT THE PRODUCT, EVERYTHING IS CONFIGURED IN IT, WHAT THE

2      PRODUCT NEEDS TO DO, RIGHT FROM THE START, DESIGN IS INVOLVED

3      AND IN A CENTRAL ROLE IN PUTTING ALL OF THOSE IDEAS TOGETHER.

4           AND THEN WORKING WITH ALL THE OTHER TEAMS TO MAKE IT

5      HAPPEN.

6           SO WE -- WE GET TO A PRODUCT THAT WE WANT TO CREATE AND

7      THEN, AND THEN AFTER THAT, WE SHOW IT TO THE REST OF THE

8      COMPANY AND WE'RE LIKE, OKAY, THIS IS IT, THIS IS WHAT WE'RE

9      GOING TO MAKE, AND THEN WE SHEPPARD IT THROUGH PRODUCTION TO

10     SORT OF, ON THE WAY THROUGH PRODUCTION, THERE'S LOTS OF THINGS

11     THAT CAN HAPPEN TO IT, AND WE'RE THERE TO GUIDE THE PRODUCT

12     THROUGH UNTIL IT GETS TO THE CUSTOMER SO THAT WE CAN MAKE SURE

13     THAT OUR IDEA ARRIVES WHOLE AND IN TACT.

14     Q.   SO, SIR, IF YOU COULD, IF YOU COULD EXPLAIN TO THE LADIES

15     AND GENTLEMEN OF THE JURY HOW IT WORKS, TAKE US INTO THE

16     PROCESS FROM THE BEGINNING OF A GIVEN PROJECT.

17     A.   SO IT ALWAYS STARTS WITH AN IDEA.  SO, YOU KNOW, WE USED

18     TO WORK VERY, VERY CLOSELY WITH STEVE JOBS WHEN HE WAS ALIVE

19     AND SO HE WOULD, HE WOULD COME IN AND SAY, I'VE GOT THIS

20     AMAZING IDEA, AND THEN WE WOULD EITHER HAVE THE TECHNOLOGY TO

21     DO THAT OR WE WOULDN'T, AND WE'D START TO DEVELOP THE

22     TECHNOLOGY.

23          AND THEN WE WOULD WORK WITH, WITH OTHER TEAMS, BASICALLY,

24     TO UNDERSTAND WHAT WE NEEDED TO DO.

25          AND THEN ALL THE DESIGNERS WOULD GET TOGETHER AND SO WE'D

1    ALL -- INCLUDING STEVE SOMETIMES -- AND WE'D GO OUT TO THE

2    KITCHEN TABLE IN THE STUDIO, THERE'S QUITE A BIG TABLE, AND WE

3    WOULD ALL GATHER ROUND IT WITH OUR SKETCHBOOKS AND BOUNCE IDEAS

4    OFF ONE ANOTHER SO WE CAN REALLY -- OUR THEORY IS LOTS OF HEADS

5    ARE BETTER THAN ONE.

6         SO WE'LL -- WE'LL ALL GET TO CREATE AN IDEA AND, YOU KNOW,

7    FIGURE OUT WHAT THE BEST IDEAS ARE AND THEN TAKE THOSE FORWARD

8    INTO A MODEL.

9         SO THE NEXT STAGE IS A MODEL AND WE'LL SHOW THAT TO EACH

10   OTHER, AND DECIDE IS THIS GREAT?  IS IT GOOD ENOUGH?

11        AND IT WORKS LIKE THIS REALLY.  SO IT'S A COMPLETELY, YOU

12   KNOW, GROUP EFFORT.

13   Q.   SO WHEN YOU GO FROM SKETCHBOOKS TO MODELS, WHAT DO YOU

14   MEAN BY A MODEL?

15   A.   WE'VE GOT -- SO IT'S A THING THAT REPRESENTS -- IT'S A

16   THING THAT REPRESENTS THE PRODUCT THAT WE'RE TRYING TO CREATE.

17   LET'S SAY IT'S A PHONE.  WE'VE GOT A MODEL SHOP IN OUR STUDIO

18   WHERE AN IDEA BASICALLY COMES IN, A SKETCH, AND WE CAN MODEL IT

19   IN 3-D CAD MODELS, WHICH MEANS IT GOES INTO A COMPUTER SO WE

20   CAN TURN IT AROUND AND SHAPE IT.

21        AND WE'VE GOT MACHINES THAT ARE 3-D MILLING MACHINES THAT

22   WE CAN DO IT, WHATEVER THE THING IS MADE OFF, AND IT COMES OUT

23   AS A PRETTY FINISHED LOOKS LIKE MODEL.  OBVIOUSLY IT DOESN'T

24   WORK, BUT IT'S A PRETTY GOOD REPRESENTATION OF A MODEL.

25   Q.   AND HOW MUCH WORK IS LEFT AFTER YOU HAVE THAT MODEL?

1    A.   THAT'S JUST THE BEGINNING.  SO THEN WE HAVE TO GUIDE AND

2    SHEPPARD IT THROUGH TO MAKE SURE THAT WHEN THE ENGINEERS ARE

3    COMING AND SAYING THIS BATTERY DOESN'T FIT, OR WHATEVER THOSE

4    DIFFERENT COMPONENTS ARE, WE WORK WITH THEM TO SHAPE THE

5    COMPONENTS AND SAY LET'S -- YOU KNOW, WE CAN MAKE THEM SMALLER.

6    WE'RE THERE THROUGHOUT THE PROCESS TO MAKE DECISIONS AS A TEAM,

7    AS PART OF THE PRODUCT DEVELOPMENT TEAM, AND TO, AND TO GUIDE

8    AND SHEPPARD THE PRODUCT THROUGH, ALL THE WAY THROUGH TO

9    PRODUCTION, WHICH IS WHEN IT'S MADE IN HIGH VOLUME, UNTIL IT

10   GETS TO THE CUSTOMERS.

11        EVEN AFTER THE CUSTOMERS HAVE GOT THEM, WE'RE STILL

12   INVOLVED.

13   Q.   WHAT ARE SOME OF THE OTHER GROUPS AT APPLE THAT THE DESIGN

14   TEAM WORKS WITH?

15   A.   VERY CLOSELY -- YOU KNOW, IN THE DESIGN TEAM, WE'VE GOT --

16   THERE'S A NUMBER OF PARTS.  THERE'S THE INDUSTRIAL DESIGN TEAM,

17   WHICH IS OUR 22 OR SO PEOPLE.

18        THEN WE'VE GOT SOME HI TEAM, WHICH ARE THE HUMAN INTERFACE

19   TEAM.  AND THEN I'VE GOT PARTNERS IN DESIGN FOR THE SOFTWARE

20   AND HARDWARE AND THE SOFTWARE PART TOGETHER.

21        AND THEN WE WORK WITH -- AND THEN WE'LL -- THAT'S IN

22   DESIGN.  WE'RE ALL TOGETHER.

23        AND THEN WE'VE GOT MARKETING, ALL SORTS OF DIFFERENT

24   ENGINEERING GROUPS, AND WE'VE GOT OPERATIONS PEOPLE AND, YOU

25   KNOW, TEAMS, REALLY EXPERT TEAMS TO MAKE SURE THAT WE'RE

1    COLLABORATING ON THE VERY BEST PRODUCT.

2    Q.   YOU MENTIONED THE HUMAN INTERFACE GROUP.  ARE YOU FAMILIAR

3    WITH THE TERM USER INTERFACE?

4    A.   YES.

5    Q.   WHAT DOES THAT MEAN?

6    A.   IT'S HOW YOU INTERACT WITH A PRODUCT.  SO IT'S YOUR --

7    IT'S THE WAY THAT YOU USE THE PRODUCT.  IN A PHONE, YOU KNOW,

8    IT'S HOW -- IT'S WHAT YOU NEED TO DO TO MAKE THE PRODUCTS DO

9    WHAT YOU NEED TO DO.

10   Q.   YOU SAID A FEW TIMES THE DESIGN TEAM STAYS INVOLVED THE

11   WHOLE WAY THROUGH THE PRODUCT LIFECYCLE.  WHY IS THAT?

12   A.   BECAUSE WE WANT TO, TO PROTECT IT, PROTECT IT, AND ALSO

13   INPUT.

14        LIKE I SAID, IT'S A TEAM EFFORT, BUT WE WANT TO -- WE'RE

15   PART OF THE DEVELOPMENT TEAM, A VERY IMPORTANT, CENTRAL

16   FUNCTION THAT IS THERE TO MAKE SURE THAT THE PRODUCT DOESN'T

17   GET -- STAYS AS THE IDEA, AS THE ESSENTIAL CONCEPT, STAYS AS

18   THE ESSENTIAL IDEA THAT IT WAS AT THE BEGINNING.

19        LOTS OF THINGS CAN HAPPEN TO IT.  IT'S QUITE FRAGILE AT

20   THE BEGINNING, AN IDEA AND A CONCEPT, AND IF YOU JUST LET IT GO

21   AND LET THE ENGINEERS, OR WHOEVER, YOU KNOW, LET WHOEVER HAVE

22   IT, THEN IT WILL GET OUT OF HAND MORE THAN LIKELY, AND IT'LL

23   END UP THE WAY THAT YOU DON'T WANT IT TO.

24        SO WE STAY COMPLETELY IN TOUCH AND GUIDE IT.

25   Q.   ALL RIGHT.  SIR, I'D LIKE TO TURN TO THE DESIGN OF THE

1    ORIGINAL IPHONE, AND YOU WERE ONE OF THE TWO LEAD DESIGNERS ON

2    THAT PROJECT?

3    A.   THAT'S RIGHT.

4    Q.   WHEN DID THE DESIGN WORK ON THE ORIGINAL IPHONE START?

5    A.   I THINK IT WAS AROUND 2004, 2005.

6    Q.   AND WHAT WERE YOUR RESPONSIBILITIES AS ONE OF THE TWO

7    LEADS?

8    A.   I -- OUR RESPONSIBILITIES REALLY WERE TO MAKE SURE THAT

9    THIS PRODUCT WAS FANTASTIC, THAT IT WAS -- THAT WE MADE SURE

10   THAT WE GOT THE REST OF THE TEAM INVOLVED, THE OTHER TEAMS TO

11   CREATE A PRODUCT THAT PEOPLE WOULD BE ABLE TO MAKE A CONNECTION

12   TO SO THAT IT WAS NOT JUST A PRODUCT.  THERE'S LOTS OF

13   DIFFERENT WAYS THAT YOU CAN CREATE A PRODUCT.  WE NEEDED TO

14   CREATE A PRODUCT THAT PEOPLE WOULD RESPOND TO, TO HAVE SOME

15   SORT OF CULTURAL SIGNIFICANCE AND BE ICONIC.

16        SO OUR JOB WAS TO MAKE SURE THAT THAT -- THAT WE CREATED A

17   PRODUCT THAT FELT AND LOOKED AMAZING.

18   Q.   AND WHAT WAS THE DESIGN GOAL FOR THE ORIGINAL IPHONE?

19   A.   THE ORIGINAL -- YOU KNOW, IT WAS QUITE A -- IT'S A

20   CHANGING TIME.  SO THERE WAS A LOT OF -- THERE WAS A LOT OF --

21   SO WE WERE CREATING SOMETHING THAT WE DIDN'T REALLY BELIEVE HAD

22   BEEN DONE PROPERLY BEFORE, AND SO IT WAS -- SO WE -- WHAT WE

23   WANTED TO DO WAS TO DISTILL, CREATE AN IDEA THAT WOULD DISTILL

24   ALL THE CHANGE THAT WAS HAPPENING.

25        SO WE WERE ABLE TO MAKE SOMETHING THAT PEOPLE COULD

1      UNDERSTAND, AN OBJECT THAT WHEN THEY SAW IT, THEY WOULD SAY, I

2      GET IT, BECAUSE IT'S COMPLICATED.

3           SO WHAT WE DID WAS WE CREATED -- WE WENT THROUGH HUNDREDS

4      AND HUNDREDS OF CONCEPTS, BUT WE CAME UP WITH ONE THAT FELT

5      LIKE A STONE AND IT FELT FAMILIAR BECAUSE IT FEELS NICE TO

6      HOLD, IT WAS POLISHED ON ONE SIDE, THERE WAS A FLAT FRONT THAT

7      WAS AS IF YOU POLISHED A STONE.  SO THE OUTSIDE WAS -- YOU'VE

8      GOT A FLAT FRONT ON THE STONE.

9           AND THEN THE IDEA WAS THAT EVERYTHING HAPPENED IN THERE.

10     SO ALL OF THE ACTION AND ALL OF THE INFORMATION CAME OUT OF

11     THIS ONE FACE.  AND THAT FELT LIKE A -- SOMETHING THAT YOU

12     COULD GET YOUR HEAD AROUND.  IT WASN'T BUTTONS EVERYONE WHERE.

13     IT WASN'T COMPLICATED.  IT'S JUST THERE IT WAS AND EVERYTHING

14     WAS THERE.

15     Q.   AND HOW MANY FOLKS DID YOU WORK WITH AT APPLE OR HOW MANY

16     DIFFERENT TYPES OF TEAMS DID YOU WORK WITH TO CREATE THIS

17     PRODUCT?

18     A.   ALL THE TEAMS.  I MEAN, IT WAS SUCH AN INCREDIBLY

19     IMPORTANT PROJECT FOR APPLE THAT WE, THAT WE WERE INVOLVED WITH

20     EVERYBODY.  IT WAS WITH ALL SORTS OF ENGINEERING TEAMS,

21     STRUCTURAL ENGINEERING TEAMS AND SO ON, YOU KNOW, BATTERY

22     TEAMS.

23          BUT THERE WERE ALL THE ENGINEERING TEAMS, THE OPERATIONS

24     TEAMS, MARKETING, HUMAN INTERFACE.  YEAH, EVERYBODY WAS, WAS

25     GETTING STUCK IN.

1    Q.   AND FOR HOW LONG DID ALL OF THESE DIFFERENT TEAMS WORK ON

2    THIS PROJECT?

3    A.   YOU KNOW, A GOOD, INTENSE FOUR YEARS.

4    Q.   NOW, IF YOU COULD PLEASE OPEN YOUR BINDER AND TURN TO TAB

5    1, THIS IS PLAINTIFF'S EXHIBIT 1.

6    A.   I HAVE TWO BINDERS HERE.

7            MR. MUELLER:  YOUR HONOR, MAY I APPROACH?

8            THE COURT:  GO AHEAD, PLEASE.

9            MR. MUELLER:  (HANDING.)

10   Q.   IF YOU CAN PLEASE TURN TO TAB 1.  THIS IS PLAINTIFF'S

11   EXHIBIT 1.  IT'S A COLLECTION OF PHOTOGRAPHS.

12       DO YOU RECOGNIZE THESE PHOTOGRAPHS?

13   A.   YES.  YES, I DO.

14   Q.   WHAT ARE THEY?

15   A.   THEY'RE -- THESE ARE JUST SOME OF THE, SOME OF THE MANY

16   CONCEPTS THAT WE WENT THROUGH ON THE WAY TO FINDING THE RIGHT,

17   FINDING THE RIGHT ONE FOR THE IPHONE.

18           MR. MUELLER:  YOUR HONOR, I OFFER PLAINTIFF'S

19   EXHIBIT 1.

20           MR. QUINN:  NO OBJECTION.

21           THE COURT:  IT'S ADMITTED.

22       (PLAINTIFF'S EXHIBIT 1 WAS ADMITTED IN EVIDENCE.)

23           THE COURT:  GO AHEAD, PLEASE.

24   BY MR. MUELLER:

25   Q.   AND IF YOU COULD PLEASE TURN TO PAGE 1.11, AND IF WE COULD

1        PUT IT ON THE PAGE, ON THE SCREEN HERE.

2            AND, SIR, ON THIS PAGE WE SEE A SERIES OF PHOTOGRAPHS.

3    WHAT DO THEY DEPICT?

4    A.   THIS IS ONE OF THE CONCEPTS THAT WE WENT THROUGH ON THE

5    WAY TO, TO THE IPHONE.  IT'S ONE THAT WE DIDN'T PICK.  BUT IT'S

6    ONE OF THEM.

7    Q.   AND DO YOU SEE APPLE PROTO?  IS THAT APPLE PROTOTYPE?

8    A.   RIGHT.

9    Q.   NUMBER 392.

10   A.   YES.

11   Q.   HOW MANY PROTOTYPES DID YOU GO THROUGH TO ARRIVE AT THE

12   IPHONE?

13   A.   HUNDREDS.  HUNDREDS AND HUNDREDS.

14   Q.   THIS SAYS IPOD ON THE BACK.  WHY DOES IT SAY IPOD?

15   A.   THERE'S NO SUCH THING AS AN IPHONE AT THE TIME.  WE

16   DIDN'T -- THERE WAS NO IPHONE.  WE -- WE DIDN'T KNOW WHAT TO

17   CALL IT.  WE KNEW THAT IT NEEDED BRANDING OF SOME SORT, SO WE'D

18   BEEN MAKING IPODS ALREADY.  THAT HAD BEEN -- WE'D MADE THOSE.

19       SO WE THOUGHT THIS MIGHT BE BRANDED IPOD.  WE DIDN'T KNOW.

20   SO WE PUT THAT ON JUST BECAUSE THERE WAS NO IPHONE.

21   Q.   COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY,

22   WHAT WERE SOME OF THE REASONS WHY THIS PARTICULAR PROTOTYPE

23   WASN'T CHOSEN?

24   A.   YEAH.  IT JUST WASN'T GOOD ENOUGH.

25       SO IT WAS -- THERE'S SOME NICE STUFF ABOUT IT, BUT IT

1    DIDN'T LOOK -- TO US, IT DIDN'T REPRESENT WHAT WE WERE TRYING

2    TO DO, WHICH WAS CREATE SOMETHING THAT FELT FRIENDLY AND

3    UNDERSTANDABLE.  IT WAS NOT FANTASTIC TO HOLD AND IT LOOKED

4    PRETTY SQUARE FROM THE FRONT, AND IT HAS, YOU KNOW, SEPARATE,

5    DISTINCT SCREEN ON THE FRONT AND SEPARATE ELEMENTS ON THE

6    FRONT.  AND IT FELT BITTY.

7    Q.   I'M SORRY?

8    A.   IT FELT BITTY, JUST LOTS OF BITS.

9    Q.   AND, SIR, IF WE FLIP THROUGH EXHIBIT 1, WERE THERE OTHER

10   PHOTOGRAPHS, OR ARE THERE OTHER PHOTOGRAPHS OF OTHER PROTOTYPES

11   IN THAT EXHIBIT?

12   A.   YES.

13   Q.   AND THESE ARE ALL DESIGNS THAT WERE NOT CHOSEN?

14   A.   YEP.

15   Q.   AND WERE THERE HUNDREDS OF OTHERS?

16   A.   YES.  NO, WE -- YOU KNOW, IT WAS ENDLESS.  IT REALLY WAS.

17   STEVE WAS VERY, VERY, VERY -- HE REALLY WANTED SOMETHING GREAT,

18   AND IT TOOK A LONG WHILE TO GET THERE.

19   Q.   SO ABOUT FOUR YEARS?

20   A.   YES.  YES, START TO FINISH.

21   Q.   LET'S GO TO PDX 3.2, PLEASE.

22        AND, SIR, IF YOU COULD LOOK AT THE SCREEN UP HERE.  IS

23   THIS THE FINAL DESIGN THAT YOU ARRIVED AT AFTER ALL OF THAT

24   HARD WORK?

25   A.   THAT'S THE FINAL PRODUCT, YEAH.  YES, IT IS.

1    Q.    WHY WAS THIS CHOSEN AS THE DESIGN FOR THE ORIGINAL IPHONE?

2    A.    IT SEEMED TO EMBODY TO US -- IT SEEMED ICONIC ENOUGH.  YOU

3    KNOW, WE WERE TRYING TO CREATE SOMETHING THAT WAS -- THAT FELT

4    NEW AND BOLD AND FRESH AND WE SAW THIS, AND IT FELT LIKE IT HAD

5    A LOT OF THE QUALITIES THAT FELT LIKE SOMETHING THAT YOU REALLY

6    WANTED, THAT YOU -- THAT WASN'T JUST, YOU KNOW, A PRODUCT.  IT

7    JUST WASN'T AN ELECTRONIC PRODUCT.  IT WAS SOMETHING THAT WHEN

8    YOU SAW IT, YOU WOULD BE LIKE, WOW, WHAT IS THAT?  THAT'S

9    AMAZING.

10        AND SO WE -- WE -- YEAH, THAT'S WHAT WE -- WHY WE LOVED

11   IT.

12   Q.    SO LET'S FOCUS ON SOME OF THE KEY ELEMENTS IF WE COULD.

13        IF WE COULD ADVANCE TO PDX 3.3.  WHY WAS THIS BLACK FRONT

14   FACE SELECTED?

15   A.    THAT WAS PART OF THE, YOU KNOW, THE ORIGINAL CONCEPT THAT

16   WE WERE TALKING ABOUT.

17        SO THERE WAS -- THERE WAS -- THERE WERE A BUNCH OF

18   ELEMENTS IN THERE.  THERE WAS THE SCREEN, AND THERE'S A BUNCH

19   OF OTHER THINGS THAT THAT -- THAT NEEDED TO HAPPEN THERE.

20        BUT WE WANTED IT TO FEEL LIKE IT WAS ALL A PART -- YOU

21   KNOW, A POLISHED SURFACE WAS REALLY THAT SINGLE ELEMENT WHERE

22   ALL THE INFORMATION CAME OUT OF.

23        SO WE WANTED IT TO APPEAR LIKE A SINGLE THING, SO WE MADE

24   THE, THE FRONT FACE BLACK SO THAT EVERYTHING SORT OF BLENDED

25   AWAY, THE SENSES THAT YOU NEEDED TO WORK -- YOU KNOW, TO TURN

1    THE SCREEN ON AND OFF AND THE RECEIVER, ALL THOSE THINGS WE

2    WANTED TO DISAPPEAR AND JUST BE JUST THE ELEMENTS, THE ICONS ON

3    THE SCREEN THAT CAME THROUGH.

4    Q.   AND WHY THE ROUNDED CORNERS?

5    A.   THEY'RE NOT JUST ANY ROUNDED CORNERS.  SO WE WORKED REALLY

6    HARD ON THOSE PARTICULAR ROUNDED CORNERS BECAUSE WE, WE WANTED

7    SOMETHING THAT FELT -- YOU KNOW, THIS IS A BIG OBJECT AT THE

8    TIME WHEN IT CAME OUT.  AND IT WAS A BIG SCREEN.  WE WANTED

9    SOMETHING THAT FELT LIKE IT WAS ALL DISPLAY, BUT STILL FIT IN

10   YOUR POCKET, RIGHT?

11        IT WAS -- IT LOOKED SMALL WITH, YOU KNOW, WITH THESE SIZE

12   RADII AND IT FELT FANTASTIC IN YOUR HAND.

13        SO THERE WERE A NUMBER OF THINGS THAT WE WERE TRYING TO

14   ACHIEVE WITH THOSE EXACT RADII.  YOU KNOW, WE CHOSE A LOT OF

15   DIFFERENT SIZES AND FORMS.

16   Q.   NOW, HAVE YOU HEARD THE TERM "BEZEL"?

17   A.   YES.

18   Q.   WHAT IS A BEZEL?

19   A.   A BEZEL -- TRADITIONALLY BEZELS ARE LIKE A PART THAT GOES

20   AROUND A CLOCK OR A WATCH FACE.  IT IS A -- THAT PROTECTS THE

21   GLASS.

22        SO IT'S, YOU KNOW -- ON A DIVER'S WATCH, OR SOMETHING LIKE

23   THAT.  SO WE, WE CREATED A BEZEL AROUND OUR, AROUND OUR GLASS

24   PART SO THAT THAT WOULD PROTECT THE GLASS.

25        AND IT WOULD ALSO FOCUS, FOCUS THE -- ALL THE SORT OF --

1        FOCUS YOU, THE USER, ON TO WHAT WAS INSIDE OF IT.

2             SO IT WAS PROTECTING THE GLASS AND DOING THAT JOB AS WELL.

3        Q.   NOW, IF WE LOOK AT THE LEFT-HAND SIDE OF THE SCREEN HERE

4        WE SEE, IS THAT THE GRAPHICAL USER INTERFACE?

5        A.   YES.

6        Q.   WHAT DID THE GRAPHICAL USER INTERFACE ACCOMPLISH FROM A

7        DESIGN PERSPECTIVE?

8        A.   IT MADE -- IT MADE -- IT MADE IT UNDERSTANDABLE.  IT WAS

9        ORGANIZED.  THERE WAS ORGANIZATION TO THIS USER INTERFACE THAT

10       WAS REALLY IMPORTANT.

11            AND IT ALSO WAS REALLY IMPORTANT THAT IT SEEMED PART OF

12       THE DEVICE, THAT IT WASN'T JUST A DEVICE WITH A DIFFERENT

13       OPERATING SYSTEM ON IT.

14            YOU KNOW, IT WAS ALL ONE THING.

15            SO IT WAS -- THE USER INTERFACE WAS -- IT COMPLETELY FELT

16       LIKE PART OF THE WHOLE PRODUCT.  IT WAS ALL ONE THING.

17       Q.   NOW, SIR, THIS WAS THE FINAL ORIGINAL IPHONE DESIGN.

18            DO I HAVE THAT RIGHT?

19       A.   YES.

20       Q.   WHEN IT WAS RELEASED, DID IT RECEIVE ANY DESIGN AWARDS?

21       A.   YEAH, IT DID.  IT -- IT WON A LOT.  SOME OF IT WE'RE

22       REALLY PROUD OF.  BUT IT WON A LOT OF AWARDS BECAUSE IT WAS

23       SUCH A GROUNDBREAKING IDEA.

24       Q.   DID IT WIN SOMETHING CALLED THE IDSA, INTERNATIONAL DESIGN

25       EXCELLENCE AWARD?

```
 1    A.   YES, IT DID.

 2    Q.   AND IF YOU COULD TURN TO TAB 2 IN YOUR BINDER, WHICH IS

 3    PLAINTIFF'S EXHIBIT 157.

 4         DO YOU RECOGNIZE THIS?

 5    A.   YES.

 6    Q.   WHAT IS IT?

 7    A.   THAT'S THE DNAD AWARD, AND THIS WAS AN AWARD THAT WE WON

 8    FOR -- IT'S USUALLY, YOU KNOW, PRESERVED FOR ADVERTISING AND

 9    THINGS.  IT WAS REALLY RARE THAT A PRODUCT WOULD ACTUALLY WIN

10    THIS AWARD AND IT DID, IT GOT THE GOLD PENCIL.

11         MR. MUELLER:  YOUR HONOR, I OFFER PLAINTIFF'S

12    EXHIBIT 157.

13         MR. QUINN:  NO OBJECTION.

14         THE COURT:  IT'S ADMITTED.

15    (PLAINTIFF'S EXHIBIT 157 WAS ADMITTED IN EVIDENCE.)

16         THE COURT:  GO AHEAD, PLEASE.

17    BY MR. MUELLER:

18    Q.   IF WE CAN PUT THIS UP, THIS IS THE GOLD PENCIL AWARD; IS

19    THAT RIGHT?

20    A.   THAT'S RIGHT.

21    Q.   WHAT'S THE SIGNIFICANCE OF THAT IN THE DESIGN INDUSTRY?

22    A.   THAT'S HUGE.  IT'S HUGE.  IT'S LIKE --

23    Q.   WAS THE IPHONE DESIGN MADE PART OF ANY MUSEUM COLLECTIONS?

24    A.   YES, IT WAS -- IT'S IN THE PERMANENT COLLECTION OF THE

25    MUSEUM OF MODERN ART IN NEW YORK AND THEN THE SMITHSONIAN.
```

1      LOTS OF DESIGN MUSEUMS RECOGNIZED IT AND OTHER MUSEUMS.

2      Q.   NOW, IF WE CAN TURN TO TAB 5 IN YOUR BINDER, WHICH IS

3      JX 1043.

4           AND I BELIEVE IT'S ALREADY BEEN ADMITTED PURSUANT TO THE

5      PRE-ADMITTED LIST, YOUR HONOR.  THIS IS THE '677 PATENT.

6                THE COURT:  OKAY.  GO AHEAD, PLEASE.

7      BY MR. MUELLER:

8      Q.   SIR, THIS IS ONE OF THE THREE PATENTS IN THIS CASE, THE

9      '677 PATENT.  I'M GOING TO REFER TO IT BY THE LAST THREE

10     NUMBERS IN THE TITLE THERE.

11          DO YOU HAVE THAT IN MIND?

12     A.   YES.

13     Q.   NOW, ARE YOU A PATENT LAWYER?

14     A.   NO.

15     Q.   DO YOU WRITE PATENTS?

16     A.   NO.

17     Q.   IN YOUR NORMAL RESPONSIBILITIES ON THE DESIGN TEAM, HOW

18     OFTEN DO YOU DEAL WITH PATENTS?

19     A.   VERY, VERY RARELY.  VERY RARELY.

20     Q.   SO WITH THAT IN MIND, I'M JUST GOING TO ASK YOU A FEW

21     QUESTIONS ABOUT THIS PATENT, BUT I DO WANT TO ASK YOU ABOUT THE

22     LIST OF INVENTORS.

23          ARE YOU ON THAT LIST?

24     A.   YES.

25     Q.   AND WHO ARE THE OTHER FOLKS ON THAT LIST?

1    A.   THAT'S THE REST OF THE DESIGN TEAM AND STEVE JOBS.

2    Q.   AND WHY ARE THERE SO MANY FOLKS LISTED ON THIS '677 PATENT

3    AS INVENTORS?

4    A.   WE ALL WORKED ON THE PROJECT TOGETHER AS A TEAM.

5    Q.   THE ORIGINAL IPHONE PROJECT?

6    A.   YES.

7    Q.   IF WE COULD TURN TO TAB 3 IN YOUR BINDER, THIS IS JX 1041.

8    THIS IS THE '087 PATENT.

9         AND, SIR, IF YOU COULD PLEASE LOOK AT THE LIST OF

10   INVENTORS.  ARE YOU LISTED THERE AS WELL?

11   A.   YES, I AM.

12   Q.   AND WHO ARE THE OTHER FOLKS LISTED AS INVENTORS ON THE

13   '087 PATENT?

14   A.   YES, THE SAME -- IT'S THE INDUSTRIAL DESIGN TEAM AND

15   STEVE JOBS, YES.

16   Q.   AND AGAIN, WHY ARE ALL THESE FOLKS LISTED AS INVENTORS?

17   A.   BECAUSE WE ALL WORKED REALLY CLOSELY AND HARD ON THIS

18   PROJECT.

19   Q.   AND THEN FINALLY, IF YOU GO TO TAB 4, WHICH IS JX 1042,

20   THIS IS THE '305 PATENT.

21        AND, SIR, DO YOU SEE THE LIST OF INVENTORS HERE?

22   MR. FREDDY ANZURES AND IMRAN CHAUDHRI.

23   A.   YES.

24   Q.   WHO ARE THEY?

25   A.   THEY ARE PART OF THE DESIGN TEAM THAT WORKED ON THE

1      INTERFACE FOR THE IPHONE.

2      Q.   HI STANDS FOR HUMAN INTERFACE?

3      A.   YES.

4      Q.   NOW, YOU TESTIFIED THAT THE DESIGN TEAM AND ALL THOSE

5      DIFFERENT FOLKS AT APPLE WORKED ON THE ORIGINAL IPHONE FOR

6      ABOUT FOUR YEARS; IS THAT RIGHT?

7      A.   RIGHT.

8      Q.   ARE YOU PROUD OF YOUR WORK?

9      A.   YEAH.  NO, WE WERE -- OF COURSE.  IT WAS ONE OF THOSE

10     PROJECTS THAT WAS -- THAT YOU'LL NEVER FORGET.  IT WAS -- WE

11     WERE VERY, VERY, VERY PROUD.

12     Q.   NOW, YOU UNDERSTAND THAT WE'RE HERE TODAY BECAUSE SAMSUNG

13     WAS FOUND TO HAVE INFRINGED THESE THREE PATENTS AND TWO OTHERS?

14     A.   YES.  YEAH.

15     Q.   ARE YOU GENERALLY FAMILIAR WITH THE SAMSUNG PRODUCTS THAT

16     WERE FOUND TO INFRINGE THESE THREE DESIGN PATENTS?

17     A.   YEAH, GENERALLY.

18     Q.   COULD YOU EXPLAIN TO THE JURY WHAT YOUR REACTION WAS WHEN

19     SAMSUNG RELEASED THOSE PRODUCTS TO THE MARKET?

20     A.   YEAH.  I THINK IT WAS THE SAME FOR LOTS OF PEOPLE, ONLY

21     TIMES TEN.  SO IT FELT LIKE IT WAS AN OBVIOUS RIP OFF TO US,

22     AND WE -- YOU KNOW, WE SAW THEM AND ALL OF OUR HARD WORK AND

23     THOUGHT THAT WE'D REALLY PUT INTO THIS PROJECT FOR YEARS AND

24     YEARS AND IT WAS JUST BLATANT.  IT WAS BLATANTLY RIPPED OFF.

25          SO IT WASN'T THAT THEY'D -- YOU KNOW, WHAT THEY TRIED TO

```
 1     DO IS REALLY STEAL THE ESSENTIAL FLAVOR OF THE IPHONE, YOU

 2     KNOW, THAT THEY WERE REALLY TRYING TO JUST RIP OFF THE, THE

 3     PART OF THE ICONIC NATURE AND SAY, WELL, WE'RE COOL, TOO, YOU

 4     KNOW, BY PUTTING -- YEAH.  ANYWAY, YEAH.

 5          NO, WE WERE ALL BROKEN UP, REALLY, REALLY.  IT WAS

 6     RIDICULOUS.

 7               MR. MUELLER:  THANK YOU, SIR.  I HAVE NO FURTHER

 8     QUESTIONS.

 9               THE COURT:  OKAY.  TIME IS NOW 2:22.  WOULD YOU LIKE

10     TO TAKE OUR TEN MINUTE BREAK NOW, OR DO YOU WANT TO GET

11     STARTED?

12               MR. QUINN:  IF WE COULD, YOUR HONOR, JUST TAKE THE

13     BREAK.

14               THE COURT:  OKAY.  LET'S TAKE A TEN MINUTE BREAK TO

15     2:30, PLEASE.

16               MR. QUINN:  I HAVE ONE QUESTION AFTER THE JURY HAS

17     LEFT.

18               THE COURT:  OKAY.  AFTER THE JURY HAS LEFT; CORRECT?

19               MR. QUINN:  YES.

20               THE COURT:  OKAY.  DO NOT RESEARCH OR DISCUSS THE

21     CASE.

22          THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL TAKE

23     A TEN MINUTE BREAK.  THANK YOU.

24          YOU MAY STEP DOWN DURING THE BREAK.

25          AND WOULD YOU LIKE HIM TO LEAVE?
```

1          MR. QUINN:  YES, PLEASE.

2          THE COURT:  OKAY.  IF YOU WOULD STEP OUTSIDE, TOO,

3     PLEASE.

4          THE WITNESS:  OKAY.

5        (JURY OUT AT 2:22 P.M.)

6          THE COURT:  ALL RIGHT.  THE DOOR HAS CLOSED.  THE

7     RECORD SHOULD REFLECT THAT ALL THE JURORS AND THE WITNESS HAVE

8     LEFT THE COURTROOM.

9        WHAT IS THE QUESTION, PLEASE?

10          MR. QUINN:  YOUR HONOR, WE HAVE -- THERE WAS A

11     MOTION, A BRIEFING ON THE SUBJECT OF UNASSERTED PATENTS.  WE

12     HAD HOPED TO USE WITH THIS WITNESS ONE OF APPLE'S UNASSERTED

13     DESIGN PATENTS.  IT WOULD BE THE '926.

14        AND WE HAVEN'T SEEN A -- AT LEAST, I HAVEN'T SEEN A

15     RULING, IF THE COURT HAS RULED ON WHETHER UNASSERTED PATENTS

16     WAS GOING TO BE USED.

17          THE COURT:  I WAS GOING TO RULE ON THEM IN THE HIGH

18     PRIORITY OBJECTIONS BECAUSE YOU HAD MANY, MANY, MANY IN THAT

19     MOTION.  HOW COME THAT WASN'T PREVIOUSLY BRIEFED IN THE HPO'S

20     FOR THIS WITNESS?  I'VE RULED ON TWO DAYS' WORTH OF OBJECTIONS.

21          MR. MUELLER:  YOUR HONOR, WE WERE RESTING ON ALL THE

22     BRIEFING WE'D DONE ON THIS.  WE THINK ALL THE UNASSERTED

23     PATENTS SHOULDN'T COME IN FOR THE REASONS ON THE BRIEFING THAT

24     WAS DONE ON WEDNESDAY, THURSDAY, FRIDAY.  BUT THERE'S THREE

25     BRIEFS ON THIS AND THOSE ARE OUR -- WE VERY MUCH BELIEVE THAT

1      NONE OF THESE UNASSERTED PATENTS ARE RELEVANT AND THAT THEY

2      ALSO FAIL THE TEST UNDER 403.

3          AMONG THE REASONS THAT THEY'RE NOT RELEVANT IS THERE'S NO

4      EXPERT OPINION LINKING ANY OF THESE PATENTS TO EITHER THE

5      SAMSUNG PRODUCTS OR THE APPLE PRODUCTS FOR THAT MATTER.  IT

6      WOULD REQUIRE THE JURY TO CONSIDER CLAIMS THAT HAVE NEVER BEEN

7      CONSTRUED, TO COMPARE THOSE CLAIMS THAT HAVE NEVER BEEN

8      CONSTRUED TO PRODUCTS WITHOUT THE BENEFIT OF ANY EXPERT OPINION

9      ON THAT SUBJECT, AND WOULD CREATE A SATELLITE LITIGATION THAT

10     WOULD DISTRACT FROM THE APPLICATION OF YOUR HONOR'S FOUR

11     FACTORS TO THE THREE DESIGN PATENTS-IN-SUIT AND THE SAMSUNG

12     PRODUCTS FOUND TO INFRINGE.

13         SO WE THINK IT'S IRRELEVANT AND PREJUDICIAL INSOFAR AS IT

14     DISTRACTS THE JURY FROM THE TASK AT HAND.

15             THE COURT:  ALL RIGHT.  SO WHICH IS THE PATENT

16     NUMBER?  THIS IS WHAT I'D LIKE TO DO, BECAUSE I THINK THERE

17     WAS -- WHAT WAS THE TOTAL NUMBER OF PATENTS IN THAT MOTION?  IT

18     WAS HUGE.

19             MR. MUELLER:  THERE WERE --

20             THE COURT:  IT WAS HUGE, AND I'M NOT GOING TO GET

21     INTO A SITUATION WHERE I'M RULING ON 500 DEMONSTRATIVE SLIDES

22     THAT ARE NOT GOING TO BE USED.  THAT'S A WASTE OF RESOURCES.

23         SO THIS IS WHAT I WOULD LIKE.  I WOULD LIKE A MORE NARROW,

24     RATHER THAN JUST SAYING WE'RE CALLING THESE 50 UNASSERTED

25     PATENTS AND WE RESERVE THE RIGHT TO RESERVE MORE.

1           I WOULD LIKE A LISTING -- BLESS YOU -- OF EVERY SINGLE

2    WITNESS AND EXACTLY WHICH DESIGN PATENT YOU INTEND TO USE FOR

3    THAT WITNESS.  WHEN CAN I GET THAT?  THAT'S WHAT I HAD WANTED

4    IN THE BRIEFING AND THAT'S NOT WHAT I GOT.  SO WHEN CAN I GET

5    THAT?  I DON'T WANT ANY SANDBAGGING, I DON'T WANT ANY HIDE THE

6    BALL.  IF YOU -- AND I DON'T WANT IT TO BE, LIKE, WELL, HERE'S

7    THE 75 UNASSERTED PATENTS WE'RE THINKING WE MIGHT USE IN THIS

8    TRIAL, EVEN THOUGH WE ONLY HAVE 8 HOURS FOR EVIDENCE.  THAT'S

9    REALLY -- IT'S NOT HELPFUL.

10          MR. QUINN:  I UNDERSTAND, YOUR HONOR.

11          THE COURT:  IT'S NOT HELPFUL.  IF IT CAN BE FOCUSSED

12   AND SAY WE'RE SERIOUS, THESE ARE THE UNASSERTED PATENTS WE

13   INTEND TO USE FOR THIS WITNESS, THAT WOULD BE MORE HELPFUL THAN

14   WHAT YOU FILED, WHICH IS LIKE HERE ARE THE 75 PATENTS THAT WE

15   MAY OR MAY NOT USE, SPEND ALL YOUR TIME SPINNING YOUR WHEELS

16   MAKING RULINGS ON 75 PATENTS WE MAY OR MAY NOT USE.  PLEASE

17   DON'T DO THAT TO ME.

18          THIS IS THE FOURTH TRIAL IN THIS CASE.  I DON'T WANT TO

19   KEEP REPEATING THAT PRACTICE.  SO WHEN CAN I GET A LIST OF

20   EXACTLY WHICH UNASSERTED PATENTS YOU MAY USE FOR EACH WITNESS?

21          MR. QUINN:  TOMORROW MORNING AS EARLY AS --

22          THE COURT:  THAT'S TOO LATE.  YOU WANT ME TO RULE ON

23   THEM RIGHT NOW, RIGHT?  ARE YOU PLANNING ON USE ANYMORE TODAY?

24   BECAUSE I WOULD LIKE TO USE THE OPPORTUNITY TO TRY TO LOOK AT

25   THOSE AS WELL DURING THE BREAK.

```
1              MR. QUINN:  NO.

2              THE COURT:  OKAY.  SO TODAY IS ONLY --

3              MR. QUINN:  I'M SORRY.

4              MS. MAROULIS:  YOUR HONOR, WE'LL PRODUCE A LIST IN

5      ABOUT 20 MINUTES.

6              THE COURT:  NO, NO, NO.  I WANT THE LIST OF HOW MANY

7      ARE YOU GOING TO USE HERE TODAY?

8              MR. PRICE:  YOUR HONOR, I CAN TELL YOU THAT WE'LL USE

9      D'926.

10             THE COURT:  OKAY.  AND THAT'S JUST WITH MR. HOWARTH?

11             MR. PRICE:  THAT MAY ALSO BE WITH THEIR EXPERT,

12     MR. BALL.

13             THE COURT:  OKAY.  ALL RIGHT.  ANY OTHERS THAT YOU

14     PLAN TO USE TODAY?

15             MR. PRICE:  JUST ONE SECOND.  THERE ARE THREE MORE.

16     THEY'RE THE APPLE DESIGN PATENTS.

17         (PAUSE IN PROCEEDINGS.)

18             MR. PRICE:  ALSO, YOUR HONOR, APPLE DESIGN PATENT

19     248.

20             THE COURT:  AND WHO WILL THAT BE WITH, MR. BALL?

21             MR. PRICE:  PROBABLY MR. BALL, YOUR HONOR.

22             THE COURT:  ANYONE ELSE?

23             MR. PRICE:  NOT TODAY.

24             THE COURT:  OKAY.  ANYONE ELSE THAT YOU'LL USE THAT

25     PATENT WITH?
```

```
 1              MR. PRICE:  I THINK THEY ARE PART OF MR. LUCENTE'S

 2     REPORT AND THEY'LL BE PART OF HIS OPINION.

 3              THE COURT:  OKAY.

 4              MR. PRICE:  AND ALSO PATENT '160.

 5              THE COURT:  AND THAT'S WITH MR. BALL AND MR. LUCENTE?

 6              MR. PRICE:  YES.

 7              THE COURT:  OKAY.  NOW, WHAT ABOUT THE D'926?  IS

 8     THAT WITH MR. LUCENTE AS WELL?

 9              MR. PRICE:  I'M SORRY, YOUR HONOR.  248, AND 160 WILL

10     ALSO BE WITH MS. KARE, WHO I DON'T THINK WILL BE TESTIFYING

11     TODAY.

12              THE COURT:  ALL RIGHT.  AND MR. -- OKAY.  LET ME JUST

13     MAKE SURE.  D'926, THAT'S ONLY WITH MR. HOWARTH?

14              MR. LEE:  HOWARTH, YEAH.

15              THE COURT:  HOWARTH AND MR. BALL.  WILL YOU BE USING

16     THAT WITH MR. LUCENTE AS WELL?

17              MR. PRICE:  YES.

18              THE COURT:  OKAY.  ALL RIGHT.  AND THEN THE 248 IS

19     WITH MR. BALL AND MR. LUCENTE.  THE 160 IS MR. BALL,

20     MR. LUCENTE, AND MS. KARE; CORRECT?

21              MR. PRICE:  ACTUALLY, I'M SORRY, 248 MAY ALSO BE WITH

22     MS. KARE.

23              THE COURT:  OKAY.  ALSO WITH MS. KARE.  OKAY.

24          ALL RIGHT.  ANY OTHER -- WHAT OTHER PATENTS?

25              MR. PRICE:  THE ONLY OTHER PATENT, YOUR HONOR, IS A
```

1      SAMSUNG DESIGN PATENT.

2            (PAUSE IN PROCEEDINGS.)

3            MR. MUELLER:  YOUR HONOR, PERHAPS IF I COULD, WHILE

4      THEY'RE GATHERING THE LIST, WITH RESPECT TO MR. HOWARTH --

5            THE COURT:  YES.

6            MR. MUELLER:  -- I THINK FOR THE REASONS ADVANCED FOR

7      WHY THESE PATENTS MIGHT BE RELEVANT IN THE BRIEFING INCLUDED

8      THINGS LIKE US CONTENDING THAT THE TITLE WAS DISPOSITIVE ON THE

9      ARTICLE OF MANUFACTURE ANALYSIS.

10           WE DISPUTE THE ARGUMENTS ADVANCED IN THE BRIEFING AS TO

11     ANY WITNESS, BUT CERTAINLY MR. HOWARTH SAID ABSOLUTELY NOTHING

12     THAT WOULD MAKE THE PATENTS RELEVANT UNDER THE LOGIC THAT WAS

13     ADVANCED TO YOUR HONOR IN THE BRIEFING BY SAMSUNG.

14           THE COURT:  ALL RIGHT.  WHAT OTHER PATENTS?

15           MR. PRICE:  SAMSUNG DESIGN PATENT D'815.

16           THE COURT:  OKAY.  AND WHO ARE YOU INTENDING TO USE

17     THAT WITH?

18           MR. PRICE:  MR. LUCENTE, MR. BALL, AND MS. KARE.

19           THE COURT:  OKAY.  NOW, IS THAT THE -- YOU ONLY HAVE

20     EIGHT HOURS.

21           MR. PRICE:  YES.

22           THE COURT:  SO IS THAT THE UNIVERSE, OR DO YOU INTEND

23     TO USE MORE?

24           MR. PRICE:  THAT'S THE UNIVERSE, YOUR HONOR.

25           THE COURT:  OKAY.  THE ONLY ONES THAT -- IS MR. BALL

1        TESTIFYING TODAY?

2                MR. MUELLER:  I BELIEVE SO, YOUR HONOR.

3                THE COURT:  OKAY.  SO THEN THE BALL ONES WE NEED TO

4        RULE ON TODAY AS WELL.

5            IS MS. KARE TESTIFYING TODAY?

6                MR. MUELLER:  IT'LL BE HARD TO REACH HER TODAY, YOUR

7        HONOR.

8                THE COURT:  AND I ASSUME MR. LUCENTE IS NOT.

9                MR. PRICE:  NOT TODAY.

10               THE COURT:  ALL RIGHT.  THANK YOU.

11               THE CLERK:  COURT'S IN RECESS.

12           (RECESS FROM 2:30 P.M. UNTIL 2:48 P.M.)

13               THE COURT:  SORRY, WOULD YOU PLEASE STEP OUTSIDE.

14               THE WITNESS:  YES.

15               THE CLERK:  PLEASE BE SEATED.

16               THE COURT:  ALL RIGHT.  THE DOOR HAS CLOSED, SO

17       MR. HOWARTH HAS LEFT, AND THE JURORS ARE NOT IN THE COURTROOM.

18           LET ME GO AHEAD AND ISSUE A RULING.

19           SO I RECEIVED A NOTE THAT SAMSUNG HAS WITHDRAWN DX 4562,

20       WHICH IS APPLE'S DESIGN PATENT 248, AND DX 4563, WHICH IS

21       APPLE'S DESIGN PATENT 160, SO I'M NOT ISSUING A RULING ON

22       THOSE.

23               MR. ARNOLD:  I JUST WANT TO CLARIFY, WITHDRAWING FOR

24       MR. BALL, NOT FOR DR. KARE, WHO WE UNDERSTAND IS NOT GOING TO

25       GO TODAY.

1              THE COURT:  OH, OKAY.  SO JUST WITHDRAWING FOR

2      MR. BALL, OKAY.

3              MR. ARNOLD:  THAT'S CORRECT.

4              THE COURT:  OKAY.  THANK YOU FOR THE CLARIFICATION.

5          ALL RIGHT.  LET ME RULE ON THE SAMSUNG DESIGN PATENT '815.

6      IT WAS FILED ON AUGUST 31ST OF 2010.  THE IPHONE WAS RELEASED

7      ON JANUARY 31ST OF 2007.

8          SO THIS ONE, I AM GOING TO EXCLUDE.

9          LET ME JUST SAY THAT SAMSUNG IN ITS BRIEF SAYS THAT

10     SAMSUNG'S ENTITLED TO ARGUE THAT SAMSUNG DIDN'T COPY THE

11     IPHONE, THAT INSTEAD SAMSUNG FOLLOWED ITS OWN DESIGN, WHICH WAS

12     NEW AND ORIGINAL WHICH WAS NOT A COPY OF THE IPHONE.

13         I THINK THAT IS UNDERMINING THE JURY'S INFRINGEMENT

14     VERDICT.

15         AND THEN IN RESPONSE TO APPLE'S ARGUMENT THAT THERE'S

16     NEVER BEEN ANY DETERMINATION ABOUT WHETHER THE PRODUCTS IN THIS

17     CASE ACTUALLY PRACTICE THE D'815 PATENT, SAMSUNG SAYS, NO,

18     WE'RE NOT REQUIRED TO SHOW THAT.  IT'S JUST ENOUGH THAT

19     MR. LUCENTE SAYS THAT THE D'815 IS RELATED TO THE DESIGN OF THE

20     PHONES.

21         AND YET IN THE SAME DOCUMENT, AND I'M SUMMARIZING ECF

22     NUMBER 3729, WHICH IS SAMSUNG'S DOCUMENT FILED ON MAY 10TH OF

23     2018, SAMSUNG SAYS, WELL, WE HAVE TO GET THIS IN BECAUSE IT

24     SHOWS THAT OUR PRODUCTS DO PRACTICE THIS PATENT.

25         AND THE PROBLEM IS THAT THERE'S NEVER BEEN ANY CLAIM

1    CONSTRUCTION ON THE D'815.  THERE'S NEVER BEEN ANY OPINION THAT

2    ANY OF THE PRODUCTS IN THIS CASE PRACTICE THE D'815.  AND YET,

3    THE ARGUMENT IS GOING TO BE MADE, WE PRACTICE THE D'815,

4    THEREFORE, WE'RE NOT COPYING.

5            AND UNDER 403, I THINK THAT WILL CONFUSE THE ISSUES,

6    MISLEAD THE JURY, AND WASTE TIME, AND THE PROBATIVE VALUE IS

7    RELATIVELY LOW BECAUSE THIS PATENT WAS FILED BASICALLY THREE

8    YEARS AND SEVEN MONTHS AFTER THE IPHONE WAS RELEASED.  THIS

9    PATENT WAS FILED ON AUGUST 31ST OF 2010.

10           SO THAT WILL BE EXCLUDED.

11           AS FAR AS THE APPLE PATENT '926, THAT WILL BE ADMISSIBLE

12   DURING THE CROSS-EXAMINATION OF MR. BALL, APPLE'S EXPERT, AND

13   MR. -- OR THE DIRECT EXAMINATION BY SAMSUNG OF MR. LUCENTE,

14   SAMSUNG'S EXPERT.

15           BUT IT'S NOT ADMISSIBLE AGAINST MR. HOWARTH.

16           THE PURPOSE FOR WHICH SAMSUNG INTENDS TO USE THAT PATENT

17   IS ALL ABOUT MR. BALL'S OPINION THAT THE TITLE OF THE PATENTS

18   INDICATE THAT THE ARTICLE OF MANUFACTURE EMBODYING THE DESIGN

19   IS THE ENTIRE ELECTRONIC DEVICE.  AND HERE I'M CITING AGAIN

20   ECF -- I'M CITING AGAIN ECF NUMBER 3729 FILED BY SAMSUNG ON

21   MAY 10TH OF 2018.

22           MR. HOWARTH HAS NOT AT ALL OPINED ON WHAT THE PATENTS MEAN

23   OR COMMENTED AT ALL ABOUT THE ELECTRONIC DEVICE.

24           ALL OF SAMSUNG'S ARGUMENTS ABOUT WHY THIS SHOULD BE

25   ADMITTED ALL PERTAIN TO MR. BALL, AND I AGREE THAT YOU SHOULD

```
1    USE IT WHEN YOU CROSS-EXAMINE MR. BALL, BUT NOT AS TO THIS

2    WITNESS.  UNDER 403, I THINK IT WOULD BE -- THE BALANCING

3    WEIGHS IN FAVOR OF EXCLUSION WITH REGARD TO THIS WITNESS, BUT

4    YOU CAN USE IT WITH MR. BALL AND MR. LUCENTE.

5         OKAY.  WITH THAT, I'D LIKE TO BRING THE WITNESSES BACK

6    IN -- THE WITNESS AND THE JURORS, PLEASE.

7         AND I WILL HAVE A RULING THEN FOR 4562 AND 4563 AS TO

8    MS. KARE TONIGHT.  OKAY?

9         (JURY IN AT 2:53 P.M.)

10         THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

11    SEAT.

12         ALL RIGHT.  MR. QUINN, IF YOU WOULD PLEASE PROCEED.

13         TIME IS NOW 2:53.

14         MR. QUINN:  THANK YOU, YOUR HONOR.

15                        CROSS-EXAMINATION

16    BY MR. QUINN:

17    Q.   GOOD AFTERNOON, MR. HOWARTH.

18    A.   HELLO.

19    Q.   MY NAME IS JOHN QUINN.  OBVIOUSLY I REPRESENT SAMSUNG.

20         AND I'D LIKE TO BEGIN BY TAKING A LOOK AT ONE OF YOUR

21    PATENTS, THE '677 PATENT.

22         IF WE COULD PUT THAT UP ON THE SCREEN.

23         WE SEE A DIAGRAM THERE ON THE FIRST PAGE OF THE PATENT,

24    DON'T WE?

25    A.   YES.
```

1    Q.   AND THEN IF WE SKIP FORWARD, THERE'S ANOTHER PAGE WHERE

2    THERE'S A FIGURE 1 AND A FIGURE 2 THERE.

3         DO YOU SEE THAT?

4    A.   I DO.

5    Q.   AND I NOTE THAT SOME OF THESE LINES ARE DOTTED LINES.

6         DO YOU SEE THAT?

7    A.   I DO.

8    Q.   AND THERE ARE ALSO SOME LINES THAT ARE NOT DOTTED, SOME

9    SOLID LINES; CORRECT?

10   A.   RIGHT.

11   Q.   AND YOU'RE -- YOU'RE AWARE THAT THERE IS A CONVENTION IN

12   THE PATENT WORLD WHERE DIAGRAMS IN PATENTS, SOLID LINES

13   INDICATE WHAT IS CLAIMED, AND WHAT IS DOTTED IS NOT CLAIMED BY

14   THE PATENT.

15        YOU'RE AWARE OF THAT?

16   A.   NO, I'M NOT AWARE OF THAT.

17   Q.   YOU'RE NOT --

18   A.   I THINK THAT THE SOLID -- THE THINGS THAT ARE IN THE SOLID

19   LINE ARE DEFINITELY CLAIMED AND THE DOTTED LINES ARE THERE FOR

20   CONTEXT.

21   Q.   RIGHT.  BUT IN TERMS OF -- I UNDERSTAND YOUR POINT ABOUT

22   CONTEXT.

23        BUT IN TERMS OF WHAT THE SUBJECT IS CLAIMED BY THE PATENT,

24   IS IT YOUR TESTIMONY THAT WHAT'S IN DOTTED LINES IS ALSO

25   CLAIMED BY THE PATENT?

1    A.   NO.

2    Q.   ALL RIGHT.  BECAUSE WE ALL KNOW -- YOU KNOW THAT THE

3    CONCEPT OF SOMETHING BEING CLAIMED IS A TERM OF ART IN THE

4    PATENT WORLD; CORRECT?

5    A.   I DON'T KNOW WHAT TERM OF ART IS, SORRY.

6    Q.   WELL, YOU'RE AWARE THAT CLAIM IS WHAT IS REFERRED TO IN

7    THE PATENT; RIGHT?

8    A.   RIGHT.

9    Q.   AND WHAT'S IN DOTTED LINES IS NOT CLAIMED, YOU'RE AWARE OF

10   THAT?

11   A.   OKAY.

12   Q.   AND CAN WE -- WE AGREE THAT WHAT WE'RE LOOKING AT HERE, IF

13   YOU JUST LOOK AT THE SOLID LINES THERE, THE CLAIMED MATTER,

14   THAT WHAT WE SEE THERE IS A RECTANGULAR, ROUND CORNERED, BLACK

15   FRONT FACE.

16        CAN WE AGREE ON THAT?

17   A.   INSIDE THE SOLID LINES?

18   Q.   YES, SIR.

19   A.   CORRECT.

20   Q.   I'M SORRY?

21   A.   YEAH.  YES.

22   Q.   ALL RIGHT.  AND THAT LITTLE CIRCLE THERE, THAT WHAT WE

23   MIGHT NOW ASSOCIATE WITH THE HOME BUTTON, THAT IS NOT CLAIMED

24   AS PART OF THE PATENT.  WE KNOW THAT BECAUSE IT'S IN THE DOTTED

25   LINES; CORRECT?

1    A.   THAT'S RIGHT.

2    Q.   OKAY.

3    A.   IT'S THERE FOR CONTEXT.

4    Q.   AND I'D LIKE TO SHOW YOU EXHIBIT 5007, OR PARTS FROM

5    EXHIBIT 5007 FROM A S 4G.  THIS IS JOINT EXHIBIT 5007.

6         IF YOU COULD APPROACH, YOUR HONOR?

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MR. QUINN:

9    Q.   I'M HANDING YOU BOTH A GLASS FACE, ROUNDED CORNERS,

10   RECTANGULAR FROM THE SAMSUNG S 4G (HANDING)?

11        AND I'D LIKE TO ASK YOU, DO YOU SEE YOUR PATENT, THE '677,

12   APPLIED TO THAT OBJECT?

13   A.   NO.

14   Q.   SO IT'S YOUR TESTIMONY THAT THIS ROUND CORNERED -- THE

15   BLACK OBJECT, OR THE OBJECT I'VE HANDED YOU FROM THE GALAXY

16   S 4G -- IF YOU COULD HOLD IT UP SO THE JURY CAN SEE IT, IF YOU

17   WOULDN'T MIND, PLEASE.

18   A.   THIS (INDICATING).  ALSO THIS.

19   Q.   I DON'T THINK YOU NEED THE BEZEL AT THIS POINT.  WE

20   HAVEN'T GOT TO THE NEXT PATENT.

21   A.   ALL RIGHT.

22   Q.   IS IT YOUR TESTIMONY THAT YOUR DESIGN THERE IS NOT

23   REFLECTED IN THAT OBJECT THAT YOU'RE HOLDING IN YOUR HAND?

24   A.   IT'S PART OF OUR DESIGN.

25   Q.   SORRY?

1    A.   IT'S PART OF IT.  THIS IS OBVIOUSLY THE FRONT FACE OF ONE

2    OF YOUR PRODUCTS THAT LOOKS LIKE THE FRONT FACE OF ONE OF OUR

3    PRODUCTS, PRODUCTS, RIGHT?  THIS IS A PIECE OF GLASS THAT GOES

4    INTO A PRODUCT, AND THIS -- AND INTO A PHONE.

5    Q.   OKAY.  WOULD YOU AGREE THAT YOUR DESIGN HAS BEEN APPLIED

6    TO THAT FRONT FACE THAT YOU'RE HOLDING IN YOUR RIGHT HAND?

7    A.   NO.

8    Q.   WHAT'S MISSING?  WHAT IS -- WHAT IS IN THE PATENT WHICH

9    ISN'T THERE IN YOUR RIGHT HAND?

10   A.   THE REST OF THE PHONE.  YEAH.

11   Q.   SO I'M CALLING YOUR ATTENTION TO WHAT'S CLAIMED IN THE

12   PATENT.

13   A.   YES.

14   Q.   WHICH I THINK WE'VE AGREED IS WHAT IS IN THE SOLID LINES?

15   A.   THAT'S WHAT'S CLAIMED, YES.

16   Q.   ALL RIGHT.  SO FOCUSSING ON WHAT'S CLAIMED IN THE PATENT,

17   WOULD YOU AGREE THAT WHAT'S CLAIMED IN THE PATENT HAS BEEN

18   APPLIED TO THAT FRONT FACE THAT YOU'RE HOLDING?

19   A.   NO.  IT'S BEEN A CLAIM -- SO IT'S BEEN APPLIED TO A PHONE.

20   THIS IS -- THIS IS A PART OF A PHONE, AND THAT'S WHAT WE'RE

21   REALLY CONCERNED ABOUT.

22   Q.   I UNDERSTAND THAT'S WHAT YOU'RE CONCERNED ABOUT.

23        MY QUESTION IS A LITTLE BIT DIFFERENT.  FOCUSSING ON

24   WHAT'S CLAIMED, AND YOU TOLD ME THAT WHAT IS CLAIMED IS THAT

25   RECTANGULAR FRONT FACE WITH THE ROUNDED CORNERS --

1    A.   YES.

2    Q.   -- HAS THAT DESIGN, THE CLAIM, BEEN APPLIED TO THAT GLASS

3    FACE I HANDED YOU?

4    A.   NO.

5    Q.   THAT CLAIM?

6    A.   NO, IT HASN'T.  CLEARLY NOT.

7    Q.   ALL RIGHT.  BECAUSE THERE ISN'T A WHOLE PHONE THERE?

8    A.   YES, BECAUSE THAT'S WHAT THE DOTTED LINES ARE THERE FOR,

9    IT'S CONTEXT.  THIS IS PART OF A THING.

10   Q.   AGAIN, I'M FOCUSSING ON THE CLAIM.  I THINK YOU'VE TOLD US

11   THAT THE DOTTED LINES ARE NOT PART OF WHAT'S CLAIMED; CORRECT?

12   THE DOTTED LINES ARE NOT PART OF WHAT'S CLAIMED?

13   A.   RIGHT, THAT'S CORRECT, YES.

14   Q.   SO WE CAN SET THOSE ASIDE, AND I WANT TO FOCUS ON WHAT IS

15   CLAIMED.

16   A.   YES.

17   Q.   ARE WE ON THE SAME PAGE?

18   A.   YES, TOTALLY.

19   Q.   SO WHAT IS CLAIMED HERE, THE SOLID LINES, THE RECTANGLE,

20   ROUNDED CORNERS?

21   A.   YES.

22   Q.   THAT CLAIM --

23   A.   YES.

24   Q.   -- HAS THAT BEEN APPLIED TO THAT GLASS FACE I HANDED YOU?

25   A.   NO.  YOU'VE ASKED ME THAT ALREADY.

1    Q.   ALL RIGHT.  WELL -- I'M ASKING ABOUT THAT CLAIM --

2    A.   YES.

3    Q.   -- IN THE PATENT.  HAS THAT BEEN APPLIED TO THOSE ROUNDED

4    CORNERS, THAT OBJECT I HANDED YOU?

5    A.   NO.  NO, IT'S NOT APPLIED TO IT, WHICH IS REALLY AN

6    IMPORTANT WORD.  IT HASN'T BEEN APPLIED TO IT.  THIS HAS

7    BEEN -- THIS IS -- IT'S A VERY IMPORTANT PART OF OUR DESIGN,

8    BUT IT'S BEEN APPLIED TO THE PHONE, AND THAT'S REALLY CRITICAL.

9    Q.   DO YOU SEE YOUR DESIGN?  DO YOU SEE THE DESIGN THAT'S

10   CLAIMED IN YOUR PATENT IN THAT RECTANGULAR OBJECT I SHOWED YOU?

11   A.   I SEE SOME SHAPES THAT ARE REALLY SIMILAR TO WHAT WE

12   DESIGNED IN THE IPHONE, UNCANNILY SIMILAR.

13   Q.   AND IF I ASK YOU -- YOU ALSO -- I HANDED YOU A BEZEL ALSO

14   FROM THE S 4G?

15   A.   YES.

16   Q.   AND IF WE COULD TAKE A LOOK AT THE '087 PATENT, AND THE

17   '087 PATENT INCLUDES BOTH THE FRONT FACE AND THE BEZEL; IS THAT

18   CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   OKAY.  AND IF WE LOOK, FOR EXAMPLE, AT THE FIGURES 5 AND

21   10 IN THE PATENT, FIGURES 5 -- NUMBER -- I'M SORRY.  FIGURES 9

22   AND 10.

23        WE CAN SEE THERE A REAR VIEW OF AN OBJECT, THE BACK, THE

24   SIDES, THAT'S ALL IN DOTTED LINES; CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   AND I THINK WE'VE AGREED THAT'S NOT PART OF THE CLAIM IN

2    THE PATENT?

3    A.   IT'S THERE FOR CONTEXT.

4    Q.   RIGHT.  AND WE SEE THE SOLID LINES THERE WHICH NOW CIRCLE

5    AND INCLUDE SOMETHING AROUND THE GLASS FRONT FACE; CORRECT?

6    A.   RIGHT.

7    Q.   AND IF WE -- I HANDED YOU ALSO A BEZEL FROM THE S 4G?

8    A.   YEAH (INDICATING).

9    Q.   AND IF WE PUT THAT TOGETHER WITH THAT GLASS THAT I GAVE

10   YOU, DO YOU SEE WHAT'S DEPICTED IN SOLID LINES IN THE '677,

11   YOUR '677 PATENT WHEN YOU PUT THOSE TOGETHER?  FOCUSSING ON THE

12   SOLID LINES.

13        I UNDERSTAND YOU WANT TO TALK ABOUT THE PHONE.

14        FOCUSSING ON THE SOLID LINES.

15   A.   RIGHT, THE SOLID LINE, GOT IT.

16   Q.   YES.  DO YOU SEE THE '677 -- I'M SORRY.

17        DO YOU SEE WHAT'S DEPICTED IN YOUR PATENT WHEN YOU TAKE

18   THAT BEZEL AND THE GLASS FACE TOGETHER?

19   A.   WHAT DO YOU MEAN BY DEPICTED?  SORRY.

20   Q.   I'M SORRY.  I MISSPOKE.  IT'S THE '087 PATENT?

21   A.   RIGHT.

22   Q.   WHEN YOU TAKE -- AND IF YOU WOULDN'T MIND, TAKE THE GLASS

23   FACE AND PUT IT TOGETHER WITH THE BEZEL?

24   A.   YES (INDICATING).

25   Q.   DO YOU SEE THE DESIGN THAT IS IN SOLID LINES REFLECTED IN

1      WHAT YOU'RE HOLDING IN YOUR HAND?

2      A.   THIS -- WHAT I SEE RIGHT HERE, YEAH, IT SEEMS TO ME TO

3      BE --

4      Q.   SIR, COULD YOU ANSWER MY QUESTION.

5      A.   YES.

6      Q.   DO YOU SEE THE DESIGN THAT'S REFLECTED IN SOLID LINES

7      THERE IN WHAT YOU'RE HOLDING IN YOUR HAND?

8      A.   IT'S REALLY SIMILAR, YES.

9      Q.   OKAY.  AND IF WE LOOK AT -- YOU WERE DESIGNATED IN THIS

10     CASE AS -- BY APPLE TO TESTIFY AS ITS CORPORATE REPRESENTATIVE

11     CONCERNING THE IDENTITY OF THE ARTICLE OF MANUFACTURE TO WHICH

12     APPLE'S DESIGNS HAVE BEEN APPLIED.

13          DO YOU RECALL THAT?

14     A.   YES.

15     Q.   AND AS THE PERSON DESIGNATED TO TESTIFY FOR APPLE ON THAT

16     SUBJECT, YOU UNDERSTOOD THAT YOU'RE REQUIRED TO EDUCATE

17     YOURSELF ABOUT WHAT THE ARTICLE OF MANUFACTURE WAS; CORRECT?

18     A.   RIGHT.

19     Q.   AND YOU DID THAT?  YOU DID EDUCATE YOURSELF; CORRECT?

20     A.   I THINK SO.

21     Q.   YEAH.

22     A.   I THINK SO.

23     Q.   AND ONE OF THE THINGS THAT YOU LOOKED AT WAS THE FOUR

24     FACTORS THAT THE COURT HAS GIVEN US --

25     A.   RIGHT.

1       Q.   -- WHICH ARE UP ON THE SCREEN HERE.

2            AND YOU UNDERSTOOD THAT IN DECIDING WHAT THE ARTICLE, THE

3       PURPOSE OF THIS WAS TO DETERMINE WHAT IS THE ARTICLE OF

4       MANUFACTURE TO WHICH APPLE'S PROTECTED DESIGNS HAVE BEEN

5       APPLIED.

6            YOU UNDERSTOOD THAT?

7       A.   YES.

8       Q.   OKAY.  AND YOU SAW FACTOR 1 IS THE SCOPE OF THE DESIGN

9       CLAIMED IN THE PLAINTIFF'S PATENT, INCLUDING THE DRAWINGS AND

10      WRITTEN DESCRIPTION; CORRECT?

11      A.   RIGHT.

12      Q.   AND THE OTHER FACTORS, THE OTHER -- YOU ALSO CONSIDERED

13      THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A

14      WHOLE?

15      A.   RIGHT.

16      Q.   INCLUDING SAMSUNG'S PRODUCT, THE PROMINENCE WITHIN

17      SAMSUNG'S PRODUCT; CORRECT?

18      A.   CORRECT.

19      Q.   NOT APPLE'S PRODUCT?

20      A.   BOTH.

21      Q.   WELL, WAS IT YOUR UNDERSTANDING THAT IN DECIDING

22      WHETHER -- WHAT THE ARTICLE OF MANUFACTURE IN THE SAMSUNG PHONE

23      WAS, THAT -- TO WHICH THE DESIGN HAD BEEN APPLIED, YOU WERE TO

24      LOOK AT THE APPLE PRODUCT?

25      A.   NO, NO.  SORRY ABOUT THAT.  I MEAN, IT'S THERE FOR

1    REFERENCE.

2    Q.   RIGHT.  SO YOU UNDERSTOOD THAT THAT FACTOR REQUIRED THAT

3    YOU LOOKED AT THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE

4    SAMSUNG PRODUCT AS A WHOLE; CORRECT?

5    A.   RIGHT.

6    Q.   AND THE THIRD FACTOR IS WHETHER THE DESIGN IS CONCEPTUALLY

7    DISTINCT FROM THE PRODUCT AS A WHOLE; CORRECT?

8    A.   RIGHT.

9    Q.   AND CONCEPTUAL -- DO YOU HAVE -- WE TALKED ABOUT "CLAIM"

10   BEING KIND OF A TERM OF ART IN THE PATENT WORLD.

11        DID YOU UNDERSTAND THAT "CONCEPTUALLY DISTINCT" WAS A

12   SIMILAR TERM OF ART?

13   A.   THIS TERM OF ART IS A LITTLE CONFUSING FOR ME.

14   Q.   ALL RIGHT.  WELL, TO HAVE ANYTHING OTHER THAN JUST A

15   DICTIONARY MEANING WHEN YOU DID YOUR ANALYSIS?  JUST SORT OF AN

16   ORDINARY DICTIONARY MEANING, LIKE CONCEPTUAL DISTINCT MEANS,

17   LIKE, A DIFFERENT IDEA?

18   A.   RIGHT.

19   Q.   AND THAT'S HOW YOU USED THE TERM?

20   A.   RIGHT.

21   Q.   RIGHT.  AND SO IS IT -- IS IT THEN -- IT'S YOUR

22   UNDERSTANDING THEN THAT YOUR -- YOUR DESIGNS, WHEN YOU

23   SUBMITTED THESE TO THE PATENT OFFICE, YOU CERTIFIED THAT THESE

24   ARE INVENTIVE; RIGHT?  UNIQUE?

25   A.   (NODDING HEAD UP AND DOWN.)

1    Q.   I NEED AN AUDIBLE RESPONSE.

2         YOU CERTIFIED THAT THEY'RE -- THAT THESE WERE UNIQUE, YOUR

3    DESIGNS?

4    A.   WE THOUGHT THEY WERE REALLY NEW, YEAH.  WE THOUGHT THEY

5    WERE NEW.

6    Q.   AND DISTINCT FROM ANYTHING --

7    A.   IN COMBINATION.

8    Q.   DISTINCT FROM ANYTHING THAT HAD BEEN DONE BEFORE?

9    A.   FOR THIS APPLICATION, WE -- WHAT WE DID WAS TRY TO PROTECT

10   SOMETHING THAT WE HAD COME UP WITH THAT WE THOUGHT WAS

11   IMPORTANT.

12   Q.   RIGHT.  AND YOU UNDERSTOOD THAT YOU -- YOU UNDERSTOOD THAT

13   YOUR DESIGNS, YOU THOUGHT THEY WERE DISTINCT FROM ANYTHING THAT

14   HAD BEEN DONE BEFORE?

15   A.   YEAH.

16   Q.   ALL RIGHT.  AND YOU UNDERSTOOD THAT, YOU KNOW, THE FRONT

17   FACE IS DISTINCT FROM, LIKE, THE BATTERY IN THE PHONE?

18   A.   YEAH, THIS "DISTINCT" WORD, I'M NOT QUITE SURE HOW YOU'RE

19   USING THAT.

20   Q.   WELL, AGAIN, YOU WERE THE PERSON WHO WAS DESIGNATED BY

21   APPLE --

22   A.   RIGHT.

23   Q.   -- TO GET EDUCATED AND APPLY THIS TEST; RIGHT?

24   A.   I WAS THE DESIGNER OF THE PHONE.

25   Q.   AT LEAST FROM A DESIGN STANDPOINT?

1    A.   RIGHT.

2    Q.   AND YOU READ THE TEST AND YOU APPLIED THAT; CORRECT?

3    A.   I LOOKED AT THE PARTS, YES.

4    Q.   AND THESE PARTICULAR DESIGNS, THE BEZEL PLUS THE FRONT

5    FACE AND THE FRONT FACE AND THAT GRAPHICAL USER INTERFACE

6    SCREEN, THEY ARE CONCEPTUALLY DISTINCT FROM THE PHONE AS A

7    WHOLE; RIGHT?

8    A.   THEY'RE PARTS OF THE PHONE.

9    Q.   RIGHT.

10   A.   YEAH, THEY'RE PART OF THE WHOLE PHONE.

11   Q.   SO EVERYTHING THAT'S PART OF THE WHOLE PHONE -- ANYTHING,

12   IF IT'S PART OF THE PHONE, IT CANNOT BE DISTINCT?  IS THAT YOUR

13   UNDERSTANDING?

14   A.   IT WAS -- WHAT WE WERE TRYING TO PROTECT WAS AN IDEA THAT,

15   YEAH, AND A PATENT IS ONE OF THE FEW WAYS OF TRYING TO PROTECT

16   IT.  SO THAT'S WHAT WE WERE TRYING TO DO.

17   Q.   DID YOU THINK THAT THE FRONT FACE WAS CONCEPTUALLY

18   DISTINCT FROM THE BATTERY?  LET ME JUST ASK YOU THAT?

19   A.   THEY ARE -- I DON'T KNOW WHAT YOU MEAN BY "CONCEPTUALLY

20   DISTINCT."

21        BUT TO US, THE DESIGN OF THE PHONE WAS A WHOLE, AND WE

22   WERE TRYING TO PROTECT AS MUCH AS WE COULD ON THE PHONE BECAUSE

23   IT WAS BRILLIANT.

24   Q.   I UNDERSTAND.  BUT YOU'RE THE ONE THAT RESEARCHED THIS FOR

25   APPLE.  SO I'M ASKING, YOU KNOW, BASED ON YOUR CONCLUSION AND

1    THE RESEARCH YOU DID, ARE YOU SAYING THAT THEIR DESIGN THERE,

2    FOR LACK OF FRONT FACE, IT'S NOT CONCEPTUALLY DISTINCT FROM THE

3    PHONE AS A WHOLE?  YOU CAN'T MAKE A DISTINCTION BETWEEN THE

4    TWO?  IS THAT TRUE?

5    A.   NO, BECAUSE THE PHONE IS AN IDEA.  THE WHOLE THING IS THE

6    PHONE THAT WE'RE -- YEAH, IT'S PART OF THAT.

7    Q.   SO THERE IS NOTHING -- NOTHING ABOUT THE DESIGN THAT IS

8    CONCEPTUALLY DISTINCT FROM THE PHONE AS A WHOLE?  IS THAT YOUR

9    TESTIMONY?

10   A.   IT'S PART OF THE DESIGN OF THE PHONE.

11   Q.   ALL RIGHT.  IT'S PART, BUT CONCEPTUALLY DISTINCT?

12   A.   IT'S PART OF THE PHONE.  THIS IS, THIS IS -- YOU CAN'T

13   TAKE JUST A PART AND SAY, THEREFORE, IN ORDER TO PROTECT THAT.

14   WE WANT TO PROTECT THE PHONE.

15   Q.   LET'S LOOK AT THE LAST FACTOR, THE FISCAL RELATIONSHIP

16   BETWEEN THE PATENTED DESIGN AND THE REST OF THE PRODUCT,

17   INCLUDING WHETHER THE DESIGN PERTAINS TO A COMPONENT THAT A

18   USER OR SELLER CAN PHYSICALLY SEPARATE FROM THE PRODUCT AS A

19   WHOLE.

20       NOW, YOU'RE AWARE THAT GLASS FRONT FACES CAN BE REMOVED

21   FROM PHONES?

22   A.   TECHNICALLY.

23   Q.   WELL --

24   A.   POSSIBLE.

25   Q.   WE'RE TALKING ABOUT SAMSUNG PHONES BECAUSE, REMEMBER,

1    WE'RE TRYING TO DECIDE, WHAT'S THE ARTICLE OF MANUFACTURE TO

2    WHICH THE DESIGNS WERE APPLIED ON THE SAMSUNG PHONES?

3    A.   WHICH IS THE PHONE, BECAUSE THIS IS PART OF THE PHONE.

4    Q.   EXACTLY.  BUT WHAT WE'RE -- WHAT THIS TELLS US WE HAVE TO

5    LOOK AT IS WHETHER THAT GLASS FRONT FACE CAN BE REMOVED FROM A

6    SAMSUNG PHONE.

7    A.   WHY WOULD YOU DO THAT IF IT WAS?

8    Q.   I'LL ASK YOU ABOUT THAT.  BUT FIRST ANSWER MY QUESTION IF

9    YOU WOULD, PLEASE.

10   A.   TECHNICALLY, IT'S POSSIBLE TO DISASSEMBLE A PRODUCT

11   BECAUSE YOU, YOU CREATE A PRODUCT BY ASSEMBLING IT.  SO YOU

12   WOULD NATURALLY BE ABLE TO DISASSEMBLE IT IF YOU HAD THE RIGHT

13   TOOLS.

14   Q.   RIGHT.  AND THERE'S NOTHING IN HERE THAT SAYS WHETHER IT

15   CAN BE PHYSICALLY DISASSEMBLED WITHOUT THE RIGHT TOOLS?  THAT'S

16   NOT THERE, IS IT, SIR?  THAT'S NOT THERE?

17   A.   I THINK -- THE MEANING, TO ME, FEELS LIKE IT -- IT NEEDS

18   TO FEEL LIKE A PART OF THE WHOLE.

19   Q.   IT DOESN'T ASK WHETHER IT WOULD HAVE A USE SEPARATELY?  IT

20   DOESN'T -- THERE ARE NO WORDS THERE THAT SUGGEST THAT; CORRECT?

21   A.   "THE PHYSICAL RELATIONSHIP BETWEEN THE PATENTED DESIGN AND

22   THE REST OF THE PRODUCT, INCLUDING WHETHER THE DESIGN PERTAINS

23   TO A COMPONENT THAT A USER OR SELLER CAN PHYSICALLY SEPARATE."

24        AGAIN, CAN BE PHYSICALLY SEPARATED FROM THE PRODUCT AS A

25   WHOLE, AND WHETHER THE DESIGN IS EMBODIED IN A COMPONENT --

1    Q.  IT DOESN'T SAY ANYTHING ABOUT WHETHER IT'S EASY TO

2    SEPARATE OR HARD TO SEPARATE, DOES IT, SIR?

3    A.  IT DOESN'T, NO.  IT'S IMPLIED.

4    Q.  AND IT DOESN'T SAY ANYTHING ABOUT WHETHER IT WOULD HAVE A

5    USE SEPARATELY OR NOT, DOES IT?  IT'S NOT THERE?

6    A.  NO.

7    Q.  OKAY.  AND THEN IT SAYS WHETHER THE DESIGN IS EMBODIED IN

8    A COMPONENT THAT IS MANUFACTURED SEPARATELY FROM THE REST OF

9    THE PRODUCT, OR IF THE COMPONENT CAN BE SOLD SEPARATELY.

10        YOU'RE AWARE THAT SAMSUNG BUYS SCREENS AND BEZELS FROM

11   SUPPLIERS?

12   A.  I DON'T KNOW WHERE YOU GET THEM FROM.

13   Q.  I'M SORRY?

14   A.  I DON'T KNOW WHERE YOU GET THEM FROM.

15   Q.  WELL, I MEAN, YOU DON'T HAVE ANY INFORMATION TO THE

16   CONTRARY?

17   A.  RIGHT.

18   Q.  OKAY.  AND YOU DON'T KNOW WHETHER SAMSUNG BUYS THOSE

19   COMPONENTS SEPARATELY; IS THAT TRUE?

20   A.  NOPE.  I'VE GOT NO IDEA.

21        MR. QUINN:  ALL RIGHT.  NOTHING FURTHER.  THANK YOU.

22        THE COURT:  ALL RIGHT.  THE TIME IS 3:11.

23        MR. MUELLER:  COULD YOU PLEASE PUT THAT BACK UP, SDX

24   29.

25        MAY A PROCEED, YOUR HONOR.

1          THE COURT:  GO AHEAD.  IT'S 3:11.

2          MR. MUELLER:  MAY I APPROACH THE SCREEN.

3          THE COURT:  GO AHEAD, PLEASE.

4          MR. MUELLER:  SDX 29, PLEASE.

5                     **REDIRECT EXAMINATION**

6    BY MR. MUELLER:

7    Q.   SIR, YOU WERE ASKED BY MR. QUINN ABOUT THE FOUR FACTOR

8    TEST.

9          DO YOU REMEMBER THAT, SIR?

10   A.   YES.

11   Q.   THESE ARE THE FOUR FACTORS THAT YOUR HONOR HAS GIVEN THE

12   JURY TO DETERMINE THE ARTICLE OF MANUFACTURE TO WHICH SAMSUNG

13   APPLIED THE CLAIMED DESIGNS.

14         DO YOU HAVE THAT IN MIND?

15   A.   YES.

16   Q.   THE FIRST FACTOR REFERRED TO THE SCOPE OF THE DESIGN

17   CLAIMED IN THE PLAINTIFF'S PATENT, INCLUDING THE DRAWING AND

18   THE WRITTEN DESCRIPTION.

19         DO YOU SEE THAT, SIR?

20   A.   YES.

21   Q.   BUT DO YOU SEE THERE'S FACTORS 2, 3, AND 4 AS WELL?  WE

22   DON'T STOP WITH JUST THE CLAIM?

23   A.   RIGHT.

24   Q.   WE HAVE TO FIGURE OUT WHAT IT'S BEEN APPLIED TO.

25         DO YOU UNDERSTAND THAT?

1   A.   YES.

2   Q.   WITH THAT IN MIND, SIR, IF WE COULD TURN TO EXHIBIT, JOINT

3   EXHIBIT 1043, AND THE LADIES AND GENTLEMEN OF THE JURY HAVE

4   THIS IN THEIR BINDER AS WELL.

5        THIS IS THE '677 PATENT THAT MR. QUINN ASKED YOU ABOUT.

6        AND IF WE COULD LOOK AT THE DESCRIPTION -- SURE.

7        MAY I APPROACH THE WITNESS JUST TO --

8             THE COURT:  GO AHEAD, PLEASE.

9   BY MR. MUELLER:

10  Q.   THIS IS THE DESCRIPTION.  AND LET ME DIRECT YOUR

11  ATTENTION, IF I COULD, SIR, DO YOU SEE THE SENTENCE THAT STARTS

12  "THE CLAIMED SURFACE"?

13  A.   YES.

14  Q.   IT SAYS, "THE CLAIMED SURFACE OF THE ELECTRONIC DEVICE IS

15  ILLUSTRATED WITH THE COLOR DESIGNATION FOR THE COLOR BLACK."

16       DO YOU SEE THAT, SIR?

17  A.   YES.

18            MR. MUELLER:  MAY I APPROACH THE WITNESS, YOUR HONOR.

19            THE COURT:  GO AHEAD, PLEASE.

20  BY MR. MUELLER:

21  Q.   WHAT COLOR IS THE SURFACE THAT MR. QUINN HANDED YOU?

22  A.   IT'S BLACK.

23  Q.   WHAT COLOR IS THAT (INDICATING)?

24  A.   THAT'S CLEAR.

25  Q.   IS THE BLACK SURFACE OF THE '677, SIR?

1         IS THAT GLASS ALONE THE '677 SURFACE?

2    A.   YES.

3    Q.   THE GLASS SURFACE, IS THAT THE BLACK SURFACE?

4    A.   OH, NO, NO, NO.

5    Q.   OKAY.  NOW, IF YOU COULD GO TO THE NEXT SENTENCE, DO YOU

6    SEE WHERE IT STARTS, "THE ARTICLE OF MANUFACTURE"?  AND IF WE

7    COULD HIGHLIGHT STARTING AT "THE ARTICLE OF MANUFACTURE."

8         IT STATES, "THE ARTICLE OF MANUFACTURE TO WHICH THE

9    ORNAMENTAL DESIGN HAS BEEN APPLIED IS AN ELECTRONIC DEVICE,

10   MEDIA PLAYER (E.G., MUSIC, VIDEO AND/OR GAME PLAYER) MEDIA

11   STORAGE DEVICE, PERSONAL DIGITAL ASSISTANT, COMMUNICATION

12   DEVICE (E.G., CELLULAR PHONE), NOVELTY ITEM OR TOY."

13        DO YOU SEE THAT, SIR?

14   A.   YES, I DO.

15   Q.   SO THE PATENT IS TELLING US THERE'S A CLAIM ON THE ONE

16   HAND AND THEN AN ARTICLE OF MANUFACTURE TO WHICH IT COULD BE

17   APPLIED ON THE OTHER; IS THAT RIGHT?

18   A.   YES.

19   Q.   IN FACT, THERE'S A WHOLE LIST OF ARTICLES OF MANUFACTURE;

20   IS THAT RIGHT?

21   A.   YES.

22   Q.   ON THAT LIST, IS PANE OF GLASS LISTED?

23   A.   NO.  NO, NO, IT'S NOT.

24   Q.   SIR, WHAT DID APPLE APPLY THE DESIGN OF THE '677 TO?

25   A.   THE PHONE.

1    Q.   WHAT DOES APPLE APPLY THE DESIGN OF THE '087 TO?

2    A.   TO THE IPHONE.

3    Q.   AND WHAT DID SAMSUNG APPLY THOSE CLAIMED DESIGNS TO?

4    A.   TO THE PHONE.

5            MR. MUELLER:  I HAVE NO FURTHER QUESTIONS.

6            THE COURT:  ALL RIGHT.  I WOULD REMIND THE JURY, THE

7    PTO HAS NOT MADE A DETERMINATION AS TO WHAT THE ARTICLE OF

8    MANUFACTURE IS.

9        IT'S 3:15.  GO AHEAD, PLEASE.

10           MR. QUINN:  THAT IS -- THAT WAS THE ISSUE I WAS GOING

11   TO ADDRESS, YOUR HONOR.

12                    **RECROSS-EXAMINATION**

13   BY MR. QUINN:

14   Q.   IS IT TRUE A LOT OF PEOPLE BREAK THE GLASS ON THEIR PHONES

15   AND GET THAT REPLACED?

16   A.   THEY DO.

17           MR. PRICE:  THANK YOU.

18           THE COURT:  ALL RIGHT.

19       ANY FURTHER QUESTIONS FOR THIS WITNESS?

20           MR. MUELLER:  NO, YOUR HONOR.

21           THE COURT:  ALL RIGHT.  AND MAY HE BE EXCUSED WITH OR

22   WITHOUT BEING SUBJECT TO RECALL?

23           MR. MUELLER:  WITHOUT SUBJECT TO RECALL.

24           THE COURT:  DO YOU AGREE WITH THAT, MR. QUINN?

25           MR. QUINN:  WE DO AGREE, YOUR HONOR.

```
 1                THE COURT:  ALL RIGHT.

 2           THEN YOU ARE EXCUSED, AND YOU HAVE COMPLETED YOUR TRIAL

 3      TESTIMONY.

 4                THE WITNESS:  THANK YOU.

 5                THE COURT:  I'D LIKE YOU TO CALL YOUR NEXT WITNESS,

 6      PLEASE.

 7                MR. LEE:  YOUR HONOR, APPLE CALLS TONY BLEVINS.

 8      MS. WIGMORE WILL DO THE EXAMINATION.

 9                THE COURT:  OKAY.

10                MR. LEE:  YOUR HONOR, I'M GOING TO RETRIEVE THE

11      EXHIBITS.

12                THE COURT:  YES, YES.

13           AND IF YOU COULD BRING THE BINDER FOR THIS WITNESS,

14      PLEASE.

15                THE CLERK:  THERE IS NO BINDER.

16                MS. WIGMORE:  THERE IS NO BINDER FOR THIS ONE.  OKAY.

17                THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18           **(PLAINTIFF'S WITNESS, TONY BLEVINS, WAS SWORN.)**

19                THE WITNESS:  YES, I DO.

20                THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE

21      YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR

22      THE RECORD.

23                THE WITNESS:  CAN YOU HEAR ME OKAY?  IS THAT OKAY?

24           MY NAME IS TONY BLEVINS.  AND THE LAST NAME IS SPELLED

25      B-L-E-V-I-N-S.
```

1        THE COURT:  DO WE HAVE A PHOTO FOR THIS WITNESS?

2        MS. WIGMORE:  I BELIEVE SO.

3        THE COURT:  OKAY.  DO THE JURORS HAVE IT?

4        THE CLERK:  NOT YET, YOUR HONOR.

5        THE COURT:  OKAY.  I'LL TAKE ONE AS WELL.

6     AND ALSO FOR THE OTHER PREVIOUS WITNESSES, IF I CAN HAVE

7  ONE.

8     OKAY.  THANK YOU.

9     ALL RIGHT.  TIME IS 3:17.  GO AHEAD, PLEASE.

10                     **DIRECT EXAMINATION**

11  BY MS. WIGMORE:

12  Q.  GOOD AFTERNOON, MR. BLEVINS.  WOULD YOU PLEASE INTRODUCE

13  YOURSELF TO THE MEMBERS OF THE JURY.

14  A.  YES.  ME NAME IS TONY BLEVINS.  I'M CURRENTLY VICE

15  PRESIDENT AT APPLE, AND I'VE BEEN THERE FOR APPROXIMATELY

16  18 YEARS.

17  Q.  SO YOU JOINED IN THE FALL OF 2000?

18  A.  YES, THAT'S CORRECT.

19  Q.  WHAT IS YOUR CURRENT POSITION AT APPLE?

20  A.  MY CURRENT POSITION IS VICE PRESIDENT OF PROCUREMENT.  SO

21  MY RESPONSIBILITIES INCLUDE ACQUIRING THE GOODS, MATERIALS,

22  COMPONENTS AND SUBCOMPONENTS, AS WELL AS ANY OTHER SERVICES

23  THAT APPLE MIGHT NEED IN ORDER TO BUILD AND SHIP ITS PRODUCTS.

24  Q.  WHAT POSITIONS HAVE YOU HELD AT APPLE SINCE YOU JOINED THE

25  COMPANY IN 2000?

1      A.    WHEN I FIRST JOINED APPLE IN 2000, I HAD BEEN AT IBM FOR

2      APPROXIMATELY 11 YEARS IN VARIOUS ENGINEERING FUNCTIONS

3      PREVIOUSLY.

4           BUT IN 2000, I BECAME RESPONSIBLE FOR WHAT WAS KNOWN AS

5      CORPORATE PROCUREMENT.  SO THAT INCLUDED THE PURCHASE OF GOODS

6      AND MATERIALS THAT APPLE NEEDED NOT TO RESELL, BUT FOR GOODS

7      AND MATERIALS IT NEEDED TO ACTUALLY MAKE ITS PRODUCTS ENABLED.

8           SO, FOR EXAMPLE, IT WOULD BE THINGS LIKE LAB EQUIPMENT AND

9      VARIOUS OTHER SUPPLIES THAT WE WOULD NEED TO BUILD PRODUCTS,

10     BUT WE DID NOT RESELL.

11          LATER, IN 2001, I WAS ONE OF THE INAUGURAL MEMBERS OF THE

12     IPOD TEAM, A FACT THAT I'M VERY PROUD OF.

13          AFTER THAT, IN APPROXIMATELY 2004, I WAS PROMOTED TO

14     SENIOR DIRECTOR OF OPERATIONS WHERE MY RESPONSIBILITIES AT THAT

15     POINT INCLUDED GLOBAL LOGISTICS AND TRANSPORTATION.

16          THEN LATER IN APPROXIMATELY 2011, I WAS PROMOTED TO VICE

17     PRESIDENT OF PROCUREMENT WHERE I HAD RESPONSIBILITY FOR ALL OF

18     THE THINGS I'VE DESCRIBED PREVIOUSLY.

19     Q.    HOW MANY PEOPLE DO YOU SUPERVISE IN YOUR CURRENT POSITION?

20     A.    THERE ARE APPROXIMATELY 800.

21     Q.    AND TO WHOM DO YOU REPORT TODAY?

22     A.    I REPORT TO MR. JEFF WILLIAMS, WHO IS THE COO OF APPLE.

23     Q.    SO HE'S THE CHIEF OF OPERATIONS FOR THE ENTIRE COMPANY?

24     A.    YES, THAT'S CORRECT.

25     Q.    TO WHOM DOES HE REPORT?

1    A.    MR. WILLIAMS REPORTS TO MR. TIM COOK, WHO IS THE CEO OF

2    APPLE.

3    Q.    MR. BLEVINS, WHAT RESPONSIBILITIES DID YOU HAVE WITH

4    REGARD TO THE ORIGINAL IPHONE?

5    A.    I WAS ACTUALLY ONE OF THE FIRST MEMBERS OF THE IPHONE

6    TEAM.  WE HAD A VERY SMALL GROUP THAT WERE TAKEN ASIDE AND WERE

7    TASKED WITH THE RESPONSIBILITY OF WORKING ON THIS REALLY NEW,

8    EXCITING ENDEAVOR ON BEHALF OF APPLE.

9    Q.    HOW DID YOU BECOME AWARE OF THE PROJECT THAT LED TO THE

10   ORIGINAL IPHONE?

11   A.    I RECALL THERE WAS A VERY SMALL MEETING THAT INCLUDED A

12   FEW APPLE SENIOR EXECUTIVES, INCLUDING MR. STEVE JOBS, AND IT

13   WAS DESCRIBED TO US THAT WE WERE GOING TO ATTEMPT TO ENTER THE

14   PHONE BUSINESS, AND THAT WAS SOMETIME AROUND 2004.

15   Q.    WHAT WAS YOUR REACTION TO LEARNING THAT APPLE WAS

16   DEVELOPING A PHONE?

17   A.    MORE THAN ANYTHING ELSE, ANXIETY.  WE LOOKED AT THIS AND

18   SAID THIS IS A VERY MATURE MARKET WITH A LOT OF REALLY STIFF

19   COMPETITION.  MOST OF THOSE COMPANIES WERE SIGNIFICANTLY LARGER

20   THAN APPLE.  THERE WERE COMPANIES LIKE NOKIA, MOTOROLA,

21   INCLUDING SAMSUNG.  APPLE WAS A RELATIVELY SMALL COMPANY AT

22   THAT POINT IN TIME.  WE HAD AROUND 2 PERCENT SHARE OF PERSONAL

23   COMPUTERS.

24        SO IT WAS CONSIDERED SOMEWHAT OF AN OVERWHELMING AND

25   DAUNTING TASK.

1    Q.   NOW, YOU MENTIONED THE ORIGINAL IPHONE.  ASIDE FROM THAT

2    PHONE, HAVE YOU BEEN INVOLVED IN PROCUREMENT FOR ANY OTHER

3    VERSIONS OF THE IPHONE?

4    A.   YES.  AS A MATTER OF FACT, I'VE BEEN INVOLVED IN THE

5    PROCUREMENT FOR EVERY IPHONE THAT WE HAVE PRODUCED TO DATE.

6    Q.   SO THAT WOULD INCLUDE THE IPHONE 3G, THE IPHONE 3GS, AND

7    THE IPHONE 4?

8    A.   YES, THAT'S CORRECT.

9    Q.   NOW, THE JURY HEARD TESTIMONY FROM MR. JOSWIAK ABOUT

10   APPLE'S DESIGN PHILOSOPHY.

11        HOW, IF AT ALL, DOES APPLE'S DESIGN PHILOSOPHY IMPACT YOUR

12   JOB AS THE HEAD OF PROCUREMENT?

13   A.   IT'S ACTUALLY INTEGRAL AND ONE OF THE MOST IMPORTANT PARTS

14   OF THE JOB.  THE EASIEST WAY TO DESCRIBE IT, BECAUSE IN MY JOB

15   IN PROCUREMENT, I WORK WITH LITERALLY THOUSANDS OF SUPPLIERS,

16   AND I HAD EXPERIENCE WITH IBM PREVIOUSLY.

17        WHAT I'VE NOTICED IS THAT THE VAST MAJORITY OF THE

18   COMPANY, THEY DEVELOP AND BUILD PRODUCTS, THEY USE A BUILDING

19   BLOCK PHILOSOPHY, MEANING YOU WOULD GO OUT AND CHOOSE AMONG THE

20   BEST BUILDING BLOCKS AVAILABLE WITHIN THE INDUSTRY AND YOU

21   WOULD OPTIMIZE SOMETHING THAT'S AVAILABLE, SOMETHING THAT COULD

22   BE MANUFACTURED IN A QUALITY, COST EFFECTIVE WAY.

23        AND SO ONCE YOU'VE DONE THAT, THEN YOU WOULD CREATE YOUR

24   DESIGN AROUND IT.  ONCE YOU HAVE THE BUILDING BLOCKS, THEN YOU

25   WOULD COME UP WITH THE BEST DESIGN POSSIBLE.

1          AND SO WHAT I NOTICED AT APPLE RIGHT AWAY IS APPLE DID

2     ABSOLUTELY THE OPPOSITE.  AT APPLE, EVERYTHING STARTED WITH

3     DESIGNS, PARTICULARLY INDUSTRIAL DESIGN.  SO THAT WOULD BE HOW

4     THE CONSUMER WOULD HOLD THE PRODUCT, HOW IT WOULD LOOK, HOW

5     THEY WOULD INTERACT WITH THE PRODUCT.

6          THEN ONCE THAT INDUSTRIAL DESIGN WAS DONE, YOU WOULD HAVE

7     CERTAIN VOLUME AND SPACE BUDGETS FOR ALL THE COMPONENTS.

8          AND SO THEREFORE, IN MY POSITION, UNLIKE OTHER COMPANIES,

9     INSTEAD OF GOING OUT AND CHOOSING THE BEST AVAILABLE BUILDING

10    BLOCK, I WOULD GET A SET OF SPECIFICATIONS AND THE TASK OF

11    GOING OUT AND IN MANY CASES HAVING SOMETHING BUILT IN A WAY OR

12    TO A SPECIFICATION THAT HAD NEVER BEEN BUILT BEFORE IN ORDER TO

13    ACHIEVE APPLE'S DESIGN PHILOSOPHY, WHICH WAS VERY UNIQUE TO

14    ANYONE ELSE.

15    Q.   DID THAT CREATE CHALLENGES FOR YOU IN YOUR JOB?

16    A.   IT CREATES A GREAT MANY CHALLENGES, MAKES IT MORE

17    DIFFICULT, BUT IT ALSO MAKES IT MORE CHALLENGING AND REWARDING.

18    THAT'S HOW WE DO THINGS AT APPLE.  SO AFTER 18 YEARS, I'VE

19    LEARNED THIS IS HOW WE DO THINGS AND IT MAKES IT FUN AND

20    EXCITING.

21    Q.   CAN YOU GIVE US AN EXAMPLE OF HOW APPLE'S DESIGN

22    PHILOSOPHY IMPACTED PROCUREMENT RELATING TO THE IPHONE?

23    A.   I CAN THINK OF SO MANY.  FOR THE INTEREST OF BREVITY,

24    WHILE WE'RE HERE TODAY, ONE THAT COMES TO MIND IS WITHIN

25    VIRTUALLY EVERY PHONE THAT I'VE SEEN, EACH OF THEM HAVE WHAT'S

1       CALLED A VIBE MOTOR, OR VIBRATION MOTOR.  THE PURPOSE OF THAT

2       IS IF YOUR PHONE IS ON SILENT AND THE PHONE RINGS OR YOU GET A

3       TEXT MESSAGE, YOU'LL GET A VIBRATION ALERT.

4            AND WITHIN THE INDUSTRY, THERE WERE TWO OR THREE REALLY

5       GOOD, ROBUST VIBRATION MOTOR DESIGNS AND MOST PEOPLE CHOOSE

6       AMONG THOSE TWO OR THREE AND INTEGRATE THEM INTO THEIR

7       PRODUCTS.

8            AT APPLE, WE DO THINGS ABSOLUTELY THE OPPOSITE.  AFTER WE

9       STARTED WITH THE INDUSTRIAL DESIGN, I HAD THE TASK OF HAVING

10      CERTAIN BUDGETS RELATIVE TO SIZE, PARTICULARLY HEIGHT OF

11      PRODUCT.  SO THEREFORE, WE WENT TO FACTORIES THAT WE THOUGHT

12      MIGHT BE CAPABLE OF MAKING SUCH A THING, AND WE WOULD WORK WITH

13      THEM TIRELESSLY TO ACTUALLY GET SOMETHING BUILT THAT HAD NEVER

14      BEEN BUILT BEFORE.

15           AND THIS PARTICULAR EXAMPLE COMES TO MIND BECAUSE WE HAD

16      SUCH TIGHT DESIGN REQUIREMENTS FOR THE VIBE MOTOR, I RECALL

17      SPENDING TWO AND A HALF WEEKS OF MY LIFE IN A FACTORY WHERE WE

18      WERE TRYING TO HELP PEOPLE TAKE COPPER WIRE THAT WAS ABOUT

19      ONE EIGHTH OF THE DIAMETER OF A HUMAN HAIR AND FIGURE OUT A WAY

20      UNDER MICROSCOPIC APPLICATION TO WRAP IT AROUND A COIL AT LEAST

21      FOUR TIMES AND THEN ATTACH IT IN A ROBUST WAY.  I THINK OF THAT

22      EXAMPLE OF HOW APPLE DOES EVERYTHING ABSOLUTELY DIFFERENTLY AND

23      HOW EVERYTHING REVOLVES AROUND THE DESIGN.

24      Q.   NOW, I'D LIKE TO FOCUS YOUR ATTENTION ON PROCUREMENT

25      RELATING TO THE ORIGINAL IPHONE, THE IPHONE 3G, THE IPHONE 3GS,

1      AND THE IPHONE 4.

2           DO YOU HAVE THOSE PRODUCTS IN MIND?

3      A.   YES, I DO.

4      Q.   GENERALLY SPEAKING, HOW DID APPLE GO ABOUT OBTAINING THE

5      MATERIALS USED TO MAKE THOSE PHONES?

6      A.   SO GENERALLY SPEAKING, WE WOULD START WITH THAT FINAL

7      INDUSTRIAL DESIGN AND FROM THAT WE WOULD GIVE SPECIFICATION FOR

8      INDIVIDUAL COMPONENTS.  WE WOULD HAVE CERTAIN SIZE AND BUDGET

9      LIMITATIONS.

10          AND THEN ONCE WE DESIGNED ALL THE UNIQUE SPECS FOR THE

11     COMPONENT, THEN WE WOULD GO OUT AND PROCURE THE COMPONENTS.

12          BUT THE MOST IMPORTANT PART PERHAPS OF THE ENTIRE PROCESS

13     IS WHAT WE CALL TRANSFORMATION.  SO THEN WE WOULD TAKE ALL

14     THOSE INDIVIDUAL COMPONENTS, WHICH THEMSELVES WOULD HAVE A

15     LITTLE VALUE OR UTILITY TO AN END USER, AND THEN WE WOULD

16     ASSEMBLE THEM IN SUCH A WAY THAT THAT WOULD HOPEFULLY CREATE

17     GREAT VALUE TO AN END USER AND ACCOMPLISH OUR OBJECTIVE, WHICH

18     WAS FROM THE OUTSET TO SURPRISE AND DELIGHT.

19     Q.   AND WHO ASSEMBLED THESE COMPONENTS FOR APPLE?

20     A.   WITH RESPECT TO THE PRODUCTS THAT WE'RE TALKING ABOUT HERE

21     TODAY, THERE WAS A SINGLE ASSEMBLER, AND THAT WAS HON HAI,

22     H-O-N, H-A-I PRECISION.

23     Q.   I'D LIKE TO PUT ON THE SCREEN PDX 4.3.

24          CAN YOU EXPLAIN TO THE MEMBERS OF THE JURY, MR. BLEVINS,

25     WHAT IS SHOWN ON THIS SLIDE?

1    A.   THERE ARE A SERIES OF IPHONES ON THIS SLIDE.  THE ONE AT

2    YOUR OUTER MOST LEFT IS THE ORIGINAL IPHONE, WHICH WAS SIMPLY

3    CALLED IPHONE.

4         THEN JUST TO THE RIGHT IS THE IPHONE 3G, WHICH WAS OUR

5    FIRST PHONE CAPABLE OF OPERATING ON 3G NETWORKS.

6         AND THEN WE HAD A SUBSEQUENT ITERATION OF THAT KNOWN AS

7    THE 3GS.

8         THEN WE FOLLOWED UP WITH THE IPHONE 4 AND IPHONE 4S.

9    Q.   AND IF YOU COULD JUST INDICATE FOR THE JURY WHERE ON THESE

10   PHONES IS THE ROUND CORNERED, GLASS FRONT FACE?

11   A.   ON EACH OF THE PHONES, IT WOULD BE ON THE EXTREME CORNERS.

12   Q.   AND DID APPLE PURCHASE THE GLASS FRONT FACE FOR THESE

13   PHONES OFF OF THE SHELF?

14   A.   NO, ABSOLUTELY NOT.  THEY WERE CUSTOM DESIGNED TO UNIQUE

15   APPLE SPECIFICATIONS.  THEY NEVER EXISTED BEFORE.

16   Q.   CAN THE GLASS FRONT FACE OF THE IPHONE BE USED SEPARATELY

17   FROM THE PHONE ITSELF?

18   A.   I'M NOT AWARE OF WHAT POSSIBLE PURPOSE IT WOULD BE.

19   Q.   AND CAN THE GLASS FRONT FACE BE SEPARATED FROM THE IPHONE

20   MODELS SHOWN HERE?

21   A.   IT CAN BE PHYSICALLY SEPARATED, CERTAINLY.  AT ONE POINT

22   IN TIME, IT'S AN INDIVIDUAL COMPONENT.  WE ASSEMBLED THEM IN

23   THE MOST ROBUST MANNER POSSIBLE.  BUT, YES, THEY CAN BE

24   SEPARATED.

25   Q.   WOULD A CONSUMER, IN YOUR EXPERIENCE, BE ABLE TO SEPARATE

1    THE PHONE?

2    A.   IN MY EXPERIENCE, NO.  WE ASSEMBLE THEM IN SUCH A WAY THAT

3    THEY'RE ACTUALLY VERY DIFFICULT TO DISASSEMBLE AND THEN

4    REASSEMBLE WITHIN THE UTILITY, EVEN BY OUR MANUFACTURER WHO

5    BUILDS THEM INITIALLY.

6    Q.   ARE THERE TOOLS THAT ARE REQUIRED TO TAKE THE GLASS FRONT

7    FACE OFF OF THE PHONE?

8    A.   AT OUR MANUFACTURER, WE HAVE HUNDREDS OF MILLIONS OF

9    DOLLARS WORTH OF CAPITAL THAT WE PUT IN PLACE TO ATTEMPT TO DO

10   THIS DISASSEMBLY AND REASSEMBLY, AND I CAN TELL YOU IT'S VERY,

11   VERY DIFFICULT.

12       AND ONE EXAMPLE TO MAKE THAT POINT PERHAPS A BIT MORE

13   CLEAR, ALMOST EVERYONE IN THE PHONE INDUSTRY DOES WHAT'S CALLED

14   LOCAL REPAIR, MEANING IF YOU SELL A PHONE IN THE U.S. AND IT

15   WERE TO FAIL, YOU WOULD LIKE TO GET IT REPAIRED AS CLOSE AS

16   POSSIBLE AS YOU CAN TO THE END USER.

17       APPLE SPENT A SIGNIFICANT AMOUNT OF TIME TRYING TO FIND

18   SOMEONE LOCAL IN THE U.S., FOR EXAMPLE, THAT WE THOUGHT WERE

19   CAPABLE OF DISASSEMBLING AND REASSEMBLING OUR PHONES, AND WE

20   EVENTUALLY GAVE UP AND SAID IT WOULD BE SIGNIFICANTLY MORE

21   EXPENSIVE FOR US, BUT WE'RE GOING TO HAVE TO SEND THEM BACK TO

22   THE ORIGINAL MANUFACTURER BECAUSE IT'S JUST NOT POSSIBLE TO

23   DISASSEMBLE AND REASSEMBLE WITHOUT CREATING WHAT WE CALL

24   MATERIAL ATTRITION, MEANING YOU DAMAGE A SIGNIFICANT NUMBER OF

25   COMPONENTS AND YOU DAMAGE SIGNIFICANT COMPONENTS THAT ARE

1    ADJACENT TO THE COMPONENTS YOU'RE TRYING TO REPLACE.

2    Q.   NOW I'D LIKE TO TURN TO THE BEZEL.

3         CAN YOU INDICATE FOR US, WHAT IS A BEZEL?

4    A.   FOR THE FIRST THREE PHONES ON THE LEFT, IT WOULD BE THE

5    OUTER MOST METALLIC RIM.

6         ON THE NEXT TWO PHONES, WE DIDN'T TERM THAT A BEZEL.  WE

7    TERMED IT A BAND.  SO IT'S NOT SO VISIBLE IN THESE PARTICULAR

8    DIAGRAMS.

9    Q.   DID APPLE PURCHASE THE BEZEL FOR THOSE IPHONES FROM

10   VENDORS OFF THE SHELF?

11   A.   NO, ABSOLUTELY NOT.  THEY WERE CUSTOM AND UNIQUELY

12   DESIGNED FOR THE PARTICULAR IPHONE MODEL THAT THEY WERE

13   INTENDED TO BE USED.

14   Q.   CAN THE BEZELS FOR THESE PHONES BE USED SEPARATELY FROM

15   THE PHONE AS A WHOLE?

16   A.   I'M NOT AWARE OF WHAT PARTICULAR PURPOSE THEY WOULD HAVE

17   OTHER THAN A PAPER WEIGHT.  I MEAN, THEY'RE A PIECE OF METAL,

18   SO PERHAPS THEY COULD BE USED FOR SOMETHING, BUT IT'S DIFFICULT

19   FOR ME TO IMAGINE THEM HAVING MUCH VALUE.

20   Q.   AND WHAT WOULD BE INVOLVED IN ATTEMPTING TO REMOVE THE

21   BEZEL FROM THESE PHONES?

22   A.   THAT ONE IS PARTICULARLY DIFFICULT.  OUR EXPERIENCE HAS

23   BEEN WHEN YOU ATTEMPT TO REMOVE THE BEZEL, SOMETIMES YOU CAN

24   REMOVE IT WITHOUT CREATING SIGNIFICANT COSMETIC DAMAGE.  BUT IN

25   THOSE CASES, YOU GENERALLY BREAK THE GLASS.  SO WHEN YOU'RE

1    TRYING TO SEPARATE THE BEZEL FROM THE GLASS, CHANCES ARE ONE OF

2    THE TWO, IF NOT BOTH, ARE GOING TO BE SUBJECT TO WHAT I TERMED

3    EARLIER MATERIAL ATTRITION, MEANING THEY GOT DAMAGED IN THE

4    REPAIR ITSELF.

5    Q.   NOW, I'D LIKE TO TURN YOUR ATTENTION TO THE DISPLAY

6    SCREENS FOR THE IPHONES THAT ARE SHOWN HERE.  IF YOU CAN

7    IMAGINE, IT'S NOT SHOWN HERE, THE ARRAY OF ICONS THAT IS SEEN

8    ON THE DISPLAY SCREEN.

9         DO YOU HAVE THAT IN MIND?

10   A.   YES.

11   Q.   DID APPLE BUY THOSE DISPLAY SCREENS OFF THE SHELF?

12   A.   NO.  JUST AS BEFORE, EACH OF THOSE DISPLAY SCREENS WERE

13   SPECIFICALLY DESIGNED TO VERY UNIQUE APPLE SPECIFICATIONS, AND

14   WE WORKED WITH OUR SUPPLIERS AND PARTNERS FOR A LONG PERIOD OF

15   TIME TO GET SOMETHING BUILT THAT WOULD BE TOTALLY CUSTOM AND

16   UNIQUE.

17   Q.   CAN THE DISPLAY SCREEN, AS WE'VE JUST DESCRIBED, BE USED

18   SEPARATELY FROM THE REST OF THE PHONE, THE PHONE AS A WHOLE?

19   A.   NO.  IN FACT, THE DISPLAY SCREEN WITHOUT THE ELECTRONICS

20   THAT DRIVES IT WOULD HAVE ABSOLUTELY NO FUNCTION AT ALL.

21   Q.   CAN THE DISPLAY SCREEN BE REMOVED FROM ANY OF THESE MODELS

22   OF THE IPHONE?

23   A.   YES, IT CAN BE PHYSICALLY REMOVED.  BUT AS I'VE DESCRIBED

24   EARLIER, IT'S VERY DIFFICULT TO REMOVE IT WITHOUT DAMAGING

25   EITHER THE DISPLAY SCREEN AND/OR THE ADJACENT AXILLARY

1        COMPONENTS.

2        Q.   YOU'VE DESCRIBED THE DIFFICULTY IN DISASSEMBLING THESE

3        PHONES.   WHY DOESN'T APPLE MANUFACTURE PHONES SO THEY CAN BE

4        EASILY DISASSEMBLED?

5        A.   WELL, IT'S VERY INTERESTING.   I SPOKE EARLIER ABOUT DESIGN

6        CONCEPT.   AS AN ADJUNCT TO THAT, MY PREVIOUS EXPERIENCE WAS

7        WITH COMPANIES WHO WOULD ACTUALLY DO WHAT THEY CALLED DESIGN

8        FOR REPAIR, MEANING AT THE VERY INCEPTION OF WHEN THEY WERE

9        DESIGNING THEIR PRODUCT, THEY WOULD THINK ABOUT HOW WOULD YOU

10       REPAIR IT MOST EFFICIENTLY AND LEAST EXPENSIVELY.   THE

11       AUTOMOTIVE INDUSTRY BEING AN INDUSTRY THAT GREATLY FOCUSES ON

12       THAT BECAUSE THEY KNOW AUTOMOBILES NEED TO BE REPAIRED AND THEY

13       NEED TO BE DONE COST EFFECTIVELY.

14            APPLE'S PHILOSOPHY WAS VERY DIFFERENT.   INSTEAD OF TRYING

15       TO MAKE, TO DO A DESIGN FOR REPAIR, WE TRIED TO MAKE A DESIGN

16       FOR ROBUSTNESS, MEANING WE TRIED TO ASSEMBLE THEM IN SUCH A WAY

17       THAT THEY WOULD NEVER NEED TO BE REPAIRED.

18            SO THAT INVOLVED SOME CONCEPTS LIKE HEAT STAKING,

19       SIGNIFICANT GLUE, VHB'S, UNDERFILLS.   SO WE DID A GREAT DEAL IN

20       THE MANUFACTURING PROCESS THAT LED US TO BELIEVE THE PRODUCTS

21       WOULD PERFORM IN A MORE ROBUST FASHION IN THE FIELD AND WE HAVE

22       HAD SEVERAL AWARDS FROM J.D. POWER AND OTHERS ON QUALITY OF

23       PRODUCTS.

24            BUT ONE UNFORTUNATE BYPRODUCT OF SUCH A DESIGN PHILOSOPHY

25       IS IF THEY DO FAIL, AND IN A REAL LIFE WORLD THEY DO FAIL, IT

1    MAKES THEM SIGNIFICANTLY MORE DIFFICULT TO REPAIR.

2    Q.   NOW, I'D LIKE TO TAKE YOU BACK TO 2007.  DO YOU RECALL THE

3    DAY THE IPHONE WAS FIRST PUBLICLY INTRODUCED?

4    A.   I DO.  I RECALL THAT DAY VERY WELL.

5    Q.   WHERE WERE YOU?

6    A.   I WAS IN THE MOSCONE CENTER IN SAN FRANCISCO.

7    Q.   AND WHAT WAS THE REACTION THERE TO THE INTRODUCTION OF THE

8    IPHONE?

9    A.   I'VE BEEN TO A NUMBER OF APPLE LAUNCHES OVER THE LAST

10   18 YEARS, AND I THINK THEY'RE ALL EXCITING IN THEIR OWN WAY.

11        BUT I NEVER EXPERIENCED ONE LIKE THAT.  IT WAS A GAME

12   CHANGING MOMENT.  I RECALL STEVE JOBS BEING ON THE STAGE, AND

13   WHEN HE FIRST PULLED THE IPHONE OUT OF HIS POCKET, IT WAS A

14   COMPLETE SHOCK TO THE WORLD BECAUSE WE'D DONE SUCH A GOOD JOB

15   OF KEEPING IT A SECRET THAT NO ONE HAD ANY IDEA WHAT APPLE WAS

16   GOING TO ANNOUNCE, WHETHER IT WAS A NEW MACBOOK OR A NEW

17   POWERBOOK.  WAS IT A NEW IPOD?  THAT NO ONE EXPECTED US TO

18   ENTER THE PHONE INDUSTRY, I DON'T THINK.  AND CERTAINLY NO ONE,

19   INCLUDING OUR COMPETITION, EXPECTED US TO ENTER THE MARKET IN

20   SUCH A COMPLETE GAME CHANGING WAY.

21        AND SO IT WAS ONE OF THE MOST EXCITING MOMENTS IN MY LIFE.

22   IT WAS SPECTACULAR.

23   Q.   ARE YOU AWARE THAT CERTAIN SAMSUNG PHONES HAVE BEEN FOUND

24   TO INFRINGE APPLE'S DESIGN PATENTS?

25   A.   YES, I AM.

1     Q.   WHAT WAS YOUR REACTION WHEN YOU FIRST SAW ONE OF THE

2     SAMSUNG INFRINGING PHONES?

3     A.   THAT WAS DIFFICULT.  AS I RECALL, IT WAS SOMETIME AROUND

4     2010 THAT I WAS INVITED TO AN ABSOLUTE EMERGENCY MEETING AT

5     APPLE.  I WASN'T TOLD WHAT THE SUBJECT WAS.

6          BUT WE GATHERED REALLY QUICKLY, A SMALL GROUP OF US IN A

7     ROOM, AND WE SAW WHAT WAS LATER THE GALAXY S.  AND I CAN RECALL

8     PERSONALLY, I THINK IT WAS THE OTHER PEOPLE IN THAT ROOM, WE

9     EXPERIENCED A WHOLE RANGE OF HUMAN EMOTIONS.

10         PERHAPS NOT THE ENTIRE RANGE OF POSITIVE ONES.  IT WAS

11    VERY NEGATIVE.  I CAN REMEMBER FEELING SOME HORROR, SHOCK,

12    FRUSTRATION, ANGER.  A GREAT DEAL OF FRUSTRATION AND ANGER.

13         I THINK YOU HAVE TO UNDERSTAND, THE SMALL GROUP OF US HAD

14    WORKED TIRELESSLY ON THIS PRODUCT FOR THE LAST SEVERAL YEARS.

15    WE HAD WORKED LATE NIGHTS.  WE HAD WORKED WEEKENDS.  WE HAD

16    SACRIFICED PERSONAL FAMILY TIME.  WE HAD MISSED CHILDREN'S

17    BIRTHDAY PARTIES.  WE FELT LIKE WE WERE DOING SOMETHING THAT

18    MIGHT BE THE BEST WORK OF OUR ENTIRE CAREER, AND WE WERE VERY

19    PROUD OF IT.

20         AND WE ALSO TOOK PAINS TO MAKE CERTAIN THAT WE FOLLOWED

21    THE RULES AND WE PLAYED FAIR, MEANING THAT WE FILED FOR

22    PATENTS, WE TRIED TO DO THINGS IN THE RIGHT WAY SO THAT WE

23    COULD ENJOY THE FRUITS OF OUR LABOR.

24         SO WHEN WE SAW THAT, IT WAS JUST EVERY NEGATIVE EMOTION

25    YOU COULD IMAGINE, THAT ALL OF US JUST FELT LIKE WE WERE

1    COMPLETELY RIPPED OFF.

2              MS. WIGMORE:  THANK YOU, MR. BLEVINS.  I HAVE NO

3    FURTHER QUESTIONS.

4              THE COURT:  OKAY.  THE TIME IS 3:35.

5         GO AHEAD, PLEASE.

6                      **CROSS-EXAMINATION**

7    BY MS. MAROULIS:

8    Q.   GOOD AFTERNOON, MR. BLEVINS.  HOW ARE YOU.

9    A.   GOOD AFTERNOON, MA'AM.

10   Q.   I'M VICTORIA MAROULIS, COUNSEL FOR SAMSUNG.

11        SIR, YOU DON'T KNOW HOW THE SAMSUNG PHONES AND ITS

12   COMPONENTS ARE MANUFACTURED; IS THAT CORRECT?

13   A.   I WOULD SAY THAT'S FAIR.  I DON'T KNOW VERY MUCH ABOUT

14   SAMSUNG'S PHONES.

15   Q.   AND YOU DON'T KNOW HOW SAMSUNG'S PHONES ARE REPAIRED AND

16   HOW THE GLASS IS REPLACED; IS THAT CORRECT?

17   A.   THAT IS TRUE.

18   Q.   SO YOU WOULDN'T HAVE ANY KNOWLEDGE OR OPINION ABOUT HOW

19   HARD IT IS TO REPLACE A COVER GLASS ON THE SAMSUNG PHONE; IS

20   THAT RIGHT?

21   A.   I THINK THAT'S FAIR.

22   Q.   OKAY.  BUT AS APPLE'S HEAD OF PROCUREMENT, YOU DO KNOW A

23   LOT ABOUT APPLE COMPONENTRY; RIGHT?

24   A.   I'M CERTAIN I KNOW MORE ABOUT APPLE COMPONENTRY THAN I DO

25   SAMSUNG, YES.

1    Q.   SO THE ORIGINAL IPHONE HAD THOUSANDS OF COMPONENTS THAT

2    WERE MADE BY 900 MANUFACTURERS; IS THAT RIGHT?

3    A.   THAT'S APPROXIMATELY CORRECT, YES.

4    Q.   THE SAME WAS TRUE ABOUT THE SUBSEQUENT GENERATIONS OF

5    IPHONES; CORRECT?

6    A.   YES.

7    Q.   NOW, COVER GLASS IS ONE OF THOSE COMPONENTS; IS THAT

8    RIGHT?

9    A.   YES, IT IS.

10   Q.   OKAY.  AND THE COVER GLASS FOR APPLE IPHONE IS

11   MANUFACTURED BY DOW CORNERING; IS THAT RIGHT?

12   A.   YES, THAT'S CORRECT.

13   Q.   AND AS YOU TESTIFIED, APPLE PROVIDES DOW CORNING WITH

14   UNIQUE SPECIFICATIONS TO MANUFACTURE THE GLASS; IS THAT

15   CORRECT, SIR?

16   A.   YES, IT IS.

17   Q.   YES.  AND DOW CORNING PACKAGES AND SHIPS THE COVER GLASS

18   TO APPLE?

19   A.   THEY DO NOT SHIP IT DIRECTLY TO APPLE.  THEY SHIP TO

20   SOMEONE IN YOUR SUPPLY CHAIN WHO DOES FURTHER VALUE ADD.

21   Q.   BUT EVENTUALLY IT MAKES INTO AN ASSEMBLED PHONE; CORRECT?

22   A.   THAT IS CORRECT.

23   Q.   SIR, IF YOU LOOK AT THE BINDER IN FRONT OF YOU AND TURN TO

24   EXHIBIT 4549, PLEASE.

25   A.   THE WHITE ONE OR THE GREEN?

1    Q.   DO YOU RECOGNIZE THIS DOCUMENT, SIR, AS AN AGREEMENT

2    BETWEEN APPLE AND CORNING?

3    A.   I'M SORRY.   IN THE WHITE DOCUMENT?   THIS ONE (INDICATING)?

4    Q.   YES, SIR, THE THICK BINDER WITH TABS.   IF YOU LOOK AT TAB

5    4549.

6    A.   OKAY.   YES, MA'AM, I HAVE IT NOW.

7    Q.   OKAY.   DO YOU RECOGNIZE THIS DOCUMENT AS AN AGREEMENT

8    BETWEEN APPLE AND DOW CORNING FOR SUPPLY OF THE COVER GLASS?

9    A.   YES, I DO RECOGNIZE THIS DOCUMENT.

10   Q.   THANK YOU, SIR.

11        YOUR HONOR, I'D MOVE IT INTO EVIDENCE.

12             MS. WIGMORE:   NO OBJECTION.

13             THE COURT:   IT'S ADMITTED.

14   (DEFENDANTS' EXHIBIT 4549 WAS ADMITTED IN EVIDENCE.)

15             THE COURT:   GO AHEAD, PLEASE.

16   BY MS. MAROULIS:

17   Q.   SIR, AT SOME POINT APPLE BEGAN SELLING COVER GLASS AS AN

18   IPHONE REPLACEMENT PART TO AUTHORIZED SERVICE PROVIDERS; IS

19   THAT RIGHT?

20   A.   I DON'T RECALL EXACTLY WHEN, BUT, YES, I THINK THAT'S

21   CORRECT.

22   Q.   OKAY.   AND APPLE PROVIDED INSTRUCTIONS TO THOSE VENDORS

23   HOW TO REPLACE THE GLASS; IS THAT RIGHT?

24   A.   WE DID HAVE DISASSEMBLY INSTRUCTIONS, THAT'S CORRECT.

25   Q.   AND THE GLASS WAS MADE BY DOW CORNING AND SOLD IN SEPARATE

1    PARTS SO IT COULD BE USED IN THE IPHONE REPAIR; CORRECT?

2    A.   YES, THAT'S CORRECT.

3    Q.   SO LET'S TALK ABOUT A BEZEL.

4         DO YOU REMEMBER TESTIFYING ON DIRECT ABOUT THAT?

5    A.   YES, MA'AM, I DO.

6    Q.   SO THAT PART IS ALSO SEPARATELY MANUFACTURED FOR THE

7    IPHONE; CORRECT?

8    A.   YES, THAT'S CORRECT.

9    Q.   OKAY.  APPLE CREATES ENGINEERING SCHEMATICS FOR THE BEZEL?

10   A.   I BELIEVE SO, YES.

11   Q.   ALL RIGHT.  THERE'S A WHOLE GROUP AT APPLE THAT'S CALLED

12   ENCLOSURE ENGINEERING THAT WORKS WITH BEZELS; IS THAT RIGHT?

13   A.   YES, THAT'S CORRECT.

14   Q.   OKAY.  AND APPLE THEN HAS BEZEL MADE SEPARATELY BY A THIRD

15   PARTY VENDOR, I BELIEVE YOU SAID ON DIRECT IT WAS HON HAI

16   PRECISION; CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   SO THE BEZELS THEN ARE SEPARATELY MANUFACTURED BY HON HAI

19   AND MANY OTHERS AND ARE SHIPPED AS SEPARATE PARTS FOR ASSEMBLY;

20   IS THAT RIGHT, SIR?

21   A.   YES, THAT'S CORRECT.

22   Q.   AND YOU GAVE INSTRUCTIONS TO THE VENDORS ABOUT HOW TO

23   REPLACE THE BEZEL FOR THE IPHONES; CORRECT?

24   A.   TO AUTHORIZED REPAIR VENDORS, YES.

25   Q.   IN FACT, THE BEZEL IS THE PART OF THE IPHONE THAT IS

1    COMMONLY REPLACED; CORRECT?

2    A.   I'M NOT SURE OF THE STATISTICS.  IT'S NOT THE MOST COMMON,

3    BUT IT IS SOMEWHAT COMMONLY REPLACED.

4    Q.   SIR, IF YOU LOOK AT EXHIBIT DX 4573 IN YOUR BINDER, DO YOU

5    RECOGNIZE THIS EXHIBIT AS AN APPLE DOCUMENT SHOWING SCHEMATICS

6    FOR VARIOUS IPHONE PRODUCTS?  I'M NOT GOING TO PUT IT ON THE

7    SCREEN BECAUSE IT'S CONFIDENTIAL, SO --

8    A.   YES, I DO.

9    Q.   OKAY.

10        YOUR HONOR, I MOVE INTO EVIDENCE EXHIBIT DX 4573.

11             MS. WIGMORE:  NO OBJECTION.

12             THE COURT:  IT'S ADMITTED.

13        (DEFENDANTS' EXHIBIT 4573 WAS ADMITTED IN EVIDENCE.)

14             THE COURT:  GO AHEAD, PLEASE.

15   BY MS. MAROULIS:

16   Q.   SIR, IF YOU TURN TO EXHIBIT 4545 THAT'S RIGHT IN FRONT OF

17   YOU IN THE BINDER, DO YOU RECOGNIZE THIS EXHIBIT AS AN APPLE

18   INTERNAL FINANCIAL DOCUMENT?

19   A.   YES, I THINK THAT'S CORRECT.

20   Q.   ALL RIGHT.

21        YOUR HONOR, I MOVE 4545 INTO EVIDENCE.

22             MS. WIGMORE:  NO OBJECTION.  JUST A CLARIFICATION, I

23   THINK EACH OF THE EXHIBITS MENTIONED SO FAR HAVE BEEN FILED

24   UNDER SEAL.

25             MS. MAROULIS:  THAT IS CORRECT, YOUR HONOR.  THAT IS

1    WHY IT'S NOT BEING SHOWN TO THE JURY.

2              THE COURT:  SO 4549, 4573, AND 4545 ARE THOSE THE

3    ONLY ONES?

4              MS. MAROULIS:  CORRECT.

5              THE COURT:  OKAY.

6         (DEFENDANTS' EXHIBIT 4545 WAS ADMITTED INTO EVIDENCE.)

7    BY MS. MAROULIS:

8    Q.   SIR, IF YOU ALSO LOOK AT 4546, AND MAYBE TO EXPEDITE THIS

9    4547, AND LET ME KNOW IF YOU RECOGNIZE THESE DOCUMENTS AS APPLE

10   INTERNAL FINANCIAL DOCUMENTS?

11   A.   4546, YES.  I'M NOT CERTAIN ABOUT 4547.  IT'S NOT AS

12   FAMILIAR -- I MEAN, I'VE SEEN IT BEFORE, BUT I'M NOT CERTAIN

13   ABOUT THAT ONE.

14   Q.   DO YOU REALIZE THIS AS A BILL OF MATERIALS, ALSO KNOWN AS

15   BOM, B-O-M?

16   A.   I'M NOT ACCUSTOMED TO SEEING THEM IN THIS FORMAT.  THE

17   INFORMATION LOOKS FAMILIAR.  IT'S JUST THE FORMAT OF THE REPORT

18   AND SOME OTHER THINGS LOOK A BIT UNFAMILIAR.  THE CONTENTS I'M

19   FAMILIAR WITH.

20             MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBITS 4546 AND

21   4547, BASED ON THE WITNESS'S TESTIMONY, INTO EVIDENCE.

22             MS. WIGMORE:  NO OBJECTION, SUBJECT TO SEALING.

23             THE COURT:  THAT'S FINE.  THEY'RE BOTH ADMITTED, AND

24   THEY'RE BOTH SEALED.

25             (DEFENDANTS' EXHIBITS 4546 AND 4547 WERE ADMITTED IN

1    EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3    BY MS. MAROULIS:

4    Q.   SIR, FOR THE BENEFIT OF THE JURY, BILL OF MATERIALS ARE

5    DOCUMENTS THAT ARE KEPT TO ACCOUNT FOR ALL DIFFERENT SEPARATE

6    PARTS THAT GO INTO THE PRODUCT; IS THAT RIGHT?

7    A.   THAT'S NOT EXACTLY RIGHT, BUT THE BILL OF MATERIAL WOULD

8    BE AN INVENTORY OF THE PARTS USED TO BUILD THE PRODUCT.

9              MS. MAROULIS:  OKAY.  THANK YOU, SIR.  NO FURTHER

10   QUESTIONS.

11             THE COURT:  ALL RIGHT.  THE TIME IS 3:41.

12        IS THERE ANY REDIRECT?

13             MS. WIGMORE:  JUST ONE QUESTION, YOUR HONOR.

14             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

15                    **REDIRECT EXAMINATION**

16   BY MS. WIGMORE:

17   Q.   MR. BLEVINS, YOU WERE SHOWN A NUMBER OF DOCUMENTS FROM

18   APPLE CONCERNING COMPONENTS OF THE IPHONE AND THE COSTS OF

19   THEM.

20        DO YOU RECALL THAT?

21   A.   YES, MA'AM.

22   Q.   DO THE COSTS OF APPLE'S COMPONENTS TELL YOU ANYTHING ABOUT

23   THE COSTS OF SAMSUNG'S COMPONENTS?

24   A.   NO, THEY DO NOT.  I WOULD EXPECT THEM TO BE VERY

25   DISSIMILAR.

1        MS. WIGMORE:  THANK YOU.

2        THE COURT:  ALL RIGHT.  THE TIME IS 3:42.

3    ANY FURTHER CROSS, MS. MAROULIS?

4        MS. MAROULIS:  NO, YOUR HONOR.

5        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

6    AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

7        MR. LEE:  HE CAN BE EXCUSED, NOT SUBJECT TO RECALL.

8        THE COURT:  MS. MAROULIS, DO YOU AGREE WITH THAT?

9        MS. MAROULIS:  YES, YOUR HONOR.

10       THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

11   TESTIMONY, AND YOU'RE FREE TO LEAVE.

12       SHOULD WE TAKE A BRIEF BREAK?

13       MR. LEE:  SURE.

14       THE COURT:  I'D LIKE TO SEE HOW FAR WE CAN GET TODAY.

15   IS IT OKAY IF WE JUST TAKE A FIVE MINUTE BREAK SINCE WE TOOK A

16   LONGER BREAK EARLIER?

17       ALL RIGHT.  LET'S TAKE A FIVE MINUTE BREAK.  THANK YOU.

18       DO NOT RESEARCH OR DISCUSS THE CASE.  THANK YOU FOR YOUR

19   PATIENCE AND YOUR SERVICE.

20       (JURY OUT AT 3:43 P.M.)

21       THE COURT:  OKAY.  WE'RE IN RECESS THANK YOU.

22       (RECESS FROM 3:43 P.M. UNTIL 3:55 P.M.).

23       (JURY IN AT 3:55 P.M.).

24       THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

25       CALL YOUR NEXT WITNESS.

```
 1              MR. LEE:  YOUR HONOR, AS OUR NEXT WITNESS, WE'RE

 2     GOING TO CALL BY DEPOSITION SAMSUNG EMPLOYEE JUN, J-U-N, WON,

 3     W-O-N, LEE, L-E-E.

 4          HE WILL DISCUSS EXHIBIT 1 IN HIS DEPOSITION, WHICH IS

 5     EXHIBIT -- PLAINTIFF'S EXHIBIT 52.

 6          THE CLIP IS 6 MINUTES, YOUR HONOR, AND 25 SECONDS, ALL

 7     CHARGEABLE TO APPLE.

 8              THE COURT:  AND ARE YOU MOVING PX --

 9              MR. LEE:  YES, I WAS GOING TO WAIT FOR THE END OF THE

10     CLIP, BUT I'LL DO IT NOW.

11              THE COURT:  GOT IT.  WELL, IS IT GOING TO BE SHOWN

12     THROUGH HIS DEPOSITION?

13              MR. LEE:  IT'LL BE SHOWN.

14              THE COURT:  ALL RIGHT.  ANY OBJECTION TO HAVING THAT

15     ADMITTED?

16              MS. MAROULIS:  NO FURTHER OBJECTION, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.  THAT IS

18     PX 52.

19          ALL RIGHT.  GO AHEAD, PLEASE.

20          (PLAINTIFF'S EXHIBIT 52 WAS ADMITTED IN EVIDENCE.)

21              THE COURT:  ALL RIGHT.  3:52.  GO AHEAD.

22          (VIDEOTAPED DEPOSITION OF JUNWON LEE WAS PLAYED IN OPEN

23     COURT OFF THE RECORD.)

24              THE COURT:  ALL RIGHT.

25              MR. LEE:  YOUR HONOR, I SHOULD -- FOLLOWING THE
```

1     PROTOCOL --

2              THE COURT:  YES.

3              MR. LEE:  -- I THINK IF WE COULD LODGE --

4              THE COURT:  THE TRANSCRIPT?

5              MR. LEE:  -- THE TRANSCRIPT AS PLAINTIFF'S

6     EXHIBIT 4072, WE HAVE COPIED FOR THE COURT AND THE REPORTER.

7              THE COURT:  ALL RIGHT.  4072, THAT TRANSCRIPT IS

8     LODGED.

9              MR. LEE:  AND OUR NEXT EXHIBIT -- OUR NEXT WITNESS,

10    YOUR HONOR, IS MR. ALAN BALL.  AND MS. WIGMORE WILL DO THE

11    DIRECT EXAMINATION.

12             THE COURT:  ALL RIGHT.  THANK YOU.

13          THE TIME IS 4:03.  I'LL GIVE YOU TIME TO GET SET UP.

14             MR. LEE:  PX 52 IS IN.

15             THE COURT:  YES, IT WAS ACTUALLY ADMITTED.

16             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND, SIR.

17        **(PLAINTIFF'S WITNESS, ALAN BALL, WAS SWORN.)**

18             THE WITNESS:  I DO.

19             THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE

20    YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR

21    THE RECORD.

22             THE WITNESS:  HELLO.  I'M ALAN BALL.  THAT'S SPELLED

23    A-L-A-N, B-A-L-L.

24             THE COURT:  ALL RIGHT.  TIME IS 4:04.  GO AHEAD,

25    PLEASE.

|   |   |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MS. WIGMORE: |
| 3 | Q.   GOOD AFTERNOON, MR. BALL.  WOULD YOU PLEASE INTRODUCE |
| 4 | YOURSELF TO THE MEMBERS OF THE JURY? |
| 5 | A.   HI.  I'M ALAN BALL AND I'M A PRODUCT DESIGNER.  I HAVE A |
| 6 | DESIGN CONSULTANCY.  I LIVE IN BOSTON.  I HAVE A FAMILY, A |
| 7 | 12-YEAR-OLD DAUGHTER, AND -- THAT'S PRETTY MUCH IT. |
| 8 | Q.   AND WHAT KIND OF WORK DO YOU DO? |
| 9 | A.   WELL, I'M ON INDUSTRIAL DESIGNER.  I'M A CONSULTING |
| 10 | INDUSTRIAL DESIGNER. |
| 11 | Q.   WHAT IS INDUSTRIAL DESIGN? |
| 12 | A.   WELL, INDUSTRIAL DESIGN IS A PROFESSIONAL ACTIVITY OF |
| 13 | CREATING A DESIGN FOR PRODUCTS OR SYSTEMS THAT ARE GOING TO BE |
| 14 | MANUFACTURED USING MODERN TECHNIQUES OR IN MASS PRODUCTION. |
| 15 | AND WITH INDUSTRIAL DESIGN, WE'RE CONCERNED WITH DESIGNING |
| 16 | PRODUCTS THAT LOOK GREAT AND WORK REALLY WELL, DELIGHT THE |
| 17 | USER, ARE INTUITIVE, AND SUCCESSFUL IN THE MARKETPLACE. |
| 18 | Q.   FOR HOW LONG HAVE YOU BEEN WORKING AS AN INDUSTRIAL |
| 19 | DESIGNER? |
| 20 | A.   OVER 30 YEARS NOW. |
| 21 | Q.   NOW, LET'S PUT UP PDX 5.2 ON THE SCREEN. |
| 22 | IS THIS A SUMMARY OF YOUR EDUCATIONAL BACKGROUND AND |
| 23 | EMPLOYMENT HISTORY, MR. BALL? |
| 24 | A.   YES. |
| 25 | Q.   WHAT IS YOUR EDUCATIONAL BACKGROUND? |

1     A.   I HAVE A BACHELOR'S OF INDUSTRIAL DESIGN FROM SYRACUSE

2     UNIVERSITY.

3     Q.   WHERE DO YOU CURRENTLY WORK?

4     A.   I HAVE MY OWN PRODUCT CONSULTING FIRM CALLED ALAN BALL

5     INDUSTRIAL DESIGN, OR ABD.

6     Q.   COULD YOU EXPLAIN TO THE JURY WHAT PRODUCTS YOU HAVE

7     EXPERIENCE DESIGNING?

8     A.   AS A CONSULTANT, I'M HIRED BY COMPANIES TO CONSULT ON

9     PRODUCTS THAT THEY'RE BRINGING TO MARKET, AND OVER THE YEARS,

10    THERE'S BEEN A HUGE VARIETY OF DIFFERENT KINDS OF PRODUCTS I'VE

11    HAD THE OPPORTUNITY TO WORK ON.

12         SO THOSE INCLUDE HOUSEHOLD PRODUCTS OR CONSUMER PRODUCTS

13    LIKE KITCHEN PRODUCTS.  I'VE DONE A LOT OF PRODUCTS FOR

14    CUISINART.

15         I'VE DONE A LOT OF MEDICAL INSTRUMENTATION, SURGICAL

16    DEVICES OR INSTRUMENTATION THAT MIGHT BE FOUND IN A HOSPITAL

17    LAB.

18         I'VE DONE SPORTS EQUIPMENT.  I'VE DONE TOYS.  I'VE DONE

19    QUITE A BIT OF ELECTRONIC DESIGN, INCLUDING TABLET COMPUTERS OR

20    OTHER ELECTRONIC COMPUTER PRODUCTS OR TOYS.

21         I'VE DONE EVERY -- I'VE DONE PRODUCTS, AND I'VE DONE SOME

22    EXHIBIT AND DISPLAY OR POINT OF PURCHASE DESIGN THAT WOULD BE

23    FOUND IN A STORE.

24    Q.   MR. BALL, OVER THE COURSE OF YOUR CAREER, HAVE YOU GAINED

25    EXPERIENCE IN VALUING HOW A CUSTOMER WOULD VIEW AND INTERACT

1        WITH ELECTRONIC DEVICES?

2        A.   YES, I BELIEVE SO.

3             I MEAN, THAT'S REALLY THE STARTING POINT FOR DESIGNING A

4        GREAT PRODUCT BECAUSE YOU HAVE TO UNDERSTAND WHO'S GOING TO USE

5        THE PRODUCT AND BY UNDERSTANDING THAT PERSON, YOU -- YOU

6        IDENTIFY OPPORTUNITIES TO REALLY DESIGN SOMETHING GREAT.

7        Q.   DO YOU HAVE ANY PATENTS?

8        A.   YEAH.  I HAVE QUITE A FEW NOW.  I THINK IT'S GETTING CLOSE

9        TO 70, AND THAT INCLUDES DESIGN AND UTILITY PATENTS.

10       Q.   HAVE YOU WON ANY AWARDS FOR YOUR INDUSTRIAL DESIGN WORK?

11       A.   YEAH, QUITE A FEW.

12            MS. WIGMORE:  YOUR HONOR, APPLE OFFERS MR. BALL AS AN

13       EXPERT IN THE FIELD OF INDUSTRIAL DESIGN.

14            THE COURT:  ANY OBJECTION?

15            MR. PRICE:  NO OBJECTION TO THE FOUNDATION, YOUR

16       HONOR.

17       BY MS. WIMORE:

18       Q.   WERE YOU RETAINED FOR APPLE, INC., IN THIS CASE?

19            THE COURT:  I'M SORRY.  SO -- SO CERTIFIED.

20       GO AHEAD, PLEASE.

21       BY MS. WIGMORE:

22       Q.   WERE YOU RETAINED AS AN EXPERT FOR APPLE IN THIS CASE?

23       A.   YES.

24       Q.   HAVE YOU BEEN COMPENSATED FOR YOUR WORK IN THIS CASE.

25       A.   YES.

1    Q.  DOES YOUR COMPENSATION DEPEND IN ANY WAY ON THE SUBSTANCE

2    OF YOUR OPINIONS OR ON THE OUTCOME OF THIS CASE?

3    A.  NO.

4    Q.  WHAT WERE YOU ASKED TO DO IN THIS CASE?

5    A.  I WAS ASKED TO APPLY A FOUR FACTOR TEST TO TRY TO RIGHTLY

6    DETERMINE WHAT THE ARTICLE OF MANUFACTURE SHOULD BE RELEVANT --

7    RELEVANT TO A NUMBER OF SMARTPHONES THAT SAMSUNG MADE THAT

8    INFRINGED TWO APPLE DESIGN PATENTS.

9    Q.  NOW, WE'VE HEARD ABOUT A NUMBER OF PATENTS IN THIS CASE.

10   WHICH TWO PATENTS DO YOUR OPINIONS FOCUS ON?

11   A.  THE D'677 PATENT AND THE D'082 PATENT, I BELIEVE.

12   Q.  THE D'087?

13   A.  '087, YEAH, I'M SORRY.

14   Q.  OKAY.

15   A.  LOTS OF NUMBERS TODAY.

16   Q.  NOW, YOU MENTIONED THAT YOU'VE BEEN ASKED TO FORM OPINIONS

17   ABOUT AN ARTICLE OF MANUFACTURE.

18       WHAT IS YOUR UNDERSTANDING OF THE RELATIONSHIP BETWEEN A

19   PATENTED DESIGN AND AN ARTICLE OF MANUFACTURE?

20   A.  WELL, A PATENTED DESIGN IS A, A DESIGN, IN THE CASE OF A

21   DESIGN PATENT, IT'S AN ORNAMENTAL DESIGN ABOUT HOW SOMETHING

22   LOOKS THAT IS PROTECTED.

23       AND THE ARTICLE OF MANUFACTURE WOULD BE ANY PRODUCT THAT

24   THAT DESIGN IS APPLIED TO.

25   Q.  NOW, HOW DID YOU GO ABOUT THE TASK OF IDENTIFYING THE

1    ARTICLES OF MANUFACTURE FOR THE PRODUCTS FOUND TO INFRINGE THE

2    D'677 PATENT AND THE PRODUCTS FOUND TO INFRINGE THE D'087

3    PATENTS?

4    A.   I APPLIED A FOUR FACTOR TEST.

5    Q.   LET'S PUT UP PDX 5.3 ON THE SCREEN.

6         WHAT DOES THIS SLIDE SHOW?

7    A.   THIS IS THE FOUR FACTOR TEST THAT I WAS ASKED TO APPLY.

8    Q.   NOW, TURNING TO PDX 5.4, CAN YOU EXPLAIN FOR US THE TYPES

9    OF EVIDENCE YOU REVIEWED IN ANALYZING THOSE FACTORS AND FORMING

10   YOUR OPINIONS?

11   A.   WELL, I LOOKED AT THE INFRINGING PHONES, AND I LOOKED AT

12   THEM CAREFULLY.  I HELD THEM IN MY HAND.  I LOOKED AT THEM.  I

13   EXAMINED THEM PRETTY CAREFULLY.

14        AND I ALSO LOOKED AT PHOTOGRAPHS OF THOSE PHONES,

15   INCLUDING PHOTOGRAPHS AND SOME ADS AND THINGS.

16        I ALSO LOOKED AT THE PATENTS THAT I WAS CONSIDERING, D'677

17   AND D'087.

18        I ALSO HAD AN OPPORTUNITY TO LOOK AT JOURNALED SAMSUNG

19   DOCUMENTS, APPLE DOCUMENT, AND THEN PUBLIC DOCUMENTS LIKE

20   REVIEWS OR ADS THAT CONCERN DIFFERENT ELEMENTS OF THE FOUR

21   FACTORS.

22   Q.   DID YOU ALSO REVIEW TESTIMONY?

23   A.   I DID.  I HAD A CHANCE TO REVIEW TESTIMONY FROM BOTH

24   SAMSUNG EMPLOYEES AND APPLE EMPLOYEES.

25   Q.   NOW, WE'LL COME TO THE DETAILS OF YOUR FOUR FACTOR

1    ANALYSIS, BUT IN SUMMARY, WITH RESPECT TO THE D'677 PATENT,

2    WHAT IS THE ARTICLE OF MANUFACTURE FOR THE INFRINGING SAMSUNG

3    PHONES?

4    A.   WELL, I BELIEVE IT'S THE ENTIRE PHONE THAT THE DESIGN WAS

5    APPLIED TO.

6    Q.   AND TURNING TO THE D'087 PATENT, IN SUMMARY, WHAT IS THE

7    ARTICLE OF MANUFACTURE FOR THE INFRINGING SAMSUNG PHONES?

8    A.   I BELIEVE IT'S THE ENTIRE INFRINGING SMARTPHONE.

9    Q.   NOW, BRINGING UP PDX 5.5, CAN YOU PLEASE IDENTIFY THE

10   SAMSUNG PHONES THAT HAVE BEEN FOUND TO INFRINGE THE D'677

11   PATENT.

12   A.   SURE.  THERE'S 12.  THE TOP ROW, READING LEFT TO RIGHT IS

13   THE GALAXY S I9000, THE VIBRANT, THE FASCINATE, THE MESMERIZE,

14   THE GALAXY S SHOWCASE, THE S 4G.

15        AND THEN ON THE BOTTOM ROW LEFT TO RIGHT IS THE INFUSE 4G,

16   THE GALAXY S II, I9100, THE GALAXY S II EPIC 4G TOUCH, THE

17   GALAXY S II AT&T, THE GALAXY S II SKYROCKET, AND THE

18   GALAXY S II T-MOBILE.

19   Q.   NOW, TURNING TO PDX 5.6, CAN YOU PLEASE IDENTIFY WHICH

20   PHONES HAVE BEEN FOUND TO INFRINGE THE D'087 PATENT?

21   A.   YES.  THE GALAXY S I9000, THE VIBRANT, AND THE S 4G.

22   Q.   WE'VE JUST LOOKED AT A LOT OF PHONES.  CAN YOU TELL US

23   WHETHER THERE'S ANY OVERLAP BETWEEN THE PHONES THAT INFRINGE

24   THE D'677 PATENT AND THE PHONES THAT INFRINGE THE D'087?

25   A.   SURE.  THESE THREE PHONES ON THE SCREEN NOW THAT INFRINGE

1    THE D'087 ALSO WERE FOUND TO INFRINGE THE D'677.

2    Q.   NOW, CAN YOU IDENTIFY WHICH IPHONES ARE COVERED BY THE

3    D'677 PATENT?

4    A.   YES.

5    Q.   WHAT ARE THOSE?

6    A.   THE D'677 PATENT WOULD COVER THE ORIGINAL IPHONE, THE 3G

7    IPHONE, THE IPHONE 3GS, THE IPHONE 4, AND THE IPHONE 4S.

8    Q.   AND WITH RESPECT TO THE D'087 PATENT, WHICH IPHONES ARE

9    COVERED BY THAT PATENT?

10   A.   THE ORIGINAL IPHONE, THE IPHONE 3G, AND THE IPHONE 3GS.

11   Q.   NOW, TURNING TO PDX 5.9.  WERE YOU HERE WHEN MR. JOSWIAK

12   TESTIFIED ABOUT THE STATE OF MOBILE PHONE DESIGN BEFORE THE

13   IPHONE?

14   A.   YES.

15   Q.   AND DOES THIS SLIDE REPRESENT, AS HE CHARACTERIZED IT, THE

16   STATE OF DESIGN BEFORE THE IPHONE CAME ALONG?

17   A.   YEAH, I REMEMBER ALL THESE PHONES.

18   Q.   AND HOW DID THE DESIGN OF THE IPHONE COMPARE TO THE MOBILE

19   PHONE DESIGNS THAT PRECEDED IT?

20   A.   IT WAS VERY DIFFERENT.  IT WAS SO DIFFERENT THAT -- IT WAS

21   A LITTLE BIT HARD TO BELIEVE WHEN I FIRST SAW IT INTRODUCED.

22        IT DIDN'T HAVE ALL OF THE FOLDING AND MANIPULATING AND

23   SLIDING THAT YOU SAW IN ALL SORTS OF CELL PHONES OR, YOU KNOW,

24   SMARTPHONES AT THE TIME.

25        IT DOESN'T HAVE ALL THOSE BUTTONS AND KEYS.  IT DOESN'T

1       HAVE AN EXTERNAL ANTENNA.

2            AND ONE THING THAT I THOUGHT WAS NEAT WAS THAT IT WAS

3       SYMMETRIC TOP AND BOTTOM, LEFT TO RIGHT.  IT WAS JUST THIS

4       BEAUTIFUL DESIGN WITH A FULL GLASS FRONT.

5       Q.   WHAT WAS THE MARKET REACTION TO THE DESIGN OF THE IPHONE?

6       A.   WELL, EVERYONE WAS REALLY EXCITED.  I REMEMBER THAT EVEN

7       IN BOSTON PEOPLE WERE TALKING ABOUT IT THE DAY IT HAPPENED,

8       RIGHT?  YOU KNOW, IT WAS -- IT WAS VERY EXCITING, AND I THINK

9       PEOPLE WERE SHOCKED AND THEIR CURIOSITY WAS PIQUED BECAUSE WE

10      WANTED TO HOLD ONE, I THINK.  YOU KNOW, IT WAS JUST ANNOUNCED.

11      IT WAS A WHILE BEFORE YOU COULD ACTUALLY GET YOUR HANDS ON ONE,

12      BUT EVERYONE WAS PRETTY EXCITED I THINK.

13      Q.   NOW, I WANT YOU TO TURN IN YOUR BINDER TO TAB 1.  WE'RE

14      NOT GOING TO PUT THIS ON THE SCREEN YET.  AND IF YOU COULD LOOK

15      IN YOUR BINDER AT TAB 1, PX 3A.

16           DO YOU HAVE THAT IN FRONT OF YOU?

17      A.   YES.

18      Q.   DO YOU RECOGNIZE PX 3A?

19      A.   I DO.

20      Q.   AND JUST GENERALLY, WHAT IS THIS EXHIBIT?

21      A.   THE FIRST PAGE SHOWS FOUR SAMSUNG PHONES ON THE LEFT SIDE

22      OF THE PAGE AND THE IPHONE ON THE RIGHT SIDE OF THE PAGE.

23           AND THESE ARE SAMSUNG PRODUCTS THAT EXISTED IN THE WORLD

24      BEFORE THE IPHONE WAS INTRODUCED.

25      Q.   AND IS THIS A DOCUMENT YOU CONSIDERED IN FORMING YOUR

1    OPINIONS?

2    A.   YES.

3            MS. WIGMORE:  WE OFFER PX 3A IN EVIDENCE.

4            MR. PRICE:  I OBJECT, YOUR HONOR.  I THINK THIS IS A

5    DEMONSTRATIVE.

6            MS. WIGMORE:  YOUR HONOR, IT WAS ADMITTED PREVIOUSLY

7    AND HAS BEEN USED BY BOTH SIDES ALREADY.

8            MR. PRICE:  I WITHDRAW MY OBJECTION.  SORRY, YOUR

9    HONOR.

10           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

11        (PLAINTIFF'S EXHIBIT 3A WAS ADMITTED IN EVIDENCE.)

12           THE COURT:  GO AHEAD, PLEASE.

13   BY MS. WIGMORE:

14   Q.   SO WE'RE PUTTING PAGE 3A.1 ON THE SCREEN.  CAN YOU

15   DESCRIBE FOR THE JURY WHAT THIS PAGE SHOWS?

16   A.   SURE.  THERE ARE FOUR SAMSUNG PHONES ON THE LEFT, AND

17   THERE'S THE IPHONE ON THE RIGHT.

18       AND THESE WERE SAMSUNG PHONES THAT EXISTED BEFORE THE

19   IPHONE WAS ANNOUNCED, AND THE YEARS ARE DOWN AT THE BOTTOM.

20   Q.   AND DO YOU RECALL IN MR. LEE'S OPENING THE REFERENCE TO

21   PHASE 1?

22   A.   YES.

23   Q.   DOES THIS LOOK LIKE THE PHASE 1 STAGE THAT HE DESCRIBED IN

24   THE OPENING?

25   A.   THAT'S THE WAY I UNDERSTOOD IT.

1    Q.   NOW, TURNING TO PX 3A.2, WHAT DOES THIS SLIDE SHOW?

2    A.   WELL, THESE ARE SOME PHONES THAT, ON THE LEFT YOU SEE THE

3    IPHONE, AND THAT WAS INTRODUCED IN 2007, RIGHT IN THE BEGINNING

4    OF THE YEAR.

5         AND THEN ON THE RIGHT THERE ARE SIX SAMSUNG PHONES THAT

6    CAME OUT AFTER THE IPHONE, AND I GUESS THEY CAME OUT OVER THE

7    RANGE OF 2008 THROUGH 2009, YOU KNOW, EVEN UP TO, YOU KNOW, THE

8    FIRST QUARTER OF 2010.

9         AND --

10   Q.   AND DOES THIS SLIDE CORRESPOND WITH PHASE 2 AS MR. LEE

11   DESCRIBED IT IN THE OPENING STATEMENT?

12   A.   YES, THEY DO.

13   Q.   NOW, LET'S TURN, PLEASE, TO PAGE PX 3A.3.

14        WHAT DOES THIS PAGE ILLUSTRATE?

15   A.   THIS PAGE SHOWS FOUR SAMSUNG PHONES THAT WERE FOLLOWING

16   THE ONES ON THE PREVIOUS PAGE IN THE YEARS 2010 AND 2011.

17        AND AGAIN, IT SHOWS THE IPHONE ON THE LEFT.

18   Q.   AND DOES THIS CORRESPOND WITH PHASE 3 AS MR. LEE DESCRIBED

19   IT?

20   A.   YES, I BELIEVE SO.

21   Q.   AND WHAT DO YOU NOTICE AS A DESIGNER ABOUT THE DESIGN OF

22   THE SAMSUNG PHONES SHOWN HERE?

23   A.   WELL, I SEE A CHANGE.  THE PHONES ON THE PREVIOUS SHEET

24   WERE ALL VERY DIFFERENT, AND IT LOOKS LIKE THEY'RE TRYING LOTS

25   OF DIFFERENT DESIGNS THERE.  THEY HAVE BIGGER DISPLAYS, BUT

1       THEY DON'T HAVE -- THEY DON'T LOOK LIKE THE IPHONES.  THEY LOOK

2       LIKE DIFFERENT KINDS OF PHONES.  SOME OF THEM LOOKED COOL, BUT

3       THEY'RE ALL DIFFERENT.

4           THEN THE SECOND PAGE, YOU SEE FOUR SAMSUNG PHONES WHICH

5       LOOK VERY MUCH LIKE THE IPHONE, AND THE SIMILARITY IS

6       REMARKABLE TO ME, AND I THINK IT SHOWS THAT THE STRATEGY MIGHT

7       HAVE CHANGED.  THE DESIGN CHANGED.

8       Q.  NOW, LET'S TURN TO YOUR OPINIONS REGARDING THE ARTICLE OF

9       MANUFACTURE.

10          DO YOU UNDERSTAND THAT IT'S UP TO THE JURY TO DETERMINE

11      THE ARTICLES OF MANUFACTURE TO WHICH SAMSUNG APPLIED APPLE'S

12      DESIGNS?

13      A.  YES.

14      Q.  AND DO YOU UNDERSTAND THAT NEITHER THE COURT NOR THE

15      PATENT OFFICE HAS DETERMINED THE ARTICLES OF MANUFACTURE IN

16      THIS CASE?

17      A.  YES.

18      Q.  NOW, MOVING TO PDX 5.10, WHAT IS THE FIRST FACTOR OF THE

19      FOUR FACTOR TEST THAT YOU CONSIDERED IN FORMING YOUR OPINIONS?

20      A.  THE SCOPE OF THE DESIGN CLAIMED IN APPLE'S PATENT,

21      INCLUDING THE DRAWING AND WRITTEN DESCRIPTION.

22      Q.  DID YOU ANALYZE THIS FACTOR WITH RESPECT TO EACH OF THE

23      D'677 PATENT AND THE D'087 PATENT?

24      A.  YES, I DID.

25      Q.  NOW, I'M SHOWING YOU JX 1043, WHICH IS THE '677 PATENT.

1    THAT'S IN TAB 2 OF YOUR BINDER.  IT'S ALSO IN THE JURORS'

2    BINDERS.

3         DO YOU RECOGNIZE THIS D'677 PATENT?

4    A.   YES.

5    Q.   NOW, DO YOU RECALL MR. QUINN IN HIS OPENING TALKING ABOUT

6    THE SCOPE OF THE CLAIM IN THIS PATENT?

7    A.   YES.

8    Q.   LET'S LOOK AT THE PATENT AND LOOK AT THE LANGUAGE AND SEE

9    WHAT IT SAYS.

10        IF YOU COULD READ FOR US, PLEASE, THE CLAIM.

11   A.   SURE.  IT SAYS, "THE ORNAMENTAL DESIGN OF AN ELECTRONIC

12   DEVICE, AS SHOWN AND DESCRIBED."

13   Q.   DO YOU UNDERSTAND THAT THE D'677 CLAIM HAS INTERPRETED BY

14   THE COURT IN THIS CASE?

15   A.   YES.

16   Q.   AND DID YOU CONSIDER THE COURT'S CONSTRUCTION IN FORMING

17   YOUR OPINIONS?

18   A.   SURE.

19   Q.   NOW, TURNING TO THE DRAWINGS FROM THE D'677 PATENT, DO YOU

20   SEE SOME LINES HERE ARE SHOWN IN SOLID LINES AND OTHERS ARE

21   BROKEN?

22   A.   YES.

23   Q.   WHAT IS SHOWN IN THE SOLID LINES, USING FIGURE 1 OF THE

24   D'677 PATENT AS AN EXAMPLE?

25   A.   THE SOLID LINES INDICATE THE PROTECTED OR CLAIMED DESIGN,

1      AND IN THIS PARTICULAR VIEW I SEE A TOP SURFACE, I SEE A

2      RECTANGULAR SURFACE, I SEE RADIUS CORNERS OF A SPECIFIC RADIUS

3      IN THAT DRAWING.

4           I SEE A BLACK TOP, AND I ALSO SEE AN INDICATION THAT'S GOT

5      SOME REFLECTIVITY.  THAT'S WHAT THE DIAGONAL LINES ARE FOR.

6           AND I ALSO SEE A DISPLAY OR A RECTANGLE IN THE CENTER THAT

7      I UNDERSTAND TO BE SOME SORT OF DISPLAY ELEMENT, AND A LITTLE

8      LOZENGE SHAPED FEATURE ON SORT OF THE TOP PART OF THE PHONE.

9           I'M SORRY.  I ALSO SEE THE PRESENCE OF SOME SORT OF THING

10     AT THE BOTTOM THAT'S ROUND AND BROKEN.  I -- I THINK THAT IT

11     SAYS THERE'S SOMETHING THERE, BUT IT DOESN'T DEFINE WHAT IT IS.

12     IT JUST IS AN UNDEFINED SHAPE.

13     Q.   SO THAT CIRCLE IS NOT CLAIMED?  IT'S NOT WITHIN THE SOLID

14     LINE?

15     A.   IT'S NOT PART OF THE CLAIM, BUT I THINK IT SUGGESTS THAT

16     THE CLAIM, THERE MAY BE SOMETHING THERE.

17     Q.   NOW, DOES THE D'677 CLAIM THE DESIGN ITSELF, THE PART

18     SHOWN HERE IN SOLID LINES?

19     A.   SURE.

20     Q.   DOES IT COVER THE ENTIRE PHONE?

21     A.   NO.  THE SOLID LINES DON'T -- THE ENTIRE PHONE ISN'T SHOWN

22     IN SOLID LINE, SO THE ENTIRE DESIGN OF THE PHONE ISN'T CLAIMED.

23          BUT THAT DOESN'T MEAN WE CAN IGNORE THE BROKEN LINES

24     BECAUSE THOSE ARE REALLY HELPFUL BECAUSE YOU'VE GOT A CLAIM,

25     NOW YOU NEED TO KNOW HOW IT'S APPLIED TO A PRODUCT AND WHAT

1        KIND OF PRODUCT THAT IS.

2             SO I THINK THE BROKEN LINES PROVIDE SOME CONTEXT THAT HELP

3        US UNDERSTAND THE CLAIM.

4        Q.   AND LOOKING AT THE BROKEN LINE, IF WE COULD EXPAND THIS

5        OUT TO SHOW FIGURES 1 AND 2, WHAT DO THE BROKEN LINES REVEAL

6        ABOUT THE CONTEXT OF THIS CLAIMED DESIGN?

7        A.   THAT IT'S A SMARTPHONE AND THE CLAIMED DESIGN IS LOCATED

8        ON THE FRONT MOST PROMINENT SIDE OF THE PHONE.

9        Q.   IF WE COULD TURN TO THE TITLE OF THE D'677 PATENT, WHAT IS

10       THE TITLE?

11       A.   "ELECTRONIC DEVICE."

12       Q.   AND NOW LET'S TURN TO THE WRITTEN DESCRIPTION, THE SECTION

13       TITLED "DESCRIPTION."

14            WE HAVE THAT UP ON THE SCREEN.  COULD YOU READ THE

15       DESCRIPTION OF FIGURE 1, PLEASE?

16       A.   "FIGURE 1 IS A FRONT PERSPECTIVE VIEW OF AN ELECTRONIC

17       DEVICE IN ACCORDANCE WITH THE PRESENT INVENTION."

18       Q.   AND IF YOU COULD GO TO THE SAME BELOW THE FIGURES AND READ

19       THAT SENTENCE FOR US, PLEASE?

20       A.   "THE CLAIMED SURFACE OF THE ELECTRONIC DEVICE IS

21       ILLUSTRATED WITH THE COLOR DESIGNATION FOR THE COLOR BLACK."

22       Q.   AND THEN IF YOU TURN TO THE NEXT PARAGRAPH, DO YOU SEE

23       THAT ALSO BEGINS WITH THE FACE "THE ELECTRONIC DEVICE."

24       A.   "THE ELECTRONIC DEVICE IS NOT LIMITED TO THE SCALE SHOWN

25       HEREIN.  AS INDICATED IN THE TITLE, THE ARTICLE OF MANUFACTURE

1        TO WHICH THE ORNAMENTAL DESIGN HAS BEEN APPLIED IS AN

2        ELECTRONIC DEVICE, MEDIA PLAYER (E.G., MUSIC, VIDEO AND/OR GAME

3        PLAYER) MEDIA STORAGE DEVICE, A PERSONAL DIGITAL ASSISTANT, A

4        COMMUNICATION DEVICE, (E.G., CELLULAR PHONE) A NOVELTY ITEM OR

5        TOY."

6        Q.   MR. BALL, BASED ON EVERYTHING WE'VE JUST DISCUSSED, THE

7        CLAIMS, THE DRAWINGS AND THE WRITTEN DESCRIPTION, WHAT INSIGHT

8        DOES THE D'677 PROVIDE AS TO THE ARTICLE OF MANUFACTURE TO

9        WHICH THE CLAIMED DESIGN WAS INTENDED TO BE APPLIED?

10       A.   A SMARTPHONE.

11       Q.   NOW, LET'S TURN TO THE D'087 PATENT, WHICH IS IN YOUR

12       BINDER AT TAB 3, ALSO IN THE JURORS' BINDERS.  THIS IS JX 1041.

13            WE CAN PUT THAT ON THE SCREEN.  DO YOU RECOGNIZE THIS,

14       MR. BALL, AS THE D'087 PATENT?

15       A.   I DO.

16       Q.   LET'S TURN TO THE CLAIM.  COULD YOU READ THE CLAIM FOR US,

17       PLEASE?

18       A.   SURE.  "THE ORNAMENTAL DESIGN OF AN ELECTRONIC DEVICE,

19       SUBSTANTIALLY AS SHOWN AND DESCRIBED."

20       Q.   AND DID YOU CONSIDER THE COURT'S INTERPRETATION OF THIS

21       CLAIM IN FORMING YOUR OPINIONS?

22       A.   YES.

23       Q.   NOW, FOCUSSING YOUR ATTENTION ON FIGURE 9 AS AN EXAMPLE,

24       LET'S HAVE FIGURE 9, THE DRAWING, SHOWN HERE.

25            CAN YOU EXPLAIN FOR US WHAT IS SHOWN HERE IN THE SOLID

BALL DIRECT BY MS. WIGMORE

1    LINES?

2    A.   SURE.  THE SOLID LINES, THEY CLAIM A RECTANGULAR TOP

3    SURFACE, IT APPEARS FLAT, RUNS EDGE TO EDGE, IT HAS RADIUS

4    CORNERS, YOU KNOW, A PARTICULAR KIND OF RADIUS CORNERS.

5         IT HAS A BEZEL THAT SURROUNDS THAT, IT'S A DIFFERENT

6    SURFACE, IT ACTUALLY WRAPS DOWN A BIT ON TO THE SIDES OF THE

7    PHONE, AND IT'S ROUNDED OFF THAT TOP SURFACE ON ALL SIDES.

8         AND THEN IT HAS INSET IN THE SURFACE, THERE'S ANOTHER

9    RECTANGLE THAT LOOKS LIKE A SCREEN OF SOME SORT.

10   Q.   SO HERE WE SEE IN THE SOLID LINES THE ROUND CORNERED GLASS

11   FRONT FACE AND THE BEZEL?  IS THAT RIGHT?

12   A.   YEAH, A SEE A FLAT FRONT FACE AND THE BEZEL, YES.

13   Q.   NOW, DOES THE D'087 CLAIMED DESIGN ITSELF AS SHOWN IN

14   THESE SOLID LINES COVER AN ENTIRE PHONE?

15   A.   THE ACTUAL CLAIM DOESN'T, NO.

16   Q.   OKAY.

17   A.   BUT --

18   Q.   AND WHAT IS SHOWN IN THE BROKEN LINES OF THE FIGURES IN

19   THIS PATENT, JUST USING FIGURES 9 AND 10 AS AN EXAMPLE?

20   A.   WELL, THE BROKEN LINES COMPLETE THE PICTURE, AND IT SHOWS

21   AN ENTIRE SMARTPHONE UPON WHICH THIS CLAIMED DESIGN IS APPLIED.

22        AND IT NOT ONLY SHOWS THAT, BUT IT KIND OF SHOWS WHERE ON

23   THE PHONE AND IT WOULD BE INSTRUCTIVE TO HOW TO APPLY THAT

24   CLAIM.

25   Q.   WHAT IS THE TITLE OF THE D'087 PATENT, TURNING TO THAT

1      FIRST PAGE?

2      A.   "ELECTRONIC DEVICE."

3      Q.   AND IF WE COULD TURN TO THE DESCRIPTION, IF YOU COULD READ

4      FOR US THE DESCRIPTION NEXT TO FIGURE 9 IN THE WRITTEN

5      DESCRIPTION.

6      A.   "FIGURE 9 IS A FRONT PERSPECTIVE VIEW OF ANOTHER

7      EMBODIMENT OF AN ELECTRONIC DEVICE IN ACCORDANCE WITH THE

8      PRESENT INVENTION."

9      Q.   TURNING TO PAGE 3 OF THIS DESCRIPTION, COULD YOU READ FOR

10     US, PLEASE, THE SENTENCE FOLLOWING THE DESCRIPTION OF THE

11     FIGURES, THAT FIRST SENTENCE.

12     A.   "THE BROKEN LINES SHOWING THE REMAINDER OF THE ELECTRONIC

13     DEVICE ARE DIRECTED TO ENVIRONMENT.  THE BROKEN LINES, WITHIN

14     THE CLAIMED DESIGN, IN EMBODIES 1, 2, AND 4 THAT DEPICT AN

15     ELONGATED OVAL SHAPE AND THE BROKEN LINES, WITHIN THE CLAIMED

16     DESIGN, IN EMBODIMENTS 2, 3, AND 6 THAT DEPICT A CIRCLE SHAPE

17     ARE SUPERIMPOSED ON A CONTINUOUS SURFACE AND ARE FOR

18     ILLUSTRATIVE PURPOSES ONLY."

19     Q.   OKAY.  YOU CAN STOP THERE.  THANK YOU.

20          SO BASED ON EVERYTHING WE'VE JUST DISCUSSED, THE CLAIM,

21     THE DRAWINGS AND THE WRITTEN DESCRIPTION, WHAT INSIGHT DOES THE

22     D'087 PATENT PROVIDE AS TO THE ARTICLE OF MANUFACTURE TO WHICH

23     THE CLAIMED DESIGN IS INTENDED TO BE APPLIED?

24     A.   A SMARTPHONE.

25     Q.   NOW, LET'S MOVE TO FACTOR 2, TURNING TO PDX 5.11.

1        WHAT IS THE SECOND FACTOR YOU CONSIDERED IN YOUR ANALYSIS?

2    A.   THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE PRODUCT

3    AS A WHOLE.

4    Q.   AND WHAT WAS YOUR OVERALL CONCLUSION AS TO THE RELATIVE

5    PROMINENCE OF THE D'677 AND D'087 DESIGNS WITHIN SAMSUNG'S

6    INFRINGING PHONES?

7    A.   WELL, I THINK IT'S VERY, VERY PROMINENT BECAUSE IT IS THE

8    ENTIRE FRONT FACE UPON WHICH PEOPLE MOST COMMONLY LOOK AT THE

9    PHONE AT THAT VANTAGE POINT AND THEY USE THE PHONE.  IT'S THE

10   SIDE YOU HAVE TO LOOK AT IN ORDER TO ENTER DATA OR SEE DATA.

11        AND IT REALLY IS THE SIDE THAT IDENTIFIES THE PHONE FOR

12   WHAT IT IS.

13        AND SO IT'S VERY PROMINENT.

14   Q.   NOW, YOU MENTIONED THAT YOU EXAMINED EACH OF THE

15   INFRINGING PHONES BY HAND.

16        HAVE YOU -- DO YOU HAVE A POSTER BOARD THAT WILL HELP YOU

17   DESCRIBE YOUR PHYSICAL EXAMINATION OF THESE DEVICES?

18   A.   YES.

19        MS. WIGMORE:  YOUR HONOR, MAY THE WITNESS APPROACH

20   THE DEMONSTRATIVE EXHIBIT?

21        THE COURT:  YES.  WHAT'S THE NUMBER OF THAT EXHIBIT?

22        MS. WIGMORE:  PDX 10.5.

23   Q.   AND AS WE'RE LOOKING AT PDX 10.5, I'D ALSO LIKE TO HAND

24   YOU JX 1019, WHICH IS THE --

25   A.   CAN EVERYONE SEE THIS?

```
 1              (PAUSE IN PROCEEDINGS.)

 2                   MR. PRICE:  DO YOU GUYS NEED SOME HELP?

 3                   THE COURT:  IT'S ACTUALLY 4:29.

 4                   MS. WIGMORE:  WE CAN PICK THIS UP TOMORROW.

 5                   THE COURT:  ALL RIGHT.  WHY DON'T WE DO THAT.  IT'S

 6      4:30.

 7              OKAY.  I'M JUST GOING TO REMIND THE JURY THAT NEITHER THE

 8      COURT NOR THE UNITED STATES PATENT AND TRADEMARK OFFICE HAS

 9      IDENTIFIED THE ARTICLES OF MANUFACTURE IN THIS CASE.  THAT

10      WOULD BE YOUR TASK AS JURORS TO IDENTIFY THOSE ARTICLES OF

11      MANUFACTURE FOR THE PATENTS, THE DESIGN PATENTS.

12              WITH THAT, I'M GOING TO REMIND YOU THAT YOU ARE NOT TO

13      RESEARCH OR DISCUSS THE CASE.  WE WILL SEE YOU TOMORROW

14      MORNING.

15              THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

16              WE'LL BEGIN AT 9:00.  THANK YOU.

17              (JURY OUT AT 4:30 P.M.)

18                   THE COURT:  ALL RIGHT.  ANYTHING FOR US TO DISCUSS?

19      I CAN GIVE YOU YOUR TIME IF YOU'D LIKE THAT.

20                   MS. MAROULIS:  YES, PLEASE, YOUR HONOR.

21                   THE COURT:  SO SAMSUNG HAS USED 58 MINUTES; AND APPLE

22      HAS USED 2 HOURS AND 1 MINUTE.

23              ALL RIGHT.  ANYTHING MORE FOR TODAY?

24                   MR. LEE:  NOT FOR APPLE, YOUR HONOR.

25                   THE COURT:  NO?  ALL RIGHT.  THANK YOU ALL.  I'LL SEE
```

```
1        YOU IN THE MORNING.

2            OH, LET ME ASK, IS SAMSUNG -- BEFORE WE END -- ARE YOU

3    GOING TO FILE THAT DOCUMENT TOMORROW MORNING OF WHAT -- OR -- I

4    THINK IT ACTUALLY WOULD BE BENEFICIAL TO, RATHER THAN JUST

5    DOING BLANKET, UNASSERTED PATENT RULINGS, IT REALLY DOES MAKE A

6    DIFFERENCE WHAT WITNESS, FOR WHAT PURPOSE, WHICH ONE, IF WE

7    JUST DO IT AS WE DID TODAY ON A WITNESS-BY-WITNESS BASIS,

8    BECAUSE IT DOES DEPEND.

9            MS. MAROULIS:  SURE, YOUR HONOR.  WHEN WOULD YOU LIKE

10   US TO FILE SOMETHING AND IN WHAT FORMAT?  JUST A LIST, OR --

11           THE COURT:  WELL, LET ME HEAR, MR. MUELLER, IS THIS

12   YOUR ISSUE?  WHAT DO YOU THINK MAKES SENSE?

13           SO I WILL TONIGHT RULE ON THE D'248 AND THE D'160 FOR BOTH

14   MS. KARE AND MR. LUCENTE BECAUSE I THINK THOSE HAVE TO BE

15   DECIDED TONIGHT SO YOU CAN KNOW BEFORE TOMORROW MORNING'S TRIAL

16   STARTS.

17       BUT --

18           MR. MUELLER:  THAT WOULD CERTAINLY BE HELPFUL.  YOUR

19   HONOR, TO THE EXTENT THERE'S ANY OTHERS, OUR ONE REQUEST WOULD

20   BE THAT WE BE GIVEN A REASONABLE LIST OF, YOU KNOW, SOME LENGTH

21   THAT WE COULD ACTUALLY DEAL WITH AS OPPOSED TO THE HUNDREDS

22   THAT WE HAVE PREVIOUSLY.

23           MS. MAROULIS:  YOUR HONOR, THE PARTIES HAVE BEEN

24   EXCHANGING THEIR DISCLOSURES.  WE CAN CERTAINLY FILE SOMETHING

25   TONIGHT WITH THE NUMBERS OF PATENTS FOR THE COURT'S BENEFIT.
```

1    BUT APPLE HAS BEEN ON NOTICE FOR WHAT WE WANT TO INTRODUCE.

2         THE COURT:  WELL, YOUR MOTION WAS WAY OVERBROAD, AND

3    YOU'RE NOT EVEN GOING TO USE ALL OF THOSE.  AND SO I -- I JUST

4    WOULD, YOU KNOW, PREFER NOT TO DO THE SAME EXERCISE WE DO IN

5    THIS CASE ALL THE TIME WHERE YOU ALL WANT 500 RULINGS WHEN

6    YOU'RE ONLY GOING TO USE 7.

7         I'M GOING TO ASK YOU TO PLEASE BE AWARE OF OUR LIMITED

8    RESOURCES.

9         I DON'T SEE THE POINT IN DOING -- YOU KNOW, I GIVE THIS AS

10   AN EXAMPLE JUST BECAUSE I THINK IT WAS SO EGREGIOUS.  YOU ALL

11   HAD 500 SLIDES FOR YOUR CLOSING AND YOU ALL FILED OBJECTIONS

12   AND RESPONSES TO OBJECTIONS TO 500 SLIDES, AND I RULED ON

13   THOSE.

14        THAT IS REALLY ABUSIVE, OKAY?  AND SO I JUST WOULD PREFER

15   THIS NOT TO CONTINUE TO HAPPEN IN EVERYTHING IN THIS CASE,

16   WHICH HAS BEEN GOING ON FOR SEVEN YEARS.

17        SO WHAT CAN WE DO TO LIMIT -- I'D REALLY LIKE TO KNOW --

18   BECAUSE EVEN IN THE MOTION YOU FILED LAST WEEK, YOU SAID THERE

19   ARE A BUNCH OF OTHERS THAT WE'RE THINKING ABOUT THAT WE MAY

20   USE.  IT'S KIND OF TIME TO KNOW AND IT'S TIME FOR ME TO GIVE

21   YOU A RULING SO THAT THE JURY'S NOT WAITING AROUND FOR THIS TO

22   BE RESOLVED.

23        CAN YOU GIVE ME THE LIST OF WHAT YOU WANT TO USE FOR WHICH

24   WITNESS, FOR WHAT REASON, AND THEN I CAN GIVE YOU A RULING.

25        OTHERWISE I'M HAPPY TO DO THIS ON THIS CASE BY CASE, WHICH

1    I THINK IS MORE NARROW, MORE TARGETED, AND ALLOWS ME TO MAKE A

2    DECISION IN CONTEXT BASED ON HOW THAT WITNESS TESTIFIES, WHAT

3    THEY WERE ASKED ABOUT IN BOTH DIRECT AND CROSS-EXAMINATION.  SO

4    I'M HAPPY TO DO IT THIS WAY.  IT'S JUST THAT IT IS GOING TO

5    CAUSE DELAYS WHERE THE JURY WILL BE WAITING FOR RULINGS.

6            MS. MAROULIS:  YES, YOUR HONOR.  WHY DON'T WE FILE BY

7    9:00 O'CLOCK TONIGHT A SHORT LIST OF PATENTS, LITERALLY JUST

8    THREE OR FOUR OR FIVE PATENT NUMBERS AND PUT A WITNESS NEXT TO

9    EACH?  AND I ASSUME THE COURT DOES NOT NEED EXPLANATION SINCE

10   WE DID THAT IN THE PRIOR BRIEF, BUT WE'RE HAPPY TO --

11           THE COURT:  BUT THE PRIOR BRIEF SAID, OKAY, FOR THESE

12   50 PATENTS, HERE'S, LIKE, 3 LINES.  WE WANT ALL THESE STANDARD

13   ESSENTIAL PATENTS, HERE'S A PARAGRAPH.

14       IT DIDN'T REALLY TELL ME, WITH THESE BROAD CATEGORIES,

15   LIKE HOW MANY PATENTS ARE ON THESE CHARTS?  HUNDREDS?  I DON'T

16   KNOW.  THERE'S, LIKE, A CHART OF PATENTS OF -- OKAY.  LET'S

17   JUST GO THROUGH.

18       YOU KNOW, THE STANDARD ESSENTIAL PATENTS, LOOK AT, THERE'S

19   A GRAPH OF PATENTS OF THIRD PARTIES, APPLE, SAMSUNG, FROM 2006

20   TO 2016.  SO TEN YEARS WORTH OF PATENTS FROM MULTIPLE PARTIES.

21       YOU WANT ME TO RULE ON TEN YEARS WORTH OF PATENTS OF

22   MULTIPLE PARTIES?

23       I MEAN, I JUST DON'T THINK IT'S REASONABLE TO MAKE THE

24   COURT --

25           MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

```
1          THE COURT:  -- TO MAKE THE COURT DO THIS.

2          MS. MAROULIS:  WHY DON'T WE DO SPECIFIC PATENT

3    NUMBERS AS OPPOSED TO SUMMARY EXHIBITS, AND THE COURT CAN RULE

4    ON THE SPECIFIC PATENT NUMBERS.

5          THE COURT:  ALL RIGHT.  WELL, IT WOULD AT LEAST BE

6    HELPFUL TO HAVE THAT, EVEN IF YOU'RE NOT -- EVEN IF I MAKE THE

7    RULING AS TO EACH WITNESS WHEN THEY TESTIFY, IT WOULD JUST BE

8    HELPFUL IN ADVANCE TO BE ABLE TO FOCUS ON AND TARGET THE

9    ANALYSIS ON THOSE.

10         ALL RIGHT.  SO YOU'RE GOING TO FILE THOSE AT 9:00 TONIGHT?

11         MS. MAROULIS:  THAT'S CORRECT.

12         THE COURT:  ALL RIGHT.  I APPRECIATE THAT.  THANK

13   YOU.

14         MS. MAROULIS:  YOUR HONOR, IF I MAY RAISE ON THE

15   CLOSING DISCLOSURES, BECAUSE THIS MORNING THE COURT MENTIONED

16   THAT WE SHOULD DISCLOSE BOTH THE SLIDES AND THE EXHIBITS THAT

17   BOTH PARTIES USED, AND WE'RE WONDERING ABOUT THE TIMING BECAUSE

18   SAMSUNG IS NOT GOING TO BEGIN ITS CASE-IN-CHIEF UNTIL PROBABLY

19   THE END OF TOMORROW AT SOME POINT.  SO WE CAN'T REALLY FILE THE

20   EXHIBITS THAT WILL BE IN EVIDENCE TOMORROW.  SO WE'RE SEEKING

21   THE COURT'S GUIDANCE ON THAT.  WE WANT TO PROVIDE THE COURT

22   WITH THE OPPORTUNITY TO RULE ON EVERYTHING.

23         THE COURT:  SO YOU DON'T KNOW AT THIS POINT WHICH

24   EXHIBITS YOU'RE GOING TO SEEK TO HAVE ADMITTED?

25         MS. MAROULIS:  WE GENERALLY HAVE AN IDEA, BUT IF
```

1    APPLE OBJECTS TO SOME OF THEM, THEY MAY NOT COME IN, FOR

2    EXAMPLE.  HOPEFULLY WE CAN GET THEM TO AGREE TO EXHIBITS THAT

3    WE WANT TO DO.  BUT AS FAR AS THE SLIDES, IT'S A LITTLE BIT

4    EASIER, BECAUSE THE PICTORIALS, THEY'RE DEMONSTRATIVES.  BUT AS

5    FAR AS ACTUAL EXHIBITS --

6              THE COURT:  THIS IS THE THIRD TIME WE'RE DOING THIS.

7    YOU'RE TELLING ME YOU DON'T KNOW WHAT EXHIBITS YOU'RE GOING TO

8    HAVE ADMITTED?  IT JUST SEEMS A LITTLE BIT UNUSUAL.

9         I -- WELL, IF YOU PUT THEM IN AND THEY'RE OBJECTED TO AND

10   THEY DON'T COME IN, THEN THAT ANSWERS THE QUESTION.  IT MOOTS

11   THE OBJECTION, RIGHT?

12             MS. MAROULIS:  UNDERSTOOD, YOUR HONOR.  DOES THE

13   COURT HAVE A SPECIFIC PREFERRED TIME OR SHOULD THE PARTIES WORK

14   OUT THE DISCLOSURE?  AS LONG AS THE COURT GETS EVERYTHING BY

15   THURSDAY AT 1:00 P.M., WHICH I THINK IS THE DEADLINE.

16             THE COURT:  WELL, SO DO YOU THINK THAT WE HAVE -- I'M

17   JUST TRYING TO WORK FORWARD HERE.  WE REALLY HAVE ONLY DONE

18   ABOUT 3 HOURS -- I'M SORRY, PLEASE TAKE A SEAT -- WE'VE REALLY

19   ONLY DONE ABOUT 3 HOURS OF TRIAL EVIDENCE, SO YOU HAVE 15 HOURS

20   LEFT, WHICH --

21             MR. LEE:  WE ONLY HAVE 13 HOURS LEFT, YOUR HONOR.

22             THE COURT:  OH, WAIT A MINUTE.  THAT'S CORRECT.  YOU

23   HAD 16 HOURS TOTAL.  SO YOU HAVE 13 HOURS LEFT.

24             MR. LEE:  RIGHT.

25             THE COURT:  SO HOPEFULLY WE WOULD GET AT LEAST

```
 1        10 HOURS ON WEDNESDAY AND THURSDAY, SO WE MAY ACTUALLY BE USING

 2        HALF THE DAY ON FRIDAY FOR EVIDENCE POTENTIALLY, OR AT LEAST

 3        2 HOURS DEPENDING ON -- NORMALLY I CAN GET ABOUT 5 HOURS AND

 4        40 MINUTES OF TRANSCRIPT TIME.  BUT THIS CASE, THERE ARE BREAKS

 5        WHERE WE HAVE TO GO OVER OBJECTIONS, SO THAT SLOWS THINGS DOWN

 6        A LITTLE BIT.

 7             WHEN CAN YOU -- AND REMIND ME, DID I SET THE DEADLINE FOR

 8        FINAL DEMONSTRATIVES?  I DON'T THINK I DID, OR SLIDES.  I DON'T

 9        THINK I DID.

10             MR. LEE:  1:00 O'CLOCK ON THURSDAY, YOUR HONOR.

11             THE COURT:  OKAY.  CAN YOU MEET THAT, OR WOULD THAT

12        BE PROBLEMATIC?

13             MR. LEE:  I THINK TWO THINGS.  I THINK WE CAN MEET

14        THAT, AND I ALSO THINK WE'RE LIKELY TO PICK UP SOME SPEED.  I

15        MEAN, TODAY WE ONLY GOT THREE, BUT WE ALSO HAD THE OPENINGS AND

16        SORTING OUT SOME ISSUES THAT HOPEFULLY WON'T REOCCUR.

17             SO I THINK WE CAN EASILY CLOSE ON FRIDAY AFTERNOON.

18             THE COURT:  DO YOU THINK THAT'S REALISTIC?

19             MS. MAROULIS:  YOUR HONOR, WE'RE AIMING TOO, BECAUSE

20        YOU TOLD THE JURY THAT THAT'S GOING TO BE THE AIM, SO THAT'S

21        WHAT BOTH PARTIES WANT TO DO.

22             PERHAPS MR. LEE AND I CAN TALK ABOUT WHEN THE PARTIES

23        EXCHANGE THEIR DISCLOSURES, BECAUSE I THINK WE CAN MEET THE

24        COURT'S DEADLINE FOR WHEN THEY COME TO COURT ON THURSDAY.

25        WE'LL JUST HAVE TO DISCLOSE A LITTLE BIT LATER THAN WE USUALLY
```

1        DO BETWEEN THE PARTIES, AND WE CAN WORK THAT OUT.

2               MR. LEE:  AND WE'RE HAPPY TO CONFER ON THAT AND WORK

3        IT OUT SO THAT YOU GET IT BY 1:00 O'CLOCK ON THURSDAY.

4               THE COURT:  OKAY.  I'D LIKE TO -- SO I HAVE TO GIVE

5        YOU THE RULINGS ON THOSE TWO PATENTS FOR MS. KARE AND

6        MR. LUCENTE.  WE HAVE THE OBJECTIONS FOR DAY THREE.

7               AND I WOULD LIKE TO TRY TO MAKE FURTHER HEADWAY ON THE

8        FINAL JURY INSTRUCTIONS BECAUSE THAT IS ALSO SOMETHING WE WOULD

9        NEED TO GET DONE.

10              SO IF IT'S POSSIBLE -- IT'S ALMOST 4:40 NOW.  IS THAT

11       RIGHT?

12              MS. MAROULIS:  YES, YOUR HONOR.

13              THE COURT:  WE'LL TRY TO FILE THOSE SOON TO GIVE

14       YOU -- COULD YOU GIVE ME OBJECTIONS -- THIS WILL BE A SECOND

15       ROUND FOR OBJECTIONS -- WITHIN A DAY?

16              MS. MAROULIS:  YES, YOUR HONOR.

17              MR. LEE:  YES.

18              THE COURT:  OKAY.  AND THEN WE'LL FILE IT AGAIN.

19       OBVIOUSLY YOUR OBJECTIONS WILL BE PRESERVED.

20              AND THAT THIRD ROUND OF OBJECTIONS, I WOULD REALLY JUST

21       PREFER YOU IDENTIFY OBVIOUS ERRORS OR INCONSISTENCIES OR

22       TYPOGRAPHICAL ERRORS OR THINGS LIKE THAT.

23              SO WE'LL PROBABLY DO ABOUT TWO MORE ROUNDS ON THE FINAL

24       JURY INSTRUCTION, BUT HOPEFULLY DO THOSE VERY QUICKLY.

25              THE SECOND TIME THIS WEEK THAT YOU CAN COMMENT ON THE

1    FINAL JURY INSTRUCTIONS, THAT I'D LIKE TO BE VERY FAST BECAUSE

2    THAT REALLY SHOULDN'T BE SUBSTANTIVE AT THAT POINT BECAUSE YOU

3    WILL HAVE HAD TWO SUBSTANTIVE ROUNDS.

4              MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

5              MR. LEE:  THAT'S FINE.

6              THE COURT:  OKAY.  WHAT ELSE?  ANYTHING ELSE?

7              MR. LEE:  NOT FOR APPLE, YOUR HONOR.

8              THE COURT:  NO?

9              MS. MAROULIS:  NO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THANK YOU.  SEE YOU TOMORROW.

11    THANK YOU VERY MUCH.

12         (THE EVENING RECESS WAS TAKEN AT 4:40 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  MAY 15, 2018

22

23

24

25