1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3        SAN JOSE DIVISION

4

5

6
APPLE INC., A CALIFORNIA          )  C-11-01846 LHK
CORPORATION,                      )
                                  )  SAN JOSE, CALIFORNIA
7                PLAINTIFF,        )
                                  )  MAY 16, 2018
8         VS.                     )
                                  )  VOLUME 3
9
SAMSUNG ELECTRONICS CO., LTD.,    )
A KOREAN BUSINESS ENTITY;         )  PAGES 519 - 807
10  SAMSUNG ELECTRONICS AMERICA,      )
INC., A NEW YORK CORPORATION;     )
11  SAMSUNG TELECOMMUNICATIONS         )
AMERICA, LLC, A DELAWARE          )
12  LIMITED LIABILITY COMPANY,         )
                                  )
13                DEFENDANTS.      )
_____      )

14

15

16        TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LUCY H. KOH
17        UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTERS:     LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, CMR
CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      APPEARANCES

 2      FOR PLAINTIFF          WILMER, CUTLER, PICKERING,
        APPLE:                 HALE AND DORR
 3                             BY:  WILLIAM F. LEE
                                    JOSEPH J. MUELLER
 4                                  SARAH R. FRAZIER
                               60 STATE STREET
 5                             BOSTON, MASSACHUSETTS  02109

 6                             BY:  AMY K. WIGMORE
                               1875 PENNSYLVANIA AVENUE, N.W.
 7                             WASHINGTON, D.C.  20006

 8                             MORRISON & FOERSTER
                               BY:  NATHAN B. SABRI
 9                             425 MARKET STREET, 32ND FLOOR
                               SAN FRANCISCO, CALIFORNIA  94105
10
                               BY:  ERIK OLSON
11                             755 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
12

13      ALSO PRESENT:          NOREEN KRALL
                               CYNDI WHEELER
14                             THOMAS LEE

15

16

17

18

19

20

21

22

23

24

25
```

1       APPEARANCES (CONTINUED)

2

3       FOR DEFENDANT           QUINN, EMANUEL, URQUHART & SULLIVAN
        SAMSUNG:                BY:   JOHN B. QUINN
4                                     WILLIAM C. PRICE
                                      SCOTT L. WATSON
5                               865 SOUTH FIGUEROA STREET, 10TH FLOOR
                                LOS ANGELES, CALIFORNIA  90017
6
                                BY:  VICTORIA F. MAROULIS
7                                     BRETT J. ARNOLD
                                555 TWIN DOLPHIN DRIVE
8                               SUITE 560
                                REDWOOD SHORES, CALIFORNIA  94065
9

10
        ALSO PRESENT:           CHRIS GRANT
11                              KEN KOTARSKI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>INDEX OF WITNESSES</u>

2          <u>PLAINTIFF'S</u>

3          **ALAN BALL**
               DIRECT EXAM BY MS. WIGMORE (RES.)      P. 527
4              CROSS-EXAM BY MR. PRICE                P. 547
               REDIRECT EXAM BY MS. WIGMORE           P. 591
5

6          **SUSAN KARE**
               DIRECT EXAM BY MR. MUELLER             P. 595
7              CROSS-EXAM BY MR. QUINN                P. 625
               REDIRECT EXAM BY MR. MUELLER           P. 661
8

9          **RAVIN BALAKRISHNAN**
               DIRECT EXAM BY MR. SABRI               P. 668
               CROSS-EXAM BY MS. MAROULIS             P. 684
10

11         **KARAN SHAR SINGH**
               DIRECT EXAM BY MR. SABRI               P. 686
               CROSS-EXAM BY MS. MAROULIS             P. 695
12

13         **JULIE DAVIS**
               DIRECT EXAM BY MR. LEE                 P. 701
               CROSS-EXAM BY MR. PRICE                P. 765
14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

                                    MARKED        ADMITTED

PLAINTIFF'S

36                                                531
4055                                              532
4052                                              532
1030                                              582
40                                                611
4071                                              614
4061                                              617
44                                                618
8                                                 659
10006                                             665
46                                                678
38                                                692
57                                                682
180B                                              709
25K                                               713
25L (SEALED)                                      713
34                                                716
36                                                717
60                                                747

DEFENDANTS'

4561                                              559
754                                               772
4554                                              774

JOINT

7                                                 582
1045                                              672
1046                                              689
1500C                                             710

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                         MAY 16, 2018 |
| | 2 | P R O C E E D I N G S |
| 09:07:13 | 3 | (JURY OUT AT 9:07 A.M.) |
| 09:07:13 | 4 | THE COURT:  GOOD MORNING AND WELCOME. |
| 09:07:16 | 5 | WE HAVE A -- WE HAVE A JUROR WHO WAS EXPOSED TO SOME |
| 09:07:20 | 6 | INFORMATION LAST NIGHT, SO I THINK WE NEED TO INDIVIDUALLY VOIR |
| 09:07:23 | 7 | DIRE HER. |
| 09:07:24 | 8 | OKAY.  IF YOU COULD PLEASE BRING HER IN.  IT'S JUROR |
| 09:07:27 | 9 | NUMBER 8. |
| 09:07:38 | 10 | (ONLY JUROR NUMBER 8, MS. SERNA, PRESENT.) |
| 09:07:42 | 11 | THE COURT:  GOOD MORNING.  PLEASE TAKE A SEAT. |
| 09:07:44 | 12 | SO, MS. SERNA, I UNDERSTAND THAT YOU WERE EXPOSED TO SOME |
| 09:07:48 | 13 | INFORMATION LAST NIGHT.  CAN YOU TELL US WHAT YOU HEARD OR WHAT |
| 09:07:51 | 14 | HAPPENED. |
| 09:07:52 | 15 | JUROR:  WELL, IT WAS -- I WAS WATCHING "AMERICAN |
| 09:07:56 | 16 | GANGSTER," BUT IT JUST CAME ON.  THIS IS A SHOW ABOUT THE |
| 09:08:00 | 17 | MOGUL, SAMSUNG MOGUL'S GRANDDAUGHTER.  THAT'S ALL.  I TURNED IT |
| 09:08:04 | 18 | OFF AFTER THAT. |
| 09:08:06 | 19 | THE COURT:  OKAY. |
| 09:08:06 | 20 | DOES ANY COUNSEL WANT TO ASK ANY QUESTIONS? |
| 09:08:09 | 21 | MR. LEE:  NOT FOR APPLE, YOUR HONOR. |
| 09:08:10 | 22 | MR. QUINN:  I TAKE IT YOU DIDN'T HEAR OR SEE ANYTHING |
| 09:08:15 | 23 | THAT WOULD AFFECT YOUR VIEWS OF -- |
| 09:08:17 | 24 | JUROR:  NO, I DIDN'T -- I JUST TURNED IT OFF.  I WAS |
| 09:08:21 | 25 | LIKE, OH, I DON'T WANT TO SEE THIS. |

09:08:23  1          THE COURT:  OKAY.  I ALSO HEARD YOUR HUSBAND WAS

09:08:25  2   LISTENING TO THE NEWS AND HE HEARD SOMETHING ABOUT THIS CASE.

09:08:27  3       WHAT IS THAT?

09:08:28  4          JUROR:  HE WAS WATCHING "ARCHIE BUNKER" THIS MORNING

09:08:32  5   AND HE TURNED IT OVER TO THE NEWS, AND ALL I HEARD WAS THEY

09:08:34  6   STARTED THE CASE WITH APPLE AND SAMSUNG, THE $1 BILLION CASE,

09:08:37  7   AND I TURNED AWAY AND WALKED OUT OF THE ROOM.  HE ASKED ME

09:08:41  8   SOMETHING ABOUT, OH, IS THAT THE CASE YOU'RE ON?  AND I DIDN'T

09:08:43  9   SAY NOTHING.  I JUST WALKED AWAY.

09:08:45  10          THE COURT:  OKAY.

09:08:46  11      DO ANY COUNSEL WANT TO ASK ANY QUESTIONS ABOUT THAT?

09:08:50  12   MR. LEE IS SHAKING HIS HEAD NO.

09:08:52  13       WHAT ABOUT --

09:08:57  14          MR. QUINN:  HAVING HEARD THAT, DID THAT AFFECT YOUR

09:09:01  15   VIEW AT ALL WHETHER THIS ACTUALLY IS A BILLION DOLLAR CASE?

09:09:05  16          JUROR:  NO.  I MEAN, I -- I WAS LIKE, OKAY.  I DON'T

09:09:08  17   KNOW WHAT -- YOU KNOW, I WAS LIKE, WELL, I DON'T KNOW WHAT IT'S

09:09:11  18   REALLY -- THE NUMBER.  THAT'S ALL I HEARD WAS THAT.

09:09:14  19          MR. QUINN:  THANK YOU.

09:09:16  20      NOTHING FURTHER.

09:09:17  21          THE COURT:  NOTHING FURTHER?  OKAY.

09:09:19  22      IF YOU WOULD PLEASE STEP OUTSIDE.  DO NOT DISCUSS WITH

09:09:21  23   ANYONE IN THE JURY ROOM WHAT WE JUST TALKED ABOUT, AND YOU'RE

09:09:25  24   NOT TO DISCLOSE ANY OF THIS TO ANYONE.  YOU HAVEN'T SPOKEN TO

09:09:29  25   ANYONE ABOUT YOUR --

09:09:30  1          JUROR:  NO.  I JUST SAID I HAD TO TALK TO THE JUDGE.

09:09:33  2              THE COURT:  OKAY.  LET'S KEEP IT THAT WAY.  THANK YOU

09:09:36  3    VERY MUCH.

09:09:37  4              THE CLERK:  YOUR HONOR, WOULD YOU LIKE HER TO WAIT

09:09:39  5    OUTSIDE THE JURY ROOM?

09:09:40  6              THE COURT:  NO, THAT'S OKAY.  THANK YOU.

09:09:42  7         OKAY.  THE DOOR HAS CLOSED.  JUROR NUMBER 8, THERE'S

09:09:47  8    SERNA, HAS LEFT.  WHAT DO YOU WANT TO DO?  WE HAVE EIGHT

09:09:50  9    JURORS, SO WE DO HAVE A LITTLE CUSHION.  WE ONLY NEED SIX, BUT

09:09:53  10   I HAVEN'T --

09:09:54  11             MR. LEE:  WE HAVE NO OBJECTION TO HER CONTINUING.  I

09:09:56  12   DON'T THINK IT'S ENOUGH TO HAVE HER DEPART FROM THE JURY.

09:09:59  13             THE COURT:  ALL RIGHT.

09:09:59  14             MR. QUINN:  WE AGREE, YOUR HONOR.

09:10:00  15             THE COURT:  OKAY.  ALL RIGHT.  THEN LET'S GO AHEAD,

09:10:03  16   PLEASE, AND BRING IN OUR EIGHT JURORS.

09:10:05  17             THE CLERK:  YES, YOUR HONOR.

09:10:06  18             THE COURT:  AND WHERE IS YOUR WITNESS?  CAN YOU

09:10:08  19   PLEASE GO AHEAD AND TAKE THE STAND?  THANK YOU.

09:10:15  20        (JURY IN AT 9:10 A.M.)

09:10:22  21             MR. QUINN:  YOUR HONOR, TO THE EXTENT THAT THIS IS

09:10:26  22   BEING USED, CAN I STAND OVER THERE?

09:10:28  23             THE COURT:  PLEASE, GO AHEAD.

09:10:55  24        **(PLAINTIFF'S WITNESS, ALAN BALL, WAS PREVIOUSLY SWORN.)**

09:11:00  25             THE COURT:  PLEASE BE SEATED.

09:11:02  1          GOOD MORNING.  WELCOME BACK.  TIME IS NOW 9:10, OR 9:11.

09:11:07  2     GO AHEAD, PLEASE.

09:11:07  3              **DIRECT EXAMINATION (RESUMED)**

09:11:10  4     BY MS. WIGMORE:

09:11:10  5     Q.   GOOD MORNING, MR. BALL.

09:11:12  6          YOUR HONOR, MAY MR. BALL APPROACH THE DEMONSTRATIVE?

09:11:15  7              THE COURT:  THAT'S FINE, GO AHEAD, PLEASE.

09:11:17  8     BY MS. WIGMORE:

09:11:19  9     Q.   WHEN WE LEFT OFF YESTERDAY, WE WERE TALKING ABOUT FACTOR

09:11:22  10    2, RELATIVE PROMINENCE, AND YOU INDICATED YOU HAD DONE A

09:11:26  11    PHYSICAL EXAMINATION OF EACH OF THE INFRINGING PHONES.

09:11:27  12         USING THIS DEMONSTRATIVE, CAN YOU EXPLAIN TO THE JURORS

09:11:29  13    WHAT YOU CONCLUDED FROM THAT PHYSICAL EXAMINATION, STARTING

09:11:32  14    WITH THE D'677 PATENT?

09:11:35  15    A.   SURE.  THIS IS THE PICTURE OF ONE OF THE FIGURES FROM THE

09:11:38  16    D'677 PATENT, AND THESE ARE PICTURES OF ALL THE INFRINGING

09:11:43  17    PHONES I EXAMINED.

09:11:44  18         AND THE IMAGES ARE SUCH THAT -- WE'VE SEEN A LOT OF THE

09:11:48  19    IMAGES OF THE FRONT OF THE PHONE QUITE COMMONLY DISPLAYED, AND

09:11:53  20    IN THAT IMAGE, YOU CAN SEE THE RECTANGULAR SHAPE, THE FULL

09:11:58  21    BLACK FRONT, THE FULL BLACK FLAT FRONT, AND YOU CAN SEE IN EACH

09:12:05  22    ONE OF THESE, THAT'S REALLY ALL YOU CAN SEE IN THIS VIEW.

09:12:10  23         AND THIS IS AN IMPORTANT VIEW BECAUSE THIS IS HOW PEOPLE

09:12:12  24    INTERACT AND USE THE PHONE.  SO YOU CAN SEE IN THIS VIEW HOW

09:12:16  25    PROMINENT THIS VERY, VERY PROMINENT, ALMOST DETERMINATIVE IN

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:12:22  1    HOW THIS PHONE LOOKS TO SOMEBODY USING IT.

09:12:24  2        SO MY CONCLUSION WAS IT WAS VERY PROMINENT.

09:12:27  3    Q.   AND LET'S MOVE TO THE D'087.  CAN YOU EXPLAIN YOUR

09:12:30  4    OBSERVATIONS AND WHAT YOU CONCLUDED ABOUT RELATIVE PROMINENCE?

09:12:34  5    A.   YES.  IN THIS VIEW, YOU CAN SEE THE ENTIRE CLAIMED DESIGN

09:12:37  6    IN BLACK LINES, AND YOU CAN SEE THAT'S WHAT YOU SEE IN THESE

09:12:44  7    VIEWS AS WELL.  AGAIN, THE SAME FLAT FRONT, THE SAME BEZEL

09:12:47  8    SURROUNDING THAT FLAT FACE, CLEARLY SEEN IN ALL OF THESE PHONES

09:12:52  9    SUCH THAT THIS IS REALLY ALL YOU SEE WHEN YOU USE THE PHONE

09:12:56  10   THAT WAY, WHICH IS REALLY HOW IT'S USED BY MOST.

09:13:02  11       AND AGAIN AND AGAIN, WE SEE THE PHONES PICTURED IN THIS

09:13:05  12   VIEW IN DIFFERENT DOCUMENTS OR ADS OR PROMOTIONS TO IDENTIFY

09:13:09  13   WHAT THE PHONES ARE.  SO I THINK IT'S VERY PROMINENT.

09:13:12  14   Q.   MR. BALL, I'M HANDING YOU WHAT'S BEEN MARKED AS JX 1019.

09:13:17  15   THIS HAS BEEN ADMITTED (HANDING).

09:13:20  16       CAN YOU EXPLAIN FOR THE JURORS WHAT THAT IS?

09:13:22  17   A.   THIS IS A SAMSUNG S 4G PHONE.

09:13:27  18   Q.   IS THAT ONE OF THE PHONES THAT INFRINGES BOTH THE D'667

09:13:32  19   AND D'087 PATENTS?

09:13:35  20   A.   YES, I BELIEVE IT'S THIS ONE AND THIS ONE.

09:13:42  21   Q.   NOW, THAT COMES IN A PACKAGE.  WHAT IS -- WHAT DO YOU SEE

09:13:44  22   WHEN YOU OPEN THE PACKAGE?

09:13:46  23   A.   WELL, THE PACKAGE WOULD COME CLOSED.  THERE'S A PICTURE OF

09:13:50  24   THE PHONE ON THE FRONT OF THE PACKAGE.

09:13:52  25       AND WHEN IT'S OPENED, THE PACKAGE KIND OF TURNS INTO A

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:13:55   1    NICE DISPLAY FOR THE PHONE, AND IN THAT DISPLAY YOU SEE REALLY

09:14:01   2    ONLY THE CLAIMED DESIGN IN THAT PACKAGE.

09:14:02   3    Q.   IF YOU COULD TAKE THE PHONE OUT OF THE PACKAGE -- I CAN

09:14:05   4    HELP YOU SINCE YOU HAVE THE MICROPHONE.

09:14:12   5         USING THE PHONE ITSELF AS AN EXAMPLE, CAN YOU EXPLAIN YOUR

09:14:15   6    PHYSICAL OBSERVATIONS AND WHAT YOU CONCLUDED ABOUT RELATIVE

09:14:22   7    PROMINENCE.

09:14:22   8    A.   WELL, AGAIN, I'M HOLDING THE PHONE IN MY HAND LIKE I WOULD

09:14:26   9    USE IT, AND I SEE THE BEZEL, AND I SEE THE GLASS FACE, OR THE

09:14:31  10    FRONT FLAT FACE AS YOU SEE HERE AND HERE.  I SEE THAT IT'S ALL

09:14:35  11    BLACK, WHICH RELATES TO THIS.

09:14:37  12         AND I REALLY DON'T, JUST IN THE ACT OF HOLDING IT OR USING

09:14:39  13    IT, DON'T SEE ANY AREA OF THE PHONE THAT ISN'T PART OF THAT

09:14:42  14    CLAIM, AND I THINK THAT'S REALLY VERY PROMINENT IN, IN THIS

09:14:46  15    PHONE, THE CLAIMED DESIGN.

09:14:48  16    Q.   NOW, MR. BALL, WHEN YOU DID THE EXAMINATION, DID YOU

09:14:50  17    CONSIDER HOW THE PHONE IS ACTUALLY USED?

09:14:53  18    A.   SURE.

09:14:54  19    Q.   AND HOW DID THAT IMPACT YOUR OPINION REGARDING RELATIVE

09:14:59  20    PROMINENCE?

09:14:59  21    A.   GREATLY BECAUSE WHEN THE PHONE IS USED, THAT'S WHAT YOU

09:15:06  22    SEE, THE CLAIMED DESIGN AS APPLIED TO THAT PHONE.

09:15:09  23    Q.   AND IS -- IS THE SCREEN SOMETHING THAT'S USED BY THE

09:15:13  24    CONSUMER WHEN THEY USE THE PHONE?

09:15:15  25    A.   I THINK IT'S VERY DIFFICULT TO USE THE PHONE WITHOUT USING

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:15:18   1    THE SCREEN.  THAT'S WHERE YOU SEE THE INFORMATION AND THAT'S

09:15:21   2    WHERE YOU ENTER THE GESTURES THAT CONTROL THE PHONE.

09:15:24   3    Q.    THANK YOU, MR. BALL.

09:15:26   4         YOU MAY BE SEATED.

09:15:44   5         I'D LIKE TO RETURN TO PX 3A.3, IF I COULD HAVE THAT

09:15:49   6    BROUGHT UP ON THE SCREEN.

09:15:51   7         WHAT DOES THIS EXHIBIT REVEAL ABOUT THE RELATIVE

09:15:54   8    PROMINENCE OF THE CLAIMED DESIGNS IN SAMSUNG'S INFRINGING

09:15:58   9    PHONES?

09:15:59   10   A.    I BELIEVE THAT IT SHOWS HOW PROMINENT THE CLAIMED DESIGNS

09:16:04   11   ARE IN THOSE PHONES.

09:16:06   12   Q.    AND WHY IS THAT?

09:16:07   13   A.    BECAUSE WHEN YOU LOOK AT THE PHONES AS THEY'RE BEING USED,

09:16:12   14   THAT'S REALLY ALL YOU SEE.  YOU DON'T SEE ANY OTHER PARTS OF

09:16:15   15   THE PHONE.

09:16:16   16        AND THAT'S SUCH A LARGE PORTION OF THE PHONE THAT IT

09:16:19   17   REALLY SORT OF DETERMINES WHAT THE OVERALL DESIGN OF THOSE

09:16:21   18   PHONES ARE.

09:16:22   19   Q.    NOW, IF YOU COULD TURN IN YOUR BINDER, IF YOU HAVE THAT IN

09:16:25   20   FRONT OF YOU, TO TAB 4 AND HAVE A LOOK AT PX 36.

09:16:34   21        WHAT IS THIS DOCUMENT?

09:16:35   22   A.    THIS IS SOMETHING CALLED TOUCH PORTFOLIO ROLLOUT STRATEGY,

09:16:47   23   AND IT'S A RECOMMENDATION BASED ON CONSUMER INSIGHT.

09:16:50   24   Q.    AND WHAT IS THE DATE ON THIS DOCUMENT?

09:16:53   25   A.    17 DECEMBER 2008.

BALL DIRECT BY MS. WIGMORE (RESUMED)                    531

09:16:55  1    Q.   IS THIS A DOCUMENT PRODUCED BY SAMSUNG IN THIS CASE THAT

09:16:58  2    YOU CONSIDERED IN FORMING YOUR OPINIONS?

09:17:01  3    A.   YES.

09:17:02  4          MS. WIGMORE:  WE OFFER PX 36 IN EVIDENCE.

09:17:04  5          THE COURT:  NO OBJECTION?

09:17:05  6          MR. PRICE:  NO FURTHER OBJECTIONS.

09:17:07  7          THE COURT:  IT'S ADMITTED.

09:17:08  8       (PLAINTIFF'S EXHIBIT 36 WAS ADMITTED IN EVIDENCE.)

09:17:09  9          MS. WIGMORE:  IF WE COULD TURN ON THE SCREEN, PLEASE,

09:17:12  10   TO PX 36.19.

09:17:14  11   Q.   DO YOU SEE THAT THIS IS A SECTION CALLED IPHONE FEEDBACK

09:17:17  12   AND ANALYSIS?

09:17:18  13   A.   YES.

09:17:18  14   Q.   WITHIN THAT SECTION, TURNING TO PAGE 36.20, WOULD YOU

09:17:24  15   PLEASE READ THE HEADING ON THAT PAGE.

09:17:27  16   A.   YES.  IT SAYS, "PUNDITS TELL US THAT THE IPHONE IS A

09:17:32  17   REVOLUTION."

09:17:33  18   Q.   AND THIS IS FROM A DOCUMENT THAT WAS PREPARED FOR SAMSUNG?

09:17:36  19   A.   YES.

09:17:37  20   Q.   IF YOU COULD TURN TO PAGE 36.31.  WHAT IS THE HEADING ON

09:17:44  21   THAT PAGE?

09:17:44  22   A.   "SCREEN-CENTRIC DESIGN HAS SET THE STANDARD FOR TOUCH."

09:17:49  23   Q.   NOW, IF WE COULD LOOK IN YOUR BINDER -- WE CAN TAKE THAT

09:17:53  24   DOWN FROM THE SCREEN -- TO TAB 5, PX 4055.

09:18:01  25          DO YOU RECOGNIZE THIS, MR. BALL, AS A DOCUMENT PRODUCED BY

09:18:04   1      SAMSUNG THAT YOU CONSIDERED IN FORMING YOUR OPINIONS?

09:18:07   2      A.   YES.

09:18:10   3           MS. WIGMORE:  WE OFFER PX 4055 INTO EVIDENCE.

09:18:15   4           MR. PRICE:  NO OBJECTION.

09:18:15   5           THE COURT:  IT'S ADMITTED.

09:18:16   6       (PLAINTIFF'S EXHIBIT 4055 WAS ADMITTED IN EVIDENCE.)

09:18:17   7           THE COURT:  GO AHEAD, PLEASE.

09:18:18   8      BY MS. WIGMORE:

09:18:19   9      Q.   LET'S TURN NOW TO PX -- TO TAB 6 IN YOUR BINDER.  LET'S

09:18:22  10      TAKE THAT DOWN FOR A MOMENT.

09:18:24  11           TAB 6 IS PX 4052.

09:18:29  12           IS THIS ANOTHER DOCUMENT PRODUCED BY SAMSUNG THAT YOU

09:18:32  13      CONSIDERED IN FORMING YOUR OPINION?

09:18:33  14      A.   YES.

09:18:34  15           MS. WIGMORE:  WE OFFER PX 4052.

09:18:37  16           MR. PRICE:  NO OBJECTION, YOUR HONOR.

09:18:38  17           THE COURT:  IT'S ADMITTED.

09:18:39  18       (PLAINTIFF'S EXHIBIT 4052 WAS ADMITTED IN EVIDENCE.)

09:18:39  19           THE COURT:  GO AHEAD, PLEASE.

09:18:40  20      BY MS. WIGMORE:

09:18:41  21      Q.   NOW, LET'S PUT UP PX 4055 ON THE SCREEN.

09:18:51  22           JUST FOCUSSING ON THE -- FIRST OF ALL, WHAT IS THIS,

09:18:55  23      MR. BALL?

09:18:55  24      A.   THAT IS A, A -- AN AD OR A WEB PAGE AD OF THE GALAXY S II.

09:19:04  25      Q.   AND JUST FOCUSSING ON THE FACTS OF THIS ADVERTISEMENT,

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:19:07  1    WHAT DOES THE ADVERTISEMENT SHOW?

09:19:09  2    A.   IT SHOWS THE FRONT OF A SMARTPHONE PROMOTED AND IT HAS A,

09:19:19  3    YOU KNOW, A BACKGROUND BEHIND IT.

09:19:21  4         BUT IN THIS VIEW, YOU SEE IT'S SHOWN SUCH THAT THE ENTIRE

09:19:25  5    FRONT OF THE PHONE IS SHOWN AND THE ENTIRE CLAIMED PATENT IS

09:19:32  6    SHOWN FOR THAT FRONT FACE --

09:19:35  7    Q.   AND THAT'S THE --

09:19:36  8    A.   -- THAT VIEW.

09:19:37  9    Q.   -- D'677 DESIGN YOU'RE REFERRING TO?

09:19:40  10   A.   YES.

09:19:41  11   Q.   NOW, IF YOU CAN LOOK IN YOUR BINDER -- WE CAN TAKE THAT

09:19:44  12   DOWN -- TO TAB 7, PX 174.

09:19:47  13        AND ACTUALLY, THIS HAS BEEN ALREADY INTRODUCED IN

09:19:51  14   EVIDENCE.

09:19:51  15        SO DO YOU RECALL MR. JOSWIAK TESTIFYING ABOUT THIS

09:19:54  16   ARTICLE?

09:19:55  17   A.   YES.

09:19:56  18   Q.   AND THIS COMES FROM WIRED.COM.  IS THAT A SOURCE THAT YOU,

09:20:01  19   AS AN INDUSTRIAL DESIGNER, FIND USEFUL?

09:20:03  20   A.   SURE.

09:20:04  21   Q.   COULD YOU READ THE TITLE OF THE ARTICLE, PLEASE?

09:20:07  22   A.   "FIRST LOOK:  SAMSUNG VIBRANT RIPS OFF IPHONE 3G DESIGN."

09:20:13  23   Q.   AND TURNING TO THE FIRST TWO SENTENCES OF THE ARTICLE, THE

09:20:19  24   PART SHOWN IN HIGHLIGHTING, COULD YOU READ THAT FOR US, PLEASE.

09:20:24  25   A.   JUST THE HIGHLIGHTED PORTION?

09:20:25  1    Q.   YES.

09:20:26  2    A.   "AT VIBRANT'S INDUSTRIAL DESIGN IS SHOCKINGLY SIMILAR TO

09:20:30  3    THE IPHONE 3G:  THE ROUNDED CURVES AT THE CORNERS, THE CANDY

09:20:35  4    BAR SHAPE, THE GLOSSY, BLACK FINISH AND THE CHROME-COLORED

09:20:39  5    METALLIC BORDER AROUND THE DISPLAY."

09:20:41  6    Q.   AND HOW DOES THAT CORRESPOND WITH THE DESIGNS THAT YOU'VE

09:20:44  7    BEEN TESTIFYING ABOUT?

09:20:45  8    A.   I THINK IT CORRELATES WITH THOSE DESIGNS.  IT DESCRIBES

09:20:49  9    THEM.

09:20:49  10   Q.   NOW LET'S PUT UP PX 52.

09:20:55  11        WERE YOU HERE WHEN MR. JUNWON LEE TESTIFIED BY DEPOSITION

09:21:00  12   CONCERNING THIS DOCUMENT YESTERDAY?

09:21:02  13   A.   YES.

09:21:03  14   Q.   AND WHAT IS YOUR UNDERSTANDING ABOUT WHAT THIS DOCUMENT

09:21:06  15   IS?

09:21:06  16   A.   I BELIEVE THIS WAS A DOCUMENT THAT WAS USED IN THE MEETING

09:21:12  17   IN WHICH APPLE PRESENTED SOME INFORMATION TO SAMSUNG ABOUT USE

09:21:18  18   OF THEIR PATENTS OR I.P.

09:21:21  19   Q.   LET'S TURN TO PAGE 52.17.

09:21:25  20        WHAT IS SHOWN ON THIS PAGE?

09:21:30  21   A.   ON THE LEFT, YOU CAN SEE AN IPHONE.  AND ON THE RIGHT IS A

09:21:32  22   SAMSUNG GALAXY S.

09:21:35  23   Q.   AND --

09:21:35  24   A.   AND YOU'RE SEEING THAT FRONT VIEW THAT WE'VE SEEN A COUPLE

09:21:38  25   OF DIFFERENT TIMES BEFORE BETWEEN THE TWO, AND YOU CAN SEE THAT

09:21:43   1      THERE'S -- YOU KNOW, THEY LOOK THE SAME.

09:21:45   2      Q.   AND WHAT'S THE HEADING ON THIS PAGE?

09:21:47   3      A.   WELL, THE HEADING SAYS, "SAMSUNG COPYING IPHONE."

09:21:51   4      Q.   NOW, IF WE COULD TURN TO PDX 5.12, WHAT IS SHOWN ON THIS

09:21:58   5      PAGE?

09:21:58   6      A.   THERE ARE THREE SAMSUNG -- THREE OF THE INFRINGING PHONES.

09:22:04   7      Q.   AND WE'VE LOOKED AT THE PACKAGING FOR THE GALAXY 4G.

09:22:08   8      A.   YES.  THAT'S NOT THE SAME PACKAGE I HELD.  IT'S A SIMILAR

09:22:11   9      ONE.  IT'S THE -- YOU KNOW, IT'S WHAT WE JUST LOOKED AT.

09:22:14  10           THE COURT:  IS THIS EXHIBIT -- I'M SORRY TO

09:22:16  11      INTERRUPT.  IS THIS EXHIBIT -- OH, THIS IS A PDX.

09:22:19  12           GO AHEAD, PLEASE.

09:22:20  13      BY MS. WIGMORE:

09:22:20  14      Q.   THESE ARE PACKAGES FOR OTHER OF THE PHONES THAT WE'VE BEEN

09:22:24  15      TALKING ABOUT HERE TODAY?

09:22:25  16      A.   YES.

09:22:25  17      Q.   AND JUST FROM A FACTUAL STANDPOINT, WHAT DO YOU SEE WHEN

09:22:28  18      YOU OPEN THE PACKAGE?

09:22:29  19      A.   THE FRONT OF THE PHONE.

09:22:31  20      Q.   NOW, BASED ON EVERYTHING THAT WE JUST DISCUSSED, WHAT WAS

09:22:35  21      YOUR CONCLUSION AS TO THE RELATIVE PROMINENCE OF THE D'677 AND

09:22:40  22      D'087 DESIGNS IN SAMSUNG'S INFRINGING PHONES?

09:22:44  23      A.   I THINK IT'S, IT'S EXTREMELY PROMINENT AND VERY

09:22:52  24      DETERMINATIVE OF KIND OF WHAT THE OVERALL PHONE LOOKS LIKE AND

09:22:56  25      KIND OF WHAT THAT PHONE WOULD BE RECOGNIZED AS BY A CUSTOMER.

09:23:01   1      Q.   LET'S TURN NOW TO FACTOR 3, PULLING UP PDX 5.13.

09:23:06   2           THE THIRD FACTOR IS WHETHER THE DESIGN IS CONCEPTUALLY

09:23:10   3    DISTINCT FROM THE PRODUCT AS A WHOLE.  DID YOU CONSIDER THIS

09:23:13   4    FACTOR WITH RESPECT TO BOTH D'087 AND D'677?

09:23:17   5      A.   YES.

09:23:18   6      Q.   NOW, STARTING WITH YOUR PHYSICAL EXAMINATION OF THE

09:23:22   7    PHONES, I WILL BRING BACK TO YOU --

09:23:25   8           YOUR HONOR, MAY I APPROACH WITH THE EXHIBIT?

09:23:27   9              THE COURT:  GO AHEAD, PLEASE.

09:23:28  10    BY MS. WIGMORE:

09:23:30  11      Q.   -- JX 1019 (HANDING).

09:23:34  12           AND IF YOU COULD JUST HOLD THAT UP AND EXPLAIN YOUR

09:23:36  13    PHYSICAL EXAMINATION AND WHAT YOU CONCLUDED ABOUT WHETHER THE

09:23:39  14    DESIGN IS CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE.

09:23:42  15      A.   WELL, I DON'T THINK IT'S CONCEPTUALLY DISTINCT.  IT'S

09:23:49  16     INTEGRATED INTO THE PHONE.  IT REALLY DEFINES THIS WHOLE FRONT

09:23:55  17     FACE (INDICATING).

09:23:57  18           AND IN DOING SO, IT DEFINES THE OVERALL SHAPE OF THE PHONE

09:24:00  19    AS YOU SEE IT.

09:24:01  20           AND THIS IS JUST A ONE PIECE SHAPE.  SOMETIMES WE SAY THE

09:24:06  21    DESIGNER MIGHT CALL IT UNITARY OR MONOLITHIC.  IT'S ONE SHAPE.

09:24:11  22    THERE'S NO HARD FOLDING.  IT ONLY HAS ONE SHAPE, AND THAT ONE

09:24:14  23    SHAPE THAT IT IS, IS INDISTINGUISHABLE FROM THE FRONT OF IT.

09:24:18  24    IT'S PART OF IT.  IT'S -- I DON'T SEE THAT IT'S CONCEPTUALLY

09:24:23  25    DISTINCT AT ALL.

09:24:23  1    Q.   THANKS, MR. BALL.  YOU MAY BE SEATED.

09:24:26  2         DID YOU MAKE THAT CONCLUSION WITH RESPECT TO EACH OF THE

09:24:28  3    INFRINGING PHONES YOU EVALUATED?

09:24:30  4    A.   YES.

09:24:31  5    Q.   THANK YOU.

09:24:33  6         NOW, HAVE YOU IDENTIFIED EXAMPLES OF MULTI COMPONENT

09:24:36  7    PRODUCTS THAT DO CONTAIN CONCEPTUALLY DISTINCT DESIGNS?

09:24:41  8    A.   YES.

09:24:42  9    Q.   LET'S TURN TO PDX 5.14.  WHAT IS SHOWN ON THIS SLIDE?

09:24:47 10    A.   THIS IS AN H.P. PRINTER.

09:24:49 11    Q.   AND HOW DOES THIS RELATE TO YOUR OPINIONS?

09:24:54 12    A.   WELL, I THOUGHT IT WAS INTERESTING BECAUSE THE CONTROL

09:24:56 13    PANEL ON THIS PRINTER, YOU KNOW, HAS A FLAT FRONT FACE AND IT

09:25:01 14    HAS SORT OF TRIM AROUND IT.  BUT IT SEEMS TO BE FLOATING, OR

09:25:05 15    DISINTEGRATED IN SOME WAY FROM THE REST OF THE PRINTER.  IT'S

09:25:08 16    NOT PART OF THE REST OF THE PRINTER.

09:25:10 17         AND I COULD IMAGINE THAT MAYBE A NUMBER OF H.P. PRINTERS,

09:25:16 18    MAYBE THEY HAVE DIFFERENT FEATURE, DIFFERENT NUMBER OF PAPER

09:25:18 19    TRAYS, BUT THEY MIGHT ALL USE A SIMILAR KIND OF CONSISTENT

09:25:22 20    CONTROL PANEL.

09:25:23 21         SO CONCEPTUALLY, I THINK THE DESIGNER INTENDED THAT

09:25:26 22    CONTROL PANEL TO BE DISTINCT FROM THE REST OF THE PRINTER.  SO

09:25:29 23    I THINK THIS IS AN INTERESTING EXAMPLE OF CONCEPTUAL

09:25:34 24    DISTINCTNESS.

09:25:35 25    Q.   NOW LET'S TURN TO SLIDE PDX 5.15.

09:25:39  1        WHAT IS SHOWN ON THIS SLIDE?

09:25:41  2   A.   THIS IS A TELEPHONE, OR A LINE OF TELEPHONES FROM MOTOROLA

09:25:46  3   CALLED MOTO MODS.

09:25:48  4        AND THIS WHOLE PRODUCT WAS DESIGNED WITH THE CONCEPT OF

09:25:56  5   HAVING MODULAR BACKS ON THE PHONE.

09:25:59  6        SO THERE WOULD BE A FRONT, AND THEN YOU COULD SNAP ON

09:26:02  7   DIFFERENT BACKS FOR DIFFERENT FUNCTIONS THAT WERE IMPORTANT TO

09:26:05  8   YOU.  SO IF YOU WANTED -- I MEAN, IF YOU WANTED MAYBE A HIGH --

09:26:09  9   A LONG BATTERY, YOU COULD PUT AN EXTRA BATTERY PACK ON.  IF YOU

09:26:12  10  WANTED A LITTLE PROJECTOR THAT YOU COULD PROJECT, YOU COULD PUT

09:26:16  11  THE PROJECTOR BACK ON.  THERE MAY HAVE BEEN A PRINTER BACK.  I

09:26:20  12  CAN'T REMEMBER.

09:26:20  13       BUT THE IDEA IS BAKED INTO THE DESIGN IS MODULARITY, AND

09:26:25  14  SO THE FRONT FACE OF THOSE PHONES ARE CONCEPTUALLY DISTINCT

09:26:31  15  BECAUSE THEY WERE IN FACT TO BE USED WITH LOTS OF DIFFERENT

09:26:34  16  BACKS.  SO I THOUGHT THAT WAS ANOTHER GOOD EXAMPLE.

09:26:36  17  Q.   HOW DO THESE TWO EXAMPLES COMPARE TO THE DESIGNS YOU

09:26:39  18  EVALUATED IN RELATION TO THE SAMSUNG INFRINGING PHONES?

09:26:42  19  A.   THESE TWO EXAMPLES ARE EXAMPLES OF CONCEPTUALLY DISTINCT

09:26:49  20  PORTIONS OF THE DESIGN AND ARE VERY DIFFERENT FROM WHAT I SEE

09:26:53  21  IN THE INFRINGING PHONES WHERE I DON'T FIND THAT THEY'RE

09:26:57  22  CONCEPTUALLY DISTINCT.  I FIND THAT THOSE DESIGNS ARE FULLY

09:26:59  23  INTEGRATED INTO THE PHONE.

09:27:00  24  Q.   NOW, LET'S TURN TO FACTOR 4, PUTTING UP PDX 5.16.

09:27:06  25       WE WON'T READ THIS ENTIRE FACTOR ALL AT ONCE, BUT DID YOU

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:27:11  1    CONSIDER FACTOR 4 WITH RESPECT TO THE INFRINGING PHONES FOR

09:27:13  2    BOTH THE D'677 AND D'087?

09:27:17  3    A.   YES, I DID.

09:27:19  4    Q.   AND WE'LL GET INTO THE DETAILS, BUT GENERALLY, WHAT DID

09:27:21  5    YOU CONCLUDE?

09:27:22  6    A.   WELL, I CONCLUDED THAT THE PHYSICAL RELATIONSHIP BETWEEN

09:27:27  7    THE PARTS OF THE SAMSUNG PHONE THAT PRACTICE THE DESIGNS AREN'T

09:27:34  8    REALLY SEPARABLE FROM THE REST OF THE PHONES IN A MEANINGFUL

09:27:41  9    WAY.

09:27:42  10   Q.   SO LET'S TAKE THIS IN PIECES.  THE FIRST PART OF FACTOR 4

09:27:45  11   REFERS TO THE PHYSICAL RELATIONSHIP BETWEEN THE PATENTED DESIGN

09:27:47  12   AND THE REST OF THE PRODUCT.

09:27:50  13        WHAT DID YOU OBSERVE WITH RESPECT TO THAT FOR EACH OF THE

09:27:53  14   INFRINGING PHONES AND THE CLAIMED DESIGNS?

09:27:58  15   A.   WELL, UNLIKE THOSE OTHER PRODUCTS WITH THE MODULAR BACKS

09:28:03  16   OR SOMETHING, THERE WAS REALLY NO EVIDENT INTENT THAT IT WOULD

09:28:06  17   BE -- THE FRONT WOULD BE SEPARATED FROM THE PHONES.  THERE'S NO

09:28:09  18   REASON TO DO THAT.

09:28:11  19        AND, YOU KNOW, THE WAY THAT THOSE PARTS ARE ASSEMBLED,

09:28:16  20   THEY'RE ACTUALLY TAPED, THEY'RE GLUED ON TO THE PHONE, WHICH IS

09:28:21  21   A WAY US DESIGNERS ASSEMBLE PHONES THAT, YOU KNOW, WE REALLY

09:28:25  22   DON'T INTEND IT TO BE TAKEN APART.

09:28:28  23        SO I THINK THE PHYSICAL RELATIONSHIP IS SUCH THAT THIS

09:28:32  24   WASN'T DESIGNED TO BE TAKEN APART BY THE USER OR DURING THE USE

09:28:37  25   OF THE PHONE.

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:28:37  1    Q.   LET'S TURN TO THE NEXT PART OF THE FACTOR, WHETHER THE

09:28:41  2    DESIGN PERTAINS TO A COMPONENT THAT A USER OR SELLER CAN

09:28:45  3    PHYSICALLY SEPARATE FROM THE PRODUCT AS A WHOLE.

09:28:49  4         WHAT WERE YOUR OBSERVATIONS ABOUT THAT PORTION OF THIS

09:28:52  5    FACTOR?

09:28:53  6    A.   WELL, I DON'T THINK THAT A USER COULD SEPARATE THAT.  AND

09:29:05  7    IT'S SO INTEGRATED AND THERE'S SUCH A RISK THAT YOU'LL DAMAGE

09:29:09  8    THE REST OF THE PHONE THAT, YOU KNOW, I HAVEN'T SEEN CONVINCING

09:29:14  9    EVIDENCE THAT A SELLER COULD REALLY DO THAT WITHOUT RISKING

09:29:17  10   DAMAGE TO THE PHONE.

09:29:18  11   Q.   DID YOU SEE ANY EVIDENCE AT ALL THAT THE FRONT FACE OR THE

09:29:22  12   BEZEL COULD BE PHYSICALLY SEPARATED FROM THE PHONE?

09:29:26  13   A.   YES.

09:29:27  14   Q.   AND DID YOU REVIEW ANY EVIDENCE RELATING TO HOW SEPARATING

09:29:32  15   THOSE PARTS FROM THE PHONE WOULD IMPACT THE CUSTOMER WARRANTY?

09:29:35  16   A.   YES, I DID.

09:29:36  17   Q.   WHAT DID YOU LEARN FROM THAT REVIEW?

09:29:39  18   A.   WELL, I BELIEVE THAT IF YOU TAKE YOUR PHONE APART, YOU

09:29:42  19   VOID THE WARRANTY AND THAT WOULD INCLUDE TAKING OFF THOSE

09:29:46  20   PARTS.

09:29:47  21   Q.   AND DOES THE FACT THAT AT LEAST IN SOME INSTANCES A

09:29:50  22   PHYSICAL SEPARATION HAS OCCURRED CHANGE YOUR OPINION IN ANY

09:29:54  23   WAY?

09:29:54  24   A.   NO.

09:29:56  25   Q.   WHY NOT?

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:29:57  1    A.   WELL, ANY -- ANYTHING THAT GETS PUT TOGETHER CAN BE TAKEN

09:30:01  2    APART.

09:30:03  3        BUT I THINK WE NEED TO LOOK AT KIND OF THE -- WAS IT

09:30:06  4    INTENDED TO BE TAKEN TOGETHER AND CAN IT GO BACK TOGETHER AND

09:30:10  5    WORK JUST AS GOOD AS IT WAS WHEN I BOUGHT IT?

09:30:12  6        AND I DON'T BELIEVE THAT'S TRUE.  I BELIEVE THAT JUST

09:30:20  7    BECAUSE YOU CAN TAKE SOMETHING APART DOESN'T NECESSARILY MEAN

09:30:23  8    THAT IT WAS DESIGNED TO BE THAT WAY.

09:30:26  9        AND I THINK IF YOU DO REPLACE IT WITH A REPAIR, YOU'RE

09:30:30  10   JUST TRYING TO GET IT BACK TO THAT THING THAT YOU BOUGHT, WHICH

09:30:34  11   IS THIS MONOLITHIC, ALTOGETHER, TOTAL SMARTPHONE.

09:30:39  12   Q.   LET'S TURN TO THE NEXT PART OF THE FACTOR 4, WHETHER THE

09:30:42  13   DESIGN IS EMBODIED IN A COMPONENT THAT IS MANUFACTURED

09:30:46  14   SEPARATELY FROM THE REST OF THE PRODUCT.

09:30:48  15       WHAT DID YOU CONCLUDE ABOUT THAT PORTION OF THE FACTOR

09:30:50  16   WITH RESPECT TO EACH OF THESE D'677 AND D'087 INFRINGING

09:30:56  17   DESIGNS AND PRODUCTS?

09:30:57  18   A.   WELL, ALL OF THE PARTS AND PIECES OF THE PHONE ARE

09:31:03  19   MANUFACTURED.  SOME OF THEM ARE ACTUALLY MANUFACTURED BY THE

09:31:07  20   SAME MANUFACTURER AND SOMETIMES THE PARTS ARE SOURCED.

09:31:10  21       BUT THEY ALL GO TOGETHER IN A FACTORY AS A SMARTPHONE, AND

09:31:17  22   I DIDN'T FIND THAT THE FACT THAT THEY MIGHT BE MANUFACTURED AT

09:31:25  23   A DIFFERENT POINT OR DIFFERENT FACTORY PARTICULARLY INDICATIVE

09:31:27  24   THAT THE PHYSICAL RELATIONSHIP WAS SUCH THAT THEY WERE

09:31:30  25   DIFFERENT THAN THE WHOLE PHONE WHEN IT GOES TOGETHER.

BALL DIRECT BY MS. WIGMORE (RESUMED)

09:31:33   1    Q.   NOW, WERE YOU HERE YESTERDAY IN THE OPENING WHEN MR. QUINN

09:31:38   2    SHOWED SOME COMPONENTS OF THE INFRINGING PHONE, THE GLASS FRONT

09:31:42   3    FACE WITH THE CLEAR GLASS AND THE BEZEL?

09:31:45   4    A.   YES.

09:31:45   5    Q.   WITH RESPECT TO THOSE PARTICULAR PIECES, IS THE DESIGN OF

09:31:49   6    THESE PATENTS EMBODIED JUST IN THOSE PARTICULAR COMPONENTS?

09:31:53   7    A.   NO.

09:31:54   8    Q.   NOW, THE LAST PORTION OF FACTOR 4 IS IF THE COMPONENT CAN

09:32:01   9    BE SOLD SEPARATELY.

09:32:02   10        FIRST OF ALL, HOW DID SAMSUNG'S SALES PRACTICES IMPACT

09:32:07   11   YOUR ASSESSMENT OF THIS FACTOR?

09:32:08   12   A.   I DON'T THINK REVIEWING ALL THE INFORMATION THAT I'VE SEEN

09:32:16   13   COMPELLING EVIDENCE THAT THEY WERE REALLY SOLD SEPARATELY, TO

09:32:19   14   PROTECT THE PARTS THAT THEY SAY CORRELATE TO THE DESIGN.

09:32:22   15   Q.   WHAT DOES SAMSUNG SELL WITH RESPECT TO THESE PRODUCTS?

09:32:24   16   A.   WELL, I THINK -- I DON'T KNOW EXACTLY WHO SELLS IT.  I

09:32:30   17   KNOW THAT THERE HAS BEEN SOME REPAIR PARTS OR KITS THAT INCLUDE

09:32:33   18   LOTS OF PARTS TO REPAIR.

09:32:38   19        I DON'T KNOW THAT THEY REALLY LINE UP TO THE PARTS THAT WE

09:32:41   20   SAW YESTERDAY.

09:32:42   21   Q.   AND HOW DOES THE FACT THAT YOU MIGHT BE ABLE TO GET A PART

09:32:45   22   ON THE INTERNET, IF THAT'S TRUE, HOW DOES THAT IMPACT YOUR

09:32:49   23   OPINION?

09:32:49   24   A.   WELL, IT -- THE GREAT THING ABOUT THE INTERNET, YOU CAN

09:32:53   25   GET JUST ABOUT ANYTHING IF YOU LOOK HARD ENOUGH.

BALL DIRECT BY MS. WIGMORE (RESUMED)                    543

09:32:56   1        SO I'VE SOME PICTURES OF WEBSITES THAT SAY THEY SELL

09:33:01   2   THOSE, BUT I DON'T FIND THAT PARTICULARLY CONVINCING.  I MEAN,

09:33:04   3   I WOULD WANT TO SEE THE PART AND HOW THE PACKAGING IS AND THE

09:33:07   4   ADVERTISEMENT THAT THIS IS A REPLACEMENT PART.

09:33:10   5        I HAVEN'T SEEN ANYTHING THAT REALLY CONVINCES ME THAT

09:33:12   6   THESE ARE READILY AVAILABLE OR COMMONLY AVAILABLE OR INTENDED

09:33:16   7   TO BE.

09:33:17   8   Q.   LET'S TALK ABOUT SAMSUNG'S ADVERTISEMENT AND SALES

09:33:19   9   PRACTICES, EVERYTHING THAT WE TALKED ABOUT EARLIER.

09:33:22  10        WHAT DOES SAMSUNG ADVERTISE AND SELL WITH RESPECT TO THESE

09:33:25  11   CLAIMED DESIGNS?

09:33:26  12   A.   WELL, THEY SELL SMARTPHONES.

09:33:28  13   Q.   NOW, CONSIDERING EVERYTHING WE'VE JUST DISCUSSED, WHAT IS

09:33:33  14   YOUR CONCLUSION WITH RESPECT TO FACTOR 4?

09:33:35  15   A.   THAT IT'S THE ENTIRE SMARTPHONE THAT THE DESIGN HAS BEEN

09:33:42  16   APPLIED TO.

09:33:43  17   Q.   NOW, I WANT TO TALK VERY BRIEFLY ABOUT THE IPHONE.

09:33:46  18        DID YOU CONSIDER EVIDENCE RELATING TO THE IPHONE IN

09:33:50  19   ANALYZING YOUR FOUR FACTOR TEST?

09:33:52  20   A.   YES.

09:33:52  21   Q.   NOW, YOU WERE HERE WHEN MR. HOWARTH AND MR. BLEVINS

09:33:56  22   TESTIFIED ABOUT APPLE'S DESIGN PHILOSOPHY AND EVERYTHING BEING

09:34:01  23   SUBSERVIENT TO DESIGN WHEN MAKING THE IPHONE.

09:34:03  24        HOW DID THAT IMPACT YOUR OPINION ABOUT ARTICLES OF

09:34:06  25   MANUFACTURE?

09:34:06   1    A.   WELL, I THINK IT CONFIRMED MY ANALYSIS.  IT SEEMED SORT OF

09:34:13   2    EVIDENT IN THE DESIGN, AND I FOUND THAT THEIR TESTIMONY WAS

09:34:20   3    INSIGHTFUL AND CONFIRMED MY ANALYSIS.

09:34:23   4    Q.   AND YOU WERE HERE WHEN MR. JOSWIAK TESTIFIED ABOUT THE

09:34:26   5    PRODUCT AS HERO MARKETING APPROACH?

09:34:28   6    A.   YEAH.

09:34:28   7    Q.   HOW DID THAT TESTIMONY IMPACT YOUR OPINION?

09:34:31   8    A.   WELL, IT -- IT -- AGAIN, IT CONFIRMED IT.  AND IT WAS

09:34:36   9    INTERESTING TO HEAR THE THINKING BEHIND IT, BECAUSE THEY

09:34:39   10   RECOGNIZED THAT THEY'RE MAKING SMARTPHONES AND THEY'RE

09:34:42   11   PROMOTING THE SMARTPHONE ALL TOGETHER, AND THAT'S THE HERO.

09:34:48   12        IT'S THE ENTIRE PRODUCT THAT DOES ALL OF THE THINGS IN ONE

09:34:51   13   ELEGANT PACKAGE IN THIS DESIGN THAT REALLY HOLDS IT ALL

09:34:55   14   TOGETHER AND TURNS ALL THESE THINGS INTO A PRODUCT THAT CAN BE

09:34:59   15   USED.

09:35:00   16        MS. WIGMORE:  NOW, YOUR HONOR, MAY I APPROACH THE

09:35:01   17   WITNESS WITH JX 5007?

09:35:03   18        THE COURT:  GO AHEAD, PLEASE.

09:35:06   19   BY MS. WIGMORE:

09:35:06   20   Q.   (HANDING.)

09:35:18   21        WERE YOU HERE WHEN MR. QUINN SHOWED THESE COMPONENTS FROM

09:35:22   22   JX 5007 IN THE OPENING AND STATED THAT THESE WERE THE ARTICLES

09:35:28   23   OF MANUFACTURE FOR THE D'677 AND D'087 PATENTS?

09:35:35   24   A.   YES.

09:35:35   25   Q.   STARTING WITH WHAT YOU'RE HOLDING ON YOUR RIGHT?

09:35:41   1    A.   (INDICATING.)  OH, I'M SORRY (INDICATING).

09:35:43   2    Q.   DOES THAT -- IF YOU COULD PUT THE FIGURE FROM THE D'677 ON

09:35:48   3    THE SCREEN.

09:35:50   4         DOES THAT ARTICLE THAT YOU'RE HOLDING, THAT ITEM OR

09:35:54   5    COMPONENT, CORRESPOND WITH THE FIGURE IN THE D'677 PATENT?

09:35:59   6    A.   NO.

09:36:00   7    Q.   AND WHY NOT?

09:36:01   8    A.   WELL, WE SEE A DESIGN HERE THAT CLAIMS AN ENTIRELY BLACK

09:36:08   9    FRONT FACE, AND IN THIS -- AND THIS IS A LITTLE BLACK FRAME

09:36:12  10    AROUND A MOSTLY CLEAR PART (INDICATING).

09:36:15  11    Q.   AND DO YOU AGREE WITH SAMSUNG'S CONTENTION THAT THAT, WHAT

09:36:19  12    YOU'RE HOLDING IN YOUR HAND, IS THE ARTICLE OF MANUFACTURE FOR

09:36:22  13    THE PRODUCTS INFRINGING THE D'677 PATENT?

09:36:25  14    A.   NO.

09:36:26  15    Q.   AND WHY NOT?

09:36:28  16    A.   I THINK IT FAILS ALL FOUR FACTORS AND IT -- AND IT -- YOU

09:36:36  17    KNOW, I THINK MOST OBVIOUSLY, IT DOESN'T LOOK LIKE THE CLAIMED

09:36:41  18    DESIGN THAT IS SHOWN.

09:36:42  19    Q.   SO NOW TURNING TO THE D'087, CAN YOU HOLD UP IN YOUR LEFT

09:36:46  20    HAND THE OTHER PIECE THAT MR. QUINN SAID COULD BE COMBINED WITH

09:36:51  21    THE ONE IN YOUR RIGHT HAND TO FORM THE ARTICLE OF MANUFACTURE

09:36:54  22    FOR THE D'087.

09:36:56  23         FIRST OF ALL, ARE THEY -- DID THEY COME TOGETHER IN THIS

09:36:59  24    BOX?

09:36:59  25    A.   WHEN YOU HANDED ME THE BOX, THEY WERE TOGETHER.

09:37:02   1      Q.   BUT THEY'RE ACTUALLY SEPARATE PIECES; CORRECT?

09:37:05   2      A.   THEY'RE SEPARATE PIECES (INDICATING).

09:37:08   3      Q.   SO YOU HAVE TO PHYSICALLY PUT THEM TOGETHER?

09:37:09   4      A.   I CAN SET THEM IN THERE.  BUT FOR THEM TO REALLY HOLD

09:37:13   5   TOGETHER, I NEED OTHER COMPONENTS BECAUSE THEY ALL GLUE TO

09:37:16   6   OTHER THINGS.  ALL THE PARTS ARE SORT OF DEPENDENT ON EACH

09:37:19   7   OTHER.

09:37:20   8        SO I CAN SORT OF FIT IT IN TOGETHER LIKE THAT, BUT AS SOON

09:37:24   9   AS I MOVE IT, IT COMES OUT (INDICATING).

09:37:26  10      Q.   ARE YOU AWARE OF ANY INSTANCE WHERE JUST THESE TWO

09:37:29  11   COMPONENTS HAVE BEEN SOLD TOGETHER, JUST THESE TWO?

09:37:33  12      A.   NO.

09:37:34  13      Q.   NOW, DO YOU AGREE THAT -- ARE YOU AWARE OF ANY INSTANCE

09:37:43  14   WHERE THEY'VE BEEN SOLD TOGETHER?

09:37:48  15      A.   NO.

09:37:48  16      Q.   DO YOU AGREE WITH SAMSUNG'S CONTENTION THAT THESE TWO

09:37:51  17   THINGS PUT TOGETHER ARE THE ARTICLE OF MANUFACTURE FOR THE

09:37:54  18   D'087 PATENT?

09:37:57  19      A.   NO.

09:37:58  20      Q.   WHY NOT?

09:37:58  21      A.   WELL, I THINK THEY DON'T LOOK LIKE WHAT IS CLAIMED HERE,

09:38:06  22   AND I DON'T THINK HAVING APPLIED THE FOUR FACTORS ANY OF THEM

09:38:12  23   INDICATE THAT THIS SHOULD RIGHTLY BE CONSIDERED THE ARTICLE OF

09:38:16  24   MANUFACTURE.

09:38:16  25      Q.   IN CONCLUSION, MR. BALL, BASED ON YOUR APPLICATION OF THE

| | |
|---|---|
| 09:38:19 | 1 |
| 09:38:23 | 2 |
| 09:38:27 | 3 |
| 09:38:31 | 4 |
| 09:38:33 | 5 |
| 09:38:34 | 6 |
| 09:38:46 | 7 |
| 09:38:49 | 8 |
| 09:38:50 | 9 |
| 09:38:52 | 10 |
| 09:38:56 | 11 |
| 09:39:04 | 12 |
| 09:39:52 | 13 |
| 09:39:53 | 14 |
| 09:39:54 | 15 |
| 09:39:57 | 16 |
| 09:40:00 | 17 |
| 09:40:00 | 18 |
| 09:40:02 | 19 |
| 09:40:04 | 20 |
| 09:40:09 | 21 |
| 09:40:14 | 22 |
| 09:40:14 | 23 |
| 09:40:17 | 24 |
| 09:40:23 | 25 |

1  FOUR FACTOR TEST, WHAT ARE THE ARTICLES OF MANUFACTURE FOR THE

2  PRODUCTS FOUND TO INFRINGE THE D'677 PATENT AND ALSO THE

3  PRODUCTS FOUND TO INFRINGE THE D'087 PATENT?

4  A.   WELL, THE ENTIRE SMARTPHONES.

5          MS. WIGMORE:  THANK YOU.

6          THE COURT:  OKAY.  TIME IS 9:38:32.

7          MR. PRICE:  YOUR HONOR, IF I MAY PLACE SOME BINDERS

8  IN FRONT OF MR. BALL.

9          THE COURT:  SURE.  TAKE YOUR TIME TO GET SET UP AND

10  THEN JUST LET ME KNOW WHEN YOU'RE READY TO GO SO I CAN START

11  THE CLOCK.

12      (PAUSE IN PROCEEDINGS.)

13          THE COURT:  READY TO GO?

14          MR. PRICE:  READY, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  HANG ON ONE SECOND.

16      THE CLOCK IS 9:39.  GO AHEAD, PLEASE.

17                      **CROSS-EXAMINATION**

18  BY MR. PRICE:

19  Q.   MR. BALL, I WANT TO TAKE YOU BACK TO YOUR TESTIMONY

20  YESTERDAY WHEN YOU FIRST GOT ON THE WITNESS, AND DO YOU

21  REMEMBER THAT YOU WERE ASKED WHAT YOUR ASSIGNMENT WAS; CORRECT?

22  A.   YES.

23  Q.   AND YOU WERE ASKED WHAT YOUR UNDERSTANDING OF THE

24  RELATIONSHIP BETWEEN A PATENTED DESIGN AND AN ARTICLE OF

25  MANUFACTURE.

BALL CROSS BY MR. PRICE

09:40:24  1          DO YOU REMEMBER THAT QUESTION?

09:40:25  2     A.   I BELIEVE I DO, YES.

09:40:26  3     Q.   AND YOU SAID, WELL, A PATENTED DESIGN IS A DESIGN IN THE

09:40:30  4     CASE OF A DESIGN PATENT.  IT'S AN ORNAMENTAL DESIGN ABOUT HOW

09:40:34  5     SOMETHING LOOKS THAT IS PROTECTED.  AND THE ARTICLE OF

09:40:37  6     MANUFACTURE WOULD BE ANY PRODUCT THAT THE DESIGNS APPLY TO.

09:40:41  7          DO YOU REMEMBER GIVING THAT ANSWER?

09:40:43  8     A.   I THINK I DO, YES.

09:40:44  9     Q.   THAT'S A LEGALLY INCORRECT ANSWER, ISN'T IT?  IT'S NOT

09:40:48  10    TRUE THAT THE ARTICLE OF MANUFACTURE IS ALWAYS THE PRODUCT THAT

09:40:54  11    THE DESIGN IS APPLIED TO; CORRECT?

09:40:57  12    A.   I DON'T UNDERSTAND.

09:41:00  13    Q.   WELL, YOU UNDERSTAND THAT THE LAW IS, AND THE JURY WILL BE

09:41:04  14    TOLD, THAT THE ARTICLE OF MANUFACTURE CAN BE THE PRODUCT OR IT

09:41:08  15    CAN BE THE COMPONENT OF A PRODUCT.  IT CAN BE LESS THAN THE

09:41:11  16    PRODUCT, AND THE ONLY WAY TO DETERMINE THAT IS TO USE THE FOUR

09:41:15  17    FACTOR TEST; CORRECT?

09:41:16  18    A.   YES.

09:41:17  19    Q.   YOU CAN'T ASSUME IT'S THE PRODUCT; CORRECT?

09:41:20  20    A.   NO.

09:41:22  21    Q.   IS THAT CORRECT, YOU CAN'T ASSUME THAT?  YOU HAVE TO DO A

09:41:24  22    TEST, AN EXAMINATION; CORRECT?

09:41:26  23    A.   I DON'T THINK YOU CAN ASSUME IT.  I THINK YOU HAVE TO

09:41:28  24    APPLY THE FOUR FACTORS.

09:41:30  25    Q.   RIGHT.  SO YOU CAN'T START OUT THE WAY YOU DID AND ASSUME

BALL CROSS BY MR. PRICE

09:41:32   1    THAT THE ARTICLE OF MANUFACTURE IS THE PRODUCT.  YOU HAVE TO

09:41:35   2    LOOK AT THE FOUR FACTOR TEST TO SEE IF IT'S THE PRODUCT OR

09:41:39   3    SOMETHING LESS THAN THE PRODUCT OR SOME COMPONENT OF THE

09:41:42   4    PRODUCT; RIGHT?

09:41:44   5    A.   I -- YES.  I DON'T THINK THAT'S INCONSISTENT WITH WHAT I

09:41:50   6    SAID YESTERDAY.

09:41:51   7    Q.   YOU CAN'T START WITH THE ASSUMPTION THAT THE ARTICLE OF

09:41:56   8    MANUFACTURE IS THE PRODUCT THAT THE DESIGN IS APPLIED TO.  YOU

09:41:59   9    HAVE TO ACTUALLY DO AN ANALYSIS?

09:42:01  10    A.   YOU MEAN THE WHOLE PRODUCT?

09:42:02  11    Q.   YEAH, THE PRODUCT?

09:42:03  12    A.   OR THE PARTS COULD BE CONSIDERED THE PRODUCT.

09:42:05  13    Q.   THAT'S WHAT I'M SAYING.  IT CAN BE THE PARTS; CORRECT?

09:42:08  14    A.   SURE.

09:42:08  15    Q.   OKAY.  AND WHEN YOU LOOKED AT THE FOUR FACTOR TEST -- I

09:42:11  16    WANT TO DRAW YOUR ATTENTION TO -- IF WE CAN LOOK AT THOSE

09:42:16  17    FACTORS ACTUALLY.  SDX 301.

09:42:21  18         AND IF WE CAN LOOK AT THE FIRST FACTOR, AND YOU TALKED

09:42:23  19    ABOUT THE SCOPE OF THE DESIGN CLAIMED IN THE PLAINTIFF'S

09:42:27  20    PATENT, INCLUDING THE DRAWING AND THE WRITTEN DESCRIPTION.

09:42:30  21         DO YOU SEE THAT?

09:42:30  22    A.   YES.

09:42:31  23    Q.   OKAY.  AND YOU LOOKED AT THE SPECIFIC PATENTS IN THIS

09:42:35  24    CASE, INCLUDING THE D'677; CORRECT?  AND THE '087; CORRECT?

09:42:41  25    A.   YES.

09:42:41  1    Q.  AND WHEN YOU LOOK AT THIS, BY THE WAY, FACTOR 1, YOUR

09:42:45  2    ANALYSIS OF FACTOR 1 DOESN'T DEPEND AT ALL ON WHETHER APPLE HAS

09:42:50  3    EVER SOLD A PHONE; CORRECT?

09:42:52  4    A.  I DON'T THINK IT MATTERS AT ALL.  IT'S WHAT'S IN THE

09:42:56  5    PATENT AS EXPLAINED HERE.

09:42:59  6    Q.  EXACTLY.  SO WE'VE HAD A LOT OF TESTIMONY ABOUT WHAT APPLE

09:43:02  7    SOLD AND YOU'VE SEEN A LOT OF IPHONES.

09:43:05  8        THAT HAS NOTHING TO DO WITH YOUR ANALYSIS OF THE SCOPE OF

09:43:08  9    THE DESIGN CLAIMED IN THE PLAINTIFF'S PATENT; CORRECT?

09:43:10  10   A.  YES.

09:43:11  11   Q.  AND IF YOU LOOK AT THE PATENT ITSELF, IF WE CAN PUT UP

09:43:17  12   JX 1043, THIS IS THE PATENT.

09:43:22  13       AND IF WE CAN HIGHLIGHT THE TITLE.

09:43:28  14       YOU TESTIFIED THAT YOU TOOK INTO ACCOUNT THE FACT THAT IN

09:43:31  15   THIS PATENT THE TITLE SAYS, "ELECTRONIC DEVICE."

09:43:38  16       CORRECT?

09:43:39  17   A.  YES.

09:43:40  18   Q.  AND YOU KNOW FOR A FACT THAT THE UNITED STATES PATENT AND

09:43:42  19   TRADEMARK OFFICE HAS NOT GIVEN ANY OPINION, HAS NOT GIVEN ANY

09:43:45  20   INDICATION, HAS NOT DETERMINED THAT THE ARTICLE OF MANUFACTURE

09:43:47  21   WAS THE ELECTRONIC DEVICE; CORRECT?

09:43:49  22   A.  I'M NOT SURE I UNDERSTAND YOUR QUESTION.  COULD YOU ASK ME

09:43:52  23   AGAIN?

09:43:53  24   Q.  SURE.  THIS IS A PATENT THAT WAS ISSUED BY THE

09:43:55  25   UNITED STATES PATENT AND TRADEMARK OFFICE; CORRECT?

BALL CROSS BY MR. PRICE                                        551

09:43:57   1      A.   YES.

09:43:58   2      Q.   IT'S AN AGENCY OF THE U.S. GOVERNMENT; CORRECT?

09:44:01   3      A.   YES.

09:44:01   4      Q.   IT ISSUES PATENTS THAT GIVE PATENT HOLDERS THE EXCLUSIVE

09:44:05   5      RIGHT TO USE WHAT IS CLAIMED IN THE PATENT; CORRECT?

09:44:08   6      A.   YES.

09:44:09   7      Q.   OKAY.  AND BY PUTTING "ELECTRONIC DEVICE" THERE, YOU KNOW

09:44:14   8      THAT THE UNITED STATES PATENT AND TRADEMARK OFFICE HAS NOT

09:44:16   9      OPINED, HAS NOT INDICATED, HAS NOT MADE A DETERMINATION THAT

09:44:20  10      THE ARTICLE OF MANUFACTURE TO WHICH THAT CLAIMED DESIGN IS

09:44:25  11      APPLIED IS AN ELECTRONIC DEVICE; CORRECT?

09:44:29  12      A.   YES.

09:44:30  13      Q.   NOW, YOU ALSO LOOKED AT -- CAN YOU HIGHLIGHT THE OTHER

09:44:41  14      ONE, KEN.

09:44:42  15           YOU SEE IT SAYS, "AS INDICATED IN THE TITLE, THE ARTICLE

09:44:46  16      OF MANUFACTURE TO WHICH THE ORNAMENTAL DESIGN HAS BEEN APPLIED

09:44:48  17      IS AN ELECTRONIC DEVICE."

09:44:50  18           DO YOU SEE THAT?

09:44:51  19      A.   YES.

09:44:51  20      Q.   AND YOU POINTED THAT OUT TO THE JURY; CORRECT?

09:44:54  21      A.   I READ THAT, YES.

09:44:57  22      Q.   AND, AGAIN, IN THIS PATENT ISSUED BY THE UNITED STATES

09:45:02  23      PATENT AND TRADEMARK OFFICE, THAT OFFICE IS NOT GIVING YOU ANY

09:45:06  24      OPINION, ANY INDICATION, ANY DETERMINATION THAT THE ARTICLE OF

09:45:11  25      MANUFACTURE IS, IN FACT, AN ELECTRONIC DEVICE; CORRECT?



09:45:14  1      A.   YES.

09:45:17  2      Q.   SO WE KNOW THAT THIS DOCUMENT, THERE'S NOTHING IN HERE

09:45:20  3    WHERE THE AGENCY OF THE UNITED STATES THAT ISSUES IT IS GIVING

09:45:23  4    ANY INDICATION OR OPINION ABOUT WHAT THE ARTICLE OF MANUFACTURE

09:45:27  5    IS; CORRECT?

09:45:28  6      A.   YES.

09:45:29  7      Q.   OKAY.  IN FACT, THOSE WORDS WERE WRITTEN BY APPLE'S

09:45:33  8    ATTORNEYS; CORRECT?

09:45:35  9      A.   YEAH, MAYBE THE DESIGNER OR THE INVENTOR MIGHT HAVE HELPED

09:45:42 10    OUT WITH THOSE.  BUT I WOULD ASSUME THAT IT WAS AN ATTORNEY.

09:45:46 11      Q.   ALL RIGHT.  AND YOU KNOW WHEN THIS PATENT WAS FILED?

09:45:50 12      A.   I DON'T RECALL RIGHT OFF THE TOP OF MY HEAD.  IT SHOULD

09:45:55 13    SAY RIGHT ON THE FRONT.

09:45:57 14      Q.   LET'S TAKE IT DOWN SO MR. BALL CAN SEE.

09:46:00 15           IT'S FILED SEVERAL YEARS AGO; CORRECT?

09:46:02 16      A.   YEAH.  IT APPEARS THAT IT WAS FILED ON NOVEMBER 18TH,

09:46:08 17    2008.

09:46:08 18      Q.   AND ONE THING WE KNOW IS THAT THE DESIGNER OR THE APPLE

09:46:14 19    LAWYER, WHOEVER WROTE THAT LANGUAGE IN THERE, ONE THING WE KNOW

09:46:18 20    IS THEY WERE NOT USING THE FOUR FACTOR TEST THAT YOU HAVE TO

09:46:21 21    USE TO DETERMINE WHAT AN ARTICLE OF MANUFACTURE IS; CORRECT?

09:46:24 22      A.   YEAH, I -- I THINK, FROM WHAT I KNOW, THAT'S RIGHT.  BUT

09:46:31 23    I'M NOT A LAWYER, AND I'M JUST APPLYING THINGS AS THEY'VE BEEN

09:46:36 24    EXPLAINED.

09:46:36 25      Q.   WELL, MR. BALL, THE REASON YOU KNOW THAT IS THAT THE FOUR

09:46:41   1    FACTOR TEST WASN'T ANNOUNCED UNTIL LAST YEAR?

09:46:42   2    A.   YES.

09:46:43   3    Q.   SO LET'S GO BACK TO THE QUESTION.

09:46:45   4         WHOEVER WROTE THOSE WORDS IN THAT PATENT --

09:46:48   5    A.   YES.

09:46:48   6    Q.   -- WASN'T USING THE FOUR FACTOR TEST?  THAT DIDN'T EVEN

09:46:53   7    EXIST; RIGHT?

09:46:54   8    A.   NOT TO MY KNOWLEDGE, NO.

09:46:56   9    Q.   SO LET'S TALK ABOUT WHAT THE UNITED STATES PATENT AND

09:47:06  10    TRADEMARK OFFICE HAS DETERMINED IN THIS PATENT, OKAY?

09:47:10  11         AND LET'S GO BACK TO THAT FIRST FACTOR IF WE CAN.

09:47:15  12         DO YOU SEE IT -- LET'S TRY AGAIN -- IT SAYS, "THE SCOPE OF

09:47:20  13    THE DESIGN CLAIMED IN THE PLAINTIFF'S PATENT, INCLUDING THE

09:47:23  14    DRAWING AND WRITTEN DESCRIPTION."

09:47:24  15         DO YOU SEE THAT?

09:47:26  16    A.   YES, SIR.

09:47:26  17    Q.   AND THE SCOPE OF THE DESIGN CLAIMED IS THE DRAWING AND THE

09:47:32  18    WRITTEN DESCRIPTION; CORRECT?

09:47:33  19    A.   YES.

09:47:36  20    Q.   IN OTHER WORDS, WE DO A PICTURE AND THEN YOU EXPLAIN THE

09:47:40  21    PICTURE, CORRECT, IN WORDS?

09:47:42  22    A.   YES.

09:47:42  23    Q.   AND ONE THING WE CAN AGREE ON -- IF WE GO LOOK AT THE

09:47:46  24    PATENT AGAIN, KEN.  SORRY TO GO BACK AND FORTH LIKE THAT.

09:47:50  25         IF WE CAN -- ONE THING WE CAN AGREE ON IS THAT THE DOTTED

BALL CROSS BY MR. PRICE

09:47:57  1    LINES ARE UNCLAIMED; CORRECT?

09:48:01  2    A.   YES.   THEY'RE -- THEY'RE NOT CLAIMED.

09:48:05  3    Q.   THAT'S WHAT THE WRITTEN DESCRIPTION SAYS.   IT'S NOT

09:48:07  4    CLAIMED.   IT'S NOT PART OF THE PATENT; RIGHT?

09:48:10  5    A.   WELL, THOSE ARE TWO DIFFERENT QUESTIONS.   IT'S NOT

09:48:13  6    CLAIMED.

09:48:15  7         BUT IT'S PART OF THE PATENT.   IT CLEARLY SHOWS IT IN THE

09:48:18  8    PATENT.

09:48:18  9    Q.   AND THE REASON IT'S SHOWN IS IT'S TELLING WHOEVER LOOKS AT

09:48:23  10   THIS, WHATEVER IS IN THAT DOTTED LINE IS NOT CLAIMED IN THE

09:48:27  11   PATENT; CORRECT?   IT'S BEYOND THE SCOPE OF THE CLAIM?

09:48:33  12   A.   RIGHT.   YES.   IT INDICATES AREAS THAT AREN'T PART OF THE

09:48:40  13   CLAIM.

09:48:41  14   Q.   SO IF WE GO TO FACTOR 1 AGAIN WHERE IT TALKS ABOUT THE

09:48:48  15   SCOPE OF THE CLAIM, THE DESIGN CLAIMED IN THE PATENT, THAT IS

09:48:51  16   SIMPLY THAT BLACK FRONT FACE; CORRECT?

09:48:56  17   A.   YES, THE CLAIMED AREA IS THE BLACK FRONT FACE.

09:48:59  18   Q.   THIS PATENT DOESN'T CLAIM THE SIDES OF ANYTHING; RIGHT?

09:49:02  19   A.   NO, IT DOESN'T.

09:49:06  20   Q.   IT DOESN'T CLAIM THE BACK; CORRECT?

09:49:07  21   A.   IT DOESN'T CLAIM THE BACK.

09:49:09  22   Q.   IT DOESN'T CLAIM WHATEVER IS INSIDE, WHATEVER ARTICLE

09:49:16  23   THAT, OR DEVICE THAT THIS BLACK FACE IS ON TOP OF; CORRECT?

09:49:21  24   A.   NO, IT DOESN'T.

09:49:22  25   Q.   NOW, YOU WERE TALKING ABOUT USING THOSE DOTTED LINES AS

BALL CROSS BY MR. PRICE

09:49:28 1    PART OF YOUR INTERPRETATION.  I GUESS YOU SAID FOR CONTEXT;

09:49:32 2    RIGHT?

09:49:32 3    A.   I THINK THAT'S A GOOD WORD.  I THINK I COULD DESCRIBE IT

09:49:36 4    DIFFERENT WAYS, BUT --

09:49:38 5    Q.   OKAY.

09:49:38 6    A.   IT'S HELPFUL.

09:49:39 7    Q.   I'M SORRY.  I DIDN'T MEAN TO INTERRUPT YOU.

09:49:42 8         LET'S LOOK AT THE CLAIMED DESIGN THEN AND SEE WHAT YOU'RE

09:49:44 9    TALKING ABOUT, CONTEXT.

09:49:46 10        NOW, IT SAYS IN THE PATENT THAT AN EXAMPLE OF THE KIND OF

09:49:50 11   THING THAT YOU MIGHT USE THIS DESIGN WITH WOULD BE AN

09:49:54 12   ELECTRONIC DEVICE, A TOY, A CAR -- NOT A CAR, SORRY.  IT SAYS A

09:50:00 13   NOVELTY ITEM, TOY, COMMUNICATION DICE, MUSIC, VIDEO, CORRECT?

09:50:07 14   A.   SURE, YES.

09:50:09 15   Q.   I WANT TO SEE IF I CAN FIGURE OUT YOUR ANALYSIS HERE.  YOU

09:50:12 16   SAID FACTOR 1, YOU'RE LOOKING AT THE DOTTED LINES, AND THAT

09:50:16 17   TELLS YOU THAT THE ARTICLE OF MANUFACTURE IS, YOU SAID, A

09:50:19 18   PHONE; RIGHT?

09:50:21 19   A.   WELL, I RECOGNIZED IT AS A PHONE.  IT'S AN ELECTRONIC

09:50:24 20   DEVICE.

09:50:24 21   Q.   OKAY.

09:50:25 22   A.   AND A SMARTPHONE LIKE WHAT I RECOGNIZE THERE IS ALL OF

09:50:29 23   THOSE THINGS THAT ARE LISTED.

09:50:30 24   Q.   BUT WAIT A MINUTE.  THIS COULD BE THE -- THE UNCLAIMED

09:50:36 25   PORTION COULD BE ANY ELECTRONIC DEVICE; RIGHT?

09:50:39  1     A.   I DON'T KNOW.  I SUPPOSE.

09:50:39  2     Q.   WELL, DID YOU HAVE ONE OF THE SAMSUNG PHONES WITH YOU?

09:50:44  3     JUST TELL ME THE NUMBER AND HAND IT TO ME.

09:50:46  4     A.   WELL, THIS IS THE S 4G.

09:50:49  5     Q.   THANK YOU.  MAY I SEE IT?

09:50:50  6     A.   OH, SORRY (HANDING).

09:50:52  7     Q.   SO I WANT YOU TO ASSUME THIS:  THAT YOU HAVE A DEVICE THAT

09:50:56  8     HAS THE CLAIMED PATENTED FACE ON IT.  OKAY?

09:50:59  9     A.   UM-HUM.

09:51:00  10    Q.   AND THAT WHAT THIS DEVICE IS IS AN INCREDIBLE,

09:51:06  11    REVOLUTIONARY MEDICAL BREAKTHROUGH THAT ALLOWS YOU TO SCAN A

09:51:12  12    PERSON'S BODY AND DETECT CANCERS THAT WERE PREVIOUSLY

09:51:16  13    UNDETECTABLE.

09:51:17  14         OKAY?  ARE YOU WITH ME SO FAR?

09:51:19  15    A.   OKAY.

09:51:20  16    Q.   THAT WOULD BE AN ELECTRONIC DEVICE; RIGHT?

09:51:21  17    A.   OKAY.

09:51:22  18    Q.   OKAY.  AND SO LET'S ASSUME THAT THAT'S WHAT THIS DEVICE

09:51:26  19    WAS, OKAY?  AND THAT APPLE DIDN'T HAVE ANY PATENTS ON THAT

09:51:30  20    INVENTION, THE INVENTION, THAT INCREDIBLE, REVOLUTIONARY

09:51:34  21    INVENTION.  OKAY?

09:51:35  22    A.   YOU MEAN A UTILITY PATENT.

09:51:36  23    Q.   ON THE INVENTION OF BEING ABLE TO SCAN AND SEE WHETHER YOU

09:51:40  24    HAVE CANCER.  LET'S ASSUME APPLE HAS NO PATENTS ON THAT.  OKAY?

09:51:43  25    A.   OKAY.

BALL CROSS BY MR. PRICE

09:51:44  1    Q.   ALL THEY HAVE IS THE -- THAT DESIGN ON THE FRONT FACE.

09:51:47  2    OKAY?

09:51:47  3    A.   OKAY.

09:51:48  4    Q.   OKAY.  SO I'M WONDERING THEN, YOU SAID IN YOUR REPORT YOUR

09:51:57  5    UNDERSTANDING IS THAT THE ARTICLE OF MANUFACTURE IS THE ENTIRE

09:52:02  6    DEVICE AND THE DEVICE IS AN ELECTRONIC DEVICE, THAT APPLE WOULD

09:52:05  7    GET THE PROFITS ON THE ENTIRE DEVICE; RIGHT?

09:52:08  8    A.   I'M -- JUST REPEAT THAT.  I WANT TO MAKE SURE I HEARD IT

09:52:11  9    CORRECTLY.

09:52:12  10   Q.   YEAH.  I MEAN, YOU SAID IN YOUR REPORT YOUR UNDERSTANDING

09:52:15  11   IS IF THE ARTICLE OF MANUFACTURE IS THAT ENTIRE ELECTRONIC

09:52:18  12   DEVICE, JUST BECAUSE A BLACK FACE IS PUT ON IT, THAT APPLE

09:52:22  13   WOULD GET ALL OF THE PROFITS FOR THAT DEVICE?

09:52:24  14   A.   NO, I DON'T THINK I SAID IT LIKE THAT, NO.

09:52:27  15   Q.   IS THAT YOUR UNDERSTANDING?

09:52:28  16   A.   WELL, I THINK I LOOKED AT THE FOUR FACTORS, I LOOKED AT

09:52:32  17   THE PATENT, I CONSIDERED THE INFRINGING PHONES, APPLIED THE

09:52:36  18   FOUR FACTORS TO THEM TO DETERMINE WHAT THE ARTICLE OF

09:52:39  19   MANUFACTURE IS.

09:52:40  20        IN THIS CASE, I FOUND IT WAS THE ENTIRE SMARTPHONE.

09:52:43  21   Q.   OKAY.  AND BASED UPON YOUR TESTIMONY, USING THE DOTTED

09:52:47  22   LINES, IF THIS DEVICE WERE A MEDICAL DEVICE THAT SOLD FOR

09:52:50  23   MILLIONS OF DOLLARS AND HAD REVOLUTIONARY TECHNOLOGY, YOU WOULD

09:52:53  24   SAY, BASED UPON THIS, THAT THE ARTICLE OF MANUFACTURE IS THE

09:52:56  25   MEDICAL DEVICE THAT HAS MILLIONS OF DOLLARS IN TECHNOLOGY IN IT

BALL CROSS BY MR. PRICE                                         558

09:53:00  1    AND IS SOLD FOR A MILLION DOLLARS?

09:53:01  2    A.   NO.

09:53:03  3    Q.   BUT IT HAS THE BLACK FACE, THE DOTTED LINES SHOWS AN

09:53:07  4    ELECTRONIC DEVICE.

09:53:08  5    A.   YES.

09:53:08  6    Q.   SO USING YOUR LOGIC THAT YOU USED LOOKING AT THIS PATENT,

09:53:14  7    THAT INCREDIBLY EXPENSIVE MEDICAL DEVICE THAT APPLE HAD NOTHING

09:53:19  8    TO DO WITH CONCERNING THE INVENTIONS INSIDE, THAT WOULD BE THE

09:53:23  9    ARTICLE OF MANUFACTURE; RIGHT?

09:53:25 10    A.   NO, NOT NECESSARILY.

09:53:29 11    Q.   WHY --

09:53:30 12    A.   I MEAN, I HAVEN'T -- THIS IS A HYPOTHETICAL SITUATION AND

09:53:34 13    I THINK WE NEED TO APPLY ALL FOUR OF THOSE FACTORS.  SO I

09:53:38 14    REALLY CAN'T ANSWER YOUR QUESTION WITHOUT SEEING THE PRODUCT

09:53:40 15    AND DOING THE ANALYSIS.

09:53:41 16    Q.   WELL, YOUR REPORT DID SAY THAT WHAT YOU WOULD DO IS

09:53:44 17    CALCULATE THE INFRINGER'S TOTAL PROFIT MADE ON THE ARTICLE OF

09:53:47 18    MANUFACTURE; CORRECT?  THAT'S IN YOUR REPORT?

09:53:49 19    A.   I -- I THINK THAT'S THE LAW.

09:53:51 20    Q.   OKAY.  WELL, LET ME ASK YOU THEN ANOTHER QUESTION

09:53:58 21    CONCERNING THE USE OF THESE UNCLAIMED DOTTED LINES TO DETERMINE

09:54:01 22    THE ARTICLE OF MANUFACTURE.

09:54:03 23         IF YOU WOULD LOOK IN YOUR BINDER AT EXHIBIT 4561.

09:54:17 24         AND 4561 YOU SEE IS A PATENT, ANOTHER DESIGN PATENT THAT

09:54:22 25    APPLE GOT; CORRECT?  IT'S DESIGN PATENT '926.

| | |
|---|---|
| 09:54:30 | 1 |
| 09:54:31 | 2 |
| 09:54:35 | 3 |
| 09:54:40 | 4 |
| 09:54:44 | 5 |
| 09:54:47 | 6 |
| 09:54:49 | 7 |
| 09:54:51 | 8 |
| 09:54:52 | 9 |
| 09:54:53 | 10 |
| 09:54:53 | 11 |
| 09:54:55 | 12 |
| 09:54:56 | 13 |
| 09:55:00 | 14 |
| 09:55:03 | 15 |
| 09:55:03 | 16 |
| 09:55:04 | 17 |
| 09:55:10 | 18 |
| 09:55:18 | 19 |
| 09:55:21 | 20 |
| 09:55:25 | 21 |
| 09:55:29 | 22 |
| 09:55:31 | 23 |
| 09:55:34 | 24 |
| 09:55:46 | 25 |

A.   YES.

Q.   AND YOU'VE SEEN THIS BEFORE, CORRECT, FOR YOUR TESTIMONY

TODAY?

A.   I MIGHT HAVE.  I'VE SEEN A LOT.  I DON'T RECOGNIZE THIS

SPECIFIC ONE.  I THINK I SAW IT.  I JUST CAN'T REMEMBER.

          MR. PRICE:  YOUR HONOR, I'D MOVE EXHIBIT 4561 INTO

EVIDENCE.

          MS. WIGMORE:  NO FURTHER OBJECTION.

          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

     (DEFENDANTS' EXHIBIT 4561 WAS ADMITTED IN EVIDENCE.)

          THE COURT:  GO AHEAD, PLEASE.

          MR. PRICE:  IF WE CAN SHOW THAT DESIGN PATENT.

Q.   YOU SEE THE FIRST PAGE HAS ALL THESE DOTTED LINES, THAT

MEANS THAT IS NOT CLAIMED.  THAT IS NOT A CLAIMED INVENTION;

CORRECT?

A.   YES.

Q.   NOW, IF WE GO TO THE NEXT PAGE -- I'M SORRY, NOT THE NEXT

PAGE.  IF YOU GO TO PAGE 8 -- I'M SORRY -- PAGE 7.

     YOU SEE OTHER DOTTED LINES.  THESE ARE NOT CLAIMED

INVENTIONS; CORRECT?

A.   HERE EVERYTHING IS DOTTED.

Q.   SO IT'S NOT A CLAIMED INVENTION; CORRECT?

A.   NO, IT'S NOT SHOWN IN SOLID LINES.

Q.   SO LET'S GO TO THE LAST PAGE, .008.

     AND SO HERE'S THE DESIGN PATENT HERE.  LOOK AT FIGURE 5.

BALL CROSS BY MR. PRICE

09:55:50 1    THE ONLY THING THAT'S CLAIMED IN THIS PATENT, RIGHT, IS WHAT?

09:55:56 2    A.   WELL, IT'S A LITTLE HARD TO TELL BECAUSE IT LOOKS LIKE

09:55:59 3    EVERYTHING IS IN DOTTED LINES, BUT I THINK THAT THE DOOR IS

09:56:02 4    KIND OF LIKE A SLIGHTLY DIFFERENT DOTTED LINE, SO I THINK MAYBE

09:56:05 5    THAT WAS INTENDED TO BE A SOLID LINE, WHICH WOULD INDICATE

09:56:09 6    THAT'S WHAT'S BEING CLAIMED.

09:56:10 7    Q.   AND YOU UNDERSTAND THIS IS A PATENT FOR AN ORNAMENTAL

09:56:13 8    DESIGN; CORRECT?

09:56:14 9    A.   YES.

09:56:14 10   Q.   AND THIS PATENT HAS, HAS SIMILAR DOTTED LINES TO THE ONES

09:56:19 11   IN THE '677 AND '087 PATENT; RIGHT?

09:56:22 12   A.   YEAH, YEAH.  THE BROKEN LINES ARE SIMILAR, YEAH.

09:56:26 13   Q.   THE CONTEXT, THE UNCLAIMED AREA; CORRECT?

09:56:31 14   A.   YES, THERE'S -- YOU KNOW, IT'S A DIFFERENT SET OF

09:56:37 15   DRAWINGS, BUT THERE'S SOME SIMILARITIES, SURE.

09:56:39 16   Q.   WHICH COULD BE ANY ELECTRONIC DEVICE, A TOY, A PHONE,

09:56:44 17   SOMETHING THAT JUST TOLD THE TIME AND TEMPERATURE, OR AN

09:56:47 18   INCREDIBLY EXPENSIVE MEDICAL SCANNER; RIGHT?

09:56:51 19   A.   I DON'T KNOW.

09:56:53 20   Q.   WELL, CERTAINLY YOU CAN'T CONCLUDE BY LOOKING AT THIS THAT

09:56:56 21   THE ARTICLE OF MANUFACTURE TO WHICH THAT DESIGN IS APPLIED

09:57:00 22   WOULD BE THE ENTIRE PRODUCT; RIGHT?

09:57:02 23   A.   WELL, IT'S -- IT'S THERE.  THERE'S ONLY ONE KIND OF

09:57:09 24   PRODUCT BEING SHOWN HERE.  IT LOOKS LIKE AN ELECTRONIC DEVICE

09:57:12 25   OR A SMARTPHONE.  SO THESE DRAWINGS SUGGEST TO ME THAT THE

BALL CROSS BY MR. PRICE

09:57:16   1    DESIGNER INTENDED THIS TO BE A DOOR ON A SMARTPHONE.

09:57:21   2    Q.   THEY DIDN'T GET A PATENT ON A DOOR TO A SMARTPHONE; RIGHT?

09:57:24   3    A.   I DON'T KNOW WHAT THE -- WHAT YOU WOULD CALL THIS.   BUT

09:57:27   4    THAT -- THAT CLAIM IS SHOWN ON ONE END OF THE -- OF A

09:57:32   5    SMARTPHONE.

09:57:32   6    Q.   OKAY.   SO ACCORDING TO YOUR TESTIMONY AND YOUR REASONING,

09:57:35   7    IF THE DESIGN PATENT INFRINGED WAS A SLOT ON TOP OF AN

09:57:42   8    ELECTRONIC DEVICE, THEN THE ARTICLE OF MANUFACTURE AND THE

09:57:48   9    PROFITS TO WHICH APPLE WOULD BE ENTITLED WOULD BE THAT ENTIRE

09:57:52   10   ELECTRONIC DEVICE BECAUSE OF THAT SLOT?

09:57:54   11   A.   NO.

09:57:56   12   Q.   CERTAINLY YOU CAN'T CONCLUDE THAT FROM THE PATENT; RIGHT?

09:57:59   13   A.   WELL, I THINK -- I'M SORRY.   I'M TRYING TO UNDERSTAND.

09:58:09   14   YOU NEED TO LOOK AT ALL FOUR FACTORS AND -- WHAT I SEE IN THIS

09:58:16   15   PATENT, I SEE A SMARTPHONE AND I SEE A PART OF A SMARTPHONE

09:58:19   16   BEING CLAIMED.

09:58:20   17        IF THERE'S AN INFRINGING PRODUCT, THEN I THINK WE HAVE TO

09:58:23   18   DO AN ANALYSIS CONSIDERING ALL OF THE FACTORS.

09:58:26   19   Q.   SO YOU'RE SAYING THAT EVEN IN THIS PATENT, WHAT YOU SEE

09:58:29   20   INDICATES TO YOU IS THE ARTICLE OF MANUFACTURE WOULD BE THE

09:58:31   21   ENTIRE PHONE, EVEN THOUGH THE ONLY PATENTED PART IS A LITTLE

09:58:35   22   SLOT THERE?

09:58:36   23   A.   WELL, THAT'S WHAT I SEE IN THE DRAWINGS.   I SEE A PHONE,

09:58:39   24   AND I SEE A DESIGN THAT'S PART OF THAT PHONE.

09:58:42   25        SO I GUESS I SEE IT BEING APPLIED TO A PHONE.

BALL CROSS BY MR. PRICE

09:58:44   1          BUT THERE'S OTHER -- WE NEED TO DO ALL FOUR FACTORS.

09:58:49   2     Q.   OKAY.  SO LET'S LOOK AT THE FOUR FACTORS THEN.  LET'S LOOK

09:58:52   3     AT THE FIRST FACTOR.

09:58:54   4          TO BE CLEAR, THE FIRST FACTOR, THOUGH, TELLS YOU TO JUST

09:58:57   5     LOOK AT THE SCOPE OF THE DESIGN CLAIMED AS THAT IS DESCRIBED TO

09:59:01   6     YOU IN THE DRAWING AND THE WRITTEN DESCRIPTION; CORRECT?

09:59:04   7     A.   YES, THAT'S WHAT IT SAYS.

09:59:05   8     Q.   IT DOESN'T SAY LOOK AT THE DRAWING AND THE WRITTEN

09:59:08   9     DESCRIPTION TO SEE WHAT THE ARTICLE OF MANUFACTURE IS.  IT SAYS

09:59:10   10    LOOK AT THAT TO SEE WHAT IS THE DESIGN CLAIMED; RIGHT?

09:59:13   11    A.   YES.

09:59:13   12    Q.   AND THE DESIGN CLAIMED IS JUST THE FRONT FACE; CORRECT?

09:59:18   13    IN THE D'677?

09:59:19   14    A.   YES.

09:59:20   15    Q.   AND THE D'087 INCLUDES A BEZEL; RIGHT?

09:59:28   16    A.   YES.

09:59:28   17    Q.   AND THOSE ARE THE ONLY -- THOSE ARE THE SCOPES OF THE

09:59:32   18    DESIGNS CLAIMED IN THOSE PATENTS WHEN YOU LOOK AT THE DRAWINGS

09:59:35   19    AND THE WRITTEN DESCRIPTIONS; CORRECT?

09:59:37   20    A.   YES, THESE -- THE '677 IS THE ENTIRE FRONT FACE AND THE

09:59:43   21    '087 IS THAT FRONT FACE WITH THE BEZEL.

09:59:45   22    Q.   NOW, LET ME ASK YOU ABOUT THE OTHER FACTORS THEN.  IF WE

09:59:49   23    COULD LOOK AT FACTOR 2, AND THAT IS THE RELATIVE PROMINENCE OF

09:59:53   24    THE DESIGN WITHIN THE PRODUCT AS A WHOLE.

09:59:56   25          DO YOU SEE THAT?

BALL CROSS BY MR. PRICE

09:59:56   1     A.   YES, SIR.

09:59:57   2     Q.   NOW, THAT DOES NOT SAY THE RELATIVE VISUAL PROMINENCE,

10:00:01   3     DOES IT?

10:00:02   4     A.   NO, I DON'T SEE THE WORD "VISUAL" THERE.

10:00:06   5     Q.   AND IF YOU LOOK AT THE SAMSUNG PHONES, THERE ARE A LOT OF

10:00:08   6     THINGS PROMINENT ABOUT THESE PHONES, INCLUDING WHAT THOSE

10:00:11   7     PHONES CAN DO; CORRECT?

10:00:12   8     A.   WELL, I SUPPOSE THERE'S ALL SORTS OF THINGS SMARTPHONES

10:00:21   9     CAN DO.

10:00:22   10    Q.   AND YOU SHOWED SOME SAMSUNG ADVERTISEMENTS.  YOU DIDN'T

10:00:25   11    SHOW SAMSUNG ADVERTISEMENTS THAT SHOWED WHAT THE PHONE COULD

10:00:29   12    DO, BUT YOU KNOW THEY EXIST, A LOT OF THEM EXIST; RIGHT?

10:00:33   13    A.   SURE.

10:00:34   14    Q.   OKAY.  SO IF YOU LOOK BEYOND VISUAL PROMINENCE --

10:00:37   15    ACTUALLY, LET'S STAY WITH VISUAL PROMINENCE, EVEN THOUGH THAT'S

10:00:40   16    NOT LIMITED TO THAT.

10:00:42   17         IF WE LOOK AT THAT, IN YOUR REPORT YOU HAVE SECTIONS ON

10:00:45   18    THE RELATIVE PROMINENCE; RIGHT?

10:00:48   19    A.   WHAT -- YEAH.

10:00:50   20    Q.   IN YOUR REPORT, YOU DISCUSS THAT?

10:00:52   21    A.   YEAH.

10:00:52   22    Q.   AND I'M GOING TO LOOK AT PAGE 39 OF YOUR REPORT, AND UNDER

10:00:55   23    VISUAL PROMINENCE, PARAGRAPH -- I THINK IT'S PARAGRAPH 186.

10:01:09   24         AND THIS IS WITH RESPECT TO THE D'087 DESIGN.  IN REACHING

10:01:12   25    YOUR CONCLUSION, YOU SAY THE CLAIMED DESIGN ALSO SERVES TO

10:01:15   1    DIFFERENTIATE THE INFRINGING PHONES FROM OTHER PHONE DESIGNS;

10:01:19   2    CORRECT?   THAT'S PART OF YOUR ANALYSIS?

10:01:20   3    A.   I DON'T HAVE MY REPORT.   CAN I LOOK AT WHAT I WROTE?

10:01:23   4              MR. PRICE:   YOUR HONOR, MAY I APPROACH?

10:01:25   5              THE COURT:   YES.   DO YOU HAVE A COPY FOR HIM?

10:01:27   6              MR. PRICE:   THERE IS A COPY.

10:01:29   7              THE COURT:   ALL RIGHT.   WHY DON'T YOU SHOW HIM WHERE

10:01:30   8    IT IS.   SHOW HIM -- THERE SHOULD BE BINDERS FOR THIS WITNESS ON

10:01:37   9    THE WITNESS STAND.   IF YOU CAN JUST SHOW HIM THAT VERSUS

10:01:39  10    SHARING ONE, I THINK IT WOULD BE A LITTLE FASTER.

10:01:43  11              MR. PRICE:   IT'S LIGHT BLUE, AND I'M LOOKING AT PAGE

10:01:46  12    40.

10:01:50  13              THE WITNESS:   WHICH TAB?

10:01:51  14    BY MR. PRICE:

10:01:52  15    Q.   IT'S THE FIRST TAB, SIR.

10:01:56  16    A.   WHICH PARAGRAPH?

10:01:57  17    Q.   PARAGRAPH 186.   YOU WRITE, "THE CLAIMED DESIGN ALSO SERVES

10:02:04  18    TO DIFFERENTIATE THE INFRINGING PHONES FROM OTHER PHONE

10:02:08  19    DESIGNS," AND THEN YOU CITE TO OTHER PARAGRAPHS IN YOUR REPORT.

10:02:13  20       DO YOU SEE THAT.

10:02:13  21    A.   THAT'S THE LAST SENTENCE.   IT'S A LONG PARAGRAPH.   LET ME

10:02:16  22    READ.

10:02:17  23    Q.   WELL, YOU KNOW I'M ON THE CLOCK, SO CAN YOU TELL ME,

10:02:21  24    THAT'S WHAT YOU WROTE; RIGHT?

10:02:22  25    A.   YES.

565
BALL CROSS BY MR. PRICE

10:02:23    1    Q.   AND YOU REFER THERE -- REMEMBER YOU SHOWED THE JURY THE

10:02:26    2    FLIP PHONES AND SLIDER PHONES?  YOU REFER TO THOSE PHONES AS

10:02:29    3    BEING WHAT YOU'RE COMPARING TO, TO SHOW THAT THE CLAIMED DESIGN

10:02:33    4    DIFFERENTIATING THE INFRINGING PHONES; CORRECT?

10:02:36    5    A.   NO.  CAN YOU REPEAT THAT QUESTION?  I DON'T --

10:02:42    6    Q.   SURE.  WHEN YOU SAY THE CLAIMED DESIGN SERVES TO

10:02:46    7    DIFFERENTIATE THE INFRINGING PHONES FROM OTHER PHONE DESIGNS,

10:02:49    8    IN YOUR REPORT, YOU'RE REFERRING BACK TO THESE FLIP PHONES;

10:02:57    9    RIGHT?

10:02:58   10    A.   NOT NECESSARILY.  I -- IT'S THE LAST PARAGRAPH -- SENTENCE

10:03:01   11    IN A BIG PARAGRAPH, AND I HAVEN'T HAD A CHANCE TO READ THE

10:03:04   12    WHOLE PARAGRAPH.  SO I THINK IT'S IMPORTANT THAT I READ IT IN

10:03:07   13    CONTEXT OF WHAT I WROTE BEFORE.  JUST GIVE ME A MOMENT, PLEASE.

10:03:14   14    Q.   LET ME MOVE ON.  YOU DID WRITE THAT; CORRECT?

10:03:18   15    A.   ABSOLUTELY.

10:03:18   16    Q.   AND YOU WROTE THE SAME THING FOR THE D'677 DESIGN, THAT IN

10:03:21   17    LOOKING AT PROMINENCE, YOU LOOKED AT THE CLAIM DESIGN AS

10:03:25   18    DIFFERENTIATING THE INFRINGING PHONES FROM OTHER PHONE DESIGNS;

10:03:28   19    RIGHT?  THAT'S PARAGRAPH 192, PAGE 42; RIGHT?

10:03:41   20    A.   YES.

10:03:42   21    Q.   NOW, I WANT YOU TO LOOK AT AND COMPARE AN INFRINGING PHONE

10:03:46   22    TO A NON-INFRINGING DESIGN TO TELL US WHAT THE RELATIVE

10:03:50   23    PROMINENCE IS OF THE PATENTED DESIGN, WHICH IS WHAT YOU WERE

10:03:53   24    DOING IN YOUR REPORT.

10:03:54   25         AND IF YOU'D LOOK AT -- AND I'M GOING TO PUT ON THE

BALL CROSS BY MR. PRICE

10:03:57  1    SCREEN, THIS IS PLAINTIFF'S EXHIBIT 7, PAGE 16.

10:04:02  2          THIS IS THE GALAXY ACE.  THE PHYSICAL EXHIBIT, WHICH THE

10:04:07  3    JURY WILL SEE, IS JX 1030.

10:04:11  4          NOW, YOUR UNDERSTANDING IS THAT THIS FRONT FACE DOES NOT

10:04:14  5    INFRINGE THE '677 PATENT; CORRECT?

10:04:16  6    A.   YES, I BELIEVE SO.

10:04:18  7    Q.   AND IN YOUR REPORT, YOU SAID, IN DETERMINING PROMINENCE,

10:04:25  8    YOU COMPARED THE INFRINGING DESIGNS WITH NON-INFRINGING TO SEE

10:04:28  9    IF THERE WERE DIFFERENTIATING DIFFERENCES; RIGHT?  THAT'S WHAT

10:04:32 10    YOUR REPORT SAID?

10:04:33 11    A.   OKAY.  YES.

10:04:34 12    Q.   SO LET'S COMPARE THIS DESIGN, THIS NON-INFRINGING DESIGN

10:04:38 13    THEN, TO JX -- IT'S PX 7.19, WHICH IS PHYSICAL, THE PHONE WILL

10:04:46 14    BE JX 1007.

10:04:48 15          THIS IS THE -- THIS ONE DOES INFRINGE; CORRECT?

10:04:52 16    A.   YES, I BELIEVE SO.

10:04:53 17    Q.   OKAY.

10:04:55 18          KEN, CAN YOU PUT THOSE TWO SIDE BY SIDE?  BLOW THEM UP.

10:04:59 19              MS. WIGMORE:  YOUR HONOR, I OBJECT.

10:05:01 20              MR. PRICE:  JUST WITH USING TRIAL DIRECTOR TO --

10:05:03 21              THE COURT:  I DON'T SEE JX 1030 BEING ADMITTED.  WE

10:05:07 22    SKIPPED FROM 1027 TO 1031 YESTERDAY, AND I JUST DON'T SEE IT

10:05:11 23    BEING ADMITTED.  SO IF YOU WANT TO PUBLISH IT TO THE JURY --

10:05:14 24              MR. PRICE:  I MOVE TO ADMIT THAT, YOUR HONOR.

10:05:16 25              THE COURT:  OKAY.  SO THAT'S JX -- JX 1030; RIGHT?

BALL CROSS BY MR. PRICE

| | |
|---|---|
| 10:05:19 | 1 | MR. PRICE:  YES, YOUR HONOR. |
| 10:05:20 | 2 | THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT? |
| 10:05:21 | 3 | MS. WIGMORE:  YES, WE OBJECT.  IT'S ALREADY IDENTICAL |
| 10:05:24 | 4 | TO WHAT WAS EXCLUDED EARLIER, THE COMPARISON. |
| 10:05:28 | 5 | MR. PRICE:  JX 1030 IS THE PHONE. |
| 10:05:30 | 6 | MS. WIGMORE:  THE PHONE IS FINE.  BUT THE COMPARISON |
| 10:05:32 | 7 | IS NOT CONSISTENT WITH WHAT YOUR HONOR RULED. |
| 10:05:35 | 8 | MR. QUINN:  YOUR HONOR, YOU RULED -- |
| 10:05:36 | 9 | THE COURT:  THE COMPARISON WAS EXCLUDED. |
| 10:05:38 | 10 | MR. PRICE:  BUT YOU LATER RULED WE COULD USE THE |
| 10:05:41 | 11 | COMPARISON TO SHOW THE SCOPE BECAUSE THE RULING WAS BASED ON |
| 10:05:46 | 12 | CHALLENGING INFRINGEMENT.  IT'S NOT.  IT'S BASED ON ITS |
| 10:05:49 | 13 | PROMINENCE SINCE HE USED THESE PHONES TO COMPARE THE PROMINENCE |
| 10:05:53 | 14 | AND -- |
| 10:05:54 | 15 | THE COURT:  ALL RIGHT.  LET -- LET'S DO THIS:  JUST |
| 10:05:57 | 16 | GIVE ME THE NUMBER -- LET ME STOP THE CLOCK HERE.  IT'S |
| 10:06:03 | 17 | 10:05:54.  AND I'M USING -- I UNDERSTAND THERE WAS A CHALLENGE |
| 10:06:08 | 18 | TO MY TIME YESTERDAY.  I'M USING THE CLOCK THAT IS ATTACHED TO |
| 10:06:10 | 19 | THE REALTIME TRANSCRIPT.  OKAY. |
| 10:06:12 | 20 | SO ANYWAY, LET'S TAKE A BREAK NOW, AND WE CAN SORT THIS |
| 10:06:17 | 21 | OUT. |
| 10:06:18 | 22 | ALL RIGHT.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE. |
| 10:06:21 | 23 | DO NOT RESEARCH OR DISCUSS THE CASE. |
| 10:06:43 | 24 | (JURY OUT AT 10:06 A.M.) |
| 10:06:44 | 25 | THE COURT:  YOU COULD TAKE -- STEP DOWN FROM THE |

| | |
|---|---|
| 10:06:46 | 1 |
| 10:07:08 | 2 |
| 10:07:10 | 3 |
| 10:07:14 | 4 |
| 10:07:14 | 5 |
| 10:07:17 | 6 |
| 10:07:17 | 7 |
| 10:07:19 | 8 |
| 10:07:21 | 9 |
| 10:07:21 | 10 |
| 10:07:23 | 11 |
| 10:07:28 | 12 |
| 10:07:32 | 13 |
| 10:07:34 | 14 |
| 10:07:35 | 15 |
| 10:07:37 | 16 |
| 10:07:37 | 17 |
| 10:07:39 | 18 |
| 10:07:40 | 19 |
| 10:07:45 | 20 |
| 10:07:49 | 21 |
| 10:07:49 | 22 |
| 10:07:52 | 23 |
| 10:07:55 | 24 |
| 10:08:01 | 25 |

WITNESS STAND, I THINK IT'S BEST IF YOU STEP OUTSIDE.

      (WITNESS NOT PRESENT.)

            THE COURT:  THE DOOR HASN'T CLOSED YET.  I'M JUST

WAITING.

      ALL RIGHT.  THE RECORD SHOULD REFLECT THE JURORS HAVE LEFT

THE COURTROOM AND THE WITNESS HAS LEFT THE COURTROOM.  I

UNDERSTAND THAT SAMSUNG IS CHALLENGING MY TIME CALCULATION

YESTERDAY FROM WHAT MS. MAROULIS WAS TELLING MS. MASON IN MY

PRESENCE.

      SO I'M JUST TELLING YOU THAT THIS IS THE REALTIME

TRANSCRIPT AND I AM JUST USING THE TIME THAT IS ASSOCIATED WITH

THE OFFICIAL TRANSCRIPT IN THE CASE AND IT GOES BY MINUTE AND

SECONDS.

            MS. MAROULIS:  THANK YOU, YOUR HONOR.  WE WILL FOLLOW

THE COURT'S TIME CALCULATIONS.

            THE COURT:  I'M SORRY?

            MS. MAROULIS:  THANK YOU, YOUR HONOR.  WE WILL FOLLOW

THE COURT'S TIME CALCULATIONS.

            THE COURT:  AND I ANNOUNCE IT WHENEVER ANYONE STARTS

SPEAKING AND STOPS SPEAKING SO YOU CAN CHECK ME BY CHECKING THE

TRANSCRIPT.

      IF I DON'T ANNOUNCE ANOTHER TIME WHEN A SECOND SPEAKER

COMES UP, IT'S BECAUSE THE MINUTE HAS NOT CHANGED.  OKAY?  SO

IF IT'S 10 MINUTES -- IF IT'S 10:06:16, AND THEN MR. PRICE

STARTS AT 10:06:20, THEN I DON'T ANNOUNCE THE TIME AGAIN

BALL CROSS BY MR. PRICE

10:08:06  1    BECAUSE IT'S THE SAME MINUTE.

10:08:07  2        BUT CHECK THE TRANSCRIPT.  I ALWAYS ANNOUNCE AT THE

10:08:09  3    BEGINNING AND AT THE END WHENEVER WE GET A NEW SPEAKER.

10:08:12  4        SO YOU CAN CHALLENGE MY TIME CALCULATIONS BASED ON THAT.

10:08:15  5    OKAY?

10:08:16  6            MS. MAROULIS:  THANK YOU, YOUR HONOR.

10:08:17  7            THE COURT:  ALL RIGHT.  AND NEXT TIME, DO IT TO ME.

10:08:19  8    YOU DON'T HAVE TO DO IT TO MS. MASON WHILE I'M STILL HERE.

10:08:22  9    JUST TELL ME THAT YOU HAVE A PROBLEM WITH MY TIME CALCULATION

10:08:25  10   AND WE CAN TALK ABOUT IT.  OKAY?

10:08:27  11           MS. MAROULIS:  YES, YOUR HONOR.

10:08:28  12           THE COURT:  AND WE'LL PUT IT ON THE RECORD.

10:08:30  13       OKAY.  SO THE F700 ITSELF COMES IN.  AND IS 1030 THE F700?

10:08:38  14           MR. PRICE:  NO, YOUR HONOR.

10:08:38  15           THE COURT:  I'M SORRY.  THE -- WHAT IS THE 1030?

10:08:41  16           MR. PRICE:  THE GALAXY ACE.

10:08:42  17           THE COURT:  OKAY.  WHAT IS THE PROBLEM WITH THE

10:08:43  18   GALAXY ACE?

10:08:44  19           MR. PRICE:  IT IS JX 1030.

10:08:47  20           THE COURT:  OKAY.  THE GALAXY ACE IS 1030.  IT'S A

10:08:50  21   JOINT EXHIBIT THAT SHOULD BE ADMITTED.

10:08:52  22       WHAT'S YOUR PROBLEM, MS. WIGMORE?

10:08:54  23           MS. WIGMORE:  THE PROBLEM IS THE COMPARISON OF

10:08:56  24   INFRINGING TO NON-INFRINGING PHONES IN THE SIDE BY SIDE.  WE

10:08:59  25   ESTABLISHED THROUGH YOUR HONOR'S PRIOR RULINGS THAT THE PHONES

10:09:03  1      THEMSELVES CAN BE REFERRED TO NON-INFRINGING ALTERNATIVES BUT

10:09:09  2      TO PUT THE PHONES UP ON THE SCREEN AND COMPARE THEIR FEATURES

10:09:13  3      GETS INTO RELITIGATING INFRINGEMENT.  IT'S CONFUSING AND IT'S

10:09:16  4      NOT RELEVANT.  THAT IT'S A NON-INFRINGING ALTERNATIVE ARE ALL

10:09:20  5      THAT THEY CAN SAY.

10:09:21  6          THE COURT:  GIVE ME ONE SECOND.  DID I AT LEAST ADMIT

10:09:24  7      JX 1030 ON THE RECORD?

10:09:25  8          MR. PRICE:  I DON'T REMEMBER IF WE MOVED IT IN AT

10:09:28  9      THIS TIME.

10:09:28  10         THE COURT:  I WANT TO MAKE SURE I DO THAT IN FRONT OF

10:09:31  11     THE JURY SO THEY KNOW IT'S ADMITTED.  SO LET ME JUST MAKE A

10:09:37  12     NOTE TO MYSELF TO DO THAT.  SO I'LL ADMIT JX 1030.

10:09:40  13         ALL RIGHT.  NOW, WHAT IS THE -- WHAT -- IS IT A

10:09:45  14     DEMONSTRATIVE THAT'S BEING OBJECTED TO?

10:09:47  15         MS. WIGMORE:  YES.  AND THAT SAME DEMONSTRATIVE

10:09:51  16     OBJECTION WAS SUSTAINED IN THE OPENING.

10:09:52  17         THE COURT:  WELL, GIVE ME THE NUMBER OF THE EXHIBIT.

10:09:59  18         MR. PRICE:  YOUR HONOR, THE EXHIBIT IS -- IS PX 7.19.

10:10:05  19         THE COURT:  OKAY.  BUT WAS THERE A DEMONSTRATIVE THAT

10:10:07  20     WAS OBJECTED TO AND RULED ON?  WHAT'S THE NUMBER OF THE

10:10:09  21     DEMONSTRATIVE.

10:10:10  22         MR. PRICE:  HERE'S WHAT'S HAPPENING.  PX 7.19 IS -- I

10:10:14  23     THINK THAT'S IN EVIDENCE, OR IT'S A PLAINTIFF'S DEMONSTRATIVE.

10:10:19  24         MR. KOTARSKI:  I DON'T THINK EXHIBIT 7 IS IN

10:10:21  25     EVIDENCE.

BALL CROSS BY MR. PRICE

10:10:22   1          MR. PRICE:  THAT'S PLAINTIFF'S DEMONSTRATIVE.  THAT'S

10:10:23   2   FROM APPLE.

10:10:24   3          AND THERE'S NO OBJECTION TO SHOWING 7.19, I DON'T THINK.

10:10:29   4          MS. WIGMORE:  THAT'S CORRECT.  IT'S THE COMPARISON.

10:10:31   5          THE COURT:  OKAY.  I'M SORRY.  IF APPLE IS CLAIMING

10:10:33   6   THAT I'VE ALREADY RULED ON THIS, CAN YOU PLEASE TELL ME, WAS IT

10:10:36   7   IN THE OPENING DEMONSTRATIVES?  OR WHICH RULING --

10:10:41   8          MS. WIGMORE:  YES.

10:10:42   9          THE COURT:  WHICH RULING SHOULD I BE LOOKING TO?

10:10:45  10          MS. WIGMORE:  IT'S DOCKET 3734.

10:10:47  11          THE COURT:  OKAY.  I HAVE THAT.  AND WHAT NUMBER?

10:10:49  12          MS. WIGMORE:  IT'S THE RULING ON SDX 2 TO 4, 6, AND

10:10:55  13   8, AND IT'S ONE OF THOSE SLIDES THAT WAS A SLIDE THAT YOUR

10:10:59  14   HONOR SUSTAINED OUR OBJECTION TO.

10:11:00  15          THE COURT:  ALL RIGHT.  HANG ON ONE SECOND.  I WILL

10:11:02  16   GO BACK AND TAKE A LOOK.  I DON'T HAVE THE ORIGINAL

10:11:06  17   DEMONSTRATIVES THAT WERE RULED UPON ON SATURDAY WITH ME HERE ON

10:11:09  18   THE BENCH, SO I'LL HAVE TO GO BACK AND LOOK.

10:11:11  19          SO YOU'RE CLAIMING THAT IT'S INCLUDED IN SDX 2 THROUGH 4,

10:11:14  20   6, AND 8?

10:11:16  21          MS. WIGMORE:  YES, IT'S THE SAME CONCEPT THAT THEY

10:11:18  22   ARE NOW CONSTRUCTING LIVE THAT WAS EXCLUDED FROM THE OPENING

10:11:21  23   DEMONSTRATIVE.

10:11:23  24          THE COURT:  OKAY.  AND IS THERE A PARTICULAR NUMBER,

10:11:27  25   BECAUSE THAT'S -- THERE'S FIVE NUMBERS THERE.  WAS THERE A

```
10:11:32   1        PARTICULAR ONE THAT YOU'RE --

10:11:35   2                  MS. WIGMORE:  WE'RE JUST PULLING THOSE UP RIGHT NOW.

10:11:38   3                  THE COURT:  OKAY.  AND THEN CAN I HAVE -- DO I HAVE A

10:11:41   4        COPY OF THE DEMONSTRATIVE THAT IS CURRENTLY BEING DISPUTED?  DO

10:11:45   5        I HAVE THAT NUMBER?

10:11:47   6                  MR. PRICE:  PX 7.

10:11:48   7                  THE COURT:  WHAT IS THAT, PLEASE?

10:11:50   8                  MR. PRICE:  IT'S FROM PX 7, YOUR HONOR.

10:11:52   9                  THE COURT:  NO, BUT I WANT THE DEMONSTRATIVE.  THAT'S

10:11:54  10        WHAT'S BEING CHALLENGED.

10:11:55  11                  MS. WIGMORE:  WE DON'T HAVE ANY OBJECTION.  WE HAD

10:11:58  12        PX 7.  BUT IT'S THE COMPARISON THAT WE NEED.

10:12:01  13                  MR. PRICE:  YOUR HONOR, IT'S NOT A --

10:12:03  14                  THE COURT:  AND PX 7 IS WHAT?  GIVE ME A MOMENT TO

10:12:06  15        TAKE A LOOK AT THE EXHIBIT LIST.  WHAT IS PX 7?

10:12:09  16                  MR. PRICE:  IT'S PLAINTIFF'S EXHIBIT 7.

10:12:14  17                  THE COURT:  ALL RIGHT.  THAT IS PHOTOGRAPHS OF

10:12:17  18        INFRINGING SAMSUNG DEVICES.

10:12:20  19                  MR. PRICE:  YES.  AND IN PARTICULAR, WE'RE SHOWING

10:12:25  20        7.19.

10:12:27  21                  THE COURT:  OKAY.  GIVE ME JUST ONE MINUTE, PLEASE.

10:12:30  22        I SHOULD HAVE THAT UP HERE.

10:12:34  23            PX 7, I SHOULD HAVE THAT.

10:12:49  24            OKAY.  SO WHAT IS THE NUMBER ON PX 7?  I HAVE IT IN FRONT

10:12:53  25        OF ME.
```

BALL CROSS BY MR. PRICE

10:12:54  1          MR. PRICE:  SO WE WERE COMPARING PX 7.16.

10:12:56  2          THE COURT:  .16, OKAY.

10:12:58  3          MR. PRICE:  THAT'S THE GALAXY ACE.

10:12:59  4          THE COURT:  OKAY.

10:13:00  5          MR. PRICE:  AND PX 7.19, THAT'S THE GALAXY S 1900.

10:13:09  6     I9000, I'M SORRY.

10:13:11  7          THE COURT:  IS THAT WHAT THIS DEMONSTRATIVE IS?

10:13:12  8          MR. PRICE:  WHAT WE'RE DOING IS USING TRIAL DIRECTOR

10:13:15  9     JUST TO PULL OUT THOSE TWO PICTURES AND PUT THEM SIDE BY SIDE.

10:13:18  10         THE COURT:  WHICH PICTURES?  THERE ARE AT LEAST --

10:13:21  11         MR. PRICE:  IT'S THE PICTURE ON JX .19 --

10:13:24  12         THE COURT:  EIGHT PICTURES ON .16, AND THERE ARE AT

10:13:27  13    LEAST EIGHT PICTURES ON .19.  SO WHICH PICTURES ARE YOU

10:13:31  14    SHOWING?

10:13:31  15         MR. PRICE:  I'M SHOWING ON YOUR MONITOR NOW, YOUR

10:13:34  16    HONOR, WE CAN SHOW, IT'S THIS PICTURE OF THE I9000, PX 19, AND

10:13:40  17    THEN IF WE GO TO PX 16 --

10:13:44  18         THE COURT:  OKAY.  SO THE COMPARISON OF THE GALAXY

10:13:47  19    ACE AND THE GALAXY S I9000 WAS EXCLUDED.

10:13:51  20         MS. WIGMORE:  AND THAT WAS SDX 8.

10:13:52  21         THE COURT:  THAT WAS SDX 8.  THAT'S RIGHT.

10:13:55  22         MR. PRICE:  YOUR HONOR, THAT WAS FOR OPENING BECAUSE

10:13:57  23    IT SAID NOT ACCUSED.  AND WHAT YOUR HONOR SAID WE COULD DO IS

10:14:02  24    WE CAN PUT INTO EVIDENCE --

10:14:03  25         THE COURT:  NO, NO, NO, NO.  THIS IS YOUR ORIGINAL.

BALL CROSS BY MR. PRICE

10:14:06  1    IT DOESN'T SAY NON-ACCUSED.  IT JUST SAYS COMPARISON OF GALAXY

10:14:11  2    ACE AND GALAXY S I9000.  THIS IS WHAT YOU SUBMITTED AND WHAT I

10:14:15  3    RULED ON (INDICATING).

10:14:17  4         MR. PRICE:  I'M SORRY.  AND, YOUR HONOR, ON THE

10:14:19  5    RECORD, YOU SAID WE COULD SAY NON-INFRINGING ALTERNATIVE AND

10:14:23  6    NON-ACCUSED.  AND HERE WE'RE AT TRIAL NOW WHERE WE HAVE THE

10:14:26  7    PHYSICAL EXHIBITS IN AND THE EXPERT HAS TOLD US THAT AS PART OF

10:14:30  8    PROMINENCE, TO DETERMINE PROMINENCE, YOU COMPARE THE INFRINGING

10:14:36  9    PHONES TO OTHER PHONE DESIGNS THAT ARE NOT INFRINGING.

10:14:41  10        THAT'S PART OF HIS PROMINENCE ANALYSIS.

10:14:44  11        SO WHAT WE'RE ASKING TO DO IS TO COMPARE -- DO THE

10:14:49  12   COMPARISON HE SAID SHOULD BE DONE, BUT HE LEFT OUT

10:14:55  13   NON-INFRINGING ALTERNATIVES AND YOU SAID WE COULD USE

10:14:58  14   NON-INFRINGING ALTERNATIVES.

10:15:00  15        AND YESTERDAY YOUR HONOR --

10:15:02  16        THE COURT:  OKAY.  CAN YOU GIVE ME JUST ONE MINUTE

10:15:04  17   AND STOP TALKING, PLEASE.  I JUST NEED TO FOCUS ON THIS.

10:15:08  18        MR. PRICE:  YES.

10:15:09  19        THE COURT:  I NEED TO FOCUS ON THIS.

10:15:11  20        MR. PRICE:  I'LL BE GLAD TO.

10:15:12  21        THE COURT:  I'LL GIVE YOU A MINUTE TO HEARD JUST AS

10:15:15  22   SOON AS I CAN FIND THE RATIONALE FOR THE RULINGS.  JUST GIVE ME

10:15:19  23   ONE MINUTE, PLEASE.

10:15:20  24        (PAUSE IN PROCEEDINGS.)

10:15:41  25        THE COURT:  ALL RIGHT.  I SUSTAINED THE OBJECTION

10:15:52  1      AND -- UNDER 403.

10:16:00  2           AND NOW YOU WANT TO DO IT AGAIN.

10:16:03  3               MR. PRICE:  AND, YOUR HONOR, YOU EXPLAINED --

10:16:05  4               THE COURT:  NO, I DIDN'T.  IT JUST SAYS SUSTAINED.

10:16:07  5               MR. PRICE:  BUT YESTERDAY IN COURT, YOUR HONOR, WE

10:16:09  6      HAD A DISCUSSION ON THIS.  AND YOU EXPLAINED THAT YOU SUSTAINED

10:16:14  7      THE SLIDE BECAUSE THEY SEEMED LIKE INFRINGEMENT SLIDES, AND

10:16:21  8      MR. LEE WAS OBJECTING TO COMPARING THE TWO PHONES SIDE BY SIDE.

10:16:27  9           AND WHAT YOU RULED, YOUR HONOR, IS, WELL -- YOU SAID, "WHY

10:16:32 10      ARE YOU --" THIS IS AT PAGE 331.  "WELL, WHY ARE YOU MENTIONING

10:16:36 11      PREVIOUS VERDICTS?  YOU CAN'T -- YOU JUST -- YOU JUST SAY IT'S

10:16:40 12      A NON-INFRINGING ALTERNATIVE, I DON'T THINK SAMSUNG OR APPLE

10:16:43 13      CAN OBJECT BECAUSE I SAID IT'S PERMISSIBLE FOR THAT PURPOSE."

10:16:47 14           AND THEN MR. QUINN SAID, "THE POINT IS THAT --"

10:16:50 15               THE COURT:  WAS HE TRYING TO GET THIS SLIDE IN EVEN

10:16:52 16      THOUGH I SUSTAINED THE OBJECTION TO IT?  IS THAT WHAT YOU'RE

10:16:54 17      TELLING ME THAT HE WAS DOING THAT YESTERDAY, SAME THING THAT

10:16:57 18      YOU'RE TRYING TO DO TODAY?

10:16:58 19               MR. PRICE:  NO, I'M NOT TRYING TO GET THAT SLIDE IN.

10:17:00 20               THE COURT:  YES, YOU ARE.  YOU'RE SAYING THERE'S A

10:17:04 21      REINCARNATION OF JX 8 THAT YOU'RE SAYING, AND YOU'RE SAYING IN

10:17:07 22      TRIAL I'M ALLOWED TO DO MORE THAN IN OPENING.  THAT'S THE

10:17:10 23      RATIONALE I'M HEARING.  I SAID UNDER 403, I DO THINK THIS IS

10:17:14 24      TRYING TO UNDERMINE THE INFRINGEMENT VERDICT.  THAT'S WHY

10:17:16 25      THAT'S -- I MEAN, YOU HAVE THE OBJECTS IN.  WHY CAN'T YOU HAVE

| | |
|---|---|
| 10:17:20 | 1 |
| 10:17:25 | 2 |
| 10:17:28 | 3 |
| 10:17:29 | 4 |
| 10:17:32 | 5 |
| 10:17:33 | 6 |
| 10:17:36 | 7 |
| 10:17:37 | 8 |
| 10:17:40 | 9 |
| 10:17:43 | 10 |
| 10:17:47 | 11 |
| 10:17:50 | 12 |
| 10:17:51 | 13 |
| 10:17:54 | 14 |
| 10:17:57 | 15 |
| 10:17:59 | 16 |
| 10:18:03 | 17 |
| 10:18:05 | 18 |
| 10:18:08 | 19 |
| 10:18:13 | 20 |
| 10:18:15 | 21 |
| 10:18:15 | 22 |
| 10:18:17 | 23 |
| 10:18:20 | 24 |
| 10:18:22 | 25 |

1   HIM ACTUALLY USE THE ACTUAL PHONES AND MAKE THE COMPARISONS?

2           MR. PRICE:  BECAUSE THEY CAN'T SEE THE PHONES FROM

3   THAT DISTANCE.

4           THE COURT:  THEY WILL HAVE THEM IN THE JURY ROOM.

5           MR. PRICE:  WHAT THE --

6           THE COURT:  YOU CAN HAVE THEM PASSED AROUND.  JURORS

7   CAN LOOK AT THEM THEMSELVES.

8           MR. PRICE:  WE TOLD THE JURY, WITH THE COURT'S

9   PERMISSION --

10          THE COURT:  YOU'RE ALLOWED TO TALK ABOUT

11  NON-INFRINGING ALTERNATIVES, YES.

12          MR. PRICE:  YOUR HONOR --

13          THE COURT:  LET ME -- YOU KNOW WHAT?  I WANT A COPY

14  OF THAT SLIDE.  DO YOU HAVE A COPY OF THAT SLIDE?  I'D LIKE TO

15  TAKE A RECESS.  I WANT TO TAKE A LOOK AT IT.  I WANT TO COMPARE

16  IT TO WHAT I HAVE.  I HAVE YOUR ORIGINAL.  I'LL HAVE WHAT WAS

17  USED YESTERDAY.

18          MR. PRICE:  YOUR HONOR, WE CAN GIVE YOU PX 7, WE'RE

19  BLOWING UP ONE FROM PX -- LET ME GET THE EXACT --

20          MS. WIGMORE:  YOUR HONOR, COULD WE HAVE THE SLIDE PUT

21  UP?

22          THE COURT:  YOU KNOW, IT WOULD BE HELPFUL -- I

23  THOUGHT YOU ALL WERE EXCHANGING DEMONSTRATIVES AND THAT YOU'RE

24  DOING A WHOLE HIGH PRIORITY OBJECTION PROCESS TO

25  DEMONSTRATIVES.  SO THE FACT THAT YOU'RE CREATING

BALL CROSS BY MR. PRICE

10:18:24  1    DEMONSTRATIVES ON THE SLIDE -- ON THE FLY THAT THE OTHER SIDE

10:18:27  2    HASN'T SEEN THAT WE HAVEN'T BEEN ABLE TO LITIGATE AND ARE

10:18:29  3    HAVING TO LITIGATE WHILE THE JURY IS WAITING IS NOT IDEAL.

10:18:32  4         THE WHOLE POINT WAS TO EXCHANGE EVERYTHING IN ADVANCE, TO

10:18:35  5    MEET AND CONFER IN ADVANCE, TO TRY TO NARROW THE DISPUTES IN

10:18:38  6    ADVANCE, AND THEN HAVE ME RULE ON THE ONES THAT YOU NEED ME TO

10:18:42  7    RULE ON.

10:18:42  8         SO YOU'RE MAKING ME -- HOW MANY OTHERS HAVE YOU MADE ON

10:18:45  9    THE FLY TODAY THAT YOU'RE GOING TO SANDBAG AND JUST BRING UP

10:18:49  10   DURING TRIAL?  BECAUSE I WOULD APPRECIATE IF YOU COULD DO THE

10:18:51  11   EXCHANGE SO WE COULD DO -- WE HAVE THIS WHOLE HIGH PRIORITY

10:18:55  12   OBJECTION PROCESS, WE STAY LATE EVERY NIGHT TO GIVE YOU RULINGS

10:19:00  13   EVERY NIGHT FOR THE NEXT DAY.  WE'RE TRYING TO MAKE THIS A

10:19:03  14   STREAMLINED PROCESS.

10:19:04  15        SO DO YOU HAVE ANY OTHERS THAT YOU HAVE NOT EXCHANGED?

10:19:07  16        MR. PRICE:  PX 7 HAS BEEN EXCHANGED, HAS BEEN

10:19:10  17   DESIGNATED.

10:19:10  18        THE COURT:  I'M SORRY.  YOU'RE NOT HEARING ME.  DO

10:19:12  19   YOU HAVE ANY OTHER DEMONSTRATIVES THAT HAVE NOT BEEN EXCHANGED?

10:19:15  20        MR. PRICE:  WE PLAN TO DO PULLOUTS, AS WE DID WITH

10:19:18  21   THE PATENT AND AS THE PARTIES AGREED --

10:19:20  22        THE COURT:  SO YOU HAVE MORE.  HOW MANY MORE ARE YOU

10:19:22  23   ANTICIPATING?

10:19:23  24        MR. PRICE:  WE'RE GOING TO PULL OUT FROM OTHER

10:19:25  25   DOCUMENTS, AS APPLE HAS, THAT AREN'T CONSIDERED SLIDES OR

10:19:28  1    DEMONSTRATIVES.  THEY HAVEN'T BEEN BETWEEN THE PARTIES.

10:19:30  2         PX 7 WE'RE GOING TO MOVE INTO EVIDENCE.  THAT'S BEEN IN

10:19:33  3    EVIDENCE IN PRIOR TRIALS.

10:19:34  4         THE COURT:  OKAY.  I'M SORRY.  YOU'RE NOT ANSWERING

10:19:36  5    MY QUESTION.

10:19:37  6         HOW MANY OTHER NEW DEMONSTRATIVES DO YOU INTEND TO USE

10:19:40  7    TODAY?  IS THERE ANY WAY THAT WE COULD DO AN EXCHANGE SO I

10:19:43  8    COULD TRY TO RULE ON THEM DURING THE BREAK?  THAT'S MY ONLY

10:19:46  9    REASON FOR ASKING, SO THAT WE DON'T HAVE THIS JURY WAITING.

10:19:49  10        MR. PRICE:  IF YOUR HONOR IS SAYING FOR

10:19:51  11   DEMONSTRATIVES, WHAT ARE WE GOING TO PULL OUT VISUALLY, FROM

10:19:54  12   PX 7, THAT'S GOING TO BE 7.16, THE SAYS; 7.19, WHICH IS THE --

10:20:02  13        THE COURT:  OKAY.  WAIT ONE SECOND.  7.19, ARE THOSE

10:20:05  14   EXHIBITS?  I DON'T -- I JUST DIDN'T THINK THERE WERE EXHIBITS

10:20:09  15   THAT HAD DECIMALS.  I THOUGHT THE DECIMALS WERE DEMONSTRATIVES.

10:20:13  16        MR. PRICE:  THIS IS ALL THE INFRINGING PHONES.  APPLE

10:20:15  17   PUT THIS INTO EVIDENCE IN PRIOR TRIALS.  WE'RE GOING TO MOVE IT

10:20:19  18   INTO EVIDENCE THROUGH THIS WITNESS.  IT'S .19 IS THE PAGE

10:20:22  19   NUMBER.

10:20:24  20        THE COURT:  WHAT, WHAT -- I'M SORRY.  JUST WHAT ARE

10:20:26  21   THE EXHIBITS?  WHAT ARE THE EXHIBITS?

10:20:30  22        MR. QUINN:  YOUR HONOR, CAN I SHOW YOU IT?

10:20:33  23        THE COURT:  I'M REALLY -- I'M LESS CONCERNED ABOUT

10:20:34  24   THE EXHIBITS BECAUSE I'M THE EXHIBITS ARE ON AN EXHIBIT LIST

10:20:38  25   AND THERE'S NO SURPRISE.  WE KNOW WHAT THE EXHIBITS ARE.  I

BALL CROSS BY MR. PRICE                                                579

10:20:41   1    WANT TO KNOW WHAT NEW DEMONSTRATIVES ARE YOU CREATING THAT YOU

10:20:44   2    WILL BE TRYING TO INTRODUCE DURING TRIAL SO WE CAN SEE IF I CAN

10:20:47   3    GET A RULING ON THEM WITHOUT HAVING TO DO THIS IN FRONT OF THE

10:20:49   4    JURY?

10:20:50   5            MR. PRICE:  SURE.  AND WHAT I'M SAYING IS PX 7 ON

10:20:53   6    PAGE 16, WHICH WE'RE GOING TO MOVE IN, WE'RE GOING TO CREATE --

10:20:59   7    WE'RE GOING TO BLOW UP THE GALAXY ACE, YOU CAN SEE IT ON THE

10:21:05   8    MONITOR, AND PX 7.19, IT'S PX 7, PAGE 19, AN EXHIBIT.

10:21:09   9            THE COURT:  YOU DON'T HAVE ANY OF THESE ALREADY?  YOU

10:21:12   10   MUST HAVE PLANNED THEM OUT LAST NIGHT AT LEAST.

10:21:14   11           MR. PRICE:  NO, WE HAVE THE --

10:21:15   12           THE COURT:  YOU'RE TELLING ME NO ONE ON YOUR TEAM

10:21:18   13   KNOWS WHAT YOU'RE BLOWING UP TODAY?

10:21:19   14           MR. PRICE:  I'M TELLING YOU WHAT WE'RE DOING, YOUR

10:21:21   15   HONOR.  THIS IS HOW WE'VE ALWAYS DONE IT.  THIS IS AN EXHIBIT.

10:21:24   16   WE'RE JUST BLOWING IT UP.

10:21:26   17       LET ME TELL YOU THE OTHER ONES SO THAT YOU HAVE A COMPLETE

10:21:28   18   RECORD FOR THIS CROSS-EXAMINATION, AND THAT IS PX 7, THESE ARE

10:21:33   19   ALL FROM PX --

10:21:34   20           THE COURT:  YOU KNOW WHAT, IF YOU DON'T WANT TO DO IT

10:21:36   21   THIS WAY, LET'S DO IT THE OTHER WAY WHERE WE TELL THE JURY, I'M

10:21:39   22   SORRY, THERE'S A DISPUTE THAT HAS NOT BEEN RESOLVED, PLEASE

10:21:42   23   STEP OUTSIDE.  IF YOU PREFER THAT WAY, THAT'S OKAY WITH ME.

10:21:45   24   NO, NO, NO, LET'S DO IT THAT WAY.  YOU SAID IT'S

10:21:47   25   CROSS-EXAMINATION, WHICH I'M SORRY, LET'S NOT DO IT THAT WAY

BALL CROSS BY MR. PRICE

10:21:52  1    THEN.  WE'LL DO IT EVERY TIME THAT YOU BRING UP SOMETHING THAT

10:21:54  2    HASN'T BEEN RESOLVED, I'LL JUST ASK THEM TO STEP OUTSIDE.

10:21:57  3    THAT'S WHAT WE CAN DO.

10:21:59  4             MR. PRICE:  YOUR HONOR, I'M --

10:22:00  5             THE COURT:  LET ME RULE ON THIS ONE NOW, PLEASE.  SO

10:22:02  6    YOU WANT ME TO CHECK ON A COMPARISON OF PX 7 WHERE YOU'RE

10:22:06  7    PULLING OUT A PHONE ON PX 7.

10:22:08  8             MR. QUINN:  PAGE 7 -- PAGE 16.

10:22:10  9             THE COURT:  CORRECT?  PAGE -- PX 7.18.

10:22:17  10            MR. PRICE:  16, IT'S PAGE 16.

10:22:19  11            THE COURT:  AND 7.16, CORRECT.

10:22:22  12            MR. PRICE:  YES.  AND 7.19.

10:22:24  13            THE COURT:  OKAY.

10:22:25  14            MR. PRICE:  AND THERE'S ONLY ONE OTHER COMPARISON

10:22:27  15   WE'RE GOING TO DO IN CROSS-EXAMINATION, WHICH WILL IMMEDIATELY

10:22:30  16   COME AFTER THAT.

10:22:31  17            THE COURT:  BUT .16 IS COMBINING WITH .18; CORRECT?

10:22:34  18            MR. PRICE:  .19, YOUR HONOR.

10:22:36  19            THE COURT:  OKAY.  YOU'RE NOT USING .18?  THAT'S THE

10:22:38  20   GALAXY S I9000.

10:22:41  21            MR. PRICE:  I THINK BOTH .18 AND .19 ARE THE GALAXY

10:22:45  22   ACE.

10:22:45  23            THE COURT:  OKAY.  SO YOU DON'T WANT TO USE .18, ONLY

10:22:50  24   .16 AND .19; CORRECT?

10:22:51  25            MR. PRICE:  CORRECT.

BALL CROSS BY MR. PRICE

10:22:52  1          THE COURT:  AND THAT'S THE ONE YOU WANT TO DO A

10:22:54  2     COMPARISON OF?

10:22:55  3          MR. PRICE:  AND THE ONE RIGHT AFTER THAT.

10:22:58  4          THE COURT:  YOU DON'T HAVE TO TELL ME.  LET'S NOT DO

10:23:00  5     THE CROSS-EXAMINATION.  LET'S DO IT IN FRONT OF THE JURY.  I

10:23:03  6     WAS JUST TRYING TO ASK TO SEE IF WE CAN AVOID DOING THIS IN

10:23:06  7     FRONT OF THE JURY, BUT IF YOU'D PREFER NOT, THEN I'M OKAY WITH

10:23:10  8     THAT.  I'M OKAY WITH THAT.

10:23:12  9          LET'S TAKE A TEN MINUTE BREAK, PLEASE.

10:23:14  10         THE CLERK:  COURT'S IN RECESS.

10:23:26  11     (RECESS FROM 10:23 A.M. UNTIL 10:39 A.M.)

10:39:32  12         THE COURT:  ONE JUROR IS IN THE RESTROOM.

10:39:35  13     (PAUSE IN PROCEEDINGS.)

10:40:23  14         MR. MUELLER:  YOUR HONOR, MAY WE BRING THE WITNESS

10:40:26  15     BACK TO THE STAND?

10:40:27  16         THE COURT:  YES, PLEASE.

10:40:29  17         MR. MUELLER:  THANK YOU.

10:40:34  18     (PAUSE IN PROCEEDINGS.)

10:40:56  19     (JURY IN AT 10:40 A.M.)

10:41:19  20         THE COURT:  ALL RIGHT.  GOOD MORNING.  WELCOME BACK.

10:41:22  21     PLEASE TAKE A SEAT.

10:41:23  22         THE OBJECTION'S OVERRULED.

10:41:25  23         GO AHEAD, PLEASE.  TIME IS 10:41.

10:41:32  24         MR. PRICE:  THANK YOU, YOUR HONOR.

10:41:32  25     Q.  SO, MR. BALL, WE WERE SHOWING YOU JX 7, PAGE 16, THE

10:41:37  1    GALAXY ACE, WHICH YOU SAID IS NON-INFRINGING; CORRECT?

10:41:42  2    A.   UM -- I -- I UNDERSTAND THAT THAT WASN'T FOUND TO

10:41:50  3    INFRINGE.

10:41:51  4         MR. PRICE:  AND, YOUR HONOR, I'M GOING TO MOVE

10:41:52  5    EXHIBIT, JOINT EXHIBIT 1030, WHICH IS THE ACTUAL PHYSICAL

10:41:57  6    EXHIBIT, INTO EVIDENCE, AND I'M GOING TO SHOW IT TO THE

10:42:00  7    WITNESS.

10:42:00  8         THE COURT:  ALL RIGHT.  ANY OBJECTION?

10:42:01  9         MS. WIGMORE:  NO OBJECTION.

10:42:02  10         THE COURT:  IT'S ADMITTED.

10:42:05  11      (JOINT EXHIBIT 1030 WAS ADMITTED IN EVIDENCE.)

10:42:05  12         THE COURT:  GO AHEAD, PLEASE.

10:42:05  13   BY MR. PRICE:

10:42:06  14   Q.   I'M GOING TO HAND BACK TO YOU, THIS HAS BEEN PRE-ADMITTED,

10:42:10  15   JX 1007, WHICH IS THE GALAXY S I9000, AND IF WE CAN SHOW

10:42:18  16   PX 7.19.

10:42:19  17      YOUR HONOR, WE MOVE PLAINTIFF'S EXHIBIT 7 INTO EVIDENCE.

10:42:22  18         MS. WIGMORE:  NO OBJECTION.

10:42:22  19         THE COURT:  OKAY.  AND THE ONE THAT YOU JUST SHOWED

10:42:24  20   HIM NOW WAS 1007; CORRECT?

10:42:27  21         MR. PRICE:  YES, YOUR HONOR.

10:42:27  22         THE COURT:  OKAY.  THE I9000.  AND PX 7 IS ADMITTED.

10:42:33  23      (PLAINTIFF'S EXHIBIT 7 WAS ADMITTED IN EVIDENCE.)

10:42:34  24         THE COURT:  GO AHEAD, PLEASE.

10:42:35  25   BY MR. PRICE:

BALL CROSS BY MR. PRICE

10:42:36   1    Q.   AND IF YOU -- YOU CAN HOLD THESE UP AND I'M TALKING ABOUT

10:42:42   2    THE D'677 PATENT IN YOUR ANALYSIS OF PROMINENCE, YOU TALKED

10:42:52   3    ABOUT -- YOU TALKED ABOUT WHETHER THE CLAIMED DESIGN SERVED TO

10:42:56   4    DIFFERENTIATE THE INFRINGING PHONE FROM OTHER PHONE DESIGNS

10:43:00   5    THAT ARE NOT INFRINGING; RIGHT?

10:43:03   6         THAT TELLS YOU WHAT PROMINENCE IS WITH RESPECT TO THE

10:43:06   7    PATENT; RIGHT?  THAT'S WHAT YOUR REPORT SAID?

10:43:12   8    A.   I -- I DON'T UNDERSTAND -- I'M NOT UNDERSTANDING THE LAST

10:43:17   9    QUESTION YOU SAID ABOUT PROMINENCE.

10:43:20  10    Q.   OKAY.  IN YOUR REPORT, IN YOUR SECTION ON PROMINENCE --

10:43:25  11    A.   YES.

10:43:26  12    Q.   -- YOU SAID ONE THING YOU DID TO DETERMINE THE PROMINENCE

10:43:28  13    WAS TO LOOK AT THE CLAIMED DESIGN, AND YOU SAID THE CLAIMED

10:43:31  14    DESIGN, THAT CLAIMED DESIGN IS THE D'677, RIGHT, WHICH IS

10:43:35  15    INFRINGED BY THE I9000; RIGHT?

10:43:39  16    A.   YES.

10:43:39  17    Q.   AND YOU SAID YOU LOOK AT THE CLAIMED DESIGN, YOU SAY IT

10:43:43  18    SERVES TO DIFFERENTIATE THE INFRINGING PHONES FROM OTHER PHONE

10:43:48  19    DESIGNS; RIGHT?  THAT'S WHAT YOU SAID?

10:43:51  20    A.   I THINK THAT'S REASONABLE.  YEAH, I AGREE WITH THAT.

10:43:57  21    Q.   SO IN DOING THAT ANALYSIS, YOU COMPARED THE INFRINGING

10:44:00  22    DESIGN TO FLIP PHONES AND CANDY PHONES; RIGHT?

10:44:02  23    A.   NO.

10:44:03  24    Q.   YOU DIDN'T COMPARE IT TO THIS GALAXY ACE, DID YOU?

10:44:06  25    A.   NOT SPECIFICALLY.

584

```
10:44:07   1      Q.   SO LOOKING AT THOSE TWO, IN TERMS OF PROMINENCE THEN, IN

10:44:12   2      TERMS OF THE D'677, HOW DOES THE INFRINGING DESIGN

10:44:18   3      DIFFERENTIATE ITSELF FROM THE NON-INFRINGING DESIGN?

10:44:22   4      A.   I HAVEN'T DONE AN INFRINGEMENT ANALYSIS.  I WASN'T ASKED

10:44:26   5      TO DO THAT.

10:44:28   6      Q.   FOR PROMINENCE, YOU SAID YOU -- THE CLAIMED DESIGN SERVES

10:44:32   7      TO DIFFERENTIATE -- THAT MEANS MAKE A DIFFERENCE, RIGHT?

10:44:35   8      A.   YEAH.

10:44:36   9      Q.   -- THE INFRINGING PHONES FROM OTHER PHONE DESIGNS WHICH

10:44:42  10      ARE NOT INFRINGING; RIGHT?

10:44:45  11      A.   YEAH.

10:44:45  12      Q.   OKAY.  SO I'D LIKE YOU TO TELL ME WHAT -- HOW, AS A

10:44:48  13      DESIGNER, YOU -- YOU KNOW, IS THAT A PROMINENT DIFFERENCE?

10:44:52  14      A.   IS WHAT A PROMINENT DIFFERENCE?

10:44:55  15      Q.   THE CLAIMED DESIGN VERSUS THE NON-INFRINGING DESIGN.

10:44:59  16      A.   WELL, I MEAN, I'M A LITTLE CONFUSED BECAUSE THE -- BOTH OF

10:45:08  17      THESE PHONES HAVE A DESIGN FOR A FRONT THAT IS VERY PROMINENT

10:45:14  18      RELEVANT TO THE WHOLE PHONE DESIGN.

10:45:16  19      Q.   HERE'S MY QUESTION.  MY QUESTION IS, IS THERE A PROMINENT

10:45:20  20      DIFFERENCE?  IN YOUR REPORT, YOU SAID COMPARING THE CLAIMED

10:45:25  21      PHONE TO OTHERS IS IMPORTANT.  IS THIS A PROMINENT DIFFERENCE?

10:45:28  22               MS. WIGMORE:  OBJECTION, YOUR HONOR.  RELEVANCE, 403.

10:45:31  23               THE WITNESS:  SURE, I CAN TELL THESE PHONES APART.

10:45:33  24               THE COURT:  EXCUSE ME ONE SECOND, PLEASE.

10:45:35  25               THE WITNESS:  OH, I'M SORRY.
```

10:45:38  1          MR. PRICE:  IT'S PART OF HIS ANALYSIS.

10:45:40  2          THE COURT:  OVERRULED.  GO AHEAD, PLEASE.  YOU CAN

10:45:42  3   ANSWER.

10:45:42  4   BY MR. PRICE:

10:45:43  5   Q.  IS THERE A PROMINENT DIFFERENCE BETWEEN THE INFRINGING AND

10:45:47  6   NON-INFRINGING DESIGN WITH RESPECT TO THE D'677?

10:45:49  7   A.  WELL, THERE'S A DIFFERENCE.  I CAN TELL THESE PHONES APART

10:45:53  8   FROM ONE OTHER.

10:45:55  9   Q.  BUT I'M ASKING IS THERE A PROMINENT DIFFERENCE BETWEEN

10:45:57 10   THOSE TWO PHONES?  IS THAT WHAT YOU'RE TELLING THE JURY?

10:46:00 11   A.  I DON'T THINK I SAID THAT.

10:46:01 12   Q.  OKAY.  BECAUSE YOU CAN'T SAY THAT; RIGHT?

10:46:03 13   A.  I SAID THAT THE DESIGN IN THE INFRINGING PHONES IS VERY

10:46:06 14   PROMINENT IN THOSE PHONE DESIGNS.

10:46:08 15   Q.  BUT MY QUESTION IS DEALING WITH THE PART IN YOUR REPORT

10:46:12 16   THAT DOES A COMPARISON.  YOU CAN'T TELL ME THAT PART -- THAT

10:46:16 17   DIFFERENCE BETWEEN THOSE TWO PHONES IS PROMINENT FOR THE

10:46:19 18   PROMINENCE FACTOR; CORRECT?

10:46:22 19   A.  WELL, I CAN -- THERE MAY NOT BE A PROMINENT DIFFERENCE

10:46:26 20   BETWEEN THESE PHONES, BUT THAT'S A DIFFERENT QUESTION TO ADD

10:46:31 21   WHETHER THE INFRINGING DESIGN IS PROMINENT IN THE INFRINGING

10:46:34 22   PHONES.

10:46:35 23   Q.  AND ANSWERING THAT QUESTION, IN YOUR REPORT, YOU SAID YOU

10:46:37 24   COMPARED THE INFRINGING PHONES TO NON-INFRINGING DESIGNS.  THAT

10:46:41 25   WAS IN YOUR REPORT; RIGHT?

BALL CROSS BY MR. PRICE

10:46:43  1    A.   YES, I SAID THAT, YOU KNOW, THESE DESIGNS HELP IDENTIFY

10:46:48  2    WHAT THE PHONE LOOKS LIKE, AND IN IDENTIFYING IT, THAT MEANS

10:46:53  3    YOU'RE LOOKING AT PHONES THAT MAY NOT BE THEM AND YOU'RE

10:46:57  4    TELLING WHICH ONES THESE PHONES ARE.

10:46:59  5    Q.   IF YOU LOOK AT THE ONE THAT WAS RULED TO BE INFRINGING,

10:47:02  6    JX 1027, YOU WERE SHOWING THE PHONE AND SAYING THAT YOU -- THAT

10:47:07  7    WHEN THE PHONE IS ON, YOU'RE LOOKING AT IT, YOU'RE LOOKING AT

10:47:10  8    THE FRONT SCREEN; RIGHT?  DO YOU REMEMBER SAYING THAT TO THE

10:47:14  9    JURY?

10:47:14  10   A.   I SAID WHEN YOU USE THE PHONE, YOU'RE LOOKING AT THE

10:47:18  11   FRONT.

10:47:18  12   Q.   AND WHEN YOU USE THAT PHONE AND LOOKING AT THE FRONT, HOW

10:47:23  13   MUCH TIME DO YOU THINK THE PERSON -- THE CONSUMER LOOKS AT THE

10:47:26  14   PHONE WHEN IT'S NOT ON VERSUS WHEN IT IS ON?

10:47:29  15   A.   I THINK THAT --

10:47:33  16   Q.   DO YOU HAVE ANY INTERACTING --

10:47:34  17   A.   -- WHEN THEY'RE INTERACTING -- I DIDN'T DO AN ANALYSIS OF

10:47:38  18   HOW MUCH TIME THE SCREEN IS ON OR OFF.

10:47:40  19   Q.   WHEN THE SCREEN IS ON, THAT FRONT DESIGN DOES NOT INFRINGE

10:47:45  20   THE '677 PATENT, DOES IT, BECAUSE IT'S NOT A BLACK FACE?

10:47:50  21   A.   I DON'T AGREE.

10:47:51  22   Q.   YOU UNDERSTAND THAT THE '677 PATENTS COVERS A BLACK FACE.

10:47:58  23   THAT'S WHAT YOU TOLD THE JURY; RIGHT?

10:48:00  24   A.   YES.

10:48:00  25   Q.   NOW, LET ME TALK ABOUT ANOTHER PART OF PROMINENCE.  WE

BALL CROSS BY MR. PRICE

10:48:07  1    TALKED -- WE'VE BEEN TALKING ABOUT VISUAL PROMINENCE, AND THAT

10:48:11  2    IS THE FEATURES.

10:48:12  3        AND YOU AGREE THAT THESE SAMSUNG PHONES DO HAVE FEATURES,

10:48:15  4    SUCH AS TAKING PICTURES, TAKING VIDEO, SENDING TEXTS.  SO THEY

10:48:22  5    HAVE A NUMBER OF FEATURES; CORRECT?

10:48:24  6    A.   YES.

10:48:24  7    Q.   AND THEY ADVERTISE THOSE FEATURES EXTENSIVELY; RIGHT?

10:48:28  8    A.   SURE.

10:48:30  9    Q.   AND THE PATENTS DO NOT COVER THOSE PROMINENT FEATURES, DO

10:48:34 10    THEY?

10:48:34 11    A.   NO.

10:48:35 12    Q.   AND IF WE LOOK AT EXHIBIT -- BACK TO THE FACTORS, AND LOOK

10:48:47 13    TO FACTOR 3, CONCEPTUALLY DISTINCT, YOU WERE TESTIFYING ABOUT

10:48:53 14    CONCEPTUAL DISTINCTNESS; RIGHT?

10:48:55 15    A.   YES, DESIGN PATENTS COVER THE ORNAMENTAL DESIGN OF A

10:48:58 16    PRODUCT, SO I THINK WE'RE TALKING ABOUT ORNAMENTAL QUALITIES

10:49:01 17    HERE, YES.

10:49:02 18    Q.   BUT A CONCEPT IS AN IDEA, RIGHT?  THAT'S THE TEXTBOOK

10:49:06 19    DEFINITION OF A CONCEPT; RIGHT?

10:49:08 20    A.   A CONCEPT IS -- YEAH, IT'S A DESIGN -- A DESIGNER'S

10:49:14 21    CONCEPT MIGHT BE A PROPOSED DESIGN THAT ISN'T FULLY DEVELOPED

10:49:17 22    THAT WE'RE SHOWING A CLIENT AND THERE MIGHT BE A LOT OF

10:49:21 23    CONCEPTS THAT WE GO THROUGH.

10:49:22 24    Q.   A BATTERY IS A DIFFERENT CONCEPT THAN A GLASS FACE; RIGHT?

10:49:26 25    A.   SURE.

BALL CROSS BY MR. PRICE

588

10:49:27  1    Q.   A VIDEO CAMERA IS A DIFFERENT CONCEPT THAN A GLASS FACE;

10:49:31  2    CORRECT?

10:49:31  3    A.   YES.

10:49:32  4    Q.   A CAMERA IS A DIFFERENT CONCEPT THAN A GLASS FACE;

10:49:36  5    CORRECT?

10:49:36  6    A.   YES.

10:49:37  7    Q.   THERE ARE MANY, MANY INVENTIONS IN THESE PHONES THAT ARE

10:49:39  8    DIFFERENT CONCEPTS, DIFFERENT IDEAS THAN A BLACK GLASS FACE;

10:49:44  9    CORRECT?

10:49:44 10    A.   YES.

10:49:48 11    Q.   AND WITH RESPECT THEN TO THE PHYSICAL PART HERE, WE WERE

10:49:51 12    TALKING ABOUT THE PHYSICAL RELATIONSHIP, AND I WANT TO LOOK AT

10:49:55 13    THE WORDS IN THE TEST.  YOU SEE IT SAYS WHETHER THE DESIGN

10:50:00 14    PERTAINS TO A COMPONENT THAT A USER OR SELLER CAN PHYSICALLY

10:50:05 15    SEPARATE FROM THE PRODUCT AS A WHOLE?  DO YOU SEE THAT?

10:50:13 16    A.   YES.

10:50:13 17    Q.   AND THE FRONT BEZEL, YOU KNOW THAT A SELLER CAN PHYSICALLY

10:50:16 18    SEPARATE THAT FROM THE SAMSUNG PHONES?  YOU KNOW THAT FOR A

10:50:19 19    FACT?

10:50:19 20    A.   I KNOW THAT THEY CAN BE TAKEN APART, YES.

10:50:21 21    Q.   AND YOU KNOW THAT THE GLASS FACE CAN PHYSICALLY BE

10:50:23 22    SEPARATED BY THE SELLER; CORRECT?

10:50:25 23    A.   SOME PEOPLE THAT MIGHT SELL THEM MIGHT BE ABLE TO DO IT,

10:50:32 24    YEAH.

10:50:33 25         I THINK THEY MAY BE ABLE TO TAKE THEM APART, YES.

10:50:36  1    Q.   AND THE FACTOR DOESN'T SAY IS IT HARD OR DO YOU NEED

10:50:40  2    SPECIAL TOOLS.  IT ASKS WHETHER OR NOT THE SELLER CAN DO THAT.

10:50:43  3    THAT'S WHAT THE FACTOR SAYS; CORRECT?

10:50:45  4    A.   YEAH, I THINK SO.

10:50:49  5         BUT I THINK IT'S IMPORTANT TO LOOK AT PHYSICAL

10:50:51  6    RELATIONSHIP BECAUSE IF IT'S IN A PHYSICAL RELATIONSHIP THAT

10:50:55  7    REQUIRES SPECIALIZED TOOLS THAT MAY BE HARD TO GET OR WHATNOT,

10:50:59  8    I THINK THAT FALLS WITHIN THE PHYSICAL RELATIONSHIP PART.

10:51:02  9    Q.   IT'S IMPORTANT, BUT THAT'S NOT WHAT THAT SAYS HERE.  IT

10:51:05 10    JUST SAYS WHETHER A SELLER CAN PHYSICALLY SEPARATE IT; RIGHT?

10:51:08 11    A.   NO, BUT IT'S INCLUDED SO IT'S ALL PART OF THAT PHYSICAL

10:51:11 12    RELATIONSHIP.

10:51:12 13    Q.   AND THEN YOU SAY WHETHER THE DESIGN IS EMBODIED IN A

10:51:19 14    COMPONENT THAT IS MANUFACTURED SEPARATELY FROM THE REST OF THE

10:51:22 15    PRODUCT.

10:51:26 16         THE GLASS FACE IS MANUFACTURED SEPARATELY; CORRECT.

10:51:28 17    A.   YEAH, I THINK ALL OF THE PARTS ARE MANUFACTURED SEPARATELY

10:51:31 18    AND ASSEMBLED INTO A SMARTPHONE, SURE.

10:51:33 19    Q.   AND THEN IF THE COMPONENT CAN BE SOLD SEPARATELY.  THE

10:51:36 20    GLASS FACE IS SOLD SEPARATELY; CORRECT?

10:51:38 21    A.   I HAVEN'T SEEN EVIDENCE OF THAT.

10:51:39 22    Q.   IT'S SOLD TO SAMSUNG?

10:51:41 23    A.   OH, YOU MEAN FROM THE SUPPLIER?  OR --

10:51:44 24    Q.   YEAH.

10:51:45 25    A.   OH, OKAY.

10:51:46  1    Q.    AND THE BEZEL WAS SOLD SEPARATELY?  IT'S SOLD TO SAMSUNG;

10:51:49  2    RIGHT?

10:51:50  3    A.    I -- I SUPPOSE OR SAMSUNG MIGHT MAKE THEM.  I DON'T KNOW.

10:51:56  4    Q.    AND SOLD TO THE REPAIR CENTERS BEZELS ARE SOLD TO?

10:52:02  5    A.    I -- SEPARATELY?  I DON'T KNOW THAT.

10:52:06  6    Q.    DID YOU TRY AND LOOK INTO THAT TO SEE WHETHER OR NOT THE

10:52:11  7    FACT THAT THE COMPONENTS WERE SOLD IN THE MARKET SEPARATELY?

10:52:14  8    A.    YES, I TRIED TO, YEAH.

10:52:24  9           MR. PRICE:  JUST ONE SECOND, YOUR HONOR.

10:52:25  10       (PAUSE IN PROCEEDINGS.)

10:52:37  11   BY MR. PRICE:

10:52:40  12   Q.    DOES THE FRONT FACE NEED TO BE BLACK TO SHOW THE D'677

10:52:47  13   PATENT?

10:52:47  14   A.    I DON'T KNOW.  I'D HAVE TO SEE A PHONE THAT IS THAT.

10:52:54  15   Q.    NO, I'M ASKING YOU ABOUT THE PATENT.  YOU SAW WHAT THE

10:52:56  16   PATENT CLAIMS.  DOES THE PHONE HAVE TO BE BLACK IN ORDER TO

10:53:00  17   SHOW THE D'677 PATENT?  DOES THAT FRONT FACE HAVE TO BE BLACK?

10:53:06  18   A.    I DON'T KNOW.  I'D HAVE TO LOOK AT THE PHONE.  I MEAN,

10:53:08  19   WE'D HAVE TO -- AT THAT POINT, I WOULD APPLY AN INFRINGEMENT

10:53:12  20   TEST AND THAT SAYS, YOU KNOW, SUBSTANTIALLY SIMILAR IN THE EYES

10:53:17  21   OF A -- THERE'S A SPECIFIC TEST FOR INFRINGEMENT THAT WOULD

10:53:22  22   APPLY.

10:53:23  23   Q.    SO YOU DON'T KNOW WHETHER IT HAS TO BE BLACK?

10:53:25  24   A.     I THINK THAT IT -- BLACK IS AN IMPORTANT ASPECT OF THAT

10:53:31  25   PATENT AND THERE ARE OTHER ASPECTS OF THAT PATENT, AND THEY ALL

BALL REDIRECT BY MS. WIGMORE

10:53:35   1    CONTRIBUTE TO THE OVERALL DESIGN.  AND THERE MAY BE AN

10:53:39   2    INFRINGING PRODUCT THAT HAS SOME OF THOSE, AND I GUESS YOU'D

10:53:42   3    HAVE TO DO AN INFRINGEMENT ANALYSIS TO DETERMINE WHETHER THE

10:53:46   4    BLACKNESS GREATLY INFORMS THE OVERALL LOOK OR WHETHER THERE ARE

10:53:50   5    OTHER THINGS.

10:53:51   6        I JUST HAVEN'T BEEN ASKED TO DO THAT ANALYSIS.

10:53:53   7    Q.   CAN WE AGREE THAT THE D'087 PATENT, THE BEZEL PATENT, THAT

10:53:57   8    THE FACE DOESN'T HAVE TO BE BLACK?  THE PICTURES THERE ARE

10:54:00   9    WHITE?

10:54:00  10    A.   THERE WAS NO DESIGNATION IN THAT PATENT FOR THE BLACK.

10:54:03  11            MR. PRICE:  THANK YOU.

10:54:04  12        THANK YOU, YOUR HONOR.

10:54:04  13            THE COURT:  ALL RIGHT.  THE TIME IS 10:54.

10:54:07  14        GO AHEAD, PLEASE.

10:54:09  15                        **REDIRECT EXAMINATION**

10:54:10  16    BY MS. WIGMORE:

10:54:10  17    Q.   MR. BALL, DO YOU RECALL MR. PRICE SUGGESTING THAT YOU MADE

10:54:14  18    ASSUMPTIONS THAT THE ARTICLE OF MANUFACTURE HAD TO BE A

10:54:20  19    PRODUCT?

10:54:20  20    A.   YES.

10:54:21  21    Q.   DID YOU MAKE ANY ASSUMPTIONS ABOUT THAT BEFORE YOU APPLIED

10:54:24  22    THE FOUR FACTOR TEST?

10:54:26  23    A.   NO.

10:54:30  24    Q.   NOW, DO YOU HAVE YOUR EXPERT REPORT IN FRONT OF YOU THAT

10:54:34  25    MR. PRICE SHOWED YOU?  IT WAS IN A SEPARATE BINDER.

BALL REDIRECT BY MS. WIGMORE



10:54:37   1      A.    YES.

10:54:38   2      Q.    YOUR OPENING REPORT?

10:54:39   3      A.    YES.

10:54:39   4      Q.    AND DO YOU RECALL MR. PRICE READING THE LAST SENTENCE OF

10:54:43   5      PARAGRAPH 186, THE PART ABOUT COMPARING TO OTHER PHONES?

10:54:49   6      A.    YES.

10:54:50   7      Q.    COULD YOU PLEASE READ, SO THAT THE COURT REPORTER CAN

10:54:54   8      RECORD IT, THE SENTENCES IN THAT SAME PARAGRAPH THAT PRECEDE

10:54:58   9      THE ONE SENTENCE THAT MR. PRICE READ?

10:55:01  10      A.    ALL OF THE PARAGRAPH?

10:55:05  11      Q.    YES, THE PART HE DID NOT READ.

10:55:07  12      A.    "THE D'087 DESIGN, INCLUDING THE OVERALL SHAPE OF THE

10:55:12  13      FRONT FACE OF THE PHONE, INCLUDING THE RELATIVE PROPORTIONS,

10:55:18  14      STRAIGHT EDGES AND ROUNDED CORNERS, THE GLASS FRONT FACE

10:55:21  15      EXTENDING FROM EDGE TO EDGE OF THE DEVICE, AND THE SURROUNDING

10:55:24  16      BEZEL, WHICH EXTENDS AROUND THE EDGE OF THE SIDES, IS VERY

10:55:28  17      PROMINENT IN THESE THREE INFRINGING SAMSUNG PHONES AND

10:55:32  18      CONTRIBUTES GREATLY TO THEIR OVERALL APPEARANCE.  THESE ARE

10:55:35  19      PRIMARY DESIGN FEATURES THAT ARE NOTICED QUICKLY WHEN LOOKING

10:55:39  20      AT THE PRODUCTS AND CONTRIBUTE SIGNIFICANTLY TO THE LOOK OF THE

10:55:43  21      INFRINGING PHONES AS A WHOLE.  THE CLAIMED DESIGN INFLUENCES

10:55:48  22      THE SHAPE AND SIZE OF OTHER PROPORTIONS OF THE INFRINGING

10:55:52  23      PHONES, FOR EXAMPLE, BY DEFINING THE GENERAL SHAPE OF THE

10:55:56  24      DEVICE."

10:55:57  25      Q.    THANK YOU.

10:55:59  1          MR. BALL, COULD YOU JUST BRIEFLY TURN TO PARAGRAPH 192 OF

10:56:02  2   YOUR REPORT.

10:56:05  3          THIS IS THE PARAGRAPH THAT ADDRESSES THE D'677 AS OPPOSED

10:56:09  4   TO THE D'087; IS THAT RIGHT?

10:56:11  5   A.   YES.

10:56:11  6   Q.   AND IS THERE SIMILAR LANGUAGE IN THIS PARAGRAPH AS TO WHAT

10:56:14  7   YOU JUST READ?

10:56:15  8   A.   YES.

10:56:16  9   Q.   AND IS THAT SOMETHING THAT MR. PRICE READ WHEN HE FOCUSSED

10:56:19 10   YOUR ATTENTION ON THAT PARAGRAPH?

10:56:21 11   A.   NO.

10:56:23 12   Q.   CAN WE PULL UP PDX 5.3, THE FOUR FACTOR TEST.

10:56:36 13          I WANT TO FOCUS YOUR ATTENTION ON FACTOR 3.

10:56:39 14          DO YOU RECALL MR. PRICE ASKING YOU WHETHER THE DESIGN IS

10:56:43 15   CONCEPTUALLY DISTINCT FROM OTHER PARTS OF THE PHONE, LIKE THE

10:56:47 16   BATTERY?

10:56:48 17   A.   I REMEMBER THAT, YES.

10:56:49 18   Q.   COULD YOU READ FOR US, PLEASE, WHAT FACTOR 3 REQUIRES YOU

10:56:52 19   TO ANALYZE?

10:56:54 20   A.   "WHETHER THE DESIGN IS CONCEPTUALLY DISTINCT FROM THE

10:56:57 21   PRODUCT AS A WHOLE."

10:56:59 22   Q.   AND WHAT IS THE PRODUCT WAS A WHOLE THAT YOU COMPARED THE

10:57:03 23   DESIGN TO IN THIS CONTEXT?

10:57:08 24   A.   THE PRODUCT AS A WHOLE WAS THE SMARTPHONE.

10:57:10 25          MS. WIGMORE:  THANK YOU.  NO FURTHER QUESTIONS.

```
10:57:11   1              THE COURT:  ALL RIGHT.  THE TIME IS 10:57.

10:57:14   2         ANY RECROSS?

10:57:16   3              MR. PRICE:  NO MORE TIME, YOUR HONOR.

10:57:18   4              THE COURT:  ALL RIGHT.  AND IS THIS WITNESS EXCUSED

10:57:21   5      NOT SUBJECT TO RECALL, OR SUBJECT TO RECALL?

10:57:25   6              MR. LEE:  SUBJECT TO RECALL, YOUR HONOR.

10:57:26   7              THE COURT:  ALL RIGHT.

10:57:28   8         THEN YOU HAVE NOT COMPLETED YOUR TRIAL TESTIMONY, BUT YOU

10:57:30   9      ARE DONE FOR NOW.

10:57:31  10              THE WITNESS:  THANK YOU.

10:57:32  11              THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

10:57:33  12         CALL YOUR NEXT WITNESS, PLEASE.

10:57:35  13              MR. LEE:  YOUR HONOR, APPLE CALLS DR. SUSAN KARE.

10:57:38  14      MR. MUELLER WILL DO THE EXAMINATION.

10:57:55  15         (PAUSE IN PROCEEDINGS.)

10:57:59  16              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

10:58:01  17         **(PLAINTIFF'S WITNESS, SUSAN KARE, WAS SWORN.)**

10:58:01  18              THE WITNESS:  YES.

10:58:06  19              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

10:58:08  20         AND ONCE YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR

10:58:11  21      FULL NAME FOR THE RECORD.

10:58:12  22              THE WITNESS:  MY NAME IS SUSAN KARE.  S-U-S-A-N,

10:58:18  23      K-A-R-E.

10:58:21  24              THE COURT:  ALL RIGHT.  GIVE ME ONE MINUTE.  TIME IS

10:58:23  25      10:58.  GO AHEAD, PLEASE.
```

10:58:25  1              MR. MUELLER:  THANK YOU, YOUR HONOR.

10:58:26  2                      **DIRECT EXAMINATION**

10:58:27  3      BY MR. MUELLER:

10:58:28  4      Q.   DR. KARE, COULD YOU PLEASE INTRODUCE YOURSELF TO THE

10:58:31  5      LADIES AND GENTLEMEN OF THE JURY?

10:58:32  6      A.   HI.  MY NAME IS SUSAN KARE.  I'M A GRAPHIC DESIGNER.  I

10:58:36  7      LIVE IN SAN FRANCISCO.  I HAVE THREE SONS AND ONE AUSTRALIAN

10:58:40  8      SHEPPARD.

10:58:41  9      Q.   DR. KARE, YOU'RE A GRAPHIC DESIGNER.  COULD YOU EXPLAIN TO

10:58:45  10     THE JURY, WHAT IS A GRAPHIC DESIGNER?

10:58:47  11     A.   IT'S A PERSON WHO MAKES THEIR LIVING BY SOLVING VISUAL AND

10:58:55  12     DESIGN PROBLEMS, TYPICALLY WORKING WITH COLOR, TYPE, LAYOUT.

10:59:03  13     Q.   AND IF WE COULD PUT PDX 6.2 UP ON THE SCREEN.

10:59:13  14          WHAT DO WE SEE HERE?

10:59:16  15     A.   THESE ARE, AS IT SAYS, TYPES OF GRAPHIC DESIGN.  REALLY

10:59:19  16     THE KINDS OF PROJECTS YOU WORK ON WHEN YOU'RE A GRAPHIC

10:59:22  17     DESIGNER MAKING LOGOS, POSTERS, PRODUCT DESIGN GRAPHICS, ICONIC

10:59:35  18     WAYFINDING FOR PUBLIC SPACES, INFO GRAPHICS LIKE CHARTS, AND

10:59:40  19     ALSO INTERACTIVE DESIGN FOR DEVICES.

10:59:42  20     Q.   AND DO YOU SPECIALIZE IN ANY FORM OF GRAPHIC DESIGN

10:59:46  21     YOURSELF?

10:59:48  22     A.   I CREATE TRADITIONAL GRAPHIC DESIGN, BUT MY FOCUS HAS

10:59:52  23     REALLY BEEN ON INTERACTIVE DIGITAL DESIGN.

10:59:55  24     Q.   SO WE'LL COME RIGHT BACK TO THAT IN A MOMENT, BUT IF YOU

10:59:59  25     COULD FIRST JUST SUMMARIZE YOUR EDUCATIONAL BACKGROUND?

11:00:03   1        A.   I GRADUATED FROM MOUNT HOLYOKE COLLEGE SUMMA CUM LAUDE,

11:00:07   2    AND THEN I WENT TO GRADUATE SCHOOL AT NEW YORK UNIVERSITY WHERE

11:00:10   3    I EARNED A MASTER'S AND A PH.D.

11:00:13   4        Q.   SO YOU MENTIONED YOU FOCUS ON INTERACTIVE GRAPHIC DESIGN.

11:00:16   5    WHEN DID YOU BEGIN WORKING ON INTERACTIVE GRAPHIC DESIGN?

11:00:19   6        A.   I BEGAN WORKING IN INTERACTIVE DESIGN WHEN I JOINED APPLE

11:00:25   7    IN 1982.

11:00:27   8        Q.   SO LET'S SET THE STAGE, IF WE COULD.  AND IF WE COULD

11:00:30   9    PLEASE PUT UP PDX 6.3.

11:00:35  10        DR. KARE, WHAT DO WE SEE HERE?

11:00:37  11        A.   THIS IS A PERSONAL COMPUTER MADE BY IBM PROBABLY EARLY

11:00:42  12    '80S.

11:00:42  13        Q.   AND COULD YOU -- DO YOU UNDERSTAND THE TERM "USER

11:00:47  14    INTERFACE"?

11:00:48  15        A.   YES.

11:00:49  16        Q.   WHAT IS A USER INTERFACE?

11:00:50  17        A.   IT'S A WAY THAT PEOPLE INTERACT WITH MANUFACTURES.

11:00:57  18        Q.   AND DID THIS PARTICULAR COMPUTER HAVE A USER INTERFACE?

11:01:00  19        A.   IT DID.

11:01:01  20        Q.   AND WHAT DO WE SEE HERE IN THE CALLOUT BOX ACROSS THE

11:01:06  21    FRONT OF THE COMPUTER?

11:01:07  22        A.   THIS COMPUTER HAS A COMMAND LINE INTERFACE.  REALLY THE

11:01:14  23    WAY THAT YOU COULD GET THIS COMPUTER TO DO THINGS WAS BY TYPING

11:01:18  24    IN COMPUTER LANGUAGE COMMANDS LIKE THAT IS PROBABLY MOVING A

11:01:28  25    FILE.

11:01:28   1    Q.   SO WORDS AND NUMBERS?

11:01:29   2    A.   YES.

11:01:30   3    Q.   OKAY.

11:01:31   4    A.   ALL TEXT.

11:01:35   5    Q.   ALL TEXT.  NOW, IF WE COULD PLEASE GO TO THE NEXT SLIDE,

11:01:38   6    PDX 6.5.  WHAT DO WE SEE HERE?

11:01:41   7    A.   THAT IS AN EARLY, ALSO EARLY '80S MACINTOSH COMPUTER WITH

11:01:46   8    A MAC PAINT ON THE SCREEN.

11:01:50   9    Q.   DID THIS COMPUTER ALSO HAVE A USER INTERFACE?

11:01:53  10    A.   YES.

11:01:53  11    Q.   WHAT TYPE OF USER INTERFACE DID THE ORIGINAL MAC HAVE?

11:01:57  12    A.   THE FIRST MAC HAD A GRAPHICAL USER INTERFACE.  YOU COULD

11:02:06  13    ACCOMPLISH THINGS BY MOVING THE MOUSE, WHICH MOVED A CURSOR ON

11:02:10  14    THE SCREEN, TO INTERACT WITH DIFFERENT GRAPHICS.

11:02:13  15    Q.   AND IF WE CAN ADVANCE A SLIDE, WHAT DO WE SEE HERE AROUND

11:02:18  16    THE SIDE OF THE MAC?

11:02:19  17    A.   THOSE ARE TYPICAL ICONS FROM THE MACINTOSH COMPUTER THAT

11:02:28  18    LET PEOPLE PERFORM DIFFERENT TASKS.

11:02:30  19    Q.   SO JUST AS AN EXAMPLE, WHAT WAS THE TRASH CAN GRAPHIC ON

11:02:35  20    THE BOTTOM RIGHT USED FOR?

11:02:36  21    A.   THAT WAS A SYMBOL FOR DELETE SO PEOPLE WOULD BE ABLE TO

11:02:42  22    JUST DRAG FILES TO THE TRASH CAN TO ACCOMPLISH GETTING RID OF

11:02:48  23    SOMETHING.

11:02:48  24    Q.   AND THAT DISK, IS THAT A FLOPPY DISK IN THE TOP RIGHT

11:02:53  25    THERE?

KARE DIRECT BY MR. MUELLER

11:02:53  1     A.    YEAH.   IT'S A -- IT IS A PRETTY CLEAR SYMBOL OF THE DISKS

11:03:01  2     THAT FIT INTO THE SLOT ON THE FRONT OF THAT COMPUTER THAT HELD

11:03:05  3     ALL YOUR DATA AT THE TIME.

11:03:09  4     Q.    NOW, HOW DOES A GRAPHICAL USER INTERFACE LIKE THE ONE WE

11:03:13  5     SEE HERE COMPARE TO THAT TEXT INTERFACE THAT YOU SHOWED US ON

11:03:17  6     THE IBM COMPUTER?

11:03:18  7     A.    WELL, I KNOW, HAVING WORKED ON THIS, THAT THE IDEA WAS

11:03:23  8     THAT BY USING GRAPHICS, IT MADE COMPUTERS MORE ACCESSIBLE TO

11:03:29  9     REGULAR PEOPLE WHO WOULDN'T BE ENGINEERS AND KNOW PROGRAMMING

11:03:34  10    LANGUAGES, AND IT JUST MADE IT FRIENDLIER AND EASIER TO USE.

11:03:42  11    Q.    DR. KARE, WHO DEVELOPED OR CREATED THESE ICONS THAT WE SEE

11:03:46  12    HERE FOR THE ORIGINAL MACINTOSH?

11:03:48  13    A.    I DESIGNED THOSE.

11:03:49  14    Q.    AND, IN FACT, WHO CREATED ALL OF THE ICONS FOR THE

11:03:52  15    ORIGINAL MAC?

11:03:53  16    A.    THAT WAS PART OF MY JOB AT APPLE.

11:03:56  17    Q.    AND WHAT WAS YOUR POSITION AT APPLE?

11:03:58  18    A.    I WAS A MEMBER OF THE MACINTOSH SOFTWARE GROUP, BUT I WAS

11:04:02  19    THE MACINTOSH ARTIST AND GRAPHIC DESIGNER.

11:04:07  20    Q.    FOR HOW LONG DID YOU WORK AT APPLE?

11:04:09  21    A.    I WORKED AT APPLE FROM 1982 UNTIL 1986.

11:04:13  22    Q.    AND COULD YOU SUMMARIZE FOR THE JURY YOUR WORK EXPERIENCE

11:04:17  23    SINCE LEAVING APPLE?

11:04:19  24    A.    I LEFT APPLE, I JOINED STEVE JOBS AT NEXT, WHICH WAS

11:04:24  25    ANOTHER COMPUTER COMPANY MAKING A DEVICE; AND AFTER A FEW YEARS

11:04:29  1       THERE, I SET UP MY OWN SUSAN KARE DESIGN, AND I WORKED ON ALL

11:04:35  2       KINDS OF -- ALL KINDS OF DEVICES AND GRAPHICS PROJECTS FOR A

11:04:40  3       NUMBER OF DIFFERENT COMPANIES.

11:04:41  4       Q.   AND IF WE GO TO PDX 6.6.  ARE THESE SOME EXAMPLES OF SOME

11:04:47  5       OF THE COMPANIES YOU'VE WORKED FOR?

11:04:49  6       A.   A FEW OF THEM, YES.

11:04:50  7       Q.   AND MANY OTHERS AS WELL?

11:04:52  8       A.   YES, LARGE AND SMALL.

11:04:53  9       Q.   AND WHAT IS THE FOCUS OF YOUR WORK FOR THESE TYPES OF

11:04:57  10      COMPANIES OVER THE LAST 30 YEARS?

11:04:59  11      A.   YOU KNOW, THE DESIGN PROBLEM VARIED FROM COMPANY TO

11:05:05  12      COMPANY AND PROJECT TO PROJECT.

11:05:07  13           BUT I DESIGNED A GREAT DEAL OF PARTS, GRAPHIC PARTS OF

11:05:15  14      GRAPHICAL USER INTERFACES AND ICONS AND OTHER -- OTHER GRAPHICS

11:05:21  15      THAT HELPED PEOPLE INTERACT AND USE DEVICES.

11:05:25  16      Q.   SO IF WE GO TO PDX 6.6, WHAT DO WE SEE HERE, DR. KARE?

11:05:30  17      A.   THESE ARE JUST SOME GRAPHIC EXAMPLES FROM A FACEBOOK

11:05:38  18      PROJECT AND A PAYPAL PROJECT THAT ARE ICON VISUALS I DESIGNED.

11:05:42  19      Q.   OVER THE COURSE OF YOUR CAREER, HOW MANY ICONS HAVE YOU

11:05:47  20      DESIGNED FOR GRAPHICAL USER INTERFACES?

11:05:49  21      A.   I DON'T HAVE AN EXACT LIST, BUT DEFINITELY THOUSANDS OF

11:05:58  22      ICONS.

11:06:00  23      Q.   HAVE YOU WON ANY AWARDS?

11:06:03  24      A.   I -- I HAVE BEEN LUCKY TO HAVE BEEN RECOGNIZED BY MY PEERS

11:06:11  25      PERIODICALLY.

11:06:12  1    Q.   AND IF WE COULD PUT PDX 6.8 ON THE SCREEN, AND, DR. KARE,

11:06:17  2    I'LL ASK YOU TO BE A LITTLE BIT IMMODEST.

11:06:20  3         ON THE LEFT-HAND SIDE HERE WE SEE A MEDAL, AIGA.  CAN YOU

11:06:26  4    EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY, WHAT IS THAT

11:06:28  5    MEDAL?

11:06:29  6    A.   I GOT THAT ABOUT A MONTH AGO, AND I'M GRATEFUL.

11:06:33  7         IT WAS AN AWARD FROM THE AMERICAN INSTITUTE OF GRAPHIC

11:06:38  8    ARTS.  IT'S KNOWN AS KIND OF A LIFETIME ACHIEVEMENT AWARD FOR

11:06:44  9    GRAPHIC DESIGN, AND I WAS EXCITED AND HONORED TO GET THAT

11:06:52  10   BECAUSE IT'S BEEN GIVEN SINCE THE '20S AND A LOT OF MY DESIGN

11:06:56  11   HEROS ARE ON THAT RECIPIENT LIST.

11:06:59  12   Q.   IN THE MIDDLE HERE WE SEE DESIGN WEEK.  WHAT IS DESIGN

11:07:03  13   WEEK?

11:07:04  14   A.   IT'S A LONDON BASED WEBSITE FOR ALL KINDS OF DESIGN

11:07:11  15   PRACTITIONERS WITH PRETTY CLOSE TO 600,000 FOLLOWERS.

11:07:17  16   Q.   AND DID DESIGN WEEK DESCRIBE YOU, IN THEIR WORDS, AS

11:07:22  17   AMONG, QUOTE, "THE MOST INFLUENTIAL FEMALE DESIGNERS OF THE

11:07:26  18   LAST CENTURY," END QUOTE?

11:07:28  19   A.   YES.  AND AGAIN, NICE, NICE TO BE RECOGNIZED BECAUSE THE

11:07:35  20   OTHER NINE PEOPLE WERE DESIGNERS I ADMIRED.

11:07:39  21   Q.   AND THEN FINALLY, DR. KARE, ON THE RIGHT HERE WE SEE A

11:07:43  22   "WIRED" MAGAZINE ARTICLE TITLED "MEET THE WOMAN WHO LAUNCHED A

11:07:48  23   BILLION CLICKS."

11:07:49  24        IS THAT ABOUT YOU?

11:07:51  25   A.   YES.

11:07:51   1          MR. MUELLER:  AT THIS POINT, YOUR HONOR, WE OFFER

11:07:53   2   DR. KARE AS AN EXPERT IN THE DESIGN OF GRAPHICAL USER

11:07:56   3   INTERFACES FOR ELECTRONIC DEVICES.

11:07:59   4          THE COURT:  ANY OBJECTION OR DO YOU WANT TO VOIR DIRE

11:08:03   5   HERE?

11:08:05   6          MR. QUINN:  NO, YOUR HONOR.

11:08:05   7          THE COURT:  SO CERTIFIED.  GO AHEAD, PLEASE.

11:08:07   8   BY MR. MUELLER:

11:08:10   9   Q.  DURING KARE, HAVE YOU BEEN RETAINED AS AN EXPERT IN THIS

11:08:12   10  CASE?

11:08:12   11  A.  YES.

11:08:13   12  Q.  NOW, YOU UNDERSTAND THERE'S A SET OF SAMSUNG PHONES THAT

11:08:15   13  HAVE BEEN FOUND TO INFRINGE APPLE'S D'305 PATENT.

11:08:20   14      DO YOU UNDERSTAND THAT?

11:08:20   15  A.  YES.

11:08:21   16  Q.  WHAT WERE YOU ASKED TO DO WITH RESPECT TO THE D'305 PATENT

11:08:26   17  AND THE INFRINGING SAMSUNG PHONES?

11:08:28   18  A.   I WAS ASKED TO CONSIDER THE FOUR FACTORS PROVIDED BY

11:08:35   19  JUDGE KOH AND GIVE MY OPINION AS TO -- TO DETERMINE THE ARTICLE

11:08:49   20  OF MANUFACTURE TO WHICH THE D'305 WAS APPLIED IN THE CASE OF

11:08:54   21  THE 13 PHONES THAT INFRINGE THE D'305.

11:09:00   22  Q.  WERE YOU COMPENSATED FOR YOUR TIME?

11:09:02   23  A.  YES.

11:09:02   24  Q.  DOES YOUR COMPENSATION DEPEND IN ANY WAY ON THE OPINIONS

11:09:06   25  YOU'RE GIVING OR THE OUTCOME IN THIS CASE?

11:09:08  1     A.   NO.

11:09:08  2     Q.   NOW, DO YOU UNDERSTAND THAT THE LADIES AND GENTLEMEN OF

11:09:13  3     THE JURY ARE GOING TO BE DECIDING WHAT THE ARTICLE OF

11:09:17  4     MANUFACTURE IS FOR THE '305 PATENT AS APPLIED TO THE INFRINGING

11:09:22  5     SAMSUNG PHONES?

11:09:24  6     A.   YES.

11:09:24  7     Q.   DO YOU UNDERSTAND NO ONE HAS DECIDED THAT YET, NOT HER

11:09:28  8     HONOR, NOT THE PATENT OFFICE, THAT'S FOR THE JURY?

11:09:30  9     A.   YES.

11:09:31  10    Q.   WHAT LEGAL TEST DID YOU APPLY IN ANALYZING THE QUESTION OF

11:09:34  11    THE ARTICLE OF MANUFACTURE TO WHICH SAMSUNG APPLIED THE '305

11:09:39  12    DESIGN?

11:09:40  13    A.   THE FOUR FACTOR TEST.

11:09:42  14    Q.   SO LET'S GO TO PDX 6.9.  ARE THESE THE FOUR FACTORS THAT

11:09:47  15    HER HONOR HAS GIVEN US?

11:09:49  16    A.   YES.

11:09:50  17    Q.   AND THESE ARE THE FACTORS THAT YOU APPLIED IN THIS CASE;

11:09:53  18    DR. KARE?

11:09:54  19    A.   YES.

11:09:54  20    Q.   LET'S GO TO PDX 6.10.

11:10:00  21         AND WHAT DO WE SEE HERE, DR. KARE?

11:10:02  22    A.   I UNDERSTAND THAT THESE ARE THE 13 PHONES THAT INFRINGE --

11:10:13  23    THAT A JURY FOUND IN 2012 TO INFRINGE APPLE'S D'305 DESIGN

11:10:21  24    PATENT.

11:10:21  25    Q.   AND I'M JUST GOING TO READ THE LIST SO THE RECORD IS

KARE DIRECT BY MR. MUELLER                                             603

11:10:23   1    CLEAR.  THE GALAXY S I9000; THE VIBRANT; THE CAPTIVATE; THE

11:10:29   2    EPIC 4G; THE FASCINATE; THE MESMERIZE; GEM; INDULGE; THE

11:10:37   3    CONTINUUM; THE GALAXY S SHOWCASE; S 4G; DROID CHARGE; AND THE

11:10:45   4    INFUSE 4G.

11:10:46   5        ARE THOSE THE INFRINGING SAMSUNG PHONES THAT YOU ANALYZED?

11:10:50   6    A.   YES.

11:10:51   7    Q.   WHAT EVIDENCE DID YOU CONSIDER IN APPLYING THE FOUR FACTOR

11:10:55   8    TEST TO THESE PHONES?

11:10:56   9    A.   YOU KNOW, I TRIED TO GET EVERY SCRAP OF INFORMATION THAT I

11:11:03   10   COULD FIND OR WAS PROVIDED, STARTING WITH THE PATENT ITSELF,

11:11:11   11   DEPOSITION TESTIMONY FROM THE TWO APPLE EMPLOYEES WHO ACTUALLY

11:11:16   12   DESIGNED THE ART IN THE '305, SOME PAGES OF INTERNAL DESIGN

11:11:23   13   MEETINGS AT SAMSUNG RELEVANT TO WHEN THESE -- THE GRAPHICS ON

11:11:37   14   THESE PHONES, NEWSPAPERS AND MAGAZINES AND ONLINE ARTICLES

11:11:41   15   ABOUT THE INTRODUCTION OF THE IPHONE.

11:11:51   16   Q.   AND AFTER REVIEWING ALL THAT EVIDENCE, WHAT CONCLUSION DID

11:11:55   17   YOU DRAW AS TO THE ARTICLE OF MANUFACTURE TO WHICH SAMSUNG

11:11:57   18   APPLIED THE CLAIMED DESIGN?

11:11:58   19   A.   TO ME, NO QUESTION, IN EACH CASE THE D'305 WAS APPLIED TO

11:12:07   20   EACH OF THOSE FINISHED PHONES, THE WHOLE PHONE.

11:12:10   21   Q.   SO LET'S GO THROUGH THIS STEP BY STEP, AND LET'S START

11:12:13   22   WITH FACTOR 1, WHICH STATES, "THE SCOPE OF THE DESIGN CLAIMED

11:12:21   23   IN THE PLAINTIFF'S PATENT, INCLUDING THE DRAWING AND THE

11:12:23   24   WRITTEN DESCRIPTION."

11:12:25   25       DID YOU CONSIDER THAT FACTOR, DR. KARE?

11:12:27  1    A.   YES.

11:12:27  2    Q.   SO PLEASE TURN TO JX 1042, WHICH HAS BEEN ADMITTED.  THIS

11:12:32  3    IS TAB 1 IN YOUR BINDER.  THIS IS THE '305 PATENT.  DO YOU HAVE

11:12:40  4    THAT IN FRONT OF YOU?

11:12:41  5    A.   YES.

11:12:41  6    Q.   AND, DR. KARE, IF YOU COULD, WHAT IS CLAIMED IN THIS

11:12:44  7    PATENT IN THE SECTION TITLED "CLAIM"?

11:12:46  8    A.   IT SAYS, "THE ORNAMENTAL DESIGN FOR A GRAPHICAL USER

11:12:51  9    INTERFACE FOR A DISPLAY SCREEN, OR PORTION THEREOF, AS SHOWN

11:12:55 10    AND DESCRIBED."

11:12:59 11    Q.   DO YOU UNDERSTAND THAT HER HONOR HAS ALSO CONSTRUED THIS

11:13:03 12    CLAIM?

11:13:03 13    A.   YES.

11:13:04 14    Q.   DID YOU APPLY HER HONOR'S CONSTRUCTION?

11:13:06 15    A.   YES.

11:13:07 16    Q.   LET'S LOOK AT THE FIGURES IN THIS PATENT, FIGURES 1 AND 2.

11:13:11 17         AND BEFORE WE DO, CAN YOU JUST GO BACK TO THE CLAIM FOR A

11:13:13 18    MOMENT?

11:13:18 19         AND I JUST WANT TO FOCUS YOUR LANGUAGE ON -- YOUR

11:13:21 20    ATTENTION, IF I COULD, ON THE WORDS "GRAPHICAL USER INTERFACE."

11:13:27 21         AGAIN, WHAT HAVE YOU SPENT YOUR CAREER WORKING ON?

11:13:30 22    A.   A LOT OF DESIGN FOR GRAPHICAL USER INTERFACES.

11:13:33 23    Q.   AND WHAT IS A GRAPHICAL USER INTERFACE?

11:13:35 24    A.   SO THAT TERM MEANS A LOT TO ME BECAUSE WHATEVER ELSE IS IN

11:13:44 25    THERE, HERE'S A BIG CLUE THAT THIS DESIGN PATENT IS ABOUT

11:13:50  1     SOMETHING THAT LETS A USER INTERACT WITH A DEVICE.

11:13:54  2     Q.   SO WITH THAT IN MIND, LET'S LOOK AT FIGURE 1 AND 2.

11:14:00  3          AND IF YOU COULD PLEASE, JUST DESCRIBE TO THE LADIES AND

11:14:02  4     GENTLEMEN OF THE JURY, WHAT DO WE SEE HERE?  WHAT IS THE

11:14:04  5     DESIGN?

11:14:05  6     A.   IT'S A DESIGN THAT'S, LIKE, A VERTICAL RECTANGLE WITH A

11:14:13  7     NUMBER OF COLORFUL TILES THAT ARE SHADED A BIT TO MAKE THEM

11:14:22  8     LOOK THREE DIMENSIONAL, KIND OF PRESSABLE, AND -- POTENTIALLY

11:14:27  9     PRESSABLE.

11:14:28 10          AND THERE ARE ICONS ON THEM THAT DIFFERENTIATE EACH FROM

11:14:32 11     THE OTHER AND A WORD OF TEXT UNDERNEATH TO DESCRIBE THE APPS.

11:14:41 12          AT THE BOTTOM THERE'S A SEPARATE AREA SO THAT TREATS FOUR

11:14:48 13     OF THESE TILES WITH ICONS DIFFERENTLY.

11:14:51 14     Q.   AND WHAT IS THAT REGION CALLED IN THAT DESIGN?

11:14:54 15     A.   IT'S A DOCK, KIND OF INDICATING THOSE MIGHT BE FIXED AS

11:14:58 16     OPPOSED TO MOVING FROM SCREEN-TO-SCREEN SHOTS.

11:15:03 17     Q.   NOW, AFTER STUDYING THE PATENT, WHAT DID THE SCOPE OF THE

11:15:06 18     CLAIMED DESIGN ON THE ONE HAND INDICATE TO YOU ABOUT THE

11:15:10 19     INTENDED ARTICLE OF MANUFACTURE ON THE OTHER HAND?

11:15:13 20     A.   WELL, I'VE LEARNED THAT THE PATENT IS WHAT WE SEE AND THE

11:15:21 21     ARTICLE OF MANUFACTURE IS WHAT IT'S APPLIED TO.

11:15:24 22          SO I REALLY WAS LOOKING FOR CLUES HERE IN BOTH THE CLAIM

11:15:30 23     AND IN THIS ILLUSTRATION ABOUT WHAT THE ARTICLE OF MANUFACTURE

11:15:35 24     MIGHT BE.

11:15:37 25          AND IT'S PRETTY EASY TO SEE.  IN THIS, IN THIS FIGURE,

11:15:45   1        THERE'S A LOT -- THERE'S A PHONE AND THERE'S A LOT OF VISUAL

11:15:50   2   CLUES TO TYPICAL APPLICATIONS THAT YOU COULD INTERACT WITH A

11:15:58   3   PHONE TO DO, LIKE THE CAMERA AND THE CALENDAR AND TEXTING AND

11:16:04   4   STOCKS.

11:16:06   5        SO YOU KNOW THE ART WAS APPLIED TO A SERIES OF PHONES THAT

11:16:15   6   WERE FOUND TO INFRINGE.

11:16:16   7        SO -- BUT EVEN JUST IN THE PATENT ITSELF, YOU SEE A LOT OF

11:16:23   8   INDICATORS ABOUT WHAT THE ARTICLE OF MANUFACTURE MIGHT BE.

11:16:27   9   Q.   BUT, OF COURSE, YOU DIDN'T STOP THERE.  YOU WENT THROUGH

11:16:30  10   FACTOR 2, 3, AND 4 AS WELL?

11:16:33  11   A.   YES, ALL UNWEIGHTED.  I HAD TO LOOK AT ALL 4.

11:16:36  12   Q.   SO LET'S LOOK AT FACTOR 2, WHICH STATES, "THE RELATIVE

11:16:39  13   PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A WHOLE."

11:16:44  14        AND LET'S SET THE STAGE HERE BY LOOKING AT THE ORIGINAL

11:16:48  15   IPHONE IN PDX 6.14.

11:16:51  16        HOW PROMINENT WAS THE '305 DESIGN IN THE ORIGINAL IPHONE?

11:16:56  17   A.   I MEAN, TO ME, TO JUST -- IT GLOWS AND IT JUMPS OUT AT YOU

11:17:06  18   BECAUSE IT'S SO COLORFUL, BECAUSE IT DRAWS YOU IN WITH ALL

11:17:11  19   THESE IDEAS OF WHAT IT MIGHT BE ABLE TO DO.

11:17:14  20        AND PHYSICALLY, THE DESIGN OF THE D'305 JUST TAKES UP SUCH

11:17:20  21   A MAJOR PART OF THE FRONT FACE OF THIS PHONE.

11:17:24  22   Q.   LET'S LOOK AT PDX 6.15.  AND WHAT DO WE SEE HERE?

11:17:31  23   A.   I THINK -- THIS IS A GOOD ILLUSTRATION TO TALK ABOUT THE

11:17:40  24   PROMINENCE OF THE D'305 NOT JUST -- IF YOU'RE GOING TO DRAW A

11:17:46  25   PHONE AND YOU WANT PEOPLE TO KNOW THAT IT'S A SMARTPHONE, IF

11:17:49   1    YOU MAKE A REGULAR GRID OF TILES AND YOU HAVE A DOCK AT THE

11:17:54   2    BOTTOM, LIKE THAT'S ENOUGH INFORMATION THAT ANYONE EVEN JUST

11:17:59   3    LOOKING AT HOMER SIMPSON'S SMARTPHONE KNOWS WHAT IT IS.

11:18:05   4         AND IT SPEAKS TO THE ICONIC PROMINENCE OF THIS GRAPHIC,

11:18:14   5    BUT ALSO THE CULTURAL PROMINENCE, THAT IT KIND OF SEEPS INTO

11:18:19   6    ENTERTAINMENT AND OUT INTO THE WORLD.

11:18:21   7    Q.   SO LET'S GO BACK TO THE SAMSUNG PHONES THAT INFRINGE THE

11:18:28   8    '305 PATENT, PDX 6.10.

11:18:31   9         HOW PROMINENT WAS THE '305 DESIGN IN THE SAMSUNG PHONES?

11:18:35  10    A.   WELL, SIMILARLY -- VERY SIMILARLY -- TO THE IPHONE, FROM

11:18:41  11    PHONE TO PHONE, YOU SEE THIS, WHAT WE'VE -- WHAT WE HAVE COME

11:18:48  12    TO UNDERSTAND AS THIS VERY RECOGNIZABLE ROW AND COLUMN ARRAY OF

11:18:56  13    TILE-LIKE BUTTONS.

11:18:59  14         YOU KNOW, THE -- IF YOU SQUINT, THEY ALL -- THEY ALL LOOK

11:19:04  15    PRETTY SIMILAR, AND PART OF THE REASON THAT THEY LOOK SIMILAR

11:19:09  16    IS THE PROMINENCE AND FAMILIARITY OF THIS ICONIC DESIGN.

11:19:15  17    Q.   NOW, TO BE CLEAR, WAS THIS SCREEN THAT WE SEE UP HERE NOW

11:19:18  18    THE HOME SCREEN FOR THESE PHONES?

11:19:20  19    A.   NO.

11:19:20  20    Q.   HOW DID THAT IMPACT YOUR ANALYSIS?

11:19:23  21    A.   YOU KNOW, I -- I WAS ABLE TO TAKE THE BOX FOR EACH PHONE,

11:19:28  22    TAKE IT OUT, TURN IT ON, LOOK AT IT.

11:19:31  23         THERE WERE ALL KINDS OF DIFFERENT HOME SCREENS.  THERE'S

11:19:36  24    ALWAYS ONE BUTTON, ONE TAP GETS YOU TO THIS SCREEN, WHICH I

11:19:43  25    THINK OF AS REALLY THE GATEWAY TO ALL THE FUNCTIONALITY ON THE

11:19:48  1    PHONE.

11:19:49  2          AND IT WAS A SCREEN THAT WAS COMMON TO ALL THE PHONES, SO

11:19:56  3    IT HAS A CERTAIN WELCOMING FAMILIARITY.

11:20:01  4          SO TO ME, IT SEEMED SO CENTRAL TO USING THESE DEVICES.

11:20:08  5    TYPICALLY YOU CAN SEE THERE ARE THREE DOTS AT THE TOP.  THERE

11:20:12  6    ARE USUALLY A COUPLE OF THESE SCREENS FULL OF APPS.

11:20:17  7          SO IT WASN'T NECESSARILY THE HOME SCREEN VERSUS THIS ONE

11:20:22  8    SCREEN.  IT WAS GETTING TO THE APP SCREEN AND ITS COMPANION

11:20:30  9    SCREENS.

11:20:30  10   Q.   NOW, DR. KARE, YOU'VE BEEN HERE THIS WEEK TO WATCH THE

11:20:33  11   TRIAL?

11:20:34  12   A.   YES.

11:20:34  13   Q.   AND HAVE YOU HEARD SAMSUNG REFER A FEW TIMES TO

11:20:37  14   ALTERNATIVE DESIGNS THAT DON'T INFRINGE?

11:20:39  15   A.   YES.

11:20:40  16   Q.   TO BE VERY CLEAR WITH THE LADIES AND GENTLEMEN OF THE

11:20:43  17   JURY, THESE PHONES RIGHT HERE ARE THE ONES THAT INFRINGE; RIGHT

11:20:46  18   (INDICATING)?

11:20:46  19   A.   YES.  AND THESE WERE THE ONES THAT I HAD THE OPPORTUNITY

11:20:52  20   TO EXAMINE IN PERSON.

11:20:56  21   Q.   AND YOUR ANALYSIS WAS OF THE INFRINGING PHONES, OR

11:20:59  22   ALTERNATIVE PHONES?

11:21:00  23   A.   THE INFRINGING PHONES.

11:21:02  24   Q.   DID YOU CONSIDER PRESS COVERAGE OF THE SAMSUNG PHONES THAT

11:21:07  25   WE SEE HERE WHEN THEY WERE RELEASED?

11:21:09  1    A.   YES.

11:21:09  2    Q.   LET'S TAKE A LOOK AT PDX 6.16.  WHAT DO WE SEE HERE,

11:21:15  3    DR. KARE?

11:21:16  4    A.   WE SEE A FEW DIFFERENT ARTICLES FROM 2010 WHEN THE SAMSUNG

11:21:26  5    VIBRANT, ONE OF THE INFRINGING PHONES, WAS RELEASED.

11:21:30  6         AND I GUESS BECAUSE I'M A DESIGNER, IT'S SO INTERESTING TO

11:21:41  7    RELOOK BACK AT THESE AND SEE SAMSUNG RIPS OFF IPHONE 3G DESIGN.

11:21:48  8    IT DOESN'T JUST SAY RIPS OFF THE IPHONE 3G.  IT HAS -- IT GIVES

11:21:54  9    DESIGN, LIKE, IN MY OPINION, ITS PROPER PLACE BECAUSE IT WAS

11:22:03 10    SO -- SUCH A SALIENT DETAIL OF THESE PHONES.

11:22:08 11         SO THE ONE ON THE RIGHT SAYS, "TO AN IPHONE-LIKE

11:22:16 12    FOUR-BY-FOUR GRID OF ICONS."

11:22:18 13         OR "THE U/I LOOKS QUITE SIMILAR TO THE IOS."

11:22:23 14         IT TALKS ABOUT THE RIP-OFF ISSUE, BUT IT ALSO REALLY

11:22:27 15    FOCUSES ON THE DESIGN.

11:22:29 16              MR. QUINN:  YOUR HONOR, WE HAVE NO FURTHER OBJECTION

11:22:31 17    TO THIS BEING OFFERED IF THAT'S WHAT COUNSEL INTENDS.  WE DO

11:22:34 18    THINK A LIMITING INSTRUCTION IS APPROPRIATE.

11:22:35 19              THE COURT:  THIS IS A DEMONSTRATIVE.  I DON'T THINK

11:22:39 20    YOU'RE SEEKING TO ADMIT THIS DEMONSTRATIVE; RIGHT?

11:22:42 21              MR. MUELLER:  THAT'S RIGHT, YOUR HONOR.

11:22:43 22              THE COURT:  OKAY.

11:22:43 23    BY MR. MUELLER:

11:22:44 24    Q.   AND IF WE COULD MOVE TO -- WELL, I HAVE ONE MORE QUESTION

11:22:47 25    ABOUT THIS BEFORE WE DO.

11:22:48  1          HOW DOES THIS DEMONSTRATIVE RELATE TO YOUR OPINION ON

11:22:51  2    PROMINENCE AND DESIGN?

11:22:52  3    A.   WELL, BECAUSE THAT WAS THE SECOND OF THE FOUR FACTORS, HOW

11:22:59  4     PROMINENT WAS THIS DESIGN?

11:23:00  5          AND I THINK IT SPEAKS TO THIRD PARTIES LOOKING AT THESE

11:23:09  6    SAMSUNG PHONES AND TALKING ABOUT THE PROMINENCE OF THE DESIGN

11:23:15  7    RELATED TO THEM.

11:23:16  8    Q.   NOW, DR. KARE, YOU ALSO CONSIDERED SOME INTERNAL SAMSUNG

11:23:19  9    DOCUMENTS; IS THAT RIGHT?

11:23:20  10   A.   YES.

11:23:21  11   Q.   AND TO BE CLEAR, THESE ARE DOCUMENTS THAT WERE PRODUCED BY

11:23:24  12   SAMSUNG IN THIS LITIGATION?

11:23:26  13   A.   YES.

11:23:27  14   Q.   CONFIDENTIAL DOCUMENTS THAT WERE ONLY PRODUCED AS A RESULT

11:23:30  15    OF THIS LITIGATION?

11:23:31  16   A.   YES, AS I UNDERSTAND IT.

11:23:35  17   Q.   SO LET'S TURN TO PX 40, AND WE WON'T PUT IT UP YET.  THIS

11:23:39  18    IS IN TAB 2 IN YOUR BINDER.

11:23:46  19          THIS IS A COLLECTION OF E-MAILS.  DO YOU RECOGNIZE THIS

11:23:48  20   SET OF E-MAILS?

11:23:49  21   A.   YES.  IT'S TWO SUMMARIES OF A MEETING THAT TOOK PLACE WITH

11:24:00  22   DESIGN EXECUTIVES AND DESIGNERS.

11:24:02  23   Q.   AT SAMSUNG?

11:24:04  24   A.   AT SAMSUNG IN 2010.

11:24:07  25   Q.   AND DID YOU CONSIDER THESE E-MAILS AND RELY ON THEM AS

11:24:10   1        PART OF YOUR ANALYSIS IN THIS CASE?

11:24:12   2        A.   YES.

11:24:13   3                 MR. MUELLER:  YOUR HONOR, WE OFFER PX 40.

11:24:15   4                 MR. QUINN:  NO FURTHER OBJECTION, YOUR HONOR.

11:24:17   5                 THE COURT:  IT'S ADMITTED.

11:24:18   6             (PLAINTIFF'S EXHIBIT 40 WAS ADMITTED IN EVIDENCE.)

11:24:18   7                 THE COURT:  GO AHEAD, PLEASE.

11:24:19   8        BY MR. MUELLER:

11:24:20   9        Q.   DR. KARE, IF WE COULD PLEASE TURN TO 40.3, THAT'S THE PAGE

11:24:26  10        NUMBER IN THE TOP RIGHT-HAND CORNER, AND I WANT TO FOCUS YOUR

11:24:30  11        ATTENTION, IF I COULD, ON THE E-MAIL AT THE BOTTOM OF THE PAGE.

11:24:33  12             AND DO YOU SEE IT REFERS TO A MOBILE COMMUNICATION

11:24:36  13        DIVISION MEETING --

11:24:37  14        A.   YES.

11:24:38  15        Q.   -- THAT OCCURRED IN MARCH -- I'M SORRY -- IN FEBRUARY OF

11:24:42  16        2010?

11:24:42  17        A.   YES.

11:24:43  18        Q.   AND WHAT DOES THE E-MAIL PROCEED TO DESCRIBE ABOUT THAT

11:24:46  19        MEETING?

11:24:46  20        A.    IT SAYS THAT IT WAS AN E-MAIL FROM THE MANAGER OF THE

11:24:55  21        WIRELESS COMMUNICATION DESIGN GROUP AND THAT IT WAS A DIVISION

11:25:00  22        MEETING.

11:25:00  23        Q.   AND IF WE GO TO THE VERY NEXT PAGE, 40.4, DO WE SEE A LIST

11:25:06  24        OF ATTENDEES?

11:25:07  25        A.   YES.

11:25:07   1    Q.   AND DO THESE INCLUDE VARIOUS EXECUTIVES IN THAT GROUP?

11:25:11   2    A.   IT LOOKS LIKE IT, PRINCIPALS, LEADS, MANAGERS.

11:25:15   3    Q.   AND WHAT DOES THE OVERALL SUMMARY DESCRIBE ABOUT THAT

11:25:19   4    MEETING?

11:25:22   5    A.   IT TALKS ABOUT ALL KINDS OF DIFFERENT ISSUES OF DESIGN,

11:25:29   6    BOTH GRAPHIC DESIGN AND PRODUCT DESIGN.

11:25:35   7    Q.   NOW, TO BE CLEAR, WERE SOME GOOD THINGS SAID ABOUT THE

11:25:39   8    SAMSUNG PRODUCTS AT THIS MEETING OF SAMSUNG EXECUTIVES?

11:25:42   9    A.   WELL, IT WAS AN HOUR -- YOU CAN TELL IT WAS AN HOUR AND 20

11:25:46   10   MINUTE MEETING.  YEAH, POSITIVES AND NEGATIVES AND ISSUES AND

11:25:54   11   ALL KINDS OF DESIGN.

11:25:59   12   Q.   SO I WANT TO FOCUS YOUR ATTENTION ON ONE OF THE CHALLENGES

11:26:02   13   IDENTIFIED AT THIS MEETING ON PAGE 40.5.

11:26:10   14       SECOND SENTENCE STATES "INFLUENTIAL FIGURES OUTSIDE THE

11:26:15   15   COMPANY COME ACROSS THE IPHONE AND THEY POINT OUT THAT,

11:26:19   16   'SAMSUNG IS DOZING OFF.'"

11:26:21   17       DO YOU SEE THAT, DR. KARE?

11:26:23   18   A.   I DO.

11:26:24   19   Q.   AND THEN IT GOES ON TO STATE, "ALL THIS TIME WE'VE BEEN

11:26:28   20   PAYING ALL OUR ATTENTION ON NOKIA, AND CONCENTRATED OUR EFFORTS

11:26:32   21   ON THINGS LIKE FOLDER, BAR, SLIDE, YET WHEN OUR UX IS COMPARED

11:26:36   22   TO THE UNEXPECTED COMPETITOR APPLE'S IPHONE, THE DIFFERENCE IS

11:26:40   23   TRULY THAT OF HEAVEN AND EARTH."

11:26:42   24       DO YOU SEE THAT, DR. KARE?

11:26:43   25   A.   I DO.

11:26:44   1    Q.   AND HOW WAS THIS DESCRIBED IN THE VERY NEXT SENTENCE?

11:26:46   2    A.   IN BOLD, "IT'S A CRISIS OF DESIGN."

11:26:51   3    Q.   NOW, TO BE CLEAR, DID YOU ADD THAT BOLD?

11:26:55   4    A.   NO.

11:26:56   5    Q.   THIS IS THE ORIGINAL DOCUMENT?

11:26:57   6    A.   YES.

11:26:57   7    Q.   NOW, DID YOU SEE MR. QUINN SPOKE ABOUT THIS DOCUMENT A BIT

11:27:04   8    IN HIS OPENING STATEMENT?

11:27:05   9    A.   YES.

11:27:06   10   Q.   DID HE SHOW THE JURY ANY OF THE INTERNAL SAMSUNG DOCUMENTS

11:27:11   11   THAT FOLLOWED THIS MEETING IN FEBRUARY OF 2010?

11:27:15   12   A.   I DON'T BELIEVE SO.

11:27:18   13   Q.   SO LET'S GO THROUGH SOME OF THOSE DOCUMENTS IF WE COULD.

11:27:21   14        AND LET'S START AT TAB 3 IN YOUR BINDER.  THIS IS

11:27:26   15   PLAINTIFF'S EXHIBIT 40.71.  AND THIS IS TITLED "KEPLER

11:27:35   16   USABILITY EVALUATION REVIEW RESULTS."

11:27:41   17        DO YOU RECOGNIZE THIS DOCUMENT?

11:27:42   18   A.   I DO.

11:27:42   19   Q.   WHAT IS IT?

11:27:43   20   A.   IT IS USABILITY RESULTS AND CHIEFLY SIDE-BY-SIDE IMAGES OF

11:27:54   21   SAMSUNG PHONES UNDER DEVELOPMENT PAIRED WITH THE IPHONE SO THAT

11:27:59   22   COMPARISONS COULD BE POINTED OUT.

11:28:01   23   Q.   AND WE'RE GOING TO GO THROUGH PORTIONS OF THIS, BUT HOW

11:28:04   24   MANY COMPARISON PAGES ARE THERE IN THIS DOCUMENT?

11:28:07   25   A.   PROBABLY A COUPLE HUNDRED.

11:28:12   1    Q.   AND DID YOU CONSIDER THIS DOCUMENT AS PART OF YOUR

11:28:14   2    ANALYSIS IN THIS CASE AND RELY ON IT?

11:28:17   3    A.   DEFINITELY.

11:28:18   4              MR. MUELLER:  YOUR HONOR, WE OFFER PX 4071.

11:28:22   5              MR. QUINN:  NO FURTHER OBJECTION, YOUR HONOR.

11:28:24   6              THE COURT:  IT'S ADMITTED.

11:28:26   7         (PLAINTIFF'S EXHIBIT 4071 WAS ADMITTED IN EVIDENCE.)

11:28:26   8              THE COURT:  GO AHEAD, PLEASE.

11:28:27   9    BY MR. MUELLER:

11:28:27  10    Q.   LET'S TURN IF WE COULD TO PAGE 4071.6.

11:28:31  11         AND, DR. KARE, WHAT DO WE SEE HERE?

11:28:34  12    A.   WE SEE THAT EVEN THOUGH IT'S DARK THERE'S A SAMSUNG SCREEN

11:28:45  13    IN PROGRESS ON THE LEFT WITH THE DOCK AREA, A BOX AROUND IT,

11:28:53  14    AND THE IPHONE SCREEN ON THE RIGHT.

11:28:55  15              MR. MUELLER:  YOUR HONOR, MAY I APPROACH THE SCREEN?

11:28:57  16              THE COURT:  GO AHEAD, PLEASE.

11:29:01  17    BY MR. MUELLER:

11:29:01  18    Q.   SO JUST SO WE'RE CLEAR, ON THIS SIDE, WHAT IS BEING

11:29:05  19    DESCRIBED?

11:29:05  20    A.   THEY'RE TALKING ABOUT THE FIXED MENUS AT THE VERY BOTTOM

11:29:11  21    OF THE HOME SCREEN, WHICH ARE ICONS THAT YOU CAN'T SEE WELL.

11:29:17  22    Q.   AND, DR. KARE, YOU'RE REFERRING TO THIS REGION RIGHT HERE

11:29:21  23    (INDICATING)?

11:29:21  24         I'M SORRY, I'M ON THE BIG SCREEN.  THIS REGION RIGHT HERE

11:29:24  25    (INDICATING)?

11:29:25   1    A.   YES.

11:29:25   2    Q.   AND THIS IS IN THE SAMSUNG PROTOTYPE PHONE?

11:29:27   3    A.   YES.

11:29:28   4    Q.   WHAT DO WE SEE OVER HERE ON THE RIGHT (INDICATING)?

11:29:31   5    A.   WE SEE AN IMAGE OF THE IPHONE ON THE RIGHT.

11:29:39   6    Q.   AND WHAT IS DESCRIBED IN TEXT ALONGSIDE THE IPHONE IMAGE?

11:29:43   7    A.   IT SAYS, "THE VERY BOTTOM OF THE MENU PAGE WHERE THE FIXED

11:29:49   8    ICONS ARE LOCATED, IS SHADED TO DISTINGUISH FROM OTHER MOVEABLE

11:29:54   9    ICONS."

11:29:55  10         IT'S THAT LITTLE SHELF THAT THEY SIT ON.

11:29:59  11    Q.   SO AFTER MAKING THIS COMPARISON, WHAT IS THE DIRECTION OF

11:30:02  12    IMPROVEMENT?

11:30:03  13    A.   IT SAYS, "DIRECTION FOR IMPROVEMENT," RIGHT HERE IN BLOCK

11:30:08  14    AND WHITE, "INDICATE THAT IT IS A FIXED MENU BY SHADING THE

11:30:12  15    BACKGROUND OF THE FIXED MENU AT THE VERY BOTTOM OR

11:30:15  16    DISTINGUISHING IT WITH THE ARRANGEMENT OF COLORS."

11:30:19  17         AND THAT WAY IT WOULD PROVIDE CONSISTENCY, JUST LIKE APPLE

11:30:24  18    DID, BY MAINTAINING THE SAME BACKGROUND DURING MENU SCREEN

11:30:28  19    CONVERSION, I MEAN FROM SCREEN-TO-SCREEN SHOTS.

11:30:32  20    Q.   MAKE IT LIKE THE IPHONE?

11:30:34  21    A.   YES.

11:30:35  22    Q.   NOW, IF WE -- MR. LEE, IF WE FLIP THROUGH SOME OF THE

11:30:39  23    PAGES IN THIS DOCUMENT, 7, 8, 9, THESE COMPARISONS GO ON AND

11:30:44  24    ON; IS THAT RIGHT?

11:30:45  25    A.   YES.

11:30:46  1        Q.   LET'S GO TO --

11:30:53  2        A.   IT HAS ALL KINDS OF DIRECTIONS FOR IMPROVEMENT.

11:30:57  3        Q.   NOW, ARE ALL THESE COMPARISONS FOR IMPROVEMENT IN THIS

11:31:01  4        DOCUMENT ABOUT THE OPERATING SYSTEM?

11:31:02  5        A.   THERE ARE -- IT'S KIND OF A BIG SPAN, NOT -- SOME MORE OR

11:31:12  6        LESS RELATED TO WHAT I AM FOCUSSED ON, SOME NOT.

11:31:16  7        Q.   DIFFERENT FEATURES IN DIFFERENT AREAS?

11:31:17  8        A.   (NODS HEAD UP AND DOWN.)

11:31:18  9        Q.   LET'S TURN TO TAB 4 IN YOUR BINDER, THIS IS PLAINTIFF'S

11:31:22 10        EXHIBIT 40.61.  THIS IS TITLED "AMETHYST IPHONE USABILITY TEST

11:31:32 11        RESULT."

11:31:33 12             DO YOU RECOGNIZE THIS?

11:31:34 13        A.   YES.

11:31:35 14        Q.   WHAT IS IT?

11:31:36 15        A.   IT'S ANOTHER SET OF SIDE-BY-SIDE COMPARISONS FOCUSSED ON

11:31:42 16        USABILITY.

11:31:44 17        Q.   AND, AGAIN, A COMPARISON OF SAMSUNG PROTOTYPE PHONES WITH

11:31:48 18        THE IPHONE?

11:31:49 19        A.   YES, AND LOOKING AT CONTAINING A LOT OF SIDE BY SIDE OF

11:31:54 20        GRAPHICAL USER INTERFACES.

11:31:56 21        Q.   DID YOU ANALYZE THIS DOCUMENT AS PART OF YOUR WORK IN THIS

11:31:58 22        CASE AND RELY ON IT?

11:32:00 23        A.   YES.

11:32:00 24             MR. MUELLER:  YOUR HONOR, WE OFFER PX 4061.

11:32:05 25             MR. QUINN:  NO FURTHER OBJECTION.

11:32:06  1                    THE COURT:  IT'S ADMITTED.

11:32:07  2              (PLAINTIFF'S EXHIBIT 4061 WAS ADMITTED IN EVIDENCE.)

11:32:08  3                    THE COURT:  GO AHEAD, PLEASE.

11:32:09  4        BY MR. MUELLER:

11:32:10  5        Q.   LET'S TURN TO PAGE 4061.42, PLEASE.  AND WHAT DO WE SEE

11:32:17  6        HERE, DR. KARE.

11:32:18  7        A.   HERE WE SEE ANOTHER TYPICAL SET OF SCREENS, THE SAMSUNG

11:32:26  8        SCREEN IN DEVELOPMENT, THE AMETHYST ON THE LEFT, THE IPHONE ON

11:32:32  9        THE RIGHT.

11:32:34  10            AND THE AUTHOR POINTS OUT THAT ON THE LEFT, THE SIZES OF

11:32:41  11       THE ICONS ARE IRREGULAR.  AND ON THE RIGHT, THE SIZES OF THE

11:32:46  12       ICONS ARE REGULAR AND STANDARDIZED.

11:32:48  13       Q.   WHAT WAS THE DIRECTION FOR IMPROVEMENT?

11:32:50  14       A.   "SET THE STANDARD ICON SIZE."

11:32:56  15            ALTHOUGH WHEN I LOOK AT THIS, I SEE PART OF IT IS THE ICON

11:33:02  16       SIZE, BUT PART OF THE DIFFERENCE BETWEEN THESE TWO SCREENS IS

11:33:06  17       THAT IT'S EASY TO SEE THAT APPLE EMPLOYED THESE TILES, ROUNDED

11:33:14  18       CORNER TILES IN A GRID, AND THAT'S PART OF WHAT MADE THINGS

11:33:21  19       LOOK REGULAR.

11:33:22  20            LIKE THE ICONS ON TOP OF THOSE MIGHT VARY IN SIZES A

11:33:26  21       LITTLE, BUT I THINK WHAT BECAME ICONIC AND CHARACTERISTIC,

11:33:35  22       WHICH IS IN THE D'305 DESIGN, IS THAT, AND THAT'S WHY IT LOOKS

11:33:40  23       SO DIFFERENT IN THE ONE ON THE LEFT.

11:33:42  24       Q.   AND, AGAIN, MR. LEE, IF WE FLIP THROUGH THE PAGES HERE.

11:33:46  25            DO WE AGAIN SEE PAGE AFTER PAGE AFTER PAGE OF COMPARISON,

11:33:50  1      IDENTIFICATIONS OF DIFFERENCES FROM THE IPHONE AND

11:33:52  2      RECOMMENDATIONS FOR IMPROVEMENT?

11:33:54  3      A.   YES, TO A PRETTY MOLECULAR LEVEL.

11:33:59  4      Q.   MAKE IT LIKE THE IPHONE?

11:34:01  5      A.   RIGHT.

11:34:02  6      Q.   LET'S GO TO TAB 5 IN YOUR BINDER, PLEASE, WHICH IS THE

11:34:05  7      RELATIVE EVALUATION REPORT ON S1 AND THE IPHONE.

11:34:12  8          DO YOU RECOGNIZE THIS?

11:34:15  9          THERE IS PLAINTIFF'S EXHIBIT 44.

11:34:17  10     A.   YES.  YES.

11:34:19  11     Q.   WHAT IS IT?

11:34:20  12     A.   IT'S ANOTHER SIDE-BY-SIDE COMPARISON DOCUMENT EVALUATING

11:34:30  13     PROTOTYPES AND THE IPHONE.

11:34:33  14     Q.   BY THE WAY, WERE ANY OF THESE PROTOTYPES OF MEDICAL

11:34:37  15     DEVICES FOR CANCER?

11:34:39  16     A.   NOT THAT I KNOW OF.

11:34:42  17          THEY -- IT SEEMED THAT THEY WERE PHONES TO PHONES.

11:34:46  18     Q.   AND DID YOU RELY ON PLAINTIFF'S EXHIBIT 44 AS PART OF YOUR

11:34:50  19     WORK ON THIS CASE?

11:34:51  20     A.   YES.

11:34:53  21          MR. MUELLER:  YOUR HONOR, WE OFFER PLAINTIFF'S

11:34:55  22     EXHIBIT 44.

11:34:55  23          MR. QUINN:  NO FURTHER OBJECTION.

11:34:56  24          THE COURT:  IT'S ADMITTED.

11:34:57  25          (PLAINTIFF'S EXHIBIT 44 WAS ADMITTED IN EVIDENCE.)

11:34:58    1                    THE COURT:  GO AHEAD, PLEASE.

11:35:00    2                    MR. MUELLER:  IF WE COULD PLEASE TURN TO 44.127,

11:35:09    3      44.127.

11:35:11    4      Q.    DR. KARE, WHAT DO WE SEE HERE?

11:35:13    5      A.    WE SEE THE IPHONE ON THE LEFT, A SAMSUNG PHONE UNDER

11:35:19    6      DEVELOPMENT ON THE RIGHT, AND SOME TEXT POINTING OUT SOME

11:35:27    7      DETAILS ABOUT THE ICONS, THE RELATIVE DIFFERENCES.

11:35:31    8      Q.    AND IF WE LOOK AT THE TOP HERE, THAT TOP BULLET POINT, HOW

11:35:35    9      WAS THE IPHONE DESCRIBED?

11:35:36   10      A.    "INSTANT RECOGNIZABILITY DUE TO HIGHLY INTUITIVE ICON

11:35:43   11      USAGE."

11:35:44   12      Q.    AND RIGHT BELOW THAT, HOW IS THE SAMSUNG PROTOTYPE

11:35:48   13      DESCRIBED?

11:35:49   14      A.    "DIFFICULT DIFFERENTIATION DUE TO ICONS THAT ARE

11:35:52   15      DUPLICATIVE OR ARE INTUITIVELY DEFICIENT."

11:35:56   16                    MR. MUELLER:  YOUR HONOR, MAY I APPROACH THE SCREEN.

11:35:58   17                    THE COURT:  GO AHEAD, PLEASE.

11:35:59   18      BY MR. MUELLER:

11:36:00   19      Q.    NOW, TO BE CLEAR, DR. KARE, THIS PROTOTYPE ON THE RIGHT

11:36:03   20      DOES BEAR SOME FAMILIARITY TO THIS; IS THAT RIGHT?  AT A HIGH

11:36:07   21      LEVEL, THERE'S SOME SIMILARITY HERE?

11:36:09   22      A.    THERE'S ALREADY, I MEAN, QUITE A BIT OF BASIC -- I'M

11:36:15   23      SORRY -- FUNDAMENTAL SIMILARITY, LIKE ROWS AND COLUMNS AND YOU

11:36:20   24      CAN SEE THE TILES HAVE BEEN INTEGRATED AT THIS POINT ON THIS

11:36:24   25      PHONE.

11:36:25   1       Q.   BUT THERE WERE STILL SOME DISTINCTIONS?

11:36:27   2       A.   STILL SOME DISTINCTIONS.  I MEAN, THE DOCK IS PRETTY

11:36:33   3    SUBTLE.

11:36:34   4            BUT YOU CAN SEE ON THE RIGHT WHERE THEY HAVE POINTED OUT,

11:36:37   5    THERE ARE TWO ICONS THAT HAVE ENVELOPES, SO THAT HYPOTHETICALLY

11:36:44   6    IS, LIKE, ALERTING THEM THAT THEY MIGHT WANT TO TAKE ANOTHER

11:36:48   7    LOOK AT THEIR ICONS TO SEE IF THEY COULD BE BETTER.

11:36:53   8       Q.   WHAT WAS THE DIRECTION FOR IMPROVEMENT?

11:36:55   9       A.   "CHANGE REPLICATE ICONS AND SELECT AND USE HIGHLY

11:37:01  10    INTUITIVE ICONS."

11:37:04  11            THEY ALSO ACTUALLY MADE A NOTE ABOUT EVEN MAKING THE TEXT

11:37:09  12    MATCH THE IPHONE BECAUSE IT'S A LITTLE HARD TO SEE, BUT THERE'S

11:37:14  13    A LABEL THAT HAS -- THAT WRAPS THAT HAS TWO LINES.  AND THEY

11:37:20  14    SAY, "CHANGE LONG NAMES TO SIMPLE ONES."

11:37:24  15            SO THEY'RE DEFINITELY PAYING ATTENTION TO THE NUANCE OF

11:37:28  16    THE DESIGN OF THE PHONE.

11:37:29  17       Q.   SO THE RECOMMENDATION IS "MAKE IT MORE LIKE THE IPHONE,"

11:37:33  18    EVEN AT THE NUANCE LEVEL?

11:37:35  19       A.   YES.

11:37:35  20       Q.   AND, AGAIN, IF WE FLIP THROUGH THIS EXHIBIT -- AND THE

11:37:39  21    JURY WILL HAVE IT -- THERE'S PAGE AFTER PAGE AFTER PAGE OF

11:37:41  22    COMPARISONS, IS THAT RIGHT, DR. KARE?

11:37:43  23       A.   YES.

11:37:44  24       Q.   DR. KARE, WHAT IS THE RELEVANCE OF ALL OF THIS EVIDENCE

11:37:48  25    FROM SAMSUNG'S INTERNAL FILES TO FACTOR 2, THE RELATIVE

11:37:54   1      PROMINENCE OF THE '305 DESIGN IN THE INFRINGING PHONES?

11:37:57   2      A.   I MEAN, TO ME, THIS DOCUMENT -- WELL, THERE WAS A LOT OF

11:38:04   3      INFORMATION HERE WHERE YOU COULD LOOK AT HOW ONE COMPANY,

11:38:08   4      SAMSUNG, THOUGHT ABOUT CALENDAR ICONS COMPARED TO APPLE'S.

11:38:13   5      LITTLE DETAILS.

11:38:14   6           BUT OVERALL, IT'S JUST SEEING ALL THESE PAGES OF THE

11:38:20   7      VISUAL COMPARISON WITH NOTES.  IT WAS OBVIOUS HOW PROMINENT

11:38:28   8      THAT SCREEN DESIGN WAS TO THE, TO THE PHONE DEVELOPMENT BECAUSE

11:38:35   9      SO MUCH ATTENTION AND SO MUCH DETAIL AND OVER AND OVER AGAIN

11:38:41   10     THE SUGGESTED IMPROVEMENT BEING TO MAKE IT MORE LIKE THE

11:38:46   11     IPHONE, IT WAS A REALLY PROMINENT PART OF THIS DOCUMENT, REALLY

11:38:50   12     PROMINENT PART OF DESIGN THINKING.

11:38:52   13     Q.   DR. KARE, LET'S TURN TO FACTOR 3, WHICH IS WHETHER THE

11:38:58   14     DESIGN IS CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE.

11:39:03   15          DID YOU CONSIDER THAT FACTOR AS WELL?

11:39:04   16     A.   YES.

11:39:05   17     Q.   LET'S GO TO PDX 6.19, AND USING THE IMAGES OF THE

11:39:09   18     INFRINGING -- I'M SORRY -- AN IMAGE OF ONE OF THE INFRINGING

11:39:13   19     PHONES, THE SAMSUNG VIBRANT, CAN YOU EXPLAIN HOW FACTOR 3

11:39:17   20     APPLIES TO THE INFRINGING SAMSUNG PHONES?

11:39:20   21     A.   WELL, I THINK THAT THE -- YOU CAN SEE THAT THE D'305

11:39:29   22     DESIGN IS PROMINENT HERE, BUT IT ALSO INCORPORATES DESIGN

11:39:35   23     DETAILS FROM THE REST OF THE PHONE.

11:39:37   24          YOU CAN SEE HOW THE BEZEL CATCHES A LITTLE HIGHLIGHT, AND

11:39:41   25     YOU SEE THAT HIGHLIGHT ON THE EDGES OF THE TILES.  YOU CAN SEE

11:39:47  1      A ROUNDED CORNER ON THE TILES AND ROUNDED CORNER ON THE PHONE.

11:39:53  2           THE DARK BACKGROUND OF THE DESIGN BLENDS SEAMLESSLY WITH

11:40:00  3      THE DARK PARTS OF THE PHONE SO THAT YOU CAN'T REALLY TELL WHERE

11:40:05  4      THE PHYSICAL PHONE STARTS AND THE ART BEGINS.

11:40:14  5           THE DESIGN JUST BLENDS SEAMLESSLY WITH THE PHONE.

11:40:17  6      Q.   AND IS THAT TRUE FOR ALL OF THE SAMSUNG INFRINGING PHONES

11:40:20  7      AS APPLIED TO THE '305 PATENT?

11:40:23  8      A.   YES, THE ONES I LOOKED AT.

11:40:25  9      Q.   LET'S GO TO PDX 6.19, THE FOUR FACTOR TEST.  PDX 6.9.

11:40:41 10      THERE WE GO.

11:40:42 11           DR. KARE, WE'VE GONE THROUGH FACTORS 1, 2, AND 3; IS THAT

11:40:45 12      RIGHT?

11:40:45 13      A.   YES.

11:40:46 14      Q.   LET'S FINISH UP WITH FACTOR 4, WHICH IS A BIT OF A

11:40:50 15      MOUTHFUL, BUT IT'S THE PHYSICAL RELATIONSHIP TEST, INCLUDING

11:40:55 16      SEPARABILITY.

11:40:55 17           DID YOU CONSIDER THIS FACTOR?

11:40:56 18      A.   YES.

11:40:57 19      Q.   AND IF WE COULD APPLY THIS TO THE PHONE, AND LET'S LOOK AT

11:41:00 20      THE FULL COLLECTION IN PDX 6.10.  HOW DOES FACTOR 4 APPLY TO

11:41:05 21      THESE PHONES?

11:41:05 22      A.   WELL, I MEAN, THE KEY THING TO ME IS YOU CAN SEE THE

11:41:13 23      DESIGN OF THE GRAPHICAL INTERFACE IN ALL THESE PHONES LIT UP

11:41:20 24      AND GLOWING AND -- BECAUSE IN THIS IMAGE, OBVIOUSLY THEY'RE ALL

11:41:26 25      TURNED ON.

11:41:28    1        BUT THE NATURE OF DOING DIGITAL DESIGN IS THAT YOU VIEW IT

11:41:33    2   ON A DEVICE.  THAT'S WHERE YOUR WORK -- HOW YOUR WORK IS SEEN.

11:41:40    3   Q.   AND HOW DOES SAMSUNG SELL THESE PHONES, AS PHONES OR

11:41:43    4   COLLECTIONS OF COMPONENTS?

11:41:44    5   A.   EVERYTHING I SAW WAS A BOX WITH A PHONE IN IT.

11:41:48    6   Q.   ALL RIGHT.  NOW, YOU UNDERSTAND THAT IN THIS CASE, SAMSUNG

11:41:50    7   IS TAKING THE POSITION THAT FOR THE '305 PATENT, THE ARTICLE OF

11:41:56    8   MANUFACTURE FOR EACH OF THESE PHONES IS SOMETHING LESS THAN THE

11:41:59    9   PHONE?  IT'S A COMPONENT OR A COLLECTION OF COMPONENTS?  DO YOU

11:42:02   10   UNDERSTAND THAT'S THEIR POSITION?

11:42:03   11   A.   I UNDERSTAND THAT'S THEIR POSITION.

11:42:06   12        MR. MUELLER:  YOUR HONOR, MAY I APPROACH THE WITNESS?

11:42:08   13        THE COURT:  GO AHEAD, PLEASE.

11:42:09   14   BY MR. MUELLER:

11:42:09   15   Q.   DR. KARE, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS

11:42:12   16   JOINT EXHIBIT JX 5001.  I'LL REPRESENT TO YOU THAT THIS IS THE

11:42:17   17   ARTICLE OF MANUFACTURE THAT SAMSUNG IS ALLEGING IS THE ARTICLE

11:42:23   18   OF MANUFACTURE FOR THE CAPTIVATE.

11:42:24   19        DO YOU HAVE THAT IN MIND?  IT'S IN THIS BOX.

11:42:26   20   A.   OKAY.

11:42:27   21   Q.   (HANDING.)

11:42:30   22        DR. KARE, IF YOU COULD -- FIRST OF ALL, HAVE YOU SEEN THIS

11:42:34   23   BEFORE?

11:42:35   24   A.   YOU KNOW, I'VE SEEN IT, BUT I HAVEN'T EVER PICKED IT UP

11:42:39   25   (INDICATING).

11:42:40  1    Q.   DO YOU AGREE THAT THAT'S THE ARTICLE OF MANUFACTURE TO

11:42:44  2    WHICH SAMSUNG APPLIED THE '305 DESIGN IN THE CAPTIVATE?

11:42:48  3    A.   I -- I WOULD SAY NO, I DON'T AGREE.

11:42:54  4    Q.   WHY NOT?

11:42:55  5    A.   BECAUSE I CAN'T SEE THE '305.  I DON'T -- I DON'T SEE

11:43:06  6    THAT, ALL THE THINGS THAT MAKE THAT DESIGN A GRAPHICAL USER

11:43:10  7    INTERFACE.  IT'S JUST -- THE SCREEN IS KIND OF BLANK.

11:43:14  8    Q.   AND WHAT CAUSES THE '305 DESIGN TO ACTUALLY APPEAR?

11:43:18  9    A.   I'M NOT A HARDWARE DESIGNER, BUT I THINK YOU NEED A POWER

11:43:23 10    SUPPLY AND YOU NEED, YOU NEED, LIKE, ALL THE PARTS THAT MAKE

11:43:28 11    THE FINISHED PRODUCT ABLE TO BE INTERACTED WITH.

11:43:33 12    Q.   DR. KARE, YOU CAN PUT THAT BACK IN THE BOX IF YOU WOULD,

11:43:37 13    PLEASE.

11:43:38 14         LAST QUESTION:  AFTER REVIEWING ALL THE EVIDENCE,

11:43:42 15    CONSIDERING HER HONOR'S FOUR FACTORS, FOR THE PHONES THAT WE

11:43:47 16    SEE UP HERE, WHAT IS THE ARTICLE OF MANUFACTURE TO WHICH

11:43:53 17    SAMSUNG TOOK THE CLAIMED DESIGNS AND APPLIED THE CLAIMED

11:43:56 18    DESIGNS?  WHAT IS THE ARTICLE OF MANUFACTURE?

11:43:57 19    A.    IT IS EACH FINISHED PHONE BECAUSE THEN YOU SEE THE D'305.

11:44:08 20          MR. MUELLER:  THANK YOU, DR. KARE.  I HAVE NO FURTHER

11:44:10 21    QUESTIONS.

11:44:11 22          THE COURT:  WHAT IS THE TIME ON THE TRANSCRIPT,

11:44:13 23    PLEASE?

11:44:13 24          THE REPORTER:  11:44:11.

11:44:16 25          THE COURT:  11:44 AND?

11:44:18   1            THE REPORTER:  11 SECONDS.

11:44:21   2            THE COURT:  ALL RIGHT.  THANK YOU.

11:44:22   3        ALL RIGHT.  GO AHEAD.  LET'S GO UNTIL NOON, PLEASE.  IT'S

11:44:25   4    11:44.

11:44:27   5        GO AHEAD, PLEASE.

11:44:30   6                         **CROSS-EXAMINATION**

11:44:30   7    BY MR. QUINN:

11:44:31   8    Q.   GOOD MORNING.  IS IT DR. KARE?

11:44:32   9    A.   YES.

11:44:33   10   Q.   MY NAME IS JOHN QUINN.  I REPRESENT SAMSUNG.

11:44:36   11        NOW, YOU TOLD US THAT YOU WORKED FOR APPLE FOR A WHILE.

11:44:39   12   A.   THIRTY-TWO YEARS AGO.

11:44:41   13   Q.   OKAY.  AND YOU GOT TO KNOW MR. JOBS WHILE YOU WORKED AT

11:44:47   14   APPLE?

11:44:47   15   A.   AT THAT POINT IN TIME.

11:44:48   16   Q.   YEAH.  AND THERE CAME A POINT WHERE HE STARTED A NEW

11:44:51   17   COMPANY CALLED NEXT?

11:44:52   18   A.   YES.

11:44:53   19   Q.   AND THEN YOU JOINED HIM AT THAT NEW COMPANY, NEXT?

11:44:57   20   A.   YES.

11:44:58   21   Q.   OKAY.  AND IS HE SOMEONE WHO YOU HAD A FRIENDSHIP WITH?

11:45:03   22   A.   I -- I WORKED WITH HIM TANGENTIALLY BECAUSE, OF COURSE, HE

11:45:13   23   WAS THE CEO OF APPLE AND I WAS IN THE SOFTWARE GROUP.  SO HE --

11:45:20   24   THERE WERE MANY, MANY, MANY LAYERS OF MANAGEMENT BETWEEN ME AND

11:45:24   25   HIM.

11:45:24  1    Q.   ALL RIGHT.  BUT YOU WENT FROM APPLE TO JOIN HIS NEW

11:45:27  2    COMPANY, NEXT?

11:45:29  3    A.   TO WORK IN DESIGN.

11:45:30  4    Q.   YEAH.  AND YOU'VE BEEN CANDID THAT YOU'VE BEEN RETAINED,

11:45:35  5    AND, OF COURSE, YOU DON'T DO THIS FOR FREE.  YOU'RE COMPENSATED

11:45:38  6    FOR THE WORK THAT YOU'VE DONE AND THE TIME THAT YOU'VE SPENT ON

11:45:41  7    THIS PROJECT?

11:45:42  8    A.   YES.

11:45:42  9    Q.   AND IT'S TRUE, ISN'T IT, THAT BY THE TIME YOU ACTUALLY

11:45:50  10   WROTE YOUR REPORT HERE, YOU ALREADY KNEW THAT IT WAS APPLE'S

11:45:54  11   POSITION AND WHAT APPLE HOPED YOU WOULD FIND IS THAT THE

11:46:00  12   ARTICLE OF MANUFACTURE WAS THE WHOLE PHONE?

11:46:05  13   A.   I KNOW THAT THAT WAS APPLE'S POSITION.

11:46:11  14        BUT BECAUSE I'M IN -- I'M INDEPENDENT.  I CAME INTO IT

11:46:17  15   WITHOUT A FOREGONE CONCLUSION.

11:46:19  16   Q.   ALL RIGHT.  SO THE ANSWER TO MY QUESTION IS, YES, AT THE

11:46:24  17   TIME YOU FINISHED YOUR REPORT, YOU ALREADY KNEW THAT IT WAS

11:46:26  18   APPLE'S POSITION, AND THEIR HOPE, THAT THE ARTICLE OF

11:46:31  19   MANUFACTURE WOULD BE FOUND TO BE THE WHOLE PHONE?  YOU KNEW

11:46:33  20   THAT?

11:46:34  21   A.   I -- I WAS AWARE OF APPLE'S POSITION.

11:46:39  22   Q.   ALL RIGHT.  IF WE COULD -- LET'S TALK ABOUT THE FOUR

11:46:42  23   FACTORS.

11:46:43  24        YOU'RE -- THERE WAS SOME -- YOU WERE EXAMINED ABOUT THEM

11:46:46  25   BY APPLE'S COUNSEL, AND YOU UNDERSTAND THAT THE PURPOSE OF

11:46:56  1    THIS -- I THINK YOU SAID IN YOUR REPORT -- YOU APPLY THE FOUR

11:47:00  2    FACTORS IN ORDER TO IDENTIFY THE ARTICLE THAT MAY BE SAID TO

11:47:04  3    EMBODY SAMSUNG'S USE OF APPLE'S PATENTED '305 DESIGN; CORRECT?

11:47:11  4    A.   I'M LOOKING FOR HOW SAMSUNG APPLIED THE D'305 TO THE

11:47:19  5    INFRINGING PHONES.

11:47:20  6    Q.   EXACTLY.  YOU WANT TO FIND WHERE THAT DESIGN IS APPLIED ON

11:47:25  7    THE SAMSUNG PHONES?

11:47:27  8    A.   YES.

11:47:27  9    Q.   AND THAT'S THE PURPOSE OF THIS, THIS FOUR FACTOR ANALYSIS?

11:47:33  10   A.   TO DETERMINE THE ARTICLE OF MANUFACTURE, YES.

11:47:35  11   Q.   RIGHT.  HOW IT WAS USED BY SAMSUNG?

11:47:37  12   A.   YES.

11:47:38  13   Q.   SO HOW IT WAS USED BY APPLE IS COMPLETELY IRRELEVANT TO

11:47:42  14   APPLYING THESE FOUR FACTORS?

11:47:44  15   A.   I WOULDN'T SAY IRRELEVANT BECAUSE SOMETHING LIKE

11:47:50  16   PROMINENCE, LIKE WHY WAS THAT DESIGN PROMINENT IN THE WORLD,

11:47:56  17   AND THEN THERE'S TWO INTERPRETATIONS OF PROMINENCE, BOTH THE

11:48:02  18   LITERAL PROMINENCE ON WHATEVER THE ARTICLE OF MANUFACTURE IS,

11:48:08  19   BUT MORE OF A -- ANOTHER WAY OF THINKING ABOUT THE PROMINENCE

11:48:14  20   OF THAT DESIGN AND ITS IMPORTANCE.

11:48:16  21   Q.   ALL RIGHT.  BUT THE WAY WE'RE TO BE APPLYING THESE

11:48:20  22   FACTORS, AND I THINK YOU TOLD ME, THE OBJECT IS TO FIND OUT HOW

11:48:23  23   APPLE'S PROTECTED DESIGNS WERE APPLIED TO THE SAMSUNG PRODUCTS.

11:48:30  24        AS TO THE PROMINENCE FACTOR, WE'RE LOOKING TO SEE HOW

11:48:33  25   PROMINENT THAT USE WAS ON THE SAMSUNG PRODUCT?

KARE CROSS BY MR. QUINN

```
11:48:35   1        A.   YES.

11:48:36   2        Q.   WE CAN AGREE WITH THAT?

11:48:37   3        A.   YES.

11:48:37   4        Q.   LET'S TAKE A LOOK -- LET'S START WITH THE FIRST FACTOR,

11:48:40   5   AND IF WE COULD JUST PUT THAT UP.  I THINK THAT'S -- OH, WE'LL

11:48:43   6   SEE HERE WITH THAT SLIDE.  THAT'S OKAY, KEN.

11:48:46   7        FACTOR NUMBER 1, "THE SCOPE OF THE DESIGN CLAIMED IN THE

11:48:52   8   PLAINTIFF'S PATENT."

11:48:53   9        AND YOU UNDERSTAND -- YOU'RE SOMEONE WHO I THINK HAS SOME

11:48:56   10  DESIGN PATENTS YOURSELF.  YOU UNDERSTAND THAT THE TERM "CLAIM"

11:49:01   11  IN THE PATENT WORLD IS KIND OF -- HAS KIND OF SPECIALIZED

11:49:05   12  MEANING?  IT'S KIND OF A TERM OF ART?

11:49:07   13       A.   I DON'T KNOW ABOUT TERM OF ART.  BUT I DO UNDERSTAND WHAT

11:49:16   14  THE CLAIM IS IN A DESIGN PATENT.

11:49:18   15       Q.   ALL RIGHT.  WHEN YOU SAY SOMETHING IS "CLAIMED BY A

11:49:21   16  PATENT," YOU UNDERSTAND THAT MEANS THAT'S WHAT THE PERSON

11:49:24   17  APPLYING FOR THE PATENT SAYS IS WHAT THE INVENTION IS?  THAT'S

11:49:28   18  THE CLAIM; CORRECT?

11:49:29   19       A.   YES.

11:49:30   20       Q.   AND IF WE LOOK AT THIS FACTOR, IT TELLS US TO LOOK AT THE

11:49:34   21  SCOPE OF THE DESIGN CLAIMED IN THE PATENT, AND WE CAN AGREE IT

11:49:39   22  DOESN'T SAY YOU LOOKED AT CLAIMED INFORMATION AND UNCLAIMED

11:49:42   23  INFORMATION?  IT SAYS YOU'RE SUPPOSED TO LOOK AT WHAT'S CLAIMED

11:49:46   24  IN THE PATENT; CORRECT?

11:49:47   25       A.   CORRECT.
```

11:49:48  1    Q.   AND LET'S TAKE IT -- IF WE COULD TURN TO THE '305 PATENT.

11:49:55  2    KEN, IF WE COULD PUT THAT UP ON THE SCREEN.   JX 1042.

11:50:01  3         AND FIRST, IF WE COULD JUST ENLARGE THE TITLE UP AT AT

11:50:05  4    TOP.

11:50:05  5         THE TITLE THERE WE SEE IS A "GRAPHICAL USER INTERFACE FOR

11:50:10  6    A DISPLAY SCREEN OR PORTION THEREOF."

11:50:13  7         DO YOU SEE THAT?

11:50:14  8    A.   YES.

11:50:15  9    Q.   AND THEN THERE'S A SECTION OF THE PATENT THAT'S ACTUALLY

11:50:18  10   ENTITLED "CLAIM."

11:50:20  11        IF WE CAN TAKE A LOOK AT THAT.

11:50:22  12        AND I THINK IT SAYS BASICALLY THE SAME THING, "THE

11:50:27  13   ORNAMENTAL DESIGN FOR A GRAPHICAL USER INTERFACE FOR A DISPLAY

11:50:30  14   SCREEN OR A PORTION THEREOF, AS SHOWN AND DESCRIBED."

11:50:33  15        DO YOU SEE THAT?

11:50:34  16   A.   YES.

11:50:35  17   Q.   NOW, A GRAPH -- A DISPLAY SCREEN, THAT'S AN OBJECT?  YOU

11:50:43  18   KNOW WHAT THAT IS, THAT'S AN ARTICLE ITSELF?  IF WE JUST FOCUS

11:50:48  19   ON DISPLAY SCREEN.

11:50:49  20   A.   IT -- IT IS AN ARTICLE THAT IS TYPICALLY PART OF A DEVICE.

11:50:56  21   Q.   RIGHT.  SO MY QUESTION IS, A DISPLAY SCREEN IS AN ARTICLE?

11:51:00  22   A.   YES.

11:51:01  23   Q.   ALL RIGHT.  THAT IS A PHYSICAL OBJECT?

11:51:03  24   A.   (NODS HEAD UP AND DOWN.)

11:51:03  25   Q.   CORRECT?

11:51:04   1      A.   CORRECT.

11:51:04   2      Q.   ALL RIGHT.  AND A DISPLAY SCREEN IN ITSELF IS AN ARTICLE

11:51:11   3      OF MANUFACTURE?

11:51:13   4      A.   I GUESS IF I WERE GOING TO SAY ANYTHING WAS AN ARTICLE OF

11:51:25   5      MANUFACTURE, I WOULD OFFICIALLY, I'D WANT TO LOOK AT THE PATENT

11:51:30   6      AND THE FOUR FACTORS.

11:51:31   7           I GET THAT A DISPLAY SCREEN IS A THING.

11:51:36   8      Q.   RIGHT.  AND I THINK YOU SAID IN YOUR REPORT, YOU QUOTED A

11:51:38   9      DEFINITION.  IT'S PRETTY SIMPLE.  AN ARTICLE OF MANUFACTURE IS

11:51:43   10     JUST SOMETHING MADE BY HAND OR MACHINE?

11:51:45   11     A.   UM-HUM.

11:51:46   12     Q.   IT'S THAT SIMPLE; CORRECT?

11:51:47   13     A.   YES.

11:51:48   14     Q.   SO THE DISPLAY SCREEN, WE CAN AGREE, IS AN ARTICLE OF

11:51:52   15     MANUFACTURE.  IT'S SOMETHING MADE BY HAND OR MACHINE, PROBABLY

11:51:55   16     BY MACHINE MOSTLY?

11:51:56   17     A.   (NODS HEAD UP AND DOWN.)  YES.

11:51:58   18     Q.   AND THE SAMSUNG PHONES CONTAIN MANY, MANY ARTICLES OF

11:52:03   19     MANUFACTURE?  WE CAN AGREE ABOUT THAT?

11:52:05   20     A.   THEY'RE COMPRISED OF MANY PARTS.

11:52:05   21     Q.   RIGHT.

11:52:12   22     A.   LIKE ANY PHONE.

11:52:13   23     Q.   RIGHT.  HUNDREDS OF PARTS PROBABLY?

11:52:16   24     A.   NOT MY AREA OF EXPERTISE.

11:52:20   25     Q.   UNDERSTOOD.

11:52:21  1    A.   BUT PROBABLY.

11:52:23  2    Q.   BUT YOU WOULD EXPECT THERE TO BE --

11:52:24  3    A.   AND PARTS WITH PARTS.

11:52:26  4    Q.   YEAH.  YOU WOULD EXPECT THERE WOULD BE SOME KIND OF PARTS

11:52:28  5    THAT DEALT WITH MAKING PHONE CALLS, FOR EXAMPLE?

11:52:33  6    A.   I'M NOT A HARDWARE EXPERT.

11:52:37  7    Q.   I KNOW.  BUT THERE WOULD BE PARTS FOR MAKING PHONE CALLS?

11:52:40  8    A.   YEAH.

11:52:40  9    Q.   AND PARTS FOR, LIKE, TEXTING AND DOING E-MAILS AND

11:52:43  10   SEARCHING THE INTERNET, ALL THOSE DIFFERENT THINGS?

11:52:46  11   A.   DEFINITELY PARTS AND -- BUT --

11:52:51  12   Q.   SO --

11:52:52  13   A.   I'M NOT THE ONE TO TALK ABOUT THAT --

11:52:53  14   Q.   I GOT THAT.  I KNOW.  I UNDERSTAND.

11:52:56  15   A.   -- ABOUT PHONE ELECTRONICS.

11:52:59  16   Q.   BUT YOU UNDERSTAND THAT THERE'S ALL THOSE DIFFERENT

11:53:02  17   THINGS, WIRES, ASSEMBLIES, CIRCUITS, PROCESSORS, AND ALL THOSE

11:53:05  18   THINGS ARE MADE BY HAND OR MACHINE AND ARE SEPARATELY ARTICLES

11:53:08  19   OF MANUFACTURE IN THEMSELVES; CORRECT?

11:53:12  20   A.   DEFINITELY A BUNCH OF THINGS.

11:53:18  21   Q.   ALL RIGHT.  ALL OF WHICH ARE ARTICLES OF MANUFACTURE?

11:53:21  22   A.   UM --

11:53:23  23   Q.   IN THE SENSE, IN YOUR DEFINITION IN YOUR REPORT --

11:53:26  24   A.   THEN AN ARTICLE OF MANUFACTURE IS A THING.

11:53:29  25   Q.   A THING MADE BY HAND OR MACHINE?

11:53:31   1    A.   (NODS HEAD UP AND DOWN.)

11:53:31   2    Q.   OKAY.  SO IF WE CAN GO BACK TO FACTOR 1, KEN.  NO, I'M

11:53:40   3    SORRY.  BACK TO THE PATENT.  I'M SORRY.

11:53:49   4         I'LL REVERSE MYSELF.  GO BACK TO 1.  I'M SORRY.  I LOST MY

11:53:53   5    WAY.

11:53:53   6         YOU SEE THERE WHERE IT SAYS, "THE SCOPE OF THE DESIGN

11:53:57   7    CLAIMED IN PLAINTIFF'S PATENT, INCLUDING THE DRAWINGS AND

11:54:01   8    WRITTEN DESCRIPTION."

11:54:02   9         NOW, YOU ANALYZED THIS FACTOR AND APPLIED IT IN YOUR

11:54:06   10   EXPERT ANALYSIS; CORRECT?

11:54:07   11   A.   YES.

11:54:08   12   Q.   AND YOU UNDERSTOOD THAT THE PHRASE THAT FOLLOWS WHAT'S

11:54:12   13   CLAIMED IN PLAINTIFF'S PLAINTIFF, THE PHRASE "INCLUDING THE

11:54:16   14   DRAWING AND WRITTEN DESCRIPTION," YOU UNDERSTOOD THAT THAT DID

11:54:20   15   NOT EXPAND THE SCOPE OF WHAT'S CLAIMED?  JUST THE WAY THAT'S

11:54:26   16   WRITTEN?

11:54:26   17   A.   YES.

11:54:27   18   Q.   ALL RIGHT.  SO INCLUDING THE DRAWINGS AND WRITTEN

11:54:31   19   DESCRIPTION, THAT'S KIND OF A SUBSET OF WHAT'S CLAIMED;

11:54:33   20   CORRECT?

11:54:34   21   A.   I UNDERSTAND THAT THE ORNAMENTAL DESIGN FOR A GRAPHICAL

11:54:46   22   USER INTERFACE OR FOR A DISPLAY SCREEN AS SHOWN AND DESCRIBED

11:54:51   23   MEANS THAT TO UNDERSTAND WHAT'S CLAIMED.

11:54:54   24   Q.   I'M JUST FOCUSSING HERE ON FACTOR 1 AND ASKING YOU --

11:54:58   25   A.   OKAY.

11:54:58   1    Q.   I MEAN, YOU TOLD ME THAT YOU UNDERSTOOD THAT THE PHRASE

11:55:04   2    "INCLUDING THE DRAWINGS AND WRITTEN DESCRIPTION," THAT DOES NOT

11:55:07   3    BROADEN WHAT'S CLAIMED IN THE FACTOR.  I THINK YOU JUST TOLD ME

11:55:10   4    THAT?

11:55:10   5    A.   YEAH, I UNDERSTAND THAT WHAT'S SHOWN AND IT DESCRIBES

11:55:13   6    ABOUT THE CLAIM, BUT NOT ABOUT THE ARTICLE.  IT IS NOT -- IT

11:55:19   7    DOESN'T SPECIFY THE ARTICLE OF MANUFACTURE.

11:55:21   8    Q.   THAT'S NOT REALLY MY QUESTION.

11:55:23   9    A.   OKAY.

11:55:24  10    Q.   MY QUESTION IS, I'M FOCUSSING ON HOW YOU UNDERSTOOD AND

11:55:26  11    APPLIED THIS FIRST FACTOR.  OKAY?  ARE YOU WITH ME?

11:55:29  12    A.   OKAY.

11:55:30  13    Q.   AND I THINK YOU TOLD ME THAT YOU UNDERSTOOD THAT THE

11:55:33  14    PHRASE "INCLUDING THE DRAWING AND WRITTEN DESCRIPTION," THAT IN

11:55:37  15    ITSELF DIDN'T TELL YOU THAT THIS IS BROADENING WHAT'S CLAIMED?

11:55:42  16         IN OTHER WORDS, INCLUDING MEANS IT'S INCLUDED WITHIN

11:55:45  17    WHAT'S CLAIMED; CORRECT?

11:55:47  18    A.   MAYBE I'M NOT QUITE UNDERSTANDING WHAT YOU'RE TRYING TO

11:56:00  19    DEFINE.

11:56:01  20    Q.   LET ME GET AT IT.  WOULD YOU AGREE --

11:56:05  21    A.   SORRY.

11:56:05  22    Q.   NO, IT'S MY FAULT.

11:56:07  23         WOULD YOU AGREE THAT THERE'S A DIFFERENCE BETWEEN SAYING,

11:56:11  24    YOU KNOW, WE'RE GOING TO TALK ABOUT X, SUBJECT X, COMMA,

11:56:19  25    INCLUDING Y?

11:56:21   1              YOU WOULD UNDERSTAND, IF I SAID THAT, THAT Y IS PART OF X?

11:56:25   2       WE'RE GOING TO TALK ABOUT SUBJECT X, INCLUDING Y.  SO Y IS PART

11:56:29   3       OF X IN THAT SENTENCE?

11:56:32   4       A.   YES.

11:56:35   5       Q.   ALL RIGHT.  AND THEN IT WOULD BE DIFFERENT IF IT SAID

11:56:38   6       WE'RE GOING TO TALK ABOUT X AND Y?  THAT WOULD BE DIFFERENT?

11:56:42   7       A.   I THINK SO.

11:56:44   8       Q.   ALL RIGHT.  BUT IF I TOLD YOU, FOR EXAMPLE, THAT I WENT TO

11:56:48   9       THE ZOO AND I SAW -- I WENT TO THE ZOO AND I SAW ALL OF THE

11:56:53  10       MAMMALS, INCLUDING THE REPTILES AND BIRDS, THAT WOULD MAKE ZERO

11:56:57  11       SENSE?

11:56:58  12       A.   CORRECT.

11:56:58  13       Q.   BUT IT WOULD BE DIFFERENT IF I SAID I WENT TO THE ZOO AND

11:57:02  14       I SAW THE MAMMALS AND THE BIRDS; RIGHT?

11:57:06  15       A.   THAT IS MORE LOGICAL.

11:57:14  16       Q.   ALL RIGHT.  WE'LL MOVE ON.

11:57:15  17              SO THE WRITTEN DESCRIPTION AND DRAWINGS, YOU UNDERSTOOD

11:57:21  18       THEY HELP DEFINE THE CLAIM, BUT THEY DON'T EXPAND THE CLAIM;

11:57:24  19       CORRECT?

11:57:25  20       A.   CORRECT.

11:57:25  21       Q.   AND IF WE CAN NOW LOOK AT THE PATENT --

11:57:31  22       A.   OH, EXCUSE ME.

11:57:33  23              YOU KNOW HOW YOU SAID THEY DON'T EXPAND THE CLAIM?  I -- I

11:57:39  24       GUESS I DO THINK THAT THEY DO PROVIDE CLUES TO HOW YOU MIGHT

11:57:45  25       THINK ABOUT HOW THE CLAIM MIGHT BE APPLIED.  LIKE WHEN I SAY

KARE CROSS BY MR. QUINN

11:57:49  1    ORNAMENTAL DESIGN FOR A GRAPHICAL USER INTERFACE, THEN I KNOW

11:57:54  2    THAT THIS, THIS -- THE ILLUSTRATION ISN'T FOR ART FOR A T-SHIRT

11:58:01  3    OR SHOWER CURTAIN.

11:58:02  4        Q.   RIGHT.

11:58:03  5        A.   IT DOES GIVE ME OUTWARD CLUES --

11:58:06  6        Q.   SURE.

11:58:07  7        A.   -- AS A WAY OF THINKING ABOUT IT.

11:58:09  8        Q.   AND WE'RE GOING TO TALK ABOUT THAT.

11:58:11  9             I'M JUST LOOKING AT FACTOR 1.  YOU'VE AGREED WITH ME, I

11:58:15  10   THINK A COUPLE OF TIMES, THAT THE DRAWINGS AND WRITTEN

11:58:18  11   DESCRIPTION, THAT'S KIND OF A SUBSET OF THE CLAIM?  IT DOESN'T

11:58:20  12   EXPAND THE CLAIM ITSELF?

11:58:26  13       A.   WELL, IT -- I MEAN, I READ WHAT THE CLAIM IS AND I SEE

11:58:32  14   WHAT'S THERE AND I SEE THESE WORDS, AND I SEE THESE DRAWINGS

11:58:36  15   AND I UNDERSTAND THAT THAT IS THE CLAIM.

11:58:40  16       Q.   OKAY.

11:58:42  17       A.   BUT AS I SAID, SOME -- IN TRYING TO DETERMINE -- IN

11:58:48  18   THINKING ABOUT THE FIRST FACTOR AND TRYING TO DETERMINE THE

11:58:51  19   ARTICLE OF MANUFACTURE, I SEE CLUES THAT, THAT GO BEYOND WHAT'S

11:58:58  20   HERE.

11:58:59  21       Q.   I UNDERSTAND WHAT YOU'RE SAYING.

11:59:00  22       A.   THAT ARE INSIGHTFUL.

11:59:02  23       Q.   OKAY.  BUT THE DRAWINGS AND WRITTEN DESCRIPTION DON'T

11:59:04  24   EXPAND WHAT'S CLAIMED?  I THINK YOU'VE --

11:59:08  25       A.   THEY ARE WHAT'S CLAIMED.

| | |
|---|---|
| 11:59:09 | 1 |

Q.   THEY DON'T EXPAND IT; CORRECT?

A.   WELL, AGAIN, I -- WHEN I THINK ABOUT, LIKE, WHAT'S

INSIGHTFUL, MAYBE THAT'S A WORD THAT MEANS MENTALLY TO EXPAND

YOUR NOTION OF --

Q.   WELL, I DON'T KNOW --

A.   -- OF WHAT MIGHT BE CLAIMED.  BUT -- I'M NOT TRYING TO

ARGUE.

Q.   OKAY.

A.   BUT I'M JUST TRYING TO BE REALLY CAREFUL TO LISTEN TO WHAT

YOU'RE ASKING.

Q.   AND I APPRECIATE THAT.

     LET ME JUST SEE IF I CAN LIMIT IT, GO BACK TO ONE THING

AND SEE IF WE CAN AGREE AND GET CLARITY AND AGREE ON ONE THING.

     JUST IN TERMS OF HOW YOU WRITE AND UNDERSTAND THE ENGLISH

LANGUAGE AND THE WAY YOU APPLY THESE FACTORS, YOU AGREE THERE'S

A DIFFERENCE BETWEEN SAYING, WE'RE GOING TO TALK ABOUT X,

INCLUDING Y, AND SAYING, WE'RE GOING TO TALK ABOUT X AND Y?

THERE'S A DIFFERENCE?

A.   OKAY.

Q.   IN THE FIRST CASE, Y IS INCLUDED IN X?

A.   I'LL THINK ABOUT THE ZOO.

Q.   IN THE FIRST CASE, Y IS INCLUDED IN X; RIGHT?

A.   RIGHT.

     MR. MUELLER:  YOUR HONOR, THIS IS YOUR TEST.  AND I

WOULD ASK AT THIS POINT -- THIS IS REALLY GETTING INTO WHAT

12:00:17   1        YOU'RE GOING TO INSTRUCT THE JURY ON WITH RESPECT TO THE FOUR

12:00:20   2    FACTORS.  I THINK WE'VE PROBABLY SPENT ENOUGH TIME ON TRYING TO

12:00:23   3    PARSE THE WORDS.  IT'S REALLY A MATTER FOR YOUR HONOR.

12:00:26   4             THE COURT:  WELL, IT'S ACTUALLY NOON.  I WAS GOING TO

12:00:29   5    STOP.  WHAT IS THE TIME ON THE TRANSCRIPT?  MY REAL TIME HAS

12:00:32   6    DECIDE.

12:00:33   7             THE REPORTER:  12:00 O'CLOCK AND 26 SECONDS.

12:00:35   8             THE COURT:  12:00 O'CLOCK AND 26 SECONDS.  SO IT'S

12:00:37   9    NOON NOW.  I'D LIKE TO GO AHEAD AND TAKE OUR LUNCH BREAK.  DO

12:00:41  10    NOT RESEARCH OR DISCUSS THE CASE.

12:00:43  11        THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL BE

12:00:45  12    BACK -- DO YOU WANT TO DISCUSS THAT?  OKAY.  LET'S SAY 1:05,

12:00:50  13    PLEASE.

12:00:50  14             MR. QUINN:  I'M MOVING -- I'M DONE WITH THAT.

12:00:52  15             MR. MUELLER:  WE DON'T NEED TO KEEP GOING.

12:00:55  16             THE COURT:  OKAY.  LET'S SAY 1:00 O'CLOCK, PLEASE.

12:00:58  17    1:00 O'CLOCK WE'LL SEE YOU BACK.

12:01:00  18        AND YOU MAY STEP DOWN DURING THE LUNCH BREAK.

12:01:03  19        (JURY OUT AT 12:01 P.M.)

12:01:06  20             THE COURT:  AND YOU MAY STEP DOWN NOW.

12:01:09  21             THE DEFENDANT:  CAN I LEAVE MY STUFF?

12:01:11  22             THE COURT:  YES, YOU CAN LEAVE EVERYTHING ON THE

12:01:13  23    STAND.

12:01:13  24        THE SECOND SHOULD REFLECT THE JURORS HAVE LEFT THE

12:01:16  25    COURTROOM.

12:01:16   1            I HAVE TWO ISSUES.

12:01:17   2            ONE IS CAN YOU FILE A JOINT ADMITTED EXHIBITS LIST,

12:01:21   3    BECAUSE I FORGOT TO ASK YOU TO DO THAT, AND WE'LL NEED TO

12:01:24   4    FINALIZE THAT QUICKLY.

12:01:26   5            PLEASE TAKE A SEAT.

12:01:27   6            WHEN DOES THAT SOUND REASONABLE TO DO?

12:01:29   7            MS. MAROULIS:  YOUR HONOR, WOULD YOU LIKE TO DO THIS

12:01:31   8    DAILY OR AT THE END OF THE EVIDENCE?

12:01:32   9            THE COURT:  IT MIGHT BE GOOD TO DO IT DAILY JUST SO

12:01:35  10    THAT WE HAVE AGREEMENT, AND THEN EVERY TIME WE ONLY NEED TO ADD

12:01:39  11    A FEW NUMBERED ITEMS EACH DAY TOWARDS THE END.

12:01:42  12            BUT WHAT -- I KNOW YOU'RE REALLY BUSY PREPARING FOR TRIAL,

12:01:47  13    SO WHAT IS REALISTIC?

12:01:48  14            MS. MAROULIS:  WE CAN DO IT AT 9:00 O'CLOCK EACH DAY.

12:01:51  15            THE COURT:  OKAY.  IS THAT A.M. OR P.M.?

12:01:53  16            MS. MAROULIS:  P.M., AFTER THE EVIDENCE.

12:01:56  17            THE COURT:  OKAY.  COULD YOU DO THE FIRST ONE TODAY,

12:01:59  18    PLEASE.

12:01:59  19            MS. MAROULIS:  SURE.

12:02:00  20            THE COURT:  GOOD.  THANK YOU.  THEN THE OTHER

12:02:01  21    QUESTION I HAD, AND I MAY BE WASTING MY BREATH, BUT I WANTED TO

12:02:04  22    ASK IF YOU WOULD GO BACK TO YOUR CLIENTS AND ASK IF THEY WOULD

12:02:07  23    BE WILLING TO PARTICIPATE IN ADR AFTER IF THERE IS A VERDICT,

12:02:11  24    OR IF THERE'S NOT A VERDICT.

12:02:13  25            I JUST THINK, YOU KNOW, THIS CASE HAS BEEN GOING ON FOR

12:02:17   1    SEVEN YEARS.  I THINK IT'S AT LEAST WORTH ATTEMPTING TO SEE IF

12:02:21   2    THERE'S A RESOLUTION.  I MEAN, OBVIOUSLY THAT'S UP TO YOUR

12:02:24   3    CLIENTS, BUT IS THAT SOMETHING THAT YOU WOULD BE WILLING -- OR

12:02:28   4    ACTUALLY, I'M GOING TO ASK YOU TO JUST LET THEM KNOW THAT

12:02:32   5    THAT'S MY REQUEST, THAT THEY AT LEAST CONSIDER IT.

12:02:34   6          AND THEN IF YOU COULD REPORT BACK TO ME WHETHER THEY WOULD

12:02:37   7    BE OPEN, AFTER THE VERDICT, TO ATTEMPT ANY ADR.  THEY DON'T

12:02:40   8    HAVE TO RESOLVE IF THEY DON'T WANT TO.  BUT AT LEAST TO -- I

12:02:43   9    MEAN, THEY CAME CLOSE IN, WHAT, 2013?  I DON'T KNOW WHEN THAT

12:02:47   10   WAS, BUT I RECALL THEY CAME CLOSE, AND I WOULD JUST ASK, IF

12:02:50   11   IT'S POSSIBLE FOR THEM TO CONSIDER THAT AND THEN LET ME KNOW.

12:02:54   12         WHEN CAN YOU GET BACK TO ME ON THAT POINT?

12:02:59   13             MS. MAROULIS:  TOMORROW, YOUR HONOR.

12:03:00   14             THE COURT:  ALL RIGHT.  ARE YOU GOING TO GIVE THE

12:03:03   15   SAME ANSWER?

12:03:03   16             MR. LEE:  THAT'S FINE.

12:03:04   17             THE COURT:  ALL RIGHT.  IF YOU WOULD LET ME KNOW

12:03:07   18   THAT, THAT WOULD BE MUCH APPRECIATED.

12:03:08   19             MR. LEE:  YOUR HONOR, CAN I RAISE ONE THING BEFORE

12:03:10   20   YOU GO?

12:03:11   21             THE COURT:  WHAT'S THAT?

12:03:11   22             MR. LEE:  I'M GOING TO PROPOSE A CURATIVE INSTRUCTION

12:03:14   23   BECAUSE THIS COMPARISON OF THE PHONES AND WHETHER THE FEATURE

12:03:16   24   IS PROMINENT, A FEATURE CAN BE PROMINENT IN A NON-INFRINGING

12:03:20   25   PHONE.  THERE'S NO PURPOSE FOR COMPARING WHETHER THE RELATIVE

12:03:24  1      PROMINENCE OF AN INFRINGING AND NON-INFRINGING PHONE IS, MAKING

12:03:27  2      THAT COMPARISON, EXCEPT TO REOPEN THE ISSUE OF INFRINGEMENT.

12:03:31  3      THE COMPARISON HAS NOTHING TO DO WITH WHETHER THE FEATURE IS

12:03:34  4      PROMINENT IN THE INFRINGING PHONES.

12:03:36  5          IT CAN BE PROMINENT IN A NON-INFRINGING PHONE AS WELL.

12:03:40  6      IT'S JUST DIFFERENT.  AND THAT -- THAT IS NOTHING OTHER THAN

12:03:45  7      CALCULATED TO CONFUSE.

12:03:47  8          AND THAT SLIDE AND THAT EXAMINATION WERE -- YOU KNOW,

12:03:52  9      MR. BALL TRIED TO RESIST THE IDEA THAT YOU SHOULD BE COMPARING

12:03:55 10      THE RELATIVE PROMINENCE OF AN INFRINGING AND A NON-INFRINGING

12:03:59 11      PHONE, RIGHT?  AND THAT IS NOT -- IT'S REALLY A BIG 403

12:04:05 12      PROBLEM, OR IT'S A 403 PROBLEM.

12:04:08 13          SO WE'RE GOING TO ACTUALLY PROPOSE A CURATIVE INSTRUCTION

12:04:11 14      TO MAKE CLEAR THAT THE ISSUE OF INFRINGEMENT HAS BEEN DECIDED

12:04:15 15      AND THE ISSUE OF THE NON-INFRINGING ALTERNATIVES HAS NOTHING TO

12:04:19 16      DO WITH THE ISSUE OF INFRINGEMENT.

12:04:20 17              THE COURT:  SO ARE YOU PROPOSING A CURATIVE, LIKE,

12:04:23 18      NOW?  OR DURING THE TRIAL?  OR YOU'RE ONLY GOING TO PROPOSE IT

12:04:28 19      FOR A FINAL JURY INSTRUCTION.

12:04:29 20              MR. LEE:  YOUR HONOR, IF I CAN HAVE THE LUNCH BREAK

12:04:31 21      TO TALK ABOUT IT.  IT MAY BE THAT IT'S ENOUGH THAT IT'S IN THE

12:04:35 22      FINAL JURY INSTRUCTIONS SO WE HAVE THEM BEFORE CLOSE.

12:04:38 23          BUT IT IS -- I CAN HAVE A NON-INFRINGING PHONE AND I CAN

12:04:42 24      HAVE THE BLACK FRONT FACE OF THAT PARTICULAR PHONE BEING A

12:04:45 25      PROMINENT FEATURE.  BUT THE COMPARISON OF ONE PHONE TO THE

12:04:49  1        OTHER, NON-INFRINGING TO INFRINGING, IS WHAT IS THE PROBLEM.

12:04:53  2            AND --

12:04:54  3                THE COURT:  WELL, YOU'RE GOING TO HAVE TO BRIEF THIS

12:04:57  4        BECAUSE I DON'T THINK I FULLY UNDERSTAND YOUR POINT.

12:04:58  5                MR. LEE:  FAIR ENOUGH.  ALL RIGHT.

12:05:00  6                THE COURT:  SO IT'LL HAVE TO BE BRIEFED.

12:05:02  7                MR. LEE:  WHY DON'T WE DO THIS THEN AS PART OF THE

12:05:04  8        FINAL INSTRUCTION PROCESS, AND WE'LL PROPOSE SOMETHING FOR THE

12:05:07  9        FINAL INSTRUCTIONS.  THAT MAY BE THE BEST WAY TO DEAL WITH IT

12:05:11 10        RATHER THAN DEALING WITH IT JUST ONE OFF.

12:05:13 11                THE COURT:  ALL RIGHT.  WELL, MY HOPE IS TO TRY TO

12:05:15 12        GET -- WELL, MAYBE I SHOULDN'T COMMIT.  BUT I'D LIKE TO TRY TO

12:05:20 13        GET FINAL JURY INSTRUCTIONS TONIGHT SO THAT YOU CAN REVIEW

12:05:25 14        THEM.

12:05:26 15            SO YOU'LL HAVE TO DO IT SOON, ALTHOUGH I GUESS WE COULD

12:05:29 16        TRY AND INCORPORATE IT OR AT LEAST THINK ABOUT IT TOMORROW.  I

12:05:32 17        ASSUME THAT SAMSUNG WOULD WANT TO RESPOND.

12:05:34 18                MR. PRICE:  OH, YES.

12:05:35 19                THE COURT:  RIGHT?

12:05:36 20                MR. PRICE:  AND I THINK WE MAY HAVE SOME COMMON

12:05:38 21        GROUND ON THIS.

12:05:39 22                THE COURT:  OKAY.

12:05:40 23                MR. PRICE:  ONE INSTRUCTION THAT THAT COMPARISON

12:05:43 24        ISN'T MEANT TO CHALLENGE INFRINGEMENT, I HAVE NO PROBLEM WITH

12:05:46 25        THAT.

```
12:05:46   1              THE COURT:  OKAY.

12:05:47   2              MR. PRICE:  AS LONG AS THE JURY IS TOLD WHAT IT WAS

12:05:49   3    FOR, WHICH IT WENT TO HIS PROMINENCE ANALYSIS, AND IT CAN GO TO

12:05:53   4    THE SCOPE OF THE CLAIM.

12:05:54   5              THE COURT:  OKAY.  CAN YOU PERHAPS TALK AND THERE MAY

12:05:57   6    BE A MIDDLE GROUND HERE, EITHER IN WHOLE OR IN PART.  THAT

12:06:01   7    WOULD BE MUCH APPRECIATED.

12:06:03   8              MR. LEE:  YEAH.  WE CAN TRY.

12:06:04   9         I DON'T -- I MEAN, WE'RE TRYING NOT TO HAVE TOO MUCH TIME

12:06:08  10    LOST WITH THE JURY, BUT THESE CONSTANT QUESTIONS ABOUT WHAT THE

12:06:11  11    SCOPE OF THE CLAIM IS, YOUR HONOR HAS DECIDED THE SCOPE OF THE

12:06:14  12    CLAIM AND THE ONLY REASON WE'RE NOT PUTTING IT UP THERE AND

12:06:16  13    ASKING THE WITNESSES ABOUT IT IS BECAUSE OF YOUR HONOR'S

12:06:20  14    ADMONITION THAT THAT WAS DONE BEFORE THE SUPREME COURT'S

12:06:23  15    DECISION, YOU DON'T WANT TOO MUCH RELIANCE ON IT.

12:06:27  16         SO OUR WITNESSES HAVE BEEN VERY CAREFUL TO SAY THEY'VE

12:06:30  17    JUST CONSIDERED IT.  BUT WE'VE HAD THE CONSTANT EXAMINATION OF

12:06:33  18    EVERY WITNESS ABOUT WHAT THE SCOPE OF EVERY CLAIM IS.  THAT WAS

12:06:36  19    MR. MUELLER'S OBJECTION.  BUT WE CAN TRY.

12:06:38  20              THE COURT:  IF YOU COULD SEE IF YOU CAN REACH SOME

12:06:40  21    AGREEMENT, AT LEAST IN PART OR IN WHOLE, THAT WOULD BE

12:06:42  22    APPRECIATED.

12:06:42  23              MR. LEE:  OKAY.

12:06:43  24              THE COURT:  OKAY.  WHAT ELSE?  NOTHING ELSE?

12:06:45  25         OKAY.  THANK YOU.  SEE YOU BACK AT 1:00.
```

12:06:48  1                    THE CLERK:   COURT IS IN RECESS.

12:07:10  2                    EXCUSE ME.   HELLO.   MY REALTIME MIGHT BE DYING

12:07:13  3       BECAUSE PEOPLE ARE NOT USING AIRPLANE MODE.   IF IT'S

12:07:16  4       POSSIBLE -- UNFORTUNATELY, WE'VE HAD THIS PROBLEM IN THE

12:07:19  5       PREVIOUS TRIALS WHEN THERE ARE TOO MANY PHONES ON, OUR REALTIME

12:07:23  6       TRANSCRIPT DISCONNECTS.   SO IF YOU COULD PLEASE TURN YOUR

12:07:26  7       DEVICES TO AIRPLANE MODE.   THANK YOU.

12:07:29  8            (THE LUNCH RECESS WAS TAKEN FROM 12:07 P.M. UNTIL 1:04

          9       P.M.)

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    **AFTERNOON SESSION**

01:04:25  2          (JURY OUT AT 1:04 P.M.)

01:04:25  3              THE CLERK:  YOUR HONOR, WE HAVE ONE JUROR IN THE

01:04:27  4      RESTROOM.

01:04:28  5              THE COURT:  OH, OKAY.

01:04:34  6          (PAUSE IN PROCEEDINGS.)

01:05:22  7              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

01:05:31  8      OKAY.  THE TIME IS 1:05.  GO AHEAD, PLEASE.

01:05:34  9              MR. QUINN:  THANK YOU, YOUR HONOR.

01:05:35  10     Q.  GOOD AFTERNOON, DR. KARE.

01:05:37  11     A.  GOOD AFTERNOON.

01:05:38  12     Q.  IF WE CAN GO BACK TO THE '305 PATENT ITSELF, AND IF WE

01:05:48  13     COULD TAKE A LOOK AT, UNDER THE DESCRIPTION HEADING, IF WE

01:05:51  14     COULD PUT THAT -- KEN, IF YOU COULD BLOW THAT UP.

01:05:54  15         UNDER THE DESCRIPTION THERE IT SAYS, "THE BROKEN LINE

01:05:58  16     SHOWING OF A DISPLAY SCREEN IN BOTH VIEWS FORMS NO PART OF THE

01:06:02  17     CLAIMED DESIGN."

01:06:03  18         DO YOU SEE THAT?

01:06:04  19     A.  YES.

01:06:05  20     Q.  NOW, IF WE CAN -- THESE ICONS, THE WAY THEY APPEAR IN THE

01:06:08  21     PATENT, HAVE THIS BROKEN LINE.

01:06:10  22         MAYBE WE CAN TAKE A LOOK AT THAT FIGURE, KEN.

01:06:15  23         IT HAS THIS BROKEN LINE AROUND IT, AND YOU UNDERSTAND WHEN

01:06:18  24     IT SAYS HERE THE BROKEN LINE IN BOTH VIEWS FORMS NO PART OF THE

01:06:22  25     CLAIMED DESIGN, THAT MEANS THAT NO -- NOTHING OUTSIDE OF THAT

01:06:26   1      IMAGE IS ACTUALLY CLAIMED; CORRECT?

01:06:29   2      A.   YES.

01:06:29   3      Q.   IS THAT CORRECT?

01:06:30   4      A.   YES.

01:06:31   5      Q.   ALL RIGHT.

01:06:32   6           SO EVERYTHING ELSE OUTSIDE JUST THIS ONE IMAGE IS

01:06:36   7      UNCLAIMED SUBJECT MATTER?

01:06:39   8      A.   I KNOW THAT WHAT'S INSIDE IS WHAT'S CLAIMED.

01:06:48   9      Q.   EXACTLY.  AND WHAT'S OUTSIDE IS NOT CLAIMED.  THAT'S WHAT

01:06:54   10     IT'S SAYING IN THAT WRITTEN DESCRIPTION.

01:06:57   11          AGAIN, WHEN IT SAYS, "THE BROKEN LINE SHOWING OF A DISPLAY

01:07:01   12     SCREEN IN BOTH VIEWS FORMS NO PART OF THE CLAIMED DESIGN," YOU

01:07:06   13     UNDERSTAND THAT WHATEVER IS OUTSIDE IS NOT PART OF THE CLAIM?

01:07:10   14     A.   YOU KNOW, I'M ONLY SPLITTING HAIRS BECAUSE WE'RE IN A

01:07:13   15     COURT.  IT DOESN'T REALLY SAY ANYTHING ABOUT WHAT'S OUTSIDE.  I

01:07:17   16     SEE IT TALKS ABOUT WHAT'S INSIDE.  IT'S LIMITED TO WHAT'S

01:07:20   17     INSIDE.

01:07:20   18     Q.   OKAY.  SO YOU UNDERSTAND IT'S JUST THIS ONE IMAGE WHICH IS

01:07:24   19     WHAT IS CLAIMED IN THIS PATENT; CORRECT?

01:07:28   20     A.   YES.

01:07:29   21     Q.   AND THIS WOULD APPEAR, YOU TOLD US, IN A GRAPHICAL USER

01:07:32   22     INTERFACE IN A PHONE AND WE KNOW THAT'S WHERE IT APPEARS.

01:07:35   23          AND DO YOU KNOW HOW MANY PAGES THERE ARE IN THE GRAPHICAL

01:07:37   24     USER INTERFACES OF THE SAMSUNG PHONES WHICH ARE PART OF THIS

01:07:41   25     CASE?

01:07:42  1    A.   I DON'T KNOW EXACTLY.

01:07:46  2    Q.   ALL RIGHT.  BUT IT'S HUNDREDS, IF NOT THOUSANDS, OF PAGES

01:07:51  3    IN ADDITION TO THIS ONE PAGE; CORRECT?

01:07:54  4    A.   I GUESS DEPENDING WHAT APPS YOU HAVE.

01:07:57  5    Q.   RIGHT.  AND THIS OBVIOUSLY -- THIS DOESN'T CLAIM ANY PART

01:08:04  6    OF THE INSIDE OF THE PHONE OR THE OUTSIDE OF THE PHONE?

01:08:07  7    A.   NO.

01:08:08  8    Q.   AND IT REALLY DOESN'T SAY ANYTHING ABOUT HOW THE PHONE

01:08:14  9    WORKS, ANY OF THE FUNCTIONALITY, THAT IS TO SAY, YOU KNOW,

01:08:19  10   VIDEO CAPABILITY OR ACCESSING THE INTERNET OR ANYTHING LIKE

01:08:22  11   THAT?  IT DOESN'T ADDRESS FUNCTIONALITY?

01:08:25  12   A.   I -- I UNDERSTAND THAT THIS IS A DESIGN PATENT, SO IT'S

01:08:29  13   ABOUT ORNAMENTAL DESIGN.

01:08:31  14   Q.   RIGHT.  NOW, YOU SAID SOMETHING ON YOUR DIRECT EXAM

01:08:40  15   THAT -- YOU MADE A COMMENT ABOUT YOU DON'T SEE THIS IMAGE

01:08:43  16   UNLESS IT'S CONNECTED TO A POWER SOURCE.

01:08:46  17        DO YOU RECALL THAT?

01:08:47  18   A.   YES.

01:08:47  19   Q.   AND A POWER SOURCE IN A SMARTPHONE MIGHT BE A BATTERY, FOR

01:08:53  20   EXAMPLE?

01:08:55  21   A.   YOU KNOW, I -- I JUST KNOW THAT YOU NEED TO TURN THE PHONE

01:09:02  22   ON TO SEE THIS.

01:09:03  23   Q.   ALL RIGHT.  YOU NEED TO HAVE A POWER SOURCE?

01:09:05  24   A.   I -- YOU KNOW, I'M A GRAPHIC DESIGNER, SO I JUST DON'T

01:09:11  25   WANT TO MAKE ANY POSSIBLE, LIKE, MISSTATEMENT ABOUT HOW A PHONE

KARE CROSS BY MR. QUINN

01:09:16  1    WORKS.

01:09:17  2          BUT IT DOESN'T SEEM ILLOGICAL WHEN YOU SAY IT.

01:09:20  3    Q.   BUT IT WOULDN'T MAKE ANY SENSE TO SAY THAT THE '305 DESIGN

01:09:24  4    IS APPLIED TO A BATTERY OR SOME OTHER POWER SOURCE?  THAT WOULD

01:09:28  5    NOT BE LOGICAL?

01:09:30  6    A.   THAT'S NOT MY CONCLUSION.

01:09:32  7    Q.   OKAY.  I KNOW.  BUT IT WOULDN'T BE LOGICAL TO SPEAK IN

01:09:36  8    THOSE TERMS OF THE '305 BEING APPLIED TO A BATTERY?

01:09:41  9    A.   YOU KNOW, I -- I DON'T KNOW FOR CERTAIN THAT THAT'S

01:09:46  10   IMPOSSIBLE.  I -- THAT'S NOT SOMETHING I CONSIDERED.

01:09:51  11   Q.   IS THIS CLAIM, AS IT'S DESCRIBED IN THE PATENT, IS IT

01:09:55  12   DESCRIBED AS APPLYING TO A BATTERY OR A POWER SOURCE?

01:09:58  13   A.   THE PATENT DOESN'T SAY WHAT IT'S APPLIED TO.

01:10:02  14   Q.   ALL RIGHT.  SO WHEN WE SEE IT, IT APPEARS ON THE DISPLAY

01:10:07  15   SCREEN; CORRECT?  WHEN YOU SEE IT IN A PHONE, IN A WORKING

01:10:12  16   PHONE WHEN IT'S TURNED ON, WE SEE IT ON THE DISPLAY SCREEN?

01:10:18  17   A.   I WOULD -- HONESTLY, I WOULD SAY YOU SEE IT ON THE PHONE.

01:10:22  18   THE PHONE AS A DISPLAY SCREEN, BUT IT'S NOT LIKE IT LIVES ON

01:10:28  19   THE DISPLAY SCREEN.

01:10:30  20   Q.   ALL RIGHT.  THERE'S A DISPLAY SCREEN; YES?

01:10:35  21   A.   YES.

01:10:36  22   Q.   IT'S BEHIND THE GLASS?

01:10:37  23   A.   YES.

01:10:38  24   Q.   AND WHEN YOU SEE THIS, IT APPEARS THROUGH THE GLASS ON

01:10:40  25   THAT DISPLAY SCREEN; CORRECT?

01:10:44  1    A.   POWERED BY THE REST OF THE PHONE, YES.

01:10:48  2    Q.   IF WE COULD LOOK AT THE PX 7.26, THIS IS THE IMAGE OF THE

01:10:57  3    GS I 9100, AND YOU UNDERSTAND THAT THESE ICONS THAT WE SEE HERE

01:11:06  4    ON THE GALAXY S II I 9100, THESE WERE FOUND NOT TO BE

01:11:15  5    INFRINGING?  YOU UNDERSTAND THAT?

01:11:17  6    A.   I DON'T HAVE THAT LIST IN MY MEMORY, BUT I'LL -- YES.

01:11:20  7    Q.   ALL RIGHT.  BUT YOU UNDERSTAND THAT THERE ARE SOME

01:11:23  8    ALTERNATIVES THAT SAMSUNG HAD THAT WERE NOT INFRINGING?

01:11:26  9    A.   ABSOLUTELY.

01:11:27  10   Q.   AND YOU'RE NOT SUGGESTING THAT SAMSUNG OWNS THE RIGHT TO

01:11:33  11   USE A COLORFUL ARRAY OF ICONS IN COLUMNS IN A GRID?  I MEAN,

01:11:40  12   THAT IS NOT YOUR TESTIMONY, IS IT?

01:11:42  13   A.   I SEE --

01:11:50  14   Q.   I'M SORRY.  I SAID SAMSUNG.

01:11:52  15        YOU'RE NOT SAYING THAT APPLE OWNS THE CONCEPT OF USING A

01:11:55  16   COLORFUL ARRAY OF ICONS IN A GRID?

01:12:00  17   A.   I -- NO.  I CAN SPEAK TO THE '305, AND I KNOW THAT AN

01:12:07  18   ILLUSTRATION FOR THE '305, ALL THE ICONS ARE IN ROUNDED

01:12:12  19   CORNERED TILES AND I DON'T SEE THOSE IN -- ON THIS PHONE.

01:12:16  20   Q.   RIGHT.

01:12:16  21   A.   SO I UNDERSTAND HOW THIS -- I CAN SEE WAYS THAT THIS

01:12:21  22   DIFFERS FROM THE '305.

01:12:23  23   Q.   RIGHT.  AND THIS -- YOU UNDERSTAND THIS IMAGE THAT YOU'RE

01:12:26  24   LOOKING AT HERE FROM THE S II, THAT IS AN ALTERNATIVE THAT

01:12:29  25   DOESN'T USE THE '305?  IT DOESN'T HAVE THOSE ROUNDED TILES IN

KARE CROSS BY MR. QUINN

01:12:34   1     THE BACKGROUND WHICH THE '305 HAS; CORRECT?

01:12:37   2     A.   CORRECT.

01:12:37   3     Q.   ALL RIGHT.  SO, I MEAN, WE CAN AGREE THAT -- AND THIS IS A

01:12:41   4     COLORFUL ARRAY OF ICONS?

01:12:42   5     A.   YES.

01:12:43   6     Q.   IN A GRID IN COLUMNS?

01:12:45   7     A.   YES.

01:12:46   8     Q.   AND IT'S OKAY FOR SAMSUNG AND OTHER PEOPLE IN THE WORLD TO

01:12:49   9     USE THIS?

01:12:51   10    A.   NOT REALLY MY PLACE TO RULE ON THAT.  YOU KNOW, I KNOW

01:12:56   11    THOSE OTHER PHONES WERE FOUND TO INFRINGE.  IF THIS ONE DIDN'T,

01:13:00   12    YOU KNOW, IT DOESN'T HAVE A DOCK, IT DOESN'T HAVE SOME OF THE

01:13:03   13    CHARACTERISTIC D'305 FEATURES.

01:13:07   14    Q.   LET'S TURN THEN TO THE SECOND FACTOR, PROMINENCE.

01:13:10   15         IF WE COULD PUT THAT UP, KEN.

01:13:12   16         AND THIS FACTOR, OF COURSE, ASKS US TO LOOK AT THE

01:13:15   17    RELATIVE PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A

01:13:19   18    WHOLE; RIGHT?

01:13:19   19    A.   YES.

01:13:20   20    Q.   AND IT DOESN'T SAY THE RELATIVE PROMINENCE OF THE DESIGN

01:13:24   21    WITHIN THE DESIGN OF THE PRODUCT AS A WHOLE?  IT ASKS FOR THE

01:13:29   22    PRODUCT AS A WHOLE; CORRECT?

01:13:30   23    A.   CORRECT.

01:13:31   24    Q.   SO THIS TEST, YOU UNDERSTAND, REQUIRES THAT YOU LOOK AT

01:13:34   25    FACTORS OTHER THAN DESIGN ELEMENTS IN DECIDING PROMINENCE?

01:13:38  1     A.   IT'S SAYING LOOK AT THE PRODUCT AS A WHOLE.

01:13:51  2     Q.   RIGHT.

01:13:51  3     A.   AND TALK ABOUT THE PROMINENCE THAT'S ON IT.

01:13:55  4     Q.   SO THE PRODUCT AS A WHOLE WOULD INCLUDE A LOT OF THINGS

01:13:58  5     BESIDES THE DESIGN OF THE PRODUCT.  IT WOULD INCLUDE ALL OF

01:14:00  6     THOSE FEATURES AND FUNCTIONS AND COMPONENTS, THAT'S ALL PART OF

01:14:04  7     THE PRODUCT AS A WHOLE?

01:14:05  8     A.   TRUE.

01:14:06  9     Q.   SO IN ASSESSING THE PROMINENCE OF THIS ONE PAGE OF THE

01:14:10  10    GRAPHICAL USER INTERFACE, WE REALLY HAVE TO CONSIDER ALL THOSE

01:14:14  11    DIFFERENT ELEMENTS, ALL THOSE DIFFERENT FEATURES AND DESIGNS

01:14:17  12    THAT GO INTO THE PRODUCT AS A WHOLE; CORRECT?

01:14:20  13    A.   TRUE.  WE'RE -- WE'RE FOCUSSED ON AN ORNAMENTAL DESIGN.

01:14:32  14         BUT WE'RE TO LOOK AT THE ARTICLE OF MANUFACTURE FOR THIS

01:14:37  15    ORNAMENTAL DESIGN, YES, AND CONSIDER THE WHOLE.

01:14:39  16    Q.   CONSIDER THE PRODUCT AS A WHOLE AND ALL THOSE DIFFERENT

01:14:42  17    FUNCTIONS, FEATURES, COMPONENTS AND ON AND ON; CORRECT?

01:14:46  18    A.   YES.

01:14:47  19    Q.   ALL RIGHT.  YOU SHOWED US THIS -- IF WE COULD LOOK AT PDX

01:14:52  20    6.10.

01:14:54  21         I MEAN, YOU'RE AWARE THAT -- AND I THINK YOU MADE

01:14:57  22    REFERENCE TO THIS ON YOUR DIRECT EXAM -- THE '305 DESIGN WHERE

01:15:04  23    IT APPEARED ON THE SAMSUNG PHONES AS YOU SEE HERE, THAT IS NOT

01:15:06  24    THE HOME PAGE ON THE SAMSUNG PHONES?  YOU'RE AWARE OF THAT?

01:15:10  25    A.   AGREED.

01:15:10   1     Q.   SO TO GET TO WHAT WE'RE LOOKING AT HERE ON THE SAMSUNG

01:15:14   2     PHONES, IF THE PHONE WAS LOCKED, YOU'D HAVE TO GO TWO SCREENS

01:15:19   3     IN TO GET THIS; CORRECT?

01:15:21   4     A.   YOU WOULD SWIPE.

01:15:22   5     Q.   RIGHT.

01:15:23   6     A.   SEE A SCREEN AND --

01:15:27   7     Q.   RIGHT.

01:15:25   8     A.   -- THEN TAP ON THE APP SCREEN BUTTON.

01:15:28   9     Q.   SO THIS -- THE '305 ONLY APPEARS ON THE APPLICATIONS PAGE

01:15:33   10    IN THE SAMSUNG PHONES; CORRECT?

01:15:35   11    A.   CORRECT.

01:15:36   12    Q.   NOT THE HOME PAGE?

01:15:37   13    A.   CORRECT.

01:15:38   14    Q.   AND ON THE HOME PAGE, THERE ARE SOME ICONS THAT ARE

01:15:41   15    ALREADY PRE-INSTALLED; CORRECT?

01:15:43   16    A.   I -- THAT MAY MATTER FROM PHONE TO PHONE.  AND I'M NOT

01:15:51   17    100 PERCENT SURE WHAT COMES PRE-INSTALLED.

01:15:57   18    Q.   ALL RIGHT.  YOU SAID THAT THIS PAGE -- YOU CAN TAKE IT

01:16:01   19    DOWN NOW, KEN.

01:16:02   20         ALL THESE HERE, YOU'VE PORTRAYED THESE, THESE ARE THE APP

01:16:06   21    PAGES ON THE SAMSUNG PHONES THAT WE WERE JUST LOOKING AT.

01:16:09   22    A.   YES.

01:16:09   23    Q.   AND YOU INDICATED THAT YOU SAW THIS AS SORT OF THE GATEWAY

01:16:12   24    TO THE USE OF THE PHONE?

01:16:13   25    A.   RIGHT.

KARE CROSS BY MR. QUINN

01:16:13  1    Q.    AND LET ME JUST ASK YOU, DID YOU -- DO YOU KNOW THE

01:16:16  2    FREQUENCY WITH WHICH USERS OF SAMSUNG PHONES OR ANDROID PHONES

01:16:21  3    KIND OF CUSTOMIZE THEIR HOME PAGE BY TAKING ICONS AND APPS FROM

01:16:25  4    THE APPLICATION TRAY AND BRINGING THEM TO THE HOME PAGE?  DID

01:16:29  5    YOU DO ANY KIND OF ANALYSIS OF THAT?

01:16:31  6    A.    I TOTALLY KNOW THAT YOU CAN DO THAT.

01:16:33  7    Q.    RIGHT.  SO YOU KNOW THAT IT'S POSSIBLE ON THESE SAMSUNG

01:16:38  8    PHONES TO TAKE THE APP ICON AND BRING IT TO YOUR HOME PAGE IF

01:16:41  9    IT'S SOMETHING THAT YOU WANT TO USE A LOT, WITH FREQUENCY, YOU

01:16:44  10   CAN BRING IT TO YOUR HOME PAGE?

01:16:46  11   A.    YES.

01:16:46  12   Q.    AND YOU KNOW WHEN YOU DO THAT, WHEN THE ICON MOVES FROM

01:16:49  13   THE APP PAGE TO THE HOME PAGE, THAT CONTAINER, THAT TILE,

01:16:54  14   DISAPPEARS?  YOU KNOW THAT AS WELL?

01:16:56  15   A.    I -- I GUESS I JUST KNOW THAT YOU CAN CUSTOMIZE YOUR HOME

01:17:03  16   PAGE.

01:17:07  17   Q.    AND, I MEAN, HAVE YOU EVER HEARD THAT ANDROID USERS TEND

01:17:13  18   TO BE KIND OF NERDIER MAYBE A LITTLE BIT AND LIKE TO CUSTOMIZE

01:17:17  19   THEIR HOME PAGES AND PUT THE APPS THAT THEY'RE GOING TO USE THE

01:17:21  20   MOST, THAT ARE MOST PROMINENT TO THEM ON THEIR HOME PAGE?

01:17:25  21   A.    I -- I'M AN EQUAL OPPORTUNITY ASSIGNOR OF NERDHOOD.

01:17:31  22         BUT I THINK THAT -- I TOTALLY UNDERSTAND WHAT YOU'RE

01:17:36  23   SAYING.

01:17:37  24         I GUESS I'M SAYING THAT YOU'D HAVE TO GO TO THE APP SCREEN

01:17:44  25   AS THE NEXUS OF THE SOURCE OF THOSE TO SEE THAT BEFORE YOU

01:17:49   1      CUSTOMIZED IT.

01:17:51   2      Q.   UNDERSTOOD.  BUT, I MEAN, YOU DIDN'T LOOK AT -- YOU DIDN'T

01:17:56   3      UNDERTAKE ANY KIND OF -- BEFORE GIVING YOUR OPINION ON

01:17:59   4      PROMINENCE TO SAMSUNG USERS, YOU DIDN'T UNDERTAKE ANY ANALYSIS

01:18:02   5      OF SAMSUNG USER BEHAVIOR AS TO HOW OFTEN THEY JUST MOVE ICONS

01:18:06   6      TO THEIR HOME SCREEN AND HOW OFTEN THEY GO BACK TO THE APP

01:18:11   7      PAGE?  YOU DIDN'T DO THAT?

01:18:13   8      A.   NO.

01:18:13   9      Q.   AND THAT CUSTOM -- THE HOME PAGE, WHETHER IT'S WHAT'S

01:18:19   10     PRE-INSTALLED WITH SOME ICONS OR ICONS ADDED FROM THE APP PAGE,

01:18:25   11     YOU UNDERSTAND THAT DOES NOT INFRINGE THE '305 PATENT, THE

01:18:29   12     SAMSUNG HOME PAGE?  YOU UNDERSTAND THAT?

01:18:30   13     A.   YES.

01:18:31   14     Q.   YOU TESTIFIED ABOUT THE MEETING AT SAMSUNG WHERE YOU MADE

01:18:45   15     REFERENCE TO THE CRISIS OF DESIGN, THAT DISCUSSION.

01:18:48   16          AND THAT'S ACTUALLY SOMETHING THAT YOU REFERENCED IN YOUR,

01:18:52   17     IN YOUR REPORT, DIDN'T YOU?  AND YOU QUOTED SOME FROM THAT

01:18:56   18     E-MAIL?

01:18:56   19     A.   YES.

01:18:57   20     Q.   BUT I NOTICE THAT YOU DID NOT QUOTE IN YOUR REPORT THAT --

01:19:07   21     THE LANGUAGE FROM THE E-MAIL THAT SAYS, YOU KNOW, "I HEAR

01:19:10   22     THINGS LIKE THIS FROM THE CARRIERS, MAKE SOMETHING LIKE THE

01:19:13   23     IPHONE, THE KIND THAT SAYS YES TO WHAT A CARRIER WANTS, THAT'S

01:19:16   24     A SHORTCUT TO GOING OUT OF BUSINESS."

01:19:19   25          YOU DIDN'T QUOTE THAT IN YOUR REPORT, DID YOU?

01:19:22   1    A.   I'M LOOKING FOR WHERE THAT COMES FROM, BECAUSE I KNOW IT'S

01:19:27   2    A -- THERE ARE TWO SUMMARIES.  SO --

01:19:31   3    Q.   WELL, I'M JUST ASKING --

01:19:33   4    A.   IT'S TWO PRETTY LONG SUMMARIES, AND I DIDN'T QUOTE THEM IN

01:19:37   5    THEIR ENTIRETY.

01:19:39   6    Q.   RIGHT.  HOW DID YOU CHOOSE -- YOU KNOW, HOW DID YOU CHOOSE

01:19:42   7    WHAT YOU WERE GOING TO QUOTE FROM THAT E-MAIL IN YOUR REPORT

01:19:46   8    AND WHAT YOU DECIDED NOT TO QUOTE?

01:19:48   9    A.   WELL, THERE WAS A LOT TO CHOOSE FROM IN BOTH OF THESE

01:20:00  10    MEMOS THAT SUPPORTS -- I WAS LOOKING FOR THE BEST WAY TO

01:20:07  11    EXPRESS THAT AS PART OF THESE SUMMARIES, THERE WAS QUITE A BIT

01:20:12  12    OF TALK ABOUT EITHER CRISIS OF DESIGN OR FOCUS ON THE

01:20:19  13    IMPORTANCE OF THE IPHONE DESIGN.  YOU KNOW, THERE WAS ONE LINE

01:20:24  14    LIKE, I THOUGHT I WAS LOOKING AT A COLLEGE GRADUATION PROJECT,

01:20:28  15    MEANING, YOU KNOW, THERE WAS SOME, LIKE, OH, WE HAVE STUDENT

01:20:32  16    WORK HERE.

01:20:33  17         SO, I MEAN, I --

01:20:34  18    Q.   DID YOU --

01:20:35  19    A.   I CHOSE WHAT I THOUGHT WAS THE MOST PITHY ABOUT THE

01:20:40  20    DESIGN.

01:20:41  21    Q.   OKAY.  AND YOU DID NOT DECIDE IT WAS PITHY TO QUOTE THE

01:20:45  22    LANGUAGE THAT IT'S A SHORTCUT TO GOING OUT OF BUSINESS?  THAT'S

01:20:48  23    NOT IN YOUR REPORT; CORRECT?

01:20:50  24    A.   I'M STILL NOT EXACTLY -- WHERE EXACTLY IS THAT LANGUAGE?

01:20:55  25    Q.   I WITHDRAW THE QUESTION.  I'M SO SHORT ON TIME HERE.

01:20:58   1      A.   OKAY.

01:20:59   2      Q.   DO YOU SEE -- YOU SAW A REFERENCE THERE TO A PHONE CALLED

01:21:03   3      THE OMNIA --

01:21:04   4      A.   YES.

01:21:05   5      Q.   -- THAT WAS BEING DISCUSSED?

01:21:06   6      A.   (NODS HEAD UP AND DOWN.)

01:21:07   7      Q.   AND DO YOU KNOW THE OMNIA HAD THE WINDOWS OPERATING

01:21:11   8      SYSTEM?

01:21:11   9      A.   I UNDERSTAND THAT.

01:21:11   10     Q.   AND DID YOU UNDERSTAND THAT WHAT WAS SAID THERE, IT'S THE

01:21:14   11     DIFFERENCE BETWEEN THE WINDOWS OPERATING SYSTEM AND THE USER

01:21:17   12     EXPERIENCE OF THAT AND THE IPHONE IS THE DIFFERENCE BETWEEN

01:21:21   13     HEAVEN AND EARTH?

01:21:23   14     A.   I -- I REALLY WENT BACK AND I LOOKED AT REALLY -- I REALLY

01:21:28   15     READ CAREFULLY BOTH THESE SUMMARIES.  THEY DO USE THE OMNIA AS

01:21:33   16     A FOR EXAMPLE IN ONE OF THE SUMMARIES.

01:21:36   17          BUT I FOUND IT TO BE ACTUALLY KIND OF A -- IT'S TRUE WHAT

01:21:40   18     YOU SAY, BUT IT'S KIND OF ONE OF MANY, MANY EXAMPLES AND

01:21:44   19     COMMENTS IN THE SUMMARY.

01:21:46   20     Q.   OKAY.  AND THEN YOU REFER TO SOME OTHER DOCUMENTS, SOME

01:21:49   21     SLIDES, LIKE, OH, EXHIBIT 4071, KEPLER USABILITY EVALUATION

01:21:58   22     REVIEW RESULTS, SOFTWARE VERIFICATION GROUP?

01:22:02   23     A.   YES.

01:22:03   24     Q.   MAY 2010?

01:22:05   25     A.   YES.

01:22:05   1   Q.   DO YOU KNOW WHAT THE KEPLER PHONE IS?  IS THAT ONE OF THE

01:22:09   2   INFRINGING PHONES IN THIS CASE?

01:22:11   3   A.   I ONLY -- I DON'T KNOW IN EXACT DETAIL WHICH PHONE THAT

01:22:20   4   IS.

01:22:20   5   Q.   AND THE DATE OF THIS IS MAY 3, 2010?

01:22:23   6   A.   YES.

01:22:23   7   Q.   AND YOU KNOW THE PHONES THAT ARE THE SUBJECT OF THIS CASE

01:22:26   8   WERE INTRODUCED TO MARKET IN 2010?

01:22:28   9   A.   YES.

01:22:31  10   Q.   DO YOU KNOW WHEN THOSE PHONES WERE LOCKED DOWN, THE

01:22:34  11   DESIGNS WERE LOCKED DOWN?

01:22:35  12   A.   I DON'T KNOW.

01:22:37  13   Q.   YOU DON'T KNOW IF IT WAS BEFORE OR AFTER THE DATE OF THIS

01:22:39  14   DOCUMENT?

01:22:40  15   A.   DON'T KNOW.

01:22:41  16   Q.   AND DO YOU KNOW WHAT THE SOFTWARE VERIFICATION GROUP IS

01:22:48  17   THAT'S REFERRED TO HERE?  DO YOU KNOW WHO THEY ARE OR WHAT THEY

01:22:51  18   DO?

01:22:52  19   A.   NOT EXPLICITLY.

01:22:53  20   Q.   DO YOU KNOW IF THEY'RE DESIGNERS?

01:22:55  21   A.   I WOULD SAY THE COMMENTS ARE ALL SUGGESTIONS THAT

01:23:01  22   DESIGNERS WOULD TAKE ADVANTAGE OF.

01:23:05  23   Q.   BUT DO YOU KNOW IF THOSE PEOPLE ACTUALLY ARE DESIGNERS OR

01:23:09  24   WHETHER ANY OF THEIR SUGGESTIONS WERE IMPLEMENTED?

01:23:11  25   A.   I DON'T KNOW.

01:23:13  1    Q.   ALL RIGHT.  THE AMETHYST, THE SUBJECT OF EXHIBIT 4061, IS

01:23:20  2    THAT ONE OF THE -- DO YOU KNOW WHAT PHONE THAT IS?

01:23:22  3    A.   I JUST KNOW IF IT WAS A PROTOTYPE.

01:23:25  4    Q.   DO YOU KNOW IF IT WAS ONE OF THE INFRINGING PHONES IN THIS

01:23:27  5    CASE?

01:23:28  6    A.   I DON'T KNOW.

01:23:28  7    Q.   IF WE COULD LOOK AT PDX 7 AT 42.  THIS IS THE IMAGE OF THE

01:23:40  8    GEM PHONE, ONE OF THE INFRINGING PHONES.

01:23:45  9              MR. KOTARSKI:  PDX OR PX?

01:23:49 10              MR. QUINN:  PX.  I'M SORRY.  THE GEM.

01:23:52 11              MR. KOTARSKI:  SURE.

01:23:56 12              THE WITNESS:  I'M NOT SEEING ANYTHING.

01:23:57 13    BY MR. QUINN:

01:23:58 14    Q.   IT HASN'T COME UP YET.

01:24:00 15    A.   THANK YOU.

01:24:01 16    Q.   AND CAN WE JUST -- NOW -- IS THAT TWO COPIES OF THE SAME

01:24:11 17    THING?

01:24:11 18        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

01:24:15 19    BY MR. QUINN:

01:24:15 20    Q.   SO THIS IS TWO DIFFERENT SCREENS OF THE GEM PHONE, ONE OF

01:24:20 21    THE INFRINGING PHONES IN THIS CASE?

01:24:22 22    A.   YES.

01:24:22 23    Q.   AND YOU'RE FAMILIAR WITH THE FIRST IPHONE, OBVIOUSLY?

01:24:25 24    A.   YES.

01:24:25 25    Q.   AND CAN WE AGREE THAT THIS -- JUST LOOKING AT THE

01:24:29    1    HARDWARE, THE SHAPE ON THE OUTSIDE OF THIS PHONE, IT LOOKS VERY

01:24:34    2    DIFFERENT THAN THE ORIGINAL IPHONE?

01:24:37    3    A.   YOU KNOW, OBVIOUSLY I -- I'VE SEEN AN IPHONE.  BUT IF I

01:24:42    4    WERE GOING TO GIVE AN EXACT -- YOU KNOW, I'D PROBABLY OVERLAY

01:24:46    5    THEM AND, YOU KNOW, THAT WASN'T REALLY PART OF MY ANALYSIS.

01:24:51    6         MR. QUINN:  YOUR HONOR, I'D REQUEST --

01:24:53    7         THE WITNESS:  BEYOND -- OH, SORRY.

01:24:57    8    BUT, YES, I SEE YOUR POINT, ALTHOUGH THEIRS STILL DOES

01:25:02    9    HAVE ROUNDED CORNERS.

01:25:04   10         MR. QUINN:  ALL RIGHT.  YOUR HONOR, I'D REQUEST

01:25:05   11    PERMISSION TO BE ABLE TO SHOW AN IPHONE WITH THE GEM.

01:25:10   12         THE COURT:  ANY OBJECTION?

01:25:11   13         MR. MUELLER:  NO OBJECTION, YOUR HONOR.

01:25:12   14         THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

01:25:13   15         MR. QUINN:  CAN WE PUT AN IPHONE UP NEXT TO IT.

01:25:16   16    Q.   NOW, YOU'RE A VERY DISTINGUISHED DESIGNER WITH A LONG

01:25:21   17    CAREER.

01:25:22   18    LOOKING AT THIS FROM A DESIGN STANDPOINT, WILL YOU -- CAN

01:25:26   19    YOU AGREE THAT THE GEM, THE DESIGN OF THE HARDWARE THERE, IS

01:25:30   20    VERY DIFFERENT THAN THE IPHONE?

01:25:31   21    A.   I SEE SOME DIFFERENCES, AND I SEE SOME SIMILARITIES.

01:25:38   22    Q.   OKAY.  BUT BECAUSE THE GEM USED THOSE ICONS WITH THE TILES

01:25:47   23    IN THE BACKGROUND, THOSE CONTAINERS, NOTWITHSTANDING THE DESIGN

01:25:53   24    SIMILARITIES, IT'S YOUR POSITION THAT APPLE SHOULD RECOVER ALL

01:25:57   25    THE PROFITS THAT SAMSUNG MADE ON THIS PHONE?

KARE CROSS BY MR. QUINN

```
01:26:00   1          MR. MUELLER:  YOUR HONOR, I OBJECT.  THIS IS CLEARLY
01:26:02   2   TRYING TO RELITIGATE THE INFRINGEMENT VERDICT.
01:26:04   3          THE COURT:  OKAY.  AND ALSO, PX 8 HASN'T BEEN
01:26:07   4   ADMITTED YET.  DO YOU WANT THAT ADMITTED?
01:26:09   5          MR. QUINN:  I'LL OFFER THAT, YOUR HONOR.
01:26:10   6          THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT?
01:26:12   7          MR. MUELLER:  NO, YOUR HONOR.
01:26:12   8          THE COURT:  I WANT ALL EXHIBITS TO BE ADMITTED BEFORE
01:26:15   9   WE PUBLISH THEM TO THE JURY, PLEASE.
01:26:19  10       ALL RIGHT.  SO PX 8 IS ADMITTED.
01:26:21  11       (PLAINTIFF'S EXHIBIT 8 WAS ADMITTED IN EVIDENCE.)
01:26:26  12          THE COURT:  ALL RIGHT.  NOW, WHAT WAS THE QUESTION?
01:26:34  13          MR. QUINN:  IF WE COULD HAVE SDX 412.
01:26:39  14          THE COURT:  I'M SORRY.  THERE'S A PENDING OBJECTION.
01:26:41  15   GIVE ME A MINUTE, PLEASE.
01:26:43  16       (PAUSE IN PROCEEDINGS.)
01:26:48  17          THE COURT:  ALL RIGHT.  GO AHEAD.  YOU CAN ANSWER.
01:26:50  18   THE OBJECTION IS OVERRULED.
01:26:51  19       BUT NOTHING THAT IS BEING SAID DURING THIS TRIAL SHOULD IN
01:26:55  20   ANY WAY UNDERMINE THE JURY VERDICT OF THE PREVIOUS JURY.
01:26:57  21       OKAY.  GO AHEAD, PLEASE.
01:26:59  22          THE WITNESS:  COULD YOU JUST, JUST SO I MAKE SURE I'M
01:27:02  23   REALLY --
01:27:04  24   BY MR. QUINN:
01:27:04  25   Q.   WE CAN PUT THE IMAGE BACK UP.
```

01:27:07  1    A.   DO YOU THINK YOU COULD JUST SAY THAT QUESTION ONE MORE

01:27:09  2    TIME.

01:27:10  3    Q.   I WILL TRY TO.

01:27:10  4    A.   THANK YOU.  I THINK I REMEMBER, BUT --

01:27:13  5    Q.   YEAH.  IS IT YOUR UNDERSTANDING THAT NOTWITHSTANDING THE

01:27:16  6    DESIGN DIFFERENCES ON THE EXTERIOR OF THE PHONE THAT WE SEE

01:27:20  7    HERE, THAT BECAUSE THE GEM USED THOSE ICONS WITH CONTAINERS

01:27:26  8    THAT INFRINGED THE '305 DESIGN PATENT, THAT APPLE SHOULD

01:27:31  9    RECOVER ALL THE PROFITS THAT SAMSUNG MADE ON THE GEM PHONE?

01:27:36  10   A.   I THINK THAT THE REMEDY IS THE REMEDY.  THIS PHONE WAS

01:27:44  11   FOUND TO INFRINGE.  THAT'S WATER UNDER THE BRIDGE.

01:27:49  12        AND PERSONALLY, IN TERMS OF SHOULD THEY HAVE TO PAY, I

01:27:54  13   THINK IT'S THAT IT'S AN ORGANIC, HOLISTIC DESIGN WHOLE THAT

01:28:01  14   MAKES THE GEM INFRINGE ON THE D'305, AND I GUESS AS A DESIGNER,

01:28:09  15   IT'S -- I FEEL IT'S IMPORTANT THAT DESIGN IS RECOGNIZED AS --

01:28:16  16   FOR HAVING THE IMPORTANT ROLE THAT IT DOES IN THIS PHONE.

01:28:19  17   Q.   UM-HUM.  BUT THERE IS A DISPLAY SCREEN WHICH THIS APPEARS

01:28:23  18   ON WHICH IS AN ARTICLE OF MANUFACTURE; CORRECT?  YOU SAID THAT

01:28:28  19   EARLIER TODAY.

01:28:29  20   A.   I WOULD SAY THAT, TO CLARIFY BEFORE, WHEN YOU'RE LOOKING

01:28:34  21   AT -- WHEN WE WERE TALKING ABOUT THE WHOLE PHONE, THE FINISHED

01:28:38  22   PRODUCT, WHEN THE FINISHED PRODUCT IS THERE AND IT'S TURNED ON,

01:28:44  23   YES, THE DISPLAY SCREEN IS WHERE YOU SEE THE ICONS APPEAR.

01:28:51  24        BUT YOU DON'T SEE IT WHEN THE DISPLAY SCREEN IS SEPARATED

01:28:56  25   FROM THE PHONE.

01:28:57  1    Q.   I UNDERSTAND.  THE DISPLAY SCREEN IS AN ARTICLE OF

01:28:59  2    MANUFACTURE?

01:28:59  3    A.   NOT IN THE -- NOT IN THE CASE OF THE 13 INFRINGING PHONES

01:29:07  4    REGARDING THE D'305.

01:29:09  5    Q.   A DISPLAY SCREEN -- AN ARTICLE OF MANUFACTURE IS ANYTHING

01:29:11  6    MADE BY HAND OR MACHINE.  I THINK WE TALKED ABOUT THAT THIS

01:29:15  7    MORNING?

01:29:15  8    A.   YES.

01:29:16  9    Q.   ALL RIGHT.

01:29:17  10   A.   BUT --

01:29:18  11   Q.   IF WE COULD LOOK AT SDX 412.

01:29:21  12        THESE ARE THE HOME SCREENS OF THE INFRINGING SAMSUNG

01:29:26  13   PHONES?

01:29:27  14   A.   UM-HUM.

01:29:27  15   Q.   AND NONE OF THEM HAVE BEEN ACCUSED OF INFRINGING; RIGHT?

01:29:30  16   A.   NO.

01:29:31  17        MR. QUINN:  THANK YOU.

01:29:34  18        THE COURT:  ALL RIGHT.  THE TIME IS 1:29.

01:29:40  19        MR. MUELLER:  MAY I PROCEED, YOUR HONOR.

01:29:42  20        THE COURT:  GO AHEAD, PLEASE.  IT'S 1:29.

01:29:44  21                    **REDIRECT EXAMINATION**

01:29:44  22   BY MR. MUELLER:

01:29:46  23   Q.   DR. KARE, I'D LIKE TO START WHERE MR. QUINN LEFT OFF IF WE

01:29:49  24   COULD, AND IF WE COULD PUT ON THE SCREEN PDX 6.10.

01:29:54  25        YOUR HONOR, MAY I APPROACH THE SCREEN?

01:29:55   1              THE COURT:  GO AHEAD, PLEASE.

01:29:56   2     BY MR. MUELLER:

01:29:58   3     Q.   FIRST OF ALL, JUST TO ORIENT OURSELVES, DR. KARE, ARE

01:30:02   4     THESE THE INFRINGING PHONES?

01:30:04   5     A.   YES.

01:30:05   6     Q.   SO WE KEEP HEARING ABOUT ALTERNATIVES.  WHAT WAS YOUR

01:30:08   7     ANALYSIS OF?

01:30:09   8     A.   OF WHAT IS THE ARTICLE OF MANUFACTURE TO WHICH THE -- WHAT

01:30:18   9     IS THE ARTICLE OF MANUFACTURE TO WHICH THE D'305 WAS APPLIED IN

01:30:24   10    THE INFRINGING PHONES.

01:30:25   11    Q.   OKAY.  SO YOU DIDN'T FOCUS ON ALTERNATIVES, YOU FOCUSSED

01:30:29   12    ON THE DESIGNS THAT SAMSUNG CHOSE THAT USED APPLE'S DESIGNS

01:30:35   13    APPLIED TO THOSE PHONES; IS THAT RIGHT?

01:30:37   14    A.   EXACTLY.

01:30:37   15    Q.   OKAY.  AND MR. QUINN WAS ASKING YOU ABOUT THE DISPLAY

01:30:41   16    SCREEN AND HE KEPT SAYING IT'S AN ARTICLE OF MANUFACTURE, IT'S

01:30:43   17    AN ARTICLE OF MANUFACTURE.

01:30:44   18         WHAT IS THE TEST HER HONOR HAS GIVEN US TO APPLY?

01:30:48   19    A.   IT'S TO CONSIDER FOUR FACTORS REALLY IN ALL, NOT ANY ONE

01:30:59   20    OF THOSE FACTORS.

01:31:00   21    Q.   AND ARE WE TRYING TO FIND AN ARTICLE OF MANUFACTURE IN THE

01:31:03   22    ABSTRACT, OR AN ARTICLE OF MANUFACTURE TO WHICH SAMSUNG APPLIED

01:31:09   23    APPLE'S DESIGNS?

01:31:10   24    A.   IT'S A VERY SPECIFIC CASE OF -- IT'S NOT A THEORETICAL.

01:31:18   25    IT'S THESE 13 PHONES, THAT ORNAMENTAL DESIGN, AND WHAT IS THE

01:31:25  1    ARTICLE OF MANUFACTURE THAT ORNAMENTAL DESIGN WAS APPLIED TO IN

01:31:29  2    EACH OF THESE CASES?

01:31:31  3    Q.   SO IF WE PULL OFF THE SCREEN AND JUST HOLD IT HERE BY

01:31:34  4    ITSELF, WILL IT HAVE THE '305 DESIGN?

01:31:39  5    A.   NO.

01:31:41  6    Q.   IF WE TAKE OUT THE BATTERY AND THE WIRES AND THE CHIPS AND

01:31:44  7    JUST TOLD THEM OVER HERE, WILL THAT HAVE THE '305 DESIGN?

01:31:49  8    A.   I DON'T THINK SO.  IN FACT, YOU CAN KIND OF SEE IT LOOKS

01:31:52  9    LIKE IT TOOK A LOT OF PRYING TO GET THIS OFF (INDICATING).

01:31:57  10   Q.   AND WHEN DOES THE '305 DESIGN APPEAR?  HOW WAS IT APPLIED

01:32:01  11   IN THESE INFRINGING PHONES?

01:32:03  12   A.   IT IS PART OF THE SOFTWARE.  I WOULD STILL SAY THE KEY

01:32:10  13   GATEWAY TO USING THE APPLICATIONS THAT WE KNOW A SMARTPHONE IS

01:32:16  14   KNOWN FOR.

01:32:17  15   Q.   IN THE FULL PHONE?

01:32:18  16   A.   IN THE FULL PHONE.

01:32:19  17   Q.   NOW, DR. KARE, IF WE COULD, I WANT TO ASK YOU ABOUT

01:32:25  18   PROMINENCE.  MR. QUINN SPENT SOME TIME ASKING YOU ABOUT THAT

01:32:31  19   SECOND FACTOR, THE PROMINENCE OF THE CLAIMED DESIGN IN THE

01:32:33  20   WHOLE PRODUCT.

01:32:34  21       DO YOU RECALL THAT?

01:32:35  22   A.   YES.

01:32:36  23   Q.   AND I THINK HE SAID SOMETHING TO THE EFFECT OF YOU DON'T

01:32:38  24   LOOK AT THE PROMINENCE OF THE DESIGN WITHIN THE DESIGN, YOU

01:32:40  25   HAVE TO LOOK AT THE WHOLE PHONE.

01:32:42    1              DO YOU RECALL THAT?

01:32:43    2    A.   YES.

01:32:43    3    Q.   NOW, YOU MENTIONED THAT YOU LOOKED AT SOME PRESS COVERAGE

01:32:46    4    IN EVALUATION OF PROMINENCE.

01:32:48    5              DO YOU RECALL THAT?

01:32:49    6    A.   YES.

01:32:49    7              MR. MUELLER:  YOUR HONOR, MAY I APPROACH THE WITNESS?

01:32:51    8    I'LL HAND A COPY TO COUNSEL AS WELL.

01:32:53    9              THE COURT:  GO AHEAD, PLEASE.

01:32:57   10    BY MR. MUELLER:

01:33:08   11    Q.   (HANDING.)

01:33:09   12         DR. KARE, THIS IS PLAINTIFF'S EXHIBIT 6.  IS THIS A

01:33:12   13    SUMMARY OF PRESS ARTICLES THAT YOU REVIEWED IN EVALUATING

01:33:15   14    PROMINENCE?

01:33:16   15    A.   THERE'S A LOT OF THESE, SO I DON'T HAVE A PHOTOGRAPHIC

01:33:23   16    MEMORY OF EXACTLY -- YOU KNOW, THERE COULD BE ONE HERE I DIDN'T

01:33:28   17    LOOK AT.

01:33:29   18    Q.   WELL, I'LL GIVE YOU -- LET ME SEE IF I CAN REFRESH YOUR

01:33:32   19    MEMORY.  IF YOU TURN TO PAGE 2, DO YOU SEE THE SAMSUNG VIBRANT

01:33:38   20    REVIEW BY STEWART WOLPIN IN DIGITAL TRENDS?

01:33:40   21    A.   YES.

01:33:41   22    Q.   AND THAT WAS ONE OF THE ONES YOU LOOKED AT?

01:33:42   23    A.   YES.

01:33:43   24              MR. MUELLER:  OKAY.  YOUR HONOR, WE OFFER PLAINTIFF'S

01:33:45   25    EXHIBIT NUMBER 6 AS A 100006 SUMMARY THAT WAS PREVIOUSLY

01:33:50   1    ADMITTED.

01:33:51   2              THE COURT:  I'M SORRY, WHAT WAS THAT?

01:33:52   3              MR. MUELLER:  10006 SUMMARY THAT HAD BEEN PREVIOUSLY

01:33:55   4    ADMITTED IN THE LAST TRIAL.

01:33:56   5              THE COURT:  OKAY.  AND THIS IS A PX, NOT A PDX,

01:34:00   6    RIGHT?

01:34:00   7              MR. MUELLER:  THAT'S CORRECT, YOUR HONOR, PX 6.

01:34:02   8              THE COURT:  OKAY.  WITH THE SAME LIMITING INSTRUCTION

01:34:04   9    THAT IT'S NOT BEING OFFERED FOR THE TRUTH OF THE MATTER

01:34:06   10   ASSERTED IN THE DOCUMENT.

01:34:07   11             MR. LEE:  THAT'S RIGHT.

01:34:08   12             THE COURT:  ALL RIGHT.  ANY OBJECTION?

01:34:09   13             MR. QUINN:  NO FURTHER OBJECTION.

01:34:11   14             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

01:34:12   15        (PLAINTIFF'S EXHIBIT 1006 WAS ADMITTED IN EVIDENCE.)

01:34:13   16             THE COURT:  GO AHEAD, PLEASE.

01:34:13   17   BY MR. LEE:

01:34:18   18   Q.  IF WE LOOK AT THE SAMSUNG VIBRANT REVIEW BY STEWART

01:34:24   19   WOLPIN, DIGITAL TRENDS, JULY 30TH, 2010.  DO YOU UNDERSTAND

01:34:29   20   THESE REVIEWERS WERE LOOKING AT THE WHOLE PHONE; RIGHT?

01:34:33   21   A.  RIGHT.

01:34:34   22   Q.  AND WHAT WAS ONE OF THE THINGS THAT MR. WOLPIN IDENTIFIED

01:34:37   23   AS PROMINENT WITHIN THE WHOLE PHONE?

01:34:39   24   A.  WELL, WHEN IT'S FRONT -- WITH ITS FRONT SILVER FRAME, THE

01:34:53   25   SMOOTH ROUNDED VIBRANT BEARS A RESEMBLANCE TO THE FIRST IPHONE.

01:35:01  1        BUT IT ALSO TALKS ABOUT THE IPHONE-LIKE FOUR-BY-FOUR GRID

01:35:06  2   OF ICONS ARRAYED ACROSS A SERIES OF WIPABLE HORIZONTAL SCREENS.

01:35:13  3   Q.   AND WERE THERE OTHER PRESS ARTICLES THAT ALSO IDENTIFIED

01:35:15  4   THE GRAPHICAL USER INTERFACE AS A PROMINENT FEATURE WITHIN THE

01:35:17  5   WHOLE PHONE?

01:35:18  6   A.   YES, IT SEEMS LIKE A LOT OF THE REVIEWS SPEAK TO THE

01:35:23  7   HAND-IN-GLOVE SITUATION OF THE PHYSICAL PHONE AND THIS

01:35:27  8   INCREDIBLY PROMINENT '305 PATH BREAKING DESIGN.

01:35:33  9   Q.   OKAY.  LAST COUPLE OF QUESTIONS.

01:35:35 10        EXHIBIT 40, THE CRISIS OF DESIGN E-MAILS, MR. QUINN ASKED

01:35:39 11   YOU ABOUT THE OMNIA.

01:35:41 12        DO YOU KNOW WHAT THE OMNIA IS?

01:35:44 13   A.   I RECALL THAT IT WAS A PHONE, I RECALL READING ABOUT IT,

01:35:48 14   THAT IT WAS FIRST INTRODUCED IN RUSSIA, THEN EUROPE, THEN THE

01:35:51 15   U.S., AND IT HAD WINDOWS OPERATING SYSTEM.

01:35:54 16   Q.   AND IS PLAINTIFF'S EXHIBIT 40 ALL ABOUT THE OMNIA?

01:35:58 17   A.   THERE REALLY WAS ONLY ONE SMALL PARAGRAPH THAT MENTIONED

01:36:02 18   IT AMIDST, IN MY BINDER, PROBABLY FOUR OR FIVE PAGES OF OTHER

01:36:09 19   COMMENTS.

01:36:09 20   Q.   AND THE LADIES AND GENTLEMEN OF THE JURY WILL GET A CHANCE

01:36:11 21   TO REVIEW THAT DOCUMENT FOR THEMSELVES AND SEE EVERYTHING IT

01:36:14 22   SAYS.

01:36:15 23        LAST QUESTION.  IF WE GO TO PDX 6.10, MR. QUINN ASKED YOU

01:36:22 24   ABOUT THESE SCREENS AND HE MENTIONED THAT THE HOME SCREENS ARE

01:36:26 25   DIFFERENT.

KARE REDIRECT BY MR. MUELLER

01:36:26   1         DO YOU RECALL THAT?

01:36:27   2    A.   YES.

01:36:28   3    Q.   AND HE SAID THAT USERS CAN CHANGE APPLICATIONS TO PUT THEM

01:36:30   4    ON THE HOME SCREEN.

01:36:31   5         DO YOU RECALL THAT?

01:36:32   6    A.   YES.

01:36:32   7    Q.   AND THE VARIOUS WAYS IN WHICH THESE PHONES CAN BE

01:36:35   8    MODIFIED.

01:36:36   9         DO YOU RECALL THAT?

01:36:37   10   A.   YES.

01:36:37   11   Q.   HOW DID THESE GRIDS RIGHT HERE COME TO BE?  DID YOU

01:36:41   12   MANIPULATE THEM?

01:36:42   13   A.   NO.

01:36:43   14   Q.   DID APPLE PUT THEM IN THAT FORMAT BEFORE TRIAL?

01:36:46   15   A.   NO.

01:36:46   16   Q.   ARE THESE THE WAY THEY'RE SOLD IN THE BOX BY SAMSUNG?

01:36:50   17   A.   YES.

01:36:51   18        MR. MUELLER:  THANK YOU, DR. KARE.  I HAVE NO FURTHER

01:36:53   19   QUESTIONS.

01:36:53   20        THE COURT:  OKAY.  IT'S 1:36.  ANY RECROSS?

01:36:56   21        MR. QUINN:  NO, YOUR HONOR.

01:36:57   22        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

01:36:58   23   AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

01:37:01   24        MR. LEE:  SUBJECT TO RECALL, YOUR HONOR.

01:37:02   25        THE COURT:  SUBJECT TO RECALL, OKAY.  YOU MAY STEP

01:37:04   1       DOWN, MA'AM, BUT YOU MAY HAVE TO COME BACK.

01:37:07   2            PLEASE CALL YOUR NEXT WITNESS.

01:37:09   3            MR. LEE:  YOUR HONOR, APPLE CALLS AS ITS NEXT WITNESS

01:37:12   4       RAVIN BALAKRISHNAN.

01:37:14   5            AND MR. SABRI IS GOING TO DO THE EXAMINATION.

01:37:16   6            THE COURT:  OKAY.  DO WE HAVE A PHOTO FOR OUR JURORS?

01:37:21   7            MR. LEE:  WE DO, YOUR HONOR.

01:37:22   8            THE COURT:  OKAY.  THANK YOU.  I'LL TAKE ONE AS WELL,

01:37:24   9       PLEASE.

01:37:52   10           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

01:37:53   11           **(PLAINTIFF'S WITNESS, RAVIN BALAKRISHNAN, WAS SWORN.)**

01:37:54   12           THE WITNESS:  I DO.

01:37:55   13           THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE

01:37:57   14      YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR

01:38:00   15      THE RECORD.

01:38:01   16           THE WITNESS:  MY NAME IS RAVIN BALAKRISHNAN.  THAT'S

01:38:04   17      SPELLED R-A-V-I-N.  LAST NAME B-A-L-A-K-R-I-S-H-N-A-N.

01:38:18   18           MR. SABRI:  GOOD AFTERNOON, DR. BALAKRISHNAN.

01:38:22   19           THE WITNESS:  GOOD AFTERNOON.

01:38:22   20           THE COURT:  ALL RIGHT.  IT'S 1:30.  GO AHEAD, PLEASE.

01:38:25   21           MR. SABRI:  THANK YOU, YOUR HONOR.

01:38:25   22                          **DIRECT EXAMINATION**

01:38:26   23      BY MR. SABRI:

01:38:27   24      Q.  EVEN THOUGH YOU JUST SAID YOUR NAME FOR THE RECORD, COULD

01:38:28   25      YOU INTRODUCE YOURSELF TO THE JURY?

01:38:28   1   A.   SURE.  MY NAME IS RAVIN BALAKRISHNAN.  I'M A PROFESSOR OF

01:38:31   2   COMPUTER SCIENCE AT THE UNIVERSITY OF TORONTO WHERE I'M ALSO

01:38:34   3   CURRENTLY THE CHAIR OF THE DEPARTMENT OF COMPUTER SCIENCE.

01:38:40   4   Q.   WHAT ARE YOUR RESPONSIBILITIES AT THE UNIVERSITY?

01:38:46   5   A.   AT THE UNIVERSITY, AS A PROFESSOR, I CONDUCT RESEARCH IN

01:38:49   6   THE AREA OF HUMAN COMPUTER INTERACTION, USER INTERFACES, AND

01:38:53   7   INTERACTIVE COMPUTER GRAPHICS.  I SUPERVISE GRADUATE STUDENTS

01:38:57   8   WHO DO THEIR RESEARCH IN THEIR AREAS.  I TEACH COURSES AT THE

01:39:02   9   UNDERGRADUATE AND GRADUATE LEVEL.

01:39:05   10       AND AS THE CHAIR OF THE DEPARTMENT, I'M RESPONSIBLE FOR

01:39:07   11   THE OVERALL MANAGEMENT AND DIRECTION OF THE ENTIRE DEPARTMENT.

01:39:10   12   Q.   ARE YOU THE DIRECTOR OR CO-DIRECTOR OF A RESEARCH

01:39:13   13   LABORATORY AT THE UNIVERSITY?

01:39:14   14   A.   YES, I AM.  MY RESEARCH IS CONDUCTED IN A LAB CALLED THE

01:39:17   15   DYNAMIC GRAPHICS PROJECT LAB.  IT HAS ABOUT 7 FACULTY AND 50

01:39:27   16   STUDENTS APPROXIMATELY.

01:39:29   17   Q.   MR. LEE, LET'S CALL UP PDX 7.2 IF WE COULD.

01:39:34   18       CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND?

01:39:35   19   A.   SURE.  I HOLD A BACHELOR'S DEGREE IN COMPUTER SCIENCE,

01:39:39   20   FOLLOWED BY A MASTER'S AND PH.D. DEGREES, ALSO IN COMPUTER

01:39:42   21   SCIENCE.  MY PH.D. IS FROM THE UNIVERSITY OF TORONTO.

01:39:45   22   Q.   HOW LONG HAVE YOU BEEN TEACHING NOW?

01:39:46   23   A.   I'M BEEN TEACHING SINCE 2001; ABOUT 17 YEARS NOW.

01:39:51   24   Q.   CAN YOU DESCRIBE FOR THE JURY SOME OF THE AREAS RESEARCH

01:39:53   25   THAT YOU'RE CURRENTLY FOCUSSED ON?

01:39:55  1    A.   SURE.  MY RESEARCH IS BROAD, AS I MENTIONED, IN THE AREA

01:39:58  2    OF HUMAN COMPUTER INTERACTION WORKING ON DIFFERENT FORMS OF

01:40:01  3    USER INTERFACES.  IN THE PAST, I'VE WORKED ON USER INTERFACES

01:40:04  4    FOR TOUCH DEVICES, LARGE SCREEN DEVICES.

01:40:08  5         TODAY SOME OF MY STUDENTS AND I ARE WORKING ON THE USER

01:40:12  6    INTERFACES FOR NEW PHONES AND DISPLAYS THAT ARE COMING DOWN THE

01:40:15  7    ROAD, FOR EXAMPLE, THREE-DIMENSIONAL DISPLAY, DISPLAYS FOR

01:40:20  8    MAGIC REALITY, VIRTUAL REALITY SYSTEMS, JUST TO GIVE YOU A FEW

01:40:24  9    EXAMPLES.

01:40:25  10   Q.   HAVE YOU DONE ANY RESEARCH WITH COMPANIES IN THE INDUSTRY,

01:40:27  11   AS WELL AS ACADEMIA?

01:40:28  12   A.   YES, I HAVE.  I'VE CONSULTED WITH SEVERAL DIFFERENT

01:40:31  13   COMPANIES, INCLUDING MICROSOFT RESEARCH, HEWLETT-PACKARD

01:40:34  14   RESEARCH, AND MITSUBISHI ELECTRIC RESEARCH LABS OVER THE YEARS.

01:40:38  15   Q.   DO YOU HAVE ANY WRITTEN PUBLICATIONS?

01:40:39  16   A.   YES, I DO.  I'VE PUBLISHED OVER 140 PAPERS IN REFEREED

01:40:43  17   JOURNALS AND CONFERENCES IN MY FIELD.

01:40:45  18   Q.   ON THE TOPIC OF JOURNALS, ARE YOU ON THE EDITORIAL STAFF

01:40:49  19   OF TECHNICAL JOURNALS?

01:40:51  20   A.   YES, I'M CURRENTLY ON THE EDITORIAL BOARD OF ACM

01:41:02  21   TRANSACTIONS ON HUMAN COMPUTER INTERACTION, WHICH IS ONE OF THE

01:41:06  22   PREMIER JOURNALS IN MY FIELD.

01:41:08  23   Q.   DO YOU HAVE ANY ISSUED PATENTS ON WHICH YOU ARE AN

01:41:10  24   INVENTOR YOURSELF, DOCTOR?

01:41:11  25   A.   YES, I DO.  I BELIEVE AT THE LAST COUNT IT WAS ABOUT 31

01:41:15   1      PATENTS ISSUED AND A FEW MORE PENDING AT THE PATENT OFFICE.

01:41:18   2      Q.   I THINK I HEARD YOU SAY ABOUT A MINUTE AGO SOMETHING ABOUT

01:41:21   3      THE HUMAN COMPUTER INTERACTION FIELD.

01:41:23   4           WHAT IS THAT?

01:41:24   5      A.   SURE.  HUMAN COMPUTER INTERACTION IS THE STUDY OF HOW

01:41:29   6      HUMANS INTERACT WITH DIFFERENT FORMS OF COMPUTING TECHNOLOGY.

01:41:34   7      THIS INCLUDES UNDERSTANDING HUMAN CAPABILITIES AS IT RELATES TO

01:41:38   8      DIFFERENT KINDS OF TECHNOLOGY, DESIGNING NEW FORMS OF USER

01:41:42   9      INTERFACES FOR THOSE TECHNOLOGIES, ACTUALLY IMPLEMENTING THOSE

01:41:46   10     NEW INTERFACES, AND THEN EVALUATING HOW WELL THEY PERFORM

01:41:51   11     BEFORE THEY MAY BE TURNED INTO A PRODUCT.

01:41:54   12          MR. SABRI:  YOUR HONOR, APPLE TENDERS

01:41:57   13     DR. RAVIN BALAKRISHNAN AS AN EXPERT IN COMPUTER SCIENCE AND

01:42:00   14     HUMAN COMPUTER INTERACTION.

01:42:01   15          THE COURT:  ANY OBJECTION?

01:42:02   16          MS. MAROULIS:  NO OBJECTION, YOUR HONOR.

01:42:03   17          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

01:42:04   18     BY MR. SABRI:

01:42:05   19     Q.   DOCTOR, HAVE YOU BEEN COMPENSATED FOR YOUR WORK IN THIS

01:42:08   20     CASE?

01:42:08   21     A.   YES, I HAVE.  I HAVE BEEN COMPENSATED FOR MY TIME.

01:42:09   22     Q.   HAVE YOU BEEN COMPENSATED AT YOUR STANDARD CONSULTING

01:42:11   23     RATE?

01:42:11   24     A.   YES, I AM.

01:42:12   25     Q.   DOES YOUR COMPENSATION DEPEND IN ANY WAY ON THE SUBSTANCE

01:42:15  1    OF YOUR OPINIONS OR HOW THIS CASE TURNS OUT?

01:42:17  2    A.   NO, IT DOES NOT.

01:42:19  3    Q.   PLEASE TURN TO TAB JX 1045 IN YOUR BINDER, IF YOU WOULD.

01:42:22  4    A.   SURE.  I'M THERE.

01:42:27  5    Q.   DO YOU RECOGNIZE THAT TO BE THE '381 PATENT?

01:42:33  6    A.   YES, I DO.

01:42:34  7    Q.   IS THE '381 PATENT A PATENT THAT YOU ANALYZED IN

01:42:37  8    CONNECTION WITH YOUR WORK IN THIS CASE?

01:42:38  9    A.   YES, IT IS.

01:42:41  10        MR. SABRI:  YOUR HONOR, MOVE THE ADMISSION OF JOINT

01:42:44  11   EXHIBIT 1045.

01:42:45  12        THE COURT:  ANY OBJECTION.

01:42:46  13        MS. MAROULIS:  NO OBJECTION, YOUR HONOR.

01:42:47  14        THE COURT:  IT'S ADMITTED.

01:42:48  15      (JOINT EXHIBIT 1045 WAS ADMITTED IN EVIDENCE.)

01:42:49  16        THE COURT:  GO AHEAD, PLEASE.

01:42:51  17        MR. SABRI:  MR. LEE, BRING UP PX 7.3.

01:42:55  18   Q.   WE'VE BEEN TALKING ABOUT IN THIS TRIAL THE BOUNCEBACK,

01:42:58  19   RUBBER BANDING PATENT.  ARE YOU FAMILIAR WITH THOSE AND ANY

01:43:00  20   OTHER NICKNAMES?

01:43:01  21   A.   YES, I'M FAMILIAR WITH THOSE TERMS, THE BOUNCEBACK PATENT,

01:43:05  22   RUBBER BANDING PATENT.  OTHER TERMS THAT HAVE BEEN USED FOR

01:43:07  23   THIS INCLUDE THE ELASTIC EFFECT PATENT.

01:43:09  24   Q.   DO YOU UNDERSTAND THAT A PRIOR JURY FOUND THAT THE '381

01:43:13  25   PATENT WAS BOTH VALID AND INFRINGED BY SAMSUNG; RIGHT?

BALAKRISHNAN DIRECT BY MR. SABRI

01:43:18   1    A.   YES, I DO.

01:43:19   2    Q.   WHAT, IN YOUR OPINION, IS THE SIGNIFICANCE OF THE '381

01:43:22   3    PATENT'S INVENTION?

01:43:23   4    A.   THE SIGNIFICANCE OF THE '381 PATENT INVENTION IS IT

01:43:26   5    PROVIDES A NICE, ELEGANT WAY TO HANDLE THE NAVIGATION OF

01:43:31   6    CONTENT ON MOBILE DEVICES IN A WAY THAT IS SEAMLESS TO THE USER

01:43:37   7    AND SOLVES A FEW VEXING PROBLEMS THAT EXISTED IN THE INTERFACE

01:43:43   8    WORLD WITH REGARDS TO NAVIGATING CONTENT ON SMALL DISPLACE.

01:43:47   9    Q.   LET'S TURN TO PDX 7.4.  AT A HIGH LEVEL TO BEGIN WITH,

01:43:51  10    WHAT WERE SOME OF THESE TECHNICAL PROBLEMS THAT PROMPTED THE

01:43:56  11    INVENTION OF THE '381 PATENT?

01:43:57  12    A.   SURE.  AT A VERY HIGH LEVEL, THE PROBLEMS ARISE WHEN WE

01:44:01  13    STARTED TRYING TO DISPLAY CONTENT ON MUCH SMALLER SCREENS THAT

01:44:06  14    WERE PREVALENT ON MOBILE DEVICES.

01:44:08  15         SO IN THE PAST WHEN WE HAD BIG SCREENS, WE COULD DISPLAY

01:44:10  16    QUITE A BIT OF CONTENT ON THE SCREEN BEFORE ONE HAD TO NAVIGATE

01:44:14  17    TO SEE OTHER PARTS OF THE CONTENT.  SO, FOR EXAMPLE, ON A

01:44:17  18    REGULAR DISPLAY, YOU MIGHT USE A SCROLL BAR TO SCROLL TO

01:44:20  19    ADDITIONAL PAGES.

01:44:21  20         ON A SMALL DISPLAY, THE NEED TO NAVIGATE BECOMES ALL THE

01:44:26  21    MORE IMPORTANT ALMOST RIGHT UPFRONT.  SO, FOR EXAMPLE, I'VE GOT

01:44:30  22    AN IMAGE UP HERE ON THE SCREEN WHERE I'VE GOT A REGULAR SIZE

01:44:34  23    PHOTOGRAPH, AND IT DOESN'T REALLY FIT ON THE DISPLAY SCREEN IN

01:44:37  24    ITS ENTIRETY.  SO THE USER COULD SEE A PORTION OF IT AND WOULD

01:44:41  25    HAVE TO NAVIGATE TO DIFFERENT PARTS OF IT BY PANNING OR

01:44:44   1    SCROLLING TO SEE THE OTHER PARTS OF THE SCREEN.

01:44:47   2         SO THIS IS ONE OF THE CHALLENGES, HOW DO YOU PROVIDE THIS

01:44:50   3    NAVIGATION IN A WAY THAT ACTUALLY WORKS WELL FOR THE USER?

01:44:54   4    Q.   CAN I DISCUSS SOME SPECIFIC PROBLEMS THAT THE '381 PATENT

01:44:58   5    SOLVED?

01:44:58   6    A.   SURE.  THE FIRST PROBLEM OCCURS WHEN LET'S SAY THE USER IS

01:45:02   7    NAVIGATING THE SCREEN, THE CONTENT ON THE SCREEN AND REACHES

01:45:05   8    THE EDGE OF THAT PHOTOGRAPH IN THIS PARTICULAR EXAMPLE.

01:45:09   9         WHEN THEY REACH THE EDGE OF THE PHOTOGRAPH, TYPICALLY IN

01:45:14   10   THE PAST, THE PHOTOGRAPH WILL SIMPLY STOP MOVING AND THIS IS

01:45:17   11   KNOWN AS THE FROZEN SCREEN PROBLEM, BECAUSE WHAT WOULD HAPPEN

01:45:19   12   THEN IS THE USER WOULD NOT NECESSARILY KNOW WHETHER THEY

01:45:23   13   REACHED THE END OF THE PARAGRAPH OR WHETHER THE SCREEN IS

01:45:26   14   SIMPLY FROZEN BECAUSE IT WASN'T TRACKING THE FINGER

01:45:29   15   PARTICULARLY WELL AT THAT TIME.

01:45:31   16        AND YOU'VE GOT TO REMEMBER AT THE TIME, TEN YEARS AGO

01:45:34   17   ALMOST, THE TRACKING SYSTEMS IN A LOT OF THESE TOUCHSCREEN

01:45:37   18   DEVICES WERE NOT AS GOOD AS THEY ARE TODAY.

01:45:40   19        SO SOMETIMES YOU COULD GET THE SENSE OF IT BEING FROZEN.

01:45:43   20   Q.   AND, MR. LEE, IF WE COULD BRING UP PDX 7.5, I THINK WE

01:45:48   21   HAVE AN ANIMATION HERE IF YOU CAN SHOW THE JURY WHAT YOU'RE

01:45:52   22   TALKING ABOUT?

01:45:52   23   A.   I HAVE AN ANIMATION HERE.  AS YOU CAN SEE, I'M SHOWING THE

01:45:55   24   PORTION OF THE PHOTOGRAPH THAT YOU CAN SEE ON THE SCREEN, WHICH

01:45:57   25   IS A SMALL PORTION OF IT, AND THE USER IS MANIPULATING IT, AND

01:46:01  1    HAS REACHED THE EDGE OF THE PHOTO ON THE RIGHT-HAND SIDE THERE.

01:46:04  2    BUT THE SCREEN NO LONGER REACTS TO THE USER BECAUSE IT'S COME

01:46:07  3    TO THE EDGE OF THE PHOTO, BUT THE USER DOESN'T KNOW THAT.

01:46:10  4    MAYBE THERE'S MORE OR MAYBE THE SCREEN IS FROZEN AND THEY ARE

01:46:14  5    NOT, THEY DON'T HAVE THAT INFORMATION.

01:46:15  6    Q.   LET'S TURN TO PDX 7.6 NOW, MR. LEE.

01:46:21  7         CAN YOU DISCUSS ANOTHER SPECIFIC PROBLEM THAT THE '381

01:46:23  8    PATENT SOLVED.

01:46:24  9    A.   SO IN TRYING TO SOLVE THAT FROZEN SCREEN PROBLEM, SOME

01:46:27  10   DESIGNERS DID WHAT'S CALLED ALLOWED THE USER TO GO BEYOND THE

01:46:31  11   EDGE OF THE CONTENT AND KEEP SCROLLING.

01:46:33  12        SO IF YOU KEEP MOVING AND ALLOW THE PHOTOGRAPH TO KEEP

01:46:36  13   MOVING TO THE LEFT, THIS'LL SHOW A BUNCH OF BLANK SCREENS, IF

01:46:41  14   YOU KEEP ALLOWING THAT TO HAPPEN, YOU END UP IN WHAT'S KNOWN AS

01:46:45  15   DESERT FOG, BASICALLY A BUNCH OF BLANK SCREEN SPACE.

01:46:48  16        AND NOW THE USER HAS LOST THE CONTENT, AND YOU HAVE NO

01:46:50  17   IDEA WHERE YOU ARE, AND IT'S DIFFICULT TO GET BACK TO WHERE YOU

01:46:53  18   WERE BEFORE.

01:46:53  19   Q.   LET'S PULL UP PDX 7.7 NOW.  HOW DOES THE '381 PATENT SOLVE

01:46:59  20   THESE PROBLEMS?

01:46:59  21   A.   SO THE '381 PATENT SOLVES BOTH PROBLEMS IN A VERY ELEGANT

01:47:04  22   WAY THAT ACTUALLY INTEGRATE NICELY TO THE OVERALL USER

01:47:08  23   EXPERIENCE.

01:47:08  24        SO, FOR EXAMPLE, WHEN THE USER IS SCROLLING AGAIN, JUST

01:47:11  25   LIKE WE DID BEFORE, TO THE LEFT, IT SHOWS A BIT OF BLANK SPACE,

676

BALAKRISHNAN DIRECT BY MR. SABRI

01:47:14  1    BUT WHEN YOU LET GO, IT BOUNCES BACK TO THE EDGE SO YOU KNOW,

01:47:18  2    THE USER KNOWS, YES, I'VE COME TO THE END OF MY CONTENT,

01:47:21  3    THERE'S NO MORE CONTENT TO BE SEEN.  AND WHEN THEY LET GO, IT

01:47:25  4    GOES BACK SO YOU NEVER GET LOST IN THE DESERT FOG LIKE IN THE

01:47:28  5    PREVIOUS EXAMPLE.

01:47:29  6        SO IT REALLY SOLVES THESE TWO PROBLEMS.  IT DOES IT IN A

01:47:32  7    WAY THAT'S NOT INTRUSIVE TO THE USER'S INTERACTION BECAUSE THEY

01:47:36  8    ARE SCROLLING, THEY COME TO THE END OF IT, THEY LET GO, IT

01:47:39  9    BOUNCES BACK, AND THEY DON'T HAVE TO SWITCH MODES OR DO

01:47:42  10   ANYTHING CRAZY TO MANIPULATE THAT PHOTOGRAPH.

01:47:45  11   Q.   DID SAMSUNG INCORPORATE THE FEATURES OF CLAIM 19 OF THE

01:47:49  12   '381 PATENT INTO ITS PRODUCTS?

01:47:51  13   A.   YES, IT DID.

01:47:52  14   Q.   LET'S TAKE A LOOK AT PDX 7.8.

01:47:59  15       NOW, DOES THIS CHART SHOW, IF YOU LOOK AT -- IT'S HARD TO

01:48:03  16   SEE ON THE BIG SCREEN ANY HIGHLIGHTS, BUT IF YOU LOOK AT THE

01:48:06  17   '381 COLUMN, ARE THOSE THE PRODUCTS THAT A PRIOR JURY FOUND TO

01:48:09  18   INFRINGE THE '381 PATENT?

01:48:11  19   A.   THE HIGHLIGHTED AND THE HIGHLIGHTED ITEMS ARE MARKED WITH

01:48:15  20   AN X IN THE '381 COLUMN ARE THE PRODUCTS THAT WERE FOUND TO

01:48:18  21   INFRINGE.

01:48:19  22   Q.   SO I'LL JUST WALK THROUGH THEM FOR THOSE WHO AREN'T ABLE

01:48:22  23   TO SEE THE HIGHLIGHTING.  THE CAPTIVATE, CONTINUUM, DROID

01:48:26  24   CHARGE, EPIC 4G, FASCINATE, GALAXY S I9000, S 4G, GALAXY S II

01:48:36  25   AT&T, GALAXY S II I9100, AND THEN IF WE SKIP DOWN, THE GEM,

01:48:44   1       INDULGE, INFUSE 4G, MESMERIZE, AND VIBRANT.

01:48:48   2           THOSE ARE ALL PRODUCTS THAT WERE FOUND TO INFRINGE THE

01:48:52   3       VALID '381 PATENT; RIGHT.

01:48:53   4       A.   THAT IS CORRECT.

01:48:54   5       Q.   YOU'VE BEEN IN THE COURTROOM FROM OPENING STATEMENT

01:48:57   6       THROUGH ALL THE WITNESSES; RIGHT?

01:48:58   7       A.   YES, I HAVE.

01:48:59   8       Q.   HAVE YOU HEARD SOME DISCUSSION OF THE GALAXY ACE PRODUCT?

01:49:01   9       A.   YES, I DID.

01:49:02   10      Q.   ALTHOUGH IT'S NOT ON THIS LIST, DO YOU UNDERSTAND THAT THE

01:49:04   11      GALAXY ACE WAS ALSO FOUND TO INFRINGE THE '381 PATENT?

01:49:07   12      A.   YES, I DO.

01:49:08   13      Q.   IN WORKING ON THIS CASE, DID YOU HAVE A CHANCE TO SEE

01:49:13   14      SAMSUNG'S INTERNAL, PREVIOUSLY CONFIDENTIAL DOCUMENTS?

01:49:15   15      A.   YES, I DID.

01:49:16   16      Q.   DO ANY OF THOSE DISCUSS THE PATENTED FEATURE IN THE '381

01:49:20   17      PATENT?

01:49:20   18      A.   YES, THEY DID.

01:49:22   19      Q.   PLEASE LOOK AT TAB PX 46 IN YOUR BINDER.

01:49:30   20           DO YOU RECOGNIZE THAT DOCUMENT?

01:49:31   21      A.   YES, I DO.

01:49:32   22      Q.   AT A HIGH LEVEL, WHAT IS IT?

01:49:34   23      A.   AT A HIGH LEVEL, THIS IS AN INTERNAL SAMSUNG DOCUMENT

01:49:37   24      DESCRIBING THE SUMMARIES OF THE USABILITY EVALUATION RESULT

01:49:42   25      THAT SAMSUNG CONDUCTED COMPARING THE BEHOLD3 SAMSUNG PHONE TO

01:49:47   1      THE IPHONE.

01:49:48   2           AND THE BEHOLD3 WAS THE CODE NAME FOR ONE OF THE PHONES

01:49:52   3      THAT WAS FOUND TO INFRINGE IN THIS CASE.  IT'S CALLED THE

01:49:55   4      VIBRANT.

01:49:55   5      Q.   IS THIS A DOCUMENT THAT YOU REVIEWED IN CONNECTION WITH

01:49:58   6      YOUR ANALYSIS IN THIS CASE?

01:50:00   7      A.   YES.

01:50:01   8           MR. SABRI:  YOUR HONOR, APPLE MOVES THE ADMISSION OF

01:50:04   9      PX 46.

01:50:05   10          MS. MAROULIS:  NO FURTHER OBJECTION.

01:50:06   11          THE COURT:  IT'S ADMITTED.

01:50:07   12       (PLAINTIFF'S EXHIBIT 46 WAS ADMITTED IN EVIDENCE.)

01:50:07   13          THE COURT:  GO AHEAD, PLEASE.

01:50:08   14          MR. SABRI:  LET'S PULL UP THE COVER PAGE.  THERE IT

01:50:11   15     IS.

01:50:11   16     Q.   WHAT IS THE DATE ON THIS DOCUMENT?

01:50:13   17     A.   THE DATE IS THE 10TH OF MAY 2010.

01:50:16   18     Q.   AND THIS DOCUMENT WAS TRANSLATED INTO ENGLISH FROM KOREAN;

01:50:19   19     RIGHT?

01:50:19   20     A.   THAT'S CORRECT.

01:50:20   21     Q.   LET'S LOOK FIRST AT PAGE 14, SO THAT'S PX 46.14.  YOU CAN

01:50:26   22     SEE IT ON YOUR SCREEN THERE.

01:50:28   23          IF WE LOOK AT THE BULLET UNDER BACKGROUND AT THE TOP, WHAT

01:50:32   24     DOES THAT TELL YOU ABOUT THE SUBJECT MATTER OF THIS DOCUMENT?

01:50:36   25     A.   BASICALLY IT SAYS THE SUBJECT MATTER AND THE BULLET

BALAKRISHNAN DIRECT BY MR. SABRI                        679

01:50:39   1      ACTUALLY SAYS IT -- IT SAYS, "TO ENHANCE THE PERCEIVED QUALITY

01:50:43   2      OF THE INFOTAINMENT-REINFORCED T-MOBILE PREMIUM ANDROID MODEL

01:50:50   3      BEHOLD3 AND THE IPHONE 3 EVALUATION IN THE AREAS OF EASE OF USE

01:50:55   4      FOR MULTIMEDIA FUNCTION, OVERALL AESTHETIC, PERSONAL

01:50:59   5      INFORMATION MANAGERS," THAT'S WHAT PIM'S MEAN, "AND WEB

01:51:05   6      BROWSING."

01:51:05   7      Q.   AND YOU SAID THE BEHOLD3 IS THE VIBRANT?

01:51:08   8      A.   IT'S THE CODE NAME FOR THE VIBRANT.

01:51:10   9      Q.   LET'S TURN NOW TO PAGE 66.  THERE'S A LOT GOING ON HERE,

01:51:13  10      SO CAN YOU UNPACK IT FOR THE JURY AND DESCRIBE WHAT YOU'RE

01:51:15  11      SEEING ON THIS PAGE?

01:51:16  12      A.   SURE.  THIS PAGE IS ONE OF THE PAGES IN THIS DOCUMENT, AND

01:51:20  13      IT RELATES TO AN ANALYSIS THAT WAS DONE BY THE TEAM WITH

01:51:25  14      REGARDS TO THE BROWSING CAPABILITY IN THE WEB BROWSER,

01:51:29  15      COMPARING THE WEB BROWSER IN THE BEHOLD3, AND THAT'S ON THE

01:51:32  16      LEFT-HAND SIDE ON THE IMAGES THERE, AND THE IPHONE, WHICH IS ON

01:51:37  17      THE RIGHT-HAND SIDE.

01:51:39  18           AND IF YOU CAN LOOK AT THE TEXT ON THE LEFT-SIDE HAND, IT

01:51:42  19      SAYS, THAT'S FOR THE BEHOLD3, IT SAYS "PLANE BECAUSE NO SPECIAL

01:51:47  20      EFFECTS ARE PROVIDED WHEN DRAGGING WEB PAGE TO THE BOTTOM MOST

01:51:50  21      OR SIDE EDGES."

01:51:52  22           AND YOU CAN SEE IN THE SCREEN SHOT, THE WEB PAGE IS KIND

01:51:56  23      OF FROZEN IN SPACE.  IT HASN'T MOVED.

01:51:58  24           ON THE RIGHT-HAND SIDE ON THE IPHONE, YOU CAN SEE IN THE

01:52:02  25      SCREEN SHOT, THERE IS THE ACTION OF IT MOVING FROM THE BOTTOM

01:52:06  1    LEFT CORNER TO THE RIGHT, AND THERE'S SOME GRAPHIC THERE

01:52:10  2    INDICATING MOVEMENT IN THE ILLUSTRATION.

01:52:12  3         AND THE TEXT SAYS "IF A WEB PAGE IS DRAGGED TO THE EDGE

01:52:15  4    AND THE HAND IS RELEASED, A BOUNCING VISUAL EFFECT IS

01:52:19  5    PROVIDED."

01:52:20  6         THIS IS ESSENTIALLY DESCRIBING THE FUNCTIONALITY OF THE

01:52:24  7    '381 PATENT.

01:52:26  8         AND THEN IF YOU GO TO THE TOP THERE, ON THE TOP BULLET, IT

01:52:31  9    SAYS -- IT'S A SUMMARY.  IT SAYS, "NO VISUAL EFFECTS PROVIDED

01:52:34 10    WHEN A WEB PAGE IS DRAGGED TO ITS END."

01:52:38 11         AND, AGAIN, IT SAYS FOR THE BEHOLD3, "WHEN A WEB PAGE IS

01:52:42 12    DRAGGED TO ITS END, ONLY INFORMATION IS PROVIDED WITHOUT ANY

01:52:45 13    EFFECT."

01:52:46 14         IN CONTRAST, FOR THE IPHONE, IT SAYS, "GENERATES FUN FOR

01:52:50 15    THE USER WITH A VISUAL ELEMENT THAT SEEMS TO BOUNCE."

01:52:55 16    Q.   SO AFTER IDENTIFYING THIS PROBLEM THAT THE IPHONE HAS A

01:52:58 17    FUN, VISUAL ELEMENTS THAT THE VIBRANT BEING DEVELOPED LACKED.

01:53:03 18    IS THERE A DIRECTION FOR HOW SAMSUNG COULD IMPROVE THE

01:53:06 19    DIFFERENCE IN TECHNOLOGY?

01:53:07 20    A.   YES.  IT SAYS SO RIGHT AT THE BOTTOM OF THE SLIDE, AND

01:53:10 21    MR. LEE HAS ALREADY BLOWN IT UP HERE.  DIRECTION OF

01:53:14 22    IMPROVEMENT, IT SAYS, "PROVIDE A FUN VISUAL EFFECT WHEN DRAGS A

01:53:17 23    WEB PAGE."

01:53:18 24         AND IT FURTHER SAYS, "CORRESPONDING EFFECT NOT SUPPORTED,

01:53:21 25    ISSUED SHARED BY BROWSER ANDROID ECLAIR."

01:53:25   1    Q.   NOW, I WANT TO LOOK AT THE NUMBERS AT THE BOTTOM.  WE'VE

01:53:29   2    HEARD ABOUT THIS IN CONNECTION WITH A FEW OTHER DOCUMENTS.

01:53:32   3         DO YOU SEE THE 66 OF 94?

01:53:34   4    A.   YES.

01:53:35   5    Q.   WHEN YOU WERE DOING YOUR WORK, YOU HAD ACCESS TO THE HARD

01:53:38   6    COPY DOCUMENT; RIGHT?

01:53:38   7    A.   YES.

01:53:39   8    Q.   AS THE JURY WILL.

01:53:40   9         WE FOCUSSED ON THIS BECAUSE IT TALKS ABOUT THE '381 PATENT

01:53:44   10   SPECIFICALLY; RIGHT?

01:53:45   11   A.   OF COURSE.

01:53:46   12   Q.   DID YOU SEE SIMILAR PAGES COMPARING OTHER FUNCTIONALITY OF

01:53:50   13   THE TWO PRODUCTS?

01:53:50   14   A.   YES, I DID.

01:53:51   15   Q.   LET'S TURN NOW TO TAB PX 57 IN YOUR BINDER.

01:54:00   16   A.   SURE.

01:54:01   17   Q.   AGAIN, AT A HIGH LEVEL, WHAT IS THIS DOCUMENT?

01:54:03   18   A.   THIS IS A DIFFERENT USABILITY EVALUATION RESULT SUMMARY

01:54:07   19   DOCUMENT.  IT'S SUMMARIZING THE WORK DONE BY SAMSUNG COMPARING

01:54:12   20   THEIR P5, THE TABLET DEVICE, TO THE IPAD 2.

01:54:16   21   Q.   IS THIS ALSO A DOCUMENT THAT YOU CONSIDERED IN YOUR

01:54:19   22   ANALYSIS IN THIS CASE?

01:54:20   23   A.   YES, IT IS.

01:54:23   24        MR. SABRI:  MOVE THE ADMISSION OF PX 57.

01:54:25   25        THE COURT:  MS. MAROULIS.

BALAKRISHNAN DIRECT BY MR. SABRI

```
01:54:27  1              MS. MAROULIS:  NO FURTHER OBJECTION.

01:54:28  2              THE COURT:  IT'S ADMITTED.

01:54:29  3         (PLAINTIFF'S EXHIBIT 57 WAS ADMITTED IN EVIDENCE.)

01:54:29  4              THE COURT:  GO AHEAD, PLEASE.

01:54:31  5      BY MR. SABRI:

01:54:31  6      Q.   SO YOU SEE ON THE COVER THERE NOW.  WHAT IS THE DATE OF

01:54:35  7      THIS DOCUMENT?

01:54:35  8      A.   IT'S THE 9TH OF APRIL 2011.

01:54:37  9      Q.   SO WE'VE GONE FORWARD ABOUT A YEAR AS COMPARED TO THE

01:54:40 10      PREVIOUS DOCUMENT; RIGHT?

01:54:41 11      A.   ROUGHLY, YES.

01:54:42 12      Q.   LET'S MOVE AHEAD TO PAGE 73, THAT'S PX 57.73.

01:54:50 13           WHAT, IF ANYTHING, IS SIGNIFICANT HERE TO YOU?

01:54:52 14      A.   SO HERE, AS WITH THE PREVIOUS DOCUMENT, AGAIN, THERE'S AN

01:54:56 15      ANALYSIS OF THE FUNCTIONALITY IN THE BROWSER, AND I'LL POINT

01:55:01 16      OUT A FEW THINGS HERE.

01:55:02 17           FIRST OF ALL, IT SAYS IN THE TOP BULLET, IT SAYS "DURING

01:55:05 18      TOP MOST/BOTTOM MOST DIAGONAL MOVEMENTS THERE IS NO SPRINGING

01:55:11 19      BOUNCE EFFECT."

01:55:12 20           AND IF YOU LOOK AT THE IMAGES ON THE LEFT-HAND SIDE IS THE

01:55:16 21      IMAGE OF THE P5, WHICH IS THE SAMSUNG TABLET, AND THE TEXT

01:55:21 22      THERE SAYS "DURING THE TOP MOST/BOTTOM MOST DIAGONAL MOVEMENTS,

01:55:26 23      THERE IS NO BOUNCE EFFECT IN THE HEADER'S MENU SECTION."

01:55:30 24           AND YOU CAN SEE THE IMAGE, IT'S NOT INDICATING THAT IT'S

01:55:32 25      MOVING AT ALL.
```

683
BALAKRISHNAN DIRECT BY MR. SABRI

01:55:33   1           ON THE RIGHT-HAND SIDE, WHICH IS THE IPAD 2, IN THE IMAGE,

01:55:39   2     YOU CAN SEE THAT THE USER HAS DRAGGED THE TOP LEFT CORNER OF

01:55:42   3     THE WEB PAGE DOWN A LITTLE BIT, EXPOSING SOME BLANK AREA, AND

01:55:46   4     THE TEXT DESCRIBING THIS ON THE RIGHT SAYS, "IN THE CASE OF

01:55:51   5     PATH 2, THERE IS A FUN ELEMENT FROM A NATURAL BOUNCE EFFECT

01:55:55   6     THAT FOLLOWS HAND GESTURES."

01:55:57   7     Q.   WHAT IS THAT WORDING THAT I SEE AFTER IPAD 2 IN THE

01:56:01   8     HEADING ON THE RIGHT?  DO YOU SEE THAT?  IT SAYS

01:56:05   9     IPAD 2/PROPOSED IMPROVEMENT?

01:56:06   10    A.   YES.

01:56:07   11    Q.   ARE YOU ABLE TO DETERMINE FROM THIS DOCUMENT THE LEVEL OF

01:56:12   12    IMPORTANCE THAT SAMSUNG ATTACHED TO THE ISSUE?

01:56:14   13    A.   YES.  IF YOU LOOK AT THE TOP OF THE DOCUMENT THERE, IT

01:56:16   14    TAGS THIS PARTICULAR ISSUE, NUMBER 51, AS SERIOUS.

01:56:25   15    Q.   ARE THESE THE ONLY TWO DOCUMENTS THAT YOU SAW IN SAMSUNG'S

01:56:29   16    INTERNAL MATERIALS DISCUSSING THE '381'S FUNCTIONALITY?

01:56:32   17    A.   NO.  I REVIEWED OTHER DOCUMENTS, AS WELL AS E-MAILS WITH

01:56:35   18    REGARD TO THIS FUNCTIONALITY.

01:56:36   19    Q.   DID SAMSUNG EVENTUALLY ADOPT THE BOUNCEBACK FUNCTIONALITY

01:56:39   20    PROTECTED BY THE '381 PATENT?

01:56:41   21    A.   YES, THEY DID.

01:56:43   22           MR. SABRI:  NOTHING FURTHER.

01:56:44   23           THE COURT:  ALL RIGHT.  THE TIME IS 1:56.

01:56:49   24           1:56.  GO AHEAD, PLEASE.

           25

01:56:51   1                      **CROSS-EXAMINATION**

01:56:52   2    BY MS. MAROULIS:

01:56:53   3    Q.   GOOD AFTERNOON, DR. BALAKRISHNAN.  I'M VICTORIA MAROULIS,

01:56:57   4    SAMSUNG'S COUNSEL.  HOW ARE YOU?

01:56:58   5    A.   VERY GOOD.  THANK YOU.

01:56:59   6    Q.   SIR, YOU ARE HERE TESTIFYING AS A COMPUTER SCIENCE EXPERT;

01:57:02   7    CORRECT?

01:57:03   8    A.   COMPUTER SCIENCE AND HUMAN COMPUTER INTERACTION.

01:57:05   9    Q.   YOU TALKED TO THE JURY ABOUT HOW THE PHONE WORKS, NOT HOW

01:57:08   10   IT LOOKS; IS THAT RIGHT?

01:57:10   11   A.   I AM TESTIFYING WITH REGARD TO THE PARTICULAR

01:57:12   12   FUNCTIONALITY IN THE '381 PATENT.

01:57:14   13   Q.   SO YOU'RE TALKING ABOUT WHAT'S INSIDE THE PHONE, NOT ON

01:57:16   14   THE OUTSIDE OF THE PHONE?

01:57:18   15   A.   I'M TALKING ABOUT HOW THE USER INTERACTS WITH THE PHONE IN

01:57:21   16   A PARTICULAR FUNCTIONALITY AS EMBODIED IN THE '381 PATENT.

01:57:26   17   Q.   AND THAT FUNCTIONALITY, IN YOUR OPINION, IS IMPORTANT, THE

01:57:28   18   ONE THAT'S EMBODIED IN THE '381 PATENT?

01:57:30   19   A.   YES, IT IS.

01:57:31   20   Q.   OKAY.  SIR, YOU'RE NOT AN EXPERT ON ORNAMENTAL DESIGN;

01:57:35   21   RIGHT?

01:57:35   22   A.   I HAVE PROVIDED NO OPINION ON ORNAMENTAL DESIGN.

01:57:37   23   Q.   SO YOU WON'T BE TELLING THE JURY ANYTHING ABOUT THE DESIGN

01:57:41   24   PATENTS IN THIS CASE?

01:57:42   25   A.   I HAVE NO INTENTION OF DOING THAT.

01:57:44  1   Q.   AND YOU WILL NOT BE PROVIDING ANY OPINIONS ABOUT THE

01:57:47  2   ARTICLE OF MANUFACTURE THAT'S AT ISSUE IN THIS CASE; CORRECT?

01:57:50  3   A.   THAT IS CORRECT.

01:57:51  4         MS. MAROULIS:  NO FURTHER QUESTIONS, YOUR HONOR.

01:57:52  5         THE COURT:  ALL RIGHT.  THE TIME IS 1:57.

01:57:55  6      IS THERE ANY REDIRECT FOR THIS WITNESS?

01:57:57  7         MR. SABRI:  NO, YOUR HONOR.

01:57:58  8         THE COURT:  OKAY.  MAY HE BE EXCUSED SUBJECT TO

01:58:00  9   RECALL OR NOT.

01:58:01  10        MR. SABRI:  NOT SUBJECT.

01:58:02  11        THE COURT:  DO YOU AGREE WITH THAT, MS. MAROULIS?

01:58:04  12        MS. MAROULIS:  YES, YOUR HONOR.

01:58:05  13        THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED, AND

01:58:07  14  YOU'VE COMPLETED YOUR TRIAL TESTIMONY.

01:58:08  15        THE WITNESS:  THANK YOU.

01:58:09  16        THE COURT:  ALL RIGHT.  BRING YOUR NEXT WITNESS IN,

01:58:11  17  PLEASE.

01:58:12  18        MR. LEE:  YOUR HONOR, APPLE CALLS AS ITS NEXT WITNESS

01:58:17  19  KARAN SINGH, AND MR. SABRI IS GOING TO DO THIS EXAMINATION AS

01:58:20  20  WELL.

01:58:32  21        THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

01:58:33  22     **(PLAINTIFF'S WITNESS, KARAN SHAR SINGH, WAS SWORN.)**

01:58:38  23        THE WITNESS:  I DO.

01:58:39  24        THE CLERK:  THANK YOU.  PLEASE BE SEATED AND ONCE

01:58:41  25  SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR THE

01:58:44   1    RECORD.

01:58:44   2              THE WITNESS:  MY NAME IS KARAN SHAR SINGH.  THAT'S

01:58:50   3    SPELL K-A-R-A-N, S-H-A-R, AND MY LAST NAME IS S-I-N-G-H.

01:58:59   4              THE COURT:  ALL RIGHT.  THE TIME IS 1:58.  GO AHEAD,

01:59:02   5    PLEASE.

01:59:02   6                          **DIRECT EXAMINATION**

01:59:03   7    BY MR. SABRI:

01:59:04   8    Q.   DR. SINGH, PLEASE INTRODUCE YOURSELF TO THE JURY.

01:59:08   9    A.   MY NAME IS KARAN SHAR SINGH, BUT MOST PEOPLE CALL ME

01:59:12   10   KARAN.

01:59:12   11   Q.   WHAT DO YOU DO FOR A LIVING, DR. SINGH?

01:59:15   12   A.   I'M A PROFESSOR OF COMPUTER SCIENCE AT THE UNIVERSITY OF

01:59:17   13   TORONTO.

01:59:18   14   Q.   WHAT ARE YOUR RESPONSIBILITIES AT THE UNIVERSITY?

01:59:20   15   A.   I CO-DIRECT RESEARCH -- I CO-DIRECT GRAPHICS AND HUMAN

01:59:25   16   COMPUTER INTERACTION RESEARCH LAB.  I PERFORM RESEARCH AS A

01:59:29   17   RESULT THERE.

01:59:30   18        I TEACH CLASSES.  I SUPERVISE MASTER'S AND PH.D. STUDENTS.

01:59:36   19   Q.   IS THAT LAB THAT YOU MENTIONED, DO YOU CO-DIRECT THAT WITH

01:59:39   20   DR. BALAKRISHNAN, WHO THE JURY ALSO JUST MET?

01:59:42   21   A.   THAT IS CORRECT.

01:59:43   22   Q.   WHAT IS SOME OF THE RESEARCH THAT DO YOU AT THE LAB?

01:59:45   23   A.   SO MY AREA OF RESEARCH BROADLY FALLS IN THE AREA OF

01:59:49   24   INTERACTIVE GRAPHICS AND THAT INCLUDES SKETCH AND TOUCH BASED

01:59:55   25   INTERFACES, GEOMETRIC MODELING, ANIMATION, AND MORE RECENTLY

02:00:00  1    THE EMERGING AREA OF AUGMENTED AND VIRTUAL REALITY.

02:00:05  2    Q.   LET'S BRING UP PDX 8.2 PLEASE, MR. LEE.

02:00:11  3         WHILE WE'RE WAITING FOR THAT, WHAT IS YOUR EDUCATIONAL

02:00:13  4    BACKGROUND?

02:00:14  5    A.   I HAVE A BACHELOR'S IN COMPUTER SCIENCE FROM THE INDIAN

02:00:20  6    INSTITUTE OF TECHNOLOGY; I ALSO HAVE A MASTER'S AND PH.D. IN

02:00:24  7    COMPUTER SCIENCE FROM THE OHIO STATE UNIVERSITY.

02:00:28  8    Q.   HAVE YOU AUTHORED ANY PUBLICATIONS?

02:00:30  9    A.   SURE.  OVER THE YEARS, I HAVE WELL OVER 100 PEER REVIEWED

02:00:34  10   ARTICLES AND CONFERENCES AND JOURNALS IN ANY AREA OF RESEARCH.

02:00:41  11   Q.   HOW LONG HAVE YOU BEEN A COMPUTER SCIENCE PROFESSOR?

02:00:43  12   A.   FOR 16 YEARS.

02:00:44  13   Q.   WHAT DID YOU DO BEFORE YOU BECAME A PROFESSOR AFTER YOUR

02:00:48  14   PH.D.?

02:00:49  15   A.   WELL, AFTER MY PH.D. IN 1995, I WORKED IN PRIVATE INDUSTRY

02:00:54  16   FOR A NUMBER OF YEARS.  IMMEDIATELY AFTER MY DEGREE, I WAS PART

02:01:00  17   OF A TEAM THAT DESIGNED AND DEVELOPED AN ANIMATION SYSTEM

02:01:03  18   CALLED MAYA.  LATER I WORKED HERE IN CALIFORNIA ON ANOTHER

02:01:09  19   SOFTWARE SYSTEM CALLED PARAFORM THAT WAS A REVERSE ENGINEERING

02:01:14  20   SYSTEM.

02:01:15  21   Q.   IS MAYA NOW AUTO DESK MAYA?

02:01:19  22   A.   THAT'S RIGHT.  MAYA IS THE SYSTEM THAT'S NOW OWNED AND

02:01:24  23   CALLED AUTO DESK MAYA.

02:01:24  24   Q.   DO YOU YOURSELF DO COMPUTER PROGRAMMING?

02:01:26  25   A.   SURE, FOR OVER 20, 25 YEARS.  IT'S BEEN -- IT'S BEEN MY

02:01:31  1    TOOL OF EXPRESSION IN TERMS OF BOTH MY RESEARCH TEACHING,

02:01:35  2    PRIVATE INDUSTRY WORK, YES.

02:01:37  3    Q.   THE MAYA AND PARAFORM SOFTWARE SYSTEMS THAT YOU MENTIONED,

02:01:41  4    WERE THOSE SUCCESSFUL?

02:01:42  5    A.   YES.  WELL, THE MAYA ANIMATION SYSTEM HAS AND IS THE

02:01:49  6    INDUSTRY STANDARD NOW FOR OVER TWO DECADES FOR COMPUTER

02:01:53  7    GRAPHICS AND ANIMATION EFFECTS IN FILM AND ANIMATION, AND FOR

02:01:58  8    THIS IT WAS GIVEN A TECHNICAL OSCAR IN 2003.

02:02:03  9         AND PARAFORM ALSO RECEIVED AN ACADEMY AWARD OF TECHNICAL

02:02:07  10   ACHIEVEMENT.

02:02:08  11         MR. SABRI:  YOUR HONOR, APPLE TENDERS DR. KARAN SINGH

02:02:12  12   AS AN EXPERT IN COMPUTER PROGRAMMING, HUMAN COMPUTER

02:02:15  13   INTERFACES, AND COMPUTER GRAPHICS.

02:02:16  14         THE COURT:  ANY OBJECTION?

02:02:17  15         MS. MAROULIS:  NO OBJECTION.

02:02:18  16         THE COURT:  ALL RIGHT.  SO CERTIFIED.

02:02:20  17     GO AHEAD, PLEASE.

02:02:21  18   BY MR. SABRI:

02:02:21  19   Q.   DR. SINGH, HAVE YOU BEEN COMPENSATED FOR YOUR WORK IN THIS

02:02:24  20   CASE?

02:02:24  21   A.   I HAVE.

02:02:25  22   Q.   DOES YOUR COMPENSATION DEPEND ON THE SUBSTANCE OF YOUR

02:02:31  23   OPINION OR HOW THIS CASE TURNS OUT?

02:02:34  24   A.   NO.  I'M COMPENSATED FOR MY TIME AS AN EXPERT.

02:02:37  25   Q.   PLEASE TURN TO TAB 1046 IN YOUR BINDER.

02:02:46    1       A.   I'M THERE.

02:02:47    2       Q.   DO YOU RECOGNIZE THAT TO BE THE '163 PATENT AT ISSUE IN

02:02:50    3    THIS CASE?

02:02:51    4       A.   IT IS.

02:02:52    5       Q.   IS THAT ONE OF THE PATENTS THAT YOU ANALYZED FOR THIS

02:02:56    6    CASE?

02:02:57    7       A.   THAT IS CORRECT.

02:02:59    8            MR. SABRI:  YOUR HONOR, I'D MOVE THE ADMISSION OF

02:03:01    9    JOINT EXHIBIT 1046.

02:03:02   10            THE COURT:  ANY OBJECTION?

02:03:03   11            MS. MAROULIS:  NO OBJECTION.

02:03:04   12            THE COURT:  IT'S ADMITTED.

02:03:05   13       (JOINT EXHIBIT 1046 WAS ADMITTED IN EVIDENCE.)

02:03:05   14            THE COURT:  GO AHEAD, PLEASE.

02:03:06   15    BY MR. SABRI:

02:03:07   16       Q.   IN GENERAL, WHAT DOES THE '163 PATENT RELATE TO?

02:03:09   17       A.   THE '163 PATENT IS AN INVENTION THAT STREAMLINES THE

02:03:13   18    BROWSING EXPERIENCE OF STRUCTURED DOCUMENTS, LIKE WEB PAGES, ON

02:03:18   19    SMALL TOUCH DEVICES, LIKE SMARTPHONES.

02:03:22   20            AND IT DOES THIS BY USING TAP GESTURES, SO IT USER SIMPLY

02:03:28   21    TAPS ON REGIONS OR ARTICLES OF INTEREST AND THE DEVICE, THE

02:03:36   22    PROGRAM, AUTOMATICALLY RESIZES AND REPOSITIONS THE DOCUMENT SO

02:03:41   23    THAT CONTENT IS READABLE.

02:03:42   24       Q.   LET'S PUT UP JUST FOR A MOMENT PDX 8.3.

02:03:47   25            IS THIS THE '163 PATENT?

SINGH DIRECT BY MR. SABRI

02:03:49  1    A.   IT IS.

02:03:50  2    Q.   DO YOU UNDERSTAND THAT THIS IS ONE OF THE PATENTS THAT A

02:03:54  3    PRIOR JURY FOUND VALID AND INFRINGED BY SAMSUNG?

02:03:57  4    A.   THAT IS CORRECT.

02:04:00  5    Q.   LET'S ADVANCE TO PDX 8.4.  CAN YOU GIVE THE JURY AN

02:04:04  6    EXAMPLE OF HOW THE '163 PATENT MIGHT BE USED IN VIEWING A WEB

02:04:09  7    PAGE?

02:04:09  8    A.   SURE.  AS PREVIOUSLY DESCRIBED, IN GENERAL THERE IS A HIGH

02:04:15  9    LEVEL INTERFACE PROBLEM THAT ARISES WHEN YOU HAVE LARGE AMOUNTS

02:04:20  10   OF CONTENT THAT YOU ARE TRYING TO PRESENT IN A COMPELLING

02:04:27  11   FASHION ON A SMALL FORM FACTOR DEVICE.

02:04:30  12        SO AS YOU SEE OVER HERE, THIS IS A WEB PAGE, THE

02:04:36  13   "NEW YORK TIMES" WEB PAGE, ON A SAMSUNG DEVICE.

02:04:41  14        AT MOST, YOU COULD SEE THE OVERALL LAYOUT OF NEWS STORIES

02:04:44  15   AND CONTENT AND MAYBE SOME IMAGES.  PROGRAMS YOU CAN READ THE

02:04:49  16   HEADLINES.

02:04:52  17        BUT IF YOU REALLY WANTED TO READ THE CONTENT, YOU WOULD

02:04:55  18   HAVE TO MAGNIFY AND MOVE AROUND THE DOCUMENT TO CONSUME THAT.

02:04:59  19        SO WITH THE '163, AS YOU WILL SEE OVER HERE AS YOU PLAY

02:05:03  20   THE VIDEO, THE USER SIMPLY TAPS ON THE ARTICLE OF INTEREST AND

02:05:08  21   THE PROGRAM MAGNIFIES, REPOSITIONS AUTOMATICALLY THAT ARTICLE

02:05:17  22   SO THAT IT IS APPROPRIATELY READABLE.

02:05:19  23        AND THEN ONCE HAVING READ THAT ARTICLE, IF THE USER WANTS

02:05:23  24   TO READ ANOTHER ARTICLE, THEY TAP ON THAT AND YOU'LL SEE, IF

02:05:27  25   YOU PLAY THE VIDEO, THAT THE CONTENT -- THE CONTENT IS MOVED

02:05:34   1      OVER SO THAT THAT ARTICLE IS READABLE AND SO ON AND SO FORTH.

02:05:38   2      Q.   DR. SINGH, IN THE VIDEO YOU JUST SHOWED, WAS THERE A

02:05:41   3      SINGLE TAP OR A DOUBLE TAP ON THE SECOND ARTICLE?

02:05:44   4      A.   I BELIEVE THERE WAS A SINGLE TAP.

02:05:46   5      Q.   OKAY.  IS THE '163 INVENTION LIMITED TO THAT OR WOULD IT

02:05:51   6      COVER BOTH WAYS OF MOVING AROUND A DOCUMENT?

02:05:53   7      A.   IT COVERS BOTH SINGLE AND DOUBLE TAP GESTURES.

02:05:56   8      Q.   IN YOUR ANALYSIS IN THIS CASE, DID YOU CONFIRM WHETHER

02:06:01   9      APPLE WAS USING THE '163 INVENTION IN ITS OWN PRODUCTS?

02:06:04   10     A.   I DID.

02:06:05   11     Q.   AND WAS IT?

02:06:06   12     A.   YES, THEY WERE USING THE '163 INVENTION.

02:06:09   13     Q.   LET'S MOVE, MR. LEE, TO PDX 8.6, PLEASE.

02:06:15   14          DO YOU SEE THERE HIGHLIGHTED, ARE THOSE PRODUCTS THAT WERE

02:06:21   15     FOUND TO INFRINGE THE '163 PATENT?

02:06:23   16     A.   THAT IS CORRECT.  THE PRODUCTS MARKED WITH AN X IN THE

02:06:26   17     RIGHT MOST COLUMN UNDER THE '163 HEADING WERE FOUND TO

02:06:31   18     INFRINGE.

02:06:31   19     Q.   SO JUST TO BE CLEAR, WE'RE TALKING ABOUT THE DROID CHARGE,

02:06:36   20     THE EPIC 4G, FASCINATE, GALAXY S I9000, S 4G, GALAXY S II AT&T,

02:06:48   21     GALAXY S II 9100, GALAXY S II T-MOBILE, INFUSE 4G, AND

02:06:56   22     MESMERIZE; CORRECT?

02:06:58   23     A.   THAT IS CORRECT.

02:06:58   24     Q.   AND YOU WERE HERE A MOMENT AGO WHEN I ASKED

02:07:03   25     DR. BALAKRISHNAN ABOUT THE GALAXY ACE; RIGHT?

02:07:05  1      A.   YES.

02:07:06  2      Q.   WAS THE GALAXY ACE ALSO FOUND TO INFRINGE THE '163 PATENT?

02:07:09  3      A.   YES, THE GALAXY ACE WAS ALSO FOUND TO INFRINGE THE '163

02:07:12  4      PATENT.

02:07:13  5      Q.   IN WORKING ON THIS CASE, DID YOU ALSO HAVE THE OPPORTUNITY

02:07:18  6      TO REVIEW SAMSUNG'S INTERNAL CONFIDENTIAL DOCUMENTS?

02:07:21  7      A.   I DID.

02:07:22  8      Q.   DO ANY OF THEM DISCUSS THE '163 PATENTED FEATURE?

02:07:26  9      A.   THEY DO.

02:07:28  10     Q.   LET'S TURN TO PX 38 IN YOUR BINDER, PLEASE.

02:07:36  11     A.   OKAY.

02:07:37  12     Q.   WHAT IS PX 38?

02:07:38  13     A.   PX 38, AS THE TITLE SAYS, IS A UX, THAT'S USER EXPERIENCE,

02:07:48  14     EXPLORATION STUDY THAT COMPARES ALTERNATE ZOOMING METHODS FOR A

02:07:54  15     WEB BROWSER.

02:07:55  16     Q.   IS THIS A DOCUMENT THAT YOU CONSIDERED IN CONNECTION WITH

02:07:58  17     YOUR ANALYSIS IN THIS CASE?

02:08:00  18     A.   YES, IT IS.

02:08:02  19              MR. SABRI:  YOUR HONOR, I'D MOVE THE ADMISSION OF

02:08:04  20     PX 38.

02:08:05  21              MS. MAROULIS:  NO FURTHER OBJECTION.

02:08:06  22              THE COURT:  IT'S ADMITTED.

02:08:07  23         (PLAINTIFF'S EXHIBIT 38 WAS ADMITTED IN EVIDENCE.)

02:08:08  24              THE COURT:  GO AHEAD, PLEASE.

02:08:09  25              MR. SABRI:  LET'S GO AHEAD AND TURN TO PX 38.24.

02:08:13   1    Q.   ACTUALLY, LET ME UNWIND THAT.  CAN WE GO BACK TO THE COVER

02:08:20   2    FOR JUST A MOMENT AND ZOOM IN ON THE -- THANK YOU, MR. LEE.

02:08:23   3         WHAT IS THE DATE ON THIS DOCUMENT, DR. SINGH?

02:08:26   4    A.   APRIL 17TH, 2009.

02:08:28   5    Q.   NOW LET'S ADVANCE TO PAGE 24.

02:08:33   6         IF WE CAN BLOW UP THE TEXT AT THE TOP.  WHAT DID THIS

02:08:39   7    DOCUMENT TELL YOU ABOUT SAMSUNG'S CONSIDERATION OF APPLE'S

02:08:42   8    PRODUCTS IN DEVELOPING ITS OWN PRODUCTS?

02:08:45   9    A.   WELL, AFTER A RESULT OF THIS EXPLORATORY STUDY, THERE WERE

02:08:54  10    A NUMBER OF DESIGN AND RECOMMENDATIONS AND SUGGESTIONS, AND

02:08:58  11    AMONG THOSE IS THE RECOMMENDATION TO ADOPT DOUBLE TAP AS A

02:09:07  12    SUPPLEMENTARY ZOOMING METHOD FOR MULTIPLE LEVELS OF ZOOMING,

02:09:13  13    AND THAT THE USER EXPERIENCE OF THE IPHONE CAN BE USED AS A

02:09:18  14    DESIGN BENCHMARK.

02:09:19  15    Q.   LET'S JUMP FORWARD ABOUT A YEAR NOW, AND THIS IS ALREADY

02:09:24  16    IN EVIDENCE.  SO, MR. LEE, IF YOU COULD PULL UP PX 44.1,

02:09:28  17    PLEASE.

02:09:29  18         YOU WERE HERE IN THE COURTROOM WHEN THIS DOCUMENT WAS

02:09:32  19    DISCUSSED A FEW MINUTES AGO; RIGHT?

02:09:34  20    A.   I SAW A FEW DOCUMENTS UP.  IT MAY HAVE BEEN.

02:09:39  21    Q.   IS THIS A DOCUMENT THAT YOU ALSO CONSIDERED DURING YOUR

02:09:42  22    WORK ON THE CASE?

02:09:43  23    A.   YES, IT WAS.

02:09:49  24    Q.   WHAT IS THE S1?

02:09:49  25    A.   THE S1 IS THE INTERNAL NAME FOR A SAMSUNG PHONE IN

02:09:53   1    DEVELOPMENT AT THE TIME, WHICH I BELIEVE TURNED INTO A GALAXY S

02:09:57   2    PHONE.

02:09:58   3    Q.    AND WHAT'S THE DATE ON THIS DOCUMENT?

02:10:00   4    A.    MARCH THE 2ND, 2010.

02:10:04   5    Q.    WE'VE SEEN A FEW PAGES OF THIS ALREADY.  LET'S JUST JUMP

02:10:08   6    STRAIGHT TO PAGE 58.

02:10:13   7          LIKE MANY OF THE OTHERS WE'VE SEEN, THERE'S A LOT GOING ON

02:10:16   8    ON THIS PAGE.

02:10:18   9          YOU CAN LOOK AT YOUR SCREEN IF IT'S QUICKER.

02:10:22  10    A.    RIGHT.

02:10:23  11    Q.    SO LET'S ZOOM IN AND TAKE IT PIECE BY PIECE.  IT LOOKS

02:10:27  12    LIKE THE PRODUCTS MAY HAVE BEEN FLIPPED COMPARED TO SOME OF THE

02:10:30  13    OTHER COMPARISONS.  LET'S LOOK AT THE RIGHT FIRST, THE S1

02:10:34  14    DISCUSSION?

02:10:34  15    A.    OKAY.  SO THIS PAGE IS COMPARING THE BROWSING CAPABILITIES

02:10:44  16    ON THE WEB BROWSER FOR THE IPHONE ON ONE HAND AND THE S1 ON THE

02:10:48  17    OTHER HAND.

02:10:48  18          SO WHAT YOU'RE SEEING ON THE RIGHT FOR THE S1 IS THAT

02:10:51  19    AFTER THE SCREEN HAS BEEN EXPANDED AND ANOTHER POINT IS DOUBLE

02:10:56  20    TAPPED, THE SCREEN GOES BACK TO ITS ORIGINAL SIZE.

02:11:02  21          IN OTHER WORDS, YOU ZOOM IN WHEN YOU TAP ON ONE LOCATION,

02:11:07  22    YOU ZOOM IN.  IF YOU TAP A SECOND TIME SOMEWHERE ELSE AND YOU

02:11:11  23    ZOOM OUT.  SO YOU'RE CONSTANTLY ZOOMING IN AND OUT BY TAPPING.

02:11:15  24    Q.    AND BY CONTRAST, WHAT DID THE SAMSUNG DOCUMENT SAY ABOUT

02:11:18  25    THE IPHONE?

02:11:19  1    A.   THE IPHONE, IN CONTRAST OVER HERE, IS ESSENTIALLY

02:11:24  2    DESCRIBING THE '163 FUNCTIONALITY, WHICH IS THAT ONCE YOU'VE

02:11:28  3    TAPPED AND THE SCREEN HAS ZOOMED IN TO SHOW YOU THE CONTENT,

02:11:35  4    ANOTHER DOUBLE TAP AT ANOTHER LOCATION IN THE SCREEN MOVES THE

02:11:38  5    CONTENT OVER TO MAKE THAT CONTENT READABLE.

02:11:42  6    Q.   AFTER IDENTIFYING THIS DIFFERENCE IN TECHNOLOGY, DID THE

02:11:46  7    SAMSUNG DOCUMENT IDENTIFY HOW TO IMPROVE THE SAMSUNG PHONE?

02:11:50  8    A.   YES.  IF YOU LOOK AT THE BOTTOM, THERE'S A SUGGESTION FOR

02:11:53  9    IMPROVEMENT THAT SAYS THAT THIS ZOOM IN/OUT DOUBLE TAP

02:11:58  10   FUNCTIONALITY NEEDED TO BE SUPPLEMENTED.

02:12:01  11   Q.   AND DID SAMSUNG SUPPLEMENT ITS DOUBLE TAP FUNCTIONALITY AS

02:12:05  12   COMPARED TO THE PROTOTYPE PHONE DISCUSSED IN THE DOCUMENT?

02:12:08  13   A.   YES.  WELL, THE GALAXY S PHONE THAT CAME OUT ESSENTIALLY

02:12:13  14   IMPLEMENTED THE '163 FUNCTIONALITY.

02:12:16  15            MR. SABRI:  THANK YOU, DR. SINGH.  NOTHING FURTHER.

02:12:18  16            THE COURT:  ALL RIGHT.  THE TIME IS 2:12.  GO AHEAD,

02:12:21  17   PLEASE.

02:12:22  18                        **CROSS-EXAMINATION**

02:12:23  19   BY MS. MAROULIS:

02:12:38  20   Q.   GOOD AFTERNOON, DR. SINGH.

02:12:40  21            THE COURT:  THE TIME IS STILL 2:12.  GO AHEAD,

02:12:43  22   PLEASE.

02:12:44  23            MS. MAROULIS:  THANK YOU, YOUR HONOR.

02:12:44  24   Q.   GOOD AFTERNOON, DR. SINGH.  I'M VICTORIA MAROULIS,

02:12:48  25   SAMSUNG'S COUNSEL.  HOW ARE YOU?

02:12:49   1      A.   VERY GOOD.  THANK YOU.

02:12:51   2      Q.   DR. SINGH, IN THIS CASE YOU OPINED ON THE IMPORTANCE OF

02:12:54   3      THE '163 INVENTION; CORRECT?

02:12:56   4      A.   YES.

02:12:56   5      Q.   IN ONE OF YOUR REPORTS YOU REFERENCED A "NEW YORK TIMES"

02:12:59   6      ARTICLE BY DAVID POGUE REGARDING THE '163 FUNCTIONALITY; IS

02:13:02   7      THAT RIGHT?

02:13:03   8      A.   I MAY HAVE.

02:13:04   9      Q.   OKAY.

02:13:05  10      A.   YES.

02:13:06  11      Q.   DO YOU RECALL SAYING THAT THIS WAS A REVOLUTIONARY IMPACT,

02:13:11  12      THAT THIS FUNCTION HAD A REVOLUTIONARY IMPACT ON THE MOBILE

02:13:14  13      DEVICE WEB BROWSING EXPERIENCE?

02:13:16  14      A.   I MAY HAVE.

02:13:18  15      Q.   DO YOU CONSIDER THE '163 FUNCTIONALITY REVOLUTIONARY?

02:13:22  16      A.   I CERTAINLY CONSIDER THE '163 FUNCTIONALITY VALUABLE WHEN

02:13:28  17      IT CAME OUT.

02:13:29  18      Q.   CAN YOU PLEASE TAKE A LOOK AT YOUR REPORT, WHICH IS IN THE

02:13:32  19      BINDER IN FRONT OF YOU?

02:13:33  20      A.   YES.

02:13:34  21      Q.   IT'S DATED APRIL 16TH, 2012, AND PLEASE TURN YOUR

02:13:38  22      ATTENTION TO ONE -- PARAGRAPH 137.

02:13:45  23      A.   137.  SORRY.  IT'S A SIX-YEAR-OLD REPORT.  IT MIGHT TAKE

02:13:50  24      ME A MINUTE TO FIND.

02:13:52  25      Q.   TAKE YOUR TIME, SIR.

SINGH CROSS BY MS. MAROULIS

02:13:53  1    A.   137.  YES, I'M THERE.

02:13:57  2    Q.   DO YOU SEE THAT YOU REFERRED TO THE ARTICLE SAYING THAT IT

02:14:00  3    COMMENTED ON THE REVOLUTIONARY IMPACT OF THE '163 PATENT'S

02:14:04  4    FEATURES?

02:14:05  5    A.   UH-HUH.

02:14:08  6    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU THOUGHT AT

02:14:11  7    THE TIME THAT THE '163 FUNCTIONALITY WAS REVOLUTIONARY?

02:14:14  8    A.   PERHAPS.

02:14:18  9    Q.   OKAY.  NOW, COUNSEL ASKED YOU ABOUT GALAXY ACE PHONE.

02:14:23  10   SIR, YOU REALIZE THAT THAT PHONE WAS FOUND TO NOT INFRINGE THE

02:14:26  11   D '677 PATENT; CORRECT?

02:14:29  12   A.   I DID NOT ANALYZE THE DESIGN PATENTS.

02:14:32  13   Q.   THAT'S RIGHT, BECAUSE YOU'RE NOT A DESIGN PATENT EXPERT IN

02:14:35  14   THIS CASE?

02:14:35  15   A.   I HAVE NOT MADE ANY ANALYSIS ON THE DESIGN PATENTS.

02:14:39  16   Q.   YOU'RE NOT HERE TO TELL THE JURY ABOUT HOW THEY ANALYZE

02:14:44  17   DESIGN PATENTS OR ABOUT HOW THE PHONE LOOKS; CORRECT?

02:14:46  18   A.   NO, I'M NOT.

02:14:47  19   Q.   YOU'RE HERE TO TALK ABOUT HOW THE PHONE WORKS; RIGHT?

02:14:50  20   A.   I'M HERE TO TALK ABOUT THE UTILITY PATENTS, THE '163 IN

02:14:53  21   PARTICULAR.

02:14:53  22   Q.   OKAY.  AND YOU'RE NOT GOING TO GIVE THE JURY ANY OPINION

02:14:56  23   ABOUT THE ARTICLE OF MANUFACTURE; CORRECT?

02:14:59  24   A.   NO.

02:15:00  25        MS. MAROULIS:  OKAY.  THANK YOU.

SINGH CROSS BY MS. MAROULIS

02:15:04  1          THE COURT:  ALL RIGHT.  THE TIME IS 2:14.  ACTUALLY,

02:15:08  2     IT'S 2:15.

02:15:10  3        GO AHEAD, PLEASE.

02:15:10  4          MR. SABRI:  NO REDIRECT, YOUR HONOR.

02:15:12  5          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

02:15:15  6          MR. SABRI:  YES, HE MAY, NOT SUBJECT TO RECALL.

02:15:17  7          THE COURT:  DO YOU AGREE WITH THAT?

02:15:18  8          MS. MAROULIS:  YES, YOUR HONOR.

02:15:19  9          THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

02:15:22 10     TRIAL TESTIMONY, AND YOU ARE FREE TO LEAVE.  NOW, IT'S 2:15.

02:15:26 11     SHOULD WE TAKE A TEN MINUTE BREAK NOW?

02:15:29 12          MR. SABRI:  SURE.

02:15:30 13          THE COURT:  WE'LL TAKE A TEN MINUTE BREAK, AND WE'LL

02:15:32 14     TAKE A TEN MINUTE BREAK AT 3:30.

02:15:36 15        OH, YOU MAY STEP DOWN.

02:15:37 16          THE WITNESS:  THANK YOU.

02:15:38 17          THE COURT:  DO NOT RESEARCH OR DISCUSS THE CASE.

02:15:40 18     THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

02:15:47 19        WE'LL BE IN RECESS FOR TEN MINUTES, PLEASE.

02:16:03 20        (RECESS FROM 2:16 P.M. UNTIL 2:26 P.M.)

02:26:53 21          THE COURT:  OKAY.  WE HAVE ONE ISSUE I'D LIKE TO

02:26:55 22     RAISE, AND THAT IS IN SAMSUNG'S OPPOSITION TO APPLE'S MOTION IN

02:27:02 23     LIMINE NUMBER 2 TO EXCLUDE THE UNASSERTED PATENTS -- PLEASE

02:27:07 24     TAKE A SEAT -- THAT'S ECF NUMBER 3658 FILED ON APRIL 13TH,

02:27:14 25     2018.

02:27:14   1          THIS IS WHAT SAMSUNG SAYS, STARTING ON LINES 10, I'M GOING

02:27:18   2   TO READ THROUGH 12.  "APPLE NEXT ASSERTS AT 3 THAT SAMSUNG MAY

02:27:24   3   NOT USE UNASSERTED PATENTS TO ARGUE FAIRNESS.  TO BE CLEAR,

02:27:27   4   SAMSUNG HAS NO INTENTION OF INVITING THE JURY TO RECONSIDER THE

02:27:30   5   POLICY IMPLICATIONS OF SECTION 289 RATHER THAN SIMPLY FOLLOWING

02:27:35   6   THE LAW AS INSTRUCTED BY THE COURT."

02:27:37   7          OKAY.  THAT'S THE QUOTE OF SAMSUNG.

02:27:40   8          AND THEN YOU ASKED MS. KARE CERTAINLY, DO YOU THINK IT'S

02:27:44   9   FAIR TO GET THE FULL SAMSUNG PROFITS ON A PHONE THAT INFRINGES

02:27:48   10  THE '305, AND YOU WERE VERY MUCH INVITING JURY NULLIFICATION.

02:27:52   11         SECTION 289 SAYS WHAT IT SAYS.  YOU CAN ARGUE THE ARTICLE

02:27:56   12  OF MANUFACTURE POINT, WHICH IS WHY WE'RE HAVING THIS TRIAL.

02:27:58   13         BUT TO BASICALLY INVITE A WITNESS TO SAY, WELL, DON'T YOU

02:28:03   14  THINK 289 IS NOT FAIR?  WHY SHOULD YOU GET THE ENTIRE PROFITS

02:28:07   15  ON A PHONE BECAUSE IT INFRINGES A DESIGN PATENT?

02:28:09   16         THAT IS WHAT THE STATUTE SAYS.

02:28:11   17         IF DO YOU THAT AGAIN WITH ANY OTHER WITNESS OR IN CLOSING,

02:28:14   18  I'M GOING TO ADMONISH YOU IN FRONT OF THE JURY.  I'M GOING TO

02:28:17   19  READ WHAT YOU REPRESENTED TO ME, AND I'M GOING TO SAY THAT I

02:28:20   20  TOLD YOU OUTSIDE THE PRESENCE OF THE JURY THAT YOU SHOULD NOT

02:28:23   21  BE INVITING -- WHAT THE STATUTE SAYS, THAT IS WHAT WE ARE STUCK

02:28:27   22  WITH.

02:28:27   23         I THINK THAT WAS INVITING JURY NULLIFICATION, AND IF IT

02:28:30   24  HAPPENS AGAIN, I WILL ADMONISH YOU IN FRONT OF THE JURY.

02:28:34   25         OKAY.  SO THAT'S THE POINT THAT I WANTED TO RAISE.

SINGH CROSS BY MS. MAROULIS

02:28:37   1          WHAT WAS THE POINT THAT YOU WERE GOING TO RAISE?

02:28:38   2              MR. LEE:  I WAS GETTING UP TO ANNOUNCE OUR NEXT

02:28:43   3   WITNESS ONCE THE JURY CAME IN.

02:28:46   4              THE COURT:  OKAY.  I WILL READ THIS IF THIS HAPPENS

02:28:49   5   AGAIN.  I THINK THAT WAS VERY IMPROPER, AND IT WAS

02:28:51   6   INTENTIONALLY DONE.

02:28:53   7          LET'S BRING OUR JURORS IN.

02:28:56   8              THE CLERK:  YES, YOUR HONOR.

02:29:22   9          (JURY IN AT 2:29 P.M.).

02:29:28   10              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

02:29:34   11   SEAT.

02:29:37   12          TIME IS 2:29.  GO AHEAD, PLEASE.

02:29:39   13              MR. LEE:  YOUR HONOR, OUR NEXT WITNESS IS

02:29:42   14   JULIE DAVIS.

02:29:47   15              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

02:29:57   16          **(PLAINTIFF'S WITNESS, JULIE DAVIS, WAS SWORN.)**

02:29:58   17              THE WITNESS:  I DO.

02:30:01   18              THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE

02:30:03   19   YOUR SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR THE

02:30:08   20   RECORD.

02:30:08   21              THE WITNESS:  MY NAME IS JULIE L. DAVIS.  J-U-L-I-E,

02:30:12   22   D-A-V-I-S.

02:30:13   23              THE COURT:  OKAY.  TIME IS 2:30.  GO AHEAD, PLEASE.

02:30:16   24

           25

DAVIS DIRECT BY MR. LEE

|  |  |
|---|---|
| 02:30:16 | 1 |

**DIRECT EXAMINATION**

02:30:16  2   BY MR. LEE:

02:30:17  3   Q.   WOULD YOU INTRODUCE YOURSELF TO THE JURY, PLEASE?

02:30:18  4   A.   MY NAME IS JULIE DAVIS, AND I WORK FOR A FIRM IN CHICAGO

02:30:22  5   CALLED DAVIS & HOSFIELD CONSULTING.

02:30:24  6   Q.   WHAT IS DAVIS & HOSFIELD CONSULTING?

02:30:26  7   A.   OUR FIRM IS A GROUP OF ABOUT 20 PROFESSIONALS WHO ALL COME

02:30:31  8   FROM BACKGROUNDS IN ACCOUNTING AND FINANCE, AND MOST OF OUR

02:30:35  9   WORK IS IN THE CONTEXT OF LITIGATION MATTERS LIKE THIS WHERE

02:30:39  10  OUR JOB IS TO DETERMINE DAMAGES.

02:30:41  11  Q.   AND HAVE YOU ASSISTED COMPANIES IN DEVELOPING INTELLECTUAL

02:30:47  12  PROPERTY STRATEGIES AND MANAGING INTELLECTUAL PROPERTY

02:30:49  13  PORTFOLIOS?

02:30:50  14  A.   YES, I HAVE.  THAT'S PART OF MY BACKGROUND AS WELL.

02:30:53  15  Q.   LET'S TALK BRIEFLY ABOUT YOUR BACKGROUND.

02:30:55  16      WHERE DID YOU GO TO SCHOOL AND WHAT DEGREE DID YOU

02:30:57  17  RECEIVE?

02:30:57  18  A.   I GREW UP IN KANSAS, AND MY DEGREE IS FROM THE KANSAS

02:31:01  19  STATE UNIVERSITY.  IT'S IN ACCOUNTING.

02:31:03  20  Q.   LET ME ASK YOU TO BE IMMODEST ON YOUR OWN BEHALF.  DID YOU

02:31:06  21  RECEIVE ANY AWARDS DURING YOUR COLLEGE CAREER?

02:31:09  22  A.   I DID.  I GRADUATED SUMMA CUM LAUDE, AND I ALSO RECEIVED

02:31:12  23  WHAT WAS CALLED THE GOLD KEY FOR THE HIGHEST SCORE IN THE STATE

02:31:16  24  ON THE CPA EXAM.

02:31:18  25  Q.   WHAT IS THE CPA EXAM?

DAVIS DIRECT BY MR. LEE

| | |
|---|---|
| 02:31:20 | 1 |

A.   THE CPA EXAM IS THE TEST THAT YOU HAVE TO TAKE IN ORDER TO

BECOME A CERTIFIED PUBLIC ACCOUNTANT.

Q.   ARE YOU A CERTIFIED PUBLIC ACCOUNTANT TODAY?

A.   I AM, AND I'M LICENSED IN FIVE STATES, INCLUDING HERE IN

CALIFORNIA.

Q.   ARE YOU A MEMBER OF ANY PROFESSIONAL ORGANIZATIONS?

A.   I'M.  I'M A MEMBER OF THE AICPA, WHICH IS THE AMERICAN

INSTITUTE OF CPA'S; AS WELL AS THE LICENSING EXECUTIVE SOCIETY.

Q.   COULD I HAVE PDX 9.1 ON THE SCREEN, PLEASE.

DO YOU HAVE THAT BEFORE YOU?

A.   I DO.

Q.   CAN YOU GIVE THE JURY A SUMMARY OF YOUR PROFESSIONAL

EXPERIENCE THAT LED YOU TO DAVIS & HOSFIELD?

A.   WHEN I GRADUATED FROM K STATE IN 1978, I JOINED ONE OF THE

BIG EIGHT ACCOUNTING FIRMS AT THE TIME KNOWN AS TOUCHE ROSS.

IT HAS SINCE BECOME PART OF DELOITTE & TOUCHE.

MY JOB THERE FOR THE NINE YEARS WAS IN THE AUDIT PRACTICE.

SO I AUDITED FINANCIAL STATEMENTS TO MAKE SURE THEY CONFORMED

TO GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

I MOVED ON FROM THERE TO ANOTHER ACCOUNTING FIRM AT THE

TIME, ARTHUR ANDERSEN, AND I WAS THERE FOR 15 YEARS.  TOWARDS

THE END OF THAT TIME, I WAS IN CHARGE OF THE WORLDWIDE

INTELLECTUAL ASSET CONSULTING PRACTICE.

AND THEN THAT PRACTICE WAS LATER SOLD TO YET ANOTHER ONE

OF THE LARGE ACCOUNTING AND CONSULTING FIRMS CALL KPMG, AND I

02:32:36   1    HAD A SIMILAR ROLE THERE BEFORE STARTING MY OWN FIRM WITH ONE

02:32:39   2    OF MY COLLEAGUES IN 2003.

02:32:41   3    Q.   HAVE YOU PUBLISHED ANY ARTICLES OR BOOKS RELATING TO

02:32:46   4    PATENTS OR PATENT DAMAGE AWARDS?

02:32:49   5    A.   I HAVE.  I HAVE PUBLISHED A NUMBER OF ARTICLES, AND THEN

02:32:54   6    ALSO I CO-AUTHORED A BOOK CALLED "EDISON IN THE BOARDROOM," AND

02:32:58   7    IT TOLD THE STORIES OF COMPANIES THAT WERE KNOWN TO BE MANAGING

02:33:03   8    THEIR INTELLECTUAL PROPERTY WELL, IN PARTICULAR THEIR PATENT

02:33:06   9    PORTFOLIOS.

02:33:07  10    Q.   AGAIN, ASKING YOU TO BE IMMODEST ON YOUR OWN BEHALF, HAS

02:33:11  11    YOUR WORK AS AN ACCOUNTANT LED TO ANY PERSONAL RECOGNITION?

02:33:14  12    A.   YES.  I'VE BEEN INDUCTED INTO THE K STATE ACCOUNTING HALL

02:33:17  13    OF FAME.

02:33:18  14    Q.   NOW, LET'S TURN TO YOUR EXPERIENCE AS AN EXPERT WITNESS

02:33:20  15    CONCERNING DAMAGES.

02:33:21  16         APPROXIMATELY HOW MANY CASES HAVE YOU WORKED ON?

02:33:24  17    A.   I'VE WORKED ON AT LEAST 300 PATENT CASES.

02:33:29  18    Q.   AND HOW MANY TIMES HAVE YOU TESTIFIED IN COURT AS AN

02:33:32  19    EXPERT WITNESS ON THE ISSUE OF PATENT DAMAGES?

02:33:34  20    A.   THAT MUST BE SOMEWHERE BETWEEN 60 AND 70 BY NOW.

02:33:37  21    Q.   HAVE YOU TESTIFIED MORE FOR THE PLAINTIFFS OR MORE FOR THE

02:33:41  22    DEFENDANTS?

02:33:41  23    A.   I THINK IT'S PRETTY EVENLY SPLIT BETWEEN THE PLAINTIFFS

02:33:44  24    AND THE DEFENDANTS.

02:33:45  25         MR. LEE:  YOUR HONOR, APPLE OFFERS MS. DAVIS AS AN

02:33:46   1    EXPERT WITNESS IN ACCOUNTING AND EVALUATION AND DETERMINATION

02:33:50   2    OF DAMAGES IN A PATENT INFRINGEMENT CASE.

02:33:54   3              MR. PRICE:  NO OBJECTION.

02:33:54   4              THE COURT:  ALL RIGHT.  SO CERTIFIED.

02:33:56   5         GO AHEAD, PLEASE.

02:33:56   6    BY MR. LEE:

02:33:56   7    Q.   MS. DAVIS, WHAT ASSIGNMENT WERE YOU ASKED TO PERFORM IN

02:34:00   8    THIS CASE?

02:34:00   9    A.   I WAS ASKED TO DETERMINE THE AMOUNT OF DAMAGES THAT

02:34:03  10    SAMSUNG SHOULD PAY TO APPLE FOR ITS INFRINGEMENT OF THE PATENTS

02:34:08  11    THAT YOU'VE BEEN HEARING ABOUT THIS WEEK.

02:34:10  12    Q.   WHAT HAVE YOU DONE TO CARRY OUT THAT ASSIGNMENT?

02:34:12  13    A.   I HAVE LOOKED AT THE BOOKS AND RECORDS OF BOTH APPLE AND

02:34:16  14    SAMSUNG; I'VE REVIEWED A NUMBER OF DEPOSITION TESTIMONY

02:34:21  15    TRANSCRIPTS; I HAVE REVIEWED A NUMBER OF DETAILS AND PERFORMED

02:34:24  16    ALL KINDS OF ANALYSES AND EVENTUALLY SUBMITTED A REPORT.

02:34:29  17         BUT PART AFTER THAT WAS IN THE CONTEXT OF UNDERSTANDING

02:34:31  18    WHAT EXACTLY WAS GOING ON IN THE MARKET AT THE TIME, AND HOW

02:34:35  19    IMPORTANT WERE THESE INVENTIONS AND DID THEY DRIVE DEMAND FOR

02:34:39  20    THESE PRODUCTS.

02:34:40  21    Q.   DID ANYONE WORK WITH YOU IN HELPING YOU PREPARE YOUR

02:34:44  22    ULTIMATE OPINIONS?

02:34:45  23    A.   YES.  IN FACT, THIS WORK WAS INITIALLY STARTED PROBABLY

02:34:50  24    SEVEN OR EIGHT YEARS AGO NOW BY A GENTLEMAN NAMED TERRY MUSIKA,

02:34:55  25    AND MR. MUSIKA TESTIFIED AT THE FIRST TRIAL IN THIS CASE, BUT

02:34:58  1    HE PASSED AWAY SHORTLY THEREAFTER.

02:35:00  2         SO I STEPPED INTO HIS SHOES, AND I PICKED UP WHERE HE LEFT

02:35:04  3    OFF WORKING WITH HIS TEAM, AS WELL AS A COUPLE OF MY

02:35:07  4    COLLEAGUES.

02:35:07  5    Q.   HOW MUCH TIME HAVE YOU SPENT PREPARING TO GIVE YOUR

02:35:12  6    OPINIONS TO THE JURY?

02:35:13  7    A.   MY TWO COLLEAGUES AND I HAVE SPENT TOGETHER ABOUT

02:35:16  8    1800 HOURS PREPARING FOR THIS TRIAL.

02:35:20  9    Q.   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHY IT

02:35:23  10   TOOK SO MUCH TIME TO PREPARE TO GIVE YOUR OPINIONS ON THE

02:35:27  11   INFRINGING PHONES SOLD BY SAMSUNG?

02:35:30  12   A.   WELL, MR. MUSIKA AND HIS TEAM, DURING THE TIME THAT THEY

02:35:34  13   WERE WORKING ON IT TOGETHER, HAD 70 -- ABOUT 7,000 HOURS

02:35:38  14   DEVELOPING A VERY SOPHISTICATED DATABASE THAT KEPT TRACK OF ALL

02:35:43  15   THE INFRINGING UNITS IN THIS CASE.

02:35:45  16        AND MY COLLEAGUES AND I WANTED TO MAKE SURE THAT WE TESTED

02:35:47  17   THAT DATABASE TO MAKE SURE IT WORKED THE WAY WE EXPECTED IT TO,

02:35:51  18   AND THAT'S WHY IT TOOK SO LONG.

02:35:53  19   Q.   LET ME TURN TO THE TYPE OF DAMAGES REMEDIES THAT THE JURY

02:35:57  20   WILL ADDRESS.

02:35:58  21        CAN I HAVE PDX 9.2 ON THE SCREEN, PLEASE.

02:36:02  22        THERE ARE TWO DESCRIBED HERE.  WHAT TYPES OF DAMAGES DID

02:36:05  23   YOU CONSIDER TO ADDRESS SAMSUNG'S INFRINGEMENT OF APPLE'S

02:36:10  24   PATENTS?

02:36:10  25   A.   THERE'S TWO DIFFERENT KINDS OF DAMAGES THAT ARE

02:36:13  1      APPROPRIATE IN THIS CASE, AND ONE OF THOSE IS CALLED SAMSUNG'S

02:36:17  2      TOTAL PROFITS; AND THE OTHER ONE IS CALLED REASONABLE

02:36:20  3      ROYALTIES.

02:36:20  4      Q.   SO LET ME TURN TO THE FIRST ON TOTAL PROFITS.

02:36:24  5           DO YOU UNDERSTAND THAT THE TOTAL PROFIT REMEDY IS

02:36:28  6      SOMETHING THAT CONGRESS HAS DESCRIBED AND ENACTED?

02:36:31  7      A.   I DO.

02:36:32  8      Q.   AND IT HAS SPECIFIC REQUIREMENTS; CORRECT?

02:36:35  9      A.   YES.

02:36:35  10     Q.   AND HER HONOR WILL INSTRUCT THE JURY ON WHAT THOSE VERY

02:36:39  11     SPECIFIC REQUIREMENTS ARE?

02:36:40  12     A.   YES, THAT'S MY UNDERSTANDING.

02:36:41  13     Q.   AND WITH THAT IN MIND, TELL US WHAT SAMSUNG'S TOTAL

02:36:45  14     PROFITS REFERS TO?

02:36:47  15     A.   WHAT I UNDERSTAND THAT TERM TO MEAN IN THE CONTEXT OF THIS

02:36:50  16     CASE IS THAT IS THE AMOUNT OF PROFIT THAT SAMSUNG HAS EARNED BY

02:36:57  17     APPLYING APPLE'S DESIGNS TO THE ARTICLE OF MANUFACTURE.

02:37:04  18     Q.   AND THE TOTAL PROFIT IS THE MEASURE OF APPLE'S DAMAGES;

02:37:07  19     CORRECT?

02:37:07  20     A.   YES, IT IS.

02:37:08  21     Q.   THE SECOND -- AND WE'LL COME BACK TO THIS.

02:37:10  22          THE SECOND IS LISTED AS A REASONABLE ROYALTY.

02:37:13  23          COULD YOU BRIEFLY EXPLAIN WHAT THAT SECOND REMEDY IS?

02:37:16  24     A.   YOU CAN THINK OF A REASONABLE ROYALTY A LITTLE BIT LIKE

02:37:20  25     RENT.  IF YOU WERE TO RENT AN APARTMENT FROM SOMEBODY, YOU

DAVIS DIRECT BY MR. LEE

02:37:22  1    WOULD EXPECT TO PAY THEM FOR THE RIGHT TO USE THAT APARTMENT TO

02:37:25  2    LIVE THERE.

02:37:26  3        A PATENT IS SIMILAR IN THAT A REASONABLE ROYALTY IS THE

02:37:30  4    AMOUNT YOU PAY FOR THE RIGHT TO USE SOMEBODY ELSE'S PATENTED

02:37:33  5    TECHNOLOGY OR PATENTED DESIGN.

02:37:35  6    Q.   HOW DID YOU GO ABOUT DETERMINING WHICH OF THESE TWO

02:37:39  7    REMEDIES APPLIED TO A PARTICULAR UNIT OR A PARTICULAR

02:37:43  8    INFRINGING SAMSUNG PHONE SOLD?

02:37:46  9    A.   WE HAD TO LOOK AT EACH UNIT ESSENTIALLY ONE BY ONE TO MAKE

02:37:52  10   SURE THAT WE HAD THEM IN THE RIGHT BUCKET SO THERE WAS NO

02:37:55  11   DOUBLE COUNTING.  THEY CAN GO IN ONE OR THE OTHER, BUT THEY

02:37:59  12   CAN'T GO IN BOTH.

02:38:00  13   Q.   SO LET'S SEE IF WE CAN GET SOME TERMINOLOGY STRAIGHT TO

02:38:03  14   MOVE US ALONG THIS OFTEN.

02:38:04  15       WHEN YOU REFER TO PRODUCTS, THE SAMSUNG PRODUCTS, WHAT ARE

02:38:07  16   YOU REFERRING TO?

02:38:08  17   A.   I THINK OF PRODUCTS AS THE MODEL OF PHONES.  YOU'VE HEARD

02:38:12  18   ABOUT THE CAPTIVATE OR THE FASCINATE.  THAT IS A MODEL OF

02:38:15  19   PHONE.

02:38:15  20   Q.   AND WHEN YOU USE THE WORD "UNIT," WHAT ARE YOU REFERRING

02:38:18  21   TO?

02:38:19  22   A.   I'M TALKING ABOUT A SINGLE PHONE, LIKE YOU MAY HAVE IN

02:38:22  23   YOUR POCKET.

02:38:23  24   Q.   CAN ONE PRODUCT FALL INTO MORE THAN ONE OF THESE TWO

02:38:27  25   CATEGORIES?

02:38:28    1      A.   IT CAN AND SOMETIMES DOES, YES.

02:38:30    2      Q.   BUT CAN ANY ONE UNIT, ANY ONE PHONE, FALL INTO ONE -- MORE

02:38:37    3      THAN ONE DAMAGES CATEGORY?

02:38:38    4      A.   NO.   THERE'S ONLY ONE FORM OF DAMAGES FOR EACH UNIT.   YOU

02:38:41    5      HAVE TO MAKE SURE YOU'RE NOT DOUBLE COUNTING.

02:38:43    6      Q.   SO FOR EACH UNIT, EVEN IF IT INFRINGED MULTIPLE PATENTS,

02:38:47    7      YOU HAVE JUST GIVEN ONE REMEDY?

02:38:49    8      A.   THAT'S CORRECT.

02:38:49    9      Q.   OKAY.   NOW, LET'S TALK ABOUT SAMSUNG'S INFRINGING SALES IF

02:38:55   10      WE COULD.

02:38:56   11           HOW MANY INFRINGING UNITS DID SAMSUNG SELL DURING THE

02:39:01   12      DAMAGES PERIOD IN THIS CASE?

02:39:02   13      A.   FOR THE PRODUCTS WE'RE HERE TO TALK ABOUT TODAY, IT'S

02:39:07   14      15.3 MILLION UNITS.

02:39:09   15      Q.   15.3 MILLION UNITS?

02:39:12   16      A.   YES.

02:39:13   17      Q.   15.3 MILLION PHONES?

02:39:15   18      A.   YES.

02:39:15   19      Q.   WHERE DID THAT NUMBER COME FROM?

02:39:18   20      A.   THAT NUMBER COMES FROM THE BOOKS AND RECORDS OF SAMSUNG.

02:39:21   21      Q.   TURN, IF YOU WOULD, IN THE NOTEBOOK BEFORE YOU TO TAB 1.

02:39:31   22           DO YOU HAVE THAT BEFORE YOU?

02:39:33   23      A.   YES, I DO.

02:39:35   24      Q.   DO YOU FIND PX 180B?

02:39:40   25      A.   I HAVE IT RIGHT HERE.

| | | |
|---|---|---|
| 02:39:41 | 1 | Q.   WHAT IS IT? |
| 02:39:42 | 2 | A.   THIS IS THE DETAILED SPREADSHEET PROVIDED BY SAMSUNG FOR |
| 02:39:45 | 3 | EACH OF THE MODELS SHOWING THE REVENUES AND EXPENSES ASSOCIATED |
| 02:39:50 | 4 | WITH EACH OF THOSE BY MONTH DURING THE DAMAGES PERIOD. |
| 02:39:55 | 5 | Q.   WHEN YOU ARE REFERRING TO MODELS, YOU'RE REFERRING TO |
| 02:39:58 | 6 | MODELS OF INFRINGING PRODUCTS? |
| 02:40:00 | 7 | A.   I AM. |
| 02:40:01 | 8 | MR. LEE:  YOUR HONOR, WE OFFER PX 180B INTO EVIDENCE. |
| 02:40:03 | 9 | THE COURT:  ANY OBJECTION? |
| 02:40:04 | 10 | MR. PRICE:  NO OBJECTION. |
| 02:40:04 | 11 | THE COURT:  IT'S ADMITTED. |
| 02:40:05 | 12 | (PLAINTIFF'S EXHIBIT 180B WAS ADMITTED IN EVIDENCE.) |
| 02:40:06 | 13 | THE COURT:  GO AHEAD, PLEASE. |
| 02:40:06 | 14 | BY MR. LEE: |
| 02:40:07 | 15 | Q.   TURN TO TAB 2 IN YOUR NOTEBOOK IF YOU WOULD, MS. DAVIS. |
| 02:40:10 | 16 | A.   I HAVE THAT. |
| 02:40:11 | 17 | Q.   DO YOU FIND THE JX 1500C? |
| 02:40:14 | 18 | A.   YES. |
| 02:40:15 | 19 | Q.   WHAT IS THAT? |
| 02:40:16 | 20 | A.   THIS IS A TWO PAGE SUMMARY OF THE DOCUMENT WE JUST POINTED |
| 02:40:22 | 21 | TO. |
| 02:40:22 | 22 | MR. MUELLER:  WE OFFER JX 1500C INTO EVIDENCE, YOUR |
| 02:40:26 | 23 | HONOR. |
| 02:40:26 | 24 | THE COURT:  ANY OBJECTION? |
| 02:40:27 | 25 | MR. PRICE:  NO FURTHER OBJECTION, YOUR HONOR. |

02:40:29  1                  THE COURT:  IT'S ADMITTED.

02:40:30  2              (JOINT EXHIBIT 1500C  WAS ADMITTED IN EVIDENCE.)

02:40:31  3                  THE COURT:  GO AHEAD, PLEASE.

02:40:32  4        BY MR. LEE:

02:40:33  5        Q.   WOULD YOU PUT PAGE 2 OF JX 1500C ON THE SCREEN FOR THE

02:40:37  6        JURY.

02:40:39  7                  THE COURT:  AND THIS YOU DO NOT WANT SEEN BY THE

02:40:41  8        AUDIENCE, CORRECT?

02:40:42  9                  MR. LEE:  NO, THIS CAN BE SEEN.

02:40:45  10                 THE COURT:  OH, IT DOES NOT MATTER.  OKAY.  GO AHEAD.

02:40:48  11       BY MR. LEE:

02:40:48  12       Q.   DO YOU SEE PAGE 2?

02:40:49  13       A.   I DO.

02:40:49  14       Q.   WHAT'S SHOWN ON PAGE 2?

02:40:51  15       A.   THIS IS THE SECOND PAGE OF THE DOCUMENT THAT SHOWS THE

02:40:53  16       MONTHLY SALES OF EACH OF THESE INFRINGING PRODUCTS.  PERHAPS

02:40:57  17       THE MOST IMPORTANT PART OF IT IS IN THE BOTTOM RIGHT-HAND

02:41:01  18       CORNER.

02:41:01  19       Q.   IF I COULD HAVE THE BOTTOM RIGHT-HAND CORNER BLOWN UP.

02:41:05  20            THERE ARE TWO NUMBERS -- THE JURY WILL HAVE THIS DOCUMENT

02:41:08  21       WITH IT IN THE JURY ROOM.

02:41:09  22            WOULD YOU TELL US WHAT THOSE TWO NUMBERS ARE AND WHAT THEY

02:41:12  23       REPRESENT?

02:41:13  24       A.   THE FIRST NUMBER, 15,347 IS THE TOTAL NUMBER OF INFRINGING

02:41:20  25       SMARTPHONES.  SO THAT IS EXPRESSED IN THOUSANDS.  THAT'S WHY

02:41:24   1        YOU'RE MISSING THE THREE O'S.

02:41:27   2        Q.   SO THE NUMBER IS ACTUALLY WHAT?

02:41:28   3        A.   15,347,000 UNITS.

02:41:32   4        Q.   WHAT IS THE TOTAL REVENUE THAT SAMSUNG RECEIVED FOR

02:41:36   5    SELLING THESE INFRINGING UNITS?

02:41:37   6        A.   THAT'S THE NUMBER RIGHT BELOW IT.  IT'S $6.3 MILLION.  SO

02:41:43   7    THAT PARTICULAR NUMBER IS EXPRESSED IN MILLIONS.

02:41:50   8        Q.   YOU WERE IN THE COURTROOM DURING THE OPENING STATEMENTS?

02:41:52   9        A.   YES.

02:41:52  10        Q.   YOU HEARD ME REFER TO THE $3.3 BILLION IN REVENUES FOR THE

02:41:57  11    PRODUCTS INFRINGING THE DESIGN PATENTS?

02:41:59  12        A.   I. DID.

02:42:00  13        Q.   CAN YOU JUST EXPLAIN THE DIFFERENCE IN THE TWO AMOUNTS TO

02:42:03  14    THE JURY?

02:42:04  15        A.   THE NUMBER THAT YOU USED, THE $3.3 BILLION, IS THE REVENUE

02:42:08  16    ASSOCIATED WITH JUST THE PHONES THAT INFRINGE THE DESIGN

02:42:15  17    PATENTS IN THIS CASE.

02:42:15  18             THE REST OF THE PHONES AND THE REST OF THE REVENUE THAT

02:42:18  19    YOU SEE ON THIS DOCUMENT WE'RE LOOKING AT RIGHT NOW ARE ALL THE

02:42:22  20    PHONES THAT INFRINGE ALL OF THE PATENTS.

02:42:24  21        Q.   NOW, MS. DAVIS, YOU WERE IN THE COURTROOM THIS MORNING

02:42:28  22    WHEN THERE WAS SOME DISCUSSION OF THE ACE, THE GALAXY ACE?

02:42:32  23        A.   I WAS.

02:42:33  24        Q.   AND WERE YOU HERE WHEN DR. BALAKRISHNAN AND DR. SINGH SAID

02:42:38  25    THAT THE ACE INFRINGED THE TWO APPLE UTILITY PATENTS?

02:42:41    1    A.   YES, I WAS.

02:42:42    2    Q.   COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY HOW

02:42:46    3    MANY UNITS OF THE ACE WERE SOLD IN THE UNITED STATES OF

02:42:50    4    AMERICA?

02:42:51    5          MR. PRICE:  I'M GOING TO OBJECT, YOUR HONOR.  IT'S

02:42:53    6    IRRELEVANT TO ANY OPINION.

02:42:54    7          THE COURT:  OVERRULED.

02:42:54    8          THE WITNESS:  NOT ONE.  ZERO.

02:42:57    9    BY MR. LEE:

02:42:57   10    Q.   ZERO?

02:42:58   11    A.   (NODS HEAD UP AND DOWN.)

02:43:03   12    Q.   NOW, ON THE QUESTION OF THE TOTAL REVENUES AND THE TOTAL

02:43:08   13    NUMBER OF UNITS FROM JX 1500C, DO YOU AND SAMSUNG'S EXPERT,

02:43:14   14    MR. WAGNER, DISAGREE?

02:43:17   15    A.   NO.  WE AGREE ON BOTH OF THOSE TWO NUMBERS THAT ARE DOWN

02:43:20   16    IN THE BOTTOM RIGHT-HAND CORNER.

02:43:22   17    Q.   AND DO YOU ALSO AGREE ON THE $3.3 BILLION NUMBER FOR

02:43:26   18    DESIGN PATENT INFRINGEMENT?

02:43:27   19    A.   WE DO.

02:43:28   20    Q.   DID YOU PREPARE A SUMMARY OF YOUR DAMAGES CONCLUSIONS IN

02:43:32   21    AN EXHIBIT THAT THE JURY CAN USE WHEN IT'S DELIBERATING?

02:43:35   22    A.   I DID.

02:43:35   23    Q.   WHAT -- TURN, IF YOU WOULD, TO TAB 3 IN YOUR NOTEBOOK.

02:43:42   24    DO YOU HAVE THAT?

02:43:43   25    A.   I DO.

02:43:44   1      Q.   WHAT IS TAB 3?

02:43:45   2      A.   THIS IS THE SUMMARY THAT YOU WILL HAVE WITH YOU IN THE

02:43:47   3      JURY ROOM.  THIS IS EXHIBIT NUMBER 25K.

02:43:52   4           MR. LEE:  YOUR HONOR, WE OFFER EXHIBIT 25K.

02:43:55   5           MR. PRICE:  NO FURTHER OBJECTIONS, YOUR HONOR.

02:43:57   6           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

02:43:59   7         (PLAINTIFF'S EXHIBIT 25K WAS ADMITTED IN EVIDENCE.)

02:43:59   8           THE COURT:  GO AHEAD, PLEASE.

02:44:00   9      BY MR. LEE:

02:44:00  10      Q.   TURN, IF YOU WOULD, TO TAB 4.

02:44:02  11           DO YOU FIND PX 25L?

02:44:05  12      A.   I DO.

02:44:05  13      Q.   WHAT IS PX 25L?

02:44:08  14      A.   THIS, TOO, IS A SUMMARY THAT I HAVE PREPARED, ALONG WITH

02:44:12  15      MY COLLEAGUES, THAT PROVIDES A LITTLE BIT MORE INFORMATION IN

02:44:17  16      ADDITION TO WHAT YOU HAVE IN 25K.

02:44:20  17           HOWEVER, THIS PARTICULAR EXHIBIT INCLUDES SOME

02:44:22  18      CONFIDENTIAL INFORMATION, AND THAT'S WHY IT IS SPLIT OUT INTO A

02:44:25  19      SEPARATE DOCUMENT.

02:44:27  20           MR. LEE:  YOUR HONOR, WE OFFER PX 25L UNDER SEAL.

02:44:31  21           MR. PRICE:  NO FURTHER OBJECTIONS.

02:44:32  22           THE COURT:  ALL RIGHT.  THAT IS ADMITTED AND SEALED.

02:44:34  23         (PLAINTIFF'S EXHIBIT 25L WAS ADMITTED IN EVIDENCE UNDER

02:44:35  24      SEAL.)

          25

BY MR. LEE:

Q.   COULD I HAVE PDX 9.5 ON THE SCREEN, PLEASE.

     DO YOU HAVE THAT BEFORE YOU?

A.   I DO.

Q.   CAN YOU TELL US WHAT'S SUMMARIZED ON PDX 9.5?

A.   WHEN YOU FINALLY SORT OUT THE DAMAGES FOR EACH OF THE TWO

CATEGORIES OF REMEDY, THE TOTAL PROFIT AND THE REASONABLE

ROYALTY, I COME TO A TOTAL OF $1.1 BILLION, ROUGHLY, FOR THE

TOTAL PROFIT CATEGORY, AND $5.3 MILLION FOR THE REASONABLE

ROYALTY CATEGORY.

Q.   AND THIS IS THE TOTAL DAMAGES FOR WHAT HAVE BEEN 15

MILLION INFRINGING SALES; CORRECT?

A.   IT IS.

Q.   NOW, WE'RE GOING TO COME BACK TO THE SPECIFICS OF THE

DAMAGES CALCULATIONS IN A FEW MINUTES.

     WHAT TYPES OF INFORMATION DID YOU ANALYZE TO HELP YOU

UNDERSTAND THE MARKETPLACE FOR SAMSUNG PHONES AND APPLE PHONES

DURING THE DAMAGES PERIOD?

A.   WE LOOKED AT A VARIETY OF DIFFERENT KINDS OF INFORMATION.

WE LOOKED AT INFORMATION FROM THE FILES OF APPLE, INFORMATION

FROM THE FILES OF SAMSUNG, INFORMATION FROM THIRD PARTIES, AS

MUCH AS WE COULD GET TO UNDERSTAND THE LANDSCAPE AT THE TIME.

Q.   DID YOU CONSIDER THE MARKET SHARES, THE MARKET PERFORMANCE

OF BOTH APPLE AND SAMSUNG?

A.   YES.  THAT INFORMATION WAS AVAILABLE FROM THIRD PARTY

02:45:53  1    SOURCES.

02:45:54  2    Q.   LET ME HAVE ON THE SCREEN, IF I COULD, PDX 9.6.

02:46:00  3         DO YOU HAVE THAT BEFORE YOU?

02:46:01  4    A.   I DO.

02:46:02  5    Q.   WHAT IS PDX 9.6?

02:46:04  6    A.   THIS IS A GRAPH THAT WE'VE ALREADY SEEN ONCE OR TWICE THIS

02:46:08  7    WEEK.

02:46:08  8         THIS SHOWS THE MARKET SHARE THAT SAMSUNG HAD IN THE U.S.

02:46:12  9    FOR SMARTPHONES AFTER APPLE INTRODUCED THE IPHONE UP TO THE

02:46:19  10   POINT WHERE THE INFRINGING SMARTPHONES CAME ON TO THE MARKET.

02:46:23  11   Q.   MARKET SHARE CAN BE AFFECTED BY MANY DIFFERENT FACTORS AND

02:46:27  12   CONSIDERATIONS; CORRECT?

02:46:28  13   A.   THAT'S CORRECT.

02:46:29  14   Q.   WHAT HAPPENED TO THE MARKET SHARE OF SAMSUNG AFTER THE

02:46:36  15   IPHONE WAS INTRODUCED AND CONTINUING THROUGH THE BEGINNING OF

02:46:39  16   2010?

02:46:40  17   A.   AFTER THE IPHONE WAS INTRODUCED, THE SAMSUNG MARKET SHARE,

02:46:45  18   AS YOU CAN TELL THERE, STARTED TO TREND DOWNWARDS.

02:46:47  19   Q.   AND HAVE YOU REVIEWED SOME OF SAMSUNG'S INTERNAL DOCUMENTS

02:46:51  20   TO SEE HOW SAMSUNG REACTED TO THIS TRENDING DOWN OF ITS MARKET

02:46:56  21   SHARE?

02:46:59  22   A.   I HAVE.

02:46:59  23   Q.   ALL RIGHT.  TURN, IF YOU WOULD, TO TAB 5 IN YOUR NOTEBOOK,

02:47:02  24   WHICH IS PX 34?

02:47:04  25   A.   I HAVE THAT.

| | | |
|---|---|---|
| 02:47:05 | 1 | Q.   WHAT IS IT? |
| 02:47:06 | 2 | A.   THIS IS A DOCUMENT FROM THE FILES OF SAMSUNG FROM |
| 02:47:10 | 3 | SEPTEMBER OF 2007. |
| 02:47:12 | 4 | MR. LEE:  YOUR HONOR, WE OFFER PX 34. |
| 02:47:15 | 5 | THE COURT:  ANY OBJECTION? |
| 02:47:16 | 6 | MR. PRICE:  NO FURTHER OBJECTIONS. |
| 02:47:18 | 7 | THE COURT:  ALL RIGHT.  IT'S ADMITTED. |
| 02:47:19 | 8 | (PLAINTIFF'S EXHIBIT 34 WAS ADMITTED IN EVIDENCE.) |
| 02:47:19 | 9 | THE COURT:  GO AHEAD, PLEASE. |
| 02:47:20 | 10 | BY MR. LEE: |
| 02:47:22 | 11 | Q.   I'M PUTTING THE FIRST PAGE OF PX 34 ON THE SCREEN. |
| 02:47:26 | 12 | COULD YOU TELL US WHAT THE DOCUMENT CONCERNS? |
| 02:47:29 | 13 | A.   THE TITLE, AS YOU SEE THERE, IS CALLED THE FEASIBILITY |
| 02:47:34 | 14 | REVIEW ON STANDALONE AP BUSINESS FOR SMARTPHONE MARKET.  IT'S |
| 02:47:38 | 15 | DATED SEPTEMBER OF 2007, AND IT'S A GROUP WITHIN SAMSUNG CALLED |
| 02:47:45 | 16 | SYSTEM LSI. |
| 02:47:46 | 17 | SO THIS DOCUMENT IS PREPARED ABOUT THREE MONTHS AFTER THE |
| 02:47:51 | 18 | IPHONE COMES ON TO THE MARKET. |
| 02:47:58 | 19 | Q.   TURN, IF YOU WOULD, TO PAGE 38, AND I'LL PUT IT ON THE |
| 02:48:01 | 20 | SCREEN. |
| 02:48:02 | 21 | DO YOU HAVE THAT BEFORE YOU? |
| 02:48:03 | 22 | A.   I DO. |
| 02:48:03 | 23 | Q.   THERE'S A LOT OF WORDS ON PAGE 38, AND IT'S COMPLICATED. |
| 02:48:07 | 24 | WHAT DID YOU FIND ON PAGE 38 THAT HELPED EDUCATE YOUR |
| 02:48:12 | 25 | ANALYSIS OF THE DAMAGES IN THIS CASE? |

02:48:14   1      A.   ON THIS PAGE, SAMSUNG WAS IDENTIFYING THOSE FACTORS THAT

02:48:19   2      COULD MAKE THE IPHONE A SUCCESS, AND ALSO FACTORS THAT MIGHT

02:48:23   3      CAUSE THE IPHONE TO FAIL.

02:48:29   4      Q.   AND IF I LOOK AT THE TOP, IT'S THE FACTORS THAT COULD MAKE

02:48:33   5      IT A SUCCESS, AND CLOSER TO THE BOTTOM, THE FACTORS THAT MIGHT

02:48:38   6      MAKE IT A FAILURE; CORRECT?

02:48:39   7      A.   EXACTLY.

02:48:41   8      Q.   ALL RIGHT.  NOW, LET ME TURN YOU TO ANOTHER SAMSUNG

02:48:43   9      DOCUMENT.  TURN, IF YOU WOULD, TO TAB 6 IN YOUR NOTEBOOK, WHICH

02:48:47  10      IS PX 36.

02:48:53  11           CAN YOU TELL US WHAT THIS IS?

02:48:54  12      A.   THIS IS A DOCUMENT THAT'S DATED DECEMBER OF 2008.  IT ALSO

02:48:59  13      COMES FROM THE FILES OF SAMSUNG.

02:49:02  14                  MR. LEE:  WE OFFER PX 36, YOUR HONOR.

02:49:03  15                  THE COURT:  ANY OBJECTION?

02:49:05  16                  MR. PRICE:  NO FURTHER OBJECTION.

02:49:07  17                  THE COURT:  IT'S ADMITTED.

02:49:08  18           (PLAINTIFF'S EXHIBIT 36 WAS ADMITTED IN EVIDENCE.)

02:49:08  19                  THE COURT:  GO AHEAD, PLEASE.

02:49:09  20      BY MR. LEE:

02:49:10  21      Q.   NOW, MS. DAVIS, ALL OF THESE DOCUMENTS THAT WE ARE WALKING

02:49:13  22      THROUGH NOW THAT ARE INTERNAL SAMSUNG DOCUMENTS WERE

02:49:16  23      CONFIDENTIAL OR SECRET SAMSUNG DOCUMENTS; CORRECT?

02:49:19  24      A.   THEY WERE.

02:49:20  25      Q.   THEY BECAME AVAILABLE AS A RESULT OF APPLE BRINGING THIS

DAVIS DIRECT BY MR. LEE

02:49:23   1        LAWSUIT; CORRECT?

02:49:24   2        A.   ONLY FOR THAT REASON, YES.

02:49:26   3        Q.   I'M PUTTING PAGE 1 OF PX 36 ON THE SCREEN.

02:49:31   4             DO YOU HAVE IT?

02:49:32   5        A.   I DO.

02:49:32   6        Q.   CAN YOU EXPLAIN TO THE JURY HOW AND WHY THIS DOCUMENT WAS

02:49:36   7        PREPARED FOR SAMSUNG?

02:49:37   8        A.   THIS IS A DOCUMENT THAT WAS PREPARED FOR SAMSUNG BY A

02:49:40   9        CONSULTING GROUP CALLED GRAVITYTANK, AND IT'S 177 PAGES, SO

02:49:47  10        THERE ARE LOTS OF DETAILS IN HERE.

02:49:49  11             BUT IT WAS EXAMINING THE SMARTPHONE MARKET AND PROVIDING

02:49:52  12        RECOMMENDATIONS, AT LEAST IN PART BASED UPON SURVEYS THAT WERE

02:49:55  13        CONDUCTED OF BOTH APPLE AND SAMSUNG USERS.

02:49:59  14        Q.   TURN, IF YOU WOULD, TO PAGE 20, AND I'LL PUT IT ON THE

02:50:02  15        SCREEN OF PX 36.

02:50:04  16             DO YOU HAVE THAT BEFORE YOU?

02:50:08  17        A.   YES, I DO.

02:50:10  18        Q.   DID YOU FIND ANYTHING ON PAGE 20 THAT WAS IMPORTANT TO

02:50:14  19        YOUR OPINIONS ON THE DAMAGES ISSUES IN THIS CASE?

02:50:17  20        A.   YES.  I THINK THE TITLE TELLS THIS STORY PRETTY WELL,

02:50:22  21        "PUNDITS TELL US THAT THE IPHONE IS A REVOLUTION."

02:50:25  22             IT ALSO POINTS TO VARIOUS ARTICLES THAT WERE PUBLISHED AT

02:50:29  23        THE TIME, INCLUDING A COMMENT IN THE UPPER LEFT-HAND CORNER

02:50:33  24        WHERE IT SAYS THAT THE "IPHONE HAS BEEN WIDELY HAILED FOR ITS

02:50:38  25        BEAUTY AND FUNCTIONALITY."

02:50:40    1          AND AS YOU CAN SEE HERE, WE'VE GOT THE DESIGN OF THE

02:50:44    2    IPHONE RIGHT THERE FRONT AND CENTER.

02:50:45    3    Q.    NOW, IN THE TOP LEFT-HAND CORNER, MR. LEE HAS PUT A BOX

02:50:49    4    AROUND A PARAGRAPH.

02:50:50    5          DO YOU SEE THAT?

02:50:51    6    A.    I DO.

02:50:51    7    Q.    AND CAN YOU READ THAT FOR THE JURY, PLEASE?

02:50:54    8    A.    THAT'S WHAT I WAS POINTING TO EARLIER WHERE I SAID "APPLE

02:50:58    9    INC.'S IPHONE HAS BEEN THE WORLD'S MOST INFLUENTIAL SMARTPHONE

02:51:02   10    SINCE ITS DEBUT A YEAR AGO, WIDELY HAILED FOR ITS BEAUTY AND

02:51:08   11    FUNCTIONALITY."

02:51:09   12          AND WHAT DID YOU FIND -- I GUESS YOU ANSWERED THIS

02:51:12   13    QUESTION, BUT DID THE INFORMATION ON THIS PAGE AND THE EARLIER

02:51:15   14    DOCUMENTS EDUCATE YOU ABOUT WHAT WAS GOING ON IN THE

02:51:17   15    MARKETPLACE?

02:51:19   16    A.    THEY DID.

02:51:19   17    Q.    NOW, LET'S LOOK AT PAGE 36.  DO YOU HAVE THAT BEFORE YOU?

02:51:27   18    A.    YES, I DO.

02:51:29   19    Q.    AND WHAT ON PAGE 36 OF THIS SAMSUNG DOCUMENT DID YOU FIND

02:51:34   20    IMPORTANT TO YOUR OPINIONS?

02:51:35   21    A.    THE MIDDLE OF THIS PAGE -- YOU'RE LOOKING AT 31 OR 36?

02:51:43   22    Q.    I THINK 36, BUT LET ME CHECK.

02:51:51   23          PEOPLE WISER AND SMARTER THAN ME SAY 31.  YOU'RE CORRECT.

02:51:54   24    A.    OH, OKAY.  GOOD.  WE'RE LOOKING AT 31, SO --

02:51:57   25    Q.    MY FAULT.  I'M SORRY?

02:51:59  1    A.   THAT'S ALL RIGHT.

02:52:00  2    Q.   MY APOLOGIES.  WHAT ON THIS PAGE, 31, HELPED FORMULATE

02:52:05  3    YOUR OPINIONS ABOUT THE DAMAGES IN THIS CASE?

02:52:07  4    A.   THIS TALKS, AND YOU SEE, ABOUT THE SCREEN-CENTRIC DESIGN

02:52:12  5    THAT HAS SET THE STANDARD FOR TOUCH AND IT POINTS IN THE MIDDLE

02:52:17  6    TO THE FACT THAT IT'S BEAUTIFUL.

02:52:19  7    Q.   NOW, LET'S MOVE TO PAGE 36.  AND WHAT IS THIS SAMSUNG

02:52:27  8    DOCUMENT TELLING US?

02:52:28  9    A.   THIS IS ANOTHER PAGE THAT'S RELEVANT TO THIS CASE BECAUSE

02:52:30  10   RIGHT IN THE MIDDLE, IT'S TALKING ABOUT A FEATURE THAT IT CALLS

02:52:34  11   WHIMSICAL.  "LISTS BOUNCE, ICONS FLITTER -- THE IPHONE HAS A

02:52:39  12   SENSE OF WHIMSY."

02:52:41  13        AND IT GOES ON AND SAYS, "YOU PLAY MORE WITH IT BECAUSE

02:52:44  14   IT'S SIMPLY FUN TO HANDLE."

02:52:46  15   Q.   NOW, IF WE CAN HAVE PDX 9.6 BACK ON THE SCREEN.

02:52:52  16        THE DOCUMENTS WE'VE JUST LOOKED AT ARE IN THE PERIOD OF

02:52:54  17   TIME COMING UP TO 2010; CORRECT?

02:52:57  18   A.   THAT'S RIGHT.

02:52:57  19   Q.   AND YOU WERE HERE AT THE OPENING WHEN I DESCRIBED TO THE

02:52:59  20   JURY STAGE 1 AND STAGE 2?

02:53:02  21   A.   (NODS HEAD UP AND DOWN.)

02:53:03  22   Q.   THESE ARE DOCUMENTS FROM STAGE 1 AND STAGE 2; CORRECT?

02:53:06  23   A.   YES.

02:53:06  24   Q.   LET'S SEE WHAT HAPPENED IN STAGE 3.

02:53:10  25        AND IF YOU'D TURN IN YOUR NOTEBOOK TO TAB 15, SECTION

02:53:19  1      9. -- PDX 9.9.

02:53:23  2          DO YOU HAVE THAT?

02:53:24  3      A.   I HAVE THAT RIGHT HERE IN FRONT OF ME.

02:53:30  4      Q.   OKAY.  THIS IS EXCERPTS FROM ADMITTED EXHIBIT PX 40, WHICH

02:53:35  5      THE JURY HAS SEEN A NUMBER OF TIMES.

02:53:37  6          I JUST WANT TO ASK YOU A COUPLE QUESTIONS.

02:53:40  7          HAVE YOU READ THE MULTI PAGE DOCUMENT BEGINNING TO END?

02:53:45  8      A.   YES.

02:53:46  9      Q.   WERE YOU HERE IN THE OPENING WHEN SAMSUNG SUGGESTED THAT

02:53:51  10     WE, ACTUALLY I, MISREPRESENTED THE DOCUMENT BECAUSE IT WAS

02:53:55  11     LIMITED TO THE OMNIA PHONE?

02:53:57  12     A.   I DID HEAR THAT.

02:53:59  13     Q.   WOULD YOU TELL THE JURY, IS THIS DOCUMENT LIMITED TO THE

02:54:02  14     OMNIA PHONE?

02:54:03  15             MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT.  THAT'S

02:54:05  16     A MISSTATEMENT OF WHAT MR. QUINN SAID.

02:54:08  17             THE COURT:  OVERRULED.

02:54:09  18         GO AHEAD, PLEASE.

02:54:10  19             THE WITNESS:  NO, THIS IS NOT LIMITED TO THE OMNIA

02:54:13  20     PHONE.  IT'S SIX PAGES LONG, AND THERE ARE TWO OR THREE

02:54:16  21     SENTENCES ABOUT OMNIA.  BUT THE REST OF IT IS ABOUT OTHER

02:54:20  22     ASPECTS OF THEIR PHONES AT THE TIME.

02:54:21  23     BY MR. LEE:

02:54:22  24     Q.   THERE ARE SOME GOOD THINGS SAID ABOUT SAMSUNG PHONES;

02:54:25  25     CORRECT?

02:54:25   1      A.   YES.

02:54:26   2      Q.   THERE ARE SOME CONCERNS EXPRESSED ABOUT SAMSUNG PHONES;

02:54:28   3      CORRECT?

02:54:29   4      A.   YES.

02:54:29   5      Q.   AND THERE ARE THINGS SAID ABOUT SOFTWARE; CORRECT?

02:54:32   6      A.   YES.

02:54:32   7      Q.   BUT ALSO THINGS SAID ABOUT DESIGN; CORRECT?

02:54:36   8      A.   QUITE A FEW THINGS SAID ABOUT DESIGN.

02:54:38   9      Q.   AND ONE OF THEM WAS, "CRISIS OF DESIGN."

02:54:43  10      CORRECT?

02:54:44  11      A.   THAT'S RIGHT.

02:54:44  12      Q.   LET'S TALK ABOUT SAMSUNG'S INFRINGING PHONES THAT COME OUT

02:54:48  13      DURING PERIOD 3, OR STAGE 3.

02:54:51  14      COULD I HAVE PDX 9.3.  9.13 ON THE SCREEN, PLEASE.

02:54:57  15      DO YOU HAVE THAT BEFORE YOU?

02:54:58  16      A.   I DO.

02:54:59  17      Q.   ALL RIGHT.  AFTER THE CRISIS OF DESIGN MEETING, WHAT

02:55:06  18      HAPPENS TO THE SAMSUNG PHONES?

02:55:08  19      A.   IN JUNE OF 2010, THESE PHONES START GETTING INTRODUCED.

02:55:14  20      SO YOU SEE HERE ACROSS THE TOP THOSE THAT WERE INTRODUCED IN

02:55:18  21      2010 BY DATE.

02:55:20  22      AND THEN ALSO THOSE INTRODUCED IN 2011 BY DATE, LAUNCH

02:55:25  23      DATE.

02:55:25  24      Q.   AND ARE THESE INFRINGING PHONES?

02:55:27  25      A.   THEY ARE.

02:55:28   1    Q.   INFRINGING MODELS; CORRECT?

02:55:31   2    A.   YES.

02:55:31   3    Q.   AND WOULD YOU REMIND ME HOW MANY DIFFERENT MODELS WERE

02:55:35   4    FOUND TO INFRINGE?

02:55:35   5    A.   IN TOTAL, 15.3 MILLION UNITS.

02:55:39   6         OH, I'M SORRY, MODELS YOU'RE ASKING ABOUT?

02:55:42   7    Q.   YES.

02:55:42   8    A.   THERE ARE 18 MODELS, ONLY 16 OF WHICH HAVE SALES.

02:55:46   9    Q.   HOW MANY INFRINGED APPLE'S DESIGN PATENTS?

02:55:51  10    A.   I BELIEVE 13 IN TOTAL.

02:55:56  11    Q.   THIRTEEN IN TOTAL FOR THE D'677 PATENT?

02:55:59  12    A.   THAT'S MY RECOLLECTION.  I MAY HAVE THAT MIXED UP WITH THE

02:56:04  13    '305.  ONE IS 12 AND THE OTHER ONE IS 13.

02:56:07  14    Q.   OKAY.  WHEN DID SAMSUNG LAUNCH THE INFRINGING PHONES?

02:56:10  15    A.   THEY WERE LAUNCHED IN JUNE OF 2010, THE FIRST ONE.

02:56:13  16    Q.   NOW, LET'S LOOK AT PDX 9.17.

02:56:18  17         CAN YOU TELL US WHAT'S SHOWN ON PDX 9.17?

02:56:23  18    A.   THIS IS WHAT HAPPENED TO SAMSUNG'S U.S. MARKET SHARE FOR

02:56:27  19    SMARTPHONES AFTER IT INTRODUCES THE INFRINGING PHONES.

02:56:30  20    Q.   WHAT HAPPENED?

02:56:32  21    A.   IT INCREASED DRAMATICALLY.

02:56:34  22    Q.   NOW, DURING THE PERIOD 2000 -- THE MIDDLE OF 2010 TOWARDS

02:56:42  23    THE END OF THE THIRD QUARTER OF 2010, THERE'S A VERY SHARP,

02:56:47  24    DRAMATIC INCREASE; CORRECT?

02:56:49  25    A.   YES.

02:56:49   1    Q.   WHAT PORTION OF THAT INCREASE IN THE MARKET SHARE --

02:56:55   2         MAY I APPROACH, YOUR HONOR?

02:56:56   3              THE COURT:  GO AHEAD, PLEASE.

02:56:57   4    BY MR. LEE:

02:56:58   5    Q.   I WANT TO FOCUS THE LADIES AND GENTLEMEN OF THE JURY, AND

02:57:01   6    YOU, ON THIS SPIKE THAT OCCURS RIGHT AFTER THE FIRST INFRINGING

02:57:08   7    PHONE HAS BEEN INTRODUCED (INDICATING)?

02:57:10   8         DO YOU SEE THAT?

02:57:11   9    A.   I DO.

02:57:11   10   Q.   WHAT PORTION OF THAT SPIKE IS ACCOUNTED FOR BY

02:57:17   11   INFRINGING -- PHONES FOUND TO INFRINGE?

02:57:19   12   A.   90 PERCENT OF THAT INCREASE IS MADE UP OF INFRINGING

02:57:23   13   SMARTPHONES.

02:57:23   14   Q.   OKAY.  NOW, THERE WAS A SUGGESTION DURING SAMSUNG'S

02:57:29   15   OPENING THAT YOU HAD NOT DONE A CAUSATION ANALYSIS.

02:57:32   16        DO YOU REMEMBER THAT.

02:57:33   17   A.   I DO.

02:57:34   18   Q.   DID YOU HAVE THE INFORMATION TO DO A CAUSATION ANALYSIS?

02:57:37   19   A.   NO.

02:57:38   20   Q.   WHO WOULD HAVE THAT INFORMATION?

02:57:40   21   A.   PROBABLY SAMSUNG, IF ANYONE.

02:57:43   22   Q.   EVEN WITHOUT BEING ABLE TO --

02:57:45   23              MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT AND MOVE

02:57:47   24   TO STRIKE AS SPECULATION.

02:57:50   25              THE COURT:  SHE SAID PROBABLY.

02:57:53   1           OKAY.  OVERRULED.

02:57:55   2           GO AHEAD.

02:57:55   3    BY MR. LEE:

02:57:57   4    Q.   MY NEXT QUESTION.  EVEN HAVING NOT PERFORMED A DIRECT

02:58:01   5    CAUSATION ANALYSIS, DO YOU BELIEVE THE FACT THAT THERE'S AN

02:58:05   6    INCREASE IN MARKET SHARE AND AT 94 -- 90 PERCENT OF THAT

02:58:10   7    INCREASE IS ATTRIBUTABLE TO INFRINGING PHONES TELLS YOU

02:58:14   8    SOMETHING ABOUT THE INFRINGING PHONES?

02:58:16   9    A.   YES, I THINK IT DOES.  I THINK IT'S AN INFORMATIVE DATA

02:58:19   10   POINT FOR SURE.

02:58:20   11   Q.   OKAY.  NOW, AS YOU TOLD ME JUST A FEW MINUTES AGO, MARKET

02:58:24   12   SHARE CAN BE AFFECTED BY MANY OTHER THINGS; CORRECT?

02:58:26   13   A.   THAT'S RIGHT.

02:58:27   14   Q.   ARE YOU SUGGESTING THAT THERE WERE NO OTHER INFLUENCES

02:58:30   15   THAT AFFECTED THAT INCREASE IN MARKET SHARE?

02:58:32   16   A.   NO, NOT AT ALL.  BUT I DON'T THINK THIS IS A MERE

02:58:35   17   COINCIDENCE THAT IT HAPPENED AT THE TIME THAT THE NEW PHONES

02:58:37   18   WERE -- INFRINGING PHONES WERE LAUNCHED.

02:58:41   19   Q.   DID YOU MAKE ANY EFFORT TO SEE WHAT APPLE DID TO RESPOND

02:58:43   20   TO THE ANNOUNCEMENT OF THE GALAXY PHONES?

02:58:45   21   A.   I DID.

02:58:46   22   Q.   LET ME TURN YOU TO PX 52, WHICH IS ALREADY IN EVIDENCE,

02:58:53   23   AND TO PAGE 17.

02:58:57   24       WHAT DID YOU LEARN ABOUT WHAT APPLE DID AFTER THE GALAXY

02:59:02   25   INFRINGING PHONE WAS INTRODUCED?

02:59:04  1    A.   WHAT WE KNOW IS THAT A LITTLE OVER A MONTH LATER, SAMSUNG

02:59:08  2    AND APPLE MET TO DISCUSS WHAT APPLE BELIEVED TO BE THE

02:59:14  3    SITUATION WHERE SAMSUNG WAS COPYING THE IPHONE AND APPLE ASKED

02:59:19  4    SAMSUNG TO STOP DOING SO.

02:59:21  5    Q.   DID APPLE ASK SAMSUNG FOR ANY MONEY AT THE TIME?

02:59:26  6    A.   NO, APPARENTLY NOT.

02:59:27  7    Q.   DID THEY ASK THEM JUST TO STOP COPYING?

02:59:31  8    A.   THAT SEEMS TO BE THE GIST OF THIS PRESENTATION.

02:59:33  9    Q.   AND HOW LONG AFTER THE FIRST SAMSUNG INFRINGING PHONE WAS

02:59:38  10   INTRODUCED TO THE MARKET DID THIS MEETING OCCUR?

02:59:41  11   A.   JUST A LITTLE OVER A MONTH.

02:59:43  12   Q.   DID SAMSUNG STOP COPYING THE IPHONE?

02:59:45  13   A.   NO, IT DID NOT.  AND AS WE HAVE TALKED ABOUT, IT WENT ON

02:59:51  14   TO SELL 15.3 MILLION UNITS OF THE INFRINGING SMARTPHONES.

02:59:54  15   Q.   LET'S GO BACK NOW TO THE QUESTION OF TOTAL PROFITS AND THE

03:00:00  16   STATUTORY REMEDY FOR DESIGN PATENT INFRINGEMENT.

03:00:04  17        DO YOU HAVE THAT IN MIND?

03:00:05  18   A.   I DO.

03:00:06  19   Q.   WHERE DOES THE TERM "TOTAL PROFIT" COME FROM?

03:00:08  20   A.   THAT TERM COMES FROM THE STATUTE ITSELF.

03:00:11  21   Q.   CAN I HAVE PDX 9.3 ON THE SCREEN.

03:00:17  22        MAY I APPROACH THE SCREEN, YOUR HONOR?

03:00:19  23        THE COURT:  GO AHEAD, PLEASE.

03:00:19  24   BY MR. LEE:

03:00:20  25   Q.   IS THIS THE STATUTE THAT DEFINES THE REMEDY FOR DESIGN

03:00:25   1    PATENT INFRINGEMENT?

03:00:26   2    A.   YES, IT DOES.

03:00:27   3    Q.   AND IT SAYS, "WHOEVER DURING THE TERM OF A PATENT FOR

03:00:32   4    DESIGN, WITHOUT LICENSE OF THE OWNER, APPLIES THE PATENTED

03:00:37   5    DESIGN, OR ANY COLORABLE IMITATION THEREOF, TO ANY ARTICLE OF

03:00:41   6    MANUFACTURE FOR THE PURPOSE OF SALE, OR SELLS OR EXPOSES FOR

03:00:46   7    SALE ANY ARTICLE OF MANUFACTURE TO WHICH SUCH DESIGN OR

03:00:49   8    COLORABLE IMITATION HAS BEEN APPLIED SHALL BE LIABLE TO THE

03:00:54   9    OWNER TO THE EXTENT OF HIS TOTAL PROFIT."

03:00:57   10       HAVE I READ THAT CORRECTLY?

03:01:00   11   A.   YOU DID.

03:01:00   12   Q.   AND THAT'S WHERE THE CONCEPT OF TOTAL PROFIT COMES FROM?

03:01:04   13   A.   YES.

03:01:05   14   Q.   AND DO YOU UNDERSTAND THAT HER HONOR WILL PROVIDE THE JURY

03:01:07   15   WITH INSTRUCTIONS ON HOW TO IMPLEMENT CONGRESS'S STATUTORY

03:01:11   16   REMEDY?

03:01:12   17   A.   THAT'S MY UNDERSTANDING.

03:01:14   18   Q.   WHAT STEPS DID YOU TAKE TO CALCULATE SAMSUNG'S TOTAL

03:01:20   19   PROFIT ON THE ARTICLE OF MANUFACTURE FOR THE PURPOSE OF SALE?

03:01:24   20   A.   FROM A BIG PICTURE PERSPECTIVE, THERE ARE TWO STEPS.   ONE

03:01:28   21   IS TO IDENTIFY THE ARTICLE OF MANUFACTURE, AND THE SECOND ONE

03:01:33   22   THEN IS TO CALCULATE THE TOTAL PROFITS ATTRIBUTABLE TO THAT

03:01:37   23   PARTICULAR ARTICLE.

03:01:37   24   Q.   AND WHO DID YOU RELY UPON TO DETERMINE THE ARTICLE OF

03:01:42   25   MANUFACTURE FOR THE THREE DESIGN PATENTS?

DAVIS DIRECT BY MR. LEE                                        728

03:01:44  1    A.   I RELIED UPON THE OPINIONS OF MR. BALL AND DR. KARE.

03:01:48  2    Q.   TURN, IF YOU WOULD, TO PDX 9.19.

03:01:54  3         DO YOU HAVE THAT BEFORE YOU?

03:01:55  4    A.   YES.

03:01:56  5    Q.   CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

03:01:57  6    WHAT'S SHOWN ON THIS SLIDE?

03:01:59  7    A.   THIS IS THE SAME GRAPHIC THAT WE HAVE SEEN EARLIER THAT

03:02:03  8    SHOWS ALL OF THE INFRINGING PRODUCTS IN ALPHABETICAL ORDER AND

03:02:09  9    EACH OF THE PATENTS THAT THEY INFRINGE.

03:02:13  10        SO EACH OF THEM INFRINGE AT LEAST ONE OF THE DESIGN

03:02:17  11   PATENTS.

03:02:17  12   Q.   WHAT DOES THE TERM "NOTICE DATE," WHICH IS IN THE SECOND

03:02:24  13   ROW DOWN, THIRD ROW DOWN, INDICATE?

03:02:26  14   A.   NOTICE DATE IS THE DATE THAT APPLE PROVIDED NOTICE TO

03:02:31  15   SAMSUNG OF INFRINGEMENT, AND IT BEGINS THE DAMAGES PERIOD.

03:02:37  16        SO FOR THE D'677 PATENT, THE DAMAGES BEGIN APRIL 15TH OF

03:02:43  17   2011.

03:02:45  18        THE D'087 PATENT, DAMAGES BEGIN JUNE 16TH OF 2011, AS DO

03:02:52  19   THE DAMAGES FOR THE D'305 PATENT.

03:02:56  20        THE '381 PATENT, DAMAGES BEGIN WITH A NOTICE DATE OF

03:03:01  21   AUGUST 4, 2010.

03:03:03  22        AND THE '163 PATENT, DAMAGES BEGIN JUNE 16TH OF 2011.

03:03:08  23   Q.   ONCE YOU KNEW THE PRODUCTS, THE TIMEFRAMES, AND THE UNITS

03:03:13  24   INVOLVED, WHAT DID YOU DO TO CALCULATE SAMSUNG'S TOTAL PROFITS

03:03:18  25   FROM ARTICLES OF MANUFACTURE COVERED BY SECTION 289?

DAVIS DIRECT BY MR. LEE

03:03:25  1      A.    THEN WE TURN TO THE BOOKS AND RECORDS OF SAMSUNG, AS WELL

03:03:28  2      AS THE TESTIMONY OF SAMSUNG'S WITNESSES AND SAMSUNG'S EXPERT

03:03:32  3      ABOUT THOSE RECORDS.

03:03:33  4      Q.    COULD I HAVE PDX 9.20 ON THE SCREEN, PLEASE.

03:03:40  5            DO YOU HAVE IT BEFORE YOU?

03:03:41  6      A.    I DO.

03:03:42  7      Q.    THERE IS A ROW LABELED "REVENUE."  WOULD YOU TELL THE

03:03:45  8      LADIES AND GENTLEMEN OF THE JURY WHAT THE REVENUE NUMBER IS.

03:03:48  9      A.    THAT'S THE $3.3 BILLION NUMBER THAT YOU HEARD IN THE

03:03:52  10     OPENING.  THAT IS THE TOTAL REVENUE THAT IS ATTRIBUTABLE TO THE

03:03:58  11     SALE OF INFRINGING SMARTPHONES THAT ARE USING APPLE'S PATENTED

03:04:04  12     DESIGNS.

03:04:05  13     Q.    IS THERE ANY DISAGREEMENT BETWEEN MR. WAGNER AND YOU ON

03:04:08  14     THIS SPECIFIC NUMBER?

03:04:09  15     A.    THERE IS NOT.

03:04:10  16     Q.    AFTER CALCULATING TOTAL REVENUES, WHAT DID YOU DO NEXT?

03:04:16  17     A.    THE NEXT THING TO DO IS TO DETERMINE WHAT COST SHOULD BE

03:04:21  18     DEDUCTED SO THAT WE CAN FILL IN THAT NEXT LINE CALLED DIRECTLY

03:04:26  19     ATTRIBUTABLE EXPENSES.

03:04:28  20     Q.    AND IF I TURN YOU TO -- LET ME ASK YOU THIS FIRST:  HOW

03:04:34  21     DID YOU DETERMINE WHICH EXPENSES TO DEDUCT?

03:04:38  22     A.    I LOOKED AT THE SAMSUNG SPREADSHEETS THAT REFLECTED THE

03:04:44  23     REVENUES AND EXPENSES FOR EACH OF THESE PHONES, AND I ALSO

03:04:47  24     RELIED UPON THE TESTIMONY OF THE SAMSUNG WITNESSES AND

03:04:51  25     SAMSUNG'S EXPERT.

03:04:52    1    Q.   NOW, YOU DESCRIBED THE REMEDY FOR DESIGN PATENT

03:04:58    2    INFRINGEMENT AS A SPECIAL REMEDY; CORRECT?

03:05:01    3    A.   IT IS.

03:05:02    4    Q.   ARE THERE ANY SPECIAL RULES FOR DETERMINING WHICH EXPENSES

03:05:08    5    MAY BE DEDUCTED FROM REVENUE TO DETERMINE THE TOTAL PROFIT?

03:05:13    6    A.   I UNDERSTAND THAT THE TEST WE ARE TO APPLY IS TO DETERMINE

03:05:18    7    WHICH EXPENSES ARE DIRECTLY ATTRIBUTABLE TO THE MANUFACTURE AND

03:05:25    8    SALE OF THESE PHONES.

03:05:26    9    Q.   THAT IS THE TEST YOU UNDERSTAND JUDGE KOH WILL INSTRUCT

03:05:31   10    ON; CORRECT?

03:05:31   11    A.   YES.

03:05:32   12    Q.   IS THAT DIFFERENT THAN THE TEST USED FOR GENERALLY

03:05:39   13    ACCEPTED ACCOUNTS PRINCIPLES?

03:05:40   14    A.   YES, IT IS.  GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ARE

03:05:44   15    USED BY COMPANIES WHEN THEY'RE PUBLISHING THEIR FINANCIAL

03:05:46   16    STATEMENTS, BUT THAT IS NOT THE SAME SET OF RULES THAT WE ARE

03:05:50   17    TO APPLY HERE FOR THIS PURPOSE.

03:05:53   18    Q.   CAN YOU EXPLAIN -- CAN YOU GIVE THE JURY AN EXAMPLE THAT

03:05:57   19    WOULD EXPLAIN HOW YOU CALCULATE TOTAL PROFITS FOR AN ARTICLE

03:06:04   20    THAT HAS BEEN MADE AND SOLD?

03:06:06   21    A.   IF YOU AND I ARE TALKING ABOUT THE SAME ARTICLE, THIS IS A

03:06:09   22    PEN, SO ONE WOULD EXPECT THERE ARE COSTS ASSOCIATED WITH

03:06:15   23    MANUFACTURING THIS PEN, SO THAT WOULD BE THE PLASTIC AND INK

03:06:18   24    AND WHATEVER ELSE IS IN HERE AS MATERIAL, AS WELL AS ANY LABOR

03:06:22   25    ASSOCIATED WITH MAKING THE PEN.

03:06:25   1          AND THEN THAT IS THE AMOUNT THAT WE WOULD BE LOOKING AT

03:06:29   2   FOR COSTS THAT ARE DIRECTLY ATTRIBUTABLE TO THE PEN ITSELF.

03:06:33   3   Q.   ARE THERE OTHER COSTS THAT THE COMPANY THAT'S MAKING THE

03:06:37   4   PEN WOULD INCUR?

03:06:38   5   A.   SURE.  THE COMPANY INCURS ALL KINDS OF COSTS ASSOCIATED

03:06:43   6   WITH RUNNING A COMPANY, SO YOU HAVE TO HAVE AN ACCOUNTING

03:06:46   7   DEPARTMENT, YOU PROBABLY HAVE A HUMAN RESOURCES DEPARTMENT, YOU

03:06:49   8   HAVE A LEGAL DEPARTMENT.  ALL OF THOSE PEOPLE ARE NECESSARY TO

03:06:51   9   RUN A COMPANY.

03:06:52  10          BUT THEY ARE NOT DIRECTLY ATTRIBUTABLE, THOSE EXPENSES ARE

03:06:57  11   NOT DIRECTLY ATTRIBUTABLE TO THE SALE OF THIS PEN.

03:07:01  12   Q.   FOR GENERALLY ACCEPTED ACCOUNTING PRINCIPLE PURPOSES, OR

03:07:05  13   AUDITED FINANCIAL PURPOSES, DOES THE CONCEPT OF DIRECTLY

03:07:11  14   ATTRIBUTABLE HAVE ANY MEANING?

03:07:12  15   A.   THAT'S NOT A TERM THAT'S USED IN GENERALLY ACCEPTED

03:07:14  16   ACCOUNTING PRINCIPLES.

03:07:15  17   Q.   FOR GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, ARE THESE

03:07:19  18   COSTS THAT ARE INCURRED, BUT NOT DIRECTLY ATTRIBUTABLE,

03:07:22  19   ALLOCATED IN SOME WAY TO THE PRODUCTS OR TO THE UNITS?

03:07:25  20   A.   USUALLY THEY ARE, BUT ON A COMPANY-WIDE BASIS, THE PURPOSE

03:07:28  21   OF PUBLISHING FINANCIAL STATEMENTS IS TO SHOW ALL OF THE

03:07:31  22   REVENUES AND ALL OF THE COSTS SO THAT YOU GET TO THE FINAL

03:07:36  23   PROFIT NUMBER FOR THE COMPANY.

03:07:37  24   Q.   AND AS YOU'VE APPLIED THE DIRECTLY ATTRIBUTABLE STANDARD,

03:07:41  25   HOW IS THAT DIFFERENT?

03:07:43   1      A.   IT'S DIFFERENT IN THAT WE ARE TRYING TO FIGURE OUT THE

03:07:45   2      PROFITS ASSOCIATED WITH THE SALE OF THIS PEN.   SO THE COST

03:07:49   3      ASSOCIATED WITH THE HUMAN RESOURCES DEPOSIT OR THE ACCOUNTING

03:07:53   4      DEPARTMENT IS NOT GOING TO CHANGE BECAUSE THEY SELL ANOTHER

03:07:57   5      PEN.

03:07:57   6      Q.   NOW, LET'S TURN TO YOUR ANALYSIS, OR RETURN TO YOUR

03:08:00   7      ANALYSIS OF THE COSTS AND EXPENSES THAT YOU DETERMINED WERE

03:08:02   8      DIRECTLY ATTRIBUTABLE TO SAMSUNG'S INFRINGING PRODUCTS.

03:08:06   9           FIRST, WHAT INFORMATION DID YOU LOOK AT TO MAKE THAT

03:08:09   10     DETERMINATION?

03:08:10   11     A.   I STARTED WITH THE SPREADSHEETS THAT WERE PROVIDED BY

03:08:14   12     SAMSUNG THAT SHOWED REVENUE AND EXPENSES AND THEN I ANALYZED

03:08:18   13     THOSE USING THE TESTIMONY THAT I MENTIONED EARLIER.

03:08:20   14     Q.   LET ME PUT ON THE SCREEN PDX 9.21, WHICH IS FROM ADMITTED

03:08:26   15     EXHIBIT PX 180B.

03:08:28   16          CAN YOU TELL US WHAT'S SHOWN ON THE SCREEN?

03:08:30   17     A.   THIS IS ONE PAGE FROM THAT 104 PAGE DOCUMENT THAT SHOWS

03:08:34   18     THE REVENUES AND EXPENSES BY MONTH FOR EACH OF THE INFRINGING

03:08:39   19     PHONE MODELS.

03:08:40   20     Q.   NOW, THERE ARE FOUR CATEGORIES OF EXPENSES SHOWN ON THE

03:08:43   21     LEFT.

03:08:45   22          CAN YOU TELL US WHAT THOSE ARE?

03:08:47   23     A.   YES.   WE CAN TAKE THEM ONE BY ONE IF YOU'D LIKE.

03:08:50   24     Q.   SURE.

03:08:51   25     A.   THE FIRST OF THOSE, COGS.   COG STANDS FOR COST OF GOODS

03:08:56  1      SOLD.

03:08:57  2           SO THAT IS THE COSTS ASSOCIATED WITH MANUFACTURING, IN

03:09:01  3      YOUR EXAMPLE, THE PEN.  TYPICALLY, AS YOU SEE THERE, IT'S

03:09:04  4      MATERIAL COST AND MANUFACTURING EXPENSE, SO EVERY TIME YOU SELL

03:09:08  5      ANOTHER PEN, YOU'RE GOING TO HAVE MORE MATERIAL AND

03:09:11  6      MANUFACTURING COSTS ASSOCIATED WITH THAT.

03:09:13  7      Q.   WERE YOU ABLE TO DETERMINE WHETHER THOSE EXPENSES WERE

03:09:15  8      DIRECTLY ATTRIBUTABLE TO THE INFRINGING UNITS?

03:09:18  9      A.   YES, THEY ARE.

03:09:19  10     Q.   COULD I HAVE PDX 9.22 ON THE SCREEN, PLEASE.

03:09:25  11          USING PDX 9.22, CAN YOU EXPLAIN TO US WHAT INFORMATION YOU

03:09:31  12     HAD AND WHAT CONCLUSION YOU REACHED ON WHETHER THE COST OF

03:09:34  13     GOODS TOLD SHOULD BE DEDUCTED?

03:09:37  14     A.   WHAT WE KNOW IS THE COST OF GOODS SOLD, AS REFLECTED IN

03:09:41  15     SAMSUNG'S SPREADSHEETS, IS SPECIFIC FOR THE INFRINGING MODELS.

03:09:45  16          SO THEY DO INDEED RELATE TO EACH ADDITIONAL MODEL, OR EACH

03:09:51  17     ADDITIONAL UNIT THAT IS SOLD.

03:09:53  18          AND WE KNOW THAT, BY DEFINITION, COSTS OF GOODS SOLD

03:09:57  19     CHANGES WITH EVERY ADDITIONAL SALE.  SO IT'S A VARIABLE COST,

03:10:03  20     AND FOR THIS PURPOSE, IT MEETS OUR DIRECTLY ATTRIBUTABLE TEST.

03:10:06  21     Q.   DID YOU DEDUCT FROM THE TOTAL REVENUES ANY COSTS OF GOODS

03:10:10  22     SOLD EXPENSES?

03:10:11  23     A.   I DID.

03:10:11  24     Q.   COULD I HAVE PDX 9.23.

03:10:16  25          WHAT IS THE AMOUNT THAT YOU DEDUCTED BASED UPON THE

03:10:20  1    SAMSUNG RECORDS MADE AVAILABLE TO YOU FROM THE TOTAL REVENUE

03:10:23  2    FOR THE INFRINGING UNITS, OR THE UNITS THAT INFRINGED THE

03:10:27  3    DESIGN PATENTS?

03:10:27  4    A.   THE COST OF GOODS SOLD FOR THOSE UNITS WAS $2.3 BILLION.

03:10:33  5    Q.   AND YOU FOUND THOSE ACCURATELY DESCRIBED AND RECORDED IN

03:10:39  6    SAMSUNG'S DOCUMENTS; CORRECT?

03:10:40  7    A.   YES.

03:10:41  8    Q.   DO YOU AND MR. WAGNER DISAGREE ABOUT THIS AMOUNT,

03:10:45  9    2.264 BILLION?

03:10:47  10   A.   NO.  WE BOTH AGREE THAT THAT CATEGORY OF EXPENSES SHOULD

03:10:50  11   BE DEDUCTED, AND WE ESSENTIALLY AGREE ON THE AMOUNT.

03:10:53  12   Q.   AND HOW DO THE COSTS OF GOODS SOLD EXPENSES COMPARE TO ALL

03:10:57  13   OF THE OTHER EXPENSES THAT WERE REFLECTED ON THAT CHART I HAD

03:11:01  14   ON THE SCREEN A FEW MINUTES AGO, THE FOUR CATEGORIES?

03:11:04  15   A.   THAT'S THE LARGEST CATEGORY OF EXPENSES IN THE ENTIRE

03:11:07  16   SPREADSHEET.

03:11:08  17   Q.   DID YOU AND MR. WAGNER AGREE UPON THE OTHER THREE

03:11:10  18   CATEGORIES?

03:11:11  19   A.   WE DO NOT.

03:11:13  20   Q.   ALL RIGHT.  LET'S TURN TO THE NEXT CATEGORY.  AND IF I

03:11:16  21   COULD HAVE PDX 9.24 ON THE SCREEN.

03:11:21  22        DO YOU HAVE THAT?

03:11:22  23   A.   I DO.

03:11:22  24   Q.   THERE'S A CATEGORY CALLED GA EXPENSE.  WHAT IS THAT?

03:11:26  25   A.   THAT STANDS FOR GENERAL AND ADMINISTRATIVE EXPENSE.  SO

03:11:30   1   THAT IS THE EXPENSE ASSOCIATED WITH RUNNING THE COMPANY.  SO

03:11:34   2   THAT IS KIND OF LIKE THE EXAMPLES WE USED EARLIER OF THE

03:11:36   3   ACCOUNTING DEPARTMENT OR HUMAN RESOURCES DEPARTMENT.

03:11:39   4   Q.   DO YOU HAVE ANY DOUBT THAT THESE EXPENSES WERE INCURRED?

03:11:43   5   A.   NO.  I KNOW SAMSUNG WOULD HAVE EXPENSES LIKE THAT.  BUT

03:11:46   6   THEY ARE NOT DIRECTLY ATTRIBUTABLE TO THE SALE OF THE

03:11:49   7   INFRINGING PHONES.

03:11:50   8   Q.   SO YOU'RE NOT DISPUTING THAT THE EXPENSES WERE INCURRED,

03:11:54   9   IT'S JUST A QUESTION OF HOW THEY ARE TREATED UNDER THE TEST WE

03:11:57   10  ARE TO APPLY?

03:11:57   11  A.   RIGHT.

03:11:58   12  Q.   OKAY.  AND WHAT CONCLUSION DID YOU REACH ON WHETHER THEY

03:12:01   13  WERE DIRECTLY ATTRIBUTABLE OR NOT?

03:12:03   14  A.   THEY ARE NOT DIRECTLY ATTRIBUTABLE TO THE SALE OF THESE

03:12:06   15  PRODUCTS, AND, THEREFORE, THEY SHOULD NOT BE DEDUCTED.

03:12:11   16  Q.   AND ON YOUR CHART, YOU REFER TO INDIRECT.

03:12:13   17       COULD YOU TELL US WHAT THAT MEANS AND HOW IT EDUCATED YOUR

03:12:16   18  OPINION ON GA EXPENSE?

03:12:18   19  A.   THAT INDIRECT TERM MEANS, IN THE SAMSUNG LINGO BASED UPON

03:12:26   20  THE SYSTEM OF A SAMSUNG WITNESS, THAT THIS IS A POOL OF COST

03:12:30   21  INCURRED BY THE COMPANY AND THEY ALLOCATE PORTIONS OF THAT TO

03:12:35   22  EACH OF THE PRODUCTS THEY SELL.

03:12:37   23       SO THAT IS NOT SPECIFIC TO THE PRODUCTS, IT'S JUST SPREAD

03:12:41   24  ACROSS ALL THE PRODUCTS.

03:12:42   25  Q.   DID SAMSUNG PROVIDE TO YOU, OR TO MR. WAGNER, ANY EXHIBITS

03:12:49  1    OR DOCUMENTS THAT WOULD HAVE TIED ANY OF THE GA EXPENSES TO

03:12:55  2    SPECIFIC INFRINGING PRODUCTS?

03:12:57  3    A.   NO.

03:12:58  4    Q.   IF SAMSUNG HAD GIVEN YOU THAT INFORMATION, WOULD YOU HAVE

03:13:01  5    DEDUCTED THOSE EXPENSES?

03:13:03  6    A.   YES, IF IT WAS DIRECTLY ATTRIBUTABLE TO THESE SMARTPHONES.

03:13:07  7    Q.   LET'S LOOK AT THE NEXT CATEGORY, RESEARCH AND DEVELOPMENT.

03:13:11  8         DO WE HAVE THAT?  CAN WE HAVE PDX 9.25.

03:13:15  9         DO YOU SEE THE REFERENCE TO R&D EXPENSE?

03:13:18  10   A.   I DO.

03:13:18  11   Q.   ALL RIGHT.  WHAT CONCLUSION DID YOU -- WELL, WHAT DOES R&D

03:13:22  12   EXPENSE REFERS TO?

03:13:23  13   A.   R&D REFERS TO RESEARCH AND DEVELOPMENT COSTS.  SO THESE

03:13:26  14   ARE THE COSTS THAT WERE INCURRED BY SAMSUNG AT THAT TIME TO

03:13:30  15   DEVELOP FUTURE PRODUCTS.

03:13:31  16   Q.   SO THAT THE EXPENSES THAT SAMSUNG GAVE YOU THAT IT WANTS

03:13:39  17   TO DEDUCT WERE FOR PRODUCTS IN THE FUTURE, NOT FOR THE

03:13:43  18   INFRINGING PHONES?

03:13:44  19   A.   CORRECT.

03:13:44  20   Q.   WOULD YOU HAVE EXPECTED SAMSUNG TO HAVE THE RESEARCH AND

03:13:49  21   DEVELOPMENT INFORMATION FOR THESE PHONES?

03:13:51  22   A.   YES, I WOULD.

03:13:53  23   Q.   WAS IT PROVIDED TO YOU?

03:13:54  24   A.   NO.

03:13:55  25   Q.   WAS IT PROVIDED TO MR. WAGNER?

DAVIS DIRECT BY MR. LEE

03:13:56    1    A.   NO.

03:13:57    2    Q.   IS THERE ANY DISAGREEMENT THAT THESE RESEARCH AND

03:14:01    3    DEVELOPMENT EXPENSES ARE FOR FUTURE PHONES?

03:14:04    4    A.   NO.  THAT WAS EXPLAINED VERY CLEARLY BY THE SAMSUNG

03:14:08    5    WITNESS AND MR. WAGNER AND I BOTH AGREE ON THAT POINT.

03:14:12    6    Q.   IF THE EXPENSES ARE FOR FUTURE PHONES, CAN THEY BE

03:14:15    7    DIRECTLY ATTRIBUTABLE TO THE INFRINGING PHONES?

03:14:18    8    A.   IF THE EXPENSES ARE FOR FUTURE PHONES, THEY ARE NOT

03:14:23    9    DIRECTLY ATTRIBUTABLE TO THESE PHONES THAT ARE ALREADY ON THE

03:14:26   10    MARKET.

03:14:26   11    Q.   DID SAMSUNG PROVIDE YOU OR MR. WAGNER WITH ANY DOCUMENTS

03:14:30   12    OR INFORMATION THAT WOULD ALLOW YOU TO TIE ANY OF THESE

03:14:34   13    RESEARCH AND DEVELOPMENT EXPENSES TO ANY OF THE 18 INFRINGING

03:14:39   14    PHONES?

03:14:40   15    A.   NO.

03:14:41   16    Q.   DID YOU DEDUCT ANY OF THE RESEARCH AND DEVELOPMENT

03:14:44   17    EXPENSE?

03:14:44   18    A.   NO.  THEY ARE NOT DIRECTLY ATTRIBUTABLE TO THE INFRINGING

03:14:47   19    PHONES.  THEY -- ALL THOSE EXPENSES RELATED TO FUTURE PRODUCTS.

03:14:52   20    Q.   IF SAMSUNG HAD GIVEN YOU THE INFORMATION THAT TIED

03:14:54   21    RESEARCH AND DEVELOPMENT EXPENSE TO THE INFRINGING PHONES,

03:14:58   22    WOULD YOU HAVE DEDUCTED IT?

03:14:59   23    A.   YES, IF THERE WAS THAT LINK.

03:15:02   24    Q.   LET'S TURN TO THE LAST CATEGORY OF EXPENSE.  CAN I HAVE

03:15:05   25    PDX 9.26.

DAVIS DIRECT BY MR. LEE

03:15:07  1          DO YOU SEE THE REFERENCE TO SALES EXPENSE?

03:15:09  2     A.   I DO.

03:15:10  3     Q.   WHAT FALLS INTO THIS CATEGORY?

03:15:12  4     A.   THIS WOULD INCLUDE THE EXPENSES ASSOCIATED WITH THE SALES

03:15:17  5     FORCE, AS WELL AS THE MARKETING EXPENSES.

03:15:21  6     Q.   NOW, DO YOU HAVE ANY DOUBT THAT SAMSUNG INCURRED MARKETING

03:15:25  7     EXPENSES?

03:15:26  8     A.   NONE WHATSOEVER.

03:15:27  9     Q.   WE KNOW THAT THEY INCURRED ADVERTISING EXPENSES.

03:15:29  10    A.   YES.

03:15:30  11    Q.   WAS THE QUESTION OF YOU WHETHER SAMSUNG WOULD GIVE YOU

03:15:37  12    INFORMATION THAT TIED OR DIRECTLY ATTRIBUTED ANY OF THOSE

03:15:39  13    EXPENSES TO THE INFRINGING PHONES?

03:15:42  14    A.   THAT WAS THE QUESTION WE WERE TRYING TO SORT OUT, AND WHAT

03:15:45  15    WE KNOW IS THAT THE COSTS THAT WERE REFLECTED IN THE

03:15:49  16    SPREADSHEET ARE, ONCE AGAIN, COMING FROM POOLED COSTS THAT WERE

03:15:53  17    ALLOCATED ACROSS ALL PRODUCTS.

03:15:55  18          THEY ARE NOT SPECIFIC TO THESE PHONES.

03:15:58  19    Q.   SO WE KNOW THAT SAMSUNG HAD ADVERTISEMENTS AND MARKETING

03:16:04  20    FOR SOME OF THE 18 PHONE MODELS.  WE'VE SEEN THEM DURING THE

03:16:09  21    COURSE OF THE WEEK; CORRECT?

03:16:10  22    A.   WE DO.  WE JUST DON'T KNOW HOW MUCH WAS SPENT ON THOSE

03:16:13  23    ADVERTISEMENTS.

03:16:14  24    Q.   DID SAMSUNG GIVE YOU ANY OF THE FINANCIAL INFORMATION THAT

03:16:19  25    WOULD SHOW THE COSTS FOR ANY OF THOSE ADVERTISEMENT, TV SPOTS,

DAVIS DIRECT BY MR. LEE

03:16:25  1    ANYTHING?

03:16:25  2    A.   NO.

03:16:26  3    Q.   NOW, BASED UPON YOUR EXPERIENCE AS AN AUDITOR OVER THE

03:16:36  4    YEARS, WOULD YOU EXPECT SAMSUNG TO HAVE DOCUMENTATION THAT

03:16:38  5    WOULD DEMONSTRATE THE COSTS OF THOSE ADVERTISEMENTS, THAT

03:16:42  6    MARKETING FOR THE SPECIFIC INFRINGING PHONES?

03:16:43  7    A.   YES, I WOULD.

03:16:44  8    Q.   WAS IT PROVIDED TO MR. WAGNER?

03:16:47  9    A.   NO.

03:16:47  10   Q.   WAS IT PROVIDED TO YOU?

03:16:48  11   A.   NO.

03:16:49  12   Q.   IF SAMSUNG HAD PROVIDED YOU THOSE RECEIPTS, THOSE RECORDS,

03:16:53  13   WOULD YOU HAVE DEDUCTED THOSE COSTS?

03:16:55  14   A.   YES, IF THEY WERE DIRECTLY ATTRIBUTABLE TO THE SALE OF THE

03:16:58  15   PHONES IN THIS CASE.

03:16:59  16   Q.   AND DID YOU REVIEW THE RECORDS THAT SAMSUNG PRODUCED TO

03:17:02  17   LOOK FOR RECEIPTS, DOCUMENTS, ANY RECORDS INDICATING THAT THESE

03:17:08  18   EXPENSES COULD BE DIRECTLY ATTRIBUTED TO THE INFRINGING SALES?

03:17:13  19   A.   I DID.

03:17:14  20   Q.   NOW, WE'VE REVIEWED EXPENSE CATEGORIES ON PX 180B.

03:17:21  21        IN ADDITION TO THE REASONS THAT WE'VE JUST DISCUSSED, WERE

03:17:26  22   THERE OTHER REASONS THAT CAUSED YOU CONCERN ABOUT DEDUCTING ANY

03:17:32  23   FURTHER EXPENSES BASED UPON SAMSUNG'S FINANCIAL RECORDS?

03:17:35  24   A.   YES.  I WAS CONCERNED ABOUT THE DATA IN THOSE SPREADSHEETS

03:17:39  25   THEMSELVES.

DAVIS DIRECT BY MR. LEE

03:17:40  1   Q.   WERE YOU CONCERNED ABOUT THE RELIABILITY OF THAT DATA?

03:17:44  2   A.   I WAS.

03:17:45  3   Q.   LET'S HAVE A LOOK AT PDX 9.28.

03:17:50  4        DO YOU HAVE IT ON THE SCREEN?

03:17:52  5   A.   I DO.

03:17:52  6   Q.   USING THIS DEMONSTRATIVE, CAN YOU EXPLAIN TO THE JURY WHAT

03:17:57  7   YOUR CONCERNS WERE WITH THE INFORMATION THAT WAS PROVIDED TO

03:18:02  8   BOTH MR. WAGNER AND TO YOU?

03:18:03  9   A.   HAVING SPENT 10 YEARS AS AN AUDITOR, I STILL HAVE THAT

03:18:09 10   SENSE OF SKEPTICISM THAT MAKES ME WANT TO LOOK FOR RELIABLE

03:18:15 11   DATA TO USE IN ANY ANALYSIS THAT I'M PUTTING FORTH.

03:18:21 12        AND WHAT WAS CONCERNING ABOUT THE SAMSUNG INFORMATION THAT

03:18:25 13   WAS ON THE SPREADSHEET WE WERE LOOKING AT WAS THAT SAMSUNG

03:18:29 14   PRODUCED A SERIES OF NINE DIFFERENT SPREADSHEETS, AND FROM ONE

03:18:32 15   TO THE NEXT, THINGS WOULD CHANGE.

03:18:35 16        SO THERE MIGHT BE MORE MODELS; THERE MIGHT BE FEWER

03:18:38 17   MODELS.  SOME OF THE TOTALS MIGHT CHANGE; SOME OF THE DETAIL

03:18:42 18   MIGHT CHANGE.

03:18:43 19        SO THAT WAS CONCERNING TO ME BECAUSE IF THIS INFORMATION

03:18:45 20   WAS COMING DIRECTLY OUT OF THE RECORDS OF SAMSUNG, ONE WOULD

03:18:49 21   THINK THAT THE NUMBERS WOULD BE THE SAME EVERY TIME YOU ASKED

03:18:52 22   THAT QUESTION.

03:18:53 23        BUT IT WASN'T.

03:18:54 24        SO THAT'S CONCERNING.

03:18:56 25   Q.   AND UNDER THAT FIRST ISSUE, OR FIRST SUBJECT, YOU HAVE AN

03:19:00  1    ENTRY RECLASSIFIED 1.3 BILLION.

03:19:05  2         COULD YOU EXPLAIN TO THE JURY WHAT HAPPENED?

03:19:07  3    A.   THAT'S AN EXAMPLE OF A CHANGE FROM ONE SPREADSHEET TO

03:19:10  4    ANOTHER.  SO FROM ONE SPREADSHEET TO ANOTHER, ALL OF A SUDDEN

03:19:14  5    THERE'S A NEW NUMBER IN COST OF GOODS SOLD THAT IS $1.3 BILLION

03:19:21  6    HIGHER THAN THE LAST SPREADSHEET.

03:19:23  7         AND IT COMES OUT IN THE GENTLEMAN'S DEPOSITION IN KOREA,

03:19:28  8    THE SAMSUNG GENTLEMAN SAID THAT NUMBER, THE $1.3 BILLION,

03:19:33  9    REPRESENTED PROFITS OF A CHINESE SUBSIDIARY THAT HE, ALONG WITH

03:19:38  10   THE LAWYERS, HAD DECIDED SHOULD BE CLASSIFIED AS COSTS OF GOODS

03:19:41  11   SOLD.

03:19:42  12        AND AFTER THE DEPOSITION, THEY CHANGED THEIR MIND AND THEY

03:19:46  13   TOOK IT BACK OUT OF COSTS OF GOODS SOLD.

03:19:49  14        BUT YOU SHOULDN'T BE ABLE TO MAKE THOSE KINDS OF DECISIONS

03:19:52  15   ON SPREADSHEET DATA, AND IT MAKES YOU WONDER WHAT EXACTLY

03:19:58  16   YOU'RE LOOKING AT.

03:19:59  17   Q.   LET'S GO TO USED IN THE ORDINARY COURSE.

03:20:02  18        WHAT ARE YOU REFERRING TO?

03:20:03  19   A.   ONE WOULD PREFER TO USE INFORMATION OR DATA THAT COMES OUT

03:20:09  20   OF BUSINESS RECORDS THAT ARE KEPT IN THE ORDINARY COURSE OF

03:20:13  21   BUSINESS.

03:20:13  22        IN THIS CASE, THESE SPREADSHEET, INCLUDING THE 180 THAT WE

03:20:18  23   WERE LOOKING AT, WERE PREPARED SPECIFICALLY FOR THIS

03:20:21  24   LITIGATION.

03:20:21  25   Q.   AND THE LAST CATEGORY, BACKED UP BY PRODUCT-SPECIFIC

03:20:24   1   RECORDS, WHAT ARE YOU REFERRING TO?

03:20:25   2   A.   ONCE AGAIN, AS A FORMER AUDITOR, YOU'RE ACCUSTOMED TO

03:20:29   3   SUPPORTING THE NUMBERS THAT APPEAR IN ANY FINANCIAL STATEMENT.

03:20:33   4        IN THIS PARTICULAR CASE, I DON'T HAVE ANY DETAILS THAT

03:20:35   5   SUPPORT THE NUMBERS IN THOSE SPREADSHEETS.

03:20:38   6   Q.   LET ME MOVE US TO, BACK TO SLIDE 9 -- PDX 9.29.

03:20:53   7        SO IF WE TAKE THE REVENUE, WE DEDUCT THE COSTS OF GOODS

03:20:56   8   SOLD, WHAT DOES THAT GIVE US AS THE TOTAL PROFIT NUMBER UNDER

03:21:01   9   CONGRESS'S STATUTORY REMEDY?

03:21:05   10  A.   THE TOTAL PROFIT WOULD BE $1.1 MILLION.

03:21:09   11  Q.   INCIDENTALLY, MS. DAVIS, AS YOU LOOKED AT APPLE AND

03:21:16   12  SAMSUNG'S RECORDS, DID YOU FIND ANYONE KEEPING REVENUE FOR

03:21:19   13  GLASS FRONT FACES?

03:21:20   14  A.   NO.

03:21:21   15  Q.   BEZELS?

03:21:22   16  A.   NEITHER COMPANY WAS -- I'M NOT FAMILIAR WITH ANY RECORDS

03:21:25   17  THAT SHOWS SALES OF BEZELS OR DISPLAYS OR GLASS FRONT FACES.

03:21:33   18  Q.   DID EITHER COMPANY KEEP MARKET SHARE DATA FOR ANY OF

03:21:37   19  THOSE?

03:21:37   20  A.   NO.  AS FAR AS I KNOW, THAT'S NOT TRACKED AT ALL.

03:21:41   21  Q.   DID YOU FIND MARKET SHARE DATA, THOUGH, FOR PHONES?

03:21:44   22  A.   OF COURSE.

03:21:45   23  Q.   DID YOU FIND SALES INFORMATION FOR PHONES?

03:21:47   24  A.   YES.

03:21:47   25  Q.   NOW, IS THE NUMBER 1.06 BILLION YOUR BEST JUDGMENT ON THE

03:21:53   1   TOTAL PROFITS COMPUTED ACCORDING TO THE LAW FOR THE DESIGN

03:21:58   2   PATENT INFRINGEMENT?

03:21:59   3   A.   YES, ACCORDING TO THE DIRECTLY ATTRIBUTABLE TEST THAT WE

03:22:03   4   TALKED ABOUT.

03:22:03   5   Q.   AND IF THE JURY WANTED TO LOOK AT THIS BY PRODUCT, IS

03:22:11   6   THERE A SPECIFIC EXHIBIT THAT WE COULD TURN THEM TO THAT WOULD

03:22:14   7   GIVE THEM THIS INFORMATION BROKEN DOWN BY PRODUCT?

03:22:17   8   A.   THAT DETAIL IS IN EXHIBIT 25K, WHICH YOU WILL HAVE WITH

03:22:24   9   YOU IN THE JURY ROOM.

03:22:25   10   Q.   AND IS THERE A SPECIFIC PAGE OF 25K THAT PROVIDES THE

03:22:28   11   BREAKDOWN?

03:22:29   12   A.   PAGE 4 WILL SHOW YOU, BY PRODUCT, HOW MUCH TOTAL PROFIT

03:22:34   13   THERE IS FOR EACH OF THESE.

03:22:35   14   Q.   NOW LET'S MOVE TO THE REASONABLE ROYALTY, IF WE COULD.

03:22:40   15        COULD I HAVE PDX 9.32 ON THE SCREEN.

03:22:44   16        YOU'VE DESCRIBED TO US WHAT A REASONABLE ROYALTY IS

03:22:47   17   BRIEFLY.

03:22:48   18        IS THIS AN ILLUSTRATION OF THE RENTAL ANALOGY THAT YOU

03:22:53   19   USED A LITTLE BIT EARLY?

03:22:54   20   A.   YES.   IT'S THINKING LIKE A RENTAL OF AN APARTMENT, EXCEPT

03:22:59   21   THAT NOW YOU'RE ASKING PERMISSION TO USE SOMEBODY'S PATENTED

03:23:03   22   TECHNOLOGY OR PATENTED DESIGNS.

03:23:04   23   Q.   SO THE PROPERTY IN THE FIRST EXAMPLE IS REAL ESTATE

03:23:09   24   PROPERTY, AND IN THE SECOND IT'S PATENTS; CORRECT?

03:23:11   25   A.   THAT'S RIGHT.

DAVIS DIRECT BY MR. LEE

03:23:12   1    Q.   IN THE REAL ESTATE EXAMPLE, THERE ARE TWO HANDS SHAKING;

03:23:16   2    CORRECT?

03:23:16   3    A.   YES.

03:23:16   4    Q.   BUT THEN THERE IS, BELOW FOR THE PATENTS, A BOX THAT SAYS

03:23:20   5    HYPOTHETICAL NEGOTIATION.

03:23:21   6         DO YOU SEE THAT?

03:23:22   7    A.   YES.

03:23:22   8    Q.   WOULD YOU EXPLAIN TO THE JURY WHAT THE HYPOTHETICAL

03:23:26   9    NEGOTIATION CONCEPT IS AND HOW IT APPLIES TO A REASONABLE

03:23:28   10   ROYALTY?

03:23:29   11   A.   WE KNOW THAT THESE TWO PARTIES NEVER HAD AN ACTUAL

03:23:32   12   NEGOTIATION BACK AT THE TIME SAMSUNG LAUNCHED THE INFRINGING

03:23:37   13   SMARTPHONES.

03:23:39   14        HAD THEY DONE SO, THEN WE COULD HAVE -- WE'RE TRYING TO

03:23:43   15   FIGURE OUT WHAT AGREEMENT THEY WOULD HAVE REACHED AND HOW MUCH

03:23:46   16   SAMSUNG WOULD HAVE PAID FOR THE RIGHT TO USE BOTH THE DESIGNS

03:23:50   17   AND THE PATENTED TECHNOLOGY IN THE '381 AND '163 PATENTS.

03:23:54   18   Q.   WHAT DATE DID YOU USE FOR THE DATE OF THE HYPOTHETICAL

03:23:57   19   NEGOTIATION?

03:23:58   20   A.   JUNE OF 2010 WHEN SAMSUNG FIRST LAUNCHED THE INFRINGING

03:24:03   21   SMARTPHONES.

03:24:04   22   Q.   WHAT PATENTS DID YOU INCLUDE IN THE HYPOTHETICAL

03:24:06   23   NEGOTIATION?

03:24:06   24   A.   I INCLUDED ALL OF THE INTELLECTUAL PROPERTY THAT WAS

03:24:11   25   INCLUDED IN THE FIRST TRIAL IN THIS CASE.

| | |
|---|---|
| 03:24:13 | 1 | Q.  HOW DID YOU APPROACH DETERMINING A REASONABLE ROYALTY? |
| 03:24:15 | 2 | A.  I USED A COMMONLY USED TEST REFERRED TO AS THE |
| 03:24:22 | 3 | GEORGIA PACIFIC FACTORS.  THAT'S A LIST OF 15 DIFFERENT FACTORS |
| 03:24:27 | 4 | THAT COME OUT OF CASE FROM YEARS AGO THAT INVOLVED THE |
| 03:24:30 | 5 | GEORGIA PACIFIC COMPANY AND THOSE FACTORS HAVE SINCE BECOME |
| 03:24:33 | 6 | KIND OF THE STANDARD AGAINST WHICH MOST DAMAGES EXPERTS LOOK AT |
| 03:24:37 | 7 | REASONABLE ROYALTY ANALYSIS. |
| 03:24:38 | 8 | Q.  COULD I HAVE PDX 9.33 ON THE SCREEN. |
| 03:24:44 | 9 |     DO YOU HAVE THAT BEFORE YOU? |
| 03:24:45 | 10 | A.  I DO. |
| 03:24:46 | 11 | Q.  WE'RE NOT GOING TO GO THROUGH ALL OF THEM, BUT WHAT IS |
| 03:24:48 | 12 | THIS LIST OF FACTORS? |
| 03:24:50 | 13 | A.  THERE IS AN ABBREVIATED LIST OF THE 15 FACTORS. |
| 03:24:54 | 14 |     SO THE ENTIRE FACTOR HAS MORE WORDS IN IT, BUT THIS IS |
| 03:24:58 | 15 | KIND OF WHAT IT BOILS DOWN TO. |
| 03:24:59 | 16 | Q.  IS IT YOUR UNDERSTANDING THAT HER HONOR WILL INSTRUCT THE |
| 03:25:05 | 17 | JURY ON HOW TO USE THESE 15 FACTORS? |
| 03:25:08 | 18 | A.  YES. |
| 03:25:08 | 19 | Q.  WHAT FACTORS WERE MOST RELEVANT TO YOUR ANALYSIS? |
| 03:25:13 | 20 | A.  THERE WERE SEVERAL THAT I THOUGHT WE SHOULD TALK ABOUT |
| 03:25:16 | 21 | TODAY, STARTING WITH THE COMMERCIAL RELATIONSHIP BETWEEN APPLE |
| 03:25:18 | 22 | AND SAMSUNG. |
| 03:25:19 | 23 | Q.  COULD I HAVE PDX 9.34 ON THE SCREEN.  THAT'S FACTOR NUMBER |
| 03:25:25 | 24 | 5? |
| 03:25:25 | 25 | A.  YES. |

03:25:26   1    Q.   AND WHAT DOES FACTOR 5 CONCERN AND WHY DID YOU THINK IT

03:25:30   2    WAS IMPORTANT?

03:25:30   3    A.   THIS RELATES TO WHAT IS THE RELATIONSHIP?  AND IN THIS

03:25:35   4    CASE, OF COURSE, THEY ARE DIRECT COMPETITORS FOR THE SALE OF

03:25:38   5    SMARTPHONES, AND TYPICALLY ONE WOULD EXPECT A ROYALTY TO BE

03:25:42   6    PAID BETWEEN COMPETITORS TO BE HIGHER THAN IF THEY'RE NOT

03:25:46   7    COMPETITORS.

03:25:48   8        THE REASON FOR THAT IS SIMPLE.  IT'S BECAUSE BOTH PARTIES

03:25:50   9    WOULD EXPECT THAT IF SAMSUNG'S ALLOWED TO USE APPLE'S PATENTS,

03:25:56  10    THEN APPLE MAY END UP LOSING SALES AS A RESULT OF THAT.

03:25:59  11    Q.   TURN, IF YOU WOULD, TO TAB 8 IN YOUR NOTEBOOK.

03:26:09  12    A.   I HAVE THAT.

03:26:10  13    Q.   DO YOU HAVE IT?

03:26:12  14    A.   YES.

03:26:12  15    Q.   WHAT -- DO YOU FIND PX 60?

03:26:15  16    A.   YES.

03:26:16  17    Q.   WHAT IS IT?

03:26:17  18    A.   THIS IS ANOTHER DOCUMENT FROM THE FILES OF SAMSUNG DATED

03:26:22  19    FEBRUARY 16TH OF 2012.

03:26:24  20         MR. LEE:  YOUR HONOR, WE OFFER PX 60.

03:26:26  21         THE COURT:  ANY OBJECTION?

03:26:27  22         MR. PRICE:  JUST ONE MINUTE.

03:26:30  23         THE COURT:  ALL RIGHT.

03:26:37  24         MR. PRICE:  WHICH ONE?

03:26:38  25         MR. LEE:  TAB 8, PX 60.

DAVIS DIRECT BY MR. LEE

```
03:26:43   1              MR. PRICE:  NO FURTHER OBJECTION.

03:26:44   2              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  IT'S

03:26:48   3   ADMITTED.

03:26:48   4         (PLAINTIFF'S EXHIBIT 60 WAS ADMITTED IN EVIDENCE.)

03:26:48   5              MR. LEE:  THANK YOU, YOUR HONOR.

03:26:49   6   Q.   DO YOU SEE PAGE 1 OF PX 60?

03:26:51   7   A.   YES.

03:26:52   8   Q.   FOR WHAT PURPOSE WAS THIS DOCUMENT PREPARED?

03:26:55   9   A.   THIS WAS A DOCUMENT THAT WAS PREPARED FOR A GROUP OF

03:27:00  10   SENIOR EXECUTIVES AT SAMSUNG.

03:27:02  11   Q.   IN THE BOTTOM RIGHT-HAND CORNER, IS THERE A

03:27:05  12   CONFIDENTIALITY DESIGNATION ON THE ORIGINAL DOCUMENT?

03:27:08  13   A.   YES.  YOU SEE THAT TOP SECRET STAMP THERE?

03:27:11  14   Q.   TURN, IF YOU WOULD, TO PAGE 8 OF PX 60.

03:27:21  15        DO YOU HAVE THAT BEFORE YOU?

03:27:22  16   A.   I DO.

03:27:23  17   Q.   WHAT, IF ANYTHING, IS DESCRIBED ON PAGE 8 THAT TOLD YOU

03:27:29  18   ANYTHING ABOUT THE COMPETITIVE RELATIONSHIP BETWEEN APPLE AND

03:27:33  19   SAMSUNG?

03:27:33  20   A.   THE HEADING PRETTY MUCH SAYS IT ALL.  WHAT IS SAYS IS

03:27:38  21   "CONSOLIDATION AROUND 2 OS," OPERATING SYSTEM "PLATFORMS, U.S.

03:27:45  22   MARKET BECOMING A TWO HORSE RACE BETWEEN APPLE AND SAMSUNG."

03:27:50  23        AND MORE SPECIFICALLY ON THE RIGHT-HAND SIDE, YOU SEE A

03:27:54  24   THREE HORSE RACE BECOMING A TWO HORSE RACE, MEANING THAT

03:27:58  25   SAMSUNG IS BEATING OUT ONE OF THE OTHER ANDROID MANUFACTURERS,
```

03:28:02   1    WHICH WAS HTC.

03:28:03   2    Q.   AND THIS WAS A DOCUMENT THAT WAS GENERATED IN -- LET ME GO

03:28:06   3    BACK TO THE FIRST PAGE -- DURING WHAT WE HAVE DESCRIBED AS

03:28:12   4    PHASE 3; CORRECT?

03:28:13   5    A.   THAT'S RIGHT.   THIS IS AFTER THE SMARTPHONES THAT HAVE

03:28:16   6    BEEN FOUND TO INFRINGE ARE ON THE MARKET.

03:28:18   7    Q.   LET'S TURN TO PDX 9.35 AND LOOK AT ANOTHER GEORGIA PACIFIC

03:28:25   8    FACTOR, FACTOR NUMBER 9.

03:28:28   9         DO YOU SEE IT?

03:28:29  10    A.   I DO.

03:28:30  11    Q.   WAS THIS ONE IMPORTANT TO YOU?

03:28:31  12    A.   YES, IT WAS.

03:28:32  13    Q.   WHAT DOES IT REFER TO AND WHY DID YOU FIND IT IMPORTANT?

03:28:35  14    A.   THIS LOOKS AT ANY OF THE ADVANTAGES THAT THE PATENTS HAVE

03:28:38  15    IN THE TECHNOLOGY OR THE DESIGNS OVER THE OLDER WAY OF DOING

03:28:42  16    THINGS.

03:28:42  17    Q.   THERE HAVE BEEN A SERIES OF INTERNAL SAMSUNG DOCUMENTS

03:28:47  18    COMPARING THE PATENTED DESIGNS AND THE FEATURES TO SAMSUNG'S

03:28:51  19    PHONES.

03:28:53  20         YOU HAVE REVIEWED THEM; CORRECT?

03:28:55  21    A.   I HAVE.

03:28:55  22    Q.   AND YOU'VE BEEN IN THE COURTROOM WHEN DR. KARE, DR. SINGH,

03:28:58  23    DR. BALAKRISHNAN REVIEWED THEM?

03:29:00  24    A.   YES.

03:29:00  25    Q.   I'M NOT GOING TO GO THROUGH THEM WITH YOU IN DETAIL, BUT

03:29:04  1    IF I GO TO PDX 9.11, WHICH SHOWS SOME ADMITTED PAGES FROM PX 44

03:29:13  2    AND 46, WHAT DID THESE INTERNAL SAMSUNG DOCUMENTS DURING PHASE

03:29:19  3    3 TELL YOU ABOUT THE BENEFITS OF APPLE'S PATENTED DESIGNS AND

03:29:24  4    FEATURES TO SAMSUNG?

03:29:25  5    A.   I THINK THE STORY THAT THESE DOCUMENTS COLLECTIVELY TELL

03:29:30  6    IS THAT SAMSUNG WAS COMPARING ITS PHONES THAT WERE UNDER

03:29:35  7    DEVELOPMENT WITH THE IPHONE AND IN EACH CASE THAT WE LOOKED AT

03:29:38  8    EARLIER TODAY AND YESTERDAY WAS DECIDING THAT THERE WAS

03:29:42  9    SOMETHING ABOUT THEIR PHONE THAT THEY WANTED TO CHANGE TO BE

03:29:45  10   MORE LIKE THE IPHONE.

03:29:47  11   Q.   LET ME HAVE PDX 9.36 IF I COULD, AND LOOK AT

03:29:53  12   GEORGIA PACIFIC FACTOR NUMBER 11.

03:29:56  13        DO YOU HAVE THAT BEFORE YOU?

03:29:57  14   A.   I DO.

03:29:58  15   Q.   WHAT IS THAT FACTOR AND WHY DID YOU CONSIDER IT IMPORTANT?

03:30:03  16   A.   THIS FACTOR LOOKS AT THE EXTENT TO WHICH THE INFRINGER HAS

03:30:09  17   PUT TO USE THE PATENTED TECHNOLOGY, OR IN THIS CASE THE

03:30:11  18   PATENTED DESIGNS.

03:30:14  19        AND WHAT WE KNOW HERE IS THAT SAMSUNG HAS SOLD

03:30:17  20   15.3 MILLION UNITS, SO THAT IS EXTENSIVE USE OF THESE PATENTS.

03:30:22  21   Q.   DID YOU CONSIDER ALL OF THE GEORGIA PACIFIC FACTORS IN

03:30:25  22   YOUR ANALYSIS?

03:30:26  23   A.   I DID.

03:30:27  24   Q.   DID YOU COME TO A CONCLUSION CONCERNING THE REASONABLE

03:30:30  25   ROYALTY FOR THE UTILITY PATENTS, THE '381 AND '163 PATENTS?

DAVIS DIRECT BY MR. LEE

03:30:35  1      A.   I DID.

03:30:35  2      Q.   COULD I HAVE PDX 9.38, PLEASE.

03:30:43  3           WHAT WAS YOUR CONCLUSION CONCERNING THE REASONABLE ROYALTY

03:30:47  4      FOR THE TWO UTILITY PATENTS?

03:30:48  5      A.   I BELIEVE THAT THE REASONABLE ROYALTY RATE ON A PER UNIT

03:30:53  6      BASIS FOR EACH OF THESE PATENTS WOULD BE $2.02.

03:30:59  7      Q.   NOW, YOU TOLD US EARLIER FOR EACH INFRINGING UNIT, YOU CAN

03:31:03  8      ONLY AWARD DAMAGES ONCE AND OF ONE KIND; CORRECT?

03:31:06  9      A.   THAT'S RIGHT.

03:31:06  10     Q.   FOR WHICH PATENTS AND PRODUCTS DID YOU CALCULATE A

03:31:09  11     REASONABLE ROYALTY AWARD?

03:31:11  12     A.   THE ONLY REASONABLE ROYALTY AWARD IS RELATED TO THE '381

03:31:17  13     PATENT BECAUSE ALL OF THE OTHER UNITS QUALIFY FOR A DEFENDANTS'

03:31:28  14     PROFIT, TOTAL PROFIT AWARD.

03:31:30  15     Q.   SO TO UNPACK THAT A LITTLE, ALL OF THE UNITS THAT INFRINGE

03:31:33  16     THE '163 UNIT ALSO INFRINGE THE DESIGN PATENT?

03:31:37  17     A.   YES.

03:31:37  18     Q.   AND IF THEY WERE ELIGIBLE FOR THE TOTAL PROFIT AWARD, IS

03:31:41  19     THAT WHAT YOU AWARDED?

03:31:42  20     A.   YES.

03:31:43  21     Q.   AND THE UNITS OF THE '381 PATENT THAT YOU COMPUTED A

03:31:50  22     ROYALTY FOR, WERE THEY ELIGIBLE FOR A TOTAL PROFITS AWARD FOR

03:31:54  23     INFRINGING THE DESIGN PATENTS?

03:31:55  24     A.   THEY ARE NOT.  THAT'S WHY THEY ARE IN A SEPARATE CATEGORY.

03:31:58  25     Q.   TURN, IF YOU WOULD, TO SLIDE PDX 9.5, WHICH HAS THE TOTALS

03:32:04    1        OF WHAT WE'VE BEEN TALKING ABOUT.

03:32:07    2              NOW, THERE'S A BIG DIFFERENCE BETWEEN THE DESIGN PATENT'S

03:32:14    3        TOTAL PROFITS AND THE REASONABLE ROYALTY; CORRECT?

03:32:16    4        A.   THERE IS.

03:32:17    5        Q.   WHAT LEADS TO THAT DIFFERENCE?

03:32:19    6        A.   THE DIFFERENCE IS THE NATURE OF THE DAMAGES REMEDY ITSELF,

03:32:25    7        TOTAL PROFITS IS A REMEDY THAT GIVES RISE TO A HIGHER AWARD

03:32:32    8        THAN A REASONABLE ROYALTY.

03:32:33    9        Q.   SO WHAT ACCOUNTS FOR THE DIFFERENCE IS THE DIFFERENT LEGAL

03:32:38   10        STANDARDS FOR DETERMINING A REMEDY FOR THE TWO DIFFERENT TYPES

03:32:42   11        OF PATENTS; CORRECT?

03:32:43   12        A.   THAT'S RIGHT.

03:32:44   13        Q.   AND, AGAIN, IF THE JURY WANTED TO DETERMINE -- WELL, LET

03:32:49   14        ME DO THIS.

03:32:50   15              LET'S TURN BACK TO TAB 3 IN YOUR NOTEBOOK TO PX 25K.

03:32:58   16              DO YOU HAVE THAT BEFORE YOU?

03:32:59   17        A.   I DO.

03:33:01   18                   THE COURT:  IT'S 3:32.  LET'S TAKE OUR BREAK NOW.

03:33:04   19                   MR. LEE:  SURE.

03:33:05   20                   THE COURT:  OKAY.  DO NOT RESEARCH OR DISCUSS THE

03:33:07   21        CASE.

03:33:07   22              THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

03:33:10   23              WE'LL TAKE A TEN MINUTE BREAK, AND WE'LL GO TO 4:30 TODAY.

03:33:14   24              AND YOU MAY STEP DOWN DURING THE BREAK.

03:33:16   25                   THE WITNESS:  THANK YOU.

DAVIS DIRECT BY MR. LEE

03:33:32  1          (JURY OUT AT 3:33 P.M.)

03:33:33  2              THE COURT:  OKAY, THANK YOU.  LET'S TAKE OUR BREAK

03:33:35  3      NOW.

03:33:35  4              MR. LEE:  YOUR HONOR, CAN I RAISE ONE THING BRIEFLY.

03:33:37  5              THE COURT:  LET'S WAIT UNTIL THE DOOR CLOSES.  OKAY.

03:33:40  6      THE DOOR IS CLOSED.  ALL THE JURORS HAVE LEFT.

03:33:42  7              MR. LEE:  THERE WAS AN EXHIBIT THAT CAME IN

03:33:44  8      YESTERDAY, DX 2627.  THIS IS SOMETHING THAT YOUR HONOR

03:33:48  9      ADDRESSED BEFORE LAST TIME, AND THAT'S WHY I WANT TO BRING IT

03:33:51  10     UP NOW BEFORE THE BREAK.

03:33:52  11             THE COURT:  OKAY.

03:33:53  12             MR. LEE:  THE EXHIBIT HAS A TYPO, AND IT DID THE LAST

03:33:55  13     TIME IT WAS INTRODUCED, SAYING THAT THE F700 WAS AVAILABLE IN

03:34:00  14     FEBRUARY OF 2006.

03:34:03  15         LAST TIME YOUR HONOR GAVE A LIMITING INSTRUCTION SAYING

03:34:06  16     THAT THE DATE ON THE DOCUMENT WAS CORRECT -- INCORRECT AND THE

03:34:10  17     CORRECT DATE IS 2007.

03:34:13  18         THAT'S AT DOCUMENT 2789, PAGE 4, ABOUT HALFWAY DOWN THE

03:34:20  19     PAGE.

03:34:20  20         I DON'T THINK THERE'S ANY DISAGREEMENT UPON THIS.  WE

03:34:23  21     AGREED UPON IT THE LAST TIME THAT THE DATE WAS WRONG.

03:34:26  22         I THINK GIVEN THAT IT'S IN THE RECORD, I THINK AT SOME

03:34:28  23     POINT AN INSTRUCTION FROM YOUR HONOR SHOULD SAY THE DATE OF

03:34:31  24     THAT SHOULD BE 2007.

03:34:32  25             THE COURT:  SO DX 2627, IS THAT ONE OF THE PHOTOS OF

03:34:38   1    ALL THE PHONES?

03:34:40   2         (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

03:34:46   3              MR. LEE:  WE'LL BRING IT UP ON THE SCREEN.

03:34:56   4              MR. PRICE:  YOUR HONOR, WE AGREE THE COVER DATE IS

03:34:57   5    WRONG.

03:34:58   6              THE COURT:  OKAY.  I JUST DON'T -- I CAN'T FIND THAT

03:35:03   7    PARTICULAR DOCUMENT.

03:35:08   8         WHO WAS THAT INTRODUCED WITH YESTERDAY?  WAS THAT

03:35:12   9    MR. BALL?  ACTUALLY, IT SHOULD BE ON MY LIST.

03:35:16  10              MR. PRICE:  THE DATE SHOULD BE FEBRUARY 2007.  I

03:35:20  11    THINK WE AGREE WITH THAT.

03:35:21  12              MR. LEE:  I THINK IT WAS USED WITH MR. JOSWIAK, YOUR

03:35:25  13    HONOR --

03:35:25  14              THE COURT:  OKAY.

03:35:26  15              MR. LEE:  -- ON CROSS.

03:35:28  16              THE COURT:  2627 WAS WITH MR. JOSWIAK, UH-HUH.

03:35:33  17         OKAY.  SO WHAT IS YOUR RECOMMENDATION?

03:35:35  18              MR. LEE:  YOUR HONOR, THE LAST TIME YOU JUST

03:35:37  19    INSTRUCTED THE -- YOU GAVE THE JURY A LIMITING INSTRUCTION

03:35:40  20    SAYING THAT FOR THAT EXHIBIT, THE CORRECT DATE WAS

03:35:43  21    FEBRUARY 2007.

03:35:45  22              THE COURT:  OKAY.  BUT HOW DO YOU WANT THAT DONE?  DO

03:35:47  23    YOU WANT THAT DONE ON THE EXHIBIT LIST?  BECAUSE I'M -- I'M

03:35:50  24    ASSUMING THE JOINT EXHIBIT LIST THAT YOU'RE PREPARING WILL HAVE

03:35:53  25    ALL OF THE LIMITING INSTRUCTIONS, NOT OFFERED FOR THE TRUTH OF

03:35:55  1      THE MATTER ASSERTED, AND WHATEVER LIMITATIONS THAT HAVE BEEN

03:35:59  2   IMPOSED WHEN WE HAVE ADMITTED THE DOCUMENTS.

03:36:02  3        SO WOULD THAT BE SUFFICIENT?  OR YOU'RE SUGGESTING

03:36:05  4   SOMETHING ELSE?

03:36:05  5           MR. LEE:  I -- LET ME TALK TO MS. MAROULIS DURING THE

03:36:11  6   BREAK.  I THINK THAT'S PROBABLY SUFFICIENT.

03:36:13  7        I DON'T THINK THAT THE INSTRUCTION --

03:36:14  8           MS. MAROULIS:  I THINK IT'S SUFFICIENT.

03:36:15  9           MR. LEE:  -- IN THE ABSTRACT IS GOING TO MEAN

03:36:18  10  ANYTHING TO ANYBODY.  SO I THINK SO LONG AS IT'S ON THE EXHIBIT

03:36:20  11  LIST AND SAYS THE CORRECT DATE IS FEBRUARY 2007, WE SHOULD BE

03:36:23  12  FINE.

03:36:24  13           THE COURT:  PLEASE INCLUDE ALL OF THE LIMITING

03:36:26  14  INSTRUCTIONS ON THE EXHIBIT LIST.  I THINK YOU'VE DONE THAT IN

03:36:29  15  THE PAST, AND IT SHOULD BE DONE THIS TIME AS WELL.  WHY DON'T

03:36:31  16  YOU MAKE THE CORRECTION ON THE EXHIBIT LIST AND THEN THAT WILL

03:36:34  17  TAKE CARE OF YOUR CONCERN.

03:36:35  18           MR. LEE:  OKAY.

03:36:36  19           THE COURT:  ANYTHING ELSE?

03:36:36  20           MR. PRICE:  YOUR HONOR, THERE IS ONE THING CONCERNING

03:36:38  21  MS. DAVIS'S CROSS.

03:36:39  22           THE COURT:  OKAY.

03:36:40  23           MR. PRICE:  WHICH I'D LIKE TO TALK ABOUT IF SHE'S NOT

03:36:44  24  IN THE ROOM.

03:36:45  25           THE COURT:  IS SHE OUT OF THE ROOM?

DAVIS DIRECT BY MR. LEE

03:36:46  1          CAN YOU PLEASE STEP OUTSIDE?  THANK YOU.

03:36:48  2          JUST WAIT UNTIL SHE STEPS OUTSIDE, PLEASE.

03:36:51  3          (PAUSE IN PROCEEDINGS.)

03:36:52  4              THE COURT:  LET'S WAIT UNTIL THE DOOR CLOSES, PLEASE.

03:36:56  5          ALL RIGHT.  THE DOOR HAS CLOSED, SHE'S OUT OF THE ROOM.

03:36:59  6          GO AHEAD, PLEASE.

03:36:59  7              MR. PRICE:  DURING HER DIRECT, SHE -- TESTIMONY WAS

03:37:02  8      ELICITED THAT THE GALAXY ACE --

03:37:05  9              THE COURT:  UM-HUM.

03:37:07 10              MR. PRICE:  -- HAD NO SALES IN THE UNITED STATES.

03:37:10 11      THE IMPLICATION BEING THAT IT'S IRRELEVANT.

03:37:12 12          I THINK THAT OPENS THE DOOR, SINCE SHE WAS TALKING ABOUT

03:37:14 13      THE REVENUE, IT OPENS THE DOOR TO, WELL, NONETHELESS, IT WAS

03:37:19 14      ACCUSED OF INFRINGING THE DESIGN PATENTS AND IT DOESN'T.

03:37:22 15          THAT'S WHY IT'S RELEVANT.  AND THEY TRIED TO DIMINISH THAT

03:37:26 16      BY SAYING THERE ARE NO SALES AND THAT'S IRRELEVANT.

03:37:28 17              MR. LEE:  THEY ALREADY ASKED THAT QUESTION AND GOT

03:37:30 18      THAT ANSWER.

03:37:30 19              THE COURT:  I THINK THAT'S ALREADY IN THE RECORD.

03:37:31 20              MR. LEE:  IT'S ALREADY IN THE RECORD.

03:37:33 21              MR. PRICE:  SO I CAN ASK IT.

03:37:34 22              THE COURT:  IF YOU WANT TO ASK IT AGAIN OF THIS

03:37:35 23      WITNESS, YOU CAN.

03:37:36 24              MR. PRICE:  I JUST WANT TO MAKE SURE.

03:37:37 25              THE COURT:  OKAY.

DAVIS DIRECT BY MR. LEE

03:37:38  1                MR. LEE:  THANK YOU, YOUR HONOR.

03:37:38  2                MR. QUINN:  YOUR HONOR, IF I MAY, YOU KNOW, WE

03:37:41  3     RESPONDED IN FRONT OF THE JURY SO MANY TIMES NO FURTHER

03:37:44  4     OBJECTIONS.  OF COURSE, WE DON'T WANT TO ELABORATE IN FRONT OF

03:37:47  5     THE JURY.

03:37:48  6                THE COURT:  YES.

03:37:48  7                MR. QUINN:  BUT A FOCUS OF THIS TRIAL -- A FOCUS, AT

03:37:52  8     LEAST, HAS BECOME COPYING.  IT'S BECOME A -- AN AWFUL LOT OF

03:37:56  9     TIME HAS BEEN SPENT ON THAT, AND I WOULD JUST LIKE TO

03:37:59  10    REITERATE, PLACE ON THE RECORD THE FACT THAT WE DO OBJECT TO

03:38:02  11    ALL THIS EVIDENCE REGARDING THE COPYING COMING INTO THE CASE.

03:38:05  12    AND WHEN WE SAY NO FURTHER OBJECTIONS TO ALL THOSE DOCUMENTS IN

03:38:08  13    THAT TESTIMONY, WE'RE REFERRING TO THAT, AMONG OTHER THINGS.

03:38:11  14                THE COURT:  OKAY.  BUT I THINK YOU'VE BEEN SAYING

03:38:13  15    THAT TO EVERY SINGLE EXHIBIT, WHETHER IT'S COPYING OR NOT.

03:38:16  16                MR. QUINN:  I JUST WANT IT TO BE CLEAR, YOUR HONOR.

03:38:17  17                THE COURT:  SO I'M NOT SURE WHAT OBJECTIONS YOU'RE

03:38:19  18    RESERVING.

03:38:20  19                MR. QUINN:  WELL, I MEAN, THERE ARE SOME THERE ARE

03:38:23  20    HEARSAY WITH WHICH YOUR HONOR HAS OVERRULED.

03:38:26  21                THE COURT:  OKAY.  IF IT'S AN OBJECTION THAT'S

03:38:28  22    ALREADY BEEN OVERRULED, THAT'S FINE.  BUT IF YOU'RE RESERVING

03:38:31  23    ANYTHING ELSE, THEN YOU SHOULD PUT IT ON THE RECORD.

03:38:34  24                MR. QUINN:  WE'RE NOT RESERVING, YOUR HONOR.  I THINK

03:38:36  25    WE'VE MADE MOTIONS IN LIMINE, AND WE UNDERSTAND THE COURT'S

03:38:39   1        RULING ABOUT THE RELEVANCE OF COPYING.

03:38:42   2            I JUST WANTED TO BE CLEAR, SOME DAY SOMEBODY ELSE MAY READ

03:38:46   3     THIS RECORD, I WANT IT ABSOLUTELY CLEAR THAT WE OBJECT TO THAT

03:38:49   4     EVIDENCE AND WHEN THE COPYING EVIDENCE COMES IN AND WE'RE

03:38:51   5     SAYING NO FURTHER OBJECTIONS, THAT'S WHAT WE'RE REFERRING TO.

03:38:54   6            THE COURT:  OKAY.  BUT, YOU KNOW, I WOULD PREFER THAT

03:38:56   7      YOU STATE WHAT YOUR OBJECTIONS ARE BECAUSE I DON'T KNOW WHAT

03:39:00   8      YOU'RE REFERRING TO WHEN YOU SAY "NO FURTHER OBJECTIONS."

03:39:02   9            BECAUSE YOU SAY THAT TO VIRTUALLY EVERY SINGLE EXHIBIT,

03:39:05  10     AND SO I THINK IT WOULD BE HELPFUL FOR THE RECORD.  IF IT'S

03:39:07  11     SOMETHING THAT'S ALREADY BEEN RULED ON IN THIS CASE IN A HIGH

03:39:12  12     PRIORITY OBJECTION, THEN I THINK THERE'S A RECORD.

03:39:14  13            BUT OTHERWISE THERE'S REALLY NO RECORD OF WHAT YOU'RE

03:39:16  14     OBJECTING TO.

03:39:17  15            MR. QUINN:  WELL, FOR EXAMPLE, THERE WERE A LOT OF

03:39:19  16     RULINGS ON MOTIONS IN LIMINE AND THE COURT HAS MADE RULINGS,

03:39:23  17     AND THE COURT --

03:39:24  18            THE COURT:  SO ARE THOSE THE ONLY ONES YOU ARE

03:39:26  19     PRESERVING THEN, THE ONES THAT HAVE ALREADY BEEN RULED ON ON

03:39:30  20     EITHER A MOTION IN LIMINE OR A HIGH PRIORITY OBJECTION.

03:39:32  21            MR. QUINN:  YES, OR OTHERWISE THE COURT HAS ALREADY

03:39:36  22     OVERRULED AN OBJECTION.  OR DAUBERT, FOR THAT MATTER.

03:39:40  23            THE COURT:  OKAY.  SO YOU'RE PRESERVING -- I JUST

03:39:43  24     WANT TO PLACE ON THE RECORD, BECAUSE WHEN YOU SAY "NO FURTHER

03:39:45  25     OBJECTION," I DON'T WANT TWO YEARS FROM NOW SOMEONE TO SAY, WE

03:39:49  1    WERE REALLY PRESERVING THIS THAT WAS BRIEFED IN OCTOBER OR

03:39:51  2    NOVEMBER OR DECEMBER.

03:39:52  3         WHAT YOU ARE PRESERVING ARE DAUBERTS, MOTIONS IN LIMINE,

03:39:56  4    HIGH PRIORITY OBJECTIONS; CORRECT?

03:40:00  5              MR. QUINN:  THAT'S IT, YOUR HONOR, THOSE THREE.

03:40:02  6              THE COURT:  DAUBERTS, HIGH PRIORITY OBJECTIONS, AND

03:40:04  7    MOTIONS IN LIMINE?

03:40:06  8              MR. QUINN:  YES, YOUR HONOR.

03:40:06  9              THE COURT:  ALL RIGHT.  THANK YOU.

03:40:07  10             MR. QUINN:  THANK YOU.

03:40:08  11             THE COURT:  ALL RIGHT.  THANK YOU.  I THINK THAT'S

03:40:09  12   CLEAR.

03:40:10  13             MS. SULLIVAN:  YOUR HONOR, JUST ONE MORE THING.

03:40:12  14             THE COURT:  YES.

03:40:12  15             MS. SULLIVAN:  KATHLEEN SULLIVAN FOR SAMSUNG.

03:40:15  16             THE COURT:  YES.

03:40:17  17             MS. SULLIVAN:  AT THE CLOSE OF APPLE'S CASE-IN-CHIEF,

03:40:19  18   WHICH MAY BE TODAY, SAMSUNG REQUESTS A VERY BRIEF TIME TO MAKE

03:40:23  19   A MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A).  NOT

03:40:26  20   TO BURDEN THE COURT, WE PREFER TO DO IT ORALLY.  I DON'T THINK

03:40:29  21   I NEED MORE THAN SEVEN MINUTES.  I JUST WANTED TO ADVISE THE

03:40:32  22   COURT THAT WE WERE GOING TO ASK.

03:40:34  23             THE COURT:  OKAY.  LET ME ASK ONE QUESTION.  DO YOU

03:40:35  24   THINK YOU WILL FINISH TODAY?

03:40:37  25             MR. LEE:  IT WILL BE CLOSE.  IT DEPENDS ON THE LENGTH

DAVIS DIRECT BY MR. LEE

03:40:39  1    OF THE CROSS.  BUT WE WOULD ALSO MOVE JMOL EVEN AS PLAINTIFF.

03:40:44  2    WE COULD DO WHATEVER YOUR HONOR WANTS.  I DON'T THINK WE SHOULD

03:40:46  3    USE THE JURY'S TIME.

03:40:47  4           THE COURT:  NO, NO, I DON'T WANT TO -- SO I'M JUST

03:40:50  5    TRYING TO THINK OF WHEN WE -- WE SHOULD DO THAT WHEN THEY'VE

03:40:55  6    GONE HOME.  IF YOU FINISH TODAY, THEN THIS AFTERNOON MIGHT BE A

03:40:58  7    GOOD TIME.  BUT --

03:41:00  8           MR. PRICE:  WE WILL NOT FINISH TODAY.

03:41:02  9           THE COURT:  I THINK MR. LEE PROBABLY HAS MORE TO GO

03:41:04  10   TOO, RIGHT?

03:41:05  11          MR. LEE:  JUST A LITTLE BIT.

03:41:06  12          THE COURT:  SO WE'RE PROBABLY NOT GOING TO BE

03:41:08  13   FINISHED TODAY.  WOULD YOU BE ABLE TO RESERVE IT, CONTINUE, BUT

03:41:12  14   RESERVE THE ARGUMENT UNTIL PERHAPS 4:30 TOMORROW?

03:41:16  15          MR. LEE:  SURE.

03:41:17  16          THE COURT:  HAVE IT FOR PURPOSES OF APPEAL, IT'S

03:41:19  17   BEING ASSERTED TIMELY AFTER APPLE'S CASE-IN-CHIEF.

03:41:22  18      BUT IN ORDER NOT TO DO THIS WHILE THE JURY IS WAITING,

03:41:25  19   COULD WE ARGUE IT AT 4:30 TOMORROW?

03:41:27  20          MS. SULLIVAN:  THAT'S FINE WITH SAMSUNG, YOUR HONOR.

03:41:30  21          THE COURT:  ALL RIGHT.

03:41:30  22          MR. LEE:  THAT'S FINE WITH US.

03:41:31  23          THE COURT:  SO WHEN THE TIME COMES, IF I DON'T

03:41:33  24   REMEMBER, REMIND ME.  BUT I'LL SAY -- OKAY -- WELL, WE COULD

03:41:37  25   JUST RIGHT NOW, BY STIPULATION, SAY THAT WHEN APPLE COMPLETES

DAVIS DIRECT BY MR. LEE

03:41:42  1       ITS CASE-IN-CHIEF, THAT SAMSUNG HAS TIMELY ASSERTED A JMOL

03:41:48  2       MOTION, BUT THAT WE WILL ARGUE IT TOMORROW.

03:41:49  3               MR. LEE:  AND THAT WE HAVE AS WELL, YOUR HONOR.

03:41:51  4               THE COURT:  THAT'S FINE.  IS THERE AN AGREEMENT THAT

03:41:53  5       BOTH SIDES HAVE --

03:41:55  6               MS. SULLIVAN:  SAMSUNG STIPULATES.

03:41:56  7               MR. LEE:  YES.

03:41:57  8               THE COURT:  OKAY.  PERFECT.

03:41:58  9               MR. LEE:  NOT A PROBLEM.

03:41:58 10               THE COURT:  THEN LET'S DO THAT AT THE END OF THE DAY

03:42:01 11       TOMORROW THEN.

03:42:01 12               MR. LEE:  OKAY.  THANK YOU, YOUR HONOR.

03:42:03 13               MS. SULLIVAN:  THANK YOU, YOUR HONOR.

03:42:04 14               THE COURT:  ALL RIGHT.  THANK YOU.

03:42:05 15               THE CLERK:  COURT'S IN RECESS.

03:42:07 16          (RECESS FROM 3:42 P.M. UNTIL 3:48 P.M.)

03:48:46 17               THE COURT:  DO YOU WANT MS. DAVIS TO LEAVE THE ROOM?

03:48:49 18               MR. PRICE:  I DON'T THINK SHE NEEDS TO LEAVE FOR

03:48:52 19       THIS, YOUR HONOR.

03:48:53 20               THE COURT:  OKAY.

03:48:53 21               MR. PRICE:  IT'S A QUESTION OF HAVING TESTIMONY

03:48:55 22       STRUCK.

03:48:56 23               THE COURT:  OKAY.  ALL RIGHT.

03:48:57 24          DO WE HAVE ENOUGH PEOPLE THAT WE CAN PROCEED NOW?  I'D

03:49:00 25       LIKE TO GET MORE TESTIMONY TIME IN TODAY.

03:49:03   1              WHAT'S THE ISSUE?

03:49:04   2                   MR. PRICE:  THE ISSUE, YOUR HONOR, IS THAT IN

03:49:06   3      MS. DAVIS'S DIRECT, SHE WAS ASKED WHAT PERCENTAGE OF THAT -- OF

03:49:12   4      THE INCREASE IN SAMSUNG'S SALES --

03:49:14   5                   THE COURT:  YES.

03:49:15   6                   MR. PRICE:  -- WAS ATTRIBUTED TO INFRINGING

03:49:17   7      SMARTPHONES.

03:49:18   8          MY UNDERSTANDING IS THE ONLY PLACE SHE GIVES THAT OPINION

03:49:21   9      IN HER REPORT IS THE SECTION THAT WAS STRUCK ON, ON THE

03:49:28   10     ANALYSIS REGARDING ARTICLE OF MANUFACTURE.

03:49:32   11         AND SO MY REQUEST IS THAT THAT TESTIMONY BE STRUCK.

03:49:37   12                  THE COURT:  I WAS PAYING ATTENTION TO THAT BECAUSE I

03:49:39   13     REMEMBER HAVING STRUCK THAT, BUT I -- LET ME WAIT UNTIL THE

03:49:46   14     DOOR IS CLOSED.

03:49:49   15         I WAS PAYING ATTENTION TO EVERYTHING THAT I STRUCK FROM

03:49:51   16     HER REPORT, BUT I ACTUALLY DID NOT -- I WAS LISTENING CLOSELY,

03:49:54   17     AND I DID NOT THINK THAT WAS A PROBLEM.

03:49:57   18                  MR. PRICE:  YOUR HONOR, IT'S IN SECTION 1 AND IT'S ON

03:49:59   19     PAGE 56, PARAGRAPH 140H, AS IN HARRY.

03:50:11   20                  THE COURT:  I STILL -- I JUST DID NOT THINK THAT WAS

03:50:13   21     A PROBLEM.  I WAS PAYING ATTENTION TO THAT BECAUSE I KNOW THAT

03:50:16   22     SHE PREVIOUSLY TESTIFIED THAT SHE CAN'T COMMENT AS TO WHAT

03:50:20   23     CAUSES THE INCREASE, OR SHE DOESN'T KNOW FOR SURE.

03:50:22   24                  MR. LEE:  YES.

03:50:23   25                  MR. PRICE:  AND NOW SHE SAID IT'S INFORMATIVE, MAKES

03:50:26   1    HER BELIEVE, AND SHE'S ADDED THIS.  SO EITHER IT SHOULD BE

03:50:28   2    STRUCK OR MR. WAGNER SHOULD BE ABLE TO RESPOND.

03:50:31   3              MR. LEE:  WELL, SHE ACTUALLY -- TO CORRECT THE

03:50:34   4    RECORD, SHE TESTIFIED TO THIS FACT IN THE 2013 TRIAL BEFORE THE

03:50:38   5    JURY, PRECISELY THE SAME QUESTION AND ANSWER.  WE ASKED HER THE

03:50:45   6    SAME QUESTION, SHE GAVE THE SAME ANSWER.

03:50:49   7              THE COURT:  DO YOU HAVE THE TRANSCRIPT?

03:50:50   8              MR. LEE:  YES.  DOCKET 2840 AT PAGE 719, LINES 9 TO

03:50:57   9    20.

03:50:57  10              THE COURT:  WHY DON'T YOU READ IT, READ AT LEAST THE

03:51:00  11    QUESTION, PLEASE.

03:51:03  12              MR. LEE:  WE NEED TO GET IT, YOUR HONOR.

03:51:05  13              MR. OLSON:  WE DON'T HAVE IT.

03:51:06  14              THE COURT:  YOU DON'T HAVE IT?

03:51:08  15              MR. LEE:  YES.

03:51:09  16              THE COURT:  OKAY.  I DID NOT THINK THAT WAS

03:51:10  17    PROBLEMATIC.  I WAS LISTENING CLOSELY.  I THINK YOU CAN

03:51:14  18    CERTAINLY CROSS-EXAMINE HER WHERE SHE SAID SOMETHING THAT WOULD

03:51:17  19    CERTAINLY CALL THAT INTO QUESTION.

03:51:19  20         BUT I WAS LISTENING AND I -- AND I WAS ALSO PAYING

03:51:25  21    ATTENTION WHEN WE STRUCK SOME OF THE OTHER EXHIBITS ABOUT THE

03:51:28  22    CRISIS OF DESIGN, WHICH I THOUGHT THE WAY MR. LEE HANDLED IT

03:51:32  23    WAS OKAY.  I WAS CERTAINLY WATCHING FOR THAT.

03:51:35  24         SO THAT REQUEST IS DENIED.  I'D LIKE TO BRING THE JURORS

03:51:38  25    IN, PLEASE.

03:51:39  1            MR. PRICE:  MY ONLY QUESTION, YOUR HONOR, WHEN

03:51:42  2       MR. WAGNER TAKES THE STAND, I'D LIKE HIM TO BE ABLE TO RESPOND.

03:51:45  3            MR. LEE:  IT'S NOT IN HIS REPORT.  SHE TESTIFIED TO

03:51:48  4       IT IN THE 2013 TRIAL.  HE DIDN'T RESPOND TO IT IN HIS REPORT,

03:51:51  5       WHICH WAS LIKE 2,000 PAGES HERE.  I DON'T THINK HE GETS TO

03:51:54  6       RESPOND NOW.

03:51:55  7            THE COURT:  WHAT'S THE -- WHAT'S -- OH, THIS IS

03:52:01  8       HER --

03:52:04  9            (PAUSE IN PROCEEDINGS.)

03:52:07  10           THE COURT:  OKAY.  SO HERE IS THE QUESTION AND

03:52:08  11      ANSWER.  THIS IS DATED DECEMBER 3RD, 2013, ECF NUMBER 2840.

03:52:17  12           "QUESTION:  SO IN YOUR -- IN YOUR DIRECT, I THOUGHT THAT I

03:52:20  13      HEARD YOU SAY -- AND IF WE CAN GO BACK TO SLIDE 8 -- I THOUGHT

03:52:23  14      I HEARD YOU SAY THAT INTRODUCING THESE PHONES IS THE REASON

03:52:26  15      SAMSUNG'S MARKET SHARE INCREASED.

03:52:28  16           "ANSWER:  WELL, I KNOW THAT IN THAT FIRST QUARTER WHERE

03:52:31  17      YOU SEE THE JUMP IN THE RED LINE, 90 PERCENT OF THAT ARE

03:52:34  18      INFRINGING PHONES.  SO --

03:52:37  19           "QUESTION:  I'M SORRY.  90 PERCENT?

03:52:38  20           "ANSWER:  90 PERCENT OF THAT INCREASE IN 2010, IN THAT

03:52:41  21      RED, RED LINE THAT GOES UP --

03:52:43  22           "QUESTION:  UM-HUM?

03:52:45  23           "ANSWER:  -- ARE INFRINGING PHONES."

03:52:48  24           ANYWAY, IT'S OVERRULED.

03:52:50  25           LET'S GO AHEAD AND BRING IN OUR JURY.

DAVIS DIRECT BY MR. LEE

03:52:52   1          THE COURT:  YES, YOUR HONOR.

03:53:26   2          (JURY IN AT 3:53 P.M.)

03:53:33   3          THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

03:53:38   4          TIME IS 3:53.  GO AHEAD, PLEASE.

03:53:41   5    BY MR. LEE:

03:53:41   6    Q.   TURN, IF YOU WOULD, TO TAB 3 IN YOUR NOTEBOOK, WHICH IS

03:53:44   7    PX 25K.

03:53:45   8    A.   I'M THERE.

03:53:46   9    Q.   AND WOULD YOU TURN TO PAGE 4 OF PX 25K.

03:53:52  10    A.   I HAVE THAT.

03:53:54  11    Q.   WE'VE REFERRED TO THIS PAGE BEFORE, BUT I'M PUTTING IT UP

03:53:57  12    ON THE SCREEN.

03:53:58  13          AND WHAT CAN THE JURY FIND ON PAGE 4 OF PX 25K.

03:54:06  14    A.   WHAT YOU SEE ON THIS PAGE IS A SUMMARY OF SAMSUNG'S

03:54:10  15    PROFITS AND REASONABLE ROYALTY FOR EACH OF THE INFRINGING

03:54:12  16    PRODUCTS IN THIS CASE.

03:54:13  17    Q.   AND IS EACH UNIT PLACED IN ONE OF THE TWO CATEGORIES?

03:54:18  18    A.   IT IS.

03:54:18  19    Q.   AND NO UNIT IS PLACED IN MORE THAN ONE CATEGORY?

03:54:23  20    A.   THAT'S RIGHT.

03:54:25  21          MR. LEE:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

03:54:26  22          THE COURT:  ALL RIGHT.  TIME IS 3:54.  AND I'M SORRY

03:54:46  23    IT'S SO WARM IN HERE.  WE'RE NOT ABLE TO GET THE TEMPERATURE

03:54:48  24    COOLED DOWN.

03:54:49  25          THE WITNESS:  NO PROBLEM.

DAVIS CROSS BY MR. PRICE

03:54:56   1          (PAUSE IN PROCEEDINGS.)

03:55:08   2                 THE COURT:  OKAY.  ARE WE READY TO PROCEED?

03:55:10   3                 MR. PRICE:  YES, YOUR HONOR, READY TO PROCEED.

03:55:11   4                 THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  3:55.  GO

03:55:15   5     AHEAD.

03:55:16   6                          **CROSS-EXAMINATION**

03:55:17   7     BY MR. PRICE:

03:55:17   8     Q.   GOOD AFTERNOON, MS. DAVIS?

03:55:18   9     A.   GOOD AFTERNOON.

03:55:19  10     Q.   I WANT TO START BY ASKING YOU QUESTIONS ABOUT -- QUESTIONS

03:55:22  11     YOU WERE ASKED ABOUT BY MY COLLEAGUE, MR. QUINN, AND YOU WERE

03:55:27  12     ASKED WHETHER YOU WERE HERE WHEN MR. QUINN TALKED ABOUT THE

03:55:30  13     OMNIA IN OPENING AND THAT PARTICULAR EXHIBIT; CORRECT?

03:55:33  14     A.   YES.

03:55:34  15     Q.   AND I THINK YOU WERE SHOWN EXHIBIT 9.9, AND IF WE CAN SHOW

03:55:38  16     THAT.

03:55:38  17          DO YOU RECALL IN THE OPENING MR. LEE SAYING THAT THE

03:55:42  18     DOCUMENT SAID THAT THE DIFFERENCE BETWEEN THE IPHONE AND WHAT

03:55:45  19     SAMSUNG HAD WAS THE DIFFERENCE BETWEEN 11 AND EARTH?

03:55:48  20     A.   I DON'T REMEMBER HIS EXACT WORDS.  I KNOW THE DOCUMENT

03:55:52  21     SAYS THE DIFFERENCE BETWEEN, AS YOU SEE PERHAPS EVEN ON HERE,

03:55:57  22     THE DIFFERENCE BETWEEN THE IPHONE AND THE OMNIA IS THE

03:56:00  23     DIFFERENCE BETWEEN HEAVEN AND EARTH.

03:56:01  24     Q.   IT'S A PRETTY MEMORABLE PHRASE, HEAVEN AND EARTH?

03:56:04  25     A.   OF COURSE.

03:56:05   1    Q.   AND THAT'S WHAT THIS SAYS, WHERE IT SAYS, IF YOU COMPARE

03:56:09   2    THE UX WITH THE IPHONE, IT'S A DIFFERENCE BETWEEN HEAVEN AND

03:56:13   3    EARTH.

03:56:13   4         THAT IS, IN FACT, COMPARING THE OMNIA TO AN IPHONE;

03:56:17   5    CORRECT?

03:56:18   6    A.   THAT SENTENCE IS, YES.

03:56:21   7    Q.   AND OMNIA WAS USING A MICROSOFT SOFTWARE?

03:56:25   8    A.   IT WAS, WHICH WAS A WINDOWS PLATFORM.

03:56:28   9    Q.   WHICH IS NOW DISCONTINUED?

03:56:29   10   A.   THAT'S WHAT I UNDERSTAND.

03:56:30   11   Q.   AND THE BEST SELLING OPERATING SYSTEM IN THE WORLD TODAY

03:56:33   12   IS THE ANDROID SYSTEM?

03:56:34   13   A.   TODAY IN 2018, I THINK THAT'S CORRECT.

03:56:36   14   Q.   AND THESE SAMSUNG PHONES WE'RE TALKING ABOUT IN THIS CASE,

03:56:39   15   THEY WERE USING THE ANDROID OPERATING SYSTEM; CORRECT?

03:56:42   16   A.   THEY WERE.

03:56:43   17   Q.   NOW, LET ME ASK YOU ABOUT -- A LOT OF YOUR TESTIMONY, YOU

03:56:48   18   USED THE WORD DIRECTLY ATTRIBUTABLE QUITE A BIT; CORRECT?

03:56:52   19   A.   I DID.

03:56:52   20   Q.   AND I WANT TO TALK TO YOU ABOUT THAT.  AND YOU SAID -- AND

03:56:56   21   THERE WAS -- THERE WAS A STATUTE SHOWN TO THE JURY THAT YOU

03:56:59   22   TALKED ABOUT.

03:57:00   23        DO YOU REMEMBER THAT?

03:57:01   24   A.   I DID.  THAT'S DIFFERENT THAN THE DIRECTLY ATTRIBUTABLE

03:57:03   25   LANGUAGE, THOUGH?

DAVIS CROSS BY MR. PRICE

03:57:04 1    Q.   OKAY.  SO I WANT TO MAKE SURE.  YOU TOLD US THAT YOU WERE

03:57:07 2    NOT A LEGAL EXPERT; CORRECT?

03:57:09 3    A.   I DIDN'T SAY THAT, BUT I WOULD AGREE WITH YOU, I'M

03:57:11 4    CERTAINLY NOT A LEGAL EXPERT.

03:57:13 5    Q.   I'M THINKING ABOUT THE MANY TIMES I'VE SPOKEN WITH YOU.

03:57:16 6    BUT YOU HAVE TOLD US IN YOUR DEPOSITIONS THAT YOU'RE NOT A

03:57:19 7    LEGAL EXPERT; CORRECT?

03:57:19 8    A.   THAT IS CORRECT.

03:57:20 9    Q.   AND THAT YOU'RE NOT GOING TO GIVE LEGAL OPINIONS; CORRECT?

03:57:23 10   A.   I CERTAINLY AM NOT.

03:57:24 11   Q.   AND YOU SAID THAT YOU BELIEVED THE COURT WOULD TALK TO THE

03:57:28 12   JURY ABOUT A CONCEPT CALLED DIRECTLY ATTRIBUTABLE; CORRECT?

03:57:32 13   A.   MY UNDERSTANDING IS THAT THOSE WOULD BE THE WORDS USED IN

03:57:37 14   THE COURT'S INSTRUCTION.

03:57:38 15   Q.   AND ACTUALLY YOUR UNDERSTANDING IS THAT THE WORDS THAT

03:57:41 16   WILL BE USED IS THAT EXPENSES CAN INCLUDE COSTS INCURRED IN

03:57:44 17   PRODUCING THE GROSS REVENUE, SUCH AS COSTS OF GOODS?  YOU

03:57:49 18   UNDERSTAND THAT IS PART OF THE STANDARD; CORRECT?

03:57:50 19   A.   THAT'S THE FIRST PART OF THE INSTRUCTION AS I RECALL IT.

03:57:53 20   Q.   ALL RIGHT.  AND THAT'S ALL THAT YOU SUBTRACT FROM TOTAL

03:57:56 21   REVENUES IS COSTS OF GOODS SOLD; RIGHT?

03:57:59 22   A.   THAT'S RIGHT.

03:57:59 23   Q.   AND THEN IT GOES ON TO SAY, OTHER COSTS MAY BE INCLUDED AS

03:58:02 24   DEDUCTIBLE EXPENSES IF THEY ARE DIRECTLY ATTRIBUTABLE TO THE

03:58:07 25   SALE OR MANUFACTURE RESULTING IN A NEXUS BETWEEN THE INFRINGING

```
03:58:13   1    ARTICLE OF MANUFACTURE AND THE EXPENSE; CORRECT?

03:58:16   2    A.   RIGHT.

03:58:17   3    Q.   AND THAT PHRASE, "NEXUS," IS NOT ANYWHERE IN YOUR REPORT;

03:58:22   4    IT?

03:58:22   5    A.   NO, IT IS NOT.

03:58:23   6    Q.   SO LET'S TALK ABOUT THE -- YOUR UNDERSTANDING OF THIS.

03:58:27   7         YOU ARE A, A WELL REGARDED, DECORATED ACCOUNTANT; CORRECT?

03:58:34   8    A.   I'LL TAKE YOUR WORD FOR THAT.  THANK YOU.

03:58:36   9    Q.   AND YOU HAVE BEEN -- YOU'RE A CERTIFIED PUBLIC ACCOUNTANT;

03:58:41   10   CORRECT?

03:58:41   11   A.   I AM.

03:58:42   12   Q.   AND THERE'S A LARGE BODY OF ACCOUNTING PRINCIPLES THAT ARE

03:58:48   13   IN WRITING; CORRECT?

03:58:49   14   A.   YES.

03:58:49   15   Q.   AND THOSE ARE CALLED GENERALLY ACCEPTED ACCOUNTING

03:58:52   16   PRINCIPLES?

03:58:53   17   A.   CORRECT.

03:58:54   18   Q.   AND YOU -- I THINK YOU MENTIONED THAT YOU USED TO AUDIT

03:58:58   19   COMPANIES TO MAKE SURE THEY PERFORMED?

03:59:01   20   A.   MAKE SURE THAT THEY WERE PRESENTING THEIR FINANCIAL

03:59:05   21   STATEMENTS IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTS

03:59:07   22   PRINCIPLES.

03:59:08   23   Q.   THANK YOU.  I APPRECIATE THAT.

03:59:09   24        NOW, IN ALL OF THOSE ACCOUNTING PRINCIPLES THAT WE LOOK

03:59:13   25   AT, THESE GENERALLY ACCEPTED ACCOUNTS PRINCIPLES, IT'S TRUE
```

DAVIS CROSS BY MR. PRICE

```
03:59:17   1    THAT YOU DON'T FIND THE PHRASE DIRECTLY ATTRIBUTABLE; RIGHT?

03:59:20   2    A.   I THINK THAT'S EXACTLY RIGHT.

03:59:22   3    Q.   NOW, THOSE PRINCIPLES DO TALK ABOUT THE DIFFERENCE BETWEEN

03:59:25   4    DIRECT AND INDIRECT EXPENSES?

03:59:26   5    A.   THEY DO.

03:59:27   6    Q.   BUT THAT'S NOT THE SAME THING AS DIRECTLY ATTRIBUTABLE;

03:59:30   7    CORRECT?

03:59:30   8    A.   NOT EXACTLY.

03:59:31   9    Q.   SO IT'S NOT AN ACCOUNTING TERM, AND IN CONNECTION WITH

03:59:35  10    WHAT THE COURT IS GOING TO TELL THE JURY, YOU DON'T HAVE A

03:59:39  11    LEGAL OPINION AS TO WHAT THAT TERM MEANS UNDER THE LAW;

03:59:42  12    CORRECT?

03:59:42  13    A.   I DO NOT.

03:59:49  14    Q.   SO LET'S TALK ABOUT THE WORD "NEXUS," WHETHER OR NOT

03:59:53  15    EXPENSES HAVE A NEXUS TO REVENUE.

03:59:55  16         IS THERE SOME TERM OF ART IN THE ACCOUNTING WORLD WHERE

03:59:58  17    YOU USE THE PHRASE "NEXUS"?

04:00:00  18    A.   I DON'T RECALL EVER HEARING THE WORD "NEXUS" IN CONNECTION

04:00:03  19    WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

04:00:06  20    Q.   SO WHEN YOU LOOK -- WHEN YOU CONSIDER THAT WORD, YOU THINK

04:00:10  21    THAT "NEXUS" MEANS A RELATIONSHIP; CORRECT?

04:00:13  22    A.   YES.   THAT'S THE WAY I WOULD THINK OF IT AS A NON-LAWYER.

04:00:17  23    Q.   SO THAT THERE HAS TO BE SOME RELATIONSHIP BETWEEN THE

04:00:21  24    EXPENSE AND THE REVENUE; RIGHT?

04:00:23  25    A.   RIGHT.
```

DAVIS CROSS BY MR. PRICE                                                    770

04:00:23   1    Q.   NOW, ARE YOU AWARE OF COMPANIES SELLING PRODUCTS WITHOUT

04:00:30   2    MARKETING?

04:00:30   3    A.   I THINK THERE ARE PROBABLY COMPANIES OUT THERE THAT DO

04:00:35   4    THAT.  BUT THAT WOULD BE RARE.

04:00:37   5    Q.   YOU TOLD US PREVIOUSLY, CERTAINLY AS OF 2013, THAT YOU

04:00:41   6    WEREN'T AWARE OF COMPANIES THAT SOLD PRODUCTS WITHOUT HAVING

04:00:43   7    MARKETING EXPENSES?

04:00:44   8    A.   I'VE NOT HAD ANY CLIENTS THAT DO THAT.

04:00:47   9    Q.   OKAY.  AND YOU TOLD US THAT YOU DO THINK SAMSUNG PROBABLY

04:00:51   10   HAD TO INCUR RESEARCH AND DEVELOPMENT COSTS FOR THE SMARTPHONE;

04:00:54   11   CORRECT?

04:00:55   12   A.   YES, OF COURSE.

04:00:55   13   Q.   AND I THINK YOU TOLD US THAT YOU DON'T KNOW IF IT'S

04:00:58   14   POSSIBLE TO SELL A SMARTPHONE WITHOUT SALES PEOPLE; CORRECT?

04:01:02   15   A.   RIGHT.

04:01:03   16   Q.   AND IN YOUR CALCULATIONS, YOU DON'T DEDUCT A PENNY OF

04:01:11   17   MARKETING EXPENSE; CORRECT?

04:01:12   18   A.   THAT'S CORRECT.

04:01:13   19   Q.   IN YOUR CALCULATIONS, YOU DON'T DEDUCT A PENNY OF RESEARCH

04:01:19   20   AND DEVELOPMENT EXPENSE; CORRECT?

04:01:21   21   A.   THAT'S CORRECT, TOO.

04:01:22   22   Q.   AND IN YOUR CALCULATIONS, YOU DO NOT DEDUCT A PENNY OF

04:01:25   23   SALES EXPENSE FOR SALES PEOPLE; CORRECT?

04:01:27   24   A.   I DON'T.

04:01:29   25   Q.   NOW, OF THE OPERATING EXPENSES THAT YOU DO NOT DEDUCT AND

04:01:33  1    THAT MR. WAGNER DOES, ISN'T IT CORRECT THAT ABOUT 44 PERCENT OF

04:01:37  2    THOSE EXPENSES ARE SALES AND MARKING?

04:01:41  3    A.   I DON'T HAVE THAT NUMBER IN FRONT OF ME, BUT THAT SOUNDS

04:01:44  4    PLAUSIBLE.

04:01:44  5    Q.   AND ABOUT 32 PERCENT ARE RESEARCH AND DEVELOPMENT?

04:01:49  6    A.   THAT WOULD NOT SURPRISE ME.

04:01:50  7    Q.   NOW, COMPANIES HAVE TO FILE FINANCIAL INFORMATION

04:01:57  8    PUBLICLY; CORRECT?

04:01:57  9    A.   PUBLICLY HELD COMPANIES DO, YES.

04:01:59 10    Q.   THANK YOU.

04:02:00 11         AND THOSE PUBLICLY HELD COMPANIES, IT'S YOUR UNDERSTANDING

04:02:04 12    THAT THE PUBLIC AND INVESTORS RELY ON WHAT'S IN THOSE REPORTS;

04:02:08 13    CORRECT?

04:02:08 14    A.   YES.

04:02:09 15    Q.   AND ONE OF THE REPORTS THAT'S FILED FOR PUBLIC REPORTING

04:02:14 16    COMPANIES, SUCH AS APPLE, IS A 10-K; CORRECT?

04:02:17 17    A.   YES, THAT'S RIGHT.

04:02:18 18    Q.   AND IF WE LOOK AT APPLE'S 10-K -- IF WE COULD SHOW YOU

04:02:22 19    EXHIBIT 754.  I THINK YOU HAVE THAT IN THAT BINDER THERE.  IT'S

04:02:32 20    DX 754.

04:02:43 21    A.   ALL RIGHT.  I HAVE IT.

04:02:44 22    Q.   DO YOU SEE THAT'S AN APPLE FORM 10-K FILED OCTOBER 26,

04:02:49 23    2000; CORRECT?

04:02:50 24         THE COURT:  WOULD YOU LIKE TO MOVE IT INTO EVIDENCE?

04:02:52 25         MR. PRICE:  YES.

DAVIS CROSS BY MR. PRICE                                          772

04:02:53  1           THE COURT:  ALL RIGHT.  ANY OBJECTION?

04:02:54  2           MR. LEE:  NO, BUT IF WE COULD WAIT TO PUT THEM ON THE

04:02:57  3   SCREEN UNTIL AFTER THEY'VE BEEN OFFERED SO WE HAVE A CHANCE TO

04:02:59  4   LOOK AT THEM.

04:03:00  5           MR. PRICE:  I AGREE.

04:03:01  6           THE COURT:  THAT'S FINE.  BUT YOU HAVE NO OBJECTION

04:03:02  7   TO THIS ONE; CORRECT?

04:03:03  8           MR. LEE:  NO OBJECTION.

04:03:04  9           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

04:03:06  10      (DEFENDANTS' EXHIBIT 754 WAS ADMITTED IN EVIDENCE.)

04:03:07  11          THE COURT:  GO AHEAD.  YOU MAY PUBLISH IT TO THE

04:03:09  12   JURY.

04:03:10  13          THE WITNESS:  MR. PRICE, BEFORE WE GO THERE, I

04:03:12  14   THOUGHT I HEARD YOU SAY THIS WAS A 2011 DOCUMENT.

04:03:15  15   BY MR. PRICE:

04:03:15  16   Q.   THIS WAS FILED OCTOBER 20, 2011, FOR THE PERIOD ENDING

04:03:20  17   9-24-2011 IS WHAT IT APPEARS TO SAY?

04:03:23  18   A.   THE ONE I HAVE IN FRONT OF ME, AND THAT'S ON THE SCREEN,

04:03:26  19   IS A 2007 10-K.

04:03:28  20   Q.   OH.  LOOK AT 754. -- I'M SORRY.  754.501.  IT'S A PRETTY

04:03:37  21   BIG DOCUMENT.

04:03:45  22   A.   ALL RIGHT.  NOW I HAVE THE RIGHT DATE.

04:03:49  23   Q.   SO HERE WE'RE LOOKING AT THE 2011 10-K, AND IF YOU LOOK AT

04:03:53  24   PAGE 545, YOU SEE THERE'S SOMETHING CALLED A CONSOLIDATED

04:03:57  25   STATEMENT OF OPERATIONS.

DAVIS CROSS BY MR. PRICE                                    773

04:04:00    1              DO YOU SEE THAT?

04:04:01    2    A.   I DO.

04:04:01    3    Q.   AND THIS IS APPLE REPORTING ITS NET SALES; CORRECT?

04:04:05    4    A.   YES.   THIS IS COMPANY WIDE.

04:04:06    5    Q.   AND THEN THERE'S A COST OF SALES, THAT'S LIKE COSTS OF

04:04:09    6    GOODS SOLD?

04:04:10    7    A.   YES, IT IS.

04:04:11    8    Q.   AND THEN DOES THE COMPANY PAY TAXES ON THIS GROSS MARGIN

04:04:15    9    THAT'S COLLECTED?

04:04:16   10    A.   NO.   IT WOULD PAY TAXES ON ITS NET PROFIT, TAXABLE PROFIT.

04:04:21   11    Q.   AND SO THEN WE HAVE OPERATING EXPENSES, INCLUDING RESEARCH

04:04:24   12    AND DEVELOPMENT, SELLING, GENERAL ADMINISTRATIVE; RIGHT?

04:04:28   13    A.   THAT'S RIGHT.

04:04:29   14    Q.   AND THEN THAT IS SUBTRACTED TO COME TO OPERATING EXPENSES?

04:04:32   15    A.   CORRECT.

04:04:33   16    Q.   AND THERE'S ANOTHER ADJUSTMENT BEFORE YOU GET TO THAT

04:04:36   17    SECTION HERE THAT SAYS INCOME BEFORE PROVISION FOR INCOME

04:04:39   18    TAXES; RIGHT?

04:04:40   19    A.   THAT'S NOT AN ADJUSTMENT.   THAT IS A NET OF THE OPERATING

04:04:45   20    EXPENSES DEDUCTED FROM THE REST OF THE REVENUES.

04:04:50   21    Q.   OKAY.   AND IN THIS PUBLIC REPORTING, COULD APPLE DEDUCT

04:04:57   22    THESE OPERATING EXPENSES TO GET TO OPERATING INCOME IF THOSE

04:05:02   23    EXPENSES DID NOT HAVE A RELATIONSHIP TO THE REVENUE?

04:05:05   24    A.   THIS IS COMPANY WIDE, SO IT WOULD BE ALL REVENUE AND ALL

04:05:11   25    EXPENSES REGARDLESS OF WHAT RELATIONSHIP THE TWO HAD TO EACH

04:05:15  1   OTHER, AS LONG AS IT'S PART OF THE COMPANY.

04:05:19  2   Q.   OKAY.  WELL, APPLE ALSO, INTERNALLY, BREAKS DOWN AND DOES

04:05:25  3   A, A CONSOLIDATED STATEMENT OF ITS PRODUCT, THE IPHONE;

04:05:31  4   CORRECT?

04:05:31  5   A.   I WOULDN'T THINK OF IT AS A CONSOLIDATED STATEMENT.  IT'S

04:05:36  6   CALLED A GAAP LINE OF BUSINESS REPORT.

04:05:38  7   Q.   OKAY.  AND IN THAT GAAP LINE OF BUSINESS REPORT, THEY'RE

04:05:41  8   REFERRING JUST TO A PARTICULAR LINE OF BUSINESS; CORRECT?

04:05:44  9   A.   RIGHT.

04:05:45  10  Q.   AND I'M GOING TO SHOW YOU ONE OF THOSE.

04:05:47  11       THAT IS EXHIBIT -- OH.

04:06:03  12       (PAUSE IN PROCEEDINGS.)

04:06:05  13  BY MR. QUINN:

04:06:06  14  Q.   EXHIBIT 4554.

04:06:19  15       DO YOU HAVE THAT IN FRONT OF YOU?

04:06:23  16  A.   I DO.

04:06:26  17       MR. PRICE:  YOUR HONOR, I BELIEVE THIS IS

04:06:27  18  CONFIDENTIAL AND CANNOT BE SHOWN TO THE PUBLIC.

04:06:29  19       THE COURT:  OKAY.  HAS THIS ONE BEEN ADMITTED?

04:06:31  20       MR. PRICE:  I'M GOING TO MOVE IT INTO EVIDENCE NOW,

04:06:33  21  YOUR HONOR, 4554.

04:06:38  22       MR. LEE:  OBJECTION, YOUR HONOR, JUST UNDER SEAL.

04:06:40  23       THE COURT:  OKAY.  THAT'S FINE.  IT'S ADMITTED.

04:06:42  24       (DEFENDANTS' EXHIBIT 4554 WAS ADMITTED IN EVIDENCE.)

04:06:42  25       THE COURT:  GO AHEAD, PLEASE.

DAVIS CROSS BY MR. PRICE

04:06:43   1      BY MR. PRICE:

04:06:44   2      Q.   AND IF WE LOOK AT THE, AT THAT PAGE THERE, DO YOU HAVE

04:06:47   3      THAT IN FRONT OF YOU?

04:06:48   4      A.   I DO.

04:06:49   5      Q.   AND THIS IS A GAAP LINE OF BUSINESS REPORT FOR THE IPHONE;

04:06:52   6      CORRECT?

04:06:53   7      A.   YES, IT IS, FOR ALL MODELS OF THE IPHONE.

04:06:55   8      Q.   AND AT THIS TIME APPLE HAD, AND STILL HAS, OTHER LINES OF

04:07:00   9      BUSINESS OTHER THAN THE IPHONE; CORRECT?

04:07:02   10     A.   THAT'S RIGHT.

04:07:02   11     Q.   SO THIS IS REPORTING A GAAP LINE OF BUSINESS REPORT

04:07:05   12     SHOWING GROSS MARGIN AND REVENUE AND OTHER THINGS FOR THE

04:07:12   13     IPHONE PRODUCT; CORRECT?

04:07:13   14     A.   YES, UNDER GENERALLY ACCEPTED ACCOUNTING PRINCIPLES,

04:07:16   15     THAT'S WHAT THE GAAP MEANS.

04:07:18   16     Q.   AND IF WE LOOK AT -- I'M GOING TO PUT UP SLIDE SDX 700,

04:07:23   17     SLIDE 719, WHICH IS JUST A PULLOUT FROM THIS.

04:07:40   18          AND IF WE LOOK AT THAT, YOU SEE -- I FORGOT IT WASN'T

04:07:53   19     GOING TO BE SHOWN -- YOU'LL SEE THAT THERE ARE SALES EXPENSES

04:07:56   20     WHICH ARE DEDUCTED FROM REVENUE; CORRECT?

04:07:58   21     A.   YES.

04:07:59   22     Q.   AND INCLUDING, AMONG THOSE SALES EXPENSES ARE MARKETING

04:08:02   23     AND ADVERTISING; CORRECT?

04:08:04   24     A.   RIGHT.

04:08:04   25     Q.   GENERAL ADMINISTRATIVE CORRECT?

04:08:08  1    A.   RIGHT.

04:08:08  2    Q.   FINANCE, HR; CORRECT?

04:08:11  3    A.   YES.

04:08:11  4         THE COURT:  EXCUSE ME.  ARE THE SCREENS IN THE PUBLIC

04:08:13  5    AREA TURNED OFF?

04:08:14  6         THE CLERK:  YES, THEY'RE OFF.

04:08:15  7         THE COURT:  OKAY.  THANK YOU.  SORRY FOR THE

04:08:17  8    INTERRUPTION.

04:08:18  9         GO AHEAD, PLEASE.

04:08:20  10   BY MR. PRICE:

04:08:22  11   Q.   SO APPLYING GENERALLY ACCEPTED ACCOUNTING PRINCIPLES,

04:08:26  12   APPLE COULD NOT DEDUCT THOSE EXPENSES UNLESS THEY WERE RELATED

04:08:30  13   TO THE REVENUE; CORRECT?

04:08:32  14   A.   YES, UNDER A LINE OF BUSINESS REPORT, THAT WOULD BE TRUE.

04:08:36  15   Q.   AND IF YOU LOOK AT THE BOTTOM THERE, THERE'S A NOTE.  DO

04:08:41  16   YOU SEE THAT?

04:08:41  17   A.   I DO.

04:08:42  18   Q.   AND WHAT IT SAYS IS "NOTE:  IPHONE REVENUE, STD COST AND

04:08:50  19   UNITS ARE DIRECT.  OTHER AMOUNTS ARE ALLOCATED BASED ON OVERALL

04:08:53  20   COMPANY RESULTS."

04:08:55  21        CORRECT?

04:08:55  22   A.   YES.

04:08:56  23   Q.   SO APPLE, IN DOING ITS GAAP LINE OF BUSINESS REPORT FOR

04:08:59  24   THE IPHONE IN CALCULATING ITS OPERATING PROFIT, ALLOCATES THESE

04:09:03  25   EXPENSES THAT WE SEE HERE, THE SALES EXPENSES, THE MARKETING

04:09:07   1      AND ADVERTISING; CORRECT?

04:09:08   2      A.   IT DOES.

04:09:09   3      Q.   AND THEY DO THAT BASED IN PART ON THE OVERALL COMPANY

04:09:13   4      RESULTS; CORRECT?

04:09:14   5      A.   YES.

04:09:15   6      Q.   NOW, LET ME TALK TO YOU ABOUT ALLOCATION.

04:09:24   7           YOU SUBTRACTED COSTS OF GOODS SOLD; CORRECT?

04:09:28   8      A.   I DID.

04:09:29   9      Q.   THAT COST OF GOODS SOLD INCLUDES ALLOCATED EXPENSES;

04:09:33   10     CORRECT?

04:09:33   11     A.   TO SOME EXTENT.  MOST OF THEM ARE DIRECT.

04:09:36   12     Q.   AND TO WHAT EXTENT DOES IT INCLUDE ALLOCATED EXPENSES?

04:09:40   13     A.   AS I RECALL, THE SAMSUNG RECORDS SHOW SOMETHING LIKE

04:09:45   14     MOLDS, FOR INSTANCE, M-O-L-D-S, SO THE MOLD THAT IS USED IS

04:09:50   15     SHAPE THE PLASTIC ON THE PHONE, FOR EXAMPLE.

04:09:53   16          I RECALL THE SAMSUNG DOCUMENTS TO REFLECT THAT AS A FIXED

04:09:59   17     COST THAT HAS TO BE ALLOCATED.

04:10:02   18     Q.   AND GAAP GIVES ACCOUNTANTS GUIDANCE ON HOW TO ATTRIBUTE

04:10:05   19     COMMON COSTS SO THAT SHARED COSTS CAN BE ATTRIBUTED TO A, FOR

04:10:10   20     EXAMPLE, A SPECIFIC LINE OF BUSINESS; CORRECT?

04:10:12   21     A.   THAT'S RIGHT.

04:10:12   22     Q.   AND, AGAIN, IN ORDER TO DO THAT, YOU HAVE TO HAVE A NEXUS,

04:10:17   23     A RELATIONSHIP BETWEEN THAT EXPENSE AND THE REVENUE; RIGHT?

04:10:20   24     A.   YES, ONE WOULD EXPECT THAT, OR AT LEAST A NEXUS TO THE

04:10:24   25     METHOD OF ALLOCATION.

DAVIS CROSS BY MR. PRICE

04:10:26  1    Q.   SO LET ME ASK YOU THEN, USING YOUR METHOD, HOW YOU WOULD

04:10:33  2    DEAL WITH A PARTICULAR HYPOTHETICAL, AND IT'S GOING TO BE ONE

04:10:36  3    THAT I'VE DISCUSSED WITH YOU BEFORE.

04:10:40  4         I WANT TO MAKE SURE I GET THE WORDS RIGHT HERE.

04:10:43  5         SO LET'S SAY A COMPANY HAS A SALESMAN AND THAT SALESMAN

04:10:47  6    SELLS PHONES AND TV'S, OKAY?

04:10:50  7         AND THAT THE REVENUE THAT'S GENERATED FROM HIS EFFORTS IS

04:10:53  8    50/50, AND IF HE WANTED TO TREAT THE TV AND THE PHONE AS A

04:10:58  9    SEPARATE PRODUCT LINE AND WE WERE TRYING TO SAY WHAT'S THE

04:11:01  10   OPERATING MARGIN OF THE SALE ON THE PHONE, UNDER GAAP

04:11:04  11   PRINCIPLES, WOULD YOU DEDUCT FROM THE REVENUE FROM THE PHONE A

04:11:09  12   PERCENTAGE OF THE SALESMAN EXPENSE?

04:11:11  13   A.   IF WHAT YOU'RE TRYING TO DO IS TO REPORT OPERATING RESULTS

04:11:16  14   UNDER GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, YOU COULD

04:11:20  15   ALLOCATE THAT SALES EXPENSE TO THE TWO CATEGORIES OF PRODUCTS

04:11:24  16   YOU'RE TALKING ABOUT, THE PHONES AND THE TV'S.

04:11:27  17   Q.   NOW, IS IT CORRECT THAT USING THE METHODOLOGY THAT YOU

04:11:30  18   APPLIED IN THIS CASE WHERE YOU HAD A SALESMAN GENERATING

04:11:35  19   REVENUE 50/50 BETWEEN TV AND PHONES, THAT YOU WOULD NOT DEDUCT

04:11:40  20   A PENNY OF THAT SALESMAN'S SALARY IF YOU'RE TRYING TO CALCULATE

04:11:48  21   THE PROFITS FOR THE PHONE?

04:11:49  22   A.   USING THE DIRECTLY ATTRIBUTABLE TEST AND THE HYPOTHETICAL

04:11:53  23   THAT YOU AND I HAVE TALKED ABOUT BEFORE, AS LONG AS THAT

04:11:56  24   SALESMAN IS GOING TO CONTINUE TO BE EMPLOYED REGARDLESS OF

04:12:00  25   WHETHER HE'S SELLING THE TV'S OR THE PHONES OR BOTH, THEN YOU

04:12:05  1    WOULD NOT DEDUCT IT BECAUSE THAT AMOUNT IS NOT GOING TO CHANGE

04:12:10  2    IF THE PHONES ARE NO LONGER SOLD.

04:12:12  3    Q.   SO THE ANSWER IS YOU WOULD NOT DEDUCT 50 PERCENT OF THE

04:12:14  4    COST OF HIS SALES; RIGHT?

04:12:16  5    A.   NOT UNDER THAT EXAMPLE, RIGHT.

04:12:18  6    Q.   IN FACT, I LATER GAVE YOU AN EXAMPLE, WHAT IF IT WAS

04:12:21  7    99 PERCENT, YOU KNOW, OF PHONES AND 1 PERCENT TV?  IN ORDER TO

04:12:25  8    CALCULATE THE PROFIT OF THE PHONES, YOU WOULD NOT DEDUCT A

04:12:30  9    PENNY OF THAT SALESPERSON'S SALARY UNDER THE METHODOLOGY THAT

04:12:35  10   YOU WERE USING?

04:12:35  11   A.   USING THE DIRECTLY ATTRIBUTABLE TEST, IF THAT SALESMAN IS

04:12:38  12   GOING TO CONTINUE TO BE PAID THAT AMOUNT, WHETHER OR NOT HE

04:12:44  13   SELLS ANYMORE SMARTPHONES, YES, YOU WOULD NOT DEDUCT THAT.

04:12:47  14   Q.   YOU KEEP SAYING THE DIRECTLY ATTRIBUTABLE TEST.  AS PART

04:12:50  15   OF THAT TEST, YOU NEVER ONCE DISCUSSED IN YOUR REPORT WHAT THE

04:12:53  16   NEXUS MEANS; RIGHT?

04:12:54  17   A.   THAT'S RIGHT.  YOU AND I TALKED ABOUT THAT IN MY

04:12:57  18   DEPOSITION.

04:12:57  19   Q.   AND THIS IS NOT A, A PHRASE THAT YOU ARE FAMILIAR WITH

04:13:04  20   BEING IN GAAP; CORRECT?

04:13:06  21   A.   THAT'S RIGHT, I DON'T THINK THE TERM "NEXUS" IS USED IN

04:13:10  22   GAAP.

04:13:10  23   Q.   YOU ARE NOT A LEGAL EXPERT ON WHAT THAT TERM MEANS;

04:13:12  24   CORRECT?

04:13:12  25   A.   I AM NOT.

DAVIS CROSS BY MR. PRICE

04:13:13  1    Q.   IN FACT, YOU SAID THAT YOU'VE NEVER SEEN A CASE WHERE THAT

04:13:16  2    STANDARD HAS BEEN WORDED AS IT HAS BEEN IN THIS CASE; CORRECT?

04:13:19  3    A.   THE DIRECTLY ATTRIBUTABLE STANDARD WITH THE WORD "NEXUS"

04:13:21  4    IN IT.

04:13:22  5    Q.   WITH THE NEXUS, YES?

04:13:24  6    A.   THAT'S RIGHT.  I SEE NEXUS IN OTHER TYPES OF CASES, BUT

04:13:28  7    NOT IN CONNECTION WITH THE DIRECTLY ATTRIBUTABLE TEST.

04:13:30  8    Q.   AND YOU'VE SEEN NO OTHER CASE WHERE YOU HAVE APPLIED THE

04:13:33  9    STANDARD THAT'S BEEN ARTICULATED IN THIS CASE, WHICH IS THAT IN

04:13:36  10   ADDITION TO COSTS OF GOODS SOLD, YOU CAN DEDUCT EXPENSES THAT

04:13:39  11   ARE DIRECTLY ATTRIBUTABLE, SUCH AS THERE IS A NEXUS BETWEEN THE

04:13:44  12   COSTS AND THE REVENUE; CORRECT?

04:13:45  13   A.   THAT'S RIGHT.  I'VE NOT BEEN IN ANY OTHER CASES THAT

04:13:49  14   REQUIRED THE USE OF THAT STANDARD.

04:13:51  15   Q.   AND YOU HAVE NO DOUBT THAT SAMSUNG SPENT MONEY ON

04:13:55  16   MARKETING; CORRECT?

04:13:56  17   A.   I DO NOT HAVE ANY DOUBT THAT THERE WAS MONEY SPENT ON

04:13:59  18   MARKETING.

04:13:59  19   Q.   YOU HAVE NO DOUBT THEY SPENT A LOT OF MONEY ON -- YOU HAVE

04:14:02  20   NO DOUBT THEY SPENT MONEY ON RESEARCH AND DEVELOPMENT; CORRECT?

04:14:06  21   A.   I EXPECT THAT THEY SPENT MONEY ON RESEARCH AND

04:14:09  22   DEVELOPMENT.  WE JUST DIDN'T KNOW HOW MUCH.

04:14:11  23   Q.   YOU HAVE NO DOUBT THAT THEY USE SALESMEN TO SELL THESE

04:14:14  24   PHONES TO THE CARRIERS?

04:14:15  25   A.   I KNOW YOU DO USE SALESMEN TO SELL THE PHONES.  BUT THOSE

04:14:19   1    SALES PEOPLE ARE SELLING ALL THE PHONES THAT SAMSUNG HAS TO

04:14:23   2    OFFER TO THOSE CARRIER, NOT JUST THE INFRINGING PHONES.

04:14:27   3    Q.   AND IF A SALESMAN WAS SELLING TWO PHONES, ONE INFRINGING

04:14:30   4    AND ONE NON-INFRINGING, AND 99 PERCENT OF THE REVENUE WAS FROM

04:14:34   5    THE INFRINGING, YOU WOULDN'T DEDUCT A PENNY OF HIS SALARY TO

04:14:39   6    ARRIVE AT PROFIT; CORRECT?

04:14:41   7    A.   WELL, LET'S TALK ABOUT THE SPECIFICS THERE, BECAUSE WHEN A

04:14:46   8    SALESMAN IS SELLING A PHONE, YOU DON'T YET HAVE ANY REVENUES

04:14:50   9    ATTRIBUTABLE TO IT, SO I DON'T KNOW HOW TO WORK WITH YOUR 99

04:14:54  10    VERSUS 1 PERCENT HYPOTHETICAL.

04:14:58  11    Q.   IT'S THE SAME HYPOTHETICAL I GAVE YOU FOR A SALESMAN IN

04:15:02  12    GENERAL, IF THEY'RE SELLING TWO PHONES AND 99 PERCENT OF THE

04:15:05  13    REVENUE THAT THEY SELL IS AN INFRINGING PHONE AND 1 PERCENT IS

04:15:09  14    NOT, YOU WON'T DEDUCT A PENNY OF THAT PERSON'S SALARY?

04:15:13  15    A.   NOT AS LONG AS THAT SALES PERSON CONTINUES TO SELL OTHER

04:15:16  16    PHONES, AND WE DON'T KNOW HOW MUCH, IF ANY, HIS SALARY WOULD

04:15:22  17    CHANGE IF HE WAS NO LONGER SELLING THE INFRINGING PHONES.

04:15:25  18    Q.   NOW, LET ME TALK TO YOU ABOUT HOW -- LET ME TALK TO YOU

04:15:40  19    ABOUT THE DATA THAT YOU RECEIVED IN ORDER TO DO YOUR

04:15:43  20    CALCULATIONS.

04:15:44  21        YOU UNDERSTAND THAT SAMSUNG USES A, A -- AN S.A.P.

04:15:50  22    ACCOUNTING SOFTWARE SYSTEM; CORRECT?

04:15:52  23    A.   I'M AWARE OF THAT.

04:15:53  24    Q.   AND S.A.P. IS A VENDOR THAT PROVIDES SOFTWARE FOR

04:15:57  25    ACCOUNTING; RIGHT?

04:15:58    1      A.   YES.

04:15:59    2      Q.   IT'S THE SAME ACCOUNTING SOFTWARE SYSTEM THAT APPLE USES;

04:16:02    3      CORRECT?

04:16:03    4      A.   A SIMILAR SYSTEM, YES.   APPLE DOES USE PROS FROM S.A.P.

04:16:07    5      Q.   AND YOUR UNDERSTANDING IS THAT THE WAY THAT SYSTEM WORKS

04:16:10    6      IS THAT DATA IS INPUT INTO THAT SYSTEM AT OR NEAR THE TIME --

04:16:15    7      WELL, IT'S USUALLY PUT IN ON A DAILY BASIS; YES?

04:16:19    8      A.   YES.

04:16:20    9      Q.   AND THE DATA IS INPUT AT OR NEAR THE TIME YOU GET THE

04:16:23   10      DATA; RIGHT?

04:16:24   11      A.   YES.

04:16:24   12      Q.   AND IN THIS CASE, YOUR UNDERSTANDING IS THAT SAMSUNG INPUT

04:16:27   13      ITS DATA INTO THE S.A.P. SYSTEM AT OR NEAR THE TIME THE DATA

04:16:31   14      WAS RECEIVED; CORRECT?

04:16:32   15      A.   I WOULD EXPECT THAT.

04:16:33   16      Q.   AND AT THE TIME THAT IT WAS INCURRED, SAMSUNG ATTRIBUTED

04:16:38   17      EXPENSES TO SPECIFIC PHONES; CORRECT?

04:16:41   18      A.   ONLY CERTAIN EXPENSES, THE KINDS OF EXPENSES WE'VE BEEN

04:16:48   19      TALKING ABOUT THAT ARE POOLED EXPENSES ARE NOT ATTRIBUTED TO

04:16:51   20      CERTAIN PHONES.   THAT DOESN'T HAPPEN IN TOTAL.

04:16:54   21      Q.   WHEN DOES THAT --

04:16:55   22      A.   THAT HAPPENS WHEN THERE'S A POOL OF EXPENSE TO SPREAD

04:17:01   23      ACROSS ALL THE PRODUCTS.

04:17:06   24      Q.   HOW OFTEN IS THAT DONE?

04:17:07   25      A.   I DON'T KNOW HOW OFTEN SAMSUNG DOES IT.   I WOULD EXPECT

04:17:10  1    MOST COMPANIES DO IT ON A MONTHLY OR QUARTERLY BASIS.

04:17:13  2    Q.   THIS DATA IS PUT TOGETHER USUALLY ON A MONTHLY BASIS AFTER

04:17:18  3    BEING INPUT ON A DAILY BASIS; CORRECT?

04:17:19  4    A.   I WOULD EXPECT THAT TO BE TRUE.

04:17:22  5    Q.   SO FOR CLARIFICATION THEN, THE ATTRIBUTION OF EXPENSES TO

04:17:27  6    THESE PHONES WOULD HAVE BEEN DONE ABOUT ON A MONTHLY BASIS;

04:17:32  7    CORRECT?

04:17:32  8    A.   RIGHT.

04:17:33  9    Q.   BACK AT THE TIME.  NOT, NOT CURRENTLY; CORRECT?

04:17:43  10   A.   I AGREE THAT IT WAS DONE BACK AT THAT TIME AS OPPOSED TO

04:17:46  11   TODAY IF THAT'S WHAT YOU MEAN.

04:17:47  12   Q.   AND YOU SAID THAT THE SPREADSHEETS YOU GOT HERE WERE NOT

04:17:49  13   CREATED IN THE ORDINARY COURSE OF BUSINESS; RIGHT?

04:17:52  14   A.   THAT'S RIGHT.

04:17:53  15   Q.   IN THE ORDINARY COURSE OF BUSINESS, YOU DON'T USUALLY

04:17:57  16   GENERATE REPORTS DOWN TO THE PHONE LEVEL, DO YOU?

04:17:59  17   A.   YOU DO NOT.

04:18:01  18   Q.   SO WHAT HAPPENED HERE WAS WE HAVE LITIGATION; CORRECT?

04:18:04  19   A.   RIGHT.

04:18:04  20   Q.   AND DEMANDS ARE MADE, REQUESTS ARE MADE FOR INFORMATION;

04:18:08  21   CORRECT?

04:18:08  22   A.   YES.

04:18:08  23   Q.   AND BY THE WAY, THIS IS SOME OF THE MOST CONFIDENTIAL

04:18:11  24   INFORMATION THAT A COMPANY HAS; RIGHT?

04:18:13  25   A.   YES.

DAVIS CROSS BY MR. PRICE

04:18:13  1     Q.   WHAT ITS SPECIFIC COSTS ARE?

04:18:15  2     A.   I AGREE.

04:18:16  3     Q.   AND SO WHAT HAPPENED IS THAT WHEN THE INFORMATION IS

04:18:19  4     REQUESTED, THEN THAT S.A.P. SYSTEM WHERE YOU'VE BEEN INPUTTING

04:18:23  5     INTO AND ATTRIBUTING EXPENSES ON A MONTHLY BASIS, YOU PULL THAT

04:18:29  6     INFORMATION; CORRECT?

04:18:30  7     A.   RIGHT.

04:18:30  8     Q.   AND IS THAT THE SAME WAY YOU THINK APPLE WOULD DO IT IF

04:18:37  9     THEY HAD TO TRY TO GET INFORMATION ON A SPECIFIC MODEL?  WOULD

04:18:40  10    THEY ACCESS THEIR S.A.P. SYSTEM AND ASK FOR THE CALL OUT OF

04:18:45  11    THAT INFORMATION?

04:18:45  12    A.   I DON'T KNOW HOW APPLE WOULD DO IT.  I DON'T THINK IT WAS

04:18:47  13    ASKED TO DO SO ON A SPECIFIC MODEL BASIS.

04:18:50  14    Q.   OKAY.  NOW, YOU SAID THAT THERE WERE MULTIPLE VERSIONS OF

04:18:53  15    SPREADSHEETS IN THIS CASE; RIGHT?

04:18:54  16    A.   YES.

04:18:54  17    Q.   I THINK THERE ARE NINE SPREADSHEETS?

04:18:56  18    A.   I REMEMBER NINE DIFFERENT VERSIONS.

04:18:58  19    Q.   OKAY.  AND WITH RESPECT TO THOSE SPREADSHEETS, ISN'T IT

04:19:01  20    YOUR UNDERSTANDING THAT SOMETIMES ADDITIONAL INFORMATION WOULD

04:19:05  21    BE REQUESTED BY APPLE?

04:19:06  22    A.   YES.

04:19:06  23    Q.   SOMETIMES THEY WOULD ASK ABOUT ADDITIONAL MODELS; CORRECT?

04:19:09  24    A.   YES.

04:19:10  25    Q.   SO IN THE END, YOU END UP WITH NINE SPECIFIC SPREADSHEETS

04:19:14    1    RESULTING IN A SPREADSHEET THAT YOU USED FOR CERTAIN ASPECTS OF

04:19:16    2    YOUR OPINION; CORRECT?

04:19:17    3    A.   THERE ARE NINE DIFFERENT SPREADSHEETS.  SOMETIMES THAT

04:19:21    4    INFORMATION MATCHED WHEN IT SHOULD MATCH AND SOMETIMES IT DID

04:19:24    5    NOT MATCH WHAT SHOULD HAVE BEEN IN THE SAME INFORMATION IN THE

04:19:27    6    PRIOR SPREADSHEETS.

04:19:28    7    Q.   AND I'LL ASK YOU ABOUT THAT.  BUT WHAT I'M ASKING YOU

04:19:30    8    RIGHT NOW IS THAT SOMETIMES THE INFORMATION CHANGED BECAUSE

04:19:33    9    APPLE REQUESTED ADDITIONAL INFORMATION; RIGHT?

04:19:35   10    A.   I AGREE WITH THAT.

04:19:36   11    Q.   AND THERE WAS A FINAL VERSION OF THAT SPREADSHEET THAT YOU

04:19:38   12    ARE RELYING ON FOR CERTAIN ASPECTS OF YOUR OPINION; RIGHT?

04:19:42   13    A.   YES.

04:19:42   14    Q.   NOW, YOU TESTIFIED ABOUT ONE CHANGE THAT WAS A BIG CHANGE

04:19:47   15    OF $1.3 BILLION; RIGHT?

04:19:50   16    A.   I DID.

04:19:50   17    Q.   AND IT'S CORRECT THAT OTHER THAN THAT CHANGE AMONG THOSE

04:19:54   18    NINE SPREADSHEETS, OTHER THAN THAT CHANGE, THERE WERE NO

04:20:09   19    SIGNIFICANT CHANGES AS YOU RECALL AS TO THE 13 PRODUCTS THAT

04:20:13   20    YOU WERE ADDRESSING IN YOUR TESTIMONY; CORRECT?

04:20:16   21    A.   BACK AT THAT TIME, THAT IS CORRECT, YES.

04:20:19   22    Q.   AND THAT YOUR TESTIMONY WAS THAT AS FAR AS YOU RECALL,

04:20:24   23    THERE WERE NO SIGNIFICANT CHANGES TO THE PRODUCTS, TO THE

04:20:27   24    INFORMATION; CORRECT?

04:20:28   25    A.   TO THOSE 13 PRODUCTS AT THAT TIME.

DAVIS CROSS BY MR. PRICE                                          786

04:20:30  1    Q.   AND SO THE ONLY SIGNIFICANT CHANGE WAS THIS 1.3 BILLION;

04:20:35  2    RIGHT?

04:20:35  3    A.   RIGHT.

04:20:36  4    Q.   AND THAT WAS NOT A SUBTLE CHANGE?  I MEAN, WHEN YOU WENT

04:20:39  5    FROM ONE SPREADSHEET TO ANOTHER, THAT JUST JUMPED OUT AT YOU;

04:20:42  6    RIGHT?

04:20:43  7    A.   RIGHT.

04:20:43  8    Q.   IT WAS PRETTY TRANSPARENT; RIGHT?

04:20:45  9    A.   RIGHT.

04:20:46  10   Q.   AND THAT WAS PROFITS FROM A CHINESE SUBSIDIARY; RIGHT?

04:20:49  11   A.   YES.

04:20:50  12   Q.   AND THAT WAS LATER BACKED OUT IN THE FINAL SPREADSHEET

04:20:52  13   THAT YOU GOT; RIGHT?

04:20:53  14   A.   IT WAS TAKEN BACK OUT OF THE COSTS OF GOODS SOLD.

04:20:56  15   Q.   AND YOU TESTIFIED THAT YOU RELIED ON THE SPREADSHEET COSTS

04:21:02  16   OF GOODS SOLD BECAUSE THE COSTS OF GOODS SOLD, YOU THOUGHT, THE

04:21:07  17   DATA IN THAT LINE IN THE SPREADSHEET ACCURATELY DESCRIBED AND

04:21:12  18   REPORTED THE EXPENSES; RIGHT?

04:21:14  19   A.   THAT'S RIGHT.

04:21:15  20   Q.   SO ON THAT SPREADSHEET, YOU RELIED ON COSTS OF GOODS SOLD;

04:21:19  21   RIGHT?

04:21:19  22   A.   I DID.

04:21:20  23   Q.   AND ON THAT SPREADSHEET, YOU RELIED ON REVENUE; CORRECT?

04:21:23  24   A.   I DID.

04:21:23  25   Q.   AND THIS ONLY SIGNIFICANT CHANGE IN THE SPREADSHEETS, THAT

04:21:27  1    1.3 BILLION, WAS IN THE COSTS OF GOODS SOLD CATEGORY, THE

04:21:33  2    CATEGORY YOU RELIED ON; RIGHT?

04:21:35  3    A.   I AGREE.

04:21:36  4    Q.   AND SO DESPITE TELLING THE JURY THAT THERE WAS A

04:21:40  5    $1.3 BILLION SWITCH IN THAT CATEGORY, THAT'S THE VERY CATEGORY

04:21:44  6    WHICH YOU ARE SAYING ACCURATELY DESCRIBES AND REPORTS THE

04:21:49  7    EXPENSES; CORRECT?

04:21:50  8    A.   YES, I THINK THAT FINAL SPREADSHEET ACCURATELY DOES SO FOR

04:21:53  9    THE COSTS OF GOODS SOLD.

04:21:55  10   Q.   AND THE OTHER AREA, THE OPERATING EXPENSES, FOR WHICH

04:22:02  11   THERE WERE NO SIGNIFICANT CHANGES, IS IT YOUR TESTIMONY THAT

04:22:04  12   YOU THINK THAT'S UNRELIABLE?

04:22:06  13   A.   I THINK IT'S UNRELIABLE IF YOU'RE LOOKING AT EXPENSES THAT

04:22:09  14   ARE INTENDED TO BE DIRECTLY ATTRIBUTABLE TO THOSE PHONES FOR

04:22:12  15   THE REASONS WE'VE TALKED ABOUT.  THE AMOUNTS THAT ARE THERE ARE

04:22:15  16   ALLOCATED.  THEY ARE NOT DIRECTLY OR SPECIFICALLY RELATED TO

04:22:20  17   THE PHONES IN THIS CASE.

04:22:21  18   Q.   ALL RIGHT.  SO I WANT TO MAKE SURE I UNDERSTAND WHAT

04:22:23  19   YOU'RE SAYING.

04:22:24  20        YOU DON'T QUESTION THE RELIABILITY OF THE DATA, YOU

04:22:27  21   QUESTION THAT IT'S ALLOCATED; RIGHT?

04:22:30  22   A.   I QUESTION THE ALLOCATIONS BECAUSE THAT'S NOT THE AMOUNT

04:22:37  23   THAT RELATES SPECIFICALLY TO THESE PHONES.

04:22:41  24        THAT IS ALLOCATED FROM A POOL OF EXPENSE.

04:22:43  25   Q.   THE DATA, THOUGH, THAT WAS INPUT YEARS AGO ON A MONTHLY

04:22:47  1    BASIS, YOU BELIEVE THAT DATA IS RELIABLE?  THERE'S BEEN NO

04:22:51  2    MONKEYING AROUND WITH THAT DATA; RIGHT?

04:22:53  3    A.   I HAVE NO INFORMATION THAT WOULD SUGGEST ANYBODY'S BEEN

04:22:55  4    MONKEYING AROUND WITH THAT DATA.

04:22:57  5         BUT AS WE DESCRIBED, THINGS LIKE THE RESEARCH AND

04:23:00  6    DEVELOPMENT COSTS THAT ARE GOING INTO THAT MONTH'S

04:23:05  7    ACCUMULATION, AS YOU TALKED ABOUT, RELATE TO R&D THAT MONTH,

04:23:09  8    NOT THE SALES OF PRODUCTS THAT ARE ALREADY OUT IN THE MARKET.

04:23:13  9    Q.   AND WE'LL GET TO THAT LATER.  BUT THE DATA, THE

04:23:16  10   RELIABILITY YOU DO NOT QUESTION; CORRECT?

04:23:18  11   A.   I DON'T HAVE ANY INFORMATION TO VERIFY THAT DATA, AND I

04:23:21  12   DON'T HAVE ANY REASON TO THINK RIGHT NOW THAT IT'S, IT'S

04:23:24  13   SUBSTANTIALLY WRONG.

04:23:25  14   Q.   OKAY.  THEN LET'S MOVE TO ANOTHER TOPIC.

04:23:33  15        YOU PRESENTED A DEMONSTRATIVE THAT'S PDX 9.17.  AND DO YOU

04:23:53  16   REMEMBER THIS DEMONSTRATIVE THAT YOU TALKED ABOUT CONCERNING

04:23:57  17   SAMSUNG'S INCREASED SMARTPHONE MARKET SHARE; CORRECT?

04:24:00  18   A.   I DO.

04:24:01  19   Q.   AND YOU HAVE TOLD US UNDER OATH THAT YOU ARE NOT ABLE, OR

04:24:05  20   ARE NOT EXPRESSING AN OPINION AS TO WHETHER OR NOT THE

04:24:08  21   INFRINGING DESIGNS CAUSED SAMSUNG'S MARKET SHARE TO INCREASE;

04:24:13  22   CORRECT?

04:24:14  23   A.   THAT IS CORRECT.

04:24:14  24   Q.   AND, IN FACT, THIS INFORMATION COMES FROM A CHART IN YOUR

04:24:20  25   REPORT THAT SHOWS MARKET SHARE CHANGES AMONG SEVERAL COMPANIES;

DAVIS CROSS BY MR. PRICE

04:24:24  1    CORRECT?

04:24:24  2    A.   IT SHOWS THE DATA FROM IDC, THE THIRD PARTY RESEARCH

04:24:30  3    COMPANY.

04:24:30  4    Q.   THAT'S WHAT YOU SAY HERE IS THE SOURCE OF DATA, THE IDC

04:24:33  5    WORLDWIDE QUARTERLY MOBILE PHONE TRACKER; RIGHT?

04:24:37  6    A.   THAT'S RIGHT.

04:24:38  7    Q.   AND THIS CHART DOESN'T SHOW ALL OF THAT DATA THAT'S IN

04:24:41  8    YOUR CHART, DOES IT?

04:24:42  9    A.   NO.  IT WOULD BE VERY BUSY IF WE DID.

04:24:44  10   Q.   WELL, DOES IT SHOW THE DATA FOR ANY OTHER COMPANY OTHER

04:24:49  11   THAN SAMSUNG?

04:24:49  12   A.   NO.

04:24:49  13   Q.   AND YOU TOLD US THAT IF YOU WANT TO SEE WHETHER OR NOT --

04:24:52  14   IF YOU WANTED TO SEE WHETHER THE INFRINGING DESIGNS CAUSED AN

04:24:54  15   INCREASE IN THE MARKET SHARE, YOU WOULD HAVE TO LOOK AT A

04:24:57  16   NUMBER OF FACTORS, INCLUDING WHAT THE OTHER COMPETITORS WERE

04:25:00  17   DOING, WHETHER THEY WERE INFRINGING, WHAT THE FEATURES WERE IN

04:25:03  18   THE PHONE, WHAT APPLE WAS DOING; CORRECT?

04:25:05  19   A.   RIGHT.

04:25:06  20   Q.   AND BY THE WAY, APPLE HAD A BUSINESS MODEL THEN THAT IT

04:25:09  21   DIDN'T COME OUT WITH A PHONE EVERY MONTH; RIGHT?

04:25:12  22   A.   IT DID NOT.

04:25:13  23   Q.   HOW MANY PHONES WOULD SAMSUNG COME OUT WITH IN A SINGLE

04:25:17  24   MONTH?

04:25:17  25   A.   IT DEPENDS ON WHETHER YOU'RE LOOKING AT WORLDWIDE OR U.S.,

DAVIS CROSS BY MR. PRICE

04:25:22  1    BUT IT WAS EVERY WEEK OR TWO.

04:25:24  2    Q.   AND WHAT WOULD HAPPEN IN APPLE'S MARKET SHARE IS THAT IT

04:25:27  3    WOULD SPIKE WHEN IT CAME OUT WITH A PHONE AND THEN IT WOULD

04:25:31  4    GRADUALLY DROP AS PEOPLE WAITED FOR A YEAR OR SO TO GET

04:25:35  5    SOMETHING ELSE; RIGHT?

04:25:36  6    A.   EXACTLY.

04:25:37  7    Q.   AND IF WE LOOK AT THE DATA THAT YOU LOOKED AT, IT'S

04:25:41  8    EXHIBIT 11.1 OF YOUR REPORT.

04:25:43  9         AND, YOUR HONOR, IF WE MAY DISPLAY THAT AS SDX 702.

04:25:46  10              THE COURT:  WOULD YOU LIKE THAT ADMITTED, SDX 702?

04:25:52  11              MR. PRICE:  IT'S JUST A DEMONSTRATIVE.

04:25:55  12              THE COURT:  OH, IT'S JUST A DEMONSTRATIVE.  OKAY.  GO

04:25:58  13   AHEAD PLEASE.

04:25:58  14   BY MR. PRICE:

04:26:00  15   Q.   SO IF WE LOOK AT THIS REPORT, WE SEE IT SHOWS APPLE'S

04:26:04  16   SHARE, IT SHOWS SAMSUNG'S, IT SHOWS HTC.

04:26:10  17        IF WE CAN BLOW THIS UP.

04:26:11  18        THERE ARE A LOT OF COMPANIES THAT IT SHOWS WHAT'S GOING ON

04:26:14  19   IN THAT TIMEFRAME; CORRECT?

04:26:15  20   A.   IT DOES.

04:26:16  21   Q.   AND IF YOU WANTED TO SEE WHAT THE MARKET REALLY LOOKED

04:26:18  22   LIKE, YOU MIGHT PUT SOME OF THESE OTHER COMPANIES IN THERE;

04:26:21  23   CORRECT?

04:26:21  24   A.   YOU COULD.  I'M NOT SURE WHAT IT WOULD TELL YOU.

04:26:23  25   Q.   WELL, FOR EXAMPLE, LET'S SAY -- WHAT IF, IN JULY 2010, HTC

DAVIS CROSS BY MR. PRICE

04:26:29  1    STARTED INCREASING IN MARKET SHARE SIGNIFICANTLY?

04:26:31  2    A.   OKAY.

04:26:32  3    Q.   THAT WOULDN'T BE BECAUSE THEY'RE SELLING INFRINGING

04:26:35  4    PHONES, WOULD IT?

04:26:36  5    A.   THAT'S CORRECT.

04:26:37  6    Q.   AND I'M GOING TO SHOW YOU WHAT WE'VE MARKED FOR

04:26:41  7    IDENTIFICATION AS SDX 705.  ACTUALLY, LET'S NOT DISPLAY THAT

04:26:50  8    YET.

04:26:54  9        DO YOU HAVE THAT IN FRONT OF YOU?  IT SHOULD BE IN ONE OF

04:26:59  10   THE BINDERS, SDX 705.

04:27:03  11   A.   ALL RIGHT.

04:27:13  12   Q.   IT'S THE SECOND TAB IN.  SDX 700, IT'S PAGE 5, I BELIEVE.

04:27:21  13   A.   OKAY.  I THINK I HAVE PAGE 700.  LET ME GET TO PAGE 5.

04:27:26  14       I'M THERE.

04:27:26  15   Q.   AND YOU SEE THERE'S A CHART THERE THAT GRAPHS U.S. MARKET

04:27:32  16   SHARE BY PERCENTAGE THAT INCLUDES INFORMATION NOT JUST ABOUT

04:27:36  17   SAMSUNG, BUT ABOUT HTC AND LG; CORRECT?

04:27:39  18   A.   I SEE THAT.

04:27:40  19   Q.   AND DOESN'T THAT ACCURATELY REFLECT THE INFORMATION THAT

04:27:44  20   WAS IN -- THAT YOU SUMMARIZE THERE FROM THE IDC REPORT?

04:27:48  21   A.   I THINK IT DOES.

04:27:50  22       MR. PRICE:  YOUR HONOR, IF WE MAY THEN DISPLAY

04:27:53  23   EXHIBIT 705.

04:27:54  24       THE COURT:  ALL RIGHT.  THAT'S A DEMONSTRATIVE AS

04:27:55  25   WELL?

04:27:56  1                    MR. PRICE:  ACTUALLY, YOUR HONOR, I THINK WE'LL MOVE

04:27:58  2      THAT INTO EVIDENCE.

04:27:59  3                    THE COURT:  EXHIBIT 705.

04:28:02  4                    MR. PRICE:  YES.

04:28:02  5                    THE COURT:  OKAY.  I DON'T THINK I HAVE THAT.

04:28:07  6                    MR. LEE:  IT CERTAINLY WASN'T LISTED AS AN EXHIBIT

04:28:09  7      FOR THIS WITNESS.

04:28:10  8                    MR. PRICE:  WELL, SHE'S LAID THE FOUNDATION FOR IT.

04:28:12  9                    MR. LEE:  BUT YOU HAVE TO TELL US, AS PART OF YOUR

04:28:15 10      HONOR'S DISCLOSURE PROCESS, WHAT THE EXHIBITS ARE GOING TO BE.

04:28:17 11                    MR. PRICE:  WE DISCLOSED THIS DOCUMENT.

04:28:19 12                    MR. LEE:  AS A DEMONSTRATIVE.

04:28:20 13                    THE COURT:  WHAT IS IT?  I DON'T HAVE A COPY OF IT.

04:28:22 14                    MR. PRICE:  YOUR HONOR, WE'LL DEAL WITH THIS OFFLINE,

04:28:25 15      AND I'LL DISPLAY IT AS A DEMONSTRATIVE NOW.

04:28:27 16                    THE COURT:  OKAY.

04:28:28 17      BY MR. PRICE:

04:28:30 18      Q.   SDX 705.  AND SO HERE YOU HAVE SAMSUNG IN BLUE INCREASING

04:28:35 19      ITS SHARE; CORRECT?

04:28:37 20      A.   YES.

04:28:37 21      Q.   AND YOU HAVE LG INCREASING ITS SHARE; CORRECT?

04:28:40 22      A.   TO A POINT, YES.

04:28:42 23      Q.   IN FACT, AT SOME POINT IT'S BIGGER THAN SAMSUNG; CORRECT?

04:28:46 24      A.   BARELY.

04:28:47 25      Q.   AND YOU'VE GOT HTC WAY UP HERE, IT SPIKES, AND I'M TRYING

DAVIS CROSS BY MR. PRICE

04:28:52  1    TO SEE THE -- WHAT IT SPIKES LIKE IN THE THIRD QUARTER, SECOND

04:28:56  2    QUARTER OF 2011, SECOND OR THIRD QUARTER OF 2011; RIGHT?

04:29:00  3    A.   RIGHT.

04:29:00  4    Q.   NOW, DID YOU DO AN ANALYSIS OF ALL OF THIS DATA TO TRY TO

04:29:08  5    SEE WHAT WAS CAUSING THESE OTHER MANUFACTURERS TO HAVE

04:29:12  6    INCREASED MARKET SHARE IN THIS YEAR TIME PERIOD?

04:29:15  7    A.   ONCE AGAIN, I DIDN'T DO ANY CAUSATION ANALYSIS.

04:29:24  8    Q.   AND IF YOU'D LOOK AT EXHIBIT 711, SDX 711.  DO YOU SEE

04:29:37  9    THAT'S A GRAPH THAT HAS BLACKBERRY RIM'S SHARE?

04:29:41  10   A.   IT DOES.

04:29:41  11   Q.   AND DOES THAT FAIRLY ACCURATELY REPRESENT THE INFORMATION?

04:29:44  12   A.   I WOULD EXPECT IT TO.

04:29:46  13   Q.   OKAY.  LET'S SHOW SDX 711.

04:29:51  14        AND WHAT YOU SEE HERE THAT'S GOING ON IS THAT BLACKBERRY'S

04:29:55  15   MARKET SHARE IS JUST FALLING OFF A CLIFF; RIGHT?

04:30:00  16   A.   IT IS.

04:30:00  17   Q.   AND SOME OF THE ANDROID COMPANIES WERE GETTING CUSTOMERS

04:30:04  18   FROM BLACKBERRY; CORRECT?

04:30:06  19   A.   I WOULD EXPECT THAT.

04:30:09  20        THE COURT:  I'M SORRY TO INTERRUPT.  IT'S 4:30 NOW.

04:30:11  21   LET'S GO AHEAD AND TAKE OUR BREAK FOR THE DAY.

04:30:14  22        PLEASE COME BACK TOMORROW MORNING AT 9:00 A.M.  DO NOT

04:30:17  23   RESEARCH OR DISCUSS THE CASE.

04:30:19  24        THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

04:30:23  25        WE'LL SEE YOU TOMORROW.

04:30:24  1          AND YOU MAY STEP DOWN.

04:30:26  2               THE WITNESS:  THANK YOU.

04:30:37  3          (JURY OUT AT 4:30 P.M.)

04:30:44  4               THE COURT:  OKAY.  PLEASE TAKE A SEAT.

04:30:47  5          LET ME ASK THAT IN YOUR EXHIBIT LIST, WOULD YOU PLEASE

04:30:50  6     ALSO INCLUDE WHICH EXHIBITS NEED TO BE SEALED?

04:30:54  7               MS. MAROULIS:  YES, YOUR HONOR.

04:30:55  8               THE COURT:  JUST SO WE DON'T MAKE ANY MISTAKES.  SO

04:30:58  9      IF YOU WOULD INCLUDE BOTH LIMITING INSTRUCTIONS AND SEALING.

04:31:02 10          I DIDN'T SEE ANY FURTHER OBJECTIONS TO THE VERDICT FORM,

04:31:04 11     SO WE'LL FILE A FINAL VERSION OF THAT TONIGHT.

04:31:08 12          AND WE'LL ALSO FILE PROPOSED FINAL JURY INSTRUCTIONS AGAIN

04:31:13 13     THIS EVENING.

04:31:14 14          WHEN CAN YOU GIVE ME ANY RESPONSE -- I MEAN, WE'RE REALLY

04:31:17 15     DOWN TO A VERY SMALL, NARROW WINDOW OF CHANGES AT THIS POINT.

04:31:22 16        WHEN CAN YOU RESPOND?

04:31:27 17               MS. MAROULIS:  1:00 P.M. TOMORROW?  IS THAT

04:31:30 18      ACCEPTABLE?

04:31:34 19               THE COURT:  OKAY.  THAT'S FINE.

04:31:35 20          AND I WOULD ASSUME THAT ANY OBJECTIONS YOU'VE PREVIOUSLY

04:31:39 21     RAISED ARE PRESERVED, SO I'D LIKE TO KEEP THAT, AS WE'VE DONE

04:31:42 22     IN THE PREVIOUS THREE TRIALS, THAT ONCE YOU'VE RAISED YOUR

04:31:45 23     OBJECTION, IF I OVERRULE IT, I PROPOSE SOMETHING, YOU'VE

04:31:49 24     PRESERVED IT, WE DON'T HAVE TO KEEP RELITIGATING EVERYTHING

04:31:51 25     THREE TIMES, FOUR TIMES.  OKAY?

04:31:53  1        ALL RIGHT.  THAT'S FINE.

04:31:56  2        NOW, I DID HAVE A QUESTION ABOUT MR. LUCENTE, WHICH I

04:31:59  3    THOUGHT MIGHT BE COMING TOMORROW, BUT I THINK PROBABLY FRIDAY.

04:32:03  4    DOES THAT SOUND RIGHT?  I KNOW HE'S -- IS MR. WAGNER YOUR LAST

04:32:07  5    WITNESS AND THEN MR. LUCENTE IS YOUR SECOND TO LAST?  DOES THAT

04:32:11  6    SOUND RIGHT?

04:32:12  7             MS. MAROULIS:  IT COULD BE TOMORROW, BUT HE IS OUR

04:32:14  8    NEXT TO LAST WITNESS, YES.

04:32:16  9             THE COURT:  OKAY.  SO THIS IS THE -- THIS IS THE

04:32:17 10    QUESTION I HAD.

04:32:19 11        I HAD DENIED APPLE'S OBJECTION TO SAMSUNG'S OPENING SLIDE

04:32:25 12    ON WHAT THE ARTICLE OF MANUFACTURE WAS, WHETHER IT WAS THE

04:32:28 13    DISPLAY SCREEN OR ONLY THE DISPLAY SCREEN WHEN IT'S SHOWING THE

04:32:32 14    D'305 ICONS BASED ON THE INTERROGATORY RESPONSE THAT WAS FILED

04:32:36 15    AT THE END OF DECEMBER OF 2017, WHICH SAYS IN THE ALTERNATIVE.

04:32:41 16        BUT NOW, HAVING LOOKED THROUGH MR. LUCENTE'S REPORT, HE'S

04:32:44 17    VERY SPECIFIC THAT THE ARTICLE OF MANUFACTURE IS THE DISPLAY

04:32:46 18    SCREEN WHEN IT'S SHOWING THE ICONS.

04:32:50 19        HE TALKS SOMETHING ABOUT, YOU KNOW, WHETHER THEY'RE SOLD

04:32:53 20    SEPARATELY, BUT THAT'S NOT HIS OPINION.  HIS ACTUAL OPINION IS

04:32:56 21    IT'S A DISPLAY SCREEN WHEN IT'S SHOWING THE ICONS.

04:33:01 22        SO I GUESS THE QUESTION I HAVE IS IT SEEMS A LITTLE BIT

04:33:04 23    UNFAIR TO HAVE THAT BE YOUR EXPERT REPORT, TO HAVE EVERYONE DO

04:33:08 24    EXPERT DISCOVERY ASSUMING THAT IS SAMSUNG'S ARTICLE OF

04:33:11 25    MANUFACTURE, AND THEN TO SUDDENLY SHOW UP ON THE DAY OF TRIAL

| | | |
|---|---|---|
| 04:33:13 | 1 | AND HAVE A DIFFERENT OPENING SAYING, WELL, WE'RE DROPPING THAT, |
| 04:33:17 | 2 | YOU KNOW, IT'S WHAT'S BEEN LITIGATED JANUARY, FEBRUARY, AND UP |
| 04:33:21 | 3 | UNTIL NOW, SUMMARY JUDGMENT, MOTIONS IN LIMINE, DAUBERTS, AND |
| 04:33:24 | 4 | THEN NOW WE'RE JUST GOING TO COME UP WITH THIS ALTERNATIVE THAT |
| 04:33:28 | 5 | WE KIND OF INCLUDED IN A ROG RESPONSE IN DECEMBER BEFORE WE |
| 04:33:32 | 6 | ENGAGED IN ANY EXPERT DISCOVERY, ANY DAUBERT MOTIONS, IN ANY |
| 04:33:36 | 7 | MOTIONS IN LIMINE, PRETRIAL CONFERENCE. |
| 04:33:38 | 8 | SO IT DOES CONCERN ME.  IT SEEMS UNFAIR.  IT SEEMS LIKE A |
| 04:33:42 | 9 | LITTLE BIT OF A BAIT AND SWITCH.  SO THEN DO YOU ALL WANT TO |
| 04:33:47 | 10 | RESPOND TO THAT?  BUT THEN WHAT'S THE PREJUDICE TO APPLE? |
| 04:33:49 | 11 | BECAUSE IT WAS IN THE INTERROGATORY RESPONSE THAT WAS FILED |
| 04:33:52 | 12 | DECEMBER 25TH OF 2017, IT SAYS IN THE ALTERNATIVE, IT DOES |
| 04:33:56 | 13 | INCLUDE THE DISPLAY SCREEN.  WHY SHOULDN'T IT JUST BE THE |
| 04:33:58 | 14 | CROSS? |
| 04:33:59 | 15 | MR. LEE:  I THINK, YOUR HONOR, I THINK THIS IS -- I |
| 04:34:01 | 16 | THINK HE MAY BE IN THE COURTROOM. |
| 04:34:03 | 17 | THE COURT:  IS MR. LUCENTE IN THE COURTROOM? |
| 04:34:04 | 18 | MR. LEE:  MAYBE NOT ANY LONGER. |
| 04:34:06 | 19 | THE PURPOSE OF THE DISCOVERY AND EXPERT PROCESS IS TO GET |
| 04:34:09 | 20 | US DOWN TO WHAT'S FINAL.  SOMEONE SAYS IN INTERROGATORIES IT |
| 04:34:13 | 21 | COULD BE A OR B, AND THEN THE EXPERT REPORT FOLLOWS AND HE SAYS |
| 04:34:15 | 22 | IT'S B, THEN THE EXPERT DISCOVERY IS TAKEN ON THE BASIS OF B. |
| 04:34:19 | 23 | THE RESPONSE FROM OUR EXPERT IS BASED ON -- |
| 04:34:22 | 24 | THE COURT:  IT BEING B, RIGHT. |
| 04:34:23 | 25 | MR. LEE:  AND THAT'S WHAT IT SHOULD BE LIMITED TO. |

04:34:25   1    IT CAN'T BE THAT -- IT WOULD BE ONE THING IF THE EXPERT TRIED

04:34:28   2    TO EXPAND ON THE INTERROGATORY RESPONSE.  BUT IT'S A DIFFERENT

04:34:31   3    THING WHEN HE'S BASICALLY TRYING TO GO BACK TO WHAT HE DID

04:34:34   4    BEFORE.

04:34:34   5            MS. MAROULIS:  YOUR HONOR, IF I MAY ADDRESS, I DON'T

04:34:37   6    HAVE MY TEAM MEMBERS WHO WERE RESPONSIBLE FOR MR. LUCENTE IN

04:34:39   7    THE COURTROOM.  I DIDN'T REALIZE THIS ISSUE WOULD BE

04:34:41   8    VENTILATED.

04:34:42   9            THE COURT:  WELL, THE PROBLEM IS I HAVE TO RULE ON

04:34:44   10   THEM.  I THINK IT'S COMING UP IN HIGH PRIORITY OBJECTIONS

04:34:47   11   TONIGHT, AND SO IT'S AN ISSUE.  IT'S ALSO AN ISSUE KIND OF IN

04:34:50   12   THE FINAL JURY INSTRUCTIONS, WHICH I ALSO WANTED TO FILE

04:34:53   13   TONIGHT.

04:34:53   14       WHAT --

04:34:54   15           MS. MAROULIS:  IT IS MY UNDERSTANDING --

04:34:56   16           THE COURT:  MR. LEE, HAS YOUR POSITION CHANGED OR

04:34:59   17   WHAT?

04:34:59   18           MR. MUELLER:  CAN WE SPEAK FOR ONE MOMENT?

04:35:01   19           THE COURT:  YEAH, GO AHEAD, PLEASE.

04:35:03   20       (DISCUSSION AFTER THE RECORD BETWEEN PLAINTIFF'S COUNSEL.)

04:35:08   21           MR. LEE:  YOUR HONOR, WE'RE CONTENT TO CROSS-EXAMINE

04:35:11   22   HIM ON IT.

04:35:11   23           THE COURT:  OKAY.  ALL RIGHT.  SO YOU'RE NOT GOING TO

04:35:13   24   RAISE IT.  OKAY.  THEN THAT MIGHT TAKE CARE OF IT.  THEY'RE

04:35:16   25   FINE WITH IT.

04:35:17  1             MS. MAROULIS:  THANK YOU, YOUR HONOR.

04:35:17  2             THE COURT:  OKAY.  THAT WAS EASY.

04:35:19  3         OKAY, GOOD.  THEN VERDICT FORM, FINAL JURY INSTRUCTIONS

04:35:22  4    TONIGHT, AS WELL AS HIGH PRIORITY OBJECTIONS.

04:35:25  5         YOU ALL WILL FILE YOUR JOINT EXHIBIT LIST, PLEASE.

04:35:31  6         WHAT ELSE?  AND THEN TOMORROW, THURSDAY, 4:30, YOU CAN

04:35:35  7    ARGUE RULE 50'S WHICH YOU HAVE PRESERVED WHEN APPLE CLOSES ITS

04:35:39  8    CASE-IN-CHIEF TOMORROW.

04:35:40  9         WHAT ELSE?

04:35:40 10             MR. LEE:  AND, YOUR HONOR, I DON'T KNOW IF THERE'S

04:35:42 11    ONE POSSIBILITY RATHER THAN, YOU KNOW, DEPENDING UPON WHERE WE

04:35:46 12    ARE IN THE EVIDENCE, WE CAN FILE A WRITTEN JMOL IF THAT'S

04:35:50 13    EASIER FOR YOUR HONOR.

04:35:51 14             THE COURT:  ARE YOU KIDDING?

04:35:52 15         (LAUGHTER.)

04:35:53 16             THE COURT:  NO.  I DON'T WANT THAT.  I DON'T WANT

04:35:54 17    THAT.

04:35:55 18             MR. LEE:  I TRIED.

04:35:55 19         (LAUGHTER.)

04:35:56 20             THE COURT:  I PREFER TO JUST GIVE YOU A FEW MINUTES.

04:36:01 21    ANYWAY -- WELL, ANYWAY.  WE CAN DISCUSS IT LATER.  I DON'T WANT

04:36:07 22    A WRITTEN JMOL.

04:36:09 23             MR. LEE:  OKAY.

04:36:09 24             THE COURT:  OKAY?  I'D LIKE TO HANDLE EVERYTHING

04:36:12 25    ORALLY AND KEEP THINGS MOVING.  I STILL INTEND TO HAVE THIS

| | |
|---|---|
| 04:36:15 | 1 |

1    CLOSE ON FRIDAY AFTERNOON.  I THINK IT'S DOABLE.

2         OH, LET ME GIVE YOU YOUR TIME ESTIMATES.  SORRY.

3         (PAUSE IN PROCEEDINGS.)

4              THE COURT:  OKAY.  SO TODAY APPLE USED 3 HOURS AND

5    6 MINUTES, SO IN TOTAL, WITH THE TIME YOU USED YESTERDAY, YOU

6    USED 5 HOURS AND 7 MINUTES BETWEEN THE 2 DAYS.  YOU HAVE

7    2 HOURS AND 53 MINUTES LEFT, SO LESS THAN 3 HOURS.

8         SAMSUNG TODAY USED 2 HOURS AND 5 MINUTES.  WITH THE TIME

9    USED YESTERDAY, YOU'VE USED A TOTAL OF 3 HOURS AND 3 MINUTES.

10   SO YOU HAVE 4 HOURS AND 57 MINUTES, JUST SLIGHTLY LESS THAN

11   5 HOURS LEFT.

12        SO I THINK BASED ON THAT, IF WE DO A GOOD 5-PLUS HOURS

13   TOMORROW, HOPEFULLY, THAT YOU COULD FINISH ALL OF YOUR EVIDENCE

14   IN THE MORNING ON FRIDAY, AND THAT I COULD GIVE CLOSING JURY

15   INSTRUCTIONS -- YOU KNOW, THE PRELIMINARIES TOOK, WHAT, ABOUT

16   30 MINUTES.  THERE WILL BE A LITTLE LONGER, BUT I THINK WE

17   COULD GET THAT DONE IN 45 MINUTES.

18        YOU HAVE, WHAT, 1 HOUR EACH ON CLOSINGS?  IS THAT CORRECT?

19   LET ME CHECK.

20        I THINK WE CAN GET THIS DONE BY -- I'M SORRY IT'S SO WARM

21   IN HERE -- I THINK WE CAN GET THIS DONE BY FRIDAY AFTERNOON,

22   AND THE JURY WILL REALLY START DELIBERATING IN FULL FORCE ON

23   MONDAY MORNING.  OKAY?

24        SO LET'S TRY TO KEEP THIS ON TRACK.

25        ANYTHING ELSE FOR TODAY?

800

04:38:10  1          MS. MAROULIS:  YOUR HONOR, A COUPLE OF SMALL ISSUES.

04:38:12  2          THE COURT:  OKAY.

04:38:12  3          MS. MAROULIS:  ONE, WE WANTED TO SEEK CLARIFICATIONS

04:38:14  4  ABOUT SUBMISSION TO THE COURT IN EXCHANGE OF CLOSING

04:38:17  5  DEMONSTRATIVES.

04:38:17  6          THE COURT:  UM-HUM.

04:38:18  7          MS. MAROULIS:  PER THE COURT'S DIRECTION, WE'RE

04:38:20  8  PLANNING TO EXCHANGE EXHIBITS AND DEMONSTRATIVE SLIDES.  WE DID

04:38:23  9  NOT THINK WE NEEDED TO EXCHANGE TESTIMONY.  IN OTHER WORDS, IF

04:38:26  10  WE WANTED TO SHOW THE WITNESS'S TESTIMONY AND JUST HIGHLIGHT ON

04:38:29  11  THE FLY, WOULD THAT COUNT AGAINST THE 50 AND DOES THE COURT

04:38:33  12  NEED TO SEE IT?  WE'RE JUST TRYING TO UNDERSTAND.

04:38:35  13          THE COURT:  I ASSUME NO, AS LONG AS IT'S NOT

04:38:37  14  TESTIMONY THAT'S BEEN OBJECTED TO OR STRICKEN, I DON'T THINK

04:38:40  15  ANY TESTIMONY HAS BEEN STRICKEN THUS FAR.  AS LONG AS IT'S NOT

04:38:43  16  ANYTHING THAT'S BEEN OBJECTED TO, I THINK THAT'S FINE.

04:38:45  17     MR. LEE, ARE YOU FINE WITH THAT?

04:38:47  18          MR. LEE:  I THINK AS LONG AS WHAT'S DONE IS IF

04:38:50  19  THERE'S A PICTURE OF THE WITNESS AND THE TESTIMONY AND NOTHING

04:38:53  20  ELSE.

04:38:53  21          MS. MAROULIS:  RIGHT, NO TITLES.

04:38:55  22          MR. LEE:  NO TITLES, NO EDITORIALIZING, JUST THE

04:38:57  23  TESTIMONY.

04:38:58  24          THE COURT:  OKAY.  CAN YOU PLEASE MAYBE STIPULATE TO

04:39:00  25  SOME KIND OF PROTOCOL AMONGST YOURSELVES?

| | |
|---|---|
| 04:39:05 | 1 |
| 04:39:05 | 2 |
| 04:39:06 | 3 |
| 04:39:08 | 4 |
| 04:39:12 | 5 |
| 04:39:16 | 6 |
| 04:39:18 | 7 |
| 04:39:20 | 8 |
| 04:39:34 | 9 |
| 04:39:39 | 10 |
| 04:39:40 | 11 |
| 04:39:41 | 12 |
| 04:39:43 | 13 |
| 04:39:45 | 14 |
| 04:39:47 | 15 |
| 04:39:50 | 16 |
| 04:39:54 | 17 |
| 04:39:57 | 18 |
| 04:39:57 | 19 |
| 04:39:58 | 20 |
| 04:39:59 | 21 |
| 04:40:02 | 22 |
| 04:40:04 | 23 |
| 04:40:06 | 24 |
| 04:40:09 | 25 |

1    MS. MAROULIS:  YES, YOUR HONOR.

2    THE COURT:  OKAY.  WHAT ELSE?

3    MS. MAROULIS:  AND THEN WHEN WE EXCHANGE TOMORROW

4  MORNING AND WHEN WE BRING OBJECTIONS TO THE COURT, SOME OF THE

5  EVIDENCE WON'T BE IN YET, SO WE AGREED TENTATIVELY THAT PEOPLE

6  CAN SUPPLEMENT THAT AFTER THE EVIDENCE CLOSES, AND WE WILL TRY

7  TO KEEP IT TO A MINIMUM.

8    THE COURT:  OKAY.  WOULD IT HELP YOU TO GET A COUPLE

9  MORE HOURS TO PERHAPS FILE IT, I DON'T KNOW, 3:00 INSTEAD OF

10  1:30?

11    MS. MAROULIS:  IT MAY.

12    THE COURT:  I DON'T KNOW IF THAT MAKES A DIFFERENCE.

13    MS. MAROULIS:  WE'RE JUST ENVISIONING IF YOU HAVE,

14  FOR EXAMPLE, A DEMONSTRATIVE EXHIBIT THAT SOMEBODY WOULD --

15  EITHER SIDE WOULD OBJECT TO BEFORE THEY SAW THE TESTIMONY, AND

16  ONCE THEY SAW THE TESTIMONY, THEY DON'T OBJECT, AND THE COURT

17  WOULDN'T HAVE TO RULE ON IT.  THAT'S WHAT WE'RE CONCERNED

18  ABOUT.

19    THE COURT:  UM-HUM.

20    MR. LEE:  YOUR HONOR, WHATEVER THE TIME IS, I THINK

21  THERE'S GOING TO BE A DISCRETE NUMBER OF THINGS THAT COME IN

22  AFTER WE FILE TOMORROW.

23    I THINK ONE QUESTION WE DO HAVE IS THAT THERE WAS 50

24  DEMONSTRATIVE LIMIT, I THINK, BEFORE.

25    THE COURT:  UM-HUM.

802

| 04:40:10 | 1 | MR. LEE:  AND THE WAY WE BOTH DID IT THE FIRST TIME |
| 04:40:13 | 2 | IS THAT THE LIMIT OF 40, I THINK, FOR THE FIRST GO ROUND, WAS |
| 04:40:17 | 3 | DEMONSTRATIVES AND THEN WE GAVE EACH OTHER A LIST OF EXHIBITS. |
| 04:40:20 | 4 | WE UNDERSTAND THAT YOUR HONOR WANTS TO SEE NOT ONLY THE |
| 04:40:23 | 5 | DEMONSTRATIVES, BUT WHAT WE'RE GOING TO SHOW FROM THE EXHIBITS |
| 04:40:27 | 6 | SO YOU CAN SEE THE FORMAT TO MAKE SURE THERE'S NOT SOMETHING |
| 04:40:29 | 7 | OBJECTIONABLE, AND I THINK WE BOTH WANT TO, TOO.  I THINK WE |
| 04:40:33 | 8 | BOTH -- |
| 04:40:33 | 9 | THE COURT:  YOU NEED MORE NUMBERS? |
| 04:40:35 | 10 | MR. LEE:  YEAH. |
| 04:40:35 | 11 | THE COURT:  OKAY.  WHAT NUMBERS DO YOU NEED?  I JUST |
| 04:40:37 | 12 | DON'T WANT TO HAVE AN OVERWHELMING NUMBER, PLEASE. |
| 04:40:40 | 13 | WHAT WOULD YOU NEED TO INCLUDE EVERYTHING, OTHER THAN |
| 04:40:43 | 14 | TRIAL TESTIMONY? |
| 04:40:47 | 15 | (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.) |
| 04:40:58 | 16 | MR. LEE:  I THINK 75 WOULD DO IT FOR US, YOUR HONOR. |
| 04:41:02 | 17 | MS. MAROULIS:  THAT SHOULD BE FINE, YOUR HONOR. |
| 04:41:03 | 18 | THE COURT:  OKAY.  ALL RIGHT.  SO WE'LL SEE -- THAT'S |
| 04:41:06 | 19 | FINE, 75.  SO YOU SHOULD INCLUDE EVERYTHING, DEMONSTRATIVES, |
| 04:41:09 | 20 | BLOWUPS OF EXHIBITS, POWERPOINT SLIDES, JUST NOT TRIAL |
| 04:41:14 | 21 | TESTIMONY; CORRECT? |
| 04:41:15 | 22 | MR. LEE:  CORRECT. |
| 04:41:16 | 23 | MS. MAROULIS:  RIGHT. |
| 04:41:16 | 24 | THE COURT:  OKAY.  SO IF YOU COULD INCLUDE ALL THAT |
| 04:41:19 | 25 | IN THE 75, PLEASE. |

803

```
04:41:20   1           I -- WELL, WHEN WOULD YOU NEED THAT RULING?
04:41:35   2                MR. LEE:  FRIDAY MORNING TO GIVE US SOME TIME TO
04:41:38   3      ADJUST.
04:41:39   4                THE COURT:  WOULD FRIDAY MORNING BE SUFFICIENT?
04:41:41   5                MS. MAROULIS:  YES, YOUR HONOR.
04:41:42   6                THE COURT:  OKAY.  THEN WHY DON'T -- I MEAN, MOST
04:41:45   7      LIKELY WE'LL DO IT ON THURSDAY NIGHT AND NOT FRIDAY MORNING.
04:41:51   8          WOULD THE EXTRA 2 HOURS HELP YOU?
04:41:54   9                MS. MAROULIS:  YES, YOUR HONOR, IT MAY.
04:41:55  10                THE COURT:  OKAY.
04:41:56  11                MS. MAROULIS:  BECAUSE WE'RE STARTING OUR CASE
04:41:58  12      TOMORROW.
04:41:58  13                THE COURT:  SURE.  YEAH.  AND I'M SORRY THIS DOES
04:42:02  14      CREATE A PROBLEM IN THAT WAY.
04:42:04  15          OKAY.  LET'S SAY 3:00 O'CLOCK THEN TOMORROW.
04:42:06  16                MS. MAROULIS:  THANK YOU.
04:42:06  17                MR. LEE:  THAT'S FINE.
04:42:07  18                THE COURT:  ALL RIGHT.  3:00 O'CLOCK TOMORROW.
04:42:09  19          YOU'LL GET THE RULING ON YOUR FOURTH DAY HIGH PRIORITY
04:42:13  20      OBJECTIONS.  I ASSUME YOU HAVE FIFTH DAY ONES AS WELL THAT
04:42:16  21      YOU'LL FILE TOMORROW?
04:42:18  22                MS. MAROULIS:  ARE YOU DISCLOSING MORE WITNESSES?
04:42:20  23                MR. LEE:  ONLY THE REBUTTALS THAT WE'VE DISCLOSED
04:42:22  24      ALREADY.
04:42:23  25          SO THERE MAY BE A SMALL NUMBER.
```

```
04:42:25  1              MS. MAROULIS:  A FEW.

04:42:26  2              THE COURT:  OKAY.  SO NOT MUCH.  OKAY.  THAT'S FINE.

04:42:28  3     THEN WE'LL TRY TO GET YOU THE RULINGS ON YOUR CLOSINGS THURSDAY

04:42:31  4     NIGHT SO YOU CAN TRY TO INCORPORATE IT INTO YOUR PREPARATION

04:42:34  5     FOR CLOSING ARGUMENTS.

04:42:35  6              MR. LEE:  AND CAN WE EXCLUDE FROM THE 75, YOUR HONOR,

04:42:39  7     ANY -- IF WE PROJECT ANY PORTION OF YOUR INSTRUCTIONS ON THE

04:42:43  8     SCREEN SO THAT THEY CAN READ AGAINST THEM?

04:42:45  9              THE COURT:  YES, THAT'S FINE.

04:42:47  10             MR. LEE:  THANK YOU.

04:42:47  11             MS. MAROULIS:  THANK YOU.

04:42:48  12             THE COURT:  SO ANY TRIAL TESTIMONY, ANY JURY

04:42:50  13    INSTRUCTIONS ARE EXCLUDED FROM THE 75.

04:42:52  14        BUT ANY DEMONSTRATIVES, ANY POWERPOINT, ANY BLOWUPS OF

04:42:56  15    EXHIBITS IS INCLUDED IN THAT.

04:42:58  16             MR. LEE:  OKAY.

04:42:58  17             THE COURT:  OKAY.  WHAT ELSE?

04:43:00  18             MR. LEE:  THANK YOU.

04:43:00  19             THE COURT:  ANYTHING ELSE?

04:43:01  20             MS. MAROULIS:  YOUR HONOR, ONE MORE THING AND

04:43:04  21    MR. ANDERSON IS GOING TO ADDRESS THAT.

04:43:05  22             THE COURT:  OKAY.  WHAT'S THAT?

04:43:06  23             MR. ANDERSON:  WE HAD A REQUEST FROM THE COURT DURING

04:43:08  24    THE BREAK ABOUT JX 1500P -- SORRY.  FOR CONTEXT, SAMSUNG FILED

04:43:15  25    AN HPO ON SOME OF THE DISCLOSURES.
```

04:43:15   1                THE COURT:  OKAY.

04:43:18   2                MR. ANDERSON:  AND IT'S ABOUT USING 2012 TRIAL

04:43:21   3        EXHIBITS WITH MR. WAGNER'S TESTIMONY.

04:43:25   4            WE GOT A REQUEST DURING THE BREAK FOR SOMETHING, BUT IT

04:43:28   5        WASN'T CLEAR TO ME IF THE COURT NEEDED SOMETHING FROM US TO

04:43:30   6        CLEAR THINGS UP.

04:43:31   7                THE CLERK:  YOUR HONOR, MY APOLOGIES.  I DID RECEIVE

04:43:35   8        A NOTE FROM CHAMBERS.

04:43:36   9                MR. ANDERSON:  IF WE DON'T NEED TO -- WE'RE JUST HERE

04:43:39  10        TO ANSWER THE QUESTIONS.

04:43:40  11                THE COURT:  I THINK IT'S BECAUSE WE DON'T HAVE IT.  I

04:43:42  12        THINK WE DON'T HAVE THE DOCUMENT THAT WOULD BE HELPFUL IN

04:43:44  13        RULING ON THE HPO.  IS THAT SOMETHING THAT YOU --

04:43:47  14                MR. ANDERSON:  SO I THINK YOU HAVE -- I THINK YOU

04:43:49  15        HAVE THE 1500C.

04:43:51  16                THE COURT:  OKAY.

04:43:52  17                MR. ANDERSON:  IT JUST WENT INTO EVIDENCE TODAY, IN

04:43:54  18        FACT.  IT'S COMPLICATED.

04:43:56  19            THE OTHER EXHIBITS ARE FROM 2012, AND I'D HAVE TO -- AND

04:44:00  20        APPLE'S THE ONE WHO WANTS TO USE THEM, SO I'D HAVE TO ASK THEM.

04:44:03  21                MR. LEE:  CAN I ASK MR. OLSON TO ADDRESS IT.

04:44:05  22                THE COURT:  THAT'S FINE.

04:44:07  23            MS. MASON, DID YOU GIVE THE REQUEST ONLY TO ONE SIDE?

04:44:10  24                THE CLERK:  NO.  IT WAS EARLIER AT THE BREAK, YOUR

04:44:13  25        HONOR.

04:44:13  1                    THE COURT:  OH, OKAY.

04:44:14  2                    THE CLERK:  I THINK BOTH COUNSEL --

04:44:16  3                    THE COURT:  IS IT SOMETHING THAT APPLE HAS?

04:44:19  4                    MR. OLSON:  ABSOLUTELY.  WE BELIEVED THE COURT

04:44:21  5      ALREADY HAS IT.  IT'S A THREE PAGE DOCUMENT.  WE WILL SUBMIT IT

04:44:24  6      AS SOON AS WE GET BACK.

04:44:26  7                    THE COURT:  OKAY.  HOW ARE YOU GOING TO SUBMIT IT?

04:44:28  8                    MR. OLSON:  HOWEVER THE COURT WOULD LIKE IT.  WE

04:44:30  9      COULD RUN IT OVER, WE COULD --

04:44:32  10                   THE CLERK:  E-MAIL A PDF COPY, YOUR HONOR.

04:44:34  11                   THE COURT:  YEAH, COULD YOU E-MAIL IT?

04:44:36  12                   MR. OLSON:  ABSOLUTELY, YOUR HONOR.

04:44:37  13                   THE COURT:  WE'LL BE HERE, BUT THE COURTHOUSE WILL BE

04:44:40  14     CLOSED.

04:44:41  15                   MR. OLSON:  UNDERSTOOD.

04:44:41  16                   THE COURT:  IF YOU COULD E-MAIL IT TO MS. MASON,

04:44:43  17     PLEASE.

04:44:44  18                   MR. OLSON:  WE'LL DO THAT.

04:44:45  19                   THE COURT:  ALL RIGHT.

04:44:46  20                   MR. OLSON:  THANK YOU.

04:44:46  21                   THE COURT:  DOES THAT TAKE CARE OF THAT ISSUE?

04:44:48  22                   MR. ANDERSON:  YES.

04:44:49  23                   THE COURT:  OKAY.  ANYTHING ELSE?  AND I'M GOING TO

04:44:51  24     TRY TO SEE IF WE CAN DO ANYTHING ABOUT THE AIR IN HERE.  I

04:44:54  25     CAN'T MAKE ANY PROMISE, BUT -- ANYTHING ELSE?

807

| | | |
|---|---|---|
| 04:44:57 | 1 | MR. LEE:  NOTHING FOR APPLE, YOUR HONOR. |
| 04:44:58 | 2 | MS. MAROULIS:  NOTHING FOR SAMSUNG, YOUR HONOR. |
| 04:45:00 | 3 | THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH. |
| 04:45:01 | 4 | THANK YOU. |
| 04:45:20 | 5 | OH, YOU KNOW, ONE QUICK THING.  SORRY.  ONE OF THE |
| 04:45:23 | 6 | EXHIBITS THAT YOU ADMITTED DURING MS. DAVIS WAS ALREADY |
| 04:45:25 | 7 | PREVIOUSLY ADMITTED, AND THAT IS PX 36.  SO WE JUST DON'T NEED |
| 04:45:36 | 8 | TO ADMIT THAT TWICE.  BUT -- |
| 04:45:38 | 9 | MR. LEE:  OKAY. |
| 04:45:39 | 10 | THE COURT:  USE THE EARLIER DATE, PLEASE.  IT WAS |
| 04:45:41 | 11 | ADMITTED WITH MR. BALL. |
| 04:45:45 | 12 | THANK YOU. |
| 04:45:45 | 13 | MR. LEE:  THANK YOU. |
| 04:45:46 | 14 | (THE EVENING RECESS WAS TAKEN AT 4:45 P.M.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18        _____

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  MAY 16, 2018

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25