1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
    CORPORATION,              )
7                      )  SAN JOSE, CALIFORNIA
             PLAINTIFF,   )
8                      )  MAY 17, 2018
         VS.             )
9                      )  VOLUME 4
    SAMSUNG ELECTRONICS CO., LTD., )
10  A KOREAN BUSINESS ENTITY;   )  PAGES 808 - 1115
    SAMSUNG ELECTRONICS AMERICA,  )
11  INC., A NEW YORK CORPORATION; )
    SAMSUNG TELECOMMUNICATIONS   )
12  AMERICA, LLC, A DELAWARE    )
    LIMITED LIABILITY COMPANY,   )
13                      )
           DEFENDANTS.   )
14  _____)

15

16              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17         UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595
23                   IRENE RODRIGUEZ, CSR, CRR, CMR
                       CERTIFICATE NUMBER 8074
24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER

```
1        APPEARANCES

2        FOR PLAINTIFF         WILMER, CUTLER, PICKERING,
         APPLE:                HALE AND DORR
3                              BY:  WILLIAM F. LEE
                                    JOSEPH J. MUELLER
4                                   SARAH R. FRAZIER
                               60 STATE STREET
5                              BOSTON, MASSACHUSETTS  02109

6                              BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
7                              PALO ALTO, CALIFORNIA  94304

8                              BY:  AMY K. WIGMORE
                               1875 PENNSYLVANIA AVENUE, N.W.
9                              WASHINGTON, D.C.  20006

10                             MORRISON & FOERSTER
                               BY:  NATHAN B. SABRI
11                             425 MARKET STREET, 32ND FLOOR
                               SAN FRANCISCO, CALIFORNIA  94105
12
                               BY:  ERIK OLSON
13                             755 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
14

15       ALSO PRESENT:         NOREEN KRALL
                               CYNDI WHEELER
16                             THOMAS LEE

17

18

19

20

21

22

23

24

25
```

1       APPEARANCES (CONTINUED)

2

3       FOR DEFENDANT            QUINN, EMANUEL, URQUHART & SULLIVAN
        SAMSUNG:                 BY:  JOHN B. QUINN
4                                     WILLIAM C. PRICE
                                      SCOTT L. WATSON
5                                865 SOUTH FIGUEROA STREET, 10TH FLOOR
                                 LOS ANGELES, CALIFORNIA  90017
6
                                 BY:  VICTORIA F. MAROULIS
7                                555 TWIN DOLPHIN DRIVE
                                 SUITE 560
8                                REDWOOD SHORES, CALIFORNIA  94065

9                                BY:  KATHLEEN M. SULLIVAN
                                 50 MADISON AVENUE, 22ND FLOOR
10                               NEW YORK, NEW YORK  10022

11

12      ALSO PRESENT:            CHRIS GRANT
                                 KEN KOTARSKI
13
                                 INTERPRETERS:
14                               ALBERT S. KIM
                                 ANN PARK
15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF WITNESSES

2        PLAINTIFF'S

3        JULIE DAVIS
              CROSS-EXAM BY MR. PRICE (RES.)          P. 815
4

5

6        DEFENDANTS'

7        DREW BLACKARD
              DIRECT EXAM BY MS. MAROULIS            P. 828
8             CROSS-EXAM BY MR. LEE                  P. 848
              REDIRECT EXAM BY MS. MAROULIS          P. 857
9

10       JINSOO KIM
              DIRECT EXAM BY MR. QUINN              P. 859
11            CROSS-EXAM BY MR. MUELLER             P. 880

12       DONGWOOK KIM
              DIRECT EXAM BY MS. MAROULIS            P. 887
13            CROSS-EXAM BY MR. SABRI                P. 895

14       TIMOTHY SHEPPARD
              DIRECT EXAM BY MS. MAROULIS            P. 900
15            CROSS-EXAM BY MS. WIGMORE              P. 915
              REDIRECT EXAM BY MS. MAROULIS          P. 938
16

17       SAM LUCENTE
              DIRECT EXAM BY MR. QUINN              P. 939
18            CROSS-EXAM BY MR. MUELLER             P. 986
              REDIRECT BY MR. QUINN                 P. 1020
19

20       MICHAEL WAGNER
              DIRECT EXAM BY MR. PRICE              P. 1025
21

22

23

24

25

812

INDEX OF EXHIBITS

                                    MARKED      ADMITTED

PLAINTIFF'S




DEFENDANTS'

4528                                            840
4607                                            842
4606                                            845
684                                             867
526                                             879
4568                                            889
4509 (SEALED)                                   892
4520 (SEALED)                                   895
753                                             903
676                                             910
4561                                            978
4516                                            985
781                                             1032
4536                                            1055
4537                                            1066

JOINT

1093                                            870
1062                                            954
1064                                            958
1063                                            961

|     |                                                                                  |
| --- | -------------------------------------------------------------------------------- |
|  1  | SAN JOSE, CALIFORNIA                    MAY 17, 2018                              |
|  2  | P R O C E E D I N G S                                                            |

09:02:00  3     (JURY OUT AT 9:02 A.M.)

09:02:00  4          THE COURT:  TWO QUICK QUESTIONS.  HAVE WE FINISHED

09:02:03  5     WITH HIGH PRIORITY OBJECTIONS FOR WITNESSES?  BECAUSE THERE

09:02:06  6     WERE NONE FILED THIS MORNING.

09:02:07  7          MS. MAROULIS:  YES, YOUR HONOR.  THE PARTIES DID NOT

09:02:09  8     FILE OBJECTIONS.

09:02:10  9          MR. LEE:  THAT'S TRUE.  THERE WERE NONE FOR THE

09:02:12  10    REBUTTAL CASE.

09:02:12  11         THE COURT:  OKAY.  SO THEN IT'LL JUST BE THE CLOSING.

09:02:15  12    OKAY.

09:02:15  13      IN THE PAST, I DON'T THINK WE'VE ACTUALLY ADMITTED

09:02:18  14    DEMONSTRATIVES AS EXHIBITS, BUT IF YOU'D LIKE TO, I'LL DEFER TO

09:02:21  15    THE PARTIES.

09:02:23  16         MR. LEE:  I THINK WE HAVE NOT IN THE PAST, AND I

09:02:25  17    THINK WE SHOULD ADHERE TO THAT.

09:02:26  18         THE COURT:  YEAH.

09:02:28  19         MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

09:02:29  20         THE COURT:  OKAY.  ALL RIGHT.  I JUST WASN'T SURE.

09:02:32  21      ALL RIGHT.  LET'S BRING IN OUR JURY, PLEASE.

09:02:34  22         THE CLERK:  YES, YOUR HONOR.

09:02:50  23      YOUR HONOR, ONE IS IN THE RESTROOM.

09:02:51  24         THE COURT:  OKAY.  NO.  PROBLEM.

09:02:53  25         OH, IRENE, COULD YOU CLOSE THE DOOR A MINUTE, PLEASE,

814

| | | |
|---|---|---|
| 09:02:56 | 1 | WHILE WE'RE WAITING.  I WANT TO ASK ONE MORE QUESTION. |
| 09:02:59 | 2 | WERE YOU ABLE TO CHECK WITH YOUR CLIENTS ABOUT ADR? |
| 09:03:02 | 3 | MR. LEE:  WE WERE, YOUR HONOR.  I THINK, DEPENDING ON |
| 09:03:06 | 4 | WHAT HAPPENS NEXT WEEK, WE'D BE HAPPY TO REVISIT THE ISSUE |
| 09:03:10 | 5 | AFTER WE KNOW WHAT HAPPENS NEXT WEEK. |
| 09:03:14 | 6 | MS. MAROULIS:  YOUR HONOR, SAMSUNG IS WILLING TO |
| 09:03:16 | 7 | PARTICIPATE IN ADR. |
| 09:03:17 | 8 | THE COURT:  OKAY, THANK YOU.  I HOPE APPLE IS AS WELL |
| 09:03:20 | 9 | IF SAMSUNG IS WILLING TO.  IT'S BEEN EIGHT YEARS. |
| 09:03:23 | 10 | ALL RIGHT.  SO YOU WANT TO JUST HAVE ANOTHER CONVERSATION |
| 09:03:26 | 11 | NEXT WEEK, ASSUMING THERE'S A VERDICT? |
| 09:03:28 | 12 | MR. LEE:  YES. |
| 09:03:29 | 13 | MS. MAROULIS:  YES, YOUR HONOR. |
| 09:03:30 | 14 | THE COURT:  OKAY.  WELL, I WOULD -- MR. LEE, I DO |
| 09:03:33 | 15 | WANT YOU TO CONVEY TO YOUR CLIENT THAT THEY REALLY SHOULD BE |
| 09:03:36 | 16 | WILLING TO IF SAMSUNG IS WILLING TO. |
| 09:03:38 | 17 | MR. LEE:  FINE, YOUR HONOR.  I DIDN'T INTEND TO SAY |
| 09:03:41 | 18 | THAT WE WEREN'T.  I JUST THOUGHT THAT DEPENDING ON WHAT |
| 09:03:44 | 19 | HAPPENS, IT'S GOING TO AFFECT BOTH OF OUR VIEW ON ADR.  TO BE |
| 09:03:48 | 20 | CLEAR -- |
| 09:03:48 | 21 | THE COURT:  I UNDERSTAND, BUT I'D LIKE AT LEAST AN |
| 09:03:51 | 22 | ATTEMPT EVEN IF YOU'RE NOT ABLE TO RESOLVE YOUR DISPUTE. |
| 09:03:53 | 23 | MR. LEE:  WE'RE HAPPY TO DO THAT EVEN IF WE'RE NOT |
| 09:03:55 | 24 | ABLE TO RESOLVE IT. |
| 09:03:56 | 25 | THE COURT:  ALL RIGHT.  THANK YOU BOTH.  AND THANK |

09:03:58   1     YOU FOR CHECKING WITH YOUR CLIENTS SO QUICKLY.

09:04:02   2          OKAY.  LET'S SEE IF OUR JURORS ARE OUT OF THE RESTROOM.

09:04:05   3              THE CLERK:  YOUR HONOR, ARE YOU READY?

09:04:08   4              THE COURT:  YEAH, IF THEY'RE READY.

09:04:12   5          (JURY IN AT 9:04 A.M.).

09:04:24   6              THE COURT:  ALL RIGHT.  GOOD MORNING.  WELCOME BOX.

09:04:26   7     PLEASE TAKE A SEAT.

09:04:28   8          MS. DAVIS, IF YOU WOULD PLEASE TAKE THE STAND, YOU ARE

09:04:31   9     STILL UNDER OATH.

09:04:33   10         I'M GOING TO GIVE MR. PRICE A MINUTE TO GET SET UP.  LET

09:04:36   11    ME KNOW WHEN YOU'RE READY TO GO.

09:04:38   12         **(PLAINTIFF'S WITNESS, JULIE DAVIS WAS PREVIOUSLY SWORN.)**

09:04:43   13             MR. PRICE:  READY, YOUR HONOR.

09:04:45   14             THE COURT:  WOULD YOU LIKE TO BEGIN?  OKAY.  9:04.

09:04:48   15    GO AHEAD.

09:04:49   16              **CROSS-EXAMINATION (RESUMED)**

09:04:50   17    BY MR. PRICE:

09:04:51   18    Q.   GOOD MORNING, MS. DAVIS.

09:04:52   19    A.   GOOD MORNING, MR. PRICE.

09:04:54   20    Q.   ONE OF THE EXHIBITS WE LOOKED AT YESTERDAY WAS SDX 705,

09:04:58   21    AND THAT -- AND THAT'S ON A SCALE OF 0 TO 25 PERCENT SHOWING

09:05:08   22    BASIC MARKET SHARE OF THESE THREE COMPANIES; RIGHT?

09:05:11   23    A.   IT IS.

09:05:12   24    Q.   AND IF WE ADDED APPLE TO THAT, YOU LITERALLY HAVE TO GO

09:05:18   25    OFF THAT CHART, IF YOU LOOK AT APPLE IN THAT SAME TIMEFRAME;

09:05:22   1      RIGHT?

09:05:23   2      A.   THAT'S RIGHT.

09:05:23   3      Q.   SO LET ME SHOW YOU IN FRONT OF YOU, THERE'S AN EXHIBIT,

09:05:27   4      712.

09:05:34   5           DO YOU SEE THAT, IT LOOKS LIKE --

09:05:36   6                MR. LEE:   THAT'S SDX.

09:05:38   7                MR. PRICE:   SDX 712, YES.

09:05:40   8                MR. LEE:   THANK YOU.

09:05:40   9      BY MR. PRICE:

09:05:42   10     Q.   THIS IS FROM THAT SAME IDC INFORMATION; CORRECT?

09:05:45   11     A.   IT SURE IS.

09:05:46   12     Q.   IT LOOKS LIKE THIS ACCURATELY REPRESENTS THE MARKET SHARE

09:05:49   13     OF SAMSUNG AND APPLE THROUGHOUT THIS TIME PERIOD?

09:05:51   14     A.   IT LOOKS LIKE IT DOES.

09:05:52   15     Q.   AND SO WE HAVE -- AND AS YOU SAID, APPLE DOESN'T COME OUT

09:05:56   16     WITH NEW PRODUCTS THAT FREQUENTLY; CORRECT?

09:05:58   17     A.   ABOUT ONCE A YEAR FOR THE IPHONES.

09:06:00   18     Q.   YEAH.   AND SO DO YOU KNOW WHAT THE TIMEFRAME THIS IS,

09:06:04   19     FOURTH QUARTER, 2011?

09:06:05   20     A.   I WOULD EXPECT THAT TO BE PROBABLY THE IPHONE 4.

09:06:08   21     Q.   OKAY.

09:06:08   22     A.   OR THE 4S.

09:06:10   23     Q.   AND THERE'S A PEAK HERE, THEY WENT ON VERIZON; CORRECT?

09:06:14   24     A.   YES.

09:06:14   25     Q.   SO APPLE'S GOES UP AND DOWN AND IT PEAKS, AT LEAST ON THIS

09:06:18  1    CHART, AT AROUND -- IS IT CLOSE TO 50 PERCENT?

09:06:22  2    A.   I'D SAY SO.

09:06:23  3    Q.   OKAY.  AND ONE THING, YOU SAID YOU LOOKED AT THIS MARKET

09:06:30  4    AND YOU KNEW THAT IN 2010, OR THAT TIMEFRAME, THAT SAMSUNG

09:06:37  5    ACTUALLY WAS AHEAD OF EVERYONE IN TERMS OF ITS PROCESSOR SPEED;

09:06:42  6    CORRECT?

09:06:42  7    A.   I'M AWARE OF THAT.

09:06:44  8    Q.   AND IT WAS AHEAD OF EVERYONE IN THAT IT HAD 4G CAPABILITY;

09:06:48  9    CORRECT?

09:06:48  10   A.   IT DID HAVE 4G CAPABILITY.  MAY NOT HAVE BEEN THE ONLY

09:06:51  11   ONE.

09:06:51  12   Q.   WHEN IT CAME OUT WITH 4G CAPABILITY, APPLE DIDN'T HAVE IT;

09:06:56  13   CORRECT?

09:06:56  14   A.   I DO AGREE WITH YOU THERE.

09:06:57  15   Q.   AND APPLE ALSO HAD THE TURN-BY-TURN GPS BEFORE APPLE DID;

09:07:04  16   CORRECT?

09:07:04  17   A.   I THINK YOU MEAN APPLE.

09:07:07  18   Q.   SAMSUNG HAD TURN-BY-TURN GPS BEFORE APPLE DID?

09:07:11  19   A.   CORRECT.

09:07:12  20   Q.   THEY HAD THE HIGH QUALITY AMOLED, A-M-O-L-E-D, SCREEN;

09:07:19  21   CORRECT?

09:07:20  22   A.   IT DID.

09:07:21  23   Q.   AND THAT'S SORT OF THE STATE OF THE ART TODAY; CORRECT?

09:07:23  24   A.   I DON'T KNOW IF IT STILL IS, BUT IT WAS THEN.

09:07:28  25   Q.   YOU WERE ASKED SOME QUESTIONS IN YOUR DIRECT EXAMINATION

09:07:30  1    ABOUT THE GALAXY ACE.

09:07:32  2        DO YOU REMEMBER THAT?

09:07:33  3    A.   YES.

09:07:34  4    Q.   AND YOU WERE ASKED WHAT THE SALES WERE OF THE GALAXY ACE

09:07:36  5    IN THE U.S.; RIGHT?

09:07:38  6    A.   RIGHT.

09:07:38  7    Q.   IN FACT, THE GALAXY ACE WAS SOLD OVERSEAS; CORRECT?

09:07:42  8    A.   YES.

09:07:42  9    Q.   AND THE GALAXY ACE WAS ONE OF THE PRODUCTS THAT SAMSUNG

09:07:46  10   WAS SUED ON SEVERAL YEARS AGO; CORRECT?

09:07:48  11   A.   SAMSUNG DIDN'T SUE, BUT APPLE DID.

09:07:51  12   Q.   YOU'RE RIGHT.  I DID IT AGAIN.

09:07:50  13   A.   I AGREE WITH YOU THERE.

09:07:51  14   Q.   THANK YOU.  APPLE SUED SAMSUNG WITH RESPECT TO THE GALAXY

09:07:57  15   ACE; RIGHT?

09:07:58  16   A.   IT DID.

09:07:59  17   Q.   AND ONE OF THE THINGS IT ALLEGED WITH RESPECT TO THE

09:08:01  18   GALAXY ACE WAS THAT THE GALAXY ACE INFRINGED THAT '677 PATENT,

09:08:06  19   THE BLACK FRONT FACE; RIGHT?

09:08:07  20   A.   I DON'T REMEMBER IF IT HAD ALLEGATIONS ON THE '677.

09:08:12  21   DEFINITELY DID ON THE '381 AND THE '163.

09:08:15  22   Q.   WELL, YOU'VE REVIEWED THE VERDICT IN THE -- STRIKE THAT.

09:08:19  23        YOU REVIEWED THE PRIOR PROCEEDINGS; CORRECT?

09:08:21  24   A.   SURE.  BUT THERE'S A LOT OF PHONES INVOLVED.

09:08:24  25   Q.   AND ISN'T IT YOUR UNDERSTANDING THAT THE GALAXY ACE DOES

09:08:30   1    NOT INFRINGE THE '677 PATENT?

09:08:32   2            MR. LEE:  YOUR HONOR, WE'RE GETTING INTO THE PRIOR

09:08:34   3    VERDICT AGAIN AND OPENING IT UP.  AND JUST TO GO BACK TO WHAT

09:08:37   4    YOUR HONOR SAID ON THE FIRST DAY, IF IT OPENS IT UP, IT OPENS

09:08:41   5    IT UP.

09:08:42   6            MR. PRICE:  I PREVIEWED THIS EXACT QUESTION YESTERDAY

09:08:44   7    AND WAS TOLD I COULD ASK IT.

09:08:45   8            THE COURT:  THE OBJECTION'S OVERRULED.  YOU CAN

09:08:47   9    ANSWER THE QUESTION.

09:08:49  10            THE WITNESS:  I'M SORRY.  ASK AGAIN, PLEASE.

09:08:51  11    BY MR. PRICE:

09:08:52  12    Q.   THE GALAXY ACE DOES NOT INFRINGE THE D'677 PATENT;

09:09:00  13    CORRECT?

09:09:00  14    A.   IT DOES NOT, I AGREE.

09:09:02  15    Q.   NOW, YOU TESTIFIED ON DIRECT ON YOUR REVIEW, THAT YOU

09:09:07  16    REVIEWED AND BASED YOUR OPINION ON THE SPREADSHEET; CORRECT?

09:09:10  17    A.   YES.

09:09:10  18    Q.   AND THAT WAS EXHIBIT I THINK 676, AND IF WE CAN SHOW THE

09:09:17  19    FIRST PAGE OF THIS -- AND WHAT YOU USED FROM THIS --

09:09:24  20        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL).

09:09:34  21            MR. PRICE:  PX 180B, KEN.

09:09:38  22    Q.   SO THE SPREADSHEET THAT YOU LOOKED AT -- FOR ONE THING,

09:09:41  23    YOU NEED A MAGNIFYING GLASS TO READ IT; RIGHT?

09:09:43  24    A.   ALMOST.

09:09:45  25    Q.   AND WHAT YOU USED ARE THE SALES AND THIS COGS, COST OF

09:09:51   1    GOODS SOLD; CORRECT?

09:09:53   2    A.   NOT FOR THE PARTICULAR ROW YOU'RE LOOKING AT.  BUT I DID

09:09:57   3    CONSIDER COST OF GOODS SOLD AS A DEDUCTIBLE EXPENSE.  BUT IT'S

09:10:01   4    THE SEC COST OF GOODS SOLD, NOT STA LIKE YOU'RE POINTING AT.

09:10:06   5    Q.   THAT'S FURTHER DOWN ON HERE.  CAN WE SHOW THAT, KEN.

09:10:09   6         SO YOU'RE TALKING ABOUT THE STA COST OF GOODS SOLD; RIGHT?

09:10:13   7    A.   SEC COST OF GOODS SOLD.

09:10:16   8    Q.   AND JUST TO BE CLEAR, YOU THOUGHT THAT THAT FIGURE WAS A

09:10:23   9    FIGURE THAT HAD SOME INTEGRITY AND RELIABILITY BECAUSE THIS WAS

09:10:26   10   INFORMATION THAT WAS TAKEN FROM THE S.A. -- SAMSUNG'S S.A.P.

09:10:34   11   SYSTEM; CORRECT?

09:10:34   12   A.   THAT'S NOT NECESSARILY THE REASON WHY I BELIEVED IT WAS A

09:10:37   13   DEDUCTIBLE EXPENSE.  BUT IT IS A NUMBER THAT MR. WAGNER AND I

09:10:41   14   BOTH AGREE ON, AND THAT NUMBER DIDN'T REALLY CHANGE IN THE

09:10:46   15   VARIATIONS OF THE NINE DIFFERENT SPREADSHEETS.

09:10:48   16   Q.   EXCEPT FOR THAT $1.3 BILLION?

09:10:50   17   A.   EXCEPT FOR THE $1.3 BILLION.

09:10:52   18   Q.   AND THE WAY THAT SYSTEM IS DERIVED IS INFORMATION IS

09:10:56   19   ACCESSED FROM THIS S.A.P. SYSTEM; CORRECT?

09:11:02   20   A.   MY UNDERSTANDING FROM THE SAMSUNG WITNESSES IS THAT THESE

09:11:05   21   SPREADSHEETS WERE CREATED BY PULLING NUMBERS FROM THE S.A.P.

09:11:09   22   SYSTEM.

09:11:09   23   Q.   THAT S.A.P. SYSTEM, BY THE WAY, IS THE SYSTEM THAT IS

09:11:12   24   AUDITED WHEN SAMSUNG'S AUDITORS REVIEW ITS, ITS COMPANYWIDE

09:11:19   25   FINANCIAL INFORMATION; CORRECT?

09:11:20  1    A.   I WOULD EXPECT THAT'S WHAT PWC IS RELYING ON.

09:11:23  2    Q.   AND THOSE AUDITORS DO SORT OF LIKE SPOT CHECKS TO MAKE

09:11:26  3    SURE THAT THE TESTIMONY HAS INTEGRITY; CORRECT?

09:11:29  4    A.   I WOULD EXPECT THAT.

09:11:30  5    Q.   AND THAT'S A REASON TO RELY ON THAT NUMBER THAT IS DERIVED

09:11:33  6    FROM THAT S.A.P. SYSTEM; CORRECT?

09:11:36  7    A.   IT'S A REASON TO RELY UPON THE S.A.P. NUMBER.  THE

09:11:39  8    AUDITORS AREN'T LOOKING AT THESE SPREADSHEETS.

09:11:41  9    Q.   SO IT'S A REASON TO RELY ON -- YOU RELIED ON THE COST OF

09:11:47  10   GOODS SOLD; RIGHT?

09:11:48  11   A.   I DID.

09:11:49  12   Q.   AND JUST THE COST OF GOODS SOLD IS ABOUT 2 BILLION?

09:11:53  13   A.   2.3 BILLION FOR THE PHONES THAT WE'RE TALKING ABOUT HERE

09:11:56  14   DURING THE DAMAGES PERIOD.

09:11:58  15   Q.   AND THAT WOULD BE A LOT OF BILLS AND RECEIPTS FOR 2. --

09:12:03  16   $2 BILLION OF COST OF GOODS SOLD; RIGHT?

09:12:06  17   A.   YES.

09:12:07  18   Q.   AND YOU'RE RELYING ON THAT NUMBER PULLED FROM THE S.A.P.

09:12:12  19   SYSTEM; CORRECT?

09:12:13  20   A.   I AM.  I'M RELYING ON WHAT'S ON THE SPREADSHEET.

09:12:16  21   Q.   AND YOU HAVEN'T SEEN A SINGLE ACTUAL BILL OR RECEIPT IN

09:12:18  22   ORDER TO TELL THE JURY THAT YOU BELIEVE THAT THAT COST OF GOODS

09:12:22  23   SOLD NUMBER IS ACCURATE AND RELIABLE; CORRECT?

09:12:29  24   A.   I HAVE SEEN BILLS OF MATERIAL RELATED TO THE COST OF GOODS

09:12:34  25   SOLD.

09:12:34   1    Q.   AND THAT'S IN CONNECTION WITH MR. WAGNER'S COMPUTATION OF

09:12:40   2    THE ARTICLES OF MANUFACTURE?

09:12:41   3    A.   NO.   THAT WAS YEARS AGO BEFORE WE GOT TO THE ARTICLES OF

09:12:46   4    MANUFACTURE.

09:12:46   5    Q.   DID YOU RELY ON INDIVIDUAL BILLS AND RECEIPTS TOTALING

09:12:51   6    $2 BILLION TO RELY ON THE COST OF GOODS SOLD THAT YOU WERE

09:12:54   7    RELYING ON IN YOUR CALCULATIONS?

09:12:56   8    A.   NO.   I LOOKED AT THOSE BILLS OF MATERIAL, AND I INCLUDE

09:12:59   9    THAT INFORMATION IN MY RECORD.   BUT I HAVE NOT RELIED ON THAT

09:13:02   10   SPECIFICALLY.

09:13:03   11   Q.   ALL RIGHT.   THAT DOESN'T COME CLOSE TO $2 BILLION, DOES

09:13:08   12   IT?

09:13:08   13   A.   IT DOES NOT.

09:13:20   14   Q.   WHAT'S THE -- WHAT'S THE PROFIT MARGIN AS A PERCENT OF

09:13:25   15   REVENUE FOR YOUR OPINION ON SAMSUNG'S PROFITS?

09:13:29   16   A.   IF WE WERE TO LOOK AT EXHIBIT 1500, MY RECOLLECTION IS

09:13:34   17   THAT IT'S ABOUT 36 PERCENT.

09:13:36   18   Q.   AND AT YOUR DEPOSITION, I ASKED YOU TO CALCULATE

09:13:39   19   MR. WAGNER'S PROFITS MARGIN AS A PERCENTAGE OF REVENUE.   DO YOU

09:13:42   20   REMEMBER THAT?

09:13:43   21   A.   I DON'T REMEMBER THE NUMBER.   I REMEMBER THE QUESTION.

09:13:46   22   Q.   DO YOU REMEMBER ARRIVING AT -- WHEN YOU DID THE

09:14:16   23   CALCULATION ARRIVING AT A FIGURE SOMEWHERE BETWEEN 10 AND

09:14:19   24   12 PERCENT?

09:14:19   25   A.   I DON'T REMEMBER THE EXACT NUMBER.   BUT I WAS USING THE

09:14:22  1    SAME CALCULATOR, SO I WOULD PRESUMABLY GET THE SAME ANSWER

09:14:25  2    AGAIN.

09:14:25  3    Q.   OKAY.  SO IF YOU DIVIDED 443,553,699 BY 3, -- I'M SORRY,

09:14:38  4    443 BY 3,757,800, YOU'D GET ABOUT 12 PERCENT?

09:14:45  5    A.   I GET ABOUT 12 PERCENT.

09:14:46  6    Q.   AND IF YOU DIVIDE -- I SAID MILLION -- I SAID BILLION, BUT

09:14:56  7    THAT DOESN'T CHANGE THE RATIO; RIGHT?

09:14:58  8    A.   I KNEW WHAT YOU MEANT.

09:14:59  9    Q.   AND IF YOU DIVIDED 388,583,579 BY 3,757,800, WHAT DO YOU

09:15:16  10   GET?

09:15:17  11   A.   I GET ABOUT 10 PERCENT.

09:15:20  12   Q.   YOU WERE ASKED SOME QUESTIONS ABOUT PX 34, AND IF WE CAN

09:15:32  13   SHOW PX 34, THE FRONT PAGE.

09:15:34  14       YOU SAID THAT IN LOOKING AT SAMSUNG'S DOCUMENTS, YOU

09:15:39  15   WANTED TO KIND OF SEE THE CONTEXT OF WHAT WAS GOING ON IN THE

09:15:41  16   MARKET; RIGHT?

09:15:42  17   A.   RIGHT.

09:15:43  18   Q.   SO IN LOOKING AT THIS, YOU WANTED TO KNOW THE CONTEXT OF

09:15:45  19   WHAT THIS DOCUMENT WAS ABOUT; RIGHT?

09:15:47  20   A.   TO SOME EXTENT.  I WAS PROVIDING SOME INSIGHT AS TO WHAT

09:15:51  21   WAS GOING ON AT SAMSUNG AT THE TIME.

09:15:53  22   Q.   SO THIS IS DATED IN SEPTEMBER OF 2007; RIGHT?

09:15:56  23   A.   RIGHT.

09:15:57  24   Q.   AND THIS SAYS SYSTEM LSI, AND YOUR UNDERSTANDING IS THAT'S

09:16:01  25   A SEMICONDUCTOR SEGMENT AT SAMSUNG; RIGHT?

09:16:04  1    A.   IT'S PART OF THE HARDWARE GROUP AT SAMSUNG IS MY

09:16:08  2    UNDERSTANDING.

09:16:08  3    Q.   IT MAKES SEMICONDUCTOR CHIPS; RIGHT?

09:16:11  4    A.   YES.

09:16:11  5    Q.   IT DOES NOT MAKE PHONES; CORRECT?

09:16:13  6    A.   IT DOES NOT MAKE PHONES.

09:16:15  7    Q.   IN FACT, IT SELLS THESE CHIPS TO OTHER PHONE MAKERS?

09:16:18  8    A.   INCLUDING APPLE IN THE PAST.

09:16:19  9    Q.   AND WHAT THIS IS -- IF WE CAN NOW SHOW THE WHOLE THING.

09:16:23 10        SO WHEN IT SAYS FEASIBILITY REVIEW ON STANDALONE AP

09:16:27 11    BUSINESS, THAT'S TALKING ABOUT A FEASIBILITY REVIEW ON A

09:16:29 12    STANDALONE APPLICATION PROCESSOR BUSINESS; CORRECT?

09:16:32 13    A.   EXACTLY.

09:16:33 14    Q.   AND AS PART OF THIS DOCUMENT, THIS SEGMENT, THE

09:16:40 15    SEMICONDUCTOR SEGMENT IS TRYING TO SEE WHAT'S GOING TO BE THE

09:16:43 16    EFFECT ON SELLING THESE MICROCHIPS OF THE FACT THAT THE IPHONE

09:16:46 17    HAS ENTERED THE MARKET; CORRECT?

09:16:48 18    A.   I THINK THAT'S THEIR OVERALL OBJECTIVE, YES.

09:16:51 19    Q.   OKAY.  THIS HAS NOTHING TO DO WITH WHAT THE PHONE DIVISION

09:16:56 20    IS GOING TO DO AND HOW THEY'RE GOING TO MAKE THEIR PHONES IN

09:16:59 21    TERMS OF THE DESIGN OR ANYTHING LIKE THAT; CORRECT?

09:17:01 22    A.   I DON'T THINK THIS PARTICULAR DOCUMENT DOES.

09:17:07 23    Q.   YOU TESTIFIED THAT NO ONE AT APPLE OR SAMSUNG KEPT TRACK

09:17:13 24    OF REVENUES FOR, LIKE, WINDOW GLASS OR BEZELS.

09:17:17 25        DO YOU RECALL SAYING SOMETHING LIKE THAT?

09:17:20  1    A.   WHAT I WAS SUGGESTING WAS THAT NEITHER OF THOSE COMPANIES

09:17:22  2    IS IN THE BUSINESS OF SELLING GLASS PANES OR BEZELS.

09:17:30  3    Q.   BUT YOU KNOW THAT THERE ARE COMPANIES THAT ARE IN THAT

09:17:33  4    BUSINESS?

09:17:33  5    A.   YES.

09:17:33  6    Q.   YOU KNOW THAT CORNING SELLS, FOR EXAMPLE, GLASS TO, TO

09:17:37  7    APPLE; CORRECT?

09:17:37  8    A.   YES, WE HEARD THAT EARLIER THIS WEEK.

09:17:41  9    Q.   AND BEIL SELLS TO SAMSUNG; CORRECT?

09:17:44  10   A.   WHO DOES?

09:17:45  11   Q.   BEIL, B-I-E-L?

09:17:46  12   A.   I'M NOT SURE I WOULD HAVE KNOWN WHO THE SUPPLIER WAS TO

09:17:49  13   SAMSUNG, BUT I'LL TAKE YOUR WORD FOR IT.

09:17:51  14   Q.   AND THOSE MANUFACTURERS, THEY MIGHT HAVE RECORDS OF WHAT

09:17:54  15   THEY SELL TO THE MARKET PLACE; CORRECT?

09:17:57  16   A.   I WOULD ASSUME SO.

09:17:58  17   Q.   AND THEY MIGHT HAVE REPRESENTATIVE OF THE MARKET SHARE

09:18:05  18   INFORMATION; CORRECT?

09:18:05  19   A.   THAT'S A LITTLE HARDER TO GUESS.  I DON'T KNOW WHAT MARKET

09:18:08  20   SHARE INFORMATION MIGHT EXIST WHEN IT COMES TO WINDOW GLASS FOR

09:18:13  21   SMARTPHONES.

09:18:14  22   Q.   AND FINALLY, UNLESS SOMEONE TAPS ME ON THE SHOULDER AND

09:18:22  23   SAYS I FORGOT SOMETHING, I WANT TO MAKE SURE WE UNDERSTAND

09:18:25  24   THIS.

09:18:26  25        YOU HAVE GIVEN YOUR OPINION AS TO A PROFIT FIGURE ON THE

09:18:31  1    ASSUMPTION THAT THE ARTICLE OF MANUFACTURE IS THE ENTIRE PHONE;

09:18:34  2    CORRECT?

09:18:34  3    A.   THAT'S CORRECT.

09:18:35  4    Q.   AND YOU HAVE GIVEN NO OPINION WHATSOEVER AS TO WHAT A

09:18:38  5    PROFIT FIGURE WOULD BE IF THE ARTICLE OF MANUFACTURE IS LESS

09:18:42  6    THAN THE ENTIRE PHONE; CORRECT?

09:18:44  7    A.   I HAVE NOT TALKED AT ALL ABOUT THE PROFITS ATTRIBUTABLE TO

09:18:48  8    ANY PORTION OF THE PHONE THAT IS LESS THAN THE PHONE.

09:18:52  9    Q.   NOW, IF YOU WERE GOING TO DO THAT AND YOU HAD RELIABLE

09:18:56  10   INFORMATION, YOU BELIEVE IT WOULD BE APPROPRIATE TO USE A COST

09:19:02  11   APPORTIONMENT METHODOLOGY; CORRECT?

09:19:04  12   A.   I THINK IF YOU APPLIED THAT METHODOLOGY CORRECTLY, THAT

09:19:07  13   WOULD BE AN APPROPRIATE METHODOLOGY TO USE.

09:19:09  14   Q.   AND THAT APPROPRIATE METHODOLOGY WOULD BE TO DIVIDE THE

09:19:13  15   COST OF THAT PART THAT'S LESS THAN THE PHONE BY THE COST OF THE

09:19:19  16   ENTIRE PHONE, USING THAT PERCENTAGE, AND THEN MULTIPLYING THAT

09:19:24  17   TIMES WHATEVER THE TOTAL PHONE PROFIT IS; CORRECT?

09:19:28  18   A.   THAT WOULD BE ONE WAY TO DO IT, YES.

09:19:30  19   Q.   AND THEN THE TOTAL PHONE PROFIT, YOU AND MR. WAGNER HAVE A

09:19:34  20   DISAGREEMENT OVER THAT NUMBER BECAUSE YOU DON'T DEDUCT THE

09:19:39  21   OPERATING EXPENSES; CORRECT?

09:19:40  22   A.   WE DO DISAGREE OVER THAT.

09:19:47  23        MR. PRICE:  NO ONE HAS TAPPED ME ON THE SHOULDER, BUT

09:19:50  24   LET ME CHECK.

09:19:51  25        THANK YOU VERY MUCH, MS. DAVIS.

09:19:52  1          THE COURT:  ALL RIGHT.  THE TIME IS 9:19.  IS THERE

09:19:55  2    ANY REDIRECT?

09:19:55  3          MR. LEE:  NO REDIRECT, YOUR HONOR.

09:19:57  4          THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED WITH

09:19:59  5    OR WITHOUT RECALL?

09:20:00  6          MR. LEE:  WITH RECALL, YOUR HONOR.

09:20:01  7          THE COURT:  WITH RECALL, OKAY.

09:20:03  8       ALL RIGHT.  THEN YOU MAY STEP DOWN, BUT YOU MAY BE

09:20:06  9    RECALLED.

09:20:10  10      ALL RIGHT.

09:20:11  11         MR. LEE:  APPLE RESTS, YOUR HONOR.

09:20:13  12         THE COURT:  ALL RIGHT.  AND THE PARTIES HAVE RESERVED

09:20:15  13   THEIR RULE 50 MOTIONS TO BE ARGUED AT THE END OF THE DAY.

09:20:19  14      THEN PLEASE CALL YOUR FIRST WITNESS.

09:20:21  15         MS. MAROULIS:  GOOD MORNING, YOUR HONOR.  SAMSUNG

09:20:25  16   CALLS DREW BLACKARD AS ITS FIRST WITNESS.

09:21:06  17         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

09:21:08  18         **(DEFENDANTS' WITNESS DREW BLACKARD, WAS SWORN.)**

09:21:08  19         THE WITNESS:  I DO.

09:21:13  20         THE CLERK:  THANK YOU.  PLEASE BE SEATED.

09:21:15  21      AND ONCE YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR

09:21:18  22   FULL NAME FOR THE RECORD.

09:21:19  23         THE WITNESS:  MY NAME IS DREW BLACKARD.  IT'S

09:21:22  24    D-R-E-W, B-L-A-C-K-A-R-D.

         25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 09:21:26 | 1  | **DIRECT EXAMINATION** |
| 09:21:27 | 2  | BY MS. MAROULIS: |
| 09:21:27 | 3  | Q.   GOOD MORNING, MR. BLACKARD.  CAN YOU PLEASE INTRODUCE |
| 09:21:31 | 4  | YOURSELF TO THE JURY. |
| 09:21:32 | 5  | THE COURT:  ONE MINUTE.  IT'S 9:21. |
| 09:21:34 | 6  | GO AHEAD, PLEASE. |
| 09:21:35 | 7  | THE WITNESS:  GOOD MORNING.  MY NAME IS DREW |
| 09:21:39 | 8  | BLACKARD.  I'M BASED IN OUR RICHARDSON, TEKSLER OFFICE, WHICH |
| 09:21:44 | 9  | IS A SUBURB OF DALLAS, FOR SAMSUNG ELECTRONICS AMERICA. |
| 09:21:49 | 10 | MY TITLE IS SENIOR DIRECTOR OF PRODUCT MARKETING, AND I |
| 09:21:51 | 11 | LEAD A TEAM THAT'S RESPONSIBLE FOR THE PRODUCT MARKETING OF OUR |
| 09:21:54 | 12 | PREMIUM SMARTPHONES. |
| 09:21:56 | 13 | BY MS. MAROULIS: |
| 09:21:56 | 14 | Q.   MR. BLACKARD, WHEN DID YOU FIRST JOIN SAMSUNG? |
| 09:22:02 | 15 | A.   I JOINED SAMSUNG IN NOVEMBER OF 2009. |
| 09:22:07 | 16 | Q.   WHAT WAS THE NAME OF THE SAMSUNG ENTITY WHEN YOU JOINED IN |
| 09:22:10 | 17 | 2009? |
| 09:22:11 | 18 | A.   AT THE TIME THE COMPANY WAS CALLED SAMSUNG |
| 09:22:13 | 19 | TELECOMMUNICATIONS AMERICA.  AFTER THAT, WE ENDED UP MERGING |
| 09:22:18 | 20 | INTO SAMSUNG ELECTRONICS AMERICA, WHICH IS THE ENTITY THAT I |
| 09:22:21 | 21 | WORK FOR TODAY. |
| 09:22:22 | 22 | Q.   AND AT THAT TIME, WHAT DID STA, SAMSUNG TELECOMMUNICATIONS |
| 09:22:26 | 23 | AMERICA, DO? |
| 09:22:26 | 24 | A.   SAMSUNG TELECOMMUNICATIONS AMERICA WAS RESPONSIBLE FOR THE |
| 09:22:30 | 25 | U.S. MOBILE BUSINESS, SO THAT INCLUDED MOBILE PHONES, |

09:22:35  1      NETWORKING AND STRUCTURE TECHNOLOGY AND ALL THE ACCESSORIES AND

09:22:38  2      PRODUCTS THAT WOULD SURROUND THE SYSTEM OF A MOBILE PHONE.

09:22:41  3      Q.   WHEN YOU FIRST STARTED IN 2009, WHAT WAS YOUR POSITION,

09:22:44  4      SIR?

09:22:44  5      A.   THE TITLE OF MY POSITION WAS A PRODUCT PLANNING MANAGER.

09:22:51  6      AND THAT WAS FOR OUR AT&T ACCOUNT.  AND AT THE TIME AT&T WAS

09:22:58  7      ABOUT 25 PERCENT OF OUR OVERALL BUSINESS.

09:23:01  8      Q.   MR. BLACKARD, WHEN DID YOU GET PROMOTED TO YOUR POSITION

09:23:04  9      AS THE DIRECTOR OF PRODUCT MARKETING?

09:23:06  10     A.   WELL, I GOT A PROMOTION FROM PRODUCT PLANNING MANAGER TO

09:23:10  11     SENIOR MANAGER IN 2011; AND THEN TO DIRECTOR IN 2013; AND THEN

09:23:15  12     SENIOR DIRECTOR IN 2016.

09:23:18  13     Q.   CAN YOU PLEASE TELL THE JURY BRIEFLY YOUR EDUCATIONAL

09:23:20  14     BACKGROUND?

09:23:20  15     A.   SURE.  I WENT TO VANDERBILT UNIVERSITY IN NASHVILLE,

09:23:25  16     TENNESSEE.  I HAVE A BACHELOR OF SCIENCE, I DOUBLE MAJORED IN

09:23:30  17     COMPUTER SCIENCE AND COMMUNICATIONS.  I GRADUATED IN 2002.

09:23:33  18          I WENT ON TO GET A MASTER'S IN BUSINESS FROM THE

09:23:35  19     UNIVERSITY OF TEKSLER AT AUSTIN IN 2006.

09:23:38  20     Q.   AND WHAT WAS YOUR FIRST JOB AFTER SCHOOL?

09:23:42  21     A.   MY FIRST JOB AFTER SCHOOL WAS AT TEKSLER INSTRUMENTS.

09:23:45  22     Q.   WHAT DID YOU DO AT TEKSLER INSTRUMENTS?

09:23:47  23     A.   TEKSLER INSTRUMENTS, TO MANY OF US IS KNOWN AS LIKE A

09:23:51  24     CALCULATOR COMPANY.  THEY ACTUALLY AT THE TIME WERE ONE OF THE

09:23:53  25     BIGGEST MOBILE CHIPSET COMPANIES, PROCESSOR, COMPONENTS FOR

09:23:57  1    MOBILE PHONES.  SO I JOINED THE MOBILE DIVISION OF TEKSLER

09:24:00  2    INSTRUMENTS.

09:24:01  3    Q.   WHAT KIND OF CHIPSETS DID YOU WORK ON?

09:24:03  4    A.   WE HAD A RANGE OF PRODUCTS FROM APPLICATION PROCESSORS,

09:24:08  5    WHICH ARE KIND OF THE BRAINS OF THE DEVICE; THE MODEM, WHICH

09:24:12  6    ESTABLISHES THE NETWORK CONNECTION; WE HAD BLUETOOTH CHIPS;

09:24:15  7    WI-FI CHIP ATTENTION; GPS, CO-PROCESSORS FOR CAMERAS, THINGS

09:24:19  8    LIKE THAT.

09:24:20  9    Q.   IN THAT POSITION, DID YOU SEE ANY PHONE DISASSEMBLIES?

09:24:23  10   A.   IT WAS QUITE COMMON, JUST AS PART OF THE SALES PROCESS,

09:24:26  11   BECAUSE WE ACTUALLY, YOU KNOW, SOLD COMPONENTS.  WE WOULD HAVE

09:24:29  12   THOSE LAID OUT ON BOARDS, WHAT WE CALLED DEVELOPMENT BOARDS.

09:24:33  13   THOSE WERE SHOWN TO CUSTOMERS TO DEMONSTRATE DIFFERENT

09:24:36  14   FUNCTIONALITY OF THOSE CHIPS.

09:24:37  15        IT WAS ALSO QUITE COMMON FOR US TO PURCHASE WHAT WE CALLED

09:24:41  16   TEARDOWN REPORTS FROM THIRD PARTY RESEARCH COMPANIES, AND

09:24:45  17   BASICALLY THOSE ARE A RESEARCH COMPANY WOULD BREAK DOWN AN

09:24:47  18   ENTIRE PHONE PIECE BY PIECE BY PIECE, AND YOU'D BE ABLE TO SEE

09:24:52  19   ALL THE DIFFERENT COMPONENTS OF THE PHONE, WHO MADE THOSE

09:24:54  20   COMPONENTS, WHAT THOSE COMPONENTS COST.  SO THAT WAS A TYPICAL

09:24:57  21   PART OF THE JOB THAT WE LOOKED AT.

09:24:59  22   Q.   AND HOW MANY COMPONENTS WERE IN THE PHONE DISASSEMBLIES?

09:25:02  23   A.   THOSE TEARDOWN REPORTS WOULD USUALLY BE IN THE HUNDREDS OF

09:25:05  24   COMPONENTS.  THERE'S A HUGE LIST FROM THE HIGH END PARTS ALL

09:25:09  25   THE WAY DOWN TO EVERY COMPONENT.

BLACKARD DIRECT BY MS. MAROULIS

```
09:25:10   1    Q.   AND AFTER YOUR JOB AT T.I., DID YOU JOIN SAMSUNG?

09:25:13   2    A.   I DID.

09:25:14   3    Q.   WHY DID YOU JOIN SAMSUNG?

09:25:15   4    A.   I THINK FOR TWO REASONS.  ONE IS FROM MY TIME IN BUSINESS

09:25:20   5    SCHOOL, I WANTED TO GET INTO A ROLE THAT WAS MORE DIRECTLY

09:25:22   6    MARKETING TO CONSUMERS AND SAMSUNG REPRESENTED AN OPPORTUNITY

09:25:25   7    TO DO THAT.

09:25:26   8         AND THEN ALSO, IN NOVEMBER 2009, THEY HAD REALLY BECOME A

09:25:29   9    LEADER IN THE U.S. MARKET.  THEY HAD ACHIEVED NUMBER ONE EVEN

09:25:32  10    BEFORE THE TIME I GOT THERE.  SO THE COMBINATION OF MY PERSONAL

09:25:36  11    INTEREST AND THE TRAJECTORY OF THE COMPANY WAS A GREAT MATCH

09:25:40  12    FOR ME AND MY CAREER GOALS AT THE TIME.

09:25:43  13    Q.   AT THE TIME YOU JOINED THE COMPANY, WHAT WAS SAMSUNG'S

09:25:45  14    GOAL?

09:25:46  15    A.   WELL, YOU KNOW, AS I SAID, I THINK WE HAD JUST ACHIEVED

09:25:49  16    NUMBER ONE IN THE OVERALL MARKET.  AT THE TIME, SMARTPHONES

09:25:52  17    WERE -- YOU KNOW, TODAY EVERYONE CARRIES A SMARTPHONE.  BUT AT

09:25:56  18    THE TIME IT WAS ONLY ABOUT 20 PERCENT OF THE OVERALL MARKET.

09:25:58  19    SO THAT WAS SEEN AS THE GROWTH MARKET.

09:26:00  20         AND SAMSUNG STILL WASN'T NUMBER ONE IN THAT 20 PERCENT OF

09:26:03  21    THE MARKET, SO I THINK THAT THE SHIFT HAD GONE FROM WE'RE

09:26:06  22    NUMBER ONE OVERALL, BUT WE NEED TO TRY TO GET TO BE NUMBER ONE

09:26:12  23    IN THE SMARTPHONE MARKET.

09:26:13  24    Q.   IN 2009, WHAT WAS SAMSUNG'S STRATEGY IN TERMS OF ITS

09:26:16  25    MARKETING PHONE OFFERINGS?
```

09:26:18  1    A.   YEAH, WE HAD, I THINK, THE WAY I'D CHARACTERIZE IT IS A

09:26:21  2    CLOSE PARTNERSHIP WITH OUR CARRIER PARTNERS.  WHEN I SAY

09:26:25  3    CARRIER, I MEAN LIKE AT&T, VERIZON, SPRINT, KIND OF A NETWORK

09:26:29  4    PROVIDER.

09:26:29  5         AND WE WOULD PARTNER WITH THEM VERY CLOSELY ON THE PRODUCT

09:26:34  6    SIDE.  SO MY TEAM FOR AT&T, FOR EXAMPLE, WOULD GO AND PROPOSE

09:26:37  7    PRODUCTS TO AT&T.  THEY WOULD PROVIDE US FEEDBACK, WE WOULD

09:26:40  8    TAKE THAT FEEDBACK, TWEAK THAT PRODUCT AND TRY TO GO BACK AND

09:26:44  9    FORTH FOR THEM TO DESIGN AND DEVELOP A PRODUCT THAT WE WOULD

09:26:47  10   ULTIMATELY LAUNCH.

09:26:48  11        WE ALSO HAD A PARTNERSHIP WITH THEM AS EARLY AS TO

09:26:52  12   MARKETING.  SO WE WOULD ACTUALLY FUND THE CARRIER.  AND AT&T,

09:26:56  13   THEY WOULD PROVIDE SOME OF THEIR OWN FUNDING DOLLARS AND THEN

09:26:59  14   THEY WOULD PROMOTE THE DEVICE ON OUR BEHALF.

09:27:02  15        SO THEY MIGHT MAKE IT A TV AD THAT WAS ABOUT AT&T, BUT IT

09:27:06  16   WOULD FEATURE A SAMSUNG PHONE.

09:27:08  17        SO IT WAS A VERY CLOSE PARTNERSHIP SO COLLABORATION WITH

09:27:09  18   CARRIERS WAS VERY IMPORTANT.

09:27:11  19        AND THEN THE SECOND WAS RESEARCH AND DEVELOPMENT.  I THINK

09:27:13  20   EVEN AT THAT TIME, SAMSUNG WAS A LEADER IN TECHNOLOGY AND THAT

09:27:17  21   WAS KEY IN ORDER TO BE ABLE TO GET THOSE PRODUCTS AWARDS WITH

09:27:20  22   CARRIERS, THAT WE ALWAYS HAD A LEADERSHIP POSITION WHEN IT CAME

09:27:24  23   TO THINGS LIKE PROCESSING POWER AND NETWORK TECHNOLOGY AND ALL

09:27:27  24   THE DIFFERENT THINGS THAT THE CARRIERS WERE EXPECTING FROM THE

09:27:30  25   DEVICES.

09:27:30  1    Q.   MR. BLACKARD, YOU MENTIONED THAT YOU WERE FUNDING CARRIERS

09:27:33  2    THAT THEN WOULD ADVERTISE.  WERE THERE ANY LIMITATIONS TO THAT

09:27:36  3    STRATEGY IN TERMS OF MARKETING?

09:27:37  4    A.   I THINK THERE WERE.  I MEAN, AS I SAID, YOU KNOW, YOU CAN

09:27:40  5    ALL REMEMBER BACK IN THE DAY, THERE WERE CARRIERS WERE

09:27:43  6    PROMOTING MESSAGING PLANS AND VOICE PLANS AND DATA.  SO IT WAS

09:27:46  7    LESS ABOUT THE PRODUCT AND MORE ABOUT THE SERVICE THAT YOU

09:27:48  8    WOULD GET WITH A SPECIFIC CARRIER.

09:27:51  9         AND SO, YOU KNOW, AS A COMPANY THAT SOLD THE ACTUAL

09:27:54 10    DEVICE, WE WERE MORE INTERESTED IN TRYING TO TALK ABOUT THE KEY

09:27:57 11    BENEFITS OF THE DEVICE, AND SO I THINK THERE WAS KIND OF THIS

09:28:00 12    INFLECTION POINT WHERE WE NEEDED TO TAKE MORE OF WHAT I JUST

09:28:05 13    WOULD SAY IS A DIRECT COMMUNICATION WITH OUR CUSTOMER BASE AS

09:28:08 14    OPPOSED TO ALLOWING THAT MESSAGE TO GO MORE THROUGH THE

09:28:11 15    CARRIER.

09:28:12 16    Q.   DID THERE COME A TIME WHEN THAT STRATEGY CHANGED AND

09:28:15 17    SAMSUNG CHANGED ITS APPROACH TO MARKETING?

09:28:17 18    A.   IT DEFINITELY DID.  I THINK THAT ALL STARTED TO CHANGE

09:28:20 19    AROUND THE FIRST GALAXY S PRODUCT.

09:28:23 20    Q.   WHEN WAS THAT?  WHAT YEAR?

09:28:25 21    A.   THAT WOULD HAVE BEEN IN 2010.  GALAXY S WAS ANNOUNCED IN

09:28:28 22    JANUARY OF 2010.

09:28:29 23    Q.   IN WHAT WAYS OR HOW DID THE STRATEGY CHANGE?

09:28:32 24    A.   YEAH.  I THINK THERE'S, THERE'S PROBABLY AT LEAST THREE

09:28:34 25    KEY WAYS THAT YOU CAN THINK ABOUT.  THE FIRST IS JUST WHAT I

09:28:37   1    CALL BRANDING STRATEGY.  BEFORE THAT, I WAS SAYING WE HAD A

09:28:40   2    CLOSE COLLABORATION WITH CARRIERS AND NOT ONLY DID WE

09:28:43   3    COMMUNICATE ON THE PRODUCT, BUT WHAT THAT MEANT IS EACH CARRIER

09:28:46   4    HAD AN EXCLUSIVE PRODUCT, SO THEY HAD ALL OF THEIR OWN

09:28:49   5    PRODUCTS, THE NAME OF EACH PRODUCT WAS DIFFERENT.

09:28:51   6         SO YOU COULD NOT GET ONE DEVICE THAT YOU COULD GET AT

09:28:54   7    AT&T, YOU COULDN'T NECESSARILY GET THAT AT A VERIZON OR A

09:28:57   8    SPRINT OR A T-MOBILE.

09:28:59   9         SO PART OF IT WAS A BRANDING STRATEGY.  FOR THE FIRST TIME

09:29:03  10    WE HAD A UNIFIED NAME ACROSS THE PRODUCT LINE AND YOU COULD GET

09:29:07  11    IT AT EVERY CARRIER.  AND THAT WAS A FIRST FOR TOUCHSCREEN

09:29:11  12    SMARTPHONES.  NO ONE HAD EVER DONE THAT.

09:29:13  13         AND SECONDLY, TO SYNCHRONIZE THE LAUNCH DATE SUCH THAT

09:29:16  14    THEY WERE ALL WITHIN A VERY CLOSE TIME WINDOW.  BEFORE THAT ONE

09:29:19  15    MIGHT LAUNCH IN MARCH, ANOTHER MAYBE IN SEPTEMBER AT A

09:29:22  16    DIFFERENT CARRIER, AND CONSUMERS DIDN'T KNOW WHEN THEY COULD

09:29:25  17    GET THEM, WHERE THEY COULD GET THEM.  THEY HAD DIFFERENT BRAND

09:29:28  18    NAMES.  SO WE CONSOLIDATED THE BRAND NAMES AND SYNCHRONIZED THE

09:29:32  19    TIMING.

09:29:33  20         AND THE LAST PART, I MENTIONED BEFORE WE USED TO CO-FUND

09:29:35  21    THE CARRIER, PROVIDE THEM FUNDING SO THEY COULD GO DO THE

09:29:38  22    ADVERTISING.  AND WITH THE GALAXY S, WE KEPT THAT FUNDING AND

09:29:42  23    TOLD THE CARRIER WE'RE ACTUALLY GOING TO USE THAT TO PROMOTE

09:29:46  24    THE GALAXY S BRAND, AND BY DOING THAT, WE'RE GOING TO SEND

09:29:49  25    TRAFFIC TO YOUR STORY, BUT WE'RE GOING TO TAKE OWNERSHIP OF THE

BLACKARD DIRECT BY MS. MAROULIS

09:29:52  1    CONSUMER COMMUNICATION SO WE CAN BETTER COMMUNICATE THE

09:29:54  2    BENEFITS OF THE DEVICE.

09:29:55  3    Q.   MR. BLACKARD, YOU TOLD THE JURY THAT THE PRODUCT GALAXY S

09:29:59  4    WAS ANNOUNCED IN JANUARY 2010.   WHEN WAS IT PLACED ON THE

09:30:02  5    PRODUCT ROADMAP?

09:30:02  6    A.   THE AT&T GALAXY S PRODUCT, THE CAPTIVATE THAT LAUNCHED,

09:30:08  7    WAS ALREADY ON THE ROADMAP WHEN I JOINED IN NOVEMBER OF 2009.

09:30:11  8    SO IT WAS A PRODUCT THAT WAS ALREADY ON OUR ROADMAP.

09:30:14  9    Q.   MR. BLACKARD, WHAT ARE THE STANDOUT FEATURES OF THE GALAXY

09:30:17  10   S PRODUCT?

09:30:18  11   A.   THE GALAXY S, THE PRODUCT PILLAR IS THAT WE REALLY

09:30:23  12   FOCUSSED ON FROM A MARKETING PERSPECTIVE WERE THREE THINGS.

09:30:26  13   THE FIRST WAS SPEED, THE SECOND PILLAR WAS SCREEN, AND THEN THE

09:30:31  14   THIRD PILLAR WAS CONTENT.   THAT WAS THE CORE MESSAGE OF THE

09:30:35  15   GALAXY S DEVICE.

09:30:36  16   Q.   LET'S TAKE THEM ONE AT A TIME TO MAKE IT EASIER.   LET'S

09:30:39  17   TALK ABOUT THE SCREEN.   WHAT ABOUT IT WAS THE STANDOUT FEATURE?

09:30:41  18   A.   I THINK WITH THE SCREEN, IT WAS TWO THINGS.   FIRST WAS THE

09:30:44  19   SIZE, IT WAS A FOUR INCH DISPLAY, WHICH WAS HUGE FOR THAT TIME.

09:30:47  20   TODAY PEOPLE TAKE IT FOR GRANTED THAT THEY'RE CARRYING AROUND

09:30:51  21   LARGE SCREEN PHONES BUT FOUR INCHES AT THE TIME WAS

09:30:55  22   DRAMATICALLY BIGGER THAN THE COMPETITION.

09:30:57  23       WE ALSO USED TECHNOLOGY CALLED SUPER AMOLED, WHICH WAS

09:31:01  24   BASICALLY VERY HIGH CONTRAST WHERE YOU GET IMAGES THAT POP OFF

09:31:04  25   OF THE SCREEN BECAUSE THE BLACKS ARE REALLY DEEP AND DARK AND

09:31:08  1      THE BRIGHTS ARE REALLY VIBRANT.  SO YOU GET REALLY IMPRESSIVE

09:31:12  2      IMAGES.

09:31:13  3      Q.   AT THAT TIME, DID THE IPHONE HAVE A SIMILAR SIZE SCREEN?

09:31:15  4      A.   NO.  THEY HAD A THREE AND A HALF INCH DISPLAY.

09:31:19  5      Q.   AND AT THAT TIME, DID APPLE HAVE AMOLED SCREENS?

09:31:22  6      A.   THEY DID NOT, NO.

09:31:23  7      Q.   OKAY.  YOU MENTIONED THE SECOND PILLAR WAS SPEED.  CAN YOU

09:31:26  8      PLEASE EXPLAIN TO THE JURY WHAT YOU MEANT BY THAT?

09:31:28  9      A.   SPEED SIMILARLY, THERE'S A COUPLE ITEMS THERE.  THE FIRST

09:31:31 10      IS THAT IT WAS A GIGAHERTZ PROCESSOR, WHICH AT THE TIME WAS

09:31:35 11      EXTREMELY POWERFUL.

09:31:37 12          SO WHEN YOU THINK FOR THINGS LIKE MULTITASKING ON A

09:31:39 13      SMARTPHONE HAVING A STRONG, POWERFUL PROCESS IS VERY IMPORTANT,

09:31:43 14      SO WE HAD A GIGAHERTZ PROCESSOR, WHICH WAS CUTTING EDGE.

09:31:46 15          AND THEN IT WAS ALSO, GALAXY S HAD OUR FIRST 4G PHONE.  SO

09:31:51 16      AT THE TIME MOST EVERY SMARTPHONE WAS 3G, AND THEN WE WERE KIND

09:31:54 17      OF STARTING THE TRANSITION TO 4G.

09:31:57 18          SO THE 4G SPEEDS ENABLES FASTER DOWNLOADS, BETTER

09:32:01 19      STREAMING ON THE DEVICE.

09:32:02 20      Q.   AND FINALLY, YOU MENTIONED CONTENT.  CAN YOU PLEASE

09:32:04 21      ELABORATE ON THAT?

09:32:06 22      A.   SURE.  SO CONTENT, I THINK ONE OF THE KEY THINGS WITH

09:32:09 23      GALAXY S IS IT WAS OUR FIRST PRODUCT LINE ACROSS ALL CARRIERS

09:32:13 24      THAT WAS BASED ON GOOGLE'S ANDROID OPERATING SYSTEM, AND THAT

09:32:17 25      WAS IMPORTANT FOR A COUPLE REASONS.

BLACKARD DIRECT BY MS. MAROULIS                                                837

09:32:18   1        THE FIRST IS THAT AS PART OF ANDROID, GOOGLE PRE-LOADED A

09:32:21   2   LOT OF THEIR KEY POPULAR SERVICES, LIKE GMAIL, GOOGLE MAPS FOR

09:32:27   3   NAVIGATION, YOU KNOW, A VARIETY OF THEIR DIFFERENT SERVICES.

09:32:31   4        THEY ALSO HAD A DOWNLOADABLE, OR A -- AN APP STORE WHERE

09:32:35   5   YOU COULD GO AND DOWNLOAD APPLICATIONS AND SERVICES.  AND AT

09:32:38   6   THE TIME, THE ALTERNATIVES WERE NOT GREAT.  WINDOWS MOBILE, FOR

09:32:41   7   EXAMPLE, HAD AN APP STORE, BUT THERE WAS VERY LIMITED

09:32:44   8   SELECTION.  SO WHEN CONSUMERS HAD A MUCH LARGER SET OF

09:32:47   9   APPLICATIONS AVAILABLE TO THEM FROM ANDROID, THAT WAS VERY

09:32:51  10   ATTRACTIVE.

09:32:52  11        AND THEN THE OTHER PART OF CONTENT WAS SAMSUNG DEVELOPED

09:32:55  12   OUR OWN CONTENT STORY FOR MOVIES.  WE HAD A SERVICE CALLED

09:32:58  13   MEDIA HUB, AND THE LOGIC BEHIND THAT WAS NOW THAT YOU HAD FAST

09:33:03  14   DOWNLOAD SPEEDS AND THIS GREAT DISPLAY, YOU NEED TO BE ABLE TO

09:33:07  15   WATCH SOMETHING ON IT.  IT CHANGES THE BEHAVIOR OF HOW YOU USE

09:33:10  16   THE PHONE.  SO TO BE ABLE TO DOWNLOAD MOVIES AND WATCH THOSE ON

09:33:15  17   THAT BIG SCREEN WAS IMPORTANT.  SO IT HAD A MEDIA HUB AS WELL.

09:33:15  18   Q.   MR. BLACKARD, WERE THERE ANY OTHER ADVANTAGES OF THE

09:33:18  19   ANDROID SYSTEM?

09:33:19  20   A.   I THINK CONSUMERS REALLY LIKED DROID FOR CUSTOMIZATION.

09:33:23  21   THEY WOULD -- WITH THE HOME SCREENS, YOU CAN ADD NOT ONLY APPS,

09:33:28  22   BUT WIDGET, SO YOU CAN HAVE SHORTCUTS TO SEARCH BARS.

09:33:32  23        SAMSUNG HAD OTHER OUR OWN WIDGET WHICH WAS CALLED SOCIAL

09:33:36  24   HUB, WHICH YOU COULD HAVE TWITTER FEED AND FACEBOOK FEED AND

09:33:39  25   INTEGRATED INTO A SINGLE FEED SO ALL ON THE HOME SCREEN.  SO IT

BLACKARD DIRECT BY MS. MAROULIS

09:33:42  1    KIND OF SAVED STEPS TO DO THINGS.

09:33:44  2         ON ANDROID THERE'S ALSO THINGS CALLED LAUNCHERS WHERE YOU

09:33:49  3    CAN DOWNLOAD THEM TO RESKIN THE ENTIRE SCREEN TO LOOK AND FEEL

09:33:52  4    TOTALLY DIFFERENT AND DEVELOPERS CAN DEVELOP THEIR OWN

09:33:55  5    LAUNCHERS FOR THAT.

09:33:56  6         SO CUSTOMIZATION WAS A BIG PART OF WHAT PEOPLE LIKED ABOUT

09:33:59  7    ANDROID.

09:34:00  8    Q.   MR. BLACKARD, YOU MENTIONED MICROSOFT OPERATING TESTIMONY.

09:34:06  9    WHAT HAPPENED TO THE MICROSOFT MOBILE OPERATING SYSTEM?

09:34:10  10   A.   THEY EVENTUALLY SHUT IT DOWN.  IT'S NO LONGER A MOBILE

09:34:14  11   OPERATING SYSTEM.

09:34:16  12   Q.   OKAY.  AND, SIR, WHEN I WAS QUESTIONING YOU ABOUT ONE OF

09:34:22  13   THE PILLARS, WHICH IS SPEED, I WANTED TO ASK YOU ABOUT MESSAGE

09:34:27  14   PROCESSING SPEED.  I NEGLECTED TO DO THAT.

09:34:30  15        CAN YOU PLEASE COMMENT ON THAT?

09:34:31  16   A.   CAN YOU SAY THE QUESTION AGAIN.

09:34:32  17   Q.   SURE.  CAN YOU ELABORATE ON YOUR COMMENT THAT THERE WAS A

09:34:39  18   HIGHER SPEED ON THE PHONES?

09:34:40  19   A.   YEAH.  I MEAN, I THINK, YOU KNOW, 4G, AGAIN, JUST IN TERMS

09:34:45  20   OF THE OVERALL CONNECTIVITY SPEED WITH THE NETWORK, SO FASTER

09:34:48  21   DOWNLOADS, FASTER STREAMING, GIGAHERTZ PROCESSOR FOR BETTER

09:34:52  22   OVERALL PERFORMANCE, MULTITASKING, THINGS LIKE THAT.

09:34:56  23   Q.   OKAY.  NOW, I WANT TO FOCUS YOU ON THE MARKETING SPENT.

09:35:00  24   HOW DID IT CHANGE BETWEEN 2009 AND 2010?

09:35:02  25   A.   I MEAN, THERE WAS A DRAMATIC SHIFT.  SO IN 2009, OUR

09:35:06   1    OVERALL BRAND MARKETING SPEND WAS IN THE NEIGHBORHOOD OF ABOUT

09:35:11   2    $25 MILLION.

09:35:12   3         IN 2010, WE INCREASED THAT OVER SIX TIMES, SO IT WAS A

09:35:16   4    REALLY BIG INCREASE.  SO UPWARDS OF 150 MILLION IN 2010.

09:35:21   5         AGAIN, THAT WAS BY WAY OF PULLING ALL THE INVESTMENT FROM

09:35:24   6    WHAT WE TRADITIONALLY DO WITH CARRIER PARTNERS AND KIND OF

09:35:28   7    AMPLIFYING THAT AT THE BRAND LEVEL.

09:35:30   8    Q.   TO YOUR KNOWLEDGE, HOW DID THAT RANK AGAINST OTHER MOBILE

09:35:33   9    PHONE MANUFACTURERS?

09:35:35  10    A.   IT WAS AMONGST THE VERY TOP.

09:35:37  11    Q.   DID YOU SEE THE RESULTS OF THE INCREASE IN SPEND?

09:35:40  12    A.   DEFINITELY.  I THINK IT WAS A COMBINATION OF THAT BRAND

09:35:42  13    MARKETING SPIN, BUT OF COURSE THE BENEFIT OF HAVING THE

09:35:45  14    PRODUCTS IN A SINGLE BRAND THAT YOU CAN PROMOTE TO ALL LAUNCHED

09:35:49  15    AT THE SAME TIME AND THEN YOU PUT THE SPIN BEHIND IT, KIND OF

09:35:53  16    ALL THAT TOGETHER, ALONG WITH A CUTTING EDGE PRODUCT ALLOWED US

09:35:56  17    TO GAIN MARKET SHARE AT THAT TIME.

09:35:59  18    Q.   AND DID SAMSUNG CONTINUE THE STRATEGY INTO 2011?

09:36:02  19    A.   WE DID.

09:36:03  20    Q.   AND HOW DID SAMSUNG DO THAT?

09:36:04  21    A.   IN 2011, WE BROUGHT IN A NEW MARKETING TEAM.  WE HIRED A

09:36:09  22    CMO FROM NIKE WHO HAD BEEN IN CHARGE OF THEIR GLOBAL BRAND

09:36:15  23    CREATIVE.  WE HAD A NEW V-P OF CREATIVE, AND THEY HAD KIND OF A

09:36:20  24    FRESH TAKE ON THINGS.  THEY LAUNCHED ON A CAMPAIGN CALLED THE

09:36:24  25    NEXT BIG THING IS ALREADY HERE.  THAT WAS KIND OF A HIT ON THE

09:36:28   1    MARKET AT THAT TIME.

09:36:29   2    Q.   DID YOU PERSONALLY WORK ON THAT CAMPAIGN?

09:36:31   3    A.   I DID.  AS A PRODUCT MARKETER, I REVIEWED SCRIPTS, I WAS

09:36:35   4    EVEN ON THE SET FOR SOME OF THE TV SPOTS WHERE I WOULD BE A

09:36:39   5    PRODUCT CONSULTANT, SHOWED THEM HOW TO USE THE PHONE.

09:36:43   6    Q.   MR. BLACKARD, DID YOU REVIEW A COMPILATION OF SAMSUNG ADS

09:36:47   7    THAT WERE SUBMITTED IN THIS CASE?

09:36:47   8    A.   I DID.

09:36:48   9    Q.   OKAY.  ARE YOU FAMILIAR WITH THOSE ADS?

09:36:50   10   A.   I'M FAMILIAR, YES.

09:36:52   11        MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT DX 4528

09:36:54   12   INTO EVIDENCE.  IT'S A COMPILATION OF ADS.

09:36:57   13        MR. LEE:  NO OBJECTION, YOUR HONOR.

09:36:58   14        THE COURT:  IT'S ADMITTED.

09:37:01   15        (DEFENDANTS' EXHIBIT 4528 WAS ADMITTED IN EVIDENCE.)

09:37:01   16        THE COURT:  GO AHEAD, PLEASE.

09:37:02   17        MS. MAROULIS:  THANK YOU.

09:37:03   18   Q.   MR. BLACKARD, LET'S LOOK AT JUST A COUPLE OF THEM.

09:37:06   19        MR. KOTARSKI, CAN YOU PLEASE PLAY US A CLIP THAT ENDS IN

09:37:10   20   BATES RANGE 585.

09:37:12   21        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

09:37:42   22   BY MS. MAROULIS:

09:37:42   23   Q.   MR. BLACKARD, WHAT FEATURE OF THE PHONE DID THIS AD

09:37:45   24   EMPHASIZE?

09:37:46   25   A.   THAT WAS ABOUT THE SCREEN, OF COURSE, THE SCREEN SIZE AND

09:37:49   1    THE VIBRANCY OF THE SCREEN WHERE THEY CAN SEE IT FROM ACROSS

09:37:52   2    THE STREET.

09:37:53   3    Q.   OKAY.   MR. KOTARSKI, CAN WE NOW PLAY THE CLIP ENDING IN

09:37:57   4    BATES RANGE 581.

09:38:03   5         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

09:38:30   6    BY MS. MAROULIS:

09:38:32   7    Q.   MR. BLACKARD, WHAT FEATURE OF THE SAMSUNG GALAXY S II

09:38:39   8    PHONE DID THIS AD FEATURE?

09:38:42   9    A.   THAT WAS ABOUT THE SPEED.

09:38:43   10   Q.   WAS THIS "NEXT BIG THING" AD CAMPAIGN SUCCESSFUL?

09:38:47   11   A.   IT WAS.   IT PLAYED ON THE INSIGHT THAT OBVIOUSLY AT THE

09:38:50   12   TIME PEOPLE WOULD WAIT IN LINE FOR THE IPHONE.   WE HAD ALREADY

09:38:53   13   LAUNCHED OUR PHONE, SO THEY WERE ANNOUNCING A PRODUCT OR HAD

09:38:56   14   ANNOUNCED A PRODUCT THAT WAS YET TO BE RELEASED THAT HAD A

09:38:59   15   SMALLER SCREEN, DIDN'T HAVE 4G, IT HAD 3G.

09:39:02   16        SO THE WHOLE NEXT BIG THING IS ALREADY HERE WAS KIND OF A

09:39:05   17   TAG LINE, AND IT WAS KIND OF A PLAYFUL, TONGUE IN CHEEK VIEW

09:39:09   18   THAT WE THOUGHT WE ALREADY HAD DELIVERED THE CUTTING EDGE

09:39:12   19   TECHNOLOGY AND THEY WERE WAITING FOR SOMETHING THAT WE ALREADY

09:39:14   20   HAD.

09:39:15   21   Q.   AND HOW DID THIS CAMPAIGN AFFECT THE MARKET SHARE?

09:39:18   22   A.   VERY WELL.   WE CONTINUED TO GROW THROUGH THAT PERIOD.

09:39:20   23   Q.   OKAY.   MR. BLACKARD, I'D LIKE TO TURN YOUR ATTENTION TO AN

09:39:23   24   EXHIBIT IN YOUR BINDER THAT IS DX '4607.   PLEASE TAKE A LOOK

09:39:28   25   AND LET ME KNOW IF YOU RECOGNIZE IT.

09:39:37  1    A.   YES, IT LOOKS FAMILIAR.

09:39:39  2    Q.   WHAT IS IT?

09:39:40  3    A.   IT'S A GALAXY S II LAUNCH PLAN WHICH, YOU KNOW,

09:39:45  4    ESSENTIALLY INCLUDES INFORMATION ABOUT THE PRODUCT, CONTEXT

09:39:47  5    ABOUT THE MARKET, OUR OVERALL MARKETING STRATEGY.  IT'S

09:39:51  6    SOMETHING THAT WE WOULD DISTRIBUTE INTERNALLY TO A LINE TEAM.

09:39:56  7    IT'S A COMMON MARKETING STRATEGY.

09:39:59  8         MS. MAROULIS:  YOUR HONOR, I MOVE DX 4607 INTO

09:40:02  9    EVIDENCE.

09:40:02 10         MR. LEE:  OBJECTION.

09:40:03 11         THE COURT:  IT'S ADMITTED.

09:40:04 12    (DEFENDANTS' EXHIBIT 4607 WAS ADMITTED IN EVIDENCE.)

09:40:04 13         THE COURT:  GO AHEAD, PLEASE.

09:40:06 14         MS. MAROULIS:  MR. KOTARSKI, PLEASE DISPLAY THE PAGE

09:40:09 15    FOR US, 4607, PAGE 9.

09:40:14 16    Q.   MR. BLACKARD, CAN YOU PLEASE DESCRIBE TO US WHAT IS

09:40:17 17    DEPICTED ON PAGE 9 OF THIS DOCUMENT.

09:40:19 18    A.   THIS WOULD BE, YOU KNOW, COMMON COURSE OF WORK WHERE WE'RE

09:40:23 19    COMPARING ONE OF OUR NEW DEVICES TO A RANGE OF COMPETITOR

09:40:27 20    DEVICES IN THE MARKET AT THE TIME, AGAIN, TO PROVIDE CONTEXT TO

09:40:29 21    THE ORGANIZATION AS TO WHAT OUR COMPETITIVE BENEFITS ARE.

09:40:32 22    Q.   AND WHICH FEATURES ARE BEING COMPARED?

09:40:35 23    A.   THEY'RE ALL DOWN THE LEFT SIDE.  BUT YOU HAVE NETWORK

09:40:39 24    SPEED, OF COURSE, DISPLAY, CAMERA, PROCESSOR, BATTERY, STORAGE,

09:40:46 25    ET CETERA.

09:40:46   1    Q.   AND WHAT DOES THE COLOR CODING MEAN?

09:40:51   2    A.   THE COLOR CODING AT THE BOTTOM IS BASICALLY MARKETING.  IF

09:40:54   3    IT'S GREEN, THAT'S AREAS OF COMPETITIVE ADVANTAGE THAT WE HAD

09:40:58   4    ASSESSED; YELLOW WOULD BE COMPETITIVE PARITY WHERE WE FEEL LIKE

09:41:07   5    COMPETITORS MIGHT BE EQUAL; AND PINK OR RED WOULD BE WHERE THE

09:41:09   6    COMPETITOR HAS A DISADVANTAGE.

09:41:11   7    Q.   AND LOOKING AT THIS PAGE, HOW DO SAMSUNG'S PHONES STACK UP

09:41:15   8    AGAINST IPHONE?

09:41:16   9    A.   VERY WELL.  4G LTE, THEY WERE STILL ON 3G.  THE DISPLAY

09:41:22   10   SIZE, WE HAD 4.3 INCH DISPLAY, WE HAD 3.5 INCH.  OUR CAMERA HAD

09:41:25   11   MORE MEGAPIXELS, OUR BATTERY WAS LARGER, AND THERE WAS

09:41:36   12   EXPANDABLE STORAGE.

09:41:38   13   Q.   THANK YOU, MR. BLACKARD.

09:41:42   14        NOW, AS PART OF YOUR JOB, DO YOU HAVE TO UNDERSTAND WHY

09:41:46   15   CONSUMERS BUY SMARTPHONES?

09:41:48   16   A.   DEFINITELY.  IT'S PART OF THE JOB.

09:41:51   17   Q.   AND HOW DO YOU GET THAT UNDERSTANDING?

09:41:53   18   A.   WE DO A LOT OF OUR OWN MARKET RESEARCH.  WE'LL SEND OUT

09:41:56   19   SURVEYS, DO FOCUS GROUPS.  WE PURCHASE RESEARCH FROM THIRD

09:42:00   20   PARTY COMPANIES.  WE, YOU KNOW, TALK WITH MEDIA.  WE REVIEW A

09:42:04   21   LOT OF THE MEDIA REVIEWS THAT YOU ALL PROBABLY READ.

09:42:07   22        WE TRY TO CONSOLIDATE A LOT OF INFORMATION FROM DIFFERENT

09:42:10   23   PLACES TO COME TO THAT KNOWLEDGE.

09:42:11   24   Q.   DO YOU USE CONSUMER RESEARCH IN YOUR WORK?

09:42:13   25   A.   WE DO.

BLACKARD DIRECT BY MS. MAROULIS

09:42:14  1    Q.   OKAY.  DURING THE PERIOD WE'RE TALKING ABOUT, 2010 THROUGH

09:42:18  2    2012, WHAT DID CONSUMERS WANT?

09:42:20  3    A.   I THINK, YOU KNOW, AT THE TIME IT WAS MANY OF THE THINGS

09:42:24  4    THAT WE'RE TALKING ABOUT.  WE WERE TRANSITIONING TO

09:42:27  5    SMARTPHONES, PEOPLE WANTED A SMARTPHONE.  A LOT OF THAT

09:42:31  6    PURCHASE DECISION, YOU KNOW, STARTS EVEN BEFORE CONSIDERING A

09:42:34  7    PHONE.  PEOPLE WILL CONSIDER THE CARRIER THAT THEY WANT TO BE

09:42:37  8    ON; THEY'LL CONSIDER, YOU KNOW, THE PRICE OF THE PLAN; THE

09:42:41  9    DEVICE, THE DEVICE PRICE.

09:42:44  10        ONCE THEY GET PAST THAT, THEY'LL OFTEN THINK ABOUT

09:42:46  11   OPERATING SYSTEM, WHICH OPERATING SYSTEM DO I WANT.

09:42:50  12        AND THEN WHEN THEY GET TO THE ACTUAL DEVICE, THEY'RE

09:42:53  13   THINKING ABOUT THE THINGS THAT WE WERE TALKING ABOUT, THE SPEED

09:42:56  14   OF THE DEVICE, THE DISPLAY SIZE, THE AMOUNT OF CONTENT

09:42:59  15   AVAILABLE, THINGS LIKE THAT.

09:43:00  16   Q.   DID YOU SEE ORNAMENTAL DESIGN OF THE PHONES PLAYING A

09:43:03  17   SIGNIFICANT ROLE IN CUSTOMER PURCHASING DECISIONS?

09:43:06  18   A.   IT'S NEVER BEEN A SIGNIFICANT ROLE.  I MEAN, I THINK THE

09:43:08  19   DESIGN, PEOPLE WILL WEIGH KIND OF THE FUNCTIONAL FACTORS, LIKE

09:43:12  20   SIZE AND WEIGHT OFTENTIMES MORE BEFORE, YOU KNOW, THE AESTHETIC

09:43:16  21   OR ORNAMENTAL DESIGN.

09:43:18  22        A LOT OF TIMES PEOPLE ARE WILLING TO TRADE OFF THINGS LIKE

09:43:22  23   COLORS AND DIFFERENT ASPECT, ELEMENTS LIKE THAT.

09:43:25  24   Q.   MR. BLACKARD, I'D LIKE YOU TO TURN TO EXHIBIT 4606 IN YOUR

09:43:29  25   BINDER.

BLACKARD DIRECT BY MS. MAROULIS

09:43:31  1          DO YOU RECOGNIZE THIS DOCUMENT AS THE FEATURED IMAGES OF

09:43:35  2   SAMSUNG PHONES?

09:43:36  3   A.   YES.

09:43:40  4   Q.   AND WHAT IS PICTURED HERE?

09:43:42  5   A.   THERE'S A FEW THINGS, BUT EACH -- THEY'RE BASICALLY A

09:43:46  6   LARGE PHOTO OF EACH GALAXY S PRODUCT FOLLOWED BY A SPEC SHEET

09:43:51  7   FROM GSM MARINA, WHICH IS JUST A PUBLIC WEBSITE THAT TRACKS

09:43:55  8   SPECS.

09:43:57  9          AS WELL AS SOME COPIES OF PRINT ADVERTISING FROM BEST BUY

09:44:01  10  FOR THOSE PRODUCTS.

09:44:03  11              MS. MAROULIS:  YOUR HONOR, I MOVE 4606 INTO EVIDENCE.

09:44:05  12              MR. LEE:  NO OBJECTION, YOUR HONOR.

09:44:06  13              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

09:44:07  14      (DEFENDANTS' EXHIBIT 4606 WAS ADMITTED IN EVIDENCE.)

09:44:08  15              THE COURT:  GO AHEAD, PLEASE.

09:44:08  16  BY MS. MAROULIS:

09:44:09  17  Q.   SIR, PLEASE TURN TO PAGE 4606, PAGE 2.

09:44:13  18          WHAT DO YOU SEE THERE?

09:44:14  19  A.   THIS IS THE GALAXY S CAPTIVATE, WHICH WAS ON AT&T.  THAT

09:44:19  20  WAS ACTUALLY THE PRODUCT THAT I WORKED ON WHEN I JOINED

09:44:22  21  SAMSUNG.

09:44:22  22  Q.   WHEN DOES A SMARTPHONE USER SEE THE HOME SCREEN?

09:44:27  23  A.   THE HOME SCREEN, WHICH IS DEPICTED HERE IN THIS IMAGE, IS

09:44:30  24  THE FIRST THING YOU'D SEE WHEN YOU UNLOCK THE PHONE.  SO IF YOU

09:44:34  25  SWIPE TO UNLOCK, THAT'S THE IMAGE THAT YOU SEE.

09:44:37  1    Q.   AND OF COURSE WE'RE TALKING ABOUT A SAMSUNG SMARTPHONE

09:44:39  2    USER HERE?

09:44:40  3    A.   CORRECT, YES, ON THAT PHONE.

09:44:42  4    Q.   IS APP TRAY OR APP SCREEN DIFFERENT FROM THE HOME SCREEN?

09:44:45  5    A.   IT WOULD BE.  DOWN ON KIND OF THE BOTTOM RIGHT THERE'S AN

09:44:48  6    APPLICATIONS BUTTON, AND IF YOU HIT THE APPLICATIONS BUTTON,

09:44:52  7    THERE WOULD BE AN APP TRAY BEHIND THAT.

09:44:54  8    Q.   DO YOU KNOW FROM YOUR DAY-TO-DAY WORK WHETHER CONSUMERS OF

09:44:57  9    SAMSUNG PHONES USE THE APP TRAY?

09:44:59  10   A.   IT WOULD BE USED, BUT A LOT LESS COMMONLY THAN THE HOME

09:45:03  11   SCREEN.  OF COURSE THE HOME SCREEN IS THE PRIMARY PLACE THAT

09:45:06  12   YOU END UP WHEN YOU UNLOCK THE PHONE.

09:45:09  13        BY DEFAULT YOU SEE SAMSUNG HAS LAID OUT THE MOST

09:45:11  14   FREQUENTLY USED APPLICATIONS.  BUT CONSUMERS, OF COURSE, CAN

09:45:14  15   ADD TO THAT.  SO YOU CAN ADD YOUR OWN FAVORITE APPS THERE.  YOU

09:45:17  16   CAN ADD HOME SCREENS TO THE RIGHT OR LEFT.  YOU HAVE THE

09:45:20  17   WIDGETS LIKE I WAS TALKING ABOUT BEFORE, QUICK SEARCH WITH

09:45:23  18   GOOGLE ON THERE IS AN EXAMPLE.  BUT YOU CAN ADD OTHER WIDGETS.

09:45:26  19        SO THAT ENDS UP BEING THE PRIMARY PLACE THAT CONSUMERS

09:45:29  20   WOULD ACCESS THEIR APPLICATIONS BECAUSE IT'S THE FIRST ENTRY

09:45:32  21   POINT TO THE PHONE.

09:45:33  22        IF THERE'S AN APP THAT THEY DON'T USE VERY FREQUENTLY,

09:45:39  23   THEY MIGHT ACCESS THAT THROUGH THE APPLICATION.

09:45:42  24   Q.   LET'S LOOK AT EXHIBIT 4607 ALREADY IN EVIDENCE AT PAGE 13

09:45:46  25   IN YOUR BINDER.  WHAT DOES THIS SLIDE SHOW.

09:45:50    1      A.   THIS IS JUST CONSUMER RESEARCH, IT'S BASICALLY A CHART

09:45:56    2    COMPARING THE PERCENT OF PEOPLE WHO DO CERTAIN ACTIVITIES AT

09:46:00    3    LEAST ONCE A WEEK, AND IT'S COMPARING IN THE DARK BLUE A

09:46:03    4    TYPICAL GALAXY S OWNER VERSUS IN THE LIGHT BLUE A REGULAR, OR A

09:46:09    5    NON-GALAXY S SMARTPHONE OWNER.

09:46:13    6      Q.   AND LOOKING AT THIS CHART AND THE DEPICTIONS THERE, DOES

09:46:16    7    THE USER SEE THE APP TRAY WHEN THE USER IS PERFORMING ANY ONE

09:46:19    8    OF THESE FUNCTIONS?

09:46:20    9      A.   NO, THEY DO NOT.

09:46:22   10      Q.   DOES THE USER NEED TO ACCESS APP TRAY TO START DOING THESE

09:46:27   11    THINGS?

09:46:27   12      A.   NO, THEY DO NOT.

09:46:29   13      Q.   IS THERE AN EASIER WAY TO GET TO THE APPLICATION?

09:46:31   14      A.   TYPICALLY FROM THE HOME SCREEN.

09:46:33   15      Q.   MR. BLACKARD, IN YOUR EXPERIENCE, DO CONSUMERS BUY PHONES

09:46:36   16    BASED ON THE SHAPE OF THE BEZEL?

09:46:37   17      A.   NO.

09:46:39   18      Q.   DO CONSUMERS BUY PHONES BASED ON THE LAYOUT OF THE APP

09:46:41   19    SCREEN?

09:46:41   20      A.   NO.

09:46:42   21      Q.   DO CONSUMERS BUY PHONES BASED ON THE ROUNDED CORNERS OF

09:46:46   22    THE GLASS COVER?

09:46:46   23      A.   NO.

09:46:47   24           MS. MAROULIS:  THANK YOU, SIR.  NO FURTHER QUESTIONS.

09:46:49   25           THE WITNESS:  THANK YOU.

BLACKARD CROSS BY MR. LEE

| | |
|---|---|
| 09:46:50 | 1 |

THE COURT:  THE TIME IS NOW 9:46.

MR. LEE:  CAN WE HAVE A MINUTE TO SET UP, YOUR HONOR?

THE COURT:  YES, GO AHEAD, PLEASE.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ALL RIGHT.  TIME IS 9:47.  GO AHEAD,

PLEASE.

                    **CROSS-EXAMINATION**

BY MR. LEE:

Q.   GOOD MORNING, MR. BLACKARD.

A.   GOOD MORNING.

Q.   YOU ARE AWARE THAT A PRIOR JURY FOUND 16 SAMSUNG PHONE

MODELS TO INFRINGE APPLE'S THREE DESIGN PATENTS; CORRECT?

A.   I'M AWARE THAT WAS THE OUTCOME, YES.

Q.   AND I WANT TO ASK YOU ABOUT THOSE 18 MODELS.

     YOU WERE NOT INVOLVED IN THE DESIGN PROCESS FOR ANY OF

THOSE 18 MODELS; CORRECT?

A.   IN TERMS OF LIKE THE PHYSICAL DESIGN?

Q.   YES, SIR.

A.   THAT'S CORRECT.

Q.   YOU WEREN'T INVOLVED IN PREPARING THE PROTOTYPES; CORRECT?

A.   SOME OF THE PROTOTYPES WOULD HAVE BEEN FOR THE AT&T

PRODUCT SPECIFICALLY, I PROBABLY WOULD HAVE HANDLED THEM.  I

DIDN'T PERSONALLY DESIGN THEM.  WE WOULD TAKE THEM TO CUSTOMER

MEETINGS.

Q.   RIGHT.  YOU HAD A DESIGN TEAM THAT GAVE YOU THOSE

BLACKARD CROSS BY MR. LEE

09:48:03 1    PROTOTYPES OF THE DESIGNS TO TAKE TO CLIENT MEETINGS; CORRECT?

09:48:07 2    A.   THAT'S CORRECT.

09:48:09 3    Q.   YOU NEVER ATTENDED A SINGLE DESIGN MEETING FOR ANY OF THE

09:48:13 4    18 PHONES THAT WERE FOUND TO INFRINGE THE APPLE PATENTS;

09:48:17 5    CORRECT?

09:48:18 6    A.   YOU KNOW, AGAIN, IN TERMS OF PHYSICAL DESIGN.  I WAS VERY

09:48:22 7    INVOLVED IN OTHER ASPECTS OF THE DESIGN.

09:48:24 8    Q.   MR. BLACKARD, MY QUESTION WAS, WERE YOU INVOLVED IN

09:48:28 9    DEVELOPING THE PHYSICAL DESIGN FOR ANY OF THE 18 PHONES?  DID

09:48:31 10   YOU ATTEND A MEETING?  DID YOU WRITE A MEMO?  DID YOU DRAFT,

09:48:35 11   DRAW A PROTOTYPE?  DID YOU DO ANYTHING LIKE THAT?

09:48:37 12   A.   NOT THE PHYSICAL DESIGN.

09:48:39 13   Q.   NOW, YOU DESCRIBED A LOT OF FEATURES TO THE LADIES AND

09:48:42 14   GENTLEMEN OF THE JURY, SPEED, THE OPERATING SYSTEM, BRANDING.

09:48:47 15       THAT ACTUALLY, ALL THOSE FEATURES WERE IN OTHER PHONES

09:48:50 16   THAT SAMSUNG HAD THAT DIDN'T USE APPLE'S DESIGNS; CORRECT?

09:48:55 17   A.   I GUESS -- I DON'T BELIEVE -- WELL, CAN YOU SAY THE

09:49:06 18   QUESTION AGAIN.

09:49:06 19   Q.   DID SAMSUNG SELL OTHER MODELS OF PHONES THAT HAD THE

09:49:13 20   ATTRIBUTES YOU SPENT SOME TIME EXPLAINING TO THE JURY TODAY

09:49:18 21   THAT DIDN'T -- WEREN'T COVERED BY THE DESIGNS OF THE APPLE

09:49:23 22   PATENTS?

09:49:23 23   A.   AT THE TIME THAT, YOU KNOW, THE GALAXY S PRODUCT WAS THE

09:49:27 24   FIRST, YOU KNOW, OF THE -- THAT HAD 4G.  IT WAS THE FIRST FOUR

09:49:33 25   EDGE.

09:49:33   1        SO I WOULD SAY, YOU KNOW, IN ALL CASES THOSE WERE THE

09:49:36   2   FIRST DESIGNS.  THERE WERE PROBABLY OTHER DESIGNS AS WELL OVER

09:49:39   3   TIME THAT INCLUDED SOME OF THOSE ELEMENTS.

09:49:41   4   Q.   MR. BLACKARD, MY QUESTION WAS, DID SAMSUNG HAVE CHOICES

09:49:45   5   FOR THE DESIGN OTHER THAN USING THE APPLE DESIGNS?  DO YOU

09:49:49   6   KNOW?

09:49:49   7   A.   THERE IS, YOU KNOW, ALWAYS CHOICES FOR DESIGNS.

09:49:53   8   Q.   NOW, YOU DESCRIBED MARKETING EXPENSES AND A CHANGE IN THE

09:49:58   9   MARKETING PHILOSOPHY.

09:49:59  10        DO YOU REMEMBER THAT?

09:50:00  11   A.   YES.

09:50:01  12   Q.   AND I THINK THE NUMBER YOU GAVE US WAS $180 MILLION?

09:50:04  13   A.   I THINK 150.

09:50:06  14   Q.   RIGHT.  HOW MUCH OF THAT CAN YOU DIRECTLY ATTRIBUTE TO THE

09:50:09  15   18 INFRINGING PHONE MODELS?

09:50:12  16        MS. MAROULIS:  OBJECTION.  CALLS FOR LEGAL

09:50:14  17   CONCLUSION.

09:50:15  18        THE COURT:  OVERRULED.

09:50:17  19        THE WITNESS:  WHAT DO YOU MEAN BY DIRECTLY ATTRIBUTE?

09:50:20  20   BY MR. LEE:

09:50:20  21   Q.   DIRECTLY ATTRIBUTE IT TO A SPECIFIC INFRINGING PHONE

09:50:23  22   MODEL?  CAN YOU DO THAT?

09:50:26  23   A.   I GUESS I CAN'T DO THAT, NO.

09:50:28  24   Q.   OKAY.  NOW, I THINK I WROTE IT DOWN CORRECTLY, BUT THE

09:50:32  25   PHRASE YOU USED WHEN YOU WERE TALKING ABOUT APPROACHING THE

09:50:36   1    CARRIERS WAS YOU WERE SELLING THE DEVICE.

09:50:40   2         DO YOU REMEMBER USING THAT PHRASE?

09:50:41   3    A.   THAT SOUNDS LIKE THAT I WOULD SAY.

09:50:44   4    Q.   RIGHT.  THE DEVICE YOU WERE SELLING WAS A PHONE; CORRECT?

09:50:47   5    A.   I THINK IT'S MORE THAN THE PHONE; RIGHT?  WE'RE TALKING

09:50:51   6    ABOUT BRAND.  WHEN WE GO INTO A CARRIER, WE'RE TALKING ABOUT

09:50:56   7    THE PHYSICAL DESIGN, AS WE'VE TALKED ABOUT.  WE TALKED ABOUT

09:50:59   8    ALL THE BENEFITS AND SERVICES WHICH IS, YOU KNOW, SOFTWARE THAT

09:51:02   9    IN MANY CASES IS DOWNLOADED FROM SOMEWHERE ELSE.  THERE'S

09:51:05   10   ECOSYSTEM, BENEFITS OF CONNECTING TO TV.

09:51:09   11        SO IT'S A LOT MORE THAN JUST THE PHONE WHEN WE GO AND SELL

09:51:12   12   TO A CARRIER.

09:51:14   13   Q.   BUT THE PRODUCT YOU SELL TO THEM IS A SMARTPHONE; CORRECT?

09:51:17   14   A.   WE SELL A SMARTPHONE, YES.

09:51:19   15   Q.   RIGHT.  AND WHEN YOU SAID SELL THE DEVICE, THE DEVICE YOU

09:51:23   16   WERE REFERRING TO WAS THE SMARTPHONE; CORRECT?

09:51:25   17   A.   AGAIN, WHEN I SAID SELL THE DEVICE, JUST TO CLARIFY, MY

09:51:29   18   TEAM, WE CALL IT SELL IN, BUT WE'LL GO TO A CARRIER AND PITCH

09:51:34   19   THAT DICE, AND WHEN WE'RE PINCHING THAT, WE'RE PINCHING THE

09:51:39   20   BROADER VALUE PROPOSITION.

09:51:40   21        SO SAMSUNG DOES SELL THE PHYSICAL DEVICE TO THE CARRIER,

09:51:43   22   BUT IN THE CONTEXT THAT I WAS USING IT, WE SELL A VALUE

09:51:47   23   PROPOSITION, THE SAMSUNG SERVICES AND ALL THE SERVICES THAT WE

09:51:51   24   OFFER.

09:51:51   25   Q.   MR. BLACKARD, I APOLOGIZE IF MY QUESTION WAS CONFUSING.  I

BLACKARD CROSS BY MR. LEE

09:51:55    1    JUST ASKED, WHEN YOU USED THE WORD THE "DEVICE," WERE YOU

09:51:58    2    REFERRING TO THE SMARTPHONE?

09:51:58    3    A.   AGAIN, I SAID NO.  I WAS REFERRING TO THE BROADER SET.

09:52:02    4    Q.   SO WHEN YOU USED THE WORD "DEVICE," YOU WERE REFERRING TO

09:52:04    5    THE PRODUCT AND A BROADER SET, AND IT INCLUDED THE PHYSICAL

09:52:08    6    DESIGN OF THE PHONE, YES?

09:52:09    7    A.   I THINK, YES, IT WOULD INCLUDE PHYSICAL DESIGN.

09:52:12    8    Q.   NOW, MR. BLACKARD, YOU WERE AT SAMSUNG IN 2012, IN 2010 TO

09:52:18    9    2012; CORRECT?

09:52:19   10    A.   YES.

09:52:20   11    Q.   SAMSUNG SOLD SMARTPHONES IN THE UNITED STATES DURING THAT

09:52:24   12    PERIOD OF TIME; CORRECT?

09:52:24   13    A.   CORRECT.

09:52:25   14    Q.   SAMSUNG SOLD MILLIONS AND MILLIONS OF SMARTPHONES THAT

09:52:29   15    INFRINGED THE APPLE PATENTS; CORRECT?

09:52:32   16    A.   THERE WERE MILLIONS THAT WERE KIND OF PART OF THAT CASE.

09:52:36   17    Q.   RIGHT.  AND FOR THE PHONES THAT WERE SOLD IN 2010 TO 2012,

09:52:41   18    WHEN WAS THE RESEARCH AND DEVELOPMENT EXPENSE INCURRED?

09:52:45   19    A.   I MEAN, A LOT OF THOSE IS, YOU KNOW, IF YOU THINK ABOUT

09:52:52   20    THE TYPICAL DEVELOPMENT TIMELINE, A PHONE, WHEN WE SELL IT INTO

09:52:56   21    A CARRIER, SELLING IN, NOT SELL, THAT PROCESS USUALLY HAPPENS

09:53:00   22    ABOUT A YEAR OUT.  SO THEY WOULD HAVE AN RFP, AND SO BEFORE A

09:53:05   23    YEAR OUT, THE TECHNOLOGY ACTUALLY HAS TO HAVE BEEN INVESTED IN,

09:53:09   24    OF COURSE.

09:53:10   25         SOMETHING LIKE 4G TECHNOLOGY WOULD HAVE BEEN WORKED ON FOR

09:53:14   1        YEARS BEFORE THAT.

09:53:15   2        Q.   SO IF WE WANTED TO KNOW WHAT THE RESEARCH AND DEVELOPMENT

09:53:18   3    COSTS WERE ATTRIBUTABLE TO THE PHONES SOLD IN 2010 AND 2012, WE

09:53:23   4    WOULD KNOW THE RESEARCH -- WE WOULD WANT TO KNOW THE RESEARCH

09:53:25   5    AND DEVELOPMENT COSTS INCURRED SEVERAL YEARS BEFORE; CORRECT?

09:53:28   6             MS. MAROULIS:  OBJECTION.  CALLS FOR EXPERT

09:53:31   7    TESTIMONY, YOUR HONOR.

09:53:31   8             THE COURT:  OVERRULED.

09:53:32   9             THE WITNESS:  IT WOULD BE INCLUSIVE OF -- YOU KNOW,

09:53:35  10    AGAIN, YOU WOULD HAVE TO INVEST RESEARCH AND DEVELOPMENT BEFORE

09:53:38  11    YOU LAUNCH A PRODUCT.

09:53:39  12    BY MR. LEE:

09:53:39  13        Q.   NOW, WHAT WERE SAMSUNG'S REVENUES BETWEEN 2010 AND 2012

09:53:43  14    FOR THE SALE OF GLASS FRONT FACES?

09:53:46  15        A.   I DON'T KNOW.

09:53:52  16        Q.   WHAT WAS SAMSUNG'S REVENUES IN 2012 TO 2012 FOR BEZELS?

09:53:57  17        A.   I DON'T KNOW.

09:53:58  18        Q.   FOR DISPLAY SCREENS?

09:54:00  19        A.   I DON'T KNOW.

09:54:02  20        Q.   WHAT WAS SAMSUNG'S MARKET SHARE FOR GLASS FRONT FACES IN

09:54:06  21    2010 TO 2012?

09:54:09  22        A.   AGAIN, NOT AN AREA I WOULD HAVE INFORMATION ON.  I DON'T

09:54:12  23    KNOW.

09:54:12  24        Q.   FOR BEZELS?

09:54:13  25        A.   I DON'T KNOW.

09:54:14  1    Q.   FOR DISPLAY SCREENS?

09:54:16  2    A.   I DON'T KNOW.

09:54:16  3    Q.   BUT YOU HAVE MARKET SHARE AND COMPARATIVE INFORMATION FOR

09:54:20  4    SMARTPHONES, WHICH YOU JUST SHOWED THE JURY; CORRECT?

09:54:27  5    A.   WELL, YOU KNOW, I'M PART OF THE SMARTPHONE DIVISION, SO

09:54:30  6    YEAH.

09:54:30  7    Q.   NOW, I WANT TO ASK YOU SOME QUESTIONS ABOUT ARTICLE OF

09:54:33  8    MANUFACTURE.

09:54:33  9         YOU WERE DESIGNATED BY SAMSUNG AS ITS CORPORATE

09:54:39  10   REPRESENTATIVE TO TESTIFY UNDER OATH ABOUT THE ARTICLE OF

09:54:41  11   MANUFACTURE IN THIS CASE; CORRECT?

09:54:42  12   A.   THAT'S CORRECT.

09:54:46  13   Q.   NOW, YOU KNOW THE INFRINGEMENT VERDICT IN THIS CASE WAS

09:54:49  14   RENDERED IN 2012; CORRECT?

09:54:55  15   A.   THAT'S MY UNDERSTANDING.

09:54:56  16   Q.   YOU NEVER SAW ANY OF THE THREE DESIGN PATENTS UNTIL

09:54:59  17   DECEMBER 2017 FOR THE FIRST TIME; CORRECT?

09:55:02  18   A.   IT WOULD HAVE BEEN DURING MY FIRST DEPOSITION, THAT'S

09:55:07  19   RIGHT.

09:55:07  20   Q.   DECEMBER 2017?

09:55:08  21   A.   IF THAT'S THE DATE, YES.

09:55:10  22   Q.   AND THAT'S WHEN A LAWYER GAVE THEM TO YOU; CORRECT?

09:55:13  23   A.   CORRECT.

09:55:14  24   Q.   NOW, A LAWYER DIDN'T JUST GIVE YOU THE THREE PATENTS, THEY

09:55:18  25   ALSO GAVE YOU THREE BOXES; CORRECT?

09:55:22   1               MS. MAROULIS:  OBJECTION.  MISLEADING.

09:55:24   2       A.   I REVIEWED --

09:55:25   3               THE COURT:  OVERRULED.  GO AHEAD.

09:55:27   4               THE WITNESS:  -- BOXES WITH COMPONENTS IN THEM, YES.

09:55:30   5       BY MR. LEE:

09:55:30   6       Q.   RIGHT.  SO THE LAWYERS HANDED YOU BOXES AND SAID TO YOU,

09:55:33   7       THESE ARE THE ARTICLES OF MANUFACTURE; CORRECT?

09:55:35   8       A.   WE REVIEWED THE DEFINITION --

09:55:43   9               MS. MAROULIS:  YOUR HONOR, I'M GOING TO OBJECT TO

09:55:45  10       THIS BECAUSE THIS CALLS FOR ATTORNEY-CLIENT COMMUNICATIONS.

09:55:47  11               THE COURT:  WELL, WHAT HE REVIEWED IS NOT PRIVILEGED,

09:55:50  12       BUT WHAT THEY SAID TO HIM IS NOT PRIVILEGED.

09:55:52  13               MS. MAROULIS:  THE QUESTION WAS ABOUT WHAT WAS

09:55:54  14       DISCUSSED THAT WAS IN THE QUESTION TO THE WITNESS.

09:55:57  15       BY MR. LEE:

09:55:57  16       Q.   MR. BLACKARD, I AM NOT ASKING YOU WHAT THE ATTORNEYS SAID

09:56:00  17       TO YOU.  OKAY?  AND MS. MAROULIS DOESN'T WANT YOU TO GO THERE

09:56:05  18       AND NEITHER DO I.

09:56:06  19               MY QUESTION IS, DID YOU COME TO A MEETING WITH LAWYERS,

09:56:10  20       DID THEY HAND YOU THREE BOXES THAT CONTAINED A GLASS FRONT

09:56:15  21       FACE, A BEZEL, AND A DISPLAY SCREEN?  IS THAT WHAT THEY DID?

09:56:21  22       A.   YEAH, THAT WAS, THAT WAS PART OF IT.  WE ALSO REVIEWED

09:56:25  23       JUST --

09:56:26  24       Q.   DON'T TELL US WHAT YOU TALKED ABOUT.  MY QUESTION IS, DID

09:56:29  25       THEY HAND THOSE THREE THINGS TO YOU?

09:56:31   1    A.   YES.

09:56:31   2    Q.   ALL RIGHT.  NO ONE EVER ASKED YOU, SETTING ASIDE THE

09:56:35   3    LAWYERS, WOULD YOU LOOK AT THE SAMSUNG SMARTPHONE AND TELL US

09:56:40   4    WHAT THE ARTICLE OF MANUFACTURE IS, DID THEY?

09:56:43   5    A.   WELL, I REVIEWED THE DEFINITION OF THE FOUR POINT TEST SO

09:56:49   6    I COULD DETERMINE IF, YOU KNOW, IN MY OWN MIND WHAT THE ARTICLE

09:56:53   7    OF MANUFACTURE WERE.

09:56:54   8    Q.   AND YOU REFERRED -- YOU REVIEWED THAT FOUR POINT TEST FOR

09:56:57   9    THE FIRST TIME ON THE VERY SAME DAY THAT SAMSUNG'S LAWYERS

09:57:00  10    HANDED YOU THE THREE BOXES WITH A BEZEL, A DISPLAY SCREEN, AND

09:57:06  11    A GLASS FRONT FACE FOR THE VERY FIRST TIME; CORRECT?

09:57:09  12    A.   I DID.  THAT WAS MY FIRST INVOLVEMENT.

09:57:12  13    Q.   AND THAT IS THE FIRST TIME YOU SAW ANY PHYSICAL DEVICE

09:57:16  14    THAT SUGGESTED THAT THE ARTICLE OF MANUFACTURE FOR THESE PHONES

09:57:20  15    WAS A GLASS FRONT FACE, A BEZEL, OR A DISPLAY SCREEN; CORRECT?

09:57:25  16    A.   I HADN'T BEEN INVOLVED IN THE CASE PRIOR TO THAT.

09:57:28  17    Q.   AND NO SAMSUNG EMPLOYEE, SETTING ASIDE -- I WANT YOU TO

09:57:32  18    SET ASIDE ANYTHING THAT LAWYERS TOLD YOU.  CAN YOU DO THAT?

09:57:35  19    A.   SURE.

09:57:36  20    Q.   NO SAMSUNG EMPLOYEE, A DESIGNER, AN ENGINEER, A MARKETING

09:57:41  21    EXECUTIVE, HAS EVER SUGGESTED TO YOU THAT A GLASS FRONT FACE, A

09:57:48  22    BEZEL, OR A DISPLAY SCREEN IS THE PRODUCT TO WHICH THE APPLE

09:57:52  23    DESIGNS WERE APPLIED; CORRECT?

09:57:53  24    A.   IT'S JUST I'VE NEVER HAD A DISCUSSION, PERIOD, ABOUT THAT,

09:57:58  25    NO.

09:57:58   1      Q.   SO IT'S CORRECT?

09:57:59   2      A.   I SUPPOSE.

09:58:01   3             MR. LEE:  THANK YOU, YOUR HONOR.  NOTHING FURTHER.

09:58:02   4             THE COURT:  OKAY.  TIME IS 9:57.

09:58:05   5          GO AHEAD, PLEASE.

09:58:06   6                      **REDIRECT EXAMINATION**

09:58:07   7      BY MS. MAROULIS:

09:58:07   8      Q.   MR. BLACKARD, JUST ONE QUESTION.  HAVE YOU SEEN

09:58:09   9      DISASSEMBLED PHONE PARTS BEFORE YOUR DECEMBER DEPOSITION?

09:58:13  10      A.   AGAIN, QUITE COMMON, BOTH AT SAMSUNG AND TEKSLER

09:58:16  11      INSTRUMENTS.  WE TALKED ABOUT TEARDOWN AND DEVELOPMENT BOARDS.

09:58:20  12      Q.   SO YOU'RE VERY FAMILIAR WITH THE COMPONENTRY; RIGHT?

09:58:23  13      A.   VERY FAMILIAR.  THAT WAS MY JOB FOR FOUR AND A HALF YEARS,

09:58:26  14      YES.

09:58:26  15             MS. MAROULIS:  THANK YOU, SIR.  NO FURTHER QUESTIONS.

09:58:29  16             THE COURT:  ALL RIGHT.  TIME IS 9:58.

09:58:31  17          ANY FURTHER RECROSS?

09:58:32  18             MR. LEE:  NOTHING FURTHER, YOUR HONOR.

09:58:34  19             THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

09:58:36  20      AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

09:58:40  21             MS. MAROULIS:  NOT SUBJECT TO RECALL.

09:58:42  22             THE COURT:  DO YOU AGREE WITH THAT?

09:58:44  23             MR. LEE:  YES, YOUR HONOR.

09:58:44  24             THE COURT:  ALL RIGHT.  THEN YOU'VE COMPLETED YOUR

09:58:46  25      TRIAL TESTIMONY, AND YOU'RE FREE TO LEAVE.

09:58:48  1          CALL YOUR NEXT WITNESS.

09:58:49  2               MR. QUINN:  YOUR HONOR, SAMSUNG CALLS JINSOO KIM.

09:58:59  3          AND, YOUR HONOR, MAY WE HAVE JUST A MOMENT?

09:59:01  4               THE COURT:  YES.

09:59:02  5               MR. QUINN:  MR. KIM WILL BE TESTIFYING THROUGH AN

09:59:04  6     INTERPRETER.

09:59:06  7               THE COURT:  ALL RIGHT.  GO AHEAD AND GET SET UP,

09:59:09  8     PLEASE.

09:59:32  9          WE'RE HAVING TWO INTERPRETERS, SO IS THERE ROOM FOR ONE

09:59:37 10     MORE CHAIR.

09:59:37 11               THE CLERK:  I CAN PUSH ANOTHER CHAIR OVER AND THEY

09:59:40 12     CAN PERHAPS SWITCH OUT.

09:59:42 13               THE INTERPRETER:  ONE OF US CAN SIT BEHIND.

09:59:44 14               THE CLERK:  OKAY.

10:00:19 15          (PAUSE IN PROCEEDINGS.)

10:00:56 16               THE CLERK:  CAN I HAVE THE WITNESS COME UP SO I CAN

10:00:59 17     SWEAR HIM IN, PLEASE.

10:01:00 18          AND PLEASE RAISE YOUR RIGHT HAND, SIR.

10:01:04 19               THE COURT:  WAIT.  ONE SECOND.  WE NEED TO SWEAR IN

10:01:10 20     THE INTERPRETERS.

10:01:11 21               THE CLERK:  YES, YOUR HONOR.

10:01:13 22          CAN I HAVE YOU BOTH RAISE YOUR RIGHT HAND FIRST.

10:01:17 23          **(KOREAN INTERPRETERS ANN PARK AND ALBERT S. KIM WERE**

10:01:20 24     **SWORN.)**

10:01:22 25               INTERPRETER PARK:  I DO.

10:01:23  1          INTERPRETER KIM:  I DO.

10:01:24  2          THE CLERK:  THANK YOU.  AND IF YOU BOTH WOULD PLEASE

10:01:27  3   STATE AND SPELL YOUR NAMES FOR THE RECORD.

10:01:29  4          INTERPRETER PARK:  MY NAME IS ANN PARK, A-N-N,

10:01:32  5   P-A-R-K, INTERPRETER.

10:01:34  6          INTERPRETER KIM:  ALBERT S. KIM, LAST NAME K-I-M.

10:01:38  7          THE CLERK:  CAN I HAVE THE WITNESS RAISE HIS RIGHT

10:01:41  8   HAND, PLEASE.

10:01:44  9          **(DEFENDANTS' WITNESS, JINSOO KIM, WAS SWORN.)**

10:02:03 10          THE WITNESS:  YES, I DO.

10:02:04 11          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

10:02:07 12      AND ONCE SEATED, PLEASE HAVE HIM STATE AND THEN SPELL HIS

10:02:11 13   FULL NAME FOR THE RECORD.

10:02:12 14          THE WITNESS:  YES.  MY NAME IS JINSOO KIM.

10:02:28 15   J-I-N-S-O-O, K-I-M.

10:02:31 16          THE COURT:  OKAY.  TIME IS 10:02.  GO AHEAD, PLEASE.

10:02:37 17          MR. QUINN:  THANK YOU, YOUR HONOR.

10:02:38 18                        **DIRECT EXAMINATION**

10:02:39 19   BY MR. QUINN:

10:02:39 20   Q.   MR. KIM, WOULD YOU PLEASE STATE YOUR FULL NAME.

10:02:47 21   A.   YES.  MY NAME IS JINSOO KIM.  J-I-N-S-O-O, K-I-M.

10:02:52 22   Q.   AND WHERE DO YOU CURRENTLY WORK?

10:02:54 23   A.   I WORK AT SAMSUNG ELECTRONICS.

10:03:04 24   Q.   AND WHERE IS THAT, WHERE IS YOUR PLACE OF WORK LOCATED?

10:03:08 25   A.   IT'S IN SEOUL, SOUTH KOREA.

10:03:10  1      Q.   CAN YOU TELL US A LITTLE BIT ABOUT YOURSELF.  ARE YOU

10:03:12  2      MARRIED?

10:03:13  3      A.   YES, I AM.

10:03:18  4      Q.   DO YOU HAVE ANY CHILDREN?

10:03:19  5      A.   I HAVE TWO CHILDREN.

10:03:22  6      Q.   BOYS?  GIRLS?  AGES?

10:03:24  7      A.   MY OLDEST ONE IS A BOY, AND HE'S 16 YEARS OLD.  SECOND ONE

10:03:36  8      IS TEN, AND SHE'S MY DAUGHTER.

10:03:40  9      Q.   OKAY.  WHAT KIND OF WORK DO YOU DO FOR SAMSUNG?

10:03:51  10     A.   I WORK ON DESIGN RELATED.

10:03:54  11     Q.   AND WHAT TYPE OF DESIGN?

10:03:55  12     A.   WHAT I'M TALKING ABOUT IS DESIGN OF OUR PRODUCTS, SO OUR

10:04:11  13     TELECOMMUNICATIONS DEVICE, WIRELESS DEVICES, CELL PHONES, AND

10:04:15  14     WEARABLE DEVICES, AND THINGS OF THAT NATURE.

10:04:17  15     Q.   ARE YOU INVOLVED IN THE DESIGN OF THE HARDWARE AND THE

10:04:20  16     EXTERIOR OF THE PHONE OR THE COMPONENTS OR THE SOFTWARE?  COULD

10:04:24  17     YOU GIVE US SOME IDEA OF WHAT TYPE OF DESIGN WORK YOU DO?

10:04:53  18     A.   SO WHAT WE DO IN MY TEAM, IT'S NOT RELATED TO HARDWARE NOR

10:04:59  19     IS IT RELATED TO SOFTWARE.  WE ARE WORKING ON THE DESIGN OF

10:05:02  20     WHAT YOU CAN SEE WHEN CONSUMERS ARE USING OUR DEVICES.  SO

10:05:05  21     EXTERIOR DESIGN IS WHAT I WORK ON.

10:05:07  22     Q.   ALL RIGHT.  SORT OF THE PHONE CASE?

10:05:09  23     A.   THAT'S CORRECT.  THE EXTERIOR OF THE PHONE ITSELF.

10:05:13  24     Q.   THANK YOU.

10:05:13  25          AND FOR HOW MANY YEARS HAVE YOU WORKED AT SAMSUNG?

10:05:16    1    A.   THIS IS MY 16TH YEAR.

10:05:27    2    Q.   AND WHAT IS YOUR CURRENT POSITION, OR TITLE?

10:05:29    3    A.   I'M A VICE PRESIDENT.

10:05:35    4    Q.   IF WE GO BACK TO THE 2009 TO 2011 PERIOD, WHAT WAS YOUR

10:05:39    5    JOB AT SAMSUNG?

10:05:40    6    A.   BACK THEN, I SERVED AS THE CREATIVE DIRECTOR, WHAT WAS

10:06:03    7    CALLED CREATIVE DIRECTOR OF THE TEAM THAT WORKED ON THE

10:06:07    8    TELECOMMUNICATIONS DEVICES, DESIGN, THAT WAS MY TEAM.  AND THIS

10:06:13    9    WAS A TEAM THAT WAS DEVOTED TO DESIGNING THE EXTERIOR OF THE

10:06:17   10    PRODUCT.

10:06:17   11    Q.   DURING THAT TIMEFRAME, DID YOU WORK ON THE INDUSTRIAL

10:06:19   12    DESIGN OF ANY OF THE PHONES THAT ARE AT ISSUE IN THIS CASE?

10:06:36   13    A.   YES, I DID.

10:06:37   14    Q.   KEN, IF WE COULD PULL UP SDX 1103.

10:06:40   15         AND I'M GOING TO ASK YOU WHAT IS SHOWN ON THIS SLIDE.

10:06:59   16    A.   YES.

10:07:00   17    Q.   WHAT IS IT THAT WE SEE HERE?

10:07:02   18    A.   THESE ARE THE CELL PHONES THAT I WORKED ON.

10:07:04   19    Q.   AND THESE -- ARE THESE THE PHONES THAT WERE FOUND TO

10:07:08   20    INFRINGE THAT YOU WORKED ON?

10:07:09   21    A.   I'M NOT -- I DON'T HAVE ANY EXPERTISE IN LEGAL MATTER, SO

10:07:33   22    WHEN WE TALK ABOUT INFRINGEMENT, WHAT WAS EXACTLY BEING

10:07:35   23    INFRINGED AND TO WHAT EXTENT, THAT I DIDN'T -- I DO NOT KNOW.

10:07:40   24         BUT THAT'S WHAT I HEARD.  THAT'S THE EXTENT OF WHAT I

10:07:42   25    HEARD.

10:07:43   1    Q.   BUT THESE ARE PHONES WHERE YOU WORKED ON THE OUTSIDE OF

10:07:48   2    THE EXTERIOR DESIGN OF THESE PHONES; IS THAT TRUE?

10:07:51   3    A.   YES, THAT IS CORRECT.

10:07:53   4    Q.   AND JUST FOR THE RECORD, THAT INCLUDED -- IF WE COULD

10:07:57   5    LEAVE THAT UP, KEN -- THE EPIC 4G, THE GEM, THE ANDROID CHARGE,

10:08:02   6    THE GALAXY S II AT&T, THE GALAXY S II EPIC 4G TOUCH, THE

10:08:12   7    GALAXY S II SKYROCKET, AND THE GALAXY S II I9000; CORRECT?

10:08:24   8    A.   THAT IS CORRECT.

10:08:41   9    Q.   DID YOU WORK AS A DESIGNER ON THE WIRELESS PRODUCT DESIGN

10:08:44   10   TEAM FROM 2002 WHEN YOU FIRST JOINED SAMSUNG RIGHT UP THROUGH

10:08:49   11   2009?

10:09:05   12   A.   THAT IS CORRECT.

10:09:06   13   Q.   HAVE YOU RECEIVED ANY AWARDS FROM DESIGN ORGANIZATIONS FOR

10:09:09   14   YOUR DESIGN WORK AT SAMSUNG?

10:09:10   15   A.   YES, I HAVE.

10:09:31   16   Q.   YES.  IF YOU LOOK AT THE INDUSTRY RELATING TO DESIGN, THEN

10:09:54   17   ON A WORLDWIDE BASIS, THE BIGGEST DESIGN AWARDS THAT YOU CAN

10:09:58   18   GET IN GERMANY, WE CAN THINK OF I.F. AWARD AND RED DOT AWARD.

10:10:03   19        IN THE U.S., YOU CAN THINK OF I.D.E.A. AWARD.

10:10:10   20        AND I HAVE RECEIVED AWARDS IN ALL THREE OF THESE THAT I

10:10:13   21   JUST MENTIONED.

10:10:14   22   Q.   HAVE YOU RECEIVED ANY DESIGN PATENTS WHILE YOU'VE BEEN

10:10:17   23   WORKING AT SAMSUNG?

10:10:30   24   A.   YES, I HAVE.

10:10:31   25   Q.   HOW MANY APPROXIMATELY?



10:10:32   1        A.   APPROXIMATELY A LITTLE OVER 400, I BELIEVE.

10:10:35   2        Q.   NOW, I'D LIKE TO GO INTO YOUR EDUCATIONAL BACKGROUND.

10:10:39   3             DID YOU GRADUATE FROM A UNIVERSITY?

10:10:41   4        A.   I DID.

10:10:44   5        Q.   AND WHEN ONE WAS THAT?

10:10:46   6        A.   I GRADUATED FROM KOOKMIN UNIVERSITY LOCATED IN SOUTH

10:10:55   7        KOREA, SEOUL, KOREA.

10:10:56   8        Q.   AND WHERE DID YOU WORK BEFORE YOU WORKED AT SAMSUNG?

10:11:10   9        A.   I WORKED AT HYUNDAI MOTORS.  I WORKED AS A DESIGNER OF THE

10:11:14  10        AUTOMOBILES THAT THEY MAKE THERE AT HYUNDAI.

10:11:16  11        Q.   IN THE INDUSTRIAL DESIGN FIELD IN KOREA, ARE HYUNDAI AND

10:11:21  12        SAMSUNG CONSIDERED PRESTIGIOUS COMPANIES TO WORK FOR?

10:11:26  13        A.   YES, INDEED.  THOSE ARE TWO COMPANIES THAT ALL THE

10:11:47  14        DESIGNERS WORKING IN KOREA ASPIRE TO WORK FOR.

10:11:51  15        Q.   I'D LIKE YOU TO GO BACK IN YOUR MEMORY NOW AND ASK YOU IF

10:11:56  16        YOU CAN RECALL ATTENDING A MEETING IN FEBRUARY OF 2010 WITH THE

10:12:01  17        HEAD OF THE SAMSUNG MOBILE DIVISION, MR. J.K. SHIN.

10:12:27  18        A.   OKAY.

10:12:27  19        Q.   AND DO YOU RECALL ATTENDING SUCH A MEETING?

10:12:30  20        A.   I DO.

10:12:31  21        Q.   IF WE COULD LOOK AT, KEN, EXHIBIT 40, PLAINTIFF'S

10:12:37  22        EXHIBIT 40.  AND IF WE COULD GO TO PAGE 4 AT THE TOP, THE TOP

10:12:46  23        LIST.

10:12:47  24             DO YOU SEE A LIST OF ATTENDEES UP THERE WITH YOUR NAME,

10:12:52  25        JINSOO KIM, AT THE LEFT-HAND SIDE?

10:12:55  1        A.   YES, I DO.

10:13:01  2        Q.   ALL RIGHT.  IN THIS MEETING, DO YOU REMEMBER MR. SHIN

10:13:05  3    MAKING REFERENCE TO A CRISIS OF DESIGN?

10:13:09  4        A.   YES, I DO.

10:13:21  5        Q.   AND -- I'M SORRY.

10:13:22  6        A.   YES, INDEED, BECAUSE THE MANAGEMENT AT OUR COMPANY, THEY

10:13:45  7    ACTUALLY HOLD THIS TYPE OF MEETING EVERY YEAR AND ACTUALLY THEY

10:13:50  8    WOULD ADDRESS WHAT'S HAPPENING.  EVERY YEAR, LAST YEAR, THIS

10:13:53  9    YEAR, AND EVEN THE YEARS GOING FORWARD.

10:13:56  10            AND THEY WOULD HOLD THESE MEETINGS, AND THIS IS SOME KIND

10:14:02  11   OF A RALLY CRY, I WOULD SAY, AND THAT WAS A MEETING -- THE

10:14:08  12   SPIRIT IN WHICH THE MEETING WAS HELD AS FAR AS I REMEMBER.

10:14:11  13       Q.   WHEN MR. SHIN REFERRED TO A CRISIS OF DESIGN, WAS HE

10:14:17  14   REFERRING TO THE EXTERIOR DESIGN OF SAMSUNG'S PHONES?

10:14:39  15       A.   IT WAS NOT.

10:14:40  16       Q.   DO YOU REMEMBER HIM USING THE PHRASE, "COMPARED TO THE

10:14:43  17   IPHONE, IT'S THE DIFFERENCE BETWEEN HEAVEN AND EARTH"?

10:14:48  18            DO YOU RECALL HIM USING THAT PHRASE?

10:14:50  19       A.   YES.

10:14:57  20       Q.   AND WHEN HE USED THAT PHRASE, "COMPARED TO THE IPHONE,

10:15:02  21   IT'S THE DIFFERENCE BETWEEN HEAVEN AND EARTH," DO YOU RECALL

10:15:06  22   WHAT HE WAS REFERRING TO?

10:15:07  23       A.   MOSTLY IT WAS RELATED TO UX.

10:15:28  24       Q.   DO YOU RECALL HIM REFERRING TO A PHONE CALLED THE OMNIA?

10:15:40  25       A.   YES, HE USED SOME STRONG EXPRESSION IN REFERENCE TO THAT.

10:15:46  1    Q.   WHAT OPERATING SYSTEM ABOUT THE OMNIA USE?

10:15:48  2    A.   MICROSOFT WINDOWS MOBILE.

10:15:54  3    Q.   WAS THAT A SUCCESSFUL OPERATING SYSTEM FOR PHONES?

10:15:58  4    A.   IT WASN'T.

10:16:10  5    Q.   AT THAT MEETING, DID MR. SHIN INSTRUCT YOU TO COPY THE

10:16:13  6    IPHONE?

10:16:13  7    A.   HE DIDN'T.

10:16:22  8    Q.   DID HE MAKE ANY COMMENTS ABOUT WHETHER OR NOT HE THOUGHT

10:16:24  9    IT WAS A GOOD IDEA TO DO JUST WHAT THE CARRIERS WERE ASKING

10:16:28  10   FOR?

10:16:28  11   A.   NO, THAT'S NOT WHAT HE SAID.  HE SAID IF YOU JUST FOCUS ON

10:16:53  12   WHAT THE CARRIERS ARE SAYING, THEN THE COMPANY WILL GO BUST.

10:16:56  13   Q.   WHEN DID SAMSUNG ANNOUNCE THE FIRST GALAXY S?

10:17:02  14   A.   THAT WAS IN MARCH OF 2010.

10:17:12  15   Q.   SO THAT WOULD HAVE BEEN ONE MONTH AFTER THIS MEETING THAT

10:17:15  16   WE'VE BEEN DISCUSSING?

10:17:17  17   A.   THAT IS CORRECT.

10:17:24  18   Q.   AT THAT TIME, HAD THE DESIGNS BEEN FINALIZED?  SO AS OF

10:17:31  19   THE TIME OF THAT MEETING, WOULD THE DESIGNS HAVE BEEN FINALIZED

10:17:34  20   FOR THE GALAXY PHONE?

10:17:36  21   A.   THAT IS CORRECT.

10:17:50  22   Q.   DUE TO YOUR WORK ON THIS PRODUCT DESIGN TEAM, ARE YOU

10:17:54  23   GENERALLY FAMILIAR WITH THE DESIGN OF MOBILE PRODUCTS THAT

10:17:56  24   SAMSUNG DEVELOPED DURING THE TIME PERIOD 2010 TO 2012?

10:18:04  25   A.   YES, THAT'S CORRECT.

10:18:18   1    Q.   BUT BACK IN THE 2009, 2011 TIME PERIOD, HOW MANY DIFFERENT

10:18:25   2    MODELS PHONES DID SAMSUNG RELEASE EACH YEAR?

10:18:30   3    A.   EVERY YEAR, SEVERAL HUNDREDS OF PRODUCTS, PHONES, WERE

10:18:53   4    RELEASED.

10:18:55   5    Q.   BACK IN THE 2009 TO 2011 TIMEFRAME, WHAT TYPES OF PHONES

10:19:00   6    DID SAMSUNG OFFER TO THE MARKET?

10:19:02   7    A.   AT THE TIME WE WERE MAKING VARIOUS DIFFERENT TYPES OF

10:19:36   8    PHONES.  SO CONSIDERING VARIOUS FORM FACTORS, THERE WERE

10:19:41   9    FOLDING PHONES, THERE WERE SLIDING PHONES, THERE WERE QWERTY

10:19:46   10   SLIDING PHONES.

10:19:47   11        AND EVEN IF YOU'RE TALKING ABOUT THE QWERTY SLIDING

10:19:51   12   PHONES, THERE COULD BE PHONES THAT WOULD HAVE THE HORIZONTAL

10:19:54   13   ORIENTATION AND WHATNOT.

10:19:56   14        AND THERE WAS TOUCH PHONES.

10:19:59   15        SO MANY DIFFERENT PHONES.

10:20:00   16   Q.   DID SAMSUNG OFFER THESE VARIOUS TYPES OF PHONES BOTH

10:20:03   17   BEFORE JANUARY OF 2007 WHEN THE IPHONE WAS ANNOUNCED AND AFTER

10:20:07   18   JANUARY 2007?

10:20:09   19   A.   YES, THAT IS CORRECT.

10:20:24   20   Q.   IF YOU'D TAKE A LOOK -- THERE SHOULD BE A BINDER THERE --

10:20:30   21   AT DX EXHIBIT 684.

10:20:41   22        THE COURT:  WHAT'S THE TAB NUMBER, PLEASE?

10:20:45   23        MR. QUINN:  THE TAB NUMBER?  IT SHOULD JUST SAY

10:21:05   24   DX 684, YOUR HONOR.

10:21:06   25        THE COURT:  OKAY.  THIS WAS WHAT WAS GIVEN TO ME

10:21:13   1   (INDICATING).

10:21:25   2              MR. QUINN:  MAY I PROCEED, YOUR HONOR?

10:21:34   3              THE COURT:  PLEASE, GO AHEAD.

10:21:36   4              MR. QUINN:  ALL RIGHT.

10:21:37   5   Q.   LOOKING AT EXHIBIT DX 684, CAN YOU IDENTIFY THESE AS

10:21:42   6   PHONES THAT -- THAT YOU KNOW OF YOUR OWN PERSONAL KNOWLEDGE

10:21:47   7   THAT ARE IMAGES OF PHONES THAT WERE OFFERED OR DEVELOPED BY

10:21:50   8   SAMSUNG IN THE TIMEFRAMES INDICATED ON THIS CHART?

10:21:56   9   A.   YES, AND WHAT I CAN SAY IS EVEN OTHER THAN THIS, EVEN

10:22:23   10  THERE WERE A LOT MORE OTHER PHONES OTHER THAN THE PHONES THAT

10:22:25   11  YOU SEE HERE.

10:22:26   12             MR. QUINN:  WE OFFER EXHIBIT DX 684, YOUR HONOR.

10:22:30   13             MR. MUELLER:  YOUR HONOR, I HAVE NO OBJECTION TO THIS

10:22:32   14  BEING SHOWN, BUT THIS IS A DEMONSTRATIVE.  WE JUST DISCUSSED

10:22:35   15  THIS THIS MORNING.

10:22:36   16             THE COURT:  NO, THIS IS AN EXHIBIT.

10:22:38   17             MR. QUINN:  THIS IS AN EXHIBIT.

10:22:39   18             THE COURT:  IT'S ADMITTED.

10:22:39   19        (DEFENDANTS' EXHIBIT 684 WAS ADMITTED IN EVIDENCE.)

10:22:41   20             MR. QUINN:  IF WE COULD DISPLAY THAT ON THE SCREEN.

10:22:44   21  Q.   SO WE SEE IN THE MIDDLE WHERE IT SAYS IPHONE JANUARY 2007.

10:22:49   22       DO YOU SEE THAT?

10:22:49   23  A.   YES, I DO.

10:22:54   24  Q.   AND ABOVE THAT ARE VARIOUS PHONES WITH SOME OF THESE

10:22:59   25  DIFFERENT STYLES OR FORM FACTORS THAT WERE OFFERED BY SAMSUNG

10:23:02   1    BEFORE THE IPHONE?

10:23:04   2    A.   YES, THAT IS CORRECT.

10:23:15   3    Q.   AND AT LEAST ONE THERE ABOVE -- I SAID OFFERED.  THAT'S

10:23:18   4    ACTUALLY -- IT SAYS -- A COUPLE OF THEM SAY MOCKUPS?

10:23:23   5    A.   YES, I DO SEE THOSE.

10:23:30   6    Q.   SO WHAT DOES THAT MEAN WHEN IT SAYS IT'S A MOCKUP?

10:23:33   7              MR. MUELLER:  YOUR HONOR, MAY WE APPROACH AT

10:23:36   8    SIDE-BAR?

10:23:36   9              THE COURT:  OKAY.  ALL RIGHT.

10:23:43   10        (SIDE-BAR DISCUSSION ON THE RECORD.)

10:23:47   11             MR. MUELLER:  YOUR HONOR, AT DOCKET 3756 -- YOU

10:23:58   12   TALKED SPECIFICALLY ABOUT THIS EXHIBIT AND YOU SAID IT WAS --

10:24:01   13             THE COURT:  OH, THAT'S TRUE.  THAT'S TRUE.

10:24:03   14             MR. MUELLER:  THIS IS WHERE WE'RE GETTING INTO

10:24:06   15   INDEPENDENT DEVELOPMENT OF THOSE PHONES, THE MOCKUPS OF THOSE

10:24:10   16   PHONES.  THAT'S EXACTLY WHAT HE WAS NOT ALLOWED TO SAY.

10:24:13   17             THE COURT:  I THINK THAT'S TRUE.  I THINK YOU DO NEED

10:24:14   18   TO MOVE ON.  HE WAS ONLY ASKED THAT ONE QUESTION DURING THE

10:24:17   19   PREVIOUS TRIAL.

10:24:19   20             MR. QUINN:  ALL RIGHT.  I WILL MOVE ON, YOUR HONOR.

10:24:20   21             THE COURT:  THANK YOU.

10:24:23   22        (END OF DISCUSSION AT SIDE-BAR.)

10:24:23   23             THE COURT:  THE OBJECTION IS SUSTAINED.

10:24:24   24   BY MR. QUINN:

10:24:34   25   Q.   COULD YOU PLEASE TAKE A LOOK AT SDX 16?

10:24:36   1          IF WE COULD PUT THAT UP ON THE SCREEN, KEN.

10:24:53   2          DO YOU RECOGNIZE THE IMAGES SHOWN ON THIS SLIDE?

10:24:56   3   A.   YES, THAT'S RIGHT.

10:25:01   4   Q.   WHAT ARE THESE?

10:25:02   5   A.   THESE ARE THE MOBILE PHONES MANUFACTURED AT SAMSUNG.

10:25:11   6   Q.   ARE YOU FAMILIAR WITH SAMSUNG'S F700 PHONE?

10:25:14   7   A.   YES, I AM VERY FAMILIAR WITH IT.

10:25:21   8   Q.   IF WE COULD LOOK AT SDX 1105.

10:25:29   9          DOES THIS DEPICT THE F700 PHONE?

10:25:32  10   A.   YES, THAT IS CORRECT.

10:25:38  11          MR. QUINN:  YOUR HONOR, I UNDERSTAND WE WERE GOING TO

10:25:40  12   OFFER THE PHONE ITSELF, BUT I UNDERSTAND IT CAN'T BE FOUND

10:25:42  13   RIGHT NOW, SO I'LL MOVE ON AND WE MAY NEED TO RECALL THE

10:25:46  14   WITNESS FOR THE PURPOSE OF IDENTIFYING IT.

10:25:49  15   Q.   HAVE YOU HEARD OF THE LG PRADA?

10:25:58  16          INTERPRETER PARK:  LG?

10:25:59  17          MR. QUINN:  PRADA.

10:26:02  18          THE WITNESS:  YES, I DO KNOW THAT PHONE.

10:26:04  19   BY MR. QUINN:

10:26:05  20   Q.   IF WE CAN LOOK AT SDX 7002.6.  1104, SORRY.  SDX 1104.

10:26:28  21          IS THIS A PICTURE OF THE LG PRADA?

10:26:31  22   A.   YES, IT IS.

10:26:32  23   Q.   WHEN WAS THE LG PRADA FIRST ANNOUNCED?

10:26:35  24   A.   TO MY RECOLLECTION, I BELIEVE IT WAS DURING THE SECOND

10:26:42  25   HALF OF 2004.

10:26:45   1                    INTERPRETER PARK:  SORRY.  2006.

10:26:48   2      BY MR. QUINN:

10:26:48   3      Q.   DO YOU HAVE THE LG PRADA, DO YOU SEE THAT UP THERE ON THE

10:26:51   4      WITNESS STAND WITH YOU, THE ACTUAL PHONE ITSELF?  IS IT UP

10:26:55   5      THERE?  THIS IS JX 1093.  CAN YOU IDENTIFY THAT AS THE LG

10:27:13   6      PRADA?

10:27:13   7      A.   YES, INDEED.

10:27:15   8              MR. QUINN:  WE'D OFFER THAT IN EVIDENCE, YOUR HONOR.

10:27:17   9              MR. MUELLER:  NO OBJECTION, YOUR HONOR.

10:27:18   10             THE COURT:  IT'S ADMITTED.

10:27:19   11         (JOINT EXHIBIT 1093 WAS ADMITTED IN EVIDENCE.)

10:27:19   12             THE COURT:  GO AHEAD, PLEASE.

10:27:20   13     BY MR. QUINN:

10:27:20   14     Q.   YOU SHOULD ALSO HAVE -- I'M SORRY.  YOU SHOULD ALSO HAVE

10:27:24   15     UP THERE A GALAXY S II AT&T.

10:27:39   16     A.   YES.

10:27:40   17     Q.   DID YOU WORK ON THE DESIGN OF THAT PHONE?

10:27:46   18     A.   YES, I DID.

10:27:47   19     Q.   AND DOES THAT PHONE HAVE ON THE BACK KIND OF A BUMP ON THE

10:27:51   20     BACK?

10:27:51   21     A.   YES, THERE IS.

10:27:57   22     Q.   AND WHAT IS -- WHY DID YOU DESIGN THAT BUMP INTO THIS

10:28:00   23     PHONE?

10:28:00   24     A.   SO WHEN WE TALK ABOUT A DESIGN, WE ARE DESIGNERS, BUT

10:28:49   25     WE'RE NOT WORKING ON DESIGN ONLY.  SINCE WE'RE WORKING ON A

10:28:53   1   PRODUCT THAT WOULD BE MASS PRODUCED, WE HAVE TO MAKE THEM -- WE

10:28:56   2   HAVE TO TAKE THAT INTO CONSIDERATION AS WELL.

10:28:58   3        SO AT LEAST WE HAVE TO CONSIDER THE HARDWARE PERFORMANCE

10:29:02   4   SO THAT IT COULD -- WE COULD ENHANCE THE PERFORMANCE AND

10:29:06   5   WHATNOT.

10:29:06   6        SO, FOR EXAMPLE, IN THE U.S., THERE IS WHAT'S CALLED AN

10:29:09   7   AREA WHERE THERE IS A WEAK ELECTRIC FIELD, SO THERE IS SOME

10:29:18   8   AREA THAT WOULD ACTUALLY HAVE A WEAK ELECTRIC FIELD.

10:29:22   9        IF THAT IS THE CASE, WE HAVE TO ACTUALLY CONSIDER THE WAYS

10:29:25  10   TO INCREASE THE PERFORMANCE IN TERMS OF THE ANTENNAS.

10:29:28  11        SO IN THAT REGARD, WE ACTUALLY MADE IT THICKER, THE

10:29:33  12   ANTENNA, MADE IT THICKER AS YOU CAN SEE HERE.  THAT'S WHAT THIS

10:29:36  13   PORTION REFLECTS.

10:29:38  14   Q.   HOW MANY ANTENNAS ARE THERE IN THE GALAXY S II AT&T PHONE?

10:29:45  15   A.   THERE ARE MANY, MANY ANTENNAS INVOLVED BECAUSE YOU HAVE TO

10:30:26  16   CONSIDER COMPATIBILITY WITH THE LOWER NUMBERED G'S AS WELL.

10:30:33  17   SO, FOR EXAMPLE, 2.5G, 3G, 4G, AND AS THOSE ASPECTS, YOU HAVE

10:30:38  18   TO CONSIDER THOSE.

10:30:39  19        AND THERE IS THE CONSIDERATIONS THAT WOULD NEED TO TAKE

10:30:42  20   PLACE IN TERMS OF WI-FI SERVICE, THE BLUETOOTH SERVICE, AND

10:30:45  21   SUBANTENNAS AS WELL.

10:30:47  22        SO THERE ARE MORE THAN TEN ANTENNAS INVOLVED TO --

10:30:53  23        THE COURT:  EXCUSE ME -- GO AHEAD COMPLETE THE

10:30:55  24   ANSWER.

10:30:57  25        THE WITNESS:  -- CONSIDER COMPATIBILITY.

10:31:00    1              THE COURT:  IT'S 10:30 NOW.  I'M SORRY TO INTERRUPT.

10:31:03    2    LET'S GO AHEAD AND TAKE OUR MORNING BREAK.  WE WILL TAKE A

10:31:05    3    15 MINUTE BREAK NOW UNTIL 10:45.

10:31:07    4         DO NOT RESEARCH OR DISCUSS THE CASE.  THANK YOU FOR YOUR

10:31:10    5    PATIENCE AND YOUR SERVICE.

10:31:11    6         AND YOU MAY STEP DOWN DURING THE BREAK.  WE'LL TAKE A

10:31:14    7    15 MINUTE RECESS.

10:31:26    8              (JURY OUT AT 10:31 A.M.)

10:31:29    9              THE COURT:  ALL RIGHT.  LET'S TAKE OUR RECESS NOW.

10:31:31   10    THANK YOU.

10:31:32   11              MR. LEE:  YOUR HONOR, COULD I RAISE ONE POINT?

10:31:34   12              THE COURT:  OKAY.  CAN YOU WAIT UNTIL THE DOOR IS

10:31:35   13    CLOSED?

10:31:36   14              MR. LEE:  YES.

10:31:36   15              THE COURT:  AND DOES THE WITNESS NEED TO STEP

10:31:38   16    OUTSIDE?

10:31:39   17              MR. LEE:  THIS WITNESS DOES NOT, BUT I WOULD ASK THAT

10:31:41   18    MR. LUCENTE AND MR. WAGNER BE EXCUSED.

10:31:46   19              MS. MAROULIS:  YOUR HONOR, THE EXPERTS GET TO ATTEND

10:31:48   20    THE TRIAL.

10:31:49   21         IS THERE ANYTHING IN PARTICULAR?

10:31:51   22              MR. LEE:  SAME REASON MS. DAVIS WAS EXCUSED

10:31:54   23    YESTERDAY.  I WANT TO TALK ABOUT THEM.

10:31:56   24         YOUR HONOR, I WANTED TO RAISE AN ISSUE --

10:31:58   25              THE COURT:  OKAY.  HAVE THEY BOTH STEPPED OUTSIDE?

10:32:00   1          MR. LEE:  I WANTED TO RAISE AN ISSUE IN OUR

10:32:02   2   CROSS-EXAMINATIONS OF MR. LUCENTE AND MR. WAGNER SO IT DIDN'T

10:32:07   3   COME UP AND TAKE THE JURY'S TIME.

10:32:09   4          BUT AT TRANSCRIPT AT PAGE 320:3 TO 22, DURING THE OPENING

10:32:16   5   STATEMENT, THE QUESTION OF SAMSUNG REFERRING TO THE JURY

10:32:21   6   VERDICT ON NON-INFRINGING PHONES CAME UP, AND YOUR HONOR

10:32:24   7   SPECIFICALLY SAID THAT IF THEY CONTINUED TO OPEN THAT DOOR, THE

10:32:29   8   WILLFULNESS FINDINGS COULD COME IN.

10:32:32   9          THAT'S AT 320:3 TO 337, LINE 22.

10:32:39   10         THEY'VE DONE IT ABOUT HALF A DOZEN TIMES SINCE THEN:  IN

10:32:45   11   MR. JOSWIAK'S TESTIMONY ON HIS CROSS, 390:23 TO 391:19, THREE

10:32:54   12   TIMES.  ON HIS RECROSS, TRANSCRIPT 416:3 TO 416:16; YESTERDAY

10:33:03   13   IN MR. QUINN'S CROSS OF DR. KARE AT 648:2 TO 649:13; AND IN THE

10:33:13   14   CROSS OF DR. SINGH AT 697, LINES 9 TO 15.

10:33:21   15         THERE ARE ABOUT HALF A DOZEN OTHER EXAMPLES.

10:33:23   16         BUT THIS CONSTANT REFERRING TO THE JURY VERDICTS -- THE

10:33:26   17   JURY'S VERDICT OF NON-INFRINGEMENT OF OTHER MODELS, YOUR HONOR

10:33:29   18   SAID ON THE FIRST DAY THAT IF THEY PURSUED THAT, IT WOULD OPEN

10:33:33   19   UP WILLFULNESS.

10:33:35   20         WE INTEND TO CROSS MR. LUCENTE AND MR. WAGNER WITH THE

10:33:38   21   WILLFULNESS FINDINGS FOR THE D'677 AND D'305, BUT WE DIDN'T

10:33:44   22   WANT TO DO IT ON THE FLY AND SURPRISE YOUR HONOR, SO I'M

10:33:46   23   RAISING IT NOW SO YOUR HONOR HAS SOME TIME TO CONSIDER IT.

10:33:49   24          THE COURT:  OKAY.  LET ME JUST CHECK THESE TRANSCRIPT

10:33:54   25   CITES.

10:33:55    1          YOU SAID 320, LINES 3 THROUGH 22 IN THE OPENING?

10:33:59    2              MR. LEE:  I'M SORRY.  320, LINE 3, TO 337, LINE 22 IS

10:34:05    3    THE DISCUSSION.

10:34:06    4          AND THE SPECIFIC PLACES, YOUR HONOR, IS AT 320, LINE 3 TO

10:34:13    5    8; 337 --

10:34:16    6              THE COURT:  AND THEN 390 TO 391, THE CROSS OF

10:34:20    7    MR. JOSWIAK; AND 416, LINES 3 THROUGH 16; AND THEN 648, LINES 2

10:34:24    8    THROUGH 13; MR. SINGH, 697, LINES 9 THROUGH 15.

10:34:28    9          I THINK IT ALSO CAME UP WITH MR. BALL.

10:34:30   10              MR. LEE:  IT CAME -- YES, AND IT CAME UP AGAIN THIS

10:34:33   11    MORNING, WHICH IS THE REASON I OBJECTED.

10:34:37   12          YOU CAN'T BE -- AND I THINK, TO STATE THE OBVIOUS, IT

10:34:42   13    WOULD BE VERY UNFAIR TO APPLE FOR THE JURY'S VERDICTS OF

10:34:47   14    NON-INFRINGEMENT OF OTHER PHONES TO COME IN WITHOUT THE JURY

10:34:50   15    KNOWING THAT, AS TO THE PATENTS THAT ARE ACTUALLY IN ISSUE,

10:34:54   16    SAMSUNG WAS FOUND TO WILLFULLY INFRINGE.

10:34:57   17          AND IF SAMSUNG WANTS TO SAY THAT THEY DIDN'T WILLFULLY

10:34:59   18    INFRINGE THE D'677, THAT WOULD BE FAIR GAME.

10:35:03   19              THE COURT:  NOW, I BELIEVE THAT YOU ASKED

10:35:06   20    MR. SINGH -- NOT YOU, SOMEONE ON YOUR TEAM, I THINK

10:35:10   21    MR. SABRI -- WHETHER -- OR MAYBE MR. BALAKRISHNAN AS WELL,

10:35:14   22    WHETHER EVEN THOUGH THE ACE DIDN'T INFRINGE THE DESIGN PATENTS,

10:35:21   23    THEY INFRINGED THE UTILITY PATENTS.

10:35:25   24          ISN'T THAT CORRECT?

10:35:26   25              MR. SABRI:  YOUR HONOR, I DIDN'T ADDRESS THE DESIGN

| | |
|---|---|
| 10:35:28 | 1 |

PATENTS.  I DID ASK THEM TO CONFIRM THAT THE ACE INFRINGED THE
'381 AND THE '163 PATENT.

            MR. LEE:  THAT'S CORRECT.

            THE COURT:  OKAY.

            MR. SABRI:  BUT WE DID NOT ADDRESS THE NON-INFRINGING
PORTION.

            THE COURT:  OKAY.  AND THEN FOR DAVIS AS WELL, I
RECALL THAT THAT ISSUE CAME UP AGAIN.

            MR. LEE:  IT CAME UP JUST REFERRING BACK TO WHAT
DR. BALAKRISHNAN AND DR. SINGH SAID.

            THE COURT:  UM-HUM.  NOW, I DO THINK -- ONCE IT'S IN
THERE THAT THE ACE DOESN'T INFRINGE THE DESIGN PATENTS, I THINK
IT'S FAIR GAME TO SAY THAT IT DOES INFRINGE THE UTILITY
PATENTS, BECAUSE I THINK IT DOES AFFECT THE DAMAGES
CALCULATION.

        I DO THINK WILLFULNESS WOULD HAVE A HIGHER LEVEL OF
PREJUDICE, SO I'M GOING TO HAVE TO THINK ABOUT THIS.

            MR. LEE:  AND, YOUR HONOR, WE WOULD NOT --

            THE COURT:  AND UNDER 403, THAT MAY JUST NEED TO BE
EXCLUDED.

            MR. LEE:  YOUR HONOR, WE WOULD NOT HAVE RAISED THIS
IF THEY HADN'T REPEATEDLY GONE INTO THE QUESTION OF THE JURY'S
FINDING OF OUR PRODUCTS NOT TO INFRINGE.

        IT'S AN EFFORT -- AS I SAID TO YOUR HONOR YESTERDAY WHEN
THEY WERE ALLEGEDLY DOING IT UNDER FACTOR 3, IT'S AN EFFORT TO

10:36:38   1    UNDERMINE THE JURY'S VERDICT, AND IF THEY'RE GOING TO BE ABLE

10:36:43   2    TO TELL JURY REPEATEDLY THAT THERE ARE OTHER PHONES THAT DIDN'T

10:36:46   3    INFRINGE, PUT THEM UP FOR SIDE-BY-SIDE COMPARISONS, IT WOULD BE

10:36:50   4    VERY PREJUDICIAL -- IT IS VERY PREJUDICIAL FOR APPLE NOT TO BE

10:36:55   5    ABLE TO SAY THERE ARE OTHER PARTS OF THE JURY VERDICT, AND FOR

10:36:59   6    THE D'677 AND THE D'305, HERE ARE TWO IMPORTANT PARTS.

10:37:04   7         AND, YOU KNOW, MR. QUINN IN HIS OPENING SAID THAT SAMSUNG

10:37:09   8    TOOK THIS LITTLE STEP TO INFRINGE THIS NARROW PATENT.  THAT WAS

10:37:14   9    THE QUOTE, SOMETHING CLOSE TO THAT.

10:37:18   10        THAT'S NOT WHAT THE JURY FOUND.  THEY FOUND THAT SAMSUNG

10:37:20   11   WILLFULLY INFRINGED.

10:37:22   12        WE WOULD -- I WOULD NOT BE HERE ASKING YOU TO DO THIS IF

10:37:27   13   THEY HADN'T DONE THIS REPEATEDLY AND IF YOUR HONOR, IN THE VERY

10:37:31   14   OPENING COLLOQUY, HADN'T SAID IF THE DOOR GETS OPENED,

10:37:35   15   WILLFULNESS COMES ALONG.

10:37:36   16        THE COURT:  WELL, THAT'S ALSO IN THE MOTION IN LIMINE

10:37:38   17   RULING, BECAUSE SAMSUNG ASKED THAT THE WILLFULNESS AND OTHER

10:37:40   18   ASPECTS OF THE VERDICT NOT BE INTRODUCED.  I GRANTED THE MOTION

10:37:43   19   AND SAID, BUT IF THE DOOR GETS OPENED, THEN IT GETS OPENED.

10:37:48   20        MR. LEE:  RIGHT.

10:37:48   21        THE COURT:  THAT'S WHAT'S IN MY RULING.

10:37:50   22     MR. PRICE, WOULD YOU LIKE TO RESPOND?

10:37:52   23        MR. PRICE:  YES, ALTHOUGH I HAVEN'T HAD THE

10:37:54   24   OPPORTUNITY TO LOOK AT THE SITES AND WHAT CAME BEFORE THEM.

10:37:58   25        I HAVE A VERY GOOD MEMORY ABOUT WHAT HAPPENED WITH

10:38:01  1    MS. DAVIS, AND I TALKED TO YOU ABOUT IT YESTERDAY, AND THAT IS

10:38:03  2   IN HER EXAMINATION, IN ORDER TO MINIMIZE WHAT WE WERE SAYING

10:38:08  3   ABOUT HOW THAT PHONE IS RELEVANT TO THE SCOPE, FACTOR 1, AND TO

10:38:13  4   THE PROMINENCE, FACTOR 2, THAT'S HOW WE USED IT.

10:38:17  5       THEY ASKED HER, WHAT WERE THE SALES OF THE GALAXY ACE, AND

10:38:21  6   SHE SAID ZERO.

10:38:22  7       AND AS --

10:38:23  8           THE COURT:  WELL, THAT'S BECAUSE YOU'VE ALREADY

10:38:25  9   BROUGHT THAT UP A NUMBER OF TIMES WITH ALL THE PREVIOUS

10:38:27 10   WITNESSES, THAT IT DOESN'T INFRINGE THE DESIGN PATENTS.

10:38:29 11           MR. PRICE:  THAT'S TRUE.

10:38:30 12           THE COURT:  SO THEN I THINK IT'S A FAIR RESPONSE TO

10:38:32 13   SAY, WELL, WHAT ARE THE SIGNIFICANCE FOR DAMAGES IF IT'S BEEN

10:38:36 14   BROUGHT UP?

10:38:36 15           MR. PRICE:  AND WE'RE NOT ARGUING THAT IT'S

10:38:38 16   SIGNIFICANT ON DAMAGES AND ARTICLE OF MANUFACTURE.

10:38:41 17       BUT THAT LEFT THE IMPRESSION THAT THE GALAXY ACE WAS

10:38:45 18   IRRELEVANT, AND I ASKED YOU YESTERDAY THEN AND PREVIEWED, WELL,

10:38:49 19   THEN, I SHOULD BE ABLE TO SAY, WAIT A MINUTE, IT WAS SUED AND

10:38:52 20   IT DIDN'T INFRINGE, WHICH IS THE WAY I ASKED THE QUESTION.

10:38:54 21           THE COURT:  RIGHT.  BUT YOU ALREADY ASKED IT OF

10:38:57 22   MR. JOSWIAK.  I ALREADY SAID IT WAS IN THE RECORD BECAUSE IT'S

10:38:59 23   ALREADY BEEN COVERED MANY TIMES WITH PREVIOUS WITNESSES.

10:39:03 24       SO LET ME THINK ABOUT THIS.  I DO WANT US TO TAKE OUR

10:39:05 25   BREAK NOW.  IT DOESN'T SOUND LIKE THIS IS IMMINENT IN TERMS OF

10:39:09  1        NEEDING A DECISION; CORRECT?

10:39:12  2                  MR. LEE:  NO, IT'S NOT UNTIL MR. LUCENTE.

10:39:14  3                  THE COURT:  OKAY.  AND HE'S, I BELIEVE, THE SECOND TO

10:39:16  4        LAST WITNESS.

10:39:17  5             OKAY.  THANK YOU.

10:39:18  6                  THE CLERK:  COURT'S IN RECESS.

10:40:09  7             (RECESS FROM 10:40 A.M. UNTIL 10:48 A.M.)

10:49:08  8             (JURY IN AT 10:49 A.M.)

10:49:10  9                  THE COURT:  OKAY.  PLEASE TAKE A SEAT.

10:49:18 10             ALL RIGHT.  IF YOU'D PLEASE CONTINUE WITH THE EXAMINATION.

10:49:22 11             IT'S 10:49.  GO AHEAD, PLEASE.

10:49:25 12        BY MR. QUINN:

10:49:26 13        Q.   MR. KIM, WE WERE TALKING ABOUT THE ANTENNAS THAT ARE

10:49:33 14        WITHIN THAT GALAXY PHONE THAT WE LOOKED AT.

10:49:36 15             CAN YOU TELL US APPROXIMATELY HOW MANY COMPONENTS ARE IN

10:49:39 16        THAT PHONE?

10:49:49 17        A.   WE'RE TALKING ABOUT HUNDREDS.  AND IF YOU'RE TALKING ABOUT

10:50:09 18        THE VENDORS OR THE SUPPLIERS, THE SECOND SUPPLIERS, SECOND TIER

10:50:15 19        SUPPLIERS AND THE THIRD TIER SUPPLIERS, IF YOU'RE INCLUDING ALL

10:50:18 20        OF THOSE, I WOULD BELIEVE THAT WE'RE TALKING ABOUT THOUSANDS OF

10:50:21 21        VENDORS --

10:50:22 22        Q.   IF WE COULD JUST --

10:50:24 23        A.   -- OF COMPONENTS.

10:50:25 24        Q.   THANK YOU.

10:50:26 25             IF WE COULD JUST BACK UP FOR A MOMENT, IF YOU COULD GO

10:50:28   1    BACK TO DX 684, KEN, WHICH IS IN EVIDENCE NOW.

10:50:34   2        DO YOU SEE THERE UP IN THE UPPER -- IN THE TOP COLUMN ON

10:50:37   3    THE LEFT-HAND SIDE THE REFERENCE TO THE F700?

10:50:42   4        DO YOU SEE THAT THERE?

10:50:49   5    A.   YES, I DO.

10:50:50   6    Q.   AND DO YOU HAVE A COPY OF -- DO YOU HAVE AN F700 PHONE

10:50:55   7    THERE WITH YOU ON THE WITNESS STAND?  IS THERE ONE THERE?

10:50:59   8    A.   YES, I DO.

10:51:00   9    Q.   AND THAT'S EXHIBIT 1093?

10:51:08   10       WE'D OFFER THAT, YOUR HONOR.

10:51:10   11            THE COURT:  1093 IS THE PRADA.  THAT'S ALREADY BEEN

10:51:13   12   ADMITTED.

10:51:14   13            MR. MUELLER:  NO, THIS IS THE -- I THINK IT'S THE

10:51:17   14   F700 THEY'RE OFFERING NOW.

10:51:19   15            THE COURT:  RIGHT.  BUT JX 1093 HAS ALREADY BEEN

10:51:22   16   ADMITTED.

10:51:23   17            MR. MUELLER:  OKAY.  NO OBJECTION ANYWAY.  IT'S FINE.

10:51:25   18            THE COURT:  SO WHAT'S THE CORRECT NUMBER?

10:51:39   19            MR. QUINN:  DX 526, YOUR HONOR.  I APOLOGIZE.

10:51:42   20            THE COURT:  DX 526 IS ADMITTED.

10:51:44   21       (DEFENDANTS' EXHIBIT 526 WAS ADMITTED IN EVIDENCE.)

10:51:44   22            THE COURT:  GO AHEAD, PLEASE.

10:51:45   23            MR. QUINN:  AND THEN, KEN, IF WE COULD PUT UP ON THE

10:51:48   24   SCREEN THE FIRST PAGE OF PLAINTIFF'S EXHIBIT 34.

10:52:00   25   Q.   THERE'S A REFERENCE THERE IN THAT DOCUMENT THERE TO SYSTEM

10:52:04    1      LSI.

10:52:05    2            DO YOU SEE THAT?

10:52:05    3      A.   YES, I DO.

10:52:06    4      Q.   WHAT IS SYSTEM LSI?

10:52:08    5      A.   IT IS A BUSINESS DIVISION WITHIN SAMSUNG ELECTRONICS, AND

10:52:29    6      THIS IS WHERE THE APPLICATION PROCESSOR CHIPS THAT ARE

10:52:33    7      INCORPORATED INTO MOBILE PRODUCTS ARE BEING USED.

10:52:36    8            SO IT'S A CHIP MAKER.

10:52:38    9      Q.   AND DO THEY MAKE CHIPS FOR DIFFERENT CELL PHONE

10:52:44   10      MANUFACTURERS?

10:52:45   11      A.   YES.

10:52:50   12      Q.   AND ARE THEY INVOLVED AT ALL IN THE DESIGN OF THE

10:52:56   13      SMARTPHONES, THE SAMSUNG SMARTPHONES?

10:53:00   14      A.   THERE ISN'T.

10:53:08   15            MR. QUINN:  NOTHING FURTHER.

10:53:09   16            THE COURT:  ALL RIGHT.  TIME IS NOW 10:52.

10:53:14   17            MR. MUELLER:  MAY I PROCEED, YOUR HONOR?

10:53:16   18            THE COURT:  GO AHEAD.  TIME IS 10:53.  GO AHEAD.

10:53:20   19                         **CROSS-EXAMINATION**

10:53:21   20      BY MR. MUELLER:

10:53:21   21      Q.   GOOD MORNING, MR. KIM.  MY NAME IS JOE MUELLER AND I'D

10:53:24   22      LIKE TO ASK YOU A FEW QUESTIONS IF I COULD.

10:53:30   23      A.   YES.

10:53:31   24      Q.   SIR, YOU WORK ON DESIGN AT SAMSUNG; IS THAT RIGHT?

10:53:34   25      A.   YES, I DO.

10:53:38   1    Q.   AND YOU WORK WITH OTHER TEAM MEMBERS ON THE DESIGN TEAM AT

10:53:41   2    SAMSUNG?

10:53:41   3    A.   THAT IS CORRECT, YES.

10:53:48   4    Q.   AND YOUR TEAM'S WORK IS IMPORTANT; RIGHT?

10:53:52   5    A.   YES.   AND I BELIEVE EVERYBODY HAS THEIR OWN ROLE AND

10:54:17   6    RESPONSIBILITY WITHIN THE COMPANY.

10:54:19   7         SO FOR US, DESIGN IS IMPORTANT; FOR DEVELOPMENT TEAM, THE

10:54:23   8    DEVELOPMENT THAT THEY'RE DOING IS IMPORTANT; FOR PROCUREMENT,

10:54:27   9    THE FOLKS THAT ARE IN PROCUREMENT, THEY WOULD BELIEVE THEIR

10:54:33  10    PROCUREMENT ACTIVITIES WOULD BE IMPORTANT.

10:54:35  11         SO I BELIEVE THAT EVERYBODY HAS A DIFFERENT FUNCTION IN

10:54:37  12    THE COMPANY WHICH IS IMPORTANT.

10:54:38  13    Q.   THANK YOU.

10:54:40  14         SAMSUNG APPLIES YOUR TEAM'S DESIGNS TO PHONES; CORRECT?

10:54:45  15    A.   YES.

10:54:55  16    Q.   AND THOSE PHONES ARE SOLD; RIGHT?

10:54:58  17    A.   YES.

10:55:01  18    Q.   SO SAMSUNG APPLIES DESIGNS TO PHONES FOR PURPOSES OF SALE;

10:55:06  19    CORRECT?

10:55:07  20    A.   YES.

10:55:17  21    Q.   NOW, LET'S GO TO EXHIBIT 40, PLAINTIFF'S EXHIBIT 40 IF WE

10:55:24  22    COULD.

10:55:25  23         AND LET ME KNOW WHEN YOU'RE THERE, SIR.

10:55:48  24         ARE YOU THERE, SIR?

10:55:49  25    A.   YES.

10:55:51  1    Q.   OKAY.  AND MR. QUINN SHOWED YOU THIS DOCUMENT.  THIS IS A

10:55:54  2    SERIES OF E-MAILS THAT INCLUDES THE CRISIS OF DESIGN LANGUAGE.

10:55:58  3         DO YOU RECALL THAT?

10:55:59  4    A.   I SEE THAT.  BUT -- OH, NOW I CAN SEE IT CLEARLY.  I

10:56:21  5    WASN'T ABLE TO SEE THAT CLEAR A MOMENT AGO.

10:56:24  6    Q.   AND, SIR, YOU UNDERSTAND THIS SERIES OF E-MAILS IN

10:56:27  7    PLAINTIFF'S EXHIBIT 40 ARE ACCOUNTS OF A MEETING THAT YOU WERE

10:56:31  8    AT; CORRECT?

10:56:32  9    A.   THAT'S RIGHT.

10:56:43  10   Q.   AND I BELIEVE MR. QUINN ASKED YOU IF THE MEETING WAS ABOUT

10:56:45  11   EXTERIORS OF PHONES AND YOU SAID IT WAS NOT.

10:56:49  12        DO I HAVE THAT RIGHT?

10:56:50  13   A.   YES.  YES, THAT'S RIGHT.  RATHER, IT WAS ABOUT THE OVERALL

10:57:12  14   ATMOSPHERE OF THOSE MEETINGS.  SO YOU CAN THINK OF IT AS SOME

10:57:18  15   KIND OF NEW YEAR MEETING TYPE OF MEETING.

10:57:22  16   Q.   NOW, WE CAN AGREE IT WASN'T JUST ABOUT THE OMNIA, IT WAS A

10:57:26  17   BROADER DISCUSSION; CORRECT?

10:57:28  18   A.   YES.

10:57:45  19   Q.   SIR, IF YOU COULD TURN TO PAGE 40.5.

10:57:50  20        AND, MR. LEE, IF YOU COULD PLEASE HIGHLIGHT THE SENTENCE

10:57:52  21   THAT STARTS "IN REGARDS" IN THE MIDDLE OF THE PAGE.

10:58:01  22        AND I'LL READ THE SENTENCE.  IT STATES, "IN REGARDS TO

10:58:06  23   EXTERIORS, DO YOUR BEST NOT TO CREATE A PLASTIC FEELING AND

10:58:10  24   INSTEAD CREATE A METALLIC FEEL."

10:58:14  25        CORRECT?

JINSOO KIM CROSS BY MR. MUELLER

10:58:14   1   A.   YES.

10:58:30   2   Q.   MR. KIM, THAT'S PART OF THE SUMMARY OF THE MEETING; RIGHT?

10:58:34   3   A.   ALTHOUGH I DO NOT REMEMBER IN EXACT DETAIL BECAUSE IT WAS

10:59:02   4   A LONG TIME AGO, BUT AS FAR AS I REMEMBER, IT WAS NOT LIKE HE

10:59:08   5   WAS EMPHASIZING THIS ASPECT ONLY.

10:59:11   6   Q.   SIR, IF YOU COULD PLEASE TURN TO PAGE 40.3, AND I WANT TO

10:59:16   7   DRAW YOUR ATTENTION, IF I COULD, TO A SENTENCE THAT'S AFTER

10:59:20   8   THREE STARS, AND IT STARTS "THE LOOK AND FEEL."

10:59:24   9        MR. LEE, IF YOU COULD HIGHLIGHT THAT SENTENCE, PLEASE.

10:59:30   10       AND, SIR, ANOTHER PART OF THIS MEETING SUMMARY STATES,

10:59:35   11   "THE LOOK AND FEEL OF A PRODUCT MATTERS MOST."

10:59:39   12       CORRECT?

10:59:41   13   A.   YES.

10:59:50   14   Q.   NOW, SIR, SAMSUNG SELLS FINISHED PRODUCTS; CORRECT?

10:59:57   15   PHONES -- I'M SORRY.  LET ME WITHDRAW MY QUESTION.

11:00:00   16       SAMSUNG SELLS PHONES AS FINISHED PRODUCTS; CORRECT?

11:00:03   17   A.   YES, WE DO SELL FINISHED PRODUCTS, BUT WE ALSO SELL THE

11:00:28   18   SEPARATE COMPONENTS AS WELL.

11:00:29   19   Q.   BUT, SIR, YOU DON'T HAVE ANY KNOWLEDGE OF SAMSUNG EVER

11:00:33   20   MARKETING THE GLASS FRONT FACE OF THE INFRINGING PHONES AT

11:00:39   21   ISSUE IN THIS CASE SEPARATE FROM THE REST OF THOSE PHONES;

11:00:42   22   CORRECT?

11:00:42   23   A.   TO MY UNDERSTANDING, THESE WINDOW GLASSES ONLY WOULD BE

11:01:50   24   PRODUCTS SOLD TO SAMSUNG'S REPAIR CENTERS AND WHATNOT.  THAT'S

11:01:54   25   MY UNDERSTANDING.

JINSOO KIM CROSS BY MR. MUELLER

11:01:55   1        AND I ALSO UNDERSTAND THAT A LOT OF AMERICANS THROUGH EBAY

11:01:59   2   AND AMAZON AND WHATNOT, THEY BUY THESE WINDOW GLASSES ONLY FOR

11:02:03   3   THEIR OWN PURPOSES.  WHAT I UNDERSTAND IS THAT IT'S REFERRED TO

11:02:06   4   AS EIY.

11:02:08   5   Q.   SIR, YOU WERE DEPOSED IN THIS CASE; CORRECT?

11:02:17   6   A.   YES.

11:02:17   7   Q.   AND A DEPOSITION IS OUR OPPORTUNITY TO ASK YOU QUESTIONS

11:02:20   8   UNDER OATH BEFORE WE ARRIVE AT TRIAL; RIGHT?

11:02:24   9   A.   YES.

11:02:38   10  Q.   AND THAT'S SO WE ALL HAVE THE SAME INFORMATION BEFORE WE

11:02:41   11  ARRIVE IN COURT AND THERE'S A LEVEL PLAYING FIELD; RIGHT?

11:02:44   12  A.   YES.

11:03:01   13  Q.   IF YOU'D TURN TO THE FINAL TAB IN YOUR BINDER, THERE'S A

11:03:05   14  TRANSCRIPT OF YOUR DEPOSITION.  I'D LIKE YOU TO TURN TO PAGE

11:03:09   15  64, LINE 24, CARRYING OVER TO PAGE 65, LINE 3.

11:03:15   16       IF WE CAN PUT THIS ON THE SCREEN.

11:03:16   17           MR. QUINN:  CAN WE WAIT JUST A SECOND?

11:03:24   18       I'M SORRY, YOUR HONOR.  MAY I HAVE THE CITE AGAIN, PLEASE?

11:03:27   19           MR. MUELLER:  64:24 TO 65:3.

11:03:31   20           MR. QUINN:  NO OBJECTION, YOUR HONOR.

11:03:44   21  BY MR. MUELLER:

11:03:45   22  Q.   SIR, YOU WERE ASKED THE QUESTION UNDER OATH, "DID SAMSUNG

11:03:48   23  EVER MARKET THE GLASS FRONT FACE OF THE INFRINGING PHONES

11:03:51   24  SEPARATE FROM THE REST OF THE PHONES?"

11:04:05   25       AND YOUR ANSWER WAS:  "NOT TO MY KNOWLEDGE, NO."

11:04:25  1    A.   OH, THIS I DO REMEMBER BECAUSE WE WERE TALKING ABOUT

11:05:00  2    MARKETING IN THIS INSTANCE.

11:05:02  3         WE'RE NOT TALKING ABOUT SALES.

11:05:06  4         AND WHEN I THINK ABOUT THIS QUESTION, I BELIEVE THAT THIS

11:05:09  5    WAS RELATING TO A SERIES OF ACTIVITIES THAT ARE INVOLVED IN

11:05:11  6    MARKETING.

11:05:12  7         SO THE SAMSUNG MARKET OR PROMOTE LIKE GLASSES OR BEZELS

11:05:17  8    AND THINGS LIKE THAT TO THE ULTIMATE CONSUMERS.  IN THAT

11:05:21  9    REGARD, THAT WAS MY ANSWER TO THAT QUESTION.

11:05:23  10   Q.   I SEE.  SIR, WERE YOU ASKED THAT QUESTION AND DID YOU GIVE

11:05:26  11   THAT ANSWER?

11:05:27  12   A.   THAT'S RIGHT, THAT WE DID NOT MARKET THOSE.

11:05:42  13   Q.   LAST QUESTION.  IF WE CAN PLEASE PULL UP SDX 684.

11:05:48  14   MR. QUINN SHOWED YOU THIS SLIDE, AND IT'S TITLED SAMSUNG PHONE

11:05:51  15   DESIGNS, AND IT INCLUDES A NUMBER OF DIFFERENT PHONES; CORRECT?

11:05:54  16   A.   THAT'S RIGHT.

11:06:00  17   Q.   SIR, DO YOU UNDERSTAND THAT THE ONLY 18 PHONES THAT THE

11:06:05  18   LADIES AND GENTLEMEN OF THE JURY NEED TO CONSIDER ARE THE 18

11:06:07  19   PHONES THAT INFRINGE AND WERE FOUND TO INFRINGE BY A JURY?

11:06:33  20        MR. QUINN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE,

11:06:36  21   LEGAL CONCLUSION AS TO WHAT THE JURY IS TO CONSIDER.

11:06:40  22        MR. MUELLER:  YOUR HONOR, I WAS SHOWN THIS SLIDE BY

11:06:42  23   MR. QUINN.  I THINK IT'S ABSOLUTELY FAIR TO POINT OUT THAT 18

11:06:45  24   PHONES AT ISSUE IN THIS CASE FOR DAMAGES ARE THE 18 PHONES THAT

11:06:49  25   INFRINGE.

| | | |
|---|---|---|
| 11:06:52 | 1 | THE COURT:  SUSTAINED. |
| 11:06:54 | 2 | MR. MUELLER:  THANK YOU, SIR. |
| 11:06:56 | 3 | I HAVE NO FURTHER QUESTIONS. |
| 11:06:57 | 4 | THE COURT:  OKAY.  TIME IS 11:06. |
| 11:06:59 | 5 | IS THERE ANY REDIRECT? |
| 11:07:01 | 6 | MR. QUINN:  NOTHING FURTHER, YOUR HONOR. |
| 11:07:04 | 7 | THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED, |
| 11:07:06 | 8 | AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL? |
| 11:07:08 | 9 | MR. QUINN:  NOT SUBJECT. |
| 11:07:09 | 10 | MR. MUELLER:  NOT SUBJECT, YOUR HONOR. |
| 11:07:10 | 11 | THE COURT:  ALL RIGHT.  THEN YOU'RE EXCUSED, AND |
| 11:07:12 | 12 | YOU'VE COMPLETED YOUR TRIAL TESTIMONY. |
| 11:07:16 | 13 | CALL YOUR NEXT WITNESS, PLEASE. |
| 11:07:17 | 14 | MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS DONGWOOK |
| 11:07:21 | 15 | KIM.  THAT'S D-O-N-G-W-O-O-K, KIM. |
| 11:07:44 | 16 | THE COURT:  ARE THESE THE SAME AS WHAT I HAVE?  I GOT |
| 11:07:46 | 17 | FOUR BINDERS FOR MR. KIM'S CROSS?  SHOULD I RETURN THESE? |
| 11:07:50 | 18 | MS. MAROULIS:  NO, YOUR HONOR.  THERE'S A BINDER OF |
| 11:07:52 | 19 | THIS SIZE (INDICATING). |
| 11:07:52 | 20 | THE COURT:  NO, NO, FOR THE PREVIOUS WITNESS, I GOT |
| 11:07:55 | 21 | THESE AS THE CROSS BINDERS FOR HIM (INDICATING), OR THE DIRECT |
| 11:08:00 | 22 | BINDERS FOR HIM. |
| 11:08:16 | 23 | IS THERE A DIRECT BINDER FOR HIM? |
| 11:08:20 | 24 | THE CLERK:  IT'S COMING, YOUR HONOR. |
| 11:08:21 | 25 | THE COURT:  OKAY.  THANK YOU. |

| | | |
|---|---|---|
| 11:08:33 | 1 | THE CLERK:  PLEASE RAISE YOUR RIGHT HAND. |
| 11:08:35 | 2 | **(DEFENDANTS' WITNESS, DONGWOOK KIM, WAS SWORN.)** |
| 11:08:45 | 3 | THE WITNESS:  YES. |
| 11:08:45 | 4 | THE CLERK:  THANK YOU.  PLEASE BE SEATED. |
| 11:08:47 | 5 | AND ONCE SEATED, PLEASE STATE AND THEN SPELL YOUR FULL |
| 11:08:52 | 6 | NAME FOR THE RECORD. |
| 11:09:00 | 7 | MS. MAROULIS:  MAY I PROCEED, YOUR HONOR. |
| 11:09:01 | 8 | THE COURT:  HE DIDN'T STATE AND SPELL HIS FULL NAME |
| 11:09:04 | 9 | FOR THE RECORD. |
| 11:09:07 | 10 | THE WITNESS:  MY NAME IS DONGWOOK KIM.  AND I SPELL |
| 11:09:14 | 11 | MY NAME K-I-M, LAST NAME, D-O-N-G-W-O-O-K. |
| 11:09:19 | 12 | THE COURT:  ALL RIGHT.  TIME IS 11:09.  GO AHEAD, |
| 11:09:21 | 13 | PLEASE. |
| 11:09:23 | 14 | **DIRECT EXAMINATION** |
| 11:09:23 | 15 | BY MS. MAROULIS: |
| 11:09:24 | 16 | Q.   GOOD MORNING, MR. KIM.  WHAT COMPANY DO YOU WORK FOR? |
| 11:09:34 | 17 | A.   I CURRENTLY SERVE WITH THE SAMSUNG ELECTRONICS COMPANY, |
| 11:09:39 | 18 | LIMITED'S MOBILE TELECOM BUSINESS. |
| 11:09:41 | 19 | Q.   HOW LONG HAVE YOU BEEN AT SAMSUNG? |
| 11:09:44 | 20 | A.   THIS WOULD BE MY 21ST YEAR. |
| 11:09:51 | 21 | Q.   CAN YOU BRIEFLY DESCRIBE THE DIFFERENT POSITIONS YOU'VE |
| 11:09:54 | 22 | HAD WITHIN SAMSUNG? |
| 11:09:56 | 23 | A.   SO AT THE OUTSET, I WAS CHARGED WITH PROCUREMENT RELATED |
| 11:10:11 | 24 | AFFAIRS FOR AUTOMOBILE PRODUCTS. |
| 11:10:19 | 25 | LATER ON I WAS TASKED WITH PROCUREMENT RELATED ACTIVITIES |

11:10:23   1    FOR TV MONITORS FOR DISPLAYS OR COMPONENTS THEREOF.

11:10:34   2         AND PRESENTLY I'M TASKED WITH HANDLING PROCUREMENT RELATED

11:10:37   3    ACTIVITIES FOR -- WITHIN THE MOBILE TELECOM BUSINESS FOR

11:10:43   4    COMPONENTS THERE.

11:10:44   5    Q.   WHICH COMPONENTS, MR. KIM?

11:10:45   6    A.   DISPLAY COMPONENTS.

11:10:47   7    Q.   WHAT ARE YOUR CURRENT RESPONSIBILITIES?

11:10:49   8         I'M SORRY.  WHAT IS YOUR CURRENT TITLE?

11:10:52   9    A.   I'M A PRINCIPAL PROFESSIONAL.

11:10:59  10    Q.   AND WHAT ARE YOUR RESPONSIBILITIES AS THE PRINCIPAL

11:11:04  11    PROFESSIONAL IN MOBILE COMMUNICATION?

11:11:07  12    A.   SO MY WORK ENTAILS SOURCING OUR COMPONENTS AND TO CONDUCT

11:11:24  13    PROCUREMENT ACTIVITIES FOR SUCH, AND TO MANAGE OUR PROCUREMENT

11:11:28  14    PERSONNEL.

11:11:29  15    Q.   AND WHAT HAPPENS TO THE COMPONENTS THAT YOU SOURCE AND

11:11:32  16    PROCURE, MR. KIM?

11:11:33  17    A.   ALSO IN THE PAST I USED TO HANDLE BATTERIES, ALSO AP'S,

11:11:58  18    AND AT THE PRESENT I'M ALSO HANDLING DISPLAYS.

11:12:01  19    Q.   OKAY.  MR. KIM, IF YOU CAN PLEASE TURN TO EXHIBIT DX 4568

11:12:07  20    IN THE BINDER IN FRONT OF YOU?

11:12:20  21    A.   ALL RIGHT.

11:12:21  22    Q.   DO YOU RECOGNIZE THE DOCUMENT THAT APPEARS AT DX 4568?

11:12:27  23    A.   I KNOW THIS QUITE WELL.

11:12:33  24    Q.   WHAT IS IT?

11:12:34  25    A.   SO THIS CONSTITUTES A REQUISITION FORM, A FORM FOR

11:12:54  1    APPROVAL PERTAINING TO BASICALLY DISPLAY COMPONENTS AND FRONT

11:13:03  2    CASE ASSEMBLY UNITS, MODULES AS PERTAINING TO VARIOUS

11:13:07  3    SMARTPHONES.

11:13:09  4            MR. SABRI:  I'M SORRY, YOUR HONOR.  I DON'T THINK WE

11:13:11  5    HAVE EXHIBITS FOR THIS WITNESS.  IS THERE A BINDER?

11:13:14  6            MS. MAROULIS:  YES, YOUR HONOR.  ONE MINUTE.

11:13:28  7    Q.  SIR, DO YOU USE THIS DOCUMENT IN YOUR DAY-TO-DAY WORK?

11:13:31  8    A.  INDEED.  THIS IS SOMETHING THAT I ALWAYS GET TO SEE

11:13:45  9    BECAUSE THIS IS SOMETHING THAT YOU NEED, NECESSARILY NEED IN

11:13:50  10   ORDER TO CONDUCT PROCUREMENT ACTIVITIES OF COMPONENTS.

11:13:53  11           MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT 4568 INTO

11:13:56  12   EVIDENCE.

11:13:57  13           MR. SABRI:  NO OBJECTION, YOUR HONOR.

11:13:59  14           THE COURT:  IT'S ADMITTED.

11:14:00  15      (DEFENDANTS' EXHIBIT 4568 WAS ADMITTED IN EVIDENCE.)

11:14:00  16           THE COURT:  GO AHEAD, PLEASE.

11:14:01  17   BY MS. MAROULIS:

11:14:02  18   Q.  SIR, IF YOU CAN PLEASE TAKE A LOOK AT PAGE 100 IN THIS

11:14:05  19   EXHIBIT.

11:14:12  20      MR. KIM, WHAT IS SHOWN ON THIS PAGE?

11:14:14  21   A.  SO THIS IS A PHOTO -- THAT ENTAILS PHOTOS OF A DISPLAY

11:14:34  22   MODULE AND COMPONENTS AS IT GETS INCORPORATED INTO A MODEL

11:14:39  23   CALLED VIBRANT.

11:14:40  24   Q.  SIR, WOULD YOU PLEASE WALK US THROUGH THIS PICTURE AND

11:14:44  25   EXPLAIN WHAT'S SHOWN IN ALL THE COLUMNS.

11:14:46  1    A.   SO IN THE VERY FIRST COLUMN, WHAT WE ARE LOOKING AT HERE

11:15:14  2    IS A DISPLAY COMPONENT MODULE, AND IN THE SECOND COLUMN WE'RE

11:15:20  3    LOOKING AT A DISPLAY PANEL.

11:15:29  4         AND THAT IS FOLLOWED BY A PRINTED CIRCUIT BOARD, A PCB, IF

11:15:41  5    YOU WILL.

11:15:42  6         AND LASTLY, IN THE FIFTH ONE, WE'RE LOOKING AT THE WINDOW

11:15:45  7    GLASS.

11:15:46  8         NOW, ALL THESE ARE COMPONENTS THAT GET INCORPORATED INTO A

11:15:50  9    PHONE, IN A MODULE.

11:15:54  10   Q.   SIR, DO YOU RECOGNIZE THE NUMBERS SHOWN IN RED IN THE

11:15:58  11   RIGHT-HAND COLUMN?

11:16:06  12   A.   YES, YES, THESE ARE THINGS I'M QUITE FAMILIAR WITH.

11:16:11  13   Q.   CAN YOU PLEASE TURN TO PAGE 45 -- PAGE 146 OF THIS

11:16:22  14   EXHIBIT.

11:16:22  15        WHAT DOES THIS PAGE SHOW?

11:16:24  16   A.   ONE SECOND, PLEASE.

11:16:39  17        SO THIS ALSO IS ONE OF THOSE REQUISITION AUTHORIZATION

11:16:43  18   FORMS AND THIS ONE PERTAINS TO THE FRONT CASE ASSEMBLY UNIT AS

11:16:49  19   IT PERTAINS TO THE VIBRANT MODEL.

11:16:53  20   Q.   AND WHAT IS SHOWN ON HERE?

11:16:56  21   A.   THIS IS THE PLASTIC PERIPHERY, WHAT IS REFERRED TO AS THE

11:17:14  22   BEZEL.  IT IS A PHOTO OF IT.

11:17:16  23   Q.   THANK YOU, MR. KIM.

11:17:18  24        I NEGLECTED TO ASK YOU ONE MORE QUESTION.  LET'S GO BACK

11:17:20  25   TO THE PHOTOS OF THE DISPLAY PANEL.  LET'S GO BACK TO PAGE 100.

DONGWOOK KIM DIRECT BY MS. MAROULIS

11:17:36   1          AND I'M GOING TO ASK YOU, WHAT DO THE RED CODES IN THE

11:17:39   2   RIGHT-HAND COLUMN MEAN?

11:17:41   3   A.   OH, THESE ARE INDIVIDUAL COMPONENT CODE, COMPONENT CODES

11:17:55   4   AS KEPT TRACK OF OR CONTROLLED WITHIN THE MOBILE TELECOM

11:17:59   5   BUSINESS.

11:18:00   6   Q.   THANK YOU, SIR.

11:18:02   7          I'M NOW GOING TO SHOW YOU A DOCUMENT THAT IS A DIGITAL

11:18:05   8   DOCUMENT, SO WE HAVE TO DISPLAY IT ON THE SCREEN.

11:18:08   9          AND, YOUR HONOR, THIS IS A CONFIDENTIAL DOCUMENT THAT ONLY

11:18:10   10   THE JURY AND THE COURT SHOULD SEE.

11:18:12   11          THE COURT:  OKAY.  LET'S MAKE SURE THAT THE PUBLIC

11:18:14   12   MONITORS ARE TURNED OFF, PLEASE.

11:18:19   13   BY MS. MAROULIS:

11:18:21   14   Q.   OKAY.  MR. KIM, WHAT YOU SEE BEFORE YOU ON THE SCREEN

11:18:24   15   HOPEFULLY IS AN EXHIBIT THAT I'M GOING TO ASK YOU SOME

11:18:29   16   QUESTIONS ABOUT.

11:18:30   17          CAN YOU PLEASE TAKE A LOOK AT THE SECOND TAB OF THIS

11:18:34   18   SPREADSHEET THAT APPEARS IN DIGITAL EXHIBIT 4509?  DO YOU

11:18:39   19   RECOGNIZE IT?

11:18:49   20   A.   SO THIS CONSTITUTES THE BOM, THE BILL OF MATERIALS, AS

11:19:04   21   PERTAINED TO THE VARIOUS RESPECTIVE SMARTPHONE COMPONENTS.

11:19:08   22          MS. MAROULIS:  YOUR HONOR, I MOVE DX 4509 INTO

11:19:11   23   EVIDENCE.

11:19:13   24          MR. SABRI:  NO OBJECTION.

11:19:14   25          THE COURT:  IT'S ADMITTED.

11:19:15   1          (DEFENDANTS' EXHIBIT 4509 WAS ADMITTED IN EVIDENCE.)

11:19:16   2              THE COURT:  GO AHEAD, PLEASE.

11:19:18   3     BY MS. MAROULIS:

11:19:19   4     Q.   SIR, DO YOU KNOW THE SOURCE OF INFORMATION FOR THIS BILL

11:19:21   5     OF MATERIALS AT SAMSUNG?

11:19:23   6     A.   YES.  THIS IS DATA THAT IS CULLED THROUGH THE S.A.P.

11:19:41   7     SYSTEM, WHICH IS SOMETHING THAT WE MAINTAIN AND ALWAYS USE AT

11:19:45   8     SAMSUNG.

11:19:46   9     Q.   AND DO YOU USE THESE KIND OF DOCUMENTS IN YOUR DAY-TO-DAY

11:19:49   10    WORK?

11:19:49   11    A.   YES.  THIS IS DATA THAT WE ALWAYS USE BECAUSE THIS

11:20:04   12    EMBODIES IMPORTANT DATA FOR OUR PURPOSES.

11:20:08   13    Q.   AND IN YOUR VIEW, IS THE INFORMATION RELIABLE?

11:20:11   14    A.   YES, THIS IS INDEED SOMETHING CONSIDERED RELIABLE BECAUSE

11:20:27   15    THIS IS COURTESY OF THE SYSTEM.

11:20:29   16    Q.   MR. KIM, FROM YOUR WORK AT SAMSUNG, DO YOU KNOW HOW

11:20:33   17    SAMSUNG TRACKS ITS INTERNAL INFORMATION ABOUT COMPONENTS USED

11:20:36   18    IN ITS SMARTPHONES?

11:20:37   19    A.   CERTAINLY.  BASICALLY WHEN IT COMES TO OUR COMPONENTS, AND

11:21:19   20    STARTING FROM PROCUREMENT TO, YOU KNOW, THE ISSUANCE OF

11:21:24   21    PURCHASE ORDERS AND WHAT HAVE YOU, THE UNIT PRICES MUST

11:21:27   22    NECESSARILY BE PRE-INPUT, AND SO WE TRY TO KEEP TRACK OF ALL

11:21:34   23    THE COMPONENTS FROM THE MOMENT OF INTAKE INTO OUR WAREHOUSE

11:21:37   24    UNTIL IT GOES EX-WAREHOUSE, BASICALLY ALL BY WAY OF OUR SYSTEM.

11:21:43   25              THE COURT:  I'M SORRY TO INTERRUPT.

11:21:45  1          WOULD YOU LIKE TO SEAL 4509?  IT'S BEEN ADMITTED, BUT DO

11:21:49  2     YOU WANT THIS SEALED?

11:21:50  3              MS. MAROULIS:  YES, YOUR HONOR, WE'RE GOING TO

11:21:51  4     REQUEST THAT WHEN WE UPDATE THE JOINT EXHIBIT LIST.

11:21:54  5              THE COURT:  OKAY.  GO AHEAD, PLEASE.  SORRY TO

11:21:55  6     INTERRUPT.

11:21:56  7              MS. MAROULIS:  THANK YOU.

11:22:01  8     Q.  SIR, THE SYSTEM THAT YOU REFERRED TO, IS THAT THE S.A.P.

11:22:05  9     SYSTEM?

11:22:05  10    A.  YES, THAT IS CORRECT, THAT'S THE S.A.P.

11:22:08  11    Q.  AND DOES THE INFORMATION THAT YOU REFERRED TO GO INTO THE

11:22:10  12    S.A.P. SYSTEM AT OR NEAR THE ACTUAL PURCHASE TRANSACTION?

11:22:26  13    A.  YES, THAT IS CORRECT.

11:22:27  14    Q.  DO YOU SEE COMPONENT LEVEL PURCHASE AND COST INFORMATION

11:22:31  15    FROM THE S.A.P. SYSTEM IN YOUR REGULAR WORK AT SAMSUNG?

11:22:35  16    A.  YES, ALWAYS.

11:22:52  17    Q.  AND CAN EMPLOYEES AT SAMSUNG PULL INFORMATION FROM THE

11:22:56  18    S.A.P. SYSTEM ABOUT SPECIFIC COMPONENTS AND SPECIFIC PHONES?

11:23:01  19    A.  YES, WE CAN RUN QUERIES BASED UPON PART NUMBERS, AND ALL

11:23:25  20    THESE PART NUMBERS, MIND YOU, ARE INTERCONNECTED, SO YOU GAIN

11:23:29  21    ACCESS TO EVERYTHING YOU WANT.

11:23:30  22    Q.  OKAY.  SIR, I'M GOING TO SHOW YOU ANOTHER EXHIBIT THAT IS

11:23:33  23    GOING TO BE DIGITAL, AND IT'S ANOTHER CONFIDENTIAL INFORMATION.

11:23:36  24         SO PLEASE TAKE A LOOK ON YOUR SCREEN AT EXHIBIT DX 4520.

11:23:50  25         MR. KIM, IT SHOULD BE IN FRONT OF YOU.

11:23:55   1        KEN -- IT'S CONFIDENTIAL.

11:24:04   2        MY APOLOGIES, SIR.  JUST WAIT ONE SECOND UNTIL IT'S SORTED

11:24:08   3   OUT.

11:24:08   4            THE COURT:  AND IT SHOULDN'T BE SHOWN TO THE JURY

11:24:10   5   UNTIL IT'S ADMITTED.

11:24:12   6   BY MS. MAROULIS:

11:24:13   7   Q.   SO, MR. KIM, LET'S LOOK AT THIS DOCUMENT TOGETHER.

11:24:16   8        DO YOU RECOGNIZE THE INFORMATION SHOWN IN EXHIBIT DX 4520?

11:24:33   9   A.   ARE YOU TALKING ABOUT THE OTHER SPREADSHEET WE LOOKED AT?

11:24:36  10   Q.   NO, I'M LOOKING AT EXHIBIT DX 4520 THAT IS IN FRONT OF

11:24:40  11   YOU, AND I'M ASKING WHETHER YOU RECOGNIZE THE INFORMATION

11:24:44  12   INSIDE THE SPREADSHEET.

11:24:59  13   A.   YES, I DO RECOGNIZE THIS.

11:25:01  14   Q.   DO YOU RECOGNIZE THE CODE INFORMATION IN THE COLUMN IN

11:25:05  15   FRONT OF YOU?

11:25:11  16   A.   YES.  WHAT WE'RE LOOKING AT HERE IS INFORMATION PERTAINING

11:25:20  17   TO THE WINDOW GLASS PER MODEL.

11:25:22  18            MS. MAROULIS:  YOUR HONOR, I MOVE DX 4520 INTO

11:25:25  19   EVIDENCE.

11:25:25  20            THE COURT:  ANY OBJECTION?

11:25:26  21            MR. SABRI:  OBJECTION.

11:25:27  22            THE COURT:  AND WOULD YOU LIKE IT SEALED,

11:25:29  23   MS. MAROULIS?

11:25:30  24            MS. MAROULIS:  YES, PLEASE, YOUR HONOR.

11:25:31  25            THE COURT:  ALL RIGHT.  THIS IS SEALED AND ADMITTED.

11:25:33   1            (DEFENDANTS' EXHIBIT 4520 WAS ADMITTED IN EVIDENCE.)

11:25:34   2                 THE COURT:  GO AHEAD, PLEASE.

11:25:35   3        BY MS. MAROULIS:

11:25:36   4        Q.   MR. KIM, NOW THAT THIS EXHIBIT IS IN EVIDENCE, CAN YOU

11:25:38   5        PLEASE WALK US BRIEFLY THROUGH THIS CHART AND WHAT IS SHOWN

11:25:42   6        HERE?

11:25:42   7        A.   SO WHAT WE HAVE HERE ARE THE RESPECTIVE SMARTPHONES AS

11:26:07   8        DISTINGUISHED BY THEIR RESPECTIVE CODE NUMBERS AND THE WINDOW

11:26:10   9        GLASS COMPONENTS THAT GO WITH EACH.

11:26:15  10            AND IT FURTHER ENTAILS THE MONTHLY QUANTITIES AND, SAY,

11:26:24  11        AMOUNTS.

11:26:28  12                 MS. MAROULIS:  THANK YOU VERY MUCH, MR. KIM.  I HAVE

11:26:30  13        NO FURTHER QUESTIONS FOR YOU.

11:26:31  14                 THE COURT:  ALL RIGHT.  THE TIME IS 11:26.

11:27:00  15                 MR. SABRI:  MAY I PROCEED, YOUR HONOR.

11:27:02  16                 THE COURT:  11:27.  GO AHEAD, PLEASE.

11:27:04  17                         **CROSS-EXAMINATION**

11:27:06  18        BY MR. SABRI:

11:27:06  19        Q.   MR. KIM, WE HAVEN'T MET.  MY NAME IS NATE SABRI.  GOOD

11:27:11  20        MORNING.

11:27:12  21        A.   GOOD MORNING, SIR.

11:27:13  22        Q.   YOU JUST DISCUSSED TWO SPREADSHEETS WITH THE JURY; RIGHT?

11:27:27  23        A.   YES, THAT'S CORRECT.

11:27:31  24        Q.   YOU DID NOT CREATE THOSE SPREADSHEETS; CORRECT?

11:27:34  25        A.   THEY ARE NOT SPREADSHEETS THAT I CREATED, BUT THEY ARE

11:27:43  1    THINGS THAT ARE ALWAYS MAINTAINED.

11:27:45  2    Q.   YOU DON'T KNOW WHEN THESE SPREADSHEETS WERE CREATED, DO

11:27:48  3    YOU?

11:27:48  4    A.   RIGHT, I DON'T QUITE KNOW.

11:27:55  5    Q.   YOU DON'T KNOW WHY THEY WERE CREATED?

11:27:57  6    A.   RIGHT, I DO NOT EXACTLY KNOW.

11:28:03  7    Q.   YOU DON'T KNOW HOW THEY WERE CREATED; RIGHT?

11:28:06  8    A.   WELL, HERE -- THIS IS BASIC TYPE OF DATA AND THESE

11:28:22  9    NECESSARILY MUST BE CULLED VIA THE S.A.P. SYSTEM.

11:28:26  10   Q.   MAYBE I WASN'T QUITE CLEAR.

11:28:28  11        YOU DON'T KNOW HOW IT WAS DETERMINED WHAT INFORMATION TO

11:28:30  12   PUT IN THOSE SPREADSHEETS; RIGHT?

11:28:32  13   A.   PERHAPS I DON'T UNDERSTAND WHAT YOU MEAN WHEN YOU SAY I

11:28:53  14   DON'T KNOW WHAT THEY WENT BY IN DETERMINING WHAT TO PUT IN.

11:28:58  15   Q.   LET ME TRY IT THIS WAY:  THE FIRST TIME YOU SAW BOTH OF

11:29:01  16   THOSE SPREADSHEETS WAS THE DAY BEFORE YOUR DEPOSITION THIS PAST

11:29:05  17   DECEMBER; RIGHT?

11:29:20  18   A.   YES, THAT IS CORRECT.

11:29:26  19   Q.   NOW, YOU TALKED ABOUT COMPONENTS AND INDICATED THAT YOU

11:29:30  20   WORKED WITH PROCUREMENT; RIGHT?

11:29:32  21   A.   THAT IS CORRECT.

11:29:43  22   Q.   SAMSUNG DOES NOT SELL ANY OF THOSE PARTS OR COMPONENTS TO

11:29:47  23   CONSUMERS DIRECTLY, DOES IT?

11:29:49  24   A.   WHEN IT COMES TO THAT, I'M NOT TOO SURE.  BUT I DO

11:30:17  25   UNDERSTAND THAT WE SELL THOSE SUCH THINGS FOR SERVICE PURPOSE,

11:30:23  1        FOR REPAIR PURPOSES.

11:30:24  2        Q.   YOU THINK YOU DO SELL TO SERVICE PARTS, BUT YOU DON'T

11:30:29  3    THINK YOU SELL THE PARTS DIRECTLY; CORRECT?

11:30:31  4        A.   I DO NOT QUITE KNOW THAT AS TO WHETHER THEY GET DIRECTLY

11:30:46  5    SOLD OR NOT.

11:30:47  6        Q.   MR. KIM, YOU WERE DEPOSED IN THIS CASE; RIGHT?

11:30:49  7        A.   THAT IS CORRECT.

11:30:57  8        Q.   YOU WERE UNDER OATH WITH A PENALTY OF PERJURY?

11:31:00  9        A.   THAT'S CORRECT.

11:31:07  10       Q.   YOU HAD ATTORNEYS THERE DEFENDING YOUR DEPOSITION; RIGHT?

11:31:10  11       A.   THAT'S CORRECT.

11:31:20  12       Q.   YOU HAD AN OPPORTUNITY TO REVIEW THE TRANSCRIPT AND

11:31:22  13   CORRECT IF THERE WERE ANY ERRORS; RIGHT?

11:31:25  14       A.   THAT IS CORRECT.

11:31:38  15       Q.   WOULD YOU TURN IN THE BINDER THAT'S IN FRONT OF YOU,

11:31:44  16   PLEASE, TO PAGE 23, LINES 6 TO 12.

11:31:53  17            YOU WERE ASKED:

11:31:55  18            "HAS SAMSUNG EVER SOLD ANY PART OR COMPONENT OF THESE

11:31:59  19   INFRINGING PHONES SEPARATELY FROM THE PHONES THEMSELVES?"

11:32:02  20            YOUR ANSWER:  "THOUGH I DON'T THINK WE SELL PARTS

11:32:05  21   DIRECTLY, I THINK WE DO SELL TO SERVICE PARTS."

11:32:32  22            MS. MAROULIS:  YOUR HONOR, OBJECTION.  THAT'S

11:32:34  23   IMPROPER IMPEACHMENT.  THAT'S EXACTLY WHAT THE WITNESS JUST

11:32:38  24   SAID RIGHT NOW.

11:32:45  25            MR. SABRI:  THAT WAS MY EXACT QUESTION.

| | | |
|---|---|---|
| 11:32:47 | 1 | THE COURT:  OVERRULED. |
| 11:32:48 | 2 | BY MR. SABRI: |
| 11:32:50 | 3 | Q.   THAT'S YOUR TESTIMONY; RIGHT? |
| 11:32:51 | 4 | A.   THAT IS CORRECT. |
| 11:32:54 | 5 | Q.   SAMSUNG SELLS SERVICE PARTS TO THE PHONE REPAIR SIDE; |
| 11:32:57 | 6 | RIGHT? |
| 11:32:57 | 7 | A.   YES.  I UNDERSTAND THAT OUR HEAD OFFICE HAS SALES VIA STA |
| 11:33:19 | 8 | OR OTHER OVERSEAS BRANCHES FOR SERVICE PURPOSES. |
| 11:33:24 | 9 | Q.   TO THE PHONE REPAIR SIDE; RIGHT? |
| 11:33:26 | 10 | A.   YES, THAT IS CORRECT. |
| 11:33:30 | 11 | Q.   YOUR UNDERSTANDING IS THERE'S ACTUALLY A BAN AT SAMSUNG ON |
| 11:33:34 | 12 | SELLING THOSE PARTS AND COMPONENTS SEPARATELY; RIGHT? |
| 11:33:37 | 13 | A.   SELL TO WHOM?  COULD YOU PLEASE BE A LITTLE CLEARER. |
| 11:33:59 | 14 | Q.   WELL, YOU'VE TESTIFIED, RIGHT, THAT SAMSUNG DOES NOT SELL |
| 11:34:03 | 15 | PARTS DIRECTLY AND THAT THERE IS A BAN ON SELLING THEM |
| 11:34:06 | 16 | SEPARATELY? |
| 11:34:06 | 17 | THOSE ARE YOUR WORDS, NOT MINE; RIGHT? |
| 11:34:10 | 18 | A.   YES, THAT IS CORRECT. |
| 11:34:43 | 19 | HOWEVER, I BELIEVE MY TESTIMONY WAS IN THE SENSE OF HOW WE |
| 11:34:47 | 20 | DO NOT SELL TO INDIVIDUAL CUSTOMERS. |
| 11:34:51 | 21 | MR. SABRI:  THANK YOU.  I HAVE NOTHING FURTHER. |
| 11:34:53 | 22 | THE COURT:  ALL RIGHT.  11:34. |
| 11:34:55 | 23 | ANY REDIRECT? |
| 11:34:56 | 24 | MS. MAROULIS:  NO REDIRECT, YOUR HONOR.  MAY THE |
| 11:34:59 | 25 | WITNESS PLEASE BE EXCUSED? |

899

| | | |
|---|---|---|
| 11:35:02 | 1 | THE COURT:  AND NOT SUBJECT TO RECALL; CORRECT? |
| 11:35:03 | 2 | MS. MAROULIS:  NOT SUBJECT TO RECALL. |
| 11:35:04 | 3 | THE COURT:  DO YOU AGREE WITH THAT, MR. SABRI? |
| 11:35:07 | 4 | MR. SABRI:  YES, YOUR HONOR. |
| 11:35:08 | 5 | THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED, AND |
| 11:35:10 | 6 | YOU'VE COMPLETED YOUR TRIAL TESTIMONY. |
| 11:35:11 | 7 | PLEASE HAVE YOUR NEXT WITNESS READY. |
| 11:35:27 | 8 | MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS TIM SHEPPARD |
| 11:35:31 | 9 | AS ITS NEXT WITNESS. |
| 11:35:43 | 10 | YOUR HONOR, THERE ARE TWO EXHIBITS THAT WERE PREVIOUSLY |
| 11:35:45 | 11 | ADMITTED WITH THIS WITNESS IN PRIOR TRIAL.  MAY WE SUBMIT THEM |
| 11:35:49 | 12 | BEFORE WE START THE TESTIMONY? |
| 11:35:52 | 13 | THE COURT:  NO.  YOU NEED TO ADMIT THEM ON YOUR TIME. |
| 11:35:55 | 14 | OKAY.  DO YOU HAVE ANY BINDERS FOR HIM? |
| 11:35:59 | 15 | MS. MAROULIS:  YES. |
| 11:36:00 | 16 | THE COURT:  OKAY.  PERFECT.  THANK YOU.  THANK YOU SO |
| 11:36:03 | 17 | MUCH. |
| 11:36:05 | 18 | THE CLERK:  PLEASE RAISE YOUR RIGHT HAND. |
| 11:36:08 | 19 | **(DEFENDANTS' WITNESS, TIM SHEPPARD, WAS SWORN.)** |
| 11:36:08 | 20 | THE WITNESS:  YES. |
| 11:36:12 | 21 | THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE |
| 11:36:14 | 22 | YOU'RE SEATED, PLEASE STATE AND THEN SPELL YOUR FULL NAME FOR |
| 11:36:18 | 23 | THE RECORD. |
| 11:36:19 | 24 | THE WITNESS:  CAN YOU HEAR ME? |
| 11:36:23 | 25 | MY NAME IS TIM SHEPPARD.  TIM SPELLED T-I-M, |

11:36:26   1      S-H-E-P-P-A-R-D.

11:36:30   2            THE COURT:  ALL RIGHT.  TIME IS 11:36.  GO AHEAD,

11:36:32   3      PLEASE.

11:36:32   4                     **DIRECT EXAMINATION**

11:36:33   5      BY MS. MAROULIS:

11:36:34   6      Q.   GOOD MORNING, MR. SHEPPARD.  CAN YOU PLEASE INTRODUCE

11:36:36   7      YOURSELF TO THE JURY?

11:36:37   8      A.   SURE.  MY NAME IS TIM SHEPPARD.  I WORK FOR SAMSUNG.  I'VE

11:36:41   9      WORKED FOR SAMSUNG FOR TEN YEARS.

11:36:44   10     Q.   WHICH SAMSUNG COMPANY DO YOU WORK FOR?

11:36:47   11     A.   I CURRENTLY WORK FOR SAMSUNG ELECTRONICS AMERICA.  I'VE

11:36:51   12     WORKED FOR THAT COMPANY FOR THREE YEARS.  PRIOR TO THAT I

11:36:55   13     WORKED FOR SAMSUNG TELECOMMUNICATIONS AMERICA FOR SEVEN YEARS

11:36:58   14     BEFORE IT MERGED WITH SAMSUNG ELECTRONICS AMERICA.

11:37:01   15     Q.   WHAT WAS YOUR POSITION AT SAMSUNG TELECOMMUNICATIONS

11:37:04   16     AMERICA, WHICH I'LL REFER TO AS STA, IN THE 2010 TO 2012

11:37:08   17     TIMEFRAME?

11:37:11   18     A.   MY TITLE WAS VICE PRESIDENT OF FINANCE AND OPERATIONS.  I

11:37:14   19     WAS ALSO RESPONSIBLE FOR THE CELL PHONE REPAIR BUSINESS AND THE

11:37:21   20     LOGISTICS.

11:37:22   21     Q.   SIR, WHAT DID YOU DO BEFORE JOINING SAMSUNG?

11:37:25   22     A.   I WORKED IN A VENTURE CAPITAL COMPANY IN FINANCE.  I

11:37:31   23     WORKED ON A NUMBER OF DIFFERENT FINANCE ROLES IN OTHER

11:37:34   24     COMPANIES, AND I STARTED MY CAREER IN PUBLIC ACCOUNTING IN

11:37:39   25     LONDON.

SHEPPARD DIRECT BY MS. MAROULIS

11:37:40  1    Q.   DO YOU HAVE ANY ACCOUNTING CERTIFICATIONS?

11:37:43  2    A.   I DO.  I PASSED THE EQUIVALENCY OF THE CPA IN LONDON.  I

11:37:48  3    ALSO HAVE AN M.B.A.

11:37:49  4    Q.   THANK YOU, SIR.  FROM YOUR ROLES AT STA AND SEA, ARE YOU

11:37:54  5    FAMILIAR WITH THE ACCOUNTING SYSTEMS USED BY SAMSUNG

11:37:56  6    TELECOMMUNICATIONS AMERICA AND SEA?

11:37:57  7    A.   YES, I AM.

11:37:59  8         IN MY ROLE, I WAS RESPONSIBLE FOR IMPLEMENTING S.A.P.,

11:38:03  9    WHICH IS OUR FINANCIAL ACCOUNTING DATABASE IN 2009.

11:38:08  10   Q.   AND ARE YOU FAMILIAR WITH THE ACCOUNTING STANDARDS USED BY

11:38:11  11   THOSE TWO COMPANIES.

11:38:14  12   A.   YES.  SAMSUNG TELECOMMUNICATIONS AMERICA ADOPTED IFRS,

11:38:18  13   WHICH IS THE INTERNATIONAL FINANCIAL REPORTING STANDARDS

11:38:20  14   ACCOUNTING SYSTEM.  IT'S A GLOBAL STANDARD.

11:38:22  15   Q.   WHAT IS THE RELATIONSHIP WITH THAT STANDARD TO GAAP,

11:38:28  16   G-A-A-P?

11:38:28  17   A.   THERE'S A U.S. GAAP, IT'S VERY, VERY SIMILAR.  THERE ARE

11:38:33  18   RELATIVELY MINOR DIFFERENCES BETWEEN THE STANDARDS.  ONE IS

11:38:37  19   USED IN THE U.S. AND IFRS IS USED IN OTHER COUNTRIES.

11:38:42  20   Q.   CAN YOU BRIEFLY EXPLAIN TO US WHAT INFORMATION IS

11:38:44  21   MAINTAINED IN THE S.A.P. ACCOUNTING SYSTEM?

11:38:47  22   A.   ALL OF SAMSUNG'S FINANCIAL TRANSACTIONS AND INFORMATION,

11:38:49  23   BUT THERE ARE THINGS LIKE SALES, COSTS, EXPENSES, PRODUCT

11:38:54  24   LEVEL, FINANCIAL INFORMATION.

11:38:55  25   Q.   IS THE S.A.P. DATABASE MAINTAINED IN THE ORDINARY COURSE

11:38:58   1    OF BUSINESS?

11:38:59   2    A.   IT IS.  IT'S UPDATED AND USED EACH DAY, EACH HOUR, EACH

11:39:03   3    MINUTE.

11:39:04   4    Q.   WHAT STEPS ARE TAKEN TO MAKE SURE THE S.A.P. SYSTEM IS

11:39:10   5    ACCURATE?

11:39:10   6    A.   SO THERE ARE A NUMBER OF STEPS, BUT THERE ARE INTERNAL

11:39:15   7    PROCESSES AND CHECKS USED, FOLLOWED BY MY ACCOUNTING TEAM AT

11:39:19   8    THE TIME.

11:39:19   9         BUT ALSO SAMSUNG HAS AN EXTERNAL AUDIT WHICH IS PERFORMED

11:39:24  10    BY PRICEWATERHOUSECOOPERS WHICH CHECKS THE UNDERLYING DATABASE

11:39:28  11    RECORDS AND SYSTEMS TO CHECK THE ACCURACY AND INTEGRITY OF THE

11:39:32  12    PROCESSES AND SYSTEMS.

11:39:33  13    Q.   THANK YOU, MR. SHEPPARD.

11:39:35  14         CAN YOU PLEASE TURN TO DX 753 IN YOUR BINDER.

11:39:44  15         DO YOU RECOGNIZE THIS DOCUMENT AS SAMSUNG'S AUDITED

11:39:48  16    FINANCIAL STATEMENTS?

11:39:49  17    A.   IT IS.  IT IS THE AUDITED FINANCIAL STATEMENTS FOR 2011

11:39:53  18    AND 2010.

11:39:54  19    Q.   IS THIS DOCUMENT PUBLICLY AVAILABLE?

11:39:56  20    A.   IT IS.

11:39:57  21    Q.   AND HAS DX 753 BEEN AUDITED?

11:40:01  22    A.   IT HAS.  IT'S BEEN AUDITED BY PRICEWATERHOUSECOOPERS, ONE

11:40:05  23    OF THE BIG FOUR GLOBAL ACCOUNTING FIRMS.

11:40:08  24         MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT DX 753 INTO

11:40:11  25    EVIDENCE.

SHEPPARD DIRECT BY MS. MAROULIS

11:40:12   1          THE COURT:  ANY OBJECTION?

11:40:13   2          MS. WIGMORE:  NO OBJECTION.

11:40:14   3          THE COURT:  IT'S ADMITTED.

11:40:15   4      (DEFENDANTS' EXHIBIT 753 WAS ADMITTED IN EVIDENCE.)

11:40:16   5          THE COURT:  GO AHEAD, PLEASE.

11:40:18   6   BY MS. MAROULIS:

11:40:19   7   Q.   SIR, IF YOU LOOK AT PAGE 4 OF THIS DOCUMENT, IT APPEARS

11:40:22   8   ON -- IT'S PAGE 4 ON THE BOTTOM, BUT IT'S ACTUALLY PAGE NUMBER

11:40:25   9   5 IN YOUR BINDER.

11:40:27  10        WHAT INFORMATION IS DEPICTED AT DX 753.005?

11:40:32  11   A.   THIS SHOWS THE PROFIT AND LOSS FOR SAMSUNG FOR THE YEARS

11:40:34  12   2011 AND 2010.

11:40:38  13   Q.   WHAT WERE SAMSUNG'S CONSOLIDATED OPERATING PROFIT MARGIN

11:40:44  14   IN 2011?

11:40:45  15   A.   IN 2011, THE MARGIN WAS APPROXIMATELY 10 PERCENT.

11:40:49  16   Q.   AND HOW WAS THAT DERIVED?

11:40:51  17   A.   I TAKE THE OPERATING PROFIT IN THE MIDDLE, DIVIDE IT INTO

11:40:55  18   THE TOTAL REVENUE NUMBER AT THE TOP OF THE SCREEN.

11:40:57  19   Q.   CAN YOU GIVE US SOME EXAMPLES OF EXPENSES THAT WOULD BE

11:41:01  20   ACCOUNTED FOR IN ARRIVING AT THE OPERATING PROFIT SHOWN HERE?

11:41:05  21   A.   YES.

11:41:06  22          MS. WIGMORE:  YOUR HONOR, OBJECTION.  WE HAVE AN HPO

11:41:08  23   RULING THAT HE MAY ONLY TESTIFY ABOUT THE ACCOUNTING FOR SEA

11:41:12  24   AND SAMSUNG TELECOMMUNICATIONS AMERICA.  SO THERE SHOULD BE

11:41:14  25   CLARIFICATION HE'S NOT TESTIFYING ABOUT THE ACCOUNTING OF SEC

11:41:17  1      PURSUANT TO YOUR RULING.

11:41:19  2              THE COURT:  SUSTAINED.

11:41:20  3              MS. MAROULIS:  THAT IS CORRECT, YOUR HONOR.  THE

11:41:21  4      WITNESS'S TESTIMONY IS ONLY TO SEA AND SAMSUNG

11:41:24  5      TELECOMMUNICATIONS AMERICA.

11:41:25  6              THE COURT:  IF YOU WOULD MAKE THAT CLEAR IN YOUR

11:41:27  7      QUESTION, PLEASE.  THANK YOU.

11:41:28  8              MS. MAROULIS:  OKAY.

11:41:29  9      Q.  CAN YOU GIVE US SOME EXAMPLES OF SAMSUNG

11:41:31  10     TELECOMMUNICATIONS AMERICA AND SEA, OR SEA AT THE TIME EXPENSES

11:41:34  11     THAT WOULD BE ACCOUNTED FOR IN ARRIVING AT THE OPERATING

11:41:36  12     PROFITS SHOWN HERE?

11:41:37  13     A.  THE KIND OF EXPENSES WOULD BE THE COSTS OF MAKING,

11:41:45  14     PURCHASING, FINISHING AND COMPLETION OF ASSEMBLY OF THE PHONES;

11:41:50  15     COMPLETING OUR SOFTWARE UPGRADES ON THE PHONES; SELLING, TAKING

11:41:54  16     ORDERS FROM CUSTOMERS; MARKETING, BILLBOARD, TV COMMERCIALS,

11:42:00  17     THAT KIND OF STUFF; THE GENERAL PROCESSES FOR BILLING

11:42:04  18     CUSTOMERS, COLLECTING THE PAYMENTS FROM THOSE CUSTOMERS.

11:42:06  19     Q.  THOSE ARE JUST EXAMPLES; RIGHT?

11:42:09  20     A.  THOSE ARE JUST EXAMPLES.

11:42:11  21     Q.  ARE THERE OTHERS?

11:42:12  22     A.  YES, WE COULD TALK FOR MANY HOURS.

11:42:14  23     Q.  IF YOU COULD PLEASE TURN TO PAGE DX 753.076 IN YOUR

11:42:19  24     BINDER.

11:42:20  25              WHAT IS SHOWN IN PARAGRAPH 31?

SHEPPARD DIRECT BY MS. MAROULIS

11:42:21   1    A.   I'M SORRY.  CAN YOU SAY THAT AGAIN, 753?

11:42:26   2    Q.   SURE.  IT'S PAGE 76 ON THE TOP OF THE DOCUMENT.

11:42:31   3    A.   THIS SHOWS THE, THE SEGMENTAL REPORTING FOR THE COMPANY,

11:42:38   4    AND IT SHOWS THE PROFIT AND LOSS FOR THE -- THE PROFIT -- THE

11:42:42   5    OPERATING PROFIT AND REVENUE FOR THE TELECOMMUNICATION BUSINESS

11:42:47   6    IN 2011, 2010.

11:42:50   7    Q.   WHAT ARE THE OPERATING PROFIT MARGIN FOR SAMSUNG

11:42:52   8    TELECOMMUNICATIONS AMERICA FOR THE SEGMENT IN 2011?

11:42:54   9    A.   THE PROFIT HERE IS APPROXIMATELY 15 PERCENT.

11:43:04  10    Q.   SO THE OPERATING PROFIT MARGIN IS 15, AROUND 15 PERCENT IN

11:43:10  11    2011.

11:43:12  12         IF YOU LOOK AT THE PAGE 77 IN YOUR BINDER, WHAT WAS THE

11:43:14  13    OPERATING PROFIT MARGIN FOR SAMSUNG TELECOMMUNICATIONS AMERICA

11:43:17  14    IN THE PREVIOUS YEAR, 2010?

11:43:19  15    A.   OH, APPROXIMATELY 10 PERCENT.

11:43:21  16    Q.   OKAY.  WHAT IS THE HISTORICAL AVERAGE PROFIT MARGIN FOR

11:43:24  17    THE TELECOMMUNICATIONS SEGMENT?

11:43:26  18    A.   APPROXIMATELY 10 TO 12 PERCENT.

11:43:28  19    Q.   OKAY.  PLEASE TURN BACK TO PAGE 5 WE LOOKED AT A MINUTE

11:43:34  20    AGO.

11:43:34  21         CAN YOU TELL US HOW MUCH SAMSUNG SPENT ON RESEARCH AND

11:43:38  22    DEVELOPMENT IN 2010?  I'M REFERRING TO SAMSUNG

11:43:41  23    TELECOMMUNICATIONS AMERICA.

11:43:50  24         MS. WIGMORE:  I'LL OBJECT, YOUR HONOR.  I DON'T SEE

11:43:53  25    SAMSUNG TELECOMMUNICATIONS AMERICA REFERRED TO HERE.  IT'S

11:43:56  1    SAMSUNG ELECTRONICS.

11:43:57  2              THE COURT:  YOU NEED TO SPEAK MORE LOUDLY.  I CAN'T

11:43:59  3    HEAR YOU.

11:43:59  4              MS. WIGMORE:  THIS IS THE SAME OBJECTION.  THE

11:44:01  5    DOCUMENT DOES NOT RELATE TO SAMSUNG TELECOMMUNICATIONS AMERICA

11:44:02  6    SPECIFICALLY.

11:44:04  7              THE COURT:  SUSTAINED.

11:44:04  8              MS. MAROULIS:  I'LL WITHDRAW THE QUESTION, YOUR

11:44:06  9    HONOR.  THANK YOU.

11:44:07 10    Q.  SIR, CAN YOU PLEASE LOOK AT DEMONSTRATIVE EXHIBIT SDX

11:44:11 11    1500.  AND LOOK AT DX 1501.

11:44:18 12        ARE THESE EXAMPLES OF THE TYPICAL OPERATING EXPENSES THAT

11:44:21 13    SAMSUNG TELECOMMUNICATIONS AMERICA INCURRED IN SELLING

11:44:24 14    SMARTPHONES?

11:44:24 15    A.  YES, THEY ARE.

11:44:25 16    Q.  CAN YOU PLEASE WALK US THROUGH THESE EXPENSES.

11:44:28 17    A.  SURE.  SO THE -- STARTING FROM THE TOP TO BOTTOM, THE

11:44:31 18    FIRST LINE IS ABOUT THE COST OF DELIVERING THE PRODUCTS,

11:44:35 19    STORING IN THE WAREHOUSE AND ACTUALLY DELIVERING THEM TO

11:44:38 20    CUSTOMERS.

11:44:39 21        THE NEXT ONE TALKS ABOUT SEASONALITY OF HIRING STAFF TO

11:44:43 22    SUPPORT VARIANCES IN THE BUSINESS.

11:44:45 23        THE NEXT TALKS ABOUT GENERAL INSURANCE THAT'S REQUIRED TO

11:44:49 24    ENSURE THE PRODUCT ARRIVED SAFELY, STORED IN THE WAREHOUSE, AND

11:44:53 25    DELIVERED SAFELY ON THE TRUCKS USED.

11:44:55  1      AND THEN THERE ARE DIFFERENT EXPENSES AROUND THE SALES

11:44:58  2   TEAM FOR TAKING ORDERS, PROCESSING ORDERS.

11:45:03  3      ON THE BOTTOM PART OF THE SPREADSHEET, IT TALKS ABOUT

11:45:06  4   GENERAL ADMINISTRATION EXPENSE, G AND A EXPENSE.

11:45:10  5      HERE WE HAVE THE COST OF INVOICING THE CUSTOMERS.

11:45:17  6   Q.   MR. SHEPPARD, LET'S SPEAK A LITTLE BIT SLOWER SO THE

11:45:19  7   REPORTERS CAN GET YOUR INFORMATION.  THANK YOU.

11:45:21  8   A.   I'M SORRY.

11:45:23  9      SO YEAH, IT'S THE COST OF INVOICING CUSTOMERS, THE COST OF

11:45:26 10   CALLING AND COLLECTING ON THE PAYMENTS, ON THE PAYMENTS DUE AND

11:45:29 11   THOSE KIND OF THINGS.

11:45:31 12      THOSE ARE THE GENERAL ACTIVITIES.

11:45:32 13   Q.   CAN YOU GIVE ME SOME EXAMPLES OF THE SALES EXPENSES THAT

11:45:35 14   SAMSUNG TELECOMMUNICATIONS AMERICA INCURRED IN SELLING THE

11:45:37 15   PRODUCTS AT ISSUE IN THIS TRIAL?

11:45:38 16   A.   I THINK I COVERED THAT.  BUT TYPICALLY EXPENSES FROM THE

11:45:42 17   SALES TEAM ARE TO WORK WITH THE CUSTOMERS TO TAKE THE ORDERS,

11:45:47 18   PLAN THE MARKETING EXPENSES, DETERMINE WHAT THE RIGHT STRATEGY

11:45:52 19   IS FOR MARKETING PRODUCTS AT ISSUE.

11:45:54 20   Q.   OKAY.  SIR, ARE ALL THESE EXPENSES NECESSARY TO CREATE AND

11:45:59 21   SELL THE PRODUCT?

11:46:00 22   A.   ABSOLUTELY, YES.

11:46:01 23   Q.   OKAY.  NOW, LET'S TALK ABOUT EXPENSES A LITTLE BIT MORE.

11:46:07 24      WOULD SAMSUNG TELECOMMUNICATIONS AMERICA ALLOCATE EXPENSES

11:46:09 25   IN THE ORDINARY COURSE OF BUSINESS?

SHEPPARD DIRECT BY MS. MAROULIS

11:46:12  1    A.   YES.  THAT WAS ONE OF MY ROLES AS THE VICE PRESIDENT OF

11:46:15  2    FINANCE TO ENSURE THE NUMBERS WOULD INCLUDE ALLOCATION.

11:46:21  3    Q.   AND HOW DOES SAMSUNG TELECOMMUNICATIONS AMERICA GO ABOUT

11:46:22  4    ALLOCATING EXPENSES?

11:46:24  5    A.   IF WE TAKE THE EXAMPLES HERE THAT WE JUST TALKED THROUGH,

11:46:28  6    THE FIRST ONE IS THE COST OF DELIVERING THE PRODUCT, TYPICALLY

11:46:31  7    A TRUCK TAKING MULTIPLE PRODUCTS AND THE COST OF THAT TRUCK

11:46:35  8    WOULD BE ALLOCATED ACROSS THOSE PRODUCTS.

11:46:38  9         THE NEXT EXAMPLE WOULD BE THE SALES TEAM THAT MAY SUPPORT

11:46:41  10   A TYPICAL LARGE ACCOUNT, LIKE AT&T, WOULD SUPPORT MULTIPLE

11:46:45  11   PRODUCTS THAT WOULD BE SOLD INTO AT&T, AND THOSE COSTS WOULD BE

11:46:49  12   ALLOCATED ACROSS THOSE PRODUCTS.

11:46:52  13        AND IF I TAKE THE THIRD EXAMPLE I MENTIONED BEFORE, THE

11:46:54  14   COST OF BILLING, THERE WAS ONE TEAM THAT INVOICES ALL CUSTOMERS

11:46:58  15   FOR ALL THAT ACTIVITY AND THE COSTS WOULD BE ALLOCATED ACROSS

11:47:01  16   THOSE PRODUCTS.

11:47:02  17   Q.   OKAY.  IS THIS METHODOLOGY, THIS THREE STEP PROCESS YOU

11:47:05  18   DESCRIBED, COMMON PRACTICE FOR ACCOUNTANTS?

11:47:07  19   A.   IT IS.  IT'S STUDIED IN ACCOUNTING SCHOOL.  I STUDIED IT

11:47:12  20   AS PART OF MY EDUCATION, AND I BELIEVE IT'S STILL A REQUIREMENT

11:47:15  21   IN THE CPA EXAM.

11:47:23  22   Q.   SIR, WHAT WOULD BE THE ALTERNATIVE TO ALLOCATING EXPENSES

11:47:29  23   TO VARIOUS COST CENTERS FOR A COMPANY LIKE SAMSUNG

11:47:32  24   TELECOMMUNICATIONS AMERICA?

11:47:33  25   A.   I'M NOT AWARE OF ONE.  I THINK THAT'S WHY IT'S A

11:47:37   1     REQUIREMENT.

11:47:38   2         IF YOU DIDN'T ALLOCATE, I DON'T THINK YOU'D KNOW YOUR

11:47:41   3   PROFITABILITY ON YOUR PRODUCTS.  YOU WOULDN'T KNOW HOW TO CHART

11:47:44   4   THE PRODUCTS.  YOU WOULDN'T KNOW IF YOU WERE MAKING GOOD

11:47:47   5   BUSINESS DECISIONS.

11:47:48   6   Q.   AND, SIR, IS THE ALLOCATION METHODOLOGY YOU APPLIED ALSO

11:47:52   7   APPLIED COMPANYWIDE?

11:47:53   8   A.   IT IS.

11:47:54   9         MS. WIGMORE:  OBJECTION, YOUR HONOR.

11:47:56  10         MS. MAROULIS:  YOUR HONOR, THIS QUESTION WAS

11:47:57  11   PERMITTED --

11:47:58  12         THE COURT:  SUSTAINED.  IT NEEDS TO BE CLEAR BY

11:48:00  13   WHICH -- THERE ARE MULTIPLE ENTITIES HERE, SO IT NEEDS TO BE

11:48:04  14   CLEAR.

11:48:04  15       GO AHEAD, PLEASE.

11:48:05  16         MS. MAROULIS:  THANK YOU, YOUR HONOR.

11:48:06  17   Q.   SIR, CAN YOU PLEASE TAKE A LOOK AT EXHIBIT DX 676 THAT'S

11:48:13  18   IN YOUR BINDER.

11:48:20  19       DO YOU RECOGNIZE WHAT EXHIBIT DX 676 IS?

11:48:23  20   A.   I DO.

11:48:26  21   Q.   CAN YOU PLEASE DESCRIBE IT?

11:48:28  22   A.   SURE.  IT IS A REPORT THAT SHOWS REVENUE, QUANTITY OF

11:48:34  23   UNITS, COSTS, PROFIT FOR INDIVIDUAL PRODUCTS FROM THE PERIOD

11:48:43  24   MAY 2010 THROUGH JUNE 2012.

11:48:48  25         MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT DX 676 INTO

11:48:51   1   EVIDENCE.

11:48:52   2           MS. WIGMORE:  NO OBJECTION SUBJECT TO THE LIMITATION

11:48:54   3   OF YOUR HONOR'S RULING ABOUT THE SCOPE OF HIS TESTIMONY

11:48:56   4   REGARDING THE DOCUMENT.

11:48:57   5           THE COURT:  THAT'S FINE.  IT'S ADMITTED.

11:48:59   6       (DEFENDANTS' EXHIBIT 676 WAS ADMITTED IN EVIDENCE.)

11:48:59   7           THE COURT:  GO AHEAD, PLEASE.

11:49:01   8           MR. KOTARSKI:  IS THIS CONFIDENTIAL?

11:49:03   9           MS. MAROULIS:  NO.  THIS WAS ADMITTED IN OPEN COURT

11:49:05   10  BEFORE.

11:49:05   11  Q.   FOCUSSING ON THE PORTION OF DX 676 THAT RELATES TO SAMSUNG

11:49:10   12  TELECOMMUNICATIONS AMERICA, CAN YOU PLEASE DESCRIBE FOR ME WHAT

11:49:12   13  INFORMATION IS SHOWN HERE?

11:49:13   14  A.   YES.  SO IT SHOWS THE -- SO IF WE TAKE THE FIRST COLUMN,

11:49:20   15  IT SHOWS THE QUANTITY OF UNITS SOLD, THE SALES PRICE, COST OF

11:49:26   16  GOODS SOLD, WHICH IS THE COST OF THE PRODUCTS AND THE COST OF

11:49:32   17  IMPORTING PRODUCTS, AND THEN IT SHOWS THE GENERAL

11:49:37   18  ADMINISTRATION COSTS WE TALKED ABOUT, THE COSTS OF INVOICING,

11:49:41   19  THE COSTS OF BILLING.

11:49:42   20      AND THEN THE COSTS BELOW THAT ARE THE SALES EXPENSES, IT

11:49:46   21  SHOWS THE COST OF THE SALES TEAM, THE COST OF SHIPPING

11:49:48   22  PRODUCTS, THE COST OF THE DIFFERENT STAFF AS WE TALKED ABOUT

11:49:52   23  BEFORE.

11:49:52   24  Q.   DID THIS SPREADSHEET COME FROM THE AUDITED S.A.P.

11:49:57   25  DATABASE?

SHEPPARD DIRECT BY MS. MAROULIS

11:49:57   1    A.   YES, IT DID.

11:49:59   2    Q.   ARE ANY OF THE SAMSUNG TELECOMMUNICATIONS AMERICA EXPENSES

11:50:03   3    IN THIS EXHIBIT, DX 676, ALLOCATED?

11:50:07   4    A.   YES.   THIS IS -- THIS SPREADSHEET COMES FROM THE S.A.P.

11:50:11   5    MODULE AFTER THE ALLOCATION PROCESS I REFERRED TO HAS BEEN

11:50:16   6    PERFORMED.

11:50:17   7    Q.   SIR, WHAT WAS YOUR INVOLVEMENT IN PREPARING THE STA DATA

11:50:20   8    IN THIS EXHIBIT?

11:50:21   9    A.   I -- IN MY ROLE AT THAT TIME AS VICE PRESIDENT OF FINANCE,

11:50:26   10   I WAS RESPONSIBLE FOR WORKING WITH THE HEADQUARTERS TEAM TO

11:50:29   11   PRODUCE THIS DATA.

11:50:30   12   Q.   DID YOU DO ANYTHING TO VERIFY THE ACCURACY OF THE SAMSUNG

11:50:34   13   TELECOMMUNICATIONS AMERICA INFORMATION ON THIS SPREADSHEET,

11:50:38   14   DX 676?

11:50:38   15   A.   I DID.   THERE WAS A FINANCIAL TEAM THAT PRODUCED THE

11:50:41   16   INFORMATION.   I HAD A SEPARATE TEAM CHECK THE INFORMATION, I

11:50:45   17   PUT MY AUDITOR'S HAT ON AND ASKED THEM TO RE-VERIFY THAT THE

11:50:50   18   DATA WAS PULLED DIRECTLY FROM S.A.P., AND THEN I PERSONALLY

11:50:54   19   CHECKED THAT THE DATA WAS CORRECTLY PRESENTED IN THE

11:50:56   20   SPREADSHEET.

11:50:57   21   Q.   AND, AGAIN, ARE THE EXPENSES PRESENTED IN THE SPREADSHEET,

11:51:00   22   THE SAMSUNG TELECOMMUNICATIONS AMERICA EXPENSES, NECESSARY TO

11:51:02   23   SELL SAMSUNG'S PRODUCTS?

11:51:04   24   A.   ABSOLUTELY, YES.

11:51:05   25   Q.   SIR, YOU MENTIONED EARLIER WHEN WE TALKED ABOUT YOUR

11:51:08   1       TENURE AT SAMSUNG THAT YOU HAD RESPONSIBILITIES FOR THE REPAIR

11:51:12   2       SERVICES AT SAMSUNG TELECOMMUNICATIONS AMERICA.

11:51:14   3           CAN YOU PLEASE DESCRIBE TO THE JURY BRIEFLY WHAT REPAIR

11:51:17   4       SERVICES ENTAIL.

11:51:20   5       A.   YES.  SO AFTER THE SALES TEAM HAS DONE THEIR JOB AND THE

11:51:23   6       MARKETING TEAM HAS MARKETED THE DEVICES, CONSUMERS THEN HAVE

11:51:27   7       DEVICES IN THEIR HAND.

11:51:28   8           MY JOB WAS THEN TO PROVIDE THE CARE THEY NEED IF THEY

11:51:31   9       DAMAGE THE PHONE OR IF THEY NEED HELP USING THE PHONE, THEY

11:51:34  10       WOULD CALL MY TEAM, AND THAT INVOLVED, REQUIRED ME TO SET UP

11:51:38  11       FACTORIES INSIDE THE U.S. THAT WOULD THEN REPAIR PHONES,

11:51:42  12       MILLIONS OF PHONES EACH YEAR.

11:51:44  13       Q.   WHAT IS THE SIZE OF THIS REPAIR PROGRAM YOU'RE DESCRIBING?

11:51:47  14       A.   IN THAT TIMEFRAME, IT WAS FOUR TO FIVE MILLION REPAIRS A

11:51:51  15       YEAR ON GENERAL PHONES.

11:51:52  16           AND THEN FOR BROKEN GLASS, THEN IN THE DIRECTION OF MAYBE

11:51:59  17       A MILLION A YEAR.

11:52:01  18       Q.   I NEED YOU TO BE A LITTLE MORE SPECIFIC.  HOW MANY

11:52:06  19       DIFFERENT COMPONENTS DID SAMSUNG TELECOMMUNICATIONS AMERICA

11:52:08  20       PURCHASE FOR THE REPAIR PROGRAM?

11:52:09  21       A.   SO MY TEAM IS ALSO RESPONSIBLE FOR PURCHASING COMPONENTS,

11:52:13  22       SO AT ANY ONE TIME, WE HAD SOMEWHERE BETWEEN 10- AND 12,000

11:52:17  23       DIFFERENT COMPONENTS IN THE WAREHOUSE I RAN.

11:52:20  24       Q.   WAS WINDOW GLASS ONE OF THOSE COMPONENTS?

11:52:22  25       A.   YES, IT WAS.



11:52:23  1    Q.   WHY WAS WINDOW GLASS ONE OF THE COMPONENTS YOU FOCUSSED

11:52:28  2    ON?

11:52:28  3    A.   SO TO DESCRIBE THIS BRIEFLY, IN ORDER TO REPAIR A PHONE,

11:52:33  4    THE PROCESS WOULD BE TO COMPLETELY DISMANTLE THE PHONE,

11:52:37  5    DETERMINE WHICH INDIVIDUAL COMPONENTS AT THE LOWEST GRANULAR

11:52:40  6    LEVEL NEEDED REPLACEMENT OR REPAIR, AND THEN ONLY CHANGE THAT

11:52:44  7    COMPONENT, REASSEMBLE THE PHONE AND TEST IT, AND THEN YOU WOULD

11:52:48  8    BE COMPLETE WITH THE PROCESS.

11:52:49  9    Q.   DOES REPAIRING THE WINDOW GLASS ENTAIL SEPARATING THE

11:52:55  10   GLASS FROM THE DISPLAY SCREEN?

11:52:57  11   A.   YES, IT DOES.

11:52:58  12   Q.   AND WHERE DOES SAMSUNG TELECOMMUNICATIONS AMERICA PURCHASE

11:53:00  13   THE WINDOW GLASS FROM?

11:53:01  14   A.   FROM HEADQUARTERS, SAMSUNG ELECTRONICS.

11:53:04  15   Q.   DO YOU KNOW WHAT SAMSUNG TELECOMMUNICATIONS AMERICA'S COST

11:53:06  16   IS FOR THE WINDOW GLASS DURING THE 2010, 2012 TIME PERIOD?

11:53:11  17   A.   IT'S APPROXIMATELY $3 TO $5, IN THAT RANGE.

11:53:14  18   Q.   DO YOU KNOW HOW STA ACCOUNTS FOR THE COMPONENTS THAT WERE

11:53:17  19   PURCHASED AS PART OF THIS REPAIR PROGRAM?

11:53:19  20   A.   YES.  SO, AGAIN, SWITCHING BACK TO MY VICE PRESIDENT OF

11:53:24  21   FINANCE ROLE, I KNOW THAT THE TRANSACTIONS WERE ORDERED AT

11:53:28  22   S.A.P., BUT IT WAS SENT FROM HQ TO SAMSUNG TELECOMMUNICATIONS

11:53:31  23   AMERICA.  SAMSUNG TELECOMMUNICATIONS AMERICA WOULD RECEIVE

11:53:32  24   THEM, PUT THEM IN THE WAREHOUSE, AND THEN REPORT THAT

11:53:36  25   TRANSACTION IN S.A.P.

11:53:40   1            MS. MAROULIS:  ONE MINUTE, MR. SHEPPARD.

11:53:42   2            THE COURT:  SURE.

11:53:44   3         (PAUSE IN PROCEEDINGS.)

11:53:46   4   BY MS. MAROULIS:

11:53:56   5   Q.   SIR, LAST QUESTION.  FROM YOUR REVIEW OF THE CONSOLIDATED

11:54:01   6   FINANCIAL MATERIALS FOR SAMSUNG TELECOMMUNICATIONS AMERICA, DO

11:54:02   7   YOU KNOW HOW MANY PATENTS SAMSUNG IS ISSUED ON AN ANNUAL BASIS

11:54:09   8   IN THE UNITED STATES?

11:54:10   9   A.   THE NUMBER IS GROWING EACH YEAR, BUT -- ARE WE TALKING

11:54:15  10   ABOUT TIME PERIOD OR RECENTLY?

11:54:18  11   Q.   LET'S FOCUS ON THE CORRECT TIME PERIOD, WHICH IS 2010 TO

11:54:22  12   2012?

11:54:22  13   A.   I BELIEVE THE NUMBER -- WE TALK ABOUT THIS IN OUR TOWN

11:54:26  14   HALLS ON A REGULAR BASIS, BUT I THINK THE NUMBER IN THIS TIME

11:54:29  15   PERIOD WAS MAYBE 3- TO 4,000.

11:54:31  16   Q.   OKAY.  SIR, LAST QUESTION.  ARE YOU FAMILIAR WITH A PHONE

11:54:35  17   CALLED GALAXY ACE?

11:54:36  18   A.   YES, I AM.

11:54:37  19   Q.   WHAT WAS THE RELEASE DATE FOR THAT PHONE?

11:54:39  20   A.   I THINK IT WAS FEBRUARY 2011.

11:54:43  21            MS. MAROULIS:  THANK YOU VERY MUCH, SIR.  I HAVE NO

11:54:45  22   FURTHER QUESTIONS FOR YOU.

11:54:46  23            THE WITNESS:  THANK YOU.

11:54:47  24            THE COURT:  ALL RIGHT.  THE TIME IS 11:54.

11:55:02  25         DO YOU HAVE A BINDER FOR ME?  OKAY.  THANK YOU.

| | | |
|---|---|---|
| 11:55:12 | 1 | ALL RIGHT.  THE TIME IS 11:55.  GO AHEAD, PLEASE. |
| 11:55:17 | 2 | **CROSS-EXAMINATION** |
| 11:55:17 | 3 | BY MS. WIGMORE: |
| 11:55:18 | 4 | Q.   GOOD MORNING, MR. SHEPPARD.  MY NAME IS AMY WIGMORE. |
| 11:55:21 | 5 | A.   GOOD MORNING. |
| 11:55:22 | 6 | Q.   LET ME START BY DETERMINING WHETHER THERE ARE A FEW THINGS |
| 11:55:24 | 7 | WE CAN AGREE ON. |
| 11:55:25 | 8 | YOU WERE NOT INVOLVED IN DESIGNING ANY OF THE INFRINGING |
| 11:55:29 | 9 | SAMSUNG PHONES; CORRECT? |
| 11:55:30 | 10 | A.   MY ROLE HAS NOT BEEN IN THE DESIGN PART OF THE BUSINESS. |
| 11:55:36 | 11 | Q.   AND YOU ARE NOT HERE TO TELL THE JURY WHAT THE ARTICLES OF |
| 11:55:40 | 12 | MANUFACTURE WERE THAT SAMSUNG APPLIED APPLE'S DESIGNS TO; |
| 11:55:44 | 13 | CORRECT? |
| 11:55:45 | 14 | A.   I'M NOT HERE TO EXPLAIN THE ARTICLE OF MANUFACTURE TO THE |
| 11:55:52 | 15 | BEST OF MY KNOWLEDGE. |
| 11:55:53 | 16 | Q.   AND YOU ARE NOT HERE TO TELL THE JURY THE TOTAL PROFIT |
| 11:55:56 | 17 | SAMSUNG MADE ON THE ARTICLES OF MANUFACTURE TO WHICH SAMSUNG |
| 11:56:02 | 18 | APPLIED THE APPLE DESIGNS; CORRECT? |
| 11:56:04 | 19 | MS. MAROULIS:  OBJECTION, YOUR HONOR.  CALLS FOR |
| 11:56:06 | 20 | EXPERT TESTIMONY. |
| 11:56:07 | 21 | THE COURT:  OVERRULED. |
| 11:56:11 | 22 | THE WITNESS:  I'M SORRY.  CAN YOU REPEAT THAT LAST |
| 11:56:13 | 23 | QUESTION? |
| 11:56:14 | 24 | BY MS. WIGMORE: |
| 11:56:14 | 25 | Q.   YOU ARE NOT HERE TO TESTIFY ABOUT THE TOTAL PROFITS |

11:56:17  1    SAMSUNG MADE ON THE ARTICLES OF MANUFACTURE THAT INFRINGE

11:56:22  2    APPLE'S DESIGNS; CORRECT?

11:56:24  3    A.   WELL, I CAN EXPLAIN COMPONENTS AND COMPONENT PRICES AND

11:56:30  4    COSTS BECAUSE THAT WAS MY BUSINESS AND MY RESPONSIBILITY.  SO

11:56:34  5    IF YOU HAVE QUESTIONS ABOUT COMPONENTS, I'M VERY HAPPY TO

11:56:37  6    EXPLAIN.

11:56:38  7    Q.   MY QUESTION, HOWEVER, WAS ARE YOU HERE TO EXPLAIN THE

11:56:42  8    TOTAL PROFITS SAMSUNG MADE ON THE ARTICLES OF MANUFACTURE THAT

11:56:45  9    INFRINGE APPLE'S PATENTS?

11:56:48  10       DO YOU HAVE THAT NUMBER FOR US HERE TODAY?

11:56:50  11   A.   I'M NOT SURE.

11:56:51  12   Q.   OKAY.  NOW, YOU -- AT THE 2012 TIME PERIOD, YOU WERE THE

11:56:57  13   VICE PRESIDENT FOR FINANCE AND OPERATIONS AT SAMSUNG

11:57:00  14   TELECOMMUNICATIONS AMERICA; CORRECT?

11:57:01  15   A.   AND AS I SAID EARLIER, I ALSO WAS RESPONSIBLE FOR THE

11:57:05  16   REPAIR BUSINESS, AND I ALSO WAS RESPONSIBLE FOR THE LOGISTICS

11:57:09  17   BUSINESS.

11:57:09  18   Q.   AND YOU WERE ONE OF THE MOST SENIOR FINANCE PEOPLE WITHIN

11:57:12  19   SAMSUNG TELECOMMUNICATIONS AMERICA IN THE UNITED STATES;

11:57:14  20   CORRECT?

11:57:14  21   A.   YES, THAT IS CORRECT.

11:57:17  22   Q.   BUT YOU CANNOT TELL THE JURY THE AMOUNT OF UNITS SOLD OF

11:57:22  23   SOMETHING SAMSUNG WOULD DESCRIBE AS THE ARTICLE OF MANUFACTURE

11:57:26  24   IN THIS CASE; CORRECT?

11:57:27  25   A.   IF YOU GIVE ME A -- SO AS I TRIED TO EXPLAIN JUST NOW, IF

11:57:33   1    YOU TELL ME ABOUT A SPECIFIC COMPONENT, I CAN DO MY BEST TO

11:57:37   2    EXPLAIN THE SALES INFORMATION AND THE COSTS AND IT'S ALL IN OUR

11:57:43   3    S.A.P. DATABASE.

11:57:44   4    Q.   OKAY.  NOW, I'M PUTTING BEFORE YOU WHAT'S BEEN MARKED AS

11:57:48   5    JX 5007.  IT'S ALREADY BEEN ADMITTED.

11:57:56   6        DO YOU UNDERSTAND -- MAY I APPROACH THE WITNESS, YOUR

11:57:58   7    HONOR?

11:57:58   8            THE COURT:  GO AHEAD, PLEASE.

11:58:00   9    BY MS. WIGMORE:

11:58:01  10    Q.   THAT THIS FRONT GLASS FACE AND THIS BEZEL HAVE BEEN

11:58:04  11    IDENTIFIED AS ARTICLES OF MANUFACTURE BY SAMSUNG (INDICATING)?

11:58:08  12    A.   I DID NOT KNOW THAT, BUT PLEASE PROCEED.

11:58:11  13    Q.   AND THAT THIS DISPLAY SCREEN HAS ALSO BEEN IDENTIFIED BY

11:58:16  14    SAMSUNG AS AN ARTICLE OF MANUFACTURE (HANDING).

11:58:19  15        ARE YOU AWARE OF THAT?

11:58:20  16    A.   NO, BUT THANK YOU FOR TELLING ME.

11:58:23  17    Q.   YOU CANNOT GIVE US ANY INFORMATION ABOUT THE COSTS OF

11:58:28  18    GOODS SOLD FOR ANY OF THOSE PARTICULAR ITEMS; CORRECT?

11:58:32  19    A.   THANK YOU FOR SHOWING ME THESE.

11:58:34  20        SO LET ME EXPLAIN WHAT I DO KNOW, WHICH IS THIS IS THE

11:58:38  21    FRONT GLASS I JUST TALKED ABOUT THAT'S ABOUT $3 TO $5, AND I

11:58:43  22    KNOW THAT.  I PURCHASE THESE BECAUSE I ACTUALLY SET UP A REPAIR

11:58:49  23    LINE THAT I WAS ABLE TO TAKE THESE, WHEN THE GLASS WAS BROKEN,

11:58:52  24    SEPARATE THEM OUT, AND REASSEMBLE THEM AFTERWARDS.

11:58:56  25    Q.   BUT MY QUESTION IS, WHAT ARE THE COST OF GOODS SOLD FOR

SHEPPARD CROSS BY MS. WIGMORE

11:58:59  1   THAT PARTICULAR ITEM?  YOU DO NOT HAVE THAT INFORMATION;

11:59:02  2   CORRECT?

11:59:02  3   A.   IN WHAT CONTEXT DO YOU MEAN "COST OF GOODS SOLD"?

11:59:05  4   Q.   IT'S NOT MAINTAINED IN SAMSUNG'S, SAMSUNG

11:59:08  5   TELECOMMUNICATIONS AMERICA'S FINANCIAL RECORDS; CORRECT?

11:59:11  6   A.   THIS IS -- YES.  THIS IS A $3 TO $5 ITEM.  I CAN SHOW YOU

11:59:14  7   IN S.A.P. WHERE IT IS.  I CAN LOOK UP THE COMPONENT.

11:59:17  8   Q.   I'M SORRY.  SAMSUNG DID NOT SELL THAT OBJECT DIRECTLY TO

11:59:20  9   CONSUMERS; CORRECT?

11:59:21  10  A.   THE WAY IT WORKS WAS THE CONSUMER WOULD BREAK THEIR PHONE

11:59:25  11  IN ERROR, IN ACCIDENT, WE HOPE, AND THEY WOULD MAKE A CLAIM,

11:59:28  12  THEY COULD CALL SAMSUNG AND WE WOULD REPAIR AND REPLACE THE,

11:59:32  13  THE DISPLAY.

11:59:33  14  Q.   MR. SHEPPARD, DID SAMSUNG SELL THAT PARTICULAR ARTICLE TO

11:59:38  15  CONSUMERS; YES OR NO?

11:59:40  16  A.   YES, IN A ROUNDABOUT KIND OF WAY.

11:59:46  17  Q.   NOW, DID YOU GIVE A DEPOSITION IN THIS CASE IN DECEMBER OF

11:59:48  18  2017?

11:59:49  19  A.   YES, I DID.

11:59:50  20  Q.   COULD YOU TURN, PLEASE, TO TAB 4 IN YOUR BINDER.

11:59:57  21     THAT DEPOSITION WAS GIVEN UNDER OATH; CORRECT?

12:00:00  22  A.   I BELIEVE SO, YES.

12:00:02  23  Q.   AND IF YOU COULD TURN, PLEASE, TO PAGE 55, LINE 20, AND

12:00:07  24  WE'LL HAVE THIS HIGHLIGHTED ON THE SCREEN, PAGE 55, LINE 20

12:00:11  25  THROUGH PAGE 56, LINE 4.

12:00:16   1          NOW, DO YOU RECALL AT YOUR DEPOSITION, YOU WERE SHOWN AN

12:00:19   2    ARTICLE SIMILAR TO WHAT I JUST SHOWED YOU, THE PIECE OF GLASS

12:00:22   3    FROM THE FRONT OF THE PHONE?

12:00:24   4    A.   I'M SORRY.  CAN YOU REPEAT YOUR QUESTION.

12:00:26   5    Q.   YES.  PAGE 55, LINE 20, TO PAGE 56, LINE 4.

12:00:32   6    A.   56?

12:00:37   7    Q.   AND IT'S ON THE SCREEN IF THAT WOULD BE HELPFUL TO YOU,

12:00:40   8    SIR.

12:00:47   9    A.   I'M SORRY.  56, LINE 20?

12:00:49   10   Q.   55, LINE 20.  IT'S ON THE SCREEN AS WELL.

12:00:55   11   A.   OKAY.

12:00:56   12   Q.   AND YOU WERE ASKED IF YOU -- "SO THE ITEM THAT'S THERE IN

12:01:01   13   THE BOX FOR D'710, THE SPRINT GALAXY S II EPIC 4G TOUCH, DID

12:01:09   14   YOU EVER SELL THAT -- SAMSUNG TELECOMMUNICATIONS AMERICA, DID

12:01:11   15   IT EVER SELL IT TO CONSUMERS?  APART FROM THIS RECLAMATION

12:01:15   16   PROCESS, DID IT EVER SELL IT TO CONSUMERS?

12:01:18   17        "ANSWER:  TO THE BEST OF MY KNOWLEDGE, NO SCREENS WERE

12:01:20   18   EVER SOLD DIRECT TO CONSUMERS, BUT WE DID SELL THE SERVICE TO

12:01:26   19   CARRIERS, TO THE MAIN CARRIERS LIKE SPRINT, T-MOBILE, AND

12:01:29   20   AT&T."

12:01:29   21        DID YOU GIVE THAT ANSWER IN YOUR DEPOSITION?

12:01:31   22   A.   YES, THAT'S WHAT I TRIED TO EXPLAIN TO YOU JUST NOW.  IF

12:01:34   23   THE CONSUMER BROKE THEIR PHONE, THEY WOULD CALL 1-800 SAMSUNG,

12:01:39   24   AND WE PROVIDED THE SERVICE TO MAKE THE REPAIR.

12:01:41   25   Q.   YOU SOLD SERVICE, BUT NOT THE SCREENS IN PARTICULAR;

12:01:43   1    CORRECT?

12:01:44   2    A.   WELL, THE ANALOGY I USED, THIS IS LIKE REPAIRING A

12:01:48   3    WINDSHIELD.  YOU COULD BUY GLASS AND CHANGE YOUR WINDSHIELD

12:01:52   4    YOURSELF, BUT MOST PEOPLE WOULD BUY THE SERVICE TO GET THE

12:01:54   5    COMBINED RESULT, WHICH IS A WORKING WINDSHIELD AGAIN.

12:01:57   6    Q.   SO THE ANSWER TO MY QUESTION IS YES; CORRECT?

12:01:59   7    A.   THE ANSWER IS THE CONSUMER WOULD MAKE AN INSURANCE CLAIM

12:02:03   8    TO THE CARRIER, THE CARRIER WOULD TAKE THE REPAIR, THE CARRIER

12:02:08   9    WOULD THEN COME TO US AND WE PROVIDE THE SERVICE TO MAKE THE

12:02:11   10   REPAIR, WHICH WAS A COMBINATION OF A GLASS SCREEN AND THE

12:02:17   11   SERVICE PHYSICAL WORK TO CHANGE THEIR PIECE OF GLASS OUT.

12:02:21   12   Q.   SO YOU DON'T HAVE SPECIFIC FINANCIAL INFORMATION ABOUT THE

12:02:24   13   SALE OF THE SCREEN ITSELF?  YOU HAD TO COMBINE IT WITH THE

12:02:27   14   SERVICE TO DETERMINE THE AMOUNT; CORRECT?

12:02:33   15   A.   THAT WAS THE OPERATION AT THAT TIME, YES.

12:02:35   16   Q.   AND YOU DON'T KNOW WHAT SAMSUNG'S PROFITS ARE FOR JUST

12:02:39   17   THAT DISPLAY SCREEN I SHOWED YOU?  IF YOU COULD HOLD THAT UP?

12:02:42   18   A.   WHICH DISPLAY SCREEN?

12:02:44   19   Q.   I'LL SHOW YOU IT.

12:02:45   20   A.   THIS ONE (INDICATING)?

12:02:46   21   Q.   YES.  YOU DO NOT HAVE INFORMATION ABOUT THE PROFITS FOR

12:02:49   22   THE SALE OF THAT ITEM IN PARTICULAR; CORRECT?

12:02:51   23   A.   WELL, AGAIN, THIS COMES BACK TO THE SAME SERVICE

12:02:53   24   DISCUSSION.

12:02:54   25        IF SOMEONE SENT IN THESE TWO COMPONENTS, THESE TWO

12:03:01  1    SEPARATES SEPARATELY AND SAID I NEED YOU TO REPAIR THIS, WE

12:03:05  2    WOULD MAKE THE DETERMINATION, DO YOU NEED TO REPAIR THIS OR DO

12:03:07  3    YOU NEED TO REPAIR THIS, AND DEPENDING ON WHAT THE ACTUAL

12:03:10  4    UNDERLYING ISSUE WAS, WE WOULD RESOLVE IT IN THE CHARGE.

12:03:14  5    Q.   AND THE CHARGE WOULD BE COMBINED FOR SERVICE AND ANY PARTS

12:03:17  6    THAT MIGHT BE INCLUDED IN THE SERVICE; CORRECT?

12:03:19  7    A.   THAT IS CORRECT.

12:03:20  8    Q.   OKAY.  NOW, YOU TESTIFIED ABOUT EXHIBIT PX 676.  DX 676,

12:03:30  9    EXCUSE ME.  IF WE COULD PUT THAT ON THE SCREEN.

12:03:32  10        NOW, YOU'RE HERE, SIR, TO TESTIFY ABOUT THE FINANCIALS FOR

12:03:36  11   SAMSUNG TELECOMMUNICATIONS AMERICA, WHICH BECAME SEA; CORRECT?

12:03:45  12   A.   THAT IS CORRECT.

12:03:45  13   Q.   YOU WERE NOT HERE TO TESTIFY ABOUT THE FINANCIALS OF

12:03:48  14   SAMSUNG ELECTRONICS CORPORATION; CORRECT?

12:03:50  15   A.   THAT'S CORRECT.

12:03:51  16   Q.   AND THIS EXHIBIT, 676, THE TOP HALF, IF WE COULD JUST

12:03:56  17   EXPAND THAT ONE PAGE, IS THE INFORMATION FOR SAMSUNG

12:04:00  18   TELECOMMUNICATIONS AMERICA; CORRECT?

12:04:01  19   A.   IT IS.

12:04:02  20        MS. WIGMORE:  AND IF I MAY APPROACH, YOUR HONOR?

12:04:04  21        THE COURT:  GO AHEAD, PLEASE.

12:04:05  22   BY MS. WIGMORE:

12:04:07  23   Q.   SAMSUNG TELECOMMUNICATIONS AMERICA IS INDICATED UP THERE

12:04:08  24   AT THE TOP, AND THEN THERE ARE COSTS FOR EACH OF THE INFRINGING

12:04:12  25   PHONES IN THIS CASE THAT SAMSUNG TELECOMMUNICATIONS AMERICA

12:04:13  1    INCURRED; CORRECT?

12:04:14  2    A.   PLEASE PROCEED.

12:04:19  3    Q.   AND IF WE COULD LOOK AT THE LINE FOR MARKETING, AND IF WE

12:04:22  4    COULD STRETCH THAT OUT, MR. LEE.

12:04:25  5         THE MARKETING COSTS INCURRED BY SAMSUNG TELECOMMUNICATIONS

12:04:28  6    AMERICA FOR THE INFRINGING PHONES, THAT LINE IS COMPLETELY

12:04:31  7    BLANK; CORRECT?

12:04:32  8    A.   IT ACTUALLY SHOWS IN THE BOTTOM PART OF THE SPREADSHEET

12:04:37  9    BECAUSE HQ REIMBURSES SAMSUNG TELECOMMUNICATIONS AMERICA FOR

12:04:40  10   THOSE COSTS THAT ARE INCURRED.

12:04:42  11   Q.   THE BOTTOM PART OF THE SPREADSHEET IS FOR SEC, ISN'T IT,

12:04:47  12   SIR?

12:04:47  13   A.   THAT PART IS NOT, NO.  BUT YOU ASKED ME NOT TO TESTIFY

12:04:50  14   ABOUT THAT.

12:04:51  15   Q.   RIGHT.  SO TO THE EXTENT -- THERE'S NO MARKETING COSTS IN

12:04:54  16   THE SAMSUNG TELECOMMUNICATIONS AMERICA PART OF THIS

12:04:56  17   SPREADSHEET; CORRECT?

12:04:57  18   A.   THE PROCESS WAS -- AND YOU'VE ASKED ME -- APPLE HAS ASKED

12:05:02  19   ME IN DEPOSITION ABOUT THIS.

12:05:04  20        THE PROCESS IS THAT SAMSUNG TELECOMMUNICATIONS AMERICA

12:05:06  21   INCURS THE EXPENSES, AND THE SEC, AS PART OF OUR TRANSFER IN

12:05:11  22   PRICING AGREEMENT, REIMBURSES FULLY FOR THAT WORK.

12:05:14  23   Q.   YOU'RE NOT HERE TO TESTIFY ABOUT SEC.  I WANT YOU TO

12:05:17  24   TESTIFY AS SAMSUNG TELECOMMUNICATIONS AMERICA AS HER HONOR HAS

12:05:20  25   INSTRUCTED.

12:05:21  1      THE LINE FOR SAMSUNG TELECOMMUNICATIONS AMERICA THERE HAS

12:05:23  2  NOTHING IN IT FOR MARKETING.  CAN YOU ANSWER THAT YES OR NO.

12:05:26  3  A.   I'M ANSWERING YOUR QUESTION.  I'M TRYING TO GIVE YOU THE

12:05:29  4  BEST ANSWER FOR WHY THE EXPENSES ARE INCURRED.  EVERYONE KNOWS

12:05:33  5  MARKETING HAPPENS IN THE U.S. MARKET.  I'M TELLING YOU HOW THE

12:05:36  6  ACTUAL MECHANISM IS BY HOW THAT STUFF GETS PROCESSED.

12:05:39  7      THE COURT:  IT'S 12:05.  LET'S GO AHEAD AND TAKE OUR

12:05:43  8  LUNCH BREAK TO -- LET'S TAKE IT TO 1:10, PLEASE.

12:05:49  9      DO NOT RESEARCH OR DISCUSS THE CASE.  THANK YOU FOR YOUR

12:05:52  10  PATIENCE AND YOUR SERVICE.  WE'LL SEE YOU BACK AT 1:10.

12:05:55  11      AND YOU MAY STEP DOWN DURING THE LUNCH BREAK.  GO AHEAD,

12:05:58  12  PLEASE.  YOU CAN STEP DOWN NOW.

12:06:00  13      THE COURT:  MR. SHEPPARD, YOU CAN LEAVE, AND IF YOU

12:06:03  14  CAN PLEASE LEAVE THE COURTROOM.

12:06:08  15      MS. MAROULIS:  YOUR HONOR, MAY I ADDRESS SOMETHING

12:06:10  16  BRIEFLY ONCE THE WITNESS EXITS?

12:06:13  17      THE COURT:  I HAVE AN ISSUE, TOO.  YOU CHANGED THE

12:06:15  18  WITNESS LIST AT 11:30, SO --

12:06:18  19      MS. MAROULIS:  YES, YOUR HONOR.  SO I CAN ADDRESS

12:06:19  20  THAT, TOO.

12:06:20  21      THE COURT:  OKAY.  CAN WE JUST WAIT.

12:06:23  22      MS. MAROULIS:  SORRY.

12:06:23  23      THE COURT:  OKAY.

12:06:24  24      MS. MAROULIS:  WOULD YOU LIKE ME TO ADDRESS THE

12:06:26  25  WITNESSES FIRST OR THE -- THIS ISSUE?  THE ISSUE I WANTED TO

12:06:30   1      ADDRESS --

12:06:30   2              THE COURT:  WHY DID YOU CHANGE YOUR WITNESS LIST AT

12:06:32   3      11:30?  THE WHOLE POINT OF THE ROLLING LIST IS TO TRY TO GIVE

12:06:36   4      FAIR NOTICE TO THE OTHER SIDE.

12:06:39   5              MS. MAROULIS:  YOUR HONOR, WE DIDN'T CHANGE IT.  WE

12:06:41   6      DELETED TWO WITNESSES BECAUSE WE NEED TO SAVE TIME FOR EXPERT

12:06:44   7      REBUTTALS, AND I NOTIFIED MR. LEE AND MR. SABRI YESTERDAY THAT

12:06:48   8      I ONLY NEEDED ONE OF THE WITNESSES, MR. HAN, TO AUTHENTICATE

12:06:52   9      THE COST OF BOM.

12:06:53  10          I ASKED MR. SABRI WHETHER THEY WOULD BE WILLING TO

12:06:56  11      STIPULATE TO ADMISSION AND NOT HAVE THE WITNESS AT THAT TIME.

12:06:59  12      AT THAT TIME HE WASN'T ABLE TO GIVE ME YES OR NO ANSWER BECAUSE

12:07:02  13      HE HADN'T SEEN THE TESTIMONY.  THAT INFORMATION CAME IN THROUGH

12:07:06  14      MR. DONGWOOK KIM SO WE DID NOT CALL MR. KIM, AND I DID NOTIFY

12:07:10  15      THAT.  AND WE DIDN'T CALL ANOTHER WITNESS BECAUSE WE WANTED TO

12:07:13  16      SAVE TIME.

12:07:13  17              THE COURT:  WELL, THE WITNESS LIST YOU FILED LAST

12:07:15  18      NIGHT SAYS YOU'RE GOING TO CALL MR. HAN AND MR. DENISON.

12:07:19  19          IS MR. DENISON NO LONGER BEING CALLED EITHER.

12:07:22  20              MS. MAROULIS:  THEY'RE NOT COMING.

12:07:23  21              THE COURT:  WHEN DID YOU GIVE NOTICE THAT YOU WEREN'T

12:07:26  22      GOING TO CALL MR. DENISON, WHEN YOU FILED YOUR AMENDED LIST AT

12:07:29  23      11:30 TODAY WHILE WE'RE IN TRIAL?

12:07:31  24              MS. MAROULIS:  YES, YOUR HONOR.  WE -- WE TALKED TO

12:07:33  25      APPLE PREVIOUSLY IN THE CONTEXT OF INTERPRETERS, AND WE

12:07:37  1    EXPLAINED THAT WE MAY BE CALLING FEWER WITNESSES AT ONE POINT

12:07:40  2    BECAUSE WE ARE GOING SECOND FROM APPLE, AND WE NEEDED TO

12:07:44  3    RESPOND TO WHAT THEY BROUGHT UP, AND WE GOT EVIDENCE IN FROM

12:07:48  4    OTHER WITNESSES SO WE WOULD BE NOT CALLING SOME WITNESSES

12:07:50  5    POTENTIALLY.

12:07:51  6            MR. LEE:  YOUR HONOR, WE'VE CALLED EVERY -- WHEN WE

12:07:54  7    GAVE OUR ROLLING WITNESS LIST, WE'VE CALLED EVERYBODY IN THE

12:07:58  8    ORDER WE'VE GIVEN IT.

12:07:59  9        THERE'S A LOT GOING ON TO GET THIS CASE DONE BY TOMORROW.

12:08:02  10   WE HAD PEOPLE WORKING ALL NIGHT ON THE CLOSINGS, AND WE HAD

12:08:06  11   PEOPLE WORKING ALL NIGHT TO PREPARE FOR TWO WITNESSES.

12:08:08  12   MR. DENISON WAS MINE.

12:08:10  13       THE FIRST TIME WE KNEW WAS ABOUT 11:45 TODAY.  IT'S JUST

12:08:15  14   NOT A FAIR WAY FOR THE RAILROAD TO RUN.

12:08:17  15           THE COURT:  BUT WHAT DO I DO?

12:08:20  16           MS. MAROULIS:  YOUR HONOR, I SPECIFICALLY -- AS TO

12:08:22  17   MR. HAN, I SPECIFICALLY HAD A CONVERSATION YESTERDAY AT 4:30 --

12:08:25  18           THE COURT:  WHEN DID YOU TELL APPLE YOU WEREN'T

12:08:27  19   CALLING MR. DENISON?  I JUST -- YOU KNOW, YOU CAN PLAY THESE

12:08:31  20   GAMES IF YOU FEEL LIKE IT'S NECESSARY FOR YOUR CASE, I GUESS

12:08:34  21   YOU DO, BUT IT JUST IS UNFORTUNATE.

12:08:36  22       WE'RE TRYING TO GIVE PEOPLE NOTICE AND TO BE, WHILE IN THE

12:08:38  23   MIDDLE OF TRIAL CHANGING WITNESSES, DROPPING WITNESSES, IT'S

12:08:41  24   UNFORTUNATE.  BUT I DON'T THINK THERE'S ANYTHING TO DO ABOUT

12:08:44  25   IT.  SO, I MEAN, UNLESS -- WHAT DO YOU THINK?  I THINK THERE'S

1    NOTHING THAT CAN BE DONE.

2           MR. LEE:  WELL, YOUR HONOR, IT MAY BE, IF WE COULD

3    CONFER OVER LUNCH, IF I COULD CONFER WITH MY FOLKS AT LUNCH,

4    THERE MAY BE SOMETHING THAT SHOULD BE DONE WITH THE TIME.

5    THESE ARE TWO WITNESSES THAT WE ALLOCATED TIME TO AS WE

6    PREPARED.  WE ALLOCATED ABOUT 20 MINUTES OF OUR TIME TO

7    CROSS-EXAMINE -- 15 MINUTES OF OUR TIME CROSS-EXAMINATION THEM

8    IN TOTAL.

9           BUT IT'S JUST -- I MEAN, I GUESS I WOULD ASK IS

10   MR. DENISON EVEN IN THE JURISDICTION?

11           MS. MAROULIS:  HE WAS.

12           MR. LEE:  WHEN DID HE LEAVE?

13           MS. MAROULIS:  THIS MORNING.

14           YOUR HONOR, WE'RE NOT PLAYING ANY GAMES.  WE HAVE A COUPLE

15   OF TRANSLATED WITNESSES.  WE NEEDED TO PUT THEM ON.  THEY TOOK

16   LONGER THAN WE EXPECTED BECAUSE IT TAKES TIME TO TRANSLATE.

17           THE COURT:  BUT WHAT TIME DID MR. DENISON LEAVE?  I

18   WANT HIS PLANE TICKET FILED.  I WANT TO SEE WHAT TIME DID HE

19   LEAVE.  I WANT HIS BOARDING PASS.  I WANT TO KNOW, WHEN DID HE

20   LEAVE?  BECAUSE IF YOU KNEW IN ADVANCE YOU WERE NOT GOING TO

21   CALL HIM AND YOU STILL PUT HIM ON THE LIST ANYWAY AND WE DO ALL

22   THESE HIGH PRIORITY OBJECTIONS AS TO HIS TESTIMONY AND HE'S

23   JUST NOT EVER GOING TO BE CALLED, THERE'S PROBABLY NOTHING THAT

24   CAN BE DONE ABOUT IT, BUT I WANT TO KNOW WHAT KIND OF GAMES ARE

25   BEING PLAYED.

12:09:59   1          I THINK THERE'S NO REMEDY, BUT I'D LIKE TO KNOW.

12:10:03   2          SO I WANT TO KNOW WHEN MR. HAN AND MR. DENISON, I WANT TO

12:10:06   3   SEE THEIR PLANE TICKETS, WHEN DID THEY -- WHEN WAS IT PURCHASED

12:10:09   4   FOR THEM TO LEAVE?  I ASSUME THEY'RE BOTH GONE NOW, OR MR. HAN

12:10:13   5   IS STILL HERE.

12:10:13   6          MS. MAROULIS:  YOUR HONOR, MR. HAN MIGHT BE HERE.

12:10:16   7   BUT I SPECIFICALLY TOLD MR. LEE, AND I HOPE HE CONFIRMED, THAT

12:10:19   8   I ONLY NEEDED MR. HAN -- AFTER THE COURT SUSTAINED CERTAIN

12:10:22   9   OBJECTIONS TO EXHIBITS, I SAID TO THEM --

12:10:25  10          THE COURT:  I WANT TO KNOW WHEN MR. DENISON LEFT.

12:10:26  11   WHAT TIME DID HE LEAVE?  WHAT TIME WAS HIS FLIGHT?

12:10:29  12          MS. MAROULIS:  I DON'T KNOW, YOUR HONOR.

12:10:30  13          THE COURT:  WAS IT BEFORE YOU FILED THE NEW LIST AT

12:10:32  14   11:30 SAYING HE'S NOT COMING.  I WANT TO SEE WHEN, WHEN WAS THE

12:10:36  15   TICKET PURCHASED?  HAS HE LEFT, IN FACT, OR IS HE STILL HERE?

12:10:39  16          MS. MAROULIS:  I WOULD NEED TO CHECK, YOUR HONOR.  I

12:10:41  17   WAS HERE AT THE PODIUM THIS WHOLE MORNING.

12:10:43  18          THE COURT:  AS WERE WE ALL, AND YOUR WITNESSES ARE

12:10:45  19   BEING DROPPED WHILE WE'RE IN THE MIDDLE OF TRIAL.

12:10:48  20          ANYWAY, I'D LIKE TO KNOW WHEN HIS TICKET WAS PURCHASED AND

12:10:51  21   WHEN HE LEFT.  OKAY?  AND WHAT HIS FLIGHT WAS TO LEAVE.

12:10:55  22          MS. MAROULIS:  OKAY, YOUR HONOR.

12:10:56  23          THE COURT:  ALL RIGHT.  WHAT'S THE OTHER -- WHAT'S

12:10:58  24   THE OTHER ISSUE?  SO YOU'RE NOT CALLING THEM AT ALL, SO I'LL GO

12:11:02  25   AHEAD AND STRIKE THOSE TWO; CORRECT?

12:11:04   1          MS. MAROULIS:  YOUR HONOR --

12:11:05   2          THE COURT:  WHEN CAN YOU SEND ME -- I WANT THE

12:11:07   3   DENISON STUFF DURING LUNCH.  CAN YOU FILE THAT.

12:11:11   4          MS. MAROULIS:  I'LL LOOK INTO IT.  IF I'M INCORRECT,

12:11:13   5   I'LL LET YOU KNOW.  BECAUSE I PRESUME HE DID ONCE THE LIST WAS

12:11:16   6   FILED, BUT I NEED TO DOUBLE-CHECK THAT.

12:11:18   7          THE COURT:  OKAY.  ALL RIGHT.  WELL, I'D LIKE TO SEE

12:11:20   8   HIS PLANE TICKET, WHEN IT WAS -- WHERE IS HE COMING FROM?

12:11:23   9   WHERE IS HE FROM?

12:11:24  10          MS. MAROULIS:  HE'S FROM TEKSLER.

12:11:25  11          THE COURT:  OKAY.  SO WHEN IT WAS PURCHASED AND WHAT

12:11:27  12   TIME THE FLIGHT WAS SUPPOSED TO LEAVE, PLEASE.  AND WHETHER

12:11:30  13   HE'S STILL HERE.  PERHAPS HE'S STILL HERE.

12:11:32  14      OKAY.  SO WHAT IS THE OTHER ISSUE?

12:11:37  15          MS. MAROULIS:  YOUR HONOR, IN 2013 TRIAL, WE EXAMINED

12:11:39  16   MR. SHEPPARD, AND HE WAS PERMITTED TO ANSWER ONE SPECIFIC

12:11:41  17   QUESTION, AND I REPEATED THAT QUESTION VERBATIM AND YOUR HONOR

12:11:44  18   SUSTAINED THAT.  I DIDN'T WANT TO GO IN FRONT OF THE JURY TO

12:11:47  19   THE FACT THAT THERE WAS A PRIOR TRIAL WHEN MR. SHEPPARD

12:11:50  20   TESTIFIED.

12:11:50  21          THE COURT:  OKAY.  CAN YOU GIVE ME THE CITE, AND I'LL

12:11:53  22   LOOK IT UP DURING THE LUNCH, PLEASE.

12:11:56  23          MS. MAROULIS:  YES, YOUR HONOR.  IT'S DOCKET 2842.

12:11:58  24          THE COURT:  OKAY.

12:11:59  25          MS. MAROULIS:  AND IT'S 15TH OF NOVEMBER 2013, AND

12:12:01  1    THE PAGE IS 967, AND THE LINES ARE 12 THROUGH 17.

12:12:12  2         THE COURT:  OKAY.  SO IT'S DOCKET NUMBER 2842, PAGE

12:12:17  3    967, LINES 12 THROUGH 17.

12:12:21  4         MS. MAROULIS:  CORRECT, YOUR HONOR.

12:12:22  5         THE COURT:  OKAY.  I WILL TAKE A LOOK AT THAT.

12:12:24  6      AND WHAT WAS THE QUESTION -- LET ME SEE IF I CAN --

12:12:28  7         MS. MAROULIS:  I CAN READ IT FOR YOUR HONOR FOR THE

12:12:32  8    RECORD.

12:12:33  9         THE COURT:  -- FIND IT HERE.

12:12:34  10        MS. MAROULIS:  MY QUESTION WAS HOPEFULLY THE SAME AS

12:12:37  11   IN THE TRANSCRIPT.  I'M READING FROM THE TRANSCRIPT.  IT SAYS,

12:12:40  12   "DO OTHER PARTS OF SAMSUNG USE THE SAME EXPENSE ALLOCATION

12:12:47  13   METHODOLOGY AS THE ONE YOU JUST DESCRIBED?"

12:12:51  14     AND THE ANSWER WAS:  "YES, THEY DO."

12:12:54  15        THE COURT:  I'M SORRY.  IS THAT THE QUESTION TODAY?

12:12:56  16        MS. MAROULIS:  NO, THAT WAS THE QUESTION FROM THE

12:12:58  17   TRIAL.

12:12:58  18        THE COURT:  OKAY.  I WILL LOOK THAT UP.

12:13:00  19        MS. MAROULIS:  WOULD IT BE HELPFUL TO READ FROM MY

12:13:02  20   OUTLINE, YOUR HONOR?

12:13:03  21        THE COURT:  IT JUST MIGHT HELP FIND IT IN THE

12:13:05  22   TRANSCRIPT.  IF YOU WOULD, PLEASE.

12:13:14  23        MS. MAROULIS:  SO THE QUESTION TODAY WAS --

12:13:15  24        THE COURT:  CAN YOU LOOK UP "METHODOLOGY"?  IS THAT

12:13:18  25   SEARCHABLE?

12:13:19   1          MS. MAROULIS:  "ALLOCATION METHODOLOGY" SHOULD BE THE

12:13:22   2    KEY WORDS.

12:13:24   3          THE COURT:  IT IS APPORTIONMENT METHODOLOGY?

12:13:27   4          MS. MAROULIS:  "ALLOCATION METHODOLOGY"?

12:13:29   5          THE REPORTER:  ONE SECOND.

12:13:31   6          THE COURT:  IF IT WAS MY MISTAKE, I'LL LET YOU ASK

12:13:34   7    HIM IN REDIRECT.

12:13:35   8          THE REPORTER:  I HAVE IT.

12:13:37   9          THE COURT:  YOU ACTUALLY WANT TO SEE THE WHOLE

12:13:39  10    CONTEXT.  I THOUGHT THIS TESTIMONY WAS REALLY UNCLEAR.

12:13:44  11          THE REPORTER:  IT'S AT 11:47:48.

12:13:47  12          THE COURT:  I'M SORRY.

12:13:48  13          THE REPORTER:  11:47:48.

12:13:51  14          THE COURT:  11:47:48.  OKAY.  I WILL TAKE A LOOK AT

12:13:59  15    THAT.  IF THAT'S MY MISTAKE, I WILL ALLOW YOU TO CORRECT IT.

12:14:02  16    OKAY.

12:14:03  17          MS. WIGMORE:  YOUR HONOR, MAY I BE HEARD BRIEFLY ON

12:14:05  18    THIS POINT.

12:14:05  19          THE COURT:  WHAT IS THAT?

12:14:06  20          MS. WIGMORE:  THIS HAS BEEN THE SUBJECT OF REPEATED

12:14:08  21    RULINGS, NOT JUST THAT QUESTION, BUT THE ONES THAT PRECEDED IT.

12:14:12  22       AND MS. MAROULIS ASKED -- HE IS NOT PERMITTED TO TESTIFY

12:14:14  23    ABOUT THE ACCOUNTING OF SEC, AND THEY'VE BEEN TRYING TO DO THAT

12:14:19  24    THROUGH VARIOUS EXHIBITS AND QUESTIONS.  SO WE'D JUST ASK THAT

12:14:22  25    THEY BE HELD TO THE COURT'S RULING THAT WAS MADE BOTH ON THE

```
12:14:25   1   HIGH PRIORITY OBJECTIONS AND PREVIOUSLY.

12:14:28   2        MS. MAROULIS:  YOUR HONOR, I'M ONLY ASKING TO REPEAT

12:14:31   3   THE SAME EXACT QUESTION AS IN THE PRIOR TRIAL IF THAT WOULD BE

12:14:34   4   OKAY.

12:14:35   5        MS. WIGMORE:  I THINK THE CONTEXT OF THE QUESTION IS

12:14:36   6   IMPORTANT, AND WHEN IT'S BEING ASKED ABOUT DOCUMENTS WHERE HE

12:14:40   7   DOES NOT HAVE THE ABILITY TO TESTIFY ABOUT SEC, THAT'S A

12:14:43   8   VIOLATION OF YOUR HONOR'S RULING.

12:14:56   9        MS. MAROULIS:  YOUR HONOR, MY SCRIPT WAS VIRTUALLY

12:14:58  10   IDENTICAL TO THE 2013 TRIAL.

12:15:00  11        THE COURT:  OKAY.  WAS THERE AN OBJECTION BY APPLE IN

12:15:04  12   THAT CASE?

12:15:04  13        MS. MAROULIS:  THERE WAS, BUT IT WAS OVERRULED.

12:15:06  14        MS. WIGMORE:  AS TO THAT PARTICULAR QUESTION?

12:15:08  15        MS. MAROULIS:  YEAH.

12:15:09  16        THE COURT:  ALL RIGHT.  LET'S ALL TAKE A LOOK AT IT

12:15:11  17   OVER THE LUNCH BREAK.  WHAT ELSE?  IS THERE ANYTHING ELSE?

12:15:13  18        MR. LEE:  YOUR HONOR, I APOLOGIZE.  COULD I VERY

12:15:16  19   BRIEFLY ADDRESS AN ISSUE AT THE SIDE-BAR WITH YOU?

12:15:18  20        THE COURT:  WHAT'S THAT?

12:15:19  21        MR. LEE:  IT'S AN ISSUE AS TO SOMETHING I'D LIKE THE

12:15:22  22   JURORS TO BE INSTRUCTED ON, BUT IF I COULD DO IT AT THE

12:15:26  23   SIDE-BAR, I APPRECIATE IT.  IT WOULD BE VERY BRIEF.

12:15:29  24        THE COURT:  OKAY.

12:15:39  25        (SIDE-BAR DISCUSSION ON THE RECORD.)
```

12:15:40  1          MR. LEE:  THE REASON I DON'T WANT TO ADDRESS IT

12:15:41  2    PUBLICLY IS IT'S BECAUSE OF THE PRESS.

12:15:43  3          BUT SAMSUNG HAS JUST RELEASED A NEWS AD THAT'S A MINUTE

12:15:47  4    LONG THAT'S ALL ABOUT CRITICIZING APPLE FOR THE BATTERY

12:15:53  5    THROTTLING ISSUE.

12:15:53  6          IT'S SO OUT OF TIME THAT, IN FACT, THE COMMENTATORS ARE

12:15:57  7    SAYING, WHY IS IT BEING RELEASED NOW?  AND WHY IS IT SO LONG?

12:16:01  8          AND AT SOME POINT I MAY ASK FOR DISCOVERY ON WHY, BUT I

12:16:05  9    THINK IF YOUR HONOR, WHEN YOU DO YOUR ADMONITION TONIGHT ABOUT

12:16:07  10   NOT TALKING TO ANYBODY, IF YOU COULD INCLUDE, YOU KNOW, NOT

12:16:10  11   LOOKING AT EITHER PARTY'S ADVERTISEMENTS OR ANYTHING LIKE THAT.

12:16:13  12   I MEAN, IT'S JUST -- THIS IS A PRETTY GOOD AD.

12:16:18  13         BUT THE TIMING IS NOT A COINCIDENCE, AND, IN FACT, THIS

12:16:22  14   ENTIRE ARTICLE IS ABOUT WHY WOULD THEY RELEASE IT NOW, A

12:16:27  15   ONE MINUTE LONG ADVERTISEMENT, OR SOMETHING THAT HAPPENS MONTHS

12:16:32  16   AGO.

12:16:33  17         I HAVE A SUSPICION, BUT THE ONLY THING I WOULD ASK IS THAT

12:16:36  18   YOUR HONOR, WHEN YOU ADMONISH THEM TONIGHT NOT TO BE TALKING TO

12:16:39  19   EACH OTHER, BUT THEY SHOULD ALSO NOT BE LOOKING AT NEWS

12:16:43  20   STORIES, LOOKING AT ADS, BECAUSE --

12:16:45  21         THE COURT:  I THINK THEY ALREADY KNOW THEY'RE NOT

12:16:47  22   SUPPOSED TO BE LOOKING AT ANYTHING RELATING TO THE CASE.

12:16:50  23         MR. LEE:  OR ANYTHING THAT RELATES TO THE PARTIES, I

12:16:52  24   THINK.

12:16:52  25         THE COURT:  OKAY.  I CAN ADD THAT.  ANY OBJECTION TO

```
12:16:55   1        THAT?

12:16:58   2                    MR. QUINN:  NO OBJECTION.

12:17:02   3                    MR. LEE:  THANK YOU, YOUR HONOR.

12:17:02   4                    THE COURT:  OKAY.

12:17:05   5           (END OF DISCUSSION AT SIDE-BAR.)

12:17:05   6                    THE COURT:  THEN I WILL TAKE A LOOK AT THIS.  IF IT'S

12:17:08   7        MY MISTAKE, I WILL HAVE YOU CORRECT THAT -- OR ALLOW TO YOU DO

12:17:14   8        THAT DURING THE REDIRECT.

12:17:20   9            AND I DO WANT TO KNOW ABOUT MR. DENISON.

12:17:23  10                    MS. MAROULIS:  THANK YOU, YOUR HONOR.  WE'LL CHECK

12:17:25  11        THAT.

12:17:25  12                    THE COURT:  PLEASE FILE IT.  THANK YOU.

12:17:27  13                    THE CLERK:  COURT'S IN RECESS.

12:18:10  14           (THE LUNCH RECESS WAS TAKEN FROM 12:18 P.M. UNTIL 1:09

12:18:10  15        P.M.)

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

| | | |
|---|---|---|
| 12:18:10 | 1 | **AFTERNOON SESSION** |
| 01:09:27 | 2 | (JURY OUT AT 1:09 P.M.) |
| 01:09:27 | 3 | THE COURT:  SO SINCE MR. LUCENTE IS COMING NEXT, I |
| 01:09:30 | 4 | WANTED TO GIVE YOU THE RULING ON APPLE'S REQUEST TO INTRODUCE |
| 01:09:38 | 5 | THE WILLFULNESS VERDICT.  THAT REQUEST IS DENIED. |
| 01:09:40 | 6 | THE PROBATIVE VALUE IS MINIMAL SINCE THERE'S NO KNOWLEDGE |
| 01:09:43 | 7 | REQUIREMENT, THAT REQUIREMENT WAS SPECIFICALLY REMOVED IN THE |
| 01:09:49 | 8 | 1952 PATENT ACT.  SO THE PROBATIVE VALUE IS LOW AND THE |
| 01:09:52 | 9 | PREJUDICIAL VALUING IS HIGH, SO I'M GOING TO EXCLUDE THAT. |
| 01:09:56 | 10 | AND THEN WITH REGARD TO THE QUESTION, MS. MAROULIS IS |
| 01:10:03 | 11 | CORRECT THAT ONE QUESTION AND ANSWER WAS ALLOWED, IT WAS NOT |
| 01:10:05 | 12 | OBJECTED TO DURING THE 2013 TRIAL.  IT SHOULD HAVE BEEN.  IT |
| 01:10:13 | 13 | WAS EXCLUDABLE SINCE MR. SHEPPARD HAS NO PERSONAL KNOWLEDGE OF |
| 01:10:16 | 14 | SEC FINANCES, BUT I WILL ALLOW THAT QUESTION, AND I WILL NOT |
| 01:10:19 | 15 | CHARGE HER TIME FOR THAT QUESTION AND ANSWER. |
| 01:10:22 | 16 | MS. MAROULIS:  THANK YOU, YOUR HONOR.  MAY I PREVIEW, |
| 01:10:24 | 17 | I'LL SAY DO OTHER PARTS OF SAMSUNG USE THE SAME ALLOCATION |
| 01:10:28 | 18 | METHODOLOGY AS THE ONE YOU JUST DESCRIBED ON DIRECT? |
| 01:10:32 | 19 | THE COURT:  THAT'S FINE.  NOW, IF YOU HAVE ANY OTHER |
| 01:10:33 | 20 | QUESTIONS BEYOND, THAT I WILL START CHARGING YOU TIME, BUT NOT |
| 01:10:36 | 21 | FOR THAT QUESTION AND ANSWER. |
| 01:10:38 | 22 | MS. MAROULIS:  OKAY. |
| 01:10:39 | 23 | MR. LEE:  YOUR HONOR, AS TO THE FIRST, WE MAY ASK |
| 01:10:41 | 24 | THAT ADDITIONAL ISSUES MAY ARISE WITH MR. LUCENTE AND |
| 01:10:45 | 25 | MR. WAGNER.  IF THE DOOR GETS OPENED WIDER, I MAY COME BACK. |

01:10:49   1          THE COURT:  THINGS CHANGE.  BUT AT THIS TIME HAVING

01:10:52   2    GONE BACK AND LOOKED AT EVERYTHING, I STILL THINK THE

01:10:54   3    PREJUDICIAL VALUE WOULD BE TOO HIGH.  OKAY?

01:10:58   4          ALL RIGHT.  SO LET'S BRING IN OUR JURY, PLEASE.

01:11:22   5          MR. SHEPPARD, YOU MAY GO AHEAD AND HAVE A SEAT, PLEASE.

01:11:26   6          (JURY IN AT 1:11 P.M.)

01:11:35   7          THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

01:11:38   8    SEAT.

01:11:38   9          TIME IS 1:11.  GO AHEAD, PLEASE.

01:11:41  10    BY MS. WIGMORE:

01:11:41  11    Q.    MR. SHEPPARD, AS OF 2012, TO THE BEST OF YOUR KNOWLEDGE,

01:11:48  12    THERE WAS NOT A STANDARD REPORT THAT ALLOCATES R&D ACTIVITY TO

01:11:52  13    PARTICULAR DEVICES; CORRECT?

01:11:55  14    A.    THE -- LET ME -- YES, THERE WOULD HAVE BEEN AS PART OF THE

01:12:05  15    MONTHLY CLOSE PROCESS, THE MONTHLY CLOSE PROCESS TO ALLOCATE,

01:12:12  16    WHICH I'M RESPONSIBLE FOR, THERE WAS A PROCESS TO ALLOCATE R&D

01:12:16  17    EXPENSES TO INDIVIDUAL PRODUCTS.

01:12:18  18    Q.    TO PARTICULAR SAMSUNG PHONES?

01:12:20  19    A.    ALL PRODUCTS THAT SAMSUNG MAKES.

01:12:24  20    Q.    COULD WE HAVE MR. SHEPPARD'S DEPOSITION FROM

01:12:27  21    FEBRUARY 29TH, 2012, LYON 132 -- PAGE 132, LINE 13 TO 18.

01:12:33  22          I'M JUST GOING TO READ THAT TO YOU.

01:12:37  23          "I'M ASKING YOU --"

01:12:38  24          MS. MAROULIS:  MAY I JUST HAVE A MINUTE TO FIND THE

01:12:41  25    DEPOSITION?

01:12:41  1            THE COURT:  THAT'S FINE.

01:12:42  2            MS. MAROULIS:  COUNSEL, REPEAT THE PAGE NUMBERS,

01:12:44  3      PLEASE.

01:12:44  4            MS. WIGMORE:  PAGE 132, LINE 13 TO 18.

01:12:49  5         "I'M ASKING YOU WHETHER SAMSUNG TELECOMMUNICATIONS AMERICA

01:12:51  6      DOES HAVE A NUMBER REFLECTING THE AMOUNT OF H & D THAT IT

01:12:54  7      INCURRED TO DEVELOP ANY OF THE PRODUCTS IN EXHIBIT 1919?

01:12:58  8         "ANSWER:  TO THE BEST OF MY KNOWLEDGE, THERE ISN'T A

01:13:00  9      STANDARD REPORT WE RUN TODAY THAT TRIES TO ALLOCATE THE R&D

01:13:04  10     ACTIVITY TO THESE DEVICES."

01:13:07  11     Q.   DID YOU GIVE THAT TESTIMONY, SIR?

01:13:09  12     A.   THANK YOU -- WHICH DAY WAS THIS?  WHICH DEPOSITION?

01:13:13  13     Q.   FEBRUARY OF 2012?

01:13:14  14     A.   WHICH ONE.

01:13:15  15     Q.   FEBRUARY 29TH OF 2012.

01:13:19  16     A.   OKAY.  SO I DON'T RECALL THIS EXACT DISCUSSION, BUT I DO

01:13:26  17     REMEMBER EXPLAINING GENERAL ALLOCATION.

01:13:28  18     Q.   OKAY.  LET'S MOVE ON TO THE NEXT QUESTION.

01:13:30  19     A.   NO, NO, THIS IS IMPORTANT.  YOU ASKED ME --

01:13:33  20     Q.   SIR, YOU NEED YOU TO ANSWER MY QUESTIONS AND NOT -- YOUR

01:13:36  21     COUNSEL CAN COME UP AND ASK SOME FURTHER QUESTIONS?

01:13:38  22     A.   SURE.

01:13:39  23     Q.   SO YOU'VE NOT TRIED TO CALCULATE THE DIRECT COSTS

01:13:42  24     ASSOCIATED WITH A PARTICULAR MODEL OF THE SAMSUNG PHONE;

01:13:45  25     CORRECT?

01:13:46  1        A.   CAN YOU ASK ME THAT QUESTION.

01:13:51  2        Q.   YOU HAVE NOT TRIED TO CALCULATE THE DIRECT COSTS

01:13:54  3   ASSOCIATED WITH A PARTICULAR MODEL OF THE SAMSUNG PHONE;

01:13:58  4   CORRECT?

01:13:58  5             MS. MAROULIS:  OBJECTION.  CALLS FOR EXPERT

01:14:00  6   TESTIMONY.

01:14:00  7             THE COURT:  OVERRULED.

01:14:02  8        YOU MAY ANSWER.

01:14:03  9             THE WITNESS:  THANK YOU.

01:14:05  10       YOU HAVE TO CLARIFY WHAT YOU MEAN BY "DIRECT COSTS.  "I

01:14:08  11  DON'T KNOW WHAT THAT EXPRESSION MEANS FOR YOU.

01:14:10  12            MS. WIGMORE:  COULD WE BRING UP MR. SHEPPARD'S

01:14:13  13  TESTIMONY FROM MARCH 30TH OF 2012 AT PAGE 81, LINES 8 THROUGH

01:14:16  14  15.

01:14:17  15            "QUESTION:  OKAY.  IF I WANT TO CALCULATE THE DIRECT

01:14:20  16  COSTS, NOT THE ALLOCATED COSTS, BUT THE DIRECT COSTS ASSOCIATED

01:14:24  17  WITH A PARTICULAR MODEL OF SAMSUNG PHONE, HOW WOULD I DO THAT?

01:14:29  18            "THE WITNESS:  I'M NOT SURE.  I DON'T THINK WE'VE TRIED TO

01:14:33  19  DO THAT."

01:14:35  20       Q.   THAT WAS YOUR TESTIMONY, WASN'T IT, SIR?

01:14:36  21       A.   BUT AS I EXPLAINED AT THAT TIME, RECALLING FROM THIS SMALL

01:14:40  22  EXCERPT OF THAT PARTICULAR LONG DAY --

01:14:42  23       Q.   WAS THAT TRUE WHEN YOU GAVE THAT TESTIMONY, SIR?

01:14:44  24       A.   I'M ASKING THE SAME QUESTION THAT YOU JUST ASKED ME, AND I

01:14:48  25  JUST TRIED TO EXPLAIN THIS NOW.

01:14:50   1         YOUR DEFINITION OF "DIRECT," I DON'T KNOW WHAT THAT MEANS

01:14:53   2    FOR YOU.  I CAN EXPLAIN THE ALLOCATION PROCESS, WHICH I DID.

01:14:57   3         MS. WIGMORE:  NO FURTHER QUESTIONS.  THANK YOU.

01:14:59   4         THE COURT:  ALL RIGHT.  TIME IS 1:14.

01:15:01   5    GO AHEAD, PLEASE.

01:15:02   6                    **REDIRECT EXAMINATION**

01:15:04   7    BY MS. MAROULIS:

01:15:04   8    Q.   MR. SHEPPARD, I HAVE ONLY ONE QUESTION FOR YOU.  DO OTHER

01:15:07   9    PARTS OF SAMSUNG USE THE SAME EXPENSE ALLOCATION METHODOLOGY AS

01:15:12   10   THE ONE YOU JUST DESCRIBED ON DIRECT EXAMINATION?

01:15:14   11   A.   YES, THEY DO.

01:15:15   12        MS. MAROULIS:  THANK YOU, SIR.  NO FURTHER QUESTIONS.

01:15:17   13        THE COURT:  NO TIME WAS ALLOCATED TO THAT.

01:15:20   14   ALL RIGHT.  MAY THIS WITNESS BE EXCUSED.  AND IS IT

01:15:23   15   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

01:15:24   16        MS. MAROULIS:  NOT SUBJECT TO RECALL.

01:15:27   17        THE COURT:  DO YOU AGREE WITH THAT, MS. WIGMORE?

01:15:29   18        MS. WIGMORE:  I AGREE.

01:15:30   19        THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

01:15:32   20   TRIAL TESTIMONY, AND YOU MAY STEP DOWN.

01:15:33   21        THE WITNESS:  THANK YOU VERY MUCH.

01:15:34   22        THE COURT:  ALL RIGHT.  AND PLEASE HAVE YOUR NEXT

01:15:36   23   WITNESS COME, AND WE'LL JUST PUT THESE AWAY.

01:15:38   24        MR. QUINN:  YOUR HONOR, SAMSUNG CALLS AS ITS NEXT

01:15:59   25   WITNESS SAM LUCENTE.

01:16:00   1          THE COURT:  ALL RIGHT.  PLEASE COME FORWARD, SIR.

01:16:09   2          THE CLERK:  IF YOU CAN STAND AND RAISE YOUR RIGHT

01:16:14   3   HAND FOR ME.

01:16:15   4      **(DEFENDANTS' WITNESS, SAM LUCENTE, WAS SWORN.)**

01:16:16   5          THE WITNESS:  I DO.

01:16:20   6          THE CLERK:  THANK YOU.  PLEASE BE SEATED.  AND ONCE

01:16:22   7   SEATED, PLEASE STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

01:16:25   8          THE WITNESS:  SAM, S-A-M, LUCENTE, L-U-C-E-N-T-E.

01:16:33   9          THE COURT:  ALL RIGHT.  TIME IS 1:16.

01:16:36  10      GO AHEAD, PLEASE.

01:16:37  11                         **DIRECT EXAMINATION**

01:16:37  12   BY MR. QUINN:

01:16:38  13   Q.   GOOD AFTERNOON, MR. LUCENTE.

01:16:40  14   A.   GOOD AFTERNOON.

01:16:40  15   Q.   WHAT DO YOU DO FOR A LIVING?

01:16:43  16   A.   I AM AN INDUSTRIAL DESIGNER AND A USER INTERFACE DESIGNER.

01:16:47  17   Q.   HOW LONG HAVE YOU BEEN A DESIGNER?

01:16:49  18   A.   FOR OVER 30 YEARS.

01:16:51  19   Q.   HAVE YOU EVER TESTIFIED IN COURT BEFORE?

01:16:54  20   A.   NO.  THIS IS MY FIRST TIME TESTIFYING.

01:16:56  21   Q.   YOU WERE RETAINED BY SAMSUNG AS AN EXPERT IN THIS CASE?

01:17:01  22   A.   YES.

01:17:01  23   Q.   WHAT WAS YOUR ASSIGNMENT?

01:17:04  24   A.   MY ASSIGNMENT WAS TO LOOK AT THE APPLE DESIGN PATENTS AND

01:17:10  25   THE SAMSUNG PHONES TO DETERMINE THE ARTICLE OF MANUFACTURE TO

01:17:16   1      WHICH THE DESIGN WAS APPLIED.

01:17:17   2      Q.   IF WE COULD PUT UP, PLEASE, SDX 1401.

01:17:26   3           COULD YOU TELL US ABOUT YOUR EDUCATION, PLEASE.

01:17:28   4      A.   YES.  I STUDIED AT THE UNIVERSITY OF CINCINNATI, THE

01:17:32   5      SCHOOL OF DESIGN ARCHITECTURE, ART, AND PLANNING.

01:17:34   6      Q.   WHY DID YOU CHOOSE THAT SCHOOL?

01:17:36   7      A.   IT IS ONE OF THE TOP DESIGN SCHOOLS IN THE NATION.

01:17:42   8      Q.   AND WHERE DID YOU BEGIN YOUR PROFESSIONAL CAREER?

01:17:45   9      A.   AT IBM.

01:17:46  10      Q.   AND WHEN WAS THAT?

01:17:47  11      A.   THAT WAS IN 1981.

01:17:50  12      Q.   WHY DID YOU CHOOSE IBM TO START WORKING AT?

01:17:54  13      A.   WELL, IBM HAD A STORIED REPUTATION FOR DESIGN, AND I WAS

01:17:59  14      INTERESTED IN COMPUTER TECHNOLOGY EVEN THEN.

01:18:01  15      Q.   HOW LONG DID YOU WORK AT IBM?

01:18:03  16      A.   FOR 14 YEARS.

01:18:06  17      Q.   IF WE COULD LOOK, PLEASE, AT SDX 1402.

01:18:11  18           CAN YOU TELL US ABOUT SOME OF THE PRODUCTS THAT YOU WORKED

01:18:13  19      ON AT IBM.

01:18:15  20      A.   WELL, I WORKED ON JUST ABOUT EVERY COMPUTER PRODUCT YOU

01:18:19  21      COULD IMAGINE.

01:18:21  22           BUT WHILE I WAS THERE, WE WERE CREATING SOME OF THE FIRST

01:18:25  23      LAPTOP DESIGNS AND --

01:18:28  24      Q.   PERHAPS YOU CAN TELL US WHAT WE HAVE -- WHAT WE'RE LOOKING

01:18:31  25      AT UP ON THE SCREEN HERE.

LUCENT DIRECT BY MR. QUINN

01:18:32  1    A.   YEAH.  SO -- SO ON THE -- AT THE TOP, THIS IS ONE OF THE

01:18:36  2    IBM THINK PADS.  WHEN YOU OPENED IT, IT HAD A SMALL DISPLAY, SO

01:18:42  3    WE WANTED TO GIVE IT A FULL SIZE KEYBOARD SO WHEN YOU OPENED

01:18:46  4    THIS, A FULL SIZE KEYBOARD APPEARED.

01:18:51  5         AND ON THE BOTTOM, THIS WAS ONE OF THE FIRST TABLET

01:18:54  6    COMPUTERS EVER DESIGNED CALLED THE LEAP FROG, AND IT NOT ONLY

01:18:59  7    INTEGRATED PEN AND -- PEN KIND OF INPUT, BUT IT ALSO INTEGRATED

01:19:06  8    BOTH VOICE AND THEN REGULAR KEYBOARD ENTRY AS WELL.

01:19:10  9    Q.   WERE YOU INVOLVED IN THE DESIGN OF THESE PRODUCTS AT IBM?

01:19:13  10   A.   YES.

01:19:14  11   Q.   WHAT YEAR DID THESE PRODUCTS COME OUT?

01:19:16  12   A.   IN THE EARLY '90S.

01:19:18  13   Q.   DID YOU GET ANY RECOGNITION FOR THESE PRODUCTS?

01:19:21  14   A.   YES.  THE -- BOTH OF THEM HAVE WON SEVERAL AWARDS.  THE --

01:19:28  15   Q.   IF WE COULD LOOK AT SLIDE 1401, PLEASE.

01:19:36  16        AND YOU WERE TELLING US ABOUT THE RECOGNITION FOR YOUR

01:19:39  17   WORK.

01:19:39  18   A.   YEAH.  SO THE -- THE LEAP FROG IS IN THE SMITHSONIAN.

01:19:45  19   IT'S CONSIDERED, YOU KNOW, KIND OF A PIVOTAL BREAKTHROUGH IN

01:19:51  20   THE DESIGN OF COMPUTERS.

01:19:52  21        AND THEN THE THINK PAD IS IN MANY DESIGNS, INCLUDING,

01:19:57  22   LIKE, THE NEW YORK MUSEUM OF MODERN ART AND MANY MUSEUMS IN

01:20:04  23   EUROPE AND THROUGHOUT THE WORLD.

01:20:05  24   Q.   WHERE DID YOU WORK AFTER IBM?

01:20:07  25   A.   I WENT TO NETSCAPE.  I MOVED FROM NEW YORK TO CALIFORNIA

01:20:14  1      AND LIVED IN PALO ALTO.

01:20:15  2      Q.   AND WHAT DID YOU DO AT NETSCAPE?

01:20:17  3      A.   WELL, THAT WAS WHEN THE, YOU KNOW, THE BROWSER WAS, WAS --

01:20:23  4      THE FIRST GRAPHICAL BROWSER WAS BEING INVENTED.

01:20:27  5           SO I WAS HEAD OF DIRECTOR -- I WAS THE DIRECTOR OF USER

01:20:30  6      EXPERIENCE AT NETSCAPE, FORMED A TEAM OF ABOUT 30 OR 40 PEOPLE,

01:20:35  7      AND WE WERE RESPONSIBLE FOR THE THREE PANE E-MAIL THAT YOU SEE

01:20:43  8      ON COMPUTERS.  AND OF COURSE WE WORKED ON THE, THE INTERNET

01:20:48  9      BROWSER.

01:20:49  10     Q.   AFTER NETSCAPE, WHAT DID YOU DO?

01:20:51  11     A.   I TOOK A BREAK AND THEN WENT TO HEWLETT-PACKARD AS

01:20:56  12     DIRECTOR OF DESIGN.

01:20:57  13     Q.   WHAT DID YOU DO AT HEWLETT-PACKARD?

01:21:00  14     A.   I, I STARTED AS DIRECTOR OF DESIGN AND THEN I MANAGED THE

01:21:10  15     WHOLE DESIGN TEAM ACROSS THE, ACROSS THE WHOLE COMPANY.

01:21:15  16          I BECAME THE VICE PRESIDENT OF DESIGN.  AND MY TEAM WAS

01:21:20  17     RESPONSIBLE FOR THE DESIGN OF VIRTUALLY ALL THE HARDWARE AND

01:21:24  18     SOFTWARE PRODUCTS, AND I GREW THAT TEAM FROM 30 TO 300 PEOPLE.

01:21:31  19     Q.   HOW LONG WERE YOU AT H.P.?

01:21:34  20     A.   FOR EIGHT YEARS, FROM 2002 TO 2010.

01:21:38  21     Q.   WHILE YOU WERE AT H.P., DID YOU OVERSEE BOTH INDUSTRIAL

01:21:42  22     DESIGN AND THE USER INTERFACE?

01:21:44  23     A.   YES.  AND ALSO THE HUMAN FACTORS ENGINEERING.

01:21:49  24     Q.   DID YOUR WORK INCLUDE TOUCHSCREEN DESIGN?

01:21:52  25     A.   YES.

01:21:53  1     Q.   LET'S TAKE A LOOK AT SDX 403, PLEASE.

01:22:04  2          WHAT ARE THESE IMAGES HERE?

01:22:05  3     A.   SO ON THE TOP LEFT, H.P. WAS THE NUMBER ONE PRINTER

01:22:10  4     COMPANY AND WE, WE TIED ALL THE PRINTERS TOGETHER UNDER ONE

01:22:17  5     COMMON DESIGN.

01:22:20  6          YOU CAN SEE HERE THAT WE INTEGRATED THIS COMMON CONTROL

01:22:25  7     AND DISPLAYS.

01:22:28  8          AND THEN THE OTHER PRODUCT, WE ALSO DID A LOT OF BRANDED

01:22:33  9     DESIGN WORK AND THESE ARE TOUCH AND SMARTPHONE AND TABLET AND

01:22:39  10    PRINTER CONCEPTS THAT INTEGRATED TOUCH TECHNOLOGY.

01:22:42  11    Q.   AND YOU AND YOUR TEAM WERE RESPONSIBLE FOR THESE?

01:22:46  12    A.   YES.

01:22:46  13    Q.   WHAT DID YOU DO AFTER H.P.?

01:22:49  14    A.   I WENT OUT, WE OUT ON MY OWN AFTER H.P., AND I'M FOCUSSED

01:22:55  15    ON WORKING WITH COMPANIES THAT HAVE A LOT OF SOCIAL IMPACT.

01:23:00  16         SO I'M WORKING WITH THE NATIONAL FITNESS CAMPAIGN.  WE --

01:23:05  17    THAT COMPANY BRINGS FREE FITNESS TO -- FREE OUTDOOR FITNESS TO

01:23:10  18    AMERICA.  WE'RE BUILDING FITNESS COURTS ACROSS THE U.S.

01:23:15  19         AND I'M WORKING WITH A PROSTHETICS COMPANY THAT CREATE,

01:23:20  20    LIKE, SOCKETS FOR AMPUTEES.

01:23:24  21         AND THEN ALSO WORKING WITH A COMPANY THAT PROVIDES SOLAR

01:23:30  22    POWERED MEDICAL EQUIPMENT TO UNDERDEVELOPED COUNTRIES IN REMOTE

01:23:35  23    AREAS.

01:23:36  24    Q.   HAVE YOU DESIGNED APPS FOR SMARTPHONES?

01:23:38  25    A.   YES, MANY MOBILE APP, BOTH IOS AND ANDROID.

LUCENT DIRECT BY MR. QUINN

01:23:41  1    Q.   HAVE YOU RECEIVED ANY AWARDS FOR YOUR PROFESSIONAL DESIGN

01:23:45  2    WORK?

01:23:45  3    A.   YES.

01:23:46  4    Q.   LET'S LOOK AT SLIDE SDX 1404.

01:23:53  5         AND COULD YOU TELL US WHAT THIS SHOWS, PLEASE.

01:23:55  6    A.   WELL, ON THE LEFT, THE PRODUCTS I'VE, I'VE HELPED DESIGN

01:23:59  7    ARE IN PERMANENT COLLECTIONS AT THE SMITHSONIAN.  I MENTIONED

01:24:04  8    THE NEW YORK MOMA, SAN FRANCISCO MOMA, AND THESE ARE SOME OF

01:24:09  9    THE MUSEUMS THEY'RE IN.

01:24:12  10        AND THE AWARDS, ONE I'M VERY PROUD OF IS THE

01:24:16  11   COMPASSO D'ORO.  IT'S ALL THE BIG ITALIAN DESIGNERS, THEY'VE

01:24:23  12   WON THAT AWARD AND NOT MANY AMERICANS HAVE.

01:24:29  13        ALSO, THE I.D.E.A., INDUSTRIAL DESIGN EXCELLENT AWARDS.

01:24:38  14        I'VE ONE GOLD, SILVER, AND BRONZE AWARDS FROM THEM.

01:24:42  15        THE I.F. AND RED DOT AWARDS IN GERMANY.

01:24:45  16        AND THE MITI AWARDS IN ASIA AND JAPAN.

01:24:50  17   Q.   ARE YOU THE INVENTOR OF ANY PATENTS?

01:24:51  18   A.   YES.  OVER 35 PATENTS, MOSTLY DESIGN PATENTS.

01:24:57  19   Q.   AND WHERE ARE YOU BASED NOW?

01:24:58  20   A.   IN SAN FRANCISCO, CALIFORNIA.

01:25:00  21        MR. QUINN:  YOUR HONOR, WE OFFER MR. LUCENTE AS AN

01:25:05  22   EXPERT IN INDUSTRIAL DESIGN AND GRAPHICAL USER INTERFACE

01:25:09  23   DESIGN.

01:25:10  24        MR. MUELLER:  NO OBJECTION, YOUR HONOR.

01:25:11  25        THE COURT:  ALL RIGHT.  SO CERTIFIED.

LUCENT DIRECT BY MR. QUINN

01:25:12  1          GO AHEAD, PLEASE.

01:25:18  2     BY MR. QUINN:

01:25:18  3     Q.   YOU SAID YOUR ASSIGNMENT WAS TO LOOK AT APPLE AS DESIGN

01:25:21  4     PATENTS TO DETERMINE THE ARTICLE OF MANUFACTURE TO WHICH

01:25:24  5     APPLE'S PATENTS, DESIGN PATENTS, WERE APPLIED BY SAMSUNG.

01:25:28  6          WHAT CRITERIA DID YOU USE IN DOING THAT ANALYSIS?

01:25:31  7     A.   I USED THE FOUR FACTOR TEST GIVEN TO ME BY THE COURT.

01:25:35  8     Q.   AND AS A RESULT OF YOUR WORK, DID YOU REACH ANY

01:25:39  9     CONCLUSIONS?

01:25:39  10    A.   YES.

01:25:40  11    Q.   WHAT CONCLUSIONS DID YOU REACH?

01:25:42  12    A.   MY CONCLUSION WAS THAT THE ARTICLES OF MANUFACTURE ARE

01:25:49  13    COMPONENTS OF THE SAMSUNG PHONE, NOT THE ENTIRE PHONE.

01:25:53  14    Q.   LET'S TAKE A LOOK AT SLIDE SDX 41 -- OR 1405.  AND I'D

01:26:00  15    LIKE TO ASK YOU, WHAT WORK DID YOU DO IN ORDER TO REACH THESE

01:26:04  16    CONCLUSIONS?

01:26:05  17    A.   WELL, THIS, THIS KIND OF GIVES AN OVERVIEW OF THE WORK

01:26:09  18    THAT I DID.

01:26:11  19         SO IT COVERS LOTS OF DOCUMENTS AND DIFFERENT KIND OF

01:26:15  20    ACTIVITIES.

01:26:16  21         AND DIFFERENT, YOU KNOW, IN THE INFORMATION.

01:26:19  22    Q.   NOW, HOW DID YOU START?

01:26:21  23    A.   SO I STARTED LOOKING AT THE DESIGN PATENTS.

01:26:24  24    Q.   AND THEN WHAT WAS THE NEXT THING YOU DID?

01:26:26  25    A.   THEN, THEN I LOOKED AT SAMSUNG PHONES.

LUCENT DIRECT BY MR. QUINN

01:26:30   1          THEN I FELT IT WAS IMPORTANT TO, TO GO TO KOREA TO MEET

01:26:37   2   WITH THE DESIGNERS FACE-TO-FACE AND LOOK AT THE DESIGN

01:26:41   3   FACILITIES, TALK TO THEM ABOUT THEIR APPROACH TO DESIGN.

01:26:45   4          AND THEN I ALSO WANTED TO UNDERSTAND HOW NOT ONLY DID

01:26:49   5   SAMSUNG KIND OF DESIGN AND DEVELOP THE PHONES, BUT HOW THEY

01:26:53   6   MANUFACTURED THE PHONES.  SO I WENT TO THE GUMI, G-U-M-I,

01:27:00   7   MANUFACTURING FACILITY.

01:27:01   8   Q.   THAT'S IN KOREA?

01:27:02   9   A.   YES, IN KOREA.

01:27:03   10  Q.   SO IN KOREA, YOU -- DID YOU GO TO THE MANUFACTURING

01:27:06   11  FACILITIES?

01:27:07   12  A.   YES.

01:27:07   13  Q.   DID YOU GO TO DESIGN FACILITIES?

01:27:09   14  A.   YES.

01:27:10   15  Q.   AND YOU TALKED TO VARIOUS PEOPLE AT SAMSUNG INVOLVED IN

01:27:14   16  DESIGN AND MANUFACTURE?

01:27:15   17  A.   YES.

01:27:16   18  Q.   COULD YOU TELL US, PLEASE, APPROXIMATELY HOW MANY PEOPLE

01:27:19   19  YOU SPOKE TO IN KOREA AT SAMSUNG?

01:27:21   20  A.   FIFTEEN PEOPLE.

01:27:23   21  Q.   WHAT ELSE DID YOU DO BESIDES THIS TRIP TO KOREA AND

01:27:29   22  WORK -- AND INTERVIEWING THESE PEOPLE?

01:27:31   23  A.   WELL, I -- I ASKED FOR ONE EACH OF THE SAMSUNG PHONES

01:27:37   24  WORKING WITH SOFTWARE ON IT.

01:27:39   25          I LOOKED AT ALL KINDS OF MANUFACTURING AND COMPUTER AIDED

01:27:46   1        DESIGN DOCUMENTS AND MANUFACTURING SPECIFICATION DOCUMENTS.

01:27:54   2               AND I LOOKED ON THE INTERNET TO SEE, YOU KNOW, HOW -- YOU

01:27:59   3        KNOW, IF I COULD BUY THESE COMPONENTS, THINGS LIKE THAT.

01:28:02   4               AND AT ONE POINT -- AND AT ONE POINT I ACTUALLY CREATED A

01:28:08   5        KIND OF EVOLUTION OF THE SMARTPHONE BECAUSE I REALLY WANTED TO

01:28:12   6        UNDERSTAND HOW THE SMARTPHONE HAD EVOLVED OVER TIME.

01:28:16   7        Q.   WHAT DID YOU DO WHEN YOU GOT BACK TO -- FROM KOREA?

01:28:22   8        A.   WELL, I -- I WAS -- AT THAT POINT I WAS REALLY INTERESTED

01:28:27   9        IN, YOU KNOW, THE PHONES AND THE DESIGN AND HOW THEY WERE MADE.

01:28:33   10              AND SO I -- I DISASSEMBLED -- YOU KNOW, I DID THREE

01:28:39   11       THINGS:  I -- YOU KNOW, I ACTUALLY DISASSEMBLED A PHONE; AND --

01:28:46   12       Q.   YOU DISASSEMBLED ONE PHONE?

01:28:49   13       A.   YEAH.  I DISASSEMBLED ONE PHONE COMPLETELY SO THAT I HAD

01:28:52   14       THE COMPONENTS TO WORK WITH AS I DID MY ANALYSIS.

01:28:56   15              I --

01:28:57   16       Q.   DOWN TO HOW MANY -- CAN YOU TELL US ROUGHLY HOW MANY

01:29:00   17       COMPONENTS, HOW MANY YOU BROKE IT DOWN TO?

01:29:04   18       A.   YEAH.  IT WAS MANY COMPONENTS.

01:29:06   19              AND THEN AFTER THAT, I -- I THEN ACTUALLY TOOK ONE PHONE

01:29:12   20       APART AND REASSEMBLED IT.

01:29:15   21              AND THEN I ACTUALLY WENT ONLINE AND -- I WANTED TO REPLACE

01:29:19   22       THE DISPLAY SCREEN, SEE WHAT THAT WAS LIKE, SO I DID THAT.  I

01:29:24   23       ORDERED A PART ONLINE, HAD IT SHIPPED TO ME FROM

01:29:31   24       DR. CELLULAR.COM, AND I REPLACED THE DISPLAY SCREEN AND FRONT

01:29:38   25       GLASS AND BEZEL IN 35 MINUTES AND THE PHONE WORKED FINE.

01:29:42   1    Q.   SO THERE WERE -- THERE WERE THREE PHONES THAT YOU

01:29:45   2    DISASSEMBLED?

01:29:47   3    A.   YES.

01:29:47   4    Q.   ONE YOU DISASSEMBLED COMPLETELY AND YOU LEFT DISASSEMBLED?

01:29:52   5    A.   YES.

01:29:52   6    Q.   AND DO YOU HAVE THOSE -- THE PART THAT -- THE PARTS OF

01:29:55   7    THAT PHONE IN THE COURTROOM WITH YOU?

01:29:56   8    A.   YES, I DO.   IT'S IN THE -- IT'S IN MY BAG, YES.

01:30:00   9    Q.   AND THERE'S ANOTHER PHONE WHERE YOU -- YOU SAID SOMETHING

01:30:05   10   ABOUT BUYING A SCREEN REPAIR KIT?

01:30:08   11   A.   YES.

01:30:08   12   Q.   TELL US AGAIN ABOUT THAT.

01:30:10   13   A.   WELL, YEAH.   THAT ONE I, I LITERALLY -- I ORDERED THE

01:30:16   14   PART, TOOK THE PHONE APART, AND REPLACED THE DISPLAY SCREEN AND

01:30:21   15   PUT IT BACK TOGETHER.

01:30:22   16   Q.   AND DID IT WORK?

01:30:23   17   A.   YES.

01:30:24   18   Q.   ALL RIGHT.   AND HOW LONG DID IT TAKE YOU TO DO THAT?

01:30:27   19   A.   THIRTY-FIVE MINUTES.

01:30:28   20   Q.   AND DID YOU NEED ANY SPECIAL TOOLS TO DO THAT?

01:30:31   21   A.   YEAH.   WHEN I ORDER THAT KIT, YOU -- YOU KNOW, IT COMES

01:30:37   22   WITH A SMALL SCREWDRIVER AND A PLASTIC PIECE TO, TO HELP PRY

01:30:43   23   THE PHONE APART.

01:30:45   24   Q.   AND THE THIRD ONE, YOU DISASSEMBLED COMPLETELY AND PUT IT

01:30:48   25   ALL BACK TOGETHER?

01:30:49  1      A.   YES.

01:30:50  2           MR. MUELLER:  YOUR HONOR, IF I MIGHT, I'M NOT SURE

01:30:52  3   WHAT IS BEING REFERRED TO HERE, BUT WE HAVEN'T SEEN THE PHONES

01:30:55  4   IN HIS BAG THAT HE'S REFERRING TO.  THIS WAS NOT PART OF WHAT

01:30:58  5   WAS DISCLOSED TO US.  I'M JUST NOT CLEAR WHAT HE'S DISCUSSING.

01:31:01  6           THE COURT:  DO YOU HAVE ANY OF THE PARTS WITH YOU?

01:31:03  7   IS THAT --

01:31:04  8           MR. MUELLER:  IF HE DOESN'T, WE HAVEN'T SEEN THEM

01:31:06  9   BEFORE.

01:31:06 10           THE COURT:  DO YOU HAVE THEM?  DO YOU HAVE ANY OF THE

01:31:09 11   PARTS WITH YOU?

01:31:09 12           THE WITNESS:  YES.

01:31:11 13           MR. QUINN:  WE'RE GOING TO GET TO THAT, YOUR HONOR.

01:31:14 14           THE COURT:  OKAY.  BUT THIS WAS LITIGATED, THAT --

01:31:17 15           MR. MUELLER:  IT'S NOT, YOUR HONOR.

01:31:18 16           THE COURT:  ONE PARTY CLAIMANT HASN'T SEEN IT; RIGHT?

01:31:22 17           MR. MUELLER:  THAT'S EXACTLY RIGHT.

01:31:24 18           MR. QUINN:  THE ONE HE'S GOING TO USE, YOUR HONOR, IS

01:31:26 19   A DEMONSTRATIVE.  IT'S A DEMONSTRATIVE.  IT WAS A DEPOSITION

01:31:30 20   EXHIBIT AND THEY QUESTIONED HIM ABOUT IT.  AND WE ALSO SHOWED

01:31:36 21   IT TO THEM YESTERDAY.

01:31:37 22           MR. MUELLER:  I JUST DON'T KNOW WHAT IS IN HIS BAG

01:31:39 23   AND WHAT IS BEING REFERRED TO.  IT'S A LITTLE UNCLEAR TO ME

01:31:43 24   WHAT THIS IS.  IF WE COULD TAKE IT STEP BY STEP AND REFER TO

01:31:46 25   THE ACTUAL EXHIBITS AND ACTUAL DEMONSTRATIVE, WE MAY HAVE NO

01:31:49    1        ISSUE.  BUT WE DO NOT KNOW THIS BAG.

01:31:51    2             MR. QUINN:  WE'RE GOING TO DO IT STEP BY STEP, YOUR

01:31:53    3        HONOR.  THAT'S OUR INTENTION.

01:31:54    4             THE COURT:  OKAY.  COULD YOU JUST IDENTIFY WHAT

01:31:56    5        EXHIBIT IS BEING REFERRED TO IN YOUR QUESTIONS, PLEASE.

01:31:58    6             MR. QUINN:  YES, YOUR HONOR.

01:31:59    7             THE COURT:  THANK YOU.

01:31:59    8        BY MR. QUINN:

01:32:01    9        Q.   DO YOU HAVE THERE WITH YOU THE PHONE WHERE YOU REPLACED

01:32:06   10        THE DISPLAY SCREEN?

01:32:07   11        A.   YES.

01:32:19   12        Q.   AND CAN YOU HOLD THAT UP, PLEASE?

01:32:21   13        A.   (INDICATING.)

01:32:21   14        Q.   AND TELL US WHAT YOU'RE HOLDING IN YOUR TWO HANDS.

01:32:24   15        A.   SO THIS IS -- THIS IS THE -- I ORDERED THIS PART, WHICH IS

01:32:29   16        THE DISPLAY SCREEN, THE BEZEL, AND THE FRONT GLASS

01:32:33   17        (INDICATING).

01:32:33   18             AND I -- I THEN TOOK THIS PHONE APART, PUT IT INTO HERE,

01:32:41   19        AND LIKE I SAID, THE PHONE WORKED (INDICATING).

01:32:45   20             AND THAT TOOK ME ABOUT 35 MINUTES.

01:32:47   21        Q.   SO YOU SUBSTITUTED THE PART THAT YOU HAVE IN YOUR RIGHT

01:32:49   22        HAND?

01:32:49   23        A.   YEAH, REPLACED THE PART.

01:32:51   24        Q.   IS THERE AN EXHIBIT NUMBER ON THAT BOX THERE?

01:32:53   25        A.   YES.  EXHIBIT 5.

01:32:56   1    Q.   I'M SORRY?

01:32:57   2    A.   EXHIBIT 5.

01:32:58   3    Q.   EXHIBIT 5?  AND WHAT IS THE OTHER STICKER ON THE BOX?  I

01:33:03   4    THINK THAT MAY HAVE BEEN THE DEPOSITION STICKER.

01:33:04   5    A.   OH, I'M SORRY.  IT'S SDX 1450.

01:33:11   6    Q.   ALL RIGHT.

01:33:16   7         THE COURT:  IS THAT A DEMONSTRATIVE?

01:33:17   8         MR. QUINN:  IT'S A DEMONSTRATIVE, YOUR HONOR.

01:33:19   9         THE COURT:  OKAY.  GO AHEAD, PLEASE.

01:33:23   10   BY MR. QUINN:

01:33:23   11   Q.   AND THEN YOU ALSO REFERRED TO A PHONE THAT YOU -- THAT'S

01:33:29   12   SDX 1450; CORRECT?

01:33:32   13   A.   YES.

01:33:32   14   Q.   OKAY.  ALL RIGHT.  YOU REFERRED TO THE FOUR FACTORS THAT

01:33:37   15   YOU USED IN DOING YOUR ANALYSIS ABOUT WHAT WAS THE ARTICLE OF

01:33:41   16   MANUFACTURE TO WHICH APPLE'S DESIGN WAS APPLIED.

01:33:44   17        AND I'D LIKE TO WALK THROUGH THOSE, YOUR ANALYSIS OF THOSE

01:33:47   18   FACTORS WITH YOU IF WE COULD, PLEASE.

01:33:49   19   A.   ALL RIGHT.

01:33:50   20   Q.   AND IF WE COULD BEGIN WITH FACTOR 1 AND PUT UP ON THE

01:33:54   21   SCREEN SDX 1406.

01:34:00   22        HOW DID YOU APPLY THIS FACTOR?

01:34:02   23   A.   WELL, SO THIS IS FOCUSSED ON THE SCOPE OF THE CLAIMED

01:34:09   24   DESIGN.  SO I FIRST CONSIDERED THE DRAWING AND THE WRITTEN

01:34:15   25   DESCRIPTION, AND THEN FOCUSSED ON DETERMINING THE SCOPE OF THE

01:34:20   1    CLAIMED DESIGN.

01:34:21   2    Q.   LET'S START WITH -- THIS IS THE '087.  LET'S START WITH

01:34:26   3    THE '087 PATENT.  IF WE COULD PUT UP SDX 1407.

01:34:36   4         IS THIS A DEMONSTRATIVE SHOWING THE CLAIMS, DRAWINGS, AND

01:34:39   5    WRITTEN DESCRIPTIONS FROM THE '087 PATENT?

01:34:41   6    A.   YES.

01:34:41   7    Q.   AND WHAT DID THIS TELL YOU FROM LOOKING AT THE PATENT

01:34:44   8    ABOUT THE SCOPE OF THE CLAIMED DESIGN?

01:34:46   9    A.   WELL, MAY I STAND UP AND --

01:34:51  10         MR. QUINN:  WITH THE COURT'S PERMISSION.

01:34:52  11         THE COURT:  GO AHEAD, PLEASE.

01:34:58  12    BY MR. QUINN:

01:34:59  13    Q.   IT WOULD BE HELPFUL --

01:35:06  14    A.   SO WHAT I SEE HERE IS THE ACTUAL CLAIM, AND THEN THE

01:35:10  15    WRITTEN DESCRIPTION, AND THEN THE, THE EIGHT VIEWS, WHICH IS

01:35:14  16    TYPICAL OF A DESIGN PATENT.

01:35:16  17         AND WHAT IS ACTUALLY CLAIMED IS HERE WITHIN THE SOLID

01:35:21  18    LINES, AND THE BROKEN LINE PROVIDES THE ENVIRONMENT.

01:35:27  19         AND IT SAYS VERY CLEARLY HERE THAT NONE OF THE BROKEN

01:35:30  20    LINES FORM A PART OF THE CLAIMED DESIGN.

01:35:32  21    Q.   SO WHAT -- WHAT DO THE SOLID LINES SHOW YOU, THE SOLID

01:35:38  22    LINES?

01:35:38  23    A.   SO THE SOLID LINES SHOW WHAT IS ACTUALLY CLAIMED IN THIS

01:35:43  24    PATENT.

01:35:44  25    Q.   DID YOU PREPARE A DEMONSTRATIVE THAT JUST SHOWS ONLY THE

01:35:47  1      SOLID LINES, THE CLAIMED --

01:35:50  2      A.   YES.

01:35:51  3      Q.   -- MATTER?

01:35:52  4           IF WE COULD LOOK AT SDX 1408.

01:35:56  5           AND WHAT HAVE YOU DEPICTED HERE?

01:35:58  6      A.   SO ONCE YOU REMOVE THE, THE BROKEN LINES, WHICH, AGAIN, IS

01:36:03  7      THE SURROUNDING ENVIRONMENT FOR CONTEXT, THIS SHOWS VERY

01:36:06  8      CLEARLY THAT, YOU KNOW, THE CLAIMED DESIGN IS A FRONT FACE AND

01:36:12  9      A BEZEL.

01:36:14  10          AND THEN -- THAT'S A FRONT VIEW (INDICATING).

01:36:17  11          AND THEN THE SIDE VIEW GIVES YOU A SENSE OF HOW BIG IT IS

01:36:21  12     (INDICATING).

01:36:21  13     Q.   THANK YOU.

01:36:22  14          WHAT ISN'T CLAIMED BY THIS PATENT?

01:36:24  15     A.   SO EVERYTHING ELSE IN THIS -- YOU KNOW, THAT WAS SHOWN IN

01:36:29  16     THE BROKEN LINES.

01:36:30  17     Q.   THAT --

01:36:31  18     A.   SO THE BACK, THE SIDES, THE -- YOU KNOW, THE TOP, THE

01:36:38  19     BOTTOM, ALL OF THAT.

01:36:40  20     Q.   HOW ABOUT ANYTHING ON THE INSIDE OF THE -- YOU MIGHT WANT

01:36:44  21     TO KEEP THAT MIKE UP THERE IN CASE YOU NEED TO GET BACK UP

01:36:48  22     AGAIN, IF THAT'S OKAY.

01:36:49  23          HOW ABOUT ANYTHING ON THE INSIDE OF WHAT YOU SEE THERE?

01:36:53  24     IS ANYTHING CLAIMED?

01:36:54  25     A.   NO.  A -- A DESIGN PATENT CLAIMS THE SHAPE AND THE SURFACE

LUCENT DIRECT BY MR. QUINN

01:37:02  1    TREATMENT, AND SO IT DOESN'T, YOU KNOW, CLAIM THE INTERNAL

01:37:07  2    COMPONENT.

01:37:08  3    Q.   WHERE IN THE SAMSUNG PHONES DID YOU -- THAT WERE FOUND TO

01:37:12  4    INFRINGE DID YOU FIND THE '087 PATENT DESIGN?

01:37:17  5    A.   YEAH.   IT -- IT IS ON THE FRONT FACE AND THE BEZEL OF THE

01:37:22  6    SAMSUNG PHONES THAT INFRINGE THE D'087 PATENT.

01:37:28  7    Q.   YOU SHOULD HAVE A BINDER UP THERE.

01:37:31  8    A.   YES.

01:37:31  9    Q.   AND IF YOU COULD TURN, PLEASE, TO TAB JX 1062.   JX 1062.

01:37:52  10   A.   OKAY.

01:37:53  11   Q.   AND DO YOU RECOGNIZE THIS AS THE PROSECUTION HISTORY FOR

01:37:56  12   THE '087 PATENT?

01:37:58  13   A.   YES.

01:37:58  14   Q.   IS THIS SOMETHING YOU RELIED ON IN DOING YOUR WORK AND

01:38:02  15   GIVING YOUR OPINIONS?

01:38:05  16   A.   YES.   I WENT THROUGH THIS, YES.

01:38:08  17        MR. QUINN:   YOUR HONOR, WE OFFER JX 1062.

01:38:12  18        MR. MUELLER:   NO OBJECTION, YOUR HONOR.

01:38:13  19        THE COURT:   IT'S ADMITTED.

01:38:14  20   (JOINT EXHIBIT 1062 WAS ADMITTED IN EVIDENCE.)

01:38:15  21        THE COURT:   GO AHEAD, PLEASE.

01:38:15  22   BY MR. QUINN:

01:38:16  23   Q.   LET'S LOOK AT THE '087 AGAIN, SDX 1409.

01:38:20  24   YOU SEE REFERENCES THERE TO ELECTRIC DEVICE BOTH IN THE

01:38:25  25   TITLE UP IN THE UPPER LEFT AND ALSO IN THE WRITTEN DESCRIPTION.

01:38:28   1          DO YOU SEE THAT?

01:38:29   2     A.   YES.

01:38:29   3     Q.   WHAT DOES THAT TELL YOU?

01:38:31   4     A.   WELL, ELECTRONIC DEVICE, WHEN YOU FILE A DESIGN PATENT,

01:38:35   5     YOU HAVE TO CHOOSE A CATEGORY FOR IT, AND THAT'S WHAT THAT IS.

01:38:42   6     THAT'S A CATEGORY.

01:38:43   7     Q.   DOES IT TELL -- DOES THAT TELL YOU ANYTHING ABOUT THE

01:38:47   8     SCOPE OF THE CLAIM?

01:38:48   9     A.   NO.

01:38:50   10    Q.   DOES IT TELL YOU ANYTHING ABOUT WHAT THE ARTICLE OF

01:38:54   11    MANUFACTURE IS TO WHICH SAMSUNG APPLIED THE PATENTED DESIGN?

01:38:58   12    A.   NO.

01:38:59   13    Q.   HAVE YOU SEEN OTHER PATENTS WITH THE TITLE "ELECTRONIC

01:39:05   14    DEVICE"?

01:39:06   15    A.   YES, MANY.

01:39:07   16    Q.   IF WE COULD LOOK AT SLIDE SDX 1410.

01:39:15   17          WHAT IS THIS?  WHAT ARE WE LOOKING AT HERE?

01:39:18   18    A.   WELL, SO HERE YOU HAVE THE, ESSENTIALLY THE SAME DRAWING

01:39:25   19    THAT --

01:39:25   20    Q.   FIRST OFF, IS THIS ANOTHER APPLE PATENT?

01:39:28   21    A.   YES.  THIS IS ANOTHER APPLE PATENT, APPLE PATENT D'926.

01:39:33   22    Q.   AND WHAT IS THE TITLE OF IT?

01:39:34   23    A.   SO, AGAIN, IT'S TITLED "ELECTRONIC DEVICE."

01:39:38   24    Q.   OKAY.  AND WHAT DOES THIS TELL YOU AS TO WHAT THE SCOPE OF

01:39:42   25    THE CLAIM IS IN THIS APPLE PATENT ENTITLED "ELECTRONIC DEVICE"?

LUCENT DIRECT BY MR. QUINN

01:39:49  1   A.   SO, AGAIN, I HAVE THE SAME BROKEN LINES THAT PROVIDE THE

01:39:52  2   SURROUNDING ENVIRONMENT.

01:39:54  3       AND THEN WITHIN THE SOLID LINES I SEE THIS SMALL SLOT HERE

01:39:59  4   (INDICATING).

01:39:59  5   Q.   DID YOU CREATE A DEMONSTRATIVE TO ILLUSTRATE THIS?

01:40:02  6   A.   YES.

01:40:02  7   Q.   IF WE COULD LOOK AT SDX 1411, PLEASE.

01:40:08  8   A.   SO THIS --

01:40:09  9   Q.   AND MY QUESTION IS, WHAT DOES THIS SHOW?

01:40:12  10  A.   OKAY, SORRY.

01:40:13  11      THIS SHOWS THE, YOU KNOW, WHAT IS ACTUALLY CLAIMED IN THIS

01:40:18  12  PATENT ENTITLED "ELECTRONIC DEVICE," AND IT'S SIMPLY THIS SMALL

01:40:25  13  SLOT.

01:40:28  14  Q.   SO IF WE COULD TURN NOW TO THE '677 PATENT, IF WE COULD

01:40:31  15  LOOK AT SLIDE SDX 1412.

01:40:37  16      ARE THESE DRAWINGS OF THE '677 PATENT?

01:40:41  17  A.   YES.

01:40:41  18  Q.   FROM THE PATENT?

01:40:42  19  A.   YES.

01:40:43  20  Q.   WHAT DOES THIS TELL YOU ABOUT THE SCOPE OF THE CLAIMED

01:40:45  21  DESIGN FOR THE '677 PATENT?

01:40:47  22  A.   WELL, AGAIN, SO IF YOU LOOK CLOSELY AT THE PATENT, YOU SEE

01:40:53  23  THAT THERE'S A SOLID LINE AROUND THIS RECTANGULAR, YOU KNOW,

01:41:00  24  FRONT FACE WITH -- IT HAS CURVED CORNERS.

01:41:07  25      AND THEN THERE'S A SMALL SOLID LINE AROUND THIS, THIS AREA

01:41:12    1    AT THE TOP (INDICATING).

01:41:19    2        THIS AREA HAS A DOTTED LINE, SO THAT'S NOT CLAIMED

01:41:22    3    (INDICATING).

01:41:22    4        AND THEN YOU SEE THE REST OF THE PATENT DRAWING, WHICH --

01:41:27    5    WITH THE SURROUNDING ENVIRONMENT OF THE BROKEN LINES

01:41:31    6    (INDICATING).

01:41:32    7        AND THEN HERE'S A FRONT VIEW, AND WHAT YOU NOTICE ON THIS

01:41:35    8    PATENT IS IT HAS A CROSSHATCHING, WHICH IS TYPICAL OF DESIGN

01:41:41    9    PATENT, AND THAT IS HOW YOU DETERMINE THE COLOR BLACK, AND THEN

01:41:44   10    THESE DIAGONAL LINES SHOW THAT IT'S A HIGHLY POLISHED SURFACE

01:41:49   11    (INDICATING).

01:41:49   12    Q.   ALL RIGHT.  DID YOU PREPARE A DEMONSTRATIVE TO ILLUSTRATE

01:41:52   13    WHAT THE CLAIMED PART OF THIS DESIGN IS?

01:41:54   14    A.   YES.

01:41:55   15    Q.   IF WE COULD LOOK AT SDX 1413.

01:41:58   16        WHAT HAVE YOU DEPICTED HERE?

01:41:59   17    A.   SO, AGAIN, ONCE YOU REMOVE THE BROKEN LINES, THIS IS

01:42:03   18    WHAT'S ACTUALLY CLAIMED IN THIS PATENT, AND, YOU KNOW, IT'S A

01:42:08   19    BLACK FRONT FACE WITH THAT LITTLE DETAIL AT THE TOP.

01:42:14   20        AND THEN YOU SEE HERE THAT THE THICKNESS OF THIS, YOU

01:42:21   21    KNOW -- YOU KNOW, THIS DRAWING (INDICATING).

01:42:23   22        SO IT -- THAT'S WHAT'S ACTUALLY CLAIMED IN THIS PATENT.

01:42:27   23    A.   AND WHAT ISN'T CLAIMED?

01:42:29   24    Q.   SO NOTHING ELSE IS CLAIMED, NOT THE INTERNAL COMPONENTS,

01:42:33   25    NOT THE SIDES, THE BACK, ANY, ANY OTHER DETAILS.

```
01:42:40   1          THIS IS WHAT'S CLAIMED IN THE PATENT.

01:42:43   2     Q.   WHERE IN THE SAMSUNG PHONES THAT WERE FOUND TO INFRINGE

01:42:46   3     THE '677 PATENT DID YOU FIND THIS DESIGN APPEAR?

01:42:51   4     A.   IN, IN THE -- ON THE -- IT APPEARS ON THE FRONT FACE OF

01:42:57   5     THE SAMSUNG PHONE.

01:42:58   6     Q.   COULD YOU TURN TO THAT BINDER AGAIN, PLEASE, AND TURN TO

01:43:02   7     TAB JX 1064.  1064.

01:43:08   8     A.   YES.

01:43:09   9     Q.   DO YOU RECOGNIZE THIS AS THE PROSECUTION HISTORY FOR THE

01:43:14   10    '677 PATENT?

01:43:15   11    A.   YES.

01:43:16   12    Q.   AND IS THIS SOMETHING THAT YOU RELIED ON IN FORMING AND

01:43:20   13    GIVING YOUR OPINIONS?

01:43:20   14    A.   YES.

01:43:21   15          MR. QUINN:  WE'D MOVE THAT INTO EVIDENCE, YOUR HONOR.

01:43:23   16          MR. MUELLER:  NO OBJECTION, YOUR HONOR.

01:43:24   17          THE COURT:  IT'S ADMITTED.

01:43:25   18       (JOINT EXHIBIT 1064 WAS ADMITTED IN EVIDENCE.)

01:43:25   19          THE COURT:  GO AHEAD, PLEASE.

01:43:26   20    BY MR. QUINN:

01:43:26   21    Q.   NOW, THIS PATENT DOESN'T ACTUALLY USE THE WORDS "ARTICLE

01:43:31   22    OF MANUFACTURE," DOES IT?

01:43:34   23          ACTUALLY, IT DOES USE THE WORDS "ARTICLE OF MANUFACTURE,"

01:43:38   24    DOESN'T IT?

01:43:38   25    A.   YES.
```

LUCENT DIRECT BY MR. QUINN

01:43:39  1    Q.   AND LET'S TAKE A LOOK AT SDX 1414 IF WE COULD, PLEASE.

01:43:43  2         AND WE HAVE A HIGHLIGHTED PORTION THERE.  COULD YOU TELL

01:43:47  3    US WHAT WE'RE LOOKING AT THERE?

01:43:49  4    A.   SO THIS IS PART OF THE WRITTEN DESCRIPTION.

01:43:53  5    Q.   AND IT SAYS, "AS INDICATED IN THE TITLE, THE ARTICLE OF

01:43:57  6    MANUFACTURE TO WHICH THE ORNAMENTAL DESIGN HAS BEEN APPLIED IS

01:44:00  7    AN ELECTRONIC DEVICE, MEDIA PLAYER," AND IT GOES ON, IT

01:44:05  8    MENTIONS CELLULAR PHONE, TOY, AND IT MENTIONS SOME OTHER

01:44:08  9    THINGS.

01:44:09  10        DO YOU SEE THAT?

01:44:09  11   A.   YES.

01:44:10  12   Q.   DID THE USE OF THAT, THOSE WORDS, "ARTICLE OF MANUFACTURE"

01:44:16  13   IN THE WRITTEN DESCRIPTION HERE, GIVE YOU ANY INDICATION THAT

01:44:18  14   THE PATENT OFFICE OR ANY OTHER AUTHORITY HAD ALREADY MADE A

01:44:22  15   DETERMINATION THAT THE SAMSUNG PHONE WAS THE ARTICLE OF

01:44:26  16   MANUFACTURE?

01:44:26  17   A.   NO.  MY UNDERSTANDING IS THAT THE -- EITHER THE COURT NOR

01:44:35  18   THE PATENT OFFICE HAS DETERMINED THE ARTICLE OF MANUFACTURE FOR

01:44:40  19   THIS PATENT AND THE WAY YOU DO DETERMINE THAT IS, YOU KNOW, WE

01:44:47  20   APPLY THE FOUR FACTOR TEST TO DETERMINE THE ARTICLE OF

01:44:51  21   MANUFACTURE.

01:44:51  22   Q.   WELL, DOES THE APPEARANCE OF THESE THREE WORDS IN THE

01:44:55  23   WRITTEN DESCRIPTION -- IN THE WRITTEN DESCRIPTION GIVE YOU ANY

01:44:58  24   INSIGHT INTO WHAT THE ARTICLE OF MANUFACTURE IS TO WHICH THE

01:45:04  25   APPLE PATENTED DESIGNS WERE APPLIED IN THIS CASE?

01:45:06  1   A.   NO.

01:45:10  2   Q.   WHY NOT?

01:45:10  3   A.   BECAUSE, YOU KNOW, FACTOR 1, I'VE DETERMINED THE SCOPE OF

01:45:17  4   THE CLAIMED DESIGN, WHICH, YOU KNOW, IS SHOWN IN THE SOLID

01:45:23  5   LINES.

01:45:24  6        AND THEN THE -- THE RELATIVE PROMINENCE DOESN'T, DOESN'T,

01:45:33  7   YOU KNOW, COVER THIS.

01:45:36  8        CONCEPTUAL DISTINCTNESS DOESN'T COVER THIS, AND THE NOTION

01:45:42  9   OF -- YOU KNOW, THE PHYSICAL RELATIONSHIP, THOSE THREE FACTORS,

01:45:47  10  YOU KNOW, DON'T COVER THIS.

01:45:51  11  Q.   ALL RIGHT.  WELL, WE'LL GET TO THOSE FACTORS.

01:45:55  12       LET'S TURN NOW, PLEASE, TO THE THIRD APPLE DESIGN PATENT,

01:45:57  13  THE '305 PATENT.

01:46:00  14       AND IF WE COULD PLEASE PUT UP ON THE SCREEN SDX 1415.

01:46:05  15       WHAT ARE WE LOOKING AT ON THIS SCREEN?

01:46:07  16  A.   SO THIS IS THE D'305, AND ON THIS PATENT, WE'RE LOOKING

01:46:17  17  AT -- ON THIS SCREEN, WE ARE LOOKING AT THE TITLE, THE

01:46:20  18  DESCRIPTION, AND THEN THE DRAWING (INDICATING).

01:46:24  19  Q.   WHAT DO THE BROKEN LINES AROUND THAT IMAGE INDICATE?

01:46:28  20  A.   SO IT -- IT'S SHOWN THERE, "THE BROKEN LINE SHOWING OF A

01:46:37  21  DISPLAY SCREEN IN BOTH VIEWS FORMS NO PART OF THE CLAIMED

01:46:40  22  DESIGN."

01:46:41  23       SO ANYTHING OUTSIDE OF THOSE BROKEN LINES IS NOT CLAIMED.

01:46:47  24  THE ONLY THING CLAIMED IN THIS PATENT IS WHAT YOU SEE INSIDE

01:46:51  25  THE LINES.

LUCENT DIRECT BY MR. QUINN

01:46:52  1    Q.   WHERE IN THE SAMSUNG PHONES THAT WERE FOUND TO INFRINGE

01:46:57  2    DOES THIS '305 DESIGN APPEAR?

01:47:00  3    A.   SO THIS ONE SINGLE IMAGE APPEARS ON THE DISPLAY SCREEN OF

01:47:09  4    THE SAMSUNG PHONE.

01:47:10  5    Q.   IF I COULD ASK YOU TO SIT BACK DOWN AGAIN, PLEASE, AND

01:47:13  6    TAKE A LOOK AT THAT BINDER AND GO TO JX 1063.  1063.

01:47:23  7    A.   OKAY.

01:47:24  8    Q.   DO YOU RECOGNIZE THIS AS THE PROSECUTION FILE HISTORY FOR

01:47:27  9    THE '305 PATENT?

01:47:29  10   A.   YES.

01:47:29  11   Q.   IS THIS SOMETHING THAT YOU RELIED ON FOR YOUR OPINIONS?

01:47:31  12   A.   YES.

01:47:32  13        MR. QUINN:  WE OFFER JX 1063.

01:47:36  14        MR. MUELLER:  NO OBJECTION, YOUR HONOR.

01:47:37  15        THE COURT:  IT'S ADMITTED.

01:47:38  16   (DEFENDANTS' EXHIBIT 1063 WAS ADMITTED IN EVIDENCE.)

01:47:38  17        THE COURT:  GO AHEAD, PLEASE.

01:47:38  18   BY MR. QUINN:

01:47:39  19   Q.   WHAT IS THE TITLE OF THIS PATENT?

01:47:42  20   A.   "GRAPHICAL USER INTERFACE FOR A DISPLAY SCREEN OR PORTION

01:47:47  21   THEREOF."

01:47:48  22   Q.   DOES THIS PATENT COVER AN ENTIRE GRAPHICAL USER INTERFACE?

01:47:53  23   A.   NO.  WHAT IS -- WHAT IS SHOWN HERE IS, YOU KNOW, IT'S AN

01:48:00  24   ORNAMENTAL DESIGN FOR A SINGLE GRAPHICAL USER INTERFACE SCREEN

01:48:10  25   AND -- YOU KNOW, WITH THE ICONS, WITH THE GROUPED ICONS AT THE

01:48:14  1    BOTTOM, AND, YOU KNOW, IN A COLORFUL ARRAY.

01:48:18  2    Q.   CAN THIS DESIGN BE USED IN CONNECTION WITH PRODUCTS OTHER

01:48:22  3    THAN A PHONE?

01:48:23  4    A.   YES.   YOU KNOW, IT COULD BE USED -- YES.

01:48:31  5    Q.   DO YOU KNOW IF APPLE HAS USED THIS DESIGN IN PRODUCTS

01:48:36  6    OTHER THAN A PHONE?

01:48:36  7    A.   YES.   APPLE HAS USED THIS DESIGN ON THEIR -- ONE OF THE

01:48:42  8    IPOD PRODUCTS.

01:48:43  9    Q.   OKAY.   SO LET -- JUST WRAPPING UP ON THE FIRST FACTOR, THE

01:48:47  10   SCOPE OF THE CLAIM, WHAT WAS YOUR OVERALL CONCLUSION IN YOUR

01:48:51  11   ANALYSIS OF THE SCOPE OF THE CLAIM IN THESE THREE PATENTS AS IT

01:48:54  12   RELATES TO FACTOR 1?

01:48:56  13   A.   THAT FOR THE D'087, IT IS A FRONT FACE AND BEZEL; FOR THE

01:49:05  14   D'677, IT IS A BLACK GLASS FRONT FACE WITH A HIGHLY REFLECTIVE

01:49:13  15   SURFACE; AND THEN FOR THE D'305, IT'S A -- ONE SINGLE IMAGE OF

01:49:20  16   A GRAPHICAL ARRAY OF ICONS FOR -- YEAH.

01:49:25  17   Q.   LET'S TURN TO THE SECOND FACTOR NOW.

01:49:28  18        IF WE COULD PLEASE PUT UP SDX 1416, HOW DID YOU APPLY THIS

01:49:35  19   FACTOR?

01:49:39  20   A.   YEAH.   SO FACTOR 2 IS THE RELATIVE PROMINENCE OF THE

01:49:47  21   DESIGN WITHIN THE PRODUCT AS A WHOLE.

01:49:49  22        SO I THOUGHT ABOUT THIS AS RELATIVE, SO THAT'S COMPARED

01:49:54  23   TO -- AND PROMINENCE IS IMPORTANT.   SO IT'S REALLY ASKING ME,

01:49:58  24   WHAT IS THE, YOU KNOW, RELATIVE PROMINENCE OF THE DESIGN, THE

01:50:08  25   PATENTED DESIGNS, WITHIN THE SAMSUNG PHONE AS A WHOLE?

LUCENT DIRECT BY MR. QUINN

01:50:11  1    Q.   YOU SAY "AS A WHOLE."  DID YOU UNDERSTAND THIS FACTOR TO

01:50:14  2    BE LIMITED TO THE VISUAL OR DESIGN ASPECTS OF THE PRODUCT?

01:50:19  3    A.   NO.  I -- NO.  I DID A -- I -- TO APPROACH THIS, I FIRST

01:50:28  4    DID A VISUAL ANALYSIS OF THE DESIGN, AND THEN -- AND THEN, YOU

01:50:36  5    KNOW, I HAD TO STEP BACK THEN AND SAY, WHAT'S KIND OF THE

01:50:40  6    COMPARATIVE IMPORTANCE, THE RELATIVE PROMINENCE OF, YOU KNOW,

01:50:45  7    THE PATENTED DESIGN, THE BEZEL, THE FRONT FACE, AND THE DISPLAY

01:50:53  8    SCREEN?  OR THE, THE D'305 ICON WITHIN THE BIGGER PRODUCT, THE

01:51:02  9    SMARTPHONE.

01:51:03  10   Q.   ALL RIGHT.  NOT JUST LIMITED TO DESIGN ASPECTS OR VISUAL

01:51:06  11   ASPECTS?

01:51:07  12   A.   NO.

01:51:07  13   Q.   WHICH PRODUCT DID YOU LOOK AT?  WHEN YOU'RE APPLYING THIS

01:51:14  14   PROMINENCE FACTOR, WERE YOU LOOKING AT AN APPLE PRODUCT OR THE

01:51:18  15   SAMSUNG PHONES THAT WERE FOUND TO BE INFRINGING?

01:51:20  16   A.   I WAS LOOKING AT THE SAMSUNG PHONES.

01:51:25  17   Q.   WHY?

01:51:25  18   A.   BECAUSE THE -- THE DESIGNS THAT, YOU KNOW, APPEAR IN THE

01:51:32  19   SAMSUNG PHONES.

01:51:36  20   Q.   DID YOU UNDERSTAND WHETHER THE PURPOSE OF THIS WAS TO FIND

01:51:39  21   WHERE IN THE SAMSUNG PHONES APPLE'S DESIGNS APPEARED?

01:51:43  22   A.   YES.

01:51:44  23   Q.   LET'S START OFF WITH WHERE WE LEFT OFF, FACTOR 1.  IF WE

01:51:51  24   COULD START OFF WITH THE '305 PATENT.

01:51:53  25        AND IF WE COULD, KEN, PLEASE BRING UP SDX 1417.

LUCENT DIRECT BY MR. QUINN

01:51:58  1        WHAT WAS YOUR CONCLUSION ABOUT THE PROMINENCE OF THE '305

01:52:03  2   DESIGN WITHIN THE SAMSUNG PRODUCTS AS A WHOLE?

01:52:07  3   A.   THAT IT WAS VERY LOW.

01:52:10  4   Q.   WHY IS THAT?

01:52:11  5   A.   WELL, FOR SEVERAL REASONS, AND A FEW KEY ONES ARE THAT,

01:52:18  6   AGAIN, WE'RE TALKING ABOUT ONE SINGLE GRAPHICAL USER INTERFACE

01:52:26  7   IN THE SAMSUNG ANDROID GOOGLE OPERATING SYSTEM WHICH HAS

01:52:32  8   THOUSANDS OF SCREENS LIKE THIS.

01:52:36  9        AND THEN SECONDLY, ON THE SAMSUNG PHONES, THIS PATENT --

01:52:46  10  THIS PATENT WAS USED ON THE APP MENU SCREEN, WHICH IS THE --

01:52:54  11  WHICH IS A COUPLE CLICKS DOWN FROM THE HOME SCREEN ON THE

01:52:57  12  SAMSUNG PHONES.

01:52:59  13        SO IT'S A DIFFERENT SCREEN AND IT'S A SCREEN THAT'S SELDOM

01:53:03  14  USED.

01:53:03  15  Q.   DID THE -- THIS DESIGN DOES APPEAR AS THE HOME SCREEN ON

01:53:08  16  THE IPHONE?

01:53:08  17  A.   YES.

01:53:09  18  Q.   DID YOU CREATE A VIDEO TO DEMONSTRATE HOW THIS WORKS, WHAT

01:53:15  19  YOU JUST REFERRED TO, THE APP SCREEN AND THE HOME SCREEN ON THE

01:53:20  20  SAMSUNG PHONES?

01:53:21  21  A.   YES.  BECAUSE WE'RE DEALING WITH TWO DIFFERENT OPERATING

01:53:24  22  SYSTEMS, SO I WANTED TO MAKE THAT CLEAR, YES.

01:53:30  23        MR. QUINN:  THIS IS DX 4564, YOUR HONOR, AND I'D

01:53:37  24  REQUEST PERMISSION TO PLAY THAT.

01:53:40  25        MR. MUELLER:  I'M SORRY, CAN YOU REPEAT THE NUMBER,

01:53:42   1        PLEASE.

01:53:42   2                MR. QUINN:  IT'S 4564, A VIDEO.

01:53:56   3                MR. MUELLER:  YOUR HONOR, WE HAD OBJECTED TO THIS

01:53:59   4     AS -- WE DO OBJECT TO IT AS UNDISCLOSED BEFORE.

01:54:03   5                THE COURT:  IT HASN'T BEEN DISCLOSED?

01:54:07   6                MR. MUELLER:  NOT IN HIS REPORT.

01:54:08   7                MR. QUINN:  4564.  IT'S A DEMONSTRATIVE, YOUR HONOR.

01:54:11   8     WE'RE NOT GOING TO OFFER THIS INTO EVIDENCE.  BOTH SIDES

01:54:15   9     EXPERTS HAVE CREATED DEMONSTRATIVES.

01:54:19   10               THE COURT:  THIS WAS NOT PART OF HIS REPORT?

01:54:20   11               MR. MUELLER:  NO.

01:54:21   12               MR. QUINN:  WE'RE OFFERING IT ONLY AS A

01:54:24   13    DEMONSTRATIVE, YOUR HONOR.

01:54:24   14               MR. MUELLER:  IT'S A SUBSTANTIVE -- I GUESS I WOULD

01:54:27   15    SAY, YOUR HONOR, TO THE EXTENT THEY'RE TRYING TO INTRODUCE

01:54:30   16    SUBSTANTIVE OPINIONS BY PLAYING THE VIDEO, THAT'S EXACTLY THE

01:54:33   17    SORT OF THING THAT SHOULD HAVE BEEN IN THE REPORT.

01:54:35   18               MR. QUINN:  YOUR HONOR, WE'RE JUST GOING TO SHOW THE

01:54:37   19    ILLUSTRATION OF THE HOME SCREEN AND THE APP SCREEN.

01:54:39   20               THE COURT:  ALL RIGHT.  HAVE YOU SEEN IT BEFORE?

01:54:40   21               MR. MUELLER:  YOU KNOW, JUST TO KEEP IT MOVING, YOUR

01:54:43   22    HONOR, WE'LL LET THEM PLAY THIS, AND WE'LL TAKE IT UP ON CROSS.

01:54:46   23               THE COURT:  OKAY.  GO AHEAD, PLEASE.

01:54:48   24               MR. QUINN:  THANK YOU, YOUR HONOR.

01:54:49   25           CAN WE PLAY THAT VIDEO, KEN.

966

01:54:51  1      Q.   AND PERHAPS YOU CAN WALK US THROUGH IT AND TELL US WHAT

01:54:54  2      YOU'RE DOING HERE AND WHAT WE SEE?

01:54:55  3      A.   YEAH.  SO THIS IS THE SAMSUNG CAPTIVATE, AND IT STARTS

01:55:01  4      WITH THE HOME SCREEN ON THE SAMSUNG CAPTIVATE PHONE.  SO HERE

01:55:07  5      YOU'RE, YOU'RE ACCESSING, YOU KNOW, THE PHONE.

01:55:11  6           AND THEN YOU CAN SEE HERE, THIS IS THE HOME SCREEN AND IT

01:55:17  7      HAS ALL YOUR -- THE KIND OF FUNCTIONS USED MOST OFTEN ON A

01:55:24  8      COUPLE PAGES.

01:55:25  9           AND YOU CAN -- YOU CAN SCROLL BACK AND FORTH THROUGH THOSE

01:55:29  10     PAGES.

01:55:30  11          SO IF -- YOU CAN SEE HERE IF I WENT TO ACCESS ONE OF THESE

01:55:37  12     FUNCTIONS LIKE GMAIL, I CAN CLICK ON THAT.

01:55:42  13          AND THEN I JUST TOUCH THE NAVIGATION BAR AT THE BOTTOM TO

01:55:46  14     GET BACK TO THE HOME SCREEN.  SO THIS IS WHERE YOU WOULD

01:55:50  15     INTERACT WITH YOUR E-MAIL, SEND E-MAIL, READ E-MAILS.

01:55:55  16          THIS IS ALSO, YOU KNOW, WE'LL CONTINUE TO GO THROUGH SOME

01:55:59  17     OF THESE FUNCTIONS.

01:56:01  18          SO OBVIOUSLY THIS IS -- YOU MAKE PHONE CALLS FROM THE HOME

01:56:04  19     SCREEN.

01:56:04  20     Q.   THESE ARE DIFFERENT GRAPHICAL USER INTERFACE SCREENS WE'RE

01:56:08  21     LOOKING AT NOW?

01:56:08  22     A.   YES.  AND SO HERE WE'RE LOOKING AT, YOU KNOW, THE -- THAT

01:56:14  23     WAS THE PHONE.

01:56:18  24          AND THEN OTHER THINGS LIKE MUSIC IS ON YOUR, MESSAGING,

01:56:28  25     CAMERA FUNCTIONS, THESE ARE ALL THINGS THAT YOU WOULD TYPICALLY

01:56:30  1      USE ON A -- AND IT SHOULD BE RUNNING MORE QUICKLY THAN THIS.

01:56:35  2      Q.   WHILE THAT'S WORKING --

01:56:37  3      A.   YEAH.

01:56:38  4      Q.   DO YOU -- DO SOME OR ALL OF THESE APPS COME PRE-INSTALLED

01:56:42  5      ON THE HOME PAGE OF THE SAMSUNG PHONE?

01:56:45  6      A.   YES.

01:56:46  7           SO THE -- YOU KNOW, THE APPS THAT PEOPLE TYPICALLY USE

01:56:50  8      MOST OFTEN COME PRE-INSTALLED.

01:56:52  9      Q.   HOPEFULLY WE'LL BE ABLE TO SHOW HOW YOU GET TO THE APP

01:56:57  10     PAGE.

01:56:59  11     A.   YES.  AND YOU CAN --

01:57:00  12     Q.   AND BY THE WAY, YOU UNDERSTAND THAT THIS HOME SCREEN HERE

01:57:04  13     THAT WE'RE LOOKING AT, THAT DOES NOT INFRINGE THE '305 PATENT?

01:57:08  14     A.   YES.

01:57:10  15          AND THEN HERE YOU CAN ACCESS YOUR MUSIC, YOUR PLAY LIST.

01:57:14  16     THIS WAS ON A CAPTIVATE PHONE A WHILE BACK.

01:57:17  17          BUT, YOU KNOW, THEN ALSO YOU CAN ACCESS THE INTERNET.  SO

01:57:25  18     YOU WOULD CLICK ON THAT TO BROWSE THE INTERNET.

01:57:28  19     Q.   WE'RE STILL ON THE HOME, THE HOME PAGE?

01:57:30  20     A.   YES, STILL WORKING OFF OF THE HOME PAGE.

01:57:33  21          AND THEN YOU, YOU TOUCH THE NAVIGATION BAR TO GO BACK AND

01:57:43  22     YOU COULD LOOK AT MAP FUNCTIONS.

01:57:45  23          SO THESE ARE ALL THINGS THAT YOU WOULD USE MOST OFTEN ON

01:57:49  24     YOUR PHONE AND THEY RESIDE ON THE HOME PAGE, WHICH IS VERY

01:57:54  25     DIFFERENT THAN THE APP MENU SCREEN.

01:57:57   1       Q.   DIFFERENT THAN THE IPHONE IN THAT RESPECT?

01:57:59   2       A.   YES, AND DIFFERENT FROM THE IPHONE.

01:58:02   3            AND SO IF I WERE TO, YOU KNOW -- YOU'LL SEE IF I WANTED TO

01:58:09   4       GO TO THE APP MENU SCREEN --

01:58:16   5            MR. KOTARSKI:   THAT'S THE END.

01:58:17   6            MR. QUINN:   THAT'S THE END?   ALL RIGHT.

01:58:21   7       Q.   SO IF YOU WANTED TO GO -- WE'RE APPARENTLY HAVING SOME

01:58:24   8       TECHNICAL PROBLEMS?

01:58:26   9       A.   YEAH.

01:58:26  10       Q.   THERE WE GO.   IF YOU WANTED TO GET TO THE, THE APP SCREEN

01:58:31  11       THAT HAS THE '305 DESIGN, HOW WOULD YOU GET TO THAT?

01:58:35  12       A.   WELL, SO -- YEAH.   I WOULD -- I WOULD -- TO GET TO THE APP

01:58:39  13       MENU SCREEN, I WOULD JUST TAP ON THIS, AND THAT TAKES ME TO

01:58:46  14       WHERE THE APPS ARE STORED (INDICATING).

01:58:48  15            KIND OF LIKE IN A LIBRARY.

01:58:50  16            AND SO AT THAT POINT, I COULD ACTUALLY SELECT ONE OF THOSE

01:58:54  17       APPS, AND THEN AS SOON AS YOU PUT YOUR FINGER ON THIS, THEN --

01:59:00  18       AND YOU PRESS AND HOLD IT, THEN IT -- YOU CAN DRAG IT DIRECTLY

01:59:04  19       TO THE HOME SCREEN.

01:59:05  20       Q.   SO YOU CAN ADD APPS ON YOUR HOME PAGE FROM THAT APP SCREEN

01:59:10  21       THAT'S DOWN BELOW?

01:59:12  22       A.   YES.

01:59:13  23       Q.   AND DO YOU KNOW WHETHER THE ICONS CHANGE APPEARANCE WHEN

01:59:16  24       THEY'RE MOVED FROM THE APP PAGE TO THE HOME PAGE?

01:59:18  25       A.   YEAH.   AS YOU SEE HERE ON THE HOME SCREEN, THERE'S NO

01:59:21   1    CONTAINER, AND SO AS -- WHEN THOSE ICONS ARE MOVED TO THE

01:59:28   2    SAMSUNG PHONE'S HOME SCREEN, THE CONTAINER GOES AWAY.

01:59:34   3    Q.   ALL RIGHT.   YOU INDICATED THERE ARE HUNDREDS, MAYBE

01:59:35   4    THOUSANDS OF GRAPHICAL USER INTERFACE SCREENS IN THESE SAMSUNG

01:59:41   5    PHONES?

01:59:41   6    A.   YES.

01:59:42   7    Q.   AND DID YOU CREATE A SLIDE TO DEMONSTRATE THIS?

01:59:45   8    A.   YES.

01:59:45   9    Q.   IF WE COULD LOOK AT SDX 1418, PLEASE.

01:59:54   10        WHAT IS THIS?

01:59:55   11   A.   SO THIS IS SOME OF THE THOUSANDS OF SCREENS THAT MAKE UP

02:00:00   12   A, YOU KNOW, A GOOGLE ANDROID INTERFACE.

02:00:05   13        SO YOU SEE THE PHONE, WE TALKED ABOUT THAT.

02:00:10   14        YOU KNOW, LOTS -- CALCULATOR FUNCTIONS, CLOCKS, LOTS OF

02:00:14   15   DIFFERENT -- BOOKS, ACCESS TO BOOKS, THOSE KINDS OF THINGS.

02:00:19   16   Q.   OKAY.   LET'S TURN TO THE OTHER TWO PATENTS, STILL TALKING

02:00:22   17   ABOUT FACTOR 2, PROMINENCE.

02:00:26   18        LET'S TURN TO THE '677 AND THE '087 PATENTS, AND LET'S

02:00:29   19   START WITH A DEMONSTRATIVE, SDX 1419.

02:00:34   20        AND WHAT DOES THIS SHOW?

02:00:35   21   A.   SO THIS, THIS SHOWS THE GALAXY S, WHICH INFRINGED THE

02:00:43   22   D'677 AND D'087, AND THEN THE GALAXY ACE, WHICH IS AN

02:00:48   23   ALTERNATIVE DESIGN.

02:00:49   24   Q.   OKAY.   AND WHY DID -- DID YOU FIND THIS SIGNIFICANT IN

02:00:53   25   YOUR ANALYSIS OF FACTOR 2, RELATIVE PROMINENCE?

02:00:57  1    A.   YES, BECAUSE I -- I WANTED TO UNDERSTAND IT WHAT THE, WHAT

02:01:04  2    THE -- HOW NARROW OR BROAD THE PROTECTION WAS ON THE PATENT.

02:01:09  3    Q.   OKAY.  AND IF WE COULD LOOK AT SDX 1420, AGAIN, WHAT

02:01:15  4    YOU'RE LOOKING AT -- THIS IS THE FACTOR THAT YOU'RE ANALYZING

02:01:18  5    HERE?

02:01:19  6    A.   YES.

02:01:20  7    Q.   AND DID -- CONSIDERING THE ALTERNATIVE DESIGN THAT WASN'T

02:01:25  8    INFRINGING, HOW DID THAT INFORM YOUR OPINION ABOUT RELATIVE

02:01:29  9    PROMINENCE?

02:01:30  10        IF WE CAN GO BACK TO SDX 14, PLEASE.

02:01:35  11   A.   SO IT -- IF YOU --

02:01:39  12   Q.   I'M SORRY, 1419.

02:01:42  13   A.   YEAH.  IF YOU -- IF YOU LOOK AT THIS CLOSELY, YOU SEE

02:01:48  14   THAT, YOU KNOW, BY SIMPLY CHANGING A SMALL DETAIL ON THE -- BY

02:01:54  15   ADDING A CHROME FINISH TO THE SPEAKER, CHANGING SLIGHTLY THE

02:02:01  16   SHAPE OF THE BUTTON AT THE BOTTOM, AND THEN SMALL CHANGES TO

02:02:05  17   THE BEZEL, YOU KNOW, IT'S -- IT'S NOW NON-INFRINGING

02:02:10  18   ALTERNATIVE DESIGN.

02:02:12  19   Q.   SO LOOKING AT THIS EXAMPLE AND LOOKING AT THE LANGUAGE OF

02:02:16  20   FACTOR 2, DO YOU FIND THE DESIGN OF THE '677 AND THE '087

02:02:21  21   PATENTS TO BE RELATIVELY PROMINENT WITHIN THE SAMSUNG PHONES

02:02:26  22   THAT WERE FOUND TO INFRINGE?

02:02:27  23   A.   NO.

02:02:28  24   Q.   WHY NOT?

02:02:29  25   A.   BECAUSE IT'S -- YOU KNOW, IT -- IT'S JUST NOT A PROMINENT

02:02:40  1    DESIGN.  IT -- YOU KNOW, YOU SEE HERE THAT THE PROTECTION OF

02:02:46  2    THE PATENT IS ZERO.

02:02:48  3    Q.  IF WE COULD TURN, PLEASE, TO FACTOR 3, CONCEPTUAL

02:02:54  4    DISTINCTNESS, SDX 1421.

02:02:57  5        HOW DID YOU APPLY THIS FACTOR?

02:02:59  6    A.  SO THIS FACTOR IS -- IT'S SAYING WHETHER THE DESIGN IS

02:03:05  7    CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE.

02:03:07  8        SO TO ME, THIS MEANT IS THE -- IS THE DESIGN, YOU KNOW,

02:03:18  9    CONCEPTUALLY DISTINCT?  SO YOU'RE SAYING CONCEPTUAL, THAT'S AN

02:03:20  10   IDEA, AND DISTINCT MEANS DIFFERENT.

02:03:23  11       SO IS THIS PATENTED DESIGN, THE BEZEL, THE PIECE OF GLASS

02:03:29  12   AND THE SINGLE, YOU KNOW, GUI IMAGE, ARE THOSE, ARE THOSE A

02:03:38  13   DIFFERENT IDEA THAN THE NOTION OF A SMARTPHONE --

02:03:41  14   Q.  DID --

02:03:43  15   A.  -- OF A SAMSUNG SMARTPHONE?

02:03:44  16   Q.  DID YOU UNDERSTAND FACTOR 3 TO REQUIRE AN ANALYSIS OF

02:03:49  17   WHETHER THERE'S VISUAL DISTINCTNESS?

02:03:52  18   A.  NO.  THIS -- THIS IS -- THIS IS GOING BEYOND VISUAL

02:03:57  19   DISTINCTNESS.

02:03:58  20       EVEN THOUGH I ADDRESSED IT IN RELATIVE PROMINENCE, THIS IS

02:04:04  21   REALLY ASKING ABOUT ARE THE IDEAS DIFFERENT, YOU KNOW, BETWEEN

02:04:09  22   THE PATENT AND THIS NOTION OF A SMARTPHONE.

02:04:14  23   Q.  AND, AGAIN, WHICH PRODUCTS DID YOU LOOK AT IN ASSESSING

02:04:17  24   CONCEPTUAL DISTINCTION?  DID YOU LOOK AT THE IPHONE OR ARE YOU

02:04:20  25   LOOKING AT THE SAMSUNG PHONES THAT WERE FOUND TO BE INFRINGING?

02:04:24   1      A.   YES, I'M -- I'M FOCUSSED ON THE SAMSUNG PHONES.

02:04:28   2      Q.   AND WHY IS THAT?

02:04:29   3      A.   BECAUSE THAT'S -- THEY -- THAT'S WHERE THE DESIGN APPEARS,

02:04:37   4      IN THE SAMSUNG PHONES.

02:04:38   5      Q.   IF WE COULD LOOK AT SDX 1436, WHAT ARE WE LOOKING AT HERE?

02:04:46   6      A.   SO THIS IS A DIAGRAM I CREATED IN MY REPORT TO KIND OF

02:04:52   7      CONVEY MY THINKING.

02:04:55   8          YOU KNOW, IF YOU HAVE A NUMBER OF COMPONENTS ON ONE AXES

02:05:02   9      AND INCREASING COMPLEXITY ON ANOTHER AXES.

02:05:06   10         SO THIS IS A REALLY GOOD WAY TO KIND OF ANALYZE THIS IF

02:05:09   11     WE'RE TALKING ABOUT DIFFERENT IDEAS.

02:05:11   12         SO --

02:05:12   13     Q.   YEAH, FIRST, COULD YOU -- IT LOOKS LIKE A DINNER PLATE

02:05:16   14     DOWN THERE TO THE LOWER LEFT?

02:05:18   15     A.   YES.

02:05:18   16     Q.   DID YOU APPLY FACTOR 3, CONCEPTUAL DISTINCTNESS, WOULD YOU

02:05:22   17     TELL US HOW YOU WOULD APPLY THAT TO A DINNER PLATE?

02:05:25   18     A.   SO A DINNER PLATE AND THE DESIGN OF THAT AND THE IDEA OF A

02:05:29   19     DINNER PLATE IS, YOU KNOW, THE SAME IDEA; RIGHT?

02:05:35   20     Q.   AND THE NEXT EXAMPLE?

02:05:36   21     A.   AND THEN IF YOU LOOK AT A BOOK, YOU BEGIN TO THINK

02:05:40   22     ABOUT -- WITH A BOOK, YOU HAVE THE LITERARY WORK INSIDE THE

02:05:44   23     WORK AND YOU HAVE THIS COVER.  SO THE COVER IS, IS MORE LIKE

02:05:50   24     THE ENCLOSURE, BUT THEN YOU HAVE THIS COMPLETELY DIFFERENT IDEA

02:05:54   25     OF THE CONTENT AND THE LITERARY WORK, THE STORY INSIDE.

02:06:00  1        AND WITH A PIANO, AGAIN, ON THE INSIDE YOU HAVE THIS

02:06:05  2   AMAZING MUSIC MAKING CAPABILITY OF IT THE -- WITHIN THE INSIDE

02:06:11  3   OF A PIANO.  BUT THEN YOU HAVE THIS SHELL, THIS ENCLOSURE

02:06:16  4   THAT'S DESIGNED THAT IS A SEPARATE IDEA FROM THE PIANO.

02:06:19  5        AND THEN AS YOU MOVE ALL THE WAY UP, A SMARTPHONE IS --

02:06:25  6   YOU CAN SEE HOW THAT'S A VERY DIFFERENT IDEA WITH THE VIDEO

02:06:29  7   CAMERA, THE PHOTOS, THE ABILITY TO MAKE PHONE CALLS AND ACCESS

02:06:34  8   THE INTERNET AND GPS AND MAPPING AND ALL THESE FUNCTIONS AND

02:06:39  9   POWER ON THE SMARTPHONE, THAT'S A VERY DIFFERENT IDEA THAN A

02:06:44  10  PIECE OF PLASTIC ON A BEZEL OR A PIECE OF GLASS ON THE FRONT OR

02:06:49  11  ONE SINGLE IMAGE ON A GRAPHICAL USER INTERFACE.

02:06:53  12       THEY'RE VERY DIFFERENT IDEAS.

02:06:54  13  Q.   YOU SAID YOU LOOKED SOMETHING INTO THE EVOLUTION, THE

02:06:57  14  HISTORY OF THE SMARTPHONE.

02:06:59  15       DO YOU HAVE ANY INFORMATION ABOUT HOW MANY COMPONENTS

02:07:03  16  THERE ARE IN SMARTPHONES BACK IN THIS TIME PERIOD

02:07:06  17  APPROXIMATELY?

02:07:06  18  A.   YES, THERE ARE -- YEAH.  THERE ARE THOUSANDS OF COMPONENTS

02:07:10  19  IN A SMARTPHONE.

02:07:11  20  Q.   AND HOW ABOUT PATENTS, NUMBERS OF PATENTS IN A SMARTPHONE?

02:07:19  21  A.   WELL, ONE OF THE THINGS I LOOKED AT WAS, YOU KNOW, JUST

02:07:22  22  TRYING TO UNDERSTAND THE POWER OF A SMARTPHONE, I FOUND THAT

02:07:25  23  THE -- A TYPICAL SMARTPHONE PRACTICES OVER 200,000 PATENTS.

02:07:32  24  Q.   YOU WERE HERE WHEN THE EXPERT RETAINED BY APPLE, MR. BALL,

02:07:37  25  TESTIFIED AND YOU HEARD HIS TESTIMONY?

LUCENT DIRECT BY MR. QUINN                                          974

02:07:39  1    A.   YES.

02:07:40  2    Q.   AND YOU HEARD HIS TESTIMONY THAT HE THOUGHT THE '677 AND

02:07:46  3    '087 PATENTS ARE NOT DISTINCT FROM THE PHONE AS A WHOLE BECAUSE

02:07:51  4    THE SAMSUNG PHONES ARE MONOLITHIC PRODUCTS.

02:07:55  5         DO YOU RECALL THAT TESTIMONY?

02:07:56  6    A.   YES.

02:07:57  7    Q.   DO YOU AGREE WITH THAT?

02:07:58  8    A.   NO.  I -- YOU KNOW, HAVING VISITED -- TALKED WITH THE

02:08:04  9    DESIGNERS, VISITING THE MANUFACTURING FACILITIES, SAMSUNG TAKES

02:08:09  10   A VERY DIFFERENT APPROACH TO THE DESIGN OF THEIR PHONES.

02:08:15  11        AND IF YOU -- IF YOU LOOK AT -- IF YOU LOOK AT THE PHONE I

02:08:27  12   BROUGHT UP BEFORE --

02:08:28  13   Q.   YEAH, CAN YOU TELL US WHAT YOU'VE GOT IN YOUR HAND?

02:08:32  14   A.   SO THIS IS THE GALAXY S 4G.

02:08:34  15   Q.   THE SAME ONE YOU WERE HOLDING BEFORE?

02:08:36  16   A.   YEAH, THE SDX 1450.

02:08:39  17   Q.   ALL RIGHT.

02:08:40  18   A.   AND WITH A SAMSUNG PHONE, THE BACK COVER, THESE PLASTIC

02:08:48  19   BACK COVERS COME OFF EASILY.  THE BATTERIES COME OUT, THE SIM

02:08:52  20   CARDS.

02:08:54  21        SO THIS, TO ME, IS NOT A MONOLITHIC DESIGN.  IT'S NOT A

02:08:58  22   SLAB.  IT'S NOT, YOU KNOW, SOMETHING THAT, YOU KNOW, IS ALL

02:09:04  23   MADE OF 1 PIECE.

02:09:05  24   Q.   ALL RIGHT.  PUTTING THAT ISSUE ASIDE, DO YOU AGREE WITH

02:09:09  25   MR. BALL THAT IT'S THE VISUAL APPEARANCE THAT WE NEED TO LOOK

02:09:14  1    AT IN DECIDING WHETHER IT'S CONCEPTUAL -- THE DESIGNS ARE

02:09:18  2    CONCEPTUALLY DISTINCT FROM THE PRODUCT, THAT WE SHOULD ONLY

02:09:21  3    LOOK AT THE VISUAL APPEARANCE?

02:09:23  4    A.   NO.  NO.

02:09:25  5    Q.   WHY?

02:09:25  6    A.   WELL, AGAIN, WHAT WE'RE LOOKING FOR, THIS -- THE

02:09:34  7    CONCEPTUAL DISTINCTNESS.

02:09:36  8         SO WE'RE LOOKING FOR WHAT IS THE IDEA OF A SMARTPHONE AND

02:09:39  9    WHAT DOES THAT CONVEY AND HOW POWERFUL THAT SMARTPHONE IS

02:09:42  10   COMPARED TO THE ORNAMENTAL DESIGN OF THESE THREE PATENTS.

02:09:48  11   Q.   AND IF WE CAN LOOK AT FACTOR 3 AGAIN, KEN, SDX 1421.

02:09:55  12        DID YOU UNDERSTAND THAT FACTOR TO REQUIRE YOU TO LOOK AT

02:09:59  13   VISUAL CONCEPTUAL DISTINCTNESS IN TERMS OF THE PRODUCT AS A

02:10:03  14   WHOLE?

02:10:03  15   A.   NO.

02:10:04  16   Q.   PRODUCT AS A WHOLE?

02:10:06  17   A.   OH, THE -- THE VISUAL --

02:10:10  18   Q.   DID YOU UNDERSTAND THIS TO BE LIMITED TO VISUAL

02:10:14  19   DISTINCTNESS?

02:10:14  20   A.   NO.

02:10:15  21   Q.   OKAY.  WHAT WAS YOUR CONCLUSION AS IT REGARDS TO

02:10:19  22   CONCEPTUAL DISTINCTNESS, THIS FACTOR AS IT APPLIES TO THESE

02:10:24  23   PATENTS, THE THREE PATENTS?

02:10:27  24   A.   YEAH, THAT THE 3 PATENTS, THE D'087, AND THE D'677 AND THE

02:10:37  25   D'305 WERE CONCEPTUALLY DISTINCT FROM THE PRODUCT AS A WHOLE.

02:10:41  1   Q.   IF WE COULD TURN NOW TO THE FOURTH FACTOR.

02:10:45  2        AND, KEN, IF YOU COULD PUT UP SDX 1423.

02:10:48  3        AND THIS FACTOR FOCUSES ON THE PHYSICAL RELATIONSHIP

02:10:51  4   BETWEEN THE DESIGN AND THE PRODUCT?

02:10:55  5   A.   YES.

02:10:56  6   Q.   AND, AGAIN, WHICH PHONES WERE YOU LOOKING AT TO ASSESS

02:10:59  7   THIS FACTOR?  THE APPLE PHONE OR THE SAMSUNG PHONES?

02:11:03  8   A.   YEAH, I'M LOOKING AT THE SAMSUNG PHONES.

02:11:06  9   Q.   OKAY.  SO THIS ONE IS KIND OF LONG, SO LET'S BREAK IT UP.

02:11:11  10       ONE THING THE FACTOR ASKS IS "WHETHER THE DESIGN --" IF WE

02:11:16  11  CAN LOOK AT SDX 1424, KEN -- "WHETHER THE DESIGN PERTAINS TO A

02:11:21  12  COMPONENT THAT A USER OR SELLER CAN PHYSICALLY SEPARATE FROM

02:11:24  13  THE PRODUCT AS A WHOLE."

02:11:26  14       DO YOU SEE THAT?

02:11:27  15  A.   YES.

02:11:27  16  Q.   AND DID YOU INVESTIGATE THAT?

02:11:34  17  A.   YES.  SO IT'S ASKING WHETHER THE DESIGN, THE PATENTED

02:11:37  18  DESIGN, YOU KNOW, THE D'305, THE D'677, THE D'087, IF THEY

02:11:42  19  PERTAIN TO A COMPONENT, YOU KNOW, THAT A USER OR SELLER CAN

02:11:50  20  PHYSICALLY SEPARATE FROM THE PRODUCT AS A WHOLE.

02:11:53  21  Q.   FIRST YOU HAVE TO FIND OUT IF IT PERTAINS TO A COMPONENT?

02:11:56  22  A.   YES.

02:11:56  23  Q.   AND DID YOU FIND WHETHER OR NOT IT PERTAINS TO A COMPONENT

02:11:59  24  IN THIS CASE?

02:12:00  25  A.   YES.  SO THIS -- THIS IS AGAIN ABOUT THE PHYSICAL

02:12:02   1    RELATIONSHIP; RIGHT?  SO I'M LOOKING FOR THINGS, I'M LOOKING

02:12:06   2    FOR ACTUAL THINGS, AND I FOUND THAT -- YOU KNOW, THAT THE

02:12:15   3    DESIGNS PERTAIN TO, YOU KNOW, THE GLASS FRONT FACE, THE

02:12:23   4    DISPLAY, YOU KNOW, AND THE, YOU KNOW, THE DISPLAY SCREEN AND

02:12:27   5    THE BEZEL.

02:12:29   6    Q.   DID YOU CONSIDER WHETHER THESE COMPONENTS ARE SEPARABLE?

02:12:34   7    A.   YES.

02:12:34   8    Q.   WHAT DID YOU DO TO INVESTIGATE THAT?

02:12:36   9    A.   SO AS YOU SAW, I -- I ACTUALLY DID DISASSEMBLY ON MY OWN.

02:12:47  10    I LOOKED AT VIDEOS ON THE INTERNET THAT SHOWED HOW THINGS WERE

02:12:52  11    DISASSEMBLED, YOU KNOW, AND I SAW THE, THE COMPONENTS IN, YOU

02:13:00  12    KNOW, ON THE -- I SAW THE WHOLE MANUFACTURING PROCESS AND

02:13:07  13    DOCUMENTS WHEN I WAS IN KOREA.

02:13:09  14    Q.   IN YOUR BINDER, IF YOU COULD PLEASE TURN TO DX 4569.

02:13:18  15    4569.

02:13:30  16         AND DO YOU RECOGNIZE THIS AS A COLLECTION OF IMAGES OF

02:13:32  17    DISASSEMBLED SAMSUNG PHONES AND COMPONENTS THAT YOU ANALYZED

02:13:36  18    DURING YOUR ANALYSIS?

02:13:37  19    A.   YES.

02:13:37  20    Q.   AND IS THIS SOMETHING THAT YOU RELIED ON FOR YOUR

02:13:40  21    OPINIONS?

02:13:40  22    A.   YES.

02:13:41  23              MR. QUINN:  WE OFFER 4569, YOUR HONOR.

02:13:43  24              MR. MUELLER:  NO OBJECTION, YOUR HONOR.

02:13:44  25              THE COURT:  IT'S ADMITTED.

02:13:46   1            (DEFENDANTS' EXHIBIT 4569 WAS ADMITTED IN EVIDENCE.)

02:13:46   2                 THE COURT:  GO AHEAD, PLEASE.

02:13:47   3    BY MR. QUINN:

02:13:49   4    Q.   AND WHAT DID THIS -- WHAT DID THIS TELL YOU, THESE

02:13:52   5    DISASSEMBLIES?

02:13:53   6    A.   THAT, YOU KNOW, THAT THE COMPONENTS THAT I IDENTIFIED WERE

02:14:03   7    SEPARABLE.

02:14:04   8    Q.   LET'S LOOK AT SLIDE SDX 1425.  THE SECOND QUESTION ASKED

02:14:12   9    IN FACTOR 4 IS WHETHER THE DEADLINE IS EMBODIED IN A COMPONENT

02:14:15   10   THAT IS MANUFACTURED SEPARATELY.

02:14:17   11             WHAT DID YOU DO TO INVESTIGATE THAT?

02:14:19   12   A.   SO, SO HERE I -- I -- WELL, YOU KNOW, I -- BASED ON ALL

02:14:30   13   THE ANALYSIS I DID, YOU KNOW, I WAS REALLY LOOKING TO SEE, WERE

02:14:36   14   THESE COMPONENTS MANUFACTURED SEPARATELY?

02:14:39   15                 MR. QUINN:  YOUR HONOR, WOULD NOW BE A GOOD TIME FOR

02:14:42   16   A BREAK?

02:14:42   17                 THE COURT:  WE COULD DO THAT NOW, OR YOU COULD GO

02:14:45   18   UNTIL 4:20.  WHATEVER YOU PREFER.

02:14:48   19                 MR. QUINN:  4:20?

02:14:51   20                 THE COURT:  THAT'S FINE.

02:14:52   21                 MR. QUINN:  I PREFER TO TAKE THE BREAK NOW.

02:14:54   22                 THE COURT:  OH, NOW.  THAT'S FINE.  SO 4:14.

02:14:59   23                 THE CLERK:  2:00, YOUR HONOR.

02:15:01   24                 THE COURT:  I'M SORRY.  I'M LOOKING AT THIS.  THIS

02:15:04   25   SAYS 4:14, I'M SORRY.

LUCENT DIRECT BY MR. QUINN

| | | |
|---|---|---|
| 02:15:06 | 1 | ALL RIGHT.  LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK |
| 02:15:09 | 2 | NOW, PLEASE.  DON'T RESEARCH, DISCUSS, OR LISTEN TO ANYTHING |
| 02:15:12 | 3 | ABOUT THE CASE, THESE PARTIES OR THEIR PRODUCTS. |
| 02:15:15 | 4 | THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE. |
| 02:15:19 | 5 | AND YOU MAY STEP DOWN DURING THE BREAK.  IT'LL BE A TEN |
| 02:15:22 | 6 | MINUTE BREAK. |
| 02:15:23 | 7 | (JURY OUT AT 2:15 P.M.) |
| 02:15:30 | 8 | THE COURT:  ALL RIGHT.  I DO THINK IT'S FAIR, SINCE |
| 02:15:36 | 9 | WHAT THE ARTICLE OF MANUFACTURE FOR THE GUI PATENT IS, IS IT |
| 02:15:44 | 10 | GOING TO BE JUST THE DISPLAY SCREEN?  IS THAT CORRECT? |
| 02:15:47 | 11 | MR. QUINN:  YES, YOUR HONOR. |
| 02:15:47 | 12 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 02:15:49 | 13 | LET'S TAKE OUR BREAK NOW. |
| 02:15:50 | 14 | THE CLERK:  COURT'S IN RECESS. |
| 02:15:52 | 15 | (RECESS FROM 2:15 P.M. UNTIL 2:28 P.M.) |
| 02:28:18 | 16 | (JURY OUT AT 2:28 P.M.) |
| 02:28:19 | 17 | THE COURT:  OKAY.  WELCOME BACK.  WE HAVE A JUROR IN |
| 02:28:21 | 18 | THE RESTROOM. |
| 02:28:22 | 19 | PLEASE TAKE A SEAT. |
| 02:28:23 | 20 | BUT I THINK WE'LL NEED TO HAVE A JURY INSTRUCTION |
| 02:28:25 | 21 | CONFERENCE. |
| 02:28:27 | 22 | IS IT CORRECT THAT MS. DAVIS DID NOT PROPOSE A REASONABLE |
| 02:28:31 | 23 | ROYALTY ON THE DESIGN PATENTS? |
| 02:28:33 | 24 | MR. LEE:  NOT AT THIS POINT, YOUR HONOR. |
| 02:28:34 | 25 | THE COURT:  OKAY.  I THINK IT WOULD BE HELPFUL TO GET |

02:28:38   1    RESPONSES TO EACH PARTIES' OBJECTIONS TO THE LAST SET.  I THINK

02:28:46   2    I MAY HAVE MADE A MISTAKE IN INSTRUCTION NUMBER 30.  I AGREE

02:28:50   3    WITH APPLE'S APPORTIONMENT POINT.  I THINK IT SHOULD SAY TOTAL

02:28:54   4    PROFIT ON THE ARTICLE OF MANUFACTURE.  THAT WAS A MISTAKE, SO I

02:28:58   5    APOLOGIZE FOR THAT.

02:28:59   6         BUT I WOULD LIKE TO HEAR, HOW DOES THE FACT THAT MS. DAVIS

02:29:04   7    DIDN'T PUT IN A REASONABLE ROYALTY AFFECT THE INSTRUCTIONS

02:29:08   8    THEN?

02:29:10   9         WE TAKE THEM ALL OUT FOR THE DESIGN PATENT INSTRUCTIONS.

02:29:14   10        MR. LEE:  YOUR HONOR, LET ME CONFER WITH FOLKS.

02:29:18   11        THE COURT:  OKAY.

02:29:18   12        MR. LEE:  THE QUESTION OF WHETHER SHE'S GOING TO

02:29:20   13   OFFER THAT OPINION OR NOT I VIEWED AS A REBUTTAL ISSUE, AND I

02:29:23   14   WAS GOING TO MAKE IT, OBVIOUSLY WHEN SHE TESTIFIES ON REBUTTAL.

02:29:28   15   SHE'LL BE REUSING IT TO REBUT WHAT MR. WAGNER HAS TO SAY

02:29:32   16   ABOUT -- HE'S GOING TO COME UP WITH ARTICLES OF MANUFACTURE

02:29:35   17   THAT ARE LESS THAN THE ENTIRE PHONE AND THEN COME UP WITH A

02:29:38   18   TOTAL PROFIT NUMBER.

02:29:40   19        AND THE QUESTION IS WHETHER I OFFER HER TO SAY, WELL, IF

02:29:44   20   THAT'S THE ARTICLE OF MANUFACTURE, THEN THE APPROPRIATE MEASURE

02:29:47   21   OF DAMAGES IS A REASONABLE ROYALTY.

02:29:50   22        WE MAY NOT OFFER IT, YOUR HONOR, AND IT WILL DEPEND IN

02:29:53   23   PART ON MY CROSS-EXAMINATION OF MR. WAGNER.

02:29:55   24        THE COURT:  OKAY.  WELL, I KNOW WE'RE GOING TO HAVE

02:29:57   25   RULE 50 ARGUMENTS AT 4:30, BUT I ACTUALLY THINK THE FINAL JURY

LUCENT DIRECT BY MR. QUINN

02:30:02   1    INSTRUCTIONS ARE MORE PRESSING.  I MEAN, I'M HAPPY TO HEAR THE

02:30:06   2    RULE 50 ARGUMENTS TOMORROW IF NECESSARY.  YOU'VE PRESERVED YOUR

02:30:10   3    ASSERTION AND INVOCATION OF RULE 50 FOR JMOL.

02:30:16   4        SO WHY DON'T WE TALK LATER.  LET'S FINISH WITH OUR JURY

02:30:22   5    TODAY, BUT THE INSTRUCTIONS ARE NOT FINAL.  I THINK I WILL BE

02:30:24   6    MAKING SOME CHANGES TO THEM.  I JUST WANT TO PUT THE PARTIES ON

02:30:27   7    NOTICE OF THAT, AND I'D LIKE TO HAVE A CONVERSATION AT 4:30,

02:30:30   8    PERHAPS AFTER WE'VE ALL HAD A CHANCE TO DIGEST WHAT YOU FILED

02:30:34   9    AT 1:00 O'CLOCK.  OKAY?

02:30:35   10        MS. MAROULIS:  YOUR HONOR, FOR AVOIDANCE OF DOUBT,

02:30:38   11   SAMSUNG BELIEVES THAT APPLE WAIVED THEIR REASONABLE ROYALTY

02:30:40   12   OPINION AS TO DESIGN PATENTS BECAUSE IT WAS THEIR BURDEN TO PUT

02:30:43   13   THAT IN THEIR CASE-IN-CHIEF.  MS. SULLIVAN CAN ADDRESS THAT IN

02:30:48   14   THE CHARGING CONFERENCE OR JMOL'S.  BUT I WANTED TO PUT THAT ON

02:30:53   15   THE RECORD TODAY.

02:30:53   16        MR. LEE:  OUR OBLIGATION WAS TO OFFER A DAMAGES

02:30:56   17   THEORY AND THE EVIDENCE TO SUPPORT IT.

02:30:58   18        WE DID ONE ON THE TOTAL PROFITS ON THE ARTICLE OF

02:31:01   19   MANUFACTURE AS THE PHONE.

02:31:02   20        WE WEREN'T OBLIGATED TO THEN ANTICIPATE WHAT MR. WAGNER

02:31:07   21   WOULD DO AND THEN RESPOND WITH WHAT OUR ALTERNATIVE WOULD BE.

02:31:10   22        IT WOULD BE IMPOSING ON A PLAINTIFF THE OBLIGATION, DURING

02:31:14   23   THEIR DIRECT CASE, TO PUT ON THEIR DIRECT CASE, ANTICIPATE THE

02:31:17   24   DEFENDANTS, AND PUT ON THEIR RESPONSE.  THAT'S WHY WE HAVE A

02:31:20   25   REBUTTAL CASE.

LUCENT DIRECT BY MR. QUINN

02:31:20  1        THE COURT:  WELL, LET'S GO FORWARD SO WE CAN GET AS

02:31:24  2   MUCH OF MR. WAGNER'S TESTIMONY IN TODAY BECAUSE I THINK THAT

02:31:28  3   WOULD BE INFORMATIVE OF THE JURY INSTRUCTIONS.

02:31:30  4        BUT LET'S PLAN ON HAVING A CONFERENCE THEN AT THE END OF

02:31:33  5   THE DAY ON THE JURY INSTRUCTIONS BECAUSE I THINK THAT'S THE

02:31:35  6   MOST PRESSING.

02:31:36  7        MS. MAROULIS:  YES, YOUR HONOR.

02:31:37  8        THE COURT:  AND WE CAN DO ONE ON RULE 50 AS WELL, BUT

02:31:40  9   I'D LIKE TO MAKE THIS THE PRIORITY.

02:31:42  10       OKAY.  THANK YOU.

02:31:43  11       MS. MAROULIS:  THANK YOU, YOUR HONOR.

02:31:44  12       THE COURT:  OKAY.  LET'S BRING IN OUR JURY, PLEASE.

02:31:46  13       THE CLERK:  YES, YOUR HONOR.

02:31:57  14       (JURY IN AT 2:31 P.M.)

02:32:17  15       THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

02:32:21  16       THE TIME IS 2:32.

02:32:23  17       GO AHEAD, PLEASE.

02:32:24  18       MR. QUINN:  THANK YOU, YOUR HONOR.

02:32:27  19       KEN, IF WE COULD PUT BACK UP SDX 1425.

02:32:31  20   Q.  WE WERE ON THE SECOND PART OF THE FOURTH FACTOR, AND I'D

02:32:35  21   ASKED YOU ABOUT THE SECOND QUESTION THERE IN THE FOURTH FACTOR,

02:32:40  22   WHETHER THE DESIGN IS EMBODIED IN A COMPONENT THAT CAN BE

02:32:43  23   MANUFACTURED SEPARATELY.

02:32:45  24   A.  YES.

02:32:46  25   Q.  IT'S NOT UP ON THE SCREEN.  CAN YOU PUT IT UP ON THE

LUCENT DIRECT BY MR. QUINN

02:32:50  1     SCREEN?  IS THERE SOME ISSUE?

02:32:53  2          THERE WE GO.

02:32:54  3          DO YOU SEE THAT?

02:32:55  4     A.   YES.

02:32:56  5     Q.   AND WHAT DID YOU DO TO INVESTIGATE THAT?

02:32:58  6     A.   SO I, I LOOKED AT THE MANUFACTURING SPECIFICATIONS; I

02:33:05  7     SPOKE TO THE MANUFACTURING ENGINEERS WHO HAD ASSEMBLED, OR --

02:33:13  8     YOU KNOW, THE PRODUCTS; AND JUST UNDERSTOOD THE COMPONENTS.

02:33:19  9     Q.   DID YOU REACH A CONCLUSION ABOUT WHETHER THE DESIGN WAS

02:33:24  10    EMBODIED IN COMPONENTS THAT ARE MANUFACTURED SEPARATELY FROM

02:33:26  11    THE REST OF THE PRODUCT?

02:33:27  12    A.   YES.

02:33:30  13    Q.   AND WHAT WAS THAT?

02:33:30  14    A.   THAT THE -- THAT THE COMPONENTS ARE -- THAT THE DESIGN IS

02:33:36  15    EMBODIED IN A COMPONENT THAT IS MANUFACTURED SEPARATELY.

02:33:39  16    Q.   ONE COMPONENT OR THREE?

02:33:41  17    A.   THREE COMPONENTS, YES.

02:33:43  18    Q.   IF WE COULD LOOK NOW AT SDX 1426, THE LAST PART OF FACTOR

02:33:49  19    4, AND THE LAST QUESTION THERE IS WHETHER THE COMPONENT CAN BE

02:33:53  20    SOLD SEPARATELY.

02:33:55  21          DID YOU LOOK INTO THAT?

02:33:56  22    A.   YES.

02:33:57  23    Q.   AND WHAT DID YOU FIND OUT?

02:33:59  24    A.   WELL, IF YOU -- AS I LOOKED AT IT, I REALIZED THAT THE

02:34:03  25    COMPONENTS ARE ACTUALLY SOLD TO SAMSUNG, SO ON ONE KIND OF SIDE

02:34:14  1    OF THE SPECTRUM.

02:34:16  2    Q.   AGAIN, WHICH COMPONENTS ARE WE TALKING ABOUT?

02:34:18  3    A.   I'M TALKING ABOUT THE BEZEL, THE GLASS FRONT FACE, AND THE

02:34:23  4    DISPLAY SCREEN.

02:34:24  5    Q.   OKAY.

02:34:24  6    A.   AND SO, FOR INSTANCE, WITH THE BEZEL, IT WAS ACTUALLY, YOU

02:34:29  7    KNOW, MANUFACTURED AT A COMPANY THAT DOES INJECTION MOLDED

02:34:34  8    PLASTIC AND THINGS LIKE THAT.

02:34:36  9         AND THEN THIS WAS SOLD TO SAMSUNG.

02:34:42  10        AND THEN, YOU KNOW, THE SAME THING WITH THE DISPLAY

02:34:45  11   SCREEN.  THE DISPLAY SCREEN CAME FROM, YOU KNOW, I THINK I SAW

02:34:49  12   THREE DIFFERENT SOURCES:  SHARP DISPLAY, SONHA, AND THEN

02:34:55  13   SAMSUNG DISPLAY COMPANY, WHICH IS A SEPARATE COMPANY FROM

02:35:01  14   SAMSUNG FROM SAMSUNG ELECTRONICS.

02:35:05  15        AND THEN ON THE FLIP SIDE OF THAT, I WAS ABLE TO ACTUALLY

02:35:10  16   BUY THESE COMPONENTS, YOU KNOW, ON THE INTERNET THROUGH AMAZON

02:35:14  17   AND THROUGH REPAIR IT AND I THINK DR. CELLULAR.

02:35:21  18   Q.   IF WE COULD LOOK AT DX 4516 IN YOUR BINDER THERE,

02:35:28  19   MR. LUCENTE, 4516.

02:35:30  20   A.   YES.

02:35:31  21   Q.   AND DO YOU RECOGNIZE THIS AS A COMPILATION OF DOCUMENTS

02:35:36  22   SHOWING SAMSUNG REPAIR PARTS AVAILABLE FOR SALE ONLINE?

02:35:40  23   A.   YES.

02:35:41  24   Q.   AND IS THIS SOMETHING THAT YOU RELIED ON FOR YOUR

02:35:45  25   OPINIONS?

LUCENT DIRECT BY MR. QUINN

02:35:45  1      A.   YES.

02:35:46  2                MR. QUINN:  YOUR HONOR, WE MOVE 4516.

02:35:48  3                MR. MUELLER:  NO OBJECTION, YOUR HONOR.

02:35:49  4                THE COURT:  IT'S ADMITTED.

02:35:51  5            (DEFENDANTS' EXHIBIT 4516 WAS ADMITTED IN EVIDENCE.)

02:35:51  6                THE COURT:  GO AHEAD, PLEASE.

02:35:52  7      BY MR. QUINN:

02:35:53  8      Q.   IN FACTOR 4 -- IF WE COULD PUT THAT LAST SLIDE BACK UP,

02:35:57  9      KEN.

02:35:57 10           IN FACTOR 4, DID YOU SEE ANYTHING THERE ABOUT WHETHER OR

02:36:00 11      NOT THE MANUFACTURER SELLS THESE PARTS TO CONSUMERS?  IS THAT

02:36:07 12      THERE ANYWHERE?

02:36:09 13      A.   NO, THERE'S NOTHING THAT ASKED ME THAT.

02:36:11 14      Q.   AND IS THERE ANYTHING THERE ABOUT WHETHER THE MANUFACTURER

02:36:16 15      EXPECTS OR INTENDS CONSUMERS TO TAKE APART THE PHONES?

02:36:19 16      A.   NO.

02:36:21 17      Q.   IS THERE ANYTHING THERE ABOUT WHETHER IT'S HARD OR EASY TO

02:36:25 18      TAKE APART THE PHONES?

02:36:26 19      A.   NO, THAT IS NOT IN FACTOR 4.

02:36:30 20      Q.   BASED ON YOUR REVIEW OF THE APPLE PATENT, THE SAMSUNG

02:36:35 21      PHONES FOUND TO INFRINGE, AND ALL THE OTHER INFORMATION THAT

02:36:38 22      YOU CONSIDERED, AND THE FOUR FACTORS, DID YOU REACH A

02:36:42 23      CONCLUSION ABOUT WHAT ARTICLES OF MANUFACTURE APPLE'S DESIGNS

02:36:47 24      WERE APPLIED TO IN THE SAMSUNG PHONES?

02:36:50 25      A.   YES.

02:36:51  1     Q.   WHAT WAS YOUR CONCLUSION?

02:36:52  2     A.   SO FOR THE D'677, THE DESIGN WAS APPLIED TO THE GLASS

02:37:05  3     FRONT FACE (INDICATING).

02:37:08  4          FOR THE D'087, IT WAS THE -- THE PATENT WAS APPLIED TO THE

02:37:18  5     BEZEL AND GLASS FRONT FACE COMPONENTS.

02:37:22  6          AND FOR THE D'305, THE PATENT WAS APPLIED TO THE DISPLAY

02:37:28  7     SCREEN (INDICATING).

02:37:29  8               MR. MUELLER:  YOUR HONOR, JUST SO THE RECORD IS

02:37:31  9     CLEAR, IF I CAM HAVE THE EXHIBIT NUMBERS?

02:37:32  10              MR. QUINN:  YES.

02:37:33  11    Q.   IS THAT JOINT EXHIBIT 5007, THE GALAXY S 4G PARTS?

02:37:41  12    A.   YES.

02:37:41  13    Q.   AND WAS THAT CONCLUSION WITH RESPECT TO THOSE COMPONENTS

02:37:48  14    BEING THE ARTICLE OF MANUFACTURE TO WHICH THE DESIGNS WERE

02:37:51  15    APPLIED THE SAME WITH RESPECT TO EACH OF THE SAMSUNG PHONES

02:37:57  16    THAT WERE FOUND TO INFRINGE THOSE DESIGN PATENTS?

02:38:01  17    A.   YES.

02:38:01  18              MR. QUINN:  NOTHING FURTHER.

02:38:06  19              THE COURT:  ALL RIGHT.  THE TIME IS 2:38.

02:38:11  20              MR. MUELLER:  MAY I PROCEED, YOUR HONOR.

02:38:13  21              THE COURT:  GO AHEAD, PLEASE.

02:38:14  22                         **CROSS-EXAMINATION**

02:38:15  23    BY MR. MUELLER:

02:38:15  24    Q.   GOOD AFTERNOON, MR. LUCENTE.  MY NAME IS JOE MUELLER.  I'D

02:38:20  25    LIKE TO ASK YOU A FEW QUESTION, IF I COULD.

02:38:21   1     A.   GOOD AFTERNOON, MR. MUELLER.

02:38:24   2     Q.   MR. LUCENTE, YOU'VE SPENT YOUR PROFESSIONAL CAREER AS A

02:38:27   3     DESIGNER; IS THAT RIGHT?

02:38:28   4     A.   YES.

02:38:28   5     Q.   AND YOU HAVE BOTH BEEN INVOLVED IN INDUSTRIAL DESIGN, AS

02:38:31   6     WELL AS THE DESIGN OF GRAPHICAL USER INTERFACES AND OTHER TYPES

02:38:34   7     OF DIGITAL DESIGNS?

02:38:35   8     A.   YES.

02:38:36   9          MR. QUINN:  EXCUSE ME.  I DON'T BELIEVE WE'VE

02:38:37   10    RECEIVED A CROSS BINDER.

02:38:51   11         THE COURT:  GO AHEAD, PLEASE.

02:38:52   12         MR. MUELLER:  OKAY.  THANK YOU, YOUR HONOR.

02:38:53   13    Q.   YOU'VE WORKED ON BOTH INDUSTRIAL DESIGN AND DIGITAL

02:38:56   14    DESIGN; IS THAT RIGHT, SIR?

02:38:57   15    A.   YEAH, INDUSTRIAL DESIGN AND GRAPHICAL USER INTERFACES.

02:39:01   16    Q.   AND I THINK YOU SAID THAT YOU'VE WORKED FOR SOME PRIVATE

02:39:03   17    COMPANIES LIKE IBM, HEWLETT-PACKARD, AND YOU ALSO REFERRED TO

02:39:07   18    SOME SOCIAL IMPACT WORK YOU'VE DONE; IS THAT RIGHT?

02:39:09   19    A.   YES.

02:39:10   20    Q.   EXCUSE ME.

02:39:11   21         WERE THOSE FOR NON-PROFIT ORGANIZATIONS?

02:39:13   22    A.   I THINK THAT THE WE CARE SOLAR, THAT THAT IS A NON-PROFIT.

02:39:22   23         BUT THE OTHER TWO, THE -- THE NATIONAL FITNESS CAMPAIGN IS

02:39:30   24    FOR PROFIT, BUT IT'S REALLY -- I DON'T THINK THE COMPANY

02:39:33   25    ACTUALLY MAKES ANY MONEY.

| | | |
|---|---|---|
| 02:39:34 | 1 | Q.   FAIR ENOUGH? |
| 02:39:35 | 2 | A.   I MEAN, IT'S REALLY FOCUSSED ON -- IT'S NOT FOCUSSED ON |
| 02:39:40 | 3 | MAKING A LOT OF MONEY. |
| 02:39:41 | 4 | Q.   OKAY.  BUT YOU'VE WORKED ON SOME DESIGNS FOR PRODUCTS FOR |
| 02:39:44 | 5 | SALE, AS WELL AS SOME DESIGNS FOR PRODUCTS FOR SOCIAL IMPACT; |
| 02:39:48 | 6 | IS THAT FAIR? |
| 02:39:49 | 7 | A.   YES. |
| 02:39:49 | 8 | Q.   AND THE COMPANIES THAT YOU WORK FOR APPLIED YOUR DESIGNS |
| 02:39:53 | 9 | TO PRODUCTS FOR PURPOSES OF SALE? |
| 02:39:57 | 10 | A.   YEAH.  THE -- THE -- THE COMPANIES USED MY -- YOU KNOW, I |
| 02:40:09 | 11 | HELPED CREATE THE DESIGNS FOR THOSE PRODUCTS. |
| 02:40:12 | 12 | Q.   AND YOU SHOWED US SOME OF THOSE PRODUCTS, AND WE COULD -- |
| 02:40:16 | 13 | IF WE COULD PUT THEM BACK UP AGAIN, SDX 1402. |
| 02:40:23 | 14 | THESE ARE SOME OF THE PRODUCTS THAT YOU HELPED DESIGN AT |
| 02:40:25 | 15 | IBM; IS THAT RIGHT, SIR? |
| 02:40:27 | 16 | A.   YES. |
| 02:40:28 | 17 | Q.   AND IF WE GO TO SDX 1403, THESE ARE SOME OF THE PRODUCTS |
| 02:40:34 | 18 | THAT YOU HELPED DESIGN AT HEWLETT-PACKARD; CORRECT? |
| 02:40:37 | 19 | A.   YES.  PRODUCTS AND CONCEPTS, YES. |
| 02:40:40 | 20 | Q.   AND YOUR DESIGNS WERE IMPORTANT TO THESE PRODUCTS; |
| 02:40:43 | 21 | CORRECT? |
| 02:40:43 | 22 | A.   YES, DESIGN IS AN IMPORTANT FACTOR IN THESE PRODUCTS. |
| 02:40:49 | 23 | Q.   AND, IN FACT, YOU'VE RECOGNIZED YOURSELF THAT IF YOU HAVE |
| 02:40:52 | 24 | A GREAT PRODUCT DESIGN, YOU CAN INCREASE YOUR BRAND VALUE, |
| 02:40:56 | 25 | CHARGE PREMIUMS, AND EXTEND THE LIFE OF YOUR TECHNOLOGY; |

02:41:00  1   CORRECT?

02:41:00  2   A.   I -- YOU KNOW, I THINK THAT DESIGN IS, IS ONE OF THE

02:41:07  3   FACTORS THAT LETS YOU DO THOSE THINGS, AND WHEN I TALK ABOUT

02:41:12  4   DESIGN, I NEVER REALLY TALK ABOUT DESIGN BY ITSELF, YOU KNOW?

02:41:17  5        I ALWAYS TALK ABOUT DESIGN AND BUSINESS AND THE TEAMS AND,

02:41:23  6   YOU KNOW, AND DEVELOPMENT TEAMS AND, YOU KNOW, WORKING TOGETHER

02:41:29  7   TO CREATE A PRODUCT.

02:41:33  8        IT'S ONE -- IT'S ONE OF THE FACTORS.

02:41:35  9   Q.   AND YOU HAVE WORKED AND PLAYED A KEY ROLE ON PRODUCT

02:41:39  10  DESIGN, INCLUDING SOME OF THE PRODUCTS THAT WE SEE RIGHT HERE;

02:41:41  11  RIGHT?

02:41:42  12  A.   YES.

02:41:42  13  Q.   AND YOUR DESIGNS WERE FUNDAMENTAL TO PRODUCTS LIKE THESE,

02:41:45  14  LIKE THE ONES AT IBM?

02:41:47  15  A.   WHAT -- I'M NOT SURE WHAT YOU MEAN BY "FUNDAMENTAL," BUT

02:41:53  16  THEY WERE DEFINITELY PART OF DESIGNS LIKE THESE.

02:41:56  17  Q.   OKAY.  NOW, IF WE GO TO SDX 1436, WHICH IS ANOTHER SLIDE

02:42:00  18  YOU SHOWED THE JURY.

02:42:04  19       YOUR HONOR, MAY I APPROACH?

02:42:06  20            THE COURT:  GO AHEAD, PLEASE.

02:42:08  21  BY MR. MUELLER:

02:42:11  22  Q.   THIS IS THE DINNER PLATE, THE BOOK, THE PIANO, THE STOVE;

02:42:15  23  IS THAT RIGHT?

02:42:16  24  A.   THE OVEN, YEAH.

02:42:20  25  Q.   AND YOU WERE SHOWING THE JURY THIS GRAPH OF INCREASING

02:42:23   1   PRODUCT COMPLEXITY; CORRECT?

02:42:25   2   A.   YES.

02:42:25   3   Q.   THOSE PRODUCTS WE JUST LOOKED AT FROM HEWLETT-PACKARD AND

02:42:28   4   IBM WOULD BE UP HERE (INDICATING); RIGHT?

02:42:30   5   A.   NO.  I -- NO.

02:42:34   6   Q.   THEY WOULD NOT BE?  THEY'D BE UP --

02:42:37   7        MAY I APPROACH, YOUR HONOR?

02:42:38   8            THE COURT:  GO AHEAD, PLEASE.

02:42:39   9   BY MR. MUELLER:

02:42:39   10  Q.   WE HAVE A MODERN SMARTPHONE HERE, RIGHT, SIR (INDICATING)?

02:42:43   11  A.   YES.

02:42:44   12  Q.   AND WE'D ALSO HAVE COMPUTERS AND PRINTERS AND OTHER HIGH

02:42:47   13  TECHNOLOGY DEVICES THAT YOU DESIGNED SOMEWHERE IN THIS REGION

02:42:51   14  UP HERE BEYOND THE STOVE; CORRECT (INDICATING)?

02:42:54   15  A.   YES.  I WOULD SAY -- YOU KNOW, IT DEPENDS ON, ON WHAT

02:42:58   16  YOU'RE LOOKING AT.  BUT, YES, I THINK A PRINTER WOULD COME

02:43:02   17  BETWEEN THE OVEN AND THE SMARTPHONE.

02:43:05   18  Q.   AND WE CAN AGREE ON THIS:  THE COMPUTER, THE PRINTER, ALL

02:43:09   19  THOSE PRODUCTS YOU SHOWED THE JURY HAVE COMPONENTS WITHIN THEM;

02:43:12   20  RIGHT?

02:43:13   21  A.   YES.

02:43:17   22  Q.   AND, IN FACT, THERE'S CIRCUIT DESIGNER, MEMORY

02:43:21   23  SPECIALISTS, WIRING EXPERTS, AND THOUSANDS OF OTHER FOLKS WHO

02:43:24   24  WORKED ON THOSE PRODUCTS, TOO; CORRECT?

02:43:27   25  A.   YES.

02:43:30    1    Q.   THOUSANDS OF COMPONENTS WITHIN EACH ONE OF THEM; RIGHT?

02:43:34    2    A.   WITH -- YEAH, WITHIN, YOU MEAN LIKE THE PRINTERS, YES.

02:43:41    3    Q.   BUT YOU WERE INVOLVED IN DESIGN?  YOU HELPED TO DESIGN

02:43:45    4    THOSE -- YOU HELPED TO DESIGN KEY PRODUCTS AT HEWLETT-PACKARD,

02:43:49    5    INCLUDING THE FULL PRODUCTS; CORRECT?

02:43:51    6    A.   YES, I HELPED -- YES, I -- I HELPED DESIGN THOSE PRODUCTS.

02:43:58    7    Q.   RIGHT.  AND YOU'VE DESCRIBED YOURSELF AS A DESIGNER OF

02:44:01    8    THOSE PRODUCTS, NOTWITHSTANDING THAT OTHER FOLKS HELPED AND

02:44:05    9    WERE INVOLVED IN THE INTERNAL COMPONENTRY; CORRECT?

02:44:09   10    A.   YES.

02:44:10   11    Q.   NOW, LET'S SET THE STAGE FOR THE JURY, IF WE COULD.

02:44:16   12         THIS CASE IS ABOUT -- A BIG PART OF THIS CASE IS ABOUT THE

02:44:19   13    APPROPRIATE ARTICLE OF MANUFACTURE FOR THE THREE DESIGN PATENTS

02:44:21   14    IN THIS CASE AS APPLIED TO THE INFRINGING SAMSUNG PRODUCTS;

02:44:26   15    RIGHT?

02:44:26   16    A.   COULD YOU REPEAT THE QUESTION?

02:44:31   17    Q.   SURE.  A MAJOR ISSUE FOR THE LADIES AND GENTLEMEN OF THE

02:44:34   18    JURY TO DECIDE IS HOW DID SAMSUNG APPLY APPLE'S PATENTED

02:44:40   19    DESIGNS TO THE INFRINGING SAMSUNG PRODUCTS; CORRECT?

02:44:43   20    A.   YES.

02:44:46   21    Q.   AND JUDGE KOH HAS GIVEN US A FOUR FACTOR TEST TO HELP US

02:44:49   22    ANALYZE THAT QUESTION; RIGHT?

02:44:50   23    A.   YES.

02:44:51   24    Q.   NOW, YOU TESTIFIED WITH MR. QUINN ON YOUR DIRECT

02:44:56   25    EXAMINATION THAT IT WASN'T AS RELEVANT TO YOU HOW APPLE APPLIED

LUCENT CROSS BY MR. MUELLER

02:44:59  1    THE CLAIMED DESIGNS IN THE IPHONE; RIGHT?

02:45:02  2    A.   NO.  WHAT I TESTIFIED TO WAS THAT I DIDN'T FOCUS ON THE

02:45:13  3    IPHONE, YOU KNOW, WITH THE FOUR FACTORS BECAUSE I WAS

02:45:18  4    DETERMINING HOW, AS YOU SAID, THE APPLE DESIGN PATENTS WERE

02:45:23  5    APPLIED TO, YOU KNOW, SAMSUNG PHONES.

02:45:26  6    Q.   RIGHT.  SAMSUNG PHONES, THE PARTICULAR SAMSUNG PHONES, THE

02:45:31  7    ONES THAT WERE FOUND TO INFRINGE BY THE EARLIER JURY; RIGHT?

02:45:34  8    A.   YES.

02:45:35  9    Q.   WE'VE GOT TO KEEP OUR EYE ON THE BALL AND APPLY HER

02:45:39  10   HONOR'S FOUR FACTOR TEST TO THOSE INFRINGING PHONES; CORRECT?

02:45:43  11   A.   YES.  I NEEDED TO DETERMINE IF THE APPLE DESIGN PATENTS

02:45:49  12   WERE APPLIED TO, YOU KNOW -- WHAT THE ARTICLE OF MANUFACTURE

02:45:54  13   WAS WITH, YOU KNOW, WITHIN THE SAMSUNG PHONES.

02:45:58  14   Q.   THE SAMSUNG PHONES FOUND TO INFRINGE?

02:46:00  15   A.   YES.

02:46:00  16   Q.   NOW, YOU'VE BEEN HERE FOR THE WHOLE TRIAL?

02:46:03  17   A.   NOT, NOT ALL OF IT, NO.

02:46:08  18   Q.   WERE YOU HERE FOR THE OPENING STATEMENTS?

02:46:10  19   A.   NO.

02:46:11  20   Q.   WERE YOU HERE FOR SOME OF THE TESTIMONY THE LAST DAY AND A

02:46:14  21   HALF?

02:46:14  22   A.   YES.

02:46:14  23   Q.   AND HAVE YOU HEARD REFERENCES TO OTHER SAMSUNG PHONES NOT

02:46:18  24   FOUND TO INFRINGE?

02:46:19  25   A.   YOU MEAN LIKE THE GALAXY ACE?

02:46:26  1   Q.   WE'VE HEARD REFERENCES TO THE ACE IS ONE PHONE, THAT WAS

02:46:29  2   ACTUALLY FOUND TO INFRINGE.

02:46:30  3        BUT WE HAVE HEARD REFERENCES TO THE ACE AND WE'VE HEARD

02:46:33  4   REFERENCES TO OTHER PHONES AS WELL; RIGHT?

02:46:35  5             MR. QUINN:  OBJECTION, YOUR HONOR.  NOT THE DESIGN

02:46:36  6   PATENT, YOUR HONOR.

02:46:37  7             MR. MUELLER:  THE UTILITY PATENTS.

02:46:38  8             THE COURT:  OVERRULED.

02:46:39  9        GO AHEAD, PLEASE.

02:46:40  10            MR. MUELLER:  OKAY.

02:46:41  11  Q.   SIR, YOU'VE HEARD REFERENCES TO OTHER SAMSUNG PHONES;

02:46:43  12  RIGHT?

02:46:44  13  A.   YES.

02:46:45  14  Q.   BUT DO YOU UNDERSTAND THE LADIES AND GENTLEMEN OF THE JURY

02:46:47  15  ARE TRYING TO FIGURE OUT THE ARTICLE OF MANUFACTURE TO WHICH

02:46:52  16  SAMSUNG APPLIED THE CLAIMED DESIGNS IN THE INFRINGING PHONES;

02:46:56  17  RIGHT?

02:46:57  18  A.   COULD YOU REPEAT THE QUESTION?

02:47:04  19  Q.   SURE.  THE LADIES AND GENTLEMEN OF THE JURY ARE CHARGED

02:47:07  20  WITH DETERMINING THE ARTICLE OF MANUFACTURE TO WHICH SAMSUNG

02:47:12  21  APPLIED APPLE'S DESIGNS IN THE INFRINGING PHONES; CORRECT?

02:47:17  22  A.   YEAH.  THE -- THE JURY IS, IS APPLYING THE FOUR FACTOR

02:47:30  23  TEST TO, YEAH, TO DETERMINE HOW THE THREE APPLE DESIGN PATENTS

02:47:37  24  WERE APPLIED, YEAH.

02:47:43  25  Q.   THEY'RE NOT BEING ASKED TO DETERMINE HOW THE ARTICLE OF

02:47:46   1    MANUFACTURE TEST WOULD APPLY TO SOME OTHER SAMSUNG PHONES THAT

02:47:50   2    WERE NOT FOUND TO INFRINGE?  THAT'S NOT PART OF THEIR ANALYSIS;

02:47:53   3    CORRECT?

02:47:53   4    A.   YES.

02:47:54   5    Q.   NOR ARE THEY GOING TO BE ASKED TO FIGURE OUT HOW THE

02:47:57   6    ARTICLE OF MANUFACTURE TEST MIGHT APPLY TO THE LG PRADA; RIGHT?

02:48:01   7    A.   YEAH.  NOR THE IPHONE.  IT'S ABOUT THIS -- THIS FOUR

02:48:08   8    FACTOR TEST IS FOCUSSED ON THE SAMSUNG PHONES, NOT THE IPHONE.

02:48:14   9    Q.   RIGHT.

02:48:15   10   A.   NOT THE LG PRADA, YES.

02:48:17   11   Q.   IN FACT, YOU SAID NOT A WORD ABOUT THE PRADA ON YOUR

02:48:21   12   DIRECT EXAMINATION; RIGHT?

02:48:22   13   A.   NO.

02:48:25   14   Q.   NO, YOU DID NOT?

02:48:27   15   A.   I DID NOT.

02:48:27   16   Q.   NOW, YOU UNDERSTAND THERE'S A LOT OF DIFFERENT DESIGNS OUT

02:48:30   17   THERE IN THE WORLD FOR SMARTPHONES; CORRECT?

02:48:32   18   A.   YES.

02:48:33   19   Q.   AND YOU HEARD MR. BLACKARD SAY THAT HAVING LOTS OF DESIGNS

02:48:36   20   IS A GOOD THING; RIGHT?

02:48:37   21   A.   I WASN'T HERE FOR HIS TESTIMONY.

02:48:41   22   Q.   OKAY.  WELL, I'LL REPRESENT TO YOU THAT -- I WON'T EVEN

02:48:45   23   REPRESENT TO YOU.

02:48:46   24        DO YOU AGREE THAT HAVING LOTS OF DESIGNS FOR SMARTPHONES

02:48:49   25   THAT ARE AVAILABLE IS A GOOD THING?

02:48:51   1    A.   THAT'S KIND OF A BROAD QUESTION, BUT I -- I WOULD AGREE

02:49:04   2    THAT HAVING SMARTPHONE DESIGN SOLUTIONS THAT MEET USER'S NEEDS

02:49:15   3    IS A GOOD THING.

02:49:17   4    Q.   AND IF COMPANIES COMPETE ON A LEVEL PLAYING FIELD, EACH

02:49:20   5    COME UP WITH THEIR OWN DESIGNS, CONSUMERS BENEFIT; RIGHT?

02:49:24   6    A.   YOU KNOW, I THINK IT'S -- YES.

02:49:36   7    Q.   BUT IT'S NOT FAIR IF THAT PLAYING FIELD IS UNEVEN AND ONE

02:49:40   8    COMPANY TAKES THE OTHER'S DESIGNS; RIGHT?

02:49:46   9              MR. QUINN:   THIS IS BEYOND THE SCOPE OF HIS

02:49:48   10   EXPERTISE, YOUR HONOR.   IT'S JUST ARGUMENTATIVE AS TO WHAT'S

02:49:50   11   UNFAIR.

02:49:51   12             MR. MUELLER:   I'LL MOVE ON.

02:49:52   13             THE COURT:   ALL RIGHT.   SUSTAINED.

02:49:53   14        GO AHEAD, PLEASE.

02:49:54   15   BY MR. MUELLER:

02:49:54   16   Q.   MR. LUCENTE, YOU SHOWED THE JURY A VIDEO DURING YOUR

02:49:59   17   DIRECT EXAMINATION.

02:49:59   18        IF WE COULD BRING UP A STILL FRAME OF THE BEGINNING.

02:50:03   19        YOUR HONOR, MAY I APPROACH THE SCREEN?

02:50:04   20             THE COURT:   GO AHEAD, PLEASE.

02:50:05   21   BY MR. MUELLER:

02:50:07   22   Q.   THIS IS THE BEGINNING OF THE VIDEO, MR. LUCENTE?

02:50:10   23   A.   YES.

02:50:10   24   Q.   AND YOU SHOWED THE JURY A VARIETY OF THINGS THAT COULD BE

02:50:13   25   DONE WITH THIS FIRST SCREEN HERE; RIGHT?

02:50:16  1    A.   YES.

02:50:16  2    Q.   BUT YOU DIDN'T SHOW THEM WHAT WOULD HAPPEN IF YOU PRESSED

02:50:21  3    THIS BUTTON RIGHT THERE (INDICATING); CORRECT?

02:50:23  4    A.   I WAS -- I WAS TRYING TO SHOW THAT AND -- BUT THE VIDEO

02:50:27  5    DIDN'T WORK.  THAT WAS AT THE END OF THE VIDEO, AND I -- I

02:50:30  6    THINK I EXPLAINED THAT WHEN YOU TAP ON THE APPLICATION MENU,

02:50:38  7    THAT THE APP MENU APPEARS AND THAT -- IF YOU LOOK AT THE ACTUAL

02:50:42  8    VIDEO, THAT -- THAT WAS THE INTENT OF THE VIDEO, TO SHOW THE

02:50:48  9    DIFFERENCE BETWEEN THE HOME SCREEN ON THE SAMSUNG PHONE WITH

02:50:52  10   THE ANDROID INTERFACE AND THE APP MENU SCREEN.

02:50:58  11   Q.   RIGHT.  AND THE TRUTH IS, SIR, IF YOU PRESS THAT BUTTON,

02:51:01  12   WHAT POPS UP IS THE '305 DESIGN; CORRECT?

02:51:06  13   A.   WHAT POPS UP IS THE APPLICATION MENU, ACTUALLY MANY -- OR

02:51:14  14   SEVERAL PAGES OF THE -- YOU CAN THEN SCROLL THROUGH SEVERAL

02:51:17  15   PAGES OF THE APP MENU ON THE -- ON, YOU KNOW, ON THE -- ON THIS

02:51:23  16   PHONE.

02:51:23  17   Q.   SO THE LADIES AND GENTLEMEN OF THE JURY WILL HAVE THE

02:51:25  18   PHONES.

02:51:26  19        DO YOU UNDERSTAND THAT 13 DIFFERENT SAMSUNG PHONES WERE

02:51:29  20   FOUND BY A JURY TO HAVE THE ICON LAYOUT OF THE '305 PATENT;

02:51:35  21   CORRECT?

02:51:36  22   A.   I -- I NEED TO REFERENCE MY REPORT TO SEE WHICH OF THOSE

02:51:46  23   PHONES.  I'M NOT SURE THAT 13 ACTUALLY INFRINGED THE D'305.

02:51:56  24   Q.   YOU DON'T REMEMBER THE DETAILS OF IT?

02:51:58  25   A.   I JUST WOULD HAVE TO LOOK AT MY REPORT TO SEE THE ACTUAL

02:52:03  1    PHONES.

02:52:03  2    Q.   BUT YOU'RE NOT HERE TO CALL INTO QUESTION IN ANY WAY THE

02:52:07  3    VERDICT OF THE JURY FINDING THE D'305 INFRINGED, THE D'087

02:52:12  4    INFRINGED, THE D'677 INFRINGED; CORRECT?

02:52:15  5    A.   AND YOU'RE REFERRING TO WHAT?

02:52:18  6    Q.   THE JURY VERDICT.  YOU'RE NOT HERE TO CALL THAT INTO

02:52:22  7    QUESTION IN ANY WAY?

02:52:22  8    A.   WHICH JURY VERDICT?

02:52:24  9    Q.   THE JURY VERDICT OF INFRINGEMENT OF THE D'305, THE D'087,

02:52:29  10   AND THE D'677?

02:52:31  11   A.   YOU MEAN FROM THE PREVIOUS TRIAL.

02:52:32  12   Q.   SIR, YOU UNDERSTAND THE JURY FOUND PHONES INFRINGE THOSE

02:52:36  13   THREE PATENTS AND YOU'RE NOT HERE TO CALL THAT INTO QUESTION,

02:52:38  14   ARE YOU?

02:52:39  15   A.   YES.  I UNDERSTAND, YES, THAT SEVERAL OF THE PHONES

02:52:43  16   INFRINGE THE D'305 PATENT IN THE PREVIOUS, I THINK IT WAS THE

02:52:51  17   2012 CASE.

02:52:52  18   Q.   AS WELL AS THE D'087 AND THE D'677?

02:52:56  19   A.   YES, SOME OF -- I THINK TWO PHONES INFRINGED ALL THREE.

02:53:06  20        YOU KNOW, IF I COULD LOOK AT MY REPORT, I COULD TELL YOU

02:53:09  21   EXACTLY.

02:53:09  22   Q.   MY POINT IS JUST THIS:  YOU'RE NOT HERE TO CALL INTO

02:53:12  23   QUESTION THE JURY VERDICT OF INFRINGEMENT; CORRECT?

02:53:14  24   A.   NO.

02:53:15  25   Q.   BUT WHAT HAS TO HAPPEN NOW IS THE LADIES AND GENTLEMEN OF

02:53:18    1    THE JURY NEED TO FIGURE OUT HOW SAMSUNG APPLIED THE CLAIMED

02:53:22    2    DESIGNS TO THE INFRINGING PHONES; CORRECT?

02:53:25    3    A.   THE JURY IS HERE TO APPLY THE FOUR FACTOR TEST, YES.

02:53:31    4    Q.   NOW, YOUR POSITION AND SAMSUNG'S POSITION IS THAT THE

02:53:34    5    APPROPRIATE ANSWER TO THAT QUESTION IS COMPONENTS, LIKE THE

02:53:38    6    COMPONENTS IN THE BOX RIGHT IN FRONT OF YOU; RIGHT?

02:53:41    7    A.   WELL, MY -- MY CONCLUSION IS THAT, YOU KNOW, BASED ON THE

02:53:51    8    FOUR FACTOR ANALYSIS IS THAT THE THREE APPLE DESIGN PATENTS

02:53:59    9    WERE APPLIED TO COMPONENTS OF THE SAMSUNG PHONE, NOT THE ENTIRE

02:54:04   10    PHONE.  THAT WAS MY INDEPENDENT CONCLUSION.

02:54:08   11    Q.   AND APPLE'S POSITION IS THAT THE PHONES THAT SAMSUNG

02:54:12   12    APPLIED THE CLAIMED DESIGNS TO ITS PHONES; RIGHT?  THAT'S THE

02:54:16   13    CLASH HERE?  APPLE IS SAYING THE PHONES, SAMSUNG AND YOU ARE

02:54:22   14    SAYING COMPONENTS; CORRECT?

02:54:23   15    A.   BASED ON MY -- BASED ON ME APPLYING THE FOUR FACTOR

02:54:28   16    ANALYSIS, I CAME TO THE CONCLUSION THAT FOR EACH OF THOSE

02:54:35   17    COMPONENTS -- OR EACH OF THOSE PATENTS, THAT, YEAH, THEY WERE

02:54:41   18    APPLIED TO COMPONENTS OF THE SAMSUNG PHONE.

02:54:43   19         MR. MUELLER:  YOUR HONOR, I HAVE RIGHT HERE A.S. 316

02:54:46   20    (INDICATING).

02:54:47   21        MAY I PUBLISH THE PHONE IN THIS BOX TO THE JURY, JUST HAND

02:54:50   22    IT TO THEM?

02:54:50   23         THE COURT:  IS THAT A DEMONSTRATIVE OR IS THAT AN

02:54:52   24    EXHIBIT?

02:54:52   25         MR. MUELLER:  THIS IS ACTUALLY AN EXHIBIT, YOUR

02:54:54   1       HONOR.

02:54:54   2               THE COURT:  AND YOU'RE MOVING FOR IT TO BE --

02:54:57   3               MR. MUELLER:  THIS ONE IS JOINT TRIAL EXHIBIT 1015.

02:55:00   4               THE COURT:  OH, SO IT'S BEEN ADMITTED.

02:55:02   5               MR. MUELLER:  IT'S BEEN ADMITTED.

02:55:03   6               THE COURT:  IT WAS ADMITTED ON MAY 15TH.

02:55:06   7           GO AHEAD, PLEASE.

02:55:06   8               MR. MUELLER:  THIS IS THE MESMERIZE.

02:55:09   9           MAY I APPROACH THE JURY, YOUR HONOR?

02:55:10   10              THE COURT:  GO AHEAD, PLEASE.

02:55:12   11              MR. LEE:  (HANDING.)

02:55:19   12      Q.   SO THIS IS THE FULL SAMSUNG MESMERIZE.  YOU'VE SEEN THIS

02:55:22   13      PHONE YOURSELF; RIGHT?

02:55:23   14      A.   YES.

02:55:24   15      Q.   AND THIS IS AN EXAMPLE OF WHAT APPLE SAYS IS THE ARTICLE

02:55:27   16      OF MANUFACTURE, THE PHONE ITSELF; RIGHT?

02:55:28   17      A.   YEAH.  I'M NOT LOOKING AT THE PHONE, BUT I ASSUME IT'S A

02:55:34   18      COMPLETE MESMERIZE.

02:55:36   19              MR. MUELLER:  YOUR HONOR, I'D NEXT LIKE -- I'LL SHOW

02:55:38   20      THE WITNESS FIRST AND THEN I'D LIKE TO PUBLISH TO THE JURY AN

02:55:41   21      EXAMPLE OF A COMPONENT, THIS IS JX 5012 FROM THE GALAXY S II.

02:55:45   22              THE COURT:  OKAY.  AND IT WAS ADMITTED ON MAY 15TH.

02:55:49   23           GO AHEAD, PLEASE.

02:55:49   24      BY MR. MUELLER:

02:55:50   25      Q.   OKAY.  SO, SIR, I'M GOING TO FIRST SHOW IT TO YOU AND THEN

02:55:52   1       I'M GOING TO HAVE THE JURY SEE?

02:55:54   2       A.   OKAY.  GREAT.

02:55:57   3       Q.   (INDICATING.)

02:55:59   4       A.   OKAY.

02:56:00   5       Q.   (HANDING.)

02:56:09   6            NOW, WHAT I JUST SHOWED YOU IS WHAT YOU CONTEND TO BE THE

02:56:12   7       ARTICLE OF MANUFACTURE FOR THE '677 PATENT, ONE OF THOSE GLASS

02:56:15   8       FRONT FACES; CORRECT?

02:56:16   9       A.   YES.

02:56:17  10       Q.   AND FINALLY, I'M GOING TO SHOW YOU JOINT EXHIBIT 5004,

02:56:24  11       THIS ONE IS THE MESMERIZE, IT'S THE SAME FOR THE PHONE THAT

02:56:27  12       JUST WENT AROUND, AND THESE ARE THE COMPONENTS THAT YOU CONTEND

02:56:31  13       ARE ARTICLES OF MANUFACTURE FOR THE '305 AND THE '677, BUT I'LL

02:56:37  14       ASK YOU TO CONFIRM, SIR.

02:56:39  15            YOUR HONOR, MAY I APPROACH?

02:56:40  16            THE COURT:  GO AHEAD, PLEASE.

02:56:42  17            MR. MUELLER:  (HANDING.)

02:57:00  18            THE WITNESS:  SO WHICH PATENTS WERE YOU REFERRING TO?

02:57:03  19       BY MR. MUELLER:

02:57:03  20       Q.   SO THE DISPLAY SCREEN.  IS THERE A DISPLAY SCREEN?

02:57:05  21       A.   YES.

02:57:06  22       Q.   AND THAT'S WHAT YOU CONTEND IS THE ARTICLE OF MANUFACTURE

02:57:09  23       FOR THE '305?

02:57:11  24       A.   THE D'305.

02:57:13  25       Q.   AND THEN THERE IS ALSO A GLASS FRONT FACE IN THERE, SIR?

02:57:16  1    IS THAT RIGHT?

02:57:16  2    A.   FOR THE D'677.

02:57:17  3    Q.   THAT'S YOUR CONTENTION; RIGHT?

02:57:19  4    A.   YEAH.   I IDENTIFIED THESE AS THE ARTICLES OF MANUFACTURE

02:57:22  5    FOR THOSE TWO PATENTS.

02:57:24  6    Q.   NOW, IT LOOKS LIKE THE GLASS -- THE DISPLAY SCREEN IS

02:57:27  7    ACTUALLY FRACTURED; IS THAT RIGHT?

02:57:29  8    A.   YES.

02:57:29  9    Q.   OKAY.   SO WE'LL ASK THE JURY TO BE A LITTLE CAREFUL WITH

02:57:33  10   THAT ONE.

02:57:34  11        MAY I PUBLISH TO THE JURY, YOUR HONOR?

02:57:37  12           THE COURT:   GO AHEAD, PLEASE.

02:57:38  13           THE WITNESS:   AND I -- IT'S IMPORTANT THAT THE JURY

02:57:40  14   KNOWS WHAT THEY'RE LOOKING AT HERE WERE PARTS THAT WERE --

02:57:47  15   THESE ARE NOT NEW PARTS.   THESE ARE PARTS THAT CAME FROM A

02:57:50  16   DISASSEMBLED PHONE.   SO THE DISPLAY IS BROKEN.   BUT IF IT WERE,

02:57:56  17   YOU KNOW, IF IT WERE THE COMPONENT BEFORE IT WENT INTO THE

02:57:59  18   PRODUCT, IT WOULD BE AN ACTUAL, YOU KNOW, DISPLAY.

02:58:04  19           MR. MUELLER:   THANK YOU, SIR.

02:58:07  20        (HANDING).

02:58:09  21   Q.   OKAY.   SO THAT'S THE CLASH, WE SAY FULL PHONES, YOU SAY

02:58:12  22   COMPONENTS LIKE THE ONES IN THOSE BOXES, AND THE JURY NEEDS TO

02:58:15  23   DECIDE WHO'S RIGHT; CORRECT?

02:58:18  24   A.   THE JURY NEEDS -- OR THE JURY HAS BEEN ASKED TO APPLY THE

02:58:23  25   FOUR FACTOR ANALYSIS.

02:58:24   1    Q.   SO LET'S START WITH FACTOR 1, AND IF WE COULD PUT FACTOR 1

02:58:28   2    UP ON THE SCREEN.   THIS IS THE "THE SCOPE OF THE DESIGN CLAIMED

02:58:32   3    IN APPLE'S PATENT, INCLUDING THE DRAWING AND THE WRITTEN

02:58:35   4    DESCRIPTION."

02:58:35   5         CORRECT?

02:58:36   6    A.   YES.

02:58:37   7              MR. MUELLER:   MAY I APPROACH, YOUR HONOR.

02:58:39   8              THE COURT:   GO AHEAD, PLEASE.

02:58:39   9    BY MR. MUELLER:

02:58:42   10   Q.   NOW, LET'S LOOK AT THIS VERY CAREFULLY.   IT SAYS THE SCOPE

02:58:45   11   OF THE DESIGN CLAIMED IN APPLE'S PATENT; CORRECT?

02:58:48   12   A.   YES.

02:58:49   13   Q.   AND IT SAYS INCLUDING THE DRAWING AND THE WRITTEN

02:58:51   14   DESCRIPTION; CORRECT?

02:58:51   15   A.   YES.

02:58:52   16   Q.   SO WE NEED TO LOOK WITH CARE AT THE DRAWINGS AND THE

02:58:56   17   WRITTEN DESCRIPTION OF THE THREE PATENTS AT ISSUE IN THIS CASE;

02:58:58   18   DO YOU AGREE?

02:58:58   19   A.   YES.   IT -- YOU HAVE TO CONSIDER THE DRAWINGS AND THE

02:59:02   20   WRITTEN DESCRIPTION, AND THEN DETERMINE THE SCOPE.

02:59:04   21   Q.   AND EVERY WORD MATTERS, EVERY PICTURE MATTERS; RIGHT?

02:59:08   22   A.   WELL, WHAT -- WHAT MATTERS WITH THE SCOPE OF THE DESIGN,

02:59:14   23   AS I SAID, IS YOU CONSIDER THE WRITTEN DESCRIPTION AND THE

02:59:19   24   DRAWINGS, BUT WHEN YOU LOOK AT A DESIGN PATENT, WHAT IS

02:59:24   25   ACTUALLY CLAIMED IN A DESIGN PATENT, WHICH I -- YOU KNOW, I'M

02:59:32   1    TRYING TO MAKE VERY CLEAR IS WHAT IS WITHIN THE SOLID LINES OF

02:59:36   2    A DESIGN PATENT.

02:59:36   3    Q.   SIR, I WAS SIMPLY SAYING WE NEED TO CONSIDER THE DRAWING

02:59:39   4    AND THE WRITTEN DESCRIPTION FOR THE ENTIRE PATENT; RIGHT?  EACH

02:59:41   5    ONE?  FOR EACH OF THESE THREE PATENTS, WE HAVE TO CONSIDER THE

02:59:45   6    FULL THING?

02:59:45   7    A.   YES, YOU CONSIDER IT.

02:59:47   8    Q.   NOW, WE DON'T STOP THERE.  WE DON'T STOP AT THE SCOPE OF

02:59:49   9    THE DESIGN.

02:59:50  10        WE GO TO FACTOR 2, 3, AND 4; CORRECT?

02:59:54  11    A.   YES.

02:59:54  12    Q.   SO ANY, ANY SUGGESTION TO THE JURY THAT YOU STOP THE

02:59:58  13    ANALYSIS AT THE SCOPE OF THE CLAIM IS JUST FLAT WRONG.

03:00:01  14        WE NEED TO LOOK AT FACTORS 2, 3, AND 4; CORRECT?

03:00:04  15    A.   YES, YOU NEED TO CONSIDER ALL OF THE FACTORS.

03:00:08  16    Q.   AND IT --

03:00:09  17    A.   WHAT FACTOR 1 DOES FOR YOU, THOUGH, IS IT -- IT REALLY

03:00:14  18    SHOWS YOU, WHEN YOU LOOK AT WHAT'S WITHIN THE SOLID LINES, IT

03:00:20  19    SHOWS YOU WHAT IS ACTUALLY CLAIMED IN THE PATENT AND WHAT IS

03:00:25  20    PROTECTED, YOU KNOW, IN THAT PATENT.

03:00:28  21    Q.   SIR, MY QUESTION IS QUITE SIMPLE.  WE DON'T STOP THERE?

03:00:32  22    THE ANALYSIS THE JURY NEEDS TO ENGAGE IN IS TO FIGURE OUT WHAT

03:00:35  23    THE CLAIMED DESIGN WAS APPLIED TO; CORRECT?

03:00:38  24    A.   YES, YOU'RE LOOKING FOR EITHER, YOU KNOW, WHAT THE ARTICLE

03:00:46  25    OF MANUFACTURE IS.

03:00:48   1    Q.   AND WE NEED TO LOOK AT FACTOR 2 AND 3 AND 4; CORRECT?

03:00:51   2    A.   YES.

03:00:52   3    Q.   AND WE'LL GET TO FACTOR 4, BUT WE DON'T TREAT THAT IN

03:00:55   4    ISOLATION.  IT DOESN'T JUST SAY, IF YOU CAN SOMEHOW PULL THIS

03:00:58   5    APART, YOU'VE ANSWERED THE QUESTION, IT'S A COMPONENT THAT'S

03:01:01   6    THE ARTICLE OF MANUFACTURE.

03:01:03   7         THAT'S NOT WHAT THIS SAYS; CORRECT?

03:01:05   8    A.   NO.  IN MY ANALYSIS, YOU KNOW, I STEP THROUGH EACH OF --

03:01:12   9    EACH OF THESE.

03:01:13  10    Q.   ALL FOUR FACTORS MATTER?

03:01:15  11    A.   YES.

03:01:15  12    Q.   ALL RIGHT.  SO LET'S GO BACK TO FACTOR 1.

03:01:18  13         AND WE NEED TO LOOK AT THE WORDS IN THE WRITTEN

03:01:22  14    DESCRIPTION IN THE DRAWINGS.

03:01:24  15         NOW, IF WE COULD, SIR, GO TO YOUR EXHIBIT PDX 1408.

03:01:29  16         ACTUALLY, FIRST LET'S GO TO THE PATENT, THE '677 PATENT.

03:01:34  17    AND THIS IS JX 1043.

03:01:37  18         HERE IS FIGURE 1, RIGHT, SIR?

03:01:40  19    A.   YES.

03:01:40  20    Q.   AND WE HAVE SOLID LINES THAT SHOW THE SCOPE OF THE CLAIMED

03:01:43  21    DESIGN; CORRECT?

03:01:44  22    A.   UM-HUM.

03:01:45  23    Q.   IS THAT RIGHT?

03:01:46  24    A.   YES.

03:01:47  25    Q.   NOW, WE ALSO HAVE DOTTED LINES HERE THAT SHOW THE CONTOURS

03:01:52   1    OF UNCLAIMED SUBJECT MATTER IN THIS ELECTRONIC DEVICE; CORRECT?

03:01:57   2    A.   YEAH.  WHAT THE -- AGAIN, THE BROKEN LINES SHOW A

03:02:02   3    SURROUNDING ENVIRONMENT AND, YOU KNOW, IT'S -- IT'S -- YOU

03:02:10   4    KNOW, IT PROVIDES SOME CONTEXT, RIGHT?  BUT NOTHING IS CLAIMED

03:02:14   5    IN THE SOLID LINE.

03:02:15   6    Q.   IT PROVIDES CONTEXT, IMPORTANT CONTEXT; CORRECT?

03:02:17   7    A.   YEAH.

03:02:18   8    Q.   NOW, THIS CLAIMS A BLACK FRONT FACE OF THE PHONE; CORRECT?

03:02:21   9    A.   YES.  IT CLAIMS THE GLASS FRONT FACE OF, YOU KNOW, IT --

03:02:31   10   THAT'S WHAT IT CLAIMS, IT CLAIMS A GLASS FRONT FACE.

03:02:35   11        IT DOESN'T TELL YOU -- YOU KNOW, NOWHERE IN THE SCOPE DOES

03:02:41   12   IT SAY THAT THIS CLAIM IS FOR A PHONE OR THIS CLAIM IS FOR A

03:02:47   13   TOY.  YOU KNOW, THAT -- THIS CONTEXT IS OFFERED UP TO YOU, BUT

03:02:53   14   TO REALLY UNDERSTAND WHERE THIS ACTUAL PATENT IS APPLIED, YOU

03:03:01   15   HAVE TO LOOK AT WHERE IT'S EMBODIED IN AN ACTUAL PRODUCT.

03:03:08   16   Q.   OKAY.  AND WE'LL GET THERE.

03:03:09   17   A.   AND THAT'S THE ANALYSIS I WENT THROUGH.

03:03:11   18   Q.   WE'LL --

03:03:12   19   A.   AND IN THIS CASE IT'S, YOU KNOW, THE SAMSUNG PHONES.

03:03:15   20   Q.   I PROMISE WE'LL GET THERE.  BUT MY POINT FOR RIGHT NOW IS

03:03:18   21   WE HAVE THESE DOTTED LINES PROVIDING CONTEXT; CORRECT?

03:03:21   22   A.   YES.

03:03:21   23   Q.   NOW, LET'S GO TO THE DESCRIPTION SECTION OF THE PATENT,

03:03:24   24   THE LAST PARAGRAPH.

03:03:25   25        AND MR. QUINN ASKED YOU WHETHER HER HONOR OR THE PATENT

03:03:29  1    OFFICE HAD DETERMINED WHICH ARTICLE OF MANUFACTURE SAMSUNG HAD

03:03:32  2    APPLIED TO THE CLAIMED DESIGNS TO, AND I THINK YOUR ANSWER WAS,

03:03:36  3    NO, THAT THAT DETERMINATION HAS NOT BEEN MADE YET; IS THAT

03:03:40  4    RIGHT?

03:03:41  5    A.   YES.  MY UNDERSTANDING IS THAT THE COURT HAS INSTRUCTED

03:03:50  6    US, OR HAS TOLD US THAT NEITHER THE COURT NOR THE PATENT OFFICE

03:03:58  7    HAS DETERMINED THE ARTICLE OF MANUFACTURE.

03:04:00  8    Q.   AND THERE'S NO DISAGREEMENT, SO I'LL JUST STOP YOU THERE.

03:04:03  9    THERE'S NO DISAGREEMENT ON THAT.  THAT'S FOR THE LADIES AND

03:04:05  10   GENTLEMEN OF THE JURY TO DECIDE BECAUSE THEY HAVE SAMSUNG'S

03:04:08  11   PRODUCTS, THE PATENT OFFICE DIDN'T HAVE THOSE; RIGHT?

03:04:11  12   A.   WELL, THEY -- BECAUSE THEY HAVE THE FOUR FACTORS TO DO THE

03:04:14  13   ANALYSIS.

03:04:15  14   Q.   OKAY.  SO RIGHT HERE, I WANT TO START WITH THE WORDS "THE

03:04:19  15   ARTICLE OF MANUFACTURE TO WHICH THE ORNAMENTAL DESIGN HAS BEEN

03:04:21  16   APPLIED."

03:04:22  17       IF WE COULD HIGHLIGHT THAT.

03:04:24  18       THERE'S A LIST OF PRODUCTS; CORRECT?

03:04:25  19   A.   YES, THERE'S -- THERE'S A LIST OF PRODUCTS.

03:04:32  20   Q.   NOW, TO BE CLEAR, THE PATENT OFFICE DIDN'T HAVE THE

03:04:35  21   SAMSUNG INFRINGING PRODUCTS IN FRONT OF THEM.  THERE'S NO WAY

03:04:37  22   TO KNOW WHAT SAMSUNG WOULD DO.

03:04:40  23       BUT THIS PATENT DOES STATE, "THE ARTICLE OF MANUFACTURE TO

03:04:42  24   WHICH THE ORNAMENTAL DESIGN HAS BEEN APPLIED IN THE PATENT IS

03:04:45  25   AN ELECTRONIC DEVICE, A MEDIA PLAYER," AND SO ON, INCLUDING A

03:04:49  1    CELL PHONE; CORRECT?

03:04:51  2    A.   YEAH.  BUT, AGAIN, IT'S CLEAR TO ME THAT, YOU KNOW, I

03:04:59  3    THINK THE COURT SAYS IT VERY CLEARLY THAT I CANNOT -- YOU KNOW,

03:05:07  4    THAT THE PATENT OFFICE HAS NOT DETERMINED WHAT THE ARTICLE OF

03:05:11  5    MANUFACTURE IS.

03:05:11  6         THE ONLY WAY TO DETERMINE THE ARTICLE OF MANUFACTURE IS TO

03:05:17  7    APPLY THE FOUR FACTORS.

03:05:19  8    Q.   TO SAMSUNG'S PRODUCTS, AND I PROMISE YOU WE'LL GET THERE.

03:05:23  9    A.   YEAH.

03:05:23  10   Q.   I'M JUST SAYING THIS PATENT RECOGNIZES THAT THE CLAIMED

03:05:26  11   DESIGN COULD BE APPLIED TO PRODUCTS INCLUDING A CELLULAR PHONE;

03:05:30  12   CORRECT?

03:05:30  13   A.   NO, THAT'S NOT CORRECT.  ALL THIS -- ALL THIS -- THIS IS A

03:05:34  14   WRITTEN DESCRIPTION WHICH I'M CONSIDERING.  BUT NOWHERE DOES IT

03:05:39  15   SAY YOU KNOW -- THIS DOES NOT COME TO GIVE ME ANY CONCLUSION

03:05:46  16   ABOUT HOW THIS, HOW THIS PATENT WAS APPLIED.  I NEED TO, AGAIN,

03:05:53  17   LOOK AT THE SCOPE OF THE PATENT, UNDERSTAND IT, AND LOOK AT HOW

03:05:57  18   THAT PATENT APPEARS IN THE SAMSUNG PHONES.

03:06:01  19        THAT'S TWO -- YOU KNOW, THAT'S TWO VERY DIFFERENT THINGS.

03:06:05  20   I CAN'T JUST LOOK AT WHAT'S WRITTEN HERE AND THEN COME TO A

03:06:07  21   CONCLUSION.

03:06:08  22   Q.   SO WHAT WAS WRITTEN IN BLACK AND WHITE RIGHT HERE DID NOT

03:06:11  23   IMPACT YOUR ANALYSIS; RIGHT?

03:06:12  24   A.   I TOOK THIS INTO CONSIDERATION.

03:06:15  25        BUT CLEARLY WHAT -- WHEN I LOOK AT THE DRAWINGS FOR, YOU

03:06:20  1    KNOW, FOR THIS PATENT AND THESE -- I THINK IT'S THE D'677, IT'S

03:06:26  2    A GLASS FRONT FACE.

03:06:28  3    Q.   WELL, LET'S TAKE A LOOK AT THOSE DRAWINGS AND LET'S GO TO

03:06:31  4    YOUR DEMONSTRATIVE, SDX 1408.

03:06:37  5         SIR, YOU REMOVED THE IMPORTANT CONTEXT; CORRECT?

03:06:40  6    A.   NO.  I REMOVED THE SURROUNDING ENVIRONMENT, AND I KEPT THE

03:06:48  7    IMPORTANT -- WHAT IS WITHIN THE SOLID LINES.

03:06:54  8    Q.   SIR, WE JUST -- WE JUST TALKED ABOUT THIS.  THE DOTTED

03:06:57  9    LINES ARE CONTEXT; CORRECT?

03:06:58  10        MR. QUINN:  EXCUSE ME, YOUR HONOR.  THE WITNESS

03:07:00  11   SHOULD BE PERMITTED TO FINISH HIS ANSWER.

03:07:02  12        THE COURT:  GO AHEAD, FINISH YOUR ANSWER.

03:07:05  13        THE WITNESS:  SO ALL I WAS SAYING IS THAT WHAT I'M

03:07:07  14   SHOWING HERE IS WHAT'S CLAIMED IN THE SOLID LINES, AND WHAT WAS

03:07:10  15   REMOVED IS -- ARE THE BROKEN LINES WHICH PROVIDED THE

03:07:16  16   SURROUNDING ENVIRONMENT.

03:07:18  17        BUT, AGAIN, THAT SURROUNDING ENVIRONMENT IS NOT -- IT'S

03:07:22  18   NOT CONCLUSIVE.  IT'S SIMPLY A SURROUNDING ENVIRONMENT TO LET

03:07:26  19   ME KNOW THAT THIS IS A BEZEL OR A FRONT FACE.

03:07:32  20        IF THIS WAS ALL THAT WAS SHOWN IN THIS PATENT, I MIGHT NOT

03:07:36  21   KNOW THAT THIS IS A BEZEL AND A FRONT FACE.

03:07:39  22        BUT IT -- SO THAT'S THE PURPOSE OF THE SURROUNDING

03:07:42  23   ENVIRONMENT.  BUT IT -- THE SURROUNDING ENVIRONMENT.

03:07:45  24   Q.   SIR, PLEASE, WE HAVE LIMITED TIME.

03:07:47  25   A.   IT DOESN'T --

03:07:47  1   Q.   WE HAVE LIMITED TIME.  I UNDERSTAND.  BUT WE TALKED ABOUT

03:07:50  2   THIS JUST A FEW MOMENTS AGO.  YOU TOLD ME IT'S A SURROUNDING

03:07:53  3   ENVIRONMENT, IT WAS CONTEXT, IT WAS IMPORTANT, AND THEN YOU

03:07:57  4   ERASED IT; RIGHT?

03:07:58  5   A.   I DON'T KNOW THAT I, I -- I DON'T KNOW THAT I SAID IT WAS

03:08:01  6   IMPORTANT.  I SAID THAT THE SURROUNDING ENVIRONMENT PROVIDED

03:08:04  7   CONTEXT.

03:08:05  8   Q.   OKAY.  LET'S LOOK AT SDX 1413.  THIS IS THE OTHER PATENT.

03:08:12  9        AND, ONCE AGAIN, YOU JUST SIMPLY ERASED THE DOTTED LINES;

03:08:16  10  CORRECT?

03:08:16  11  A.   WELL, I COULDN'T CHARACTERIZE IT THAT WAY.  I SHOWED --

03:08:21  12  FIRST I SHOWED THE WHOLE PATENT, AND THEN -- AND THEN I

03:08:28  13  SHOWED -- YOU KNOW, I SHOWED THE WHOLE PATENT DRAWING; RIGHT?

03:08:32  14       AND THEN I WANTED TO MAKE IT CLEAR TO THE JURY THAT THIS

03:08:36  15  IS WHAT'S ACTUALLY CLAIMED; THIS IS WHAT'S PROTECTED IN THIS

03:08:40  16  DESIGN.  IT'S -- YOU KNOW, THAT'S WHY I DID THAT.

03:08:44  17  Q.   THE CONTEXT IS GONE FROM THIS SLIDE; CORRECT?

03:08:47  18  A.   THE SURROUNDING ENVIRONMENT OF THE BROKEN LINES IS NOT

03:08:54  19  SHOWN HERE.

03:08:55  20  Q.   NOW, LET'S GO BACK TO THE '677, THE ACTUAL FIGURE 1 FROM

03:09:00  21  THE ACTUAL '677 PATENT FOR A MOMENT.

03:09:04  22       AND, SIR, THE CROSSHATCHING ACROSS THE FRONT, YOU

03:09:07  23  MENTIONED THIS DURING YOUR DIRECT EXAMINATION; RIGHT?

03:09:10  24  A.   YES.

03:09:10  25  Q.   THAT MEANS THE ENTIRE SURFACE IS IN BLACK; CORRECT?

03:09:15   1    A.   YEAH, EXCEPT FOR THE AREA DEPICTED WITH THE CIRCULAR

03:09:20   2    BROKEN LINE.

03:09:21   3    Q.   AND THE ENTIRE SURFACE IS CLAIMED; CORRECT?

03:09:24   4    A.   YES.

03:09:24   5    Q.   NOW, LET'S GO TO FACTOR 2, PROMINENCE OF THE CLAIMED

03:09:32   6    DESIGN.

03:09:32   7         AND LET'S SHOW THE JURY A SLIDE YOU SHOWED THEM, SDX 1419.

03:09:41   8         YOUR HONOR, MAY I APPROACH?

03:09:42   9             THE COURT:  GO AHEAD, PLEASE.

03:09:43   10   BY MR. MUELLER:

03:09:43   11   Q.   NOW, YOU ASKED THE JURY TO COMPARE THE PROMINENCE BETWEEN

03:09:46   12   THE TWO PHONES; RIGHT?

03:09:48   13   A.   NO, I DIDN'T ASK THE JURY TO COMPARE THEM.

03:09:55   14   Q.   OKAY.

03:09:55   15   A.   I WAS -- I WAS POINTING OUT TO THE JURY THAT ONE IS -- ONE

03:10:02   16   DESIGN INFRINGES THE PATENT, ONE IS AN ALTERNATIVE DESIGN, SO I

03:10:07   17   WAS POINTING OUT THE NARROWNESS OF THE PROTECTION OF THE

03:10:11   18   INVENTION.

03:10:12   19   Q.   THE TITLE IS COMPARISON; RIGHT?

03:10:13   20   A.   YES.

03:10:14   21   Q.   NOW, IN THIS PHONE ON THE LEFT, IF WE JUST LOOK AT IT, IF

03:10:18   22   WE JUST LOOK AT THIS PHONE, UNQUESTIONABLY THE BLACK FRONT FACE

03:10:22   23   IS A PROMINENT FEATURE ON THAT PHONE IF WE JUST LOOK AT IT;

03:10:26   24   CORRECT?

03:10:26   25   A.   WELL, THE WAY IT -- THE WAY I THINK ABOUT IT IS IF I APPLY

03:10:32  1    THE FOUR FACTOR ANALYSIS, THEN I ACTUALLY FOUND -- YOU KNOW,

03:10:38  2    BECAUSE THE FOUR FACTOR ANALYSIS --

03:10:40  3    Q.   SIR, WE HAVE LIMITED TIME.  IF YOU'LL STICK WITH MY

03:10:43  4    QUESTION.

03:10:43  5         MR. QUINN:  EXCUSE ME, YOUR HONOR.

03:10:44  6    BY MR. MUELLER:

03:10:45  7    Q.   YOU CAN GIVE YOUR EXPLANATION, BUT I'D APPRECIATE A YES OR

03:10:47  8    A NO.

03:10:48  9         MR. QUINN:  YOUR HONOR --

03:10:49  10   BY MR. MUELLER:

03:10:49  11   Q.   IF YOUR LAWYER WANTS TO ASK YOU A QUESTION --

03:10:55  12        THE COURT:  OKAY, PLEASE STOP.  FINISH YOUR ANSWER.

03:10:58  13   GO AHEAD, PLEASE.

03:10:59  14        THE WITNESS:  OKAY.  SO I'LL TRY TO SAY IT QUICKLY.

03:11:04  15        SO IF -- YOU KNOW, IF I'M JUST LOOKING AT THE ENCLOSURE IN

03:11:08  16   THE SHELL OF A PHONE AND LOOKING AT THE WHOLE PHONE, THEN

03:11:12  17   THAT'S ONE ANALYSIS.

03:11:14  18        BUT WHAT -- WHAT THE FACTOR 2 ASKS ME TO DO WAS LOOK AT

03:11:19  19   THE RELATIVE PROMINENCE.  SO THAT MEANT I HAD TO DETERMINE,

03:11:24  20   GEE, IS THE SCREEN PHONE -- IS A SCREEN ON, ON ITS OWN?

03:11:28  21   BECAUSE IF A SCREEN IS ON, MOST OF THE TIME WHEN YOU'RE USING

03:11:31  22   THE PHONE, THEN THIS -- THE D'677 IS NOT PROMINENT.

03:11:37  23        SO IT'S, IT'S ALL THOSE KIND OF FACTORS THAT I HAD TO,

03:11:42  24   TO -- THAT'S WHY I SAID THAT THE PROMINENCE WAS, WAS LOW FOR

03:11:45  25   THE D'677.

03:11:47  1    BY MR. MUELLER:

03:11:47  2    Q.   SIR, PLEASE JUST STAY WITH MY QUESTION.  BLACK FRONT FACE,

03:11:52  3    WHEN WE LOOK AT THIS PHONE RIGHT HERE, IS AWFULLY PROMINENT;

03:11:56  4    CORRECT?

03:11:56  5    A.   WHAT I WOULD SAY IS IF, IF YOU'RE DOING A PURE VISUAL

03:12:03  6    ANALYSIS OF AN ENCLOSURE, YOU KNOW, OF A PHONE AND YOU'RE NOT

03:12:08  7    THINKING ABOUT THE POWER OF A SMARTPHONE AND ALL THE INTERNAL

03:12:12  8    COMPONENTS, THE FACT THAT IT'S ON MOST OF THE TIME AND YOU

03:12:18  9    RARELY SEE THE BLACK SCREEN, THEN IN TERMS OF IS THE FRONT MORE

03:12:24  10   PROMINENT THAN THE BACK, YEAH, I WOULD SAY IT'S MORE PROMINENT.

03:12:28  11   Q.   THAT ACTUALLY WASN'T MY QUESTION, BUT I'LL TAKE THAT AS A

03:12:31  12   YES IT IS PROMINENT, AND WE'LL TRY TO KEEP MOVING HERE IF WE

03:12:33  13   COULD.

03:12:35  14        MR. QUINN:  YOUR HONOR, I OBJECT TO COUNSEL'S

03:12:39  15   CHARACTERIZATION.

03:12:39  16        THE COURT:  OKAY, PLEASE.  GO AHEAD WITH YOUR NEXT

03:12:41  17   QUESTION, PLEASE.

03:12:42  18        MR. MUELLER:  THANK YOU, YOUR HONOR.

03:12:42  19   Q.   SIR, IF WE COMPARE THE COMPONENT THAT YOU'VE IDENTIFIED AS

03:12:46  20   CORRESPONDING TO THE ARTICLE OF MANUFACTURE FOR THE '677

03:12:50  21   PATENT, I THINK YOU HAVE AN EXAMPLE OF THAT RIGHT IN FRONT OF

03:12:52  22   YOU; IS THAT RIGHT?

03:12:54  23   A.   I'M SORRY.  I MISSED THE QUESTION.

03:12:56  24        MR. MUELLER:  YOUR HONOR, I THINK THE JURY MAY HAVE

03:12:58  25   IT.  MAY I GRAB IT FROM THE JURY.

03:13:00    1                    THE COURT:  GO AHEAD, PLEASE.

03:13:02    2        BY MR. MUELLER:

03:13:06    3        Q.   SO I HAVE HERE THE JX 5012.  THIS IS THE GLASS DISPLAY

03:13:13    4        SCREEN, OR NOT SCREEN, GLASS DISPLAY SURFACE (INDICATING).

03:13:16    5             DO YOU SEE THAT, SIR.

03:13:17    6        A.   YES.

03:13:18    7        Q.   AND THAT'S WHAT YOU SAY THE '677 COMPONENT IS?

03:13:20    8        A.   SO, YEAH.  THIS IS WHAT I IDENTIFIED AS THE ARTICLE OF

03:13:27    9        MANUFACTURE FOR THE D'677.

03:13:29   10        Q.   AND IF YOU COULD JUST HOLD THAT UP FOR THE JURY SO THEY

03:13:32   11        CAN SEE IT ONE MORE TIME.

03:13:34   12        A.   (INDICATING.)

03:13:34   13        Q.   SIR, IT'S NOT BLACK; CORRECT?

03:13:36   14        A.   SO, YEAH, IT -- THIS GLASS FRONT COVER AS IT'S -- YOU

03:13:44   15        KNOW, AS THE -- AS -- IN LOOKING FOR THE COMPONENT, YOU KNOW,

03:13:49   16        LIKE FACTOR 4 ASKED, YOU KNOW, WHICH COMPONENT DOES THE DESIGN

03:13:53   17        PERTAIN TO?

03:13:54   18             THIS IS THE COMPONENT I SELECTED.

03:13:57   19        Q.   BUT THE CLAIMED DESIGN IS ACTUALLY NOT EVEN THERE.  YOU

03:14:00   20        HAVE TO USE IT IN THE FINISHED PRODUCT WITH POLARIZATION,

03:14:05   21        COMPRESSION TO THE BACK SURFACE, AND SO ON BEFORE IT BECOMES

03:14:09   22        BLACK; CORRECT?

03:14:10   23        A.   SO THIS -- YOU KNOW, THIS BECOMES BLACK, YOU KNOW, WHEN,

03:14:15   24        WHEN I PUT IT AGAINST, YOU KNOW, A DISPLAY SCREEN; RIGHT?  OR I

03:14:21   25        PUT IT AGAINST ANY DARK SURFACE, LIKE MY SUIT.

03:14:26  1        AND SO NOTHING IN FACTOR 4 WHERE IT'S ASKING ME TO

03:14:29  2    ACTUALLY DETERMINE THE COMPONENT THAT THE DESIGN PERTAINS TO,

03:14:34  3    NOTHING IN THAT FACTOR SAYS, YOU KNOW, THAT, YOU KNOW, THAT IT

03:14:42  4    HAS TO BE IN A FINISHED PRODUCT WHEN I DEFINE WHAT THAT

03:14:47  5    COMPONENT IS.

03:14:48  6        THAT FACTOR IS ALL ABOUT, YOU KNOW, FINDING THE COMPONENT,

03:14:53  7    YOU KNOW, THAT THE DESIGN PERTAINS TO, AND THIS IS THE

03:14:56  8    COMPONENT THAT, TO ME, CLEARLY THAT D'677 DESIGN PERTAINS TO.

03:15:01  9    Q.   SIR, AS YOU RECOGNIZED AT YOUR DEPOSITION, WHEN YOU APPLY

03:15:05  10    THAT THAT BLACK GLASS, WHEN YOU PUT IT ON THE LCD IN THE

03:15:10  11    FINISHED PRODUCT, THEN IT IS ESSENTIALLY WHAT'S IN THE D'677;

03:15:14  12    CORRECT?

03:15:14  13    A.   NO.  THE PATENT IS APPLIED TO THIS GLASS FRONT FACE WHEN,

03:15:28  14    YOU KNOW, WHEN IT'S IN THE D 6 -- OR WHEN IT'S IN THE -- WHEN

03:15:32  15    IT'S AGAINST THE GLASS FRONT SCREEN, THEN IT'S BLACK.

03:15:37  16        AND LIKE I SAID, WHEN IT'S AGAINST ANY SURFACE, IT'S

03:15:40  17    BLACK.

03:15:40  18    Q.   SIR, I'M JUST GOING TO ASK YOU THIS ONE MORE TIME BEFORE I

03:15:44  19    CALL UP YOUR DEPOSITION.

03:15:45  20        WHEN YOU APPLY THE GLASS, YOU KNOW, WHEN YOU PUT IT ON THE

03:15:47  21    LCD IN THE FINISHED PRODUCT, THEN IT ESSENTIALLY IS WHAT'S IN

03:15:52  22    THE D'677; RIGHT?

03:15:53  23    A.   ARE YOU -- YOU'RE QUOTING FROM MY DEPOSITION?

03:15:56  24    Q.   I AM?

03:15:56  25    A.   OKAY.

03:15:57  1      Q.   BUT JUST IN THE INTEREST OF SHORTENING THIS UP, YOU WOULD

03:16:00  2      AGREE WITH THAT; CORRECT?

03:16:01  3      A.   WELL, MAY I -- I JUST WANT TO KNOW THE CONTEXT OF WHAT I

03:16:04  4      WAS SAYING.

03:16:05  5      Q.   SURE.   LET'S PUT IT UP ON THE SCREEN THEN.   THIS IS FROM

03:16:08  6      YOUR DEPOSITION UNDER OATH, PAGE 70, LINE 12, TO PAGE 71:6?

03:16:13  7      A.   MAY I LOOK IN HERE.

03:16:14  8      Q.   AND YOUR TRANSCRIPT SHOULD BE IN THE BINDER AS WELL, SIR.

03:16:17  9      TAKE YOUR TIME.

03:16:18  10     A.   WHICH TAB?   WHICH TAB IS THAT?

03:16:22  11     Q.   IT'S THE LAST TAB IN THE BINDER THERE.   TAKE YOUR TIME.

03:16:25  12     LET US KNOW WHEN YOU'RE THERE.   PAGE 70, LINE 12, TO PAGE 71,

03:16:37  13     LINE 6.

03:16:38  14     A.   AND WHICH --

03:16:41  15          MR. MUELLER:   MAY I HELP THE WITNESS, YOUR HONOR.

03:16:42  16          THE COURT:   GO AHEAD, PLEASE.

03:16:43  17          THE WITNESS:   YEAH, I'M SORRY.

03:17:06  18        OKAY.   THANK YOU.

03:17:08  19     BY MR. MUELLER:

03:17:09  20     Q.   PAGE 70, PLEASE, SIR.

03:17:11  21     A.   ALL RIGHT.

03:17:16  22          MR. MUELLER:   AND MAY I APPROACH THE SCREEN, YOUR

03:17:18  23     HONOR.

03:17:18  24          THE COURT:   GO AHEAD, PLEASE.

          25

03:17:19   1    BY MR. MUELLER:

03:17:20   2    Q.   IN THE INTEREST OF TRYING TO DO THIS AS QUICK AS POSSIBLE,

03:17:22   3    I'M GOING TO HIGHLIGHT IT ON THE SCREEN.  YOU'RE REFERRING TO

03:17:25   4    THE GLASS.  AND YOU SAID "IT'S NOT COMPLETELY BLACK IN COLOR

03:17:29   5    WHEN YOU PURCHASE IT, BUT WHEN YOU APPLY IT, YOU KNOW, WHEN YOU

03:17:32   6    PUT IT ON THE LCD AND THE FINISHED PRODUCE, THEN IT ESSENTIALLY

03:17:36   7    WHAT'S IN THE '677."

03:17:38   8         CORRECT.

03:17:39   9              MR. QUINN:  YOUR HONOR, FOR COMPLETENESS, I'D REQUEST

03:17:41   10   THAT COUNSEL READ PAGE 71, LINE 24 TO 72 --

03:17:44   11              THE COURT:  OVERRULED.  YOU CAN DO THAT IN YOUR

03:17:46   12   REDIRECT.

03:17:46   13              MR. QUINN:  ALL RIGHT.  THANK YOU.

03:17:47   14              THE COURT:  GO AHEAD, PLEASE.

03:17:48   15              THE WITNESS:  WELL, SO -- SO AS I'M -- YOU KNOW, AS

03:17:52   16   I'M LOOKING AT MY DEPOSITION, OKAY, YOU KNOW, IT'S TALKING

03:17:58   17   ABOUT THIS AND I -- YOU KNOW --

03:18:06   18   BY MR. MUELLER:

03:18:07   19   Q.   SIR, WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT

03:18:10   20   ANSWER?

03:18:13   21   A.   YEAH, WHAT -- BUT THEN LATER I, I JUST SAY WHEN, WHEN IT

03:18:19   22   IS -- WHAT I SAID IS WHEN YOU PUT THE SCREEN ON, OR THE BLACK,

03:18:23   23   YOU PUT THE GLASS FRONT FACE ON A DARK SURFACE, IT, YOU KNOW,

03:18:27   24   IT BECOMES LIKE THE LCD, YOU KNOW, WHEN IT GOES ON THE LCD

03:18:32   25   SCREEN, IT BECOMES BLACK.  NOT NECESSARILY THE WHOLE PRODUCT.

LUCENT CROSS BY MR. MUELLER

03:18:37   1          SO I -- I TALKED ABOUT IT THAT WAY MUCH LIKE I DID, YOU

03:18:42   2   KNOW, JUST NOW.

03:18:43   3   Q.   LET'S -- A FEW MORE LAST QUESTIONS HERE.

03:18:45   4          IF YOU COULD PLEASE -- MAY I APPROACH, YOUR HONOR.

03:18:49   5              THE COURT:  GO AHEAD, PLEASE.

03:18:50   6   BY MR. MUELLER:

03:18:50   7   Q.   IF YOU COULD PLEASE LOOK AT THE DISPLAY SCREEN ARTICLE OF

03:18:54   8   COMPONENT THAT YOU SAY CORRESPONDS TO THE '305 PATENT?

03:18:58   9   A.   YES.

03:18:58  10   Q.   THIS IS WHAT YOU SAY THE '305 PATENT DESIGN HAS BEEN

03:19:06  11   APPLIED TO BY SAMSUNG; CORRECT?

03:19:08  12   A.   SO, YEAH.  WHAT I SAID IS THAT THIS IS THE COMPONENT THAT

03:19:13  13   THE D'305, IN FACTOR 4, THIS IS WHAT IT PERTAINS TO, AND THIS

03:19:21  14   IS THE ARTICLE OF MANUFACTURE FOR THE D'305 WHEN, WHEN IT'S

03:19:28  15   DISPLAYING THE, YOU KNOW, THE ACTUAL D'305 PATENT.

03:19:34  16   Q.   AND WE CAN AGREE ON THIS:  THE JURY COULD LOOK AT THAT FOR

03:19:38  17   WEEKS AND THE GRAPHICAL USER INTERFACE WILL NEVER APPEAR ON

03:19:40  18   THAT DISPLAY SCREEN AS YOU HOLD IT IN YOUR HAND?

03:19:43  19   A.   WELL, I -- I THINK WE CAN AGREE ON THAT.

03:19:47  20          BUT WE CAN ALSO -- I THINK WHAT -- IT'S -- THE D'305 IS,

03:19:55  21   YOU KNOW, IS A GRAPHICAL USER INTERFACE WHICH IS, YOU KNOW, FOR

03:20:02  22   A DISPLAY SCREEN; RIGHT?

03:20:04  23          SO WHEN YOU WRITE THAT CODE, IT'S ACTUALLY DESIGNED

03:20:08  24   METICULOUSLY TO, TO APPEAR AS PIXELS ON A DISPLAY SCREEN;

03:20:14  25   RIGHT?

03:20:14   1    Q.   SIR --

03:20:15   2    A.   AND THE WAY IT WAS IMPLEMENTED ON, ON THE SAMSUNG PHONES

03:20:19   3    WAS THAT -- IT'S ALMOST LIKE A PAINT BY NUMBER.  THE CODE SAYS,

03:20:25   4    YOU KNOW, LOOK AT THIS DISPLAY SCREEN, IT'S THIS KIND OF

03:20:28   5    RESOLUTION, AND MAKE IT APPEAR THIS WAY.

03:20:31   6         AND THAT'S HOW THE D'305 APPEARS.

03:20:34   7         SO, AGAIN, WHEN I DO THE FOUR FACTOR ANALYSIS --

03:20:37   8              MR. MUELLER:  YOUR HONOR, IF I MIGHT, I DON'T HAVE

03:20:40   9    TIME FOR THE LONG ANSWERS.

03:20:42   10             THE COURT:  THAT'S NONRESPONSIVE.  PLEASE ANSWER THE

03:20:45   11   QUESTION.  OKAY?

03:20:46   12   BY MR. MUELLER:

03:20:46   13   Q.   SIR, THE POINT IS SIMPLY THIS:  THAT DISPLAY SCREEN AS YOU

03:20:49   14   HOLD IT IS NEVER GOING TO SHOW A GRAPHICAL INTERFACE?  IT NEEDS

03:20:53   15   TO BE HOOKED UP TO CIRCUITRY AND A POWER SOURCE AND MANY OTHER

03:20:56   16   THINGS; CORRECT?

03:20:57   17   A.   THAT I AGREE WITH, BUT THERE'S NOTHING IN THE FOUR FACTORS

03:21:00   18   THAT SAYS, YOU KNOW, THAT SAYS IT'S -- YOU KNOW, IT HAS TO WORK

03:21:06   19   AFTER IT'S SEPARATED.  IT'S ASKING FOR THE ARTICLE OF

03:21:12   20   MANUFACTURE THAT PERTAINS TO THAT PATENT.

03:21:14   21   Q.   LAST FEW QUESTIONS.

03:21:17   22        A JURY FOUND THAT THE CLAIMED DESIGNS WERE ACTUALLY IN

03:21:21   23   15.3 SAMSUNG -- 15.3 MILLION SAMSUNG PHONES; CORRECT.

03:21:26   24   A.   I DON'T KNOW ANYTHING ABOUT THAT.

03:21:27   25   Q.   LET ME ASK YOU IF YOU KNOW THIS:  HOW MANY OF THOSE

03:21:30  1    15.3 MILLION UNITS WAS A PIECE OF GLASS STANDING ALONE?

03:21:34  2    A.   WELL, ALL 15 MILLION HAD A PIECE OF GLASS IN THEM, I'M

03:21:42  3    SURE.

03:21:43  4    Q.   SIR, MY WAS QUESTION, HOW MANY OF THOSE 15.3 MILLION ACTS

03:21:47  5    OF INFRINGEMENT WAS THE SALE OF A PIECE OF GLASS STANDING

03:21:50  6    ALONE?

03:21:51  7    A.   AGAIN, THAT'S, THAT'S NOT WHAT THE FOUR FACTOR ANALYSIS --

03:21:57  8    Q.   SIR, IF YOU PLEASE --

03:21:58  9    A.   -- THAT I DID ASK.

03:22:00  10        MR. MUELLER:  YOUR HONOR, I'D ASK THAT HE STAY WITH

03:22:02  11   MY QUESTION.

03:22:03  12   Q.   MY QUESTION WAS HOW MANY OF THE 15.3 ACTS OF INFRINGEMENT

03:22:07  13   WAS THE SALE OF A PIECE OF GLASS STANDING ALONE?

03:22:09  14   A.   SO I THINK THE 15.3 MILLION, THAT'S REFERRING TO FINISHED

03:22:14  15   PRODUCTS.

03:22:15  16   Q.   SMARTPHONES?

03:22:17  17   A.   YES.

03:22:18  18        MR. MUELLER:  I HAVE NO FURTHER QUESTIONS.

03:22:19  19        THE COURT:  ALL RIGHT.  IT IS 3:22.  LET'S GO TO

03:22:24  20   3:30, PLEASE, AND TAKE A TEN MINUTE BREAK AT THAT TIME.  THANK

03:22:27  21   YOU.

03:22:27  22                      **REDIRECT EXAMINATION**

03:22:29  23   BY MR. QUINN:

03:22:30  24   Q.   MR. LUCENTE, COUNSEL WAS ASKING YOU QUESTIONS ABOUT THAT

03:22:33  25   DISPLAY SCREEN, WHETHER YOU COULD STARE AT IT FOREVER AND IF

03:22:37   1    YOU'D EVER SEE THAT '305 GRAPHICAL DESIGN.

03:22:41   2         DO YOU RECALL THAT QUESTION?

03:22:42   3    A.   YES.

03:22:42   4    Q.   DOES THAT REQUIRE A PHONE IN ORDER FOR THAT IMAGE TO

03:22:45   5    APPEAR?

03:22:46   6    A.   NO.

03:22:46   7    Q.   WHAT DOES IT REQUIRE?  DOES IT REQUIRE SOME TYPE OF POWER

03:22:51   8    SOURCE?

03:22:51   9    A.   YES.

03:22:52   10   Q.   DOES IT REQUIRE THE ABILITY TO TAKE A VIDEO, WHICH IS IN A

03:22:55   11   PHONE?

03:22:55   12   A.   NO.

03:22:56   13   Q.   DOES IT REQUIRE THE ABILITY TO ACCESS THE INTERNET, WHICH

03:23:00   14   IS IN A PHONE?

03:23:00   15   A.   NO.

03:23:01   16   Q.   DOES IT REQUIRE THE ABILITY TO TEXT?

03:23:04   17   A.   NO.

03:23:05   18   Q.   DOES IT REQUIRE THE ABILITY TO DO MAPS OR TURN BY TURN OR

03:23:09   19   ANYTHING OF THAT NATURE?

03:23:10   20   A.   NO.

03:23:14   21   Q.   YOU WERE ASKED SOME QUESTIONS ABOUT THE DISPLAY SCREEN AND

03:23:19   22   THE LANGUAGE IN THE PATENT FOR THE BLACK SURFACE.

03:23:28   23        DO YOU RECALL THAT?

03:23:29   24        DO YOU HAVE BEFORE YOU YOUR REPAIR LCD?  IT'S SDX 1450.

03:23:36   25   DO YOU HAVE THAT THERE?

```
03:23:39   1    A.   ARE YOU TALKING ABOUT --

03:23:41   2    Q.   THE REPAIR SCREEN, THE REPAIR.  IF YOU CAN HOLD THAT UP.

03:23:46   3    A.   YOU MEAN THIS (INDICATING)?

03:23:48   4    Q.   YEAH.

03:23:48   5    A.   YES.

03:23:49   6    Q.   AND CAN YOU SHOW THAT TO THE JURY.

03:23:51   7    A.   (INDICATING.)

03:23:52   8    Q.   IS THAT BLACK?

03:23:52   9    A.   YES.

03:23:53  10    Q.   IS THERE A WHOLE PHONE THERE?

03:23:55  11    A.   NO.  (INDICATING.)

03:23:59  12    Q.   YOU WERE ASKED SOME QUESTIONS -- IF WE COULD PUT UP SDX

03:24:11  13    1419 -- ABOUT PROMINENCE.

03:24:14  14         AND YOU SAID THAT WHEN THE PHONE IS ON, THE '677 PATENT IS

03:24:22  15    NOT PROMINENT.  THAT'S THE ONE FOR THE SURFACE.

03:24:28  16         COULD YOU EXPLAIN TO THE JURY WHAT YOU MEANT BY THAT.

03:24:30  17    A.   WELL, THE D'677, YOU KNOW, CLAIMS A BLACK FRONT SURFACE,

03:24:38  18    AND MY POINT WAS THAT WHEN -- THAT CELL PHONES ARE -- WHEN

03:24:45  19    YOU'RE LOOKING AT THEM, WHEN YOU'RE INTERACTING WITH THEM,

03:24:48  20    THEY'RE ON.  AND SO, YOU KNOW, WHEN YOU'RE LOOKING AT THAT

03:24:52  21    FACTOR, YOU HAVE TO REALLY THINK ABOUT ALL OF THE DIFFERENT

03:24:58  22    WAYS TO DETERMINE, YOU KNOW, THE RELATIVE PROMINENCE.

03:25:02  23         SO MY POINT WAS THAT WHEN THE SCREEN IS ON, YOU DON'T SEE

03:25:07  24    THE D'677 PATENT.  IT'S NOT -- IT'S NOT PRACTICED.

03:25:14  25    Q.   SO THAT'S -- YOU'RE LOOKING AT PROMINENCE IN ANSWERING
```

03:25:18  1    THAT QUESTION, AND COUNSEL'S QUESTION, YOU WERE LOOKING AT

03:25:22  2    PROMINENCE FROM A VISUAL STANDPOINT?

03:25:24  3    A.   YES.

03:25:25  4    Q.   BUT THAT FACTOR, THAT PROMINENCE FACTOR, FACTOR NUMBER

03:25:29  5    2 -- IF WE COULD PULL THAT UP, KEN -- DOES THAT LIMIT THE

03:25:33  6    ANALYSIS TO THE VISUAL -- FROM A VISUAL STANDPOINT?  OR DOES

03:25:38  7    THAT ASK ABOUT PROMINENCE OF THE DESIGN WITHIN THE PRODUCT AS A

03:25:40  8    WHOLE?

03:25:41  9    A.   YES, IT -- IT ASKS ABOUT THE PROMINENCE OF THE DESIGN AND,

03:25:49  10   YOU KNOW, RELATIVE TO THE PRODUCT AS A WHOLE.

03:25:51  11        SO YOU REALLY -- TO REALLY THINK ABOUT THAT, RIGHT, YOU

03:25:55  12   HAVE TO ASK YOURSELF, YOU KNOW, IS -- ARE THESE THREE

03:26:02  13   COMPONENTS, YOU KNOW, WHAT'S THE RELATIVE PROMINENCE OF THE

03:26:09  14   DESIGNS RELATIVE TO THE POWER OF A SMARTPHONE AND ALL OF THE

03:26:15  15   FUNCTIONALITY OF THE SMARTPHONE, THE -- YOU KNOW, THE VIDEO

03:26:21  16   CAMERA, THE -- YOU KNOW, THE POWER TO MAKE PHONE CALLS AND

03:26:26  17   TEXTS AND DO GPS AND ALL THOSE THINGS.

03:26:30  18        SO IT'S ALL THOSE UNAFFECTED COMPONENTS THAT YOU HAVE TO

03:26:33  19   LOOK AT.

03:26:33  20   Q.   AND THEN YOU WERE ASKED SOME QUESTIONS ABOUT THAT LANGUAGE

03:26:35  21   IN THE WRITTEN DESCRIPTION THAT REFERS TO ARTICLE OF

03:26:41  22   MANUFACTURE.  IT'S THE '677 PATENT, THAT LANGUAGE THERE ABOUT

03:26:52  23   ARTICLE OF MANUFACTURE THAT COUNSEL SHOWED YOU.

03:26:55  24   A.   YES.

03:26:56  25   Q.   IF WE COULD ENLARGE THAT.

```
03:27:03   1        ONE THING THAT WE DO KNOW IS THAT THE AUTHOR OF THIS

03:27:09   2   LANGUAGE, WHATEVER PUT THESE THREE WORDS IN HERE, DID NOT KNOW

03:27:12   3   ABOUT THE FOUR FACTOR TEST; CORRECT?

03:27:15   4   A.   CORRECT.

03:27:15   5   Q.   AND WAS NOT APPLYING --

03:27:18   6   A.   THIS WAS BEFORE THAT, YES.

03:27:19   7   Q.   AND WERE YOU HERE WHEN MR. BALL TESTIFIED?

03:27:21   8   A.   YES.

03:27:22   9   Q.   AND DID YOU HEAR THE TESTIMONY OF MR. BALL, THAT THAT WAS

03:27:26  10   WRITTEN BY -- PROBABLY WRITTEN BY APPLE'S LAWYERS?

03:27:29  11   A.   YES.

03:27:29  12            MR. QUINN:  NOTHING FURTHER.

03:27:31  13            MR. MUELLER:  NO REDIRECT, YOUR HONOR.

03:27:32  14            THE COURT:  ALL RIGHT.  THE TIME IS 3:27.

03:27:35  15        NO REDIRECT.

03:27:36  16        OKAY.  IS THIS WITNESS EXCUSED WITH OR WITHOUT SUBJECT TO

03:27:39  17   RECALL?

03:27:41  18            MR. MUELLER:  NOT SUBJECT TO RECALL FROM OUR

03:27:42  19    PERSPECTIVE, YOUR HONOR.

03:27:43  20            MR. QUINN:  NOT SUBJECT TO RECALL, YOUR HONOR.

03:27:48  21            THE COURT:  OKAY.  THEN YOU MAY STEP DOWN AND YOU

03:27:51  22    HAVE COMPLETED YOUR TRIAL TESTIMONY.

03:27:53  23        LET'S GO AHEAD, IT'S ONLY 3:27, BUT LET'S GO AHEAD AND

03:27:56  24   TAKE OUR BREAK.  I'M JUST GOING TO INSTRUCT YOU ONE MORE TIME

03:27:59  25   THAT THE U.S. PATENT AND TRADEMARK OFFICE HAS NOT IDENTIFIED
```

03:28:01  1   THE ARTICLES OF MANUFACTURE IN THIS CASE.  THAT WILL BE A

03:28:05  2   DECISION THAT THE JURY MUST ADDRESS.

03:28:08  3        ALSO, DON'T RESEARCH, DISCUSS, OR LISTEN TO ANYTHING ABOUT

03:28:11  4   THIS CASE, THESE PARTIES, OR THEIR PRODUCTS.

03:28:14  5        THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL TAKE

03:28:17  6   A TEN MINUTE BREAK TO 3:40.

03:28:21  7        (JURY OUT AT 3:28 P.M.)

03:28:30  8        THE COURT:  IF THERE ARE NO ISSUE, LET'S TAKE OUR

03:28:34  9   BREAK NOW.  THANK YOU.

03:28:36  10       (RECESS FROM 3:28 P.M. UNTIL 3:41 P.M.)

03:41:29  11       THE COURT:  WELCOME BACK.

03:41:31  12   WE DO NOT HAVE SAMSUNG'S CLOSING DEMONSTRATIVES.  WE HAVE

03:41:35  13   APPLE'S.

03:41:44  14       GREAT.  THANK YOU.  AND WE'LL START WORKING ON ALL THE

03:41:46  15   OBJECTIONS.

03:41:47  16       ALL RIGHT.  LET'S GO AHEAD AND HAVE YOUR WITNESS READY TO

03:41:54  17   GO.

03:41:54  18       I THINK ONE JUROR IS IN THE BATHROOM, BUT --

03:41:57  19       THE CLERK:  LET ME CHECK, YOUR HONOR.

03:41:58  20       THE COURT:  OKAY.

03:42:06  21       THE CLERK:  THEY ARE READY, YOUR HONOR.

03:42:08  22       (JURY IN AT 3:42 P.M.)

03:42:24  23       THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

03:42:33  24   SEAT.

03:42:34  25       PLEASE CALL YOUR NEXT WITNESS.

| | |
|---|---|
| 03:42:39 | 1 |
| 03:42:42 | 2 |
| 03:42:49 | 3 |
| 03:42:52 | 4 |
| 03:42:53 | 5 |
| 03:42:53 | 6 |
| 03:42:55 | 7 |
| 03:42:58 | 8 |
| 03:42:59 | 9 |

03:42:39  1        MR. PRICE:  YOUR HONOR, SAMSUNG CALLS MICHAEL WAGNER.

03:42:42  2        THE COURT:  ALL RIGHT.  PLEASE COME UP, SIR.

03:42:49  3        THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

03:42:52  4        **(DEFENDANTS' WITNESS, MICHAEL WAGNER, WAS SWORN.)**

03:42:53  5        THE WITNESS:  I DO.

03:42:53  6        THE CLERK:  THANK YOU.  PLEASE BE SEATED.

03:42:55  7        AND ONCE SEATED, PLEASE STATE AND THEN SPELL YOUR NAME FOR

03:42:58  8    THE RECORD.

03:42:59  9        THE WITNESS:  MY NAME IS MICHAEL JOSEPH WAGNER.

03:43:04  10   THAT'S SPELLED M-I-C-H-A-E-L, JOSEPH, J-O-S-E-P-H, WAGNER,

03:43:12  11   W-A-G-N-E-R.

03:43:13  12       THE COURT:  ALL RIGHT.  THE TIME IS 3:43.

03:43:17  13       GO AHEAD, PLEASE.

03:43:17  14       MR. PRICE:  THANK YOU, YOUR HONOR.

03:43:19  15                    **DIRECT EXAMINATION**

03:43:19  16   BY MR. PRICE:

03:43:20  17   Q.   GOOD AFTERNOON, MR. WAGNER.  COULD YOU TELL US WHAT YOU DO

03:43:23  18   FOR A LIVING?

03:43:23  19   A.   I'M A MANAGEMENT CONSULTANT THAT SPECIALIZES IN ANALYZING

03:43:27  20   DAMAGES IN MATTERS THAT ARE IN DISPUTE.

03:43:28  21   Q.   WERE YOU RETAINED BY SAMSUNG TO BE AN EXPERT IN THIS CASE?

03:43:32  22   A.   I WAS.

03:43:32  23   Q.   COULD YOU TELL US WHAT YOUR ASSIGNMENT WAS?

03:43:35  24   A.   MY ASSIGNMENT WAS TO REVIEW THE WORK OF MS. DAVIS, APPLE'S

03:43:39  25   DAMAGE EXPERT, TO DETERMINE WHETHER I AGREED OR DISAGREED WITH

03:43:41  1    HER OPINIONS OR HER BASES FOR OPINIONS, AND TO COME UP WITH MY

03:43:46  2    INDEPENDENT OPINION OF DAMAGES IN THIS CASE.

03:43:49  3    Q.   WERE YOU ALSO ASKED TO PREPARE AN OPINION ON THE AMOUNT OF

03:43:52  4    DAMAGES THAT'S ADEQUATE TO COMPENSATE APPLE FOR SAMSUNG'S USE

03:43:57  5    OF APPLE'S PATENTS BY THE 16 SAMSUNG PRODUCTS AT ISSUE HERE?

03:44:01  6    A.   YES.

03:44:02  7    Q.   ALL RIGHT.  SO JUST MORE CLARIFIES IT ALSO.

03:44:07  8         DID YOU DO THAT?

03:44:07  9    A.   I DID.

03:44:08  10   Q.   AND LET'S GO INTO NOW WHY YOU'RE QUALIFIED TO DO THAT, AND

03:44:13  11   IF WE COULD PUT UP SLIDE SDX 1701.

03:44:17  12        AND YOU PROBABLY HAVE THIS ON THE MONITOR IN FRONT OF YOU.

03:44:21  13        CAN YOU TELL US ABOUT YOUR EDUCATIONAL BACKGROUND?

03:44:23  14   A.   I RECEIVED A BACHELOR OF SCIENCE AND ENGINEERING FROM

03:44:27  15   SANTA CLARA UNIVERSITY, WHICH IS JUST 3.51 MILES UP THE ROAD

03:44:31  16   FROM HERE.  I GOT THAT IN 1969.

03:44:33  17        I THEN GOT A MASTER'S IN BUSINESS ADMINISTRATION, WHICH I

03:44:37  18   GOT FROM UCLA IN 1971.

03:44:40  19        AND THEN I GOT A JURIS DOCTORATE DEGREE FROM LOYOLA

03:44:45  20   UNIVERSITY SCHOOL OF LAW IN LOS ANGELES IN 1975.

03:44:48  21   Q.   ARE YOU A PRACTICING LAWYER?

03:44:49  22   A.   NO.  I HAD AN ACTIVE LICENSE TO PRACTICE, BUT I DON'T

03:44:52  23   PRACTICE AS A LAWYER.

03:44:53  24   Q.   OKAY.  AND COULD YOU TELL US WHETHER YOU HAVE ANY

03:44:56  25   PROFESSIONAL LICENSES?

03:44:57    1    A.   I HAVE TWO PROFESSIONAL LICENSES IN THE STATE OF

03:44:59    2    CALIFORNIA.   I WAS AN ACTIVE LICENSEE IN THE STATE OF

03:45:03    3    CALIFORNIA AS A CERTIFIED PUBLIC ACCOUNTANT FOR 35 YEARS.

03:45:07    4        I HAD AN ACTIVE LICENSE TO PRACTICE LAW FOR 38 YEARS.   I

03:45:10    5    STILL HAVE LICENSES IN BOTH THOSE PROFESSIONS, BUT I'VE GONE ON

03:45:13    6    INACTIVE STATUS.

03:45:15    7    Q.   ARE YOU A MEMBER OF ANY PROFESSIONAL ORGANIZATIONS?

03:45:17    8    A.   YES.   THE ORGANIZATION I WAS WITH MOST OF MY CAREER WAS

03:45:21    9    THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, WHICH

03:45:24   10    IS THE ORGANIZATION THAT REALLY GOVERNS THE PRACTICE OF

03:45:27   11    ACCOUNTANCY IN OUR COUNTRY.

03:45:28   12    Q.   AND HAVE YOU -- COULD YOU TELL ME, WHAT'S THE SEDONA

03:45:40   13    CONFERENCE WORKING GROUP ON PATENT DAMAGES?

03:45:42   14    A.   THAT IS A NONPROFIT THINK TANK ORGANIZATION WHOSE CHARTER

03:45:47   15    IS TO IMPROVE THE PRACTICE OF LAW IN THE FEDERAL COURT SYSTEM,

03:45:49   16    AND FOR FIVE YEARS I WAS ON A WORKING GROUP IN THAT

03:45:52   17    ORGANIZATION TO IMPROVE THE PRACTICE OF CALCULATING DAMAGES IN

03:45:57   18    PATENT CASES.

03:45:59   19        AND WE FINALLY, AFTER FIVE YEARS, ISSUED A PUBLICATION TO

03:46:03   20    GIVE SOME ADVICE TO THE COURT SYSTEM OF HOW BETTER TO CALCULATE

03:46:06   21    DAMAGES.

03:46:07   22        NOW, THAT WORKING GROUP CONSISTED OF 4 FEDERAL JUDGES,

03:46:11   23    ABOUT 26 PRACTICING LAWYERS IN THIS AREA, AND 3 PATENT DAMAGE

03:46:15   24    EXPERTS.   I WAS ONE OF THE PATENT DAMAGE EXPERTS WHO HELPED

03:46:18   25    WRITE THAT PAPER.

03:46:19   1   Q.   SO THE EXPERTS WERE HEAVILY OUTNUMBERED?

03:46:22   2   A.   AS IS USUAL.

03:46:23   3   Q.   AND IN THESE ORGANIZATIONS, HAVE YOU HELD ANY LEADERSHIP

03:46:27   4   POSITIONS?

03:46:27   5   A.   YES.   AT THE AMERICAN INSTITUTE OF PUBLIC ACCOUNTANTS,

03:46:33   6   I'VE HAD VARIOUS LEADERSHIP ROLES.   I SERVED ON THE INAUGURAL

03:46:38   7   COMMITTEE THAT SET UP THE STANDARDS FOR CPA'S TO GET A

03:46:41   8   CERTIFICATE IN FORENSICS WHICH IS THE TYPE OF WORK CPA'S DO IN

03:46:45   9   THE JUDICIAL SYSTEM.   I WAS NUMBER 23 OUT OF NOW MORE THAN

03:46:47   10   5,000 CPA'S THAT HAVE THAT CREDENTIAL.   I HELPED SET THE

03:46:51   11   STANDARDS TO GET THE CREDENTIAL AND THE EDUCATIONAL

03:46:53   12   REQUIREMENTS THAT YOU HAD TO PASS.

03:46:55   13       I ALSO SERVED ON THE PRACTICE STANDARDS COMMITTEE OF THE

03:46:58   14   MANAGEMENT CONSULTING DIVISION, AND WHEN I WAS ON THAT

03:47:00   15   COMMITTEE, WE SET THE STANDARDS FOR CPA'S WHO PRACTICE

03:47:06   16   MANAGEMENT CONSULTING IN THE COUNTRY AND THAT WAS BACK IN 1988

03:47:09   17   AND 1999.

03:47:10   18       SO I'M VERY FAMILIAR WITH WHAT STANDARDS CPA'S DOING

03:47:14   19   MANAGEMENT CONSULTING WORK MUST ABIDE BY, WHICH THIS IS A

03:47:17   20   MANAGEMENT CONSULTING ASSIGNMENT.

03:47:19   21       I SERVED ON NATIONAL LITIGATION SERVICES COMMITTEE -- AND

03:47:25   22   I'M SORRY, I'LL TRY TO SLOW DOWN -- AND I ALSO SERVED ON THE

03:47:29   23   COMMITTEE THAT SET THE AGENDA FOR THE NATIONAL CONFERENCE ON

03:47:32   24   LITIGATION SERVICES.

03:47:34   25       AND THEN FINALLY, I WAS THE EDITOR OF THE "CPA EXPERT,"

03:47:37    1    WHICH IS A PUBLICATION OF THE AICPA FOR CPA'S WHO DO BUSINESS

03:47:44    2    VALUATION OR LITIGATION SERVICES WORK, AND I DID THAT FOR A

03:47:47    3    NUMBER OF YEARS.

03:47:48    4    Q.   IF WE LOOK AT THE DEMONSTRATIVE WE HAVE HERE, IT SAYS 33

03:47:52    5    PUBLISHED ARTICLES.  COULD YOU TELL ME ABOUT YOUR PUBLICATIONS

03:47:55    6    IN THE FIELD?

03:47:56    7    A.   I DO HAVE 33 PROFESSIONAL PUBLICATIONS; 11 OF THEM DEAL

03:48:00    8    DIRECTLY WITH CALCULATED PATENT DAMAGES.

03:48:02    9         AND ONE OF MY PUBLICATIONS, WHICH IS THE "LITIGATION

03:48:06   10    SERVICES HANDBOOK," I THINK IS AUTHORITATIVE.

03:48:08   11    Q.   HAS THAT BOOK GAINED ANY RECOGNITION?

03:48:10   12    A.   YES.  I WAS THE FOUNDING EDITOR OF THE BOOK, AND I WAS

03:48:14   13    AFFILIATED WITH IT FOR OVER 20 YEARS.

03:48:16   14         IN THE FIRST TWO EDITIONS OF THE FEDERAL JUDICIAL CENTER'S

03:48:19   15    TREATISE IN SCIENTIFIC EVIDENCE, THEY HAVE A CHAPTER ON

03:48:22   16    ECONOMIC DAMAGES.  AND IN THAT CHAPTER, IT HAD A BIBLIOGRAPHY

03:48:26   17    THAT FURTHER REFERENCES SOURCES IF YOU WANTED TO UNDERSTAND HOW

03:48:28   18    TO CALCULATE DAMAGES, AND MY BOOK WAS ONE OF THOSE REFERENCE

03:48:31   19    SOURCES.

03:48:32   20    Q.   AND HAVE YOU WRITTEN ANY CHAPTERS OF ANY BOOKS?

03:48:35   21    A.   WELL, IN THE "LITIGATION SERVICES HANDBOOK," I WAS THE

03:48:40   22    CO-AUTHOR OF THE CHAPTER ON PATENT DAMAGES, AND I HAVE WRITTEN

03:48:42   23    CHAPTERS IN TWO VALUATION BOOKS AS WELL.

03:48:46   24         MR. PRICE:  YOUR HONOR, SAMSUNG TENDERS MR. WAGNER AS

03:48:49   25    AN EXPERT IN PATENT DAMAGES AND ACCOUNTING.

03:48:52   1              MR. LEE:  NO OBJECTION, YOUR HONOR.

03:48:53   2              THE COURT:  ALL RIGHT.  SO CERTIFIED.  GO AHEAD,

03:48:55   3    PLEASE.

03:48:55   4    BY MR. PRICE:

03:48:56   5    Q.   AND ARE YOU WORKING FOR FREE IN THIS CASE?

03:48:59   6    A.   NO.  I'M BILLING YOUR CLIENT AT THE STANDARD BILLING RATE

03:49:02   7    THAT I HAD AT THE TIME I STARTED WORKING ON THIS CASE IN 2011.

03:49:05   8    Q.   AND COULD YOU TELL THE JURY HOW MANY HOURS YOU AND YOUR

03:49:09   9    STAFF HAVE SPENT IN THIS CASE SINCE ITS INCEPTION?

03:49:12   10   A.   SINCE WE STARTED WORKING ON THIS CASE, EITHER I OR MY

03:49:15   11   STAFF HAVE BILLED YOUR CLIENT 8,626.5 HOURS.

03:49:20   12   Q.   AND DOES YOUR PAYMENT DEPEND IN ANY WAY ON THE OUTCOME OF

03:49:23   13   THE CASE?

03:49:24   14   A.   IT DOES NOT.

03:49:25   15   Q.   AND WHAT'S THE NAME OF THE FIRM THAT YOU WORK WITH?

03:49:28   16   A.   THE FIRM I CURRENTLY WORK WITH IS CALLED LITIGATION --

03:49:31   17   PARDON ME, LITINOMICS, INCORPORATED, AND I'M NOW A SENIOR

03:49:34   18   ADVISER TO THIS FIRM.  I USED TO BE THE MANAGING DIRECTOR, BUT

03:49:38   19   I ACTUALLY RETIRED EARLIER THIS YEAR.

03:49:40   20   Q.   SO LET'S TRY TO CUT TO YOUR OPINIONS THEN.

03:49:43   21        YOU WERE IN THE ROOM WHEN MS. DAVIS TESTIFIED; CORRECT?

03:49:46   22   A.   I WAS.

03:49:47   23   Q.   AND LET'S START WITH SHE TESTIFIED ABOUT WHAT SHE SAID

03:49:49   24   WERE TOTAL PROFITS ON 16 PHONES, SAMSUNG PHONES IN THIS CASE,

03:49:54   25   THAT INFRINGED THE APPLE'S DESIGN PATENTS.

03:49:57  1          DO YOU RECALL THAT?

03:49:58  2     A.   I DO.

03:49:58  3     Q.   AND SHE CONCLUDED THAT THE TOTAL PROFITS WERE

03:50:02  4     APPROXIMATELY $1,067,128,207, OR PRECISELY, I GUESS?

03:50:10  5     A.   THAT SOUNDS PRECISE, AND I REMEMBER THAT NUMBER.

03:50:13  6     Q.   DO YOU AGREE WITH THAT CONCLUSION?

03:50:14  7     A.   NO, I DO NOT.

03:50:15  8     Q.   AND WHY NOT?

03:50:16  9     A.   I THINK THAT SHE HAS NOT INCLUDED ALL THE COSTS THAT ARE

03:50:19 10     NECESSARY TO CALCULATE TOTAL PROFITS.

03:50:22 11     Q.   AND WHAT IS, IN YOUR OPINION, THE CORRECT NUMBER ON WHAT

03:50:26 12     THE TOTAL PROFITS ARE OF THE 16 SAMSUNG PHONES THAT ARE

03:50:31 13     INVOLVED IN THIS CASE?

03:50:33 14     A.   THAT INCLUDES ALL OF THE COSTS THAT ARE RELEVANT TO

03:50:37 15     EARNING THE REVENUES THAT THEY EARN BY SELLING THESE PHONES.

03:50:41 16          SO THAT WOULD INCLUDE THE COSTS THAT MS. DAVIS DID

03:50:43 17     INCLUDE, THE COST OF GOODS SOLD, BUT ALSO INCLUDES THE

03:50:47 18     OPERATING EXPENSES THAT ARE NECESSARY TO MAKE THOSE SALES,

03:50:50 19     WHICH INCLUDE SALES, MARKETING, AND GENERAL ADMINISTRATIVE

03:50:53 20     EXPENSES.

03:50:54 21     Q.   AND COULD YOU TELL US WHAT YOUR, YOUR BOTTOM LINE NUMBER

03:50:56 22     IS THEN ON, ON THE INFRINGER'S PROFITS, THAT IS, SAMSUNG'S

03:51:02 23     PROFITS ON THESE PHONES?

03:51:03 24     A.   IT'S APPROXIMATELY $370 MILLION.

03:51:05 25     Q.   AND IF WE COULD PUT UP EXHIBIT 781.003 --

WAGNER DIRECT BY MR. PRICE

03:51:19  1          MR. KOTARSKI:  IT'S COMING UP.

03:51:20  2          MR. PRICE:  OKAY.

03:51:21  3  Q.  HAVE YOU PREPARED A CHART IN YOUR REPORT SUMMARIZING THAT?

03:51:24  4  A.  I DID.

03:51:25  5  Q.  AND SUMMARIZING THE PROFITS BY PHONE?

03:51:27  6  A.  YES.

03:51:27  7  Q.  IS THAT REFLECTED IN EXHIBIT 781.003.

03:51:32  8      YOU SHOULD HAVE A BINDER IN FRONT OF YOU.

03:51:41  9  A.  WHAT IS THE NUMBER AGAIN?

03:51:43  10 Q.  IT'S DX 781, AND IT WOULD BE THE LAST -- IT WOULD BE THE

03:51:50  11 THIRD PAGE.

03:51:56  12 A.  YES.

03:51:58  13         MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 781, DX 781 INTO

03:52:02  14 EVIDENCE.

03:52:02  15         THE COURT:  ANY OBJECTION?

03:52:05  16         MR. LEE:  NO OBJECTION.

03:52:06  17         THE COURT:  IT'S ADMITTED.

03:52:08  18     (DEFENDANTS' EXHIBIT 781 WAS ADMITTED IN EVIDENCE.)

03:52:08  19         THE COURT:  GO AHEAD, PLEASE.

03:52:09  20         MR. PRICE:  AND IF WE CAN PUT UP 781, THE THIRD PAGE.

03:52:12  21 Q.  AND COULD YOU TELL US WHAT THIS EXHIBIT SHOWS?

03:52:19  22 A.  IT SHOWS MY CALCULATIONS DURING THE RELEVANT DAMAGE

03:52:23  23 PERIODS FOR EACH OF THE 16 PHONES THAT HAD ACTUAL SALES IN THE

03:52:27  24 UNITED STATES.

03:52:28  25 Q.  NOW, THIS SHOWS THAT YOUR CONCLUSION ABOUT THE TOTAL

03:52:32   1      PROFITS; CORRECT?

03:52:33   2      A.   YES.

03:52:33   3      Q.   DID YOUR ANALYSIS STOP THERE WITH RESPECT TO WHAT THE

03:52:39   4      TOTAL PROFITS WERE ON THE ARTICLES OF MANUFACTURE?

03:52:41   5      A.   NO.  I'VE ALSO MADE ADDITIONAL CALCULATIONS ASSUMING THE

03:52:45   6      JURY FIND THAT THE ARTICLE OF MANUFACTURE IS SOMETHING LESS

03:52:48   7      THAN THE ENTIRE PHONE.

03:52:50   8      Q.   BUT THIS IS YOUR FIRST STEP; IS THAT RIGHT?

03:52:52   9      A.   THIS IS THE FIRST STEP.

03:52:53   10     Q.   OKAY.  SO LET'S -- LET'S TALK ABOUT THIS CALCULATION, THE

03:52:57   11     TOTAL PROFITS ON THE 16 PHONES.

03:52:59   12          AND IF WE COULD PUT UP SDX 1702, IT'S A DEMONSTRATIVE.

03:53:07   13          AND COULD YOU EXPLAIN TO THE JURY THE ANALYSIS YOU DID IN

03:53:11   14     DETERMINING WHAT THE TOTAL PROFITS WERE ON THE SALE OF THESE

03:53:14   15     PHONES?

03:53:15   16     A.   WELL, I START WITH TOTAL REVENUES, AND, AGAIN, MS. DAVIS

03:53:20   17     TOLD YOU THAT WE BOTH AGREE ON THIS NUMBER.

03:53:22   18          TO GET TO TOTAL PROFITS, YOU DO START WITH TOTAL REVENUES.

03:53:25   19          BUT THEN IN MY UNDERSTANDING, TO GET TO TOTAL PROFITS,

03:53:29   20     YOU'VE GOT TO SUBTRACT TOTAL COSTS, AND TOTAL COSTS INCLUDE ALL

03:53:33   21     OF THE ITEMS THAT I'VE SHOWN YOU ON THIS DEMONSTRATIVE.

03:53:36   22          IT INCLUDES THE COST OF GOODS SOLD, WHICH MS. DAVIS AND I

03:53:39   23     AGREE UPON, AND THE AMOUNT OF THAT.

03:53:41   24          BUT THEN THERE'S THESE OTHER OPERATING EXPENSES.  THERE'S

03:53:44   25     SALES EXPENSES, INCLUDING MARKETING WITHIN THOSE SALES

03:53:47  1    EXPENSES; THERE'S RESEARCH AND DEVELOPMENT EXPENSES TO ACTUALLY

03:53:52  2    DEVELOP THE PHONES AT ISSUE; AND THEN THERE'S GENERAL AND

03:53:57  3    ADMINISTRATIVE EXPENSES NECESSARY TO RUN THE BUSINESS.

03:53:59  4    Q.   LET'S TALK ABOUT SOME OF THESE EXPENSES AND WHY YOU

03:54:02  5    THOUGHT IT WAS PROPER TO DEDUCT THEM.

03:54:04  6         AND LET'S START UNDER OPERATING EXPENSES, IT SAYS

03:54:07  7    OPERATING EXPENSES -- PARDON ME, AND UNDER SALES EXPENSES YOU

03:54:11  8    HAVE MARKETING.

03:54:12  9         SO LET'S START FIRST WITH MARKETING.  CAN YOU TELL US WHAT

03:54:15  10   THAT'S REFERRING TO?

03:54:17  11   A.   WELL, MARKETING IS HOW YOU PROMOTE YOUR PRODUCT, AND

03:54:20  12   SAMSUNG DOES THAT A NUMBER OF WAYS:  THEY HAVE PRINT ADS YOU

03:54:23  13   MIGHT SEE IN A MAGAZINE OR A NEWSPAPER; THEY HAVE TV

03:54:27  14   COMMERCIALS; THEY HAVE THEIR WEB PAGE; THEY MAY EVEN HAVE

03:54:32  15   YOUTUBE VIDEOS; THEY MAY HAVE IN STORE PROMOTIONS TO PROMOTE

03:54:37  16   THEIR PHONES VERSUS THEIR COMPETITORS'.

03:54:41  17        IT'S THAT TYPE OF INFORMATION AND COSTS THAT ARE RELEVANT

03:54:43  18   TO WHY THEY SOLD THESE 16 PHONES.

03:54:48  19   Q.   AND IN THE TIMEFRAME WE'RE LOOKING AT, APPROXIMATELY HOW

03:54:51  20   MUCH MONEY DID SAMSUNG SPEND ON MARKETING THE PHONES IN THIS

03:54:54  21   CASE?

03:54:54  22   A.   APPROXIMATELY $369 MILLION.

03:54:56  23   Q.   COULD YOU EXPLAIN TO US, IS THERE A RELATIONSHIP BETWEEN

03:55:00  24   SPENDING THAT MARKETING MONEY, MONEY FOR MARKETING, AND

03:55:03  25   REVENUE?

03:55:03   1    A.   CLEARLY THERE IS A RELATION.  OTHERWISE THERE WOULDN'T BE

03:55:06   2    A MARKETING PROFESSION IN OUR COUNTRY.  COMPANIES WOULDN'T

03:55:10   3    MARKET THEIR PHONES IF THEY COULD SELL THEM TO YOU WITHOUT

03:55:13   4    PROMOTING THEM TO YOU AND MAKING YOU UNDERSTAND THEM AND WANT

03:55:16   5    TO BUY THEM.  IF THEY DIDN'T DO THAT, THESE PHONES WOULDN'T

03:55:18   6    HAVE BEEN SOLD.

03:55:19   7    Q.   IS THERE A NEXUS BETWEEN THAT EXPENSE AND THE REVENUES ON

03:55:22   8    THESE PHONES?

03:55:23   9    A.   THERE'S A CLEAR NEXUS IN MY JUDGMENT.

03:55:25   10   Q.   HAVE YOU, HAVE YOU LOOKED AT ANY OF THE ADVERTISING OR

03:55:29   11   SEEN ANY OF THE SAMSUNG ADVERTISING?

03:55:31   12   A.   I HAVE.

03:55:32   13   Q.   HAVE YOU ALSO LOOKED, BY THE WAY, AT SOME OF APPLE'S

03:55:34   14   REPORTS REGARDING SAMSUNG'S ADVERTISING?

03:55:36   15   A.   YES, I HAVE.

03:55:41   16        MR. PRICE:  AND, YOUR HONOR, EXHIBIT 4540 IS ALREADY

03:55:43   17   IN EVIDENCE.

03:55:44   18       IF WE COULD SHOW THE SECOND PAGE.

03:55:46   19        THE COURT:  GO AHEAD, PLEASE.

03:55:46   20   BY MR. PRICE:

03:55:49   21   Q.   COULD YOU TELL US WHAT THIS DOCUMENT IS?

03:55:50   22   A.   THIS IS A STUDY THAT WAS COMMISSIONED BY APPLE TO STUDY

03:55:55   23   SAMSUNG'S BRAND AND GIVE THEM AN UPDATE ABOUT WHAT SAMSUNG WAS

03:55:59   24   DOING IN THE MARKETPLACE.

03:56:01   25   Q.   AND IF WE COULD LOOK AT PAGE 4 OF THAT DOCUMENT.  AND

03:56:06   1     MAYBE WE CAN BLOW THIS UP A LITTLE BIT.

03:56:09   2          PERHAPS YOU CAN TELL US WHAT, HOW THIS ASSISTED YOU, WHAT

03:56:13   3     THIS SAYS.

03:56:13   4     A.   WELL, THIS IS SHOWING THE AMOUNT OF ADVERTISING OR

03:56:15   5     MARKETING DONE BY A NUMBER OF COMPANIES BETWEEN 2009 AND 2012,

03:56:22   6     WHICH PRETTY MUCH COVERS THE BEGINNING OF THIS DAMAGE PERIOD

03:56:25   7     AND A LITTLE TIME BEFORE THAT.

03:56:27   8          AND THE VERY TOP BARS ARE HOW MUCH APPLE HAS SPENT IN

03:56:29   9     ADVERTISING, AND THE BOTTOM SET, OR GRID ABOVE THE LINE ACROSS

03:56:37  10     IT TO THIS TABLE IS SAMSUNG ELECTRONICS ADVERTISING.

03:56:45  11     Q.   AND WHAT DOES THIS SHOW?

03:56:46  12     A.   THIS SHOWS THAT DURING THIS TIME PERIOD, PARTICULARLY THE

03:56:50  13     TWO MOST RELEVANT YEARS HERE DURING THE DAMAGE PERIOD, THAT

03:56:53  14     SAMSUNG IS CONSIDERABLY OUTSPENDING APPLE TO PROMOTE ITS

03:56:57  15     PRODUCTS.

03:56:58  16     Q.   NOW, LET ME ASK YOU, IS -- IS THERE A METHOD RECOGNIZED IN

03:57:03  17     YOUR PROFESSION FOR QUANTIFYING THESE REAL AND NECESSARY COSTS

03:57:09  18     AS THEY'RE APPLIED TO, TO SPECIFIC PRODUCTS?

03:57:13  19     A.   YES.

03:57:13  20     Q.   OKAY.  AND WHAT'S THE METHOD IN YOUR PROFESSION THAT'S

03:57:16  21     USED TO QUANTIFY WHAT THESE REAL AND NECESSARY COSTS ARE?

03:57:21  22     A.   WELL, ANY COMPANY THAT SELLS MORE THAN JUST ONE PRODUCT,

03:57:24  23     YOU HAVE TO ALLOCATE OFTEN WHAT'S CALLED COMMON COSTS.  COSTS

03:57:28  24     ARE GOING TO BENEFIT MORE THAN ONE OF THE PRODUCTS, SO THE WAY

03:57:33  25     TO DO THAT IS THERE'S THREE WAYS THAT ARE GENERALLY DONE.

03:57:36   1        THE FIRST, IF YOU CAN ACTUALLY DIRECTLY, SPECIFICALLY

03:57:40   2   ATTRIBUTE ONE OF THOSE COSTS TO A PARTICULAR PRODUCT, YOU

03:57:42   3   WOULD, OF COURSE, ATTRIBUTE THE PRODUCT USING THAT INFORMATION.

03:57:47   4        IF YOU DON'T HAVE THAT, YOU TRY TO USE SOMETHING CALLED

03:57:51   5   CAUSE AND EFFECT, THAT YOU TRY TO USE SOME RELATIONSHIP USING

03:57:54   6   CAUSE AND EFFECT TO MAKE THAT JUDGMENT AS TO HOW TO DIVIDE UP

03:57:58   7   THESE COMMON COSTS.

03:58:01   8        AND THE THIRD BUT BY FAR THE MOST COMMON METHODOLOGY IS

03:58:04   9   YOU HAVE WHAT'S CALLED AN ABILITY TO BEAR METHODOLOGY, YOU

03:58:07   10  ALLOCATE BASED ON THE REVENUES OF THE DIFFERENT PRODUCTS.

03:58:11   11  PRODUCTS WITH MORE REVENUE GET MORE COSTS BECAUSE THAT'S A FAIR

03:58:14   12  WAY TO ALLOCATE.

03:58:15   13  Q.   WERE SAMSUNG'S MARKETING COSTS FOR THE PHONES IN THIS

03:58:18   14  CASE, WERE THEY QUANTIFIED AND ALLOCATED DURING THE TIMEFRAME

03:58:24   15  BETWEEN 2010 AND 2012?

03:58:26   16  A.   THEY WERE.

03:58:27   17  Q.   OKAY.  THAT'S NOT SOMETHING THAT WAS DONE FOR THIS

03:58:29   18  LITIGATION, IS IT?

03:58:30   19  A.   NO.  THIS IS THE WAY THAT SAMSUNG ALLOCATES THEIR COMMON

03:58:34   20  COSTS TO PRODUCTS OR TO PRODUCT LINES, AND THEY DID THIS BEFORE

03:58:37   21  THIS LITIGATION, THEY'RE GOING TO DO IT AFTER THIS LITIGATION.

03:58:40   22  THIS IS A VERY COMMON, ACCEPTED METHODOLOGY OF COST ACCOUNTING.

03:58:44   23       NOW, APPLE DOES IT EXACTLY THE SAME WAY, BECAUSE THIS IS

03:58:47   24  THE WAY THAT MOST MAJOR, MULTI LINE PRODUCT COMPANIES ALLOCATE

03:58:52   25  THEIR COMMON COSTS THAT ARE RELATED TO THE REVENUES THAT EACH

03:58:56  1   PRODUCT LINE IS GENERATING.

03:58:58  2   Q.   HOW FREQUENTLY IS THIS DONE IN THE SAMSUNG SYSTEM?

03:59:00  3   A.   THIS IS DONE EVERY MONTH WHEN THEY HAVE A MONTHLY CLOSE

03:59:04  4   FOR EACH FINANCIAL MONTH.

03:59:05  5   Q.   AND WE HEARD ABOUT THE S.A.P. SYSTEM.  IS THAT WHAT YOU'RE

03:59:08  6   TALKING ABOUT?

03:59:09  7   A.   YEAH, THE -- THE ACCOUNTING SYSTEM FOR THE BOOKS AND

03:59:12  8   RECORDS OF SAMSUNG IS S.A.P., AND S.A.P. MAY NOT BE THAT

03:59:16  9   FAMILIAR TO YOU BECAUSE THEY DON'T SELL CONSUMER PRODUCTS.

03:59:20  10  THEY ARE THE LARGEST PROVIDER OF SOFTWARE TO BIG COMPANIES.

03:59:25  11  IT'S NOT MICROSOFT; IT'S S.A.P., AND MANY MAJOR CORPORATIONS

03:59:29  12  USE THAT FOR THEIR ACCOUNTING RECORDS.  APPLE DOES.  SAMSUNG

03:59:33  13  DOES.

03:59:35  14       AND THAT'S THE -- THAT IS THE TYPE OF SYSTEM THAT IS USED

03:59:37  15  TO MAKE ALL THESE DAILY ACCOUNTING CALCULATIONS.

03:59:41  16  Q.   NOW, LET'S GO BACK, IF WE COULD, TO THE CHART WE HAD UP,

03:59:48  17  1702, SDX 1702, AND WE WERE JUST, TALKING ABOUT THE MARKETING

03:59:53  18  EXPENSES THAT WERE NECESSARY FOR THE PRODUCTION OF THIS

03:59:56  19  REVENUE.

03:59:57  20       THERE'S A GENERAL SALES AND MARKETING IS A SUBPART OF

04:00:00  21  THAT.  WHAT ELSE IS IN THE SALES EXPENSE?

04:00:02  22  A.   WELL, MARKETING IS JUST KIND OF DEVELOPING YOUR BRAND,

04:00:05  23  DOING THESE ADS.

04:00:07  24       YOU HAVE TO GO OUT AND ACTUALLY GET THEM TO SELL AS WELL.

04:00:12  25  THERE ARE PEOPLE AT SAMSUNG THAT HAVE TO GO OUT TO THE CARRIERS

04:00:15  1     AND CONVINCE THE CARRIERS, IN YOUR STORES, WE WANT YOU TO GIVE

04:00:19  2     US SO MUCH OF YOUR SHELF SPACE TO SELL OUR PHONES BECAUSE

04:00:22  3     THEY'RE COMPETING AGAINST NOT ONLY APPLE, BUT HTC, HUAWEI, ZTE,

04:00:29  4     THERE'S ALL KINDS OF COMPETITORS AND LIMITED SHELF SPACE.

04:00:32  5     THOSE SALES PEOPLE HAVE TO GO OUT AND MAKE THE SALE, AND THOSE

04:00:35  6     ARE REAL COSTS THAT HAVE TO BE INCURRED.

04:00:40  7          NOW, THEY DON'T HAVE A SALES PERSON AT SAMSUNG FOR JUST

04:00:43  8     SELLING ONE PHONE.  THEY'RE SELLING ALL OF THE PHONES ALL OVER

04:00:47  9     THE UNITED STATES TO AT&T AND TO VERIZON AND TO T-MOBILE AND TO

04:00:51  10    SPRINT.

04:00:51  11         SO YOU'RE GOING TO HAVE TO ALLOCATE THOSE COSTS, BUT THOSE

04:00:55  12    ARE REAL, RELEVANT COSTS TO SELL -- OR MAKE THE SALES THAT WERE

04:00:59  13    MADE BY THESE INFRINGING PHONES.

04:01:01  14    Q.   SO IS IT YOUR UNDERSTANDING THAT THE SAMSUNG EMPLOYEES GO

04:01:03  15    TO THE CARRIERS WITH A NUMBER OF PHONES TO SELL, NOT JUST ONE?

04:01:06  16    A.   YES, AND THEY'RE COMING OUT WITH ALMOST A PHONE A WEEK, SO

04:01:10  17    WE HAVE A LOT OF PRODUCT, AND THEY TRY TO GET INTO THOSE

04:01:12  18    CUSTOMERS AS OFTEN AS POSSIBLE TO SELL ALL OF THESE NEW PHONES.

04:01:15  19    Q.   AND TO BE CLEAR THEN, WHAT'S YOUR UNDERSTANDING OF THE

04:01:19  20    RELATIONSHIP BETWEEN THIS SALES EXPENSE AND THE REVENUE THAT

04:01:23  21    WAS GENERATED IN THIS CASE?

04:01:25  22    A.   THERE'S A CLEAR RELATIONSHIP IN MY JUDGMENT.

04:01:27  23    Q.   COULD THE PHONES HAVE BEEN SOLD WITHOUT THE SALES PEOPLE?

04:01:31  24    A.   NO.  IF THERE'S NO ONE GOING OUT TO THESE CARRIERS,

04:01:36  25    THEY'RE MAKING SOME INTERNET SALES, BUT THEY WOULD NOT HAVE

04:01:38  1    MADE THE VOLUME OF SALES THAT THEY MADE.

04:01:40  2    Q.   AGAIN, IS THERE A METHOD IN YOUR PROFESSION THAT'S

04:01:42  3    RECOGNIZED FOR, FOR QUANTIFYING, YOU KNOW, WHAT PART OF THE

04:01:46  4    SALES EXPENSE IS ATTRIBUTABLE TO A SPECIFIC PRODUCT?

04:01:48  5    A.   YES.  IT'S CALLED THE ALLOCATION OF COMMON COSTS THAT I'VE

04:01:52  6    EXPLAINED BEFORE, AND THAT WAS DONE BY SAMSUNG.  IT'S DONE IN

04:01:56  7    AN IDENTICAL FASHION BY APPLE WHEN THEY DO PRODUCT LINE

04:02:00  8    REPORTING, AND THESE ARE REAL COSTS THAT THEY PUT ON THEIR

04:02:03  9    FINANCIAL STATEMENTS FOR A SEGMENT OR A PRODUCT BECAUSE THEY

04:02:07  10   HAPPEN AND ARE THE REASONS WHY THEY MADE THE SALES THEY MADE.

04:02:10  11   Q.   IS THIS ALSO DONE ON A MONTHLY BASIS?

04:02:13  12   A.   YES.

04:02:14  13   Q.   SO WHEN WE GET INTO YOUR CALCULATIONS, WHEN YOU OBTAINED

04:02:18  14   SAMSUNG'S DATA FOR MARKETING AND SALES EXPENSE, WERE YOU

04:02:23  15   OBTAINING DATA THAT WAS NEWLY CREATED?

04:02:25  16   A.   NO.  THIS WAS HISTORICAL INFORMATION FOR THE RELEVANT TIME

04:02:28  17   PERIOD.  IT WASN'T CREATED FOR ME.  THEY PREPARED SOME SPECIAL

04:02:32  18   REPORTS FOR ME, BUT THE INFORMATION WAS HISTORICAL INFORMATION

04:02:36  19   FROM SAMSUNG KEPT IN THE ORDINARY COURSE OF BUSINESS.

04:02:39  20   Q.   SO THEY BASICALLY HAD TO ACCESS THE DATABASE AND PUNCH IN

04:02:42  21   THE REQUEST?

04:02:42  22   A.   RIGHT.  IT'S ALL COMPUTERIZED.  THIS IS NOT MANUAL.  IT'S

04:02:46  23   ALL DONE WITH COMPUTERS.

04:02:47  24   Q.   ALL RIGHT.  NOW, ONE OF THE OTHER EXPENSES YOU HAVE HERE

04:02:51  25   IS R&D EXPENSE.  COULD YOU TELL US WHAT EXPENSE THAT IS?

04:02:55  1    A.   WELL, IT'S TWO THINGS.  IT'S RESEARCH AND DEVELOPMENT.

04:02:58  2    BUT A LOT OF PEOPLE THINK OF THAT AS THE COST YOU INCUR TO

04:03:01  3    ACTUALLY PRODUCE THIS PHONE.  THEY HAVE TO DECIDE, WHAT ARE THE

04:03:05  4    FEATURES THIS PHONE IS GOING TO HAVE?

04:03:07  5         AND IT TAKES TIME TO DO THAT.  AND THEY HAVE TO DESIGN

04:03:10  6    THAT, AND THOSE ARE REAL COSTS.  IF THERE WAS NO R&D FOR 1 OF

04:03:14  7    THESE 16 PHONES, THERE WOULD BE NO PHONE TO SELL.  I MEAN,

04:03:17  8    THOSE ARE REAL COSTS TO GET THESE PHONES INTO THE MARKETPLACE.

04:03:21  9         BUT THE D FOR DEVELOPMENT, THAT OFTEN OCCURS AFTER THE

04:03:24 10    PHONE IS ACTUALLY IN THE MARKETPLACE.  YOU'VE PROBABLY SEEN

04:03:28 11    THIS WITH SOME PRODUCTS THAT YOU HAVE THAT THERE'S CONTINUED

04:03:30 12    DEVELOPMENT, THAT THEY COME UP WITH UPDATES FOR YOUR SOFTWARE,

04:03:34 13    OR THEY MAY EVEN HAVE SOME REDESIGN OF SOME PART THAT'S NOT

04:03:37 14    WORKING RIGHT.

04:03:38 15         SO THOSE DEVELOPMENT COSTS ARE INCURRED AND ARE BEING

04:03:42 16    EXPENSED DURING THE PERIOD THE PHONES ARE BEING SOLD.

04:03:45 17    Q.   NOW, WE HEARD SOME TESTIMONY THAT RESEARCH AND DEVELOPMENT

04:03:49 18    SOMETIMES CAN OCCUR, AND PROBABLY CERTAINLY DOES OCCUR BEFORE

04:03:54 19    THE PHONES ARE ON THE MARKET.  RIGHT?

04:03:56 20    A.   WELL, CLEARLY THEY HAVE TO BECAUSE IT TAKES TIME TO

04:03:58 21    DEVELOP THE PHONES.  IT COULD TAKE SIX MONTHS TO A YEAR TO

04:04:01 22    DEVELOP A PHONE, AND IT'S GOT TO BE COMPLETELY DEVELOPED BEFORE

04:04:04 23    YOU SELL IT.  SO OF COURSE THOSE EXPENSES ARE INCURRED BEFORE

04:04:07 24    THE PHONE IS IN THE MARKETPLACE.

04:04:08 25    Q.   NOW, IS THERE, AGAIN, AN ACCEPTED METHODOLOGY IN YOUR

04:04:11  1    PROFESSION AS TO HOW THEN YOU, YOU QUANTIFY THE RESEARCH AND

04:04:14  2    DEVELOPMENT COSTS FOR A SPECIFIC PHONE?

04:04:16  3    A.   YES.  SO FIRST LET ME GIVE YOU SOME HISTORY.  I'M OLD

04:04:21  4    ENOUGH TO KNOW THIS.

04:04:22  5         WHEN I WAS MUCH YOUNGER THAN I AM TODAY, COMPANIES WOULD

04:04:26  6    CAPITALIZE THEIR R&D AND THEN THEY WOULD ALLOCATE IT OVER THE

04:04:30  7    PERIOD OF TIME THAT THE PHONE WAS BEING SOLD OR THE PRODUCT WAS

04:04:33  8    BEING SOLD.  SO THERE WAS A TRUE MATCHING OF THAT COST WITH THE

04:04:36  9    REVENUES.

04:04:37  10        BUT YEARS AND YEARS AGO, THE ACCOUNTING PROFESSION, THE

04:04:41  11   FINANCIAL ACCOUNTING STANDARDS BOARD IN THE UNITED STATES

04:04:44  12   DECIDED THAT WASN'T APPROPRIATE, THAT YOU HAVE TO EXPENSE THOSE

04:04:46  13   COSTS.

04:04:47  14        SO ALL OF THOSE COSTS WOULD HIT FINANCIAL STATEMENTS

04:04:50  15   BEFORE THE PRODUCT WAS ACTUALLY SOLD.

04:04:52  16        SO THAT IS, WAS NORMAL AND CUSTOMARY.

04:04:58  17        SO WHAT COMPANIES DO THOUGH, AND THEY DO IT TODAY, APPLE

04:05:01  18   DOES IT FOR ITS R&D, SAMSUNG DOES IT FOR ITS R&D -- SAMSUNG

04:05:11  19   WILL ALLOCATE THE R&D TO ITS NEXT GENERATION OF THE PHONE TO

04:05:15  20   THE PHONES THAT ARE BEING SOLD TODAY.

04:05:17  21   Q.   AND YOU SAID THAT'S REQUIRED?

04:05:22  22   A.   IT'S REQUIRED BY THE ACCOUNTING STANDARDS.  SAMSUNG IS

04:05:26  23   REQUIRED TO KEEP THEIR BOOKS AND RECORDS THAT WAY.  SO IS

04:05:30  24   APPLE.  SO THAT'S JUST THE NATURE OF THE BEAST, AND IF YOU HAVE

04:05:33  25   TO HAVE THIS STANDARD THAT NOW WE HAVE TO GO BACK AND TRY TO

04:05:35  1    FIGURE OUT THE ACTUAL, PERFECT, EXACT COSTS TO DEVELOP A PHONE.

04:05:40  2    THE RECORDS AREN'T KEPT THAT WAY BECAUSE IF YOU DID IT, YOU

04:05:45  3    WOULD BE IN VIOLATION OF THE ACCOUNTING RULES.

04:05:47  4    Q.   IS THE METHOD THAT IS REQUIRED BY THE ACCOUNTING RULES AND

04:05:50  5    THAT WAS IMPLEMENTED BY YOU IN THIS CASE, IS THAT A REASONABLE

04:05:53  6    ESTIMATE OF THE RESEARCH AND DEVELOPMENT COSTS FOR THE PHONES

04:05:56  7    IN THIS CASE?

04:05:57  8    A.   IT IS.   THESE COSTS WOULD JUST BE THE NEXT GENERATION, AND

04:06:00  9    THESE ARE -- PHONES ARE BEING DEVELOPED EVERY YEAR, JUST LIKE

04:06:04  10   AT APPLE.

04:06:04  11       SO I THINK THE COSTS THAT ARE BEING CHARGED TODAY ARE

04:06:08  12   SIMILAR TO THE COSTS THAT WERE BEING CHARGED IN THE YEAR

04:06:12  13   BEFORE.   THERE WOULDN'T BE ANY MATERIAL DIFFERENCE, AND IT IS

04:06:14  14   REASONABLE, AND IT'S REQUIRED, AND ALL COMPANIES DO IT THIS

04:06:17  15   WAY.

04:06:17  16       SO I THINK IT'S THE BEST INFORMATION THAT I HAVE.   IT'S

04:06:20  17   NOT PERFECT, BUT IT IS THE BEST INFORMATION I HAVE.

04:06:22  18   Q.   NOW, A FINAL AREA HERE IS GENERAL AND ADMINISTRATIVE

04:06:29  19   EXPENSE THAT'S BEING DEDUCTED FROM TOTAL REVENUES.

04:06:32  20       COULD YOU TELL US WHAT -- GIVE US EXAMPLES OF WHAT THAT

04:06:35  21   IS?

04:06:36  22   A.   YES.   I THINK YOU ALREADY HEARD SOME EXAMPLES FROM

04:06:41  23   MR. SHEPPARD.   THEY HAVE A PURCHASING DEPARTMENT, AND ALL THESE

04:06:46  24   COMPONENTS THAT ARE BEING BOUGHT FOR THESE PHONES, THERE HAVE

04:06:49  25   TO BE NEGOTIATIONS WITH THE SUPPLIERS, THERE HAS TO BE PURCHASE

04:06:52   1    ORDERS SENT, THERE HAVE TO BE INVOICES SENT OUT TO THE CARRIERS

04:06:56   2    WHO BUY THESE PHONES.

04:06:57   3        THERE'S A LOT OF WORK THAT HAS TO BE DONE BY THE

04:07:00   4    ORGANIZATION TO MAKE THIS WHOLE THING WORK, AND THESE COSTS ARE

04:07:03   5    BOTH NECESSARY AND RELEVANT TO THE SALE OF THESE PRODUCTS.

04:07:06   6    Q.   AND HOW WERE THOSE COSTS DETERMINED IN THIS CASE?

04:07:11   7    A.   IN THE SAME WAY THAT R&D WAS.  THEY'RE ALLOCATED TO THE

04:07:15   8    PRODUCTS BASED ON IF THEY HAVE SPECIFIC GENERAL ADMINISTRATIVE

04:07:20   9    COSTS THEY COULD CHARGE TO A PRODUCT OR PRODUCT LINE, THEY

04:07:23  10    WOULD DO SO.

04:07:23  11        IF THERE'S SOME CAUSE AND EFFECT, LIKE A BUILDING THAT

04:07:26  12    HALF THE PEOPLE ARE WORKING ON ONE PRODUCT AND HALF THE PEOPLE

04:07:29  13    ARE WORKING ON ANOTHER PRODUCT, THE RENT ON THAT BUILDING WOULD

04:07:33  14    BE SPLIT 50/50.  AND IF YOU DON'T HAVE ANY OF THOSE TYPES OF

04:07:36  15    ABILITIES, YOU'LL USE THIS ALLOCATION BY REVENUE.

04:07:40  16    Q.   AGAIN, THIS ALLOCATION, WAS IT DONE SPECIFICALLY FOR THIS

04:07:42  17    CASE?

04:07:43  18    A.   NO.

04:07:43  19    Q.   WHEN WAS THAT DONE?

04:07:44  20    A.   IT WAS DONE MONTHLY IN THE NORMAL COURSE OF BUSINESS.

04:07:47  21    Q.   NOW, YOU WERE TALKING -- YOU'VE MENTIONED A COUPLE TIMES

04:07:50  22    AS TO WHAT APPLE DOES, AND I'D LIKE TO SHOW THE JURY AND YOU --

04:07:54  23        BUT, YOUR HONOR, NOT THE PUBLIC.  THIS IS CONFIDENTIAL, I

04:07:57  24    BELIEVE.

04:07:57  25            THE COURT:  OKAY.

WAGNER DIRECT BY MR. PRICE

04:07:59  1          MR. PRICE:  IT'S GOING TO BE SLIDE 1707.

04:08:05  2     Q.   DO YOU HAVE THAT ON THE MONITOR IN FRONT OF YOU?

04:08:16  3          DO YOU SEE, SIR, THIS IS A BLOWN OUT -- THERE'S SOME

04:08:21  4     INFORMATION BLOWN OUT FROM EXHIBIT DX 4554 WHICH SAYS GAAP LINE

04:08:25  5     OF BUSINESS REPORTING, IPHONE.

04:08:27  6          COULD YOU TELL THE JURY WHAT THIS IS?

04:08:29  7     A.   WELL, APPLE DOES PRODUCE SEGMENT REPORTING AND FINANCIALS

04:08:34  8     BY PRODUCT LINE.  THIS IS THE IPHONE PRODUCT LINE.  THEY

04:08:38  9     PROBABLY HAVE ONE LIKE THIS FOR THE MACINTOSH COMPUTERS.

04:08:41  10         SO THEY WANT TO FIND OUT, WHAT IS OUR OPERATING PROFIT BY

04:08:44  11    THIS SEGMENT?

04:08:45  12         SO WHEN THEY'RE TRYING TO DETERMINE AND MEASURE THE

04:08:47  13    PERFORMANCE OF THIS PRODUCT GROUP, THIS PRODUCT LINE, THEY

04:08:54  14    INCLUDE ALL THESE OPERATING EXPENSES IN COMING UP WITH WHAT

04:08:57  15    THAT OPERATING PROFIT IS, THEIR TOTAL PROFITS.

04:09:00  16         AND THEY DO THE SAME TYPE OF ALLOCATION THAT SAMSUNG HAS

04:09:03  17    DONE, AND THEY BASICALLY ALLOCATE MOST OF THESE COSTS BY THE

04:09:07  18    OVERALL COMPANY RESULT, WHICH IS REVENUES.

04:09:09  19    Q.   AND YOU SAID THAT'S ONE OF THE METHODS THAT YOUR

04:09:13  20    PROFESSION USES IN ORDER TO QUANTIFY THE AMOUNT OF THESE COMMON

04:09:18  21    SHARED COSTS THAT WOULD BE ATTACHED TO A SPECIFIC PRODUCT?

04:09:20  22    A.   IT IS THE MOST COMMON ALLOCATION METHODOLOGY IN BUSINESS.

04:09:24  23    Q.   NOW, I WANT TO TALK TO YOU, SIR.  DID YOU HEAR MS. DAVIS'S

04:09:28  24    TESTIMONY ABOUT THE RELIABILITY OF SAMSUNG'S DATA THAT WAS

04:09:34  25    PROVIDED IN THE SPREADSHEETS THAT WERE PROVIDED TO HER?

04:09:36  1     A.   YES.

04:09:37  2     Q.   AND DO YOU RECALL THAT IN HER DIRECT EXAMINATION, SHE

04:09:39  3     OPINED THAT SHE WASN'T SURE ABOUT THE RELIABILITY OF THAT DATA?

04:09:43  4     DO YOU RECALL THAT?

04:09:43  5     A.   I DO.

04:09:44  6     Q.   WHAT'S YOUR CONCLUSION ABOUT THE RELIABILITY OF THAT DATA?

04:09:46  7     A.   I THINK THE DATA IS RELIABLE.

04:09:48  8     Q.   AND COULD YOU TELL US, WOULD SDX 1708, A DEMONSTRATIVE,

04:09:54  9     HELP YOU IN EXPLAINING THAT?

04:09:56  10    A.   YES.

04:09:58  11    Q.   LET'S PUT IT UP.

04:10:02  12    A.   IS THERE A QUESTION PENDING?

04:10:03  13          MR. PRICE:  THIS CAN BE PUBLIC.  SWITCH BACK.  THANK

04:10:07  14    YOU.

04:10:08  15    Q.   ONCE IT'S UP, WE'LL TALK ABOUT IT.

04:10:12  16          SO IS IT ON THE MONITOR?  THERE WE GO.

04:10:15  17          SO USING THIS DEMONSTRATIVE THAT YOU CREATED, COULD YOU

04:10:18  18    EXPLAIN TO US WHY YOU HAVE CONCLUDED THAT SAMSUNG'S DATA IS

04:10:21  19    RELIABLE?

04:10:22  20    A.   WELL, THE FIRST IS THAT I GOT EXTREMELY DETAILED FINANCIAL

04:10:27  21    INFORMATION FOR COSTS BY EACH OF THE ACCUSED 16 PRODUCTS HERE,

04:10:33  22    MUCH MORE DETAILED COST INFORMATION THAN I NORMALLY SEE

04:10:36  23    COMPANIES LIKE SAMSUNG COULD ACTUALLY GENERATE FOR ME, BECAUSE

04:10:41  24    BELIEVE ME, I'VE ASKED FOR THIS TYPE OF INFORMATION MANY TIMES,

04:10:43  25    AND IT IS RARE THAT I GET THIS MUCH DETAILED INFORMATION.

04:10:47   1        BUT THEN I DETERMINED, WHERE DID THIS COME FROM?  AND

04:10:51   2   WHERE IT CAME FROM WAS THIS RELIABLE ACCOUNTING SYSTEM, S.A.P.,

04:10:55   3   PRODUCED IN THE NORMAL COURSE OF BUSINESS, ACCUMULATED MONTHLY.

04:10:58   4        AND I BELIEVE THIS IS RELIABLE INFORMATION BECAUSE THIS

04:11:03   5   SYSTEM OF RECORDS, S.A.P., IS AUDITED BY

04:11:08   6   PRICEWATERHOUSECOOPERS.

04:11:08   7        I USED TO BE A PARTNER AT PRICEWATERHOUSECOOPERS, THE

04:11:10   8   PREDECESSOR FIRM TO PRICEWATERHOUSECOOPERS, AND I KNOW THE TYPE

04:11:14   9   OF WORK THAT THEY WOULD DO TO SATISFY THEMSELVES THAT THE

04:11:17  10   INFORMATION PRODUCED BY THIS ACCOUNTING SYSTEM IS RELIABLE

04:11:20  11   ENOUGH TO PRESENT THE FINANCIAL STATEMENTS OF SAMSUNG TO THE

04:11:24  12   PUBLIC.

04:11:24  13        SO THEY'VE DONE TESTING, THEY'VE GONE DOWN TO THE INVOICE

04:11:28  14   LEVEL AT TIMES TO DETERMINE WHETHER THE COSTS IN THIS DATABASE

04:11:33  15   ARE APPROPRIATE AND FAIR.

04:11:35  16        SO I DON'T NEED TO DO THAT FOR THIS CASE.  IN FACT, IN MY

04:11:40  17   41 YEARS OF DOING THIS, I HAVE NEVER GONE DOWN TO THE INVOICE

04:11:43  18   LEVEL TO DETERMINE WHETHER I THOUGHT COSTS WERE APPROPRIATE

04:11:47  19   THAT I'VE USED IN MY PROFIT CALCULATIONS.

04:11:49  20   Q.   AND THEN YOU CHECK YOU RELIABLE METHOD ALLOCATION, WHAT

04:11:55  21   ARE YOU REFERRING TO THERE?

04:11:56  22   A.   WE'VE ALREADY TALKED ABOUT THAT, THAT THEY USED THE MOST

04:12:00  23   COMMON METHODS.  WE TRY TO BE AS PRECISE AS POSSIBLE WHEN THEY

04:12:04  24   CAN, AND AT THE LAST RESORT, THEY USE A REVENUE OR ABILITY TO

04:12:08  25   BEAR METHOD TO ALLOCATE THESE COSTS.

04:12:11  1    Q.   NOW, YOU HEARD MS. DAVIS SAY THAT IN THE SPREADSHEETS THAT

04:12:15  2    SHE RECEIVED, THAT THERE WAS A $1.3 BILLION ENTRY AT ONE POINT

04:12:18  3    THAT WAS THEN TAKEN OUT.

04:12:20  4         DO YOU RECALL THAT?

04:12:20  5    A.   I RECALL THAT.

04:12:21  6    Q.   AND IF WE CAN PUT UP SDX 1702 AGAIN, WHICH HAS THE -- HOW

04:12:29  7    YOU DID YOUR CALCULATIONS.  WHAT DID THAT ENTRY IMPACT?

04:12:35  8    A.   IT WAS A, A PROBLEM WITH COST OF GOODS SOLD, AND THAT'S

04:12:39  9    WHERE THIS PROBLEM EXISTED IN THE ACCOUNTING RECORDS.

04:12:42  10        AND IT WASN'T THE ACCOUNTING RECORDS.  IT WAS SCHEDULES

04:12:45  11   PRODUCED TO ME, AND I KNEW IT WAS A PROBLEM WHEN I SAW IT, AND

04:12:49  12   I GOT IT CORRECTED.

04:12:50  13   Q.   NOW, THAT WAS DONE IN THE CATEGORY COST OF GOODS SOLD; IS

04:12:54  14   THAT CORRECT?

04:12:54  15   A.   YES.

04:12:55  16   Q.   DID MS. DAVIS RELY ON THAT DATA, COST OF GOODS SOLD?

04:12:59  17   A.   YES, SHE DID.

04:13:01  18   Q.   SO THAT CRITICISM OF THE RELIABILITY, DOES THAT GO TO THE

04:13:08  19   OPERATING EXPENSES THAT WERE ALSO IN THOSE SCHEDULES?

04:13:10  20   A.   NO.  THERE WERE NO CHANGEOVER THESE NINE GENERATIONS OF

04:13:14  21   SCHEDULES REALLY IN THE OPERATING EXPENSES EXCEPT FOR THERE WAS

04:13:18  22   SOME REALLOCATION WITHIN R&D.  BUT BESIDES THAT, NO.

04:13:22  23        AND THE REALLOCATION IN R&D WAS BECAUSE OF A LOGIC ERROR

04:13:26  24   IN THE SPREADSHEETS.  IT WASN'T THE DATA.

04:13:28  25   Q.   SO IF WE PUT UP EXHIBIT 781.003 AGAIN, SO SUBTRACTING FROM

04:13:34  1    THESE TOTAL REVENUES -- AND YOU AGREE ON THE REVENUES; CORRECT?

04:13:38  2    A.   WE DO.

04:13:39  3    Q.   SUBTRACTING FROM TOTAL REVENUES THE ACTUAL TOTAL COSTS

04:13:43  4    THAT WERE NECESSARY FOR PRODUCING THAT REVENUE, YOU COME UP

04:13:46  5    WITH A TOTAL PROFIT NUMBER OF WHAT?

04:13:48  6    A.   $370,831,174.

04:13:54  7    Q.   SO LET'S SWITCH NOW.  YOU SAID THIS WAS THE FIRST STEP.

04:13:58  8         WHAT WAS THE SECOND STEP OF YOUR ANALYSIS TO DETERMINE

04:14:01  9    PROFITS ON WHAT HAVE BEEN IDENTIFIED BY SAMSUNG AS THE ARTICLES

04:14:05  10   OF MACHINE?

04:14:06  11   A.   SAMSUNG IS TAKING THE POSITION THAT THE DESIGN PATENTS AT

04:14:12  12   ISSUE IN THIS CASE DO NOT APPLY TO THE TOTAL PHONE, BUT TO ONLY

04:14:16  13   CERTAIN COMPONENTS OF THE PHONE.

04:14:19  14        I HAD TO TRY TO DETERMINE WHAT ARE THE PROFITS ON THOSE

04:14:23  15   COMPONENTS RATHER THAN THE ENTIRE PHONE.

04:14:25  16   Q.   NOW, YOU'RE NOT TESTIFYING AS AN EXPERT ON WHAT THE

04:14:28  17   ARTICLE OF MANUFACTURE IS; CORRECT?

04:14:29  18   A.   I AM NOT.

04:14:30  19   Q.   INSTEAD, YOU ARE DOING A DAMAGES COMPILATION ON THE

04:14:33  20   ASSUMPTION THAT THE ARTICLES OF MANUFACTURE ARE WHAT SAMSUNG

04:14:37  21   BELIEVES THAT THEY ARE; CORRECT?

04:14:38  22   A.   THAT IS CORRECT.

04:14:40  23   Q.   DID -- DID YOU -- WHAT METHOD DID YOU USE TO TRY TO

04:14:44  24   DETERMINE THE PROFIT ON SOMETHING LESS THAN THE ENTIRE PHONE?

04:14:47  25   A.   I USED WHAT I CALL A COST COMPONENT APPROACH, THAT I WANT

04:14:53   1   TO DETERMINE WHAT WAS THE COST OF EACH OF THESE COMPONENTS THAT

04:14:55   2   MAKE UP THE ARTICLES OF MANUFACTURE, AND THEN DETERMINE WHAT

04:14:59   3   PERCENTAGE OF THE TOTAL COST OF THE PHONE THOSE COMPONENTS ARE

04:15:03   4   AND THEN USE THAT RATIO AND APPLY IT TO THE TOTAL PROFITS TO

04:15:07   5   DETERMINE THE PROFITS ON EACH INDIVIDUAL COMPONENT.

04:15:09   6   Q.   AND IF WE CAN PUT UP SDX 1709, THIS COST METHOD YOU

04:15:17   7   REFERRED TO, IS THAT SHOWN HERE?

04:15:19   8   A.   IT IS.

04:15:20   9   Q.   OKAY.  SO YOU TAKE THE COST OF THE COMPONENT, DIVIDE IT BY

04:15:25  10   THE ENTIRE PHONE COST, AND MULTIPLY IT BY THE ENTIRE PROFIT;

04:15:28  11   CORRECT?

04:15:28  12   A.   RIGHT, AND THAT WILL GIVE YOU THE PROFIT ON THE ARTICLE OF

04:15:31  13   MANUFACTURE.

04:15:31  14   Q.   AND YOU'RE MULTIPLYING IT BY THE PROFIT THAT YOU FOUND,

04:15:34  15   THE 370 MILLION?

04:15:36  16   A.   I DID.

04:15:37  17   Q.   OKAY.  SO LET'S GO INTO HOW YOU DID THE ARTICLE OF

04:15:41  18   MANUFACTURE COST, YOUR FIRST STEP.

04:15:48  19       HOW WERE YOU ABLE TO CALCULATE THE PERCENTAGES, OR THE

04:15:54  20   ARTICLE OF MANUFACTURE COST FOR THE ARTICLES THAT WERE

04:15:56  21   IDENTIFIED BY SAMSUNG AS THE ARTICLE OF MANUFACTURE?

04:15:58  22   A.   WELL, I FIRST HAD TO DETERMINE WHAT THE COMPONENTS WERE

04:16:03  23   THAT SAMSUNG'S EXPERT THOUGHT WAS THE ARTICLE OF MANUFACTURE.

04:16:07  24       THEN I HAD TO DETERMINE, DOES SAMSUNG CAPTURE THOSE COSTS

04:16:11  25   IN THEIR ACCOUNTING SYSTEM?

1    SO I TRIED TO INVESTIGATE WHAT COSTS I COULD COME UP WITH

2    FOR THESE ARTICLES OF MANUFACTURE.

3        SO I DID THE BEST JOB I COULD, AND I USED A COUPLE SOURCES

4    TO DO THAT, PRINCIPALLY THE COST OF BILL OF MATERIALS, AND THEN

5    ALSO THE, THE -- SOMETHING CALLED A SPECIFICATION FOR APPROVAL,

6    BUT DIVIDED THE COMPONENTS UP A LITTLE BIT FURTHER.

7        AND THEN FINALLY FOR THE WINDOW GLASS, I GOT INFORMATION

8    FROM SAMSUNG TELECOMMUNICATIONS AS TO WHAT COSTS THEY INCURRED

9    TO BUY WINDOW GLASS FOR THEIR REPAIR PROGRAM.

10   Q.   AND FOR THE ARTICLES OF MANUFACTURE HERE, YOU WERE

11   ASSUMING THAT FOR THE D'305 PATENT, THE ICONS, IT WAS THE

12   DISPLAY SCREEN; RIGHT?

13   A.   YES.

14   Q.   AND FOR THE D'677 PATENT, THAT'S THE FRONT AREA THERE,

15   THAT'S THE, THE ARTICLE OF MANUFACTURE YOU WERE ASKED TO ASSUME

16   WAS THAT ROUND CORNERED GLASS FRONT FACE; CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   AND FOR THE D'087, IT WAS THAT GLASS INCLUDING THE RIM OR

19   THE BEZEL; CORRECT?

20   A.   THOSE TWO COMPONENTS, YES.

21       MR. PRICE:  SO I'D LIKE TO PUT UP, YOUR HONOR, IF I

22   COULD, DEMONSTRATIVE SDX 1710.

23   Q.   AND COULD YOU TELL US WHAT THIS IS?

24   A.   YES.  THIS IS ONE OF THE SPECIFICATIONS FOR APPROVAL

25   DOCUMENTS AT SAMSUNG, AND IT SHOWS YOU SOME OF THE COMPONENTS

04:17:33  1     THAT ARE INCLUDED IN THE DISPLAY ASSEMBLY.

04:17:37  2          AND THAT'S THE TOP PICTURE YOU SEE THERE IS THE -- THEY

04:17:41  3     CALL IT THE FULL MODULE, AND YOU CAN SEE ON THE NOTE, THERE'S A

04:17:45  4     PRODUCT NUMBER SO THAT I CAN USE THAT TO GO TO THE BILL OF

04:17:49  5     MATERIALS TO FIGURE OUT THE COST OF THIS ENTIRE DISPLAY MODULE.

04:17:54  6          THIS DISPLAY MODULE WAS MADE UP OF FOUR DIFFERENT

04:17:57  7     SUBASSEMBLIES.  THE TOP ONE, OR THE SECOND ONE, IS THE CORE,

04:18:01  8     AND THAT'S ACTUALLY THE DISPLAY SCREEN WHICH IS RELEVANT TO THE

04:18:06  9     D'305 PATENT.

04:18:08  10         AND THEN THERE'S ALSO, THOUGH, INCLUDED TWO CIRCUIT BOARDS

04:18:13  11    THAT ARE INCLUDED IN THIS DISPLAY MODULE.

04:18:16  12         AND THEN FINALLY, THERE'S THE WINDOW GLASS.  AND THAT HAS

04:18:19  13    ALSO A PRODUCT NUMBER THAT I CAN USE TO THEN GO TO THE SAMSUNG

04:18:23  14    TELECOMMUNICATIONS AMERICA DATA TO FIND THE COSTS FOR THAT

04:18:25  15    PARTICULAR PRODUCT.

04:18:26  16    Q.   OKAY.  AND IF WE CAN LOOK AT SLIDE SDX 1711.  NOW, HERE WE

04:18:31  17    HAVE AT THE TOP THE DISPLAY ASSEMBLY.  IS THAT SOMETHING THAT

04:18:35  18    WE JUST SAW?

04:18:35  19    A.   THIS IS REALLY JUST A DIFFERENT PICTURE OF WHAT WE JUST

04:18:38  20    SAW.

04:18:39  21    Q.   OKAY.  SO COULD YOU EXPLAIN HOW THE, THE DISPLAY ASSEMBLY

04:18:42  22    IS WHAT'S -- WHAT IT'S COMPOSED OF THEN?

04:18:44  23    A.   WELL, AGAIN, IT'S COMPOSED OF THESE FOUR DIFFERENT

04:18:47  24    SUBASSEMBLIES, AND WHAT I REALLY WANT IS THE COST OF JUST THE

04:18:51  25    DISPLAY SCREEN, BUT UNFORTUNATELY, FOR ME, THE DISPLAY ASSEMBLY

04:18:57  1      IS THE ONLY -- OR THE FINEST LEVEL OF GRANULARITY OF COSTS IN

04:19:02  2      THE BILL OF MATERIALS.  THEY DON'T HAVE THE COST OF THESE FOUR

04:19:05  3      DIFFERENT COMPONENTS BECAUSE THE MANUFACTURER ASSEMBLED THOSE

04:19:09  4      TOGETHER AND SOLD THE TOTAL DISPLAY ASSEMBLY TO SAMSUNG.

04:19:14  5          SO THE ONLY COST INFORMATION I HAD WAS FOR THE ENTIRE

04:19:17  6      ASSEMBLY.

04:19:18  7      Q.   SO WAS YOUR -- WHAT WAS YOUR FIRST STEP THEN?  WHAT DID

04:19:22  8      YOU DO WITH THE DATA -- STEP BACK.

04:19:25  9          YOU HAD DATA ON THE COST OF THE DISPLAY ASSEMBLY; CORRECT?

04:19:28  10     A.   I DID.

04:19:28  11     Q.   AND WHERE DID YOU GET THAT INFORMATION?

04:19:30  12     A.   I GOT THAT FROM THE COST OF BILL OF MATERIALS.  I GOT THAT

04:19:33  13     FOR EACH MONTH DURING THE DAMAGE PERIOD FOR EACH OF THE 16

04:19:37  14     ACCUSED PRODUCTS, AND I FIGURED OUT THE TOTAL WEIGHTED AVERAGE

04:19:42  15     COST OF THE TOTAL COMPONENTS IN THE PHONE AND THE COST OF THE

04:19:46  16     DISPLAY ASSEMBLY.

04:19:47  17         AND IN THOSE DETAILED BILL OF MATERIALS ON AVERAGE, EACH

04:19:51  18     ONE OF THESE PHONES HAD 246 DIFFERENT COMPONENTS.  THIS IS ONLY

04:19:55  19     ONE OF THOSE 246.  BUT I WAS UNABLE TO DETERMINE THE TOTAL COST

04:19:59  20     OF THE DISPLAY ASSEMBLY STRAIGHT FROM THE BILL OF MATERIALS.

04:20:02  21     Q.   OKAY.  AND THEN HOW DID YOU THEN TRY TO FIGURE OUT WHAT

04:20:05  22     THE COST WAS OF THE WINDOW GLASS AS A PART OF THE DISPLAY

04:20:09  23     ASSEMBLY?

04:20:10  24     A.   WELL, THE -- LIKE I SAID, I COULD GET SOME INFORMATION

04:20:13  25     FROM SAMSUNG TELECOMMUNICATIONS AMERICA AND FROM THEIR REPAIR

04:20:16  1    PROGRAM BECAUSE THEY BUY THAT PART NUMBER THAT WE SAW ON THE

04:20:19  2    PREVIOUS DEMONSTRATIVE, AND I COULD TRACE THAT INTO THEIR

04:20:21  3    RECORDS, AND THEY BOUGHT THAT PART NUMBER FOR THEIR REPAIR

04:20:25  4    PROGRAM.  AND I COULD ALSO FIND THE COSTS FOR THAT FROM THE

04:20:28  5    S.A.P. SYSTEM.

04:20:29  6    Q.    NOW, WHAT DID YOU DO TO -- WITH RESPECT TO THE BEZEL THAT

04:20:34  7    SAMSUNG HAS IDENTIFIED AS THE ARTICLE OF MANUFACTURE FOR THE

04:20:37  8    D'087 PATENT?

04:20:39  9    A.    WELL, THAT IS A SEPARATE COMPONENT IN THE BILL OF

04:20:42  10   MATERIALS AT SAMSUNG.  SO I COULD GET THAT COST, AND THAT COST

04:20:47  11   THEN IS CALLED, I THINK, ASSEMBLY CASE FRONT.  IT INCLUDES THE

04:20:52  12   BEZEL AND A LITTLE BIT MORE.  BUT, AGAIN, THAT REALLY IS PRETTY

04:20:56  13   MUCH THE COST OF THE BEZEL.  SO I HAD THAT INFORMATION IN THE

04:20:58  14   BILL OF MATERIALS.

04:20:59  15   Q.    AND IF WE COULD PUT UP SDX 1713.  AND PERHAPS, MR. WAGNER,

04:21:07  16   YOU COULD DESCRIBE TO US WHAT THIS IS?

04:21:08  17   A.    WELL, AGAIN, I THINK THIS IS A PICTURE FROM ONE OF THOSE

04:21:11  18   SPECIFICATIONS FOR APPROVAL.  BUT IT SHOWS WHAT THE COMPONENT

04:21:15  19   IS AND THE PART NUMBER SO I COULD GO TO THE BILL OF MATERIALS

04:21:18  20   AND PULL OUT THE COST FOR THAT PART.

04:21:20  21   Q.    OKAY.  SO WE'VE GOT THE SPECS OF SAMSUNG; YOU'VE GOT THE

04:21:28  22   BILL OF MATERIALS.  LET'S GO THROUGH VERY QUICKLY THEN.  HOW DO

04:21:33  23   YOU USE THE DATA FROM THE SEC BILL OF MATERIALS, SAMSUNG

04:21:37  24   ELECTRONICS BILL OF MATERIALS, TO CALCULATE WHAT THE PROFIT WAS

04:21:42  25   ON THE SMALLER PORTION AFTER THAT ASSEMBLY?

WAGNER DIRECT BY MR. PRICE                                    1055

04:21:44  1            WAS YOUR FIRST STEP TO TRY TO CALCULATE WHAT PERCENTAGE OF

04:21:48  2    OVERALL COSTS THAT LARGER ASSEMBLY WAS?

04:21:51  3    A.   THAT AND THE BEZEL, YES.

04:21:54  4    Q.   AND IF WE COULD LOOK AND PUT UP ON THE SCREEN EXHIBIT --

04:22:02  5    ACTUALLY, IF YOU WOULD LOOK AT EXHIBIT 4536. -- EXHIBIT 4536,

04:22:08  6    AND THE SECOND PAGE.  IT SHOULD BE IN YOUR BINDER, DX 4536.

04:22:13  7    A.   I'LL WAIT FOR THE SCREEN.

04:22:14  8    Q.   I THINK I'M SUPPOSED TO MOVE IT INTO EVIDENCE FIRST.

04:22:29  9    A.   I'M NOT SEEING 45 --

04:22:32  10   Q.   LET ME SEE IF I HAVE IT.

04:22:34  11   A.   OH, 45 -- I'VE GOT IT.  I'M SORRY.

04:22:37  12   Q.   YEAH.

04:22:40  13   A.   YES.

04:22:41  14   Q.   AND COULD YOU TELL US WHAT THAT IS?

04:22:43  15   A.   THIS IS THE FIRST STEP IN DETERMINING THE PERCENTAGE COST

04:22:47  16   TO THE TOTAL COST OF THE PHONES TO DO MY PROFIT ALLOCATION.

04:22:53  17            MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 4536 INTO

04:22:55  18   EVIDENCE.

04:22:55  19            THE COURT:  ANY OBJECTION?

04:22:56  20            MR. LEE:  JUST A SECOND, YOUR HONOR, SO I CAN FIND

04:22:59  21   IT.

04:23:01  22       NO OBJECTION, YOUR HONOR.

04:23:01  23            THE COURT:  IT'S ADMITTED.

04:23:02  24       (DEFENDANTS' EXHIBIT 4536 WAS ADMITTED IN EVIDENCE.)

04:23:02  25            THE COURT:  GO AHEAD, PLEASE.

04:23:03  1    BY MR. PRICE:

04:23:04  2    Q.   AND FIRST LET'S START, IT SAYS "ASSEMBLY PERCENT OF TOTAL

04:23:10  3    MATERIAL COST."

04:23:11  4         AND JUST SO WE'RE CLEAR ABOUT THIS, LET'S PUT UP SDX 1712.

04:23:19  5    WHAT THIS IS SHOWING IS THE PERCENTAGE OF OVERALL COSTS FOR THE

04:23:22  6    PHONE OF THIS LARGER DISPLAY ASSEMBLY; CORRECT?

04:23:26  7    A.   IT IS, AND ALSO THE, THE OTHER ITEM FOR THE BEZEL.

04:23:29  8    Q.   OKAY.  SO IF WE PUT THAT UP -- SO IF -- IF FOR SOME REASON

04:23:35  9    YOU CONCLUDED, OH, THE ARTICLE OF MANUFACTURE ISN'T THESE

04:23:38  10   PARTS, BUT IT'S THIS ENTIRE ASSEMBLY SAMSUNG BUYS, RIGHT --

04:23:43  11   A.   YES.

04:23:43  12   Q.   -- THEN YOU WOULD USE THE PERCENTAGE OF THAT?

04:23:46  13   A.   I WOULD.

04:23:47  14   Q.   OF COSTS?

04:23:47  15   A.   YES.

04:23:48  16   Q.   SO LET'S PUT BACK UP ON THE SCREEN THEN 4536.002.  AND

04:23:55  17   COULD YOU TELL US WHAT THIS SHOWS?

04:23:57  18   A.   WELL, THE FIRST COLUMN IS RELEVANT TO THE D'305 PATENT

04:24:03  19   BASED ON MY UNDERSTANDING OF WHAT SAMSUNG BELIEVES THE ARTICLE

04:24:06  20   OF MANUFACTURE IS, AND THAT'S THE ENTIRE DISPLAY ASSEMBLY.

04:24:10  21        AND THOSE PERCENTAGES ARE THE PERCENTAGES OF DISPLAY

04:24:13  22   ASSEMBLY TO THE TOTAL COST OF THE PHONES.

04:24:15  23   Q.   AND WHAT'S THE SECOND COLUMN?

04:24:18  24   A.   THE SECOND COLUMN IS ALSO, RIGHT NOW, JUST THE DISPLAY

04:24:23  25   ASSEMBLY BECAUSE THAT INCLUDES THE WINDOW GLASS.  I'M GOING TO

04:24:26  1    TRY TO ADJUST THAT IN A FURTHER STEP, BUT IT'S ALSO THE TOTAL

04:24:30  2    DISPLAY ASSEMBLY COST AS A PERCENT OF THE TOTAL PHONE COSTS,

04:24:34  3    AND THERE'S SLIGHTLY DIFFERENT NUMBERS BECAUSE THERE'S SLIGHTLY

04:24:37  4    DIFFERENT DAMAGE PERIODS FOR THOSE TWO DESIGN PATENTS.

04:24:41  5    Q.   AND DO WE ADD THOSE TWO TOGETHER OR --

04:24:44  6    A.   NO.

04:24:45  7    Q.   OKAY.  SO WHY NOT?  COULD YOU EXPLAIN THAT TO US.

04:24:48  8    A.   WELL, IT'S -- IT'S BECAUSE MY ULTIMATE CALCULATION DEPENDS

04:24:53  9    ON HOW MANY DESIGN PATENTS EACH PRODUCT INFRINGES.  SOME

04:24:57  10   INFRINGE ONLY ONE.  SOME INFRINGE TWO.  A COUPLE, I THINK TWO

04:25:01  11   OF THEM, INFRINGE ALL THREE.

04:25:03  12       IT'S MUCH MORE COMPLICATED THAN JUST WHAT YOU'RE TRYING TO

04:25:06  13   HAVE ME DO.

04:25:07  14   Q.   OKAY.  SO LOOKING AT THE ENTIRE DISPLAY ASSEMBLY, WHICH

04:25:12  15   INCLUDES THOSE OTHER COMPONENTS, AND YOU WANTED TO SEE WHAT

04:25:15  16   THE -- YOU KNOW, THE TOTAL PROFITS WERE OF THAT, YOU WOULD

04:25:19  17   MULTIPLY, YOU KNOW, RANGES FROM 32 PERCENT TO 12 PERCENT TIMES

04:25:25  18   TOTAL PROFITS, RIGHT?

04:25:26  19   A.   YES, IT DOES.

04:25:27  20   Q.   OKAY.  BUT YOUR ANALYSIS DOESN'T STOP THERE BECAUSE THAT'S

04:25:31  21   MORE THAN THE ARTICLE OF MANUFACTURE; CORRECT?

04:25:33  22   A.   IT IS FOR SOME OF THE PATENTS.  THIS IS -- THIS IS GOOD

04:25:36  23   FOR THE DISPLAY ASSEMBLY ONCE I SUBTRACT THE WINDOW GLASS FROM

04:25:41  24   IT.

04:25:41  25   Q.   AND ARE THESE CALCULATIONS HERE BASED ONLY ON THE COST

04:25:46  1    DATA THAT YOU RECEIVED FROM SEC?

04:25:48  2    A.   YES.

04:25:48  3    Q.   AND THAT'S FROM THOSE BILL OF MATERIALS?

04:25:51  4    A.   CORRECT.

04:25:53  5    Q.   ALL RIGHT.  SO WHAT WAS THEN -- WHAT WAS YOUR NEXT STEP IN

04:25:55  6    DETERMINING, YOU KNOW, WHAT THE COST PERCENTAGE WAS FOR THE

04:25:59  7    ARTICLES OF MANUFACTURE?

04:26:00  8    A.   TO DETERMINE THE COST OF THE WINDOW GLASS WHICH IS

04:26:04  9    RELEVANT TO THE D'677 AND THE D'087 PATENTS.

04:26:09  10   Q.   AND WHAT DID YOU DO FOR THAT?

04:26:10  11   A.   THAT, AGAIN, I GOT A SCHEDULE OF BOTH PURCHASES AND USAGE

04:26:15  12   OF REPAIR GLASS BY SAMSUNG TELECOMMUNICATIONS AMERICA FOR A

04:26:21  13   13-MONTH PERIOD, AND I THINK MR. SHEPPARD TESTIFIED THAT THE

04:26:24  14   COST OF THE GLASS IS ABOUT $3 TO $5.

04:26:27  15        BUT I DETERMINED FROM THAT THE PERCENTAGE OF WINDOW GLASS

04:26:30  16   TO THE ENTIRE DISPLAY ASSEMBLY SO I COULD MAKE MY ADJUSTMENT.

04:26:34  17   Q.   AND DO YOU HAVE THAT REFLECTED IN EXHIBIT 4536 AT PAGE 4?

04:26:40  18   A.   YES.

04:26:42  19   Q.   SO IF WE BRING THAT TO THE SCREEN, PLEASE.

04:26:48  20        COULD YOU TELL THE JURY THEN WHAT THIS IS, WHAT THIS

04:26:50  21   SHOWS?

04:26:50  22   A.   WHAT THIS SHOWS NOW IS I'VE ISOLATED FOR THE D'305 THE

04:26:54  23   DISPLAY SCREEN BY SUBTRACTING THE COST OF THE WINDOW GLASS FROM

04:26:59  24   THE ENTIRE DISPLAY SCREEN COST.

04:27:01  25        SO IT'S GONE DOWN SLIGHTLY, ABOUT 2 PERCENT, BUT NOW THIS

04:27:06   1     FIRST COLUMN DOES NOT INCLUDE ANY WINDOW GLASS COSTS FOR THE

04:27:10   2     '305 PATENT.

04:27:14   3          THE SECOND COLUMN IS USING THE SAMSUNG TELECOMMUNICATIONS

04:27:16   4     AMERICA COST DATA TO DETERMINE THE COST OF THE WINDOW GLASS IN

04:27:20   5     ALL OF THE PHONES.  I COULDN'T, OR DID NOT HAVE INFORMATION FOR

04:27:23   6     ALL OF THE ACCUSED PRODUCTS, BUT I HAVE IT FOR A NUMBER OF

04:27:28   7     THEM, AND WHEN I DON'T HAVE THE COST FOR A PARTICULAR PRODUCT,

04:27:32   8     ACCUSED PRODUCT, I'VE USED THE AVERAGE OF THESE NUMBERS FOR

04:27:36   9     THOSE PRODUCTS.

04:27:37   10         AND THEN, OF COURSE, I'VE -- FROM THE PREVIOUS SCHEDULE, I

04:27:39   11    ALREADY HAVE THE COST OF THE BEZEL TO THE TOTAL COST IN THE

04:27:42   12    THIRD COLUMN.

04:27:43   13    Q.   SO WHY ARE THERE SOME BLANKS HERE?

04:27:47   14    A.   THERE'S BLANKS -- ONE REASON THERE'S BLANKS IS BECAUSE NOT

04:27:51   15    ALL PHONES ARE ACCUSED OF INFRINGING ALL PATENTS.  THAT'S THE

04:27:55   16    REASON WHY THERE'S BLANKS ON THIS SCHEDULE.

04:27:57   17    Q.   SO HAVING DONE THESE CALCULATIONS, DO YOU BELIEVE THAT

04:28:04   18    USING THESE CALCULATIONS ACCURATELY REFLECTS THE COSTS TO

04:28:07   19    SAMSUNG IN CONNECTION WITH THE PHONES IN THIS CASE?

04:28:10   20    A.   I DO.

04:28:10   21    Q.   SO LET'S TURN TO WHAT YOU DID WITH THESE PERCENTAGES THEN.

04:28:15   22         WHAT DID YOU DO THEN WHEN YOU CALCULATED THESE PERCENTAGES

04:28:19   23    AS TO WHAT THE PARTICULAR COMPONENT COST AS A PERCENTAGE OF THE

04:28:22   24    ENTIRE COST?  WHAT DID YOU DO TO ARRIVE AT TOTAL PROFIT?

04:28:25   25    A.   I APPLIED THESE PERCENTAGES TO THE TOTAL PROFITS FOR EACH

04:28:29  1    OF THE PHONES THAT ARE ACCUSED TO COME UP WITH WHAT THE ARTICLE

04:28:33  2    OF MANUFACTURE PROFITS ARE FOR EACH OF THE ACCUSED PHONES FOR

04:28:36  3    EACH OF THE DESIGN PATENTS.

04:28:37  4    Q.   AND IF YOU LOOK AT EXHIBIT DX 4537 IN YOUR BINDER.

04:28:49  5    A.   YES.

04:28:49  6    Q.   AND COULD YOU TELL US WHAT THAT IS?

04:28:55  7    A.   YES.  THIS IS MY CALCULATION, THE DETAILED SCHEDULE TO

04:28:58  8    SHOW HOW I CAME UP WITH THE FINAL NUMBERS THAT I BELIEVE ARE

04:29:01  9    THE PROFITS FOR THE ARTICLES OF MANUFACTURE THAT SAMSUNG

04:29:04  10   BELIEVES ARE RELEVANT.

04:29:06  11        MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 4537 INTO

04:29:08  12   EVIDENCE.

04:29:10  13        MR. LEE:  NO OBJECTION.

04:29:11  14        THE COURT:  IT'S ADMITTED.

04:29:13  15   (DEFENDANTS' EXHIBIT 4537 WAS ADMITTED IN EVIDENCE.)

04:29:13  16        THE COURT:  GO AHEAD, PLEASE.

04:29:15  17        MR. PRICE:  SO IF WE COULD PUT UP EXHIBIT 4537, IT'S

04:29:17  18   THE SECOND PAGE, .002.

04:29:19  19   Q.   SO COULD YOU TELL US WHAT THIS SCHEDULE IN EXHIBIT 4537

04:29:26  20   SHOWS?

04:29:26  21   A.   YES.  BASED ON ALL OF THE CALCULATIONS THAT I'VE TOLD YOU

04:29:30  22   I'VE MADE, THIS IS THE TOTAL AMOUNT OF PROFITS FOR EACH OF THE

04:29:37  23   ARTICLES OF MANUFACTURE FOR EACH OF THE DESIGN PATENTS THAT

04:29:40  24   EACH OF THESE PRODUCTS ARE ACCUSED OF INFRINGING, OR HAVE BEEN

04:29:44  25   FOUND TO INFRINGE.

04:29:47  1          AND THE TOTAL IS $28,085,061.

04:29:52  2     Q.   NOW, SOME OF THESE HAVE 0.  HOW CAN YOU HAVE 0 PROFITS?

04:29:58  3     A.   WELL, ACTUALLY, THE -- ALL OF THE FIVE PRODUCTS THAT HAVE

04:30:01  4     0'S ACTUALLY HAVE NEGATIVE PROFITABILITY DURING THE DAMAGE

04:30:04  5     PERIOD.

04:30:06  6          WHAT YOU HAVE TO UNDERSTAND IS BECAUSE OF THE NOTICE

04:30:08  7     PERIODS AND WHEN THE DAMAGES STOP HERE, A NUMBER OF THESE

04:30:12  8     PHONES WERE REALLY NEAR THE END OF THEIR LIFE AND YOU MAKE YOUR

04:30:16  9     REAL PROFIT ON A PHONE WHEN THEY FIRST COME OUT, AND THEN YOU

04:30:19  10    DON'T MAKE AS MUCH PROFIT AT THE END.

04:30:21  11         AND THAT IS THE REASON WHY SOME OF THESE PHONES ACTUALLY

04:30:24  12    HAVE NO PROFITS.

04:30:26  13         BUT IT IS, IN MY JUDGMENT, NOT APPROPRIATE TO SUBTRACT

04:30:29  14    THOSE PROFITS FROM THE PHONES THAT ACTUALLY DO HAVE PROFITS.

04:30:32  15         THE COURT:  I'M SORRY TO INTERRUPT, BUT IT'S 4:30

04:30:36  16    NOW.  SO SHOULD WE GO AHEAD AND TAKE OUR BREAK FOR THE DAY?

04:30:39  17         MR. PRICE:  SURE.

04:30:39  18         THE COURT:  SO DON'T RESEARCH, DISCUSS, OR LISTEN TO

04:30:42  19    ANYTHING ABOUT THE CASE, THESE PARTIES, OR THEIR PRODUCTS.

04:30:45  20         WE WILL SEE YOU TOMORROW MORNING AT 9:00 A.M.  THANK YOU

04:30:48  21    FOR YOUR PATIENCE AND YOUR SERVICE.

04:30:55  22         AND YOU MAY STEP DOWN?

04:31:06  23         (JURY OUT AT 4:31 P.M.)

04:31:16  24         THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT THE

04:31:17  25    JURORS HAVE LEFT THE COURTROOM.

04:31:19   1          LET ME GIVE YOU YOUR TIME LIMITS.  I HAVE NOT FINISHED --

04:31:22   2    PLEASE TAKE A SEAT -- READING THE OBJECTIONS THAT WERE FILED AT

04:31:24   3    1:00 O'CLOCK, SO I'D LIKE SOME TIME TO DIGEST THEM, AND I'D

04:31:28   4    LIKE TO DO THE FINAL JURY INSTRUCTIONS FIRST AND THEN DO RULE

04:31:31   5    50 ARGUMENTS SECOND.

04:31:33   6          IS THAT OKAY?

04:31:36   7              MS. SULLIVAN:  THAT'S FINE, YOUR HONOR.

04:31:37   8              MR. LEE:  THAT'S FINE, YOUR HONOR.  AFTER WE DO JURY

04:31:39   9    INSTRUCTIONS, IF SOME OF US DEPARTED BECAUSE WE NEED TO GO BACK

04:31:42  10    AND WORK ON CLOSING, WOULD THAT BE OKAY?

04:31:45  11              THE COURT:  COMPLETELY FINE.

04:31:46  12              MR. LEE:  OKAY.  THANK YOU.

04:31:46  13              THE COURT:  LET ME GIVE YOU YOUR TIME CALCULATIONS

04:31:49  14    FOR THE FOLKS WHO HAVE TO WORK ON TRIAL TOMORROW.

04:31:51  15          SO APPLE TODAY USED AN HOUR AND 33 MINUTES, SO YOU HAVE

04:31:58  16    1 HOUR AND 20 MINUTES LEFT BECAUSE IN TOTAL YOU HAVE USED

04:32:02  17    6 HOURS AND 40 MINUTES.  OKAY.  SO YOU HAVE AN HOUR AND 20

04:32:06  18    LEFT.

04:32:06  19          SAMSUNG TODAY USED 3 HOURS AND 54 MINUTES, SO I BELIEVE

04:32:11  20    YOU HAVE 1 HOUR AND 3 MINUTES LEFT BECAUSE IN TOTAL YOU HAVE

04:32:19  21    USED 6 HOURS AND 57 MINUTES.

04:32:23  22          OKAY.  SO I DEFINITELY THINK WE WILL BE ABLE TO CLOSE

04:32:26  23    TOMORROW, ASSUMING WE CAN GET ALL OF THE FINAL JURY

04:32:29  24    INSTRUCTIONS IN ORDER BASED ON THE FACT THAT THERE ARE ONLY

04:32:37  25    2 HOURS AND 23 MINUTES OF ACTUAL TRIAL TIME LEFT.  SO WE SHOULD

04:32:40  1    BE ABLE TO COMPLETE THAT IN THE MORNING.

04:32:44  2        YOU KNOW, IF I NEED MORE TIME ON THE FINAL JURY

04:32:46  3    INSTRUCTIONS, I COULD GIVE THE JURORS AN EXTENDED LUNCH BREAK

04:32:49  4    AND THEN WE CAN COME BACK AT 1:00 TO DO THE READING.  THAT'S

04:32:53  5    ONLY ASSUMING WE CAN'T GET THIS FINALIZED SOONER.  BUT I DO

04:32:57  6    WANT TO GIVE YOU -- I'VE FOUND IT HELPFUL TO HAVE YOU

04:33:00  7    OPPORTUNITIES TO OBJECT -- THANK YOU -- AND SO EVEN AFTER THIS

04:33:06  8    NEXT ROUND OF CHANGES, I'D LIKE TO GIVE YOU ANOTHER OPPORTUNITY

04:33:09  9    TO SPEAK ON IT BECAUSE I DON'T WANT TO MAKE A MISTAKE, AND THIS

04:33:12  10   IS VERY COMPLICATED.

04:33:14  11        MS. SULLIVAN:  THANK YOU, YOUR HONOR, WE REALLY

04:33:16  12   APPRECIATE THAT.

04:33:16  13        AND JUST TO BE CLEAR, YOU'D LIKE TO ARGUE THE CURRENT SET

04:33:19  14   OF OBJECTIONS TODAY AFTER YOU'VE HAD TIME TO READ THEM?

04:33:22  15        THE COURT:  YES, BECAUSE I DO HAVE SOME -- AND I

04:33:24  16   DON'T KNOW IF YOU'VE THOUGHT MORE ABOUT YOUR -- UNFORTUNATELY,

04:33:27  17   THERE'S NOT A LOT OF LAW ON WAIVER ON THIS.

04:33:30  18        MS. SULLIVAN:  I'VE GOT QUITE A BIT OF IT, YOUR

04:33:33  19   HONOR.

04:33:33  20        THE COURT:  DO YOU?  DO YOU HAVE SOME CITES THAT YOU

04:33:34  21   CAN SHARE WITH ME?

04:33:35  22        MS. SULLIVAN:  I ABSOLUTELY DO, YOUR HONOR.

04:33:37  23        THE COURT:  BEFORE YOU DO THAT, LET'S SEE IF WE EVEN

04:33:39  24   NEED TO GO THERE.

04:33:40  25        I DON'T KNOW -- HOW MUCH MORE, MR. PRICE, DO YOU HAVE WITH

1064

04:33:46   1        MR. WAGNER?

04:33:47   2                MR. PRICE:  FIVE MINUTES.

04:33:51   3                THE COURT:  OKAY.  SO I GUESS YOU DON'T KNOW YET,

04:33:54   4    BECAUSE HE HASN'T OFFERED A REASONABLE ROYALTY OPINION.

04:33:57   5                MR. LEE:  HE HASN'T DONE -- HE HASN'T COMPLETED HIS

04:34:00   6    ANALYSIS.

04:34:00   7                MR. PRICE:  YOUR HONOR, HE WILL NOT OFFER A

04:34:02   8    REASONABLE ROYALTY OPINION.

04:34:03   9                THE COURT:  OKAY.  HE WILL NOT?

04:34:04  10                MR. LEE:  BUT HE'LL OFFER AN OPINION -- HE'S GOT TO

04:34:07  11    OFFER AN OPINION IF THE ARTICLES OF MANUFACTURE ARE LESS THAN

04:34:10  12    THE FULL PHONES.  I MEAN, I -- IF MR. PRICE IS DONE, I'LL GIVE

04:34:14  13    AN ANSWER PRETTY QUICKLY.  I JUST HAVEN'T HAD A CHANCE TO TALK

04:34:17  14    TO OUR FOLKS.

04:34:18  15        BUT I DON'T THINK WE'VE HAD TO OFFER ALL OF OUR

04:34:23  16    ALTERNATIVE DAMAGES THEORIES.  OUR POSITION IN THE DIRECT CASE

04:34:26  17    IS THAT THE ARTICLE OF MANUFACTURE IS THE PHONE.

04:34:31  18        WE PUT ON AFFIRMATIVE PROOF AS TO THAT.  WE DEMONSTRATED

04:34:34  19    THE REVENUES.  WHILE IT'S SAMSUNG'S BURDEN TO DEMONSTRATE THE

04:34:39  20    COST, WE STILL ADDRESS THE ISSUE, AND WE HAVE A NUMBER.

04:34:42  21        AND BEFORE THAT POINT IN TIME, YOUR HONOR, THERE WAS NO

04:34:44  22    PROOF OR EVIDENCE OFFERED OF AN ALTERNATIVE ARTICLE OF

04:34:44  23    MANUFACTURE.

04:34:51  24        IT WAS WHEN SAMSUNG DID CROSS-EXAMINE, BUT THEN WHEN THEY

04:34:53  25    PUT MR. LUCENTE ON, THAT WAS THE AFFIRMATIVE CASE.

04:34:57  1          AND I WANT TO BE VERY CANDID.  I'M NOT SURE THAT WE'RE

04:35:01  2     GOING TO OFFER IT, AND IF WE'RE NOT, WE UNDERSTAND THAT THE

04:35:04  3     REASONABLE ROYALTY INSTRUCTION FOR THE DESIGN PATENTS SHOULD GO

04:35:06  4     OUT.

04:35:07  5               THE COURT:  UM-HUM.

04:35:08  6               MR. LEE:  IF YOU --

04:35:11  7               THE COURT:  OKAY.

04:35:11  8               MR. LEE:  IF WE HAD TEN MINUTES NOW, I COULD TALK TO

04:35:14  9     MY FOLKS AND COME BACK AND GIVE YOU AN ANSWER.

04:35:16 10               THE COURT:  OKAY.

04:35:17 11               MS. SULLIVAN:  YOUR HONOR, I'M PREPARED TO TELL YOU

04:35:19 12     NOW IF YOU'D LIKE TO STUDY THE CITES ON YOUR BREAK.

04:35:21 13               THE COURT:  I DO WANT THE CITES, PLEASE.

04:35:23 14               MS. SULLIVAN:  ABSOLUTELY, YOUR HONOR.

04:35:25 15          THERE'S ABSOLUTELY NO QUESTION THAT APPLE HAS ELECTED TO

04:35:27 16     PURSUE ONLY ITS 289 REMEDY AND NOT ITS 284 REMEDY BY HAVING PUT

04:35:33 17     IN MS. DAVIS'S REPORT A 284 ANALYSIS OF REASONABLE ROYALTY AND

04:35:38 18     THEN AFFIRMATIVELY FAILING TO PRESENT ANY EVIDENCE OF THAT

04:35:42 19     THEORY IN THE CASE-IN-CHIEF.

04:35:43 20          SO WE KNEW FROM HER REPORT THEY HAD A THEORY OF A

04:35:46 21     REASONABLE ROYALTY UNDER 284.  SHE DID NOT PRESENT THAT IN THE

04:35:49 22     CASE-IN-CHIEF.

04:35:50 23          THAT HAS ELECTED THE 289 REMEDY AS THE SOLE POSSIBLE

04:35:54 24     REMEDY, AND APPLE CANNOT POSSIBLY PRESENT A 284 ANALYSIS IN ITS

04:36:00 25     REBUTTAL FOR THE FIRST TIME.

1066

```
04:36:02   1          TWO REASONS, YOUR HONOR.

04:36:03   2              THE COURT:  OKAY.

04:36:03   3              MS. SULLIVAN:  NUMBER ONE IS WAIVER UNDER THE PATENT

04:36:06   4      ACT.  I'D CITE TO YOUR HONOR PROMEGA CORP. VERSUS LIFE

04:36:10   5      TECHNOLOGIES CORPORATION, 875 F.3D 651.

04:36:14   6              THE COURT:  SO I HAD A QUESTION FOR YOU, BECAUSE THAT

04:36:16   7      WAS IN THE FOOTNOTE THAT WAS THE FINJAN TRIAL; CORRECT?

04:36:20   8              MS. SULLIVAN:  WE DID, YOUR HONOR, YES.

04:36:22   9              THE COURT:  AND THIS DIDN'T HAVE TO DO WITH WAIVER IN

04:36:24  10      REBUTTAL.

04:36:25  11              MR. LEE:  CORRECT.

04:36:25  12              THE COURT:  I THINK IN THAT CASE THE ISSUE WAS NEVER

04:36:27  13      RAISED THROUGHOUT THE TRIAL.

04:36:28  14          SO IS THERE ONE THAT WOULD ADDRESS THIS SORT OF NUANCE OF,

04:36:32  15      WELL, THEY'RE TRYING TO BRING IT IN IN REBUTTAL EVEN THOUGH

04:36:34  16      THEY NEVER BROUGHT IT IN THE CASE-IN-CHIEF?

04:36:37  17              MS. SULLIVAN:  YOUR HONOR, PROMEGA IS THE CASE THAT

04:36:41  18      SAYS YOU CAN'T -- "WHEN A PLAINTIFF DELIBERATELY TAKES A RISK

04:36:44  19      BY RELYING AT TRIAL EXCLUSIVELY ON A DAMAGES THEORY THAT

04:36:47  20      ULTIMATELY PROVES UNSUCCESSFUL, A DISTRICT COURT DOES NOT ABUSE

04:36:57  21      ITS DISCRETION BY DECLINING TO GIVE THAT PLAINTIFF MULTIPLE

04:37:01  22      CHANCES TO CORRECT DEFICIENCIES IN ITS ARGUMENT OR THE RECORD."

04:37:05  23          NOW, YOUR HONOR, LET ME GET TO THE REBUTTAL POINT, BECAUSE

04:37:08  24      THAT'S THE SECOND HALF OF THE ARGUMENT.

04:37:10  25              THE COURT:  YES, THANK YOU.  GO AHEAD.
```

```
04:37:14   1            MS. SULLIVAN:  I COULD STAND HERE A LONG TIME WITH

04:37:16   2       THOSE CITES, YOUR HONOR.

04:37:17   3            IT IS SO BASIC THAT YOU WAIVE A POINT BY FAILING TO RAISE

04:37:20   4       IT IN YOUR CASE-IN-CHIEF AND CAN'T RAISE IT FOR THE FIRST TIME

04:37:23   5       IN REBUTTAL.

04:37:24   6            LET ME GIVE YOU JUST A FEW, YOUR HONOR.  ALLEN VERSUS

04:37:27   7       PRINCE GEORGE'S COUNTY.

04:37:28   8                 THE COURT:  A-L-A-N?

04:37:30   9                 MS. SULLIVAN:  A-L-L-E-N.

04:37:32   10                MR. LEE:  IS THAT A PATENT CASE?

04:37:35   11                MS. SULLIVAN:  IT'S NOT A PATENT CASE.

04:37:38   12           "REBUTTAL EVIDENCE CAN BE INTRODUCED ONLY TO COUNTER NEW

04:37:41   13      FACTS PRESENTED IN THE DEFENDANT'S CASE-IN-CHIEF."

04:37:43   14           "A CHANGE IN LITIGATION STRATEGY IS NOT NORMALLY PERMITTED

04:37:46   15      ON REBUTTAL."

04:37:48   16           SO IT WAS A DIFFERENT CASE, BUT THE EVIDENTIARY POINT,

04:37:51   17      YOUR HONOR, IS CLEAR.  IT'S ABOUT REBUTTAL -- REBUTTAL IS

04:37:55   18      LIMITED TO THE SCOPE OF THE OPPONENT'S CASE.

04:38:00   19                THE COURT:  WOULD YOU PLEASE GIVE ME THE CITE FOR

04:38:01   20      THAT?

04:38:02   21                MS. SULLIVAN:  TO ALLEN?

04:38:03   22                THE COURT:  YES, PLEASE.

04:38:06   23                MS. SULLIVAN:  ALLEN VERSUS PRINCE GEORGE'S COUNTY,

04:38:08   24      737 F.2D 1299.

04:38:10   25                THE COURT:  OKAY, THANK YOU.  AND I HAVE PROMEGA FROM
```

04:38:13  1        YOUR FOOTNOTE 3, SO I DON'T NEED THE CITE ON THAT.

04:38:16  2            IS THERE ANY OTHERS THAT YOU WANT?

04:38:18  3                MS. SULLIVAN:  YES, YOUR HONOR.  I'LL JUST GIVE YOU

04:38:20  4    THE CITES.

04:38:20  5                THE COURT:  OKAY.  THAT'S GREAT.

04:38:22  6                MS. SULLIVAN:  UNITED STATES VERSUS LAMOREAUX,

04:38:24  7    L-A-M-O-R-E-A-U-X.

04:38:26  8                THE COURT:  OKAY.

04:38:27  9                MS. SULLIVAN:  422 F.3D 750 AT 755.

04:38:33  10               THE COURT:  ALL RIGHT.

04:38:33  11               MS. SULLIVAN:  THIS IS ON THE FUNCTION OF REBUTTAL

04:38:36  12   TESTIMONY BEING SOLELY TO REPEL OUR ARGUMENTS, AND WE'RE NOT

04:38:42  13   GOING TO MAKE A REASONABLE ROYALTY ARGUMENT, SO THERE'S NOTHING

04:38:44  14   TO REPEL.

04:38:44  15        I'M GOING TO GIVE YOU TWO OTHERS, YOUR HONOR.  FAIGIN

04:38:47  16   VERSUS KELLY, 184 F.3D 67 AT 85.

04:38:55  17        MARMO, M-A-R-M-O, VERSUS TYSON FRESH MEATS.

04:38:59  18               THE COURT:  OKAY.

04:39:00  19               MS. SULLIVAN:  457 F.3D 748 AT 759.

04:39:08  20               THE COURT:  OKAY.

04:39:09  21               MS. SULLIVAN:  CATES, C-A-T-E-S, VERSUS SEARS

04:39:13  22   ROEBUCK, 928 F.2D 679 AT 685.

04:39:20  23        AND IF I COULD INVOKE WIGMORE -- YOUR HONOR, I DON'T GET A

04:39:25  24   CHANCE EVERY DAY -- WIGMORE AT SECTION 1873, "A DISTRICT COURT

04:39:31  25   SHOULD ALLOW REBUTTAL EVIDENCE ONLY IF IT IS NECESSARY TO

04:39:35  1        REFUTE THE OPPONENT'S CASE."

04:39:37  2            IT'S SUCH A BASIC PRINCIPLE OF EVIDENCE LAW THAT THAT'S

04:39:40  3        REALLY THE OTHER PART OF THE ARGUMENT.

04:39:42  4            BUT PROMEGA GIVES YOU CERTAINLY AN ARGUMENT HERE.  IF

04:39:45  5        ANYTHING, WE'RE A FORTIORI PROMEGA, YOUR HONOR, BECAUSE THEY

04:39:49  6        ELECTED THE 289 REMEDY.  PROMEGA, THE PLAINTIFF, WAS SEEKING --

04:39:53  7        HE MISSED ON ROYALTIES AFTER HE LOST ON LOST PROFITS.  HE HAD

04:39:55  8        TWO 284 REMEDIES.

04:39:55  9            BUT THEY AFFIRMATIVELY ELECTED 289 AND THEY TEED UP 284 IN

04:40:00  10       THEIR REPORT.  THEY DID NOT PRESENT IT.  THEY CAN'T PRESENT IT

04:40:02  11       FOR THE FIRST TIME IN REBUTTAL, YOUR HONOR.

04:40:04  12            THE COURT:  OKAY.

04:40:04  13            MR. LEE:  YOUR HONOR, IF I COULD JUST VERY -- I KNOW

04:40:06  14       YOU WANT TO LOOK AT THE CASE, BUT LET ME SAY THREE THINGS VERY

04:40:10  15       BRIEFLY.

04:40:11  16            I'M IMPRESSED THAT THINGS ARE SO CLEAR FOR MS. SULLIVAN ON

04:40:15  17       THE FOURTH DAY OF TRIAL AS TO WHAT HAS OCCURRED AND WHAT HAS

04:40:19  18       HAPPENED.

04:40:19  19            THERE WAS NO PROOF IN THE RECORD OF AN ARTICLE OF

04:40:24  20       MANUFACTURE LESS THAN THE PHONES BEFORE TODAY.  THERE WAS NO

04:40:26  21       REASON FOR US TO ELECT A REMEDY FOR SOMETHING LESS THAN ALL THE

04:40:30  22       PHONES BEFORE TODAY.

04:40:32  23            HER QUOTE IS ACCURATE; RIGHT?  WE GET TO REBUT THINGS THAT

04:40:36  24       WEREN'T IN THE RECORD BEFORE OUR CASE.  IF THE TRIAL HAD ENDED,

04:40:40  25       IF SAMSUNG HAD IMMEDIATELY RESTED AFTER WE HAD RESTED, WE WOULD

04:40:45  1   HAVE ASKED FOR JMOL OF TOTAL PROFITS OF REVENUES MINUS THE

04:40:49  2   COSTS.

04:40:51  3        TODAY THEY, FOR THE FIRST TIME, PUT IN THEIR ARTICLE OF

04:40:56  4   MANUFACTURE.  AND TODAY MR. WAGNER IS ABOUT TO SAY FOR THE

04:41:01  5   FIRST TIME WHAT DAMAGES SHOULD BE COMPUTED IF THAT'S THE

04:41:05  6   ARTICLE OF MANUFACTURE.

04:41:07  7        IF, IF -- AND AS I SAID TO YOUR HONOR -- SO THAT'S THE

04:41:13  8   FIRST THING.

04:41:14  9        THE SECOND THING, AS I SAID, AFTER MR. WAGNER IS DONE --

04:41:18  10  MAYBE EVEN, IF YOUR HONOR WANTS, THIS EVENING -- WE'LL FIGURE

04:41:20  11  OUT IF WE'RE GOING TO ASK FOR THE REASONABLE ROYALTY.  IF

04:41:24  12  MR. PRICE ONLY HAS FIVE MINUTES LEFT, I'M PRETTY CLOSE TO

04:41:28  13  KNOWING WHERE I AM, SO WE MAY SAVE YOUR HONOR A LOT OF TIME AND

04:41:31  14  EFFORT IF WE JUST HAVE A FEW MINUTES TO THINK ABOUT IT.

04:41:34  15           THE COURT:  UM-HUM.

04:41:35  16           MR. LEE:  THIRD IS I HAVEN'T HAD A CHANCE TO LOOK AT

04:41:37  17  ALL THOSE CASES, BUT I KNOW SOME OF THEM, AND THOSE ARE NOT

04:41:41  18  CASES WHERE A PLAINTIFF AFFIRMATIVELY PUT FORTH THEIR CASE,

04:41:45  19  THEN A DEFENDANT PUT FORTH THEIR ALTERNATIVE UNIVERSE OR THEIR

04:41:50  20  ALTERNATIVE CONTENTIONS AND THE PLAINTIFF REBUTTED IT.

04:41:53  21       THAT IS -- I APPRECIATE THAT MS. SULLIVAN SAYS IT HAPPENS

04:41:57  22  ALL THE TIME.

04:41:58  23       MY EXPERIENCE IS WHAT WE DID HAPPENS ALL THE TIME, WHICH

04:42:01  24  IS YOU PUT IN ONE DAMAGES REMEDY, AND THEY COME IN WITH AN

04:42:05  25  ALTERNATIVE THEORY IN RESPONSE TO THAT IN REBUTTAL.  THAT'S WHY

| | | |
|---|---|---|
| 04:42:08 | 1 | IT'S CALLED REBUTTAL. |
| 04:42:09 | 2 | THE COURT:  ALL RIGHT.  BUT YOU MAY -- THIS MAY BE A |
| 04:42:11 | 3 | MOOT ISSUE, IT SOUNDS LIKE, BECAUSE YOU MAY NOT PURSUE IT |
| 04:42:14 | 4 | ANYWAY, AND YOU WON'T KNOW UNTIL MR. WAGNER FINISHES TOMORROW |
| 04:42:17 | 5 | FOR SURE?  FOR CERTAIN? |
| 04:42:18 | 6 | MR. LEE:  I ACTUALLY, YOUR HONOR, IF YOU GAVE ME |
| 04:42:20 | 7 | TEN MINUTES, I COULD COME BACK TO YOUR HONOR AND TELL YOU IF I |
| 04:42:23 | 8 | CAN ANSWER IT RIGHT NOW. |
| 04:42:24 | 9 | THE COURT:  OKAY. |
| 04:42:25 | 10 | MS. SULLIVAN:  YOUR HONOR -- |
| 04:42:26 | 11 | THE COURT:  COULD WE DO THIS?  I STILL HAVEN'T READ |
| 04:42:29 | 12 | ALL OF THE BRIEFING BECAUSE IT WAS FILED AT 1:00 O'CLOCK -- |
| 04:42:32 | 13 | MS. SULLIVAN:  UNDERSTOOD. |
| 04:42:33 | 14 | THE COURT:  -- TODAY, AND I WOULD LIKE TO READ IT. |
| 04:42:35 | 15 | COULD WE REASSEMBLE -- AND I KNOW YOU WANT TO ARGUE RULE 50'S |
| 04:42:40 | 16 | AS WELL.  HOW MUCH TIME WOULD YOU ALL NEED?  I WOULD LIKE SOME |
| 04:42:44 | 17 | TIME TO ABSORB ALL THIS, TOO. |
| 04:42:46 | 18 | MS. SULLIVAN:  YOUR HONOR, YOU SHOULD TAKE WHATEVER |
| 04:42:48 | 19 | TIME YOU NEED, AND WE'LL BE HERE WHENEVER YOU'D LIKE. |
| 04:42:52 | 20 | THE COURT:  OKAY.  NOW, THE OTHER THING IS WE ONLY |
| 04:42:54 | 21 | HAVE -- AND THIS IS ONLY ASSUMING THAT YOU USE ALL YOUR TIME, |
| 04:42:58 | 22 | WHICH YOU MAY NOT, WE ONLY HAVE 2 HOURS AND 23 MINUTES LEFT IN |
| 04:43:02 | 23 | THE MORNING, SO WE COULD ALSO FINALIZE THIS AFTER YOU FINISH |
| 04:43:07 | 24 | ALL OF THE EVIDENCE BECAUSE I'M HOPING THAT YOU WILL BE DONE BY |
| 04:43:12 | 25 | ROUGHLY 10:30, AND IF WE COULD THEN FINALIZE ALL OF THE FINAL |

04:43:18   1      JURY INSTRUCTIONS BECAUSE THERE MAY BE CHANGES YOU WANT TO

04:43:24   2      MAKE, I DON'T KNOW, BASED ON ANYTHING ELSE THAT COMES IN

04:43:26   3      TOMORROW.

04:43:27   4           MS. SULLIVAN:  YOUR HONOR, I'D RESPECTFULLY REQUEST

04:43:29   5      THAT WE DO THE ARGUMENT TODAY BECAUSE I THINK IT WILL BE VERY

04:43:32   6      HELPFUL TO YOUR HONOR IN CRAFTING THE FINAL INSTRUCTIONS TO

04:43:36   7      HAVE --

04:43:36   8           THE COURT:  I DO WANT TO.

04:43:37   9           MS. SULLIVAN:  UNDERSTOOD.

04:43:38  10           THE COURT:  NO, I WANT TO DO ANOTHER ROUND.  SO THAT

04:43:41  11      NECESSITATES US DOING -- MAKING SOME PROGRESS TONIGHT.

04:43:46  12      LET ME -- I DON'T WANT -- I DON'T WANT TO -- WOULD IT BE

04:43:58  13      POSSIBLE PERHAPS IF WE COULD DO RULE 50 ARGUMENTS TOMORROW?  I

04:44:01  14      HATE TO CONTINUE TO PUSH IT, BUT I ALSO CAN'T ASK PEOPLE TO

04:44:05  15      STAY INDEFINITELY LONG THIS EVENING.

04:44:07  16           MS. SULLIVAN:  WE WANT TO DO ANYTHING WE CAN TO

04:44:09  17      ACCOMMODATE THE COURT REPORTER.

04:44:10  18           THE COURT:  AND I'M PROBABLY VIOLATING CALIFORNIA

04:44:12  19      LABOR LAWS AS WE SPEAK BY MAKING THIS EXTEND BEYOND ANY LATER.

04:44:16  20           MS. SULLIVAN:  THE ONLY REQUEST, YOUR HONOR, IS I DO

04:44:19  21      WANT TO PRESERVE SAMSUNG'S RIGHT TO MAKE A 50(A) THAT

04:44:22  22      CORRESPONDS TO APPLE'S CASE-IN-CHIEF.

04:44:24  23           THE COURT:  YES.

04:44:25  24           MS. SULLIVAN:  SEPARATE FROM AN ADDITIONAL 50(A) I

04:44:28  25      WILL FILE, IF NECESSARY, AT THE END OF ALL THE EVIDENCE.  SO I

04:44:30  1    JUST MAY BE READING TO YOUR HONOR TWO 50(A)'S TOGETHER, AS LONG

04:44:34  2    AS I UNDERSTAND THAT IT'S NUNC PRO TUNC ON THE FIRST ONE.

04:44:37  3             THE COURT:  SO I WOULD LIKE A STIPULATION OF THE

04:44:41  4    PARTIES, IF YOU COULD, THAT YOU FULLY RESERVED YOUR RIGHTS

04:44:45  5    AFTER APPLE'S CASE.

04:44:46  6        IF YOU WANTED TO MOVE AGAIN AFTER SAMSUNG'S CASE, IF YOU

04:44:48  7    WANTED TO MOVE AGAIN AFTER APPLE'S REBUTTAL CASE, YOU'VE

04:44:51  8    RESERVED YOUR RIGHTS IN ALL SITUATIONS.

04:44:55  9        COULD WE HAVE THAT?

04:44:56  10            MS. SULLIVAN:  WE'RE HAPPY TO PUT ONE TOGETHER.

04:44:58  11   WOULD YOU LIKE THAT FILED ON THE RECORD?

04:45:00  12            MR. LEE:  I CAN STIPULATE RIGHT NOW ON THE RECORD

04:45:01  13   THAT THAT'S WHAT WE'LL DO.

04:45:02  14            THE COURT:  OKAY.

04:45:03  15            MR. LEE:  IT WILL MAKE IT EASIER.

04:45:04  16        AND I THINK IF IT'S BETTER FOR THE REPORTERS AND YOUR

04:45:07  17   HONOR TO DO THEM TOMORROW, THAT ACTUALLY WOULD BE GREAT BECAUSE

04:45:10  18   WE'D LIKE TO HAVE SOME TIME TO WORK ON THE CLOSING BECAUSE I

04:45:14  19   THINK WE'LL GET TO IT SHORTLY AFTER LUNCH TOMORROW.

04:45:16  20            THE COURT:  WELL, I ALSO HAVE TO WORK ON THE CLOSINGS

04:45:19  21   AS WELL, AND I'D LIKE TO DO ANOTHER ROUND OF FINAL JURY

04:45:21  22   INSTRUCTIONS.

04:45:22  23        SO I DEFINITELY DO WANT TO HEAR YOUR ARGUMENTS, BUT I JUST

04:45:29  24   FEEL THAT RIGHT NOW THE CLOSING OBJECTIONS AND THE FINAL JURY

04:45:34  25   INSTRUCTIONS ARE A LITTLE MORE PRESSING THAN THE RULE 50

```
04:45:38   1    ARGUMENTS.

04:45:38   2              MS. SULLIVAN:  UNDERSTOOD, YOUR HONOR.

04:45:41   3              THE COURT:  I APOLOGIZE FOR CONTINUING THEM ONE MORE

04:45:43   4    TIME.

04:45:43   5              MS. SULLIVAN:  I'M SO SORRY.  I DIDN'T MEAN TO

04:45:45   6    INTERRUPT.

04:45:46   7        I JUST WANT TO SAY THAT SAMSUNG ALSO AGREES THAT WE WILL

04:45:50   8    STIPULATE TO TREAT THE 50(A) MOTIONS, EVEN IF THEY GO ON THE

04:45:53   9    RECORD TOMORROW, AS CORRESPONDING TO THE TIMES AFTER THE CLOSE

04:45:56  10    OF THE CASE-IN-CHIEF, AFTER THE CLOSE OF EVIDENCE, AND AFTER

04:45:59  11    THE CLOSE OF REBUTTAL EVIDENCE IF NEEDED.

04:46:00  12              THE COURT:  THANK YOU.  SO THAT'S THE STIPULATION.

04:46:02  13    YOU HAVE PRESERVED YOUR RIGHTS AT ALL THREE JUNCTURES IN THIS

04:46:05  14    TRIAL.  WE'LL HAVE THE ARGUMENT TOMORROW.

04:46:07  15        BUT LET'S TAKE A BRIEF BREAK ON THE JURY INSTRUCTIONS,

04:46:10  16    PLEASE.

04:46:10  17              ALL RIGHT.  THANK YOU.

04:46:11  18              MR. LEE:  THANK YOU, YOUR HONOR.

04:46:12  19              MS. SULLIVAN:  THANK YOU, YOUR HONOR.

04:46:13  20              THE CLERK:  COURT'S IN RECESS.

05:12:42  21        (RECESS FROM 4:46 P.M. UNTIL 5:18 P.M.)

05:18:15  22              THE COURT:  ALL RIGHT.  WELCOME BACK.

05:18:19  23        OKAY.  SO I HAVE A LIST OF QUESTIONS TO ASK YOU.  LET'S

05:18:26  24    TALK ABOUT THE FIRST ONE.

05:18:27  25        AND THIS IS GOING TO BE IN THE ORDER OF SAMSUNG'S
```

1075

05:18:35   1        OBJECTIONS.

05:18:38   2             SO I THINK THE PATENT TEXT CAN AND SHOULD BE CONSIDERED.

05:18:43   3    I AGREE IT'S NOT DISPOSITIVE, BUT I ALSO THINK IT WOULD BE

05:18:46   4    ERROR FOR ME TO SAY YOU HAVE TO DISREGARD IT.

05:18:50   5             SO I AM OPEN TO IF THERE IS SOME LANGUAGE THAT COULD BE

05:18:53   6    PUT IN, BUT I THINK THIS IS LEGALLY INCORRECT TO SAY YOU HAVE

05:18:56   7    TO DISREGARD REFERENCES IN THE PATENTS TO "ELECTRONIC DEVICE"

05:19:04   8    AND "ARTICLE OF MANUFACTURE" BECAUSE THE SUPREME COURT SAID IT

05:19:07   9    COULD -- THE PATENTED DESIGN COULD BE APPLIED TO A SMARTPHONE.

05:19:13   10   IT'S JUST THAT IT'S NOT AUTOMATICALLY APPLIED TO A SMARTPHONE.

05:19:18   11   IT HAS TO BE DECIDED BY THE JURY.

05:19:20   12            AND I THINK APPLE HAS BEEN VERY CAREFUL.  THEY'VE BEEN

05:19:22   13   SAYING "IT COULD BE," THE PATENTED DESIGN COULD BE APPLIED TO

05:19:25   14   THE DIFFERENT ARTICLES OF MANUFACTURE OR DEVICES LISTED IN THE

05:19:30   15   PATENT.

05:19:31   16            SO WHAT LANGUAGE?  IS THERE SOME LANGUAGE THAT PERHAPS

05:19:33   17   BOTH SIDES COULD AGREE TO?

05:19:35   18            I UNDERSTAND SAMSUNG'S POINT --

05:19:42   19            MS. SULLIVAN:  YOUR HONOR, I HAVE A PROPOSAL.

05:19:44   20            THE COURT:  WHAT'S THAT?

05:19:46   21            MS. SULLIVAN:  WE CAN SEE IF APPLE WERE TO AGREE TO

05:19:50   22   IT.  WHAT IF WE WERE TO LIMIT -- I'M ON PAGE 1 OF DOCKET

05:19:54   23   3770 --

05:19:54   24            THE COURT:  OKAY.

05:19:55   25            MS. SULLIVAN:  -- AT LINES 18 AND A HALF THROUGH

05:19:57  1    19 AND A HALF, THE SENTENCE BEGINNING "THIS MEANS."

05:20:02  2         AND I THINK IF WE JUST FOCUSSED ON THAT SENTENCE, "THIS

05:20:06  3    MEANS THAT THE USE OF THE WORDS 'ELECTRONIC DEVICE' AND

05:20:13  4    'ARTICLE OF MANUFACTURE' IN APPLE'S DESIGN PATENTS DOES NOT

05:20:18  5    DETERMINE THE IDENTITY OF THE ARTICLES OF MANUFACTURE" --

05:20:21  6         THE COURT:  OH, I THINK --

05:20:24  7         MS. SULLIVAN:  -- "THAT YOU ARE ASKED TO DECIDE."

05:20:27  8         THE COURT:  I THINK "DETERMINE" IS TOO STRONG BECAUSE

05:20:32  9    I THINK IT COULD BE "INFORM" AND IT SHOULD BE "CONSIDERED."

05:20:36  10   IT'S NOT DISPOSITIVE, BUT I DON'T KNOW IF WE SAID -- LET ME

05:20:39  11   HEAR FROM MR. LEE.

05:20:40  12        MR. LEE:  YOUR HONOR, WE'VE TRIED TO BE VERY CAREFUL,

05:20:42  13   AND I THINK EVERY TIME WE'VE ELICITED THE TESTIMONY, WE'VE

05:20:46  14   STARTED IT BY SAYING "YOU UNDERSTAND THE ISSUE IS FOR THE JURY,

05:20:49  15   THE JUDGE HASN'T DECIDED IT, THE PATENT OFFICE HASN'T DECIDED

05:20:52  16   IT."

05:20:52  17        THE COURT:  AND YOU HAVE DONE THAT EVERY TIME --

05:20:52  18        MR. LEE:  EVERY SINGLE TIME.

05:20:54  19        THE COURT:  -- AND I APPRECIATE IT.  I APPRECIATE

05:20:55  20   THAT.

05:20:55  21        MR. LEE:  YES.  AND ALL WE'VE DONE IS HAD OUR PEOPLE

05:20:58  22   SAY, "HERE'S THE INFORMATION.  IT'S RELEVANT TO MY

05:21:01  23   DETERMINATION WHEN I CONSIDER ALL FOUR FACTORS TOGETHER."

05:21:04  24        IT IS RELEVANT TO THEIR DETERMINATION.

05:21:07  25        WHILE THE FOUR FACTOR TEST MAY BE RELATIVELY NEW, THE WORD

1077

```
05:21:13   1    "ARTICLE OF MANUFACTURE" HAS BEEN IN THE STATUTE FOR OVER A

05:21:16   2    HUNDRED YEARS.

05:21:19   3         SO THE FACT THAT IT'S IN THE PATENT AND IT'S USED IN SOME

05:21:21   4    WAY IS EVIDENCE.  IT'S NOT DISPOSITIVE IN OUR FAVOR.

05:21:25   5         IT WOULD BE WRONG TO SAY IT IS -- THAT IT CAN'T BE

05:21:29   6    CONSIDERED IN ANY WAY.

05:21:31   7         I THINK THE WAY YOUR HONOR HAS DONE IT, WHICH IS THE

05:21:34   8    PATENT OFFICE HASN'T DECIDED THE ISSUE, THE COURT HASN'T

05:21:41   9    DECIDED THE ISSUE, THE INFORMATION IS RELEVANT.

05:21:44  10         AND, YOUR HONOR, ON FACTOR 1, WHICH WE'VE BEEN OVER MANY

05:21:48  11    TIMES, IT SAYS, INCLUDING THE WRITTEN -- INCLUDING THE

05:21:51  12    SPECIFICATION -- OR THE DRAWINGS AND THE WRITTEN DESCRIPTION.

05:21:55  13    IT'S JUST PART OF THE WRITTEN DESCRIPTION.

05:21:56  14         THE COURT:  UM-HUM.

05:21:57  15         MR. LEE:  WE'RE BACK TO TRYING TO EDIT OUT PORTIONS

05:22:01  16    THAT ONE PARTY LIKES OR NOT THE OTHER.

05:22:04  17         I THINK THE -- YOUR HONOR HAS -- EVERY TIME WE'VE GOTTEN

05:22:08  18    CLOSE, YOUR HONOR HAS GIVEN THE ADDITIONAL INSTRUCTION.  WE'VE

05:22:11  19    TRIED TO BE VERY CAREFUL.

05:22:12  20         I WILL TELL YOU THAT IN THE CLOSING WE'RE GOING TO BE VERY

05:22:15  21    CAREFUL AGAIN, AND WHEN WE GET TO FACTOR 1, WE'RE GOING TO SAY

05:22:19  22    THREE THINGS.  ONE IS THE COURT HAS CONSTRUED THE CLAIMS, HERE

05:22:24  23    IS HER CONSTRUCTION.

05:22:26  24         WE'LL SAY FIRST, THE COURT -- NEITHER THE COURT NOR THE

05:22:30  25    PATENT OFFICE HAS DECIDED THE ISSUE.  THE COURT HAS CONSTRUED
```

05:22:33    1    THE CLAIMS, HERE'S HER CLAIM CONSTRUCTION, HERE'S WHAT THE

05:22:36    2    PATENT SAYS.  THERE IS INFORMATION IN THE PATENT THAT IS

05:22:39    3    RELEVANT TO EVALUATING THE FOUR FACTORS.

05:22:43    4         I DON'T THINK ANY MORE THAN WHAT YOU HAVE NOW IS

05:22:45    5    NECESSARY.

05:22:46    6              MS. SULLIVAN:  YOUR HONOR, MAY I RESPOND?

05:22:47    7              THE COURT:  YOU KNOW WHAT WE COULD DO -- AND THIS HAS

05:22:49    8    COME UP A NUMBER OF TIMES -- IS THAT THE FOUR FACTOR TEST, IT

05:22:52    9    CAME UP THROUGH A NUMBER OF WITNESSES, ONLY WAS CREATED IN

05:22:55   10    DECEMBER OF 2017, AND IT'S ALSO COME UP A NUMBER OF TIMES THAT

05:23:02   11    THIS PATENT WAS APPLIED FOR MANY YEARS AGO WHEN THE FOUR FACTOR

05:23:07   12    TEST DIDN'T EXIST AND WAS PREPARED BY APPLE'S LAWYERS.

05:23:13   13         ALL RIGHT.  I'LL GIVE YOU ONE LAST WORD ON THIS.

05:23:17   14              MS. SULLIVAN:  THANK YOU, YOUR HONOR.

05:23:18   15         FIRST OF ALL, I THINK WHAT YOU JUST SUGGESTED WOULD BE

05:23:20   16    HELPFUL.

05:23:21   17         BUT I ALSO THINK, WITH RESPECT, YOU NEED TO ADD -- IT

05:23:25   18    WOULD BE APPROPRIATE FOR YOU TO ADD OUR SENTENCE, AND WE TOOK

05:23:28   19    THE WORD "DETERMINED" FROM YOUR OWN SENTENCE.  WE'RE JUST

05:23:32   20    TRYING TO BE MORE EXPLICIT THAT THE WORDS IN THE PATENT DO NOT

05:23:36   21    DETERMINE.

05:23:36   22         YOU'VE SAID THE PATENT AND TRADEMARK OFFICE, BUT IT MAY

05:23:39   23    NOT BE CLEAR TO A JUROR THAT THE PATENT AND TRADEMARK OFFICE IS

05:23:44   24    THE SAME PERSON WHO'S SAYING THE WORDS IN THE PATENT.  SO WE'RE

05:23:47   25    JUST TRYING TO CLARIFY YOUR HONOR'S EXISTING INSTRUCTION.

05:23:50  1          AND I WANT TO EXPRESS APPRECIATION FOR YOUR HONOR HAVING

05:23:53  2   MADE THE CAUTION SO MANY TIMES.  WE THINK IT'S BEEN VERY

05:23:57  3   HELPFUL FOR TO YOU MAKE IT.

05:23:58  4          IT JUST COMES DOWN, YOUR HONOR, FRANKLY TO THE PINK

05:24:03  5   GIRAFFE PROBLEM.  YOU SAY, "NOW, I WANT TO TELL YOU, DON'T

05:24:07  6   THINK ABOUT PINK GIRAFFES.  NOW, CALLING YOUR ATTENTION TO THE

05:24:12  7   PINK GIRAFFE ON THE SCREEN."

05:24:14  8          THE PROBLEM IS THAT IF YOU'RE TOLD THAT THE PATENT OFFICE

05:24:18  9   DIDN'T DETERMINE THE MEANING OF "ARTICLE OF MANUFACTURE" AND

05:24:20 10   THEN YOU'RE CALLED REPEATEDLY -- WE SAW MR. MUELLER ENGAGE IN

05:24:24 11   AN EXTREMELY INSISTENT VERSION OF THIS TODAY IN HIS CROSS OF

05:24:28 12   MR. LUCENTE, ASKING HIM OVER AND OVER AND OVER AGAIN TO READ

05:24:33 13   THE WORD "ELECTRONIC DEVICE" IN THE PATENT.

05:24:35 14          THAT'S MAKING THE PATENT INTO A WITNESS IN THE CASE

05:24:37 15   AGAINST US, AND YOU DON'T WANT TO HAVE THAT ON THE RECORD

05:24:40 16   BECAUSE OF 403.

05:24:41 17          I'M NOT SAYING IT'S NOT RELEVANT, AND I'M HAPPY TO

05:24:45 18   WITHDRAW THE REQUEST TO STRIKE THE TESTIMONY.

05:24:48 19          WHAT I'M ASKING FOR IS THAT ONE LITTLE SENTENCE THAT HELPS

05:24:51 20   THE JURY UNDERSTAND YOUR POINT, WHICH IS THOSE WORDS ARE NOT

05:24:55 21   TESTIMONY FOR APPLE.  THOSE WORDS FROM THE PATENT OFFICE ARE

05:24:58 22   NOT TESTIMONY FROM APPLE.

05:24:59 23          THE COURT:  WHAT ABOUT THIS:  "THIS MEANS THAT THE

05:25:02 24   USE OF THE WORDS 'ELECTRONIC DEVICE' AND 'ARTICLE OF

05:25:06 25   MANUFACTURE' IN APPLE'S DESIGN PATENTS IS NOT DISPOSITIVE, BUT

1080

05:25:11  1    MAY BE CONSIDERED IN DETERMINING THE IDENTITY OF THE ARTICLES

05:25:15  2    OF MANUFACTURE THAT YOU AND YOU ALONE ARE ASKED TO DECIDE FOR

05:25:18  3    EACH PATENT"?

05:25:20  4         WHAT 3DO YOU THINK ABOUT THAT?

05:25:21  5             MS. SULLIVAN:  NO, NOT -- I'M SORRY.  SAMSUNG WOULD

05:25:24  6    LIKE IT -- IT'S NOT DISPOSITIVE.

05:25:27  7         BUT IF YOU SAY "MAY BE CONSIDERED," I THINK THAT JUST

05:25:29  8    REINFORCES THE PROBLEM THAT WE'RE TRYING TO CURE.

05:25:32  9             THE COURT:  BUT IT IS PERMISSIBLE TO BE CONSIDERED.

05:25:35  10   THAT'S THE PROBLEM.

05:25:35  11        IF WE CAN'T THINK OF ANY LANGUAGE, I'M GOING TO LEAVE IT

05:25:38  12   AS IS.  I THINK EVERYONE HAS BEEN EXTREMELY CAREFUL THAT UNDER

05:25:41  13   FACTOR 1, IT IS SOMETHING THAT SHOULD BE CONSIDERED.

05:25:46  14        SO PERHAPS THERE'S JUST NOT GOING TO BE ANY ADDITIONAL

05:25:50  15   LANGUAGE THAT WILL WORK.

05:25:52  16            MS. SULLIVAN:  YOUR HONOR, COULD I MAKE --

05:25:53  17            MR. LEE:  I'M SORRY, GO AHEAD.

05:25:55  18            MS. SULLIVAN:  I'M SORRY.  I WAS GOING TO SUGGEST ONE

05:25:57  19   MORE TRY THAT PERHAPS WOULD BE ACCEPTABLE TO APPLE.

05:26:00  20        WHAT IF YOU SIMPLY TOOK YOUR EXISTING SENTENCE AND SAID,

05:26:03  21   "NEITHER THE COURT NOR THE UNITED STATES PATENT AND TRADEMARK

05:26:06  22   OFFICE, NOR THE PREVIOUS JURY, NOR THE WORDS IN THE PATENT HAVE

05:26:10  23   DETERMINED."

05:26:11  24            MR. LEE:  NO.

05:26:12  25        YOUR HONOR, IF WE'RE GOING TO TRY TO MODIFY YOUR HONOR'S

05:26:16  1    INSTRUCTIONS TO CABIN OR COMMENT UPON THE DIFFERENT EVIDENCE

05:26:21  2    THAT'S COME IN DURING THE COURSE OF THIS CASE, WE'LL NEVER GET

05:26:25  3    TO THE JURY TOMORROW.

05:26:26  4         I MEAN, THE PURPOSE OF THE INSTRUCTIONS IS TO GIVE THEM

05:26:28  5    GUIDANCE, NOT TO TELL THEM WHAT TO DO WITH THE DIFFERENT

05:26:32  6    EVIDENTIARY -- THE DOCUMENTS AND THE TESTIMONY THAT THEY'VE

05:26:35  7    HEARD.

05:26:36  8         I THINK IT'S SUFFICIENT NOW.

05:26:38  9         WE REPRESENTED TO YOUR HONOR AT THE PRETRIAL THAT WE WOULD

05:26:41 10    NEVER SAY IT WAS DISPOSITIVE.  I THINK WE'VE TRIED TO BE VERY

05:26:44 11    CAREFUL.

05:26:44 12         I ACTUALLY THINK, YOUR HONOR, IF YOU THINK ABOUT WHAT

05:26:47 13    YOU'VE SEEN IN THE LAST THREE DAYS, THE PARTY WHO'S CLAIMING

05:26:50 14    THAT THE COVERAGE OF THE CLAIM IS DISPOSITIVE IS NOT US.  IF

05:26:54 15    YOU -- WE'RE GOING TO BE VERY FOCUSSED ON TAKING ALL FOUR OF

05:26:59 16    THESE ELEMENTS AND DOING THEM TOGETHER.

05:27:01 17         SO IN SOME SENSE, THE WAY WE'VE DONE IT HAS NOT ONLY

05:27:06 18    CONFORMED TO WHAT YOUR HONOR TOLD US TO DO, BUT WE THINK THAT'S

05:27:09 19    THE RIGHT ANALYSIS.  YOU CONSIDER ALL THIS TOGETHER.

05:27:11 20         THE COURT:  COULD WE PLEASE GO TO THE REASONABLE

05:27:13 21    ROYALTY?  HAVE YOU MADE A DECISION?

05:27:15 22         MR. LEE:  YES.  WE'RE NOT GOING TO OFFER THE $24 PER

05:27:17 23    UNIT REASONABLE ROYALTY ALTERNATIVE, SO THERE DOES NOT NEED TO

05:27:20 24    BE A REASONABLE ROYALTY INSTRUCTION FOR THE DESIGN PATENTS.

05:27:23 25         THE COURT:  OKAY.  ALL RIGHT.

05:27:26  1          NOW, IF MR. WAGNER CHANGES HIS MIND AND DOES ASSERT ONE

05:27:29  2     TOMORROW, THEN YOU MAY?

05:27:31  3               MR. LEE:  NO, I DON'T --

05:27:32  4               THE COURT:  ALL RIGHT.  THAT'S FINE.

05:27:33  5               MR. LEE:  IF THEY TRULY ARE FIVE MINUTES FROM THE

05:27:35  6     END, YOUR HONOR, I DON'T THINK THERE'S ANYTHING THAT'S GOING TO

05:27:38  7     OCCUR THAT WOULD CHANGE THAT.

05:27:39  8               THE COURT:  OKAY.

05:27:39  9               MR. LEE:  SO I THINK WE CAN TAKE IT OUT.

05:27:41  10              THE COURT:  ALL RIGHT.  THEN I'M GOING TO ASSUME THAT

05:27:43  11    IT'S OUT AND TAKE IT OUT THROUGHOUT.

05:27:44  12              MR. LEE:  THAT'S FINE.

05:27:45  13              THE COURT:  NOW, IT'S STILL IN FOR THE UTILITY

05:27:47  14    PATENTS.

05:27:47  15              MR. LEE:  IT SHOULD BE.

05:27:48  16              THE COURT:  IT'S OUT FOR THE DESIGN PATENTS, WHICH

05:27:50  17    WOULD MAKE SOME OF THE DOUBLE RECOVERY INSTRUCTIONS A LITTLE

05:27:52  18    CLEANER.

05:27:53  19              MR. LEE:  YES.

05:27:54  20              MS. SULLIVAN:  YES, YOUR HONOR.  WE'VE SUGGESTED

05:27:55  21    EXACT LANGUAGE FOR YOU IN OUR OBJECTIONS.

05:27:57  22              THE COURT:  ALL RIGHT.  THANK YOU.

05:27:58  23         OKAY.  LET'S TALK ABOUT THIS $250 STATUTORY MINIMUM

05:28:03  24    AMOUNT.  WHAT'S APPLE'S POSITION?  WHAT'S THE HARM IN INCLUDING

05:28:06  25    THAT?

05:28:06   1        MR. LEE:  YOUR HONOR, THIS IS AN UNDISCLOSED DAMAGES

05:28:08   2   THEORY THAT'S NEVER BEEN DISCLOSED.  IT'S NOT IN THE PRETRIAL.

05:28:11   3   IT WASN'T IN THE PRETRIAL CONFERENCE.  IT HASN'T BEEN ADVANCED

05:28:15   4   BY MR. WAGNER.

05:28:17   5        THIS IS A DAMAGES THEORY THAT'S BEING ADVANCED TODAY.  HOW

05:28:23   6   CAN THAT BE FAIR?

05:28:24   7        MS. SULLIVAN:  MR. LEE, IT'S IN THE STATUTE THAT YOU

05:28:26   8   RELY ON, SECTION 289.  IT'S YOUR BURDEN.

05:28:30   9        WE SUGGEST SIMPLY THAT IF -- FOR COMPLETENESS, THE STATUTE

05:28:34  10   BE INSTRUCTED TO THE JURY.

05:28:38  11        MR. LEE:  YOUR HONOR, IT'S IN THE STATUTE, BUT IF

05:28:41  12   SAMSUNG WAS GOING TO RELY UPON IT AS AN ALTERNATIVE DAMAGE

05:28:43  13   THEORY, IT SHOULD HAVE BEEN DISCLOSED.  IT SHOULD HAVE BEEN

05:28:46  14   DISCLOSED IN INTERROGATORIES.  IT SHOULD HAVE BEEN DISCLOSED IN

05:28:49  15   MR. WAGNER'S REPORT.  IT SHOULD HAVE BEEN DISCLOSED IN THE

05:28:52  16   PRETRIAL.

05:28:53  17        IT CERTAINLY SHOULD HAVE BEEN DISCLOSED BEFORE MAY 17TH,

05:28:57  18   2018, ON THE FOURTH DAY OF TRIAL.

05:28:59  19        AND I THINK -- I DON'T THINK MS. SULLIVAN WILL DISAGREE --

05:29:02  20   THE FIRST TIME THEY HAVE ADVANCED THIS THEORY IS TODAY.

05:29:07  21        MS. SULLIVAN:  WE'LL BE HAPPY TO WITHDRAW IT IN

05:29:09  22   EXCHANGE FOR A CURATIVE INSTRUCTION ON THE PATENT.

05:29:13  23        MR. LEE:  I DON'T THINK THIS IS BARGAIN HALL.  I

05:29:15  24   THINK IT'S A TRIAL, AND WE'VE HAD FOUR DAYS OF EVIDENCE.

05:29:20  25        THE COURT:  OKAY.

05:29:21  1    MR. LEE:  YOUR HONOR, I DON'T THINK YOU CAN START

05:29:23  2  ADVANCING NEW DAMAGES THEORIES WHEN YOU'RE FIVE MINUTES FROM

05:29:26  3  THE END OF YOUR CASE.

05:29:27  4    MS. SULLIVAN:  YOUR HONOR, WE'RE HAPPY TO WITHDRAW

05:29:29  5  IT.

05:29:29  6    THE COURT:  ALL RIGHT.  THANK YOU.

05:29:31  7   LET'S MOVE ON TO ANOTHER ISSUE.

05:29:32  8    MS. SULLIVAN:  YOUR HONOR, I'M SORRY TO INTERRUPT.

05:29:34  9    THE COURT:  YES.

05:29:35  10    MS. SULLIVAN:  I WANTED TO JUST GO BACK TO ISSUE ONE

05:29:37  11  FOR A MOMENT JUST FOR THE RECORD IF I MAY?

05:29:38  12    THE COURT:  YES.

05:29:39  13    MS. SULLIVAN:  FIRST, I WANT TO SUGGEST THAT YOUR

05:29:41  14  HONOR'S IDEA FOR A POSSIBLE CURATIVE INSTRUCTION, SAYING THAT

05:29:44  15  THE FOUR FACTOR TEST ONLY CAME INTO BEING IN LATE 2017 AND,

05:29:49  16  THEREFORE, THE PATENT OFFICE DIDN'T KNOW ABOUT IT WHEN IT WROTE

05:29:52  17  ALL THOSE WORDS IN THE PATENT, THAT WOULD BE VERY -- WE THINK

05:29:55  18  IT WOULD BE VERY HELPFUL TO CURE THE PREJUDICE THAT WE'RE

05:29:57  19  CONCERNED ABOUT.

05:29:58  20   AND I JUST WANTED TO ALSO SAY THAT IF THERE IS NO

05:30:01  21  AMENDMENT TO THE CURATIVE INSTRUCTION AS IT'S BEEN GIVEN, THEN

05:30:04  22  I WOULD -- JUST FOR THE RECORD, I WANT TO RENEW OUR MOTION TO

05:30:07  23  STRIKE THE EVIDENCE THAT WE REFER TO IN HERE THAT RELIES ON THE

05:30:11  24  WORDS OF THE PATENT ABSENT A MORE ROBUST JURY INSTRUCTION.

05:30:16  25    MR. LEE:  YOUR HONOR --

05:30:16   1            THE COURT:  WHAT'S YOUR RESPONSE TO THAT?  WE'VE HAD

05:30:19   2     A NUMBER OF WITNESSES SAY, INCLUDING APPLE WITNESSES, SAY, YEP,

05:30:22   3     THIS TEST -- I THINK MR. BALL WAS THE FIRST ONE WHO SAID, YEAH,

05:30:25   4     THIS JUST CAME INTO CREATION IN DECEMBER OF 2017.

05:30:28   5            MR. LEE:  HE WAS CROSS-EXAMINED ON THAT, AND THE JURY

05:30:30   6     HAS HEARD IT.  THAT'S BASICALLY, AGAIN, HAVING YOUR HONOR

05:30:33   7     COMMENT ON A PIECE OF EVIDENCE.

05:30:34   8        ARTICLE OF MANUFACTURE WAS ENACTED BY CONGRESS A HUNDRED

05:30:39   9     YEARS AGO.

05:30:40  10        BY THE TIME THIS PATENT WAS APPLIED FOR AND IN THE

05:30:43  11     WRITTEN -- WHEN IT WAS ISSUED AND THE WRITTEN DESCRIPTION

05:30:47  12     DESCRIBED THE ARTICLE OF MANUFACTURE, IT WAS USING A TERM THAT

05:30:50  13     HAD BEEN IN THE BOOKS FOR A HUNDRED YEARS.

05:30:54  14        SO FOCUSSING ON THE FACT THAT THE TEST HAS BEEN -- THIS

05:30:58  15     TEST HAS BEEN ARTICULATED IN THE LAST YEAR OR SO, WITHOUT

05:31:01  16     SAYING THAT THIS CONCEPT HAS BEEN IN THE STATUTE FOR A HUNDRED

05:31:05  17     YEARS AND SUGGESTING SOMEHOW THAT AS A CONSEQUENCE, WHAT

05:31:10  18     HAPPENED IN 2006 OR 2007 IS IRRELEVANT, THIS IS THE PROBLEM

05:31:15  19     WITH COMMENTING UPON SPECIFIC PIECES OF EVIDENCE.

05:31:18  20        WHEN MR. BALL WAS CROSSED ON THIS, WE DIDN'T OBJECT AND

05:31:21  21     THE JURY HAS HEARD IT.  AND IF THEY WANT TO ARGUE IT, THEY CAN

05:31:25  22     ARGUE IT.

05:31:26  23            THE COURT:  ALL RIGHT.  I THINK THAT'S MORE FOR

05:31:28  24     ARGUMENT.

05:31:29  25        CAN WE GO TO THE COPYING?

05:31:30  1          MS. SULLIVAN:  YES, YOUR HONOR.

05:31:31  2          THE COURT:  SO THAT IS RELEVANT FOR THE REASONABLE

05:31:33  3   ROYALTY FOR THE UTILITY PATENT, SO I THINK -- IT SEEMS WRONG TO

05:31:37  4   SAY, WELL, IN THIS CONTEXT, YOU ONLY CONSIDER IT FOR FOUR

05:31:40  5   FACTORS, BECAUSE I THINK THAT'LL BE CONFUSING TO THE JURY.

05:31:49  6          AND I THINK IT IS RELEVANT TO THE FOUR FACTOR TEST.  I

05:31:51  7   THINK CONTEMPORANEOUS EVIDENCE ON PROMINENCE OF THE DESIGN IS

05:31:55  8   RELEVANT EVIDENCE THAT CAN BE CONSIDERED.

05:32:00  9          BUT IS THERE ANY -- WHAT'S APPLE'S POSITION -- WHAT'S

05:32:04 10   APPLE'S POSITION ON ANY PERVASIVE AND INFLAMMATORY EFFECT OF

05:32:14 11   ALL THE COPYING EVIDENCE?

05:32:15 12          MR. LEE:  YOUR HONOR, IT'S --

05:32:16 13          THE COURT:  IS THERE A LIMITING INSTRUCTION THAT YOU

05:32:18 14   WOULD AGREE TO?

05:32:19 15          MR. LEE:  NO, YOUR HONOR.  IT'S TWO THINGS.  I MEAN,

05:32:22 16   THE COPYING IS RELEVANT TO THE REASONABLE ROYALTY.

05:32:25 17          IT'S ALSO RELEVANT TO FACTOR 2.  WE ARGUED THIS BEFORE

05:32:28 18   YOUR HONOR, I THINK, SIX OR SEVEN MONTHS AGO.  WE'VE PUT IT IN

05:32:32 19   IN A MANNER THAT'S RELEVANT.

05:32:34 20          IN FACT, YOUR HONOR, THE PARTY THAT HAS ACTUALLY DEPARTED

05:32:38 21   FROM WHERE WE WERE WITH YOUR HONOR IS SAMSUNG BECAUSE THERE'S

05:32:41 22   THIS CONSTANT CROSS-EXAMINATION ABOUT APPLE'S PRODUCTS BEING

05:32:45 23   IRRELEVANT, EVEN THOUGH IN THE WAIVER BRIEFING, THE APPLE

05:32:51 24   PRODUCTS WERE CONSIDERED VERY RELEVANT AS PROVIDING EVIDENCE

05:32:54 25   THAT WOULD HAVE SUPPORTED A JURY VERDICT THAT THE ARTICLE OF

05:32:56  1    MANUFACTURE WAS SOMETHING OTHER THAN THE PHONE.  FOR HAVING

05:33:02  2    RELIED UPON IT FOR WAIVER THAT GETS US HERE TODAY, THEY'VE NOW

05:33:05  3    DONE A CROSS-EXAMINATION WHERE THEY CONSTANTLY HAVE THIS

05:33:08  4    DRUMBEAT OF NOT RELEVANT, NOT RELEVANT.

05:33:11  5          THE ANSWER IS, YOUR HONOR, THAT COPYING IS RELEVANT.  IT

05:33:14  6    GOES TO THE PROMINENCE AND CONCEPTUAL DISTINCTIVENESS.

05:33:21  7          THE FACT THAT APPLE'S PRODUCTS EMBODY THE PATENT, THE FACT

05:33:24  8    THAT THEY COPIED THOSE DESIGNS IS A DEMONSTRATION OF BOTH

05:33:28  9    FACTOR 2 AND 3.

05:33:30  10         BUT YOUR HONOR HAS RULED ON THIS FOUR OR FIVE TIMES, THAT

05:33:33  11   IT'S RELEVANT TO FACTOR 2.

05:33:34  12         THE LINE THAT YOU DREW, WHICH WE'VE TRIED TO ADHERE TO

05:33:38  13   VERY CAREFULLY, WAS YOU CAN'T GET INTO INTENT.  MS. DAVIS COULD

05:33:42  14   NOT OFFER OPINIONS AS TO WHAT PEOPLE INTENDED TO DO.

05:33:45  15             THE COURT:  WELL, HOW WOULD SHE KNOW?

05:33:47  16             MR. LEE:  THAT'S -- YOUR HONOR, THAT WAS YOUR RULING

05:33:50  17    IN 2013, WHICH IS SHE COULD MAKE A JUDGMENT AS TO WHAT THE

05:33:54  18    DOCUMENTS SHOWED ABOUT THE STATE OF THE MARKETPLACE, BUT THERE

05:33:58  19    WAS TO BE NO DISCUSSION OF INTENT.

05:34:00  20         MANY OF THESE DOCUMENTS CAME IN NOW THROUGH A DIFFERENT

05:34:03  21   SET OF WITNESSES BECAUSE WE HAVE THE ARTICLE OF MANUFACTURE.

05:34:06  22         BUT IT'S RELEVANT TO THE REASONABLE ROYALTY, IT'S RELEVANT

05:34:08  23   TO FACTOR 2, AND I THINK WE'VE ADHERED TO WHAT -- WE'VE ADHERED

05:34:16  24   TO THE GROUND RULES THAT YOUR HONOR ESTABLISHED FOR PUTTING

05:34:19  25   THIS IN.

05:34:20   1        AND I THINK, YOUR HONOR, AGAIN, IT'S -- HONESTLY, IT'S A

05:34:24   2   LITTLE HARD FOR US.  IF WE'VE SET THE GROUND RULES FOUR OR FIVE

05:34:28   3   TIMES AND THEY'VE BEEN THE SAME AND WE'VE ADHERED TO THEM,

05:34:36   4   GETTING TO THE NIGHT BEFORE CLOSING AND HAVING THE GROUND RULES

05:34:38   5   CHANGE IS NOT FAIR TO EITHER PARTY.

05:34:40   6        THE COURT:  I'M JUST ASKING QUESTIONS.

05:34:42   7        MR. LEE:  I UNDERSTAND.

05:34:43   8        THE COURT:  THIS -- THIS HEARING IS JUST ASKING

05:34:47   9   QUESTIONS.  I -- I -- JUST BECAUSE I'D LIKE TO HEAR THE

05:34:52  10   ARGUMENT ON DIFFERENT SIDES.

05:34:53  11        MS. SULLIVAN:  MAY I RESPOND, YOUR HONOR?

05:34:54  12        THE COURT:  YES, GO AHEAD, PLEASE.

05:34:55  13        MS. SULLIVAN:  I'D LIKE TO START, MOST IMPORTANTLY,

05:34:57  14   BY SAYING SOMETHING THAT I HOPE YOUR HONOR WILL AGREE WITH.  WE

05:35:00  15   DON'T WANT TO BE BACK HERE IN 2021, AND YOU'VE SEEN ENOUGH OF

05:35:04  16   THIS TRIAL.

05:35:05  17        AND I'M TRYING TO MAKE SURE THAT WE GET WHATEVER WE NEED

05:35:08  18   TO AVOID A 403 PROBLEM ON APPEAL.

05:35:11  19        AND I THINK WE'VE GOT A VERY SERIOUS PROBLEM RIGHT NOW.

05:35:15  20   WE'VE GOT A PROBLEM THAT A TRIAL THAT SHOULD HAVE JUST BEEN

05:35:18  21   ABOUT DAMAGES ON AN ARTICLE OF MANUFACTURE, OR AN ALTERNATIVE

05:35:22  22   REASONABLE ROYALTY APPROACH THAT THEY'VE NOW ABANDONED AT TRIAL

05:35:25  23   AFTER MAKING US WORK ON IT ALL THIS TIME SINCE THE ORIGINAL

05:35:28  24   REPORT, IT SHOULD HAVE JUST BEEN ABOUT THAT.

05:35:32  25        BUT THEY MADE IT INTO A REPLAY OF THE COPYING TRIAL, SO

| | |
|---|---|
| 05:35:35 | 1 |
| 05:35:38 | 2 |
| 05:35:40 | 3 |
| 05:35:44 | 4 |
| 05:35:49 | 5 |
| 05:35:52 | 6 |
| 05:35:55 | 7 |
| 05:35:58 | 8 |
| 05:36:03 | 9 |
| 05:36:03 | 10 |
| 05:36:07 | 11 |
| 05:36:07 | 12 |
| 05:36:14 | 13 |
| 05:36:16 | 14 |
| 05:36:16 | 15 |
| 05:36:18 | 16 |
| 05:36:20 | 17 |
| 05:36:21 | 18 |
| 05:36:23 | 19 |
| 05:36:29 | 20 |
| 05:36:34 | 21 |
| 05:36:35 | 22 |
| 05:36:39 | 23 |
| 05:36:42 | 24 |
| 05:36:47 | 25 |

WE'VE GOT A VERY SERIOUS 403 PROBLEM RIGHT NOW.

THE COURT:  BUT DON'T YOU THINK EVIDENCE OF ARTICLE OF MANUFACTURE, WHAT -- THE CONTEMPORANEOUS EVIDENCE OF WHEN THESE PRODUCTS WERE CREATED IS RELEVANT VERSUS WHAT EVERYONE, LAWYERS AND PAID EXPERTS, ARE SAYING EIGHT YEARS LATER?

I MEAN, I DO THINK IT'S RELEVANT.  YOU DON'T THINK ANY OF THE COPYING -- I THINK IT'S RELEVANT OF HOW PROMINENT WAS THIS DESIGN.  HOW DID SAMSUNG TREAT DESIGN WHEN IT WAS CREATING THESE PRODUCTS?

I THINK IT'S RELEVANT EVIDENCE, SO THAT'S WHY I ALLOWED IT.

BUT I WOULD BE OPEN, IF THERE'S SOME WAY TO CABIN IT OR -- THAT'S WHY I'M ASKING THE QUESTION.

MR. LEE:  YOUR HONOR --

THE COURT:  I THINK IT'S HIGHLY RELEVANT.

MR. LEE:  CAN I OFFER ONE ADDITIONAL THOUGHT?

THE COURT:  WHAT'S THAT?

MR. LEE:  THE COPYING EVIDENCE THAT HAS COME IN, EXCEPT FOR THE EXPLANATION WE HAD FROM MR. KIM TODAY, IS LARGELY THE SAME AS WHAT CAME IN IN THE 2013 TRIAL, AND THAT WAS JUST DAMAGES.

AND IT'S BASICALLY IDENTICAL.

THAT WENT UP ON APPEAL.  THERE WAS NO ERROR CLAIMED IN THE ADMISSION OF THAT EVIDENCE.  IT WAS AFFIRMED ON THAT EVIDENCE.

AND, IN FACT, THE COPYING EVIDENCE WAS CONSIDERED BOTH BY

05:36:50  1   THE FEDERAL CIRCUIT ON THE LIABILITY APPEAL, BUT ALSO ON THE

05:36:54  2   INJUNCTIONS.

05:36:55  3        SO THE -- THIS IS -- IF THE GROUNDHOG DAY RULES ARE

05:37:00  4   APPLYING, WE ACTUALLY PUT IN THE SAME DOCUMENTS, MADE THE SAME

05:37:05  5   ARGUMENT, ELICITED VIRTUALLY THE SAME TESTIMONY AS THE 2013

05:37:09  6   DAMAGES TRIAL, WHICH ACTUALLY DIDN'T HAVE THE ARTICLE OF

05:37:13  7   MANUFACTURE ISSUE IN TO MAKE THESE EVEN MORE RELEVANT, AND IT

05:37:19  8   WENT UP ON APPEAL AND IT'S COME BACK DOWN.

05:37:22  9        AND WE'RE -- THE ARGUMENT NOW BEING MADE, OR THE

05:37:25 10   SUGGESTION NOW BEING MADE TO YOU IS EVIDENCE THAT WENT IN THAT

05:37:32 11   WENT UP ON APPEAL, WAS NOT APPEALED, VERDICT'S AFFIRMED, COMES

05:37:37 12   BACK DOWN, HAS SOMEHOW BECOME 403 PREJUDICIAL.

05:37:44 13        THE COURT:  WELL, I THINK IT'S RELEVANT TO FACTOR 2

05:37:46 14   AND 3 OF THE ARTICLE OF MANUFACTURE TEST.

05:37:48 15        MS. SULLIVAN:  YOUR HONOR --

05:37:49 16        THE COURT:  BUT IF THERE'S A WAY -- CAN YOU GIVE ME A

05:37:52 17   PROPOSAL?

05:37:52 18        MS. SULLIVAN:  YES.

05:37:53 19        THE COURT:  I HAVE A PROBLEM WITH WHAT YOU HAVE

05:37:54 20   PROPOSED.  IS THERE ANYTHING ELSE YOU'D LIKE TO --

05:37:57 21        MS. SULLIVAN:  SURE.

05:37:58 22        THE COURT:  -- BECAUSE I DO THINK IT'S RELEVANT TO

05:38:00 23   THE INQUIRY, SO I'M NOT GOING TO GIVE AN INSTRUCTION THAT IT'S

05:38:03 24   IRRELEVANT TO THEIR INQUIRY.

05:38:04 25        MS. SULLIVAN:  OKAY.  SO WE'LL FORGET ABOUT THE

05:38:06  1       INSTRUCTION WE PROPOSED ON PAGE 10 OF DOCKET 3770.

05:38:11  2                 THE COURT:  OKAY.

05:38:12  3                 MS. SULLIVAN:  AT PAGE -- WE'LL FORGET ABOUT THE ONE

05:38:14  4       AT 8 TO 10.

05:38:15  5                 THE COURT:  OKAY.

05:38:16  6                 MS. SULLIVAN:  AND I PROPOSE MODIFYING THE ONE

05:38:18  7       PROPOSED AT LINES 17 THROUGH 20 SO THAT YOU SAY THAT IT IS

05:38:21  8       RELEVANT ONLY TO FACTORS 2 AND 3 OF THE FOUR FACTOR TEST.

05:38:26  9           IN OTHER WORDS, IF YOU TAKE EXACTLY WHAT WE HAVE HERE, "IN

05:38:28  10      DETERMINING THE ARTICLES OF MANUFACTURE TO WHICH SAMSUNG

05:38:32  11      APPLIED APPLE'S PATENTED DESIGNS, YOU MUST APPLY THE FOUR

05:38:36  12      FACTOR TEST ABOUT WHICH I HAVE INSTRUCTED YOU.

05:38:38  13          "ANY EVIDENCE OR ARGUMENT THAT SAMSUNG COPIED THE IPHONE

05:38:41  14      MAY BE CONSIDERED ONLY TO THE EXTENT THAT IT IS RELEVANT TO

05:38:44  15      FACTORS 2 AND 3."

05:38:46  16                THE COURT:  WHY ISN'T IT RELEVANT TO 4 AS WELL?  THE

05:38:53  17      ONLY ONE THAT IT MAY NOT BE RELEVANT TO IS 1.  I THINK 2, 3,

05:38:59  18      AND 4 COULD BE INFORMED.

05:39:01  19                MS. SULLIVAN:  YOUR HONOR, YOUR PREVIOUS RULING ON

05:39:03  20      THIS WAS 2 AND 3.  WE RESERVE OUR OBJECTIONS TO THAT BECAUSE WE

05:39:06  21      DON'T THINK 2 AND 3 ARE PROPER.

05:39:09  22          BUT FOR PURPOSES OF YOUR TEST, YOUR HONOR, WE DON'T THINK

05:39:10  23      IT IS RELEVANT TO PHYSICAL SEPARABILITY, WHICH WAS JUST

05:39:10  24      APPOINTED OUT BY WHETHER YOU CAN DISASSEMBLE THE PHONE.

05:39:13  25                RESPECTFULLY, WE REALLY DON'T --

1092

05:39:15  1          THE COURT:  I DO THINK IT'S RELEVANT TO 4 AS WELL.

05:39:19  2          MS. SULLIVAN:  TO THE ABILITY TO SEPARATE THE PIECES

05:39:21  3    OF THE PHONE?

05:39:22  4          THE COURT:  THE RELATIONSHIP BETWEEN THE DESIGN AND

05:39:23  5    THE PRODUCT.

05:39:29  6          MS. SULLIVAN:  WELL, THIS IS WHAT WE PROPOSED, YOUR

05:39:32  7    HONOR.  WE SAID -- THINKING THAT YOU MIGHT TAKE THAT VIEW, WHAT

05:39:34  8    WE'VE PROPOSED IS, "ANY EVIDENCE OR ARGUMENT THAT SAMSUNG

05:39:38  9    COPIED THE IPHONE MAY BE CONSIDERED ONLY IF AND TO THE EXTENT

05:39:41  10   THAT IT IS RELEVANT TO THE FOUR FACTOR TEST ON WHICH I HAVE

05:39:46  11   INSTRUCTED YOU."

05:39:47  12         WHAT WE'RE TRYING TO DO HERE, YOUR HONOR, IS WE'RE TRYING

05:39:49  13   TO REINFORCE THE REALLY IMPORTANT 403 POINT, WHICH IS THE

05:39:53  14   COPYING EVIDENCE SHOULD NOT BE USED TO PUNISH SAMSUNG.

05:39:57  15         AND THERE WAS NO FOUNDATION LAID EVERY TIME THE EXTENSIVE

05:40:00  16   COPYING EVIDENCE CAME IN SAYING IN ORDER TO DECIDE WHETHER THIS

05:40:03  17   WAS PROMINENT, LET'S GO BACK TO WHETHER IT WAS COPIED.

05:40:06  18         THERE WAS ABSOLUTELY NO FOUNDATION RELATED TO THE FACTORS.

05:40:09  19   SO RIGHT NOW THE COPYING EVIDENCE CAME IN AS SAMSUNG COPIED AND

05:40:12  20   THAT IMPRESSION TO THE JURY, IF YOU DON'T RESTRAIN IT THROUGH

05:40:16  21   SOME KIND OF LIMITING INSTRUCTION SO THAT YOU *COME BACK TO THE

05:40:19  22   FOUR FACTOR TEST IS HIGHLY PREJUDICIAL, AS YOU HAVE SEEN.

05:40:22  23         MR. LEE:  YOUR HONOR, TWO POINTS AS WE DISCUSS THIS.

05:40:25  24   THE FIRST THING IS THE COPYING EVIDENCE IS RELEVANT TO A

05:40:29  25   REASONABLE ROYALTY.

05:40:30  1          THERE ARE TWO UTILITY PATENTS.  THERE'S REASONABLE ROYALTY

05:40:34  2     OPINIONS FOR BOTH.

05:40:37  3          THERE IS COPYING EVIDENCE FOR BOTH OF THE SPECIFIC

05:40:40  4     FEATURES THAT ARE DESCRIBED IN THE UTILITY PATENTS.

05:40:42  5          YOUR HONOR HAS GIVEN -- ALLOWED THIS EVIDENCE AND GIVEN

05:40:46  6     THE INSTRUCTIONS YOU'VE GIVEN NOW TWICE BEFORE.  THERE WAS NO

05:40:50  7     CHALLENGE TO THAT ON APPEAL.

05:40:53  8          THAT'S NUMBER ONE.

05:40:54  9          THE SECOND IS THAT THIS SUGGESTION THAT THE COPYING IS

05:41:00  10    SOMEHOW A REASON TO PUNISH SAMSUNG, YOUR HONOR HAS GIVEN THE

05:41:06  11    INSTRUCTION THAT DAMAGES ARE NOT USED TO PUNISH.  THEY'RE TO

05:41:10  12    COMPENSATE.

05:41:11  13         TYING THAT TO A SPECIFIC SET OF FACTS IS FOR ARGUMENT, NOT

05:41:16  14    FOR AN INSTRUCTION, AND THE COPYING EVIDENCE IS RELEVANT FOR

05:41:21  15    BOTH DAMAGES REMEDIES THAT ARE STILL IN THE CASE.

05:41:25  16         THEY CAN BE CONSIDERED FOR BOTH.

05:41:28  17         AND THE SECOND POINT IS THIS:  I DON'T THINK THAT DURING

05:41:31  18    THE COURSE OF A TRIAL THAT YOU HAVE TO LAY A FOUNDATION FOR

05:41:36  19    EACH AREA THAT YOU EXPLORE BY SAYING, OKAY, NOW I'M ADDRESSING

05:41:40  20    THIS LEGAL ISSUE.

05:41:41  21         THE EVIDENCE COMES IN AS FACTS AND DOCUMENTS.

05:41:46  22         THE REASON WE ASKED THE QUESTIONS ON THE CLAIM

05:41:48  23    INTERPRETATION AND THE QUESTION OF THE COURT OR THE PATENT

05:41:53  24    OFFICE DECIDING THE ISSUE IS TO INFORM THE JURY, BUT ALSO THE

05:41:55  25    COURT, THAT WE WERE DOING OUR VERY BEST TO TREAD THE LINE ON

05:41:59   1     FACTOR 1 THAT YOUR HONOR HAD DEFINED.

05:42:01   2             THE COURT:  WHAT ABOUT JURY INSTRUCTION NUMBER 27,

05:42:04   3     WHICH DOES SAY THAT YOU ARE NOT TO PUNISH SAMSUNG, AND THAT'S

05:42:09   4     IN THE DESIGN PATENT DAMAGES BURDEN OF PROOF INSTRUCTION.

05:42:12   5             MS. SULLIVAN:  WE LIKE THAT A LOT, YOUR HONOR.  THANK

05:42:14   6     YOU.  WE CAN DELETE IT FROM THIS ONE, AND I HAVE A PROPOSAL

05:42:17   7     THAT MIGHT RESOLVE IT.

05:42:18   8             THE COURT:  OKAY.  WHAT'S THAT?

05:42:20   9             MS. SULLIVAN:  KEEP EVERYTHING AT LINES 17 THROUGH

05:42:24   10    19, ENDING IN "INSTRUCTED YOU," AND INSERT THE FOLLOWING

05:42:28   11    LANGUAGE:  "OR TO THE CALCULATION OF REASONABLE ROYALTIES FOR

05:42:33   12    THE UTILITY PATENTS."

05:42:35   13        THAT WOULD COVER MR. LEE'S POINT.  YOU CAN STRIKE THE REST

05:42:39   14    OF IT AND -- BECAUSE YOU'VE ALREADY MADE THE PUNISHMENT, THE DO

05:42:44   15    NOT PUNISH INSTRUCTION, AND THAT WOULD COVER MR. LEE'S POINT.

05:42:47   16        IT WOULD GREATLY GET THE JURY BACK TO WHAT THE CASE SHOULD

05:42:50   17    BE ABOUT, WHICH IS YOUR FOUR FACTOR TEST.

05:42:52   18             MR. LEE:  YOUR HONOR --

05:42:53   19             MS. SULLIVAN:  AND I CAN'T SEE WHY APPLE WOULD

05:42:55   20    DISAGREE WITH IT.  MR. LEE, I THINK, AGREES THAT IT'S RELEVANT

05:42:58   21    IN THIS CASE, IF AT ALL, ONLY BECAUSE OF RELEVANCE TO THE FOUR

05:43:02   22    FACTOR TEST.  SO WHY WOULD APPLE OPPOSE THIS INSTRUCTION?

05:43:04   23             MR. LEE:  BECAUSE, YOUR HONOR, I DON'T BELIEVE THAT

05:43:06   24    THE COURT'S INSTRUCTION SHOULD BE USED TO COMMENT ON SPECIFIC

05:43:10   25    PORTIONS OF EVIDENCE THAT HAVE COME IN OVER A MULTI DAY PERIOD.

05:43:14  1          AND YOUR HONOR'S INSTRUCTIONS HAVE BEEN CAREFULLY CRAFTED

05:43:17  2     TO BASICALLY NOT HAVE YOUR HONOR COMMENTING ON ANY SPECIFIC

05:43:22  3     PIECE OF EVIDENCE, UNLESS, UNLESS THERE IS A REASON TO DO SO.

05:43:27  4          SO YOUR HONOR HAS, ON A NUMBER OF OCCASIONS, COMMENTED ON

05:43:32  5     THE FACT THAT NEITHER YOU NOR THE PATENT OFFICE HAS DECIDED THE

05:43:35  6     ISSUE.

05:43:36  7          YOUR HONOR ALSO YESTERDAY, AFTER CROSS-EXAMINATION,

05:43:38  8     COMMENTED THAT NOTHING THAT OCCURS IN THIS TRIAL SHOULD BE USED

05:43:43  9     TO UNDERMINE THE VERDICT OF THE FIRST JURY.

05:43:46 10          THOSE ARE A GOOD AND APPROPRIATE USE OF THE INSTRUCTIONS.

05:43:51 11          I THINK WHEN FOLKS START ASKING THE COURT TO START

05:43:55 12     COMMENTING UPON SPECIFIC PIECES OF EVIDENCE AND SOMEHOW

05:44:00 13     CHARACTERIZING THE MANNER IN WHICH THEY CAN BE USED, IT'S BOTH

05:44:04 14     DANGEROUS AND THEN THERE IS A WHOLE SERIES OF DIFFERENT

05:44:08 15     INSTRUCTIONS WE COULD ASK ABOUT.

05:44:10 16          YOU KNOW, FOR INSTANCE, YOUR HONOR, REMEMBER WHEN THEY HAD

05:44:13 17     THE ACE AND THE GALAXY SIDE BY SIDE AND THEY DID THE

05:44:16 18     INFRINGEMENT COMPARISON?

05:44:18 19          THEY CLAIMED THAT THAT'S RELEVANT TO THE PROMINENCE OF THE

05:44:21 20     DESIGN.  THIS IS THE ARGUMENT WE STARTED TO HAVE YESTERDAY, AND

05:44:25 21     THEN WE WENT BACK AND LOOKED -- I HAD SAID WE'D GO BACK AND

05:44:29 22     LOOK AT YOUR HONOR'S INSTRUCTIONS, I THINK THEY DEAL WITH THE

05:44:32 23     ISSUE.

05:44:33 24          YOUR HONOR, THERE'S NO REASON THAT BOTH OF THOSE PHONES

05:44:35 25     COULDN'T HAVE THE BLACK FRONT FACE BEING PROMINENT DESIGNS.

05:44:39    1          MS. SULLIVAN:  YOUR HONOR, I WOULD --

05:44:41    2          MR. LEE:  YOU COULD HAVE --

05:44:43    3          MS. SULLIVAN:  I'M SORRY.

05:44:44    4          MR. LEE:  THE MERE FACT THAT ONE PHONE INFRINGED AND

05:44:47    5    ONE PHONE DOESN'T MEAN --

05:44:49    6          (DRILLING NOISE.)

05:44:49    7          THE COURT:  THIS NOISE IS WHAT WE LISTEN TO ALL

05:44:51    8    NIGHT.

05:44:52    9          MS. SULLIVAN:  THAT'S VERY DIFFICULT.

05:44:53   10          THE COURT:  WHEN WE'RE WORKING ON YOUR CASE, THIS IS

05:44:55   11    WHAT WE HEAR.

05:44:56   12          MS. SULLIVAN:  MAYBE WE SHOULD TRY TO MOVE IT ALONG

05:44:59   13    SO WE CAN GET YOU OUT OF HERE FASTER.

05:45:01   14          MR. LEE:  IN ANY EVENT, I JUST DON'T THINK THAT

05:45:04   15    COMMENTING UPON -- WE REALLY WOULD URGE THE COURT NOT TO BEGIN

05:45:07   16    COMMENTING ON SPECIFIC PIECES OF EVIDENCE.

05:45:09   17          I WOULD LOVE TO ASK FOR AN INSTRUCTION THAT SAYS, YOU

05:45:13   18    KNOW, WHEN THEY'VE COMPARED INFRINGING TO NON-INFRINGING

05:45:16   19    PRODUCTS, IT'S ONLY FOR THE PURPOSE OF THE FOUR FACTOR TEST,

05:45:18   20    IT'S NOT FOR ANY OTHER PURPOSE.

05:45:20   21          I THINK WE'D BE ENTITLED TO THAT, GIVEN -- RIGHT?  BUT I

05:45:25   22    DON'T THINK WE SHOULD DO THAT BECAUSE WE'D BE HERE FOREVER

05:45:27   23    TRYING TO IDENTIFY THE AREAS WE'D LIKE TO COMMENT UPON.

05:45:30   24          THE COURT:  CAN I ASK YOU, THERE'S ONE LIMITING

05:45:32   25    INSTRUCTION THAT APPLE REQUESTED, AND THAT WAS JUST THAT

05:45:35    1        NOTHING IN THE TRIAL IS TO UNDERMINE THE VERDICT OF THE

05:45:39    2    PREVIOUS JURY.

05:45:40    3            WHAT'S SAMSUNG'S POSITION ON THAT?

05:45:42    4            MS. SULLIVAN:  SAMSUNG HAS NO PROBLEM WITH THAT, YOUR

05:45:44    5    HONOR.

05:45:45    6        BUT WE WOULD HAVE A PROBLEM IF YOU GAVE THAT AND DIDN'T

05:45:47    7    GIVE SOME OF OURS BECAUSE WE THINK THAT -- YOU KNOW, WE'RE BOTH

05:45:50    8    TRYING TO MAKE SURE THAT THE JURY CONSIDERS THE CASE FAIRLY.

05:45:53    9            THE COURT:  ALL RIGHT.  WHY CAN'T YOU JUST ARGUE THAT

05:46:00   10    POINT?

05:46:01   11            MR. LEE:  THAT'S FINE.

05:46:02   12            THE COURT:  OKAY.

05:46:06   13        OKAY.  THANK YOU.  I REALLY APPRECIATE IT.

05:46:06   14        (JACKHAMMERING NOISE.)

05:46:10   15            THE COURT:  SORRY FOR THE JACKHAMMERING.

05:46:12   16        BUT WHAT I'D LIKE TO DO IS TO ISSUE A SECOND AMENDED SET

05:46:22   17    OF FINAL JURY INSTRUCTIONS.

05:46:25   18        WHEN CAN YOU RESPOND TO THAT?  I'D LIKE TO TRY TO FINALIZE

05:46:29   19    THEM LATE MORNING, IF THAT'S POSSIBLE, OR POTENTIALLY OVER THE

05:46:36   20    LUNCH HOUR IF YOU NEEDED MORE TIME.

05:46:38   21        I'M JUST GOING TO TELL YOU THAT AT THIS POINT, THE ONLY

05:46:44   22    CHANGE I'M INCLINED TO MAKE BASED ON BOTH SIDES' OBJECTIONS IS

05:46:49   23    TO GO BACK TO THE ORIGINAL NUMBER 30.

05:46:52   24            MS. SULLIVAN:  WELL, NO, YOUR HONOR, THAT WOULD TRULY

05:46:54   25    BE REVERSIBLE ERROR, SO CAN WE ADDRESS THAT, PLEASE?

05:46:57  1          THE COURT:  SURE.  PLEASE, GO AHEAD.

05:46:59  2          MS. SULLIVAN:  YES.  SO, YOUR HONOR, THIS IS -- THIS

05:47:01  3     IS THE MOST IMPORTANT ISSUE OF THE DAY, SO I'M SORRY IT'S

05:47:04  4     COMING LAST.

05:47:05  5          THE COURT:  OKAY.

05:47:06  6          MS. SULLIVAN:  YOUR NEW INSTRUCTION 30 IS CORRECT.

05:47:09  7     IT CORRECTLY EMBODIES THE RESULT OF THE SUPREME COURT'S

05:47:14  8     DECISION.

05:47:16  9          AND APPLE, APPLE'S REQUEST IGNORES THE SUPREME COURT

05:47:21  10    DECISION, WHICH IS THE REASON WE ARE HERE.

05:47:25  11         AND I STRENUOUSLY DISAGREE WITH EVERYTHING IN APPLE'S

05:47:29  12    BRIEF.  IT COMPLETELY MISAPPREHENDS THE SUPREME COURT'S

05:47:33  13    DECISION.

05:47:34  14         SO TO BE CLEAR, IT'S NOT THAT "APPORTIONMENT" IS A DIRTY

05:47:40  15    WORD.  THE QUESTION IS -- WHAT WAS DECIDED BY THE SUPREME COURT

05:47:48  16    IS WHETHER AN ARTICLE OF MANUFACTURE CAN BE A COMPONENT, AND IF

05:47:51  17    THE ARTICLE OF MANUFACTURE IS A COMPONENT, THEN THE TOTAL

05:47:53  18    PROFIT THAT 289 ENTITLES APPLE TO IS THE TOTAL PROFIT

05:47:59  19    ATTRIBUTABLE TO THE COMPONENT, TO THE ARTICLE OF MANUFACTURE.

05:48:05  20         WHAT DOBSON WAS -- DOBSON SAID YOU CAN'T APPORTION FROM

05:48:13  21    THE DESIGN TO THE VALUE.  YOU CAN'T APPORTION TO THE DESIGN,.

05:48:16  22         BUT WE'RE NOT APPORTIONING TO THE DESIGN HERE.  YOU'RE

05:48:20  23    APPORTIONING TO THE ARTICLE, AND THAT'S WHAT THE SUPREME COURT

05:48:23  24    HELD.

05:48:25  25         AND DON'T TAKE IT FROM ME.  LET'S TAKE IT FROM THE

05:48:28   1    JUSTICES OF THE SUPREME COURT, AND LET ME READ TO YOU WHAT THEY

05:48:31   2    SAID AND WHAT MR. WAXMAN SAID IN RESPONSE.

05:48:33   3              THE COURT:  I HAVE READ THAT TRANSCRIPT MANY TIMES.

05:48:33   4              MS. SULLIVAN:  JUST ONE WORD, "ATTRIBUTABLE."

05:48:35   5              THE COURT:  THIS IS WHAT NUMBER 30 SAYS:  "ONCE YOU

05:48:38   6    DETERMINE THE ARTICLES OF MANUFACTURE TO WHICH SAMSUNG APPLIED

05:48:41   7    APPLE'S PATENTED DESIGN, YOU MUST THEN CALCULATE SAMSUNG'S

05:48:45   8    TOTAL PROFIT FROM SALES OF THOSE ARTICLES OF MANUFACTURE."

05:48:50   9         I THINK THAT'S A LEGALLY CORRECT STATEMENT.

05:48:52   10             MR. LEE:  IT IS.

05:48:53   11             THE COURT:  OKAY.  SO THAT'S THE FIRST SENTENCE.

05:48:55   12        NEXT SENTENCE:  "SAMSUNG'S TOTAL PROFIT MEANS THE ENTIRE

05:49:00   13   PROFIT ON THE SALE OF AN ARTICLE OF MANUFACTURE TO WHICH THE

05:49:03   14   PATENTED DESIGN IS APPLIED AND NOT JUST THE PORTION OF PROFIT

05:49:09   15   ATTRIBUTABLE TO THE DESIGN OR ORNAMENTAL ASPECTS COVERED BY THE

05:49:13   16   PATENT."

05:49:14   17        I THINK THAT IS ALSO A CORRECT STATEMENT OF LAW.

05:49:16   18             MR. LEE:  THAT'S CORRECT.

05:49:17   19             THE COURT:  SO LET'S GO TO THE NEXT SENTENCE:  "TOTAL

05:49:20   20   PROFIT DOES NOT INCLUDE PROFIT ATTRIBUTABLE TO OTHER PRODUCTS

05:49:23   21   OR OTHER ARTICLES OF MANUFACTURE THAT MAY BE SOLD IN

05:49:27   22   ASSOCIATION WITH AN ARTICLE EMBODYING BODYING THE PATENTED

05:49:31   23   DESIGN."

05:49:32   24        I THINK THAT IS A CORRECT STATEMENT OF LAW.

05:49:36   25        "PROFIT IS DETERMINED BY DEDUCTING --" AND THEN THE REST

1100

05:49:40  1    OF THIS IS JUST WHAT WE'VE USED IN THE PREVIOUS TRIALS AND --

05:49:44  2              MS. SULLIVAN:  SO, YOUR HONOR, THE ERROR IS IN LINES

05:49:46  3    13 TO 14.  THAT IS ERRONEOUS UNDER THE SUPREME COURT'S

05:49:50  4    DECISION.

05:49:50  5              THE COURT:  "GROSS REVENUE IS ALL OF THE INFRINGER'S

05:49:53  6    RECEIPTS FROM THE SALE OF THE ARTICLES OF MANUFACTURE TO WHICH

05:49:57  7    THE PATENTED DESIGNS WERE APPLIED"?  IS THAT --

05:49:59  8              MS. SULLIVAN:  THAT'S RIGHT, YOUR HONOR, BECAUSE

05:50:01  9    REMEMBER WHAT HAPPENED IN THE FEDERAL CIRCUIT IS THE FEDERAL

05:50:03  10   CIRCUIT SAID YOU CAN'T GET PROFITS ON THE, ON THE --

05:50:09  11   DISTINGUISHING THE CASE FROM THE INNARDS BECAUSE THE INNARDS

05:50:14  12   ARE NOT SEPARATELY SOLD, AND THE SUPREME COURT REVERSES THAT,

05:50:17  13   AND THE EXACT HOLDING OF THE SUPREME COURT IS THAT THE FEDERAL

05:50:20  14   CIRCUIT FOUND THAT COMPONENTS OF THE INFRINGING SMARTPHONES

05:50:23  15   COULD NOT BE THE RELEVANT ARTICLES OF MANUFACTURE BECAUSE

05:50:26  16   CONSUMERS COULD NOT PURCHASE THOSE COMPONENTS SEPARATELY FROM

05:50:31  17   THE SMARTPHONES, CITING TO 786 F.3D AT 1002, WHICH WAS THE

05:50:38  18   FEDERAL CIRCUIT REFUSING TO LIMIT A 289 AWARD TO A COMPONENT

05:50:42  19   BECAUSE THE INNARDS OF SAMSUNG'S SMARTPHONES WERE NOT SOLD

05:50:47  20   SEPARATELY FROM THEIR SHELLS AS DISTINCT ARTICLES OF

05:50:49  21   MANUFACTURE TO ORDINARY PURCHASERS.

05:50:53  22        IF YOU'RE STATING THE HOLDING OF THIS CASE, THE HOLDING IS

05:50:56  23   THAT 289 ARTICLES OF MANUFACTURE ARE NOT LIMITED TO ARTICLES OF

05:51:02  24   MANUFACTURE THAT ARE SOLD SEPARATELY.

05:51:06  25        THIS INSTRUCTION ERRS UNDER THAT RULING BECAUSE IT IMPLIES

05:51:10  1    THAT THE SALE HAS TO BE OF THE ARTICLES OF MANUFACTURE.

05:51:13  2        THAT WOULD OBVIOUSLY PREJUDICE US BECAUSE WE DON'T SELL

05:51:16  3    THE COMPONENTS SEPARATELY.

05:51:19  4        SO IT WOULD BIAS THE CASE --

05:51:20  5        THE COURT:  THAT'S NOT THE TESTIMONY.  YOU JUST HAD

05:51:22  6    MR. SHEPPARD SAY MULTIPLE TIMES "I SELL THAT GLASS SCREEN FOR

05:51:27  7    $4 TO $5," OR $3 TO $5 AND, "I SELL 4 TO 5 MILLION OF THEM A

05:51:31  8    YEAR."

05:51:32  9        MS. SULLIVAN:  YOUR HONOR, THE POINT IS YOUR NEW

05:51:34  10   INSTRUCTION GETS IT EXACTLY RIGHT AND YOU SHOULD NOT CHANGE IT.

05:51:37  11       YOUR NEW INSTRUCTION CORRECTLY ALLOWS US TO PROVE PROFIT

05:51:41  12   FROM THE ARTICLE OF MANUFACTURE.  AND THE -- WHAT YOUR NEW --

05:51:47  13   WHAT YOUR NEW INSTRUCTION SAYS -- AND THIS IS DOCKET 3764 AT

05:51:51  14   47 -- YOU SAY, IN THE CORRECT NEW INSTRUCTION YOU DRAFTED,

05:52:00  15   WHICH SHOULD REMAIN, YOU SAY THAT "IF YOU FIND THAT THE ARTICLE

05:52:05  16   OF MANUFACTURE IS SOMETHING LESS THAN THE ENTIRE PHONE," ON

05:52:08  17   THAT PAGE 47, LINES 1 THROUGH 3, "THEN YOU MUST DETERMINE HOW

05:52:13  18   MUCH OF SAMSUNG'S TOTAL PROFIT FROM THE PHONE IS ATTRIBUTABLE

05:52:15  19   TO WHATEVER ARTICLE OF MANUFACTURE YOU HAVE IDENTIFIED."

05:52:19  20       THAT LANGUAGE COMES OUT OF THE COLLOQUY IN THE SUPREME

05:52:22  21   COURT.  JUSTICE SOTOMAYOR TALKED ABOUT WHETHER THE PROFIT

05:52:26  22   CAME -- EXPERTS WOULD COME IN -- SHE SAID IT'S ASSUMED TO ME,

05:52:30  23   BECAUSE IT MAKES LOGICAL SENSE -- IT MAY NOT TO ANYBODY ELSE --

05:52:36  24   THAT THE VOLKSWAGEN BODY, NOT THE INNARDS, ARE THE ARTICLE OF

05:52:36  25   MANUFACTURE.

05:52:39  1        I'M SORRY.

05:52:40  2            THE COURT:  WHAT ABOUT MR. SHEPPARD'S TESTIMONY THAT

05:52:43  3    SAMSUNG HAS A ROBUST REPAIR PROGRAM WHERE YOU REPLACE ONE

05:52:48  4    MILLION BROKEN GLASSES A YEAR WHICH ARE PURCHASED FOR $3 TO $5?

05:52:56  5        I MEAN, THERE WAS A LOT OF TESTIMONY FROM BOTH

05:52:59  6    MR. BLACKARD AND MR. SHEPPARD AND THE TWO, AT LEAST

05:53:05  7    MR. DONGWOOK KIM, THAT THERE'S THIS ROBUST REPAIR WHERE SAMSUNG

05:53:09  8    BUYS AND SELLS TO ITS CARRIERS ALL THESE COMPONENTS FOR REPAIR.

05:53:15  9            MS. SULLIVAN:  AND, YOUR HONOR, THAT'S --

05:53:16  10           THE COURT:  I GUESS THAT WAS FAIRLY EXTENSIVE

05:53:21  11   TESTIMONY TODAY.

05:53:22  12           MS. SULLIVAN:  HIGHLY RELEVANT TO FACTOR 4, YOUR

05:53:25  13   HONOR.

05:53:25  14       BUT YOU'RE NOT INSTRUCTING ON FACTOR 4.  YOU'RE STATING

05:53:29  15   THE PROFITS TEST, AND THE PROFITS TEST IS FROM THE ARTICLE.

05:53:32  16       IT'S NOT PROFITS FROM THE SALE OF THE ARTICLE BECAUSE THE

05:53:36  17   ARTICLE NEED NOT BE SOLD SEPARATELY.

05:53:39  18       THE WHOLE REASON WE ARE HERE --

05:53:40  19           THE COURT:  RIGHT.  BUT YOU'RE -- YOUR CLIENT

05:53:43  20   INTRODUCED EXTENSIVE EVIDENCE TODAY THAT YOU DO SELL THE

05:53:47  21   COMPONENTS SEPARATELY.

05:53:48  22           MS. SULLIVAN:  BUT, YOUR HONOR, I'M FOCUSSING ON THE

05:53:50  23   RULE OF LAW HERE, AND I WANT TO MAKE SURE THAT WE DON'T HAVE TO

05:53:53  24   BE BACK HERE IN 2021, BECAUSE IF THIS INSTRUCTION GOES IN, WE

05:53:57  25   WILL HAVE A VERY GOOD CHANCE OF HAVING IT BE REVERSED.

05:54:00  1          THE COURT:  I'M GOING TO BUY STOCK IN BOTH COMPANIES

05:54:02  2     AND RECUSE MYSELF BEFORE THE NEXT TRIAL.

05:54:05  3          (LAUGHTER.)

05:54:05  4          MR. LEE:  IF WE'RE BACK IN 2021, IT'S NOT GOING TO

05:54:08  5     INCLUDE ME.

05:54:08  6          THE COURT:  WELL, IT WON'T INCLUDE ME, EITHER,

05:54:10  7     BECAUSE I'M GOING TO RECUSE.  I'M GOING TO BUY STOCK IN BOTH OF

05:54:13  8     YOUR COMPANIES.

05:54:13  9          MR. LEE:  YOUR HONOR --

05:54:14  10         MS. SULLIVAN:  YOUR HONOR, I DON'T WANT TO BORE YOU

05:54:16  11    WITH THE TRANSCRIPT, BUT I DO WANT TO SAY --

05:54:19  12         THE COURT:  LET ME ASK YOU, WHAT -- I MEAN, I DON'T

05:54:22  13    THINK THAT I SHOULD CHANGE AN INSTRUCTION JUST BECAUSE IT

05:54:25  14    DOESN'T NECESSARILY FIT EXACTLY WITH ONE SIDE'S EVIDENCE.

05:54:36  15         MS. SULLIVAN:  BUT YOU SHOULD CHANGE IT IF IT'S LEGAL

05:54:39  16    ERROR, YOUR HONOR, AND THIS IS LEGAL ERROR.  WE'RE TRYING TO

05:54:42  17    SAVE YOU FROM REVERSAL HERE.

05:54:44  18         MR. LEE:  YOUR HONOR, I HAVEN'T HAD A CHANCE TO

05:54:45  19    RESPOND.  THE SUGGESTION THAT THIS IS LEGAL ERROR AND THAT

05:54:47  20    WE'LL BE BACK HERE IN 2021 --

05:54:50  21         THE COURT:  WELL, WE MAY.  I'M SURE I'VE MADE TONS OF

05:54:53  22    ERRORS THIS WEEK, AND BEFORE.

05:54:54  23         MR. LEE:  AND ALL OF US, OVER THE COURSE OF THE

05:54:56  24    FOUR DAYS, MAY HAVE STUCK OUR FOOT IN IT OR SHOT OURSELVES IN

05:54:59  25    OUR COLLECTIVE FOOT.

1104

05:55:00  1          YOUR HONOR, THE PART THAT WE'VE OBJECTED TO IS -- I DON'T

05:55:03  2     CARE IF YOU CALL IT ATTRIBUTION OR YOU CALL IT APPORTIONMENT.

05:55:07  3          WHAT SECTION 289 OVERRULED WERE THE DOBSON CASES, WHICH

05:55:12  4     WERE AN EFFORT TO ATTRIBUTE, RIGHT, THE TOTAL PROFIT THE TOTAL

05:55:17  5     PROFIT OR THE PROFIT FROM SOMETHING TO A PORTION OF IT, WHICH

05:55:20  6     WAS WHETHER IT'S THE DESIGN OR THE COMPONENT, IT'S THE SAME

05:55:22  7     IDEA.

05:55:23  8          THIS CASE STARTED AS APPORTIONMENT.  IT WENT TO THE

05:55:26  9     FEDERAL CIRCUIT LARGELY AS APPORTIONMENT.

05:55:28  10         THE PART OF THE OPINION THAT MS. SULLIVAN JUST RECITED TO

05:55:33  11    YOU, IT ACTUALLY WAS CHIEF JUDGE PROST DISTINGUISHING THE PIANO

05:55:39  12    CASES.

05:55:40  13         THEN WE WENT TO THE SUPREME COURT, AND THEY SAID, TO BE

05:55:42  14    PRECISE AT PAGE 434, "THE SECOND STEP IS CALCULATE THE

05:55:46  15    INFRINGER'S TOTAL PROFIT MADE ON THAT ARTICLE OF MANUFACTURE."

05:55:49  16         IT DOESN'T SAY HOW YOU DO IT.  IT SAYS NOTHING ABOUT

05:55:52  17    ATTRIBUTING.  IT SAYS NOTHING ABOUT APPORTIONMENT.

05:55:56  18         NOW, THE STATUTE ITSELF DOES, YOUR HONOR --

05:55:59  19              MS. SULLIVAN:  WELL, MR. LEE, HOW WOULD YOU DETERMINE

05:56:01  20    THE PROFITS ON THE ARTICLE OF MANUFACTURE IF NOT DETERMINING

05:56:04  21    WHAT PORTION OF THE PROFITS ON THE PHONE ARE ATTRIBUTABLE TO

05:56:07  22    THE PROFITS FROM THE ARTICLE OF MANUFACTURE?

05:56:09  23         YOU'RE SAYING THERE'S NO DAMAGES THEORY THAT WE COULD

05:56:11  24    PRESENT?

05:56:12  25              MR. LEE:  NO.  ACTUALLY, HER HONOR JUST TOLD YOU WHAT

1105

05:56:14  1    IT IS.  YOU PUT IN TESTIMONY FROM THREE WITNESSES TODAY THAT

05:56:17  2    SAYS YOU SELL THE GLASS FRONT FACES SEPARATELY, THAT YOU KNOW

05:56:21  3    WHAT THE REVENUES ARE, THAT YOU KNOW WHAT THE COSTS ARE,

05:56:24  4    COMPUTE THE TOTAL PROFITS.

05:56:26  5        THAT'S WHAT YOU WOULD DO.

05:56:28  6        AND --

05:56:29  7            THE COURT:  WELL, I THINK THEY SAID THEY SELL IT AS A

05:56:32  8    SERVICE --

05:56:32  9            MR. LEE:  IN COMBINATION WITH THE SERVICE.

05:56:33  10           THE COURT:  -- WHICH WOULD INCLUDE THE COMPONENTS FOR

05:56:35  11   REPAIR.

05:56:36  12           MR. LEE:  RIGHT, YEAH.

05:56:36  13           MS. SULLIVAN:  YOUR HONOR, WE WEREN'T ACCUSED --

05:56:38  14           MR. LEE:  COULD I --

05:56:39  15           MS. SULLIVAN:  YES.

05:56:40  16       I'M SORRY, MR. LEE.

05:56:41  17           MR. LEE:  IF I COULD JUST FINISH, YOUR HONOR?

05:56:43  18       THE -- THE PORTION THAT WE OBJECTED TO THAT WAS ADDED IS

05:56:49  19   JUST -- WHETHER YOU CALL IT ATTRIBUTION OR APPORTIONMENT,

05:56:53  20   THAT'S PRECISELY WHAT IT IS.  YOU'RE TAKING THE TOTAL PROFIT

05:56:55  21   FOR THE ENTIRE DEVICE, AND THEN YOU ARE ALLOCATING A PORTION OF

05:57:00  22   IT OR ATTRIBUTING A PORTION OF IT.

05:57:04  23       THAT IS APPORTIONMENT.

05:57:06  24       I THINK, YOUR HONOR, ACTUALLY YOUR ORIGINAL INSTRUCTION,

05:57:13  25   WHICH IS AT A HIGHER LEVEL, WE'VE ARGUED TO YOU THAT IS THE

05:57:19   1    RIGHT INSTRUCTION.

05:57:20   2         AND THE SUPREME COURT DIDN'T TELL US ANYTHING ABOUT THE

05:57:22   3    MANNER IN WHICH YOUR HONOR SHOULD INSTRUCT ON THE TOTAL PROFIT

05:57:27   4    CALCULATION, AND THE INSTRUCTION YOUR HONOR GAVE IN THE

05:57:31   5    ORIGINAL CASE ON THE TOTAL PROFIT CALCULATION, WHICH INCLUDED

05:57:36   6    THE SHIFTING BURDENS, THE TOTAL REVENUES, THERE WAS NO ERROR IN

05:57:41   7    THAT.

05:57:42   8         AND SO THE ONLY QUESTION WE HAVE NOW IS THE SET -- THE

05:57:45   9    SENTENCE OR TWO THAT WAS ADDED -- THE MODIFICATIONS THAT WERE

05:57:47   10   ADDED YESTERDAY AND THE SENTENCE THAT WAS ADDED MAKES THIS

05:57:51   11   APPORTIONMENT.

05:57:53   12        WE SAY -- WE SAY THE ORIGINAL 30 IS THE CORRECT

05:57:58   13   ARTICULATION OF THE LAW.

05:58:00   14             MS. SULLIVAN:  YOUR HONOR --

05:58:01   15             MR. LEE:  I'M SORRY.

05:58:02   16             MS. SULLIVAN:  YOUR HONOR, I HAVE THREE RESPONSES, IF

05:58:04   17   I MAY.

05:58:05   18             THE COURT:  OKAY.  CAN I ASK YOU -- OKAY.  I'M

05:58:10   19   LOOKING AT A RED LINE THAT COMPARES THE MAY 7TH INSTRUCTION

05:58:14   20   NUMBER 30 TO THE MAY 16TH.

05:58:24   21             MR. LEE:  SO, YOUR HONOR, I THINK -- AND I'M DOING

05:58:27   22   THIS OFF MY MEMORY OF RED LINE -- BUT YOUR ORIGINAL VERSION

05:58:30   23   ACTUALLY ADHERED TO WHAT THE SUPREME COURT SAID, WHICH IS

05:58:35   24   "TOTAL PROFIT MADE ON THAT ARTICLE OF MANUFACTURE."

05:58:38   25        AND THEN THE PARTIES WILL DISPUTE WHAT THE ARTICLE OF

05:58:43  1    MANUFACTURE IS.

05:58:45  2         THE CHANGE THAT WAS MADE YESTERDAY -- AND AGAIN, I'M DOING

05:58:49  3    THIS FROM MEMORY -- IS THAT YOU ALLOWED FOR THE COMPUTATION OF

05:58:53  4    TOTAL PROFITS ON THE ARTICLE OF MANUFACTURE -- ON THE

05:58:57  5    INFRINGING PHONES, AND THEN ALLOWED THE ARTICLE OF MANUFACTURE

05:59:02  6    TO BE USED AS THE MECHANISM FOR ALLOCATING OR ATTRIBUTING.

05:59:13  7         AND THAT'S WHY, YOUR HONOR, WHAT THE SUPREME COURT SAID IS

05:59:17  8    IT IS A TWO-STEP PROCESS, AND IT SPECIFICALLY REFERS TO TOTAL

05:59:21  9    PROFIT MADE ON THE ARTICLE OF MANUFACTURE.

05:59:23  10        SAMSUNG HAS TURNED THIS INTO A THREE-STEP PROCESS, AND I

05:59:26  11   THINK THAT'S WHERE YOUR HONOR GOT THE REVISION THAT YOU SENT US

05:59:30  12   YESTERDAY, WHICH IS TOTAL PROFITS ON THE INFRINGING PHONES

05:59:34  13   WITHOUT REGARD TO WHAT THE ARTICLE OF MANUFACTURE IS.

05:59:38  14        THEN --

05:59:38  15             MS. SULLIVAN:  YOUR HONOR -- I'M SORRY.

05:59:40  16             MR. LEE:  -- DEDUCT THE COSTS.

05:59:42  17        THEN THEY SAY THERE'S A THIRD STEP, AND THAT IS THE

05:59:50  18   ATTRIBUTION OR ALLOCATION STEP.

05:59:51  19        AND WHEN YOUR HONOR LOOKS AT THE CLOSING DEMONSTRATIVES

05:59:55  20   TONIGHT, YOU'LL SEE THAT THEY'VE TAKEN THIS THREE-STEP PROCESS,

05:59:58  21   WHICH IS A CHANGE FROM THE ORIGINAL RULE 30, AND AFTER

06:00:01  22   MS. DAVIS HAS TESTIFIED AND IS OFF THE STAND, ACCUSED US OF NOT

06:00:05  23   HAVING PERFORMED THE THIRD STEP.

06:00:07  24        SO THIS IS JUST -- THIS IS NOT ONLY A CASE WHERE I THINK

06:00:13  25   THE TWO-STEP PROCESS YOUR HONOR DESCRIBED IS CORRECT, BUT IT IS

06:00:18  1    THE SET OF INSTRUCTIONS THAT WE WERE WORKING ON RIGHT UP UNTIL

06:00:23  2    THE TIME THAT WE PASSED THE WITNESS WITH OUR DAMAGES EXPERT,

06:00:27  3    AND THEY'RE NOW TRYING TO TURN THIS INTO A THREE-STEP PROCESS.

06:00:31  4           MS. SULLIVAN:  YOUR HONOR, MAY I RESPOND?

06:00:32  5           THE COURT:  YES.

06:00:37  6           MS. SULLIVAN:  NUMBER ONE, APPLE HAS WAIVED THIS

06:00:40  7    OBJECTION.

06:00:40  8       THE IDEA THAT THEY DIDN'T KNOW ABOUT THIS THEORY IS ABSURD

06:00:43  9    BECAUSE IT'S MIKE WAGNER'S THEORY, AND THEY DID NOT DAUBERT

06:00:47 10    MR. WAGNER ON THIS THEORY.

06:00:49 11       NUMBER 2, APPLE WAIVED OBJECTION TO THIS FORM OF

06:00:52 12    APPORTIONMENT IN THE SUPREME COURT WHEN JUSTICE KENNEDY ASKED

06:00:55 13    APPLE, "ONCE YOU'VE IDENTIFIED THE RELEVANT ARTICLE, THEN IT

06:00:59 14    SEEMS TO ME NECESSARILY WHAT YOU'RE DOING IS APPORTIONING

06:01:02 15    PROFITS.  I DON'T SEE HOW WE CAN GET AWAY FROM THAT WORD."

06:01:05 16       MR. WAXMAN FOR APPLE:  "YES.  IN THIS SENSE,

06:01:07 17    JUSTICE KENNEDY, THE VERNACULAR SENSE OF 'APPORTIONMENT,' IF

06:01:11 18    THE JURY ANSWERS THE QUESTION AT STEP 1 AND SAYS THE ARTICLE OF

06:01:16 19    MANUFACTURE IS THE REFRIGERATOR LATCH OR THE CUP-HOLDER, HOW DO

06:01:20 20    WE DETERMINE THE TOTAL PROFITS FROM THE SALE OF THAT THING?

06:01:24 21       "YOU DO HAVE TO ENGAGE IN A KIND OF APPORTIONMENT THAT

06:01:27 22    LOOKS TO HOW MUCH DID IT COST TO MAKE THE CUP-HOLDER, AND WHAT

06:01:31 23    IS -- YOU KNOW, WHAT IS THE PROFIT MARGIN FOR THE CAR OR THE

06:01:34 24    REFRIGERATOR OR SOMETHING LIKE THAT?  THAT, IT SEEMS TO ME, IS

06:01:39 25    THE WAY THAT YOU WOULD DO IT IF YOU FOUND IT."

06:01:42  1          SO APPLE HAS CONCEDED THAT APPORTIONMENT TO THE ARTICLE IS

06:01:45  2     AN ACCEPTABLE MEANS OF DETERMINING PROFIT FROM THE ARTICLE OF

06:01:51  3     MANUFACTURE.

06:01:51  4          THIRD, YOUR HONOR, IF THE WORD "ATTRIBUTABLE" IS A

06:01:54  5     PROBLEM, EVEN THOUGH IT'S THE EXACT WORD USED BY JUSTICE KAGAN

06:01:57  6     AND JUSTICE SOTOMAYOR IN THEIR QUESTION, THEY SAID THE QUESTION

06:02:00  7     IS HOW MUCH OF THE PROFITS ARE ATTRIBUTABLE TO THAT ARTICLE,

06:02:03  8     HOW MUCH --

06:02:04  9          THE COURT:  YOU KNOW, I'M SORRY.  IF YOU'RE GOING TO

06:02:07  10    SAY ANY JUDGE IS BOUND BY A QUESTION THEY ASK AT A HEARING AND

06:02:11  11    THAT THAT IS NOW LAW --

06:02:13  12         MS. SULLIVAN:  NOT AT ALL, YOUR HONOR.

06:02:14  13         THE COURT:  -- THEN I'M GOING TO VACATE EVERY

06:02:16  14    HEARING.  I'M GOING TO VACATE EVERY HEARING.

06:02:19  15         MS. SULLIVAN:  NOT AT ALL, YOUR HONOR.

06:02:20  16         THE COURT:  BECAUSE IN THIS CASE, ANY LITTLE BURP IS

06:02:23  17    QUOTED FROM ANY TRANSCRIPT.

06:02:24  18       I MEAN, IT'S JUST A QUESTION AT A HEARING.

06:02:26  19         MS. SULLIVAN:  I APPRECIATE THAT, YOUR HONOR.

06:02:27  20         THE COURT:  SO --

06:02:28  21         MS. SULLIVAN:  ALL I'M SAYING IS THAT APPLE

06:02:30  22    CONCEDED -- IT WAS -- THEIR COUNSEL'S WORDS ARE A CONCESSION,

06:02:35  23    AND IT IS A FORM OF APPORTIONMENT.

06:02:36  24       BUT I HAVE A SOLUTION, YOUR HONOR.  LEAVE YOUR NEW

06:02:39  25    INSTRUCTION 29 -- SORRY -- YOUR NEW INSTRUCTION 30 AS YOU'VE

06:02:42    1    REVISED IT, AND IF THE OBJECTION IS TO THE TERM "ATTRIBUTABLE

06:02:46    2    TO," CHANGE THAT AT LINE 2 ON PAGE 47 TO "MADE ON."  "MADE ON."

06:02:54    3            MR. LEE:  MS. SULLIVAN MISAPPREHENDS MY CONCERN.

06:02:58    4        THE STARTING POINT OF THE REVISED INSTRUCTION, IF YOUR

06:03:00    5    HONOR IS LOOKING AT THE RED LINE, THE ORIGINAL FORM WAS TOTAL

06:03:05    6    PROFIT ON THE ARTICLE OF MANUFACTURE.

06:03:07    7        THE REVISED INSTRUCTION STARTS WITH TOTAL PROFIT OF THE

06:03:11    8    INFRINGING PRODUCT, AND THEN ARTICULATES TWO STEPS.

06:03:15    9        THAT'S OUR CONCERN, BECAUSE THAT HAPPENS TO BE

06:03:19   10    MR. WAGNER'S METHODOLOGY WHICH HE'S OFFERED, WHICH WE'LL

06:03:24   11    CROSS-EXAMINE HIM ON.

06:03:25   12        BUT IT DOESN'T SAY THAT YOUR HONOR SHOULD GIVE AN

06:03:28   13    INSTRUCTION THAT VALIDATES HIS METHODOLOGY.

06:03:31   14        THERE'S NOTHING IN THE SUPREME COURT DECISION, WHICH IS

06:03:34   15    WHAT GOVERNS, THAT SAYS YOU START WITH THE TOTAL PROFITS OF THE

06:03:39   16    INFRINGING PRODUCTS.

06:03:41   17        IN FACT, AT PAGE 434, THEIR SECOND -- THE DESCRIPTION OF

06:03:46   18    THE SECOND STEP DESCRIBES ONLY TOTAL PROFIT MADE FROM THE

06:03:49   19    ARTICLE OF MANUFACTURE, WHICH IS WHAT YOUR ORIGINAL INSTRUCTION

06:03:51   20    SAID.

06:03:52   21        THAT MEANS THAT BOTH OF US HAVE TO PROVE THE REVENUES

06:03:57   22    ATTRIBUTABLE TO OUR ARTICLE OF MANUFACTURE, THE COSTS DIRECTLY

06:04:03   23    ATTRIBUTABLE TO THE ARTICLE OF MANUFACTURE, AND THEN THAT GIVES

06:04:06   24    YOU A NUMBER.

06:04:07   25        BUT THERE'S NO THREE-STEP PROCESS.  YOU'LL SEE WHEN YOU

1111

06:04:11  1    LOOK AT THE SLIDES TONIGHT, THEY'RE TRYING TO TURN THIS

06:04:15  2    INSTRUCTION INTO SUGGESTING MS. DAVIS DIDN'T CONFORM TO THE

06:04:20  3    REQUIREMENTS.  OF COURSE, THEY'RE REQUIREMENTS THAT WEREN'T IN

06:04:23  4    THE INSTRUCTION AS WAS AVAILABLE.

06:04:24  5        THE LAST THING IS THIS, YOUR HONOR:  IF THESE COUPLE

06:04:27  6    THINGS THAT MS. SULLIVAN SUGGESTS ARE WAIVED, WOW, WE SHOULDN'T

06:04:32  7    BE HERE AT ALL BECAUSE THIS WAS ALL -- THIS

06:04:36  8    APPORTIONMENT/ATTRIBUTION WAS WAIVED A LONG TIME AGO.

06:04:38  9            MS. SULLIVAN:  YOUR HONOR, WE'RE ENTITLED TO AN

06:04:41  10    INSTRUCTION ON OUR THEORY OF THE CASE.  THIS THEORY HAS BEEN IN

06:04:43  11    THE CASE FOR MONTHS.  IT'S BEEN IN MR. WAGNER'S REPORT FOR

06:04:47  12    MONTHS.  THEY DIDN'T DAUBERT THIS THEORY.  WE ARE ENTITLED TO

06:04:50  13    AN INSTRUCTION ON OUR THEORY.

06:04:52  14        OUR THEORY IS NOT THAT WE'RE ENTITLED -- THAT THE PROFITS

06:04:55  15    SHOULD BE CALCULATED ON THE SEPARATE SALE OF COMPONENTS.

06:04:57  16    THAT'S NOT OUR THEORY.

06:04:59  17        APPLE ACCUSED THE PHONES.  THEY DIDN'T ACCUSE OUR

06:05:02  18    COMPONENTS.  THEY ACCUSED OUR PHONES.

06:05:05  19        THIS IS AN ACCEPTABLE ACCOUNTING METHOD FOR DETERMINING

06:05:09  20    THE ARTICLE OF MANUFACTURE PROFITS IF THE ARTICLE IS THE

06:05:12  21    COMPONENT, AND WE ARE ENTITLED TO AN INSTRUCTION ON THAT

06:05:15  22    THEORY.

06:05:15  23        AND YOUR NEW INSTRUCTION 30 APPROPRIATELY ALLOWS US THAT

06:05:19  24    INSTRUCTION ON OUR THEORY.

06:05:21  25        AND IF YOU GIVE THE SALE OF THE ARTICLES INSTRUCTION AS IT

| | |
|---|---|
| 06:05:24 | 1 |

WAS WRITTEN BEFORE, THAT WOULD BE ERROR FOR THE REASONS WE

EXPLAINED IN DOCKET 3723 AT 14 AND 15.  I HOPE THOSE PAGES

MIGHT BE HELPFUL WHEN YOUR HONOR WORKS ON THE INSTRUCTION

LATER.

        BUT WITH RESPECT, WE THINK THAT YOUR NEW INSTRUCTION 30 IS

CORRECT AND YOUR REVERSION TO THE PRIOR ONE WILL CREATE LEGAL

ERROR WHERE IT NEED NOT BE THERE.

        AND I'M NOT SURE WHY APPLE IS SO AFRAID OF OUR LEGAL

THEORY.  THEY'VE KNOWN ABOUT IT FOR MONTHS, AND THEY CAN ARGUE

ABOUT IT.

        BUT THEY CAN'T TAKE IT OUT OF THE CASE.  IT'S OUR THEORY.

            MR. LEE:  YOUR HONOR, I'VE DONE A LOT OF TRIALS IN

THE LAST 42 YEARS.  I'VE NEVER BEEN IN A TRIAL WHERE A COURT

FEELS COMPELLED TO INSTRUCT ON EVERY SUB-THEORY THAT EVERY

PARTY ARTICULATES.  THE INSTRUCTIONS WOULD GO ON FOREVER.

        AND IN THE FIRST TRIAL, YOUR HONOR HAD A SET OF

INSTRUCTIONS THAT I KNOW FELT LIKE THEY WENT ON FOREVER.

        THERE IS A THEORY WHICH REQUIRES THAT THERE BE TOTAL

PROFITS FROM THE ARTICLES OF MANUFACTURE.  BOTH PARTIES ARE

INSTRUCTED -- ARE ENTITLED TO HAVE YOUR HONOR INSTRUCT ON THE

REQUIREMENTS OF TOTAL PROFITS.

        NEITHER OF US IS ENTITLED TO HAVE YOU BLESS OUR SPECIFIC

THEORY, OUR SPECIFIC THEORY FOR DETERMINING ARTICLE OF

MANUFACTURE OR OUR SPECIFIC THEORY HOW YOU GET TO THE PROFITS.

        THAT'S WHY YOUR HONOR'S ORIGINAL PROPOSAL, WHICH ACTUALLY

1113

06:06:50  1    WAS FOLLOWED -- FOLLOWED CLOSELY WHAT THE SUPREME COURT SAID

06:06:57  2    WAS THE RIGHT ARTICULATION.

06:06:59  3         THE THREE-STEP PROCESS THAT SAMSUNG HAS URGED YOU TO

06:07:02  4    IMPLEMENT -- I'VE BEEN AT THIS TOO LONG TO TRY TO PREDICT ERROR

06:07:06  5    AND WHETHER WE'LL BE BACK OR NOT.

06:07:08  6         BUT IF YOUR HONOR LOOKS AT WHAT THE DOBSON CASES SAID,

06:07:12  7    WHAT SECTION 289 WAS INTENDED TO OVERRULE, WHAT THE FEDERAL

06:07:16  8    CIRCUIT SAID ABOUT APPORTIONMENT IN SECTION 289 CASES, WHAT THE

06:07:21  9    SUPREME COURT SAID IN THE FOOTNOTE SAYING SAMSUNG HAD ABANDONED

06:07:24 10    APPORTIONMENT, AND THEN YOU LOOK AT THIS INSTRUCTION, YOU HAVE

06:07:28 11    TO SAY, HOW DID WE GET OURSELVES BACK HERE?

06:07:31 12         MS. SULLIVAN:  YOUR HONOR, THIS IS --

06:07:32 13         MR. LEE:  I'LL GO NO FURTHER BECAUSE IT'S LATE IN THE

06:07:35 14    DAY, AND FOR THOSE OF US CLOSING TOMORROW, WE'D LOVE TO GET

06:07:38 15    BACK TO THE CLOSINGS.

06:07:40 16         MS. SULLIVAN:  YOUR HONOR, THIS IS NOT APPORTIONMENT

06:07:41 17    TO THE DESIGN.  THIS IS APPORTIONMENT TO THE ARTICLE.

06:07:44 18         I DOUBT THAT -- MR. LEE HAS ONE OF THE MOST DISTINGUISHED

06:07:47 19    RECORDS OF PERFORMANCE IN TRIALS AS ANY LAWYER IN AMERICA.

06:07:53 20         BUT IT'S NOT EVERY DAY YOU COME BACK FROM THE SUPREME

06:07:55 21    COURT UNDER A NEW RULE OF LAW FROM THE SUPREME COURT OF THE

06:07:59 22    UNITED STATES, AND I THINK IT'S NOT TOO MUCH TO ASK THAT THE

06:08:02 23    INSTRUCTIONS PROPERLY REFLECT WHAT WE DID UP THERE IN THE

06:08:04 24    SUPREME COURT, AND THAT WAS TO SHOW THAT A COMPONENT CAN BE THE

06:08:06 25    ARTICLE OF MANUFACTURE.

06:08:09  1          YOUR NEW INSTRUCTION 30 BEAUTIFULLY AND FAIRLY EXPRESSES

06:08:12  2     THE TWO RESULTS.

06:08:13  3          IF YOU AGREE WITH APPLE'S THEORY, YOU GET TOTAL PROFIT

06:08:15  4     FROM THE PHONE.

06:08:16  5          IF YOU AGREE WITH OUR THEORY, YOU GET TOTAL PROFITS THAT

06:08:19  6     COME FROM THE ARTICLE THAT IS THE COMPONENT OF THE PHONE.

06:08:22  7          THAT'S FAIR, AND YOU SHOULD KEEP YOUR INSTRUCTION AS

06:08:24  8     YOU'VE REWRITTEN IT.

06:08:26  9             MR. LEE:  THERE ARE LOTS AND LOTS OF WAYS TO COMPUTE

06:08:30 10     THE TOTAL PROFITS ON A COMPONENT.  THERE'S NO REASON FOR THE

06:08:33 11     COURT TO BLESS ONE, AND THERE REALLY IS NO REASON TO BLESS ONE

06:08:38 12     AFTER OUR DAMAGES PERSON HAS STEPPED OFF THE STAND.

06:08:41 13             THE COURT:  ALL RIGHT.  WELL, THANK YOU ALL VERY

06:08:44 14     MUCH.  THANK YOU.

06:08:46 15             MR. LEE:  THANK YOU, YOUR HONOR.

06:08:46 16             THE COURT:  I'LL SEE YOU TOMORROW MORNING.

06:08:48 17             MS. SULLIVAN:  THANK YOU, YOUR HONOR.

06:08:48 18             MS. MAROULIS:  YOUR HONOR, DID THE COURT SET THE TIME

06:08:51 19     CERTAIN FOR CLOSINGS, OR ARE WE GOING TO GO ALONG AND SEE WHAT

06:08:54 20     HAPPENS?

06:08:55 21             THE COURT:  OH, WHEN CAN YOU RESPOND?  IF ANOTHER SET

06:08:59 22     OF FINAL JURY INSTRUCTIONS IS FILED TONIGHT AND -- WE'LL FILE

06:09:03 23     THE -- HOW MANY OBJECTIONS DID YOU ALL HAVE ON THE CLOSINGS?

06:09:10 24             MS. MAROULIS:  I HAVEN'T READ THE BRIEF YET.  BOTH

06:09:12 25     PARTIES FILED BRIEFS, BUT IT'S --

06:09:14  1                    THE COURT:  OKAY.  ALL RIGHT.

06:09:15  2                    MR. LEE:  IT'S SIX PAGES EACH YOUR HONOR.

06:09:17  3                    THE COURT:  OKAY.

06:09:18  4                    MR. LEE:  SIX PAGES EACH WITH THE OBJECTIONS AND

06:09:20  5      RESPONSES.

06:09:21  6                    THE COURT:  OKAY.

06:09:21  7                    MS. SULLIVAN:  YOUR HONOR, WOULD NOON SUIT YOU FOR

06:09:23  8      THE FINAL INSTRUCTIONS?

06:09:24  9                    THE COURT:  I'D LIKE IT EARLIER IF POSSIBLE.

06:09:26  10                   MS. SULLIVAN:  10:00?  9:00?

06:09:28  11                   THE COURT:  THAT WOULD BE GREAT.  IF WE FILED IT

06:09:30  12     TONIGHT, CAN YOU DO IT BY 10:00?

06:09:31  13                   MS. SULLIVAN:  10:00 TONIGHT.

06:09:33  14                   THE COURT:  WOULD THAT BE FEASIBLE.

06:09:34  15                   MR. LEE:  10:00 IS GREAT.

06:09:36  16                   THE COURT:  ALL RIGHT.  THAT'S GREAT.  THANK YOU.

06:09:38  17                   MR. LEE:  THANK YOU, YOUR HONOR.

06:09:39  18                   MS. SULLIVAN:  THANK YOU, YOUR HONOR.

06:09:40  19                   THE COURT:  THANK YOU.

06:09:41  20           (THE EVENING RECESS WAS TAKEN AT 6:09 P.M.)

          21

          22

          23

          24

          25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16          _____
            IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076

17

18          _____

19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595

20

21          DATED:  MAY 17, 2018

22

23

24

25